# Exhibit 30

1             UNITED STATES DISTRICT COURT

2            SOUTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
5                                    )
                    Plaintiff,       )
6                                    ) Case No.
            vs.                      ) 20-civ-10832(AT)(SN)
7                                    )
    RIPPLE LABS, INC., BRADLEY       )
8   GARLINGHOUSE, and CHRISTIAN A.   )
    LARSEN,                          )
9                                    )
                    Defendants.      )
10  _____)

11

12            VIDEOTAPED DEPOSITION OF

13                 ALAN SCHWARTZ

14            Friday, February 11, 2022

15

16

17

18

19

20

21

22

23
    Reported by:
24  JEFFREY BENZ, RMR, CRR
    STENOGRAPHIC REPORTER
25  JOB No. 220211JBE

                                                        1

1

2

3

4          VIDEOTAPED DEPOSITION of ALAN SCHWARTZ, taken by

5    Plaintiff, at the offices of Debevoise & Plimpton, 919

6    Third Avenue, New York, New York, on February 11, 2022

7    commencing at 9:13 a.m., before Jeffrey Benz, a

8    Certified Realtime Reporter, Registered Merit Reporter

9    and Notary Public within and for the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

```
 1   A P P E A R A N C E S:

 2

 3   FOR THE PLAINTIFF:

 4        SECURITIES AND EXCHANGE COMMISSION
          200 Vesey Street, Suite 400
 5        New York, New York  10281-1022
               BENJAMIN HANAUER, ESQ
 6             DAPHNA WAXMAN, ESQ.
          Telephone: 212.336.0153
 7        Email: hanauer@sec.gov
               waxmand@sec.gov
 8

 9   FOR DEFENDANT RIPPLE LABS:

10        KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
          1615 M Street, N.W.
11        Washington, D.C.  20036
          BY:   REID M. FIGEL, ESQ.
12             GAVAN GIDEON, ESQ.
               ROBERT L. MOORE, ESQ. (Remotely)
13             ELIANA M. PFEFFER, ESQ. (Remotely)
               JUSTIN B. BERG, ESQ. (Remotely)
14        Telephone: 202.326.7918
          Email: rfigel@kellogghansen.com
15             ggideon@kellogghansen.com
               rmoore@kellogghansen.com
16             epfeffer@kellogghansen.com
               jberg@kellogghansen.com
17
                    -and-
18
          DEBEVOISE & PLIMPTON LLP
19        919 Third Avenue
          New York, New York   10022
20        BY:   BENJAMIN LEB, ESQ. (Remotely)
          Telephone: 212.909.6089
21        Email: bjleb@debevoise.com

22

23

24

25
                                                      3
```

```
 1  A P P E A R A N C E S: (Ctd.)

 2

 3  FOR DEFENDANT BRADLEY GARLINGHOUSE:

 4       CLEARY GOTTLIEB STEEN & HAMILTON LLP
         2112 Pennsylvania Avenue, NW
 5       Washington, D.C.  20037
         BY:  JORGE A. BONILLA LOPEZ, ESQ. (Remotely)
 6       Telephone: 202.974.1517
         Email: jbonillalopez@cgsh.com

 7

 8  FOR DEFENDANT CHRISTIAN A. LARSEN:

 9       PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
         1285 Avenue of the Americas
10       New York, New York  10019-6064
         BY:  SARAH J. PROSTKO, ESQ.  (Remotely)
11           CONNOR J. RITSCHARD, ESQ. (Remotely)
         Telephone: 212.373.2491
12       Email: sprostko@paulweiss.com
                 critschard@paulweiss.com

13

14  ALSO PRESENT:

15       ANA GUARDADO, Ripple Labs, Inc. (Remotely)

16       KYLE E. CHERMAK, Debevoise & Plimpton (Remotely)

17       JIM BAKER, Videographer

18

19

20

21

22

23

24

25
```

4

1                          INDEX

2     ALAN SCHWARTZ

3        Examination by:                      Page

4           MR. HANAUER                        6

5

6                        EXHIBITS

7     NUMBER              DESCRIPTION         PAGE

8     Exhibit 1   Expert Report of Alan        16
                  Schwartz, dated October 4,
9                 2021

10    Exhibit 4   Supreme Court's Decision in   63
                  Securities and Exchange
11                Commission v. W.J. Howey
                  Co., et al.
12
      Exhibit 5   Transcript of Howey           55
13                litigation

14    Exhibit 8   XRP Purchase Summary         120

15    Exhibit 9   Bitstamp Wholesale Order     125

16    Exhibit 10  Agreement between Ripple and 131
                  GSR Holdings Limited
17
      Exhibit 11  ████ Agreement              142
18
      Exhibit 12  Copy of ████ Agreement      148
19
      Exhibit 15  MoneyGram Agreement          156
20
      Exhibit 16  Loan Agreement               158
21
      Exhibit 17  █ Custody Agreement          161
22
      Exhibit 18  Copy of Custody Agreement    166
23
      Exhibit 20  Joint Venture Agreement      177
24                Between Ripple and ███

25    Exhibit 21  ████ Contract                178

                                                    5

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

| | | |
|---|---|---|
| 09:12 | 1 | THE VIDEOGRAPHER:  Good morning.  We're now |
| 09:12 | 2 | on the record.  Today's date is February 11, 2022. |
| 09:12 | 3 | The time is 9:13 a.m.  This is Disk 1 of the video |
| 09:12 | 4 | deposition of Alan Schwartz, in the matter of SEC |
| 09:12 | 5 | versus Ripple Labs, et al. |
| 09:12 | 6 | My name is Jim Brady.  I'm the |
| 09:12 | 7 | videographer.  Today's court reporter is Jeff Benz. |
| 09:12 | 8 | We're both with Gradillas Reporting. |
| 09:12 | 9 | Today's deposition is taking place at |
| 09:12 | 10 | Debevoise & Plimpton, 919 Third Avenue, New York, |
| 09:12 | 11 | New York. |
| 09:12 | 12 | The attorneys' appearances will appear on |
| 09:12 | 13 | the transcript.  May I ask now that the court |
| 09:12 | 14 | reporter please swear in the witness. |
| 09:13 | 15 | ALAN SCHWARTZ, |
| 09:13 | 16 | called as a witness, having been first |
| 09:13 | 17 | duly sworn by Jeffrey Benz, a Notary |
| 09:13 | 18 | Public within and for the State of New |
| 09:13 | 19 | York, was examined and testified as |
| 09:13 | 20 | follows: |
| 09:10 | 21 | EXAMINATION BY MR. HANAUER: |
| 09:13 | 22 | Q.  Good morning, sir.  My name's Ben Hanauer. |
| 09:13 | 23 | I represent the SEC, who's the plaintiff in this |
| 09:13 | 24 | lawsuit. |
| 09:13 | 25 | Can you please state your name for the |

6

09:13 1    record.

09:13 2         A.    Alan Schwartz.

09:13 3         Q.    And, Professor Schwartz, is there any

09:13 4    reason why you cannot give accurate testimony today?

09:13 5         A.    No.

09:13 6         Q.    How many preparation sessions did you do

09:13 7    for today's deposition?

09:13 8         A.    Four, I think.  Three or four.

09:13 9         Q.    And when were they?

09:13 10        A.    Yesterday and Wednesday, and then a couple

09:13 11   of weeks ago we did a couple.

09:13 12        Q.    And when you say "we," who was present for

09:13 13   those preparation sessions?

09:13 14        A.    Mr. Figel, Mr. Gideon, and a gentleman

09:14 15   whose name I -- I never got Robert's last name.

09:14 16   There's another person, an employee of the firm, the

09:14 17   Kellogg Hansen firm.

09:14 18        Q.    And how long total did you spend preparing

09:14 19   for today's deposition?

09:14 20        A.    I would -- between 15 and 20 hours.

09:14 21        Q.    And in your preparation, did you review any

09:14 22   documents other than the ones cited in your

09:14 23   October 4, 2021, report?

09:14 24        A.    Yes, I did.

09:14 25              MR. FIGEL:  Start -- say yes -- answer yes

7

09:14 1    or no.  Give me a chance -- there may be some

09:14 2    privilege issues, so if you just give a pause after

09:14 3    Mr. Hanauer's question, please.

09:14 4        Q.   And what did you review other than the

09:14 5    documents cited in your report?

09:14 6            MR. FIGEL:  I direct you not to answer that

09:14 7    question based on attorney work product.

09:14 8        Q.   Did you review any deposition transcripts?

09:14 9        A.   No.

09:14 10           MR. FIGEL:  Again, let me -- let me give

09:14 11   you the instruction --

09:14 12           THE WITNESS:  Okay.

09:14 13           MR. FIGEL:  -- but fine, start by answering

09:15 14   yes or no.

09:15 15       Q.   Have you ever been deposed or given

09:15 16   testimony in a lawsuit before?

09:15 17           MR. FIGEL:  You can answer.

09:15 18       A.   Yes.

09:15 19       Q.   How many times?

09:15 20       A.   Over the years -- hard to remember over the

09:15 21   years.  More than ten.

09:15 22       Q.   And I guess I should probably split that

09:15 23   up.  How many times have you been deposed in

09:15 24   connection with a lawsuit?

09:15 25       A.   Same answer.

8

09:15  1          Q.    Around 10?

09:15  2          A.    Or more, 10, 12, something like that.

09:15  3          Q.    And beyond those depositions, how many

09:15  4    times have you given testimony in a lawsuit?

09:15  5          A.    Does that include an arbitration?

09:15  6          Q.    Yes.

09:15  7          A.    Four or five.

09:15  8          Q.    Generally speaking, what were the cases

09:15  9    about that you've testified in?

09:16 10          A.    They were in a variety of areas.  I've been

09:16 11    an expert in bankruptcy, corporate governance,

09:16 12    contracts, sales.

09:16 13          Q.    Have you ever offered expert testimony in a

09:16 14    case involving allegations of federal securities law

09:16 15    violations?

09:16 16          A.    No.

09:16 17          Q.    Have you ever testified as a fact witness?

09:16 18          A.    No.

09:16 19          Q.    How much of your professional time do you

09:16 20    spend working as a litigation expert or consultant on

09:16 21    one hand, as opposed to working as a law professor?

09:16 22          A.    Less than 5 percent, maybe less than

09:16 23    3 percent.

09:16 24          Q.    Has your expert testimony ever been

09:16 25    excluded for any reason?

9

09:17 1      A.   Yes.

09:17 2      Q.   Can you tell me about that, please.

09:17 3      A.   It was -- it's hard to -- once I was an

09:17 4  expert in a dispute between oil companies, and a part

09:17 5  of my report was excluded on the ground that there

09:17 6  was economic analysis in it and I hadn't qualified as

09:17 7  an economic expert.

09:17 8      Q.   And what case was that?

09:17 9      A.   Well, I can't remember the name, but it was

09:17 10  between two big oil companies, involving oil leases

09:17 11  in Prudhomme Bay.

09:17 12      Q.   Do you know what court that case was in?

09:17 13      A.   What case.

09:17 14      I think that was in Washington, D.C.

09:17 15      Q.   District -- federal court?

09:17 16      A.   District court in Washington, D.C.

09:17 17      Q.   Federal district court?

09:18 18      A.   Yes.

09:18 19      Q.   Has -- besides that occasion, has your

09:18 20  expert testimony ever been excluded for any other

09:18 21  reason?

09:18 22      A.   Not that I can recall.

09:18 23      Q.   Were you retained as an expert in a case

09:18 24  called Mason Capital versus Cayman Corp., in the

09:18 25  District of Connecticut?

10

09:18 1     A.   Yes.

09:18 2     Q.   And you testified at a trial that took

09:18 3 place in that case in October 2005?

09:18 4     A.   I don't remember the date, but I did

09:18 5 testify in a trial.

09:18 6     Q.   And one of the subjects of your testimony

09:18 7 in that case was about your beliefs about the meaning

09:18 8 of Connecticut's Business Combination Act?

09:18 9     A.   I don't specifically recall, but I wouldn't

09:18 10 object to that characterization.

09:18 11     Q.   And in that case, did the court grant the

09:18 12 opposing side's motion in limine to preclude that

09:18 13 portion of your testimony?

09:18 14     A.   I think it did.

09:19 15     Q.   And the reason the court excluded that

09:19 16 portion of your testimony was because the court found

09:19 17 the constructions of statutes is a judicial task and

09:19 18 not a proper subject of expert testimony?

09:19 19     A.   I don't particularly recall why the court

09:19 20 excluded my re-- that part of my report.  I don't

09:19 21 recall what the judge said or whether the judge wrote

09:19 22 something down.

09:19 23     Q.   Any other instances where your testimony

09:19 24 was excluded?

09:19 25     A.   Not that I can recall.

11

09:19  1      Q.   Has a court ever expressed disagreement

09:19  2  with an opinion you expressed?

09:19  3      A.   I -- I'm not exactly sure how to answer

09:20  4  that question because I -- I expressed -- when I

09:20  5  testified, the court didn't always come out on the

09:20  6  side for which I was an expert.

09:20  7      Q.   So there are cases where you testified

09:20  8  where ultimately the other side prevailed in the

09:20  9  lawsuit?

09:20 10      A.   I think so.

09:20 11      Q.   You're a professor at the Yale Law School?

09:20 12      A.   That's correct.

09:20 13      Q.   Since when?

09:20 14      A.   1987.

09:20 15      Q.   And have you held any other employment

09:20 16  since 1987?

09:20 17      A.   I'm also a professor in the Yale School of

09:20 18  Management.

09:20 19      Q.   Any other employment over the past

09:20 20  30 years?

09:20 21      A.   No.

09:20 22      Q.   Are you a member -- sit on any corporate

09:20 23  boards?

09:20 24      A.   I have sat on corporate boards.

09:20 25      Q.   Which ones?

12

| | | |
|---|---|---|
| 09:20 | 1 | A.   ████████████████████ |
| 09:20 | 2 | ████████████████████ |
| 09:21 | 3 | Q.   Are you still on any of those boards? |
| 09:21 | 4 | A.   No. |
| 09:21 | 5 | Q.   Why did you leave? |
| 09:21 | 6 | A.   I aged out. |
| 09:21 | 7 | Well, actually I ages out of ████████ |
| 09:21 | 8 | ████████ and ████████████  We sold ████ |
| 09:21 | 9 | ████████ |
| 09:21 | 10 | Q.   Understood. |
| 09:21 | 11 | And what's your date of birth, sir? |
| 09:21 | 12 | A.   ████████ 1940. |
| 09:21 | 13 | Q.   Are you licensed to practice law? |
| 09:21 | 14 | A.   Not currently. |
| 09:21 | 15 | Q.   When were you last licensed to practice |
| 09:21 | 16 | law? |
| 09:21 | 17 | A.   Actually, I -- I'm going to give a little |
| 09:21 | 18 | bit of a complicated answer to that question.  I was |
| 09:21 | 19 | a member of the New York Bar.  I think that I let my |
| 09:21 | 20 | membership lapse. |
| 09:21 | 21 | I think if you're a professor at an |
| 09:21 | 22 | accredited Connecticut law school for a certain |
| 09:21 | 23 | period of time, you become a member of the |
| 09:21 | 24 | Connecticut Bar. |
| 09:22 | 25 | Q.   So when did your New York law license |

13

09:22 1    lapse?

09:22 2        A.   I don't recall how long it takes for a

09:22 3    license to lapse, but I have not practiced law in

09:22 4    New York for a very long time.

09:22 5        Q.   Have you practiced law anywhere else?

09:22 6        A.   No.

09:22 7        Q.   Have you ever represented clients in court?

09:22 8        A.   No.

09:22 9             Well, I have when I was a practicing

09:22 10   attorney.

09:22 11       Q.   And when you say "a long time ago," is

09:22 12   there any way we can --

09:22 13       A.   I left the -- yes, I left practice in 1969.

09:22 14       Q.   And when you did practice, did you have

09:22 15   areas of expertise or specialization?

09:22 16       A.   I was a litigator.

09:22 17       Q.   You are an expert in contract law?

09:22 18       A.   I think so, yes.

09:22 19       Q.   Do you consider yourself an expert in the

09:22 20   federal securities laws?

09:22 21       A.   No.

09:23 22       Q.   Are you qualified to offer expert testimony

09:23 23   on how courts interpret the term, "investment

09:23 24   contract," in cases applying the federal securities

09:23 25   laws?

14

09:23  1          MR. FIGEL:  Objection.  You can answer.

09:23  2      A.   No, I'm not an expert in the federal

09:23  3  securities laws.

09:23  4      Q.   And will you be offering any such opinions

09:23  5  in this case about how courts interpret the term,

09:23  6  "investment contract," under the federal securities

09:23  7  laws?

09:23  8      A.   No.

09:23  9      Q.   Are you offering an opinion that under the

09:23 10  federal securities laws, investment contracts are

09:23 11  limited to common law contracts?

09:23 12          MR. FIGEL:  Objection.

09:23 13      A.   No.

09:23 14      Q.   Are you offering an opinion that investment

09:23 15  contracts under the federal securities laws cannot

09:23 16  contain representations beyond the four corners of

09:23 17  any common law contract?

09:23 18      A.   No, I'm not offering an opinion.

09:24 19      Q.   Are you offering an opinion whether any of

09:24 20  Ripple's offers or sales of XRP qualify for an

09:24 21  exemption from registration under the federal

09:24 22  securities laws?

09:24 23      A.   No.

09:24 24      Q.   Are you an expert in the field of

09:24 25  blockchain technologies?

15

```
09:24    1        A.    No.

09:24    2        Q.    Are you an expert in the field of digital

09:24    3   assets or cryptocurrencies?

09:24    4        A.    No.

09:24    5        Q.    Before this case, have you ever worked on a

09:24    6   case involving digital assets or cryptocurrencies?

09:24    7        A.    No.

09:24    8        Q.    And I believe I tendered Exhibit 1.  It

09:24    9   should be sitting right in front of you.

09:24   10        A.    Yes.

09:24   11              MR. HANAUER:  Do you want to share with --

09:25   12   oh, you did.  Good.  Thank you.

09:25   13        Q.    And Exhibit 1, that's the expert report you

09:25   14   submitted in this case, on October 4, 2021?

09:25   15        A.    Yes.

09:25   16              (Expert Report of Alan Schwartz, dated

09:25   17         October 4, 2021, was marked Exhibit AS-1 for

09:25   18         identification, as of this date.)

09:25   19        Q.    And on page 65 of the report, is that your

09:25   20   signature?

09:25   21        A.    Yes, it is.

09:25   22        Q.    Did anyone assist you in the preparation of

09:25   23   your report?

09:25   24              MR. FIGEL:  Answer that question yes or no.

09:25   25        A.    Yes.
```

                                                              16

09:25  1      Q.   Who?

09:25  2      A.   Mr. Figel.

09:25  3      Q.   Anyone else?

09:25  4      A.   No.

09:25  5      Q.   Did you write the whole report?

09:25  6      A.   Yes.

09:25  7      Q.   Was anything in the report written by

09:25  8  Ripple's attorneys?

09:25  9      A.   No.

09:25 10      Q.   Did Ripple's attorneys direct you to write

09:25 11  anything?

09:26 12      A.   No.

09:26 13      Q.   Who prepared Exhibits C through F to your

09:26 14  report?

09:26 15      A.   I think employees of Mr. Figel's firm.

09:26 16      Q.   Do you know who?

09:26 17      A.   I think it was -- I think it is Robert --

09:26 18      Q.   Well, I don't want you to speculate.  Just

09:26 19  to the best of your knowledge, do you know who

09:26 20  prepared Exhibits C to F of your report?

09:26 21      A.   No.

09:26 22          MR. FIGEL:  Just so you know, it's not a

09:26 23  mystery, but I'm not allowed to testify.

09:26 24      Q.   Is there -- and -- just so I have that,

09:26 25  Mr. Figel is the only attorney who assisted you in

                                                           17

09:26  1    the preparation of your report?

09:26  2         A.    There were other attorneys on phone calls,

09:26  3    but Mr. Figel played the largest role.

09:26  4         Q.    Can you name any of the other attorneys?

09:26  5         A.    Gavan Gideon.

09:26  6         Q.    Anyone else?

09:26  7         A.    No.

09:27  8         Q.    Is there anything in your report that is

09:27  9    inaccurate?

09:27 10         A.    Not to my knowledge.

09:27 11         Q.    Just so we're clear for the record, when I

09:27 12    say "report," I'm referring to Exhibit 1.

09:27 13         A.    Yes.

09:27 14         Q.    Is there anything in your report that you

09:27 15    need to correct or supplement?

09:27 16         A.    Not -- not now.

09:27 17         Q.    Does your report contain -- well, do you

09:27 18    intend to supplement your report in the future?

09:27 19         A.    That would depend on events yet to occur.

09:27 20         Q.    Do you have any intention to at this time?

09:27 21         A.    No.

09:27 22         Q.    Does your report contain a complete

09:27 23    statement of all the opinions you will express in

09:27 24    this case?

09:27 25         A.    Yes.

18

09:27  1          MR. FIGEL:  Objection.

09:27  2          You can answer.

09:27  3      A.   Yes.

09:27  4      Q.   Does your report contain all the bases and

09:27  5  reasons for the opinions you are offering?

09:27  6          MR. FIGEL:  Objection.

09:28  7      A.   Yes.

09:28  8      Q.   Does your report identify all the facts and

09:28  9  data you considered in forming the opinions expressed

09:28 10  in your report?

09:28 11      A.   Yes.

09:28 12          Well, let me clarify.

09:28 13          I've had conversations about the nature of

09:28 14  crypto markets with various people, and I assume that

09:28 15  they -- they were informative for me, but they --

09:28 16  those conversations aren't in this report.

09:28 17      Q.   Did you rely on any of those conversations,

09:28 18  in forming -- well, strike that.

09:28 19          Did you consider any of those

09:28 20  conversations, in forming the opinions you're

09:28 21  expressing in this case?

09:28 22      A.   No.

09:28 23      Q.   Besides the contracts which you

09:29 24  specifically refer to in the report, are all of the

09:29 25  facts and data that you relied on listed in Exhibit B

                                                              19

09:29   1   to your report?

09:29   2        A.   Let me look at Exhibit B.

09:29   3             Yeah, that's the materials I considered.

09:29   4        Q.   And from Exhibit B, it looks like the only

09:29   5   document prepared by an attorney in this case that

09:29   6   you considered, was the SEC's amended complaint.

09:29   7        A.   That's correct.

09:29   8        Q.   Did you consider any of the SEC's

09:29   9   interrogatory responses?

09:30  10        A.   I considered them after this report was

09:30  11   written.

09:30  12        Q.   Which ones?

09:30  13        A.   I can't exactly remember.  I visited --

09:30  14   what's the name of the document that the SEC

09:30  15   submitted in response?  I read one document the SEC

09:30  16   prepared after I prepared this report.

09:30  17        Q.   So a single interrogatory response?

09:30  18        A.   Yeah, it was response to interrogatories.

09:30  19   That's -- I think it was.

09:30  20        Q.   Do those -- after reviewing those

09:30  21   interrogatory responses, does that in any way impact

09:30  22   the opinions you're offering in this case?

09:30  23        A.   No.

09:30  24        Q.   You considered the amended complaint in

09:30  25   this case in forming your opinions?

20

09:30 1      A.   The SEC's amended complaint?

09:30 2      Q.   Yes, sir.

09:30 3      A.   Yes.

09:30 4      Q.   Did you read the whole thing?

09:31 5      A.   Yes.

09:31 6      Q.   Are you offering the opinion that any

09:31 7  allegation in the complaint is untrue?

09:31 8      A.   No.

09:31 9      Q.   Do -- so -- you said that after you wrote

09:31 10  your report, you reviewed one of the SEC's

09:31 11  interrogatory responses.  After you signed your

09:31 12  report, have you reviewed any other documents or

09:31 13  information that are relevant to the opinions

09:31 14  expressed in your report?

09:31 15          MR. FIGEL:  You can answer if you

09:31 16  understand the question.

09:31 17          And don't identify what they are yet.

09:31 18      A.   Yes.

09:31 19      Q.   And what documents are those?

09:31 20          MR. FIGEL:  You can answer, but don't

09:31 21  reveal any documents that you were shown in

09:31 22  connection with your preparation for your testimony.

09:32 23      A.   I looked at additional contracts of Ripple.

09:32 24      Q.   How many?

09:32 25      A.   Hundreds.

                                                          21

09:32  1      Q.   And how would I be able to tell which

09:32  2  contracts you reviewed after signing your report?

09:32  3      A.   They wouldn't be -- they wouldn't be

09:32  4  referred to in my report.

09:32  5      Q.   Does your review -- are those documents

09:32  6  that you reviewed after signing your report in any

09:32  7  way relevant to your report?

09:32  8      A.   In any way, it's very broad.  I reviewed

09:32  9  them to see whether there were any inconsistencies

09:32 10  between the -- those contracts and my report.

09:33 11      Q.   And how many -- you said there are hundreds

09:33 12  that you reviewed?

09:33 13      A.   Yeah.  I think there were 1700 in total.

09:33 14      Q.   Well, there are 1700 listed in your report.

09:33 15  How many did you review after your report was signed?

09:33 16      A.   I can't remember.  A lot.

09:33 17      Q.   More than a hundred?

09:33 18      A.   Yes.

09:33 19      Q.   More than 200?

09:33 20      A.   Probably.

09:33 21      Q.   More than 500?

09:33 22      A.   Yes.  I -- yeah, more than -- yes.

09:33 23      Q.   And you reviewed the entirety of those

09:33 24  500-plus contracts?

09:33 25      A.   Yes.

22

09:33 1        Q.   Did you review more than 700 contracts?

09:33 2        A.   I -- I basically went through all of them,

09:33 3   in the binders that were submitted, that I had.

09:33 4        Q.   Who submitted binders to you?

09:33 5        A.   The Kellogg firm gave me binders and

09:33 6   informed me that those binders had Ripple contracts

09:34 7   in them, which they did.

09:34 8        Q.   Did they -- those binders have all 1700

09:34 9   contracts?

09:34 10       A.   I didn't -- I didn't count them.

09:34 11       Q.   What's your best approximation of the

09:34 12  number of contracts you reviewed after signing your

09:34 13  report?

09:34 14       A.   Over a thousand.

09:34 15       Q.   All 1700 contracts cited in your report?

09:34 16       A.   It would be hard, honestly, to say every

09:34 17  one, but a very large proportion.

09:34 18       Q.   Do you still have those contracts?

09:34 19       A.   I do.

09:34 20       Q.   Do the opinions in your report rely on any

09:34 21  assumptions?

09:34 22            MR. FIGEL:  Objection.

09:34 23       A.   I would have to review my report, but I

09:34 24  don't think I made very many assumptions in it.

09:35 25       Q.   Did anyone ask you to make any assumptions,

23

09:35  1    in preparing your report?

09:35  2            MR. FIGEL:  Start with answering yes or no.

09:35  3            THE WITNESS:  What?

09:35  4            MR. FIGEL:  Start by answering yes or no.

09:35  5        A.   No.

09:35  6        Q.   Will you be offering any opinions in this

09:35  7    case that are not contained in your report?

09:35  8        A.   No.

09:35  9        Q.   Will you be offering any opinions related

09:35 10    to the conduct of either of the individual defendants

09:35 11    in this case?

09:35 12        A.   No.

09:35 13        Q.   Will you be offering any opinion related to

09:35 14    industry custom or practice?

09:35 15        A.   No.

09:35 16            MR. FIGEL:  Objection.  You can answer.

