# Exhibit 33

## COINONE XRP Volume Incentive Program

**Overview:**

This Volume Incentive Agreement (the "Agreement") is between Ripple Markets Inc. ("**Ripple**"), a California corporation doing business at 300 Montgomery Street, 12th Floor, San Francisco, CA 94129, and CoinOne Ltd. ("**COINONE**"), a *Kato of Korea* corporation, doing business at *19F lo Three JFC Crosgamyungro* and is effective as of the date the last Party signs (the "**Effective Date**").  In this Agreement Ripple and COINONE may be referred to individually as "Party" and together as "Parties."

1. **Purpose:**  The Parties are entering into this Agreement in an effort to increase the liquidity of XRP, an asset native to the Ripple Consensus Ledger ("**RCL**"), through the application of certain XRP transaction volume incentives. Pursuant to the terms and conditions of this Agreement, COINONE agrees to engage in efforts to promote the liquidity of XRP on its exchange platform by implementing an incentive program applicable to a selection of its qualified registered members of COINONE's services. In return for COINONE's efforts intended to increase XRP liquidity, Ripple agrees to reserve certain and defined incentives, as described in this Agreement, and will compensate COINONE in XRP. Lock Up Periods are referenced in the below terms. Ripple will provide CoinOne with exclusivity for Ripple's XRP volume incentive program in the Korean Won (KRW) digital asset exchange market for 6 months starting from the program launch date.

2. **Duties of COINONE:**

    2.1 COINONE has implemented systems and procedures to meet anti-money laundering, sanctions and other regulations.  These systems and procedures include risk-based customer due diligence such as identification, verification and "know your customer" procedures and enhanced due diligence for those customers presenting higher risk, such as Politically Exposed Persons.  COINONE also maintains a sanctions policy which prohibits it from transacting with individuals, companies and countries on proscribed sanctions lists, including the UK Treasury and the US Office of Foreign Assets Control. COINONE will continue to maintain these policies and procedures to ensure that its services comport with applicable law, including, but not limited to, those discussed above.  The Parties agree that COINONE will adhere to these requirements for the duration of the Parties' Agreement.

    2.2 For market transparency and to engage COINONE's registered members who meet COINONE's user requirements ("**Participants**"), COINONE will announce the terms of the Volume Incentive Program (the "**Program**") on or before June 1, 2017. COINONE will publish the material terms of the Program in an effort to notify and encourage participation, and to inform the market of these Program incentives.

    2.3 COINONE will enroll Participants in the Program beginning on the Effective Date.

    2.4 The Program will be live for three (3) months, June, July, and August 2017 ("**Program Duration**".

    2.5 For the Program Duration, the top ten (10) Participants ranked by notional trading volume in XRP on COINONE will receive a monthly rebate of up to one percent (1%) of their notional trade volume in XRP for that month, not to exceed a total of USD $75,000, or the equivalent amount in XRP as specified below, for all ten (10) Participants in total for each month, excluding self-matching volume ("**Volume Incentives**").

    2.6 COINONE agrees to make any and all necessary changes to its website and user agreements to further facilitate participation in the Program.

3. **Incentives and Payment:**

    3.1 Ripple agrees to pay Volume Incentives, with the total maximum of up to $75,000 per each month or the equivalent amount in XRP as specified below, for each calendar month of the Program Duration. Ripple

1                                                                                          Confidential

will pay the Volume Incentive, following Section 3.2 of this Agreement, on the Payment Date. Ripple, at its own option, may pay the Rebate in USD or XRP. If paid in XRP, Ripple will value the XRP using the price of XRP traded against USD on the Primary Market at 12:00:01 a.m. GMT, as reported on https://charts.ripple.com, for the day immediately preceding the Payment Date. The Primary Market means the market for the exchange of XRP on Ripple Consensus Ledger where trades are made on the XRP/USD cross, which has the highest volume of trading as compared to other XRP/USD crosses on the relevant date.

3.2 By no later than the first Monday of the following month (July 2017, August 2017, September 2017) that the Program is live (June 2017, July 2017, August 2017) COINONE will inform Ripple of the total calculated incentive payout, not to exceed USD $75,000 or equivalent value. The Volume Incentive will be paid to COINONE by no later than the third Monday of the applicable month (**"Payment Date"**). For clarity and to provide an example, for the month of July, COINONE will inform Ripple of the July total calculated incentive payout by August 7 (the first Monday), and Ripple will pay COINONE the undisputed Volume Incentive (in USD or XRP) no later than August 21 (the third Monday). If paid in XRP, the number of XRP will be based on the XRP price (as specified in section 3.1) as of 12:00:01 GMT on August 20.

4. **Desired Outcome of the Volume Incentive Program:** The Parties anticipate that the end result of the Program will be a liquid and robust XRP market on COINONE's exchange. If the Program is successful, the Parties may extend the Program through an additional agreement.

5. **Compliance with Laws:** Each party shall at all times comply with all laws, regulations, and administrative or judicial orders that are applicable to the operation of its business, this Agreement, and its performance hereunder, including, but not limited to, any applicable asset control or anti-money laundering laws, rules, and regulations. Without limiting the generality of the foregoing, each party shall at all times at its own expense, obtain and maintain all certifications, authorizations, licenses, and permits materially necessary to the exercise of its rights and the performance of its obligations under this Agreement.

