# Exhibit 37

**XRP Volume Incentive and Fee Rebate Program Agreement**

This XRP Volume Incentive and Fee Rebate Program Agreement (the "**Agreement**") is effective the date the last Party signs ("**Effective Date**") and is between Ripple Markets Inc., a California corporation doing business at 315 Montgomery Street, San Francisco, CA 94104 ("**Ripple**"), and SFOX, Inc., a Texas corporation doing business at 8939 S. Sepulveda Blvd, Suite 102, Los Angeles, CA 90045 ("**SFOX**"). Ripple and SFOX are hereby each individually referred to as a "**Party**", and collectively referred to as the "**Parties**."

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

**SECTION 1. SFOX XRP SUPPORT AND XRP FEE REBATE PROGRAM.**

(a) **SFOX Duties.**

(i) No later than [REDACTED] from the Effective Date, SFOX shall expand its integrated order book platform to support trading pairs in XRP, the digital asset native to the XRP Ledger, available to its customers ("**XRP Support**"). SFOX shall ensure XRP Support is similar in quality to the support it may provide other similarly situated and comparable digital assets. For the avoidance of doubt and subject to the foregoing sentence, SFOX in its sole and absolute discretion, will ultimately decide the particulars of the support and resources it dedicates or allocates to the XRP Support.

(ii) Upon SFOX's launch of XRP Support, SFOX shall promote the liquidity of XRP on the digital asset exchanges with which it maintains accounts, with the goal of supporting, as a market maker, the trading activity of its customers ("**Market Making**").

(iii) For [REDACTED] from the Effective Date ("**SFOX Fee Rebate Program Duration**"), SFOX shall implement a trading fee rebate program available to its customers who trade in XRP on SFOX's integrated order book platform, covering in full any fees SFOX charges such customers for such transactions ("**SFOX Fee Rebate Program**"), subject to such customer eligibility criteria as SFOX may develop in its discretion; provided, however, SFOX shall have no obligation to provide such rebate to its customers beyond an aggregate amount under the SFOX Fee Rebate Program of [REDACTED]

(iv) SFOX shall provide to Ripple [REDACTED] reporting of: (A) all SFOX customer trading volume with respect to XRP ("**Reported SFOX Customer Volume**") and (B) the itemized fees SFOX has charged to its customers who trade in XRP on its integrated order book platform and the trading fee rebate it has provided to such customers under the SFOX Fee Rebate Program ("**Reported SFOX Fees and Rebates**"). The Reported SFOX Customer Volume and Reported SFOX Fees and Rebates shall specify such amounts in total and broken down by currency or digital asset type and such pricing or fee tier as SFOX may implement in its discretion; provided, however, SFOX shall not provide to Ripple any information that would potentially identify any specific individual or any other

information that is unrelated to this Agreement. With respect to each [REDACTED] SFOX shall deliver to Ripple the Reported SFOX Customer Volume and the Reported SFOX Fees and Rebates no later than the [REDACTED] During the term of this Agreement and for [REDACTED] thereafter, at Ripple's expense, Ripple will have the right to review SFOX's records as necessary to confirm the accuracy of the Reported SFOX Customer Volume and Reported SFOX Fees and Rebates. Such records will be made available electronically or, if such records are not maintained in electronic form, made available to Ripple during normal business hours at SFOX's office and shall be subject to [REDACTED] advance written notice.

(v) For the period beginning no later than [REDACTED] from the Effective Date through the term of this Agreement, SFOX shall make commercially reasonable efforts to operate a rippled validator (the open source software with respect to the XRP Ledger located at https://github.com/ripple/rippled), under the license terms with respect to that software located at https://github.com/ripple/rippled/blob/develop/LICENSE.

(vi) SFOX shall allow Ripple to create an account for the purpose of testing from time to time the basic operational functionality of SFOX's integrated order book platform (a "**Test Account**"). Notwithstanding anything to the contrary in this Agreement, SFOX has and will retain sole responsibility for the operational reliability of its platforms, products, and services. SFOX agrees that the terms of this Agreement will not relieve it of its obligation and responsibility to exercise its own independent judgment with respect to operational risk and additional steps or procedures appropriate to mitigate such risk. RIPPLE HAS NO OBLIGATION OR LIABILITY FOR ANY LOSS THAT SFOX MAY SUSTAIN RESULTING FROM ANY OPERATIONAL FAILURES INVOLVING SFOX's PLATFORMS, PRODUCTS, AND SERVICES.

