# Exhibit 39

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                Plaintiff,<br><br>    -against-<br><br>RIPPLE LABS, INC.,<br>CHRISTIAN A. LARSEN, and<br>BRADLEY GARLINGHOUSE,<br><br>             Defendants. | 20 Civ. 10832 (AT) (SN) |

## PLAINTIFF'S SUPPLEMENTAL RESPONSES AND OBJECTIONS TO DEFENDANT RIPPLE LABS, INC.'S INTERROGATORIES NOS. 1, 2, 3, 6, 7, 11, 17, 18, 19, 22, 23, AND 24

Pursuant to Federal Rules of Civil Procedure ("Federal Rules") 26 and 33, and the Court's October 21, 2021 Order (D.E. 397), Plaintiff Securities and Exchange Commission (the "SEC" or "Commission") hereby provides supplemental responses to certain of Defendant Ripple Labs, Inc.'s ("Ripple") Interrogatories to Plaintiff Securities and Exchange Commission (the "Interrogatories"). The SEC's responses and objections to the Interrogatories are made to the best of its present knowledge, information, or belief. These responses and objections are made without prejudice to the SEC's right to revise or supplement its responses and objections as appropriate and to rely upon and produce witnesses or evidence at trial or at any proceeding, particularly given that discovery is ongoing. The SEC does not waive any applicable privilege, protection, doctrine, or right by providing these responses. The SEC also provides these responses without prejudice to its right to produce or object to evidence, witnesses, facts, writings, or documents that are identified either in these responses or in any later supplements or amendments. The SEC does not necessarily represent or agree, by virtue of providing a response, that any of the information identified below is relevant or admissible.

# GENERAL OBJECTIONS

1.      The SEC objects to the Interrogatories on the ground that they are not

"proportional to the needs of the case" to the extent they call for answers that are premature given

that the parties have not completed expert discovery and Ripple is continuing to produce documents

as part of its fact discovery obligations.  Fed. R. Civ. P. 26(b)(1); Fed. R. Civ. P. 33(b) ("An

interrogatory is not objectionable merely because it asks for an opinion or contention that relates to

fact or the application of law to fact, but the court may order that the interrogatory need not be

answered until designated discovery is complete."); *County of Suffolk v. Lilco*, No. 87 CV 0646 (JBW),

1988 WL 69759, at *1–2 (E.D.N.Y. June 13, 1988) ("Contention interrogatories such as those

propounded by the defendant here are generally not favored in the early stages of discovery….

[F]orcing the plaintiffs to answer these interrogatories is not justified when balancing the burden

imposed upon the plaintiffs in responding to these requests against the likelihood that useful

information will be produced."); *Roth v. Bank of Commonwealth*, No. CIV-79-36E, 1988 WL 43963, at

*4 (W.D.N.Y. May 4, 1988) (contention interrogatories include "those that ask the adverse party to

state all the *facts* or all the *evidence* upon which he *bases* some specific contention" (emphases in

original)).

The SEC faces a heavy burden in identifying and listing each and every fact underlying

various mixed legal and factual allegations in the Complaint when Individual Defendants Christian

A. Larsen and Bradley Garlinghouse have yet to answer the Complaint and when Defendants have

not made complete productions in response to the SEC's document requests.  Furthermore, it is

unlikely that any responses to the Interrogatories will be substantially more useful than the

information Ripple already has.  Specifically, the Complaint (D.E. 46) provides a summary of certain

key factual allegations underlying each of the SEC's claims, the SEC has produced to Ripple its

entire non-privileged investigative file, and much of the information sought for by the Interrogatories is public (such as public statements by Ripple) or is in Ripple's possession and therefore more easily accessible to Ripple.

2.      The SEC further objects to the Interrogatories on the ground that they are not "proportional to the needs of the case" because they are overly broad, regardless of their timing. Fed. R. Civ. P. 26(b)(1); *Lucero v. Valdez*, 240 F.R.D. 591, 594 (D.N.M. 2007) ("Contention interrogatories that systematically track all of the allegations in an opposing party's pleadings, and that ask for 'each and every fact' and application of law to fact that supports the party's allegations, are an abuse of the discovery process because they are overly broad and unduly burdensome…. [They] should not require a party to provide the equivalent of a narrative account of its case, including every evidentiary fact, details of testimony of supporting witnesses, and the contents of supporting documents."); *Moses v. Halstead*, 236 F.R.D. 667, 674 (D. Kan. 2006) ("The Court, however, does find [an interrogatory] to be overly broad and unduly burdensome on its face to the extent it asks Allstate to state 'all' facts that support each defense.").

3.      The SEC objects to Defendant's Definition No. 9, "Securities and Exchange Commission," "Plaintiff," "SEC," "You," or "Your," to the extent that it means each of the Commission's Divisions and Offices, and each current or former SEC Commissioner, staff member or employee, because it is overly broad and not proportional to the needs of the case.  Accordingly, unless expressly stated otherwise, the SEC has limited its inquiry to information in the possession, custody, or control of the Division of Enforcement, as further limited by the other general and specific objections herein with the exception of Interrogatories No. 6 and 18, as noted herein.

## SPECIFIC RESPONSES AND OBJECTIONS

**Interrogatory No. 1**
Identify each contract that You contend constituted or was part of an investment contract that Ripple offered or sold as part of the unregistered distribution of securities alleged in the Complaint.

**Response and Objections to Interrogatory No. 1**

The Commission incorporates the General Objections above in its response to Interrogatory No. 1. The Commission objects to this Interrogatory because, when combining the interrogatories, their subparts, and the separate pieces of information sought by the definitions and their subparts, the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33. This Interrogatory is overbroad, oppressive, and unduly burdensome, to the extent that Ripple seeks identification of "each contract" the Commission alleges "constituted or was part of an investment contract that Ripple offered or sold as part of the unregistered distribution of securities alleged in the Complaint."

To the extent that the Interrogatory would require the Commission to review and parse the testimony taken and the over 93,000 documents gathered during the investigation that preceded this case or the tens of thousands of documents collected in discovery, and any publicly available documents, and locate every testimony phrase or document that in any way forms part of what the Commission "contend[s]," doing so would be unreasonably burdensome and would invade the attorney work product doctrine. The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant. Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review. Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case. To the extent this Interrogatory requires the Commission to identify contracts which involve the offer or

sale or distribution of XRP by Ripple or any of its subsidiaries, agents, or affiliates (including specifically XRP II, LLC) to a third party, Ripple is in possession of such information and can identify it. The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product and do nothing but waste time.

Finally, the Commission objects to this Interrogatory to the extent it seeks evidence that is not relevant to any claim or defense in this case insofar as it relies on an incorrect understanding of the meaning of the term "investment contract" as that term is used in the Securities Act of 1933 ("Securities Act"). "[A]n investment contract for purposes of the Securities Act means a *contract*, *transaction* or *scheme* whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (emphasis added). "[A]rrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed." *Id.* at 300. The Securities Act's terms are defined broader than and independently from their common law or contract law meaning. *E.g.*, *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). "[T]he test whether a contract constitutes an investment contract within the Securities Act is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'" *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1029, 1034 (2d Cir. 1974) (quoting *SEC v. C.M. Joiner Leasing Co.*, 320 U.S. 344, 352-353 (1943)); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178-79 (S.D.N.Y. 2020) ("courts regularly consider representations and behavior outside the contract," discussing *Joiner*).

Subject to and without waiving the foregoing objections, the Commission responds as follows:  We contend that every offer, sale and distribution of XRP by Ripple, Larsen, and Garlinghouse (and their agents, affiliates, subsidiaries, underwriters, conduits, brokers, and dealers) during the Relevant Period, was the offer, sale, or distribution of an investment contract under *Howey*. Such transactions include, but are not limited to, Ripple's market and institutional sales of XRP; Ripple's sales of XRP on behalf of RippleWorks; Ripple's sales of XRP to certain entities that exercised options to buy XRP; Larsen's and Garlinghouse's XRP sales; and Ripple's distributions of XRP to (i) executives as compensation, (ii) entities associated with its xRapid product, and (iii) entities associated with xPring.  Many of these transactions were effectuated through or pursuant to contracts that Ripple negotiated with its executives, agents, and/or other third parties and include but are not limited to: XRP purchase agreements and commitment to sell agreements with wholesale purchasers; XRP sale and purchase agreements with market makers; market maker and programmatic market making activity agreements with market makers; hosted services agreements and related work orders with ODL customers; services and marketing agreements, technology research and development agreements, and development and integration agreements with third party developers; and fee rebate and volume incentive agreements with digital asset trading platforms.

In addition, to the extent this Interrogatory asks for "contracts" (in the common law, not securities law sense), examples of "contracts" (in the common law, not securities law sense) that were part of the "investment contracts" (in the securities laws sense) that Ripple and the Individual Defendants offered and sold, include but are not limited to the following (though in identifying the following examples the Commission does not purport to and is not obligated to provide an exhaustive list of any such contracts): spreadsheets produced by Ripple identifying various XRP transactions (*e.g.*, RPLI-SEC 00024512; RPLI-SEC 74559; RPLI_SEC 0072667; RPLI-SEC 0301033; RPLI-SEC 0248118-119; RPLI-SEC 0072667; RPLI-SEC 0069918; RPLI-SEC 0001641; RPLI-SEC

0001640; RPLI-SEC 0001629; RPLI-SEC 006919; RPLI-SEC 0301008; RPLI-SEC 0301161; RPLI-SEC 0301162); spreadsheets produced by GSR, a third party that Defendants' contracted with, identifying XRP sales on behalf of Ripple and the Individual Defendants (*e.g.*, GSR 00000100; GSR 00000101; GSR 00000102; GSR 00000103; GSR 0000010; GSR 00000445; GSR 00000446; GSR 00000447; GSR 00000439; GSR 00000440; GSR 00000441; GSR 00000442; GSR 00000443; GSR 00000444); spreadsheets provided by Individual Defendants identifying their XRP sales (*e.g.*, GARL 00000001); XRP purchase agreements and sales orders for certain purchasers (*e.g.*, RPLI-SEC-609612; RPLI-SEC-609617; RPLI-SEC 173808; ▮▮▮▮▮XRP_SEC_0000001; ▮▮▮▮▮XRP_SEC_00000019); certain XRP purchase summaries between XRP II, LLC and third parties, such as ▮▮▮▮▮▮▮▮▮▮on June 9 and June 23, 2016; the Master Purchase Agreement between XRP II, LLC and ▮▮▮▮▮▮▮▮▮▮dated August 3, 2017; the Master Purchase Agreement between XRP II, LLC and ▮▮▮▮▮▮▮▮C dated June 21, 2018 and the Commitment to Sell Agreement with ▮▮▮▮▮▮▮▮ated September 5, 2018; Master Purchase Agreement between XRP II, LLC and ▮▮▮▮▮▮▮▮dated August 6, 2018; and certain contracts between Ripple and Market Makers dated between 2014 and 2020, including but not limited to GSR (*e.g.*, Bates GSR00000732), ▮▮▮▮▮▮▮▮▮▮▮(*e.g.*, Bates ▮▮▮▮▮▮▮▮S 000001), and ▮▮▮▮▮*e.g.*, Bates RPLI_SEC 423561).

## Interrogatory No. 2

For each contract You listed in response to Interrogatory No. 1, Identify all terms of the contract that You contend created an "expectation of profits" (as that term is used in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946)) by the purchaser of XRP, stating with particularity the factual basis, and citing any Documents or Communications relied upon, for that contention.

## Response and Objections to Interrogatory No. 2

The Commission incorporates the General Objections above in its response to Interrogatory No. 2. The Commission objects to this Interrogatory because, when combining the interrogatories, their subparts, and the separate pieces of information sought by the definitions and their subparts,

the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33.   This Interrogatory is overbroad, oppressive, and unduly burdensome, to the extent that Ripple seeks identification of "all terms of the contract" the Commission alleges "created an 'expectation of profit.'"

To the extent that the Interrogatory would require the Commission to review and parse the testimony taken and the over 93,000 documents gathered during the investigation that preceded this case or the tens of thousands of documents collected in discovery, and any publicly available documents, and locate every testimony phrase or document that in any way forms part of what the Commission "alleges," would be unreasonably burdensome and would invade the attorney work product doctrine.  The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant.  Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review. Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case.  To the extent this Interrogatory requires the Commission to identify contracts which involve the offer or sale or distribution of XRP by Ripple or any of its subsidiaries, agents, or affiliates (including specifically XRP II, LLC) to a third party, Ripple is in possession of such information and can identify it.  The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product and would do nothing but waste time.

Finally, the Commission objects to this Interrogatory to the extent it seeks evidence that is not relevant to any claim or defense in this case insofar as it relies on an incorrect understanding of the meaning of the term "investment contract" as that term is used in the Securities Act. "[T]he test whether a contract constitutes an investment contract within the Securities Act is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'" *Glen-Arden Commodities*, 493 F.2d at 1029, 1034 (quoting *Joiner*, 320 U.S. at 352-353). "In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Joiner*, 320 U.S. at 352-53. Proof of whether something is an investment contract "[i]n some cases [may] be done by proving the document itself, which on its face would be a note, a bond, or a share of stock. In others proof must go outside the instrument itself." *Id.* at 355; *see also Kik Interactive*, 492 F. Supp. 3d at 178-79 (S.D.N.Y. 2020) ("courts regularly consider representations and behavior outside the contract," discussing *Joiner*). As such, the Commission objects to the use of the word "term" in the Interrogatory, to the extent Defendant suggests that the investment contracts alleged in the Complaint necessarily contain explicit or written provisions, or "terms" in the contract law sense.

Subject to and without waiving the foregoing objections, the Commission responds as follows: The Commission contends that many of Ripple's contracts provide evidence of and/or contain terms that reinforce public statements that Ripple and its executives made regarding Ripple's various XRP-related efforts to increase XRP liquidity and increase XRP demand, which Ripple and its executives stated and suggested would lead to an increase in XRP's value and price. Ripple and its executives also represented that it sought to create and maintain XRP's value and price through the use of various smart contracts and other contractual provisions that restricted the amount of XRP

that large XRP holders, including Ripple, could sell and/or distribute into market in order to limit the impact these sales would have on XRP price.

<u>Contracts and Provisions Evidencing Ripple's Efforts to Restrict XRP Supply</u>:

Ripple and its executives repeatedly stated that, according to rules of the XRP Ledger, no additional XRP could ever be created or issued and as a result, an increase in demand for XRP would lead to an increase in the value and price of XRP.  *See, e.g,* The Ripple Protocol: A Deep Dive for Finance Professionals, September 2014 ("Given that there is a finite number of XRP, as demand for XRP grows, the value of XRP should appreciate.") RPLI_SEC 0097442-488, at 458.  In 2012, the creators of the XRP Ledger along with Ripple's co-founders pre-programmed the XRP Ledger to create a limited, fixed supply of XRP (100 billion units).  We contend that, along with the above statements, Ripple's pre-programming of the XRP ledger to create a fixed supply of XRP led XRP holders to expect that an increase in XRP demand would lead to an increase in XRP price.

In May 2017, Ripple publicly reported that it would control and restrict the timing and volume of Ripple's own XRP distributions and sales by placing a portion of its XRP into cryptographically-secured escrow contracts, and therefore allay market concerns that Ripple's sales would negatively impact XRP's price.  *See* Ripple to Place 55 Billion XRP in Escrow to Ensure Certainty of Total XRP Supply, May 16, 2017, available at https://ripple.com/insights/ripple-to-place-55-billion-xrp-in-escrow-to-ensure-certainty-into-total-xrp-supply/.  According to the blog post, which listed Garlinghouse as the author, the purpose of the escrow was to address "concerns in the market about uncertainty surrounding our ongoing XRP distribution.  The root of this uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time – a scenario that would be bad for Ripple!  Our self-interest is aligned with building and maintaining a healthy XRP market."  *See id.*  Ripple and Garlinghouse also repeatedly told XRP holders that Ripple wanted to be "good stewards" of XRP.  *See* Ripple Pledges to Lock Up $14 Billion in XRP

Cryptocurrency, available at https://www.coindesk.com/markets/2017/05/16/ripple-pledges-to-lock-up-14-billion-in-xrp-cryptocurrency/. As evidence of this commitment, in December 2017, Ripple implemented a cryptographically-secured escrow – a series of smart contracts on the XRP Ledger – that made only 1 billion XRP available for use by Ripple every month. *See* An Explanation of Ripple's XRP Escrow, December 15, 2017, available at https://ripple.com/insights/explanation-ripples-xrp-escrow/. We contend that by creating the escrow contracts, which provided for a fixed supply of XRP that could be released each month, Ripple led XRP holders to expect that Ripple would limit *its* supply and pace of new XRP entering the market for the explicit purpose of maintaining and strengthening XRP price.

