# Exhibit 41

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

SECURITIES AND EXCHANGE
COMMISSION,

                Plaintiff,

    v.

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

                Defendants.

Case No. 20 Civ. 10832 (AT) (SN)

## Expert Report of Professor Yesha Yadav

October 4, 2021

*Designated Highly Confidential*

*Pursuant to the Protective Order Filed March 9, 2021*

*Highly Confidential*

## I.      Qualifications and Experience

1.      I am a Professor of Law and Associate Dean and Robert Belton Director for Diversity, Equity and Community at Vanderbilt Law School. I also serve as the Faculty Co-director of the Law School's Masters-in-Law (LL.M.) Program. At Vanderbilt Law School, I have taught courses covering securities regulation, corporate bankruptcy, market structure, financial markets, and financial innovation where I focus on digital financial technologies categorized under the rubric of "fintech," or financial technology. A copy of my curriculum vitae, including a list of all the publications I have authored in the previous ten years, is attached as **Exhibit A**. I have not testified as an expert at trial or by deposition in the previous four years.

2.      My research, consistently published in the leading law journals, examines the regulation of market structure, credit risk, financial innovation, and financial system stability. This research agenda necessitates an interdisciplinary and real-world lens through which to understand the systems and processes underlying securities market trading; the design of exchanges, domestic and international; alternative trading platforms; financial risk management; and technological innovation. This research spans equity markets, derivatives (exchange-traded and over-the-counter), corporate bond and U.S. Treasury markets, and fintech including cryptocurrencies. I have developed a particular specialty in market microstructure and the dynamics of securities market trading, clearing and settlement. This discipline broadly describes the nuts-and-bolts processes and systems that enable securities trading to take place in markets like equities, derivatives, or Treasuries; and how markets operationally produce informative prices for efficient capital allocation and safeguard their trading systems from fragility and disruption. As reflected in my research, this discipline sits at the intersection of literature in financial economics, policymaking, industry practice, and regulation. My work also engages with international developments in market design to explore how foreign jurisdictions organize their trading markets; oversee innovation; and contend with frictions and opportunities created by cross-border flows of capital, traders, investors, and information.

3.      I have a dedicated research focus as well as specific teaching interests in the areas of fintech, cryptocurrencies and distributed ledger technologies (DLT) (or blockchains) that reflect particular expertise cultivated over my academic career. In researching

*Highly Confidential*

*Fintech and the Innovation Trilemma* (co-authored with Prof. Chris Brummer), published in the *Georgetown Law Journal,* and selected for reprinting in the *Corporate Practice Commentator*, I explored in-depth the workings of technologies underlying modern-day fintech – exemplified, *inter alia*, by cryptocurrencies and blockchains – and the challenges these create for conventional regulatory paradigms.[1] As evidenced throughout this work, the task of theorizing on how fintech differs from past eras of innovation and why that matters for regulation required me to engage deeply with the technology being developed at the frontiers of fintech, including within the context of crypto-markets and blockchains. Given the global nature of fintech – as highlighted by the international use and trading of cryptocurrencies – I have extended this research to examine the cross-border regulation of fintech and approaches to fintech regulation in foreign jurisdictions. As a lawyer that specialized in working in international financial standards prior to joining academia, my research has focused on how effectively international standards can apply in this area and the implications of divergent jurisdictional approaches to the supervision of highly mobile and geographically dispersed cross-border technologies (*e.g.*, cryptocurrencies).[2]

4.       I am working on several projects that examine the regulation of cryptocurrencies and blockchains. First, I am presently working on a project analyzing cryptocurrency exchanges and their capacity to deliver private oversight in the marketplace akin to traditional exchanges that carry the designation of self-regulatory organizations (SRO). My focus lies in determining whether unique aspects about the design and structure of cryptocurrency exchanges will impact their capacity to deliver robust oversight of their marketplace and users. In a separate project, I am researching the application of international regulatory standards on market infrastructure (*e.g.*, in relation to capital standards and risk management) to cryptocurrency exchanges. I am also pursuing two pieces of study on regulatory issues in relation to central bank digital currencies.

5.       As noted above, I have taught seminars at Vanderbilt Law School focused on financial technology that necessarily included instruction on cryptocurrencies and the role of

---

[1] Chris Brummer & Yesha Yadav, *Fintech and the Innovation Trilemma*, 107 Geo. L. J. 235 (2019).
[2] Yesha Yadav, *Fintech and International Financial Regulation*, 53 Vand. J. Transnat'l L. 1109 (2020).

*Highly Confidential*

blockchains. My teaching philosophy for this seminar lies in ensuring that law students understand the fundamentals of the underlying technologies as much as they engage with their risks and regulation. For example, in discussing cryptocurrencies, I seek to provide students with an overview of the computational principles that are utilized in the creation of cryptocurrencies like Bitcoin (*e.g.*, to explain the need for mining within its decentralized blockchain).

6.     In relation to more traditional market structure, my academic work has focused on several key areas to develop an account of how financial innovation impacts fundamental concepts in securities and financial regulation. A brief overview of this ongoing research and key areas of focus are described below.

7.     First, a key focus of my research has been on the impact of innovative high-speed automation in trading and market design covering the stock market and the market for U.S. Treasuries. This body of work highlights ways in which algorithmic trading impacts the production of efficient information flows and prices in U.S. securities markets, as well as various risks that are generated in markets that are reliant on high-speed trading for liquidity. It also details how regulation and industry incentives have led stock exchanges to reshape their trading systems to accommodate this technological shift. As part of my research, I endeavor to understand the real-world operation of trading market microstructure and the detailed processes and systems that exchanges build to enable trading. In *Insider Trading and Market Structure*, for example, I focused on the technological developments in communication and order submission systems that exchanges have developed to facilitate high-speed automated trading.[3] This work has involved researching the detailed logistics involved in data capture by traders, order submission, matching, and price-updating to determine whether high-speed traders enjoy special advantages in trading relative to those that transact from spaces that are not co-located with those of an exchange. In researching *How Algorithmic Trading Undermines Efficiency in Capital Markets*, I studied the ways in which high speed traders use creative order choice and order submission techniques to operationalize a variety of trading strategies.[4] The goal of this

---

[3] Yesha Yadav, *Insider Trading and Market Structure*, 63 UCLA L. Rev. 968 (2016).
[4] Yesha Yadav, *How Algorithmic Trading Undermines Efficiency in Capital Markets*, 68 Vand. L. Rev. 1607 (2015).

*Highly Confidential*

work was to develop an account of how high-speed trading affects the quality of price formation with a view to connecting these shifts to regulation that relies on securities prices as a monitoring lever for market participants and regulators. For *The Failure of Liability in Modern Markets*, I studied markets more broadly from a structural standpoint to examine interconnections between exchanges and platforms across asset classes, opining that high-speed trading upends conventional ways of thinking about the liability standards that underpin market regulation (*e.g.*, negligence, strict liability and intent).[5] Relatedly, in my article, *The Failed Regulation of U.S. Treasury Markets*, I have focused on the microstructure of the U.S. Treasury market to detail the impact of recent shifts towards automated trading technologies that have resulted in novel and unexamined risks being faced by the world's preeminent risk-free market and to explain why current regulatory approaches are insufficient in light of these risks. For this area of work, I closely study the microstructure of trading in U.S. Treasuries as well as issues in relation to clearing and settlement of U.S. Treasuries.[6]

        8.     Second, my academic work focuses on the significance of exchanges, trading platforms and clearinghouses as critical actors in private industry self-governance. It details the amplified importance assumed by providers of financial markets infrastructure in offering oversight of technologically innovative, transactionally complex markets. As part of this research, I study innovations such as alternative equity trading platforms or disintermediating financial technologies (*e.g.*, blockchains) to analyze the ways in which creativity in platform design can affect the delivery of oversight and risk management in financial markets. In *Oversight Failure in Securities Markets*, for example, I researched, *inter alia*, how traders transact across multiple platforms – exchanges as well as alternative trading venues – to execute trading strategies.[7] I speak to traders to gain insight into their trading mechanisms, the risks they face and their lived experience of trade execution quality – and also engage with exchange providers. These conversations facilitate discussions of costs entailed in trade execution to help nurture thinking about structural, technological solutions. From early in my academic career and following on from my professional work as a lawyer with expertise in

---

[5] Yesha Yadav, *The Failure of Liability in Modern Markets*, 102 VA. L. REV. 1031 (2016).

[6] Yesha Yadav, *The Failed Regulation of U.S. Treasury Markets*, 121 COLUM. L. REV. 1173 (2021); Pradeep Yadav & Yesha Yadav, *Fragile Financial Regulation*, VAND. L. RSCH. PAPER NO. 20-46 (2021).

[7] Yesha Yadav, *Oversight Failure in Securities Markets*, 104 CORNELL L. Rev. 101 (2019).

*Highly Confidential*

financial markets infrastructure, I have also studied clearinghouses and how they settle transactions. As clearinghouses have taken on greater significance in risk management of complex derivatives globally following the 2008 financial crisis, I have examined how effectively they might perform this role to safeguard themselves and the financial system from transactional and counterparty risks.

9.      Third, my research explores the impact of financial innovation – and in some cases, the lack thereof – on market quality and investor protection. Most recently, I have worked extensively on the microstructure of U.S. Treasury and U.S. corporate bond markets to describe the systematic risks and economic costs they create for everyday investors and for the effectiveness of these markets as conduits of capital. For example, in *The Broken Bond Market* (with Prof. Jonathan Brogaard), I studied over-the-counter bond market microstructure to develop an understanding of why bond markets appear to lack important attributes like liquidity and transparency.[8] This work has involved exploring trade execution mechanisms in over-the-counter markets to develop an account of why these are falling short in producing important efficiencies for trading.

10.      Finally, because capital is global and mobile, my research also focuses on comparative analysis of these issues across foreign jurisdictions, building on my professional background in cross-border work as a regulatory lawyer at Clifford Chance LLP and at the World Bank. It studies the approaches adopted by foreign regulators and international standard-setting bodies to regulate innovation, risk-taking and the governance of financial institutions, noting jurisdictional divergences in supervisory strategies and examining their implications for understanding how international firms and technologies operate, the ease of geographic migration and the challenges these create for domestic regulators.

11.      My research has been cited in judicial decisions by the U.S. Supreme Court, the U.S. Court of Appeals for the District of Columbia Circuit, and the U.S. Court of Appeals for the Sixth Circuit.[9] It has been referenced by securities regulators and policymakers

---

[8] Jonathan Brogaard & Yesha Yadav, *The Broken Bond Market*, Working Paper (2021).
[9] *Alice Corp. Pty. Ltd. v. CLS Bank Int'l*, 573 U.S. 208, 220 (2014) (citing Yesha Yadav, *The Problematic Case of Clearinghouses in Complex Markets*, 101 Geo. L. J. 387, 406–12 (2013), for the proposition that

*Highly Confidential*

in the U.S. and abroad. Additionally, my work has been covered by the business media, including by the Wall Street Journal, Bloomberg News, the Financial Times, and the Economist. I have been invited to present my research to regulators and policymakers in the U.S. as well as internationally. As an academic specializing in U.S. and comparative financial regulation, I have delivered research talks at leading universities in the U.S., Europe, Asia, South America, and Australia. Finally, my research has been recognized institutionally. At Vanderbilt University, I was selected to receive a Chancellor Faculty Fellowship for 2019-2021, reflecting the institution's commitment to recognizing outstanding, recently-tenured faculty. I also serve on the board of editors for the Capital Markets Law Journal and the International Economic Law Journal (both, Oxford University Press).

12.     My academic interests reflect my professional background and areas of specialization. Prior to joining academia, I worked as a lawyer in the London and Paris offices of Clifford Chance LLP, a leading international law firm, specializing in financial regulation and derivatives. As part of this practice group, I developed a particular focus on issues affecting financial market infrastructure providers like exchanges and clearinghouses. This work entailed building an understanding of the detailed processes underlying risk management of such institutions, often with a cross-border perspective.

13.     Additionally, I was one of the two main financial regulatory lawyers assigned to advise the European Payments Council (EPC) in the development of a harmonized and standardized transactional environment for euro payments across the European Economic Area (EEA) and Switzerland - an initiative known as the Single Euro Payments Area (SEPA). In this capacity, I worked extensively with the EPC as a key resource person to draft the rules governing SEPA payment schemes, advise on technical standards and risk management for various kinds of payments and work with industry and European Union (EU) regulators to implement this initiative. In bringing together a fragmented system of domestic payment

---

clearinghouses are a building block of the modern economy); *Coburn v. Evercore Trust Co.*, 844 F.3d 965, 969 (D.C. Cir. 2016) (quoting Yesha Yadav, *How Algorithmic Trading Undermines Efficiency in Capital Markets*, 68 VAND. L. REV. 1607, 1632 (2015), for an explanation of efficient capital market theory in the context of algorithmic trading); *see also Saumer v. Cliffs Nat. Res. Inc.*, 853 F.3d 855, 859 (6th Cir. 2017) (same).

*Highly Confidential*

schemes within a harmonized and integrated payments environment, SEPA is now a critical part of the financial ecosystem in the EEA, Switzerland, and the United Kingdom.[10]

14.     In 2008, I joined the World Bank as legal counsel in the Legal Vice Presidency. My work at the World Bank further developed my interest and specialization in market regulation and risk management. At the World Bank, I worked as part of a small team of specialist lawyers focused on assessing the regulatory systems of World Bank client countries with a particular emphasis on studying and opining on the effectiveness of domestic insolvency, restructuring and credit risk management regimes. In addition, the team advised more broadly on issues concerning the health of domestic financial markets as measured against the standards expounded by the Financial Stability Board.[11] This work was international and comparative in nature and was designed to analyze the workings of domestic regulatory environments within the larger context of transnational best practices, standards, and benchmarks. While working at the World Bank, I also served as the Acting Research Director for the Committee on Capital Markets Regulation, a leading think tank on issues relating to financial regulation and policy reform.

15.     Since joining academia, I have engaged actively with policymakers and industry participants, both domestically and internationally, on matters concerning financial innovation, market structure, and the impact of emerging digital technologies on regulatory standards. I was a member of the Atlantic Council's Task Force examining the diverging implementation of financial regulatory standards between the U.S. and the E.U. after the 2008 Financial Crisis and focusing on reform efforts in the area of derivatives and clearinghouses.[12] I was selected to serve as an Honorary Advisor to India's Financial Services Law Reform Commission as part of India's wide-ranging overhaul of its domestic regulatory system following the 2008 Financial Crisis.

---

[10] *See* European Commission, *Single Euro Payments Area (SEPA)*, https://ec.europa.eu/info/business-economy-euro/banking-and-finance/consumer-finance-and-payments/payment-services/single-euro-payments-area-sepa_en.

[11] Financial Stability Board, *Key Standards for Sound Financial Systems*, https://www.fsb.org/work-of-the-fsb/about-the-compendium-of-standards/key_standards/.

[12] Chris Brummer, Atlantic Council, *The Danger of Divergence: Transatlantic Financial Reform & the G20 Agenda* (Dec. 2013), 29–48.

*Highly Confidential*

16.     Since 2018, I have been a member of the Commodity Futures Trading Commission's (CFTC) Technology Advisory Committee (TAC). As part of this role, I have participated in the TAC's subcommittees on Distributed Ledger Technology (DLT) (blockchain) and Algorithmic Trading and acted as the recent co-chair of the DLT subcommittee. In recent years, the DLT subcommittee and the TAC have examined issues in relation to the potential deployment of blockchain-based technologies for payment and settlement in derivatives markets with a view to informing the CFTC about the opportunities and challenges these present.[13] Reflecting my interest in exchange oversight, I sit as a member of the Hearings Panel of the Nasdaq as part of its panel of outside experts examining breaches of listing rules. At Vanderbilt Law School, I am a part of a small interdisciplinary group of Vanderbilt University scholars working to develop a research-based prediction market for measures relating to climate.

17.     I hold a MA(Hons)(First Class) in Modern Languages and Law from the University of Cambridge and a Masters-in-Law from Harvard Law School. While at Harvard Law School, I served as a researcher for the Committee on Capital Markets Regulation as part of its efforts to produce a detailed report into the 2008 Financial Crisis.

18.     I am being compensated at my ordinary hourly rate of $800 per hour. No part of my opinion is based in any way on my compensation, and my compensation is not dependent on the outcome of this matter or the substance of the opinions that I render.

## II.    Scope of Assignment, Materials Relied Upon and Summary

19.     I have been retained by Debevoise & Plimpton LLP and Kellogg, Hansen, Todd, Figel & Frederick P.L.L.C., on behalf of Ripple Labs Inc., ("Ripple"), as well as by Paul, Weiss, Rifkind, Wharton & Garrison LLP, on behalf of Christian Larsen, and Cleary Gottlieb Steen & Hamilton LLP, on behalf of Bradley Garlinghouse. I have been asked by counsel for Ripple to offer an opinion on how offers to buy and sell, and trades of, cryptocurrencies are

---

[13] *E.g.,* Commodity Futures Trading Commission, *CFTC's Technology Advisory Committee to Meet on October 3, 2019,* https://www.cftc.gov/PressRoom/Events/opaeventtac100319.

*Highly Confidential*

made on cryptocurrency exchanges, the location of those offers and trades, and the location of various cryptocurrency exchanges.

20.     In forming my opinions, I reviewed academic literature and relied on my own experience. I also requested, reviewed, and considered additional materials, information, and documents in order to form the opinions I express in this report. A list of the materials I considered in forming my opinions is attached hereto as **Exhibit B**. In addition, to the extent not reflected in Exhibit B, I considered and relied on material that is reflected in the footnotes in this report.

21.     All opinions expressed herein are mine alone.

22.     This report is organized as follows. Sections III & IV provide background on the core functions of traditional exchanges, cryptocurrency exchanges, and blockchains and set out key facts, principles and research that ground my conclusions. In Section V, I conclude that offers to buy and sell of cryptocurrencies that are posted to an exchange, once matched on the exchange in accordance with exchange rules, become final and binding on the exchange as soon as they are matched by the exchange in accordance with exchange rules. Therefore, as soon as offers to buy and sell cryptocurrencies are posted on and matched by an exchange in accordance with its rules, I conclude that they become final and binding transactions at the geographical location where the exchange is based. Section VI examines settlement procedures for cryptocurrency transactions to conclude that cryptocurrency transactions become final and binding as soon as the exchange matches buy and sell orders in accordance with its rules. To give effect to this binding transaction and move value between exchange users, it is common industry practice for exchanges to settle transactions on the books of the exchange itself by adjusting the respective balances of user accounts. In any event, because transactions become binding as soon as orders are matched on and by the exchange, finality does not depend on publication on a blockchain. In fact, owing to the proliferation of in-house settlement, an unknown and substantial number of exchange-traded cryptocurrency transactions are never recorded on blockchains. Section VII examines the location of the exchanges listed in Table A and concludes that most of the exchanges listed in Table A lack any significant indicia showing that offers on these exchanges are made in the United States, or that trades being matched on

*Highly Confidential*

these exchanges become final and binding in the United States, or that those exchanges could be properly considered to be domestic exchanges. Further, while four exchanges may have indicia suggesting a connection to the United States, determinations about where particular offers were made and where trades became final and binding in their context must be undertaken on a case-by-case basis, as trading may have occurred though a foreign arm of each of these four exchanges and therefore outside of the United States.

23.    My opinions are based on the information available to me as of the date of this report. Should additional relevant documents or information be made available to me, I may adjust or supplement my opinions as appropriate.

## III.    <u>Background on the Role and Function of Exchanges</u>

24.    Cryptocurrency exchanges have many structural features in common with traditional commodities or stock exchanges.[14] Their growth in recent years has been rapid and economically significant, with trillions of dollars' worth of trades moving through their venues on a monthly basis. Consider Binance – the world's largest cryptocurrency exchange by trading volume. In May 2021, it reportedly hosted around $1.5 trillion worth of spot trades,[15] seeing around $20-$30 billion in daily trading volume.[16] These figures represented a gain of 63% from April 2021.[17] This substantial trading volume reflects, in part, the fruits of a tried-and-tested approach to platform design, likely evidencing familiarity among market participants to the experience and transactional practices of traditional exchanges, such as those used to trade commodities.

25.    To situate the role and function of cryptocurrency exchanges specifically, it is helpful to outline the economic role and function of exchanges generally. Below, I set out

---

[14] Cong et al., *Crypto Wash Trading*, Working Paper, 3 (Jul. 2021).
[15] Lyllah Ledesma, *Binance Extended Crypto Exchange Dominance During May Trading Frenzy*, COINDESK, Jun. 7, 2021.
[16] Jen Wieczner, *The World's Largest Crypto Exchange Keeps Losing CEOs*, NEW YORK MAGAZINE, Aug. 17, 2021. Spot trades refer to trades in the actual coins and tokens, rather than to any derivatives that may reference the coins and tokens. It is worth noting that Binance and other exchanges also transact in derivatives written on popular crypto-assets.
[17] Ledesma, *supra* note 15.

*Highly Confidential*

an introduction to traditional exchange design, highlighting key aspects of its usefulness for anchoring markets in claims and for establishing the operational mechanisms of trading.

## *A Brief Introduction to Exchange Design and Trading Mechanics*

26.     Exchanges constitute an essential pillar of the economy.[18] In the absence of exchanges, capital faces costly frictions to move from one party to another and risk can become hard to manage.[19] Those wishing to trade must independently find one another, perform due diligence on and negotiate with their counterparty, make a deal, and then finally send payment to receive the agreed-upon assets.[20] Such systematic costs can diminish or eliminate the incentives of those looking to enter the market. Those that do should rationally charge more for their participation or anticipate receiving less capital than they might otherwise receive to reflect in-built costs.[21] These kinds of frictions can result in market participants facing information gaps, lacking confidence in a deal's integrity, and becoming forced to take extra care to reduce the risk that counterparties fail to honor their end of the bargain.[22]

27.     Exchanges have a storied history, including in the U.S., arising out of private efforts to reduce these and other frictions entailed in bilateral trading. For example, to respond to vibrant interest among farmers looking to sell their grain, others looking to buy it – and with speculators in the middle – the Chicago Board of Trade came into being in 1848. It became a recognizably formal exchange in the 1860s, setting rules governing such matters as standardized contracts, grain inspections, margin, delivery, and acceptable trader conduct.[23]

---

[18] Stavros Gadinis & Howell E. Jackson, *Markets as Regulators: A Survey*, 80 S. CAL L. REV. 1239, 1242 (2007).

[19] For example, risks may be mitigated by entering into derivatives contracts to hedge exposures. A farmer expecting a harvest can enter into a future/forward contract to sell their grain at a specific price at a particular time in the future, ensuring that they can receive a set price for their goods. On the other side, a consumer of grain agrees to purchase the contract, ensuring a floor to the price they pay for the goods. In this way, both parties can reduce their economic risk of commodity price fluctuations.

[20] Yesha Yadav, *Oversight Failure in Securities Markets*, 104 CORNELL L. Rev. 101, 113–16 (2019).

[21] *See, e.g.*, Aswath Damodaran, *Equity Risk Premiums (ERP): Determinants, Estimation and Implications – The 2021 Edition*, 11–14 (2013).

[22] Craig Pirrong, *A Theory of Financial Exchange Organization*, 43 U. CHI. J. L. & ECON. 437, 439–40 (2000).

[23] Commodity Futures Trading Commission, *US Futures Trading and Regulation Before the Creation of the CFTC*, https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html; Jeffrey C. Williams, *The Origin of Futures Markets*, 56 AGRIC. HIST. 306 (1982).

*Highly Confidential*

Over time, other Boards of Trade and commodities exchanges emerged across the country, facilitated and linked by easier communication and travel between major cities.[24] With various Boards of Trade and commodity exchanges convening participants and creating rules-of-the-road, commodity and other futures markets expanded in their reach and sophistication.[25] In the context of stock exchanges, brokers have come together since the earliest days of the Republic to standardize and systematize the trading process. In signing the famous Buttonwood Agreement in 1792 – originating the New York Stock Exchange (NYSE) – 24 stockbrokers contractually bound themselves to a set of multilateral rules designed to enable cheaper and more predictable trading between them.[26] By bringing interested parties together to transact in accordance with group norms, exchanges have reflected the aim of reducing search costs, easing the process of coming to agreement, mitigating the risks of contract default and building confidence about the integrity of the marketplace by applying centrally-governed rules and standards.[27]

28.    Crucially, when performing effectively, exchanges can create a virtuous cycle that yields a multitude of economic benefits. By increasing confidence among market participants and responding to economic needs and preferences (e.g., to hedge risk or invest capital for future returns), exchanges can generate positive "network effects."[28] In other words, smooth trading encourages more and more participants, which in turn reduces transaction costs and builds even more momentum for others to join the market. Such network effects have real power in financial markets.[29] Notably, their presence enhances the "liquidity" of the exchange. That is, in ever greater numbers, market participants can transact with increasing ease, more cheaply and avoid causing sudden price crashes and spikes if trading parties cannot be found.[30] With large groups wishing to trade, exchanges can attract engaged market makers – professional

---

[24] Commodity and Futures Trading Commission, *supra* note 23; Williams, *supra* note 23.

[25] Williams, *supra* note 23.

[26] Olivia Waxman, *How a Financial Panic Helped Launch the New York Stock Exchange*, TIME (May, 17, 2017); Paul G. Mahoney, *Exchange as Regulator*, 83 VA. L. Rev. 1453, 1459–60 (1997).

[27] Mahoney, *supra* note 26, 1460–62.

[28] *See, e.g.*, Haim Mendelson, *Consolidation, Fragmentation and Market Performance*, 22 J. FIN. QUAN. A. 189 (1987).

[29] For discussion *see, e.g.*, Ananth Madhavan, *Market Microstructure: A Survey*, 3 J. FIN. MKTS. 205, 226–27 (2000).

[30] *Id.*

*Highly Confidential*

traders that stand ready to use their own supply of cash and tradeable assets to lubricate the flow of transactions, assuring investors that a counterparty is always available even when investors might not find others to transact with them.[31] With deep liquidity, those that wish to buy or hedge risk at a particular moment can do so, making the most of any private information that they may have.[32] Alternatively, others can sell at their chosen time, releasing cash and exiting risk to reflect their preference. By allowing such fluid transfers of risk, economic benefits can redound widely where those best placed to bear the risk calibrate a precise price for their services, while those that need the market for capital or risk protection can access it seamlessly. Additionally, speculators can enter and exit the market, contributing liquidity and providing information.

29.     Network effects and resilient liquidity can also contribute to building efficient, informative prices. By encouraging participants to the marketplace, exchanges can attract a lively mix of informed, lesser informed and uninformed actors whose combined interactions can produce insightful prices.[33] It is a cornerstone of finance theory that trading markets offer efficiencies where the prices they create quickly reflect publicly available information.[34] The ability to gather a diverse mix of participants, possessing varying levels of information and expertise, can help to mobilize the process of making markets efficient, pooling reserves of information and extracting a price from an interactive trading environment. That is, knowledgeable actors will place offers and engage in trades that reflect the general trajectory of a contract's likely performance, leading prices to eventually move as others follow their lead and converge upon a value that best approximates the worth of the contract's future cash flows at a given point in time. To be sure, theory recognizes that this process is not perfect. Participants can behave irrationally, for example.[35] They may overweight certain pieces of key

---

[31] Lawrence R. Glosten, *Insider Trading, Liquidity and the Role of the Monopolist Specialist*, 62 J. Bus. 211 (1989).

[32] Lawrence R. Glosten & Paul R. Milgrom, *Bid, Ask and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders*, 14 J. Fin. Econ. 71 (1985).

[33] Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency*, 70 Va. L. Rev. 549 (1984).

[34] Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. Fin. 383, 383 (1970); Gilson & Kraakman, *supra* note 33.

[35] *See generally,* Lawrence H. Summers, *Does the Stock Market Rationally Reflect Fundamental Values?,* 41 J. Fin. 591 (1986).

*Highly Confidential*

information and underweight others, showcasing various biases that muddy the clarity of prices. Nevertheless, it is broadly accepted that busy, liquid markets can help achieve informative prices.[36] By revealing the state of a contract's value through an easily understood measure, liquid exchange-based markets provide an essential tool – prices – through which to understand dematerialized claims (*e.g.*, futures contracts, swaps, shares or bonds) that can lack any inherent worth, or would otherwise be difficult to value.[37]

30.     Importantly, from their very beginnings, exchanges have set the rules and industry practices that organize how transacting parties interact with one another on the venue.[38] Those wishing to enjoy the economic services of an exchange would first have to agree to abide by these rules.[39] In the case of commodities exchanges, for example, Boards of Trade established standardized terms that govern contract sales between trading parties.[40] Similarly, members forming the NYSE crafted common terms for solving differences about finality of transactions and what to do if a party defaulted.[41] This focus on standardization continues to this day, and means that parties can transact in accordance with a pre-accepted set of terms that are common to all deals – no matter the quantity of the assets being traded, their type or quality (*e.g.*, a certain kind of wheat), the method of payment, delivery specifications, settlement mechanisms, future maturity dates, etc. – as managed by a centralized authority (the exchange). By creating a shared set of terms, exchange rules establish market expectations regarding what trade is executed on the exchange, in what form, how trading takes place, when trades become binding on the venue, who can trade on the exchange, how traders must behave, what resources they must possess, how they should protect the market from their default, and what kind of discipline the exchange can assert to safeguard market integrity. Standardization thus builds

---

[36] Ronald J. Gilson & Reinier Kraakman, *Market Efficiency after the Financial Crisis: It's Still a Matter of Information Costs*, COLUM. L. ECON., Working Paper No. 470 (2014).

[37] Gilson & Kraakman, *supra* note 33; James Dow et al., *Incentives for Information Production in Markets where Prices Affect Real Investment*, 15 J. EUR. ECON. ASS'N 877 (2017).

[38] Commodity Futures Trading Commission, *supra* note 23.

[39] Mahoney, *supra* note 26, 1459–61.

[40] Commodity Futures Trading Commission, *supra* note 23.

[41] Mahoney, *supra* note 26, 1459–61.

*Highly Confidential*

certainty and stability, and encourages liquidity.[42] It shapes how traders interact with one another and within the larger marketplace.[43]

31.     Additionally, in the U.S., regulation requires exchanges to act as self-regulatory organizations (SROs) and to ensure the enforcement of securities laws and industry standards on their venue.[44] As detailed below, modern financial exchanges generally mandate compliance by members with a detailed rulebook that governs, *inter alia*, trading, transaction finality, settlement, and exchange discipline.[45] By seeking to create standards and certainty through their rulebooks, exchanges can achieve two critical goals. First, they help individual actors transact on terms that are well-known in advance, reducing the cognitive and logistical burdens of evaluating deals and processing risk. This brings positive payoffs by helping to generate network effects, informed trading, and price efficiencies. Second, exchange rulemaking can organize the experience of the market by shaping how its participants expect to trade and the environment in which this trading occurs. With exchange rules creating expectations about the ease of trading, finality, speed, cost and integrity, participants can have greater confidence about structuring their own economic interactions in reliance on the exchange's promise and capacity to perform. As a result, farmers can have confidence that they will receive $1000 dollars for their wheat in three months' time after purchasing a futures contract on these terms on the exchange. Expecting this $1000, they can enter their own contracts to purchase seeds or machinery. They will also make provision to harvest the wheat in time and to warehouse and deliver it to the exchange at the conclusion of three months. Importantly, unrelated third parties, too, gain a reliance interest in the exchange's workings. For example, sellers of the seed and machinery will depend on the farmer's business, as will those operating the warehouse and delivery transport. And if the farmers and their counterparties have a dispute about the terms of their transactions, the exchange can serve as a centralized authority to enforce its rules.

---

[42] *See generally*, Jonathan Brogaard & Yesha Yadav, *The Broken Bond Market*, Working Paper (2021).

[43] Mahoney, *supra* note 26, 1459–61.

[44] Yadav, *supra* note 20, 1818–26; *see also* Exchange Act § 6(a), 15 U.S.C. § 78f(b) (2000); Roberta Karmel, *Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies*, 14 STAN. J. L. BUS. & FIN. (2008).

[45] *See, e.g.*, Chicago Mercantile Exchange, *CME Rulebook*, https://www.cmegroup.com/rulebook/CME/.

*Highly Confidential*

*Key Aspects of the Microstructure of Exchange Trading*

32.     In addition to possessing features in common with traditional exchanges, cryptocurrency platforms also share many microstructural similarities. To operationalize trading, cryptocurrency exchanges utilize key conventions that have long been relied on by traditional venues to enable order submission, matching, trade execution and information dissemination. A full description of exchange microstructure is outside the scope of this opinion. However, below, I briefly describe some key processes by which traditional financial exchanges connect buyers and sellers as part of a fluid trading environment.

33.     Traditional financial exchanges today are largely automated and electronic.[46] This means that the popular image of bustling trading pits has been replaced by a present-day reality where computerized processes guide virtually all aspects of trading. Order submission, matching, trade execution and settlement are thus completed by trading algorithms – broadly defined as pre-programmed computerized instructions that encode a set of actions in relation to the trading process.[47] Viewing exchanges in terms of simple brick-and-mortar entities is thus mostly obsolete. Instead, the exchange's "floor" is more accurately seen as a function of its internal computerized matching engines. When a person wishes to make an order to buy or sell on an exchange, automated algorithms can receive exchange data, process it, attach a value to the input, put a price to an electronic order and then submit the order into the exchange's order submission system. The orders to buy and sell are automatically processed by and executed through the matching engine of the exchange. The exchange then updates the

---

[46] Alain Chaboud et al., *Rise of the Machines: Algorithmic Trading in the Foreign Exchange Market*, Int'l Fin. Discussion Papers, No. 980 (July 5, 2013). While trading is mostly electronic, the NYSE, for example, maintains a small floor trading presence to backstop trading operations particularly when markets open and close. For discussion on the impact of floor trading on the NYSE, *see* Jonathan Brogaard et al., *Does Floor Trading Matter?* Working Paper (Jan. 2021). In the derivatives markets, the Chicago Mercantile Exchange closed its floor trading facilities in response to the COVID-19 pandemic and took the decision to shut it down permanently in in May 2021, while maintaining discrete floor trading within certain product categories. CME Group, *Update on Trading at CME Group*, https://www.cmegroup.com/company/information.html.

[47] Yadav, *supra* note 4**Error! Bookmark not defined.**, 1617–30; John Bates, *Algorithmic Trading and High Frequency Trading: Experiences and Thoughts on Regulatory Requirements*, Tech. Advisory Comm., U.S. Commodity Futures Trading Comm'n, Technological Trading in the Markets 27 (2010), http://www.cftc.gov/ucm/groups/public/@newsroom/documents/file/tac_071410_binder.pdf ("An algorithm is 'a sequence of steps to achieve a goal'---and the general case of algorithmic trading is 'using a computer to automate a trading strategy.'").

*Highly Confidential*

internal books and records that it maintains to reflect the outcomes of the executed trade.[48] This is all done without real-time human intervention and at speeds and data quantities that are excessive for human beings to achieve.[49] In this way, the "floor" or "pit" is now very much electronic and essentially dematerialized.[50]

34.      Exchanges generally stipulate precise rules and processes in relation to the order submission and matching process that they use. Each exchange's rules set out the specific steps that the exchange requires to be met for orders to be valid and active in the matching engine. Otherwise, trades cannot occur. For example, the CME stipulates that all trading must occur on or through its trading facilities and in compliance with its rulebook to be acceptable.[51] Irrespective of how an order is submitted – using one trading firm's electronic interface or another's – it must be routed through the CME Globex trading platform and matched using CME Globex matching algorithms.[52] The CME also internally vets each order to ensure that it conforms with its standards. As an illustration, the CME sets price bands on incoming orders. A limit order that quotes a price that is far too distant from the best price currently on the exchange is automatically rejected. These and other checks are designed by the exchange to occur in milliseconds. They generally show an exchange-specific process that determines which orders are permitted to enter as live orders in its matching engine.[53]

35.      Broadly speaking, most traditional financial exchanges use matching engines that rely on a "central limit order book" (CLOB) model. In a central order book, the exchange matches buy and sell orders in accordance with pre-specified matching rules. The most common such rule is the "price/time priority rule" which states that orders that are the most competitive in price – so, the highest price in the case of a buy order, or the lowest price in

---

[48]     CME   Group,   Rulebook:   Data   Submitted   to   the   Exchange   (535), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CBOT/I/5.pdf.
[49] Yadav, *supra* note 3, 992–1001.
[50] *Id*.
[51]   CME   Group,   *Rulebook: Trading Practices, Trading Confined to Exchange Facilities* (520), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/5/5.pdf.
[52]  CME Group, *Things to Know Before Trading CME Group Futures: Submitting a Futures Order*, https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/submitting-a-futures-order.html.
[53] *Id. See also* CME Group, *Things to Know Before Trading CME Group Futures: What Happens When You Submit   an   Order*,   https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/what-happens-when-you-submit-an-order.html.

*Highly Confidential*

the case of a sell order – are first in the queue to be matched. Where multiple orders are entered with the same top price, then the order that is the first to arrive gets the highest priority for execution.[54] Within this basic CLOB model, different exchanges can vary in how they calibrate their matching algorithms. For example, the NYSE, deploys a "parity/priority" model. Here, the NYSE's matching algorithm first rewards orders posting the best price and then allocates any remaining shares to other orders that also match the price.[55] Others, like the CBOE's foreign exchange trading platform establishes matching rules that seek to reward the faster liquidity providers.[56]

        36.     Exchanges generally have firm-specific rules in relation to order-types and fees, creating a unique ecosystem of rules and trading practices for their markets. Broadly, the two main types of orders that exchanges use are limit orders and market orders. Limit orders refer to orders that seek to execute a trade at a specific price or better. A person trying to buy an asset at $20 would place a limit order for $20 and get the deal if the price of the asset is trading at $20 or lower. In the case of a sale, a seller submitting a limit order to sell the asset at $20 would want to make a deal if the price of the asset is at $20 or higher.[57] Market orders, by contrast, are those that wish to trade straight away no matter what the price of the asset may be. They provide immediate execution but create the risk that the trader pays a high price or receives a low price.[58] Nevertheless, exchanges can also offer an array of bespoke and firm-specific order types that can offer sophisticated traders a complex menu of options around which to design their trading.[59] They also stipulate particular fee schedules to reflect a trader's

---

[54]    *See, e.g.*, CME Group, *How CME Group Ag Markets Operate*, https://www.cmegroup.com/education/articles-and-reports/overview-what-makes-ags-markets-work.html.

[55]  New York Stock Exchange, *Explaining Parity/Priority*, https://www.nyse.com/article/parity-priority-explainer.

[56]  Hayley McDowell, *CBOE Launches Central Limit Order Book*, THE TRADE, Jun. 20, 2020, https://www.thetradenews.com/cboe-launches-fx-central-limit-order-book/.

[57]  Securities and Exchange Commission, *Types of Orders*, https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/types-orders.

[58]  *Id.*

[59]  *See, e.g.*, New York Stock Exchange, *Trading Information: Order Types*, https://www.nyse.com/markets/nyse-arca/trading-info#equities-order-types; *Investors Exchange, Order Types*, https://iextrading.com/trading/order-types/.

*Highly Confidential*

various preferences and order types, as well as their own firm's efforts to attract volume to the venue (*e.g.*, through specific fees that reward those that produce liquidity).[60]

37.     Importantly, exchange rules clearly set out the conditions that determine when orders become binding and cannot be modified, canceled, or reversed by a trader. Here, there is significant convergence on the key principles among exchanges. A buyer or seller's order becomes binding as soon as it is matched with another that results in the order being filled in accordance with the exchange's matching algorithms. At this point, once matching occurs, both the buyer and seller are bound and cannot modify, cancel, or reverse their respective orders.  For example, the CME states that all or any part of a bid or offer is subject to immediate acceptance and that the price at which it is accepted becomes the final, execution price for the trade.[61] In the explanatory language used by the CME, as soon as an order matches, the trader gets a confirmation that they are a holder of a new futures contract in their trading account.[62]

38.     Executed trades may be reversed by the exchange in only rare cases – on narrow, specific grounds.[63] On this matter, the CME, acting through its Global Command Center (GCC), retains for itself the "absolute and sole discretion" to adjust prices and reverse trades in the event of disruptive malfunctions to the electronic trading system and for other system defects. Its decisions are final. In addition to the CME taking action on its own initiative, a user can also request the CME to review the trade, and has eight minutes to do so following its execution.[64] This authority is part of a broad power held by the GCC to take any action that it

---

[60]     NYSE      Arca      Equities,      *Fees      and      Charges*,      Sept.      30,      2021, https://www.nyse.com/publicdocs/nyse/markets/nyse-arca/NYSE_Arca_Marketplace_Fees.pdf;      Stanislav Dolgopolov, *The Maker-Taker Pricing Model and Its Impact on the Securities Market Structure: A Can of Worms for Securities Fraud?* 8 VA. L. BUS. REV. 231 (2014).

[61]     CME      Group,      Rulebook:      *Acceptance      of      Bids      and      Offers*      (522), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/5/5.pdf.

[62]     CME      Group,      *What      Happens      When      You      Submit      an      Order*, https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/what-happens-when-you-submit-an-order.html.

[63]     CME      Group,      *Rulebook:      Acceptance      of      Bids      and      Offers*      (522), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/5/5.pdf.

[64]     CME      Group,      *Rulebook*:      *Trade      Cancellations      and      Price      Adjustments*      (588), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/5/5.pdf (detailing the various processes involved in reversing a trade, or in adjusting prices, including steps parties can take to deal with any losses that may arise). In Rules 588A and 588B, the Rulebook notes that trade cancellations and price adjustments can help to preserve market integrity and mitigate negative effects where a defective trading system causes trades

*Highly Confidential*

considers necessary to maintain the integrity of CME Group markets, such as to stop trading or prevent customers from accessing the platform.[65] To further exemplify the expansive power of the exchange in the context of maintaining finality, the NYSE ARCA platform allows traders 30 minutes after execution to submit a request to review the trade on the grounds that this trade was "clearly erroneous."[66] The exchange will then review it and make a determination if it is "clearly erroneous" according to established guidelines and factors, and if so, the exchange has discretion to cancel the trade. Following this period of review, the trade is considered as being binding on the parties at its execution price.[67]

> 39.     It is understandable that exchanges seek to provide clear, categorical rules about when contracts become binding on their venues. As detailed above, significant economic relationships depend on the ability of an exchange to foster contractual certainty between parties. Consider again the case of the farmer looking to sell their wheat in three months' time. Once the farmer's sell order is matched with a corresponding buy order, this order becomes

---

to be executed at prices that are inconsistent with prevailing market conditions. Such events might arise for any number of reasons. For example, disruption might arise where a defective electronic trading system produces a sudden *flash* event that causes prices to suddenly surge or plummet, out-of-step with real information about the asset but as a direct result of malfunctioning electronic trading systems. When reviewing whether to adjust or cancel trades, an application can be made by a user, or by the CME may act on its own. In other words, under Rule 588B, a user that considers their trade to have been executed during such disrupted conditions may seek redress by application to the CME.

[65] CME Group, *Rulebook: Global Command Center* (579), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/5/5.pdf.

[66] This might happen, for example, where traders enter a "fat finger" trade and conclude it at a reference price that is well in excess of what it should be. The NYSE sets out the grounds that qualify a trade as being within the categorization of "clearly erroneous." In 2010, the Securities and Exchange Commission approved measures put forward by exchanges to institute circuit breakers to counter the negative effects of sudden price surges/drops in the market prices of traded assets as well as provisions clarifying the price deviations that would justify an exchange reversing a trade. These measures were instituted in response to the May 2010 *Flash Crash* when the Dow Jones Index lost almost 1000 points in minutes, wiping out around one trillion dollars in value, before rebounding quickly. This turbulence prompted review by exchanges and regulators of procedures to control such swings and to reverse trades or adjust prices in their aftermath. Securities and Exchange Commission, *SEC Approves Rules Expanding Stock-by-Stock Circuit Breakers and Clarifying Process for Breaking Erroneous Trades* (Sept. 10, 2010), https://www.sec.gov/news/press/2010/2010-167.htm. On the flash crash, *see, e.g.*, Andrei A. Kirilenko et al., *The Flash Crash: High-Frequency Trading in an Electronic Market*, 72 J. FIN. 967 (2017).

[67] NYSE ARCA, *Rules: Rule 7.9-E & Rule 7.9-10*, https://nysearcaguide.srorules.com/rules/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7B57E4C5DB-A9B6-48EB-964A-3E2CA5EDB8C6%7D--WKUS_TAL_18878%23teid-504.

*Highly Confidential*

binding.[68] In an alternative reality, if such an order were instead to be contingent even after matching or face a long lag before its irrevocability could be established, then the buyer could decide to renege on the bargain upon finding a cheaper deal. Or the farmer might cancel the deal if the price of wheat suddenly increases. Such a situation would be undesirable economically and from the perspective of fostering a vibrant market. Where parties can renege easily or have the option to do so after matching, concerns about a market's reliability and integrity return, forcing parties to worry, pay more to protect themselves or consider not participating in the market at all.

40.     It is well recognized that national exchanges, traditional as well as those trading cryptocurrencies, often exert international reach.[69] However, even though they host and conduct extensive business on a cross-border basis, they remain subject to a domestic home base and regulatory system.[70] As recognized by the International Organization of Securities Commissions (IOSCO), despite deepening globalization, "market oversight remains a local affair, with national or provincial-level regulators implementing legislation passed by their jurisdictions' legislatures."[71]

41.     An internationalized business model means that exchanges frequently attract a global customer base on their platforms.[72] Orders may be submitted from around the world, while still executing within the order books of an exchange and within its home jurisdiction. And exchanges may locate offices or computer servers in various locations around the world to facilitate rapid trading and other efficiencies. In the case of the London Stock Exchange, for example, all incoming orders – from around the world – match within the LSE's order books that are governed by the rules of the London Stock Exchange and subject to the

---

[68] For example, it would become binding in accordance with CME rules. CME Group, *Rulebook: Acceptance of Bids and Offers* (522), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/5/5.pdf.

[69] *See, e.g.*, Tech. Comm. of the International Organization of Securities Commissions (IOSCO), *Principles Regarding Cross-Border Supervisory Cooperation* (May 2010), 3–4.

[70] *Id.*

[71] *Id.*

[72] London Stock Exchange, *International Order Book*, https://www.londonstockexchange.com/trade/equity-trading/international-order-book?lang=en.

*Highly Confidential*

laws of England and Wales.[73] To operationalize cross-border trading, exchanges have invested in connecting their home markets through communications infrastructure that facilitates order submission from the jurisdiction where one exchange is located to a platform situated in a different country and subject to the laws of a different legal system. Similarly, an exchange located in one jurisdiction may place a satellite office in another jurisdiction to represent its interests. The London Stock Exchange, for example, has a network of local offices in cities around the world.[74] Nevertheless, even with these operations, including in the United States, it is clear that market participants understand the London Stock Exchange to be located in London, United Kingdom. As such, offers to buy and sell on the London Stock Exchange are made in London once they enter its order books and trades become final there once offers match on its platform in accordance with the Exchange's rules and procedures.[75]

42.     Consider another example. To facilitate trading in Japanese Yen-denominated Tokyo Stock Price Index (TOPIX) futures on the CME, the CME, and the Japan Exchange Group (including the Tokyo Stock Exchange) launched the JPX-Chicago Co-Location Direct. This service seeks to create high-speed connections for traders between data centers for the Tokyo Stock Exchange and the CME to encourage liquidity from both markets to animate trading in TOPIX futures.[76] Even with this infrastructure connecting Chicago and Tokyo, it is clear that market participants understand the Chicago Mercantile Exchange to be located in Chicago, Illinois, United States, and the Tokyo Stock Exchange to be situated in Tokyo, Japan.

43.     In sum, domestic exchanges in international markets can have operations around the world to facilitate cross-border trading. As exemplified above, the London Stock Exchange, the CME and the Tokyo Stock Exchange – despite their international connections –

---

[73] London Stock Exchange, *A Guide to London Stock Exchange Trading Service for Equity Securities*, 3 (Mar. 2015).

[74] London Stock Exchange, *Contact: Our Global Office*, https://www.londonstockexchange.com/contact.

[75] London Stock Exchange, *A Guide to London Stock Exchange Trading Service for Equity Securities*, 3 (Dec. 2015).

[76] Japan Exchange Group, *Introduction of "JPX-Chicago Co-Location Direct" As a New Arrownet-Global Service*, News Release, Oct. 19, 2017, https://www.jpx.co.jp/english/corporate/news/news-releases/0060/20171019-01.html; Finextra, *Colt to Provide Direct Connectivity for Japan Exchange Group to Chicago*, Oct. 19, 2017, https://www.finextra.com/pressarticle/71259/colt-to-provide-direct-connectivity-for-japan-exchange-group-to-chicago.

*Highly Confidential*

are recognizably located in and around London, Chicago, and Tokyo, representing major economic hubs for their home countries and overseen under their respective governing laws.[77]

44.     The development of cryptocurrency exchanges therefore comes in the wake of the growth and proliferation of traditional exchanges that have, over centuries, innovated to convene sophisticated markets that operate under a system of public and private rules, enable capital transfers in milliseconds, host traders from around the world and maintain profitability. As discussed further below, cryptocurrency exchanges tend to borrow noticeably from the model of traditional exchanges in important ways. For example, they operate centralized, electronic marketplaces that use central limit order books and they secure binding agreements on the exchange as soon as buy and sell orders match in accordance with exchange rules.

*Risk Management, Clearing, and Settlement after Contract Execution*

45.     Most traditional exchanges in financial markets rely on outside clearinghouses to clear and settle trades. On this matter, cryptocurrency exchanges appear to diverge from the settlement model adopted by traditional exchanges. While mainstream financial exchanges look to outside clearinghouses, cryptocurrency exchanges tend to settle their trades in-house. In the vast majority of cases, this happens soon after contract execution on the exchange is completed, using internal ledgers, rather than blockchains, in a process referred to as "off-chain" settlement.[78] As detailed more fully below, during off-chain settlement, the exchange simply debits one user's account and credits another's to reflect the outcome of a deal. Because the exchange is frequently also acting as the custodian of digital assets belonging to customers, it can settle trades without the need to contact an outside actor like a clearinghouse

---

[77]     CME Group, *CME Group Rules and Regulation Overview*, https://www.cmegroup.com/education/courses/market-regulation/overview/cme-group-rules-and-regulation-overview.html (noting the primary jurisdiction of the CFTC); London Stock Exchange, *Rules of the London Stock Exchange: Rule Book*, 3, https://docs.londonstockexchange.com/sites/default/files/documents/rules-of-the-london-stock-exchange-effective-1-january-2021.pdf (noting that it is subject to the governing law of England and Wales); Japan Exchange Group, *Rules: Tokyo Stock Exchange*, https://www.jpx.co.jp/english/rules-participants/rules/regulations/index.html (detailing the system of self-regulation and applicable legislation).

[78]     *See, e.g.*, Tom Casteleyn, *Cryptocurrencies: The New Market Structure*, Bank of New York Mellon, May 2019, https://www.bnymellon.com/latam/en/insights/all-insights/cryptocurrencies-the-new-market-structure.html (noting that the "vast majority" of transactions are conducted "off-chain.").

*Highly Confidential*

or custodian.[79] It also does not need to engage blockchains to validate user identities, transfer value and publish transaction data.

46.     By comparison, in traditional markets, clearinghouses are critical to ensuring that contract bargains concluded on exchanges are honored.[80] Once a contract becomes binding on the exchange, it is then cleared and settled. The clearing and settlement process, effectively, ensures that the terms of the contract are performed even if a party breaches down the line – such that the farmer always gets the money for selling their wheat, and the counterparty receives the wheat even if the farmer fails to deliver it. Clearinghouses do this by creating a structure whereby they "novate" each leg of the bargain to their own institution. In other words, the clearinghouse becomes the buyer to the seller and the seller to buyer. In this way, the clearinghouse intercedes to remove the risk that a lesser counterparty fails to perform. Even if the farmer's harvest fails, the clearinghouse promises to the buyer that it (the clearinghouse) will find the wheat to deliver, even if it costs the clearinghouse a great deal of money. Similarly, the clearinghouse promises to pay the farmer for their wheat even in cases where the buyer becomes insolvent before they can send payment. By guaranteeing performance, clearinghouses provide enormous reassurance to the marketplace that financial contracts made final and binding on exchanges are robust to default risks.

47.     This traditional clearinghouse model diverges from the internal off-chain based cryptocurrency exchange settlement process. Despite this divergence, however, both methods work to recognize and implement a bargain reached on an exchange and made binding in accordance with the exchange's matching algorithms.

48.     In summary, traditional exchanges have, for centuries, provided forums to convene market participants to transact with one another in accordance with a set of agreed-upon rules. Now largely electronic and automated, financial exchanges reflect a tried-and-tested model for actively transacting in claims, and for producing multiple ancillary benefits like

---

[79] For a summary of custody services in financial markets, *see* The Clearing House, *The Custody Services of Banks* (Jul. 2016), https://www.davispolk.com/sites/default/files/20160728_tch_white_paper_the_custody_services_of_banks.pdf .
[80] *See, e.g.*, Yesha Yadav, *The Problematic Case of Clearinghouses in Complex Markets*, 101 GEO. L. J. 387 (2013).

*Highly Confidential*

liquidity, efficient prices, and external market monitoring. Exchanges each stipulate detailed microstructural rules and processes to govern such trading logistics as order types, submission, matching and execution. When one order matches with another on the exchange in accordance with its internal rules and matching algorithms, this trade becomes final and binding. To honor the significance and terms of this bargain, the traditional market looks to clearinghouses and various third-party custodians and payment services providers to ensure performance of the contract through the transfer of cash and assets between parties.

## IV.   Background on Cryptocurrencies, Blockchains and Cryptocurrency Exchanges

49.    Cryptocurrencies have, in short order, attracted sizable valuations and global capital. While subject to fluctuation, it is estimated that the market capitalization of all cryptocurrencies exceeded $1.5 trillion as of February 2021.[81] In the first quarter of 2020, global trading volume in cryptocurrencies reached around $8.8 trillion.[82] As described in my research, this worldwide excitement about fintech, including and perhaps most especially about cryptocurrencies, reflects a trend toward highly digitized (rather than bricks-and-mortar) finance that does not depend on conventional intermediaries like banks.[83] In some cases, this preference reflects a particular philosophical worldview, emerging out of the collapse of financial markets in 2008, that seeks to deemphasize traditional intermediaries and the role of the state in overseeing finance.[84] In others, or alongside, it highlights a motivation to embrace digital solutions where traditional intermediaries, such as banks and other payment service providers, have been costly or less successful in meeting economic needs.[85] The XRP cryptocurrency, for

---

[81] Cong et al., *supra* note 14.
[82] *Id.*
[83] Brummer & Yadav, *supra* note 1; Yadav, *supra* note 2.
[84] Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System* (2008).
[85] *See, e.g.,* Santiago Pérez and Caitlin Ostroff, *El Salvador Becomes First Country to Adopt Bitcoin as National Currency*, WALL ST. J., Sept. 7, 2021; Charlotte Principato, *Banking the Unbanked Requires Raising Trust and Awareness. For the Underbanked, Better Service Means Payments Innovation*, MORNING CONSULT, Aug. 17, 2021; On trading in crypto by younger people, *see, e.g.*, Qing Chan et al., *An Inside Look into Cryptocurrency Exchanges*, Working Paper (Dec. 9, 2020).

*Highly Confidential*

example, has been used as a digital settlement asset to overcome the speed and costly frictions entailed in making cross-border payments between different currencies.[86]

*An Outline of Blockchains and Cryptocurrencies*

50.    A blockchain – often referred to as a distributed ledger – constitutes the record of transactions for a cryptocurrency.[87] To understand how that record is built and maintained, it is helpful to briefly describe what blockchains are designed to achieve computationally. Public blockchains operate as a decentralized network of digital nodes governed by a shared protocol – or code. Decentralization means that, rather than be operated and backstopped by a single trusted institution – like an exchange – the blockchain is designed to function independently and without reliance on a central authority.[88] The first task of a blockchain is to validate information for a transaction – such as a payment where cryptocurrency moves from one user to another. To do this, the decentralized network of nodes checks the information it receives from a user to determine, *inter alia*, their digital identity, whether they have funds in their account, whether these funds validly exist (*e.g.*, they do not represent an attempt to spend the same funds twice) and the identity of the payee. Because of the absence of a central player, the nodes on the blockchain must validate this data by some form of consensus – that is, they come to agreement jointly (the code of the particular blockchain specifies how consensus is reached and how many nodes need to agree). Once the transaction information is validated, it becomes part of the blockchain's ledger. Usually, the network picks up multiple potential transactions that must be validated and organizes them into blocks for the nodes to validate together – thus giving distributed ledger technology its nomenclature of being a blockchain.[89]

51.    The second task of the blockchain is to maintain a record of information about all the transactions that have occurred on its network as part of its public ledger. On the Bitcoin blockchain, for example, a transaction is generally accepted to be final after six

---

[86] *See, e.g.*, Garrick Hileman & Michael Rauchs, *Global Cryptocurrency Benchmarking Study*, CAMBRIDGE CTR. FOR ALTERNATIVE FIN., 15 (2017).

[87] *Id.* at 13–14.

[88] Lin William Cong & Zhiguo He, *Blockchain Disruption & Smart Contracts*, 32 REV. FIN. STUDIES 1754 (2018).

[89] Mike Orcutt, *How Secure Is Bitcoin Really*, MIT TECH. REV., Apr. 25, 2018.

*Highly Confidential*

subsequent blocks have been added to the chain containing that transaction, after which point it is highly unlikely that sufficient computing power could be devoted to a different chain that did not contain the transaction.[90] The process thus offers several advantages to its users, including: (i) transparency by allowing the entire ledger to be examined; and (ii) immutability and irreversibility of the transaction record. These attributes are essential for building trust, accountability and certainty within a community that lacks any centralized actor that can offer these assurances.

52.     The third task of the blockchain network is to protect its integrity. This is generally achieved in two ways. For a start, networks rely on encryption to engineer user and transaction privacy. Encryption must be strong enough throughout to prevent determined actors from breaking the code and uncovering underlying information in the blocks as well as about the users.[91] In addition, the network has to guard against bad actors, including within the network itself, that may behave maliciously to disrupt its process. In the case of Bitcoin, for example, this task is achieved through "mining" – where nodes are incentivized to solve computational problems by receiving some of the native Bitcoin tokens as a prize. Miners can also earn transaction fees that may be appended by users to each transaction and that encourage a miner to pick up the transaction for the block.[92] Those that solve the puzzle propose the block for validation. This process is supposed to motivate good behavior by participating nodes.[93] As a decentralized, encrypted system, blockchains lack a central point for failure.[94] If some of the nodes shut down, the blockchain should, in theory, keep operating. They should be resistant to undue control by a central authority.[95] Encryption ought to also prevent theft of information and maintain user privacy.[96]

---

[90] Andrey Didovskiy, *Blockchain's Flavors of Finality,* MEDIUM, Feb. 3, 2021.

[91] Orcutt, *supra* note 89.

[92] Easley et al., *From Mining to Markets: The Evolution of Bitcoin Transaction Fees*, 134 J. FIN. ECON. 91 (2019).

[93] Nakamoto, *supra* note 84, at 4.

[94] Nic Carter & Linda Jeng, *DeFi Protocol Risks: The Paradox of DeFi*, REGTECH, SUPTECH AND BEYOND: INNOVATION AND TECH. FIN. SERV. (FORTHCOMING), 5 (Jun. 2021).

[95] *Id.*

[96] Orcutt, *supra* note 89.

*Highly Confidential*

53.     When transacting on decentralized blockchains, participants operate with various degrees of pseudonymity. They are identifiable by their public key on the ledger. Each public key links to a private key that is known only to the user. Private keys constitute the password that unlocks value for the user within the ledger and makes it available for use.

54.     Certain blockchains can suffer from several sources of disruption and fragility that create uncertainty about the resilience of the blockchain and the up-to-date reliability of the information appearing on the ledger. First, some transactions do not make it into the ledger because they are not picked up by a proposing node. This might happen if high levels of traffic into the blockchain slow it down and result in transactions being left unprocessed. The Bitcoin blockchain, for example, has experienced this problem. Uncertainty about uptake, especially during busy periods, can motivate users to attach optional transaction fees (like tips) to their instructions in a bid to encourage a self-interested node to include a fee-carrying transaction in its proposed block.[97] Conversely, users that do not include fees may feel less certain about whether their transaction makes it into a block. While transactions may be more likely to be picked up in quieter periods, high traffic can lead to expensive transaction costs where users attach fees to their instructions as well as to the possibility that transactions – both fee-carrying and not – are excluded from inclusion into a block.[98] In May 2020, it was reported that Bitcoin's pool of unprocessed transactions reached 77.58 million bytes.[99] The Ethereum blockchain has suffered well-documented slowdowns owing to its general popularity as a platform for supporting various kinds of crypto-projects. During such periods, users can be charged higher transaction fees.[100]

55.     Second, blockchains may be vulnerable to outages. This might happen if the network fails owing to excessive volume, or it may arise where the blockchain experiences some other adverse event that results in a shutdown. In September 2021, the Solana blockchain experienced a 17-hour outage caused by a denial-of-service attack that overwhelmed its

---

[97] Easley, *supra* note 92.

[98] *Id.*

[99] Zack Voell, *Bitcoin Miners Usually Create 6 Blocks per Hour. They Just Banged Out 16*, COINDESK, May 1, 2020.

[100] Carter & Jeng, *supra* note 94, 4–5.

*Highly Confidential*

validators and precluded them from reaching consensus on the state of the ledger.[101] Notably, Bitcoin suffered two major rollbacks in 2010 and 2013 where blocks were unrecorded, or the transactions reversed. It was reported that around 15 hours of transactions were lost during these two failures.[102]

56.      Third, permissionless and decentralized blockchains can become victims of malicious events like hacks or collusive attacks. Famously, in 2016, the Ethereum blockchain was forced to "reset" itself following a hack on an application that used its blockchain, which led to the theft of a significant quantity of ether. Ethereum's leadership used a "hard fork" to reverse the hack and reset users' balances.[103] In another attack, the Verge blockchain experienced an attack by its validators in 2021 that resulted in 200 days of data being eliminated and transactions being removed from the ledger.[104]

*An Overview of Cryptocurrency Exchanges and their Market Structure*

57.      Cryptocurrency exchanges permit users to buy and sell various cryptocurrencies and other digital tokens as well as to engage in a variety of strategies and transactions relating to crypto assets (*e.g.*, derivatives, mining, yield farming).[105] In contrast to the emphasis on blockchain decentralization, most cryptocurrency exchanges work as centralized institutions.[106] Recent years have witnessed a dramatic rise in the volume of exchange trading in cryptocurrencies, confirming that exchanges represent some of the most profitable actors within this ecosystem.[107]

---

[101] *Network Outage Initial Overview: Incident on Sept. 14, 2021*, SOLANA, Sept. 20, 2021, https://solana.com/news/9-14-network-outage-initial-overview.

[102] Carter & Jeng, *supra* note 94.

[103] *Id.* at 14–15.

[104] *Id.*

[105] *See* Kyle Soska et al., *Towards Understanding Cryptocurrency Derivatives: A Case Study of BitMEX*, Working Paper (2021). On the practice of yield-farming, or lending cryptocurrencies in return for interest, fees and other gains, *see* Olga Kharif, *What's 'Yield Farming'? (And How Do You Grow Crypto?)*, WASH. POST, Sept. 9, 2021.

[106] Kristin N. Johnson, *Decentralized Finance: Regulating Cryptocurrency Exchanges*, 62 WM. & MARY L. REV. 1911 (2021).

[107] Cong et al., *supra* note 14; Soska et al., *supra* note 1055; *see also* Deposition Transcript of Cristian Gil ("Gil Dep. Tr."), 129:2–4 , Aug. 11, 2021 ("I believe 2017 was when this whole thing was the first kind of big explosion in activity.")*.*

*Highly Confidential*

58.     Cryptocurrency exchanges resemble traditional financial exchanges in important ways. There are several reasons that may explain these similarities. Perhaps most persuasive is that cryptocurrency exchanges seek to accomplish similar goals to two-hundred-year-old exchanges – starting with the objective of being able to host a vibrant market in claims.[108] Even if their origins are historic, modern financial exchanges are now highly automated, technologically sophisticated venues, boasting turnover in milliseconds or less, information efficiencies and capabilities of moving hundreds of billions in transaction volumes daily. Rather than spend time and effort to reinvent new ways of trading, relying on effective, existing models and their trading processes may represent a sound way for cryptocurrency exchanges to avoid large start-up costs. This would allow cryptocurrency exchanges to purchase working technologies, hardware, and software, for such processes as order submission and matching, trade verification, fraud-detection, data analysis and gathering as well as to promote the exchanges to users that are familiar to existing financial platforms.[109] In addition, prominent cryptocurrency exchanges have often been built by founders and include senior management with a pedigree in more traditional finance.[110] Traditional financial firms, like high-speed traders, are now also increasingly attracted to participate in cryptocurrency exchanges in various capacities, for example as market makers.[111] This cross-fertilization between traditional and cryptocurrency markets can offer pathways to import features of structural scaffolding seen in more traditional platforms to cryptocurrency exchanges.

---

[108] *See, e.g.*, *About Coinbase*, COINBASE, https://www.coinbase.com/about; *Mission*, FTX US, https://about.ftx.us/; *About Us*, BITTREX US, https://bittrex.zendesk.com/hc/en-us/articles/115003684411.

[109] For example, BitStamp notes that it uses the TRADExpress Trading System provided by Nasdaq (formerly, Cinober). Bitstamp describes this system as a "fully developed, modular, multi-asset and multi-market trading platform for high- volume trading venues." *See* BS-LTD-00000005, *Letter from Preiskel & Co LLP on behalf of Bitstamp Ltd*.

[110] For example, Mr. Changpeng Zhao, CEO of Binance, started his career building trading systems for the Tokyo Stock Exchange as well as for a high-speed automated trader. Sam Bankman-Fried, Founder of FTX, also began in a more traditional trading firm, Jane Street Capital. *See* Pamela Ambler, *From Zero to Crypto Billionaire In Under A Year: Meet The Founder Of Binance*, FORBES, Feb. 27, 2018; Roger Parloff, *Portrait of a 29-Year-Old Billionaire: Can Sam Bankman-Fried Make His Risky Crypto Business Work?* YAHOO, Aug. 12, 2021, https://news.yahoo.com/ftx-ceo-sam-bankman-fried-profile-085444366.html.

[111] Frank Chaparro, *Jump Trading No Longer Wants To Be Secretive About Its Multi-Billion Dollar Crypto Operation*, THE BLOCK, Sept. 14, 2021, https://www.theblockcrypto.com/post/117595/jump-trading-no-longer-wants-to-be-secretive-about-its-multi-billion-dollar-crypto-operation; Frank Chaparro, *Market Making Giant Virtu Financial is Now Active on Coinbase and Gemini*, THE BLOCK, Aug. 5, 2021, https://www.theblockcrypto.com/post/113683/market-making-giant-virtu-financial-is-now-active-on-coinbase-and-gemini.

*Highly Confidential*

59.     As with traditional exchanges, one of the key benefits of cryptocurrency exchanges is that they allow for trading with predictability, confidence, and certainty of outcome. Market participants understand that their trades will be executed and then immediately settled within the confines of the exchange. Many cryptocurrency exchanges, including several on which I understand XRP to have been transacted, contractually stipulate rules-of-the-road for order submission, matching, trade execution and settlement that are consistent with this understanding. Users that wish to transact on an exchange are generally required to agree to a set of pre-agreed set of rules and trading standards when they apply. As with traditional exchanges that enter into contracts with users, thereby creating a unique trading environment, cryptocurrency exchanges tend to similarly establish a core set of rules and standards for their particular market. I reviewed user agreements for a number of high-profile and well-known cryptocurrency exchanges on which XRP has been traded. The Ascendex (BitMax), Binance, Bittrex, Coinbase, and Korbit agreements provide examples of this industry practice.

60.     For Binance, the user agreement states that it represents a contractual agreement between exchange operators and the user to create a binding legal relationship (Article II(1)(a)). To onboard a user, it specifies the personal and financial information that it must receive before the user can begin activities on the exchange (e.g., Article II(3)(a)-(e)). It also details the services that it is contracted to provide to a user, and its responsibilities vis-à-vis the user's data and trading information (e.g., Article II(3)(f)). To settle any disputes, the contract requires users to contact Binance first before mandating the use of arbitration proceedings by the Hong Kong International Arbitration Centre (HKIAC) (Article X). User agreements also specify disciplinary procedures for users that fail to comply.

61.     In the Ascendex (BitMax) user agreement, Article 4.13 of the agreement sets out types of trading behavior that are prohibited on the venue. These include practices such as price manipulation, wash trading and front running. Pursuant to this provision, users can be fined for misbehavior. Further, under Articles 2.6-2.8, the exchange can investigate user accounts and take steps to freeze and suspend users that are suspected of breaching the rules.

62.     As part of this onboarding into a cryptocurrency exchange, it is common to see that exchanges require a user to use an exchange's specific trading systems and

*Highly Confidential*

technology. For example, exchanges require that a user apply to the exchange for an account and crypto-wallet(s) that are specifically hosted by the exchange, as opposed to a wallet or wallets on the underlying blockchains for the cryptocurrencies users wish to trade. Binance, for example, requires that users open an account with Binance for the deposit of digital assets into that account (Article II (3)). These accounts serve as the basis for transactions on the Binance platform (Definitions, Article I (8)). In the terms of service for Coinbase US and Coinbase Singapore, the exchanges provide hosted accounts for digital currencies and fiat currencies as part of opening an account with the Coinbase exchange (e.g., Coinbase US, Part I (2)). In some cases, the wallet bears the name of the exchange itself. For example, the Korbit terms of service call the wallet, "the Korbit Wallet" (Chapter I (2)(10)). Bittrex Global provides users with a Bittrex Global Account that includes a hosted wallet for trading in digital currencies.

63. Based on my review of their user agreements, exchanges mostly use a trading model that closely resembles a central order book that matches buy and sell orders in accordance with a set matching algorithm. Offers to buy or sell are made on the exchange and appear on the central order book within the confines of the exchange. For example, in Article 21, Korbit describes the processes by which users must submit buy and sell orders – offers to buy or sell – into the exchange, conforming to any minimum order size that the exchange requires. At Binance, offers are submitted using the Binance order submission system and then enter the Binance order book. Orders may be canceled until such time as they match (Article III(2)(a) & (b)). Bitstamp captures orders and quotes using its TRADExpress Trading System. It "matches orders and quotes in accordance with trade schedules and order books." This trading system allows orders to be submitted to a single order book or a combination of order books and accommodates a variety of order types and trading actions to enable implementation of various trading strategies.[112]

64. Orders, once matched, then become automatically binding in the exchange's trading system.[113] In other words, they become binding within the exchange's order matching systems, such that trades then become final and binding on the parties and are quickly

---

[112] RPLI_SEC 1078045, *Bitstamp Terms of Service*; BS-LTD-00000005, *Letter from Preiskel & Co LLP on behalf of Bitstamp Ltd*.
[113] Johnson, *supra* note 106.

*Highly Confidential*

reflected through debits and credits to accounts of participants on the exchange (discussed more fully below). The terms of service of most of the exchanges that I reviewed refer to specific in-house order matching systems that result in orders becoming binding as soon as a sell and buy order match. For example, Bitstamp notes that once orders match on its platform, they are executed and sent for post-trade processing. It specifies that "all sales and purchases of virtual assets . . . are final . . . there is no stage at which a customer is able to cancel the trade."[114] To be sure, exchanges might deploy various degrees of sophistication in their order matching technologies. For example, some platforms offer a larger and more nuanced menu of order types.[115] Variation in the sophistication of matching algorithms would make sense given that some exchanges attract far higher volumes of trading than others, professional traders, trades in assets with varying levels of liquidity and user demand, etc. Once offers entering the exchange are matched by the exchange and become final, reversal can occur only on narrow grounds (as described below) and, per my review of several user agreements, only at the discretion of the exchange. This aligns with practice in traditional exchanges that affords exchanges "absolute" discretion in determining when traders can be adjusted or reversed.[116]

65.     Per many of the terms of service that I reviewed, cryptocurrency exchanges appear to use the common order matching conventions seen in traditional financial exchanges to create binding finality for offers entering an exchange once they match on the exchange in accordance with exchange rules. For example, BitBank describes a trading process that follows a price/time priority matching system. BitBank reserves the right to cancel a limit order where the price band specified by a user is distant from a suddenly changing price of a cryptocurrency (Written Delivery Instructions, Section 4). BitBank's trading terms therefore imply that the exchange is systematically vetting the orders within its order submission engines to ensure they conform to acceptable order types and price bands. Similarly, Coinbase's order

---

[114] BS-LTD-00000005, *Letter from Preiskel & Co LLP on behalf of Bitstamp Ltd*.
[115] *See, e.g., Overview of Order Types and Settings (Stop, Limit, Market)*, COINBASE, https://help.coinbase.com/en/pro/trading-and-funding/orders/overview-of-order-types-and-settings-stop-limit-market; *Understanding Bittrex Order Types*, BITTREX, Nov. 3, 2020, https://bittrex.com/discover/understanding-bittrex-order-types; BS-LTD-00000005, *Letter from Preiskel & Co LLP on behalf of Bitstamp Ltd*. (noting availability of a variety of order types to enable a variety of trading strategies).
[116] CME Group, *Rulebook: Trade Cancellations and Price Adjustments* (588), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/5/5.pdf.

*Highly Confidential*

matching rules describes the system as based on a central limit order book that operates in accordance with price/time priority.[117] It sets out price bands for orders and terms for protecting orders (Coinbase Trading Rules, Section 1). Once offers coming into the exchange are matched on the exchange, trades are final, unless the system detects a serious technical error or some abusive conduct like manipulation (Rules of Trading, Section 2). On Ascendex (BitMax), "orders that are filled, executed or matched (in whole or in part) settle immediately and are recorded on…the Exchange Ledger" (Article 4.3). Customers cannot cancel, modify or seek reversal of any trade that is marked by the exchange as "complete," "under review," or "pending" (Article 4.6). The exchange, however, retains "sole" discretion to reverse trades even when these trades are marked as "complete." Ascendex also retains the power to reverse trades and cancel orders in the event that the exchange suffers some form of system malfunction (Article 4.5). CoinOne details that user orders, once matched, become final. Order submission is performed in accordance with the exchange's particular instructions (Section 16). As noted above, Bitstamp deems all sales and purchases to be final and users cannot cancel trades for a refund.[118] For Binance, once offers on the exchange match, either in whole or in part, the matched portions are final, meaning that the user loses the right to cancel, modify or revoke any filled part of the order. The user's account is then updated to note that the transaction has been executed and closed. Orders may be canceled until such time as they match (Articles III(2)(a) & (b)).

66.     This order matching process and the finality of trades is further corroborated by industry participants' understanding of how trades are executed on cryptocurrency exchanges. In his deposition, Mr. Cristian Gil, a principal of GSR, a well-established cryptocurrency market maker, was asked "how . . . buyers [are] matched with sellers at the exchanges?"  He responded "there is something called a matching engine" and "[w]hen an order and a bid cross, a transaction occurs."[119] He elaborated that "[t]here's an order book where there are a whole bunch of different offers at different price levels and with different sizes, and

---

[117] Coinbase's rules provide detailed matching protocols depending on whether a user is providing price improvement (maker order) or posting at an existing price in the order book (taker order).
[118] BS-LTD-00000005, *Letter from Preiskel & Co LLP on behalf of Bitstamp Ltd.*
[119] Gil Dep. Tr. 289:22–290:2.

*Highly Confidential*

same on the bid side. And when those cross, transactions occur."[120] He explained that an offer to sell is accepted when there is an "opposite order that wants to purchase at least that much size at that price."[121]

67.     Cryptocurrency exchanges vary from traditional exchanges in relation to the clearing and settlement of transactions. Rather than rely on third-party clearinghouses and custodians to implement the bargain and move cash and assets between users, it is common for cryptocurrency exchanges to do this task themselves and within their own institutions. Cryptocurrency exchanges face a particular challenge when it comes to clearing and settlement of trades. While underlying blockchains are created with the assumption of a lack of central player, most exchanges operate as centralizing focal points within the market. This mismatch raises some key difficulties: (i) transactions on blockchains – like in the Bitcoin blockchain – to move value from one account to another must be signed using private keys whose unique identifier is known only to an account holder; (ii) consensus-based verification may take time and this time may vary depending on traffic; (iii) transparent ledgers may not always be desirable for professional traders; and (iv) speed and transaction ledger entry may be impaired by slow and unreliable blockchains. To better assure a workable, active, and liquid exchange, permitting the rapid flow of transactions, most centralized cryptocurrency exchanges offer users a custody function for their wallets and private keys to enable rapid "off-chain" settlement. Off-chain settlement means that the exchange reconciles trades on its own books and records, rather than on the blockchain, and moves any value from one wallet to another within the exchange's wallet-hosting system. For example, User A holds 10 Bitcoin in its Exchange wallet. User B holds 100 ether. Hypothetically (and without making any reference to the conversion rate between these different pairs), they agree to trade 2 Bitcoin for 5 ether. Once the offer and sale orders are matched by the Exchange and become binding, the Exchange simply adjusts the wallet balances within its private in-house ledger for Users A and B. There is no need for the Exchange to do any more. It does not need to send information to the underlying blockchains.[122]

---

[120] Gil Dep. Tr. 290:9–12.
[121] Gil Dep. Tr. 291:17–21.
[122] Johnson, *supra* note 106, 1953–54.

*Highly Confidential*

Whenever a user wishes to withdraw their cryptocurrency, the Exchange can make a transfer from its hosted wallet system to the user's address on a blockchain.[123]

68.     A few examples from the user agreements I reviewed highlight the role of off-chain settlement and its importance for exchange liquidity and efficiency. In the case of Coinbase Singapore, for example, digital assets are held in hosted wallets by Coinbase. Coinbase does not assert any kind of ownership rights over the assets. However, it does offer custody and rapid ("immediate[]") settlement once a transaction is executed (Coinbase Singapore, Article 5.18, Rules of Trading, 1.82) by reconciling balances between different users' accounts. Korbit's user agreement stipulates that it provides custody for customer wallets (Article 22). Transactions are reflected immediately in the books and records of the exchange once they become final upon matching (Article 21). The company does not post transactions to underlying blockchains (Article 21). Korbit does state that any transfers of assets to and from the exchange may occur on external blockchains but that the company takes no responsibility for this type of transaction (Article 20.1, 20.2). Bittrex adopts a slightly different model. It offers users two options: (i) the irregular option; and (ii) the regular option. The irregular option is stated as being the more common. Under this option, Bittrex assumes ownership over the tokens in the hosted wallet and can dispose of them as it chooses. For irregular holdings, Bittrex functionally acts as a traditional clearinghouse by novating each leg of the claim to itself and settling the trade, giving the user a direct claim for the asset against Bittrex. For such an option, both traders must have agreed to irregular holdings and settlement is off-chain. Under the regular option, Bittrex does not take ownership but is the custodian of customer assets. Once a trade is matched on an exchange, it becomes final. In the case of regular holdings, Bittrex matches users (both must have agreed to regular holdings), finalizes the trade, and then uses underlying blockchains to transfer value between the users *on-chain* (Articles 7.3-7.6). Execution of the trade is final as soon as the matching engine – which is run by the exchange – matches buy and sell orders. As described by Bitstamp, once trades are matched, the exchange's internal ledger is updated to reflect the transfer of assets.[124]

---

[123] Casteleyn, *supra* note 78 (noting the use of off-chain settlement for the "vast majority" of transactions).
[124] BS-LTD-00000005, *Letter from Preiskel & Co LLP on behalf of Bitstamp Ltd*. As noted in this Letter, Bitstamp contracts with BitGo for custody and wallet services. BitGo operates the digital wallets for Bitstamp

*Highly Confidential*

69.     The fact that transactions are executed instantaneously and are final following matching is supported by the understanding of market participants. Mr. Gil testified that "[t]he sale is . . . final when the bid and the offer cross" because "in crypto, there is instantaneous settlement"—"[w]hen that bid and offer cross, if we were selling XRP, we no longer have that XRP. Now we have Bitcoin or dollars or yen or whatever it was that the buyer used to purchase the XRP from us."[125] He testified that it is his understanding that, when GSR makes a trade on a client's behalf on a cryptocurrency exchange, "that sale only becomes final after . . . the offer and acceptance are matched."[126]

70.     In summary, cryptocurrencies represent an entirely digital asset class hosted on decentralized blockchains. In the absence of a central authority, the blockchain acts by consensus to verify transactions and transfer value between users. Cryptocurrency exchanges are, by contrast, mostly centralized institutions. As seen in the user agreements of exchanges that listed XRP, many exchanges also tend to internalize clearing, settlement, and custody functions. Cryptocurrency exchanges otherwise resemble traditional financial exchanges in important ways. They (i) organize their markets in accordance with stipulated contractual rules; (ii) seek to grow volume and liquidity; (iii) provide a unique transactional environment with distinct, exchange-specific trading processes; (iv) run a central order book that matches buy and sell orders; (v) order matching results in a final bargain subject to modification only at the discretion of an exchange; and (vi) endeavor for rapid settlement by using off-chain settlement through custody of customer digital assets, resulting in limited real-time interaction with underlying blockchains.

---

customers and is also the custodian of their digital assets. BitGo holds wallets in the name of Bitstamp, with Bitstamp acting as agent for its customers.
[125] Gil Dep. Tr. 293:7–16.
[126] Gil Dep. Tr. 293:17–294:1.

*Highly Confidential*

## V.   Opinion: Offers to Buy and Sell Cryptocurrencies on an Exchange are Made on the Exchange. Once Offers to Buy and Sell Are Matched, They Become Final and Binding Trades on the Exchange and, thus, at the Geographic Location of the Exchange

71.     I have been asked to provide an opinion on whether offers to buy and sell cryptocurrencies like XRP, trading on an exchange, take place on the exchange itself or elsewhere. Based on my research and experience, I conclude that offers to buy and sell cryptocurrencies take place on an exchange and become binding trades as soon as they are matched within the books and records of the exchange in accordance with the rules of the exchange. Therefore, both offers and trades occur on the exchange and at the geographic location of the exchange.

72.     As a first and basic matter, for the reasons detailed below, an offer to buy and sell cryptocurrencies on an exchange can only be made on that particular exchange, where that exchange matches the offer with another in accordance with exchange rules. Put another way, an offer to buy or sell cryptocurrencies on an exchange may only be executed on the exchange itself. An executable offer to trade does not materialize when and where a client instructs their agent to buy/sell certain assets at a future date and time. At that stage, there is no actual offer to trade on an exchange – and certainly none that can be seen by or bind an exchange to act in a certain way because it is simply not available on the exchange to be accepted. The act of a client instructing an execution agent – like Mr. Cristian Gil of GSR[127] – to eventually trade for the client is, microstructurally, irrelevant to the specific processes that must be engaged when the agent seeks to implement their client's instructions on an exchange to buy and sell cryptocurrency assets like XRP. Indeed, hypothetically speaking, if the agent decided not to implement their client instructions to trade, any consequences would be a matter to be resolved between the agent and client. The exchange and its users would not have come to

---

[127] Gil Dep. Tr. 281:24–282:1.

*Highly Confidential*

know of any contemplated offer because exchanges play no role until such time as an actual order is placed on an actual exchange using the exchange's specific and actual processes.[128]

73.     Conversely, it is commonplace for agents to have discretion in how they execute their client's instructions, particularly to account for volatile and shifting markets. An agent may decide not to trade, to transact across multiple exchanges depending on the trading conditions in the asset, and to take such time to trade as might most optimally reflect a client's instructions and preferences. Often, this process is dynamic, where agents are constantly responding to shifting market environments with adjusted execution strategies. To propose that any general instruction to buy and sell XRP represents an offer to trade on a particular exchange thus runs completely counter to the standard market practice that affords agents discretion in how they give effect to their client's wishes. In short, an offer to trade is made on the actual exchange where the trade takes place and at the geographical location of the exchange in accordance with the exchange's unique rules and processes. Based on my understanding of exchange processes and rules, it cannot arise at any other geographical location, like where an instruction to trade may be given. As detailed in Section III, traditional exchanges now constitute highly global venues, attracting customers from around the world. All instructions must be converted into executable orders to be submitted to the exchange, enter the exchange's order submission system, be vetted, processed, matched, and rendered binding within and on its books.

74.     The reasons for this opinion are as follows. As detailed in Section III, exchanges establish rules-of-the-road for their users as a basis for enabling vibrant trading to take place. These rules reflect a set of distinct contractual measures to tailor the trading process to such aspects as the assets being bought and sold (*e.g.*, commodities versus stock), the specific risks presented by the asset (*e.g.*, risk of wastage for some commodities), availability of leverage (*e.g.*, for derivatives trades), the types of traders involved (*e.g.*, high speed algorithmic traders versus fundamental institutional actors), the state of technology (*e.g.*, open outcry pit-trading versus high-speed automated trading) and the post-trade services provided by an

---

[128] Gil Dep. Tr. 306:5–18 (a potential purchaser of XRP knows when an offer to sell XRP has been placed when they "see an offer in the order book" on the exchange).

*Highly Confidential*

exchange for clearing and settlement. These exchange rules thus set the basis for better assuring a smooth transfer of cash and assets between a dispersed set of traders. They also affect what users expect from the exchange (*e.g.*, execution, delivery, and payment within a certain timeframe) and what the exchange expects from them (*e.g.*, good behavior, honest dealings, and solvency). Importantly, as highlighted by the history of Boards of Trade and the NYSE, such exchanges would not exist as they do without such rules. Investment in their creation reflected a recognition by the industry itself that the needs of a market required its members to submit to a set of specific measures to formalize risk sharing, predictability, reliance, and standardization. By establishing a particular contractual ecosystem designed for their market, exchanges created the conditions for active trading, hedging, speculation, information sharing, price efficiency, monitoring, and more effective capital allocation. The logic behind this model is intuitive. The more effectively an exchange can offer a safe, standardized, and trustworthy environment for its users, the more likely it is to attract more users and generate positive network effects. This can enhance the quality of the market. It should also bolster the profitability of the exchange itself – and ideally, the productive capacity of the larger economy.

75.     As further discussed in Section III, this need to ground trading in a distinctive set of common standards is reflected in the highly technical processes that convert a broad instruction from a client into an actual order that is practicably executable on an exchange.

76.     The electronification and automation of today's traditional financial exchanges further underscores the unique microstructural environment within each venue. As seen by reference to the order submission process for the CME in Section III, order submission generally follows a format established by a venue. Once orders are verified by the venue's algorithms (*e.g.*, to ensure conformity of limit orders with applicable format conventions, price bands, and check for errors, etc.), they enter the exchange's proprietary matching engine. Matching algorithms utilize a specific sorting formula (*e.g.*, price/parity priority or price/time priority as a reward for faster traders) to fill outstanding orders. Exchanges tend to competitively offer an array of order types in a bid to attract liquidity to their venue.[129] To

---

[129] Dolgopolov, *supra* note 600.

*Highly Confidential*

distinguish themselves, some venues might offer a "speed bump" in the order submission system to slow down high-speed traders from getting ahead of other market participants.[130] Others sell co-location and data services designed to maximize the speed of liquidity provision.[131]

77.     The need for exchanges to stipulate a set of house rules combined with the particularities of a venue's rulebook and trading microstructure mean that each platform generally offers a distinctive trading ecosystem for its users legally, contractually, and economically. For any offer to materialize and become executable, therefore, it must both be published on the exchange's platform, or otherwise be entered into the exchange's systems, and be matched in the books and records of the exchange itself. Without being entered into the submission process established by an exchange, an order – as understood in a microstructural context – cannot be considered to exist. Rather, it only achieves form and executability by being absorbed and processed by the specific rules and systems that an exchange establishes for trading on its venue. Only by doing so does an idea or instruction about a potential future trade become converted into an actual and realizable offer that can be available on the exchange to become an executable trade. For completeness, it is worth highlighting that electronic order matching trading systems are, overwhelmingly, anonymous spaces.[132] In other words, parties do not generally know in advance with whom they are trading. They cannot submit an offer with the express aim of trading with a specific party on the other side.[133] It seems extremely unlikely that cryptocurrency exchanges would depart from this model. First, anonymity is a prized value for the cryptocurrency industry in general. Second, transparency about counterparties would

---

[130]     *Our Story*, INVESTORS EXCHANGE, https://iextrading.com/about/?gclid=Cj0KCQjw18WKBhCUARIsAFiW7Jx7-n_ycfE0BcAS97Bphktj4zSqssR4VHmgF9psgNJGDj5AkV4QIcoaAikkEALw_wcB; Alexander Osipovich, *More Exchanges Add 'Speed Bumps,' Defying High-Frequency Traders*, WALL ST. J., Jul. 29, 2019.

[131]     *See, e.g.*, McDowell, *supra* note 56.

[132]     *See, e.g.*, CME Group, *Rulebook: Disclosing Orders Prohibited* (532), https://www.cmegroup.com/content/dam/cmegroup/rulebook/CBOT/I/5.pdf; Chicago Board of Trade, *Definitions: Futures Contract*, https://www.cmegroup.com/rulebook/files/CBOT_Definitions.pdf; Chicago Board of Trade, *Definitions: Order Types*, https://www.cmegroup.com/rulebook/files/CBOT_Definitions.pdf. For discussion, *see* Tom Grimstvedt Meling, *Anonymous Trading in Equities*, 76 J. FIN. 707 (2020).

[133]     Indeed, in some circumstances, this may be considered to be potentially manipulative behavior where parties pre-arrange illusory trades. For example, the user agreement for Ascendex (BitMax) notes that pre-arranged trades can constitute prohibited conduct where they are entered into as part of a fictitious, anti-competitive or unfair course of trading (Article 4.13.5).

*Highly Confidential*

likely work to reduce liquidity on exchanges, a phenomenon observed on traditional exchanges.[134] Given that cryptocurrency exchanges have modeled many aspects of their trading systems on those of traditional markets, added to the gains of anonymity between users for liquidity and exchange reputation within the crypto community, it seems implausible that they would create an open environment. From the user agreements I reviewed, the terms of DigiFinex explicitly underscored the importance of pre-trade anonymity. The exchange notes that it will not disclose information about a counterparty to a user. As such, the terms note that orders ". . . will be listed anonymously setting out only the price and lot size in the Order Book and presented to other users of the Platform for trading." (Article 9: Order Books). Finally, anecdotally, Mr. Cristian Gil testified in this deposition that he did not know the identities of those with whom he was trading, in other words, that the venues on which he had been trading anonymized participant identities.[135]

78.     The idea that an order can only exist within an exchange's system of rules and microstructure also follows from an understanding of the steps that an exchange takes when it accepts this order into its system. In confirming that the order can enter the venue, the exchange gains a form of authorization from the user to automatically match their order against a corresponding one so long as the order is in line with the exchange's rules. In so doing, the exchange acts to make the deal on behalf of a user that results in the user becoming subject to a host of financial obligations to the exchange and to the user's counterparty. Because of this authorization, the user stands to be deprived of their property, become subject to a host of financial risks, and face potential sanction if they cannot perform. In other words, an order works to confer a form of specific authority to the exchange that can cause the exchange to bind the user to a set of financial and legal obligations. Numerous user agreements that I reviewed specifically describe the authority that the user confers on the exchange to execute an order on the user's behalf and to make subsequent debits and credits to their account. For example, Bittrex Global's terms of service define an order as an authority given by a user to the exchange

---

[134] Meling, *supra* note 132.

[135] Gil Dep. Tr., 297:25–298:11 ("Q. Okay. So we've talked a little bit about the buyers of XRP on these exchanges. And I believe that you previously testified that GSR has no way of knowing the identity of the buyer of the XRP. Do I have that right? A. Correct. … Q. Do you have any way of knowing whether or not that purchaser is a foreign buyer? … A. I have no way of knowing who is on the other side of the trades… .").

*Highly Confidential*

to "execute a Trade on a spot basis for all or a portion of the number of Tokens specified . . . ." The order also creates additional authority for the exchange to deduct any fees owed by the user to Bittrex for executing the trade (Article 7.1). Similarly, under DigiFinex's terms of service, a user authorizes the exchange to match its orders on the platform in accordance with price/time priority (Article 9).

79.     In my view, therefore, for such authority to exist, for an exchange to have the power to match the order and bind a user, as well as debit and credit funds from the user's account subsequently, this order needs to be seen and accepted by the specific exchange itself.

80.     As detailed in Section IV, most cryptocurrency exchanges are and have been centralized firms that resemble traditional exchanges in significant ways. In my opinion, the reasons and arguments described above, therefore, generally also apply to centralized cryptocurrency exchanges. Per my review of various user agreements, cryptocurrency exchanges stipulate their own rules-of-the-road for users. These exchanges also appear to use particularized processes to ensure that a user becomes native to that venue and required to use the order submission, custody and settlement processes required by the platform. This is exemplified by the demand that users each open an account with the exchange that acts as a conduit for the exchange to hold the user's digital assets and private keys for trading. In addition, many of the user agreements describe specific order submission and matching processes. Several agreements stipulate rules on transaction sizes for the venue (often subject to change at the discretion of the venue), verification protocols (*e.g.*, to check for price bands) and procedures for transaction error, reversal, or modification after matching (largely at the discretion of the exchange).

81.     As with traditional exchanges, the user agreement and the distinct microstructural environment created by a cryptocurrency exchange highlight the need for an order to be actually entered into the exchange's systems so that this order can have any realizable form and content. Without such input, the order is not visible to the exchange or any potential counterparties. As stipulated by a number of user agreements, to become an order – microstructurally – an instruction to buy/sell a cryptocurrency needs to be translated into a specific form as required by the exchange to become an order to buy/sell on the exchange.

*Highly Confidential*

82.     For cryptocurrency exchanges, the location of the order within a particular venue is reinforced by the role of the exchange as a frequent custodian and settlement services provider. Because exchanges demand that users open an account and hold digital wallets with the exchange, the link between an order as existing within the institution of a particular exchange is even more inextricable. An order to buy/sell a cryptocurrency thus cannot exist unless it can connect to the exchange that can settle it by updating the entitlements in the user's exchange account. By the act of submitting an order, the user is also conferring specific authorization on the exchange to match its order and adjust the user's proprietary entitlements in the digital wallets/accounts that the exchange maintains for the user on the user's behalf.

83.     In view of the above, it is my opinion that an offer to trade is made on an exchange and becomes binding on the exchange as soon as it matches with a corresponding offer in accordance with exchange rules. Order submission, matching and finality take place only within the exchange, reflecting a particularized authority conferred by the user to the exchange to conduct the transaction and to adjust the user's proprietary entitlements on this exchange. The frequent role played by cryptocurrency exchanges as custodians for their users' digital assets further deepens the singular nexus between the user and the exchange. Once binding, most cryptocurrency exchanges use off-chain settlements to move value between users rapidly after execution. With offers to buy and sell becoming binding trades on an exchange in accordance with exchange rules, both the offers and resulting trades thus become binding in the geographic location of the exchange. As per my review of various user agreements, these rules establish, *inter alia*, processes and procedures relating to dispute resolution, governing law, place of domicile and incorporation. In doing so, they also work to tie an exchange more formally to a geographic locale as a matter of its operation and, arguably also, in the expectations of those that use the venue.

## VI.    Opinion: Trades of Cryptocurrencies on Exchanges Become Final When Orders Are Matched By An Exchange Pursuant To Exchange Rules—Not When Any Transactions Are Reflected on the Blockchain (Which May Never Occur).

84.     I have been asked to provide an opinion on when trades on cryptocurrency exchanges become final. Based on my research and work experience in exchange trading

*Highly Confidential*

microstructure, the operation of clearing and settlement systems in traditional markets, as well as in blockchain-based settlement systems for cryptocurrencies, and having reviewed cryptocurrency exchanges' user agreements, I conclude that a trade becomes final on a cryptocurrency exchange as soon as an order to trade is matched with another order in accordance with the exchange's rules. Further, the fact of becoming binding on the exchange in this way is sufficient to make this deal final and binding on the parties. In the context of cryptocurrency exchange-trading, binding finality thus generally occurs without regard for entry into an underlying blockchain.

85.     As an initial matter, it does not make sense to conflate the process of consensus building, validation, and publishing on a decentralized blockchain with the process of achieving execution, finality, and settlement of a cryptocurrency trade on a centralized exchange. These arenas represent two distinct paradigms for trading in cryptocurrencies. Cryptocurrency traders can choose the ecosystem they wish to inhabit, whether they wish to buy/sell using the decentralized blockchain, or whether they wish to enter an exchange to do so. In the case of the former, consensus building, validation, and publishing on a decentralized blockchain is necessary to authenticate a trade. In the case of the latter, it is not. Rather, the exchange undertakes to perform the validation and verification necessary to maintain transactional authenticity. The technology of the blockchain is not required. Crucially, the mission behind decentralized blockchains is to provide a proxy process to realize integrity in trading in the absence of a central trusted authority. This means that users need the innovations of the blockchain – like automated consensus-building, validation, verification, trust-creation, and ledger transparency – because no central trusted authoritative mechanism exists to instrumentalize these aspects of trading.  By choosing to transact on an exchange – and according to its rules – users declare that they wish to affirmatively become bound by an exchange's process and to enjoy the advantages that an exchange can generally provide, like liquidity, timely and convenient execution, and centralized verification. Equally, they also miss out on the advantages of blockchain-based trading like those attached to being mostly outside the purview of a centralized authority. Moreover, some users may lack the technological know-how to transact fully on blockchain but may be more comfortable buying crypto assets on an exchange owing to familiarity with exchange-based trading mechanics.

*Highly Confidential*

86.     To make an exchange's tried-and-tested processes for ensuring transactional certainty (order matching) and settlement subject to a largely separate blockchain-based system would disregard the principal reasons why exchange-trading in cryptocurrencies exists and has become immensely popular in the first place.[136] To be sure, some exchanges (*e.g.*, Bittrex's regular-account settlement) do use underlying blockchains to move funds (on-chain settlement). However, two points are worth noting even in these cases. First, on-chain activity in that circumstance is an explicit part of the exchange's rules and process. This means that customers accept these rules as a part of their agreement with the exchange. In the case of Bittrex, it affords customers both options to accommodate on-and-off-chain settlement, such that those wishing to be on-chain in this manner can do so. Second, the fact of an exchange moving value on-chain and publishing transaction details on the ledger does not change the basic microstructural reality that the transaction becomes binding on the exchange when two orders are matched in accordance with exchange rules. On-chain value-transfer and ledger publishing memorializes and implements a binding bargain made on the exchange – much like a clearinghouse implements a bargain reached on the CME. It does not change the fact that, in accordance with the rules accepted by the user and the exchange, the transaction became binding – and the user does not have the discretion to undo that transaction – once orders are matched on the platform by the exchange's order matching system.

87.     The reasons supporting this opinion are as follows. As exemplified extensively in each of the user agreements I reviewed and discussed in Section IV, centralized cryptocurrency exchanges set clear rules for when a transaction becomes final and binding on the exchange. These rules reflect the normal microstructural approach common to order matching markets, namely that orders become legally binding on parties as soon as the orders match in accordance with exchange rules. In traditional markets, after a trade is matched on and by the exchange, clearinghouses and custodians tend to assume responsibility for ensuring that this binding trade is honored, and its terms implemented in accordance with the expectations of the parties. A clearinghouse usually becomes a central counterparty (through novation of both legs of the deal to itself) to ensure that the terms of the bargain are performed and the parties receive their contracted-for assets and payment on time. This intercession by the clearinghouse

---

[136] Cong et al., *supra* note 14; Ledesma, *supra* note 16.

*Highly Confidential*

– designed to provide an ultra-safe counterparty to both traders – reflects the paramount importance of the bargain reached on the exchange. It does not create a fundamentally novel economic bargain. It simply offers maximum assurance that the bargain reached on the exchange will actually be performed.

88.     Similarly, as seen in the user agreements discussed in Section IV above, these cryptocurrency exchanges also create binding obligations for their users when trades are matched in accordance with their rules and microstructural processes. Except in narrow circumstances (*e.g.*, in case of serious technical error), trades cannot be reversed or modified except by an exchange itself. In contrast to traditional markets, cryptocurrency exchanges do not frequently rely on third-party clearinghouses and custodians to ensure the performance of the bargain. Most carry out the task in-house and settle transactions off-chain by updating the entitlements recorded in the exchange's hosted wallets for each user. This enables rapid trading to occur and for a user to see their account balance quickly adjusted to reflect the fruits of their trading.

89.     Moreover, as detailed in Section V above, an exchange user can only revoke their offer until such time as the offer is matched by an exchange. After the offer and bid are matched, the trade becomes irreversible.[137] Several of the user agreements that I reviewed reflect this position. For example, the Binance Terms of Use provide that "[o]nce your Order has been matched with another user's Order, you may not change, revoke or cancel Binance's authorization to complete the Order" (Article 2(b)). Similarly, the BitMart Terms of Service state that "[y]ou cannot cancel, reverse, or change any transaction marked as complete or pending" (Article 5.9), and Bitrue provides that "[b]y using this service you accept that all trade executions are final and irreversible" (Article 3).

---

[137] Gil Dep. Tr. 291:22–293:8 ("Q . Okay. Now, before an offer is accepted, could a client tell GSR, actually, I don't want to trade this XRP anymore, I'd like it back? A . Yes. … But before the bid is accepted, could the client modify their -- the amount of XRP, for example, that they wanted to sell? A . Yeah, they could -- they could tell us to pause, they could tell us to ratchet up or slow down. Yeah. Q . And the bid isn't -- or the sale isn't final, at that point, right? … THE WITNESS: Correct. The sale is only final when the bid and the offer cross."); *Id.* at 296:15–20 ("Q. Okay. When does GSR have the ability to stop a trade, if the answer is any different? A. We can – that's a different question. We can stop a trade whenever we want. But once the bid and the offer has crossed the trade has occurred and you cannot reverse it.").

*Highly Confidential*

90.     At no point in this process is the underlying blockchain needed to verify the trade and to move value between users (or implicated at all). Per exchange rules, transactions are final once orders are matched, and the exchange immediately verifies and settles the trade accordingly. To the extent a user wishes to renege on its bargain, user agreements will forbid such an action except in extremely narrow circumstances, such as a large technical error.[138] If there is a dispute, the user agreement generally sets out a process to follow. As detailed in Section III, the reason for such binding finality goes to the heart of why exchanges have become essential for their markets. Without it or if such finality were contingent, parties transacting on exchanges could not depend on the integrity of their economic bargains, compromising any number of onward transactions. Similarly, per the user agreements that I reviewed, transaction finality appears to be also viewed as essential to cryptocurrency exchanges and to their users helping ensure that trades are not subject to idiosyncratic unwinding.[139]

91.     The fact that trades on cryptocurrency exchanges become final within the confines of the relevant exchange is supported by the testimony of market participants, notably Mr. Gil, who testified that "a sale of XRP . . . done on an exchange" is <u>not</u> "recorded on the XRP Ledger."[140] He testified that certain "movements" of XRP are shown on the XRP Ledger, but those are not necessarily sales.[141] He testified that activity on the XRP Ledger does not necessarily show a change in ownership of XRP.[142] Further, the fact that these transactions become final on an exchange ties finality to the geographic location of an exchange. As noted above, the operation of various legal anchors within the user agreements that I reviewed, such as applicable governing law, dispute resolution processes, and corporate head office suggest a close geographical intersection between an exchange's rules and the location noted in its legal

---

[138] *See, e.g.*, RPLI_SEC 1078162, Coinbase Trading Rules (permitting review on account of a large technical error).

[139] The inability of a customer to reverse a trade once matching has occurred is confirmed by the testimony of Mr. Gil, a market participant. Mr. Gil's understanding as a market participant is that GSR and any client cannot reverse a trade "once the bid and offer has crossed" because "the trade has occurred." Gil Dep. Tr. 296:7–20; *id.* at 293:4–294:1 ("The sale is only final when the bid and the offer cross…. in crypto, there is instantaneous settlement. When that bid and offer cross, if we were selling XRP, we no longer have that XRP. Now we have Bitcoin or dollars or yen or whatever.").

[140] Gil Dep. Tr. 299:3–5.

[141] Gil Dep. Tr. 300:11–17.

[142] Gil Dep. Tr. 301:18–21.

*Highly Confidential*

agreements. This aspect is especially pertinent in the context of matters concerning digital asset storage and settlement of user accounts. In particular, governing laws and the location of an exchange's corporate domicile will likely impact critical issues such as the location where the exchange would declare insolvency, the procedures governing asset distribution and the controls on extra-territorial asset transfer that might apply in such circumstances (*e.g.*, ringfencing).

92.     It has become common industry practice to settle exchange trades off-chain and to avoid publishing information to blockchains in real-time.[143] There are compelling reasons to justify this approach, chiefly, to enable transactions to take place quickly and reliably, creating liquidity, certainty, and greater conformity with investor expectations. Importantly, this industry norm in favor of off-chain settlement means that a requirement for on-chain settlement as a precondition for finality is not only incorrect as a matter of exchange process but also unworkable in practice. My reasons for this opinion are as follows. Importantly, exchanges vary in their use of on-chain and off-chain settlement, making a blockchain-based finality rule unworkable in practice. As seen in the user agreements I reviewed, a significant proportion of exchanges favor off-chain settlement, where the exchange adjusts user balances on hosted wallets following a trade. This approach allows exchanges to transact rapidly while minimizing contingencies for themselves and users (on which more below). As acknowledged by certain user agreements (e.g., Korbit), transactions on these exchanges are, therefore, never/infrequently published to the cryptocurrency blockchains.[144] In other words, most exchanges provide an in-house ledger that constantly updates with adjusted book entries and revised balances to native in-house wallets (e.g., the CoinOne Exchange Service). They do not need to (and thus do not) communicate constantly with the underlying blockchains. Instead, trades are reported with a confirmation "fill" from the exchange to the trading entities using the exchange.[145]

93.     This widespread reliance on off-chain settlement means that a meaningfully large proportion of exchange-traded cryptocurrency transactions are never

---

[143] Casteleyn, *supra* note 78.
[144] As detailed in Section IV, an exchange might send transactions to a blockchain where a user instructs the exchange to transfer its digital assets to a blockchain-based address, thus withdrawing these assets from the exchange.
[145] Gil Dep. Tr. 294:18–295:5.

*Highly Confidential*

recorded on an underlying blockchain ledger. A hypothetical rule subjecting all cryptocurrency trades to ledger-based finality would mean that an unknown and likely extraordinarily large number of exchange trades would never effectively settle nor become final. To be clear, in my opinion, there is currently no such rule or accepted norm in cryptocurrency exchange markets, nor has there ever been. Based on my research and experience, such a rule or approach would (i) be antithetical to the norm established in traditional markets where finality, predictability, and protecting market participants carries signal priority (*e.g.*, reliance on clearinghouses to implement exchange bargains even at grave risk to systemic stability), (ii) create chaos for the cryptocurrency industry and users, and (iii) create legal and economic inconsistency between transactions in the same cryptocurrencies that are executed on different exchanges. Indeed, even within the same exchange (*e.g.*, Bittrex), it would mean that trades that settle on-chain carry finality, while those settled off-chain do not. As an aside, to the extent that exchanges settle large amounts of trades off-chain, blockchains do not now constitute an up-to-date public account of transactions in a cryptocurrency. It is unclear what transparency gains might thus be offered by a requirement for ledger-based publication to ground settlement that are not already provided by exchanges circulating transaction data (likely in a more accessible/readable form) to its users and the public.

94.     A hypothetical rule that looks to blockchains to finalize trades on cryptocurrency exchanges would import systematic contingencies to the settlement process that are inconsistent with market practice in traditional markets that seeks to minimize uncertainties about transaction finality and settlement. Two aspects of cryptocurrency blockchains create especially problematic sources of fragility for exchange-based trading.

95.     One, as detailed and exemplified in the discussion in Section IV, certain blockchains can be slow to update and it is not guaranteed that miners will pick up transactions. The Bitcoin and Ethereum blockchains, for example, have experienced slowdowns arising out of high traffic. In addition, as detailed with respect to Bitcoin, transactions can be left behind by miners.[146] This creates obvious problems for exchange users that might experience delays or rejection of their trades by blockchains. For an exchange-based environment, it would also

---

[146] Voell, *supra* note 99.

*Highly Confidential*

mean that an entire marketplace is vulnerable to the machinations of multiple different blockchain networks whose workings are outside of the control of exchanges but that create random delays and stoppages impacting the risks that exchanges carry. From a consumer protection standpoint, a dependence on blockchain networks would force users to internalize high transaction fees when seeking to ensure that their trades have maximum chance of being validated. Whereas off-chain settlement likely keeps costs consistent and low, on-chain settlement exposes users to uncertain fees (whose costs are not controlled by an exchange).[147] Some user agreements (*e.g.*, Korbit, CoinOne) mention that users might have to cover the exchange's expenses when it sends value on-chain to a blockchain destination specified by the user (*e.g.*, when withdrawing assets from the exchange). As these agreements often mention, the exchange takes fees from a user to compensate itself for having to pay fees to miners. Speculating, the need for customers to pay high on-chain settlement fees would likely result in diminished liquidity and perhaps restrict trading only to those that are willing and able to pay systematically.

96.     Two, blockchains may have fragilities in the form of possible malicious attacks or outages. As exemplified in Section IV, blockchains have suffered various hacks, collusive attacks, outages, and rollbacks that have caused the blockchain to stop working, unwind trades or fork.[148] While this is unfortunate when it happens, connecting an exchange-based settlement to ledger-based settlement would create a direct risk of contagion between the fate of underlying blockchains and the finality of any number of exchange-settled trades. In other words, if a blockchain is hacked resulting in large-scale loss of trade data (*e.g.*, see the discussion in Section IV on the Verge blockchain), exchanges would also face direct repercussions for unwinding or otherwise reviewing concluded trades on their venues. If this causes an exchange to have to cover customer costs, it may find itself in financial peril, potentially setting the stage for large-scale failure. Given that exchanges can offer off-chain settlement by adjusting the balance of in-house accounts, while also appearing to increase user

---

[147] Easley et al., *supra* note 97.

[148] *See, e.g., Consensus Protections Against Attacks and Failure Modes*, XRP LEDGER, https://xrpl.org/consensus-protections.html (highlighting the various attacks that may be experienced by the XRP Ledger and the steps taken to maintain network resiliency against these vulnerabilities).

*Highly Confidential*

volumes, it is not clear what meaningful gains would be offered by subjecting finality to the need for validation by potentially fragile blockchains.

97.     In my time working and researching market structure, I have understood exchanges as having special responsibilities for assuring that markets remain safe and liquid.[149] A rule that effectively delegates responsibility for settlement to decentralized blockchains could let exchanges off the hook for the responsibility of assuring that their own in-house settlement and custody processes are ironclad and failsafe. It would risk an eventuality where cryptocurrency exchange customers lacked all recourse for trades that fail to settle on blockchains. As a result, some exchanges could end up less likely to maintain top-of-the-line settlement, security, and custody mechanisms, avoiding responsibility for creating an ecosystem that boasts rapid and reliable settlement for customer trades. If customers are currently choosing exchange-based trading as a way to protect themselves from the frictions of blockchain-based trading, blockchain-based finality would cause them to lose these gains and be left exposed to the uncertainties and risks they wish to avoid, while insulating exchanges from taking execution and settlement safety seriously. In this way, such a default rule would be out-of-step with general market practice in financial markets and, presumably also, the expectations of cryptocurrency market participants.

98.     To summarize, offers to buy and sell cryptocurrencies that occur on an exchange and are matched in accordance with exchange rules become final and binding on the exchange. Exchanges mostly settle their transactions off-chain. Even so, the settlement process merely follows from the fact of transactions becoming final and binding as soon as offers are matched on the exchange. Further, transmission and publication to a blockchain are not needed where transactions take place on a cryptocurrency exchange that settles trades off-chain. Indeed, the widespread use of off-chain settlement means that requiring blockchain publication for transaction finality represents an unworkable and unsafe proposition for the exchanges, their users and the market. By becoming final and binding within an exchange and not requiring settlement on a blockchain, it is my opinion that transactions become binding in the geographic location of the exchange upon which the trades are made.

---

[149] *See, e.g.*, Yadav, *supra* note 20.

*Highly Confidential*

## VII.   Opinion: For 21 of 25 of the Exchanges Listed in Table A, There is No Indication that Trades on the Exchange Become Final and Binding in the United States

99.   I have been asked to provide an opinion, based on my expertise in the operation of domestic and international exchanges (both traditional and cryptocurrency), on whether offers and trades on the exchanges listed in TABLE A below are made and become final within the U.S. or outside the U.S. on foreign exchanges.[150] I conclude that, for all but four of the exchanges listed in TABLE A, there is no indication that offers are made on the exchanges in the U.S., or that trades on these exchanges become final in the U.S. While a small handful of the exchanges listed below may bear some indicia of a U.S. presence, they also have foreign exchanges/units affiliated with them. Given the possible presence of a foreign arm on which a trade may have occurred, it is not determinable in the abstract whether, for any particular trade, the transaction became final within the U.S. or outside the U.S. through a unit located in a foreign jurisdiction. To determine whether a trade through such entities is domestic, one would need to determine whether a trade was made on the domestic, or the foreign arm of the exchange. If orders were made and trades became final on the foreign arm, the offer and the trade would, therefore, have been made and become final outside of the U.S.

100.   As an initial matter, exchanges are subject to national, domestic regulatory regimes despite conducting a highly internationalized business.[151] Cryptocurrency exchanges operate in and from locations around the world, just as other types of businesses do.[152] As businesses that transact in digital assets and embrace electronic, automated solutions for their trading processes (rather than physical pit trading, for example), they are quintessentially primed to be global players.

101.   As detailed in Sections V and VI, I conclude that offers are made, and transactions become final and binding, where exchanges match buy and sell orders in accordance with the rules of the exchange. This means, therefore, that offers are made and

---

[150] Note that I have analyzed the information that is available regarding the location of various cryptocurrency exchanges today. It is possible that the exchanges for which there is a U.S. nexus today did not have any U.S. nexus at earlier points in time.
[151] IOSCO, *supra* note 69.
[152] Cong et al., *supra* note 144; Hileman & Rauchs, *supra* note 86, at 8.

*Highly Confidential*

transactions become final and binding in the jurisdiction where an exchange is geographically located to match trades. In determining where offers are made, and where transactions match and become final, pinpointing the exact geographic location of cryptocurrency exchanges poses logistical and analytical challenges.[153] With usually lower start-up costs (*e.g.*, limited need to buy real-estate) and high mobility, cryptocurrency exchanges have proliferated around the world.[154] With a much shorter history in the marketplace than established exchanges like the CME or London Stock Exchange, cryptocurrency exchanges can lack deep roots within a particular geographic location, introducing an additional layer of complexity.[155]

102.    The mobile, digital nature of cryptocurrency exchanges arguably exacerbates the challenge of ascribing particular weight to various potential indicia of location (*e.g.*, location of employees, servers, cold key storage) as providing definitive "proof" of the location of the exchange on which trades are made final. In some cases, an exchange might locate different functions in different jurisdictions. Bitstamp, for example, has its registered office in the United Kingdom but states that its location of "principal financial functions and operational control" is in Slovenia. It also has servers in Ireland and Germany.

103.    Nevertheless, based on my research and experience relating to how offers to buy and sell are made on exchanges and how exchanges finalize trades, I believe the question of where offers are made and trades on an exchange become final should be answered by examining a number of indicia to determine the location of exchanges on which offers were made and trades finalized. It is my view that a trade on an exchange bearing no significant indicia of being located in the United States is not finalized within the United States. The same is true with respect to where offers to trade are made. To begin, I examine factual criteria about the corporation that operates the exchange. Here, certain core indicia stand out as being especially important. *First*, where is the exchange's place of business, registered office and domicile? These identify the location of operations for the exchange on which offers are made and trades finalized. In some cases, of course, an exchange may conduct most of its business in

---

[153] Ryan Brown, *Cryptocurrency Traders Seek Damages from Binance After a Major Outage Cost Them Millions*, CNBC, Aug.19, 2021.
[154] Hileman & Rauchs, *supra* note 86, at 28.
[155] *Id.* at 27–28.

*Highly Confidential*

a different jurisdiction from its registered domicile. *Second*, what location is mentioned in the exchange's terms of use or terms of service? Based on my review, user terms generally identify a jurisdiction to cover dispute resolution and claims against the exchange. They also often note a governing law to which matters concerning use of the exchange, including trades that are finalized on the exchange, are subject. Sometimes these two locations are the same, but in some cases, they are not (*e.g.*, Binance Holdings identifies a forum for dispute resolution but does not mention a governing law for itself). *Third*, in what country do market participants and the public believe the exchange does business? By examining informed media reports and terms of use, it is possible to gauge reasonable market participants' understanding about where an exchange is located and does its business. *Fourth*, where do regulators believe an exchange is located for purposes of addressing requests to the corporation operating the exchange? In this case, the SEC's various requests to foreign regulators to capture information about an exchange's activities pursuant to IOSCO's cross-border co-operative procedures are indicative that the SEC understands such exchanges to be located abroad.

104.     These indicia might not all be applicable for every exchange, or even knowable for every exchange. Not every factor is necessary, and no factor is sufficient, to understand the location of the exchanges. But together they allow market participants, regulators, and others to form an understanding of where a given exchange is located and accordingly where offers on that exchange are made and trades are finalized. In circumstances where there are no significant indicia that an exchange is located in the United States, it is my opinion that offers on that exchange are not made in the United States, and trades on that exchange do not become final and binding in the United States.

105.     These indicia are important for a variety of reasons. They provide concrete attributes that are possible to identify for the large majority of exchanges with a degree of certainty. These attributes are also pertinent to determine the question of where trades become final. The place of domicile and place of business point to the possible location of an exchange's books and records. Moreover, local laws can stipulate strict recordkeeping demands on regulated entities. To take one such illustration, firms under the jurisdiction of the CFTC are required to keep detailed paper and electronic records of their activities that must be stored

*Highly Confidential*

safely and reliably and be capable of being inspected promptly by the regulator.[156] In practice, the significance of such recordkeeping rules for major exchanges can mean a direct link between their home base and the location where they maintain an accounting of their activities and those of their users. Even if an exchange locates some of its data servers in a different jurisdiction, the need for documents to always be kept safe and available can mean that it also maintains storage capacity close to home, where it can be accessed by its regulators as well as by itself when it needs information on its users. Governing laws offer an anchor to situate its business operations within a legal framework that clarifies aspect of its corporate constitution, location of assets, contract disputes and forum for insolvency. For example, in the U.S., the CME is subject to a special regulatory designation as a "systemically important financial markets utility" (SIFMU) – one of eight national firms to be classified under this category. As a result, it falls under an intensive regulatory scheme designed to oversee market infrastructure providers with heavy significance for the financial system.[157] Furthermore, national exchanges like the NYSE and Nasdaq are classified by the U.S. as self-regulatory organizations. This designation subjects them to a host of responsibilities in relation to how they organize their business and treat their users.[158] The perception of market participants develops a picture of market expectations about where exchange users believe they are doing business and where their trades become binding (*e.g.*, where do they think they will get redress if an exchange loses their assets?). For example, foreign traders looking to transact on the London Stock Exchange generally have to open an account with and trade using the services of a firm with representation rights to trade directly on the Exchange.[159] This kind of interaction can reinforce expectations about location and about where offers are being made and trades becoming final. The need for a user to take steps to "naturalize" themselves within the jurisdiction of the London Stock Exchange can thus work to concretize perceptions about what rules and processes will be applicable in case a trader suffers harm and where redress may be found (*e.g.*, in the courts of England and Wales). Finally, formal inquiries by regulators to their foreign

---

[156] For example, Regulatory Records; Retention and Production, 17 CFR § 1.31 (noting the importance of "prompt" production of information for the regulator upon request to a regulated firm).

[157] *Designated Financial Market Utilities*, BD. GOVERNORS FED. RSRV. SYS., https://www.federalreserve.gov/paymentsystems/designated_fmu_about.htm.

[158] Exchange Act § 6(a), 15 U.S.C. § 78f(b) (2000).

[159] *See, e.g.*, Jay Hawk & Julie Hawk, *How to Trade on the London Stock Exchange*, BENZINGA, Apr. 5, 2021, https://www.benzinga.com/money/how-to-trade-on-london-stock-exchange/.

*Highly Confidential*

counterparts provide evidence of what jurisdiction's laws regulators believe govern the operations of the exchange. As in this case, this may be evidenced by the SEC relying on measures for cross-border cooperation, notably those set out by IOSCO, to liaise with foreign counterparts about a particular exchange.

106.    In certain circumstances, these indicia will clearly point to a single jurisdiction where offers are made on an exchange and the trades become final. In others, it may not be possible to determine a single jurisdiction, but it may be possible to *exclude* jurisdictions that plainly have no connection to trading activity on the exchange. In other words, even if the indicia point to multiple foreign jurisdictions (such as the United Kingdom and Slovenia for Bitstamp) but with no link to the United States, I can exclude the United States as the site where trades on an exchange became final. As described below, I have identified 21 exchanges that contain no significant indicia of being located in the United States.

107.    Applying this approach to determining where trades on cryptocurrency exchanges become final, I first examined certain core pieces of information on the exchanges listed in TABLE A. Specifically, I have reviewed information about their place of domicile, principal place of business (where known), registered address (where known), the choice of law listed in the user terms and conditions of user agreements, as well as various public sources and media reports. I have also reviewed certain requests for assistance to foreign regulators issued in this litigation by the SEC.

108.    For the next step, after studying these pieces of information, it is my opinion that, for 21 out of 25 exchanges listed in TABLE A, there does not appear to be any indication that offers are made, or trades become final, in the United States.

109.    My understanding is corroborated by the deposition of Mr. Cristian Gil of GSR. He testified that it was "fair" to suggest that "GSR executes cryptocurrency strategies on

*Highly Confidential*

behalf of [its] clients mostly on non-U.S. exchanges," a matter that had been true since these platforms came online.[160]

## TABLE A

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| Binance | Grand Cayman[161]<br><br>Hong Kong, China[162] | N/A[163] | 23 Lime Tree Bay, Georgetown, Grand Cayman, KY 1203. Cayman Islands[164] | Governing law of the ToS is that of Hong Kong. [165] Arbitrations to be administered in Hong Kong.[166] | Grand Cayman[167] |
| Bitbank | Japan[168] | Japan[169] | 7F, KDX Nishigotanda Building, 7-20-9 Nishigotanda, Shinagawa-ku, Tokyo 141-0031[170] | Governing law of the ToS is that of Japan, [171] the Tokyo District Court has exclusive jurisdiction. [172] | Japan[173] |

---

[160] Gil Dep. Tr.158:17–159:7, 302:8–305:12 (with the exception of four exchanges on which Ripple sold XRP that have some ties to the United States, "the rest of the exchanges are located outside of the United States," and more than 90 percent of Mr. Larsen's, Mr. Garlinghouse's, and Ripple's exchange trades, on a dollar-adjusted basis, were done on these foreign exchanges).

[161] *See D&B Business Directory: Binance Holdings Limited*, DUN & BRADSTREET, https://www.dnb.com/business-directory/company-profiles.binance_holdings_limited.4c5e5e9fe1cb37cf1e43e9dc3be92377.html (last visited Oct. 3, 2021), Exhibit B1.

[162] *Binance Holdings Limited*, CIPHERTRACE, Exhibit B2; *Binance Holdings Limited*, S&P CAPITAL IQ, Exhibit B3.

[163] *See, e.g.*, Scott Chipolina & Daniel Roberts, *Binance CEO CZ Still Says His Company Has No Headquarters,* DECRYPT (May 7, 2021), https://decrypt.co/70045/cz-pressed-on-binance-headquarters-at-ethereal-summit.

[164] *Binance Holdings Limited*, CIPHERTRACE, Exhibit B2.

[165] RPLI_SEC 1077884, *Binance Terms of Use, Binance*.

[166] *Id.*

[167] *See, e.g.*, Adam Samson & Philip Stafford, *Financial Watchdog Bans Crypto Exchange Binance from UK*, FIN. REV. (Jun. 28, 2021), https://www.afr.com/markets/currencies/financial-watchdog-bans-crypto-exchange-binance-from-uk-20210628-p584ye ("The FCA also at the weekend issued consumer warnings against the Cayman Islands-registered Binance holdings company"); Shivam Vahia, *Binance's Compliance 'Journey' Gets Bumpier As Another Partner Backs Out*, BUSINESS INSIDER (July 14, 2021), https://www.businessinsider.in/cryptocurrency/news/binances-compliance-journey-gets-bumpier-as-another-partner-backs-out/articleshow/84373786.cms ("Binance was originally founded in China by Canadian Changpeng Zhao but was forced to move out during the 2017 crackdown by the authorities. Since then, the exchange has been based out of the Cayman Islands.").

*Highly Confidential*

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| Bitfinex | British Virgin Islands[174] | Hong Kong, China[175] | 13/F 1308 Bank of America Tower 12 Harcourt Road Central,  Hong Kong[176] | Governing law of the ToS is that of the British Virgin Islands.[177] | Hong Kong[178] |
| BitForex | Singapore[179] / Seychelles[180] | | Paya LeBar Rd. #10-24 Singapore, 409051[181] | Governing law of ToS is "the laws of the Website registration country".[182] | |
| Bithumb | South Korea[183] | South Korea[184] | 17, Teheran-ro-16-gil, Gangnam-gu, Seoul, South Korea, (Dongwoo Bldg.) 08378[185] | Governing law of ToS is that of South Korea.[186] | South Korea[187] |

[168] *About Us*, BITBANK CO., Exhibit B4.

[169] *Id.*

[170] *Bitbank*, CIPHERTRACE, Exhibit B2; *see also* GSR00002411.

[171] RPLI_SEC 1077900, *Terms of Service, Bitbank*.

[172] *Id.*

[173] *See, e.g.*, Thomas Wilson, *Japan Watchdog Orders Improvement,* REUTERS (June 22, 2018), https://www.reuters.com/article/us-cryptocurrencies-japan/japan-watchdog-orders-improvements-at-cryptocurrency-exchanges-idUSKBN1JI0R0 (Japan's financial regulator said on Friday it has ordered cryptocurrency exchanges including bitFlyer, Inc., one of the country's biggest, to make improvements to lax measures on money laundering . . . Others targeted by the FSA included well-known exchanges Quione and Bitbank Inc.").

[174] *Bitfinex*, CIPHERTRACE, Exhibit B2; *see also In the Matter of: BFXNA INC. d/n/a Bitfinex*, CFTC No. 16-19, Comm. Fut. L. Rep. P 33766 (2016).

[175] *In the Matter of: BFXNA INC. d/n/a BitFinex*, CFTC No. 16-19, Comm. Fut. L. Rep. P 33766 (2016)

[176] *Bitfinex*, CIPHERTRACE, Exhibit B2.

[177] RPLI_SEC 1077963, *Terms of Service, Bitfinex*.

[178] *See, e.g.*, Amie Tsang, *Bitcoin Plunges After Hacking of Exchange in Hong Kong,* NY TIMES (Aug. 3, 2016), https://www.nytimes.com/2016/08/04/business/dealbook/bitcoin-bitfinex-hacked.html ("The digital currency Bitcoin plunged on Wednesday after Bitfinex, an exchange based in Hong Kong, said it had been hacked and funds stolen.").

[179] *BitForex*, CIPHERTRACE, Exhibit B2.

[180] RPLI_SEC 1077993, *BitForex Terms of Service, BitForex*; Certificate of Incorporation of a Private Limited Company, Noah Trade LTD, Co. No. 11386260 (filed on May 29, 2018), Exhibit B5.

[181] *BitForex*, CIPHERTRACE, Exhibit B2.

[182] RPLI_SEC 1077993, *BitForex Terms of Service, BitForex.*

[183] *Bithumb*, CIPHERTRACE, Exhibit B2; *Bithumb*, S7P CAPITAL IQ, Exhibit B6; *see also* GSR00014791.

[184] *Bithumb*, CIPHERTRACE, Exhibit B2; Bithumb, S&P Capital IQ, Exhibit B6.

[185] *Bithumb*, CIPHERTRACE, Exhibit B2.

[186] RPLI_SEC 1078001, *Terms of Service, Bithumb*.

*Highly Confidential*

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| Bitlish | United Kingdom[188] | United Kingdom[189] | Suite 14056 43 Bedford Street, London, Greater London, WC2E 9HA, United Kingdom[190] | | United Kingdom[191] |
| BitMart | Cayman Islands[192] | | 23 Lime Tree Bay Avenue, Grand Cayman KY1–1110, Cayman Islands[193] | Governing law of ToS is that of the Cayman Islands.[194] | |
| BitMAX | Singapore[195] | | | Governing law of the ToS is that of Singapore.[196] | Singapore[197] |
| Bitrue | Singapore[198] | Singapore[199] | | | Singapore[200] |

[187] *See, e.g.*, Nathaniel Popper, *Bitcoin Bug Bites Japan and South Korea as China Clamps Down*, NY TIMES (Oct. 1, 2017), https://www.nytimes.com/2017/10/01/technology/bitcoin-japan-south-korea.html ("Trading has been so popular that two South Korean exchanges, Bithumb and Coinone, have set up storefronts in Seoul that people can visit to buy and sell in person.").

[188] *Bitlish*, CIPHERTRACE, Exhibit B2; *Bitlish*, S&P CAPITAL IQ, Exhibit B7; *Bitlish*, ARACHNYS, Exhibit B8.

[189] *Bitlish*, CIPHERTRACE, Exhibit B2.

[190] *Id.*

[191] *See, e.g.*, William Suberg, *We Plan to Open 5,000 Bitcoin ATMs in Europe in 2017: Bitlish*, COINTELEGRAPH (May 29, 2017), https://cointelegraph.com/news/we-plan-to-open-5000-bitcoin-atms-in-europe-in-2017-bitlish ("UK-based Bitlish thus surprised when one of its branded machines opened in Russia's second city St. Peterburg, closely followed by another.").

[192] *BitMart*, CIPHERTRACE, Exhibit B2.

[193] *Id.*

[194] RPLI_SEC 1078012, *User Agreement, BitMart*.

[195] *BitMax*, CIPHERTRACE, Exhibit B2; *BMXDM Technology Pte. Ltd*, S&P CAPITAL, Exhibit B9; *BMXDM Technology Pte. Ltd*, ARACHNYS, Exhibit B10.

[196] RPLI_SEC 1078022, *Terms of Service, AscendEX*.

[197] *See, e.g.*, Yoon Young-sil, *Bithumb to Collaborate with Singaporean Exchange BitMax*, BUSINESSKOREA (Feb. 20, 2020), http://www.businesskorea.co.kr/news/articleView.html?idxno=41587 ("Bithumb, a cryptocurrency exchange, said on Feb. 18 that it signed a strategic partnership agreement with BitMax, a Singaporean exchange.").

[198] *Bitrue*, CIPHERTRACE, Exhibit B2; *Bitrue Singapore Pte. Ltd.*, ARACHNYS, Exhibit B11.

[199] *Bitrue Singapore Pte. Ltd.*, ARACHNYS, Exhibit B11.

[200] *See, e.g.,* Daniel Palmer, *Singapore Exchange Bitrue Hacked for Over $4 Million in Crypto*, *CoinDesk* (July 27, 2019), https://www.coindesk.com/markets/2019/06/27/singapore-exchange-bitrue-hacked-for-over-4-million-in-crypto/ ("Singapore-based cryptocurrency exchange Bitrue has been hacked for around $4.2 million in user assets."); Danny Nelson, *Bitrue Exchange to Launch Crypto-Backed Loan Platform* (Sept. 24, 2019), https://www.coindesk.com/markets/2019/09/24/bitrue-exchange-to-launch-crypto-backed-loan-platform/ ("Singapore-based exchange Bitrue is launching a low-interest crypto lending platform.").

*Highly Confidential*

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| Bitstamp | United Kingdom[201] | Slovenia[202] | 5 New Street Square, London[203] | Governing law of the ToU is that of England and Wales.[204] | United Kingdom / Slovenia[205] |
| Bittrex | United States[206] | United States[207] | Bittrex, Inc. 701 5th Ave., Ste 4200 Seattle, WA 98104-7047[208] | Governing law of the ToS is that of Washington State.[209] | United States[210] Bittrex (Global): Bermuda[211] |
| BW | Australia[212] | Australia[213] | | | |
| Coinbase | United States[214] | N/A[215] | 548 Market Street #23008, San Francisco, CA 94104[216] | Governing law for the User Agreement is that of California.[217] | United States[218] |

---

[201] BS-LTD-00000051, Certificate of Incorporation of a Private Limited Company, Bitstamp Ltd, Company No. 8157033 (filed on July 25, 2012); *see also Bitstamp*, CIPHERTRACE, Exhibit B2.

[202] BS-LTD-00000013, *Bitstamp's Annual Report and Financial Statements for 2020*; Exhibit B13; BS-LTD-00000005, *Letter from Preiskel & Co LLP on behalf of Bitstamp Ltd*.

[203] BS-LTD-00000013, *Bitstamp Ltd 2019 Annual Report*; *see also* RPLI_SEC0057357.

[204] RPLI_SEC 1078033, *Terms of Use, Bitstamp Ltd.*

[205] *See, e.g.*, Sydney Ember, *Dealbook: Jitters After Bitcoin Exchange Suspends Services*, NY TIMES (Jan. 6, 2015), https://dealbook.nytimes.com/2015/01/06/jitters-after-bitcoin-exchange-suspends-services/ ("On Tuesday morning, Bitstamp, based in London, posted a message on its website saying it had 'temporarily suspended Bitstamp services' and urged its customers not to make deposits to previously issued Bitcoin deposit addresses."); Robert Hackett, *Bitcion Exchange Bitstamp Wins EU Approval*, FORTUNE (Apr. 25, 2016), https://fortune.com/2016/04/25/bitcoin-exchange-eu-approval-bitstamp/ ("Bitstamp, a Slovenian Bitcoin exchange now based in the United Kingdom, said on Monday that it had received a license from Luxembourg's Ministry of Finance to operate as a payment institution.").

[206] *Bittrex, Inc.*, DEL. DEP'T OF STATE: DIV. OF CORPS., Exhibit B12.

[207] *Privacy Policy*, BITTREX, INC., Exhibit B13.

[208] *Id.*

[209] *Id.*

[210] *See, e.g.*, Kellie Ell, *Bittrex Exchange Will Let Investors Swap Their Dollars for Cryptocurrency*, CNBC (June 1, 2018), https://www.cnbc.com/2018/06/01/bittrex-exchange-will-let-investors-swap-their-dollars-for-cryptocurrency.html.

[211] *See, e.g.*, *Bittrex Global to Operate Cryptocurrency Exchange from Bermuda*, BUSINESSWIRE (Sept. 30, 2020), https://www.businesswire.com/news/home/20200930005717/en/Bittrex-Global-to-Operate-Cryptocurrency-Exchange-From-Bermuda.

[212] *BW*, CIPHERTRACE, Exhibit B2. BW was acquired by CollinStar Holdings in 2017. *See CollinStar Holdings to Acquire BiWang Group in a 100 Million US Dollars Buyout*, BUSINESSWIRE (Dec. 3, 2017), https://www.businesswire.com/news/home/20171203005059/en/CollinStar-Holdings-to-Acquire-BiWang-Group-in-a-100-Million-US-Dollars-Buyout. CollinStar Holdings is incorporated in Australia. *See CollinStar Holdings Pty, Ltd.*, AUSTRALIAN BUSINESS REGISTER, Exhibit B14.

[213]*CollinStar Holdings Pty, Ltd.*, AUSTRALIAN BUSINESS REGISTER, Exhibit B14; *Collinstar Holdings Pty. Ltd.*, AUSTRALIAN SECS. & INVS. COMM'N, Exhibit B15.

*Highly Confidential*

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| CoinBene | Vanuatu[219] | | 1 Coleman Street, Adelphi, Singapore 179803[220] | User Agreement requires that any arbitration would occur in Vanuatu.[221] | |
| CoinOne | South Korea[222] | South Korea[223] | 4F, Coinon, 69, Hangang-daero, Yongsan-gu, Seoul, South Korea, 04378[224] | The ToS frequently references Korea.[225] | South Korea[226] |
| DigiFinex | Singapore[227] | Hong Kong, China[228] | | Governing law of the ToS is that of Singapore.[229] The ToS also stated that the company is registered in the Seychelles.[230] | |

---

[214] *Coinbase Global, Inc.*, DEL. DEP'T OF STATE: DIV. OF CORPS., Exhibit B16.

[215] Coinbase Global Inc. S-1 Filing (filed on Feb. 25, 2021), Exhibit B17 ("In May 2020, we became a remote-first company. Accordingly we do not maintain a headquarters"); *see also* Andrew Chamings, *Coinbase to Close San Francisco Offices for Good, Will Have No Headquarters,* SFGATE (May 6, 2021), https://www.sfgate.com/local/article/2021-05-coinbase-san-francisco-office-closure-tech-16157042.php.

[216] *Coinbase*, CIPHERTRACE, Exhibit B2.

[217] RPLI_SEC 1078173, *Coinbase Legal Agreement (US), Coinbase*.

[218] *See, e.g.,* Jason Brett, *With Coinbase And SAP, Vast Bank Offers Bitcoin, Ethereum, Cardano and Litecoin,* FORBES (Sept. 1, 2021), https://www.forbes.com/sites/jasonbrett/2021/09/01/with-coinbase-and-sap-vast-bank-offers-bitcoin-ethereum-cardano-and-litecoin/.

[219] *CoinBene*, CIPHERTRACE, Exhibit B2.

[220] *Id.*

[221] RPLI_SEC 1078201, *Terms of Service, Coinbene*.

[222] *CoinOne*, CIPHERTRACE, Exhibit B2.

[223] *Id.*; *Home*, COINONE, https://coinone.co.kr (identifying South Korea as the location of CoinOne's offices at bottom of homepage); *see also* GSR00014791.

[224] *Id.*

[225] RPLI_SEC 1078206, *Basic Terms of Use, Coinone*.

[226] *See, e.g.,* Nathaniel Popper, *Bitcoin Bug Bites Japan and South Korea as China Clamps Down*, NY TIMES (Oct. 1, 2017), https://www.nytimes.com/2017/10/01/technology/bitcoin-japan-south-korea.html ("Trading has been so popular that two South Korean exchanges, Bithumb and Coinone, have set up storefronts in Seoul that people can visit to buy and sell in person."); Joori Roth, *As Crackdown Looms, South Korea's Defiant Crypto Fans Dig In*, REUTERS (July 12, 2021), https://www.reuters.com/technology/crackdown-looms-south-koreas-defiant-crypto-fans-dig-2021-07-12.

[227] *DigiFinex,* THE GRID, Exhibit B18.

[228] *DigiFinex Global*, LINKEDIN (last visited Oct. 1, 2021), https://sg.linkedin.com/company/digifinex-global.

[229] *Terms and Conditions*, DIGIFINEX, Exhibit B19.

[230] *Id.*

*Highly Confidential*

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| HitBTC | Hong Kong, China[231] | | Viru väljak 2, Tallinn 10111, Estonia[232] | User Agreement requires that any arbitration would occur in arbitration will occur in British Virgin Islands.[233] | |
| Huobi Global[234] | Seychelles[235] | | Asia Square Tower 1, 8 Marina View, Central Business District, 01, Singapore[236] | User Agreement requires that any arbitration would occur in Belize.[237] | China[238] |
| Korbit | South Korea[239] | South Korea[240] | Seonjeongreung Gangnam-gu Yeoksam-dong Seoul, Seoul-t Seonjeongreung Gangnam-gu Yeoksam-dong Seoul, Seoul-tukpyolsi 135080 South Korea[241] | Governing law of the ToS is that of South Korea.[242] | South Korea[243] |

---

[231] *HitBTC*, CIPHERTRACE, Exhibit B2.

[232] *Id.*

[233] RPLI_SEC 1078221, *Terms of Service, HitBTC.*

[234] Huobi Global had an exclusive partner in the United States from July 2018. *See HBUS. The Strategic Partner of Huobi Will Launch on July 6*, HUOBI (July 6, 2018), https://www.huobi.com/support/en-us/detail/360000117702. That partner subsequently traded XRP pairs for a period of time in 2019. *See* Aziz Abdel-Qader, *Huobi's US Arm Goes Live with Trading Three XRP Pairs*, FINANCE MAGnates (Apr. 18, 2019), https://www.financemagnates.com/cryptocurrency/exchange/huobis-us-arm-goes-live-with-trading-three-xrp-pairs. There is no indication that trades of XRP executed on behalf of Ripple by GSR during that eight month period occurred on Huobi's U.S.-based partner as opposed to Huobi Global, where XRP trades had been previously executed. *See* GSR00003239. During his deposition, Mr. Gil of GSR identified Huobi as one of the exchanges on which GSR traded XRP and confirmed that it was located outside of the United States. *See* Gil Dep. Tr. 303:17—304:2.

[235] *Huobi Global*, CIPHERTRACE, Exhibit B2.

[236] *Id.*

[237] RPLI_SEC 1078239, *User Agreement, Huobi Global.*

[238] *See, e.g.,* Gregor Stuart Hunter & Chao Deng, *China Buying Sparks Bitcoin Surge*, WALL ST. J. (May 30, 2016), https://www.wsj.com/articles/china-buying-sparks-bitcoin-surge-1464608221 ("Huobi and OKCoin, two Chinese exchanges, now collectively account for some 92% of global trading in bitcoin.").

[239] *Korbit*, CIPHERTRACE, Exhibit B2; *Korbit*, S&P CAPITAL IQ, Exhibit B20.

[240] *Home*, KORBIT (last visited Oct. 1, 2021), www.korbit.co.kr (identifying South Korea as the location of Korbit's offices at bottom of homepage).

[241] *Korbit*, CIPHERTRACE, Exhibit B2.

[242] RPLI_SEC 1078247, *Terms and Conditions, Korbit.*

64 of 71

*Highly Confidential*

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| Kraken | United States[244] | United States[245] | 237 Kearny Street #102, San Francisco, CA[246] | Governing law of the ToS is that of California.[247] Non-US residents are directed to contact Payward Trading Ltd.,c/o SHRM Trustees (BVI) Limited, Trinity Chambers, Ora et Labora Building, Road Town, Tortola, VG1110, British Virgin Islands.[248] | United States[249] |
| Aux Cayes FinTech Co. Ltd d/b/a OKEx | Seychelles[250] / Malta[251] | Seychelles[252] | | Governing law of the ToS are that of England and Wales. [253] User Agreement requires that any arbitration would occur in Hong Kong.[254] | China[255] |

---

[243] *See, e.g.*, Nathaniel Popper, *Bitcoin Bug Bites Japan and South Korea as China Clamps Down*, NY TIMES (Oct. 1, 2017), https://www.nytimes.com/2017/10/01/technology/bitcoin-japan-south-korea.html; Joori Roth, *As Crackdown Looms, South Korea's Defiant Crypto Fans Dig In*, REUTERS (July 12, 2021) https://www.reuters.com/technology/crackdown-looms-south-koreas-defiant-crypto-fans-dig-2021-07-12.

[244] *Payward Ventures Inc.*, CAL. SEC. OF STATE, Exhibit B21; *Payward Ventures, Inc.*, DEL. DEP'T OF STATE: DIV. OF CORPS., Exhibit B22.

[245] *Payward Ventures Inc.*, S&P CAPITAL IQ, Exhibit B23.

[246] *Id.*

[247] RPLI_SEC 1078259, *Terms of Service*, *Kraken*.

[248] *Terms of Service*, Kraken (last updated June 23, 2021), https://www.kraken.com/en-us/legal/.

[249] *See, e.g.*, Steven Russolillo, *Coinbase Wants to Pounce on Another Cryptocurrency Paradise*: *Japan*, WALL ST. J. (June 5, 2018), https://www.wsj.com/articles/coinbase-wants-to-pounce-on-another-cryptocurrency-paradise-japan-1528178585; Laura Saunders, *The IRS Is Coming for Crypto Investors Who Haven't Paid Their Taxes*, WALL ST. J. (May 14, 2021), https://www.wsj.com/articles/bitcoin-irs-comes-for-crypto-investors-who-havent-paid-their-taxes-11620937095.

[250] RPLI_SEC 1078293, *Terms of Service*, *OKEx*.

[251] *OKEx*, CIPHERTRACE, Exhibit B2.

[252] *Contact Us*, OKEx, Exhibit B24.

[253] RPLI_SEC 1078293, *Terms of Service*, *OKEx*.

[254] *Id.*

*Highly Confidential*

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| Poloniex | United States[256] | United States[257] | 99 High Street, Suite 1701 Boston, MA 02110 | Governing law of the User Agreement is that of Panama.[258] | United States[259] |
| Upbit | Upbit (Global) Singapore[260]  *Upbit Korea*: South Korea[261] | | *Upbit Global*: 1 Harbourfront Avenue #16-02, Keppel Bay Tower, S098632, Singapore[262]  *Upbit Korea*: 5th Floor 14, Teheran-ro 4-gil, Gangnam-Seoul Korea[263] | | South Korea[264] |
| ZB | United Arab Emirates[265] | | | Governing law of the ToS is that of the United Arab Emirates.[266] | Singapore[267] |

---

[255] *See, e.g.*, Kenneth Rapoza, *Chinese Founder of OKEx Crypto Exchange 'Arrested' Again; Whales Bail*, FORBES (Oct. 16, 2020), https://www.forbes.com/sites/kenrapoza/2020/10/16/chinese-ceo-of-okex-crypto-exchange-arrested-again-whales-bail/?sh=65423d141461.

[256] *Poloniex, LLC*, MASS. CORPS. DIV., Exhibit B25; *Poloniex, LLC (E1082390)*, MONT. SEC. OF STATE, Exhibit B26.

[257] *Id.*

[258] RPLI_SEC 1078300, *User Agreement, Poloniex*.

[259] *See, e.g.*, Mengqi Sun, *Circle Sets Aside $10.4 Million to Settle SEC Case on Poloniex*, WALL ST. J. (July 20, 2021), https://www.wsj.com/articles/circle-sets-aside-10-4-million-to-settle-sec-case-on-poloniex-11626825346.

[260] RPLI_SEC 1078314, *Terms of Use, UpBit*.

[261] *Home*, UPBIT KOREA (last visited Oct. 1, 2021), https://www.upbit.com/home (identifying South Korea as the location of Upbit Korea's offices at bottom of homepage).

[262] *Home*, UPBIT (last visited Oct. 1, 2021), https://sg.upbit.com/home (identifying Singapore as the location of Upbit's offices at bottom of homepage).

[263] *Upbit*, CIPHERTRACE, Exhibit B2.

[264] *See, e.g.*, *Over 60 South Korean crypto exchanges set to suspend services next week*, CNBC (Sept. 17, 2021), https://www.cnbc.com/2021/09/17/over-60-south-korean-crypto-exchanges-set-to-suspend-services.html.

[265] RPLI_SEC 1078338, *User Agreement, ZB*.

[266] *Id.*

[267] *See, e.g.*, Kenneth Rapoza, *Does China Have a Role in Bitcoin's Rise?*, FORBES (Jan. 10, 2021), https://www.forbes.com/sites/kenrapoza/2021/01/10/does-china-have-a-role-in-bitcoins—rise.

*Highly Confidential*

| Exchange | Place of Incorporation/ Domicile | Principal Place of Business | Registered Office Address (as applicable) | Locations Referenced in ToS/ToU/ToA | Notable Items in Public Sources and Media |
|---|---|---|---|---|---|
| ZBG | Hong Kong, China[268] | Hong Kong, China[269] | | | Hong Kong[270] |

110.     As part of reviewing information, I noted that the SEC has acknowledged in this litigation that certain of the exchanges on which Ripple traded XRP are located outside of the United States. For example, I have reviewed a number of requests for assistance issued by the SEC to various overseas regulators in connection with this litigation to obtain documents from cryptocurrency exchanges based outside the United States. These requests were made pursuant to IOSCO procedures for inter-regulatory cooperation. As detailed below, the requests illustrate that the SEC perceives these exchanges to be based and/or located outside the United States. For example, the SEC issued requests for assistance to:

a.   The Financial Services Commission in South Korea, pursuant to the IOSCO Multilateral Memorandum of Understanding, seeking its assistance to obtain documents from "the following digital asset trading platforms based in South Korea: Upbit, Bithumb, Coinone, and Korbit."[271]

b.   The Financial Conduct Authority in the United Kingdom, pursuant to the IOSCO Enhanced Multilateral Memorandum of Understanding, seeking its assistance to obtain documents from "UK-based Bitlish."[272]   The request also noted that "Bitlish is located at Suite 14056, 43 Bedford Street, London, England, WC2E 9HA.[273]

---

[268] *ZBG*, CIPHERTRACE, Exhibit B2.
[269] *ZBG Exchange*, LINKEDIN (last visited Oct. 1, 2021), https://hk.linkedin.com/company/zbgexchange.
[270] *See, e.g.*, Rachel McIntosh, *Time & Power:  APAC's Continued Influence on Crypto Markets*, Finance Magnates (Nov. 15, 2019), https://www.financemagnates.com/cryptocurrency/news/time-power-apacs-continued-influence-on-crypto-markets/.
[271] NYRO_RIPPLE_RFA_00011.
[272] NYRO_RIPPLE_RFA_000118.
[273] *Id.*

*Highly Confidential*

c. The Monetary Authority of Singapore, pursuant to the IOSCO Enhanced Multilateral Memorandum of Understanding, seeking its assistance to obtain documents from "the following digital asset trading platforms based in Singapore: Bitmax, Bitrue, and Coinbene."[274]  The request also noted that Bitmax was "located at 114 Lavender Street, Number 09-88, Ct Hub 2, Singapore, 338729,"that Bitrue was "located at 8 Wilkie Road #03-01, Wilkie Edge, Singapore, 228095," that Coinbene was "located at 1 Coleman St., Singapore, 179803."[275]

d. The Cayman Islands Monetary Authority, pursuant to the May 2002 IOSCO Multilateral Memorandum of Understanding, seeking its assistance to obtain documents from "BitMart, a digital asset exchange platform and company incorporated in the Cayman Islands."[276]  The request also noted that BitMart was "located at 23 Lime Tree Bay Avenue, Grand Cayman, Cayman Islands KY1-1110, KY."[277]

e. The Cayman Islands Monetary Authority, pursuant to the May 2002 IOSCO Multilateral Memorandum of Understanding, seeking its assistance to obtain documents from "Binance Holdings, Inc. . . . a digital asset exchange platform and company incorporated in the Cayman Islands."[278]  The request also noted that Binance is "located at Suite 5-204, 23 Lime Tree Bay Avenue, P.O., George Town, Grand Cayman, KY11104, Cayman Islands."

f. The Malta Financial Services Authority, pursuant to the May 2002 IOSCO Multilateral Memorandum of Understanding, seeking its assistance to obtain documents from "Okex, a digital asset trading platform based in Malta."[279]  The

---

[274] NYRO_RIPPLE_RFA_00124.
[275] *Id*. at -125.
[276] NYRO_RIPPLE_RFA_000130.
[277] *Id*. at -131.
[278] NYRO_RIPPLE_RFA_000143.
[279] NYRO_RIPPLE_RFA_000137

*Highly Confidential*

request also noted that Okex is located at "35, Room 1A, Salvu Psaila Street, Birkirkara, Malta."[280]

g.   The Hong Kong Securities and Futures Commission, pursuant to the Memorandum of Understanding between the SEC and the Hong Kong authorities dated October 5, 1995 and the IOSCO Enhanced Multilateral Memorandum of Understanding, seeking its assistance to obtain documents from "Bitfinex, Inc. . . . a digital asset trading platform that is wholly owned and operated by iFinex, Inc., which is headquartered in Hong Kong."[281]  The request also noted that iFinex is "located at Suite 13/F, 1308 Bank of America Tower, 12 Harcourt Road Central, Hong Kong."

h.   The Securities Commission of Malaysia, pursuant to the May 2002 IOSCO Multilateral Memorandum of Understanding, seeking its assistance to obtain documents from "Okex, a digital asset trading platform with offices in Malaysia."[282]  The request noted that Okex is "located at 18th Floor, Menara TA One 22, Jalan P. Ramlee, Kuala Lumpur 50250."[283]

111.   The only four exchanges where there are indicia that a trade may occur within the United States are Bittrex, Poloniex, Coinbase, and Kraken. However, these indicia do not conclusively determine that any given offer or trade on any one of these four exchanges definitively took place and became final in the U.S. Trades may have occurred outside of the U.S. even in these cases because (1) the relevant market-maker might have been interfacing with a foreign unit or platform of the particular exchange (e.g., trading on a foreign affiliate like Bittrex Global); and (2) some exchanges may have been based outside of the U.S. for a particular period of time before domiciling themselves within U.S. borders through a U.S. affiliate. In analyzing trades purported to have occurred on these four exchanges, it is important to proceed on a case-by-case basis to establish on which platform/unit of the exchange, in fact, offers were being made and the trades were being executed and finalized.

---

[280] *Id*. at -138.
[281] NYRO_RIPPLE_RFA_000150.
[282] NYRO_RIPPLE_RFA_000163.
[283] *Id*. at -164.

*Highly Confidential*

112.    For example, when asked whether he considered Bittrex to be a "U.S. exchange" in connection with GSR's trades on Bittrex on behalf of Ripple, Mr. Gil answered that he did not know because Bittrex "spun out their international entity" and "they pushed all the non-U.S. people to the international entity."[284] Thus, at some points in time, trades through Bittrex may actually have been made on a foreign exchange. With respect to Poloniex, Mr. Gil also testified that it "might have been in one of th[o]se Caribbean Islands."[285] As to Coinbase, its User Agreement refers to Coinbase Singapore Pte. Ltd., which is incorporated in Singapore. With respect to Kraken, its terms of service provide that "products and services are provided through local operating entities that are subsidiaries of Payward, Inc." If the user resides outside of countries such as the U. S., then the counterparty to the terms of service is a British Virgin Islands entity.[286]

113.    There are two final points worth noting on this question of where exchange-traded cryptocurrency transactions become final. First, I am aware that certain of the exchanges listed in Table A, including those that I do not believe finalize trades in the U.S., have had contact with or submitted license applications to certain U.S. regulators.[287] The existence of these contacts and filings do not change my conclusions. Importantly, to the best of my understanding, these interactions with regulators do not constitute evidence that these exchanges were finalizing trades in the U.S. Rather, a more plausible account is that these exchanges were trying to get permission to engage in some exchange business in the U.S. (e.g., through registration with FinCEN as a money services business). Indeed, based on my impressions of the current marketplace for cryptocurrency exchanges, those looking to trade in the U.S. try to do so through a special U.S. domiciled affiliate that operates with a distinct transactional profile and with a stated intention to gain compliance with applicable rules.[288]

---

[284] Gil Dep. Tr.159:3–7.

[285] Gil Dep. Tr. 303:15–16.

[286] *Summary of Terms of Service*, KRAKEN, at Section 1.5, https://www.kraken.com/en-us/legal ("If you reside in any other country not set forth in 1.1-1.4 above (other than Japan, in which case, you have been provided with a separate terms of service that is applicable to you)- Payward Trading Ltd., c/o SHRM Trustees (BVI) Limited, Trinity Chambers, Ora et Labora Building, Road Town, Tortola, VG1110, British Virgin Islands.").

[287] For example, I have reviewed records via FinCEN's public "MSB Registrant Search" page and identified registered entities that appear to be affiliated with Binance US, BitMart, Bitstamp, Bittrex, Coinbase, DigiFinex, Korbit, Kraken, Aux Cayes FinTech Co. Ltd d/b/a OKEx, and Poloniex. *See MSB Registrant Search*, FINCEN, https://www.fincen.gov/msb-registrant-search.

[288] Emily Flitter, *The World's Biggest Crypto Exchange Still Lacks U.S. Footing*, N.Y. TIMES, Aug. 19, 2021.

*Highly Confidential*

Thus, absent other specific indicia, and based on the approach outlined in this Section, I would continue to conclude that trades on the exchanges in Table A other than Bittrex, Poloniex, Coinbase, and Kraken would not have occurred in the U.S.

114.    Second, I do not find it surprising that the vast majority of exchanges do not execute and finalize trades in the U.S. Based on my research, it is my understanding that many cryptocurrency exchanges tend to avoid becoming located in the U.S. and falling within the purview of U.S. regulators.[289] For example, it is common to discover advice online to would-be cryptocurrency exchange providers that exhorts them to try and remain distant from U.S. shores.[290] Indeed, even businesses run by U.S. citizens and residents often operate offshore.[291] Within this environment, it makes sense that most of the exchanges noted above would locate themselves in jurisdictions outside of the U.S. and would seek to avoid falling within U.S. territorial borders. To the extent they do so, it is likely to be an accidental and inadvertent mistake or by way of minor, inconsequential physical presence that does not affect the location of the underlying exchange or where trades on the exchange become final.

*(Remainder of page intentionally left blank)*

---

[289] *See, e.g.*, Eric Lipton and Ephrat Livni, *Crypto Nomads: Surfing the World for Risk and Profit*, N.Y. TIMES, Jul. 13, 2021.
[290] *See, e.g.*, Christian Reeves, *How to Build a Cryptocurrency Exchange*, PREMIER OFFSHORE, Apr. 7, 2018, https://premieroffshore.com/how-to-build-an-international-cryptocurrency-exchange/.
[291] Lipton & Livni, *supra* note 297.

*Highly Confidential*

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on October 4, 2021

_____

Yesha Yadav

# YESHA YADAV

*Professor of Law*
*Associate Dean, Diversity, Equity & Community*
*Vanderbilt University Law School*
*131 21st Avenue South • Nashville, TN 37203*
*Yesha.Yadav@vanderbilt.edu*

## PROFESSIONAL EXPERIENCE

**Professor of Law, Vanderbilt University Law School (July 2016-)**
**Associate Dean & Robert Belton Director of Diversity, Equity & Community (August 2020-)**
**Co-Faculty Director, Master of Laws (LL.M) Program (July 2016-)**
**Chancellor Faculty Fellow (July 2019-21)**
**Enterprise Scholar (July 2017-July 2019)**
**Associate Professor of Law, Vanderbilt University Law School (2014-2016)**
**Assistant Professor of Law, Vanderbilt University Law School (2011-2014)**

- Teaching: Securities Regulation, Corporate Bankruptcy, Financial Regulation, Market Microstructure, Financial Innovation and Technology.
- Affiliation: Law and Business Program, International Legal Studies Program; Program on Law and Innovation.
- Law School Service: Associate Dean (August 2020-); Lateral Faculty Appointments Committee/Appointments Committee (2011-2012; 2012-2013; 2014-2015; 2015-2016; 2016-2017; 2018, 2019-2020); Faculty Advisor, Equality, Diversity, and Inclusion Council (2019-); Vanderbilt Law School Anti-Racism Task Force Steering Committee (July 2020).
- University Service: Vanderbilt University Shared Governance Project Committee; University Senate (Law School Representative, 2017-), Senate Grievance Committee, Vanderbilt University Covid-19 Continuity Committee (May 2020).
- Honors: Hall-Hartman Award for Outstanding Teaching 2015 (Hall Division), Hall-Hartman Award for Outstanding Teaching 2020 (Hartman Division).
- Team Recipient of University's Trans-institutional Program (TIPs) funding to build a prediction market for climate change (led by Mark Cohen and Michael Vandenbergh) (July 2020).

## Bankruptcy Scholars & COVID-19 Working Group (Spring 2020)

- Member of the small business bankruptcy sub-committee researching and advising on small business distress in the wake of the pandemic.

## Visiting Research Professor of Law, NYU Stern School of Business (Spring 2019)

- Visiting research appointment.

## NASDAQ Hearings Panel (Nov. 2018-)

- Member of the NASDAQ Hearings Panel, deliberating on cases arising out of the regulatory and risk-management functions of the NASDAQ exchange.

## Commodities Futures Trading Commission, Technology Advisory Committee (Jan 2018-Committee Currently Awaiting CFTC Commissioner Sponsorship)

- Member of the Technology Advisory Committee examining issues relating to the interaction of emerging technologies and financial regulation and risk management.
- Co-Chair, Distributed Ledger Technology Subcommittee; Member, Algorithmic Trading Subcommittee.

## Tennessee State Advisory Committee to the U.S. Commission on Civil Rights (July 2016-)

- Member of Advisory Committee examining issues concerning voting rights, policing, housing policy, discrimination and other matters relating to civil rights; Subcommittee Chair: Committee Report into Penal Debt (Legal Financial Obligations), published November 2019.

## Board of Editors, Capital Markets Law Journal (Oxford University Press) (2020-)

- Editor of the Journal on issues relating to securities and financial markets.

## Board of Editors, Journal of International Economic Law (Oxford University Press) (Jan 2016-)

- Editor of the Journal on international trade and financial regulatory issues.

## Atlantic Council, Task Force on the Rise of the Renminbi (2014)

- Analysis of financial regulation and currency reform in China.

## Atlantic Council, Task Force on Divergences in EU-US Financial Regulation (2013)

- Analysis of divergences in the implementation of EU-US financial services regulation, with a special focus on over-the-counter derivatives regulation.

## Honorary Advisor, Indian Financial Services Law Reform Commission (2012-2013)

- Analysis on wide-ranging financial services law reform issues pursuant to the FSLRC's mandate to overhaul Indian financial services regulation.

## Legal Counsel, Legal Vice-Presidency of the World Bank, Finance, Private Sector Development and Infrastructure Unit: 2009 to 2011.
### *Insolvency and Creditor-Debtor Rights; Financial Markets, Systems and Infrastructure*

- Legal Counsel in the World Bank's Insolvency and Creditor-Debtor Rights Initiative. This work focused on the implementation of the mandate given to the World Bank by the G-20 to perform a standard-setting function in the area of insolvency and creditor rights. The work included diagnostic assessment of insolvency and creditor rights systems under the World Bank/IMF Reports on the Observance of Standards and Codes (ROSC) and Finance Sector Assessment Programs (FSAP). I was also involved in more broad-based financial regulatory work, relating to diagnostic and evaluative analysis of financial regulatory systems in World Bank client countries.

## Adjunct Professor of Law, Georgetown University Law Center: Academic Year 2010-2011
### *International Finance and Regulation*

- Appointed to co-teach International Finance and Regulation for the 2010-2011 academic year with Professor Christopher J. Brummer.

**Committee on Capital Markets Regulation, Cambridge, MA: 2009**
*Interim Research Director*

- Co-ordination of the research agenda of the Committee on financial regulation.

**Committee on Capital Markets Regulation, Cambridge, MA: August 2008 – 2010**
*Senior Research Associate*

- Research on various regulatory issues relating to the regulation of the U.S. and international financial markets, including with respect to the Committee's May 2009 Report into the Financial Crisis, *the Global Financial Crisis: A Plan for Regulatory Reform*.

**Attorney, Clifford Chance LLP, London, England and Paris, France:  August 2004 to July 2008 (qualifying in the Financial Regulation and Derivatives Group).**

- **International Payments** – key resource person for work on legal aspects of international payments markets notably, the establishment of the *Single Euro Payments Area* ("SEPA"), a harmonized payments market for the *European Economic Area* ("EEA") and Switzerland, championed as an essential pillar of the *European Union's Internal Market* by the *European Commission* and the *European Central Bank* ("ECB"). This included a secondment as legal advisor to the European Payments Council, representing the major banking and payment industry players in furtherance of the SEPA program.

- **Financial Regulation** – advice on of capital adequacy regulations, notably, under Basel I and Basel II, market microstructure mechanisms focusing on exchanges and clearing and settlement systems, Islamic finance, regulatory aspects of derivative transactions, mergers and acquisitions, work on regulatory compliance aspects for financial institutions, and other miscellaneous regulatory work in financial markets regulation.

**ACADEMIC EDUCATION**

**Harvard Law School, Cambridge, MA**                                    **2008 to 2009**
*LL.M.*

- Focus: Financial and capital markets regulation, payment systems and terrorist financing.

**University of Cambridge, Cambridge, England**                          **1999 to 2003**
*M.A (Honors) in Law and Modern Languages (French and German)*

- Program equivalent to a general focus J.D. with a bachelor's degree in Modern Languages.
- Achieved "First Class" Honors.
- Named *"Scholar"* of the University.
- Awarded the *Betty Wu Lee Prize in Law*.

**PUBLICATIONS**

*Articles*

- *Failed Regulation of U.S. Treasury Markets*, 121 Columbia Law Review 1173 (2021)

- *Oversight Failure in Securities Markets*, 104 Cornell Law Review 1799 (2019)

- *Too-Big-to-Fail Shareholders,* 103 Minnesota Law Review 587 (2019)

- *Fintech and the Innovation Trilemma*, 107 Georgetown Law Journal 235 (2019) (with Chris Brummer) (selected for reprinting in the Corporate Practice Commentator).

- *Insider Trading and Market Structure*, 63 UCLA Law Review 968 (2016)

- *The Failure of Liability in Modern Markets,* 102 Virginia Law Review 1031 (2016)

- *The Extra-Territorial Regulation of Clearinghouses* (with Dermot Turing) 2 Journal of Financial Regulation 21 (2016)

- *How Algorithmic Trading Undermines Efficiency in Capital Markets,* 68 Vanderbilt Law Review 1607 (2015) (First Prize Winner, George Washington University-C-Leaf Junior Faculty Business Law Workshop, 2015) (earlier draft noted in the Economist and Bloomberg) (cited by the D.C. Circuit in *Coburn v Evercore* and by the Sixth Circuit in *Paul Saumer v. Cliffs Natural Resources Inc.*).

- *Insider Trading in Derivatives Markets*, 103 Georgetown Law Journal 381 (2015) (noted in the Wall Street Journal and Bloomberg) (chosen by the Corporate Practice Commentator as a top 10 article in securities and corporate law in 2014).

- *The Case for a Market in Debt Governance*, 67 Vanderbilt Law Review 771 (2014)

- *The Problematic Case of Clearinghouses in Complex Markets*, 101 Georgetown Law Journal 387 (2013) (selected to be reprinted in the Securities Law Review as a notable article in 2013) (cited in SCOTUS opinion in Alice Corp. v. CLS Bank International)

- *Looking for the Silver Lining: Regulatory Reform after the "Credit Crunch,"* 15(2) *Stanford Journal of Law, Business and Finance*, 314 (2010)

- *The Specter of Sisyphus: Re-making International Financial Regulation after the Global Financial Crisis,* 24 *Emory International Law Review* 83 (2010)

- *Separated by a Common Language*: An Examination of the Transatlantic Dialogue on Data Privacy Law and Policy in the War on Terror, 36 Rutgers Journal of Law and Computer Technology, 73 (2009)

### Shorter Works and Works in Progress

- *The Broken Bond Market* (with Jonathan Brogaard)

- *Fragile Financial Regulation* (with Pradeep Yadav)

- *Dismantling Bondholder Rights*

- *A Blueprint for Reforming US Treasury Markets*, Vanderbilt Law Research Paper No. 20-58 (2020).

- *Debt Buybacks and the Weakening of Bondholder Protection* 35 Butterworths Journal of International Banking and Financial Law 310 (2020)

- *Fintech and International Financial Regulation,* 53 Vanderbilt Journal of Transnational Law 1109 (2020) (symposium).

- *Insider Trading and The Limits of Insider Information*, 56 Washington University Journal of Law and Policy 133 (2018) (symposium).

- *Algorithmic Trading and Market Regulation* in Global Algorithmic Capital Markets: High Frequency Trading, Dark Pools and Regulatory Challenges (Walter Mattli, ed.) (2018).

- *Financial Markets Infrastructure and Swaps Trading* (book chapter), Oxford Research Encyclopedia of Economics and Finance (2018) (invited)

- *We Need to Know Who Invests in Bank Equity*, 70 Vanderbilt Law Review En Banc 283 (2017)

- *Algorithmic Trading, Capital Allocation and the Law*, Butterworths Journal of International Banking and Financial Law (October 2015)

- *Clearinghouses and Regulation by Proxy,* 43 Georgia Journal of International and Comparative Law 161 (2014) (symposium)

- *Empty Creditors in Sovereign Debt: What Now?* 9 Capital Markets Law Journal 103 (2014) (peer reviewed)

- *Opting Against International Law in International Financial Regulation,* 106 Proceedings of the Annual Meeting of the American Society for International Law 317 (2012).

- *Executive Compensation in India*, in Jennifer G. Hill and Randall S. Thomas (eds.), *Research Handbook on Executive Pay* (Edward Elgar Publishing) (2012) (with Rajesh Chakrabarti, Krishnamurthy Subramanian and Pradeep Yadav)

## PROFESSIONAL MEMBERSHIPS

- Admitted to the *Roll of Solicitors* (i.e., Attorneys) in England and Wales.

- Membership of the *Law Society of England and Wales* (i.e., the "Bar Association" for qualified lawyers in England and Wales).

## LANGUAGES

- English (native)
- Hindi (fluent)
- French (fluent)

- German (fluent)
- Urdu (spoken only)
- Spanish (basic)

**Selected Recent Conferences and Presentations**

- Feb 2019 – UNC Faculty of Law – Faculty Workshop Presentation

- April 2019 – U Penn Wharton Business School Conference – Invited Participant

- April 2019 – Michigan Law School – Seminar Paper Presentation

- May 2019 – Vanderbilt Law School/University of Ghent Conference – Paper Presentation

- July 2019 – Singapore/NUS Conference – Paper Presentation

- July 2019 – National Stock Exchange, Mumbai – Paper Presentation

- August 2019 – Indian Institute of Technology Delhi – Paper Presentation

- September 2019 – Harvard Law School Roundtable on Common Ownership – Invited Participant

- October 2019 – DC Georgetown Fintech Week – Invited Attendance

- October 2019 – Commodities Futures Trading Commission (TAC) – Presentation and Panel

- October 2019 – Vanderbilt Law Review Symposium – Paper Presentation

- October 2019 – IIM Calcutta, NYU Stern School Conference on India – Discussion Presentation

- November 2019 – International Monetary Fund – Paper Presentation

- November 2019 – University of Florida Conference – Presentation

- November 2019 – Investors' Exchange Academic Conference – Conference Attendance

- December 2019 – Toulouse School of Economics – Presentation

- December 2019 – National Stock Exchange India/NYU Business School Conference – Presentation

- December 2019 – IGIDR/Vanderbilt Conference in Mumbai – Paper Presentation

- December 2019 – Indian Institute for Corporate Governance – Speech/Presentation

- January 2020 – Utah Law School, Faculty Workshop – Paper Presentation

- February 2020 – U Pennsylvania Law School Seminar on Financial Regulation – Paper Presentation

- March 2020 – BYU Winter Deals Conference – Paper Presentation

- April 2020 – Boston University Law School Financial Regulation Seminar – Paper Presentation

- June 2020 – U of Florida Law School/U Virginia Law School Workshop – Paper Presentation

- September 2020 – Vanderbilt Law School Corporate Governance Workshop – Paper Presentation

- October 2020 – Georgetown DC Fintech Week – Panel Participation

- October 2020 – Berkeley Law School, Faculty Workshop – Paper Presentation

- October 2020 – Yale Law School Conference on Law and Economics – Paper Presentation

- December 2020 – Vanderbilt Law School, Emerging Markets Conference – Paper Presentation

# Materials Considered and Relied Upon

In addition to the materials directly cited in the text of my Report, which are incorporated by reference as materials I considered, I considered the following materials in forming my opinions.

**Academic Articles and Books**

- Alain Chaboud, Benjamin Chiquoine, Erik Hjalmarsson & Clara Vega, *Rise of the Machines: Algorithmic Trading in the Foreign Exchange Market* (July 5, 2013)

- Andrei Kirilenko et al., *The Flash Crash: High Frequency Trading in an Electronic Market*, 72 J. FIN. 967 (2017)

- Aswath Damodaran, *Equity Risk Premiums (ERP): Determinants, Estimation and Implications* (2013)

- Ananth Madhavan, *Market Microstructure: A Survey*, 3 J. FIN. MKTS. 205 (2000)

- Chris Brummer, Stock Exchanges and the New Markets for Securities Laws, 75 U. CHI. L. REV. 1435 (2008)

- Chris Brummer & Yesha Yadav, *Fintech and the Innovation Trilemma*, 107 GEO. L. J. 235 (2019)

- Craig Pirrong, *A Theory of Financial Exchange Organization*, U. CHI 43 J. L. & ECON. 437 (2000)

- Cong et al., *Crypto Wash Trading*, Working Paper  (Jul. 2021)

- Cong et al., Decentralized Mining in Centralized Pools, NBER Working Paper Series Number 25592 (Feb. 2019)

- Easley et al., *From Mining to Markets: The Evolution of Bitcoin Transaction Fees*, 134 J. FIN. ECON. 91 (2019)

- Eugene F. Fama, *Efficient Capital Markets: A Review of Theory and Empirical Work*, 25 J. FIN. 383 (1970)

- Garrick Hileman & Michael Rauchs, *Cryptocurrency Benchmarking Study* (2017)

- Haim Mendelson, *Consolidation, Fragmentation and Market Performance*, 22 J. FIN. QUAN. A. 189 (1987)

- Hossein Nabilou, *The Dark Side of Licensing Cryptocurrency Exchanges as Payment Institutions*, L. AND FINANC. MARKETS REV. (2019)

- James Dow et al., *Incentives for Information Production in Markets where Prices Affect Real Investment*, 15 J. EUR. ECON. ASS'N 877 (2017)

- Jeffrey Williams, *The Origin of Futures Markets*, 56 AGRIC. HIST 306 (1982)

- Jonathan Brogaard et al., *Does Floor Trading Matter?* Working Paper (Jan. 2021)

- Jonathan Brogaard & Yesha Yadav, *The Broken Bond Market*, Working Paper (2021)

- Julia Lees Allen, Note, Derivatives Clearinghouses and Systemic Risk: A Bankruptcy and Dodd-Frank Analysis, 64 STAN. L. REV. 1079 (2012)

- Kristin Johnson, *Decentralized Finance: Regulating Cryptocurrency Exchanges*, 62 WM. & MARY L. REV. 1911 (2021)

- Kyle Soska et al., *Towards Understanding Cryptocurrency Derivatives: A Case Study of BitMEX*, Working Paper (2021)

- Lawrence R. Glosten, *Insider Trading, Liquidity and the Role of the Monopolist Specialist*, 62 J. BUS. 211 (1989)

- Lawrence R. Glosten & Paul R. Milgrom, *Bid, Ask and Transaction Prices in a Specialist Market with Heterogeneously Informed Traders*, 14 J. FIN. ECON. 71 (1985)

- Lawrence H. Summers, *Does the Stock Market Rationally Reflect Fundamental Values?* 41 J. FIN. 591 (1986)

- Lin William Cong & Zhiguo He, *Blockchain Disruption & Smart Contracts*, NBER Paper Working Series 24399 (Apr. 2018)

- Mark Roe, Clearinghouse Overconfidence, 101 CAL. L. REV. 1642 (2013).

- Nic Carter & Linda Jeng, *DeFi Protocol Risks: The Paradox of DeFi*, Working Paper, 5 (Jun. 2021)

- Paul G. Mahoney, *Exchange as Regulator*, 83 VA. L. Rev. 1453 (1997)

- Pradeep Yadav & Yesha Yadav, *Fragile Financial Regulation*, VAND. L. RSCH. PAPER NO. 20-46 (2021)

- Qing Chan et al., *An Inside Look into Cryptocurrency Exchanges*, Working Paper (Dec. 9, 2020)

- Roberta Karmel, *Should Securities Industry Self-Regulatory Organizations Be Considered Government Agencies*, 14 Stan. J. L. Bus. & Fin. (2008)

- Roger Silvers, *Cross-Border Cooperation Between Securities Regulators*, J. OF ACCOUNT. AND ECON. 69 (2020).

- Ronald J. Gilson & Reinier Kraakman, *Market Efficiency after the Financial Crisis: It's Still a Matter of Information Costs*, COLUM. L. ECON., Working Paper No. 470 (2014)

- Ronald J. Gilson & Reinier H. Kraakman, *The Mechanisms of Market Efficiency*, 70 VA. L. REV. 549 (1984)

- Satoshi Nakamoto, *Bitcoin: A Peer-to-Peer Electronic Cash System*

- Stanislav Dolgopolov, *The Maker-Taker Pricing Model and Its Impact on the Securities Market Structure: A Can of Worms for Securities Fraud?* 8 VA. L. BUS. REV. 231 (2014)

- Stavros Gadinis & Howell E. Jackson, *Markets as Regulators: A Survey*, 80 S. CAL L. REV. 1239 (2007)

- Chris Brummer, Atlantic Council, *The Danger of Divergence: Transatlantic Financial Reform & the G20 Agenda* (Dec. 2013)

- Tom Grimstvedt Meling, *Anonymous Trading in Equities,* 76 J. FIN. 707 (2020)

- Yesha Yadav, *Fintech and International Financial Regulation*, 53 VAND. J. TRANSNAT'L L. 1109 (2020)

- Yesha Yadav, *How Algorithmic Trading Undermines Efficiency in Capital Markets*, 68 VAND. L. REV. 1607 (2015).

- Yesha Yadav, *Insider Trading and Market Structure*, 63 UCLA L. REV. 968 (2016)

- Yesha Yadav, *Oversight Failure in Securities Markets*, 104 CORNELL L. Rev. 101 (2019)

- Yesha Yadav, *The Failed Regulation of U.S. Treasury Markets*, 121 COLUM. L. REV. 1173 (2021)

- Yesha Yadav, *The Failure of Liability in Modern Markets*, 102 VA. L. REV. 1031 (2016)

- Yesha Yadav, *The Problematic Case of Clearinghouses in Complex Markets*, 101 GEO. L. J. 387 (2013)

**Bates Stamped Materials**

- Bittrex, Inc. Terms of Service, SEC v. Ripple RL-B-0000001

- Submitting a Token for Listing on Bittrex, SEC v. Ripple RL-B-0000028

- How do I submit a token to Bittrex for listing?, SEC v. Ripple RL-B-0000031

- Binance – Terms of Use, RPLI_SEC 1077884

- Bitbank – Terms of Use, RPLI_SEC 1077900

- Bitbank – Written delivery and instructions before conclusion of the conclusion of the contract, RPLI_SEC 1077911

- Bitfinex – Derivatives Terms of Service, RPLI_SEC 1077935

- Bitfinex – Bitfinex Pulse Terms of Service, RPLI_SEC 1077928

- Bitfinex – Terms of Service, RPLI_SEC 1077963

- BitForex – Terms of Service, RPLI_SEC 1077993

- Bithumb – Terms of Service, BitGlobal support, RPLI_SEC 1078001

- Bitmart – User Agreement, RPLI_SEC 1078012

- AscendEX (BitMax) – Terms of Service, RPLI_SEC 1078022

- Bitrue – Terms of Use, RPLI_SEC 1078031

- Bitstamp – EU Terms of Use, RPLI_SEC 1078033

- Bitstamp – Terms of Use, RPLI_SEC 1078045

- Bitstamp – Terms of Use (BitGo), RPLI_SEC 1078058

- Bittrex – Global Terms of Service, RPLI_SEC 1078066

- Bittrex – US Terms of Service, RPLI_SEC 1078103

- BW – Users Agreement, RPLI_SEC 1078122

- Coinbase – Commerce Terms of Service, RPLI_SEC 1078130

- Coinbase – User Agreement – Singapore, RPLI_SEC 1078139

- Coinbase – Markets Trading Rules, RPLI_SEC 1078162

- Coinbase – User Agreement, RPLI_SEC 1078173

- CoinBene – Terms of Service, RPLI_SEC 1078201

- Coinone – Basic Terms of Use, RPLI_SEC 1078206

- HitBTC – Terms of Service, RPLI_SEC 1078221

- Huobi – Terms of Use, Huobi Futures, RPLI_SEC 1078232

- Huobi Global – User Agreement, RPLI_SEC 1078239

- Korbit – Terms and Conditions, RPLI_SEC 1078247

- Kraken – Terms of Service, RPLI_SEC 1078259

- OKEx – Terms of Service, RPLI_SEC 1078293

- Poloniex – User Agreement, RPLI_SEC 1078300

- Upbit – Terms of Use, RPLI_SEC 1078314

- ZB – OTC Term of Services, RPLI_SEC 1078334

- ZB – User Agreement, RPLI_SEC 1078338

- ZBG – User Agreement, RPLI_SEC 1078346

- GSR00002411

- GSR00014791

- GSR00003239

- BS-LTD-00000005

- BS-LTD-00000013

- BS-LTD-00000051

- BS-LTD-00000073

- BS-LTD-00004243

- BS-LTD-00004297

- BS-LTD-00004316

- BS-LTD-00004335

- BS-LTD-00004349

- BS-LTD-00004369

- BS-LTD-00004390

- RPLI_SEC0057357

- NYRO_RIPPLE_RFA_000085

- NYRO_RIPPLE_RFA_000091

- NYRO_RIPPLE_RFA_000099

- NYRO_RIPPLE_RFA_000105

- NYRO_RIPPLE_RFA_000111

- NYRO_RIPPLE_RFA_000118

- NYRO_RIPPLE_RFA_000124

- NYRO_RIPPLE_RFA_000130

- NYRO_RIPPLE_RFA_000137

- NYRO_RIPPLE_RFA_000143

- NYRO_RIPPLE_RFA_000150

- NYRO_RIPPLE_RFA_000163

**Case Filings**

- First Amended Complaint, Docket No. 46

- Memorandum of Law in Support of Defendant Christian A. Larsen's Motion to Dismiss the First Amended Complaint, Docket No. 107

- Memorandum of Law in Support of Defendant Bradley Garlinghouse's Motion to Dismiss the Amended Complaint, Docket No. 111

- Plaintiff Securities and Exchange Commission's Memorandum of Law in Opposition to Defendants Christian A. Larsen's and Bradley Garlinghouse's Motions to Dismiss, Docket No. 182

- Reply Memorandum of Law in Further Support of Defendant Christian A. Larsen's Motion to Dismiss the First Amended Complaint, Docket No. 223

- Reply Memorandum of Law in Support of Defendant Bradley Garlinghouse's Motion to Dismiss the Amended Complaint, Docket No. 224

**Depositions**

- August 11, 2021 Deposition of Cristian Gil

**Other Materials**

- Arachnys: Bitlish Ltd. (Exhibit B8)

- Arachnys: BMXDM Technology Pte. Ltd. (Exhibit B10)

- Arachnys: Bitrue Singapore Pte. Ltd. (Exhibit B11)

- Australian Business Register, ABN Lookup: Collinstar Holding Pty. Ltd. (Exhibit B14)

- Australian Securities & Investments Commission Database: Collinstar Holding Pty. Ltd. (Exhibit B15)

- Bitstamp Ltd Annual Report and Financial Statements, 2019

- California Secretary of State: Payward Ventures, Inc. (C3593001) (Exhibit B21)

- Certificate of Incorporation of a Private Limited Company, Noah Trade LTD, Company No. 11386260 (filed on May 29, 2018) (Exhibit B5)

- Certificate of Incorporation of a Private Limited Company, Bitstamp Limited, Company No. 8157033 (filed on July 25, 2012)

- CipherTrace Profiles (Exhibit B2)

- Coinbase Global Inc. S-1 Filing (filed on Feb. 25, 2021) (Exhibit B17)

- Coinone Chat Terms of Use

- Committee for Payment and Settlement Systems (CPSS) & IOSCO, *Principles for Financial Markets Infrastructure* (April 2012), https://www.bis.org/cpmi/publ/d101a.pdf

- Delaware Department of State, Division of Corporations: Bittrex, Inc. (6092401) (Exhibit B12)

- Delaware Department of State, Division of Corporations: Coinbase Global, Inc. (5465078) (Exhibit B16)

- Delaware Department of State, Division of Corporations: Payward Ventures, Inc. (5359931) (Exhibit B22)

- Dun & Bradstreet: Binance Holdings Limited (Exhibit B1)

- FinCEN MSB Registration Information for Binance US, BitMart, Bitstamp, Bittrex, Coinbase, DigiFinex, Korbit, Kraken, Aux Cayes FinTech Co. Lwtd d/b/a OKEx, and Poloniex available via FinCEN's website at https://www.fincen.gov/msb-registrant-search

- *In re CRED Inc*., et al, 20-12836-JTD, Declaration of Service (Bankr. D. Del. Dec. 20, 2020)

- *In the Matter of: BFXNA INC. d/n/a BitFinex*, CFTC No. 16-19, Comm. Fut. L. Rep. P 33766 (2016)

- International Organization of Securities Commissions (IOSCO), *Principles Regarding Cross-Border Supervisory Cooperation* (May 2010), https://www.iosco.org/library/pubdocs/pdf/IOSCOPD322.pdf

- MA Corporations Division: Poloniex, LLC, Mass. Corps. Div. (Exhibit B25)

- Montana Secretary of State: Poloniex, LLC (E1082390) (Exhibit B26)

- S&P Capital IQ: Binance Holdings Ltd. (Exhibit B3)

- S&P Capital IQ: Bithumb Holdings Co., Ltd. (Exhibit B6)

- S&P Capital IQ: Bitlish Ltd. (Exhibit B7)

- S&P Capital IQ: BMXDM Technology Pte. Ltd. (Exhibit B9)

- S&P Capital IQ: Korbit, Inc. (Exhibit B20)

- S&P Capital IQ: Payward Ventures Inc. (Exhibit B23)

**Podcasts**

- *Bittrex Global's CEO says the exchange company is exploring safe havens in light of regulatory tightening*, The Block, available at: https://www.theblockcrypto.com/post/117690/bittrex-globals-ceo-says-the-exchange-company-is-exploring-safe-havens-in-light-of-regulatory-tightening

- *The Ex-Jane Street Trader Who's Building a Multi-Billion Crypto Empire*, Odd Lots, Bloomberg, available at: https://www.theblockcrypto.com/post/117690/bittrex-globals-ceo-says-the-exchange-company-is-exploring-safe-havens-in-light-of-regulatory-tightening

- *Sam Bankman-Fried and Matt Levine on How the Crypto Market Really Works*, Odd Lots, Bloomberg, available at: https://podcasts.apple.com/us/podcast/sam-bankman-fried-and-matt-levine-on-how-the/id1056200096?i=1000531062191

**Statutes & Regulations**

- Exchange Act § 6(a), 15 U.S.C. § 78f(b)

- 17 CFR § 1.31

**Websites**

- https://bitbank.cc/about/corporate (Exhibit B4)

- https://bitbank.cc/about/tos/bitbankcc/

- https://www.afr.com/markets/currencies/financial-watchdog-bans-crypto-exchange-binance-from-uk-20210628-p584ye

- https://www.businessinsider.in/cryptocurrency/news/binances-compliance-journey-gets-bumpier-as-another-partner-backs-out/articleshow/84373786.cms

- https://www.reuters.com/article/us-cryptocurrencies-japan/japan-watchdog-orders-improvements-at-cryptocurrency-exchanges-idUSKBN1JI0R0

- https://www.nytimes.com/2016/08/04/business/dealbook/bitcoin-bitfinex-hacked.html

- https://www.nytimes.com/2017/10/01/technology/bitcoin-japan-south-korea.html

- https://advance.lexis.com/document?crid=91aeed24-d0d7-4dbb-9934-0a511dc7209e&pddocfullpath=%2Fshared%2Fdocument%2Fnews%2Furn%3AcontentItem%3A5P0H-5B71-JB5Y-B3RH-00000-00&pdsourcegroupingtype=G&pdcontentcomponentid=404704&pdmfid=1000516&pdisurlapi=true

- https://cointelegraph.com/news/we-plan-to-open-5000-bitcoin-atms-in-europe-in-2017-bitlish

- http://www.businesskorea.co.kr/news/articleView.html?idxno=41587

- https://www.coindesk.com/markets/2019/06/27/singapore-exchange-bitrue-hacked-for-over-4-million-in-crypto/

- https://www.coindesk.com/markets/2019/09/24/bitrue-exchange-to-launch-crypto-backed-loan-platform/

- https://dealbook.nytimes.com/2015/01/06/jitters-after-bitcoin-exchange-suspends-services/

- https://fortune.com/2016/04/25/bitcoin-exchange-eu-approval-bitstamp/

- https://www.cnbc.com/2018/06/01/bittrex-exchange-will-let-investors-swap-their-dollars-for-cryptocurrency.html

- https://www.businesswire.com/news/home/20200930005717/en/Bittrex-Global-to-Operate-Cryptocurrency-Exchange-From-Bermuda

- https://www.businesswire.com/news/home/20171203005059/en/CollinStar-Holdings-to-Acquire-BiWang-Group-in-a-100-Million-US-Dollars-Buyout

- https://bwgroup.com/about/#:~:text=BW%20Group%20is%20one%20of,by%20compete co%20and%20experienced%20staff

- https://www.forbes.com/sites/jasonbrett/2021/09/01/with-coinbase-and-sap-vast-bank-offers-bitcoin-ethereum-cardano-and-litecoin/?sh=64ce5cef6389

- https://www.sfgate.com/local/article/2021-05-coinbase-san-francisco-office-closure-tech-16157042.php

- https://www.reuters.com/technology/crackdown-looms-south-koreas-defiant-crypto-fans-dig-2021-07-12/

- https://www.maltatoday.com.mt/news/national/101920/maltas_blockchain_flop_70_of_c rypto_firms_have_given_up#.YVcbXjHMI2x

- https://www.wsj.com/articles/china-buying-sparks-bitcoin-surge-1464608221

- https://www.wsj.com/articles/coinbase-wants-to-pounce-on-another-cryptocurrency-paradise-japan-1528178585

- https://www.wsj.com/articles/bitcoin-irs-comes-for-crypto-investors-who-havent-paid-their-taxes-11620937095

- https://coinone.co.kr

- https://sgpgrid.com/company-details/digifinex-pte-ltd (Exhibit B18)

- https://sg.linkedin.com/company/digifinex-global

- https://digifinex.zendesk.com/hc/en-us/articles/360011676013--Contract-List-Terms-and-Conditions (Exhibit B19)

- www.korbit.co.kr

- https://www.forbes.com/sites/kenrapoza/2020/10/16/chinese-ceo-of-okex-crypto-exchange-arrested-again-whales-bail/?sh=36a83fdd1461

- https://www.wsj.com/articles/circle-sets-aside-10-4-million-to-settle-sec-case-on-poloniex-11626825346

- https://www.ft.com/content/c3bbf8cc-6d6c-4673-bf47-b3a5e3e32dc8

- https://sg.upbit.com/home

- https://www.upbit.com/home

- https://hk.linkedin.com/company/zbgexchange

- https://www.ltddir.com/companies/zillion-biz-global-limited

- https://www.forbes.com/sites/kenrapoza/2021/01/10/does-china-have-a-role-in-bitcoins--rise

- https://www.financemagnates.com/cryptocurrency/news/time-power-apacs-continued-influence-on-crypto-markets/

- https://ec.europa.eu/info/business-economy-euro/banking-and-finance/consumer-finance-and-payments/payment-services/single-euro-payments-area-sepa_en

- https://www.fsb.org/work-of-the-fsb/about-the-compendium-of-standards/key_standards/

- https://www.coindesk.com/markets/2021/06/07/binance-extended-crypto-exchange-dominance-during-may-trading-frenzy/

- https://nymag.com/intelligencer/2021/08/the-worlds-largest-crypto-exchange-keeps-losing-ceos.html

- https://www.cftc.gov/About/HistoryoftheCFTC/history_precftc.html

- https://www.cftc.gov/PressRoom/Events/opaeventtac100319

- http://www.cftc.gov/ucm/groups/public/@newsroom/documents/file/tac_071410_binder.pdf

- https://time.com/4777959/buttonwood-agreement-stock-exchange/

- https://www.cmegroup.com/rulebook/CME/

- https://www.cmegroup.com/company/information.html

- https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/submitting-a-futures-order.html

- https://www.cmegroup.com/education/courses/things-to-know-before-trading-cme-futures/what-happens-when-you-submit-an-order.html

- https://www.cmegroup.com/education/courses/market-regulation/overview/cme-group-rules-and-regulation-overview.html

- https://www.cmegroup.com/education/articles-and-reports/overview-what-makes-ags-markets-work.html

- https://www.cmegroup.com/content/dam/cmegroup/rulebook/CME/I/5/5.pdf

- https://www.cmegroup.com/market-data.html?redirect=/market-data/index.html#data-products

- https://www.sec.gov/news/press/2010/2010-167.htm

- https://www.nyse.com/article/parity-priority-explainer

- https://www.thetradenews.com/cboe-launches-fx-central-limit-order-book/

- https://www.investor.gov/introduction-investing/investing-basics/how-stock-markets-work/types-orders

- https://www.nyse.com/markets/nyse-arca/trading-info#equities-order-types

- https://iextrading.com/trading/order-types/

- https://www.nyse.com/publicdocs/nyse/markets/nyse-arca/NYSE_Arca_Marketplace_Fees.pdf

- https://nysearcaguide.srorules.com/rules/document?treeNodeId=csh-da-filter!WKUS-TAL-DOCS-PHC-%7B57E4C5DB-A9B6-48EB-964A-3E2CA5EDB8C6%7D--WKUS_TAL_18878%23teid-504

- https://www.londonstockexchange.com/contact

- https://www.jpx.co.jp/english/corporate/about-jpx/access/02.html

- https://www.jpx.co.jp/english/corporate/news/news-releases/0060/20171019-01.html

- https://www.finextra.com/pressarticle/71259/colt-to-provide-direct-connectivity-for-japan-exchange-group-to-chicago

- https://www.wsj.com/articles/bitcoin-comes-to-el-salvador-first-country-to-adopt-crypto-as-national-currency-11631005200

- https://morningconsult.com/2021/08/17/trust-awareness-paynents-unbanked-underbanked/

- https://solana.com/news/9-14-network-outage-initial-overview

- https://www.washingtonpost.com/business/whats-yield-farming-and-how-do-you-grow-crypto/2021/09/08/451af008-10f9-11ec-baca-86b144fc8a2d_story.html

- https://www.coinbase.com/about

- https://about.ftx.us/

- https://bittrex.zendesk.com/hc/en-us/articles/115003684411

- https://bittrex.zendesk.com/hc/en-us/articles/360038032572-Bittrex-Inc-Privacy-Policy-Version-3-2 (Exhibit B13)

- https://www.forbes.com/sites/pamelaambler/2018/02/07/changpeng-zhao-binance-exchange-crypto-cryptocurrency/?sh=53ad8c641eee

- https://news.yahoo.com/ftx-ceo-sam-bankman-fried-profile-085444366.html

- https://www.theblockcrypto.com/post/117595/jump-trading-no-longer-wants-to-be-secretive-about-its-multi-billion-dollar-crypto-operation

- https://www.theblockcrypto.com/post/113683/market-making-giant-virtu-financial-is-now-active-on-coinbase-and-gemini

- https://www.theblockcrypto.com/linked/118663/ftx-will-begin-to-move-key-operations-to-bahamas-as-part-of-hq-shiftleman

- https://help.coinbase.com/en/pro/trading-and-funding/orders/overview-of-order-types-and-settings-stop-limit-market

- https://bittrex.com/discover/understanding-bittrex-order-types

- https://iextrading.com/about/

- https://www.wsj.com/articles/more-exchanges-add-speed-bumps-defying-high-frequency-traders-11564401611

- https://xrpl.org/intro-to-consensus.html

- https://xrpl.org/consensus-protections.html

- https://xrpl.org/consensus-principles-and-rules.html

- https://www.cnbc.com/2021/08/19/cryptocurrency-traders-seek-damages-from-binance-after-major-outage.html

- https://www.kraken.com/en-us/legal

- https://www.londonstockexchange.com/trade/equity-trading/international-order-book?lang=en

- https://docs.londonstockexchange.com/sites/default/files/documents/rules-of-the-london-stock-exchange-effective-1-january-2021.pdf

- https://www.lseg.com/sites/default/files/content/documents/LSEG_CM_LSE_TRADING_SERVICES_GUIDE_03.pdf

- https://www.jpx.co.jp/english/rules-participants/rules/regulations/index.html

- https://www.theice.com/about/exchanges-clearing

- https://www.bnymellon.com/latam/en/insights/all-insights/cryptocurrencies-the-new-market-structure.html

- https://www.davispolk.com/sites/default/files/20160728_tch_white_paper_the_custody_services_of_banks.pdf

- https://www.technologyreview.com/2018/04/25/143246/how-secure-is-blockchain-really/

- https://medium.com/coinmonks/blockchains-flavors-of-finality-a019deb4d003

- https://river.com/learn/why-should-i-run-a-bitcoin-node/

- https://cointelegraph.com/news/bitcoin-network-node-count-sets-new-all-time-high

- https://www.vanityfair.com/news/2019/11/the-big-bitcoin-heist

- https://www.wsj.com/articles/cryptocurrency-exchanges-curb-trading-from-china-after-beijings-warning-11632739277

- https://www.bbc.com/news/world-us-canada-58414555

- https://www.cmegroup.com/rulebook/files/CBOT_Definitions.pdf

- https://www.nytimes.com/2021/08/19/business/binance-cryptocurrency-exchange-ipo.html

- https://premieroffshore.com/how-to-build-an-international-cryptocurrency-exchange/

- https://www.nytimes.com/2021/07/23/us/politics/crypto-billionaires.html

- https://www.coindesk.com/business/2021/09/24/ftx-moves-headquarters-from-hong-kong-to-bahamas-report/

- https://decrypt.co/70045/cz-pressed-on-binance-headquarters-at-ethereal-summit

- https://www.bloomberg.com/news/articles/2021-05-24/ex-trump-official-at-binance-us-faces-uproar-over-firm-s-sibling

- https://www.forbes.com/sites/michaeldelcastillo/2020/10/29/leaked-tai-chi-document-reveals-binances-elaborate-scheme-to-evade-bitcoin-regulators/?sh=75e2747f2a92

- https://www.nytimes.com/2018/01/31/technology/bitfinex-bitcoin-price.html

- https://www.bizjournals.com/newyork/news/2018/06/22/bitcoin-review-a-cryptic-code-dorseys-bit-license.html?ana=synd_fc

- https://www.coindesk.com/markets/2018/06/20/bithumb-31-million-crypto-exchange-hack-what-we-know-and-dont/

- https://www.koreatimes.co.kr/www/biz/2021/06/602_309889.html

- https://www.wsj.com/articles/why-cryptocurrency-exchange-hacks-keep-happening-1531656000

- https://www.nasdaq.com/articles/bitrue-exchange-to-launch-crypto-backed-loan-platform-2019-09-24

- https://www.bizjournals.com/newyork/news/2019/04/12/bitcoin-review-facebook-to-tap-vc-funds.html

- https://www.wsj.com/articles/bitcoin-exchange-bitstamp-temporarily-suspends-services-1420575704

- https://www.wsj.com/articles/SB10001424052702304607104579212101356897382

- https://www.newswire.com/news/apm-coin-to-premiere-on-bittrex-global-on-november-14th-21032823

- https://www.nytimes.com/2017/12/03/technology/virtual-currency-south-korea.html

- www.koreaherald.com/view.php?ud=20210804000755

- http://www.businesskorea.co.kr/news/articleView.html?idxno=77031

- https://www.cnbc.com/2018/01/10/police-tax-authorities-raid-south-korea-cryptocurrency-exchanges-for-tax-evasion.html

- https://www.koreatimes.co.kr/www/biz/2021/06/602_309889.html

- https://www.ft.com/content/dccac69e-9ebe-468a-b089-4f40d77d5a80

- https://www.businessinsider.in/cryptocurrency/news/south-korean-banks-are-finding-a-way-to-hold-onto-cryptocurrencies-without-having-to-touch-the-asset-itself/articleshow/84349075.cms#:~:text=the%20asset%20itself-,South%20Korean%20banks%20are%20creating%20custody%20companies%20to%20deal%20with,to%20touch%20the%20asset%20itself&text=South%20Korea's%20new%20legislation%20states,the%20services%20of%20cryptocurrency%20exchanges

- https://www.wsj.com/articles/crypto-startups-are-raising-money-again-with-a-twist-11559995203

15

- https://www.wsj.com/articles/u-s-crypto-traders-evade-offshore-exchange-bans-11627637401

- https://www.forbes.com/sites/cryptoconfidential/2020/02/16/xrp-hits-a-6-month-high-cryptos-heavy-hitters-bet-on-asia/?sh=430e3f853625

- https://www.cnbc.com/2018/01/10/south-korea-official-reportedly-readying-bill-to-ban-all-cryptocurrency-trading.html

- https://www.reuters.com/article/us-bitcoin-exchange-bitstamp-idUSKCN1N314I

- https://www.koreatimes.co.kr/www/biz/2021/04/175_307487.html

- www.koreaherald.com/view.php?ud=20210630000920

- https://www.cnbc.com/2021/09/17/over-60-south-korean-crypto-exchanges-set-to-suspend-services.html

- https://www.regulationasia.com/three-more-korean-crypto-exchanges-secure-deals-with-banks/

- https://www.wsj.com/articles/coinbase-wants-to-pounce-on-another-cryptocurrency-paradise-japan-1528178585

- https://kryptomoney.com/south-korean-crypto-exchange-upbit-to-launch-in-thailand-and-indonesia/

- https://cointelegraph.com/news/crypto-prices-see-calm-as-zbcom-bypasses-binance-to-become-top-exchange

- https://clsbluesky.law.columbia.edu/2021/01/07/the-unfinished-business-of-regulating-clearinghouses/

- https://www.dtcc.com/clearing-services

- https://www.coindesk.com/markets/2020/05/01/bitcoin-miners-usually-create-6-blocks-per-hour-they-just-banged-out-16/

- https://www.binance.com/en/support/announcement/360034573691

- https://www.coinbase.com/exchange/market-maker-program

- https://www.huobi.com/support/en-us/detail/360000117702

- https://www.financemagnates.com/cryptocurrency/exchange/huobis-us-arm-goes-live-with-trading-three-xrp-pairs

- https://www.okex.com/captcha?to=aHR0cHM6Ly93d3cub2tleC5jb20vY29udGFjdC11c y5odG1s (Exhibit B24)

- https://www.federalreserve.gov/paymentsystems/designated_fmu_about.htm

- https://www.benzinga.com/money/how-to-trade-on-london-stock-exchange/

- https://www.coindesk.com/markets/2019/05/14/bitgo-offers-institutional-clients-new-off-chain-settlement-system/

- https://www.escapeartist.com/blog/liechtenstein-a-small-country-with-a-huge-crypto-market/

- https://www.escapeartist.com/blog/where-are-the-major-crypto-exchanges-located

- https://support.cryptofacilities.com/hc/en-us/articles/360033311834-Order-Types

- https://www.marketwatch.com/story/ethereum-the-no-2-behind-bitcoin-fi ghts-off-challengers-that-offer-cheaper-and-faster-blockchains-11627058363

- https://www.gemini.com/cryptopedia/crypto-trading-strategies-trading-basics-limit-orders#section-crypto-and-stock-trading-basics

- https://www.binance.com/en/support/announcement/6925d618ab6b47e2936cc4614eaad6 4b

# Exhibit B1

We use cookies for marketing and advertising purposes, and to provide the best experience on our website. By continuing to browse the site, you agree to our use of cookies. See our Privacy policy and Cookie policy (/utility-pages/privacy-policy.html) to learn more about how we use cookies and your choices regarding the use of cookies.

 dun & bradstreet    (/)

MENU

Log in to your product

**Finance Solutions**

Business Credit Reports ⬈

Country Insight Services ⬈

D&B Credit ⬈

D&B Credit Reporter ⬈

DNBi ⬈

**Third-Party Risk & Compliance**

Supplier Risk Manager ⬈

D&B Onboard ⬈

Supply Portfolio Manager ⬈

**Analytics Solutions**

Analytics Sandbox ⬈

**My Company Information**

View, manage, and update my information (/duns-number/view-update-company-credit-file.html)

CreditSignal ⬈

CreditBuilder ⬈

Credibility Review ⬈

VERIFIED ⬈

**Sales & Marketing**

D&B Hoovers ⬈

D&B

D&B Optimizer f

Global Referen

**Small Business**

**Solutions**

**Plan Your Small Business**



What company are you attempting to contact?

Start working on the plan to open your own business today

(/solutions/small-business/small-business-strategic-planning.html)

Launch Your Small Business

Get the information and tools you need to get your business started

(/solutions/small-business/steps-start-small-business.html)

Manage Your Small Business

Resources to help you keep your business running smoothly

(/solutions/small-business/managing-small-business.html)

Grow Your Small Business

Solutions and tips for getting new customers and keeping your current ones

(/solutions/small-business/how-to-grow-small-business.html)

View All Small Business Solutions (/solutions/small-business.html)

Products

Reach More Customers

Grow your business

(/products/small-business/reach-more-customers.html)

Business Listing (/products/small-business/business-listing-category.html)

D&B Rev.Up Now (/products/small-business/rev-up-now.html)

Check Your Business Credit

Know what's inside your business credit file

(/products/small-business/check-my-business-credit.html)

Build Your Business Credit

Potentially impact your scores and ratings

(/products/small-business/build-my-business-credit.html)

Check Others' Business Credit

Help avoid potential risk

(/products/small-business/check-other-business-credit.html)

View All Small Business Products (/products/small-business.html)

D-U-N-S® Nu

Get a D-U-N-S Number (/dun    What company are you
                               attempting to contact?
D-U-N-S Number Lookup (/dun

Update My Company Data (/duns-number/view-update-company-credit-fi

D-U-N-S Manager (/duns-number/duns-manager.html)

Feature

NEW - D&B Business Listing

(/products/small-business/dnb-business-listing.html)

Finance

Solutions

Manage Business Credit Risk

Minimize bad debt and improve profitability

(/solutions/finance-credit-risk/manage-business-credit-risk.html)

Improve Operational Efficiency

Automate your credit-to-cash processes

(/solutions/finance-credit-risk/improve-operational-efficiency.html)

Standardize Customer Data

Communicate insight and standardize data management across your business

(/solutions/finance-credit-risk/standardize-customer-data.html)

Analytics for Finance

Innovative insights provide foresight for better decisions and improved performance

(/solutions/analytics/analytics-for-risk-management.html)

View All Finance Solutions (/solutions/finance-credit-risk.html)

Products

D&B Finance Analytics – NEW!

Complete credit-to-cash for global finance teams

(/products/finance-credit-risk/dnb-finance-analytics.html)

Credit Intelligence (/products/finance-credit-risk/dnb-finance-analytics/credit-

intelligence.html)

Receivables Intelligence (/products/finance-credit-risk/dnb-finance-analytics/receivables-

intelligence.html)

D&B Direct for Finance

API for direct delivery of risk & financial data

(/products/finance-credit-risk/dnb-direct-for-finance.html)

D&B Enterprise R

Customizable platfor

(/products/finance-cred



What company are you
attempting to contact?

D&B Connect

Self-service tool to benchmark, enrich & monitor data

(/products/master-data/dnb-connect.html)

Business Credit Reports

Evaluate other companies' business credit files

(/products/small-business/compare-products-other-business.html)

View All Finance Products (/products/finance-credit-risk.html)

Thought Leadership

Content Hub (/content-hub.html)

Articles (/perspectives/finance-credit-risk.html)

Customer Stories (/perspectives/finance-credit-risk.html?content-type=Customer)

Resources (/resources.html)

Economic & Market Insights (/perspectives/finance-credit-risk.html?content-type=Economic)

Videos (/perspectives/videos.html?topic=Finance)

Featured Report

CFOs Tell Us Why Better Data and Automation Are So Necessary Right Now

(/perspectives/finance-credit-risk/dynamic-finance-organization-survey.html)

Sales & Marketing

How We Help

Clean and Enrich Data

Access industry-leading data across your organization

(/solutions/marketing-sales/data-management.html)

Reach and Engage Buyers

Engage accounts across channels with always-on campaigns

(/solutions/marketing-sales/digital-marketing.html)

Accelerate Sales

Find key sales prospects and opportunities for growth

(/solutions/marketing-sales/sales-acceleration.html)

View All Sales & Marketing Solutions (/solutions/marketing-sales.html)

View All Master Data Solutions (/solutions/master-data.html)

Products

D&B Rev.Up

Integrated software solution to reach the right buy                     ll

channels

(/products/marketing-sales/dnb-rev-up-cloud/rev-up-abx.html)

D&B Audience Targeting

Serve digital ads to the right audience

What company are you attempting to contact?

(/products/marketing-sales/audience-targeting.html)

D&B Optimizer

Clean and enrich company and contact data for your CRM and marketing automation

platforms

(/products/marketing-sales/dnb-optimizer.html)

D&B Direct

Real-time data delivered into workflows

(/products/master-data/dnb-direct.html)

D&B Email IQ

Bring sales intelligence into your inbox

(/products/marketing-sales/dnb-email-iq.html)

D&B Hoovers

Find key sales prospects and opportunities for growth

(/products/marketing-sales/dnb-hoovers.html)

D&B Connect

Self-service tool to benchmark, enrich & monitor data in your systems of record

(/products/master-data/dnb-connect.html)

View All Sales & Marketing Products (/products/marketing-sales.html)

View All Master Data Products (/products/master-data.html)

Thought Leadership

Content Hub (/content-hub.html)

Articles (/perspectives/marketing-sales.html)

Customer Stories (/perspectives/marketing-sales.html?content-type=Customer)

Resources (/resources/data-driven-marketing.html)

Videos (/perspectives/videos.html?topic=Sales)

Featured Report

Free Data Quality HealthScan

(/marketing/media/free-data-health-scan-offer.html)

Third Party Risk & C

Solution

Third-Party Risk

What company are you
attempting to contact?

Mitigate potential risk of third-party relationships

(/solutions/third-party-risk/third-party-risk-management.html)

Optimize Your Supplier Base

Take control of your strategic supplier relationships

(/solutions/third-party-risk/optimize-supplier-base.html)

Preventing Business Disruptions

Third-party disruptions can hamper your growth prospects

(/solutions/third-party-risk/prevent-business-disruption.html)

Analytics for Third-Party Risk

Measure, predict, and anticipate exposure to risk

(/solutions/analytics/analytics-for-risk-management.html)

View All Third-Party Risk Solutions (/solutions/third-party-risk.html)

View All Compliance Solutions (/solutions/compliance.html)

Products

D&B Risk Analytics - NEW!

Intelligently screen and monitor supplier risk

(/products/third-party-risk/dnb-risk-analytics.html)

D&B ESG Intelligence - NEW!

Mitigate third-party risk with ESG rankings

(/products/third-party-risk/esg-intelligence.html)

Supplier Data Services

Proactively mitigate supply chain disruption

(/products/third-party-risk/supply-data-services.html)

Beneficial Ownership

Stay compliant: identify ultimate beneficial ownership

(/products/corporate-compliance/beneficial-ownership.html)

D&B Network Intelligence - NEW!

A people-centric-lens for efficient due diligence

(/products/third-party-risk/network-intelligence.html)

D&B Onboard

Corporate regulatory compliance made easier

(/products/corporate-comp

D&B Direct fo

Automated method for cust

What company are you
attempting to contact?

(/products/corporate-compliance/direct-for-compliance.html)

D&B Connect

Self-service tool to benchmark, enrich & monitor data

(/products/master-data/dnb-connect.html)

View All Third-Party Risk Products (/products/third-party-risk.html)

View All Compliance Products (/products/corporate-compliance.html)

Thought Leadership

Content Hub (/content-hub.html)

Articles (/perspectives/supply-chain.html)

Customer Stories (/perspectives/supply-chain.html?content-type=Customer)

Podcast (/perspectives/power-of-data-podcast/power-of-data-podcast-episode-38.html)

FEATURE

From Disruption to Recovery: In Pursuit of Supply Management Resilience

(/perspectives/supply-chain/supply-management-resilience.html)

Public Sector

SOLUTIONS

Verify

Foster successful business relationships with trustworthy, meaningful data

(/solutions/government/verify-business-information.html)

Procure

Scrutinize potential suppliers more efficiently and effectively

(/solutions/government/supplier-due-diligence.html)

Fortify

Achieve the benefits of a healthy economy and society

(/solutions/government/regional-businesses-economy-health.html)

Investigate

Discover hidden threats in your business relationships

(/solutions/government/discover-hidden-business-relationships.html)

VIEW ALL PUBLIC SECTOR SOLUTIONS (/solutions/government.html)

Explore Public Sector Partnerships (/marketing/media/public-sector-partner-program.html)

Protect

Recognize who's supplying you

(/solutions/government/supp

Federal

Advance mission success with cutting edge data and analytics

(/solutions/government/federal.html)

State, Local & Provincial



What company are you attempting to contact?

Robust public sector solutions customized to the needs of unique constituencies

(/solutions/government/state-local-provincial.html)

Products

D&B Investigate

Unleashing the power of data and collaboration for government agencies

(/products/government/investigate.html)

CMMC Pre-Assessment

Help jump-start the CMMC certification process

(/products/government/cmmc-pre-assessment.html)



D-U-N-S Number & Government

Enabling better government by uncovering truth and meaning from data

(/duns-number/duns-number-and-government.html)

View All PUBLIC SECTOR Products (/products/government.html)

Thought Leadership

Content Hub (/content-hub.html)

Articles (/perspectives/government.html)

Customer Stories (/perspectives/government.html?content-type=Customer)

Videos (/perspectives/videos.html?topic=Gov)

Featured Report

Preventing Fraud and Getting Government Payments Right the First Time

(/perspectives/government/prevent-improper-payments.html)

D-U-N-S Number



What is a D-U-N-S® Number?

The Dun & Bradstreet D-U-N-S Number is a unique nine-digit identifier for businesses. This number is assigned once our patented identity resolution process, part of our DUNSRight™ methodology, identifies a company as being unique from any other in the Dun & Bradstreet Data Cloud.



### Learn More about the D-U-N-S Number

Learn about how a Dun & Bradstreet D-U-N-S number can help your company succeed

(/duns-number.html)



### Get a D-U-N-S Number

Establish your business, get noticed, and control your story in the global marketplace

(/duns-number/get-a-duns.html)



### D-U-N-S Number Lookup

Look up a partner's company or find your company's D-U-N-S Number

(/duns-number/lookup.html)



### D-U-N-S Number & Government

Enabling better government by uncovering truth and meaning from data

(/duns-number/duns-number-and-government.html)



### Update My Company Data

View and update business information on your D&B Credit file

(/duns-number/view-update-company-credit-file.html)

Our Company



### About Us

A leading global provider of business decisioning data and analytics for almost 200 years

(/about-us.h

Live Business Iden

Live Business Identity is the most comprehensive and continually updated view of a bu

(/about-us/data-cloud/live-business-identity.html)



D&B Marketplace

Our always-open marketplace for unique offers that help your business grow and thrive

(/marketplace.html)



Partner

Drive performance through our partnership program, D&B Accelerate

(/solutions/partner.html)



Investor Relations

Information and resources about the performance of Dun & Bradstreet

(https://investor.dnb.com/home/default.aspx)



D&B Analytics Studio

Combine your data with Dun & Bradstreet Data Cloud data to create new analytical models that can

give you a competitive edge. Secure and cloud-based.

(/solutions/analytics/analytics-sandbox.html)



About Our Data

The Dun & Bradstreet Data Cloud offers the world's most comprehensive business data and

analytical insights to power today's most crucial business needs. That's why 90% of the Fortune 500,

and companies of all sizes around the world, rely on Dun & Bradstreet to help grow and protect their

businesses.

Learn More About the Data Cloud (/about-us/data-cloud.html) Learn More About our Enterprise

Analytics Solutions (/solutions/analytics.html) View the Content Hub (/content-hub.html)

Business Directory (/business-directory.html) Support (/customer-success.html)

# D&B Business Directory

(/content/dnb-us/en/home/products/marketing-sal…

HOME (/)    >    BUSINESS DIRECTORY (/business-directory.html)

>

MANAGEMENT OF COMPANIES AND ENTERPRISES (/business-directory/industry-

analysis.management_of_companies_and_enterprises.html)



> CAYMAN ISLANDS (/business-directory/company-information.management_of_companies_and_enterprises.ky.html?page=1)

> GRAND CAYMAN (/business-directory/company-information.management_of_companies_and_enterprises.ky.grand_cayman.html?page=1)

> GEORGE TOWN (/business-directory/company-information.management_of_companies_and_enterprises.ky.grand_cayman.george_town.html?page=1)

> BINANCE HOLDINGS LIMITED

# Binance Holdings Limited

## ON THIS PAGE

Financial Statements

Credit Reports

Top Competitors

Company Snapshot

Related Companies

Available Contacts - Free Plug-in!

Industry Information



What company are you attempting to contact?

Install plugin and receive up to 50 free email contacts per month!

FREE INSTALL

# Company Profile

(/content/dnb-us/en/home/products/marketing-sales/dnb-hoovers/free-trial.html)

**Get a D&B Hoovers Free Trial**

LIMITED LIABILITY COMPANY          PARENT

### Address

Suite 5-204, 23 Lime Tree Bay Avenue, P.O.
GEORGE TOWN , GRAND CAYMAN, KY11104                            See other locations
Cayman Islands

### Phone

(345) 769-1314

### Company Description

Binance Holdings Limited is located in GEORGE TOWN, GRAND CAYMAN, Cayman Islands and is part of the Management of Companies and Enterprises Industry. Binance Holdings Limited has 100 total employees across all of its locations and generates $15.59 million in sales (USD). There are 4 companies in the Binance Holdings Limited corporate family.

### Key Principal

Changpeng Zhao

### Industry

Management of Companies and Enterprises (/business-directory/industry-analysis.management_of_companies_and_enterprises.html)
(/business-directory/industry-analysis..html)
Investment holding companies, except banks



# Financial Data

Get a D&B credit report on this company (/products/small-business/compare-products-other-business.html)

Revenue in USD

ANNUAL REVENUE

# $15.59 million USD

1 USD = 0.8200014757306471 KYD

Dun & Bradstreet collects private company financials for more than 23 million companies worldwide. Find out more. (https://www.dnb.com/products/small-business/compare-products-other-business.html)

# Credit Reports

See detailed business credit reports on other businesses or your own.

Buy Credit Reports 🗗

Detailed business credit reports and tools to simplify credit decisions and manage risk

Is This Your Business? 🗗

Monitor and potentially build your business credit

What company are you attempting to contact?

Need 12 or more business credit reports? Look at DNBi (/products/finance-credit-risk/analytics/credit-intelligence.html)

# Company Snapshot

Essential information for a successful call

| | |
|---|---|
| EMPLOYEES (ALL SITES) | 100 |
| REVENUE (MIL USD) | 15.5855 |
| YEAR STARTED | 2017 |
| INCORPORATED | 2017 |

Unlock full sales materials and reports (/products/marketing-sales/dnb-hoovers/free-trial.html)

# Related Companies

**Corporate Family**



# 4

Corporate Family Connections

Detailed profiles of all businesses owned and operated by this company for insights and prospecting.

---

## Binance Holdings Limited

ULTIMATE PARENT

## 3 Subsidiaries

View All with Free Trial (/products/marketing-sales/dnb-hoovers/free-trial.html)

Unlock information on related companies (/products/marketing-sales/dnb-hoovers/free-trial.html)

# Get in Touch with 1 Principals*

A D&B Hoovers Subscription is your foot in the door to Binance Holdings Limited contact information.

---

Changpeng Zhao

General Manager

Want more contacts like these available di...                                    B

__Email IQ__    to access your ne...

What company are you
attempting to contact?

Free Install

# Industry Information

See trends, challenges and opportunities with similar companies in these industries.

Management of Companies and Enterprises (/business-directory/industry-analysis.management_of_companies_and_enterprises.html)

The Management of Companies and Enterprises sector comprises (1) establishments that hold the securities...

## Related Products

Grow Business Faster

Learn More ❯ (/products/marketing-sales/dnb-hoovers.html)

# D&B Finance Analytics Credit Intelligence

Intelligent Risk Management

Learn More ❯ (/products/finance-credit-risk/dnb-intelligence.html)



What company are you attempting to contact?

Free Microsoft Outlook plugin to drive efficiency with on-demand sales intelligence

Free Install  ›

# Get full access to D&B Hoovers

With a Hoovers subscription you can get a comprehensive view of Binance Holdings Limited

### Binance Holdings Limited*

### 1 Principals

See who the company's key decision makers are

### 4 Corporate Relations

Get the big picture on a company's affiliates and who they do business with.

**Start Your Free Trial (/products/marketing-sales/dnb-hoovers/free-trial.html)**

*Contacts and Principals counts are estimates and may differ from the actual number of contacts available in D&B Hoovers.



What company are you attempting to contact?

Discover

Connect

Other D&B Sites

© Dun & Bradstreet, Inc. 2000 - 2021. All rights reserved. │ Policies & Codes of Conduct (/utility-pages/policies-codes-of-conduct.html) │ Privacy Notice (/utility-pages/privacy-policy.html) │ Accessibility (/utility-pages/accessibility.html) │ Terms of Use (/utility-pages/terms-of-use.html) │ Data Source Attribution (/utility-pages/data-source-attribution-statements.html) │ Site Map (/site-map.html)

.

What company are you attempting to contact?

# Exhibit B2

**Binance**



**Bitfinex**



## Bitforex



**NAME**
BitForex

**URL**
https://bitforex.com

**ADDRESS**
Paya LeBar Rd. #10-24 Singapore, 409051

**HOSTING COMPANY**
Amazon Data Services Singapore

**OPENED**
5/31/2018

**CLOSED**

**CURRENCIES**

**AFFILIATIONS**
Bitstar PTE Ltd.

**COMPLIANCE CONTACT**

**COMPLIANCE CONTACT PHONE**
support@bitforex.com

☑ TRADES PRIVACY COINS

☐ TRADES FIAT

**COUNTRY RELATIONSHIP**
⌄ Domiciled in Seychelles

**START DATE**

**END DATE**

**NOTES**

**KYC RISK ASSESSMENTS**
> 8/1/2021 Green
> 8/30/2020 Red
> 10/28/2019 Yellow

## Bithumb

**NAME**
Bithumb.com

**URL**
https://bithumb.com

**ADDRESS**
17, Teheran-ro-16-gil, Gangnam-gu, Seoul, South Korea, (Dongwoo Bldg.) 08378

**HOSTING COMPANY**
Cloudflare, Inc.

**OPENED**
1/10/2013

**CLOSED**

**CURRENCIES**
BTC CashEthereumBTCLitecoinRippleMoneroDashEthereum Classic

**AFFILIATIONS**
BTC Korea.com Co. Ltd.

**COMPLIANCE CONTACT**
Sungmi Lee

**COMPLIANCE CONTACT PHONE**
sungmi.lee@bithumb.com

☑ TRADES PRIVACY COINS

☑ TRADES FIAT

**COUNTRY RELATIONSHIP**
⌄ Domiciled in South Korea

**START DATE**

**END DATE**

**NOTES**

**KYC RISK ASSESSMENTS**
> 10/28/2019 Green

**Bitlish**



**BitMart**

## Bitmax



| NAME | | CURRENCIES | |
|------|--|------------|--|
| BitMax | | | |
| URL | | AFFILIATIONS | |
| https://bitmax.io | | BTMX.io | |
| ADDRESS | | COMPLIANCE CONTACT | |
| HOSTING COMPANY | | COMPLIANCE CONTACT PHONE | |
| Digital Ocean, LLC. | | support@bitmax.io | |
| OPENED | | | |
| 6/30/2018 | | ☑ TRADES PRIVACY COINS | |
| CLOSED | | ☐ TRADES FIAT | |

**COUNTRY RELATIONSHIP**   **KYC RISK ASSESSMENTS**

- ⌄ Domiciled in Singapore    › 6/17/2020 Yellow
- START DATE    › 10/28/2019 Green
- END DATE
- NOTES

## Bitrue

| NAME | | CURRENCIES | |
|------|--|------------|--|
| Bitrue | | | |
| URL | | AFFILIATIONS | |
| https://bitrue.com | | Bitapple Singapore PTE Ltd | |
| ADDRESS | | COMPLIANCE CONTACT | |
| HOSTING COMPANY | | support@bitrue.com | |
| Amazon.com | | COMPLIANCE CONTACT PHONE | |
| OPENED | | | |
| 6/30/2018 | | ☑ TRADES PRIVACY COINS | |
| CLOSED | | ☐ TRADES FIAT | |

**COUNTRY RELATIONSHIP**   **KYC RISK ASSESSMENTS**

- ⌄ Domiciled in Singapore    › 9/2/2021 Yellow
- START DATE    › 10/28/2019 Red
- END DATE
- NOTES

**Bitstamp**



## Coinbene



## Coinone



**HitBTC**

**Huobi**



## HuobiGlobal



## HuobiUS



## HuobiArgentina



## HuobiIndonesia



## HuobiJapan



## HuobiKorea



## HuobiRussia



## HuobiThailand



## Korbit



## OKEx

**Upbit**



**ZB**

## ZBG



## **Kraken**

## Coinbase



## Poloniex (Circle Financial)



## Bittrex



NAME
Bittrex.com

URL
https://bittrex.com

ADDRESS
6077 South Fort Apache Road suite 100

HOSTING COMPANY
CLOUDFLARE.com

OPENED
12/31/2013

CLOSED

CURRENCIES

AFFILIATIONS
Bill Shihara, CEObillshihara@hotmail.comhttps://www.linkedin.com/in/billshihara

COMPLIANCE CONTACT

COMPLIANCE CONTACT PHONE
+1 4252982646

☑ TRADES PRIVACY COINS

☑ TRADES FIAT

COUNTRY RELATIONSHIP

⌄ Subpoenable in United States

START DATE

END DATE

NOTES

⌄ Domiciled in United States

START DATE

END DATE

KYC RISK ASSESSMENTS

⟩ 8/30/2020 Green

⟩ 10/28/2019 Green

## Bitbank

NAME
Bitbank.cc

URL
https://bitbank.cc

ADDRESS
7th floor, KDX Nishi-Gotanda Building, 7-9-20 Nishi-Gotanda, Shinagawa-ku, Tokyo 141-00

HOSTING COMPANY
Amazon Inc.

OPENED
2/28/2017

CLOSED

CURRENCIES

AFFILIATIONS
Bitbank Inc. Bit Bank Corporation

COMPLIANCE CONTACT
Support@Bitbank.com

COMPLIANCE CONTACT PHONE

☐ TRADES PRIVACY COINS

☑ TRADES FIAT

COUNTRY RELATIONSHIP

⌄ Domiciled in Japan

START DATE

END DATE

NOTES

KYC RISK ASSESSMENTS

⟩ 12/25/2019 Green

## BW



NAME
BW

URL
https://bw.com

ADDRESS

HOSTING COMPANY
Cloudflare, Inc.

OPENED

CLOSED

COUNTRY RELATIONSHIP

✓ Domiciled in Australia

START DATE

END DATE

NOTES

CURRENCIES

AFFILIATIONS
ZB.comQuoine

COMPLIANCE CONTACT

COMPLIANCE CONTACT PHONE

☑ TRADES PRIVACY COINS

☐ TRADES FIAT

KYC RISK ASSESSMENTS

> 9/25/2019 Yellow

## Digifinex

NAME
DigiFinex

URL
https://digifinex.com

ADDRESS

HOSTING COMPANY
SHK

OPENED
3/31/2018

CLOSED

COUNTRY RELATIONSHIP

✓ Domiciled in Seychelles

START DATE

END DATE

NOTES

CURRENCIES

AFFILIATIONS
Digifinex Ltd.Shuzibi.com

COMPLIANCE CONTACT
support@digifinex.com

COMPLIANCE CONTACT PHONE

☑ TRADES PRIVACY COINS

☐ TRADES FIAT

KYC RISK ASSESSMENTS

> 10/28/2019 Yellow

# Exhibit B3



# Binance Holdings Limited – 上海比捷企业管理咨询有限公司 > Private Company Profile

## Company Overview

**Company Type:** Private Company

**Website:** www.binance.com

**Number of Employees:** -

**Year Founded:** 2017

**Total Amount Raised ($ mm)†:** -

**Total Rounds of Funding\*\*:**1

**Latest Post-Money Valuation ($ mm)** -

**Latest Pre-Money Valuation ($ mm)** -

*† This number reflects the estimated value of the total new money raised through private placement rounds.*

*\*\* This value is an estimate of the total number of funding rounds this company has received.*

## Business Description

Shanghai Bijie Enterprise Management Adivsory Co., Ltd. operates as a blockchain and crypto asset exchange. The company was founded in 2017 and is based in China.

## Primary Industry Classification

Financial Exchanges and Data

## Primary Office Location

China

## Current and Pending Investors

| Investor | Initial Investment Date | Stake Type | Current Stake Amount | Round(s) | Investment Coverage |
|---|---|---|---|---|---|
| Vertex Ventures China | Oct-23-2018 | Unknown | - | Venture | - |
| Vertex Ventures SE Asia & India | Oct-23-2018 | Minority | - | Venture | - |
| AU21 Capital | - | Unknown | - | - | Chandler Guo |
| Black Hole | - | Unknown | - | - | - |
| Zenith Ventures | - | Unknown | - | - | - |

## Prior Investors

Race Capital

## Investment Arms

Binance Labs

## Financial Information (Currency: Reported Currency, in mm)

| Total Revenue | - | Operating Income | - | Total Assets | - |
|---|---|---|---|---|---|
| **Gross Profit** | - | **EBITDA** | - | **Total Debt** | - |
| **Net Income** | - | **Estimated Number of Employees** | - | **Net Debt** | - |

*\* Hover over data point numbers for date and source.*

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Binance Holdings Limited – 上海比捷企业管理咨询有限公司 > Private Company Profile

## Company Notes

No Company Notes exist.

## Strategy Notes

No Strategy Notes exist.

## Key Professionals

No Key Professionals have been profiled.

## Last 5 Transactions

| Announced Date | Closed Date | Transaction Type | Role | Target | Buyer/Investors | Sellers | Size($mm) |
|---|---|---|---|---|---|---|---|
| Mar-09-2021 | Mar-09-2021 | Private Placement | Buyer | OpenOcean.Finance | Binance Holdings Limited,Multicoin Capital Management, LLC,Shanghai Leide Investment Management Co., Ltd.,Kenetic Trading,Altonomy Pte. Ltd.,CMS Holdings, LLC | | 2.00 |
| Nov-13-2020 | Nov-13-2020 | Private Placement | Buyer | Axelaris Corporation | Binance Holdings Limited,Data Collective,Divergence Capital Management, LLC | | 3.75 |
| Apr-02-2020 | Mar-31-2020 | Merger/Acquisition | Buyer | CoinMarketCap OpCo, LLC | Binance Holdings Limited | | 400.00 |
| Jan-22-2020 | Jan-22-2020 | Private Placement | Buyer | Numbers Co., Ltd. | Binance Holdings Limited | | - |
| Jan-14-2020 | Jan-14-2020 | Private Placement | Buyer | BxB Inc | Binance Holdings Limited | | 0.43 |

\* denotes that the relationship is proprietary

## Last 5 Key Developments

| Date | Event Type | Headline |
|---|---|---|
| Aug-18-2021 | Executive/Board Changes - Other | Binance Hires Former US Federal Law Enforcement Investigator Greg Monahan as Global Money Laundering Reporting Officer |
| Jun-24-2021 | Client Announcements | Capitalise.Ai Now Available to Binance Traders |
| Mar-23-2021 | M&A Rumors and Discussions | Various Global Companies Tapped as Potential Buyers of Bithumb |
| Mar-09-2021 | Private Placements | OpenOcean.Finance announced that it has received $2 million in funding from Kenetic Trading, Binance Holdings Limited, Multicoin Capital Management , LLC., LD Capital, Altonomy Pte. Ltd., CMS Holdings, LLC |
| Nov-13-2020 | Private Placements | Axelaris Corporation announced that it has received $3.75 million in funding from Data Collective, Binance Holdings Limited, Divergence Capital Management, LLC and other investors |

## News Headlines

| Date/Time | Headline | Source |
|---|---|---|
| Aug-15 | Bendigo and Adelaide Bank to buy Ferocia; DGB to get 74.03% stake in Newsystock | S&P Global |

Date Created: Aug-24-2021

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All rights reserved.



# Binance Holdings Limited – 上海比捷企业管理咨询有限公司 > Private Company Profile

| | | | Market Intelligence |
|---|---|---|---|
| Aug-08 | JPMorgan to fully own Chinese securities firm; Latitude to acquire Symple Loans | | S&P Global Market Intelligence |
| Aug-02 | Square to buy Afterpay; EU banks receive stress test results | | S&P Global Market Intelligence |
| Aug-01 | Square to buy Afterpay in $29B deal; Citi gets China fund custody approval | | S&P Global Market Intelligence |
| Jul-28 | Singapore lifts dividend curbs for banks; Chinese banks fined 9.1M yuan | | S&P Global Market Intelligence |

### Current and Pending Subsidiaries / Investments

| Company Name | Business Description | Geography | Primary Industry | LTM Total Rev.($mm) | LFQ Total Assets ($mm) | LFQ Total Debt ($mm) |
|---|---|---|---|---|---|---|
| CoinMarketCap OpCo, LLC | CoinMarketCap OpCo, LLC owns and operates a portal for price-tracking of cryptoassets. The company was founded in 2013 and is based in Dover, Delaware. As of March 31, 2020, CoinMarketCap OpCo, LLC operates as a subsidiary of Binance Holdings Limited. | United States and Canada | Financial Exchanges and Data | - | - | - |
| DappReview | DappReview operates DappReview, an analytics platform for decentralized applications (DApps) that scans and provides information of DApps across various blockchains. The company was founded in 2018 and is based in Beijing, China. As of December 3, 2019, DappReview operates as a subsidiary of Binance Holdings Limited. | Asia / Pacific | Internet Services and Infrastructure | - | - | - |
| Zanmai Labs Pvt Ltd. | Zanmai Labs Pvt Ltd. provides buying, selling, and trading of digital currencies including their digital coing, called WRX. The company was founded in 2017 and is headquartered in Thane, India. As of November 20, 2019, Zanmai Labs Pvt Ltd. operates as a subsidiary of Binance Holdings Limited. | Asia / Pacific | Data Processing and Outsourced Services | - | - | - |
| Binance JEX | Binance JEX operates block chain asset derivatives trading platform. The company offer derivatives products, including futures, options, and perpetual contracts. Binance JEX was formerly known as JEX Technology Limited. Binance JEX was founded in 2019 and is based in Seychelles. As of September 2, 2019, Binance JEX operates as a subsidiary of Binance Holdings Limited. | Africa / Middle East | Financial Exchanges and Data | - | - | - |

Date Created: Aug-24-2021

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Binance Holdings Limited – 上海比捷企业管理咨询有限公司 > Private Company Profile

| TravelbyBit Pty Ltd | TravelbyBit Pty Ltd operates as a blockchain payment platform and travel company that provides booking services for travelers using digital currency. The company was incorporated in 2017 and is based in Brisbane, Australia. | Asia / Pacific | Data Processing and Outsourced Services | - | - | - |
|---|---|---|---|---|---|---|
| DApps Platform, Inc. | DApps Platform, Inc. develops application software which operates as a secure wallet for Ethereum, ERC20 and ERC223 tokens. The company was founded in 2017 and is headquartered in San Francisco, California. As of July 31, 2018, DApps Platform, Inc. operates as a subsidiary of Shanghai Bijie Enterprise Management Adivsory Co., Ltd. | United States and Canada | Data Processing and Outsourced Services | - | - | - |
| Axelaris Corporation | Axelaris Corporation provides Smart Cloud, a cloud-ready software that gives communication, contact management, better collaboration, marketing, production, ERP, CRM, and project management for small and medium-sized companies, and global organizations. It offers Axelaris Smart Business Cloud, which provides a technique where computer software or hardware resources are massively scalable and elastic; managed, 24/7 support, and partner program services; and software implementation, migration, cloud hosting, special development, programming, and relevant services. The company is based in Tacoma, Washington. | United States and Canada | Application Software | - | - | - |

## S&P Global Ratings Credit Ratings

No S&P Global Ratings Credit Ratings data available.

S&P Credit Ratings and Research provided by S&P Global Ratings

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P Global Market Intelligence's opinions, analyses and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Binance Holdings Limited – 上海比捷企业管理咨询有限公司 > Private Company Profile

Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. While S&P Global Market Intelligence has obtained information from sources it believes to be reliable, S&P Global Market Intelligence does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P Global Ratings does not contribute to or participate in the creation of credit scores generated by S&P Global Market Intelligence. Lowercase nomenclature is used to differentiate S&P Global Market Intelligence PD credit model scores from the credit ratings issued by S&P Global Ratings.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.capitaliq.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Regulatory News Service data provided by 

Date Created: Aug-24-2021     Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Exhibit B4

# About bitbank

**Company Profile**

# ENHANCING VALUE EXCHANGE WITH BITCOIN TECHNOLOGY .



## Message from the President

The Internet Revolution, which began in the 1990s, has spawned numerous innovations and has contributed to the progress of humankind by bridging the digital divide in the world. In 2008, the ultimate invention of collective intelligence was made while people around the world were connected to each other via the Internet. That is Bitcoin.

By applying Bitcoin and other crypto-asset (virtual currency) technologies, we have finally begun to "Internetize money", eliminating the injustices and inconveniences surrounding money worldwide, and as a result, further humankind. I think it must make progress. They will give us more benefits than the Internet has brought. We strongly hope to contribute to the progress of the world by applying this revolutionary technology and providing various services.

April 2016

Bitbank CEO Noriyuki Hirosue

# Our Vision, Mission, Values

### VISION

## Realize an open and fair society

Bitcoin and other crypto assets are the ultimate "open" and "fair" forms that anyone can participate in and use, are not controlled by privileged people, and are not enforced. The Internet has made them possible in the realm of information, but Bitcoin-related technologies that can circulate any value will take society even further. We want to help our ultimate desire to realize a society where everyone can be free.

### MISSION

## Distribute all values around the world with Bitcoin technology

### VALUES

### Integrity

Take everything seriously and respect everyone involved. He speaks frankly, is responsible for what he says and does, and is proud of his integrity.

### Challenge

Quickly seize every opportunity and continue to realize maximum value. Therefore, I will continue to challenge everything.

### One team

Believe in your friends and work with them.

## Information

**Company name**    Bitbank Co., Ltd.

| | |
|---|---|
| **address** | 7F, KDX Nishigotanda Building, 7-20-9 Nishigotanda, Shinagawa-ku, Tokyo 141-0031 📍 (https://goo.gl/maps/2CKWJHH1JSR2) |
| **Established** | May 2014 |
| **board member** | President and CEO Noriyuki Hirosue |
| | Director Kiyoshi Hayashi |
| | Outside Director Satoshi Tsuki Outside Director |
| | Nobuhiro Kanayama |
| | Outside Director Motoyuki Komabayashi |
| | Full-time Audit & Supervisory Board Member Yojiro Takahashi |
| | Outside Audit & Supervisory Board Member Akira Takagi Outside Audit & |
| | Supervisory Board Member |
| | Yoshiaki Sugita |
| **Capital** | 1,141.59 million yen (including capital reserve) |
| **Business content** | Cryptographic Asset (Cryptocurrency) Related Business |
| | Kanto Finance Bureau Director (Cryptographic Asset Exchanger) |
| | Registration No. 00004 |
| **Membership of professional institutions** | Japan Cryptocurrency Trading Association (https://jvcea.or.jp/) |
| | Japan Cryptocurrency Business Association (https://cryptocurrency-association.org/) |
| | Blockchain Promotion Association (https://bccc.global/) |

# Officers


Executive Officer CEO
**Noriyuki Hirosue**
Noriyuki Hirosue


Executive Officer CCO
**Kiyoshi Hayashi**
Kiyoshi Hayashi


Executive Officer CSO
**Daisuke Yamazaki**
Daisuke Yamazaki


Executive Officer CTO
**Naoji Noda**
Naoji Noda


Executive Officer CFO
**Masaaki Kato**
Masaaki Kato

# General Employer Action Plan

**Next Generation Development Support Measures Promotion Law**

**About publication of general business owner action plan**

Bitbank Co., Ltd. announces the "General Business Owner Action Plan" based on the Act on Promotion of Measures to Support Raising Next-Generation Children.

**What is the Next Generation Development Support Measures Promotion Law?**

This law was enacted in July 2003 to change the trend of rapid declining birthrate. Based on this law, intensive and systematic efforts have been made, and the development of an employment environment that allows both work and child-rearing has progressed to a certain extent. The law has been extended to March 31, 2025 to improve and enhance it.

**What is the "general business owner action plan" based on the Act on Promotion of Measures to Support Raising Next-Generation Children?**

In order for companies to improve the employment environment to balance work and child-rearing of employees and to improve various working conditions including employees who are not raising children, the planning period, goals, and achievement of those goals. It defines the measures and implementation time of.

**Bitbank Co., Ltd. Action Plan**

We will formulate an action plan as follows so that all employees can fully demonstrate their abilities by creating an environment where employees can balance work and child-rearing and all employees can work comfortably.

| | |
|---|---|
| period | 3 years from April 1, 2020 to March 31, 2023 |
| Goal (1) | Disseminate information and provide information on systems such as maternity leave, childcare leave, childcare leave benefits, and exemption from social insurance premiums during childcare leave. |
| measures | From April 2020<br>・ Survey<br>of the system based on the law・ Disseminate the contents of the system to the whole |
| Goal (2) | Promote the taking of childcare leave for male employees (from the time the child is born until the age of 1) |
| measures | 2020年4月～<br>・育児休業制度の内容を全体に周知<br>・育児休業制度の理解を高めるため、管理職を対象とした研修を実施 |

# Disclosure
## 開示資料

### 決算公告

第7期（2020年12月期）貸借対照表及び損益計算書（PDF）
(/assets/images/corporate/docs/kessan_2020_7th.pdf)

第6期（2019年12月期）貸借対照表及び損益計算書（PDF）
(/assets/images/corporate/docs/kessan_2019_6th.pdf)

第5期（平成30年12月期）貸借対照表及び損益計算書（PDF）
(/assets/images/corporate/docs/kessan_2018_5th.pdf)

### 暗号資産交換業に関する開示事項

第7期（2020年12月期）事業報告書（PDF）(/assets/images/corporate/docs/jigyou_houkoku_2020_7th.pdf)

第6期（2019年12月期）事業報告書（PDF）(/assets/images/corporate/docs/jigyou_houkoku_2019_6th.pdf)

第5期（平成30年12月期）事業報告書（PDF）(/assets/images/corporate/docs/jigyou_houkoku_2018_5th.pdf)

---

**ビットコインとは** (https://bitbank.cc/info/bitcoin/about)　　価格チャート (https://bitbank.cc/info/bitcoin/chart)　　最新ニュース (https://bitbank.cc/info/bitcoin/news)　　購入方法 (https://bitbank.cc/info/bitcoin/howtobuy)

**リップルとは (https://bitbank.cc/info/ripple/about)**　　価格チャート (https://bitbank.cc/info/ripple/chart)　　最新ニュース (https://bitbank.cc/info/ripple/news)　　購入方法 (https://bitbank.cc/info/ripple/howtobuy)

**ライトコインとは** (https://bitbank.cc/info/litecoin/about)　　価格チャート (https://bitbank.cc/info/litecoin/chart)　　最新ニュース (https://bitbank.cc/info/litecoin/news)　　購入方法 (https://bitbank.cc/info/litecoin/howtobuy)

**イーサリアムとは** (https://bitbank.cc/info/ethereum/about)　　価格チャート (https://bitbank.cc/info/ethereum/chart)　　最新ニュース (https://bitbank.cc/info/ethereum/news)　　購入方法 (https://bitbank.cc/info/ethereum/howtobuy)

**モナコインとは** (https://bitbank.cc/info/monacoin/about)　　価格チャート (https://bitbank.cc/info/monacoin/chart)　　最新ニュース (https://bitbank.cc/info/monacoin/news)　　購入方法 (https://bitbank.cc/info/monacoin/howtobuy)

**ビットコインキャッシュとは** (https://bitbank.cc/info/bitcoincash/about)　　価格チャート (https://bitbank.cc/info/bitcoincash/chart)　　最新ニュース (https://bitbank.cc/info/bitcoincash/news)　　購入方法 (https://bitbank.cc/info/bitcoincash/howtobuy)

**ステラルーメンとは** (https://bitbank.cc/info/stellar/about)　　価格チャート (https://bitbank.cc/info/stellar/chart)　　最新ニュース (https://bitbank.cc/info/stellar/news)　　購入方法 (https://bitbank.cc/info/stellar/howtobuy)

**クアンタムとは (https://bitbank.cc/info/qtum/about)**　　価格チャート (https://bitbank.cc/info/qtum/chart)　　最新ニュース (https://bitbank.cc/info/qtum/news)　　購入方法 (https://bitbank.cc/info/qtum/howtobuy)

**ベーシックアテンショントークンとは** (https://bitbank.cc/info/bat/about)　　価格チャート (https://bitbank.cc/info/bat/chart)　　最新ニュース (https://bitbank.cc/info/bat/news)　　購入方法 (https://bitbank.cc/info/bat/howtobuy)

**オーエムジーとは (https://bitbank.cc/info/omg/about)**　　価格チャート (https://bitbank.cc/info/omg/chart)　　最新ニュース (https://bitbank.cc/info/omg/news)　　購入方法 (https://bitbank.cc/info/omg/howtobuy)



 日本暗号資産ビジネス協会
Japan Cryptoasset Business Association

一般社団法人
日本暗号資産取引業協会
JVCEA - Japan Virtual and Crypto assets Exchange Association

金融庁のホームページに記載された暗号資産交換業者が取り扱う暗号資産(仮想通貨)は、当該暗号資産交換業者の説明に基づき、資金決済法上の定義に該当することを確認したものにすぎません。

金融庁・財務局が、これらの暗号資産(仮想通貨)の価値を保証したり、推奨するものではありません。

暗号資産(仮想通貨)は、必ずしも裏付けとなる資産を持つものではありません。暗号資産(仮想通貨)の取引を行う際には、以下の注意点にご留意ください。

### <暗号資産(仮想通貨)を利用する際の注意点>

暗号資産(仮想通貨)は、日本円やドルなどのように国がその価値を保証している「法定通貨」ではありません。インターネット上でやりとりされる電子データです。

暗号資産(仮想通貨)は、価格が変動することがあります。暗号資産(仮想通貨)の価格が急落したり、突然無価値になってしまうなど、損をする可能性があります。暗号資産交換業者は金融庁・財務局への登録が必要です。当社は登録した暗号資産交換業者です。

暗号資産(仮想通貨)の取引を行う場合、事業者から説明を受け、取引内容をよく理解し、ご自身の判断で行ってください。

暗号資産(仮想通貨)や詐欺的なコインに関する相談が増えています。暗号資産(仮想通貨)を利用したり、暗号資産交換の導入に便乗したりする詐欺や悪質商法に御注意ください。

### <免責事項>

当サイトにおけるニュース、取引価格、データ及びその他の情報などのコンテンツは一般的な情報提供を目的に作成されたものであり、特定のお客様のニーズ、財務状況または投資対象に対応することを意図しておりません。また、当コンテンツはあくまでもお客様の私的利用のみのために当社が提供しているものであって、商用目的のために提供されているものではありません。当コンテンツ内のいかなる情報も、暗号資産(仮想通貨)、金融の個別銘柄、金融投資あるいは金融商品の売買、投資、取引、保有などを勧誘または推奨するものではなく、当コンテンツを取引または売買を行う際の意思決定の目的で使用することとは適切ではありません。

当コンテンツは信頼できると思われる情報に基づいて作成されておりますが、当社はその正確性、適時性、適切性または完全性を表明または保証するものではなく、お客様による当サイトのコンテンツの利用等に関して生じるいかなる損害についても責任を負いません。

当社は当コンテンツの信頼性を確保するよう合理的な努力をしていますが、執筆者によって提供されたいかなる見解または意見は当該執筆者自身のその時点における見解や分析であって、当社の見解、分析ではありません。

当社は当コンテンツで言及されている会社等と関係を有し、またはかかる会社等に対してサービスを提供している可能性があります。また、当社は当コンテンツで言及されている暗号資産(仮想通貨)の現物またはポジションを保有している可能性があります。

当コンテンツは予告なしに内容が変更されることがあり、また更新する義務を負っておりません。

当コンテンツではお客様の利便性を目的として他のインターネットのリンクを表示することがありますが、当社はそのようなリンクのコンテンツを是認せず、また何らの責任も負わないものとします。

### <注意事項>

There is a risk that the value of crypto assets (virtual currency) will be lost if a serious problem occurs in the transfer recording mechanism or if the crypto assets (virtual currency) are lost due to a cyber attack or the like.

If the crypto asset (virtual currency) loses its private key or is misused by a third party, the crypto asset (virtual currency) it holds cannot be used and there is a risk of losing its value. ..

Cryptographic assets (virtual currency) can be used for payment of price only with the consent of the person who receives payment of consideration.

In the unlikely event that our business cannot be continued due to changes in the external environment, etc., we will carry out procedures based on relevant laws and regulations, but it is possible that the deposited money and cryptographic assets (virtual currency) cannot be returned to the customer. There is sex. In addition, the Company separates the money and cryptographic assets (virtual currency) deposited by the user from the assets of the Company and manages them separately.

**About Us**

Company Profile (https://bitbank.cc/about/corporate/)

announcement (https://bitbank.cc/announcement/)

Service notice (https://blog.bitbank.cc)

Career recruitment (https://career.bitbank.cc/?utm_source=service&utm_medium=referral&utm_campaign=ccy)

Tech blog (https://tech.bitbank.cc/)

site map (https://bitbank.cc/about/sitemap/)

[Twitter icon] (https://twitter.com/bitbank_inc/)

[Facebook icon] (https://www.facebook.com/bitbank.inc/)

**Products**

Exchange (https://app.bitbank.cc/trade)

Sales office (https://app.bitbank.cc/dealer)

Market information (https://markets.bitbank.cc)

**Tutorial**

How to register (https://bitbank.cc/docs/registration/)

Identity verification method (https://bitbank.cc/docs/identification/)

Payment method (https://bitbank.cc/docs/deposit/%E6%B3%A8%E6%84%8F%E4%BA%8B%E9%A0%85)

Purchase / sale (https://bitbank.cc/docs/buy/)

Commission (https://bitbank.cc/docs/fees/)

Handling pairs and order units (https://bitbank.cc/docs/pairs/)

Lend and increase (https://bitbank.cc/docs/lending/)

Withdrawal method (https://bitbank.cc/docs/withdrawal/)

Glossary of crypto assets (virtual currency) (https://bitbank.cc/glossary)

**Support**

FAQ (https://support.bitbank.cc/hc/ja)

API documentation (https://docs.bitbank.cc/)

Notes (https://support.bitbank.cc/hc/ja/sections/360003397394)

To the press (https://support.bitbank.cc/hc/ja/requests/new)

Inquiries about advertising (https://support.bitbank.cc/hc/ja/requests/new)

Inquiries (https://support.bitbank.cc/hc/ja/requests/new)

**Policy Policy**

privacy policy (https://bitbank.cc/about/privacy/)

Basic policy for antisocial forces (https://bitbank.cc/docs/antisocial-forces-policy/)

Information security basic policy (https://bitbank.cc/docs/information-security-policy/)

System risk management basic policy (https://bitbank.cc/docs/system-risk-management-policy/)

Basic policy on AML / CFT (https://bitbank.cc/docs/aml-cft-policy/)

Conflict of interest management policy (https://bitbank.cc/docs/conflict-of-interest-policy/)

Best execution policy (https://bitbank.cc/docs/best-execution-policy/)

Debt fulfillment policy (https://bitbank.cc/docs/debt-fulfillment-policy/)

Efforts to protect customer assets (https://bitbank.cc/about/money-trust/)

Cryptocurrency security (https://bitbank.cc/info/security-about)

**Terms**

terms of service (https://bitbank.cc/about/tos/bitbankcc/)

Documents and instructions delivered before the conclusion of the contract (https://bitbank.cc/about/prior-confirmation/)

Transaction rules to lend and increase

(https://bitbank.cc/about/rule/lending/)

Display under the Specified
Commercial Transactions
Law
(https://bitbank.cc/about/sctl/)

---

Cryptocurrency exchange company registration number 0004

Joined Japan Crypto Asset Trading Association

(https://bitbank.cc)

© bitbank inc (https://bitbank.cc/)

# Exhibit B5

**FILE COPY**



# CERTIFICATE OF INCORPORATION
# OF A
# PRIVATE LIMITED COMPANY

Company Number **11386260**

The Registrar of Companies for England and Wales, hereby certifies that

**NOAH TRADE LTD**

is this day incorporated under the Companies Act 2006 as a private company, that the company is limited by shares, and the situation of its registered office is in England and Wales

Given at Companies House, Cardiff, on **29th May 2018**



* N11386260E *



## Companies House



THE OFFICIAL SEAL OF THE
REGISTRAR OF COMPANIES

The above information was communicated by electronic means and authenticated by the Registrar of Companies under section 1115 of the Companies Act 2006



# Companies House

# IN01 (ef)

**Application to register a company**



*Received for filing in Electronic Format on the:* **27/05/2018**

X76UMOJU

---

| | |
|---|---|
| *Company Name in full:* | **NOAH TRADE LTD** |
| *Company Type:* | **Private company limited by shares** |
| *Situation of Registered Office:* | **England and Wales** |
| *Proposed Registered Office Address:* | **334-336 FLAT B EDGWARE ROAD LONDON ENGLAND W2 1EA** |
| *Sic Codes:* | **47410** <br> **47421** <br> **14190** |

*I wish to entirely adopt the following model articles:*    **Private (Ltd by Shares)**

---

**Electronically filed document for Company Number:**    **11386260**

# Proposed Officers

## Company Director        1

Type:                        **Person**

Full Forename(s):            **MR ABDULRAZAK**

Surname:                     **IDRIS**

Service Address:             **334-336 FLAT B EDGWARE ROAD**
                             **LONDON**
                             **ENGLAND W2 1EA**

Country/State Usually        **UNITED KINGDOM**
Resident:

Date of Birth:  **\*\*/04/1968**              Nationality:    **GERMAN**

Occupation:     **MANAGER**
                **DIRCTOR**

*The subscribers confirm that the person named has consented to act as a director.*

---

# *Statement of Capital (Share Capital)*

---

| | | | | |
|---|---|---|---|---|
| *Class of Shares:* | **ORDINARY** | | *Number allotted* | **1** |
| *Currency:* | **GBP** | | *Aggregate nominal value:* | **1** |
| *Prescribed particulars* | | | | |

**ORDINARY SHARES HAVE FULL RIGHTS IN THE COMPANY WITH RESPECT TO VOTING, DIVIDENDS AND DISTRIBUTIONS.**

---

## Statement of Capital (Totals)

---

| | | | | |
|---|---|---|---|---|
| *Currency:* | **GBP** | | *Total number of shares:* | **1** |
| | | | *Total aggregate nominal value:* | **1** |
| | | | *Total aggregate unpaid:* | **0** |

---

**Electronically filed document for Company Number:**          **11386260**

# *Initial Shareholdings*

*Name:*  **ABDULRAZAK IDRIS**

| | | | |
|---|---|---|---|
| *Address* | **334-336 FLAT B EDGWARE ROAD** | *Class of Shares:* | **ORDINARY** |
| | **LONDON** | *Number of shares:* | **1** |
| | **ENGLAND** | *Currency:* | **GBP** |
| | **W2 1EA** | *Nominal value of each share:* | **1** |
| | | *Amount unpaid:* | **0** |
| | | *Amount paid:* | **1** |

---

**Electronically filed document for Company Number:**          **11386260**

## *Persons with Significant Control (PSC)*

---

---

**Statement of initial significant control**

---

**On incorporation, there will be someone who will count as a Person with Significant Control (either a registerable person or relevant legal entity (RLE)) in relation to the company**

---

---

**Electronically filed document for Company Number:**          **11386260**

# *Individual Person with Significant Control details*

*Names:*                              **MR ABDULRAZAK IDRIS**

*Country/State Usually*               **UNITED KINGDOM**
*Resident:*

*Date of Birth:*  **\*\*/04/1968**               *Nationality:*     **GERMAN**

*Service Address:*               **334-336 FLAT B EDGWARE ROAD**
                                **LONDON**
                                **ENGLAND**
                                **W2 1EA**

*The subscribers confirm that each person named as an individual PSC in this application knows that their particulars are being supplied as part of this application.*

---

**Electronically filed document for Company Number:**               **11386260**

*Nature of control*            **The person holds, directly or indirectly, 75% or more of the shares in the company.**

# *Statement of Compliance*

---

*I confirm the requirements of the Companies Act 2006 as to registration have been complied with.*

*memorandum delivered by an agent for the subscriber(s):*   **YES**

*Agent's Name:*   **COMPANIES MADE SIMPLE A DIVISION OF MADE SIMPLE GROUP LTD**

*Agent's Address:*   **20-22 WENLOCK ROAD**
**LONDON**
**ENGLAND**
**N1 7GU**

---

# **Authorisation**

*Authoriser Designation:*   **agent**                  *Authenticated*   **YES**

*Agent's Name:*   **COMPANIES MADE SIMPLE A DIVISION OF MADE SIMPLE GROUP LTD**

*Agent's Address:*   **20-22 WENLOCK ROAD**
**LONDON**
**ENGLAND**
**N1 7GU**

---

**Electronically filed document for Company Number:**        **11386260**

# Companies Act 2006

SCHEDULE 1
COMPANY HAVING A SHARE CAPITAL
Memorandum of Association of
NOAH TRADE LTD

Each subscriber to this memorandum of association wishes to form a company under the Companies Act 2006 and agrees to become a member of the company and to take at least one share each.

Subscriber:

abdulrazak  idris

Authentication: Authenticated Electronically

Dated: 27 May 2018

# Exhibit B6



# Bithumb Holdings Co., Ltd. – 주식회사 빗썸홀딩스 > Private Company Profile

## Company Overview

| | |
|---|---|
| **Company Type:** Private Company | |
| **Website:** - | |
| **Number of Employees:** 7 | |
| **Year Founded:** 2014 | |
| **Total Amount Raised ($ mm)†:** - | |
| **Total Rounds of Funding\*\*:**- | |
| **Latest Post-Money Valuation ($ mm)** - | |
| **Latest Pre-Money Valuation ($ mm)** - | |

*† This number reflects the estimated value of the total new money raised through private placement rounds.*

*\*\* This value is an estimate of the total number of funding rounds this company has received.*

## Business Description

BTC Holding Company Co., Ltd. provides management consulting services. The company is headquartered in South Korea.

## Primary Industry Classification

Research and Consulting Services

## Primary Office Location

12 Teheran-ro 26-gil Yeoksam-dong | Seoul | 06236 | South Korea

## Current and Pending Investors

| Investor | Initial Investment Date | Stake Type | Current Stake Amount | Round(s) |
|---|---|---|---|---|
| Vidente Co., Ltd. (KOSDAQ:A121800) | Jul-26-2018 | Minority | 13.00 % | - |

## Financial Information (Currency: KRW, in mm)

| | | | | | |
|---|---|---|---|---|---|
| **Total Revenue** | 219,184.7 | **EBITDA** | 143,384.7 | **EBIT** | 135,830.7 |
| **Cash & ST Invst.** | 926,977.4 | **Net Income** | 100,009.7 | **Total Debt** | 0.0 |
| **Capital Expenditure** | (697.4) | **Total Assets** | 1,172,437.0 | | |
| **U.S. Number of Employees 2021** | - | **U.S. Number of Employees 2020** | - | **U.S. Last Year Employee Growth %** | - |

*Currency in KRW in mm, LTM as of Dec-31-2020 TEV and Market Cap are calculated using the last closing price*

## Company Notes

No Company Notes exist.

## Strategy Notes

No Strategy Notes exist.

## Key Professionals

No Key Professionals have been profiled.

---

Date Created: Aug-24-2021

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Bithumb Holdings Co., Ltd. – 주식회사 빗썸홀딩스 > Private Company Profile

## Last 5 Transactions

| Announced Date | Closed Date | Transaction Type | Role | Target | Buyer/Investors | Sellers | Size($mm) |
|---|---|---|---|---|---|---|---|
| Oct-28-2020 | Oct-21-2020 | Merger/Acquisition | Seller | INBIOGEN CO.,Ltd (KOSE:A101140) | KNBP Fund | Bithumb Holdings Co., Ltd. | 5.55 |
| Oct-28-2020 | Oct-28-2020 | Merger/Acquisition | Seller | INBIOGEN CO.,Ltd (KOSE:A101140) | Hoyeon Art 1 Fund,HDOPB 2 Fund | Bithumb Holdings Co., Ltd. | 11.10 |
| Oct-16-2020 | Oct-16-2020 | Merger/Acquisition | Seller | INBIOGEN CO.,Ltd (KOSE:A101140) | Bucket Studio Co., Ltd. (KOSDAQ:A066410),DG BW Fund | Bithumb Holdings Co., Ltd. | 7.40 |
| Dec-19-2018 | Apr-22-2019 | Private Placement | Buyer | INBIOGEN CO.,Ltd (KOSE:A101140) | Bithumb Holdings Co., Ltd. | | 13.15 |
| Oct-12-2018 | - | Merger/Acquisition | Target | Bithumb Holdings Co., Ltd. | | Vidente Co., Ltd. (KOSDAQ:A121800) | 24.16 |

* denotes that the relationship is proprietary

## Last 5 Key Developments

| Date | Event Type | Headline |
|---|---|---|
| Oct-28-2020 | M&A Transaction Closings | KNBP Fund acquired 4.8% stake in BTONE CO.,Ltd (KOSE:A101140) from Bithumb Holdings Co., Ltd. for KRW 6.3 billion. |
| Oct-28-2020 | M&A Transaction Closings | Hoyeon Art 1 Fund and HDOPB 2 Fund acquired 9.5% stake in BTONE CO.,Ltd (KOSE:A101140) from Bithumb Holdings Co., Ltd. for KRW 12.6 billion. |
| Oct-16-2020 | M&A Transaction Closings | Bucket Studio Co., Ltd. (KOSDAQ:A066410), DGBW Fund and other individuals acquired 6.5% stake in BTONE CO.,Ltd (KOSE:A101140) from Bithumb Holdings Co., Ltd. for KRW 8.4 billion. |
| Jul-25-2019 | M&A Transaction Cancellations | Vidente Co., Ltd. (KOSDAQ:A121800) cancelled the acquisition of an additional 3% stake in BTC Holding Company Co., Ltd. from Yeondae Jung and Jungah Lee. |
| Apr-22-2019 | Private Placements | BTONE CO.,Ltd announced that it has received KRW 14.999997235 billion in funding from BTC Holding Company Co., Ltd. |

## News Headlines

| Date/Time | Headline | Source |
|---|---|---|
| Jul-27 | Bithumb Korea Obtains the Initial Certificate of 'Compliance Management System' in the Virtual Asset Industry [FOX 40 WICZ TV (NY)] | FOX 40 WICZ TV (NY) |

## S&P Global Ratings Credit Ratings

No S&P Global Ratings Credit Ratings data available.



S&P Credit Ratings and Research provided by

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Bithumb Holdings Co., Ltd. – 주식회사 빗썸홀딩스 > Private Company Profile

the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P Global Market Intelligence's opinions, analyses and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. While S&P Global Market Intelligence has obtained information from sources it believes to be reliable, S&P Global Market Intelligence does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P Global Ratings does not contribute to or participate in the creation of credit scores generated by S&P Global Market Intelligence. Lowercase nomenclature is used to differentiate S&P Global Market Intelligence PD credit model scores from the credit ratings issued by S&P Global Ratings.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.capitaliq.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Regulatory News Service data provided by **London STOCK EXCHANGE**

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Exhibit B7



# Bitlish Limited > Private Company Profile

## Company Overview

**Company Type:** Private Company

**Website:** www.bitlish.com

**Number of Employees:** -

**Year Founded:** -

**Total Amount Raised ($ mm)†:** -

**Total Rounds of Funding**:** -

**Latest Post-Money Valuation ($ mm)** -

**Latest Pre-Money Valuation ($ mm)** -

*† This number reflects the estimated value of the total new money raised through private placement rounds.*

*** This value is an estimate of the total number of funding rounds this company has received.*

## Business Description

No business description exists.

## Primary Industry Classification

Specialized Consumer Services

## Primary Office Location

161-165 Farringdon Road | London, Greater London | EC1R 3AL | United Kingdom

## Financial Information (Currency: Reported Currency, in mm)

| Total Revenue | - | Operating Income | - | Total Assets | - |
|---|---|---|---|---|---|
| Gross Profit | - | EBITDA | - | Total Debt | - |
| Net Income | - | Estimated Number of Employees | - | Net Debt | - |

* Hover over data point numbers for date and source.

## Company Notes

No Company Notes exist.

## Strategy Notes

No Strategy Notes exist.

## Key Professionals

No Key Professionals have been profiled.

## News Headlines

No News is currently available for the selected sources.

## S&P Global Ratings Credit Ratings

No S&P Global Ratings Credit Ratings data available.

Date Created: Aug-24-2021

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Bitlish Limited > Private Company Profile

S&P Credit Ratings and Research provided by 

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P Global Market Intelligence's opinions, analyses and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. While S&P Global Market Intelligence has obtained information from sources it believes to be reliable, S&P Global Market Intelligence does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P Global Ratings does not contribute to or participate in the creation of credit scores generated by S&P Global Market Intelligence. Lowercase nomenclature is used to differentiate S&P Global Market Intelligence PD credit model scores from the credit ratings issued by S&P Global Ratings.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.capitaliq.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Regulatory News Service data provided by 

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Exhibit B8

# BITLISH LIMITED

## Basic information

| Company Status | Active | | |
|---|---|---|---|
| Links | **Profile** | https://beta.companieshouse.gov.uk/company/09564930 | |
| | **Filing History** | https://beta.companieshouse.gov.uk/company/09564930/filing-history | |
| | **Persons With Significant Control** | https://beta.companieshouse.gov.uk/company/09564930/persons-with-significant-control | |
| | **Officers** | https://beta.companieshouse.gov.uk/company/09564930/officers | |
| | **Persons With Significant Control Statements** | https://beta.companieshouse.gov.uk/company/09564930/persons-with-significant-control-statements | |
| Company Status Detail | Active proposal to strike off | | |
| Has Super Secure Pscs | No | | |

| | |
|---|---|
| **Registered Office Is In Dispute** | No |
| **Has Charges** | No |
| **Nature Of Business (Sic)** | 96090 - Other service activities not elsewhere classified |
| **Jurisdiction** | England/Wales |

| **Confirmation Statement** | | |
|---|---|---|
| | **Next Made Up To** | 2021-10-30 |
| | **Next Due** | 2021-11-13 |
| | **Last Made Up To** | 2020-10-30 |
| | **Overdue** | No |

| | |
|---|---|
| **Company Number** | 09564930 |
| **Date Of Creation** | 2015-04-28 |

| Accounts | Next Due | | 2023-01-31 |
|---|---|---|---|
| | Last Accounts | Made Up To | 2021-04-30 |
| | | Period Start On | 2020-05-01 |
| | | Period End On | 2021-04-30 |
| | Next Made Up To | | 2022-04-30 |
| | Accounting Reference Date | Day | 30 |
| | | Month | 04 |
| | Next Accounts | Due On | 2023-01-31 |
| | | Period Start On | 2021-05-01 |
| | | Period End On | 2022-04-30 |
| | | Overdue | No |
| | Overdue | | No |
| Last Full Members List Date | 2016-04-28 | | |

| Registered Office Address | Address Line 1 | 161-165 Farringdon Road |
| --- | --- | --- |
| | Postal Code | EC1R 3AL |
| | Locality | London |
| | Country | United Kingdom |

| Has Insolvency History | No | |
| --- | --- | --- |

| Total Queries | Company | 1 |
| --- | --- | --- |

| Type | Private limited company | |
| --- | --- | --- |

| Undeliverable Registered Office Address | No | |
| --- | --- | --- |

Result from *Companies House company name search (Beta service)*

# Exhibit B9



# BMXDM Technology Pte. Ltd. > Private Company Profile

## Company Overview

**Company Type:** Private Company

**Website:** ascendex.com

**Number of Employees:** -

**Year Founded:** 2018

**Total Amount Raised ($ mm)†:** -

**Total Rounds of Funding**:** 1

**Latest Post-Money Valuation ($ mm)** -

**Latest Pre-Money Valuation ($ mm)** -

*† This number reflects the estimated value of the total new money raised through private placement rounds.*

*** This value is an estimate of the total number of funding rounds this company has received.*

## Business Description

BMXDM Technology Pte. Ltd. operates a digital asset trading platform. Its platform facilitates the buying and selling of digital assets by the platform user; and other ancillary services, including cash/spot trading, leveraged trading, staking services, and copy trading service subscriptions. The company was incorporated in 2018 and is based in Singapore.

## Primary Industry Classification

Data Processing and Outsourced Services

## Primary Office Location

10, Marina Boulevard #39 Marina Bay Financial Centre | Singapore | 018983 | Singapore

## Current and Pending Investors

| Investor | Initial Investment Date | Stake Type | Current Stake Amount | Round(s) |
|---|---|---|---|---|
| Adage, Inc. | Jul-13-2018 | Minority | - | Venture |
| Bitmain Technologies Limited | Jul-13-2018 | Minority | - | Venture |
| Danhua Capital | Jul-13-2018 | Minority | - | Venture |
| FBG Capital | Jul-13-2018 | Minority | - | Venture |
| Jingwei Venture Capital (Beijing) Investment Management Consulting Co., Ltd. | Jul-13-2018 | Minority | - | Venture |

## Investment Arms

B-Tech

## Financial Information (Currency: Reported Currency, in mm)

| | | | | | |
|---|---|---|---|---|---|
| **Total Revenue** | - | **Operating Income** | - | **Total Assets** | - |
| **Gross Profit** | - | **EBITDA** | - | **Total Debt** | - |
| **Net Income** | - | **Estimated Number of Employees** | - | **Net Debt** | - |

* Hover over data point numbers for date and source.

## Company Notes

No Company Notes exist.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# BMXDM Technology Pte. Ltd. > Private Company Profile

| Strategy Notes |
| --- |
| No Strategy Notes exist. |

| Key Professionals |
| --- |
| No Key Professionals have been profiled. |

| Last 5 Transactions | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- |
| Announced Date | Closed Date | Transaction Type | Role | Target | Buyer/Investors | Sellers | Size($mm) |
| Apr-27-2021 | May-06-2021 | Private Placement | Buyer | CoinAlpha, Inc. | Initialized Capital Management, LLC,Slow Ventures LLC,Arrington XRP Capital,Borderless Capital, LLC,Defiance Capital, LLC,Terraform Labs PTE. Ltd.,BMXDM Technology Pte. Ltd.,Ava Labs, Inc.,Altonomy Pte. Ltd. | | 8.00 |
| Apr-13-2021 | Apr-13-2021 | Private Placement | Buyer | Solid Foundations Ltd. | Pomp Investments,DeFi Technologies Inc. (DB:RMJ),Greenfield One,Galaxy Digital Holdings Ltd. (TSX:GLXY),Monday Capital,Collider Ventures,Cadenza Capital Management,BMXDM Technology Pte. Ltd.,Gate Technology Inc.,Blockware Solutions LLC | | 9.00 |
| Mar-31-2021 | Mar-31-2021 | Private Placement | Buyer | Highend Technologies LLC | Parataxis Capital Management LLC,Sino Global Capital,Shanghai Leide Investment Management Co., Ltd.,AU21 Capital,Disrupt & Company,TGE Alpha Corp,Global Digital Assets,Acheron PTE. LTD.,LedgerPrime LLC,LVT Capital,Kryptos Research,Digital Assets Corporation,BSCPad,OK Ex Blockdream Ventures,BMXDM Technology Pte. Ltd. | | 3.00 |
| Mar-19-2021 | Mar-19-2021 | Private Placement | Buyer | Eucrypt pvt. ltd., Inc. | AU21 Capital,Woodstock Fund,Black Edge Capital,Genesis Block Ventures,NGC Ventures,BMXDM Technology Pte. Ltd.,Amesten Inc,Altonomy Pte. Ltd.,Exnetwork | | 2.60 |

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# BMXDM Technology Pte. Ltd. > Private Company Profile

| | | | | | Capital,Zokyo,Brilliance Ventures Ltd | | |
|---|---|---|---|---|---|---|---|
| Jul-13-2018 | Jul-13-2018 | Private Placement | Target | BMXDM Technology Pte. Ltd. | FBG Capital,Bitmain Technologies Limited,Jingwei Venture Capital (Beijing) Investment Management Consulting Co., Ltd.,Danhua Capital,Adage, Inc.,Perseverance Capital Management,Palm Drive Ventures | | - |

\* denotes that the relationship is proprietary

## Last 5 Key Developments

| Date | Event Type | Headline |
|---|---|---|
| May-06-2021 | Private Placements | CoinAlpha, Inc. announced that it has received $8 million in funding from a group of investors |
| Apr-27-2021 | Private Placements | CoinAlpha, Inc. announced that it expects to receive $8 million in funding |
| Apr-13-2021 | Private Placements | Solid Foundations Ltd. announced that it has received $9 million in funding from a group of investors |
| Mar-31-2021 | Private Placements | Highend Technologies LLC announced that it has received $3 million in funding from a group of investors |
| Mar-19-2021 | Private Placements | Eucrypt pvt. ltd., Inc. announced that it has received $2.6 million in funding from a group of investors |

## News Headlines

No News is currently available for the selected sources.

## Current and Pending Subsidiaries / Investments

| Company Name | Business Description | Geography | Primary Industry | LTM Total Rev.($mm) | LFQ Total Assets ($mm) | LFQ Total Debt ($mm) |
|---|---|---|---|---|---|---|
| CoinAlpha, Inc. | CoinAlpha, Inc. develops technologies that enable developers, traders, and fintech companies to create contract-based financial products. It offers Hummingbot, an open-source protocol for Ethereum tokens; and Fund Protocol, an open-source protocol for fund administration needs. The company was incorporated in 2017 and is based in Mountain View, California. | United States and Canada | Application Software | - | - | - |
| Eucrypt pvt. ltd., Inc. | Eucrypt pvt. ltd., Inc. develops and offers Unmarshal, a decentralized network of blockchain data indexers and transforming tools to power DeFi applications on any chain. The platform offers features, such as data for balances and transactions, protocol positions, push notifications, DeFi taxing, profit and loss tracking, and historical prices. Eucrypt pvt. ltd., Inc. was | Asia / Pacific | Application Software | - | - | - |

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# BMXDM Technology Pte. Ltd. > Private Company Profile

| | | | | | | |
|---|---|---|---|---|---|---|
| | incorporated in 2021 and is based in Bengaluru, India. | | | | | |
| Highend Technologies LLC | Highend Technologies LLC, a fintech company, develops and operates a social crypto investment platform. It offers Zignaly, a social investment platform that facilitates profit sharing between professional traders and users who copy-trade strategies. The company's Zignaly provides a trading bot, copy trading, and profit sharing. The company was founded in 2018 and is based in Singapore. | Asia / Pacific | Application Software | - | - | - |
| Solid Foundations Ltd. | Solid Foundations Ltd. develops decentralized Bitcoin trading and lending platform. The company offers trading, lending, liquidity insurance, and other financial services. It offers trading, lending, and leveraged environments for Bitcoin; EVM-compatible smart contracts; everyday payments; and privacy tools. Solid Foundations Ltd. was founded in 2020 and is based in Gibraltar. | Europe | Data Processing and Outsourced Services | - | - | - |

## S&P Global Ratings Credit Ratings

No S&P Global Ratings Credit Ratings data available.

S&P Credit Ratings and Research provided by

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P Global Market Intelligence's opinions, analyses and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. While S&P Global Market Intelligence has obtained information from sources it believes to be reliable, S&P Global Market Intelligence does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



## BMXDM Technology Pte. Ltd. > Private Company Profile

S&P Global Ratings does not contribute to or participate in the creation of credit scores generated by S&P Global Market Intelligence. Lowercase nomenclature is used to differentiate S&P Global Market Intelligence PD credit model scores from the credit ratings issued by S&P Global Ratings.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.capitaliq.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Regulatory News Service data provided by 

Date Created: Aug-24-2021

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Exhibit B10

# BMXDM TECHNOLOGY PTE. LTD.

## Basic information

| | |
|---|---|
| **Company name** | BMXDM TECHNOLOGY PTE. LTD. |
| **Company number** | 201822565E |
| **Jurisdiction** | Singapore |
| **Company type** | Local Company |
| **Current status** | Registered |
| **Incorporation date** | 03 Jul, 2018 |
| **Registered address** | LAVENDER STREET, 338729 |
| **Updated at** | 22 Feb, 2019 |

Result from *OpenCorporates Company Search*

# Exhibit B11

# BITRUE SINGAPORE PTE. LTD.

## Basic information

| | |
|---|---|
| **Company name** | BITRUE SINGAPORE PTE. LTD. |
| **Company number** | 201818989M |
| **Jurisdiction** | Singapore |
| **Company type** | Local Company |
| **Current status** | Registered |
| **Incorporation date** | 04 Jun, 2018 |
| **Registered address** | WILKIE ROAD, 228095 |
| **Updated at** | 22 Feb, 2019 |

Result from *OpenCorporates Company Search*

# Exhibit B12

Delaware.gov                                    Governor | General Assembly | Courts | Elected Officials | State Agencies



**Department of State: Division of Corporations**

<u>Allowable Characters</u>

**HOME**

|  | Entity Details |
|---|---|

### THIS IS NOT A STATEMENT OF GOOD STANDING

| <u>File Number:</u> | **6092401** | <u>Incorporation Date / Formation Date:</u> | **7/11/2016** (mm/dd/yyyy) |
|---|---|---|---|
| <u>Entity Name:</u> | **BITTREX, INC.** | | |
| <u>Entity Kind:</u> | **Corporation** | <u>Entity Type:</u> | **General** |
| <u>Residency:</u> | **Domestic** | State: | **DELAWARE** |

### REGISTERED AGENT INFORMATION

| Name: | **THE CORPORATION TRUST COMPANY** |  |  |
|---|---|---|---|
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** |  |  |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** |  |  |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or
more detailed information including current franchise tax assessment, current filing history
and more for a fee of $20.00.
Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]          [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

site map | privacy | about this site | contact us | translate | delaware.gov

# Exhibit B13





BITTREX

Bittrex Support › Site Information › Legal

Search

# Bittrex, I[redacted]

Bittre[redacted]
Febru[redacted]

**Last Update[redacted]**

# INTRO[redacted]

Welcome to [redacted]

Bittrex Inc., [redacted]
your privacy[redacted]
termed, you[redacted]
provides ou[redacted]
assets on an[redacted]
bittrex.com [redacted]
other registe[redacted]
over the Pla[redacted]
allowing the[redacted]

This Privacy [redacted]
Bittrex and t[redacted]

- visit and [redacted]
- apply for [redacted]
- apply for, [redacted]
  Platform, [redacted]
  **"Services**[redacted]

Chat with Trexie

This includes any data that you may provide for and in relation to our newsletters, updates, events and other marketing and promotional communications.

This Privacy Policy also informs you about: (i) how we will handle and look after your personal data, (ii) our obligations in regard to processing your personal data responsibly and securely, (iii) your data protection rights as a data subject, and (iv) how the law protects you. It should be read in conjunction with our Cookie Policy.

# 1. IMP

## Purpose

We process
relevant law

This Policy a
in the scena
Platform and
may receive

The Site and
personal da

It is importa
we may prov
about you s
supplement

## Controll

Bittrex as de

We have app
questions in
questions o
please conta

## Contact





Full name of legal entity:            Bittrex, Inc.
Name of DPCP:                         John Roth
Email address:                        privacy@bittrex.com
Postal address:                       800 Fifth Ave., Suite 4100, Seattle, WA 98104

You have the right to lodge a complaint at any time to a competent supervisory authority on data protection matters, such as in particular the supervisory authority in the place of your habitual residence or your place of work. We would, however, appreciate the opportunity to deal with yo[...] the first inst[...]

Last Up[...]

This Policy w[...]

It is imperat[...] Otherwise, t[...] (amongst ot[...] changes dur[...]

Third-Pa[...]

Our Site ma[...] links or enab[...] We do not c[...] statements [...]

We encoura[...]

2. KEY [...]

Set out belo[...] Policy.

"Consent Fo[...] where we as[...] this Privacy [...]

"Data subje[...] process pers[...]

Chat with Trexie

"**Data controller**" or "**controller**" means any entity or individual who determines the purposes for which, and the manner in which, any personal data is processed.

"**Data processor**" or "**processor**" means any entity or individual that processes data on our behalf and on our instructions (we being the data controller).

"**Personal data**" means data relating to a living individual (i.e. **natural person**) who can be identified from the data (information) we hold or possess. This includes, but is not limited to,

your name [redacted]

nationality, [redacted]

details (inclu[redacted]

image, bank [redacted]

term "**perso**[redacted]

the same m[redacted]

"**Processing**[redacted]

recording or [redacted]

including, or [redacted]

Processing [redacted]

"**Sensitive p**[redacted]

information [redacted]

beliefs, trad[redacted]

the commis[redacted]

committed [redacted]

such procee[redacted]

**Note that p**[redacted]

**example, a** [redacted]

**name, its co**[redacted]

**personal da**[redacted]

**information** [redacted]

**obligations** [redacted]

**and secure** [redacted]

# 3. THE [redacted]

Personal da[redacted]

that person [redacted]

been remov[redacted]

Chat with Trexie

the account opening stage), we may collect, use, store and transfer different kinds of personal data about you which we have grouped together.

We collect information you provide directly to us. For example, we collect information when you create an account, participate in any interactive feature of the Services, fill out a form, participate in a community or forum discussion, complete an exchange transaction, apply for a job, request customer support or otherwise communicate with us. The types of information we may collect include your name, social security number or other government ID number, date of birth, email

and any oth

For avoidan

who hold a

be able to r

- **Identity D**
  username
  photogra
  informati

- **Contact D**
  and/or m

- **Financial**

- **AML / KY**
  about you
  database
  we may, f

  - be req
    applica

  - otherw
    (local d

- **Marketin**
  from us a

The categor

registered a

Services.

**Chat with Trexie**

- **Transaction Data** includes details about:
  - the type of virtual financial assets involved, the order volume, price, value and, where applicable, the proceeds derived;
  - your trading and transactional history on the Platform, including withdrawals and order activity; and
  - the payments which we receive, or otherwise, charge you (e.g. our fees for your use of the Platform)[redacted]

- **Portfolio** [redacted]
  your Acc[redacted]

- **Enhance**[redacted]
  would inc[redacted]
  and fundi[redacted]

In all cases, [redacted]

- **Technical** [redacted]
  passwor[redacted]
  plug-in ty[redacted]
  access th[redacted]
  including [redacted]
  page you [redacted]

- **Device D**[redacted]
  our Servi[redacted]
  identifier[redacted]

- **Usage Da**[redacted]

We also coll[redacted]
purpose. Ag[redacted]
personal da[redacted]
example, we[redacted]
specific feat[redacted]
Data with yo[redacted]
combined d[redacted]

## If you Fa[redacted]

Chat with Trexie



Where we need to collect personal data about you:

- by law; or
- under the terms of, or in connection with, the contract that we have with you (as discussed in Section 1 above); or
- as part of our legitimate (business) interests to verify the identity of our applicants and clients, mitigate against risks (such as potential or suspected fraud) and in particular, to assess an[redacted] (as subjec[redacted]

and you eith[redacted] insufficient [redacted] otherwise tr[redacted] Platform an[redacted]

In certain in[redacted] exercise our[redacted] of our servic[redacted] relationship[redacted]

## Sensitive[redacted]

We do not k[redacted] about you. S[redacted] where there[redacted] obligations [redacted]

**As set out b[redacted]**
(i) comply w[redacted] checks, and [redacted] identify and[redacted] informed de[redacted] positive, to [redacted] legal or regu[redacted] order that m[redacted]

# 4. HOW[redacted]

Chat with Trexie

## (A) Acco[redacted]



We will ask you to provide us with your **Identity, Contact, Financial** and **AML/KYC Data** when you apply to register and open an account with us on our Platform (including at account finalization stage). You provide these personal details and information to us, which we collect and process, when you fill in and submit our application form (together with other related forms) and complete our required application steps.

Your **Account Data** will be generated on the basis of your application and is also processed and stored by us.

(B) Servi

This may en
AML and KY

(C) Direc

You may als
by filling in
correspondi
you provide

- apply to c
- update or
- subscribe
- request w
- contact u
- report iss
- submit th
- request n
- participat
- provide u

(D) Auto



As you interact with the Platform and the Site, we may automatically collect Technical Data about your equipment, browsing actions and patterns. We collect this personal data by using cookies, server logs and other similar technologies.

Cookies are small data files stored on your hard drive or in device memory that help us improve our Services and your experience, see which areas and features of our Services are popular and count visits, manage the registration process for accounts, remember your site preferences, retain certain information to process orders for exchange transactions, and retain information

on our Platf

campaign ef

Most web br

to set your b

or reject coo

Please see o

## (E) Third

We may also

collect throu

parties, inclu

We may also

set out belo

- **Technica**
  - analyti
  - adverti
  - search

- **Identity,**
  document
  data sear
  fraud dat
  providers

Chat with Trexie

# 5. HOW WE USE YOUR PERSONAL DATA

We will only use your personal data when applicable law allows us to. Most commonly, we will use your personal data in the following circumstances:

- Where we need to perform the contract we are about to enter into or have entered into with you in respect of your customer relationship with us.
- Where it [redacted] interests [redacted]
- Where we [redacted]

## Purpose [redacted]

We have set [redacted] personal da[redacted] our legitima[redacted] than one la[redacted] Please conta[redacted] are relying [redacted] the table be[redacted]

| Purpose/Ac[redacted] | [redacted] |
|---|---|
| (i) To condu[redacted] checks on y[redacted] application [redacted] an account)[redacted]<br><br>(ii) To deter[redacted] into a relati[redacted] if positive, t[redacted] account and [redacted] new custom[redacted] | [redacted] |

Chat with Trexie

| | | |
|---|---|---|
| | | • your ability to meet financial commitments,<br>• and ultimately, to enable us to take an informed decision on whether we should enter into a relationship with you. |
| (i) To establish and verify your identity.<br><br>(ii) To fulfil o [redacted]<br>KYC policies [redacted]<br><br>(iii) To fulfil [redacted]<br>mandatory [redacted]<br>that we may [redacted]<br>regulatory, l [redacted]<br>tax authorit [redacted] | [redacted] | [redacted] |
| To provide t [redacted]<br>particular:<br><br>(i) to match [redacted]<br>financial ass [redacted]<br>an appropri [redacted]<br>another reg [redacted]<br><br>(ii) manage [redacted]<br>charges and [redacted]<br>and<br><br>(iii) collect a [redacted]<br>may be app [redacted]<br><br>(iv) investiga [redacted]<br>fraudulent t [redacted] | [redacted] | [redacted] |
| For legal, ta [redacted] | [redacted] | [redacted] |

Chat with Trexie

| | | |
|---|---|---|
| purposes (e.g. reporting to tax authorities, and accounting record requirements). | (b) Transaction. | obligation. |
| To detect, p[redacted] fraudulent [redacted] orders/trans[redacted] | (a) Identity;<br><br>(b) Contact<br><br>[redacted] | Necessary for our legitimate interests, including in particular to:<br><br>• protect the reputation of our [redacted] |
| To manage [redacted] you, includi[redacted]<br><br>(i) notify you[redacted] our terms a[redacted] privacy noti[redacted]<br><br>(ii) inform y[redacted] our Platform[redacted] addition of [redacted] assets that [redacted] trading);<br><br>(iii) deal with[redacted] requests, co[redacted] issues;<br><br>(iv) provide [redacted] support and[redacted] | [redacted] | [redacted] |

Chat with Trexie

(v) contact you in relation to your account, portfolio and other related matters;

(vi) ask you to participate in a survey;

(vii) request feedback from you;

(viii) advise y
legislative u

(ix) inform y

(x) provide y
about our P

(xi) administ

(xii) provide
information
you have re
from us;

(xiii) manage
or other pla

(xiv) to ident
issues with
the Site.

To administ
business, in
and the Site
troublesho
testing, syst
support, saf
testing, repo
data).

| | | |
|---|---|---|
| | | (c) Performance of a contract with you. |
| To deliver relevant website content and advertisements to you and measure or understand the effectiveness of the advertising [redacted] you. | (a) Identity;<br><br>(b) Contact;<br>[redacted] | [redacted] |
| To ensure th[redacted] presented i[redacted] manner for [redacted] computer a[redacted] user friendl[redacted] | [redacted] | [redacted] |
| To use data [redacted] the Site and [redacted] customer re[redacted] experiences[redacted] | [redacted] | [redacted] |

We make su[redacted] negative) an[redacted] do not use y[redacted] on you (unle[redacted] can obtain f[redacted] potential im[redacted] address: priv[redacted]

## Marketi[redacted]

Chat with Trexie

We strive to provide you with choices regarding certain personal data uses in relation to account. Through your **Account, Identity, Contact, Technical, Usage and Marketing an Communications Data**, we can form a view on what we think you may want or need. We will send details as to how you may enhance your trading activity in relation to the account.

Where permitted by applicable law and in accordance with your advertising / marketing preferences, you may receive marketing communications from us (which may consist of newsletters, industry updates, mailshots, publications, promotional materials and/or information

- you provi

- you have
  you to be

- provided
  below).

### Third-Pa

We will get y
parties (inclu

### Opting (

You can ask

- following

- contactin

Where you c
processed o
our Platform

### Change

We will only
reasonably
with the orig
other enforc

**Chat with Trexie**

If you wish to get an explanation as to how the processing for the new purpose is compatible with the original purpose, please contact us at privacy@bittrex.com.

If we need to use your personal data for an unrelated purpose, we will notify you and we will explain the legal basis which allows us to do so.

Please note that we may process your personal data without the need to obtain your consent, in compliance with the above rules, where this is required or permitted by law.

## 6. DISC [redacted]

We may hav [redacted] out in the ta [redacted]

- External t [redacted]
- Suppliers [redacted] behalf, in [redacted] requeste [redacted]
- Our subsi [redacted] us.
- Regulator [redacted] processin [redacted] certain ci [redacted]
- Professio [redacted] and audit [redacted]
- Other org [redacted] credit risk [redacted]
- Debt reco [redacted]
- Third par [redacted] assets (su [redacted] with them [redacted] personal [redacted]

We require [redacted] accordance [redacted] our third pa [redacted]

Chat with Trexie

purposes and only permit them to process your personal data for specified purposes and in accordance with our documented instructions. Furthermore, these third parties access and process your data on the basis of strict confidentiality and subject to the appropriate security measures and safeguards.

We may also disclose your data:

- if we are under a duty to disclose or share your personal data to comply with any legal obligation [redacted]
- if we beli [redacted] the rights [redacted]
- in connec [redacted] or acquisi [redacted]
- if we have [redacted]

We may also [redacted] to identify y [redacted]

## 7. INTE [redacted] RESIDE [redacted]

You consent [redacted] acknowledg [redacted] are necessa [redacted] the impleme [redacted] transfers ma [redacted] Article 45 of [redacted]

## 8. DATA [redacted]

While no on [redacted] to help prot [redacted] disclosure, a [redacted]

We have put [redacted] accidentally [redacted]

Chat with Trexie



limit access to your personal data to those employees, agents, contractors and other third parties who have a business need to know. They will only process your personal data on our instructions and they are subject to a duty of confidentiality.

We have put in place procedures to deal with any suspected personal data breach and will notify you and any applicable regulator of a breach where we are legally required to do so.

## 9. DATA RETENTION

### How lon [redacted]

**Please note [redacted]**
**customer re [redacted]**

We will only [redacted]
collected it f [redacted]
any legal, ac [redacted]
subject and/ [redacted]
assert, exerc [redacted]

By and large [redacted]
from the dat [redacted]
the closure/ [redacted]
us to use the [redacted]
into account [redacted]
certain case [redacted]
order to con [redacted]
Transaction [redacted]

In the event [redacted]
to a 'relevan [redacted]
business rel [redacted]
and, in certa [redacted]
by the FIAU [redacted]
period in the [redacted]
is the case a [redacted]

In some circ [redacted]

**Kindly conta [redacted]**

Chat with Trexie

## Data Minimization



Whenever and to the extent possible, we anonymize the data which we hold about you when it is no longer necessary to identify you from the data which we hold about you (**anonymous data**).

In some circumstances, we may even anonymize your personal data (so that it can no longer be associated with you) for research or statistical purposes, in which case we may use this information

## 10. YOU

Under certa
your person

- Request a
- Request co
- Request e
- Object to
- Request re
- Request tr
- Right to w

If you wish t
These rights

## No Fee u

You will not

However, we
excessive. A
circumstanc

## What we

We may need to request specific information from you to help us confirm your identity and ensure your right to access your personal data (or to exercise any of your other data subject rights). This is a security measure to ensure that personal data is not disclosed to any person who has no right to receive it. We may also contact you to ask you for further information in relation to your request to speed up our response.

## Time limit to Respond

We try to res [redacted] request.

Occasionally [redacted] have made a [redacted]

## Your Leg [redacted]

You have the [redacted]

1. **Request a** [redacted] This enab [redacted] we are law [redacted] informati [redacted]
2. **Right to i** [redacted] accessible [redacted] reasonab [redacted] from whic [redacted]
3. **Request c** [redacted] enables y [redacted] updated, [redacted] mentione [redacted] personal [redacted]
4. **Request e** [redacted] personal [redacted]
   - there i [redacted]
   - you ha [redacted]
   - we ma [redacted]
   - we are [redacted]

Chat with Trexie



Note, however, that we may not always be able to comply with your request of erasure for specific legal reasons which will be notified to you, if applicable, at the time of your request. These may include instances where continued processing is necessary in order to be able to:

- comply with a legal or regulatory obligation to which we are subject; or
- establish, exercise or defence of legal claims.

5. **Object to processing** of your personal data where we are relying on a legitimate interest (or those of a [redacted] you want [redacted] rights and [redacted] personal [redacted]

   In some c[redacted] your info[redacted]

6. **Request** [redacted] suspend [redacted]
   - if you [redacted]
   - where [redacted]
   - where [redacted] establi[redacted]
   - you ha[redacted] overrid[redacted]

7. **Request** [redacted] will provi[redacted] commonl[redacted] informati[redacted] informati[redacted]

8. **Withdraw**[redacted] data (whi[redacted] processin[redacted] activities [redacted]

**Kindly note** [redacted] **weighed ag**[redacted]

Chat with Trexie

**override your data subject request, you will be informed of this by our data protection team along with the reasons for our decision.**

## Your Choices Regarding Your Account Information

You may update, correct, or delete information about you at any time by logging into your online account. If you wish to delete or deactivate your account, please visit https://support.bittrex.com, but note that we may retain certain information as required by law or for legitin [redacted]

## 11. CH [redacted]

We may cha [redacted]
account and [redacted]
developmen [redacted]
under applic [redacted]
the policy ar [redacted]
statement to [redacted]
Privacy Polic [redacted]
about our in [redacted]

If you have a [redacted]
please conta [redacted]

## CONTA [redacted]

If you have a [redacted]
https://supp [redacted]

## Special [redacted]

As noted in [redacted]

- We will no [redacted]
  disclose y [redacted]
  informati [redacted]
  Vermont [redacted]
- Additiona [redacted]
  https://su [redacted]

Chat with Trexie

- We restrict access to nonpublic personal information about you to those employees and contractors of Bittrex who need to know that information to provide products or services to you. We maintain physical, electronic, and procedural safeguards that comply with state and federal regulations to guard your nonpublic personal information.

- We do not disclose any nonpublic personal financial information about our customers or former customers to anyone, except as permitted by law.

Was this a

488 out of 49



Have more

Articles in

Terms of Se

Bittrex Cred

Bittrex Refe

Bittrex, Inc.

State Licens

Update: New

Bittrex, Inc.

Bittrex, Inc.

Bittrex, Inc.

Mobile Appl

Chat with Trexie



© Bittrex Support

Chat with Trexie

# Exhibit B14

 

# Current details for ABN 49 622 797 737

## ABN details

| | |
|---|---|
| **Entity name:** | COLLINSTAR HOLDING PTY. LTD. |
| **ABN status:** | Active from 12 Nov 2017 |
| **Entity type:** | Australian Private Company |
| **Goods & Services Tax (GST):** | Not currently registered for GST |
| **Main business location:** | VIC 3000 |

## ASIC registration - ACN or ARBN

622 797 737 View record on the ASIC website

## Deductible gift recipient status

Not entitled to receive tax deductible gifts

---

**Disclaimer**
The Registrar makes every reasonable effort to maintain current and accurate information on this site. The Commissioner of Taxation advises that if you use ABN Lookup for information about another entity for taxation purposes and that information turns out to be incorrect, in certain circumstances you will be protected from liability. For more information see disclaimer

# Exhibit B15



**Australian Company**

COLLINSTAR HOLDING PTY. LTD.
ACN 622 797 737

Extracted from ASIC's database at AEST 04:33:45 on 27/08/2021

| Company Summary | |
|---|---|
| Name: | COLLINSTAR HOLDING PTY. LTD. |
| ACN: | 622 797 737 |
| ABN: | 49 622 797 737 |
| Registration Date: | 12/11/2017 |
| Next Review Date: | 12/11/2021 |
| | |
| Status: | Registered |
| Type: | Australian Proprietary Company, Limited By Shares |
| Locality of Registered Office: | MELBOURNE VIC 3000 |
| Regulator: | Australian Securities & Investments Commission |

Further information relating to this organisation may be purchased from ASIC.

# Exhibit B16

Delaware.gov                                                    Governor | General Assembly | Courts | Elected Officials | State Agencies



**Department of State: Division of Corporations**

<u>Allowable Characters</u>

**HOME**

| Entity Details |
| --- |

### THIS IS NOT A STATEMENT OF GOOD STANDING

| <u>File Number:</u> | **5465078** | <u>Incorporation Date / Formation Date:</u> | **1/27/2014** (mm/dd/yyyy) |
| --- | --- | --- | --- |
| <u>Entity Name:</u> | **COINBASE GLOBAL, INC.** | | |
| <u>Entity Kind:</u> | **Corporation** | <u>Entity Type:</u> | **General** |
| <u>Residency:</u> | **Domestic** | State: | **DELAWARE** |

### REGISTERED AGENT INFORMATION

| Name: | **THE CORPORATION TRUST COMPANY** | | |
| --- | --- | --- | --- |
| Address: | **CORPORATION TRUST CENTER 1209 ORANGE ST** | | |
| City: | **WILMINGTON** | County: | **New Castle** |
| State: | **DE** | Postal Code: | **19801** |
| Phone: | **302-658-7581** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or
more detailed information including current franchise tax assessment, current filing history
and more for a fee of $20.00.
Would you like ○ Status ○ Status,Tax & History Information

[Submit]

[View Search Results]          [New Entity Search]

For help on a particular field click on the Field Tag to take you to the help area.

site map  |  privacy  |  about this site  |  contact us  |  translate  |  delaware.gov

# Exhibit B17

S-1 1 coinbaseglobalincs-1.htm S-1

**As filed with the Securities and Exchange Commission on February 25, 2021**

Registration No. 333-

**UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
WASHINGTON, DC 20549**

**FORM S-1
REGISTRATION STATEMENT
UNDER
THE SECURITIES ACT OF 1933**

# Coinbase Global, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | **7389** | **46-4707224** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

**Brian Armstrong, Chief Executive Officer
Coinbase Global, Inc.
Address Not Applicable[1]**
(Address, including zip code, and telephone number, including area code, of registrant's principal executive offices)

**The Corporation Trust Company
1209 Orange Street
Wilmington, Delaware 19801
(302) 777-0200**
(Name, address, including zip code, and telephone number, including area code, of agent for service)

*Copies to:*

| | | |
|---|---|---|
| **Mark C. Stevens** | **Paul Grewal** | **Satoshi Nakamoto** |
| **Michael A. Brown** | **Juan Suarez** | **1A1zP1eP5QGefi2DMPTfTL5SLmv7DivfNa** |
| **Ran D. Ben-Tzur** | **Doug Sharp** | |
| **Faisal Rashid** | **Coinbase Global, Inc.** | |
| **Jennifer J. Hitchcock** | **Address Not Applicable[1]** | |
| **Fenwick & West LLP** | | |
| **228 Santa Monica Blvd, Suite 300** | | |
| **Santa Monica, California 90401** | | |
| **(310) 434-5400** | | |

**Approximate date of commencement of proposed sale to the public:
As soon as practicable after this registration statement becomes effective.**

If any of the securities being registered on this Form are to be offered on a delayed or continuous basis pursuant to Rule 415 under the Securities Act of 1933, as amended, or Securities Act, check the following box: ☒

If this Form is filed to register additional securities for an offering pursuant to Rule 462(b) under the Securities Act, please check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(c) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

If this Form is a post-effective amendment filed pursuant to Rule 462(d) under the Securities Act, check the following box and list the Securities Act registration statement number of the earlier effective registration statement for the same offering. ☐

---

[1]     In May 2020, we became a remote-first company. Accordingly, we do not maintain a headquarters.

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Securities Exchange Act of 1934, as amended.

Large accelerated filer ☐                                    Accelerated filer ☐
Non-accelerated filer ☒                                    Smaller reporting company ☐
                                                                       Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 7(a)(2)(B) of the Securities Act. ☐

<div align="center">

CALCULATION OF REGISTRATION FEE

</div>

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Share | Proposed Maximum Aggregate Offering Price[(1)] | Amount of Registration Fee |
|---|---|---|---|---|
| Class A common stock, $0.00001 par value per share | | Not applicable | $1,000,000,000 | $109,100 |

(1)   Estimated solely for purposes of calculating the registration fee pursuant to Rule 457(a) of the Securities Act. Given that there is no proposed maximum offering price per share of Class A common stock, the registrant calculates the proposed maximum aggregate offering price, by analogy to Rule 457(f)(2), based on the book value of the Class A common stock the registrant registers, which will be calculated from its audited balance sheet as of December 31, 2020. Given that the registrant's shares of Class A common stock are not traded on an exchange or over-the-counter, the registrant did not use the market prices of its ordinary shares in accordance with Rule 457(c).

**The registrant hereby amends this registration statement on such date or dates as may be necessary to delay its effective date until the registrant shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

**The information in this prospectus is not complete and may be changed. The securities may not be sold until the registration statement filed with the Securities and Exchange Commission is effective. This prospectus is not an offer to sell these securities and it is not soliciting an offer to buy these securities in any jurisdiction where the offer or sale is not permitted.**

**Subject to Completion, dated          , 2021.**

# Shares of Class A Common Stock



---

This prospectus relates to the registration of the resale of up to          shares of our Class A common stock by the stockholders identified in this prospectus, or the registered stockholders. Prior to the listing of our Class A common stock on the Nasdaq Global Select Market there has been no public market for our Class A common stock. Unlike an initial public offering, the resale by the registered stockholders is not being underwritten by any investment bank. The registered stockholders may elect to sell their shares of Class A common stock covered by this prospectus, as and to the extent they may determine. Such sales, if any, will be made through brokerage transactions on the Nasdaq Global Select Market at prevailing market prices. For more information, see the section titled "Plan of Distribution." If the registered stockholders choose to sell their shares of Class A common stock, we will not receive any proceeds from the sale of such shares.

We have two classes of common stock, Class A common stock and Class B common stock. The rights of the holders of Class A common stock and Class B common stock are identical, except with respect to voting and conversion rights. Each share of Class A common stock is entitled to one vote. Each share of Class B common stock is entitled to twenty votes and is convertible at any time into one share of Class A common stock. The holders of our outstanding Class B common stock hold approximately          % of the voting power of our outstanding capital stock, with our directors, executive officers, and 5% stockholders, and their respective affiliates, holding approximately          % of the voting power of our outstanding capital stock. Prior to any sales of shares of Class A common stock, a registered stockholder who holds Class B common stock must convert their shares of Class B common stock into shares of Class A common stock.

No public market for our Class A common stock currently exists. However, our shares of Class A common stock and Class B common stock (on an as-converted basis) have a history of trading in private transactions. Based on information available to us, the low and high sales price per share of Class A common stock and Class B common stock (on an as-converted basis) for such private transactions during the period from January 1, 2021 through          , 2021 was $          and $          , respectively. For more information, see the section titled "Sale Price History of our Capital Stock." Our recent trading prices in private transactions may have little or no relation to the opening public price or the subsequent trading price of our shares of Class A common stock on the Nasdaq Global Select Market. Further, the listing of our Class A common stock on the Nasdaq Global Select Market without underwriters is a novel method for commencing public trading in shares of our Class A common stock, and consequently, the trading volume and price of shares of our Class A common stock may be more volatile than if shares of our Class A common stock were initially listed in connection with an underwritten initial public offering.

On the day that our shares of Class A common stock are initially listed on the Nasdaq Global Select Market, the Nasdaq Stock Market LLC, or Nasdaq, will begin accepting, but not executing, pre-opening

buy and sell orders and will begin to continuously generate the indicative Current Reference Price (as defined below) on the basis of such accepted orders. During a 10-minute "Display Only" period, market participants may enter quotes and orders in Class A common stock in Nasdaq's systems and such information is disseminated, along with other indicative imbalance information, to Goldman Sachs & Co. LLC, or Goldman Sachs, and other market participants (including the other financial advisors) by Nasdaq on its NOII and BookViewer tools. Following the "Display Only" period, a "Pre-Launch" period begins, during which Goldman Sachs, in its capacity as our designated financial advisor to perform the functions under Nasdaq Rule 4120(c)(8), must notify Nasdaq that our shares are "ready to trade." Once Goldman Sachs has notified Nasdaq that our shares of Class A common stock are ready to trade, Nasdaq will calculate the Current Reference Price (as defined below) for our shares of Class A common stock, in accordance with the Nasdaq's rules. If Goldman Sachs then approves proceeding at the Current Reference Price, Nasdaq will conduct price validation checks in accordance with Nasdaq rules. As part of conducting its price validation checks, Nasdaq may consult with Goldman Sachs and other market participants (including the other financial advisors). Upon completion of such price validation checks, the applicable orders that have been entered will then be executed at such price and regular trading of our shares of Class A common stock on the Nasdaq Global Select Market will commence. Under the Nasdaq rules, the "Current Reference Price" means: (i) the single price at which the maximum number of orders to buy or sell our shares of Class A common stock can be matched; (ii) if more than one price exists under clause (i), then the price that minimizes the number of our shares of Class A common stock for which orders cannot be matched; (iii) if more than one price exists under clause (ii), then the entered price (i.e. the specified price entered in an order by a customer to buy or sell) at which our shares of Class A common stock will remain unmatched (i.e. will not be bought or sold); and (iv) if more than one price exists under clause (iii), a price determined by Nasdaq after consultation with Goldman Sachs, J.P. Morgan Securities LLC, or J.P. Morgan, Allen & Company LLC, or Allen & Co., and Citigroup Global Markets Inc., or Citigroup, in their capacity as financial advisors, Goldman Sachs, J.P. Morgan, Allen & Co., and Citigroup will exercise any consultation rights only to the extent that they may do so consistent with the anti-manipulation provisions of the federal securities laws, including Regulation M (to the extent applicable), or applicable relief granted thereunder. The registered stockholders will not be involved in Nasdaq's price-setting mechanism, including any decision to delay or proceed with trading, nor will they control or influence Goldman Sachs, J.P. Morgan, Allen & Co., and Citigroup in carrying out their roles as financial advisors. Goldman Sachs will determine when our shares of Class A common stock are ready to trade and approve proceeding at the Current Reference Price primarily based on consideration of volume, timing, and price. In particular, Goldman Sachs will determine, based primarily on pre-opening buy and sell orders, when a reasonable amount of volume will cross on the opening trade such that sufficient price discovery has been made to open trading at the Current Reference Price. For more information, see the section titled "Plan of Distribution."

We have applied to list our Class A common stock on the Nasdaq Global Select Market under the symbol "COIN." We expect our Class A common stock to begin trading on or about                    , 2021.

We will be treated as an "emerging growth company" as that term is used in the Jumpstart Our Business Startups Act of 2012 for certain purposes until we complete this listing. As such, in this prospectus we have taken advantage of certain reduced disclosure obligations that apply to emerging growth companies regarding selected financial data and executive compensation arrangements.

***See the section titled "Risk Factors" beginning on page 15 to read about factors you should consider before buying shares of our Class A common stock.***

**Neither the Securities and Exchange Commission nor any other regulatory body has approved or disapproved of these securities or passed upon the accuracy or adequacy of this prospectus. Any representation to the contrary is a criminal offense.**

                    , 2021





**OUR MISSION**

# Create an open financial system for the world



coinbase

coinbase



**OUR VISION**

# More economic freedom for every person and business

# Monthly Transacting Users



2.8M

2020

# Verified Users



43M

2020

Year-end data as of December 31, 2020



# $456 Billion
## Lifetime Trading Volume

# $90 Billion
## Assets on Platform

As of December 31, 2020

**TABLE OF CONTENTS**

| | |
|---|---|
| About This Prospectus | ii |
| Glossary to the Cryptoeconomy | iii |
| A Letter from our Co-Founder and CEO | vi |
| Prospectus Summary | 1 |
| Risk Factors | 15 |
| Special Note Regarding Forward-Looking Statements | 75 |
| Market and Industry Data | 77 |
| Use of Proceeds | 78 |
| Dividend Policy | 79 |
| Capitalization | 80 |
| Selected Consolidated Financials and Other Data | 83 |
| Management's Discussion and Analysis of Financial Condition and Results of Operations | 88 |
| Business | 120 |
| Management | 155 |
| Executive Compensation | 166 |
| Certain Relationships and Related Party Transactions | 178 |
| Principal and Registered Stockholders | 182 |
| Description of Capital Stock | 186 |
| Shares Eligible for Future Sale | 196 |
| Sale Price History of our Capital Stock | 198 |
| Certain Material U.S. Federal Income Tax Consequences to Non-U.S. Holders of Our Common Stock | 199 |
| Plan of Distribution | 204 |
| Legal Matters | 207 |
| Change In Accountants | 207 |
| Experts | 207 |
| Additional Information | 208 |
| Index to Consolidated Financial Statements | F-1 |

_____

You should rely only on the information contained in this prospectus or contained in any free writing prospectus filed with the Securities and Exchange Commission, or SEC. Neither we nor the registered stockholders have authorized anyone to provide any information or to make any representations other than those contained in this prospectus or in any free writing prospectuses we have prepared. Neither we nor the registered stockholders take responsibility for, and can provide no assurance as to the reliability of, any other information that others may give you. The registered stockholders are offering to sell, and seeking offers to buy, shares of their Class A common stock only in jurisdictions where it is lawful to do so. The information contained in this prospectus is accurate only as of the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of the Class A common stock. Our business, financial condition, operating results, and prospects may have changed since that date.

For investors outside of the United States: Neither we nor any of the registered stockholders have done anything that would permit this offering or possession or distribution of this prospectus in any jurisdiction where action for that purpose is required, other than in the United States. Persons outside the United States who come into possession of this prospectus must inform themselves about, and observe any restrictions relating to, the offering of Class A common stock by the registered stockholders and the distribution of this prospectus outside of the United States.

**ABOUT THIS PROSPECTUS**

This prospectus is a part of a registration statement on Form S-1 that we filed with the SEC using a "shelf" registration or continuous offering process. Under this shelf process, the registered stockholders may, from time to time, sell the Class A common stock covered by this prospectus in the manner described in the section titled "Plan of Distribution." Additionally, we may provide a prospectus supplement to add information to, or update or change information contained in, this prospectus (except for the section titled "Plan of Distribution," which additions, updates, or changes that are material shall only be made pursuant to a post-effective amendment). You may obtain this information without charge by following the instructions under the section titled "Additional Information" appearing elsewhere in this prospectus. You should read this prospectus and any prospectus supplement before deciding to invest in our Class A common stock.

As used in this registration statement, the term "registered stockholders" refers to the stockholders with shares registered hereunder pursuant to the table appearing in the section titled "Principal and Registered Stockholders" and their pledgees, donees, transferees, assignees, or other successors-in-interest.

ii

**Glossary to the Cryptoeconomy**

Throughout this prospectus, we use a number of industry terms and concepts which are defined as follows:

- **Address**: An alphanumeric reference to where crypto assets can be sent or stored.

- **Bitcoin**: The first system of global, decentralized, scarce, digital money as initially introduced in a white paper titled *Bitcoin: A Peer-to-Peer Electronic Cash System* by Satoshi Nakamoto.

- **Block**: Synonymous with digital pages in a ledger. Blocks are added to an existing blockchain as transactions occur on the network. Miners are rewarded for "mining" a new block.

- **Blockchain**: A cryptographically secure digital ledger that maintains a record of all transactions that occur on the network and follows a consensus protocol for confirming new blocks to be added to the blockchain.

- **Cold storage**: The storage of private keys in any fashion that is disconnected from the internet. Common cold storage examples include offline computers, USB drives, or paper records.

- **Crypto**: A broad term for any cryptography-based market, system, application, or decentralized network.

- **Crypto asset (or 'token')**: Any digital asset built using blockchain technology, including cryptocurrencies, stablecoins, and security tokens.

- **Crypto Asset Volatility**: Represents our internal measure of crypto volatility in the market relative to prior periods. The volatility of crypto assets is measured on an hourly basis (using 10 minute price intervals within each hour) for each crypto asset supported for trading on Coinbase, averaged over the applicable time period (quarterly), then weighted by each crypto asset's share of total trading volume during the same time period across a select set of trading platforms, in addition to the Coinbase platform, that operate in similar markets including itBit, Bitfinex, Bitstamp, bitFlyer, Binance.US, Binance, Kraken, Gemini, Bittrex, and Poloniex.

- **Cryptocurrency**: Bitcoin and alternative coins, or 'altcoins', launched after the success of Bitcoin. This category of crypto asset is designed to work as a medium of exchange, store of value, or to power applications and excludes security tokens.

- **Cryptoeconomy**: A new open financial system built upon crypto.

- **Customer**: A retail user, institution, or ecosystem partner on our platform.

- **DeFi**: Short for Decentralized Finance. Peer-to-peer software-based network of protocols that can be used to facilitate traditional financial services like borrowing, lending, trading derivatives, insurance, and more through smart contracts.

- **Ecosystem partners**: Developers, creators, merchants, asset issuers, organizations and financial institutions, and other groups building decentralized protocols, applications, products, or other services for the cryptoeconomy.

- **Ethereum**: A decentralized global computing platform that supports smart contract transactions and peer-to-peer applications, or "Ether," the native crypto assets on the Ethereum network.

- **Fork**: A fundamental change to the software underlying a blockchain which results in two different blockchains, the original, and the new version. In some instances, the fork results in the creation of a new token.

- **Hodl**: A term used in the crypto community for holding a crypto asset through ups and downs, rather than selling it.

- **Hot wallet**: A wallet that is connected to the internet, enabling it to broadcast transactions.

- **Institutions**: Businesses that include hedge funds, small to large financial institutions, and corporations.

- **Miner**: Individuals or entities who operate a computer or group of computers that add new transactions to blocks, and verify blocks created by other miners. Miners collect transaction fees and are rewarded with new tokens for their services.

- **Mining**: The process by which new blocks are created, and thus new transactions are added to the blockchain.

- **Network**: The collection of all miners that use computing power to maintain the ledger and add new blocks to the blockchain. Most networks are decentralized, reducing the risk of a single point of failure.

- **Protocol**: A type of algorithm or software that governs how a blockchain operates.

- **Public key or private key**: Each public address has a corresponding public key and private key that are cryptographically generated. A private key allows the recipient to access any funds belonging to the address, similar to a bank account password. A public key helps validate transactions that are broadcasted to and from the address. Addresses are shortened versions of public keys, which are derived from private keys.

- **Retail users**: Individual users with an account on our platform.

- **Security token**: A crypto asset that is a security. This includes digital forms of traditional equity or fixed income securities, or may be assets deemed to be a security based on their characterization as an investment contract or note.

- **Smart contract**: Software that digitally facilitates or enforces a rules-based agreement or terms between transacting parties.

- **Stablecoin**: Crypto assets designed to minimize price volatility. A stablecoin is designed to track the price of an underlying asset such as fiat money or an exchange-traded commodity (such as precious metals or industrial metals). Stablecoins can be backed by fiat money or other crypto assets.

- **Staking**: An energy efficient equivalent of mining. Stakers use pools of tokens as collateral to validate transactions and create blocks. In exchange for this service, stakers earn a reward.

- **Supported crypto assets**: The crypto assets we support for trading and/or custody on our platform, which included over 90 crypto assets as of December 31, 2020.

- **USD Coin or USDC**: A stablecoin issued through the Centre Consortium (co-founded by Coinbase and Circle Internet Financial Limited, or Circle), backed by fully reserved assets, held by the issuer, and able to be purchased and sold on a 1:1 basis for U.S. dollars.

- **Wallet**: A place to store public and private keys for crypto assets. Wallets are typically software, hardware, or paper-based.

- **Wallet user**: A retail user who has established an account with a username on our non-custodial software-based product. Coinbase Wallet is an application that allows the user to connect to DeFi applications and self-custody crypto assets. While they operate separately from our main

platform, wallet users are included in the following key business metrics: Verified Users and Monthly Transacting Users.

For additional information regarding our key business metrics, which include Verified Users, Monthly Transacting Users, Assets on Platform, and Trading Volume as well as our use of Adjusted EBITDA, a non-GAAP financial measure, see the section titled "Selected Consolidated Financial and Other Data—Key Business Metrics and Non-GAAP Financial Measure."

v

Letter from
Brian Armstrong

Coinbase
**Founder Letter**



**Brian Armstrong**
CEO, Coinbase

### Economic Freedom

Coinbase is a company with an ambitious vision: to create more economic freedom for every person and business. Everyone deserves access to financial services that can help empower them to create a better life for themselves and their families, but today we are a long way from this vision.

The current financial system is rife with high fees, delays, unequal access, and barriers to innovation. In many countries, citizens don't have access to sound money, a functioning credit system, or even basic property rights. If the world economy ran on a common set of standards, that could not be manipulated by any company or country, the world would be a more fair and free place, and human progress would accelerate.

When I first read the Bitcoin whitepaper back in 2010, I realized this computer science breakthrough might be the key to unlock this vision of the future. Every payment could be as fast, cheap, and global as sending an email. Cryptocurrency could provide the core tenets of economic freedom to anyone: property rights, sound money, free trade, and the ability to work how and where they want. Economic freedom is a necessary, if not sufficient, condition for human progress. Societies with greater economic freedom have higher life expectancy and GDP growth, less war and corruption, better treatment of the environment, and higher income of the poorest 10% of people in society. Higher economic freedom correlates with the kind of societies that we all aspire to create. Our job at Coinbase is to help make this future a reality.

### The Cryptoeconomy

What started with Bitcoin has spawned an entire industry with countless different blockchains and tokens. We now have stablecoins, privacy coins, security tokens, reward tokens, governance tokens, and smart contracts. We're seeing the digitization of all types of value in a new economy that we call the cryptoeconomy.

Trading and speculation were the first major use cases to take off in cryptocurrency, just like people rushed to buy domain names in the early days of the internet. But we're now seeing cryptocurrency evolve into something much more important. People are using cryptocurrency to earn, spend, save, stake, borrow, lend, vote, and perform many other types of economic activity. Companies are being funded, getting early customers, and will eventually go public, all on the blockchain. The cryptoeconomy is just getting started. It is not intended to replace the traditional economy, but instead be a complement to it, much like email was to paper mail. The cryptoeconomy offers a more global, free, and fair alternative to traditional economies that is native to the internet.

### A Safe, Trusted, and Easy-to-Use Platform

Coinbase is building the infrastructure to power the cryptoeconomy, helping bring the benefits of this new technology to the world. Today, you could think of our products as a safe and easy-to-use platform to buy, sell, store, save, spend, and use cryptocurrency. But for many of our customers, they simply think of us as their primary financial account in the cryptoeconomy. Coinbase is building a portfolio of different products and services that connect to this primary financial account, and we're enabling third party products and services to be connected as well. We seek to make all of our products and services the most trusted and easiest to use in the industry.

Trust is critical when it comes to storing money. From the early days, we decided to focus on compliance, reaching out to regulators proactively to be an educational resource, and pursuing licenses even before they were needed. We invested heavily in cybersecurity, built novel key storage mechanisms, and obtained a cybercrime insurance policy. We even developed ways for customers to custody their own cryptocurrency safely, so they didn't need to trust us at all. Most importantly, we built a culture that doesn't take shortcuts or try to make a quick buck.

Ease of use is our other major area of focus. Cryptocurrency is still much too difficult to use for the average person. In the same way that people can access the internet without understanding how TCP/IP works, or turn on a light switch without understanding how electricity works, they need to be able to use cryptocurrency without understanding the underlying complexity. We accomplish this by continually finding ways to simplify our products and pushing for new standards in the industry that improve usability.

Trust and ease of use will be as relevant in ten years as they are today, and our work here will never be done. We may not always move the fastest, or offer the lowest prices, but if we accomplish our goal of being the most trusted and easiest to use, customers will continue to choose our products and services now and in the future.

### Building for the Long Term

It is the very early days of this industry, and Coinbase has always taken a long-term view. We are squarely focused on delivering the best crypto experience to our customers. Today, we are investing in growth because we believe that scale is critical to achieving the potential of our business model.

You can expect volatility in our financials, given the price cycles of the cryptocurrency industry. This doesn't faze us, because we've always taken a long-term perspective on crypto adoption. We may earn a profit when revenues are high, and we may lose money when revenues are low, but our goal is to roughly operate the company at break even, smoothed out over time, for the time being. We are looking for long-term investors who believe in our mission and will hold through price cycles.

Our goal is to build a portfolio of products and services with efficient capital allocation and to demonstrate repeatable innovation. We have done this before, taking the profits from our early products and services and reinvesting them into new products and services that we believe help accelerate our vision of the future. We will continue to make investments in new products and services when we see a sufficient probability of gaining market leadership. Some of these investments will pay off, others will not. We will measure our products and services and the effectiveness of our investments analytically, and shut down products and services that do not provide expected returns. We will learn from our successes and mistakes, and use those learnings to inform our decision making in the future. We hope this perspective will make us more profitable in the long run as we see the full scale of this industry unfold.

Thank you,

Brian Armstrong
CEO, Coinbase



# Prospectus Summary

**PROSPECTUS SUMMARY**

*This summary highlights selected information that is presented in greater detail elsewhere in this prospectus. This summary does not contain all of the information you should consider before investing in our Class A common stock. You should carefully read this prospectus in its entirety before investing in our Class A common stock, including the sections titled "Risk Factors," "Special Note Regarding Forward-Looking Statements," and "Management's Discussion and Analysis of Financial Condition and Results of Operations," and our consolidated financial statements and the accompanying notes, provided elsewhere in this prospectus. Some of the statements in this prospectus constitute forward-looking statements. See the section titled "Special Note Regarding Forward-Looking Statements." Unless the context otherwise requires, the terms "Coinbase," "the company," "we," "us," and "our" in this prospectus refer to Coinbase Global, Inc. and our consolidated subsidiaries.*

**Overview**

Coinbase powers the cryptoeconomy.

Our mission is to create an open financial system for the world. Today, the way that we invest, spend, save, and generally manage our money remains cumbersome, inaccessible, expensive, and regionally isolated. In contrast, the internet has transformed our society by connecting the world and enabling the seamless exchange of information. The legacy financial system is struggling to keep pace with the speed of technological advancements in a global and digitally interconnected society, resulting in the need for a new, natively digital financial system.

We are building the cryptoeconomy – a more fair, accessible, efficient, and transparent financial system for the internet age that leverages crypto assets: digital assets built using blockchain technology.

We started in 2012 with the radical idea that anyone, anywhere, should be able to easily and securely send and receive Bitcoin, the first crypto asset. We built a trusted platform for accessing Bitcoin and the broader cryptoeconomy by reducing the complexity of the industry through a simple and intuitive user experience.

Today, we are a leading provider of end-to-end financial infrastructure and technology for the cryptoeconomy. Customers around the world discover and begin their journeys with crypto through Coinbase. In the early days of the internet, Google democratized access to information through its user-friendly search engine, enabling virtually any user with an internet connection to discover the world's information. Similarly, Coinbase is democratizing access to the cryptoeconomy by enabling anyone with an internet connection to easily and securely invest in and use crypto assets.

Customers that start with us, grow with us as they experience the benefits of the open financial system by using crypto-based products for staking, spending, saving, and borrowing. Today, our platform enables approximately 43 million retail users, 7,000 institutions, and 115,000 ecosystem partners in over 100 countries to participate in the cryptoeconomy:

- *Retail users*: We offer the primary financial account for the cryptoeconomy – a safe, trusted, and easy-to-use platform to invest, store, spend, earn, and use crypto assets.

- *Institutions*: We provide hedge funds, money managers, and corporations a one-stop shop for accessing crypto markets through advanced trading and custody technology, built on top of a robust security infrastructure. We also offer a state of the art marketplace with a deep pool of liquidity for transacting in crypto assets.

- *Ecosystem partners*: We provide developers, merchants, and asset issuers a platform with technology and services that enables them to build applications that leverage crypto protocols, actively participate in crypto networks, and securely accept cryptocurrencies as payment.

Bitcoin sparked a revolution by proving the ability to create digital scarcity: a unique and finite digital asset whose ownership could be proven with certainty. This innovation laid the foundation for an open financial system. Today, all forms of value – from those natively created online such as in-game digital goods to traditional securities like equities and bonds – can be represented digitally, as crypto assets. Like the bits of data that power the internet, these crypto assets can be dynamically transmitted, stored, and programmed to serve the needs of an increasingly digital and globally interconnected economy.

Today, we enable customers around the world to store their savings in a wide range of crypto assets, including Bitcoin and USD Coin, and to instantly transfer value globally with the tap of a finger on a smartphone. We provide companies with new ways to transact, incentivize, and reward their users, from offering compounding rewards on savings that pay out by the second to compensating users for virtually completing tasks through global micropayments.

We power the cryptoeconomy by combining the best of both emerging blockchain technology and traditional finance to create trusted and easy-to-use products for the industry. We have built a robust backend technology platform to support the global, real-time, and 24/7/365 demands of crypto asset markets. We invest heavily in regulatory compliance by working with regulators around the world to shape policy, and have pioneered industry-leading security practices for safeguarding crypto assets. Our early focus on trust and usability has allowed us to become the primary on-ramp to the cryptoeconomy from the fiat-based financial system.

Our unique approach draws retail users, institutions, and ecosystem partners to our platform, creating a powerful flywheel: retail users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth of crypto assets that we offer, and launch new, innovative products and services that attract new customers. Our scale and leadership position draws ecosystem partners to connect with our millions of customers around the world, further enhancing the value of our platform.

This self-reinforcing dynamic is enabled by our culture of repeatable innovation and continuous investment in our proprietary technology platform that is purpose built to address the unique engineering, cybersecurity, compliance, and usability challenges of directly interacting with blockchain protocols. With every turn of our flywheel, we develop a deeper understanding of our customers' needs and leverage our scalable platform to intelligently design, develop, launch, and market new, innovative products and services to our customers. This allows us to build a more tailored suite of products and services and enhances the value of our platform over time. By providing the necessary infrastructure and distribution for our current and future ecosystem partners to build and extend their reach, we also foster the growth of the ecosystem.

We have seen this flywheel work effectively across our business and we have grown rapidly as a result. As of December 31, 2020, our customers had traded over $456 billion on our platform since inception and stored over $90 billion worth of assets across our platform. This growth has come with minimal outbound sales and marketing effort – since inception over 90% of our retail users had found us organically or through word-of-mouth.

Since inception through December 31, 2020, we generated over $3.4 billion in total revenue, largely from transaction fees that we earn from volume-based trades on our platform by retail users and institutions. For the year ended December 31, 2020, transaction revenue represented over 96% of our net revenue. We have leveraged the strength of our trading business to scale and broaden our platform by investing in our flywheel to launch new products and services and grow the ecosystem.

Today, we directly integrate with over 15 blockchain protocols, support over 90 crypto assets for trading or custody, and offer a suite of subscription products and services that have enhanced the customer value proposition and power of our platform. Retail users are now engaging with multiple products — across the four quarters ended December 31, 2020, on average, 21% of retail users who invested also engaged with at least one non-investing product[2] per quarter. When retail users invested

---

[2] Non-investing products include our Distribute, Stake, Save, Spend, and Borrow & Lend products.

and engaged with at least one non-investing product, we saw average net revenue per retail user increase by approximately 90%. Although subscription products and services do not currently contribute a significant portion of net revenue relative to our trading business, we experienced 126% annual growth in revenue from these products and services from 2019 to 2020. We are committed to growing more stable revenue from subscription products and services, and expect that they will contribute a larger portion of our total revenue over time as our customers connect with the broader cryptoeconomy.

The overall market capitalization of crypto assets grew from less than $500 million to $782 billion between December 31, 2012 and December 31, 2020, representing a compound annual growth rate, or CAGR,[3] of over 150%. Over the same period, our retail users grew from approximately 13,000 to 43 million. More recently, we have experienced significant growth in the number of institutions on our platform, increasing from over 1,000 as of December 31, 2017 to 7,000 as of December 31, 2020.

While we have grown rapidly, similar to the evolution of the internet, e-commerce, and prior paradigm shifts in technology, our journey has not been linear. Our growth has come in waves driven by innovation in the cryptoeconomy and requires long-term perspective to evaluate our performance. Each wave expands the existing retail user community and further diversifies the ecosystem by attracting new market participants such as institutions and developers. In the short-term, we experience high variance in Trading Volume and net revenue between quarters driven by the volatile nature of the crypto asset markets. Over longer periods, we have experienced clear growth, with median quarterly Trading Volume increasing from $17 billion to $21 billion to $38 billion in 2018, 2019, and 2020, respectively.

We have grown quickly and in a capital-efficient manner since our founding. For the years ended December 31, 2020 and December 31, 2019, we generated total revenue of $1.3 billion and $533.7 million, respectively, net income (loss) of $322.3 million and $(30.4) million, respectively, and Adjusted EBITDA of $527.4 million and $24.3 million, respectively. See the section titled "Selected Consolidated Financial and Other Data—Key Business Metrics and Non-GAAP Financial Measure—Non-GAAP Financial Measure" for information regarding our use of Adjusted EBITDA and a reconciliation of net income (loss) to Adjusted EBITDA.

**Limitations of Today's Financial System**

Today's financial system relies upon a patchwork of intermediaries that spans banks, brokers, clearinghouses, custodians, exchanges, payment processors, and their networks to facilitate money movement, safekeeping, lending, credit, and other capital markets activity. The trust and reliance on this complex web of intermediaries imposes the following limitations:

- *Access.* Geographic and socioeconomic factors often limit access to legacy financial infrastructure, such as bank accounts, that are required to send, store, or receive funds.

- *Efficiency.* Multiple administrative layers, including protocols, people, procedures, and infrastructure are required to facilitate the movement of money, imposing legacy constraints on financial transactions, adding friction, and leading to the duplication of functions across the value chain.

- *Cost.* Redundancy and inefficiency result in higher costs for end users.

Many companies in the technology and financial technology industries have recognized and attempted to address some of these issues. However, these companies have built their products and services on top of the same antiquated financial infrastructure, effectively porting the limitations, inefficiencies, and costs of the traditional financial system online. As a result, these solutions do not address the core limitations of the current financial system.

---

[3] Based on publicly available data from the earliest available date. Calculation period is December 31, 2012 to December 31, 2020.

**The Need for An Internet of Value**

While the internet has transformed how we communicate and purchase goods and services, the existing financial system has hardly changed. We have reached a tipping point for the need for a new, natively digital financial system.

Crypto deeply integrates the concept of money into the internet ecosystem as a means of value exchange, storage, and unit of account, effectively creating a resilient internet of value. This enables network participants to transact with each other on the basis of trust without intermediaries. Crypto enables the digital representation and instant, secure exchange of nearly any asset of value globally in a manner as fast and seamless as the exchange of information on the internet. Today, over 50 distinct blockchain protocols support more than 7,500 crypto assets that enable all forms of digital records and transactions, including contracts, documents, identity, rights, securities, titles, in-game digital goods, and many others, to be controlled programmatically.

Anyone, anywhere with an internet connection can directly access this network of value exchange.

**Applications in the Cryptoeconomy are Expansive**

A fundamental advantage of the cryptoeconomy is that unlike the traditional financial system that relies on rigid infrastructure, crypto assets rely on software-based networks built on top of the internet. As a result, crypto assets are easily programmed, maneuvered, and as frictionless to send and receive as information on the internet.

The inherent programmability of crypto assets enables the creation of "smart contracts," self-enforcing agreements between transacting parties directly written into lines of code. Smart contracts represent a step change in the utility of blockchain-based networks by allowing parties to enter into contractual agreements without the need for a centralized intermediary.

Today, the applications of crypto assets span core financial and non-financial applications:

- ***Store of value.*** Adoption of crypto assets with attributes such as a finite supply, such as Bitcoin, or inherent parity with a fiat currency, such as USD Coin, have emerged as stores of value around the world.

- ***24/7/365 real-time cross-border payments.*** Crypto asset markets operate 24/7/365 and facilitate the instant transfer of value, eliminating the need for any intermediary, siloed payment networks, or specialized infrastructure.

- ***Democratization of financial markets.*** Blockchain protocols establish a universal source of truth, eliminating reconciliation workflows, allowing for near instantaneous settlement, enabling capital to flow more freely, and simplifying transactions that require significant documentation.

- ***Peer-to-peer financial applications (DeFi applications).*** Crypto assets rely on software-based networks that can be used to facilitate traditional financial services like borrowing, lending, trading derivatives, and insurance through smart contracts.

- ***Digital marketplaces for…anything.*** Crypto allows for the creation of new digital global marketplaces and business models that were previously not possible by substituting centralized intermediaries with open markets governed by programmable rules and incentives.

**Our Opportunity**

Crypto has the potential to be as revolutionary and widely adopted as the internet. The unique properties of crypto assets naturally position them as digital alternatives to store of value analogs such as gold, enable the creation of an internet-based financial system, and provide a development platform for

applications that are unimaginable today. These markets and asset classes collectively represent hundreds of trillions of dollars of value today.

Similar to the early days of the internet, this evolution will take time, but we expect the cryptoeconomy to expand into the mainstream and touch every individual and business around the world in the coming decades. While we are still in the early stages of adoption, the market value of exchange-traded crypto assets was already approximately $782 billion as of December 31, 2020. Our objective is to drive the growth of the overall cryptoeconomy by serving the needs of all consumers who manage their financial lives on a mobile device, and every institution – large or small – that embraces the emerging internet of value.

We expect our customer base to grow alongside the ecosystem we serve as we continue to support more asset classes and add more products to our platform. Our objective is to bring crypto-based financial services to anyone with a smartphone, a population of approximately 3.5 billion people today.

**Our Platform**

We have developed a complementary suite of products and services that are designed to meet the distinct needs of our customers as they transact in the cryptoeconomy. Our customers – retail users, institutions, and ecosystem partners – come together on our platform to create a powerful flywheel for our business.

Our platform and flywheel are powered by a robust backend technology system that enables us to develop, launch, and market scalable new products and services. Our technology platform includes the following elements:

- ***15+ native blockchain integrations and counting.*** We have developed custom technology and processes to directly integrate with over 15 blockchain protocols and efficiently support new protocols.

- ***Advanced cybersecurity and cryptography technology.*** We have pioneered industry-leading standards for managing private cryptographic keys and use sophisticated cybersecurity technologies such as multi-party computation to safeguard a wide range of crypto assets.

- ***Proprietary crypto compliance infrastructure.*** We have built bespoke transaction monitoring systems to analyze crypto asset transactions in real-time on the blockchain, allowing us to support new products and services.

- ***Powerful product experiences.*** Investments in our technology platform give us the ability to create unique product experiences for our customers that allow them to easily participate in technically complex parts of the cryptoeconomy.

**What Sets Us Apart**

We believe the following advantages set us apart from our competitors:

- ***We are a market leading brand exclusively focused on the cryptoeconomy.*** Keeping pace with the breadth and depth of innovation in the cryptoeconomy requires focus. We have and remain solely focused on building technology to power the cryptoeconomy since 2012. Our focus allows us to nimbly adapt to quickly shifting trends and support the growth of the industry. As the cryptoeconomy grows, our competitive advantage grows.

- ***We have a trusted platform owing to our heritage of security and culture of regulatory compliance.*** We are a financial technology provider that offers services to customers in over 100 countries, and we are proud to be one of the longest running crypto platforms where customers have not lost funds due to a security breach of the platform. We are also licensed to engage in

money transmission and virtual currency business in almost all U.S. states and we continue to pursue licensing in select jurisdictions internationally.

- ***We are the default starting place for new user journeys into the cryptoeconomy.*** By reducing the complexity of crypto and emphasizing intuitive product design, we have become a primary on-ramp for customers' journeys into the cryptoeconomy.

- ***We have significant scale, securely storing over $90 billion in total assets.*** We believe our market leading share of assets on our platform is a competitive advantage, and that we have a substantial opportunity to build on our customer relationships by growing with our customers and offering a broader suite of products and services.

- ***We have a robust technology platform that enables unique product experiences for our industry.*** Our custom technology platform is built to deal with the real-time, global and 24/7/365 nature of crypto asset markets, enabling us to rapidly research, develop, and launch new products and features.

- ***We operate a marketplace with one of the deepest pools of liquidity and a network effect.*** We have a deep pool of liquidity for exchanging a wide range of crypto assets, supported by a healthy mix of retail and institutional activity.

## Growth Strategy

Coinbase grows as the cryptoeconomy grows. We live in a world that is increasingly global, digital generations control a growing share of the world's wealth, and each year we see more commerce happening online. Each of these secular trends supports the growth of the cryptoeconomy and Coinbase. More importantly, we feel we have a tremendous opportunity to actively drive our business by:

- ***Adding more customers.*** Any person or business with an internet connection that is looking to access or interact with the cryptoeconomy can be an active user and customer on our platform. We intend to add more customers by expanding and growing:

  - touchpoints with our customers to increase adoption and engagement with our products.

  - retail user reach through growth marketing.

  - institutional sales coverage and trading operations support to better serve large institutional customers.

  - ecosystem relationships through targeted community engagement and product development.

  - access to our products and services by adding support for geographically local payment methods.

  - internationally to broaden local access to the cryptoeconomy.

- ***Expanding the depth and breadth of assets.*** Any asset or form of value can be represented as a crypto asset and be supported on our platform, subject to meeting our security, legal, and compliance requirements. We plan to expand the depth and breadth of assets offered by expanding:

  - support for digitally native crypto assets.

  - support for new and novel native blockchain protocol features.

  - investments in infrastructure and regulatory clarity to help pave the path for new assets to be represented as crypto assets.

- *Launching innovative products.* Any known, and many yet to be created financial and non-financial products can be built for the cryptoeconomy. We will continue to innovate by providing:

  - customers more opportunities to engage with crypto by developing and launching innovative products and services across our platform.

  - partnerships to create more opportunities for our customers to engage in new crypto-based financial transactions.

  - technology to help our ecosystem partners better connect and transact with customers.

**Summary of Risk Factors**

Our business and an investment in our Class A common stock is subject to numerous risks and uncertainties, including those highlighted in the section titled "Risk Factors" immediately following this prospectus summary. Some of these risks include:

- Our operating results have and will significantly fluctuate due to the highly volatile nature of crypto.

- Our net revenue is substantially dependent on the prices of crypto assets and volume of transactions conducted on our platform. If such price or volume declines, our business, operating results, and financial condition would be adversely affected.

- A majority of our net revenue is derived from transactions in Bitcoin and Ethereum. If demand for these crypto assets declines and is not replaced by new crypto asset demand, our business, operating results, and financial condition could be adversely affected.

- The future development and growth of crypto is subject to a variety of factors that are difficult to predict and evaluate. If crypto does not grow as we expect, our business, operating results, and financial condition could be adversely affected.

- Cyberattacks and security breaches of our platform, or those impacting our customers or third parties, could adversely impact our brand and reputation and our business, operating results, and financial condition.

- We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.

- We operate in a highly competitive industry and we compete against unregulated companies and companies with greater financial and other resources, and our business, operating results, and financial condition may be adversely affected if we are unable to respond to our competitors effectively.

- We compete against a growing number of decentralized and noncustodial platforms and our business may be adversely affected if we fail to compete effectively against them.

- As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and we may be subject to investigations and enforcement actions by regulators and governmental authorities.

- We are and may continue to be subject to material litigation, including individual and class action lawsuits, as well as investigations and enforcement actions by regulators and governmental authorities, which may adversely affect our business, operating results, and financial condition.

- If we cannot keep pace with rapid industry changes to provide new and innovative products and services, the use of our products and services and, consequently, our revenue could decline, and our business, operating results, and financial condition could be adversely impacted.

- A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, and our business, operating results, and financial condition may be adversely affected.

- We currently rely on third-party service providers for certain aspects of our operations, and any interruptions in services provided by these third parties may impair our ability to support our customers.

- Loss of a critical banking or insurance relationship could adversely impact our business, operating results, and financial condition.

- Any significant disruption in our products and services, in our information technology systems, or in any of the blockchain networks we support, could result in a loss of customers or funds and adversely impact our brand and reputation and business, operating results, and financial condition.

- Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results and financial condition.

- The loss or destruction of private keys required to access any crypto asset held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses.

- The registration and listing of our Class A common stock differs significantly from an underwritten initial public offering.

- The price of our Class A common stock may be volatile, and could, upon listing on the Nasdaq Global Select Market, decline significantly and rapidly. Market volatility may affect the value of an investment in our Class A common stock and could subject us to litigation.

- The dual class structure of our common stock will have the effect of concentrating voting control with those stockholders, including our directors, executive officers, and their respective affiliates, who held in the aggregate          % of the voting power of our capital stock upon the effectiveness of the registration statement of which this prospectus forms a part. This ownership will limit or preclude your ability to influence corporate matters, including the election of directors, amendments of our organizational documents, and any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction requiring stockholder approval.

- None of our stockholders are party to any contractual lock-up agreement or other contractual restrictions on transfer. Following our listing, the sales or distribution of substantial amounts of our Class A common stock, or the perception that such sales or distributions might occur, could cause the market price of our Class A common stock to decline.

**Channels for Disclosure of Information**

Following the effectiveness of the registration statement of which this prospectus forms a part, we intend to announce material information to the public through filings with the SEC, the investor relations page on our website (www.coinbase.com), press releases, public conference calls, public webcasts, our Twitter feed (@coinbase), our Facebook page, our LinkedIn page, our YouTube channel, and Brian Armstrong's Twitter feed (@brian_armstrong).

The information disclosed by the foregoing channels could be deemed to be material information. As such, we encourage investors, the media, and others to follow the channels listed above and to review the information disclosed through such channels.

Any updates to the list of disclosure channels through which we will announce information will be posted on the investor relations page on our website.

**Corporate Information**

We were initially incorporated in May 2012 as Coinbase, Inc., a Delaware corporation. In January 2014, Coinbase Global, Inc. was incorporated as a Delaware corporation to act as the holding company of Coinbase, Inc. and our other subsidiaries. In April 2014, we completed a corporate reorganization whereby Coinbase, Inc. became a wholly-owned subsidiary of Coinbase Global, Inc. Coinbase Global, Inc.'s principal assets are the equity interests of Coinbase, Inc. In addition to Coinbase, Inc., Coinbase Global, Inc. is the parent company of a number of other operating subsidiaries, including (i) CB Payments, Ltd, a private limited company incorporated under the laws of the United Kingdom, which provides fiat currency payment processing services to our international customers and (ii) Coinbase Custody Trust Company, LLC, a New York limited liability trust company, which is authorized to exercise fiduciary powers under New York state banking law and holds certain crypto assets in trust for the benefit of our institutional customers.

In May 2020, following the global pandemic resulting from the coronavirus known as COVID-19, we became a remote-first company, meaning that for the vast majority of roles, our employees have the option to work remotely. Due to this, we do not currently have a principal executive office. Our telephone number is (415) 843-1515. Our website address is www.coinbase.com. The information contained on, or that can be accessed through, our website is not incorporated by reference into, and is not a part of, this prospectus. Investors should not rely on any such information in deciding whether to purchase our Class A common stock.

Coinbase, the Coinbase logo, Coinbase Analytics, Coinbase Commerce, and other registered or common law trade names, trademarks, or service marks of Coinbase appearing in this prospectus are the property of Coinbase. This prospectus contains additional trade names, trademarks, and service marks of other companies that are the property of their respective owners. We do not intend our use or display of other companies' trade names, trademarks, or service marks to imply a relationship with, or endorsement or sponsorship of us by, these other companies. Solely for convenience, our trademarks and trade names referred to in this prospectus appear without the ® and ™ symbols, but those references are not intended to indicate, in any way, that we will not assert, to the fullest extent under applicable law, our rights, or the right of the applicable licensor, to these trademarks and trade names.

**JOBS Act**

We will be treated as an emerging growth company, as defined in the Jumpstart Our Business Startups Act of 2012, or JOBS Act, for certain purposes until the earlier of the date on which we complete this listing or December 31, 2021. As such, in this prospectus we have elected to take advantage of certain reduced disclosure obligations that apply to emerging growth companies regarding selected financial data and executive compensation arrangements.

**How the Crypto Community Can Participate in Our Direct Listing**

- *Eligible Investors*. Coinbase is offering our Class A common stock for sale via a direct listing. A direct listing provides any person or business with a brokerage account the opportunity to place an order for our shares in the opening order book.

- *Find a broker*. In order to buy a share of our Class A common stock, a potential investor will first need to find a broker. A broker is an individual or firm that helps a potential investor purchase a share trading on a securities exchange, like Nasdaq. In exchange for their services, a broker will

typically charge a fee to the investor wishing to purchase shares. Some brokers are self-service, meaning a potential investor trades shares through an online portal or website. Other brokers are full service, meaning a potential investor will reach out to a person to help them trade their shares. We make no recommendation as to a particular broker to use, but do suggest any potential investor use the BrokerCheck system of the Financial Industry Regulatory Authority, or FINRA, to research the background and experience of brokers. FINRA is an independent, non-governmental regulator for all securities firms doing business with the public in the United States. FINRA is authorized by Congress to protect investors by making sure the securities industry operates fairly and honestly.

•   ***Open an account with the broker***. After finding a broker, the broker will provide instructions on trading shares of our Class A common stock. A potential investor will likely need to open an account with that broker, which requires providing personal information. A potential investor will also need to provide the broker with money to purchase shares in advance of being able to trade shares of our Class A common stock. Contact a broker at least a week in advance of the first day of trading to minimize the possibility of any issues setting up and funding an account prior to purchasing shares of our Class A common stock.

•   ***Purchasing shares***. Our shares will be listed on Nasdaq on , which means that shares of our Class A common stock may be bought and sold on Nasdaq on such date. A broker will be able to advise on how to purchase shares of our Class A common stock in the opening order book, the listing date or any time after such date.

***We and the financial advisors make no recommendation as to whether a potential investor should purchase or sell shares of our Class A common stock or which broker to use for facilitating such transactions. Furthermore, there can be no guarantee that a potential investor who has placed an order for our shares will receive such shares in the opening book order or otherwise.***

11

**SUMMARY CONSOLIDATED FINANCIAL AND OTHER DATA**

The following tables summarize our consolidated financial and other data. We derived our summary consolidated statements of operations data for the years ended December 31, 2020 and December 31, 2019 (except for the pro forma share and pro forma net income per share information) and the consolidated balance sheet data as of December 31, 2020 from our audited consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results that may be expected in any other period in the future. The following summary consolidated financial and other data should be read in conjunction with the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

12

|  | Year Ended December 31, | |
| --- | --- | --- |
|  | **2020** | **2019** |
| **Consolidated Statement of Operations Data** | *(in thousands, except per share data)* | |
| Revenue: | | |
| Net revenue | $   1,141,167 | $   482,949 |
| Other revenue | 136,314 | 50,786 |
| Total revenue | 1,277,481 | 533,735 |
| Operating expenses: | | |
| Transaction expense | 135,514 | 82,055 |
| Technology and development | 271,732 | 185,044 |
| Sales and marketing | 56,782 | 24,150 |
| General and administrative | 279,880 | 231,929 |
| Restructuring | — | 10,140 |
| Other operating expense | 124,622 | 46,200 |
| Total operating expenses | 868,530 | 579,518 |
| Operating income (loss) | 408,951 | (45,783) |
| Other income, net | (248) | (367) |
| Income (loss) before provision for (benefit from) income taxes | 409,199 | (45,416) |
| Provision for (benefit from) income taxes | 86,882 | (15,029) |
| Net income (loss) | $   322,317 | $   (30,387) |
| Net income (loss) attributable to common stockholders: | | |
| Basic | $   108,256 | $   (30,387) |
| Diluted | $   127,471 | $   (30,387) |
| Net income (loss) per share attributable to common stockholders: | | |
| Basic | $   1.58 | $   (0.50) |
| Diluted | $   1.40 | $   (0.50) |
| Weighted-average shares of common stock used to compute net income (loss) per share attributable to common stockholders: | | |
| Basic | 68,671 | 61,317 |
| Diluted | 91,209 | 61,317 |
| Pro forma net income per share attributable to common stockholders (unaudited): | | |
| Basic | $   1.76 | |
| Diluted | $   1.57 | |
| Pro forma weighted-average shares of common stock used to compute pro forma net income per share attributable to common stockholders (unaudited): | | |
| Basic | 182,945 | |
| Diluted | 205,575 | |

**Consolidated Balance Sheet Data**

|  | As of December 31, 2020 | |
|  | Actual | Pro Forma[1] |
|---|---|---|
|  | *(in thousands)* | |
| Cash and cash equivalents | $ 1,061,850 | $ 1,061,850 |
| Customer custodial funds | 3,763,392 | 3,763,392 |
| Total assets | 5,855,414 | 5,855,414 |
| Custodial funds due to customers | 3,849,468 | 3,849,468 |
| Total liabilities | 4,329,363 | 4,329,363 |
| Convertible preferred stock | 562,467 | — |
| Total stockholders' equity | 963,584 | 1,526,051 |

(1)   The pro forma column reflects the automatic conversion of all outstanding shares of our Series FF, Series A, Series B, Series C, and Series D convertible preferred stock as of December 31, 2020 into 104,046,301 shares of our Class B common stock and all outstanding shares of our Series E convertible preferred stock as of December 31, 2020 into 8,831,952 shares of our Class A common stock.

**Key Business Metrics and Non-GAAP Financial Measure**

In addition to our financial results, we use the following business metrics to evaluate our business, measure our performance, identify trends affecting our business, and make strategic decisions. To evaluate our operating performance, and for internal planning and forecasting purposes, we also use Adjusted EBITDA, a non-GAAP financial measure. For additional information regarding these measures, see the section titled "Selected Consolidated Financial and Other Data—Key Business Metrics and Non-GAAP Financial Measure."

|  | As of or for the Year Ended December 31, | | % Change |
|  | 2020 | 2019 | |
|---|---|---|---|
|  | *(in millions, except percentages)* | | |
| Verified Users | 43 | 32 | 34.4 % |
| Monthly Transacting Users | 2.8 | 1.0 | 180.0 % |
| Assets on Platform | $ 90,307 | $ 16,969 | 432.2 % |
| Trading Volume | $ 193,097 | $ 79,906 | 141.7 % |
| Net income (loss) | $ 322 | $ (30) | NM |
| Adjusted EBITDA[1] | $ 527 | $ 24 | 2,095.8 % |

(1)   Adjusted EBITDA is a non-GAAP financial measure. For more information regarding our use of this measure and a reconciliation of net income to Adjusted EBITDA, see "Selected Consolidated Financial and Other Data—Key Business Metrics and Non-GAAP Financial Measure—Non-GAAP Financial Measure."
*   NM—Not meaningful



**RISK FACTORS**

*Investing in our Class A common stock involves a high degree of risk. You should carefully consider the risks and uncertainties described below, together with all of the other information in this prospectus, before making a decision to invest in our Class A common stock. The risks and uncertainties described below are not the only ones we face. Additional risks and uncertainties that we are unaware of or that we deem immaterial may also become important factors that adversely affect our business. If any of the following risks occur, our business, operating results, financial condition and future prospects could be materially and adversely affected. In that event, the market price of our Class A common stock could decline, and you could lose part or all of your investment.*

**The Most Material Risks Related to Our Business and Financial Position**

***Our operating results have and will significantly fluctuate due to the highly volatile nature of crypto.***

All of our sources of revenue are dependent on crypto assets and the broader cryptoeconomy. Due to the highly volatile nature of the cryptoeconomy and the prices of crypto assets, our operating results have, and will continue to, fluctuate significantly from quarter to quarter in accordance with market sentiments and movements in the broader cryptoeconomy. For example, the average three month Crypto Asset Volatility (as defined in our Glossary to the Cryptoeconomy) supported on our platform increased by 73% from the fourth quarter of 2019 to the first quarter of 2020, before decreasing by 36% from the first quarter of 2020 to the second quarter of 2020. Our operating results will continue to fluctuate significantly as a result of a variety of factors, many of which are unpredictable and in certain instances are outside of our control, including:

- our dependence on offerings that are dependent on crypto asset trading activity, including trading volume and the prevailing trading prices for crypto assets, whose trading prices and volume can be highly volatile;

- our ability to attract, maintain, and grow our customer base and engage our customers;

- changes in the legislative or regulatory environment, or actions by governments or regulators, including fines, orders, or consent decrees;

- regulatory changes that impact our ability to offer certain products or services;

- our ability to diversify and grow our subscription and services revenue;

- pricing for our products and services;

- investments we make in the development of products and services as well as technology offered to our ecosystem partners, international expansion, and sales and marketing;

- adding and removing of crypto assets on our platform;

- macroeconomic conditions;

- adverse legal proceedings or regulatory enforcement actions, judgments, settlements, or other legal proceeding and enforcement-related costs;

- the development and introduction of existing and new products and services by us or our competitors;

- increases in operating expenses that we expect to incur to grow and expand our operations and to remain competitive;

- system failure or outages, including with respect to our crypto platform and third-party crypto networks;

- breaches of security or privacy;

- inaccessibility of our platform due to our or third-party actions;

- our ability to attract and retain talent; and

- our ability to compete with our competitors.

As a result of these factors, it is difficult for us to forecast growth trends accurately and our business and future prospects are difficult to evaluate, particularly in the short term. In view of the rapidly evolving nature of our business and the cryptoeconomy, period-to-period comparisons of our operating results may not be meaningful, and you should not rely upon them as an indication of future performance. Quarterly and annual expenses reflected in our financial statements may be significantly different from historical or projected rates. Our operating results in one or more future quarters may fall below the expectations of securities analysts and investors. As a result, the trading price of our Class A common stock may increase or decrease significantly.

***Our total revenue is substantially dependent on the prices of crypto assets and volume of transactions conducted on our platform. If such price or volume declines, our business, operating results, and financial condition would be adversely affected.***

We generate substantially all of our total revenue from transaction fees on our platform in connection with the purchase, sale, and trading of crypto assets by our customers. Transaction revenue is based on transaction fees that are either a flat fee or a percentage of the value of each transaction. For our retail brokerage product, we also charge a spread to ensure that we are able to settle purchases and sales at the price we quote to customers. We also generate total revenue from our subscription products and services and, while revenue from these products and services have not been significant to date, most of this revenue will also fluctuate based on the price of crypto assets. As such, any declines in the volume of crypto asset transactions, the price of crypto assets, or market liquidity for crypto assets generally may result in lower total revenue to us.

The price of crypto assets and associated demand for buying, selling, and trading crypto assets have historically been subject to significant volatility. For instance, in 2017, the value of certain crypto assets, including Bitcoin, experienced steep increases in value, and our customer base expanded worldwide. The increase in value of Bitcoin from 2016 to 2017 was followed by a steep decline in 2018, which adversely affected our net revenue and operating results. The price and trading volume of any crypto asset is subject to significant uncertainty and volatility, depending on a number of factors, including:

- market conditions across the cryptoeconomy;

- changes in liquidity, market-making volume, and trading activities;

- trading activities on other crypto platforms worldwide, many of which may be unregulated, and may include manipulative activities;

- investment and trading activities of highly active retail and institutional users, speculators, miners, and investors;

- the speed and rate at which crypto is able to gain adoption as a medium of exchange, utility, store of value, consumptive asset, security instrument, or other financial assets worldwide, if at all;

- decreased user and investor confidence in crypto assets and crypto platforms;

- negative publicity and events relating to the cryptoeconomy;

- unpredictable social media coverage or "trending" of crypto assets;

- the ability for crypto assets to meet user and investor demands;

- the functionality and utility of crypto assets and their associated ecosystems and networks, including crypto assets designed for use in various applications;

- consumer preferences and perceived value of crypto assets and crypto asset markets;

- increased competition from other payment services or other crypto assets that exhibit better speed, security, scalability, or other characteristics;

- regulatory or legislative changes and updates affecting the cryptoeconomy;

- the characterization of crypto assets under the laws of various jurisdictions around the world;

- the maintenance, troubleshooting, and development of the blockchain networks underlying crypto assets, including by miners, validators, and developers worldwide;

- the ability for crypto networks to attract and retain miners or validators to secure and confirm transactions accurately and efficiently;

- ongoing technological viability and security of crypto assets and their associated smart contracts, applications and networks, including vulnerabilities against hacks and scalability;

- fees and speed associated with processing crypto asset transactions, including on the underlying blockchain networks and on crypto platforms;

- financial strength of market participants;

- the availability and cost of funding and capital;

- the liquidity of crypto platforms;

- interruptions in service from or failures of major crypto platforms;

- availability of an active derivatives market for various crypto assets;

- availability of banking and payment services to support crypto-related projects;

- level of interest rates and inflation;

- monetary policies of governments, trade restrictions, and fiat currency devaluations; and

- national and international economic and political conditions.

There is no assurance that any supported crypto asset will maintain its value or that there will be meaningful levels of trading activities. In the event that the price of crypto assets or the demand for trading crypto assets decline, our business, operating results, and financial condition would be adversely affected.

***A majority of our net revenue is from transactions in Bitcoin and Ethereum. If demand for these crypto assets declines and is not replaced by new demand for crypto assets, our business, operating results, and financial condition could be adversely affected.***

We support a diverse portfolio of crypto assets for trading and custody. However, for the year ended December 31, 2020, we derived the majority of our net revenue from transaction fees generated in connection with the purchase, sale, and trading of Bitcoin and Ethereum; these trading pairs drove over 56% of total Trading Volume on our platform. As such, in addition to the factors impacting the broader

cryptoeconomy described in this section, our business may be adversely affected if the markets for Bitcoin and Ethereum deteriorate or if their prices decline, including as a result of the following factors:

- the reduction in mining rewards of Bitcoin, including block reward halving events, which are events that occur after a specific period of time which reduces the block reward earned by miners;

- the development and launch timeline of Ethereum 2.0, including the potential migration of Ethereum to a proof-of-stake model;

- disruptions, hacks, splits in the underlying network also known as "forks", attacks by malicious actors who control a significant portion of the networks' hash rate such as double spend or 51% attacks, or other similar incidents affecting the Bitcoin or Ethereum blockchain networks;

- hard "forks" resulting in the creation of and divergence into multiple separate networks, such as Bitcoin Cash and Ethereum Classic;

- informal governance led by Bitcoin and Ethereum's core developers that lead to revisions to the underlying source code or inactions that prevent network scaling, and which evolve over time largely based on self-determined participation, which may result in new changes or updates that affect their speed, security, usability, or value;

- the ability for Bitcoin and Ethereum blockchain networks to resolve significant scaling challenges and increase the volume and speed of transactions;

- the ability to attract and retain developers and customers to use Bitcoin and Ethereum for payment, store of value, unit of accounting, and other intended uses;

- transaction congestion and fees associated with processing transactions on the Bitcoin and Ethereum networks;

- the identification of Satoshi Nakamoto, the pseudonymous person or persons who developed Bitcoin, or the transfer of Satoshi's Bitcoins;

- negative perception of Bitcoin or Ethereum;

- development in mathematics, technology, including in digital computing, algebraic geometry, and quantum computing that could result in the cryptography being used by Bitcoin and Ethereum becoming insecure or ineffective; and

- laws and regulations affecting the Bitcoin and Ethereum networks or access to these networks, including a determination that either Bitcoin or Ethereum constitutes a security or other regulated financial instrument under the laws of any jurisdiction.

***The future development and growth of crypto is subject to a variety of factors that are difficult to predict and evaluate. If crypto does not grow as we expect, our business, operating results, and financial condition could be adversely affected.***

Crypto assets built on blockchain technology were only introduced in 2008 and remain in the early stages of development. In addition, different crypto assets are designed for different purposes. Bitcoin, for instance, was designed to serve as a peer-to-peer electronic cash system, while Ethereum was designed to be a smart contract and decentralized application platform. Many other crypto networks—ranging from cloud computing to tokenized securities networks—have only recently been established. The further growth and development of any crypto assets and their underlying networks and other cryptographic and

algorithmic protocols governing the creation, transfer, and usage of crypto assets represent a new and evolving paradigm that is subject to a variety of factors that are difficult to evaluate, including:

- Many crypto networks have limited operating histories, have not been validated in production, and are still in the process of developing and making significant decisions that will affect the design, supply, issuance, functionality, and governance of their respective crypto assets and underlying blockchain networks, any of which could adversely affect their respective crypto assets.

- Many crypto networks are in the process of implementing software upgrades and other changes to their protocols, which could introduce bugs, security risks, or adversely affect the respective crypto networks.

- Several large networks, including Bitcoin and Ethereum, are developing new features to address fundamental speed, scalability, and energy usage issues. If these issues are not successfully addressed, or are unable to receive widespread adoption, it could adversely affect the underlying crypto assets.

- Security issues, bugs, and software errors have been identified with many crypto assets and their underlying blockchain networks, some of which have been exploited by malicious actors. There are also inherent security weaknesses in some crypto assets, such as when creators of certain crypto networks use procedures that could allow hackers to counterfeit tokens. Any weaknesses identified with a crypto assets could adversely affect its price, security, liquidity, and adoption. If a malicious actor or botnet (a volunteer or hacked collection of computers controlled by networked software coordinating the actions of the computers) obtains a majority of the compute or staking power on a crypto network, as has happened in the past, it may be able to manipulate transactions, which could cause financial losses to holders, damage the network's reputation and security, and adversely affect its value.

- The development of new technologies for mining, such as improved application-specific integrated circuits (commonly referred to as ASICs), or changes in industry patterns, such as the consolidation of mining power in a small number of large mining farms, could reduce the security of blockchain networks, lead to increased liquid supply of crypto assets, and reduce a crypto's price and attractiveness.

- If rewards and transaction fees for miners or validators on any particular crypto network are not sufficiently high to attract and retain miners, a crypto network's security and speed may be adversely affected, increasing the likelihood of a malicious attack.

- Many crypto assets have concentrated ownership or an "admin key", allowing a small group of holders to have significant unilateral control and influence over key decisions relating to their crypto networks, such as governance decisions and protocol changes, as well as the market price of such crypto assets.

- The governance of many decentralized blockchain networks is by voluntary consensus and open competition, and many developers are not directly compensated for their contributions. As a result, there may be a lack of consensus or clarity on the governance of any particular crypto network, a lack of incentives for developers to maintain or develop the network, and other unforeseen issues, any of which could result in unexpected or undesirable errors, bugs, or changes, or stymie such network's utility and ability to respond to challenges and grow.

- Many crypto networks are in the early stages of developing partnerships and collaborations, all of which may not succeed and adversely affect the usability and adoption of the respective crypto assets.

Various other technical issues have also been uncovered from time to time that resulted in disabled functionalities, exposure of certain users' personal information, theft of users' assets, and other negative

20

consequences, and which required resolution with the attention and efforts of their global miner, user, and development communities. If any such risks or other risks materialize, and in particular if they are not resolved, the development and growth of crypto may be significantly affected and, as a result, our business, operating results, and financial condition could be adversely affected.

***Cyberattacks and security breaches of our platform, or those impacting our customers or third parties, could adversely impact our brand and reputation and our business, operating results, and financial condition.***

Our business involves the collection, storage, processing, and transmission of confidential information, customer, employee, service provider, and other personal data, as well as information required to access customer assets. We have built our reputation on the premise that our platform offers customers a secure way to purchase, store, and transact in crypto assets. As a result, any actual or perceived security breach of us or our third-party partners may:

- harm our reputation and brand;

- result in our systems or services being unavailable and interrupt our operations;

- result in improper disclosure of data and violations of applicable privacy and other laws;

- result in significant regulatory scrutiny, investigations, fines, penalties, and other legal, regulatory, and financial exposure;

- cause us to incur significant remediation costs;

- lead to theft or irretrievable loss of our or our customers' fiat currencies or crypto assets;

- reduce customer confidence in, or decreased use of, our products and services;

- divert the attention of management from the operation of our business;

- result in significant compensation or contractual penalties from us to our customers or third parties as a result of losses to them or claims by them; and

- adversely affect our business and operating results.

Further, any actual or perceived breach or cybersecurity attack directed at other financial institutions or crypto companies, whether or not we are directly impacted, could lead to a general loss of customer confidence in the cryptoeconomy or in the use of technology to conduct financial transactions, which could negatively impact us, including the market perception of the effectiveness of our security measures and technology infrastructure.

An increasing number of organizations, including large merchants, businesses, technology companies, and financial institutions, as well as government institutions, have disclosed breaches of their information security systems, some of which have involved sophisticated and highly targeted attacks, including on their websites, mobile applications, and infrastructure.

Attacks upon systems across a variety of industries, including the crypto industry, are increasing in their frequency, persistence, and sophistication, and, in many cases, are being conducted by sophisticated, well-funded, and organized groups and individuals, including state actors. The techniques used to obtain unauthorized, improper, or illegal access to systems and information (including customers' personal data and crypto assets), disable or degrade services, or sabotage systems are constantly evolving, may be difficult to detect quickly, and often are not recognized or detected until after they have been launched against a target. These attacks may occur on our systems or those of our third-party service providers or partners. Certain types of cyberattacks could harm us even if our systems are left undisturbed. For example, attacks may be designed to deceive employees and service providers into

releasing control of our systems to a hacker, while others may aim to introduce computer viruses or malware into our systems with a view to stealing confidential or proprietary data. Additionally, certain threats are designed to remain dormant or undetectable until launched against a target and we may not be able to implement adequate preventative measures.

Although we have developed systems and processes designed to protect the data we manage, prevent data loss and other security breaches, effectively respond to known and potential risks, and expect to continue to expend significant resources to bolster these protections, there can be no assurance that these security measures will provide absolute security or prevent breaches or attacks. We have experienced from time to time, and may experience in the future, breaches of our security measures due to human error, malfeasance, insider threats, system errors or vulnerabilities, or other irregularities. Unauthorized parties have attempted, and we expect that they will continue to attempt, to gain access to our systems and facilities, as well as those of our customers, partners, and third-party service providers, through various means, including hacking, social engineering, phishing, and attempting to fraudulently induce individuals (including employees, service providers, and our customers) into disclosing usernames, passwords, payment card information, or other sensitive information, which may in turn be used to access our information technology systems and customers' crypto assets. Threats can come from a variety of sources, including criminal hackers, hacktivists, state-sponsored intrusions, industrial espionage, and insiders. Certain threat actors may be supported by significant financial and technological resources, making them even more sophisticated and difficult to detect. Further, there has been an increase in such activities as a result of the novel coronavirus, or COVID-19, pandemic. As a result, our costs and the resources we devote to protecting against these advanced threats and their consequences may continue to increase over time.

Although we maintain insurance coverage that we believe is adequate for our business, it may be insufficient to protect us against all losses and costs stemming from security breaches, cyberattacks, and other types of unlawful activity, or any resulting disruptions from such events. Outages and disruptions of our platform, including any caused by cyberattacks, may harm our reputation and our business, operating results, and financial condition.

***We are subject to an extensive and highly-evolving regulatory landscape and any adverse changes to, or our failure to comply with, any laws and regulations could adversely affect our brand, reputation, business, operating results, and financial condition.***

Our business is subject to extensive laws, rules, regulations, policies, orders, determinations, directives, treaties, and legal and regulatory interpretations and guidance in the markets in which we operate, including those governing financial services and banking, trust companies, securities, broker-dealers and ATS, commodities, credit, crypto asset custody, exchange, and transfer, cross-border and domestic money and crypto asset transmission, consumer and commercial lending, usury, foreign currency exchange, privacy, data governance, data protection, cybersecurity, fraud detection, payment services (including payment processing and settlement services), consumer protection, escheatment, antitrust and competition, bankruptcy, tax, anti-bribery, economic and trade sanctions, anti-money laundering, and counter-terrorist financing. Many of these legal and regulatory regimes were adopted prior to the advent of the internet, mobile technologies, crypto assets, and related technologies. As a result, they do not contemplate or address unique issues associated with the cryptoeconomy, are subject to significant uncertainty, and vary widely across U.S. federal, state, and local and international jurisdictions. These legal and regulatory regimes, including the laws, rules, and regulations thereunder, evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy requires us to exercise our judgement as to whether certain laws, rules, and regulations apply to us, and it is possible that governmental bodies and regulators may disagree with our conclusions. To the extent we have not complied with such laws, rules, and regulations, we could be subject to significant fines, revocation of licenses, limitations on our products and services, reputational harm, and other regulatory consequences,

22

each of which may be significant and could adversely affect our business, operating results, and financial condition.

In addition to existing laws and regulations, various governmental and regulatory bodies, including legislative and executive bodies, in the United States and in other countries may adopt new laws and regulations, or new interpretations of existing laws and regulations may be issued by such bodies or the judiciary, which may adversely impact the development of the cryptoeconomy as a whole and our legal and regulatory status in particular by changing how we operate our business, how our products and services are regulated, and what products or services we and our competitors can offer, requiring changes to our compliance and risk mitigation measures, imposing new licensing requirements, or imposing a total ban on certain crypto asset transactions, as has occurred in certain jurisdictions in the past. For example, under recommendations from the Financial Crimes Enforcement Network, or FinCEN, and the Financial Action Task Force, or FATF, the United States and several foreign jurisdictions are likely to impose the Funds Travel Rule and the Funds Transfer Rule (commonly referred to collectively as the Travel Rule) on financial service providers in the cryptoeconomy. We may face substantial compliance costs to operationalize and comply with the Travel Rule and may be further subject to administrative sanctions for technical violations or customer attrition if the user experience suffers as a result. More recently, in December 2020, FinCEN released a proposed rule that would require us to collect personal information from the owners of self-custodied wallets that transfer cryptocurrencies to or receive cryptocurrencies from Coinbase, and report certain transactions to the federal government. There are substantial uncertainties on how these requirements would apply in practice, and we may face substantial compliance costs to operationalize and comply with these rules. We may be further subject to administrative sanctions for technical violations or customer attrition if the user experience suffers as a result. As another example, the recent extension of anti-money laundering requirements to certain crypto-related activities by the E.U. Fifth Money Laundering Directive has increased the regulatory compliance burden for our business in Europe and, as a result of the fragmented approach to the implementation of its provisions, resulted in distinct and divergent national licensing and registration regimes for us in different E.U. member states. Further E.U.-level legislation imposing additional regulatory requirements in relation to crypto-related activities is also expected in the intermediate term which, among other things, may impose new or additional regulatory requirements on both crypto service providers and issuers of certain crypto assets, which may impact the our operations in the E.U.

Because we have offered and will continue to offer a variety of innovative products and services to our customers, many of our offerings are subject to significant regulatory uncertainty. For instance, we are a founding member of the Centre Consortium and the principal reseller of the USD Coin, a stablecoin issued by Circle that is backed one-to-one by U.S. dollar denominated reserves. The regulatory treatment of fiat-backed stablecoins is highly uncertain and has drawn significant attention from legislative and regulatory bodies around the world. The issuance and resale of such stablecoins may implicate a variety of banking, deposit, money transmission, prepaid access and stored value, anti-money laundering, commodities, securities, sanctions, and other laws and regulations in the United States and in other jurisdictions. Certain products and services offered by us that we believe are not subject to regulatory oversight, or are only subject to certain regulatory regimes, such as Coinbase Wallet, a standalone mobile application that allows customers to manage their own private keys and store their crypto assets directly on their mobile devices, may cause us to be deemed to be engaged in a form of regulated activity for which licensure is required or cause us to become subject to new and additional forms of regulatory oversight. We also offer various staking, rewards, and lending products, all of which are subject to significant regulatory uncertainty, and could implicate a variety of laws and regulations worldwide. For example, there is regulatory uncertainty regarding the status of our staking activities under the U.S. federal securities laws. While we have implemented policies and procedures designed to help monitor for and ensure compliance with existing and new laws and regulations, there can be no assurance that we and our employees, contractors, and agents will not violate or otherwise fail to comply with such laws and regulations. To the extent that we or our employees, contractors, or agents are deemed or alleged to have violated or failed to comply with any laws or regulations, including related interpretations, orders, determinations, directives, or guidance, we or they could be subject to a litany of civil, criminal, and

administrative fines, penalties, orders and actions, including being required to suspend or terminate the offering of certain products and services.

Due to our business activities, we are subject to ongoing examinations, oversight, and reviews by U.S. federal and state regulators, including the New York State Department of Financial Services, or NYDFS, and foreign financial service regulators, including the U.K. Financial Conduct Authority and the Central Bank of Ireland, which each have broad discretion to audit and examine our business. We are periodically subject to audits and examinations by these regulatory authorities. As a result of findings from these audits and examinations, regulators have, are, and may in the future require us to take certain actions, including amending, updating, or revising our compliance measures from time to time, limiting the kinds of customers which we provide services to, changing, terminating, or delaying the introduction of our existing or new product and services, and undertaking further external audit or being subject to further regulatory scrutiny. We have received, and may in the future receive, examination reports citing violations of rules and regulations, inadequacies in existing compliance programs, and requiring us to enhance certain practices with respect to our compliance program, including due diligence, monitoring, training, reporting, and recordkeeping. Implementing appropriate measures to properly remediate these examination findings may require us to incur significant costs, and if we fail to properly remediate any of these examination findings, we could face civil litigation, significant fines, damage awards, forced removal of certain employees including members of our executive team, barring of certain employees from participating in our business in whole or in part, revocation of existing licenses, limitations on existing and new products and services, reputational harm, negative impact to our existing relationships with regulators, exposure to criminal liability, or other regulatory consequences. Further, we believe increasingly strict legal and regulatory requirements and additional regulatory investigations and enforcement, any of which could occur or intensify, may continue to result in changes to our business, as well as increased costs, and supervision and examination for both ourselves and our agents and service providers. Moreover, new laws, regulations, or interpretations may result in additional litigation, regulatory investigations, and enforcement or other actions, including preventing or delaying us from offering certain products or services offered by our competitors or could impact how we offer such products and services. Adverse changes to, or our failure to comply with, any laws and regulations have had, and may continue to have, an adverse effect on our reputation and brand and our business, operating results, and financial condition.

***We operate in a highly competitive industry and we compete against unregulated or less regulated companies and companies with greater financial and other resources, and our business, operating results, and financial condition may be adversely affected if we are unable to respond to our competitors effectively.***

The cryptoeconomy is highly innovative, rapidly evolving, and characterized by healthy competition, experimentation, changing customer needs, frequent introductions of new products and services, and subject to uncertain and evolving industry and regulatory requirements. We expect competition to further intensify in the future as existing and new competitors introduce new products or enhance existing products. We compete against a number of companies operating both within the United States and abroad, and both those that focus on traditional financial services and those that focus on crypto-based services. Our main competitors fall into the following categories:

- Traditional financial technology and brokerage firms that have entered the crypto asset market in recent years and offer overlapping features targeted at our customers.

- Companies focused on the crypto asset market, some of whom adhere to local regulations and directly compete with our platform, and many who choose to operate outside of local rules and regulations or in jurisdictions with less stringent local rules and regulations and are potentially able to more quickly adapt to trends, support a greater number of crypto assets, and develop new crypto-based products and services due to a different standard of regulatory scrutiny.

- Crypto-focused companies and traditional financial incumbents that offer point or siloed solutions specifically targeted at institutional customers.

Our primary source of competition to date has been from companies, in particular those located outside the United States, who are subject to significantly less stringent regulatory and compliance requirements in their local jurisdictions. Their business models rely on being unregulated or only regulated in a small number of lower compliance jurisdictions, whilst also offering their products in highly regulated jurisdictions, including the United States, without necessarily complying with the relevant regulatory requirements in such jurisdictions.

To date, due to limited enforcement by U.S. and foreign regulators, many of these competitors have been able to operate from offshore while offering large numbers of products and services to consumers, including in the United States, Europe, and other highly regulated jurisdictions, without complying with the relevant licensing and other requirements in these jurisdictions, and seemingly without penalty. Due to our regulated status in several jurisdictions and our commitment to legal and regulatory compliance, we have not been able to offer many popular products and services, including products and services that our unregulated or less regulated competitors are able to offer to a group that includes many of our customers, which may adversely impact our business, financial condition, and results of operations.

In recent years, our commitment to compliance and the attendant customer-facing requirements, including customer due diligence requirements, have resulted in our customers transferring significant funds and crypto assets to these unregulated or less regulated competitors. We also have expended significant managerial, operational, and compliance costs to meet the legal and regulatory requirements applicable to us in the United States and other jurisdictions in which we operate, and expect to continue to incur significant costs to comply with these requirements, which these unregulated or less regulated competitors have not had to incur.

Additionally, due to the broad nature of our products and services, we also compete with, and expect additional competition from, digital and mobile payment companies and other traditional financial services companies.

Many innovative start-up companies and larger companies have made, and continue to make, significant investments in research and development, and we expect these companies to continue to develop similar or superior products and technologies that compete with our products. Further, more traditional financial and non-financial services businesses may choose to offer crypto-based services in the future as the industry gains adoption. Our current and potential competitors may establish cooperative relationships among themselves or with third parties that may further enhance their resources.

Our existing competitors have, and our potential competitors are expected to have, various competitive advantages over us, such as:

- the ability to trade crypto assets and offer products and services that we do not support or offer on our platform (due to constraints from regulatory authorities, our banking partners, and other factors) such as tokens that constitute securities or derivative instruments under U.S. or foreign laws;

- greater name recognition, longer operating histories, larger customer bases, and larger market shares;

- larger sales and marketing budgets and organizations;

- more established marketing, banking, and compliance relationships;

- greater customer support resources;

- greater resources to make acquisitions;

- lower labor, compliance, risk mitigation, and research and development costs;

- larger and more mature intellectual property portfolios;

- greater number of applicable licenses or similar authorizations;

- established core business models outside of the trading of crypto assets, allowing them to operate on lesser margins or at a loss;

- operations in certain jurisdictions with lower compliance costs and greater flexibility to explore new product offerings; and

- substantially greater financial, technical, and other resources.

If we are unable to compete successfully, or if competing successfully requires us to take costly actions in response to the actions of our competitors, our business, operating results, and financial condition could be adversely affected.

***We compete against a growing number of decentralized and noncustodial platforms and our business may be adversely affected if we fail to compete effectively against them.***

We also compete against an increasing number of decentralized and noncustodial platforms. On these platforms, users can interact directly with a market-making smart contract or on-chain trading mechanism to exchange one type of crypto asset for another without any centralized intermediary. These platforms are typically not as easy to use as our platform, and generally lack the speed and liquidity of centralized platforms, but various innovative models and incentives have been designed to bridge the gap. In addition, such platforms have low startup and entry costs as market entrants often remain unregulated and have minimal operating and regulatory costs. A significant number of decentralized platforms have recently been developed and released, including on Ethereum, Tron, Polkadot, and Solana, and many such platforms have experienced significant growth and adoption. For instance, we have seen increased interest in certain decentralized platforms with transaction volumes rivaling our own platform on multiple occasions, and expect interest in decentralized and noncustodial platforms to grow further as the industry develops. If the demand for decentralized platforms grows and we are unable to compete with these decentralized and noncustodial platforms, our business may be adversely affected.

***As we continue to expand and localize our international activities, our obligations to comply with the laws, rules, regulations, and policies of a variety of jurisdictions will increase and we may be subject to investigations and enforcement actions by U.S. and non-U.S. regulators and governmental authorities.***

As we expand and localize our international activities, we have become increasingly obligated to comply with the laws, rules, regulations, policies, and legal interpretations both of the jurisdictions in which we operate and those into which we offer services on a cross-border basis. Laws regulating financial services, the internet, mobile technologies, crypto, and related technologies outside of the United States often impose different, more specific, or even conflicting obligations on us, as well as broader liability. For example, we are required to comply with laws and regulations related to sanctions and export controls enforced by U.S. Department of Treasury's Office of Foreign Assets Control, or OFAC, and U.S. anti-money laundering and counter-terrorist financing laws and regulations, enforced by FinCEN and certain state financial services regulators. U.S. sanctions laws and regulations generally restrict dealings by persons subject to U.S. jurisdiction with certain governments, countries, or territories that are the target of comprehensive sanctions, currently the Crimea Region of Ukraine, Cuba, Iran, North Korea, Syria, and Venezuela as well as with persons identified on certain prohibited lists. We have shared key particulars of our compliance program with OFAC and we believe we have a reasonable risk-based program in place. That program includes monitoring of IP addresses to identify prohibited jurisdictions and of blockchain addresses that have either been identified by OFAC as prohibited or that otherwise are believed by us to be associated with prohibited persons or jurisdictions. Nonetheless, there can be no guarantee that these

26

measures will be viewed as compliant. In particular, the nature of the blockchain and of our services makes it technically infeasible in all circumstances to prevent transactions with particular persons or addresses. From time to time, we have submitted voluntary disclosures to OFAC or responded to administrative subpoenas from OFAC that have identified such transactions. Certain of these voluntary self-disclosures are currently under review by OFAC. To date, none of those proceedings has resulted in a monetary penalty or other adverse action. However, if we were to be found to have violated sanctions, or become involved in government investigations, that could result in negative consequences for us, including costs related to government investigations, financial penalties, and harm to our reputation. The impact on us related to these matters could be substantial. Although we have implemented controls, and are working to implement additional controls and screening tools designed to prevent similar activity from occurring in the future, there is no guarantee that we will not inadvertently provide our products and services to additional individuals, entities, or governments prohibited by U.S. sanctions in the future.

Regulators worldwide frequently study each other's approaches to the regulation of the cryptoeconomy. Consequently, developments in any jurisdiction may influence other jurisdictions. New developments in one jurisdiction may be extended to additional services and other jurisdictions. As a result, the risks created by any new law or regulation in one jurisdiction are magnified by the potential that they may be replicated, affecting our business in another place or involving another service. Conversely, if regulations diverge worldwide, we may face difficulty adjusting our products, services, and other aspects of our business with the same effect. These risks are heightened as we face increased competitive pressure from other similarly situated businesses that engage in regulatory arbitrage to avoid the compliance costs associated with regulatory changes.

The complexity of U.S. federal and state and international regulatory and enforcement regimes, coupled with the global scope of our operations and the evolving global regulatory environment, could result in a single event prompting a large number of overlapping investigations and legal and regulatory proceedings by multiple government authorities in different jurisdictions. Any of the foregoing could, individually or in the aggregate, harm our reputation, damage our brands and business, and adversely affect our operating results and financial condition. Due to the uncertain application of existing laws and regulations, it may be that, despite our regulatory and legal analysis concluding that certain products and services are currently unregulated, such products or services may indeed be subject to financial regulation, licensing, or authorization obligations that we have not obtained or with which we have not complied. As a result, we are at a heightened risk of enforcement action, litigation, regulatory, and legal scrutiny which could lead to sanctions, cease, and desist orders, or other penalties and censures which could significantly and adversely affect our continued operations and financial condition.

***We are and may continue to be subject to material litigation, including individual and class action lawsuits, as well as investigations and enforcement actions by regulators and governmental authorities.***

We have been, currently are, and may from time to time become subject to claims, arbitrations, individual and class action lawsuits, government and regulatory investigations, inquiries, actions or requests, including with respect to both consumer and employment matters, and other proceedings alleging violations of laws, rules, and regulations, both foreign and domestic. The scope, determination, and impact of claims, lawsuits, government and regulatory investigations, enforcement actions, disputes, and proceedings to which we are subject cannot be predicted with certainty, and may result in:

- substantial payments to satisfy judgments, fines, or penalties;

- substantial outside counsel legal fees and costs;

- additional compliance and licensure requirements;

- loss or non-renewal of existing licenses or authorizations, or prohibition from or delays in obtaining additional licenses or authorizations, required for our business;

- loss of productivity and high demands on employee time;

- criminal sanctions or consent decrees;

- termination of certain employees, including members of our executive team;

- barring of certain employees from participating in our business in whole or in part;

- orders that restrict our business or prevent us from offering certain products or services;

- changes to our business model and practices;

- delays to planned transactions, product launches or improvements; and

- damage to our brand and reputation.

Because of our large customer base, actions against us may claim large monetary damages, even if the alleged per-customer harm is small or non-existent. Regardless of the outcome, any such matters can have an adverse impact, which may be material, on our business, operating results, or financial condition because of legal costs, diversion of management resources, reputational damage, and other factors. For additional information, see the section titled "Business—Legal Proceedings."

***If we cannot keep pace with rapid industry changes to provide new and innovative products and services, the use of our products and services, and consequently our net revenue, could decline, which could adversely impact our business, operating results, and financial condition.***

Our industry has been characterized by many rapid, significant, and disruptive products and services in recent years. These include decentralized applications, DeFi, yield farming, staking, token wrapping, governance tokens, innovative programs to attract customers such as transaction fee mining programs, initiatives to attract traders such as trading competitions, airdrops and giveaways, staking reward programs, and novel cryptocurrency fundraising and distribution schemes, such as "initial exchange offerings." We expect new services and technologies to continue to emerge and evolve, which may be superior to, or render obsolete, the products and services that we currently provide. We cannot predict the effects of new services and technologies on our business. However, our ability to grow our customer base and net revenue will depend heavily on our ability to innovate and create successful new products and services, both independently and in conjunction with third-party developers. In particular, developing and incorporating new products and services into our business may require substantial expenditures, take considerable time, and ultimately may not be successful. Any new products or services could fail to attract customers, generate revenue, or perform or integrate well with third-party applications and platforms. In addition, our ability to adapt and compete with new products and services may be inhibited by regulatory requirements and general uncertainty in the law, constraints by our banking partners and payment processors, third-party intellectual property rights, or other factors. Moreover, we must continue to enhance our technical infrastructure and other technology offerings to remain competitive and maintain a platform that has the required functionality, performance, capacity, security, and speed to attract and retain customers, including large, institutional, high-frequency and high-volume traders. As a result, we expect to expend significant costs and expenses to develop and upgrade our technical infrastructure to meet the evolving needs of the industry. Our success will depend on our ability to develop and incorporate new offerings and adapt to technological changes and evolving industry practices. If we are unable to do so in a timely or cost-effective manner, our business and our ability to successfully compete, to retain existing customers, and to attract new customers may be adversely affected.

*A particular crypto asset's status as a "security" in any relevant jurisdiction is subject to a high degree of uncertainty and if we are unable to properly characterize a crypto asset, we may be subject to regulatory scrutiny, investigations, fines, and other penalties, which may adversely affect our business, operating results, and financial condition.*

The SEC and its staff have taken the position that certain crypto assets fall within the definition of a "security" under the U.S. federal securities laws. The legal test for determining whether any given crypto asset is a security is a highly complex, fact-driven analysis that evolves over time, and the outcome is difficult to predict. The SEC generally does not provide advance guidance or confirmation on the status of any particular crypto asset as a security. Furthermore, the SEC's views in this area have evolved over time and it is difficult to predict the direction or timing of any continuing evolution. It is also possible that a change in the governing administration or the appointment of new SEC commissioners could substantially impact the views of the SEC and its staff. Public statements by senior officials at the SEC indicate that the SEC does not intend to take the position that Bitcoin or Ethereum are securities (in their current form). Bitcoin and Ethereum are the only crypto assets as to which senior officials at the SEC have publicly expressed such a view. Moreover, such statements are not official policy statements by the SEC and reflect only the speakers' views, which are not binding on the SEC or any other agency or court and cannot be generalized to any other crypto asset. With respect to all other crypto assets, there is currently no certainty under the applicable legal test that such assets are not securities, notwithstanding the conclusions we may draw based on our risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws. Similarly, though the SEC's Strategic Hub for Innovation and Financial Technology published a framework for analyzing whether any given crypto asset is a security in April 2019, this framework is also not a rule, regulation or statement of the SEC and is not binding on the SEC.

Several foreign jurisdictions have taken a broad-based approach to classifying crypto assets as "securities," while other foreign jurisdictions, such as Switzerland, Malta, and Singapore, have adopted a narrower approach. As a result, certain crypto assets may be deemed to be a "security" under the laws of some jurisdictions but not others. Various foreign jurisdictions may, in the future, adopt additional laws, regulations, or directives that affect the characterization of crypto assets as "securities,"

The classification of a crypto asset as a security under applicable law has wide-ranging implications for the regulatory obligations that flow from the offer, sale, trading, and clearing of such assets. For example, a crypto asset that is a security in the United States may generally only be offered or sold in the United States pursuant to a registration statement filed with the SEC or in an offering that qualifies for an exemption from registration. Persons that effect transactions in crypto assets that are securities in the United States may be subject to registration with the SEC as a "broker" or "dealer." Platforms that bring together purchasers and sellers to trade crypto assets that are securities in the United States are generally subject to registration as national securities exchanges, or must qualify for an exemption, such as by being operated by a registered broker-dealer as an alternative trading system, or ATS, in compliance with rules for ATSs. Persons facilitating clearing and settlement of securities may be subject to registration with the SEC as a clearing agency. Foreign jurisdictions may have similar licensing, registration, and qualification requirements.

We have policies and procedures to analyze whether each crypto asset that we seek to facilitate trading on our platform could be deemed to be a "security" under applicable laws. Our policies and procedures do not constitute a legal standard, but rather represent our company-developed scoring model, which permits us to make a risk-based assessment regarding the likelihood that a particular crypto asset could be deemed a "security" under applicable laws. Regardless of our conclusions, we could be subject to legal or regulatory action in the event the SEC, a foreign regulatory authority, or a court were to determine that a supported crypto asset currently offered, sold, or traded on our platform is a "security" under applicable laws. Because our platform is not registered or licensed with the SEC or foreign authorities as a broker-dealer, national securities exchange, or ATS (or foreign equivalents), and we do not seek to register or rely on an exemption from such registration or license to facilitate the offer and sale of crypto assets on our platform, we only permit trading on our core platform of those crypto assets for

which we determine there are reasonably strong arguments to conclude that the crypto asset is not a security. We believe that our process reflects a comprehensive and thoughtful analysis and is reasonably designed to facilitate consistent application of available legal guidance to crypto assets to facilitate informed risk-based business judgment. However, we recognize that the application of securities laws to the specific facts and circumstances of crypto assets may be complex and subject to change, and that a listing determination does not guarantee any conclusion under the U.S. federal securities laws. For example, in December 2020, we announced that we had made a decision to suspend all XRP trading pairs on our platform in light of the SEC's lawsuit filed against Ripple Labs, Inc. and two of its executives, alleging that they have engaged in an unregistered, ongoing securities offering through the sale of XRP. We expect our risk assessment policies and procedures to continuously evolve to take into account case law, facts, and developments in technology.

Although we have applied to operate an ATS in the United States that would allow us to trade crypto assets that are deemed "securities" under U.S. federal securities laws, we have not yet received regulatory approval to, and do not currently, operate an ATS for trading of crypto assets deemed to be securities. Even though we have incurred substantial expenses and compliance costs, we may never receive regulatory approval to operate an ATS for the trading of crypto assets that constitute securities and, even if we were to receive such regulatory approval, the markets for trading crypto assets that constitute securities may lack the depth and liquidity of our platform. There can be no assurances that we will properly characterize any given crypto asset as a security or non-security for purposes of determining which of our platforms that crypto asset is allowed to trade on, or that the SEC, foreign regulatory authority, or a court, if the question was presented to it, would agree with our assessment. If the SEC, foreign regulatory authority, or a court were to determine that a supported crypto asset currently offered, sold, or traded on our platform is a security, we would not be able to offer such crypto asset for trading until we are able to do so in a compliant manner, such as through an ATS approved to trade crypto asset that constitute securities. A determination by the SEC, a foreign regulatory authority, or a court that an asset that we currently support for trading on our platform constitutes a security may also result in us determining that it is advisable to remove assets from our platform that have similar characteristics to the asset that was determined to be a security. In addition, we could be subject to judicial or administrative sanctions for failing to offer or sell the crypto asset in compliance with the registration requirements, or for acting as a broker, dealer, or national securities exchange without appropriate registration. Such an action could result in injunctions, cease and desist orders, as well as civil monetary penalties, fines, and disgorgement, criminal liability, and reputational harm. Customers that traded such supported crypto asset on our platform and suffered trading losses could also seek to rescind a transaction that we facilitated as the basis that it was conducted in violation of applicable law, which could subject us to significant liability. We may also be required to cease facilitating transactions in the supported crypto asset other than via our licensed subsidiaries, which could negatively impact our business, operating results, and financial condition. Furthermore, if we remove any assets from trading on our platform, our decision may be unpopular with users and may reduce our ability to attract and retain customers, especially if such assets remain traded on unregulated exchanges, which includes many of our competitors.

Further, if Bitcoin, Ethereum, or any other supported crypto asset is deemed to be a security under any U.S. federal, state, or foreign jurisdiction, or in a proceeding in a court of law or otherwise, it may have adverse consequences for such supported crypto asset. For instance, all transactions in such supported crypto asset would have to be registered with the SEC or other foreign authority, or conducted in accordance with an exemption from registration, which could severely limit its liquidity, usability and transactability. Moreover, the networks on which such supported crypto assets are utilized may be required to be regulated as securities intermediaries, and subject to applicable rules, which could effectively render the network impracticable for its existing purposes. Further, it could draw negative publicity and a decline in the general acceptance of the crypto asset. Also, it may make it difficult for such supported crypto asset to be traded, cleared, and custodied as compared to other crypto asset that are not considered to be securities.

***We currently rely on third-party service providers for certain aspects of our operations, and any interruptions in services provided by these third parties may impair our ability to support our customers.***

We rely on third parties in connection with many aspects of our business, including payment processors, banks, and payment gateways to process transactions; cloud computing services and data centers that provide facilities, infrastructure, website functionality and access, components, and services, including databases and data center facilities and cloud computing; as well as third parties that provide outsourced customer service, compliance support and product development functions, which are critical to our operations. Because we rely on third parties to provide these services and to facilitate certain of our business activities, we face increased operational risks. We do not control the operation of any of these third parties, including the data center facilities we use. These third parties may be subject to financial, legal, regulatory, and labor issues, cybersecurity incidents, break-ins, computer viruses, denial-of-service attacks, sabotage, acts of vandalism, privacy breaches, service terminations, disruptions, interruptions, and other misconduct. They are also vulnerable to damage or interruption from human error, power loss, telecommunications failures, fires, floods, earthquakes, hurricanes, tornadoes, pandemics (including the COVID-19 pandemic) and similar events. For example, on February 24, 2021, the U.S. Federal Reserve's payments network experienced an outage, which had the potential to result in reduced functionality for certain of our products. In addition, these third parties may breach their agreements with us, disagree with our interpretation of contract terms or applicable laws and regulations, refuse to continue or renew these agreements on commercially reasonable terms or at all, fail or refuse to process transactions or provide other services adequately, take actions that degrade the functionality of our services, impose additional costs or requirements on us or our customers, or give preferential treatment to competitors. There can be no assurance that third parties that provide services to us or to our customers on our behalf will continue to do so on acceptable terms, or at all. If any third parties do not adequately or appropriately provide their services or perform their responsibilities to us or our customers on our behalf, such as if third-party service providers to close their data center facilities without adequate notice, are unable to restore operations and data, fail to perform as expected, or experience other unanticipated problems, we may be unable to procure alternatives in a timely and efficient manner and on acceptable terms, or at all, and we may be subject to business disruptions, losses or costs to remediate any of the deficiencies, customer dissatisfaction, reputational damage, legal or regulatory proceedings, or other adverse consequences which could harm our business.

***Loss of a critical banking or insurance relationship could adversely impact our business, operating results, and financial condition.***

We rely on bank accounts to provide our platform and custodial services. In particular, customer cash holdings on our platform are held with one or more of our banking partners. As a registered money services business with FinCEN under the Bank Secrecy Act, as amended by the USA PATRIOT Act of 2001, and its implementing regulations enforced by FinCEN, or collectively, the BSA, a licensed money transmitter in a number of U.S. states and territories, a licensee under NYDFS's Virtual Currency Business Activity regime, commonly referred to as a BitLicense, a licensed electronic money institution under both the U.K. Financial Conduct Authority and the Central Bank of Ireland, and a limited purpose trust company chartered by the NYDFS, our banking partners view us as a higher risk customer for purposes of their anti-money laundering programs. We may face difficulty establishing or maintaining banking relationships due to our banking partners' policies and some prior bank partners have terminated their relationship with Coinbase or have limited access to bank services. The loss of these banking partners or the imposition of operational restrictions by these banking partners and the inability for us to utilize other redundant financial institutions may result in a disruption of business activity as well as regulatory risks. In addition, financial institutions in the United States and globally may, as a result of the myriad of regulations or the risks of crypto assets generally, decide to not provide account, custody, or other financial services to us or the cryptoeconomy generally. We also rely on insurance carriers to insure customer losses resulting from a breach of our physical security, cyber security, or by employee or service provider theft. Our ability to maintain crime and specie insurance is subject to the insurance carriers'

ongoing underwriting criteria and our inability to obtain and maintain appropriate insurance coverage could cause a substantial business disruption, adverse reputational impact, inability to compete with our competitors, and regulatory scrutiny.

***Any significant disruption in our products and services, in our information technology systems, or in any of the blockchain networks we support, could result in a loss of customers or funds and adversely impact our brand and reputation and our business, operating results, and financial condition.***

Our reputation and ability to attract and retain customers and grow our business depends on our ability to operate our service at high levels of reliability, scalability, and performance, including the ability to process and monitor, on a daily basis, a large number of transactions that occur at high volume and frequencies across multiple systems. Our platform, the ability of our customers to trade, and our ability to operate at a high level, are dependent on our ability to access the blockchain networks underlying the supported crypto assets, for which access is dependent on our systems' ability to access the internet. Further, the successful and continued operations of such blockchain networks will depend on a network of computers, miners, or validators, and their continued operations, all of which may be impacted by service interruptions.

Our systems, the systems of our third-party service providers and partners, and certain crypto asset and blockchain networks have experienced from time to time, and may experience in the future service interruptions or degradation because of hardware and software defects or malfunctions, distributed denial-of-service and other cyberattacks, insider threats, break-ins, sabotage, human error, vandalism, earthquakes, hurricanes, floods, fires, and other natural disasters, power losses, disruptions in telecommunications services, fraud, military or political conflicts, terrorist attacks, computer viruses or other malware, or other events. In addition, extraordinary Trading Volumes or site usage could cause our computer systems to operate at an unacceptably slow speed or even fail. Some of our systems, including systems of companies we have acquired, or the systems of our third-party service providers and partners are not fully redundant, and our or their disaster recovery planning may not be sufficient for all possible outcomes or events.

If any of our systems, or those of our third-party service providers, are disrupted for any reason, our products and services may fail, resulting in unanticipated disruptions, slower response times and delays in our customers' trade execution and processing, failed settlement of trades, incomplete or inaccurate accounting, recording or processing of trades, unauthorized trades, loss of customer information, increased demand on limited customer support resources, customer claims, complaints with regulatory organizations, lawsuits, or enforcement actions. A prolonged interruption in the availability or reduction in the availability, speed, or functionality of our products and services could harm our business. Frequent or persistent interruptions in our services could cause current or potential customers or partners to believe that our systems are unreliable, leading them to switch to our competitors or to avoid or reduce the use of our products and services, and could permanently harm our reputation and brands. Moreover, to the extent that any system failure or similar event results in damages to our customers or their business partners, these customers or partners could seek significant compensation or contractual penalties from us for their losses, and those claims, even if unsuccessful, would likely be time-consuming and costly for us to address. Problems with the reliability or security of our systems would harm our reputation, and damage to our reputation and the cost of remedying these problems could negatively affect our business, operating results, and financial condition.

Because we are a regulated financial institution in certain jurisdictions, frequent or persistent interruptions could also lead to regulatory scrutiny, significant fines and penalties, and mandatory and costly changes to our business practices, and ultimately could cause us to lose existing licenses or banking relationships that we need to operate or prevent or delay us from obtaining additional licenses that may be required for our business.

In addition, we are continually improving and upgrading our information systems and technologies. Implementation of new systems and technologies is complex, expensive, time-consuming, and may not be successful. If we fail to timely and successfully implement new information systems and technologies, or improvements or upgrades to existing information systems and technologies, or if such systems and technologies do not operate as intended, it could have an adverse impact on our business, internal controls (including internal controls over financial reporting), operating results, and financial condition.

***Our failure to safeguard and manage our customers' fiat currencies and crypto assets could adversely impact our business, operating results, and financial condition.***

As of December 31, 2020, we held $90 billion in custodial fiat currencies and cryptocurrencies on behalf of customers. Supported crypto assets are not insured or guaranteed by any government or government agency. We have also entered into partnerships with third parties, such as with the Centre Consortium, as the chief reseller of USD Coin, where we or our partners receive and hold funds for the benefit of our customers. Our and our partners' abilities to manage and accurately safeguard these customer assets requires a high level of internal controls. As our business continues to grow and we expand our product and service offerings, we must continue to strengthen our associated internal controls and ensure that our partners do the same. Our success and the success of our offerings requires significant public confidence in our and our partners' ability to properly manage customers' balances and handle large and growing transaction volumes and amounts of customer funds. In addition, we are dependent on our partners' operations, liquidity, and financial condition for the proper maintenance, use, and safekeeping of these customer assets. Any failure by us or our partners to maintain the necessary controls or to manage customer crypto assets and funds appropriately and in compliance with applicable regulatory requirements could result in reputational harm, significant financial losses, lead customers to discontinue or reduce their use of our and our partners' products, and result in significant penalties and fines and additional restrictions, which could adversely impact our business, operating results, and financial condition.

We deposit, transfer, and custody customer cash and crypto assets in multiple jurisdictions. In each instance, we are required to safeguard customers' assets using bank-level security standards applicable to our hot and cold wallet and storage systems, as well as our financial management systems related to such custodial functions. Our security technology is designed to prevent, detect, and mitigate inappropriate access to our systems, by internal or external threats. We believe we have developed and maintained administrative, technical, and physical safeguards designed to comply with applicable legal requirements and industry standards. However, it is nevertheless possible that hackers, employees or service providers acting contrary to our policies, or others could circumvent these safeguards to improperly access our systems or documents, or the systems or documents of our business partners, agents, or service providers, and improperly access, obtain, misuse customer crypto assets and funds. The methods used to obtain unauthorized access, disable, or degrade service or sabotage systems are also constantly changing and evolving and may be difficult to anticipate or detect for long periods of time. Our fidelity insurance coverage for such impropriety is limited and may not cover the extent of loss nor the nature of such loss, in which case we may be liable for the full amount of losses suffered, which could be greater than all of our assets. Our ability to maintain fidelity insurance is also subject to the insurance carriers' ongoing underwriting criteria. Any loss of customer cash or crypto assets could result in a subsequent lapse in insurance coverage, which could cause a substantial business disruption, adverse reputational impact, inability to compete with our competitors, and regulatory investigations, inquiries, or actions. Additionally, transactions undertaken through our websites or other electronic channels may create risks of fraud, hacking, unauthorized access or acquisition, and other deceptive practices. Any security incident resulting in a compromise of customer assets could result in substantial costs to us and require us to notify impacted individuals, and in some cases regulators, of a possible or actual incident, expose us to regulatory enforcement actions, including substantial fines, limit our ability to provide services, subject us to litigation, significant financial losses, damage our reputation, and adversely affect our business, operating results, financial condition, and cash flows.

33

***The loss or destruction of private keys required to access any crypto assets held in custody for our own account or for our customers may be irreversible. If we are unable to access our private keys or if we experience a hack or other data loss relating to our ability to access any crypto assets, it could cause regulatory scrutiny, reputational harm, and other losses.***

Crypto assets are generally controllable only by the possessor of the unique private key relating to the digital wallet in which the crypto assets are held. While blockchain protocols typically require public addresses to be published when used in a transaction, private keys must be safeguarded and kept private in order to prevent a third party from accessing the crypto assets held in such a wallet. To the extent that any of the private keys relating to our hot or cold wallets containing crypto assets held for our own account or for our customers is lost, destroyed, or otherwise compromised or unavailable, and no backup of the private key is accessible, we will be unable to access the crypto assets held in the related wallet. Further, we cannot provide assurance that our wallet will not be hacked or compromised. Crypto assets and blockchain technologies have been, and may in the future be, subject to security breaches, hacking, or other malicious activities. Any loss of private keys relating to, or hack or other compromise of, digital wallets used to store our customers' crypto assets could adversely affect our customers' ability to access or sell their crypto assets, require us to reimburse our customers for their losses, and subject us to significant financial losses in addition to losing customer trust in us and our products. As such, any loss of private keys due to a hack, employee or service provider misconduct or error, or other compromise by third parties could hurt our brand and reputation, result in significant losses, and adversely impact our business. The total value of crypto assets in our possession and control is significantly greater than the total value of insurance coverage that would compensate Coinbase in the event of theft or other loss of funds.

**Other Risks Related to Our Business and Financial Position**

***If we fail to retain existing customers or add new customers, or if our customers decrease their level of engagement with our products, services and platform, our business, operating results, and financial condition may be significantly harmed.***

Our success depends on our ability to retain existing customers and attract new customers, including ecosystem partners, to increase engagement with our products, services, and platform. To do so, we must continue to offer leading technologies and ensure that our products and services are secure, reliable, and engaging. We must also expand our products and services, and offer competitive prices in an increasingly crowded and price-sensitive market. There is no assurance that we will be able to continue to do so, that we will be able to retain our current customers or attract new customers, or keep our customers engaged. Any number of factors can negatively affect customer retention, growth, and engagement, including if:

- customers increasingly engage with competing products and services, including products and services that we are unable to offer due to regulatory reasons;

- we fail to introduce new and improved products and services, or if we introduce new products or services that are not favorably received;

- we fail to support new and in-demand crypto assets or if we elect to support crypto assets with negative reputations;

- there are changes in sentiment about the quality or usefulness of our products and services or concerns related to privacy, security, or other factors;

- there are adverse changes in our products and services that are mandated by legislation, regulatory authorities, or litigation;

- customers perceiving the crypto assets on our platform to be bad investments, or experiencing significant losses in investments made on our platform;

- technical or other problems prevent us from delivering our products and services with the speed, functionality, security, and reliability that our customers expect;

- cybersecurity incidents, employee or service provider misconduct, or other unforeseen activities that causes losses to us or our customers, including losses to assets held by us on behalf of our customers;

- modifications to our pricing model or modifications by competitors to their pricing;

- we fail to provide adequate customer service to customers; or

- we or other companies in our industry are the subject of adverse media reports or other negative publicity.

From time to time, certain of these factors have negatively affected customer retention, growth, and engagement to varying degrees. If we are unable to maintain or increase our customer base and customer engagement, our revenue and financial results may be adversely affected. Any decrease in user retention, growth, or engagement could render our products and services less attractive to customers, which may have an adverse impact on our revenue, business, operating results, and financial condition. If our customer growth rate slows or declines, we will become increasingly dependent on our ability to maintain or increase levels of user engagement and monetization in order to drive growth of revenue.

***We expect our operating expenses to increase significantly in the foreseeable future and may not be able to achieve profitability or achieve positive cash flow from operations on a consistent basis, which may cause our business, operating results, and financial condition to be adversely impacted.***

We anticipate that our operating expenses will increase substantially in the foreseeable future as we continue to hire additional employees, expand our sales and marketing efforts, develop additional products and services, and expand our international business. Moreover, we expect to incur significant legal, accounting, and other expenses, including substantially higher costs to obtain and maintain director and officer liability insurance, as a result of becoming a public company. This may prove more expensive than we currently anticipate, and we may not succeed in increasing our net revenue sufficiently to offset these higher expenses. Our revenue growth may slow, or our net revenue may decline for a number of other reasons, including reduced demand for our offerings, increased competition, a decrease in the growth or size of the cryptoeconomy, or any failure to capitalize on growth opportunities. Any failure to increase our revenue could prevent us from achieving profitability. We cannot be certain that we will be able to achieve profitability or achieve positive operating cash flow on any quarterly or annual basis. If we are unable to effectively manage these risks and difficulties as we encounter them, our business, operating results, and financial condition may suffer.

***Our business and operations have experienced significant growth, and if we do not effectively manage our growth, or are unable to improve our systems and processes, our operating results will be negatively affected.***

We have significantly expanded our operations in recent years, both in terms of employee headcount as well as the number of customers. For example, we have grown from 199 employees as of December 31, 2017 to 1,249 employees as of December 31, 2020. We expect such growth to continue for the foreseeable future. As we grow, our business becomes increasingly complex. To effectively manage and capitalize on our growth, we must continue to expand our information technology and financial, operating, and administrative systems and controls, and continue to manage headcount, capital, and processes efficiently. Our continued growth could strain our existing resources, and we could experience ongoing operating difficulties in managing our business as it expands across numerous jurisdictions, including difficulties in hiring, training, and managing a diffuse and growing employee base. Failure to scale and preserve our company culture with growth could harm our future success, including our ability to retain and recruit personnel and to effectively focus on and pursue our corporate objectives. If we do not adapt

to meet these evolving challenges, or if our management team does not effectively scale with our growth, we may experience erosion to our brand, the quality of our products and services may suffer, and our company culture may be harmed. Moreover, the failure of our systems and processes could undermine our ability to provide accurate, timely, and reliable reports on our financial and operating results, including the financial statements provided herein, and could impact the effectiveness of our internal controls over financial reporting. In addition, our systems and processes may not prevent or detect all errors, omissions, or fraud. Any of the foregoing operational failures could lead to noncompliance with laws, loss of operating licenses or other authorizations, or loss of bank relationships that could substantially impair or even suspend company operations.

Successful implementation of our growth strategy will also require significant expenditures before any substantial associated revenue is generated and we cannot guarantee that these increased investments will result in corresponding and offsetting revenue growth. Because we have a limited history operating our business at its current scale, it is difficult to evaluate our current business and future prospects, including our ability to plan for and model future growth. Our limited operating experience at this scale, combined with the rapidly evolving nature of the crypto asset market in which we operate, substantial uncertainty concerning how these markets may develop, and other economic factors beyond our control, reduces our ability to accurately forecast quarterly or annual revenue. Failure to manage our future growth effectively could have an adverse effect on our business, operating results, and financial condition.

***Our strategy and focus on delivering high-quality, compliant, easy-to-use, and secure crypto-related financial services may not maximize short-term or medium-term financial results.***

We have taken, and expect to continue to take, actions that we believe are in the best interests of our customers and the long-term interests of our business, even if those actions do not necessarily maximize short-term or medium-term results. These include expending significant managerial, technical, and legal efforts on complying with laws and regulations that are applicable to our products and services and ensuring that our products are secure. We also focus on driving long-term engagement with our customers through innovation and developing new industry-leading products and technologies. These decisions may not be consistent with the short-term and medium-term expectations of our stockholders and may not produce the long-term benefits that we expect, which could have an adverse effect on our business, operating results, and financial condition.

***A significant amount of the Trading Volume on our platform is derived from a relatively small number of customers, and the loss of these customers, or a reduction in their Trading Volume, could have an adverse effect on our business, operating results, and financial condition.***

A relatively small number of institutional market makers and high-transaction volume retail customers account for a significant amount of the Trading Volume on our platform and our net revenue. We expect significant Trading Volume and net revenue attributable to these customers for the foreseeable future. As a result, a loss of these customers, or a reduction in their Trading Volume, and our inability to replace these customers with other customers, could have an adverse effect on our business, operating results, and financial condition.

***Due to our limited operating history, it may be difficult to evaluate our business and future prospects, and we may not be able to achieve or maintain profitability in any given period.***

We began our operations in 2012 and since then our business model has continued to evolve. Our net revenue has significantly grown since our formation, but there is no assurance that this growth rate will continue in future periods and you should not rely on the revenue growth of any given prior quarterly or annual period as an indication of our future performance. We may not always generate sufficient total revenue to achieve positive cash flow from operations or profitability in any given period, and our limited operating history and the volatile nature of our business make it difficult to evaluate our current business and our future prospects. For instance, although we generated net income of $322.3 million in 2020, we incurred a net loss of $30.4 million in 2019. We have encountered and will continue to encounter risks

and difficulties as described in this section. If we do not manage these risks successfully, our business may be adversely impacted. If our growth rate were to decline significantly or become negative, it could adversely affect our operating results and financial condition. If we are not able to achieve or maintain positive cash flow from operations, our business may be adversely impacted and we may require additional financing, which may not be available on favorable terms or at all, or which would be dilutive to our stockholders.

***Because our long-term success depends, in part, on our ability to expand our sales to customers outside the United States, our business is susceptible to risks associated with international operations.***

We currently have subsidiaries in the United Kingdom, Japan, Singapore, Brazil, Germany, the Cayman Islands, the Philippines, and Ireland, as well as the United States. We plan to enter into or increase our presence in additional markets around the world. We have a limited operating history outside the United States, and our ability to manage our business and conduct our operations internationally requires considerable management attention and resources and is subject to particular challenges of supporting a rapidly growing business in an environment of diverse cultures, languages, customs, tax laws, legal systems, alternate dispute systems and regulatory systems. As we continue to expand our business and customer base outside the United States, we will be increasingly susceptible to risks associated with international operations. These risks and challenges include:

- difficulty establishing and managing international operations and the increased operations, travel, infrastructure, including establishment of local customer service operations, and legal and regulatory compliance costs associated with different jurisdictions;

- the need to vary pricing and margins to effectively compete in international markets;

- the need to adapt and localize our products and services for specific countries, including offering services and support in local languages;

- compliance with multiple, potentially conflicting and changing governmental laws and regulations across different jurisdictions;

- compliance with U.S. and foreign laws designed to combat money laundering and the financing of terrorist activities, as well as economic and trade sanctions;

- difficulties obtaining required licensing from regulators in foreign jurisdictions;

- competition with companies that have greater experience in the local markets, pre-existing relationships with customers in these markets or are subject to less regulatory requirements in local jurisdictions;

- varying levels of payments and blockchain technology adoption and infrastructure, and increased network, payment processing, banking, and other costs;

- compliance with anti-bribery laws, including compliance with the FCPA, the U.K. Bribery Act 2010, and other local anticorruption laws;

- difficulties in collecting in foreign currencies and associated foreign currency exposure;

- difficulties holding, repatriating, and transferring funds held in offshore bank accounts;

- difficulties in enforcing contracts and collecting accounts receivable, longer payment cycles and other collection difficulties;

- restrictions on crypto asset trading;

- stringent local labor laws and regulations;

- potentially adverse tax developments and consequences;

- antitrust and competition regulations; and

- regional economic and political conditions.

We have limited experience with international regulatory environments and market practices and may not be able to penetrate or successfully operate in the markets we choose to enter. In addition, we may incur significant expenses as a result of our international expansion, and we may not be successful. We may face limited brand recognition in certain parts of the world that could lead to non-acceptance or delayed acceptance of our products and services by customers in new markets. We may also face challenges in complying with local laws and regulations. Our failure to successfully manage these risks could harm our international operations and have an adverse effect on our business, operating results, and financial condition.

***Disputes with our customers could adversely impact our brand and reputation and our business, operating results, and financial condition.***

From time to time we have been, and may in the future be, subject to claims and disputes with our customers with respect to our products and services, such as regarding the execution and settlement of crypto asset trades, fraudulent or unauthorized transactions, account takeovers, deposits and withdrawals of crypto assets, failures or malfunctions of our systems and services, or other issues relating to our products services. For example, during periods of heavy Trading Volumes, we have received increased customer complaints. Additionally, the ingenuity of criminal fraudsters, combined with many consumers' susceptibility to fraud, may cause our customers to be subject to ongoing account takeovers and identity fraud issues. While we have taken measures to detect and reduce the risk of fraud, there is no guarantee that they will be successful and, in any case, require continuous improvement and optimization for continually evolving forms of fraud to be effective. There can be no guarantee that we will be successful in detecting and resolving these disputes or defending ourselves in any of these matters, and any failure may result in impaired relationships with our customers, damage to our brand and reputation, and substantial fines and damages. In some cases, the measures we have implemented to detect and deter fraud have led to poor customer experiences, including indefinite account inaccessibility for some of our customers, which increases our customer support costs and can compound damages. We could incur significant costs in compensating our customers, such as if a transaction was unauthorized, erroneous, or fraudulent. We could also incur significant legal expenses resolving and defending claims, even those without merit. To the extent we are found to have failed to fulfill our regulatory obligations, we could also lose our authorizations or licenses or become subject to conditions that could make future operations more costly, impair our ability to grow, and adversely impact our operating results. We currently are, and may in the future become, subject to investigation and enforcement action by state, federal, and international consumer protection agencies, including the Consumer Financial Protection Bureau, the Federal Trade Commission, state attorneys general in the United States, the U.K. Financial Conduct Authority, the U.K. Financial Ombudsman Service, and the U.K. Office of Fair Trading, each of which monitor customer complaints against us and, from time to time, escalate matters for investigation and potential enforcement against us.

While certain of our customer agreements contain arbitration provisions with class action waiver provisions that may limit our exposure to consumer class action litigation, some federal, state, and foreign courts have refused to enforce one or more of these provisions, and there can be no assurance that we will be successful in enforcing these arbitration provisions, including the class action waiver provisions, in the future or in any given case. Legislative, administrative, or regulatory developments may directly or indirectly prohibit or limit the use of pre-dispute arbitration clauses and class action waiver provisions. Any such prohibitions or limitations on or discontinuation of the use of, such arbitration or class action waiver provisions could subject us to additional lawsuits, including additional consumer class action litigation, and significantly limit our ability to avoid exposure from consumer class action litigation.

***We may suffer losses due to staking, delegating, and other related services we provide to our customers.***

Certain supported crypto assets enable holders to earn rewards by participating in decentralized governance, bookkeeping and transaction confirmation activities on their underlying blockchain networks, such as through staking, delegating, baking, and voting the crypto assets. We currently provide and expect to continue to provide such services for certain supported crypto assets to our customers in order to enable them to earn rewards based on crypto assets that we hold on their behalf. For instance, as a service to customers, we operate staking nodes on certain blockchain networks utilizing customers' crypto assets and pass through the rewards received to those customers, less a service fee. In other cases, upon customers' instructions, we may delegate or transfer our customers' assets to third party service providers that are unaffiliated with us. Some networks further require customer assets to be transferred into smart contracts on the underlying blockchain networks not under our or anyone's control. If our validator, any third-party service providers, or smart contracts fail to behave as expected, suffer cybersecurity attacks, experience security issues, or encounter other problems, our customers' assets may be irretrievably lost. In addition, certain blockchain networks dictate requirements for participation in the relevant decentralized governance activity, and may impose penalties, or "slashing," if the relevant activities are not performed correctly, such as if the staker, delegator, or baker acts maliciously on the network, "double signs" any transactions, or experience extended downtimes. If we or any of our service providers are slashed by the underlying blockchain network, our customers' assets may be confiscated, withdrawn, or burnt by the network, resulting in losses for which we are responsible. Furthermore, certain types of staking require the payment of transaction fees on the underlying blockchain network and such fees can become significant as the amount and complexity of the transaction grows, depending on the degree of network congestion and the price of Ethereum. If we experience a high volume of such staking requests from our customers on an ongoing basis, we could incur significant costs. Any penalties or slashing events could damage our brand and reputation, cause us to suffer financial losses, discourage existing and future customers from utilizing our products and services, and adversely impact our business.

***We provide secured loans to our customers, which exposes us to credit risks and may cause us to incur financial or reputational harm.***

We provide consumer and commercial loans to qualified customers secured by their crypto asset holdings on our platform, which exposes us to the risk of our borrowers' inability to repay such loans. In addition, such activity results in us being subject to lending laws and regulations in the applicable jurisdiction and as a result we may be subject to additional regulatory scrutiny. In the future we may enter into credit arrangements with financial institutions to obtain the capital we provide under this offering. Any termination or interruption in the financial institutions' ability to lend to us could interrupt our ability to provide capital to qualified customers to the extent we rely on such credit lines to continue to offer or to grow such products. Further, our credit decision process and underwriting, pricing, loss forecasting, and scoring models used to evaluate loan applications may contain errors or may not adequately assess creditworthiness of our borrowers, or may be otherwise ineffective, resulting in incorrect approvals or denials of loans. It is also possible that loan applicants could provide false or incorrect information.

Borrower loan loss rates may be significantly affected by economic downturns or general economic conditions beyond our control and beyond the control of individual borrowers. In particular, loss rates on loans may increase due to factors such as prevailing market conditions in the cryptoeconomy, the price of Bitcoin and other crypto assets, the amount of liquidity in the markets, and other factors. Borrowers may seek protection under federal bankruptcy law or similar laws. If a borrower files for bankruptcy (or becomes the subject of an involuntary petition), a stay will go into effect that will automatically put any pending collection actions on the loan on hold and prevent further collection action absent bankruptcy court approval. The efficacy of our security interest in customer collateral is not guaranteed under Delaware law or the Uniform Commercial Code and therefore we may be exposed to loss in the event of a customer default, even if we appear to be secured against such default. While we have not incurred any material losses to date, if any of the foregoing events were to occur, our reputation and relationships with

borrowers, and our financial results, could be harmed. We intend to continue to explore other products, models, and structures for offering consumer and commercial financing, and other forms of credit and loan products. Some of those models or structures may require, or be deemed to require, additional data, procedures, partnerships, licenses, regulatory approvals, or capabilities that we have not yet obtained or developed.

***We are exposed to transaction losses due to chargebacks as a result of fraud or uncollectibility that may adversely impact our business, operating results, and financial condition.***

Certain of our products and services are paid for by credit and debit cards through payment processors which exposes us to risks associated with chargebacks and refunds. These claims could arise from fraud, misuse, unintentional use, settlement delay, or other activities. Also, criminals are using increasingly sophisticated methods to engage in illegal activities, such as counterfeiting and fraud. If we are unable to collect such amounts from the customer, or if the customer refuses or is unable, due to bankruptcy or other reasons, to reimburse us, we bear the loss for the amount of the chargeback or refund.

While we have policies to manage and mitigate chargeback and fraud risks, there is no assurance that such policies will be effective. Our failure to limit chargebacks and fraudulent transactions could increase the number of refunds and chargebacks that we have to process. In addition, if the number of refunds and chargebacks increase, our payment processors could require us to increase reserves, impose penalties on us, charge additional fees, or terminate their relationships with us. Failure to effectively manage risk and prevent fraud could increase our chargeback and refund losses or cause us to incur other liabilities. Increases in chargebacks, refunds or other liabilities could have an adverse effect on our operating results, financial condition, and cash flows.

***We plan to continue to make acquisitions and investments, which could require significant management attention, disrupt our business, result in dilution to our stockholders, and adversely affect our financial results.***

As part of our business strategy, we have made and intend to continue making acquisitions to add specialized employees, complementary companies, products, services, licenses, or technologies. We also invest in companies and technologies, many of which are private companies and technologies that are highly speculative in nature. In the future, we may not be able to find other suitable acquisition and investment candidates, and we may not be able to complete acquisitions or make investments on favorable terms, if at all. In some cases, the costs of such acquisitions may be substantial, and there is no assurance that we will receive a favorable return on investment for our acquisitions. We may in the future be required to write off acquisitions or investment. Moreover, our previous and future acquisitions may not achieve our goals, and any future acquisitions we complete could be viewed negatively by customers, developers, advertisers, or investors. For example, in February 2019, we announced the acquisition of Neutrino S.r.l., a blockchain intelligence platform, whose founders were directly affiliated with the software firm the Hacking Team, which purportedly sold software with surveillance capabilities to governments with authoritarian regimes, resulting in reputational harm to our business, a loss of customers, and increased cost. In addition, if we fail to successfully close or integrate any acquisitions, or integrate the products or technologies associated with such acquisitions into our company, our net revenue and operating results could be adversely affected. Our ability to acquire and integrate companies, products, services, licenses, or technologies in a successful manner is unproven. Any integration process may require significant time and resources, and we may not be able to manage the process successfully, including successfully securing regulatory approvals which may be required to close the transaction and/or to continue to operate the target firm's business or products in a manner that is useful to Coinbase. We may not successfully evaluate or utilize the acquired products, services, technology, or personnel, or accurately forecast the financial impact of an acquisition transaction, including accounting charges. We may have to pay cash, incur debt, or issue equity securities to pay for any such acquisition, any of which could adversely affect our financial results. The sale of equity or issuance of debt to finance any such acquisitions could result in dilution to our stockholders. The incurrence of indebtedness would result in

increased fixed obligations and could also include covenants or other restrictions that would impede our ability to manage our operations.

***If we fail to develop, maintain, and enhance our brand and reputation, our business, operating results, and financial condition may be adversely affected.***

Our brand and reputation are key assets and a competitive advantage. Maintaining, protecting, and enhancing our brand depends largely on the success of our marketing efforts, ability to provide consistent, high-quality, and secure products, services, features, and support, and our ability to successfully secure, maintain, and defend our rights to use the "Coinbase" mark and other trademarks important to our brand. We believe that the importance of our brand will increase as competition further intensifies. Our brand and reputation could be harmed if we fail to achieve these objectives or if our public image were to be tarnished by negative publicity, unexpected events, or actions by third parties. Unfavorable publicity about us, including our products, services, technology, customer service, personnel, and crypto asset or crypto asset platforms generally could diminish confidence in, and the use of, our products and services. In addition, because we are a founder-led company, actions by, or unfavorable publicity about, Brian Armstrong, our co-founder and Chief Executive Officer, may adversely impact our brand and reputation. Such negative publicity also could have an adverse effect on the size and engagement of our customers and could result in decreased revenue, which could have an adverse effect on our business, operating results, and financial condition.

***Key business metrics and other estimates are subject to inherent challenges in measurement, and our business, operating results, and financial condition could be adversely affected by real or perceived inaccuracies in those metrics.***

We regularly review key business metrics, including the number of our Verified Users and MTUs, our Trading Volume and other measures to evaluate growth trends, measure our performance, and make strategic decisions. These key metrics are calculated using internal company data and have not been validated by an independent third party. While these numbers are based on what we currently believe to be reasonable estimates for the applicable period of measurement, there are inherent challenges in such measurements. If we fail to maintain an effective analytics platform, our key metrics calculations may be inaccurate, and we may not be able to identify those inaccuracies.

Our key business metrics may also be impacted by compliance or fraud-related bans, technical incidents, or false or spam accounts in existence on our platform. We regularly deactivate fraudulent and spam accounts that violate our terms of service, and exclude these users from the calculation of our key business metrics; however, we may not succeed in identifying and removing all such accounts from our platform. Additionally, users are not prohibited from having more than one account and our Verified Users metric may overstate the number of unique customers who have registered an account on our platform as one customer may register for, and use, multiple accounts with different email addresses, phone numbers, or usernames. If our metrics provide us with incorrect or incomplete information about users and their behavior, we may make inaccurate conclusions about our business.

***Unfavorable media coverage could negatively affect our business.***

We receive a high degree of media coverage in the cryptoeconomy and around the world. Unfavorable publicity regarding, for example, our product changes, product quality, litigation or regulatory activity, privacy practices, terms of service, employment matters, the use of our products, services, or supported crypto assets for illicit or objectionable ends, the actions of our customers, or the actions of other companies that provide similar services to ours, has in the past, and could in the future, adversely affect our reputation. Further, we have in the past, and may in the future, be the target of social media campaigns criticizing actual or perceived actions or inactions that are disfavored by our customers, employees, or society at-large, which campaigns could materially impact our customers' decisions to trade on our platform. Any such negative publicity could have an adverse effect on the size, activity, and

41

loyalty of our customers and result in a decrease in net revenue, which could adversely affect our business, operating results, and financial condition.

***Our platform may be exploited to facilitate illegal activity such as fraud, money laundering, gambling, tax evasion, and scams. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.***

Our platform may be exploited to facilitate illegal activity including fraud, money laundering, gambling, tax evasion, and scams. We or our partners may be specifically targeted by individuals seeking to conduct fraudulent transfers, and it may be difficult or impossible for us to detect and avoid such transactions in certain circumstances. The use of our platform for illegal or improper purposes could subject us to claims, individual and class action lawsuits, and government and regulatory investigations, prosecutions, enforcement actions, inquiries, or requests that could result in liability and reputational harm for us. Moreover, certain activity that may be legal in one jurisdiction may be illegal in another jurisdiction, and certain activities that are at one time legal may in the future be deemed illegal in the same jurisdiction. As a result, there is significant uncertainty and cost associated with detecting and monitoring transactions for compliance with local laws. In the event that a customer is found responsible for intentionally or inadvertently violating the laws in any jurisdiction, we may be subject to governmental inquiries, enforcement actions, prosecuted, or otherwise held secondarily liable for aiding or facilitating such activities. Changes in law have also increased the penalties for money transmitters for certain illegal activities, and government authorities may consider increased or additional penalties from time to time. Owners of intellectual property rights or government authorities may seek to bring legal action against money transmitters, including us, for involvement in the sale of infringing or allegedly infringing items. Any threatened or resulting claims could result in reputational harm, and any resulting liabilities, loss of transaction volume, or increased costs could harm our business.

Moreover, while fiat currencies can be used to facilitate illegal activities, crypto assets are relatively new and, in many jurisdictions, may be lightly regulated or largely unregulated. Many types of crypto assets have characteristics, such as the speed with which digital currency transactions can be conducted, the ability to conduct transactions without the involvement of regulated intermediaries, the ability to engage in transactions across multiple jurisdictions, the irreversible nature of certain crypto asset transactions, and encryption technology that anonymizes these transactions, that make crypto assets susceptible to use in illegal activity. U.S. federal and state and foreign regulatory authorities and law enforcement agencies, such as the Department of Justice, SEC, Commodity Futures Trading Commission, Federal Trade Commission, Internal Revenue Service, or IRS, and various state securities and financial regulators have taken and continue to take legal action against persons and entities alleged to be engaged in fraudulent schemes or other illicit activity involving crypto assets. We also support crypto assets that incorporate privacy-enhancing features, and may from time to time support additional crypto assets with similar functionalities. These privacy-enhancing crypto assets obscure the identities of sender and receiver, and may prevent law enforcement officials from tracing the source of funds on the blockchain. Facilitating transactions in these crypto assets may cause us to be at increased risk of liability arising out of anti-money laundering and economic sanctions laws and regulations.

While we believe that our risk management and compliance framework is designed to detect significant illicit activities conducted by our potential or existing customers, we cannot ensure that we will be able to detect all illegal activity on our platform. If any of our customers use our platform to further such illegal activities, our business could be adversely affected.

***Our compliance and risk management methods might not be effective and may result in outcomes that could adversely affect our reputation, operating results, and financial condition.***

Our ability to comply with applicable complex and evolving laws, regulations, and rules is largely dependent on the establishment and maintenance of our compliance, audit, and reporting systems, as well as our ability to attract and retain qualified compliance and other risk management personnel. While we have devoted significant resources to develop policies and procedures to identify, monitor, and

42

manage our risks, and expect to continue to do so in the future, we cannot assure you that our policies and procedures will always be effective or that we will always be successful in monitoring or evaluating the risks to which we are or may be exposed in all market environments or against all types of risks, including unidentified or unanticipated risks. Our risk management policies and procedures rely on a combination of technical and human controls and supervision that are subject to error and failure. Some of our methods for managing risk are discretionary by nature and are based on internally developed controls and observed historical market behavior, and also involve reliance on standard industry practices. These methods may not adequately prevent losses, particularly as they relate to extreme market movements, which may be significantly greater than historical fluctuations in the market. Our risk management policies and procedures also may not adequately prevent losses due to technical errors if our testing and quality control practices are not effective in preventing failures. In addition, we may elect to adjust our risk management policies and procedures to allow for an increase in risk tolerance, which could expose us to the risk of greater losses.

Regulators periodically review our compliance with our own policies and procedures and with a variety of laws and regulations. We have received in the past and may from time to time receive additional examination reports citing violations of rules and regulations and inadequacies in existing compliance programs, and requiring us to enhance certain practices with respect to our compliance program, including due diligence, training, monitoring, reporting, and recordkeeping. If we fail to comply with these, or do not adequately remediate certain findings, regulators could take a variety of actions that could impair our ability to conduct our business, including delaying, denying, withdrawing, or conditioning approval of certain products and services. In addition, regulators have broad enforcement powers to censure, fine, issue cease-and-desist orders or prohibit us from engaging in some of our business activities. We face the risk of significant intervention by regulatory authorities, including extensive examination and surveillance activities. In the case of non-compliance or alleged non-compliance, we could be subject to investigations and proceedings that may result in substantial penalties or civil lawsuits, including by customers, for damages which can be significant. Any of these outcomes would adversely affect our reputation and brand and our business, operating results, and financial condition. Some of these outcomes could adversely affect our ability to conduct our business.

***Low short-term interest rates negatively impact us.***

The level of prevailing short-term interest rates affects our profitability because we derive a portion of our revenue from interest earned from funds deposited with us by our customers which we hold on their behalf in custodial accounts at banks. Higher interest rates increase the amount of interest income earned from these customer deposits. If short-term interest rates remain low or start to decline further, our revenue derived from interest will correspondingly decline which would negatively impact our profitability.

***We hold certain investments in DeFi protocols and may suffer losses if they do not function as expected.***

We hold investments in various DeFi protocols. These protocols achieve their investment purposes through self-executing smart contracts that allow users to invest crypto assets in a pool from which other users can borrow without requiring an intermediate party to facilitate these transactions. These investments earn interest to the investor based on the rates at which borrowers repay the loan, and can generally be withdrawn with no restrictions. However, these DeFi protocols are subject to various risks, including the risk that the underlying smart contract is insecure, the risk that borrowers may default and the investor will not be able to recover its investment, the risk that any underlying collateral may experience significant volatility, and the risk of certain core developers with protocol administration rights can make unauthorized or harmful changes to the underlying smart contract. If any of these risks materialize, our investments in these DeFi protocols may be adversely impacted.

43

***We may suffer losses due to abrupt and erratic market movements.***

The crypto asset market has been characterized by significant volatility and unexpected price movements. Certain crypto assets may become more volatile and less liquid in a very short period of time, resulting in market prices being subject to erratic and abrupt market movement, which could harm our business. For instance, abrupt changes in volatility or market movement can lead to extreme pressures on our platform and infrastructure that can lead to inadvertent suspension of services across parts of the platform or the entire platform. For example, in 2020, we experienced approximately 30 outages, with an average outage duration of 64.6 minutes. These outages lead to increased customer service expense, can cause customer loss and reputational damage, and can lead to other damages for which we may be responsible.

**Risks Related to Crypto Assets**

***Due to unfamiliarity and some negative publicity associated with crypto asset platforms, existing and potential customers may lose confidence in crypto asset platforms.***

Crypto asset platforms are relatively new. Many of our competitors are unlicensed, unregulated, operate without supervision by any governmental authorities, and do not provide the public with significant information regarding their ownership structure, management team, corporate practices, cybersecurity, and regulatory compliance. As a result, customers and the general public may lose confidence in crypto asset platforms, including regulated platforms like ours.

Since the inception of the cryptoeconomy, numerous crypto asset platforms have been sued, investigated, or shut down due to fraud, manipulative practices, business failure, and security breaches. In many of these instances, customers of these platforms were not compensated or made whole for their losses. Larger platforms like us are more appealing targets for hackers and malware, and may also be more likely to be targets of regulatory enforcement actions. For example, in February 2014, Mt. Gox, the then largest crypto asset platform worldwide, filed for bankruptcy protection in Japan after an estimated 700,000 Bitcoins were stolen from its wallets. In May 2019, Binance, one of the world's largest platforms, was hacked, resulting in losses of approximately $40 million and since 2019, the Attorney General of the State of New York has been investigating the alleged misuse of over $800 million of customer assets by Bitfinex and its associated entities.

In addition, there have been reports that a significant amount of crypto asset trading volume on crypto asset platforms is fabricated and false in nature, with a specific focus on unregulated platforms located outside the United States. Such reports may indicate that the market for crypto asset platform activities is significantly smaller than otherwise understood.

Negative perception, a lack of stability and standardized regulation in the cryptoeconomy, and the closure or temporary shutdown of crypto asset platforms due to fraud, business failure, hackers or malware, or government mandated regulation, and associated losses suffered by customers may reduce confidence in the cryptoeconomy and result in greater volatility of the prices of assets, including significant depreciation in value. Any of these events could harm an adverse impact on our business.

***Depositing and withdrawing crypto assets into and from our platform involve risks, which could result in loss of customer assets, customer disputes and other liabilities, which could adversely impact our business.***

In order to own, transfer and use a crypto asset on its underlying blockchain network, a person must have a private and public key pair associated with a network address, commonly referred to as a "wallet". Each wallet is associated with a unique "public key" and "private key" pair, each of which is a string of alphanumerical characters. To deposit crypto assets held by a customer onto our platform or custody platform, a customer must "sign" a transaction that consists of the private key of the wallet from where the customer is transferring crypto assets, the public key of a wallet that we control which we provide to the customer, and broadcast the deposit transaction onto the underlying blockchain network. Similarly, to

44

withdraw crypto assets from our platform or custody platform, the customer must provide us with the public key of the wallet that the crypto assets are to be transferred to, and we would be required to "sign" a transaction authorizing the transfer. In addition, some crypto networks require additional information to be provided in connection with any transfer of crypto assets to or from our platforms. A number of errors can occur in the process of depositing or withdrawing crypto assets into or from our platform, such as typos, mistakes, or the failure to include the information required by the blockchain network. For instance, a user may incorrectly enter our wallet's public key or the desired recipient's public key when depositing and withdrawing from our platforms, respectively. Alternatively, a user may transfer crypto assets to a wallet address that he does not own, control or hold the private keys to. In addition, each wallet address is only compatible with the underlying blockchain network on which it is created. For instance, a Bitcoin wallet address can only be used to send and receive Bitcoins. If any Ethereum or other crypto assets is sent to a Bitcoin wallet address, or if any of the foregoing errors occur, all of the customer's crypto assets will be permanently and irretrievably lost with no means of recovery. We have encountered and expect to continue to encounter similar incidents with our customers. Such incidents could result in customer disputes, damage to our brand and reputation, legal claims against us, and financial liabilities, any of which could adversely affect our business.

***A temporary or permanent blockchain "fork" to any supported crypto asset could adversely affect our business.***

Blockchain protocols, including Bitcoin and Ethereum, are open source. Any user can download the software, modify it, and then propose that Bitcoin, Ethereum or other blockchain protocols users and miners adopt the modification. When a modification is introduced and a substantial majority of users and miners consent to the modification, the change is implemented and the Bitcoin, Ethereum or other blockchain protocol networks, as applicable, remain uninterrupted. However, if less than a substantial majority of users and miners consent to the proposed modification, and the modification is not compatible with the software prior to its modification, the consequence would be what is known as a "fork" (i.e., "split") of the impacted blockchain protocol network and respective blockchain, with one prong running the pre-modified software and the other running the modified software. The effect of such a fork would be the existence of two parallel versions of the Bitcoin, Ethereum or other blockchain protocol network, as applicable, running simultaneously, but with each split network's crypto asset lacking interchangeability.

Both Bitcoin and Ethereum protocols have been subject to "forks" that resulted in the creation of new networks, including Bitcoin Cash ABC, Bitcoin Cash SV, Bitcoin Diamond, Bitcoin Gold, Ethereum Classic, and others. Some of these forks have caused fragmentation among platforms as to the correct naming convention for forked crypto assets. Due to the lack of a central registry or rulemaking body, no single entity has the ability to dictate the nomenclature of forked crypto assets, causing disagreements and a lack of uniformity among platforms on the nomenclature of forked crypto assets, and which results in further confusion to customers as to the nature of assets they hold on platforms. In addition, several of these forks were contentious and as a result, participants in certain communities may harbor ill will towards other communities. As a result, certain community members may take actions that adversely impact the use, adoption, and price of Bitcoin, Ethereum, or any of their forked alternatives.

Furthermore, hard forks can lead to new security concerns. For instance, when the Ethereum and Ethereum Classic networks split in July 2016, replay attacks, in which transactions from one network were rebroadcast on the other network to achieve "double-spending", plagued platforms that traded Ethereum through at least October 2016, resulting in significant losses to some crypto asset platforms. Similar replay attacks occurred in connection with the Bitcoin Cash and Bitcoin Cash SV network split in November 2018. Another possible result of a hard fork is an inherent decrease in the level of security due to the splitting of some mining power across networks, making it easier for a malicious actor to exceed 50% of the mining power of that network, thereby making crypto assets that rely on proof-of-work more susceptible to attack, as has occurred with Ethereum Classic.

We do not believe that we are required to support any fork or provide the benefit of any forked crypto asset to our customers. However, we have in the past and may in the future continue to be subject to

45

claims by customers arguing that they are entitled to receive certain forked or airdropped crypto assets by virtue of crypto assets that they hold with us. If any customers succeed on a claim that they are entitled to receive the benefits of a forked or airdropped crypto asset that we do not or are unable to support, we may be required to pay significant damages, fines or other fees to compensate customers for their losses.

Future forks may occur at any time. A fork can lead to a disruption of networks and our information technology systems, cybersecurity attacks, replay attacks, or security weaknesses, any of which can further lead to temporary or even permanent loss of our and our customers' assets. Such disruption and loss could cause us to be exposed to liability, even in circumstances where we have no intention of supporting an asset compromised by a fork.

***We currently support, and expect to continue to support, certain smart contract-based crypto assets. If the underlying smart contracts for these crypto assets do not operate as expected, they could lose value and our business could be adversely affected.***

We currently support, and expect to continue to support, various crypto assets that represent units of value on smart contracts deployed on a third party blockchain. Smart contracts are programs that store and transfer value and execute automatically when certain conditions are met. Since smart contracts typically cannot be stopped or reversed, vulnerabilities in their programming and design can have damaging effects. For instance, in April 2018, a batch overflow bug was found in many Ethereum-based ERC20-compatible smart contract tokens that allows hackers to create a large number of smart contract tokens, causing multiple crypto asset platforms worldwide to shut down ERC20-compatible token trading. Similarly, in March 2020, a design flaw in the MakerDAO smart contract caused forced liquidations of crypto assets at significantly discounted prices, resulting in millions of dollars of losses to users who had deposited crypto assets into the smart contract. If any such vulnerabilities or flaws come to fruition, smart contract-based crypto assets, including those held by our customers on our platforms, may suffer negative publicity, be exposed to security vulnerabilities, decline significantly in value, and lose liquidity over a short period of time.

In some cases, smart contracts can be controlled by one or more "admin keys" or users with special privileges, or "super users". These users have the ability to unilaterally make changes to the smart contract, enable or disable features on the smart contract, change how the smart contract receives external inputs and data, and make other changes to the smart contract. For smart contracts that hold a pool of reserves, these users may also be able to extract funds from the pool, liquidate assets held in the pool, or take other actions that decrease the value of the assets held by the smart contract in reserves. Even for crypto assets that have adopted a decentralized governance mechanism, such as smart contracts that are governed by the holders of a governance token, such governance tokens can be concentrated in the hands of a small group of core community members, who would be able to make similar changes unilaterally to the smart contract. If any such super user or group of core members unilaterally make adverse changes to a smart contract, the design, functionality, features and value of the smart contract, its related crypto assets may be harmed. In addition, assets held by the smart contract in reserves may be stolen, misused, burnt, locked up or otherwise become unusable and irrecoverable. These super users can also become targets of hackers and malicious attackers. If an attacker is able to access or obtain the super user privileges of a smart contract, or if a smart contract's super-users or core community members take actions that adversely affects the smart contract, Coinbase customers who hold and transact in the affected crypto assets may experience decreased functionality and value of the applicable crypto assets, up to and including a total loss of the value of such crypto assets. Although we do not control these smart contracts, any such events could cause customers to seek damages against us for their losses, result in reputational damage to us, or in other ways adversely impact our business.

46

*From time to time, we may encounter technical issues in connection with the integration of supported crypto assets and changes and upgrades to their underlying networks, which could adversely affect our business.*

In order to support any supported crypto asset, a variety of front and back-end technical and development work is required to implement our wallet, custody, trading, staking and other solutions for our customers, and to integrate such supported crypto asset with our existing technical infrastructure. For certain crypto assets, a significant amount of development work is required and there is no guarantee that we will be able to integrate successfully with any existing or future crypto asset. In addition, such integration may introduce software errors or weaknesses into our platform, including our existing infrastructure. Even if such integration is initially successful, any number of technical changes, software upgrades, soft or hard forks, cybersecurity incidents, or other changes to the underlying blockchain network may occur from time to time, causing incompatibility, technical issues, disruptions, or security weaknesses to our platform. If we are unable to identify, troubleshoot and resolve any such issues successfully, we may no longer be able to support such crypto asset, our customers' assets may be frozen or lost, the security of our hot, warm, or cold wallets may be compromised, and our platform and technical infrastructure may be affected, all of which could adversely impact our business.

*If miners or validators of any supported crypto asset demand high transaction fees, our operating results may be adversely affected.*

We charge miner fees when a customer sends certain crypto assets from their Coinbase account to a non-Coinbase account. We estimate the miner fee based on the cost that we will incur to process the withdrawal transaction on the underlying blockchain network. In addition, we also pay miner fees when we move crypto assets for various operational purposes, such as when we transfer crypto assets between our hot and cold wallets, for which we do not charge our customers. However, miner fees can be unpredictable. For instance, in 2017, Bitcoin miner fees increased from approximately $0.35 per transaction in January 2017 to over $50 per transaction in December 2017. Even though Bitcoin's miner fees have since decreased, if the block rewards for miners on any blockchain network are not sufficiently high to incentivize miners, miners may demand higher transaction fees, or collude to reject low transaction fees and force users to pay higher fees. Although we generally attempt to pass miner fees relating to customer withdrawals through to our customers, we have in the past incurred, and expect to incur from time to time, losses associated with the payment of miner fees in excess of what we charge our customers, resulting in adverse impacts on our operating results.

*Future developments regarding the treatment of crypto assets for U.S. federal income and foreign tax purposes could adversely impact our business.*

Due to the new and evolving nature of crypto assets and the absence of comprehensive legal guidance with respect to crypto asset products and transactions, many significant aspects of the U.S. federal income and foreign tax treatment of transactions involving crypto assets, such as the purchase and sale of Bitcoin and other crypto assets on our platform, as well as the provision of staking rewards and other crypto asset incentives and rewards products, are uncertain, and it is unclear what guidance may be issued in the future on the treatment of crypto asset transactions for U.S. federal income and foreign tax purposes.

In 2014, the IRS released a notice, or IRS Notice, discussing certain aspects of "convertible virtual currency" (that is, digital currency that has an equivalent value in fiat currency or that acts as a substitute for fiat currency) for U.S. federal income tax purposes and, in particular, stating that such digital currency (i) is "property" (ii) is not "currency" for purposes of the rules relating to foreign currency gain or loss and (iii) may be held as a capital asset. In 2019, the IRS released a revenue ruling and a set of "Frequently Asked Questions", or the Ruling & FAQs, that provide some additional guidance, including guidance to the effect that, under certain circumstances, hard forks of digital currencies are taxable events giving rise to ordinary income and guidance with respect to the determination of the tax basis of digital currency. However, the IRS Notice and the Ruling & FAQs do not address other significant aspects of the U.S.

federal income tax treatment of crypto assets and related transactions. Moreover, although the Ruling & FAQs address the treatment of forks, there continues to be uncertainty with respect to the timing and amount of income inclusions for various crypto asset transactions including, but not limited to staking rewards and other crypto asset incentives and rewards products that we offer. Although we believe our treatment of crypto asset transactions is consistent with existing guidance provided by the IRS, because of the rapidly evolving nature of crypto asset innovations and the increasing variety and complexity of crypto asset products, it is possible the IRS may disagree with our treatment of certain of our crypto asset offerings for U.S. federal income tax purposes, which could adversely affect our customers and the vitality of our business. Similar uncertainties exist in the foreign markets in which we operate, affecting our non-U.S. customer base, and these uncertainties and potential adverse interpretations of tax law could affect our non-U.S. customers and the vitality of our platforms outside of the United States.

There can be no assurance that the IRS or other foreign tax authority will not alter its existing position with respect to crypto assets in the future or that a court would uphold the treatment set forth in the IRS Notice and the Ruling & FAQs. It is also unclear what additional guidance may be issued in the future on the treatment of existing crypto asset transactions and future crypto asset innovations for purposes of U.S. federal income tax or other foreign tax regulations. Any such alteration of existing IRS and foreign tax authority positions or additional guidance regarding crypto asset products and transactions could result in adverse tax consequences for holders of crypto assets and could have an adverse effect on the value of crypto assets and the broader crypto assets markets. Future technological and operational developments that may arise with respect to digital currencies may increase the uncertainty with respect to the treatment of digital currencies for U.S. federal income and foreign tax purposes. The uncertainty regarding tax treatment of crypto asset transactions impacts our customers, and could impact our business, both domestically and abroad.

Although we believe we are compliant with U.S. federal income tax reporting and withholding requirements with respect to customer cryptocurrency transactions, the exact scope and application of such requirements, including but not limited to U.S. onboarding requirements through Form W, backup withholding, and Form 1099 reporting obligations, is not entirely clear for all of the crypto asset transactions that we facilitate. It is likely that the IRS will introduce new rules related to our tax reporting and withholding obligations on our customer transactions in the future, possibly in ways that differ from our existing compliance protocols and where there is risk that we do not have proper records to ensure compliance for certain legacy customers. If the IRS determines that we are not in compliance with our tax reporting or withholding requirements with respect to customer crypto asset transactions, we may be exposed to significant penalties, which could adversely affect our financial position. We anticipate additional guidance from the IRS regarding tax reporting and withholding obligations with respect to customer crypto asset transactions that will likely require us to invest substantially in new compliance measures and may require significant retroactive compliance efforts, which could adversely affect our financial position.

Similarly, it is likely that new rules for reporting crypto assets under the "common reporting standard" will be implemented on our international operations, creating new obligations and a need to invest in new onboarding and reporting infrastructure. Such rules are under discussion today by the member and observer states of the "Organization for Economic Cooperation and Development" and may give rise to potential liabilities or disclosure requirements for prior customer arrangements and new rules that affect how we onboard our customers and report their transactions to taxing authorities.

***The nature of our business requires the application of complex financial accounting rules, and there is limited guidance from accounting standard setting bodies. If financial accounting standards undergo significant changes, our operating results could be adversely affected.***

The accounting rules and regulations that we must comply with are complex and subject to interpretation by the Financial Accounting Standards Board, or the FASB, the SEC, and various bodies formed to promulgate and interpret appropriate accounting principles. A change in these principles or interpretations could have a significant effect on our reported financial results, and may even affect the

reporting of transactions completed before the announcement or effectiveness of a change. Recent actions and public comments from the FASB and the SEC have focused on the integrity of financial reporting and internal controls. In addition, many companies' accounting policies are being subject to heightened scrutiny by regulators and the public. Further, there has been limited precedents for the financial accounting of crypto assets and related valuation and revenue recognition, and no official guidance has been provided by the FASB or the SEC. As such, there remains significant uncertainty on how companies can account for crypto assets transactions, crypto assets, and related revenue. Uncertainties in or changes to in regulatory or financial accounting standards could result in the need to changing our accounting methods and restate our financial statements and impair our ability to provide timely and accurate financial information, which could adversely affect our financial statements, result in a loss of investor confidence, and more generally impact our business, operating results, and financial condition.

**Risks Related to Government Regulation and Privacy Matters**

***The cryptoeconomy is novel and has little to no access to policymakers or lobbying organizations, which may harm our ability to effectively react to proposed legislation and regulation of crypto assets or crypto asset platforms adverse to our business.***

As crypto assets have grown in both popularity and market size, various U.S. federal, state, and local and foreign governmental organizations, consumer agencies and public advocacy groups have been examining the operations of crypto networks, users and platforms, with a focus on how crypto assets can be used to launder the proceeds of illegal activities, fund criminal or terrorist enterprises, and the safety and soundness of platforms and other service providers that hold crypto assets for users. Many of these entities have called for heightened regulatory oversight, and have issued consumer advisories describing the risks posed by crypto assets to users and investors. For instance, in July 2019, U.S. Treasury Secretary Steven Mnuchin stated that he had "very serious concerns" about crypto assets, and indicated that FinCEN is planning to release new requirements relating to crypto asset activities in 2020. Outside the United States, several jurisdictions have banned so-called initial coin offerings, such as China and South Korea, while Canada, Singapore, Hong Kong, have opined that token offerings may constitute securities offerings subject to local securities regulations. In July 2019, the United Kingdom's Financial Conduct Authority proposed rules to address harm to retail customers arising from the sale of derivatives and exchange-traded notes that reference certain types of cryptocurrencies, contending that they are "ill-suited" to retail investors due to extreme volatility, valuation challenges and association with financial crimes.

The cryptoeconomy is novel and has little to no access to policymakers or lobbying organizations in many jurisdictions. Competitors from other, more established industries, including traditional financial services, may have greater access to lobbyists or governmental officials, and regulators that are concerned about the potential for crypto assets for illicit usage may effect statutory and regulatory changes with minimal or discounted inputs from the cryptoeconomy. As a result, new laws and regulations may be proposed and adopted in the United States and internationally, or existing laws and regulations may be interpreted in new ways, that harm the cryptoeconomy or crypto asset platforms, which could adversely impact our business.

***Our consolidated balance sheets may not contain sufficient amounts or types of regulatory capital to meet the changing requirements of our various regulators worldwide, which could adversely affect our business, operating results, and financial condition.***

We are required to possess sufficient financial soundness and strength to adequately support our regulated subsidiaries. We may from time to time incur indebtedness and other obligations which could make it more difficult to meet these capitalization requirements or any additional regulatory requirements. In addition, although we are not a bank holding company for purposes of United States law or the law of any other jurisdiction, as a global provider of financial services and in light of the changing regulatory environment in various jurisdictions, we could become subject to new capital requirements introduced or

imposed by U.S. and international regulators. Any change or increase in these regulatory requirements could have an adverse effect on our business, operating results, and financial condition.

As a financial institution licensed to engage in money transmission in the United States, to conduct virtual currency business activity in New York, and issue electronic money in Europe, we are subject to strict rules governing how we manage and hold customer fiat currency and crypto asset. We maintain complex treasury operations to manage and move customer fiat currency and crypto asset across our platforms and to comply with regulatory requirements. However, it is possible we may experience errors in fiat currency and crypto asset handling, accounting, and regulatory reporting that lead us to be out of compliance with these requirements. In addition, regulators may increase the amount of fiat currency reserves that we are required to maintain for our operations, as has happened in the past. For instance, in 2017, the Hawaii Division of Financial Institutions imposed a new policy whereby digital currency businesses are required to maintain cash reserves in an amount equal to the aggregate face value of digital currency funds held on behalf of customers, making our operations in Hawaii impracticable and forcing us to shut down operations in the state. Any similar events, can lead to sanctions, penalties, changes to our business operations, or the revocation of licenses. Frequent launch of new products and services, including Earn campaigns, margin trading, lending functions, and the addition of new payment rails increase these risks.

***Many of the crypto assets in which we facilitate trading are subject to regulatory authority by the Commodity Futures Trading Commission, or CFTC. Any fraudulent or manipulative activity in a crypto asset occurring on our platform could subject us to increased regulatory scrutiny, regulatory enforcement, and litigation.***

The CFTC has stated and judicial decisions involving CFTC enforcement actions have confirmed that at least some crypto assets, including Bitcoin, fall within the definition of a "commodity" under the U.S. Commodities Exchange Act of 1936, or CEA. As a result, the CFTC has general enforcement authority to police against manipulation and fraud in at least some spot crypto asset markets. From time to time, manipulation, fraud, and other forms of improper trading by market participants have resulted in, and may in the future result in, CFTC investigations, inquiries, enforcement action, and similar actions by other regulators, government agencies, and civil litigation. Such investigations, inquiries, enforcement actions, and litigation may cause us to incur substantial costs and could result in negative publicity. For additional information, see the section titled "Business—Legal Proceedings."

***Certain transactions in crypto asset may constitute "retail leveraged commodity transactions" subject to regulation by the CFTC as futures contracts. If crypto asset transactions we facilitate are deemed to be such retail commodity transactions, we would be subject to additional regulatory requirements, licenses and approvals, and potentially face regulatory enforcement, civil liability, and significant increased compliance and operational costs.***

Any transaction in a commodity, including a crypto asset, entered into with or offered to retail investors using leverage, margin, or other financing arrangements (a "retail leveraged commodity transaction") is subject to CFTC regulation as a futures contract unless such transaction results in actual delivery within 28 days. The meaning of "actual delivery" has been the subject of commentary and litigation, and the CFTC has recently adopted interpretive guidance addressing the "actual delivery" of a crypto asset. To the extent that crypto asset transactions that we facilitate or facilitated are deemed retail leveraged commodity transactions, including pursuant to current or subsequent rulemaking or guidance by the CFTC, we may be subject to additional regulatory requirements and oversight, and we could be subject to judicial or administrative sanctions if we do not or did not at a relevant time possess appropriate registrations. The CFTC has previously brought enforcement actions against entities engaged in retail leveraged commodity transactions without appropriate registrations.

***Particular crypto assets or transactions therein could be deemed "commodity interests" (e.g., futures, options, swaps) or security-based swaps subject to regulation by the CFTC or SEC, respectively. If a crypto asset that we facilitate trading in is deemed a commodity interest or a security-based swap, we would be subject to additional regulatory requirements, licenses and approvals, and potentially face regulatory enforcement, civil liability, and significant increased compliance and operational costs.***

Commodity interests, as such term is defined by the CEA and CFTC rules and regulations, are subject to more extensive supervisory oversight by the CFTC, including licensing of entities engaged in, and platforms offering, commodity interest transactions. This CFTC authority extends to crypto asset futures contracts and swaps, including transactions that are based on current and future prices of crypto assets and indices of crypto assets. To the extent that a crypto asset in which we facilitate or facilitated trading or transactions in a crypto asset which we facilitate or facilitated are deemed to fall within the definition of a commodity interest, whether as a swap or otherwise and including pursuant to subsequent rulemaking or guidance by the CFTC, we may be subject to additional regulatory requirements and oversight and could be subject to judicial or administrative sanctions if we do not or did not at a relevant time possess appropriate registrations as an exchange (for example, as a designated contract market for trading futures or options on futures, or as a swaps execution facility for trading swaps) or as a registered intermediary (for example, as a futures commission merchant or introducing broker). Such actions could result in injunctions, cease and desist orders, as well as civil monetary penalties, fines, and disgorgement, as well as reputational harm. The CFTC has previously brought enforcement actions against entities engaged in crypto asset activities for failure to obtain appropriate exchange, execution facility and intermediary registrations.

Furthermore, the CFTC and the SEC have jointly adopted regulations defining "security-based swaps," which include swaps based on single securities and narrow-based indices of securities. If a crypto asset is deemed to be a security, certain transactions referencing that crypto asset could constitute a security-based swap. A crypto asset or transaction therein that is based on or references a security or index of securities, whether or not such securities are themselves crypto assets, could also constitute a security-based swap. To the extent that a crypto asset in which we facilitate or have facilitated trading or transactions in a crypto asset which we facilitate or have facilitated are deemed to fall within the definition of a security-based swap, including pursuant to subsequent rulemaking or guidance by the CFTC or SEC, we may be subject to additional regulatory requirements and oversight by the SEC and could be subject to judicial or administrative sanctions if we do not or did not a relevant time possess appropriate registrations as an exchange (for example, as a security-based swaps execution facility) or as a registered intermediary (for example, as a security-based swap dealer or broker-dealer). This could result in injunctions, cease and desist orders, as well as civil monetary penalties, fines, and disgorgement, as well as reputational harm.

***We obtain and process a large amount of sensitive customer data. Any real or perceived improper use of, disclosure of, or access to such data could harm our reputation, as well as have an adverse effect on our business.***

We obtain and process large amounts of sensitive data, including personal data related to our customers and their transactions, such as their names, addresses, social security numbers, visa information, copies of government-issued identification, trading data, tax identification, and bank account information. We face risks, including to our reputation, in the handling and protection of this data, and these risks will increase as our business continues to expand. Federal, state, and international laws and regulations governing privacy, data protection, and e-commerce transactions require us to safeguard our customers', employees', and service providers' personal data.

We have administrative, technical, and physical security measures and controls in place and maintain a robust information security program. However, our security measures may be inadequate or breached as a result of third-party action, employee or service provider error, malfeasance, malware, phishing, hacking attacks, system error, trickery, advances in computer capabilities, new discoveries in the field of

cryptography, inadequate facility security or otherwise, and, as a result, someone may be able to obtain unauthorized access to sensitive information, including personal data, on our systems. Additionally, privacy and data protection laws are evolving, and it is possible that these laws may be interpreted and applied in a manner that is inconsistent with our data handling safeguards and practices that could result in fines, lawsuits, and other penalties, and significant changes to our or our third-party partners business practices and products and service offerings.

Our future success depends on the reliability and security of our platform. To the extent that the measures we or our third-party business partners have taken prove to be insufficient or inadequate, we may become subject to litigation, breach notification obligations, or regulatory or administrative sanctions, which could result in significant fines, penalties, damages, harm to our reputation, or loss of customers. If our own confidential business information or sensitive customer information were improperly disclosed, our business could be adversely affected. Additionally, a party who circumvents our security measures could, among other effects, appropriate customer information or other proprietary data, cause interruptions in our operations, or expose customers to hacks, viruses, and other disruptions.

Depending on the nature of the information compromised, in the event of a data breach or other unauthorized access to our customer data, we may also have obligations to notify customers and regulators about the incident, and we may need to provide some form of remedy, such as a subscription to credit monitoring services, pay significant fines to one or more regulators, or pay compensation in connection with a class-action settlement (including under the new private right of action under the California Consumer Privacy Act of 2018, or the CCPA, which is expected to increase security breach litigation). Such breach notification laws continue to evolve and may be inconsistent from one jurisdiction to another. Complying with these obligations could cause us to incur substantial costs and could increase negative publicity surrounding any incident that compromises customer data. Additionally, the financial exposure from the events referenced above could either not be insured against or not be fully covered through any insurance that we may maintain, and there can be no assurance that the limitations of liability in any of our contracts would be enforceable or adequate or would otherwise protect us from liabilities or damages as a result of the events referenced above. Any of the foregoing could have an adverse effect on our business, reputation, operating results, and financial condition.

Furthermore, we may be required to disclose personal data pursuant to demands from individuals, regulators, government agencies, and law enforcement agencies in various jurisdictions with conflicting privacy and security laws, which could result in a breach of privacy and data protection policies, notices, laws, rules, court orders, and regulations. Additionally, changes in the laws and regulations that govern our collection, use, and disclosure of customer data could impose additional requirements with respect to the retention and security of customer data, could limit our marketing activities, and have an adverse effect on our business, operating results, and financial condition.

***We are subject to laws, regulations, and industry requirements related to data privacy, data protection and information security, and consumer protection across different markets where we conduct our business, including in the United States and EEA and industry requirements and such laws, regulations, and industry requirements are constantly evolving and changing. Our actual or perceived failure to comply with such laws, regulations, and industry requirements, or our privacy policies could harm our business.***

Various local, state, federal, and international laws, directives, and regulations apply to our collection, use, retention, protection, disclosure, transfer, and processing of personal data. These data protection and privacy laws and regulations are subject to uncertainty and continue to evolve in ways that could adversely impact our business. These laws have a substantial impact on our operations both outside and in the United States, either directly or as a data processor and handler for various offshore entities.

In the United States, state and federal lawmakers and regulatory authorities have increased their attention on the collection and use of consumer data. In the United States, non-sensitive consumer data generally may be used under current rules and regulations, subject to certain restrictions, so long as the

person does not affirmatively "opt-out" of the collection or use of such data. If an "opt-in" model or additional required "opt-outs", were to be adopted in the United States, less data would be available, and the cost of data would be higher. For example, California recently enacted the CCPA, which became operative on January 1, 2020 and became enforceable by California Attorney General on July 1, 2020, along with related regulations which came into force on August 14, 2020. Additionally, although not effective until January 1, 2023, the California Privacy Rights Act, or the CPRA, which expands upon the CCPA, was passed in the recent election on November 3, 2020.

The CCPA gives California residents new rights to access and require deletion of their personal data, opt out of certain personal data sharing, and receive detailed information about how their personal data is processed. The CCPA provides for civil penalties for violations, as well as a private right of action for data breaches that result in the loss of personal data, as discussed above. This private right of action may increase the likelihood of, and risks associated with, data breach litigation. The CPRA significantly modifies the CCPA, including by expanding consumers' rights with respect to certain personal data and creating a new state agency to oversee implementation and enforcement efforts. The CCPA and CPRA may increase our compliance costs and potential liability, particularly in the event of a data breach, and could have a material adverse effect on our business, including how we use personal data, our financial condition, and our operating results. Additionally, the CCPA has prompted a number of proposals for new federal and state-level privacy legislation, such as in Nevada, Virginia, New Hampshire, and others. If passed, these new laws could add additional complexity, impact our business strategies, increase our potential liability, increase our compliance costs, and adversely affect our business.

In Europe, the European General Data Protection Regulation, or the GDPR, took effect on May 25, 2018. As a result of our presence in Europe and our service offering in the European Union, or the E.U., we are subject to the GDPR, which imposes stringent E.U. data protection requirements, and could increase the risk of non-compliance and the costs of providing our products and services in a compliant manner. A breach of the GDPR could result in regulatory investigations, reputational damage, fines and sanctions, orders to cease or change our processing of our data, enforcement notices, or assessment notices (for a compulsory audit). We may also face civil claims including representative actions and other class action type litigation (where individuals have suffered harm), potentially amounting to significant compensation or damages liabilities, as well as associated costs, diversion of internal resources, and reputational harm.

Additionally, the United Kingdom, or the U.K., implemented the Data Protection Act, effective in May 2018 and statutorily amended in 2019, that contains provisions, including its own derogations, for how GDPR is applied in the U.K. From the beginning of 2021 (when the transitional period following Brexit expired), we have to continue to comply with the GDPR and also the U.K.'s Data Protection Act, with each regime having the ability to fine up to the greater of €20 million (£17 million) or 4% of global turnover. The relationship between the U.K. and the E.U. remains uncertain, for example how data transfers between the U.K. and the E.U. and other jurisdictions will be treated and the role of the U.K.'s supervisory authority. In February 2021, the European Commission proposed to issue the U.K. with an "adequacy" decision to facilitate the continued free flow of personal data from E.U. member states to the U.K.; however, this decision is subject to the review and/or approval of the European Data Protection Board and a Committee composed of the representatives of the E.U. Member States. In the meantime, the U.K. remains a "third country" for the purposes of data transfers from the E.U. to the U.K. following the expiration of the four to six-month personal data transfer grace period (from 1 January 2021) set out in the E.U. and U.K. Trade and Cooperation Agreement, unless the adequacy decision is adopted in favor of the U.K. These changes will lead to additional costs as we try to ensure compliance with new privacy legislation, and will increase our overall risk exposure.

In addition, the GDPR imposes strict rules on the transfer of personal data out of the E.U. to a "third country" including the United States. These obligations may be interpreted and applied in a manner that is inconsistent from one jurisdiction to another and may conflict with other requirements or our practices.

On July 16, 2020, the Court of Justice of the European Union, or CJEU, invalidated the European Union-United States, or E.U.-U.S., Privacy Shield (under which personal data could be transferred from the E.U. to U.S. entities that had self-certified under the Privacy Shield scheme) on the grounds that the Privacy Shield failed to offer adequate protections to E.U. personal data transferred to the United States. In addition, while the CJEU upheld the adequacy of the standard contractual clauses (a standard form of contract approved by the European Commission as an adequate personal data transfer mechanism, and potential alternative to the Privacy Shield), it made clear that reliance on them alone may not necessarily be sufficient in all circumstances. Use of the standard contractual clauses must now be assessed on a case by case basis taking into account the legal regime applicable in the destination country, in particular applicable surveillance laws and rights of individuals. The use of standard contractual clauses for the transfer of personal data specifically to the United States remains under review by a number of European data protection supervisory authorities, along with those of some other E.U. member states. German and Irish supervisory authorities have indicated, and enforced in recent rulings, that the standard contractual clauses alone provide inadequate protection for E.U.-U.S. data transfers. On August 10, 2020, the U.S. Department of Commerce and the European Commission announced new discussions to evaluate the potential for an enhanced E.U.-U.S. Privacy Shield framework to comply with the July 16 judgment of the CJEU. Further, the European Commission published new versions of the standard contractual clauses for comment. While the comment period ended in December 2020, the European Commission is expected to finalize and implement the new standard contractual clauses in early 2021. The CJEU's decision, along with the subsequent guidance issued by the European Data Protection Board on November 11, 2020, and recent statements by E.U. supervisory authorities, and the new versions of the standard contractual clauses, have led to uncertainty regarding the legality of E.U.-U.S. data flows in general and those conducted under the Privacy Shield in particular.

While we maintain a Privacy Shield certification, we rely on the standard contractual clauses for intercompany data transfers from the E.U. to the United States and have reviewed and amended any existing vendor agreements that rely only on Privacy Shield as the data transfer mechanism. As supervisory authorities continue to issue further guidance on personal data, we could suffer additional costs, complaints, or regulatory investigations or fines, and if we are otherwise unable to transfer personal data between and among countries and regions in which we operate, it could affect the manner in which we provide our services, the geographical location or segregation of our relevant systems and operations, and could adversely affect our financial results.

We are also subject to evolving E.U. privacy laws on cookies and e-marketing. In the E.U., regulators are increasingly focusing on compliance with requirements in the online behavioral advertising ecosystem, and a E.U. regulation known as the ePrivacy Regulation will significantly increase fines for non-compliance once in effect. In the E.U., informed consent, including a prohibition on pre-checked consents and a requirement to ensure separate consents for each cookie, is required for the placement of a cookie or similar technologies on a user's device and for direct electronic marketing. As regulators start to enforce the strict approach in recent guidance, this could lead to substantial costs, require significant systems changes, limit the effectiveness of our marketing activities, divert the attention of our technology personnel, negatively impact our efforts to understand users, adversely affect our margins, increase costs, and subject us to additional liabilities.

There is a risk that as we expand, we may assume liabilities for breaches experienced by the companies we acquire. Despite our efforts to comply with applicable laws, regulations and other obligations relating to privacy, data protection, and information security, it is possible that our practices, offerings, or platform could fail, or be alleged to fail to meet applicable requirements. For instance, the overall regulatory framework governing the application of privacy laws to blockchain technology is still highly undeveloped and likely to evolve. Our failure, or the failure by our third-party providers or partners, to comply with applicable laws or regulations and to prevent unauthorized access to, or use or release of personal data, or the perception that any of the foregoing types of failure has occurred, could damage our reputation or result in fines or proceedings by governmental agencies and private claims and litigation, any of which could adversely affect our business, operating results, and financial condition.

**Risks Related to Third Parties**

***Our current and future services are dependent on payment networks and acquiring processors, and any changes to their rules or practices could adversely impact our business.***

We rely on banks and other payment processors to process customers' payments in connection with the purchase of crypto assets on our platform and we pay these providers fees for their services. From time to time, payment networks have increased, and may increase in the future, the interchange fees and assessments that they charge for transactions that use their networks. Payment networks have imposed, and may impose in the future, special fees on the purchase of crypto assets, including on our platform, which could negatively impact us and significantly increase our costs. Our payment card processors may have the right to pass any increases in interchange fees and assessments on to us, and may impose additional use charges which would increase our operating costs and reduce our operating income. We could attempt to pass these increases along to our customers, but this strategy might result in the loss of customers to our competitors that may not pass along the increases, thereby reducing our revenue and earnings. If competitive practices prevent us from passing along the higher fees to our customers in the future, we may have to absorb all or a portion of such increases, thereby increasing our operating costs and reducing our earnings.

We may also be directly or indirectly liable to the payment networks for rule violations. Payment networks set and interpret their network operating rules and have alleged from time to time that various aspects of our business model violate these operating rules. If such allegations are not resolved favorably, they may result in significant fines and penalties or require changes in our business practices that may be costly and adversely affect our business. The payment networks could adopt new operating rules or interpret or reinterpret existing rules that we or our processors might find difficult or even impossible to follow, or costly to implement. As a result, we could lose our ability to give customers the option of using cards to fund their purchases or the choice of currency in which they would like their card to be charged. If we are unable to accept cards or are limited in our ability to do so, our business would be adversely affected.

***We depend on major mobile operating systems and third-party platforms for the distribution of certain products. If Google Play, the Apple App Store, or other platforms prevent customers from downloading our apps, our ability to grow may be adversely affected.***

We rely upon third-party platforms for the distribution of certain products and services. Our Coinbase, Coinbase Pro, and Coinbase Wallet apps are provided as free applications through both the Apple App Store and the Google Play Store, and are also accessible via mobile and traditional websites. The Google Play Store and Apple App Store are global application distribution platforms and the main distribution channels for our apps. As such, the promotion, distribution, and operation of our apps are subject to the respective platforms' terms and policies for application developers, which are very broad and subject to frequent changes and re-interpretation. Further, these distribution platforms often contain restrictions related to crypto assets that are uncertain, broadly construed, and can limit the nature and scope of services that can be offered. For example, Apple App Store's restrictions related to crypto assets have disrupted the proposed launch of many features within the Coinbase and Coinbase Wallet apps, including our Earn services and access to decentralized applications. If our products are found to be in violation of any such terms and conditions, we may no longer be able to offer our products through such third-party platforms. There can be no guarantee that third-party platforms will continue to support our product offerings, or that customers will be able to continue to use our products. For example, in November 2013, our iOS app was temporarily removed by Apple from the Apple App Store. In December 2019, we were similarly instructed by both Google and Apple to remove certain features relating to decentralized applications from our apps to comply with both companies' policies. Any changes, bugs, technical or regulatory issues with third-party platforms, our relationships with mobile manufacturers and carriers, or changes to their terms of service or policies could degrade our products' functionalities, reduce or eliminate our ability to distribute our products, give preferential treatment to competitive products, limit our

55

ability to deliver high quality offerings, or impose fees or other charges, any of which could affect our product usage and harm our business.

**Risks Related to Intellectual Property**

*Our intellectual property rights are valuable, and any inability to protect them could adversely impact our business, operating results, and financial condition.*

Our business depends in large part on our proprietary technology and our brand. We rely on, and expect to continue to rely on, a combination of trademark, trade dress, domain name, copyright, and trade secret and laws, as well as confidentiality and license agreements with our employees, contractors, consultants, and third parties with whom we have relationships, to establish and protect our brand and other intellectual property rights. However, our efforts to protect our intellectual property rights may not be sufficient or effective. Our proprietary technology and trade secrets could be lost through misappropriation or breach of our confidentiality and license agreements, and any of our intellectual property rights may be challenged, which could result in them being narrowed in scope or declared invalid or unenforceable. There can be no assurance that our intellectual property rights will be sufficient to protect against others offering products, services, or technologies that are substantially similar to ours and that compete with our business.

We do not intend to monetize our patents or attempt to block third parties from competing with us by asserting our patents offensively against third parties, but our ability to successfully defend intellectual property challenges from competitors and other parties may depend, in part, on our ability to counter-assert our patents defensively. Effective protection of patents, trademarks, and domain names is expensive and difficult to maintain, both in terms of application and registration costs as well as the costs of defending and enforcing those rights, and in some countries our rights to protect our core domain (coinbase.com) are currently subject to dispute. As we have grown, we have sought to obtain and protect our intellectual property rights in an increasing number of countries, a process that can be expensive and may not always be successful. For example, the U.S. Patent and Trademark Office and various foreign governmental patent agencies require compliance with a number of procedural requirements to complete the patent application process and to maintain issued patents, and noncompliance or non-payment could result in abandonment or lapse of a patent or patent application, resulting in partial or complete loss of patent rights in a relevant jurisdiction. Further, intellectual property protection may not be available to us in every country in which our products and services are available. For example, some foreign countries have compulsory licensing laws under which a patent owner must grant licenses to third parties. In addition, many countries limit the enforceability of patents against certain third parties, including government agencies or government contractors. In these countries, patents may provide limited or no benefit. We may also agree to license our patents to third parties as part of various patent pools and open patent projects. Those licenses may diminish our ability, though, to counter-assert our patents against certain parties that may bring claims against us.

*We have been, and in the future may be, sued by third parties for alleged infringement of their proprietary rights.*

In recent years, there has been considerable patent, copyright, trademark, domain name, trade secret and other intellectual property development activity in the cryptoeconomy, as well as litigation, based on allegations of infringement or other violations of intellectual property, including by large financial institutions. Furthermore, individuals and groups can purchase patents and other intellectual property assets for the purpose of making claims of infringement to extract settlements from companies like ours. Our use of third-party intellectual property rights also may be subject to claims of infringement or misappropriation. We cannot guarantee that our internally developed or acquired technologies and content do not or will not infringe the intellectual property rights of others. From time to time, our competitors or other third parties may claim that we are infringing upon or misappropriating their intellectual property rights, and we may be found to be infringing upon such rights. Any claims or litigation could cause us to incur significant expenses and, if successfully asserted against us, could require that

56

we pay substantial damages or ongoing royalty payments, prevent us from offering our products or services or using certain technologies, force us to implement expensive work-arounds, or impose other unfavorable terms. We expect that the occurrence of infringement claims is likely to grow as the crypto assets market grows and matures. Accordingly, our exposure to damages resulting from infringement claims could increase and this could further exhaust our financial and management resources. Further, during the course of any litigation, we may make announcements regarding the results of hearings and motions, and other interim developments. If securities analysts and investors regard these announcements as negative, the market price of our Class A common stock may decline. Even if intellectual property claims do not result in litigation or are resolved in our favor, these claims, and the time and resources necessary to resolve them, could divert the resources of our management and require significant expenditures. Any of the foregoing could prevent us from competing effectively and could have an adverse effect on our business, operating results, and financial condition.

***Our platform contains third-party open source software components, and failure to comply with the terms of the underlying open source software licenses could harm our business.***

Our platform contains software modules licensed to us by third-party authors under "open source" licenses. We also make certain of our own software available to users for free under various open source licenses. Use and distribution of open source software may entail greater risks than use of third-party commercial software, as open source licensors generally do not provide support, warranties, indemnification or other contractual protections regarding infringement claims or the quality of the code. In addition, the public availability of such software may make it easier for others to compromise our platform.

Some open source licenses contain requirements that we make available source code for modifications or derivative works we create based upon the type of open source software we use, or grant other licenses to our intellectual property. If we combine our proprietary software with open source software in a certain manner, we could, under certain open source licenses, be required to release the source code of our proprietary software to the public. This would allow our competitors to create similar offerings with lower development effort and time and ultimately could result in a loss of our competitive advantages. Alternatively, to avoid the public release of the affected portions of our source code, we could be required to expend substantial time and resources to re-engineer some or all of our software.

Although we monitor our use of open source software to avoid subjecting our platform to conditions we do not intend, we have not recently conducted an extensive audit of our use of open source software and, as a result, we cannot assure you that our processes for controlling our use of open source software in our platform are, or will be, effective. If we are held to have breached or failed to fully comply with all the terms and conditions of an open source software license, we could face litigation, infringement or other liability, or be required to seek costly licenses from third parties to continue providing our offerings on terms that are not economically feasible, to re-engineer our platform, to discontinue or delay the provision of our offerings if re-engineering could not be accomplished on a timely basis or to make generally available, in source code form, our proprietary code, any of which could adversely affect our business, operating results, and financial condition. Moreover, the terms of many open source licenses have not been interpreted by U.S. or foreign courts. As a result, there is a risk that these licenses could be construed in a way that could impose unanticipated conditions or restrictions on our ability to provide or distribute our platform. From time to time, there have been claims challenging the ownership of open source software against companies that incorporate open source software into their solutions. As a result, we could be subject to lawsuits by parties claiming ownership of what we believe to be open source software.

**Risks Related to Our Employees and Other Service Providers**

***The loss of one or more of our key personnel, or our failure to attract and retain other highly qualified personnel in the future, could adversely impact our business, operating results, and financial condition.***

We operate in a relatively new industry that is not widely understood and requires highly skilled and technical personnel. We believe that our future success is highly dependent on the talents and contributions of our senior management team, including Brian Armstrong, our co-founder and Chief Executive Officer, members of our executive team, and other key employees across product, engineering, risk management, finance, compliance and legal, and marketing. Our future success depends on our ability to attract, develop, motivate, and retain highly qualified and skilled employees. Due to the nascent nature of the cryptoeconomy, the pool of qualified talent is extremely limited, particularly with respect to executive talent, engineering, risk management, and financial regulatory expertise. We face intense competition for qualified individuals from numerous software and other technology companies. To attract and retain key personnel, we incur significant costs, including salaries and benefits and equity incentives. Even so, these measures may not be enough to attract and retain the personnel we require to operate our business effectively. The loss of even a few qualified employees, or an inability to attract, retain and motivate additional highly skilled employees required for the planned expansion of our business could adversely impact our operating results and impair our ability to grow.

***Our culture emphasizes innovation, and if we cannot maintain this culture as we grow, our business and operating results could be adversely impacted.***

We believe that our entrepreneurial and innovative corporate culture has been a key contributor to our success. We encourage and empower our employees to develop and launch new and innovative products and services, which we believe is essential to attracting high quality talent, partners, and developers, as well as serving the best, long-term interests of our company. If we cannot maintain this culture as we grow, we could lose the innovation, creativity and teamwork that has been integral to our business, in which case our products and services may suffer and our business, operating results, and financial condition could be adversely impacted.

***In the event of employee or service provider misconduct or error, our business may be adversely impacted.***

Employee or service provider misconduct or error could subject us to legal liability, financial losses, and regulatory sanctions and could seriously harm our reputation and negatively affect our business. Such misconduct could include engaging in improper or unauthorized transactions or activities, misappropriation of customer funds, insider trading and misappropriation of information, failing to supervise other employees or service providers, improperly using confidential information, as well as improper trading activity such as spoofing, layering, wash trading, manipulation and front-running. Employee or service provider errors, including mistakes in executing, recording, or processing transactions for customers, could expose us to the risk of material losses even if the errors are detected. Although we have implemented processes and procedures and provide trainings to our employees and service providers to reduce the likelihood of misconduct and error, these efforts may not be successful. Moreover, the risk of employee or service provider error or misconduct may be even greater for novel products and services and is compounded by the fact that many of our employees and service providers are accustomed to working at tech companies which generally do not maintain the same compliance customs and rules as financial services firms. This can lead to high risk of confusion among employees and service providers, particularly in a fast growth company like ours, with respect to compliance obligations, particularly including confidentiality, data access, trading, and conflicts. It is not always possible to deter misconduct, and the precautions we take to prevent and detect this activity may not be effective in all cases. If we were found to have not met our regulatory oversight and compliance and other obligations, we could be subject to regulatory sanctions, financial penalties, restrictions on our activities for failure to properly identify, monitor and respond to potentially problematic activity and seriously

58

damage our reputation. Our employees, contractors, and agents could also commit errors that subject us to financial claims for negligence, as well as regulatory actions, or result in financial liability. Further, allegations by regulatory or criminal authorities of improper trading activities could affect our brand and reputation.

***Our officers, directors, employees, and large stockholders may encounter potential conflicts of interests with respect to their positions or interests in certain crypto assets, entities, and other initiatives, which could adversely affect our business and reputation.***

We frequently engage in a wide variety of transactions and maintain relationships with a significant number of crypto projects, their developers, members of their ecosystem, and investors. These transactions and relationships could create potential conflicts of interests in management decisions that we make. For instance, certain of our officers, directors, and employees are active investors in crypto projects themselves, and may make investment decisions that favor projects that they have personally invested in. Many of our large stockholders also make investments in these crypto projects. For more information, see the section titled "Certain Relationships and Related Party Transactions." In addition, our co-founder and Chief Executive Officer, Mr. Armstrong, is involved in a number of initiatives related to the cryptoeconomy and more broadly. For example, Mr. Armstrong currently serves as the chief executive officer of ResearchHub Technologies, Inc., a scientific research development platform. This and other initiatives he is involved in could divert Mr. Armstrong's time and attention from overseeing our business operations which could have a negative impact on our business. Moreover, we are involved in litigation and may in the future be subject to litigation as a result of his involvement with these other initiatives.

Similarly, certain of our directors, officers, employees, and large stockholders may hold crypto assets that we are considering supporting for trading on our platform, and may be more supportive of such listing notwithstanding legal, regulatory, and other issues associated with such crypto assets. While we have instituted policies and procedures to limit and mitigate such risks, there is no assurance that such policies and procedures will be effective, or that we will be able to manage such conflicts of interests adequately. If we fail to manage these conflicts of interests, our business may be harmed and the brand, reputation and credibility of our company may be adversely affected.

**General Risk Factors**

***Adverse economic conditions may adversely affect our business.***

Our performance is subject to general economic conditions, and their impact on the crypto asset markets and our customers. The United States and other key international economies have experienced cyclical downturns from time to time in which economic activity declined resulting in lower consumption rates, restricted credit, reduced profitability, weaknesses in financial markets, bankruptcies, and overall uncertainty with respect to the economy. The impact of general economic conditions on the cryptoeconomy is highly uncertain and dependent on a variety of factors, including market adoption of crypto assets, global trends in the cryptoeconomy, central bank monetary policies, and other events beyond our control. Geopolitical developments, such as trade wars and foreign exchange limitations can also increase the severity and levels of unpredictability globally and increase the volatility of global financial and crypto asset markets. To the extent that conditions in the general economic and crypto assets markets materially deteriorate, our ability to attract and retain customers may suffer.

***The COVID-19 pandemic could have an adverse effect on our business, operating results, and financial condition.***

We are responding to the global outbreak of COVID-19 by taking steps to mitigate the potential risks to us posed by its spread and the impact of the restrictions put in place by governments to protect the population. Our employees and service providers have transitioned to work-from-home and we are now a remote-first company. This subjects us to heightened operational risks. For example, technologies in our employees' and service providers' homes may not be as robust as in our offices and could cause the networks, information systems, applications, and other tools available to employees and service providers

to be more limited or less reliable than in our offices. Further, the security systems in place at our employees' and service providers' homes may be less secure than those used in our offices, and while we have implemented technical and administrative safeguards to help protect our systems as our employees and service providers work from home, we may be subject to increased cybersecurity risk, which could expose us to risks of data or financial loss, and could disrupt our business operations. There is no guarantee that the data security and privacy safeguards we have put in place will be completely effective or that we will not encounter risks associated with employees and service providers accessing company data and systems remotely. We also face challenges due to the need to operate with the remote workforce and are addressing those challenges to minimize the impact on our ability to operate.

The transition to a remote-first company may make it more difficult for us to preserve our corporate culture and our employees may have decreased opportunities to collaborate in meaningful ways. Further, we cannot guarantee that our transition to becoming a remote-first company will not have a negative impact on employee morale and productivity. Any failure to preserve our corporate culture and foster collaboration could harm our future success, including our ability to retain and recruit personnel, innovate and operate effectively, and execute on our business strategy.

In addition, the continued spread of COVID-19 and the imposition of related public health measures have resulted in, and is expected to continue to result in, increased volatility and uncertainty in the cryptoeconomy. We also rely on third party service providers to perform certain functions. Any disruptions to a service providers' business operations resulting from business restrictions, quarantines, or restrictions on the ability of personnel to perform their jobs could have an adverse impact on our service providers' ability to provide services to us. The continued spread of COVID-19 and efforts to contain the virus could adversely impact our strategic business plans and growth strategy, reduce demand for our products and services, reduce the availability and productivity of our employees, service providers, and third-party resources, cause us to experience an increase in costs due to emergency measures, and otherwise adversely impact our business.

*Our management team has limited experience managing a public company.*

Our management team has limited experience managing a publicly traded company, interacting with public company investors, and complying with the increasingly complex laws pertaining to public companies. Our management team may not successfully or efficiently manage our transition to being a public company subject to significant regulatory oversight and reporting obligations under the federal securities laws and the continuous scrutiny of securities analysts and investors. These new obligations and constituents will require significant attention from our senior management and could divert their attention away from the day-to-day management of our business, which could adversely affect our business, operating results, and financial condition.

*Changes in U.S. and foreign tax laws, as well as the application of such laws, could adversely impact our financial position and operating results.*

We are subject to complex tax laws and regulations in the United States and a variety of foreign jurisdictions. All of these jurisdictions have in the past and may in the future make changes to their corporate income tax rates and other income tax laws which could increase our future income tax provision. For example, our future income tax obligations could be adversely affected by earnings that are lower than anticipated in jurisdictions where we have lower statutory rates and by earnings that are higher than anticipated in jurisdictions where we have higher statutory rates, by changes in the valuation of our deferred tax assets and liabilities, by changes in the amount of unrecognized tax benefits, or by changes in tax laws, regulations, accounting principles, or interpretations thereof, including changes with possible retroactive application or effect.

Our determination of our tax liability is subject to review and may be challenged by applicable U.S. and foreign tax authorities. Any adverse outcome of such challenge could harm our operating results and financial condition. The determination of our worldwide provision for income taxes and other tax liabilities

requires significant judgment and, in the ordinary course of business, there are many transactions and calculations where the ultimate tax determination is complex and uncertain. Moreover, as a multinational business, we have subsidiaries that engage in many intercompany transactions in a variety of tax jurisdictions where the ultimate tax determination is complex and uncertain. Our existing corporate structure and intercompany arrangements have been implemented in a manner we believe is in compliance with current prevailing tax laws. Furthermore, as we operate in multiple taxing jurisdictions, the application of tax laws can be subject to diverging and sometimes conflicting interpretations by tax authorities of these jurisdictions. It is not uncommon for taxing authorities in different countries to have conflicting views with respect to, among other things, the characterization and source of income or other tax items, the manner in which the arm's-length standard is applied for transfer pricing purposes, or with respect to the valuation of intellectual property. The taxing authorities of the jurisdictions in which we operate may challenge our tax treatment of certain items or the methodologies we use for valuing developed technology or intercompany arrangements, which could impact our worldwide effective tax rate and harm our financial position and operating results.

The Tax Cuts and Jobs Act, or TCJA, enacted on December 22, 2017, significantly affected U.S. tax law, including by changing how the U.S. imposes tax on certain types of income of corporations and by reducing the U.S. federal corporate income tax rate to 21%. It also imposed new limitations on a number of tax benefits, including deductions for business interest, use of net operating loss carry forwards, taxation of foreign income, and the foreign tax credit, among others. The Coronavirus Aid, Relief, and Economic Security Act, or the CARES Act, enacted on March 27, 2020, in response to the COVID-19 pandemic, further amended the U.S. federal tax code, including in respect of certain changes that were made by the TCJA, generally on a temporary basis. There can be no assurance that future tax law changes will not increase the rate of the corporate income tax significantly, impose new limitations on deductions, credits or other tax benefits, or make other changes that may adversely affect our business, cash flows or financial performance. In addition, the IRS has yet to issue guidance on a number of important issues regarding the changes made by the TCJA and the CARES Act. In the absence of such guidance, we will take positions with respect to any such unsettled issues. There is no assurance that the IRS or a court will agree with the positions taken by us, in which case tax penalties and interest may be imposed that could adversely affect our business, cash flows or financial performance.

We are also subject to non-income taxes, such as payroll, sales, use, value-added, net worth, property, and goods and services taxes in the United States and various foreign jurisdictions. Specifically, we may be subject to "digital service taxes" or new allocations of tax as a result of increasing efforts by certain jurisdictions to tax cross border activities that may not have been subject to tax under existing international tax principles. Technology companies such as ours may be subject to such taxes. Tax authorities may disagree with certain positions we have taken. As a result, we may have exposure to additional tax liabilities that could have an adverse effect on our operating results and financial condition.

In addition, our future effective tax rates could be favorably or unfavorably affected by changes in tax rates, changes in the valuation of our deferred tax assets or liabilities, the effectiveness of our tax planning strategies, or changes in tax laws or their interpretation. Such changes could have an adverse impact on our financial condition.

As a result of these and other factors, the ultimate amount of tax obligations owed may differ from the amounts recorded in our financial statements and any such difference may harm our operating results in future periods in which we change our estimates of our tax obligations or in which the ultimate tax outcome is determined.

***Our ability to use any current or future net operating loss to offset future taxable income may be subject to certain limitations under U.S. or foreign law.***

As of December 31, 2020, we had Japanese net operating loss carryforwards, or NOLs, of approximately $3.8 million, due to prior period losses which if not utilized will begin to expire beginning in 2027. Additionally, as of December 31, 2020, we had $24.5 million of U.S. Federal NOLs with an indefinite

carryforward and $13.0 million of U.S. State NOLs, primarily with a twenty-year carryforward. Realization of these NOLs, and any future domestic or foreign NOLs that we may generate will depend on future income, and there is a risk that some or all of such NOLs could be subject to limitation or otherwise unavailable to offset future income tax liabilities, which could adversely affect our operating results.

Under Section 382 of the Internal Revenue Code of 1986, as amended, or the Code, a corporation that undergoes an "ownership change" is subject to limitations on its ability to utilize its NOLs to offset future taxable income. Future changes in our stock ownership, the causes of which may be outside of our control, could result in an ownership change under Section 382 of the Code. Any future NOLs we generate may also be impaired under state laws. In addition, under the 2017 Tax Cuts and Jobs Act, or Tax Act, future tax losses may be utilized to offset no more than 80% of taxable income annually. Under the Coronavirus Aid, Relief, and Economic Security, or CARES Act, signed into law in March 2020, the limitation on the deduction of NOLs to 80% of current year taxable income is eliminated for taxable years beginning before January 1, 2021. Notwithstanding the CARES Act, we may be required to pay federal income taxes in future years despite generating a loss for federal income tax purposes. There is also a risk that due to statutory or regulatory changes, such as suspensions on the use of NOLs, or other unforeseen reasons, our future NOLs could expire or otherwise be unavailable to offset future income tax liabilities. It is uncertain if and to what extent various states will conform to the Tax Act, as modified by the CARES Act. For these reasons, we may not be able to realize a tax benefit from the use of any future NOLs we generate, whether or not we attain profitability.

***Fluctuations in currency exchange rates could harm our operating results and financial condition.***

Revenue generated and expenses incurred from our international operations are often denominated in the currencies of the local countries. Accordingly, changes in the value of foreign currencies relative to the U.S. dollar can affect our revenue and operating results reflected in our U.S. dollar-denominated financial statements. Our financial results are also subject to changes in exchange rates that impact the settlement of transactions in non-local currencies. As a result, it could be more difficult to detect underlying trends in our business and operating results. To the extent that fluctuations in currency exchange rates cause our operating results to differ from expectations of investors, the market price of our Class A common stock could be adversely impacted. To date, we have not engaged in currency hedging activities to limit the risk of exchange fluctuations. Even if we use derivative instruments to hedge exposure to fluctuations in foreign currency exchange rates, the use of such hedging activities may not offset any or more than a portion of the adverse financial effects of unfavorable movements in foreign exchange rates over the limited time the hedges are in place, and may introduce additional risks if we are unable to structure effective hedges with such instruments.

***If our estimates or judgment relating to our critical accounting policies prove to be incorrect, our operating results could be adversely affected.***

The preparation of financial statements in conformity with GAAP requires management to make estimates and assumptions that affect the amounts reported in the consolidated financial statements and accompanying notes. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances, as provided in the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations—Critical Accounting Policies and Estimates." The results of these estimates form the basis for making judgments about the carrying values of assets, liabilities, and equity, and the amount of revenue and expenses that are not readily apparent from other sources. Significant estimates and judgments involve the identification of performance obligations in revenue recognition, evaluation of tax positions, inter-company transactions, and the valuation of stock-based awards and crypto assets we hold, among others. Our operating results may be adversely affected if our assumptions change or if actual circumstances differ from those in our assumptions, which could cause our operating results to fall below the expectations of analysts and investors, resulting in a decline in the trading price of our Class A common stock.

***We may be adversely affected by natural disasters, pandemics, and other catastrophic events, and by man-made problems such as terrorism, that could disrupt our business operations, and our business continuity and disaster recovery plans may not adequately protect us from a serious disaster.***

Natural disasters or other catastrophic events may also cause damage or disruption to our operations, international commerce, and the global economy, and could have an adverse effect on our business, operating results, and financial condition. Our business operations are subject to interruption by natural disasters, fire, power shortages, and other events beyond our control. In addition, our global operations expose us to risks associated with public health crises, such as pandemics and epidemics, which could harm our business and cause our operating results to suffer. For example, the ongoing effects of the COVID-19 pandemic and/or the precautionary measures that we have adopted have resulted, and could continue to result, in difficulties or changes to our customer support, or create operational or other challenges, any of which could adversely impact our business and operating results. Further, acts of terrorism, labor activism or unrest, and other geo-political unrest could cause disruptions in our business or the businesses of our partners or the economy as a whole. In the event of a natural disaster, including a major earthquake, blizzard, or hurricane, or a catastrophic event such as a fire, power loss, or telecommunications failure, we may be unable to continue our operations and may endure system interruptions, reputational harm, delays in development of our platform, lengthy interruptions in service, breaches of data security, and loss of critical data, all of which could have an adverse effect on our future operating results. For example, certain of our corporate offices are located in the San Francisco Bay Area, a region known for seismic activity. We do not maintain insurance sufficient to compensate us for the potentially significant losses that could result from disruptions to our services. Additionally, all the aforementioned risks may be further increased if we do not implement a disaster recovery plan or our partners' disaster recovery plans prove to be inadequate. To the extent natural disasters or other catastrophic events concurrently impact data centers we rely on in connection with private key restoration, customers will experience significant delays in withdrawing funds, or in the extreme we may suffer loss of customer funds.

***The requirements of being a public company, including maintaining adequate internal control over our financial and management systems, may strain our resources, divert management's attention, and affect our ability to attract and retain executive management and qualified board members.***

As a public company we will incur significant legal, accounting, and other expenses that we did not incur as a private company. We will be subject to reporting requirements of the Exchange Act, the Sarbanes-Oxley Act, the rules subsequently implemented by the SEC, the rules and regulations of the listing standards of The Nasdaq Stock Market LLC, or Nasdaq, and other applicable securities rules and regulations. Stockholder activism, the current political and social environment and the current high level of government intervention and regulatory reform may lead to substantial new regulations and disclosure obligations, which will likely result in additional compliance costs and could impact the manner in which we operate our business in ways we cannot currently anticipate. Compliance with these rules and regulations may strain our financial and management systems, internal controls, and employees. The Exchange Act requires, among other things, that we file annual, quarterly, and current reports with respect to our business and operating results. Moreover, the Sarbanes-Oxley Act requires, among other things, that we maintain effective disclosure controls and procedures, and internal control, over financial reporting. In order to maintain and, if required, improve our disclosure controls and procedures, and internal control over, financial reporting to meet this standard, significant resources and management oversight may be required. If we encounter material weaknesses or deficiencies in our internal control over financial reporting, we may not detect errors on a timely basis and our consolidated financial statements may be materially misstated. Effective internal control is necessary for us to produce reliable financial reports and is important to prevent fraud.

We expect our independent registered public accounting firm will be required to formally attest to the effectiveness of our internal control over financial reporting commencing with our second annual report on Form 10-K. We expect to incur significant expenses and devote substantial management effort toward

ensuring compliance with the auditor attestation requirements of Section 404 of the Sarbanes-Oxley Act. As a result of the complexity involved in complying with the rules and regulations applicable to public companies, our management's attention may be diverted from other business concerns, which could harm our business, operating results, and financial condition. Although we have already hired additional employees to assist us in complying with these requirements, our finance team is small and we may need to hire more employees in the future, or engage outside consultants, which will increase our operating expenses.

We also expect that being a public company and complying with applicable rules and regulations will make it more expensive for us to obtain director and officer liability insurance, and we may be required to incur substantially higher costs to obtain and maintain the same or similar coverage. These factors could also make it more difficult for us to attract and retain qualified members of our board of directors and qualified executive officers.

***We might require additional capital to support business growth, and this capital might not be available.***

We have funded our operations since inception primarily through equity financings and revenue generated by our products and services. We cannot be certain when or if our operations will generate sufficient cash to fully fund our ongoing operations or the growth of our business. We intend to continue to make investments in our business to respond to business challenges, including developing new products and services, enhancing our operating infrastructure, expanding our international operations, and acquiring complementary businesses and technologies, all of which may require us to secure additional funds. Additional financing may not be available on terms favorable to us, if at all. If we incur additional debt, the debt holders would have rights senior to holders of our common stock to make claims on our assets, and the terms of any debt could restrict our operations, including our ability to pay dividends on our common stock. Furthermore, we have authorized the issuance of "blank check" preferred stock and common stock that our board of directors could use to, among other things, issue shares of our capital stock in the form of blockchain tokens, implement a stockholder rights plan, or issue other shares of preferred stock or common stock. We may issue shares of capital stock, including in the form of blockchain tokens, to our customers in connection with customer reward or loyalty programs. If we issue additional equity securities, including in the form of blockchain tokens, stockholders will experience dilution, and the new equity securities could have rights senior to those of our currently authorized and issued common stock. The trading prices for our common stock may be highly volatile, which may reduce our ability to access capital on favorable terms or at all. In addition, a slowdown or other sustained adverse downturn in the general economic or crypto asset markets could adversely affect our business and the value of our Class A common stock. Because our decision to raise capital in the future will depend on numerous considerations, including factors beyond our control, we cannot predict or estimate the amount, timing, or nature of any future issuances of securities. As a result, our stockholders bear the risk of future issuances of debt or equity securities reducing the value of our Class A common stock and diluting their interests. Our inability to obtain adequate financing or financing on terms satisfactory to us, when we require it, could significantly limit our ability to continue supporting our business growth and responding to business challenges.

***Although we ceased to be an emerging growth company, we have continued to take advantage of certain reduced disclosure requirements in the registration statement of which this prospectus forms a part, which may make our Class A common stock less attractive to investors.***

We ceased to be an emerging growth company, as defined in the JOBS Act, on December 31, 2020. However, because we ceased to be an emerging growth company after we confidentially submitted our draft registration statement related to this offering to the SEC, we will continue to be treated as an emerging growth company for certain purposes until the earlier of the date on which we complete this listing or December 31, 2021. As such, we have continued to take advantage of certain exemptions that allow us to comply with reduced disclosure obligations regarding selected financial data and executive compensation arrangements in the registration statement of which this prospectus forms a part that are

64

not available to non-emerging growth companies. We cannot predict if investors will find our Class A common stock less attractive because we have relied on these exemptions. If some investors find our Class A common stock less attractive as a result, there may be less demand for our Class A common stock and the market price of our Class A common stock may fall.

**Risks Related to Ownership of Our Class A Common Stock**

***The registration and listing of our Class A common stock differs significantly from an underwritten initial public offering.***

This listing is not an underwritten initial public offering of our Class A common stock. The registration and listing of our Class A common stock on the Nasdaq Global Select Market differs from an underwritten initial public offering in several significant ways, which include the following:

- There are no underwriters. Consequently, prior to the opening of trading of our Class A common stock on the Nasdaq Global Select Market, there will be no book building process and no price at which underwriters initially sold shares to the public to help inform efficient and sufficient price discovery with respect to the opening trades on the Nasdaq Global Select Market. Therefore, buy and sell orders submitted prior to and at the opening of trading of our Class A common stock on the Nasdaq Global Select Market will not have the benefit of being informed by a published price range or a price at which the underwriters initially sold shares to the public, as would be the case in an underwritten initial public offering. Moreover, there will be no underwriters assuming risk in connection with resales of shares of our Class A common stock. Additionally, because there are no underwriters, there is no underwriters' option to purchase additional shares of our Class A common stock. In an underwritten initial public offering, the underwriters may engage in "covered" short sales in an amount of shares representing the underwriters' option to purchase additional shares. To close a covered short position, the underwriters purchase shares in the open market or exercise the underwriters' option to purchase additional shares. In determining the source of shares to close the covered short position, the underwriters typically consider, among other things, the price of shares available for purchase in the open market as compared to the price at which they may purchase shares through the underwriters' option to purchase additional shares. Purchases in the open market to cover short positions, as well as other purchases underwriters may undertake for their own accounts, may have the effect of preventing a decline in the market price of shares. Given that there will be no underwriters' option to purchase additional shares and no underwriters engaging in stabilizing transactions, there could be greater volatility in the public price of our Class A common stock during the period immediately following the listing. See also "—The price of our Class A common stock may be volatile, and could, upon listing on the Nasdaq Global Select Market, decline significantly and rapidly. Market volatility may affect the value of an investment in our Class A common stock and could subject us to litigation."

- There is not a fixed or determined number of shares of Class A common stock available for sale in connection with the registration and listing of the Class A common stock on the Nasdaq Global Select Market. Therefore, there can be no assurance that any registered stockholders or other existing stockholders will sell any of their shares of Class A common stock and there may initially be a lack of supply of, or demand for, shares of Class A common stock on the Nasdaq Global Select Market. Alternatively, we may have a large number of registered stockholders or other existing stockholders who choose to sell their shares of Class A common stock in the near term, resulting in potential oversupply of our Class A common stock, which could adversely impact the price of our Class A common stock.

- None of our registered stockholders or other existing stockholders have entered into contractual lock-up agreements or other contractual restrictions on transfer. In an underwritten initial public offering, it is customary for an issuer's officers, directors, and most or all of its other stockholders to enter into a 180-day contractual lock-up arrangement with the underwriters to help promote orderly trading immediately after such initial public offering. Consequently, any of our

stockholders, including our directors and officers who own our common stock and other significant stockholders, may sell any or all of their shares of Class A common stock, including shares of Class B common stock convertible into Class A common stock at the time of sale (subject to any restrictions under applicable law), including immediately upon listing. If such sales were to occur in a significant volume in a short period of time, it may result in an oversupply of our Class A common stock in the market, which could adversely impact the price of our Class A common stock. See also "—None of our stockholders are party to any contractual lock-up agreement or other contractual restrictions on transfer. Following our listing, the sales or distribution of substantial amounts of our Class A common stock, or the perception that such sales or distributions might occur, could cause the market price of our Class A common stock to decline."

• We will not conduct a traditional "roadshow" with underwriters prior to the opening of trading of our Class A common stock on the Nasdaq Global Select Market. Instead, we may host one or more investor day presentations and/or post presentations regarding our company, our management team, and the listing through our website or other broadly-available means and intend to engage in additional investor education meetings. In advance of any investor day presentations and/or the posting of presentations regarding our company, our management team, and the listing through our website or other broadly-available means, we intend to announce the date for such day over financial news outlets in a manner consistent with typical corporate outreach to investors. We intend to prepare electronic presentations for any such investor days or other presentations regarding our company, our management team, and the listing, which will have content similar to a traditional roadshow presentation, and to make a version of any such presentation publicly available, without restrictions, on our website. There can be no guarantee that any investor day presentations, other investor education presentations, and other investor education meetings will have the same impact on investor education as a traditional "roadshow" conducted in connection with an underwritten initial public offering. As a result, there may not be efficient or sufficient price discovery with respect to our Class A common stock or sufficient demand among potential investors immediately after our listing, which could result in a more volatile price of our Class A common stock.

• Since we are not conducting an underwritten initial public offering for our Class A common stock, the market price for our Class A common stock may be volatile and trading volume may be uncertain, which may adversely affect your ability to sell any shares of Class A common stock that you may purchase.

***The price of our Class A common stock may be volatile, and could, upon listing on the Nasdaq Global Select Market, decline significantly and rapidly. Market volatility may affect the value of an investment in our Class A common stock and could subject us to litigation.***

The listing of our Class A common stock on the Nasdaq Global Select Market and the registration of the registered stockholders' shares of Class A common stock is a relatively novel process that is not an underwritten initial public offering. We have engaged Goldman Sachs, J.P. Morgan, Allen & Co., and Citigroup as our financial advisors. There will be no book building process and no price at which underwriters initially will sell shares of Class A common stock to the public to help inform efficient and sufficient price discovery with respect to the opening trades of the Class A common stock on the Nasdaq Global Select Market.

Pursuant to Nasdaq's rules, once Goldman Sachs, in its capacity as our designated financial advisor to perform the functions under Nasdaq Rule 4120(c)(8), has notified Nasdaq that our shares of Class A common stock are ready to trade, Nasdaq will calculate the Current Reference Price for our shares of Class A common stock, in accordance with Nasdaq's rules. If Goldman Sachs then approves proceeding at the Current Reference Price, Nasdaq will conduct price validation checks in accordance with Nasdaq rules. As part of conducting its price validation checks, Nasdaq may consult with Goldman Sachs and other market participants (including the other financial advisors). Upon completion of such price validation

checks, the applicable orders that have been entered will then be executed at such price and regular trading of our shares of Class A common stock on the Nasdaq Global Select Market will commence. Under Nasdaq's rules, the "Current Reference Price" means: (i) the single price at which the maximum number of orders to buy or sell our shares of Class A common stock can be matched; (ii) if more than one price exists under clause (i), then the price that minimizes the number of our shares of Class A common stock for which orders cannot be matched; (iii) if more than one price exists under clause (ii), then the entered price (i.e. the specified price entered in an order by a customer to buy or sell) at which our shares of Class A common stock will remain unmatched (i.e. will not be bought or sold); and (iv) if more than one price exists under clause (iii), a price determined by Nasdaq after consultation with Goldman Sachs, J.P. Morgan, Allen & Co., and Citigroup in their capacity as financial advisors, Goldman Sachs, J.P. Morgan, Allen & Co., and Citigroup will exercise any consultation rights only to the extent that they may do so consistent with the anti-manipulation provisions of the federal securities laws, including Regulation M (to the extent applicable), or applicable relief granted thereunder. Goldman Sachs will determine when our shares of Class A common stock are ready to trade and approve proceeding at the Current Reference Price primarily based on consideration of volume, timing, and price. In particular, Goldman Sachs will determine, based primarily on pre-opening buy and sell orders, when a reasonable amount of volume will cross on the opening trade such that sufficient price discovery has been made to open trading at the Current Reference Price. If Goldman Sachs does not approve proceeding at the Current Reference Price (for example, due to the absence of adequate pre-opening buy and sell interest), Goldman Sachs will request that Nasdaq delay the open until such a time that sufficient price discovery has been made to ensure a reasonable amount of volume crosses on the opening trade. The length of such delay could vary greatly, from a short period of time such as one day, to a decision to not list our shares on the Nasdaq Global Select Market at all. As a result, the absence of sufficient price discovery may result in delays in the opening of trading and, volatile prices and supply once trading commences. The opening public price may bear no relationship to the market price for our Class A common stock after our listing, and thus may decline below the opening public price.

Moreover, prior to the opening trade on the Nasdaq Global Select Market, there will not be a price at which underwriters initially sold shares of Class A common stock to the public as there would be in an underwritten initial public offering. The absence of a predetermined initial public offering price could impact the range of buy and sell orders collected by Nasdaq from various broker-dealers. Consequently, upon listing on the Nasdaq Global Select Market, the public price of our Class A common stock may be more volatile than in an underwritten initial public offering and could decline significantly and rapidly.

Moreover, because of the relatively novel listing process and the broad consumer awareness and brand recognition of our company, individual investors, retail, or otherwise, may have greater influence in setting the opening public price and subsequent public prices of our Class A common stock on the Nasdaq Global Select Market and may participate more in our initial trading than is typical for an underwritten initial public offering. These factors could result in a public price of our Class A common stock that is higher than other investors (such as institutional investors) are willing to pay, which could cause volatility in the trading price of our Class A common stock and an unsustainable trading price if the price of our Class A common stock significantly rises upon listing and institutional investors believe our Class A common stock is worth less than retail investors, in which case the price of our Class A common stock may decline over time. Further, if the public price of our Class A common stock is above the level that investors determine is reasonable for our Class A common stock, some investors may attempt to short our Class A common stock after trading begins, which would create additional downward pressure on the public price of our Class A common stock. Moreover, to the extent that there is a lack of consumer awareness among retail investors, such lack of consumer awareness could reduce the value of our Class A common stock and cause volatility in the trading price of our Class A common stock.

Technology stocks have historically experienced high levels of volatility. The price of our Class A common stock also could be subject to wide fluctuations in response to the risk factors described in this prospectus and others beyond our control, including:

- the number of shares of our Class A common stock publicly owned and available for trading;

- overall performance of the equity markets or publicly-listed financial services and technology companies;

- our actual or anticipated operating performance and the operating performance of our competitors;

- changes in the projected operational and financial results we provide to the public or our failure to meet those projections;

- failure of securities analysts to initiate or maintain coverage of us, changes in financial estimates by any securities analysts who follow our company, or our failure to meet the estimates or the expectations of investors;

- any major change in our board of directors, management, or key personnel;

- if we issue additional shares of capital stock, including in the form of blockchain tokens, in connection with customer reward or loyalty programs;

- rumors and market speculation involving us or other companies in our industry;

- announcements by us or our competitors of significant innovations, new products, services, features, integrations or capabilities, acquisitions, strategic investments, partnerships, joint ventures, or capital commitments; and

- other events or factors, including those resulting from COVID-19, war, incidents of terrorism, or responses to these events.

Furthermore, the stock market has recently experienced extreme price and volume fluctuations that have affected and continue to affect the market prices of equity securities of many companies and financial services and technology companies in particular. These fluctuations often have been unrelated or disproportionate to the operating performance of those companies. These broad market and industry fluctuations, as well as general economic, political and market conditions such as recessions, interest rate changes, or international currency fluctuations, may negatively impact the market price of our Class A common stock. These fluctuations may be even more pronounced in the trading market for our Class A common stock shortly following the listing of our Class A common stock on the Nasdaq Global Select Market as a result of the supply and demand forces described above. If the market price of our Class A common stock after our listing does not exceed the opening public price, you may not realize any return on your investment in us and may lose some or all of your investment. In the past, companies that have experienced volatility in the market price of their stock have been subject to securities class action litigation. We may be the target of this type of litigation in the future. Securities litigation against us could result in substantial costs and divert our management's attention from other business concerns, which could harm our business.

***The price of our Class A common stock may have little or no relationship to the historical sales prices of our capital stock in private transactions.***

Prior to the registration and listing of our Class A common stock on the Nasdaq Global Select Market there has been no public market for our capital stock. The historical sales prices of our capital stock are primarily from sales of shares of our capital stock in private transactions. In the section titled "Sale Price History of our Capital Stock," we have provided the historical sales prices of our capital stock in private transactions. However, given the limited history of sales, among other factors, this information may have

little or no relation to broader market demand for our Class A common stock and thus the price of our Class A common stock. As a result, you should not place undue reliance on these historical sales prices as they may differ materially from the opening price of the Class A common stock and subsequent prices of our Class A common stock. For more information about how the initial listing price of the Class A common stock on the Nasdaq Global Select Market will be determined, see the section titled "Plan of Distribution."

***An active, liquid, and orderly market for our Class A common stock may not develop or be sustained. You may be unable to sell your shares of Class A common stock at or above the price you bought them for.***

We currently expect our Class A common stock to be listed and traded on the Nasdaq Global Select Market. Prior to the listing of our Class A common stock on the Nasdaq Global Select Market, there has been no public market for our Class A common stock. Moreover, consistent with Regulation M and other federal securities laws applicable to our listing, we have not consulted with registered stockholders or other existing stockholders regarding their desire or plans to sell shares in the public market following the listing or discussed with potential investors their intentions to buy our Class A common stock in the open market. While our Class A common stock may be sold after our listing of the Class A common stock on Nasdaq Global Select Market by the registered stockholders pursuant to this prospectus or by our other existing stockholders in accordance with Rule 144 of the Securities Act, unlike an underwritten initial public offering, there can be no assurance that any registered stockholders or other existing stockholders will sell any of their shares of Class A common stock. As a result, there may initially be a lack of supply of, or demand for, Class A common stock on the Nasdaq Global Select Market. In the case of a lack of supply of our Class A common stock, the trading price of our Class A common stock may rise to an unsustainable level. Further, institutional investors may be discouraged from purchasing our Class A common stock if they are unable to purchase a block of our Class A common stock in the open market due to a potential unwillingness of our existing stockholders to sell a sufficient amount of Class A common stock at the price offered by such institutional investors and the greater influence individual investors have in setting the trading price. If institutional investors are unable to purchase our Class A common stock, the market for our Class A common stock may be more volatile without the influence of long-term institutional investors holding significant amounts of our Class A common stock. Conversely, there can be no assurance that the registered stockholders and other existing stockholders will not sell all of their shares of Class A common stock, resulting in an oversupply of our Class A common stock on the Nasdaq Global Select Market. In the case of a lack of demand for our Class A common stock, the trading price of our Class A common stock could decline significantly and rapidly after the listing of our Class A common stock on the Nasdaq Global Select Market. Therefore, an active, liquid, and orderly trading market for our Class A common stock may not initially develop or be sustained, which could significantly depress and result in significant volatility in the price of our Class A common stock. This could affect your ability to sell your shares of Class A common stock.

***The dual class structure of our common stock will have the effect of concentrating voting control with those stockholders, including our directors, executive officers, and their respective affiliates, who held in the aggregate         % of the voting power of our capital stock upon the effectiveness of the registration statement of which this prospectus forms a part. This ownership will limit or preclude your ability to influence corporate matters, including the election of directors, amendments of our organizational documents, and any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction requiring stockholder approval.***

Our Class B common stock has twenty votes per share, and our Class A common stock has one vote per share. Upon the effectiveness of the registration statement of which this prospectus forms a part, our directors, executive officers, and their affiliates held in the aggregate    % of the voting power of our capital stock. Because of the twenty-to-one voting ratio between our Class B common stock and our Class A common stock, the holders of our Class B common stock collectively could continue to control a significant percentage of the combined voting power of our common stock and therefore be able to control

all matters submitted to our stockholders for approval until the earliest to occur of (i) the date fixed by the board of directors that is no less than 61 days and no more than 180 days following the first time after the date of effectiveness of the registration statement of which this prospectus forms a part that the aggregate number of shares of Class B common stock held by Brian Armstrong and his affiliates is less than 25% of the aggregate number of shares of Class B common stock held by Mr. Armstrong and his affiliates on the date of effectiveness of the registration statement of which this prospectus forms a part; (ii) the date and time specified by affirmative vote of the holders of at least 66-2/3% of the outstanding shares of Class B common stock, voting as a single class, and the affirmative vote of at least 66-2/3% of the then serving members of our board of directors, which must include the affirmative vote of Mr. Armstrong, if either (A) Mr. Armstrong is serving on our board of directors and has not been terminated for cause or resigned except for good reason (as each term is defined in our restated certificate of incorporation) from his position as our Chief Executive Officer or (B) Mr. Armstrong has not been removed for cause or resigned from the position of Chairman of the board of directors; and (iii) the death or disability (as defined in our and restated certificate of incorporation) of Mr. Armstrong, when all outstanding shares of Class B common stock will convert automatically into shares of Class A common stock. Holders of our Class A common stock will not be entitled to vote separately as a single class except under certain limited circumstances as described in the section titled "Description of Capital Stock—Class A Common Stock and Class B Common Stock—Voting Rights". This concentrated control may limit or preclude your ability to influence corporate matters for the foreseeable future, including the election of directors, amendments of our organizational documents, and any merger, consolidation, sale of all or substantially all of our assets, or other major corporate transaction requiring stockholder approval. In addition, this may prevent or discourage unsolicited acquisition proposals or offers for our capital stock that you may believe are in your best interest as one of our stockholders.

Future transfers by holders of Class B common stock will generally result in those shares converting to Class A common stock, subject to limited exceptions, such as certain transfers effected for estate planning purposes. The conversion of Class B common stock to Class A common stock will have the effect, over time, of increasing the relative voting power of those holders of Class B common stock who retain their shares in the long term. As a result, it is possible that one or more of the persons or entities holding our Class B common stock could gain significant voting control as other holders of Class B common stock sell or otherwise convert their shares into Class A common stock. See the section titled "Description of Capital Stock—Anti-Takeover Provisions" for additional information.

***The dual class structure of our common stock may adversely affect the trading market for our Class A common stock.***

Certain stock index providers, such as S&P Dow Jones, exclude companies with multiple classes of shares of common stock from being added to certain stock indices, including the S&P 500. In addition, several stockholder advisory firms and large institutional investors oppose the use of multiple class structures. As a result, the dual class structure of our common stock may prevent the inclusion of our Class A common stock in such indices, may cause stockholder advisory firms to publish negative commentary about our corporate governance practices or otherwise seek to cause us to change our capital structure, and may result in large institutional investors not purchasing shares of our Class A common stock. Any exclusion from stock indices could result in a less active trading market for our Class A common stock. Any actions or publications by stockholder advisory firms or institutional investors critical of our corporate governance practices or capital structure could also adversely affect the value of our Class A common stock.

***None of our stockholders are party to any contractual lock-up agreement or other contractual restrictions on transfer. Following our listing, the sales or distribution of substantial amounts of our Class A common stock, or the perception that such sales or distributions might occur, could cause the market price of our Class A common stock to decline.***

In addition to the supply and demand and volatility factors discussed above, the sale or distribution of a substantial number of shares of our Class A common stock, particularly sales by us or our directors,

executive officers, and principal stockholders, or the perception that these sales or distributions might occur in large quantities, could cause the market price of our Class A common stock to decline.

As of December 31, 2020, giving effect to the conversion and reclassification of our Series FF, Series A, Series B, Series C, and Series D convertible preferred stock into 104,046,301 shares of our Class B common stock, and our Series E convertible preferred stock into 8,831,952 shares of our Class A common stock, which will occur in connection with the effectiveness of the registration statement of which this prospectus forms a part, we had 185,986,111 shares of common stock outstanding, all of which are "restricted securities" (as defined in Rule 144 under the Securities Act).

Approximately                    shares of Class B common stock may be converted to Class A common stock and then immediately sold either by the registered stockholders pursuant to this prospectus or by our other existing stockholders under Rule 144 since such shares held by such other stockholders will have been beneficially owned by non-affiliates for at least one year. Moreover, once we have been a reporting company subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act for 90 days and assuming the availability of certain public information about us, (i) non-affiliates who have beneficially owned our common stock for at least six months may rely on Rule 144 to sell their shares of Class A common stock, and (ii) our directors, executive officers, and other affiliates who have beneficially owned our common stock for at least six months, including certain of the shares of Class A common stock covered by this prospectus to the extent not sold hereunder, will be entitled to sell their shares of our Class A common stock subject to volume limitations under Rule 144 under the Securities Act and various vesting agreements.

Further, as of December 31, 2020, we had 63,255,357 options outstanding that, if fully exercised, would result in the issuance of 22,442,017 shares of Class B common stock and the issuance of 40,813,340 shares of Class A common stock and 3,765,760 shares of Class A common stock outstanding subject to RSUs. All of the shares of Class A common stock and Class B common stock issuable upon the exercise of stock options or vesting and settlement of RSUs, and reserved for future issuance under our equity incentive plans, will be registered for public resale under the Securities Act. Accordingly, these shares will be able to be freely sold in the public market upon issuance, subject to applicable vesting requirements and compliance by affiliates with Rule 144.

None of our stockholders are subject to any contractual lock-up or other contractual restriction on the transfer or sale of their shares.

Following the effectiveness of the registration statement of which this prospectus forms a part, the holders of up to 109,385,725 shares of our common stock will have rights, subject to some conditions, to require us to file registration statements for the public resale of the Class A common stock issuable upon conversion of such shares or to include such shares in registration statements that we may file for us or other stockholders. Any registration statement we file to register additional shares, whether as a result of registration rights or otherwise, could cause the market price of our Class A common stock to decline or be volatile.

We also may issue our capital stock or securities convertible into our capital stock, including in the form of blockchain tokens, from time to time in connection with a financing, an acquisition, investments, pursuant to customer rewards, loyalty programs, and other incentive plans, or otherwise. Any such issuance could result in substantial dilution to our existing stockholders and cause the public price of our Class A common stock to decline.

***If securities or industry analysts do not publish research, or publish inaccurate or unfavorable research, about our business, the price of our Class A common stock and its liquidity could decline.***

The trading market for our Class A common stock will depend in part on the research and reports that securities or industry analysts publish about us or our business, our market, and our competitors. We do not have any control over these analysts. If few securities analysts commence coverage of us, if industry

analysts do not cover our Class A common stock, or if industry analysts cease coverage of us altogether, the trading price for our Class A common stock would be negatively affected. If one or more of the analysts who cover us downgrade our Class A common stock, or publish inaccurate or unfavorable research about our business, the price of our Class A common stock may decline. If one or more of these analysts cease coverage of us or fail to publish reports on us regularly, demand for our Class A common stock could decrease, which might cause our Class A common stock price and trading volume to decline.

***We are not obligated to, and do not intend to pay dividends on any class of our common stock for the foreseeable future.***

We have never declared or paid any cash dividends on any class of our common stock, are not obligated to pay, and do not intend to pay any cash dividends in the foreseeable future. We anticipate that for the foreseeable future we will retain all of our future earnings for use in the development of our business and for general corporate purposes. Any determination to pay dividends in the future will be at the discretion of our board of directors.

Our payment of any dividends will be subject to contractual and legal restrictions and other factors that our board of directors deems relevant. Moreover, agreements governing any future indebtedness of ours may further limit our ability to pay dividends. In addition, our ability to pay dividends is limited by law. There is no assurance that we will be able or that our board of directors will decide to declare any dividends on any class of our common stock.

Accordingly, investors may have to rely on sales of their Class A common stock after price appreciation, which may never occur, as the only way to realize any future gains on their investment.

***Provisions in our charter documents and under Delaware law, and certain rules imposed by regulatory authorities, could make an acquisition of us, which may be beneficial to our stockholders, more difficult, limit attempts by our stockholders to replace or remove our current management, limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees, and limit the price of our Class A common stock.***

Provisions in our restated certificate of incorporation and restated bylaws that will become effective shortly following the effectiveness of the registration statement of which this prospectus forms a part may have the effect of delaying or preventing a merger, acquisition, or other change of control of our company that the stockholders may consider favorable. In addition, because our board of directors is responsible for appointing the members of our management team, these provisions may frustrate or prevent any attempts by our stockholders to replace or remove our current management by making it more difficult for stockholders to replace members of our board of directors. Among other things, our restated certificate of incorporation and restated bylaws include provisions that:

- provide that our board of directors will be classified into three classes of directors with staggered three-year terms, subject to staggered board end dates as defined and further described in the section titled "Description of Capital Stock";

- permit our board of directors to establish the number of directors and fill any vacancies and newly-created directorships;

- require unanimous approval of our board of directors for the nomination of directors for election, or to fill vacancies, on our board of directors, subject to staggered board end dates as defined and further described in the section titled "Description of Capital Stock";

- require super-majority voting to amend some provisions in our restated certificate of incorporation and restated bylaws;

- authorize the issuance of "blank check" preferred stock and common stock that our board of directors could use to implement a stockholder rights plan or issue other shares of preferred stock or common stock, including blockchain tokens;

- provide that only our Chief Executive Officer or a majority of our board of directors will be authorized to call a special meeting of stockholders;

- eliminate the ability of our stockholders to call special meetings of stockholders;

- prohibit cumulative voting;

- provide that directors may only be removed "for cause" and only with the approval of two-thirds of our stockholders, subject to staggered board end dates as defined and further described in the section titled "Description of Capital Stock";

- provide for a dual class common stock structure in which holders of our Class B common stock have the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the outstanding shares of our Class A common stock and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets;

- prohibit stockholder action by written consent, which requires all stockholder actions to be taken at a meeting of our stockholders, subject to staggered board end dates as defined and further described in the section titled "Description of Capital Stock";

- provide that the board of directors is expressly authorized to make, alter, or repeal our restated bylaws; and

- advance notice requirements for nominations for election to our board of directors or for proposing matters that can be acted upon by stockholders at annual stockholder meetings.

Moreover, Section 203 of the Delaware General Corporation Law may discourage, delay, or prevent a change of control of our company. Section 203 imposes certain restrictions on mergers, business combinations, and other transactions between us and holders of 15% or more of our common stock. See the section titled "Description of Capital Stock" for additional information.

In addition, a third party attempting to acquire us or a substantial position in our common stock may be delayed or ultimately prevented from doing so by change in ownership or control regulations to which our regulated broker-dealer subsidiaries are subject. FINRA Rule 1017 generally provides that FINRA approval must be obtained in connection with any transaction resulting in a single person or entity owning, directly or indirectly, 25% or more of a member firm's equity and would include a change of control of a parent company.

***Our restated certificate of incorporation will contain an exclusive forum provision for certain claims, which could limit our stockholders' ability to obtain a favorable judicial forum for disputes with us or our directors, officers, or employees.***

Our restated certificate of incorporation, to the fullest extent permitted by law, will provide that the Court of Chancery of the State of Delaware will be the exclusive forum for any derivative action or proceeding brought on our behalf; any action asserting a claim that is based upon a breach of fiduciary duty; any action asserting a claim against us or any current or former director, officer, stockholder, employee or agent of ours, arising pursuant to the DGCL, our restated certificate of incorporation, or our restated bylaws; any action asserting a claim against us that is governed by the internal affairs doctrine; or any action asserting an "internal corporate claim" as defined in Section 115 of the DGCL.

Moreover, Section 22 of the Securities Act creates concurrent jurisdiction for federal and state courts over all claims brought to enforce any duty or liability created by the Securities Act or the rules and

73

regulations thereunder and our restated certificate of incorporation will provide that the federal district courts of the United States of America will, to the fullest extent permitted by law, be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act, or a Federal Forum Provision, unless we consent in writing to the selection of an alternative forum. Our decision to adopt a Federal Forum Provision followed a decision by the Supreme Court of the State of Delaware holding that such provisions are facially valid under Delaware law. While there can be no assurance that federal or state courts will follow the holding of the Delaware Supreme Court or determine that the Federal Forum Provision should be enforced in a particular case, application of the Federal Forum Provision means that suits brought by our stockholders to enforce any duty or liability created by the Securities Act must be brought in federal court and cannot be brought in state court. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all claims brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder and neither the exclusive forum provision nor the Federal Forum Provision applies to suits brought to enforce any duty or liability created by the Exchange Act. Accordingly, actions by our stockholders to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder must be brought in federal court. Our stockholders will not be deemed to have waived our compliance with the federal securities laws and the regulations promulgated thereunder.

Any person or entity purchasing or otherwise acquiring or holding any interest in any of our securities will be deemed to have notice of and consented to our exclusive forum provisions, including the Federal Forum Provision. These provisions may limit our stockholders' ability to bring a claim in a judicial forum they find favorable for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers, and other employees. Alternatively, if a court were to find the choice of forum provision contained in our restated certificate of incorporation to be inapplicable or unenforceable in an action, we may incur additional costs associated with resolving such action in other jurisdictions, which could harm our business, operating results, and financial condition.

74

**SPECIAL NOTE REGARDING FORWARD-LOOKING STATEMENTS**

This prospectus contains forward-looking statements. All statements contained in this prospectus other than statements of historical fact, including statements regarding our future operating results and financial position, our business strategy and plans, market growth, and our objectives for future operations, are forward-looking statements. The words "believe," "may," "will," "estimate," "potential," "continue," "anticipate," "intend," "expect," "could," "would," "project," "plan," "target," and similar expressions are intended to identify forward-looking statements.

Forward-looking statements contained in this prospectus include, but are not limited to, statements about:

- our future financial performance, including our expectations regarding our net revenue, operating expenses, and our ability to achieve and maintain future profitability;

- our business plan and our ability to effectively manage our growth;

- anticipated trends, growth rates, and challenges in our business, the cryptoeconomy, and in the markets in which we operate;

- market acceptance of our products and services;

- beliefs and objectives for future operations;

- our ability to further penetrate our existing customer base and maintain and expand our customer base;

- our ability to develop new products and services and grow our business in response to changing technologies, customer demand, and competitive pressures;

- our expectations concerning relationships with third parties;

- our ability to maintain, protect, and enhance our intellectual property;

- our ability to continue to expand internationally;

- the effects of increased competition in our markets and our ability to compete effectively;

- future acquisitions of or investments in complementary companies, products, services, or technologies and our ability to successfully integrate such companies or assets;

- our ability to stay in compliance with laws and regulations that currently apply or become applicable to our business both in the United States and internationally;

- economic and industry trends, projected growth, or trend analysis;

- trends in revenue, cost of revenue, and gross margin;

- trends in operating expenses, including technology and development expenses, sales and marketing expenses, and general and administrative expenses, and expectations regarding these expenses as a percentage of revenue;

- increased expenses associated with being a public company; and

- other statements regarding our future operations, financial condition, and prospects and business strategies.

We have based these forward-looking statements largely on our current expectations and projections about future events and trends that we believe may affect our operating results, financial condition,

business strategy, short-term and long-term business operations and objectives, and financial needs. These forward-looking statements are subject to a number of risks, uncertainties, and assumptions, including those described in the section titled "Risk Factors." Moreover, we operate in a very competitive and rapidly changing environment. New risks emerge from time to time. It is not possible for our management to predict all risks, nor can we assess the impact of all factors on our business or the extent to which any factor, or combination of factors, may cause actual results to differ materially from those contained in any forward-looking statements we may make. In light of these risks, uncertainties, and assumptions, the future events and trends discussed in this prospectus may not occur and actual results could differ materially and adversely from those anticipated or implied in the forward-looking statements.

You should not rely upon forward-looking statements as predictions of future events. The events and circumstances reflected in the forward-looking statements may not be achieved or occur. Although we believe that the expectations reflected in the forward-looking statements are reasonable, we cannot guarantee future results, performance, or achievements. We undertake no obligation to update any of these forward-looking statements for any reason after the date of this prospectus or to conform these statements to actual results or revised expectations, except as required by law.

You should read this prospectus and the documents that we reference in this prospectus and have filed with the SEC as exhibits to the registration statement of which this prospectus forms a part with the understanding that our actual future results, performance, and events and circumstances may be materially different from what we expect.

**MARKET AND INDUSTRY DATA**

Unless otherwise indicated, information contained in this prospectus concerning our industry and the markets in which we operate, including our general expectations, market position, market opportunity, and market size, is based on information from various third-party industry and research sources, as well as assumptions that we have made that are based on those data and other similar sources, and on our knowledge of the markets for our products and services. This information involves a number of assumptions and limitations, and you are cautioned not to give undue weight to such estimates. While we believe the market position, market opportunity, and market size information included in this prospectus is generally reliable, information of this sort is inherently imprecise. In addition, projections, assumptions, and estimates of our future performance and the future performance of the industry in which we operate is necessarily subject to a high degree of uncertainty and risk due to a variety of factors, including those described in the section titled "Risk Factors" and elsewhere in this prospectus. These and other factors could cause results to differ materially from those expressed in the estimates made by the independent parties and by us.

This prospectus contains statistical data, estimates, and forecasts that are based on industry publications or reports generated by third-party providers, or other publicly available information, as well as other information based on internal estimates.

**USE OF PROCEEDS**

Registered stockholders may elect to sell shares of our Class A common stock covered by this prospectus. To the extent any registered stockholder chooses to sell shares of our Class A common stock covered by this prospectus, we will not receive any proceeds from any such sales of our Class A common stock. See the section titled "Principal and Registered Stockholders."

**DIVIDEND POLICY**

We have never declared or paid cash dividends on our capital stock. We are not obligated to pay any dividends on the Class A common stock or Class B common stock and we currently intend to retain all available funds and any future earnings for use in the operation of our business and do not anticipate paying any dividends on our capital stock in the foreseeable future. Any future determination to declare dividends will be made at the discretion of our board of directors and will depend on our financial condition, operating results, capital requirements, general business conditions, and other factors that our board of directors may deem relevant.

**CAPITALIZATION**

The following table sets forth cash and cash equivalents, as well as our capitalization, as of December 31, 2020 on:

- an actual basis; and

- a pro forma basis, giving effect to (i) the automatic conversion of all outstanding shares of our Series FF, Series A, Series B, Series C, and Series D convertible preferred stock as of December 31, 2020 into 104,046,301 shares of our Class B common stock, as if such conversion had occurred on December 31, 2020, (ii) the automatic conversion of all outstanding shares of our Series E convertible preferred stock as of December 31, 2020 into 8,831,952 shares of our Class A common stock, as if such conversion had occurred on December 31, 2020, and (iii) the filing and effectiveness of our restated certificate of incorporation.

You should read this table together with our consolidated financial statements and related notes, and the sections titled "Selected Consolidated Financial and Other Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," each included elsewhere in this prospectus.

| | As of December 31, 2020 | |
| --- | --- | --- |
| | Actual | Pro Forma |
| | *(in thousands, except share and per share data)* | |
| Cash and cash equivalents | $ 1,061,850 | $ 1,061,850 |
| Convertible preferred stock, $0.00001 par value; 126,605,028 shares authorized, 112,878,253 shares issued and outstanding, actual; no shares authorized, issued and outstanding, pro forma | $ 562,467 | $ — |
| Stockholders' equity | | |
| Preferred stock, $0.0001 par value; no shares authorized, issued, and outstanding, actual; 500,000,000 shares authorized, no shares issued and outstanding, pro forma | — | — |
| Class A common stock, $0.00001 par value; 267,640,000 shares authorized, 12,203,539 shares issued and outstanding, actual; 10,000,000,000 shares authorized, 21,035,491 shares issued and outstanding, pro forma | — | — |
| Class B common stock, $0.00001 par value; 208,413,936 shares authorized, 60,904,319 shares issued and outstanding, actual; 500,000,000 shares authorized, 164,950,620 shares issued and outstanding, pro forma | — | 1 |
| Common stock, $0.00001 par value; no shares authorized, issued, and outstanding, actual; 500,000,000 shares authorized, no shares issued and outstanding, pro forma | — | — |
| Additional paid-in capital | 231,024 | 793,490 |
| Accumulated other comprehensive income | 6,256 | 6,256 |
| Retained earnings | 726,304 | 726,304 |
| Total stockholders' equity | 963,584 | 1,526,051 |
| Total capitalization | $ 1,526,051 | $ 1,526,051 |

The number of shares of our Class A common stock and Class B common stock to be outstanding following the effectiveness of this registration statement is based upon 21,035,491 shares of our Class A

common stock outstanding and 164,950,620 shares of our Class B common stock outstanding, in each case, as of December 31, 2020 and does not include:

- 3,550,279 shares of our Class A common stock and 22,442,017 shares of our Class B common stock issuable upon the exercise of options to purchase shares of our common stock as of December 31, 2020 under our Amended and Restated 2013 Stock Plan, or 2013 Plan, with a weighted-average exercise price of $5.26 per share;

- 37,230,658 shares of our Class A common stock issuable upon the exercise of options to purchase shares of our Class A common stock as of December 31, 2020 under our 2019 Equity Incentive Plan, or 2019 Plan, with a weighted-average exercise price of $21.54 per share;

- 3,765,760 restricted stock units, or RSUs, covering shares of our Class A common stock that are issuable upon satisfaction of a service-based vesting condition outstanding as of December 31, 2020, for which the service-based vesting condition was not yet satisfied as of December 31, 2020, pursuant to our 2019 Plan;

- 1,607,982 RSUs covering shares of our Class A common stock that are issuable upon satisfaction of a service-based vesting condition that were granted after December 31, 2020, pursuant to our 2019 Plan;

- 32,403 shares of our Class A common stock issuable upon the exercise of options to purchase shares of our Class A common stock that were assumed and converted from options to purchase shares of Tagomi Holdings Inc. common stock upon completion of our acquisition of Tagomi Holdings Inc. in July 2020, with a weighted-average exercise price of $5.31 per share;

- 470,128 shares of our Class A common stock issuable upon the exercise of options to purchase shares of our Class A common stock that were assumed and converted from options to purchase shares of Bison Trails Co. common stock upon completion of our acquisition of Bison Trails Co. in February 2021, with a weighted average exercise price of $3.45 per share;

- 407,928 shares of our Class B common stock issuable upon the exercise of a warrant to purchase Class B common stock outstanding as of December 31, 2020, with an exercise price of $1.01 per share;

- 2,295,766 shares of Class A common stock reserved for the potential issuance pursuant to warrants to purchase shares of our Class A common stock that may be approved by our board of directors from time to time, of which, as of December 31, 2020, our board of directors had approved the issuance of a warrant exercisable for an aggregate of 229,577 shares of our Class A common stock at an exercise price of $0.00001 per share;

- 4,201 shares of our Class A common stock issuable upon the exercise of a warrant to purchase Class A common stock which we assumed in July 2020 in connection with the acquisition of Tagomi Holdings Inc., with an exercise price of $5.26 per share;

- 3,584,228 shares of our Class A common stock that we issued in connection with our acquisition of Bison Trails Co. in February 2021, 647,692 shares of which are subject to holdback; and

- 38,416,002 shares of our common stock reserved for future issuance under our equity compensation plans, consisting of (i) 2,193,489 shares of our Class A common stock reserved for future issuance under our 2019 Plan, as of December 31, 2020 (which reserve does not reflect the options to purchase shares of our Class A common stock granted after December 31, 2020), (ii) 31,047,869 shares of our Class A common stock reserved for future issuance under our 2021 Equity Incentive Plan, or 2021 Plan, which will become effective on the date immediately prior to the date of the effectiveness of this registration statement of which this prospectus forms a part, and (iii) 5,174,644 shares of our Class A common stock reserved for issuance under our 2021

ESPP, which will become effective on the date of the effectiveness of this registration statement of which this prospectus forms a part.

On the date immediately prior to the date of the effectiveness of this registration statement of which this prospectus forms a part, any remaining shares available for issuance under our 2019 Plan will be added to the shares of our Class A common stock reserved for issuance under our 2021 Plan, and we will cease granting awards under our 2019 Plan. Our 2021 Plan and 2021 ESPP also provide for automatic annual increases in the number of shares reserved thereunder. See the section titled "Executive Compensation—Employee Benefit Plans" for additional information.

Except as otherwise indicated, all information in this prospectus assumes:

•    the automatic conversion of all outstanding shares of our Series FF, Series A, Series B, Series C, and Series D convertible preferred stock as of December 31, 2020 into 104,046,301 shares of our Class B common stock;

•    the automatic conversion of all outstanding shares of our Class E convertible preferred stock as of December 31, 2020 into 8,831,952 shares of our Class A common stock;

•    no exercise, forfeitures, or expirations of outstanding stock options or warrants after December 31, 2020; and

•    the filing and effectiveness of our restated certificate of incorporation and the effectiveness of our restated bylaws, each of which will occur shortly following the effectiveness of the registration statement of which this prospectus forms a part.

82

**SELECTED CONSOLIDATED FINANCIAL AND OTHER DATA**

The following section presents our selected consolidated financial and other data. We derived our selected consolidated statements of operations data for the years ended December 31, 2020 and December 31, 2019 (except for the pro forma share and pro forma net income per share information) and our consolidated balance sheet data as of December 31, 2020 and December 31, 2019 from our audited consolidated financial statements included elsewhere in this prospectus. Our historical results are not necessarily indicative of the results that may be expected for any other period in the future. The following summary consolidated financial and other data should be read in conjunction with the section titled "Management's Discussion and Analysis of Financial Condition and Results of Operations" and our consolidated financial statements and related notes included elsewhere in this prospectus.

83

**Consolidated Statement of Operations Data**

| | Year Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| | *(in thousands, except per share data)* | |
| Revenue: | | |
| Net revenue | $ 1,141,167 | $ 482,949 |
| Other revenue | 136,314 | 50,786 |
| Total revenue | 1,277,481 | 533,735 |
| Operating expenses: | | |
| Transaction expense | 135,514 | 82,055 |
| Technology and development | 271,732 | 185,044 |
| Sales and marketing | 56,782 | 24,150 |
| General and administrative | 279,880 | 231,929 |
| Restructuring | — | 10,140 |
| Other operating expense | 124,622 | 46,200 |
| Total operating expenses | 868,530 | 579,518 |
| Operating income (loss) | 408,951 | (45,783) |
| Other income, net | (248) | (367) |
| Income (loss) before provision for (benefit from) income taxes | 409,199 | (45,416) |
| Provision for (benefit from) income taxes | 86,882 | (15,029) |
| Net income (loss) | $ 322,317 | $ (30,387) |
| Net income (loss) attributable to common stockholders: | | |
| Basic | $ 108,256 | $ (30,387) |
| Diluted | $ 127,471 | $ (30,387) |
| Net income (loss) per share attributable to common stockholders: | | |
| Basic | $ 1.58 | $ (0.50) |
| Diluted | $ 1.40 | $ (0.50) |
| Weighted-average shares of common stock used to compute net income (loss) per share attributable to common stockholders: | | |
| Basic | 68,671 | 61,317 |
| Diluted | 91,209 | 61,317 |
| Pro forma net income per share attributable to common stockholders (unaudited): | | |
| Basic | $ 1.76 | |
| Diluted | $ 1.57 | |
| Pro forma weighted-average shares of common stock used to compute pro forma net income per share attributable to common stockholders (unaudited): | | |
| Basic | 182,945 | |
| Diluted | 205,575 | |

84

**Consolidated Balance Sheet Data**

| | As of December 31, | |
|---|---|---|
| | **2020** | **2019** |
| | *(in thousands)* | |
| Cash and cash equivalents | $ 1,061,850 | $ 548,945 |
| Customer custodial funds | 3,763,392 | 1,201,350 |
| Total assets | 5,855,414 | 2,391,769 |
| Custodial funds due to customers | 3,849,468 | 1,106,815 |
| Total liabilities | 4,329,363 | 1,329,986 |
| Convertible preferred stock | 562,467 | 564,697 |
| Total stockholders' equity | 963,584 | 497,086 |

**Key Business Metrics and Non-GAAP Financial Measure**

| | As of or for the Year Ended December 31, | | % Change |
|---|---|---|---|
| | **2020** | **2019** | |
| | *(in millions, except percentages)* | | |
| Verified Users | 43 | 32 | 34.4 % |
| Monthly Transacting Users | 2.8 | 1.0 | 180.0 % |
| Assets on Platform | $ 90,307 | $ 16,969 | 432.2 % |
| Trading Volume | $ 193,097 | $ 79,906 | 141.7 % |
| Net income (loss) | $ 322 | $ (30) | NM |
| Adjusted EBITDA[1] | $ 527 | $ 24 | 2,095.8 % |

(1)  Adjusted EBITDA is a non-GAAP financial measure. For more information regarding our use of this measure and a reconciliation of net income to Adjusted EBITDA, see "—Non-GAAP Financial Measure" included within this section.

*   NM—Not meaningful

### Key business metrics

In addition to our financial results, we use the following business metrics to evaluate our business, measure our performance, identify trends affecting our business, and make strategic decisions:

#### Verified Users

We define Verified Users as all retail users, institutions, and ecosystem partners that have registered an account on our platform and confirmed either their email address or phone number, or that have established an account with a username on our non-custodial wallet application, as of the date of measurement. Verified Users are an indication of our scale and represent a potential revenue opportunity for us. These customers have demonstrated an interest in our platform or direct intent to transact with crypto assets. Verified Users represent the top level of our customer acquisition funnel. We believe we have an opportunity to engage Verified Users and convert them to MTUs by marketing our growing suite of products and services. Verified Users may overstate the number of unique customers who have registered an account on our platform as one customer may register for, and use, multiple accounts with different email addresses, phone numbers, or usernames.

#### Monthly Transacting Users (MTU)

We define a Monthly Transacting User, or MTU, as a retail user who actively or passively transacts in one or more products on our platform at least once during the rolling 28-day period ending on the date of measurement. MTUs presented for the end of a quarter are the average of each month's MTUs in each respective quarter. MTUs represent our transacting base of retail users who drive potential revenue generating transactions on our platform. Revenue generating transactions include active transactions,

such as buying or selling crypto assets through our Invest product and spending on the Coinbase Card, or passive transactions such as earning a staking or savings reward. MTUs also engage in transactions that are non-revenue generating such as Send and Receive. MTUs engage in transactions that drive both transaction revenue and subscription and services revenue.

*Assets on Platform*

We define Assets on Platform as the total U.S. dollar equivalent value of both fiat currency and crypto assets held or managed in digital wallets on our platform, including our custody services, calculated based on the market price on the date of measurement. Assets on Platform demonstrates the scale of balances held across our suite of products and services, the trust customers place in us to securely store their assets, and the underlying growth of the cryptoeconomy. Assets on Platform also represent our monetization opportunity for subscription products and services, including current products such as Store, Stake, Save, Borrow, and Lend. Assets on Platform generate fees that are recorded as subscription and services revenue when customers engage with these products.

*Trading Volume*

We define Trading Volume as the total U.S. dollar equivalent value of matched trades transacted between a buyer and seller through our platform during the period of measurement. Trading Volume represents the product of the quantity of asset transacted and the trade price at the time the transaction was executed. As trading activity directly impacts transaction revenue, we believe this measure is a reflection of liquidity on our order books, trading health, and the underlying growth of the cryptoeconomy. Trading Volume on our platform is influenced by the price of Bitcoin and Crypto Asset Volatility. In periods of high Bitcoin price and/or Crypto Asset Volatility, we have experienced correspondingly high levels of Trading Volume on our platform.

***Non-GAAP financial measure***

In addition to our results determined in accordance with GAAP, we believe Adjusted EBITDA, a non-GAAP measure, is useful in evaluating our operating performance. We use Adjusted EBITDA to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that Adjusted EBITDA may be helpful to investors because it provides consistency and comparability with past financial performance. However, Adjusted EBITDA is presented for supplemental informational purposes only, has limitations as an analytical tool, and should not be considered in isolation or as a substitute for financial information presented in accordance with GAAP. Among other non-cash and non-recurring items, Adjusted EBITDA excludes stock-based compensation expense, which has recently been, and will continue to be for the foreseeable future, a significant recurring expense for our business and an important part of our compensation strategy. In addition, other companies, including companies in our industry, may calculate similarly titled non-GAAP measures differently or may use other measures to evaluate their performance, all of which could reduce the usefulness of our non-GAAP financial measures as tools for comparison. A reconciliation is provided below for each non-GAAP financial measure to the most directly comparable financial measure stated in accordance with GAAP. Investors are encouraged to review the related GAAP financial measures and the reconciliation of these non-GAAP financial measures to their most directly comparable GAAP financial measures, and not to rely on any single financial measure to evaluate our business.

We calculate Adjusted EBITDA as net income (loss), adjusted to exclude interest expense, provision for (benefit from) income taxes, depreciation and amortization, interest expense, stock-based compensation expense, impairment of goodwill, acquired intangibles and crypto assets, restructuring expenses, non-recurring acquisition-related compensation expenses, unrealized gain or loss on foreign exchange, fair value adjustments on derivatives, and non-recurring legal reserves and related costs. For the years ended December 31, 2020 and December 31, 2019, we did not have any significant interest expense.

86

The following table provides a reconciliation of net income (loss) to Adjusted EBITDA:

| | Year Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| | *(in thousands)* | |
| Net income (loss) | $ 322,317 | $ (30,387) |
| Adjusted to exclude the following: | | |
| Provision for (benefit from) income taxes | 86,882 | (15,029) |
| Depreciation and amortization | 30,962 | 16,878 |
| Interest expense | 2,634 | — |
| Stock-based compensation | 69,889 | 31,147 |
| Impairment | 8,355 | 2,252 |
| Restructuring | — | 10,140 |
| Non-recurring acquisition-related compensation expenses[1] | — | 7,370 |
| Unrealized loss (gain) on foreign exchange | 1,057 | (3,106) |
| Fair value adjustments on derivatives | 5,254 | — |
| Legal reserves and related costs | — | 5,000 |
| Adjusted EBITDA | $ 527,350 | $ 24,265 |

(1)  For more information, see the section titled "Neutrino" in note 4 to our consolidated financial statements included elsewhere in this prospectus.

# Management's Discussion and Analysis of Financial Condition and Results of Operations

**MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

*You should read the following discussion and analysis of our financial condition and results of operations together with the section titled "Selected Consolidated Financial and Other Data" and our consolidated financial statements and the related notes appearing elsewhere in this prospectus. Some of the information contained in this discussion and analysis or set forth elsewhere in this prospectus, including information with respect to our plans and strategy for our business, includes forward-looking statements that involve risks and uncertainties. You should read the sections titled "Risk Factors" and "Special Note Regarding Forward-Looking Statements" for a discussion of important factors that could cause actual results to differ materially from the results described in or implied by the forward-looking statements contained in the following discussion and analysis.*

**Overview**

Coinbase powers the cryptoeconomy.

Our mission is to create an open financial system for the world. Today, the way that we invest, spend, save, and generally manage our money remains cumbersome, inaccessible, expensive, and regionally isolated. In contrast, the internet has transformed our society by connecting the world and enabling the seamless exchange of information. The legacy financial system is struggling to keep pace with the speed of technological advancements in a global and digitally interconnected society, resulting in the need for a new, natively digital financial system.

We are building the cryptoeconomy – a more fair, accessible, efficient, and transparent financial system for the internet age that leverages crypto assets: digital assets built using blockchain technology.

We started in 2012 with the radical idea that anyone, anywhere, should be able to easily and securely send and receive Bitcoin, the first crypto asset. We built a trusted platform for accessing Bitcoin and the broader cryptoeconomy by reducing the complexity of the industry through a simple and intuitive user experience.

Today, we are a leading provider of end-to-end financial infrastructure and technology for the cryptoeconomy. Customers around the world discover and begin their journeys with crypto through Coinbase. In the early days of the internet, Google democratized access to information through its user-friendly search engine, enabling virtually any user with an internet connection to discover the world's information. Similarly, Coinbase is democratizing access to the cryptoeconomy by enabling anyone with an internet connection to easily and securely invest in and use crypto assets.

Customers that start with us, grow with us as they experience the benefits of the open financial system by using crypto-based products for staking, spending, saving, and borrowing. Today, our platform enables approximately 43 million retail users, 7,000 institutions, and 115,000 ecosystem partners in over 100 countries to participate in the cryptoeconomy:

- *Retail users*: We offer the primary financial account for the cryptoeconomy – a safe, trusted, and easy-to-use platform to invest, store, spend, earn, and use crypto assets.

- *Institutions:* We provide hedge funds, money managers, and corporations a one-stop shop for accessing crypto markets through advanced trading and custody technology, built on top of a robust security infrastructure. We also offer a state of the art marketplace with a deep pool of liquidity for transacting in crypto assets.

- *Ecosystem partners:* We provide developers, merchants, and asset issuers a platform with technology and services that enables them to build applications that leverage crypto protocols, actively participate in crypto networks, and securely accept cryptocurrencies as payment.

Our unique approach draws retail users, institutions, and ecosystem partners to our platform, creating a powerful flywheel: retail users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth of crypto assets that we offer, and launch new, innovative products and services that attract new customers. Our scale and leadership position draws ecosystem partners to connect with our millions of customers around the world, further enhancing the value of our platform.

This self-reinforcing dynamic is enabled by our culture of repeatable innovation and continuous investment in our proprietary technology platform that is purpose built to address the unique engineering, cybersecurity, compliance, and usability challenges of directly interacting with blockchain protocols. With every turn of our flywheel, we develop a deeper understanding of our customers' needs and leverage our scalable platform to intelligently design, develop, launch, and market new, innovative products and services to our customers. This allows us to build a more tailored suite of products and services and enhances the value of our platform over time. By providing the necessary infrastructure and distribution for our current and future ecosystem partners to build and extend their reach, we also foster the growth of the ecosystem.

We have grown quickly and in a capital-efficient manner since our founding. However, similar to the evolution of the internet, e-commerce, and prior paradigm shifts in technology, our journey has not been linear. Due to the highly volatile nature of crypto asset prices and trading activity, historically our operating results have, and we expect will, continue to fluctuate significantly from quarter to quarter in line with market sentiment and trading activity. Transaction revenue is our primary source of revenue today and is derived directly from Trading Volume. Historically, we have observed a correlation between Trading Volume and both Bitcoin price and Crypto Asset Volatility. These correlations have generally been more pronounced with retail than institutional Trading Volume, and over the course of 2020, we saw an increase in institutional trading activity. Between June 30, 2020 and December 31, 2020, we saw the correlation between Crypto Asset Volatility and Trading Volume begin to weaken, while the correlation between Bitcoin price and Trading Volume remained.

While we experience high variance in Trading Volume and transaction revenue between quarters, we evaluate our business and key metrics over longer periods of time, and have seen clear growth with median quarterly Trading Volume increasing from $17 billion to $21 billion to $38 billion in 2018, 2019, and 2020, respectively. Over the long term, we expect further diversification of market participants, to add support for more crypto assets, and for crypto asset use cases to expand. We believe these factors will contribute to diversification in the composition of our Trading Volume and reduce the correlation to both Bitcoin price and Crypto Asset Volatility, subsequently leading to lower volatility in transaction revenues. Further, we expect that diversifying our sources of revenue towards subscription and services revenue will contribute to less fluctuation in our results from operations.

For the years ended December 31, 2020 and December 31, 2019, we generated total revenue of $1.3 billion and $533.7 million, respectively, net income (loss) of $322.3 million and $(30.4) million, respectively, and Adjusted EBITDA of $527.4 million and $24.3 million, respectively. See the section titled "Selected Consolidated Financial and Other Data—Key Business Metrics and Non-GAAP Financial Measure—Non-GAAP Financial Measure" for information regarding our use of Adjusted EBITDA and a reconciliation of net income (loss) to Adjusted EBITDA.

## Our Business Model

We believe that we are in the early stages in the development of the cryptoeconomy. While we have grown rapidly, our growth has not been linear. Instead, it has come in waves aligned with crypto asset price cycles which tend to be volatile and draw new customers, investment, and developers into the ecosystem, and typically lead to higher Trading Volume and Monthly Transacting Users, or MTUs, on our platform. For example, in 2020, as the price of Bitcoin increased from approximately $7,000 to $29,000, we experienced a correspondingly high increase in Trading Volume, which grew from nearly $80 billion in 2019 to $193 billion in 2020.

We have observed four major crypto asset price cycles since 2010. Each cycle has had a variable duration ranging from approximately two to four years, and has increased the overall crypto market capitalization significantly from the prior cycle. In the three price cycles prior to the current one, which we believe we entered in late 2020, crypto prices have subsequently declined from each peak and settled at a trough higher than the prior peak. These cycles are visible when viewing the price of Bitcoin, the first and largest crypto asset, over time on a logarithmic scale.

Bitcoin Price (Log Scale)



In the past, crypto markets have not appeared correlated with the broader U.S. equity markets. This trend held true until February 2020, when the U.S. stock market and crypto markets experienced a significant downturn due to the COVID-19 pandemic. Through December 31, 2020, these markets subsequently appeared more correlated as each market recovered.

91

Crypto Market Capitalization vs. S&P 500



At this stage in the development of the cryptoeconomy, we choose to prioritize growth because we believe that global scale is central to achieving our mission and the potential of our business model. We intend to continue to invest to drive growth in our business and the ecosystem. While our financial performance has and will fluctuate significantly between periods, our expenses are largely independent of our net revenue. Historically, we have benefited from profits during periods of higher Bitcoin prices or Crypto Asset Volatility and experienced a loss during periods of lower Bitcoin prices or Crypto Asset Volatility. While we have benefited overall from past profitability, going forward, we may see periods of profit or loss. For the foreseeable future, our intent is to reinvest profits to drive growth in both our business and the ecosystem.

Since inception through December 31, 2020, we generated over $3.4 billion in total revenue, largely from transaction fees that we earn from volume-based trades on our platform by retail users and institutions. For the year ended December 31, 2020, transaction revenue represented over 96% of our net revenue. Due to the volatile nature of crypto asset prices and trading activity, our operating results fluctuate significantly between periods. To better understand our performance, we evaluate our business, including our key metrics, over longer periods of time and across crypto asset price cycles. Due to the nature of our business and the early stage of the industry, we believe evaluating our business over longer time horizons is more informative than evaluating quarter-over-quarter fluctuations in operating results and metrics.

Since late 2018, we have focused on launching a suite of subscription products and services, such as Store, Stake, and Borrow & Lend, with the goal of providing a full service, diversified platform for the broader cryptoeconomy. These products and services reduce dependence on transaction revenue, which is highly volatile. For most of these products and services, such as Store, Save, Stake, and Borrow & Lend, we generate revenue based on a percentage of the assets on our platform participating in the product or service. As a result, we believe growing Assets on Platform will drive growth in subscription

92

and services revenue. In the future, we also expect to grow revenue from our ecosystem partner products – Distribute, Build, and Pay – based on a fixed fee and/or usage of the product or service. We believe we have demonstrated the ability to repeatedly innovate, and since inception have launched the following products and services:



Today, we directly integrate with over 15 blockchain protocols, support over 90 crypto assets for trading or custody, and offer a suite of subscription products and services that have enhanced the customer value proposition and power of our platform.

Supported Assets



Retail users are now engaging with multiple products — across the four quarters ended December 31, 2020, on average, 21% of retail users who invested also engaged with at least one non-investing

product[4] per quarter. When retail users invested and engaged with at least one non-investing product, we saw average net revenue per retail user increase by approximately 90%. Although subscription products and services do not currently contribute a significant portion of net revenue relative to our trading business, we experienced 126% annual growth in revenue from these products and services from 2019 to 2020. We are committed to growing more stable revenue from subscription products and services, and expect that they will contribute a larger portion of our total revenue over time as our customers connect with the broader cryptoeconomy.

**Key Business Metrics and Non-GAAP Financial Measure and Trends**

### Key business metrics

In addition to our financial results, we use the following business metrics to evaluate our business, measure our performance, identify trends affecting our business, and make strategic decisions. For a definition of these key business metrics, see the section titled "Selected Consolidated Financial and Other Data—Key Business Metrics and Non-GAAP Financial Measure—Key Business Metrics."

### Verified Users

Verified Users represent users who have demonstrated an interest in our platform. Our Verified Users increased sequentially for all quarters in the years ended December 31, 2018, 2019, and 2020, primarily due to growth in our products and services and the overall increase in interest in the cryptoeconomy. Our retail Wallet application, which launched in mid-2018, had grown to over 2 million users through the year ended December 31, 2020.

<div align="center">Verified Users</div>

### Monthly Transacting Users

MTUs represent our active and passive transacting base of retail users and reflect revenue opportunities on our platform. MTUs drive retail Trading Volume, and include retail users who engage with

---

[4] Non-investing products include our Distribute, Stake, Save, Spend, and Borrow & Lend products.

transaction-based products such as Invest, Spend, Send and Receive, Stake, and Distribute. MTUs have historically been correlated with both the price of Bitcoin and Crypto Asset Volatility.

In the fourth quarter of 2018, we began launching subscription products and services, which have driven broader engagement across our platform. MTUs have begun to appear less correlated to Crypto Asset Volatility, but have remained correlated with the price of Bitcoin. Over time, as we add additional products and services, and expand the assets supported on our platform, we expect these correlations to decrease.

Monthly Transacting Users and Crypto Asset Volatility

*Assets on Platform*

Assets on Platform is a measure of the scale of total value held on our platform. We believe Assets on Platform reflects the trusted nature of our platform and a monetization opportunity. Assets on Platform generate fees that are recorded as subscription and services revenue when customers engage with these products. The value of Assets on Platform is driven by three factors – the price, quantity, and type of crypto assets held by customers on our platform.

Changes in the price and quantity, particularly for Bitcoin and Ethereum, or type of crypto asset held on our platform can result in the growth or decline in Assets on Platform in a particular period. For example, we could see an increase in the quantity of assets held on our platform – measured in units of crypto assets or fiat currencies – but the value of Assets on Platform could decline if the corresponding price of a crypto asset declines. Conversely, Assets on Platform can increase in a particular period despite a decline in the quantity of assets held on our platform if the decline is offset by rising crypto asset prices.

Because Assets on Platform is driven by multiple factors, some of which are market-dependent, this metric has fluctuated in the short term. For example, Assets on Platform decreased in 2018 as crypto asset prices, in particular those of Bitcoin and Ethereum, fell from their highs in 2017. Between December 31, 2017 and December 31, 2018, Bitcoin and Ethereum prices fell approximately 74% and 82%, respectively, and total crypto asset market capitalization decreased by 80%. During the same period, our

Assets on Platform decreased by 73%. Despite short term fluctuations, Assets on Platform has grown over the longer term from $7 billion to $17 billion to $90 billion as of December 31, 2018, 2019, and 2020, respectively, driven by growth in the price, quantity, and types of crypto assets we support.



Assets on Platform and Crypto Market Capitalization

In 2019, the quantity of assets we stored increased significantly driven by both organic growth and our acquisition of Xapo's institutional custody business. To normalize for fluctuations in price, we evaluate our share of the total market capitalization of crypto assets. We measure this by comparing the total value of crypto assets on our platform, a subset of Assets on Platform, to the total market capitalization of crypto assets.

As of December 31, 2020, the total value of crypto assets on our platform represented 11.1% of the total market capitalization of crypto assets, increasing from 8.3% and 4.5% as of December 31, 2019 and December 31, 2018, respectively. In 2020, our Assets on Platform initially decreased before subsequently increasing driven by growth in the quantity, price, and breadth of crypto assets we support. We expect that the quantity of crypto assets held on our platform will steadily increase as we expand our suite of products and services and the number and types of supported crypto assets.

Share of Crypto Market Capitalization



Historically, we have derived a material portion of our Assets on Platform from the storage of Bitcoin and Ethereum. For the year ended December 31, 2019, Bitcoin, Ethereum, and other crypto assets represented 70%, 9%, and 15% of Assets on Platform, respectively, and for the year ended December 31, 2020, Bitcoin, Ethereum, and other crypto assets represented 70%, 13%, and 13% of Assets on Platform, respectively. For each period, the remaining balance consisted of fiat currencies held on behalf of our customers.

Assets on Platform Concentration



97

*Trading Volume*

Trading Volume is directly correlated with transaction revenue and is influenced by both Bitcoin price and Crypto Asset Volatility. We have experienced periods of low and high Trading Volume, and therefore transaction revenue, driven by periods of rising or declining Bitcoin prices and/or lower or higher Crypto Asset Volatility. During periods of rising Bitcoin prices and higher Crypto Asset Volatility, we have generally observed higher Trading Volume on our platform and across the broader cryptoeconomy.

There are a number of factors that contribute to changes in Bitcoin price and Crypto Asset Volatility, including, but not limited to, changes in the supply and demand for a particular crypto asset, crypto market sentiment, macroeconomic factors, utility of a particular crypto asset, and idiosyncratic events such as exchange outages or social media. For example, over the course of 2020 we observed institutions invest in Bitcoin as a hedge against inflation at an accelerated rate. Further, we saw growth in the use of crypto assets to participate in decentralized finance, or DeFi, applications such as peer-to-peer borrowing and lending, with the total value allocated towards decentralized finance globally growing from under $1 billion to over $15 billion from December 31, 2019 to December 31, 2020.

Occasionally, planned network events such as an airdrop, where the network provides holders of a particular crypto asset with a reward, or a "halving", when the reward for validating transactions for a crypto network is reduced by half, can lead to shifts in customer interest for a specific crypto asset. Event-driven changes in customer interest tend to be temporary, and as a result, our financial performance following such events may not be indicative of future operating performance or financial condition.

Retail Trading Volume is more influenced by Bitcoin price and Crypto Asset Volatility than institutional Trading Volume, and we have experienced lower period over period fluctuations in volume from institutions. As institutional trading increases, we expand the number and types of crypto assets we support, and the utility of crypto assets expands, and we expect the correlation between Bitcoin price, Crypto Asset Volatility and Trading Volume to decrease.



Trading Volume and Crypto Asset Volatility

Historically, a significant portion of Trading Volume and transaction fee revenue has been driven by the purchase, sale, and trading of Bitcoin and Ethereum, and in 2019, Litecoin. For example, for the year ended December 31, 2019, Bitcoin, Ethereum, Litecoin, and other crypto assets represented approximately 58%, 14%, 10%, and 18% of Trading Volume and 60%, 11%, 8%, and 21% of our transaction revenue, respectively, and for the year ended December 31, 2020, Bitcoin, Ethereum, and other crypto assets represented approximately 41%, 15%, and 44% of Trading Volume and 44%, 12%, and 44% of our transaction revenue, respectively.



Trading Volume Concentration

Concentration in Trading Volume can vary widely between periods. In 2020, other crypto assets contributed a greater share of Trading Volume. This growth was driven by the addition of over 20 crypto assets, including multiple DeFi crypto assets, which diversified Trading Volume away from Bitcoin and Ethereum. During the year ended December 31, 2019, no asset other than Bitcoin, Ethereum, and Litecoin individually represented more than 10% of our Trading Volume or transaction revenue, respectively. During the year ended December 31, 2020, no asset other than Bitcoin and Ethereum individually represented more than 10% of our Trading Volume or transaction revenue, respectively.

Going forward, we expect greater diversification of Trading Volume and transaction revenue by crypto asset as we continue to expand the breadth of assets available through our platform and as other crypto assets gain broader adoption. However, should the availability of one or more crypto assets on our platform change, it may have an adverse effect on our operating performance.

### *Non-GAAP financial measure*

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
|  | *(in thousands)* | |
| Adjusted EBITDA | $ 527,350 | $ 24,265 |

We define Adjusted EBITDA as net income (loss), adjusted to exclude interest expense, provision for (benefit from) income taxes, depreciation and amortization, stock-based compensation expense, impairment of goodwill, acquired intangibles and crypto assets, restructuring expenses, non-recurring

acquisition-related compensation expenses, unrealized gain or loss on foreign exchange, fair value adjustments on derivatives, and non-recurring legal reserves and related costs.

Adjusted EBITDA increased in the year ended December 31, 2020 compared to the year ended December 31, 2019 primarily due to increased transaction revenue.

See the section titled "Selected Consolidated Financial and Other Data—Key Business Metrics and Non-GAAP Financial Measure—Non-GAAP Financial Measure" for information regarding our use of Adjusted EBITDA and a reconciliation of net income (loss) to Adjusted EBITDA.

## Key Factors Affecting Our Performance

The growth and success of our business as well as our financial condition and operating results have been, and will continue to be affected by a number of factors, including:

### *Price and volatility of crypto assets*

Transaction revenue is our primary source of revenue today and is derived directly from Trading Volume. As a result, transaction revenue is correlated with Bitcoin price and Crypto Asset Volatility. There are a number of factors that contribute to changes in Bitcoin price and Crypto Asset Volatility, including, but not limited to, changes in the supply and demand for a particular crypto asset, crypto market sentiment, macroeconomic factors, utility of a particular crypto asset, and idiosyncratic events such as exchange outages or social media. While we have experienced periods of low and high Trading Volume driven by periods of rising or declining Bitcoin prices and/or higher or lower Crypto Asset Volatility, we evaluate our business over longer periods of time and have seen clear growth with median quarterly Trading Volume increasing in 2018, 2019, and 2020, respectively.

We also have other products, including Store, which are priced based on the value of the underlying crypto assets. As such, the price of crypto assets in any given period may have a significant impact on our revenue. Our continued growth is in part dependent upon the long term continued growth in the overall market capitalization of crypto assets.

We are also exposed to price volatility with respect to the corporate crypto assets we hold. A decline in price may require us to take an impairment charge on our crypto assets and a decline in the value of the crypto assets we hold in higher concentrations may have a larger impact on our operating results in any given period. As of December 31, 2019, Bitcoin, Ethereum, and Tezos represented 44%, 12%, and 16% of total crypto assets held, respectively; and as of December 31, 2020, Bitcoin and Ethereum represented 63% and 8% of total crypto assets held excluding crypto assets borrowed, respectively.

### *Adoption of crypto assets*

We have and remain solely focused on building technology to power the cryptoeconomy. As such, our financial performance is dependent on the continued growth in interest and adoption of crypto. Moreover, our growth strategy depends on our continued ability to add customers, expand the breadth of crypto assets on our platform, and launch innovative products. Over time, we have observed a positive trend in the total market capitalization of crypto assets which indicates increased adoption. The compounded annual growth rate, or CAGR, of crypto assets was over 150% between December 31, 2012 and December 31, 2020. However, historical trends are not indicative of future adoption, and it is possible that the adoption of crypto assets and blockchain technology may slow, take longer to develop, or never be broadly adopted, which would negatively impact our business and operating results.

### *Offering additional products and services*

Our Verified User base represents a sizable opportunity to offer our expanding suite of products and services with minimal incremental sales and marketing expense. Products or services we launch generally have the potential to be sold to each of our three customer segments: retail users, institutions, and ecosystem partners. We plan to continue to invest in the development of new subscription products

and services and increase sales and marketing efforts to drive adoption across our customer base. To the extent we are able to successfully sell new products and services to our customers, our revenue will be positively affected. For example, when retail users invested and engaged with at least one non-investing product, the average net revenue per retail user increased by approximately 90% across the four quarters ended December 31, 2020. Conversely, if we are unable to sell additional products and services to new and existing customers, our operating results may be negatively impacted.

### Investments in growth

Our investments in growth include new products and services, sales and marketing, and global expansion.

We will continue to invest in the development of products and services to enhance the value proposition of our platform for our customers. In the near term, we are focused on becoming the primary financial account for retail users to access the cryptoeconomy, touching every crypto transaction and building a one-stop shop for institutions, and solving our ecosystem partners' diverse problems, including a lack of distribution, trust and usability, and the availability of easy-to-use and scalable infrastructure. We expect to meaningfully increase headcount to drive and support our anticipated growth. Although we expect these investments to benefit our business over the long term, we expect our total operating expenses will increase on an absolute basis for the foreseeable future. In the short term, these investments may have negative effects on our operating results as a large portion of our operating expenses are not correlated with transaction revenue which fluctuates with market conditions.

We also plan to invest in sales and marketing channels such as digital advertising and referral and affiliate programs, which we believe will drive further growth. Given the volatility of our transaction revenue, investments in sales and marketing may not result in returns in the same period in which they are made but over subsequent periods, which could adversely affect near-term operating results.

We intend to continue to develop products and services for our global customer base and to expand our reach internationally through investments in local offices, marketing, strategic acquisitions, and partnerships. Our ability to expand into new markets depends on many factors including, but not limited to, compliance with local rules and regulations, demand for crypto assets, competition, and infrastructure. We believe our brand and reputation as a trusted, compliant, and easy-to-use provider of services to the cryptoeconomy will position us well to increase our global presence. Our ability to successfully navigate the aforementioned factors and continue to grow internationally will impact our future operating results.

### Ability to competitively price our products and services

Our operating results depend on our ability to competitively price our products and services. Similar to other financial products, as the industry matures we anticipate fee pressure to emerge over time. Our strategy is to maintain our position as a trusted brand in the crypto space and develop new products to enhance our customer value proposition and offset the effects of any future fee pressure. If we are unable to capture value through the development of new and existing products and services or if fee pressure emerges more rapidly than we anticipate, our operating results may be adversely affected.

### Control of transaction expense

Our transaction expense primarily consists of account verification fees, payment processing fees, and fraud loss expenses. We have made, and will continue to make, significant investments in our bank, payment processor, and vendor partnerships in order to manage our overall transaction expense. Maintaining these relationships has always been and will continue to be a top priority for us.

Our strategy to manage fraud is to continue investing in advanced technology for identity verification and fraud detection. Managing fraud is essential to operating profitably and maintaining the trust of our customers and our transaction processing vendors. We believe our current efforts and our forward strategy put us in a strong position to reduce our fraud rate as a percentage of total volume and capture

savings as we continue to scale our platform. If we are unsuccessful at managing these expenses, our operating results may be adversely affected.

### *Strategic acquisitions, investments, and partnerships*

We intend to continue growing our platform through strategic acquisitions, investments, and partnerships. We plan to acquire and invest in companies with complementary products and technologies. Our strategic acquisitions may affect our future financial results. We will also continue to enter into strategic partnerships with various companies to scale our business, including, but not limited to, partnerships to increase traffic to our platform, banking and payment processor partnerships, such as our partnership with PayPal, that enable us to bridge traditional finance with crypto assets, and partnerships to expand our product and service offerings such as our partnerships with Visa for the Coinbase Card or with the Centre Consortium and Circle Internet Financial for USDC. We believe these partnerships benefit our users by expanding the opportunities for users to engage with the cryptoeconomy. Over the long term, we expect these partnerships will drive an increase in our MTUs, which we believe, in turn, will drive an increase in both transaction and subscription and services revenue.

### *Regulation in U.S. and international markets*

Our financial prospects and continued growth depend in part on our ability to continue to operate in a compliant manner. Our business is subject to the oversight of numerous regulatory agencies in the United States and other jurisdictions, including, but not limited to, FinCEN, the SEC, the CFTC, and NYDFS. Our strategy is to continue to invest significantly in our finance, legal, compliance, and security functions in order to remain at the forefront of crypto policy initiatives and regulatory trends. As the industry matures, we may experience fluctuations in our operating results as a result of changes in the law and regulations that are applicable to our business, which may limit our ability to support new blockchains and crypto assets, onboard customers, and offer our products and services across jurisdictions.

### Impact of COVID-19 to our Business

The 2020 outbreak of the novel coronavirus and the COVID-19 disease that it causes has evolved into a global pandemic. In response to the pandemic and for the protection of our employees, in March 2020, we implemented remote work arrangements for nearly all of our employees and restricted business travel. Our products and services are all accessible through our technology platform and do not require physical customer interaction, thus, our ability to meet our customers' needs has not been materially affected. While the broader economic implications remain uncertain, the COVID-19 pandemic has, to date, not had any measurable material impact on our operating results.

### Components of Results of Operations

### *Net revenue*

#### *Transaction revenue*

We generate substantially all of our net revenue from transaction fees from trades that occur on our platform. The transaction fee earned is based on the price and quantity of the crypto asset that is bought, sold, or withdrawn. Transaction revenue is recognized at the time the transaction is processed and is directly correlated with Trading Volume on our platform, which has historically been influenced by the price of Bitcoin and Crypto Asset Volatility. We have experienced periods of low and high Trading Volume, and therefore transaction revenue, driven by periods of rising or declining Bitcoin prices and/or lower or higher Crypto Asset Volatility. During periods of rising Bitcoin prices and higher Crypto Asset Volatility, we have generally observed higher Trading Volume on our platform and across the broader cryptoeconomy.

Over the long term, we expect further diversification of market participants, to add support for more crypto assets, and for crypto asset use cases to expand. We believe these factors will contribute to

diversification in the composition of our Trading Volume and reduce the correlation to Bitcoin price and Crypto Asset Volatility, subsequently leading to lower volatility in transaction revenue.

*Subscription and services revenue*

Subscription and services revenue primarily consists of:



We also earn interest income on customer custodial fiat funds held at certain third-party banks, which is calculated using the interest method. Our interest income is dependent on the balance of custodial fiat funds and the prevailing interest rate environment.

### Other revenue

Other revenue includes the sale of crypto assets when we are the principal in the transaction. Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We fulfill customer accommodation transactions using our own assets for orders that do not meet the minimum trade size for execution on our platform or to maintain customers' trade execution and processing times during unanticipated system disruptions. We have custody and control of these crypto assets prior to the sale to the customer and record revenue at the point in time when the sale is processed. Accordingly, we record the total value of the sale as revenue and the cost of the crypto asset in other operating expense. Transactions involving our sale of crypto assets represented less than 11% of our total revenue for the fiscal year ended December 31, 2020.

Other revenue also includes interest income earned primarily on our cash and cash equivalents. Interest income is calculated using the interest method and depends on the balance of cash and cash equivalents as well as the prevailing interest rate environment.

### Operating expenses

Operating expenses consist of transaction, technology and development, sales and marketing, general and administrative, restructuring expenses, and other operating expense.

*Transaction expense*

Transaction expense includes costs incurred to operate our platform, process crypto asset trades, and perform wallet services. These costs include account verification fees, fees to process transactions on blockchain network, fees paid to payment processors and other financial institutions for customer

transaction activity, and crypto asset losses due to transaction reversals. Fixed-fee costs are expensed over the term of the contract and transaction-level costs are expensed as incurred.

We plan to continue to drive customer account activity and expand the reach of our platform. Transaction expense will fluctuate in absolute dollars in future periods and vary from period-to-period as a percentage of transaction revenue.

*Technology and development*

Technology and development expenses include costs incurred in operating, maintaining, and enhancing our platform, including network, website hosting, and infrastructure costs. Technology and development expenses also include costs incurred in developing new products and services, personnel-related expenses, and the amortization of acquired developed technology. Personnel-related expenses include salaries, bonuses, benefits, and stock-based compensation.

We plan to continue to invest in developing new products and services and increasing the functionality of our platform. As a result, we expect that our technology and development expenses will increase in absolute dollars in future periods and vary from period-to-period as a percentage of net revenue.

*Sales and marketing*

Sales and marketing expenses primarily include costs related to customer acquisition, advertising and marketing programs, and personnel-related expenses. Sales and marketing costs are expensed as incurred.

We plan to continue to invest in sales and marketing efforts to drive additional customers to our platform and capitalize on cross-sell opportunities from our Verified User base, and to increase our brand awareness. As a result, we expect sales and marketing costs to increase in absolute dollars in future periods and vary from period-to-period as a percentage of net revenue.

*General and administrative*

General and administrative expenses include costs incurred to support our business, including legal, finance, compliance, human resources, executive, and other support operations. General and administrative expenses also include personnel related expenses, software subscriptions for support services, facilities and equipment costs, depreciation, amortization of acquired customer relationship intangible assets, sales and property taxes, gains and losses on disposal of fixed assets, legal reserves and settlements, and other general overhead. General and administrative costs are expensed as incurred.

We expect general and administrative expenses to grow as we continue to invest to support the overall growth of our business. In addition, following the completion of this offering, we expect to incur additional general and administrative expenses as a result of operating as a public company, including expenses related to compliance and reporting obligations of a public company, and increased insurance, investor relations expenses, and legal, audit, and consulting fees. As a result, we expect that our general and administrative expenses will increase in absolute dollars in future periods and vary from period-to-period as a percentage of net revenue. We expect general and administrative expenses to generally grow in relation to technology and development costs.

*Restructuring*

Restructuring expenses primarily consist of non-recurring costs related to the closing of a Chicago office and related severance for employees in the year ended December 31, 2019. For more information, see note 3 to our consolidated financial statements included elsewhere in this prospectus.

*Other operating expense*

Other operating expense includes cost of our crypto assets used to fulfill customer accommodation transactions. Periodically, as an accommodation to customers, we may fulfill customer transactions using our own crypto assets. We have custody and control of the crypto assets prior to the sale to the customer. Accordingly, we record the total value of the sale in other revenue and the cost of the crypto asset in other operating expense.

Other operating expense also includes impairment and realized gains on the sale of crypto assets, realized gains and losses resulting from the settlement of derivative instruments, and fair value gains and losses related to derivatives and derivatives designated in qualifying fair value hedge accounting relationships.

***Other (income) expense, net***

Other (income) expense, net includes the following items:

- gain and losses on investments, net, which consists primarily of unrealized gains and losses from investment fair value adjustments; and

- realized impacts on foreign exchange resulting from the settlement of our foreign currency assets and liabilities as well unrealized impacts on foreign exchange resulting from remeasurement of transactions and monetary assets and liabilities denominated in non-functional currencies.

***Provision for (benefit from) income taxes***

Provision for (benefit from) income taxes includes income taxes related to foreign jurisdictions and U.S. Federal and state income taxes.

As we expand our international business activities, any changes in the U.S. and foreign taxation of such activities may increase our overall provision for income taxes in the future.

**Results of Operations**

The following table summarizes our historical consolidated statements of operations data:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | *(in thousands)* | |
| Revenue: | | |
| Net revenue | $ 1,141,167 | $ 482,949 |
| Other revenue | 136,314 | 50,786 |
| Total revenue | 1,277,481 | 533,735 |
| Operating expenses: | | |
| Transaction expense | 135,514 | 82,055 |
| Technology and development | 271,732 | 185,044 |
| Sales and marketing | 56,782 | 24,150 |
| General and administrative | 279,880 | 231,929 |
| Restructuring | — | 10,140 |
| Other operating expense | 124,622 | 46,200 |
| Total operating expenses | 868,530 | 579,518 |
| Operating income (loss) | 408,951 | (45,783) |
| Other income, net | (248) | (367) |
| Income (loss) before provision for (benefit from) income taxes | 409,199 | (45,416) |
| Provision for (benefit from) income taxes | 86,882 | (15,029) |
| Net income (loss) | $ 322,317 | $ (30,387) |

The following table presents the components of our consolidated statements of operations data as a percentage of total revenue:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| | *(as a percentage of total revenue)* | |
| Total revenue | 100 % | 100 % |
| Operating expenses: | | |
| Transaction expense | 11 | 15 |
| Technology and development | 21 | 35 |
| Sales and marketing | 4 | 5 |
| General and administrative | 22 | 43 |
| Restructuring | — | 2 |
| Other operating expense | 10 | 9 |
| Total operating expenses | 68 | 109 |
| Operating income (loss) | 32 | (9) |
| Other income, net | — | — |
| Income (loss) before provision for (benefit from) income taxes | 32 | (9) |
| Provision for (benefit from) income taxes | 7 | (3) |
| Net income (loss) | 25 % | (6)% |

*Comparison of the years ended December 31, 2020 and 2019*

*Revenue*

| | Year Ended December 31, | | % Change |
|---|---|---|---|
| | 2020 | 2019 | |
| | (in thousands) | | |
| Transaction revenue | $ 1,096,174 | $ 463,005 | 137 % |
| Subscription and services revenue | 44,993 | 19,944 | 126 |
| Other revenue | 136,314 | 50,786 | 168 |
| Total revenue | $ 1,277,481 | $ 533,735 | 139 |

Transaction revenue increased $633.2 million, or 137%, for the year ended December 31, 2020 compared to the year ended December 31, 2019 primarily due to a 142% year over year increase in Trading Volume.

Subscription and services revenue increased $25.0 million, or 126%, for the year ended December 31, 2020 as compared to the year ended December 31, 2019. The increase was primarily due to a $15.6 million increase in custodial fee revenue driven by an increase in the number of customers and the value of crypto assets held under custody within our Store product, a $10.2 million increase in staking revenues driven by an increase in value of customer crypto assets in staking protocols, and a $7.6 million increase as we started to monetize our crypto asset earn campaigns. The increase was partially offset by a decrease of $8.0 million in interest income related to customer custodial funds driven by lower interest rates.

Other revenue increased $85.5 million, or 168%, for the year ended December 31, 2020 compared to the year ended December 31, 2019 as a result of a $93.8 million increase in crypto asset sales where the transactions were fulfilled with our crypto assets as a result of unanticipated system disruptions. The increase was partially offset by an $8.3 million decrease in corporate interest income driven by lower interest rates.

*Operating expenses*

| | Year Ended December 31, | | % Change |
|---|---|---|---|
| | 2020 | 2019 | |
| | (in thousands) | | |
| Transaction expense | $ 135,514 | $ 82,055 | 65 % |
| Technology and development | 271,732 | 185,044 | 47 |
| Sales and marketing | 56,782 | 24,150 | 135 |
| General and administrative | 279,880 | 231,929 | 21 |
| Restructuring | — | 10,140 | (100) |
| Other operating expense | 124,622 | 46,200 | 170 |
| Total operating expenses | $ 868,530 | $ 579,518 | 50 |

Transaction expense increased $53.5 million, or 65%, for the year ended December 31, 2020 compared to the year ended December 31, 2019. The increase was primarily due to a $18.6 million increase in transaction reversal losses driven by an increase in Trading Volume, a $15.0 million increase in miner fees driven by increased blockchain network fees, a $7.5 million increase in staking expenses driven by an increase in value of customer crypto assets in staking protocols, and a $7.1 million increase in account verification fees due to an increase in new accounts.

107

Technology and development expenses increased $86.7 million, or 47%, for the year ended December 31, 2020 compared to the year ended December 31, 2019. The increase was primarily driven by a $53.5 million increase in personnel-related costs due to a 59% increase in overall headcount, a $13.6 million increase in software licenses, and a $13.1 million increase in website hosting costs to support the growth of our platform.

Sales and marketing expenses increased $32.6 million, or 135%, for the year ended December 31, 2020 compared to the year ended December 31, 2019. The increase was primarily due to a $23.3 million increase in digital advertising spend, a $5.0 million increase in personnel-related costs, and a $3.9 million increase in customer referral and promotion fees.

General and administrative expense increased $48.0 million, or 21%, for the year ended December 31, 2020 compared to the year ended December 31, 2019. The increase was driven by a $22.4 million increase in personnel-related costs due to an increase in headcount, an $12.0 million increase in professional services costs, a $10.3 million increase in charitable contributions, and a $6.7 million increase in intangible amortization expense which primarily related to 2020 being the first full year of amortization expense for the acquisition of Xapo's institutional custody business in 2019. The increase was partially offset by a $12.6 million decrease in costs related to facilities, meals, and entertainment which was primarily due to a reduction in an estimated meals and entertainment tax loss reserve and a shift to a remote working environment.

In April 2019, management approved a plan to cease development of a new trading engine, resulting in the closure of a Chicago office and incurring restructuring expenses of $10.1 million for the year ended December 31, 2019. There were no restructuring expenses incurred in the year ended December 31, 2020.

Other operating expense increased $78.4 million, or 170%, for the year ended December 31, 2020 compared to the year ended December 31, 2019. The increase was primarily driven by a $93.3 million increase in costs associated with crypto assets sold in order to fulfill customer accommodation transactions, a $8.4 million increase in crypto asset impairments, and a $5.3 million fair value loss related to derivatives and derivatives designated in qualifying fair value hedge accounting relationships. The increase was partially offset by $34.6 million increase in realized gains on crypto asset sales.

*Other income, net*

|  | | Year Ended December 31, | |
|  | | 2020 | 2019 |
|  | | *(in thousands)* | |
| Other income, net | $ | (248) | (367) |

Other income was relatively unchanged for the year ended December 31, 2020 when compared to the year ended December 31, 2019.

*Provision for (benefit from) income taxes*

|  | | Year Ended December 31, | |
|  | | 2020 | 2019 |
|  | | *(in thousands)* | |
| Provision for (benefit from) income taxes | $ | 86,882 | (15,029) |

The provision for income tax increased by $101.9 million for the year ended December 31, 2020 compared to the year ended December 31, 2019 due to an increase in our pre-tax net income.

**Quarterly Results of Operations**

The following table sets forth our unaudited quarterly consolidated results of operations for each of the quarterly periods for the years ended December 31, 2020 and December 31, 2019. These unaudited quarterly results of operations have been prepared on the same basis as our audited consolidated financial statements included elsewhere in this prospectus. In the opinion of management, the financial information set forth in the table below reflects all normal recurring adjustments necessary for the fair statement of results of operations for these periods. Our historical results are not necessarily indicative of the results that may be expected in any other period in the future, and the results of a particular quarter or other interim period are not necessarily indicative of the results to be expected for the full year or any other period. You should read the following unaudited quarterly consolidated results of operations together with our consolidated financial statements and related notes, and the sections titled "Selected Consolidated Financial and Other Data" and "Management's Discussion and Analysis of Financial Condition and Results of Operations," each included elsewhere in this prospectus.

*Quarterly Consolidated Statements of Operations*

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2020 | Sep. 30, 2020 | Jun. 30, 2020 | Mar. 31, 2020 | Dec. 31, 2019 | Sep. 30 2019 | Jun. 30, 2019 | Mar. 31, 2019 |
| | (in thousands) | | | | | | | |
| Net revenue: | $ 497,091 | $ 286,663 | $ 178,331 | $ 179,082 | $ 94,309 | $ 143,417 | $ 183,907 | $ 61,316 |
| Other revenue | 88,021 | 28,694 | 8,051 | 11,548 | 3,962 | 15,100 | 26,928 | 4,796 |
| Total revenue | 585,112 | 315,357 | 186,382 | 190,630 | 98,271 | 158,517 | 210,835 | 66,112 |
| Operating expenses: | | | | | | | | |
| Transaction expense | 49,946 | 36,766 | 23,395 | 25,407 | 14,227 | 23,051 | 29,159 | 15,618 |
| Technology and development | 90,498 | 73,319 | 60,777 | 47,138 | 43,474 | 44,751 | 43,887 | 52,932 |
| Sales and marketing | 23,501 | 11,977 | 11,383 | 9,921 | 9,659 | 5,716 | 4,213 | 4,562 |
| General and administrative | 97,501 | 71,433 | 51,988 | 58,958 | 70,227 | 53,408 | 46,648 | 61,646 |
| Restructuring | — | — | — | — | — | — | 10,140 | — |
| Other operating expense | 97,081 | 20,357 | (3,247) | 10,431 | 4,379 | 16,705 | 20,761 | 4,355 |
| Total operating expenses | 358,527 | 213,852 | 144,296 | 151,855 | 141,966 | 143,631 | 154,808 | 139,113 |
| Operating income (loss) | 226,585 | 101,505 | 42,086 | 38,775 | (43,695) | 14,886 | 56,027 | (73,001) |
| Other expense (income), net | (6,183) | (1,211) | 3,280 | 3,866 | (2,036) | 2,929 | (764) | (496) |
| Income (loss) before provision for (benefit from) income taxes | 232,768 | 102,716 | 38,806 | 34,909 | (41,659) | 11,957 | 56,791 | (72,505) |
| Provision for (benefit from) income taxes | 55,983 | 21,417 | 6,546 | 2,936 | (13,786) | 3,956 | 18,793 | (23,992) |
| Net income (loss) | $ 176,785 | $ 81,299 | $ 32,260 | $ 31,973 | $ (27,873) | $ 8,001 | $ 37,998 | $ (48,513) |

| | Three Months Ended | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| | Dec. 31, 2020 | Sep. 30, 2020 | Jun. 30, 2020 | Mar. 31, 2020 | Dec. 31, 2019 | Sep. 30 2019 | Jun. 30, 2019 | Mar. 31, 2019 |
| | (as a percentage of revenue) | | | | | | | |
| Total revenue | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % | 100 % |
| Operating expenses: | | | | | | | | |
| Transaction expense | 9 | 12 | 13 | 13 | 14 | 15 | 14 | 24 |
| Technology and development | 15 | 23 | 33 | 25 | 44 | 28 | 21 | 80 |
| Sales and marketing | 4 | 4 | 6 | 5 | 10 | 4 | 2 | 7 |
| General and administrative | 17 | 23 | 28 | 31 | 71 | 34 | 22 | 93 |
| Restructuring | — | — | — | — | — | — | 5 | — |
| Other operating expense | 16 | 6 | (3) | 6 | 5 | 10 | 9 | 6 |
| Total operating expenses | 61 | 68 | 77 | 80 | 144 | 91 | 73 | 210 |
| Operating income (loss) | 39 | 32 | 23 | 20 | (44) | 9 | 27 | (110) |
| Other expense (income), net | (1) | (1) | 2 | 2 | (2) | 1 | — | — |
| Income (loss) before provision for (benefit from) income taxes | 40 | 33 | 21 | 18 | (42) | 8 | 27 | (110) |
| Provision for (benefit from) income taxes | 10 | 7 | 4 | 1 | (14) | 3 | 9 | (37) |
| Net income (loss) | 30 % | 26 % | 17 % | 17 % | (28)% | 5 % | 18 % | (73)% |

*Quarterly Trends*

*Revenue*

| | Three Months Ended | | | | | | | |
| | Dec. 31, 2020 | Sep. 30, 2020 | Jun. 30, 2020 | Mar. 31, 2020 | Dec. 31, 2019 | Sep. 30 2019 | Jun. 30, 2019 | Mar. 31, 2019 |
|---|---|---|---|---|---|---|---|---|
| | *(in thousands)* | | | | | | | |
| Transaction revenue | $ 476,415 | $ 275,904 | $ 171,864 | $ 171,991 | $ 89,029 | $ 138,632 | $ 178,675 | $ 56,669 |
| Subscription and services revenue | 20,676 | 10,759 | 6,467 | 7,091 | 5,280 | 4,785 | 5,232 | 4,647 |
| Other revenue | 88,021 | 28,694 | 8,051 | 11,548 | 3,962 | 15,100 | 26,928 | 4,796 |
| Total revenue | $ 585,112 | $ 315,357 | $ 186,382 | $ 190,630 | $ 98,271 | $ 158,517 | $ 210,835 | $ 66,112 |

Transaction revenue is highly correlated with overall Trading Volume generated by customers on our platform and tends to align with crypto asset price cycles. See further discussion in the section above, titled "—Our Business Model."

Subscription and services revenue demonstrates less correlation with Trading Volume and is more closely tied to Assets on Platform, crypto asset prices, and growth in our Invest, Spend, Send & Receive, Store, Save, Stake, Borrow & Lend, Build, Pay, and other products.

Other revenue is primarily driven by the amount of sales where we fulfill transactions with our crypto assets, often due to platform downtime. During the three months ended September 30, 2020 and December 31, 2020, we experienced unanticipated system disruptions, which drove increases in other revenue.

*Transaction expense*

Similar to transaction revenue, transaction expense is closely tied to Trading Volume. Quarterly fluctuations in transaction expense tend to follow changes in Trading Volume and transaction revenue.

*Technology and development*

Technology and development expenses have increased upwards on an annual basis, but have fluctuated during the periods presented. For quarters presented in 2019, technology and development expenses remained relatively constant. Technology and development expenses increased for all quarters presented in 2020 due to increased headcount and increased costs due to the growth of our platform.

*Sales and marketing*

Sales and marketing expenses have trended upwards for the quarters presented. Sales and marketing expenses are primarily driven by the timing and magnitude of online advertising campaigns to increase traffic to our platform.

*General and administrative*

General and administrative expense generally trended upwards for the periods presented due to increased personnel-related costs, professional services, and other support as we continue to grow our business, in particular during the three months ended September 30, 2020 and December 31, 2020.

*Restructuring*

In April 2019, management approved a plan to cease development of a new trading engine, resulting in the closure of a Chicago office and restructuring expenses of $10.1 million for the year ended December 31, 2019. There were no restructuring expenses incurred in the year ended December 31, 2020.

*Other operating expenses*

Other operating expenses have trended with other revenue for the quarters presented, as we experienced unanticipated system disruptions, which drove increases in other revenue, and therefore increases in other expenses, in particular during the three months ended September 30, 2020 and December 31, 2020.

### Quarterly Reconciliation of Non-GAAP Financial Measure

In addition to our results determined in accordance with GAAP, we believe Adjusted EBITDA, a non-GAAP measure, is useful in evaluating our operating performance. We use Adjusted EBITDA to evaluate our ongoing operations and for internal planning and forecasting purposes. We believe that Adjusted EBITDA may be helpful to investors because it provides consistency and comparability with past financial performance. However, Adjusted EBITDA is presented for supplemental informational purposes only, has limitations as an analytical tool, and should not be considered in isolation or as a substitute for financial information presented in accordance with GAAP.

Among other non-cash and non-recurring items, Adjusted EBITDA excludes stock-based compensation expense, a non-cash expense, which has recently been, and will continue to be for the foreseeable future, a significant recurring expense for our business and an important part of our compensation strategy. In addition, other companies, including companies in our industry, may calculate similarly titled non-GAAP measures differently or may use other measures to evaluate their performance, all of which could reduce the usefulness of our non-GAAP financial measures as tools for comparison. A reconciliation is provided below for each non-GAAP financial measure to the most directly comparable financial measure stated in accordance with GAAP. Investors are encouraged to review the related GAAP financial measures and the reconciliation of these non-GAAP financial measures to their most directly comparable GAAP financial measures, and not to rely on any single financial measure to evaluate our business.

The following table provides a quarterly reconciliation of net income (loss) to Adjusted EBITDA:

| | Three Months Ended | | | | | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Dec. 31, 2020 | Sep. 30, 2020 | Jun. 30, 2020 | Mar. 31, 2020 | Dec. 31, 2019 | Sep. 30 2019 | Jun. 30, 2019 | Mar. 31, 2019 |
| | *(in thousands)* | | | | | | | |
| Net income (loss) | $ 176,785 | $ 81,299 | $ 32,260 | $ 31,973 | $ (27,873) | $ 8,001 | $ 37,998 | $ (48,513) |
| Adjusted to exclude the following: | | | | | | | | |
| Provision for (benefit from) income taxes | 55,983 | 21,417 | 6,546 | 2,936 | (13,786) | 3,956 | 18,793 | (23,992) |
| Depreciation and amortization | 8,577 | 8,007 | 7,484 | 6,894 | 8,970 | 2,958 | 2,535 | 2,415 |
| Interest expense | 2,354 | 280 | — | — | — | — | — | — |
| Stock-based compensation | 32,880 | 15,590 | 12,647 | 8,772 | 11,509 | 5,724 | 8,536 | 5,378 |
| Impairment | 3 | 8,084 | — | 268 | 2,221 | — | — | 31 |
| Restructuring | — | — | — | — | — | — | 10,140 | — |
| Non-recurring acquisition-related compensation expenses[1] | — | — | — | — | — | — | — | 7,370 |
| Unrealized (gain) loss on foreign exchange | (5,150) | (462) | 2,260 | 4,409 | (3,591) | 2,276 | (740) | (1,051) |
| Fair value adjustments on derivatives | 16,249 | (10,995) | — | — | — | — | — | — |
| Legal reserves and related costs | — | — | — | — | 5,000 | — | — | — |
| Adjusted EBITDA | $ 287,681 | $ 123,220 | $ 61,197 | $ 55,252 | $ (17,550) | $ 22,915 | $ 77,262 | $ (58,362) |

(1)   For more information, see the section titled "Neutrino" in note 4 to our consolidated financial statements included elsewhere in this prospectus.

**Liquidity and Capital Resources**

Since our inception, we have financed our operations primarily with cash flow from operating activities and net proceeds from the sale of convertible preferred stock. As of December 31, 2020, we had cash and cash equivalents of $1.1 billion, exclusive of restricted cash and customer custodial funds. Cash equivalents consisted primarily of cash deposits and money market funds denominated in U.S. dollars. As of December 31, 2020, we had restricted cash and cash equivalents of $30.8 million which consisted primarily of amounts held in restricted bank accounts at certain third-party banks as security deposits or pledged as collateral to secure letters of credit. As of December 31, 2020, we had customer custodial funds of $3.8 billion which consisted of amounts held at certain third-party banks for the exclusive benefit of customers. Crypto asset trading on our platform occurs 24 hours a day. We restrict the use of the assets underlying the customer custodial funds to meet regulatory requirements based on their purpose and availability to fulfill its direct obligation under custodial funds due to customers.

Certain jurisdictions where we operate require us to hold eligible liquid assets, as defined by applicable regulatory requirements and commercial law in these jurisdictions, equal to at least 100% of the aggregate amount of all custodial funds due to customers. Depending on the jurisdiction, eligible liquid assets can include cash and cash equivalents, customer custodial funds, and in-transit funds receivable. As of December 31, 2020 and December 31, 2019, our eligible liquid assets were greater than the aggregate amount of custodial funds due to customers.

As of December 31, 2020, we had $48.9 million of USDC, a stablecoin which can be redeemed one USDC for one U.S. dollar on demand. While not accounted for as cash or cash equivalent, we believe our USDC holdings to be an important liquidity resource.

In addition to USDC, as of December 31, 2020, we held $62.3 million of crypto assets at cost, excluding crypto assets borrowed. The fair value as of December 31, 2020 was $187.9 million which included $130.1 million of Bitcoin, $23.8 million of Ethereum and $34.0 million of other crypto assets for investment and operational purposes. The fair value is primarily based on the closing quoted market prices on our exchange as of December 31, 2020.

Our cash flow from operating activities may materially fluctuate from period-to-period based on movement within our custodial funds due to customers liability. Since our customer custodial funds are included in cash and cash equivalents, any large fluctuations in the related liability will directly impact our cash flow from operating activities. We believe our existing cash and cash equivalents will be sufficient to meet our working capital and capital expenditure needs for at least the next 12 months.

Our future capital requirements will depend on many factors, including market acceptance of crypto assets and blockchain technology, our growth, our ability to attract and retain customers on our platform, the continuing market acceptance of products and services, the introduction of new subscription products and services on our platform, expansion of sales and marketing activities, and overall economic conditions. To the extent that current and anticipated future sources of liquidity are insufficient to fund our future business activities and requirements, we may be required to seek additional equity or debt financing. The sale of additional equity would result in additional dilution to our stockholders. The incurrence of debt financing would result in debt service obligations and the instruments governing such debt could provide for operating and financing covenants that would restrict our operations. In the event that additional financing is required from outside sources, there is a possibility we may not be able to raise it on terms acceptable to us or at all. If we are unable to raise additional capital when desired, our business, operating results, and financial condition could be adversely affected.

*Cash flows*

| | Year Ended December 31, | |
|---|---|---|
| | 2020 | 2019 |
| | *(in thousands)* | |
| Net cash provided by (used in) operating activities | $ 3,004,070 | $ (80,594) |
| Net cash provided by (used in) investing activities | 50,822 | (105,353) |
| Net cash provided by (used in) financing activities | 18,801 | (16,605) |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | $ 3,073,693 | $ (202,552) |
| Change in custodial funds due to customers included in net cash provided by (used in) operating activities | 2,710,522 | (130,122) |

*Operating activities*

Net cash provided by operating activities was $3.0 billion for the year ended December 31, 2020, of which $2.7 billion related to cash from the change in custodial funds due to customers. Our net cash provided by operating activities reflected net income of $322.3 million, non-cash adjustments of $64.8 million, which primarily consisted of $70.5 million in stock-based compensation, $31.0 million in depreciation and amortization, $25.0 million in non-cash lease expense, and $5.3 million in fair value derivative adjustments. This was partially offset by $54.0 million of net crypto assets received from operating activities and $23.7 million in realized gains on crypto assets which is excluded from operating activities and included in investing activities. In addition to these changes were changes in operating assets and liabilities, other than custodial funds due to customers, of $93.6 million.

Net cash used in operating activities was $80.6 million for the year ended December 31, 2019, of which $130.1 million related to cash from the change in custodial funds due to customers. Our net cash used in operating activities reflected a net loss of $30.4 million, non-cash adjustments of $50.1 million, which primarily consisted of $31.1 million in stock-based compensation and $16.9 million in depreciation and amortization, which was partially offset by $20.9 million in deferred income taxes. In addition to these changes were changes in operating assets and liabilities, other than custodial funds due to customers, of $29.8 million

*Investing activities*

Net cash provided by investing activities of $50.8 million for the year ended December 31, 2020 primarily related to $46.0 million in net proceeds from the purchase and sale of crypto assets and $33.6 million net cash and customer custodial funds acquired in the Tagomi acquisition. This was partially offset by $10.3 million and $9.9 million in purchases of investments and property and equipment, respectively, and $8.9 million in capitalized internal-use software development costs.

Net cash used in investing activities of $105.4 million for the year ended December 31, 2019 primarily related to the cash portion of our acquisition of Xapo's institutional custody business of $55.4 million, $33.5 million for leasehold and real estate expenditures to support our increased headcount, investments in companies and technologies of $7.9 million, and capitalized internal-use software development costs of $7.0 million which were offset by net proceeds from purchase and sale of crypto assets of $1.5 million.

*Financing activities*

Net cash provided by financing activities of $18.8 million for the year ended December 31, 2020 was due to $20.7 million in proceeds from the issuance of common stock, which was partially offset by a $1.9 million cash outflow to repurchase equity awards.

Net cash used in financing activities of $16.6 million for the year ended December 31, 2019 was due to a $21.0 million cash outflow related to a tender offer, which was partially offset by proceeds of $4.4 million from the issuance of common stock.

**Contractual Obligations and Commitments**

The following tables summarize our contractual obligations and commitments as of December 31, 2020:

| | Total | Less than 1 year | 1-3 years | 3-5 years | >5 years |
|---|---|---|---|---|---|
| | | *(in thousands)* | | | |
| Operating lease commitments | $ 118,427 | $ 29,559 | $ 54,308 | $ 33,768 | $ 792 |
| Non-cancelable purchase obligation | 93,179 | 50,462 | 42,717 | — | — |
| Total contractual obligations and commitments | $ 211,606 | $ 80,021 | $ 97,025 | $ 33,768 | $ 792 |

The tables above exclude unrecognized tax benefits of $12.3 million as of December 31, 2020, that, if recognized, would reduce income tax expense and our effective tax rate. The table above also excludes uncertain tax liabilities due to the uncertainty of when the related tax settlements will become due.

In September 2018, we entered into an operating lease agreement for new office space in San Francisco, California. The lease commencement dates of floors in the building were staggered, with the lease of the final floors of the office initially set to commence in November 2020 and expire on April 30, 2025. In September 2020, we renegotiated the terms of the lease which included a partial giveback of space for which the lease had not yet commenced. The terms of the agreement include a cancellation fee of $7.9 million and commits us to enter into leases at the lessor's other properties, with a minimum committed spend of $15.5 million spread over the period from September 2020 to December 2025.

**Off-Balance Sheet Arrangements**

We did not have during the periods presented, and we do not currently have, any off-balance sheet financing arrangements or any relationships with unconsolidated entities or financial partnerships, including entities sometimes referred to as structured finance or special purpose entities, that were established for the purpose of facilitating off-balance sheet arrangements or other contractually narrow or limited purposes.

**Critical Accounting Policies and Estimates**

Our consolidated financial statements and the related notes included elsewhere in this prospectus are prepared in accordance with GAAP. The preparation of consolidated financial statements also requires us to make estimates and assumptions that affect the reported amounts of assets, liabilities, revenue, costs, and expenses and related disclosures. We base our estimates on historical experience and on various other assumptions that we believe to be reasonable under the circumstances. Actual results could differ significantly from our estimates. To the extent that there are differences between our estimates and actual results, our future financial statement presentation, financial condition, operating results, and cash flows will be affected.

We believe that the accounting policies described below involve a significant degree of judgment and complexity. Accordingly, we believe these are the most critical to aid in fully understanding and evaluating our consolidated financial condition and results of operations. For more information, see note 2 to our consolidated financial statements included elsewhere in this prospectus.

*Revenue recognition*

We primarily generate revenue through transaction fees charged on our platform. Our service comprises a single performance obligation to provide a crypto asset matching service when customers buy, sell, or convert crypto assets on the platform. That is, we are an agent in transactions between customers and present revenue for the fees earned on a net basis.

Judgment is required in determining whether we are the principal or the agent in transactions between customers. We evaluate the presentation of revenue on a gross or net basis based on whether we control the crypto asset provided before it is transferred to the customer (gross) or whether we act as an agent by arranging for other customers on the platform to provide the crypto asset to the customer (net). We do not control the crypto asset being provided before it is transferred to the buyer, do not have inventory risk related to the crypto asset, and are not responsible for the fulfillment of the crypto asset. We also do not set the price for the crypto asset as the price is a market rate established by the platform. As a result, we act as an agent in facilitating the ability for a customer to purchase crypto assets from another customer.

We consider our performance obligation satisfied, and recognize revenue, at the point in time the transaction is processed. Contracts with customers are usually open-ended and can be terminated by either party without a termination penalty. Therefore, contracts are defined at the transaction level and do not extend beyond the service already provided.

We charge a fee at the transaction level. The transaction price, represented by the trading fee, is calculated based on volume and may vary depending on payment type and the value of the transaction. Crypto asset purchase or sale transactions executed by a customer on our platform include tiered pricing, based primarily on transaction volume. The fee rate charged per transaction is adjusted up or down if the volume processed for a specific historical period meets established thresholds. We have concluded that this volume-based pricing approach does not constitute a future material right since the discount is within a range typically offered to a class of customers with similar volume. The transaction fee is collected from the customer at the time the transaction is executed. In certain instances, the transaction fee can be collected in crypto assets, with revenue measured based on the amount of crypto assets received and the fair value of the crypto assets at the time of the transaction. For the year ended December 31, 2020, we collected approximately 7.4% of total revenue in crypto assets. In such instances, we conduct periodic checks over the course of a day and convert crypto assets received for transaction fees into fiat currency once these assets reach a specified threshold of over $100. In the event the amount exceeds $5,000 at the time of our check, we will only convert crypto assets into fiat currency in the amount of $5,000 at that time. We believe this process reduces the risk related to a change in fair value of these assets prior to their conversion into fiat currency.

The transaction price includes estimates for reductions in revenue from transaction fee reversals that may not be recovered from customers. Such reversals occur when the customer disputes a transaction processed on their credit card or their bank account for a variety of reasons and seeks to have the charge reversed after we have processed the transaction. These amounts are estimated based upon the most likely amount of consideration to which we will be entitled. All estimates are based on historical experience and our best judgment at the time to the extent it is probable that a significant reversal of revenue recognized will not occur. All estimates of variable consideration are reassessed periodically. The total transaction price is allocated to the single performance obligation. While we recognize transaction fee reversals due to transaction reversals as a reduction of net revenue, crypto asset losses due to transaction reversals are included in transaction expense.

### Business combinations

We account for our business combinations using the acquisition method of accounting, which requires, among other things, allocation of the fair value of purchase consideration to the tangible and intangible assets acquired and liabilities assumed at their estimated fair values on the acquisition date. The excess of the fair value of purchase consideration over the values of these identifiable assets and liabilities is recorded as goodwill. When determining the fair value of assets acquired and liabilities assumed, we make significant estimates and assumptions, especially with respect to intangible assets. Our estimates of fair value are based upon assumptions believed to be reasonable, but which are inherently uncertain and unpredictable and, as a result, actual results may differ from estimates. During the measurement period, which does not exceed one year from the date of acquisition, we may record adjustments to the assets acquired and liabilities assumed, with a corresponding offset to goodwill if new

information is obtained related to facts and circumstances that existed as of the acquisition date. After the measurement period, any subsequent adjustments are reflected in the consolidated statements of operations. Acquisition costs, such as legal and consulting fees, are expensed as incurred.

### *Impairment of long-lived assets*

We assess potential impairments to our long-lived assets, which include property and equipment and intangible assets, whenever events or changing circumstances indicate that the carrying amount may not be recoverable. When indicators of impairment exist, we estimate the future undiscounted cash flows expected to be generated by the asset or asset group. In the event cash flows are not expected to be sufficient to recover the recorded value of the asset, an impairment loss is measured based upon the difference between the carrying amount and the fair value of the asset.

The goodwill impairment test consists of a comparison of each reporting unit's fair value to its carrying value. The fair value of a reporting unit is an estimate of the amount for which the unit as a whole could be sold in a current transaction between willing parties. If the carrying value of a reporting unit exceeds its fair value, goodwill is written down to its implied fair value. We are also permitted to make a qualitative assessment of whether it is more likely than not that the fair value of a reporting unit is less than its carrying value prior to applying the quantitative assessment. If, based on our qualitative assessment, it is more likely than not that the carrying value of the reporting unit is less than its fair value, a quantitative assessment may be required. We have identified a single reporting unit for purposes of impairment testing.

Our crypto assets held are accounted for as intangible assets with indefinite useful lives, and are initially measured at cost. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the crypto asset at the time its fair value is being measured. We assign costs to transactions on a first-in, first-out basis.

We have selected October 1 as the date on which to perform our annual impairment tests. We also test for impairment whenever events or circumstances indicate that the fair value of goodwill or intangible assets has been impaired. No impairment of goodwill was recorded during the years ended December 31, 2020 and December 31, 2019.

### *Stock-based compensation*

We recognize stock-based compensation expense using a fair-value based method for costs related to all equity awards issued under our equity incentive plans, including restricted stock, restricted stock units, or RSUs, and options granted to employees, directors, and non-employees. We estimate the fair value of stock options with only service-based conditions on the date of grant using the Black-Scholes-Merton option-pricing model. The fair value of the stock option is expensed over the related service period which is typically the vesting period and the straight-line method is used for expense attribution.

The model requires management to make a number of assumptions, including the fair value and expected volatility of our underlying common stock, expected term of the stock option, risk-free interest rate, and expected dividend yield. The expected term of the stock option is based on the average period the stock option is expected to remain outstanding based on the stock option's vesting and contractual terms. We evaluate the assumptions used to value stock awards quarterly. We have elected to account for forfeitures of awards as they occur, with previously recognized stock-based compensation reversed in the period that the awards are forfeited.

The fair value of RSUs is estimated based on the fair value of our common stock on the date of grant. Stock-based compensation expense related to the RSUs is recorded on a straight-line basis over the requisite service period.

***Common stock valuations***

In the absence of a public trading market, the fair value of the common stock was determined by our board of directors, with input from management, taking into account our most recent valuations from an independent third-party valuation specialist. Our board of directors intended all stock options granted to have an exercise price per share not less than the per share fair value of our common stock on the date of the grant and we believe that our board of directors has the relevant experience and expertise to determine the fair value of our common stock. The valuations of common stock were determined in accordance with the guidance provided by the *American Institute of Certified Public Accountants Practice Aid, Valuation of Privately-Held-Company Equity Securities Issued as Compensation*. If stock options were granted a short period of time prior to the date of a valuation report, we retrospectively assessed the fair value used for financial reporting purposes after considering the fair value reflected in the subsequent valuation report and other facts and circumstances on the date of grant as discussed below. The assumptions we use in the models were based on future expectations combined with management judgment and considered numerous and subjective factors to determine the fair value of our common stock as of the date of each option grant, including the following factors:

•  the results of contemporaneous valuations performed at periodic intervals by an independent valuation firm;

•  the prices, rights, preferences, and privileges of our convertible preferred stock relative to those of our common stock;

•  the prices of our convertible preferred stock and common stock sold to investors in arms-length transactions or offered to investors through a tender offer;

•  our actual operating and financial performance and estimated trends and prospects for our future performance;

•  our stage of development;

•  the likelihood of achieving a liquidity event, such as an initial public offering, direct listing, or sale of our company, given prevailing market conditions;

•  the lack of marketability involving securities in a private company;

•  the market performance of comparable publicly-traded companies; and

•  U.S. and global capital market conditions.

In valuing our common stock, our board of directors determined the equity value of our business generally using a weighting of the income and market approach valuation methods with input from management. The income approach estimates value based on the expectation of future cash flows that a company will generate. These future cash flows are discounted to their present values using an appropriate discount rate based on a weighted-average cost of capital and are adjusted to reflect the risks inherent in us achieving these estimated cash flows. The market approach estimates value based on a comparison of the subject company to comparable public companies in a similar line of business. From the comparable companies, a representative market value multiple is determined and then applied to the subject company's financial forecasts to estimate the value of the subject company.

For valuations prior to June 30, 2020, the equity valuation was based on both the income and the market approach valuation methods. Then, the option pricing method, or OPM, was used to allocate equity value to each class of our stock. When we had completed or were expecting to complete a convertible preferred stock financing, the terms and pricing of the financing round were included in the analysis used to estimate our value and the value of our common stock. These methods were consistent with prior valuations.

117

For valuations as of and subsequent to June 30, 2020, we have used a hybrid method utilizing a combination of the OPM and the probability-weighted expected return method, or PWERM, in estimating the value of our common stock. Using the PWERM, the value of our common stock is estimated based upon a probability-weighted analysis of varying values for our common stock assuming possible future events for our company, including a scenario of an initial public offering or a direct listing of our common stock on a stock exchange and a scenario assuming continued operation as a private entity. We also applied a discount for lack of marketability to account for a lack of access to an active public market.

Application of these approaches involves the use of estimates, judgment, and assumptions that are highly complex and subjective, such as those regarding our expected future revenue, expenses, and future cash flows, discount rates, market multiples, the selection of comparable companies, and the probability of possible future events. Changes in any or all of these estimates and assumptions or the relationships between those assumptions impact our valuations as of each valuation date and may have a material impact on the valuation of our common stock.

Our board of directors' assessments of the fair value of our common stock for grant dates between the dates of an available third-party valuation report were based in part on the current available financial and operational information and the fair market value provided in the most recent available third-party valuation report as compared to the timing of each grant.

For valuations after the completion of the listing of our Class A common stock on the Nasdaq Global Select Market, our board of directors will determine the fair value of each share of underlying common stock based on the closing price of our Class A common stock as reported on the date of grant. Future expense amounts for any particular period could be affected by changes in assumptions or market conditions.

### Income taxes

We utilize the asset and liability method for computing our income tax provision. Deferred tax assets and liabilities reflect the expected future consequences of temporary differences between the financial reporting and tax bases of assets and liabilities as well as operating loss, capital loss, and tax credit carryforwards, using enacted tax rates. Management makes estimates, assumptions, and judgments to determine our provision for income taxes, deferred tax assets and liabilities, and any valuation allowance recorded against deferred tax assets. We assess the likelihood that our deferred tax assets will be recovered from future taxable income and, to the extent we believe that recovery is not likely, we establish a valuation allowance.

We recognize the tax benefit from an uncertain tax position only if it is more likely than not the tax position will be sustained on examination by the taxing authorities, based on the technical merits of the position. The tax benefits recognized from such positions are then measured based on the largest benefit that has a greater than 50% likelihood of being realized upon settlement. Interest and penalties related to unrecognized tax benefits are recognized within provision for income taxes.

For U.S. Federal tax purposes, crypto asset transactions are treated on the same tax principles as property transactions. We recognize a gain or loss when crypto assets are exchanged for other property, in the amount of the difference between the fair market value of the property received and the tax basis of the exchanged crypto assets. Receipts of crypto assets in exchange for goods or services are included in taxable income at the fair market value on the date of receipt.

## Recent Accounting Pronouncements

See note 2 to our consolidated financial statements included elsewhere in this prospectus for recently adopted accounting pronouncements and recently issued accounting pronouncements not yet adopted as of the dates of the statement of financial position included in this prospectus.

**Quantitative and Qualitative Disclosures about Market Risk**

Market risk is the risk associated with the effect of changes in market factors on the value of the assets and liabilities held on our balance sheet, including interest rates, foreign exchange rates, prices of crypto assets, or volatilities such as market volatility or product liquidity.

*Interest rate risk*

We had cash and cash equivalents, including restricted cash and customer custodial funds, of $4.9 billion and $1.8 billion as of December 31, 2020 and December 31, 2019, respectively. Our investment policy and strategy primarily attempts to preserve capital and meet liquidity requirements without significantly increasing risk. Our cash and cash equivalents primarily consist of cash deposits and money market funds. We also earn interest based on the share of total USDC held on our platform. Changes in interest rates would primarily impact interest income due to the relatively short-term nature of our investments. A hypothetical 100 basis points increase or decrease in interest rates would have resulted in a $21.3 million and a $12.0 million increase or decrease in total revenue for the years ended December 31, 2020 and December 31, 2019, respectively.

*Foreign currency risk*

We have exposure to foreign currency translation gains and losses arising from our net investment in international subsidiaries. The revenues, expenses, and financial results of these subsidiaries are recorded in the functional currency of the countries that these subsidiaries are located in, which is primarily Euros and Japanese Yen. Accordingly, changes in exchange rates may negatively affect our future revenue and other operating results in these international subsidiaries upon translation into U.S. dollars. At this time, we do not, but we may in the future, enter into derivatives or other financial instruments in an attempt to hedge our foreign currency exchange risk. It is difficult to predict the impact hedging activities would have on our operating results. A 10% increase or decrease in current exchange rates would not have a material impact on our financial results.

*Market volatility and other risks associated with derivatives*

We have exposure to derivatives and related hedges measured at fair value. Market risk on derivatives is the exposure created by potential fluctuations in market prices and other factors and is a function of the type of derivative product, the volume of transactions, the tenor and terms of the agreement and the underlying volatility.

As at December 31, 2020, we have entered into a warrant agreement to purchase crypto assets (derivative asset of $2.6 million) and embedded derivatives as a result of entering into transactions to borrow crypto assets (derivative liabilities of $127.1 million), recorded on the consolidated balance sheets. A 10% increase or decrease in the fair value of the derivative positions would not have a material impact on our financial results. For more information, see notes 2 and 12 to our consolidated financial statements included elsewhere in this prospectus.

119



**BUSINESS**

**Coinbase Overview**

Coinbase powers the cryptoeconomy.

Our mission is to create an open financial system for the world. Today, the way that we invest, spend, save, and generally manage our money remains cumbersome, inaccessible, expensive, and regionally isolated. In contrast, the internet has transformed our society by connecting the world and enabling the seamless exchange of information. The legacy financial system is struggling to keep pace with the speed of technological advancements in a global and digitally interconnected society, resulting in the need for a new, natively digital financial system.

We are building the cryptoeconomy – a more fair, accessible, efficient, and transparent financial system for the internet age that leverages crypto assets: digital assets built using blockchain technology.

We started in 2012 with the radical idea that anyone, anywhere, should be able to easily and securely send and receive Bitcoin, the first crypto asset. We built a trusted platform for accessing Bitcoin and the broader cryptoeconomy by reducing the complexity of the industry through a simple and intuitive user experience.

Today, we are a leading provider of end-to-end financial infrastructure and technology for the cryptoeconomy. Customers around the world discover and begin their journeys with crypto through Coinbase. In the early days of the internet, Google democratized access to information through its user-friendly search engine, enabling virtually any user with an internet connection to discover the world's information. Similarly, Coinbase is democratizing access to the cryptoeconomy by enabling anyone with an internet connection to easily and securely invest in and use crypto assets.

Customers that start with us, grow with us as they experience the benefits of the open financial system by using crypto-based products for staking, spending, saving, and borrowing. Today, our platform enables approximately 43 million retail users, 7,000 institutions, and 115,000 ecosystem partners in over 100 countries to participate in the cryptoeconomy:

- *Retail users*: We offer the primary financial account for the cryptoeconomy – a safe, trusted, and easy-to-use platform to invest, store, spend, earn, and use crypto assets.

- *Institutions*: We provide hedge funds, money managers, and corporations a one-stop shop for accessing crypto markets through advanced trading and custody technology, built on top of a robust security infrastructure. We also offer a state of the art marketplace with a deep pool of liquidity for transacting in crypto assets.

- *Ecosystem partners*: We provide developers, merchants, and asset issuers a platform with technology and services that enables them to build applications that leverage crypto protocols, actively participate in crypto networks, and securely accept cryptocurrencies as payment.

Bitcoin sparked a revolution by proving the ability to create digital scarcity: a unique and finite digital asset whose ownership could be proven with certainty. This innovation laid the foundation for an open financial system. Today, all forms of value – from those natively created online such as in-game digital goods to traditional securities like equities and bonds – can be represented digitally, as crypto assets. Like the bits of data that power the internet, these crypto assets can be dynamically transmitted, stored, and programmed to serve the needs of an increasingly digital and globally interconnected economy.

Today, we enable customers around the world to store their savings in a wide range of crypto assets, including Bitcoin and USD Coin, and to instantly transfer value globally with the tap of a finger on a smartphone. We provide companies with new ways to transact, incentivize, and reward their users, from offering compounding rewards on savings that pay out by the second to compensating users for virtually completing tasks through global micropayments.

We power the cryptoeconomy by combining the best of both emerging blockchain technology and traditional finance to create trusted and easy-to-use products for the industry. We have built a robust backend technology platform to support the global, real-time, and 24/7/365 demands of crypto asset markets. We invest heavily in regulatory compliance by working with regulators around the world to shape policy, and have pioneered industry-leading security practices for safeguarding crypto assets. Our early focus on trust and usability has allowed us to become the primary on-ramp to the cryptoeconomy from the fiat-based financial system.

Our unique approach draws retail users, institutions, and ecosystem partners to our platform, creating a powerful flywheel: retail users and institutions store assets and drive liquidity, enabling us to expand the depth and breadth of crypto assets that we offer and launch new, innovative products and services that attract new customers. Our scale and leadership position draws ecosystem partners to connect with our millions of customers around the world, further enhancing the value of our platform.

This self-reinforcing dynamic is enabled by our culture of repeatable innovation and continuous investment in our proprietary technology platform that is purpose built to address the unique engineering, cybersecurity, compliance, and usability challenges of directly interacting with blockchain protocols. With every turn of our flywheel, we develop a deeper understanding of our customers' needs and leverage our scalable platform to intelligently design, develop, launch, and market new, innovative products and services to our customers. This allows us to build a more tailored suite of products and services and enhances the value of our platform over time. By providing the necessary infrastructure and distribution for our current and future ecosystem partners to build and extend their reach, we also foster the growth of the ecosystem.

We have seen this flywheel work effectively across our business and we have grown rapidly as a result. As of December 31, 2020, our customers had traded over $456 billion on our platform since inception and stored over $90 billion worth of assets across our platform. This growth has come with minimal outbound sales and marketing effort — since inception over 90% of our retail users had found us organically or through word-of-mouth.

Since inception through December 31, 2020, we generated over $3.4 billion in total revenue, largely from transaction fees that we earn from volume-based trades on our platform by retail users and institutions. For the year ended December 31, 2020, transaction revenue represented over 96% of our net revenue. We have leveraged the strength of our trading business to scale and broaden our platform by investing in our flywheel to launch new products and services and grow the ecosystem.

Today, we directly integrate with over 15 blockchain protocols, support over 90 crypto assets for trading or custody, and since the fourth quarter of 2018, we have launched a suite of subscription products and services that have enhanced the customer value proposition and power of our platform. Retail users are now engaging with multiple products — across the four quarters ended December 31, 2020, on average, 21% of retail users who invested also engaged with at least one non-investing[5] product per quarter. When retail users invested and engaged with at least one non-investing product, we saw average net revenue per retail user increase by approximately 90%. Although subscription products and services do not currently contribute a significant portion of net revenue relative to our trading business, we experienced 126% annual growth in revenue from these products and services from 2019 to 2020. We are committed to growing more stable revenue from subscription products and services, and expect that they will contribute a larger portion of our total revenue over time as our customers connect with the broader cryptoeconomy.

The overall market capitalization of crypto assets grew from less than $500 million to $782 billion between December 31, 2012 and December 31, 2020, representing a CAGR[6] of over 150%. Over the same period, our retail users grew from approximately 13,000 to 43 million. More recently, we have

---

[5] Non-investing products include our Distribute, Stake, Save, Spend, and Borrow & Lend products.
[6] Based on publicly available data from the earliest available date. Calculation period is December, 2012 to December 31, 2020.

experienced significant growth in the number of institutions on our platform, increasing from over 1,000 as of December 31, 2017 to 7,000 as of December 31, 2020.

While we have grown rapidly, similar to the evolution of the internet, e-commerce, and prior paradigm shifts in technology, our journey has not been linear. Our growth has come in waves driven by innovation in the cryptoeconomy and requires long-term perspective to evaluate our performance. Each wave expands the existing retail user community and further diversifies the ecosystem by attracting new market participants such as institutions and developers. In the short-term, we experience high variance in Trading Volume and net revenue between quarters driven by the volatile nature of the crypto asset markets. Over longer periods, we have experienced clear growth, with median quarterly Trading Volume increasing from $17 billion to $21 billion to $38 billion in 2018, 2019, and 2020, respectively.

We have grown quickly and in a capital-efficient manner since our founding. For the years ended December 31, 2020 and December 31, 2019, we generated total revenue of $1.3 billion and $533.7 million, respectively, net income (loss) of $322.3 million and $(30.4) million, respectively, and Adjusted EBITDA of $527.4 million and $24.3 million, respectively. See the section titled "Selected Consolidated Financial and Other Data—Key Business Metrics and Non-GAAP Financial Measure—Non-GAAP Financial Measure" for information regarding our use of Adjusted EBITDA and a reconciliation of net income (loss) to Adjusted EBITDA.

**Welcome to the Cryptoeconomy**

*Limitations of today's financial system*

Today's financial system relies upon a patchwork of intermediaries that spans banks, brokers, clearinghouses, custodians, exchanges, payment processors, and their networks to facilitate money movement, safekeeping, lending, credit, and other capital markets activity. Bound by legacy infrastructure and processes, the trust and reliance on this complex web of intermediaries imposes limitations on access, efficiency, and cost.

- *Access.* To send, store, or receive funds, access to legacy financial infrastructure, such as bank accounts, is required. Geographic and socioeconomic factors often limit the availability of such infrastructure. As an illustrative example, sending money from the United States to Mexico requires access to bank accounts or other intermediary outlets for both the sender and receiver of funds, in addition to at least one financial intermediary.

- *Efficiency.* The protocols, people, procedures, and infrastructure that are required to facilitate money movement impose legacy constraints on financial transactions, which effectively limit their availability and usability. Multiple administrative layers, geographic boundaries, and intermediaries standing between participants adds friction and leads to duplication of functions across the value chain. The net result is inefficiency in the movement of value, exemplified by long settlement times, seemingly arbitrary maximum and minimum transaction sizes, extended exposure to price volatility, and exposure to potential fraud. For example, an investor purchasing an institutional term loan in the secondary market may have to wait several weeks for a trade to settle.

- *Cost.* Redundancy and inefficiency result in higher costs for end users. For example, a consumer in the United States sending a remittance payment to family abroad will often incur significant fees.

Many companies in the technology and financial technology industries have recognized and attempted to address some of these issues with the current financial system. While these companies offer products and services that incorporate modern user interfaces and technology layers, they are built on top of the same antiquated financial infrastructure, effectively porting the limitations, inefficiencies, and costs of the traditional financial system online. As a result, these solutions do not address the core limitations of the current financial system.

*The need for an internet of value*

The internet has unleashed multiple waves of innovation that are continuing to connect and transform many aspects of modern society across geographies. Near ubiquity of access to real-time information has spurred the growth of economic activity and significantly increased the velocity of transactions. While technological innovation has transformed how we communicate and purchase goods and services, the existing financial system has hardly changed. We have reached a tipping point for the need for a new, natively digital financial system.

Sending value digitally without intermediaries has long been impractical. For example, once a picture is digital, it can be copied millions of times instantly. Once something is infinitely replicable, it loses its value, making the digital format ill-suited for storing or transmitting value. The foundational innovation of blockchain technology was to bring uniqueness and scarcity into the digital realm, allowing for the creation of natively digital assets. Based on an immutable, multi-party, consensus-based record-keeping system, crypto deeply integrates the concept of money into the internet ecosystem as a means of value exchange, storage, and unit of account, effectively creating a resilient internet of value. This enables network participants to transact with each other on the basis of trust without intermediaries. Crypto enables the digital representation and instant, secure exchange of nearly any asset of value globally in a manner as fast and seamless as the exchange of information on the internet.

Just as digital photos removed the format restrictions of the 3x5 print, leading to new types of photos like panoramic or 3D, the digitization of value has led to a wave of innovation that eliminates constraints inherent in the traditional financial system. Crypto enables global peer-to-peer financial applications such as borrowing and lending, but also allows for the representation of value in formats that are not monetary. For instance, crypto allows brands and creators – musicians, artists, social influencers, or anyone with an internet connection – to create verifiably unique crypto assets (known as non-fungible tokens or "NFTs") such as digital artwork, collectibles, and fan engagement tokens, which unlock new economic opportunities for creators and their communities. The cryptoeconomy provides access to a full range of services 24 hours a day, 365 days a year at low cost and with near-instant settlement. Today, over 50 distinct blockchain protocols support more than 7,500 crypto assets that enable all forms of digital records and transactions, including contracts, documents, identity, rights, securities, titles, in-game digital goods, and many others, to be controlled programmatically.

Anyone, anywhere with an internet connection can directly access this network of value exchange. As crypto asset adoption scales to a greater share of this massive base of internet users it has the potential to deliver on the promise of democratizing financial services to equal levels of ubiquity and inclusion.

*Applications in the cryptoeconomy are expansive*

A fundamental advantage of the cryptoeconomy is that unlike the traditional financial system that relies on rigid infrastructure, crypto assets rely on software-based networks built on top of the internet. Crypto assets are forms of value represented as bits and bytes – much like other digital media, such as email or digital photographs. As a result, crypto assets are easily programmed, maneuvered, and as frictionless to send and receive as any digital media. The costs incurred in the transfer of crypto assets are similarly low, allowing any quantum of value to be exchanged.

The inherent programmability of crypto assets enables the creation of "smart contracts," self-enforcing agreements between transacting parties directly written into lines of code. Smart contracts represent a step change in the utility of blockchain-based networks by allowing parties to enter into contractual agreements without the need for a centralized intermediary. For example, smart contracts can enable a distributed group of people to enter into a mutually beneficial economic relationship to share the risk of adverse events, otherwise known as insurance. Software facilitates both the collection of premiums, as well as the release of claims automatically based on predetermined conditions. While the concept is not new, smart contracts are distinct because they enable this complex economic arrangement to execute autonomously without the need for an intermediary.

124

The versatility of crypto assets has sparked waves of innovation that are only bounded by developers' creativity. Today, the applications of crypto assets span core financial functions such as store of value and medium of exchange, as well as non-financial applications such as enabling multi-sided marketplaces for goods and services. Some applications include:

### Store of value

Bitcoin has emerged as a new asset class by combining a finite supply with digital transferability. Gold has historically held a prominent role due its function as a decentralized store of value – the inability of one actor to unilaterally manipulate its value. However, the scarcity value of gold lacks the mathematically limited finite supply of Bitcoin, and gold's physical properties limit transferability and impose significant storage costs.

While the economic function of storing value is adequately served by fiat currencies in some countries, many countries experience inflation levels above their long-term expected real gross domestic product growth. Adoption of crypto assets with attributes such as a finite supply, such as Bitcoin, or inherent parity with a fiat currency, such as USD Coin, have emerged as stores of value in regions around the world with major macroeconomic imbalances. As of December 31, 2020, the combined value of U.S. dollar stablecoins, crypto assets that track the value of the U.S. dollar, exceeded $25 billion, an increase of over 375% from December 31, 2019.

### 24/7/365 real-time cross-border payments

Global payments exceed global GDP by a multiple, as every step of economic value creation is typically accompanied by an exchange of financial value. Nevertheless, a large share of payments transactions still rely on cash and paper-based formats. The ongoing digitization of commerce is driving growth in digital payments, but their primary format – card-based transactions – still relies on outdated infrastructure and communication protocols that impose costs and limitations. While most local payments can be initiated any time, back-end processes remain subject to restrictions such as cut off times and often preclude cross-border payment transactions. Crypto asset markets operate 24/7/365 and facilitate the instant transfer of value, eliminating the need for any intermediary, siloed payment networks, or specialized infrastructure. The "peer-to-peer" nature of cryptocurrency payments extends the reach, lowers the cost, and increases the speed of a payment transaction.

### Democratization of financial markets

The capital markets value chain – from sales to trading and execution, clearing and settlement, and servicing and administration has largely been translated to digital workflows and execution. Nevertheless, several underlying functions such as transaction documentation, post-trade workflows (e.g., clearing and settlement), and asset servicing remain complex, largely manual, and full of duplication. For individuals or institutions, access to financial markets is also often limited, complicated, and filled with outdated processes that can be daunting.

Blockchain technology holds the potential to increase access to markets and reduce complexity, process redundancy, and cost by allowing market participants to connect, clear, and settle peer-to-peer. Just as the internet has democratized access to information by removing information gatekeepers, blockchain technology can democratize access to the financial markets. Blockchain protocols establish a universal source of truth, eliminating reconciliation workflows and allowing for near instantaneous settlement. The programmable nature of crypto assets simplifies transactions in asset classes with heavy documentation requirements, such as loans. By removing the need for traditional market intermediaries and streamlining processes, blockchain technology allows for capital to flow more freely to a larger universe of end users who need it.

125

*Peer-to-peer financial applications (DeFi applications)*

Crypto assets rely on software-based networks that can be used to facilitate traditional financial services like borrowing, lending, trading derivatives, and insurance through smart contracts. This makes it possible for developers to design rules and actions that exist in finance today, and make those actions happen automatically. For example, a user could receive a loan from a pool of other users with the terms of that loan dynamically and autonomously triggered by software. As of December 31, 2020, there was already more than $15 billion of U.S. dollar equivalent value worldwide allocated towards decentralized finance applications and protocols. Further, the financial services enabled by crypto assets can be combined in many different permutations – similar to open source software – and serve as building blocks for more complex combinations and new capabilities. Building on top of decentralized blockchain networks lowers the barriers to access as anyone with an internet connection can become a counterparty to a transaction, putting individuals in control of their own financial well-being and increasing global economic freedom.

*Digital marketplaces for...anything*

The trustless and programmable nature of crypto allows for the creation of new digital global marketplaces and business models that were previously not possible. For instance, imagine a digital peer-to-peer marketplace that enables users to rent out underutilized resources such as computing services or internet bandwidth. Micropayments are autonomously dispatched to mirror the commercial transactions in real time. Crypto assets make such marketplaces possible on a global scale by substituting centralized intermediaries with open markets governed by programmable rules and incentives that are natively built into the marketplace infrastructure.

The possibilities do not stop with internet bandwidth – crypto-enabled marketplaces already facilitate a variety of use cases including digital collectibles and expert knowledge, and the concept extends to any multi-sided marketplace. These examples are just scratching the surface of the full potential of the cryptoeconomy. Similar to how the internet and, subsequently, the smartphone provided platforms for now common use cases such as social media and ride sharing, we are early in the evolution of the cryptoeconomy and just beginning to realize its full transformative potential.

## Our Opportunity

Crypto has the potential to be as revolutionary and widely adopted as the internet. The unique properties of crypto assets naturally position them as digital alternatives to store of value analogs such as gold, enable the creation of an internet-based financial system, and provide a development platform for applications that are unimaginable today. These markets and asset classes collectively represent hundreds of trillions of dollars of value today.

Similar to the early days of the internet, this evolution will take time, but we expect the cryptoeconomy to expand into the mainstream and touch every individual and business around the world in the coming decades. While we are still in the early stages of adoption, the market value of exchange-traded crypto assets was already approximately $782 billion as of December 31, 2020. Our objective is to drive the growth of the overall cryptoeconomy by serving the needs of all consumers who manage their financial lives on a mobile device, and every institution – large or small – that embraces the emerging internet of value.

Today, we have approximately 43 million retail users and 7,000 institutional customers across 100 countries, and work with nearly 115,000 ecosystem partners. We expect our customer base to grow alongside the ecosystem we serve as we continue to support more asset classes and add more products to our platform. Our objective is to bring crypto-based financial services to anyone with a smartphone, a population of approximately 3.5 billion people today.

126

**Our Platform**

We have developed a complementary suite of products and services that are designed to meet the distinct needs of our customers as they transact in the cryptoeconomy. All of our customer-facing products and services are powered by a robust backend technology system that enables us to develop, launch, and market scalable new products and services.

Our customers – retail users, institutions, and ecosystem partners – come together on our platform to create a powerful flywheel for our business.

Retail users and institutions come to Coinbase to discover and access the cryptoeconomy because our platform is safe, trusted, and easy to use. Expanding the depth and breadth of crypto assets that we support drives growth in transactions and assets on our platform, and enhances liquidity, in turn attracting more retail users and institutions. Our superior scale enables ecosystem partners such as asset issuers, merchants, and application developers to connect with millions of customers participating in the cryptoeconomy around the world. As customers and activity increase, we develop a deeper understanding of each customer's needs, allowing us to intelligently design, develop, and launch new innovative products. These products enhance the value of our platform, in turn attracting more customers and driving transactions, assets, and liquidity in a virtuous cycle.



Crypto asset markets are natively digital, real-time, and operate globally on a 24/7/365 basis. The "always on" nature of the cryptoeconomy demands a more scalable and higher throughput technical architecture. Our proprietary platform is purpose-built to support the unique demands of the cryptoeconomy, and is built on top of modern technology designed specifically to address the unique engineering, cybersecurity, compliance, and usability challenges of emerging blockchain technology, while seamlessly connecting to legacy technology and financial systems. This infrastructure is highly extensible and investments we have made in platform-level capabilities allow us to quickly launch new products and services that accelerate our flywheel.

*15+ native blockchain integrations and counting*

We have developed custom technology and processes to directly integrate with over 15 blockchain protocols and efficiently support new protocols. Each protocol has a unique design, with differences in characteristics such as its consensus mechanism and security model, and requires in-depth research and

specific expertise both for the initial integration and ongoing monitoring as transactions are recorded on the public blockchain. Our experience allows us to swiftly adapt to updates in the blockchain protocol, or "forks," safely support new products like staking, and creatively reduce fees for our customers through strategies like batching transactions. These integrations also enable us to quickly expand our suite of products and services – connecting with a protocol once allows us to list the native crypto asset for trading and also offer a variety of products and services unique to the cryptoeconomy across our platform.

Further, technical standards for particular crypto assets or "tokens"' have developed and once we support a particular standard, we are able to support other crypto assets based on that standard. For example, Ethereum is a popular protocol with its own native crypto asset. The ERC-20 technical standard defines a common list of rules for tokens built on Ethereum, commonly referred to as ERC-20 tokens. We directly integrate with the Ethereum blockchain and support the ERC-20 technical standard, enabling us to quickly and securely support a range of ERC-20 tokens such as Compound, USDC, and Basic Attention Token.

### Advanced cybersecurity and cryptography technology

Safely securing digital forms of value presents distinct challenges relative to securing analog assets. From a security standpoint, crypto assets are often viewed as bearer assets and possession of the private key (akin to a "password") generally determines who controls a crypto asset. Protecting private keys from unwarranted access and theft is critically important, as once the private key is taken, in most circumstances, control over the crypto asset is gone. We have pioneered industry-leading standards for managing private cryptographic keys and use sophisticated cybersecurity technologies such as multi-party computation to safeguard a wide range of crypto assets. We leverage data and machine learning to proactively identify and prevent potential exploits. These investments enable us to secure idle crypto assets in cold storage (offline and disconnected from the internet) while also offering customers the ability to quickly and safely move funds in and out of blockchain protocols.

### Proprietary crypto compliance infrastructure

In addition to robust know-your-customer and anti-money laundering programs, we have built bespoke transaction monitoring systems to analyze crypto asset transactions in real-time on the blockchain. This infrastructure allows us to quickly adapt to emerging threats in the cryptoeconomy, build scenarios and typologies around specific transaction types, and gives us the flexibility to support new products and services.

### Powerful product experiences

Investments in blockchain integrations, cybersecurity, and compliance infrastructure give us the ability to create unique product experiences that support our platform. For example, our state-of-the-art platform is specifically built to support the global, always on crypto assets markets and offers a reliable and efficient marketplace for exchanging crypto assets. Vertical integration with our technology platform gives us the ability to create unique product experiences for our customers that allow them to easily participate in technically complex parts of the cryptoeconomy.

## What Sets Us Apart

### We are a market leading brand exclusively focused on the cryptoeconomy

The cryptoeconomy is dynamic and rapidly evolving. Keeping pace with the breadth and depth of innovation in the cryptoeconomy requires focus.

We have and remain solely focused on building technology to power the cryptoeconomy since 2012. We have deep expertise in real-time distributed computing, novel consensus mechanisms, smart contracts, cryptography, and native blockchain integrations that allow us to innovate with the industry. We

have invested heavily in the scarce talent required to safely power the cryptoeconomy and employ teams dedicated to blockchain research, operations, and development.

Our focus allows us to nimbly adapt to quickly shifting trends and support the growth of the industry. As the cryptoeconomy grows, our competitive advantage grows.

### *We have a trusted platform owing to our heritage of security and culture of regulatory compliance*

We have made significant investments in regulatory compliance and cybersecurity to earn the trust of our customers. We are a financial technology provider that offers services to customers in over 100 countries. We work with regulators and law enforcement agencies around the world to drive policy and practices favorable to the cryptoeconomy, and to ensure we are licensed as appropriate under local law. We are proud to be one of the longest running crypto platforms where customers have not lost funds due to a security breach of the platform, and we secure our customers' funds with multiple layers of protection by employing what we believe to be the largest hot wallet crime program in the insurance market. We are also licensed to engage in money transmission and virtual currency business in almost all U.S. states and we continue to pursue licensing in select jurisdictions internationally. As of December 31, 2020, over 15% of our full-time employees were dedicated to legal, compliance, finance, and security.

### *We are the default starting place for new user journeys into the cryptoeconomy*

Bitcoin was introduced in 2008 and found thousands of technically savvy early adopters, but navigating the complexity of acquiring Bitcoin required significant technical knowledge that made it inaccessible to the average user.

We reduce the complexity of crypto by infusing usability at the core of each of our products and services. Our emphasis on intuitive product design has allowed us to become a primary on ramp for customers' journeys into the cryptoeconomy. This begins with our simple onboarding process that allows retail users to sign up and quickly purchase their first crypto asset, and extends to new products and services that we launch to broaden access to the cryptoeconomy. Because of our approach, since inception over 90% of our retail users had found us organically or through word-of-mouth.

### *We have significant scale, securely storing over $90 billion in total assets and we grow with our customers*

Customers that start their journeys with us by investing and storing, grow with us as they experience the benefits of the open financial system by spending, staking, lending, borrowing, and earning various crypto assets through Coinbase.

As of December 31, 2020, we stored and custodied over $90 billion in total fiat and crypto assets on behalf of our customers. The total value of crypto assets on our platform represented approximately 11.1% of the total market capitalization of crypto assets as of December 31, 2020, an increase from 8.3% and 4.5% as of December 31, 2019 and December 31, 2018, respectively. In addition, since inception, our customers have traded over $456 billion on our platform. Secure storage and investing serve as the bedrock of a customer's relationship with the cryptoeconomy. We believe our market leading share of assets on our platform is a competitive advantage, and that we have a substantial opportunity to build on our customer relationships by growing with our customers and offering a broader suite of products and services.

Our millions of customers also makes us a desirable partner for companies in our ecosystem such as asset issuers, developers, and merchants, that want to find and build relationships with our retail users and institutions. This enables us to form favorable partnerships that underpin a subset of our products.

129

*We have a robust technology platform that enables unique product experiences for our industry*

We rapidly research, develop, and launch new products and features specifically for the cryptoeconomy. Our development agility is enabled by a highly scalable and extensible technology platform that has been tailor-made to deal with the real-time, decentralized, global, and 24/7/365 nature of crypto asset markets.

Our investments in platform-level capabilities allow us to offer unique and differentiated product experiences for our industry. For example, institutions that store crypto assets using our proprietary cold storage technology are able to trade directly on our platform, borrow against their crypto asset holdings as collateral, and actively participate in decentralized networks without moving their holdings.

*We operate a marketplace with one of the deepest pools of liquidity and a network effect*

We have a deep pool of liquidity for exchanging a wide range of crypto assets. Our deep liquidity is supported by a healthy mix of retail and institutional activity, highlighting the synergistic relationship and network effect between customers on our platform. Liquidity begets liquidity, and this advantage deepens as we continue to expand the breadth of crypto assets that we support and attract new customers to our platform.

**Growth Strategy**

Coinbase grows as the cryptoeconomy grows.

There is significant momentum driving nearly every aspect of economic activity to be represented and exchanged online. We live in a world that is increasingly global, digital generations control a growing share of the world's wealth, and each year we see more commerce happening online. Each of these secular trends supports the growth of the cryptoeconomy and Coinbase.

More importantly, we feel we have a tremendous opportunity to actively drive our business by adding more customers, increasing the depth and breadth of crypto assets on our platform, and introducing new, innovative products.

*Add more customers*

Any person or business with an internet connection that is looking to access or interact with the cryptoeconomy can be an active user and customer on our platform.

- *Increase adoption and engagement with our products*. We plan to increase communications to our millions of Verified Users by expanding touchpoints such as email and in-app notifications to educate users about and drive engagement with our products and services. Education drives activity and monetization, and we plan to use these touchpoints to offer customers new and existing products.

- *Expand and accelerate retail user reach*. We believe we have a strong opportunity to grow Monthly Transacting Users by increasing our investments in growth marketing, broadening our position at the top of the customer acquisition funnel, and activating dormant Verified Users into MTUs. For the year ended December 31, 2020, we spent less than 5% of net revenue on sales and marketing, and since inception, over 90% of our retail users had found us organically or through word-of-mouth, reflecting the strength of our brand. We plan to make investments to efficiently drive retail user growth by expanding our marketing efforts across new and existing digital and offline channels.

- *Enhanced institutional coverage and support*. We have and continue to see growth with institutional customers. Verified institutions on our platform grew over 67% from approximately 4,200 to 7,000 from December 31, 2019 to December 31, 2020. In addition, Assets on Platform

from institutions grew approximately 590% from about $6.5 billion to $44.8 billion over the same period. Institutions value trust and partners who can solve their often complex business needs. To address this growing demand and better serve our institutional customers, we plan to expand our institutional customer coverage team to educate hedge funds, corporate treasurers, family offices, and other institutions about the cryptoeconomy and our platform. We are also expanding our trading operations teams to provide a comprehensive high touch support model for our large institutional customers.

- *Grow our ecosystem relationships*. Ecosystem partners are drawn to our platform for our products, scale, and distribution. We plan to attract new ecosystem partners and better serve our existing partners' needs through targeted community engagement and product development. We will build stronger relationships with the developer community by holding and/or participating in developer conferences for builders in the cryptoeconomy. We will listen to the needs of the community and build technology for the ecosystem, attracting developers to our platform.

- *Increase payment methods*. We will grow our customer base by continuing to improve access to our products and services. We will integrate with new local payment rails to provide more opportunities for customers to convert between local fiat currencies like USD and GBP and crypto assets. For example, in 2019 through our partnership with PayPal we enabled customers in the United States, United Kingdom, and Europe to transfer funds from Coinbase into their PayPal accounts.

- *Expand Internationally*. We serve customers in over 100 countries with a vast majority of our total revenue for the year ended December 31, 2020 generated from customers in the United States (76%) and Europe (24%), where we support EUR and GBP deposits. We evaluate many factors when choosing to enter a new country, including market opportunity, local bank partners, and the regulatory environment. We are expanding into additional countries to broaden local access to crypto assets and to increase our market opportunity. We also believe we can leverage our strong brand to capture a higher market share outside of the United States, United Kingdom, and European Union in the coming years.

### Expand the depth and breadth of assets

Any asset or form of value can be represented as a crypto asset and be supported on our platform, subject to meeting our security, legal, and compliance requirements.

- *Expand support for digitally native crypto assets*. We will continue to safely support new crypto assets on our platform. We started in 2012 by enabling our customers to buy and sell one crypto asset, Bitcoin. Today, we enable our customers to invest in over 45 and store over 90 crypto assets, and we plan to add support for new crypto assets each quarter.

- *Support native blockchain protocol features*. We will continue to build support for new and novel features of blockchain protocols, enabling us to offer a broader suite of financial services unique to the cryptoeconomy. Examples of protocol features include staking, on-chain governance, decentralized identity, and others unique to each blockchain protocol.

- *Tokenize new assets*. Over time we expect to add other forms of crypto assets, such as security tokens, crypto assets that represent a traditional security. We will invest in infrastructure and regulatory clarity to pave a path for the digitization of more traditional financial assets to help pave the path for new assets to be represented as crypto assets.

### Launch innovative products

Any known, and many yet to be created, financial and non-financial products can be built for the cryptoeconomy.

- *Innovate to provide customers more opportunities to engage with crypto assets.* Our goal is to become the primary financial account for our retail users and the one-stop shop for institutions' crypto asset investing needs. To achieve these goals, we are developing and launching innovative products and services across our platform to serve each customer's distinct needs. For example, in 2020 we launched support for post-trade credit to enable institutional customers to instantly invest in crypto assets without pre-funding their trade. For retail users, we have added support for staking, offering our users a simple way to earn rewards on their crypto asset holdings.

- *Expand partnerships.* In 2019, in partnership with Visa we launched the Coinbase Card, a debit card for our U.K. and select European customers that allows them to spend their crypto assets at any merchant who accepts Visa. We will look for additional partnerships to build and expand opportunities for our customers to engage in new crypto-based financial transactions.

- *Technology for ecosystem partners.* Historically, financial intermediaries have provided, amongst other services, trust, identity verification, and payment functionality to customers. DeFi allows peer-to-peer financial transactions without the need for centralized intermediaries. However, there remains a need for trust, identity verification, payments, discovery, technology and services, and distribution to support these new products. We will accelerate innovation in the cryptoeconomy by building technology to support the needs of our ecosystem partners, and enable them to connect and transact with customers without compromising the benefits of crypto. With foundational infrastructure technology, developers can imagine, experiment, and create products that the world has never seen. Growing the cryptoeconomy ecosystem in turn helps grow Coinbase. Examples of infrastructure technology include:

  - *Distribution.* We will grow our Earn technology to further help asset issuers connect with our millions of retail users.

  - *Access and identity.* We have an opportunity to leverage our large base of Verified Users to provide authentication and authorization services to ecosystem partners, streamlining the login process for our customers.

  - *Developer toolkit.* We will provide a suite of developer tools that make it easy for anyone to build applications that leverage crypto protocols, obtain information about them (query), and write data such as transactions. Further, this may include code monitoring and reporting, alerts, blockchain data and analytics, and more tools to make it easier to build for the cryptoeconomy.

  - *Payments.* We can provide external-facing application programming interfaces, or APIs, to enable third-party developers to integrate buying and selling functionality into their applications.

We are hard at work building our own suite of products and services. At the same time, we are also eagerly rooting for the best and brightest minds in the crypto space – both inside and outside of Coinbase – to develop products and services that create meaningful customer value. We support the broader cryptoeconomy by investing in companies and technologies through Coinbase Ventures, our venture capital arm. Through December 31, 2020, we had invested in over 100 companies. Our goal with these investments is to foster the development and growth of the ecosystem, which we believe will in turn benefit Coinbase.

132

**Our Customers**

Our goal is to provide an open, inclusive financial system for the world and our customers reflect this. We had approximately 43 million retail users, 7,000 institutions, and 115,000 ecosystem partners as of December 31, 2020. Our customers span continents and reside in over 100 countries.

*Retail users*

Our retail users are geographically and generationally diverse, demonstrating the reach and acceptance of Coinbase as a trusted provider to the cryptoeconomy. For the year ended December 31, 2020, we had more than 43 million retail users. For the quarter ended December 31, 2020, 2.8 million were Monthly Transacting Users, an increase of approximately 180% over the quarter ended December 31, 2019.

# coinbase

"What I think Coinbase did well was initiate people into the world of cryptocurrency, without overwhelming them with all this technical information and jargon."

Jaron





***Institutions***

Our institutional customers include hedge funds, principal trading firms, small to large financial institutions, family offices, and more recently, corporations who seek to allocate a portion of their investment portfolio to crypto assets. As of December 31, 2020, we had 7,000 institutional customers on our platform.

*Coinbase and One River*

Institutions turn to Coinbase as their full-service partner for accessing crypto markets. For example, One River Asset Management, an innovative global macro investment manager, selected Coinbase as its initial partner to acquire a large allocation of crypto assets in a matter of days. One River chose Coinbase because of our integrated solution that marries custody, advanced trade execution, and prime services with our rigorous security standards, operational controls, and experienced trading and coverage teams who meet the demands of large institutional clients.

Using the Coinbase suite of services for Institutions, Coinbase partnered with One River to execute a large and complex order over the course of five days. Our unified investing experience provided the tools to execute the trade algorithmically, and supported by the Coinbase team, One River completed the order without moving the market. Once acquired, these assets benefit from secure storage within our trusted Store product which provides a leading cold storage custody solution.

135



ONERIVER
ASSET MANAGEMENT

"Coinbase's integrated solution and institutional team provided exactly what we needed to discreetly execute this transaction, which was one of the biggest digital asset trades ever."

Eric Peters, CIO



*Ecosystem partners*

The crypto ecosystem has experienced rapid growth and we expect it to continue to quickly evolve. Though it started with Bitcoin, today over 50 unique blockchain protocols support more than 7,500 crypto assets and we have seen a proliferation of developers and projects innovating in the space. Today, our ecosystem partners include businesses who seek to build their own products and services or distribute those products and services through our platform. Examples of our early ecosystem partners include:

• Developers building new blockchain protocols.

• Developers building applications that leverage blockchain protocols.

• Creators of new tokens on these protocols.

• Merchant partners who are seeing business value in accepting these tokens as new forms of payment for their businesses.

• Organizations and financial institutions who use our Coinbase Analytics technology to monitor blockchain transactions for a variety of use cases such as compliance.

*Coinbase and Compound*

DeFi protocols are an important and rapidly growing component of the cryptoeconomy, and a substantial business opportunity for us. DeFi seeks to revolutionize financial services by establishing open, intermediary-free infrastructure for complex transactions. We have invested in building relationships with DeFi developers, and recently, we piloted a "Day 1 Launch" program to holistically support new crypto assets related to these protocols.

Compound is an autonomous interest rate protocol that allows users to supply and borrow digital assets at interest rates derived purely based on supply and demand. Today, hundreds of thousands of users leverage Compound to earn interest on billions in digital assets, including over $700 million in USDC as of December 31, 2020. Compound is owned and managed by a decentralized community of holders of the Compound Governance Token, or COMP, which was distributed in mid-2020.

Our relationship with Compound began in 2018 when Coinbase Ventures invested in Compound Labs, Inc., the DeFi pioneer behind the Compound protocol. Coinbase was also an early adopter of Compound, supplying USDC liquidity to the protocol in 2019 and allowing Coinbase Wallet users to access Compound directly starting in early 2020.

Through our Day 1 Launch program, we facilitated Compound's transition to decentralized governance in June 2020. The program highlights our ability to support new and innovative protocol developers while also driving key business metrics for Coinbase. For Compound, the program provided:

• Trading support for COMP through our Invest product, yielding over $1 billion in matched Trading Volume on our exchange through December 31, 2020.

• Custody support for COMP through our Store product, including the ability for holders to participate directly in protocol governance without moving COMP, leading to over $500 million in COMP Assets on Platform as of December 31, 2020.

• Education regarding Compound with an Earn campaign through our Distribute product, introducing over one million unique Coinbase retail users to the protocol through December 31, 2020.

 **Compound**

"DeFi has emerged as one of the most important crypto use-cases: creating transparent, efficient, autonomous financial markets. Coinbase recognized this early, and has been a critical partner for us across many dimensions as we've built and launched Compound."

Robert Leshner, Founder



**Our Products**

    We create powerful products and services for our customers using our proprietary technology infrastructure that has been purpose-built to meet the needs of the cryptoeconomy. We enable our customers to safely and easily invest, spend, send and receive, store, save, stake, borrow, and lend, distribute, build, pay and more generally access and transact with crypto assets.

## Coinbase Product Portfolio Overview

| | Retail Users | Institutions | Ecosystem Partners |
|---|:---:|:---:|:---:|
| **Transaction Revenue** | | | |
| Invest | ● | ● | |
| Spend | ● | | |
| Send & Receive | ● | ● | ● |
| **Subscription & Services** | | | |
| Store | | ● | ● |
| Save | ● | | |
| Stake | ● | ● | |
| Borrow & Lend | ● | ● | |
| Distribute | | | ● |
| Build | | | ● |
| Pay | | | ● |

139

## coinbase

"I started with Coinbase and I'm still with Coinbase. Coinbase for me is just easy, especially with the application."

Barry



*Retail*

Our retail products and services started from humble beginnings: a user-friendly application for sending and receiving Bitcoin. Over time, we grew to serve our customers' crypto asset investing needs by adding support for fiat currencies such as the U.S. dollar, British pound, and Euro, and by adding advanced trading features. More recently, we have added products and services that address our customers' broader financial needs beyond investing, such as spending crypto assets and earning rewards on their crypto asset holdings. We continue to grow our retail products and services to further our goal of becoming the primary financial account for all retail users to access the cryptoeconomy.

- *Invest.* Our secure, easy-to-use retail interface makes it simple to invest in crypto by buying and selling over 45 crypto assets. We enable our retail users to buy or sell crypto assets with the U.S. dollar, Euro, British pound, Canadian dollar, and Singapore dollar in over 40 countries, which we call fiat-to-crypto trading. Our Invest product for retail users facilitates trades on our platform, adding volume from retail users to our order books. In addition, we offer the ability to trade one crypto asset for another crypto asset, which we call crypto-to-crypto trading, in over 100 countries. We charge a fee when customers buy, sell, or convert crypto assets in either a fiat-to-crypto or crypto-to-crypto trade. Lastly, our separately managed retail software product, Coinbase Wallet, allows users to self-custody assets off-platform and interact with the cryptoeconomy.

- *Spend.* In 2019, in partnership with Visa, we launched the Coinbase Card, a debit card funded by a customer's crypto asset balance on Coinbase. The Coinbase Card allows our retail users in the United Kingdom and select countries in Europe to quickly and easily swipe or tap to pay for a purchase at any merchant that accepts Visa. A transaction is shown in local fiat currency (e.g., GBP) and this transaction sells crypto from the customer's crypto wallet to fund the purchase. We earn a transaction fee based on the transaction volume of each purchase.

- *Send & Receive.* Through our peer-to-peer payment products and services, retail users can send crypto assets to any user globally on our platform using their email, phone number, or a crypto wallet address. Sending and receiving funds to and from another Coinbase retail user is usually free, with some sends incurring a small variable transaction fee.

- *Save.* Providing opportunities for retail users to put their crypto asset investments to work and earn a yield, which we call rewards, has been a priority for us. All eligible retail users are automatically opted into available rewards programs. Today, our Save product supports two stablecoins, USDC and Dai, crypto assets that track the value of the U.S. dollar.

  - *USDC.* Retail users can earn rewards for holding USDC balances on our platform. USDC is issued by Circle and each USDC is backed 1:1 by a U.S. dollar. We earn interest on the U.S. dollars backing USDC and share a portion of that interest in the form of a reward with our customers. We issue the reward to retail users and rewards are recorded in transaction expense within our consolidated statement of operations.

  - *Dai.* Retail users also earn rewards for holding Dai, a decentralized crypto asset that attempts to maintain a value of one U.S. dollar for each Dai, in their Coinbase account. Unlike a traditional savings account where interest is earned monthly, users receive their first Dai reward within five business days, then every day following. Users always maintain control of their funds – their Dai stays in their accounts and can be withdrawn instantly at any time. The reward is paid out through the underlying protocols established by the MakerDAO network. We earn a commission on the Dai reward that is paid out to the user, which is recorded in subscription and services revenue within our consolidated statement of operations.

- *Stake.* Certain blockchain protocols, such as Tezos, rely on staking, an alternative way to validate blockchain transactions. Network participants can designate a certain amount of their crypto assets on the network as a stake (similar to a security deposit) to validate transactions and get rewarded in kind from the network. Today, staking crypto assets is a technical challenge for most users. Staking independently requires a participant to run their own hardware, software, and maintain close to 100% up-time. We provide a service known as "Delegated Proof of Stake,"

141

which reduces the complexities of staking and allows our retail users to maintain full ownership of their crypto assets while earning staking rewards. In return, we earn a commission on all staking rewards received.

- *Borrow & Lend.* We allow our U.S. retail users to borrow against and lend their crypto asset portfolios. Our first product is a portfolio-backed loan: a flexible, non-purpose 12-month term loan that allows retail users to borrow U.S. dollars using their crypto assets as collateral. Secured by their investment portfolio, customers can use the line of credit to access U.S. dollars while maintaining a "hodl" investing strategy. Over time, we plan to offer our retail users the ability to opt into lending their crypto assets to earn a passive return on their long term investments.

142

# Invest

   

# Stake

***Institutions***

We are building a "one-stop shop" for institutions to participate in the cryptoeconomy.

- *Invest.* Our institutional customers are data driven, want to be fully informed about the crypto market, and want to invest on their own terms. We help them achieve their goals with our brokerage and crypto trading products which offer advanced trading features, real-time market data, different transaction order types, and smart order routing capabilities to help customers achieve the best price on their trades. We also operate a crypto platform that aggregates and matches buy and sell orders for a number of crypto assets. Advanced market makers and other brokers often trade directly on the marketplace. For execution of complex trades, our institutional customers can use our over-the-counter, or OTC, trading desk, which offers white-glove service by a member of our trading operations team. We offer volume-based pricing and charge a transaction fee for every matched trade.

- *Send & Receive.* We offer send and receive services to our institutions on the same terms that we provide to our retail users.

- *Store.* The number one concern for institutions is the safe storage of their crypto assets, and we address this concern with a highly secure cold storage solution made available through our U.S. qualified custodian, which offers institutional grade audits, governance, digital key management, and physical security. Securely storing crypto assets is critically important as crypto assets can be viewed from a security standpoint as bearer assets, that is assets that can potentially be accessed (and thus stolen) from anywhere. This is a uniquely difficult problem to solve for the cryptoeconomy and we have, and continue, to make significant investments in developing a best-in-class security program. Our solution is vertically integrated with our investing platform, providing institutions with access to liquidity and trading services – a true one-stop shop for investing in crypto assets. We support over 90 crypto assets for trading and/or custody and continue to add support for new crypto assets. We charge a fee based on the total assets stored in custody on our platform.

- *Stake.* We offer delegated proof of stake services for supported proof of stake crypto assets, and similar to our retail users, earn a commission on staking rewards received.

- *Borrow & Lend.* We have begun to offer credit-based products and services to offer institutional customers access to liquidity for their hedging, speculation, and working capital needs.

  - *Post-trade credit.* The crypto asset market is active 24/7/365 and trades settle instantaneously. Customers typically need to pre-fund their account and maintain fiat or crypto assets on the platform in order to participate in the market. We introduced post-trade credit whereby we advance funds and settle on behalf of credit eligible customers, removing a key point of friction by allowing customers to instantly trade on credit and settle within a few days.

144

# Invest



# Store

***Ecosystem partners***

The cryptoeconomy is a young and quickly growing industry. Similar to the early days of the internet, infrastructure and technology are critical to support the growth of a vibrant ecosystem. In the same way that Android powered an entire developer community, we are building technology to empower and support developers in the cryptoeconomy. Our goal is to solve our ecosystem partners' diverse problems, including a lack of distribution, trust and usability, and the availability of easy-to-use and scalable infrastructure. The growth and success of our ecosystem partners directly drives the growth of the cryptoeconomy, which in turn benefits Coinbase.

- *Distribute.* With over 43 million Verified Users, we have a large audience of crypto enthusiasts on our platform. Asset issuers engage with our customers through our learn and earn technology where we distribute educational videos to our retail users to learn about new crypto assets and applications. In exchange for completing a task, such as watching the video or downloading an app, retail users can earn some of the crypto asset that they learned about. We earn a commission based on the value of crypto assets that are distributed to our users. We believe we will have more opportunities to allow ecosystem partners to connect with our customer base and monetize that engagement.

- *Build.* While we are hard at work developing products and services for our retail users and institutions, we also offer infrastructure technology and services to empower current and future builders of the cryptoeconomy. Examples include:

  - *Coinbase Analytics:* A blockchain analytics tool that relies solely on publicly available blockchain data, to meet our regulatory requirements and protect our customers' funds. We license this tool to law enforcement and financial institutions to monitor blockchain transactions. As a firm rule, we never share customer personal information with third parties.

  - *Rosetta:* A tool that makes it easier for developers to build applications that work across different blockchains. Rosetta has broad applicability for developers in the cryptoeconomy. Instead of writing custom parsing for every blockchain, applications can use a blockchain's Rosetta implementation to read on-chain data and construct transactions in a standard format, minimizing development and simplifying maintenance.

  - *USDC:* We are a member of the Centre Consortium, a group co-founded by Coinbase and Circle to support USDC, a crypto asset that represents and is backed 1:1 by a U.S. dollar. USDC is issued by Circle. We support our own internal products as well as ecosystem partners by creating technology that allows developers to build with USDC, such as payment APIs.

- *Pay.* We build technology to enable businesses to connect to the cryptoeconomy. Coinbase Commerce is a platform that helps merchants anywhere in the world accept cryptocurrency payments in a fully decentralized way. Our WalletLink API helps DeFi app, or "DApp", developers connect to and easily accept payments from mobile crypto wallets.

Our products and services for ecosystem partners represent an emerging growth opportunity and we believe there is a tremendous opportunity to support the development of the cryptoeconomy through additional technology and distribution for our ecosystem partners.

146

# Connect



# Pay



**Competition**

The cryptoeconomy is highly fragmented, quickly evolving, and competitive.

By combining the best of crypto and traditional finance, we believe that we are well-positioned to execute on our growth strategy, enable the cryptoeconomy, and achieve our mission of creating an open financial system for the world.

However, we do face significant competition from parties ranging from large, established financial incumbents to smaller, early stage financial technology providers and companies native to the cryptoeconomy, such as decentralized exchanges. Further, though we operate in regulated markets, some of our competitors have not or actively do not adhere to the same standards of regulation as we do. Because of our comprehensive suite of products and services, some of our competitors may also be our customers, and we believe in the benefits of 'coopetition' at these early stages of the cryptoeconomy's development.

For retail users, we compete with traditional financial technology and brokerage firms like Square, Robinhood, and PayPal, who have recently introduced crypto products and services. These companies have varying business models and focus areas and offer an overlapping, but limited, feature set, which includes buying and selling a subset of the crypto assets supported on our platform. In some cases, users who purchase through these platforms own the economic interest in a given crypto asset, but not the underlying asset itself, and therefore cannot use the asset to interact with the broader cryptoeconomy. We also compete with a number of companies that solely focus on the crypto market and have varying degrees of regulatory adherence, such as Binance.

For institutions, we primarily compete with other crypto-focused companies and a few traditional financial incumbents that offer point or siloed solutions that are limited in scope.

We differentiate ourselves through our cohesive ecosystem of products and services that address the distinct needs of our customers, our full stack technology platform that is purpose-built for the cryptoeconomy, significant investments in regulatory compliance and licensure, advanced cryptography and security expertise, and our emphasis on accessibility, trust, and ease of use. Our ability to quickly and continuously innovate to support additional blockchains, provide products and services to our customers that are native to the cryptoeconomy, such as staking and governance, and launch additional products and services further separates us from our competition.

This market is growing quickly and we expect that we will face competition from new entrants in the future that may increase competition in the markets we operate.

**Culture and Employees**

Powering the cryptoeconomy is no small task. Our employees join Coinbase to put a dent in the universe, advance the cryptoeconomy, and help create economic freedom for millions of people around the world.

Our employees are passionate about creating new products and services with technology. We hire entrepreneurs who are comfortable with ambiguity and thrive by innovating – driving our culture of repeatable innovation. We work in small teams who are empowered to create and rapidly execute toward ideas. When the creative moment strikes, we embrace efficient execution and adhere to robust security and compliance programs. However, we try not to let big company practices impede our speed to market. Our culture has and will evolve but, at our core, we strive to:

- Attract top talent in every seat.

- Play as a championship team.

- Be candid and kind.

- Focus on our customers.

- Foster repeatable innovation.

- Act like owners.

We believe that allowing our employees to work in the location that best suits them provides us access to a large talent pool and a sustained advantage in hiring and retaining employees in the United States, as well as in the United Kingdom, Ireland, Germany, Canada, Japan, Singapore, and the Philippines.

We are committed to diversity – in background, skill set, and perspective – which is business critical to ensuring we can continue to innovate and bring new products into the world to serve the broadest base of customers. We are also committed to inclusion, which to us means ensuring all employees have opportunities to learn, grow, develop, and perform the best work of their lives. And, most importantly, we are committed to belonging, such that all our employees feel they are a meaningful part of Coinbase and they matter.

As of December 31, 2020, we had 1,249 employees, of which over 40% were dedicated to engineering, product, or design roles. None of our employees are represented by a labor organization or are a party to a collective bargaining arrangement. We work to identify, attract, and retain employees who are aligned with and will help us progress with our mission, and we seek to provide competitive cash and equity compensation. We believe we have a good relationship with our employees and our unique, strong culture differentiates us and is a key driver of business success.

**Facilities**

We are a remote-first company, meaning that for the vast majority of roles, our employees have the option to work remotely. As a result of this strategy, we do not maintain a corporate headquarters, but do maintain physical offices in major cities around the world for purposes of collaboration and team building. We currently lease facilities in San Francisco, California; Redwood City, California; New York City, New York; Portland, Oregon; London, United Kingdom; Tokyo, Japan; Dublin, Ireland; Berlin, Germany; Manila, Philippines; and Singapore and may lease office space in additional cities where we find a future concentration of employees.

We believe that our facilities are adequate to meet our needs for the immediate future, and that, should we need additional physical office space, suitable additional space will be available in the future.

**Corporate Philanthropy**

At the core of our mission is the philosophy that all people should have access to a more fair, accessible, efficient, and transparent financial system to support economic freedom. This philosophy extends to how we engage with our communities. We have subscribed to the Pledge 1% and to fulfill our intent under the Pledge 1% campaign, in April 2020, our board of directors approved the reservation of up to 2,295,766 shares of Class A common stock that we may issue, over a period of ten years, pursuant to warrants to purchase shares of our Class A common stock in connection with our philanthropic endeavors. As of December 31, 2020, our board of directors had approved the issuance of a warrant exercisable for an aggregate of 229,577 shares of our Class A common stock at an exercise price of $0.00001 per share to fulfill our intent under the Pledge 1% campaign.

**State of Regulation**

We operate globally in a complex and rapidly evolving regulatory environment and are subject to a wide range of laws and regulations enacted by U.S. federal, state, and local and foreign governments, and regulatory authorities. We play a leadership role in driving innovative industry-wide solutions to new regulations. For example, we devote resources to solving interoperability issues amongst virtual asset service providers to ensure compliance with the Travel Rule under the BSA. In addition, we are a

founding member of the Crypto Rating Council, a member-owned and operated organization whose purpose is to assess whether any given crypto asset, or whether the development, issuance, and use of such asset, have characteristics that make it more or less likely to implicate U.S. federal securities laws.

The breadth of laws, rules, and regulations we are subject to include financial services and banking, consumer protection, money transmission, virtual currency, stored value and prepaid access, electronic payments, payment services, securities, commodities, and unclaimed property, as well as bespoke digital asset and cryptocurrency laws that have been promulgated in some jurisdictions. These laws, rules, and regulations evolve frequently and may be modified, interpreted, and applied in an inconsistent manner from one jurisdiction to another, and may conflict with one another. Moreover, the complexity and evolving nature of our business and the significant uncertainty surrounding the regulation of the cryptoeconomy, requires us to exercise our judgment as to whether certain laws, rules, and regulations apply to us, and it is possible that regulators may disagree with our conclusions. We are not regulated as a federal bank regulated by the Office of the Comptroller of the Currency or a CFTC-regulated futures commission merchant, designated contract market, or derivatives clearing organization. In addition, our crypto asset exchange is not an SEC-regulated national securities exchange or alternative trading system.

Globally, we are subject to increasingly strict legal and regulatory requirements relating to the detection and prevention of countering terrorist financing, anti-money laundering, fraud, and other illicit activity, the regulation of competition, economic and trade sanctions, privacy, cybersecurity, information security, and data protection. These descriptions are not exhaustive, and these laws, regulations and rules (and the interpretations thereof) frequently change and are increasing in number.

The laws and regulations to which we are subject, including those pertaining to digital assets and crypto assets, are rapidly evolving and increasing in scope. Therefore, we monitor these areas closely and invest significant resources in our legal, compliance, product, and engineering teams to ensure our business practices evolve to help us comply with the current laws, regulations, and legal standards to which we are subject, as well as to plan and prepare for changes in interpretations thereof, as well as additional laws, regulations and legal standards that are introduced in the future.

### Anti-money laundering and counter-terrorist financing

We are subject to various anti-money laundering and counter-terrorist financing laws, including the BSA in the United States, and similar laws and regulations abroad. In the United States, as a money services business registered with FinCEN, the BSA requires us to among other things, develop, implement, and maintain a risk-based anti-money laundering program, provide an anti-money laundering-related training program, report suspicious activities and transactions to FinCEN, comply with certain reporting and recordkeeping requirements, and collect and maintain information about our customers. In addition, the BSA requires us to comply with certain customer due diligence requirements as part of our anti-money laundering obligations, including developing risk-based policies, procedures, and internal controls reasonably designed to verify a customer's identity. Many states and other countries impose similar and, in some cases, more stringent requirements related to anti-money laundering and counter-terrorist financing. We have implemented a compliance program designed to prevent our platform from being used to facilitate money laundering, terrorist financing, and other illicit activity in countries, or with persons or entities, included on designated lists promulgated by OFAC and equivalent foreign authorities. Our compliance program includes policies, procedures, reporting protocols, and internal controls, and is designed to address legal and regulatory requirements as well as to assist us in managing risks associated with money laundering and terrorist financing. Anti-money laundering regulations are constantly evolving and vary from jurisdiction-to-jurisdiction. We continuously monitor our compliance with anti-money laundering and counter-terrorist financing regulations and industry standards and implement policies, procedures, and controls in light of the most current legal requirements.

In the United States, we are registered as a money services business with FinCEN and have obtained licenses to operate as a money transmitter or its equivalent in a number of states where such licenses are required, as well as in the District of Columbia and Puerto Rico. We have also obtained a BitLicense from

the NYDFS. As a registered money services business, a licensed money transmitter, and an entity subject to BitLicense compliance requirements, we are also subject to the BSA and laws and regulations related to the detection and prevention of money laundering and terrorist financing.

### Money transmission, stored value, and virtual currency business activity

In the United States, we have obtained licenses to operate as a money transmitter or its equivalent in the states where such licenses are required, as well as in the District of Columbia and Puerto Rico. In addition, we have obtained a BitLicense from the NYDFS. As a licensed money transmitter and an entity subject to the BitLicense regulatory regime, we are subject to, among other things, the BSA, restrictions and requirements with respect to the investment of customer funds and use and safeguarding of customer funds and crypto assets, and bonding, net worth, customer notice and disclosure, reporting and recordkeeping requirements applicable to the company, as well as control persons and inspection and examination by state regulatory agencies. These state licensing laws also cover matters such as regulatory approval of controlling shareholders, directors, and senior management of the licensed entity.

### New York state trust company

Our subsidiary, Coinbase Custody Trust Company, LLC, operates as a New York State-chartered limited purpose trust company, which is subject to regulation, examination, and supervision by the NYDFS. NYDFS regulations impose various compliance requirements including, without limitation, operational limitations related to the nature of crypto assets we can hold under custody, capital requirements, BSA and anti-money laundering program requirements, affiliate transaction limitations, and notice and reporting requirements.

### Electronic money and payment institution

We serve our customers through Electronic Money Institutions authorized by the U.K. Financial Conduct Authority and the Central Bank of Ireland. We comply with rules and regulations applicable to the European financial services industry, including those related to funds management, corporate governance, anti-money laundering, disclosure, reporting, and inspection. We are, or may be, subject to banking-related regulations in other countries now or in the future related to our role in the financial industry.

### Economic and trade sanctions

We are required to comply with economic and trade sanctions administered by the United States, the E.U., relevant E.U. member states, and other jurisdictions in which we operate. Economic and trade sanctions programs administered by OFAC and by certain foreign jurisdictions prohibit or restrict transactions to or from (or dealings with or involving) certain countries, regions, governments, and in certain circumstances, specified individuals and entities such as narcotics traffickers, terrorists, and terrorist organizations, as well as certain digital currency addresses.

### Securities

In recent years, the SEC and U.S. state securities regulators have stated that certain digital assets may be classified as securities under U.S. federal and state securities laws - however, there has not been definitive guidance on this point. A number of enforcement actions and regulatory proceedings have since been initiated against digital assets and their developers and proponents. Several foreign governments have also issued similar warnings cautioning that digital assets may be deemed to be securities under the laws of their jurisdictions.

We have established policies and practices to evaluate each crypto asset we consider for listing or for storage and are a founding member of the Crypto Rating Council.

151

### Broker-Dealer

Our broker-dealer business, operated by Coinbase Capital Markets, is registered with the SEC as a broker-dealer under the Exchange Act and in the states in which it conducts business. It is also a member and subject to the rules of FINRA. In addition, we own and operate Coinbase Securities, an SEC-registered alternative trading system. All of our broker-dealer and alternative trading system activities are subject to regulation, examination, investigation, and disciplinary action by the SEC, FINRA, and state securities regulators, as well as other governmental authorities and self-regulatory organizations with which they are registered or licensed or of which they are a member.

### Commodities and derivatives

The CFTC has stated and CFTC enforcement actions have confirmed that at least some crypto assets, including Bitcoin, fall within the definition of a "commodity" under the U.S. Commodities Exchange Act of 1936, or CEA. Under the CEA, the CFTC has broad enforcement authority to police market manipulation and fraud in spot crypto asset markets. We are subject to such authority with respect to improper trading on our platform. In addition, CFTC regulations and CFTC oversight and enforcement authority apply with respect to futures, swaps, other derivative products, and certain retail leveraged commodity transactions involving crypto assets, including the markets on which these products trade. Separately, security-based swaps are subject to SEC regulation and oversight. In general, we seek to ensure that crypto asset transactions on our platform do not constitute futures, swaps, security-based swaps, other derivative products, or retail leveraged commodity transactions. Given our novel business model and uncertainty regarding application of some of these laws and regulations, we may become subject to regulatory scrutiny or legal challenge with respect to our compliance with these requirements.

### Prohibitions on bribery and anti-corruption

We are subject to regulations imposed by the FCPA in the United States and similar laws in other countries, such as the Bribery Act 2010 in the United Kingdom, which generally prohibit companies and those acting on their behalf from making improper payments to foreign government officials for the purpose of obtaining or retaining business. Some of these laws, such as the Bribery Act, also prohibit improper payments between private entities and persons.

### Privacy and protection of user data

We are subject to a number of laws, rules, directives, and regulations relating to the collection, use, retention, security, processing, and transfer of personally identifiable information about our customers and employees in the countries where we operate. Our business relies on the processing of personal data in many jurisdictions and the movement of data across national borders. As a result, much of the personal data that we process, which may include certain financial information associated with individuals, is regulated by multiple privacy and data protection laws and, in some cases, the privacy and data protection laws of multiple jurisdictions. In many cases, these laws apply not only to third-party transactions, but also to transfers of information between or among us, our subsidiaries, and other parties with which we have commercial relationships.

### Consumer protection

The Federal Trade Commission, or FTC, the Consumer Financial Protection Bureau, or CFPB, and other U.S. federal, state, and local and foreign regulatory agencies regulate financial products, including money transfer services related to remittance or peer-to-peer transfers. These agencies, as well as certain other governmental bodies, in particular state attorneys general, have broad consumer protection mandates and discretion in enforcing consumer protection laws, including matters related to unfair or deceptive, and, in the case of the CFPB, abusive, acts or practices, or UDAAPs, and they promulgate, interpret, and enforce rules and regulations that affect our business. For example, all persons offering or providing financial services or products to consumers in the United States, directly or indirectly, can be subject to enforcement actions related to the prohibition of UDAAPs. The CFPB has enforcement

authority to prevent an entity that offers or provides consumer financial services or products or a service provider in the United States from committing or engaging in UDAAPs, including the ability to engage in joint investigations with other agencies, issue subpoenas and civil investigative demands, conduct hearings and adjudication proceedings, commence a civil action, grant relief (e.g., limit activities or functions; rescission of contracts), and refer matters for criminal proceedings.

### Escheatment and unclaimed property regulations

We are subject to unclaimed property laws in the United States and in other jurisdictions where we operate. These laws require us to turn over to certain government authorities the property of others held by us that has been unclaimed for a specified period of time, including airdropped tokens and forked crypto assets. We hold property subject to unclaimed property laws, and we have an ongoing program designed to help us comply with these laws. However, there is significant regulatory uncertainty with how states and foreign jurisdictions treat crypto assets under unclaimed property rules.

### Lending law

We originate secured consumer and commercial loans in certain states in the United States. As a result, we are subject to certain federal laws, including: the Truth-in-Lending Act and its implementing Regulation Z, which require creditors to provide consumers with uniform information regarding the terms of their loan and credit transactions; the Equal Credit Opportunity Act and its implementing Regulation B, which prohibits creditors from discriminating on the basis of race, color, sex, age, religion, national origin, marital status, the fact that all or part of an applicant's income derives from public assistance, or the fact that the applicant has exercised any right under the federal Consumer Credit Protection Act; the Fair Credit Reporting Act, and its implementing Regulation V administered by the CFPB, which imposes disclosure requirements on creditors who take adverse action on credit applications based on information contained in a credit report; and the Fair Debt Collection Practices Act, which imposes guidelines and limitations on the conduct of debt collectors in connection with the collection of consumer debts. Our lending activities are also subject to various state lending laws with respect to lending activities within such state. These state lending laws may be enforced by state attorneys general, state financial regulators, and private litigants, among others.

We are also subject to and seek to comply with other state and federal laws and regulations applicable to consumer and commercial lending, including additional requirements relating to loan disclosure, credit discrimination, credit reporting, debt collection, interest rate restrictions, and UDAAPs. These laws and regulations may be enforced by state financial regulators, state attorneys general, the CFPB, and private litigants, among others. Given our novel business model and uncertainty regarding application of some of these laws and regulations, particularly laws prohibiting UDAAPs, we may become subject to regulatory scrutiny or legal challenge with respect to our compliance with these requirements.

### Interchange fees

Interchange fees associated with four-party payments systems are being reviewed or challenged in various jurisdictions. For example, in the E.U., the Multilateral Interchange Fee Regulation caps interchange fees for credit and debit card payments and provides for business rules to be complied with by any company dealing with card transactions, including us. As a result, the fees that we collect in certain jurisdictions may become the subject of regulatory challenge.

### Association and network rules

The bylaws and agreements between clearing house participants and bankcard companies impose specific responsibilities and liabilities for issuers of debit cards. As the issuer of the Coinbase Card, we are required to comply with the appropriate National Automated Clearing House Association, or NACHA, bylaws, operating rules, and agreements, as well as card network rules and guidelines. Additional new products and services that we offer may also impose additional obligations on us to comply with NACHA and card network obligations related to preventing fraud, money laundering, and IT security breaches.

**Intellectual Property**

The protection of our technology and intellectual property is an important aspect of our business. We rely upon a combination of patents, trademarks, trade secrets, copyrights, confidentiality procedures, contractual commitments, and other legal rights to establish and protect our intellectual property. We generally enter into agreements with our employees and consultants that contain confidentiality provisions to control access to, and invention or work product assignment provisions to clarify ownership of, our proprietary information. We may also in the future agree to license our patents to third parties as part of various patent pools and open patent projects.

As of December 31, 2020, we held 21 issued U.S. patents and had 86 U.S. patent applications pending. We also held one issued patent and five patent applications pending in foreign jurisdictions, as well as six foreign applications pending pursuant to the Patent Cooperation Treaty. Our U.S. issued patents expire between 2035 and 2040. As of December 31, 2020, we held 14 registered trademarks in the United States, including Coinbase, and also held 82 registered trademarks in foreign jurisdictions. We also had 20 pending trademark applications in the United States, as well as 40 pending trademark applications in foreign jurisdictions. We continually review our development efforts to assess the existence and patentability of new intellectual property. We intend to continue to file additional patent applications with respect to our technology and trademark applications with respect to our brands.

Intellectual property laws, procedures, and restrictions provide only limited protection and any of our intellectual property rights may be challenged, invalidated, circumvented, infringed, or misappropriated. Further, the laws of certain countries do not protect proprietary rights to the same extent as the laws of the United States, and, therefore, in certain jurisdictions, we may be unable to protect our proprietary technology.

**Legal Proceedings**

*CFTC matter*

In July 2017, the Enforcement Division of the CFTC commenced an investigation that has covered topics including a 2017 Ethereum market event, trades made in 2017 by one of our then-current employees, the listing of Bitcoin Cash on our platform, and the design and operation of certain algorithmic functions related to liquidity management on our platform. During the course of its investigation, the CFTC has issued subpoenas to us and certain of our directors, executive officers, and former employees, including testimony subpoenas, and other requests for information. We are cooperating fully with the investigation.

*Other*

We are and, from time to time, we may become, subject to various legal proceedings and regulatory investigation matters that arise in the ordinary course of our business. We are also subject to regulatory oversight by numerous state, federal, and foreign regulators. For example, in December 2019, the Attorney General for the State of California issued an investigative subpoena for documents covering our business practices and policies, customer complaints, asset launches, and certain of our ongoing litigation. Similarly, in September 2020, the Attorney General for the State of Massachusetts issued an investigative subpoena for documents covering our business practices and policies, customer complaints, certain transfers of crypto assets, and certain of our ongoing litigation. In addition, in December 2020, the SEC issued an investigative subpoena for documents and information about certain of our customer programs and operations. And in January 2021, the California Department of Fair Employment and Housing issued an investigative subpoena for documents and information related to certain of our business practices and policies. We intend to cooperate fully with such investigations. We are not presently a party to any other legal or regulatory proceedings that in the opinion of our management, if determined adversely to us, would individually or taken together have a material adverse effect on our business, operating results, financial condition, or cash flows.

## MANAGEMENT

**Executive Officers and Directors**

The following table provides information regarding our executive officers and directors as of January 31, 2021:

| Name | Age | Position(s) |
|------|-----|-------------|
| **Executive Officers** | | |
| Brian Armstrong | 38 | Chief Executive Officer |
| Surojit Chatterjee | 46 | Chief Product Officer |
| Emilie Choi | 42 | President and Chief Operating Officer |
| Paul Grewal | 49 | Chief Legal Officer |
| Alesia J. Haas | 44 | Chief Financial Officer |
| **Non-Employee Directors** | | |
| Marc L. Andreessen | 49 | Director |
| Frederick Ernest Ehrsam III[1] | 32 | Director |
| Kathryn Haun[2,3] | 46 | Director |
| Kelly Kramer[1] | 53 | Director |
| Gokul Rajaram[2] | 46 | Director |
| Fred Wilson[1,2,3] | 59 | Director |

(1)  Member of the audit and compliance committee.
(2)  Member of the compensation committee.
(3)  Member of the nominating and corporate governance committee.

### Executive officers

*Brian Armstrong* is our co-founder and has served as our Chief Executive Officer and a member of our board of directors since our inception in May 2012. Before our founding, Mr. Armstrong served as a software engineer at Airbnb, Inc., an online marketplace company, from May 2011 to June 2012. From August 2003 to May 2012, Mr. Armstrong served as the founder and Chief Executive Officer of Universitytutor.com, an online tutoring directory and a subsidiary of Johnson Educational Technologies LLC. Mr. Armstrong also previously served as a consultant for the enterprise risk management division at Deloitte & Touche LLP, an accounting and consulting firm, from July 2005 to November 2005. In January 2020, Mr. Armstrong founded ResearchHub Technologies, Inc., a scientific research development platform, where he currently serves as Chief Executive Officer and a member of the board of directors. Mr. Armstrong holds a B.A. in Computer Science and Economics and an M.S. in Computer Science from Rice University. We believe Mr. Armstrong is qualified to serve on our board of directors because of the historical knowledge, operational expertise, leadership, and continuity that he brings to our board of directors as our co-founder and Chief Executive Officer.

*Surojit Chatterjee* has served as our Chief Product Officer since February 2020. From February 2017 to February 2020, Mr. Chatterjee served as Vice President of Product Management for Google Shopping at Google LLC, a multinational technology company and a subsidiary of Alphabet, Inc., a holding company. Mr. Chatterjee served as Senior Vice President and Head of Product at Flipkart Internet Private Limited, an e-commerce company, from October 2015 to February 2017. Prior to Flipkart, Mr. Chatterjee held various positions at Google, including Global Head of Product, Mobile Search Ads and AdSense for Search and Senior Product Manager, Mobile Search Ads, and served as Senior Product Manager at Symantec Corporation. Mr. Chatterjee holds a B. Tech in Computer Science and Engineering from the Indian Institute of Technology, Kharagpur, India, an M.S. in Computer Science from the State University of New York at Buffalo, and an M.B.A from the MIT Sloan School of Management.

*Emilie Choi* has served as our Chief Operating Officer since June 2019 and our President since November 2020. Ms. Choi previously served as our Vice President of Business, Data and International, from March 2018 to June 2019. From December 2009 to March 2018, Ms. Choi served as the Vice President and Head of Corporate Development for LinkedIn Corporation, a professional networking site and, following its acquisition in December 2016, a subsidiary of Microsoft Corporation, a software company. From August 2007 to December 2009, Ms. Choi served in various positions at Warner Bros. Entertainment Inc., a mass media and entertainment company, including as Director of Digital Business Strategy and Operations and Manager of Corporate Business Development and Strategy. Ms. Choi currently serves as a member of the board of directors of Naspers Limited, a global internet group, Prosus N.V., the international internet assets division of Naspers Limited, and ZipRecruiter, Inc., a jobs marketplace. Ms. Choi holds a B.A. in Economics from the Johns Hopkins University and an M.B.A from the Wharton School at the University of Pennsylvania.

*Paul Grewal* has served as our Chief Legal Officer since August 2020. Prior to joining us, Mr. Grewal served as Vice President and Deputy General Counsel of Facebook, Inc., a social media company, from June 2016 to August 2020. From December 2010 to June 2016, Mr. Grewal served as a U.S. Magistrate Judge for the U.S. District Court for the Northern District of California. Mr. Grewal was previously a partner at Howrey LLP and served as a Judicial Law Clerk for the U.S. Court of Appeals for the Federal Circuit and the U.S. District Court for the Northern District of Ohio. Mr. Grewal currently serves as a member of the board of directors of Epiq Systems, Inc., a global legal services company. Mr. Grewal holds a S.B. in Civil and Environmental Engineering from the Massachusetts Institute of Technology and a J.D. from the University of Chicago Law School.

*Alesia J. Haas* has served as our Chief Financial Officer since April 2018. Prior to joining us, Ms. Haas served as the Chief Financial Officer for Sculptor Capital Management, Inc. (formerly Och Ziff Capital Management Group LLC), a global institutional alternative asset manager, from December 2016 to April 2018. Prior to that, Ms. Haas served in various leadership positions at OneWest Bank, N.A., a commercial bank, from March 2009 until shortly after its acquisition by CIT Group Inc. in December 2015, including most recently as its Chief Financial Officer from January 2013 until the acquisition. Ms. Haas currently serves as a member of the board of directors of ANGI Homeservices Inc., an internet services company, and previously served as a member of the board of directors of Sears Holding Corp., a retail holding company, from February 2016 to December 2016. Ms. Haas holds a B.S. in Business Administration from California Polytechnic State University, San Luis Obispo.

### Non-employee directors

*Marc L. Andreessen* has served as a member of our board of directors since December 2020. Mr. Andreessen is a co-founder and has been a general partner of Andreessen Horowitz, a venture capital firm, since July 2009. Previously, Mr. Andreessen co-founded and served as the Chairman of the board of directors of Opsware, Inc. (formerly known as Loudcloud Inc.), a software company, from September 1999 until its acquisition by Hewlett-Packard Company, an information technology company, in September 2007. Prior to that time, Mr. Andreessen served as Chief Technology Officer of America Online, Inc., an Internet services company, during a portion of 1999. Mr. Andreessen also co-founded Netscape Communications Corporation, a software company, serving in various positions, including Chief Technology Officer and Executive Vice President of Products from April 1994 until it was acquired by America Online in March 1999. Mr. Andreessen has served as a member of the board of directors of Facebook, Inc., a social networking company, since June 2008. Mr. Andreessen also currently serves on the board of directors of several privately held companies. Mr. Andreessen previously served on the boards of directors of eBay Inc., an e-commerce corporation, from September 2008 to October 2014, Hewlett-Packard Company, an information technology company, from September 2009 to October 2015, and Hewlett Packard Enterprise Company, an enterprise information technology company, from November 2015 to April 2018. Mr. Andreessen holds a B.S. in Computer Science from the University of Illinois at Urbana-Champaign. We believe that Mr. Andreessen is qualified to serve as a member of our board of directors because of his extensive leadership and business experience with the venture capital

156

and technology industries, as well as his service on the boards of directors of other privately and publicly held companies.

*Frederick Ernest Ehrsam III* is our co-founder and has served as a member of our board of directors since March 2013. Since June 2018, Mr. Ehrsam has served as co-founder and a Managing Partner at Paradigm, a crypto-focused investment firm. From November 2012 to January 2017, Mr. Ehrsam served as our President. Prior to our founding, Mr. Ehrsam was a foreign exchange trader at The Goldman Sachs Group, Inc., a multinational investment bank and financial services company, from July 2010 to June 2012. Mr. Ehrsam holds a B.S. in Computer Science and Economics from Duke University. We believe Mr. Ehrsam is qualified to serve on our board of directors because of the historical knowledge, operational expertise, leadership, and continuity that he brings to our board of directors as our co-founder as well as his understanding of the market dynamics and developments within the crypto asset industry.

*Kathryn Haun* has served as a member of our board of directors since May 2017. Since June 2018, Ms. Haun has served as a general partner at Andreessen Horowitz, a venture capital firm. Ms. Haun has also been a lecturer in management at the Stanford University Graduate School of Business since December 2017 and a lecturer in law at the Stanford Law School since January 2016. From September 2006 to May 2017, Ms. Haun held several key positions at the U.S. Department of Justice, including Assistant U.S. Attorney & Digital Currency Coordinator, Counselor to the Attorney General, and Counsel to the Assistant Attorney General for National Security. Prior to that, Ms. Haun was an attorney at Sidley Austin LLP, a law firm, from 2001 to 2006, and clerked for Supreme Court Justice Anthony Kennedy from 2004 to 2005. Ms. Haun is a lifetime member of the Council on Foreign Relations. Ms. Haun holds a B.A. Summa Cum Laude in International Relations from Boston University and a J.D. with Honors from Stanford Law School. We believe Ms. Haun is qualified to serve as a member of our board of directors because of her deep understanding of the cryptocurrency market and the regulatory issues related thereto, and her experience in investing in and advising technology companies.

*Kelly A. Kramer* has served as a member of our board of directors since December 2020. From January 2015 to December 2020, Ms. Kramer served as the Executive Vice President and Chief Financial Officer of Cisco Systems, Inc., a worldwide technology company. Prior to that, from January 2012 to January 2015, Ms. Kramer served in various finance roles at Cisco, including Senior Vice President, Corporate Finance and Senior Vice President, Business Technology and Operations Finance. Prior to Cisco, Ms. Kramer served in various finance roles at GE Healthcare Systems, GE Healthcare Diagnostic Imaging, and GE Healthcare Biosciences, including Vice President and Chief Financial Officer of GE Healthcare Systems. Ms. Kramer has served on the board of directors of Gilead Sciences, Inc., a biopharmaceutical company, since August 2016, and on the board of directors of Snowflake Inc., a cloud-based data-warehousing company, since January 2020. Ms. Kramer also currently serves on the board of directors of a nonprofit organization. Ms. Kramer holds a B.S. in Mathematics from the Purdue University. We believe Ms. Kramer is qualified to serve as a member of our board of directors because of her extensive financial expertise and management experience.

*Gokul Rajaram* has served as a member of our board of directors since August 2020. Since November 2019, Mr. Rajaram has served on the executive team of DoorDash, Inc., an on-demand prepared food delivery service. From July 2013 to October 2019, Mr. Rajaram held several key positions, including Caviar Lead and Register Lead, at Square, Inc., a financial technology company. Prior to Square, Mr. Rajaram served as Product Director of Ads at Facebook, Inc., a social media company, from August 2010 to June 2013. Mr. Rajaram was Co-Founder and Chief Executive Officer of Chai Labs Inc., a semantic technology startup, from December 2007 until it was acquired by Facebook in September 2010. From January 2003 to November 2007, Mr. Rajaram served as Product Management Director for Google AdSense, an online advertising company. Mr. Rajaram previously served as a member of the board of directors of RetailMeNot, Inc., a multinational company that maintained a collection of coupon websites, from October 2013 until it was acquired by Harland Clarke Holdings Corp., a payment and marketing services firm, in May 2017. Mr. Rajaram has served as a member of the board of directors of Trade Desk Inc., a global technology company focused on the digital advertising space, since May 2018, and as a member of the board of directors of Pinterest, Inc., an image sharing and social media service, since

157

February 2020. Mr. Rajaram also currently serves on the board of directors of a privately held company. Mr. Rajaram holds a B. Tech in Computer Science from the Indian Institute of Technology Kanpur, a M.S. in Computer Science from the University of Texas, and an M.B.A. from the MIT Sloan School of Management. We believe Mr. Rajaram is qualified to serve as a member of our board of directors because of his extensive experience working with the management teams of a number of privately and publicly held companies and his knowledge and extensive experience with product development.

*Fred Wilson* has served as a member of our board of directors since January 2017. Since June 2003, Mr. Wilson has served as a Partner at Union Square Ventures, a venture capital firm. Mr. Wilson has also served as a Managing Partner at Flatiron Partners since June 1996. Mr. Wilson has served as a member of the board of directors of Etsy, Inc., an e-commerce website, since June 2007 and has served as the Chairman of the board of directors of Etsy since October 2014. Mr. Wilson also currently serves on the boards of directors of several privately held companies. Mr. Wilson holds a S.B. in Mechanical Engineering from the Massachusetts Institute of Technology and an M.B.A from the Wharton School at the University of Pennsylvania. We believe Mr. Wilson is qualified to serve as a member of our board of directors because of his extensive experience in the venture capital industry, his knowledge of technology companies, and his deep understanding of our business and operations as one of our early investors.

## Appointment of Officers

Our executive officers are appointed by, and serve at the discretion of, our board of directors. There are no family relationships among any of our executive officers or directors.

## Board of Directors Composition

Our board of directors currently consists of seven members with two vacancies. Pursuant to our amended and restated certificate of incorporation, as in effect prior to the effectiveness of the registration statement of which this prospectus forms a part, and amended and restated voting agreement, Mses. Haun and Kramer and Messrs. Armstrong, Andreessen, Ehrsam, Rajaram, and Wilson have been designated to serve as members of our board of directors. Pursuant to our amended and restated voting agreement (i) the seats occupied by Messrs. Armstrong and Ehrsam are elected by the holders of a majority of our Class A common stock and Class B common stock, voting exclusively and as a separate series, as the designees of the holders of our Class A common stock and Class B common stock and the holders our FF convertible preferred stock who provide services to us as officers; (ii) the seat occupied by Mr. Wilson is elected by the holders of a majority of our Series A convertible preferred stock, voting exclusively and as a separate series, as the designee of the holders of a majority of our Series A convertible preferred stock held by Union Square Ventures 2012 Fund, L.P.; (iii) the seat occupied by Mr. Rajaram is elected by the holders of a majority of our Series C convertible preferred stock, voting exclusively and as a separate series, as the designee of the holders of a majority of our Series C convertible preferred stock held by DFJ Growth 2013, L.P.; and (iv) the seats occupied by Mses. Haun and Kramer, and Mr. Andreessen, and the two vacant seats, are elected by the holders of a majority of our outstanding capital stock, excluding the Series E convertible preferred stock, voting together as a single class on an as-converted basis, with Ms. Haun as the designee of her fellow directors, Ms. Kramer as the designee of Mr. Armstrong, and Mr. Andreessen, and the two directors who fill the currently vacant seats, as the designees of the nominating and corporate governance committee.

The provisions of our amended and restated certificate of incorporation and the amended and restated voting agreement by which the directors are currently elected will terminate shortly following the effectiveness of the registration statement of which this prospectus forms a part and there will be no contractual obligations regarding the election of our directors. Each of our current directors will continue to serve until the election and qualification of his or her successor, or his or her earlier death, resignation, or removal.

**Classified Board of Directors**

In accordance with our restated certificate of incorporation that will be effective shortly following the effectiveness of the registration statement of which this prospectus forms a part, our board of directors will initially be divided into three classes with staggered three-year terms. Upon expiration of the term of a class of directors, directors for that class will be elected for three-year terms at the annual meeting of stockholders in the year in which that term expires. As a result, only one class of directors will be elected at each annual meeting of our stockholders, with the other classes continuing for the remainder of their respective three-year terms. Each director's term will continue until the election and qualification of his or her successor, or his or her earlier death, resignation, or removal. Our directors will initially be divided among the three classes as follows:

- Class I directors, whose initial term will expire at the annual meeting of stockholders to be held in 2022, will consist of Frederick Ernest Ehrsam III and Fred Wilson;

- Class II directors, whose initial term will expire at the annual meeting of stockholders to be held in 2023, will consist of Kathryn Haun, Kelly A. Kramer, and Gokul Rajaram; and

- Class III directors, whose initial term will expire at the annual meeting of stockholders to be held in 2024, will consist of Marc L. Andreessen and Brian Armstrong.

On the date on which our board of directors certifies that Mr. Armstrong and his affiliated entities hold a majority of the voting power of all the then-outstanding shares of our capital stock (any such date referred to as a staggered board end date), we will no longer have a classified board of directors, and all directors will be elected for annual terms, provided, however, that each director initially elected for a three-year term will serve the remainder of the term to which he or she was elected. If, following any staggered board end date, Mr. Armstrong and his affiliated entities cease to hold a majority of the voting power of all the then-outstanding shares of our capital stock, our board of directors will revert to being divided into three classes with staggered three-year terms as described above, until the subsequent staggered board end date. For additional information regarding the structure of our board of directors, you should refer to our restated certificate of incorporation that will be effective shortly following the effectiveness of the registration statement and which is included as an exhibit to the registration statement of which this prospectus forms a part.

Our restated certificate of incorporation and restated bylaws that will be effective shortly following the effectiveness of the registration statement of which this prospectus forms a part, provide that only our board of directors may fill vacancies on our board. Further, our restated certificate of incorporation will provide that during periods in which our board of directors is classified, any vacancy filled by our board of directors must be approved by the affirmative vote of all the directors then in office.

The classification of our board of directors may have the effect of delaying or preventing changes in our control or management. See the section titled "Description of Capital Stock—Restated Certificate of Incorporation and Restated Bylaws Provisions" for additional information.

**Director Independence**

Our Class A common stock will be listed on the Nasdaq Global Select Market. Under the rules of Nasdaq, independent directors must comprise a majority of a listed company's board of directors within a specified period of such company's listing of its shares. In addition, rules require that, subject to specified exceptions, each member of a listed company's audit, compensation, and nominating and corporate governance committees be independent. Under Nasdaq rules, a director will only qualify as an "independent director" if, in the opinion of that company's board of directors, that person does not have a

relationship that would interfere with the exercise of independent judgment in carrying out the responsibilities of a director.

Audit committee members must also satisfy the independence criteria set forth in Rule 10A-3 under the Exchange Act. In order to be considered independent for purposes of Rule 10A-3, a member of an audit committee of a listed company may not, other than in his or her capacity as a member of the audit committee, the board of directors, or any other board committee: (i) accept, directly or indirectly, any consulting, advisory, or other compensatory fee from the listed company or any of its subsidiaries; or (ii) be an affiliated person of the listed company or any of its subsidiaries. We intend to satisfy the audit committee independence requirements of Rule 10A-3 as of the effectiveness of the registration statement of which this prospectus forms a part.

Our board of directors has undertaken a review of the independence of each director and considered whether each director has a material relationship with us that could compromise his or her ability to exercise independent judgment in carrying out his or her responsibilities. As a result of this review, our board of directors determined that Mses. Haun and Kramer and Messrs. Andreessen, Ehrsam, Rajaram, and Wilson are "independent directors" as defined under the applicable rules and regulations of the SEC and the listing requirements and rules of Nasdaq. In making these determinations, our board of directors reviewed and discussed information provided by the directors and us with regard to each director's business and personal activities and current and prior relationships as they may relate to us and our management, including the beneficial ownership of our capital stock by each non-employee director and the transactions involving them described in the section titled "Certain Relationships and Related-Party Transactions."

**Committees of the Board of Directors**

Our board of directors has established an audit and compliance committee, a compensation committee, and a nominating and corporate governance committee, each of which will have the composition and responsibilities described below. Members serve on these committees until their resignation or until otherwise determined by our board of directors. Each committee will operate under a written charter approved by our board of directors that satisfies the applicable rules of the SEC and the listing standards of Nasdaq. Copies of each committee's charter will be posted on the Investor Relations section of our website.

### *Audit and compliance committee*

Our audit and compliance committee is comprised of Ms. Kramer and Messrs. Ehrsam and Wilson. Ms. Kramer is the chairperson of our audit and compliance committee. Ms. Kramer and Messrs. Ehrsam and Wilson each meet the requirements for independence under the current Nasdaq listing standards and SEC rules and regulations. In addition, our board of directors has determined that Ms. Kramer is an "audit committee financial expert" as defined in Item 407(d) of Regulation S-K promulgated under the Securities Act. This designation does not impose on her any duties, obligations, or liabilities that are greater than are generally imposed on members of our audit and compliance committee and our board of directors. Each member of our audit and compliance committee is financially literate. Our audit and compliance committee is directly responsible for, among other things:

- selecting a firm to serve as the independent registered public accounting firm to audit our consolidated financial statements;

- ensuring the independence of the independent registered public accounting firm;

- discussing the scope and results of the audit with the independent registered public accounting firm and reviewing, with management and that firm, our interim and year-end operating results;

- establishing procedures for employees to anonymously submit concerns about questionable accounting or audit matters;

160

- considering the adequacy of our internal controls and internal audit function;

- inquiring about significant risks, reviewing our policies for risk assessment and risk management, including cybersecurity risks, and assessing the steps management has taken to control these risks;

- reviewing and overseeing our policies related to compliance risks;

- reviewing related party transactions that are material or otherwise implicate disclosure requirements; and

- approving or, as permitted, pre-approving all audit and non-audit services to be performed by the independent registered public accounting firm.

### Compensation committee

Our compensation committee is comprised of Ms. Haun and Messrs. Rajaram and Wilson. Mr. Wilson is the chairperson of our compensation committee. The composition of our compensation committee meets the requirements for independence under the current Nasdaq listing standards and SEC rules and regulations. Each member of this committee is a non-employee director, as defined in Rule 16b-3 promulgated under the Exchange Act. Our compensation committee is responsible for, among other things:

- reviewing and approving, or recommending that our board of directors approve, the compensation and the terms of any compensatory agreements of our executive officers;

- reviewing and recommending to our board of directors the compensation of our directors;

- administering our stock and equity incentive plans;

- reviewing and approving, or making recommendations to our board of directors with respect to, incentive compensation and equity plans; and

- establishing our overall compensation philosophy.

### Nominating and corporate governance committee

Our nominating and corporate governance committee is comprised of Ms. Haun and Mr. Wilson. Ms. Haun is the chairperson of our nominating and corporate governance committee. The composition of our nominating and corporate governance committee meets the requirements for independence under the current Nasdaq listing standards and SEC rules and regulations. Our nominating and corporate governance committee is responsible for, among other things:

- identifying and recommending candidates for membership on our board of directors;

- recommending directors to serve on board committees;

- reviewing and recommending our corporate governance guidelines and policies;

- reviewing succession plans for senior management positions, including the chief executive officer;

- reviewing proposed waivers of the code of business conduct and ethics for directors, executive officers, and employees (with waivers for directors or executive officers to be approved by the board of directors);

- evaluating, and overseeing the process of evaluating, the performance of our board of directors and individual directors; and

161

- advising our board of directors on corporate governance matters.

**Board's Role in Risk Oversight**

Our board of directors is primarily responsible for overseeing our risk management processes. Our board of directors, as a whole, determines our appropriate level of risk, assesses the specific risks that we face, and reviews management's strategies for adequately mitigating and managing the identified risks. Although our board of directors administers this risk management oversight function, the committees of our board of directors support our board of directors in discharging its oversight duties and address risks inherent in their respective areas. The audit and compliance committee reviews our major financial risk exposures and the steps management has taken to monitor and control such exposures, including our procedures and related policies with respect to risk assessment and risk management. Our audit and compliance committee also reviews matters relating to compliance, cybersecurity, and security and reports to our board of directors regarding such matters. The compensation committee reviews risks and exposures associated with compensation plans and programs. We believe this division of responsibilities is an effective approach for addressing the risks we face and that our board leadership structure supports this approach.

**Board Diversity**

Each year, our nominating and corporate governance committee will review, with the board of directors, the appropriate characteristics, skills, and experience required for the board of directors as a whole and its individual members. In evaluating the suitability of individual candidates, our nominating and corporate governance committee will consider factors including, without limitation, an individual's character, integrity, judgment, potential conflicts of interest, other commitments, and diversity. While we have no formal policy regarding board diversity for our board of directors as a whole nor for each individual member, the nominating and corporate governance committee does consider such factors as gender, race, ethnicity and experience, area of expertise, as well as other individual attributes that contribute to the total diversity of viewpoints and experience represented on the board of directors.

**Code of Business Conduct and Ethics**

In connection with this offering, our board of directors will adopt a code of business conduct and ethics that applies to all of our employees, officers, and directors. The full text of our code of business conduct and ethics will be posted on the Investor Relations section of our website. The reference to our website address in this prospectus does not include or incorporate by reference the information on our website into this prospectus. We intend to disclose future amendments to certain provisions of our code of business conduct and ethics, or waivers of these provisions, on our website or in public filings.

**Compensation Committee Interlocks and Insider Participation**

None of the members of our compensation committee is or has been an officer or employee of our company. None of our executive officers currently serves, or during the year ended December 31, 2020 served, as a member of the board of directors, or as a member of the compensation or similar committee, of any entity that has one or more executive officers serving on our board of directors or compensation committee.

**Non-Employee Director Compensation**

The table below provides information regarding the total compensation of the non-employee members of our board of directors who served on our board of directors during the year ended December 31, 2020. All compensation that we paid to Mr. Armstrong, our only employee director, is set forth in the table below in "Executive Compensation—2020 Summary Compensation Table." Other than as set forth in the table and described more fully below, during the year ended December 31, 2020, we did not pay any fees to,

make any equity awards or non-equity awards to, or pay any other compensation to the non-employee members of our board of directors.

| Name | Stock Awards[(1)(2)] | | Total |
|---|---|---|---|
| Marc L. Andreessen | $ | — | $ — |
| Christopher V. Dodds* | | — | — |
| Frederick Ernest Ehrsam III | | — | — |
| Kathryn Haun | | 5,962,140 | 5,962,140 |
| Kelly Kramer | | 637,093 | 637,093 |
| Gokul Rajaram | | 637,093 | 637,093 |
| Barry Schuler** | | — | — |
| Fred Wilson | | — | — |

\*   Mr. Dodds resigned from our board of directors in December 2020.

\*\*   Mr. Schuler resigned from our board of directors in August 2020.

(1)   The amounts reported represent the grant date fair value of the stock awards granted to our non-employee directors during fiscal 2020 as computed in accordance with FASB Accounting Standards Codification Topic 718. The assumptions used in calculating the grant date fair value of the stock awards reported in the Stock Awards column are set forth in note 14 to our consolidated financial statements included elsewhere in this prospectus. Note that the amounts reported in this column reflect the accounting cost for these stock awards and do not correspond to the actual economic value that may be received by our non-employee directors from the stock awards.

(2)   The following table sets forth information on the aggregate number of shares of our common stock underlying outstanding stock options and stock awards held by our non-employee directors as of December 31, 2020 and the aggregate number of unvested shares of our common stock underlying outstanding stock options and stock awards held by our non-employee directors as of December 31, 2020:

| | Option Awards | | | Stock Awards | |
|---|---|---|---|---|---|
| Name | Number of Shares Underlying Stock Options Granted in the Year Ended December 31, 2020 | Number of Shares Underlying Stock Options Held as of December 31, 2020 | Number of Shares Underlying Unvested Stock Options Held as of December 31, 2020 | Number of Shares or Units Granted in the Year Ended December 31, 2020 | Number of Shares or Units of Stock That Have Not Vested as of December 31, 2020 |
| Marc L. Andreessen | — | — | — | — | — |
| Christopher V. Dodds | — | 33,750 [(1)] | — | — | — |
| Frederick Ernest Ehrsam III | — | — | — | — | — |
| Kathryn Haun | — | 235,742 [(2)] | 31,112 | 181,000 [(3)] | 181,000 |
| Kelly Kramer | — | — | — | 19,341 [(4)] | 19,341 |
| Gokul Rajaram | — | — | — | 19,341 [(5)] | 19,341 |
| Barry Schuler | — | — | — | — | — |
| Fred Wilson | — | — | — | — | — |

(1)   The stock option for 33,750 shares of our Class B common stock is fully vested.

(2)   The stock option for 266,854 shares of our Class B common stock vests monthly at the rate of 1/48th of the shares of our Class B common stock underlying the stock option following the May 17, 2017 vesting commencement date, in each case subject to continued service. The stock option is early exercisable.

(3)   The stock award for 181,000 shares of our Class A common settled in full on January 21, 2021.

(4)   The stock award for 19,341 shares of our Class A common stock settles at the rate of one half of the shares of our Class A common stock underlying the stock award on the one year anniversary of the February 20, 2021 vesting commencement date and one eighth of the shares of our Class A common stock underlying the stock award on a quarterly basis thereafter.

(5)   The stock award for 19,341 shares of our Class A common stock settles at the rate of one half of the shares of our Class A common stock underlying the stock award on the one year anniversary of the August 20, 2020 vesting commencement date and one eighth of the shares of our Class A common stock underlying the stock award on a quarterly basis thereafter.

In January 2021, we granted Ms. Haun a stock award for 19,341 shares of our Class A common stock as compensation for Ms. Haun's continued service as a member of our board of directors. The stock award is subject to the terms of the 2019 Plan and vests quarterly over two years at the rate of one eighth

of the shares of our Class A common stock underlying the stock award following the February 20, 2021 vesting commencement date, in each case subject to Ms. Haun's continued service.

Before this offering, we did not have a formal policy to provide any cash or equity compensation to our non-employee directors for their service on our board of directors or committees of our board of directors. In connection with this offering, in February 2021, our board of directors approved the following non-employee director compensation program:

### Non-Employee Director Equity Compensation

Following this offering, each non-employee director will be entitled to receive RSUs under our 2021 Plan.

*Initial Award RSU Grant.* Following the completion of this offering, each non-employee director appointed to our board of directors following this offering will be granted RSUs, or the Initial Award RSUs, on the date of his or her appointment to our board of directors having an aggregate value of $350,000 (with such amount pro-rated based on the number of days between the date of such non-employee director's appointment and (i) the date of our first annual meeting of stockholders following the date of grant or (ii) to the extent that we have not determined the date of the next annual meeting of stockholders on or before the date of grant, then the one-year anniversary of the most recently completed annual meeting of our stockholders (or in the case of a non-employee director appointed to our board of directors prior to our 2022 annual meeting of stockholders, the one-year anniversary of the effectiveness of the registration statement of which this prospectus forms a part)). The Initial Award RSUs will vest in equal quarterly installments over a period of three years from the grant date, so long as the non-employee director continues to provide services to us through each such date. The Initial Award RSUs will fully vest upon the consummation of a corporate transaction (as defined in the 2021 Plan).

If an individual is appointed as a non-employee director at an annual meeting of stockholders, he or she will be granted an Initial Award RSU in lieu of the Annual RSU Grant, as described below.

*Annual RSU Grant.* On May 15, 2021 and thereafter on the date of each annual meeting of stockholders following the completion of this offering, each non-employee director who is serving on our board of directors and will continue to serve on our board of directors following, May 15, 2021 or the date of such annual meeting will automatically be granted RSUs, or the Annual RSUs, under our 2021 Plan having an aggregate value of $300,000. The Annual RSUs will vest in four equal quarterly installments from the date of grant, except that the final installment will vest on the earlier of (i) the date of the next annual meeting of stockholders and (ii) the date that is one year following the Annual RSU grant date, in each case so long as the non-employee director continues to provide services to us through such date. In addition, the Annual RSUs will fully vest upon the consummation of a corporate transaction (as defined in the 2021 Plan).

*Additional Annual RSU Grants.* Following the completion of this offering, each non-employee director also will automatically be granted RSUs, or Additional Annual RSUs, under our 2021 Plan having an aggregate value of the dollar amount set forth below, determined based on roles served as follows:

- General Board Service: $30,000

- Audit and Compliance Committee Chair: $35,000

- Audit and Compliance Committee Member: $20,000

- Compensation Committee Chair: $25,000

- Compensation Committee Member: $15,000

- Nominating and Corporate Governance Committee Chair: $25,000

- Nominating and Corporate Governance Committee Member: $15,000

Each Additional Annual RSU will vest in four equal quarterly installments from the date of grant, except that the final installment will vest on the earlier of (i) the date of the next annual meeting of our stockholders and (ii) the date that is one year following the Additional Annual RSU Grant Date, in each case, so long as the non-employee director continues to provide services to us through each such date. In addition, the Additional Annual RSUs will fully vest upon the consummation of a corporate transaction.

Employee directors will receive no cash compensation and no additional compensation for their service as a director.

*Non-Employee Director Compensation Limits*. No non-employee director may receive equity awards under our 2021 Plan with an aggregate grant date fair value (determined as set forth in the 2021 Plan) that, when combined with cash compensation received for service as a non-employee director, exceeds $1,000,000 in a calendar year.

## EXECUTIVE COMPENSATION

We ceased to be an emerging growth company on December 31, 2020. However we will continue to be treated as an emerging growth company for certain purposes and as such we have opted to comply with the executive compensation disclosure rules applicable to "smaller reporting companies," as such term is defined in the rules promulgated under the Securities Act. This section provides an overview of the compensation awarded to, earned by, or paid to each individual who served as our principal executive officer during the year ending December 31, 2020, and our next two most highly compensated executive officers in respect of their service to our company during the year ending December 31, 2020. We refer to these individuals as our named executive officers. The compensation information disclosed herein for our three named executive officers is disclosed in accordance with SEC requirements; such disclosure does not include the compensation for our other executive officers. Our named executive officers for the year ending December 31, 2020 who appear in the 2020 Summary Compensation Table are:

- Brian Armstrong, Chief Executive Officer;

- Surojit Chatterjee, Chief Product Officer; and

- Paul Grewal, Chief Legal Officer.

**2020 Summary Compensation Table**

The amounts below represent the compensation awarded to or earned by or paid to our named executive officers for the year ended December 31, 2020:

| Name and Principal Position | Fiscal Year | Salary ($)[1] | Bonus ($)[2] | Stock Awards ($)[3] | Option Awards ($)[3] | All Other Compensation ($) | Total ($) |
|---|---|---|---|---|---|---|---|
| Brian Armstrong<br>*Chief Executive Officer* | 2020 | 1,000,000 | — | — | 56,670,000 | 1,802,256 [4] | 59,472,256 |
| Surojit Chatterjee<br>*Chief Product Officer* | 2020 | 616,435 [5] | 300,000 | — | 14,950,463 | — | 15,866,898 |
| Paul Grewal<br>*Chief Legal Officer* | 2020 | 209,519 [5] | 100,000 | 7,601,630 | 10,106,430 | — | 18,017,579 |

(1)   Messrs. Armstrong, Chatterjee, and Grewal may each elect to receive their salary, or a portion thereof, in the form of a crypto asset.

(2)   The amounts reported reflect signing bonuses received by each of Messrs. Chatterjee and Grewal pursuant to their offer letters in connection with their commencement of employment. These payments are described in greater detail in the section titled "—Executive Employment Agreements" below.

(3)   The amounts reported represent the grant date fair value of the stock options and stock awards granted to our named executive officers under our 2019 Plan during 2020 as computed in accordance with FASB Accounting Standards Codification Topic 718. The assumptions used in calculating the grant date fair value of the stock options and stock awards reported in the Option Awards and Stock Awards columns are set forth in note 14 to our consolidated financial statements included elsewhere in this prospectus. Note that the amounts reported in this column reflect the accounting cost for these stock options and do not correspond to the actual economic value that may be received by our named executive officers from the stock options.

(4)   The amount reported represents (i) $17,165 in reimbursed legal fees incurred in connection with the negotiation of certain employment matters related to Mr. Armstrong, and (ii) $1,785,091 in costs related to personal security measures for Mr. Armstrong. We view personal security expenses for Mr. Armstrong as reasonable business expenses due to a bona fide business-oriented security concern and not the receipt of taxable personal benefits.

(5)   Messrs. Chatterjee and Grewal joined us as our Chief Product Officer and Chief Legal Officer in February 2020 and August 2020, respectively. The amounts reported in this column reflect each of Messrs. Chatterjee and Grewal's salaries for the portion of their service during 2020.

**Equity Compensation**

From time to time, we have granted equity awards in the form of stock options to our named executive officers, which are generally subject to vesting based on each of our named executive officer's

continued service with us. Each of our named executive officers currently holds outstanding stock options to purchase shares of our Class A common stock and Class B common stock that were granted under our 2013 Plan or 2019 Plan, as set forth in the "—Outstanding Equity Awards at Year-End Table" below.

**Executive Employment Arrangements**

We have entered into an offer letter with Brian Armstrong and amended and restated offer letters with Surojit Chatterjee and Paul Grewal in February 2021. The foregoing offer letters set forth the terms and conditions of employment for our named executive officers, including continued payment of such executive's annual base salary, subject to periodic review. The offer letters have no specific term and provide for at-will employment. We do not currently provide annual cash bonuses to our named executive officers.

Pursuant to Mr. Chatterjee's amended and restated offer letter, he will continue to be eligible to receive any unpaid portion of the $1,000,000 signing advance set forth in his offer letter, dated December 6, 2019, less any amounts paid prior to the date of Mr. Chatterjee's amended and restated offer letter.

Pursuant to Mr. Grewal's amended and restated offer letter, in the event that his employment with us is terminated (but not due to downsizing or layoff) within twelve months of the first day of his employment start date, he agrees to repay the $100,000 signing bonus set forth in his offer letter, dated June 24, 2020, pro-rated with respect to the amount of time he has been employed by us.

**Potential Payments upon Termination and Change of Control**

Each of our officers, including our named executive officers, has also entered into a participation agreement pursuant to which he or she has become a beneficiary of our Change of Control and Severance Policy, or the COC Policy. Pursuant to the COC Policy and their respective participation agreements, in the event that the named executive officer is terminated without "cause" or resigns for "good reason" within three months before or 12 months following a "change of control" of the company (as such terms are defined in the COC Policy), he or she will be entitled to: (i) an amount equal to twelve months of his or her base salary at the rate in effect immediately prior to such termination, payable in a cash lump-sum, and (ii) to the extent the named executive officer timely elects to receive continued coverage under our group-healthcare plans, we will continue to pay the employer portion of the participant's premium payments for such continued coverage for a period ending on the earlier of (x) 12 months following the termination date and (y) the date that the named executive officer becomes eligible for coverage under another employer's plans. In addition, each of the named executive officer's outstanding equity awards will become vested and exercisable, as applicable, with respect to 100% of the underlying shares, with any performance criteria deemed achieved at the greater of 100% of target or actual projected performance. All such severance payments and benefits are subject to each named executive officer's execution of a general release of claims against us.

Additionally, in the event that our named executive officers are terminated without "cause" or resign for "good reason" outside of the period three months before or 12 months after a "change of control" (as such terms are defined in the COC Policy), each of our named executive officers will be entitled to (i) an amount equal to six months of his or her base salary at the rate in effect immediately prior to such termination, payable in a cash lump-sum and (ii) to the extent the named executive officer timely elects to receive continued coverage under our group-healthcare plans, we will continue to pay the employer portion of the participant's premium payments for such continued coverage for a period ending on the earlier of (x) six months following the termination date and (y) the date that the named executive officer becomes eligible for coverage under another employer's plans. All such severance payments and benefits are subject to each named executive officer's execution of a general release of claims against us.

**Outstanding Equity Awards at Year-End Table**

The following table sets forth information regarding outstanding equity awards held by our named executive officers as of December 31, 2020. For additional information regarding incentive plan awards, please refer to "—Current and Prior Equity Plans" below.

| Name | Grant Date | Vesting Commencement Date | Option Awards[1] | | | | | Stock Awards[1] | |
| | | | Number of Securities Underlying Unexercised Options Exercisable (#) | Number of Securities Underlying Unexercised Options Unexercisable (#) | Equity Incentive Plan Awards: Number of Securities Underlying Unexercised Unearned Options (#) | Option Exercise Price ($) | Option Expiration Date | Number of Shares or Units of Stock That Have Not Vested (#) | Market Value of Shares or Units of Stock That Have Not Vested ($)[2] |
|---|---|---|---|---|---|---|---|---|---|
| Brian Armstrong | 10/31/2019[3] | 6/3/2019 | 2,753,924 | — | | 18.71 | 10/30/2029 | — | — |
| | 8/11/2020[4] | | | — | 9,293,911 | 23.46 | 8/10/2030 | — | — |
| Surojit Chatterjee | 2/5/2020[5] | 2/3/2020 | 2,002,036 | — | | 18.71 | 2/4/2030 | — | — |
| Paul Grewal | 9/21/2020[5] | 8/31/2020 | 653,726 | — | | 26.26 | 9/20/2030 | — | — |
| | 11/23/2020[5] | 8/31/2020 | 261,605 | — | | 28.71 | 11/22/2030 | — | — |
| | 12/29/2020[6] | 11/20/2020 | | | | | | 230,772 | 7,601,630 |

---

(1) All of the outstanding stock option and stock awards were granted under the 2019 Plan and are for shares of Class A common stock.

(2) There was no public market for our Class A common stock as of December 31, 2020. The fair market value of our Class A common stock as of December 31, 2020, as determined by an independent valuation, was $32.94 per share.

(3) Vests monthly at the rate of 1/48th of the shares of our Class A common stock underlying the stock option following the vesting commencement date, in each case subject to continued service.

(4) Subject to milestone vesting: (a) 34% of the shares of our Class A common stock underlying the stock option vest upon the Company Stock Price (as defined below) reaching $200 per share and (b) 13.2% of the total shares underlying the stock option vest for each $40 increase in the Company Stock Price thereafter up to a maximum of $400, subject to certain adjustments and, in each case, subject to continued service as our Chief Executive Officer. For purposes of this stock option, "Company Stock Price" shall mean the volume weighted average price of our Class A common stock as reported on The Nasdaq Global Select Market for 60 consecutive trading days at any time during the term of the option.

(5) Vests with respect to 1/4th of the shares of our Class A common stock underlying the stock option on the one-year anniversary of the vesting commencement date and the remaining 3/4th of the shares underlying the option vest in equal monthly installments over three years, in each case subject to continued service.

(6) Settles with respect to 1/4th of the shares of our Class A common stock underlying the stock award on the one-year anniversary of the vesting commencement date and the remaining 3/4th of the shares underlying the award settle in equal quarterly installments over three years, in each case subject to continued service.

**2020 CEO Performance Award**

In August 2020, the board of directors, with participation by every independent member of the board, granted the 2020 CEO Performance Award to Mr. Armstrong. We believe the 2020 CEO Performance award serves to align Mr. Armstrong's interests with those of our stockholders by creating a strong and visible link between Mr. Armstrong's incentives and the company's long-term performance.

The 2020 CEO Performance Award is comprised of a 10-year term stock option to purchase 9,293,911 shares of our Class A common stock, which was equivalent to 3.8% of the issued and outstanding shares of our capital stock at the time of grant. The award has an exercise price of $23.46 per share, which the board of directors determined was equal to the fair market value of our Class A common stock on the date of grant. The stock option is earned upon the achievement of performance conditions based on the Class A common stock price targets set forth in the table below during the term of the stock option at any time following the effectiveness of this registration statement, based on the volume weighted average price of our shares of Class A common stock as reported on the Nasdaq Global Select Market at or above the price target for 60 consecutive trading days at any time during the term of the award, and upon certification by the compensation committee of the achievement of the stock price targets. Vesting may occur sequentially or concurrently. Except under limited circumstances, Mr.

Armstrong must continue to lead the company as our CEO, at the time each stock price target milestone is met in order for the corresponding tranche to vest.

We believe the performance conditions associated with the 2020 CEO Performance Award are extremely rigorous and appropriately align Mr. Armstrong's incentives with the interests of our stockholders. The award only begins vesting after approximately 750% stock price growth from the exercise price, and would not fully vest until approximately 1,600% stock price growth.

| Class A Common Stock Price Target($) | Percentage of Total Option Vested(%) | Relative Share Price Growth(%) |
| --- | --- | --- |
| $200 | 34.0% | ~750% |
| $240 | 13.2% | ~925% |
| $280 | 13.2% | ~1,000% |
| $320 | 13.2% | ~1,265% |
| $360 | 13.2% | ~1,435% |
| $400 | 13.2% | ~1,600% |

In the event of an acquisition (as defined in the stock option award agreement governing the 2020 CEO Performance Award) of the company, the stock price target milestones will instead be based on the consideration received per share by holders of our Class A common stock in connection with the closing of the acquisition, without giving effect to any contingent payments, effective immediately prior to the effective time of the acquisition transaction. The stock option award agreement governing the 2020 CEO Performance Award supersedes any benefits Mr. Armstrong may otherwise be entitled to under the COC Policy with respect to the 2020 CEO Performance Award.

In the event of a termination by us without "cause," due to Mr. Armstrong's resignation for "good reason" or due to Mr. Armstrong's death or "disability" (each as defined in the stock option award agreement governing the 2020 CEO Performance Award) or in the event that we and Mr. Armstrong agree that he will serve as an employee and in the capacity of an executive chairman (and not as CEO), a specified percentage of the unvested shares subject to the 2020 CEO Performance Award will remain outstanding and eligible to vest in accordance with the stock price target milestones with such specified percentage dependent on the length of service between the grant date of the 2020 CEO Performance Award and Mr. Armstrong's service as the CEO of the company. In the event of a termination outside of these circumstances, all unvested shares at the time of the termination will be forfeited. To the extent vested and exercisable, shares subject to the 2020 CEO Performance Award may be exercised by Mr. Armstrong until the earlier of seven years following his termination, the expiration date of the 2020 CEO Performance Award, or an acquisition of the company.

Mr. Armstrong must hold any shares that he acquires pursuant to the 2020 CEO Performance Award for one year following the date on which such shares became vested or, if earlier, upon an acquisition of the company, except to satisfy certain tax withholding obligations, or the 10-year term of the stock option.

The compensation committee does not anticipate making additional equity awards to Mr. Armstrong, although it reserves the authority to do so should it determine doing so would be in the best interest of the company's stockholders.

**Employee Benefit Plans**

We believe that our ability to grant equity-based awards is a valuable compensation tool that enables us to attract, retain, and motivate our employees, consultants, and directors by aligning their financial interests with those of our stockholders. The principal features of our equity incentive plans are summarized below. Our compensation committee, or our board of directors in place of the compensation committee, has authority to administer these plans. These summaries are qualified in their entirety by reference to the actual text of the plans, which are filed as exhibits to the registration statement of which this prospectus forms a part.

**Current and Prior Equity Plans**

*2013 stock plan*

Our 2013 Stock Plan, or the 2013 Plan, was initially adopted by the board of directors of our subsidiary, Coinbase, Inc., and approved by stockholders in April 2013. The 2013 Plan was subsequently assumed by Coinbase Global, Inc. in connection with our restructuring in April 2014 whereby Coinbase, Inc. became a subsidiary of Coinbase Global, Inc., and has been amended and restated from time to time. The 2013 Plan was terminated and succeeded by our 2019 Plan (described below) in July 2019. No awards were granted following the termination of the 2013 Plan and awards outstanding as of such date continue to be subject to the terms and conditions of the 2013 Plan and their applicable award agreements until such awards are exercised or until they terminate or expire by their terms.

*Outstanding awards under the 2013 plan.* As of December 31, 2020, (i) options to purchase 3,550,279 Class A shares of our common stock remained outstanding, with a weighted-average exercise price of $17.38 per share and (ii) options to purchase 22,442,017 Class B shares of our common stock remained outstanding, with a weighted-average exercise price of $3.34 per share. As of December 31, 2020, the foregoing included 65,903 shares of our Class B common stock and 5,090 shares of our Class A common stock subject to repurchase pursuant to the early-exercise of stock options granted under the 2013 Plan.

*2019 equity incentive plan*

Our 2019 Equity Incentive Plan, or the 2019 Plan, was initially adopted by our board of directors and approved by our stockholders in July 2019, as a successor to our 2013 Plan. We expect to terminate the 2019 Plan and will cease granting awards thereunder upon the effective date of our 2021 Equity Incentive Plan (described below), which is the date immediately prior to the effective date of the registration statement of which this prospectus forms a part. Any outstanding awards will continue to be subject to the terms of the 2019 Plan and their applicable award agreements until such awards are exercised or until they terminate or expire by their terms.

*Outstanding awards under the 2019 plan.* As of December 31, 2020, we had 43,666,758 shares of our Class A common stock reserved for issuance pursuant to grants under our 2019 Plan of which 2,193,489 shares remained available for grant. As of December 31, 2020, options to purchase 37,230,658 shares of our Class A common stock remained outstanding, with a weighted-average exercise price of $21.54 per share, and we had 3,765,760 shares of our Class A common stock outstanding subject to RSUs under our 2019 Plan. As of December 31, 2020, we had 192,768 shares of our Class A common stock outstanding following the early exercise of options granted under our 2019 Plan and that are subject to repurchase.

*Option terms.* Options granted under the 2013 Plan and 2019 Plan, collectively the Prior Plans, include both (i) incentive stock options, intended to qualify for tax treatment under Section 422 of the Internal Revenue Code of 1986, as amended, or the Code, which may be granted only to employees and (ii) nonqualified stock options, which may be granted to our employees, directors, and consultants. Pursuant to the Prior Plans, options must be granted with a per share exercise price at least equal to the fair market value of each underlying share as of the date of grant and the per share exercise price of incentive stock options granted to any individual who holds, directly or by attribution, more than ten percent of the total combined voting power of all classes of our capital stock as of the date of grant must be at least 110% the fair market value of each underlying share as of the date of grant.

Options granted under the Prior Plans generally vest subject to continued service. The administrator may provide for options to be exercised only as they vest or to be immediately exercisable, with any shares issued on exercise being subject to our right of repurchase that lapses as the shares vest. In the event of a participant's termination of service, an option is generally exercisable, to the extent vested, for a period of 12 months in the case of termination due to the participant's death or disability, or such longer or shorter period as the administrator may provide, but in any event no later than the expiration date of

the stock option. Stock options generally terminate upon a participant's termination of employment for cause. The maximum permitted term of options granted under our Prior Plans is ten years from the date of grant, except that the maximum permitted term of incentive stock options granted to an individual who owns more than ten percent of the total combined voting power of all classes of our capital stock as of the date of grant is five years.

*Change of control.* In the event that we are subject to a merger or other combination constituting a change of control as defined in each of the Prior Plans, outstanding awards may be (i) continued by the company, if we are the surviving corporation; (ii) assumed by the surviving corporation or its parent; (iii) substituted by the surviving corporation or its parent; (iv) the cancellation of such awards and a payment to the participants equal to the excess of the fair market value of the shares subject to such awards (as determined under the respective plan), over the exercise price or purchase price for the shares subject to such awards, in cash, cash equivalents, or securities of the successor entity, or (v) cancelled without payment of any consideration. Awards need not be treated in an identical manner and may be accelerated in full or in part in the discretion of the administrator.

*Adjustments.* In the event of a stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification or other change in our capital structure affecting our shares of Class A common stock without consideration, proportional adjustments will, to the extent determined appropriate by the administrator, be made to (i) the number of shares reserved for issuance under our 2019 Plan, and (ii) the exercise prices, number, and class of shares subject to outstanding awards under the Prior Plans, subject to any required action by our board or our stockholders and compliance with applicable laws.

*Exchange, repricing and buyout of awards.* Under the 2019 Plan, the administrator may, at any time with the consent of the respective participants, issue new awards in exchange for the surrender and cancellation of outstanding awards. Further, under the Prior Plans, the administrator may without stockholder approval (i) offer to exchange outstanding options for options with a lower exercise price, cash, shares, or other property, or (ii) amend options to decrease the exercise price, subject to the terms of the Prior Plans.

*Limited transferability.* Unless otherwise determined by the administrator, awards under the Prior Plans generally may not be sold, pledged, assigned, hypothecated, transferred, or disposed of in any manner other than by will, the laws of descent, and distribution.

### *2021 equity incentive plan*

In February 2021, our board of directors and our stockholders approved our 2021 Equity Incentive Plan, or the 2021 Plan, as a successor to our 2019 Plan that will become effective on the date immediately prior to the effectiveness of the registration statement of which this prospectus forms a part. The 2021 Plan authorizes the award of both incentive stock options, which are intended to qualify for tax treatment under Section 422 of the Code, and nonqualified stock options, as well for the award of restricted stock awards, or RSAs, stock appreciation rights, or SARs, restricted stock units, or RSUs, and performance and stock bonus awards. Pursuant to the 2021 Plan, incentive stock options may be granted only to our employees. We may grant all other types of awards to our employees, directors, and consultants.

*Shares reserved.* We have initially reserved 31,047,869 shares of our Class A common stock, plus any reserved shares not issued or subject to outstanding grants under the 2019 Plan on the effective date of the 2021 Plan, for issuance pursuant to awards granted under our 2021 Plan. The number of shares reserved for issuance under our 2021 Plan will increase automatically on January 1 of each of 2022 through 2031 by the number of shares equal to 5% of the aggregate number of outstanding shares of all classes of our common stock (on an as-converted to common stock basis) as of the immediately preceding December 31, or a lesser number as may be determined by our compensation committee, or by our board of directors acting in place of our compensation committee.

In addition, the shares set forth below will again be available for issuance pursuant to awards granted under our 2021 Plan:

• shares subject to options or SARs granted under our 2021 Plan that cease to be subject to the option or SAR for any reason other than exercise of the option or SAR;

• shares subject to awards granted under our 2021 Plan that are subsequently forfeited or repurchased by us at the original issue price;

• shares subject to awards granted under our 2021 Plan that otherwise terminate without such shares being issued;

• shares subject to awards granted under our 2021 Plan that are surrendered, cancelled, or exchanged for cash or a different award (or combination thereof);

• shares issuable upon the exercise of options or subject to other awards granted under our Prior Plans that cease to be subject to such options or other awards, by forfeiture or otherwise, after the effective date of the 2021 Plan;

• shares subject to awards granted under our Prior Plans that are forfeited or repurchased by us at the original price after the effective date of the 2021 Plan; and

• shares subject to awards under our Prior Plans or our 2021 Plan that are used to pay the exercise price of an option or withheld to satisfy the tax withholding obligations related to any award.

The shares of Class B common stock underlying awards granted under the 2013 Plan that are forfeited, canceled, or otherwise returned to the 2021 Plan pursuant to the foregoing will be converted to shares of our Class A common stock before becoming available for grant and issuance under the 2021 Plan.

*Administration*. Our 2021 Plan will be administered by our compensation committee, or by our board of directors acting in place of our compensation committee. Subject to the terms and conditions of the 2021 Plan, the administrator will have the authority, among other things, to select the persons to whom awards may be granted, construe, and interpret our 2021 Plan as well as to determine the terms of such awards and prescribe, amend, and rescind the rules and regulations relating to the plan or any award granted thereunder. The 2021 Plan provides that the administrator may delegate its authority, including the authority to grant awards, to one or more executive officers to the extent permitted by applicable law, provided that awards granted to non-employee directors may only be determined by our board of directors.

*Options*. The 2021 Plan provides for the grant of both incentive stock options intended to qualify under Section 422 of the Code, and nonqualified stock options to purchase shares of our Class A common stock at a stated exercise price. Incentive stock options may only be granted to employees, including officers and directors who are also employees. The exercise price of stock options granted under the 2021 Plan must be at least equal to the fair market value of our Class A common stock on the date of grant. Incentive stock options granted to an individual who holds, directly or by attribution, more than ten percent of the total combined voting power of all classes of our capital stock must have an exercise price of at least 110% the fair market value of our Class A common stock on the date of grant.

Options may vest based on service or achievement of performance conditions, as determined by the administrator. The administrator may provide for options to be exercised only as they vest or to be immediately exercisable, with any shares issued on exercise being subject to our right of repurchase that lapses as the shares vest. In the event of a participant's termination of service, subject to the terms of a participant's employment or other agreement with us or any parent, subsidiary or affiliate, as applicable, an option is generally exercisable, to the extent vested, for a period of three months in the case of

172

termination without cause (except due to a participant's death or disability) and for a period of 12 months in the case of termination due to the participant's death or disability, or such longer or shorter period as the administrator may provide, including as necessary to give effect to any provision in an employment or other agreement with us or any parent, subsidiary or affiliate, as applicable, but in any event no later than the expiration date of the stock option. Stock options generally terminate upon a participant's termination of employment for cause. The maximum term of options granted under our 2021 Plan is ten years from the date of grant, except that the maximum permitted term of incentive stock options granted to an individual who holds, directly or by attribution, more than ten percent of the total combined voting power of all classes of our capital stock is five years from the date of grant.

*Restricted stock awards.* An RSA is an offer by us to grant or sell shares of our Class A common stock subject to restrictions, which may lapse based on the satisfaction of service or achievement of performance conditions. The price, if any, of an RSA will be determined by the administrator. Holders of RSAs, unlike holders of options, will have the right to vote and any dividends or distributions paid with respect to such shares be subject to the same vesting and other restrictions as the RSA and will be accrued and paid when the vesting terms on such shares lapse. Unless otherwise determined by the administrator, or as provided in the participant's employment or other agreement with us or any parent, subsidiary or affiliate, as applicable, vesting will cease on the date the participant no longer provides services to us and unvested shares may be forfeited to or repurchased by us.

*Stock appreciation rights.* A SAR provides for a payment, in cash or shares of our Class A common stock (up to a specified maximum number of shares, if determined by the administrator), to the participant based upon the difference between the fair market value of our Class A common stock on the date of exercise and a predetermined exercise price, multiplied by the number of shares. The exercise price of a SAR must be at least the fair market value of a share of our Class A common stock on the date of grant. SARs may vest based on service or achievement of performance conditions. No SAR may have a term that is longer than ten years from the date of grant.

*Restricted stock units.* RSUs represent the right to receive the value of shares of our Class A common stock at a specified date in the future and may be subject to vesting based on service or achievement of performance conditions. RSUs may be settled in cash, shares of our common stock or a combination of both as soon as practicable following vesting or on a later date subject to the terms of the 2021 Plan. No RSU may have a term that is longer than ten years from the date of grant.

*Performance awards.* Performance awards granted pursuant to the 2021 Plan may be in the form of a cash bonus, or an award of performance shares or performance units denominated in shares of our Class A common stock that may be settled in cash, property, or by issuance of those shares, subject to the satisfaction or achievement of specified performance conditions.

*Stock bonus awards.* A stock bonus award provides for payment in the form of cash, shares of our Class A common stock or a combination thereof, based on the fair market value of shares subject to such award as determined by the administrator. The awards may be granted as consideration for services already rendered, or at the discretion of the administrator, may be subject to vesting restrictions based on continued service or performance conditions.

*Dividend equivalents rights.* Dividend equivalent rights may be granted at the discretion of the administrator and represent the right to receive the value of dividends, if any, paid by us in respect of the number of shares of our Class A common stock underlying an award. Dividend equivalent rights will be subject to the same vesting or performance conditions as the underlying award and will be paid only when the underlying award becomes vested or may be deemed to have been reinvested by the company. Dividend equivalent rights, if any, will be credited to participants in the form of additional whole shares.

*Change of control.* Our 2021 Plan provides that, in the event of a corporate transaction that constitutes a change of control of our company under the terms of the plan, outstanding awards will be subject to the agreement evidencing the change of control, which need not treat all outstanding awards in

an identical manner, and may include one or more of the following: (i) the continuation of the outstanding awards; (ii) the assumption of the outstanding awards by the surviving corporation or its parent; (iii) the substitution by the surviving corporation or its parent of new options or equity awards for the outstanding awards; (iv) the full or partial acceleration of exercisability or vesting or lapse of the company's right to repurchase or other terms of forfeiture and accelerated expiration of the award; or (v) the settlement of the full value of the outstanding awards (whether or not then vested or exercisable) in cash, cash equivalents, or securities of the successor entity with a fair market value equal to the required amount, as determined in accordance with the 2021 Plan, which payments may be deferred until the date or dates the award would have become exercisable or vested. Notwithstanding the foregoing, upon a change of control the vesting of all awards granted to our non-employee directors will accelerate and such awards will become exercisable, to the extent applicable, and vested in full immediately prior to the consummation of the change of control.

*Adjustment.* In the event of a change in the number of outstanding shares of our Class A common stock without consideration by reason of a stock dividend, extraordinary dividend or distribution, recapitalization, stock split, reverse stock split, subdivision, combination, consolidation reclassification, spin-off or similar change in our capital structure, proportional adjustments will be made to (i) the number and class of shares reserved for issuance under our 2021 Plan; (ii) the exercise prices, number, and class of shares subject to outstanding options or SARs; (iii) the number and class of shares subject to other outstanding awards; and (iv) the maximum number and class of shares that may be issued as incentive stock options, subject to any required action by the board or our stockholders and compliance with applicable laws.

*Exchange, repricing and buyout of awards.* The administrator may, without prior stockholder approval, (i) reduce the exercise price of outstanding options or SARs without the consent of any participant and (ii) pay cash or issue new awards in exchange for the surrender and cancellation of any, or all, outstanding awards, subject to the consent of any affected participant to the extent required by the terms of the 2021 Plan.

*Director compensation limits.* No non-employee director may receive awards under our 2021 Plan with a grant date value that when combined with cash compensation received for his or her service as a director, exceed $1,000,000 in a calendar year.

*Clawback; transferability.* All awards will be subject to clawback or recoupment pursuant to any compensation clawback or recoupment policy adopted by our board of directors or required by law during the term of service of the participant, to the extent set forth in such policy or applicable agreement. Except in limited circumstances, awards granted under our 2021 Plan may generally not be transferred in any manner other than by will or by the laws of descent and distribution.

*Sub-plans.* Subject to the terms of the 2021 Plan, the plan administrator may establish a sub-plan under the 2021 Plan and/or modify the terms of awards granted to participants outside of the United States to comply with any laws or regulations applicable to any such jurisdiction.

*Amendment and termination.* Our board of directors or compensation committee may amend our 2021 Plan at any time, subject to stockholder approval as may be required. Our 2021 Plan will terminate ten years from the date our board of directors adopts the plan, unless it is terminated earlier by our board of directors. No termination or amendment of the 2021 Plan may adversely affect any then-outstanding award without the consent of the affected participant, except as is necessary to comply with applicable laws or as otherwise provided by the terms of the 2021 Plan.

### 2021 employee stock purchase plan

In February 2021, our board of directors and our stockholders approved our 2021 Employee Stock Purchase Plan, or ESPP, that will become effective upon the date the registration statement of which this prospectus forms a part becomes effective to enable eligible employees to purchase shares of our common stock with accumulated payroll deductions. Our ESPP is intended to qualify under Section 423

of the Code, provided that the administrator may adopt sub-plans under the ESPP designed to be outside of the scope of Section 423 for participants who are non-US residents.

We have initially reserved 5,174,644 shares of our Class A common stock for issuance and sale under the ESPP. The number of shares reserved for issuance and sale under our ESPP will increase automatically on January 1 of each of 2022 through 2031 by the number of shares equal to 1% of the aggregate number of outstanding shares of all classes of our common stock (on an as-converted to common stock basis) as of the immediately preceding December 31, or a lesser number as may be determined by our compensation committee, or by our board of directors acting in place of our compensation committee. Subject to stock splits, recapitalizations, or similar events, no more than 52,000,000 shares of our Class A common stock may be issued over the term of the ESPP.

*Administration*. Our ESPP will be administered by our compensation committee, or by our board of directors acting in place of our compensation committee, subject to the terms and conditions of the ESPP. Among other things, the administrator will have the authority to determine eligibility for participation in the ESPP, designate separate offerings under the plan, and construe, interpret, and apply the terms of the plan.

*Eligibility*. Employees eligible to participate in any offering pursuant to the ESPP generally include any employee that is employed by us or certain of our designated subsidiaries at the beginning of the offering period. However, the administrator may exclude employees who do not meet eligibility requirements that our compensation committee may choose to impose (within the limits permitted by the Code), are customarily employed for 20 hours or less per week, are customarily employed for five months or less in a calendar year, or certain highly-compensated employees as determined in accordance with applicable tax laws. In addition, any employee who owns (or is deemed to own because of attribution rules) 5% or more of the total combined voting power or value of all classes of our capital stock, or the capital stock of one of our qualifying subsidiaries, or who will own such amount because of participation in the ESPP, will not be eligible to participate in the ESPP. The administrator may impose additional restrictions on eligibility from time to time.

*Offerings*. Under our ESPP, eligible employees will be offered the option to purchase shares of our Class A common stock at a discount over a series of offering periods through accumulated payroll deductions over the period. Each offering period may itself consist of one or more purchase periods. No offering period may be longer than 27 months. The initial offering period will commence on the date of this offering and will end on April 30, 2023, with purchases on October 31, 2021, April 30, 2022, October 31, 2022, and April 30, 2023. A new offering period will begin on May 1, 2021 and each November 1 and May 1 thereafter. The purchase price for shares purchased under the ESPP during any given purchase period will be 85% of the lesser of the fair market value of our common stock on (i) the first trading day of the applicable offering period or (ii) the last trading day of the purchase period.

No participant may purchase more than 5,000 shares of our Class A common stock during any one purchase period, and may not subscribe for more than $25,000 in fair market value of shares of our common stock (determined as of the date the offering period commences) in any calendar year in which the offering is in effect. The administrator in its discretion, may set a lower maximum number of shares which may be purchased.

*Adjustments upon recapitalization*. If the number of outstanding shares of our common stock is changed by stock dividend, recapitalization, stock split, reverse stock split, subdivision, combination, reclassification, or similar change in our capital structure without consideration, then the administrator will proportionately adjust the number and class of common stock that is available under the ESPP, the purchase price, and number of shares any participant has elected to purchase as well as the maximum number of shares which may be purchased by participants.

*Change of control*. If we experience a change of control transaction as determined under the terms of the ESPP, any offering period then in effect will be shortened and terminated on a final purchase date

175

established by the administrator. The final purchase date will occur on or prior to the effective date of change of control transaction, and our ESPP will terminate on the closing of the change of control.

*Transferability.* Participants may generally not assign, transfer, pledge, or otherwise dispose of payroll deductions credited to his or her account, or any rights with regard to an election to purchase shares pursuant to the ESPP other than by will or the laws of descent or distribution.

*Amendment; termination.* The board or compensation committee may amend, suspend, or terminate the ESPP at any time without stockholder consent, except as to the extent such amendment would increase the number of shares available for issuance under the ESPP, change the class or designation of employees eligible for participation in the plan or otherwise as required by law. If the ESPP is terminated, the administrator may elect to terminate all outstanding offering periods immediately, upon next purchase date (which be sooner that originally scheduled) or upon the last day of such offering period. If any offering period is terminated prior to its scheduled completion, all amounts credited to participants which have not been used to purchase shares will be returned to participants as soon as administratively practicable. Unless earlier terminated, the ESPP will terminated upon the earlier to occur of the issuance of all shares of common stock reserved for issuance under the ESPP, or the 10th anniversary of the effective date.

### Welfare and other benefits

We provide health, dental, vision, life, and disability insurance benefits to our named executive officers, on the same terms and conditions as provided to all other eligible U.S. employees.

We also sponsor a broad-based 401(k) plan intended to provide eligible U.S. employees with an opportunity to defer eligible compensation up to certain annual limits. As a tax-qualified retirement plan, contributions (if any) made by us are deductible by us when made, and contributions and earnings on those amounts are generally not taxable to the employees until withdrawn or distributed from the 401(k) plan. Our named executive officers are eligible to participate in our employee benefit plans, including our 401(k) plan, on the same basis as our other employees.

**Limitations on Liability and Indemnification Matters**

Our restated certificate of incorporation that will become effective shortly following the effectiveness of the registration statement of which this prospectus forms a part contains provisions that limit the liability of our directors for monetary damages to the fullest extent permitted by the DGCL.

Consequently, our directors will not be personally liable to us or our stockholders for monetary damages for any breach of fiduciary duties as directors, except liability for:

• any breach of the director's duty of loyalty to us or our stockholders;

• any act or omission not in good faith or that involves intentional misconduct or a knowing violation of law;

• unlawful payments of dividends or unlawful stock repurchases or redemptions as provided in Section 174 of the DGCL; or

• any transaction from which the director derived an improper personal benefit.

Our restated certificate of incorporation that will become effective shortly following the effectiveness of the registration statement of which this prospectus forms a part will require us to indemnify our directors and officers to the maximum extent not prohibited by the DGCL and allow us to indemnify other employees and agents as set forth in the DGCL. Subject to certain limitations, our restated bylaws also require us to advance expenses incurred by our directors and officers for the defense of any action for which indemnification is required or permitted.

We have entered, and intend to continue to enter, into separate indemnification agreements with our directors, officers, and certain of our other employees, in addition to the indemnification provided for in our restated certificate of incorporation and restated bylaws. These agreements, among other things, require us to indemnify our directors, officers, and key employees for certain expenses, including attorneys' fees, judgments, penalties, fines, and settlement amounts actually incurred by these individuals in any action or proceeding arising out of their service to us or any of our subsidiaries or any other company or enterprise to which these individuals provide services at our request. Subject to certain limitations, our indemnification agreements also require us to advance expenses incurred by our directors, officers, and key employees for the defense of any action for which indemnification is required or permitted. From time to time we have indemnified and may in the future indemnify our directors and officers pursuant to these indemnification agreements in connection legal or regulatory proceedings.

We believe that provisions of our restated certificate of incorporation, restated bylaws, and indemnification agreements are necessary to attract and retain qualified directors, officers, and key employees. We also maintain directors' and officers' liability insurance.

The limitation of liability and indemnification provisions in our restated certificate of incorporation and restated bylaws may discourage stockholders from bringing a lawsuit against our directors and officers for breach of their fiduciary duty. They may also reduce the likelihood of derivative litigation against our directors and officers, even though an action, if successful, might benefit us and other stockholders. Further, a stockholder's investment may be adversely affected to the extent that we pay the costs of settlement and damage awards against directors and officers as required by these indemnification provisions.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, executive officers, or persons controlling us, we have been informed that, in the opinion of the SEC, such indemnification is against public policy as expressed in the Securities Act and is therefore unenforceable.

**CERTAIN RELATIONSHIPS AND RELATED PARTY TRANSACTIONS**

In addition to the compensation arrangements discussed in the sections titled "Management" and "Executive Compensation," the following is a description of each transaction since January 1, 2018 and each currently proposed transaction in which:

• we have been or are to be a participant;

• the amount involved exceeded or will exceed $120,000; and

• any of our directors, executive officers, or holders of more than 5% of our capital stock, or any immediate family member of, or person sharing the household with, any of these individuals, had or will have a direct or indirect material interest.

## Equity Financings

### Series E convertible preferred stock financing

From October 2018 through December 2018, we sold an aggregate of 8,831,952 shares of our Series E convertible preferred stock at a purchase price of $36.1922 per share, for an aggregate purchase price of $319.6 million. Each share of Series E convertible preferred stock will convert automatically into one share of our Class A common stock upon the effectiveness of the registration statement of which this prospectus forms a part.

The following table summarizes the Series E convertible preferred stock purchased by entities affiliated with certain of our directors, and holders of more than 5% of our capital stock and their affiliated entities:

| Stockholder | Shares of Series E Convertible Preferred Stock | Total Purchase Price |
|---|---|---|
| Entities affiliated with Andreessen Horowitz[1] | 27,630 | $ 999,990 |

(1)   Andreessen Horowitz and its affiliates beneficially own more than 5% of our outstanding capital stock. Marc L. Andreessen and Kathryn Haun, members of our board of directors, are both general partners at Andreessen Horowitz.

## Stock Transfers

### 2018 transfers

In December 2018, Brian Armstrong and Frederick Ernest Ehrsam III, members of our board of directors, and with respect to Mr. Armstrong, our Chief Executive Officer, each sold an aggregate of 226,218 shares of our Class B common stock at a purchase price of $32.57 per share to certain accredited investors, for an aggregate purchase price of $7.4 million each, which shares were automatically converted into an equivalent number of shares of our Class A common stock upon completion of such sale.

### 2019 transfers

In September 2019, an entity affiliated with Andreessen Horowitz, a holder of more than 5% of our outstanding capital stock and where Marc L. Andreessen and Kathryn Haun, members of our board of directors, are general partners, purchased an aggregate of 100,000 shares of our outstanding convertible preferred stock from an existing stockholder, at a purchase price of $22.00 per share, for an aggregate purchase price of $2.2 million, which shares were converted into an equivalent number of shares of our Class A common stock upon the completion of such purchase.

In October 2019, entities affiliated with Ribbit Capital, a holder of more than 5% of our capital stock, sold, at a purchase price of $23.00 per share, (i) an aggregate of 1,864,094 shares of our convertible

preferred stock to entities affiliated with Andreessen Horowitz, a holder of more than 5% of our capital stock and where Mr. Andreessen and Ms. Haun, members of our board of directors, are general partners, for an aggregate purchase price of $42.9 million and (ii) an aggregate of 93,205 shares of our convertible preferred stock to an unrelated accredited investor for an aggregate purchase price of $2.1 million, in each case, which shares were converted into an equivalent number of shares of our Class A common stock upon the completion of such purchase.

In October 2019, entities affiliated with Union Square Ventures, a holder of more than 5% of our outstanding capital stock and where Fred Wilson, a member of our board of directors, is a partner, sold, at a purchase price of $23.00 per share, (i) to entities affiliated with Andreessen Horowitz, a holder of more than 5% of our capital stock and where Mr. Andreessen and Ms. Haun, members of our board of directors, are general partners, an aggregate of 2,483,731 shares of our convertible preferred stock, for an aggregate purchase price of $57.1 million, and (ii) to an unrelated accredited investor, an aggregate of 124,186 shares of our convertible preferred stock, for an aggregate purchase price of $2.9 million, in each case, which shares were converted into an equivalent number of shares of our Class A common stock upon the completion of such purchase.

In November 2019, Paradigm Fund L.P., a holder of more than 5% of our outstanding Class A common stock and where Mr. Ehrsam, a member of our board of directors, is a managing partner, purchased, at a purchase price of $23.00 per share, an aggregate of (i) 745,119 shares of our convertible preferred stock from entities affiliated with Union Square Ventures, a holder of more than 5% of our capital stock and where Mr. Wilson, a member of our board of directors, is a partner, for an aggregate purchase price of $17.1 million and (ii) 559,228 shares of our convertible preferred stock from an entity affiliated with Ribbit Capital, a holder of more than 5% of our capital stock, for an aggregate purchase price of $12.9 million, in each case, which shares were converted into an equivalent number of shares of our Class A common stock upon the completion of such purchase.

*2020 transfers*

In August 2020, entities affiliated with Union Square Ventures, a holder of more than 5% of our outstanding capital stock and where Mr. Wilson, a member of our board of directors, is a partner, sold, at a purchase price of $28.83 per share, an aggregate of 1,040,582 shares of our convertible preferred stock to Paradigm Fund L.P., a holder of more than 5% of our capital stock and where Mr. Ehrsam, a member of our board of directors, is a managing partner, for an aggregate purchase price of $30.0 million, which shares were converted into an equivalent number of shares of our Class A common stock upon the completion of such purchase.

In September 2020, entities affiliated with Union Square Ventures, a holder of more than 5% of our outstanding capital stock and where Mr. Wilson, a member of our board of directors, is a partner, sold, at a purchase price of $28.83 per share, an aggregate of 1,040,582 shares of our convertible preferred stock to entity affiliated with Andreessen Horowitz, a holder of more than 5% of our capital stock and where Mr. Andreessen and Ms. Haun, members of our board of directors, are general partners, for an aggregate purchase price of $30.0 million, which shares were converted into an equivalent number of shares of our Class A common stock upon the completion of such purchase.

**Investors' Rights Agreement**

In October 2018, we entered into our amended and restated investors' rights agreement, or IRA, with certain holders of our convertible preferred stock, including Tiger Global Private Investment Partners XI, L.P. and entities affiliated with Andreessen Horowitz, Union Square Ventures, and Ribbit Capital, each of which is a holder of more than 5% of our capital stock. Mr. Andreessen and Ms. Haun, members of our board of directors, are affiliated with Andreessen Horowitz. Mr. Wilson, a member of our board of directors, is affiliated with Union Square Ventures. These stockholders are entitled to rights with respect to the registration of their shares following the effectiveness of the registration statement of which this

prospectus forms a part. For a description of these registration rights, see the section titled "Description of Capital Stock—Registration Rights."

## Coinbase Ventures

From time to time, we invest in companies identified by Coinbase Ventures, our internal investment division, and certain of those investments are into companies in which entities affiliated with our directors or holders of more than 5% of our capital stock have also invested. Below is a list of our investments with an amount involved that exceeded $120,000 in companies in which entities affiliated with our directors or holders of more than 5% of our capital stock hold a 10% or greater equity interest.

### *Compound investment*

In April 2018, we invested an aggregate of $200,000 in Compound Labs, Inc.. Entities affiliated with Andreessen Horowitz, a holder of more than 5% of our capital stock and where Mr. Andreessen and Ms. Haun, members of our board of directors, are general partners, are investors in Compound Labs, Inc.

### *StarCard investment*

In August 2018, we invested an aggregate of $200,000 in StarCard, Inc. Entities affiliated with Andreessen Horowitz, a holder of more than 5% of our capital stock and where Mr. Andreessen and Ms. Haun, members of our board of directors, are general partners, are investors in StarCard, Inc.

### *Amber Group investment*

In January 2020, we invested an aggregate of $150,000 in Amber Global Limited. Paradigm Fund L.P., a holder of more than 5% of our outstanding Class A common stock and where Mr. Ehrsam, a member of our board of directors, is a managing partner, is an investor in Amber Global Limited.

### *Arweave investment*

In February 2020, we invested an aggregate of $300,000 in Minimum Spanning Technologies Limited. Entities affiliated Union Square Ventures, a holder of more than 5% of our capital stock and where Mr. Wilson, a member of our board of directors, is a general partner and entities affiliated with Andreessen Horowitz, a holder of more than 5% of our capital stock and where Mr. Andreessen and Ms. Haun, members of our board of directors, are general partner, are investors in Minimum Spanning Technologies Limited.

## Indemnification Agreements

We have entered into, and plan on entering into, indemnification agreements with each of our current and future directors and executive officers. The indemnification agreements, our restated certificate of incorporation, and our restated bylaws, which will become effective shortly following the effectiveness of the registration statement of which this prospectus forms a part, will require us to indemnify our directors to the fullest extent not prohibited by Delaware law. Subject to certain limitations, our restated bylaws also require us to advance expenses incurred by our directors and officers. For more information regarding these arrangements, see the section titled "Executive Compensation—Limitations on Liability and Indemnification Matters."

## Other Transactions

In March 2018, we entered into a series of agreements to acquire Earn Holdings, LLC. In connection with such acquisition, as prior equity holders of Earn, entities affiliated with Andreessen Horowitz, a holder

of more than 5% of our capital stock and where Mr. Andreessen and Ms. Haun, members of our board of directors, are general partners, were entitled to receive up to $6.7 million in cash.

In May 2020, we entered into a series of agreements to acquire Tagomi Holdings Inc. In connection with such acquisition, as a prior equity holder of Tagomi, Paradigm Fund L.P., a holder of more than 5% of our outstanding Class A common stock and where Mr. Ehrsam, a member of our board of directors, is a managing partner, was entitled to receive up to 264,527 shares of our Class A common stock.

Certain of our executive officers, directors, and holders of more than 5% of our capital stock, and immediate family members of, or persons sharing households with, such individuals, have accounts on our platform and use our products and services in the ordinary course. Similar to our other customers, these individuals and entities pay us transaction and other fees related to such use.

**Review, Approval, or Ratification of Transactions with Related Parties**

In January 2019, we adopted written policies for the review and approval of transactions with related persons, consisting of a director conflicts and investment policy, administered by our audit and compliance committee, and our employee conflicts and investment policy, administered by our internal legal department. In addition, our practice has been to have all related party transactions reviewed and approved by a majority of the disinterested members of our board of directors, including the transactions described above. In connection with this offering, we intend to amend our existing policies in order to comply with applicable rules and regulations of the SEC and the listing requirements and rules of the Nasdaq Global Select Market.

181

## PRINCIPAL AND REGISTERED STOCKHOLDERS

The following table sets forth certain information with respect to the beneficial ownership of our Class A common stock and Class B common stock as of January 31, 2021, by:

- each of our named executive officers;

- each of our directors;

- all of our directors and executive officers as a group;

- each stockholder known by us to be the beneficial owner of more than 5% of our outstanding shares of Class A common stock or Class B common stock; and

- the number of shares of Class A common stock and Class B common stock held by the registered stockholders and registered as Class A common stock for resale by means of this prospectus.

The registered stockholders include (i) our affiliates and certain other stockholders with "restricted securities" (as defined in Rule 144 under the Securities Act) and their pledgees, donees, transferees, assignees, or other successors-in-interest who, because of their status as affiliates pursuant to Rule 144 or because they acquired their shares of Class A common stock or Class B common stock from an affiliate or from us within the prior 12 months, would be unable to sell their securities pursuant to Rule 144 until we have been subject to the reporting requirements of Section 13 or Section 15(d) of the Exchange Act for a period of at least 90 days, and (ii) our non-executive officer service providers and their pledgees, donees, transferees, assignees, or other successors-in-interest who acquired shares of Class A common stock or Class B common stock from us within the prior 12 months under Rule 701 and hold "restricted securities" (as defined in Rule 144 under the Securities Act). The registered stockholders and their pledgees, donees, transferees, assignees, or other successors-in-interest may elect to sell their shares of Class A common stock covered by this prospectus, as and to the extent they may determine. Such sales, if any, will be made through brokerage transactions on the Nasdaq Global Select Market at prevailing market prices. As such, we will have no input if and when any registered stockholder may elect to sell their shares of common stock or the prices at which any such sales may occur. Prior to any sales of shares of Class A common stock, a registered stockholder who holds Class B common stock must convert their shares of Class B common stock into shares of Class A common stock. See the section titled "Plan of Distribution."

Information concerning the registered stockholders may change from time to time and any changed information will be set forth in supplements to this prospectus, if and when necessary. Because the registered stockholders who hold Class B common stock may convert their shares of Class B common stock into Class A common stock at any time and the registered stockholders may sell all, some, or none of the shares of Class A common stock covered by this prospectus, we cannot determine the number of such shares of Class A common stock that will be sold by the registered stockholders, or the amount or percentage of shares of common stock that will be held by the registered stockholders, either as Class A common stock or Class B common stock, upon consummation of any particular sale. In addition, the registered stockholders listed in the table below may have sold, transferred, or otherwise disposed of, or may sell, transfer, or otherwise dispose of, at any time and from time to time, shares of Class A common stock or Class B common stock in transactions exempt from the registration requirements of the Securities Act, after the date on which they provided the information set forth in the table below. The registered stockholders have not, nor have they within the past three years had, any position, office, or other material relationship with us, other than as disclosed in this prospectus. See the sections titled "Management" and "Certain Relationships and Related Party Transactions" for further information regarding the registered stockholders.

After the listing of our Class A common stock on the Nasdaq Global Select Market, certain of the registered stockholders are entitled to registration rights with respect to their shares of Class A common

182

stock or Class B common stock as described in the section titled "Description of Capital Stock—Registration Rights."

We intend to use our reasonable efforts to keep the registration statement of which this prospectus forms a part effective for a period of 90 days after the effectiveness of the registration statement. As a result, we have registered shares of Class A common stock underlying shares of Class B common stock currently held by registered stockholders, as well as by our affiliates, that can vest and settle while the registration statement of which this prospectus forms a part is effective.

We are not party to any arrangement with any registered stockholder or any broker-dealer with respect to sales of the shares of Class A common stock by the registered stockholders. However, we have engaged financial advisors with respect to certain other matters relating to the listing of our Class A common stock on the Nasdaq Global Select Market. For more information, see the section titled "Plan of Distribution."

We have determined beneficial ownership in accordance with the rules of the SEC. Unless otherwise indicated below, to our knowledge, based on information furnished to us, the persons and entities named in the table have sole voting and investment power with respect to all shares that they beneficially own, subject to applicable community property laws. Shares of our Class A common stock and Class B common stock subject to stock options and RSUs that are currently exercisable or subject to settlement or exercisable or subject to settlement within 60 days of January 31, 2021 are deemed to be outstanding and to be beneficially owned by the person holding the options or RSUs for the purpose of computing the percentage ownership of that person but are not treated as outstanding for the purpose of computing the percentage ownership of any other person.

We have based our calculation of the percentage ownership of our common stock before this offering on 22,463,455 shares of our Class A common stock and 168,867,898 shares of our Class B common stock outstanding as of January 31, 2021, which includes 104,046,301 shares of our Class B common stock resulting from the conversion of an equivalent number of outstanding shares of our Series FF, Series A, Series B, Series C, and Series D convertible preferred stock and 8,831,952 shares of our Class A common stock resulting from the conversion of an equivalent number of outstanding shares of our Series E convertible preferred stock upon the effectiveness of the registration statement of which this prospectus forms a part, as if this conversion had occurred as of January 31, 2021.

| | Shares Beneficially Owned Prior to the Effectiveness of the Registration Statement | | | | | Shares of Class A Common Stock Registered |
|---|---|---|---|---|---|---|
| | Class A | | Class B | | Percent of Total Voting Power % | |
| Named Executive Officers and Directors: | Number | % | Number | % | | |
| Brian Armstrong[1] | 2,753,924 | 10.9 | 36,851,833 | 21.8 | 21.7 | |
| Surojit Chatterjee[2] | 2,002,036 | 8.2 | — | — | * | |
| Paul Grewal[3] | 915,331 | 3.9 | — | — | * | |
| Marc Andreessen[4] | 5,516,037 | 24.6 | 23,961,498 | 14.2 | 14.3 | |
| Frederick Ernest Ehrsam III[5] | 2,570,459 | 11.4 | 15,114,503 | 9.0 | 9.0 | |
| Kathryn Haun[6] | 181,000 | * | 286,854 | * | * | |
| Kelly Kramer | — | — | — | — | — | |
| Gokul Rajaram | — | — | — | — | — | |
| Fred Wilson[7] | — | — | 13,902,324 | 8.2 | 8.2 | |
| All executive officers and directors as a group (11 persons)[8] | 15,998,205 | 53.0 | 91,947,012 | 54.0 | 54.0 | |
| Other 5% Stockholders: | | | | | | |
| Entities affiliated with Andreessen Horowitz[9] | 5,516,037 | 24.6 | 23,961,498 | 14.2 | 14.3 | |
| Entities affiliated with Paradigm[10] | 2,570,459 | 11.4 | — | — | * | |
| Entities affiliated with Ribbit Capital[11] | — | — | 11,995,949 | 7.1 | 7.1 | |
| Tiger Global Private Investment Partners XI, L.P.[12] | 2,624,880 | 11.7 | — | — | * | |
| Entities affiliated with Union Square Ventures[13] | — | — | 13,902,324 | 8.2 | 8.2 | |
| Other Registered Stockholders: | | | | | | |
| Non-Executive Officer and Non-Director Service Providers | | | | | | |
| All Other Registered Stockholders | | | | | | |

---

\*    Represents beneficial ownership of less than 1% of our outstanding shares of common stock.
(1)   Represents (i) 2,753,924 shares underlying options to purchase Class A common stock that are exercisable within 60 days of January 31, 2021; (ii) 25,959,129 shares of Class B common stock held by The Brian Armstrong Living Trust; (iii) 2,215,422 shares of Class B common stock held by the Brian Armstrong 2018 Grantor Retained Annuity Trust; (iv) 7,726,792 shares of Class B common stock held by the Brian Armstrong 2020 Grantor Retained Annuity Trust; and (v) 950,490 shares of Class B common stock held by The Ehrsam 2014 Irrevocable Trust, of which Mr. Armstrong is trustee.
(2)   Represents 2,002,036 shares underlying options to purchase Class A common stock that are exercisable within 60 days of January 31, 2021.
(3)   Represents 915,331 shares underlying options to purchase Class A common stock that are exercisable within 60 days of January 31, 2021.
(4)   Represents (i) 5,516,037 shares of Class A common stock and (ii) 23,961,498 shares of Class B common stock held by entities affiliated with Andreessen Horowitz, as reflected in footnote 9 below. Mr. Andreessen, a member of our board of directors, is a general partner of Andreessen Horowitz, and therefore, may be deemed to share voting and investment power with regard to the shares held directly by Andreessen Horowitz. The address for Mr. Andreessen is c/o Andreessen Horowitz, 2865 Sand Hill Road, Suite 101, Menlo Park, CA 94025.
(5)   Represents (i) 8,425,831 shares of Class B common stock held by The Frederick Ernest Ehrsam III Living Trust; (ii) 2,997,461 shares of Class B common stock held by The Frederick Ernest Ehrsam III 2020 Grantor Retained Annuity Trust; (iii) 601,637 shares of Class B common stock held by the Brian Armstrong Legacy Trust, of which Mr. Ehrsam is trustee; (iv) 3,089,574 shares of Class B common stock held by The Armstrong 2014 Irrevocable Trust, of which Mr. Ehrsam is trustee, and (v) 2,570,459 shares of Class A common stock held by Paradigm Fund L.P., as reflected in footnote 10 below. Mr. Ehrsam, a member of our board of directors, is a managing member of Paradigm Fund L.P., and, therefore, may be deemed to have voting and investment power with regard to the shares held directly by Paradigm Fund L.P.
(6)   Represents (i) 181,000 shares of Class A common stock and (B) 19,000 shares of Class B common stock held by EZT Trust; (ii) 150,000 shares of Class B common stock held by Gheradesca Annuity Trust; and (iii) 117,854 shares of Class B common stock held by Gheradesca LLC, of which 12,445 shares are unvested and subject to repurchase by us.
(7)   Represents 13,902,324 shares of Class B common stock held by entities affiliated with Union Square Ventures, as reflected in footnote 13 below. Mr. Wilson, a member of our board of directors, is a general partner of Union Square Ventures, and therefore, may be deemed to share voting and investment power with regard to the shares held directly by Union Square Ventures. The address for Mr. Wilson is c/o Union Square Ventures, 915 Broadway, 19th Floor, New York, NY 10010.
(8)   Represents (i) 8,272,840 shares of Class A common stock; (ii) 90,436,463 shares of Class B common stock; (iii) 7,702,340 shares underlying options to purchase shares of Class A common stock that are exercisable within 60 days of January 31, 2021; (iv) 1,510,549 shares underlying options to purchase shares of Class B common stock that are exercisable within 60

days of January 31, 2021; and (v) 23,025 shares of Class A common stock subject to RSUs that are settleable within 60 days of January 31, 2021.

(9) Represents (i) 27,630 shares of Class A common stock and 21,714,684 shares of Class B common stock held by Andreessen Horowitz Fund III, L.P. for itself and as nominee for Andreessen Horowitz Fund III-A, L.P., Andreessen Horowitz Fund III-B, L.P., and Andreessen Horowitz Fund III-Q, L.P., which are collectively referred to as the "Andreessen Horowitz Fund III Entities"; (ii) 4,618,842 shares of Class A common stock held by Andreessen Horowitz LSV Fund I, L.P., for itself and as nominee for Andreessen Horowitz LSV Fund I-B, L.P. and Andreessen Horowitz LSV Fund I-Q, L.P., which are collectively referred to as the "Andreessen Horowitz LSV Entities"; (iii) 1,817,334 shares of Class B common stock held by AH Parallel Fund III, L.P. for itself and as nominee for AH Parallel Fund III-A, L.P., AH Parallel Fund III-B, L.P., and AH Parallel Fund III-Q, L.P., which are collectively referred to as the "AH Parallel Fund III Entities"; (iv) 429,480 shares of Class B common stock held by a16z Seed-III, L.L.C., which is referred to as "a16z Seed"; and (v) 869,565 shares of Class A common stock held by CNK Fund I, L.P. for itself and as nominee for CNK Fund I-B, L.P. and CNK Fund I-Q, L.P, which are collectively referred to as the "CNK Entities". AH Equity Partners III, L.L.C., ("AH Equity Partners III"), the general partner of the Andreessen Horowitz Fund III Entities, has sole voting and dispositive power with regard to the shares held by the Andreessen Horowitz Fund III Entities. AH Equity Partners LSV I, L.L.C., ("AH Equity Partners LSV"), the general partner of the Andreessen Horowitz LSV Entities, has sole voting and dispositive power with regard to the shares held by the Andreessen Horowitz LSV Entities. AH Equity Partners III (Parallel), L.L.C., ("AH Equity Partners III (Parallel)"), the general partner of the AH Parallel Fund III Entities, has sole voting and dispositive power with regard to the shares held by the AH Parallel Fund III Entities. The shares held directly by a16z Seed are indirectly held by the Andreessen Horowitz Fund III Entities and the members of a16z Seed. AH Equity Partners III, the general partner of the Andreessen Horowitz Fund III Entities, has sole voting and dispositive power with regard to the shares held by a16z Seed. CNK Equity Partners I, L.L.C., ("CNK Equity Partners"), the general partner of the CNK Fund Entities, has sole voting and dispositive power with regard to the shared held by the CNK Fund Entities. Marc Andreessen and Ben Horowitz are the managing members of each of AH Equity Partners III, AH Equity Partners LSV, AH Equity Partners III (Parallel), and CNK Equity Partners. The address for each of these entities is 2865 Sand Hill Road, Suite 101, Menlo Park, CA 94025.

(10) Represents 2,570,459 shares of Class A common stock held by Paradigm Fund L.P. Paradigm Fund GP LLC, the general partner of Paradigm Fund L.P. has sole voting and investment power with regard to the shares held by Paradigm Fund L.P. The Frederick Ernest Ehrsam III Living Trust and Matt Huang are the managing members of Paradigm Fund GP LLC. Mr. Ehrsam is the trustee of The Frederick Ernest Ehrsam III Living Trust. The address for this entity is c/o Maples Corporate Services Limited, Ugland House, PO Box 309, George Town, Grand Cayman E9 KY1-1104.

(11) Represents (i) 1,020,672 shares of Class B common stock held by CB-D Ribbit Opportunity I, LLC; (ii) 10,089,161 shares of Class B common stock held by Ribbit Capital, L.P.; (iii) 560,610 shares of Class B common stock held by CB Ribbit Holdings, LLC; and (iv) 325,506 shares of Class B common stock held by CB Ribbit Opportunity I, LLC. The address for this entity is 364 University Avenue, Palo Alto, CA 9430.

(12) Represents 2,624,880 shares of Class A common stock held by Tiger Global Private Investment Partners XI, L.P, an affiliate of Tiger Global Management, LLC. The address for this entity is c/o Tiger Global Management, LLC, 9 West 57th Street, 35th Floor, New York, NY 10019.

(13) Represents (i) 11,626,100 shares of Class B common stock held by Union Square Ventures 2012 Fund, L.P., or USV 2012 Fund; (ii) 449,762 shares of Class B common stock held by USV Investors 2012 Fund, L.P., or USV Investors 2012 Fund; (iii) 1,738,007 shares of Class B common stock held by USV Opportunity 2014, LP, or USV Opportunity 2014 Fund, and (iv) 88,455 shares of Class B common stock held by USV Opportunity Investors 2014, LP., or USV Opportunity Investors 2014 Fund. Union Square 2012 GP, L.L.C., or Union Square 2012, is the general partner of USV 2012 Fund and USV Investors 2012 Fund, and has sole voting and investment power with regard to the shares held by USV 2012 Fund and USV Investors 2012 Fund. USV Opportunity 2014 GP, LLC, or USV Opportunity 2014, is the general partner of USV Opportunity 2014 Fund and USV Opportunity Investors 2014 Fund, and has sole voting and investment power with regard to the shares held by USV Opportunity 2014 Fund and USV Opportunity Investors 2014 Fund. We refer to Union Square 2012 and USV Opportunity 2014 and affiliated entities as Union Square Ventures. Fred Wilson, Brad Burnham, Albert Wenger, John Buttrick, and Andy Weissman are partners at Union Square Ventures and, therefore, may be deemed to have shared voting and investment power with regard to the shares held directly by Union Square Ventures. The address for each of these entities is 915 Broadway, 19th Floor, New York, NY 10010.

185

**DESCRIPTION OF CAPITAL STOCK**

The following description summarizes the most important terms of our capital stock, as they will be in effect shortly following the effectiveness of the registration statement of which this prospectus forms a part. We adopted a restated certificate of incorporation and restated bylaws that will become effective upon the completion of this offering, and this description summarizes provisions included in these documents. Because it is only a summary, it does not contain all the information that may be important to you. For a complete description, you should refer to our restated certificate of incorporation and restated bylaws, which are included as exhibits to the registration statement of which this prospectus forms a part, and to the applicable provisions of Delaware law.

Shortly following the effectiveness of the registration statement of which this prospectus forms a part, our authorized capital stock will consist of 10,000,000,000 shares of our Class A common stock, $0.00001 par value per share, 500,000,000 shares of our Class B common stock, $0.00001 par value per share, 500,000,000 shares of undesignated common stock, $0.00001 par value per share, and 500,000,000 shares of undesignated preferred stock, $0.00001 par value per share.

Assuming the conversion of our Series FF, Series A, Series B, Series C, and Series D convertible preferred stock into 104,046,301 shares of our Class B common stock and our Series E convertible preferred stock into 8,831,952 shares of our Class A common stock, which will occur in connection with the effectiveness of the registration statement of which this prospectus forms a part, as of December 31, 2020, there were outstanding:

- 21,035,491 shares of our Class A common stock, held by approximately 430 stockholders of record;

- 164,950,620 shares of our Class B common stock outstanding, held by approximately 430 stockholders of record;

- 40,813,340 shares of our Class A common stock issuable upon exercise of outstanding stock options, with a weighted-average exercise price of $21.17 per share;

- 32,403 shares of our Class A common stock issuable upon exercise of outstanding stock options assumed in connection with our acquisition of Tagomi Holdings Inc., with a weighted-average exercise price of $5.31 per share;

- 22,442,017 shares of our Class B common stock issuable upon exercise of outstanding stock options, with a weighted-average exercise price of $3.34 per share;

- 3,765,760 RSUs covering shares of our Class A common stock that are issuable upon satisfaction of service-based vesting condition;

- 407,928 shares of our Class B common stock issuable upon exercise of a warrant, with an exercise price of $1.01 per share;

- 4,201 shares of our Class A common stock issuable upon exercise of a warrant assumed in connection with our acquisition of Tagomi Holdings Inc., with an exercise price of $5.26 per share; and

- 2,295,766 shares of Class A common stock reserved for the potential issuance pursuant to warrants to purchase shares of our Class A common stock at an exercise price of $0.00001 that may be approved by our board of directors from time to time, of which, as of December 31, 2020, our board of directors has approved the issuance of a warrant exercisable for an aggregate of 229,577 shares of our Class A common stock at an exercise price of $0.00001 per share.

186

**Class A Common Stock and Class B Common Stock**

### Dividend rights

Subject to preferences that may apply to any shares of our convertible preferred stock or any new series of common stock outstanding at the time, the holders of our Class A common stock and Class B common stock are entitled to receive dividends out of funds legally available if our board of directors, in its discretion, determines to issue dividends and then only at the times and in the amounts that our board of directors may determine. Shares of Class A common stock and Class B common stock will be treated equally, identically and ratably, on a per share basis, with respect to dividends that may be declared by our board of directors. See the section titled "Dividend Policy."

### Voting rights

Holders of our Class A common stock are entitled to one vote per share, and holders of our Class B common stock are entitled to twenty votes per share, on all matters submitted to a vote of stockholders. Following the effectiveness of the registration statement of which this prospectus forms a part, the holders of our outstanding Class B common stock will hold            % of the voting power of our outstanding capital stock, with our directors, executive officers, and 5% stockholders and their respective affiliates holding            % of the voting power in the aggregate. The holders of our Class A common stock and Class B common stock will generally vote together as a single class on all matters (including the election of directors) submitted to a vote of our stockholders, unless otherwise required by Delaware law or our restated certificate of incorporation. Our restated certificate of incorporation will provide that the affirmative vote of the holders of at least 66-2/3% of the voting power of all of the then-outstanding shares of Class B common stock, voting separately and as a single class, will be required for any proposal to amend or repeal, or adopt any provision inconsistent with, any provision in the restated certificate of incorporation relating to the voting, conversion, or other rights, powers, preferences, privileges, or restrictions of the Class B common stock. Delaware law could require either holders of our Class A common stock or Class B common stock to vote separately as a single class in the following circumstances:

- if we were to seek to amend our restated certificate of incorporation to increase or decrease the par value of a class of our capital stock, then that class would be required to vote separately to approve the proposed amendment; and

- if we were to seek to amend our restated certificate of incorporation in a manner that alters or changes the powers, preferences, or special rights of a class of our capital stock in a manner that affected its holders adversely, then that class would be required to vote separately to approve the proposed amendment.

Our restated certificate of incorporation will not provide for cumulative voting for the election of directors. Our restated certificate of incorporation initially establishes a classified board of directors, to be divided in three classes with staggered three-year terms. Only one class of directors will be elected at each annual meeting of our stockholders, with the other classes continuing for the remainder for their respective three-year terms. Our board of directors will remain classified until the date on which the company certifies that Mr. Armstrong and his affiliated entities hold a majority of the voting power of all the then-outstanding shares of our capital stock entitled to vote (such date the staggered board end date and such periods of control, the founder control periods). Following each staggered board end date, all directors will be elected for annual terms as described in our restated certificate of incorporation that will be effective shortly following the effectiveness of this registration statement. If, following any staggered board end date, Mr. Armstrong and his affiliated entities cease to hold a majority of the voting power of all the then-outstanding shares of our capital stock, our board of directors will revert to being divided in three classes with staggered three-year terms as described above until the subsequent staggered board end date. For additional information regarding the structure of our board of directors, please refer to our restated certificate of incorporation that will be effective shortly following the effectiveness of the

registration statement and which is included as an exhibit to the registration statement of which this prospectus forms a part.

### Conversion

Each outstanding share of Class B common stock is convertible at any time at the option of the holder into one share of Class A common stock. In addition, each share of Class B common stock will convert automatically into one share of Class A common stock upon any transfer, whether or not for value, which occurs after the effectiveness of the registration statement of which this prospectus forms a part, except for certain permitted transfers, including certain transfers to family members, trusts solely for the benefit of the stockholder or their family members, affiliates under common control with the stockholder, and partnerships, corporations, foundations, individual retirement accounts, and other entities exclusively owned by the stockholder or their family members, in each case as fully described in our restated certificate of incorporation. Once converted into Class A common stock, the Class B common stock will not be reissued.

All the outstanding shares of Class B common stock will convert automatically into shares of Class A common stock upon the earliest to occur of (i) the date fixed by the board of directors that is no less than 61 days and no more than 180 days following the first time after the date of effectiveness of the registration statement of which this prospectus forms a part that the aggregate number of shares of Class B common stock held by Brian Armstrong and his affiliates is less than 25% of the aggregate number of shares of Class B common stock held by Mr. Armstrong and his affiliates on the date of effectiveness of the registration statement of which this prospectus forms a part; (ii) the date and time specified by affirmative vote of the holders of at least 66-2/3% of the outstanding shares of Class B common stock, voting as a single class, and the affirmative vote of at least 66-2/3% of the then serving members of our board of directors, which must include the affirmative vote of Mr. Armstrong, if either (A) Mr. Armstrong is serving on our board of directors and has not been terminated for cause or resigned except for good reason (as each term is defined in our restated certificate of incorporation) from his position as our Chief Executive Officer or (B) Mr. Armstrong has not been removed for cause or resigned from the position of Chairman of the board of directors; and (iii) the death or disability (as defined in our and restated certificate of incorporation) of Mr. Armstrong, provided, that, in the case of (iii), the date of such automatic conversion may be delayed, but not for more than six months, to a date approved by a majority of the independent directors (as defined in our and restated certificate of incorporation) then in office.

### No preemptive or similar rights

Our Class A common stock and Class B common stock are not entitled to preemptive rights and are not subject to conversion (except as noted above), redemption, or sinking fund provisions.

### Right to receive liquidation distributions

If we become subject to a liquidation, dissolution, or winding-up, the assets legally available for distribution to our stockholders would be distributed ratably among the holders of our Class A common stock and Class B common stock and any participating preferred stock or new series of common stock outstanding at that time, subject to prior satisfaction of all outstanding debt and liabilities and the preferential rights of and the payment of liquidation preferences, if any, on any outstanding shares of preferred stock or new series of common stock.

### Fully paid and non-assessable

All of the outstanding shares of our Class A common stock and Class B common stock are fully paid and non-assessable.

### "Blank check" common stock

Shortly following the effectiveness of the registration statement of which this prospectus forms a part, our board of directors will be authorized, subject to limitations prescribed by Delaware law, to issue common stock in one or more series, to establish from time to time the number of shares to be included in each series and to fix the form, designation, powers, preferences, and rights of the shares of each series and any of its qualifications, limitations, or restrictions, in each case without further vote or action by our stockholders. Our board of directors may use the "blank check" common stock to issue common stock, or rights or options thereto, in the form of blockchain-based tokens. Our board of directors may authorize the issuance of such common stock with voting or conversion rights that could adversely affect the voting power or other rights of the holders of our Class A common stock and our Class B common stock. The issuance of such common stock, or any rights or options thereto, while providing flexibility to us in connection with various corporation purposes, could, among other things, adversely affect the market price of our Class A common stock and the voting and other rights of the holders of our Class A common stock and Class B common stock. However, the authorization of any "blank check" common stock or preferred stock entitling the holder of such shares to the right to more than one vote per share must be approved by the majority of the directors then in office, including Mr. Armstrong for so long as Mr. Armstrong is then serving as a member of our board of directors and the shares of our Class B common stock have not yet been automatically converted into shares of Class A common stock.

## Preferred Stock

Each currently outstanding share of our Series FF, Series A, Series B, Series C, and Series D convertible preferred stock will automatically be converted into one share of Class B common stock and each currently outstanding share of Series E convertible preferred stock will automatically be converted into one share of Class A common stock effective, in each case, upon the effectiveness of the registration statement of which this prospectus forms a part. Following such date, no shares of convertible preferred stock will be outstanding.

Shortly following the effectiveness of the registration statement of which this prospectus forms a part, our board of directors will be authorized, subject to limitations prescribed by Delaware law, to issue preferred stock in one or more series, to establish from time to time the number of shares to be included in each series and to fix the designation, powers, preferences, and rights of the shares of each series and any of its qualifications, limitations, or restrictions, in each case without further vote or action by our stockholders. Our board of directors can also increase or decrease the number of shares of any series of preferred stock, but not below the number of shares of that series then outstanding, without any further vote or action by our stockholders. Our board of directors may authorize the issuance of preferred stock with voting or conversion rights that could adversely affect the voting power or other rights of the holders of our common stock. Notwithstanding the foregoing, the authorization of any "blank check" preferred stock entitling the holder of such shares to the right to more than one vote per share must be approved by the majority of the directors then in office, including Mr. Armstrong for so long as Mr. Armstrong is then serving as a member of our board of directors and the shares of our Class B common stock have not yet been automatically converted into shares of Class A common stock. The issuance of preferred stock, while providing flexibility in connection with possible acquisitions and other corporate purposes, could, among other things, have the effect of delaying, deferring, or preventing a change of control of our company and might adversely affect the market price of our Class A common stock and the voting and other rights of the holders of our Class A common stock and Class B common stock. We have no current plan to issue any shares of preferred stock.

## Stock Options

As of December 31, 2020, we had outstanding options to purchase an aggregate of 3,550,279 shares of our Class A common stock, with a weighted-average exercise price of $17.38 per share, and an aggregate of 22,442,017 shares of our Class B common stock, with a weighted-average exercise price of $3.34 per share, all granted pursuant to our 2013 Plan, an aggregate of 37,230,658 shares of our Class A common stock, with a weighted-average exercise price of $21.54 per share, granted pursuant to our 2019 Plan. In addition, as of December 31, 2020, we assumed and converted from options to purchase shares

189

of Tagomi Holdings Inc. common stock an aggregate of 32,403 shares of our Class A common stock issuable upon the exercise of options, with a weighted-average exercise price of $5.31 per share. Since December 31, 2020, we have not granted any additional options to purchase shares of our Class A common stock or Class B common stock. In February 2021, we assumed and converted from options to purchase shares of Bison Trails Co. common stock an aggregate of 470,128 shares of our Class A common stock issuable upon the exercise of options, with a weighted-average exercise price of $3.45 per share, upon completion of our acquisition of Bison Trails Co.

## Restricted Stock Units

As of December 31, 2020, we had an aggregate of 3,765,760 shares of our Class A common stock outstanding subject to RSUs, pursuant to our 2019 Plan. Since December 31, 2020, we have granted an aggregate of 1,607,982 shares of our Class A common stock, subject to RSUs, pursuant to our 2019 Plan.

## Warrants

As of December 31, 2020, we had outstanding a warrant exercisable for 407,928 shares of our Class B common stock at an exercise price of $1.01, which expires in June 2024. The warrant has a cashless exercise provision pursuant to which the holder, in lieu of paying the exercise price in cash, can surrender the warrant and receive a net number of shares based on the fair market value of such shares at the time of exercise, after deducting the aggregate exercise price. As of December 31, 2020, we also had outstanding a warrant, assumed in connection with our acquisition of Tagomi Holdings, Inc., exercisable for 4,201 shares of our Class A common stock at an exercise price of $5.26 per share, which expires in July 2030. In April 2020, our board of directors approved the reservation of up to 2,295,766 shares of Class A common stock that we may issue in the future pursuant to warrants to purchase shares of our Class A common stock in connection with our philanthropic endeavors. As of December 31, 2020, our board of directors had approved the issuance of a warrant exercisable for an aggregate of 229,577 shares of our Class A common stock at an exercise price of $0.00001 per share. Our board of directors will annually consider whether to issue additional warrants for the remaining 2,066,189 shares of Class A common stock reserved for such issuance to fulfill our intent under the Pledge 1% campaign.

## Registration Rights

Our IRA provides that certain holders of our Class A common stock and Class B common stock will be entitled to rights with respect to the registration of their shares under the Securities Act, as set forth below. The registration of shares of our Class A common stock or Class B common stock by the exercise of registration rights described below would enable the holders to sell these shares without restriction under the Securities Act when the applicable registration statement was declared effective. We will pay the registration expenses (other than underwriting discounts and selling commissions) of the holders of the shares registered pursuant to the demand, piggyback, and Form S-3, registrations described below, including the reasonable fees of one counsel for the selling holders, not to exceed $25,000. In an underwritten offering, the underwriters have the right, subject to specified conditions, to limit the number of shares such holders may include.

The registration rights set forth in the IRA will expire five years following the effectiveness of the registration statement of which this prospectus forms a part, or, with respect to any particular stockholder, when such stockholder is able to sell all of its shares without registration pursuant to Rule 144 of the Securities Act during any three-month period.

### *Demand registration rights*

After the effectiveness of the registration statement of which this prospectus forms a part, as of December 31, 2020 the holders of approximately 109,385,725 shares of our Class A common stock and Class B common stock will be entitled to certain demand registration rights. At any time beginning 180 days after the effectiveness of the registration statement of which this prospectus forms a part, the

holders of at least 20% of these shares then outstanding can request that we register the offer and sale of their shares. We are obligated to effect only two such registrations. If we determine that it would be materially detrimental to us and our stockholders to effect such a demand registration, we have the right to defer such registration, not more than once in any 12-month period, for a period of up to 30 days. Additionally, we will not be required to effect a demand registration during the period beginning 60 days prior to our good faith estimate of the date of the filing of and ending on a date 180 days following the effectiveness of a registration statement relating to our common stock. Such request for registration must cover securities the aggregate offering price of which is at least $10.0 million.

### Piggyback registration rights

After the effectiveness of the registration statement of which this prospectus forms a part, if we propose to register the offer and sale of our common stock under the Securities Act, in connection with the public offering of such common stock, as of December 31, 2020 the holders of up to approximately 109,385,725 shares of our Class A common stock and Class B common stock will be entitled to certain "piggyback" registration rights allowing the holders to include their shares in such registration, subject to certain marketing and other limitations. As a result, whenever we propose to file a registration statement under the Securities Act, other than with respect to (i) a registration related solely to a company equity plan, (ii) a registration relating to a corporate reorganization or transaction under Rule 145 of the Securities Act, (iii) a registration on any form that does not include substantially the same information as would be required to be included in a registration statement covering the public offering of our common stock, or (iv) a registration in which the only common stock being registered is common stock issuable upon the conversion of debt securities that are also being registered, the holders of these shares are entitled to notice of the registration and have the right, subject to certain limitations, to include their shares in the registration.

### S-3 registration rights

After the effectiveness of the registration statement of which this prospectus forms a part, as of December 31, 2020 the holders of up to approximately 109,385,725 shares of our Class A common stock and Class B common stock will be entitled to certain Form S-3 registration rights. The holders of at least 10% of these shares then outstanding may make a written request that we register the offer and sale of their shares on a registration statement on Form S-3 if we are eligible to file a registration statement on Form S-3 so long as the request covers at least that number of shares with an anticipated offering price, net of underwriting discounts and commissions, of at least $5.0 million. These stockholders may make an unlimited number of requests for registration on Form S-3; however, we will not be required to effect a registration on Form S-3 if we have effected two such registrations within the 12-month period preceding the date of the request. If we determine that it would be seriously detrimental to us and our stockholders to effect such a registration, we have the right to defer such registration, not more than once in any 12-month period, for a period of up to 30 days. Additionally, we will not be required to effect a registration on Form S-3 during the period beginning 30 days prior to our good faith estimate of the date of the filing of and ending on a date 90 days following the effectiveness of a registration statement relating to our common stock.

## Anti-Takeover Provisions

The provisions of Delaware law, our restated certificate of incorporation, and our restated bylaws, as we expect they will be in effect shortly following the effectiveness of the registration statement of which this prospectus forms a part, which are summarized below, may have the effect of delaying, deferring, or discouraging another person from acquiring control of our company. They are also designed, in part, to encourage persons seeking to acquire control of us to negotiate first with our board of directors. We believe that the benefits of increased protection of our potential ability to negotiate with an unfriendly or unsolicited acquirer outweigh the disadvantages of discouraging a proposal to acquire us because negotiation of these proposals could result in an improvement of their terms.

191

**Delaware Law**

We are subject to the provisions of Section 203 of the DGCL, regulating corporate takeovers. In general, DGCL Section 203 prohibits a publicly held Delaware corporation from engaging in a "business combination" with an "interested stockholder" for a period of three years following the date on which the person became an interested stockholder unless:

- prior to the date of the transaction, the board of directors of the corporation approved either the business combination or the transaction which resulted in the stockholder becoming an interested stockholder;

- the interested stockholder owned at least 85% of the voting stock of the corporation outstanding at the time the transaction commenced, excluding for purposes of determining the voting stock outstanding, but not the outstanding voting stock owned by the interested stockholder, (i) shares owned by persons who are directors and also officers and (ii) shares owned by employee stock plans in which employee participants do not have the right to determine confidentially whether shares held subject to the plan will be tendered in a tender or exchange offer; or

- at or subsequent to the date of the transaction, the business combination is approved by the board of directors of the corporation and authorized at an annual or special meeting of stockholders, and not by written consent, by the affirmative vote of at least 66 2/3% of the outstanding voting stock that is not owned by the interested stockholder.

Generally, a "business combination" includes a merger, asset or stock sale, or other transaction or series of transactions together resulting in a financial benefit to the interested stockholder. An "interested stockholder" is a person who, together with affiliates and associates, owns or, within three years prior to the determination of interested stockholder status, did own 15% or more of a corporation's outstanding voting stock. We expect the existence of this provision to have an anti-takeover effect with respect to transactions our board of directors does not approve in advance. We also anticipate that DGCL Section 203 may also discourage attempts that might result in a premium over the market price for the shares of common stock held by stockholders.

**Restated Certificate of Incorporation and Restated Bylaw Provisions**

Our restated certificate of incorporation and our restated bylaws will include a number of provisions that could deter hostile takeovers or delay or prevent changes in control of our board of directors or management team, including the following:

- *Dual class stock structure*. As described above in the subsection titled "—Class A Common Stock and Class B Common Stock —Voting Rights," our restated certificate of incorporation will provide for a dual-class common stock structure pursuant to which holders of our Class B common stock, including our current investors, executives, and employees, will have the ability to control the outcome of matters requiring stockholder approval, even if they own significantly less than a majority of the shares of our outstanding Class A common stock and Class B common stock, including the election of directors and significant corporate transactions, such as a merger or other sale of our company or its assets.

- *Board of directors vacancies*. Our restated certificate of incorporation and restated bylaws will authorize only our board of directors to fill vacant directorships, including newly created seats, and will further provide that, during the times in which our board of directors is classified, any director filling such a vacancy, including a newly created seat, must be approved by the affirmative vote of all of the directors then in office. In addition, the number of directors constituting our board of directors will be permitted to be set only by a resolution adopted by a majority vote of our entire board of directors. These provisions would prevent a stockholder from increasing the size of our board of directors and then gaining control of our board of directors by

192

filling the resulting vacancies with its own nominees. This will make it more difficult to change the composition of our board of directors and promote continuity of management.

- **Director Nominees**. Our restated bylaws will provide that during the times in which our board of directors is classified, any director nomination made pursuant to our notice of meeting or by or at the direction of our board of directors or a committee thereof, must be approved by the affirmative vote of all of the directors then in office.This provision would make it difficult to gain control of our board of directors as any single existing director would have the ability to veto a nominee put forth by the other members of our board of directors or by a committee thereof.

- **Classified board**. Our restated certificate of incorporation and restated bylaws will provide that our board of directors is initially classified into three classes of directors. Upon the occurrence of certain future conditions related to Mr. Armstrong's ownership of our capital stock, our board of directors may alternate between classified and declassified structures. A third party may be discouraged from making a tender offer or otherwise attempting to obtain control of us as it is more difficult and time consuming for stockholders to replace a majority of the directors on a classified board of directors. See the sections titled "—Class A Common Stock and Class B Common Stock—Voting Rights" and "Management—Classified Board of Directors."

- **Requirements for amendments of our restated certificate of incorporation**. Our restated certificate of incorporation will provide that the affirmative vote of holders of at least 66-2/3% of the voting power of all of the then-outstanding shares of voting stock will be required to amend or repeal certain provisions of our restated certificate of incorporation, including provisions relating to the classified board, the size of the board, removal of directors, special meetings, actions by written consent, and designation of our preferred stock, or, if any proposed amendment or repeal of such a provision has been approved by two-thirds of our then-serving directors, with the affirmative vote of holders of a majority of the voting power of all then outstanding shares of voting stock. Notwithstanding the foregoing, our restated certificate of incorporation will further provide that prior to the time at which all outstanding shares of Class B common stock automatically convert into shares of Class A common stock, holders of our Class B common stock will vote separately and as a single class on any proposal to amend or repeal, or adopt any provision inconsistent with, any provision in the restated certificate of incorporation relating to the voting, conversion, or other rights, powers, preferences, privileges, or restrictions of the Class B common stock.

- **Requirements for amendments of our restated bylaws**. Our restated certificate of incorporation will provide that our board of directors will have the power to adopt, amend, or repeal our restated bylaws, provided, however, that during the times in which our board of directors is classified, any proposed adoption, amendment, or repeal will must be approved by the affirmative vote of all of the directors then in office. Our restated certificate of incorporation will also provide our stockholders with the power to adopt, amend, or repeal our restated bylaws with the affirmative vote of holders of at least 66-2/3% of the voting power of all of the then outstanding shares of voting stock, or, if any proposed adoption, amendment, or repeal of any provision has been approved by two-thirds of our then-serving directors, with the affirmative vote of the holders of a majority of the voting power of all the then-outstanding shares of voting stock. Notwithstanding the foregoing, during founder control periods, the affirmative vote of holders of only a majority of the voting power of all of the then-outstanding shares of voting stock will be required for our stockholders to adopt, amend, or repeal our restated bylaws.

- **Stockholder action; Special meeting of stockholders**. Our restated certificate of incorporation will provide that, during the times in which our board of directors is classified, our stockholders may not take action by written consent, but may only take action at annual or special meetings of our stockholders. As a result, holders of our capital stock would not be able to amend our restated bylaws or remove directors without holding a meeting of our stockholders called in accordance with our restated bylaws. Our restated bylaws will further provide that special meetings of our

stockholders may be called only by a majority of our board of directors or our Chief Executive Officer, thus prohibiting a stockholder from calling a special meeting. These provisions might delay the ability of our stockholders to force consideration of a proposal or for stockholders controlling a majority of our capital stock to take any action, including the removal of directors. During founder control periods, our restated certificate of incorporation will provide that our stockholders will be permitted to take action by written consent.

• **_Advance notice requirements for stockholder proposals and director nominations_**. Our restated bylaws will provide advance notice procedures for stockholders seeking to bring business before our annual meeting of stockholders or to nominate candidates for election as directors at our annual meeting of stockholders. Our restated bylaws will also specify certain requirements regarding the form and content of a stockholder's notice. During periods in which our stockholders are not permitted to act by written consent, these provisions might preclude our stockholders from bringing matters before our annual meeting of stockholders or from making nominations for directors at our annual meeting of stockholders if the proper procedures are not followed. We expect that these provisions may also discourage or deter a potential acquirer from conducting a solicitation of proxies to elect the acquirer's own slate of directors or otherwise attempting to obtain control of our company.

• **_No cumulative voting_**. The DGCL provides that stockholders are not entitled to cumulate votes in the election of directors unless a corporation's certificate of incorporation provides otherwise. Our restated certificate of incorporation will not provide for cumulative voting.

• **_Removal of directors_**. Our restated certificate of incorporation will provide that stockholders may remove directors only for cause and with the affirmative vote of holders of at least 66 2/3% of the voting power of all of the then-outstanding shares of voting stock. However, during founder control periods, stockholders will be able to remove directors with or without cause by the affirmative vote of a majority of the then-outstanding shares of voting stock.

• **_Issuance of undesignated preferred stock and common stock_**. Our restated certificate of incorporation will provide that our board of directors has the authority, without further action by the stockholders, to issue up to 500,000,000 shares of undesignated preferred stock and 500,000,000 shares of undesignated common stock with rights and preferences, including voting rights, designated from time to time by our board of directors. The existence of authorized but unissued shares of preferred stock and common stock would enable our board of directors to render more difficult or to discourage an attempt to obtain control of us by means of a merger, tender offer, proxy contest, or other means.

• **_Exclusive forum_**. Our restated certificate of incorporation will provide that, to the fullest extent permitted by law, the Court of Chancery of the State of Delaware will be the exclusive forum for any derivative action or proceeding brought on our behalf; any action asserting a claim that is based upon a breach of fiduciary duty; any action asserting a claim against us or any current or former director, officer, stockholder, employee or agent of ours, arising pursuant to the DGCL, our restated certificate of incorporation or our restated bylaws; any action asserting a claim against us that is governed by the internal affairs doctrine. Our restated bylaws will also provide that the federal district courts of the United States will, to the fullest extent permitted by law, be the exclusive forum for resolving any complaint asserting a cause of action arising under the Securities Act, or the Federal Forum Provision, unless we consent in writing to the selection of an alternative forum. While there can be no assurance that federal or state courts will follow the holding of the Delaware Supreme Court which recently found that such provisions are facially valid under Delaware law or determine that the Federal Forum Provision should be enforced in a particular case, application of the Federal Forum Provision means that suits brought by our stockholders to enforce any duty or liability created by the Securities Act must be brought in federal court and cannot be brought in state court. Neither the exclusive forum provision nor the Federal Forum Provision applies to suits brought to enforce any duty or liability created by the

Exchange Act. Section 27 of the Exchange Act creates exclusive federal jurisdiction over all claims brought to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder. Accordingly, actions by our stockholders to enforce any duty or liability created by the Exchange Act or the rules and regulations thereunder also must be brought in federal court. Our stockholders will not be deemed to have waived our compliance with the federal securities laws and the regulations promulgated thereunder. Any person or entity purchasing or otherwise acquiring or holding any interest in any of our securities shall be deemed to have notice of and consented to our exclusive forum provisions, including the Federal Forum Provision. These provisions may limit a stockholder's ability to bring a claim in a judicial forum of their choosing for disputes with us or our directors, officers, or other employees, which may discourage lawsuits against us and our directors, officers, and other employees.

**Listing**

We have applied to list our Class A common stock on the Nasdaq Global Select Market under the symbol "COIN."

**Transfer Agent and Registrar**

On the closing of this offering, the transfer agent and registrar for our Class A common stock and Class B common stock will be Computershare Trust Company, N.A.. The transfer agent and registrar's address is 250 Royall Street, Canton, Massachusetts 02021, and its telephone number is (800) 962-4284.

195

## SHARES ELIGIBLE FOR FUTURE SALE

Prior to the listing of our Class A common stock on the Nasdaq Global Select Market, there has been no public market for our shares of Class A common stock, and we cannot predict the effect, if any, that market sales of shares of our Class A common stock or the availability of shares of our Class A common stock for sale will have on the price of our Class A common stock prevailing from time to time. Sales or distributions of substantial amounts of our Class A common stock in the public market following our listing on the Nasdaq Global Select Market, or the perception that such sales or distributions could occur, could adversely affect the public price of our Class A common stock and may make it more difficult for you to sell your Class A common stock at a time and price that you deem appropriate. We will have no input if and when any registered stockholder may elect to sell its shares of Class A common stock or the prices at which any such sales may occur. Future sales of our Class A common stock, including shares issued upon the exercise of outstanding stock options, in the public market, or the availability of such shares for sale in the public market, could adversely affect market prices prevailing from time to time.

Upon the effectiveness of the registration statement of which this prospectus forms a part, based on the number of shares of our capital stock outstanding as of December 31, 2020, we had a total of 21,035,491 shares of our Class A common stock and 164,950,620 shares of our Class B common stock outstanding, assuming the automatic conversion of all outstanding shares of our Series FF, Series A, Series B, Series C, and Series D convertible preferred stock into 104,046,301 shares of our Class B common stock and our Series E convertible preferred stock into 8,831,952 shares of our Class A common stock upon the effectiveness of the registration statement of which this prospectus forms a part.

Shares of our Class A common stock and Class B common stock will be deemed "restricted securities" (as defined in Rule 144 under the Securities Act). Restricted securities may be sold in the public market only if they are registered or if they qualify for an exemption from registration under Rule 144 or Rule 701 under the Securities Act, which rules are summarized below. Following the effectiveness of the registration statement of which this prospectus forms a part, shares of our Class A common stock may be sold either by the registered stockholders pursuant to this prospectus or by our other existing stockholders in accordance with Rule 144 of the Securities Act.

As further described below, until we have been a reporting company for at least 90 days, only non-affiliates who have beneficially owned their shares of common stock for a period of at least one year will be able to sell their shares of Class A common stock under Rule 144, which is expected to include approximately                  shares of common stock immediately after our registration.

### Rule 144

In general, under Rule 144, as currently in effect, once we have been subject to the public company reporting requirements of Section 13 or Section 15(d) of the Exchange Act for at least 90 days, a person who is not deemed to have been one of our affiliates for purposes of the Securities Act at any time during the 90 days preceding a sale and who has beneficially owned the shares proposed to be sold for at least six months, including the holding period of any prior owner other than our affiliates, is entitled to sell those shares without complying with the manner of sale, volume limitation, or notice provisions of Rule 144, subject to compliance with the public information requirements of Rule 144. If such a person has beneficially owned the shares proposed to be sold for at least one year, including the holding period of any prior owner other than our affiliates, then that person would be entitled to sell those shares without complying with any of the requirements of Rule 144.

In general, under Rule 144, as currently in effect, our affiliates or persons selling shares on behalf of our affiliates are entitled to sell, within any three-month period, a number of shares of Class A common stock that does not exceed the greater of:

- 1% of the number of shares of our Class A common stock then outstanding; or

- the average weekly trading volume of our Class A common stock during the four calendar weeks preceding the filing of a notice on Form 144 with respect to that sale.

Sales under Rule 144 by our affiliates or persons selling shares on behalf of our affiliates are also subject to certain manner of sale provisions and notice requirements and to the availability of current public information about us.

**Rule 701**

Rule 701 generally allows a stockholder who purchased shares of our capital stock pursuant to a written compensatory plan or contract and who is not deemed to have been an affiliate of our company during the immediately preceding 90 days to sell these shares in reliance upon Rule 144, but without being required to comply with the public information, holding period, volume limitation, or notice provisions of Rule 144. Rule 701 also permits affiliates of our company to sell their Rule 701 shares under Rule 144 without complying with the holding period requirements of Rule 144. All holders of Rule 701 shares, however, are required by that rule to wait until 90 days after the date of this prospectus before selling those shares pursuant to Rule 701.

**Registration Rights**

Pursuant to the IRA, we have granted demand, Form S-3, and piggyback registration rights to certain of our stockholders to sell our Class A common stock or Class B common stock. Registration of the sale of these shares under the Securities Act would result in these shares becoming freely tradable without restriction under the Securities Act immediately upon the effectiveness of the registration, except for shares purchased by affiliates. See the section titled "Description of Capital Stock—Registration Rights" for additional information.

**Registration Statements on Form S-8**

In connection with this offering, we intend to file one or more registration statements on Form S-8 under the Securities Act covering all of the shares of our Class A common stock and Class B common stock subject to outstanding stock options and the shares of our Class A common stock reserved for issuance under our equity incentive plans. We expect to file these registration statements as soon as permitted under the Securities Act. However, the shares registered on Form S-8 may be subject to the volume limitations and the manner of sale, notice, and public information requirements of Rule 144.

**SALE PRICE HISTORY OF OUR CAPITAL STOCK**

We have applied to list our Class A common stock on the Nasdaq Global Select Market. Prior to the initial listing, no public market existed for our Class A common stock. However, our Class A common stock and Class B common stock has a history of trading in private transactions. The table below shows the high and low sales prices for our Class A common stock and Class B common stock in private transactions by our stockholders, for the indicated periods, as well as the volume weighted average price per share, based on information available to us. This information may have little or no relation to broader market demand for our Class A common stock and thus the opening public price and subsequent public price of our Class A common stock on the Nasdaq Global Select Market. As a result, you should not place undue reliance on these historical private sales prices as they may differ materially from the opening public price and subsequent public price of our Class A common stock on the Nasdaq Global Select Market. See the section titled "Risk Factors —Risks Related to Ownership of Our Class A Common Stock—The price of our Class A common stock may have little or no relationship to the historical sales prices of our capital stock in private transactions."

| | Per Share Sale Price | | Number of Shares Sold in the Period | Volume Weighted Average Price (VWAP) | Number of Shares Outstanding (Period End) |
|---|---|---|---|---|---|
| | High | Low | | | |
| **Annual** | | | | | |
| Year Ended December 31, 2020 | $ 28.83 | $ 28.83 | 2,081,164 | $ 28.83 | 185,986,111 |
| **Quarterly** | | | | | |
| Year Ended December 31, 2020 | | | | | |
| First Quarter | $ — | $ — | — | $ — | 182,011,368 |
| Second Quarter | $ — | $ — | — | $ — | 182,061,183 |
| Third Quarter | $ 28.83 | $ 28.83 | 2,081,164 | $ 28.83 | 184,400,468 |
| Fourth Quarter | $ — | $ — | — | $ — | 185,986,111 |
| Year Ended December 31, 2021 | | | | | |
| First Quarter | | | | | |
| **Monthly** | | | | | |
| Year Ended December 31, 2020 | | | | | |
| June | $ — | $ — | — | $ — | 182,061,183 |
| July | $ — | $ — | — | $ — | 183,473,190 |
| August | $ 28.83 | $ 28.83 | 1,040,582 | $ 28.83 | 184,290,914 |
| September | $ 28.83 | $ 28.83 | 1,040,582 | $ 28.83 | 184,400,468 |
| October | $ — | $ — | — | $ — | 184,535,784 |
| November | $ — | $ — | — | $ — | 184,714,977 |
| December | $ — | $ — | — | $ — | 185,986,111 |
| Year Ended December 31, 2021 | | | | | |
| January | | | | | |
| February | | | | | |

**CERTAIN MATERIAL U.S. FEDERAL INCOME TAX CONSEQUENCES TO NON-U.S. HOLDERS OF OUR COMMON STOCK**

The following summary describes the material U.S. federal income tax consequences of the ownership and disposition of our Class A common stock acquired pursuant to in this offering. This discussion does not describe all of the tax considerations that may be relevant to a particular holder's acquisition, ownership or disposition of the Class A common stock such as the potential application of the alternative minimum tax or Medicare contribution tax on net investment income. In addition, this discussion does not deal with state or local taxes, U.S. federal gift, and estate tax laws, except to the limited extent provided below, or any non-U.S. tax consequences that may be relevant to holders of our Class A common stock in light of their particular circumstances.

Special rules different from those described below may apply to certain holders that are subject to special treatment under the Code, such as:

- insurance companies, banks, and other financial institutions;

- tax-exempt organizations (including private foundations) and tax-qualified retirement plans;

- foreign governments and international organizations;

- broker-dealers and traders in securities;

- U.S. expatriates and certain former citizens or long-term residents of the United States;

- persons required for U.S. federal income tax purposes to conform the timing of income accruals to their financial statements under Section 451(b) of the Code;

- persons that own, or are deemed to own, more than five percent of our capital stock;

- "controlled foreign corporations," "passive foreign investment companies," and corporations that accumulate earnings to avoid U.S. federal income tax;

- persons who acquire our Class A common stock through the exercise of an option or otherwise as compensation;

- persons that hold our Class A common stock as part of a "straddle," "hedge," "conversion transaction," "synthetic security," or integrated investment or other risk reduction strategy;

- persons who do not hold our Class A common stock as a capital asset within the meaning of Section 1221 of the Code (generally, for investment purposes); and

- partnerships and other pass-through entities, and investors in such pass-through entities (regardless of their places of organization or formation).

Such holders are urged to consult their own tax advisors to determine the U.S. federal, state, local, and other tax consequences that may be relevant to them.

Furthermore, the discussion below is based upon the provisions of the Code, and Treasury regulations, rulings, and judicial decisions thereunder as of the date hereof, and such authorities may be repealed, revoked, or modified, possibly retroactively, and are subject to differing interpretations which could result in U.S. federal income tax consequences different from those discussed below. We have not requested a ruling from the Internal Revenue Service, or IRS, with respect to the statements made and the conclusions reached in the following summary, and there can be no assurance that the IRS will agree with such statements and conclusions or will not take a contrary position regarding the tax consequences described herein, or that any such contrary position would not be sustained by a court.

PERSONS CONSIDERING THE PURCHASE OF OUR CLASS A COMMON STOCK SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE U.S. FEDERAL INCOME TAX CONSEQUENCES OF ACQUIRING, OWNING, AND DISPOSING OF OUR CLASS A COMMON STOCK IN LIGHT OF THEIR PARTICULAR SITUATIONS AS WELL AS ANY CONSEQUENCES ARISING UNDER THE LAWS OF ANY OTHER TAXING JURISDICTION, INCLUDING ANY STATE, LOCAL, OR NON-U.S. TAX CONSEQUENCES OR ANY U.S. FEDERAL NON-INCOME TAX CONSEQUENCES, AND THE POSSIBLE APPLICATION OF TAX TREATIES.

If an entity or arrangement that is treated as a partnership for U.S. federal income tax purposes holds our Class A common stock, the U.S. federal income tax treatment of a partner will generally depend on the status of the partner and the tax treatment of the partnership. A partner in a partnership that holds our Class A common stock is urged to consult its own tax advisor with regard to the U.S. federal income tax consequences of the ownership of the Class A common stock.

For purposes of this section, a "U.S. Holder" means a beneficial owner of our Class A common stock (other than an entity treated as a partnership for U.S. federal income tax purposes) that is, for U.S. federal income tax purposes:

- a citizen or resident of the United States;

- a corporation, or other entity taxable as a corporation, created or organized in or under the laws of the United States or any political subdivision thereof; or

- an estate or trust the income of which is subject to U.S. federal income taxation regardless of its source.

An individual non-U.S. citizen may, in some cases, be deemed to be a resident alien (as opposed to a nonresident alien) by virtue of being present in the United States for at least 31 days in the calendar year and for an aggregate of at least 183 days during a three-year period ending in the current calendar year. Generally, for this purpose, all the days present in the current year, one-third of the days present in the immediately preceding year, and one-sixth of the days present in the second preceding year, are counted.

Resident aliens are generally subject to U.S. federal income tax as if they were U.S. citizens. Individuals who are uncertain of their status as resident or nonresident aliens for U.S. federal income tax purposes are urged to consult their own tax advisors regarding the U.S. federal income tax consequences of the ownership or disposition of our Class A common stock.

A "Non-U.S. Holder" means a beneficial owner of our Class A common stock (other than an entity treated as a partnership for U.S. federal income tax purposes) that is not a U.S. Holder.

### *Distributions on the Class A common stock*

We do not expect to make any distributions on our Class A common stock in the foreseeable future. If we do make distributions on our Class A common stock, however, such distributions made to a Non-U.S. Holder of our Class A common stock will constitute dividends for U.S. tax purposes to the extent paid out of our current or accumulated earnings and profits (as determined under U.S. federal income tax principles). Distributions in excess of our current and accumulated earnings and profits will constitute a return of capital that is applied against and reduces, but not below zero, a Non-U.S. Holder's adjusted tax basis in our Class A common stock. Any remaining excess will be treated as gain realized on the sale or exchange of our Class A common stock as described below under "— Gain on Disposition of Our Class A Common Stock."

Any distribution on our Class A common stock that is treated as a dividend paid to a Non-U.S. Holder that is not effectively connected with the holder's conduct of a trade or business in the United States will generally be subject to withholding tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty between the United States and the Non-U.S. Holder's country of residence.

To obtain a reduced rate of withholding under a treaty, a Non-U.S. Holder generally will be required to provide the applicable withholding agent with a properly executed IRS Form W-8BEN, IRS Form W-8BEN-E, or other appropriate form, certifying the Non-U.S. Holder's entitlement to benefits under that treaty. Such form must be provided prior to the payment of dividends and must be updated periodically. If a Non-U.S. Holder holds stock through a financial institution or other agent acting on the holder's behalf, the holder will be required to provide appropriate documentation to such agent. The holder's agent will then be required to provide certification to the applicable withholding agent, either directly or through other intermediaries. Non-U.S. Holders who are eligible for a reduced rate of U.S. withholding tax under an income tax treaty, should consult with their own tax advisor to determine if they are able to obtain a refund or credit of any excess amounts withheld by timely filing an appropriate claim for a refund with the IRS.

We and the applicable withholding agents generally are not required to withhold tax on dividends paid to a Non-U.S. Holder that are effectively connected with the holder's conduct of a trade or business within the United States (and, if required by an applicable income tax treaty, are attributable to a permanent establishment that the holder maintains in the United States) if a properly executed IRS Form W-8ECI, stating that the dividends are so connected, is furnished us (or to the applicable withholding agent). In general, such effectively connected dividends will be subject to U.S. federal income tax on a net income basis at the regular graduated rates applicable to U.S. persons. A corporate Non-U.S. Holder receiving effectively connected dividends may also be subject to an additional "branch profits tax," which is imposed, under certain circumstances, at a rate of 30% (or such lower rate as may be specified by an applicable treaty) on the corporate Non-U.S. Holder's effectively connected earnings and profits, subject to certain adjustments.

See also the section below titled "—Foreign Accounts" for additional withholding rules that may apply to dividends paid to certain foreign financial institutions or non-financial foreign entities.

### *Gain on disposition of our Class A common stock*

Subject to the discussions below under the sections titled "—Backup Withholding and Information Reporting," a Non-U.S. Holder generally will not be subject to U.S. federal income or withholding tax with respect to gain realized on a sale or other disposition of our Class A common stock unless (i) the gain is effectively connected with a trade or business of the holder in the United States (and, if required by an applicable income tax treaty, is attributable to a permanent establishment that the holder maintains in the United States), (ii) the Non-U.S. Holder is a nonresident alien individual and is present in the United States for 183 or more days in the taxable year of the disposition and certain other conditions are met, or (iii) we are or have been a "United States real property holding corporation" within the meaning of Code Section 897(c)(2) at any time within the shorter of the five-year period preceding such disposition or the holder's holding period in the Class A common stock.

Non-U.S. Holders described in (i) above, will be required to pay tax on the net gain derived from the sale at the regular graduated U.S. federal income tax rates applicable to U.S. persons. Corporate Non-U.S. Holders described in (i) above may also be subject to the additional branch profits tax at a 30% rate or such lower rate as may be specified by an applicable income tax treaty. Individual Non-U.S. Holders described in (ii) above, will be required to pay a flat 30% tax on the gain derived from the sale, which gain may be offset by U.S. source capital losses (even though such holder is not considered a resident of the United States), provided such holder has timely filed U.S. federal income tax returns with respect to such losses. With respect to (iii) above, in general, we would be a United States real property holding corporation if United States real property interests (as defined in the Code and the Treasury Regulations) comprised (by fair market value) at least half of our assets. We believe that we are not, and do not anticipate becoming, a United States real property holding corporation. However, there can be no assurance that we will not become a United States real property holding corporation in the future. Even if we are treated as a United States real property holding corporation, gain realized by a Non-U.S. Holder on a disposition of our Class A common stock will not be subject to U.S. federal income tax so long as the Non-U.S. Holder is a "qualified foreign pension fund" as defined in Section 897(l)(2) of the Code or an entity all of the interests of which are held by qualified foreign pension funds, or (i) the Non-U.S. Holder

owned, directly, indirectly, or constructively, no more than five percent of our Class A common stock at all times within the shorter of (a) the five-year period preceding the disposition or (b) the holder's holding period and (ii) our Class A common stock is regularly traded on an established securities market. There can be no assurance that our Class A common stock will qualify as regularly traded on an established securities market.

### U.S. federal estate tax

The estates of nonresident alien individuals generally are subject to U.S. federal estate tax on property with a U.S. situs. Because we are a U.S. corporation, our Class A common stock will be U.S. situs property and, therefore, will be included in the taxable estate of a nonresident alien decedent, unless an applicable estate tax treaty between the United States and the decedent's country of residence provides otherwise. The terms "resident" and "nonresident" are defined differently for U.S. federal estate tax purposes than for U.S. federal income tax purposes. Investors are urged to consult their own tax advisors regarding the U.S. federal estate tax consequences of the ownership or disposition of our Class A common stock.

### Backup withholding and information reporting

Generally, we or certain financial middlemen must report information to the IRS with respect to any distributions we pay on our Class A common stock, including the amount of any such distributions, the name and address of the recipient, and the amount, if any, of tax withheld, regardless of whether such distributions constitute dividends or whether any tax was actually withheld. A similar report is sent to the holder to whom any such dividends are paid. Pursuant to tax treaties or certain other agreements, the IRS may make its reports available to tax authorities in the recipient's country of residence.

Dividends paid by us (or our paying agents) to a Non-U.S. Holder may also be subject to U.S. backup withholding. U.S. backup withholding generally will not apply to a Non-U.S. Holder who provides a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or otherwise establishes an exemption, provided that the applicable withholding agent does not have actual knowledge or reason to know the holder is a U.S. person.

Under current U.S. federal income tax law, U.S. information reporting and backup withholding requirements generally will apply to the proceeds of a disposition of our Class A common stock effected by or through a U.S. office of any broker, U.S. or non-U.S., unless the Non-U.S. Holder provides a properly executed IRS Form W-8BEN or IRS Form W-8BEN-E, as applicable, or otherwise meets documentary evidence requirements for establishing non-U.S. person status or otherwise establishes an exemption. Generally, U.S. information reporting and backup withholding requirements will not apply to a payment of disposition proceeds to a Non-U.S. Holder where the transaction is effected outside the United States through a non-U.S. office of a non-U.S. broker. Information reporting and backup withholding requirements may, however, apply to a payment of disposition proceeds if the broker has actual knowledge, or reason to know, that the holder is, in fact, a U.S. person. For information reporting purposes only, certain U.S. related brokers may be treated in a manner similar to U.S. brokers.

Backup withholding is not an additional tax. Rather, the U.S. federal income tax liability of persons subject to backup withholding will be reduced by the amount of tax withheld. If backup withholding results in an overpayment of taxes, a refund or credit may generally be obtained from the IRS, provided that the required information is furnished to the IRS in a timely manner.

### Foreign accounts

In addition, U.S. federal withholding taxes may apply under the Foreign Account Tax Compliance Act, or FATCA, on certain types of payments, including dividends on our Class A common stock, made to non-U.S. financial institutions and certain other non-U.S. entities. Specifically, a 30% withholding tax may be imposed on dividends on our Class A common stock paid to a "foreign financial institution" or a "non-financial foreign entity" (each as defined in the Code), unless (i) the foreign financial institution agrees to

undertake certain diligence and reporting obligations, (ii) the non-financial foreign entity either certifies it does not have any "substantial United States owners" (as defined in the Code) or furnishes identifying information regarding each substantial United States owner, or (iii) the foreign financial institution or non-financial foreign entity otherwise qualifies for an exemption from these rules. The 30% federal withholding tax described in this paragraph cannot be reduced under an income tax treaty with the United States. If the payee is a foreign financial institution and is subject to the diligence and reporting requirements in (i) above, it must enter into an agreement with the U.S. Department of the Treasury requiring, among other things, that it undertake to identify accounts held by certain "specified United States persons" or "United States-owned foreign entities" (each as defined in the Code), annually report certain information about such accounts, and withhold 30% on certain payments to non-compliant foreign financial institutions and certain other account holders. Under the applicable Treasury Regulations and administrative guidance, withholding under FATCA generally applies to payments of dividends on our Class A common stock, and also would generally apply to payments of gross proceeds from the sale or other disposition of such stock. Under proposed U.S. Treasury Regulations, this withholding tax will not apply to the gross proceeds from any sale or disposition of our Class A common stock. Withholding agents may, but are not required to, rely on the proposed Treasury Regulations until final Treasury Regulations are issued. Foreign financial institutions located in jurisdictions that have an intergovernmental agreement with the United States governing FATCA may be subject to different rules.

Prospective investors should consult their tax advisors regarding the potential application of withholding under FATCA to their investment in our Class A common stock.

EACH PROSPECTIVE INVESTOR SHOULD CONSULT ITS OWN TAX ADVISOR REGARDING THE TAX CONSEQUENCES OF PURCHASING, HOLDING, AND DISPOSING OF OUR CLASS A COMMON STOCK, INCLUDING THE CONSEQUENCES OF ANY PROPOSED CHANGE IN APPLICABLE LAW, AS WELL AS TAX CONSEQUENCES ARISING UNDER ANY STATE, LOCAL, NON-U.S. OR U.S. FEDERAL NON-INCOME TAX LAWS SUCH AS ESTATE AND GIFT TAX.

## PLAN OF DISTRIBUTION

The registered stockholders and their pledgees, donees, transferees, assignees, or other successors-in-interest may sell their shares of Class A common stock covered hereby pursuant to brokerage transactions on the Nasdaq Global Select Market or any other public exchange or registered alternative trading system at prevailing market prices at any time after the shares of Class A common stock are listed for trading thereon.

We are not party to any arrangement with any registered stockholder or any broker-dealer with respect to sales of shares of Class A common stock by the registered stockholders, except we will engage financial advisors with respect to certain other matters relating to our listing, as further described below. As such, we do not anticipate receiving any notice as to if and when any registered stockholder may elect to sell their shares of Class A common stock or the prices at which any such sales may occur, and there can be no assurance that any registered stockholders will sell any or all of the shares of Class A common stock covered by this prospectus.

We will not receive any proceeds from the sale of shares of Class A common stock by the registered stockholders. We expect to recognize certain non-recurring costs as part of our transition to a publicly-traded company, consisting of professional fees and other expenses. As part of our direct listing, these fees will be expensed in the period incurred and not deducted from net proceeds to the issuer as they would be in an initial public offering.

We have engaged Goldman Sachs & Co. LLC, or Goldman Sachs, J.P. Morgan Securities LLC, or J.P. Morgan, Allen & Company, or Allen & Co., and Citigroup Global Markets Inc., or Citigroup, as our financial advisors to advise and assist us with respect to certain matters relating to our listing. These matters include assisting us in defining our objectives with respect to the filing of the registration statement of which this prospectus forms a part, our preparation of the registration statement of which this prospectus forms a part, our preparation of investor communications and presentations in connection with investor education, and being available to consult with Nasdaq, including on the day that our shares of Class A common stock are initially listed on the Nasdaq Global Select Market.

In addition, Goldman Sachs will determine when our shares of Class A common stock are ready to trade and to approve proceeding with the opening of trading at the Current Reference Price (as defined below). However, the financial advisors have not been engaged to participate in investor meetings or to otherwise facilitate or coordinate price discovery activities or sales of our Class A common stock in consultation with us, except as described herein.

On the day that our shares of Class A common stock are initially listed on the Nasdaq Global Select Market, Nasdaq will begin accepting, but not executing, pre-opening buy and sell orders and will begin to continuously generate the indicative Current Reference Price on the basis of such accepted orders. During a 10-minute "Display Only" period, market participants may enter quotes and orders in Class A common stock in Nasdaq's systems and such information is disseminated, along with other indicative imbalance information, to Goldman Sachs and other market participants (including the other financial advisors) by Nasdaq on its NOII and BookViewer tools. Following the "Display Only" period, a "Pre-Launch" period begins, during which Goldman Sachs, in its capacity as our designated financial advisor to perform the functions under Nasdaq Rule 4120(c)(8), must notify Nasdaq that our shares are "ready to trade." Once Goldman Sachs has notified Nasdaq that our shares of Class A common stock are ready to trade, Nasdaq will calculate the Current Reference Price (as defined below) for our shares of Class A common stock, in accordance with Nasdaq's rules. If Goldman Sachs then approves proceeding at the Current Reference Price, Nasdaq will conduct price validation checks in accordance with Nasdaq rules. As part of conducting its price validation checks, Nasdaq may consult with Goldman Sachs and other market participants (including the other financial advisors). Upon completion of such price validation checks the applicable orders that have been entered will then be executed at such price and regular trading of our shares of Class A common stock on the Nasdaq Global Select Market will commence.

Under Nasdaq's rules, the "Current Reference Price" means: (i) the single price at which the maximum number of orders to buy or sell our shares of Class A common stock can be matched; (ii) if more than one price exists under clause (i), then the price that minimizes the number of our shares of Class A common stock for which orders cannot be matched; (iii) if more than one price exists under clause (ii), then the entered price (i.e. the specified price entered in an order by a customer to buy or sell) at which our shares of Class A common stock will remain unmatched (i.e. will not be bought or sold); and (iv) if more than one price exists under clause (iii), a price determined by Nasdaq after consultation with Goldman Sachs, J.P. Morgan, Allen & Co., and Citigroup in their capacity as financial advisors. Goldman Sachs, J.P. Morgan, Allen & Co., and Citigroup will exercise any consultation rights only to the extent that they may do so consistent with the anti-manipulation provisions of the federal securities laws, including Regulation M (to the extent applicable), or applicable relief granted thereunder. In determining the Current Reference Price, Nasdaq's algorithms will match orders that have been entered into and accepted by Nasdaq's system. This occurs with respect to a potential Current Reference Price when orders to buy shares of Class A common stock at an entered bid price that is greater than or equal to such potential Current Reference Price are matched with orders to sell a like number of shares of Class A common stock at an entered asking price that is less than or equal to such potential Current Reference Price.

To illustrate, as a hypothetical example of the calculation of the Current Reference Price, if Nasdaq's algorithms matched all accepted orders as described above, and two limit orders remained — a limit order to buy 500 shares of Class A common stock at an entered bid price of $10.01 per share and a limit order to sell 200 shares of Class A common stock at an entered asking price of $10.00 per share — the Current Reference Price would be determined as follows:

- Under clause (i), if the Current Reference Price is $10.00, then the maximum number of additional shares that can be matched is 200. If the Current Reference Price is $10.01, then the maximum number of additional shares that can be matched is also 200, which means that the same maximum number of additional shares would be matched at the price of either $10.00 or $10.01.

- Because more than one price under clause (i) exists, under clause (ii), the Current Reference Price would be the price that minimizes the imbalance between orders to buy or sell (i.e. minimizes the number of shares that would remain unmatched at such price). Selecting either $10.00 or $10.01 as the Current Reference Price would create the same imbalance in the limit orders that cannot be matched, because at either price 300 shares would not be matched.

- Because more than one price under clause (ii) exists, then under clause (iii), the Current Reference Price would be the entered price at which orders for shares of common stock at such entered price will remain unmatched. In such case, choosing $10.01 would cause 300 shares of the 500 share limit order with the entered price of $10.01 to remain unmatched, compared to choosing $10.00, where all 200 shares of the limit order with the entered price of $10.00 would be matched, and no shares at such entered price remain unmatched. Thus, Nasdaq would select $10.01 as the Current Reference Price because orders for shares at such entered price will remain unmatched.

The above example (including the prices) is provided solely by way of illustration.

Goldman Sachs, as the designated financial advisor under Nasdaq Rule 4120(c)(8), will determine when our shares of Class A common stock are ready to trade and approve proceeding at the Current Reference Price primarily based on consideration of volume, timing, and price. In particular, Goldman Sachs will determine, based primarily on pre-opening buy and sell orders, when a reasonable amount of volume will cross on the opening trade such that sufficient price discovery has been made to open trading at the Current Reference Price. If Goldman Sachs does not approve proceeding at the Current Reference Price (for example, due to the absence of adequate pre-opening buy and sell interest), Goldman Sachs will request that Nasdaq delay the open until such a time that sufficient price discovery has been made to ensure a reasonable amount of volume crosses on the opening trade.

205

Similar to a Nasdaq-listed underwritten initial public offering, in connection with the listing of our shares of Class A common stock, the financial advisors and buyers and sellers (or their brokers) who have subscribed will have access to the Nasdaq Stock Market's Order Imbalance Indicator (sometimes referred to as the Net Order Imbalance Indicator), a widely available, subscription-based data feed, prior to submitting buy or sell orders. Nasdaq's electronic trading platform simulates auctions every second to calculate a Current Reference Price, the number of shares that can be paired off the Current Reference Price, the number of shares that would remain unexecuted at the Current Reference Price and whether a buy-side or sell-side imbalance exists, or whether there is no imbalance, in order to disseminate that information continuously to buyers and sellers via the Order Imbalance Indicator data feed.

However, because this is not an underwritten initial public offering, there will be no "book building" process (i.e., an organized process pursuant to which buy and sell interest is coordinated in advance to some prescribed level – the "book"). Moreover, prior to the opening trade, there will not be a price at which underwriters initially sold shares of our Class A common stock to the public as there would be in an underwritten initial public offering. This lack of an initial public offering price could impact the range of buy and sell orders collected by the Nasdaq Global Select Market from various broker-dealers. Consequently, the public price of our shares of Class A common stock may be more volatile than in an underwritten initial public offering and could, upon listing on the Nasdaq Global Select Market, decline significantly and rapidly. See the section titled "Risk Factors—Risks Related to Ownership of Our Class A Common Stock —The price of our Class A common stock may be volatile, and could, upon listing on the Nasdaq Global Select Market, decline significantly and rapidly. Market volatility may affect the value of an investment in our Class A common stock and could subject us to litigation." and "Risk Factors—Risks Related to Ownership of Our Class A Common Stock—The price of our Class A common stock may have little or no relationship to the historical sales prices of our capital stock in private transactions."

In addition, in order to list on the Nasdaq Global Select Market, we are also required to have at least three registered and active market makers. We understand that Goldman Sachs, J.P. Morgan, and Citigroup intend (but are not obligated) to act as registered and active market makers, although any such market-making, if commenced, may be discontinued at any time. Further, our financial advisors may assist interested registered stockholders with the establishment of brokerage accounts.

In addition to sales made pursuant to this prospectus, the shares of Class A common stock covered by this prospectus may be sold by the registered stockholders in individually negotiated transactions exempt from the registration requirements of the Securities Act. Under the securities laws of some states, shares of Class A common stock may be sold in such states only through registered or licensed brokers or dealers.

The registered stockholders may from time to time transfer, pledge, assign, or grant a security interest in some or all the shares of Class A common stock owned by it and, if it defaults in the performance of its secured obligations, the transferees, pledgees, assignees, or secured parties may offer and sell the shares of Class A common stock from time to time under this prospectus, or under an amendment to this prospectus under Rule 424(b)(3) or other applicable provision of the Securities Act amending the list of the registered stockholders to include the transferee, pledgee, assignee, or other successors in interest as registered stockholders under this prospectus. The registered stockholders also may transfer the shares in other circumstances, in which case the transferees, pledgees, or other successors in interest will be the registered beneficial owners for purposes of this prospectus.

If any of the registered stockholders utilize a broker-dealer in the sale of the shares of Class A common stock being offered by this prospectus, such broker-dealer may receive commissions in the form of discounts, concessions, or commissions from such registered stockholder or commissions from purchasers of the shares of Class A common stock for whom they may act as agent or to whom they may sell as principal.

## LEGAL MATTERS

Fenwick & West LLP, San Francisco, California, which has acted as our counsel in connection with this offering, will pass upon the validity of the shares of our Class A common stock registered by this prospectus. As of the date of this prospectus, individuals and entities associated with Fenwick & West LLP beneficially own an aggregate of less than 0.01% of our capital stock, which will convert to Class B common stock in connection with this offering. Latham & Watkins LLP, New York, New York, is legal advisor to the financial advisors.

## CHANGE IN ACCOUNTANTS

On April 29, 2020, we changed our independent registered public accounting firm from Grant Thornton LLP to Deloitte & Touche LLP. The decision to change our independent registered public accounting firms was approved by the audit committee of our board of directors.

The report of Grant Thornton LLP on our consolidated balance sheet as of December 31, 2019 and the consolidated statements of operations, comprehensive income (loss), changes in convertible preferred stock and stockholders' equity, and cash flows for the year then ended, did not contain an adverse opinion or disclaimer of opinion, and were not qualified or modified as to uncertainties, audit scope or accounting principles. We had no disagreements with Grant Thornton LLP on any matter of accounting principles or practices, financial statement disclosure, or auditing scope or procedure, which disagreements, if not resolved to its satisfaction, would have caused Grant Thornton LLP to make reference in connection with its opinion to the subject matter of the disagreement during the two fiscal years prior to its dismissal and the subsequent interim period through April 29, 2020. During the two most recent fiscal years preceding our dismissal of Grant Thornton LLP, and the subsequent interim period through April 29, 2020, there were no "reportable events" as such term is defined in Item 304(a)(1)(v) of Regulation S-K.

We have provided Grant Thornton LLP with a copy of the foregoing disclosures and have requested that Grant Thornton LLP furnish us with a letter addressed to the SEC stating whether it agrees with the statements made by us as set forth above. A copy of Grant Thornton LLP's letter, dated October 9, 2020, is filed as Exhibit 16.1 to this Registration Statement on Form S-1.

During the two years ended December 31, 2019 and through the period ended April 29, 2020, neither we, nor anyone acting on our behalf, consulted with Deloitte & Touche LLP on matters that involved the application of accounting principles to a specified transaction, either completed or proposed, the type of audit opinion that might be rendered on our financial statements, or any other matter that was the subject of a disagreement as that term is used in Item 304 (a)(1)(iv) of Regulation S-K and the related instructions to Item 304 of Regulation S-K or a reportable event as that term is used in Item 304(a)(1)(v) and the related instructions to Item 304 of Regulation S-K.

## EXPERTS

### Deloitte & Touche LLP

The consolidated financial statements of Coinbase Global, Inc. and subsidiaries as of December 31, 2020 and for the year ended December 31, 2020, included in this prospectus and elsewhere in the registration statement have been audited by Deloitte & Touche LLP, an independent registered public accounting firm, as stated in their report. Such financial statements have been so included in reliance upon the report of such firm given upon their authority as experts in accounting and auditing.

### Grant Thornton LLP

The audited consolidated financial statements of Coinbase Global, Inc. and subsidiaries as of December 31, 2019, and for the year ended December 31, 2019, included in this prospectus and elsewhere in the registration statement have been so included in reliance upon the report of Grant

Thornton LLP, our independent registered public accountants and upon the authority of said firm as experts in accounting and auditing.

## ADDITIONAL INFORMATION

We have filed with the SEC a registration statement on Form S-1 under the Securities Act with respect to the shares of our Class A common stock covered by this prospectus. This prospectus, which constitutes a part of the registration statement, does not contain all of the information set forth in the registration statement or the exhibits filed therewith. For further information about us and our Class A common stock, we refer you to the registration statement and the exhibits filed therewith. Statements contained in this prospectus regarding the contents of any contract or any other document that is filed as an exhibit to the registration statement are not necessarily complete, and in each instance, we refer you to the copy of such contract or other document filed as an exhibit to the registration statement. The SEC maintains a website that contains reports, proxy, and information statements, and other information regarding registrants that file electronically with the SEC. The address of the website is www.sec.gov.

Immediately upon the effectiveness of the registration statement of which this prospectus forms a part, we will become subject to the information and reporting requirements of the Exchange Act and, in accordance with this law, will file periodic reports, proxy statements, and other information with the SEC. These periodic reports, proxy statements, and other information will be available for inspection and copying at the website of the SEC referred to above. We also maintain a website at www.coinbase.com. Upon the effectiveness of the registration statement of which this prospectus forms a part, you may access these materials free of charge as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC. The inclusion of our website address in this prospectus is an inactive textual reference only. The information contained in or accessible through our website is not part of this prospectus or the registration statement of which this prospectus forms a part, and investors should not rely on such information in making a decision to purchase shares of our Class A common stock.

**INDEX TO CONSOLIDATED FINANCIAL STATEMENTS**

|                                                                                          | Page |
|------------------------------------------------------------------------------------------|------|
| Report of Independent Registered Public Accounting Firm                                   | F-2  |
| Consolidated Balance Sheets                                                                | F-4  |
| Consolidated Statements of Operations                                                     | F-5  |
| Consolidated Statements of Comprehensive Income (Loss)                                     | F-6  |
| Consolidated Statements of Changes in Convertible Preferred Stock and Stockholders' Equity | F-7  |
| Consolidated Statements of Cash Flows                                                      | F-8  |
| Notes to Consolidated Financial Statements                                                | F-10 |

F-1

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

Board of Directors and Stockholders

Coinbase Global, Inc.

**Opinion on the financial statements**

We have audited the accompanying consolidated balance sheet of Coinbase Global, Inc. (a Delaware corporation) and subsidiaries (the "Company") as of December 31, 2019, the related consolidated statements of operations, comprehensive income (loss), changes in convertible preferred stock and stockholders' equity, and cash flows for the year ended December 31, 2019, and the related notes (collectively referred to as the "financial statements"). In our opinion, the consolidated financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2019, and the results of their operations and their cash flows for the year ended December 31, 2019, in conformity with accounting principles generally accepted in the United States of America.

**Basis for opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) ("PCAOB") and are required to be independent with respect to the Company in accordance with U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures include examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ GRANT THORNTON LLP

We have served as the Company's auditor from 2018 to 2020.

New York, New York

October 9, 2020 (except for Notes 2 and 6, as to which the date is February 25, 2021)

F-2

**REPORT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM**

To the stockholders and the Board of Directors of Coinbase Global, Inc.

**Opinion on the Financial Statements**

We have audited the accompanying consolidated Balance Sheet of Coinbase Global, Inc. (the "Company") as of December 31, 2020, the related consolidated statements of Operations, Comprehensive Income, Changes in Convertible Preferred Stock and Stockholders' Equity and Cash Flows, for the year ended December 31, 2020, and the related notes (collectively referred to as the "financial statements"). In our opinion, the financial statements present fairly, in all material respects, the financial position of the Company as of December 31, 2020, and the results of its operations and its cash flows for the year ended December 31, 2020, in conformity with accounting principles generally accepted in the United States of America.

**Basis for Opinion**

These financial statements are the responsibility of the Company's management. Our responsibility is to express an opinion on the Company's financial statements based on our audit. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audit in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement, whether due to error or fraud. The Company is not required to have, nor were we engaged to perform, an audit of its internal control over financial reporting. As part of our audit, we are required to obtain an understanding of internal control over financial reporting but not for the purpose of expressing an opinion on the effectiveness of the Company's internal control over financial reporting. Accordingly, we express no such opinion.

Our audit included performing procedures to assess the risks of material misstatement of the financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the financial statements. Our audit also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the financial statements. We believe that our audit provides a reasonable basis for our opinion.

/s/ Deloitte & Touche LLP

San Francisco, California
February 25, 2021

We have served as the Company's auditor since 2020.

F-3

**Coinbase Global, Inc.**
**Consolidated Balance Sheets**
**(In thousands, except par value data)**

| | December 31, | | Pro Forma December |
| | 2020 | 2019 | 31, 2020 (unaudited) |
|---|---|---|---|
| **Assets** | | | |
| Current assets: | | | |
| Cash and cash equivalents | $ 1,061,850 | $ 548,945 | |
| Restricted cash | 30,787 | 34,122 | |
| Customer custodial funds | 3,763,392 | 1,201,350 | |
| USDC | 48,938 | 88,429 | |
| Accounts receivable, net of allowance | 189,471 | 17,496 | |
| Income tax receivable | — | 74,171 | |
| Prepaid expenses and other current assets | 39,510 | 22,433 | |
| Total current assets | 5,133,948 | 1,986,946 | |
| Crypto assets held | 316,094 | 33,932 | |
| Lease right-of-use assets | 100,845 | 123,386 | |
| Property and equipment, net | 49,250 | 47,117 | |
| Goodwill | 77,212 | 54,696 | |
| Intangible assets, net | 60,825 | 70,137 | |
| Other non-current assets | 117,240 | 75,555 | |
| Total assets | $ 5,855,414 | $ 2,391,769 | |
| **Liabilities, Convertible Preferred Stock, and Stockholders' Equity** | | | |
| Current liabilities: | | | |
| Custodial funds due to customers | $ 3,849,468 | $ 1,106,815 | |
| Accounts payable and accrued expenses | 85,111 | 45,453 | |
| Crypto asset borrowings | 271,303 | — | |
| Lease liabilities, current | 25,270 | 23,775 | |
| Other current liabilities | 15,703 | 47,401 | |
| Total current liabilities | 4,246,855 | 1,223,444 | |
| Lease liabilities, non-current | 82,508 | 106,542 | |
| Total liabilities | 4,329,363 | 1,329,986 | |
| Commitments and contingencies (Note 19) | | | |
| Convertible preferred stock, $0.00001 par value; 126,605 shares authorized; 112,878 and 114,959 shares issued and outstanding at December 31, 2020 and December 31, 2019, respectively; aggregate liquidation preference of $578,750 and $580,981 at December 31, 2020 and December 31, 2019, respectively; no shares issued and outstanding, pro forma | 562,467 | 564,697 | $ — |
| Stockholders' equity | | | |
| Class A common stock, $0.00001 par value; 267,640 and 259,104 shares authorized at December 31, 2020 and December 31, 2019, respectively; 12,204 and 7,317 shares issued and outstanding at December 31, 2020 and December 31, 2019, respectively; 21,035 shares issued and outstanding, pro forma | — | — | — |
| Class B common stock, $0.00001 par value; 208,414 shares authorized at December 31, 2020 and December 31, 2019; 60,904 and 59,677 shares issued and outstanding at December 31, 2020 and December 31, 2019, respectively; 164,951 shares issued and outstanding, pro forma | — | — | 1 |
| Additional paid-in capital | 231,024 | 93,820 | 793,490 |
| Accumulated other comprehensive income (loss) | 6,256 | (721) | 6,256 |
| Retained earnings | 726,304 | 403,987 | 726,304 |
| Total stockholders' equity | 963,584 | 497,086 | 1,526,051 |
| Total liabilities, convertible preferred stock, and stockholders' equity | $ 5,855,414 | $ 2,391,769 | $ 5,855,414 |

The accompanying notes are an integral part of these consolidated financial statements.

**Coinbase Global, Inc.**
**Consolidated Statements of Operations**
**(In thousands, except per share data)**

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Revenue: | | |
| Net revenue | $ 1,141,167 | $ 482,949 |
| Other revenue | 136,314 | 50,786 |
| Total revenue | 1,277,481 | 533,735 |
| Operating expenses: | | |
| Transaction expense | 135,514 | 82,055 |
| Technology and development | 271,732 | 185,044 |
| Sales and marketing | 56,782 | 24,150 |
| General and administrative | 279,880 | 231,929 |
| Restructuring | — | 10,140 |
| Other operating expense | 124,622 | 46,200 |
| Total operating expenses | 868,530 | 579,518 |
| Operating income (loss) | 408,951 | (45,783) |
| Other income, net | (248) | (367) |
| Income (loss) before provision for (benefit from) income taxes | 409,199 | (45,416) |
| Provision for (benefit from) income taxes | 86,882 | (15,029) |
| Net income (loss) | $ 322,317 | $ (30,387) |
| Net income (loss) attributable to common stockholders: | | |
| Basic | $ 108,256 | $ (30,387) |
| Diluted | $ 127,471 | $ (30,387) |
| Net income (loss) per share attributable to common stockholders: | | |
| Basic | $ 1.58 | $ (0.50) |
| Diluted | $ 1.40 | $ (0.50) |
| Weighted-average shares of common stock used to compute net income (loss) per share attributable to common stockholders: | | |
| Basic | 68,671 | 61,317 |
| Diluted | 91,209 | 61,317 |
| Pro forma net income per share attributable to common stockholders (unaudited): | | |
| Basic | $ 1.76 | |
| Diluted | $ 1.57 | |
| Pro forma weighted-average shares of common stock used to compute pro forma net income per share attributable to common stockholders (unaudited): | | |
| Basic | 182,945 | |
| Diluted | 205,575 | |

The accompanying notes are an integral part of these consolidated financial statements.

**Coinbase Global, Inc.**
**Consolidated Statements of Comprehensive Income (Loss)**
**(In thousands)**

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Net income (loss) | $ 322,317 | $ (30,387) |
| Other comprehensive income (loss) | | |
| Translation adjustment, net of tax | 6,977 | (43) |
| Comprehensive income (loss) | $ 329,294 | $ (30,430) |

The accompanying notes are an integral part of these consolidated financial statements.

**Coinbase Global, Inc.**
**Consolidated Statements of Changes in Convertible Preferred Stock and Stockholders' Equity**
**(In thousands)**

| | Convertible Preferred Stock | | Common Stock | | Additional Paid-In Capital | Accumulated Other Comprehensive Income (Loss) | Retained Earnings | Total |
|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | |
| Balance at January 1, 2020 | 114,959 | $ 564,697 | 66,994 | — | $ 93,820 | $ (721) | $ 403,987 | $ 497,086 |
| Issuance of common stock upon exercise of stock options, net of repurchases | — | — | 2,038 | — | 16,707 | — | — | $ 16,707 |
| Repurchase of equity awards | — | — | — | — | (1,930) | — | — | (1,930) |
| Stock-based compensation expense | — | — | — | — | 72,643 | — | — | 72,643 |
| Issuance of equity instruments as consideration in business combination | — | — | 1,304 | — | 31,349 | — | — | 31,349 |
| Issuance of common stock to settle contingent consideration | — | — | 691 | — | 16,205 | — | — | 16,205 |
| Conversion of preferred stock | (2,081) | (2,230) | 2,081 | — | 2,230 | — | — | 2,230 |
| Comprehensive income | — | — | — | — | — | 6,977 | — | 6,977 |
| Net income | — | — | — | — | — | — | 322,317 | 322,317 |
| Balance at December 31, 2020 | 112,878 | $ 562,467 | 73,108 | — | $ 231,024 | $ 6,256 | $ 726,304 | $ 963,584 |
| | | | | | | | | |
| Balance at January 1, 2019 | 120,929 | $ 569,232 | 59,850 | — | $ 47,257 | $ (678) | $ 453,492 | $ 500,071 |
| Issuance of Class A common stock | — | — | 154 | — | 5,000 | — | — | 5,000 |
| Repurchase of equity awards | — | — | (212) | — | (1,128) | — | (19,118) | (20,246) |
| Issuance of common stock upon exercise of stock options, net of repurchases | — | — | 951 | — | 4,232 | — | — | 4,232 |
| Vesting of restricted stock | — | — | 199 | — | 1,389 | — | — | 1,389 |
| Stock-based compensation expense | — | — | 82 | — | 32,535 | — | — | 32,535 |
| Conversion of preferred stock | (5,970) | (4,535) | 5,970 | — | 4,535 | — | — | 4,535 |
| Comprehensive loss | — | — | — | — | — | (43) | — | (43) |
| Net loss | — | — | — | — | — | — | (30,387) | (30,387) |
| Balance at December 31, 2019 | 114,959 | $ 564,697 | 66,994 | — | $ 93,820 | $ (721) | $ 403,987 | $ 497,086 |

The accompanying notes are an integral part of these consolidated financial statements.

F-7

**Coinbase Global, Inc.**
**Consolidated Statements of Cash Flows**
**(In thousands)**

| | Year Ended December 31, | |
| --- | --- | --- |
| | **2020** | **2019** |
| Cash flows from operating activities | | |
| Net income (loss) | $ 322,317 | $ (30,387) |
| Adjustments to reconcile net income (loss) to net cash provided by (used in) operating activities | | |
| Depreciation and amortization | 30,962 | 16,878 |
| Impairment expense | 8,355 | 2,252 |
| Stock-based compensation expense | 70,548 | 31,147 |
| Provision for transaction losses and doubtful accounts | (2,966) | (4,679) |
| Loss on disposal of property and equipment | 355 | 9,073 |
| Deferred income taxes | 474 | (20,903) |
| Unrealized loss (gain) on foreign exchange | 1,057 | (3,106) |
| Non-cash lease expense | 25,012 | 13,323 |
| Loss on investments | 150 | 245 |
| Change in fair value of contingent consideration | 3,281 | — |
| Realized (gain) loss on crypto assets | (23,682) | 5,662 |
| Crypto assets received as revenue | (94,158) | (11,408) |
| Crypto asset payments for expenses | 40,205 | 11,622 |
| Fair value adjustment on derivatives | 5,254 | — |
| Changes in operating assets and liabilities: | | |
| USDC | 37,936 | 35,303 |
| Accounts receivable | (157,156) | 30,703 |
| Income tax receivable | 86,791 | (1,912) |
| Other assets | (48,677) | (38,594) |
| Custodial funds due to customers | 2,710,522 | (130,122) |
| Accounts payable and accrued expenses | 20,837 | (788) |
| Lease liabilities | (24,998) | (11,025) |
| Other liabilities | (8,349) | 16,122 |
| Net cash provided by (used in) operating activities | 3,004,070 | (80,594) |
| Cash flows from investing activities | | |
| Purchase of property and equipment | (9,913) | (33,521) |
| Proceeds from sale of property and equipment | — | 2,293 |
| Capitalized internal-use software development costs | (8,889) | (6,950) |
| Business combination, net of cash acquired | 33,615 | (5,698) |
| Purchase of investments | (10,329) | (7,938) |
| Asset acquisition | — | (55,389) |
| Proceeds from settlement of investments | 303 | 374 |
| Purchase of crypto assets | (528,080) | (271,266) |
| Disposal of crypto assets | 574,115 | 272,742 |
| Net cash provided by (used in) investing activities | 50,822 | (105,353) |
| Cash flows from financing activities | | |
| Issuance of common stock upon exercise of stock options | 20,731 | 4,353 |
| Cash paid to repurchase equity awards | (1,930) | (20,958) |
| Net cash provided by (used in) financing activities | 18,801 | (16,605) |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 3,073,693 | (202,552) |
| Effect of exchange rates on cash | (2,081) | (170) |
| Cash, cash equivalents, and restricted cash, beginning of year | 1,784,417 | 1,987,139 |
| Cash, cash equivalents, and restricted cash, end of year | $ 4,856,029 | $ 1,784,417 |

The accompanying notes are an integral part of these consolidated financial statements.

**Coinbase Global, Inc.**
**Consolidated Statements of Cash Flows**
**(In thousands)**

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Cash, cash equivalents, and restricted cash consisted of the following: | | |
| Cash and cash equivalents | $ 1,061,850 | $ 548,945 |
| Restricted cash | 30,787 | 34,122 |
| Customer custodial funds | 3,763,392 | 1,201,350 |
| Total cash, cash equivalents, and restricted cash | $ 4,856,029 | $ 1,784,417 |
| | | |
| Supplemental disclosure of cash flow information | | |
| Cash paid during the period for income taxes | $ 62,060 | $ 2,165 |
| Operating cash outflows for amounts included in the measurement of operating lease liabilities | $ 40,011 | $ 14,356 |
| | | |
| Supplemental schedule of non-cash investing and financing activities | | |
| Unsettled purchases of property and equipment | $ — | $ 5,522 |
| Right-of-use assets obtained in exchange for operating lease obligations | $ 2,146 | $ 110,426 |
| Issuance of common stock | $ — | $ 5,000 |
| Purchase of crypto assets and investments with non-cash consideration | $ 662 | $ 3,399 |
| Crypto assets borrowed | $ 194,696 | $ — |
| Crypto assets borrowed repaid | $ 59,171 | $ — |

The accompanying notes are an integral part of these consolidated financial statements.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

1.   **NATURE OF OPERATIONS**

Coinbase, Inc. was founded in 2012. In April 2014, in connection with a corporate reorganization, Coinbase, Inc. became a wholly-owned subsidiary of Coinbase Global, Inc. (together with its consolidated subsidiaries, the "Company").

The Company operates globally and is a leading provider of end-to-end financial infrastructure and technology for the cryptoeconomy. The Company offers retail users the primary financial account for the cryptoeconomy, institutions a state of the art marketplace with a deep pool of liquidity for transacting in crypto assets, and ecosystem partners technology and services that enable them to build crypto-based applications and securely accept crypto assets as payment.

In May 2020, the Company became a remote-first company. Accordingly, the Company does not maintain a headquarters.

2.   **SUMMARY OF SIGNIFICANT ACCOUNTING POLICIES**

**Basis of presentation and principles of consolidation**

The accompanying consolidated financial statements have been prepared in accordance with United States generally accepted accounting principles ("GAAP") and include the accounts of the Company and its subsidiaries. The Company's subsidiaries are entities in which the Company holds, directly or indirectly, more than 50% of the voting rights or where it exercises control. Certain subsidiaries of the Company have a basis of presentation different from GAAP. For the purposes of the consolidated financial statements, the basis of presentation of such subsidiaries is converted to GAAP. All intercompany accounts and transactions have been eliminated.

**Reclassification**

In the year ended December 31, 2020, the Company reclassified certain operating expenses within the consolidated statements of operations. Prior-period amounts were revised to conform with the current presentation. These changes have no impact on the Company's previously reported consolidated net income (loss) for prior periods, including total operating expenses, financial position, or cash flows for the year ended December 31, 2019.

The reclassification primarily relates to a refinement of the Company's shared expenses allocation methodology to allocate a larger share of such shared expenses among the departments. The refined methodology primarily allocated expenses out of General and administrative into Technology and development, and Sales and marketing.

The following table presents the impact of the reclassification on the presentation of these operating expenses to the previously reported consolidated statements of operations for the year ended December 31, 2019:

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

| | Year Ended December 31, 2019 | | |
| | As Previously Reported | Adjustments | Reclassified |
|---|---|---|---|
| Operating expenses: | | | |
| Transaction expense | $ 82,055 | $ — | $ 82,055 |
| Technology and development | 160,093 | 24,951 | 185,044 |
| Sales and marketing | 23,268 | 882 | 24,150 |
| General and administrative | 257,762 | (25,833) | 231,929 |
| Restructuring | 10,140 | — | 10,140 |
| Other operating expense | 46,200 | — | 46,200 |
| Total operating expenses | $ 579,518 | $ — | $ 579,518 |

**Use of estimates**

The preparation of the consolidated financial statements in accordance with GAAP requires management to make estimates and assumptions in the Company's consolidated financial statements and notes thereto.

Significant estimates and assumptions include the determination of the recognition, measurement, and valuation of current and deferred income taxes; the fair value of stock-based awards issued; the useful lives of intangible assets; the useful lives of property and equipment; the Company's incremental borrowing rate; the fair value of assets acquired and liabilities assumed in business combinations; the fair value of contingent consideration given in asset acquisitions; the fair value of derivatives and related hedges; and loss provisions.

Actual results and outcomes may differ from management's estimates and assumptions due to risks and uncertainties, including uncertainty in the current economic environment due to COVID-19. To the extent that there are material differences between these estimates and actual results, the Company's consolidated financial statements will be affected. The Company bases its estimates on historical experience and on various other assumptions that are believed to be reasonable, the result of which forms the basis for making judgments about the carrying values of assets and liabilities.

**Unaudited pro forma balance sheet and pro forma net income per share**

The unaudited pro forma balance sheet as of December 31, 2020 has been prepared assuming the automatic conversion of all outstanding shares of convertible preferred stock into 112,878,253 shares of common stock immediately following the effectiveness of the Company's registration on Form S-1 relating to the direct listing of the Company's common stock, as though the reclassification had occurred on December 31, 2020.

The unaudited pro forma basic and diluted net income per share attributable to common stockholders is computed to give effect to the automatic conversion of the Company's outstanding convertible preferred stock into shares of common stock in connection with becoming a public company. The Company used the if-converted method as though the conversion had occurred as of the beginning of the period or the original date of issuance, if later.

**Foreign currency transactions**

The Company's functional currency is the U.S. dollar. The Company has exposure to foreign currency translation gains and losses arising from the Company's net investment in foreign subsidiaries. The revenues, expenses, and financial results of these foreign subsidiaries are recorded in their respective functional currencies. The financial statements of these subsidiaries are translated into U.S. dollars using a current rate of exchange, with gains or losses, net of tax as applicable, included in accumulated other

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

comprehensive income/loss ("AOCI") within the consolidated statements of changes in convertible preferred stock and stockholders' equity. Cumulative translation adjustments are released from AOCI and recorded in the statements of operations when the Company disposes or loses control of a consolidated subsidiary. Gains and losses resulting from remeasurement recorded in other income, net within the consolidated statements of operations.

**Business combinations**

The results of businesses acquired in a business combination are included in the Company's consolidated financial statements from the date of the acquisition. Purchase accounting results in assets and liabilities of an acquired business being recorded at their estimated fair values on the acquisition date. Any excess consideration over the fair value of assets acquired and liabilities assumed is recognized as goodwill. Acquisition-related costs incurred by the Company are recognized as an expense in general and administrative expenses within the consolidated statements of operations.

The Company uses its best estimates and assumptions to assign fair value to the tangible and intangible assets acquired and liabilities assumed at the acquisition date. The Company's estimates are inherently uncertain and subject to refinement.

During the measurement period, which may be up to one year from the acquisition date, and to the extent that the value was not previously finalized, the Company may record adjustments to the fair value of these tangible and intangible assets acquired and liabilities assumed, with the corresponding offset to goodwill. In addition, uncertain tax positions and tax-related valuation allowances are initially recorded in connection with a business combination as of the acquisition date. The Company continues to collect information about facts and circumstance that existed at the date of acquisition and reevaluates these estimates and assumptions quarterly and records any adjustments to the Company's preliminary estimates to goodwill, provided that the Company is within the measurement period. Upon the conclusion of the measurement period or final determination of the fair value of assets acquired or liabilities assumed, whichever comes first, any subsequent adjustments are recorded to the Company's consolidated statements of operations.

**Fair value measurements**

The Company measures certain assets and liabilities at fair value. The Company defines fair value as the price that would be received from selling an asset or paid to transfer a liability in an orderly transaction between market participants at the measurement date. Fair value is estimated by applying the following hierarchy, which prioritizes the inputs used to measure fair value into three levels and bases the categorization within the hierarchy upon the lowest level of input that is available and significant to the fair value measurement:

- *Level 1:* Unadjusted quoted prices in active markets that are accessible at the measurement date for identical, unrestricted assets or liabilities.

- *Level 2:* Observable inputs other than quoted prices in active markets for identical assets and liabilities, quoted prices for identical or similar assets or liabilities in inactive markets, or other inputs that are observable or can be corroborated by observable market data for substantially the full term of the assets or liabilities.

- *Level 3:* Inputs that are generally unobservable and typically reflect management's estimate of assumptions that market participants would use in pricing the asset or liability.

**Cash and cash equivalents**

Cash and cash equivalents include cash and interest-bearing highly liquid investments held at financial institutions, cash on hand that are not restricted as to withdrawal or use with an initial maturity of three months or less, and cash held in accounts at crypto trading venues. Crypto asset and fiat wallet

F-12

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

service trading venues include other crypto asset trading platforms that hold money transmitter licenses, and where the Company holds funds in its accounts with those trading platforms. Cash and cash equivalents excludes customer legal tender, which is reported separately as customer custodial funds in the accompanying consolidated balance sheets. Refer to *Customer custodial funds and custodial funds due to customers* below for further details.

**Restricted cash**

The Company has restricted cash deposits at financial institutions related to operational restricted deposits and a standby letter of credit.

**Customer custodial funds and custodial funds due to customers**

Customer custodial funds represent restricted cash and cash equivalents maintained in segregated Company bank accounts that are held for the exclusive benefit of customers. Custodial funds due to customers represent cash deposits held by customers in their fiat wallets and unsettled deposits and withdrawals. The Company restricts the use of the assets underlying the customer custodial funds to meet regulatory requirements and classifies the assets as current based on their purpose and availability to fulfill its direct obligation under custodial funds due to customers.

Certain jurisdictions where the Company operates requires the Company to hold eligible liquid assets, as defined by applicable regulatory requirements and commercial law in these jurisdictions, equal to at least 100% of the aggregate amount of all custodial funds due to customers. Depending on the jurisdiction, eligible liquid assets can include cash and cash equivalents, customer custodial funds, and in-transit funds receivable. As of December 31, 2020 and December 31, 2019, the Company's eligible liquid assets were greater than the aggregate amount of custodial funds due to customers.

**USDC**

USD Coin or USDC is accounted for as a financial instrument; one USDC can be redeemed for one U.S. dollar on demand from the issuer.

**Accounts receivable and allowance for doubtful accounts**

Accounts receivables are contractual rights to receive cash either on demand or on fixed or determinable dates, and are recognized as an asset on the Company's balance sheet. Accounts receivable consists of customer funds receivable, in-transit funds receivable, custodial fee revenue receivable, loans receivable, interest receivable, and other receivables.

Customer funds receivable, including in-transit funds receivable, represent settlements due for crypto assets delivered to customers and from third-party payment processors and banks for settled customer transactions. Customer funds receivable are typically received within one or two business days of the transaction date. The Company establishes withdrawal based limits in order to mitigate potential losses by preventing customers from withdrawing the crypto asset to an external blockchain address until the payment settles.

Custodial fee revenue receivable represents the fee earned and receivable by the Company for providing a dedicated secure cold storage solution to customers. The fee is based on a contractual percentage of the daily value of assets under custody and is collected on a monthly basis. Such custodial fee revenue income is included in the net revenue in the consolidated statements of operations.

The Company recognizes an allowance for doubtful accounts for receivables that are more than 90 days past due. Accounts receivable deemed uncollectible, which occurs once they reach 180 days past due and all collection efforts have been exhausted, are charged against the allowance for doubtful accounts when identified. As of December 31, 2020 and December 31, 2019, the Company recognized

F-13

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

an allowance for doubtful accounts of $2.2 million and $4.3 million, respectively. The decrease in allowance for doubtful accounts was due to write-off of outstanding receivables that were fully reserved.

**Concentration of credit risk**

The Company's cash, cash equivalents, restricted cash, customer custodial funds, and accounts receivable are potentially subject to concentration of credit risk. Cash, cash equivalents, restricted cash, and customer custodial funds are placed with financial institutions which are of high credit quality. The Company invests cash, cash equivalents, and customer accounts primarily in highly liquid, highly rated instruments which are uninsured. The Company may also have deposit balances with financial institutions which exceed the Federal Deposit Insurance Corporation insurance limit of $250,000. The Company also holds cash at crypto trading venues and performs a regular assessment of these crypto trading venues as part of its risk management process.

The Company held $48.9 million and $88.4 million of USDC as of December 31, 2020 and December 31, 2019, respectively. The underlying U.S. dollars are held by the issuer at federally insured U.S. depository institutions and in approved investments on behalf of, and for the benefit of, holders of USDC.

As of December 31, 2020 two customers accounted for more than 10% of the Company's accounts receivable. One customer had fiat of $45.0 million transferred to their platform account prior to December 31, 2020, but the Company had not yet settled the transaction by collecting payment. The Company had extended $20.5 million of post trade credit to the second customer as of December 31, 2020. As these customers had transferred or were in the process of transferring funds to their portfolio equal to or in excess of the crypto assets purchased, the Company did not record an allowance for doubtful accounts. As of December 31, 2019, no customer accounted for more than 10% of the Company's accounts receivable.

As of December 31, 2020, the Company had one payment processor and two bank partner accounts representing 7%, 8%, and 7% of accounts receivable, respectively. As of December 31, 2019, the Company had one payment processor and one bank partner account representing 40% and 18% of accounts receivable, respectively. During the years ended December 31, 2020 and December 31, 2019, no customer accounted for more than 10% of total revenue.

**Crypto assets held**

The crypto assets held by the Company, with no qualifying fair value hedge, are accounted for as intangible assets with indefinite useful lives, and are initially measured at cost. Crypto assets accounted for as intangible assets are not amortized, but assessed for impairment annually, or more frequently, when events or changes in circumstances occur indicating that it is more likely than not that the indefinite-lived asset is impaired. Impairment exists when the carrying amount exceeds its fair value, which is measured using the quoted price of the crypto asset at the time its fair value is being measured. Impairment expense is reflected in other operating expense in the consolidated statements of operations. The Company assigns costs to transactions on a first-in, first-out basis.

Crypto assets held as the hedged item in qualifying fair value hedges are initially measured at cost. Subsequent changes in fair value attributable to the hedged risk are adjusted to the carrying amount of these crypto assets, with changes in fair value recorded in other operating expense in the consolidated statements of operations.

The Company recognizes crypto assets received through airdrops or forks if the crypto asset is expected to generate probable future benefit and if the Company is able to support the trading, custody, or withdrawal of these assets. The Company records the crypto assets received through airdrops or forks at their cost.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

**Leases**

The Company determines if an arrangement is a lease at inception. Operating leases are included in lease right-of-use ("ROU") assets and lease liabilities in the consolidated balance sheets. ROU assets represent the Company's right to use an underlying asset for the lease term and lease liabilities represent the Company's obligation to make lease payments arising from the lease. Operating lease ROU assets and liabilities are recognized at commencement date based on the present value of future minimum lease payments over the lease term. Most leases do not provide an implicit rate, so the Company uses its incremental borrowing rate. The operating lease ROU assets also include any lease payments made before commencement and exclude lease incentives.

The Company's lease terms may include options to extend or terminate the lease when it is reasonably certain that those options will be exercised. Lease expense for lease payments is recognized on a straight-line basis over the lease term. The Company has made the policy election to account for short-term leases by recognizing the lease payments in profit or loss on a straight-line basis over the lease term and not recognizing these leases on the Company's consolidated balance sheets. Variable lease payments are recognized in profit or loss in the period in which the obligation for those payments is incurred. The Company has real estate lease agreements with lease and non-lease components for which the Company has made the accounting policy election to account for these agreements as a single lease component.

**Property and equipment**

Property and equipment is stated at cost less accumulated depreciation. Depreciation is computed using the straight-line method over the lesser of the estimated useful life of the asset or the remaining lease term. The estimated useful lives of the Company's property, equipment, and software are generally as follows:

| Property and equipment | Useful life |
|---|---|
| Furniture and fixtures | Three to five years |
| Computer equipment | Two to five years |
| Leasehold improvements | Lesser of useful life or remaining lease term |
| Capitalized software | One to three years |

Construction-in-progress represents costs incurred on the construction of leasehold improvements that have not been completed or placed in service as of the end of the year, and accordingly, no depreciation expense has been recorded.

Capitalized software consists of costs incurred during the application development stage of internal-use software. Capitalized costs consist of salaries and compensation costs for employees, fees paid to third-party consultants who are directly involved in development efforts, and costs incurred for upgrades and enhancements to add functionality of the software. Other costs that do not meet the capitalization criteria are expensed as incurred.

**Long-lived assets, including ROU assets, goodwill, and acquired intangible assets**

The Company evaluates the recoverability of long-lived assets on an annual basis, or more frequently whenever circumstances indicate a long-lived asset may be impaired. When indicators of impairment exist, the Company estimates future undiscounted cash flows attributable to such assets. In the event future undiscounted cash flows do not exceed the carrying amount of the assets, the asset would be considered impaired. The impairment loss is measured based upon the difference between the carrying amount and the fair value of the assets.

Goodwill represents the excess of the purchase price over the fair value of the net tangible and intangible assets acquired in a business combination. Goodwill is tested for impairment at the reporting

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

unit level on an annual basis (October 1 for the Company) and between annual tests if an event occurs or circumstances change that would more likely than not reduce the fair value of a reporting unit below its carrying value. For the periods presented, the Company had recorded no impairment charges.

Acquired intangible assets with a definite useful life are amortized over their estimated useful lives on a straight-line basis. Each period, the Company evaluates the estimated remaining useful life of its intangible assets and whether events or changes in circumstances warrant a revision to the remaining period of amortization. Intangible assets assessed as having indefinite lives are not amortized, but are assessed for indicators that the useful life is no longer indefinite or for indicators of impairment each period.

## Investments

The Company holds the following categories of investments, which are included in other non-current assets in the consolidated balance sheets.

### Equity method investments

The Company holds equity investments in privately held companies. The Company applies the equity method of accounting for investments in other entities when it holds between 20% and 50% of the common stock or in-substance common stock in the entity or when it exercises significant influence over the entity. Under the equity method, the Company's share of each entity's profit or loss is reflected in other income, net in the consolidated statements of operations.

### Strategic investments

The Company has strategic investments in equity instruments where the Company (1) holds less than 20% ownership in the entity, and (2) does not exercise significant influence. These are recorded at cost and adjusted for observable transactions for same or similar investments of the same issuer (referred to as the measurement alternative) or impairment.

## Crypto asset borrowings

The Company borrows crypto assets, including bitcoin and ether, from third parties on an unsecured basis. Such crypto assets borrowed by the Company are reported in crypto assets held on the Company's consolidated balance sheets.

The borrowings are accounted for as hybrid instruments, with a liability host contract that contains an embedded derivative based on the changes in the fair value of the underlying crypto asset. The host contract is not accounted for as a debt instrument because it is not a financial liability, is carried at the fair value of the assets acquired and reported in crypto asset borrowings in the consolidated balance sheets. The embedded derivative is accounted for at fair value, with changes in fair value recognized in other operating expenses in the consolidated statements of operations. The embedded derivatives are included in crypto asset borrowings in the consolidated balance sheets.

The term of these borrowings can either be for a fixed term of less than one year or can be open-ended and repayable at the option of the Company or the lender. These borrowings bear a fee payable by the Company to the lender, which is based on a percentage of the amount borrowed and is denominated in the related crypto asset borrowed. The borrowing fee is recognized on an accrual basis and is included in other operating expense in the consolidated statements of operations.

### Derivative contracts

Derivative contracts derive their value from underlying asset prices, other inputs or a combination of these factors.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

As a result of the Company entering into transactions to borrow crypto assets, an embedded derivative is recognized relating to the differences between the fair value of the amount borrowed, which is recognized on the borrowing effective date, and the fair value of the amount that will ultimately be repaid, based on changes in the spot price of the crypto asset over the term of the borrowing. This embedded derivative is accounted for as a forward contract to exchange at maturity the fixed amount of the crypto asset to be repaid.

In September 2020, the Company entered into a warrant agreement to purchase 800,000 units of crypto assets from a crypto asset issuer. The warrant is immediately exercisable but had not been exercised as of December 31, 2020. This warrant is accounted for as a derivative at fair value, with changes in fair value recognized in other operating expenses in the consolidated statements of operations. The warrant derivative is included in prepaid expenses and other current assets in the consolidated balance sheets.

*Derivatives designated as hedges*

The Company applies hedge accounting to certain derivatives executed for risk management purposes. To qualify for hedge accounting, a derivative must be highly effective at reducing the risk associated with the exposure being hedged. The Company uses fair value hedges primarily to hedge the fair value exposure of crypto asset prices. For qualifying fair value hedges, the changes in the fair value of the derivative and the fair value of the hedged item, the crypto assets, are recognized in current-period earnings in other operating expense in the consolidated statements of operations. Derivative amounts affecting earnings are recognized in the same line item as the earnings effect of the hedged item.

**Revenue recognition**

See note 5, Revenue, for information on the Company's accounting policies for revenue recognition.

**Contract acquisition costs**

The Company has elected to apply the practical expedient to recognize the incremental costs of obtaining a contract as an expense when incurred if the amortization period of the asset that would otherwise have been recognized is one year or less.

**Transaction expense**

Transaction expense includes costs incurred to operate the Company's platform, process crypto asset trades, and perform wallet services. These costs include account verification fees, fees to process transactions on a blockchain network, fees paid to payment processors and other financial institutions for customer transaction activity, and crypto asset losses due to transaction reversals. Fixed-fee costs are expensed over the term of the contract and transaction-level costs are expensed as incurred.

**Technology and development**

Technology and development includes costs incurred in operating, maintaining, and enhancing the Coinbase platform, including network, website hosting, and infrastructure costs. Technology and development also includes costs incurred in developing new products and services, personnel related expenses, and the amortization of acquired and internally developed technology. Personnel related expenses include salaries, bonuses, benefits, and stock-based compensation.

**Sales and marketing**

Sales and marketing primarily includes costs related to customer acquisition, advertising and marketing programs, and personnel related expenses. Sales and marketing costs are expensed as incurred.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

**General and administrative**

General and administrative expenses include costs incurred to support the Company's business, including legal, finance, compliance, human resources, customer experience and support operations, executive management, and other administrative services. General and administrative expenses also include personnel related expenses, software subscriptions for support services, facilities and equipment costs, depreciation, amortization of acquired customer relationship intangible assets, sales and property taxes, gains and losses on disposal of fixed assets, legal reserves and settlements, and other general overhead.

General and administrative costs are expensed as incurred.

**Other operating expense**

Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets. Other operating expense includes the cost of the Company's crypto assets used to fulfill customer accommodation transactions. The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in other revenue and the cost of the crypto asset in other operating expense.

Other operating expense also includes impairment and realized gains on the sale of crypto assets, realized gains and losses resulting from the settlement of derivative instruments, and fair value gains and losses related to derivatives and derivatives designated in qualifying fair value hedge accounting relationships.

**Stock-based compensation**

The Company recognizes stock-based compensation expense using a fair-value based method for costs related to all stock-based payments issued under the Company's equity incentive plans, including restricted stock, restricted stock units ("RSUs"), and options granted to employees, directors, and non-employees.

The Company estimates the fair value of stock options with only service-based conditions on the date of grant using the Black-Scholes-Merton option-pricing model. The fair value of the stock option is expensed over the requisite service period which is typically the vesting period and the straight-line method is used for expense attribution.

The model requires management to make a number of assumptions, including the fair value and expected volatility of the Company's underlying common stock price, expected life of the option, risk-free interest rate, and expected dividend yield. The fair value of the underlying common stock is determined using the probability weighted expected return method, with a discounted cash flow model or a market multiples method used for each expected outcome. The expected stock price volatility assumption for the Company's stock options are determined by using a weighted average of the historical stock price volatilities of comparable companies from a representative peer group, as sufficient trading history for the Company's common stock is not available. The Company uses historical exercise information and contractual terms of options to estimate the expected term. The risk-free interest rate for periods within the expected life of the option is based on the U.S. Treasury zero coupon bonds with terms consistent with the expected term of the award at the time of grant. The expected dividend yield assumption is based on the Company's history and expectation of no dividend payouts.

The fair value of RSUs is estimated based on the fair value of the Company's common stock on the date of grant. Stock-based compensation expense related to RSUs is recorded on a straight-line basis over the requisite service period.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

The Company has elected to account for forfeitures of awards as they occur, with previously recognized compensation reversed in the period that the awards are forfeited.

**Income taxes**

The Company accounts for income taxes using the asset and liability method whereby deferred tax asset and liability account balances are determined based on temporary differences between the financial statement and tax bases of assets and liabilities using enacted tax rates in effect for the year in which the differences are expected to affect taxable income. A valuation allowance is established when management estimates that it is more likely than not that deferred tax assets will not be realized. Realization of deferred tax assets is dependent upon future pre-tax earnings, the reversal of temporary differences between book and tax income, and the expected tax rates in future periods.

The Company is required to evaluate the tax positions taken in the course of preparing its tax returns to determine whether tax positions are more likely than not of being sustained by the applicable tax authority. Tax benefits of positions not deemed to meet the "more-likely-than-not" threshold would be recorded as a tax expense in the current year. The amount recognized is subject to estimate and management judgment with respect to the likely outcome of each uncertain tax position. The amount that is ultimately sustained for an individual uncertain tax position or for all uncertain tax positions in the aggregate could differ from the amount that is initially recognized. It is the Company's practice to recognize interest and penalties related to income tax matters in income tax expense.

For U.S. Federal tax purposes, crypto asset transactions are treated on the same tax principles as property transactions. The Company recognizes a gain or loss when crypto assets are exchanged for other property, in the amount of the difference between the fair market value of the property received and the tax basis of the exchanged crypto assets. Receipts of crypto assets in exchange for goods or services are included in taxable income at the fair market value on the date of receipt.

**Net income per share**

The Company computes net income per share using the two-class method required for participating securities. The two-class method requires income available to common stockholders for the period to be allocated between common stock and participating securities based upon their respective rights to receive dividends as if all income for the period had been distributed. The Company's convertible preferred stock and the restricted common stock granted as consideration in the acquisition of Tagomi Holdings Inc. ("Tagomi") are participating securities. These participating securities do not contractually require the holders of such shares to participate in the Company's losses.

Basic net income per share is computed using the weighted-average number of outstanding shares of common stock during the period. Diluted net income per share is computed using the weighted-average number of outstanding shares of common stock and, when dilutive, potential shares of common stock outstanding during the period. Potential shares of common stock consist of incremental shares issuable upon the assumed exercise of stock options and warrants, vesting of RSUs, vesting of restricted common stock, as well as the shares of convertible preferred stock.

**Segment reporting**

Operating segments are defined as components of an entity for which separate financial information is available and that is regularly reviewed by the Chief Operating Decision Maker (the "CODM") in deciding how to allocate resources to an individual segment and in assessing performance. The Company's Chief Executive Officer is the Company's CODM. The CODM reviews financial information presented on a global consolidated basis for purposes of making operating decisions, allocating resources, and evaluating financial performance. While the Company does have revenue from multiple products and geographies, no measures of profitability by product or geography are available, so discrete financial information is not available for each such component. As such, the Company has determined that it operates as one operating segment and one reportable segment.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

**Recent accounting pronouncements**

*Recently adopted accounting pronouncements*

On August 27, 2018, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update No. 2018-13, *Fair Value Measurement (Topic 820), Disclosure Framework - Changes to the Disclosure Requirements for Fair Value Measurement* ("ASU 2018-13"). The guidance eliminates, adds, and modifies certain disclosure requirements for fair value measurements. The Company adopted the amendment as of January 1, 2019. Adoption of the guidance did not have a material impact on the Company's consolidated financial statements and disclosures.

On August 26, 2016, the FASB issued Accounting Standards Update No. 2016-15, *Statement of Cash Flows (Topic 230), Classification of Certain Cash Receipts and Cash Payments* ("ASU 2016-15"). These amendments provide cash flow statement classification guidance for: (1) Debt Prepayment or Debt Extinguishment Costs, (2) Settlement of Zero-Coupon Debt Instruments or Other Debt Instruments with Coupon Interest Rates That Are Insignificant in Relation to the Effective Interest Rate of the Borrowing, (3) Contingent Consideration Payments Made after a Business Combination, (4) Proceeds from the Settlement of Insurance Claims, (5) Proceeds from the Settlement of Corporate-Owned Life Insurance Policies, including Bank-Owned Life Insurance Policies, (6) Distributions Received from Equity Method Investees, (7) Beneficial Interests in Securitization Transactions, and (8) Separately Identifiable Cash Flows and Application of the Predominance Principle. The Company adopted the amendment as of January 1, 2019. Adoption of the guidance did not have a material impact on the Company's consolidated statements of cash flows.

On August 28, 2017, the FASB issued Accounting Standards Update No. 2017-12, *Derivatives and Hedging (Topic 815): Targeted Improvements to Accounting for Hedging Activities* ("ASU 2017-12"). ASU 2017-12 expands component and fair value hedging, specifies the presentation of the effects of hedging instruments, eliminates the separate measurement and presentation of hedge ineffectiveness, and updates disclosure requirements related to hedging. The Company adopted the amendment as of January 1, 2020. Adoption of the guidance did not have a material impact on the Company's consolidated financial statements, as the Company had not yet undertaken any hedging activities at the date of adoption.

On November 11, 2019, the FASB issued Accounting Standards Update No. 2019-08, *Compensation—Stock Compensation (Topic 718) and Revenue from Contracts with Customers (Topic 606): Codification Improvements—Share-Based Consideration Payable to a Customer* ("ASU 2019-08"), that simplifies and increases comparability of accounting for nonemployee share-based payments, specifically those made to customers. The new guidance requires companies to measure and classify (on the balance sheet) share-based payments to customers by applying the guidance in Topic 718. As a result, the amount recorded as a reduction in revenue would be measured based on the grant-date fair value of the share-based payment. The Company elected to early adopt the amendment as of January 1, 2019. Adoption of the guidance did not have a material impact on the Company's consolidated financial statements and disclosures.

*Accounting pronouncements pending adoption*

Under the Jumpstart Our Business Startups Act ("JOBS Act"), the Company meets the definition of an emerging growth company ("EGC"). The Company has elected to take advantage of the extended transition period for complying with new or revised accounting standards pursuant to Section 107(b) of the JOBS Act. For the year ended December 31, 2020, the Company no longer met the requirements to qualify as an EGC. However, as the Company qualified as an EGC at the time it submitted a draft registration statement, the Company will continue to be treated as an EGC until the earlier of (1) the date on which we complete this listing and (2) December 31, 2021.

On June 16, 2016, the Financial Accounting Standards Board ("FASB") issued Accounting Standards Update No. 2016-13, *Financial Instruments - Credit Losses (Topic 326), Measurement of Credit Losses*

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

*on Financial Instruments* ("ASU 2016-13"), which significantly changes how entities will measure credit losses for most financial assets and certain other instruments that are not measured at fair value through net income. ASU 2016-13 will replace today's "incurred loss" approach with an "expected loss" model for instruments measured at amortized cost. For available-for-sale debt securities, entities will be required to record allowances rather than reduce the carrying amount, as they do today under the other-than-temporary impairment model. It also simplifies the accounting model for purchased credit-impaired debt securities and loans. The new standard is effective for the Company for its fiscal year beginning January 1, 2021. The adoption of the standard is not expected to have a material impact on the consolidated financial statements.

On August 29, 2018, the FASB issued Accounting Standards Update No. 2018-15, *Intangibles—Goodwill and Other—Internal-Use Software (Subtopic 350-40)—Customer's Accounting for Implementation Costs Incurred in a Cloud Computing Arrangement That Is a Service Contract* ("ASU 2018-15"), which aligns the accounting for implementation costs incurred in a hosting arrangement that is a service contract with the accounting for implementation costs incurred to develop or obtain internal-use software under ASC 350-40, in order to determine which costs to capitalize and recognize as an asset and which costs to expense. The new standard is effective for the Company for its fiscal year beginning January 1, 2021 and interim periods within its fiscal year beginning January 1, 2021. The Company intends to apply the standard prospectively. As such, there is not expected to be an impact on adoption.

On December 18, 2019, the FASB issued Accounting Standards Update No. 2019-12, *Income Taxes: Simplifying the Accounting for Income Taxes* ("ASU 2019-12"), as part of its overall simplification initiative to reduce costs and complexity of applying accounting standards while maintaining or improving the usefulness of the information provided to users of financial statements. Among other things, the new guidance simplifies intraperiod tax allocation and reduces the complexity in accounting for income taxes with year-to-date losses in interim periods. The new standard is effective for the Company for its fiscal year beginning January 1, 2021. The adoption of the standard is not expected to have a material impact on the consolidated financial statements.

## 3.   RESTRUCTURING

In April 2019, management approved the closure of a Chicago office and ceased development of a new matching engine to facilitate high frequency trading. This resulted in a reduction of the Company's overall workforce by twenty-six employees. As part of this reduction, the affected employees were given separation pay and fifteen of those employees had a portion of their stock options accelerated. Stock options that would have vested within sixteen weeks after their termination date were accelerated to vest on their termination date.

Contracts related to the development of the matching engine were either terminated or redirected for use elsewhere within the Company. Fixed assets that mainly included the hardware necessary to support the matching engine under development were disposed of.

The restructuring was completed by December 31, 2019. The following restructuring expenses were recognized in restructuring expenses in the consolidated statements of operations for the year ended December 31, 2019 (in thousands):

|  | Costs Incurred | Cash Paid | Non-cash |
|---|---|---|---|
| Separation pay | $ 3,447 | $ 3,447 | $ — |
| Contract termination fees | 416 | 416 | — |
| Stock-based compensation | 994 | — | 994 |
| Loss on disposal of fixed assets | 5,283 | — | 5,283 |
| Total | $ 10,140 | $ 3,863 | $ 6,277 |

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

## 4.  ACQUISITIONS

2020 Acquisitions

*Tagomi*

On July 31, 2020, the Company completed the acquisition of Tagomi, by acquiring all issued and outstanding shares of common stock and stock options of Tagomi. Tagomi is an institutional brokerage for crypto assets and offers an end to end brokerage solution that caters to sophisticated traders and institutions. Tagomi operates an advanced trading platform which pools liquidity from multiple venues to offer efficient pricing, algorithmic trading, a suite of prime services (including delayed settlement and borrowing and lending of fiat currency and crypto assets), and a flexible account hierarchy and operational processes that meet the needs of institutional clients.

The total preliminary consideration transferred in the acquisition was $41.8 million, consisting of the following (in thousands):

| | | |
|---|---|---|
| Common stock of the Company | $ | 30,589 |
| Replacement of Tagomi options and warrants | | 760 |
| Cash | | 1,906 |
| Settlement of pre-existing receivable | | 8,537 |
| Total purchase consideration | $ | 41,792 |

The following table summarizes the preliminary fair values of assets acquired and liabilities assumed as of the date of acquisition (in thousands):

| | | |
|---|---|---|
| Cash and cash equivalents | $ | 13,777 |
| Customer custodial funds | | 19,837 |
| Crypto assets held | | 5,687 |
| Accounts receivable, net of allowance | | 5,795 |
| Prepaid expenses and other current assets | | 633 |
| Intangible assets | | 7,350 |
| Goodwill | | 22,516 |
| Other non-current assets | | 1,611 |
| Total Assets | $ | 77,206 |
| | | |
| Custodial funds due to customers | $ | 20,787 |
| Accounts payable and accrued expenses | | 5,953 |
| Crypto borrowings | | 8,674 |
| Total Liabilities | $ | 35,414 |
| Net assets acquired | $ | 41,792 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill of $22.5 million, which is not deductible for tax purposes. The goodwill balance is primarily attributed to the market presence, synergies, and the use of purchased technology to develop future products and technologies.

F-22

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in thousands, except for years data):

| | Fair Value | Useful Life at Acquisition (in years) |
|---|---|---|
| Developed technology | $ 6,600 | 3 |
| Customer relationships | 400 | 5 |
| Licenses | 350 | Indefinite |

The developed technology, customer relationships, and licenses represents the estimated fair value of Tagomi's trading platform, existing relationships with customers, and money transmitter licenses held, respectively. Total acquisition costs of $1.1 million were incurred related to the acquisition, which were recognized as an expense and included in general and administrative expenses in the consolidated statements of operations.

A related party of the Company was a prior equity holder of Tagomi, and as a result of the acquisition, was entitled to receive up to 264,527 shares of the Company's Class A common stock.

The impact of this acquisition was considered immaterial to both the current and prior periods of the Company's consolidated financial statements and pro forma financial information has not been provided.

*2019 Acquisitions*

*Neutrino*

On January 17, 2019, the Company entered into an agreement to purchase all issued and outstanding shares of Neutrino S.r.l. ("Neutrino"), for a total cash purchase price of $6.4 million. Neutrino developed solutions for analyzing crypto asset flows across multiple blockchains, providing actionable insight on the whole cryptoeconomy. The acquisition was completed on February 15, 2019. The Company renamed the Neutrino services to Coinbase Analytics.

As part of the transaction, the Company also paid cash of $7.4 million into an escrow fund, to be distributed to the former stockholders of Neutrino over a four year period. The distribution was initially dependent on those former stockholders continuing to be employed with the Company. During March 2019, a decision was made to separate with certain Neutrino employees. As part of their separation agreement, the full amount held in the escrow fund of $7.4 million was released and included in technology and development in the consolidated statements of operations.

The following table summarizes the fair values of assets acquired and liabilities assumed as of the date of acquisition (in thousands):

| | |
|---|---|
| Cash and cash equivalents | $ 750 |
| Accounts receivable | 227 |
| Goodwill | 3,908 |
| Intangible assets | 2,940 |
| Total assets | $ 7,825 |
| Accounts payable and accrued expenses | $ 579 |
| Deferred tax liability | 820 |
| Total liabilities | $ 1,399 |
| Net assets acquired | $ 6,426 |

The excess of purchase consideration over the fair value of net tangible and identifiable intangible assets acquired was recorded as goodwill of $3.9 million, which is not deductible for tax purposes. The

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

goodwill balance is primarily attributed to the market presence, synergies, and the use of purchased technology to develop future products and technologies.

The following table sets forth the components of identifiable intangible assets acquired and their estimated useful lives as of the date of acquisition (in thousands, except for years data):

| | Fair Value | Useful Life at Acquisition (in years) |
|---|---|---|
| Developed technology | $ 2,630 | 3 |
| Customer relationships | 280 | 3 |
| Trade name | 30 | 1 |

The developed technology, customer relationships, and trade name represents the estimated fair value of Neutrino's blockchain analytics technology, existing relationships with Neutrino users, and the Neutrino name, respectively.

The impact of this acquisition was considered immaterial to both the current and prior periods of the Company's consolidated financial statements and pro forma financial information has not been provided.

*Xapo*

On August 2, 2019, the Company closed a transaction with Xapo, Inc. ("Xapo") to acquire the customer relationships of Xapo's institutional custody business, which includes high net worth individuals and institutions. The purchase consideration was comprised of cash and contingent stock consideration, which would be issued to the seller if certain conditions were met on the anniversary of the transaction. This contingent consideration was accounted for as a liability measured at fair value, with subsequent changes in fair value being recognized in net income or loss. The total purchase consideration was $68.3 million, comprised of cash of $55.0 million, contingent consideration of $12.9 million, and direct acquisition costs of $0.4 million.

The purchase consideration was allocated as follows (in thousands, except years data):

| | Cost | Useful Life at Acquisition (in years) |
|---|---|---|
| Customer relationships | $ 65,911 | 6 |
| Non-compete agreement | 2,402 | 5 |
| Total | $ 68,313 | 6 |

The impact of this acquisition was considered immaterial to both the current and prior periods of the Company's consolidated financial statements and pro forma financial information has not been provided.

In August 2020, the Company settled the contingent consideration liability, which had a carrying value of $16.2 million at the date of settlement, by issuing 690,756 shares of common stock.

**5.  REVENUE**

*Revenue recognition*

The Company determines revenue recognition from contracts with customers through the following steps:

- identification of the contract, or contracts, with the customer;

- identification of the performance obligations in the contract;

- determination of the transaction price;

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

- allocation of the transaction price to the performance obligations in the contract; and

- recognition of the revenue when, or as, the Company satisfies a performance obligation.

Revenue is recognized when control of the promised goods or services is transferred to the customers, in an amount that reflects the consideration the Company expects to be entitled to in exchange for those goods or services. The Company primarily generates revenue through transaction fees charged on the platform.

The following table presents revenue of the Company disaggregated by revenue source (in thousands):

| | Year Ended December 31, | |
| | 2020 | 2019 |
| --- | --- | --- |
| Net revenue | | |
| Transaction revenue | | |
| Retail, net | $ 1,040,246 | $ 432,919 |
| Institutional | 55,928 | 30,086 |
| Total transaction revenue | 1,096,174 | 463,005 |
| Subscription and services revenue | | |
| Custodial fee revenue | 18,561 | 3,009 |
| Staking revenue | 10,413 | 188 |
| Earn campaign revenue | 7,720 | 117 |
| Interest income | 5,535 | 14,414 |
| Other subscription and services revenue | 2,764 | 2,216 |
| Total subscription and services revenue | 44,993 | 19,944 |
| Total net revenue | $ 1,141,167 | $ 482,949 |
| | | |
| Other revenue | | |
| Crypto asset sales revenue | $ 133,688 | $ 39,863 |
| Corporate interest income | 2,626 | 10,923 |
| Total other revenue | $ 136,314 | $ 50,786 |
| | | |
| Total revenue | $ 1,277,481 | $ 533,735 |

*Transaction revenue*

Retail transaction revenue represents transaction fees earned from customers that are primarily individuals, while institutional transaction revenue represents transaction fees earned from institutional customers, such as hedge funds, family offices, principal trading firms, and financial institutions on the institutional platform.

The Company's service is comprised of a single performance obligation to provide a crypto asset matching service when customers buy, sell, or convert crypto assets on the platform. That is, the Company is an agent in transactions between customers and presents revenue for the fees earned on a net basis.

Judgment is required in determining whether the Company is the principal or the agent in transactions between customers. The Company evaluates the presentation of revenue on a gross or net basis based on whether it controls the crypto asset provided before it is transferred to the customer (gross) or whether it acts as an agent by arranging for other customers on the platform to provide the crypto asset to the customer (net). The Company does not control the crypto asset being provided before it is transferred to

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

the buyer, does not have inventory risk related to the crypto asset, and is not responsible for the fulfillment of the crypto asset. The Company also does not set the price for the crypto asset as the price is a market rate established by the platform. As a result, the Company acts as an agent in facilitating the ability for a customer to purchase crypto assets from another customer.

The Company considers its performance obligation satisfied, and recognizes revenue, at the point in time the transaction is processed. Contracts with customers are usually open-ended and can be terminated by either party without a termination penalty. Therefore, contracts are defined at the transaction level and do not extend beyond the service already provided.

The Company charges a fee at the transaction level. The transaction price, represented by the trading fee, is calculated based on volume and may vary depending on payment type and the value of the transaction. Crypto asset purchase or sale transactions executed by a customer on the Company's platform include tiered pricing, based primarily on transaction volume. The fee rate charged per transaction is adjusted up or down if the volume processed for a specific historical period meets established thresholds. The Company has concluded that this volume-based pricing approach does not constitute a future material right since the discount is within a range typically offered to a class of customers with similar volume. The transaction fee is collected from the customer at the time the transaction is executed. In certain instances, the transaction fee can be collected in crypto assets, with revenue measured based on the amount of crypto assets received and the fair value of the crypto assets at the time of the transaction.

The transaction price includes estimates for reductions in revenue from transaction fee reversals that may not be recovered from customers. Such reversals occur when the customer disputes a transaction processed on their credit card or their bank account for a variety of reasons and seeks to have the charge reversed after the Company has processed the transaction. These amounts are estimated based upon the most likely amount of consideration to which the Company will be entitled. All estimates are based on historical experience and the Company's best judgment at the time to the extent it is probable that a significant reversal of revenue recognized will not occur. All estimates of variable consideration are reassessed periodically. The total transaction price is allocated to the single performance obligation. While the Company recognizes transaction fee reversals due to transaction reversals as a reduction of net revenue, crypto asset losses due to transaction reversals are included in transaction expense.

*Custodial fee revenue*

The Company provides a dedicated secure cold storage solution to customers and earns a fee, which is based on a contractual percentage of the daily value of assets under custody. The fee is collected on a monthly basis. These contracts typically have one performance obligation which is provided and satisfied over the term of the contracts as customers simultaneously receive and consume the benefits of the services. The contract may be terminated by a customer at any time, without incurring a penalty. Customers are billed on the last day of the month during which services were provided, with the amounts being due within thirty days of receipt of the invoice. Amounts receivable from customers for custodial fee revenue, net of allowance, were $4.4 million and $1.2 million as of December 31, 2020 and December 31, 2019, respectively. The allowance recognized against these fees was not material for any of the periods presented.

*Staking revenue*

The Company participates in networks with proof-of-stake consensus algorithms, through creating or validating blocks on the network. In exchange for participating in the consensus mechanism of these networks, the Company earns rewards in the form of the native token of the network. Each block creation or validation is a performance obligation. Revenue is recognized at the point when the block creation or

F-26

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

validation is complete and the rewards are available for transfer. Revenue is measured based on the number of tokens received and the fair value of the token at the date of recognition.

*Interest income and corporate interest income*

The Company holds customer custodial funds and cash and cash equivalents at certain third-party banks which earn interest. Interest income is calculated using the interest method and is not within the scope of Topic 606 – *Revenue from Contracts with Customers* ("Topic 606"). Interest earned on customer custodial funds is included in interest income within subscription and services revenue. Interest earned on cash and cash equivalents is included in corporate interest income, within other revenue.

*Earn campaign revenue*

The Company provides a platform for crypto asset issuers, the customer, to engage with Coinbase retail users and teach them about new crypto assets through the use of educational tools, videos, and tutorials. In exchange for completing a task, such as watching the video or downloading an application, retail users may be eligible to receive crypto assets from the crypto asset issuer. The Company is the agent with respect to the delivery of the crypto assets. The Company earns a commission from the crypto asset issuer based on the amount of crypto assets that are distributed to users.

*Other subscription and services revenue*

Other subscription and services revenue primarily includes revenue from early stage services being offered by the Company, such as subscription license revenue. Generally, contracts with customers of early stage products contain one performance obligation, do not have variable consideration, and are satisfied at a point in time or over the period that services are provided.

*Other revenue*

Other revenue includes sale of crypto assets and corporate interest income. Periodically, as an accommodation to customers, the Company may fulfill customer transactions using the Company's own crypto assets. The Company has custody and control of the crypto assets prior to the sale to the customer and records revenue at the point in time when the sale to the customer is processed. Accordingly, the Company records the total value of the sale in other revenue and the cost of the crypto assets in other operating expense within the consolidated statements of operations. The cost of crypto assets used in fulfilling customer transactions was $131.9 million and $38.6 million for the years ended December 31, 2020 and December 31, 2019, respectively.

*Related party transactions*

Certain of the Company's directors, executive officers, and principal owners, including immediate family members, are users of the Company's platform. Fees charged to these users are on terms no more favorable than terms generally available to an unaffiliated third party under the same or similar circumstances. The Company recognized revenue with related parties of $3.4 million and $0.7 million for the years ended December 31, 2020 and December 31, 2019, respectively. As of December 31, 2020 and December 31, 2019, amounts receivable from related parties were $0.6 million and $0.2 million, respectively.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

*Revenue by geographic location*

Revenue disaggregated by geography based on customers' billing addresses is as follows (in thousands):

| | Year Ended December 31, | |
| | 2020 | 2019 |
|---|---|---|
| United States | $ 966,153 | $ 417,260 |
| Rest of the World[1] | 311,328 | 116,475 |
| Total revenue | $ 1,277,481 | $ 533,735 |

(1)   No other individual country accounted for more than 10% of total revenue

## 6.   ACCOUNTS RECEIVABLE

Accounts receivable, net of allowance consisted of the following (in thousands):

| | December 31, | |
| | 2020 | 2019 |
|---|---|---|
| Customer funds receivable | $ 67,926 | $ 1,436 |
| In-transit customer receivables | 90,571 | 14,803 |
| Custodial fee revenue receivable | 4,636 | 1,365 |
| Loans receivable [1] | 6,790 | 2,001 |
| Interest and other receivables | 21,709 | 2,175 |
| Allowance for doubtful accounts | (2,161) | (4,284) |
| Total accounts receivable, net of allowance | $ 189,471 | $ 17,496 |

(1)   The fair value of collateral held as security exceeded the outstanding loans receivable as at December 31, 2020 and December 31, 2019, so no allowance was recorded.

## 7.   LEASES

The Company has operating leases for corporate offices. The leases have remaining lease terms of one to seven years. The leases contain options to extend or terminate the lease. However, these were not included in the lease terms, as the Company is not reasonably certain to exercise those options. The Company rents or subleases certain of these corporate offices to third parties. The Company recognized sublease income of $6.6 million and $2.8 million for the years ended December 31, 2020 and December 31, 2019, respectively. The remaining terms of these subleases range from two months to four years.

The components of lease cost were as follows (in thousands):

| | Year Ended December 31, | |
| | 2020 | 2019 |
|---|---|---|
| Operating lease cost | $ 30,231 | $ 17,421 |
| Short-term lease cost | 358 | 3,031 |
| Total lease cost | $ 30,589 | $ 20,452 |

Other information related to leases was as follows:

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
| Weighted-average remaining lease term (in years) | 4.1 | 5.1 |
| Weighted-average discount rate | 4.62 % | 4.58 % |

The discount rates used in measuring the lease liabilities was based on the Company's hypothetical incremental borrowing rate, as the rate implicit in the leases were not readily determinable. As the Company has not taken on any debt, its incremental borrowing rate was estimated based on sovereign yield curves and a risk premium based on yields of debt with a similar credit rating to the Company's synthetic credit rating. The Company's synthetic credit rating was estimated based on the Company's key financial metrics, including but not limited to, total assets, total liabilities, annual revenue, and annual income or loss, compared to the same metrics of companies that have issued debt.

Maturities of lease liabilities were as follows (in thousands):

| | | |
|---|---|---:|
| 2021 | $ | 29,559 |
| 2022 | | 26,887 |
| 2023 | | 27,421 |
| 2024 | | 27,171 |
| 2025 | | 6,597 |
| Thereafter | | 792 |
| Total lease payments | | 118,427 |
| Less imputed interest | | (10,649) |
| Total | $ | 107,778 |

*430 California office space*

In September 2018, the Company entered into an operating lease agreement for new office space in San Francisco, California. The lease commencement dates of floors in the building were staggered, with the lease of the final floors of the office initially set to commence in November 2020 and expire on April 30, 2025.

In September 2020, the Company renegotiated the terms of the lease which included a partial give back of space for which the lease had not yet commenced. The terms of the agreement provided that the Company would pay a cancellation fee of $7.9 million and commit to enter into leases at the lessor's other properties, with a minimum committed spend of $15.5 million spread over the period from September 2020 to December 31, 2025.

F-29

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

### 8.   PROPERTY AND EQUIPMENT

Property and equipment consisted of the following (in thousands):

|  | December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Furniture and fixtures | $ 7,161 | $ 4,134 |
| Construction in progress | 358 | 7,713 |
| Computers and equipment | 2,815 | 1,946 |
| Leasehold improvements | 40,589 | 32,403 |
| Capitalized software | 22,815 | 11,329 |
| Total cost | 73,738 | 57,525 |
| Accumulated depreciation and amortization | (24,488) | (10,408) |
| Total, net | $ 49,250 | $ 47,117 |

Depreciation and amortization expense was $14.3 million, and $7.2 million for the years ended December 31, 2020 and December 31, 2019, respectively. Total additions to capitalized software was $12.1 million and $9.5 million for the years ended December 31, 2020, and December 31, 2019, respectively.

Long-lived assets, which consist of property and equipment, net and operating lease ROU assets, by geography is as follows (in thousands):

|  | December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| United States | $ 148,199 | $ 166,630 |
| Rest of the World[1] | 1,896 | 3,873 |
| Total long-lived assets | $ 150,095 | $ 170,503 |

(1)   No other individual country accounted for more than 10% of total long-lived assets

### 9.   GOODWILL AND INTANGIBLE ASSETS

*Goodwill*

The following table reflects the changes in the carrying amount of goodwill (in thousands):

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Balance, beginning of period | $ 54,696 | $ 50,766 |
| Additions due to acquisitions | 22,516 | 3,930 |
| Balance, end of period | $ 77,212 | $ 54,696 |

There is no accumulated impairment balance recognized against goodwill at the beginning or end of the periods.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

*Intangible assets*

Intangible assets consisted of the following (in thousands, except years data):

| As of December 31, 2020 | Gross Carrying Amount | | Accumulated Amortization | | Intangible Assets, Net | | Weighted Average Remaining Useful Life (in years) |
|---|---|---|---|---|---|---|---|
| Amortizing intangible assets | | | | | | | |
| Acquired developed technology | $ | 20,708 | $ | (13,024) | $ | 7,684 | 2.09 |
| Customer relationships | | 66,591 | | (15,771) | | 50,820 | 4.58 |
| Trade name | | 30 | | (30) | | — | — |
| Non-compete agreement | | 2,402 | | (681) | | 1,721 | 3.58 |
| Indefinite life intangible assets | | | | | | | |
| Domain name | | 250 | | — | | 250 | N/A |
| Licenses | | 350 | | — | | 350 | N/A |
| Crypto assets held | | 316,094 | | — | | 316,094 | N/A |
| Total | $ | 406,425 | $ | (29,506) | $ | 376,919 | |

| As of December 31, 2019 | Gross Carrying Amount | | Accumulated Amortization | | Intangible Assets, Net | | Weighted Average Remaining Useful Life (in years) |
|---|---|---|---|---|---|---|---|
| Amortizing intangible assets | | | | | | | |
| Acquired developed technology | $ | 14,108 | $ | (7,959) | $ | 6,149 | 1.56 |
| User base | | 400 | | (400) | | — | — |
| Customer relationships | | 66,191 | | (4,659) | | 61,532 | 5.58 |
| Trade name | | 30 | | (26) | | 4 | 0.12 |
| Non-compete agreement | | 2,402 | | (200) | | 2,202 | 4.59 |
| Indefinite life intangible assets | | | | | | | |
| Domain name | | 250 | | — | | 250 | N/A |
| Crypto assets held | | 33,932 | | — | | 33,932 | N/A |
| Total | $ | 117,313 | $ | (13,244) | $ | 104,069 | |

Amortization expense of intangible assets was $16.7 million, and $9.7 million for the years ended December 31, 2020 and December 31, 2019, respectively. The Company estimates that there is no significant residual value related to its intangible assets. Impairment expense was $8.4 million and $2.3 million during the years ended December 31, 2020 and December 31, 2019, respectively.

The expected future amortization expense for intangible assets as of December 31, 2020 is as follows (in thousands):

| | | |
|---|---|---|
| 2021 | $ | 15,737 |
| 2022 | | 13,865 |
| 2023 | | 12,823 |
| 2024 | | 11,346 |
| Thereafter | | 6,454 |
| Total amortization expense | $ | 60,225 |

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

## 10.  PREPAID EXPENSES AND OTHER ASSETS

Prepaid expenses and other current assets and other non-current assets consisted of the following (in thousands):

|  | December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Prepaid expenses and other current assets | | |
| Prepaid expenses | $ 36,218 | $ 21,438 |
| Other | 3,292 | 995 |
| Total prepaid expenses and other current assets | $ 39,510 | $ 22,433 |
| | | |
| Other non-current assets | | |
| Equity method investments | $ 2,000 | $ 2,000 |
| Strategic investments | 26,146 | 15,599 |
| Deferred tax assets | 20,807 | 29,274 |
| Deposits | 68,287 | 28,682 |
| Total other non-current assets | $ 117,240 | $ 75,555 |

*Equity method investments*

The Company acquired a 50% interest in Centre Consortium LLC during August 2019. The Company has significant influence over the entity, but does not have power or control. The Company's share of earnings and losses are included in other operating expense in the consolidated statements of operations. The investment did not have material earnings or losses nor was it impaired during the periods presented.

*Strategic investments*

The Company invests in various companies and technologies through Coinbase Ventures, the Company's venture capital arm. The components of other investments accounted for under the measurement alternative included in the table above are presented below (in thousands):

|  | Year Ended December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Carrying amount, beginning of period | $ 15,599 | $ 10,130 |
| Net additions | 9,687 | 5,715 |
| Upward adjustments | 1,307 | 254 |
| Impairments and downward adjustments | (447) | (500) |
| Carrying amount, end of period | $ 26,146 | $ 15,599 |

Upward adjustments and impairments and downward adjustments from remeasurement of investments are included in other income, net in the consolidated statements of operations. As of December 31, 2020, cumulative upward adjustments and impairments and downward adjustments were $1.6 million and $0.5 million, respectively. The net unrealized loss on strategic investments for the year ended December 31, 2020 was $0.3 million.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

**11.   ACCOUNTS PAYABLE AND ACCRUED EXPENSES**

Accounts payable and accrued expenses consisted of the following (in thousands):

| | December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Accounts payable | $ 12,031 | $ 5,940 |
| Accrued expenses | 33,987 | 26,724 |
| Accrued payroll and payroll related | 23,403 | 8,931 |
| Income taxes payable | 5,805 | 2,726 |
| Other payables | 9,885 | 1,132 |
| Total accounts payable and accrued expenses | $ 85,111 | $ 45,453 |

**12.   DERIVATIVES**

*Notional amount of derivative contracts*

The following table summarizes the notional amount of derivative contracts outstanding as of December 31, 2020, in native units:

*Crypto asset borrowings with embedded derivatives*

9,305 BTC
3,000 ETH
1,500,000 XRP

*Warrant to purchase crypto assets*

800,000 UNI

The following table summarizes information on derivative assets and liabilities that are reflected in the Company's consolidated balance sheets as of December 31, 2020, by accounting designation (in thousands):

| | Gross derivative assets | | | | Gross derivative liabilities | | | |
| --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Not designated as hedges | Designated as hedges | Total derivative assets | Net derivative assets | Not designated as hedges | Designated as hedges | Total derivative liabilities | Net derivative liabilities |
| Crypto borrowings with embedded derivatives | $ — | $ — | $ — | $ — | $ 12,696 | $ 114,395 | $ 127,091 | $ 127,091 |
| Warrant to purchase crypto assets | 2,575 | — | 2,575 | 2,575 | — | — | — | — |
| Total fair value of derivative assets and liabilities | $ 2,575 | $ — | $ 2,575 | $ 2,575 | $ 12,696 | $ 114,395 | $ 127,091 | $ 127,091 |

*Fair value hedge gains and losses*

The Company includes gains (losses) on the hedging derivative and the hedged item in other operating expenses within the consolidated statements of operations. The following table presents derivative instruments used in fair value hedge accounting relationships, as well as pre-tax gains (losses) recorded on such derivatives and the related hedged items for the year ended December 31, 2020 (in thousands):

| | Gains (losses) recorded in income | | |
| --- | --- | --- | --- |
| | Derivatives | Hedged items | Income statement impact |
| Crypto borrowings with embedded derivatives | $ (114,395) | $ 113,102 | $ (1,293) |

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

As of December 31, 2020, the following amounts were recorded in the consolidated balance sheets related to certain cumulative fair value hedge basis adjustments that are expected to reverse through the consolidated statements of operations in future periods as an adjustment to other operating expense (in thousands):

| | | Cumulative amount of fair value hedging adjustments included in the carrying amount of hedged items | | |
|---|---|---|---|---|
| | Carrying amount of the hedged items | Active hedging relationships | Discontinued hedging relationships | Total |
| Assets | $ 247,735 | $ 113,102 | $ — | $ 113,102 |
| Liabilities | — | — | — | — |

*Crypto asset borrowings*

The carrying value of the outstanding host contract as of December 31, 2020 was $144.2 million and the fair value of the embedded derivative liabilities as of December 31, 2020 was $127.1 million. The fee on these borrowings ranged from 1.7% to 10%. During the year ended December 31, 2020, the Company paid $1.6 million of borrowing fees in crypto assets. The Company had no crypto borrowings as of December 31, 2019.

## 13.  FAIR VALUE MEASUREMENTS

The following table sets forth by level, within the fair value hierarchy, the Company's assets and liabilities measured and recorded at fair value on a recurring basis (in thousands):

| | December 31, 2020 | | | | December 31, 2019 | | | |
|---|---|---|---|---|---|---|---|---|
| | Level 1 | Level 2 | Level 3 | Total | Level 1 | Level 2 | Level 3 | Total |
| **Assets** | | | | | | | | |
| Cash and cash equivalents[1] | $ 212,818 | $ — | $ — | $ 212,818 | $ 418,604 | $ — | $ — | $ 418,604 |
| Customer custodial funds[2] | 1,171,274 | — | — | 1,171,274 | 669,581 | — | — | 669,581 |
| Crypto assets held[3] | — | 247,735 | — | 247,735 | — | — | — | — |
| Derivative asset | — | — | 2,575 | 2,575 | — | — | — | — |
| Total assets | $ 1,384,092 | $ 247,735 | $ 2,575 | $ 1,634,402 | $ 1,088,185 | $ — | $ — | $ 1,088,185 |
| | | | | | | | | |
| **Liabilities** | | | | | | | | |
| Contingent consideration | $ — | $ — | $ — | $ — | $ — | $ — | 12,924 | $ 12,924 |
| Crypto asset borrowings | — | 127,091 | — | 127,091 | — | — | — | — |
| Total liabilities | $ — | $ 127,091 | $ — | $ 127,091 | $ — | $ — | $ 12,924 | $ 12,924 |

(1)  Excludes corporate cash of $849.0 million and $130.3 million held in deposit at financial institutions and crypto asset trading venues and not measured and recorded at fair value as of December 31, 2020 and December 31, 2019, respectively.
(2)  Excludes customer custodial funds of $2,592.1 million and $531.8 million held in deposit at financial institutions and not measured and recorded at fair value as of December 31, 2020 and December 31, 2019, respectively.
(3)  Includes crypto assets held that have been designated as hedged items in fair value hedges and excludes crypto assets of $68.4 million and $33.9 million held at cost as of December 31, 2020 and December 31, 2019, respectively.

The Company did not make any transfers between the levels of the fair value hierarchy during the years ended December 31, 2020 and December 31, 2019.

*Derivative asset*

The following table presents a reconciliation of the derivative asset measured at fair value on a recurring basis using significant unobservable inputs (Level 3) (in thousands):

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

| | | |
|---|---|---:|
| Balance as of January 1, 2020 | $ | — |
| Fair value adjustment | | 2,575 |
| Balance as of December 31, 2020 | $ | 2,575 |

The derivative asset balance is included in prepaid expenses and other current assets in the consolidated balance sheets. The derivative asset is solely represented by a warrant agreement to purchase crypto assets from an asset issuer. Upon exercise of the warrant, the underlying crypto assets are subject to transfer and sale restrictions and vest over four years. The fair value of the warrant was based on the number of crypto assets to be received upon exercise, the fair value of the crypto asset, and a discount for lack of marketability due to the underlying restriction on the crypto assets. The discount for lack of marketability was estimated using the Finnerty and Asian put option models. The fair value adjustments are included in other operating expense in the consolidated statements of operations. The following significant unobservable inputs were used:

| | December 31, 2020 |
|---|---:|
| Discount rate | 7% - 12% |
| Historical volatility of comparable crypto assets | 90% - 125% |

*Contingent consideration*

The following table presents a reconciliation of the contingent consideration measured at fair value on a recurring basis using significant unobservable inputs (Level 3) (in thousands):

| | | |
|---|---|---:|
| Balance as of January 1, 2020 | $ | 12,924 |
| Fair value adjustment | | 3,281 |
| Settlement | | (16,205) |
| Balance as of December 31, 2020 | $ | — |

The contingent consideration balance is included in other current liabilities in the consolidated balance sheets. The fair value of the contingent consideration given in the acquisition of the Xapo intangible assets was based on the number of shares of Class A common stock that were expected to be issued and the fair value of the common stock of the Company. The fair value adjustments are included in general and administrative expense in the consolidated statements of operations. The following significant unobservable inputs were used:

| | December 31, 2019 |
|---|---:|
| Discount rate | 17.5 % |
| Long-term growth rate | 3.0 % |
| Revenue growth rate | 3% - 61% |

The contingent consideration was settled on August 27, 2020, with the Company issuing 690,756 shares of Class A common stock.

*Assets and liabilities measured and recorded at fair value on a non-recurring basis*

The Company's non-financial assets, such as goodwill, intangible assets, property and equipment, and crypto assets held but not designated in hedging relationships are adjusted to fair value when an impairment charge is recognized. Such fair value measurements are based predominately on Level 3 inputs. Fair value of crypto assets held are predominantly based on Level 2 inputs.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

*Financial assets and liabilities not measured and recorded at fair value*

The Company's financial instruments, including cash, restricted cash, certain customer custodial funds, USDC, and custodial funds due to customers are classified as Level 1 and carried at amortized cost, which approximates their fair value.

## 14. CONVERTIBLE PREFERRED STOCK

A summary of the Company's authorized, issued, and outstanding shares of convertible preferred stock was as follows (in thousands, except per share data):

| | As of December 31, 2020 | | | | |
| | Shares Authorized | Shares Issued and Outstanding | Original Issue Price per Share | Liquidation Preference | Carrying Value |
|---|---|---|---|---|---|
| FF Preferred | 5,739 | 5,739 | $ — | $ — | $ 11 |
| Series A | 30,929 | 27,349 | 0.19721 | 5,394 | 4,946 |
| Series B | 25,416 | 21,831 | 1.00676 | 21,978 | 19,228 |
| Series C | 32,542 | 31,656 | 2.76488 | 87,525 | 83,146 |
| Series D | 17,471 | 17,471 | 8.25390 | 144,205 | 135,738 |
| Series E | 14,508 | 8,832 | 36.19220 | 319,648 | 319,398 |
| | 126,605 | 112,878 | | $ 578,750 | $ 562,467 |

| | As of December 31, 2019 | | | | |
| | Shares Authorized | Shares Issued and Outstanding | Original Issue Price per Share | Liquidation Preference | Carrying Value |
|---|---|---|---|---|---|
| FF Preferred | 5,739 | 5,739 | $ — | $ — | $ 11 |
| Series A | 30,929 | 28,312 | 0.19721 | 5,584 | 5,136 |
| Series B | 25,416 | 22,429 | 1.00676 | 22,580 | 19,829 |
| Series C | 32,542 | 32,176 | 2.76488 | 88,964 | 84,585 |
| Series D | 17,471 | 17,471 | 8.25390 | 144,205 | 135,738 |
| Series E | 14,508 | 8,832 | 36.19220 | 319,648 | 319,398 |
| | 126,605 | 114,959 | | $ 580,981 | $ 564,697 |

Since inception, the Company has incurred share issuance costs totaling approximately $0.8 million, which has been applied to reduce total proceeds.

The change in the number of outstanding shares of convertible preferred stock per class was as follows (in thousands):

| | Series FF | Series A | Series B | Series C | Series D | Series E |
|---|---|---|---|---|---|---|
| Balance at January 1, 2019 | 5,739 | 30,929 | 25,416 | 32,542 | 17,471 | 8,832 |
| Conversion to Class A common stock | — | (2,617) | (2,987) | (366) | — | — |
| Balance at December 31, 2019 | 5,739 | 28,312 | 22,429 | 32,176 | 17,471 | 8,832 |
| Conversion to Class A common stock | — | (963) | (598) | (520) | — | — |
| Balance at December 31, 2020 | 5,739 | 27,349 | 21,831 | 31,656 | 17,471 | 8,832 |

During the years ended December 31, 2020 and December 31, 2019, there were sales of convertible preferred stock between shareholders. Pursuant to the terms of the convertible preferred stock, those

F-36

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

preferred shares converted to Class A common stock. The Company did not sell any shares or receive any proceeds from the transactions.

The holders of FF Preferred and Series A, Series B, Series C, Series D, and Series E convertible preferred stock have certain rights, preferences and privileges as follows:

*Voting rights*

The holders of FF Preferred and Series A, Series B, Series C, Series D, and Series E convertible preferred stock are subject to the Company's amended and restated voting agreement and are entitled to the number of votes equal to the voting power of the number of shares of common stock into which their shares of convertible preferred stock can be directly converted with FF Preferred and Series A, Series B, Series C, and Series D convertible preferred stock converting into Class B common stock entitled to ten votes per share and Series E convertible preferred stock converting into Class A common stock entitled to one vote per share. The holders of Series A convertible preferred stock have a right to elect one member of the Board of Directors and holders of Series C convertible preferred stock have a right to elect one member of the Board of Directors.

*Dividends*

The holders of Series A, Series B, Series C, Series D, and Series E convertible preferred stock, prior and in preference to holders of FF Preferred, Class A common stock, or Class B common stock, are entitled to receive dividends on a pari passu basis at the rate of 6% of the respective original issue price per annum on each outstanding share.

The dividends are non-cumulative and are payable when, as and if declared by the Board of Directors. After payment of such dividends to holders of Series A, Series B, Series C, Series D, and Series E convertible preferred stock, any additional dividends shall be distributed to holders of all classes of stock on a pro rata basis, based on the number of shares of Class A common stock and Class B common stock held by each holder (assuming conversion of all shares of convertible preferred stock into shares of common stock). As of December 31, 2020, no dividends have been declared or paid.

*Liquidation rights*

In the event of any liquidation event of the Company (a voluntary or involuntary liquidation, a merger where the holders of common stock and convertible preferred stock own less than a majority of the resulting voting power of the surviving entity, or a sale of substantially all the assets of the Company), before any distribution or payment shall be made to the holders of FF Preferred, Class A common stock, or Class B common stock, the holders of Series A, Series B, Series C, Series D, and Series E convertible preferred stock shall be entitled to receive out of the assets legally available for distribution, liquidating distributions in the amount of the greater of (a) the original per share purchase prices of $0.19721 for Series A convertible preferred stock, $1.00676 for Series B convertible preferred stock, $2.76488 for Series C convertible preferred stock, $8.2539 for Series D convertible preferred stock, and $36.1922 for Series E convertible preferred stock, plus all declared but unpaid dividends or (b) an amount per share as would have been payable had each share of convertible preferred stock converted into Class A common stock or Class B common stock, as applicable, immediately prior to the liquidation event.

If liquidation proceeds are insufficient to permit payment to the stockholders of convertible preferred stock of their preferential amount, then all liquidation proceeds shall be distributed with equal priority, on a pro-rata basis, among the holders of FF the Series A, Series B, Series C, Series D, and Series E convertible preferred stock in proportion to their liquidation preference. After payment of all preferential amounts required to be paid to the holders of Series A, Series B, Series C, Series D, and Series E convertible preferred stock, the remaining assets available for distribution shall be distributed among the holders of FF Preferred, the Class A common stock, and Class B common stock on a pro-rata basis, based on the number of shares held by each holder.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

As the shares of convertible preferred stock contain liquidation features that are not solely within the Company's control, these liquidation features result in the Series FF, Series A, Series B, Series C, Series D, and Series E convertible preferred stock to be classified as mezzanine equity rather than as a component of stockholders' equity.

*Conversion*

Each share of FF Preferred is convertible, at the option of the holder, at any time after the date of issuance according to a conversion ratio, initially $1.00, subject to adjustments for stock splits, stock dividends, and dilution.

If a share of FF Preferred is purchased by an investor in connection with an equity financing, each such share of stock transferred to the investor shall automatically convert into shares of a subsequent series of convertible preferred stock. If a transfer of shares is neither made in connection with an equity financing or authorized by a majority of the Board of Directors, the FF Preferred shall automatically convert into such number of shares of Class B common stock.

In the event the Company at any time after the original issue date of Series A, Series B, Series C, Series D, and Series E convertible preferred stock issues additional shares of capital stock without consideration or for consideration per share less than the Series A conversion price, Series B conversion price, Series C conversion price, Series D conversion price, or Series E conversion price, as applicable, then the conversion price of the above mentioned convertible preferred stock will be adjusted (subject to certain customary exceptions).

Each share of FF Preferred and Series A, Series B, Series C, and Series D convertible preferred stock automatically converts into that number of shares of Class B common stock and each share of Series E convertible preferred stock automatically converts into that number of shares of Class A common stock determined in accordance with the conversion ratio on the earlier of (i) the closing of an underwritten public offering of Class A common stock under the Securities Act of 1933, as amended (the "Securities Act"), in which the Company receives at least $100 million in aggregate net proceeds or (ii) (a) with respect to Series A, Series B, Series C, Series D, and Series E convertible preferred stock, the written request from the holders of at least a majority of the then outstanding shares of convertible preferred stock, each voting exclusively and as a separate class and voting together as a single class on an as-converted basis and (b) with respect to FF Preferred, the written request from the holders of at least a majority of the then outstanding shares of FF Preferred, voting exclusively and as a separate class.

*Redemption*

No shares of convertible preferred stock are unilaterally redeemable by either the stockholders or the Company. The Company's Amended and Restated Certificate of Incorporation provides that upon a liquidation event, the holders of convertible preferred stock shall be entitled to receive the original issue price plus declared but unpaid dividends.

## 15.   COMMON STOCK

*Stock split*

In May 2019, the Company effected a stock split, whereby each outstanding share of common stock and convertible preferred stock was split into six shares. The number of authorized shares were also increased to account for the additional outstanding shares. The strike price and number of options, of awards granted and outstanding under the 2013 Plan (as defined below) at the date of the split, were proportionately adjusted to offset the dilution caused by the stock split. The number of shares and amounts per share reported in the Company's consolidated financial statements and notes have been retrospectively updated to reflect the impact of the stock split.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

*Stock repurchases*

On December 14, 2018, the Board of Directors approved a tender offer whereby the Company offered to purchase Class A common stock, Class B common stock and vested and exercisable stock options ("Tender Offer Stocks"). The Company offered to purchase the Tender Offer Stocks at a price of $32.57 per share. This price was in excess of the fair value of the common stock. The offer to purchase expired on January 18, 2019. At completion of the tender offer, the Company purchased 1,187,784 Tender Offer Stocks (comprising 212,130 shares of Class A common stock and Class B common stock and 975,654 shares subject to stock options) for a total cash purchase price of $37.9 million.

The purchase consideration was allocated as follows (in thousands):

| | | |
|---|---|---|
| Compensation expense | $ | 17,616 |
| APIC | | 1,128 |
| Retained earnings | | 19,117 |
| Total purchase consideration | $ | 37,861 |

*Common stock*

Effective October 1, 2018, the Company implemented a dual class voting structure pursuant to which it authorized the issuance of Class A common stock and Class B common stock. The Class B common stock has ten votes per share and the Class A common stock has one vote per share. The common stock outstanding prior to the implementation of the dual class voting structure was reclassified into Class B common stock. Generally, any subsequent sale or transfer of Class B common stock will result in the automatic conversion of such Class B common stock into Class A common stock (subject to certain customary exceptions). Generally, any subsequent sale or transfer of convertible preferred stock that is convertible into Class B common stock will result in convertible preferred stock becoming convertible into Class A common stock (subject to certain customary exceptions). The holders of shares of Class A common stock and Class B common stock, voting as a separate class, have a right to elect two members of the Board of Directors. Furthermore, holders of Class A common stock and Class B common stock, voting together with holders of convertible preferred stock (other than Series E convertible preferred stock) and Series FF preferred stock on an as-converted to common stock basis, shall be entitled to fill any remaining vacancies on the Board of Directors.

As of December 31, 2020, the Company is authorized to issue up to 476,053,936 shares of common stock with par value of $0.00001 per share, consisting of 267,640,000 shares of Class A common stock and 208,413,936 shares of Class B common stock. Holders of the Company's common stock are entitled to dividends if and when declared by the Board of Directors.

In June 2014, the Company issued a warrant to a financial institution in connection with a banking agreement to purchase 407,928 shares of Class B common stock at an exercise price of $1.0068 per share. The warrant is immediately exercisable and expires on June 24, 2024. The warrant was fully expensed at December 31, 2015 and was still outstanding at December 31, 2020.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

The Company has reserved shares of Class A common stock and Class B common stock for issuance for the following purposes (in thousands):

|  | December 31, | |
|---|---|---|
|  | **2020** | **2019** |
| **Class A common stock** | | |
| Conversion of Series E convertible preferred stock | 8,832 | 8,832 |
| Options issued and outstanding under 2013 Plan | 3,550 | 4,559 |
| Options issued and outstanding under 2019 Plan | 37,232 | 7,745 |
| RSUs issued and outstanding under 2019 Plan | 3,766 | — |
| Shares available for future issuance under the 2019 Plan | 2,193 | 9,457 |
| Replacement options issued and outstanding from Tagomi acquisition | 32 | — |
| Exercise and conversion of outstanding warrant | 4 | — |
| Shares available for future issuance of warrants | 2,296 | — |
| Total Class A common stock shares reserved | 57,905 | 30,593 |
| **Class B common stock** | | |
| Conversion of FF Preferred and Series A, B, C, and D convertible preferred stock | 104,046 | 106,127 |
| Options issued and outstanding under 2013 Plan | 22,442 | 25,454 |
| Exercise and conversion of outstanding warrant | 408 | 408 |
| Total Class B common stock shares reserved | 126,896 | 131,989 |

## 16.  STOCK-BASED COMPENSATION

*Stock plans*

The Company maintains two equity incentive plans: the 2013 Stock Plan (the "2013 Plan") and the 2019 Equity Incentive Plan (the "2019 Plan" and collectively, the "Plans"). The 2019 Plan serves as the successor to the 2013 Plan. The 2019 Plan became effective on July 17, 2019. Outstanding awards under the 2013 Plan continue to be subject to the terms and conditions of the 2013 Plan. Effective July 17, 2019, no additional awards will be granted under the 2013 Plan. The 2013 Plan provides for the granting of stock options and restricted stock, while the 2019 Plan provides for the granting of stock options, restricted stock, restricted stock units, and stock appreciation rights. As of December 31, 2020, only stock options and restricted stock units ("RSUs") were issued and outstanding under the Plans.

*Stock options*

Options granted under the Plans may be either incentive stock options ("ISOs") or nonqualified stock options ("NSOs"). ISOs may be granted only to Company employees (including officers and directors who are also employees). NSOs may be granted to Company employees and non-employees.

Options under the Plans may be granted for contractual periods of up to ten years and at prices determined by the Board of Directors, provided, however, that the exercise price of an ISO and NSO shall not be less than 100% of the estimated fair value of the underlying shares on the date of the grant (110% if granted to a stockholder who owns more than ten percent of the total combined voting power of all classes of stock of the Company or any parent or subsidiary). Shares of common stock purchased under the Plans are subject to certain restrictions and repurchase rights, including the right of first refusal by the Company for sale or transfer of new shares to outside parties and other restrictions on transfers and secondary market transactions.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

To date, options granted to new employees of the Company generally vest over four years and vest at a rate of 25% upon the first anniversary of the issuance date and 1/48 per month thereafter. Refresher options granted to existing employees of the Company generally vest over four years and vest at a rate of 1/48 per month. The Plans allows for a seven year exercise window post-termination for employees of the Company who have provided at least two years of continuous service to the Company as of their termination date.

Activity of options outstanding under the Plan are as follows (in thousands, except per share and years data):

| | Options Outstanding | Weighted Average Exercise Price per Share | Weighted Average Remaining Contractual Life (Years) | Aggregate Intrinsic Value |
|---|---|---|---|---|
| Balance at January 1, 2019 | 36,214 | $ 3.90 | 8.43 | $ 501,335 |
| Granted | 15,548 | 18.27 | | |
| Exercised | (1,965) | 2.78 | | |
| Forfeited and cancelled | (12,039) | 8.64 | | |
| Balance at December 31, 2019 | 37,758 | 8.36 | 8.03 | 390,676 |
| Granted | 32,201 | 22.14 | | |
| Exercised | (2,042) | 10.10 | | |
| Forfeited and cancelled | (4,661) | 14.85 | | |
| Balance at December 31, 2020 | 63,256 | 14.84 | 8.17 | 2,527,396 |
| Vested and exercisable at December 31, 2020 | 25,504 | 6.41 | 6.63 | 1,234,159 |
| Vested and expected to vest at December 31, 2020 | 53,961 | 13.36 | 7.92 | 2,236,125 |

During the year ended December 31, 2020, the Company granted stock options to purchase 32,200,586 shares of Class A common stock, with a weighted-average grant date fair value of $7.85 per share. During the year ended December 31, 2019, the Company granted stock options to purchase 15,548,132 shares of Class A common stock, with a weighted-average grant date fair value of $7.04 per share.

During the years ended December 31, 2020 and December 31, 2019, the Company recognized $58.9 million and $51.8 million of employee stock-based compensation expense related to stock options, respectively. A total of $3.0 million and $2.6 million of stock-based compensation was included in capitalized software for the years ended December 31, 2020 and December 31, 2019, respectively.

As of December 31, 2020, there was total unrecognized compensation cost of $259.4 million related to unvested stock options. These costs are expected to be recognized over a weighted-average period of approximately 4.12 years.

The intrinsic value is calculated as the difference between the exercise price of the underlying stock option award and the estimated fair value of the Company's common stock. The aggregate intrinsic value of stock options exercised during the years ended December 31, 2020 and December 31, 2019 was $38.3 million and $30.0 million, respectively.

During the year ended December 31, 2020, 7,936,075 stock options vested with a weighted-average grant date fair value of $5.47 per share. During the year ended December 31, 2019, 8,973,267 stock options vested with a weighted-average grant date fair value of $3.43 per share.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

The assumptions used under the Black-Scholes-Merton option pricing model and the weighted average calculated value of the options granted to employees were as follows:

|  | Year Ended December 31, | |
|---|---|---|
|  | 2020 | 2019 |
| Dividend yield | 0 % | 0 % |
| Expected volatility | 41.1 % | 36.8 % |
| Expected term (in years) | 6.0 | 5.9 |
| Risk-free interest rate | 0.6 % | 2.0 % |

*Early exercise of stock options*

Stock options granted under the Plans provide employee option holders the right to exercise unvested options of restricted common stock, which is subject to a repurchase right held by the Company at the original purchase price in the event the optionee's employment is terminated either voluntarily or involuntarily prior to vesting of the exercised stock. Early exercises of options are not deemed to be substantive exercises for accounting purposes and accordingly, amounts received for early exercises are recorded as a liability. These repurchase terms are considered to be a forfeiture provision and do not result in variable accounting. As of December 31, 2020, there were 263,761 shares subject to repurchase related to stock options early exercised and not yet vested, but that are expected to vest. These amounts are reclassified to common stock and additional paid in capital as the underlying shares vest. As of December 31, 2020, the Company recorded a liability related to these shares subject to repurchase in the amount of $4.6 million, which is included within accounts payable and accrued expenses in the accompanying consolidated balance sheets.

*CEO performance award*

On August 11, 2020, the Company granted its Chief Executive Officer an option award to purchase up to 9,293,911 shares of the Class A common stock of the Company, at an exercise price of $23.46 per share. Vesting of the award is dependent on both performance-based and market-based conditions being met.

The performance condition is contingent on the Company's registration statement being declared effective by the Securities and Exchange Commission under the Securities Act. The occurrence of this event was considered to not be probable until such time that it occurs. The market condition is contingent on the Company's Class A common stock price achieving stock price target milestones.

The total grant date fair value of this award was $56.7 million. The Company determined the fair value of the option using a Monte Carlo simulation model (a binomial lattice-based valuation model). The Monte Carlo simulation model uses multiple input variables to determine the probability of satisfying the market condition requirements. The fair value of the option is not subject to change based on future market conditions. The fair value of the option will be recognized as compensation expense over the requisite service period, using the accelerated attribution method, once the performance condition becomes probable of being achieved. Once the performance condition is met, the compensation expense will be recognized over the requisite service period, regardless of whether, and the extent to which, the market condition is ultimately satisfied.

*Restricted stock units*

During December 2020, the Company began issuing RSUs. These RSUs vest upon the satisfaction of a service-based condition. In general, the Company's RSUs vest over a service period of four years. Once vested, the RSUs are settled by delivery of common stock of the Company.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

Activity of RSUs outstanding under the Plan are as follows (in thousands, except per share data):

| | Number of shares | Weighted-Average Grant Date Fair Value Per Share |
|---|---|---|
| Balance at January 1, 2020 | — | — |
| Granted | 3,766 | 54.80 |
| Vested | — | — |
| Forfeited and cancelled | — | — |
| Balance at December 31, 2020 | 3,766 | 54.80 |

The Board of Directors granted the RSUs based on the fair value of the Company's common stock of $32.94 as of November 30, 2020, because the Board of Directors was not aware of any events, or series of events, which would have clearly resulted in an increase in the fair value. However, due to higher than forecasted revenue during December 2020 and an increase in forecasted revenue utilized in the valuation approaches, the fair value of the Company's common stock as of December 31, 2020 increased to $54.80, which was used for financial reporting purposes. The Company determined the use of that valuation to be reasonable, given its close proximity to the grant date.

The Company recognized $10.4 million of stock-based compensation expense related to these RSUs for the year ended December 31, 2020. As of December 31, 2020, there was total unrecognized compensation cost of $196.0 million related to unvested RSUs. These costs are expected to be recognized over a weighted-average period of approximately 3.67 years.

Included in the total RSUs granted during 2020 was 181,000 RSUs granted to Kathryn Haun, a member of the Company's Board of Directors and general partner at Andreessen Horowitz, a related party. The RSUs were granted during December 2020 and will become fully vested on January 1, 2021. There are no other vesting conditions nor are there any conditions that would result in forfeiture of the award. The Company recognized $9.9 million of stock based compensation expense related to this award during the year ended December 31, 2020.

*Restricted common stock*

As part of the acquisition of Tagomi, the Company issued 823,629 shares of restricted common stock on July 31, 2020, with a weighted-average grant date fair value per share of $23.46. Vesting of this restricted common stock is dependent on a service-based vesting condition that is satisfied over three years. The Company has the right to repurchase shares at par value for which the vesting condition is not satisfied. As of December 31, 2020, all of the restricted common stock remained outstanding and were unvested. The Company recognized $3.3 million of stock based compensation expense related to the restricted common stock for the year ended December 31, 2020.

*Stock-based compensation expense*

Stock based compensation is included in the following components of expenses on the accompanying consolidated statements of operations (in thousands):

| | Year Ended December 31, | |
|---|---|---|
| | **2020** | **2019** |
| Technology and development | $ 36,869 | 25,220 |
| Sales and marketing | 1,566 | 970 |
| General and administrative | 34,190 | 24,699 |
| Restructuring | — | 994 |
| Total | $ 72,625 | $ 51,883 |

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

17.  **INCOME TAXES**

Income (loss) before benefit from income taxes was attributable to the following regions (in thousands):

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Domestic | $ 396,709 | $ (55,383) |
| Foreign | 12,490 | 9,967 |
|  | $ 409,199 | $ (45,416) |

Provision (benefit) from income taxes consisted of the following (in thousands):

|  | Year Ended December 31, | |
|  | 2020 | 2019 |
|---|---|---|
| Current | | |
| Federal | $ 65,269 | $ 2,053 |
| State | 18,162 | (639) |
| Foreign | 2,977 | 4,277 |
| Total current | 86,408 | 5,691 |
| Deferred | | |
| Federal | 1,373 | (15,519) |
| State | (514) | (5,496) |
| Foreign | (385) | 295 |
| Total deferred | 474 | (20,720) |
| Total provision for income taxes | $ 86,882 | $ (15,029) |

F-44

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

The effective income tax rate differs from the statutory federal income tax rate as follows:

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Provision for income taxes at U.S. statutory rate | 21.00 % | 21.00 % |
| State income taxes, net of federal benefit | 3.39 | 10.58 |
| Foreign rate differential | (0.24) | (3.52) |
| Non-deductible compensation | 0.99 | (2.20) |
| Equity compensation | 0.27 | 2.31 |
| Prior year true-ups (state and federal) | (0.11) | 1.51 |
| Research and development credits | (1.86) | 15.63 |
| Foreign tax credit | (0.05) | 2.75 |
| Subpart F income | 0.09 | (1.95) |
| Foreign Derived Intangible Income (FDII) | (1.50) | — |
| Global Intangible Low Taxed Income (GILTI) | 0.06 | (1.15) |
| Uncertain tax positions | 0.46 | (8.26) |
| CARES Act - NOL Carryback | (1.20) | — |
| Other | (0.07) | (3.61) |
| | 21.23 % | 33.09 % |

Deferred income taxes reflect the net tax effects of temporary differences between the carrying amounts of assets and liabilities for financial reporting purposes and the amounts used for income tax purposes.

Significant components of the Company's deferred tax assets and liabilities consisted of the following (in thousands):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Deferred tax assets | | |
| Accruals and reserves | $ 1,943 | $ 4,658 |
| Net operating loss carryforward | 6,322 | 938 |
| Lease liability | 29,845 | 35,603 |
| Interest carryforward | 1,047 | 799 |
| Tax credits | 4,584 | 13,559 |
| Stock-based compensation | 18,726 | 7,762 |
| Intangibles | 4,563 | 3,063 |
| Book crypto asset impairment | 1,275 | 1,204 |
| Other | 1,045 | 3,023 |
| Gross deferred tax assets | 69,350 | 70,609 |
| Less valuation allowance | (5,174) | (2,679) |
| Total deferred tax assets | 64,176 | 67,930 |

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

| | | | | |
|---|---|---|---|---|
| Deferred tax liabilities | | | | |
| State taxes | | (798) | | (1,671) |
| Depreciation and amortization | | (11,391) | | (1,436) |
| Prepaid expenses | | (3,179) | | (1,850) |
| Right of use asset | | (28,001) | | (33,699) |
| Total deferred tax liabilities | | (43,369) | | (38,656) |
| Total net deferred tax assets | $ | 20,807 | $ | 29,274 |

A valuation allowance of $5.2 million and $2.7 million was recorded against the Company's net deferred tax asset balance as of December 31, 2020 and December 31, 2019, respectively. As of each reporting date, management considers new evidence, both positive and negative, that could affect its view of the future realization of deferred tax assets. On the basis of this evaluation, only the portion of the deferred tax asset that is more likely than not to be realized was recognized. The valuation allowance included allowances primarily related to U.S. Federal net operating loss carryforwards from an acquired entity, net operating loss carryforwards in Japan, and capital loss carryforwards in Ireland.

As of December 31, 2020, the Company had California research and development credits of $4.6 million. The California credits carry forward indefinitely. The Company had $24.5 million of U.S. Federal net operating loss carryforwards, of which $5.5 million have a valuation allowance. The U.S. Federal net operating losses carryforward indefinitely. Additionally, the Company had acquired U.S. State net operating losses of $13.0 million, which have a full valuation allowance. Generally, the State net operating losses have 20 year carryforwards. The Company also had net operating loss carryforwards in Japan of $3.8 million as of December 31, 2020 which begin expiring in 2027, all of which have a full valuation allowance.

Activity related to the Company's unrecognized tax benefits consisted of the following (in thousands):

| | | Year Ended December 31, | | |
|---|---|---|---|---|
| | | 2020 | | 2019 |
| Balance, beginning of year | $ | 10,344 | $ | 6,605 |
| Increase related to tax positions taken during a prior year | | 212 | | 13 |
| Decreases related to tax positions taken during a prior year | | (882) | | (77) |
| Increases related to tax positions taken during the current year | | 3,133 | | 3,803 |
| Balance, end of year | $ | 12,807 | $ | 10,344 |

As of December 31, 2020 and December 31, 2019, the Company had $12.8 million and $10.3 million of unrecognized tax benefits, of which $12.3 million and $9.8 million would reduce income tax expense and the effective tax rate, if recognized. The Company is currently unaware of any uncertain tax positions that could result in significant additional payments, accruals, or other material deviation in this estimate over the next twelve months. The Company accounts for interest and penalties related to exposures as a component of income tax expense. The Company had approximately $0.6 million and $0.4 million and $0.3 million and $0.3 million of accrued interest and penalties for the years ended December 31, 2020 and December 31, 2019, respectively.

The Company files U.S. Federal, state, and foreign income tax returns in jurisdictions with varying statutes of limitations. Currently these statutes of limitations are open from 2017 forward for the U.S., 2016 forward for various U.S. states, 2016 forward for the United Kingdom, 2019 forward for Ireland and Italy, and generally 2017 forward for other jurisdictions. The Company's tax return is currently under audit by the U.S. Internal Revenue Service ("IRS") for 2017 and 2018.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

18.   **NET INCOME (LOSS) PER SHARE**

The computation of net income (loss) per share is as follows (in thousands, except per share amounts):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| **Basic net income (loss) per share:** | | |
| Numerator | | |
| Net income (loss) | $ 322,317 | $ (30,387) |
| Less: Income allocated to participating securities | (214,061) | — |
| Net income (loss) attributable to common stockholders, basic | $ 108,256 | $ (30,387) |
| Denominator | | |
| Weighted-average shares of common stock used to compute net income (loss) per share attributable to common stockholders, basic | 68,671 | 61,317 |
| Net income (loss) per share attributable to common stockholders, basic | $ 1.58 | $ (0.50) |
| | | |
| **Diluted net income (loss) per share:** | | |
| Numerator | | |
| Net income (loss) | $ 322,317 | $ (30,387) |
| Less: Income allocated to participating securities | (194,846) | — |
| Net income (loss) attributable to common stockholders - diluted | $ 127,471 | $ (30,387) |
| Denominator | | |
| Weighted-average shares of common stock used to compute net income (loss) per share attributable to common stockholders, basic | 68,671 | 61,317 |
| Weighted-average effect of potentially dilutive securities: | | |
| Stock options | 22,146 | — |
| Warrants | 392 | — |
| Weighted-average shares of common stock used to compute net income (loss) per share attributable to common stockholders, diluted | 91,209 | 61,317 |
| Net income (loss) per share attributable to common stockholders, diluted | $ 1.40 | $ (0.50) |

The rights, including the liquidation and dividend rights, of the holders of Class A and Class B common stock are identical, except with respect to voting. As the liquidation and dividend rights are identical for Class A and Class B common stock, the undistributed earnings are allocated on a proportionate basis and the resulting income (loss) per share will, therefore, be the same for both Class A and Class B common stock on an individual or combined basis.

The following potentially dilutive shares were not included in the calculation of diluted shares outstanding as the effect would have been anti-dilutive (in thousands):

| | Year Ended December 31, | |
| --- | --- | --- |
| | 2020 | 2019 |
| Employee stock options | 12,831 | 37,758 |
| RSUs | 3,766 | — |
| Warrants | — | 408 |
| Contingent consideration recognized in asset acquisition | — | 691 |
| Convertible preferred stock | — | 114,959 |
| Total | 16,597 | 153,816 |

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

*Unaudited pro forma net income per share*

The following table presents the calculation of unaudited pro forma basic and diluted net income per share (in thousands, except per share amounts):

| | | Year Ended December 31, 2020 |
|---|---|---:|
| Numerator | | |
| Net income attributable to common stockholders, basic and diluted | $ | 322,317 |
| Denominator | | |
| Weighted-average shares of common stock used to compute net income per share attributable to common stockholders, basic | | 68,671 |
| Assumed conversion of convertible preferred stock | | 114,274 |
| Pro forma weighted-average shares of common stock used to compute pro forma net income per share attributable to common stockholders, basic | | 182,945 |
| Assumed exercise of stock options | | 22,146 |
| Assumed exercise of warrants | | 392 |
| Assumed vesting of RSA | | 92 |
| Pro forma weighted-average shares of common stock used to compute pro forma net income per share attributable to common stockholders, diluted | | 205,575 |
| Pro forma net income per share attributable to common stockholders: | | |
| Basic | $ | 1.76 |
| Diluted | $ | 1.57 |

## 19.   COMMITMENTS AND CONTINGENCIES

*Crypto asset wallets*

The Company has committed to securely store all crypto assets it holds on behalf of users. As such, the Company may be liable to its users for losses arising from theft or loss of user private keys. The Company has no reason to believe it will incur any expense associated with such potential liability because (i) it has no known or historical experience of claims to use as a basis of measurement, (ii) it accounts for and continually verifies the amount of crypto assets within its control, and (iii) it has established security around custodial private keys to minimize the risk of theft or loss. Since the risk of loss is remote, the Company had not recorded a liability at December 31, 2020 or December 31, 2019.

*Indemnifications*

In the event any registrable securities are included in a registration statement, the Company's Amended and Restated Investors' Rights Agreement entered into with certain of the Company's holders of convertible preferred stock provides indemnity to each stockholder, their partners, members, officers, directors, and stockholders, legal counsel, and accountants; each underwriter, if any; and each person who controls each stockholder or underwriter, against any damages incurred in connection with investigating or defending any claim or proceeding arising as a result of such registration from which damages may result. The Company will reimburse each such party for any legal and any other expenses reasonably incurred, provided that the Company will not be liable in any such case to the extent the damages arise out of or are based upon any actions or omissions made in reliance upon and in conformity with written information furnished by or on behalf of such stockholder or underwriter and stated to be specifically for use therein.

The Company also has indemnity agreements with certain officers and directors of the Company pursuant to which the Company shall indemnify the officer or director against all expenses, judgments, fines, and amounts paid in settlement reasonably incurred in connection with a third party proceeding, if

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

the indemnitee acted in good faith and in a manner reasonably believed to be in or not opposed to the best interests of the Company, and in the case of a criminal proceeding, had no reasonable cause to believe the indemnitee's conduct was unlawful.

It is not possible to determine the maximum potential exposure under these indemnification agreements: (i) because the Company has had no prior indemnification claims; (ii) due to the unique facts and circumstances involved in each particular agreement; and (iii) the requirement for a registration of the Company's securities before any of the indemnification obligations contemplated in the IRA become effective.

The Company has also provided indemnities or similar commitments on standard commercial terms in the ordinary course of business.

*Legal proceedings*

The Company is subject to various litigations, regulatory investigations, and other legal proceedings that arise in the ordinary course of its business. The Company is also subject to regulatory oversight by numerous regulatory and other governmental agencies. The Company reviews its lawsuits, regulatory investigations, and other legal proceedings on an ongoing basis and provides disclosure and records loss contingencies in accordance with the loss contingencies accounting guidance. In accordance with such guidance, the Company establishes accruals for such matters when potential losses become probable and can be reasonably estimated. If the Company determines that a loss is reasonably possible and the loss or range of loss can be estimated, the Company discloses the possible loss in the consolidated financial statements.

In July 2017, the Enforcement Division of the Commodity Futures Trading Commission ("CFTC") commenced an investigation that has covered topics including an 2017 Ethereum market event, trades made in 2017 by one of the Company's then-current employees, the listing of Bitcoin Cash on the Company's platform, and the design and operation of certain algorithmic functions related to liquidity management on the Company's platform. During the course of its investigation, which remains active, the CFTC has issued subpoenas to the Company and certain of the Company's directors, executive officers, and former employees, including testimony subpoenas, and other requests for information. In February 2021, the parties are negotiating a tentative settlement agreement, which is not expected to have a material impact on the consolidated financial statements.

Except for the CFTC matter described above, the Company believes the ultimate resolution of other existing legal and regulatory investigation matters will not have a material adverse effect on the financial condition, results of operations, or cash flows of the Company. However, in light of the uncertainties inherent in these matters, it is possible that the ultimate resolution of one or more of these matters may have a material adverse effect on the Company's results of operations for a particular period, and future changes in circumstances or additional information could result in additional accruals or resolution in excess of established accruals, which could adversely affect the Company's results of operations, potentially materially.

*Tax regulation*

Current promulgated tax rules related to crypto asset are unclear and require significant judgments to be made in interpretation of the law, including but not limited to the areas of income tax, information reporting and the withholding of tax at source. Additional guidance may be issued by the IRS, Department of the Treasury, or other governing bodies that may significantly differ from the Company's interpretation of the law, which could have unforeseen effects on our financial condition and results of operations, and as a result, the related impact on our financial condition and results of operations is not estimable.

**Coinbase Global, Inc.**
**Notes to Consolidated Financial Statements**

**20.   SUBSEQUENT EVENTS**

Management has evaluated subsequent events through February 25, 2021, the date the consolidated financial statements were available for issuance.

*Bison Trails acquisition*

On January 19, 2021, the Company entered into an agreement to acquire all outstanding shares of common stock and stock options of Bison Trails Co. ("Bison Trails"). Bison Trails provides infrastructure services on multiple blockchains, allowing customers to stake crypto assets through this infrastructure. The acquisition was completed on February 8, 2021. The impact of this acquisition was considered immaterial to both the current and prior period of the Company's consolidated financial statements and pro forma financial information has not been provided. The initial accounting for the business combination was incomplete at the time the financial statements were issued. The fair value of the total consideration transferred, as well as the acquired assets and liabilities was still being determined. As such, the disclosure of these amounts could not be made.



   **Through and including                  , 2021 (the 25th day after the listing date of our Class A common stock), all dealers effecting transactions in these securities, whether or not participating in this offering, may be required to deliver a prospectus.**

## PART II

## INFORMATION NOT REQUIRED IN PROSPECTUS

### ITEM 13. OTHER EXPENSES OF ISSUANCE AND DISTRIBUTION.

The following table sets forth all expenses to be paid by the registrant in connection with this registration statement and the listing of its Class A common stock. All amounts shown are estimates except for the Securities and Exchange Commission, or SEC, registration fee and the Nasdaq Global Select Market listing fee.

|  | Amount Paid or to be Paid |
|---|---|
| SEC registration fee | $ 109,100 |
| Nasdaq Global Select Market listing fee | * |
| Printing fees and expenses | * |
| Legal fees and expenses | * |
| Accounting fees and expenses | * |
| Transfer agent and registrar fees and expenses | * |
| Other advisors' fees | * |
| Miscellaneous expenses | * |
| Total | $ * |

---
\*   To be provided by amendment.

### ITEM 14. INDEMNIFICATION OF DIRECTORS AND OFFICERS.

Section 145 of the Delaware General Corporation Law, or DGCL, authorizes a court to award, or a corporation's board of directors to grant, indemnity to directors and officers under certain circumstances and subject to certain limitations. The terms of Section 145 of the DGCL are sufficiently broad to permit indemnification under certain circumstances for liabilities, including reimbursement of expenses incurred, arising under the Securities Act of 1933, as amended, or the Securities Act.

As permitted by the DGCL, the registrant's restated certificate of incorporation that will be in effect following the effectiveness of this registration statement contains provisions that eliminate the personal liability of its directors for monetary damages for any breach of fiduciary duties as a director, except liability for the following:

•   any breach of the director's duty of loyalty to the registrant or its stockholders;

•   acts or omissions not in good faith or that involve intentional misconduct or a knowing violation of law;

•   under Section 174 of the DGCL (regarding unlawful dividends and stock purchases); or

•   any transaction from which the director derived an improper personal benefit.

As permitted by the DGCL, the registrant's restated bylaws that will be in effect following the effectiveness of this registration statement provide that:

•   the registrant is required to indemnify its directors and executive officers to the fullest extent permitted by the DGCL, subject to very limited exceptions;

•   the registrant may indemnify its other employees and agents as set forth in the DGCL;

- the registrant is required to advance expenses, as incurred, to its directors and executive officers in connection with a legal proceeding to the fullest extent permitted by the DGCL, subject to very limited exceptions; and

- the rights conferred in the restated bylaws are not exclusive.

In addition, the registrant has entered into indemnification agreements with each of its current directors and executive officers to provide these directors and executive officers additional contractual assurances regarding the scope of the indemnification set forth in the registrant's restated certificate of incorporation and restated bylaws and to provide additional procedural protections. From time to time the registrant has indemnified and may in the future indemnify its directors and officers pursuant to these indemnification agreements in connection legal or regulatory proceedings. The indemnification provisions in the registrant's restated certificate of incorporation and restated bylaws and the indemnification agreements entered into or to be entered into between the registrant and each of its directors and executive officers may be sufficiently broad to permit indemnification of the registrant's directors and executive officers for liabilities arising under the Securities Act.

The registrant has directors' and officers' liability insurance for its directors and officers.

Certain of the registrant's directors are also indemnified by their employers with regard to their service on the registrant's board of directors.

## ITEM 15. RECENT SALES OF UNREGISTERED SECURITIES.

Since February 22, 2018 and through February 22, 2021, the registrant has issued and sold the following securities:

**Option, Restricted Stock Units, and Common Stock Issuances**

Since February 22, 2018 and through February 22, 2021, the registrant granted to its employees, consultants, and other service providers options to purchase an aggregate of 8,647,032 shares of Class A common stock under its Amended and Restated 2013 Stock Plan, or 2013 Plan, at exercise prices ranging from $14.9767 to $17.87 per share.

Since February 22, 2018 and through February 22, 2021, the registrant granted to its employees, consultants, and other service providers options to purchase an aggregate of 11,107,446 shares of Class B common stock under the 2013 Plan, at exercise prices ranging from $6.9733 to $7.7450 per share.

Since February 22, 2018 and through February 22, 2021, the registrant granted to its employees, consultants, and other service providers options to purchase an aggregate of 39,949,585 shares of Class A common stock under its 2019 Equity Incentive Plan, or 2019 Plan, at exercise prices ranging from $18.13 to $28.71 per share.

Since February 22, 2018 and through February 22, 2021, the registrant issued and sold to its employees, consultants, and other service providers an aggregate of 913,251 shares of Class A common stock upon the exercise of stock options under the 2013 Plan, at exercise prices ranging from $14.9767 to $17.87 per share.

Since February 22, 2018 and through February 22, 2021, the registrant issued and sold to its employees, consultants, and other service providers an aggregate of 9,101,581 shares of Class B common stock upon the exercise of stock options under the 2013 Plan, at exercise prices ranging from $0.05 to $7.7450 per share.

Since February 22, 2018 and through February 22, 2021, the registrant issued and sold to its employees, consultants, and other service providers an aggregate of 1,936,950 shares of Class A common stock upon the exercise of stock options under the 2019 Plan, at exercise prices ranging from $18.13 to $26.26 per share.

Since February 22, 2018 and through February 22 2021, the registrant granted to its employees, consultants, and other service providers an aggregate of 5,938,422 restricted stock units to be settled in shares of Class A common stock under the 2019 Plan.

In July 2020, the registrant granted options to purchase an aggregate of 32,403 shares of Class A common stock, with a weighted-average exercise price of $5.31 per share, to certain individuals in connection with the assumption and conversion of options to purchase shares of Tagomi Holdings Inc. common stock upon completion of the registrant's acquisition of Tagomi Holdings Inc.

In February 2021, the registrant granted options to purchase an aggregate of 470,128 shares of Class A common stock, with a weighted-average exercise price of $3.45 per share, to certain individuals in connection with the assumption and conversion of options to purchase shares of Bison Trails Co. common stock upon completion of the registrant's acquisition of Bison Trails Co.

**Preferred Stock Issuances**

From October 2018 through December 2018, the registrant sold an aggregate of 8,831,952 shares of its Series E convertible preferred stock to 30 accredited investors at a purchase price of $36.1922 per share, for an aggregate purchase price of $319.6 million.

**Other Issuances**

In April 2018, the registrant issued an aggregate of 240,000 shares of its Class B common stock to an accredited investor in connection with its acquisition of two wholly-owned subsidiaries of Earn Holdings, LLC.

In December 2018, the registrant sold an aggregate of 653,682 shares of its Class A common stock to 20 accredited investors at a purchase price of $32.5729 per share, for an aggregate purchase price of $21.3 million.

In May 2019, the registrant sold an aggregate of 153,501 shares of its Class A common stock to an accredited investor at a purchase price of $32.5729 per share, for an aggregate purchase price of $5.0 million.

In December 2019, the registrant issued an aggregate of 82,890 shares of its Class A common stock to an accredited investor in connection with obtaining a release, waiver, and license from Omni Projects, Inc.

In July 2020, the registrant issued 2,127,510 shares of its Class A common stock to 75 accredited investors in connection with its acquisition of Tagomi Holdings Inc.

In July 2020, the registrant assumed a warrant exercisable for 4,201 shares of its Class A common stock in connection with its acquisition of Tagomi Holdings Inc., with an exercise price of $5.26 per share.

In August 2020, the registrant issued 690,756 shares of its Class A common stock to an accredited investor in connection with its acquisition of certain assets from Xapo Holdings Ltd.

In February 2021, the registrant issued 3,584,228 shares of its Class A common stock to 36 accredited investors in connection with its acquisition of Bison Trails Co.

Unless otherwise stated, the sales of the above securities were deemed to be exempt from registration under the Securities Act in reliance upon Section 4(a)(2) of the Securities Act (or Regulation D or Regulation S promulgated thereunder), or Rule 701 promulgated under Section 3(b) of the Securities Act as transactions by an issuer not involving any public offering or pursuant to benefit plans and contracts relating to compensation as provided under Rule 701. The recipients of the securities in each of these transactions represented their intentions to acquire the securities for investment only and not with a

view to or for sale in connection with any distribution thereof, and appropriate legends were placed upon the stock certificates issued in these transactions.

None of the foregoing transactions involved any underwriters, underwriting discounts or commissions or any public offering, and the registrant believes each transaction was exempt from the registration requirements of the Securities Act as stated above. All recipients of the foregoing transactions either received adequate information about the registrant or had access, through their relationships with the registrant, to such information. Furthermore, the registrant affixed appropriate legends to the share certificates and instruments issued in each foregoing transaction setting forth that the securities had not been registered and the applicable restrictions on transfer.

II-4

## ITEM 16. EXHIBITS AND FINANCIAL STATEMENT SCHEDULES.

### (a) Exhibits.

| Exhibit Number | Description of Document |
|---|---|
| 3.1 | Amended and Restated Certificate of Incorporation, as currently in effect. |
| 3.2 | Certificate of Amendment to Amended and Restated Certificate of Incorporation, as currently in effect. |
| 3.3 | Form of Restated Certificate of Incorporation, to be effective shortly following the effectiveness of this registration statement. |
| 3.4 | Second Amended and Restated Bylaws, as currently in effect. |
| 3.5 | Form of Restated Bylaws, to be effective shortly following the effectiveness of this registration statement. |
| 4.1 | Form of Registrant's Class A common stock certificate. |
| 4.2* | Amended and Restated Investors' Rights Agreement by and between the registrant and certain securityholders, dated            , 2021. |
| 4.3 | Warrant to Purchase Common Stock by and between the registrant and Silicon Valley Bank, dated June 24, 2014. |
| 4.4 | Warrant to Purchase Common Stock by and between the registrant and Silicon Valley Bank, dated July 31, 2020. |
| 5.1* | Opinion of Fenwick & West LLP. |
| 10.1 | Form of Indemnification Agreement by and between the registrant and each of its directors and executive officers. |
| 10.2 | 2013 Amended and Restated Stock Plan and forms of award agreements thereunder. |
| 10.3 | 2019 Equity Incentive Plan, as amended, and forms of award agreements thereunder. |
| 10.4 | 2021 Equity Incentive Plan and forms of award agreements thereunder. |
| 10.5 | 2021 Employee Stock Purchase Plan. |
| 10.6 | Employment Agreement by and between the registrant and Brian Armstrong, dated February 18, 2021. |
| 10.7 | Employment Agreement by and between the registrant and Surojit Chatterjee, dated February 24, 2021. |
| 10.8 | Employment Agreement by and between the registrant and Paul Grewal, dated February 11, 2021. |
| 10.9 | Change of Control and Severance Policy. |
| 16.1 | Letter Regarding Change in Accountants. |
| 21.1 | List of Subsidiaries of the Registrant. |
| 23.1* | Consent of Fenwick & West LLP (included in Exhibit 5.1). |
| 23.2 | Consent of Deloitte & Touche LLP, independent registered public accounting firm. |
| 23.3 | Consent of Grant Thornton LLP, independent registered public accounting firm. |
| 24.1 | Power of Attorney (included on the signature page to this registration statement). |

\*   To be provided by amendment

### (b) Financial Statement Schedules.

All financial statement schedules are omitted because they are not applicable or the information is included in the registrant's consolidated financial statements or related notes.

**ITEM 17. UNDERTAKINGS.**

The undersigned registrant hereby undertakes:

(1) To file, during any period in which offers or sales are being made, a post-effective amendment to this registration statement:

• To include any prospectus required by Section 10(a)(3) of the Securities Act of 1933, as amended, or Securities Act.

• To reflect in the prospectus any facts or events arising after the effective date of the registration statement (or the most recent post-effective amendment thereof) which, individually or in the aggregate, represent a fundamental change in the information set forth in the registration statement.

• To include any material information with respect to the plan of distribution not previously disclosed in the registration statement or any material change to such information in the registration statement.

(2) That, for the purpose of determining any liability under the Securities Act, each such post-effective amendment shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

(3) To remove from registration by means of a post-effective amendment any of the securities being registered which remain unsold at the termination of the offering.

Insofar as indemnification for liabilities arising under the Securities Act may be permitted to directors, officers, and controlling persons of the registrant pursuant to provisions described in Item 14 above, or otherwise, the registrant has been advised that in the opinion of the Securities and Exchange Commission such indemnification is against public policy as expressed in the Securities Act and is, therefore, unenforceable. In the event that a claim for indemnification against such liabilities (other than the payment by the registrant of expenses incurred or paid by a director, officer, or controlling person of the registrant in the successful defense of any action, suit, or proceeding) is asserted by such director, officer, or controlling person in connection with the securities being registered, the registrant will, unless in the opinion of its counsel the matter has been settled by controlling precedent, submit to a court of appropriate jurisdiction the question whether such indemnification by it is against public policy as expressed in the Securities Act and will be governed by the final adjudication of such issue.

The undersigned registrant hereby undertakes that:

(1) For purposes of determining any liability under the Securities Act, the information omitted from the form of prospectus filed as part of this registration statement in reliance upon Rule 430A and contained in a form of prospectus filed by the registrant pursuant to Rule 424(b)(1) or (4) or 497(h) under the Securities Act shall be deemed to be part of this registration statement as of the time it was declared effective.

(2) For the purpose of determining any liability under the Securities Act, each post-effective amendment that contains a form of prospectus shall be deemed to be a new registration statement relating to the securities offered therein, and the offering of such securities at that time shall be deemed to be the initial bona fide offering thereof.

**SIGNATURES**

Pursuant to the requirements of the Securities Act, the registrant has duly caused this registration statement to be signed on its behalf by the undersigned, thereunto duly authorized, in San Francisco, California, on February 25, 2021.

**COINBASE GLOBAL, INC.**

By:   /s/ Brian Armstrong

Brian Armstrong
Chief Executive Officer

**POWER OF ATTORNEY**

KNOW ALL PERSONS BY THESE PRESENTS, that each person whose signature appears below hereby constitutes and appoints Brian Armstrong and Alesia J. Haas, as his or her true and lawful attorneys-in-fact, proxies, and agents, each with full power of substitution, for him or her in any and all capacities, to sign any and all amendments to this registration statement (including post-effective amendments or any abbreviated registration statement and any amendments thereto filed pursuant to Rule 462(b) increasing the number of securities for which registration is sought), and to file the same, with all exhibits thereto and other documents in connection therewith, with the SEC, granting unto said attorneys-in-fact, proxies, and agents full power and authority to do and perform each and every act and thing requisite and necessary to be done in connection therewith, as fully for all intents and purposes as he or she might or could do in person, hereby ratifying and confirming all that said attorneys-in-fact, proxies, and agents, or their or his or her substitute or substitutes, may lawfully do or cause to be done by virtue hereof.

Pursuant to the requirements of the Securities Act, this Registration Statement has been signed by the following persons in the capacities and on the date indicated.

II-7

| Signature | Title | Date |
|---|---|---|
| /s/ Brian Armstrong<br>Brian Armstrong | Chief Executive Officer and Director<br>(Principal Executive Officer) | February 25, 2021 |
| /s/ Alesia J. Haas<br>Alesia J. Haas | Chief Financial Officer<br>(Principal Financial Officer) | February 25, 2021 |
| /s/ Jennifer N. Jones<br>Jennifer N. Jones | Chief Accounting Officer<br>(Principal Accounting Officer) | February 25, 2021 |
| /s/ Marc L. Andreessen<br>Marc L. Andreessen | Director | February 25, 2021 |
| /s/ Frederick Ernest Ehrsam III<br>Frederick Ernest Ehrsam III | Director | February 25, 2021 |
| /s/ Kathryn Haun<br>Kathryn Haun | Director | February 25, 2021 |
| /s/ Kelly Kramer<br>Kelly Kramer | Director | February 25, 2021 |
| /s/ Gokul Rajaram<br>Gokul Rajaram | Director | February 25, 2021 |
| /s/ Fred Wilson<br>Fred Wilson | Director | February 25, 2021 |

II-8

# Exhibit B18



19 Oct 2017

TheGrid

Log in    **Sign up  ›**

## Overview

⬇ 3

No. of Employees
**51-200**

## Profile

📍 150 BEACH ROAD, #28-05/06, GATEWAY WEST, Singapore 189720

@ support@digifinex.com

**Visit Website  →**

## General Information

Company Legal Name
**DIGIFINEX PTE. LTD.** ✅

Headquarter
**Singapore**

Registration Number
**201729928R** ✅

Operating Status
**Live Company**

Last up

**Power Search**

TheGrid

Log in    **Sign up** ▸

## Overview ⌄

**SME, Tech Startup**

- Official Entity Type

**Exempt Private Limited Company**

## Industry

- Primary SSIC Code

**62019**

- Primary Industry Classification

**DEVELOPMENT OF OTHER SOFTWARE AND PROGRAMMING ACTIVITIES N.E.C.**

## Snapshot

DIGIFINEX is an ACRA-registered entity that has been operating for 3 years 10 months in Singapore since its incorporation y in 2017. Officially, DIGIFINEX PTE. LTD. is registered as Exempt Private Limited Company with its address in District 7 (Middle Road, Golden Mile), primarily operates in the sector of "DEVELOPMENT OF OTHER SOFTWARE AND PROGRAMMING ACTIVITIES N.E.C.", SSIC code - 62019

The company appears to be exempted from statutory auditing requirements

DIGIFINEX PTE. LTD. is a non-listed entity in the private market wit

As of 1 March 2020, the company is not involved in any litigation b public records of the Supreme Court of Singapore. This informatio

Power Search

the best of our research ability and we make no warranties over any data
inaccuracies or omissions.



Log in          Sign up  ▸

## Overview                                                                              ⌄

Last updated: 10 June 2021

## Insight

- The company has recently received share capital injection/new funding of approx SGD **1,088,256**

- The company is owned by individual shareholder(s), it has no corporate shareholder.

- The company's annual budgeting is likely to take place between **July - September**

- The company is assessed to have a **strong and established presence** in the business domain it operates in, taking into account its digital footprints, company size, years of operation, overseas presence among other signals and indicators

* This information is provided to the best of our research ability and we make no warranties for any inaccuracies or omissions.

Last updated: 10 June 2021

## Contact

### Key staff

| Employee Name | Position | Staff Email | Validity |
|---|---|---|---|
| | CEO | View → | ✓ |
| | Co-Founder | View → | ✓ |

Power Search



TheGrid

View more →

Log in    Sign up →

## Overview ⌄

Email

digifinex.com

digifinex.com

View more →

## Share Capital

### Share Capital

| Paid-up Capital | Amount |
| --- | --- |
| Ordinary Shares | View → |

Last updated: 10 June 2021

## Similar Companies

**DIGIFINEX** shares similar business activities as:

360T ASIA PACIFIC PTE. LTD.

ALTERDICE PTE. LTD.

B.BUSTER PTE. LTD.

Power Search

BLOCKCHAIN WORX PTE. LTD.

**TheGrid**

CGCX PTE. LTD.

Log in    Sign up ›

**Overview**  ⌄

View more →

## Related News *(beta)*

News possibly related to DIGIFINEX:

### Digital Wallet Corporation Enters Philippines with Fintech Acquisition

*Fintech News Singapore - 23 October 19*

Digital Wallet Corporation (DWC) today announced its entry to the Philippines through the acquisition of a licensed remittance and foreign exchange company, ...

### Bitcoin IRA Announces Crypto & Cash Interest-Earning Program

*Crowdfund Insider - 21 October 19*

Bitcoin IRA, a company that allows individuals to invest in cryptocurrency in an IRS-approved retirement account, announced on Monday the launch of its new ...

### Swiss Research Firm Lists Singapore's Best and Worst Crypto Exchanges

*Fintech News Singapore - 27 September 19*

These are the best crypto exchanges in Singapore according to Swiss research firm Cryptogenes.

View more →

Power Search

Other Information

## Overview

September

Last updated: 10 June 2021



Power Search

# Exhibit B19



Submit a request

DigiFinex Help Center > User Guide > Contract List

🔍 Search

---

**Articles in this section**    ⌄

---

# 【Contract List】- Terms and Conditions

Support
5 days ago · Updated

| Follow |
|:---:|



# 1. Introduction

- The Services (defined below) is provided to you(a "**user**", "**customer**", "**you**" or "**your**") by DigiFinex Ltd  a company registered in Seychelles (the "**Company**", "DigiFinex" "**our**", "**we**" or "**us**")
- DigiFinex develops, owns, operates, and maintains:

1. digifinex.comand its affiliate website domains listed in Annex A operated by Affiliates (the "**Website**");
2. operating software hosted on through Website enabling users to buy, sell, transfer and trade Digital Assets (the "**Platform**" or "**Exchange**");
3. the technology infrastructures, security systems (the "**Software**") including any ac    Help
   apps (the "**App**") supporting the Platform; and

4. any accompanying and necessary services or outsourced services for the administration, operation, maintenance and upkeep of the Platform and Software;

(collectively the "**Services**") that enables you to trade in Digital Assets (as defined below).

- The Terms of Use stated, referred to and/or linked herein, including the applicable Schedules and Annexes all of which are incorporated herein by reference, (collectively, the "**Terms of Use**", this "**Agreement**" or "**Terms**") constitute a legally binding agreement between you the Customer and us the Company(each a "**Party**" and collectively the "**Parties**").
- Depending on your domicile the respective jurisdictional variations of these Terms as set out in the Schedule shall apply to you.
- If you are an existing registered user of the Services, you hereby acknowledge and agree to the migration from the previous version to the current version of the App governed by these Terms.
- We may amend, modify, add to or delete these Terms at our discretion and those amendments, modifications, additions or deletions apply to your use of the Platform and the Service as they are published on our Platform (whether or not you are aware of those amendments, modifications,additions or deletions). All subsequent actions governed by this Agreement shall apply the prevailing Terms.
- Before you may undertake any activity on our Platform or use our Services you must first register an account with us. By using the Services and/or registering an account with us, you have represented and warranted to us to have expressly read, understood, and agreed to be bound by these Terms and our Privacy Notice which may be amended from time to time.

# 2. Definitions

- In these terms and conditions, the following words and expressions shall have the meanings set out hereunder unless the context otherwise requires:

| | |
|---|---|
| **"Account"** | means any account of the Customer established and maintained with the Company, reflecting, and representing the respective Funds belonging to the customer and held in custody by the Company in the Custody Address; |
| **"Address"** | means an alphanumeric code representing the destination of a cryptocurrency payment on the Blockchain of a Digital Asset and used to identify the Digital Assets under the ownership of this alphanumeric code; |

| | |
|---|---|
| **"Affiliate"** | means a corporation directly or indirectly, controlling, controlled by or under direct or indirect common control with another corporation; |
| **"Annex"** | as defined in the Recital; |
| **"App"** | means the mobile application software developed, maintained, owned by and operated by the Company for the fulfilment of the Services and available for download for Android or Apple iOS, including all content and services made available on or through the same, and any and all updates, upgrades, supplements, releases and versions thereof; |
| **"Applicable Law"** | means any law, rule, statute, subordinate legislation, regulation, by-law, order, ordinance, protocol, code, guideline, treaty, policy, notice, direction or judicial, arbitral, administrative, ministerial or departmental judgment, award, decree, treaty, directive, or other requirement or guideline published or in force at any time which applies to or is otherwise intended to govern or regulate any person (including all parties to this Terms), property, transaction, activity, event or other matter, including any rule, order, judgment, directive or other requirement or guideline issued by any governmental or regulatory authority; |
| **"Business Day(s)"** | means any day except any Saturday, Sunday or public holiday which banking institutions are open for normal business activities, in the jurisdiction where the transaction or business activity under these Terms is concerned; |
| **"Blockchain"** | means the register technology that records, verify or proves data or information, in particular transactional information, with the help of numerous independent and autonomy computing nodes that participate in the verification and endorsement  of the legitimacy of that data or information and the recording thereafter; |
| **"Custody Address"** | means the Address on the Blockchain under which the Company centralizes all receipts of Funds from customers for custody, safeguarding and safekeeping; |
| **"Digital Asset"** | means any sort of cryptographic tokens, digital currencies, cryptocurrencies or virtual currencies, or digital assets including any digital payment tokens as defined under the Payment and Services Act |

es Act 2019 of Singapore supported and approved by the Company at the absolute discretion of the Company any activity or use on the Platform;

**"Enabled Device"**   means a device operated, control and maintained by the Customer with the relevant and necessary Software that enables the Customer to access the Platform and its Services;

**"Funds"**   means the respective representation of Digital Assets held custody by the Company for a customer under an Account in the Custody Address;

**"Funding Address"**   means the Address on the Blockchain of a Digital Asset from which the customer transfers Digital Assets to;

**"Services"**   means the services, information and/or functions that Company may permit the Customer to access and/or use from time to time (including but not limited to the issuance, transmission and/or receipt of Orders) via any website (including without limitation the Website), computer, telephone, mobile telephone, wireless data networks, electronic mail, mobile devices (including without limitation personal digital assistants), pager, facsimile or any other means as may be designated by the Company from time to time;

**"Force Majeure Event"**   any event beyond the Company's control, such as fire, earthquake, flood, lightning, riots, strikes, lockouts, government action, war, the acts, orders, directives, policies, regulations, prohibitions or measures of any kind on the part of any court, governmental, parliamentary and/ or regulatory authority imposed or to be imposed after the fact, power failure, acts or defaults of any telecommunications network operator, telecommunications disruption, computer failure (whether or not as a result of any failure arising from inability to process or use dates) or similar or other events or events commonly known as "force majeure";

**"Order"**   means any offer to enter into a transaction, or any request, application or order in whatever form and howsoever sent, given or transmitted including without limitation in person or by way of telephone or telefax or electronically via the Services to the Company by Users or which the Company reasonably believes to be the request, application or instruction of the Customer and includes any request or instruction to revoke, ignore or vary any previous request or instruction and includes a

Limit Order, Market Order and Stop Order;

| | |
|---|---|
| **"Receiving Address"** | means a unique and confidential Address on the Blockchain of a Digital Address provided by the Company to the user to enable the Company to receive the respective Digital Assets from the user and to identify the receipt of Digital Assets from a user; |
| **"Tainted Digital Assets"** | means any Digital Asset associated directly indirectly with the activities or entities set out in Annex B of this Agreement as amended from time to time; |

- In this Agreement: (a) words denoting a person include an entity, and vice versa, and also its personal representatives, successors and assigns; (b) unless otherwise stated, a reference to "dollar, or "$" is a reference to the lawful currency of the Republic of Singapore; (c) if any time limit specified this Agreement expires on a day which is not a Business Day, that time limit is deemed to expire on the next Business Day; (d) all headings are for convenience of reference and do not affect the construction or interpretation of this Agreement; (e) the word "includes" and words of similar effect are deemed to be followed by the words "without limitation"; (f) references to a Clause or Schedule are references to a clause or schedule of this Agreement; (g) expressions in the singular form shall include the plural and vice versa, and all references to the masculine gender shall include the female and neuter genders and vice versa; and (h) the Schedule(s) form part of this Agreement.

# 3. Disclaimer

- A digital token'sblockchain functions much like the Torrens land titles register system. If the digital token's blockchain, a register of digital assets (the "**Register**" or the "**Blockchain**"), reflects the User's digital tokens, the User's ownership is proved. The assets are recorded in Addresses on the Register belonging to users on the token's blockchain. Looking up an Address on the Register will reflect the assets in the Address.
- The Company is a centralized Digital Assets exchange. When you engage our Services on the Platform, you agree to the custody of those Digital Assets by us and accordingly, our Terms of Use. This also means that when you trade in Digital Assets with other users on the Platform you acknowledge and understand that are doing so within the custody Address maintained by the Company on the Blockchain of the respective Digital Asset.
- A digital token wallet (a "**Wallet**") is a software and security protocol that stores and encrypts a user's alphanumeric codes (termed "**Keys**") that are used to digitally sign off transactions in relation a User's Address on the Register. Because those Keys are the only way to amend the

transaction on the Register, they become a critical piece of the cryptocurrency ecosystem. Wallet security protocol becomes critical to the Agreement.

- Although we take reasonable steps to securely store 100% of all supported Digital Assets, its Custody Addresses and Keys to protect the integrity and reliability of the Platform and the Services, like all online services, you accept and acknowledge the security risks of maintaining or depositing your Digital Assets with us which may lead to the loss of some or all your Digital Assets in the event of a security breach. If you do not understand or recognize the risks sufficiently, you should first seek independent advice on the technology.

- The total number of private key combinations are = $16^{64}$ that is 1,157,920,892,373,161,954,235,709,850,086,879,078,532,699,846,656,405,640,394,575,840,079,13,129,639,936 combinations. This number is fixed across all Blockchains. While this is a big number of combinations, everybody including us, has a 1/1,157,920,892,373,161,954,235,709,850,086,879,078,532,699,846,656,405,640,394,575,840,079,13,129,639,936 * X (the number of private keys presently in use) risk of generating a key to an Address which has previously been generated or has previous ownership and digital assets in it. The risk increases as more private and public key pairs are generated every day. While we control an Address, someone may even in the future have a chance of generating our keys. We term this "**Random Ownership Risk**". There are presently no known ways of eliminating Random Ownership Risk. It is a weakness of the Blockchain technology. You acknowledge that we are subject to the same risk and not hold us liable for any losses suffered because of Random Ownership Risk.

- Therisks involved in trading and/or holding Digital
  Assets can be significant and the losses can be  Prior to opening an account with us, you should carefully consider and assess your personal financial
  circumstances and your tolerance to risk, whether you should trade Digital
  Assets and whether it is suitable for you to trade or hold Digital Assets on our Platform. Digital Assets are unlike traditional currencies, goods or commodities in the market and are subject to exceptional risks. Unlike other traditional forms of currency, Digital Assets are decentralised and are not backed by a central bank, government or legal entities and remains largely unregulated. The value or the price of Digital Assets may vary significantly depending upon the
  market, confidence of investors, competing currencies, regulatory announcements or changes, technical problems, or any other factors. You will be exposed to price, currency exchange, interest rate or other volatility in that Digital Asset market or markets. You may sustain substantial losses on the contract, trade, product, or financial investment if the market conditions move against your position(s). It is in your interest to fully understand the impact of market movements, in particular the extent of profit/loss you would be exposed to when there is an upward or downward movement in the relevant rates, and the extent of loss if you have to liquidate a position if market conditions move against you. Your position may be liquidated at a loss, and you will be liable for any resulting deficit in your account with the Company.

- You should not use the Platform or its accompanying Services unless you fully understand:-

1. the nature and fundamentals of the transaction and the market underlying such transaction;
2. the legal terms and conditions of the documentation for such transaction;
3. the extent of the economic risk to which you are exposed as a result of such transaction (and determine that such risk is suitable for you in light of your specific experience in relation to the specific transaction and your financial objectives, circumstances and resources);
4. the income tax treatment and the accounting treatment of such transaction (which can be complex);
5. the regulatory treatment of such transaction; and
6. the nature and scope of the relationship between yourself and the Company with respect of such transaction undertaken by you.

- Without limiting the foregoing, neither the Company nor its Affiliates or licensors warrant nor represent nor make any warranty nor representations to the timeliness, accessibility, availability, accuracy, reliability, suitability, safety, stability, completeness, continuity or content that the Platform or the Services.
- Neither the Company nor its Affiliates or licensors warrant nor represent nor make any warranty nor representations that:

1. the Platform or Software will be uninterrupted or error-free or that the Platform is free from viruses, worms, trojan horses, or other harmful components.
2. or to any content available in or through the Platform or Software;
3. or to its accreditation or license;
4. or to any results that may be obtained or perceived from the use of the Platform or Services,
5. or of the Platform, the Services or any products, content, information, or materials provided through or in connection with the use of the Platform, its Services, or this Agreement.

- The Company and its Affiliates and licensors cannot and do not guarantee that any information, personal or otherwise, supplied by you will not be misappropriated, intercepted, deleted, destroyed, or used by others.
- Access to the Platform is provided without charge as a courtesy. Neither the Company nor its Affiliates nor licensors are responsible for the conduct, whether online or offline, of any other user of the Platform.
- While we may take reasonable steps to notify you of a compromise in the Platform, we are not obliged to notify you of any malfunction in our Service, or if any Service feature is limited, restricted or
- It is your responsibility to check and ensure that you have downloaded the correct Software

for your device and the compatibility of your device. The Company is not liable if you do not

have a compatible device or if you have downloaded the wrong version of the Software to your device.

- The Company reserves the right to refuse your access to the Platform or to use the Service should you use the Application and/or the Software with an incompatible or unauthorized device or for purposes other than which the Software and/or the Application is intended to be used.

- Without prejudice to the foregoing and any other terms in these Terms, we shall assume that any and all instructions received from your Enabled Device have been made by you, the rightful owner. You are solely responsible and liable for keeping your Enabled Devise safe and maintaining adequate security and control of your username, password and shall likewise be solely responsible for any access to and use of the App and the Services through your Enabled Device, notwithstanding that such access and use may have been effected without your knowledge, authority or consent. We will be not liable to you for any loss or damage resulting from such access or use.

- Nothing in this Agreement or the Services constitutes, or is meant to constitute, advice of any kind. If you require advice in relation to any matter in relation to this Agreement you should first consult an appropriate professional. By using the platform, you agree that the exclusions and limitations of liability set out in this Agreement are reasonable. If you do not believe they are reasonable, you must not use the Platform or Services.

# 4. LIMITATIONS OF LIABILITY

- To the maximum extent permitted by law, except as expressly set out in these Terms and Conditions, the Company excludes all conditions, representations, warranties and statutory guarantees, whether express or implied, in relation to the Platformand/or Services, and the Company does not guarantee the timeliness, accessibility, availability, accuracy, reliability, suitability, safety, stability, completeness, continuity quality,
performance or fitness for purpose of the Platform and Service or the completeness, accuracy or currency of statements, representations and information of others (including without limitation data, reports and analyses) provided via the Platform and Service and the Company will not be liable to any person or entity for any direct, indirect, consequential or other loss, damage, liability, claim or expense (however
caused, including due to negligence or breach of contract) which may arise out of, or in conne
ction with,
the use of the Platform and Service or the use of or reliance on information contained on or lin
ked to the Platform and

- We do not provide any warranty in relation to your use of our Platform and Service and we do

not

provideany warranty that the information displayed on our Platform and in relation to the Serv

ice is up-to-date, accurate or complete. Our Platform and Service does not provide information to evaluate whether you should invest, use, and trade in Digital Assets. We may provide generic trading recommendations, market commentary or other information which do not amount to any financial advice or statement. All the information available on our Website, Platform, Software and/or any other channels through which our Services are provided is general in nature and does not constitute any advice or a recommendation to act upon the information or an offer. We give no warranties, guarantees or accept

any liability (except that which cannot be excluded by law) in relation to the statements, repres entations and information of others (including without limitation data, reports and analyses) displayed on our Platform and in relation to the

- You should independently satisfy yourself as to the information provided through our Platform and Service. You agree to use our Platform and Service at your sole risk and at an "as is"
- We shall not be liable for any and all loss you incur arising from any loss or delay in the transmission or wrongful interception of any Order through any equipment or system, including any equipment or system owned and/or operated by us including without limitation as a result of any electrical shortage, failure of communications or common carrier or failure of computer hardware and/or software.

# 5. REPRESENTATIONS AND WARRANTIES BY THE CUSTOMER

- If you agree to these Terms and Conditions, you represent to us thatyou:

1. are 18 years old or older; and
2. can enter into a legally binding agreement.


- You also represent and warrantthat:

1. all information you have provided to us is accurate, correct and current;
2. you have the necessary power, authority, regulatory approvals and/or permits necessary to enter into this Agreement and to perform the acts required under these Terms;
3. you will continue and maintain the necessary power, authority, regulatory approvals and/or permits necessary to continue the obligations under this Agreement;
4. you have complied and will continue to comply with all applicable laws, statutes, ordinances, and regulations;

5. where you purchase Digital Assets that you have full legal title and ownership of the money you use to pay for your Order, and that it is not obtained by any illicit means;

6. you are not a resident or Tax resident of, and do not otherwise have any relevant connection with, any jurisdiction in which entry into or performing your obligations under these Terms or the delivery, holding, use or exchange of supported Digital Assets is unlawful, restricted or subjected to in any way or requires licensing, registration or approval of any kind

7. you will not use any other account other than your own account;

8. you will not access the account of another user;

9. you will not assist or allow another person, subject or entity other than yourself to in obtaining access to your account;

10. you are not impersonating any other person, operating under an alias or otherwise concealing your identity;

11. are the sole ultimate beneficial owner of your account and not acting on behalf of or representing any other natural person, legal person or legal entity;

12. you will not use the Platform for any illegal or improper purpose, including money laundering, tax evasion or the financing of terrorist activities;

13. you are not using an anonymous network or virtual private networks to access the Platform;and

14. you will not and have not breached any duty toward or rights of any person or entity including, without limitation, rights of intellectual property, publicity or privacy, or rights or duties under consumer protection, product liability, tort, or contract theories.

# 6. CUSTOMER DUE DILIGENCE

- If you are not or at any point in time cease to be qualified to legally enter or continue the obligationsunder this Agreement, you shall cease using the platform and notifying us in writing at contact@digifinex.com with any email address registered with us.

- Before placing an Order for the sale of Digital Assets you shall ensure that the relevant Digital Assets available for settlement from the date of the Order.

- You agree to cooperate with all requests made by us or any third party service providers through our Platform including as authorised by us in connection with your use of the Services, including to identify or authenticate your identity or validate your Digital Assets funding sources or transactions. This may include, without limiting the generality of the foregoing, requiring further information that will allow us to reasonably identify you, including requiring you to take steps to confirm ownership of your phone number or payment instruments or verifying your information against third party databases or through other sources.

- We may confidentially verify the information you provide us with or obtain information on you ourselves or through third parties from secure databases. By agreeing to these Terms, you

acknowledge that we or a third party on our behalf will carry out such verifications.

- At the time you sign up for Services or at any time in the future, you authorise us to undertake electronic identity verification checks on you, either directly or using relevant third-party service providers.
- Notwithstanding any Terms hereunder or your successful completion of the signing up process in accordance with this Clause will not be allowed to engage in any activity on the Platform save for the registration of an Account.

# 7. OPERATION OF THE PLATFORM

- Youreligibility and use of our Platform and Service is dependent upon your country of  In the event the jurisdiction where your country of residence prohibits the activity of using our Servic e or that regulatory actions, or changes to the laws or regulations, make it illegal to operate our Platform or to provide our Services in such jurisdiction, or commercially undesirable to obtain the necessary regulatory approval to operate in such jurisdiction, we will cease to operate in such jurisdiction and we will not provide our Services to you.
- In order to use the Services, you must register as a user on the Platform, and provide us with all information and/or documents requested by us (including such information and/or documents as may be required by us for compliance with Applicable Law from time to time) in order to process your registration.

## Processing of Digital Assets

- To ensure that the Platform's community transactions only on safe, stable and secure tokens, you acknowledge and agree that we reserve the right and in our absolute discretion to support or discontinue Digital Assets for trading on the Platform.
- The loading of supported Digital Asset to your Digital Asset Wallet and any transaction, conversion or trade of Digital Asset are subject to limits imposed by us (as may be amended from time to time in our sole discretion). Such limits are set out in the Platform. We may, in our sole discretion, apply different limits to you specifically. We may also require you to submit additional information about yourself (including any person associated with you and your activities), provide records of, and arrange for meetings with our staff to discuss your loading of supported Digital Asset to your Account or any transaction, conversion or trade of Digital Asset you have effected.
- Where we discontinue Digital Assets on our Platform, you will be able to withdraw Digital Assets from our Platform, however you will not be able to continue or engage in any trading activity for unsupported Digital Assets. You accept the risks that a Digital Asset maybe discontinued, and you agree not to hold us responsible for any loss or damage resulting from

the discontinuation of a Digital Asset on the Platform.

- You agree and understand that the underlying protocols of the Digital Assets' networks are subject to changes (each, a "**Fork**") which may result in more than one version of such network (each, a "**Forked Network**"). You further agree and understand that Forks may materially affect the value, function, and/or name of the Digital Assets you hold on the App.
- In the event of a Fork, we may temporarily suspend any Services (with or without advance notice to you) and we may determine, in our sole discretion, whether to support the Forked Networks. In the event that we decide not to support any such Forked Networks ("**Unsupported Forked Network**"), the Digital Assets offered by such Unsupported Forked Networks will not be made available to you. Notwithstanding the foregoing, we may, in our sole discretion obtain and retain the Digital Assets offered by such Unsupported Forked Network as property belonging solely to us.
- You acknowledge the risks presented by Forks and hereby accept that we have no responsibility for any losses or damage arising as a result of an Unsupported Forked Network.

## Transaction Limits

- The Company may in its absolute discretion without giving any reason and without notice to you at any time and from time to time impose any limits, including without limitation, position limits and limits on contract size in respect of any Account and you shall not exceed such limits. Any limits imposed by us may be reviewed by us from time to time.

# 8. TRANSFERS OF DIGITAL ASSETS

## Funding of Accounts with Digital Assets

- Before you can engage in any trading activity on the Platform, you will first be required to fund your account by depositing Digital Assets with any such Address (a "**Custody Address**") maintained by us. You can either fund your Account with Digital Assets you own from an external Address or you can choose to purchase Digital Assets from us at the prevailing rate through a list of approved vendors on our Platform.
- You may purchase Digital Asset via the Platform from us with your debit or credit card by providing your debit or credit card details, as well as the relevant amount of Digital Assets to be purchased, through the Platform. In such case, you acknowledge that the transfer of fiat currency will depend on performance of such transfer by your bank. Upon our receipt of confirmation that such debit or credit card transaction has been authorised, we will credit the relevant amount of supported Digital Asset to your Account.
- You agree and warrant that only debit cards and/or credit cards which are issued to and/or

registered in your name will be used to purchase Digital Assets via the App.

- All purchases of Digital Assets via your debit or credit cards are irreversible and final. Once you have provided the relevant instructions and/or payments to us and you may not change, withdraw, or cancel the authorisation to us as applicable to complete any pending or partially completed transactions. We shall not be liable for any partially completed transactions or delays in the processing of your instructions. If your payment is not successful or if your payment method has insufficient funds, you authorise us, in our sole discretion, either to cancel the transaction or to debit your other payment methods in any amount necessary to complete the transaction. We do not guarantee the availability of any exchange rate.

- You shall be responsible for any fees charged by your bank or credit card issuers relating to the purchase of Digital Assets with your credit or debit card. Some banks or credit card issuers may treat the purchasing of Digital Assets with credit card as cash advance which may incur a high fee or interest rate. If you are in doubt, please check with your bank or credit card issuer prior to the purchasing of any Digital Assets.

- Where you choose to fund your Account with Digital Assets originating from an Address external to the Platform (a "**Funding Address**"), we will provide you with a unique Address (a "**Receiving Address**") on the respective Blockchain of the Digital Assets to receive and identify Digital Assets coming from you.

- You accept and acknowledge that we will conduct on-going and real time screening and due diligence of all incoming Digital Assets from Funding Addresses and its potential relationship to Tainted Addresses and Tainted Digital Assets before sending Digital Assets in the Receiving Address into our Custody Address. Where we discover that either the incoming Digital Assets or Funding Address from which you transfer are either Tainted Digital Assets or Tainted Address, you acknowledge that we shall have the sole discretion to reject the custody of these Tainted Digital Assets. You further authorise us on such determination and without notice to you, suspend any transactions to and from the Receiving Address in relation to the Tainted Digital Assets and to conduct investigations and due diligence on the Tainted Digital Assets.

- You acknowledge and agree that it is your responsibility to ensure that the correct Receiving Address for your Account is entered when you effect a transfer of Digital Asset from your Funding Address to your Account; and that only the Digital Assets that are accepted by us as will be indicated in your Account will be transferred to your Account.

- You also acknowledge that the transfer of any Digital Asset to an incorrect Address (i.e. an address other than the correct Receiving Address or the transfer of any type of Digital Asset that is not an accepted Digital Asset) or through a transaction not validated by the Blockchain, will result in the irreversible loss of such Digital Asset. You agree that we shall not be responsible or liable for any loss or damages resulting from for any such loss of Digital Assets.

- Where we do not wish to accept these deposits into our Custody Addresses, we may notify you via the Platform or such communication protocols that you have selected during the registration of your Account to seek your approval in sending the Digital Assets back to its

Funding Address. If you do not respond to us within 2 working days from the notice (the "**Rejected Funding Notice Period**"), you acknowledge and understand that you are deemed

to have either approved our transfer of the Digital Assets back to the Funding address or suspend the Receiving Address holding these Tainted Digital Assets and remit the Digital Assets into a segregated Address on the Blockchain (an "**Isolation Address**") for holding the segregated holding of Tainted Digital Assets or return.

- Digital Assets in Isolation Addresses come under heavy scrutiny of regulators, you understand and accept that withdrawals and access of these Digital Assets is challenging and will not be processed without first obtaining the approval of relevant Authorities.
- During the Rejected Funding Notice Period, you may opt through the Platform for us to send the Digital Assets to a different Address (a "**Routed Funding Address**"). You acknowledge, warrant, and represent that you control, exercise physical control or are the beneficial controller of this Address. You additionally warrant and represent that Address you instruct us to remit to is free from any prior or previous involvement with Tainted Digital Assets. You agree to undertake any test, assessment, or due diligence necessary to prove your control over the Routed Funding Address.
- You agree that we shall not be responsible for any loss or damage arising out for any transfers made under clauses 10and 8.11.

## Withdrawal / Outward Transfers of Digital Assets

- You may make a request for withdrawal or transfer of Digital Assets to Address through our Platform. However byusing our Platform and Service, you acknowledge that we are not responsible for any delays you may experience in sending and transferring tokens to and/or from our Platform to other platforms, websites, users or wallets. These delays may be due to issues beyond our control, including issues with third party websites and platforms, wallets, congestion of the blockchain or Force Majeure Events.
- We will process all Digital Asset transfers according to the instructions received from you through the Platform. Due to the nature of the Blockchain technology we do not and are not able to guarantee the identity of any recipient. It is your responsibility to verify all transaction information prior to submitting instructions for a Digital Asset Transfer through the Platform as the Digital Asset Transfer cannot be cancelled or reversed once processed and submitted to the Blockchain. You acknowledge that you are responsible for ensuring the accuracy of any instructions submitted through the App and that any errors may result in the irreversible loss(es) of your Digital Assets.
- You agree and warrantto have sufficient Funds in the Account prior to instructing us to effect any Digital Asset transfer. If your Funds in your Account is not sufficient to cover the amount required for us to complete the transfer, we will not proceed to effect the transfer and we are under no obligation to attempt to fulfil your Transfer using an alternative payment method. You hereby authorise us to debit your Account for the full amount required for us to complete

the transfer.

## Use of Digital Assets to Purchase Goods and Services

- We have no control over, or liability for, the delivery, quality, safety, legality or any other aspect of any goods or services that you may purchase from or sell to a third party. We are not responsible for ensuring that a third-party buyer or seller you transact with will complete the transaction or is authorised to do so. If you experience a problem with any goods or services purchased from, or sold to, a third party using Digital Assets transferred from your Digital Asset Wallet, or if you have a dispute with such third party, you should resolve the dispute directly with that third party. You agree that we shall not be responsible or liable for any loss or damages resulting from the dealings with such third parties.

# 9. PLACEMENT OF ORDERS

## The Company as a Counterparty

- The Platform allows a user to trade Digital Assets with other users on the Platform. The Company and its Affiliates may also transact on the Platform from time to time as a user. We may transact as a user from time to time for the purposes of market making and ensuring stability and predictable exchange rates on the Platform. You should be aware that the Company is engaged in certain customer driven and proprietary activities in many Digital Assets markets. These general activities, as well as the Company's hedging activities which are related to certain transactions entered with you, may adversely affect the value of such transactions.
- Nothing in this Agreement obligates us to enter transactions with you and we shall have the sole discretion to enter any such transaction or to act on any Order without having to give a reason.
- We may not always be your contractual counterparty or the issuer under certain transactions. Where we are not your contractual counterparty or the issuer, your contractual counterparty or a third party issuer, and not us, will be liable to you under the transaction or otherwise in respect of a Digital Asset purchased by you. Accordingly, in considering whether to enter such a transaction, you should consider all risks associated with such counterparty or third-party issuer, including the counterparty's or issuer's financial standing.

## Fees and Exchange Rates

- Prior to making an Order, you will be presented with all fees, commissions, charges, and Digital Assets exchange rates (the "**Definitives**"). When you make the Order, you are deemed

Digital Assets exchange rates (the "**Definitives**"). When you make the Order, you are deemed to have accepted the Definitives of the Order.

- You hereby authorise us to credit and debit your Account as necessary for the fulfilment of the Definitives. We shall be entitled to charge interest on any sum or payment due to us from you at such rate and calculated and/or compounded in such manner as the Company may impose and determine from time to time and to debit any Account in respect of the interest due.
- You shall reimburse all taxes duties, disbursements, costs and/or other expenses incurred by us in connection with your Orders upon demand.
- It is transactions associated with your receipt or transfer of supported Digital Asset, and/or to the transaction, conversion or trade of Digital Asset you conduct, and to withhold, collect, report and remit the correct amounts of Taxes to the appropriate tax authorities. Your Transaction History is available through the App. We are not obligated to, nor will we determine whether and to what extent Taxes apply, or calculate, collect, report, or remit any Taxes to any tax authority arising from any transaction.

## Placing Orders

- To place an Order, you must submit a lot quantity and accept the respective Definitives. You may place one of three kinds of Orders through our Platform:

1. A Limit Order is an instruction by you to the Company to buy or sell a specified quantity of a digital token at a specified price or better price for and on your behalf. A Limit Order will remain good-till-cancelled ("**GTC**"). GTC Orders are instructions to the Company by the user to maintain the order until the order is cancelled or executed as a Market Order.
2. A Market Order is an instruction by you to the Company to use whatever available balances to buy or sell a specified quantity of Digital Assets at the most favourable market exchange rates available subject to the following conditions:
3. Markets are open and Digital Assets are tradable (regardless of price);
4. The order has not been cancelled; and

- There are sufficient funds in the account.

1. A Market Order will be settled as soon as possible. Sometimes, it can be get executed immediately.If there are insufficient funds in the account at the time the first two conditions are met, the Order is cancelled.
2. A Stop Order is an instruction by you to the Company to buy or sell a specified quantity of a digital token if the last trading price of the order is equals to or surpasses the trigger price. A Stop Order instruction is GTC.
   - For the purposes of regulatory compliance, security of the Platform, maintaining an orderly and stable market, you agree and acknowledge that we shall have the absolute discretion

to act on your instructions set out in this clause 10. Where we do not execute your instructions, we shall notify you of non-execution through the Platform.You agree not to

hold us responsible for any loss or damage, in particular economic loss arising from our exercise of discretion not to act on your instructions.

## Order Books

- All successful Orders will be listed in the respective Order Books of respective Digital Asset Pairings. Orders will be listed anonymously setting out only the price and lot size in the Order Book and presented to other users of the Platform for trading. The Company is not obligated, and the Platform shall not disclose the details of the counterparty to your Order save for the transaction's details.

## Matching of Orders

- Once your Order is placed in the Order Book, you acknowledge and accept that your Order will be automatically matched based on the lowest exchange rates available at the time of your Order and in priority of first in present time. You authorise the Company to automatically match your Orders on your behalf on this basis.

# 10. SUSPENSION AND TERMINATION

## Suspension of Accounts

- You are entitled to the use of only one account. If you use or obtain access to an account, other than your own or be found to be acting for another individual through your account, we shall be entitled to immediately suspend your account and conduct investigations for suspicious and/or illicit activities. Upon suspension all pending transactions or Orders will be suspended and accordingly removed from the Order Book.
- If you are found to have funded your Account with Digital Assets identified by us from sources of illicit activities, you agree, and we shall be entitled to suspend your Account and terminate all our obligations under this Agreement to you.
- We conduct ongoing monitoring of Digital Assets, Customers and Accounts. Where we have identified suspicious or illicit activities, you agree, and we shall be entitled to suspend your account and conducted due diligence as necessary or as required by regulations to ensure such suspicious activities are sufficiently cleared. You agree not to hold us responsible for any loss or damage arising from the investigations, suspension of Accounts and/or trading activity.
- You further acknowledge and accept without our liability that we reserve the right to lodge a suspicious transactions report on your person, Account and Digital Assets where we deem that

that
your activities are involved with Illicit Activities.

# 11. MARKET INFORMATION

- Unless you have a specific agreement with the Company for the provision of market information, analysis or advisory services, you acknowledge and accept that the Company's relationship with you in relation to your Digital Assets is purely as an exchange and custodian. In either case while you are entitled to expect the Company or its employees or representatives to answer your queries, the obligation in so answering is only to be honest. Such answers should not be assumed to be backed by any prior reasonable due diligence or research or specifically suitable for reliance by yourself without you first independently confirming that the answer is intended as specific advice to and is suitable for or to your specific financial needs and objectives or your verifying the same with your independent advisers on its specific suitability for your specific financial needs and objectives.
- The information and any materials contained in this Platform should not be considered as an offer or
solicitationto buy or sell regulated instruments, provide advice, facilitate or take deposits or pr
ovide any
other regulate Service of any kind in any jurisdiction, except as expressly stated and lawfully
Any products or Service described on this Platform are not available to all persons and are subject to separate terms, conditions, and restrictions.

# 12. CUSTODY OBLIGATIONS

- We securely store Keys and other information in order to maintain the security and integrityof the system and the Company is committed to protecting users' tokens and other information it collects from you and holds in highly secured data centre operated by a third We ensure that your information is safe by managing access controls, such as identity, access management, permissions, and security credentials. Access to personal information is only granted to an employee of us to carry out duties required for the administration or Services or to support you.

## Lag Risks

- The Platform uses a combination of Keys secured online and offline to operate safe and secure. As a result, it may be necessary for us to retrieve this Digital Assets from an Address secured by Keys maintained offline to facilitate a transaction of Digital Asset in accordance with your instructions, which may delay the initiation or crediting of such transaction,

conversion or trade for 48 hours or more. As a user of the Services, you accept the risk that a transaction, conversion or trade of Digital Asset processed on the App may be delayed and

you agree not to hold us responsible for any loss or damage arising out of or related to such delay.

- As part of the Company's commitment to protecting you are required to implement and use two-factor authenticationfor all instructions to us. You agree to implement such measures, programs, and applications onto your computer and/or phone for authentication method and understand how to use these security measures to complete the transaction.
- Users are accountable for maintaining and preserving the confidentiality of their account information, personal information they provide to the Company, the strength level of the password, whether a two- factor authentication (unless otherwise stipulated in these Terms and Conditions) is implemented to protect their Digital Assets when using our Platformand
- Should you discover that your Enabled Device is compromised, lost or stolen or has been accessed or used in an unauthorised way, you shall promptly notify us of the loss or theft, or the unauthorised access or use by emailing us at contact@digifinex.com. In addition, where your Enabled Device has been accessed or used in an unauthorised manner, you should, as soon as possible, reset the password on your Enabled Device.

# 13. EXTERNAL LINKS

- Links (such as hyperlinks) from the Platform to and plug-ins from sites or applications owned, operated or controlled by third parties (collectively, "**Third-Party Sites**") do not constitute the endorsement by the Company of the Third-Party Sites or their content. Such links and plug-ins are provided as an information service, for reference and convenience only. The Company does not control any Third-Party Sites and is not responsible for their content. It is your responsibility to evaluate the content and usefulness of the information obtained from Third Party Sites. The use of any Third-Party Site is governed by the terms and conditions of use and privacy policy of that Third-Party Site.
- You access third party sites at your own risk. The Company expressly disclaims any liability arising in connection with your use and/or viewing of any third-party sites, and you hereby agree to hold the Company harmless from any liability that may result from third party sites.

# 14. PERSONAL DATA PROTECTION

- The Useracknowledges and agrees that the Company can and will collect, use, and disclose personal data collected User for various purposes such as:

1. Customer due diligence;
2. Transaction monitoring;

2. Transaction monitoring;

3. Administration of the Platform;

4. Provision of Services

5. Marketing;

6. Research on customer behaviour; and

7. asset out in the personal data protection policy of the Company (the "**PDP Policy**") as found on the Website and as amended from time to time.

- The User warrants that he/she has read and understood the PDP Policy and consents to the collection, use and disclosure of his/her personal data by the Company for the purposes set out above and in the PDP Policy and in accordance with the PDP Policy and the terms of this Agreement.

# 15. INDEMNITIES BY THE REPRESENTATIVE

- The Userhereby irrevocably and unconditionally agrees to indemnify the Company and its Affiliates on first demand for and against any loss from time to time incurred by the Company as a result of the User failing to perform any of the obligations under this Agreement, whether or not these obligations or any of the respective purported obligations of the User thereunder are or become void, violable, invalid, unenforceable or for any other reason whatsoever, whether or not known to the Company.
- The User's obligations to the Company with respect to the indemnity given pursuant to this Clause 15shall be due upon written demand from time to time given by the Company to the User setting forth the amount the Company would have been entitled to recover from the User (the "**Loss**"). In the event that the User fails to pay the amount of the Loss as set forth in any such demand, the Company shall be entitled to, and the Indemnifier shall pay, interest on such unpaid amount from the date of such demand until paid in full at such rate and upon such terms as may be determined by the User provided that the Company shall make such determination in a reasonable manner.
- In any suit or other proceeding relating to the subject matter of the Agreement, the Company shall be entitled to recover from the User all reasonable costs, fees and expenses by accountants, solicitors and other professionals for services rendered to the prevailing party in connection with the suit or other proceeding, including costs, fees and expenses of preparation and appeal.
- The obligations assumed under this Clause 15with respect to the indemnity given hereunder are independent undertakings and constitute the User's own debts and obligations.

# 16. NO PARTNERSHIP

- Nothing contained in or relating to this Agreement shall be deemed to constitute a

partnership,joint-venture, employee employer or agency relationship between the parties and the User shall have no authority to act for or assume any obligation or responsibility of any

kind, express or implied on behalf of the Company or bind or commit the Company for any purpose in any way whatsoever.

- Save for representing the Company for the purposes of the business, the relationship shall undertake not hold itself as being able to bind or commit the Company for any purpose in any way whatsoever.

# 17. ENTIRE AGREEMENT

- This Agreement contains the entire agreement between the Parties concerning the subject matter hereof and supersedes all prior agreements, understandings, discussions, negotiations and undertakings, whether written or oral, between the Parties with respect thereto.

# 18. ASSIGNABILITY

- This Agreement cannot be assigned by the User.

# 19. AMENDMENT

- You agree that we may amend, change, revise, add or modify this Agreement at any time. The most current Agreement will be posted to our Website and/or via the Platform. You understand that the Agreement cannot be modified by any verbal statements or written amendments without written acceptance or confirmation by us.

# 20. WAIVER

- Neither the failure nor any delay on the part of any Party to exercise any right, remedy, power or privilege under this Agreement shall operate as a waiver of that right, remedy, power or privilege.

# 21. SEVERABILITY OF PROVISIONS

- If any one or more of the provisions contained in this Agreement or any documents executed in connection with this Agreement shall be invalid, illegal or unenforceable in any respect under any applicable law, the validity, legality and enforceability of the remaining provisions

contained in this Agreement shall not in any way be affected or impaired and this Agreement

shall be construed as if such invalid, illegal or unenforceable provisions had never been contained in this Agreement.

- Each undertaking and agreement contained in this Agreement shall be read and construed independently of the other undertakings and agreements so that if one or more should be held to be invalid as an unreasonable restraint of trade or for any other reason whatsoeverthen the remaining undertakings and agreements shall be valid to the extent that they are held not to be so invalid.

# 22. SCHEDULES

- The respective schedules shall apply according the country of domicile of the User.

# 23. CONTRACTS (Rights of Third Parties) Act (Cap. 53B)

- Save for the Parties specifically identified at the beginning of this Agreement and the Affiliates of the Company, any person who is not a party to this Agreement whether or not any benefit is conferred or purported to be conferred on him/her directly or indirectly has no rights under the Contracts (Rights of Third Parties) Act (Cap. 53B) to enforce any term or condition of this Agreement.

# 24. DISPUTE RESOLUTION

- In the event of any dispute or difference arising out of or in connection with or in relation to this Agreement or the existence, validity, termination, application or interpretation of this Agreement or any of its provisions, both parties shall use their best endeavours to settle the dispute informally by agreement between the parties. Both parties shall always act in good faith and co-operate with each other to resolve any disputes.
- Notwithstanding anything in this Agreement, if the dispute is not settled in accordance with Clause 1 above, no party shall proceed to litigation or any other form of dispute resolution unless the parties have made reasonable efforts to resolve the same through mediation in accordance with the mediation rules of the Singapore Mediation Centre. A party who receives a notice for mediation from the other party shall consent and participate in the mediation process in accordance with this clause.

- Failure to comply with this clause shall be deemed to be a breach of this Agreement.
- In the event that mediation is unsuccessful, the dispute shall be resolved either by reference to arbitration or by court proceedings as elected by either party, by way of a written notice to the other party, which shall state the specific dispute to be resolved and the nature of such dispute.
- Any reference to arbitration in Singapore shall be a submission to arbitration within the meaning of the Arbitration Act for the time being in force in Singapore. Such arbitration shall be conducted in the English language in accordance with the Arbitration Rules of the Singapore International Arbitration Centre ("SIAC Rules") for the time being in force, which rules are deemed to be incorporated by reference into this clause, except in so far as such Rules conflict with the provisions of Clause 25herein, in which event the provisions of Clause 25 herein will prevail.
- The arbitration tribunal shall consist of one (1) arbitrator to be appointed by mutual agreement between the parties. Either party may propose to the other the name or names of one or more persons, one of whom should serve as an arbitrator. If no agreement is reached within thirty (30) days after receipt by one party of such a proposal from the other, the arbitrator shall be appointed by the Appointing Authority.
- The Appointing Authority shall be the Chairman of the SIAC.
- The arbitrator must not be a present or former employee or agent of, or consultant or counsel to, either party or any related corporation [as defined in Section 6 of the Companies Act (Cap. 50)] of either party.
- Any decision or award of an arbitration tribunal appointed pursuant to this clause will be final and binding on the parties.
- Interest at the annual rate of six percent (6%) per annum will be due and payable to the party in receipt of an arbitration award from such date as the arbitral tribunal may decide until the date of payment to such party.
- The parties hereto undertake to keep the arbitration proceedings and all information, pleadings, documents, evidence, and all matters relating thereto confidential.
- The application of Part II of the International Arbitration Act, and the Model Law referred thereto, to this Agreement is hereby excluded.
- For the avoidance of doubt, it is agreed that nothing in Clause 24shall prevent the Company from seeking urgent equitable relief before any appropriate court and the commencement of any dispute resolution proceedings shall in no way affect the continual performance of the parties' obligations under this Agreement.

# 25. GOVERNING LAW

- This Agreement shall be governed by and interpreted in accordance with the laws of Singapore. Each Party irrevocably agrees, for the sole benefit of the Company and its Affiliates that, subject as provided below, the courts of Singapore shall have exclusive jurisdiction over

any dispute or claim (including non-contractual disputes or claims) arising out of or in connection with this Agreement or its subject matter or formation. Nothing in this Clause shall

limit the right of the Company or its Affiliates to take proceedings against you in any other court of competent jurisdiction.

# Schedule 1, Country Schedule and Variations

When You are domiciled in Australia, the following amendments shall apply to you:

1. Clause 1.1 shall be replaced by the following:

"*The Services (defined below) is provided to you (a "user", "customer", "you" or "your") by Digifinex Australia Pty Ltd ACN 627 451 781 (DCE100581625-001) a company registered in Australia (the "**Company**", "**Digifinex**" "**our**", "**we**" or "**us**")." ;*

1. Clause 1.2 shall be amended by deleting ", owns";

• Clause 1.2 (1) shall be replaced by the following:

"*www.digifinexau.com only;*";

1. Clause 1.3 shall be amended by deleting ", including the applicable Schedules and Annexes all of which are incorporated herein by reference,";
2. Clause 1.4 shall be deleted;
3. The definition of "**Business Day(s)**" in Clause 2.1 shall be amended by replacing "jurisdiction" with "*State of New South Wales, Australia*";

• The definition of "**Digital Asset**" in Clause 2.1 shall be replaced by the following:

"*means any sort of cryptographic tokens, cryptocurrencies or virtual currencies, or digital assets including any digital currency as defined under the Anti-Money Laundering and Counter-Terrorism Financing Act 2006 (**AML/CTF Act**) supported and approved by the Company at the absolute discretion of the Company any activity or use on the Platform;*";

• Clause 2.2 (b) shall be amended by replacing "the Republic of Singapore" with "*Australia*";

2. Clause 2.2 (f) shall be amended by deleting "or Schedule" and "or schedule";

3. Clause 2.2 (h) shall be deleted.

4. Clause 6.1 shall be amended by replacing "contact@digifinex.com" with "*xxxxxx@digifinexau.com*";

- Clause 22 shall be deleted;
- Clause 23 shall be deleted;
- Clauses 24.1 to 24.12 (inclusive) shall be deleted and be substituted by the following clauses:

"*Clause 24.1 The procedure set out below must be followed in relation to the resolution of any difference or dispute (**Dispute**) which arises out of or in connection with these terms and conditions.*

*Clause 24.2 Within five (5) business days after the Dispute arises, each party must prepare a statement setting out that party's position on the Dispute and its reasons for adopting its position. Each party must give each other party a copy of that statement. Each other party must consider the statement and must then do their best to resolve the Dispute.*

*Clause 24.3 If agreement is reached on a means of resolving the Dispute, the parties must jointly execute a statement setting out the terms of that agreement at the cost of the party who raised the Dispute. The parties must then take all actions reasonably necessary for that agreement to be put into effect.*

*Clause 24.4 If the Dispute is not resolved within twenty (20) calendar days after the statements are due to be delivered, it must be referred to a mediator nominated by the President of the Law Society of NSW. The costs of the mediation must be paid by the party who raised the Dispute. However, any cost of legal or other representation must be borne by the party that engages the relevant legal or other representation.*

*Clause 24.4 The parties hereto undertake to keep all information, pleadings, documents, evidence, and all matters related to such Dispute strictly confidential.*"

25. Clause 25.1 shall be deleted and be replaced with the following:

"*Clause 25.1 These terms and conditions shall be governed by and construed in accordance with the laws in force in the State of New South Wales, Australia. Each Party irrevocably and unconditionally submits to the exclusive jurisdiction of the courts of NSW for determining any dispute concerning these terms and conditions.*".

**如何加入D网(DigiFinex.tv)社群**

telegram交流群：**https://t.me/DigiFinexcn** （中文）

telegram Official Community：**https://t.me/DigiFinexEN** （English）

Kakao交流群：**https://open.kakao.com/o/giKpLDsb** （Korean）

官方twitter：点击了解

官方facebook：点击了解

官方Medium：点击了解

官方linkedin：点击了解

微信群：TTTTTTbaobao (扫码添加微信客服账号拉你进群)

  

---

Was this article helpful?

 ✓ Yes     ✕ No

209 out of 321 found this helpful

---

Have more questions? Submit a request

---

Return to top ⊕

---

**Related articles**

【Contract List】- Privacy Policy

【Trading Resume】Temporary Closure of the VYNC/USDT Trading Pairs

【New Coin Listing】LSP to be Listed on DigiFinex, Retweet & Trade & Lock to Share 1,000,000 LSP(≈$60,000)

【2FA】 - How to Close 2FA

【Candy Box】 Lock WDX and share 2.5 million WDX

## Comments

0 comments

Article is closed for comments.

DigiFinex Help Center                                      English (US)  ⌄

# Exhibit B20



# Korbit, Inc. - 주식회사 코빗 > Private Company Profile

## Company Overview

**Company Type:** Private Company

**Company Status:** Operating Subsidiary

**Website:** www.korbit.co.kr

**Number of Employees:** -

**Year Founded:** 2013

**Total Amount Raised ($ mm)†:** 3.40

**Total Rounds of Funding**\*\*:2

**Latest Post-Money Valuation ($ mm)** -

**Latest Pre-Money Valuation ($ mm)** -

*† This number reflects the estimated value of the total new money raised through private placement rounds.*

*\*\* This value is an estimate of the total number of funding rounds this company has received.*

## Business Description

Korbit, Inc. provides online bitcoin exchange, wallet, and merchant processor services. The company was founded in 2013 and is based in Seoul, South Korea. As of September 26, 2017, Korbit, Inc. operates as a subsidiary of NXC Corporation.

## Primary Industry Classification

Data Processing and Outsourced Services

## Primary Office Location

6 Bongeunsa-ro 5-gil, 6F Gangnam-gu | Seoul | 01860 | South Korea
Phone: 82 1 661 9707

## Parent Company

NXC Corporation

## Current and Pending Investors

| Investor | Initial Investment Date | Stake Type | Current Stake Amount | Round(s) |
|---|---|---|---|---|
| Pantera Advisors LLC | Aug-25-2014 | Minority | - | Series A |
| SoftBank Ventures Asia Co., Ltd. | Aug-25-2014 | Minority | - | Series A |
| Banks Foundation for Young Entrepreneurs, Endowment Arm | Jan-19-2014 | Minority | - | Seed |
| Strong Ventures, LLC | Jan-19-2014 | Unknown | - | Seed |
| Firestartr LLP | - | Unknown | - | - |

## Prior Investors

BAM Ventures, GFT Ventures, LLC

## Financial Information

TEV and Market Cap are calculated using the last closing price

## Company Notes

No Company Notes exist.

---

Date Created: Aug-24-2021

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Korbit, Inc. - 주식회사 코빗 > Private Company Profile

## Strategy Notes

No Strategy Notes exist.

## Key Professionals

| Name | Title |
|------|-------|
| Lyu, Tony | Chief Executive Officer |
| Kim, Louis Jinhwa | Founder and Chief Operating Officer |

## Last 5 Transactions

| Announced Date | Closed Date | Transaction Type | Role | Target | Buyer/Investors | Sellers | Size($mm) |
|---|---|---|---|---|---|---|---|
| Sep-26-2017 | Sep-26-2017 | Merger/Acquisition | Target | Korbit, Inc. | NXC Corporation | | 80.21 |
| Aug-25-2014 | Aug-25-2014 | Private Placement | Target | Korbit, Inc. | Strong Ventures, LLC,Softbank Ventures Korea Inc. (nka:SoftBank Ventures Asia Co., Ltd.),Pantera Advisors LLC,BAM Ventures *Buyer Funds*:Bitcoin Opportunity Corp | | 3.00 |
| Jan-19-2014 | Jan-19-2014 | Private Placement | Target | Korbit, Inc. | Strong Ventures, LLC,Banks Foundation for Young Entrepreneurs, Endowment Arm | | 0.40 |

\* denotes that the relationship is proprietary

## Last 5 Key Developments

| Date | Event Type | Headline |
|------|-----------|----------|
| Jun-26-2018 | Company Conference Presentations | Korbit, Inc. Presents at Blockchain Connect Conference Silicon Valley 2018, Jun-26-2018 04:40 PM |
| Sep-26-2017 | M&A Transaction Closings | NXC Corporation acquired an additional 59.8% stake in Korbit, Inc. |
| Aug-25-2014 | Private Placements | Korbit announced that it has received $3 million in funding from BAM Ventures, Pantera Capital Management LP, SOFTBANK Ventures Korea Inc., Strong Ventures, LLC, The Bitcoin Opportunity Fund, and other investors. |
| Jan-19-2014 | Private Placements | Korbit announced that it has received $0.40 million in funding Banks Foundation for Young Entrepreneurs, Strong Ventures, LLC, and other investors. |

## News Headlines

No News is currently available for the selected sources.

## S&P Global Ratings Credit Ratings

No S&P Global Ratings Credit Ratings data available.

S&P Credit Ratings and Research provided by S&P Global Ratings

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Korbit, Inc. - 주식회사 코빗 > Private Company Profile

(Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P Global Market Intelligence's opinions, analyses and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. While S&P Global Market Intelligence has obtained information from sources it believes to be reliable, S&P Global Market Intelligence does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P Global Ratings does not contribute to or participate in the creation of credit scores generated by S&P Global Market Intelligence. Lowercase nomenclature is used to differentiate S&P Global Market Intelligence PD credit model scores from the credit ratings issued by S&P Global Ratings.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.capitaliq.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Regulatory News Service data provided by 

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.

# Exhibit B21

 **California Secretary of State**
Electronic Filing



**California Secretary of State**
Electronic Filing

# Corporation - Statement of Information

| | |
|---|---|
| Entity Name: | PAYWARD VENTURES, INC. |
| Entity (File) Number: | C3593001 |
| File Date: | 08/16/2021 |
| Entity Type: | Corporation |
| Jurisdiction: | DELAWARE |
| Document ID: | GV83543 |

**Detailed Filing Information**

1. Entity Name:

PAYWARD VENTURES, INC.

2. Business Addresses:
   a. Street Address of Principal Office in California:

   237 Kearny  St., #102
   San Francisco, California 94108
   United States of America

   b. Mailing Address:

   237 Kearny  St., #102
   San Francisco, California 94108
   United States of America

   c. Street Address of Principal Executive Office:

   237 Kearny  St., #102
   San Francisco, California 94108
   United States of America

3. Officers:
   a. Chief Executive Officer:

   David  Ripley
   237 Kearny  St., #102
   San Francisco, California 94108
   United States of America

   b. Secretary:

   David  Ripley
   237 Kearny  St., #102
   San Francisco, California 94108
   United States of America

Officers (cont'd):
   c. Chief Financial Officer:

   Kaiser  Ng
   237 Kearny  St., #102
   San Francisco, California 94108
   United States of America

4. Director:

   Not Applicable

   Number of Vacancies on the Board of Directors:

   Not Applicable

5. Agent for Service of Process:

   CALIFORNIA CORPORATE AGENTS,
   INC. (C3035398)

6. Type of Business:

   Digital Asset Exchange

By signing this document, I certify that the information is true and correct and that I am authorized by
California law to sign.

Electronic Signature:   Ronald W. Schuler

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

*Use bizfile.sos.ca.gov for online filings, searches, business records, and resources.*

Document ID: GV83543

Document ID: GV83543

# Exhibit B22

Delaware.gov                          Governor | General Assembly | Courts | Elected Officials | State Agencies



**Department of State: Division of Corporations**

<u>Allowable Characters</u>

**HOME**

|  | Entity Details |
|---|---|

### THIS IS NOT A STATEMENT OF GOOD STANDING

| <u>File Number:</u> | 5359931 | <u>Incorporation Date / Formation Date:</u> | **7/1/2013** (mm/dd/yyyy) |
|---|---|---|---|
| <u>Entity Name:</u> | **PAYWARD VENTURES, INC.** | | |
| <u>Entity Kind:</u> | **Corporation** | <u>Entity Type:</u> | **General** |
| <u>Residency:</u> | **Domestic** | State: | **DELAWARE** |

### REGISTERED AGENT INFORMATION

| Name: | **HARVARD BUSINESS SERVICES, INC.** | | |
|---|---|---|---|
| Address: | **16192 COASTAL HWY** | | |
| City: | **LEWES** | County: | **Sussex** |
| State: | **DE** | Postal Code: | **19958** |
| Phone: | **302-645-7400** | | |

Additional Information is available for a fee. You can retrieve Status for a fee of $10.00 or
more detailed information including current franchise tax assessment, current filing history
and more for a fee of $20.00.
Would you like ○ Status ○ Status,Tax & History Information

[ Submit ]

[ View Search Results ]          [ New Entity Search ]

For help on a particular field click on the Field Tag to take you to the help area.

# Exhibit B23



# Payward Ventures Inc. > Private Company Profile

## Company Overview

**Company Type:** Private Company

**Website:** www.kraken.com

**Global Number of Employees (Latest):** 1,800

**Year Founded:** 2011

**Total Amount Raised ($ mm)†:** -

**Total Rounds of Funding**:** -

**Latest Post-Money Valuation ($ mm)** -

**Latest Pre-Money Valuation ($ mm)** -

*† This number reflects the estimated value of the total new money raised through private placement rounds.*

*** This value is an estimate of the total number of funding rounds this company has received.*

## Business Description

Payward Ventures Inc. designs and develops bitcoin trading application platform for cryptocurrency. Its platform provides financial stability and helps to buy, sell, and trade crypto. Payward Ventures Inc. was founded in 2011 and is based in San Francisco, California.

## Primary Industry Classification

Data Processing and Outsourced Services

## Primary Office Location

237 Kearny Street #102 | San Francisco, CA | 94108 | United States

## Financial Information (Currency: Reported Currency, in mm)

| | | | | | |
|---|---|---|---|---|---|
| **Total Revenue** | - | **Operating Income** | - | **Total Assets** | - |
| **Gross Profit** | - | **EBITDA** | - | **Total Debt** | - |
| **Net Income** | - | **Global Number of Employees (Latest)** | 1,800 | **Net Debt** | - |
| **U.S. Number of Employees 2021** | - | **U.S. Number of Employees 2020** | - | **U.S. Last Year Employee Growth %** | - |

* Hover over data point numbers for date and source.

## Company Notes

No Company Notes exist.

## Strategy Notes

No Strategy Notes exist.

## Key Professionals

No Key Professionals have been profiled.

## Last 5 Key Developments

| Date | Event Type | Headline |
|---|---|---|
| Jun-20-2021 | Seeking Financing/Partners | Kraken Could Go Public in 12-18 Months |

Date Created: Aug-24-2021

Copyright © 2021 S&P Global Market Intelligence, a division of S&P Global Inc. All Rights reserved.



# Payward Ventures Inc. > Private Company Profile

## News Headlines

No News is currently available for the selected sources.

## S&P Global Ratings Credit Ratings

No S&P Global Ratings Credit Ratings data available.



S&P Credit Ratings and Research provided by

No content (including ratings, credit-related analyses and data, valuations, model, software or other application or output therefrom) or any part thereof (Content) may be modified, reverse engineered, reproduced or distributed in any form by any means, or stored in a database or retrieval system, without the prior written permission of S&P Global Market Intelligence or its affiliates (collectively, S&P Global). The Content shall not be used for any unlawful or unauthorized purposes. S&P Global and any third-party providers, as well as their directors, officers, shareholders, employees or agents (collectively S&P Global Parties) do not guarantee the accuracy, completeness, timeliness or availability of the Content. S&P Global Parties are not responsible for any errors or omissions (negligent or otherwise), regardless of the cause, for the results obtained from the use of the Content, or for the security or maintenance of any data input by the user. The Content is provided on an "as is" basis. S&P GLOBAL PARTIES DISCLAIM ANY AND ALL EXPRESS OR IMPLIED WARRANTIES, INCLUDING, BUT NOT LIMITED TO, ANY WARRANTIES OF MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE OR USE, FREEDOM FROM BUGS, SOFTWARE ERRORS OR DEFECTS, THAT THE CONTENT'S FUNCTIONING WILL BE UNINTERRUPTED OR THAT THE CONTENT WILL OPERATE WITH ANY SOFTWARE OR HARDWARE CONFIGURATION. In no event shall S&P Global Parties be liable to any party for any direct, indirect, incidental, exemplary, compensatory, punitive, special or consequential damages, costs, expenses, legal fees, or losses (including, without limitation, lost income or lost profits and opportunity costs or losses caused by negligence) in connection with any use of the Content even if advised of the possibility of such damages.

Credit-related and other analyses, including ratings, and statements in the Content are statements of opinion as of the date they are expressed and not statements of fact. S&P Global Market Intelligence's opinions, analyses and rating acknowledgment decisions (described below) are not recommendations to purchase, hold, or sell any securities or to make any investment decisions, and do not address the suitability of any security. S&P Global Market Intelligence assumes no obligation to update the Content following publication in any form or format. The Content should not be relied on and is not a substitute for the skill, judgment and experience of the user, its management, employees, advisors and/or clients when making investment and other business decisions. S&P Global Market Intelligence does not act as a fiduciary or an investment advisor except where registered as such. While S&P Global Market Intelligence has obtained information from sources it believes to be reliable, S&P Global Market Intelligence does not perform an audit and undertakes no duty of due diligence or independent verification of any information it receives.

S&P Global keeps certain activities of its divisions separate from each other in order to preserve the independence and objectivity of their respective activities. As a result, certain divisions of S&P Global may have information that is not available to other S&P Global divisions. S&P Global has established policies and procedures to maintain the confidentiality of certain non-public information received in connection with each analytical process.

S&P Global Ratings does not contribute to or participate in the creation of credit scores generated by S&P Global Market Intelligence. Lowercase nomenclature is used to differentiate S&P Global Market Intelligence PD credit model scores from the credit ratings issued by S&P Global Ratings.

S&P Global may receive compensation for its ratings and certain analyses, normally from issuers or underwriters of securities or from obligors. S&P Global reserves the right to disseminate its opinions and analyses. S&P Global's public ratings and analyses are made available on its Web sites, www.standardandpoors.com (free of charge), and www.capitaliq.com (subscription), and may be distributed through other means, including via S&P Global publications and third-party redistributors. Additional information about our ratings fees is available at www.standardandpoors.com/usratingsfees.

Regulatory News Service data provided by

# Exhibit B24



Sign up   

About us     Careers     Contact us

# Contact us

Phone numb

+1 226 798 4

Our customer su

Email:

support@ok

Company ad

Suite 202, 2r

Follow us on

  

About

Legal and

Service

Support

   English

  





Sign up



©2021 OKEX.COM



# Exhibit B25

# Corporations Division

## Business Entity Summary

### ID Number: 001328605

| Request certificate | | New search |
|---|---|---|

### Summary for:  POLONIEX, LLC

| **The exact name of the Foreign Limited Liability Company (LLC):** POLONIEX, LLC |
|---|
| **Converted from POLONIEX, INC.** on 05-21-2018 |
| **Entity type:**  Foreign Limited Liability Company (LLC) |
| **Identification Number:** 001328605 |
| **Date of Registration in Massachusetts:**  05-21-2018 |
| **Last date certain:** |
| **Organized under the laws of: State:** DE **Country:** USA **on:** 02-09-2016 |
| **The location of the Principal Office:** Address:  99 HIGH STREET SUITE 1701 City or town, State, Zip code, Country:　　BOSTON,　MA　02110　USA |
| **The location of the Massachusetts office, if any:** Address:  99 HIGH STREET SUITE 1701 City or town, State, Zip code, Country:　　BOSTON,　MA　02110　USA |
| **The name and address of the Resident Agent:** Name:　　C T CORPORATION SYSTEM Address:  155 FEDERAL STREET, SUITE 700 City or town, State, Zip code, Country:　　BOSTON,　MA　02110　USA |

**The name and business address of each Manager:**

| Title | Individual name | Address |
|---|---|---|
| MANAGER | JEREMY ALLAIRE | 99 HIGH STREET, SUITE 1701 BOSTON, MA 02110 USA |

**The name and business address of the person(s) authorized to execute, acknowledge, deliver, and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual name | Address |
|---|---|---|



# Exhibit B26

