# Exhibit 43

# Programmatic Market Activity Agreement

This Programmatic Market Activity Agreement (the "Agreement"), made as of the date the last party signs (the "Effective Date"), is by and between Ripple Markets Inc. ("Ripple"), a California corporation, and GSR Holdings Limited, a Hong Kong company limited by shares ("GSR"). Ripple and GSR are hereby referred to as "Party" individually and together as "Parties".

Pursuant to the terms and conditions of this Agreement, and for good and valuable consideration, the Parties agree as follows:

## 1. [Reserved.]

## 2. Programmatic Market Activity

GSR agrees to transact in XRP according to the then current programmatic schedule provided by Ripple ("Programmatic Market Activity") subject to the terms of this Agreement. Ripple will provide to GSR the Programmatic Market Activity plan on a monthly basis in advance of the subject month. Ripple reserves the right to adjust the Programmatic Market Activity plan during the month.

GSR will maintain a segregated wallet or wallets with locations on the Ripple Consensus Ledger to be used by GSR solely to transact Programmatic Market Activity. GSR may also maintain accounts at other third party digital asset exchanges and ledgers in order to transact Programmatic Market Activity, provided that Ripple approves in writing of the use of such accounts in advance. Ripple will fund GSR's segregated wallet or wallets in XRP amounts at Ripple's sole discretion for GSR's use in connection with the Programmatic Market Activity. GSR will remit proceeds back to Ripple as provided in Section 3. The public keys or other identifying information in connection with each segregated wallet(s) will be communicated to Ripple, and confirmed by GSR, within 10 business days of the date of the Effective Date. GSR shall provide Ripple with information for any other wallet it intends to use to facilitate the Programmatic Market Activity. The security of the segregated wallet or wallets created and maintained by GSR in connection with this Agreement will be the sole responsibility of GSR.

GSR will determine the specifics of each transaction that together or separately satisfy the Programmatic Market Activity plan. Ripple reserves the right to direct GSR to manage exposure related to other digital assets or locations of digital assets in connection with this Agreement.

## 3. Remittance of Proceeds to Ripple and Payment to GSR

Ripple may, at any time and in its sole discretion, direct GSR remit any portion of or all of the proceeds of GSR's Programmatic Market Activity, as such amounts are reported in the then-current daily reporting of XRP Programmatic Market Activity required in Section 4. GSR shall promptly (i) remit ▇% of the amounts of such proceeds to Ripple in a payment method(s) directed by Ripple in its sole discretion and (ii) transfer ▇% of the amounts of such proceeds to a wallet or account of GSR for its own benefit.

For the avoidance of doubt, while this Agreement is operational, and until terminated, the provisions in this section shall apply regardless of whether or not Ripple continues to fund the segregated wallet (described in Section 2 of this Agreement).

### 4. Reporting and Access to Records

   a. As a condition precedent to GSR's share of the proceeds described in Section 3, GSR must provide daily reporting of its XRP Programmatic Market Activity. Such report shall specify the balance of XRP in the segregated wallet(s) and account(s) (described in Section 2 of this Agreement) and the balance of GSR's proceeds from Programmatic Market Activity, broken down by currency, exchange, gateway, and location off the Ripple Consensus Ledger, as applicable.

   b. During the term of this Agreement and for one year thereafter, Ripple will have the right to audit and review and copy GSR's records and to inspect the accuracy of the reporting of XRP Programmatic Market Activity required under this section.

### 5. Term

The Term of this Agreement shall commence on the first day of the calendar month following the date of this Agreement and shall continue until the earlier of:

   a. 12 months;

   b. termination by Ripple upon 180 calendar days' notice to GSR;

   c. upon written notice of termination by a Party if the other Party is in material breach of this Agreement, if the breaching party does not, within ten (10) calendar days after receiving written notice describing an alleged material breach of this Agreement, cure the alleged material breach; or

   d. upon written notice in the event that the other Party has filed or has filed against it a petition for voluntary or involuntary bankruptcy or similar relief from insolvency, makes an assignment for the benefit of its creditors, has a

Confidential - 2

receiver appointed for all or a substantial part of its business or assets, or otherwise admits in writing of its inability to meet debts as they become due.

Upon termination, GSR shall return to Ripple all XRP, if any, transferred from Ripple to GSR as provided in Section 2 that GSR has not transacted following any Programmatic Market Activity plan. The following sections shall survive the termination of this Agreement: Section 4(b), Section 8 (Confidentiality), Section 8 (Limitation of Liability), and Section 16 (Law and Disputes).

## 6. Compliance with Laws

Each Party shall at all times comply with all laws, regulations, and administrative or judicial orders that are applicable to the operation of its business, this Agreement, and its performance hereunder, including, but not limited to, any applicable asset control, anti-bribery, corruption, or anti-money laundering laws, rules, and regulations. Without limiting the generality of the foregoing, GSR shall at all times, and at its own expense, obtain and maintain all necessary certifications, authorizations, licenses, and permits materially necessary to the exercise of its obligations under this Agreement.

