# Exhibit 53

**Execution Version**

# MARKET MAKING AGREEMENT

THIS MARKET MAKING AGREEMENT ("**Agreement**") is entered into as of June 26, 2014 ("**Effective Date**") by and between RIPPLE MARKETS, INC., a California corporation ("**Company**"), and [REDACTED], a Delaware limited liability company ("**Market Maker**").

RECITALS

A. Company desires to, among other things, promote liquidity of fiat and crypto currencies within the Ripple Network (defined below) by engaging Market Maker to quote binding bid and offer prices for Currency Pairs (defined below) within the Ripple Network.

B. Market Maker is experienced in market making and is willing to provide the Market Making Services described in this Agreement.

AGREEMENT

For good and valuable consideration, Company and Market Maker agree as follows:

## 1. Definitions

When used in this Agreement with initial letters capitalized, in addition to terms defined elsewhere in this Agreement, the following terms have the following meanings:

"**Affiliate**" means, with respect to any Person, any other Person that directly, or indirectly through one or more intermediaries, controls, is controlled by or is under common control with that Person. For purposes of this definition, "control" (including the terms "controlling" and "controlled") means the power to direct or cause the direction of the management and policies of a Person, directly or indirectly, whether through the ownership of equity interests, by contract or otherwise.

"**Claim**" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against any Company Indemnified Party or Market Maker Indemnified Party, as applicably, by a third party.

"**Commencement Date**" means the date upon which Market Maker must commence its Market Making Services under this Agreement, as set forth on Appendix A.

"**Company Default**" means any failure or default by Company to perform or in performing its obligations under this Agreement in any material respect.

"**Company Indemnified Party**" means Company and each of its Affiliates and each of their respective employees, shareholders, directors, members, managers and representatives.

"**Confidential Information**" means the terms of this Agreement and any non-public information or materials provided by either party to the other party in connection with the performance of this Agreement.

"**Currency Pair**" means any currency pair set forth in Section 1 or Section 2 on Appendix A, as revised from time to time in accordance with Section 2(B). For avoidance of doubt, Currency Pairs do not include Commodity-Related Pairs (as defined in Appendix A below) set forth in Section 3 on Appendix A.

"**Defined Size**" means the minimum size of any bid or offer, as set forth in Appendix A.

"**Defined Spread**" means the maximum defined spread for any bid or offer, as set forth in Appendix A.

"**Deployment Amount**" means the aggregate amount of XRP set forth in Appendix A that Market Maker must deploy or stand ready to deploy to make binding bids and offers in the Currency Pairs and any Agreed Commodity-Related Pairs (as defined in Appendix A below).

"**Fast Market**" has the meaning set forth in Scction 2(E) of this Agreement.

"**Governmental Authority**" means a Federal, state or local court, legislature, governmental agency, commission or regulatory or administrative authority or instrumentality.

"**Loss**" means any cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

"**Market Maker Default**" means any failure or default by Market Maker to perform or in performing its obligations under this Agreement in any material respect.

"**Market Maker Indemnified Party**" means Market Maker and each of its Affiliates and each of their respective employees, shareholders, directors, members, managers and representatives.

"**Market Making Services**" means the market making services provided by Market Maker under this Agreement, as described in Section 2.

"**Person**" means an individual, corporation, general partnership, limited partnership, limited liability company, joint venture, trust, business trust, association, joint stock company, Governmental Authority, unincorporated organization, or other legal entity, and the heirs, executors, administrators, legal representatives, successors and assigns of such Person as the context may require.

"**Quote Coverage Period**" means the percent of relevant trading hours in which Market Maker must quote binding bids and offers, as set forth in Appendix A.

"**Revision Notice**" has the meaning set forth in Section 2(B) of this Agreement.

"**Ripple Account**" means any Ripple Network account held by Market Maker for purposes of fulfilling its obligations under this Agreement.

"**Ripple Network**" means the decentralized, open source, global payment network operating on the Ripple protocol.

"**Suspension Event**" has the meaning set forth in Section 2(D) of this Agreement.

"**XRP**" means the crypto currency native to the Ripple Network.

