# Exhibit 54

## MASTER XRP LEASE AGREEMENT

This Master XRP Lease Agreement ("Agreement") is effective the date the last Party signs ("Effective Date") and is between Ripple Payments Inc., a Delaware corporation ("Company" or "Ripple") as lessor, with XRP II LLC, a New York limited liability company regulated by the New York State Department of Financial Services ("XRP II"), as Ripple's XRP disbursing agent, and ████████████ ("Lessee"). Ripple and Lessee are hereby referred to as "Party" individually and together as "Parties".

NOW, THEREFORE, in consideration of the mutual promises contained in this Agreement, the Parties agree as follows:

### 1.LEASE AGREEMENT.

(a)**Lease**. From time to time, the Parties may enter into Leases in which the Company, a Delaware corporation acting through XRP II, a New York limited liability company, regulated by the New York State Department of Financial Services, as disbursing agent on behalf of Ripple, will agree to transfer XRP, a digital asset native to the XRP Ledger, to the Lessee as a Lease ("Lease"). Each lease of XRP is referenced herein as a **"Lease**, the XRP leased in a Lease is referenced herein as **"Leased XRP"**, and, unless otherwise agreed in writing, such Lease is to be governed by this Agreement as a Lease.

(b)**Confirmation**. Upon agreeing to enter into a Lease and prior to the execution of such Lease, the Company shall direct XRP II as disbursing agent to deliver to the Lessee via email a written confirmation of the Lease, substantially in the form attached hereto as Attachment B (the **"Terms of XRP Lease"**). Unless the Lessee countersigns the Terms of XRP Lease and submits an electronic copy to the Company, the Company will not complete the Lease. The countersigned Terms of XRP Lease, together with this Agreement, shall constitute the terms agreed between the Company and the Lessee with respect to the Lease to which the Terms of XRP Lease relates. Within two (2) business days after receipt of the countersigned Terms of XRP Lease, the Company shall use commercially reasonable efforts to de     the Leased XRP to the Lessee's XRP address as specified by the Lessee in the Terms of XRP Lease.

In all events, and in its sole discretion, the Company and XRP II reserve the right to refuse to complete, or to otherwise cancel, any pending Lease, even after receiving the signed Terms of XRP Lease document.

(c)**Receipts; Cancellations and Reversals.**     Following the completion of a Lease, as recorded on the XRP Ledger, the Company through XRP II shall provide to the Lessee a receipt, substantially in the form attached hereto as Attachment C. Once completed, a Lease cannot be cancelled, reversed, or changed except as otherwise provided herein.

(d)**Purpose.** Company agrees to make this Lease to Lessee to enable Lessee to perform market maker activities in the virtual currency space, subject to Section 2(d) (Compliance with Laws). The Leased XRP will be used by Lessee strictly for this purpose.

(e)**Return of Leased XRP.** Either Party may terminate this Agreement or may reduce the quantum of Leased XRP for any reason or no reason at anytime, by sending a written termination notice to the other Party. The Lease Termination Date (or Partial Lease Termination Date in the case of reduction in Leased XRP) shall be the fifth day following the date upon which the termination notice is received by the other Party. On or before the Lease Termination Date (or Partial Lease Termination Date), Lessee shall return to Company all Leased XRP (or the amount of Leased XRP by which the Lease is reduced), with such delivery being made to a wallet identified by Company. For the avoidance of doubt,

1

CONFIDENTIAL

Lessee shall return the same number of units of XRP that were Leased, without regard for changes in market condition or Lessee's use or loss of the any XRP during the Lease term. Unless otherwise prescribed by law and without limiting or waiving Company's remedies in the event of breach of this Agreement, Lessee shall have no right, entitlement, or option to settle this Agreement through cash or other property. Notwithstanding the foregoing, this Agreement shall continue in full force and effect following the Lease Termination Date (or Partial Lease Termination Date) until all delivery obligations specified in this Agreement are satisfied.

