# Exhibit 55

# MARKET MAKING AGREEMENT

THIS MARKET MAKING AGREEMENT ("**Agreement**") is entered into as of 1st of January 2015 ("**Effective Date**") by and between Ripple Markets, Inc., a California corporation ("**Company**") and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ an Andorra limited liability company ("**Market Maker Software Services Provider**"). This contract superseeds any previous market making agereements signed between both parties.

## RECITALS

A.   Company desires to promote liquidity of fiat and crypto currencies within the Ripple Network (defined below) by engaging Market Maker's software to quote binding bid and offer prices for Virtual units of value (defined below) within the Ripple Network.

B.   Market Maker is experienced in market making and is willing to manage its market making software for the activities described in this Agreement.

## AGREEMENT

For good and valuable consideration, Company and Market Maker agree as follows:

### 1. Definitions

When used in this Agreement with initial letters capitalized, in addition to terms defined elsewhere in this Agreement, the following terms have the following meanings:

"**Claim**" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against any Indemnified Party by a person or entity other than Market Maker.

"**Commencement Date**" means the date upon which Market Maker must commence its Market Making activity under this Agreement, as set forth on Appendix A.

"**Confidential Information**" means the terms of this Agreement and any non-public information or materials provided by either party to the other party in connection with the performance of this Agreement.

"**Virtual unit of value Pair**" means, for the Initial Term, any virtual unit of value pair set forth on Appendix A; for the First Renewal Term, any virtual unit of value pair set forth in the First Renewal Term Notice; and for the Second Renewal Term, any virtual unit of value pair set forth in the Second Renewal Term Notice.

"**Default**" means any failure or default by Market Maker to fully and timely perform its obligations under this Agreement.

"**Defined Size**" means the minimum size of any bid or offer, as set forth in Appendix A.

"**Defined Spread**" means the maximum defined spread for any bid or offer, as set forth in Appendix A.

HIGHLY CONFIDENTIAL

GSR00010953

"**Deployment Amount**" means the aggregate amount of XRP set forth in Appendix A that Market Maker must deploy to make binding bids and offers in the Virtual units of value.

"**Fast Market**" has the meaning set forth in Section 2(D) of this Agreement.

"**First Renewal Term**" has the meaning set forth in Section 4(A) of this Agreement.

"**First Renewal Term Notice**" has the meaning set forth in Section 4(B) of this Agreement.

"**Indemnified Party**" means Company and each of its employees, shareholders, directors and representatives.

"**Initial Term**" has the meaning set forth in Section 4(A) of this Agreement.

"**Loss**" means any cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

"**Market Making Activity**" means the market making activity provided by Market Maker's software under this Agreement, as described in Section 2.

"**Notice**" has the meaning set forth in Section 4(C) of this Agreement.

"**Quote Coverage Period**" means the percent of relevant trading hours in which Market Maker Software Services Provider must quote binding bids and offers, as set forth in Appendix A.

"**Second Renewal Term**" has the meaning set forth in Section 4(A) of this Agreement.

"**Second Renewal Term Notice**" has the meaning set forth in Section 4(B) of this Agreement.

"**Ripple Account**" means any Ripple Network account held by Market Maker Software Services Provider for purposes of fulfilling its obligations under this Agreement.

"**Ripple Network**" means the decentralized, open source, global payment network operating on the Ripple protocol.

"**Ripple Ledger Close**" means an update of the Ripple Network's distributed database to reflect new bids, offers, and transactions.

"**Suspension Event**" has the meaning set forth in Section 2(C) of this Agreement.

"**XRP**" means the crypto virtual unit of value native to the Ripple Network.

2. **Market Making Activity.**

    **2.1 Liquidity providing activity**

    (A)     Except as otherwise provided in Section 2(B), upon the Commencement Date and during the remainder of the term of this Agreement, Market Maker Software Services Provider shall manage its Market Making Software which shall quote on the Ripple Network binding bid and offer prices for all Virtual units of value at or inside the Defined Spread at not less than the Defined Size during the Quote Coverage Period, and shall use not less than the applicable Deployment Amount to

79435-0001/LEGAL29031312.5

HIGHLY CONFIDENTIAL

GSR00010954

provide (or to be available to provide) market making activityvirtual units of value for the Virtual units of value. Market Maker Software Services Provider shall provide any information or reports requested by Company for the purpose of confirming that Market Maker Software Services Provider has satisfied any Deployment Amount requirements.

