# Exhibit 57

█████████ PILOT AGREEMENT

This █████████ Pilot Agreement (the "Agreement") is entered into as of September 19, 2019 ("Effective Date") and is by and between Ripple Labs Inc. ("Ripple"), a Delaware Corporation and ███████ ███████ a Cayman Islands Exempted Company ██████ Ripple and █████ shall hereby individually referred to as "Party" and together as "Parties."

WHEREAS, Ripple's products include xRapid, a hosted service that enable's Ripple's customers to source liquidity in cross-border payments through XRP, a digital asset native to the XRP Ledger ("XRP").

WHEREAS, █████ has developed proprietary trading algorithms for executing its proprietary trades on digital asset exchanges ("Trading Algorithm") and Ripple would like to evaluate whether █████ use of the Trading Algorithm can improve xRapid's performance for its customers.

NOW THEREFORE, the Parties agree as follows:

1. **█████ Obligations**. During the Term, █████ shall enable its Trading Algorithm to purchase and sell XRP for US Dollar on the digital asset exchange Bitstamp ("Transactions"). █████ shall only execute bona fide Transactions, which does not include any illegal self-trading or trading with Affiliates or Related Parties, wash trades, or other trades resulting from market manipulation or gaming. Any breach of the foregoing shall give rise to Ripple's right to immediately terminate the Agreement without any further payment to █████. As used throughout this Agreement, Affiliates means an entity that directly or indirectly, through one or more intermediaries, is controlled by or in common control with █████ and Related Parties means any Party that shares a common interest with █████ or which █████ has a pre-existing business relationship with.

2. **Reporting Requirements**. During the Term of the Agreement, █████ shall provide Ripple weekly reports of its Transactions, including each trade executed, its timestamp and price, as well as any other information Ripple may reasonably request from time to time, to an email address that Ripple shall provide.

3. **Ripple Obligations**. Pursuant to Section 5 (Payment Terms) and Section 6 (XRP Payment), Ripple shall pay █████ on a monthly basis ten basis points (0.1%) of █████ Bitstamp Volume for the preceding month in either XRP or USD in Ripple's sole discretion. Bitstamp Volume means the aggregate USD value of XRP purchased or sold by █████ on Bitstamp using the Algorithm, excluding any self trades, trades with Affiliates or Related Parties, wash trades, or other trades resulting from market manipulation or gaming.

4. **Payment Terms**. Ripple shall pay █████ within thirty (30) days of Ripple's receipt of valid invoice, provided that █████ provides Ripple with a wallet address that is solely owned by █████ and maintained by tBitStamp acting as a third party custodian solely on behalf of █████ ("Acceptable Wallet Address") for receipt of the payments by completing the "XRP Counterparty Wallet Address Confirmation" (Attachment A). Ripple shall have no obligation to make any payment of XRP to any wallet that is notan Acceptable Wallet Address, and █████ shall fully cooperate with Ripple to give effect to the foregoing. █████ shall submit all invoices to ripple_invoicecapture@concursolutions.com, and shall include a purchase number (which Ripple shall provide) in each invoice.

5. **XRP Payment**. In the event Ripple elects to make any payments to █████ pursuant to Section 3 (Ripple Obligations) in XRP, the amount of XRP payable to █████ shall be calculated based on the price of XRP trading against USD at approximately 9:00 a.m. Pacific Time on the date payment is made, as published on https://tradeblock.com/markets/index/xrx.

