# Exhibit 59

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

This Ripple Master Hosted Services Agreement is between Ripple Services, Inc., a Delaware corporation ("Ripple") and Moneygram Payment Systems, Inc. ("Customer") as of the date the last party signs ("Effective Date"). Ripple and Customer shall each be referred to herein as a "Party" and together as "Parties".

RECITALS

- Ripple develops, supports and sells hosted software services ("Hosted Services") based on its proprietary software ("Software") and related off-site and on-site professional services ("Professional Services").
- Customer would like to purchase access to the Hosted Services and engage Ripple for its Professional Services.

NOW, THEREFORE, the Parties agree as follows:

1. **Parts of Agreement**
   a. This Agreement sets forth the master terms and conditions between the Parties regarding the subject matter hereof and includes the following parts (collectively as the same may be amended or restated, the "Agreement"):
      i. This agreement
      ii. Exhibit A- Support Services Terms
      iii. Exhibit B- Professional Service Terms
2. **Orders; Delivery**
   a. <u>Orders.</u> Customer shall order Hosted and Professional Services on a valid Work Order. A valid "Work Order" is a written document which (i) expressly incorporates this Agreement by reference; (ii) identifies the Hosted and Professional Services to be provided by Ripple to Customer; (iii) sets forth the fees for such services ("Fees"); (iv) supplements this Agreement with any additional express terms and conditions set forth in that Work Order and agreed to by both Parties, if any, provided that in the event of any conflict between this Agreement and that Work Order, the provisions of that Work Order will control; and (v) is executed and delivered by both Customer and Ripple. If a Customer's systems requires a written or electronic purchase order to be issued, any terms attached to or referenced in such purchase order shall have no binding effect on Ripple even if such purchase order number is referenced on the invoice or such purchase order is attached to a Work Order.  This Agreement does not establish any commitment on the part of Customer to purchase any specific amount of Hosted Services or Professional Services.
   b. <u>Delivery, Hosted Services.</u> Following receipt of a valid Work Order, Ripple will provide Customer with: (i) technical specifications and other written documentation for the Hosted Services ("Documentation"); and (ii) the unique domain name for Customer to access its unique instance of the Hosted Services. Ripple will also provide, via secure communication channel, credentials for Customer to access the Hosted Services. Upon so making the Hosted Services available for access and use, the Hosted Services shall be deemed delivered.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272291

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

3.  **Service and System Control**.
    a.  <u>Customer Systems.</u> Customer has and will retain sole control over the operation, maintenance and management of, and all access to and use of, the Customer's information technology infrastructure, including computers, software, hardware, databases, electronic systems (including database management systems) and networks, whether operated directly by Customer or through the use of third-party services ("Customer Systems"), and sole responsibility for all access to and use of the Hosted Services by any person (other than Ripple) by or through the Customer Systems or any other means controlled by Customer.
    b.  <u>Change.</u> Ripple reserves the right, in its sole discretion, to make any changes to the Hosted Services that it deems necessary or useful to: (i) maintain or enhance (a) the quality or delivery of Ripple's services to its customers; (b) the competitive strength of or market for Ripple's services; or (c) the Hosted Services' cost efficiency or performance; or (ii) to comply with applicable Laws. Notwithstanding the foregoing, Ripple will not make any changes to the Hosted Services that substantially reduce the functionality or quality of the Hosted Services without first providing written notice to Customer at least thirty (30) days in advance of making such changes.
    c.  <u>Subcontractors.</u> Ripple may from time to time in its discretion engage third parties as subcontractors to perform services in connection with this Agreement.  Ripple shall (i) secure a contractual commitment that such subcontractor shall comply with all of the terms and conditions of this Agreement, as if such subcontractor were a party hereto; (ii) ensure that such subcontractor has proper training with regard to security, confidentiality, and data security; and (iii) remain fully liable for all acts and omissions of such subcontractor in connection with the Hosted Services and Professional Services.
    d.  <u>Suspension of Services.</u> In addition to any other provisions regarding termination of this Agreement, Ripple may, directly or indirectly, suspend or otherwise deny Customer's access to or use of all or any part of the Hosted Services, without incurring any resulting obligation or liability, if: (i) Ripple receives a judicial or other governmental demand or order, subpoena or law enforcement request that expressly or by reasonable implication requires Ripple to do so; or (ii) Ripple believes, in its good faith and sole discretion, that: (a) Customer is, has been, or is likely to be involved in any fraudulent, misleading or unlawful activities relating to or in connection with any of the Services; or (b) Ripple's ongoing provisioning of the Hosted Services pursuant to any Work Order may cause Ripple to violate a law or regulation; or (c) this Agreement expires or is terminated. Notwithstanding the foregoing and to the extent providing the Hosted Services are not prohibited by law, Ripple must provide advance written notice to Customer at least seven (7) days prior to suspension of Hosted Services.  Customer has no obligation to pay any Fees for the period for which the Hosted Services are suspended.  This Section does not limit any of Ripple's other rights or remedies, whether at law, in equity or under this Agreement.
4.  **Authorization; Services; Customer Restrictions**
    a.  <u>Authorization.</u> Subject to and conditioned on Customer's payment of undisputed Fees in accordance with this Agreement, Ripple hereby authorizes Customer to access and use, solely

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0272292

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

during the term of this Agreement, the Hosted Services in accordance with the conditions and limitations set forth in this Agreement. This authorization is non-exclusive and non-transferable (except in accordance with a transfer of the Agreement under Section 19(e)).

Ripple Responsibilities. Upon delivery of the Hosted Services as described in Section 2.b (Delivery, Hosted Services), Ripple shall: (i) provide to Customer basic support for the Hosted Services, as described in Exhibit A hereto; and (ii) make the Hosted Services available 24 hours a day, 7 days a week and at a minimum of 99.5% of the time in each calendar month (the "Availability Commitment"). The Availability Commitment will be measured based on a full calendar month using the calculation of total minutes in the month less downtime minutes divided by total minutes in the month.  Planned downtime will be excluded from the Availability Commitment calculation, but only if Ripple provides Customer with at least five (5) days' advance notice for such planned downtime to the Hosted Services for maintenance of, updates for, and upgrades to the Hosted Services, and such planned downtime must not occur during 15:00 UTC to 23:00 UTC of Customer without Customer's written consent. Ripple is not liable for unavailability caused by acts of God, acts of government, flood, fire, earthquakes, civil unrest, acts of terror, strikes or other labor problems (other than those involving Ripple employees), third party failures or delays (other than on systems or networks under the ownership or control of Ripple). If Ripple fails to meet or exceed the Availability Commitment (each such failure a "Service Level Failure"), Ripple shall perform a root cause analysis of such failure and shall promptly take corrective actions in accordance with Exhibit A.  Customer shall provide reasonable support and assistance requested by Ripple to discover the cause or a cure for the reported failure.  Until the earlier of the twenty four (24) months from the Effective Date of this Agreement or the date that Customer pays to Ripple fees for use of the Hosted Services under a mutually agreed Work Order (such earlier date, the "Service Level Termination Date"), Customer's sole remedy for violations of this Section shall be that Ripple shall toll and extend the Incentives Period, as defined in Work Order #1, by one (1) additional month for each calendar month the Availability Commitment is not met, up to a maximum of six (6) months. After such Service Level Termination Date, Customer may immediately terminate the Agreement, in whole or in part, if such Service Level Failures materially impair the Customer from providing money transfer services in the corridors identified in a Work Order or otherwise would reasonably be expected to materially impair the Customer's ability to attain the transaction volumes contemplated in the Work Order, and Ripple fails to cure such material impairment within ten (10) days of receipt of notice of such material impairment from Customer.

b.  Customer Responsibilities. Customer shall: (i) be solely responsible for the accuracy, quality, integrity and legality of any electronic data or information Customer submits to the Hosted Services ("Customer Data") and of the means by which Customer acquired Customer Data; (ii) use commercially reasonable efforts to prevent unauthorized access to or use of the Hosted Services by Customer's employees or contractors, and notify Ripple promptly of any such unauthorized access or use; (iii) use the Hosted Services only in accordance with applicable

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272293

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

Laws; (iv) only use the Hosted Services with third party software and technology for which Customer has a license or other authorization to use such software or technology; and (v) be solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that Customer uses to access its accounts at digital asset exchanges in connection with the Hosted Services ("Customer Exchange Credentials").

c. <u>Reservation of Rights.</u> Nothing in this Agreement grants any right, title or interest in or to (including any license under) any intellectual property rights in or relating to, the Hosted Services, whether expressly, by implication, estoppel or otherwise. All right, title and interest in and to the Hosted Services are and will remain with Ripple.

d. <u>Authorization Limitations and Restrictions.</u> Customer shall not, and shall not permit any other person to, access or use the Hosted Services except as expressly permitted by this Agreement. For purposes of clarity and without limiting the generality of the foregoing, Customer shall not, except as this Agreement expressly permits: (i) copy, modify or create derivative works or improvements of the Hosted Services; (ii) rent, lease, lend, sell, sublicense, assign (other than in accordance with Section 19(e)), distribute, publish, or transfer (other than in accordance with Section 19(e)) the Hosted Services; (iii) reverse engineer, disassemble, decompile, decode, adapt or otherwise attempt to derive or gain access to the source code of the Hosted Services, in whole or in part; (iv) gross negligently or intentionally bypass or breach any security device or protection used by the Hosted Services; (v) gross negligently or knowingly input, upload, transmit or otherwise provide to or through the Hosted Services, any information or materials that are unlawful or injurious, or contain, transmit or activate any virus, worm, malware or other malicious computer code; (vi) gross negligently or intentionally damage, destroy, disrupt, disable, impair, interfere with or otherwise gross negligently or intentionally impede or gross negligently or intentionally harm in any manner the Hosted Services, the information technology infrastructure used by or on behalf of Ripple in providing the Hosted Services, or Ripple's provision of services to any third party, in whole or in part; (vii) remove, delete, alter or obscure any trademarks, warranties or disclaimers, or any copyright, trademark, patent or other intellectual property or proprietary rights notices from any Hosted Services, including any copy thereof; (viii) access or use the Hosted Services in any manner or for any purpose (other than a manner or for a purpose authorized by this Agreement) that infringes, misappropriates or otherwise violates any intellectual property right or other right of any third party, or that violates any applicable Laws; or (ix) otherwise access or use the Hosted Services beyond the scope of the authorization granted under Section 4.a.

e. <u>U.S. Department of the Treasury's Specially Designated Nationals and Blocked Persons ("SDN") List.</u> Customer represents and warrants that it, its Representatives (as defined in Section 9.c) and its affiliates: (i) are not owned or controlled by any individual or entity subject to any sanctions administered or enforced by the United States, including the SDN List and Sectoral Sanctions Identifications List maintained by the U.S. Department of the Treasury's Office of Foreign Assets Control, the United Nations Security Council, the European Union and the

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272294

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

relevant sanctions authorities of each of its member states, including the United Kingdom's HM Treasury, or other relevant sanctions authority; (ii) are not located, organized, or resident in Cuba, Iran, North Korea, Syria, or the Crimea Region of Ukraine, or owned or controlled by any individual, entity or government in those countries or regions; and (iii) will not use the Hosted Services in connection with any business activities in those countries or regions. Additionally, the Hosted Services are subject to U.S. sanctions laws and may not be provided to any party listed on the SDN List or in countries or regions subject to U.S. comprehensive sanctions programs (currently Cuba, Iran, North Korea, Syria, and the Crimea Region of Ukraine). Customer will not use, transfer, or provide access to the Hosted Services: (A) to any party listed on the SDN List; or (B) in (or for the benefit of individuals or entities from) U.S. sanctioned countries or regions. Any breach of this section is a material breach of this Agreement and is grounds for immediate termination.

