# Exhibit 60

# Ripple Work Order #1

This Work Order #1 (including any attachments) ("Work Order") is between Ripple Services Inc., a Delaware corporation ("Ripple") and Moneygram Payment Systems, Inc. ("Customer"), is effective the date the last party signs ("Effective Date"), and incorporates by reference the Master Hosted Services Agreement (including its exhibits) between the Parties with the effective date of June 17, 2019 ("Agreement"). To the extent this Work Order conflicts directly with the Agreement, the Work Order will prevail. Terms not otherwise defined in this Work Order will have the definition set forth in the Agreement.

1. **Term**. The Term of this Work Order shall follow the Term of the Agreement. For the avoidance of doubt and except as otherwise provided in the Agreement, the XRP payments described in this Section E shall expire 24 months from July 1, 2019 (the "Incentives Period"), provided that if Customer's access to certain Corridors, as defined below, is not commercially practicable or is delayed, or delays are incurred as a result of regulatory or market circumstances, Ripple may in its reasonable discretion toll the Incentives Period for an equivalent period of time not to exceed six months (provided that any tolling of the Incentives Period will extend the Incentives Period for an equivalent period of time). For six (6) months following termination of the Agreement, Customer shall continue to offer the Hosted Services, and specifically Hosted Services called the Ripple xRapid platform (as used interchangeably in this Work Order, the "Hosted Services" or "Ripple xRapid Platform"), in the Corridors (as defined below) and Ripple shall continue to support Customer and the Hosted Services for such purpose.
2. **Definitions.** See Attachment A ("Definitions") for additional defined terms.
3. **Hosted Service**. The Ripple xRapid Platform relating to the transfer and receipt of cross-border payments in the then-current corridors that are made generally available to other Ripple xRapid Platform customers or upon mutual agreement in advance by the Parties (collectively, "Corridors"). Ripple may terminate or suspend a particular Corridor with thirty (30) days written notice if it is not commercially reasonable to operate the Ripple xRapid Platform in such Corridor; provided that during any time period that an Available Corridor is suspended or terminated, the Incentives Period will be tolled and extended for an equivalent period of time, not to exceed six months. As of the Effective Date, the available Corridors are from the EU and US to and from Mexico and the Philippines ("Available Corridors"). Additional Corridors may be added by mutual agreement of the Parties in the form of a written amendment or addendum to this Work Order.
4. **Support Services**. Subject to performance in accordance with the terms and conditions of the Agreement, Ripple will provide Support Services as set forth in Exhibit A (Support Service Terms) to the Agreement.
5. **Training**. Ripple will provide to the Customer (a) training guidance (in the form of telephone support, online resources, in-person training, and remote videoconference training), at the request of Customer and as mutually agreed by the Parties, with

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.   RPLI_SEC 0239684

respect to the Hosted Services and (b) access to key resources as mutually agreed by the Parties to guide Customer through its development of any business requirements.

6. **Fees and Rebates.**

   A. **Fees.** There are no fees for the Hosted Services or Support Services. Any Professional Services shall be added by mutual agreement of the Parties in the form of a written amendment or addendum to this Work Order. No Professional Services are anticipated in connection with this Work Order.

   B. **XRP Transfers.**
   
   i. With respect to any transfer of XRP from Ripple to Customer under this Work Order, Ripple shall transfer such XRP to an XRP address directly owned by Customer. Any XRP payments or transfers under this Agreement are subject to the additional terms in Attachment B (Standard XRP Terms and Conditions), which are hereby incorporated by reference.
   
   ii. Notwithstanding transfers of XRP that are expressly subject to the Baseline Conversion Rate, the XRP equivalent ("XRP Conversion Rate") for any transfer of XRP from Ripple to Customer described in amount as USD will be the greater of:
   
