# Exhibit 68

# TECHNOLOGY PROVIDER AGREEMENT

THIS TECHNOLOGY PROVIDER AGREEMENT ("Agreement") is entered into as of August 16, 2016 (the "Effective Date") by and between ███████████████████████ (the "Company"), and Ripple Labs, Inc. ("Ripple").  Capitalized terms used but not otherwise defined herein have the meanings given to such terms in Exhibit A.

## RECITALS

WHEREAS, ███████████████████, an Affiliate of the Company, has entered into an Advisory Services Agreement dated as of August 7, 2015, as amended from time to time (the "████████████████") with the 42 global banks party thereto (the "████████");

WHEREAS, pursuant to the ██████ Services Agreement, ████████ is providing certain services to the ████████ related to the investigation, evaluation, development, and deployment of distributed ledger technology ("DLT"), including a framework for pursuing collaborative projects and a global collaborative laboratory ("GCL") that enables ████████ to interconnect and work together with one another to test, experiment with, and conduct trials of, DLT and other technologies;

WHEREAS, Ripple offers banks and other financial institutions a DLT-based solution for interbank cross-border payments ("Ripple Connect"), which provides banks with (1) advanced messaging and reconciliation capabilities for payment processing and (2) connectivity to a distributed ledger technology (the "Ripple Consensus Ledger") operated by a network of servers running the rippled software to perform validations and participate in the consensus process (such network, the "Ripple Network");

WHEREAS, the Company and certain ████████ (such members, the "Participating Members;" and, collectively with █, the "Project Participants") desire to work with Ripple in a GCL project (the "Project") to explore the viability of the Ripple Consensus Ledger's native digital asset, XRP, as a bridge asset to settle transactions as an alternative to existing interbank settlement solutions ("Digital Asset Settlement"); and

WHEREAS, subject to the successful conclusion of the Project, the parties wish to explore a potential partnership (the "Commercial Partnership") to commercially deploy an interbank settlement solution utilizing XRP as a bridge asset (the "Digital Asset Settlement Solution").

NOW THEREFORE, in consideration of the foregoing premises and the mutual promises and undertakings set forth herein and for other good and valuable consideration, the parties agree as follows:

## ARTICLE I

## THE PROJECT

I.1.   Overview; Project Plan; Party Responsibilities.  The Project will consist of the establishment of Ripple Network nodes and connections to the Ripple Network by the Project Participants within the GCL to allow the Project Participants to test Digital Asset Settlement, as detailed in the project specifications attached as Exhibit B (the "Project Specifications"), as supplemented by the project timetable maintained at https://app.smartsheet.com/b/home?lx=KCJAQ8xmeFbiE7lz8haHBw (the "Project Timetable," and collectively with the Project Specifications, "Project Plan").  The Project will consist of two phases ("Phases") as set forth in the Project Plan.  The Company and Ripple shall each fulfill their respective responsibilities as set forth in the Project Plan and in this Article I, and shall use reasonable commercial efforts to cooperate with the other party as necessary for the fulfillment of the other party's responsibilities.  In the event of a conflict between this Agreement and the Project Plan, the Agreement

CONFIDENTIAL

will control. In the event of a conflict between the Project Specifications and the Project Timetable, the Project Specifications will control unless the parties agree otherwise in writing.

1.2.    <u>The Company to Manage Project, Decide Whether to Proceed with Successive Phases.</u>  The Company shall be responsible for the overall management and execution of the Project, and will have the right of final approval of any changes to the Project Plan. Following the completion of Phase 1 of the Project, after considering the results of the completed Phase and feedback from the participating ███, the determination to proceed with the Phase 2 shall be solely at ███ option and discretion. The following are some key components the Company will deliver as part of its Project management responsibilities (as further detailed in the Project Plan):

(a)           Solicitation of ███ Member participation in the Project.

(b)           Provision of Azure environment for implementation of the Project.

(c)           Implementation of Ripple Network components (Ripple nodes, Ripple Admin Console, and hosted access to Ripple Connect) in Azure.

(d)           Management of the Project including communication, documentation, coordination, and execution of all Phases.

(e)           Provision of financial and other requirements for implementation of Digital Asset Settlement as received from ███

(f)           Provision of requirements and suggestions regarding integration of Ripple Connect into existing financial institution systems as received from ███.

1.3.    <u>Project Report.</u>  Upon completion of the Project, the Company shall issue a report regarding the outcome of the Project (the <u>"Project Report"</u>). To the extent that the Project Plan includes agreed-upon success criteria, or the parties have otherwise agreed in writing on success criteria, the Project Report shall include an evaluation of the Project against those criteria. The Company shall share the Project Report with Ripple (i) at the same time it shares the Project Report with the Participating Members and (ii) at least ten (10) days before the Project Report is shared with any third party. Ripple understands and agrees that the Company, along with its subsidiaries and affiliates, has a duty to evaluate projects, experiments, and technologies objectively and without bias. Nothing herein, commercial or otherwise, will impact the Company's ability to satisfy that duty. For the avoidance of doubt, the Project Report is the Confidential Information of the Company.

1.4.    <u>Ripple to Provide XRP for Use in Project.</u>  Ripple shall provide XRP to the Participating Members for use in the Project (the <u>"Project XRP"</u>) pursuant to bilateral agreements between Ripple and each of the Participating Members (the <u>"XRP Agreements"</u>) substantially in the form of the template agreement attached as <u>Exhibit C</u>. Ripple shall be solely responsible for negotiating and executing an XRP Agreement with each Participating Member and for conducting any necessary KYC. The Company will have no responsibility or liability whatsoever with respect to the Project XRP. To the extent Ripple provides Company with XRP for use in the Project, Ripple and the Company will enter into an agreement addressing the XRP to be provided to Company.

1.5.    <u>Services to Be Provided by Ripple; Subcontracting.</u>  Ripple shall provide the services described in the Project Plan (the <u>"Services"</u>) to the Company during the term of this Agreement. Ripple shall perform the Services diligently and with the care and judgment of a professional software development, consulting and services organization experienced in performing such Services. Ripple may not subcontract the Services, or any portion thereof, to any Person except as may be approved in writing by the Company on a case-by-case basis, such approval not to be unreasonably withheld or delayed. Unless otherwise agreed to in writing by the Company, Ripple shall be solely responsible for any and all

2

payments to any permitted subcontractor. Ripple shall at all times remain fully responsible and liable to the Company for the compliance by any permitted subcontractor with the terms and conditions hereof and for any subcontractor's performance of any Services.

1.6.    Communication of Feedback. The parties understand and agree that from time to time the Company and the Participating Members may engage in discussions and/or provide feedback to one another regarding the Project and/or the Ripple Technology (such discussions or feedback, "Feedback"). Feedback from Participating Members regarding the Project or the performance, capabilities, or any other qualitative or quantitative feedback on the Ripple Technology will be communicated to Ripple via the Company, provided that if a Participating Member directs the Company not to share specific feedback with Ripple, the Company shall be under no obligation to do so. Ripple shall not solicit Feedback from ▉▉▉▉▉▉▉▉ unless and except as approved by the Company. If a Participating Member contacts Ripple to provide Feedback, Ripple shall make reasonable efforts to include the Company in the conversation. Ripple shall promptly notify the Company of any bilateral communications with Participating Member concerning the Project and provide the Company with a summary of the contents of the communication, including any notes or minutes from the meeting.

