# Exhibit 73

## DEVELOPMENT AND INTEGRATION AGREEMENT

This Development and Integration Agreement (this "***Agreement***") is made as of November 8, 2018 (the "***Effective Date***"), by and between ████████████, a Company organized under the laws of the Cayman Islands ("***Company***") with offices at ████████ ████████████████████ and Ripple Labs Inc., a Delaware corporation ("***Ripple***") with its principal office at 315 Montgomery, Second Floor, San Francisco, CA 94104 (each a "***Party***" and together, the "***Parties***").

### Recitals

**WHEREAS**, Company or its affiliate is developing fan experience social media-based games (each, a "***Company Game***") that will integrate with Company's crypto and non-fungible tokenized asset storage wallet ("***Company Wallet***") which will include exchange functionality ("***Company Exchange***", and together with Company Wallet, the "***Company MarketPlace***") and Company's game publishing platform (the "***Company Platform***"). These components collectively are referred to as the "***Company Components***";

**WHEREAS**, Ripple is interested in use cases for the cryptocurrency native to the XRP Ledger, XRP ("***XRP***"), the ████protocol for open hosting (████) and the Interledger protocol for the facilitation of payment interoperability ("***ILP***");

**WHEREAS**, the Parties desire to work together to integrate XRP, ████and ILP into the Company Components;

**WHEREAS**, Ripple desires to work with Company to promote ecosystem adoption of the XRP Ledger, XRP,████ and ILP by having Company integrate XRP, ████and ILP into the Company Components; and

**WHEREAS**, Company desires to offer such integrated Company Components to its users and third party game developers.

**NOW THEREFORE**, in consideration of the premises hereof and for other good and valuable consideration, the receipt and sufficiency of which are acknowledged by each Party, the Parties agree as follows:

1.    **PRODUCT COMMITMENTS.**

    **1.1    Company Development.** Company will use its best efforts to develop and integrate XRP, ████ and ILP into the Company Components (each, a "***Product Commitment***") as outlined in **Exhibit A** attached hereto.

    **1.2    Development Program.** Company's development efforts will be completed pursuant to a development program that will specify key deliverables and their target delivery dates (the "***Development Program***"), substantially as outlined in **Exhibit B** attached hereto. Company may update the Development Program during the Term, provided that any material amendment to the Development Program is subject to Ripple's prior written approval, such approval not to be unreasonably withheld or delayed.

**1.3     Product Offering**. Company shall offer the integrated Company Components to its users and third party game developers.

2.     **INTEGRATION GRANT; PAYMENTS.**

**2.1     Integration Grant**. In consideration for Company's development efforts under the Development Program and subject to this Agreement, Ripple will pay Company a total of up to US$██████ in XRP or United States Dollar ("*USD*") (the "*Integration Grant*"). Until Company has satisfactorily completed the Development Program, as determined by Ripple in its sole and reasonable discretion, the Integration Grant will only be used to fund Company's work to implement the Development Program. The Integration Grant will be earned in four tranches as follows (each, an "*Integration Grant Payment*"):

(a)     First tranche Integration Grant Payment of US$██████ in XRP upon Ripple's approval of the Development Program, such approval not to be unreasonably withheld or delayed, and such XRP amount to be calculated by Ripple pursuant to Section 2.9;

(b)     Second tranche Integration Grant Payment of US$██████ in XRP on the public launch date of the Company Wallet with the applicable Product Commitments for the Company Wallet listed in **Exhibit A** (the "*Company Wallet Launch Date*"), such XRP amount to be calculated by Ripple pursuant to Section 2.9;

(c)     Third tranche Integration Grant Payment of US$██████ in XRP on the public launch date of the Company Marketplace with the applicable Product Commitments for the Company Wallet and Company Exchange listed in **Exhibit A** (the "*Company Marketplace Launch Date*"), such XRP amount to be calculated by Ripple pursuant to Section 2.9; and

(d)     Fourth tranche Integration Grant Payment of US$██████ in on the public launch date of the first third party game on the Company Platform developed with the applicable Product Commitments for a third party game listed under Company Platform in **Exhibit A** (the "*Company Platform Game Launch Date*"), such XRP amount to be calculated by Ripple pursuant to Section 2.9.

**2.2     Forfeiture and Reimbursement of Integration Grant Payments**. Company's right to receive each Integration Grant Payment pursuant to Section 2.1 is subject to forfeiture as follows:

(a)     If the Company Wallet Launch Date does not occur within twelve (12) months of the Effective Date, then the second tranche Integration Grant Payment of US$██████ in XRP will be forfeited;

(b)     If the Company Marketplace Launch Date does not occur within eighteen (18) months of the Effective Date, then the third tranche Integration Grant Payment of US$██████ in XRP will be forfeited;

(c)     If the Company Platform Game Launch Date does not occur within twenty-four (24) months of the Effective Date, then the fourth tranche Integration Grant Payment of US$██████ in XRP will be forfeited; and

(d)    If none of the Company Wallet Launch Date, Company Marketplace Launch Date, and Company Platform Game Launch Date occur within twenty-four (24) months of the Effective Date, then Company will reimburse Ripple interest-free the first tranche Integration Grant Payment actually made of US$███████ in XRP, such XRP amount to be calculated by Ripple pursuant to Section 2.9.

2.3    **Tax Deductibility of Payments**. Ripple's obligation to make each Ripple Payment is conditioned upon Ripple determining that the entire amount of such Ripple Payment is deductible by Ripple in the same taxable year such Ripple Payment is paid by Ripple, for United States federal income tax and all applicable state and local income tax purposes (any such Ripple Payment being referred to as "**Tax Deductible**"). If Ripple determines in its reasonable discretion that any such Ripple Payment is not Tax Deductible, the Parties shall negotiate in good faith, for at least thirty (30) days, to modify this Agreement to structure the Ripple Payment such that it is Tax Deductible. If this Agreement is not so modified within such thirty (30) day period, Ripple may at its reasonable discretion continue to withhold such Ripple Payment, until such time that it determines in its reasonable discretion that such Ripple Payment is Tax Deductible, and Company is released from its obligations under the Development Program, with respect to any Product Commitments related to Integration Grant Payment amounts not yet paid, until such time that Ripple makes all payments that are due to Company, with no penalty or liability to Company. In case of any such delay, Company's time-based deadlines to receive Integration Grant Payments pursuant to Section 2.2 will be extended accordingly to account for the time lapsed during any such delay.