09:35 17        Q.   Will you be offering an opinion related to

09:35 18    any of the defendants' affirmative defenses?

09:35 19        A.   No.

09:35 20        Q.   Will you be offering rebuttal testimony to

09:35 21    any of the SEC's experts?

09:35 22        A.   No.

09:36 23        Q.   Have you read any of the other expert

09:36 24    reports in this case?

09:36 25        A.   No.

                                                          24

09:36  1      Q.   How many hours did you work on this

09:36  2  engagement prior to completing your report?

09:36  3           So from the time you got -- you signed your

09:36  4  engagement to the time you signed your report.

09:36  5      A.   35 to 40 hours.

09:36  6      Q.   And that includes preparing your report?

09:36  7      A.   Yes.

09:36  8      Q.   And it includes reviewing all the contracts

09:36  9  cited in your report?

09:36 10           MR. FIGEL:  Objection.

09:36 11      Q.   The answer is yes?  I'm sorry.  You need to

09:36 12  give a verbal answer.

09:36 13      A.   Yes.

09:36 14      Q.   How much time did you spend reviewing the

09:37 15  contracts that you received after you signed the

09:37 16  report?

09:37 17      A.   Maybe eight to ten hours.

09:37 18      Q.   How much money have you billed so far for

09:37 19  this case?

09:37 20      A.   Approximately $50,000.

09:37 21      Q.   Your rate is $1,200 an hour?

09:37 22      A.   Yes.

09:37 23      Q.   Is that your standard billing rate?

09:37 24      A.   Yes.

09:37 25      Q.   Since when?

25

09:37  1      A.    Since the last two or three years.

09:37  2      Q.    Have you ever charged that much per hour in

09:37  3  another case?

09:37  4      A.    Yes.

09:37  5      Q.    Have you ever billed more as an expert

09:38  6  witness than in this case?

09:38  7      A.    No.

09:38  8      Q.    So in preparing your report, how many

09:38  9  contracts did you personally review?

09:38 10      A.    I think about 140 to 150.

09:38 11      Q.    And how long did that review and analysis

09:38 12  take?

09:38 13      A.    I can't really recall what proportion of

09:38 14  the time I spent was spent writing or thinking or

09:38 15  reading or -- I just can't really break it down.

09:38 16      Q.    So, the 35- to 40-hour number you gave me a

09:38 17  couple minutes ago, that included both reviewing and

09:39 18  analyzing contracts and drafting your report?

09:39 19      A.    Yes.

09:39 20      Q.    Does your report identify the specific

09:39 21  140 contracts that you reviewed?

09:39 22      A.    I think my report refers to 17 in specific

09:39 23  contracts.

09:39 24      Q.    And if I wanted to know the remaining

09:39 25  120-plus contracts that you personally reviewed in

                                                              26

09:39  1    preparing your report, how would I figure that out?

09:39  2        A.   Well, the -- the difficulty is all these

09:39  3    contracts are very much like each other, so a way to

09:39  4    go about that would be to see what was supplied to me

09:39  5    before the date of my report.

09:40  6        Q.   Okay.  And unfortunately, I don't have that

09:40  7    information.  So what I'm trying to get at is, is

09:40  8    there any record of the 17 or so contracts that you

09:40  9    personally -- or -- I'm sorry.

09:40 10             Is there any record of the 140 contracts

09:40 11    you reviewed to prepare your report?

09:40 12        A.   I think if you did email discovery, you

09:40 13    would see that there were emails which would say

09:40 14    things like, We're sending you X, or we're sending

09:40 15    you Y.

09:40 16             MR. FIGEL:  I'm -- I'm sorry to interrupt.

09:40 17             I'm -- I'm allowing you to answer these

09:40 18    questions because he's interested, but be careful not

09:40 19    to reveal communications --

09:40 20             THE WITNESS:  No.

09:40 21             MR. FIGEL:  -- the substance of

09:40 22    communications with our firm and -- and you.

09:40 23             THE WITNESS:  Okay.

09:40 24        Q.   So, I -- I just want to make sure I have

09:41 25    this right.  So the 140 contracts you reviewed in

27

09:41  1    preparing your report, were those all emailed to you

09:41  2    by Ripple's counsel?

09:41  3              MR. FIGEL:  You can answer yes or no.

09:41  4         A.   No.

09:41  5         Q.   Okay.  So again, I'm just trying to figure

09:41  6    out which 140 contracts you -- you reviewed.

09:41  7         A.   Well, I -- I'm not trying to be evasive.

09:41  8    They sent me boxes with things in them that -- so

09:41  9    they weren't emailed.

09:41 10         Q.   So the 140 contracts you reviewed, were

09:41 11    those the only 140 contracts you got, or were they --

09:41 12    from Ripple's counsel, or were they part of a larger

09:41 13    set?

09:41 14              MR. FIGEL:  Objection.

09:41 15              You can answer if you understand.

09:41 16         A.   They were obviously part of a larger set

09:41 17    because we have the full set.

09:42 18         Q.   Are you aware of any record showing the

09:42 19    specific 100 -- strike that.

09:42 20              Are you aware of any record that documents

09:42 21    the specific 140 contracts you personally reviewed

09:42 22    before signing your report?

09:42 23         A.   No.

09:42 24         Q.   Is there a way to figure that out?

09:42 25         A.   Yes.

28

09:42 1      Q.   How?

09:42 2      A.   Well, I could go through my office in

09:42 3  New Haven and see what I had there.  And I would

09:42 4  check when I got what, because there were, as I said,

09:42 5  messages.

09:42 6           And ultimately, I could come up with the

09:42 7  ones I looked at before October 4 and the ones I

09:42 8  looked at after.

09:42 9      Q.   You have to -- is there -- did you take

09:42 10 notes of any of that, or would you have to go

09:42 11 basically on memory, I reviewed this before signing

09:42 12 my report, or I reviewed it after signing my report?

09:42 13     A.   Well, as I said, I'm not trying to be

09:43 14 evasive.  I have two offices, one in New Haven and

09:43 15 one in New York.  I did most of the work on the

09:43 16 report in New Haven, but -- but since then, I've been

09:43 17 mainly working in New York.

09:43 18          So I could go through my -- my New Haven

09:43 19 office would probably have a lot of the stuff I did

09:43 20 before the report, and my New York office would have

09:43 21 a lot of other stuff.

09:43 22     Q.   Do you have any records reflecting which

09:43 23 140 contracts you reviewed prior to signing your

09:43 24 report?

09:43 25     A.   No.

29

09:43   1          Q.    Now, prior to signing your report, who

09:43   2    reviewed the other 1500-plus contracts cited in your

09:43   3    report?

09:43   4          A.    I don't know.

09:43   5          Q.    And prior to -- did you -- signing your

09:44   6    report, did you have any firsthand knowledge of the

09:44   7    contents of the contracts you did not review?

09:44   8          A.    No.

09:44   9          Q.    Did you give direction to anybody regarding

09:44  10    the 1500 plus contracts that you did not review?

09:44  11          A.    Yes.

09:44  12          Q.    Who did -- first of all, who did you give

09:44  13    direction to?

09:44  14          A.    By who --

09:44  15                MR. FIGEL:  You can answer.  Give names.

09:44  16          A.    To Mr. Figel, to Mr. Gideon, and to --

09:44  17    what's Robert's last name?

09:44  18                MR. FIGEL:  Can I answer?

09:44  19                Moore, M-O-O-R-E.

09:44  20          A.    Right.  To Mr. Moore.

09:44  21          Q.    And do you know if they were the ones

09:44  22    reviewing the contracts?

09:44  23          A.    Do I personally know?  No.

09:44  24          Q.    And what direction did you give them?

09:45  25          A.    I directed -- I directed them to look for

                                                                    30

09:45  1    representative contracts in the categories that I

09:45  2    thought were germane.

09:45  3        Q.   And are those the categories identified in

09:45  4    your report?

09:45  5        A.   They are.

09:45  6        Q.   And did this occur -- this direction you

09:45  7    gave to counsel to categorize the contracts, was this

09:45  8    before or after you had reviewed the 140 contracts?

09:45  9        A.   Before.

09:45 10        Q.   Had you reviewed any contracts at the time

09:45 11    you gave counsel that direction?

09:45 12        A.   I think I re-- I reviewed a small number.

09:45 13        Q.   Like how many?

09:45 14        A.   I -- I can't recall how many.

09:46 15        Q.   Who came up with the categories?

09:46 16        A.   Me.

09:46 17        Q.   And how did you come up with those

09:46 18    categories before you had finished reviewing the

09:46 19    140 contracts?

09:46 20        A.   I had some understanding of Ripple's

09:46 21    business model, which led me to think that they had

09:46 22    contracts in these various categories.

09:46 23             And I wanted to see whether those contracts

09:46 24    would be relevant to any opinions that I was retained

09:46 25    to give.  And so essentially the process was I had a

31

09:46  1    small sample, and I wanted a bigger sample.

09:46  2        Q.   And how did you gain an understanding of

09:46  3    Ripple's business model?

09:46  4        A.   I -- as a general matter, I had a sense of

09:47  5    what cryptocurrency companies do, and I think I

09:47  6    had -- without revealing any substance, I had

09:47  7    conversations with counsel about, So what kind of

09:47  8    company is this, and so on.

09:47  9        Q.   So you learned about Ripple's business

09:47 10    model through communicating with counsel?

09:47 11        A.   I learned -- I learned about -- generally

09:47 12    learned about what cryptocurrencies do just because,

09:47 13    if you're interested in commerce and you were in

09:47 14    a -- a lead institution, you talk about these things

09:47 15    with people who know them.

09:47 16            And I wanted to confirm the general view I

09:47 17    had of this kind of industry with -- I wanted to see

09:47 18    whether this company was sort of like the others

09:47 19    that -- or basically a typical cryptocurrency

09:47 20    company.

09:48 21        Q.   What did you do to supervise the work of

09:48 22    the attorneys acting at your direction?

09:48 23        A.   I didn't directly supervise the attorneys.

09:48 24        Q.   What did you do to verify the accuracy of

09:48 25    their work?

32

09:48  1      A.   Well, if -- if I wanted to see direct sales

09:48  2   contracts, and I had seen a couple before the

09:48  3   attorneys were going to get me more of them, I

09:48  4   essentially internally reviewed to see whether what I

09:48  5   was being shown were direct sales contracts, in that

09:48  6   category.

09:48  7      Q.   So for the contracts listed on Exhibits C

09:48  8   through F to your report, what did you do to verify

09:48  9   that those exhibits accurately categorized the

09:49 10   contracts?

09:49 11      A.   I'm not sure --

09:49 12           MR. FIGEL:  Objection.

09:49 13           You can answer.

09:49 14      A.   Also I'm not sure I understand that

09:49 15   question.

09:49 16      Q.   What did you do to make sure Exhibit -- to

09:49 17   verify that Exhibits C to F to your report -- well,

09:49 18   let me back up.

09:49 19           You -- you testified you did not prepare

09:49 20   Exhibits C to F to your report, correct?

09:49 21      A.   That's correct.

09:49 22      Q.   And you also testified you don't know who

09:49 23   prepared them?

09:49 24      A.   I don't have -- no -- I mean, I have a

09:49 25   suspicion, but I wouldn't want to testify that I

                                                            33

09:49  1  actually know.

09:49  2      Q.   So, what did you do to verify that these

09:49  3  Exhibits C to F are accurate?

09:49  4      A.   I'm not sure what you mean by "accurate."

09:49  5      Q.   Well, so, for instance, Exhibit C lists

09:49  6  hundreds of sales contracts.

09:49  7      A.   Yes.

09:49  8      Q.   What did you do to verify that each

09:50  9  contract listed on Exhibit C appropriately belongs to

09:50 10  be listed along with the other sales contracts?

09:50 11          MR. FIGEL:  Objection.

09:50 12      A.   I looked at a lot of them to see whether

09:50 13  they were sales contracts or not.

09:50 14      Q.   And that was the work you did after signing

09:50 15  your report?

09:50 16      A.   Some before, some after.

09:50 17      Q.   So, how many -- how many hours did you

09:50 18  spend -- well, let -- you -- just to take a step

09:50 19  back.

09:50 20          You said before you signed your report, you

09:50 21  had only looked at 140 contracts.  Right?

09:50 22      A.   Yes.

09:50 23      Q.   And then --

09:50 24      A.   Approximately 140.

09:50 25      Q.   What did you do at the time you signed your

34

09:50 1    report to verify that the other 1500 contracts listed

09:50 2    on the exhibits to your report were accurately

09:50 3    categorized?

09:51 4              MR. FIGEL:  Objection.

09:51 5        A.    I didn't do -- the only way to verify --

09:51 6    let me back up.

09:51 7              I asked the attorneys for a representative

09:51 8    sample of contracts in each of the categories that I

09:51 9    thought would be relevant, and I relied on the

09:51 10   attorneys to pick contracts in those categories that

09:51 11   would, when I looked at the entire universe,

09:51 12   accurately represent the entire universe.

09:51 13       Q.    And the result of that direction was the

09:51 14   Exhibits C to F to your report?

09:51 15       A.    Yes.

09:51 16       Q.    And before you signed your report, what did

09:51 17   you do to verify that Exhibits C through F were

09:51 18   accurate?

09:52 19       A.    I think I've answered this question, but if

09:52 20   you want me to try again, I'll try again.

09:52 21             Exhibits C through F are -- are the

09:52 22   universe.  When I wrote my report, I didn't see the

09:52 23   entire universe.

09:52 24             I relied on the attorneys to give me

09:52 25   contracts in these categories that would be accurate

35

09:52  1   samples of the entire universe.

09:52  2        Q.   And did you do anything prior to signing

09:52  3   your report to verify the attorneys' work?

09:52  4        A.   No.

09:52  5        Q.   Is it your understanding that the

09:52  6   1700 contracts listed on Exhibits C to F of your

09:52  7   report reflect all of Ripple's offers and sales of

09:52  8   XRP at issue in this lawsuit?

09:53  9        A.   No.

09:53 10        Q.   How many offers and sales of XRP by Ripple

09:53 11   that are at issue in this lawsuit are not reflected

09:53 12   on Exhibits C to F of your report?

09:53 13             MR. FIGEL:   Objection.

09:53 14        A.   I don't --

09:53 15             MR. FIGEL:   You can answer.

09:53 16        A.   I don't know.

09:53 17        Q.   Do you know how many offers and sales of

09:53 18   XRP Ripple made between February 2013 and

09:53 19   December 2020 that are not reflected on Exhibit --

09:53 20   not reflected by one of the contracts on Exhibits C

09:53 21   to F of your report?

09:53 22             MR. FIGEL:   Objection.

09:53 23        A.   No.

09:53 24        Q.   Do you know whether Ripple made offers or

09:53 25   sales of XRP that were not reflected by written

36

09:53  1    agreement?

09:53  2              MR. FIGEL:  Objection.

09:53  3         A.   No.

09:54  4         Q.   If Ripple had offered or sold XRP but did

09:54  5    not document those offers or sales in a written

09:54  6    agreement, did you consider those offers or sales in

09:54  7    forming your opinions?

09:54  8              MR. FIGEL:  Objection.

09:54  9         A.   No.

09:54 10         Q.   Are you offering an opinion on any offer or

09:54 11    sale or transfer of XRP not reflected by one of the

09:54 12    contracts listed in your report?

09:54 13         A.   No.

09:54 14         Q.   Are you offering -- are you offering an

09:54 15    opinion on whether any computer code deployed on a

09:54 16    blockchain represents an enforceable contract?

09:54 17              MR. FIGEL:  Objection.

09:54 18         A.   No.

09:54 19         Q.   Are you offering an opinion on any of the

09:54 20    statements or representations made on Ripple's

09:54 21    website?

09:54 22         A.   No.

09:55 23         Q.   Did you consider any such statements or

09:55 24    representations in forming your opinions?

09:55 25         A.   The only ones that I considered were in

37

09:55 1    your complaint and response to interrogatories.

09:55 2         Q.   Are you offering an opinion on any press

09:55 3    release or social media posting made by Ripple or its

09:55 4    personnel?

09:55 5         A.   No.

09:55 6         Q.   Have you spoken with any purchaser of XRP?

09:55 7         A.   No.

09:55 8         Q.   And do you own any XRP?

09:55 9         A.   No.

09:55 10        Q.   Do you own any digital asset or

09:55 11   cryptocurrency?

09:55 12        A.   No.

09:55 13        Q.   Have you ever?

09:55 14        A.   No.

09:55 15        Q.   Are you offering an opinion on any

09:55 16   purchaser or holder of XRP's motives or intentions?

09:55 17        A.   No.

09:56 18        Q.   And then in your report, you refer to

09:56 19   the -- the various -- let's just go to your report.

09:56 20   Can you go, please, to paragraph 5 on page 4 of your

09:56 21   report.

09:56 22        And I want to direct you just to the last

09:56 23   sentence of paragraph 4 -- I'm sorry -- paragraph 5,

09:56 24   the one that reads, Of those contracts, I have

09:56 25   personally reviewed more than 140 contracts that were

38

09:56   1   exemplars of the categories and subcategories set

09:56   2   forth in this declaration.

09:56   3        A.   Yes.

09:56   4        Q.   And who determined the -- those 140

09:57   5   contracts were exemplars?

09:57   6        A.   The attorneys.

09:57   7        Q.   And who selected the 140 contracts that you

09:57   8   would review?

09:57   9        A.   The attorneys.

09:57  10        Q.   What direction, if any, did you give to the

09:57  11   attorneys who selected those 140 contracts for you?

09:57  12        A.   I -- I think I've answered this question,

09:57  13   but -- to say again, I created the categories.  And

09:57  14   so, for example, I said, I would like to see direct

09:57  15   sales contracts that were representative of the

09:57  16   direct sales contracts that Ripple sold XRP under.

09:58  17        Q.   And just so I'm clear, you came up with

09:58  18   those categories before you started reviewing

09:58  19   contracts?

09:58  20        A.   Well, I saw -- I had saw a few contracts at

09:58  21   the start, just to see what was going on.  But the

09:58  22   very bulk of the contracts that I reviewed, I

09:58  23   reviewed after I communicated the categories to the

09:58  24   attorneys and had them do a search.

09:58  25        Q.   And then following your initial review of

                                                              39

09:58  1   the 140 contracts, you were provided with access to

09:58  2   all 1700-plus contracts listed in Exhibits C

09:58  3   through F?

09:58  4        A.   I guess I could see whatever I wanted to

09:58  5   see.

09:58  6        Q.   Well, you said you were -- in your report,

09:58  7   it says you were given access to those 1700.

09:58  8        A.   Yes.

09:58  9        Q.   If you just describe the access you were

09:58 10   given.

09:59 11        A.   I could ask the attorneys for contracts,

09:59 12   and they would provide them.

09:59 13        Q.   Were all of the contracts that you had --

09:59 14   were all the contracts that were provided to you,

09:59 15   were they provided to you in paper form or electronic

09:59 16   form?

09:59 17             MR. FIGEL:  Objection.

09:59 18        A.   The contracts were provided in paper form.

09:59 19        Q.   Were you given access to any sort of

09:59 20   database containing the contracts?

09:59 21        A.   No.  I was given the contracts.

09:59 22        Q.   In hard-copy form.

09:59 23        A.   Yes.

09:59 24        Q.   Were any contracts emailed to you?

09:59 25        A.   No.

40

09:59  1      Q.   And the contracts that you were physically

09:59  2  given copies of, was -- were they all the 1700

09:59  3  contracts?

09:59  4      A.   I have all of them now.

10:00  5      Q.   Did you have all 1700 contracts before you

10:00  6  signed your report?

10:00  7      A.   No.

10:00  8      Q.   Just the 140?

10:00  9      A.   I don't recall how many I had.  But I

10:00 10  didn't have the full universe of 1700.

10:00 11      Q.   And when did you actually get the full

10:00 12  universe?

10:00 13      A.   I think it was in -- sometime after I

10:00 14  signed my report and when there was, I think the

10:00 15  earliest schedule depositions.  I recall the

10:00 16  depositions were scheduled for early January and then

10:00 17  were moved, and sometime before then and after my

10:00 18  report.

10:00 19      Q.   How many of the 1700 contracts did you

10:00 20  personally review?

10:00 21           MR. FIGEL:  Objection.

10:00 22           You can answer.

10:00 23      A.   I reviewed most of them.

10:00 24           I would say a very large percentage.

10:00 25      Q.   And in the course of that review, did you

                                                              41

10:00  1    review all of those -- the entirety of each contract?

10:01  2         A.   No.

10:01  3         Q.   How many of the 1700 contracts did you not

10:01  4    read the entirety of?

10:01  5              MR. FIGEL:  Objection.

10:01  6         A.   I didn't -- I was looking for particular

10:01  7    things in those contracts.  So either they were there

10:01  8    or they weren't, so I didn't feel that I had to read

10:01  9    the entire document.

10:01 10              So I didn't.

10:01 11         Q.   And that's the case with all 1700

10:01 12    contracts.

10:01 13         A.   Some I read the -- there were some that I

10:01 14    had to read the entire document to get a sense of

10:01 15    what it was about.  There were others when, because

10:01 16    they were form contracts that were -- each one was

10:01 17    very much like the other, I just checked to make sure

10:01 18    that Contract 47, for example, was like Contract 46.

10:01 19         Q.   And again, you said that there were some of

10:01 20    the 1700 contracts you didn't review at all.

10:02 21    Correct?

10:02 22         A.   Well, that would be a pretty small

10:02 23    fraction.

10:02 24         Q.   But there are some.

10:02 25         A.   Well, to be exact, there were these big

                                                              42

10:02  1   binders.  I went through them.  It could be that I

10:02  2   turned pages inaccurately or my attention flagged for

10:02  3   a moment, but essentially my object was to go through

10:02  4   everything in the binder.

10:02  5        Q.   But not word for word.

10:02  6        A.   Well, I was looking for particular words.

10:02  7   If I saw them, I would read them.  If they were

10:02  8   absent, then I didn't have to read them.

10:02  9        Q.   So if a contract had a provision in it that

10:02 10   you weren't necessarily looking for, you may not have

10:02 11   reviewed that provision.

10:02 12        A.   Yes.

10:02 13        Q.   Of the contracts -- well, why didn't you

10:02 14   read all -- the entirety of all 1700 contracts?

10:03 15        A.   Because I was interested in whether Ripple

10:03 16   assumed any -- or whether there were words in any of

10:03 17   these contracts that would support an inference that

10:03 18   Ripple assumed post-sale obligations toward a buyer

10:03 19   of XRP.  And there was a question whether such words

10:03 20   were in any of these contracts or not, and I looked

10:03 21   to see whether they were.

10:03 22        Q.   So does that mean you reviewed every page

10:03 23   of each contract to make sure that those provisions

10:03 24   were not there?

10:03 25             MR. FIGEL:  Objection.

43

10:03 1       A.   No.  I didn't have to do that because, as I

10:03 2   said, they were form contracts.  So if in Contract 37

10:03 3   these words would appear or not appear in a relevant

10:04 4   part of the contract, I would look at that.  For

10:04 5   example, I was interested in whether there were

10:04 6   disclaimers, so I would look for those.

10:04 7            Essentially, I searched these contracts

10:04 8   consistent with what I said in my report.

10:04 9       Q.   Of the contracts you reviewed, did any

10:04 10  contain a provision that you considered to be vague

10:04 11  or ambiguous?

10:04 12      A.   Not the -- not the words that I read.

10:04 13      Q.   And of the components of the contracts that

10:04 14  you did not review, how would you know whether they

10:04 15  contained terms that are vague or ambiguous?

10:04 16      A.   I wouldn't know that if I didn't read them.

10:05 17      Q.   So going back to -- you said you reviewed

10:05 18  a -- a relatively small amount -- you initially

10:05 19  reviewed a relatively small amount of contracts and

10:05 20  then came up with the categories described in your

10:05 21  report?

10:05 22      A.   Yeah.

10:05 23      Q.   Were Ripple's lawyers involved in coming up

10:05 24  with those categories?

10:05 25           MR. FIGEL:  You can answer yes or no.

44

10:05   1      A.   No.  They were my categories.

10:05   2      Q.   Are the categories you selected the only

10:05   3  reasonable way to categorize the contracts identified

10:05   4  in your report?

10:05   5          MR. FIGEL:  Objection.

10:05   6      A.   I can't say they were the only reasonable

10:05   7  way.  They were the way I thought would be

10:06   8  illuminating with respect to the questions that I was

10:06   9  trying to answer.

10:06  10      Q.   So I take it, then, that certain of the

10:06  11  contracts could fall into a category that you did not

10:06  12  identify in your report?

10:06  13          MR. FIGEL:  Objection.

10:06  14      A.   Well, it's certainly possible.  But if you

10:06  15  look at my report, they were forming categories and

10:06  16  then a whole bunch of miscellaneous contracts.  So I

10:06  17  would not imagine that there would be much that would

10:06  18  be missing, but I can't say that there would be

10:06  19  nothing missing.

10:06  20      Q.   Could another expert in the field of

10:06  21  contract law reasonably come up with different

10:06  22  categories?

10:06  23          MR. FIGEL:  Objection.

10:06  24      A.   You know, of course, there's that

10:06  25  possibility.  But if you were a contracts expert and

45

10:06  1   interested in the questions that I was interested in,

10:06  2   it would be difficult for me to think that you would

10:06  3   come up with anything very differently from what I

10:07  4   came up with.

10:07  5        Q.   Could Judge Torres come up with different

10:07  6   reasonable ways to categorize the contracts?

10:07  7             MR. FIGEL:  Objection.

10:07  8        A.   I don't know.

10:07  9        Q.   Do you know who Judge Torres is?

10:07 10        A.   Not offhand.

10:07 11        Q.   The Article III judge in this lawsuit.

10:07 12        A.   I don't know what Judge Torres did.

10:07 13        Q.   Is there any reason why Judge Torres is not

10:07 14   qualified to interpret the contracts cited in your

10:07 15   report?

10:07 16             MR. FIGEL:  Objection.

10:07 17        A.   I don't know anything in particular about

10:07 18   Judge Torres.

10:07 19        Q.   What was your methodology for selecting the

10:07 20   categories and the criteria?

10:07 21        A.   As I said before, I was interested in

10:07 22   whether Ripple had obligated itself to perform

10:08 23   services post sale for the buyers of XRP, so I looked

10:08 24   for contracts in which such obligations might appear.

10:08 25             So, for example, they would or would not

                                                              46

10:08  1    appear in a direct sales contract, and certain of the

10:08  2    contracts in which Ripple was a buyer of services

10:08  3    with another company, there might be a possibility

10:08  4    that there was a term in a contract like that that

10:08  5    would make an XRP buyer a third-party beneficiary, so

10:08  6    I looked at the service contracts to see whether such

10:08  7    a -- there were language that might support such an

10:08  8    inference.

10:08  9          I looked -- there were -- Ripple sold -- I

10:08  10   mean, there's a question I had, was whether Ripple

10:09  11   made only discrete sales of particular things or

10:09  12   whether they sold them in a way that is sometimes

10:09  13   customary where you make an agreement with a buyer

10:09  14   that from time to time, the buyer will submit orders,

10:09  15   and the terms of those orders will be the ones of the

10:09  16   master agreement.  So I was interested in whether

10:09  17   there were any contracts like that.

10:09  18      Q.    And -- and I'm sorry, because I'm -- I'm

10:09  19   not sure we're on the same page for -- for this

10:09  20   question.