6. **Intellectual Property:** Each party shall retain all right, title and interest in its intellectual property rights, including those held before this Agreement, or have developed independently of this Agreement.

7. **Confidentiality:** The parties agree to hold all non-public, proprietary information about their businesses, including but not limited to technology, intellectual property, business plans, strategies, pricing, systems, methods, programs, techniques, etc. in strictest confidence and use it solely to fulfill the Purpose and for no other uses. The precautions taken by the parties shall be at least equivalent in scope and effect to the measures taken by the party receiving the confidential information to protect its own confidential information of a like or similar nature, but in no case less than a reasonable degree of care. The parties further agree that the contents of this Agreement constitutes Confidential Information and shall be protected as such.

8. **Limitation of Liability:** Except for a breach of confidentiality, to the maximum extent permitted by applicable law, each party's liability to the other for any breach of this Agreement, and other party's sole and exclusive remedy, for any cause whatsoever and regardless of the form of action (whether in contract or it tort, including negligence) will be limited to actual, direct damages. In no event will Ripple or COINONE's Aggregate Liability for any losses and damages arising out of or related to this Agreement exceed the total amount paid to COINONE or received from Ripple. Furthermore, in no event will either party be liable to the other party for any lost profits, loss of business, or other consequential, special, incidental, indirect, exemplary or punitive damages arising out of or related to this Agreement, even if the party has been advised of the possibility of such damages. Each party shall defend, indemnify and hold the other party harmless from any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or related to the other party's breach of this Agreement

Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0066689

9. **Warranties:** Each party represents to the other party that it: (a) is a legal entity duly organized and validly existing under the laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement and perform its obligations hereunder; and (c) when executed and delivered by such party, this Agreement will constitute legal, valid and binding obligation of such party that is enforceable in accordance with its terms hereunder.

10. **Termination:** This Agreement shall continue until the earliest of:

   10.1    The expiration of the Volume Incentive Program exclusivity on December 31, 2017 at 11:59 pm EST;

   10.2    Upon written notice of termination by a party if the other party is in material breach of this Agreement, if the breaching party does not, within ten (10) calendar days after receiving written notice describing an alleged material breach of this Agreement, cure the material failure; or

   10.3    Upon the mutual agreement of the Parties to terminate this Agreement.

11. **Effects of Termination; Survival:**  The following rights and obligations shall survive the expiration or termination of this Agreement:  Section 5 (Compliance with Laws); Section 6 (Intellectual Property); Section 7 (Confidentiality); Section 8 (Limitation of Liability); Section 15 (Severability); and Section 16 (Law and Disputes).

12. **Relationship of the Parties:** This Agreement will not be construed as creating an agency, partnership, joint venture or any other form of association, for tax purposes or otherwise between the parties and the parties will at all times be and remain independent contractors.  Neither party will have the authority to enter into any contract on behalf of the other party or to otherwise bind the other party to any legal obligation.

13. **Assignment:** Neither party may assign this Agreement or any right hereunder without the prior written consent of the other Party.  Any purported assignment made in violation of this provision will be deemed to be and will be void.  Notwithstanding the foregoing, each party shall be entitled to assign this Agreement to in its entirety to an affiliate, acquirer or successor entity as the result of a restructuring, merger, or sale of all or a substantial part of its business or assets.

14. **Entire Agreement:** This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations, and other communications between the parties, whether oral, written, electronic or otherwise.

15. **Severability:** If any provision of this Agreement is held to be invalid or unenforceable, the parties agree that such invalidity or unenforceability shall not affect the validity of the remaining provisions of this Agreement and that they shall undertake to negotiate in good faith a substitute valid provision which most closely approximates the intentions and economic effect of the invalid provisions.

16. **Law and Disputes:**

   16.1    Governing Law -- any claim, controversy or dispute arising under or related to this Agreement will be governed by the of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.

   16.2    Informal Dispute Resolution -- At the written request for either party, the parties will attempt to resolve any dispute arising under or relating to this Agreement through the informal means described in this paragraph.  Each party will appoint a senior management representative and this representative will furnish the other all non-privileged information with respect to the dispute that the parties believe is germane.  The representatives will negotiate in an attempt to to resolve the dispute without the necessity of a formal proceeding.  A formal proceeding for the resolution of the dispute may not commence until the earlier of (i) the designated representatives conclude that resolution through continued negotiation does not appear likely, or (ii) fourteen calendar days have passed since the initial request to negotiate the dispute was made -- unless this time has been extended by both parties in a writing.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                        RPLI_SEC 0066690

16.3    Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be irrevocably submitted to federal court sitting in San Francisco, California.

As of the Effective Date, the Parties agree to be bound, and have caused this Agreement to be executed, by their authorized representatives.

**RIPPLE LABS INC.**                                     **COINONE**

By:                                                      By:

Name:                                                    Name:

Title:                                                   Title:

Date:                                                    Date:

Address:   300 Montgomery Street, 12ᵗʰ Floor            Address:

San Francisco, CA 94104

Attn: General Counsel

4                                                        Confidential