(vii) SFOX must provide to Ripple a primary technical contact at SFOX that can be reached with respect to SFOX's operation of a rippled validator and the Test Account, as provided in this Agreement. SFOX's technical contact must have appropriate training and be knowledgeable about SFOX's integrated order book platform. The technical contact will be expected to work with Ripple in a timely manner and make themselves and/or their equipment available for exigent issues. SFOX must promptly notify Ripple whenever technical contact responsibilities are transferred to another individual.

(b) **Ripple Duties**.

(i) Ripple shall pay SFOX in accordance with the following payment schedule based on Reported SFOX Customer Volume on the SFOX integrated order book platform, with the exclusion of any self-matching volume and up to an aggregate maximum of $[REDACTED] (each a "**Volume Incentive Payment**"):

| Triggering event | Payment to SFOX | Form of Payment |
|---|---|---|
| Upon Effective Date | | XRP |
| in cumulative Reported SFOX Customer Volume from the Effective Date | | USD |
| $ in cumulative Reported SFOX Customer Volume from the Effective Date | | USD |
| in cumulative Reported SFOX Customer Volume from the Effective Date | | USD |

With respect to the first Volume Incentive Payment, Ripple shall use commercially reasonable efforts to make such payment through a transfer of XRP within business days following the Effective Date. For any subsequent Volume Incentive Payment, Ripple shall make each such payment to SFOX subject to such verification as Ripple may reasonably require and SFOX's provision of reasonable assistance to Ripple in connection with such verification (including promptly providing Ripple with such records as Ripple may request under Section 1(a)(iv)), but in no case later than following Ripple's receipt from SFOX of the Reported SFOX Customer Volume that supports the occurrence of the triggering event. Ripple shall make such payment in U.S. dollars.

(ii) Ripple shall pay SFOX each within the SFOX Fee Rebate Program Duration the aggregate amount of the trading fee rebate SFOX has provided to its customers under the SFOX Fee Rebate Program based upon Reported SFOX Fees and Rebates, with the exclusion of any trading fee rebates SFOX has provided in connection with any self-matching volume; provided, however, the maximum amount of any such monthly payment from Ripple to SFOX shall be . Ripple shall make each monthly payment to SFOX under this section in U.S. dollars and subject to such verification as Ripple may reasonably require and SFOX's provision of reasonable assistance to Ripple in connection with such verification (including promptly providing Ripple with such records as Ripple may request under Section 1(a)(iv)), but in no case later than following Ripple's receipt from SFOX of the Reported SFOX Fees and Rebates for such

(iii) With respect to any transfer of XRP from Ripple to SFOX under this Agreement, Ripple shall transfer such XRP to an XRP address directly owned by SFOX. Additionally, Ripple shall calculate the amount of any such XRP payment using the price one unit of XRP is traded at the time payment is made against the USD asset on the XRP Ledger with the largest volume in the XRP/USD pair, as reported on XRP Charts (https://xrpcharts.ripple.com) over the previous seven (7) trading days immediately preceding the date payment is made.

(iv) Ripple shall use commercially reasonable efforts to provide SFOX with remote support in connection with SFOX's integration of Ripple API, the official application programming interface library that facilitates access to the XRP Ledger, with respect to SFOX's balances of XRP.

(c) **Promotion and Marketing.** Each Party shall use commercially reasonable efforts to publicize the launch of SFOX's XRP Support, Market Making, and the

SFOX Fee Rebate Program via website promotion (including, with respect to Ripple, the blog Ripple Insights), email updates, and social media, in a professional and diligent manner consistent with industry standards and good business practice; provided, however, neither Party may issue any press release or make any other public statement with respect to this Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party.

(d) **Access to XRP**. From time to time, the Parties may enter into transactions in which Ripple or an affiliate of Ripple agrees to transfer XRP to SFOX against the transfer of funds, typically U.S. dollars, by SFOX to Ripple or an affiliate of Ripple, under such terms and conditions as mutually agreed between the Parties.

**SECTION 2. OTHER TERMS AND CONDITIONS.**

(a) **Taxes**. Any payment from Ripple to SFOX under this Agreement, including payment in XRP, is exclusive of any applicable taxes. To the extent any taxes are applicable to the payment from Ripple to SFOX under this Agreement, SFOX shall be obligated to pay all taxes applicable to SFOX. Ripple is not responsible for any taxes that SFOX is legally obligated to pay in any jurisdiction in which such taxes are incurred or arise in connection with the SFOX's business activities (under this Agreement or otherwise).