Ripple publicly reported that its contracts with wholesale purchasers contained lock ups and other sales restrictions, which were designed to "mitigate the risk of market instability due to large subsequent sales." See *e.g.,* XRP Markets Reports for Q4 2018; XRP Markets Report for Q4 2016. As evidence of this commitment, many contracts with wholesale XRP purchasers included terms that restricted XRP sales and transfers, specifically (i) the time period in which the purchased XRP may be sold or transferred and (ii) the amount of XRP that may be sold or transferred. *See, e.g.,* Ripple and ▮▮▮▮▮ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-594. For example, with respect to re-sale restrictions, Ripple's contract with ▮▮▮▮▮ included the following provision: "Any sales or transfers of XRP purchased by Purchaser to this Appendix D shall not exceed 10 bps of the Average Daily Volume in any date (the '**Maximum Sales**') (emphasis in original)." *See id.* As another example, with respect to lock ups, Ripple's contracts with ▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ ncluded the following provision: "Neither the Purchased XRP nor any interest therein may be sold, pledged or otherwise transferred to any person from the Date of Purchase through July 10th, 2016 (the 'Lockup Period') unless that person also agrees not to resell or otherwise distribute the Purchased XRP to any other party during the Lockup period." *See* Ripple

and ████████████████, June 9, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000626 -631, at 627; *see also* Ripple and ██████████████████ June 23, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000636; Ripple and ████████████████████, Master XRP Purchase Agreement, August 3, 2017, RPLI_SEC 0000792; Ripple and █████, Development and Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021.  We contend that, along with the above statements, Ripple led XRP holders to expect Ripple would limit the supply and pace of new XRP entering the market by institutional investors to whom Ripple sold large amounts of XRP over-the-counter which, in turn, would maintain and strengthen XRP's price.

Finally, in its Q2 2020 XRP Markets Report, Ripple explained that, in connection with its "responsible role in the [XRP] liquidity process," it had begun purchasing XRP in the secondary market to ensure "a healthy, orderly XRP market."  *See* Q2 2020 XRP Markets Report, available at https://ripple.com/insights/q2-2020-xrp-markets-report/.  As evidence of that commitment, Ripple contracted with crypto market maker GSR to purchase XRP in the secondary market to "offset amounts of XRP that [Ripple] is selling to its own customers …."  *See* Ripple and GSR Markets Pte. Ltd., Master Purchase Agreement, July 3, 2020, RPLI_SEC 0878012-8019, at 0878012. We contend that, along with Ripple's above statements, Ripple's contract with GSR to purchase XRP led XRP holders to expect that Ripple would take steps to maintain and strengthen XRP's price.

<u>Contracts and Provisions Evidencing Ripple's Efforts to Increase XRP Liquidity and Increase XRP Demand</u>:

Ripple publicly reported its efforts to create liquidity and demand for XRP by selling XRP directly to institutional investors and making it easier for these purchasers to buy, sell, and trade XRP.  *See* Q3 2017 XRP Markets Report, available at https://ripple.com/xrp/q3-2017-xrp-markets-

report/.  As evidence of that commitment, certain of Ripple's contracts with wholesale purchasers provided for an XRP purchase price that was discounted to the market price of XRP.   For example, the XRP purchase agreements and various amendments between Ripple and ███████████████ ████████████ specifically included pricing arrangements that permitted ███ to purchase XRP at a price between ████████████ of the then-current XRP market price. *See* Ripple and ██████ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-594; Ripple and SBIVC, Amendment to Master Purchase Agreement, December 18, 2018, RPLI_SEC 0545358-0545363; Ripple and ████████ Amendment to Master Purchase Agreement, January 25, 2019 RPLI_SEC 0254877-0254878; Ripple and ████████ Amendment #3 to Master Purchase Agreement, November 18, 2019, RPLI_SEC 0991819-0991821.

Ripple publicly reported its efforts to create liquidity for XRP by partnering with digital asset trading platforms and providing incentives to market makers and other market participants to trade XRP.  *See* Q4 2016 XRP Markets Report, available at https://ripple.com/insights/q4-2016-xrp-markets-report/.  As evidence of that commitment, Ripple entered into contracts with digital asset platforms and other market participants that included recitals and/or terms aimed at creating and increasing XRP liquidity through digital asset trading platforms' admissions to trade XRP and Ripple's provision of certain market making incentives.  For example, Ripple contracted with the digital asset trading platform Bitstamp for its "efforts intended to increase liquidity" for XRP.  *See, e.g.*, Ripple and Bitstamp Ltd., XRP/EUR Volume Incentive Program, January 11, 2017, RPLI_SEC 0507279-291, at 279; s*ee, e.g.*, BitOasis Technologies FWZ and Ripple Markets, XRP Fee Rebate Program Agreement, October 13, 2017, RPLI_SEC 0153866, at 867; BITBANK Ltd. and Ripple Markets, BITBANK XRP Volume Incentive Program, May 18, 2017, RPLI_SEC 0507292; S Capital Solutions Private Limited ("BTCXINDIA") and Ripple Markets, BTCXINDIAXRP Fee Rebate Program, May 29, 2017, RPLI_SEC 0154338, at 338; CoinOne Ltd. and Ripple Markets,

COINONE XRP Volume Incentive Program, June 2, 2017, RPLI_SEC 0066688, at 689; and

████████ and Ripple Markets, XRP Listing, Volume Incentive and Rebate Agreement, May 17,

2017, RPLI_SEC 0511334, at 335.  Ripple also contracted with market makers for "Market Making

Activity," described as "efforts to promote liquidity for the buying and selling of XRP." *See, e.g.,*

Ripple and ████████████████ Market Maker and Programmatic Market Making

Activity Agreement, March 1, 2018, RPLI_SEC 0537696-702, at 696.

We contend that Ripple's contracts with wholesale purchasers led wholesale purchasers to

believe that they could profit from their XRP purchasers by quickly selling its discounted XRP at

market prices.  As discussed in the Expert Rebuttal report of ████████ we contend that

"Ripple's efforts to increase the liquidity of XRP are consistent with increasing XRP price." *See*

Expert Rebuttal Report of ████████ pp. 35-40.  In addition, by contracting to make XRP

available on digital asset trading platforms, we contend that Ripple provided investors with a venue

to sell XRP at a profit.  *See, e.g.,* ████████ and Ripple Markets, XRP Listing, Volume Incentive

and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335.  Therefore, we contend that,

along with Ripple's statements related to XRP liquidity and demand, Ripple's contracts with

wholesale purchasers, digital asset trading platforms, and market makers led XRP holders to believe

that they would be able to sell XRP at a profit.

Contracts or Provisions Evidencing Ripple's Efforts to Develop Uses for XRP and Increase XRP
Demand:

Ripple publicly reported its efforts to develop a use for XRP through its On-Demand

Liquidity Product, which was formerly known as xRapid.  For example, in its Q3 2017 XRP Markets

Report, the company stated that it would "continue to expand our xRapid partnerships" and that its

"long-term goal is, and has always been, usage of XRP as a liquidity solution" and that "partnerships

are key to achieving this goal."  *See* Q3 2017 XRP Markets Report, available at

14

https://ripple.com/xrp/q3-2017-xrp-markets-report/. As evidence of this commitment, Ripple contracted with ODL customers. Certain of these contracts contained specific provisions, among others, whereby Ripple provided XRP to ODL customers as rebates and incentives for its ODL product and the specific amount of the XRP incentive was based on the volume of ODL transactions. *See e.g.,* Ripple and MoneyGram Payment Systems, Inc., Ripple Work Order #1, June 17, 2019, RPLI_SEC 1077343-357. We contend that, along with Ripple's above statements, Ripple led XRP holders to believe that these commercial agreements would lead to an increase in demand for XRP and thereby an increase in XRP's value. We also contend that ODL customers reasonably expected to profit by selling the XRP they received as rebates incentives into the market.

Ripple publicly reported its efforts to develop alternative uses for XRP that were unrelated to payments through its xPring initiative. For example, in its Q1 2019 XRP Markets Report, the company stated that xPring had "invested in and supports" "key companies focused on projects building and utilizing XRP, the XRP Ledger, and ILP." *See* Q1 2019 XRP Markets Report, available at https://ripple.com/insights/q1-2019-xrp-markets-report/. As evidence of this commitment, Ripple entered into commercial contracts aimed at increasing XRP adoption and creating an XRP "ecosystem." Specifically, Ripple contracted with third party developers to create and integrate XRP into their own products. For example, Ripple's contract with Coil Technologies, Inc. ("Coil") stated that its purpose, among other things, was to "promote the use of the "XRP Ledger, XRP, the technologies underlying Ripple's xCurrent, xRapid, and xVia product, or other technologies of interest to Ripple." *See* Ripple and Coil, Services and Marketing Agreement, November 1, 2018, SEC-COIL-E-0000001-13. The recitals in the contract between Ripple and another third party developer ███████████████, stated that, among other things, "Ripple desire[d] to work with ███ to promote ecosystem adoption of the XRP Ledger, XRP … by having Company integrate XRP … into the Company Components." *See* Ripple and ███, Development and

Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021. The contract between

Ripple and third party developer ███████████████ also included recitals that stated that

Ripple "desire[d] to support the development of the XRP Ledger and related infrastructure." *See*

Ripple and ████ Technology Research & Development Agreement, July 17, 2019, RPLI_SEC

0275429-0275433. We contend that, along with Ripple's above statements, Ripple led XRP holders

to believe that these commercial agreements would lead to an increase in demand for XRP and

thereby an increase in XRP's value.

## Interrogatory No. 3

Identify every transaction, statement, representation, promise, or scheme, other than the contracts
You listed in response to Interrogatory No. 1, that You contend was part of an investment contract
that Ripple offered or sold as part of the unregistered distribution of securities alleged in
the Complaint.

## Response and Objections to Interrogatory No. 3

The Commission incorporates the General Objections above in its response to Interrogatory

No. 3. The Commission objects to this Interrogatory because, when combining the interrogatories,

their subparts, and the separate pieces of information sought by the definitions and their subparts,

the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil

Procedure 33. This Interrogatory is overbroad, oppressive, and unduly burdensome, to the extent

that Ripple seeks identification of "every transaction, statement, representation, promise, or scheme"

the Commission contends "was part of an investment contract that Ripple offered or sold as part of

the unregistered distribution of securities alleged in the Complaint."

To the extent that the Interrogatory would require the Commission to review and parse the

testimony taken and the over 93,000 documents gathered during the investigation that preceded this

case or the tens of thousands of documents collected in discovery, and any publicly available

documents, and locate every testimony phrase or document that in any way forms part of what the

Commission "alleges," would be unreasonably burdensome and would invade the attorney work

product doctrine.  The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant.  Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review. Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case.  To the extent this Interrogatory requires the Commission to identify contracts which involve the offer or sale or distribution of XRP by Ripple or any of its subsidiaries, agents, or affiliates (including specifically XRP II, LLC) to a third party, Ripple is in possession of such information and can identify it.  The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product and would do nothing but waste time.

Finally, the Commission objects to this Interrogatory to the extent it seeks evidence that is not relevant to any claim or defense in this case insofar as it relies on an incorrect understanding of the meaning of the term "investment contract" as that term is used in the Securities Act.  "[T]he test whether a contract constitutes an investment contract within the Securities Act is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'"  *Glen-Arden Commodities*, 493 F.2d at 1029, 1034 (quoting *Joiner*, 320 U.S. at 352-353).  "In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering.  The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of

distribution, and the economic inducements held out to the prospect." *Joiner*, 320 U.S. at 352-53. Proof of whether something is an investment contract "[i]n some cases [may] be done by proving the document itself, which on its face would be a note, a bond, or a share of stock.  In others proof must go outside the instrument itself." *Id.* at 355; *see also Kik Interactive*, 492 F. Supp. 3d at 178-79 (S.D.N.Y. 2020) ("courts regularly consider representations and behavior outside the contract," discussing *Joiner*).

Subject to and without waiving the foregoing objections, the Commission responds as follows: We contend that every offer, sale and distribution of XRP by Ripple, Larsen, and Garlinghouse (and their agents, affiliates, subsidiaries, underwriters, conduits, brokers, and dealers) during the Relevant Period, was the offer, sale, or distribution of an investment contract under *Howey*. Such transactions include, but are not limited to, Ripple's market and institutional sales of XRP; Ripple's sales of XRP on behalf of RippleWorks; Ripple's sales of XRP to certain entities that exercised options to buy XRP; Larsen's and Garlinghouse's XRP sales; and Ripple's distributions of XRP to (i) executives as compensation, (ii) entities associated with its xRapid product, and (iii) entities associated with xPring.  Many of these transactions were effectuated through or pursuant to contracts that Ripple negotiated with its executives, agents, and/or other third parties and include but are not limited to: XRP purchase agreements and commitment to sell agreements with wholesale purchasers; XRP sale and purchase agreements with market makers; market maker and programmatic market making activity agreements with market makers; hosted services agreements and related work orders with ODL customers; services and marketing agreements, technology research and development agreements, and development and integration agreements with third party developers; and fee rebate and volume incentive agreements with digital asset trading platforms.

The Commission further contends that Ripple and its executives made public statements that Ripple and its executives made regarding Ripple's various XRP-related efforts to increase XRP

liquidity and increase XRP demand, which Ripple and its executives stated and suggested would lead to an increase in XRP's value and price. Ripple and its executives also represented that Ripple sought to create and maintain XRP's value and price through the use of various smart contracts and other contractual provisions that restricted the amount of XRP that large XRP holders, including Ripple, could sell and/or distribute into market in order to limit the impact these sales would have on XRP price.

Ripple's Efforts to Restrict XRP Supply:

Ripple and its executives repeatedly stated that, according to rules of the XRP Ledger, no additional XRP could ever be created or issued and as a result, an increase in demand for XRP would lead to an increase in the value and price of XRP. *See, e.g,* The Ripple Protocol: A Deep Dive for Finance Professionals, September 2014 ("Given that there is a finite number of XRP, as demand for XRP grows, the value of XRP should appreciate.") RPLI_SEC 0097442-488, at 458. In 2012, the creators of the XRP Ledger along with Ripple's co-founders pre-programmed the XRP Ledger to create a limited, fixed supply of XRP (100 billion units). We contend that, along with the above statements, Ripple's pre-programming of the XRP ledger to create a fixed supply of XRP led XRP holders to expect that an increase in XRP demand would lead to an increase in XRP price.

In May 2017, Ripple publicly reported that it would control and restrict the timing and volume of Ripple's own XRP distributions and sales by placing a portion of its XRP into cryptographically-secured escrow contracts, and therefore allay market concerns that Ripple's sales would negatively impact XRP's price. *See* Ripple to Place 55 Billion XRP in Escrow to Ensure Certainty of Total XRP Supply, May 16, 2017, available at https://ripple.com/insights/ripple-to-place-55-billion-xrp-in-escrow-to-ensure-certainty-into-total-xrp-supply/. According to the blog post, which listed Garlinghouse as the author, the purpose of the escrow was to address "concerns in the market about uncertainty surrounding our ongoing XRP distribution. The root of this

uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time – a scenario that would be bad for Ripple!  Our self-interest is aligned with building and maintaining a healthy XRP market."  *See id.*  Ripple and Garlinghouse also repeatedly told XRP holders that Ripple wanted to be "good stewards" of XRP.  *See* Ripple Pledges to Lock Up $14 Billion in XRP Cryptocurrency, available at https://www.coindesk.com/markets/2017/05/16/ripple-pledges-to-lock-up-14-billion-in-xrp-cryptocurrency/.  As evidence of this commitment, in December 2017, Ripple implemented a cryptographically-secured escrow – a series of smart contracts on the XRP Ledger – that made only 1 billion XRP available for use by Ripple every month.  *See* An Explanation of Ripple's XRP Escrow, December 15, 2017, available at https://ripple.com/insights/explanation-ripples-xrp-escrow/.  We contend that by creating the escrow contracts, which provided for a fixed supply of XRP that could be released each month, Ripple led XRP holders to expect that Ripple would limit *its* supply and pace of new XRP entering the market for the explicit purpose of maintaining and strengthening XRP price.