## 7. Intellectual Property

Each Party shall retain all right, title and interest in its intellectual property rights, including those held before this Agreement, or they have developed independently of this Agreement.

## 8. Confidentiality

Either Party ("Discloser") may disclose to the other Party ("Recipient") information that Discloser desires Recipient to keep confidential and protect against unauthorized use or disclosure subject to the terms of this Section 8 (Confidentiality).

a.     **Definition**. "Confidential Information" means any and all information, data, software, business plans, company financial data, trade secrets or know-how disclosed during the term of the Agreement to the Recipient, either directly or indirectly by Discloser, whether in writing, by electronic means, orally or by inspection of tangible objects (including, without limitation, documents, prototypes, software, product or service roadmaps, diagrams, computer code (object or source), vendor/customer/employee lists, forecasts, videos, diagrams, presentations, financial statements), which is designated as "Confidential", "Proprietary", or some similar designation, or is by its nature and/or the circumstances of its disclosure, reasonably inferred to be confidential or proprietary. Confidential Information may include information disclosed to the Discloser by a third party.

b.     **Exclusions**. Confidential Information shall not include any information: (i) which was publicly known and/or made generally available in the public domain prior to the time of disclosure to Recipient; (ii) was generally available to the public following disclosure to Recipient

CONFIDENTIAL                                                                                          RPLI_SEC 0507302

through no act or omission by Recipient or anyone to whom the Recipient disclosed such information; (iii) Recipient rightfully possessed without any duty of non-disclosure prior to the initial disclosure to Recipient (as shown by Recipient's written files and records); (iv) which was independently developed by Recipient without use of or reference to Confidential Information received by Recipient (as shown by Recipient's documents and other competent evidence); and (v) Recipient rightfully obtained such information from a third party permitted to disclose it without a breach of such third party's obligations of confidentiality.

c.     **Confidentiality Obligations**. Recipient agrees to hold Confidential Information of the Discloser in the strictest confidence and exercise its best efforts and precautions to protect and maintain the confidentiality of the Confidential Information, which precautions shall be at least equivalent in scope and effect to the measures taken by Recipient to protect its own confidential or proprietary information of a like or similar nature, but in no case with less than a reasonable degree of care.   Recipient and any Representative further shall have the right to use such Confidential Information solely in connection with the exercise of the rights or performance of the obligations of Recipient under this Agreement and not for any other purpose at any time ("Permitted Uses").   Recipient agrees that it not disclose any Confidential Information to any third parties, except to Recipient's directors, officers, employees, contractors and agents ("Personnel") and/or its affiliates and its Personnel, and its or their consultants, attorneys, accountants or other professional advisors (all of the foregoing collectively, "Representatives") who have a need to know the information in connection with the Permitted Uses.   Such permitted disclosure shall be made only to those Representatives who have signed (or are otherwise legally bound by) a non-use and non-disclosure agreement in substance at least as protective as the provisions hereof, prior to any disclosure of Confidential Information to such persons, and which would protect the Confidential Information disclosed under this Agreement. Recipient agrees and accepts all liability for the acts and omissions of its Representatives as such acts and omissions relate to these confidentiality and non-use obligations. Recipient must reproduce all confidentiality and/or proprietary notices on all copies in the same manner as the original. Recipient agrees that it will promptly notify the Discloser of any use or disclosure of the Confidential Information in violation of this Agreement.

d.     **Mandatory Disclosures**. Recipient further may disclose Confidential Information required to be disclosed by law, regulation or a valid court order, if Recipient (a) gives Discloser timely notice so that Discloser may seek a protective order, confidential treatment, or other appropriate relief, (b) provides assistance as reasonably necessary for Discloser, at its expense, to seek a protective order, confidential treatment, or other appropriate relief, and (c) only discloses the portion of Confidential Information that Recipient's legal counsel advises is legally required to be disclosed.

e.     **Return or Destruction of Materials**. All documents and other tangible objects containing or representing Confidential Information, and all copies thereof which are in the

CONFIDENTIAL                                                                                                           RPLI_SEC 0507303

possession of the Recipient or its Representatives, shall be and remain the property of Discloser and upon termination of this Agreement shall be promptly returned or, at the option of the Recipient, destroyed with a written certification of destruction to Discloser.   Notwithstanding the preceding sentence and in the event Recipient is required by law or regulation to retain the Confidential Information, Recipient may retain only the Confidential Information necessary for compliance.

f.        **Survival**.   The respective obligations in this Section 5 shall survive the termination or expiration of this Agreement and shall continue in full force and effect for a period of five (5) years thereafter.   Termination of such obligations shall not affect or limit any independent rights of a party in or to its Confidential Information under applicable Laws.