**2. Market Making Services.**

(A) Except as otherwise provided in Sections 2(B) and (C), upon the Commencement Date and during the remainder of the Term (as defined below) of this Agreement, Market Maker shall quote on the Ripple Network binding bid and offer prices for all Currency Pairs and Agreed Commodity-Related Pairs at or inside the Defined Spread at not less than the Defined Size during the Quote Coverage Period, and (except as otherwise provided under Appendix A relating to the Other Permitted XRP Uses (as defined therein)) shall use not less than the applicable Deployment Amount to provide (or to be available to provide) market making services for the Currency Pairs and Agreed Commodity-Related Pairs. Market Maker shall provide any information or reports reasonably requested by Company for the purpose of confirming that Market Maker has satisfied any Deployment Amount requirements.

(B) From time to time, but not more frequently than once each calendar year (and in such event for a *bona fide* business purpose only using reasonably major currencies that have significant global trading volume), Company may revise one or more of the Currency Pairs then in effect by giving Market Maker written notice of such revision (the "**Revision Notice**") and such revision shall become effective 30 days after Market Maker's receipt of the Revision Notice. If the revised Currency Pairs are not acceptable to Market Maker, Market Maker may terminate this Agreement pursuant to Section 4(E). Any addition of or revision to any Commodity-Related Pairs shall be accomplished pursuant to the terms of Section 3 of Appendix A only.

(C) Market Maker may, but shall not be required to, perform the Market Making Services during the continuance of a Suspension Event or a Fast Market. If Market Maker elects to provide Market Making Services during a Fast Market, it may, in its discretion, do so with a spread other than the Defined Spread. If a party becomes aware of the existence of a Suspension Event, it shall advise the other party thereof by email as promptly as reasonably possible.

(D) "**Suspension Event**" means any of the following:

(i) the Deutsche Bank Currency Volatility Index ("CVIX" Index on Bloomberg) exceeds 12.5;

(ii) if a party provides notice to the other party that, in its reasonable judgment, a change has occurred in national or international financial, political or economic conditions, including without limitation relating to foreign exchange markets, that makes it impractical or impossible for Market Maker to enter binding bids and offers on the Ripple Network;

(iii) A preliminary or permanent injunction or other order, decree, ruling or judgment of a Governmental Authority shall be in effect or shall have been issued, or a law, rule or regulation promulgated or enacted by any Governmental Authority shall be in effect or shall have been adopted, that in the reasonable judgment of a party makes it impractical or impossible for Market Maker to enter binding bids and offers on the Ripple Network;

(iv) an act of God, war, terrorism, fire, flood, civil disturbance, failure of the Ripple Network protocol, damage to the local or global network, including without limitation the Internet, a known security breach or significant hacking event, a severed undersea cable or other similar causes beyond the Market Maker's reasonable control that in the reasonable judgment of a party prevents Market Maker from entering or makes it impossible or impracticable for Market Maker to enter binding bids and offers on the Ripple Network or otherwise adversely impacts the ability of Market Maker to perform its obligations as such in a reasonable manner; or

(v) in the event Market Maker has reached total, currency or user load transaction limits imposed by any applicable Governmental Authority.

(E) "**Fast Market**" means either of the following:

(i) the fifteen minutes before and fifteen minutes after the announcement of a U.S. or international major economic indicator; or

(ii) any unusual market condition or price volatility that Market Maker reasonably determines, after consultation with Company, prevents maintenance of an orderly market.

**3. Consideration for Performance.**

As consideration for the full and timely performance by Market Maker of its obligations under this Agreement, Company hereby grants to Market Maker [REDACTED] XRP.

**4. Term; Early Termination; Return of Consideration.**

(A) The term of this Agreement shall commence on the Effective Date and end on the 5th anniversary of the Commencement Date (the "**Term**").

(B) If (i) a Market Maker Default occurs and remains uncured for more than 30 days after notice thereof to Market Maker from the Company or (ii) after a cure contemplated in item (i) a subsequent Market Maker Default occurs within 3 months, Company may, in its discretion, terminate this Agreement upon 30 days prior written notice to Market Maker.

(C) If (i) a Company Default occurs and remains uncured for more than 30 days after notice thereof to Company from Market Maker or (ii) after a cure contemplated in item (i) a subsequent Company Default occurs within 3 months, Market Maker may, in its discretion, terminate this Agreement upon 30 days prior written notice to Company.