(f) **Events of Breach.** A Lease will be in breach with immediate effect in the event that Lessee:

(i) Materially breaches this Agreement or Company otherwise terminates the Agreement under Section 4(b) (Termination for Breach);

(ii) Has the beneficial, equitable, or legal title to a majority of the shares of Lessee (in one or a series of transactions) or substantially all of Lessee's assets transferred, assigned, conveyed, or distributed in any manner whatsoever to any party including Lessee's shareholder or owner other than regular profit distributions that are made to the members as part of the normal operation of the business;

(iii) Defaults on a financial debt to a third party;

(iv) Has a materially adverse change to its business that will impact Lessee's ability to return the Leased XRP or pay Lease Fees;

(v) Enters into an agreement with a party that will adversely impact Lessee's ability to perform its obligations under this Agreement and as it pertains to any Lease hereunder;

(vi) Files for, or has filed against it a petition for voluntary or involuntary bankruptcy or similar relief from insolvency;

(vii) Makes an assignment for the benefit of its creditors;

(viii) Becomes subject to a material judgement;

(ix) Is subject to a change of control;

(x) Has a receiver appointed for all or a substantial part of its business or assets; or

(xi) Otherwise admits in writing of its in ability to meet debts as they become due.

(g) **Effect of Breach.** In the event of the occurrence of one of the triggering events set forth in Section 1(f) (Events of Breach), (i) all outstanding Leased XRP shall be redelivered within three (3) days from the commencement of such event, and (ii) Company may set-off the amount of outstanding Leased XRP against any liability Company has against Lessee or its affiliates, including but not limited to any fees Company owes Lessee or its affiliates under any agreement for services. Company reserves the right to, and may pursue, any and all remedies available to it by law, in equity, and under contract as it sees fit. Lessee will indemnify Company for all attorney's fees and other reasonable costs associated with the return of Leased XRP and any Lease Fees due as a result of a default.

2

CONFIDENTIAL

RPLI_SEC 0898920

## 2. OTHER TERMS AND CONDITIONS OF THE LEASE.

(a) **Taxes**. To the extent any taxes are applicable with respect to the Leased XRP, each Party shall be obligated to pay all taxes applicable to their respective business activities. The Company is not responsible for any taxes that the Lessee is legally obligated to pay in any jurisdiction in which such taxes are incurred or arise in connection with the Lessee's business activities (under this Agreement or otherwise).

(b) **Risk of Loss**. Except as otherwise provided herein, the Lessee acknowledges and agrees that the Company has no liability to the Lessee or any third party for any loss, theft or misuse of any XRP that the Company has transferred at the instruction of the Lessee as provided in this Agreement. The Company and Lessee acknowledge and agree that the Company's right to demand return of Leased XRP shall be suspended solely upon on the occurrence of a Disruption Event. A Disruption Event means an actual or potential inability of Lessee to return Leased XRP due to hacking, theft, security breach (not caused by Lessee or its affiliates), at a Destination Exchange, or a Destination Exchange entering into a voluntary or involuntary bankruptcy proceeding, and in all events, where such Leased XRP is not in the reasonable custody or control of Lessee or its affiliates. For the avoidance of doubt, a Disruption Event shall exclude Lessee's trading losses, loss of Leased XRP caused by Lessee negligence, the hacking of Lessee's wallet or Lessee's account on an exchange other than a Destination Exchange. Destination Exchange means an exchange utilized by xRapid to trade XRP for fiat currency as beneficiary in respect of a transaction over xRapid undertaken pursuant to the Market Maker Service Agreement. Upon the occurrence of a Disruption Event, Lessee shall notify Company not later than forty eight (48) hours. Lessee shall provide reasonable evidence establishing the amount of Leased XRP impacted by the Disruption Event. Lessee shall use best efforts to recover and recoup all Leased XRP or other amounts including pursuing all remedies at law or equity as the parties may reasonably agree acting in good faith. Any Leased XRP or other amounts recovered shall be applied in satisfaction of Lessee's obligation to redeliver Leased XRP. In the event the parties agree, acting reasonably and in good faith, that any Leased XRP is unrecoverable ("Unrecoverable XRP") due to the Disruption Event, Company shall hold Lessee harmless for such Unrecoverable XRP.

(c) **Lessee Acknowledgement**. Lessee acknowledges and agrees that (i) the Leased XRP do not represent a right to make any demand on XRP II or its affiliates, (ii) XRP II and its affiliates have no obligation to redeem or exchange the Leased XRP for monetary value, goods, services or any other item; and (iii) XRP II and its affiliates are not responsible for any use by the Lessee or any third party of the Leased XRP.