(B)   Market Maker Software Services Provider may, but shall not be required to, perform the Market Making Services during the continuance of a Suspension Event or a Fast Market. If Market Maker Software Services Provider elects to provide Market Making Services during a Fast Market, it may, in its discretion, do so with a spread other than the Defined Spread. If a party becomes aware of the existence of a Suspension Event, it shall advise the other party thereof by telephone and email as promptly as reasonably possible.

(C)   "Suspension Event" means any of the following:

(i)   if a party provides notice to the other party that, in its reasonable judgment, a change has occurred in national or international financial, political or economic conditions that makes it impractical or impossible to accurately price the majority of virtual units of value on the Ripple Network; or

(ii)   an act of God, war, terrorism, civil disturbance, failure of the Ripple Network protocol or other similar causes beyond the Market Maker Software Services Provider's reasonable control that prevents Market Making Softwarefrom entering binding bids and offers on the Ripple Network.

(D)   "Fast Market" means either of the following:

(i)   the fifteen minutes before and fifteen minutes after the announcement of a major economic indicator; or

(ii)   any unusual market condition or price volatility that Market Maker Software Services Provider reasonably determines, after consultation with Company, prevents maintenance of an orderly market.

(E)   Market Maker Software Services Provider, with prior written consent from the Company, may contract with a third party to perform any of its obligations under this agreement, provided that doing so shall not relieve Market Maker Software Services Provider from any of its obligations hereunder.

## 3. Consideration for Performance; Return of Consideration.

As consideration for the full and timely performance by Market Maker Software Services Provider of its obligations under this Agreement for the Initial Term, Company shall deliver XRP to Market Maker Software Services Provider in the amount(s) and on the date(s) set forth on Appendix A as applicable to the Initial Term. As consideration for the full and timely performance by Market Maker Software Services Provider of its obligations under this Agreement for the First Renewal Term, if there is one, Company shall deliver XRP to Market Maker Software Services Provider in the amount(s) and on the date(s) set forth on Appendix A as applicable to the First

HIGHLY CONFIDENTIAL

GSR00010955

Renewal Term. As consideration for the full and timely performance by Market Maker Software Services Provider of its obligations under this Agreement for the Second Renewal Term, if there is one, Company shall deliver XRP to Market Maker Software Services Provider in the amount(s) and on the date(s) set forth on Appendix A as applicable to the Second Renewal Term. Company shall not be obligated to deliver XRP to Market Maker Software Services Provider at any time when a Default exists.

### 4. Term; Early Termination.

(A) The term of this Agreement shall commence on the Effective Date and end on December 31, 2014 ("**Initial Term**"). Market Maker Software Services Provider, in accordance with Section 4(B), may elect to extend the term of this Agreement for an additional one (1) year period following the Initial Term ("**First Renewal Term**"), and, if Market Maker Software Services Provider exercises this option, then Market Maker Software Services Provider may elect to extend the term of this Agreement for a second additional one (1) year period following the First Renewal Term ("**Second Renewal Term**"). If Market Maker Software Services Provider elects to extend the term of this Agreement, all the provisions of this Agreement shall continue to apply during such renewal term, except as otherwise provided in Section 4(C).

(B) Not later than forty-five (45) days before expiration of the Initial Term, Company shall advise Market Maker Software Services Provider of the Virtual unit of value Pairs that will apply during the First Renewal Term ("**First Renewal Term Notice**"). Market Maker Software Services Provider may only exercise its option to extend the term of this Agreement for the First Renewal Term by giving Company notice of such exercise within fifteen (15) days after its receipt of the First Renewal Term Notice and if no Default exists as of the end of the Initial Term. If the term of this Agreement has been extended for the First Renewal Term, then not later than forty-five (45) days before expiration of the First Renewal Term, Company shall advise Market Maker Software Services Provider of the Virtual units of value that will apply during the Second Renewal Term ("**Second Renewal Term Notice**"). Market Maker Software Services Provider may only exercise its option to extend the term of this Agreement for the Second Renewal Term by giving Company notice of such exercise within fifteen (15) days after its receipt of the Second Renewal Term Notice and if no Default exists as of the end of the First Renewal Term. It is understood by all parties that at the end of the Initial Term, and each subsequent Renewal Term, Market Maker Software Services Provider assumes total ownership of the XRP delivery relevant to said term. Once Market Maker Software Services Provider assumes ownership of an XRP delivery, it no longer has market making obligations related to said delivery.