6. **Taxes**. ▓ shall bear all applicable taxes, duties, deductions, imposts, or governmental levies, including withholding taxes, transfer taxes, sales or use taxes, value added taxes, stamp taxes, excise taxes, or other similar taxes (collectively "Taxes") arising under this Agreement. Ripple shall have no obligation to indemnify, gross-up, or otherwise reimburse ▓ for applicable Taxes. If and to the extent applicable law obligates Ripple to deduct Taxes from any Integration Incentive paid to ▓ including from a payment of XRP, Ripple shall timely deduct and remit such Taxes to the applicable tax authority and shall furnish ▓ with an official receipt or other appropriate evidence of such remittance. If requested by Ripple, ▓ shall promptly provide Ripple with a valid IRS W-9 form or a valid IRS series W-8 form, as appropriate. Without limiting the foregoing, Ripple and ▓ acknowledge and agree that net income taxes, franchise taxes, branch profit taxes, or similar income taxes imposed on a Party as a result of such Party being organized under the laws of, having its principal office, management and control, or employees located in, conducting business within, or by reason of another connection between Party and the jurisdiction imposing such tax, shall be the sole responsibility of such Party.

7. **Confidentiality**. Each Party shall maintain all Confidential Information (as defined below) it receives in strict confidence and not disclose any Confidential Information to any third party or use any Confidential Information for any purpose other than the performance of this Agreement or any other agreement between the Parties, unless agreed upon in writing by the other Party. ▓ shall not conduct any trading activates on the basis of Ripple's Confidential Information.
   a. Confidential Information means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (a) was previously known to the receiving party free of any obligation to keep it confidential, (b) becomes generally available to the public through no wrongful act, (c) is rightfully received from a third party under no obligation of confidence to such third party, (d) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (e) is required to be disclosed in order to comply with all applicable laws, administrative process or governmental or court order; provided, however, that in a circumstance in which disclosure is compelled by applicable law, administrative process or governmental or court invoices, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the invoice and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

8. **Responsibility to Third Parties**. ▓ is responsible for all matters or issues or claims relating to or in connection with any use, distribution or sale of XRP it receives as payment from Ripple. ▓ shall make no representations or warranties to any person or entity concerning, or otherwise act on behalf of, Ripple or its affiliates at any time.

9. **Risk of Loss**. Immediately upon Ripple's transfer of any XRP to ▓ XRP wallet address, all risk of loss related to such XRP passes to ▓ acknowledges and agrees that Ripple has no liability to ▓ or any third party for any loss, theft or misuse of any XRP that Ripple has transferred to ▓ per the terms of this Agreement.

10. **Material Risks** ▓ acknowledges the following material risks associated with virtual currency, including XRP:

HIGHLY CONFIDENTIAL
RPLI_SEC 0899554

a. Virtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

b. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

c. Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

d. Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

e. The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

f. There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

g. The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

h. The nature of virtual currency may lead to an increased risk of fraud or cyber-attack.

i. The nature of virtual currency means that any technological difficulties experienced by Ripple may prevent the access or use of Ripple's virtual currency.

11. **No Payment Reversal**. With respect to any payment of XRP from Ripple to ▉ under this Agreement, ▉cknowledges and agrees that Ripple cannot cancel, reserve, or change any XRP transfer that has been completed, as recorded on the XRP Ledger.

12. **No Recourse**. ▉ shall have no recourse against Ripple, its affiliates, employees, directors or officers for any liabilities of any type incurred by ▉ and/or any of its Affiliates as a result of its use, resale or distribution of XRP, including the materialization of any of the risks in Section 11 (Material Risks). ▉ shall comply with all applicable laws related to its activities and to its use, resale or distribution of XRP.

13. ▉ **Security Acknowledgment.** ▉ acknowledges and agrees that ▉ is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that it uses to access its XRP, including any XRP it receives under this Agreement ("▉ Credentials"). Any loss or compromise of ▉ Credentials may result in unauthorized access to XRP by third-parties and the loss or theft of such XRP. Ripple assumes no responsibility for any loss that ▉ may sustain due to compromise of ▉ Credentials

14. ▉ **XRP Acknowledgments**. ▉ acknowledges and agrees that (i) XRP does not represent a right to make any demand on Ripple, (ii) Ripple has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item; and (iii) Ripple is not responsible for any use by ▉ or any third party of any XRP that Ripple has delivered to ▉ under this Agreement.