5. **Processing of Personal Data**

   a. <u>Definitions.</u> For the purpose of this Section 5 (Processing of Personal Data), personal data, data subject, process/processing, data controller and data processor shall the same meaning as in the General Data Protection Regulation (Regulation (EU) 2016/679) of the European Parliament and the Council of 27 April 2017 ("GDPR") on the protection of natural persons with regard to the processing of personal data and on the free movement of such data, and repealing Directive 95/46/EC.

   b. <u>Personal Data.</u> Customer may submit personal data to the Hosted Service in its sole discretion and control. Personal data may include but is not limited to a data subject's name, address, date of birth, bank account number, a unique identifier associated with the data subject and/or other identifying information.

   c. <u>Details of Processing.</u> Ripple shall solely process personal data in accordance with the Documentation, as necessary to perform the Hosted Services under this Agreement and any applicable Work Order and/or as further instructed by Customer in writing and agreed to by Ripple in writing, provided that such instructions are in accordance with any applicable Laws. In the event that Ripple processes any personal data that implicates GDPR, the Parties shall promptly execute a data processing agreement compliant with GDPR and mutually agreeable to the Parties.

   d. <u>Roles of Parties.</u> The Parties agree and acknowledge that with respect to any processing of personal data, Ripple and its affiliates are the data processors and Customer is the data controller.

   e. <u>Deletion of Personal Data.</u> Ripple shall, to the extent allowable by applicable Laws, delete personal data in accordance with Ripple's written data privacy and security program and policy, as amended from time to time in its sole discretion, that incorporates administrative, technical, and physical safeguards (including provisions for reasonable disaster recovery and vulnerability testing) designed to ensure the security, confidentiality, and integrity of Customer's Confidential Information ("Privacy and Security Policy").

6. **Security**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272295

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

a. <u>Ripple Systems and Security Obligations.</u> Ripple will employ security measures, in accordance with Ripple's Privacy and Security Policy, that meet or exceed all requirements under applicable Laws, and that protect Customer's Confidential Information against reasonably anticipated threats or hazards, including from unauthorized access, destruction, use, modification, or disclosure.   To the extent Ripple has undergone any third party audit (e.g., SSAE-18), that assesses the effectiveness of Ripple's Privacy and Security Policy as relevant to the Hosted Services, Ripple shall provide Customer with a summary of the results of any such audit upon Customer's request.

b. <u>Data Breach Procedures.</u> Ripple shall, as soon as reasonably practicable following discovery, report to Customer any (i) loss or misuse (by any means) of Customer's Confidential Information; (ii) inadvertent, unauthorized, or unlawful processing, disclosure, access, alteration, corruption, transfer, sale, rental, destruction, or other use of Customer's Confidential Information, including any theft or unauthorized use of login information; or (iii) other act or omission that compromises or may compromise the security, confidentiality, or integrity of Customer's Confidential Information, relating to Ripple's equipment or systems (each of the foregoing events, a "Data Breach"). Ripple shall provide such information relating to such Data Breach as reasonably requested by Customer, and on an ongoing basis as such information becomes available, and use best efforts to remedy any Data Breach (and prevent any further Data Breach) as soon as reasonably practicable at Ripple's expense in accordance with applicable privacy rights, laws, regulations and industry standards. Ripple shall also: (1) undertake an investigation of such Data Breach and reasonably cooperate with Customer in connection with such investigation, including by providing Customer with a written summary of the results of Ripple's investigation; (2) not make any public announcements relating to such Data Breach without Customer's prior written approval, which shall not be unreasonably withheld; (3) take all necessary and appropriate corrective action, at the expense of Ripple, to prevent a recurrence of such Data Breach; (4) take or, at Customer's request, reasonably assist Customer in taking, all Remediation Efforts (as defined below); and (5) reimburse Customer for actual costs incurred by Customer in responding to, and mitigating damages caused by, any Data Breach, including all costs of notice, credit monitoring, identity fraud protection, identity theft restoration and other remediation efforts (collectively, "Remediation Efforts") that are necessary, reasonable, and appropriate under the circumstances, as reasonably determined by Customer, to remedy the cause and effects of the Data Breach.

c. <u>Customer Control and Responsibility.</u>   The Hosted Services do not replace the need for Customer to maintain regular data backups or redundant data archives and to maintain adequate security of Customer Exchange Credentials. RIPPLE HAS NO OBLIGATION OR LIABILITY FOR ANY LOSS, ALTERATION, DESTRUCTION, DAMAGE, CORRUPTION, RECOVERY OF CUSTOMER DATA OR ANY LOSS THAT CUSTOMER MAY SUSTAIN DUE TO THE COMPROMISE OF CUSTOMER EXCHANGE CREDENTIALS THAT IS NOT CAUSED BY RIPPLE OR THE HOSTED SERVICES.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                      RPLI_SEC 0272296

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

d. <u>Access and Security.</u> Customer shall  control the content and use of any Customer Data, including the uploading or other provision of Customer Data for processing by the Hosted Services.

e. <u>No PCI Data.</u>  Ripple shall not process or use any data, and Customer shall not transmit to Ripple any data, that is subject to the Payment Card Industry Data Standard and Payment Application Data Standard in the performance of any Services hereunder.

f. <u>Hosting Terms.</u>  To the extent the Hosted Services entail Ripple hosting Customer Data (whether itself or via a third-party service), Ripple shall ensure that: (i) its performance of the Services complies with the AICPA's Statement on Standards for Attestation Engagements No. 18 ("SSAE No. 18") and that an annual "SOC2" audit of the applicable datacenter's compliance with SSAE No. 18 is conducted by an independent third party; (ii) Customer Data is hosted in a datacenter physically located in the U.S., and that under no conditions will Ripple move Customer Data across national borders without Customer's prior written consent other than as required by the essential functions of the Hosted Service for Ripple to transmit payment data for transactions sent by Customer; (iii) all Customer Data shall be deemed to remain solely in the possession, custody, and control of Customer for all purposes, and shall not be modified by Ripple in any way unless explicitly approved in writing by Customer; and (iv) all Customer Data is stored in industry-standard encrypted format.

g. <u>Backup.</u>  Ripple will make an incremental backup of Customer Data every day and a complete backup of all Customer Data every week for the purposes of providing a continuity of service. Customer acknowledges that it is required to maintain its own records and the Hosted Services are not intended to be used as the system of record for Customer's transaction records.

h. <u>Disaster Recovery.</u>  Ripple shall include Customer in its standard site disaster recovery plan such that any Hosted Services can be made available for use on a limited basis within twelve (12) hours of any disaster and available for normal use within thirty-six (36) hours of any disaster. Within six (6) months from the Effective Date of this Agreement, Ripple will have both physical and logical contingency plans in place, which shall be provided to Customer upon request.  Ripple may review and amend such plans in accordance with technology advances provided that no such change shall reduce the benefit provide to Customer.

i. <u>Data Storage.</u>  Ripple agrees that any and all of Customer Data will be stored, processed, and maintained solely on designated systems internal to the Ripple or its third party providers as identified to Customer and that no personal data at any time will be processed on or transferred to any external systems or portable or laptop computing device or any portable storage medium, unless that device or storage medium is used as part of Ripple's designated backup and recovery processes and encrypted in accordance with HTTPS (SSL) and Transport Layer Security (TLS 1.2 or higher).

j. <u>Access and Security.</u>  Customer shall provide Ripple with reasonable access to (i) Customer facilities and (ii) Customer's computer systems, software, electronic and mobile equipment, and network (collectively, "Customer Equipment"), strictly if and to the extent necessary, and for the time period necessary, for Ripple to provide the Hosted Services and Professional Services

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272297

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

hereunder. Ripple agrees that any use of Customer Equipment (including without limitation use of internet, email or messaging applications via Customer Equipment) will be strictly as necessary to perform the Hosted Services and Professional Services (as applicable), and subject to Customer's internal rules, policies and regulations regarding use of Customer Equipment, as provided by Customer to Personnel as necessary. Customer reserves the right, in its sole and absolute discretion, to terminate Ripple's access to or use of Customer Equipment at any time, for any reason, without notice to Ripple.  Ripple shall not introduce any malware, viruses, worms, Trojan horses or other bugs or errors into Customer Equipment, or forward or access any executable "ready to run" files or other files that may cause damage to any computer systems or networks.  Customer reserves the right to monitor Customer Equipment and all use thereof by Ripple's Personnel for these and any other activities.  Except where prohibited by Laws, should Ripple learn information that (1) relates to any Personnel assigned to provide Hosted Services and/or Professional Services at any Customer facility or requiring access to Customer Equipment and (ii) would adversely affect such Personnel's suitability for performing such services, Ripple shall promptly advise Customer and remove the individual immediately from performing such services at the Customer facility or on Customer Equipment.  Ripple shall, upon request from Customer, perform a reasonable background check on any Personnel having access to Customer Equipment or accessing a Customer facility.

7.  **Payment Terms; Taxes**

    a.  <u>Payment Terms.</u> Ripple will invoice Customer for any Fees and any applicable taxes as set forth in the Work Order. Customer will pay Ripple any undisputed Fees within thirty (30) days of the Customer's receipt of a valid invoice.

    b.  <u>Disputed Fees.</u> In the event of a dispute over Fees, Customer may withhold payment of an invoice for only that portion of Fees in dispute and will remain obligated to pay Ripple for the undisputed portion of Fees by the invoice due date. Customer must provide a written notice to Ripple providing the details of such dispute prior to the applicable invoice due date in order to avoid late fees.

    c.  <u>Late Fees.</u> In the event that any undisputed invoices are past due, and without limiting its other rights or remedies, Ripple reserves the right to impose a late payment charge of one percent (1%) per month or the maximum rate permitted by Law (whichever is less) of the Fees for each day that payment thereof is due but not yet paid. Such late payment interest shall be compounded daily as of the due date until Ripple's receipt of payment of the outstanding amount. Ripple reserves the right to treat non-payment of undisputed Fees and applicable taxes as a material breach of this Agreement.

    d.  <u>Taxes.</u> Ripple shall charge any sales, value added, and/or similar tax applicable to any Services ("Indirect Taxes") to Customer, including as part of the Fees, and shall include such taxes, separately stated, on its invoices to Customer. Customer must furnish to Ripple a valid sales tax exemption certificate and other required documentation at a minimum of thirty (30) days prior to the issuance of an invoice that would exempt the transaction from sales tax, in order for Ripple to reflect this exempt treatment on such invoice. Ripple shall be responsible for the payment of

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272298

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

any interest and penalties related to its non-compliance with applicable Indirect Tax laws pertaining to the Hosted Services and Professional Services.  If Customer is required by federal, state, or local law to withhold taxes for which Ripple is responsible, Customer will deduct such withholding tax from payment to Ripple and provide to Ripple a valid tax receipt in Ripple's name. If Ripple is exempt from such withholding taxes as a result of a tax treaty or other regime, Ripple shall provide to Customer a valid tax treaty residency certificate, tax exemption certificate, or other required documentation  at a minimum of thirty (30) days prior to the payment being made. Each Party shall bear sole responsibility for all property taxes, assessments and other real or personal property-related levies on its owned or leased real or personal property, for employment taxes on its employees, and for intangible taxes on property it owns or licenses. Ripple and Customer shall fully cooperate to identify taxable and nontaxable portions of amounts payable pursuant to this Agreement (including segregation of such portions on invoices) and to obtain refunds of taxes paid, where appropriate. If Ripple is obligated to make any payment to Customer for taxes (including Indirect Taxes) under this Section 7.d, Ripple shall make sure payments are made from Ripple's United Stated business unit only.  Neither Party shall be liable for taxes or assessments on the other Party's net income, gross income, capital, net worth, franchise, privilege, property, or any similar taxes or assessments. The obligations under this Section 7.d (Taxes) shall survive termination or expiration of this Agreement or Work Order.