   1) The conversion rate of XRP as traded against USD on the Primary Market at approximately 9:00 a.m. PST on the payment date, as reported on https://tradeblock.com/markets/index/xrx.
   2) US $[redacted] per single unit of XRP
   
   iii. The "Baseline Conversion Rate" means the conversion rate of XRP as traded against USD on the Primary Market at approximately 9:00 a.m. PST on the Effective Date of this Work Order, as reported on https://tradeblock.com/markets/index/xrx.
   
   iv. The Parties acknowledge that the Baseline Conversion Rate and the XRP Conversion Rate are not to be considered fair market values.
   
   v. Except for any exchange fees that are expressly set forth in Attachment C ("Exchange Fees"), there are no fees for the XRP transfers associated with the Ripple xRapid Platform. Ripple shall reimburse Customer for any Exchange Fees in accordance with Section C below.

   C. **FX Rate Rebate.**
   Ripple shall ensure that the exchange rates charged by the Ripple xRapid Platform are within [redacted] basis points [redacted] of the Spot FX Rate at the time of each transaction under this Agreement and Work Order (including any associated XRP volatility and exchange fees), provided that, to the extent that exchange rates with respect to any transaction exceeds [redacted] basis points [redacted] of the Spot FX Rate, Ripple shall satisfy its obligation by providing to Customer make-whole payments in XRP (each a "Net Rebate") to bring such rates within [redacted] basis points [redacted] of the FX Spot Rate at the time of the transaction (including any associated XRP volatility and exchange fees), with such Net Rebate to be provided by Ripple for a 24 hour period from 00:00 UTC to 23:59 UTC as set forth in Attachment C (FX Rate Rebate Calculation).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.   RPLI_SEC 0239685

i. **Rebate Payment.** If due, each day's rebate will be paid through Customer's daily withdrawal of the Net Rebate amount in XRP from the Segregated Wallet (as defined below). No credit will be due to Ripple.

ii. **Segregated Wallet.** With respect to each daily Net Rebate payment (if necessary), Ripple shall transfer XRP ("Rebate Pool XRP") to a specified wallet directly and wholly owned by Customer, to be used specifically and solely in accordance with this Section C (the "Segregated Wallet"). Ripple will ensure that such Segregated Wallet balance is sufficient to pay each day's Net Rebate subject to Section 6.C.iii below. The security of the Segregated Wallet created and maintained by Customer will be the sole responsibility of Customer. In no event may Customer transfer any XRP into, or allow any XRP to be transferred into, the Segregated Wallet, other than XRP transferred by Ripple to the Segregated Wallet. If any XRP is transferred into the Segregated Wallet other than XRP transferred by Ripple to the Segregated Wallet, then Customer shall be required to promptly purchase all Rebate Pool XRP in the Segregated Wallet at the XRP Conversion Rate. Customer may only transfer XRP out of the Segregated Wallet in accordance with Section C.i. For the avoidance of doubt, the Parties acknowledge and agree that except as otherwise provided in this Agreement, the mere transfer of XRP by Ripple to Customer's Segregated Wallet pursuant to this Section C is not a sale or purchase of such XRP by or to Customer, is not a transfer or conveyance of legal title of the Rebate Pool XRP to Customer, that Customer holds such XRP as a bailee, and except for the XRP that is withdrawn by Customer in respect of any Net Rebate amounts, all legal title of all Rebate Pool XRP remains with Ripple. The Customer agrees to not sell, assign, transfer, pledge, hypothecate, encumber, or otherwise dispose of the Segregated Wallet or the Rebate Pool XRP therein other than in accordance with the terms of this Section C. The Parties acknowledge and agree that neither party shall treat Ripple's mere transfer of XRP to Customer's Segregated Wallet as a sale or exchange for purposes of the United States Internal Revenue Code or state and local tax law purposes. Neither Party shall take a tax reporting position, make a disclosure, or file a tax return with an applicable tax authority inconsistent with the foregoing.