## ARTICLE II

## TECHNOLOGY LICENSE AND RELATED OBLIGATIONS

II.1.    Technology Ownership Rights

(a)    Background and Derivative Intellectual Property. Each party will own all right, title and interest in and to all of the technology it contributes to the Project including all intellectual property rights in and under all of the foregoing ("Background Technology"). Each party will own all right, title and interest in and to any Adaptations and Modifications to its Background Technology, including any customizations to Background Technology made by either party or by the parties jointly, without use of Confidential Information of the other party (collectively the "Derivative Technology"). Such Derivative Technology created by either party will be and will be deemed to be part of the underlying Background Technology. The parties agree to disclose promptly in writing and deliver to the other party all Derivative Technology that it conceives, creates or develops during the Term of this Agreement and hereby grants, assigns and conveys to the owner of the underlying Background Technology all of its right, title and interest, if any, in such items and in all intellectual property associated therewith. If Derivative Technology relates to Technology licensed under this Agreement, then any such Derivative Technology shall be considered included in the Technology licensed to the other party under this Agreement. Each party agrees to promptly take, at the requesting party's expense, any actions or execute any documents that the other party reasonably requests to confirm or accomplish the allocation of ownership of this Section 2.1(a).

(b)    Developed Technology. Subject to each party's rights in Derivative Technology, each Party shall retain all rights in the technology it develops or creates in connection with the performance of Services ("Developed Technology"). Any Developed Technology of Ripple provided or delivered as part of the Project deliverables or services shall be considered included in the Ripple Technology licensed to the Company under this Section 2.2(a) of this Agreement.

II.2.    License to Ripple Technology.

(a)    Ripple hereby grants to the Company a worldwide, non-exclusive, non-assignable (except as set forth in Section 2.2(b)), non-transferable (except as set forth in Section 9.7), and non-sublicensable (except as set forth in Section 2.2(b)), limited right and license to Use the Ripple Technology, solely for purposes of conducting the Project and only during the term of the Project, in any jurisdiction in the world, and the right to make and use a sufficient number of copies to accomplish the purposes of the Project. "Ripple Technology" means the Ripple Software and other technology described

3

RPLI_SEC 0609232

in Exhibit D hereto, together with all Adaptations and Modifications thereof, including without limitation Ripple Connect, Ripple Admin Console, and Ripple Charts, but excluding Ripple, which for the avoidance of doubt is being made available under the ISC open source license. This license and any sub-licenses granted in accordance with this Section 2.2(b) shall be consistent with the terms of this Agreement and shall terminate immediately upon termination of this Agreement.

(b)         The Company shall have the right to sublicense the Ripple Technology to any Affiliate of the Company and to the Participating Members, in each case solely for the purposes set forth in Section 2.2(a). Each permitted sublicensee shall be subject to all of the limitations and restrictions applicable to the Company in this Agreement, including the license restrictions in Section 2.2(a) above.

II.3.    Additional Agreements Regarding Intellectual Property Rights in the Ripple Technology.

(a)         To the extent any portion of the Ripple Technology incorporates any Intellectual Property of third parties, Ripple shall be responsible for obtaining all necessary rights and licenses thereto, including the grant of sublicenses to the Project Participants and other permitted sublicensees so that they may enjoy the rights and licenses to the applicable Ripple Technology. Neither the Company nor its permitted sublicensees shall be responsible for, or required to pay, any license, user or maintenance fees with respect to such Intellectual Property of third parties.

(b)         All rights and licenses granted under Section 2.2 are, and shall otherwise be deemed to be, for purposes of Section 365(n) of the United States Bankruptcy Code (the "Bankruptcy Code"), licenses to rights to "intellectual property" as defined in Section 71 of the Bankruptcy Code, and the Ripple Technology constitutes the "embodiment of such intellectual property" as contemplated in Section 365(n) of the Bankruptcy Code. With respect to the foregoing, the parties agree that Section 365(n) of the Bankruptcy Code is applicable to this Agreement, and that, if Ripple as debtor in possession or a trustee in bankruptcy for Ripple in a case under the Bankruptcy Code rejects this Agreement, during the duration of this Agreement the Company may elect to retain its rights under this Agreement to the Ripple Technology as provided for in Section 365(n) of the Bankruptcy Code in such circumstances as provided in Section 365(n) of the Bankruptcy Code.

II.4.    Feedback. Feedback shall not constitute Intellectual Property of any party hereto, and, for the sake of clarity, in such case (a) no party hereto shall be responsible for indemnifying any other party hereto with respect to Feedback under Article VIII and (b) each party hereto shall have the unrestricted right to Use and exploit such Feedback and shall have no obligations to any other party with respect thereto. For the avoidance of doubt, any Feedback provided by a Participating Member to Ripple shall be subject to this Section 2.4 regardless of whether provided directly by the Participating Member or indirectly via the Company.

II.5.    Rights to IP Only as Expressly Set Forth Herein. Except as expressly set forth in this Agreement, nothing herein shall be deemed to grant to a party, by implication, estoppel or otherwise, and no party shall acquire, any right, interest or license in or to any Intellectual Property of the other party or its respective Affiliates. In addition:

(a)         Neither party will reverse engineer, disassemble, or decompile the other party's proprietary Software, or attempt to extract any materials and/or exploit any Intellectual Property embodied in the other party's proprietary Software except in furtherance of the Commercial Partnership and purposes contemplated under this Agreement.

## ARTICLE III

## COMMERCIAL TERMS

4

III.1.          The Company Revenue Share for Managing Project.  In consideration for its solicitation of ▮▮▮▮▮ as Participating Members in the Project and its role in managing the Project (the "Project Revenue Share"), the Company will receive ▮▮▮▮▮▮▮ of the revenue received by Ripple from any Participating Members or other ▮▮▮▮ that become users of Ripple Connect following the completion of the Project, subject to the following terms and conditions:

(a)          Completion of Project.  The Company shall be entitled to its Project Revenue Share if and only if (1) all Phases of the Project have been completed; and (2) the Company has issued the Project Report to ▮▮▮▮▮.

(b)          Subject Revenue.  The Project Revenue Share shall apply to (and only to) revenue received by Ripple from Participating Members and other ▮▮▮▮▮ who enter into an agreement with Ripple for the use of or otherwise relating to Ripple Connect for interbank settlement in the 12-month period commencing on the date that the Company releases the Project Report (the "Project Revenue Share Start Date"), including without limitation licensing fees, and transaction fees. The Company shall be entitled to the Project Revenue Share for the first three (3) years of an ▮▮▮▮▮ agreement with Ripple.  For the avoidance of doubt, the Project Revenue Share applies to revenue from any use of Ripple Connect for interbank settlement, regardless of whether the use involves the Digital Asset Settlement model.

(c)          Exclusions.  The foregoing notwithstanding, the Project Revenue Share shall not apply to revenue resulting from (1) integration services or other professional services performed by Ripple, or (2) agreements entered into with ▮▮▮▮▮ prior to the Project Revenue Share Start Date, provided that if the scope or nature of the use of Ripple Connect provided for under any such agreements is expanded or changed after the Project Revenue Share Start Date, the revenue attributable to the expanded or changed scope shall be subject to the Project Revenue Share, or (3) banks currently in Ripple's existing sales pipeline that are listed in Exhibit E, except where it can be demonstrated that the Company played a critical role in a bank's decision to contract with Ripple for Ripple Connect.  The exclusion contained in clause (3) of the foregoing sentence is subject to the following limitations: (x) if in any calendar quarter six (6) or more ▮▮▮▮▮ enter into an agreement with Ripple for Ripple Connect, the exclusion shall apply only to the first five (5) ▮▮▮▮▮ to do so, and shall not apply to any other ▮▮▮▮ that enter into an agreement with Ripple in that quarter, and (y) the exclusion will terminate on December 31, 2016 and will not apply to limit the Company's Project Revenue Share arising from any ▮▮▮▮ that sign an agreement with Ripple after that date.