2.4    **Milestone Payments**. As the Company Components are increasingly adopted, in consideration of this growth, Ripple will pay Company amounts in XRP, based on the achievement of certain thresholds calculated off of the total value in XRP of quarterly Transaction Volumes settled in XRP following the public launch of the Company Wallet, Marketplace or Company Exchange ("**Milestone Payments**", and together with Integration Grant Payments, "**Ripple Payments**"). Transaction Volumes means aggregate amount of XRP successfully settled through bona fide transactions initiated by end users using the Company Wallet, Marketplace or Company Exchange, excluding any wash-trades and other transactions resulting from manipulation or gaming of the system, as determined pursuant to Section 2.4(f). Payment of the Milestone Payments will be subject to the following terms:

(a)    The growth milestones will be calculated on a calendar quarter basis following the Company Wallet Launch Date.

(b)    The Milestone Payments will be paid upon the achievement of the following milestones, and, for clarity, the aggregate Milestone Payments will not exceed ██████ XRP:

(i)    In the calendar quarter during which the trailing 90 day daily average Transaction Volumes settled in XRP surpasses ██████ XRP, Ripple will owe Company a one-time payment of ██████ XRP.

(ii)     In the calendar quarter during which the trailing 90 day daily average Transaction Volumes settled in XRP surpasses ███████ XRP, Ripple will owe Company a one-time payment of ███████ XRP.

(iii)     In the calendar quarter during which the trailing 90 day daily average Transaction Volumes settled in XRP surpasses ███████ XRP, Ripple will owe Company a one-time payment of ███████ XRP.

(iv)     In the calendar quarter during which the trailing 90 day daily average Transaction Volumes settled in XRP surpasses ███████ XRP, Ripple will owe Company a one-time payment of ███████ XRP.

(c)     Milestone Payments will be paid by Ripple to Company within thirty (30) days following the end of the relevant quarter.

(d)     Milestone Payments will continue to be made for a period of two (2) years following the earlier of (i) termination of this Agreement, or (ii) expiration of the Term notwithstanding any renewal of this Agreement.  For avoidance of doubt, Company must complete and have maintained all of the Product Commitments related to the Company Components in order for Ripple to owe any Milestone Payments to Company.

(e)     Ripple's obligation to make Milestone Payments will terminate upon the occurrence of a Trigger Event (as defined below).

(f)     Measurement Methodology.  XRP will be measured according to the XRP successfully settled in conducting bona fide transactions initiated by end users using the Company Wallet, Marketplace or Company Exchange, excluding any wash-trades and other transactions resulting from manipulation or gaming of the system.

**2.5     Performance Failures**.

(a)     If, during the Term (as defined below), Company notifies Ripple that XRP, ██████ or ILP are unable to support the volume of transactions and activities resulting from Company's achievement of the Development Program, causing a material lack of liquidity, material performance inefficiencies, material failures, significant negative user experiences or other material adverse issues relating to the use of integrated Company Components by Company's users and third party game developers (collectively, "***Performance Failures***"), then Company and Ripple will work together in bona fide good faith and use best efforts to attempt to remedy any Performance Failure.

(b)     In the event of any Performance Failure related to XRP, then (i) provided that Company is in compliance with its obligations under the Development Program, Company will be released from offering XRP as a default currency and as a base pair for all currencies within the Company Components until such Performance Failure is resolved, and (ii) Ripple will be released from any and all obligations to make Integration Grant Payments and Milestone Payments to Company until such Performance Failure is resolved.

(c)     In the event of any Performance Failure related to ILP and/or ████ then Company is released from implementing ████ and ILP across the Company Components until such Performance Failure is resolved.  Provided that Company is in compliance with all of its obligations to integrate XRP into the Company Components, Ripple will continue to make applicable Milestone Payments to Company (provided that Ripple is not otherwise released from such payment obligation pursuant to other terms of this Agreement) and shall be released from any Integration Grant Payments until such Performance Failure is resolved.

(d)     In case of any delay caused by any Performance Failure that results in a release of Company from its obligations pursuant to Sections 2.5(b) (with respect to Product Commitments relating to integration of XRP) and 2.5(c) (with respect to Product Commitments relating to integration of ILP and/or ████ as applicable), Company's time-based deadlines to receive Integration Grant Payments pursuant to Section 2.2, with respect to any Product Commitments related to Integration Grant Payment amounts not yet paid, will be extended accordingly to account for the time lapsed during any such delay.

**2.6     Liquidation Limit**.  Company shall limit the Transfer (as defined below) of XRP to a daily cap of ██ basis points per day of the ADV Limit, calculated as of the end of the prior business day.  ADV Limit shall mean, with respect to any given calendar day, (i) ████ multiplied by (ii) ██████████████████████████████████████ charts.ripple.com) during the immediately preceding three (3) calendar days, and (B) ████ ██ For avoidance of doubt, Company's failure to liquidate up to the ADV Limit on any given day does not give rise to a right to sell above the ADV Limit on any subsequent days. "*Transfer*" for purposes of this Agreement means the direct or indirect sale, transfer or other disposition of all or any interest in XRP.

**2.7     Integration Grant Reporting**. On a monthly basis following the launch of the Company Components, Company will provide reports to Ripple on the ongoing financial and usage information of the launched Company Components including: (i) transaction volume of XRP on Company Wallet, Company Exchange and Company Marketplace, as applicable; (ii) transaction volume of XRP through ILP; (iii) anonymized user activity (i.e., MAU, DAU, etc.) on Company Wallet, Company Exchange and Company Marketplace, as applicable, and (iv) such other information reasonably requested by Ripple to monitor the Development Program.