10:09  21          I'm not talking about the different

10:09  22   features of the contracts, like a -- post obligations

10:09  23   or anything like that.  Just the -- basically the

10:09  24   categories you cite in your report, direct sales

10:09  25   contract, wholesale contract, programmatic contract,

47

10:09  1    loans, employee compensation, those categories.  What

10:09  2    was your --

10:09  3           MR. FIGEL:  Objection.  Can I have just a

10:09  4    moment, Mr. Hanauer?

10:09  5           MR. HANAUER:  I just want to make sure I'm

10:09  6    seeing the question.

10:09  7           MR. FIGEL:  Well, you interrupted an answer

10:10  8    to the question, What was your methodology for

10:10  9    selecting the categories in, and the criteria.  And

10:10 10    he was giving an answer as to his -- the methodology

10:10 11    that he was giving.

10:10 12           And then you interrupted him and said what

10:10 13    you just said, which is, I'm not talking about the

10:10 14    different features of the contracts.  So I don't -- I

10:10 15    just want to make sure the witness has had an

10:10 16    opportunity to finish his answer with respect to the

10:10 17    methodology, which was the question that you posed.

10:10 18       A.   I was -- I thought I had answered that.  I

10:10 19    was looking for contract types which might contain

10:10 20    terms that would create a contractual expectation on

10:10 21    the part of a buyer of XRP.  Those provisions could

10:11 22    appear in various kinds of contracts, so I was

10:11 23    interested in what kinds of contracts there were.

10:11 24       Q.   I guess my question was -- or my question

10:11 25    now is, the categories you've identified, direct

48

10:11 1   sales, programmatic, wholesale, employee

10:11 2   compensation, what was your methodology for coming up

10:11 3   with those general categories, selecting those

10:11 4   general categories?

10:11 5       A.   I think I've answered that question.  I

10:11 6   didn't have -- because I'm not sure what -- what you

10:11 7   mean in your question by a methodology.

10:11 8           I -- the overarching question that I was

10:11 9   trying to address was whether there was language in

10:11 10  contracts that Ripple used that would sustain the

10:11 11  particular inference, and I was interested in the

10:11 12  various kinds of contracts that might contain such

10:12 13  language.

10:12 14      Q.   And you split up those various kinds of

10:12 15  contracts into categories such as direct sales,

10:12 16  programmatic sales, loans?

10:12 17      A.   Right.  Yeah, there were -- yeah, there

10:12 18  were -- I think that's right.

10:12 19      Q.   So I guess what I'm trying to get at is,

10:12 20  you testified that you came up with the categories

10:12 21  after only reviewing a small amount of contracts, and

10:12 22  I guess, what was the methodology of deciding those

10:12 23  categories that you relayed to counsel and instructed

10:12 24  them on how to list in the appendix?  What was your

10:12 25  methodology, you know, of coming up with these

49

10:12 1    categories before you started your more thorough

10:12 2    review of the contracts?

10:12 3            MR. FIGEL:  Objection.

10:12 4        A.    Well, it would be were there contracts of

10:13 5    Type A, were there contracts of Type B, were there

10:13 6    contracts of Type C.

10:13 7        Q.    And what was your methodology in coming up

10:13 8    with Type A, Type B, Type C?

10:13 9        A.    Well, for example, although I think I've

10:13 10   answered this, if Type A is a direct sales contract,

10:13 11   then I wanted to see a direct sales contract because

10:13 12   you might find a commitment to buyers in a direct

10:13 13   sales contract.

10:13 14           If it was a service contract, you might

10:13 15   find third-party beneficiary language in a service

10:13 16   contract.

10:13 17           The overarching question I was trying to

10:13 18   answer was whether there was -- there were terms or

10:13 19   phrases in any of these contracts that can sus--

10:13 20   could sustain an inference that Ripple assumed

10:14 21   post-sale obligations toward buyers.

10:14 22           I really don't have anything else to say to

10:14 23   that, because I just asked for what -- is there a

10:14 24   contract like this, is there a contract like that.

10:14 25       Q.    And -- and I guess that's what I'm getting

50

10:14  1   at.  When you -- when you relayed to counsel, said,

10:14  2   Are there direct sales contracts, are there service

10:14  3   contracts, are there loan contracts, what was your

10:14  4   methodology in choosing those various categories that

10:14  5   you asked counsel to find for you?

10:14  6          MR. FIGEL:  Objection.

10:14  7      A.   Because the -- contracts of that type might

10:14  8   or might not contain the language that I was

10:14  9   interested in.

10:14 10      Q.   How did you go about choosing those

10:14 11   specific types?

10:14 12      A.    I'm not sure I have more to say about that.

10:14 13   I mean, it might be -- I mean, there was some

10:14 14   back-and-forth in the sense of -- in the course of

10:14 15   discussions in which I said I wanted to see contracts

10:14 16   in various categories, I don't have a direct

10:15 17   recollection, but it wouldn't surprise me if somebody

10:15 18   said, Well, you know they were loans.  If anybody

10:15 19   said that to me, I'd say, Well, let me see those.

10:15 20      Q.   Did you ask to review any representations

10:15 21   beyond the four corners of a contract?

10:15 22      A.   No.

10:15 23      Q.   Why not?

10:15 24      A.   Because the question that was addressed --

10:15 25   the question that was -- that I was retained to

51

```
10:15   1  answer was whether there were contractual obligations
10:15   2  created, which I sought to answer by looking at the
10:15   3  contracts.
10:15   4      Q.   Was any documentation provided to you
10:15   5  showing the work that went into the preparation of
10:15   6  Exhibits C to F of your report?
10:16   7      A.   No.
10:16   8           MR. FIGEL:  Objection.
10:16   9      A.   No.
10:16  10      Q.   How are you doing on time?  We've been
10:16  11  going a little bit more than an hour and may be
10:16  12  logical.
10:16  13      A.   Maybe another half hour, and then I'll want
10:16  14  to do pushups.
10:16  15           MR. HANAUER:  That's fine.
10:16  16           MR. FIGEL:  That was not the answer I was
10:16  17  hoping for.  Does anybody else need a break?
10:16  18           THE WITNESS:  Well, we can do a break now.
10:16  19  It's okay, I don't care.
10:16  20           MR. FIGEL:  It's up -- it's up to you.
10:16  21           THE WITNESS:  I don't mind going for a
10:16  22  little while longer.
10:16  23           MR. FIGEL:  All right.  Well, you're the
10:16  24  guy that matters, so we're going to keep going.
10:16  25  Okay.  But whenever you -- whenever you need one,
```

52

10:16  1    just let me know, okay?

10:16  2            THE WITNESS:  Well -- yeah, we've been

10:16  3    doing an hour.  Maybe a little bit more.

10:16  4        Q.   Okay.  So in your report you reference the

10:16  5    Supreme Court's decision in SEC versus

10:16  6    W.J. Howey Company?

10:16  7        A.   Yes.

10:16  8        Q.   You reviewed the Supreme Court's decision

10:16  9    in Howey before preparing your report?

10:16 10        A.   Yes.

10:16 11        Q.   Do you consider yourself an expert on how

10:16 12    courts have applied that decision?

10:17 13        A.   I don't know that anyone would be an expert

10:17 14    in how a court applied a particular decision.  I have

10:17 15    read some post Howey cases.

10:17 16        Q.   Did you consider any of the post Howey

10:17 17    cases in preparing your report?

10:17 18        A.   No, I did not.

10:17 19        Q.   Have courts provided more recent guidance

10:17 20    since the Supreme Court's Howey decision on how to

10:17 21    determine if transactions involve the offer or sale

10:17 22    of an investment contract?

10:17 23            MR. FIGEL:  Objection.

10:17 24        A.   I've read some cases, but I haven't --

10:17 25    there -- I am told that there are hundreds of cases

53

10:17  1    that apply Howey.  I have not read hundreds of cases.

10:18  2         Q.    In forming your opinions, did you consider

10:18  3    any court cases applying Howey?

10:18  4         A.    In forming my report, no.

10:18  5         Q.    And in forming your opinions, did you

10:18  6    consider the features of any contracts in cases

10:18  7    applying Howey to see how the court analyzed those

10:18  8    contracts to see if the financial instruments were

10:18  9    investment contracts?

10:18 10              MR. FIGEL:  Objection.

10:18 11         A.    Not in preparing my report.

10:18 12         Q.    In addition to reviewing the Supreme

10:18 13    Court's Howey decision, you also reviewed the lower

10:18 14    courts' opinions in the Howey litigation?

10:19 15         A.    Yes.

10:19 16         Q.    And you also read the transcript of record

10:19 17    before the Supreme Court?

10:19 18         A.    Yes.

10:19 19         Q.    Did you review all 134 pages of that

10:19 20    transcript of record?

10:19 21         A.    Yes.

10:19 22         Q.    How did you obtain it?

10:19 23         A.    I don't recall.  I -- I either got it from

10:19 24    my library, or the lawyers gave it to me.  I don't

10:19 25    recall how I came about getting it.

54

10:19  1       Q.   And when I say Howey, I'm going to refer to

10:19  2  the Supreme Court's decision.

10:19  3       A.   Right.

10:19  4       Q.   Okay.

10:19  5            Howey involved two common law contracts.

10:19  6       A.   Howey just involved two contracts.  I don't

10:19  7  know what common law adds to that description.

10:19  8       Q.   That's fair.  Howey involved a land sale

10:19  9  contract and a service contract?

10:19 10       A.   Yes.

10:19 11       Q.   And you reviewed both of those contracts?

10:20 12       A.   Yes.  They were in the record, so I...

10:20 13            MR. HANAUER:  Exhibit 5.

10:20 14            MS. WAXMAN:  Sorry.

10:20 15            THE WITNESS:  A lot of paper in this case.

10:20 16            MR. FIGEL:  Do you want me to give him --

10:20 17            MR. HANAUER:  Yeah, the witness should have

10:20 18  one.

10:20 19            MR. FIGEL:  Okay, that's fine.  He should

10:20 20  have one, yes, I was just not sure about which one.

10:20 21            (Transcript of Howey litigation was marked

10:20 22       Exhibit AS-5 for identification, as of this

10:20 23       date.)

10:20 24       Q.   So I just tendered you Exhibit 5.  Is

10:20 25  Exhibit 5 a copy of the Howey transcript of record

                                                                55

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:21 1    that you reviewed?

10:21 2        A.   It seems to be.

10:21 3        Q.   And the two contracts at issue in Howey

10:21 4    that you reviewed, those are reflected on pages 11 to

10:21 5    20 of Exhibit 5?

10:21 6        A.   Yes.

10:21 7             (Witness reviewing document.)

10:21 8        A.   Yes.

10:21 9        Q.   And Exhibit 5 also contains stipulated

10:21 10   facts that the Supreme Court considered in deciding

10:21 11   Howey?

10:21 12       A.   Yes.

10:21 13       Q.   And that's on pages 5 to 11?

10:22 14       A.   Yes.

10:22 15       Q.   And you reviewed those stipulated facts?

10:22 16       A.   Once.

10:22 17       Q.   Is it your understanding that in addition

10:22 18   to -- so let me take a step back.

10:22 19            So the two contracts at issue in Howey were

10:22 20   a land sale contract and a services contract?

10:22 21       A.   Yes.

10:22 22       Q.   In addition to receiving the land sales

10:22 23   contract and the services contract, the investors in

10:22 24   the Howey case, they also received a sales talk from

10:22 25   representatives of the companies selling those

56

10:22  1    contracts?

10:22  2         MR. FIGEL:  Objection.

10:22  3    A.   I think they did.  I think this is in the

10:22  4    record.

10:22  5    Q.   And that sales talk is included on pages 20

10:22  6    to 28 of Exhibit 5?

10:22  7    A.   I don't recall the pages, but --

10:23  8         (Witness reviewing document.)

10:23  9    A.   That seems to be correct.

10:23 10    Q.   Just for your reference, on pages 8 to 9 of

10:23 11    Exhibit 5, in paragraph 12 it says, Attached hereto

10:23 12    in a part hereof, as Exhibit B 1, is a typical sales

10:23 13    talk employed by representatives as acting for the

10:23 14    two companies in effectuating sales.

10:23 15    A.   Yes.

10:23 16    Q.   And that's the same sales talk I just asked

10:23 17    you about?

10:23 18    A.   It seems to be, yes.

10:23 19    Q.   And you reviewed the sales talk in

10:23 20    preparing your report?

10:23 21    A.   I read everything here.

10:24 22    Q.   In Exhibit 5?

10:24 23    A.   Yes.

10:24 24    Q.   In determining whether an investment

10:24 25    contract existed in Howey, did the Supreme Court look

                                                              57

10:24 1   at the two contracts, the land sales contract and the

10:24 2   services contract, in isolation; or did the Supreme

10:24 3   Court consider them together?

10:24 4       MR. FIGEL:  Objection.

10:24 5       A.   I think the court collapsed the two into

10:24 6   one.

10:24 7       Q.   And is that one of the lessons from Howey,

10:24 8   that if multiple contracts govern a commercial

10:24 9   relationship, those multiple contracts should be

10:24 10  considered together to determine if an investment

10:24 11  contract exists under the federal securities laws?

10:24 12      MR. FIGEL:  Objection.

10:24 13      A.   I'm not offering an opinion on whether

10:24 14  something is or isn't an investment contract.

10:24 15      Q.   And when you say "investment contract," do

10:24 16  you mean investment contract as that term is

10:25 17  construed under the federal securities laws?

10:25 18      A.   Yes.

10:25 19      Q.   And going forward, if I use the term

10:25 20  "investment contract," will you understand that I'm

10:25 21  referencing that term as it's used under the federal

10:25 22  securities laws?

10:25 23      A.   Yes, so long as you understand that I'm not

10:25 24  giving an opinion on that issue.

10:25 25      Q.   That should make our time here a lot of

58

```
10:25  1   shorter.

10:25  2       A.   Good.

10:25  3       Q.   Are you offering an opinion on whether or

10:25  4   not the sales talk the investors received was a

10:25  5   component of the investment contract the Court in

10:25  6   Howey found exists?

10:25  7            MR. FIGEL:  Objection.

10:25  8       A.   The contracts speak for themselves; that

10:25  9   is, the contracts create obligations and duties.

10:25 10       Q.   But my question is, when determining

10:26 11   whether an investment contract exists, was the Court

10:26 12   just looking at the land sales and services contract

10:26 13   or was it looking also at the sales talk?

10:26 14            MR. FIGEL:  Objection.

10:26 15       A.   I assume the Court read the record.

10:26 16       Q.   Can I refer you now to your report, page 7,

10:26 17   paragraph 10.

10:26 18            I want to refer you to the first full

10:26 19   sentence on paragraph 7.

10:26 20       A.   Uh-huh.

10:27 21       Q.   Do you see -- what do you mean when you

10:27 22   write, In the commercial circumstances?

10:27 23            MR. FIGEL:  Objection.

10:27 24            That's not what it says.

10:27 25       A.   Yes.
```

59

10:27  1              It's -- it says what it says, if you have a

10:27  2   question about it.

10:27  3         Q.   That's what I tried to ask.  What did

10:27  4   you -- what did you mean when you write, In the

10:27  5   commercial circumstances?

10:27  6         A.   I didn't.  I wrote, The commercial context,

10:27  7   or -- in paren, or economic substance, closed paren.

10:27  8         Q.   I just want to make sure we're on -- this

10:27  9   is the top of page 7.

10:27 10         A.   Oh.

10:27 11              Well, I am -- you said paragraph 10.  Are

10:27 12   you referring to anything --

10:27 13         Q.   Yeah.  Paragraph 10 spills over from page 6

10:27 14   into page 7.  I apologize for not trying to get you

10:28 15   there.

10:28 16              Top of page 7, the first full sentence.

10:28 17         A.   Well, the first full sentence begins, The

10:28 18   two contracts in Howey considered together.

10:28 19              Is that the sentence you're --

10:28 20         Q.   Yes.  Yes, sir.  I'm asking you, when you

10:28 21   write, Considered together in the commercial

10:28 22   circumstances, what do you mean by "commercial

10:28 23   circumstances"?

10:28 24         A.   That they were selling orange groves.

10:28 25         Q.   Were the two contracts in Howey the only

                                                                60

10:28  1   factual basis for providing the investors the

10:28  2   prospect of an investment return?

10:28  3          MR. FIGEL:  Objection.

10:28  4      A.   If you're asking me what the investors were

10:28  5   thinking or what they relied upon, that's beyond the

10:28  6   scope of my report.

10:28  7      Q.   I'm asking you what they were told.

10:29  8          MR. FIGEL:  Objection.

10:29  9      A.   What they were told is in the record.

10:29  10     Q.   Right.  So my question is, is the only

10:29  11  factual -- so in Howey, the investors were led to

10:29  12  expect returns on their investment.  Correct?

10:29  13     A.   Yeah.  Everybody who makes an investment

10:29  14  anticipates a return.

10:29  15          I mean, they weren't doing it for nothing.

10:29  16     Q.   And what I'm asking is, the only factual

10:29  17  basis that the investors received to expect that

10:29  18  return, was it just the two contracts?

10:29  19          MR. FIGEL:  Objection.

10:29  20     A.   No.  The investors thought they were making

10:29  21  an investment in orange groves.  Whatever went into

10:29  22  that determination on the part of the investors is

10:29  23  what they considered.

10:29  24     Q.   But what was told them that would create an

10:30  25  expectation that they would profit?

61

10:30 1          MR. FIGEL:  Objection.

10:30 2     A.   I don't know what was told them.  But I

10:30 3  assume that they received a sales talk which would be

10:30 4  similar to the one in the record.

10:30 5     Q.   And in that sales talk, the investors were

10:30 6  told to expect profits from their investment?

10:30 7     A.   I think the investors were told that this

10:30 8  would be a good investment, which is what sellers

10:30 9  tell buyers.

10:31 10    Q.   Is it your understanding of Howey that one

10:31 11 requisite element to find an investment contract is

10:31 12 an expectation of profit by the investor?

10:31 13         MR. FIGEL:  Objection.

10:31 14    A.   If by "investment contract," you mean

10:31 15 something under the securities laws, I'm not

10:31 16 testifying to what elements add up to what a

10:31 17 securities law conclusion would be.

10:31 18    Q.   What provision of the land sales contract

10:31 19 or the services contract in Howey led investors to

10:31 20 expect substantial profits?

10:31 21         MR. FIGEL:  Objection.

10:31 22    A.   I don't know what led investors to expect

10:31 23 whatever the investors expected.

10:31 24    Q.   What from the land sales or the services

10:31 25 contract did the Supreme Court find gave investors an

                                                      62

10:32  1   expectation of substantial profit?

10:32  2        A.   I don't think the Supreme Court said that.

10:32  3   I think the Supreme Court said that the return

10:32  4   that -- that the inventors could not realize a return

10:32  5   except for -- or at least importantly, for the

10:32  6   efforts of the Howey Company.

10:32  7            MR. HANAUER:  Daphna, could we do

10:32  8   Exhibit 4.

10:32  9            THE WITNESS:  If we're going to talk about

10:32 10   this, I -- this would be good time for me to take a

10:32 11   break, if that would be okay.

10:32 12            MR. HANAUER:  Perfect.

10:32 13            THE VIDEOGRAPHER:  Going off the record.

10:32 14   The time is 10:34.

10:33 15            (A recess was taken from 10:34 to 10:48.)

10:47 16            THE VIDEOGRAPHER:  Going back on the

10:47 17   record.  The time is 10:48.

10:47 18        Q.   Professor Schwartz, do you have Exhibit 4

10:47 19   in front of you?

10:47 20        A.   I do.

10:47 21            (Supreme Court's Decision in Securities and

10:47 22            Exchange Commission v. W.J. Howey Co., et al.,

10:47 23            was marked Exhibit AS-4 for identification, as

10:47 24            of this date.)

10:47 25        Q.   And Exhibit 4, that's a copy of the Supreme

                                                              63

10:47  1    Court's decision in Howey that you reviewed?

10:47  2        A.   Yes.

10:47  3        Q.   I would like to refer you to the -- page 3

10:47  4    of the exhibit, the paragraph that starts with, 7

10:47  5    after 4 stars.

10:47  6             The one that begins, The purchasers, for

10:47  7    the most part, are nonresidents of Florida.

10:47  8        A.   Yes.

10:47  9        Q.   And then do you see a little bit further in

10:47 10    the paragraph, it says, they are attracted by the

10:47 11    expectation of substantial profits.  It was

10:47 12    represented, for example, that profits during the

10:47 13    1943-1944 season amounted to 20 percent and that even

10:48 14    greater profits might be expected during the 1944 to

10:48 15    1945 season?

10:48 16        A.   I do.

10:48 17        Q.   Were those representations about

10:48 18    substantial profits, were those contained in the land

10:48 19    sales contract?

10:48 20        A.   No.

10:48 21        Q.   Were they contained in the services

10:48 22    contract?

10:48 23        A.   No.

10:48 24        Q.   They were in the sales talk, though.

10:48 25        A.   Yes.

                                                          64

10:48  1       Q.   Did any of the contracts in Howey give the

10:48  2  buyer a right to share in the profits of any company?

10:48  3            MR. FIGEL:  Objection.

10:48  4       A.   Yeah.  I think they were entitled to share

10:48  5  in the profits from the sale of oranges.

10:49  6       Q.   Did any of the contracts give the buyer a

10:49  7  right to share in the profits of W.J. Howey Co. --

10:49  8  Company?

10:49  9       A.   No.

10:49 10       Q.   What about Howey-in-the-Hills Service,

10:49 11  Inc.?

10:49 12       A.   I don't think so.

10:49 13       Q.   Did any of the contracts in Howey give the

10:49 14  buyer voting rights in any company?

10:49 15       A.   No.

10:49 16       Q.   Did any of the contracts in Howey give the

10:49 17  buyer the rights to dividends for any company?

10:49 18            MR. FIGEL:  Objection.

10:49 19       A.   "Dividend" is a term of art.  If by

10:49 20  "dividends" you mean payouts a corporation makes to

10:49 21  shareholders, the answer would be no.

10:49 22       Q.   Are you offering an opinion on whether any

10:49 23  of Ripple's actions affected the value of XRP or

10:49 24  resulted in profits to XRP purchasers?

10:50 25       A.   No.

65

10:50  1      Q.   Are you offering any opinion whether

10:50  2   something affected or impacted the price of XRP?

10:50  3           MR. FIGEL:  Objection.

10:50  4      A.   No.

10:50  5      Q.   I'd like you to look at your report,

10:50  6   paragraph 11.

10:50  7      A.   Okay.

10:50  8      Q.   And do you see the sentence that says, I

10:50  9   was not able to identify a single contract that

10:50 10   included an express provision that obligated Ripple

10:50 11   to perform post-sale duties that could affect the

10:50 12   value of XRP or return profits to any person?

10:51 13      A.   Yes.

10:51 14      Q.   In your opinion, is an express provision

10:51 15   that obligates Ripple to perform post-sale duties

10:51 16   that could affect the value of XRP or return profits

10:51 17   to any person required to establish the existence of

10:51 18   an investment contract under the federal securities

10:51 19   laws?

10:51 20      A.   I have --

10:51 21           MR. FIGEL:  Objection.

10:51 22      A.   -- no opinion on what would or would not

10:51 23   constitute an investment contract under the

10:51 24   securities laws.

10:51 25      Q.   And I'm just -- if you bear with me, I'm

                                                          66

| | | |
|---|---|---|
| 10:51 | 1 | going to ask you a series of fairly similar questions |
| 10:51 | 2 | that hopefully will save us a very significant amount |
| 10:51 | 3 | of time. |
| 10:51 | 4 | Are you offering the opinion that the |
| 10:51 | 5 | presence of any contractual provision or type of |
| 10:51 | 6 | contractual provision is required to establish the |
| 10:51 | 7 | existence of an investment contract under the federal |
| 10:52 | 8 | securities laws? |
| 10:52 | 9 | A.   No. |
| 10:52 | 10 | MR. FIGEL:  Objection. |
| 10:52 | 11 | Q.   Are you offering the opinion that the |
| 10:52 | 12 | absence of any contractual provision or type of |
| 10:52 | 13 | contractual provision is required to establish the |
| 10:52 | 14 | existence of an investment contract under the federal |
| 10:52 | 15 | securities laws? |
| 10:52 | 16 | MR. FIGEL:  Objection. |
| 10:52 | 17 | A.   No. |
| 10:52 | 18 | Q.   Are you offering the opinion that the |
| 10:52 | 19 | presence of any combination of contractual provisions |
| 10:52 | 20 | is required to establish the existence of an |
| 10:52 | 21 | investment contract? |
| 10:52 | 22 | MR. FIGEL:  Objection. |
| 10:52 | 23 | A.   No. |
| 10:52 | 24 | Q.   Are you offering the opinion that the |
| 10:52 | 25 | presence of any combination of contractual provisions |

67

10:52  1    precludes the existence of an investment contract?

10:52  2          MR. FIGEL:  Objection.

10:52  3    A.   No.

10:52  4    Q.   Are you offering the opinion that the

10:52  5    presence of any contractual provision or type of

10:52  6    contractual provision precludes the existence of an

10:52  7    investment contract?

10:52  8          MR. FIGEL:  Objection.

10:52  9    A.   No.

10:52 10    Q.   Are you offering the opinion that the

10:52 11    absence of any contractual provision or type of

10:53 12    contractual provision precludes the existence of an

10:53 13    investment contract under the federal securities

10:53 14    laws?

10:53 15    A.   No.

10:53 16    Q.   Did Ripple sell XRP only to people who

10:53 17    intended to use XRP for non-investment purposes?

10:53 18          MR. FIGEL:  Objection.

10:53 19    A.   I don't know the answer to that question.

10:53 20          That is, I'm -- I'm saying that I don't

10:53 21    know what any particular buyers intended.

10:54 22    Q.   Did the contracts in Howey suggest an

10:54 23    intention to convey third-party rights?

10:54 24    A.   I don't recall any language in those

10:54 25    contracts that would support that conclusion.

68

10:54  1      Q.   In your report, you talk about Ripple's

10:54  2  business model.

10:54  3           Is that accurate?

10:54  4      A.   I don't recall where in my report I said

10:54  5  that, but if I --

10:54  6      Q.   Page 8.  The last full paragraph of -- the

10:54  7  last full sen -- I'm sorry.  Page 8, the last full

10:54  8  paragraph of paragraph 12.

10:54  9      A.   I see that.

10:54 10      Q.   So what is Ripple's business model?

10:54 11      A.   That they create and sell cryptocurrency to

10:55 12  buyers and -- that's the story.  They create it and

10:55 13  sell it.

10:55 14      Q.   So Ripple created XRP.

10:55 15      A.   Yeah, and they sell it.

10:55 16      Q.   Are you aware that the vast majority of

10:55 17  Ripple's revenues come from selling XRP?

10:55 18      A.   I don't know where their revenues come

10:55 19  from.

10:55 20      Q.   Well, you just said their business model

10:55 21  was selling XRP.

10:55 22      A.   What I said was that their business model

10:55 23  doesn't require them to be a member of a network.  In

10:55 24  a variety of industries, networks are requisite to

10:55 25  how the industry functions.  Ripple essentially

69

10:56  1    functions on its own.

10:56  2        Q.    You write in your report that, Ripple's

10:56  3    return does not depend on or confer any rights in a

10:56  4    third party.

10:56  5              Do you see that?

10:56  6        A.    I see it.

10:56  7        Q.    What do you mean by that?

10:56  8        A.    What I mean by that is so far as I can

10:56  9    tell, their return comes -- primarily comes from

10:56  10   selling XRP.