(b) **Risk of Loss**. With respect to any payment of XRP from Ripple to SFOX under this Agreement, SFOX acknowledges and agrees that SFOX cannot cancel, reverse, or change any XRP transfer that has been completed, as recorded on the XRP Ledger.

(i) Immediately upon Ripple's delivery of XRP to SFOX, all title to and risk of loss related to such XRP passes to SFOX. SFOX acknowledges and agrees that Ripple has no liability to SFOX or any third party for any loss, theft or misuse of any XRP that Ripple has actually delivered to SFOX as provided in this Agreement.

(ii) SFOX acknowledges and agrees that SFOX is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that it uses to access its XRP, including any XRP it receives under this Agreement ("**SFOX Credentials**"). Any loss or compromise of SFOX Credentials may result in unauthorized access to XRP by third-parties and the loss or theft of such XRP. **Ripple assumes no responsibility for any loss that SFOX may sustain due to compromise of SFOX Credentials.**

(c) **SFOX Acknowledgment**. SFOX acknowledges and agrees that (i) XRP does not represent a right to make any demand on Ripple, (ii) Ripple has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item; and (iii) Ripple is not responsible for any use by SFOX or any third party of any XRP that Ripple has delivered to SFOX under this Agreement.

(d) **Applicable Laws**. The Parties shall at all times comply with all laws, regulations, and administrative or judicial orders that are applicable to the

operation of their respective business, this Agreement, and its performance hereunder, including, but not limited to, any applicable laws, rules, and regulations related to sanctions and asset controls, the prevention of market manipulation, fraud, anti-bribery, corruption, and anti-money laundering. Without limiting the generality of the foregoing, the Parties shall at all times, and at their own expense, obtain and maintain all material licenses, authorizations, approvals, consents, or permits required by applicable laws to conduct its business generally and to perform its obligations under this Agreement. Any breach of this section is a material breach of this Agreement and is grounds for immediate termination.

(e) **Responsibility to SFOX's Customers**. SFOX is responsible for all customer service and other issues or claims that relate to SFOX's platforms, services, and products and its distribution or sale of XRP. SFOX shall make no representations or warranties to any other party concerning, or on behalf of, Ripple.

(f) **Confidentiality**. Each Party shall maintain all Confidential Information (as that term is defined below) it receives in strict confidence and not disclose any Confidential Information to anyone other than the employees, contractors, or agents (all of the foregoing, collectively, "**Representatives**") who need to have access to such information to perform obligations under this Agreement and are bound by confidential obligations at least as protective as the provisions in this Section 2(f) prior to any disclosure of such information to such persons, or use any Confidential Information for any purpose other than the Performance of this Agreement, unless agreed upon in writing by the other Party. The receiving Party agrees and accepts all liability for the acts and omissions of its Representatives as such acts and omissions relate to these confidentiality and non-use obligations. "Confidential Information" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (i) was previously known to the receiving party free of any obligation to keep it confidential, (ii) becomes generally available to the public through no wrongful act, (iii) is rightfully received from a third party under no obligation of confidence to such third party, (iv) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (v) is required to be disclosed in invoice to comply with all applicable laws, administrative process or governmental or court invoices; provided, however, that a Party may disclose Confidential Information required to be disclosed by law, regulation, or a valid court order if that Party gives the other Party timely notice, unless legally prohibited, so that other Party may seek a protective order, confidential treatment, or other appropriate relief, and discloses only the portion of Confidential Information that is necessary to comply with such law, regulation, or order. The obligations in this section are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the Parties.

(g) **Indemnification**. SFOX agrees to defend, indemnify and hold harmless Ripple, its affiliates, and their respective officers, employees, shareholders, directors, and representatives (together with Ripple and its affiliates, the "Indemnitees") and settle against any Claim (any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against an indemnified Party hereto by a person or entity other than indemnifying Party, or its affiliates or subsidiaries) or Loss (any claim, cost, loss, damage, judgment, penalty, interest and/or expense arising out of any Claim),

including reasonable attorneys' fees and any fines, fees or penalties imposed by any regulatory authority, that arise out of or relate to any use, distribution or resale of the XRP received by SFOX under this Agreement by SFOX or by SFOX's employees, contractors or agents. Notwithstanding anything to the contrary in this Agreement, SFOX is not obligated to indemnify, hold harmless, or defend Ripple against any claims, demands, losses, expenses, and liabilities arising out of or relating to Ripple's gross negligence, fraud, or willful misconduct in the performance of this Agreement.