Ripple publicly reported that its contracts with wholesale purchasers contained lock ups and other sales restrictions, which were designed to "mitigate the risk of market instability due to large subsequent sales."  See *e.g.,* XRP Markets Reports for Q4 2018; XRP Markets Report for Q4 2016. As evidence of this commitment, many contracts with wholesale XRP purchasers included terms that restricted XRP sales and transfers, specifically (i) the time period in which the purchased XRP may be sold or transferred and (ii) the amount of XRP that may be sold or transferred.  *See, e.g.,* Ripple and ███████ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-594.  For example, with respect to re-sale restrictions, Ripple's contract with ██████ included the following provision: "Any sales or transfers of XRP purchased by Purchaser to this Appendix D shall not exceed 10 bps of the Average Daily Volume in any date (the '**Maximum Sales**') (emphasis in original)."  *See id.*  As another example, with respect to lock ups, Ripple's contracts with ████████

20

████████ included the following provision: "Neither the Purchased XRP nor any interest therein may be sold, pledged or otherwise transferred to any person from the Date of Purchase through July 10th, 2016 (the 'Lockup Period') unless that person also agrees not to resell or otherwise distribute the Purchased XRP to any other party during the Lockup period." *See* Ripple and ████████████ June 9, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000626 -631, at 627; *see also* Ripple and ████████████., June 23, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000636; Ripple and ████████████, Master XRP Purchase Agreement, August 3, 2017, RPLI_SEC 0000792; Ripple and ████, Development and Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021. We contend that, along with the above statements, Ripple led XRP holders to expect Ripple would limit the supply and pace of new XRP entering the market by institutional investors to whom Ripple sold large amounts of XRP over-the-counter which, in turn, would maintain and strengthen XRP's price.

Finally, in its Q2 2020 XRP Markets Report, Ripple explained that, in connection with its "responsible role in the [XRP] liquidity process," it had begun purchasing XRP in the secondary market to ensure "a healthy, orderly XRP market." *See* Q2 2020 XRP Markets Report, available at https://ripple.com/insights/q2-2020-xrp-markets-report/. As evidence of that commitment, Ripple contracted with crypto market maker GSR to purchase XRP in the secondary market to "offset amounts of XRP that [Ripple] is selling to its own customers …." *See* Ripple and GSR Markets Pte. Ltd., Master Purchase Agreement, July 3, 2020, RPLI_SEC 0878012-8019, at 0878012. We contend that, along with Ripple's above statements, Ripple's contract with GSR to purchase XRP led XRP holders to expect that Ripple would take steps to maintain and strengthen XRP's price.

Ripple's Efforts to Increase XRP Liquidity and Increase XRP Demand:

Ripple publicly reported its efforts to create liquidity and demand for XRP by selling XRP directly to institutional investors and making it easier for these purchasers to buy, sell, and trade XRP. *See* Q3 2017 XRP Markets Report, available at https://ripple.com/xrp/q3-2017-xrp-markets-report/. As evidence of that commitment, certain of Ripple's contracts with wholesale purchasers provided for an XRP purchase price that was discounted to the market price of XRP. For example, the XRP purchase agreements and various amendments between Ripple and ████████████████ ██████████████████ specifically included pricing arrangements that permitted ████ to purchase XRP at a price between ██████ percent of the then-current XRP market price. *See* Ripple and ██████ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-594; Ripple and ████████ Amendment to Master Purchase Agreement, December 18, 2018, RPLI_SEC 0545358-0545363; Ripple and ██████, Amendment to Master Purchase Agreement, January 25, 2019 RPLI_SEC 0254877-0254878; Ripple and ██████, Amendment #3 to Master Purchase Agreement, November 18, 2019, RPLI_SEC 0991819-0991821.

Ripple publicly reported its efforts to create liquidity for XRP by partnering with digital asset trading platforms and providing incentives to market makers and other market participants to trade XRP. *See* Q4 2016 XRP Markets Report, available at https://ripple.com/insights/q4-2016-xrp-markets-report/. As evidence of that commitment, Ripple entered into contracts with digital asset platforms and other market participants that included recitals and/or terms aimed at creating and increasing XRP liquidity through digital asset trading platforms' admissions to trade XRP and Ripple's provision of certain market making incentives. For example, Ripple contracted with the digital asset trading platform Bitstamp for its "efforts intended to increase liquidity" for XRP. *See, e.g.*, Ripple and Bitstamp Ltd., XRP/EUR Volume Incentive Program, January 11, 2017, RPLI_SEC 0507279-291, at 279; *see, e.g.*, BitOasis Technologies FWZ and Ripple Markets, XRP Fee Rebate Program Agreement, October 13, 2017, RPLI_SEC 0153866, at 867; BITBANK Ltd. and Ripple

Markets, BITBANK XRP Volume Incentive Program, May 18, 2017, RPLI_SEC 0507292; S Capital Solutions Private Limited ("BTCXINDIA") and Ripple Markets, BTCXINDIA XRP Fee Rebate Program, May 29, 2017, RPLI_SEC 0154338, at 338; CoinOne Ltd. and Ripple Markets, COINONE XRP Volume Incentive Program, June 2, 2017, RPLI_SEC 0066688, at 689; and ███████████, and Ripple Markets, XRP Listing, Volume Incentive and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335.  Ripple also contracted with market makers for "Market Making Activity," described as "efforts to promote liquidity for the buying and selling of XRP."  *See, e.g.,* Ripple and ██████████████████ Market Maker and Programmatic Market Making Activity Agreement, March 1, 2018, RPLI_SEC 0537696-702, at 696.

We contend that Ripple's contracts with wholesale purchasers led wholesale purchasers to believe that they could profit from their XRP purchasers by quickly selling its discounted XRP at market prices.  As discussed in the Expert Rebuttal report of ███████████ we contend that "Ripple's efforts to increase the liquidity of XRP are consistent with increasing XRP price." *See* Expert Rebuttal Report of ████████████ pp. 35-40.  In addition, by contracting to make XRP available on digital asset trading platforms, we contend that Ripple provided investors with a venue to sell XRP at a profit.  *See, e.g.,* ███████████ nd Ripple Markets, XRP Listing, Volume Incentive and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335.  Therefore, we contend that, along with Ripple's statements related to XRP liquidity and demand, Ripple's contracts with wholesale purchasers, digital asset trading platforms, and market makers led XRP holders to believe that they would be able to sell XRP at a profit.

Ripple's Efforts to Develop Uses for XRP and Increase XRP Demand:

Ripple publicly reported its efforts to develop a use for XRP through its On-Demand Liquidity Product, which was formerly known as xRapid. For example, in its Q3 2017 XRP Markets Report, the company stated that it would "continue to expand our xRapid partnerships" and that its "long-term goal is, and has always been, usage of XRP as a liquidity solution" and that "partnerships are key to achieving this goal." *See* Q3 2017 XRP Markets Report, available at https://ripple.com/xrp/q3-2017-xrp-markets-report/. As evidence of this commitment, Ripple contracted with ODL customers. Certain of these contracts contained specific provisions, among others, whereby Ripple provided XRP to ODL customers as rebates and incentives for its ODL product and the specific amount of the XRP incentive was based on the volume of ODL transactions. *See e.g.,* Ripple and MoneyGram Payment Systems, Inc., Ripple Work Order #1, June 17, 2019, RPLI_SEC 1077343-357. We contend that, along with Ripple's above statements, Ripple led XRP holders to believe that these commercial agreements would lead to an increase in demand for XRP and thereby an increase in XRP's value. We also contend that ODL customers reasonably expected to profit by selling the XRP they received as rebates incentives into the market.

Ripple publicly reported its efforts to develop alternative uses for XRP that were unrelated to payments through its xPring initiative. For example, in its Q1 2019 XRP Markets Report, the company stated that xPring had "invested in and supports" "key companies focused on projects building and utilizing XRP, the XRP Ledger, and ILP." *See* Q1 2019 XRP Markets Report, available at https://ripple.com/insights/q1-2019-xrp-markets-report/. As evidence of this commitment, Ripple entered into commercial contracts aimed at increasing XRP adoption and creating an XRP "ecosystem." Specifically, Ripple contracted with third party developers to create and integrate XRP into their own products. For example, Ripple's contract with Coil Technologies, Inc. ("Coil") stated that its purpose, among other things, was to "promote the use of the "XRP Ledger, XRP, the

technologies underlying Ripple's xCurrent, xRapid, and xVia product, or other technologies of interest to Ripple." *See* Ripple and Coil, Services and Marketing Agreement, November 1, 2018, SEC-COIL-E-0000001-13.  The recitals in the contract between Ripple and another third party developer ███████████████████), stated that, among other things, "Ripple desire[d] to work with █████ to promote ecosystem adoption of the XRP Ledger, XRP … by having Company integrate XRP … into the Company Components." *See* Ripple and ██████ Development and Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021.  The contract between Ripple and third party developer ███████████████████ also included recitals that stated that Ripple "desire[d] to support the development of the XRP Ledger and related infrastructure." *See* Ripple and █████ Technology Research & Development Agreement, July 17, 2019, RPLI_SEC 0275429-0275433.  We contend that, along with Ripple's above statements, Ripple led XRP holders to believe that these commercial agreements would lead to an increase in demand for XRP and thereby an increase in XRP's value.

**Interrogatory No. 6**

State whether You contend that Bitcoin and/or Ether are securities within the meaning of Section 2 of the 1933 Securities Exchange Act, and Identify with particularity the evidence (including any Documents) on which You rely for that contention.

**Response and Objections to Interrogatory No. 6**

The Commission incorporates the General Objections above in its response to Interrogatory No. 6.  The Commission also objects to this Interrogatory as consisting of multiple interrogatories, which, combined with each of Defendant's specific interrogatories, exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33.  The Commission further objects to this Interrogatory to the extent that it seeks information that is public, because such information is available on substantially the same basis to Defendant as it is to the Commission.

Furthermore, Interrogatory No. 6 is vague and ambiguous, because it is unclear at what point in time Defendant seeks to discover the SEC's position as to the status of offers and sales of Bitcoin or Ether under the Securities Act, and because it fails to identify whose or what offers and sales of Bitcoin or Ether the Interrogatory seeks to discover information about. The Commission further objects to the extent that this Interrogatory requires that the Commission, under Defendant's Definition No. 9, make representations as to any individual employee's (both current and former), Commissioner's (both current and former), Office's or Division's policy or position held from January 1, 2012 to December 22, 2020. Such a requirement is unduly burdensome and impossible to respond to. The Commission has thousands of employees. The Commission cannot reasonably inquire and determine the policy or position of each of its thousands of employees, or any other person indirectly employed by the Commission, or otherwise connected to the Commission. The Commission further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client and governmental deliberative process privileges and the work product doctrine. The Commission further objects to this Interrogatory to the extent that it seeks information that is not relevant to any claim or defense in this case. Under *Howey*, whether any asset—including any digital asset—is being offered and sold as a security requires fact-specific analysis about the manner of the offering and by whom is it offered. *See, e.g.*, *Kik Interactive*, 492 F. Supp. 3d at 183. The legal status of particular offers and sales (by particular parties, at particular times) of the digital assets Bitcoin and Ether are not relevant to this case and any attempt to procure or introduce evidence as to the legal status of those assets would unduly delay the resolution of this matter.

Subject to and without waiving the foregoing objections, the Commission states it does not typically decide whether any particular financial instrument, without additional context, qualifies as a security *per se*. Rather, the Commission typically determines*, inter alia*, whether it considers certain

offers, sales, or transactions of financial instruments to violate the federal securities laws. Responding further, the Commission avers that it has not made any public statements, or taken any actions, as to the legal status of any person's offers or sales of bitcoin or ether under the U.S. securities laws.

## Interrogatory No. 7

Identify each statement, representation, or other Communication by Ripple that You contend was a promise of profits to, or created an expectation of profits for, any purchaser or holder of XRP.

## Response and Objections to Interrogatory No. 7

The Commission incorporates the General Objections above in its response to Interrogatory No. 7. The Commission objects to this Interrogatory because, when combining the interrogatories, their subparts, and the separate pieces of information sought by the definitions and their subparts, the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33. This Interrogatory is overbroad, oppressive, and unduly burdensome, to the extent that Ripple seeks identification of "each statement, representation, or other Communication by Ripple" the Commission contends "was a promise of profits to, or created an expectation of profits for, any purchaser or holder of XRP."

To the extent that the Interrogatory would require the Commission to review and parse the testimony taken and the over 93,000 documents gathered during the investigation that preceded this case or the tens of thousands of documents collected in discovery, and any publicly available documents, and locate every testimony phrase or document that in any way forms part of what the Commission "alleges," would be unreasonably burdensome and would invade the attorney work product doctrine. The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it

required to conduct any research on behalf of Defendant. Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review. Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case. To the extent this Interrogatory requires the Commission to identify contracts which involve the offer or sale or distribution of XRP by Ripple or any of its subsidiaries, agents, or affiliates (including specifically XRP II, LLC) to a third party, Ripple is in possession of such information and can identify it. The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product and would do nothing but waste time.

Finally, the Commission objects to this Interrogatory to the extent it seeks evidence that is not relevant to any claim or defense in this case insofar as it relies on an incorrect understanding of the meaning of the term "investment contract" as that term is used in the Securities Act. "[T]he test whether a contract constitutes an investment contract within the Securities Act is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect.'" *Glen-Arden Commodities*, 493 F.2d at 1029, 1034 (quoting *Joiner*, 320 U.S. at 352-353). "In applying acts of this general purpose, the courts have not been guided by the nature of the assets back of a particular document or offering. The test rather is what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." *Joiner*, 320 U.S. at 352-53. Proof of whether something is an investment contract "[i]n some cases [may] be done by proving the document itself, which on its face would be a note, a bond, or a share of stock. In others proof must go outside the instrument itself." *Id.* at 355; *see also Kik Interactive*, 492 F. Supp. 3d at 178-79

(S.D.N.Y. 2020) ("courts regularly consider representations and behavior outside the contract," discussing *Joiner*).

Subject to and without waiving the foregoing objections, the Commission responds as follows: We contend that every offer, sale and distribution of XRP by Ripple, Larsen, and Garlinghouse (and their agents, affiliates, subsidiaries, underwriters, conduits, brokers, and dealers) during the Relevant Period, was the offer, sale, or distribution of an investment contract under *Howey*. Such transactions include, but are not limited to, Ripple's market and institutional sales of XRP; Ripple's sales of XRP on behalf of RippleWorks; Ripple's sales of XRP to certain entities that exercised options to buy XRP; Larsen's and Garlinghouse's XRP sales; and Ripple's distributions of XRP to (i) executives as compensation, (ii) entities associated with its xRapid product, and (iii) entities associated with xPring.

The Commission further contends that Ripple and its executives made public statements that Ripple and its executives made regarding Ripple's various XRP-related efforts to increase XRP liquidity and increase XRP demand, which Ripple and its executives stated and suggested would lead to an increase in XRP's value and price. Ripple and its executives also represented that it sought to create and maintain XRP's value and price through the use of various smart contracts and other contractual provisions that restricted the amount of XRP that large XRP holders, including Ripple, could sell and/or distribute into market in order to limit the impact these sales would have on XRP price.

Ripple's Efforts to Restrict XRP Supply:

Ripple and its executives repeatedly stated that, according to rules of the XRP Ledger, no additional XRP could ever be created or issued and as a result, an increase in demand for XRP would lead to an increase in the value and price of XRP. *See, e.g,* The Ripple Protocol: A Deep Dive for Finance Professionals, September 2014 ("Given that there is a finite number of XRP, as demand

for XRP grows, the value of XRP should appreciate.") RPLI_SEC 0097442-488, at 458.  In 2012, the creators of the XRP Ledger along with Ripple's co-founders pre-programmed the XRP Ledger to create a limited, fixed supply of XRP (100 billion units).  We contend that, along with the above statements, Ripple's pre-programming of the XRP ledger to create a fixed supply of XRP led XRP holders to expect that an increase in XRP demand would lead to an increase in XRP price.