### 9.   Limitation of Liability

NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OR THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT WILL RIPPLE'S AGGREGATE AND CUMULATIVE LIABLITY FOR ANY LOSSES AND DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT OR THE SUBJECT MATTER THEREOF, WHETHER BASED ON A CLAIM OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY OR OTHERWISE UNDER ANY THEORY OF LAW, EXCEED THE TOTAL AMOUNT PAID BY RIPPLE to GSR IN THE PRIOR TWELVE (12) MONTH PERIOD BEFORE THE EVENT GIVING RISE TO THE CLAIM.

EXCEPT FOR A BREACH OF SECTION 8 (CONFIDENTIALITY) OR ANY INDEMNIFICATION OBLIGATIONS IN THE AGREEMENT, IN NO EVENT WILL EITHER PARTY, THEIR RESPECTIVE REPRESENTATIVES, LICENSORS OR SUPPLIERS BE LIABLE TO THE OTHER PARTY OR ITS REPRESENTATIVES FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, HYBRID OR PUNITIVE DAMAGES, OR DAMAGES FOR LOST PROFITS, REVENUE, GOODWILL OR SAVINGS, LOSS OF USE, BUSINESS INTERRUPTION, LOSS OF DATA, COST OF REPLACEMENT GOODS OR REPUTATIONAL HARM, WHETHER OR NOT BASED ON A CLAIM OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY OR OTHERWISE UNDER ANY THEORY OF LAW, EVEN IF SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES.   GSR shall defend, indemnify and hold Ripple harmless from any and all claims, liabilities, costs and expenses (including reasonable attorneys' fees) arising out of or related to GSR's breach of this Agreement.

### 10. Warranties

Each party represents to the other party that it: (a) is a legal entity duly organized and validly existing under the laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement and perform its obligations hereunder; and (c) when executed and delivered by such

CONFIDENTIAL                                                                                                                                          RPLI_SEC 0507304

party, this Agreement will constitute legal, valid and binding obligation of such party that is enforceable in accordance with its terms hereunder.

### 11. Relationship of the Parties
This Agreement will not be construed as creating an agency, partnership, joint venture or any other form of association, for tax purposes or otherwise between the parties and the parties will at all times be and remain independent contractors. Neither party will have the authority to enter into any contract on behalf of the other party or to otherwise bind the other party to any legal obligation.

### 12. Assignment
Neither party may assign this Agreement or any right hereunder without the prior written consent of the other Party. Any purported assignment made in violation of this provision will be deemed to be and will be void. Notwithstanding the foregoing, each party shall be entitled to assign this Agreement in its entirety to an affiliate, acquirer or successor entity as the result of a restructuring, merger, or sale of all or a substantial part of its business or assets.

### 13. Entire Agreement
This Agreement shall constitute the entire agreement between the parties with respect to the subject matter hereof and supersedes all prior proposals, negotiations, and other communications between the parties, whether oral, written, electronic or otherwise.

### 14. Severability
If any provision of this Agreement is held to be invalid or unenforceable, the parties agree that such invalidity or unenforceability shall not affect the validity of the remaining provisions of this Agreement and that they shall undertake to negotiate in good faith a substitute valid provision which most closely approximates the intentions and economic effect of the invalid provisions.

### 15. Publicity
Neither Party shall publicly use or display the name, trademarks, service marks or logos (collectively, "Trademarks") of the other Party (the "Brand Owner") without the Brand Owner's prior written consent, such consent may not be unreasonably withheld.

### 16. Law and Disputes
    a. Governing Law -- any claim, controversy or dispute arising under or related to this Agreement will be governed by the state of California, without regard to any provision of California law that would require or permit the application of the substantive law of any other jurisdiction.

Confidential - 6

CONFIDENTIAL     RPLI_SEC 0507305

b. Informal Dispute Resolution -- At the written request for either party, the parties will attempt to resolve any dispute arising under or relating to this Agreement through the informal means described in this paragraph. Each party will appoint a senior management representative and this representative will furnish the other all non-privileged information with respect to the dispute that the parties believe is germane. The representatives will negotiate in an attempt to resolve the dispute without the necessity of a formal proceeding. A formal proceeding for the resolution of the dispute may not commence until the earlier of (i) the designated representatives conclude that resolution through continued negotiation does not appear likely, or (ii) fourteen calendar days have passed since the initial request to negotiate the dispute was made -- unless this time has been extended by both parties in a writing.

c. Any dispute arising out of or related to this Agreement which cannot be settled via informal means in accordance with the paragraph above shall be subject to the irrevocable and exclusive jurisdiction of the state and federal courts located in San Francisco, California.

**Signatures:**

| **RIPPLE MARKETS INC.** | **GSR HOLDINGS LIMITED** |
|---|---|
|  June 2, 2017 |  June 1, 2017 |
| Name: Patrick Griffin      Date | Name:                          Date |
| Title: Senior Vice President | Title: Founder |