(D) If this Agreement is terminated by Company pursuant to Section 4(B), Market Maker shall deliver to Company, within ten (10) days of Company's demand therefor, the number of XRP equal to:

(i) if the Market Maker Default giving rise to Company's right to terminate occurs before the first anniversary of the Commencement Date - all XRP delivered by Company to Market Maker pursuant to Section 3; and

(ii) if the Market Maker Default giving rise to Company's right to terminate occurs on or after the first anniversary of the Commencement Date (any such date on which the Market Maker Default occurs, the "**Post-First Year Default Date**") – the product of:

$$a * (b/c)$$

where:

a = the amount of Unvested XRP (as defined in Appendix A below) as of the Post-First Year Default Date;

b = the number of full calendar months that remained in the Term of this Agreement as of the Post-First Year Default Date; and

c = the number of full calendar months that remained in the Term of this Agreement as of the most recent Prior Vesting Date (as defined in Appendix A below);

an example of the application of the foregoing equation being provided in Appendix B hereto for illustrative purposes only.

(E) Within 30 days after receipt of a Revision Notice, Market Maker may terminate this Agreement without penalty or further obligations (except as provided under this Section 4(E) or Section 4(H) below) by giving Company written notice of termination. If this Agreement is terminated by Market Maker pursuant to this Section 4(E), Market Maker shall deliver to Company, within ten (10) days of Company's demand therefor, the same number of XRP deliverable to Company relating to a Forfeiture Event (as defined below) under Section 4(D)(i), in the event the termination by Market Maker pursuant to this Section 4(E) occurs before the first anniversary of the Commencement Date, or Section 4(D)(ii), in the event the termination by Market Maker pursuant to this Section 4(E) occurs on or after the first anniversary of the Commencement Date (using the date of termination by Market Maker pursuant to this Section 4(E) as the "Post-First Year Default Date" for purposes of the calculation).

(F) Company may terminate this Agreement without penalty or further obligations (except as provided under Section 4(H) below) upon notice to Market Maker in the event of a

change in or enforcement of applicable law or adverse regulatory action that in Company's reasonable judgment prohibits or materially impairs Company's ability to perform its obligations as contemplated by this Agreement.

(G) Market Maker may terminate this Agreement without penalty or further obligations (except as provided under this Section 4(G) or Section 4(H) below) upon notice to Company (a "**Section 4(G) Termination Notice**") in the event of a change in or enforcement of applicable law or adverse regulatory action that in Market Maker's reasonable judgment prohibits or materially impairs Market Maker's ability to perform its obligations as contemplated by this Agreement. If this Agreement is terminated by Market Maker pursuant to this Section 4(G), Market Maker shall deliver to Company, within ten (10) days of Company's demand therefor, the same number of XRP deliverable to Company relating to a Forfeiture Event under Section 4(D)(i), in the event the termination by Market Maker pursuant to this Section 4(G) occurs before the first anniversary of the Commencement Date, or Section 4(D)(ii), in the event the termination by Market Maker pursuant to this Section 4(G) occurs on or after the first anniversary of the Commencement Date (using the date of the Section 4(G) Termination Notice as the "Post-First Year Default Date" for purposes of the calculation).

(H) In the event of termination of this Agreement in accordance with this Section 4, all rights and obligations of the parties under this Agreement shall terminate without any liability to the other party other than in respect of the early termination consideration provided in Sections 4(D), (E) and (G) and except that (a) subject to Section 8, nothing herein shall relieve a party from any liability for any breach of its covenants, representations or warranties hereunder and (b) this Section 4 and the provisions of Sections 1, 5, 6, 7, 8 and 9 shall survive the termination of this Agreement for any reason. Each of the events giving rise to a forfeiture pursuant to Section 4(D)(i) or (ii), Section 4(E) or Section 4(G) shall be a "**Forfeiture Event**" for all purposes of this Agreement.

(I) The early termination consideration provided in Sections 4(D), (E) and (G) is not a penalty and represents fair and equitable compensation to Company for the shortened length of this Agreement in view of the difficulties and impracticality of determining actual damages and injury resulting from such shortened length.

**5. Warranties, Representations and Additional Covenants.**

(A) Each party represents and warrants to the other party and covenants that

(i) at such time as it delivers XRP to the other party, it has conveyed and will convey to the other party good title to and ownership of such XRP free and clear of all liens and other encumbrances;

(ii) it is a corporation or limited liability company, as the case may be, and is duly organized, in good standing and validly existing under the laws of its jurisdiction of organization and has all requisite corporate or limited liability company, as the case may be, power and authority to execute and deliver this Agreement and perform its obligations hereunder.