(d) **Compliance with Laws**. The Lessee shall comply with all applicable laws, rules, regulations, and orders in all relevant jurisdictions (collectively, "Laws") including, but not limited to, Laws related to its activities and to its use, resale or distribution of XRP. Without limiting the foregoing, Lessee agrees not to violate (a) any applicable domestic or foreign anti-corruption Law, including the United Kingdom Bribery Act of 2010 and the United States Foreign Corrupt Practices Act; (b) any applicable domestic or foreign Laws related to Anti-Money Laundering and anti-terrorist financing requirements, including the USA Bank Secrecy Act, as amended by the USA Patriot Act and the Financial Conduct Authority's Anti-Money Laundering Regulations; (c) any applicable sanctions Laws administered by the U.S. Department of Treasury's Office of Foreign Assets Control; (d) applicable export restrictions or other Laws, including United States Export Administration Regulations, as well as end user, end use and destination restrictions which may be issued by the United States and other governments; and (e) anti-trust, anti-competition, or other market manipulations Laws.

(e) **Responsibility to Lessee's Customers**. Lessee is responsible for all Lessee service and other issues or claims that relate to the customer's use, distribution or sale of the Leased XRP. The

3

CONFIDENTIAL

Lessee shall make no representations or warranties to any other party concerning, or on behalf of, the Company.

(f)**Publicity**. Neither Party may issue any press release of make any other public statement with respect to this Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party other than disclosures required under applicable laws and regulations.

(g)     **Confidentiality**. Each Party shall maintain all Confidential Information (as that term is defined in Attachment A) it receives in strict confidence and not disclose any Confidential Information to any third party or use any Confidential Information for any purpose other than the Performance of this Agreement, unless agreed upon in writing by the other Party. A Party may disclose Confidential Information required to be disclosed by law, regulation, or a valid court order if that Party (i) gives the other Party timely notice, unless legally prohibited, so that other Party may seek a protective order, confidential treatment, or other appropriate relief and (ii) discloses only the portion of Confidential Information that is necessary to comply with such law, regulation, or order. The obligations in this sub-paragraph are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the Parties.

(h)**Indemnification**. Lessee agrees to defend, indemnify and hold the Company, its affiliates, and their respective employees, shareholders, directors, and representatives (together with the Company and its affiliates, the "Company Indemnitees") harmless and settle against any Claim or Loss (as those terms are defined in Attachment A), including attorneys' fees and any fines, fees or penalties imposed by any regulatory authority, arising out of or related to: (i) any violation of law by the Lessee or the Customer employees, contractors, or agents in connection with this Agreement and the Leases contemplated thereby, (ii) any breach of this Agreement by the Lessee or the Customer's employees, contractors, or agents, and (iii) any use, distribution or resale of the Leased XRP by the Lessee or by the Customer's employees, contractors or agents. Notwithstanding anything to the contrary in this Agreement, Lessee is not obligated to indemnify, hold harmless, or defend the Company against any claims, demands, losses, expenses, and liabilities arising out of or relating to the Company's  gross negligence, fraud, or willful misconduct in the performance of this Agreement.

(i)      **Indemnification Procedure**. In connection with any Claim or Loss, Company shall give the Lessee prompt Notice of the Claim or Loss (however, that any delay in notification will not relieve the Lessee of its obligation to indemnify, except and solely to the extent that the delay materially impairs the Customer's ability to defend the Claim or Loss). In addition, Company will cooperate with Lessee in connection with the defense and settlement of the Claim or Loss, with Lessee having the right to choose counsel. Company may choose in its sole discretion whether it will control the defense and settlement of the Claim or Loss. The Lessee shall not enter into any settlement or compromise of any Claim or Loss without the Company's prior written consent if such settlement or compromise (i) arises from or is part of any criminal action, suit, or proceeding, (ii) contains a stipulation to or admission or acknowledgement of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of the Company, (iii)  otherwise requires the Company to refrain from or take material action (such as payment of fees) or does not contain an unconditional release of all Company Indemnitees. At its cost, the Company has the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

### 3.WARRANTY, DISCLAIMERS, LIMITATIONS.

(a)**Authority**.    Each Party represents to the other Party that it: (a) is a legal entity duly organized and validly existing under the Laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (b) has all necessary power and authority to enter into this Agreement and associated Summaries of XRP Lease and perform its obligations hereunder; (c) when executed and delivered by such Party, this Agreement and any associated Summaries of XRP Lease will

**4**

constitute a legal, valid and binding obligation of such Party that is enforceable in accordance with its terms hereunder; (d) is not creating a conflict of interest or causing a breach with a preexisting Agreement between a Party and another third party.