(C) During the First Renewal Term, the applicable Virtual units of value shall be the ones set forth in the First Renewal Term Notice. During the Second Renewal Term, the applicable Virtual units of value shall be the ones set forth in the Second Renewal Term Notice.

(D) If a Default occurs in three (3) or more months or if a Suspension Event continues for more than two (2) months, Company may, in its discretion, terminate this Agreement upon written notice to Market Maker Software Services Provider.

(E) If this Agreement is terminated by Company pursuant to Section 4(D), Market Maker Software Services Provider shall deliver to Company, within ten days of Company's demand therefor, the number of XRP equal to (i) the total number of XRP delivered by Company to Market Maker Software Services Provider pursuant to Section 3 multiplied by (ii) that fraction, the numerator of which is the number months that remained in the term immediately before the Default or Suspension Event giving rise to Company's right to terminate and the denominator of which is the number of

HIGHLY CONFIDENTIAL

GSR00010956

months remaining in the term of this Agreement as of the time such XRP was delivered by Company to Market Maker Software Services Provider (including the month in which such XRP is delivered). If XRP has been delivered pursuant to Section 3 on more than one occasion, the preceding calculation shall be made with respect to each such delivery and the aggregate amount of XRP so determined shall be the amount of XRP to be delivered by Market Maker Software Services Provider to Company. The early termination consideration is not a penalty and represents fair and equitable compensation to Company for the shortened length of this Agreement in view of the difficulties and impracticality of determining actual damages and injury resulting from such shortened length.

(F) Company may terminate this Agreement without penalty or further obligations upon notice to Market Maker Software Services Provider in the event of a change in or enforcement of applicable law or adverse regulatory action that prohibits or materially impairs Company's ability to perform its obligations as contemplated by this Agreement.

## 5. Warranties, Representations and Additional Covenants.

(A) Each party represents and warrants to the other party and covenants that

(i) at such time as it delivers XRP to the other party, it has conveyed and will convey to the other party good title to and ownership of such XRP free and clear of all liens and encumbrances;

(ii) this Agreement constitutes its legal, valid and binding obligation enforceable against it in accordance with its terms.

(B) Market Maker Software Services Provider represents and warrants to Company and covenants that:

(i) it will comply with all applicable laws in performing its obligations under this Agreement;

(ii) it has, and will at all times at its expense maintain in full force and effect, all permits, licenses, consents, approvals registrations and authorizations necessary to the performance of its obligations under this Agreement;

(iii) it will be solely responsible for implementing security safeguards that prevent any unauthorized access to any Ripple Account, provided that such unauthorized access does not result from any security failures that arise from within the Ripple Network protocol itself or the software developed or mantained by the Company. Without limiting the generality of the foregoing, Market Maker Software Services Provider will be solely responsible for creating and preventing any unauthorized access to any credentials that, on their own or in combination with other information, may allow access to a Ripple Account or any balances maintained in such Ripple Account, including any wallet name, password or passphrase, or private and public cryptographic key pairs; and

(iv) implement any security practices described from time to time on the Ripple wiki (https://www.ripple.com/wiki) or as otherwise communicated by Company to Market Maker Software Services Provider.

HIGHLY CONFIDENTIAL

GSR00010957

## 6. Indemnification.

(A)     Market Maker Software Services Provider shall defend, indemnify and hold harmless the Indemnified Party from and against any Claim or Loss to the extent any Claim or Loss is based on (a) a breach of any representation, warranty or covenant of this Agreement by Market Maker Software Services Provider or caused by Market Maker Software Services Provider's employees, contractors or agents, (b) any use, distribution or resale of any Virtual units of value Pair via the Ripple Network by Market Maker or Market Maker Software Services Provider's employees, contractors or agents, and all associated marketing and promotional activities undertaken by Market Maker Software Services Provider, or (c) any taxes that Market Maker Software Services Provider is obligated to pay.