15. **Compliance with Law**. The Parties shall comply with all applicable laws, rules, and regulations, and orders in all relevant jurisdictions (collectively, "Laws") including but not limited to Laws related to its activities and to its use, resale or distribution of XRP units. Without limiting the foregoing, The Parties agree not to violate any of (a) any applicable domestic or foreign anti-corruption Law, including the United Kingdom Bribery Act of 2010 and the United States Foreign Corrupt Practices Act; (b) any applicable domestic or foreign Laws related to Anti-Money Laundering and anti-terrorist financing requirements, including the USA Bank Secrecy Act, as amended by the USA Patriot Act and the Financial Conduct Authority's Anti-Money Laundering Regulations; (c) any applicable sanctions Laws administered by the U.S. Department of Treasury's Office of Foreign Assets Control; (d) applicable export restrictions or other Laws, including United States Export Administration Regulations, as well as end user, end use and destination restrictions which may be issued by the United States and other governments; and (e) anti-trust, anti-competition, or other market manipulations Laws.

16. **Limitation of Liability**. NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OR THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW:

    a. <u>Maximum Liability.</u> IN NO EVENT WILL EITHER PARTY'S AGGREGATE AND CUMULATIVE LIABILTY FOR ANY LOSSES AND DAMAGES ARISING OUT OF, IN CONNECTION WITH, OR RELATED TO THIS AGREEMENT WHETHER BASED ON A CLAIM OF BREACH OF CONTRACT OR WARRANT, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY OR OTHERWISE UNDER ANY THEORY OF LAW, EXCEED THE GREATER OF (i) $10,000, or (i) THE TOTAL AMOUNT PAID BY RIPPLE TO ▮ IN THE PRIOR TWELVE (12) MONTH PERIOD BEFORE THE CLAIM.

    b. <u>Exclusions to Maximum Liability.</u> The limit set forth in Section 20a. (Maximum Liability) and 9c. (Additional Exclusions) shall not apply to claims of: (i) gross negligence, fraud, or willful misconduct; (ii) personal injury, damage to tangible personal property; (iii) breach of confidentiality obligations as set forth in Section 7 (Confidentiality), and (iv) failure to make the payments as specified in Sections 3, 4, and 5.

    c. <u>Additional Exclusions.</u> IN NO EVENT WILL EITHE PARTY, ITS AFFILIATES, OR EITHER OF THEIR RESPECTIVE REPRESENTATIVES, EMPLOYEES, DIRECTORS, OFFICERS, LICENSORS, OR SUPPLIERS BE LIABLE TO THE OTHER PARTY OR ITS REPRESENTATIVES FOR ANY CONSQUENTIAL, INCIDENTIAL, INDIRECT, EXEMPLARY, SPECIAL, HYBRID OR PUNITIVE DAMAGES, OR DAMAGES FOR LOST PROFITS, REVENUE, GOODWILL OR SAVINGS, LOSS OF USE, BUSINESS INTERRUPTION, LOSS OF DATA, COST OF REPLACEMENT GOODS, OR REPUTATIONAL HARM, WHETHER NOR NOT BASED ON A CLAIM OF BRECH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY OR OTHERWISE UNDER ANY THEORY OF LAW, EVNE IF SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES.

17. **General**.

    a. **Term; Termination**. The term of this Agreement is from the Effective Date through the earlier of (i) three (3) months, or (ii) once ▮ has earned an aggregate amount of US▮ in XRP pursuant to the terms of the Agreement. Unless stated otherwise elsewhere in this Agreement and without limiting any other right or remedy that a Party may

have at law or otherwise, either Party may, in its sole discretion, terminate this Agreement immediately upon notice to the other Party if the other Party materially breaches any of its obligations under this Agreement and fails to cure its material breach within thirty (30) days of such notice

b. **Governing Law**. This Agreement and any disputes or matters arising from or relating to or in connection with the subject matter hereof shall be governed and construed by the laws of the State of California (without regard to conflict of laws principles).