8. **Intellectual Property**

   a. <u>General.</u> The Parties have no intent to jointly develop software or other intellectual property under this Agreement.

   b. <u>Pre-existing Intellectual Property.</u> Both Parties shall retain ownership of their pre-existing intellectual property.

   c. <u>Ownership of Hosted Services.</u> Ripple and Ripple's affiliates, respectively, retain exclusive ownership of all right, title, and interest in and to the Hosted Services and its related software in any and all versions that may be made available for Customer's access.   Nothing in this Agreement constitutes a sale or other transfer or conveyance of any right, title, or interest in the software or any of the intellectual property rights upon which the Hosted Services are related. Customer acknowledges that any intellectual property created or developed by Ripple in connection with the Hosted Services and any other deliverables provided to, or accessed by, Customer, including all intellectual property rights therein (collectively, "Work Product") are directly related to the implementation, configuration, documentation, and support of Hosted Services. Unless otherwise set forth in a Work Order, Ripple does and will exclusively own all right, title and interest in and to the Work Product in all jurisdictions, without regard to the source of funding or development of the same; and Customer without further consideration will and hereby does irrevocably assign and transfer to Ripple any and all rights or claims of ownership in or to any of the Work Product and all intellectual property rights therein on a continuous basis. The Parties further confirm that none of the Work Product is a "work for hire" under the US Copyright Act or similar Laws.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272299

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

d. <u>Ownership of Customer Data.</u> Customer retains exclusive ownership of all right, title and interest in and to any Customer Data provided by Customer to Ripple in connection with the Hosted Services.

e. <u>Usage Data.</u> Notwithstanding the terms of Section 8, Ripple may collect data related to Customer's use of the Hosted Services and use such data solely for the purposes of: (i) performing its obligations hereunder; (ii) billing for any fees associated with Hosted Services usage, as specified in a Work Order; and (iii) enhancing and improving the Hosted Services and its related Software for customers of Ripple or its affiliates (provided that in the case of this sub-section (iii), only aggregated or anonymized Customer Data may be used by Ripple). Customer agrees to grant and hereby grants to Ripple and its affiliates on a continuous basis the limited worldwide, non-exclusive, non-transferable (other than as set forth in Section 19(e)), non-sublicensable, revocable (upon material breach of Ripple of this Agreement), royalty-free and fully paid up right and license: (A) to use, reproduce and modify such data for any of the foregoing purposes; and (B) further to publicly disclose or distribute such data in an anonymized and aggregated format where the individual sources of such data cannot reasonably be identified, provided that if this data is disclosed pursuant to this Agreement in an anonymized and aggregated format where the individual sources of data cannot reasonably be identified, Ripple has no obligation to remove Customer's anonymized and aggregated data from such disclosure. Usage data will not include any personal data that would otherwise be subject to Section 5 (Processing of Personal Data).

f. <u>Feedback.</u> For no charge or attribution, Ripple may use and incorporate any feedback or suggestions for improvements or modifications to the Hosted Services or any related materials (i.e. Documentation, professional service deliverables, etc.) suggested or provided by Customer ("Feedback"). To the extent such Feedback is used by or for Ripple or incorporated into the Hosted Services or related materials, Customer: (i) agrees that it has no right or claim of ownership to such Feedback; and (ii) without additional consideration will and hereby does irrevocably assign and transfer to Ripple any and all rights or claims of ownership in or to any of the Feedback on a continuous basis.

g. <u>No Implied Licenses or rights.</u> Licenses or rights not expressly set forth in this Agreement or on a Work Order shall not arise by implication or estoppel otherwise. All rights and licenses not expressly granted in this Agreement are hereby expressly reserved by the owner of the relevant intellectual property or rights therein.

9. **Confidentiality.** Either Party ("Discloser") may disclose to the other Party ("Recipient") information that Discloser desires Recipient to keep confidential and protect against unauthorized use or disclosure subject to the terms of this Section 9 (Confidentiality).

a. <u>Definition.</u> "Confidential Information" means any and all information, data, software, business plans, company financial data, trade secrets or know-how disclosed during the Term of the Agreement to Recipient, either directly or indirectly by Discloser, whether in writing, by electronic means, orally or by inspection of tangible objects (including, without limitation, documents, prototypes, software, product or service roadmaps, diagrams, computer code (object or source),

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272300

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

vendor/customer/employee lists, forecasts, videos, diagrams, presentations, financial statements), which is designated as "Confidential", "Proprietary", or some similar designation, or is by its nature and/or the circumstances of its disclosure, reasonably inferred to be confidential or proprietary. Confidential Information may include information disclosed to the Discloser by a third party. The Parties agree that Hosted Services, its related Software, and the Work Product and the Feedback are Ripple's Confidential Information.

b. <u>Exclusions.</u> Confidential Information shall not include any information: (i) which was publicly known and/or made generally available in the public domain prior to the time of disclosure to Recipient without breach of a confidentiality obligation owed to the Discloser; (ii) was generally available to the public following disclosure to Recipient through no act or omission by Recipient or anyone to whom the Recipient disclosed such information; (iii) Recipient rightfully possessed without any duty of non-disclosure prior to the initial disclosure to Recipient (as shown by Recipient's written files and records); (iv) which was independently developed by Recipient without use of or reference to Confidential Information received by Recipient (as shown by Recipient's documents and other competent evidence); and (v) Recipient rightfully obtained such information from a third party permitted to disclose it without a breach of any obligations of confidentiality owed to the Discloser.

c. <u>Confidentiality Obligations.</u> Recipient agrees to hold Confidential Information of the Discloser in confidence and implement precautions to protect and maintain the confidentiality of the Confidential Information, which precautions shall be at least equivalent in scope and effect to the measures taken by Recipient to protect its own confidential or proprietary information of a like or similar nature, but in no case with less than a reasonable degree of care.  Recipient and any Representative further shall have the right to use such Confidential Information solely in connection with the exercise of the rights or performance of the obligations of Recipient under this Agreement and not for any other purpose at any time ("Permitted Uses").  Recipient agrees that it shall not disclose any Confidential Information to any third parties, except to Recipient's directors, officers, employees, contractors and agents ("Personnel") and/or its affiliates and its Personnel, and its or their consultants, attorneys, accountants or other professional advisors (all of the foregoing collectively, "Representatives") who have a need to know the information in connection with the Permitted Uses. Such permitted disclosure shall be made only to those Representatives who have signed (or are otherwise legally bound by) a non-use and non-disclosure agreement in substance at least as protective as the provisions hereof, prior to any disclosure of Confidential Information to such persons, and which would protect the Confidential Information disclosed under this Agreement. Recipient agrees and accepts all liability for the acts and omissions of its Representatives as such acts and omissions relate to these confidentiality and non-use obligations. Recipient must reproduce all confidentiality and/or proprietary notices on all copies in the same manner as the original. Recipient agrees that it will promptly notify Discloser of any use or disclosure of the Confidential Information in violation of this Agreement.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272301

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

d.  <u>Mandatory Disclosures.</u> Recipient further may disclose Confidential Information required to be disclosed by law, regulation or a valid court order, if Recipient: (i) gives Discloser timely notice so that Discloser may seek a protective order, confidential treatment, or other appropriate relief; (ii) provides assistance as reasonably necessary for Discloser, at its expense, to seek a protective order, confidential treatment, or other appropriate relief; and (iii) only discloses the portion of Confidential Information that Recipient's legal counsel advises is legally required to be disclosed.

e.  <u>Return or Destruction of Materials.</u> All documents and other tangible objects containing or representing Confidential Information, and all copies thereof which are in the possession of the Recipient or its Representatives, shall be and remain the property of Discloser and upon termination of this Agreement shall be promptly returned or, at the option of the Recipient, destroyed with a written certification of destruction to Discloser. Notwithstanding the preceding sentence and in the event that Recipient is required by law or regulation to retain the Confidential Information, Recipient may retain only the Confidential Information necessary for compliance.

f.  <u>Survival.</u> The respective obligations in this Section 9 shall survive the termination or expiration of this Agreement and shall continue in full force and effect for a period of five (5) years thereafter; provided that for any trade secrets contained in the Confidential Information, the respective obligations in this Section 9 shall continue in full force and effect until such time that such item is no longer considered a trade secret under applicable Laws. Termination of such obligations shall not affect or limit any independent rights of a Party in or to its Confidential Information under applicable Laws.

**10. Legal Compliance**

a.  <u>Compliance with Applicable Laws.</u> Each Party shall at all times have procedures and policies in place to reasonably comply with all Laws that are applicable to the operation of its business, this Agreement, and its performance hereunder, including, but not limited to, any applicable asset control or anti-money laundering Laws. In particular, Customer agrees to use the Hosted Services in compliance with all applicable laws, rules, regulations and orders in all applicable jurisdictions (collectively, "Laws"). Without limiting the foregoing, Customer represents and warrants that it will not gross negligently, knowingly or intentionally use the Hosted Services to violate: (i) any applicable domestic or foreign anti-corruption Law, including the United Kingdom Bribery Act of 2010 and the United States Foreign Corrupt Practices Act; (ii) any applicable domestic or foreign Laws related to Anti-Money Laundering and anti-terrorist financing requirements, including the USA Bank Secrecy Act, as amended by the USA Patriot Act and the Financial Conduct Authority's Anti-Money Laundering Regulations; (iii) applicable sanctions Laws administered by the U.S. Department of Treasury's Office of Foreign Assets Control; and (iv) applicable export restrictions or other Laws, including United States Export Administration Regulations, as well as end user, end use and destination restrictions which may be issued by the United States and other governments.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272302

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

b.    Customer warrants and represents that Customer is not on, and is not acting on behalf of a Transaction Party that is on any Denied Persons list, Entity List, Unverified List, Specially Designated Nationals List or on other like list of parties subject to sanctions or to whom or by whom exports or re-exports of products subject to export controls are prohibited or subject to special conditions (such as US Sectoral Sanctions) whether published by the United States Government, the European Union, or the United Kingdom. For the purposes of this Section 10.b, "Transaction Party" means any party whose identifiable information is provided by Customer or received by Customer through Hosted Services, and (i) who is a natural person; or (ii) in the case of a legal entity, the legal entity itself and any party that owns or controls directly, or indirectly, fifty percent (50%) or more of that legal entity.

**11. Representations and Warranties; Disclaimers**

a.    <u>Authority.</u> Each Party represents to the other Party that it: (i) is a legal entity duly organized and validly existing under the Laws of the jurisdiction in which it is registered or in which its principal office is located, as the case may be; (ii) has all necessary power and authority to enter into this Agreement and associated Work Orders and perform its obligations hereunder; and (iii) when executed and delivered by such Party, this Agreement and any associated Work Orders will constitute a legal, valid and binding obligation of such Party that is enforceable in accordance with its terms hereunder.

b.    <u>Hosted Services Warranty.</u> Ripple warrants that for as long as Ripple is obligated to make the Hosted Services available to Customer, the Hosted Services will substantially and materially conform to the Documentation. Ripple will use commercially reasonable efforts to fix any non-conforming Hosted Services in accordance with the Support Services Terms.  Ripple further represents and warrants that: (i) use of the Hosted Services will not require Customer to pay Ripple or any third party any additional fees as part of the Hosted Services or secure any additional licenses, clearances or rights for use of such Hosted Services not contemplated in this Agreement or applicable Work Order; (ii) the Hosted Services will be free of viruses, malware, worms, time bombs, Trojan Horses, software locks, backdoors, trapdoors, contaminants, and other harmful or malicious code that may harm Customer's computer systems or network; (iii) the Hosted Services will be free of software disabling devices, time out devices, counter devices and devices intended to collect data regarding usage or related statistics without the prior written authorization of Customer; (iv) Ripple does not and will not use any software (in source code or object code form) licensed from another party under a license commonly referred to as an open source, free software, copyleft or community source code license (collectively, "Open Source Software") in a manner that obligates Customer to disclose, make available, offer or deliver the source code of any software owned by Customer or licensed to Customer by a third party; and (v) Ripple and the Hosted Services (including the Professional Services) are in compliance with all terms of any Open Source Software license applicable to any portion of such services, including all terms related to notice, attribution, and access to source code. NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OR THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, TO THE FULLEST EXTENT

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272303

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

NOT PROHIBITED BY APPLICABLE LAW, THE REMEDY IN THIS SECTION 11.b (HOSTED SERVICES WARRANTY) SHALL BE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY, AND RIPPLE'S SOLE AND EXCLUSIVE LIABILITY, WITH RESPECT TO THE HOSTED SERVICES THAT DOES NOT CONFORM TO THE DOCUMENTATION OR OTHERWISE IS DEFECTIVE.