iii. **Funding Segregated Wallet.** Ripple shall promptly deliver to Customer via email a written confirmation of its desire to increase the balance of XRP in the Segregated Wallet, substantially in the form of Attachment D (the "Terms of Segregated Wallet Funding") that contains information including:
   1) Customer's Segregated Wallet address;
   2) the total XRP units being transferred into the Segregated Wallet, referred to as the "Rebate Pool XRP";

and is sent to Customer as set forth on Attachment D. Unless Customer countersigns the Terms of Segregated Wallet Funding in the form attached hereto as Attachment D and submits an electronic countersigned copy to Ripple, Ripple will not complete the funding. The countersigned Terms of Segregated Wallet Funding, together with this Agreement, shall constitute the

terms agreed between Ripple and Customer with respect to the Rebate Pool XRP to which the Terms of Segregated Wallet Funding relates. Ripple is not liable for Segregated Wallet to be funded in a sufficient amount to cover a given day's Net Rebate until the Terms of Segregated Wallet Funding are returned and countersigned; provided that Customer will use commercially reasonable efforts to return and countersign each Terms of Segregated Wallet Funding within two business days from the time Ripple sends such Terms of Segregated Wallet Funding to Customer. Following each funding of the Segregated Wallet by Ripple under this Section C, as recorded on the XRP Ledger, Ripple shall provide to Customer a receipt, substantially in the form attached hereto as Attachment E and adapted as appropriate. Once completed, a transfer of XRP into the Segregated Wallet cannot be cancelled, reversed or changed. Upon the termination or expiration of this Work Order and the cessation of the Hosted Service, Customer will return to Ripple the unused Rebate Pool XRP from the Segregated Wallet. The Parties acknowledge and agree that neither party shall treat Customer's return to Ripple of unused Rebate Pool XRP from the Segregated Wallet as a sale or exchange for purposes of the United States Internal Revenue Code or state and local tax law purposes.

D. **Slippage Pool.** Ripple will pay Customer for all Beneficiary Balances in XRP.
   i. Ripple will use commercially reasonable efforts to maintain an additional amount of XRP ("Slippage Pool") to cover Beneficiary Balances in the Customer's account at the Beneficiary Exchange to ensure that the (i) the Quoted Beneficiary Amount and (ii) the sum of the Beneficiary Amount plus the Beneficiary Balance, are equal. Any Beneficiary Surplus goes into the Slippage Pool. In the event that the Slippage Pool drops below a threshold reasonably determined by Ripple, with input from Customer, to support the volume of transactions occurring through Customer's use of the Ripple xRapid Platform, Ripple will periodically top up this Slippage Pool when and as needed, but in no event less frequently than every three (3) business days. Customer will promptly notify Ripple in the event that there is an increase in the volume or US dollar amount of transactions which may require more XRP to be transferred into the Slippage Pool than has historically been provided.
   ii. Customer agrees that it shall not withdraw XRP from the Slippage Pool tranche in the Customer' Account from the Customer Account unless such withdrawal is for the Beneficiary Balance ("Permitted Use"). In the event Customer uses the XRP in the Slippage Pool for any other purposes other than the Permitted Use, Customer will promptly return an equivalent amount of XRP to Ripple. This Section 6.D.ii will survive the termination or expiration of the Work Order.

E. **Additional Terms.**
   i. Customer will use commercially reasonable efforts to deploy and use the Hosted Service to send and receive cross-border payments for the Corridors.

    ii. Using the Baseline Conversion Rate, Ripple will pay Customer an amount of XRP equal to US$■■■ if the Transaction Volume equals or exceeds US$■■■ on or before March 31, 2020.

    iii. Ripple will pay Customer transaction incentive fees in XRP in an amount not to exceed US$■■■ over the Incentives Period. Such transaction incentive fees are as set forth in this Section E, to be calculated as follows:

        1) Until such time as the Transaction Volume exceeds US$■■■ Ripple will pay Customer ■■ of the Transaction Volume value in XRP; provided, in the event Customer's Transaction Volume does not exceed US$■■■ within nine months from July 1, 2019, such percentage of Transaction Volume will be reduced to ■■ until Customer achieves US$■■■ in Transaction Volume when subsection 3) below becomes effective.