(d)          Reporting by Ripple.  Ripple shall provide the Company with a quarterly report that, for the subject quarter, identifies (i) all ▮▮▮▮▮ that first entered into an agreement with Ripple concerning Ripple Connect during the quarter and the date of each such agreement; (ii) all ▮▮▮▮▮ from whom Ripple received revenue subject to the Project Revenue Share and the amount of such revenue received from each; and (iii) all ▮▮▮▮▮ from whom Ripple received revenue that Ripple believes is not subject to the Project Revenue Share and the basis for such exclusion.

III.2.          XRP Option Grant to the Company.  Through an option grant agreement, Ripple shall make available XRP to the Company (the "XRP Option").  The XRP Option will grant five (5) billion XRP.  The XRP Option strike price will be at $▮▮▮ per XRP.  The XRP Option shall expire three (3) years from Effective Date.  The Company is permitted to sell up to ▮▮▮ of the daily average trading volume of XRP on exchange per day with respect to XRP acquired pursuant to the XRP Option. Additionally, the Company is permitted to sell XRP without any quantity limits to the extent the sales are conducted in private off-exchange transactions provided that (i) the price of those transactions is within ▮▮▮▮▮ of the market price and (ii) the transactions are conditioned on the buyer's acceptance of the ▮▮▮ of daily average trading volume per-day limit on XRP sales set forth in the previous sentence with respect to the buyer's sale(s) of the purchased XRP.  Notwithstanding anything herein to the contrary, the Company shall be under no obligation to proceed with the Project unless and until the XRP Option grant has been made.

5

## ARTICLE IV

## POTENTIAL COMMERCIAL PARTNERSHIP

IV.1.   Negotiation of Terms.  In parallel with the commencement of the Project, the parties will negotiate the terms of the potential Commercial Partnership, consistent with the provisions of this Article IV.  The parties will negotiate in good faith with the goal of executing a term sheet reflecting the key terms by no later than the conclusion of the Project.  The term sheet will be non-binding, and either party may terminate negotiations on the term sheet at any time.  Following the execution of the term sheet, the parties will commence negotiation of a full agreement (the "Commercial Agreement"), with the goal of executing the agreement by no later than 30 days after the execution of the term sheet.

IV.2.   Commercial Partnership Key Terms.  Among other things, the term sheet and the Commercial Agreement shall include the following terms:

(a)         Exclusivity.  During the period beginning on May 24, 2016 and ending on the earlier of (i) June 30, 2017 and (ii) the one (1) year anniversary of the Project Completion Date (the "Exclusivity Period"), commercialization of the Digital Asset Settlement Solution and derivative works thereof by Ripple with another third party will be permitted only pursuant to the Commercial Partnership and subject to the terms of the Commercial Agreement, and commercialization of the Digital Asset Settlement Solution with another third party outside of the Commercial Partnership shall be strictly prohibited during the Exclusivity Period.  The restrictions of this Section shall not prevent Ripple from continuing any internal projects pending or in progress as of the Effective Date (such as GPSG) or from using any Ripple Technology, including Ripple Connect, existing as of the Effective Date or otherwise developed outside of the Project.  However, Ripple agrees that it will not develop or deploy a competing Digital Asset Settlement Solution during the Exclusivity Period.

(b)         Party Responsibilities.  Each party's roles and responsibilities in the Commercial Partnership shall be specified.

(c)         Commercial Partnership Commercial Terms.  The commercial terms of the Commercial Partnership, including the apportionment of revenue between the parties shall be specified.  The commercial terms shall be structured such that the economic benefit to ▮ is greater than the economic benefit provided by the Project Revenue Share.

## ARTICLE V

## TERM AND TERMINATION

V.1.   Term and Termination.  The term of this Agreement shall commence on the Effective Date and shall continue from and after the Effective Date until the later of (a) the conclusion of the Project and (b) the date of execution of the Commercial Agreement between the parties, unless earlier terminated in accordance herewith.

V.2.   Termination by the Company.  The Company may terminate this Agreement at any time by giving notice to Ripple if:

(a)         Ripple is (i) unable to perform any material portion of its obligations under this Agreement due to a Force Majeure Event and (ii) unable to resume its performance of such obligations within sixty (60) calendar days of such Force Majeure Event;

(b)         as a result of (i) the adoption of, or any change in, Applicable Law, (ii) the promulgation, or any change in the interpretation, by any Governmental Authority of any Applicable Law, or the scope of any license or permission thereunder, or (iii) any other order or determination by a

6

Governmental Authority, in each case made after the Effective Date, it becomes, or any determination is made by a Governmental Authority after the Effective Date that it would be, unlawful for the Company to conduct the Project and/or perform its obligations contemplated by this Agreement (each, an "Illegality"), and such Illegality is not mitigable through commercially reasonable steps;

(c)             the Project is terminated for any reason; or

(d)             Ripple is in material breach of this Agreement and such breach has not been cured by Ripple within ten (10) calendar days following receipt by Ripple of written notice of such breach.

V.3.   Termination by Ripple.  Ripple may terminate this Agreement at any time by giving notice to the Company if:

(a)             the Company is (i) unable to perform any material portion of its obligations under this Agreement due to a Force Majeure Event and (ii) unable to resume its performance of such obligations within sixty (60) calendar days of such Force Majeure Event; or

(b)             the Company is in material breach of this Agreement and such breach has not been cured by the Company within ten (10) calendar days following receipt by the Company of written notice of such breach.

V.4.   Survival.  From and after the Effective Date, any provisions of this Agreement that are stated to, or which by their terms or nature would be expected to, survive any expiration or termination of this Agreement shall continue in full force and effect following such termination or expiration. ▮

V.5.   Effects of Termination.  On the termination of this Agreement, for any reason, each party shall (and, where applicable, shall ensure that its respective Affiliates and sublicensees shall) (a) in the case of the Company and its sublicensees, immediately cease the Use of the Ripple Technology and any and all licenses granted by Ripple under this Agreement shall end, and (b) promptly, at its option, use commercially reasonable efforts to return to the other party or destroy all tangible copies of all materials containing the other party's Confidential Information and, in each case, delete all such Confidential Information in electronic form; provided, however, that a party shall be permitted to retain (i) electronic backup and archival copies made in the ordinary course of business and (ii) one copy of any portion of such materials with its internal legal counsel.  Any Confidential Information so retained shall remain subject to the terms of this Agreement.

## ARTICLE VI

## CONFIDENTIALITY

VI.1.   Non-Disclosure.  Each party hereto shall not disclose or make publicly available, and shall cause its respective Representatives to not disclose or make publicly available, any Confidential Information of the other party hereto or any of its Affiliates.  In any case, the receiving party shall exercise at least the same standard of care to protect such Confidential Information from unauthorized disclosure as it uses to protect its own proprietary information and data of a similar nature, which in no event shall be less than reasonable care.  For the sake of clarity, each party hereto may disclose Confidential Information to its respective Affiliates, provided that such party shall ensure that such Affiliates keep such Confidential Information confidential in accordance with the provisions of this Agreement.