**2.8     Determination of Payment Obligation**.  Company shall notify Ripple in writing (email sufficient) when it believes it has satisfied the conditions requiring Ripple to make any Ripple Payment, in each case detailing the specific conditions triggering the relevant Ripple Payment and the amount of the relevant Ripple Payment, as well as supporting documentation or information, as applicable, evidencing the occurrence of such conditions.  Ripple shall have fifteen (15) calendar days after receipt of such notice to either (i) approve the satisfaction of such conditions requiring Ripple to make the relevant Ripple Payment, which approval will not be unreasonably withheld, or (ii) if Ripple determines  in its sole and reasonable discretion that it requires more information to verify that such conditions have been satisfied, provide Company with reasons for its demand for more information and identify what documentation or evidence it requires to deem the conditions satisfied.  Company will respond promptly and in good faith to all such demands for more information until such time that Ripple approves the Ripple Payment, such approval not to be unreasonably withheld.  Any failure by Ripple to respond pursuant to

clause (i) or (ii) of the second sentence of this Section 2.8 within fifteen (15) calendar days following receipt of such notice will be deemed approval of the satisfaction of the relevant conditions.  Ripple shall pay any Ripple Payment promptly (and in no event five (5) business days) after its approval (or deemed approval) of the relevant Ripple Payment.

**2.9     Determination of Amount of XRP**.  The XRP price for the purposes of determining the number of XRP payable for each Integration Grant Payment shall be determined at each payment date as the price of XRP traded against USD at approximately 9:00 a.m. Pacific Daylight Time or Pacific Standard Time, as applicable, as reported on TradeBlock (https://tradeblock.com) ("**Market Price**") on the day of such payment, provided that if the Market Price is equal to or below $0.20 (twenty cents) on the date of any Integration Grant Payment, then Ripple will have the option, in its sole discretion and with notice to Company (email sufficient), to either (i) pay such Integration Grant Payment to Company in USD instead of XRP, or (ii) delay such Integration Grant Payment until the earlier of (x) the next day that the Market Price is above $0.20 (twenty cents), at which point Ripple will make the Integration Grant Payment to Company on such day based on the Market Price that day, or (y) ninety (90) days following the original Integration Grant Payment due date, at which point Ripple will make the Integration Grant Payment to Company on such day in USD or XRP based on the Market Price that day.

**2.10     Usage Tracking**.  Company shall track and maintain records on the use of Integration Grant Payments until one (1) full calendar quarter after all Integration Grant Payments are received.

3.     **INTELLECTUAL PROPERTY RIGHTS**.

**3.1     Definition**.  "*Intellectual Property Rights*" means any and all of the following and all rights in, arising out of, or associated therewith, throughout the world: patents, utility models, and applications therefor and all reissues, divisions, re-examinations, renewals, extensions, provisionals, continuations and continuations-in-part thereof and equivalent or similar rights in inventions and discoveries anywhere in the world, including invention disclosures, common law and statutory rights associated with trade secrets, confidential and proprietary information and know-how, industrial designs and any registrations and applications therefor, trade names, logos, trade dress, trademarks and service marks, trademark and service mark registrations, trademark and service mark applications and any and all goodwill associated with and symbolized by the foregoing items, Internet domain name applications and registrations, Internet and World Wide Web URLs or addresses, copyrights, copyright registrations and applications therefor and all other rights corresponding thereto, database rights, mask works, mask work registrations and applications therefor and any equivalent or similar rights in semiconductor masks, layouts, architectures or topology, moral and economic rights of authors and inventors, however denominated and any similar or equivalent rights to any of the foregoing.

**3.2     Company Owned IP**.  As between the Parties, Company owns all rights, title and interest (including all Intellectual Property Rights) in and to any and all intellectual property related to the Company Components, games, executions, fan engagements and other assets developed by Company, including any third party games developed on behalf of Company, and

any APIs developed by Company designed to communicate exclusively with such games, executions, fan engagements and other assets (collectively, "*Company Owned IP*"). All of Company's relationships and engagements with developers, talent, game developers and other third parties are proprietary to Company.

     **3.3**    **Ripple Owned IP**.  Ripple shall retain ownership of its Intellectual Property Rights and nothing in this Agreement is intended to or shall grant or transfer any right to Ripple's Intellectual Property Rights to Company.

     **3.4**    **Open Source**.  The Parties agree and acknowledge that ▆▆▆ is an open hosting protocol, ILP is an open protocol suite (with uses of each protocol subject to open source licensing), and the XRP Ledger is an open source decentralized Ledger. Notwithstanding anything to the contrary, if Company develops new code that specifically modifies or enhances the code base of the XRP Ledger, ▆▆▆and/or ILP (excluding any APIs developed by Company to communicate exclusively with games), then such code will not be Confidential Information of Company, and Company shall release such code under the same open source license as ILP, ▆▆▆or the XPR Ledger code base have been released, as applicable.

     **3.5**    **No Implied Rights**.  Except as expressly set forth in this Agreement, no other right is granted, by implication, estoppel or otherwise, to either Party under any Intellectual Property Rights now or hereafter owned or controlled by the other Party.  As between the Parties, all right, title and interest in and to each Party's Intellectual Property Rights will remain the property of the respective Party.  Each Party reserves all rights in its respective Intellectual Property Rights not expressly granted to the other Party under this Agreement.

4.    **CONFIDENTIAL INFORMATION**.

     **4.1**    **Definition**.  "*Confidential Information*" means any information disclosed by one Party (the "*Disclosing Party*") to the other Party (the "*Receiving Party*") that (a) if in written, graphic, machine-readable, or other tangible form is marked as "Confidential" or "Proprietary," or that, if disclosed orally or by demonstration, is identified at the time of initial disclosure as confidential and reduced to writing and marked "Confidential" within thirty (30) days of such disclosure; (b) that is otherwise deemed to be confidential by the terms of this Agreement; or (c) that should be reasonably understood by the Receiving Party to be the confidential or proprietary information of the Disclosing Party.