10:56  11       Q.    So when you say a third party, is someone

10:56  12   who purchases Ripple -- or is someone that purchases

10:56  13   XRP from Ripple a third party?

10:56  14       A.    No.

10:57  15       Q.    So, when you mean a third party, you mean

10:57  16   someone other than Ripple or the person or entity

10:57  17   that purchases XRP?

10:57  18       A.    There are industries in which there are

10:57  19   people in a network, or several parties get together

10:57  20   in a joint or common venture.  All I meant here was

10:57  21   that Ripple is just the maker and seller of a

10:57  22   product.

10:57  23       Q.    Are you offering an opinion whether

10:57  24   Ripple's products affected the price of XRP?

10:57  25       A.    No.

70

10:57  1          MS. PROSTKO:  Objection.

10:57  2      Q.   Are you offering an opinion on how the

10:57  3  liquidity of XRP affects its price?

10:57  4          MR. FIGEL:  Objection.

10:57  5      A.   I'm not offering an opinion on that.

10:58  6          MS. PROSTKO:  Sorry to interrupt,

10:58  7  interject.  I had an objection at the same time the

10:58  8  answer was being given to the question about the --

10:58  9  are you offering an opinion about whether Ripple's

10:58 10  efforts affected the price of XRP, and I don't see

10:58 11  that noted on the rough transcript.

10:58 12          MR. FIGEL:  57:52.

10:58 13      Q.   Are you offering an opinion on whether uses

10:58 14  other than trading for investment purposes existed

10:58 15  for XRP?

10:58 16          MR. FIGEL:  Objection.

10:58 17      A.   No, I don't think so.

10:58 18          If it's not in my report, I don't -- I'm

10:58 19  not offering an opinion on it.

10:58 20      Q.   Does your report rest on the assumption

10:58 21  that there were uses for XRP, other than trading for

10:59 22  investment purposes?

10:59 23          MR. FIGEL:  Objection.

10:59 24      A.   No.

10:59 25      Q.   Can you please look at paragraph 13 of your

                                                              71

10:59  1   report.

10:59  2           And then I want to refer you to the first

10:59  3   full sentence on page 9.

10:59  4       A.   Uh-huh.

10:59  5       Q.   It says, Rather, Ripple's promotional

10:59  6   actions are typical of the actions of most merchants

10:59  7   who are concerned with the aftermarket for the

10:59  8   products they sell?

10:59  9       A.   Yes.

10:59 10       Q.   What are Ripple's promotional actions that

10:59 11   you described?

11:00 12       A.   The ones I observed in the SI-- SEC's

11:00 13   complaint.

11:00 14       Q.   Anything else?

11:00 15       A.   No.

11:00 16       Q.   In forming your opinions, did you consider

11:00 17   how Ripple's promotional actions compare to the

11:00 18   promotional actions of firms offering and selling

11:00 19   securities to investors?

11:00 20       A.   No.

11:00 21       Q.   Do you see how, on page 9 of your report,

11:01 22   you reference De Beers, Rolex, and BMW?

11:01 23       A.   Yes.

11:01 24       Q.   Where did those examples come from?

11:01 25       A.   My knowledge of the world.

72

11:01  1     Q.   Did --

11:01  2     A.   Well, also, I own a Rolex and a BMW.

11:01  3         But I don't own any diamonds.

11:01  4     Q.   Did you come up with the De Beers example

11:01  5  on your own?

11:01  6     A.   Yes.

11:01  7     Q.   And if I told you that the example of

11:01  8  De Beers was listed in another expert report, would

11:01  9  you have any knowledge of that?

11:01 10     A.   No.

11:01 11     Q.   Does De Beers own and control the majority

11:01 12  of diamonds in existence?

11:01 13         MR. FIGEL:  Objection.

11:01 14     A.   I don't know De Beers' market share.

11:01 15     Q.   Do you have any reason to believe that

11:01 16  De Beers owns and controls the majority of diamonds

11:02 17  in existence?

11:02 18     A.   As I said, I don't know their market share.

11:02 19  I know that they control a lot of diamonds.

11:02 20     Q.   Does Rolex own and control the majority of

11:02 21  Rolex watches in existence?

11:02 22         MR. FIGEL:  Objection.

11:02 23     A.   Well, they don't control the aftermarket in

11:02 24  them.

11:02 25     Q.   And I guess that's my question, are there

73

11:02  1   more -- for using the Rolex example, are there more

11:02  2   Rolex sitting in Rolex's inventory or sitting in the

11:02  3   collection with people that purchase Rolexes?

11:02  4        MR. FIGEL:  Objection.

11:02  5     A.   I don't know the answer to that question.

11:02  6     Q.   And -- and it's the same question for

11:02  7   De Beers; who has more diamonds, De Beers in its

11:02  8   inventory, or all the other people in the world who

11:02  9   own diamonds put together?

11:02 10        MR. FIGEL:  Objection.

11:02 11     A.   As a matter of fact, I don't know the

11:03 12   relevant proportions.  People have been buying

11:03 13   diamonds for hundreds of years, so I would assume, if

11:03 14   I'm going to assume anything, that there are probably

11:03 15   more diamonds out there than the ones that De Beers

11:03 16   owns, but if you're asking me for a fact answer, I

11:03 17   don't know for a fact what any proportions are.

11:03 18     Q.   What -- what about for BMW?  Does BMW own

11:03 19   the majority of BMW cars in existence?

11:03 20        MR. FIGEL:  Objection.

11:03 21     A.   No.

11:03 22     Q.   Does Ripple own and control the majority of

11:03 23   XRP in existence?

11:03 24        MR. FIGEL:  Objection.

11:03 25     A.   I don't know the answer to that.

74

11:03  1         Q.    Are you familiar with the concept of
11:03  2    fiduciary duties owed by a company's management to
11:03  3    its owners?
11:03  4         A.    Yes.
11:03  5         Q.    Okay.   What does that concept mean to you?
11:03  6         A.    Well, if the owners are shareholders, the
11:03  7    manager's own duties of loyalty, care, and good faith
11:04  8    to the shareholders.
11:04  9              And those are fiduciary duties.
11:04 10         Q.    Did Ripple owe fiduciary duties to its
11:04 11    equity shareholders?
11:04 12              MR. FIGEL:   Objection.
11:04 13         A.    I don't know Ripple's corporate setup.   If
11:04 14    it was a corp-- a typical corporate setup, then the
11:04 15    answer would be yes, but I don't know for a fact what
11:04 16    their corporate setup is.
11:04 17         Q.    Do you know if Ripple has equity
11:04 18    shareholders?
11:04 19         A.    No.
11:04 20         Q.    Let's assume that Ripple did have or does
11:04 21    have equity shareholders.
11:04 22              If -- assuming that's the case, would
11:04 23    Ripple owe fiduciary duties to its equity
11:04 24    shareholders to increase the value of Ripple's
11:04 25    shares?

75

11:04  1          MR. FIGEL:  Objection.

11:04  2     A.   No.

11:05  3     Q.   Why do you say that?

11:05  4     A.   Well, you're asking me about fiduciary

11:05  5  duties.  The fiduciary duties are to manage

11:05  6  carefully, to avoid conflicts of interest, to make

11:05  7  appropriate disclosures.

11:05  8          Companies don't promise shareholders --

11:05  9  usually don't promise shareholders returns.

11:05 10     Q.   I'm not asking about the promise of

11:05 11  returns.  But does management have a fiduciary duty

11:05 12  to make good-faith efforts to increase the value of

11:05 13  the company?

11:05 14          MR. FIGEL:  Objection.

11:05 15     A.   No, they don't have a fiduciary duty as

11:05 16  fiduciary duties are technically defined in corporate

11:05 17  law.  They have a contractual obligation, implicit in

11:05 18  the share contract, to manage in the best interest of

11:06 19  their shareholders.

11:06 20          THE WITNESS:  Did anybody else hear that?

11:06 21  I hope so.

11:06 22     Q.   And the obligation of management to act in

11:06 23  the best interests of a company's shareholders, does

11:06 24  that include the obligation to increase the value of

11:06 25  the company's shares?

76

11:06  1          MR. FIGEL:  Objection.

11:06  2     A.   Managers want to maximize share value.

11:06  3     Q.   Does that include an obligation to use

11:06  4  good-faith efforts to grow the value of the company's

11:06  5  assets?

11:06  6          MR. FIGEL:  Objection.

11:06  7     A.   Those are legal terms.  I -- there's --

11:07  8  shareholder of a company doesn't have a right to any

11:07  9  particular level of effort on behalf of the managers.

11:07 10  That's why you write contracts with managers to

11:07 11  incentivize them.

11:07 12     Q.   And again, are you offering an opinion

11:07 13  about the expectations of any purchaser or holder of

11:07 14  XRP?

11:07 15     A.   No.

11:07 16     Q.   So going back to your report, paragraph 9,

11:08 17  do you see the sentence two-thirds of the way down

11:08 18  that begins, Ripple presumably also seeks to protect

11:08 19  the after-sale value of XRP for its own benefit?

11:08 20     A.   Paragraph?

11:08 21     Q.   Page 9.

11:08 22     A.   Oh, page 9.

11:08 23          MR. FIGEL:  Do you mind if I point it out

11:08 24  to him?

11:08 25          MR. HANAUER:  Yeah, of course.

77

11:08   1            MR. FIGEL:  Beginning with "Ripple."

11:08   2            THE WITNESS:  Yeah.

11:08   3            (Witness reviewing document.)

11:08   4       Q.   Did you have a chance to review that

11:08   5   sentence?

11:08   6       A.   Yes, I have.

11:08   7       Q.   What do you mean by, Protect the after-sale

11:08   8   value of XRP?

11:09   9       A.   That XRP would not fall materially in

11:09  10   value.

11:09  11       Q.   What steps did Ripple take to protect the

11:09  12   after-sale value of XRP?

11:09  13            MR. FIGEL:  Objection.

11:09  14       A.   I don't know.

11:09  15       Q.   You don't know?

11:09  16       A.   Well, other than what I read in the SEC

11:09  17   report, my language in -- my expert report uses the

11:09  18   word "presumably."

11:09  19       Q.   And why would Ripple take steps to protect

11:09  20   the after-sale value of XRP?

11:09  21            MR. FIGEL:  Objection.

11:09  22       A.   You could be asking me one of two

11:09  23   questions.  One question you can be asking me is,

11:09  24   What is the subjective intention of the people who

11:09  25   run Ripple?

78

11:09  1          I have no idea what that would be.

11:10  2          If you're asking me whether someone who

11:10  3   sells a product that has an aftermarket wants to

11:10  4   protect the aftermarket, the answer would be yes.

11:10  5      Q.   Why would Ripple presumably want to

11:10  6   protect -- strike that.

11:10  7          Why would Ripple want to prevent the price

11:10  8   of XRP from declining materially?

11:10  9          MR. FIGEL:  Objection.

11:10 10      A.   XRP -- because XRP is a cryptocurrency.  If

11:10 11   you have a currency, you don't want a currency to

11:10 12   fall in value.

11:10 13      Q.   What do you mean by, If you have a

11:10 14   currency?

11:10 15          MR. FIGEL:  Objection.

11:10 16      A.   If I'm selling someone a unit of currency,

11:11 17   which they may later use in transactions, I would

11:11 18   like, as the seller of the -- the initial seller,

11:11 19   to -- to see whether a buyer of XRP could actually

11:11 20   transact in it for the buyer's benefit.

11:11 21      Q.   And I believe you testified earlier that

11:11 22   Ripple's business model was selling XRP, right?

11:11 23      A.   Yes.

11:11 24          MR. FIGEL:  Objection.

11:11 25      Q.   And that's another reason why Ripple

                                                        79

11:11  1    doesn't want the price of XRP to decline materially,

11:11  2    is because Ripple generates revenues from selling

11:11  3    XRP.

11:11  4              MR. FIGEL:  Objection.

11:11  5        A.   No.  It's -- if my revenue depends on

11:11  6    selling apples, I don't really care what the

11:11  7    post-sale value of an apple is.

11:12  8              Ripple is selling a currency.  A currency

11:12  9    is something that people use to exchange for

11:12 10    something else.  So Ripple would have an interest in

11:12 11    having people buy their currency; that is, people

11:12 12    would only buy Ripple's currency if they thought that

11:12 13    they could use it as a currency.

11:12 14        Q.   Are you offering the opinion that XRP is a

11:12 15    currency?

11:12 16              MR. FIGEL:  Objection.

11:12 17        A.   No.  I'm offering -- what am I offering an

11:12 18    opinion on, if anything?

11:12 19              No.  I -- what I know is that Ripple sells

11:12 20    XRP and that XRP is used as a currency.

11:12 21        Q.   Are you offering any opinion as to whether

11:13 22    XRP should be legally classified as a currency?

11:13 23        A.   No.

11:13 24        Q.   Could a third party benefit from Ripple's

11:13 25    conduct even if that third party was not made a

                                                                80

11:13  1   beneficiary by virtue of a provision in any of

11:13  2   Ripple's contracts?

11:13  3          MR. FIGEL:  Objection.

11:13  4      A.   I think you'd have to make that question

11:13  5   more concrete.

11:13  6          I mean, I don't know what type of third

11:13  7   party you're talking about or what you mean by a

11:13  8   "benefit."

11:13  9      Q.   Well, you say in your report that you

11:13 10   couldn't find any provisions that would make a third

11:13 11   party a beneficiary of any of Ripple's contracts.

11:13 12   Right?

11:14 13      A.   I -- yes.

11:14 14      Q.   Are there ways that a third party could

11:14 15   benefit from Ripple's conduct, even if they weren't

11:14 16   described as a third-party beneficiary in any of

11:14 17   Ripple's contracts?

11:14 18          MR. FIGEL:  Objection.

11:14 19      A.   Well, if someone came to own Ripple and

11:14 20   Ripple increased in value, through any efforts of --

11:14 21   of -- if someone came to own XRP and XRP increased in

11:14 22   value, they would be happy about that.

11:14 23      Q.   Right.  So --

11:15 24      A.   They could own it through buying it, having

11:15 25   it be willed to them, giving it to them as a gift.

                                                        81

11:15  1      Q.   So hypothetical here:  Ripple sells XRP to

11:15  2  Party B.  There's nothing in the contract about any

11:15  3  other third party.  And then Ripple -- and then

11:15  4  Party B sells that same XRP to Party C.

11:15  5           If Ripple does something to create -- to

11:15  6  increase the value of XRP, does Party C benefit?

11:15  7           MR. FIGEL:  Objection.

11:15  8      A.   Yes.

11:15  9      Q.   Your report mentions the restatement of

11:15 10  contracts.

11:15 11      A.   Yes.

11:15 12      Q.   Does the restatement of contracts define

11:16 13  "investment contract" the same way as that term is

11:16 14  defined under the federal securities laws?

11:16 15      A.   I don't think the restatement mentions the

11:16 16  word "investment contract" or the concept.

11:16 17      Q.   Does the restatement of contracts govern

11:16 18  the determination of whether something is an

11:16 19  investment contract under the federal securities

11:16 20  laws?

11:16 21           MR. FIGEL:  Objection.

11:16 22      A.   No.

11:16 23      Q.   Did Ripple sell XRP to purchasers who

11:16 24  acquired it for investment purposes?

11:16 25           MR. FIGEL:  Objection.

                                                              82

11:17  1        A.    I don't know to whom Ripple sold XRP.

11:17  2        Q.    Well, you talk about it in your report.

11:17  3        A.    Well, I mean, they -- I know they sold XRP.

11:17  4  But if you're asking me what the purpose was of any

11:17  5  particular buyer, I don't know what that purpose

11:17  6  would have been.

11:17  7        Q.    Did any of the contracts you reviewed say

11:17  8  what the purpose of the -- of the XRP purchases were?

11:17  9        A.    Not that I recall.  But I do recall some

11:17 10  contracts explicitly saying that the buyer wasn't

11:17 11  purchasing XRP for an investment purpose.

11:17 12        Q.    When an issuer of securities sells

11:17 13  securities to an investor, does the title and risk of

11:17 14  loss typically pass to the investor?

11:17 15              MR. FIGEL:  Objection.

11:18 16        A.    I -- I don't think that would be a standard

11:18 17  term in a contract of the type you described.

11:18 18        Q.    I'm not -- independent of any contract, in

11:18 19  an IPO -- do you know what an IPO is?

11:18 20        A.    Yes.

11:18 21        Q.    When someone buys a company's securities in

11:18 22  an IPO, who assumes the title and risk of loss

11:18 23  associated with those securities?

11:18 24              MR. FIGEL:  Objection.

11:18 25        A.    The buyer.

                                                                83

11:18  1        Q.    Under what circumstances did the -- does

11:18  2   the seller of securities retain title and risk of

11:18  3   loss after the security has been sold to an investor?

11:18  4              MR. FIGEL:  Objection.

11:18  5        A.    I don't think there are any such

11:18  6   circumstances; but if there are any, I don't have

11:18  7   them in mind.

11:19  8        Q.    Can I ask you to look at paragraph 14 of

11:19  9   your report.

11:19 10              Do you see the sentence that says -- near

11:19 11   the middle, Rather than assume any post-sale

11:19 12   obligation to promote and increase the value of XRP,

11:20 13   the typical Ripple sales contract warns the customer

11:20 14   that the future value of XRP depends on the continued

11:20 15   willingness of market participants to engage fiat

11:20 16   currency for virtual currency?

11:20 17        A.    Yes.

11:20 18        Q.    How many contracts did you review that

11:20 19   contain that disclaimer?

11:20 20        A.    I don't know exactly, but I would say that

11:20 21   that's a standard term in just about all of the

11:20 22   direct sales contracts that I looked at.

11:20 23        Q.    How many of those did you look at?

11:20 24        A.    I think I've said before that I don't have

11:20 25   a precise number of the contracts I reviewed in each

                                                            84

11:20  1   category.

11:20  2        Q.   Then the next sentence, you write, The

11:21  3   service contracts in Howey set forth specific

11:21  4   contractually required value-affecting actions that

11:21  5   Howey had the unilateral ability to perform and that

11:21  6   were essential to enable the land purchaser to earn a

11:21  7   profit.

11:21  8             Why do you say that the Howey -- that the

11:21  9   Howey Company had the unilateral ability to harvest

11:21 10   and sell the oranges?

11:21 11        A.   Because the Supreme Court in the Howey case

11:21 12   said that a future of an investment contract was that

11:21 13   the investors' return depended -- and the

11:21 14   Supreme Court used the word "solely" -- on the

11:21 15   efforts of others.

11:21 16             And I wanted to -- so I -- that is my

11:21 17   interpretation of what the Supreme Court meant by

11:21 18   that, was that Howey had the ability to affect the

11:22 19   return in the way that the Supreme Court was

11:22 20   referring to.

11:22 21        Q.   Did the Howey Company have the unilateral

11:22 22   ability to harvest and sell the oranges?

11:22 23        A.   Under the service contract, I think they

11:22 24   were the only ones that could, because the buyers of

11:22 25   orange groves were precluded from entering onto the

85

11:22  1    land to harvest oranges themselves.

11:22  2         Q.   So it's your read of Howey that the

11:22  3    purchasers of the land sale contract were not

11:22  4    required to -- or did not have the ability to harvest

11:22  5    their own oranges?

11:22  6         A.   I don't think they had the ability to

11:22  7    harvest their own oranges.  I think they were

11:22  8    entitled to a share of the return from the oranges

11:22  9    that the Howey Company picked.

11:23 10         Q.   But I thought the Howey companies told the

11:23 11    investors that they were under no obligation to use

11:23 12    Howey's services.

11:23 13         A.   Howey told investors -- Howey -- well, let

11:23 14    me back up.

11:23 15              Howey sold investors orange groves.  They

11:23 16    offered the investors a service contract that would

11:23 17    go along with the orange groves.  It's my

11:23 18    recollection that about 85 percent of the buyers

11:23 19    purchased service contracts from Howey, and

11:23 20    15 percent of the buyers did not.

11:23 21         Q.   And is it your understanding that the

11:23 22    15 percent of the investors in Howey who didn't

11:23 23    purchase the service contracts were not allowed to

11:23 24    enter the orange groves they purchased or harvest the

11:23 25    crop?

                                                              86

11:24  1      A.    I think I recall language -- but I can't be

11:24  2  very precise about this -- that the service contracts

11:24  3  Howey offered were typical of service contracts

11:24  4  offered in the industry.

11:24  5      Q.    Were there factors in Howey, beyond the

11:24  6  unilateral control of the Howey companies, that could

11:24  7  have affected the investors' actual profits or

11:24  8  expectations of profits?

11:24  9            MR. FIGEL:  Objection.

11:24 10      A.    I don't know anything that the Howey

11:24 11  Company did with respect to the value of oranges.

11:24 12      Q.    Well, we know, from the Supreme Court's

11:24 13  decision, that Howey led the investors to expect

11:24 14  profits.  Right?

11:25 15            MR. FIGEL:  Objection.

11:25 16      A.    We know that Howey said that if the future

11:25 17  was like the past, you would make money.

11:25 18      Q.    And part of the expectation of profits in

11:25 19  Howey came from the efforts of the Howey companies.

11:25 20  Right?

11:25 21      A.    Well, if the Howey Company didn't expend

11:25 22  any efforts under the service contracts, there

11:25 23  wouldn't have been any profits because there wouldn't

11:25 24  have been any oranges.

11:25 25      Q.    Were there factors other than the actions

87

11:25  1   of the Howey companies that could have affected the

11:25  2   investors' profits?

11:25  3           MR. FIGEL:  Objection.

11:25  4       A.   Yeah, there's a market in oranges.

11:25  5       Q.   So like if there's a deep freeze in

11:25  6   Florida, that could affect the investor's profits.

11:25  7       A.   Yeah.

11:25  8           Yeah, as I said, there's a market in

11:25  9   oranges.  That price of oranges is, I think, set by

11:26 10   supply and demand.

11:26 11       Q.   And so the factors affecting supply and

11:26 12   demand could affect the price -- or could affect the

11:26 13   Howey's investors' returns independent of the efforts

11:26 14   of the Howey companies?

11:26 15           MR. FIGEL:  Objection.

11:26 16       A.   I would put it this way:  The efforts of

11:26 17   the Howey companies were necessary for the investors

11:26 18   to receive a return but not sufficient.

11:26 19       Q.   And even if the Howey companies took all

11:26 20   the necessary steps to generate profits for the

11:26 21   investors, there were things outside Howey's control

11:26 22   that could have affected the -- the return to the

11:26 23   investors?

11:27 24           MR. FIGEL:  Objection.

11:27 25       A.   I mean, I'm not an expert in the oranges

88

11:27  1  industry so I'm -- I can't really be -- you know,

11:27  2  give any testimony about how that industry works.

11:27  3          I do know that there's a market in oranges

11:27  4  and that the price is set by supply and demand, and

11:27  5  so any one buyer or seller probably couldn't affect

11:27  6  the price by anything it did, but -- but I don't have

11:27  7  personal knowledge of that industry, so it wouldn't

11:27  8  shock me if some industry expert contradicted what I

11:27  9  just said.

11:27 10      Q.    Is it a -- a common feature of commercial

11:27 11  enterprises that external factors beyond the control

11:27 12  of management can affect the profits of the

11:27 13  enterprise and its investors?

11:27 14      A.    It depends on the enterprise.

11:27 15      Q.    What enter-- commercial enterprises are

11:28 16  immune from external factors beyond the control of

11:28 17  management affecting the company's profits?

11:28 18          MR. FIGEL:  Objection.

11:28 19      A.    No one's immune from the world, but you

11:28 20  have a lot more control over what goes on if you're a

11:28 21  monopolist than if you're working in a competitive

11:28 22  market.  So as I said, it would depend on industry

11:28 23  structure and other things.

11:28 24      Q.    Your report talks about how New York or

11:28 25  Delaware law governs many of the Ripple contracts?

89

11:28  1    A.   Yes.

11:28  2    Q.   How many of the contracts described in

11:28  3  your -- documented in your report are governed by

11:29  4  New York and Delaware law?

11:29  5    A.   I don't know the precise number, but I

11:29  6  think a majority of them are.

11:29  7    Q.   How many of the contracts are governed by

11:29  8  California law?

11:29  9    A.   There are some, but it's my recollection

11:29 10  that that would be a relatively small fraction of the

11:29 11  full universe.

11:29 12    Q.   How many of the 1700 contracts identified

11:29 13  in your report are governed by a jurisdiction that

11:29 14  takes a different approach to the Four Corners Rule?

11:29 15         MR. FIGEL:  Objection.

11:29 16    A.   I don't know the number, but the California

11:29 17  contracts would definitely be one of those

11:29 18  jurisdictions.

11:30 19    Q.   What is the California approach to the

11:30 20  interpretation of integration clauses?

11:30 21         MR. FIGEL:  Objection.

11:30 22    A.   The California approach is that an

11:30 23  integration clause is evidence of the parties'

11:30 24  intention to make the contract the complete statement

11:30 25  of the rights and duties of the parties, but because

90

11:30  1   it is just evidence, it could be rebutted by other

11:30  2   evidence.

11:30  3       Q.   In this case, does the presence of an

11:30  4   integration clause in any of Ripple's contracts

11:30  5   preclude the court from considering representations

11:31  6   made outside the four corners of Ripple's contracts?

11:31  7       A.   If there is a merger or integration clause,

11:31  8   and you are in a jurisdiction such as New York or

11:31  9   jurisdictions that follow New York, a court would not

11:31 10   consider extracontractual representations when the

11:31 11   court is engaged on deciding what the contract --

11:31 12   what obligations the contract creates.

11:31 13       Q.   What about in an SEC enforcement action

11:31 14   alleging violations of the federal securities laws?

11:31 15       A.   I have --

11:31 16           MR. FIGEL:  Objection.

11:31 17       A.   I have no opinion on what a court would do

11:31 18   in that circumstance.

11:32 19       Q.   You write in your report that statutory

11:32 20   interpretation is within your field of expertise?

11:32 21       A.   Yes.

11:32 22       Q.   Is that the case?

11:32 23       A.   Well, I'm claiming it.

11:32 24       Q.   Is the interpretation of a statute

11:32 25   typically a legal question for the court to decide?

91

11:32  1        A.    Yes.

11:32  2        Q.    Are you opining that any statute at issue

11:32  3   in this case is ambiguous?

11:32  4              MR. FIGEL:   Objection.

11:32  5        A.    No.

11:33  6        Q.    Could you go to paragraph 16 of your

11:33  7   report.

11:33  8              So I want to refer you to the last word on

11:33  9   page 11, and then that sentence continuing on to

11:33 10   page 12.

11:33 11        A.    Uh-huh.

11:33 12        Q.    You write, Thus, under the standard

11:33 13   interpretive canon, the meaning of the word

11:33 14   "contract" in the statutory phrase "investment

11:33 15   contract" would be its common law meaning?

11:33 16        A.    Yes.

11:33 17        Q.    Does the Supreme Court say that in Howey?

11:33 18        A.    No.   The Supreme Court says that the

11:33 19   statute did not define the phrase "investment

11:33 20   contract," but it did not reach the question that I'm

11:34 21   talking about in my report.

11:34 22        Q.    Can an investment contract be established

11:34 23   by a scheme or transaction?

11:34 24              MR. FIGEL:   Objection.

11:34 25        A.    I -- I'm not a securities law expert.

                                                               92

11:34  1      Q.   The determination of whether Ripple's

11:34  2  offers and sales of XRP, whether those offers and

11:34  3  sales violate the federal securities laws, is that

11:34  4  determination governed by the common law of contracts

11:34  5  or the federal securities laws?