(h) **Indemnification Procedure**. In connection with any Claim or Loss, the Indemnitees shall give SFOX prompt Notice of the Claim or Loss (however, any delay in notification will not relieve SFOX of its obligation to indemnify, except and solely to the extent that the delay materially impairs the SFOX's ability to defend the Claim or Loss). In addition, the Indemnitees will cooperate with SFOX in connection with the defense and settlement of the Claim or Loss, with SFOX having the right to choose counsel. The Indemnitee may choose in its sole discretion whether it will control the defense and settlement of the Claim or Loss. SFOX shall not enter into any settlement or compromise of any Claim or Loss without the Indemnitee's prior written consent if such settlement or compromise (i) arises from or is part of any criminal action, suit, or proceeding, (ii) contains a stipulation to or admission or acknowledgement of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of the Indemnitee, (iii) otherwise requires the Indemnitee to refrain from or take material action (such as payment of fees) or does not contain an unconditional release of all Indemnitees. At its cost, the Indemnitees have the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

**SECTION 3. WARRANTY, DISCLAIMERS, LIMITATIONS.**

(a) **Authority**. Each Party represents to the other Party that it: (i) is a legal entity duly organized and validly existing under the Laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (ii) has all necessary power and authority to enter into this Agreement and perform its obligations hereunder; (iii) when executed and delivered by such Party, this Agreement will constitute a legal, valid and binding obligation of such Party that is enforceable in accordance with its terms hereunder; (iv) is not creating a conflict of interest or causing a breach with a preexisting Agreement between a Party and another third party; and (v) is not subject to material litigation as of the Effective Date of this Agreement.

(b) **Warranties and Representations**. Each Party hereto represents and warrants that:

(i) it and its affiliates are not owned or controlled by any individual or entity subject to any sanctions administered or enforced by the United States, including the SDN List and Sectoral Sanctions Identifications List maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union and the relevant sanctions authorities of each of its member states, including the United Kingdom's HM Treasury, or other relevant sanctions authority;

(ii) it and its affiliates are not located, organized, or resident in Cuba, Iran, North Korea, Syria, or the Crimea Region of Ukraine, or owned or controlled by any individual, entity or government in those countries or regions;

(iii) it and its affiliates will not enter into any agreement containing any provisions which would be violated or breached by the performance of its respective obligations under this Agreement or in connection herewith;

(iv) the execution, delivery, and performance of this Agreement will not violate, conflict with, require consent under, or result in any breach of any applicable law;

(v) each has obtained all material licenses, authorizations, approvals, consents, and permits required by applicable laws, including but not limited any U.S. state money transmitting licenses that are applicable to the operation of its business and its performance of this Agreement;

(vi) each is in compliance with all applicable laws relating to this Agreement, including but not limited to, if applicable, the money transmitting business registration requirements under section 5330 of title 31, United States Code, and regulations prescribed under such section; and

(vii) each is in material compliance with all applicable laws relating to this Agreement.

Any breach of this section is a material breach of this Agreement and is grounds for immediate termination.

(c) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, NEITHER PARTY MAKES ANY REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, SUITABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, OR ANY CLAIM OF RIGHT OR ANY WARRANTIES OR OBLIGATIONS ARISING FROM OF A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OR TRADE PRACTICE, AND ALL SUCH REPRESENTATIONS AND WARRANTIES AND OBLIGATIONS ARE HEREBY DISCLAIMED.

(d) IN NO EVENT SHALL EITHER PARTY, THEIR AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE TO THE OTHER PARTY FOR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES OR DAMAGES FOR LOSS OF PROFITS, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT. EACH PARTY, THEIR AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES' ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED $500,000.



CONFIDENTIAL 

**SECTION 4. TERMINATION AND EXPIRATION.**

(a) **Expiration**. If not otherwise terminated as provided below, this Agreement, and the obligations hereunder, shall automatically terminate and expire one (1) year from the Effective Date, provided Ripple has satisfied its payment obligations to SFOX hereunder.

(b) **Termination for Convenience**. Either party may terminate this Agreement immediately upon written notice to the other party if the terminating party determines in good faith that this Agreement will substantially likely raise regulatory concerns or result in the closing of any of any bank account(s) of the terminating party that may materially negatively impact the terminating party (in which case the terminating party shall inform the other party of the regulatory concern or bank account matter at issue).