In May 2017, Ripple publicly reported that it would control and restrict the timing and volume of Ripple's own XRP distributions and sales by placing a portion of its XRP into cryptographically-secured escrow contracts, and therefore allay market concerns that Ripple's sales would negatively impact XRP's price.  *See Ripple to Place 55 Billion XRP in Escrow to Ensure Certainty of Total XRP Supply*, May 16, 2017, available at https://ripple.com/insights/ripple-to-place-55-billion-xrp-in-escrow-to-ensure-certainty-into-total-xrp-supply/.  According to the blog post, which listed Garlinghouse as the author, the purpose of the escrow was to address "concerns in the market about uncertainty surrounding our ongoing XRP distribution.  The root of this uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time – a scenario that would be bad for Ripple!  Our self-interest is aligned with building and maintaining a healthy XRP market."  *See id.*  Ripple and Garlinghouse also repeatedly told XRP holders that Ripple wanted to be "good stewards" of XRP.  *See Ripple Pledges to Lock Up $14 Billion in XRP Cryptocurrency*, available at https://www.coindesk.com/markets/2017/05/16/ripple-pledges-to-lock-up-14-billion-in-xrp-cryptocurrency/.  As evidence of this commitment, in December 2017, Ripple implemented a cryptographically-secured escrow – a series of smart contracts on the XRP Ledger – that made only 1 billion XRP available for use by Ripple every month.  *See An Explanation of Ripple's XRP Escrow*, December 15, 2017, available at https://ripple.com/insights/explanation-ripples-xrp-escrow/.  We contend that by creating the escrow contracts, which provided for a fixed supply of XRP that could be released each month, Ripple led XRP holders to expect that Ripple

would limit *its* supply and pace of new XRP entering the market for the explicit purpose of maintaining and strengthening XRP price.

Ripple publicly reported that its contracts with wholesale purchasers contained lock ups and other sales restrictions, which were designed to "mitigate the risk of market instability due to large subsequent sales." See *e.g.,* XRP Markets Reports for Q4 2018; XRP Markets Report for Q4 2016. As evidence of this commitment, many contracts with wholesale XRP purchasers included terms that restricted XRP sales and transfers, specifically (i) the time period in which the purchased XRP may be sold or transferred and (ii) the amount of XRP that may be sold or transferred. *See, e.g.,* Ripple and ██████ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576- 594. For example, with respect to re-sale restrictions, Ripple's contract with ██████ included the following provision: "Any sales or transfers of XRP purchased by Purchaser to this Appendix D shall not exceed 10 bps of the Average Daily Volume in any date (the '**Maximum Sales**') (emphasis in original)." *See id.* As another example, with respect to lock ups, Ripple's contracts with ██████ ██████ included the following provision: "Neither the Purchased XRP nor any interest therein may be sold, pledged or otherwise transferred to any person from the Date of Purchase through July 10th, 2016 (the 'Lockup Period') unless that person also agrees not to resell or otherwise distribute the Purchased XRP to any other party during the Lockup period." *See* Ripple and ██████, June 9, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000626 -631, at 627; *see also* Ripple and ██████c., June 23, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000636; Ripple and ██████, Master XRP Purchase Agreement, August 3, 2017, RPLI_SEC 0000792; Ripple and ██████ Development and Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021. We contend that, along with the above statements, Ripple led XRP holders to expect Ripple would limit the supply and pace of new XRP entering the market by

31

institutional investors to whom Ripple sold large amounts of XRP over-the-counter which, in turn, would maintain and strengthen XRP's price.

Finally, in its Q2 2020 XRP Markets Report, Ripple explained that, in connection with its "responsible role in the [XRP] liquidity process," it had begun purchasing XRP in the secondary market to ensure "a healthy, orderly XRP market." *See* Q2 2020 XRP Markets Report, available at https://ripple.com/insights/q2-2020-xrp-markets-report/. As evidence of that commitment, Ripple contracted with crypto market maker GSR to purchase XRP in the secondary market to "offset amounts of XRP that [Ripple] is selling to its own customers …." *See* Ripple and GSR Markets Pte. Ltd., Master Purchase Agreement, July 3, 2020, RPLI_SEC 0878012-8019, at 0878012. We contend that, along with Ripple's above statements, Ripple's contract with GSR to purchase XRP led XRP holders to expect that Ripple would take steps to maintain and strengthen XRP's price.

Ripple's Efforts to Increase XRP Liquidity and Increase XRP Demand:

Ripple publicly reported its efforts to create liquidity and demand for XRP by selling XRP directly to institutional investors and making it easier for these purchasers to buy, sell, and trade XRP. *See* Q3 2017 XRP Markets Report, available at https://ripple.com/xrp/q3-2017-xrp-markets-report/. As evidence of that commitment, certain of Ripple's contracts with wholesale purchasers provided for an XRP purchase price that was discounted to the market price of XRP. For example, the XRP purchase agreements and various amendments between Ripple and ██████████ ███████████) specifically included pricing arrangements that permitted SBI to purchase XRP at a price between ██████ percent of the then-current XRP market price. *See* Ripple and ██████ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-594; Ripple and ██████ Amendment to Master Purchase Agreement, December 18, 2018, RPLI_SEC 0545358-0545363; Ripple and ██████ Amendment to Master Purchase Agreement, January 25, 2019

RPLI_SEC 0254877-0254878; Ripple and ███████ Amendment #3 to Master Purchase Agreement, November 18, 2019, RPLI_SEC 0991819-0991821.

Ripple publicly reported its efforts to create liquidity for XRP by partnering with digital asset trading platforms and providing incentives to market makers and other market participants to trade XRP. *See* Q4 2016 XRP Markets Report, available at https://ripple.com/insights/q4-2016-xrp-markets-report/. As evidence of that commitment, Ripple entered into contracts with digital asset platforms and other market participants that included recitals and/or terms aimed at creating and increasing XRP liquidity through digital asset trading platforms' admissions to trade XRP and Ripple's provision of certain market making incentives. For example, Ripple contracted with the digital asset trading platform Bitstamp for its "efforts intended to increase liquidity" for XRP. *See, e.g.*, Ripple and Bitstamp Ltd., XRP/EUR Volume Incentive Program, January 11, 2017, RPLI_SEC 0507279-291, at 279; s*ee, e.g.*, BitOasis Technologies FWZ and Ripple Markets, XRP Fee Rebate Program Agreement, October 13, 2017, RPLI_SEC 0153866, at 867; BITBANK Ltd. and Ripple Markets, BITBANK XRP Volume Incentive Program, May 18, 2017, RPLI_SEC 0507292; S Capital Solutions Private Limited ("BTCXINDIA") and Ripple Markets, BTCXINDIAXRP Fee Rebate Program, May 29, 2017, RPLI_SEC 0154338, at 338; CoinOne Ltd. and Ripple Markets, COINONE XRP Volume Incentive Program, June 2, 2017, RPLI_SEC 0066688, at 689; and ███████. and Ripple Markets, XRP Listing, Volume Incentive and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335. Ripple also contracted with market makers for "Market Making Activity," described as "efforts to promote liquidity for the buying and selling of XRP." *See, e.g.*, Ripple and ███████████████████, Market Maker and Programmatic Market Making Activity Agreement, March 1, 2018, RPLI_SEC 0537696-702, at 696.

We contend that Ripple's contracts with wholesale purchasers led wholesale purchasers to believe that they could profit from their XRP purchasers by quickly selling its discounted XRP at

market prices.  As discussed in the Expert Rebuttal report of ▓▓▓▓▓▓▓▓▓ we contend that "Ripple's efforts to increase the liquidity of XRP are consistent with increasing XRP price." *See* Expert Rebuttal Report of ▓▓▓▓▓▓▓▓▓ pp. 35-40.  In addition, by contracting to make XRP available on digital asset trading platforms, we contend that Ripple provided investors with a venue to sell XRP at a profit.  *See, e.g.,* ▓▓▓▓▓▓▓▓ and Ripple Markets, XRP Listing, Volume Incentive and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335.  Therefore, we contend that, along with Ripple's statements related to XRP liquidity and demand, Ripple's contracts with wholesale purchasers, digital asset trading platforms, and market makers led XRP holders to believe that they would be able to sell XRP at a profit.

Ripple's Efforts to Develop Uses for XRP and Increase XRP Demand:

Ripple publicly reported its efforts to develop a use for XRP through its On-Demand Liquidity Product, which was formerly known as xRapid.  For example, in its Q3 2017 XRP Markets Report, the company stated that it would "continue to expand our xRapid partnerships" and that its "long-term goal is, and has always been, usage of XRP as a liquidity solution" and that "partnerships are key to achieving this goal."  *See* Q3 2017 XRP Markets Report, available at https://ripple.com/xrp/q3-2017-xrp-markets-report/.  As evidence of this commitment, Ripple contracted with ODL customers.  Certain of these contracts contained specific provisions, among others, whereby Ripple provided XRP to ODL customers as rebates and incentives for its ODL product and the specific amount of the XRP incentive was based on the volume of ODL transactions.  *See e.g.,* Ripple and MoneyGram Payment Systems, Inc., Ripple Work Order #1, June 17, 2019, RPLI_SEC 1077343-357.  We contend that, along with Ripple's above statements, Ripple led XRP holders to believe that these commercial agreements would lead to an increase in demand for XRP and thereby an increase in XRP's value.  We also contend that ODL customers reasonably expected to profit by selling the XRP they received as rebates incentives into the market.

Ripple publicly reported its efforts to develop alternative uses for XRP that were unrelated to payments through its xPring initiative. For example, in its Q1 2019 XRP Markets Report, the company stated that xPring had "invested in and supports" "key companies focused on projects building and utilizing XRP, the XRP Ledger, and ILP." *See* Q1 2019 XRP Markets Report, available at https://ripple.com/insights/q1-2019-xrp-markets-report/. As evidence of this commitment, Ripple entered into commercial contracts aimed at increasing XRP adoption and creating an XRP "ecosystem." Specifically, Ripple contracted with third party developers to create and integrate XRP into their own products. For example, Ripple's contract with Coil Technologies, Inc. ("Coil") stated that its purpose, among other things, was to "promote the use of the "XRP Ledger, XRP, the technologies underlying Ripple's xCurrent, xRapid, and xVia product, or other technologies of interest to Ripple." *See* Ripple and Coil, Services and Marketing Agreement, November 1, 2018, SEC-COIL-E-0000001-13. The recitals in the contract between Ripple and another third party developer ( ), stated that, among other things, "Ripple desire[d] to work with to promote ecosystem adoption of the XRP Ledger, XRP … by having Company integrate XRP … into the Company Components." *See* Ripple and Development and Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021. The contract between Ripple and third party developer also included recitals that stated that Ripple "desire[d] to support the development of the XRP Ledger and related infrastructure." *See* Ripple and Technology Research & Development Agreement, July 17, 2019, RPLI_SEC 0275429-0275433. We contend that, along with Ripple's above statements, Ripple led XRP holders to believe that these commercial agreements would lead to an increase in demand for XRP and thereby an increase in XRP's value.

**Interrogatory No. 11**

State whether You contend that efforts by Ripple were necessary to affect any increase in the price of XRP. If that is Your contention, Identify with particularity the factual basis (including any Documents relied on) for that contention.

**Response and Objections to Interrogatory No. 11**

The Commission incorporates the General Objections above in its response to Interrogatory No. 11. The Commission also objects to this Interrogatory because, when combining the interrogatories, their subparts, and the separate pieces of information sought by the definitions and their subparts, the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33. Furthermore, Interrogatory No. 11 is vague and ambiguous, because it is unclear what the undefined terms "necessary," "affect," and "any increase" mean in the context of this Interrogatory.

This Interrogatory is also overbroad, oppressive, and unduly burdensome, to the extent that Ripple seeks identification of "the factual basis (including any Documents relied on)" for the Commission's "contention[s]." To the extent that the Interrogatory would require the Commission to review and parse the testimony taken and the over 93,000 documents gathered during the investigation that preceded this case or the tens of thousands of documents collected in discovery, and any publicly available documents, and locate every testimony phrase or document that in any way forms part of what the Commission "conten[ds]," would be unreasonably burdensome and would invade the attorney work product doctrine. The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant. Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of

conducting any such review.  Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case.  To the extent this Interrogatory requires the Commission to identify what efforts Ripple made with respect to the volume, liquidity, price, or markets for XRP, or the economic reality of XRP and the markets for XRP, Ripple is in possession of that information and can identify it.  The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product.

The Commission also objects to this Interrogatory to the extent it seeks evidence that is not relevant to any claim or defense in this case insofar as it relies on an incorrect understanding of the meaning of the term "investment contract" as that term is used in the Securities Act.  There is no requirement that a defendant's efforts be "necessary to affect any increase in the price" of one of the assets underlying an investment contract offered and sold by the defendants.  *Howey* requires a reasonable *expectation* of profit, not a guarantee of profit.

Finally, the Commission objects to this Interrogatory as premature.  Discovery on the issue of Ripple's efforts with respect to the price of XRP is ongoing.

Subject to and without waiving the foregoing objections, the Commission responds as follows:  We contend that Ripple has engaged in efforts that led XRP purchasers to reasonably expect profit based on Ripple's efforts, and that such efforts included efforts to increase or maintain the price of XRP.  Examples of such efforts include, but are not limited to, Ripple's creation and establishment of an active and liquid trading market for XRP through certain XRP giveaways, XRP market sales through market makers, and OTC XRP sales and leases; efforts to make XRP and XRP related financial products available for trading on digital asset trading platforms; partnerships with other market participants such as wallet and custody providers in order to create infrastructure for

XRP; and making efforts and statements with respect to XRP. Other examples include, but are not limited to, Ripple placing sales restrictions on large XRP holders or purchasers (*e.g.,* XRP purchase agreements containing restrictions on transfer of the XRP), placing its XRP holdings in escrow and limiting the amount of XRP available to Ripple for its own use each month, controlling the pace of new XRP supply entering the market (*e.g.* Ripple announcements related to the escrow feature), and purchasing XRP in the market (*e.g.,* Ripple's quarterly XRP Markets Reports; GSR 00000270; RPLI_SEC 0057039; RPLI_SEC 0056924). These restrictions and limitations on XRP sales sought to mitigate downward pressure on XRP's price based on the market's perception of how Ripple's large ownership stake of XRP could affect XRP's market price if Ripple decided to sell part or all of its stake, and minimize any downward pressure caused by XRP sales by Ripple and others. Ripple's purchases of XRP sought to increase and/or stabilize XRP's price. Ripple and its executives touted these efforts in public statements and other promotional material, and the economic reality of Ripple's relationship to XRP and of XRP itself incentivized Ripple to do so.

We further contend that on certain specific occasions, Ripple's efforts effected increases in the price of XRP. Examples of such occasions include, but are not limited to, instances outlined in the Expert Report of ███████████ dated October 4, 2021, including in paragraphs 15 to 25 which evidence that on four occasions in 2015 and 2016 (reflected in Figures 1 to 4), Ripple's efforts effected an increase in the price of XRP. Other examples include instances outlined in the Expert Report of ███████████ dated October 4, 2021 ("████ Report"), including in paragraphs 65 to 109. As ██████ has opined, "across major milestones in the history of Ripple Labs and across those categories of news more directly related to XRP's proposed use cases, there is statistically significant evidence that the price of XRP reacts to news of Ripple's actions." ████ Report ¶ 65. ███████████ findings include evidence that an increase in XRP price has been effected by news of: key Ripple corporate milestone events such as fundraising from venture capital investors in 2015, 2016, and

2019 (*id.* at 31, Figure 14); new listings of XRP on digital asset trading platforms partnering with Ripple (*id.* at 35, Figure 17 & ¶ 82); customer and product announcements such as financial institutions or money centers partnering with Ripple, or enhancements to the XRP ledger protocol. (*id.* at 41, Figure 21); and initiatives launched by Ripple related to the commercialization or promotion of Ripple's products or technology in the XRP ecosystem, such as the launches of Xpring in 2018 and RippleNet Line of Credit in 2020 (*id.* at 45, Figure 24).  More generally, as outlined in paragraphs 57 to 69 of the Rebuttal Report of ████████████ dated November 12, 2021, efforts by Ripple to make a liquid market for XRP—as detailed in the report of Defendants' expert, Allen Ferrell, dated October 4, 2021—are consistent with Ripple exerting efforts to increase the price of XRP.

**Interrogatory No. 17**

Identify the enterprise(s) or venture(s), if any, in which You contend XRP holders acquired a stake in by virtue of their purchase of XRP from Defendants, and all evidence on which You intend to rely to support that contention.

**Response and Objections to Interrogatory No. 17**

The Commission incorporates the General Objections above in its response to Interrogatory No. 17.  The Commission objects to this Interrogatory because, when combining the interrogatories, their subparts, and the separate pieces of information sought by the definitions and their subparts, the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33.  Furthermore, Interrogatory No. 17 is vague and ambiguous, because it is unclear what the undefined terms "acquired a stake" means in the context of this Interrogatory.