(iii) this Agreement has been duly executed and delivered by it and constitutes

its legal, valid and binding obligation enforceable against it in accordance with its terms, except to the extent enforcement may be limited by applicable bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium, and similar laws of general applicability affecting the rights of creditors and general principles of equity;

(iv) it is not in conflict with, or in default or violation of, any laws applicable to the Ripple Network or the transactions contemplated hereunder. It has not received notice of any formal or informal complaint or order filed against it alleging any non-compliance by it with respect to any such laws;

(v) its execution, delivery and performance of this Agreement will not (i) conflict with, or result in a breach or violation of, or constitute a default under, any provision of its organizational documents; (ii) constitute, with or without the giving of notice or passage of time or both, a breach, violation or default by it, create a lien or other encumbrance, or give rise to any right of termination, modification, cancellation, prepayment or acceleration, or a loss of rights, under (A) any law or governmental authorization or (B) any note, bond, mortgage, indenture, lease, agreement or other instrument, in each case which is applicable to or binding upon it or any of its assets; or (iii) require any action in respect of, or filing with, any governmental authority or any consent;

(vi) it will comply with all applicable laws in performing its obligations under this Agreement; and

(vii) it has, and will at all times at its expense maintain in full force and effect, all permits, licenses, consents, approvals, registrations and authorizations it determines in its sole reasonable discretion to be necessary to the performance of its obligations under this Agreement;

(B) Company represents and warrants to Market Maker and covenants that:

(i) any written materials regarding XRP, the Ripple Network or the Ripple protocol provided by Company or any of its Affiliates to Market Maker did not and will not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements in it, in light of the circumstances under which they are made, not misleading in any material respect, except that Company makes no representations, warranties or agreements as to information contained in or omitted from any such materials in reliance upon or in conformity with written information furnished to Company by Market Maker.

(C) Market Maker represents and warrants to Company and covenants that:

(i) it will be solely responsible for implementing reasonable security safeguards designed to prevent any unauthorized access to any Ripple Account, provided that such unauthorized access does not result from any security failures that arise from within the Ripple Network protocol itself. Without limiting the generality of the foregoing, Market Maker will be solely responsible for implementing reasonable means of preventing any unauthorized access to any credentials that, on their own or in

combination with other information, may allow access to a Ripple Account or any balances maintained in such Ripple Account, including any wallet name, password or passphrase, or private and public cryptographic key pairs; and

(ii) it will use commercially reasonable efforts to implement any reasonable security practices described from time to time on the Ripple wiki (https://www.ripple.com/wiki) or as otherwise communicated by Company to Market Maker in writing.

**6. Indemnification.**

(A) By Market Maker:

(i) Market Maker shall defend, indemnify and hold harmless the Company Indemnified Party from and against any Claim or Loss to the extent any Claim or Loss is based on (a) a breach of any representation, warranty or covenant of this Agreement by Market Maker or caused by Market Maker's employees, contractors or agents, (b) any use, distribution or resale of any Currency Pair or Commodity-Related Pair via the Ripple Network by Market Maker or Market Maker's employees, contractors or agents, and all associated marketing and promotional activities undertaken by Market Maker, in any case in violation of this Agreement or applicable law or (c) any taxes that Market Maker is obligated to pay.

(ii) In connection with any Claim or Loss described in Section 6(A), Company shall: (a) give Market Maker prompt notice of the Claim or Loss after an executive officer of Company has actual knowledge thereof (however, any delay in notification will not relieve Market Maker of its obligations under Section 6(A)(i) except and solely to the extent that the delay materially impairs Market Maker's ability to defend the Claim or Loss), (b) cooperate reasonably with Market Maker (at Market Maker's expense) in connection with the defense and settlement of the Claim or Loss, and (c) permit Market Maker to control the defense and settlement of the Claim or Loss, except that Market Maker shall not enter into any settlement or compromise of any Claim or Loss without Company's prior written consent if such settlement or compromise arises from or is part of any criminal action, suit or proceeding or contains a stipulation to or admission or acknowledgment of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of Company or otherwise requires Company to take or refrain from taking any material action (such as the payment of fees). Company (at its cost) may participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

(B) By Company:

(i) Company shall defend, indemnify and hold harmless the Market Maker Indemnified Party from and against any Claim or Loss to the extent any Claim or Loss is based on (a) a breach of any representation, warranty or covenant of this Agreement by Company or caused by Company's employees, contractors or agents, (b) third party claims that the Ripple Network infringes any patent, copyright, trade secret or other proprietary right of such third party or (c) any taxes that Company is obligated to pay.