(b)**Lessee Warranties and Representations**. Lessee represents and warrants that it and its affiliates:

(i)　are not owned or controlled by any individual or entity subject to any sanctions administered or enforced by the United States, including the SDN List and Sectoral Sanctions Identifications List maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union and the relevant sanctions authorities of each of its member states, including the United Kingdom's HM Treasury, or other relevant sanctions authority;

(ii)　are not located, organized, or resident in Cuba, Iran, North Korea, Syria, or the Crimea Region of Ukraine, or owned or controlled by any individual, entity or government in those countries or regions.

(iii)　will not enter into any agreement containing any provisions which would be violated or breached by the performance of Lessee's obligations under this Agreement or in connection herewith.

(c)EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, XRP II MAKES NO REPRESENTATIONS OR WARRANTIES OF ANY KIND, EXPRESS, IMPLIED OR STATUTORY, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, SUITABILITY, TITLE, FITNESS FOR A PARTICULAR PURPOSE, OR ANY CLAIM OF RIGHT OR ANY WARRANTIES OR OBLIGATIONS ARISING FROM OF A COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OR TRADE PRACTICE, AND ALL SUCH REPRESENTATIONS AND WARRANTIES AND OBLIGATIONS ARE HEREBY DISCLAIMED.

TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT WILL A PARTY, ITS AFFILIATES, AND ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, CONTRACTORS, OR REPRESENTATIVES' AGGREGATE AND CUMULATIVE LIABILITY EXCEED US$ 1,000.

TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, IN NO EVENT SHALL A PARTY, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES, CONTRACTORS, OR REPRESENTATIVES, BE LIABLE TO THE OTHER PARTY ANY SPECIAL, INCIDENTAL, INDIRECT, EXEMPLARY, PUNITIVE, HYBRID, OR CONSEQUENTIAL DAMAGES OR DAMAGES FOR LOST PROFITS, REVENUE, GOODWILL OR SAVINGS, LOSS OF USE, BUSINESS INTERRUPTION, REPUTATIONAL HARM, OR MARKET VOLATILITY, WHETHER OR NOT BASED ON A CLAIM OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY, OR OTHERWISE ARISING UNDER ANY THEORY OF LAW, EVEN IF SUCH PARTY IS WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES.

Lessee shall have no recourse against Company for any liabilities of any type incurred by Lessee and/or any of its affiliates as a result of its use, resale or distribution of XRP.

**4.TERMINATION.**

(a)**Termination**.  Either Party may terminate this Agreement for any reason and at any time by written notice. No such termination will become effective until there are no outstanding Leases.

CONFIDENTIAL

HIGHLY CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　RPLI_SEC 0898923

(b)**Termination for Breach.** Without limiting any other right or remedy that the Company may have at law or otherwise, the Company may, in its sole discretion, terminate this Agreement immediately upon notice to the Lessee if the Lessee breaches any of its obligations under this Agreement, in particular its obligation to comply with applicable laws and regulations as set forth in Section 2 of this Agreement. In the event of termination under this clause Section 1(f) (Event of Breach) and 1(g) (Effect of Breach) shall apply.

## 5.LEASE RESTRICTIONS

The Lessee agrees that its Leases with respect to the Leased XRP shall be conducted only on exchanges registered with the U.S. Financial Crimes Enforcement Network (FinCEN), and Lessee shall obtain the XRP it returns to XRP II as provided in Section 1(e) of the Agreement only from such exchanges.

## 6.REQUIRED DISCLOSURES.

(a)The Lessee acknowledges and agrees that Lessee cannot cancel, reverse, or change any XRP Lease that has been completed, as recorded on the XRP Ledger.

(b)The Lessee acknowledges and agrees that Lessee is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that s/he uses to access the Leased XRP ("**Lessee Credentials**"). Any loss or compromise of Lessee Credentials may result in unauthorized access to the Leased XRP by third-parties and the loss or theft of such XRP. **The Company assumes no responsibility for any loss that the Lessee may sustain due to compromise of Lessee Credentials.**

(c)The Lessee acknowledges the following material risks associated with virtual currency, including XRP:

(i)    Virtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

(ii)    Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

(iii)    Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

(iv)    Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

(v)    The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

(vi)    There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

(vii)    The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

CONFIDENTIAL

6

                                                    RPLI_SEC 0898924

(viii)   The nature of virtual currency may lead to an increased risk of fraud or cyberattack.