(B)     In connection with any Claim or Loss described in Section 5(A), Company shall: (a) give Market Maker Software Services Provider prompt notice of the Claim or Loss after an executive officer of Company has actual knowledge thereof (however, any delay in notification will not relieve Market Maker of its obligations under Section 5(A) except and solely to the extent that the delay materially impairs Market Maker Software Services Provider's ability to defend the Claim or Loss), (b) cooperate reasonably with Market Maker Software Services Provider (at Market Maker Software Services Provider's expense) in connection with the defense and settlement of the Claim or Loss, and (c) permit Market Maker Software Services Provider to control the defense and settlement of the Claim or Loss, except that Market Maker Software Services Provider shall not enter into any settlement or compromise of any Claim or Loss without Company's prior written consent if such settlement or compromise arises from or is part of any criminal action, suit or proceeding or contains a stipulation to or admission or acknowledgment of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of Company or otherwise requires Company to take or refrain from taking any material action (such as the payment of fees).  Company (at its cost) may participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

## 7. Confidentiality.

Each party shall maintain the confidentiality of the other party's Confidential Information and use Confidential Information only for the purpose of performing its obligations under this Agreement. The obligations of this Section shall not apply to any information or material that: (a) was previously known to the receiving party free of any obligation to keep it confidential, (b) becomes generally available to the public through no wrongful act, (c) is rightfully received from a third party under no obligation of confidence to such third party, (d) is independently developed by the receiving party without reference to information that has been disclosed pursuant to this Agreement, or (e) is required to be disclosed in order to comply with applicable law; provided, however, that in a circumstance in which disclosure is compelled by applicable law, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with such law and, to the extent not prohibited by applicable laws from doing so, shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

## 8. Miscellaneous.

(A)     All notices and other communications provided for herein shall be delivered to a party at the address or other contact information for such party set forth in Appendix A. provided that either party may change its address or other contact information by notice to the other party.

79435-0001/LEGAL29031312.5

HIGHLY CONFIDENTIAL

GSR00010958

(B)     This Agreement is not an exclusive agreement by either party for market making software services, and either party may at any time and from time to time enter into agreements with others for market making services in connection with Virtual units of value or otherwise.

(C)     Time is of the essence of each and every provision of this Agreement.

(D)     No failure on the part of either party to exercise, and no delay in exercising, any right, power, privilege or remedy hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such right, power, privilege or remedy preclude any other or further exercise thereof or the exercise of any other right, power, privilege or remedy. The rights and remedies under this Agreement are cumulative and not exclusive of any rights, powers, privileges and remedies that may otherwise be available to a party.

(E)     This Agreement may be amended or modified only by a written document executed by Company and Market Maker Software Services Provider. This Agreement may be executed in counterparts, each of which shall constitute an original, but all of which when taken together shall constitute a single contract. This Agreement constitutes the entire contract between the parties relating to the subject matter hereof and supersedes all previous agreements and understandings, oral or written, relating to the subject matter hereof. Delivery of an executed counterpart of a signature page of this Agreement by fax or other electronic imaging means shall be effective as delivery of a manually executed counterpart of this Agreement.

(F)     This Agreement shall be binding upon and inure to the benefit of the successors and assigns of the parties; provided, however, that Market Maker Software Services Provider may not assign, transfer or delegate any of its rights or obligations under this Agreement, including, without limitation, in connection with any sale, merger, consolidation, change of control or similar transaction, without the prior written consent of Company.

(G)     If any provision of this Agreement shall be prohibited by or invalid under applicable law, such provision shall be ineffective only to the extent of such prohibition or invalidity without invalidating the remainder of such provision or any remaining provisions of this Agreement.

(H)     This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to its rules of conflict of law, except Section 5-1401 of the New York General Obligations Law.

(I)     **EACH PARTY, TO THE FULLEST EXTENT PERMITTED BY APPLICABLE LAW, HEREBY IRREVOCABLY WAIVES ALL RIGHT TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING, COUNTERCLAIM OR OTHER LITIGATION IN ANY WAY ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE TRANSACTIONS OR EVENTS REFERENCED HEREIN OR CONTEMPLATED HEREBY, WHETHER WITH RESPECT TO CONTRACT CLAIMS, TORT CLAIMS OR OTHERWISE. THIS WAIVER SHALL APPLY TO ANY SUBSEQUENT AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT. A COPY OF THIS SECTION MAY BE FILED WITH ANY COURT AS WRITTEN EVIDENCE OF THE WAIVER OF THE RIGHT TO TRIAL BY JURY AND THE CONSENT TO TRIAL BY COURT. EACH PARTY HERETO (A) CERTIFIES THAT NO REPRESENTATIVE, AGENT OR ATTORNEY OF ANY OTHER PERSON HAS REPRESENTED, EXPRESSLY OR OTHERWISE, THAT SUCH OTHER PERSON WOULD NOT, IN THE EVENT OF LITIGATION, SEEK TO ENFORCE THE FOREGOING WAIVER AND (B) ACKNOWLEDGES THAT IT AND THE OTHER PARTY HERETO HAVE BEEN**