c. **Effects of Termination; Survival**. The following rights and obligations shall survive the expiration or termination of this Agreement: Section 6 (Taxes), Section 7 (Confidentiality) Section 16 (Limitation of Liability), and Section 17 (General).

d. **No Agency**. No agency, joint venture or employment relationship is established between the Parties. Neither Party may incur any expenses or obligations on behalf of the other Party.

e. **Assignment**. Neither Party may assign or transfer or delegate or sublicense (collectively "assign" or "assignment") this Agreement or any rights or obligations hereunder or thereunder (whether voluntarily or involuntarily, by operation of law or merger or consolidation or otherwise) without the prior written consent of the other Party, except to a successor entity or an entity purchasing or acquiring substantially all of the assets of the Party (with written notice to the other Party).

f. **Notices**. Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth at the signature section below, or by email. Such notice shall be effective upon confirmed receipt or acknowledgment with respect to certified or registered mail and upon receipt with respect to email.

g. **Force Majeure**. Neither Party shall be liable for failure or delay in the fulfillment of any of its obligations hereunder (excluding payment of Fees) where such failure is due to war, riot, strike, labor dispute, civil disturbance, rebellion, invasion, terrorist attack, embargo, national or local emergency, natural disaster, acts of God, flood, fire, malfunction of equipment or facilities, failure by the other Party or a third party to perform a prerequisite necessary to fulfill such obligation, or any other cause beyond its reasonable control. The Party unable to fulfill its obligations due to such a force majeure event shall use diligent efforts to restore its performance thereof as soon as reasonably possible.

h. **Severability; Waiver**. If any provision of this Agreement is or becomes illegal, unenforceable or invalidated, by operation of law or otherwise, that provision shall be omitted to such extent and the remainder of this Agreement shall remain in full force and effect. Any waiver by either Party of any condition, term, part or provision of this Agreement must be in writing and shall not be a waiver of any other condition, term, part or provision, nor will the waiver be a future waiver of such condition, term, part or provision.

i. **Entire Agreement; Counterparts**. This Agreement constitutes the entire agreement of the Parties pertaining to its subject matter and supersedes all prior and other contemporaneous agreements, representations, warranties and understandings of the Parties, whether written or oral or express or implied. Modifications to this Agreement may only be taken in the form of a mutually executed amendment in the sole discretion of both Parties. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email

HIGHLY CONFIDENTIAL

or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

j. **Third Party Rights**. A person or entity that is not a party to this Agreement shall not have any rights to enforce any term of this Agreement, excluding for these purposes any Ripple Indemnitee.

k. **Interpretation**. When the context requires, the plural will include the singular and the singular the plural; and any gender will include any other gender. Section headings are not part of this Agreement and are only for the convenience of the Parties. No provision of this Agreement will be interpreted or construed against any Party because such Party or its counsel was the drafter thereof. Whenever the words "include," "includes" or "including" or any other variation are used in this Agreement, such words will be deemed to be followed by the words "without limitation."

l. **Provide Assurances On Notice**. Each Party, on receipt of notice from the other party, shall sign, or cause to be signed, all further documents, do, or cause to be done, all further acts, and provide all assurances as may reasonably be necessary or desirable to give effect to the terms of this agreement.

As of the Effective Date the Parties agree to be bound, and have caused this Agreement to be executed, by their authorized representatives.

**RIPPLE LABS INC.**

| | | | |
|---|---|---|---|
| By: | █████████ | By: | █████████ |
| Name: | █████████ | Name: | █████████ |
| Title: | VP, Head Institutional Markets | Title: | Authorized Signatory |
| Date: | 30 September 2019 | Date: | September 30, 2019 |
| Address: | 315 Montgomery Street, 2nd Fl. San Francisco, CA 94104 | Address: | █████████ |
| | Attn: General Counsel | Attn: | █████████ |