c. <u>Professional Services Warranty.</u> Ripple warrants that its Professional Services, if any, will be performed in a professional workmanlike manner by skilled personnel during the period of time when the Services are being delivered. Ripple warrants that the performance of the Professional Services stipulated in a relevant Work Order, any Deliverables of such Professional Services will materially conform to the specifications for any deliverables to be provided by the Professional Services ("Deliverables") as agreed in writing by the Parties in the applicable Work Order ("Specifications"). Customer will have thirty (30) days from the completion of the Professional Services to give notice (with significant detail) to Ripple of such claim of non-conformance. Within thirty (30) days of receiving such claim of non-conformance, Ripple will fix any material non-conformance of such Deliverable, and, on an interim basis, promptly provide any appropriate workarounds, or at Ripple's sole election refund fees paid, if any, for the deficient Deliverable.  If Ripple does not fix the material non-conformance within such time period, Customer may reject such Deliverable and obtain a refund on a pro rata basis for any Fees prepaid for the affected Deliverable and associated Professional Services.  Ripple further represents and warrants that all Deliverables comply with the representations and warranties set forth in Section 11.b.i through 11.b.v, and that  Ripple will obtain and assign or otherwise provide to Customer the benefits of warranties and guarantees provided by manufacturers or suppliers of ideas, software, components or equipment incorporated into the Deliverables, and will perform its responsibilities so that such warranties or guarantees remain in full effect. NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OR THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, THE REMEDY IN THIS SECTION 11.c (PROFESSIONAL SERVICES WARRANTY) WILL CONSTITUTE CUSTOMER'S SOLE AND EXCLUSIVE REMEDY, AND RIPPLE'S ENTIRE LIABILITY WITH RESPECT TO RIPPLE'S FAILURE TO PERFORM, THE SERVICES OR PROVIDE DELIVERABLES THAT CONFORM TO THE SPECIFICATIONS OR ARE OTHERWISE DEFECTIVE.

d. <u>Customer Representations and Warranties.</u> Customer represents and warrants that any background screening requirements that they impose on Ripple for Ripple personnel who are onsite will: (i) be provided to Ripple in writing in advance; (ii) not violate any Laws; (iii) be carried out in a confidential manner as to protect the privacy of the individual being screened; (iv) not be performed on an individual without their written, informed, and voluntary consent (though if an individual refuses to consent, Ripple will replace them on the project); (v) not exceed the screening performed on Customer employees interacting on a daily basis with Ripple personnel; and (vi) will not include drug screening. Customer further represents and warrants that any information provided to Ripple in the performance of the Services will be accurate and complete and that Ripple may rely on such information in performance of the Services.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272304

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

e.  EXCEPT FOR THE WARRANTIES AND REPRESENTATIONS THAT ARE EXPRESSLY SET FORTH IN THIS AGREEMENT, RIPPLE MAKES NO REPRESENTATION OR WARRANTY OF ANY KIND, EXPRESS, IMPLIED, OR STATUTORY, INCLUDING, BUT NOT LIMITED TO, IMPLIED WARRANTIES OF MERCHANTIBILITY, FITNESS FOR A PARTICULAR PURPOSE, SUITABILITY, TITLE, NONINFRINGEMENT OR CLAIM OF RIGHT OR ANY WARRANTIES OR OBLIGATIONS ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE, AND ALL SUCH REPRESENTATIONS AND WARRANTIES AND OBLIGATIONS ARE HEREBY DISCLAIMED. EXCEPT AS EXPRESSLY SET FORTH IN THIS AGREEMENT, RIPPLE FURTHER DOES NOT REPRESENT OR WARRANT THAT THE HOSTED SERVICES WILL BE ERROR FREE OR UNINTERRUPTED.

**12. Ripple Indemnity.**

a.  <u>Ripple Indemnity Obligations.</u> Ripple will defend, indemnify and hold harmless (at its sole expense) Customer and Customer's Representatives ("Customer Indemnitees") from any third party demands, suits, liabilities, judgments, obligations, causes of action (including unaffiliated third party claims), penalties, claims, costs, expenses or damages of any kind or nature, including liquidated damages and reasonable attorneys' fees or disbursements, or losses of any kind or nature, whether brought on an individual, class, collective, representative, governmental agency or other basis ("Claims") solely to the extent that such Claims are based on: (i) an allegation that the Hosted Services or Deliverables infringe on an unaffiliated third party patent or copyright, or misappropriate an unaffiliated third party trade secret; or (ii) personal injury or tangible property damage solely caused by the gross negligence or willful misconduct of Ripple or Ripple's Representatives.  NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OTHER THAN SECTION 16 (LIMITATION OF LIABILITIES), AND TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW, THE SOLE AND EXCLUSIVE REMEDY OF CUSTOMER OR OTHER CUSTOMER INDEMNITEE AND RIPPLE'S SOLE OBLIGATIONS TO DEFEND AND INDEMNIFY CLAIMS OF INTELLECTUAL PROPERTY INFRINGEMENT OR MISAPPROPRIATION ARE SET FORTH IN THIS SECTION 12 (RIPPLE INDEMNIFICATION), PROVIDED FOR THE AVOIDANCE OF DOUBT THAT SECTION 16 SHALL FURTHER EXCLUDE OR LIMIT ANY OTHERWISE APPLICABLE OBLIGATION OF RIPPLE UNDER THIS SECTION 12 WITH RESPECT TO SUCH CLAIMS.

b.  <u>Exclusions to Ripple Indemnity Obligations.</u> The respective indemnity and defense obligations set forth above in Section 12.a (Ripple Indemnity Obligations) will not apply to the extent any Claim arises out of any: (i) combination of the Hosted Services with Customer or third party software, services, or hardware other than that which is appropriate  for use with the Ripple Software, or that is otherwise contemplated by Ripple for use with the Hosted Services; or (ii) use of the Hosted Services in an manner unauthorized by this Agreement or any Work Order (collectively "Ripple Exclusions"). For the purposes of this section, all references to third party software, services, or hardware shall not include software, services or hardware provided to Customer by Ripple.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.    RPLI_SEC 0272305

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

c. <u>Right to Mitigate.</u> In the event the Hosted Services become, or in Ripple's opinion is likely to become, impacted by a claim of infringement or misappropriation or other violation, Ripple may take any of the following actions in its sole discretion and at its sole expense: (i) obtain the license rights for Customer to continue to use the Hosted Services; (ii) modify or replace the Hosted Services in a functionally equivalent manner; or (iii) if in Ripple's good faith and reasonable opinion, subparts (i)-(ii) are not commercially reasonable options, Ripple will have the unilateral right in is sole discretion to terminate the applicable Work Order or this Agreement without further liability (other than to refund on a pro-rata basis any unconsumed fees paid by Customer for the Hosted Services, if any).

13. **Customer Indemnity.** Customer will defend, indemnify and hold harmless (at Customer's sole expense) Ripple and Ripple's Representatives ("Ripple Indemnitees") against any Claims solely to the extent based on: (i) personal injury or tangible property damage caused by any gross negligence or willful misconduct of Customer or any of its Representatives; (ii) Customer's breach of confidentiality obligations or breach of Section 4.e (Authorization Limitations and Restrictions) in connection with the Hosted Services; or (iiii) Customer's failure to prevent a transaction from occurring with a sanctioned party (as described in Section 10.b).

14. **Indemnification Procedures.** A Party seeking defense or indemnification under Sections 12 (Ripple Indemnity) or 13 (Customer Indemnity) will: (i) promptly notify the indemnifying Party of the Claim in writing in a manner that enables the indemnifying Party to reasonably initially defend/respond to the Claim, provided however that the failure to give such notice shall not relieve the indemnifying Party of its obligations hereunder except to the extent that such indemnifying party is materially prejudiced by such failure; (ii) reasonably cooperate in its defense at its own expense; (iii) not make any admission as to its liability in respect to the Claim; and (iv) provide the indemnifying Party sole control and defense of the Claim and all related settlement negotiations, provided that the indemnifying Party shall not enter into a settlement that admits liability or fault to, requires a payment by, or otherwise adversely affects the rights of the indemnified Party without the prior written consent of the indemnified Party, which will not be unreasonably withheld or delayed. The indemnified Party's non-compliance with this Section 14 in a manner which materially impacts the indemnifying Party's ability to defend a Claim will render the indemnifying Party's defense and indemnification obligations void. It is acknowledged and agreed that nothing contained herein (1) shall be considered a waiver by either Party of any remedy or right, in law or equity, all of which are expressly reserved without prejudice; or (2) prevents the indemnified Party from obtaining separate counsel at such Party's sole expense. If Ripple accepts complete responsibility for any Claims, Ripple may control the defense of the legal proceedings related to such Claims, including the selection of counsel. Customer may participate in the defense of the Claims, at its own expense. If Ripple accepts only partial responsibility (e.g., if Claims involve products or services not provided by Ripple), Customer shall control the defense of the legal proceedings related to such Claims, including the selection of counsel. In the latter circumstance, Customer agrees to consult with Ripple as to all material decisions in the defense of such Claims.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272306

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

15. **Implied Indemnification; Other Provisions.**  No indemnitee or any other person or entity shall be entitled to any form of equitable or implied indemnification at any time. For purposes of this Agreement, any reference to "indemnify" or "indemnification" or any variation thereof shall be deemed to include defense, indemnification and hold harmless obligations unless expressly provided to the contrary.

16. **Limitation of Liabilities.** NOTWITHSTANDING ANY CONTRARY PROVISION OF THIS AGREEMENT OR THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY, TO THE FULLEST EXTENT NOT PROHIBITED BY APPLICABLE LAW:

    a. <u>Maximum Liability.</u> IN NO EVENT WILL EITHER PARTY'S AGGREGATE AND CUMULATIVE LIABILITY FOR ANY LOSSES AND DAMAGES ARISING OUT OF OR RELATED TO THIS AGREEMENT, HOSTED SERVICES OR THE SUBJECT MATTER THEREOF, WHETHER BASED ON A CLAIM OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY OR OTHERWISE UNDER ANY THEORY OF LAW, EXCEED US$100,000.

    b. <u>Exclusions to Maximum Liability.</u> THE LIMIT SET FORTH IN SECTION 16.a (MAXIMUM LIABILITY) WILL NOT APPLY TO: (i) GROSS NEGLIGENCE, FRAUD, OR WILLFUL MISCONDUCT; (ii) PERSONAL INJURY OR DEATH; (iii) BREACH OF THE CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 9 (CONFIDENTIALITY); (iv) EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 12 (RIPPLE INDEMNITY) OR SECTION 13 (CUSTOMER INDEMNITY); OR (v) RIPPLE'S BREACH OF ITS OBLIGATIONS REGARDING PERSONAL DATA OR SECURITY UNDER SECTION 5 (PROCESSING OF PERSONAL DATA) OR SECTION 6 (SECURITY).

    c. <u>Exclusion of Liability.</u> IN NO EVENT WILL EITHER PARTY, THEIR RESPECTIVE REPRESENTATIVES, LICENSORS OR SUPPLIERS BE LIABLE TO THE OTHER PARTY OR ITS REPRESENTATIVES FOR ANY CONSEQUENTIAL, INCIDENTAL, INDIRECT, EXEMPLARY, SPECIAL, HYBRID OR PUNITIVE DAMAGES, OR DAMAGES FOR LOST PROFITS, REVENUE, GOODWILL OR SAVINGS, LOSS OF USE, BUSINESS INTERRUPTION, LOSS OF DATA, COST OF REPLACEMENT GOODS OR REPUTATIONAL HARM, WHETHER OR NOT BASED ON A CLAIM OF BREACH OF CONTRACT OR WARRANTY, NEGLIGENCE OR OTHER TORT, STRICT LIABILITY OR OTHERWISE UNDER ANY THEORY OF LAW, EVEN IF SUCH PARTY WAS ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES; PROVIDED, HOWEVER, THAT WITH RESPECT TO (i) BREACHES OF THE CONFIDENTIALITY OBLIGATIONS SET FORTH IN SECTION 9 (CONFIDENTIALITY); (ii) EACH PARTY'S INDEMNIFICATION OBLIGATIONS UNDER SECTION 12 (RIPPLE INDEMNITY) OR SECTION 13 (CUSTOMER INDEMNITY); (iii) RIPPLE'S BREACH OF ITS OBLIGATIONS REGARDING PERSONAL DATA OR SECURITY UNDER SECTION 5 (PROCESSING OF PERSONAL DATA) OR SECTION 6 (SECURITY); OR (iv) GROSS NEGLIGENCE, THE EXCLUSIONS OF LIABILITY SET FORTH IN THIS SECTION 16.c SHALL ONLY APPLY IF AND TO THE EXTENT SUCH LIABILITY EXCEEDS $5,000,000; AND PROVIDED FURTHER, THAT THE EXCLUSIONS OF LIABILITY SET FORTH IN THIS

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                      RPLI_SEC 0272307

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

SECTION 16.c SHALL NOT APPLY TO (A) FRAUD OR WILLFUL MISCONDUCT OR (B) PERSONAL INJURY OR DEATH.