        2) Following such time as Transaction Volume exceeds US$■■■ but is less than US$■■■ Ripple will pay Customer ■■ of the Transaction Volume in XRP.

        3) Following such time as Transaction Volume exceeds US$■■■, Ripple will pay Customer ■■ of the Transaction Volume in XRP until the earlier of the total amount of XRP paid to Customer until such time as the cumulative XRP incentive fees paid by Ripple to Customer reaches US$■■■ or the expiration or termination of this Work Order.

        4) If Customer implements or utilizes any other product that utilizes a cryptocurrency as a bridge currency for cross-border settlement during the Incentives Period all transaction incentive fees payable from Ripple to Customer as provided for in this Section (iii) shall be reduced by ■■ effective from the date Customer implements or utilizes any other product that utilizes a cryptocurrency as a bridge currency for cross-border settlement.

        5) The amount of XRP to be paid under this Section E (iii) will be calculated so that ■■ of a given payment will be based on the Baseline Conversion Rate. The remaining ■■ of such payment will be based on the XRP Conversion Rate.

    iv. All amounts paid in XRP to Customer under this Section E will be paid on a weekly basis following the calendar week in which the Transaction Volume occurred, or in the case of Section E(ii), when the incentive fee was earned, within thirty days from Customer's invoice, which shall be provided within two business days after the end of the prior week. Customer's invoice shall include the Ripple Purchase Order #, the calendar week such invoice is in reference to, the Transaction Volume arranged by Corridor, and the amount of XRP owed in USD, as determined pursuant to Section E(iii). The invoice shall be sent to ripple_invoicecapture@concursolutions.com. Ripple shall have reasonable audit and inspection rights of Customer's records during normal business hours solely for purposes of evaluating the reported Transaction Volume.

    v. With respect to all XRP transferred to Customer by Ripple under SectionE (the "Incentive XRP"), Customer will limit the amount of such XRP that is

sells or transfers, on a daily basis to the Daily Sales Limitation. In addition, with respect to the XRP withdrawn by Customer under Section C as a Net Rebate ("Net Rebate XRP"), Customer will make commercially reasonably efforts to sell or transfer each day's Net Rebate XRP within seven (7) business days of withdrawal of such Net Rebate XRP. Except as provided below, in no event will Customer sell or transfer on any given day an amount of Net Rebate XRP exceeding two (2) calendar days' Net Rebates, for the calendar days preceding that particular day on which Net Rebates were actually received by Customer (the amount of such two (2) days' Net Rebates, together with the Daily Sales Limitation for that day, the "Maximum Daily Sales Limitation"). The Maximum Daily Sales Limitation will not apply to Customer's transfer or sale of XRP to its affiliates, provided Customer warrants and represents that Customer will ensure (and such affiliates shall agree as a condition of transfer of such XRP that) all affiliates' sales of XRP on any day are limited to the same Maximum Daily Sale Limitation as Customer, when measured in combination with the XRP transfers and sales of Customer. If Customer determines that regulatory considerations make it impracticable for Customer to hold XRP, it may sell all or any portion of such XRP to Ripple for mutually agreed consideration (provided that if Customer proposes that Ripple pay aggregate consideration of $[REDACTED] for all XRP then held by Customer, Ripple will promptly accept) upon at least five (5) business days' notice or transfer or sell all or any portion of such XRP to a third party, provided that the third party and any of that parties' transferees may not collectively transfer or sell in excess of the Maximum Daily Sales Limitation.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0239689

As of the Effective Date, the Parties agree to be bound, and have caused this Work Order to be executed, by their authorized representatives.

| | RIPPLE SERVICES INC. | | MONEYGRAM PAYMENT SYSTEMS, INC. |
|---|---|---|---|
| By: | [redacted] | By: | |
| Name: | Brad Garlinghouse | Name: | |
| Title: | CEO | Title: | |
| Date: | 6/17/19 | Date: | |
| Address: | 315 Montgomery Street, 2nd Fl.<br>San Francisco, CA 94104<br>Attn: General Counsel | Address: | 2828 N. Harwood Street, 15th Floor<br>Dallas, Texas 75201<br>Attn: General Counsel |