VI.2.   Exceptions from Confidentiality.  Notwithstanding the foregoing, a recipient may disclose Confidential Information to third parties if and to the extent that (a) such Confidential Information is required to be filed with or disclosed to any Governmental Authority, (b) it is requested to do so by any Governmental Authority having regulatory authority over such recipient (or its Affiliates), (c) the recipient determines in its sole discretion that it is necessary or appropriate to provide such Confidential

CONFIDENTIAL

RPLI_SEC 0609236

Information to a Governmental Authority, or (d) disclosure of such Confidential Information is otherwise required by Applicable Law; provided, in each case, that the recipient shall have, where applicable, taken such reasonable steps to protect the confidentiality of such information as the recipient takes with respect to the protection of its own comparable confidential information in such circumstances; and provided, further, that, the recipient shall, to the extent practicable and permitted by Applicable Law, (x) notify the disclosing party in advance of any disclosure of such Confidential Information to a Governmental Authority and (y) provide the disclosing party with a reasonable opportunity to seek an appropriate protective order or other reliable assurances that confidential treatment shall be afforded to such Confidential Information.

6.3    Equitable Relief. Each party acknowledges that money damages may not be adequate in the event of an actual or threatened breach of this Article VI and that in such event the other party shall be entitled to seek injunctive or similar equitable relief, in addition to any and all other remedies available at law or in equity.

## ARTICLE VII

## REPRESENTATIONS AND WARRANTIES

VII.1.    General Representations and Warranties. Each party hereby represents and warrants to the other party, as of the Effective Date, that:

(a)            Such party is duly organized and validly existing under the laws of its jurisdiction of incorporation or organization, and in good standing in each jurisdiction necessary or applicable for the performance of its obligations under this Agreement, except where the failure to so be in good standing would not have a material adverse effect on its ability to perform its obligations under this Agreement.

(b)            The execution, delivery and performance of this Agreement by such party have been duly approved and authorized by all necessary action. This Agreement constitutes the legal, valid and binding obligation of such party, enforceable against such party in accordance with its terms.

(c)            The execution, delivery and performance of this Agreement by such party shall not (i) conflict with, violate or result in any breach of any of the terms and provisions of, or constitute a default under, any material agreement, arrangement, or other instrument to which such party is a party or by which it or any of its properties are bound, (ii) violate any organizational document of such party, (iii) require any consent of approval under any judgment, order, decree, permit or license to which such party is a party or by which its assets are bound, or (iv) require the consent or approval of any other party.

VII.2.    Representations Regarding the Ripple Technology. Ripple hereby represents and warrants to the Company, as of the Effective Date and throughout the term of this Agreement, that:

(a)            Ripple is the sole legal and beneficial owner of all right, title and interest in, or has all necessary rights to license or sublicense hereunder, as applicable, the Ripple Technology.

(b)            To the best of Ripple's knowledge, the Use of the Ripple Technology in accordance with this Agreement shall not breach, violate, infringe or constitute misappropriation of any Intellectual Property or other proprietary right or interest of any other Person at any time.

(c)            If Ripple learns of any such breach, violation, infringement or misappropriation, Ripple shall promptly notify the Company thereof.

(d)            The Ripple Technology does not contain (i) any virus, worm, Trojan horse or other harmful or malicious code or components, and (ii) is free from any "self-help" code and other disabling code.

8

(e) Ripple shall comply with all Applicable Laws when offering its Technology to the Company and the Participating Members.

7.3    The Company's Representations.  The Company hereby represents and warrants to the Company that, as of the Effective Date and throughout the term of this Agreement, that:

(a) it shall comply with all Applicable Laws as they relate to the access and use of Ripple Connect and any other Ripple Technology, products and services.

7.4    Disclaimer. EXCEPT FOR THE WARRANTIES THAT ARE EXPRESSLY SET FORTH IN THIS ARTICLE VII, EACH PARTY, TO THE MAXIMUM EXTENT PERMISSIBLE BY LAW, EXPRESSLY DISCLAIMS ALL OTHER WARRANTIES, WHETHER EXPRESS, IMPLIED, STATUTORY, ORAL OR WRITTEN, OR OTHERWISE, INCLUDING BUT NOT LIMITED TO IMPLIED WARRANTIES OF MERCHANTABILITY, QUALITY, FITNESS FOR A PARTICULAR PURPOSE AND WARRANTIES ARISING FROM A COURSE OF DEALING, USAGE OR TRADE PRACTICE.

## ARTICLE VIII

## INDEMNIFICATION AND LIMITATIONS ON LIABILITY

VIII. 1.  Indemnification by Ripple.

(a)            Ripple shall, to the maximum extent permitted under Applicable Law, indemnify, defend and hold harmless each of the Company, each Participating Member, their respective Affiliates and/or each of their respective Representatives, as applicable, for any and all Losses in respect of, arising from, or asserted in, any demand, or any civil, criminal, administrative, or investigative claim or proceeding commenced or threatened by any third party (a "Third Party Claim") (i) arising or resulting from the gross negligence or willful misconduct of Ripple (including any of its Affiliates or subcontractors), (ii) alleging that the Ripple Technology violates, misappropriates or infringes upon any Intellectual Property or other proprietary right of any third party; or a violation of Applicable Law.  In the defense or settlement of or in order to mitigate any Third Party Claim relating to breach, violation, infringement or misappropriation of Intellectual Property or other proprietary right, Ripple may, in its reasonable judgment and at its option and expense, (1) obtain, for the Company and its permitted sublicensees, the right to continue using the infringing item, (2) replace the applicable portion of the Ripple Technology with equivalent Intellectual Property or modify the applicable portion of the Ripple Technology to make it non-infringing or free of the claimed breach, violation or misappropriation or (3) in the event that the taking of actions set forth in clauses (1) and (2) above is not commercially reasonable, terminate the license to the Ripple Technology and, if applicable, refund all payments made by the Company with respect thereto.

(b)            Notwithstanding anything to the contrary herein, Ripple shall have no liability in connection with any claim related to breach, violation, infringement or misappropriation of Intellectual Property or other proprietary right of any third party to the extent such alleged breach, violation, infringement or misappropriation or the Losses resulting therefrom are based on (i) any Adaptation and Modification of the Ripple Technology by any Person other than Ripple or an Affiliate thereof, unless performed at the direction, or with the written consent, of Ripple (and, where applicable, in accordance with Ripple's instructions), (ii) the Use and/or Adaptation and Modification of the Ripple Technology in combination with other Intellectual Property not provided or approved in writing by Ripple or any of its Affiliates, (iii) any Intellectual Property of any third party that is licensed or provided to the Company or any of its sublicensees and/or (iv) Use and/or Adaptation and Modification of other than the most current version of the Ripple Technology provided to the Company hereunder, if the user was aware that Use and/or Adaptation and Modification of the most current version would have avoided the claimed breach, violation, misappropriation or infringement.