     **4.2**    **Non-Disclosure of Confidential Information**.  Receiving Party shall exercise the same degree of care and protection with respect to the Disclosing Party's Confidential Information that it exercises with respect to its own Confidential Information of like nature, which will in no event be less than a reasonable standard of care.  Accordingly, during the term of this Agreement and for three (3) years thereafter, Receiving Party shall hold the Disclosing Party's Confidential Information in strict confidence.  Receiving Party shall use Disclosing Party's Confidential Information solely as necessary to exercise Receiving Party's rights and/or perform Receiving Party's obligations under this Agreement.  Receiving Party shall not disclose Disclosing Party's Confidential Information to any third party except to those of Receiving Party's employees and independent contractors with a need to know such information to perform their obligations under this Agreement.  Such third parties who are permitted access to any of

Disclosing Party's Confidential Information shall be bound by obligations of confidentiality that are no less restrictive than the obligations set forth in this Agreement.

    **4.3**    **Exclusions**.  The restrictions and obligations set forth in Section 4.2 will not apply to information Receiving Party can show:  (a) was in the public domain at the time it was disclosed or has become in the public domain through no act or omission of Receiving Party; (b) was known to Receiving Party, without restriction, at the time of disclosure, as demonstrated by files in existence at the time of disclosure; (c) was independently developed by Receiving Party without any use of Disclosing Party's Confidential Information; or (d) becomes known to Receiving Party, without restriction, from a source other than Disclosing Party without breach of an obligation to keep such information in confidence.

    **4.4**    **No Obligation to Disclose**.  Disclosing Party will retain sole discretion concerning whether any particular Confidential Information will be disclosed to Receiving Party and the nature of such Confidential Information, provided that each Party shall use good faith efforts to accomplish the objectives of this Agreement.  Any disclosure of Confidential Information under this Agreement will not imply any grant of or license to Intellectual Property Rights contained or related therein by Disclosing Party.

    **4.5**    **Compelled Disclosure**.  If the Confidential Information of Disclosing Party must be disclosed by Receiving Party pursuant to the order or requirement of a court, administrative agency, or other governmental body, Receiving Party shall:  (a) provide prompt notice thereof to Disclosing Party (unless legally prohibited from doing so); (b) use its commercially reasonable efforts to cooperate with Disclosing Party to obtain a protective order or otherwise prevent public disclosure of such information; and (c) limit the disclosure to the exact Confidential Information (or portion thereof) required to be disclosed.

    **4.6**    **Confidentiality of Agreement**.  Except as required by law or as otherwise explicitly set forth herein, neither Company nor Ripple, nor any of their respective affiliates, officers, directors, employees, equity holders, agents or representatives, without the prior written consent of the other Party, may (i) make any public announcement of the signing of this Agreement or the transactions contemplated hereby or of the existence of discussions between the Parties, or (ii) disclose the terms of this Agreement or the existence of discussions between the Parties to any person, other than to employees, contractors, advisors, agents and representatives who are bound by confidentiality obligations and who have a need to know such information in connection with the performance of their duties under this Agreement.

    **4.7**    **Ownership**.  Title to all Confidential Information will be retained by the Disclosing Party.  The Receiving Party agrees to return all tangible copies of all Confidential Information to the Disclosing Party or destroy them (at the Disclosing Party's option), within thirty (30) days following (a) a written request of the Disclosing Party for the return or destruction of such Confidential Information or (b) expiration or termination of this Agreement.

5.    **MATERIAL RISKS**.  Company acknowledges the following material risks associated with virtual currency, including XRP:

**5.1**     Virtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

**5.2**     Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

**5.3**     Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

**5.4**     Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

**5.5**     The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

**5.6**     There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

**5.7**     The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

**5.8**     The nature of virtual currency may lead to an increased risk of fraud or cyber-attack.

**5.9**     The nature of virtual currency means that any technological difficulties experienced by Ripple or Company may prevent the access or use of Company's virtual currency.

**5.10**     With respect to any payment of XRP from Ripple to Company under this Agreement, Company acknowledges and agrees that Company cannot cancel, reverse, or change any XRP transfer that has been completed, as recorded on the XRP Ledger.

**5.11**     Immediately upon Ripple's delivery of XRP to Company, all title to and risk of loss related to such XRP passes to Company. Company acknowledges and agrees that Ripple has no liability to Company or any third party for any loss, theft or misuse of any XRP that Ripple has actually delivered to Company as provided in this Agreement.

**5.12**     Company acknowledges and agrees that Company is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that it uses to access its XRP, including any XRP it receives under this Agreement ("***Company Credentials***"). Any loss or compromise of Company Credentials may result in unauthorized access to XRP by third-parties and the loss or theft of such XRP. Ripple assumes no responsibility for any loss that Company may sustain due to compromise of Company Credentials.

**5.13**    Company shall have no recourse against Ripple, its affiliates, employees, directors or officers for any liabilities of any type incurred by Company and/or any of its affiliates as a result of its use, resale or distribution of XRP, including the materialization of any of the risks in Section 5 (Material Risks). Company shall comply with all Laws (as defined below) related to its activities and to its use, resale or distribution of XRP.

6.    ████████ **ACKNOWLEDGMENT**. Company acknowledges and agrees that (i) XRP does not represent a right to make any demand on Ripple, (ii) Ripple has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item; and (iii) Ripple is not responsible for any use by Company or any third party of any XRP that Ripple has delivered to Company under this Agreement.

7.    **TERM AND TERMINATION**.

**7.1**    **Term**.  This Agreement will have a term commencing on the Effective Date and continuing for thirty (30) months (the "*Term*"), unless sooner terminated as provided below. The Parties may mutually agree to renew the Term for an additional twelve (12) months.

**7.2**    **Termination for Material Breach**.  Either Party will have the right to terminate this Agreement in its entirety in case of material breach of the other Party that is not curable, or, if curable, that is not cured within thirty (30) days, following receipt of written notice from the non-breaching Party of the nature of the material breach (a "*Material Breach*").