11:34  6          MR. FIGEL:  Objection.

11:34  7      A.   That would be determined by the federal

11:34  8  securities laws.

11:35  9      Q.   So do you see paragraph 17 of your report,

11:35 10  the last sentence.

11:35 11          It says, It would follow that the contracts

11:35 12  Ripple uses to market XRP are distinguishable from

11:35 13  the contracts Howey used to market citrus groves?

11:35 14      A.   Yes.

11:35 15      Q.   In forming your opinions, did you consider

11:35 16  whether Ripple's representations on its website and

11:35 17  its social media posts are distinguishable or similar

11:36 18  to the sales talk from Howey?

11:36 19          MR. FIGEL:  Objection.

11:36 20      A.   No.

11:36 21      Q.   Will you be offering any such opinion?

11:36 22      A.   No.

11:36 23      Q.   Will you be offering an opinion on whether

11:36 24  any of Ripple's contracts are distinguishable from

11:36 25  any contract in any court case applying the Howey

93

11:36 1    decision?

11:36 2         A.   If I'm -- if I'm shown such a case and

11:36 3    asked for my views, I would give them.

11:36 4              But in the absence of being shown such a

11:36 5    case, I have no intention of giving any such opinion.

11:36 6         Q.   So when you considered a particular

11:37 7    contract, a particular Ripple contract, did you

11:37 8    examine all of the contracts between Ripple and its

11:37 9    counterparty that governed their commercial

11:37 10   relationship?

11:37 11             MR. FIGEL:  Objection.

11:37 12        A.   I'm not sure I understand that question.

11:37 13   If -- if -- if it -- if the question is did I read

11:37 14   every word in each of these contracts, I've testified

11:37 15   to that before.

11:37 16        Q.   And the answer's no?

11:37 17        A.   And the answer would be no.

11:37 18             Is there -- if you're asking me a different

11:37 19   question, I'm not quite sure I understand what that

11:37 20   would be.

11:37 21        Q.   And I'm sorry, because it is a different

11:37 22   question.

11:37 23             So when you were considering any specific

11:37 24   contract or -- that you discuss in your report, did

11:37 25   you examine all of the contracts between Ripple and

94

11:37  1    its counterparty governing their commercial

11:37  2    relationship or just the specific contract you

11:37  3    discussed in your report?

11:38  4         A.   Once again, I'm a little bit confused.

11:38  5    When I -- when I looked at the contracts referred to

11:38  6    in my report, or other ones, I was asking what the

11:38  7    legal relationship -- what the relationship was that

11:38  8    the contract created.

11:38  9         Q.   Right.  So -- well, let's assume that

11:38  10   Ripple -- well, so let's use the example of the

11:38  11   direct sales contract.

11:38  12              For a direct sales contract between Ripple

11:38  13   and its counterparty, how do you know that that sales

11:38  14   contract was the only contract governing the

11:38  15   commercial relationship between Ripple and its

11:38  16   counterparty?

11:38  17        A.   I don't know that.

11:39  18        Q.   So talking about the direct sales

11:39  19   contracts, are you offering an opinion on how

11:39  20   Ripple's direct sales of XRP were similar or

11:39  21   different than an IPO?

11:39  22        A.   No.

11:39  23        Q.   What about a secondary offering?

11:39  24        A.   In an IPO, you're selling securities.  A

11:39  25   security is a contract between the holder and the

95

```
11:40  1   firm.
11:40  2           Ripple is selling a thing; that is, an item
11:40  3   of cryptocurrency, not a contract.
11:40  4           So there would be a major difference, if
11:40  5   I'm -- between selling a contract and selling a
11:40  6   thing.
11:40  7       Q.  Isn't that the ultimate legal dispute in
11:40  8   this case?
11:40  9           MR. FIGEL:  Objection.
11:40 10       A.  No, I don't think so.  You asked me whether
11:40 11   there was a similarity.  I said Ripple was selling an
11:40 12   item of currency.  In an IPO, you're selling
11:40 13   something different.
11:40 14       Q.  So you're opining that what Ripple sold was
11:40 15   not a security?
11:40 16           MR. FIGEL:  Objection.
11:40 17       A.  No.
11:40 18           No, I'm not opining that at all.
11:40 19       Q.  I think just said in an IPO, they sell
11:40 20   securities; in Ripple's case, they sell something
11:40 21   else.
11:40 22       A.  No.  In an IPO, you're selling a contract,
11:41 23   like a share of stock.  If you're selling an item of
11:41 24   cryptocurrency, that's sold under a contract.  It
11:41 25   isn't a contract.
```

96

11:41  1       Q.   In an IPO, can the issuer sell securities

11:41  2  directly to a counterparty for the counterparty's own

11:41  3  use?

11:41  4            MR. FIGEL:  Objection.

11:41  5       A.   I'm not an expert in that.

11:41  6       Q.   In a public or private securities offering,

11:41  7  can the issuer and its counterparty execute a single

11:41  8  master agreement containing the terms that would

11:41  9  apply to all subsequent sales of the issuer's

11:41 10  securities to the counterparty?

11:41 11            MR. FIGEL:  Objection.

11:42 12       A.   I'm not an expert in securities.  I do know

11:42 13  that companies that issue stock hold back stock that

11:42 14  they may later issue.  And if they later issue stock,

11:42 15  it would be under the same terms as the earlier

11:42 16  issue.

11:42 17            But I don't have an opinion on anything

11:42 18  else about that.

11:42 19       Q.   Can the issuer of securities agree to

11:42 20  exchange a defined quantity of securities with a

11:42 21  counterparty for a defined quantity of U.S. dollars?

11:42 22            MR. FIGEL:  Objection.

11:42 23       A.   I don't have an opinion on that.

11:42 24       Q.   Are you familiar with the term

11:43 25  "underwriter"?

97

11:43  1          A.    Yes.

11:43  2          Q.    And what's your understanding of the term

11:43  3    "underwriter"?

11:43  4          A.    Underwriter is an intermediary between the

11:43  5    company and an ultimate purchaser.

11:43  6          Q.    Are you offering an opinion -- I want to

11:43  7    ask you about the wholesale sales contracts you talk

11:43  8    about in your report.

11:43  9                Are you offering an opinion on whether the

11:43 10    wholesale sales contracts are different or similar

11:43 11    than underwriter contracts in a securities offering?

11:43 12                MR. FIGEL:  Objection.

11:43 13          A.    No, I'm not offering an opinion on that.

11:43 14          Q.    In a securities offering, can the issuer of

11:43 15    the securities sell securities to an underwriter

11:43 16    whose stated intent is to sell those securities to an

11:43 17    ultimate third-party purchaser in a transaction to

11:44 18    which the issuer is not a party?

11:44 19                MR. FIGEL:  Objection.

11:44 20          A.    I think the answer is "yes" to that.

11:44 21          Q.    Are you offering an opinion on whether the

11:44 22    wholesale sales contracts are different or similar

11:44 23    than broker-dealer contracts in a securities

11:44 24    offering?

11:44 25                MR. FIGEL:  Objection.

                                                              98

11:44  1      A.   No.

11:44  2           THE COURT REPORTER:  If you answered, I'm

11:44  3  sorry; I didn't hear it.

11:44  4      A.   No.

11:45  5      Q.   Can you look at paragraph 27, please, of

11:45  6  your report.

11:45  7           And you write about -- in the second full

11:45  8  sentence, you write about the wholesale sales orders.

11:45  9           The counterparty would expressly represent

11:45 10  and warrant that it was not purchasing XRP for any

11:45 11  investment purpose.

11:45 12           Do you see that?

11:45 13      A.   Yes.

11:45 14      Q.   Did the direct sales contracts have a

11:45 15  similar representation on the part of the purchaser?

11:45 16      A.   I don't think so.

11:46 17           But I have to check.

11:46 18           (Witness reviewing document.)

11:47 19      Q.   Can I continue?

11:47 20      A.   What?

11:47 21      Q.   May I continue?

11:47 22      A.   Yes.

11:47 23      Q.   I'm sorry.  I thought you were still --

11:47 24      A.   No, no.

11:47 25      Q.   Do you know whether or not the wholesale

                                                              99

11:47  1    contract counterparties marketed their XRP to third

11:47  2    parties for investment purposes?

11:47  3         A.   No.

11:47  4         Q.   Do you have any understanding of how the

11:47  5    wholesale contract counterparties marketed the XRP

11:47  6    they sold to third parties?

11:47  7              MR. FIGEL:  Objection.

11:47  8         A.   I have no direct knowledge of that.

11:48  9         Q.   You write in your report that the wholesale

11:48 10    sales contracts were only executed between

11:48 11    February 2013 and March 2016.

11:48 12         A.   Yes.

11:48 13         Q.   During that period of time, what uses

11:48 14    beyond investment purposes existed for XRP?

11:48 15              MR. FIGEL:  Objection.

11:48 16         A.   I don't know.

11:48 17         Q.   Do you know when Ripple's cross-border

11:48 18    payment software became commercially functional?

11:48 19              MR. FIGEL:  Objection.

11:48 20         A.   I don't know the date of that.

11:49 21         Q.   For the wholesale contracts, does it make

11:49 22    commercial sense for Ripple's counterparty to

11:49 23    purchase the XRP from Ripple if the counterparty does

11:49 24    not believe it can sell that XRP to a third party for

11:49 25    a higher price?

                                                              100

11:49  1          MR. FIGEL:  Objection.

11:49  2      A.   It's a wholesale contract in which the

11:49  3  buyer pays.  It would be irrational for the buyer to

11:49  4  believe that they couldn't resell for more than they

11:49  5  bought it for.

11:49  6      Q.   And in paragraph 28 of your report, do you

11:50  7  see how you discuss purchase letters of intent, where

11:50  8  Ripple would pay the counterparty a commission of

11:50  9  ██ to ██ percent of the XRP the counterparty sold?

11:50 10      A.   Yes.

11:50 11      Q.   By earning that commission, is Ripple's

11:50 12  counterparty -- is Ripple's counterparty profiting

11:50 13  off its XRP purchases?

11:50 14          MR. FIGEL:  Objection.

11:50 15      A.   I think that's a -- that's an ambiguous

11:50 16  question.

11:50 17          The counterparty is providing a service,

11:50 18  and its being paid a commission.  Whether the

11:50 19  counterparty's business is profitable or not, I have

11:50 20  no idea.

11:51 21      Q.   The counterparty's generating revenues

11:51 22  based on that commission, correct?

11:51 23          MR. FIGEL:  Objection.

11:51 24      A.   Well, yeah, the counterparty gets a

11:51 25  commission on sales, so it has to have sales.

101

11:51  1      Q.   And by paying those commissions, are

11:51  2  Ripple's efforts a cause of the counterparty's

11:51  3  revenues?

11:51  4           MR. FIGEL:  Objection.

11:51  5      A.   No.  The counterparty's revenues depend on

11:51  6  the market for XRP, which is a function of a whole

11:51  7  variety of factors that would affect price and

11:51  8  demand.  Ripple is just, as I said, buying services

11:51  9  and paying a commission.

11:52 10      Q.   Do you see how you discuss the -- the

11:52 11  contracts described in paragraph 28 required Ripple's

11:52 12  counterparty to sell XRP to third parties at or above

11:52 13  market price?

11:52 14           MR. FIGEL:  Objection.

11:52 15      A.   Yes, I see that.

11:52 16      Q.   Are you offering an opinion on whether that

11:52 17  requirement impacts the price of XRP?

11:52 18      A.   No.

11:52 19      Q.   Paragraph 29, you talk about the UCC.

11:52 20           Is that right?

11:52 21      A.   Yes.

11:53 22      Q.   Are you offering an opinion in this case

11:53 23  whether UCC Article 2 applies to the sales of XRP?

11:53 24      A.   No.

11:53 25      Q.   Are you offering an opinion whether any

102

11:53  1    part of the UCC applies to sales of XRP?

11:53  2             MR. FIGEL:  Objection.

11:53  3        A.   No.

11:53  4        Q.   Does the UCC -- the UCC, that's the Uniform

11:53  5    Commercial Code?

11:53  6        A.   Yes.

11:53  7        Q.   Does the UCC contain a provision regarding

11:53  8    the sales of securities?

11:53  9        A.   I think Article 8 contains -- regulates

11:53 10    security transactions.

11:53 11        Q.   Is the UCC's definition of "securities" the

11:53 12    same as the definition of "securities" under the

11:53 13    federal securities laws?

11:53 14        A.   I don't recall what Article 8 provides.

11:53 15        Q.   In a lawsuit alleging violations of the

11:53 16    federal securities laws, if there's a dispute between

11:53 17    the UCC and the federal securities laws, which one

11:54 18    controls?

11:54 19             MR. FIGEL:  Objection.

11:54 20        A.   The federal securities laws.

11:54 21        Q.   In this lawsuit, does the Court look to the

11:54 22    UCC or the federal securities laws to determine if

11:54 23    Ripple's XRP offers and sales involve securities?

11:54 24             MR. FIGEL:  Objection.

11:54 25        A.   The Court is going to look to whatever it

                                                              103

11:54  1  thinks is relevant.

11:54  2      Q.   Are you offering an opinion whether the

11:54  3  Court should look to the UCC or the federal

11:54  4  securities laws?

11:54  5      A.   No.

11:54  6      Q.   Is it a legal defense to an SEC enforcement

11:54  7  action that the financial instrument at issue does

11:54  8  not meet the UCC definition of a security?

11:54  9           MR. FIGEL:  Objection.

11:55 10      A.   I don't know the precise answer to that

11:55 11  question, but I would doubt it.

11:55 12      Q.   And do you see on paragraph 29, you list a

11:55 13  variety of terms that the Ripple sales contracts

11:55 14  typically contain?

11:55 15      A.   Yes.

11:55 16      Q.   Are you offering an opinion whether these

11:55 17  terms are also present in contracts for the sales of

11:55 18  securities in public or private offerings?

11:55 19           MR. FIGEL:  Objection.

11:55 20      A.   No.

11:56 21      Q.   And then do you see, in paragraph 30, there

11:56 22  are a list of bullet points, that -- of types of

11:56 23  provisions that you say that the sales contracts

11:56 24  don't have?

11:56 25      A.   Yes.

                                                      104

11:56  1  Q. All things being equal, would the presence

11:56  2 of any of these provisions make a contract more or

11:56  3 less likely to be an investment contract under the

11:56  4 federal securities laws?

11:56  5   MR. FIGEL:  Objection.

11:56  6  A. I don't have an opinion on that.

11:56  7  Q. You see in paragraph 32, you talk about

11:56  8 programmatic sales contracts?

11:56  9  A. Yes.

11:56 10  Q. Are you offering an opinion on how the

11:57 11 programmatic contracts are similar or different to

11:57 12 underwriter contracts in a securities offering?

11:57 13  A. No.

11:57 14   MR. FIGEL:  Objection.

11:57 15  A. No, I'm not.

11:57 16  Q. Are you offering an opinion on how the

11:57 17 programmatic contracts are similar or different to

11:57 18 broker-dealer contracts in a securities offering?

11:57 19   MR. FIGEL:  Objection.

11:57 20  A. No.

11:57 21  Q. For the programmatic sales contracts, does

11:57 22 it make commercial sense for Ripple's counterparty to

11:57 23 purchase XRP from Ripple if it does not believe it

11:57 24 can sell that XRP to a third party for a higher

11:57 25 price?

105

```
11:57  1            MR. FIGEL:  Objection.

11:57  2       A.   I think there's a problem with your

11:57  3  question because in these agreements, they're not

11:58  4  selling XRP, they're just transferring it.

11:58  5       Q.   Do you see, in paragraph 33, how you say

11:58  6  that the programmatic sales contracts are consignment

11:58  7  contracts?

11:58  8       A.   I said in substance they're consignment

11:58  9  contracts.  Consignment agreements.

11:58 10       Q.   Are you offering an opinion on whether an

11:58 11  underwriter contract in a securities offering is a

11:58 12  consignment contract?

11:58 13       A.   No.

11:58 14            MR. FIGEL:  Objection.

11:58 15       Q.   Do you have an opinion on that?

11:58 16       A.   No.

11:58 17       Q.   Are you offering an opinion on whether a

11:59 18  broker-dealer contract in a securities offering is a

11:59 19  consignment contract?

11:59 20       A.   No.

11:59 21            MR. FIGEL:  Objection.

11:59 22            MR. HANAUER:  We're at noon, and we've been

11:59 23  going an hour and 15, I think.  I just want to check

11:59 24  to make sure you're okay.

11:59 25            THE WITNESS:  I could take a break.  When
```

106

```
11:59  1   will we break for lunch?
11:59  2          MR. HANAUER:  Let's go off the record.
11:59  3          THE VIDEOGRAPHER:  We're off the record.
11:59  4   The time is 12:00 p.m.
11:59  5          (Discussion off the record.)
12:00  6          (A recess was taken from 12:00 noon to
12:00  7      12:13.)
12:11  8          THE VIDEOGRAPHER:  Going back on the
12:11  9   record, the time is 12:13.
12:11 10          MR. FIGEL:  Mr. Hanauer, before you begin,
12:11 11   could I just memorialize a -- an agreement we just
12:11 12   reached, which is that the normal practice, which is
12:11 13   an objection by one counsel, can serve to preserve
12:12 14   the objections of all parties?
12:12 15          MR. HANAUER:  So stipulated.
12:12 16          MR. FIGEL:  Thank you.
12:12 17      Q.  So, Professor Schwartz, your report talks
12:12 18   about various market maker contracts.
12:12 19      A.  Let me --
12:12 20      Q.  In paragraph 38 of your report.
12:12 21      A.  Yes.
12:12 22      Q.  Are you offering an opinion whether or not
12:12 23   the securities -- strike that.
12:12 24          Are you offering an opinion whether the
12:12 25   issuer of securities is permitted to offer
```

107

12:12 1    consideration to a market maker in exchange for the

12:13 2    market maker making a market in the issuer's

12:13 3    securities?

12:13 4        A.    No.

12:13 5        Q.    Are you offering an opinion whether the

12:13 6    issuer of securities is allowed to contract with a

12:13 7    market maker in a way that allows the issuer to set

12:13 8    terms for the market maker's sales of the issuer's

12:13 9    securities?

12:13 10       A.    No.

12:13 11       Q.    Do you see, in paragraph 39, you talk about

12:13 12   the product incentive contracts?

12:13 13       A.    Uh-huh.  Yes.

12:14 14       Q.    And I believe you talk about -- or are you

12:14 15   familiar with Ripple's On-Demand Liquidity product or

12:14 16   xRapid product?

12:14 17       A.    I know what it is.

12:14 18       Q.    And I believe that you classified contracts

12:14 19   related to that product as both product incentive

12:14 20   contract and master-hosted services contracts?

12:14 21       A.    Yes.

12:14 22       Q.    Are you aware that Ripple's On-Demand

12:14 23   Liquidity and xRapid contracts provided that Ripple

12:14 24   would pay incentives and rebates to the counterparty

12:14 25   for using On-Demand Liquidity or xRapid?

108

```
12:14   1              MR. FIGEL:  Objection.
12:14   2       A.   I am aware of contracts in which Ripple
12:14   3  made such agreements.
12:15   4       Q.   Are you aware that On-Demand Liquidity or
12:15   5  xRapid required Ripple's counterparty to purchase XRP
12:15   6  in order to transfer currency using Ripple's
12:15   7  software?
12:15   8              MR. FIGEL:  Objection.
12:15   9       A.   Will you repeat that question, please?  I'm
12:15  10  not sure I -- I followed the entire question.
12:15  11              (The record was read back.)
12:15  12       A.   I'm not aware of that.
12:15  13       Q.   And do you -- going to paragraph 46.
12:16  14              I think -- do you see how you talk about
12:16  15  the last sentence, Ripple also agreed to pay
12:16  16  MoneyGram certain market development fees and bonuses
12:16  17  in XRP if the transactions executed on Ripple's
12:16  18  platform exceeded specified volume thresholds?
12:16  19       A.   Yes.
12:16  20       Q.   Did those bonus provisions incentivize
12:17  21  MoneyGram to increase the volume of its XRP
12:17  22  transactions using Ripple's software product?
12:17  23              MR. FIGEL:  Objection.
12:17  24       A.   I don't know what "incentivize
12:17  25  MoneyGram" -- I mean, but those payments essentially
```

                                                                109

12:17  1    were linked to volume so the more the -- the larger

12:17  2    the dollar volume of transactions MoneyGram made

12:17  3    through the ODL platform, the greater the bonus

12:17  4    payment.

12:17  5         Q.   Do you have an opinion on how MoneyGram

12:17  6    increasing the volume of its XRP transactions would

12:17  7    impact XRP's price?

12:17  8              MR. FIGEL:  Objection.

12:17  9         A.   No.

12:17 10         Q.   Are you offering an opinion whether ODL or

12:17 11    xRapid would be commercially viable for its users if

12:17 12    not for the rebates and incentives paid by Ripple?

12:18 13         A.   I have no opinion on that.

12:18 14         Q.   Can you go to -- so do you see on

12:18 15    paragraph 35 of your report.

12:18 16              You list five bullet points for the type of

12:18 17    provisions you say are absent from the programmatic

12:18 18    contracts?

12:18 19         A.   Yes.

12:18 20         Q.   And then compare that with paragraph 42.

12:19 21              There are three bullet points for

12:19 22    provisions you say are absent from the service

12:19 23    contracts.

12:19 24              Do you see that?

12:19 25         A.   Yup.

110

12:19 1      Q.   And so one of the bullet points that's in

12:19 2  paragraph 35, but not paragraph 42, is a provision

12:19 3  that creates an ongoing obligation owed by Ripple to

12:19 4  the counterparty with respect to any tran-- XRP

12:19 5  transfer pursuant to the contract?

12:19 6      A.   Yes.

12:19 7      Q.   So I take it from the absence of a bullet

12:19 8  point like that in paragraph 42, did you find such

12:20 9  provisions in the services contracts?

12:20 10     A.   I did not.

12:20 11     Q.   Then -- if that's the case, then why did

12:20 12 you not include that bullet point in paragraph 42?

12:20 13     A.   The -- they were different kinds of

12:20 14 contracts.  In the programmatic contracts, you're --

12:20 15 XRP was transferred, so -- so it could be -- it could

12:20 16 conceivably be possible if there would be some

12:20 17 obligation with respect to what was transferred.

12:20 18 But -- essentially transferred for resale.  So I

12:20 19 found no such provisions, so I said so.

12:20 20          Services contracts were a different kind of

12:21 21 agreement.

12:21 22     Q.   What about the bullet point from

12:21 23 paragraph 35, you -- provisions that impose on Ripple

12:21 24 any fiduciary or similar duty owed to the

12:21 25 counterparty?

111

12:21 1          Were there provisions like that in the

12:21 2  services contract?

12:21 3      A.   No.

12:21 4      Q.   So if -- in paragraph 35, and in other

12:21 5  paragraphs of your report, you're listing all these

12:21 6  types of provisions that are not in the contracts.

12:21 7  Right?

12:21 8      A.   Right.

12:21 9      Q.   And you're doing the same thing with

12:21 10 paragraph 42.  Right?  The same type of exercise,

12:21 11 listing provisions that are not in the contract?

12:21 12     A.   Yes.

12:21 13     Q.   So what should we infer from the fact that

12:21 14 for some types of contracts, there are only -- you

12:22 15 only identify three types of provisions missing, but

12:22 16 for other types, of contracts, you identify four or

12:22 17 five types of provisions missing?

12:22 18     A.   It's a question of the --

12:22 19          MR. FIGEL:  Objection.

12:22 20          You can answer.

12:22 21          THE WITNESS:  Should I --

12:22 22          MR. FIGEL:  Yes, yeah, I just made the

12:22 23 record.

12:22 24     A.   It's a function of the kind of contract it

12:22 25 is.  So, for example, if I'm buying services, I can't

                                                          112

12:22  1    possibly own a fiduciary obligation to the seller so

12:22  2    it's pointless to say there's no fiduciary

12:22  3    obligation.

12:22  4         But if I'm selling something, then a

12:22  5    fiduciary obligation may be attached to it.

12:22  6         So, I think the things that I said are a

12:22  7    function of the kind of contracts that there were.

12:23  8         Q.   Let's go to paragraph 56, please.

12:23  9         And you describe the ███████ agreement as

12:23 10    a representative example of an XRP direct sales

12:23 11    contract?

12:23 12         A.   Yes.

12:23 13         Q.   What percentage of the direct sales

12:23 14    contracts did you personally review?

12:23 15         MR. FIGEL:  Objection.

12:23 16         A.   I can't recall what percentage.  I can only

12:23 17    recall that I reviewed a lot of them.

12:24 18         Q.   Did you review all the direct sales

12:24 19    contracts?

12:24 20         A.   I reviewed most of them because I reviewed,

12:24 21    as I previously testified, almost all of the

12:24 22    1700 contracts.  But if you're going to ask me what

12:24 23    percentage fell in each category, I would have

12:24 24    trouble recalling that.

12:24 25         Q.   And you didn't document that in any way.

113

12:24 1    Correct?

12:24 2         A.   No.

12:24 3         Q.   Did you -- just so I have a better record,

12:24 4    did you document in any way which contracts you

12:24 5    reviewed and which ones you didn't review?

12:24 6         A.   Not in a systematic way.  I made notes

12:24 7    about some of the contracts to refresh my

12:24 8    recollection when I was writing a report.

12:24 9         Q.   Did you document in any way which contracts

12:24 10   you reviewed and which contracts you didn't review?

12:25 11        A.   Up to the date of -- up to the date of --

12:25 12   no, I didn't -- I'm trying to -- trying to actually

12:25 13   answer your question truthfully.

12:25 14             I just was looking at what -- at

12:25 15   representative samples of the various kinds of

12:25 16   contracts.  I didn't document the formal search

12:25 17   process on my part because I didn't do a formal

12:25 18   search process.

12:25 19        Q.   When you looked at the direct sales

12:25 20   contracts, what did you do to determine that the

12:25 21   contracts you reviewed were the only contracts

12:25 22   governing the commercial relationship between Ripple

12:25 23   and its counterparty?

12:25 24        A.   I don't know if they were the only

12:25 25   contracts that constituted a commercial relationship.

114

12:25 1       Q.   What is █████████?

12:25 2       A.   It's a -- I don't know very much about

12:26 3   them.  They buy and trade.

12:26 4       Q.   Are you aware that █████████ is a

12:26 5   venture capital and private equity firm?

12:26 6       A.   No.

12:26 7       Q.   Are you aware that █████████ is an

12:26 8   investor in Ripple?

12:26 9       A.   I don't know anything about ████████

12:26 10  ████████ business.

12:26 11      Q.   When you determined that the ████████

12:26 12  agreement is a representative example of an XRP

12:26 13  direct sales contract, did you consider that ████████

12:26 14  ████████ is an equity shareholder of Ripple?

12:26 15      A.   No.

12:26 16      Q.   How many direct sales contracts did you

12:27 17  personally review that did not involve an investor in

12:27 18  Ripple?

12:27 19           MR. FIGEL:  Objection.

12:27 20      A.   I have no idea.

12:27 21      Q.   Did you consider how the ████████ contract

12:27 22  is in any way different from a contract in which the

12:27 23  issuer of securities agrees to sell its securities

12:27 24  directly to an institutional investor?

12:27 25           MR. FIGEL:  Objection.

115

12:27  1      A.    No.

12:27  2      Q.    Are you offering an opinion that the

12:27  3  ██████████  contract is different from a contract in

12:27  4  which the issuer of securities agrees to sell its

12:27  5  securities directly to an institutional investor?