(c) **Termination by Mutual Consent**. The Parties may terminate this Agreement by written mutual consent.

(d) **Termination for Breach**. Either Party may terminate this Agreement if the other Party is in material breach of this Agreement and does not cure such breach to the reasonable satisfaction of the non-breaching Party within thirty (30) days following its receipt of written notice of the breach from the non-breaching Party, unless otherwise provided for in this Agreement.

(e) **Effect of Termination.** Upon termination of this Agreement for any reason, Ripple will pay to SFOX all amounts due under this Agreement in accordance with the payment terms set forth in Section 1(b), including any yet unpaid, but earned, payments based on Reported SFOX Fees and Rebates or Volume Incentive Payment, unless SFOX has materially breached this Agreement. Neither party will be liable to the other for damages of any kind solely as a result of terminating this Agreement in accordance with its terms, and termination of this Agreement by a party will be without prejudice to any other right or remedy of such party under this Agreement or applicable law.

**SECTION 5. MISCELLANEOUS PROVISIONS.**

(a) **Choice of Law; Jurisdiction and Venue.** This Agreement shall be governed by, and construed in accordance with the laws of the State of California, U.S.A., as such laws are applied to contracts entered into and performed in such State and without reference to any conflict of laws rules or provisions. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement. For any disputes arising out of, relating to, or in connection with this Agreement or the subject matter hereof, the Parties irrevocably submit to the jurisdiction and venue of the courts of the State of California and the Federal Courts of the United States located in the Northern District of California.

(b) **Notice.** Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth below. Notice may also be given electronically provided that the other Party provides acknowledgement of receipt. Notice shall be effective upon receipt.

(c) **Entire Agreement; Amendments; Counterparts.** This Agreement constitutes the entire contract between the Parties hereto with regard to the subject matter hereof. It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof. Except for a writing signed by both parties, this Agreement may not be modified or amended. If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

(d) **Successors and Assigns.** SFOX may not assign any rights granted under this Agreement without the prior written consent of Ripple, such consent not to be unreasonably withheld; provided, however, any assignment by proposed SFOX shall be subject to Ripple's standard counterparty diligence and screening procedures. Ripple reserves the right to assign its rights without restriction, including without limitation to any affiliates or subsidiaries. Any attempted transfer or assignment in violation hereof shall be null and void. Subject to the foregoing, the provisions of this Agreement shall inure to the benefit of, and be binding upon, Ripple and its successors and assigns and be binding upon SFOX and its successors and assigns. In addition, this Agreement is not intended to confer any right or benefit on any third party.

(e) **Relationship of the Parties.** Nothing in this Agreement shall be construed or is intended to be construed as creating an employer-employee or agency relationship, a partnership, or a joint venture between the Parties.

(f) **Survival.** Section 1(a)(iv), Section 1(c), Section 2(c), Section 2(f), Section 2(g), Section 2(h), Section 3(d), and Section 5 shall survive the termination or expiration of this Agreement, as well as any other provision that, in order to give proper effect to their intent, should survive such expiration or termination. Termination or expiration of this Agreement shall not affect or limit any independent rights of a Party in or to its Confidential Information under applicable laws.

(g) **Severability.** If any provision of this Agreement is determined to be invalid or unenforceable under any rule, law or regulation or any governmental agency, local, state, or federal, such provision will be changed and interpreted to accomplish the objectives of the provision to the greatest extent possible under any applicable law and the validity or enforceability of any other provision of this Agreement shall not be affected.

(h) **Non-Waiver.** The failure of either Party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the Party's rights to subsequently enforce the provision or exercise those rights or remedies. All waivers must be in the form of a writing signed by both Parties' authorized representatives. The remedies specified in this Agreement are in addition to any other remedies that may be available at law or equity.

(i) **Force Majeure.** Neither Party shall be liable for delays, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond its reasonable control, including but not limited to, any delay or

failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is beyond its reasonable control and shall not affect the validity and enforceability of any remaining provisions.

**[End of text. Signature page follows.]**

As of the Effective Date, the Parties agree to be bound and have caused this Agreement to be executed.

**SFOX, Inc.**

By:______________________________

Name:

Title: CEO

Date: Oct 19, 2017

Address:

**Ripple Markets Inc.**

By:______________________________

Name: Patrick Griffin

Title: SVP Business Development

Date: October 30, 2017

Address: 315 Montgomery Street, Mezz.

San Francisco, CA 94104