This Interrogatory is overbroad, oppressive, and unduly burdensome, to the extent that Ripple seeks identification of "all evidence" on which the SEC intends to "rely to support" a particular contention.  To the extent that the Interrogatory would require the Commission to review and parse the testimony taken and the over 93,000 documents gathered during the investigation that

preceded this case or the tens of thousands of documents collected in discovery, and any publicly available documents, and locate every testimony phrase or document that in any way forms part of what the Commission "conten[ds]," doing so would be unreasonably burdensome and would invade the attorney work product doctrine.  The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant.  Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review.  Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case.  The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product and would do nothing but waste time.

The Commission further objects to this Interrogatory to the extent it relies on an incorrect understanding of the meaning of "investment contract" under *Howey* and the cases applying it. There is no requirement under the law that the purchaser "acquire a stake" in an "enterprise or venture" in order for that purchaser to have purchased an investment contract.  Instead, an investment contract exists when, based upon the totality of the circumstances, the representations and statements made by the promoter, and the economic realities of the transaction, a purchaser invested money in a common enterprise with a reasonable expectation of profit based upon the efforts of others.

Subject to and without waiving the foregoing objections, the Commission responds that it contends that XRP holders were invested in Ripple's efforts to create a use for and demand for XRP. XRP holders hoped to profit from a potential increase in the value of XRP based on Ripple's efforts to create a use for XRP and develop the XRP "ecosystem," potentially increasing demand for the token.

We further contend that Ripple has engaged in efforts that led XRP purchasers to reasonably expect profit based on Ripple's efforts, and that such efforts included efforts to increase or maintain the price of XRP. Examples of such efforts include, but are not limited to, Ripple's creation and establishment of an active and liquid trading market for XRP through certain XRP giveaways, XRP market sales through market makers, and OTC XRP sales and leases; efforts to make XRP and XRP related financial products available for trading on digital asset trading platforms; partnerships with other market participants such as wallet and custody providers in order to create infrastructure for XRP; and making efforts and statements with respect to XRP. Other examples include, but are not limited to, Ripple placing sales restrictions on large XRP holders or purchasers (*e.g.,* XRP purchase agreements containing restrictions on transfer of the XRP), placing its XRP holdings in escrow and limiting the amount of XRP available to Ripple for its own use each month, controlling the pace of new XRP supply entering the market (*e.g.* Ripple announcements related to the escrow feature), and purchasing XRP in the market (*e.g.,* Ripple's quarterly XRP Markets Reports; GSR 00000270; RPLI_SEC 0057039; RPLI_SEC 0056924). These restrictions and limitations on XRP sales sought to mitigate downward pressure on XRP's price based on the market's perception of how Ripple's large ownership stake of XRP could affect XRP's market price if Ripple decided to sell part or all of its stake, and minimize any downward pressure caused by XRP sales by Ripple and others. Ripple's purchases of XRP sought to increase and/or stabilize XRP's price. Ripple and its executives touted

these efforts in public statements and other promotional material, and the economic reality of Ripple's relationship to XRP and of XRP itself incentivized Ripple to do so.

We further contend that on certain specific occasions, Ripple's efforts effected increases in the price of XRP. Examples of such occasions include, but are not limited to, instances outlined in the Expert Report of ███████████ dated October 4, 2021, including in paragraphs 15 to 25 which evidence that on four occasions in 2015 and 2016 (reflected in Figures 1 to 4), Ripple's efforts effected an increase in the price of XRP. Other examples include instances outlined in the Expert Report of ██████████ dated October 4, 2021 ("████ Report"), including in paragraphs 65 to 109. As ██████ has opined, "across major milestones in the history of Ripple Labs and across those categories of news more directly related to XRP's proposed use cases, there is statistically significant evidence that the price of XRP reacts to news of Ripple's actions." ██████ Report ¶ 65. ████████████ findings include evidence that an increase in XRP price has been effected by news of: key Ripple corporate milestone events such as fundraising from venture capital investors in 2015, 2016, and 2019 (*id.* at 31, Figure 14); new listings of XRP on digital asset trading platforms partnering with Ripple (*id.* at 35, Figure 17 & ¶ 82); customer and product announcements such as financial institutions or money centers partnering with Ripple, or enhancements to the XRP ledger protocol. (*id.* at 41, Figure 21); and initiatives launched by Ripple related to the commercialization or promotion of Ripple's products or technology in the XRP ecosystem, such as the launches of Xpring in 2018 and RippleNet Line of Credit in 2020 (*id.* at 45, Figure 24). More generally, as outlined in paragraphs 57 to 69 of the Rebuttal Report of ██████████████ dated November 12, 2021, efforts by Ripple to make a liquid market for XRP—as detailed in the report of Defendants' expert, Allen Ferrell, dated October 4, 2021—are consistent with Ripple exerting efforts to increase the price of XRP.

We further contend that during the Relevant Period, Ripple, its subsidiaries, employees, agents, and representatives implicitly or explicitly led investors to expect that Ripple would create and maintain a liquid trading market in XRP, and that Ripple and its agents, subsidiaries, and affiliates did in fact undertake certain efforts in furtherance of that expectation.  Examples of such efforts, and statements with respect to such efforts, include but are not limited to Ripple's giveaways of XRP, Ripple's retention of XRP market makers to facilitate trading of XRP, Ripple's payments to exchanges to list XRP, Ripple's institutional and market sales of XRP, Ripple's incentive payments to users of its xRapid/ODL product, and Ripple's other distributions of XRP, as well as Ripple's establishment of the XRP Escrow, and Ripple's statements and actions aimed at affecting the volume, price, liquidity, and trading in XRP markets.  Some additional examples of statements by Ripple and its executives, include, but are not limited to, Ripple's promotion of XRP as a long term investment that would increase in value with increased demand, statements related to Ripple's efforts to increase demand for XRP by developing a "use" for XRP, and statements related to Ripple's efforts to make XRP available for digital asset trading platforms that would provide XRP holders with a venue to sell XRP at a profit (*e.g.*, Ripple's quarterly XRP Markets Reports; https://twitter.com; https://ripple.com/insights/).

We further contend that Ripple pooled the funds it obtained from various XRP purchasers and used those funds to finance its business operations, growth, and research and development. Ripple and its executives, including, but not limited to David Schwartz, Arthur Britto, and Defendants Larsen and Garlinghouse, publicly stated that Ripple would "invest" in the XRP ecosystem using its XRP holdings and XRP sales proceeds.  Examples of such representations include public statements that the company would use XRP sales proceeds to further develop and improve the XRP Ledger (*e.g.,* Ripple's Q1 2017 XRP Markets Report), and that it would use its XRP holdings and XRP sales proceeds to "invest" in the XRP ecosystem by partnering with funds,

digital asset trading platforms, market makers and others (*e.g.,* Ripple's Q1 2019 XRP Markets Report). Other examples of the factual basis for such contention include that Ripple did not distinguish between funds it obtained from any particular XRP purchasers when it decided how to disburse those funds, Ripple's use of XRP sales proceeds to fund its operations, pay salaries, develop "uses" for XRP, and fund other initiatives that would develop uses for XRP, the XRP Ledger ecosystem, and/or create and support a market for XRP). The Commission further avers that based upon the information provided to it by Ripple and certain third parties to date, it appears as if most of the XRP purchaser funds Ripple pooled were held at various Ripple accounts at Silicon Valley Bank. The Commission further avers that Ripple's bank accounts and financial statements are evidence of what the funds at issue "were used for," and that the testimony of various Ripple employees also establishes what funds were obtained, how they were pooled, and what they were used for. The Commission further avers that Ripple has set forth no evidence that it systematically segregated proceeds from any particular sales of XRP, or otherwise distinguished between the source of any sales of XRP to any person when accepting and depositing into its bank accounts fiat currency received in the course of Ripple's XRP sales, and the Commission has come across no such evidence.

**Interrogatory No. 18**

Describe all uses, functionality, features, or other characteristics of Bitcoin, Ether, or XRP that You contend distinguish Bitcoin or Ether from XRP with respect to the registration requirements of Section 5 of the Securities Act of 1933.

**Response and Objections to Interrogatory No. 18**

The Commission incorporates the General Objections above in its response to Interrogatory No. 18. The Commission also objects to this Interrogatory as consisting of multiple interrogatories, which, combined with each of Defendant's specific interrogatories, exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33. The Commission further objects to this

Interrogatory to the extent that it seeks information that is public, because such information is available on substantially the same basis to Defendant as it is to the Commission.

Furthermore, Interrogatory No. 18 is vague and ambiguous, because it is unclear at what point in time Defendant seeks to discover the SEC's position as to the status of offers and sales of Bitcoin or Ether under the Securities Act, and because it fails to identify whose or what offers and sales of Bitcoin or Ether the Interrogatory seeks to discover information about. The Commission further objects to the extent that this Interrogatory requires that the Commission, under Defendant's Definition No. 9, make representations as to any individual employee's (both current and former), Commissioner's (both current and former), Office's or Division's policy or position held from January 1, 2012 to December 22, 2020. Such a requirement is unduly burdensome and impossible to respond to. The Commission has thousands of employees. The Commission cannot reasonably inquire and determine the policy or position of each of its thousands of employees, or any other person indirectly employed by the Commission, or otherwise connected to the Commission. The Commission further objects to this Interrogatory to the extent that it seeks information protected by the attorney-client and governmental deliberative process privileges and the work product doctrine. The Commission further objects to this Interrogatory to the extent that it seeks information that is not relevant to any claim or defense in this case. Under *Howey*, whether any asset—including any digital asset—is being offered and sold as a security requires fact-specific analysis about the manner of the offering and by whom is it offered. *See, e.g.*, *Kik Interactive*, 492 F. Supp. 3d at 183. The legal status of particular offers and sales (by particular parties, at particular times) of the digital assets Bitcoin and Ether are not relevant to this case and any attempt to procure or introduce evidence as to the legal status of those assets would unduly delay the resolution of this matter.

Subject to and without waiving the foregoing objections, the Commission states it does not typically decide whether any particular financial instrument, without additional context, qualifies as a security *per se*. Rather, the Commission typically determines, *inter alia*, whether it considers certain offers, sales, or transactions of financial instruments to violate the federal securities laws. Responding further, the Commission avers that as entity it has not made any public statements, or taken any actions, as to the legal status of any person's offers or sales of bitcoin or ether under the U.S. securities laws, although certain members of its staff may have done so. Because the Commission has not considered whether Bitcoin or Ether, in a vacuum and without regard to any particular offers or sales, is a "security," it is not in a position to distinguish Bitcoin or Ether, generally, from the specific offers and sales of XRP at issue in this case.

The Commission further avers that certain critical aspects of the XRP Ledger were centralized to Ripple between 2012 and 2020, including through Ripple's control over several aspects of the XRP Ledger, such as the ledger's maintenance, development, governance, functionality, default trusted nodes list, and consensus mechanism. For a period of time through at least 2020, validation of transactions on the XRP Ledger was under Ripple's control, as it operated at times *all* the validators on the default trusted nodes list, and through almost the entire relevant period, at least 20% of such validators, sufficient to essentially "veto" changes to the XRP Ledger. Nor was there ever any incentive for a third-party to act as a validator on the XRP Ledger, until Ripple affirmatively sought out third parties (and at times covered expenses for third parties) to do so, further showing that Ripple "controlled" who would become a validator on the XRP Ledger. Examples of information related to the level of centralization of the XRP Ledger can be surmised from portions of the investigative testimony and deposition testimony of Ripple employee David Schwartz. Other examples of such information is also publicly available and equally available to Ripple as it is to the Commission, including, but not limited to, white papers related to the ledger's

functionality, websites that act as repositories of XRP Ledger data (*e.g.,* https://xrpscan.com;

https://github.com;), and information related to the number of validating nodes and nodes on the

Ripple default Unique Node List that were operated, controlled, or run by Ripple or entities

affiliated with Ripple at various times (*e.g.,* https://xrpcharts.ripple.com).  Other documents upon

which the Commission may rely to establish the level of centralization of the XRP Ledger (to the

extent relevant or in rebuttal to arguments by any Defendant) include, but are not limited to

communications, documents, or contracts between Ripple personnel related to the ledger's

centralization (*e.g.,* RPLI_SEC 0026658; RPLI_SEC 0574082-101; RPLI_SEC 0555975; RPLI_SEC

0541809) and between Ripple and its affiliates and other parties on Ripple's default Unique Node

List, or other persons operating or controlling nodes on the XRP Ledger that are actually necessary

for the state of the XRP Ledger to advance (*e.g.,* RPLI_SEC 0509804; RPLI_SEC 0554278;

RPLI_SEC 0546274).

 The Commission further contends that, as outlined in the Expert Report of ▮▮▮▮▮▮▮

▮▮▮▮▮▮ dated October 4, 2021 (the "▮▮▮▮▮ Report"), the XRP Ledger does not satisfy the basic

definition of a decentralized system, whereas the Bitcoin Blockchain and the Ethereum Blockchain

are relatively more decentralized, for the reasons described in the ▮▮▮▮▮ Report (*see* ▮▮▮▮ Report

at 5, Table 1).  Because the XRP Ledger is a centralized system, serious risks related to the correct

operation of the XRP Ledger network may arise if Ripple ceased making efforts toward the proper

functioning of the XRP Ledger, for the reasons explained in the ▮▮▮▮▮ Report (*see* ▮▮▮▮ Report

at 25-28).

**<u>Interrogatory No. 19</u>**

Identify with particularity any evidence (including any Documents relied upon) that You contend
demonstrates that any XRP holder has or had any right, as a result of his or her purchase of XRP in
the unregistered distribution of securities alleged in the Complaint, to receive any future payment
directly from Ripple, in any form, at any time, or for any purpose (including but not limited to any
fiat currency, XRP, or any other Digital Asset or commodity, or any other form of consideration).

47

**Response and Objections to Interrogatory No. 19**

The Commission incorporates the General Objections above in its response to Interrogatory No. 19.  The Commission objects to this Interrogatory because, when combining the interrogatories, their subparts, and the separate pieces of information sought by the definitions and their subparts, the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33.  Furthermore, Interrogatory No. 19 is vague and ambiguous, because it is unclear what the undefined terms "receive," "payment" or "purpose" mean in the context of this Interrogatory.

This Interrogatory is overbroad, oppressive, and unduly burdensome, to the extent that Ripple seeks identification of "any evidence" and "any Document relied upon" for a particular contention, or the extent it asks for "any" payment "in any form" "at any" time and "for any purpose."  To the extent that the Interrogatory would require the Commission to review and parse the testimony taken and the over 93,000 documents gathered during the investigation that preceded this case or the tens of thousands of documents collected in discovery, and any publicly available documents, and locate every testimony phrase or document that in any way forms part of what the Commission "contend[s]," doing so would be unreasonably burdensome and would invade the attorney work product doctrine.  The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant.  Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review.  Further, requesting the Commission to do so imposes a significant

burden on the Commission, which is not a percipient witness to any of the facts in the case. The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product and would do nothing but waste time.

The Commission also objects to this Interrogatory as premature. Discovery on the issue of Ripple's offers and sales of XRP is ongoing.

Subject to and without waiving the foregoing objections, the Commission responds as follows: Whether the purchaser had a right to receive payments from Ripple is irrelevant. The relevant inquiry is whether a purchaser invested money in a common enterprise with a reasonable expectation of profit based upon the efforts of others. The Commission further notes that the Securities Act of 1933 creates rights, under certain circumstances, to receive payments from issuers of securities offered and sold without meeting the Act's registration requirements.

The Commission further avers that purchasing XRP on the open market typically does not convey any right to the purchaser, based solely on his, her, or its status as a holder of XRP, to receive payment directly from Ripple.

## Interrogatory No. 22

Identify with particularity any evidence (including any Documents relied upon) that You contend demonstrates that any Defendant pooled the funds from any XRP purchaser with those from any other XRP purchaser.

## Response and Objections to Interrogatory No. 22

The Commission incorporates the General Objections above in its response to Interrogatory No. 22. The Commission also objects to this Interrogatory because, when combining the interrogatories, their subparts, and the separate pieces of information sought by the definitions and their subparts, the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33.

To the extent that the Interrogatory would require the Commission to review and parse the testimony taken and the over 93,000 documents gathered during the investigation that preceded this case or the tens of thousands of documents collected in discovery, and any publicly available documents, and locate every testimony phrase or document that in any way forms part of what the Commission "conten[ds]," would be unreasonably burdensome and would invade the attorney work product doctrine. The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant. Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review. Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case. To the extent this Interrogatory requires the Commission to identify what Ripple did with the funds it obtained from its unregistered offers and sales of XRP, including where Ripple collected and held those funds, and how Ripple disbursed them, Ripple is in possession of that information and can identify it. The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product.