(ii) In connection with any Claim or Loss described in Section 6(B), Market Maker shall: (a) give Company prompt notice of the Claim or Loss after an executive officer of Market Maker has actual knowledge thereof (however, any delay in notification will not relieve Company of its obligations under Section 6(B)(i) except and solely to the extent that the delay materially impairs Company's ability to defend the Claim or Loss), (b) cooperate reasonably with Company (at Company's expense) in connection with the defense and settlement of the Claim or Loss, and (c) permit Company to control the defense and settlement of the Claim or Loss, except that Company shall not enter into any settlement or compromise of any Claim or Loss without Market Maker's prior written consent if such settlement or compromise arises from or is part of any criminal action, suit or proceeding or contains a stipulation to or admission or acknowledgment of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of Market Maker or otherwise requires Market Maker to take or refrain from taking any material action (such as the payment of fees). Market Maker (at its cost) may participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

**7. Confidentiality.**

(A) Each party shall maintain the confidentiality of the other party's Confidential Information and use Confidential Information only for the purpose of performing its obligations under this Agreement. The obligations of this Section shall not apply to any information or material that the receiving party can demonstrate: (i) was previously known to the receiving party free of any obligation to keep it confidential, (ii) becomes generally available to the public through no wrongful act, (iii) is rightfully received from a third party under no obligation of confidence to such third party, (iv) is independently developed by the receiving party without reference to information that has been disclosed pursuant to this Agreement, or (v) is required to be disclosed in order to comply with applicable law; provided, however, that in a circumstance in which disclosure is compelled by applicable law, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with such law and, to the extent not prohibited by applicable laws from doing so, shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

(B) Except to the extent required by applicable law (and then, to the extent it is not prohibited by applicable laws from doing so, Company shall give Market Maker prompt prior notice of such compelled disclosure so that Market Maker may seek to protect such information), none of the Company or its Affiliates or any of their respective directors, officers, members, managers, employees, independent contractors, agents or other representatives (collectively, "**Representatives**") shall use or disclose Market Maker's name or any other characteristics or attributes that could reasonably be used to determine the identity of Market Maker or any of its Representatives or investors, to any Person, including without limitation by virtue of disclosure to print publications or television news media or social media, blogs, forum posts or similar digital media, in all events without prior written permission from Market Maker on a case-by-case basis in its sole discretion.

**8. Limitations on Liability.**

(A) Except with respect to: (i) a party's obligations, as set forth in this Agreement, with regard to indemnification (Section 6) and confidentiality (Section 7) or (ii) gross negligence or willful misconduct by a party, in each case as to which the following limitations do not apply, in no event shall either party be liable to the other party for any indirect, special, exemplary, punitive or consequential damages in connection with this Agreement.

(B) Except with respect to: (i) a party's obligations, as set forth in this Agreement, with regard to indemnification (Section 6) and confidentiality (Section 7) or (ii) gross negligence or willful misconduct by a party, in each case as to which the following limitations do not apply, in no event shall either party be liable one to the other for any claims arising in connection with this Agreement, regardless of the cause of the loss or injury and regardless of the legal right claimed to have been violated, in excess of direct damages (x) in the case of Market Maker, satisfied solely by virtue of the return to Company of up to all of the XRP previously delivered by Company to Market Maker pursuant to Section 3 above to the extent such XRP are in Market Maker's or any of its Affiliate's possession as of the applicable date of determination and (y) in the case of Company, equal to $500,000.

**9. Miscellaneous.**

(A) All notices and other communications provided for herein shall be delivered to a party at the address or other contact information for such party set forth in Appendix A, provided that either party may change its address or other contact information by notice to the other party.

(B) This Agreement is not an exclusive agreement by either party for market making services, and either party may at any time and from time to time enter into agreements with others for market making services in connection with Currency Pairs or Commodity-Related Pairs or otherwise.

(C) No failure on the part of either party to exercise, and no delay in exercising, any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. The rights and remedies under this Agreement are cumulative and not exclusive of any rights, powers, privileges and remedies that may otherwise be available to a party.