(ix)   The nature of virtual currency means that any technological difficulties experienced by the Company may prevent the access or use of a customer's virtual currency.

(x)   Any bond or trust account maintained by the Company for the benefit of its customers may not be sufficient to cover all losses incurred by customers.

(d) If the Lessee has any questions. needs assistance, or wishes to contact the Company with a complaint, Lessee may contact the Company's Lessee Support at complaints@ripple.com.   If the Lessee is dissatisfied with the manner in which a complaint has been handled, or for any other reason, Lessee can also refer the matter to the New York State Department of Financial Services ("**NYDFS**") located at:  One State Street, New York, NY 10004-1511, USA. Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST).   To file an electronic compliant with NYDFS, visit https:// myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

(e) The Lessee acknowledges and agrees that the Company may share information concerning the Lessee in accordance with XRP II's Privacy Policy Addendum (attached as Exhibit C) including, without limitation, (i) with appropriate state and federal regulatory authorities in connection with the Leases contemplated by this Agreement, (ii) in response to a court or government order, and (iii) with other affiliates of the Company in accordance with applicable laws. Lastly, the Lessee agrees that the Company may obtain and use such information as may be necessary for legitimate business needs in connection with the operation of the Company and its affiliates.

## SECTION 7.  MISCELLANEOUS PROVISIONS.

(a) **Choice of Law; Jurisdiction and Venue**. This Agreement shall be governed by, and construed in accordance with the laws of the State of New York, U.S.A., as such laws are applied to contracts entered into and performed in such State and without reference to any conflict of laws rules or provisions. The Parties irrevocably consent to the non-exclusive jurisdiction and venue of the federal and state courts located in New York, New York, U.S.A. with respect to any claim, action or proceeding arising out of or in connection with this Agreement. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

(b) **Notice.**   Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth below; provided, however, the Lessee agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures that the Company provides in connection with this Agreement, including but not limited to the Terms of XRP Lease, Lease receipts, and any other disclosures or statements the Company may be required under applicable law or regulation to make to the Lessee. Notice may also be given electronically provided that the other Party provides acknowledgement of receipt.  Notice shall be effective upon receipt.

(c) **Entire Agreement; Amendments; Counterparts**.  This Agreement constitutes the entire contract between the Parties hereto with regard to the subject matter hereof. It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof. Except for a writing signed by both parties, this Agreement may not be modified or amended. If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

7

CONFIDENTIAL

HIGHLY CONFIDENTIAL

(d)**Successors and Assigns.**   Neither party may assign any rights granted or obligations owed under this Agreement other than by mutual agreement.  Any attempted transfer or assignment in violation hereof shall be null and void.  Subject to the foregoing, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon the Lessee and the Lessee's legal representatives, heirs, legatees, distributes, assigns and transferees by operation of law, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof.  In addition, this Agreement is not intended to confer any right or benefit on any third party.

(e)**Relationship of the Parties.**  Nothing in this Agreement shall be construed or is intended to be construed as creating an employer-employee or agency relationship, a partnership, or a joint venture between the Parties.

(f)**Survival.**     Section 2, Section 3(c), Section 6(b) and this Section 7 shall survive the termination or expiration of this Agreement, as well as any other provision that, in order to give proper effect to their intent, should survive such expiration or termination. Termination or expiration of this Agreement shall not affect or limit any independent rights of a Party in or to its Confidential Information under applicable laws.

(g)**Severability**. If any provision of this Agreement is determined to be invalid or unenforceable under any rule, law or regulation or any governmental agency, local, state, or federal, such provision will be changed and interpreted to accomplish the objectives of the provision to the greatest extent possible under any applicable law and the validity or enforceability of any other provision of this Agreement shall not be affected.

(h)**Non-Waiver**. The failure of either Party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the Party's rights to subsequently enforce the provision or exercise those rights or remedies. All waivers must be in the form of a writing signed by both Parties' authorized representatives. The remedies specified in this Agreement are in addition to any other remedies that may be available at law or equity.