HIGHLY CONFIDENTIAL

GSR00010959

**INDUCED TO ENTER INTO THIS AGREEMENT BY, AMONG OTHER THINGS, THE MUTUAL WAIVERS AND CERTIFICATIONS IN THIS SECTION.**

IN WITNESS WHEREOF, this Agreement has been duly executed by the parties hereto as of the Effective Date.

**Ripple Markets, Inc. ("Company")**

By: _____

Title: __CEO_____

███████████████████████████ ("Market Maker Software Services Provider")

By: ███████████████████

Title: __Sole Administrator_____

79435-0001/LEGAL29031312.5

HIGHLY CONFIDENTIAL

GSR00010960

## APPENDIX A

1. **Fiat**:

    (a)   **Virtual units of value**:

    | Currency | Issuing Address | / | Currency | Issuing Address |
    |---|---|---|---|---|
    | XAU | ███ | / | USD. | ███ |
    | EUR | ███ | / | USD. | ███ |
    | EUR | ███ | / | USD. | ███ |
    | EUR | ███ | / | USD. | "TBD" |
    | EUR | ███ | / | USD. | "TBD" |

    This list may be amended during the Initial Term by mutual agreement between Company and Market Maker Software Services Provider.

    (b)   **Defined Spread**: ███ basis points

    (c)   **Defined Size**: ███

    (d)   **Quote Coverage Period**: ███ of the Ripple ledgers that close between Sunday 10pm GMT (5pm EST) and Friday 10pm GMT (5pm EST)

2. **Crypto**:

    (a)   **Virtual units of value**:

    | Currency | Issuing Address | / | Currency | Issuing Address |
    |---|---|---|---|---|
    | XRP | Not Applicable | / | BTC | ███ |
    | XRP | Not Applicable | / | USD | ███ |
    | BTC | ███ | / | USD | ███ |
    | XRP | Not Applicable | / | USD | ███ |
    | XRP | Not Applicable | / | BTC | ███ |
    | XRP | Not Applicable | / | EUR | ███ |
    | BTC | ███ | / | USD | ███ |
    | XRP | Not Applicable | | MXN | ███ |
    | XRP | Not Applicable | | BTC. | ███ |
    | XRP | Not Applicable | | JPY. | ███ |
    | XAU | ███ | | XRP | Not Applicable |

    This list may be amended during the Initial Term by mutual agreement between Company and Market Maker Software Services Provider.

    (b)   **Defined Spread**: ███ basis points

    (c)   **Defined Size**: ███

    (d)   **Quote Coverage Period**: ███ of the Ripple ledgers that close between Sunday 10pm GMT (5pm EST) and Friday 10pm GMT (5pm EST)

HIGHLY CONFIDENTIAL                                                                                                                              GSR00010961

3. **Deployment Amount**: The following percentage of the XRP delivered to Market Maker Software Services Provider pursuant to Section 2(a): ▮ until September 1, after which the deployment amount drops to ▮

4. **Delivery of XRP by Company to Market Maker Software Services Provider:**

    **4.1 For liquidity providing activity as defined in 2.1**

    (a) For Initial Term - within seven (7) days after the Effective Date: ▮ XRP.

    (b) For First Renewal Term, if there is one - on the first day of the First Renewal Term: ▮ XRP

    (c) For Second Renewal Term, if there is one - on the first day of the Second Renewal Term: N/A

5. **Commencement Date**: 1/1/2015

6. **Contact Information**:

    To Company:   Ripple Markets, Inc.

                              300 Montgomery St 12th Floor
                              San Francisco, CA 94104
                              Attn: Chief Executive Officer
                              Email: ▮@ripple.com
                              Fax: ▮

    To Market Maker: ▮

HIGHLY CONFIDENTIAL