ATTACHMENT A



## XRP COUNTERPARTY WALLET ADDRESS CONFIRMATION

*Please complete and return this form in addition to relevant supporting documentation listed in Appendix A for the Counterparty via email to ap@ripple.com (AP) and duediligence@ripple.com. You may also contact AP via email with any questions regarding the information requested.*

| New Request   | Update

**Legal Name of Counterparty**

**XRP Ledger Address**

**Destination Tag (if applicable)**

If the XRP Ledger Address above belongs to a third party (e.g. custodian or exchange), name of third party:

---

I certify that the XRP Ledger Address and (if applicable) destination tag ("Address") listed above is directly and wholly owned by the Counterparty, or to the extent it is associated with a third party custodian ("Third Party"), I acknowledge and agree that (1) the Counterparty is designating the Address for receipt of XRP from Ripple and (2) XRP sent to the Address will be owned by the Counterparty.

| Name | | Title | |
|---|---|---|---|
| Email | | Phone | |
| Signature | | Date | |

**APPENDIX A:**
- US individuals or entities: Form W9
- Non-US individuals: Form W-8BEN
- Non-US entities: Form W-8BENE

HIGHLY CONFIDENTIAL     RPLI_SEC 0899560

## APPENDIX A—DATA PROTECTION

1. All capitalized terms used in this Appendix and not otherwise defined in this Appendix or the remainder of this Agreement, shall be defined by the General Data Protection Regulation (EU 2016/679) (the "GDPR").
2. Each Party shall comply with all applicable laws and regulations pertaining to the Processing of Personal Data, including, but not limited to, the GDPR (collectively, "Data Protection Laws").  For the purposes of this Appendix, either Party may be the Controller of Personal Data shared by the other Party.  Any Processing of Personal Data shall be done pursuant to the requirements of Section 2 of Article 28 of the GDPR, which is hereby incorporated by reference.
3. Each Party shall maintain appropriate technical and organizational security measures for the integrity and protection of Personal Data and make available to the other Party all information necessary to demonstrate compliance with Data Protection Laws. Each Party shall ensure that the Processing of Personal Data from the other Party is done in accordance with the terms of this Appendix and the Data Protection Laws, unless such instructions are legally prohibited.
4. Personal Data shall only be Processed in accordance with the Controller's instructions and for the purpose and duration necessary for the purpose of the Personal Data, as agreed to by the Parties.  Neither Party shall provide to a third-party, any Personal Data received from the other Party, without evaluating the security, privacy, and confidentiality practices of the third-party and enter into a binding, written agreement imposing data protection obligations at least as protective as those in this Appendix, unless required by law.  Each Party shall maintain and make available to the other Party, upon request, a list of all third-parties to whom it has shared Personal Data disclosed by the other Party.  Each Party and any associated third-party shall Process Personal Data fairly and lawfully and shall be subject to a strict duty of confidentiality by contract or applicable law.
5. Each Party warrants and represents that it has obtained all necessary consents from the relevant Data Subjects to Process their Personal Data and that it will comply with, and promptly respond to, all Data Subjects' requests for exercising their rights in accordance with Section 3 of the GDPR.
6. Each Party agrees to provide assistance to the other Party for compliance with Data Protection Laws pertaining to the subject matter herein, including, but not limited to, responding to a request, query, or complaint from a data subject or regulator.  Each Party shall notify the other Party without undue delay of any material breach or access request that affects, or may affect, Personal Data and provide additional information and reasonable support to enable the other Party to comply with Data Protection Laws.
7. A Party in breach of any of its obligations under this Appendix or Data Protection Laws shall indemnify the other Party against any third-party claims, demand, or action and all liabilities, costs, expenses, damages, and losses suffered or incurred by the indemnified Party arising out of or in connection with the breach of this Appendix or Data Protection Laws by the indemnifying Party, provided that the indemnified Party gives to the indemnifying Party prompt notice of such claim, full information about the

circumstances giving rise to it, reasonable assistance in dealing with, and sole authority to manage, defend, and/or settle the claim.
8. Each Party shall be responsible for any breach of the terms of this Appendix, by their respective affiliates or employees.

HIGHLY CONFIDENTIAL

RPLI_SEC 0899562