d. <u>Ripple Exclusions.</u> IN ADDITION TO THE FOREGOING LIMITATIONS AND EXCLUSIONS, CUSTOMER FURTHER ACKNOWLEDGES AND AGREES THAT NEITHER RIPPLE NOR ANY AFFILIATE WILL BE LIABLE FOR ANY DAMAGES, DIRECT OR CONSEQUENTIAL OR OTHERWISE, RELATING DIRECTLY OR INDIRECTLY TO OR IN CONNECTION WITH ANY UNLAWFUL ACT OR OMISSION OF CUSTOMER OR ANY REPRESENTATIVE IN CONNECTION WITH ANY USE OF THE HOSTED SERVICES OR CUSTOMER'S AGREEMENTS WITH THIRD PARTIES.

e. <u>Insurance.</u>   Ripple shall at its own expense secure and continuously maintain throughout the Term, the following insurance with companies qualified to do business in the jurisdiction in which the Services will be performed and rating A-VII or better in the current Best's Insurance Reports published by A. M. Best Company.  If such insurance covers only claims made during policy life, insurance shall be maintained for three (3) years following termination of the Term.  Ripple shall, within thirty (30) calendar days of the Effective Date and prior to commencing work, and thereafter upon Customer's request, furnish to Customer certificates and required endorsements evidencing such insurance.  Customer shall be named as an "Additional Insured" to the coverages described in Subsection (iii) below for the purpose of protecting Customer from any expense and/or liability arising out of, alleged to arise out of, related to, or connected with the Services provided by Ripple and/or its subcontractors.  The certificates shall state the amount of all deductibles and self-insured retentions.  Ripple shall notify Customer in writing promptly (but in no more than three (3) Business Days) after becoming aware that the policy or policies will be canceled or materially altered.  Ripple and its Subcontractors shall pay costs which are incurred by Customer as a result of any such deductibles or self-insured retentions, and to the same extent as if the policies contained no deductibles or self-insured retention. The insurance coverages and limits required to be maintained by Ripple and its Subcontractors shall be primary and non-contributory to insurance coverage, if any, maintained by Customer.  With respects to Subsections (i), (ii) and (iii) below, Ripple and its subcontractors and their underwriters shall waive subrogation against Customer and shall cause their insurer(s) to waive subrogation against Customer.  Coverages must include a duty to defend.

Insurance Coverages:

    i.  Workers' Compensation Insurance which shall fully comply with the statutory requirements of all applicable state and federal laws.

    ii.  Employer's Liability Insurance which limit shall be one million dollars ($1,000,000) per accident for Bodily Injury and one million dollars ($1,000,000) per employee/aggregate for disease.

    iii.  Commercial General Liability Insurance with a minimum combined single limit of liability of one million dollars ($2,000,000) per occurrence and two million dollars

Metric Page **18** of 27

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

($5,000,000) aggregate for bodily injury, death, property damage and personal injury. This policy shall include products/completed operations coverage and shall also include contractual liability coverage.

iv. Excess/Umbrella coverage with respect to subsections (ii) and (iii) above with a per occurrence limit of five million dollars ($5,000,000). The limits of liability required in such subsections may be satisfied by a combination of those policies with an Umbrella/Excess Liability policy.

v. Technology Liability Errors and Omissions Insurance and Cyber Liability/Network Security & Privacy Liability Insurance with limits of five million dollars ($5,000,000) per claim and annual aggregate.

vi. Fidelity Bond or Crime Coverage: Ripple shall be responsible for loss to Customer property and customer property, directly or indirectly, and shall maintain Fidelity Bond or Crime coverage for the dishonest acts of its employees in a minimum amount of five million dollars ($5,000,000).

17. **Publicity.** Neither Party shall publicly use or display the name, trademarks, service marks or logos (collectively, "Trademarks") of the other Party (the "Brand Owner") without the Brand Owner's prior written consent, such consent may not be unreasonably withheld, except for: (i) a joint press release as mutually agreed by the Parties regarding their relationship under this Agreement; and (ii) identification of the other Party's name and/or logo on its client or vendor list or specified marketing collateral (as applicable). A Party's use of the Brand Owner's trademarks shall comply with the Brand Owner's trademark guidelines (as may be provided by the Brand Owner from time to time, including Ripple's branding terms and guidelines as may be posted on www.ripple.com) and all legal requirements applicable to such use, and any such use shall be for the sole benefit of the Brand Owner. A Party will not use or register any trademark or trade name identical with, or confusingly similar to, any Brand Owner's Trademarks.

18. **Term and Termination.**

a. <u>Term of Agreement.</u> This Agreement and the Work Order executed by the Parties concurrently with this Agreement ("Work Order #1") shall commence on the Effective Date and shall remain in effect until the 24 month incentive period expires as set forth in Work Order #1 ("Initial Term"), unless earlier terminated or tolled under this Agreement or the Work Order. This Agreement and Work Order #1 shall thereafter renew automatically for successive one (1) year periods (each, a "Renewal Term"), unless either Party notifies the other in writing of its intent to terminate at least ninety (90) days prior to the end of the Initial Term or any Renewal Term or unless earlier terminated hereunder. The Initial Term and any Renewal Term (if any) collectively shall be referred to as the "Term" hereunder. The Agreement may not be terminated in the event that there is an active Work Order in place.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272309

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

b. <u>Termination by Mutual Consent.</u> The Parties may terminate this Agreement or any or all Work Orders by mutual written consent in their respective sole discretion.

c. <u>Termination for Breach.</u> A Party may terminate this Agreement and all Work Orders for cause if the other Party has materially breached any provision of this Agreement and such material breach is not cured within thirty (30) days of written notice of the breach by the non-terminating Party, unless otherwise provided for in this Agreement. The right to cure shall not be applicable to a series of the same or similar breaches.

d. <u>Additional Rights to Terminate.</u> Ripple shall have the right to terminate this Agreement and all Work Orders pursuant to Section 12.c (Right to Mitigate).  In addition, Ripple may terminate this Agreement and all Work Orders with immediate effect upon written notice as follows (i) if Customer files for liquidation or bankruptcy or is declared insolvent by a court of competent jurisdiction, (ii) if an event of default occurs under the the Customer's  senior secured first lien term facility or senior secured second lien term facility (or any successor debt facility), (iii) if Customer experiences a material adverse regulatory action that materially affects Customer's ability to perform its obligations under this Agreement or (iv) if Customer undergoes a change of control whereby Customer becomes under the control of a competitor of Ripple.  Customer may terminate this Agreement and all Work Orders with immediate effect upon written notice as follows (1) if Ripple files for liquidation or bankruptcy or is declared insolvent by a court of competent jurisdiction, (2) if Ripple experiences a material adverse regulatory action that materially affects Ripple's ability to perform its obligations under this Agreement, or (3) if Ripple undergoes a change of control whereby Ripple becomes under the control of a competitor of Customer (each of the events in sub-sections (i) through (iv) or (1) through (3) above, a "Termination Event").

e. <u>Effects of Termination; Survival.</u> The following rights and obligations shall survive the expiration or termination of this Agreement: (i) Section 5 (Processing of Personal Data), Section 6 (Security), Section 8 (Intellectual Property), Section 9 (Confidentiality), Section 10 (Legal Compliance), Section 12 (Ripple Indemnity), Section 13 (Customer Indemnity), Section 14 (Indemnification Procedures), Section 15 (Implied Indemnification; Other Provisions), Section 16 (Limitation of Liabilities), Section 18 (Term and Termination) and Section 19 (General); and (ii) any claim or cause of action for breach or violation of this Agreement existing as of the date of termination or expiration. All other rights and obligations of the respective Parties hereunder, including but not limited to the authorization to access and use Hosted Services granted pursuant to Section 4.a and any then-existing Work Orders, shall automatically terminate and cease, subject to Section 18.g.

f. <u>Continuation of Service.</u>   Upon expiration or any termination of this Agreement except for termination pursuant to Section 11.b(Hosted Services Warranty) or Section 12.c (Right to Mitigate), Ripple will, at Customer's request, continue to allow Customer to access and use the Hosted Services after the date of such termination or expiration to effectuate an orderly transition to a substitute solution. During such period, the terms of this Agreement and all Work Orders shall survive and continue to govern the parties' rights and obligations with respect to the

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0272310

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

Hosted Services.   The usage period shall end six (6) months from the effective date of the termination or expiration.

**19. General**

a. <u>Governing Law.</u> This Agreement and any disputes or matters arising from or relating to or in connection with the subject matter hereof shall be governed and construed by the laws of the State of New York (without regard to conflict of laws principles). The provisions of the Uniform Computer Information Transaction Act will not apply. The provisions of the UN Convention for the International Sales of Goods will not apply.

b. <u>Venue.</u> For any disputes arising out of, relating to, or in connection with this Agreement or the subject matter hereof, the Parties irrevocably submit to the jurisdiction and venue of the courts of the State of New York and the Federal Courts of the United States located in the Southern District of New York, except that either Party may seek equitable relief in any court of competent jurisdiction to protect its Confidential Information or other intellectual property or rights therein from infringement or misappropriation or other violation or from disclosure, as monetary damages may not be adequate or easily ascertainable in such a situation.

c. [Reserved]

d. <u>No Agency.</u> No agency or partnership or joint venture or employment relationship is established between the Parties. Neither Party may incur any expenses or obligations on behalf of the other Party.

e. <u>Assignment.</u> Neither Party may assign or transfer or delegate or sublicense (collectively "assign" or "assignment") this Agreement or any Work Orders or any rights or obligations hereunder or thereunder (whether voluntarily or involuntarily, by operation of law or merger or consolidation or otherwise) without the prior written consent of the other Party, except to a successor entity or an entity purchasing or acquiring substantially all of the assets of the Party (with written notice to the other Party). Notwithstanding the preceding sentence, Ripple may assign the Agreement and/or any Work Orders to a Ripple affiliate at any time in furtherance of the contracted performance in its sole discretion.   Any attempted assignment made by a Party without the required prior written consent shall be void and of no effect. Subject to the foregoing restrictions, this Agreement and the Work Orders shall inure to the benefit of and be binding upon the Parties and their successors and permitted assigns.

f. <u>Notices.</u> Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth at the signature section below. Such notice shall be effective upon confirmed receipt or acknowledgment.

g. <u>Force Majeure.</u> Neither Party shall be liable for failure or delay in the fulfillment of any of its obligations hereunder (excluding payment of fees) where such failure is due to war, riot, strike, labor dispute, civil disturbance, rebellion, invasion, terrorist attack, embargo, national or local emergency, natural disaster, acts of God, flood, fire, or any other cause beyond its reasonable control; <u>but excluding</u> for these purposes any indemnification or defense obligations. The Party unable to fulfill its obligations due to such a force majeure event shall use diligent efforts to restore its performance thereof as soon as reasonably possible.

Metric Page **21** of **27**

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

h. <u>Severability; Waiver.</u> If any provision of this Agreement is or becomes illegal, unenforceable or invalidated, by operation of law or otherwise, that provision shall be omitted to such extent and the remainder of this Agreement shall remain in full force and effect. Any waiver by either Party of any condition, term, part or provision of this Agreement must be in writing and shall not be a waiver of any other condition, term, part or provision, nor will the waiver be a future waiver of such condition, term, part or provision.

i. <u>Entire Agreement; Counterparts.</u> This Agreement (including all Exhibits) and any Work Order constitutes the entire agreement of the Parties pertaining to its subject matter and supersedes all prior and other contemporaneous agreements, representations, warranties and understandings of the Parties, whether written or oral or express or implied. Modifications to this Agreement or any Work Order may only be taken in the form of a mutually executed amendment in the sole discretion of both Parties. This Agreement may be signed in any number of counterparts, each of which is an original and all of which taken together form one single Agreement. A signed copy of this Agreement transmitted by email or any other means of electronic transmission shall be deemed to have the same legal effect as an original executed copy of this Agreement.

j. <u>Third Party Rights.</u> A person or entity that is not a party to this Agreement shall not have any rights to enforce any term of this Agreement, excluding for these purposes any Ripple or Customer Indemnitee in such capacity.

k. <u>Interpretation.</u> When the context requires, the plural will include the singular and the singular the plural; and any gender will include any other gender. Section headings are not part of this Agreement and are only for the convenience of the Parties. No provision of this Agreement will be interpreted or construed against any Party because such Party or its counsel was the drafter thereof.  Whenever the words "include", "includes" or "including" or any other variation are used in this Agreement, such words will be deemed to be followed by the words "without limitation."

l. <u>Provide Assurances On Notice.</u> Each Party, on receipt of notice from the other Party, shall sign, or cause to be signed, all further documents, do, or cause to be done, all further acts, and provide all assurances as may reasonably be necessary or desirable to give effect to the terms of this Agreement.