SIGNATURE PAGE TO WORK ORDER

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0239690

As of the Effective Date, the Parties agree to be bound, and have caused this Work Order to be executed, by their authorized representatives.

| | RIPPLE SERVICES INC. | | MONEYGRAM PAYMENT SYSTEMS, INC. |
|---|---|---|---|
| By: | | By: | |
| Name: | | Name: | Lawrence Angelilli |
| Title: | | Title: | Chief Financial Officer |
| Date: | | Date: | |
| Address: | 315 Montgomery Street, 2nd Fl. | Address: | 2828 N. Harwood Street, 15th Floor |
| | San Francisco, CA 94104 | | Dallas, Texas 75201 |
| | Attn: General Counsel | | Attn: General Counsel |

SIGNATURE PAGE TO WORK ORDER

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0239691

**ATTACHMENT A**
**DEFINITIONS**

Definitions

Capitalized terms not otherwise defined in this Work Order have the following meanings:
1. **"Beneficiary Amount"** means, for a transaction, the amount of beneficiary fiat currency transacted in the XRP to fiat currency transaction at the Beneficiary Exchange, excluding Exchange Fees.
2. **"Beneficiary Balance"** means an amount equal to the difference between the Quoted Beneficiary Amount and the Beneficiary Amount when the Quoted Beneficiary Amount is greater than the Beneficiary Amount.
3. **"Beneficiary Exchange"** means, for a transaction, the digital asset exchange that lists the beneficiary fiat currency/XRP cross that is used by the Hosted Services.
4. **"Beneficiary Surplus"** means an amount equal to the difference between the Quoted Beneficiary Amount and the Beneficiary Amount when the Beneficiary Amount is greater than the Quoted Beneficiary Amount.
5. **"Customer Account"** means the Customer's account at the Beneficiary Exchange which is linked to the Ripple xRapid Platform.
6. **"Daily Sales Limitation"** means an amount of XRP that shall not exceed ▮ basis points ▮ of the trading volume of XRP, represented in USD, across all markets, for the previous calendar day, as reported on xrpcharts.ripple.com (or if the volume of XRP traded is not reported at this URL, another mutually agreed data source ("**Listing Source**") on such day, unless there is at least a ▮ difference between the Average Daily Volume of XRP on the Listing Source and a Second Source, in which case, the trading volume of XRP will be whichever of the Listing Source or the Second Source that has reported the higher trading volume.
7. **"Spot FX Rate"** means the interbank exchange rate for the fiat currency pair, as such rate is reported at Reuters Datasource Select or other data source mutually agreed by the parties, at approximately the time of the transaction, and in no event more than one hour from such time. Ripple may substitute another data source to provide such rate, upon mutual agreement of the Parties.
8. **"Originating Exchange"** means, for a transaction, the digital asset exchange that lists the originating fiat currency/XRP cross that is used by the Hosted Services.
9. **"Primary Market"** means the market for the exchange of XRP on the XRP Ledger where trades are made on the XRP/USD cross, which has the highest volume of trading as compared to the other XRP/USD crosses on the date prior to the XRP payment date.
10. **"Quote"** means the quote returned by the Hosted Services for a potential Transaction, which contains, among other things, the estimated originating currency and receiving currency quotes from the Originating Exchange and Beneficiary Exchange, respectively.
11. **"Quoted Beneficiary Amount"** means, for a transaction, the amount of fiat currency that the Beneficiary Exchange would provide Customer in its real-time quote delivered through the Ripple xRapid Platform prior to initiating an actual transaction, excluding Exchange Fees.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.   RPLI_SEC 0239692