9

RPLI_SEC 0609238

VIII.2.  <u>Indemnification by the Company.</u>  The Company shall, to the maximum extent permitted under Applicable Law, indemnify, defend and hold harmless each of Ripple, its Affiliates and/or each of their respective Representatives, as applicable, for any and all Losses in respect of, arising from, or asserted in, any Third Party Claim (i) arising or resulting from the gross negligence or willful misconduct of the Company (including any of its Affiliates or permitted sublicensees); or (b) a violation by the Company of Applicable Law.

VIII.3.  <u>Limitation on Damages.</u>  EXCEPT IN CONNECTION WITH A THIRD PARTY CLAIM THAT IS INDEMNIFIED UNDER THE INDEMNIFICATION PROVISIONS SET FORTH IN <u>SECTION 8.1</u> OR <u>8.2</u>, AS APPLICABLE, A BREACH OF ANY PARTY'S CONFIDENTIALITY OBLIGATIONS UNDER <u>ARTICLE VI</u>, OR A PARTY'S BREACH, VIOLATION, INFRINGEMENT OR MISAPPROPRIATION OF ANOTHER PARTY'S INTELLECTUAL PROPERTY OR OTHER PROPRIETARY RIGHT, NO PARTY SHALL BE LIABLE FOR ANY SPECIAL, INDIRECT, EXEMPLARY, INCIDENTAL, PUNITIVE OR CONSEQUENTIAL DAMAGES (INCLUDING ANY DAMAGES FOR LOSS OF PROFITS, LOSS OF GOODWILL, LOSS OF OPPORTUNITY, LOSS OF USE OR LOSS OF BUSINESS EXPECTATIONS), RELATING TO OR ARISING IN ANY MANNER OUT OF THIS AGREEMENT OR THE PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT, EVEN IF SUCH PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH DAMAGES AND REGARDLESS OF WHETHER SUCH DAMAGES COULD HAVE BEEN FORESEEN OR PREVENTED; <u>PROVIDED</u>, THAT THE LIABILITY OF A PARTY FOR FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT SHALL NOT BE LIMITED BY THE PROVISIONS OF THIS <u>SECTION 8.3</u>.

VIII.4.  <u>Limitation on Recovery.</u>  EXCEPT IN CONNECTION WITH A THIRD PARTY CLAIM THAT IS INDEMNIFIED UNDER THE INDEMNIFICATION PROVISIONS SET FORTH IN <u>SECTION 8.1</u> OR <u>8.2</u>, AS APPLICABLE, A BREACH OF ANY PARTY'S CONFIDENTIALITY OBLIGATIONS UNDER <u>ARTICLE VI</u>, OR A PARTY'S BREACH, VIOLATION, INFRINGEMENT OR MISAPPROPRIATION OF ANOTHER PARTY'S INTELLECTUAL PROPERTY OR OTHER PROPRIETARY RIGHT, IN NO EVENT SHALL THE LIABILITY OF A PARTY ARISING OUT OF ALL CLAIMS (WHETHER ARISING IN CONTRACT, TORT (INCLUDING NEGLIGENCE), STRICT LIABILITY, STATUTORY OR OTHERWISE) RELATING TO OR ARISING IN ANY MANNER OUT OF THIS AGREEMENT, OR THE PERFORMANCE OR NON-PERFORMANCE OF THIS AGREEMENT, TOGETHER, EXCEED IN THE AGGREGATE AN AMOUNT EQUAL TO ████; <u>PROVIDED</u> THAT THE LIABILITY OF A PARTY SHALL NOT BE LIMITED BY THE PROVISIONS OF THIS <u>SECTION 8.4</u> IN THE CASE OF FRAUD, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT.

## ARTICLE IX

### MISCELLANEOUS

IX.1.  <u>Force Majeure.</u>  Neither party shall be considered to be in default of any of its representations and warranties under this Agreement as a result of a Force Majeure Event, or in breach of its obligations under this Agreement to the extent that performance of such obligations is prevented by any Force Majeure Event; provided, that the Force Majeure Event was not caused by the negligence of the party whose performance is adversely affected, or by the negligence of its Affiliate or Representative, that notice of such Force Majeure Event is given in accordance with the provisions of <u>Section 9.4</u> and that the party whose performance is adversely affected uses commercially reasonable efforts to promptly overcome or mitigate the effects of such Force Majeure Event.  Upon the occurrence of a Force Majeure Event, the parties shall consult in good faith with respect to any commercially reasonable measures that may be taken in order to mitigate the impact of such Force Majeure Event.  The party whose performance is adversely affected by a Force Majeure Event shall give the other parties prompt written notice of the Force Majeure Event's cessation or abatement.

10

RPLI_SEC 0609239

IX.2.   <u>Governing Law; WAIVER OF JURY TRIAL; Dispute Resolution.</u> This Agreement and all matters or disputes arising out of or in connection with this Agreement shall be governed by, construed under and enforced in accordance with the laws of the State of New York applicable to contracts to be performed wholly within such state. **THE PARTIES HERETO HEREBY IRREVOCABLY WAIVE ALL RIGHT TO TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM (WHETHER BASED ON CONTRACT, TORT OR OTHERWISE) ARISING OUT OF OR RELATING TO THIS AGREEMENT.**

IX.3.   <u>Further Assurances.</u> The parties shall furnish upon request to each other further information, execute and deliver to each other documents, and do other acts and things, all as another party may reasonably request for the purpose of giving effect to the intent or express terms of this Agreement and the documents referred to in this Agreement; provided, that no party shall be obligated to incur any material liability, expense or obligation pursuant to this <u>Section 7.3</u> without its consent.

IX.4.   <u>Notices.</u> All notices and other communications pertaining to this Agreement shall be in writing and may be given in any manner described below to the address set out below, and shall be deemed effective as follows: (a) if delivered personally to the Person designated below, (b) when the same is actually received, if sent by express overnight courier service, with charges prepaid and return receipt requested, or (c) if sent by email, with receipt confirmed (i) at or prior to 5:00 pm local time of the recipient on a Business Day, on that Business Day or (ii) later than 5:00 pm local time of the recipient, on the next succeeding Business Day.

The initial addresses and contact details of the parties are as follows:

To the Company:



Attention: ████
Email: ████

To Ripple:
Ripple Labs, Inc.
300 Montgomery St, Floor 12
San Francisco, CA 94104
United States of America
Attention: Chris Larsen
Email: ███@ripple.com

Any party may change its address or contact details from time to time by giving notice to the other party in writing of such change.

IX.5.   <u>Relationship of the Parties.</u> This Agreement shall not be deemed to establish a joint venture, partnership, association or fiduciary or similar relationship between the parties. Nothing herein contained shall be construed as authorizing any party to act as general agent or to negotiate or conclude any contract (or similar instrument) in the name of or on behalf of the other party.

IX.6.   <u>Entire Agreement; Amendments and Waivers.</u> This Agreement constitutes the entire agreement between the parties with respect to the matters contemplated hereby and supersedes all prior and contemporaneous oral or written agreements or understandings of the parties relating thereto. The provisions of this Agreement may not be amended, modified or supplemented, and waivers or consents to departures from the provisions of this Agreement may not be given without the written consent of each party hereto. No consent or waiver, express or implied, by a party hereto of his or its obligations under this Agreement shall constitute a consent to or waiver of any similar breach or default by any other party. Failure by a party hereto to complain of any act or omission to act by any other party, or to declare such other party in default shall not constitute a waiver by such party of its rights under this Agreement.