**7.3**    **Termination for Insolvency**.  Either Party will have the right in its sole discretion to immediately terminate this Agreement if the other Party dissolves or otherwise fails to operate or exist as a viable ongoing business entity, becomes insolvent, makes a general assignment for the benefit of creditors, suffers or permits the appointment of a receiver for its business or assets, avails itself of or becomes subject to any petition or proceeding under any statute of any state or country relating to insolvency or the protection of the rights of creditors, or any other insolvency or bankruptcy proceeding or similar proceeding for the settlement of such other Party's debt is instituted (each such event, an "*Insolvency Event*").

**7.4**    **Additional Termination Rights of Ripple**.  Ripple may terminate this Agreement in its entirety upon providing written notice to Company if any of the following events occur: (i) the sale of all or substantially all the assets of Company, (ii) any merger, consolidation or acquisition of Company with, by or into another corporation, entity or person, or any change in the ownership of more than fifty percent (50%) of the voting capital stock of Company in one or more related transactions, (iii) Company shutting down its game development platform business, (iv) Company's commission of an unlawful or criminal act, (v) Company entering into a substantially similar deal with a competitor of Ripple, (vi) Ripple becomes subject to a temporary restraining order or preliminary injunction of any U.S. Court that prohibits the distribution or use of XRP or the XRP Ledger as contemplated by this Agreement, or (vii) Ripple is notified in writing by, or receives guidance or interpretation from an federal, state or local regulatory body of the United States that the distribution or use of XRP as contemplated by this Agreement may violate any applicable, law rule or regulation provided in the case of this clause (vii), (A) after consulting with nationally known legal counsel and consistent with the advice of such legal counsel, Ripple determines in good faith that there is a

substantial risk of such violation and (B) such violation would have a material adverse impact on Ripple's business, operations, financial results, or financial condition (each, along with a Company Insolvency Event or Company's Material Breach, referred to herein as a "***Trigger Event***"). For clarity, Decentralization of any Company Component will not be deemed a Trigger Event. "***Decentralization***" shall mean, for purposes of this Agreement, the point at which a Company Component is no longer controlled or managed by Company and is maintained through a distributed ledger technology.

   **7.5**     **Consequences of Termination**.

      (a)     Subject to Section 7.5(b), at the request of Ripple at its sole discretion, any Integration Grant Payment paid to Company that has not been spent by Company at the end of the Term shall be refunded to Ripple promptly (and in any event within ten (10) business days) after such request.

      (b)     In the case of termination by Company for Ripple's Material Breach, the Integration Grant Payments earned and received by Company will not be returned to Ripple (and, Integration Grant Payments earned prior to termination but not yet received by Company, will remain payable to Company), provided that any unearned Integration Grant Payments will no longer be payable.

      (c)     In the case of termination by Ripple as a result of a Trigger Event, any Integration Grant Payment paid to Company that has not been spent by Company prior to Ripple's termination shall be refunded to Ripple promptly (and in any event within ten (10) business days of Ripple's termination).

      (d)     In the case of any termination of this Agreement, all rights and obligations under this Agreement will terminate, except that Sections 2.4(d) (unless Ripple terminates because of Company's Material Breach or a Trigger Event), 2.6, 3, 4, 5, 6, 7.5, 8, 9 and 10 of this Agreement will survive in accordance with their terms. In addition, unless otherwise provided for herein, any amounts earned by Company prior to the date of termination but not yet paid will remain payable to Company. Termination is without prejudice to any other right or remedy that each Party may have under the terms and conditions of this Agreement, whether at law or in equity.

      (e)     For the avoidance of doubt, this Section 7.5 shall not limit any remedies that may be available to any Party as a result of termination or breach of this Agreement.

**8.**     **REPRESENTATIONS AND WARRANTIES**.

   **8.1**     **Mutual Representations and Warranties.** Each Party represents and warrants to the other Party as follows:

      (a)     Such Party has the full corporate power and authority to execute and deliver this Agreement and to perform its obligations hereunder. The execution, delivery and performance of this Agreement have been duly and validly authorized by such Party and this Agreement constitutes a valid and binding agreement of such Party enforceable against such Party in accordance with its terms, except as may be limited by (i) applicable bankruptcy,

insolvency, reorganization, or similar laws relating to or affecting the enforcement of creditors' rights and (ii) laws relating to the availability of specific performance, injunctive relief or other equitable remedies.

(b)     The execution, delivery and performance by such Party of this Agreement do not and will not (a) contravene or conflict with the certificate of incorporation, memorandum and articles of association or equivalent organizational documents of such Party, (b) contravene or conflict with any agreement, contract, instrument or understanding, oral or written, to which it is a Party or by which it may be bound, or (c) violate any law, statute, rule or regulation of any court, governmental body or administrative or other agency (collectively, "**Laws**") having authority over it, provided that Ripple makes no representation and warranty with respect to any risks acknowledged by Company in Section 5.

**8.2     Disclaimer**.  EXCEPT AS EXPRESSLY PROVIDED IN SECTION 8.1, NEITHER PARTY MAKES ANY OTHER WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THIS AGREEMENT, INCLUDING WITHOUT LIMITATION ANY TECHNOLOGY OR SERVICES PROVIDED UNDER THIS AGREEMENT.  ALL OTHER WARRANTIES, EXPRESS OR IMPLIED, INCLUDING THE IMPLIED WARRANTIES OF MERCHANTABILITY, FITNESS FOR A PARTICULAR PURPOSE OR NON-INFRINGEMENT, ARE HEREBY DISCLAIMED BY THE PARTIES.

9.     **INDEMNIFICATION**.

**9.1     Indemnification by Company**.  Company hereby agrees to indemnify, defend and hold Ripple, its directors, officers, employees and agents harmless from and against any and all liabilities, losses, damages, costs and expenses (including, but not limited to, reasonable attorneys' fees except for the fees for separate counsel chosen pursuant to Section 9.3 below) which they or any of them may incur or be obligated to pay in any action, investigation, claim or proceeding against them or any of them (collectively, "***Indemnification Claims***") in connection with or arising out of (a) any breach of Company's representations or warranties under this Agreement, (b) the infringement by any Company Component of any third party Intellectual Property Rights or (c) the Transfer or use by Company, in a single transaction or a series of transactions treated as a single transaction for regulatory purposes, of XRP that is paid to Company pursuant to this Agreement.