12:27  6          MR. FIGEL:  Objection.

12:28  7      A.    Well, you would only say that under the

12:28  8  ████████  agreement, they're selling XRP, which itself

12:28  9  isn't a security.

12:28 10      Q.    You're offering that opinion in this case?

12:28 11      A.    Well, XRP is a thing, not -- I mean, you

12:28 12  asked me whether the contracts under which XRP is

12:28 13  sold are investment contracts.  I have no opinion

12:28 14  about that.

12:28 15          I just know that XRP is like a widget.

12:28 16      Q.    Are you offering the opinion that XRP is

12:28 17  not a security?

12:28 18          MR. FIGEL:  Objection.

12:28 19      A.    No.

12:28 20      Q.    Can a widget be a security?

12:28 21          MR. FIGEL:  Objection.

12:28 22      A.    I don't see -- I don't see how.

12:29 23      Q.    No matter the commercial circumstances?

12:29 24          MR. FIGEL:  Objection.

12:29 25      A.    I think there's a difference between a

                                                            116

12:29  1    contract and a thing.

12:29  2        Q.   Can an orange grove be a security?

12:29  3        A.   Orange grove is a thing.

12:29  4        Q.   Can an orange grove be a security?

12:29  5        A.   Itself?  No.

12:29  6             I guess I would add that a car isn't a

12:29  7    security.  A TV isn't a security.

12:29  8        Q.   Can offers or sales of orange groves

12:29  9    constitute the offer and sale of securities?

12:29 10             MR. FIGEL:  Objection.

12:29 11        A.   I don't have an opinion on that.

12:30 12        Q.   Do you have an opinion on whether the offer

12:30 13    or sale of anything can constitute the offer or sale

12:30 14    of a security?

12:30 15             MR. FIGEL:  Objection.

12:30 16        A.   It would depend on -- it would depend on

12:30 17    the terms.

12:30 18        Q.   But are you offering an opinion in this

12:30 19    case?

12:30 20        A.   No.

12:30 21             MR. FIGEL:  Can I just add an objection?  I

12:30 22    mean the last question.

12:30 23             Thanks.

12:30 24        Q.   Can you look at paragraph 68, please.

12:31 25             And do you see that you said that the

117

12:31 1    ███████ agreement contains terms related to

12:31 2    restrictions on transfer of XRP by ████████

12:31 3         A.   I recall saying that.  Is there a paragraph

12:31 4    that you are particularly referring to?

12:31 5         Q.   I'm --

12:31 6         A.   Oh, yeah.

12:31 7         Q.   Of your report, 68.  I'm sorry.

12:31 8         A.   Yes, okay.

12:31 9              (Witness reviewing document.)

12:31 10        Q.   Does the ████████ contract allow the

12:31 11   parties to set a period of time in which ████████

12:31 12   cannot resell or otherwise distribute the XRP it

12:31 13   purchased from Ripple?

12:31 14        A.   Yeah, I recall that.

12:31 15        Q.   Does the ████████ contract allow the

12:32 16   parties to set a limitation on the amount of XRP

12:32 17   that -- or purchase from Ripple that ████████ can

12:32 18   sell on a daily basis?

12:32 19             MR. FIGEL:  Objection.

12:32 20        A.   I think there were sales restrictions.

12:32 21        Q.   And how many contracts did you review

12:32 22   containing restrictions on what Ripple's counterparty

12:32 23   could do with the XRP they obtained from Ripple?

12:32 24        A.   I don't have a number, but there were some

12:32 25   that had such wholesale restrictions.

118

12:32  1       Q.   How many contracts did you review that

12:32  2  contained restrictions limiting the quantity of XRP

12:32  3  the purchaser could obtain to the amount needed for

12:32  4  the purchaser's non-investment purposes?

12:33  5            MR. FIGEL:  Objection.

12:33  6       A.   I don't recall.

12:33  7       Q.   How many contracts did you review

12:33  8  containing restrictions limiting Ripple's

12:33  9  counterparty from selling the XRP they purchased from

12:33  10  Ripple only to parties outside the United States?

12:33  11            MR. FIGEL:  Objection.

12:33  12      A.   I only recall reading a couple of contracts

12:33  13  like that.

12:33  14      Q.   How many contracts did you review limiting

12:33  15  Ripple's counterparty from selling the XRP they

12:33  16  obtained from Ripple only to accredited investors?

12:33  17      A.   I don't recall any such restrictions.

12:33  18      Q.   How many contracts did you review that

12:33  19  contained restrictions allowing Ripple's counterparty

12:34  20  to sell the XRP they obtained from Ripple only to

12:34  21  those third parties that would use XRP for

12:34  22  non-investment purposes?

12:34  23            MR. FIGEL:  Objection.

12:34  24      A.   I recall that there was such contracts.  I

12:34  25  don't recall the number.

119

12:34  1              MR. HANAUER:  Can you send Exhibit 8,

12:34  2     please.

12:34  3              (XRP Purchase Summary was marked

12:34  4         Exhibit AS-8 for identification, as of this

12:34  5         date.)

12:34  6              MR. HANAUER:  One for the court reporter,

12:34  7     please.

12:35  8         Q.   Is Exhibit 8 a copy of the XRP purchase

12:35  9     summary you reference in paragraph 69 of your report?

12:35 10         A.   Yes.

12:35 11         Q.   So do you see how there's a line for

12:35 12     lock-up period and daily sales limitations, on

12:35 13     Exhibit 8?

12:35 14         A.   Yes.

12:35 15         Q.   And are those the sales restrictions we

12:35 16     were just talking about or resale restrictions?

12:36 17         A.   Yes.

12:36 18         Q.   Did you review any documents, including

12:36 19     other summary of XRP purchases, that actually imposed

12:36 20     a lock-up period or daily sale limitation?

12:36 21         A.   Yes.

12:36 22         Q.   How many did you review?

12:36 23         A.   You know, I -- this may short-circuit it,

12:36 24     but I didn't really count.  So.  I -- if the answer

12:36 25     is, did I review a contract of a certain type or -- a

                                                                  120

```
12:36  1   few contracts or some contracts, the answer would be

12:36  2   yes.  If you're asking me whether it's 11 or 34, I

12:36  3   don't have an answer to that.

12:36  4       Q.   By setting a lock-up period or volume

12:36  5   restriction, could one of these XRP purchase

12:36  6   summaries add a substantive term to a direct sales

12:37  7   contract?

12:37  8            MR. FIGEL:  Objection.

12:37  9       A.   I would have to review the contract.  There

12:37 10   would be a question whether this was a modification

12:37 11   or not.  Modifications are not enforceable unless

12:37 12   they're supported by a separate consideration.

12:37 13            On the other hand, this document says it's

12:37 14   governed by the master agreement, and it could just

12:37 15   be filling in the blanks.  If it's filling in the

12:37 16   blanks, then it would be enforceable.

12:38 17       Q.   Are you -- sitting here today, are you

12:38 18   aware of the length of any lock-up period or daily

12:38 19   sales limitation governing any of Ripple's XRP sales

12:38 20   to          ?

12:38 21       A.   No.  I'm not aware -- I have a recollection

12:38 22   that they went through              but I don't

12:38 23   have any particular recollection.

12:38 24       Q.   And are you offering any opinion on how the

12:38 25   lock-up periods or daily volume limitations could
```

                                                            121

12:38  1  affect the price of XRP?

12:38  2      A.   No.

12:39  3      Q.   So in paragraph 71 of your report, you say

12:39  4  that each of the direct sales contracts is in

12:39  5  substance similar to the relevant part of the

12:39  6  ███████ agreement?

12:39  7      A.   Uh-huh.  Yes.

12:39  8      Q.   What was your basis for saying that for the

12:39  9  sales contracts you did not personally review?

12:39 10      A.   I think the answer to that question is in

12:39 11  the first sentence of paragraph 71.

12:40 12           I don't have anything to add to my -- to

12:40 13  what the first sentence of paragraph 71 says.

12:40 14      Q.   So is the answer that for the contracts,

12:40 15  you didn't personally review your basis for

12:40 16  concluding that those contracts were in substance

12:40 17  similar to the ███████ agreement; the basis of that

12:40 18  was the work done by counsel?

12:40 19      A.   It was a combination of my work and work

12:40 20  done from counsel, acting at my direction.  I asked

12:40 21  counsel in particular, whether those contracts were

12:40 22  relevantly different.  I assume that my counsel knew

12:40 23  how to read a contract, too.

12:40 24      Q.   Are there any written communications on

12:41 25  that subject between you and counsel?

                                                        122

12:41  1        A.    I don't recall any.

12:41  2        Q.    Do you see the list of bullet points, on

12:41  3   paragraph 71 of provisions you say that the direct

12:41  4   sales contracts typically contain?

12:41  5        A.    Yes.

12:41  6        Q.    Are there direct sales contracts listed on

12:41  7   Exhibit C that do not contain all those terms?

12:41  8        A.    Well, yeah, because some of the direct

12:41  9   sales contracts just were an exchange of a certain

12:41 10   number of XRP in return for price, but this contract

12:41 11   contemplates a series of sales.

12:42 12        Q.    Were there direct sales contracts that had

12:42 13   terms that created an ongoing obligation owed by

12:42 14   Ripple after delivery of the purchased units of XRP?

12:42 15        A.    I don't recall any such language that would

12:42 16   sustain an inference like that.

12:42 17        Q.    Then why is that bullet point missing from

12:42 18   paragraph 72?

12:42 19             MR. FIGEL:  Objection.

12:43 20        A.    I don't recall why it's missing, but I

12:43 21   would -- it is my recollection that you couldn't find

12:43 22   any such language in that contract.

12:43 23        Q.    Okay.  Let's go to paragraph 75, please,

12:43 24   where you talk about the wholesale sales contracts.

12:43 25             For the wholesale sales contracts, what did

123

12:43  1    you do to determine that the contracts you reviewed

12:43  2    were the only contracts governing the relationship

12:43  3    between Ripple and its counterparty?

12:43  4         A.   I didn't do anything.

12:44  5         Q.   What is Bitstamp?

12:44  6         A.   I don't know very much about the

12:44  7    business -- businesses of any of the buyers or a lot

12:44  8    of the buyers to these contracts because that was

12:44  9    beyond the scope of my report to know that.

12:44 10         Q.   Are you aware that Bitstamp is a digital

12:44 11    asset exchange?

12:44 12         A.   I think I knew that.  But as I said, I

12:44 13    wasn't asked to investigate or learn about the

12:44 14    business buyers; that is, what their businesses were.

12:44 15         Q.   Could the business of Ripple's counterparty

12:44 16    inform what they intended to do with the XRP they

12:45 17    obtained from Ripple?

12:45 18              MR. FIGEL:  Objection.

12:45 19         A.   Well, there were contractual restrictions

12:45 20    on what they could do.  I don't have direct knowledge

12:45 21    as to whether they adhered to those restrictions or

12:45 22    not.

12:45 23         Q.   But beyond the four corners of the

12:45 24    contract, if someone wanted to know what the

12:45 25    purchaser of XRP wanted to do with that XRP that they

                                                              124

12:45  1   purchased, would they want to know what the business

12:45  2   is of the person or entity that purchased the XRP?

12:45  3          MR. FIGEL:  Objection.

12:45  4      A.   Well, you're describing a -- a search.  If

12:45  5   I -- I want to know what Bitstamp was doing, I would

12:45  6   assume that someone would search in a rational way to

12:45  7   find out what Bitstamp was doing.

12:45  8      Q.   Did you perform any such searches?

12:46  9      A.   No.

12:46  10         MR. HANAUER:  Exhibit 9, please.

12:46  11         (Bitstamp Wholesale Order was marked

12:46  12     Exhibit AS-9 for identification, as of this

12:46  13     date.)

12:46  14     Q.   Is Exhibit 9 a copy of the Bitstamp

12:46  15  wholesale order referenced in paragraph 75 of your

12:46  16  report?

12:47  17     A.   I think it is.

12:47  18     Q.   Do you see the second paragraph of

12:47  19  Exhibit 9?  It says, This agreement governs the

12:47  20  purchase and sale of the purchased Ripple currency

12:47  21  specified below.

12:47  22     A.   Yes.

12:47  23     Q.   Why does it refer to whatever Ripple is

12:47  24  selling as purchased Ripple currency?

12:47  25         MR. FIGEL:  Objection.

125

```
12:47  1              (Witness reviewing document.)

12:48  2         A.   Can you repeat that question?  I just

12:48  3    was --

12:48  4              THE WITNESS:  Mr. Reporter, could you

12:48  5    please repeat that question.

12:48  6              (The record was read back.)

12:48  7         A.   I don't know.

12:48  8         Q.   And then, do you see on Exhibit 9 -- if we

12:48  9    go to Section 1.4 of that contract, which I believe

12:48 10    is on page 2 of Exhibit 9.

12:48 11         A.   Yes.

12:49 12         Q.   And one of the terms of the sale is that

12:49 13    Bitstamp represents that it will not resell or

12:49 14    otherwise distribute the Ripple currency to any party

12:49 15    if Bitstamp has actual or reasonable knowledge that

12:49 16    such other party intends to purchase or acquire the

12:49 17    Ripple currency as an investment.

12:49 18         A.   Yes, I looked at this section.

12:49 19         Q.   What is the purpose of such a provision?

12:49 20              MR. FIGEL:  Objection.

12:49 21         A.   I can only infer purpose from the words.  I

12:50 22    don't have any independent knowledge of what the

12:50 23    purpose is -- of the parties were in adopting

12:50 24    Section 1.4.

12:50 25         Q.   I'll take your reasonable inference.
```

126

12:50 1   What's that?

12:50 2       A.   Well, it -- my reasonable inference is that

12:50 3   they -- that Ripple wanted XRP to be used in commerce

12:50 4   rather than held.

12:50 5       Q.   And what do you mean by "used in commerce"?

12:50 6       A.   Used in transactions.

12:50 7       Q.   You mean used to facility cross-border

12:50 8   payments?

12:50 9            MR. FIGEL:  Objection.

12:50 10      A.   I don't know anything in -- as I said, I

12:50 11  don't have any independent knowledge, but the point

12:51 12  of a restriction like this would be that you want the

12:51 13  product to be used in various kinds of transactions.

12:51 14  I don't know whether they would be cross border or

12:51 15  not cross border.

12:51 16      Q.   When someone purchases digital currency off

12:51 17  a digital currency exchange, does the exchange have

12:51 18  any knowledge whether the purchaser intends to use

12:51 19  the digital currency for investment purposes?

12:51 20           MR. FIGEL:  Objection.

12:51 21      A.   I -- I don't know what particular people

12:51 22  from particular exchanges know, but that's not the

12:51 23  point of an exchange is to know what people use

12:52 24  what's being traded -- what purpose they have.  The

12:52 25  point of an exchange is to facilitate deals.

127

12:52  1        Q.   And the Bitstamp wholesale order, that's

12:52  2   back from 2000-- or Exhibit 9, that's back from 2013?

12:52  3   That's when it was executed?

12:52  4        A.   That's the effective date.

12:52  5        Q.   And back in 2013, what noninvestment uses

12:52  6   existed for XRP?

12:52  7        A.   I don't know.

12:52  8        Q.   Were -- back in 2013, were any of Ripple's

12:52  9   products that used XRP in commercial operation?

12:52 10             MR. FIGEL:  Objection.

12:52 11        A.   I don't know that.

12:52 12        Q.   Are you offering an opinion that the

12:52 13   Bitstamp contract in Exhibit 9 is different from a

12:52 14   contract in which the issuer of securities agrees to

12:52 15   sell its securities directly to an exchange?

12:53 16             MR. FIGEL:  Objection.

12:53 17        A.   No.

12:53 18        Q.   And then, do you see on paragraph -- excuse

12:53 19   me, on Section 9.3 of Exhibit 9, the no third-party

12:53 20   beneficiaries?

12:53 21        A.   Yes.

12:53 22        Q.   Are you offering an opinion whether the

12:53 23   federal securities laws allow parties to an

12:53 24   investment contract to waive away the requirements of

12:53 25   the Securities Act of 1933?

128

12:53  1          MR. FIGEL:  Objection.

12:53  2      A.   No.

12:53  3      Q.   Do you have an opinion on that subject?

12:53  4      A.   No.

12:53  5      Q.   Can you look at paragraph 85 of your

12:54  6  report, please.

12:54  7          And you list a bunch of bullet points after

12:54  8  writing, Specifically, the wholesale contracts

12:54  9  typically contain.  And then you list various types

12:54 10  of provisions.

12:54 11          Do you see that?

12:54 12      A.   Yes.

12:54 13      Q.   Are there wholesale sales contracts listed

12:54 14  on Exhibit C to report that do not contain any of the

12:54 15  terms listed in those bullet points?

12:55 16      A.   I don't recall reading any such contract.

12:55 17      Q.   Then why are you using the word "typical,"

12:55 18  or "typically"?

12:55 19      A.   I'm using the word "typical" as a hedge

12:55 20  because at that point, I hadn't read every single

12:55 21  one.

12:55 22      Q.   And then in paragraph 86, where you say

12:55 23  that Each of the wholesale sales contracts listed in

12:55 24  Exhibit C lacks any express provision or

12:55 25  representation, you were relying on counsel to tell

                                                        129

12:55 1    you that for the contracts you didn't review?

12:55 2        A.   Yes.

12:56 3        Q.   Did any of the wholesale sales contracts

12:56 4    you reviewed, or have counsel review, contain a

12:56 5    provision restricting what someone who purchased XRP

12:56 6    from Ripple's counterparty could do with the XRP they

12:56 7    purchased?

12:56 8             MR. FIGEL:   Objection.

12:56 9        A.   I don't recall any such restriction.

12:56 10            MR. HANAUER:   Ready for lunch?

12:56 11            THE WITNESS:   Yes.

12:56 12            THE VIDEOGRAPHER:   Off the record.   The

12:56 13   time is 12:57.

12:56 14            (Luncheon recess at 12:57)

15

16

17

18

19

20

21

22

23

24

25

130

```
12:56  1       A F T E R N O O N   S E S S I O N

12:56  2       (1:52)

12:56  3  ALAN SCHWARTZ

12:56  4       resumed, having been previously duly

12:56  5       sworn by a Notary Public, was

12:56  6       examined and testified further

12:56  7       as follows:

01:50  8            THE VIDEOGRAPHER:  We are going back on the

01:50  9  record.  The time is 1:52.

01:50 10  CONTINUED EXAMINATION BY MR. HANAUER:

01:50 11       Q.   Professor Schwartz, can you please look at

01:50 12  paragraph 89 of your report, where you talk about the

01:51 13  programmatic contracts.

01:51 14            And you reference an agreement between

01:51 15  Ripple and GSR Holdings Limited?

01:51 16       A.   Yes.

01:51 17       Q.   And is Exhibit 10, which I -- which should

01:51 18  be in front of you, is that a copy of the GSR

01:51 19  agreement referenced in paragraph 89 of your report?

01:51 20            (Agreement between Ripple and GSR Holdings

01:51 21       Limited was marked Exhibit AS-10 for

01:51 22       identification, as of this date.)

01:51 23       A.   I'm afraid I don't have Exhibit 10.

01:51 24            Oh, okay.  Now I have Exhibit 10.

01:51 25            Yes.
```

131

01:51 1     Q.  And when you looked at the programmatic

01:52 2  contracts, what did you do, if anything, to determine

01:52 3  that the contracts you reviewed were the only

01:52 4  contracts governing the commercial relationship

01:52 5  between Ripple and its counterparty?

01:52 6     A.  I didn't do anything.

01:52 7     Q.  What is GSR Holdings Limited?

01:52 8     A.  GSR -- I think it's a digital asset

01:52 9  exchange.

01:52 10     Q.  And did all of the programmatic contracts

01:52 11  you reviewed or had reviewed for you by counsel have

01:52 12  a digital asset exchange as the counterparty?

01:52 13       MR. FIGEL:  Objection.

01:53 14     A.  I think the answer is yes.

01:53 15     Q.  And do you see, on Exhibit 10, Section 2,

01:53 16  it says, GSR agrees to transact in XRP according to

01:53 17  the then current programmatic schedule provided by

01:53 18  Ripple, (programmatic market activity) subject to the

01:53 19  terms of this agreement?

01:53 20     A.  Yes.

01:53 21     Q.  And did you review any of the program --

01:53 22  programmatic market activity schedules?

01:53 23     A.  I think I reviewed the one attached to the

01:53 24  GSR agreement.

01:53 25     Q.  Is that the only one?

132

01:53  1      A.   I don't recall -- I -- I probably reviewed

01:54  2  one or two others, but I mainly focused on that one.

01:54  3      Q.   And which one was the one -- which schedule

01:54  4  was attached to the programmatic -- the GSR

01:54  5  agreement?

01:54  6      A.   Whichever the one was attached was the one

01:54  7  I looked at.

01:54  8      Q.   And that's where I'm getting at, I'm not

01:54  9  sure there is one attached to the agreement, and I

01:54 10  don't see any listed in your report.

01:54 11      A.   No, I think this is about -- I have a

01:54 12  recollection, but it may be in error, in one of the

01:54 13  large binders that I was given, I saw such a thing,

01:55 14  but -- but I can't right now reconstruct it.

01:55 15      Q.   And you think you may have looked at one?

01:55 16  Just one?

01:55 17      A.   I haven't looked at a lot of them.

01:55 18      Q.   Do you know how many exist?

01:55 19      A.   No.

01:55 20      Q.   Do you know what they say, the program--

01:55 21  the programmatic market activity schedules?

01:55 22      A.   I think they -- they control the -- the

01:55 23  timing and distribution of Ripple.

01:55 24          I'm sorry.

01:55 25      Q.   Do you need to take that?

                                                                133

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

01:55 1      A.   I don't have to take it, I just wanted to

01:55 2 not take it.

01:55 3      Q.   And I think your answer was -- when I asked

01:55 4 you about what the programmatic market activity

01:55 5 schedules say, I think you responded, They control

01:55 6 the timing and distribution of Ripple?

01:55 7      A.   Of -- I mean of XRP.

01:56 8      Q.   And could your opinions about the

01:56 9 programmatic contracts change based on what's in the

01:56 10 schedules that you did not review?

01:56 11      MR. FIGEL:  Objection.

01:56 12      A.   Yeah, if there's anything inconsistent with

01:56 13 anything I said, that would -- and it was materially

01:56 14 inconsistent, my views would change.

01:56 15      Q.   And do you see, on Exhibit 10, I want to

01:56 16 refer you to Section 3.

01:56 17      The remittance of proceeds to Ripple.

01:57 18      A.   Yes.

01:57 19      Q.   So what is your understanding of how that

01:57 20 works?

01:57 21      MR. FIGEL:  Objection.

01:57 22      Q.   Of how GSR makes money off this contract.

01:57 23      MR. FIGEL:  Objection.

01:57 24      A.   What I infer from the contract is the

01:57 25 percent is a commission.

134

01:57  1          Q.    Did you review any other programmatic

01:57  2    contracts that allowed Ripple's counterparty to

01:57  3    retain a portion of the proceeds from distributing

01:57  4    the XRP obtained from Ripple?

01:57  5              MR. FIGEL:  Objection.

01:57  6          A.    I think I did, but I don't have a direct

01:57  7    recollection of that.

01:57  8          Q.    If I asked you to assume that Ripple's

01:58  9    efforts caused the price of XRP to increase, would

01:58  10   Exhibit 10 lead GSR to expect profits based on

01:58  11   Riffle -- Ripple's efforts?

01:58  12             MR. FIGEL:  Objection.

01:58  13         A.    As I recall, your question was efforts to

01:58  14   increase the price.  Was that -- was that what you

01:58  15   said?

01:58  16         Q.    Yeah.  Assume -- and I know it's disputed

01:58  17   in this case.  But just assume that Ripple's efforts,

01:58  18   in fact, caused the price of XRP to increase.

01:58  19             Okay?

01:58  20         A.    Yeah.

01:58  21             And the question is, would that affect

01:58  22   GSR's return?

01:58  23         Q.    If that's the case, can GSR expect profits

01:58  24   off this contract in Exhibit 10 based on Ripple's

01:59  25   efforts?

                                                                135

01:59  1              MR. FIGEL:  Objection.

01:59  2        A.    I can't answer that question without

01:59  3  knowing what -- what you -- what Ripple would be

01:59  4  doing.

01:59  5              For example, increasing the price is

01:59  6  consistent with reducing the supply.  Since GSR gets

01:59  7  compensated on the basis of the sales it makes, if

01:59  8  supply shrunk, they would lose money rather than gain

01:59  9  it so that there would be a question as to what

01:59 10  Ripple was doing.

01:59 11        Q.    Could reducing the supply of XRP increase

01:59 12  its price?

01:59 13              MR. FIGEL:  Objection.

01:59 14        A.    Reducing -- this is an "other things equal"

01:59 15  question?

01:59 16        Q.    Correct.

01:59 17        A.    Other things equal, if the supply curve

01:59 18  shifts in, the price goes up, assuming demand is

01:59 19  unchanged.

01:59 20        Q.    So assuming demand is unchanged, if the

02:00 21  supply of XRP drops, the price of XRP goes up?

02:00 22              MR. FIGEL:  Objection.

02:00 23        A.    I mean, I can't say that as a matter of

02:00 24  fact.  It's a matter of theory.  If demand is

02:00 25  unchanged and the supply of an asset falls, the price

136

02:00 1   of the asset should rise.

02:00 2       Q.   Are you aware of any efforts by Ripple, to

02:00 3   decrease the supply of XRP available to the

02:00 4   marketplace?

02:00 5            MR. FIGEL:  Objection.

02:00 6       A.   No.

02:00 7            MS. PROSTKO:  Objection.

02:00 8       Q.   Are you aware of Ripple's escrow program?

02:00 9       A.   Excuse me?

02:00 10      Q.   Are you aware of Ripple's escrow program?

02:00 11      A.   Yes, I think so.

02:00 12      Q.   What do you know about that?

02:00 13           MR. FIGEL:  Objection.

02:00 14      A.   I think it's an orderly market provision.

02:00 15      Q.   Can you elaborate, please.

02:00 16      A.   I don't have much more to say than that,

02:00 17   that it's -- it's an interest of any seller to insure

02:01 18   that -- essentially to reduce volatility.

02:01 19      Q.   Is that in the contracts, the escrow

02:01 20   program?

02:01 21           MR. FIGEL:  Objection.

02:01 22      A.   No.  It's what I infer from -- it's what --

02:01 23   what I would infer, but it is not so far as I can

02:01 24   tell in the contract.

02:01 25      Q.   Can you look at paragraph 101 of your

                                                            137

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

02:01 1    report, please.

02:01 2             And you -- just picking up halfway through

02:01 3    that first sentence, you write, I conclude that each

02:01 4    of the programmatic contracts is in substance similar

02:01 5    to the GSR agreement.

02:02 6        A.   Yes.

02:02 7        Q.   And at the time you wrote that, you were

02:02 8    relying on Ripple's attorneys to tell you about the

02:02 9    contracts that you did not personally review?

02:02 10       A.   Yeah.  I think I've testified to that.

02:02 11       Q.   And would that be the case for any contract

02:02 12   that you didn't personally review, you relied on

02:02 13   Ripple's attorneys to tell you whether they were

02:02 14   similar to the contracts you did review?

02:02 15            MR. FIGEL:  Objection.

02:02 16       A.   That's partly right.  I also asked whether

02:02 17   there were material differences.