Finally, the Commission objects to this Interrogatory to the extent it seeks evidence that is not relevant to any claim or defense in this case insofar as it relies on an incorrect understanding of the meaning of the term "investment contract" as that term is used in the Securities Act. There is no requirement that a defendant "pool assets" (as that term is used in the Interrogatory) in order to

find the existence of a "common enterprise" with respect to an asset.  Rather, a common enterprise

exists when the fortunes of investors are tied to the fortunes of the promoter, or to the fortunes of

other investors in the enterprise.  *Revak v. SEC Realty Corp.*, 18 F.3d 81, 87-88 (2d Cir. 1994).

Subject to and without waiving the foregoing objections, the Commission responds as

follows:  We contend that Ripple pooled the funds it obtained from various XRP purchasers.

Ripple and its executives, including, but not limited to David Schwartz, Arthur Britto, and

Defendants Larsen and Garlinghouse, publicly stated that Ripple would "invest" in the XRP

ecosystem using its XRP holdings and XRP sales proceeds.  Examples of such representations

include public statements that the company would use XRP sales proceeds to further develop and

improve the XRP Ledger (*e.g.,* Ripple's Q1 2017 XRP Markets Report), and that it would use its

XRP holdings and XRP sales proceeds to "invest" in the XRP ecosystem by partnering with funds,

digital asset trading platforms, market makers and others (*e.g.,* Ripple's Q1 2019 XRP Markets

Report).  Some other examples of the factual basis for such contention include that Ripple did not

distinguish between funds it obtained from any particular XRP purchasers when it decided how to

disburse those funds, Ripple's use of XRP sales proceeds to fund its operations, pay salaries, develop

"uses" for XRP, and fund other initiatives that would develop uses for XRP, the XRP Ledger

ecosystem, and/or create and support a market for XRP).  The Commission further avers that based

upon the information provided to it by Ripple and certain third parties to date, it appears as if most

of the XRP purchaser funds Ripple pooled were held at various Ripple accounts at Silicon Valley

Bank.  The Commission further avers that Ripple's bank accounts and financial statements are

evidence of what the funds at issue "were used for," and that the testimony of various Ripple

employees also establishes what funds were obtained, how they were pooled, and what they were

used for.  The Commission further avers that Ripple has set forth no evidence that it systematically

segregated proceeds from any particular sales of XRP, or otherwise distinguished between the

source of any sales of XRP to any person when accepting and depositing into its bank accounts fiat currency received in the course of Ripple's XRP sales, and the Commission has come across no such evidence.

## Interrogatory No. 23

Identify with particularity any evidence (including any Documents relied upon) that You contend supports the allegation that "the fortunes of XRP purchasers were and are tied to one another, and each depend on the success of Ripple's XRP Strategy," as alleged in ¶ 291 of the Complaint.

## Responses and Objections to Interrogatory No. 23:

The Commission incorporates the General Objections above in its response to Interrogatory No. 23. The Commission also objects to this Interrogatory because, when combining the interrogatories, their subparts, and the separate pieces of information sought by the definitions and their subparts, the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil Procedure 33.

This Interrogatory is also overbroad, oppressive, and unduly burdensome, to the extent that Ripple seeks identification of "any evidence (including any Documents relied on)" for the Commission's "contention[s]." To the extent that the Interrogatory would require the Commission to review and parse the testimony taken and the over 93,000 documents gathered during the investigation that preceded this case or the tens of thousands of documents collected in discovery, and any publicly available documents, and locate every testimony phrase or document that in any way forms part of what the Commission "conten[ds]," would be unreasonably burdensome and would invade the attorney work product doctrine. The Commission is not required to compile and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant. Further, to the

extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review.  Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case.  To the extent this Interrogatory requires the Commission to identify what efforts Ripple made with respect to the volume, liquidity, price, or markets for XRP, or the economic reality of XRP and the markets for XRP, Ripple is in possession of that information and can identify it.  The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product.

Subject to and without waiving the foregoing objections, the Commission responds as follows:  We contend that Ripple has engaged in efforts that led XRP purchasers to reasonably expect profit based on Ripple's efforts, and that such efforts included efforts to increase or maintain the price of XRP.  Examples of such efforts include, but are not limited to, Ripple's creation and establishment of an active and liquid trading market for XRP through certain XRP giveaways, XRP market sales through market makers, and OTC XRP sales and leases; efforts to make XRP and XRP related financial products available for trading on digital asset trading platforms; partnerships with other market participants such as wallet and custody providers in order to create infrastructure for XRP; and making efforts and statements with respect to XRP.  Other examples include, but are not limited to, Ripple placing sales restrictions on large XRP holders or purchasers (*e.g.,* XRP purchase agreements containing restrictions on transfer of the XRP), placing its XRP holdings in escrow and limiting the amount of XRP available to Ripple for its own use each month, controlling the pace of new XRP supply entering the market (*e.g.* Ripple announcements related to the escrow feature), and purchasing XRP in the market (*e.g.,* Ripple's quarterly XRP Markets Reports; GSR 00000270;

RPLI_SEC 0057039; RPLI_SEC 0056924).  These restrictions and limitations on XRP sales sought to mitigate downward pressure on XRP's price based on the market's perception of how Ripple's large ownership stake of XRP could affect XRP's market price if Ripple decided to sell part or all of its stake, and minimize any downward pressure caused by XRP sales by Ripple and others.  Ripple's purchases of XRP sought to increase and/or stabilize XRP's price.  Ripple and its executives touted these efforts in public statements and other promotional material, and the economic reality of Ripple's relationship to XRP and of XRP itself incentivized Ripple to do so.

We further contend that on certain specific occasions, Ripple's efforts effected increases in the price of XRP.  Examples of such occasions include, but are not limited to, instances outlined in the Expert Report of ████████ dated October 4, 2021, including in paragraphs 15 to 25 which evidence that on four occasions in 2015 and 2016 (reflected in Figures 1 to 4), Ripple's efforts effected an increase in the price of XRP.  Other examples include instances outlined in the Expert Report of ████████ dated October 4, 2021 ("████ Report"), including in paragraphs 65 to 109.  As ████████ has opined, "across major milestones in the history of Ripple Labs and across those categories of news more directly related to XRP's proposed use cases, there is statistically significant evidence that the price of XRP reacts to news of Ripple's actions." ████Report ¶ 65. ████████ findings include evidence that an increase in XRP price has been effected by news of: key Ripple corporate milestone events such as fundraising from venture capital investors in 2015, 2016, and 2019 (*id.* at 31, Figure 14); new listings of XRP on digital asset trading platforms partnering with Ripple (*id.* at 35, Figure 17 & ¶ 82); customer and product announcements such as financial institutions or money centers partnering with Ripple, or enhancements to the XRP ledger protocol. (*id.* at 41, Figure 21); and initiatives launched by Ripple related to the commercialization or promotion of Ripple's products or technology in the XRP ecosystem, such as the launches of Xpring in 2018 and RippleNet Line of Credit in 2020 (*id.* at 45, Figure 24).  More generally, as

outlined in paragraphs 57 to 69 of the Rebuttal Report of ██████████ dated November 12, 2021, efforts by Ripple to make a liquid market for XRP—as detailed in the report of Defendants' expert, Allen Ferrell, dated October 4, 2021—are consistent with Ripple exerting efforts to increase the price of XRP.

Subject to and without waiving the foregoing objections, the Commission responds as follows:

We further contend that during the Relevant Period, Ripple, its subsidiaries, employees, agents, and representatives implicitly or explicitly led investors to expect that Ripple would create and maintain a liquid trading market in XRP, and that Ripple and its agents, subsidiaries, and affiliates did in fact undertake certain efforts in furtherance of that expectation. Examples of such efforts, and statements with respect to such efforts, include but are not limited to Ripple's giveaways of XRP, Ripple's retention of XRP market makers to facilitate trading of XRP, Ripple's payments to exchanges to list XRP, Ripple's institutional and market sales of XRP, and Ripple's other distributions of XRP, as well as Ripple's establishment of the XRP Escrow, and Ripple's statements and actions aimed at affecting the volume, price, liquidity, and trading in XRP markets. Some additional examples of statements by Ripple and its executives, include, but are not limited to, Ripple's promotion of XRP as a long term investment that would increase in value with increased demand, statements related to Ripple's efforts to increase demand for XRP by developing a "use" for XRP, and statements related to Ripple's efforts to make XRP available for digital asset trading platforms that would provide XRP holders with a venue to sell XRP at a profit (*e.g.*, Ripple's quarterly XRP Markets Reports; https://twitter.com; https://ripple.com/insights/), and other statements and the economic reality.

We further contend that Ripple pooled the funds it obtained from various XRP purchasers. Ripple and its executives, including, but not limited to David Schwartz, Arthur Britto, and Defendants Larsen and Garlinghouse, publicly stated that Ripple would "invest" in the XRP

ecosystem using its XRP holdings and XRP sales proceeds. Examples of such representations include public statements that the company would use XRP sales proceeds to further develop and improve the XRP Ledger (*e.g.,* Ripple's Q1 2017 XRP Markets Report), and that it would use its XRP holdings and XRP sales proceeds to "invest" in the XRP ecosystem by partnering with funds, digital asset trading platforms, market makers and others (*e.g.,* Ripple's Q1 2019 XRP Markets Report). Some other examples of the factual basis for such contention include that Ripple did not distinguish between funds it obtained from any particular XRP purchasers when it decided how to disburse those funds, Ripple's use of XRP sales proceeds to fund its operations, pay salaries, develop "uses" for XRP, and fund other initiatives that would develop uses for XRP, the XRP Ledger ecosystem, and/or create and support a market for XRP). The Commission further avers that based upon the information provided to it by Ripple and certain third parties to date, it appears as if most of the XRP purchaser funds Ripple pooled were held at various Ripple accounts at Silicon Valley Bank. The Commission further avers that Ripple's bank accounts and financial statements are evidence of what the funds at issue "were used for," and that the testimony of various Ripple employees also establishes what funds were obtained, how they were pooled, and what they were used for. The Commission further avers that Ripple has set forth no evidence that it systematically segregated proceeds from any particular sales of XRP, or otherwise distinguished between the source of any sales of XRP to any person when accepting and depositing into its bank accounts fiat currency received in the course of Ripple's XRP sales, and the Commission has come across no such evidence.

The Commission further contends that Ripple and its executives made public statements regarding Ripple's various XRP-related efforts to increase XRP liquidity and increase XRP demand, which Ripple and its executives stated and suggested would lead to an increase in XRP's value and price. Ripple and its executives also represented that it sought to create and maintain XRP's value

and price through the use of various smart contracts and other contractual provisions that restricted

the amount of XRP that large XRP holders, including Ripple, could sell and/or distribute into

market in order to limit the impact these sales would have on XRP price.

<u>Ripple's Efforts to Restrict XRP Supply:</u>

Ripple and its executives repeatedly stated that, according to rules of the XRP Ledger, no

additional XRP could ever be created or issued and as a result, an increase in demand for XRP

would lead to an increase in the value and price of XRP.  *See, e.g*, The Ripple Protocol: A Deep Dive

for Finance Professionals, September 2014 ("Given that there is a finite number of XRP, as demand

for XRP grows, the value of XRP should appreciate.") RPLI_SEC 0097442-488, at 458.  In 2012,

the creators of the XRP Ledger along with Ripple's co-founders pre-programmed the XRP Ledger

to create a limited, fixed supply of XRP (100 billion units).  We contend that, along with the above

statements, Ripple's pre-programming of the XRP ledger to create a fixed supply of XRP led XRP

holders to expect that an increase in XRP demand would lead to an increase in XRP price.

In May 2017, Ripple publicly reported that it would control and restrict the timing and

volume of Ripple's own XRP distributions and sales by placing a portion of its XRP into

cryptographically-secured escrow contracts, and therefore allay market concerns that Ripple's sales

would negatively impact XRP's price.  *See* Ripple to Place 55 Billion XRP in Escrow to Ensure

Certainty of Total XRP Supply, May 16, 2017, available at https://ripple.com/insights/ripple-to-

place-55-billion-xrp-in-escrow-to-ensure-certainty-into-total-xrp-supply/.  According to the blog

post, which listed Garlinghouse as the author, the purpose of the escrow was to address "concerns

in the market about uncertainty surrounding our ongoing XRP distribution.  The root of this

uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time – a

scenario that would be bad for Ripple!  Our self-interest is aligned with building and maintaining a

healthy XRP market."  *See id*.  Ripple and Garlinghouse also repeatedly told XRP holders that Ripple

wanted to be "good stewards" of XRP. *See* Ripple Pledges to Lock Up $14 Billion in XRP
Cryptocurrency, available at https://www.coindesk.com/markets/2017/05/16/ripple-pledges-to-
lock-up-14-billion-in-xrp-cryptocurrency/. As evidence of this commitment, in December 2017,
Ripple implemented a cryptographically-secured escrow – a series of smart contracts on the XRP
Ledger – that made only 1 billion XRP available for use by Ripple every month. *See* An Explanation
of Ripple's XRP Escrow, December 15, 2017, available at https://ripple.com/insights/explanation-
ripples-xrp-escrow/. We contend that by creating the escrow contracts, which provided for a fixed
supply of XRP that could be released each month, Ripple led XRP holders to expect that Ripple
would limit *its* supply and pace of new XRP entering the market for the explicit purpose of
maintaining and strengthening XRP price.

Ripple publicly reported that its contracts with wholesale purchasers contained lock ups and
other sales restrictions, which were designed to "mitigate the risk of market instability due to large
subsequent sales." See *e.g.*, XRP Markets Reports for Q4 2018; XRP Markets Report for Q4 2016.
As evidence of this commitment, many contracts with wholesale XRP purchasers included terms
that restricted XRP sales and transfers, specifically (i) the time period in which the purchased XRP
may be sold or transferred and (ii) the amount of XRP that may be sold or transferred. *See, e.g.*,
Ripple and ▮▮▮▮▮Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-
594. For example, with respect to re-sale restrictions, Ripple's contract with ▮▮▮▮included the
following provision: "Any sales or transfers of XRP purchased by Purchaser to this Appendix D
shall not exceed 10 bps of the Average Daily Volume in any date (the '**Maximum Sales**') (emphasis
in original)." *See id.* As another example, with respect to lock ups, Ripple's contracts with ▮▮▮▮
▮▮▮▮▮▮ included the following provision: "Neither the Purchased XRP nor any interest
therein may be sold, pledged or otherwise transferred to any person from the Date of Purchase
through July 10th, 2016 (the 'Lockup Period') unless that person also agrees not to resell or

otherwise distribute the Purchased XRP to any other party during the Lockup period." *See* Ripple

and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮, June 9, 2016, Summary of XRP Purchase and XRP Purchase

Agreement, RPLI_SEC 0000626 -631, at 627; *see also* Ripple and ▮▮▮▮▮▮▮▮▮▮▮▮▮, June

23, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000636; Ripple

and ▮▮▮▮▮▮▮▮▮▮▮▮▮, Master XRP Purchase Agreement, August 3, 2017, RPLI_SEC

0000792; Ripple and ▮▮▮▮ Development and Integration Agreement, November 8, 2018,

RPLI_SEC 0266000-0266021.  We contend that, along with the above statements, Ripple led XRP

holders to expect Ripple would limit the supply and pace of new XRP entering the market by

institutional investors to whom Ripple sold large amounts of XRP over-the-counter which, in turn,

would maintain and strengthen XRP's price.

　　　　Finally, in its Q2 2020 XRP Markets Report, Ripple explained that, in connection with its

"responsible role in the [XRP] liquidity process," it had begun purchasing XRP in the secondary

market to ensure "a healthy, orderly XRP market."  *See* Q2 2020 XRP Markets Report, available at

https://ripple.com/insights/q2-2020-xrp-markets-report/.  As evidence of that commitment,

Ripple contracted with crypto market maker GSR to purchase XRP in the secondary market to

"offset amounts of XRP that [Ripple] is selling to its own customers …."  *See* Ripple and GSR

Markets Pte. Ltd., Master Purchase Agreement, July 3, 2020, RPLI_SEC 0878012-8019, at 0878012.

We contend that, along with Ripple's above statements, Ripple's contract with GSR to purchase

XRP led XRP holders to expect that Ripple would take steps to maintain and strengthen XRP's

price.