(D) This Agreement may be amended or modified only by a written document executed by the parties. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement (for avoidance of doubt including Appendix A) constitutes the entire contract between the parties relating to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by fax or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

(E) This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties. Neither party may assign, transfer or delegate any of its rights or obligations under this Agreement, including, without limitation, in connection with any sale,

merger, consolidation, change of control or similar transaction, without the prior written consent of the other party. Any assignment, transfer or delegation of any rights or obligations in violation of this Section 9(E) shall automatically be null and void *ab initio*.

(F) If any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or any remaining provisions of this Agreement.

(G) This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its rules of conflict of law, except Section 5-1401 of the New York General Obligations Law. Each party agrees that it shall bring any action or proceeding in respect of any claim arising out of or related to this Agreement, whether in tort or contract or at law or in equity, exclusively in the United States District Court for the Southern District of New York or the courts of the State of New York located in New York County, City of New York (the "**Chosen Courts**") and (i) irrevocably submits to the exclusive jurisdiction of the Chosen Courts, (ii) waives any objection to laying venue in any such action or proceeding in the Chosen Courts for purposes of any such action or proceedings and (iii) waives any objection that the Chosen Courts are an inconvenient forum or do not have jurisdiction over any party.

(H) **EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, COUNTERCLAIM OR OTHER LITIGATION IN ANY WAY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS OR EVENTS REFERENCED HEREIN OR CONTEMPLATED HEREBY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. A COPY OF THIS SECTION MAY BE FILED WITH ANY COURT AS WRITTEN EVIDENCE OF THE WAIVER OF THE RIGHT TO TRIAL BY JURY AND THE CONSENT TO TRIAL BY COURT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the Effective Date.






2957331.3

# APPENDIX A

1. **Fiat Currency:**

(a) **Currency Pairs:**

| Currency | Issuing Address | | Currency | Issuing Address |
|---|---|---|---|---|
| EUR | [redacted] | / | USD | [redacted] |
| GBP | [redacted] | / | USD | [redacted] |
| MXN.bitso | [redacted] | / | USD | [redacted] |
| EUR | [redacted] | / | USD.bitstamp | [redacted] |

(b) **Defined Spread:** [redacted]

(c) **Defined Size:** [redacted]

(d) **Quote Coverage Period:** [redacted] of Ripple ledgers that close in a given week

For avoidance of doubt, the parties intend that this Section 1 of Appendix A will include and the related market making parameters under foregoing clauses (b), (c) and (d) (collectively, "**Market Making Parameters**") will apply to Market Making Services in fiat currencies only.

2. **Crypto Currency:**

(a) **Currency Pairs:**

| Currency | Issuing Address | | Currency | Issuing Address |
|---|---|---|---|---|
| XRP | Not Applicable | / | BTC.bitstamp | [redacted] |
| XRP | Not Applicable | / | USD.bitstamp | [redacted] |
| BTC.bitstamp | [redacted] | / | USD.bitstamp | [redacted] |
| XRP | Not Applicable | / | USD [redacted] | [redacted] |
| XRP | Not Applicable | / | BTC [redacted] | [redacted] |
| XRP | Not Applicable | / | EUR [redacted] | [redacted] |
| XRP | Not Applicable | / | GBP [redacted] | [redacted] |
| BTC [redacted] | [redacted] | / | USD [redacted] | [redacted] |
| | | | | |

(b) **Defined Spread:** [redacted]

(c) **Defined Size:** [redacted]

(d) **Quote Coverage Period:** [redacted] of Ripple ledgers that close in a given week

3. **Commodity-Related Pairs:**

| Currency | Issuing Address | | Currency | Issuing Address |
|---|---|---|---|---|
| XAU.[redacted] | | / | USD.bitstamp | [redacted] |
| XAU.[redacted] | | / | USD[redacted] | |

together with any other physical gold related crosses as may be mutually agreed by the parties from time to time in writing following the Effective Date (each, a "**Commodity-Related Pair**" and, collectively, the "**Commodity-Related Pairs**"). Notwithstanding the foregoing or any other provision of this Agreement, the parties understand and agree that it shall be a condition precedent to the obligation of Market Maker to provide Market Making Services in respect of any Commodity-Related Pair (including without limitation each of the Commodity-Related Pairs specified in the table above) that the parties shall first mutually agree in writing on the Market Making Parameters and any other reasonably necessary terms and conditions (as determined by a party) relating to any such Market Making Services in respect of the applicable Commodity-Related Pair, which Market Making Parameters may take account of, among other things, then current market conditions such as the costs associated with shipping and storing physical gold and any other costs or expenses which would have to be borne by Market Maker in providing Market Making Services relating to the applicable Commodity-Related Pair (each Commodity-Related Pair in respect of which the foregoing condition precedent is satisfied, an "**Agreed Commodity-Related Pair**"). For avoidance of doubt, any failure by the parties to mutually agree on a Commodity-Related Pair for any reason or satisfy the foregoing condition precedent in respect of any Commodity-Related Pair for any reason shall in no event constitute or be deemed a circumstance which gives rise to a Forfeiture Event for any purposes of this Agreement.