(i)**Force Majeure**. Each Party shall not be liable for delays, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond its reasonable control, including but not limited to, any delay or failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is beyond its reasonable control and shall not affect the validity and enforceability of any remaining provisions. As of the Effective Date, the Parties agree to be bound and have caused this Agreement to be executed.

8

CONFIDENTIAL

HIGHLY CONFIDENTIAL                                                    RPLI_SEC 0898926



Ripple Payments Inc.

Title: CEO

Date: August 8, 2019

Title: Treasurer

Date: Sept 3, 2018

Address: 315 Montgomery St. 2nd Fl

CONFIDENTIAL

1

HIGHLY CONFIDENTIAL

RPLI_SEC 0898927

CONFIDENTIAL

2

HIGHLY CONFIDENTIAL

RPLI_SEC 0898928

Attachment A

## Definitions

CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS AGREEMENT HAVE THE FOLLOWING MEANINGS:

"**Claim**" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against XRP II, LLC, its affiliates, or any of their respective employees, shareholders, directors or representatives by a person or entity other than Lessee, or its affiliates or subsidiaries.

"**Confidential Information**" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (a) was previously known to the receiving party free of any obligation to keep it confidential, (b) becomes generally available to the public through no wrongful act, (c) is rightfully received from a third party under no obligation of confidence to such third party, (d) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (e) is required to be disclosed in invoice to comply with all applicable laws, administrative process or governmental or court invoices; provided, however, that in a circumstance in which disclosure is compelled by applicable law, administrative process or governmental or court invoices, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the invoice and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

"**Loss**" means any Claim, cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

"**XRP**" means the decentralized digital asset that is native to the XRP Ripple Ledger.

3

CONFIDENTIAL

RPLI_SEC 0898929

**XRP II, LLC**
80 State Street
Albany, NY 12207

Lease Effective Date:        [Current date]

**TERMS OF XRP LEASE**

**NOT A RECEIPT OR OFFER**

The Lessee would like to lease units of XRP, the decentralized digital asset that is native to the XRP Ledger, on the following terms:

Lessee Name:            [Full name of customer]
Lessee XRP Address:        [Ripple wallet address]

Transaction Type:        Lease
Total XRP Units:        [Number of XRPs] Units priced at $[Unit price] per Unit
Applicable fees, expenses or charges:

Lease Fee:            [Lease Fee]

Lease Term:            [Insert Lease Term]
Additional terms, if applicable:

The Lease specified above is governed by the terms and conditions of the Master XRP Lease Agreement, (the Agreement).  The Lessee agrees to accept by email all documents relating to this Lease and all other documents that XRP II is required to deliver to its customers.   Once completed, the Lease cannot be cancelled or revoked.

**XRP II, LLC**
By: _____
Name:
Title:

Agreed and Ack

Title:    CEO

CONFIDENTIAL

4

HIGHLY CONFIDENTIAL                    RPLI_SEC 0898930

**XRP II, LLC**
80 State Street
Albany, NY 12207

Today's Date:          [Current date]

### RECEIPT

Lessee Name:              [Full name of customer]
Lessee XRP Address:           [Ripple wallet address]

Transaction ID (hash):            [Transaction hash]

Transaction Type:          Lease to Customer
Total XRP Units:           [Number of XRPs] Units priced at $[Unit price] per Unit
Applicable fees, expenses or charges:

Total Lease Value:      $[Total value]
Date of Lease:          [Lease date]

Additional terms, if applicable:

The Lease of the Total XRP Units specified above is governed by the terms and conditions of the Master Lease Agreement (the Agreement), including but not limited to, the provisions relating to the liability of XRP II, under which XRP II will not be liable for any incidental, indirect, or consequential damages arising out of the Agreement, and its entire liability arising out of or in connection with the Agreement will not exceed any purchase price it receives under the Agreement.

If you have any questions, need assistance, or wish to contact us with a complaint, please contact XRP II Lessee Support at complaints@ripple.com. If you are dissatisfied with the manner in which a complaint has been handled, you can also refer the matter to the New York State Department of Financial Services (NYDFS) located at: One State Street, New York, NY 10004-1511, USA. Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST).
To file an electronic compliant with NYDFS, you can visit https://myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

5

CONFIDENTIAL

HIGHLY CONFIDENTIAL

RPLI_SEC 0898931