[Remainder of page intentionally left blank; signature page follows]

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0272312

| RIPPLE SERVICES INC. | MONEYGRAM PAYMENT SYSTEMS, INC. |
|---|---|
| By: ████████████ | By: _____ |
| Name: Brad Garlinghouse | Name: _____ |
| Title: CEO | Title: _____ |
| Date: 6/7/19 | Date: _____ |
| Address: 315 Montgomery Street, 2nd Fl | Address: 2828 N. Harwood Street, 15th Floor |
| San Francisco, CA 94104 | Dallas, Texas 75201 |
| Attn: General Counsel | Attn: General Counsel |

SIGNATURE PAGE TO COMMERCIAL AGREEMENT

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

**RIPPLE SERVICES INC.**

By:

Name:

Title:

Date:

Address:  315 Montgomery Street, 2nd Fl.
San Francisco, CA 94104
Attn: General Counsel

**MONEYGRAM PAYMENT SYSTEMS, INC.**

By:

Name:  Lawrence Angelilli

Title:  Chief Financial Officer

Date:

Address:  2828 N. Harwood Street, 15th Floor
Dallas, Texas 75201
Attn: General Counsel

SIGNATURE PAGE TO COMMERCIAL AGREEMENT

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272314

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

## EXHIBIT A. SUPPORT SERVICES TERMS

1. **Support Services**. During the Support Service Term as set out in the relevant Work Order, Ripple will provide Customer with Support Services as described in this Exhibit A.

   a. Client Portal. Ripple will provide Customer's designated support contacts ("Support Contact") with access to Ripple's online support service portal ("Client Portal") where the requests for service ("Service Requests") tool and Documentation are made available. The Client Portal is found at the following URL: https://clients.ripple.com. Ripple reserves the right to change the URL for the Client Portal with written notice to Customer. This site may change in name and location from time to time in Ripple's sole discretion with notice to Customer.

   b. Service Requests. Ripple will respond to Customer's requests for service ("Service Requests"), provide workarounds as needed, and to correct issues in the Hosted Services.

      i. Support Contacts. Customer will designate support contacts ("Support Contacts") in writing to Ripple. Customer is entitled to no more than five (5) Support Contacts. In order to replace or delete a Support Contact, Customer must submit a Service Request to Ripple and provide the changes to Ripple.

      ii. Operating Executive. Ripple shall have the right to designate a Ripple executive who will work at Customer during the term of the Agreement, who shall be reasonably acceptable to Customer and employed and compensated by Ripple ("Operating Executive"). The Operating Executive shall be responsible for overseeing deployment and implementation of the Hosted Services. The Operating Executive shall have such authority and resources at Customer as shall be mutually agreed by Customer and Ripple to enable such Operating Executive to discharge such responsibility. If requested by Customer, Ripple shall promptly remove Operating Executive and replace the Operating Executive with someone reasonably acceptable to Customer.

      iii. Submission. Support Contacts may submit request Service Requests via the Client Portal on a 24/7 basis.

      iv. Response. Ripple will review Service Requests and assign them a Severity Level according to the definitions in Table 1 below. In the event the Parties cannot agree on a severity classification, the Service Request shall be addressed in accordance with the severity level reasonably assigned by Customer. For all Service Requests, Ripple will respond to Support Contact in accordance with Table 1 below. "Response" or "response" is this context means that a Ripple support representative has contacted Customer regarding a request by Customer regarding any Service Request and appropriate technical support resources have been assigned to the issue and Customer has received a written summary of the error subject to the Service Request as it is known by Ripple at the time of communication.

      v. Resolution. Ripple shall resolve errors detailed in a Service Request according to Table 1 below. "Resolve" or "resolution" means that the correction of an error subject to a Service Request has been completed. "Correct" or "correction" in this context means that the Hosted Services have been modified in a way that conforms to the applicable Documentation or Specifications, as applicable, and that otherwise eliminates any adverse effect on Customer

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0272315

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

caused by such error. Catastrophic errors must be worked on by Ripple twenty-four (24) hours a day, seven (7) days a week until a satisfactory resolution can be reached. Severe errors must be worked on by Ripple continually and diligently during Ripple's normal business hours until a satisfactory resolution can be reached. Minor and Cosmetic errors will be worked on by Ripple using commercially reasonable efforts during Ripple's normal business hours until a satisfactory resolution can be reached.

vi.   <u>Restrictions on Service Requests.</u> Ripple has no obligation to support Services Requests arising from the following: (A) use by Customer of the Hosted Services in a manner unauthorized by the Agreement; or (B) third party software and hardware (that is not provided by Ripple).

vii.   <u>Escalation.</u>   All new cases will initially be taken and handled by Ripple's support representatives on duty at the time the Service Request is submitted. Ripple's support representative will notify Ripple's Support Contact immediately upon determining that an issue may not be resolved within the designated amount of time described above. Ripple's support representative will notify the Operating Executive and Ripple's highest ranking support personnel (the "Support Lead") immediately when any Catastrophic or Severe error has not been resolved within the designated amount of time described below in Table 1. The Operating Executive will ensure that the issue is properly prioritized and appropriate resources are engaged to resolve the error in a timely manner. The Operating Executive will provide regular updates to Customer management until the error has been resolved. Successive levels of Ripple management will become involved in the support process each day a Catastrophic or Sever error remains unresolved. The Support Lead shall cover the obligations of the Operating Executive in the event there is no named Operating Executive.

**Table 1**

| Severity Level | Definition | Initial Response Time | Resolution Time |
|---|---|---|---|
| Severity 1 | A "Catastrophic" error causing 100% loss (or near 100% loss) of Hosted Services access or use. | One (1) hour | Five (5) hours |
| Severity 2 | A "Severe" error that affects a substantial part of the Hosted Services; operations can continue in a restricted fashion. | One (1) hour | One (1) business day |
| Severity 3 | A "Minor" error resulting in improper functionality in part of | One (1) business day | Time period mutually agreed by the |

Metric Page **25** of **27**

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

|  | the Hosted Services, or impact to a limited subset of features of the Hosted Services. |  | Parties |
|---|---|---|---|
| Severity 4 | A "Cosmetic" error not affecting functionality, or occasional impact to a small set of features. | One (1) business day | Time period mutually agreed by the Parties |

2.  **Customer Responsibilities.** Customer is obligated to the following:
   a. Provide as much detail about the incident as possible, e.g. symptoms, conditions, diagnostics, prior actions taken to troubleshoot the issue, etc., and include email, phone and mobile contact information for a Ripple engineer to contact Customer in the Service Request.
   b. Troubleshoot issues to aid Ripple in resolving incidents prior to submitting Service Requests.
   c. Provide a primary technical contact that can be reached during any incident. Customer's technical contact must have reasonable product training and supplemental training appropriate for the integration in place. Customer's technical contact must be reasonably knowledgeable about the Hosted Services, its dependencies and the environment it is hosted in to help resolve issues and to assist Ripple in analyzing and resolving Service Requests. To avoid interruptions in support services, Customer must immediately notify Ripple whenever technical contact responsibilities are transferred to another individual.
   d. Keep Ripple up to date with the correct Support Contacts for submitting Service Requests and receiving Support Services. Customer shall report to Ripple any Support Contacts who are terminated (either voluntarily or involuntarily) or who no longer require authorization to submit Service Requests so their authorization can be terminated. This must be done within a reasonable time of termination.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272317

**RIPPLE MASTER HOSTED SERVICES AGREEMENT**

## EXHIBIT B. Professional Services Terms

1. **Ordering Professional Services.** Customer may request in a Work Order that Ripple provide Professional Services related to the implementation, testing, and support (other than Support Services) of the Hosted Services. The Work Order will set forth the project details including but not limited to project scope, prerequisite requirements, assumptions, Deliverables, any acceptance criteria or requirements, and an estimated project timeline.

2. **Performance.** Ripple will: (i) render the Professional Services set forth in a Work Order; and (ii) use best efforts to maintain the project schedule. Customer acknowledges that Ripple's performance is contingent on assumptions, Customer obligations, and third party dependencies set forth in a Work Order.

3. **Personnel.** Customer acknowledges that Ripple may use its affiliates to provide Professional Services at its discretion. Ripple will be responsible for the performance of all of its personnel and their compliance with Ripple's obligations under this Agreement. If in Customer's reasonable opinion, one of Ripple's personnel providing Professional Services is not acting in a professional manner is failing in their performance of the Professional Services, Customer shall provide Ripple with a documented and substantiated notification, and shall discuss the matter with Ripple upon Ripple's request. If Ripple has not addressed the issue sufficiently, Customer may request that such individual be replaced, and Ripple will take commercially reasonable efforts to replace such individual as promptly as possible. Ripple agrees to take commercially reasonable efforts to maintain the continuity of Ripple personnel assigned to provide Professional Services hereunder, however, Ripple may replace personnel designated by name in a Work Order when necessary and appropriate upon written notice to Customer, and freely replace other personnel without notice.

4. **Workplace Requirements.** Ripple agrees that it will comply and cause its personnel to comply with Customer's workplace safety and security policies, provided such policies are provided to Ripple in writing prior to Ripple personnel going onsite.

5. **Change Requests.** Either Party may request a change or modification ("Change") to the Hosted Services and/or Deliverables (a "Change Request"). All Change Requests shall be made in writing and shall be delivered to the other Party. The Parties will review the proposed Changes and determine the effect that the implementation of the Change will have on price, schedule and other terms and conditions of the affected Work Order. Upon completion of the review and mutual acceptance of the Change Request, any changes in price, fees, schedule or other terms will be documented. A Change Request shall be become effective upon execution by both Parties. In no event shall Ripple be penalized for delays caused by a Change Request initiated by Customer or be obligated to accept work proposed pursuant to a Change Request initiated by Customer. All Changes shall be owned exclusively by Ripple without regard to the source of funding or development of the same.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272318

**Ripple Work Order #1**

This Work Order #1 (including any attachments) ("Work Order") is between Ripple Services Inc., a Delaware corporation ("Ripple") and Moneygram Payment Systems, Inc. ("Customer"), is effective the date the last party signs ("Effective Date"), and incorporates by reference the Master Hosted Services Agreement (including its exhibits) between the Parties with the effective date of June 17, 2019 ("Agreement"). To the extent this Work Order conflicts directly with the Agreement, the Work Order will prevail. Terms not otherwise defined in this Work Order will have the definition set forth in the Agreement.

1.  **Term**. The Term of this Work Order shall follow the Term of the Agreement.  For the avoidance of doubt and except as otherwise provided in the Agreement, the XRP payments described in this Section E shall expire 24 months from July 1, 2019 (the "Incentives Period"), provided that if Customer's access to certain Corridors, as defined below, is not commercially practicable or is delayed, or delays are incurred as a result of regulatory or market circumstances, Ripple may in its reasonable discretion toll the Incentives Period for an equivalent period of time not to exceed six months (provided that any tolling of the Incentives Period will extend the Incentives Period for an equivalent period of time).  For six (6) months following termination of the Agreement, Customer shall continue to offer the Hosted Services, and specifically Hosted Services called the Ripple xRapid platform (as used interchangeably in this Work Order, the "Hosted Services" or "Ripple xRapid Platform"), in the Corridors (as defined below) and Ripple shall continue to support Customer and the Hosted Services for such purpose.

2.  **Definitions.**  See Attachment A ("Definitions") for additional defined terms.

3.  **Hosted Service**. The Ripple xRapid Platform relating to the transfer and receipt of cross-border payments in the then-current corridors that are made generally available to other Ripple xRapid Platform customers or upon mutual agreement in advance by the Parties (collectively, "Corridors"). Ripple may terminate or suspend a particular Corridor with thirty (30) days written notice if it is not commercially reasonable to operate the Ripple xRapid Platform in such Corridor; provided that during any time period that an Available Corridor is suspended or terminated, the Incentives Period will be tolled and extended for an equivalent period of time, not to exceed six months. As of the Effective Date, the available Corridors are from the EU and US to and from Mexico and the Philippines ("Available Corridors"). Additional Corridors may be added by mutual agreement of the Parties in the form of a written amendment or addendum to this Work Order.