12. **"Second Source"** means the Blockchain Transparency Institute data source for XRP volume, located here https://www.bti.live/xrp-coin/ (or if the volume of XRP traded is not reported at this URL, or the Parties otherwise agree, another mutually agreed data source).
13. **"Spot Beneficiary Amount"** means the amount of Beneficiary Currency that would have been available using the Spot FX Rate (excluding Exchange Fees).
14. **"Transaction Volume"** means the total cumulative Beneficiary Amount for a designated period of time. Beneficiary Amounts denominated in a currency other than USD will be converted to USD using the Spot FX Rate, provided, however, Transaction Volume may not exceed the Maximum Daily Transaction Volume without Ripple's prior written consent (email okay). "Maximum Daily Transaction Volume" means US$ [redacted] per day during the first twelve months of the Incentives Period, and US$ [redacted] per day during the second twelve months of the Incentives Period.

## ATTACHMENT B Standard XRP Terms and Conditions

1. <u>Scope.</u> For all transfers of XRP, a digital asset native to the XRP Ledger, described under the agreement to which this Exhibit ("<u>XRP Terms and Conditions</u>") is attached, to the named party in such agreement to whom/which such XRP is to be transferred to ("<u>Recipient</u>"), these XRP Terms and Conditions shall apply.
2. <u>Delivery.</u> Subject to Recipient's execution of Ripple's standard compliance policies and procedures, Ripple shall send any payments (due in the form of XRP) to an XRP Ledger address under the sole custody of Recipient and no other party. The Parties agree to fully cooperate in good faith in all respects in order to give effect to the terms of this clause.
3. <u>Taxes.</u> Recipient shall bear all applicable taxes, duties, deductions, imposts, or governmental levies, including withholding taxes, transfer taxes, sales or use taxes, value-added taxes, stamp taxes, excise taxes, or other similar taxes (collectively "<u>Taxes</u>") arising from payments to Recipient under this Agreement. Ripple shall have no obligation to indemnify, gross-up, or otherwise reimburse Recipient for such Taxes. If and to the extent applicable law obligates Ripple to deduct Taxes from any payment to Recipient including from a payment of XRP, Ripple shall timely deduct and remit such Taxes to the applicable tax authority and shall furnish Recipient with an official receipt or other appropriate evidence of such remittance. If requested by Ripple, Recipient shall promptly provide Ripple with a valid IRS W-9 form or a valid IRS series W-8 form, as appropriate. Without limiting the foregoing, Ripple and Recipient acknowledge and agree that net income taxes, franchise taxes, branch profit taxes, or similar income taxes imposed on a Party as a result of such Party being organized under the laws of, having its principal office, management and control, or employees located in, conducting business within, or by reason of another connection between Party and the jurisdiction imposing such tax, shall be the sole responsibility of such Party. All payments to Recipient hereunder shall be made by Ripple's U.S. entity or entities.
4. <u>Material Risks.</u> Recipient acknowledges and assumes the following material risks associated with virtual currency, including XRP:
   a. Virtual currency is not legal tender, is not backed by any government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.
   b. Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.
   c. Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.
   d. Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.
   e. The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.
   f. There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.
   g. The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.
5. <u>Risk of Loss.</u>
   a. With respect to any payment of XRP from Ripple to Recipient under these XRP Terms and Conditions, Recipient acknowledges and agrees that Recipient cannot cancel, reverse, or change any XRP transfer that has been completed, as recorded on the XRP Ledger.
   b. Immediately upon Recipient's withdrawal of Net Rebate XRP from the Segregated Wallet or receipt of Incentive XRP, all title to and risk of loss related to such XRP passes to Recipient. Recipient acknowledges and agrees that Ripple, its affiliates, employees, directors and officers ("<u>Ripple Parties</u>") have no liability to Recipient or any third party for any loss theft or misuse of any Net Rebate

XRP that Recipient has withdrawn or Incentive XRP that Recipient has received as provided in these XRP Terms and Conditions.

c. Recipient acknowledges and agrees that Recipient is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PI**N**s), secret keys or any other codes that it uses to access its XRP or Segregated Wallet, including any XRP it receives under this these XRP Terms and Conditions ("Recipient Credentials"). Any loss or compromise of Recipient Credentials may result in unauthorized access to XRP by third-parties and the loss or theft of such XRP. Ripple Parties assume no responsibility for any loss that Recipient may sustain due to compromise of Recipient Credentials.