IX.7.   <u>Assignments, Successors.</u> The provisions of this Agreement shall be binding upon and inure to the benefit of the parties and their successors and permitted assigns. Except as expressly permitted hereunder, neither party may or shall assign this Agreement or any of its respective rights or obligations hereunder without the prior written consent (which consent shall not be unreasonably withheld) of the

11

RPLI_SEC 0609240

other party hereto; provided that either party may assign this Agreement, upon notice to the other party but without the consent of the other party, to an Affiliate of such party or to a Person that acquires all or substantially all of the assets or operations of such party; provided, that such Affiliate or Person acknowledges and assumes in writing all responsibilities under this Agreement of the assigning party. Any purported assignment or delegation made in violation of this Section 9.7 shall be null and void *ab initio*.

IX.8.    Third Party Rights.  Except for the rights of the indemnified parties pursuant to Section 8.1 or Section 8.2, as applicable, the parties do not intend that any term of this Agreement shall be enforceable by any Person who is not a party to this Agreement, including the Participating Members. Notwithstanding the foregoing, the parties entitled to indemnification pursuant to Article VIII shall be third party beneficiaries of such Article VIII.

IX.9.    Severability.  If one or more provisions of this Agreement are held by a court of component jurisdiction to be unenforceable under applicable law, portions of such provisions, or such provisions in their entirety, to the extent necessary and permitted by applicable law, shall be severed herefrom, and the balance of this Agreement shall be enforceable in accordance with its terms.  In the circumstances referred to in this Section 9.9, the parties shall use reasonable efforts to negotiate in good faith to substitute any invalid, illegal or unenforceable provision with a valid, legal or enforceable provision which achieves to the greatest extent enforceable the original intent (and commercial position) of the parties as would have been achieved by the original provision.

IX.10.    Remedies Cumulative.  All rights, powers and remedies provided under this Agreement or otherwise available in respect hereof or thereof at law or in equity shall be cumulative and not alternative, and the exercise or beginning of the exercise of any thereof by a party shall not preclude the simultaneous or later exercise of any other such right, power or remedy by such party.

IX.11.    Counterparts.  This Agreement may be executed in one or more counterparts, each of which shall be deemed to be an original copy of this Agreement and all of which, when taken together, shall be deemed to constitute one and the same agreement.

IX.12.    Public Disclosures; Use of Names and Marks.

(a)            No party hereto shall, and each party shall cause its Affiliates not to, make, issue or cause the publication of any press release or other public announcement with respect to this Agreement or the transactions contemplated hereunder, or use the name of such other party, or any of its respective Affiliates, or the name of any member, stockholder, partner, manager or employee of such other party, or any of its respective Affiliates, or any trade name, trademark, trade device, logo, service mark, symbol or any abbreviation, contraction or simulation thereof owned or used by such other party, or any of its respective Affiliates, in any such press release or other public announcement, other than with the prior written consent of the other party hereto in each case.  In no event shall either party issue a press release or make any other public statements regarding the Project prior to the earlier of (1) the date that the Project Report is released to the Participating Members or (2) twenty (20) days after the Project has been completed in every respect except for the release of the Project Report (in either case, the "Project Completion Date").  Thereafter, the parties shall consider the issuance of a joint press release concerning the Project, provided that neither party shall be under any obligation to do so.  In no case shall either party issue a press release relating to the Project without the other party's prior written approval, which shall not be unreasonably withheld or conditioned.  A party's use of the other party's marks must comply with that party's branding terms and guidelines (in Ripple's case as may be posted on www.ripple.com) and all legal requirements applicable to such use.  For avoidance of doubt, a party's use of the other party's marks is to accrue to the benefit of the mark's owner.

(b)            In addition, each party shall not, and shall ensure that its Affiliates, and their respective Representatives do not, without the prior written consent of the other party in each instance, (i)

12

use in advertising, publicity or otherwise the name of the other party, or any of its respective Affiliates, or the name of any member, stockholder, partner, manager or employee of such party or any of its respective Affiliates, or any trade name, trademark, trade device, logo, service mark, symbol or any abbreviation, contraction or simulation thereof owned or used by the other party or any of its respective Affiliates, or (ii) represent, directly or indirectly, that any service provided by such party has been approved, endorsed, recommended or provided by, or in association with, the other party, or any of its Affiliates.

[Signature Pages Follow]

13

CONFIDENTIAL

RPLI_SEC 0609242

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed by their duly authorized representatives as of the date first above written.

By:

Name:

Title:   Managing Member


**[RIPPLE LABS, INC.]**

By:

Name:  Patrick Griffin

Title:  EVP, Business Development

14

CONFIDENTIAL

## EXHIBIT A

## DEFINED TERMS

"Adaptations and Modifications" means, with respect to any Intellectual Property, all derivative works thereof, developments therefrom or improvements or enhancements thereto. The term "Adapt and Modify" shall have a correlative meaning.

"Affiliate" means, with respect to any Person, any other Person directly or indirectly Controlling or Controlled by, or under direct or indirect common Control with, such Person. The term "Affiliated" shall have a correlative meaning.

"Applicable Law" means, with respect to any Person any and all (a) federal, territorial, state, local and foreign laws, ordinances, or regulations, (b) codes, standards, rules, requirements, orders and criteria issued under any federal, territorial, state, local or foreign laws, ordinances or regulations, (c) rules of an SRO (including the rules of any national securities exchange or foreign equivalent) and (d) any and all judgments, orders, writs, directives, authorizations, rulings, decisions, injunctions, decrees, assessments, settlement agreements, or awards of any governmental, judicial, legislative, executive, administrative or regulatory authority of the United States of America, or of any state, local, foreign, or multinational government, or any government of any possession or territory of the United States of America, or any subdivision, agency, commission, office or authority of any of the foregoing, in each case (a)-(d) applicable to such Person or its business or properties.

"Business Day" means any day except (a) a Saturday or a Sunday or (b) any other day on which commercial banking institutions in the State of New York are authorized or directed by Applicable Law to close.

"Confidential Information" means all non-public records, books, contracts, reports, instruments, computer data and other data and information of or concerning a party (the "disclosing party") furnished or made available to another party (the "receiving party") by, on behalf of, a disclosing party or its Representatives in connection with the Project, except to the extent that the same can be shown to have been (a) previously known by the receiving party on a non-confidential basis, (b) available to the receiving party on a non-confidential basis from a source other than the disclosing party or its Representatives without such source being in violation of any obligation to the disclosing party or its Representatives, (c) in the public domain through no fault of the receiving party or (d) later lawfully acquired by the receiving party from sources other than the disclosing party or its Representatives. In the case of the Company, Confidential Information includes such information provided by Project Participants and other permitted sublicensees of the Company.

"Control" means (a) the ownership, directly or indirectly, of fifty percent (50%) or more of the voting equity share capital of a specific Person or (b) the possession, directly or indirectly, of the power to direct or cause the direction of the management or policies of a Person, whether through the ownership of voting securities or general partnership or managing member interests, by contract or otherwise. "Controlling" and "Controlled" shall have correlative meanings. Without limiting the generality of the foregoing, a Person shall be deemed to Control any other Person of which it owns, directly or indirectly, a majority of the ownership or voting interests.

"Force Majeure Event" means any action, event or occurrence outside the reasonable control of the party in question, including riot, strike, other labor dispute, insurrection, terrorism,

RPLI_SEC 0609244

fire, severe weather, other act of God, shortages of materials, rationing, internet failure or other delay in receiving data, explosion, war, acts of public enemies, blockade, embargo, power failure or action of any Governmental Authority (other than any action of a Governmental Authority directed specifically to the affected party).