**9.2     Indemnification by Ripple**.  Ripple hereby agrees to indemnify, defend and hold Company, its directors, officers, employees and agents harmless from and against any and all Indemnification Claims in connection with or arising out of any breach of Ripple's representations or warranties under this Agreement.

**9.3     General Indemnity Matters**.  The indemnity obligations of a Party (an "***Indemnifying Party***") under this Section 9 are expressly conditioned on the Party seeking indemnity (the "***Indemnified Party***"): (i) providing the Indemnifying Party with prompt notice of any Indemnification Claim; provided that the failure to provide such notice shall not relieve the Indemnifying Party of its indemnification obligations hereunder except to the extent of any material prejudice directly resulting from such failure; (ii) permitting the Indemnifying Party to assume and control the defense of such Indemnification Claim, with counsel chosen by the

Indemnifying Party, provided that the Indemnifying Party shall not settle any Indemnification Claim on behalf of the Indemnified Party without the Indemnified Party's prior written approval, which approval shall not be unreasonably withheld or delayed; and (iii) reasonably cooperating with the Indemnifying Party in the defense of the Indemnification Claim. The Indemnifying Party shall allow the Indemnified Party to participate in the Indemnifying Party's defense of any Indemnification Claim with counsel of the Indemnified Party's own choosing and at the Indemnified Party's expense.

    **9.4**    **Inspection Rights**. During the Term and for six months thereafter, with a minimum of ten (10) business days advance written notice, during normal working hours only and no more frequently than twice each calendar year, Company shall permit Ripple (or an independent third party appointed by Ripple and approved by Company, such approval not to be unreasonably withheld), to inspect the books and records of Company and its affiliates as reasonably necessary to verify compliance with the terms and conditions of this Agreement by Company, including Company's satisfaction of the conditions to Ripple's obligations to make Ripple Payments pursuant to Section 2.8. Any information obtained by Ripple (or any such independent third party) may be redacted by Company as necessary to comply with Company's confidentiality arrangements with third parties and shall be treated as confidential and used solely for purposes of verifying and enforcing compliance with the terms and conditions of this Agreement by Company, including confirming that Company has satisfied its conditions to receive Ripple Payments. Any costs of Ripple (or any independent third party) associated with such inspections will be borne solely by Ripple.

10.    **LIMITATION OF LIABILITY**. IN NO EVENT WILL A PARTY BE LIABLE TO THE OTHER PARTY (I) FOR ANY INDIRECT, INCIDENTAL, SPECIAL, EXEMPLARY, PUNITIVE OR CONSEQUENTIAL DAMAGES OR DAMAGES FOR LOSS OF PROFITS, BUSINESS INTERRUPTION, LOSS OF GOODWILL OR OTHERWISE, ARISING FROM OR RELATING TO THIS AGREEMENT, EVEN IF ANY SUCH PARTY IS EXPRESSLY ADVISED OF THE POSSIBILITY OF THESE DAMAGES, AND (II) FOR ANY AMOUNTS IN EXCESS OF AMOUNTS ACTUALLY PAID BY RIPPLE TO STARCARD PURSUANT TO THE INTEGRATION GRANT; PROVIDED THAT THE LIMITATIONS OUTLINED IN THIS SECTION 10 WILL NOT APPLY TO DAMAGES RESULTING FROM BREACHES OF CONFIDENTIALITY, GROSS NEGLIGENCE OR WILLFUL MISCONDUCT THE PARTIES ACKNOWLEDGE THAT THIS SECTION 10 REFLECTS THE AGREED UPON ALLOCATION OF RISK BETWEEN THE PARTIES AND THAT NEITHER PARTY WOULD ENTER INTO THIS AGREEMENT WITHOUT THESE LIMITATIONS ON ITS LIABILITY. THE LIMITATION OF LIABILITY WILL APPLY NOTWITHSTANDING THE FAILURE OF ESSENTIAL PURPOSE OF ANY LIMITED REMEDY SET FORTH HEREIN.

11.    **MISCELLANEOUS**.

    **11.1**    **Notice**. All notices provided for in this Agreement or related to this Agreement, which either Party desires to serve on the other, will be in writing and will be considered delivered upon receipt. Any and all notices or other papers or instruments related to this Agreement will be sent by

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

(a)     by United States registered or certified mail (return receipt requested), postage prepaid, in an envelope properly sealed; or

(b)     a nationally recognized overnight delivery service;

provided for receipted delivery, addressed as follows:

Company:     ████████████████████████████

Ripple:     Ripple Labs Inc.
315 Montgomery, Second Floor
San Francisco, CA 94104
Attn:  Senior Vice President of Xpring and General Counsel

Either Party may change the address or name of addressee applicable to subsequent notices (including copies of said notices as hereinafter provided) or instruments or other papers to be served upon or delivered to the other Party, by giving notice to the other Party as aforesaid.

**11.2     Assignment**.  Either Party may assign this Agreement only with the express prior written consent of the other Party.  Any assignment of this Agreement in violation of the foregoing shall be void and of no force or effect.

**11.3     Relationship of the Parties**.  Neither Party will represent itself as the agent or legal representative of the other Party or as a joint venturer with the other Party for any purpose whatsoever, and neither will have any right to create or assume any obligations of any kind, express or implied, for or on behalf of the other Party in any way whatsoever.  Each Party is an independent contractor.  Each Party is responsible for the direction and compensation of its employees and shall be obligated to perform all requirements of an employer in accordance with applicable laws and regulations.

**11.4     Non-Waiver**.  The waiver of any term, condition or provision of this Agreement must be in writing and signed by an authorized representative of the waiving Party.  Any such waiver will not be construed as a waiver of any other term, condition or provision except as provided in writing, nor a waiver of any subsequent breach of the same term, condition or provision.