02:02 18       Q.   So for any contract that you did not

02:02 19   personally review, you relied on Ripple's counsel to

02:02 20   tell you whether there were material similarities or

02:02 21   differences to the contracts that you had reviewed?

02:03 22       A.   That's correct.

02:03 23       Q.   And then, in staying with paragraph 1,

02:03 24   you're saying, after you -- strike that.  Going back

02:03 25   to paragraph 101, after you write that the

                                                              138

02:03  1   programmatic contracts are similar to the GSR

02:03  2   agreement, you write, Specifically, each of these

02:03  3   contracts contains a provision stating that the

02:03  4   agreement in any related documents constitute the

02:03  5   entire agreement between the parties?

02:03  6        A.   Yes.

02:03  7        Q.   Is that type of provision, that's an

02:03  8   integration clause?

02:03  9        A.   Yes, it is.

02:03 10        Q.   And why is it that an integration clause

02:03 11   makes all the programmatic contracts similar in

02:03 12   substance?

02:03 13             MR. FIGEL:  Objection.

02:04 14        A.   I didn't say that.

02:04 15        Q.   Well, you write -- the first sentence says

02:04 16   they're all similar in substance.  Paragraph 101.

02:04 17   Right?

02:04 18        A.   Yes.

02:04 19        Q.   And then the second sentence is,

02:04 20   Specifically these contracts all have integration

02:04 21   clauses?

02:04 22        A.   Yeah, that's an example of similarity.

02:04 23   Other examples of similarity are in paragraph 102.

02:04 24        Q.   So I guess the -- the presence of

02:04 25   integration clauses is not what makes all of these

139

02:04  1    programmatic contracts the same; they just all happen

02:04  2    have to integration clauses?

02:04  3          A.   Well, they can't be the same because

02:04  4    they're different, logically speaking.

02:04  5              The contracts, I thought, were similar in

02:05  6    important respects, of which the presence of an

02:05  7    integration clause is one.

02:05  8          Q.   Do most commercial contracts between

02:05  9    sophisticated parties contain integration clauses?

02:05 10          A.   I can't answer that.

02:05 11          Q.   Well, you're an expert on contracts, right?

02:05 12          A.   There are maybe 20 million commercial

02:05 13    contracts a year.  If you're asking me whether

02:05 14    2,417,312 have an integration clause, I'd say I don't

02:05 15    know the answer to that.

02:05 16          Q.   But, I mean, you studied contracts for a

02:05 17    long time, right?

02:05 18          A.   I have.

02:05 19          Q.   For most of the contracts you personally

02:05 20    reviewed between sophisticated parties, do those

02:05 21    contracts typically contain integration clauses?

02:05 22          A.   It would depend on the industry.  I don't

02:05 23    think they're in M&A contracts.  But they're in other

02:05 24    kinds of -- they're also not in a usual sales

02:05 25    contract.  But they tend to be in complicated

140

02:05  1    agreements, such as construction contracts or the

02:06  2    agreements to construct a shopping center contract.

02:06  3            So it would depend on the context.

02:06  4    Sometimes you have one, and sometimes you don't.

02:06  5        Q.   Did any of the 1700 contracts you reviewed

02:06  6    or had counsel review in this case not contain

02:06  7    integration clauses?

02:06  8        A.   I think -- yes, I think I've seen some that

02:06  9    didn't.

02:06  10       Q.   What percentage generally of the contracts?

02:06  11       A.   I can't say without going over that sample

02:06  12   again.

02:06  13       Q.   Did any of the programmatic sales contracts

02:06  14   identified in your report contain a provision

02:07  15   restricting what someone who purchased XRP from

02:07  16   Ripple's counterparty could do with the XRP they

02:07  17   purchased?

02:07  18            MR. FIGEL:  Objection.

02:07  19       A.   No, I don't think so.

02:07  20            No.

02:07  21       Q.   Did you review any contracts between Ripple

02:07  22   and GSR where Ripple contracted with GSR to purchase

02:07  23   XRP in the secondary market?

02:07  24       A.   I don't recall that.

02:07  25       Q.   Did you consider any such contract in

                                                              141

02:07  1    forming your opinions?

02:07  2        A.   I don't think so.

02:08  3        Q.   Okay.  Paragraph 105 discusses the

02:08  4    market-making contracts.

02:08  5             MR. HANAUER:  Can you send around 11,

02:08  6        please.

02:08  7             (GSS Agreement was marked Exhibit AS-11 for

02:08  8        identification, as of this date.)

02:08  9        A.   I think I have -- okay.

02:08 10        Q.   Is Exhibit 11 a copy of the GSS agreement

02:08 11    referenced in paragraph 105 of your report?

02:09 12        A.   I think so.

02:09 13        Q.   Any reason why you would say Exhibit 11 is

02:09 14    not a copy of the GSS agreement referenced in

02:09 15    paragraph 105 of your report?

02:09 16        A.   No.

02:09 17        Q.   When you looked at the market-making

02:09 18    contracts, did you do anything to determine that the

02:10 19    contracts you reviewed were the only contracts

02:10 20    governing the commercial relationship between Ripple

02:10 21    and its counterparty?

02:10 22        A.   No.

02:10 23        Q.   Independent of this case, have you reviewed

02:10 24    any contracts involving a market maker?

02:10 25             MR. FIGEL:  Objection.

                                                              142

02:10 1    A.   In my life?

02:10 2    Q.   Yeah.

02:10 3    A.   I can't remember.  Probably, but I can't

02:10 4    remember for sure.

02:10 5    Q.   Can you name any today as you sit here

02:10 6    today?

02:10 7    A.   No.

02:10 8    Q.   Are you offering any opinion on how

02:10 9    Exhibit 11 is different or similar than any other

02:10 10   contract involving a securities market maker?

02:10 11        MR. FIGEL:  Objection.

02:10 12   A.   No, I'm not.

02:11 13   Q.   By contracting with market makers, did

02:11 14   Ripple help facilitate the trading of XRP?

02:11 15        MR. FIGEL:  Objection.

02:11 16   A.   I can infer such an intention from the

02:11 17   agreement.

02:11 18        Other than that, I don't have an answer.

02:11 19   Q.   What is the job of a market maker?

02:11 20   A.   To make a market.

02:11 21   Q.   And does making that market help facilitate

02:11 22   trading in whatever is being sold?

02:11 23   A.   Yes.

02:11 24   Q.   By contracting with market makers, did

02:11 25   Ripple help provide investors with a mechanism to

143

```
02:11  1   sell XRP at a profit?
02:11  2          MR. FIGEL:  Objection.
02:11  3          MS. PROSTKO:  Objection.
02:11  4      A.   I'm going to resist the last part of your
02:11  5   question.  They -- it provided an opportunity to
02:12  6   trade XRP.  Whether at a profit or not, I have no
02:12  7   idea.
02:12  8      Q.   So by contracting with market makers,
02:12  9   Ripple provided an opportunity for traders to trade
02:12 10   in XRP?
02:12 11          MR. FIGEL:  Objection.
02:12 12      A.   That is the purpose of -- of these
02:12 13   agreements.
02:12 14      Q.   And do you see on Exhibit 11 how the
02:12 15   agreement talks about a defined spread and a
02:12 16   deployment amount?
02:12 17      A.   Yes.
02:13 18      Q.   Did the other market-making contracts you
02:13 19   reviewed contain similar provisions?
02:13 20      A.   I can't recall right now.
02:13 21      Q.   In paragraph 108 of your report, you say
02:13 22   that the market-making contract provides that Ripple
02:13 23   will deliver ███████████ --
02:13 24      A.   Yes.
02:13 25      Q.   -- to GSS?
```

144

02:13  1      A.    Yes.

02:13  2      Q.    Is that ███████████ is that

02:13  3   compensation to GSS, or is that for GSS to use in its

02:13  4   market-making activities?

02:13  5         MR. FIGEL:   Objection.

02:14  6      A.    The contract defines it as compensation.

02:14  7      Q.    Is there any restrictions in the GSS

02:14  8   agreement on what GSS can do with the ████████████

02:14  9   it obtained from Ripple?

02:14 10      A.    I don't recall any such restrictions.

02:14 11      Q.    And since GSS is obtaining ██████████

02:14 12   as compensation, does that incentivize GSS to make a

02:14 13   market for XRP at a higher price?

02:14 14         MR. FIGEL:   Objection.

02:15 15      A.    That's payment for GSR to make a market,

02:15 16   which is to say it's payment for GSR to do what they

02:15 17   do.

02:15 18      Q.    GSS?

02:15 19      A.    GSS, that is.

02:15 20      Q.    So -- but now -- once GSR -- once GSS

02:15 21   obtains that ██████████████ --

02:15 22      A.    Right.

02:15 23      Q.    -- it's in GSS's interest for that XRP to

02:15 24   be worth more.

02:15 25         MR. FIGEL:   Objection.

145

02:15  1      A.   Not necessarily.

02:15  2      Q.   Why do you say that?

02:15  3      A.   Because if their intention is to convert it

02:15  4  immediately into dollars, they only care about the

02:15  5  price at the time they get it.

02:16  6      Q.   Do you know what GSS's intentions were to

02:16  7  do with the ███████████ it obtained from -- or

02:16  8  ████████  XRP it obtained from Ripple?

02:16  9      A.   No.

02:16 10      Q.   So can you look at paragraph 111 of your

02:16 11  report.

02:16 12          Again, I'd ask you to compare that with

02:16 13  paragraph 102.

02:16 14          And it looks like paragraph 102 contains a

02:16 15  bullet point that paragraph 111 does not, that

02:16 16  says -- discusses provisions that create an ongoing

02:17 17  obligation owed by Ripple to the counterparty?

02:17 18      A.   Yes.

02:17 19      Q.   Did you find any such provisions in the GSS

02:17 20  contract or market maker contracts?

02:17 21      A.   No.

02:17 22      Q.   So, again, why were you listing five bullet

02:17 23  points in paragraph 102 but only four bullet points

02:17 24  in paragraph 111?

02:17 25      A.   I can't recall why I did that, but I do

146

02:17  1    know that there's no such language in Exhibit 10.

02:17  2        Q.    What about Exhibit 11?

02:17  3        A.    Which one is -- oh, Exhibit 11?

02:17  4              I don't -- I have -- 5, 4 -- oh.  This

02:18  5    is -- this is Exhibit 10.

02:18  6              MR. FIGEL:  Is that --

02:18  7        A.    You referred to Exhibit 11, I don't think I

02:18  8    have an Exhibit 11.

02:18  9              MR. FIGEL:  I think it's in front of right

02:18 10    there.

02:18 11        A.    There's Exhibit 10.

02:18 12              Oh, this is Exhibit -- no, I didn't see

02:18 13    anything in that agreement either.

02:18 14              MR. FIGEL:  Just so the record's clear, do

02:18 15    you have Exhibit 11?

02:18 16              THE WITNESS:  I do.  It's right here.

02:18 17              MR. HANAUER:  Mr. Court Reporter, was I

02:18 18    asking a question about -- an authentication question

02:18 19    on Exhibit 11?  Just to make sure I have it.

02:18 20              (The record was read back.)

02:19 21        Q.    Okay.  Sorry about that, sir.

02:19 22              Just so I have this in the record, is

02:19 23    Exhibit 11 an accurate copy of the GSS agreement

02:19 24    referenced in paragraph 105 of your report?

02:19 25        A.    Yes.

147

| | | |
|---|---|---|
| 02:19 | 1 | Q.   Thank you. |
| 02:19 | 2 | Did any of the market maker contracts you |
| 02:19 | 3 | reviewed contain a provision restricting what someone |
| 02:19 | 4 | who purchased XRP from the market maker could do with |
| 02:19 | 5 | the XRP they purchased? |
| 02:20 | 6 | MR. FIGEL:  Objection. |
| 02:20 | 7 | A.   No. |
| 02:20 | 8 | MR. HANAUER:  Exhibit 12. |
| 02:20 | 9 | (Copy of ▇▇▇ Agreement was marked Exhibit |
| 02:20 | 10 | AS-12 for identification, as of this date.) |
| 02:20 | 11 | Q.   While we're passing out exhibits, I will |
| 02:20 | 12 | ask you to refer to paragraph 116 of your report. |
| 02:20 | 13 | And once you've had a chance to review |
| 02:20 | 14 | Exhibit 12 I'll ask you, is Exhibit 12 a copy of the |
| 02:20 | 15 | Azimo agreement referenced in paragraph 116 of your |
| 02:20 | 16 | report? |
| 02:20 | 17 | A.   Yes. |
| 02:20 | 18 | Q.   And when you looked at the product |
| 02:21 | 19 | incentive contracts, did you do anything to determine |
| 02:21 | 20 | that the contracts you reviewed were the only |
| 02:21 | 21 | contracts governing the commercial relationship |
| 02:21 | 22 | between Ripple and its counterparty? |
| 02:21 | 23 | A.   No. |
| 02:21 | 24 | Q.   What is ▇▇▇? |
| 02:21 | 25 | (Witness reviewing document.) |

148

02:21  1        A.   ███████ is a company that -- well, I must

02:21  2   say, I don't know very much about ███████, but it

02:21  3   essentially does transactions in cryptocurrency in

02:22  4   various markets.

02:22  5        Q.   Do you know what type -- type or -- of

02:22  6   transactions or the purpose of the transactions?

02:22  7        A.   No.

02:22  8        Q.   And do you see how the preamble to

02:22  9   Exhibit 12 references a master-hosted services

02:22 10   agreement between Ripple and ██████?

02:22 11        A.   Are you referring to my report or to

02:22 12   Exhibit 12?

02:22 13        Q.   Exhibit 12.  The preamble to Exhibit 12.

02:22 14        A.   Yes.

02:22 15        Q.   Did you review the master-hosted services

02:22 16   agreement between Ripple and ██████?

02:22 17        A.   I don't recall doing so.

02:22 18        Q.   Do you know if ██████ was a user of Ripple's

02:23 19   ODL product?

02:23 20        A.   I don't know whether it was or wasn't.

02:23 21        Q.   Are you offering an opinion whether --

02:23 22   okay.  Let me try and help you out with this.  Let's

02:23 23   look at paragraph 117.

02:23 24             Can you just read that to yourself.

02:23 25        A.   Yes.

149

02:23 1          Oh, yes.  Yeah.  It -- that's -- I now --

02:23 2     it has refreshed my recollection.

02:23 3          Q.   Okay.  So I'll ask you again, was ▮▮▮▮ a

02:23 4     user of Ripple's ODL product?

02:23 5          A.   Yes.

02:23 6          Q.   And you say that -- in paragraph 117, you

02:24 7     say, Ripple purchases services from ▮▮▮▮ in exchange

02:24 8     for payment.

02:24 9          A.   Yes.

02:24 10         Q.   Does ▮▮▮▮ also purchase services from

02:24 11    Ripple?

02:24 12         A.   Well, if it's using the ODL product, it

02:24 13    must purchase services, but I was referring to the

02:24 14    particular contract in Exhibit 12.

02:24 15         Q.   And you reference, in paragraph 117, how

02:24 16    the ▮▮▮▮ agreement obligates Ripple to pay ▮ million

02:24 17    in XRP -- $▮ million worth of XRP --

02:24 18         A.   Yes.

02:24 19         Q.   -- in exchange for ▮▮▮▮ meeting certain

02:24 20    milestones?

02:24 21         A.   Not milestones.  Well, yes, incentive

02:24 22    milestones, but then it's later defined in particular

02:25 23    as a number of transactions.

02:25 24         Q.   Are you offering an opinion whether it

02:25 25    would be commercially viable for ▮▮▮▮ to use ODL

150

```
02:25  1    absent the incentives paid by Ripple?

02:25  2           MR. FIGEL:  Objection.

02:25  3    A.   No.

02:25  4    Q.   Can you look at paragraph -- or Section 4,

02:25  5    Exhibit A to Exhibit 12.

02:26  6           It's part of Exhibit 12 with a Bates number

02:26  7    ending in 182.

02:26  8    A.   Yes, I'm looking at that now.

02:26  9    Q.   And do you see that ███████ acknowledges that

02:26 10    virtual currency, including XRP, is not legal tender?

02:26 11    A.   Yes.

02:26 12    Q.   Did any of the contracts you reviewed treat

02:26 13    XRP as either fiat currency or legal tender?

02:26 14           MR. FIGEL:  Objection.

02:26 15    A.   No, I don't recall seeing any such

02:26 16    provisions.

02:26 17    Q.   Do you have an opinion whether XRP is

02:26 18    either legal tender or fiat currency?

02:27 19           MR. FIGEL:  Objection.

02:27 20    A.   I don't think it's either one.

02:27 21    Q.   So paragraph 124 of your report references

02:27 22    an agreement with -- references the ██████████

02:27 23    pilot agreement.

02:28 24           Do you see that?

02:28 25    A.   Uh-huh.
```

                                                                      151

02:28  1       Q.    And you conclude paragraph 124 by writing,

02:28  2   Ripple agrees to pay ████, on a monthly basis,

02:28  3   ██████████  of the aggregate value of XRP purchased or

02:28  4   sold by ██████ on Bitstamp using its algorithm?

02:28  5       A.    Yes.

02:28  6       Q.    By contracting with ██████, did Ripple help

02:28  7   facilitate the trading of XRP?

02:28  8            MR. FIGEL:  Objection.

02:28  9       A.    I don't know.  That's a question of fact as

02:28 10   to the effect of the agreement.  I don't have any

02:28 11   opinion on the effect of any of these agreements.

02:29 12       Q.    Going back to ██████, what purchases -- or

02:29 13   what services did Ripple purchase from ██████?

02:29 14            MR. FIGEL:  Objection.

02:29 15       A.    To use Ripple in -- to use XRP in

02:29 16   transactions in the specified markets.  Specified

02:29 17   countries, actually.

02:29 18       Q.    Did Ripple pay ██████ to buy and sell XRP in

02:29 19   the market?

02:29 20            MR. FIGEL:  Objection.

02:29 21       A.    I don't recall any contract provisions to

02:29 22   that effect.

02:29 23       Q.    And again, you did not review the master

02:29 24   services agreement between Ripple and ██████?

02:30 25       A.    I don't recall reviewing that particular

                                                              152

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

02:30  1    one.

02:30  2         Q.   Can you look at paragraph 131, please.

02:30  3              And do you see how you write, the --

02:30  4    Specifically the product incentive contracts

02:30  5    typically contain, and then there are two bullet

02:31  6    points?

02:31  7         A.   Uh-huh.

02:31  8         Q.   So, similar question to what I was asking

02:31  9    you earlier about the integration clause.  Is it

02:31 10    the -- are you -- are you saying that all of the

02:31 11    products incentive contracts had the two provisions

02:31 12    listed in the bullet points on paragraph 31, or are

02:31 13    you saying that those two provisions are what make

02:31 14    the product incentive contracts similar in substance?

02:31 15              MR. FIGEL:  Objection.

02:31 16         A.   What makes the contracts similar are the

02:31 17    clauses they have in common and the clauses that they

02:31 18    in common lack.  So I'm not basing similarity on any

02:31 19    particular term.

02:31 20         Q.   Would you be able to find provision -- are

02:32 21    the two provisions listed in -- on the bullet points

02:32 22    in paragraph 131, are those common provisions in

02:32 23    contracts in a whole variety of industries?

02:32 24         A.   I guess I would answer it in this way.

02:32 25              With a lot of contracts, there is -- there

                                                              153

```
02:32  1    are few or no precontractual communications between
02:32  2    parties.  Example, in a typical sales contract, if
02:32  3    you want to ship TVs to a retailer, they're sold
02:32  4    under a standard contract, then retailer takes the
02:32  5    contract or it doesn't.
02:32  6           In other areas, there are discussions prior
02:32  7    to the making of a contract.  And that -- it's --
02:33  8    that creates an incentive to use a merger clause in
02:33  9    order to ensure that the enforceable promises people
02:33 10    make are in their written contract.
02:33 11    Q.   Did any of the product incentive contracts
02:33 12    identified in your report contain a provision
02:33 13    restricting what someone who purchased XRP from
02:33 14    Ripple's counterparty could do with the XRP they
02:33 15    purchased?
02:33 16           MR. FIGEL:  Objection.
02:33 17    A.   No.
02:33 18    Q.   Did any contract identified in your report
02:33 19    contain a provision restricting what someone who
02:33 20    purchased XRP from Ripple's counterparty could do
02:33 21    with the XRP they purchased?
02:33 22           MR. FIGEL:  Objection.
02:33 23    A.   No.  Maybe this is volunteering, but you
02:34 24    couldn't bind a party who wasn't -- an agent who
02:34 25    wasn't a party to a contract to do or not do things.
```

154

02:34  1        Q.    So, it would have been impossible for

02:34  2   Ripple to put restrictions on what the purchaser of

02:34  3   XRP from one of Ripple's counterparties could do with

02:34  4   the XRP purchased from the counterparty?

02:34  5             MR. FIGEL:  Objection.

02:34  6        A.    Well, Ripple could do what it did do.  It

02:34  7   could require the buyer of XRP to restrict the use by

02:34  8   parties down in the distribution chain.

02:34  9             And I think I recall provisions saying that

02:34 10   the buyer wouldn't sell to anyone who had an

02:34 11   investment purpose or the like.

02:35 12             But the most you could do is -- is to have

02:35 13   your -- is to require your counterparty to make

02:35 14   transactions with nonparties under certain terms so

02:35 15   that if the counterparty didn't do that, you could

02:35 16   sue the counterparty.

02:35 17        Q.    Did any of Ripple's contracts identified in

02:35 18   your report bind third parties that were not Ripple's

02:35 19   counterparties?

02:35 20             MR. FIGEL:  Objection.

02:35 21        A.    No.

02:35 22        Q.    Can we go to paragraph 135 where you talk

02:35 23   about the employee and executive compensation

02:36 24   contract.

02:36 25        A.    Yes.

155

02:36  1          MR. HANAUER:  Bless you.

02:36  2      Q.    Did any of the employee and executive

02:36  3  compensation contracts contain a restriction on what

02:36  4  the Ripple employee or executive could do with the

02:36  5  XRP they obtained from Ripple?

02:36  6          MR. FIGEL:  Objection.

02:36  7      A.    I don't think so.

02:36  8      Q.    Did you review any of Defendant

02:37  9  Garlinghouse's employee executive compensation

02:37 10  contracts with Ripple?

02:37 11      A.    No.

02:37 12      Q.    Did you review any of Defendant

02:37 13  Garlinghouse's contracts between him and Ripple?

02:37 14      A.    No.

02:37 15      Q.    Did you consider any of Defendant

02:37 16  Garlinghouse's contracts in forming your opinions?

02:37 17      A.    No.

02:38 18      Q.    Could you go to paragraph 144 of your

02:38 19  report, please.

02:38 20          (MoneyGram Agreement was marked Exhibit

02:38 21      AS-15 for identification, as of this date.)

02:38 22      Q.    Is Exhibit 15 a copy of the MoneyGram

02:38 23  agreement referenced in paragraph 144 of your report.

02:38 24      A.    Yes.

02:38 25      Q.    And when you looked at the master-hosted

                                                            156

02:39  1    services agreements, did you do anything to determine

02:39  2    that the contracts you reviewed were the only

02:39  3    contracts governing the commercial relationship

02:39  4    between Ripple and its counterparty?

02:39  5         A.   No.

02:39  6         Q.   Why was Ripple contracting with MoneyGram?

02:39  7              MR. FIGEL:  Objection.

02:39  8         A.   I don't know why, as a matter of fact, they

02:39  9    were contracting with MoneyGram.

02:39 10         Q.   And do you see how -- or can I refer you to

02:39 11    paragraph 147 of your report.

02:39 12         A.   Uh-huh.

02:40 13         Q.   Do you see how that discusses Ripple paying

02:40 14    rebates to MoneyGram?

02:40 15         A.   Yes.

02:40 16         Q.   Are you offering an opinion whether it

02:40 17    would be commercially viable for MoneyGram to use

02:40 18    Ripple's products, if not for the rebates and

02:40 19    incentives Ripple offered?

02:40 20              MR. FIGEL:  Objection.

02:40 21         A.   No.

02:41 22         Q.   Can I refer you to paragraph 160 of your

02:41 23    report, please.

02:41 24              (Loan Agreement was marked Exhibit AS-16

02:41 25         for identification, as of this date.)

157

02:41 1      Q.   Before I ask you about the loan agreements,

02:41 2  we just looked at the ███ agreement and the

02:41 3  MoneyGram agreement.

02:41 4      A.   Yes.

02:41 5      Q.   Why did you put them in different

02:41 6  categories?

02:41 7      A.   Because the loan is a different transaction

02:41 8  from --

02:41 9      Q.   I'm sorry.  And I'm not trying to be

02:41 10 confusing or anything like that.

02:41 11     A.   No.

02:41 12     Q.   Before we get to the loan agreements, I

02:41 13 want to refer back to the last two sets of agreements

02:41 14 we looked at, the MoneyGram agreement and the ███

02:41 15 agreement.

02:41 16          And my question is, why did you put them

02:42 17 into different categories?

02:42 18     A.   The -- because they had different

02:42 19 commercial purposes.

02:42 20          The ███ agreement, at least as I infer

02:42 21 from the words, was an agreement in which ███ is

02:42 22 being paid to conduct certain transactions.

02:42 23          In the MoneyGram agreement, MoneyGram was

02:42 24 using a service that Ripple provided.  So they were

02:42 25 different deals.

                                                              158

02:42 1      Q.   Do you know if ███████ used a service that

02:42 2   Ripple provided?

02:42 3      A.   I don't know any more than what the

02:42 4   contract says.

02:42 5      Q.   The contract that you reviewed says?

02:42 6      A.   Yes.

02:43 7      Q.   So do you see Exhibit 16 in front of you?

02:43 8      A.   I do.

02:43 9      Q.   Is Exhibit 16 a copy of the loan agreement

02:43 10  referenced in paragraph 160 of your report?

02:43 11     A.   Yes.

02:43 12     Q.   What is ██████████ or ████████████████?

02:44 13     A.   I'm not sure what ██████████ is.

02:44 14     Q.   Do you know what their -- what ████████████

02:44 15  business is?

02:44 16     A.   Not right now, no.

02:44 17     Q.   Do you know what the businesses of the

02:44 18  other counterparties to the loan agreements

02:44 19  identified in your report are?

02:44 20     A.   I don't recall.

02:44 21     Q.   Do you know what the purpose of the loans

02:44 22  identified in your report were?

02:44 23     A.   I think ██████████ -- ████████████ is a financial

02:44 24  services company, which is about all I know about it.

02:45 25          I would infer from looking at the agreement

                                                              159

02:45 1  that the goal was to have ███████ use XRP, but I

02:45 2  don't know that as a matter of fact.

02:45 3      Q.  Was the loan agreement with ████████

02:45 4  related to a broader commercial relationship between

02:45 5  Ripple and ██████?

02:45 6      MR. FIGEL:  Objection.

02:45 7      A.  I don't know that.

02:45 8      Q.  Were -- do you know if any of the other

02:45 9  loan agreements identified in your report were part

02:45 10  of larger commercial relationships between Ripple and

02:45 11  the counterparty?

02:45 12      A.  I don't know that.

02:45 13      Q.  Do you know if Ripple paid ████████

02:45 14  incentives, bonuses, or rebates as part of a broader

02:45 15  commercial relationship?

02:45 16      MR. FIGEL:  Objection.

02:46 17      A.  No.

02:46 18      Q.  Do you know if Ripple paid the other loan

02:46 19  and promissory note counterparties bonuses,

02:46 20  incentives, or rebates as part of a larger commercial

02:46 21  relationship?