Ripple's Efforts to Increase XRP Liquidity and Increase XRP Demand:

　　　　Ripple publicly reported its efforts to create liquidity and demand for XRP by selling XRP

directly to institutional investors and making it easier for these purchasers to buy, sell, and trade

XRP.  *See* Q3 2017 XRP Markets Report, available at https://ripple.com/xrp/q3-2017-xrp-markets-

report/. As evidence of that commitment, certain of Ripple's contracts with wholesale purchasers provided for an XRP purchase price that was discounted to the market price of XRP. For example, the XRP purchase agreements and various amendments between Ripple and ██████████████████ ████████████████ specifically included pricing arrangements that permitted ███ to purchase XRP at a price between ████████████ of the then-current XRP market price. *See* Ripple and ████████ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-594; Ripple and ████████ Amendment to Master Purchase Agreement, December 18, 2018, RPLI_SEC 0545358- 0545363; Ripple and ████████ Amendment to Master Purchase Agreement, January 25, 2019 RPLI_SEC 0254877-0254878; Ripple and ████████ Amendment #3 to Master Purchase Agreement, November 18, 2019, RPLI_SEC 0991819-0991821.

Ripple publicly reported its efforts to create liquidity for XRP by partnering with digital asset trading platforms and providing incentives to market makers and other market participants to trade XRP. *See* Q4 2016 XRP Markets Report, available at https://ripple.com/insights/q4-2016-xrp-markets-report/. As evidence of that commitment, Ripple entered into contracts with digital asset platforms and other market participants that included recitals and/or terms aimed at creating and increasing XRP liquidity through digital asset trading platforms' admissions to trade XRP and Ripple's provision of certain market making incentives. For example, Ripple contracted with the digital asset trading platform Bitstamp for its "efforts intended to increase liquidity" for XRP. *See, e.g.*, Ripple and Bitstamp Ltd., XRP/EUR Volume Incentive Program, January 11, 2017, RPLI_SEC 0507279-291, at 279; s*ee, e.g.*, BitOasis Technologies FWZ and Ripple Markets, XRP Fee Rebate Program Agreement, October 13, 2017, RPLI_SEC 0153866, at 867; BITBANK Ltd. and Ripple Markets, BITBANK XRP Volume Incentive Program, May 18, 2017, RPLI_SEC 0507292; S Capital Solutions Private Limited ("BTCXINDIA") and Ripple Markets, BTCXINDIAXRP Fee Rebate Program, May 29, 2017, RPLI_SEC 0154338, at 338; CoinOne Ltd. and Ripple Markets,

COINONE XRP Volume Incentive Program, June 2, 2017, RPLI_SEC 0066688, at 689; and ▮▮▮▮▮▮▮ and Ripple Markets, XRP Listing, Volume Incentive and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335.  Ripple also contracted with market makers for "Market Making Activity," described as "efforts to promote liquidity for the buying and selling of XRP." *See, e.g.,* Ripple and ▮▮▮▮▮▮▮▮▮▮ Market Maker and Programmatic Market Making Activity Agreement, March 1, 2018, RPLI_SEC 0537696-702, at 696.

We contend that Ripple's contracts with wholesale purchasers led wholesale purchasers to believe that they could profit from their XRP purchasers by quickly selling its discounted XRP at market prices.  As discussed in the Expert Rebuttal report of ▮▮▮▮▮▮ we contend that "Ripple's efforts to increase the liquidity of XRP are consistent with increasing XRP price." *See* Expert Rebuttal Report of ▮▮▮▮▮ pp. 35-40.  In addition, by contracting to make XRP available on digital asset trading platforms, we contend that Ripple provided investors with a venue to sell XRP at a profit.  *See, e.g.,* ▮▮▮▮▮ and Ripple Markets, XRP Listing, Volume Incentive and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335.  Therefore, we contend that, along with Ripple's statements related to XRP liquidity and demand, Ripple's contracts with wholesale purchasers, digital asset trading platforms, and market makers led XRP holders to believe that they would be able to sell XRP at a profit.

Ripple's Efforts to Develop Uses for XRP and Increase XRP Demand:

Ripple publicly reported its efforts to develop a use for XRP through its On-Demand Liquidity Product, which was formerly known as xRapid.  For example, in its Q3 2017 XRP Markets Report, the company stated that it would "continue to expand our xRapid partnerships" and that its "long-term goal is, and has always been, usage of XRP as a liquidity solution" and that "partnerships are key to achieving this goal."  *See* Q3 2017 XRP Markets Report, available at https://ripple.com/xrp/q3-2017-xrp-markets-report/.  As evidence of this commitment, Ripple

contracted with ODL customers.  Certain of these contracts contained specific provisions, among others, whereby Ripple provided XRP to ODL customers as rebates and incentives for its ODL product and the specific amount of the XRP incentive was based on the volume of ODL transactions.  *See e.g.,* Ripple and MoneyGram Payment Systems, Inc., Ripple Work Order #1, June 17, 2019, RPLI_SEC 1077343-357.  We contend that, along with Ripple's above statements, Ripple led XRP holders to believe that these commercial agreements would lead to an increase in demand for XRP and thereby an increase in XRP's value.  We also contend that ODL customers reasonably expected to profit by selling the XRP they received as rebates incentives into the market.

Ripple publicly reported its efforts to develop alternative uses for XRP that were unrelated to payments through its xPring initiative.  For example, in its Q1 2019 XRP Markets Report, the company stated that xPring had "invested in and supports" "key companies focused on projects building and utilizing XRP, the XRP Ledger, and ILP."  *See* Q1 2019 XRP Markets Report, available at https://ripple.com/insights/q1-2019-xrp-markets-report/.  As evidence of this commitment, Ripple entered into commercial contracts aimed at increasing XRP adoption and creating an XRP "ecosystem."  Specifically, Ripple contracted with third party developers to create and integrate XRP into their own products.  For example, Ripple's contract with Coil Technologies, Inc. ("Coil") stated that its purpose, among other things, was to "promote the use of the "XRP Ledger, XRP, the technologies underlying Ripple's xCurrent, xRapid, and xVia product, or other technologies of interest to Ripple."  *See* Ripple and Coil, Services and Marketing Agreement, November 1, 2018, SEC-COIL-E-0000001-13.  The recitals in the contract between Ripple and another third party developer ███████████████, stated that, among other things, "Ripple desire[d] to work with ████ to promote ecosystem adoption of the XRP Ledger, XRP … by having Company integrate XRP … into the Company Components."  *See* Ripple and ████ Development and Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021.  The contract between

Ripple and third party developer ████████████████ also included recitals that stated that

Ripple "desire[d] to support the development of the XRP Ledger and related infrastructure." *See*

Ripple and ████ Technology Research & Development Agreement, July 17, 2019, RPLI_SEC

0275429-0275433.  We contend that, along with Ripple's above statements, Ripple led XRP holders

to believe that these commercial agreements would lead to an increase in demand for XRP and

thereby an increase in XRP's value.

## Interrogatory No. 24

Identify with particularity the factual basis (including any statements or Documents on which You
intend to rely) to support Your contention that XRP is a security, and that Ripple's distributions,
transfers or sales of XRP are investment contracts, as those terms are construed under the federal
securities laws and *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and its progeny

## Responses and Objections to Interrogatory No. 24:

The Commission incorporates the General Objections above in its response to Interrogatory

No. 24.  The Commission objects to this Interrogatory because, when combining the interrogatories,

their subparts, and the separate pieces of information sought by the definitions and their subparts,

the Interrogatories exceed the allowable number of interrogatories under Federal Rule of Civil

Procedure 33.

This Interrogatory is also overbroad, oppressive, and unduly burdensome, to the extent that

Ripple seeks identification of "the factual basis (including any statements or Documents)" for the

Commission's "contention[s]."  To the extent that the Interrogatory would require the Commission

to review and parse the testimony taken and the over 93,000 documents gathered during the

investigation that preceded this case or the tens of thousands of documents collected in discovery,

and any publicly available documents, and locate every testimony phrase or document that in any

way forms part of what the Commission "contend[s]," doing so would be unreasonably burdensome

and would invade the attorney work product doctrine.  The Commission is not required to compile

and correlate the evidence, nor to provide a narrative of its entire case, nor to marshal the evidence

or to state each and every one of the many facts or identify every one of the many documents or witnesses that may support its contentions, nor is it required to organize the evidence in this matter for Defendant, nor is it required to conduct any research on behalf of Defendant. Further, to the extent this Interrogatory seeks to require the Commission to review testimony, documents or public information that is, or has been made, available to Defendant, Defendant is equally capable of conducting any such review. Further, requesting the Commission to do so imposes a significant burden on the Commission, which is not a percipient witness to any of the facts in the case. The results of this unduly burdensome review would not translate into the "discovery" of actual facts; at most, such an endeavor would simply describe the Commission counsel's mental impressions and related work-product and would do nothing but waste time.

Finally, the Commission objects to this Interrogatory to the extent it seeks evidence that is not relevant to any claim or defense in this case insofar as it relies on an incorrect understanding of the meaning of the term "investment contract" as that term is used in the Securities Act of 1933 ("Securities Act"). "[A]n investment contract for purposes of the Securities Act means a *contract, transaction* or *scheme* whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party, it being immaterial whether the shares in the enterprise are evidenced by formal certificates or by nominal interests in the physical assets employed in the enterprise." *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298-99 (1946) (emphasis added). "[A]rrangements whereby the investors' interests are made manifest involve investment contracts, regardless of the legal terminology in which such contracts are clothed." *Id.* at 300. The Securities Act's terms are defined broader than and independently from their common law or contract law meaning. *E.g.*, *SEC v. Cavanagh*, 155 F.3d 129, 135 (2d Cir. 1998). "[T]he test whether a contract constitutes an investment contract within the Securities Act is 'what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the

economic inducements held out to the prospect.'" *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027, 1029, 1034 (2d Cir. 1974) (quoting *SEC v. C.M. Joiner Leasing Co.*, 320 U.S. 344, 352-353 (1943)); *SEC v. Kik Interactive, Inc.*, 492 F. Supp. 3d 169, 178-79 (S.D.N.Y. 2020) ("courts regularly consider representations and behavior outside the contract," discussing *Joiner*).

Subject to and without waiving the foregoing objections, the Commission responds as follows:  We contend that every offer, sale and distribution of XRP by Ripple, Larsen, and Garlinghouse (and their agents, affiliates, subsidiaries, underwriters, conduits, brokers, and dealers) during the Relevant Period, was the offer, sale, or distribution of an investment contract under *Howey*. Such transactions include, but are not limited to, Ripple's market and institutional sales of XRP; Ripple's sales of XRP on behalf of RippleWorks; Ripple's sales of XRP to certain entities that exercised options to buy XRP; Larsen's and Garlinghouse's XRP sales; and Ripple's distributions of XRP to (i) executives as compensation, (ii) entities associated with its xRapid product, and (iii) entities associated with xPring.  Many of these transactions were effectuated through or pursuant to contracts that Ripple negotiated with its executives, agents, and/or other third parties and include but are not limited to: XRP purchase agreements and commitment to sell agreements with wholesale purchasers; XRP sale and purchase agreements with market makers; market maker and programmatic market making activity agreements with market makers; hosted services agreements and related work orders with ODL customers; services and marketing agreements, technology research and development agreements, and development and integration agreements with third party developers; and fee rebate and volume incentive agreements with digital asset trading platforms.

We further contend that Ripple has engaged in efforts that led XRP purchasers to reasonably expect profit based on Ripple's efforts, and that such efforts included efforts to increase or maintain the price of XRP.  Examples of such efforts include, but are not limited to, Ripple's creation and establishment of an active and liquid trading market for XRP through certain XRP giveaways, XRP

market sales through market makers, and OTC XRP sales and leases; efforts to make XRP and XRP related financial products available for trading on digital asset trading platforms; partnerships with other market participants such as wallet and custody providers in order to create infrastructure for XRP; and making efforts and statements with respect to XRP.  Other examples include, but are not limited to, Ripple placing sales restrictions on large XRP holders or purchasers (*e.g.,* XRP purchase agreements containing restrictions on transfer of the XRP), placing its XRP holdings in escrow and limiting the amount of XRP available to Ripple for its own use each month, controlling the pace of new XRP supply entering the market (*e.g.* Ripple announcements related to the escrow feature), and purchasing XRP in the market (*e.g.,* Ripple's quarterly XRP Markets Reports; GSR 00000270; RPLI_SEC 0057039; RPLI_SEC 0056924).  These restrictions and limitations on XRP sales sought to mitigate downward pressure on XRP's price based on the market's perception of how Ripple's large ownership stake of XRP could affect XRP's market price if Ripple decided to sell part or all of its stake, and minimize any downward pressure caused by XRP sales by Ripple and others.  Ripple's purchases of XRP sought to increase and/or stabilize XRP's price.  Ripple and its executives touted these efforts in public statements and other promotional material, and the economic reality of Ripple's relationship to XRP and of XRP itself incentivized Ripple to do so.

We further contend that on certain specific occasions, Ripple's efforts effected increases in the price of XRP.  Examples of such occasions include, but are not limited to, instances outlined in the Expert Report of ███████ dated October 4, 2021, including in paragraphs 15 to 25 which evidence that on four occasions in 2015 and 2016 (reflected in Figures 1 to 4), Ripple's efforts effected an increase in the price of XRP.  Other examples include instances outlined in the Expert Report of ███████ dated October 4, 2021 ("████Report"), including in paragraphs 65 to 109. As ███████ has opined, "across major milestones in the history of Ripple Labs and across those categories of news more directly related to XRP's proposed use cases, there is statistically significant

evidence that the price of XRP reacts to news of Ripple's actions." ███████Report ¶ 65. ████████ findings include evidence that an increase in XRP price has been effected by news of: key Ripple corporate milestone events such as fundraising from venture capital investors in 2015, 2016, and 2019 (*id.* at 31, Figure 14); new listings of XRP on digital asset trading platforms partnering with Ripple (*id.* at 35, Figure 17 & ¶ 82); customer and product announcements such as financial institutions or money centers partnering with Ripple, or enhancements to the XRP ledger protocol. (*id.* at 41, Figure 21); and initiatives launched by Ripple related to the commercialization or promotion of Ripple's products or technology in the XRP ecosystem, such as the launches of Xpring in 2018 and RippleNet Line of Credit in 2020 (*id.* at 45, Figure 24).  More generally, as outlined in paragraphs 57 to 69 of the Rebuttal Report of ████████ dated November 12, 2021, efforts by Ripple to make a liquid market for XRP—as detailed in the report of Defendants' expert, Allen Ferrell, dated October 4, 2021—are consistent with Ripple exerting efforts to increase the price of XRP.

We further contend that during the Relevant Period, Ripple, its subsidiaries, employees, agents, and representatives implicitly or explicitly led investors to expect that Ripple would create and maintain a liquid trading market in XRP, and that Ripple and its agents, subsidiaries, and affiliates did in fact undertake certain efforts in furtherance of that expectation.  Examples of such efforts, and statements with respect to such efforts, include but are not limited to Ripple's giveaways of XRP, Ripple's retention of XRP market makers to facilitate trading of XRP, Ripple's payments to exchanges to list XRP, Ripple's institutional and market sales of XRP, and Ripple's other distributions of XRP, as well as Ripple's establishment of the XRP Escrow, and Ripple's statements and actions aimed at affecting the volume, price, liquidity, and trading in XRP markets.  Some additional examples of statements by Ripple and its executives, include, but are not limited to, Ripple's promotion of XRP as a long term investment that would increase in value with increased

demand, statements related to Ripple's efforts to increase demand for XRP by developing a "use"

for XRP, and statements related to Ripple's efforts to make XRP available for digital asset trading

platforms that would provide XRP holders with a venue to sell XRP at a profit (*e.g.*, Ripple's

quarterly XRP Markets Reports; https://twitter.com; https://ripple.com/insights/), and other

statements and the economic reality.

We further contend that Ripple pooled the funds it obtained from various XRP purchasers.