4. **Deployment Amount**: The following percentage of the XRP delivered to Market Maker pursuant to Section 3: [redacted]. Notwithstanding the foregoing or the terms of Section 2(a), Company understands and agrees that following the first anniversary of the Commencement Date Market Maker may use the XRP delivered to Market Maker pursuant to Section 3 for any purpose (including without limitation a purpose unrelated to market making) without restriction (collectively, "**Other Permitted XRP Uses**") as follows: (a) commencing with the first anniversary of the Commencement Date, up to [redacted] of the XRP may be used by Market Maker for Other Permitted XRP Uses; (b) commencing with the second anniversary of the Commencement Date, up to an additional [redacted] of the XRP may be used by Market Maker for Other Permitted XRP Uses; (c) commencing with the third anniversary of the Commencement Date, up to an additional [redacted] of the XRP may be used by Market Maker for Other Permitted XRP Uses; (d) commencing with the fourth anniversary of the Commencement Date, up to an additional [redacted] of the XRP may be used by Market Maker for Other Permitted XRP Uses; and (e) commencing with the fifth anniversary of the Commencement Date, the balance of the XRP may be used by Market Maker for Other Permitted XRP Uses. For avoidance of doubt, prior to the first anniversary of the Commencement Date Market Maker may only use the XRP delivered to Market Maker pursuant to Section 3 for Market Making Services and in no event for Other Permitted XRP Uses. For purposes of this Agreement, each of the first, second, third, fourth and

fifth anniversaries of the Commencement Date, automatically upon the occurrence of each such date, shall be and become a "**Prior Vesting Date**"; and, any balance of XRP which may not be used by Market Maker for Other Permitted XRP Uses as of any applicable date of determination is referred to under this Agreement as the "**Unvested XRP**". Following any Forfeiture Event any Unvested XRP which for any reason is not required to be forfeited to Company in accordance with Section 4 above shall automatically be and become (in addition to any XRP previously vested in Market Maker as of the applicable Prior Vesting Dates) accelerated and vested in full in Market Maker, fully available for Other Permitted XRP and in no event subject to any subsequent forfeiture for the benefit of Company or any of its Affiliates.

5. **Commencement Date**: 14 months after the Effective Date, or such earlier date after the Effective Date as determined by Market Maker in its sole discretion, in which event Market Maker shall so notify Company in writing.

6. **Contact Information**:

To Company:

Ripple Markets, Inc.
268 Bush St., #2724
San Francisco, CA 94104-3503
Attn: Chief Executive Officer
Email: ________________
Fax: ____________

To Market Maker: to be provided by Market Maker as soon as practicable following the Effective Date

## APPENDIX B

Hypothetical Application of the Equation Under Section 4(D)(ii)

**Equation (restated below for convenience of reference):**

$$x = a * (b/c)$$

where:

x = the amount of XRP to be forfeited;

a = the amount of Unvested XRP as of the Post-First Year Default Date;

b = the number of full calendar months that remained in the Term of this Agreement as of the Post-First Year Default Date; and

c = the number of full calendar months that remained in the Term of this Agreement as of the most recent Prior Vesting Date.

**Hypothetical Facts:**

Commencement Date = August 1, 2015

Expiration Date = August 1, 2020 (*i.e.*, 5 year anniversary of Commencement Date)

Post-First Year Default Date = March 15, 2018

XRP vested through Post-First Year Default Date = 250 million XRP

Unvested XRP through Post-First Year Default Date = 750 million XRP

No. of Full Calendar Months Remaining in the Term as of the Post-First Year Default Date = 28

No. of Full Calendar Months Remaining in the Term as of the most recent Prior Vesting Date (8/1/17) = 36

Formula Applied: x = 750 million * (28/36)

x = 583,333,333 XRP to be forfeited under hypothetical