4.  **Support Services**.  Subject to performance in accordance with the terms and conditions of the Agreement, Ripple will provide Support Services as set forth in Exhibit A (Support Service Terms) to the Agreement.

5.  **Training**.  Ripple will provide to the Customer (a) training guidance (in the form of telephone support, online resources, in-person training, and remote videoconference training), at the request of Customer and as mutually agreed by the Parties, with

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                      RPLI_SEC 0272319

respect to the Hosted Services and (b) access to key resources as mutually agreed by the Parties to guide Customer through its development of any business requirements.

6. **Fees and Rebates.**

    **A. Fees.** There are no fees for the Hosted Services or Support Services. Any Professional Services shall be added by mutual agreement of the Parties in the form of a written amendment or addendum to this Work Order. No Professional Services are anticipated in connection with this Work Order.

    **B. XRP Transfers.**

      i.   With respect to any transfer of XRP from Ripple to Customer under this Work Order, Ripple shall transfer such XRP to an XRP address directly owned by Customer. Any XRP payments or transfers under this Agreement are subject to the additional terms in Attachment B (Standard XRP Terms and Conditions), which are hereby incorporated by reference.

      ii.  Notwithstanding transfers of XRP that are expressly subject to the Baseline Conversion Rate, the XRP equivalent ("XRP Conversion Rate") for any transfer of XRP from Ripple to Customer described in amount as USD will be the greater of:

           1)  The conversion rate of XRP as traded against USD on the Primary Market at approximately 9:00 a.m. PST on the payment date, as reported on https://tradeblock.com/markets/index/xrx.

           2)  US ▮▮▮ per single unit of XRP

      iii. The "Baseline Conversion Rate" means the conversion rate of XRP as traded against USD on the Primary Market at approximately 9:00 a.m. PST on the Effective Date of this Work Order, as reported on https://tradeblock.com/markets/index/xrx.

      iv. The Parties acknowledge that the Baseline Conversion Rate and the XRP Conversion Rate are not to be considered fair market values.

      v.  Except for any exchange fees that are expressly set forth in Attachment C ("Exchange Fees"), there are no fees for the XRP transfers associated with the Ripple xRapid Platform. Ripple shall reimburse Customer for any Exchange Fees in accordance with Section C below.

    **C. FX Rate Rebate.**

Ripple shall ensure that the exchange rates charged by the Ripple xRapid Platform are within ▮▮▮ basis points ▮▮▮▮ of the Spot FX Rate at the time of each transaction under this Agreement and Work Order (including any associated XRP volatility and exchange fees), provided that, to the extent that exchange rates with respect to any transaction exceeds ▮▮▮ basis points ▮▮▮▮ of the Spot FX Rate, Ripple shall satisfy its obligation by providing to Customer make-whole payments in XRP (each a "Net Rebate") to bring such rates within ▮▮▮ basis points ▮▮▮▮ of the FX Spot Rate at the time of the transaction (including any associated XRP volatility and exchange fees), with such Net Rebate to be provided by Ripple for a 24 hour period from 00:00 UTC to 23:59 UTC as set forth in Attachment C (FX Rate Rebate Calculation).

Ripple Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0272320

i.   **Rebate Payment.** If due, each day's rebate will be paid through Customer's daily withdrawal of the Net Rebate amount in XRP from the Segregated Wallet (as defined below). No credit will be due to Ripple.

ii.  **Segregated Wallet.** With respect to each daily Net Rebate payment (if necessary), Ripple shall transfer XRP ("Rebate Pool XRP") to a specified wallet directly and wholly owned by Customer, to be used specifically and solely in accordance with this Section C (the "Segregated Wallet").  Ripple will ensure that such Segregated Wallet balance is sufficient to pay each day's Net Rebate subject to Section 6.C.iii below. The security of the Segregated Wallet created and maintained by Customer will be the sole responsibility of Customer.  In no event may Customer transfer any XRP into, or allow any XRP to be transferred into, the Segregated Wallet, other than XRP transferred by Ripple to the Segregated Wallet.  If any XRP is transferred into the Segregated Wallet other than XRP transferred by Ripple to the Segregated Wallet, then Customer shall be required to promptly purchase all Rebate Pool XRP in the Segregated Wallet at the XRP Conversion Rate. Customer may only transfer XRP out of the Segregated Wallet in accordance with Section C.i. For the avoidance of doubt, the Parties acknowledge and agree that except as otherwise provided in this Agreement, the mere transfer of XRP by Ripple to Customer's Segregated Wallet pursuant to this Section C is not a sale or purchase of such XRP by or to Customer, is not a transfer or conveyance of legal title of the Rebate Pool XRP to Customer, that Customer holds such XRP as a bailee, and except for the XRP that is withdrawn by Customer in respect of any Net Rebate amounts, all legal title of all Rebate Pool XRP remains with Ripple. The Customer agrees to not sell, assign, transfer, pledge, hypothecate, encumber, or otherwise dispose of the Segregated Wallet or the Rebate Pool XRP therein other than in accordance with the terms of this Section C. The Parties acknowledge and agree that neither party shall treat Ripple's mere transfer of XRP to Customer's Segregated Wallet as a sale or exchange for purposes of the United States Internal Revenue Code or state and local tax law purposes. Neither Party shall take a tax reporting position, make a disclosure, or file a tax return with an applicable tax authority inconsistent with the foregoing.

iii. **Funding Segregated Wallet**. Ripple shall promptly deliver to Customer via email a written confirmation of its desire to increase the balance of XRP in the Segregated Wallet, substantially in the form of Attachment D (the "Terms of Segregated Wallet Funding") that contains information including:

    1) Customer's Segregated Wallet address;

    2) the total XRP units being transferred into the Segregated Wallet, referred to as the "Rebate Pool XRP";

and is sent to Customer as set forth on Attachment D.  Unless Customer countersigns the Terms of Segregated Wallet Funding in the form attached hereto as Attachment D and submits an electronic countersigned copy to Ripple, Ripple will not complete the funding.  The countersigned Terms of Segregated Wallet Funding, together with this Agreement, shall constitute the

terms agreed between Ripple and Customer with respect to the Rebate Pool XRP to which the Terms of Segregated Wallet Funding relates. Ripple is not liable for Segregated Wallet to be funded in a sufficient amount to cover a given day's Net Rebate until the Terms of Segregated Wallet Funding are returned and countersigned; provided that Customer will use commercially reasonable efforts to return and countersign each Terms of Segregated Wallet Funding within two business days from the time Ripple sends such Terms of Segregated Wallet Funding to Customer. Following each funding of the Segregated Wallet by Ripple under this Section C, as recorded on the XRP Ledger, Ripple shall provide to Customer a receipt, substantially in the form attached hereto as Attachment E and adapted as appropriate. Once completed, a transfer of XRP into the Segregated Wallet cannot be cancelled, reversed or changed. Upon the termination or expiration of this Work Order and the cessation of the Hosted Service, Customer will return to Ripple the unused Rebate Pool XRP from the Segregated Wallet. The Parties acknowledge and agree that neither party shall treat Customer's return to Ripple of unused Rebate Pool XRP from the Segregated Wallet as a sale or exchange for purposes of the United States Internal Revenue Code or state and local tax law purposes.

**D. Slippage Pool.** Ripple will pay Customer for all Beneficiary Balances in XRP.

    i.    Ripple will use commercially reasonable efforts to maintain an additional amount of XRP ("Slippage Pool") to cover Beneficiary Balances in the Customer's account at the Beneficiary Exchange to ensure that the (i) the Quoted Beneficiary Amount and (ii) the sum of the Beneficiary Amount plus the Beneficiary Balance, are equal. Any Beneficiary Surplus goes into the Slippage Pool. In the event that the Slippage Pool drops below a threshold reasonably determined by Ripple, with input from Customer, to support the volume of transactions occurring through Customer's use of the Ripple xRapid Platform, Ripple will periodically top up this Slippage Pool when and as needed, but in no event less frequently than every three (3) business days. Customer will promptly notify Ripple in the event that there is an increase in the volume or US dollar amount of transactions which may require more XRP to be transferred into the Slippage Pool than has historically been provided.

    ii.    Customer agrees that it shall not withdraw XRP from the Slippage Pool tranche in the Customer' Account from the Customer Account unless such withdrawal is for the Beneficiary Balance ("Permitted Use"). In the event Customer uses the XRP in the Slippage Pool for any other purposes other than the Permitted Use, Customer will promptly return an equivalent amount of XRP to Ripple. This Section 6.D.ii will survive the termination or expiration of the Work Order.

**E. Additional Terms.**

    i.    Customer will use commercially reasonable efforts to deploy and use the Hosted Service to send and receive cross-border payments for the Corridors.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

    ii.    Using the Baseline Conversion Rate, Ripple will pay Customer an amount of XRP equal to US█████████ if the Transaction Volume equals or exceeds US$█████████ on or before March 31, 2020.

    iii.    Ripple will pay Customer transaction incentive fees in XRP in an amount not to exceed US█████████ over the Incentives Period.  Such transaction incentive fees are as set forth in this Section E, to be calculated as follows:

        1)    Until such time as the Transaction Volume exceeds US$██████ Ripple will pay Customer ████ of the Transaction Volume value in XRP; provided, in the event Customer's Transaction Volume does not exceed US█████████ within nine months from July 1, 2019, such percentage of Transaction Volume will be reduced to ████ until Customer achieves US████████ in Transaction Volume when subsection 3) below becomes effective.

        2)    Following such time as Transaction Volume exceeds US$████ but is less than US$█████████ Ripple will pay Customer ████ of the Transaction Volume in XRP.

        3)    Following such time as Transaction Volume exceeds US$████████ Ripple will pay Customer ██████ of the Transaction Volume in XRP until the earlier of the total amount of XRP paid to Customer until such time as the cumulative XRP incentive fees paid by Ripple to Customer reaches US█████████████ or the expiration or termination of this Work Order.

        4)    If Customer implements or utilizes any other product that utilizes a cryptocurrency as a bridge currency for cross-border settlement during the Incentives Period all transaction incentive fees payable from Ripple to Customer as provided for in this Section (iii) shall be reduced by ████ effective from the date Customer implements or utilizes any other product that utilizes a cryptocurrency as a bridge currency for cross-border settlement.

        5)    The amount of XRP to be paid under this Section E (iii) will be calculated so that ████ of a given payment will be based on the Baseline Conversion Rate. The remaining ████ of such payment will be based on the XRP Conversion Rate.

    iv.    All amounts paid in XRP to Customer under this Section E will be paid on a weekly basis following the calendar week in which the Transaction Volume occurred, or in the case of Section E(ii), when the incentive fee was earned, within thirty days from Customer's invoice, which shall be provided within two business days after the end of the prior week. Customer's invoice shall include the Ripple Purchase Order #, the calendar week such invoice is in reference to, the Transaction Volume arranged by Corridor, and the amount of XRP owed in USD, as determined pursuant to Section E(iii). The invoice shall be sent to ripple_invoicecapture@concursolutions.com.  Ripple shall have reasonable audit and inspection rights of Customer's records during normal business hours solely for purposes of evaluating the reported Transaction Volume.

    v.    With respect to all XRP transferred to Customer by Ripple under SectionE (the "Incentive XRP"), Customer will limit the amount of such XRP that is

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

sells or transfers, on a daily basis to the Daily Sales Limitation.  In addition, with respect to the XRP withdrawn by Customer under Section C as a Net Rebate ("Net Rebate XRP"), Customer will make commercially reasonably efforts to sell or transfer each day's Net Rebate XRP within seven (7) business days of withdrawal of such Net Rebate XRP. Except as provided below, in no event will Customer sell or transfer on any given day an amount of Net Rebate XRP exceeding two (2) calendar days' Net Rebates, for the calendar days preceding that particular day on which Net Rebates were actually received by Customer (the amount of such two (2) days' Net Rebates, together with the Daily Sales Limitation for that day, the "Maximum Daily Sales Limitation"). The Maximum Daily Sales Limitation will not apply to Customer's transfer or sale of XRP to its affiliates, provided Customer warrants and represents that Customer will ensure (and such affiliates shall agree as a condition of transfer of such XRP that) all affiliates' sales of XRP on any day are limited to the same Maximum Daily Sale Limitation as Customer, when measured in combination with the XRP transfers and sales of Customer. If Customer determines that regulatory considerations make it impracticable for Customer to hold XRP, it may sell all or any portion of such XRP to Ripple for mutually agreed consideration (provided that if Customer proposes that Ripple pay aggregate consideration of ███████ for all XRP then held by Customer, Ripple will promptly accept) upon at least five (5) business days' notice or transfer or sell all or any portion of such XRP to a third party, provided that the third party and any of that parties' transferees may not collectively transfer or sell in excess of the Maximum Daily Sales Limitation.