d. Recipient shall have no recourse against Ripple Parties for any liabilities of any type incurred by Recipient and/or any of its affiliates as a result of its use, resale or distribution of XRP, including but not limited to the materialization of any of the risks in Section 4 (Material Risks) or losses associated with the decline in market value of XRP for any reason. Recipient acknowledges and agrees that XRP does not represent a right to make any demand on Ripple. Recipient acknowledges and agrees that Ripple has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                          RPLI_SEC 0239695

Attachment C: FX Rate Rebate Calculation

# Definitions

- $FX_{USD}$: Spot FX Rate from a particular currency to USD
- $FX_{Spot}$: Spot FX Rate for any currency pair
- $SBA$: Spot Beneficiary Amount
- $QBA$: Quoted Beneficiary Amount

# Rebate Calculation

$\Delta_i$ is the difference between what would have been delivered at the Spot FX Rate (which is the Spot Beneficiary Amount) and what was delivered through the Ripple xRapid Platform (which is the Quoted Beneficiary Amount less any additional transaction fees charged by exchanges ("Exchange Fees").

$$\Delta_i = SBA - (QBA - \text{Exchange Fees})$$

The rate-related credit or debit for a particular transaction is calculated as follows:

IF $-0.0005 * SBA \leq \Delta_i \leq 0.0005 * SBA$ THEN $credit_i = debit_i = 0$
IF $\Delta_i > 0.0005 * SBA$ THEN $debit_i = (\Delta_i - 0.0005 * SBA) * FX_{USD}$
IF $\Delta_i < -0.0005 * SBA$ THEN $credit_i = (\Delta_i + 0.0005 * SBA) * FX_{USD}$

The credits and debits are summed at the end of the 24 hour period.

$$\text{Net Rebate in USD} = \sum credit_i + \sum debit_i$$

If Net Rebate is positive, Ripple will pay the customer Net Rebate as set forth in the Work Order. If Net Rebate is negative, then no payment is owed by either Party.

Attachment D:

Today's Date:            [Current date]

To [Moneygram to provide delivery instructions]

TERMS OF SEGREGATED WALLET FUNDING

NOT A RECEIPT OR OFFER

Ripple would like to send units of XRP to Customer, to be held in its Segregated Wallet on the following terms:

Customer Name:              [Full name of customer]
Customer XRP Address:       [XRP wallet address]
Customer Destination Tag:   [Destination Tag or "Null" if none]

Expected Delivery Date:     [Expected delivery date]

Total XRP Units:            [Number of XRP]

Additional terms, if applicable:

This Terms of Segregated Wallet Funding is being delivered pursuant to, and is governed by, the terms and conditions of the Work Order between the parties, dated as of [_____]. Once completed, the transaction cannot be cancelled or revoked.

Ripple Services Inc.
315 Montgomery St., 2nd Floor
San Francisco, CA 94104

By: _____

Name:
Title:

Agreed and Acknowledged:
[CUSTOMER NAME]

By: _____
Name:
Title:

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0239697

Attachment E:

Ripple Services Inc.
315 Montgomery St., 2nd Floor
San Francisco, CA 94104

Today's Date:            [Current date]

RECEIPT

Customer Name:              [Full name of customer]
Customer XRP Address:       [XRP wallet address]
Transferor XRP Address:     [Ripple's wallet address]
Customer Destination Tag:   [Destination Tag or "null" if none]
Transaction Time:           [Time of transaction]

Transaction ID (hash):      [Transaction hash]

Total XRP Units:    [Number of XRP]

Additional terms, if applicable:

The funding of the Segregated Wallet of the Total XRP Units specified above is governed by the terms and conditions of the Work Order (the "Agreement"), including but not limited to, the provisions set forth in Attachment B (Standard XRP Terms and Conditions).