"Governmental Authority" means any nation or government, any state or other political subdivision thereof, and any supra-national, governmental, federal, state, provincial, local governmental or municipal entity or authority and any SRO or other self-regulatory or quasi-governmental organization exercising executive, legislative, judicial, regulatory or administrative functions or pertaining to government (including, in each case, any branch, department or official thereof).

"Intellectual Property" means any intellectual property or similar proprietary rights in any jurisdiction, whether registered or unregistered, including such rights in and to: (a) trademarks and pending trademark applications, trade dress, service marks, certification marks, logos, domain names, uniform resource locators, trade names and fictional business names, together with all translations, adaptations, derivations and combinations and like intellectual property rights, together with all goodwill associated with the foregoing, (b) issued patents and pending patent applications, and any and all divisions, continuations, continuations-in-part, reissues, renewals, provisionals, continuing patent applications, reexaminations, and extensions thereof, any counterparts claiming priority therefrom, utility models, patents of importation/confirmation, certificates of invention, certificates of registration and like rights, inventions, invention disclosures, discoveries and improvements, whether or not patentable, (c) works of authorship, all copyrightable works (including Software) and all copyrights including all applications, registrations and renewals thereof, and all rights corresponding thereto, (d) trade secrets (including those trade secrets defined in the Uniform Trade Secrets Act promulgated by the National Conference of Commissioners on Uniform State Laws in 1979, as amended and under corresponding foreign statutory and common law), business, technical and know-how information, non-public information, and confidential information and rights to limit the use or disclosure thereof by any Person, (e) mask works and (f) moral rights.

"Losses" means any and all losses, penalties, fines, costs, damages (and any interest due thereon), liabilities, amounts paid in settlements and offsets and any reasonable out-of-pocket costs, expenses and attorneys' fees, including any of the foregoing incurred in connection with the investigation, response to and defense or settlement of a claim against or in respect of which indemnification is provided hereunder (including any such reasonable costs, expenses and attorneys' fees incurred in enforcing a party's right to indemnification against or with respect to any appeal) and penalties and interest.

"New Release" shall mean an Adaptation or Modification to or new version of the Ripple Technology, or any portion thereof, that Ripple makes available to its customers or other third parties, other than customized Adaptations and Modifications or new versions developed specifically for a single customer or other third party.

"Patches" means all Adaptations and Modifications to the Ripple Technology intended to correct bugs, problems or errors, or to remove or protect against viruses or other harmful or malicious code, including bug fixes, patches, hot fixes, and other revisions.

"Person" means a natural person, partnership, domestic or foreign limited partnership, domestic or foreign limited liability company, trust, estate, association, corporation, or any other legal entity, or Governmental Authority.

"Representatives" means, with respect to any party, its Affiliates, and its and their respective managers, members, officers, directors, employees, stockholders, financial advisors, legal counsel, representatives and/or agents.

"Software" means computer programs and software, including data files, source code, object code, application programming interfaces, architecture, documentation, files, records, schematics, emulation and simulation reports, test vectors and hardware development tools.

"SRO" means a self-regulatory organization with the meaning of the U.S. Securities Exchange Act of 1934 and any equivalent foreign statute.

"Third Party Software" shall mean any Software that is not solely owned by the Company or licensed to the Company pursuant hereto.

"Use" means, with respect to any item of Intellectual Property, the right to access, use, import, run, copy, execute, perform and display such item of Intellectual Property or, where applicable, any part of its functionality.

CONFIDENTIAL

CONFIDENTIAL

RPLI_SEC 0609247

**EXHIBIT B**

**THE PROJECT PLAN ('Project Specifications' or 'Experiment Design Document')**

## 1    Background

The objective of this project is to explore the potential of digital assets and shared ledger technology in executing customer money movements (as opposed to only moving cash in support of other assets on a ledger).

The focus will be on interbank settlement & investigating the potential to rationalize and retire the use of current Nostro accounts for local currency payouts. The initial trial will introduce a native digital asset (XRP) as a means for low-friction cross border settlement. The aim is to demonstrate where the current overheads involved in Nostro accounting can potentially be reduced. The value proposition from a Ripple perspective is to demonstrate how Ripple technology and XRP can collectively enable both cost-cutting opportunities (liquidity efficiencies and Nostro consolidation) as well as revenue opportunities (new product offerings such as low-value P2P/B2B and new corridors).

## 2    Goals/Success

- To demonstrate value moving via a shared ledger across borders
- Connects to real-world bank GLs and/or is demand-convertible to cash off-chain.
- In real time, banks assuming various roles will exchange XRP & transfer cross border
- █ operates Azure node running Rippled
- XRP can then be sold for fiat currency i.e. demand convertible to cash off-chain.
- Explore pros and cons of different funding models
- Connect to Ripple platform by API to support bank platform independence.

## 3    Scope

### 3.1    In-Scope

- For this stage of the exercise, a small group of banks is appropriate
- █ will send initial communication to member banks who expressed interest in the project in order to establish a firm commitment for bank resources to participate.
- Ripple platform to be trialed within the █ Microsoft Azure environment initially
- Banks will hold a specified quantity of XRP
- Exchange of XRP between member banks in a direct, atomic transaction.
- Implementation of following Ripple components:
  a. Ripple Connect: messaging and synchronization of settlement for banks. Additional benefits from real-time liquidity management and reconciliation.
  b. Ripple Admin Console: locally installed software with a graphical user interface

RPLI_SEC 0609248

that allows banks to interface with the Ripple network in the most simplified manner.
c. XRP on the Ripple Consensus Ledger (RCL): digital asset that enables Nostro consolidation and efficient liquidity networks with greater reach.
d. Ripple Charts: browser-based network viewing and monitoring tool.
e. Rippled server: Follows the RCL and keeps a copy of the ledger.
f. Validator: A rippled server configured to run the consensus process and validate transactions.
- Legal & Regulatory issues to be explored

## 3.2   Out-of-Scope

- Trading use cases which are not settled in cash (e.g., title change)
- Nostro accounts held by banks funded with XRP
- Existing authoritative actors (central banks, exchanges, etc.) will not validate or endorse our model
- ■ will aim to work with these authorities eventually and will share our findings if relevant
- New standards in asset issuance or programmable money more broadly will not be explored at length; this is an exercise in value transfer
- Out-of-scope business considerations (supported by Ripple technology):

  o Hedging:
    - The proposition to use XRP as a bridging asset requires the holding of quantities of XRP as an asset. In production, this will result in exposure to price/value volatility, which needs to be managed.
    - As XRP is being granted for the purposes of this project, banks will not realize any profit or loss from XRP volatility during the project.
    - This summer, Ripple and Crypto Facilities will be bringing an XRP future to market. This will allow institutions that custody XRP to hedge their exposure, thereby protecting institutions from XRP volatility.

  o Wholesale transaction sizes
    - The amount of XRP granted to banks for this project will be around ■ USD at market rate. Based on the application of market rates, this will limit the size of the payments processed.
    - The purpose of the project is to prove out the value proposition before implementing the technology for wholesale transactions. However, the amount of XRP granted to the banks is not permissive for wholesale transaction sizes.
    - Ripple's technology is capable of supporting wholesale transactions. Ripple is exploring a partnership with ■ around wholesale XRP transactions.

  o Alternative diverse liquidity arrangements

- Ripple technology supports multiple, diverse liquidity arrangements. XRP bridging is one example of such arrangements.
- Alternative liquidity arrangements include direct fiat currency liquidity providers, net deferred fiat currency positions and multi-hop atomic payments (using a combination of liquidity arrangements in a real-time atomic settlement capability).
- Liquidity arrangements outside XRP markets/bridging will not be explored in the project.