**11.5     Integration and Severability**.  This Agreement, including all exhibits referred to herein and attached hereto (which are hereby incorporated by reference), constitutes the entire agreement of the Parties with respect to the subject matter hereof and supersedes all previous discussions, prior agreements and understandings concerning the same, whether oral or written. If any term or provision of this Agreement is found to be illegal, invalid, void or otherwise unenforceable, this Agreement will remain in full force and effect and such term or provision will be deemed stricken and the remaining provisions will not be affected or impaired and will be

interpreted, as far as and if possible, so as to give them effect consistent with the original terms of this Agreement.

**11.6    Counterparts**.  This Agreement may be executed in two counterparts, each of which shall be deemed an original but all of which together shall constitute one and the same instrument.  Any signature required for the execution of this Agreement may be in the form of either an original signature, a facsimile transmission bearing the signature of any Party to this Agreement, or electronic signature in portable document format (i.e. through DocuSign or similar electronic signature software).

**11.7    Publicity and Trademarks**.  Nothing contained in this Agreement will be construed as conferring any right to use in advertising, publicity or other promotional activities, any name, trade name, trademark, service mark, or any contraction, abbreviation or other designation of the other Party without prior express written approval of such other Party.

**11.8    Governing Law, Forum and Jurisdiction.**  This Agreement shall be governed by, construed and enforced in accordance with the laws of the State of California without reference to its choice of law provisions.  The Parties expressly agree that any action at law or in equity arising out of or relating to this Agreement shall be filed only in the courts of the State of California for San Francisco County, or the United States District Court for the Northern District of California.  The parties hereby consent and submit to the exclusive jurisdiction and venue of such courts for the purposes of litigating any such action.  Both parties irrevocably waive any objection to such jurisdiction and irrevocably waive the right to seek dismissal or transfer on the grounds of lack of *in personam* jurisdiction, improper venue, *forum non conveniens* or similar grounds.  The prevailing party in any action shall be entitled to recover from the non-prevailing party the prevailing party's reasonable costs and expenses including, without limitation, attorney's fees.  Any dispute, claim, or controversy arising out of or in connection with this Agreement or the breach, termination, enforcement, interpretation or validity thereof, shall be determined through binding arbitration under JAMS' Comprehensive Arbitration Rules and Procedures.  The Parties shall share equally the fees and expenses of the JAMS arbitrator.  The arbitration shall be conducted by a sole arbitrator chosen by the mutual agreement of the parties or, failing that, by JAMS under its then prevailing rules.  Judgment on the award rendered by the arbitrator may be entered in any court of competent jurisdiction.  The arbitrator shall have the authority to grant specific performance or any other equitable or legal remedy, including provisional remedies.  Each party will be responsible for its own incurred expenses arising out of any dispute resolution procedure.  The parties will jointly bear the expense of any arbitrator.  Any arbitration proceedings shall take place in San Francisco, CA.

**11.9    Remedies; Equitable Relief**.  All remedies under this Agreement shall be cumulative except as expressly provided otherwise and each Party shall be entitled to seek any and all remedies available to it at law or in equity  The Parties acknowledge that the disclosure of the other Party's Confidential Information or violation of the other Party's Intellectual Property Rights would cause substantial and irreparable harm to the other Party that could not be remedied by the payment of damages alone.  Accordingly, each Party agrees that the other Party would be entitled to seek and obtain preliminary and permanent injunctive relief and other equitable relief for any breach of Section 4.

**11.10   Third-Party Beneficiaries**.  None of the obligations hereunder of either Party shall run to or be enforceable by any party other than the Parties to this Agreement and their respective successors and assigns in accordance with the provisions of this Agreement.

**11.11   Amendments**.  No addition to, deletion from, or modification of any of the provisions of this Agreement will be binding upon the Parties unless made in writing, referencing this Agreement and the provisions to be modified therein, and signed by a duly authorized representative of each Party.

**11.12   Expenses**. Company and Ripple shall each bear their own fees and expenses incurred in connection with the preparation, negotiation, execution and delivery of this Agreement and, except as expressly notified hereby, the transactions contemplated hereby.

*[Signature Page Follows]*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives effective as of the Effective Date.

By: _____

Name: _____

Title: _DIRECTOR_____

Date: _6 NOVEMBER 2018_____

**RIPPLE LABS INC.**

By: _____

Name: _____

Title: _____

Date: _____

*[Signature Page to Development and Integration Agreement]*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

IN WITNESS WHEREOF, the Parties have caused this Agreement to be executed by their duly authorized representatives effective as of the Effective Date.

████████████████                                    **RIPPLE LABS INC.**

By: _____ __                            By:_____

Name:_____                       Name:_____

Title:_____                      Title:___Senior Vice President, Xpring_____

Date: _____ __                            Date: _____ ___

*[Signature Page to Development and Integration Agreement]*

**Exhibit A**

**Product Commitments**

| Company Component | Xpring/Company Component | Deliverable |
|---|---|---|
| Company Wallet | Interledger & Related Protocols such as SPSP and STREAM (collectively "ILP") | - All cryptocurrency or blockchain-based deposits, withdrawal, trades and payments within the Company Wallet will use ILP.<br>- Company Wallet accounts will use an ILP-compliant addressing standard (e.g., payment pointers).<br>- Company Wallet and accounts therein will be linked and have accounts with public network ILP connectors. |
| | ▮▮▮▮ | ▮▮▮▮ will be used for decentralized key storage to the extent that ▮▮▮ implements decentralized key storage. |
| | XRP | - Payments to ▮▮▮ hosts enabling decentralized key storage will be made in XRP.<br>- All deposits to the Company Wallet will buy XRP by default within the Company Exchange<br>- All end users will have XRP accounts by default. |
| Company Exchange | XRP | - XRP will serve as the exclusive base pair for all trades, both between games on the Company Platform and externally to other venues (e.g., outside wallets, exchanges, etc.)<br>- Marketplace transaction fees (if any) will be paid in XRP. |
| | ILP | All trades within the Company Exchange will use ILP and public ILP connectors for execution. |
| Company Platform | ▮▮▮▮ | All blockchains created by the Company Platform and underlying Company and third party games will be hosted on ▮▮▮. |
| | ILP | All blockchains underlying the Company Platform and Company and third party games will be ILP-enabled (e.g., production ready ILP plug-ins) |
| | XRP | - All payments to third-party developers through the Company Platform or other Company Components will be in XRP via ILP.<br>- ▮▮▮ hosts will be paid in XRP via ILP.<br>- Pricing is optionally listed in XRP by default. |
| | Company Wallet | - All Company and third-party games must use the Company Wallet.<br>- If Company or any third parties launch any games prior to the launch of the Company Wallet, then Company will integrate the Company Wallet into such game following the launch of the Company Wallet. |
| | Company Exchange | All Company and third-party games must use the Company Exchange. |

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

**Exhibit B**

**Development Program**

Below are milestones relating to key deliverables and target delivery dates to launch the Company Wallet, the Company Exchange (together, the "***Company MarketPlace***"), and facilitate the launch of the first 3rd party product using these technologies.