02:46 22      A.  No.

02:46 23      Q.  Did Ripple reimburse ███████ for the --

02:46 24  for the interest Ripple charged on the loan?

02:46 25      MR. FIGEL:  Objection.

160

02:46  1          A.   Well, there's no contractual obligation for

02:46  2     Ripple to do that.  If -- at least no contractual

02:47  3     obligation under the digital asset loan agreement.

02:47  4          Q.   Do you know if Ripple reimbursed ███████

02:47  5     for the interest it charged on the loan?

02:47  6          A.   No.

02:47  7          Q.   Do you know if Ripple reimbursed any other

02:47  8     of the loan or promissory note counterparties for the

02:47  9     interest it charged?

02:47  10         A.   No.

02:47  11         Q.   Did the loan -- the ███████ loan agreement

02:47  12    contain a provision restricting what ███████ could

02:47  13    do with the XRP Ripple loaned it?

02:47  14         A.   Such a restriction would -- is not in the

02:47  15    contract.

02:47  16         Q.   Did any other of the loans or promissory

02:47  17    notes identified in your report contain restrictions

02:47  18    on what Ripple's counterparty could do with the XRP?

02:48  19         A.   I don't recall seeing any of them in this

02:48  20    type of agreement.

02:48  21         Q.   May I direct your attention to

02:48  22    paragraph 170, please.

02:48  23              (█ Custody Agreement was marked Exhibit

02:48  24         AS-17 for identification, as of this date.)

02:48  25         Q.   And Exhibit 17, is that a copy of the ████

161

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

02:49 1    custody agreement referenced in paragraph 170 of your

02:49 2    report?

02:49 3         A.   Yes.

02:49 4         Q.   When you looked at the custody agreements

02:49 5    referenced in your report, did you do anything to

02:49 6    determine that those agreements that you reviewed

02:49 7    were the only contracts governing the commercial

02:49 8    relationship between Ripple and its counterparty?

02:49 9         A.   No.

02:49 10        Q.   So the counterparty to the █ custody

02:49 11   agreement is an entity called ███████████████

02:49 12        A.   Yes.

02:49 13        Q.   What is their business?

02:49 14        A.   I don't know.

02:50 15        Q.   Do you know the businesses of any of the

02:50 16   other parties to the custody agreements identified in

02:50 17   your report?

02:50 18        A.   I don't recall.

02:50 19        Q.   And do you know what the purpose was of the

02:50 20   █ custody agreement?

02:50 21             MR. FIGEL:  Objection.

02:50 22        A.   The customer had purchased XRP.  And it

02:50 23   wanted Ripple to essentially hold it for them, to be

02:50 24   the custodian of it for them rather than take

02:50 25   possession themselves.

                                                            162

02:50 1      Q.    And do you know what ██████████
02:50 2  intended to do with the XRP Ripple loaned it?
02:51 3            MR. FIGEL:  Objection.
02:51 4      A.    No.
02:51 5            I think -- no, I don't.
02:51 6      Q.    And was the ████ custody agreement
02:51 7  substantially similar to the other custody agreements
02:51 8  you reviewed?
02:51 9      A.    Yes.
02:51 10     Q.    So the ████ custody agreement lays out the
02:51 11 terms for Ripple to custody XRP that ██████████ had
02:51 12 previously purchased from Ripple?
02:51 13     A.    That is my understanding.
02:52 14     Q.    And why did ████████████ originally buy XRP
02:52 15 from Ripple?
02:52 16           MR. FIGEL:  Objection.
02:52 17     A.    I don't know.
02:52 18     Q.    Can I ask you to look at paragraph 8 of
02:52 19 Exhibit 17.
02:52 20     A.    Uh-huh.
02:52 21     Q.    And after that first romanette, is ██████
02:52 22 ██████ representing that its holding the XRP for
02:52 23 investment purposes?
02:53 24     A.    It's representing it has the authority to
02:53 25 hold XRP for investment purposes.

                                                    163

02:53 1      Q.    And do you know whether or not ████████

02:53 2  was, in fact, holding XRP for investment purposes?

02:53 3      A.    No.

02:53 4      Q.    How many of the other custody agreements

02:53 5  contained a similar provision where the counterparty

02:53 6  represented that it is authorized to hold XRP for

02:53 7  investment purposes?

02:53 8      A.    I think they all did.

02:53 9      Q.    Was the ██ custody agreement related to a

02:53 10  broader commercial relationship between Ripple and

02:53 11  ██████████?

02:53 12      A.    I don't know that.

02:53 13      Q.    Were the other custody agreements

02:53 14  identified in your report part of -- strike that.

02:54 15          Did you review any other contracts,

02:54 16  reflecting a broader commercial relationship between

02:54 17  Ripple and the counterparties to the other custody

02:54 18  agreements identified in your report?

02:54 19          MR. FIGEL:  Objection.

02:54 20      A.    No.

02:54 21      Q.    Do you know if Ripple paid ████████

02:54 22  incentives, bonuses, or rebates?

02:54 23          MR. FIGEL:  Objection.

02:54 24      A.    No, I don't know whether they did or not.

02:54 25      Q.    Do you know if Ripple paid incentives,

164

02:54   1    bonuses, or rebates to the other counterparties of

02:54   2    the custody agreements?

02:54   3              MR. FIGEL:  Objection.

02:54   4        A.    No.

02:54   5        Q.    Did the ███ custody agreement contain a

02:54   6    provision restricting what ██████████ could do with

02:55   7    the XRP that Ripple custodied?

02:55   8        A.    No.

02:55   9        Q.    Did the other custody agreements identified

02:55  10    in your report contain provisions restricting what

02:55  11    Ripple's counterparty could do with the XRP?

02:55  12        A.    Not to my knowledge.

02:55  13        Q.    How are you doing on breaks?

02:55  14        A.    Doing okay.

02:55  15        Q.    Doing okay.  All right.  Let's keep going.

02:55  16              Can I ask you to look at page -- I'm sorry,

02:55  17    paragraph 178 of your report.

02:56  18              And you reference that ██████████ is a

02:56  19    charitable organization that provides grants and

02:56  20    other funding to Social Impact Ventures?

02:56  21        A.    Yes.

02:56  22        Q.    What is your basis for saying that?

02:56  23        A.    I think that -- that they were identified

02:56  24    as such in the contract.

02:56  25              MR. HANAUER:  Let's do Exhibit 18.

                                                              165

02:56  1          (Copy of Custody Agreement was marked

02:56  2     Exhibit AS-18 for identification, as of this

02:56  3     date.)

02:57  4     Q.   Is Exhibit 18 a custody -- a copy of the

02:57  5  custody agreement identified in paragraph 178 of your

02:57  6  report?

02:57  7     A.   Yes.

02:57  8     Q.   I'll -- I'll return to my question, and --

02:57  9  and what is your basis for saying that ███████ is

02:57 10  a charitable organization that provides grants and

02:57 11  funding to Social Impact Ventures?

02:57 12     A.   It's described as a foundation.  Foundation

02:58 13  is not a profit-making company.  So foundation's

02:58 14  usually charitable companies, which essentially make

02:58 15  grants.

02:58 16       I might have learned, in conversation about

02:58 17  this case, about Social Impact Ventures.  But it

02:58 18  was -- and I don't recall where I heard that, but it

02:58 19  was clear to me that -- just from reading the

02:58 20  agreement that we were not talking about a

02:58 21  profit-making enterprise as a counterparty.

02:58 22     Q.   Did you write the words, "A charitable

02:58 23  organization that provides grants and other funding

02:58 24  to Social Impact Ventures"?

02:58 25     A.   Yes, I did.

166

02:58 1   Q. Are you aware that the amended complaint in

02:58 2 this case alleges that Ripple and the individual

02:58 3 defendants used ███████ as a mechanism to achieve

02:59 4 Ripple's goal of distributing XRP into the public

02:59 5 trading market and increase trading in XRP?

02:59 6   A. I'm not aware of that.

02:59 7   Q. Are you offering any opinion that

02:59 8 challenges those allegations?

02:59 9   A. I don't have an opinion one way or the

02:59 10 other.

02:59 11   Q. Are you offering any opinion challenging

02:59 12 the amended complaint's -- strike that.

02:59 13    Are you offering any opinion challenging

02:59 14 any of the amended complaint's allegations relating

02:59 15 to Rippleworks?

02:59 16   MR. FIGEL:  Objection.

02:59 17   A. I would have to know what they were.

02:59 18   Q. Well, you did review the complaint, the

02:59 19 amended complaint, correct?

02:59 20   A. Yes.

02:59 21   Q. And as you sit here today, are you refuting

03:00 22 any of the allegations about ████████?

03:00 23   A. No, that's not in my report.  I don't have

03:00 24 any -- any expert opinion on what Ripple and

03:00 25 ████████ did.

167

03:00  1      Q.   Did the ██████████ cus-- did Exhibit 18,

03:00  2   did that contain a -- does that contain a provision

03:00  3   restricting what ██████████ can do with the XRP

03:00  4   Ripple custody?

03:00  5      A.   No.

03:00  6      Q.   Can you look at your report, paragraph 188,

03:00  7   please.

03:00  8           So do you see how paragraph 188 references

03:01  9   settlement agreements involving Ripple on one hand,

03:01 10   and on the other hand, ██████████, Jed McCabe [sic],

03:01 11   Arthur Britto, ██████████████████████████?

03:01 12      A.   Yes.

03:01 13      Q.   Were those the only parties to settlement

03:01 14   agreements that you reviewed?

03:01 15      A.   I think so.

03:02 16      Q.   So in Exhibit 5 to your report, it looks

03:02 17   like there could be more than a hundred settlement

03:02 18   agreements.

03:02 19      A.   I don't know how many there were.

03:02 20      Q.   Well, you can look at Exhibit F to your

03:02 21   report.

03:02 22      A.   Yeah, I -- there were a lot of them.  I

03:02 23   don't -- you asked me, once again, about a specific

03:02 24   number.  I don't have a specific number.

03:02 25      Q.   And did the -- the settlement agreements

                                                            168

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

03:02 1   on -- identified in Exhibit F to your report, did all

03:02 2   of those settlement agreements involve either

03:02 3   ████████, Jed McCabe, Arthur Britto, ████████

03:02 4   ████████?

03:03 5         A.   I think so.

03:03 6              I don't recall any other parties.

03:03 7         Q.   Why were there so many settlement

03:03 8   agreements for only a handful of counterparties?

03:03 9              MR. FIGEL:  Objection.

03:03 10        A.   I don't know.

03:03 11        Q.   Did you review all the settlement

03:03 12  agreements contained on Exhibit F to your report?

03:03 13        A.   If they were an exhibit to my report, I

03:03 14  looked at them, or most of them, or almost all of

03:03 15  them.

03:03 16        Q.   After you signed your report.

03:03 17        A.   Some before, more after.

03:04 18        Q.   For ████████, what is that company's

03:04 19  business?

03:04 20        A.   I'm not sure.

03:04 21        Q.   And do you know what the purpose was of

03:04 22  ████████ original contractual relationship with

03:04 23  Ripple?

03:04 24        A.   No.

03:04 25        Q.   Do you know what Arthur Britto or ████████

                                                              169

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

03:04 1    ███████  relationship was with Ripple?

03:04 2        A.   No.

03:05 3        Q.   What about ████████████?

03:05 4        A.   I know that ██████████████ was supposed to

03:05 5    provide certain services to Ripple.

03:05 6        Q.   What services were those?

03:05 7        A.   The contract describes them as ambassador

03:05 8    services.

03:05 9        Q.   Are you able to fill in any more details on

03:05 10   what those ambassador services entailed?

03:05 11       A.   No.

03:05 12       Q.   Did any of the settlement agreements

03:05 13   identified in your report contain a provision

03:05 14   restricting what Ripple's counterparty could do with

03:05 15   the XRP Ripple provided?

03:05 16            MR. FIGEL:   Objection.

03:05 17       A.   I don't think so.

03:06 18       Q.   So in paragraph 191, you say that the R3

03:06 19   option sets out terms pursuant to which XRP2 grants

03:06 20   R3 HoldCo the right to purchase up 5 billion units of

03:06 21   XRP at a per-unit price of .8 -- of .85 cents.

03:06 22            Is that correct?

03:06 23       A.   Yeah.

03:06 24       Q.   And you understood XRP2 to be a subsidiary

03:06 25   of Ripple?

170

03:06  1        A.   Yes.

03:06  2        Q.   Is the option to purchase point -- XRP at

03:06  3   .85 cents per unit, is that a significant discount to

03:07  4   Ripple's market price?

03:07  5             MR. FIGEL:  Objection.

03:07  6        A.   I don't know the answer to that.

03:07  7        Q.   If you were to assume that .85 cents per

03:07  8   unit was a significant discount to market price, did

03:07  9   the ▮ option allow ▮▮▮▮ to profit from the XRP

03:07 10   it obtain-- purchased from Ripple if it immediately

03:07 11   sold that XRP into the market?

03:07 12             MR. FIGEL:  Objection.

03:07 13        A.   That's a two -- maybe you could break that

03:07 14   question down into two, because that was a pretty

03:07 15   long question.

03:07 16        Q.   Okay.  So the first part is the -- I asked

03:08 17   you if the -- the option price was a significant

03:08 18   discount to market price.

03:08 19        A.   I said I didn't know the answer to that.

03:08 20        Q.   Fair enough.

03:08 21             Now I'm asking you to assume that it was a

03:08 22   significant discount to market price.

03:08 23        A.   Yes.

03:08 24        Q.   If that's the case, does the ▮ option

03:08 25   allow Ripple's counterparty to profit off the XRP it

171

03:08  1    purchased from Ripple if it turns around and sells

03:08  2    that XRP at market price?

03:08  3              MR. FIGEL:  Objection.

03:08  4         A.   Well, I mean, if -- if I could sell

03:08  5    something at $10 a unit in the market and you're

03:08  6    charging me $2 for it, I'm going to make $8 if I

03:08  7    resell it.  That seems to be -- so it's certainly --

03:08  8    what you say is a possibility.

03:08  9              But in other words, this -- so far as I can

03:08 10    tell, these were -- this is another way to make a --

03:09 11    to make a payment pursuant to a settlement agreement.

03:09 12              So instead of giving you a hundred dollars,

03:09 13    I give you the right to buy an asset for 50 you can

03:09 14    sell at a hundred dollars.  It seems as if that

03:09 15    was -- that there was just a settlement and that's

03:09 16    the way that ███████ is partially compensated.  But

03:09 17    that's all I know about it.

03:09 18         Q.   Would it make commercial sense for

03:09 19    ████████ to exercise the ███ option if the market

03:09 20    price of XRP was below .85 cents per unit?

03:09 21              MR. FIGEL:  Objection.

03:09 22         A.   No.

03:10 23         Q.   Did you review -- so can I refer you to

03:10 24    paragraph 204 of your report, please.

03:10 25         A.   Yes.

                                                            172

03:10  1        Q.   And do you see how you say, In addition to

03:10  2   the ████████ settlement, I also reviewed the Britto

03:10  3   settlement agreement?

03:10  4        A.   Yes.

03:10  5        Q.   Did you review any other settlement

03:10  6   agreements other than the ones between ██████ and

03:11  7   Ripple and Arthur Britto and Ripple?

03:11  8        A.   I don't recall doing that.

03:11  9        Q.   Did you review any settlement agreement

03:11  10  between Ripple and Mr. McCaleb?

03:11  11       A.   I don't recall reading that.

03:11  12       Q.   Did the Britto settlement agreement allow

03:11  13  Mr. Britto to purchase XRP at a discount to market

03:11  14  price?

03:11  15            MR. FIGEL:  Objection.

03:11  16       A.   The contract does not give Mr. Britto any

03:11  17  such rights.  If there are any extracontractual

03:11  18  rights, I don't know about them.

03:12  19            MR. HANAUER:  How are you doing?

03:12  20            THE WITNESS:  I'm okay.  Well, it's -- we

03:12  21  could take a break for a little while.

03:12  22            MR. FIGEL:  I think we should.

03:12  23            MR. HANAUER:  Go off the record, please.

03:12  24            THE VIDEOGRAPHER:  Off the record, the time

03:12  25  is 3:13.

173

03:12  1            (A recess was taken from 3:13 to 3:39.)

03:37  2         THE VIDEOGRAPHER:  Back on the record.  The

03:37  3  time is 3:39.  And, Reid, just put your microphone

03:37  4  on.

03:38  5         MR. FIGEL:  Thank you.

03:38  6     Q.  Professor Schwartz, can I direct you to

03:38  7  paragraph 209 of your report where you're talking

03:38  8  about the Xpring contracts?

03:38  9     A.  Yes.

03:38 10     Q.  What was the Xpring program?

03:38 11     A.  Excuse me?

03:38 12     Q.  What was the -- and I'm not sure if I'm

03:38 13  saying this right.  What was the Xpring program?

03:38 14     A.  It's a program under which Ripple made

03:38 15  investments in other companies and which they

03:38 16  exchanged either cash or XRP for equity or services.

03:38 17     Q.  And what's your basis for saying that?

03:38 18     A.  The contract -- that's what the contracts

03:38 19  provided.

03:39 20     Q.  And do you know what the Xpring

03:39 21  counterparties intended to do with the XRP Ripple

03:39 22  provided them?

03:39 23     A.  Do I -- no, I don't know what they intended

03:39 24  to do.

03:39 25     Q.  Are you aware that the amended complaint in

174

```
03:39  1   this case alleges that Ripple used Xpring as a
03:39  2   mechanism to achieve Ripple's goal of distributing
03:39  3   XRP into the public trading market and increase
03:39  4   trading in XRP?
03:39  5        A.   Yes, I'm aware of that.
03:39  6             I want to amend what I said in the ████
03:39  7   contract.
03:39  8             THE COURT REPORTER:  I'm sorry.  In the
03:39  9   what?
03:39 10             THE WITNESS:  ██████
03:39 11             THE COURT REPORTER:  Thank you.
03:39 12        A.   ████ promised to -- to develop and
03:40 13   integrate XRP, and to essentially, you know, get X--
03:40 14   increase XRP's use.  So...
03:40 15        Q.   That was the purpose of ████ contract
03:40 16   with Ripple?
03:40 17        A.   That's what they promised to use best
03:40 18   efforts to do.
03:40 19        Q.   So going -- is there anything else you need
03:40 20   to amend or correct?
03:40 21        A.   No.
03:40 22        Q.   So, I believe you said that you were aware
03:40 23   of the allegations in the amended complaint regarding
03:40 24   Xpring?
03:40 25        A.   Yes.  I read the amended complaint.
```

175

03:40  1        Q.    Are you offering any opinion that

03:40  2    challenges the amended complaint's allegations

03:40  3    regarding Xpring?

03:40  4        A.    No.

03:40  5             MR. FIGEL:   Objection.

03:41  6        Q.    Did the Xpring contracts contain a

03:41  7    provision restricting what Ripple's counterparty

03:41  8    could do with the XRP Ripple provided?

03:41  9        A.    Not to my recollection.

03:41  10       Q.    Did Ripple take any steps to restrict the

03:41  11   Xpring counterparties from reselling the XRP Ripple

03:41  12   provided them to the public?

03:41  13            MR. FIGEL:   Objection.

03:41  14       A.    No.

03:41  15            Not that -- no.

03:42  16       Q.    Can I refer you to paragraph 216 of your

03:42  17   report, please.

03:42  18            So you reference various joint venture

03:42  19   contracts?

03:42  20       A.    Yes.

03:42  21       Q.    And what did you do to determine that the

03:42  22   joint venture contracts you reviewed were the only

03:42  23   contracts governing the commercial relationship

03:42  24   between Ripple and its counterparty?

03:42  25       A.    I didn't do anything.

                                                              176

03:43  1          (Joint Venture Agreement Between Ripple and

03:43  2     ███ was marked Exhibit AS-20 for identification,

03:43  3     as of this date.)

03:43  4     Q.   Do you see how Exhibit-- I'm sorry.

03:43  5          Do you see on paragraph 216 of your report

03:43  6     references a joint venture agreement between Ripple

03:43  7     and ███

03:43  8     A.   Yes.

03:43  9     Q.   Is Exhibit 20 a copy of that joint venture

03:43 10     agreement?

03:44 11     A.   Yes.

03:44 12     Q.   What was the business purpose of the ███

03:44 13     joint venture?

03:44 14     A.   Essentially to distribute or increase

03:44 15     distribution of Ripple, in the territory defined

03:44 16     under agreement.

03:44 17     Q.   When you say "increase the distribution of

03:44 18     Ripple," do you mean the distribution of XRP?

03:44 19     A.   Yes, the distribution of XRP in Japan,

03:44 20     specifically.

03:44 21     Q.   By entering into the joint venture

03:45 22     agreement, did Ripple help facilitate the trading of

03:45 23     XRP?

03:45 24          MR. FIGEL:  Objection.

03:45 25     A.   The object was to have ███, I think it's

                                                            177

03:45  1    ██████ clients and future clients use XRP.

03:45  2         Q.   For what?

03:45  3         A.   For whatever purpose that they wanted to

03:45  4    use it.

03:45  5         Q.   Are you offering any opinion on what

03:45  6    anybody who obtained XRP from the joint venture

03:45  7    intended to do with it?

03:45  8              MR. FIGEL:   Objection.

03:45  9         A.   No.

03:45 10         Q.   Did the joint venture -- any of the joint

03:45 11    venture agreements contain a provision restricting

03:46 12    what could be done with any of the XRP Ripple

03:46 13    provided?

03:46 14         A.   No.

03:46 15         Q.   Can you look at paragraph 219 of your

03:46 16    report.

03:47 17              Do see how paragraph 219 of your report

03:47 18    references an entity called ██████?

03:47 19         A.   Yes.

03:47 20         Q.   And do you have Exhibit 21 in front of you?

03:47 21         A.   Yes.

03:47 22              (██████ Contract was marked Exhibit AS-21 for

03:47 23         identification, as of this date.)

03:47 24         Q.   Is Exhibit 21 one of the ██████ contracts

03:47 25    referenced in paragraph 219?

                                                              178

03:47  1        A.   Yes.

03:47  2        Q.   And what was the purpose of the

03:48  3   contemplated arrangement between Ripple and ███?

03:48  4        A.   ███ was supposed to create a -- a fund and

03:48  5   sell shares in it to investors.

03:48  6             And the fund was going to hold as an asset

03:48  7   XRP.

03:48  8        Q.   Is it your understanding that the potential

03:48  9   investors in the XRP fund would seek to profit off

03:48 10   their investment?

03:48 11             MR. FIGEL:  Objection.

03:48 12        A.   I think everybody seeks to profit off their

03:48 13   investment.

03:48 14        Q.   And you write in paragraph 219 that the

03:48 15   parties contemplated that interest in the fund would

03:49 16   be offered and sold in the United States pursuant to

03:49 17   an exemption from registration under the Securities

03:49 18   Act?

03:49 19        A.   Yes.

03:49 20        Q.   Would the interests in the ███ fund sold

03:49 21   to investors, would those have been securities under

03:49 22   the federal securities laws?

03:49 23             MR. FIGEL:  Objection.

03:49 24        A.   I don't have an opinion about that.

03:49 25        Q.   Do you know why the ███ fund was never

                                                          179

03:49  1   established?

03:49  2        A.   No.

03:49  3             MR. HANAUER:  Can I take one minute to

03:49  4   confer with counsel.

03:49  5             THE VIDEOGRAPHER:  Going off the record.

03:49  6   The time is 3:51.

03:50  7             (Discussion off the record.).

03:50  8             THE VIDEOGRAPHER:  Back on the record.  The

03:50  9   time is 3:51.

03:50  10            MR. HANAUER:  Thank you very much,

03:50  11   Professor Schwartz.  We have no further questions at

03:50  12   this time.

03:50  13            THE WITNESS:  Okay.

03:50  14            MR. FIGEL:  And on behalf of Ripple, we

03:50  15   have no questions.

03:50  16            I'm not sure if anyone else on -- do

03:50  17   counsel for the other parties have any questions for

03:50  18   Professor Schwartz?

03:50  19            MS. PROSTKO:  No.  On behalf of Larsen

03:50  20   defendant, we have no questions, but we thank you

03:50  21   very much for your time today.

03:50  22            MR. BONILLA:  I have no questions, for

03:50  23   Defendant Garlinghouse.

03:50  24            MR. HANAUER:  Do you do the reserving

03:50  25   signature on the record here in New York?

                                                              180

03:50   1                MR. FIGEL:  Yes.

03:50   2                We will just assume it.

03:51   3                MR. HANAUER:  Okay.  Thank you.

03:51   4                THE VIDEOGRAPHER:  That concludes today's

03:51   5      deposition.  The time is 3:52.

        6                (Time noted: 3:52 p.m.)

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25

                                                              181

```
 1                CERTIFICATE OF WITNESS

 2

 3

 4        I, ALAN SCHWARTZ, do hereby declare under

 5        penalty of perjury that I have read the entire

 6        foregoing transcript of my deposition testimony,

 7        or the same has been read to me, and certify that

 8        it is a true, correct and complete transcript of

 9        my testimony given on February 11, 2022, save and

10        except for changes and/or corrections, if any, as

11        indicated by me on the attached Errata Sheet, with

12        the understanding that I offer these changes and/or

13        corrections as if still under oath.

14           _____ I have made corrections to my deposition.

15           _____ I have NOT made any changes to my deposition.

16

17    Signed: _____
                 ALAN SCHWARTZ
18

19    Dated this _____ day of _____ of 20____.

20

21

22

23

24

25
                                                            182
```

```
1                    C E R T I F I C A T E

2

3    STATE OF NEW YORK      )
                            )   Ss.:
4    COUNTY OF NEW YORK     )

5

6        I JEFFREY BENZ, a Certified Realtime Reporter,

7    Registered Merit Reporter and Notary Public within and

8    for the State of New York, do hereby certify:

9        That the witness whose examination is hereinbefore

10   set forth was duly sworn by me and that this transcript

11   of such examination is a true record of the testimony

12   given by such witness.

13       I further certify that I am not related to any of

14   the parties to this action by blood or marriage and that

15   I am in no way interested in the outcome of this matter.

16       IN WITNESS WHEREOF, I have hereunto set my hand

17   this  14th  of  February , 2022

18

19   _____

20   JEFFREY BENZ, CRR, RMR

21

22

23

24

25
```

```
1                         ERRATA SHEET

2     Deposition of: ALAN SCHWARTZ
      Date taken:  FEBRUARY 11, 2022
3     Case:  SEC v. RIPPLE LABS, INC., et al.

4     PAGE  LINE
      _____ _____    CHANGE: _____
5                      REASON: _____

6     _____ _____    CHANGE: _____
                       REASON: _____
7
      _____ _____    CHANGE: _____
8                      REASON: _____

9     _____ _____    CHANGE: _____
                       REASON: _____
10
      _____ _____    CHANGE: _____
11                     REASON: _____

12    _____ _____    CHANGE: _____
                       REASON: _____
13
      _____ _____    CHANGE: _____
14                     REASON: _____

15    _____ _____    CHANGE: _____
                       REASON: _____
16
      _____ _____    CHANGE: _____
17                     REASON: _____

18    _____ _____    CHANGE: _____
                       REASON: _____
19
      _____ _____    CHANGE: _____
20                     REASON: _____

21    _____ _____    CHANGE: _____
                       REASON: _____
22
      _____ _____    CHANGE: _____
23                     REASON: _____

24
      Signed_____
25    Dated_____

                                                      184
```