Ripple and its executives, including, but not limited to David Schwartz, Arthur Britto, and

Defendants Larsen and Garlinghouse, publicly stated that Ripple would "invest" in the XRP

ecosystem using its XRP holdings and XRP sales proceeds.  Examples of such representations

include public statements that the company would use XRP sales proceeds to further develop and

improve the XRP Ledger (*e.g.,* Ripple's Q1 2017 XRP Markets Report), and that it would use its

XRP holdings and XRP sales proceeds to "invest" in the XRP ecosystem by partnering with funds,

digital asset trading platforms, market makers and others (*e.g.,* Ripple's Q1 2019 XRP Markets

Report).  Some other examples of the factual basis for such contention include that Ripple did not

distinguish between funds it obtained from any particular XRP purchasers when it decided how to

disburse those funds, Ripple's use of XRP sales proceeds to fund its operations, pay salaries, develop

"uses" for XRP, and fund other initiatives that would develop uses for XRP, the XRP Ledger

ecosystem, and/or create and support a market for XRP).  The Commission further avers that based

upon the information provided to it by Ripple and certain third parties to date, it appears as if most

of the XRP purchaser funds Ripple pooled were held at various Ripple accounts at Silicon Valley

Bank.  The Commission further avers that Ripple's bank accounts and financial statements are

evidence of what the funds at issue "were used for," and that the testimony of various Ripple

employees also establishes what funds were obtained, how they were pooled, and what they were

used for.  The Commission further avers that Ripple has set forth no evidence that it systematically

segregated proceeds from any particular sales of XRP, or otherwise distinguished between the source of any sales of XRP to any person when accepting and depositing into its bank accounts fiat currency received in the course of Ripple's XRP sales, and the Commission has come across no such evidence.

The Commission further avers that certain critical aspects of the XRP Ledger were centralized to Ripple between 2012 and 2020, including through Ripple's control over several aspects of the XRP Ledger, such as the ledger's maintenance, development, governance, functionality, default trusted nodes list, and consensus mechanism.  For a period of time through at least 2020, validation of transactions on the XRP Ledger was under Ripple's control, as it operated at times *all* the validators on the default trusted nodes list, and through almost the entire relevant period, at least 20% of such validators, sufficient to essentially "veto" changes to the XRP Ledger. Nor was there ever any incentive for a third-party to act as a validator on the XRP Ledger, until Ripple affirmatively sought out third parties (and at times covered expenses for third parties) to do so, further showing that Ripple "controlled" who would become a validator on the XRP Ledger. Examples of information related to the level of centralization of the XRP Ledger can be surmised from portions of the investigative testimony and deposition testimony of Ripple employee David Schwartz.  Other examples of such information is also publicly available and equally available to Ripple as it is to the Commission, including, but not limited to, white papers related to the ledger's functionality, websites that act as repositories of XRP Ledger data (*e.g.,* https://xrpscan.com; https://github.com;), and information related to the number of validating nodes and nodes on the Ripple default Unique Node List that were operated, controlled, or run by Ripple or entities affiliated with Ripple at various times (*e.g.,* https://xrpcharts.ripple.com).  Other documents upon which the Commission may rely to establish the level of centralization of the XRP Ledger (to the extent relevant or in rebuttal to arguments by any Defendant) include, but are not limited to

communications, documents, or contracts between Ripple personnel related to the ledger's centralization (*e.g.,* RPLI_SEC 0026658; RPLI_SEC 0574082-101; RPLI_SEC 0555975; RPLI_SEC 0541809) and between Ripple and its affiliates and other parties on Ripple's default Unique Node List, or other persons operating or controlling nodes on the XRP Ledger that are actually necessary for the state of the XRP Ledger to advance (*e.g.*, RPLI_SEC 0509804; RPLI_SEC 0554278; RPLI_SEC 0546274).

The Commission further contends that Ripple and its executives made public statements that Ripple and its executives made regarding Ripple's various XRP-related efforts to increase XRP liquidity and increase XRP demand, which Ripple and its executives stated and suggested would lead to an increase in XRP's value and price. Ripple and its executives also represented that it sought to create and maintain XRP's value and price through the use of various smart contracts and other contractual provisions that restricted the amount of XRP that large XRP holders, including Ripple, could sell and/or distribute into market in order to limit the impact these sales would have on XRP price.

Ripple's Efforts to Restrict XRP Supply:

Ripple and its executives repeatedly stated that, according to rules of the XRP Ledger, no additional XRP could ever be created or issued and as a result, an increase in demand for XRP would lead to an increase in the value and price of XRP.  *See, e.g,* The Ripple Protocol: A Deep Dive for Finance Professionals, September 2014 ("Given that there is a finite number of XRP, as demand for XRP grows, the value of XRP should appreciate.") RPLI_SEC 0097442-488, at 458.  In 2012, the creators of the XRP Ledger along with Ripple's co-founders pre-programmed the XRP Ledger to create a limited, fixed supply of XRP (100 billion units).  We contend that, along with the above statements, Ripple's pre-programming of the XRP ledger to create a fixed supply of XRP led XRP holders to expect that an increase in XRP demand would lead to an increase in XRP price.

In May 2017, Ripple publicly reported that it would control and restrict the timing and volume of Ripple's own XRP distributions and sales by placing a portion of its XRP into cryptographically-secured escrow contracts, and therefore allay market concerns that Ripple's sales would negatively impact XRP's price. *See* Ripple to Place 55 Billion XRP in Escrow to Ensure Certainty of Total XRP Supply, May 16, 2017, available at https://ripple.com/insights/ripple-to-place-55-billion-xrp-in-escrow-to-ensure-certainty-into-total-xrp-supply/. According to the blog post, which listed Garlinghouse as the author, the purpose of the escrow was to address "concerns in the market about uncertainty surrounding our ongoing XRP distribution. The root of this uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time – a scenario that would be bad for Ripple! Our self-interest is aligned with building and maintaining a healthy XRP market." *See id.* Ripple and Garlinghouse also repeatedly told XRP holders that Ripple wanted to be "good stewards" of XRP. *See* Ripple Pledges to Lock Up $14 Billion in XRP Cryptocurrency, available at https://www.coindesk.com/markets/2017/05/16/ripple-pledges-to-lock-up-14-billion-in-xrp-cryptocurrency/. As evidence of this commitment, in December 2017, Ripple implemented a cryptographically-secured escrow – a series of smart contracts on the XRP Ledger – that made only 1 billion XRP available for use by Ripple every month. *See* An Explanation of Ripple's XRP Escrow, December 15, 2017, available at https://ripple.com/insights/explanation-ripples-xrp-escrow/. We contend that by creating the escrow contracts, which provided for a fixed supply of XRP that could be released each month, Ripple led XRP holders to expect that Ripple would limit *its* supply and pace of new XRP entering the market for the explicit purpose of maintaining and strengthening XRP price.

Ripple publicly reported that its contracts with wholesale purchasers contained lock ups and other sales restrictions, which were designed to "mitigate the risk of market instability due to large subsequent sales." See *e.g.,* XRP Markets Reports for Q4 2018; XRP Markets Report for Q4 2016.

As evidence of this commitment, many contracts with wholesale XRP purchasers included terms that restricted XRP sales and transfers, specifically (i) the time period in which the purchased XRP may be sold or transferred and (ii) the amount of XRP that may be sold or transferred. *See, e.g.,* Ripple and ███████ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-594. For example, with respect to re-sale restrictions, Ripple's contract with ███████ included the following provision: "Any sales or transfers of XRP purchased by Purchaser to this Appendix D shall not exceed 10 bps of the Average Daily Volume in any date (the '**Maximum Sales**') (emphasis in original)." *See id.* As another example, with respect to lock ups, Ripple's contracts with ███████ ███████ included the following provision: "Neither the Purchased XRP nor any interest therein may be sold, pledged or otherwise transferred to any person from the Date of Purchase through July 10th, 2016 (the 'Lockup Period') unless that person also agrees not to resell or otherwise distribute the Purchased XRP to any other party during the Lockup period." *See* Ripple and ███████, June 9, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000626 -631, at 627; *see also* Ripple and ███████., June 23, 2016, Summary of XRP Purchase and XRP Purchase Agreement, RPLI_SEC 0000636; Ripple and ███████, Master XRP Purchase Agreement, August 3, 2017, RPLI_SEC 0000792; Ripple and ███, Development and Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021. We contend that, along with the above statements, Ripple led XRP holders to expect Ripple would limit the supply and pace of new XRP entering the market by institutional investors to whom Ripple sold large amounts of XRP over-the-counter which, in turn, would maintain and strengthen XRP's price.

Finally, in its Q2 2020 XRP Markets Report, Ripple explained that, in connection with its "responsible role in the [XRP] liquidity process," it had begun purchasing XRP in the secondary market to ensure "a healthy, orderly XRP market." *See* Q2 2020 XRP Markets Report, available at

https://ripple.com/insights/q2-2020-xrp-markets-report/. As evidence of that commitment, Ripple contracted with crypto market maker GSR to purchase XRP in the secondary market to "offset amounts of XRP that [Ripple] is selling to its own customers …." *See* Ripple and GSR Markets Pte. Ltd., Master Purchase Agreement, July 3, 2020, RPLI_SEC 0878012-8019, at 0878012. We contend that, along with Ripple's above statements, Ripple's contract with GSR to purchase XRP led XRP holders to expect that Ripple would take steps to maintain and strengthen XRP's price.

Ripple's Efforts to Increase XRP Liquidity and Increase XRP Demand:

Ripple publicly reported its efforts to create liquidity and demand for XRP by selling XRP directly to institutional investors and making it easier for these purchasers to buy, sell, and trade XRP. *See* Q3 2017 XRP Markets Report, available at https://ripple.com/xrp/q3-2017-xrp-markets-report/. As evidence of that commitment, certain of Ripple's contracts with wholesale purchasers provided for an XRP purchase price that was discounted to the market price of XRP. For example, the XRP purchase agreements and various amendments between Ripple and ████████████████ ████████████████ specifically included pricing arrangements that permitted ████ to purchase XRP at a price between ██████████████ of the then-current XRP market price. *See* Ripple and ██████ Master XRP Purchase Agreement, September 24, 2018, RPLI_SEC 0492576-594; Ripple and ██████ Amendment to Master Purchase Agreement, December 18, 2018, RPLI_SEC 0545358-0545363; Ripple and ██████ Amendment to Master Purchase Agreement, January 25, 2019 RPLI_SEC 0254877-0254878; Ripple and ██████ Amendment #3 to Master Purchase Agreement, November 18, 2019, RPLI_SEC 0991819-0991821.

Ripple publicly reported its efforts to create liquidity for XRP by partnering with digital asset trading platforms and providing incentives to market makers and other market participants to trade XRP. *See* Q4 2016 XRP Markets Report, available at https://ripple.com/insights/q4-2016-xrp-

markets-report/. As evidence of that commitment, Ripple entered into contracts with digital asset platforms and other market participants that included recitals and/or terms aimed at creating and increasing XRP liquidity through digital asset trading platforms' admissions to trade XRP and Ripple's provision of certain market making incentives. For example, Ripple contracted with the digital asset trading platform Bitstamp for its "efforts intended to increase liquidity" for XRP. *See, e.g.,* Ripple and Bitstamp Ltd., XRP/EUR Volume Incentive Program, January 11, 2017, RPLI_SEC 0507279-291, at 279; *see, e.g.,* BitOasis Technologies FWZ and Ripple Markets, XRP Fee Rebate Program Agreement, October 13, 2017, RPLI_SEC 0153866, at 867; BITBANK Ltd. and Ripple Markets, BITBANK XRP Volume Incentive Program, May 18, 2017, RPLI_SEC 0507292; S Capital Solutions Private Limited ("BTCXINDIA") and Ripple Markets, BTCXINDIAXRP Fee Rebate Program, May 29, 2017, RPLI_SEC 0154338, at 338; CoinOne Ltd. and Ripple Markets, COINONE XRP Volume Incentive Program, June 2, 2017, RPLI_SEC 0066688, at 689; and ███████████ and Ripple Markets, XRP Listing, Volume Incentive and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335. Ripple also contracted with market makers for "Market Making Activity," described as "efforts to promote liquidity for the buying and selling of XRP." *See, e.g.,* Ripple and ███████████████ Market Maker and Programmatic Market Making Activity Agreement, March 1, 2018, RPLI_SEC 0537696-702, at 696.

We contend that Ripple's contracts with wholesale purchasers led wholesale purchasers to believe that they could profit from their XRP purchasers by quickly selling its discounted XRP at market prices. As discussed in the Expert Rebuttal report of ███████████ we contend that "Ripple's efforts to increase the liquidity of XRP are consistent with increasing XRP price." *See* Expert Rebuttal Report of ███████████ pp. 35-40. In addition, by contracting to make XRP available on digital asset trading platforms, we contend that Ripple provided investors with a venue to sell XRP at a profit. *See, e.g.,* ███████████ and Ripple Markets, XRP Listing, Volume Incentive

and Rebate Agreement, May 17, 2017, RPLI_SEC 0511334, at 335.  Therefore, we contend that,

along with Ripple's statements related to XRP liquidity and demand, Ripple's contracts with

wholesale purchasers, digital asset trading platforms, and market makers led XRP holders to believe

that they would be able to sell XRP at a profit.

Ripple's Efforts to Develop Uses for XRP and Increase XRP Demand:

Ripple publicly reported its efforts to develop a use for XRP through its On-Demand

Liquidity Product, which was formerly known as xRapid.  For example, in its Q3 2017 XRP Markets

Report, the company stated that it would "continue to expand our xRapid partnerships" and that its

"long-term goal is, and has always been, usage of XRP as a liquidity solution" and that "partnerships

are key to achieving this goal."  *See* Q3 2017 XRP Markets Report, available at

https://ripple.com/xrp/q3-2017-xrp-markets-report/.  As evidence of this commitment, Ripple

contracted with ODL customers.  Certain of these contracts contained specific provisions, among

others, whereby Ripple provided XRP to ODL customers as rebates and incentives for its ODL

product and the specific amount of the XRP incentive was based on the volume of ODL

transactions.  *See e.g.,* Ripple and MoneyGram Payment Systems, Inc., Ripple Work Order #1, June

17, 2019, RPLI_SEC 1077343-357.  We contend that, along with Ripple's above statements, Ripple

led XRP holders to believe that these commercial agreements would lead to an increase in demand

for XRP and thereby an increase in XRP's value.  We also contend that ODL customers reasonably

expected to profit by selling the XRP they received as rebates incentives into the market.

Ripple publicly reported its efforts to develop alternative uses for XRP that were unrelated

to payments through its xPring initiative.  For example, in its Q1 2019 XRP Markets Report, the

company stated that xPring had "invested in and supports" "key companies focused on projects

building and utilizing XRP, the XRP Ledger, and ILP."  *See* Q1 2019 XRP Markets Report, available

at https://ripple.com/insights/q1-2019-xrp-markets-report/.  As evidence of this commitment,

Ripple entered into commercial contracts aimed at increasing XRP adoption and creating an XRP

"ecosystem."  Specifically, Ripple contracted with third party developers to create and integrate XRP

into their own products.  For example, Ripple's contract with Coil Technologies, Inc. ("Coil") stated

that its purpose, among other things, was to "promote the use of the "XRP Ledger, XRP, the

technologies underlying Ripple's xCurrent, xRapid, and xVia product, or other technologies of

interest to Ripple."  *See* Ripple and Coil, Services and Marketing Agreement, November 1, 2018,

SEC-COIL-E-0000001-13.  The recitals in the contract between Ripple and another third party

developer ██████████████████), stated that, among other things, "Ripple desire[d] to work

with████████] to promote ecosystem adoption of the XRP Ledger, XRP … by having Company

integrate XRP … into the Company Components."  *See* Ripple and ████ Development and

Integration Agreement, November 8, 2018, RPLI_SEC 0266000-0266021.  The contract between

Ripple and third party developer "██████████████████) also included recitals that stated that

Ripple "desire[d] to support the development of the XRP Ledger and related infrastructure."  *See*

Ripple and ████, Technology Research & Development Agreement, July 17, 2019, RPLI_SEC

0275429-0275433.  We contend that, along with Ripple's above statements, Ripple led XRP holders

to believe that these commercial agreements would lead to an increase in demand for XRP and

thereby an increase in XRP's value.


Dated:  New York, New York                    SECURITIES AND EXCHANGE COMMISSION
        December 6, 2021

                                        By: /s/ Mark R. Sylvester_____
                                            Mark R. Sylvester
                                            Pascale Guerrier
                                            Robert S. Moye
                                            Benjamin Hanauer
                                            Daphna A. Waxman
                                            Jon A. Daniels
                                            Ladan F. Stewart

Securities and Exchange Commission
New York Regional Office
200 Vesey Street, Suite 400
New York, NY 10281
(212) 336-0159 (Sylvester)
SylvesterM@sec.gov

*Attorneys for Plaintiff*

**Verification for Supplemental Responses to Interrogatories No. 1, 2, 3, 6, 7, 11, 17, 18, 19, 22, 23, and 24**

I declare under penalty of perjury, that the factual statements made above are true to the best of my knowledge, information, and belief. Executed in Washington, District of Columbia on this 6th Day of December 2021.

*A. Kristina Littman*

A. Kristina Littman
Division of Enforcement

78