Ripple Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0272324

As of the Effective Date, the Parties agree to be bound, and have caused this Work Order to be executed, by their authorized representatives.

**RIPPLE SERVICES INC.**

By:

Name: Brad Garlinghouse

Title: CEO

Date: 6/17/19

Address: 315 Montgomery Street, 2nd Fl

San Francisco, CA 94104

Attn: General Counsel

**MONEYGRAM PAYMENT SYSTEMS, INC.**

By

Name

Title :

Date:

Address: 2828 N. Harwood Street, 15th Floor

Dallas, Texas 75201

Attn: General Counsel

SIGNATURE PAGE TO WORK ORDER

As of the Effective Date, the Parties agree to be bound, and have caused this Work Order to be executed, by their authorized representatives.

| | |
|---|---|
| **RIPPLE SERVICES INC.** | **MONEYGRAM PAYMENT SYSTEMS, INC.** |
| By: _____ | By: _____ |
| Name: _____ | Name: Lawrence Angelilli |
| Title: _____ | Title: Chief Financial Officer |
| Date: _____ | Date: _____ |
| Address: 315 Montgomery Street, 2nd Fl. | Address: 2828 N. Harwood Street, 15th Floor |
| San Francisco, CA 94104 | Dallas, Texas 75201 |
| Attn: General Counsel | Attn: General Counsel |

SIGNATURE PAGE TO WORK ORDER

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

**ATTACHMENT A**
**DEFINITIONS**

Definitions

Capitalized terms not otherwise defined in this Work Order have the following meanings:

1. **"Beneficiary Amount**" means, for a transaction, the amount of beneficiary fiat currency transacted in the XRP to fiat currency transaction at the Beneficiary Exchange, excluding Exchange Fees.

2. **"Beneficiary Balance"** means an amount equal to the difference between the Quoted Beneficiary Amount and the Beneficiary Amount when the Quoted Beneficiary Amount is greater than the Beneficiary Amount.

3. **"Beneficiary Exchange"** means, for a transaction, the digital asset exchange that lists the beneficiary fiat currency/XRP cross that is used by the Hosted Services.

4. **"Beneficiary Surplus"** means an amount equal to the difference between the Quoted Beneficiary Amount and the Beneficiary Amount when the Beneficiary Amount is greater than the Quoted Beneficiary Amount.

5. **"Customer Account"** means the Customer's account at the Beneficiary Exchange which is linked to the Ripple xRapid Platform.

6. **"Daily Sales Limitation"** means an amount of XRP that shall not exceed ███████ basis points ███████ of the trading volume of XRP, represented in USD, across all markets, for the previous calendar day, as reported on xrpcharts.ripple.com (or if the volume of XRP traded is not reported at this URL, another mutually agreed data source ("**Listing Source**") on such day, unless there is at least a ███████ difference between the Average Daily Volume of XRP on the Listing Source and a Second Source, in which case, the trading volume of XRP will be whichever of the Listing Source or the Second Source that has reported the higher trading volume.

7. **"Spot FX Rate"** means the interbank exchange rate for the fiat currency pair, as such rate is reported at Reuters Datasource Select or other data source mutually agreed by the parties, at approximately the time of the transaction, and in no event more than one hour from such time.  Ripple may substitute another data source to provide such rate, upon mutual agreement of the Parties.

8. **"Originating Exchange"** means, for a transaction, the digital asset exchange that lists the originating fiat currency/XRP cross that is used by the Hosted Services.

9. **"Primary Market"** means the market for the exchange of XRP on the XRP Ledger where trades are made on the XRP/USD cross, which has the highest volume of trading as compared to the other XRP/USD crosses on the date prior to the XRP payment date.

10. **"Quote**" means the quote returned by the Hosted Services for a potential Transaction, which contains, among other things, the estimated originating currency and receiving currency quotes from the Originating Exchange and Beneficiary Exchange, respectively.

11. **"Quoted Beneficiary Amount"** means, for a transaction, the amount of fiat currency that the Beneficiary Exchange would provide Customer in its real-time quote delivered through the Ripple xRapid Platform prior to initiating an actual transaction, excluding Exchange Fees.

Ripple Confidential

12. **"Second Source"** means the Blockchain Transparency Institute data source for XRP volume, located here https://www.bti.live/xrp-coin/ (or if the volume of XRP traded is not reported at this URL, or the Parties otherwise agree, another mutually agreed data source).

13. **"Spot Beneficiary Amount"** means the amount of Beneficiary Currency that would have been available using the Spot FX Rate (excluding Exchange Fees).

14. **"Transaction Volume"** means the total cumulative Beneficiary Amount for a designated period of time. Beneficiary Amounts denominated in a currency other than USD will be converted to USD using the Spot FX Rate, provided, however, Transaction Volume may not exceed the Maximum Daily Transaction Volume without Ripple's prior written consent (email okay). "Maximum Daily Transaction Volume" means US$███████ per day during the first twelve months of the Incentives Period, and US$███████ per day during the second twelve months of the Incentives Period.

Ripple Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0272328

### ATTACHMENT B Standard XRP Terms and Conditions

1. Scope. For all transfers of XRP, a digital asset native to the XRP Ledger, described under the agreement to which this Exhibit ("XRP Terms and Conditions") is attached, to the named a. party in such agreement to whom/which such XRP is to be transferred to ("Recipient"), these XRP Terms and Conditions shall apply.

2. Delivery. Subject to Recipient's execution of Ripple's standard compliance policies and procedures, Ripple shall send any payments (due in the form of XRP) to an XRP Ledger address under the sole custody of Recipient and no other party. The Parties agree to fully cooperate in good faith in all respects in order to give effect to the terms of this clause.

3. Taxes. Recipient shall bear all applicable taxes, duties, deductions, imposts, or governmental levies, including withholding taxes, transfer taxes, sales or use taxes, value-added taxes, stamp taxes, excise taxes, or other similar taxes (collectively "Taxes") arising from payments to Recipient under this Agreement. Ripple shall have no obligation to indemnify, gross-up, or otherwise reimburse Recipient for such Taxes. If and to the extent applicable law obligates Ripple to deduct Taxes from any payment to Recipient including from a payment of XRP, Ripple shall timely deduct and remit such Taxes to the applicable tax authority and shall furnish Recipient with an official receipt or other appropriate evidence of such remittance. If requested by Ripple, Recipient shall promptly provide Ripple with a valid IRS W-9 form or a valid IRS series W-8 form, as appropriate. Without limiting the foregoing, Ripple and Recipient acknowledge and agree that net income taxes, franchise taxes, branch profit taxes, or similar income taxes imposed on a Party as a result of such Party being organized under the laws of, having its principal office, management and control, or employees located in, conducting business within, or by reason of another connection between Party and the jurisdiction imposing such tax, shall be the sole responsibility of such Party. All payments to Recipient hereunder shall be made by Ripple's U.S. entity or entities.

4. Material Risks. Recipient acknowledges and assumes the following material risks associated with virtual currency, including XRP:

a. Virtual currency is not legal tender, is not backed by any government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

b. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

c. Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

d. Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

e. The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

f. There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

g. The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

5. Risk of Loss.

a. With respect to any payment of XRP from Ripple to Recipient under these XRP Terms and Conditions, Recipient acknowledges and agrees that Recipient cannot cancel, reverse, or change any XRP transfer that has been completed, as recorded on the XRP Ledger.

b. Immediately upon Recipient's withdrawal of Net Rebate XRP from the Segregated Wallet or receipt of Incentive XRP, all title to and risk of loss related to such XRP passes to Recipient. Recipient acknowledges and agrees that Ripple, its affiliates, employees, directors and officers ("Ripple Parties") have no liability to Recipient or any third party for any loss theft or misuse of any Net Rebate

Ripple Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

XRP that Recipient has withdrawn or Incentive XRP that Recipient has received as provided in these XRP Terms and Conditions.

c. Recipient acknowledges and agrees that Recipient is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that it uses to access its XRP or Segregated Wallet, including any XRP it receives under this these XRP Terms and Conditions ("Recipient Credentials"). Any loss or compromise of Recipient Credentials may result in unauthorized access to XRP by third-parties and the loss or theft of such XRP. Ripple Parties assume no responsibility for any loss that Recipient may sustain due to compromise of Recipient Credentials.

d. Recipient shall have no recourse against Ripple Parties for any liabilities of any type incurred by Recipient and/or any of its affiliates as a result of its use, resale or distribution of XRP, including but not limited to the materialization of any of the risks in Section 4 (Material Risks) or losses associated with the decline in market value of XRP for any reason. Recipient acknowledges and agrees that XRP does not represent a right to make any demand on Ripple. Recipient acknowledges and agrees that Ripple has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item.

Ripple Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0272330

Attachment C: FX Rate Rebate Calculation

# Definitions

- $FX_{USD}$: Spot FX Rate from a particular currency to USD
- $FX_{Spot}$: Spot FX Rate for any currency pair
- SBA: Spot Beneficiary Amount
- QBA: Quoted Beneficiary Amount

# Rebate Calculation

$\Delta_i$ is the difference between what would have been delivered at the Spot FX Rate (which is the Spot Beneficiary Amount) and what was delivered through the Ripple xRapid Platform (which is the Quoted Beneficiary Amount less any additional transaction fees charged by exchanges ("Exchange Fees").

$$\Delta_i = SBA - (QBA - Exchange\ Fees)$$

The rate-related credit or debit for a particular transaction is calculated as follows:

$$IF\ -0.0005 * SBA \leq \Delta_i \leq 0.0005 * SBA\ THEN\ credit_i = debit_i = 0$$
$$IF\ \Delta_i > 0.0005 * SBA\ THEN\ debit_i = (\Delta_i - 0.0005 * SBA) * FX_{USD}$$
$$IF\ \Delta_i < -0.0005 * SBA\ THEN\ credit_i = (\Delta_i + 0.0005 * SBA) * FX_{USD}$$

The credits and debits are summed at the end of the 24 hour period.

$$Net\ Rebate\ in\ USD = \sum credit_i + \sum debit_i$$

If Net Rebate is positive, Ripple will pay the customer Net Rebate as set forth in the Work Order.  If Net Rebate is negative, then no payment is owed by either Party.

Ripple Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0272331

Attachment D:


Today's Date:                    [Current date]


To [Moneygram to provide delivery instructions]


TERMS OF SEGREGATED WALLET FUNDING

NOT A RECEIPT OR OFFER


Ripple would like to send units of XRP to Customer, to be held in its Segregated Wallet on the following terms:

Customer Name:                  [Full name of customer]
Customer XRP Address:           [XRP wallet address]
Customer Destination Tag:       [Destination Tag or "Null" if none]

Expected Delivery Date:         [Expected delivery date]

Total XRP Units:                [Number of XRP]

Additional terms, if applicable:

This Terms of Segregated Wallet Funding is being delivered pursuant to, and is governed by, the terms and conditions of the Work Order between the parties, dated as of [_____]. Once completed, the transaction cannot be cancelled or revoked.


                                Ripple Services Inc.
                                315 Montgomery St., 2nd Floor
                                San Francisco, CA 94104

                                By:

                                _____
                                Name:
                                Title:


Agreed and Acknowledged:
[CUSTOMER NAME]

By:  _____.
Name:
Title:

Ripple Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272332

Attachment E:

Ripple Services Inc.
315 Montgomery St., 2nd Floor
San Francisco, CA 94104

Today's Date:                    [Current date]

RECEIPT

Customer Name:                    [Full name of customer]
Customer XRP Address:            [XRP wallet address]
Transferor XRP Address:          [Ripple's wallet address]
Customer Destination Tag:        [Destination Tag or "null" if none]
Transaction Time:                [Time of transaction]

Transaction ID (hash):            [Transaction hash]

Total XRP Units:                 [Number of XRP]

Additional terms, if applicable:

The funding of the Segregated Wallet of the Total XRP Units specified above is governed by the terms and conditions of the Work Order (the "Agreement"), including but not limited to, the provisions set forth in Attachment B (Standard XRP Terms and Conditions).

Ripple Confidential

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0272333