### 3.3    Requirements for experiment

### 3.3.1   Components
- Azure nodes set up by ██
- GUI (Ripple Admin Console) to facilitate end user transfer of XRP
- XRP: digital asset that enables nostro consolidation, exists on the Ripple Consensus Ledger
- Ripple Connect: messaging and settlement synchronization for banks
- Rippled server: keeps copy of ledger
- Validator: runs consensus process & validates transactions

### 3.3.2   Project Phases

| Phase | Implementation | Goal | Software Solution | Time Needed | Delivery Date | Success Criteria |
|---|---|---|---|---|---|---|
| 1<br><br>(Demo) | Enable banks to settle transactions on Ripple with each other using XRP to create markets from cash balances | Prove the viability of Ripple technology for efficient, distributed processing and XRP for nostro consolidation | Downloadable Ripple Admin Console (RAC) for each bank; Ripple Charts browser GUI to view balances; 1 rippled in Azure for ██ | 2 days per bank | | Members able to connect to Ripple, send transactions from **XRP-XRP** and fiat-**XRP-fiat**(using only 'X' fiat-XRP markets) |
| 2 | Provide member banks with an | Prove the viability of | Browser-accessible | 3 days per | | Members able to send |

RPLI_SEC 0609250

| (Demo) | additional hosted Ripple Connect instance accessible via browser (fiat payments and messaging)<br><br>Keep Phase 1 running | Ripple technology for efficient, distributed enterprise-grade processing and payment messaging | Ripple Connect | bank | | transactions from **fiat-fiat and fiat-XRP-fiat** with messaging information |
|---|---|---|---|---|---|---|

### 3.3.3   Example End-state Scenario: Company A, a client of a USA bank wants to make a supply chain payment of THB 7,000 to Company B, a client of a Thai bank.

#### 3.3.3.1   Actors

| Actor | Role |
|---|---|
| Bank A USA | XRP holder; Liquidity provider of XRP against USD |
| Bank B Thailand | Receiver of XRP from Bank A; Liquidity provider of THB against XRP |



*Direct settlement through XRP*

#### 3.3.3.2   Assumptions

- All actors are identified and authorized to move assets/funds as directed per instructions
- XRP is a native asset on the RCL and settled off ledger in fiat currency
- Bank A has XRP funds available to send to Bank B and provides a conversion quote of USD to XRP

RPLI_SEC 0609251

- Bank B provides a conversion quote of XRP to THB
- Bank A and Bank B have access to the Ripple network (via the Ripple Admin Console or Ripple Connect)

### 3.3.4    Trade Terms

| XRP sent from Bank A to Bank B | |
|---|---|
| XRP Amount Required | ~32,000 XRP |

#### 3.3.4.1    Step-by-Step

| Step | Command | Actor | Date |
|---|---|---|---|
| 1 | Bank A's USA customer requests to send 7,000 THB to their Thai supplier. | Bank A | |
| 2 | Bank A USA accesses Ripple GUI and checks XRP available. Bank A confirms XRP available in wallet. | Bank A | |
| 3 | Bank A creates quote (for sending customer) from USD to XRP at market rate. | Bank A | |
| 4 | Bank A sends 32,000 XRP (converted from USD at market rate) to Bank B. | Bank A | |
| 5 | Bank B, meanwhile, creates a quote (for the receiving Thai customer) from XRP to THB at market rate. | Bank B | |
| 6 | Bank B confirms receipt of 32,000 XRP (converted to THB at market rate). 7,000 THB delivered to beneficiary customer. | Bank B | |

## 4    Resourcing and Contributions

### 4.1    Bank Contributions

- For phase 1 and 2, the demo requires each bank member to nominate 1 technical resource with sufficient technical know-how and accessibility required to complete the project as designed as well as 1 business resource to assess the value of the proposal and outcomes.

## 1.1    Ripple and ■ resourcing

| Ripple | ■ |
|---|---|
| • Project management, delivery support, and client solutions support directly with bank technical and business teams until 8/15/16 (can agree to extend) <br><br> • Delivery of specified software <br><br> • Evaluate public announcement of pilot/demo after both Phase 1 and 2 | • Project oversight and coordination <br><br> • Participant and market feedback <br><br> • Evaluate public announcement of pilot/demo after both Phase 1 and 2 |

# 5   Key Stakeholders

| | Institution | Name |
|---|---|---|
| Sponsor | ■ | ■ |
| Manager | ■ | ■ |
| Manager | Ripple | ■ |
| Member Bank | TBD | TBD |
| Sponsor | Ripple | Patrick Griffin |

CONFIDENTIAL

**THE PROJECT PLAN ('Project Timetable' snapshot as of 7/13/16)**

| ID | Task Name | Star |
|----|-----------|------|
| ID1 | Xenon Ripple Deep Dive Project Plan ACTIVE | 03/2 |
| ID2 | Project Deliverables | 03/2; |
| ID3 | Bank Members Confirmed | 03/2; |
| ID18 | Proposal | 04/0 |
| ID24 | Wiki | 05/3 |
| ID31 | Resources | 06/0; |
| ID33 | ■ Microsoft Azure Environment | 05/16 |
| ID41 | Governance Documents | 04/25 |
| ID28 | Communication Plan | 03/2; |
| ID29 | Conference Call 1 with Member Banks | 03/2; |
| ID147 | Send communication on Project Phases and Paperwork | 06/1; |
| ID30 | Schedule Conference Call 2 with Member Banks | 06/20 |
| ID139 | Send Ripple Technology Documents to Member Banks | 06/2; |
| ID128 | Technical & Business Solutions Documents | 06/2; |
| ID148 | Sent Ripple KYC and XRP Documents to Member Banks | 06/2; |
| ID149 | Conference Call 2 with Australia Member Banks | 06/29 |
| ID176 | Conference Call 2 with US, CAD, European Member Banks | 07/1; |
| ID39 | Ripple Deliverables | 07/1; |
| ID58 | Phase 1 Ripple XRP | 07/1; |
| ID167 | Phase 2 Ripple Ripple Connect | 08/0; |
| ID69 | Closure | 08/18 |

CONFIDENTIAL

CONFIDENTIAL

RPLI_SEC 0609255

**EXHIBIT C**

### Grant of XRP to Project Xenon Participant

In light of your firm's agreement to participate in Project Xenon, Ripple Labs Inc. ("Ripple") hereby grants _____ █████ XRP.  At the conclusion of Project Xenon, you may keep this XRP, or you may return it to Ripple.

██████████████████████████████████████████████████████████

*EVP Business Development*
Title

_7/13/16_
Date

**EXHIBIT D**

CONFIDENTIAL

## RIPPLE TECHNOLOGY

1)      <u>Ripple Connect</u>

2)      Ripple Admin Console

3)      Browser-accessible Ripple Charts

RPLI_SEC 0609257

## EXHIBIT E

## BANKS IN RIPPLE PIPELINE



CONFIDENTIAL