The target dates and development priorities may be adjusted during the development process to accommodate: (i) unknown technical requirements with ████ and Interledger (ILP), (ii) timing and needs of 3rd party products, (iii) new product requirements, and/or (iv) longer periods in alpha or beta periods to test and debug software.

| Company Wallet | |
|---|---|
| **Component** | **Target Date** |
| Alpha - Closed Network | 3/29/2019 |
| Alpha - Live Ops: Release Support | 3/29-> 4/30/2019 |
| Beta - Multi-sig + 3rd party support | 5/31/2019 |
| ████ security review for decentralized key storage complete | 5/31/2019 |
| Beta and security audit of decentralized wallet key storage via ████ (contingent on satisfactory security review) | 7/31/2019 |
| Public Release - Decentralized wallet key storage via ████ (contingent on satisfactory security review and audit) | 8/30/2019 |
| Public Release - Usability Features + Cold Wallet | 8/30/2019 |

- Alpha - Closed Network
  - Wallet address and storage support for crypto coins and NFT assets
- Alpha - Live Ops
  - Any support or changes necessary to support production release
- Beta - Multi-sig Wallets + 3rd Party App support
  - Multi-signature transaction support for crypto coin and NFTs as well as whitelisting auth for 3rd party applications
- ████ security review for decentralized key storage complete
  - General security review of the ████ decentralized key storage to prep for beta integration and production release
- Beta and security audit of decentralized wallet key storage via ████
  - Contingent upon satisfactory security audit and review.
- Public Release - Decentralized wallet key storage via ████ (to the extent decentralized key

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

storage is implemented)
- ○ Contingent upon satisfactory security audit and review
- ○ Bundled in Public Release
- Public Release - Usability & Cold Wallet Support
  - ○ 1.0 Release. Support for MFA workflows, Cold Wallet Storage support, ███ key storage and Clearinghouse
  - ○ Company Wallet accounts use ILP-compliant addressing standard(s) (e.g., ILP payment pointers) and have accounts with public network ILP Connectors.
  - ○ All cryptocurrency and NFT assets paid for or deposited via the ILP and public ILP network
  - ○ All fiat deposited to Wallet converted to XRP by default within Wallet
  - ○ All cross-chain or cross-ledger transfers and withdrawals from the Wallet will use the ILP and the public ILP network
  - ○ End users have XRP accounts by default

| Company Exchange | |
|---|---|
| **Component** | **Target Date** |
| Alpha - MS1: In-Network only | 9/30/2019 |
| Alpha - MS2: crypto coin for XRP | 11/29/2019 |
| Beta - ETH support + 3rd party Beta project | 2/28/2020 |
| Public release - 3rd party whitelisting | 3/31/2020 |

- Alpha - MS1: Closed Network
  - ○ Exchange functionality for crypto coins and NFTs. Incorporate ILP if possible for dedicated network NFTs.
- Alpha - MS2: selected crypto coins ILP exchanges for XRP
  - ○ Supporting the exchange of crypto coins to XRP; XRP as base-pair for all crytpocurrency exchanges, both between games on the Company Platform and externally to other venues (e.g., outside wallets, exchanges, etc)
  - ○ Utilize the ILP and public ILP network Connectors for all distributed ledgers underlying all of the cryptocurrencies supported in MS2
- Beta - Additional Altcoin support + 3rd Party Beta Access
  - ○ Support for additional exchanges of cryptocurrencies using XRP base-pairing and in-game tokens using the ILP and public ILP network. Connect all ILP Senders, Receivers and Connectors enabling token payments and exchanges via the Company Exchange to Connectors in the public ILP network.
  - ○ First Access for 3rd party game developers to use the ILP and public ILP network exchange functionality
- Public Release - 3rd Party Whitelisting
  - ○ 1.0 Release for 3rd party exchanges using the ILP and public ILP network

- ■ Payments for NFT sales and remainder payments for 3rd party NFT exchanges (received in XRP by default)
  - ○ Payments between 3rd party games made in XRP by default
  - ○ Exchanges of in-game currencies and assets across games or ledgers facilitated via the ILP and public ILP network

| 3rd Party Project Integrations | |
|---|---|
| **Component** | **Target Date** |
| 3rd party Alpha SDK available for integration | 4/29/2019 |
| Alpha Game Release using Wallet | 9/30/2019 |
| Sidechain hosting with ▮ | 9/30/2019 |
| Beta Game Release using Exchange | 3/31/2020 |
| Public Production Release - Public launch of 3rd party game using 1.0 Wallet and 1.0 Exchange features. | 6/30/2020 |

- Alpha - Release
  - ○ Test Network product using Beta Wallet
- Beta - Release
  - ○ Test Network product using 1.0 Wallet and Beta Exchange functionality
- Side-chain hosting with ▮
  - ○ ▮ hosting for sidechains (or other third-party ledgers) released for all Company and 3rd party games
- The ILP and public ILP network used as exclusive transaction mechanism across ledgers (so long as transaction throughput can be handled on the public ILP network exclusively)
- Public Production Release - 3rd Party Whitelisting
  - ○ Live Network release using 1.0 Wallet and 1.0 Exchange features
  - ○ All blockchains underlying the Company Platform and Company and third-party games will be ILP-enabled (e.g., have production-ready ILP plug-ins)

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.