# Exhibit 76

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                    Plaintiff,        )
6                                     ) Case No.
           v.                         ) 20-Civ-10832(AT)(SN)
7                                     )
     RIPPLE LABS, INC., BRADLEY       )
8    GARLINGHOUSE, and CHRISTIAN      )
     LARSEN,                          )
9                                     )
                    Defendants.       )
10   _____ )

11

12       **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

13

14              VIDEOTAPED DEPOSITION OF

15           BRADLEY KENT GARLINGHOUSE, JR.

16            Monday, September 20, 2021

17

18

19

20

21

22

23

     Reported by:
24   BRIDGET LOMBARDOZZI,
     CSR, RMR, CRR, CLR
25   Job No. 210920BLO

                                                        1

```
1                   UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
5                                    )
                     Plaintiff,      )
6                                    ) Case No.
            v.                       ) 20-Civ-10832(AT)(SN)
7                                    )
    RIPPLE LABS, INC., BRADLEY       )
8   GARLINGHOUSE, and CHRISTIAN      )
    LARSEN,                          )
9                                    )
                     Defendants.     )
10  _____ )

11

12

13

14

15          Videotaped deposition of BRADLEY KENT GARLINGHOUSE,

16  JR. taken on behalf of Plaintiff, held at the offices of

17  Cleary Gottlieb Steen & Hamilton LLP, 1 Liberty Plaza,

18  New York, New York, commencing at 8:20 a.m. and ending

19  at 8:01 p.m., on Monday, September 20, 2021, before

20  Bridget Lombardozzi, CCR, RMR, CRR, CLR, and a Notary

21  Public of the States of New York and New Jersey,

22  pursuant to notice.

23

24

25
                                                              2
```

```
1    A P P E A R A N C E S (Via Remote where indicated):

2

3    For the Plaintiff:

4

5            UNITED STATES SECURITIES AND EXCHANGE COMMISSION

6            NEW YORK REGIONAL OFFICE

7            BY:  JORGE G. TENREIRO, ESQUIRE

8                 MARK SYLVESTER, ESQUIRE

9                 JON DANIELS, ESQUIRE

10                DAPHNA A. WAXMAN, ESQUIRE.

11                LADAN STEWART, ESQUIRE (Remote)

12                BEN HANAUER, ESQUIRE (Remote)

13                ELIZABETH GOODY, ESQUIRE (Remote)

14           200 Vesey Street

15           Suite 400

16           New York, New York  10281-1022

17           Telephone:  212.336.1060

18           Email:  tenreiroj@sec.gov

19                   hanauerb@sec.gov

20                   jdaniels@sec.gov

21                   waxmand@sec.gov

22                   stewartl@sec.gov

23                   goodye@sec.gov

24

25
```

3

```
1    A P P E A R A N C E S (Continued):

2

3    For Defendant Ripple Labs Inc.:

4

5              DEBEVOISE & PLIMPTON LLP

6              BY:  ANDREW CERESNEY, ESQUIRE

7                   MICHAEL J. PISEM, ESQUIRE (Remote)

8                   ASHLEY V. HAHN, ESQUIRE (Remote)

9                   CHRISTOPHER FORD, ESQUIRE (Remote)

10             919 Third Avenue

11             New York, New York  10022

12             Telephone:  212.909.6000

13             E-Mail:  aceresney@debevoise.com

14                      apisem@debevoise.com

15                      avhahn@debevoise.com

16                      cford@debevoise.com

17                         -and-

18             KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

19             BY:  BRADLEY OPPENHEIMER, ESQUIRE (Remote)

20             Sumner Square

21             1615 M Street, N.W.

22             Suite 400

23             Washington, D.C.  20036

24             Telephone:  202.326.7999

25             E-mail:  Boppenheimer@kellogghansen.com
```

4

```
 1   A P P E A R A N C E S (Continued):

 2

 3   For Defendant/Witness Bradley Garlinghouse:

 4

 5          CLEARY GOTTLIEB STEEN & HAMILTON

 6          BY:  MATTHEW C. SOLOMON, ESQUIRE

 7               NICOLE TATZ, ESQUIRE

 8               SAMUEL LEVANDER, ESQUIRE

 9               JACKIE BRUNE, ESQUIRE (Remote)

10               NOAH BAMBERGER, ESQUIRE

11               JORGE BONILLA LOPEZ, ESQUIRE (Remote)

12               TAYLOR H. BATES, ESQUIRE (Remote)

13               BEN ROSENBLUM, ESQUIRE (Remote)

14               CALEB J. ROBERTSON, ESQUIRE (Remote)

15          2112 Pennsylvania Avenue, NW

16          Washington, D.C.  20037

17          Telephone:  202.974.1500

18          E-mail:  Msolomon@cgsh.com
                     ntatz@cgsh.com
19                   Slevander@cgsh.com
                     jabrune@cgsh.com
20                   nbamberger@cgsh.com
                     jbonillalopez@cgsh.com
21                   tbates@cgsh.com
                     brosenblum@cgsh.com
22                   crobertson@cgsh.com

23

24

25
```

5

```
1    A P P E A R A N C E S (Continued):

2

3    For Defendant Christian A. Larsen:

4

5         PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

6         By:  JUSTIN WARD, ESQUIRE

7              MICHAEL GERTZMAN, ESQUIRE (Remote)

8              CONNOR RITSCHARD, ESQUIRE (Remote)

9              KRISTINA BUNTING, ESQUIRE (Remote)

10        1285 Avenue of the Americas

11        New York, New York  10019-6064

12        Telephone:  212.373.2491

13        E-mail:  Jward@paulweiss.com

14                 mgertzman@paulweiss.com

15                 critschard@paulweiss.com

16                 kbunting@paulweiss.com

17

18   ALSO PRESENT:

19

20        ████████████  General Counsel, Ripple

21        NICOLE FORBES, SEC (Remote)

22        DAVID SHERECK, Videographer

23

24

25

                                                    6
```

```
 1                          INDEX
 2   WITNESS                              EXAMINATION
 3   BRADLEY KENT GARLINGHOUSE, JR.
 4       BY MR. TENREIRO                       18
 5
 6
 7
 8                         EXHIBITS
     SEC BG
 9   NUMBER              DESCRIPTION            PAGE
10
11   Exhibit 1    4/1/15 Ripple Labs Employment   342
12                Offer Letter Garlinghouse
13                GARL_Civil-000462-73
14
15   Exhibit 13   Series of emails dated       378
16                March 2017
17                RPLI_SEC 0763477-78
18
19   Exhibit 15   4/6/17 Email from            348
20                Garlinghouse to ███████, et al
21                █████0058119-21
22
23   Exhibit 16   4/7/17 Email from Garlinghouse   363
24                to Larsen, et al
25                SEC-███-RIPPLE 0010806-07
```

7

```
 1                          EXHIBITS

 2     SEC BG
       NUMBER                DESCRIPTION              PAGE
 3

 4     Exhibit 17    4/8/17 Email from Garlinghouse    368

 5                   to ███████, et al

 6                   RPLI SEC 0361257-60

 7

 8     Exhibit 18    5/1/17 Email from Garlinghouse    385

 9                   to Larsen, et al

10                   SEC-███-RIPPLE 0010934-35

11

12     Exhibit 27    9/27/17 Email from Garlinghouse   215

13                   to ██████, et al

14                   RPLI SEC 0866887-88

15

16     Exhibit 31    12/1/17 Email from Garlinghouse   309

17                   to Leadership

18                   RPLI SEC 0054606-07

19

20     Exhibit 32    String of emails dated            429

21                   12/14/17

22                   ██████0041460-61

23

24

25

                                                         8
```

```
 1                        EXHIBITS

 2   SEC BG
     NUMBER               DESCRIPTION              PAGE
 3

 4   Exhibit 33   12/15/17 Email from               434

 5                Garlinghouse to Larsen, et al

 6                RPLI_SEC_0866480-84

 7

 8   Exhibit 35   Printout of Text Messages         407

 9                ████████ - Garlinghouse

10                GARL Civil 000982-93

11

12   Exhibit 36   Twitter tweet 10/17/17            409

13                Garlinghouse

14                NO BATES, 2 pages

15

16   Exhibit 41   String of emails dated            199

17                7/12/18

18                RPLI SEC 0949371-72

19

20   Exhibit 44   String of emails dated            267

21                July 2018

22                RPLI SEC 0221392-95

23

24

25
```

9

```
1                          EXHIBITS

2    SEC BG
     NUMBER              DESCRIPTION                PAGE
3

4    Exhibit 49    10/26/18 Email from              78

5                  Garlinghouse to ███████

6                  RPLI SEC 0766852

7

8    Exhibit 50    11/11/18 Email from              86

9                  Garlinghouse to Larsen

10                 RPLI SEC 0626652-53

11

12   Exhibit 51    11/11/18 Email from              74

13                 Garlinghouse to ██████, et al

14                 RPLI SEC 0235167

15

16   Exhibit 53    String of emails dated           109

17                 12/13/18

18                 RPLI SEC 0971415-17

19

20   Exhibit 68    3/29/20 Email from               480

21                 Garlinghouse

22                 GARL Civil 000394

23

24

25
                                                      10
```

```
 1                          EXHIBITS

 2    SEC BG
      NUMBER              DESCRIPTION              PAGE
 3

 4    Exhibit 77   String of emails dated          255

 5                 2/23/16

 6                 RPLI SEC 0765249-50

 7

 8    Exhibit 78   String of emails dated          418

 9                 June 5, 2017

10                 RPLI SEC 0054397-400

11

12    Exhibit 81   String of emails dated          262

13                 October 31, 2016

14                 RPLI SEC 0761766-67

15

16    Exhibit 87   3/26/17 Email from Long         393

17                 to Garlinghouse

18                 RPLI SEC 0513551

19

20    Exhibit 90   String of emails dated          476

21                 January 2018

22                 RPLI SEC 0054005-08

23

24

25

                                                    11
```

```
 1                           EXHIBITS

 2     SEC BG
       NUMBER            DESCRIPTION              PAGE
 3

 4     Exhibit 94    String of emails dated         184

 5                   July 11, 2018

 6                   RPLI SEC 1028005-07

 7

 8     Exhibit 96    Printout of text               166

 9                   messages

10                   RPLI SEC 0533153-61

11

12     Exhibit 97    12/9/20 Email from ████████    223

13                   to Garlinghouse

14                   RPLI SEC 0494774-75

15

16     Exhibit 99    Video Transcription            458

17                   Undated

18                   SEC-SEC-E-0010269-97

19

20     Exhibit 101   Video Transcription            451

21                   Undated

22                   SEC-SEC-E-0010452-82

23

24

25

                                                     12
```

```
1                         EXHIBITS
2    SEC BG
     NUMBER              DESCRIPTION              PAGE
3
4    Exhibit 106  Printout of Chat Messages        146
5                 Garlinghouse - ███████████
6                 GARL Civil 001344-48
7
8    Exhibit 108  Printout of Chat Messages        233
9                 Garlinghouse - ████████
10                GARL Civil 001342-43
11
12   Exhibit 121  String of emails dated           243
13                November 27, 2018
14                RPLI SEC 0235028
15
16   Exhibit 122  String of emails dated           246
17                May 27-28, 2020
18                RPLI SEC 0591715-16
19
20   Exhibit 127  7/27/17 Email from Griffin       327
21                to ████████, et al
22                RPLI SEC 0178836
23
24
25
                                                    13
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
 1                          EXHIBITS

 2    SEC BG
      NUMBER                 DESCRIPTION              PAGE
 3

 4    Exhibit 129   Video Transcription,             469

 5                  Undated

 6                  SEC-SEC-E-0010519-22

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

                                                      14
```

```
1                    DEPOSITION SUPPORT INDEX

2

3      DIRECTION TO WITNESS NOT TO ANSWER

4         Page    Line

5          45       9

6         192       2

7         193       4

8

9

10

11     STIPULATIONS

12        Page    Line

13         17      11

14

15

16     QUESTIONS MARKED

17        Page    Line

18        - -none- -

19

20

21

22     REQUEST FOR DOCUMENTS

23        Page    Line

24        - -none- -

25
```

15

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
1                    -  -  -

2                 8:20 a.m.

3            September 20, 2021

4                    -  -  -

5            THE VIDEOGRAPHER:  We're on the

6       record.  The time is approximately 8:20

7       a.m.  Today's date is Monday, September

8       20th, 2021.  This is the video deposition

9       of Bradley Kent Garlinghouse, Jr., in the
08:18:49 10      matter of the Securities and Exchange

11      Commission versus Ripple Labs Inc.,

12      Bradley Garlinghouse, and Christian

13      Larsen.  The index number is 20-Civ-10832

14      in the United States District Court,
08:19:04 15      Southern District of New York.

16            My name is David Shereck,

17      certified legal videographer, with

18      Shereck Video in association with

19      Gradillas Court Reporting of Glendale,
08:19:16 20      California.  We're located today at the

21      office of Cleary Gottlieb, located at 1

22      Liberty Plaza in New York.  And all

23      attorneys present will appear on the

24      stenographic record.  And the court
08:19:29 25      reporter is Bridget Lombardozzi.  Thank
```

16

```
08:19:32  1        you.
          2                And will you please swear in the
          3        witness.
          4                B R A D L E Y   K E N T
08:19:37  5        G A R L I N G H O U S E, Jr., having been
          6        duly sworn, was examined and testified as
          7        follows:
          8                THE REPORTER:  Thank you.
          9                You may proceed.
08:19:48 10                MR. TENREIRO:  Thank you.
         11                Stipulations, Matt?
         12                MR. SOLOMON:  Yes.  Just that any
         13        objection by any counsel will be deemed an
         14        objection by all counsel if that's
08:19:56 15        agreeable to the SEC.
         16                MR. TENREIRO:  Yes.
         17                MR. HORTON:  Thank you.
         18                MR. TENREIRO:  And we're going
         19        to --
08:20:01 20                MR. SOLOMON:  And confidentiality
         21        as well.
         22                MR. TENREIRO:  Sure.  We're going
         23        to go nine hours today as we discussed.  I
         24        think that's also stipulated.
08:20:09 25
```

17

| | | |
|---|---|---|
| 08:20:09 | 1 | DIRECT-EXAMINATION |
| | 2 | BY MR. TENREIRO: |
| | 3 | Q.   Good morning.  Could you please state |
| | 4 | your name for the record. |
| 08:20:12 | 5 | A.   Good morning.  Brad Garlinghouse. |
| | 6 | Q.   Good morning, Mr. Garlinghouse.  I'm |
| | 7 | Jorge Tenreiro for the SEC.  I'll be asking |
| | 8 | questions on behalf of the plaintiff today. |
| | 9 | Mr. Garlinghouse, you gave testimony to |
| 08:20:23 | 10 | the SEC in an investigation that led up to this |
| | 11 | case in September of 2020, is that right? |
| | 12 | A.   I believe the date's correct, yeah. |
| | 13 | Q.   And you were under oath for that |
| | 14 | testimony, is that right? |
| 08:20:35 | 15 | A.   I was. |
| | 16 | Q.   And did you provide truthful answers to |
| | 17 | the SEC during your testimony on that date? |
| | 18 | A.   I did. |
| | 19 | Q.   Since that -- since that testimony, have |
| 08:20:44 | 20 | you given under -- other under oath testimony |
| | 21 | other than in the ███████ matter? |
| | 22 | A.   Not that I can recall, no. |
| | 23 | Q.   Okay.  And other than ███████ and the |
| | 24 | SEC investigation, have you given other testimony |
| 08:20:57 | 25 | under oath before? |

18

08:21:00  1        A.   I don't recall.  You're asking in my

        2   whole lifetime?

        3        Q.   Sure.  Yes.

        4        A.   Not that I can recall.

08:21:08  5        Q.   Okay.  The important thing to keep in

        6   mind today, I think as you've done this before,

        7   other than to try to speak slowly and not talk

        8   over each other, is that I'm never asking you to

        9   tell me the substance of any advice you got from

08:21:21 10   counsel.  So let's try to stay away from that.

       11        Do you understand?

       12        A.   I do.

       13        Q.   Is there any reason why you cannot

       14   testify truthfully or accurately today?

08:21:29 15        A.   No.

       16        Q.   Did you take steps to prepare for

       17   today's deposition?

       18        A.   I did.

       19        Q.   And what steps did you take, without

08:21:38 20   discussing the substance of conversations with

       21   counsel?

       22        A.   I met with counsel to prepare for today.

       23        Q.   How many times did you meet?

       24        A.   I don't know exactly.  As you may

08:21:53 25   recall, this -- the date of this event moved a few

                                                            19

08:21:56  1    times.  And so we met a couple times to prepare

2    each time that it got moved.

3            So, you know, more than five, less than

4    ten.

08:22:06  5        Q.   How many hours would you approximate you

6    met?

7        A.   Twenty hours.

8        Q.   Did you review documents?

9        A.   Yes.

08:22:16 10        Q.   Did any of the documents you reviewed

11    refresh your recollection as to the matters

12    related to this case?

13        A.   Not specifically, no.

14        Q.   Who was present at the preparation

08:22:26 15    sessions, generally, other than your counsel?

16        A.   Other than my counsel?

17        Q.   Yes.

18        A.   No one.

19        Q.   Was counsel for Ripple present?

08:22:35 20        A.   Yes.  Sorry.  I -- I should have been

21    more precise.  When you said my counsel, I

22    included Ripple's counsel within that construct.

23        Q.   Okay.  What about counsel for

24    Mr. Larsen?

08:22:43 25        A.   No.

20

08:22:44   1        Q.   Did you discuss your testimony with

       2   Mr. Larsen?

       3        A.   No.

       4        Q.   Did you discuss his testimony with him?

08:22:50   5        A.   Actually, one clarification.  I didn't

       6   discuss my testimony with him because I haven't

       7   given the testimony yet.  I did not discuss his

       8   testimony with -- his testimony, we didn't discuss

       9   that either.

08:23:00  10        Q.   Did you discuss your preparation for

      11   your testimony with Mr. Garling -- with

      12   Mr. Larsen?

      13        A.   Other than acknowledging that I was

      14   doing preparation because I would be out-of-pocket

08:23:08  15   for some segment of time, no.

      16        Q.   Okay.  And did you discuss any other

      17   witness's testimony with that witness?

      18        A.   No.

      19        Q.   Okay.  Do you own any XRP today?

08:23:22  20        A.   Yes.

      21        Q.   How much?  How many units?

      22        A.   I have -- that's a direct question.  I'm

      23   trying to parse it a little bit.  In terms of my

      24   direct ownership that I have custody myself?  Are

08:23:40  25   you asking what I have custody of myself or are

                                                              21

```
08:23:44   1    you asking --
           2         Q.   I'm asking how much XRP you own.
           3         A.   Well, so, by virtue of my ownership in
           4    Ripple, the company, I have indirect ownership of,
08:24:04   5    you know, say, three and a half billion units of
           6    XRP as a -- as a rough estimate.
           7         Q.   Okay.  And by -- and what about other
           8    holdings of XRP that are not by virtue of your
           9    ownership in Ripple, the company?
08:24:17  10         A.   I hold some XRP at CoinBase.  I don't
          11    know exactly how much.  Maybe ▇▇▇▇▇▇▇▇
          12    ▇▇▇▇▇▇▇▇▇▇▇  And I hold XRP in a couple of
          13    cold wallets which cumulatively probably
          14    represents ▇▇▇▇▇▇▇ units of XRP.
08:24:46  15         Q.   Any other units of XRP that you might
          16    own indirectly through an organization, an LLC, a
          17    family trust, anything like that?
          18              MR. SOLOMON:  Objection to form.
          19         A.   Not that I can recall.
08:25:00  20         Q.   Okay.  And other than XRP that you might
          21    own indirectly through your ownership in Ripple,
          22    have you ever sold any of your XRP?
          23         A.   Yes.
          24         Q.   How?  How did you sell it?
08:25:12  25         A.   I have sold XRP through Bitstamp and I
```

                                                          22

```
08:25:19   1    have sold XRP through a -- an entity called GSR.
           2         Q.   On what platforms did GSR sell the XRP
           3    for you?
           4         A.   I can't recall.
08:25:35   5         Q.   Are there records that reflect that
           6    information?
           7         A.   Yes.
           8         Q.   Where are those records?
           9         A.   In my e-mail I have those records.  I'd
08:25:45  10    imagine GSR has it.  I -- I don't think I can
          11    provide an exhaustive list of where those records
          12    are.
          13         Q.   When is the last time you sold XRP?
          14    Again, I'm talking about yours, not the indirectly
08:25:56  15    owned.
          16         A.   ███████████████ is my recollection.
          17         Q.   Do you have any present plans to sell
          18    your XRP?
          19         A.   No, I don't.
08:26:05  20         Q.   Okay.  And why did you sell XRP in
          21    ███████████████████████
          22         A.   I had a trading plan that I -- that -- a
          23    company-approved trading plan of XRP.  I vested
          24    some XRP as part of an XRP grant from the company,
08:26:25  25    and as part of that trading plan, I sold XRP.
```

23

08:26:31  1          Q.    But why did you sell it?  For what
       2  purpose?
       3          A.    No particular purpose.
       4          Q.    Who did you sell it to, the one -- the
08:26:37  5  XRP you sold in ██████████?
       6          A.    I don't know.
       7          Q.    How much did you sell it for?
       8          A.    I can't recall specifically.  I mean,
       9  I -- I think in ███████████,  my recollection is
08:26:55 10  XR -- I would be, not speculating, but guessing
      11  where the price of XRP was ███████████,  which I
      12  can't recall exactly.
      13          Q.    Can you recall the number of units you
      14  sold in ███████████?
08:27:09 15          A.    I -- I would guess it's between ██████
      16  ██████████  units.
      17          Q.    And why have you not sold since?
      18                    MR. CERESNEY:  Objection to
      19          form.
08:27:24 20                    THE REPORTER:  Who --
      21                    MR. TENREIRO:  That was Andrew.
      22          A.    I think that would encroach upon
      23  attorney-client privilege.
      24          Q.    Okay.  How is it that you don't know who
08:27:32 25  you sold the XRP to in ███████████?

                                                              24

08:27:34   1              MR. SOLOMON:  Objection; form.

         2       A.    The nature of how -- I guess the way I

         3  think about that is if I ever -- well, when you

         4  are selling XRP on an exchange, you don't know who

08:27:52   5  the counterparty is.

         6       Q.    Okay.  And is that true for the Bitstamp

         7  platform?  Is that true that you don't know who

         8  the counterparty is?

         9       A.    Yes.

08:28:01  10       Q.    And is that true for the platforms on

        11  which GSR sold your XRP?

        12       A.    I believe so.

        13       Q.    Okay.  Have you ever asked GSR if they

        14  know who they're selling your XRP to?

08:28:15  15       A.    Not that I can recall.

        16       Q.    Okay.  So you are currently employed as

        17  Ripple's CEO, is that right?

        18       A.    Yes.

        19       Q.    Okay.  And you've held that position

08:28:22  20  since January 1st, 2017, is that correct?

        21       A.    Yes.

        22       Q.    Before that you were Ripple's COO, is

        23  that right?

        24       A.    That is correct.

08:28:32  25       Q.    Okay.  And I think you became the COO

                                                            25

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
08:28:34   1   around April of 2015, is that correct?
           2        A.   Yes, that sounds correct.
           3        Q.   As CEO, do you have the power to make
           4   decisions on behalf of Ripple?
08:28:43   5        A.   As CEO, I have the authority to make
           6   decisions on behalf of Ripple.
           7        Q.   Do you have authority to manage Ripple's
           8   activities?
           9        A.   Yes.
08:28:55  10        Q.   How about to direct -- sorry.
          11        A.   I believe so.  Yes.
          12        Q.   How about to direct its policies?
          13             MR. CERESNEY:  Objection to
          14    form.
08:29:04  15        A.   Yes.
          16        Q.   Did Ripple ever file a registration
          17   statement for any XRP offer or sale with the SEC?
          18        A.   Not of which I'm aware.
          19        Q.   If you decided -- if you,
08:29:14  20   Mr. Garlinghouse, decided that Ripple should file
          21   such a registration statement, would you have the
          22   power to make that decision?
          23             MR. CERESNEY:  Objection to
          24    form.
08:29:23  25             MR. SOLOMON:  Objection.
```

                                                      26

08:29:24  1       A.   Yes.

        2       Q.   Is there anyone else who would have the

        3  authority at Ripple to make the decision to file a

        4  registration statement?

08:29:29  5                  MR. SOLOMON:  Objection.

        6       A.   I guess -- during what time period?

        7  After January 1st, 2017?

        8       Q.   Sure.

        9       A.   I mean, I think the -- the board of

08:29:42 10  directors could act in some manner to facilitate

       11  that.

       12       Q.   And have you ever sat on the board?

       13       A.   I do sit on the board.

       14       Q.   Since when?

08:29:56 15       A.   I believe I officially took the board

       16  seat in January of 2017.

       17       Q.   How many directors are on the board as

       18  of December of 2020?

       19       A.   December 2020.  I don't recall exactly.

08:30:13 20  I think seven.

       21       Q.   Okay.  And who are they?

       22       A.   In -- in December of 2020, the board

       23  members would have been myself, Chris Larsen, Anja

       24  Manuel, Susan Athey, I think, depending upon

08:30:34 25  what -- I think Ben Lawsky resigned from the board

                                                            27

```
08:30:38   1    in roughly December 2020.  Craig Phillips, Yoski
           2    Kitao.
           3         Q.    That's seven.
           4         A.    Yeah, I feel like I forgot somebody.
08:30:57   5         Q.    It's confidential.  They won't see it.
           6    It's okay.  If you don't remember, it's okay.
           7         A.    You don't want to forget one of your
           8    board members.
           9         Q.    Yeah.
08:31:05  10         A.    I said Craig Phillips.  Gene -- he's
          11    already off the board at that time.  I think
          12    that's it.
          13         Q.    Who selects -- as of December 2020, who
          14    selected who would be on the board?
08:31:19  15         A.    I mean, I'd say, generally speaking,
          16    Chris Larsen would be -- would have been the
          17    primary person, but typically what would happen if
          18    we were adding a board member is I would take
          19    point in interviewing candidates, discussing
08:31:40  20    various -- you know, the possibility of the
          21    various candidates, and then would present to
          22    Chris and the rest of the board, you know,
          23    effectively a finalist or two for the board's
          24    consideration.
08:31:51  25         Q.    Why was Mr. Larsen the primary person?
```

                                                        28

08:31:54   1                    MR. SOLOMON:   Objection.

           2          A.   Chris was the executive chairman of

           3   Ripple.  And as executive chairman, you know, I

           4   think, generally speaking, you -- the Chair of the

08:32:08   5   board as -- if the Chair of the board is not

           6   supportive of a candidate, that probably isn't a

           7   good path to push.

           8          Q.   And why did Lawsky resign?

           9          A.   Mr. Lawsky had been on the board for a

08:32:25  10   few years.  He was approaching his four-year

          11   tenure.  He had worked at a digital asset

          12   investment group -- or he does work at a digital

          13   asset investment group, as an advisor, called

          14   ███████   which I think stands for ████████████████

08:32:44  15   ██████████████████████████

          16            And by virtue of his position -- you

          17   know, his board position sometimes created

          18   knowledge he had about Ripple that couldn't be

          19   shared and needed to be kind of firewalled within

08:32:58  20   the ███████████████████████.  And I think over time

          21   he felt like, as █████████ was growing and his time

          22   spent on ████████ was growing, I think he felt that

          23   his -- that the conflict was becoming more

          24   problematic.  Or the potential conflict was

08:33:13  25   becoming more problematic.

                                                              29

08:33:17  1          Q.    Before working for Ripple,
          2    Mr. Garlinghouse, did you have any experience with
          3    cryptography?
          4          A.    No.
08:33:23  5          Q.    Did you have any experience before
          6    working for Ripple with distributed ledgers?
          7          A.    No.
          8          Q.    Did you have any experience before you
          9    joined Ripple with cryptocurrency?
08:33:35 10          A.    Minimal.
         11          Q.    What was that experience?
         12          A.    I owned some bitcoin.
         13          Q.    Other than that, did you have any
         14    experience with cryptocurrency?
08:33:45 15          A.    No.
         16          Q.    Did you have any experience with
         17    Byzantine fault theory?
         18          A.    No.
         19          Q.    When you joined Ripple, what, if any,
08:33:53 20    work did you do to sort of educate yourself or
         21    familiarize yourself with distributed ledgers and
         22    blockchain technology?
         23          A.    I met with people at Ripple to better
         24    understand Ripple's technology.
08:34:16 25          Q.    What people did you meet with?

                                                              30

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
08:34:20    1        A.   Certainly ████████   I believe was
            2   the CTO at the time.  ████████   was the VP of
            3   engineering at the time.  Arthur Britto was an
            4   outside advisor to the company.  That would be a
08:34:38    5   handful of examples.
            6        Q.   Okay.  When you joined Ripple, did you
            7   understand that Ripple owned XRP?
            8        A.   I actually don't recall what I actually
            9   understood at the time I joined Ripple.
08:34:51   10        Q.   You're talking about, like, the day you
           11   started?
           12        A.   Yeah.
           13        Q.   Shortly after starting Ripple --
           14   starting to work at Ripple, did you come to
08:34:57   15   understand that Ripple held XRP?
           16        A.   Certainly during the course of calendar
           17   year 2015 I came to understand that Ripple owned
           18   XRP.
           19        Q.   Before you started at Ripple, who did
08:35:08   20   you meet with about Ripple at Ripple?
           21        A.   Sorry.  Maybe just restate the question,
           22   please.
           23        Q.   Sure.
           24             Who did you meet with Ripple sort of --
08:35:20   25   let me start again.
```

                                                                31

| | | |
|---|---|---|
| 08:35:22 | 1 | Who did you meet with at Ripple in |
| | 2 | connection with starting your employment there? |
| | 3 | A.    Including interviews? |
| | 4 | Q.    Yeah. |
| 08:35:31 | 5 | A.    So my first interview -- well, the |
| | 6 | interview came by virtue of outreach from a |
| | 7 | recruiter named ████████ with a recruiting firm |
| | 8 | I can't recall the name of.  Includes the name |
| | 9 | ████████ |
| 08:35:46 | 10 | And I first met with Chris Larsen.  I |
| | 11 | probably met people coming and going, but the |
| | 12 | first meeting was Chris Larsen.  I think I was |
| | 13 | introduced to a couple of people on the way in and |
| | 14 | the way out. |
| 08:35:59 | 15 | I remember coming back and meeting with |
| | 16 | a number of people who would have reported to this |
| | 17 | newly created position of COO.  That included |
| | 18 | ████████, that included Monica Long, that |
| | 19 | included Patrick Griffin.  I think that included |
| 08:36:17 | 20 | Asheesh Birla. |
| | 21 | I met with at least one board member, a |
| | 22 | gentleman named Arjan Schutte, who is no longer on |
| | 23 | the board.  I can't -- that's all I can recall. |
| | 24 | Q.    So is it your recollection today that |
| 08:36:38 | 25 | after these meetings, these sort of preliminary |

32

```
08:36:41   1   meetings or interviews, you were not necessarily
           2   sure about whether Ripple owned XRP, is that
           3   right?
           4              MR. SOLOMON:  Objection.
08:36:51   5        A.   Yeah, I actually remember -- and I think
           6   in my deposition from the investigation, you know,
           7   I remember interviewing with Chris Larsen.  I
           8   remember leaving the meeting and thinking I did
           9   not know what he was talking about because I maybe
08:37:06  10   hadn't done enough homework going into the meeting
          11   to understand some of the things that he was
          12   describing.
          13              I remember him talking about billions of
          14   XRP and me -- the word "billions" is a notable
08:37:19  15   thing.  And so I was, like, what is he talk -- you
          16   know.  So I did not understand and sought to
          17   better understand, but I don't recall, you know,
          18   what research I did.
          19        Q.   Sure.
08:37:30  20              So throughout the calendar year 2015,
          21   you -- you came to understand that Ripple held
          22   billions of XRP, is that right?
          23        A.   Yes.
          24        Q.   And how did you come to gain that
08:37:39  25   understanding?
```

                                                                    33

08:37:43  1        A.   I don't recall.

       2        Q.   And throughout calendar year 2015, did

       3   you come to understand that Ripple's XRP holdings

       4   were a significant asset for Ripple?

08:37:51  5                  MR. SOLOMON:  Objection to form.

       6        A.   No.

       7        Q.   Did you ever come to understand that

       8   X -- Ripple's XRP holdings were a significant

       9   asset for Ripple?

08:37:59 10        A.   Yes.

      11        Q.   At what point did you come to understand

      12   that?

      13        A.   I didn't consider Ripple's holdings of

      14   XRP significant probably until 2017.

08:38:13 15        Q.   And why -- why in 2017 did you start to

      16   consider them to be significant?

      17        A.   Two factors:  One is the liquidity in

      18   the XRP market had increased markedly and the

      19   value of the XRP that Ripple held increased

08:38:30 20   markedly.

      21        Q.   And "the value," do you mean the -- does

      22   that include the price of XRP?

      23        A.   Price I think would be included in

      24   value, yes.

08:38:37 25        Q.   Okay.  So -- understood.

                                                          34

GRADILLAS COURT REPORTERS
(424) 239-2800

08:38:41  1              Has the regulatory status of XRP -- I'm
          2   not talking just about securities laws, but has
          3   the regulatory status of XRP been an important
          4   issue for you throughout your tenure as Ripple's
08:38:55  5   CEO?
          6              MR. SOLOMON:  Objection to form.
          7       A.   No.
          8       Q.   Has -- at any time during your tenure as
          9   Ripple's CEO, has the regulatory status of XRP
08:39:03 10   been important to you?
         11              MR. SOLOMON:  Objection to form.
         12       A.   Yes.
         13       Q.   At what time did that -- did it begin
         14   being important to you?
08:39:09 15       A.   What I -- what I recall is Ripple
         16   received a letter from the SEC in spring, late
         17   spring, of 2018.  And that was a time when I was,
         18   like, oh, okay, this needs to increase on the
         19   prioritization list.
08:39:32 20              MR. SOLOMON:  And if I could just
         21          interrupt, when you say "regulatory
         22          status," do you mean across the board or
         23          just with respect to the Securities and
         24          Exchange --
08:39:41 25              MR. TENREIRO:  No, I meant across

                                                                    35

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
08:39:42    1            the board.  And that's why I want to go
            2            back, because I think he might have --
            3                     MR. SOLOMON:  That's what I was
            4            clarifying, yes.
08:39:46    5   BY MR. TENREIRO:
            6       Q.   So let me -- let me -- thank you for
            7   that.  I want to get to that.
            8                     MR. TENREIRO:  And thank you to
            9            Mr. Solomon, because my question was
08:39:49   10            broader first.
           11       A.   Okay.
           12       Q.   So sort of the regulatory status of XRP.
           13       A.   Oh, yeah.
           14       Q.   You know, it doesn't just have to be
08:39:55   15   securities laws.
           16            Was that important in general to you
           17   when you were the CEO?
           18       A.   Well, maybe even going slightly more
           19   macro, you know, I -- I would say I spent --
08:40:08   20   certainly before the time I referenced earlier of
           21   the spring of 2018, early spring of 2018, you
           22   know, I was meeting with central bankers around
           23   the world.  You know, that was primarily to
           24   provide clarity, transparency, education about
08:40:25   25   Ripple, about how we used XRP.
```

36

```
08:40:32   1            You know, other governments around the
           2    world are, frankly, ahead of the United States in
           3    providing clarity about how they looked at digital
           4    assets broadly.  You know, the UK created
08:40:47   5    something called the Token Taxonomy Act.  Other
           6    governments created various things.
           7            So I spent time, energy -- directly,
           8    indirectly -- to educate myself as well as
           9    evangelize and hopefully educate the market on,
08:41:06  10    you know, various constructs that I thought would
          11    allow for these industries to thrive.
          12        Q.   Okay.  So -- and -- and in terms of the
          13    importance -- let me start again.
          14            As the CEO of Ripple, throughout your
08:41:21  15    tenure has it been important to you that Ripple
          16    comply with U.S. law?
          17                MR. CERESNEY:  Objection to
          18        form.
          19        A.   Yes.
08:41:29  20        Q.   Okay.  And to the extent that you spent
          21    time -- I think we said central bankers -- did
          22    this begin when you were COO? when you were CEO?
          23    Can you give me a point of reference as to when
          24    this sort of activity began for you?
08:41:44  25        A.   I don't recall specifically.  I think
```

37

08:41:45   1   it's fair to say that it has always been a

2   priority for Ripple to act, you know, within and

3   in concert with governments around the world in

4   how the digital asset market was evolving.

08:42:02   5          As you probably are aware, I think in

6   contrast -- and, frankly, one of the things that

7   drew me to Ripple, I felt, having owned bitcoin

8   and looked at the digital asset mark -- market

9   broadly, I felt that the idea that bitcoin and

08:42:20  10   some in the early origins of the kind of crypto

11   industry were very anti-government, anti-bank,

12   we're going to circumvent the government, we're

13   going to circumvent the banks.  And I always felt

14   that that was, at best, shortsighted.

08:42:35  15          And one of the things that drew me to

16   Ripple was Ripple's view that, hey, we're going to

17   work with the banks, we're going to work alongside

18   the governments, and use these technologies to

19   provide benefit to customers, to consumers, to,

08:42:48  20   you know, all segments of the population.

21       Q.   Okay.  And did you -- you -- you -- you

22   mentioned a few moments ago sort of the late

23   spring of 2018 as a moment where you got a letter

24   from the SEC, is that correct?

08:43:02  25       A.   That's correct.

38

08:43:03  1          Q.    Did you get it personally or did you get
          2     it through counsel?
          3          A.    I believe I got it through counsel.
          4          Q.    Okay.  And who was that?
08:43:09  5          A.    ███████████ was our general counsel at
          6     the time.
          7          Q.    Okay.  Do you know how ███████ got it?
          8          A.    I do not.
          9          Q.    Okay.  Did you read the letter?
08:43:18 10          A.    And, by the way, to be fair, it may have
         11     come directly to me.  Someone -- between the time
         12     it came into the building and got to me, I think
         13     ████████ was probably the first recipient of it.
         14          Q.    Did you read the letter?
08:43:32 15          A.    At some point I'm sure I did.
         16          Q.    Okay.  Did you -- so I'm just going to
         17     use the late spring of 2018 as that moment in
         18     time.
         19                Before the late spring of 2018, had you
08:43:42 20     had conversations with your chief compliance
         21     officer about the regulatory status of XRP under
         22     U.S. laws?
         23          A.    I don't recall.
         24          Q.    And the chief compliance officer, just
08:43:51 25     to be clear, was Antoinette O'Gorman at that time?

                                                                    39

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

08:43:55   1              A.    I believe so, yes.

           2              Q.    Okay.  If XRP is deemed to be a security

           3      under United States law, would that have a

           4      significant impact on Ripple?

08:44:08   5                        MR. CERESNEY:  Objection.

           6                        MR. SOLOMON:  Objection.

           7              A.    Well, part of -- I mean, I think, to

           8      answer that question, I'd be commenting on

           9      conversations I've had with counsel.

08:44:19  10              Q.    So I'm asking you as the CEO of the

          11      business, you know.  From your business

          12      perspective, would that determination have a

          13      significant impact on your company?

          14                        MR. SOLOMON:  Only if you can

08:44:28  15                  answer the question without getting into

          16                  conversations that you've had with

          17                  attorneys.

          18                        THE WITNESS:  Yeah.

          19              A.    When I arrived at Ripple, I knew nothing

08:44:36  20      about securities laws.  Probably in late spring of

          21      2018, I had limited familiarity with securities

          22      laws.

          23                     So my understanding of how Ripple's

          24      business might, could have been, would be affected

08:44:53  25      by -- if XRP were deemed to be a security was

                                                                      40

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

08:44:58  1    certainly informed by legal counsel.

       2        Q.   Okay.  If you -- if Ripple was not ever

       3    able to sell another unit of XRP again, would that

       4    be significant for Ripple?

08:45:08  5                 MR. SOLOMON:  Objection to form.

       6        A.   Possibly.

       7        Q.   What would it depend on?

       8        A.   How Ripple's business evolved without

       9    having XRP.

08:45:25 10        Q.   We'll get back to that.

      11             Let's -- you said when you arrived at

      12    Ripple you knew nothing about securities laws, is

      13    that correct?

      14        A.   I knew very little about securities

08:45:35 15    laws.

      16        Q.   You've -- you've never gone to law

      17    school, for example, correct?

      18        A.   Correct.

      19        Q.   You've never practiced law?

08:45:43 20        A.   I have never practiced law.

      21        Q.   Okay.  In 2017 you read the SEC's DAO

      22    Report, D-A-O Report?

      23                 MR. SOLOMON:  Objection to form.

      24        A.   I don't recall reading the DAO Report.

08:45:56 25        Q.   You were aware of the DAO Report?

                                                            41

```
08:45:56   1                    MR. SOLOMON:  Objection to form.

           2        A.   I was aware of the DAO Report.

           3        Q.   And -- all right.

           4             So do you understand that one of the

08:46:05   5   issues in this case is whether XRP was offered and

           6   sold by -- by Ripple as a security subject to

           7   regulation by the SEC?

           8                    MR. SOLOMON:  Objection to form.

           9        A.   Can you repeat that question?

08:46:18  10        Q.   Yes.

          11             Do you understand that one of the issues

          12   in this matter, in this litigation, is whether

          13   Ripple offered and sold XRP as a security?

          14                    MR. SOLOMON:  Objection to form.

08:46:26  15        A.   Yes.

          16        Q.   Has anyone at the SEC ever told you that

          17   they did not view Ripple's offers and sales of XRP

          18   as securities transactions?

          19                    MR. CERESNEY:  Do you mean other

08:46:42  20             than with discussions with counsel?

          21                    THE REPORTER:  I'm sorry, I

          22             can't hear you.

          23                    MR. CERESNEY:  Do you mean other

          24             than through discussions with counsel?

08:46:43  25                    MR. SOLOMON:  I think he was
```

                                                                  42

```
08:46:44   1              saying at the -- has any SEC employee --
           2                      MR. TENREIRO:  Has any SEC
           3              employee told him --
           4                      THE WITNESS:  Will you repeat the
08:46:52   5              question, please?
           6                      MR. TENREIRO:  Yes.
           7                      THE WITNESS:  Thank you.
           8      BY MR. TENREIRO:
           9          Q.   Has any SEC employee ever told you that
08:46:56  10      they did not view Ripple's offers and sales of XRP
          11      as securities transactions?
          12          A.   No.
          13          Q.   Has any SEC employee ever told you that
          14      they did not view your offers and sales of XRP as
08:47:11  15      a securities transaction?
          16          A.   No.
          17          Q.   Has any SEC employee ever told you that
          18      the SEC does not view Ripple's offers and sales of
          19      XRP as a securities transaction?
08:47:24  20          A.   No.
          21          Q.   Has any SEC employee ever told you that
          22      the SEC does not view your offers and sales of XRP
          23      as a securities transaction?
          24          A.   I think implicit in that question is
08:47:36  25      that -- sorry, could you repeat the question?
```

43

08:47:38  1        Q.   Has any SEC employee ever told you that
         2   the SEC does not view you, Mr. Garlinghouse's,
         3   sales of XRP as securities transactions?
         4        A.   I'm not trying to be -- I'm having
08:47:51  5   trouble following that whole thing.  One more
         6   time.  I apologize.
         7        Q.   Yeah.  No problem.
         8             Has any SEC employee ever told you that
         9   the SEC itself --
08:47:59 10        A.   Yes.
        11        Q.   -- does not view Mr. Garlinghouse's
        12   transactions as securities transactions?
        13        A.   No.
        14        Q.   Okay.  Are you aware of anyone
08:48:06 15   affiliated with the SEC communicating to anyone at
        16   Ripple sort of in sum and substance that Ripple's
        17   transactions are not securities transactions?
        18        A.   Well, when you include anyone at the SEC
        19   and anyone at Ripple, I guess that includes public
08:48:22 20   statements that the SEC and individuals at the SEC
        21   may have made to the public.
        22        Q.   Well, we can talk about those, but I --
        23   here I was asking about conversations between SEC
        24   employees or, you know, people affiliated with the
08:48:37 25   SEC, working for the SEC, and people working for

                                                              44

```
08:48:40   1   Ripple.
           2          A.   Not of which I'm aware.
           3          Q.   Okay.  And are you aware that in
           4   approximately September of 2019, SEC staff
08:48:46   5   informed Ripple that they were likely to conclude
           6   that it did view Ripple's offers and sales of XRP
           7   as securities transactions?
           8                MR. SOLOMON:  Objection to form.
           9                MR. CERESNEY:  Also, here again,
08:48:57  10          this is other than discussions with
          11          counsel.  So if the only discussion you
          12          had was with counsel in this regard, then
          13          I would instruct you not to answer.
          14                MR. TENREIRO:  So you're going to
08:49:05  15          instruct him not to answer the transmittal
          16          information simply repeating what the SEC
          17          said.  Okay.
          18                MR. CERESNEY:  Yes, I am.
          19                MR. TENREIRO:  Go ahead.
08:49:12  20                MR. CERESNEY:  And not -- and
          21          not simply repeating.  Your question was
          22          broader than that.  In any event, the
          23          discussion between counsel and
          24          Mr. Garlinghouse would be privileged.
08:49:19  25                MR. TENREIRO:  My question is not
```

45

08:49:20  1          broader.

       2   BY MR. TENREIRO:

       3          Q.   My question is:  Are you aware -- yes or

       4   no.  Are you aware that in September of 2019, SEC

08:49:25  5   staff informed Ripple that the SEC staff was

       6   likely to conclude that it viewed Ripple's offers

       7   and sales of XRP as securities transactions?

       8          A.   No.

       9              MR. SOLOMON:  Objection to form.

08:49:33 10              MR. CERESNEY:  And I'm going to

      11        instruct the witness that if that

      12        discussion was with counsel, he should

      13        not answer the question.

      14          Q.   So are you -- you're -- go ahead.

08:49:41 15          A.   My testimony is no.

      16          Q.   Okay.  In 2018 you met with certain SEC

      17   Commissioners at the SEC's headquarters in

      18   Washington, correct?

      19          A.   Sorry.  Could you repeat the dates?

08:49:53 20          Q.   In 2018.

      21              MR. SOLOMON:  Objection; form.

      22          A.   I don't know the exact dates.  I -- in,

      23   I believe, June of 2018 -- you know, to be honest,

      24   I don't remember the exact dates.  It was later in

08:50:06 25   the summer of 2018 I met with Chairman Clayton and

                                                        46

```
08:50:10   1    subsequently had meetings with Commissioner
           2    Roisman and Commissioner Pierce.
           3         Q.   What was the purpose of the meetings?
           4         A.   To discuss, as I had with, you know,
08:50:20   5    kind of many government officials around the
           6    world, what Ripple does, how we use XRP, our views
           7    on the crypto markets.
           8         Q.   How did you procure the meetings?
           9              MR. SOLOMON:  Objection to form.
08:50:34  10         A.   Which -- well, I recall the meeting with
          11    Chairman Clayton was organized by individuals at
          12    the White House.  I don't recall how the meetings
          13    with Commissioner Pierce or Commissioner Roisman
          14    came to fruition.
08:50:54  15         Q.   Okay.  What individuals at the White
          16    House were you referencing in your prior answer?
          17         A.   A gentleman, ███████████ had taken an
          18    interest in what was going on and he had been
          19    helpful in organizing the meeting.
08:51:11  20         Q.   Had taken an interest in what had been
          21    going on.  Can you be a little more specific?
          22         A.   So I think this was after the SEC had --
          23    let me back up a little bit.
          24              One of the things that I came to feel
08:51:29  25    in, you know, early 208 -- sorry, early summer of
```

47

08:51:32  1    2018, as evidenced by the letter we received from

2    the SEC, is that we had not been -- I had not been

3    particularly proactive or, frankly, I don't think

4    I made any trips to Washington, D.C., despite

08:51:49  5    talking to governments in other parts of the world

6    to talk about what Ripple's doing, how we use

7    these technologies, how the crypto markets were

8    evolving.

9           So I came to feel that we needed to be

08:52:00 10    more proactive in Washington.  And John Roscoe had

11    taken an interest in, I guess, the crypto markets

12    and had offered to help arrange a meeting.

13       Q.    Did someone at Ripple know him or did

14    someone just contact him randomly?

08:52:19 15           MR. SOLOMON:  Objection.

16       A.    No, it -- it was even more circuitous

17    than that.  The ███████████████ a

18    gentleman, as I recall, named ████████, he

19    proactively reached out to me via an introduction

08:52:39 20    by a gentleman named ██████████. ██████ reached

21    out to me -- he's a friend -- and said ██████

22    ██████ would like to talk to you."  Again, I don't

23    remember exactly.  But, "Hey, would you be open to

24    an introduction to the ████████████████

08:52:54 25    He's, you know, pro crypto.  You might enjoy

48

```
08:52:57   1   talking to him."

           2          I talked to him.  And he mentioned -- I

           3   think ████████ used to work for him.  And the

           4   three of us did a phone call -- ████████ and

08:53:08   5   myself -- and then after that ████ arranged -- or,

           6   actually, I don't know how ████ arranged the

           7   meeting, but he -- ████████ attended the

           8   meeting.

           9      Q.   So you're talking about the Clayton

08:53:22  10   meeting?

          11      A.   Yes.

          12      Q.   Let me put a pause on that because I

          13   want to go back to something we were discussing a

          14   moment ago.

08:53:28  15          I had asked you if you were aware of

          16   anyone affiliated with the SEC communicating to

          17   anyone at Ripple that they did not view Ripple's

          18   transactions to be securities transactions.  And

          19   I'm paraphrasing, but you said -- you referenced

08:53:41  20   public statements that the SEC and individuals

          21   made.

          22          Do you recall referencing that a few

          23   moments ago?

          24      A.   I do.

08:53:47  25      Q.   What were you referring to when you were
```

49

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

08:53:49  1    referencing public statements?

2          A.   I mean, there have been a number of

3    interviews by people who are currently at the SEC,

4    people who were at the SEC, who have given

08:54:04  5    interviews about crypto and about the regulatory

6    status of crypto.

7          Q.   Did any -- in any of those interviews

8    someone at the SEC mention a view that XRP

9    transactions by Ripple were not securities

08:54:21  10   transactions?

11         A.   Well, I think members of SEC staff, both

12   at that time and members of the SEC today, have

13   made comments which have suggested that they did

14   not view XRP as a security.

08:54:41  15        Q.   What -- and what comments are you

16   referencing?

17         A.   Well, I happened to see on Twitter

18   yesterday Chair Gensler was saying in 2018 that he

19   viewed 75 percent of the crypto market as not

08:54:54  20   securities, as one example.

21         Q.   Right.

22              So Mr. Gensler was not associated with

23   the SEC in 2018, correct?

24         A.   As far as I know, yes.

08:55:04  25        Q.   Okay.  So let me frame the question in

50

```
08:55:07   1    time.

           2              Before the filing of the lawsuit, did

           3    anyone at -- at the SEC, who was at the SEC at

           4    that time, make public statements that they did

08:55:19   5    not view Ripple's transactions in XRP as

           6    securities transactions?

           7         A.   Well, I mean, again, referencing public

           8    statements, the director of corporate finance,

           9    Bill Hinman, had given an in-depth speech.  One of

08:55:37  10    the topics he covered in that was that X -- excuse

          11    me, ETH was not a security and, in large part,

          12    because of the decentralization of ETH, which I

          13    viewed -- and I think others viewed as well -- XRP

          14    in many ways is more decentralized than ETH.  And

08:55:58  15    if decentralization was an important component of

          16    the SEC's determination that ETH was not a

          17    security, that seemed like a positive indicator

          18    for how the SEC may view XRP.

          19              MR. SOLOMON:  That was your

08:56:10  20         inference.  I think what he's asking is

          21         specifically about XRP.  If you recall

          22         anybody from the SEC specifically

          23         commenting on the regulatory status of

          24         XRP, whether it was or was not a security,

08:56:21  25         if I have that right.
```

                                                                    51

```
08:56:22   1          A.   No.

           2                    MR. TENREIRO:  You do.

           3                    MR. SOLOMON:  Okay.

           4     BY MR. TENREIRO:

08:56:24   5          Q.   Okay.  So let's go back to the -- the

           6     meeting, I think with Clayton.  Generally your

           7     recollection is somebody named ████████ might

           8     have helped secure that meeting, correct?

           9          A.   Not might have.  He did.

08:56:39  10          Q.   Oh, he did.  Okay.

          11                    And what about -- did he also help you

          12     set up the meeting with Commissioner Pierce?

          13          A.   I don't recall.

          14          Q.   Okay.  And did Ripple give ████████

08:56:54  15     anything of value in connection with him setting

          16     up the meeting?

          17          A.   Not that I'm aware of.

          18          Q.   Okay.  Did you meet with Commissioner

          19     Pierce?

08:57:01  20          A.   Yes.

          21          Q.   Who was present?  Sorry.

          22          A.   Yes.  I believe so.

          23          Q.   Okay.  Where?

          24          A.   I believe it was at the SEC's offices.

08:57:11  25          Q.   Who was present?
```

                                                              52

08:57:12   1          A.   Commissioner Pierce was present.  I was
           2     present.  And I don't recall who else.
           3          Q.   Were any of your lawyers present?
           4          A.   Not to my recollection.
08:57:21   5          Q.   And at the meeting with Commissioner
           6     Roisman, who was present?
           7          A.   Commissioner Roisman was present.  I
           8     believe his chief of staff was present.  Actually,
           9     I do believe at that meeting that maybe his -- to
08:57:35  10     the extent he has counsel, I think there was a
          11     lawyer that attended from the SEC.
          12          Q.   You mean for Mr. Roisman?
          13          A.   Yes.
          14          Q.   Commissioner Roisman.
08:57:44  15          A.   Sorry.  Yes.
          16          Q.   Did -- was your counsel present?
          17          A.   No.  Actually, let me restate that.  Not
          18     to my recollection.
          19               MR. SOLOMON:  And just for
08:57:55  20          clarification, when you say "your
          21          counsel," do you mean Ripple's counsel,
          22          Brad's personal counsel, or both?  I just
          23          want to make sure that we're clear on
          24          that.
08:58:03  25     BY MR. TENREIRO:

                                                                  53

08:58:03    1          Q.   Were either of -- either your personal

            2    counsel or Ripple's counsel present?

            3          A.   I didn't have personal counsel until

            4    2020.  So I'm certain that my personal counsel was

08:58:12    5    not present.

            6          Q.   Sure.  And -- okay.

            7               And, now, at the meeting with Chair

            8    Clayton, was -- since you did not have personal

            9    counsel, was Ripple's counsel present at that

08:58:19   10    meeting?

           11          A.   No.

           12          Q.   Who was present?

           13          A.   From Ripple?

           14          Q.   Yes.  Well, anybody.  Who was present?

08:58:29   15          A.   I -- I doubt I can -- I mean, my

           16    recollection, Chair Clayton was certainly there,

           17    Director Hinman was there.  I believe Chair

           18    Clayton's chief of staff was there, David Schwartz

           19    was there, I was there, and ███████████ was there.

08:58:45   20    And I think that's a comprehensive list.

           21          Q.   How long did that meeting last?

           22          A.   I believe an hour.

           23          Q.   Did -- have you ever met with any other

           24    sitting SEC commissioner?  I understand, you know,

08:58:55   25    there's some former commissioners, but have you

                                                                        54

08:58:58   1   ever had meetings with sitting -- sitting SEC

           2   commissioners?

           3         A.   Not to my knowledge.

           4         Q.   Other than the meetings with Chair

08:59:04   5   Clayton, Commissioners Roisman and Pierce, other

           6   than those three meetings -- sorry.

           7              Did you meet with any of them more than

           8   once?

           9              MR. SOLOMON:  Objection to form.

08:59:16  10         A.   Sorry.  One recollection I just had is I

          11   did -- I don't remember when Commissioner Jackson

          12   left his tenure.  I think I may have met with him

          13   immediately before, within like the week before he

          14   exited his commissioner status.

08:59:31  15         Q.   Okay.  For what purpose did you meet

          16   with him?

          17         A.   I mean, similar to talk about what's

          18   going on in crypto, to talk about with what's

          19   going on with Ripple.  Evangelizing, you know,

08:59:41  20   what Ripple's up to and our views of, you know,

          21   U.S. regulatory dynamics.

          22         Q.   Did you meet with him at the SEC?

          23         A.   No.

          24         Q.   Where did you meet with him?

08:59:52  25         A.   Here in New York.

                                                                      55

| | | |
|---|---|---|
| 08:59:54 | 1 | Q.   Where in New York? |
| | 2 | A.   I don't recall the name of the place, to |
| | 3 | be honest with you.  It was a coffee shop, I |
| | 4 | think. |
| 09:00:02 | 5 | Q.   In these meetings with the |
| | 6 | Commissioners, did any of the commissioners tell |
| | 7 | you that they did not believe that XRP is a |
| | 8 | security? |
| | 9 | A.   Yes. |
| 09:00:14 | 10 | Q.   Who? |
| | 11 | A.   I recall Commissioner Roisman very |
| | 12 | specifically saying "I'm sorry you've even had to |
| | 13 | come here."  I think that the confusion about the |
| | 14 | status of XRP he viewed as not healthy for the |
| 09:00:31 | 15 | market.  I -- I don't -- I recall less about the |
| | 16 | meeting with Commissioner Pierce. |
| | 17 | Q.   Okay.  Did the Chair tell you he did not |
| | 18 | believe XRP was a security? |
| | 19 | A.   No. |
| 09:00:44 | 20 | Q.   Okay.  And Commissioner Roisman, you -- |
| | 21 | you referenced he said he was sorry you had to |
| | 22 | come here, but did he tell you that he did not |
| | 23 | view XRP as a security? |
| | 24 | MR. SOLOMON:  If you recall. |
| 09:00:56 | 25 | A.   Yeah.  I don't recall the exact words |

56

09:00:57   1      that were used.  I -- I think -- I mean,

           2      understandably, you're asking me did I have

           3      clarity -- you're asking about each of these

           4      meetings and did someone make an affirmative

09:01:08   5      statement they didn't view XRP as a security.  In

           6      none of these meetings did everyone -- anyone ever

           7      say they viewed that XRP was a security.

           8           Q.   Okay.  So you recall that -- you recall

           9      that at none of these meetings anyone said that

09:01:21  10      they viewed that XRP was a security?  You recall

          11      that, is that fair?

          12           A.   I think I would certainly recall if a --

          13      if a -- and as I testified earlier in this

          14      deposition, if a SEC member, commissioner or

09:01:35  15      otherwise, had said they viewed XRP was a

          16      security, I would remember that.

          17           Q.   And would you remember if one of them

          18      had said they viewed it as not a security?

          19           A.   Well, I -- I recall Commissioner

09:01:46  20      Roisman, without knowing exactly the words that

          21      were said, making statements that in the -- you

          22      know, there may be contemporaneous emails,

          23      although those may have been internal with

          24      counsel, but said that, you know, having had these

09:02:03  25      meetings, I -- I think it's worth pointing out,

                                                                      57

```
09:02:06    1    you know, I didn't go to any of these meetings

            2    with a lawyer because there never was a viewpoint

            3    that that would have even have been necessary.

            4    And certainly no one at the SEC ever said anything

09:02:20    5    to suggest that perhaps the SEC might view XRP as

            6    a security and perhaps they might view Ripple's

            7    sales of XRP as unregistered such that a lawyer

            8    would have even have been necessary.

            9         Q.   Okay.  But let's just go back because

09:02:36   10    I'm trying to get an answer on the Rois -- the

           11    Commissioner Roisman question.

           12              You have a recollection that none of the

           13    Commissioners told you they viewed it as a

           14    security.  And my question is, do you have a

09:02:45   15    recollection of any of the Commissioners telling

           16    you they did view it as a security specifically?

           17              MR. SOLOMON:  Objection to form.

           18         A.   Can you repeat the question?

           19         Q.   Yes.

09:02:55   20              Do you have a recollection of any of the

           21    commissioners at these meetings telling you they

           22    viewed XRP as a security?

           23         A.   I think I testified the answer to that

           24    is no.

09:03:03   25         Q.   Okay.  And do you have any recollection
```

                                                                    58

```
09:03:05   1   of any of the commissioners at these meetings
           2   telling you they did not view XRP as a security?
           3         A.   And I think I testified yes.
           4         Q.   Okay.  And that's Commissioner Roisman?
09:03:14   5         A.   Correct.
           6         Q.   And did any of the commissioners' staff
           7   members share with you their views as to whether
           8   XRP was a security?
           9         A.   I don't recall.
09:03:30  10         Q.   Okay.  Did you convey what Commissioner
          11   Roisman told you to anybody else?
          12              MR. SOLOMON:  And, again, be
          13         careful here not to --
          14              THE WITNESS:  Yeah.
09:03:35  15              MR. SOLOMON:  -- disclose
          16         information that you may have conveyed to
          17         counsel in connection with privileged
          18         conversation.
          19         A.   Could you repeat the question?
09:03:42  20         Q.   Did you convey what the commissioner
          21   told you, Commissioner Roisman told you, to
          22   anybody else?
          23         A.   Not that I can specifically recall.
          24         Q.   At the time of the meeting with
09:03:52  25   Commissioner Roisman, you are aware that the SEC
```

                                                          59

09:03:54  1    was investigating Ripple, correct?

        2          A.   No.

        3          Q.   You had not received -- you had not

        4    received the letter from SEC when you met with

09:04:03  5    Commissioner Roisman?

        6          A.   I definitely did not and I don't think

        7    even from the SEC's definition that that would

        8    have been considered an investigation at that

        9    time.

09:04:11 10          Q.   Okay.  You had received -- you

       11    definitely did -- had not received a letter from

       12    the SEC by the time you met with Commissioner

       13    Roisman?

       14          A.   No, that's not my testimony.

09:04:19 15          Q.   Okay.  I -- I apologize.  Can you

       16    clarify?

       17          A.   Ask the question again, please.

       18          Q.   Yes.

       19               At the time that you -- that you met

09:04:25 20    with Commissioner Roisman, had you received a

       21    letter from the SEC?

       22          A.   Yes.

       23          Q.   Okay.  So you were aware that the SEC

       24    was asking questions about Ripple's activities at

09:04:34 25    that time?

                                                              60

09:04:38   1        A.   I don't remember, and I haven't reread

          2   the -- that letter from the SEC.  I think my

          3   understanding at the time was that the SEC wanted

          4   to discuss the status of XRP, not necessarily

09:04:54   5   Ripple's activity with it.

          6        Q.   The status of XRP under the securities

          7   laws?

          8        A.   Under the securities laws.

          9        Q.   Okay.  What was the understanding based

09:05:02  10   on?

         11             MR. SOLOMON:  Again, be very

         12         careful in responding that you don't

         13         disclose attorney-client privileged

         14         information you may have had with counsel.

09:05:13  15         Not me, other counsel.

         16        A.   Okay.  Can you ask the question again?

         17        Q.   Sure.

         18             You said "my understanding at the time

         19   was that the SEC wanted to discuss the status of

09:05:21  20   XRP, not necessarily Ripple's activity with it."

         21   And my question is, what was that understanding

         22   based on?

         23        A.   I think I can't really comment to that

         24   outside of attorney-client privilege.

09:05:32  25        Q.   Okay.  So you had -- but you had an

                                                              61

09:05:35  1   understanding that the SEC wanted to discuss the

2   status of XRP when you met with Commissioner

3   Roisman?

4        A.   Yes.

09:05:42  5        Q.   Did that understanding that the SEC

6   wanted to discuss the status of XRP change after

7   your meeting with Commissioner Roisman?

8        A.   You know, even today I don't fully

9   understand the dynamic between a commissioner and

09:05:58 10   staff.  And so I would not have expected that a

11   commissioner having a viewpoint, whether or not

12   that affected staff's activity.

13             And, again, I think it's worth pointing

14   out I never would have used the word

09:06:19 15   "investigation" to describe the SEC's activities.

16   I think it was primarily led by corporate finance

17   as it related to XRP in this time period.

18             And so I kind of viewed it as, okay, you

19   know, as I had with many government -- governments

09:06:38 20   around the world, this was an opportunity to

21   explain, discuss, educate.  And in part, frankly,

22   because other governments around the world had

23   taken express clarifying views that XRP was a

24   currency, I viewed it as, okay, you know, let's

09:07:01 25   have conversations with the SEC as well.

62

```
09:07:12   1        Q.    You said "other governments around the
           2   world have taken express clarifying views that XRP
           3   was a currency."  As of the time you were having
           4   conversations with the SEC?
09:07:21   5        A.    I think that's right, yes.  I believe
           6   so.
           7        Q.    Can you recall which ones?
           8        A.    Well, certainly the UK, Japan, and
           9   Singapore would all come to mind.
09:07:31  10        Q.    Any others?
          11        A.    Switzerland has taken a -- I mean, my
          12   one qualification here is I don't remember exactly
          13   what timelines and, you know, the fuzzy --
          14   fuzziness of, you know, what happened in 2017,
09:07:45  15   2018.  But certainly in -- my recollection is that
          16   a number of governments around the world in 2017,
          17   because of what I would describe as an ICO boom,
          18   an initial coin offering boom, got more active and
          19   provided clarifying statements.
09:08:04  20             And so I would probably highlight Japan,
          21   UK, Singapore, maybe Switzerland.
          22        Q.    Okay.  And, again, this issue of
          23   regulatory status was important to you as CEO.
          24   You were meeting with, I think you said, central
09:08:18  25   banks, et cetera.
```

                                                              63

```
09:08:19   1                    MR. SOLOMON:  Objection to form.
           2          A.    I don't think that was my testimony.  I
           3     think my testimony -- I didn't consider regulatory
           4     status.  I thought it was important that central
09:08:28   5     banks understood that how Ripple uses its
           6     technology doesn't circumvent any of the
           7     financial, you know, rules and regulations
           8     associated with money laundering, KYC, OFAC
           9     compliance.
09:08:41  10              And I think -- my experience was that
          11     when central banks, when various regulators
          12     understood that the nature of Ripple's technology,
          13     and even how we use XRP, doesn't circumvent a
          14     regulated end point in a financial institution,
09:08:59  15     that the laws that they apply for whatever
          16     financial regulations they want to put in place
          17     don't change based upon using Ripple's technology
          18     in their markets.
          19          Q.    Separate from meetings with central
09:09:13  20     banks, was the regulatory status of XRP important
          21     to you as CEO in 2017?
          22          A.    No.
          23          Q.    Okay.  Did it ever become important to
          24     you?
09:09:22  25          A.    Yes.
```

64

09:09:22  1        Q.   When?

       2        A.   I -- I think my testimony earlier was

       3   when we received a letter from the SEC, it -- it

       4   raised on my prioritization list.

09:09:32  5                MR. SOLOMON:  Again, I just want

       6          to clarify.  His regulatory status in

       7          relation to the SEC or generally?

       8                MR. TENREIRO:  I was talking

       9          generally.

09:09:39 10                MR. SOLOMON:  Okay.  That's not

      11          the question.  He was asking you --

      12                THE WITNESS:  Yes.

      13                MR. SOLOMON:  -- as to whether

      14          the regulatory status was important to you

09:09:46 15          at any point in time.

      16                THE WITNESS:  Repeat the question

      17          one more time.  I apologize.

      18   BY MR. TENREIRO:

      19        Q.   Was the regulatory status of XRP

09:09:51 20   important to you as CEO in 2017?

      21        A.   The thing I'm trying to separate is

      22   regulatorily -- regulatory status as opposed to,

      23   you know, regulatory, you know, rules and

      24   regulations associated with money transmission.

09:10:08 25   The latter would have always been important to me.

                                                        65

09:10:13   1          Q.   Okay.
           2          A.   The former generally wasn't because I
           3    didn't think of it as an important, critical
           4    issue, because it seemed so obvious to me that it
09:10:24   5    was a currency and is being regulated as a
           6    currency by many governments around the world.  I
           7    didn't think of it as a critical, important issue
           8    that needed lots of attention because it seemed
           9    obvious to me.
09:10:37  10          Q.   So the regulatory status of XRP, for
          11    example, with respect to money transmission rules,
          12    were important to you throughout your tenure as
          13    CEO, is that correct?
          14          A.   Yes.
09:10:47  15          Q.   Okay.  Were there any other sort of
          16    regulatory frameworks that were important to you?
          17    So I think you -- we've been talking about
          18    securities and -- and money transmission.  Other
          19    regulatory frameworks that were important to you
09:11:00  20    with respect to XRP in 2017?
          21          A.   It's a very broad question.  You know,
          22    well, maybe ask the question one more time so I --
          23    or if you could maybe narrow it a little bit, that
          24    would be helpful.
09:11:18  25          Q.   Well, other -- just -- I'm just asking

                                                                      66

09:11:19  1    for a recollection.

       2              So other than, you know, money

       3    transmission type rules, securities-related

       4    issues, were there other regulatory issues that

09:11:25  5    were important to you with respect to XRP in 2017?

       6         A.   Is KYC considered a money transmission

       7    rule?

       8         Q.   So KYC is another.

       9              Any -- anything else you can recall?

09:11:38 10         A.   So I view -- I viewed -- my recollection

      11    from really the earliest days, in part because of

      12    the settlement that Ripple had with FinCEN, from

      13    the earliest days thinking that any rule,

      14    regulation, law, as it related to banking, whether

09:11:55 15    it's, you know, OFAC compliance, anti-money

      16    laundering, terrorist finance protection, you

      17    know, all of those constructs as very important --

      18    our work with banks meant that all of those were

      19    very important and needed to be -- we needed to

09:12:14 20    educate, both internally/externally, how Ripple

      21    did or did not impact those dynamics.

      22         Q.   Okay.  And then after you received the

      23    letter from the SEC, I think you said that the

      24    securities issues raised in importance for you.

09:12:30 25         A.   Yes, as a -- as a prioritization matter,

                                                              67

```
09:12:32   1    I had not considered that a high priority.  And
           2    after receiving the SEC's letter, it became a
           3    higher priority.
           4        Q.   Okay.  After your meeting with
09:12:44   5    Commissioner Roisman, did you come to understand
           6    that whatever questions the SEC had about Ripple's
           7    XRP activities had ceased?
           8            MR. SOLOMON:  Objection.
           9        A.   No.
09:13:01  10        Q.   And did the issue of XRP status with the
          11    SEC, did that lower in priority after your meeting
          12    with Commissioner Roisman?
          13            MR. SOLOMON:  Objection to form.
          14        A.   I -- probably directionally, yes.
09:13:14  15    Right?  I mean, if you meet with a commissioner of
          16    the SEC and you come away feeling like there's,
          17    you know -- at no point did it seem like there
          18    was a -- at least at that point it did not seem
          19    like there was an investigation.  At no point did
09:13:28  20    it seem like, you know -- the posture of an
          21    important U.S. regulator was kind of, hey, we're
          22    exploring and trying to figure this out ourselves.
          23    And it seemed very cooperative and -- to me.  Even
          24    meetings I recall you sitting in, you know, there
09:13:49  25    were 20 people from the SEC attending and, you
```

                                                              68

09:13:53  1    know, 18 or 19 of them were not from enforcement.

       2        Q.   So I guess I'm trying to understand.   At

       3    no point you said -- I'm reading.   You said "At no

       4    point did it seem like -- the posture of an

09:14:05  5    important U.S. regulator was kind of, hey, we're

       6    exploring and trying to figure this out

       7    ourselves."

       8             So what did it seem like to you that it

       9    was?

09:14:12 10             MR. SOLOMON:   Objection to form.

      11        Q.   So --

      12        A.   I'm not sure that's exact -- I mean, I

      13    understand that's what you're reading, but I don't

      14    recall saying exactly that.   But maybe just to

09:14:23 15    answer your question, I think my recollection is

      16    that a letter was received from the SEC and our

      17    engagement with the SEC was not with enforcement.

      18    It was with corporate finance.

      19             And we spent a fair bit of energy with,

09:14:43 20    generally speaking -- I mean, I think I used -- I

      21    think there were about 20 people from the SEC at

      22    one meeting I recall of which I think you may have

      23    been the only person from enforcement.

      24        Q.   (Indicating.)

09:14:53 25        A.   A couple.   All right.   Very few.

                                                              69

09:14:57  1            And, you know, so my view was, hey, this
          2   is a -- a new asset class.  The SEC was trying to
          3   understand how different projects work.  I
          4   don't -- I mean, I think all those meetings
09:15:15  5   happened after Director Hinman's speech about ETH.
          6   And, you know, I think we were pushing for further
          7   clarity.  I thought the ETH speech, you know,
          8   begged many, many questions.  Like, okay, now we
          9   know the SEC's position on bitcoin.  Now we know
09:15:33 10   the SEC's position on ETH.  And that's all we
         11   knew.  I mean, with the exceptions of enforcement
         12   cases that had come out against maybe more
         13   traditionally defined ICOs.
         14            THE REPORTER:  "I mean" --
09:15:43 15       repeat.
         16       A.   I mean, other than cases that had
         17   already been brought against what we would more
         18   formally consider traditional ICOs.
         19       Q.   And I think you said enforcement cases,
09:15:55 20   but, okay.
         21            So when -- what --
         22       A.   Are there cases that aren't enforcement?
         23       Q.   That's a good point.
         24            So what did you understand the purpose
09:16:03 25   then of the meetings with CorpFin were?  With

                                                          70

```
09:16:08  1    CorpFin were, what was the purpose in your mind?
          2              MR. SOLOMON:  And I just want to
          3         know, with CorpFin, can you be more spe --
          4         you can ask him the general question.  He
09:16:17  5         can say what he recalls.  I don't know if
          6         you wanted him to be more specific in your
          7         answer.  I don't know.
          8              MR. TENREIRO:  Yeah.  I mean -- I
          9         guess let me try this.
09:16:21 10    BY MR. TENREIRO:
         11         Q.   You were talking about the meetings,
         12    there were 20 people.  I was at one of them, you
         13    know.
         14              What did you think the purpose of Ripple
09:16:27 15    meeting with the SEC was at that point in time?
         16         A.   To learn.
         17         Q.   For the SEC to learn?
         18         A.   Yeah.
         19         Q.   Okay.  To learn about what?
09:16:39 20         A.   Ripple.  To learn about XRP.
         21         Q.   Okay.  Anything else you can recall sort
         22    of thinking the purpose was?
         23         A.   (Indicating.)
         24         Q.   Verbal, please.  Verbal answer.
09:16:52 25         A.   No.  Sorry.
```

71

| | | |
|---|---|---|
| 09:16:53 | 1 | Q. The court reporter -- |
| | 2 | A. Right. Right. |
| | 3 | Q. Okay. All right. So I think -- going |
| | 4 | back, you know, I think you said directionally |
| 09:16:58 | 5 | your meeting with Commissioner Roisman was |
| | 6 | important given what he said to you. Is that -- |
| | 7 | A. I don't think that was my testimony. |
| | 8 | Q. Okay. So was -- was the meeting with |
| | 9 | Commissioner -- given that you were having |
| 09:17:10 | 10 | meetings with the SEC, was your meeting with |
| | 11 | Commissioner Roisman and what he told you |
| | 12 | important to you? |
| | 13 | A. All of the meetings I had with the SEC |
| | 14 | were important to me. I mean, I traveled to |
| 09:17:24 | 15 | Washington, D.C. as one evidence that I was |
| | 16 | prioritizing this and taking it seriously. I took |
| | 17 | all the meetings I had with individuals at the SEC |
| | 18 | as important and informative. |
| | 19 | Q. Okay. But to the extent Commissioner |
| 09:17:40 | 20 | Roisman conveyed to you or to the extent that -- |
| | 21 | to the extent that Commissioner Roisman conveyed |
| | 22 | to you his views about XRP, was that of particular |
| | 23 | significance -- |
| | 24 | MR. SOLOMON: Objection. |
| 09:17:51 | 25 | Q. -- in the role of these several |

72

| | | |
|---|---|---|
| 09:17:52 | 1 | meetings? |
| | 2 | MR. SOLOMON:  Objection to form. |
| | 3 | A.   I mean, I wouldn't say it was of |
| | 4 | particular significance beyond the idea -- I |
| 09:18:05 | 5 | viewed all the meetings with the SEC as |
| | 6 | significant.  It was significant.  I viewed all |
| | 7 | the meetings as significant.  I didn't view the |
| | 8 | Roisman conversation as massively more significant |
| | 9 | or less significant. |
| 09:18:19 | 10 | Q.   Okay.  Now, is your understanding of the |
| | 11 | purpose of your meetings with the CorpFin staff |
| | 12 | based on advice from counsel or is it based on |
| | 13 | your own sort of understanding? |
| | 14 | MR. SOLOMON:  Objection to form. |
| 09:18:33 | 15 | A.   Could you ask that question again? |
| | 16 | Q.   Yes. |
| | 17 | Is your understanding of the purpose of |
| | 18 | your meetings with the CorpFin staff based on |
| | 19 | advice from counsel or is it based on your own |
| 09:18:41 | 20 | understanding? |
| | 21 | A.   That's an excellent question.  Meaning, |
| | 22 | you know, I had very little knowledge.  As I |
| | 23 | testified earlier, I -- you know, I'm not a |
| | 24 | lawyer.  I'm not a securities lawyer.  I had very |
| 09:18:55 | 25 | little knowledge about how the SEC worked.  And so |

73

```
09:19:02   1    part of -- certainly part of the education of how
           2    the SEC worked and the significance of who was in
           3    the room for various meetings would have come from
           4    conversations with counsel.
09:19:14   5        Q.    Okay.
           6              MR. TENREIRO:  Can we take a look
           7          at Exhibit 51, please?
           8              (Whereupon, exhibit is presented
           9          and marked SEC Garlinghouse Exhibit 51
09:19:22  10          for identification.)
          11              MR. TENREIRO:  Here's to you,
          12          Matt, and then the rest down there.  One
          13          for Bridget, please.
          14    BY MR. TENREIRO:
09:20:00  15        Q.    All right.  So I'm going to just read
          16    into the record while you take a look at the
          17    exhibit, Mr. Garlinghouse.  This is BG-51, Bates
          18    RPLI_SEC 235167.  It appears to be an email of
          19    November 11, 2018, from Mr. Garlinghouse.
09:20:21  20              Do you see all that?
          21        A.    I do.
          22        Q.    Okay.  And it appears to be addressed to
          23    a ████████████, is that correct?
          24        A.    Yes.
09:20:30  25        Q.    Who is that?
```

74

```
09:20:34    1          A.    ███████████   is a friend of Chris
            2    Larsen's.
            3          Q.    But what does he do in life?
            4          A.    I don't know exactly.  I know he's been
09:20:41    5    a very successful businessman.
            6          Q.    Why did you send him this email?
            7          A.    Can I read the email first?
            8          Q.    Yeah.  Oh, I thought you had.  I'm
            9    sorry.
09:21:02   10          A.    No.
           11                (Pause)
           12          A.    Okay.
           13          Q.    Why did you send him this email?
           14                MR. SOLOMON:  Objection to form.
09:21:50   15          A.    I don't recall.
           16          Q.    Did Mr. Larsen ask you to send this
           17    email?
           18                MR. SOLOMON:  Objection to form.
           19          A.    I don't recall.
09:21:57   20          Q.    The subject is "Notes for Eli."
           21                Who is Eli?
           22          A.    I believe Eli -- well, I'm not a hundred
           23    percent sure.  I believe Eli is Secretary
           24    Mnuchin's Chief of Staff.
09:22:12   25          Q.    Was, right?  Back then.
```

75

| | | |
|---|---|---|
| 09:22:15 | 1 | A.   Yeah. |
| | 2 | Q.   Okay. |
| | 3 | A.   Well, actu -- I don't know. |
| | 4 | Q.   Why -- why were you sending notes for |
| 09:22:19 | 5 | Eli? |
| | 6 | A.   Maybe can you clarify the question a |
| | 7 | little bit? |
| | 8 | Q.   Yeah. |
| | 9 | Why were you sending ██████████ notes |
| 09:22:30 | 10 | for Eli? |
| | 11 | A.   My recollection is that ██████████ has |
| | 12 | a personal relationship with Mnuchin, with the |
| | 13 | then-sitting Secretary Mnuchin.  And in an effort |
| | 14 | to, you know -- my understanding is that the Chief |
| 09:22:46 | 15 | of Staff to the Secretary of the Treasury might be |
| | 16 | a facilitator of things that the Secretary might |
| | 17 | choose to engage or not engage in. |
| | 18 | Q.   Okay.  Was one of the purposes to see if |
| | 19 | he might engage in statements about the regulatory |
| 09:23:04 | 20 | status of XRP? |
| | 21 | MR. SOLOMON:  Objection to form. |
| | 22 | A.   I don't recall.  I obviously read the |
| | 23 | email, but I don't recall. |
| | 24 | Q.   Okay.  The email -- let's -- let's go |
| 09:23:15 | 25 | through it. |

76

```
09:23:16    1              You say "As briefly discussed, my
            2    meetings in D.C. went very well and I continue to
            3    gather evidence that the SEC (and those tangential
            4    to the SEC) do Not" -- and "not" is capitalized --
09:23:28    5    "believe that XRP is a security."
            6              Do you see that?
            7         A.   I do see that.
            8         Q.   Who are you talking about there?  What
            9    evidence are you referring to?  Let's start with
09:23:36   10    that.
           11         A.   I guess the first thing, I think the
           12    absence of anyone saying that they view XRP as a
           13    security, to me, would be evidence that they don't
           14    view XRP as a security.
09:23:50   15         Q.   Any other evidence?
           16         A.   As I testified earlier, I think my
           17    conversations with Roisman -- I mean, I don't
           18    remember the -- the exact time frame of -- it's
           19    been years.  I remember certain nuggets of my
09:24:03   20    conversation with Commissioner Roisman.  As I
           21    mentioned, I don't particularly recall my meeting
           22    with Commissioner Pierce.  Based upon her other
           23    public statements, it certainly is reasonable in
           24    my mind to imagine that I left those meetings, as
09:24:25   25    I describe here, that I feel they went very well
```

                                                              77

```
09:24:33   1    and felt like good news.
           2         Q.    Let's situate -- let's look at 49 just
           3    so we can have some timing.
           4                  (Whereupon, exhibit is presented
09:25:04   5             and marked SEC Garlinghouse Exhibit 49
           6             for identification.)
           7                  MR. TENREIRO:   All right.
           8    BY MR. TENREIRO:
           9         Q.    I'm just going to -- I'm not going to
09:25:11  10    spend any time on this, but I just want you to
          11    take a look because it seems to reference the date
          12    of your meeting with Commissioner Pierce.   This is
          13    BG-49 which is an email, RPLI_SEC 766852.
          14                  And just take a look -- have you read
09:25:35  15    the email?
          16         A.    I have.
          17         Q.    Okay.  Do you have -- you're probably
          18    not going to remember the exact date of your
          19    meeting with Commissioner Pierce, do you?
09:25:42  20         A.    No.
          21         Q.    Okay.  Do you have any reason to believe
          22    it was not on or around November 9th, 2018?
          23         A.    No.
          24         Q.    Okay.  And who is ██████████, by the
09:25:49  25    way?
```

                                                              78

09:25:50  1        A.    She was my executive assistant at the

       2    time.

       3        Q.    Okay.  And you see this email, Exhibit

       4    49, references Mr. Roscoe?

09:25:56  5        A.    Yes.

       6        Q.    Does that refresh your memory as to

       7    whether Mr. Roscoe also helped you procure the

       8    meeting with Commissioner Pierce?

       9        A.    It doesn't refresh my memory.  Obviously

09:26:04 10    I see what the email says.

      11        Q.    Okay.  All right.

      12            So back to Exhibit 51, which is a

      13    November 11th email -- and I'm going to get you

      14    the date of the Roisman meeting in a second.

09:26:19 15    Okay.  My understanding is that it was also on the

      16    9th, the same day.

      17            Do you recall if you met with both of

      18    them on the same day?

      19        A.    I don't recall.

09:26:27 20        Q.    Okay.  Any reason to believe that that

      21    is not true?

      22        A.    No reason to believe that.

      23        Q.    Okay.  So back to Exhibit 51.  We're

      24    talking -- I was asking you what evidence you had

09:26:39 25    gathered.  Can you -- I'm sorry.  I'm going to ask

                                                              79

09:26:41  1  you just repeat, please.  Can you repeat for me
        2  what evidence you had gathered that you're
        3  referencing in this email?
        4       A.    Yeah.  I think my earlier testimony was
09:26:49  5  that the -- you know, if you have lots of meetings
        6  with the SEC and no one says that XRP is a
        7  security, or even at that point no one said they
        8  think it is a security, the absence of that
        9  information would certainly be a -- I view a
09:27:04 10  positive.
       11       Q.    Okay.  Any other evidence that you have
       12  gathered?
       13       A.    Well, as I -- I testified earlier, my --
       14  my recollection from -- my recollections from my
09:27:13 15  meeting with Commissioner Roisman were more
       16  specific in his viewpoints that he did not view
       17  XRP as a security.  And I remember him apologizing
       18  that I felt like I needed to even come meet with
       19  him.
09:27:25 20       Q.    Are you referencing any other evidence?
       21       A.    I don't recall other evidence.
       22       Q.    Okay.  And then you say "and those
       23  tangential to the SEC."  That's in the
       24  parenthetical.
09:27:39 25            Do you see that?

                                                              80

```
09:27:39   1          A.    I do see that it's a parenthetical.
           2          Q.    Who are you referring to as "those
           3   tangential to the SEC"?
           4          A.    I do not recall.
09:27:51   5          Q.    Okay.  Further down you say "I've
           6   outlined some key bullets that I believe capture
           7   the major points for outreach to Eli."
           8                Do you see that?
           9          A.    I do see that.
09:28:00  10          Q.    Okay.  So I'll get to the bullets in a
          11   minute, but is it fair to -- am I correct in
          12   understanding that you were transmitting proposed
          13   sort of bullet points or ideas that ██████████
          14   could decide to transmit to -- to Eli?
09:28:12  15                MR. SOLOMON:  Objection to form.
          16          Q.    Is that what -- what's going on here?
          17                MR. SOLOMON:  Objection to form.
          18          A.    That's my interpretation of what's going
          19   on here, yes.
09:28:18  20          Q.    Do you have any reason to believe that
          21   that's not what happened?
          22          A.    No.
          23          Q.    Okay.  Well, that's not --
          24          A.    Actually, I have no idea what happened,
09:28:23  25   just to be clear.  I know I sent an email as
```

81

09:28:25    1    evidenced here.  I don't recall sending the email.

            2    But I have no idea what happened after ███████████

            3    received the email.

            4         Q.    Right.

09:28:33    5               So, for example, you don't know if he

            6    did or did not contact the Chief of Staff of the

            7    Secretary of the Treasury?

            8         A.    Correct.

            9         Q.    Okay.  Did you ever speak to the

09:28:40   10    Secretary of the Treasury about XRP?

           11         A.    Yes.

           12         Q.    Okay.  When?

           13         A.    I don't recall.  Around this time frame.

           14         Q.    Did he express any views as to the

09:28:50   15    status of the XRP under the securities laws?

           16         A.    I don't recall.

           17         Q.    Did his Chief of Staff, Eli?  I don't

           18    remember his last name.  I apologize.

           19         A.    Miller maybe?  I don't remember.  I

09:29:02   20    don't recall.

           21         Q.    Okay.  All right.  So you don't know if

           22    ████████████  sent these talking points or conveyed

           23    the talking points, but -- to Eli, but you did

           24    talk to Eli or the Secretary of the Treasury at

09:29:14   25    some point?

                                                                    82

09:29:14    1                    MR. SOLOMON:   Objection to form.

            2          A.    Yes.

            3          Q.    Okay.  Did you convey to them what --

            4    the evidence that you had gathered about the SEC's

09:29:23    5    views of XRP under the securities laws?

            6          A.    I don't recall.  I think it's unlikely I

            7    would have taken that approach in a meeting with

            8    the Secretary of the Treasury.  My recollection is

            9    a meeting with the Secretary of the Treasury, as

09:29:35   10    my meetings with other senior officials at

           11    governments around the world, is usually to talk

           12    about what Ripple is doing as a company, how we

           13    use XRP in our technology stack, how...

           14                 You know, one thing I do recall from

09:29:48   15    that meeting is there are -- a number of those

           16    people at the meeting with the Secretary of the

           17    Treasury, and there was a particular interest in

           18    how crypto flows could or could not be used to

           19    circumvent regulatory -- financial regulations in

09:30:08   20    ways that, you know, could be used for terrorist

           21    financing and things like that.

           22          Q.    This evidence that you were gathering

           23    that's referenced in this email, did you convey it

           24    to any other government official in the United

09:30:24   25    States?

                                                                    83

```
09:30:25   1            A.    I don't recall.
           2            Q.    Did you convey it to any Ripple
           3    employee?
           4            A.    I don't recall.
09:30:30   5            Q.    Did you convey it to anybody?
           6            A.    Apparently I did.
           7            Q.    Other than -- other than ███████.
           8            A.    I don't recall.
           9            Q.    Okay.  Did -- in your meetings with the
09:30:41  10    commissioners, did the commissioners or their
          11    staff, you know, tell you not to discuss publicly
          12    the conversations you had with them?
          13            A.    I don't recall.
          14            Q.    Did the commissioners or their staff
09:30:52  15    warn you not to talk about the SEC's
          16    investigation?
          17            A.    No.
          18            Q.    Okay.
          19            A.    Again, I will reiterate earlier
09:31:00  20    testimony.  I -- at that point I certainly did not
          21    view what -- the SEC's engagement with Ripple to
          22    be an investigation.
          23            Q.    At what point did you start to view this
          24    as an investigation?
09:31:11  25            A.    I don't know.  I don't recall.
```

84

09:31:14  1   Certainly in 2020 it reached that point in my

       2   mind.

       3        Q.   Okay.  You don't recall the point.  It

       4   could have been in 2019?

09:31:22  5        A.   Could have.  I don't recall.

       6        Q.   Okay.  Okay.  So you say -- sorry.

       7   "Those tangential to the SEC," who are you

       8   referring there to again?

       9             MR. SOLOMON:  Objection; asked

09:31:40 10        and answered.

      11        A.   I don't recall.

      12        Q.   You don't recall.  Okay.  All right.

      13        The third bullet point says "Brad

      14   Garlinghouse, Ripple's CEO, has met with SEC Chair

09:32:03 15   Clayton, Commissioners Roisman and Pierce to

      16   discuss the above and the Ripple team has had

      17   several meetings with SEC staff.  All indications

      18   have been that they do not believe XRP is a

      19   security."

09:32:11 20             Do you see that?

      21        A.   I do.

      22        Q.   Who does "they" refer to in that

      23   sentence?

      24        A.   I -- I -- I don't believe that I wrote

09:32:25 25   the sentence.  I think that the sentence seems to

                                                          85

```
09:32:28    1    be referring to all of the people referred to in

            2    the previous sentence.

            3         Q.   Who wrote the sentence?

            4         A.   I don't know.

09:32:37    5              MR. TENREIRO:  Let's look at

            6         Exhibit 50, please.

            7              (Whereupon, exhibit is presented

            8         and marked SEC Garlinghouse Exhibit 50

            9         for identification.)

09:32:56   10              MR. TENREIRO:  Here you go.

           11              MR. SOLOMON:  Thank you.

           12              MR. TENREIRO:  All right.  I'm

           13         just going to read into the record while

           14         Mr. Garlinghouse takes a look.  This is a

09:33:18   15         two-page email, RPLI_SEC 626652.

           16    BY MR. TENREIRO:

           17         Q.   Do you -- do you see this appears to be

           18    an email from you to Mr. Larsen on November 11th,

           19    2018?

09:33:32   20         A.   Yes.

           21         Q.   Okay.  And you tell Mr. Larsen you're

           22    planning to send ███████████ these points later

           23    today.

           24              Do you see that?

09:33:39   25         A.   Yes, I do see that.
```

                                                              86

```
09:33:40   1        Q.   Okay.  And it says "I've outlined some
           2   key bullets that I believe capture the major
           3   points for outreach to Eli."
           4             Do you see that?
09:33:49   5                  MR. SOLOMON:  Did you read the
           6        email?
           7                  THE WITNESS:  Yeah, let me just
           8        do a quick, full read of it.  Sorry.
           9                  (Pause)
09:34:22  10        A.   Okay.  Can you repeat the question,
          11   please?
          12        Q.   Yes.
          13             Do you see the part of the email that
          14   says "I've outlined some key bullets that I
09:34:28  15   believe capture the major points for outreach to
          16   Eli"?
          17        A.   Yes.
          18        Q.   Okay.  Does that refresh your
          19   recollection that you did, in fact, write these
09:34:36  20   bullets?
          21        A.   Certainly no.
          22        Q.   Okay.  Do you have any reason to
          23   believe, though, that what you told Mr. Larsen in
          24   your email, where you say "I've outlined some key
09:34:43  25   bullets" is not true?
```

87

```
09:34:44   1        A.    Yes.

           2        Q.    What is the reason?

           3        A.    I -- I think my experience in how I work

           4   with my team is that somebody on my team probably

09:34:50   5   put these together.

           6        Q.    Okay.

           7        A.    I -- I use the pronoun "I" in talking

           8   about work that my team does.  I take credit for

           9   their work all the time.

09:35:00  10        Q.    Got it.  Got it.

          11              So, in fact, you took credit for these

          12   bullets?

          13        A.    Yes.

          14        Q.    All right.  And you read them, right?

09:35:05  15        A.    I think it's almost certain that I would

          16   have read them, yes.

          17        Q.    Okay.  And you -- all right.

          18              So going back to Exhibit 51, my question

          19   was the third bullet talks about "All indications

09:35:19  20   have been that they do not believe that XRP is a

          21   security." I asked you who "they" referred to.

          22   And you said "I don't believe that I wrote the

          23   sentence.  I think that the sentence seems to be

          24   referring to all of the people referred to in the

09:35:31  25   previous sentence."
```

88

09:35:35   1           So is it your understanding that "they"
           2   means the SEC staff, SEC Chair Clayton,
           3   Commissioners Roisman and Pierce?  Is that your
           4   testimony?
09:35:42   5       A.   Yes.
           6       Q.   Okay.  And on what basis did you have a
           7   belief that all of those people did not believe
           8   that XRP was a security?
           9       A.   Given the opportunity, none of them
09:35:54  10   chose to express to me they did believe XRP was a
          11   security.
          12       Q.   Anything else?
          13       A.   As I've already testified, I think I do
          14   have some recollections today of my conversations
09:36:02  15   with Roisman.  I don't recall anything specific in
          16   my conversations with Commissioner Pierce and I
          17   only had one meeting with Chair Clayton.
          18           So sitting here today, I can't recall
          19   other reasons why I may have said that.
09:36:21  20       Q.   Is there any document that might help
          21   refresh your memory with respect to any other
          22   reasons why you may have said this?
          23       A.   I don't recall.
          24       Q.   To the extent that your staff is the one
09:36:31  25   who wrote these bullet points, what information

                                                                89

```
09:36:33   1    did you give your staff so that they were able to

           2    write a bullet point saying that all indications

           3    have been that they do not believe XRP is a

           4    security?

09:36:41   5        A.   I probably had contemporaneous verbal

           6    conversations to debrief on various meetings.

           7              MR. SOLOMON:  Would the SEC's

           8         notes of these meetings refresh your

           9         recollection perhaps?

09:36:51  10              THE WITNESS:  If the SEC has

          11         notes about these meetings, that would be

          12         super helpful.

          13    BY MR. TENREIRO:

          14        Q.   Wait a second.  Wait a second.  I'm not

09:36:57  15    talking about the meetings between the SEC.  I'm

          16    talking about your meetings with your staff first.

          17    That's what I'm talking about.

          18        A.   Okay.

          19        Q.   I would hope the SEC does not have notes

09:37:03  20    of those meetings.

          21              Do you have notes of those meetings,

          22    though?

          23        A.   No.

          24        Q.   Okay.  Do you have recordings of those

09:37:08  25    meetings?
```

90

```
09:37:08   1          A.   No.
           2          Q.   Okay.  So you're saying these meetings
           3    were in person?
           4          A.   I believe you told me those meetings
09:37:12   5    were in person.
           6          Q.   No.  I'm talking about your meetings
           7    with your staff, Mr. Garlinghouse.
           8          A.   Oh, I apologize.
           9          Q.   Were the --
09:37:18  10          A.   Let me -- yeah, let me back up.  I think
          11    I misunderstood a number of those questions.
          12    Maybe we should rewind for a moment.
          13          Q.   Let's rewind.  I think you were telling
          14    me that your staff might have drafted these bullet
09:37:29  15    points and I'm asking you what information you
          16    gave them so that they were able to draft the
          17    bullet points.  And so I think you said,
          18    generally, that you had meetings with them and I'm
          19    trying to understand where, when, how these
09:37:43  20    meetings occurred.
          21                MR. SOLOMON:  Objection.
          22          Q.   So were these meetings in person?
          23                MR. SOLOMON:  Objection.
          24          A.   So let me rewind just so I now have
09:37:52  25    clarification of the questions you're asking.
```

91

09:37:53   1            I expect, based upon my behaviors of how

           2   I would operate, is after I left the meeting, I

           3   would probably --

           4        Q.   Sir, I'm going to stop you.  The meeting

09:38:02   5   with the SEC?

           6        A.   Correct.

           7        Q.   Okay.

           8        A.   Well, with members of the SEC.

           9        Q.   Uh-huh.

09:38:06  10        A.   I would have had a verbal conversation,

          11   a telephone call, to debrief about, hey, just had

          12   this meeting.  Here's how it went.  Here's a

          13   couple bullets about it.

          14        Q.   And who would that conversation have

09:38:20  15   been with?

          16        A.   I mean, amongst others, it would have

          17   included general counsel.  I -- I don't recall.

          18        Q.   After your meeting with Commissioner

          19   Roisman, who did you debrief?

09:38:33  20        A.   I don't recall.

          21        Q.   Okay.  Mr. -- Commissioner Roisman

          22   telling you his views that XRP was not a security

          23   and apologizing to you, I think you described that

          24   as -- as significant.  I think you said all the

09:38:44  25   meetings were significant, is that right?

                                                                92

09:38:45  1        A.   I did view all of the meetings with the
         2   SEC as significant.
         3        Q.   Okay.  So did you ask -- did you
         4   memorialize that anywhere in writing, what he told
09:38:53  5   you?
         6        A.   I don't recall.
         7        Q.   Did you ask anyone to memorialize it in
         8   writing?
         9        A.   I don't recall.
09:38:58 10        Q.   Okay.  So can you tell me which of your
        11   staff members wrote the drafts of these bullet
        12   points?
        13        A.   I don't recall.
        14        Q.   Would they have taken notes --
09:39:11 15        A.   Just to clarify, I believe my testimony
        16   was I don't recall who wrote these bullets.  I'm
        17   not saying definitively I didn't or did.  I'm just
        18   saying my experience is it's unlikely I wrote
        19   these bullets.
09:39:23 20        Q.   To the extent that you did not, which of
        21   your staff members would have, you know, given
        22   past practice?
        23        A.   I don't recall.
        24        Q.   Well, just give me a list of staff
09:39:30 25   members that wrote bullets for you.

                                                              93

09:39:32  1          MR. SOLOMON:  For the entire time
       2       he was at --
       3          MR. TENREIRO:  Yeah.
       4     A.   I mean, all of my direct reports at one
09:39:37  5  point or another would have drafted bullets for
       6  me.
       7     Q.   Okay.  Would your assistants have
       8  drafted bullets for you, your administrative
       9  assistants?
09:39:45 10     A.   Probably not.
      11     Q.   Okay.  So when you talk about your
      12  direct reports, you're talking, for example,
      13  Ms. Long, as one example?
      14          MR. SOLOMON:  Objection.
09:39:52 15     A.   Yes, that would be one example.
      16     Q.   Mr. Schwartz was not your direct report,
      17  at least in 2017?
      18          MR. SOLOMON:  Objection to form.
      19     A.   I don't recall when Mr. Schwartz started
09:39:59 20  reporting to me, but he would not have been
      21  someone who is likely to have written bullets for
      22  me.
      23     Q.   Mr. Griffin was a direct report?
      24     A.   Mr. Griffin in 2017 would have been a
09:40:11 25  direct report, yes.

                                                    94

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

09:40:12   1          Q.   Okay.  So is there anything other than

           2   the absence of statements and the conversation

           3   with Commissioner Roisman upon which you base all

           4   indications that the staff and these commissioners

09:40:27   5   do not believe XRP is a security?

           6              MR. SOLOMON:  Objection; asked

           7   and answered.

           8          A.   I don't recall.

           9          Q.   Okay.  The next bullet says "Ripple is

09:40:44  10   seeking from the SEC to proactively make a

          11   statement that XRP is not a security."

          12              Do you see that?

          13          A.   Yes.

          14          Q.   Was that true at that time?

09:40:53  15          A.   I -- I don't recall, but I believe it to

          16   be true based upon what's written here.

          17          Q.   And then it references a speaking

          18   engagement that the Chair had, a coming speaking

          19   engagement in New York.  And a statement -- you

09:41:06  20   make a statement -- or the bullet makes a

          21   statement about the opportune time for him to make

          22   a statement such as "we continue to look carefully

          23   at this developing landscape," et cetera.

          24              Do you see that?

09:41:15  25          A.   I do see that.

                                                              95

```
09:41:16   1          Q.    Okay.  Did the Chair make this statement
           2    at that public engagement?
           3          A.    Not that I'm aware of.
           4          Q.    Okay.  Did -- is -- was one of the
09:41:24   5    purposes of this email to ██████████ to suggest a
           6    way in which to convince Clayton to make the
           7    statement?
           8          A.    Could you repeat the question?
           9          Q.    Yeah.
09:41:36  10          Was the purpose -- was one of the
          11    purposes of this email to sort of see if
          12    ██████████████ could help in outreach to the Chair so
          13    that he would make that statement on the public
          14    engagement?
09:41:48  15                MR. SOLOMON:  Objection to form.
          16          Q.    Perhaps to Eli or the Secretary of the
          17    Treasury, but...
          18                MR. SOLOMON:  Objection to form.
          19          A.    I believe so.
09:41:57  20          Q.    Okay.  Okay.  Did -- did anyone at the
          21    SEC proactively make a statement that XRP is not a
          22    security after this date, as you describe it here?
          23          A.    Not that I'm aware of.
          24          Q.    Okay.  Why did you want the SEC to
09:42:10  25    make proactively --
```

96

```
09:42:10   1              MR. SOLOMON:  A -- a -- a public
           2        statement?
           3              THE WITNESS:  Oh, that's an
           4        excellent clarification.
09:42:14   5              MR. SOLOMON:  No, I'm asking what
           6        the question was.
           7              MR. TENREIRO:  Well, I said
           8        statement.
           9   BY MR. TENREIRO:
09:42:17  10        Q.   Let's start with public.
          11        A.   I'm unaware of a public statement.
          12        Q.   Okay.  And private?
          13        A.   After --
          14        Q.   I'm talking about after this.
09:42:26  15        A.   Sorry.  Not of which I'm aware.
          16        Q.   Okay.  All right.  Why did Ripple want
          17   the Chair to make this statement?
          18        A.   In making a statement about the status
          19   of bitcoin -- at the time that -- I believe at the
09:42:48  20   time that Director Hinman made an affirmative
          21   statement about the status of ETH, I believe XRP
          22   was the second-most valuable digital asset ahead
          23   of ETH.
          24              In making this clarification and
09:43:02  25   statement, it was ETH performed better in the
```

97

09:43:11   1    markets and became more valuable than XRP.  Many
            2    people in the XRP community were concerned about
            3    the lack of clarity, including myself, and felt
            4    that it was -- given the clarity that had been
09:43:29   5    provided to bitcoin and Ether and given that XRP
            6    was one of the most important and valuable and
            7    liquid digital assets, we felt that it was only a
            8    step of responsibility -- to the extent the SEC's
            9    mission is around orderly markets, I felt like the
09:43:51  10    SEC should seek to provide that clarity.
           11        Q.   I -- I -- my question, though, is why
           12    did Ripple want the Chair to make the statement?
           13    Maybe the answer's in there and I just didn't
           14    understand.  Why did the -- why would Ripple want
09:44:08  15    the Chair to make the statement?
           16        A.   Ripple is one stakeholder, and an
           17    important stakeholder, in the XRP ecosystem.  To
           18    the extent that -- that public statements from the
           19    SEC had not provided clarity -- and, in fact, some
09:44:25  20    would argue had actually added to confusion in the
           21    crypto landscape -- we sought to provide that
           22    clarity.
           23        Q.   Okay.  And why did you seek to provide
           24    that clarity?
09:44:38  25        A.   I think a community's interest in having

                                                                     98

09:44:41   1    clarity about the laws in which they operate is
           2    useful.
           3         Q.    For what purpose?
           4         A.    To follow the law.
09:44:47   5         Q.    Okay.  Anything else or any other
           6    purpose?
           7         A.    That would be the most important one, I
           8    think.
           9         Q.    And you said "in making this
09:44:59  10    clarification and statement, ETH performed better
          11    in the markets."
          12              Are you talking about -- what are you
          13    talking about that it performed better?  Its price
          14    went up?
09:45:09  15         A.    I -- to be fair, I don't remember
          16    exactly.  At various times XRP has been by market
          17    capitalization the second-most valuable digital
          18    asset.  I was making an observation that there are
          19    three -- at the time there were three that were
09:45:24  20    kind of above the rest of the noise in the crypto
          21    market.  The SEC had provided clarity about two of
          22    those top three and not provided clarity about the
          23    third.
          24              It's apparent, I believe, that Director
09:45:37  25    Hinman and Chair Clayton wanted to provide that

                                                               99

09:45:42  1    clarity around bitcoin and ETH, presumably,

2    because there wasn't clarity.  They made a public

3    statement.  They provided that clarity.  That

4    helps market participants in those -- those that

09:45:56  5    choose to participate in trading those digital

6    assets, speculating on those digital assets, to

7    provide that clarity.

8              The absence of that clarity around XRP,

9    which at the time was second or third in terms of

09:46:09 10    overall value in liquidity, seemed like it was

11    only in the market's interest, and I would assume

12    the SEC's interest, to provide that clarity.

13        Q.   When you say, though, X -- you said in

14    your prior answer, X -- XRP was one of the most

09:46:23 15    important assets.

16              How did you measure that importance?

17    Was it market --

18        A.   Liquidity and market cap.

19        Q.   Okay.  And market cap is measured by the

09:46:31 20    price and the units outstanding?

21        A.   That's how I calculate market cap.

22        Q.   I understand there's -- we'll probably

23    get to this later.  I understand you had some

24    conversations with people about whether the market

09:46:42 25    cap was based on the number of units that had been

100

```
09:46:46   1   created or the number of units that were in the
           2   market.
           3            But setting aside that sort of debate,
           4   how do you measure market cap?
09:46:55   5       A.   I -- I was making a macro general
           6   observation.  Regardless of how you measure market
           7   cap --
           8       Q.   Right.
           9       A.    -- actually, let me just answer your
09:47:04  10   question.  How do I measure market cap?  Yes, I
          11   measure market cap by multiplying price by number
          12   of units.
          13       Q.   Okay.
          14            MR. SOLOMON:  When you're done
09:47:11  15        with this line of questioning, whenever
          16        that is, it probably would be a good time
          17        to take a break.
          18            MR. TENREIRO:  Oh, okay.  Yeah.
          19            MR. SOLOMON:  There's no --
09:47:16  20        whenever you're done.
          21            MR. TENREIRO:  Just one -- one or
          22        two more questions.
          23   BY MR. TENREIRO:
          24       Q.   Okay.  So -- so when you were saying
09:47:20  25   that XRP was one of the most important assets, the
```

101

```
09:47:26   1    measure of importance is the market cap or is
           2    there any other measure?
           3         A.   I think my testimony was I -- in my mind
           4    there's multiple measures.  I think my testimony
09:47:34   5    was liquidity and market cap were two things that
           6    make digital assets more prominent than others.
           7         Q.   And so are you saying that XRP was one
           8    of the most liquid digital assets at that time?
           9         A.   Yes, I believe so.
09:47:46  10         Q.   Okay.  In the top three?
          11         A.   I believe so.
          12         Q.   Okay.  And just -- again, I'm trying to
          13    understand.  When Hinman -- when Director Hinman
          14    made statements about ETH, you -- your view was
09:48:01  15    that ETH performed better in the markets and
          16    became more valuable than XRP.
          17              So are you referring there to the market
          18    cap? to the price?  What were you referring to
          19    there that it became more valuable than XRP?
09:48:13  20         A.   Well, I'm probably referring to the same
          21    components that I was referencing earlier.  It
          22    probably became more liquid.  It probably became
          23    more valuable in price.
          24         Q.   Okay.  And how do you measure liquidity?
09:48:24  25         A.   I tend to use CryptoCompare or
```

102

09:48:28  1   CoinMarketCap as reporting mechanisms for overall
          2   liquidity in the crypto landscape.
          3       Q.   Does it have -- do those have a page
          4   that report liquidity?
09:48:39  5       A.   Yes.
          6       Q.   Okay.
          7       A.   Actually -- yes.
          8       Q.   What -- what -- what measure -- what's
          9   the -- what's the measure for liquidity that they
09:48:45 10   use?
         11            MR. SOLOMON:  Are you talking
         12        about today?
         13            MR. TENREIRO:  Sure.  Today.
         14       A.   Dollar volume.
09:48:51 15       Q.   Volume is a measure for liquidity?
         16       A.   Yeah.
         17       Q.   Okay.  That's -- your understanding of
         18   liquidity is volume?
         19       A.   One measure of liquidity is trading
09:49:02 20   volume.
         21       Q.   Why don't you tell me what your
         22   understanding of liquidity in the market means.
         23       A.   I believe that liquidity in a market
         24   from my point of view is -- one of the measures is
09:49:18 25   how much is trading.

                                                          103

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

09:49:20  1          Q.   And you don't understand that to be
        2     volume?
        3          A.   I think I just said that.  I apologize.
        4     Yes, I understand that to be volume.
09:49:28  5          Q.   So liquidity and volume are the same?
        6               MR. SOLOMON:  Objection.
        7          A.   I think my testimony was I think one
        8     important input into liquidity is volume.
        9          Q.   Okay.  Do you understand liquidity to be
09:49:38 10     the existence of willing buyers and the existence
       11     of willing sellers?
       12               MR. SOLOMON:  Objection to form.
       13          A.   I think that's a fair description.
       14          Q.   Okay.  Where did you derive your
09:49:47 15     understanding of what liquidity in the market
       16     means?
       17          A.   I don't recall.
       18          Q.   Did you have experience in financial
       19     markets before you joined Ripple?
09:49:56 20          A.   I mean, frankly, it depends how you
       21     define financial markets, I guess.
       22          Q.   What --
       23          A.   I was an active trader in public
       24     securities.  I had spent time at venture capital
09:50:08 25     firms.  I received my MBA from Harvard.  So I -- I

                                                            104

| | | |
|---|---|---|
| 09:50:15 | 1 | felt educated about generally how markets work and |
| | 2 | how to think about liquidity. |
| | 3 | Q.   Okay. |
| | 4 | MR. TENREIRO:  Why don't we take |
| 09:50:26 | 5 | a break. |
| | 6 | THE VIDEOGRAPHER:  Okay.  Going |
| | 7 | off the record at 9:51. |
| | 8 | (Whereupon, a recess is taken.) |
| | 9 | THE VIDEOGRAPHER:  Okay.  Back on |
| 10:09:13 | 10 | the record, 10:10. |
| | 11 | Go ahead. |
| | 12 | MR. TENREIRO:  Okay.  Thank you. |
| | 13 | BY MR. TENREIRO: |
| | 14 | Q.   Mr. Garlinghouse, who is ████████? |
| 10:09:23 | 15 | A.   ████████ in the context of Ripple is |
| | 16 | a -- I guess simplistically defined as a legal |
| | 17 | advisor. |
| | 18 | Q.   Okay.  Outside of the context of Ripple, |
| | 19 | who is he? |
| 10:09:39 | 20 | A.   I certainly don't know that I can do a |
| | 21 | robust job of biography, but I believe he's been a |
| | 22 | practicing criminal attorney and teaches law at |
| | 23 | ████████ in some construct.  He also, I |
| | 24 | think, is a legal advisor employed by ████ |
| 10:09:56 | 25 | ████████. |

105

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:09:58  1        Q.   Okay.  And so in the context of Ripple,
        2   you said he's a simplistically defined legal
        3   advisor?
        4        A.   I think that's a fair characterization,
10:10:06  5   yes.
        6        Q.   When was he hired as a legal advisor?
        7        A.   Sometime in the summer of 2018.
        8        Q.   Who decided to hire him?
        9        A.   I'd say Chris Larsen decided to hire
10:10:21 10   him.
       11        Q.   For what purpose was he hired?
       12             MR. CERESNEY:  I'm going to
       13        instruct the witness to answer at a high
       14        level and not to get into any details.
10:10:31 15        A.   To be a legal advisor.
       16        Q.   Was he advising with -- was he supposed
       17   to advise with respect to the federal securities
       18   laws?
       19        A.   I would say he was advising on all
10:10:43 20   matters associated with reg -- the SEC's -- yes, I
       21   guess.  Yes, I should say.  Yes.
       22        Q.   The SEC's what?
       23        A.   I don't know what I was going to say so
       24   I stopped.
10:10:58 25        Q.   That's okay.

                                                              106

```
10:10:59   1              So he was advising on all matters
           2   related to the SEC?
           3        A.   And others.
           4        Q.   What are the others?
10:11:09   5        A.   I think that would definitely encroach
           6   on attorney-client privilege.
           7        Q.   No, I'm not asking you to -- I'm asking
           8   you, was he advising you with respect to labor
           9   law?
10:11:17  10        A.   He may have.  I don't recall
          11   specifically.
          12        Q.   Okay.  What other subject areas of law
          13   was he a legal advisor for?
          14        A.   I --
10:11:31  15              MR. CERESNEY:  Hold on.  Hold on.
          16         You know, I want to be sensitive here.  He
          17         was a legal advisor to the company.  He
          18         was retained as a lawyer.  He's already
          19         said he's -- he's advised the company in
10:11:44  20         connection with the SEC.
          21              What else is relevant to this
          22         proceeding?
          23              MR. TENREIRO:  I don't think
          24         there's a relevance issue here.  I'm just
10:11:51  25         asking what he was retained --
```

107

```
10:11:53   1   BY MR. TENREIRO:
           2        Q.   Was there a retention letter?
           3        A.   I don't recall.
           4        Q.   Okay.  Did -- so Mr. Larsen made the
10:12:00   5   decision to hire him.  Did you have to approve the
           6   decision or...?
           7        A.   I implemented the decision.
           8        Q.   Okay.  How did you implement it?
           9        A.   He was compensated, and by virtue of
10:12:14  10   being compensated, he -- his engagement with the
          11   company needed to be implemented and to some
          12   degree integrated into our operational -- you
          13   know, he hears legal matters of which we would
          14   seek his counsel.
10:12:33  15        Q.   Okay.  So you don't recall if there was
          16   a retention letter but there was some
          17   compensation?
          18        A.   I would --
          19             MR. SOLOMON:  Objection to form.
10:12:41  20        A.   I believe there's likely some sort of
          21   engagement letter with            I don't recall
          22   specifically.
          23        Q.   Okay.  Let's take a look at Exhibit 53,
          24   please.
10:12:50  25             (Whereupon, exhibit is received
```

108

```
10:12:50    1              and marked Garlinghouse Deposition
            2              Exhibit 53 for identification.)
            3    BY MR. TENREIRO:
            4        Q.    While they pull it up, was he on
10:12:59    5    Ripple's board at any time?
            6        A.    Board of directors?
            7        Q.    Uh-huh.
            8        A.    No.
            9        Q.    And do you know -- do you know who
10:13:12   10    Mr. ████████ is? ████████████████
           11              MR. CERESNEY:  Do we have --
           12              MR. TENREIRO:  One second.
           13        A.    I do not.
           14        Q.    Okay.  That's fine.
10:13:23   15              All right.  Here we go, 53.  And this is
           16    a multipage email with Bates 971415, RPLI.  Most
           17    of it is redacted.  The front page is what I'm
           18    going to ask you about.
           19        A.    Okay.
10:13:47   20        Q.    This appears to be an email from you on
           21    December 13, 2018, to ████████████████ and Monica
           22    Long.  Subject "Re:  Clayton."
           23              Do you see that?
           24        A.    Yes.
10:13:59   25        Q.    Who is ████████████████
```

109

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
10:14:02  1        A.   ████████████ --
          2                  MR. SOLOMON:  Did you read the
          3         email?
          4                  THE WITNESS:  I have not read the
10:14:05  5         email.
          6        Q.   Oh.  Read it, please.
          7                  THE WITNESS:  I thought I --
          8                  MR. SOLOMON:  Sorry.  Sorry.
          9         Yeah.  Just read it.  Everything he hands
10:14:10 10         to you, just read it first.
         11                  THE WITNESS:  Okay.
         12        A.   Okay.  ████████████ is currently SVP
         13 of communications and people at Ripple.
         14        Q.   And what about around the time of the
10:14:55 15 email, December 18 -- December 2018?
         16        A.   I don't know when she became a full-time
         17 employee top of mind.  Prior to Ripple, she was a
         18 principal at a public relations firm -- a public
         19 relations firm called █████ and Ripple used █████
10:15:17 20 as our outside PR firm.
         21        Q.   Okay.  And when did you meet her?
         22        A.   Oh, my gosh.  I met ███████ in 2004
         23 probably.
         24        Q.   Under what circumstances?
10:15:34 25        A.   We both worked at ████████
```

                                                            110

| | | |
|---|---|---|
| 10:15:36 | 1 | Q.   Okay.  Here she refers to ███ |
| | 2 | Do you see that? |
| | 3 | A.   I do see that. |
| | 4 | Q.   And what is ████ |
| 10:15:42 | 5 | A.   I do not know. |
| | 6 | Q.   The ██████████ website? |
| | 7 | A.   I have no idea. |
| | 8 | Q.   Okay.  It says "An update here on |
| | 9 | outreach and plan of attack.  I've reached out to |
| 10:15:56 | 10 | both ████ (reporter and his editor) to correct the |
| | 11 | below.  They are in Hong Kong so we're also |
| | 12 | tracking down phone numbers so I can follow up |
| | 13 | with a phone call." |
| | 14 | Do you see all that? |
| 10:16:06 | 15 | A.   Yes. |
| | 16 | Q.   And then there's a reference to ████ |
| | 17 | and there's a request to correct some -- something |
| | 18 | or -- as well. |
| | 19 | Do you see all that? |
| 10:16:16 | 20 | A.   Yes. |
| | 21 | Q.   What is she trying to correct? |
| | 22 | A.   I don't recall. |
| | 23 | Q.   Okay.  The subject of the email is "Re: |
| | 24 | Clayton." |
| 10:16:24 | 25 | Do you see that? |

111

```
10:16:24   1        A.   Yes.
           2        Q.   Okay.  Was there a -- was there a point
           3   in time where Ripple became aware that there might
           4   be a publication claiming that the SEC had
10:16:36   5   determined that XRP was a security and seeked
           6   to -- and sought to correct that publication?
           7        A.   I don't recall.
           8        Q.   Okay.  It says "We're also drafting a
           9   suggested tweet for Brad to post."
10:16:50  10        Do you see that?
          11        A.   I do see that.
          12        Q.   Okay.  Did you make a tweet after the
          13   draft reflected in this email?
          14        A.   I don't recall.
10:17:01  15        Q.   Okay.  And did ████████████ --
          16   ████████████ frequently draft tweets for you to
          17   make?
          18        A.   Depends how you define "frequently."
          19   And I don't recall in 2018 how frequently that may
10:17:15  20   have happened.
          21        Q.   Did others at Ripple draft tweets for
          22   you to make while you were CEO of Ripple?
          23        A.   While I was CEO?
          24        Q.   Yes.
10:17:25  25        A.   Yes.
```

                                                              112

10:17:25  1        Q.   And Monica Long was copied.   What was
       2   her role at this time?
       3        A.   In 2018 I believe she was SVP -- or VP
       4   of marketing.
10:17:37  5        Q.   Okay.  Did she draft tweets for you to
       6   make?
       7             THE REPORTER:  I'm sorry?
       8        Q.   Did she draft tweets for you to make
       9   while you were CEO?
10:17:46 10        A.   Not that I recall.
      11        Q.   So to the extent others at Ripple
      12   drafted tweets, who would the others be?
      13   ████████████.  Who else?
      14        A.   Under what period of time?
10:17:54 15        Q.   While you were CEO.
      16        A.   So during my tenure as CEO, ████████
      17   ████████ would be on that list.  ████████████ would
      18   be on that list.  Other people on the Ripple
      19   communications team would have participated as
10:18:16 20   well.
      21        Q.   Did you typically, just generally
      22   typically, when they drafted a tweet, did you --
      23   did you actually tweet those tweets?
      24        A.   Sometimes.
10:18:25 25        Q.   Okay.  Were there times when you did

                                                          113

10:18:27  1    not?

2         A.    Yes.

3         Q.    Okay.  What was the result of her

4    outreach to ████ and the reporter, the editor and

10:18:38  5    the chief tech correspondent for █████████?

6                   MR. SOLOMON:   Objection to form.

7         A.    I don't know.

8         Q.    Okay.  We can set that aside, although

9    we should definitely keep the exhibits somewhere

10:18:50 10    in case we need to go back to them, but I'm done

11    with them now.

12               So, Mr. Garlinghouse, other than this

13    litigation, are you a party to any action

14    currently?

10:19:01 15                   MR. SOLOMON:   Do you understand

16          the question?

17         A.    Yeah.  Could you --

18         Q.    A party in a lawsuit.

19         A.    I believe, yes.

10:19:06 20         Q.    What lawsuit or lawsuits?

21         A.    Is -- is that a question of me

22    individually or me as CEO of Ripple?

23         Q.    You in -- well, you, Mr. Garlinghouse.

24         A.    Right.  The distinction I'm making is

10:19:20 25    you're -- the SEC is suing Ripple.  I'm the CEO of

114

```
10:19:22   1    Ripple.  You're also suing me personally.  I
           2    believe the answer is yes.
           3        Q.   What lawsuit or lawsuits?
           4        A.   I -- I would need to get clarity from
10:19:34   5    counsel to answer that with certainty.
           6        Q.   Let's not -- let -- we'll use -- is
           7    there a pending class action involving Ripple?
           8        A.   Yes.
           9        Q.   Okay.  Are you named in that class
10:19:45  10    action?
          11        A.   I believe, yes.
          12        Q.   Okay.  And was the first class -- there
          13    was a series of class actions filed, correct?
          14             MR. SOLOMON:  Objection to form.
10:19:58  15        A.   I believe that's correct.
          16        Q.   And consolidated into one?
          17             MR. SOLOMON:  Objection to form.
          18        A.   I believe that's correct.
          19        Q.   Okay.  And that -- I'll just refer to it
10:20:06  20    as the class action pending in California, is that
          21    right?
          22             MR. SOLOMON:  Objection, form.
          23        A.   I don't know.
          24        Q.   Okay.  And the class action was filed
10:20:16  25    when, the first one?
```

                                                              115

```
10:20:18   1              A.    I don't recall.
           2              Q.    Was there an allegation in the class
           3       action that you committed fraud?
           4              A.    I don't recall.
10:20:28   5              Q.    Okay.  And the class action is filed by
           6       a group of XRP holders, is that right?
           7                    MR. SOLOMON:  Objection to form.
           8              A.    My vague recollection is it was filed by
           9       one XRP holder to begin with and I don't know if
10:20:42  10       others have joined.  I don't understand the
          11       nuances of how class actions work.
          12              Q.    Do you have counsel that represents
          13       Ripple with respect to that class action?
          14              A.    Yes.
10:20:56  15              Q.    What's the law firm?
          16              A.    I don't know.
          17              Q.    Okay.  How often do you meet with them
          18       about that lawsuit?
          19              A.    I am not aware that I've -- I don't
10:21:07  20       recall.
          21              Q.    Okay.  Are you, Mr. Garlinghouse,
          22       represented by counsel in connection with that
          23       class action?
          24              A.    Not to my knowledge.
10:21:13  25              Q.    Okay.  The class action is pending,
```

116

```
10:21:18   1    right?
           2         A.   As far as I'm aware.
           3         Q.   Okay.  And I don't want to get into
           4    advice, the substance of advice, but you've
10:21:26   5    received advice about that lawsuit, correct?
           6         A.   I suppose, yes.
           7         Q.   Ripple has received advice as well?
           8         A.   Yes.
           9         Q.   Okay.  And that class action alleges
10:21:39  10    that Ripple engaged in unregistered offers and
          11    sales of securities, correct?
          12              MR. SOLOMON:  Objection to form.
          13         A.   I don't know.
          14         Q.   Okay.  And you have never moved to
10:21:51  15    dismiss that claim in the class action, correct?
          16              MR. SOLOMON:  Objection; form.
          17         A.   I don't know.
          18         Q.   Okay.  Did Ripple continue to sell XRP
          19    after that lawsuit was filed?
10:22:04  20         A.   I -- I believe, yes.  I don't know
          21    exactly when that was filed, so if you could help
          22    me with specifics, I would -- could be more
          23    precise.
          24         Q.   I don't have the exact date, but my
10:22:11  25    understanding is the first one was filed on or
```

117

```
10:22:13   1    around April of 2018.  And your counsel probably

           2    remembers better than I do.

           3         A.   Then, yes.

           4         Q.   Okay.  And did you continue to sell XRP

10:22:20   5    after that lawsuit was filed?

           6         A.   Yes.

           7         Q.   Did you rely on legal advice to do that?

           8         A.   I don't recall.

           9         Q.   Did Ripple rely on legal advice to sell

10:22:33  10    XRP after the lawsuit was filed?

          11         A.   I don't recall.

          12         Q.   Okay.  Is it fair -- well, did you learn

          13    of -- how did you learn of the class action

          14    lawsuit?

10:22:49  15         A.   I don't recall.

          16              MR. SOLOMON:  Objection.

          17         Q.   Okay.  Do you recall learning of it

          18    around the time it was filed?

          19              MR. SOLOMON:  Objection; form.

10:22:58  20         A.   Or did you come to find out at some

          21    point that it had been pending for months and you

          22    just found out about it?

          23              MR. SOLOMON:  Objection; form.

          24         A.   I doubt that it's the latter and very

10:23:06  25    likely the former.
```

                                                                    118

```
10:23:07   1          Q.   Okay.  When did you first hire

           2     Mr. Ceresney?

           3          A.   Around the summer of 2018.

           4          Q.   Okay.  Earlier this morning we talked

10:23:19   5     about how there was an SEC letter that either you

           6     received or ███████████ or whomever in the late

           7     spring of 2018, is that correct?

           8          A.   I believe that was my testimony.

           9          Q.   Okay.  Is that the first time that you

10:23:32  10     heard about the SEC's, you know -- I call it an

          11     investigation; I understand you have your own view

          12     of it -- but the SEC's reach out to Ripple?  Is

          13     that the first time you learned of it?

          14          A.   Yes.

10:23:48  15          Q.   Okay.  And did you become aware that the

          16     SEC had asked Ripple to preserve documents in

          17     connection with the inquiry?

          18          A.   Yes.

          19          Q.   Okay.  Did you follow these directives?

10:23:59  20          A.   Yes.

          21          Q.   Okay.  Did Ripple have a document

          22     retention policy at any point in time since --

          23     well, since you've been working there?

          24          A.   I believe so.

10:24:09  25          Q.   And what is the document retention
```

                                                                    119

```
10:24:10    1   policy?
            2        A.   I don't recall.
            3        Q.   Who drafted it?
            4        A.   I don't know.
10:24:19    5             MR. SOLOMON:  Separate and apart
            6        from any document retention policy in
            7        connection with a pending litigation
            8        you're asking him?
            9             MR. TENREIRO:  That's right.
10:24:26   10             MR. SOLOMON:  Okay.
           11             MR. TENREIRO:  I'm going to
           12        get -- Matt's in my head today and he's
           13        right every time.  I'm going to -- I'm
           14        going to ask about that in a second.
10:24:32   15             MR. SOLOMON:  Okay.
           16   BY MR. TENREIRO:
           17        Q.   So just generally, document -- corporate
           18   document retention policy, your testimony is you
           19   believe there is -- there's been one at some point
10:24:40   20   in time; don't recall who drafted it.
           21             Have you read it?
           22        A.   I expect I have.
           23        Q.   And when?
           24        A.   I don't recall.
10:24:47   25        Q.   Where is it stored?  Maybe I should ask,
```

```
10:24:52   1    is it a written policy?
           2         A.   I believe it's a written policy and I
           3    would expect that it's in the employee handbook.
           4         Q.   And it was given to employees -- was the
10:25:05   5    employee handbook handed out to employees when
           6    they begin to work the company?
           7         A.   Well, I guess I should clarify.  When we
           8    say it's written, I'm not sure that we have ever
           9    printed the employee handbook.  I think when
10:25:21  10    you're -- when you join the company, I believe we
          11    share various things like code of conduct; like a
          12    handbook that I expect would likely, to your
          13    question, include a document retention policy.
          14         Q.   Okay.  But sitting here today, you
10:25:40  15    just -- you don't -- you don't know who wrote it,
          16    for example?
          17         A.   That's correct.
          18         Q.   Okay.  Do you have any specific
          19    recollection of the retention policy?
10:25:53  20         A.   No.
          21         Q.   Do you know generally what the retention
          22    policy says?
          23         A.   No.
          24         Q.   Okay.  Now, in connection with the
10:26:04  25    lawsuit, the -- the class action lawsuit, was
```

121

```
10:26:06   1    there a document retention policy implemented by

           2    the company?

           3         A.   I believe so.

           4         Q.   Okay.  And what did it provide?

10:26:16   5         A.   I don't know specifically.

           6         Q.   Is that in some sort of -- is that

           7    documented, maybe not printed, but documented in

           8    some form of, you know, electronic record?

           9         A.   I believe so.

10:26:24  10         Q.   And where is that record stored?

          11         A.   I believe it's stored somewhere in

          12    Ripple's data infrastructure.

          13         Q.   Ripple's data infrastructure?  What is

          14    Ripple's data infrastructure?

10:26:43  15              MR. SOLOMON:  Don't guess.  If

          16         you know where it's stored, tell him.  If

          17         you don't know where it's stored, say you

          18         don't know.

          19         A.   I don't know.

10:26:46  20              MR. SOLOMON:  I don't want to

          21         waste time with these questions if you

          22         don't know.  If you do, say so.

          23         A.   The -- the distinction I was making in

          24    describing Ripple's data infrastructure, my

10:26:56  25    recollection is that when Ripple sends a document
```

                                                           122

10:27:01 1    hold -- when Ripple's legal team sends a document
2    hold, I believe it's in a Google Doc form and it's
3    collected as a Google form.
4           So when I describe Ripple's data
10:27:13 5    infrastructure, I'm being inclusive of
6    infrastructure that we may not -- it may not be
7    our servers.  I would include Ripple -- sorry,
8    Google's data infrastructure in that context for
9    us to have some license.  I don't know the
10:27:30 10   relationship there, but I believe that the data
11   you are asking about would be stored on a Google
12   Doc somewhere.
13       Q.   Maybe Google Drive that the company
14   accesses, for example?
10:27:43 15       A.   That's my best guess.  I don't know.
16       Q.   Okay.  Is it -- just -- your best
17   recollection is that it might be in some sort of
18   Google Doc, a document hold that the -- that the
19   legal team sends.
10:27:56 20          Do you know why it's a Google Doc?  Are
21   people able to sort of check that they read it or
22   is there any other reason?
23              MR. SOLOMON:  Objection; form.
24       Q.   Is there any reason, sorry, that it's a
10:28:05 25   Google Doc that you know of?

123

10:28:06 1                    MR. SOLOMON:  Objection; form.

2            A.   I don't know.

3            Q.   Okay.  Did -- and let me just go back.

4            Did the company implement a document

10:28:13 5   retention policy after -- or with respect to the

6   class action?

7            A.   Sorry.  Could you repeat the question,

8   please?

9            Q.   Yes.

10:28:22 10           Did the company implement a document

11   retention policy with respect to the class action?

12           A.   You mean a document hold?

13           Q.   A document hold.

14           A.   Thank you.  Yes.

10:28:31 15           Q.   What did it provide?

16           A.   I don't recall.

17           Q.   Did you -- but you read the whole thing?

18           A.   I believe I received that and I believe

19   I would have reviewed it, yes.

10:28:43 20           Q.   Did you follow it?

21           A.   Yes.

22           Q.   Okay.  And did the document -- did the

23   company implement a document hold policy with

24   respect to the SEC's letter?

10:28:52 25           A.   Yes.

                                                      124

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

| | | |
|---|---|---|
| 10:28:52 | 1 | Q.   Okay.  And what did that provide? |
| | 2 | A.   I don't recall. |
| | 3 | Q.   Okay.  Who -- do you know who drafted |
| | 4 | the hold? |
| 10:29:03 | 5 | A.   I do not. |
| | 6 | Q.   And where is that hold -- where is it? |
| | 7 | Is that also -- where is the document? |
| | 8 | A.   I don't know. |
| | 9 | Q.   Okay.  Did you abide by that hold? |
| 10:29:15 | 10 | A.   Yes. |
| | 11 | Q.   Okay.  You used a messaging app called |
| | 12 | Signal, right? |
| | 13 | A.   Yes.  I use, current tense, as well. |
| | 14 | Q.   When did you start using it? |
| 10:29:29 | 15 | A.   I don't recall when I was first |
| | 16 | introduced to Signal.  I -- I expect it predated |
| | 17 | my experience at Ripple, but I used it while at |
| | 18 | Ripple, also. |
| | 19 | Q.   Ripple didn't give you, like, a company |
| 10:29:41 | 20 | phone, right? |
| | 21 | A.   Not when I joined. |
| | 22 | Q.   Do you have one now? |
| | 23 | A.   I guess you could describe it as a |
| | 24 | Ripple phone, yes. |
| 10:29:53 | 25 | Q.   What do you mean, "you could describe it |

125

10:29:54  1    as a Ripple phone"?

2         A.   It's actually provided by a third-party

3    security firm that Ripple contracts to improve the

4    security posture that Ripple has on the company

10:30:08  5    from bad actors.

6         Q.   Do you have a separate personal phone

7    other than that phone?

8         A.   No.  My -- my hesitation there is I do

9    have more than one phone.  I use my Ripple phone

10:30:24 10    which is provided by a third-party security firm

11    as my primary phone.

12         Q.   You have another phone device?

13         A.   I have more than one, yes.

14         Q.   How many?

10:30:39 15         A.   I would say I have three phones and a

16    Google Voice number.  So maybe four phone numbers.

17         Q.   Phone -- four phone numbers, but three

18    devices?

19         A.   Yes.

10:30:52 20         Q.   Are they all Apple?

21         A.   Yes.

22         Q.   Okay.  And is Signal installed on all

23    three of them?

24         A.   I don't know.

10:30:58 25         Q.   Is Signal installed on the phone you

126

10:31:00  1    have with you now?

          2        A.   I don't have a phone with me right now.

          3        Q.   Okay.  Is Signal installed on the phone

          4    that you're going to go to when you leave here

10:31:07  5    today?

          6        A.   Yes.

          7        Q.   Okay.  And which one is that phone?  Is

          8    that the Ripple one, the one that Ripple --

          9        A.   Oh, yeah.  Yes.  My primary phone that I

10:31:16 10    consider my, you know, 99 percent use case phone

         11    is a -- my personal phone, my Ripple phone, it's

         12    provided by a third-party security firm for

         13    various security management.

         14        Q.   And that -- and Ripple pays for that

10:31:31 15    phone?

         16        A.   Yes.

         17        Q.   Okay.  So my questions are going to

         18    focus on that phone for the moment.

         19             When did you install Signal on that --

10:31:40 20    on that phone?

         21        A.   Well, to be precise in answering the

         22    question, I got a new phone within the last 60

         23    days and I reinstalled all of the apps that I'd

         24    had.  And so --

10:31:55 25        Q.   When did you first install the app in

                                                              127

10:31:58  1    your Ripple phone?  I understand that it, you

       2    know, moves along when you get a new phone.

       3         A.   Yeah.  Well, my -- you're asking

       4    specific to my Ripple phone.  I would have

10:32:07  5    installed Signal when I first got the Ripple

       6    phone.

       7         Q.   Which was when?

       8         A.   Probably the summer of 2017.

       9         Q.   Okay.  Why did you install it?

10:32:20 10         A.   I was using it prior to that and I was

      11    using -- I was getting a new phone and I was

      12    switching phone numbers at the time.  And so I was

      13    kind of re-establishing the same applications I

      14    had on my old phone, old phone number, to a new

10:32:36 15    phone.

      16         Q.   When did you first install -- install

      17    Signal on your old phone?

      18         A.   I don't recall.

      19         Q.   For what purpose did you install Signal?

10:32:43 20         A.   To communicate with people.

      21         Q.   Any other purpose?  Any other reason?

      22    Sorry.  Any other reason that you installed it?

      23    Did you like that app better than others, you

      24    know?

10:32:55 25         A.   You know, Signal particularly -- you

                                                                128

10:32:58  1    know, I was using it before I joined Ripple, but I
        2    probably started using it more at Ripple.  I think
        3    a lot of people in the crypto industry use Signal.
        4    It's, I think, viewed -- fairly or unfairly -- as
10:33:10  5    more secure and more private.
        6        Q.   What about Telegram?  Why not Telegram?
        7    You know, what's the difference?
        8        A.   I've never used Telegram to my knowledge
        9    so I don't have a comparison.
10:33:25 10        Q.   All right.  Did you clear your use of
       11    Signal with any counsel?
       12             MR. SOLOMON:  Objection; form.
       13        A.   My use of Signal predates my employment
       14    at Ripple and so I doubt that I would have reached
10:33:38 15    out to personal counsel to use a messaging app.
       16        Q.   You understand that messages on Signal
       17    are ephemeral?
       18        A.   I'm aware that messages on Signal can be
       19    set to disappear.
10:33:56 20        Q.   Okay.  And when did you become aware of
       21    that?  I'm sorry, who told you about the existence
       22    of the app or how did you find out?
       23        A.   I -- I don't recall.
       24        Q.   Okay.  When did you become aware that
10:34:04 25    messages on Signal can be set to disappear?

                                                              129

10:34:11  1          A.   I expect when I first started using it.

          2          Q.   Okay.  And did you set your messages to

          3    disappear when you first started using it?

          4          A.   Yes.  I -- I've always taken the point

10:34:21  5    of view that I'm going to set it on the longest

          6    time period of expiration so that I don't forget

          7    things.  But I -- so I generally set it at the

          8    one-week interval.

          9          Q.   That's the longest period of expiration?

10:34:35 10          A.   It was, I -- I think, until very

         11    recently, it was the longest period of expiration.

         12          Q.   Okay.  And what is it now?

         13          A.   I think it may now be four weeks.

         14          Q.   And is it fair to say that you can have

10:34:47 15    on Signal conversations only with other Signal

         16    users?

         17          A.   I believe that's correct.

         18          Q.   And can you have group chats on Signal?

         19          A.   Yes.

10:34:58 20          Q.   Okay.  And is it correct -- is my

         21    understanding correct that if I have a

         22    conversation with you on Signal and I set it to

         23    auto delete in one day and you set it in one week,

         24    it deletes in one day?

10:35:08 25          A.   That's correct.

                                                                   130

10:35:09   1        Q.   Okay.  But --

            2        A.   But that's my understanding.

            3        Q.   Right.

            4            You're saying that your recollection is

10:35:13   5  for your setting it was typically one -- a

            6  one-week setting, is that right?

            7        A.   Correct.  As you described, either party

            8  can set the expiration of a message.  You can't

            9  override the other person.  It goes to whatever is

10:35:35 10  set for the -- whoever sets the shortest duration.

          11        Q.   Shorter.

          12        A.   It uses that setting.

          13        Q.   And do you have -- how many Signal

          14  accounts do you have?

10:35:49 15        A.   I'm not even sure I understand the

          16  question.

          17        Q.   Well, do you have more than one login?

          18        A.   It's my understanding that Signal -- in

          19  order to authenticate on Signal, it's by a phone

10:36:02 20  number.  I use one -- I mean, is your question do

          21  I use Signal on my other phones?  I think you

          22  answered that -- or asked that.  I don't use

          23  Signal on my other phones.  To my knowledge, it's

          24  not installed there.

10:36:13 25        Q.   Okay.  So just one account, one phone,

                                                  131

10:36:15  1   that you associate with Signal?

2       A.   Yes.

3       Q.   Okay.  What setting -- what auto delete

4   setting do you have on the app now?

10:36:25  5       A.   I -- I prob -- I set one week typically.

6       Q.   Okay.  And did you -- have you at any

7   time discussed, you know, your employment --

8   things related to your employment at Ripple on

9   Signal?

10:36:41 10       A.   Yes.

11       Q.   Have you at any time discussed XRP on

12   Signal?

13       A.   I suspect at some point I have, yes.

14       Q.   Who do you communicate with on Signal?

10:36:54 15       A.   I'd say about 95 percent of my activity

16   on Ripple is either communicating with my

17   executive assistant or communicating with the

18   security team within my work.

19            MR. SOLOMON:  You said "on

10:37:05 20       Ripple."

21            THE WITNESS:  Oh, sorry.

22            MR. SOLOMON:  No, and I didn't

23       mean to scare you.  I just want to make

24       sure you're answering his question.

10:37:12 25            MR. TENREIRO:  Yes, that was very

132

```
10:37:12   1            confusing to me as well.
           2       BY MR. TENREIRO:
           3            Q.   Let me -- let me -- so I didn't ask --
           4       ask the best question.
10:37:17   5                 So on Signal -- let's -- let's take it
           6       step by step.
           7                 Do you talk to friends and family
           8       members on Signal?
           9            A.   Yes.
10:37:23  10            Q.   Okay.  Set those aside.
          11                 Do you talk to coworkers on Signal?
          12            A.   Yes.
          13            Q.   Okay.  Now back to the friends and
          14       family members.
10:37:31  15                 Do you discuss Ripple or XRP with them?
          16       Have you ever discussed Ripple or XRP with them on
          17       Signal?
          18            A.   I suspect at some point I have, yes.
          19            Q.   Have you ever discussed the --
10:37:40  20       conversations with the SEC on Signal?  Still
          21       focused on family and friends.
          22            A.   Not to my knowledge.
          23            Q.   Okay.  Now coworkers.  What coworkers do
          24       you chat with on Signal about anything?
10:37:53  25            A.   So when I misspoke a moment ago, what I
```

133

10:37:56  1    was describing is about 95-plus percent of my

        2    Signal activity consists of communication with

        3    either my executive assistant or the security team

        4    that -- with whom I work.

10:38:09  5         Q.   Is the security team, generally

        6    speaking, related to safeguarding your XRP or

        7    Ripple's XRP or something else?

        8         A.   Physical security, kind of all aspects

        9    of security associated with my position as CEO of

10:38:25 10    Ripple.

       11         Q.   Okay.  And the not 95-plus percent of

       12    communications, who are they with?

       13         A.   I mean, I don't have a list available

       14    off the top of my head.  You know, certainly a lot

10:38:41 15    of crypto people use Signal.  So if I'm

       16    communicating with other members of the crypto

       17    community at other companies, a lot of those

       18    messages would be via Signal.

       19         Q.   Right.  So I was going to get to that

10:38:57 20    third bucket.

       21         A.   Okay.

       22         Q.   But right now I'm focused on coworkers

       23    at Ripple.  So you said that for the 95 percent,

       24    executive assistant or security team, but I'm

10:39:05 25    focused on that -- the not 95 percent.

                                                              134

```
10:39:07    1              What are -- who are those conversations
            2    with that you've had on Signal?
            3                   MR. SOLOMON:  Who today?  Who
            4         during the time?
10:39:15    5                   MR. TENREIRO:  Who during the
            6         time period I mean.
            7                   MR. SOLOMON:  The entire time
            8         period?  Okay.  Generally what you
            9         remember during the entire time period.
10:39:21   10    BY MR. TENREIRO:
           11         Q.   Who at Ripple have you communicated on
           12    Signal?  You've told me your executive assistant
           13    and executive team.
           14         A.   I've communicated with Chris Larsen on
10:39:29   15    Signal.  I've communicated with Asheesh Birla on
           16    Signal.  I've communicated with Monica Long on
           17    Signal.  I don't recall communicating with Patrick
           18    Griffin, but I probably have communicated with
           19    Patrick Griffin on Signal.  I don't recall
10:39:44   20    communicating with David Schwartz on Signal.  You
           21    know, I mean, as we go through -- I've
           22    communicated with ███████████ on Signal.
           23    I've communicated with ███████████ on Signal.
           24              In general, I think many employees at
10:40:09   25    Ripple know that I use Signal and they know that
```

135

10:40:12  1    I'm quite responsive.  And so to the extent they

2    are trying to reach me about something, they know

3    that Signal's a good way for me to be responsible

4    in that regard.

10:40:22  5        Q.   And how do they know that?

6        A.   Experience.

7        Q.   So, like, did you ever tell anyone that

8    you might be more responsive if they reach out to

9    you on Signal and then the word of mouth got out

10:40:34 10   or --

11        A.   I don't recall specifically, but I

12   think -- I don't hide the fact that I use Signal

13   from the team.  And so people know that I use it

14   and they -- you know, trial and error.  They -- if

10:40:48 15   they send me a Slack message, sometimes I may not

16   reply for days.  If they send me a Signal message,

17   I'm more likely to be responsive.

18        Q.   Did you ever -- of these people you

19   recall communicating with, the communications were

10:40:59 20   messages, right, not phone calls?

21        A.   Both phone calls and messages.

22        Q.   Can you have phone calls using the

23   Signal app?

24        A.   Yes.

10:41:07 25        Q.   Sort of like WhatsApp, you can have a

136

```
10:41:09   1     message -- are you familiar with the app WhatsApp?
           2          A.   I am.
           3          Q.   Okay.  With WhatsApp you can call
           4     someone or send them a message, correct?
10:41:16   5          A.   I believe so.
           6          Q.   So that's the same on Signal?
           7          A.   Yes.
           8          Q.   Okay.  Are the records of the phone
           9     calls also -- do they also auto delete on Signal?
10:41:25  10          A.   I don't believe so.  I don't know to be
          11     honest.
          12          Q.   Like the call log?  You know what I
          13     mean?
          14          A.   Yeah, I -- I believe the call log is
10:41:33  15     maintained.
          16          Q.   Okay.  But when you -- just to be clear,
          17     you -- you said you communicated with Larsen,
          18     Birla, Long, Griffin -- actually, you said I don't
          19     recall Griffin, but probably.
10:41:45  20               To the extent you communicated with
          21     those people, it was on Signal, both phone calls
          22     and messages?
          23               MR. SOLOMON:  Objection; form.
          24          A.   I believe at one point or another I may
10:41:57  25     have had phone calls with all of those people.
```

137

10:42:00  1    And to make sure I'm being clear, I don't view

        2    that list as exhaustive --

        3        Q.   Sure.

        4        A.   -- because I don't have a list of all

10:42:06  5    the Ripple employees.  But --

        6        Q.   Absolutely.

        7        A.   Okay.

        8        Q.   I'm just trying to make sure that it was

        9    messages and phone calls that you recall.

10:42:10 10        A.   Yes.

       11        Q.   And did you discuss -- in these, you

       12    know, conversations, did you discuss, for

       13    example -- did you discuss Ripple business?

       14        A.   Yes.  At some point I'm sure with all of

10:42:26 15    those people I would have discussed Ripple

       16    business.

       17        Q.   And what about XRP?

       18        A.   During some period of time, yes.

       19        Q.   Okay.  What about conversations with the

10:42:37 20    SEC?

       21        A.   I didn't have any conversations with the

       22    SEC via Signal.

       23        Q.   Did you discuss with those people

       24    conversations that the company was having with the

10:42:46 25    SEC?

                                                          138

```
10:42:47   1          A.   I don't recall.
           2          Q.   Okay.  What about -- so now we've talked
           3    friends and family, coworkers.  Now other parties,
           4    third parties.
10:42:58   5               Did you discuss -- did you have
           6    communications on Signal with GSR?
           7          A.   Yes.
           8          Q.   Go ahead.
           9          A.   One particular person at GSR.  To my
10:43:09  10    knowledge, I only communicated with ███████.
          11          Q.   Uh-huh.
          12               Before I get to ███████, did you ask
          13    any of the Ripple employees to communicate with
          14    you via Signal?  Did you affirmatively ask them to
10:43:22  15    do that?
          16          A.   I -- I don't recall specifically.  I'm
          17    sure that there's times when I -- people are aware
          18    that I respond to -- I think people know that I
          19    communicate regularly with my assistant and the
10:43:34  20    securities team and I'm in communication with them
          21    frequently.  And so I think they know that.  And I
          22    certainly expect at some point I've said, Hey, you
          23    know, send me a message on Signal.
          24          Q.   I see.
10:43:45  25               Did you -- what about with Mr. Larsen?
```

139

```
10:43:46   1    Did you ask -- did you suggest to him that he

           2    install the app or did he have it before you?

           3         A.   I don't recall.

           4         Q.   Okay.  Okay.  Now back to third parties.

10:44:00   5              So you communicated -- it seems like you

           6    remember communicating with ███████ about -- on --

           7    on Signal, correct?

           8         A.   Yes.

           9         Q.   And generally what were those

10:44:09  10    communications about?

          11         A.   GSR -- I -- I used GSR to sell some XRP.

          12    We would share via Signal wallet information to

          13    securely -- make sure that various transfers were

          14    done securely.

10:44:30  15         Q.   So you discussed sales of XRP with

          16    ███████?

          17         A.   No.  I don't recall speaking of sales.

          18    I recall speaking of the -- the logistics of

          19    administering movement of XRP through Signal.

10:44:44  20         Q.   Logistics of sales?  The logistics of

          21    administrating some of your sales?

          22         A.   Sure.  Yes.

          23         Q.   Okay.  What other third parties have you

          24    communicated with on Signal about Ripple or XRP?

10:45:05  25         A.   I -- I -- I don't have an exhaustive
```

                                                              140

10:45:06  1    list.  Certainly around the time I started using

          2    Signal more, which was kind of 2017, there was a

          3    group of -- a group of Signal -- as you described,

          4    a group chat, effectively, of various leaders in

10:45:22  5    the crypto industry that had a -- a group chat

          6    sharing various best practices around securities.

          7         Q.   Okay.  And what about members of the XRP

          8    Army?  Have you communicated with them on Signal?

          9         A.   No.  I mean, the XRP Army is an

10:45:38 10    amorphous nonspecific.  Like, I don't know who is

         11    -- who's included on that list.  I didn't really

         12    count.

         13         Q.   Secretly being part of it.

         14              To your knowledge, have you been -- you

10:45:46 15    know, communicated -- have you communicated with

         16    members of the XRP Army on Signal?

         17         A.   Again, I don't know how to define the

         18    XRP Army and so...

         19         Q.   Fine.

10:45:57 20              Have you communicated with holders of

         21    XRP on Signal?

         22         A.   Yes.

         23         Q.   Third parties.  Third parties.  I know

         24    employees of Ripple have XRP.

10:46:04 25         A.   I mean, I'm almost certain the answer to

                                                                    141

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:46:06  1   that is yes.

2         Q.   Okay.  And why are you almost certain?

3         A.   Well, as I described, there's a group

4   chat of other leaders in the XRP -- excuse me, in

10:46:17  5   the crypto community with whom I -- there's a

6   group chat around security.  I'm certain that some

7   of them own XRP.  I believe some of them own XRP.

8   So I'd expect the answer is yes, as I said.

9         Q.   I was just --

10:46:33 10   A.   I mean, I think there's 15-ish people on

11  that group chat.  I'd have to go through it and

12  look at who all's on there.

13        Q.   Just at top of -- top of mind.  You

14  know, who's on there that you think --

10:46:44 15   A.   ███████████████.

16        Q.   Anyone else?

17        A.   My -- my connective -- I think the --

18  the CEOs of other exchanges are on there.  I --

19  I -- I don't recall who all's on there.

10:47:01 20   Q.   Okay.  Other than this group chat with

21  leaders of the crypto industry, any other holders

22  of XRP you have communicated with on Signal?

23        A.   That aren't Ripple employees?

24        Q.   That's right.

10:47:19 25   A.   I think ████████████ owns some XRP.

                                                      142

10:47:22 1        Q.   Okay.  Others?

2        A.   I -- I -- I don't have a recollection

3   without the benefit of -- if I went through the

4   list with whom I've communicated on Signal,

10:47:35 5   perhaps I could come up with some others.

6        Q.   And where's that list?

7        A.   On the Signal app.

8        Q.   So the Signal app has a list of who you

9   communicated with but not the messages?

10:47:47 10        A.   Correct.  I mean, sim -- using WhatsApp,

11   it sounds like you're familiar with, you know, you

12   see with whom you've communicated.  And so that

13   would refresh my memory.

14        Q.   By looking at the list?

10:48:01 15        A.   Correct.

16        Q.   But the messages won't be there?

17        A.   That depends.

18        Q.   Well, messages beyond the week or four

19   weeks or whatever?

10:48:08 20             MR. SOLOMON:  Objection; form.

21        A.   I mean, there's some messages on there.

22   I mean, some people don't set an expiration at all

23   and so the messages would still be there.

24        Q.   Well, I'm talking about your messages.

10:48:23 25   Have you always had the expiration of a week or

143

10:48:25  1    maybe four weeks more recently?

        2                MR. SOLOMON:  Objection; form.

        3        A.    I have always intended to, you know, in

        4    the interests of data security, data privacy, to

10:48:36  5    use Signal with that feature.  I'm certain there

        6    are times when I have not done that.

        7        Q.    Okay.

        8                MR. SOLOMON:  You said you

        9            started using it more in 2017.  You might

10:48:44 10            want to explain to the SEC the

       11            circumstances around that.  It might be

       12            helpful.

       13                MR. TENREIRO:  Yeah.  I think I'm

       14            familiar, but go ahead.

10:48:51 15                MR. SOLOMON:  Yeah, I'm sorry.

       16            It's their question, but you had mentioned

       17            it.

       18        A.    In the late spring/early summer of 2017,

       19    my phone was compromised by hackers and a lot of

10:49:05 20    my personal data was accessed, including

       21    financial.  You know, lots of money was stolen.

       22    And after that I took and prioritized uses of --

       23    of Signal more highly in the interest of data

       24    protection such that if my phone is compromised,

10:49:20 25    my phone is stolen, I have better protection of --

                                                              144

10:49:24   1    or I felt that there would be better protection of

2    my data.

3        Q.   Okay.  And with respect to the

4    litigation hold note and documents or -- or

10:49:36   5    policies that Ripple had with respect to class

6    action and the communications with the SEC, what

7    steps, if any, did you take to ensure that Signal

8    messages were preserved for those hold notices?

9            MR. SOLOMON:  Objection to form.

10:49:56  10        A.   I generally follow the same practices I

11   had been practicing.  I continued to make phone

12   calls.  I continued to write emails.  I continued

13   to use Signal.  And so I'd say my communication

14   practices didn't materially change.

10:50:09  15        Q.   Did you seek -- without getting into

16   substance, did you seek the advice of any counsel

17   with respect to using Signal after you got these

18   hold notices?

19        A.   No.

10:50:21  20        Q.   Okay.  And without getting into the

21   substance, did you receive any advice from any

22   counsel with respect to using Signal after the

23   hold notices?

24        A.   Not that I recall.

10:50:34  25            MR. TENREIRO:  Let's look at

145

```
10:50:35   1            Exhibit 106, please.
           2                    (Whereupon, exhibit is received
           3            and marked Garlinghouse Deposition
           4            Exhibit 106 for identification.)
10:50:37   5   BY MR. TENREIRO:
           6       Q.   While Mark gets the exhibit, did you
           7   ever use the desktop version of Signal?
           8       A.   Yes.
           9       Q.   Okay.  Do you have it installed on your
10:50:58  10   computer now?
          11       A.   I do.
          12       Q.   Okay.  And the computer one that you
          13   use, your primary one, is that a Ripple computer?
          14       A.   Yes.
10:51:04  15       Q.   Laptop?
          16       A.   Yes.
          17       Q.   Apple?
          18       A.   Yes.
          19       Q.   Okay.  And did -- did you use WhatsApp?
10:51:13  20   Do you use WhatsApp?
          21       A.   I had a WhatsApp account.  I would say,
          22   you know, define "use."  Minimally.
          23       Q.   With Ripple employees?
          24       A.   Not to my recollection.
10:51:29  25       Q.   Did you communicate with ███ on Signal?
```

146

```
10:51:31   1          A.    No.

           2          Q.    Did you communicate with anyone here on

           3    Signal?

           4          A.    I -- I have communicated with Matt

10:51:37   5    Solomon on Signal.

           6          Q.    Okay.   This is Exhibit 106.   This is

           7    GARL Civil 1344.   It appears to be a series of

           8    text messages.

           9                Take your time.

10:52:20  10                (Pause)

          11          Q.    Okay.   Who is ███████████████████?

          12          A.    █████████████████ is currently the

          13    chief business officer at Ripple.

          14          Q.    Who was he in 2020?   This email --

10:54:06  15    this -- this appears to be a series of text

          16    messages.

          17                Do you agree?

          18          A.    It appears to be a series of text

          19    messages, yes.

10:54:12  20          Q.    Okay.   And they appear to be from

          21    Monday, 27 January 2020.

          22                Do you see that?

          23          A.    I don't see that it's Monday, but I

          24    accept that it may be Monday.   I see that it's

10:54:21  25    January 27, 2020.
```

147

10:54:22   1          Q.   And there's a little thing here on top
           2     that says "Monday," but that's fine.
           3          A.   Okay.
           4          Q.   Did you provide your phone to counsel to
10:54:28   5     sort of, like, download messages?  Do you know the
           6     origin of this document?
           7                    MR. SOLOMON:  Objection; form.
           8          A.   I do not know the exact origin of this
           9     document, no.
10:54:39  10          Q.   Did you provide your phone to counsel to
          11     sort of --
          12                    THE REPORTER:  I'm sorry?
          13          Q.   Did you provide your phone to counsel in
          14     connection with this litigation to gather
10:54:43  15     information?
          16          A.   I mean, I think the technical answer to
          17     your question is no.  I mean, I think I understand
          18     the question you're trying to ask.
          19          Q.   So go ahead and answer that question.
10:54:54  20          A.   I think the question you're trying to
          21     ask is did counsel arrange for my phone to be
          22     reviewed or otherwise.  And so I believe my
          23     counsel engaged a third party that came -- I
          24     guess, shipped me a collection -- during COVID the
10:55:12  25     mechanisms for collection I think were unique,

                                                                    148

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

10:55:15  1   perhaps.

2          But, in effect, I think the answer to

3   your question is, yes, my phone was made available

4   and -- to provide data as part of this litigation.

10:55:25  5      Q.   And you -- was that true with respect to

6   all three of your phones or just your primary

7   Ripple phone?

8      A.   No, all of my phones.

9      Q.   All of your phones.  Okay.

10:55:34 10          Do you recognize your phone number on

11   this document?  Don't read it into the record.

12   Just yes or no.

13      A.   Yes.

14      Q.   Okay.  All right.  So having had a

10:55:43 15   chance to read this document, at some point on the

16   third page, the one that says 1346 at the bottom,

17   you say "Speaking of nothing.  Do you use Signal?"

18   Do you see that?

19      A.   I do see that.

10:55:56 20      Q.   Okay.  And is it fair to say that before

21   that you were having a text conversation with

22   █████████████████  about the amount of XRP

23   hitting the market and some sort of deal with

24   someone referred to as ████████████?

10:56:14 25      A.   You have put a description of the

149

10:56:17 1   conversation that I don't totally agree with, but,

2   yes, before that I see a text message exchange

3   between me and ███████████████.

4   Q.   Why don't you describe for me what this

10:56:27 5   conversation was about before we get to the part

6   where you ask "Do you use Signal?"

7   A.   It appears to be about some frustrations

8   I'm having with the CFO of Ripple.

9   Q.   With Ron Will?

10:56:42 10   A.   That's correct.

11          THE REPORTER:  I'm sorry?

12          MR. TENREIRO:  With Ron Will.

13   Q.   What -- what were the sources of your

14   frustration?

10:56:47 15   A.   My -- my recollection, in part informed

16   by what I'm reading, is that he had made a

17   decision of, you know, over a million dollars

18   without asking me for my opinion or input.  That

19   seemed surprising.

10:57:09 20   Q.   Over a million dollar sale of XRP?

21   A.   No.  It looks like -- there's a

22   discussion -- my -- from what I'm reading here,

23   no.

24   Q.   So like a -- sort of -- some sort of

10:57:22 25   investment of some sort?

150

| | | |
|---|---|---|
| 10:57:27 | 1 | A.   No. |
| | 2 | Q.   So what is the decision of $1 million? |
| | 3 | What -- what is it?  About what? |
| | 4 | A.   I think it's a payment. |
| 10:57:32 | 5 | Q.   Uh-huh. |
| | 6 | A.   And it's $1.75 million.  And as |
| | 7 | described in the thread, it says they would take |
| | 8 | XRP or cash. |
| | 9 | Q.   A payment for what? |
| 10:57:43 | 10 | A.   I don't recall. |
| | 11 | Q.   And where are you seeing $1.75 million? |
| | 12 | A.   Didn't I see that? |
| | 13 | MR. SOLOMON:  Yeah, you did. |
| | 14 | THE WITNESS:  Okay. |
| 10:57:51 | 15 | MR. SOLOMON:  It's about |
| | 16 | three-quarters of the way down the first |
| | 17 | page. |
| | 18 | Q.   Oh, sorry.  Yeah.  "Ron makes a decision |
| | 19 | on $1.75 and doesn't check with me." |
| 10:58:01 | 20 | You were frustrated about that? |
| | 21 | A.   It seems like it's a big enough number. |
| | 22 | You're the CFO of the company.  It feels like |
| | 23 | something that would -- in the normal course of |
| | 24 | business that you would talk to the CEO about. |
| 10:58:20 | 25 | Q.   Were there not sort of, like, approval |

151

10:58:23  1   matrices at Ripple?

2        A.   Yes, Ripple had approval matrices.

3        Q.   And was this above his approval grade or

4   whatever the term is?

10:58:37  5        A.   I don't recall exactly.  I think almost

6   certainly the answer would have been yes.

7   Moreover, it just seems like this would be

8   something that you would, as CFO, communicate

9   about.

10:58:52 10        Q.   Were you ever involved in decisions

11   about, you know, firing Ripple employees or

12   letting people go?

13        A.   Yes.

14        Q.   Which ones?

10:59:04 15        A.   Is the question which employees was I

16   part of without actually firing over the course of

17   my entire tenure of my --

18        Q.   No, that you recall.

19        A.   I mean, I'm sure there's many.

10:59:17 20        Q.   Okay.  Which ones do you recall, though?

21        A.   Maybe repeat the question so I get --

22   make sure I get it right.

23        Q.   What Ripple employees were you involved

24   in decisions about letting go?

10:59:33 25        A.   Well, we can start chronologically of my

152

| | |
|---|---|
| 10:59:36 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 11:00:05 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 11:00:18 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 11:00:28 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 11:00:37 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 11:00:50 | 25 |

1    recollections. ███████████████

2    ██████████ (phonetic), ██████████.

3          I mean, if I may, if you'd like me to

4    try to remember all of them -- I mean, there's

5    scores, you know.  There's no way I'm going to get

6    them all.

7          Q.   Okay.  So there's a lot?  Does Mr. --

8          A.   If anyone was terminated from Ripple

9    involuntarily during my tenure, generally

10   speaking, I probably had some visibility into it.

11   And if I had an opinion on the topic, I would have

12   shared that.

13         Q.   Well, did -- let me ask you this:  Did

14   you ever make the decision?  Was it ever your

15   decision initiated by you to terminate a

16   particular employee?

17         A.   Yes.

18         Q.   Who?

19         A.   Well, anyone who reported to me directly

20   it would have been my decision.

21         Q.   So who did you decide to terminate?

22         A.   I mean, again, over the six and a half

23   years I've been there, you know, it would -- I

24   would have to look at a list of who departed

25   during that time frame.

153

11:00:51  1          Q.   Was Ron Will one of those people?

        2          A.   No, Ron Will quit.

        3          Q.   Okay.  What about Patrick Griffin?

        4          A.   That's more of a gray area.

11:00:59  5          Q.   Please explain.

        6          A.   You know, Patrick is a talented, smart,

        7   energetic guy, who -- I guess I -- I look at the

        8   growth of a start-up in kind of various phases and

        9   having the right people for the right phase is

11:01:19 10   important.  And I think Patrick was very useful

       11   and constructive in an early phase, but as the

       12   company scaled, his efficacy managing and building

       13   teams and keeping teams organized and on target

       14   for their objectives wasn't as strong as other

11:01:41 15   people over time.

       16          Q.   So the decision was a mutual decision or

       17   you decided --

       18          A.   I decided --

       19               MR. SOLOMON:  Objection; form.

11:01:53 20          A.   I -- I let Patrick know that I thought

       21   it was time for him to transition and I wanted to

       22   work with him to facilitate a constructive

       23   transition.

       24          Q.   That's what the law firms do, by the

11:02:02 25   way.

                                                              154

```
11:02:08   1              Of the -- what about Antoinette
           2    O'Gorman?
           3         A.   What about?
           4         Q.   Did you have a role in deciding that she
11:02:17   5    should leave Ripple?
           6         A.   I was certainly involved in those
           7    conversations, but I was sad to see her leave.
           8    And she -- it was her choice to leave the company.
           9         Q.   So she was not someone that you said to,
11:02:30  10    you know, you might -- this might be a time to
          11    transition or something like that?
          12         A.   No, I didn't say that.
          13         Q.   Okay.  What about Ms. Madigan?
          14         A.   What about her?
11:02:41  15         Q.   Same question.
          16         A.   No.
          17         Q.   Okay.  She left Ripple --
          18         A.   To be fair, she didn't report to me so I
          19    was not a party to those conversations.  I'm
11:02:50  20    aware -- I think she reported to Monica Long.  And
          21    Monica and I certainly discussed her tenure and
          22    whether or not she was doing a great job.
          23         Q.   Was she?
          24         A.   I wasn't close enough to have a strong
11:03:06  25    opinion myself.
```

155

11:03:07 1       Q.   Do you understand that her leaving was

2    voluntary or -- or Ripple suggesting to her that

3    she should leave?

4             MR. SOLOMON:  Objection to form.

11:03:14 5       A.   My recollection is that Ripple

6    suggested -- that Monica, as her manager,

7    suggested that it wasn't working out as well as

8    she might do at another company.

9       Q.   Okay.  And what about Miguel Vias?  Same

11:03:28 10   question.

11       A.   Maybe repeat the question so I get the

12   whole --

13       Q.   Sure.

14             Were you involved in the decision with

11:03:33 15   respect to Mr. Vias leaving the company?

16       A.   Miguel did not report to me.  And, you

17   know, was I involved in that?  I'm sure that I was

18   aware and a part of the conversations about the --

19   his exit.  I'm -- I'm certain that I would have

11:03:49 20   been.  I don't recall anything specific about

21   that -- those conversations.

22       Q.   And, again, was that voluntary or was

23   that Ripple more suggesting it's not working out?

24             MR. SOLOMON:  Objection; form.

11:03:59 25       A.   I don't recall.

156

11:04:00  1        Q.    Okay.  Who was -- who was his direct
       2  report?
       3        A.    His direct report or his manager?
       4        Q.    I'm sorry.  His manager.  His manager.
11:04:13  5        A.    I think when he exited, I -- I don't
       6  know if his manager was Monica or Patrick Griffin.
       7        Q.    You have -- you mentioned start-ups a
       8  couple times today and the evolution of Ripple as
       9  a start-up.
11:04:30 10        Did you also -- do you recall mentioning
      11  that generally to me moments ago?
      12        A.    Yes.
      13        Q.    Okay.  And I think you said you got an
      14  MBA from Harvard, is that right?
11:04:38 15        A.    Yes.
      16        Q.    So what -- what is a start-up in your
      17  own words?
      18        A.    A start-up is a new company that a small
      19  group of people come together and typically raise
11:04:54 20  some capital and start to build product solutions
      21  that they think will be adopted by their customers
      22  and grow into bigger businesses.
      23        Q.    From your experience prior to joining
      24  Ripple, either educational experience or
11:05:14 25  professional background, did you come to

                                                              157

11:05:15  1  understand or become familiar with the various

2  ways in which start-ups might "typically raise

3  some capital"?

4        A.   Yes.

11:05:25  5        Q.   What were those ways that you learned

6  about?

7        A.   Is the question what ways do start-ups

8  raise capital?

9        Q.   Yeah.  That you know.  I'm not asking

11:05:34 10  you for the world.  That you know.

11        A.   Well, at different phases of a start-up

12  I think you see different approaches.  At the

13  earliest stages that we were discussing a moment

14  ago, you know, there's something loosely described

11:05:53 15  as friends and family, where a start-up might

16  raise a small amount of money from friends and

17  family.

18             As the company progresses to the extent

19  it's seeing some traction in its vision of where

11:06:07 20  the future might go, you might start to raise

21  money from what have become known as seed funds.

22  And that might be smaller or -- more money than

23  you might raise from friends and family, but less

24  money than you might raise from a traditionally

11:06:23 25  defined venture capitalist.

                                                      158

11:06:27  1          And to the extent you raise seed funds,
          2   to the extent you continue to build and grow and
          3   have some evidence of success, you might go and
          4   raise a Series A financing or Series B financing.
11:06:38  5   And that would be the way I think about raising
          6   capital.
          7          Q.   Okay.  Sometimes start-ups eventually
          8   IPO?
          9          A.   I wouldn't have called them a start-up
11:06:53 10   at that point.
         11          Q.   At that point it's no longer a start-up?
         12          A.   Yeah.  I mean, the journey of company
         13   creation in Silicon Valley, in my experience, does
         14   not have, you know, clear lines between when even
11:07:10 15   a Series A should happen versus a Series B; when
         16   it's a start-up, when it's something more than a
         17   start-up.  So it feels more art than science in
         18   those descriptions.
         19          Q.   Okay.  And why did you fire ██████?
11:07:31 20          A.   My recollection is that when I joined
         21   the company in April of 2015, one of the first
         22   conversations I had with Chris Larsen was that I
         23   probably needed to fire ██████
         24          Q.   Why?
11:07:40 25          A.   You'd have to ask Chris.

                                                            159

11:07:42   1        Q.   So he told you from 2015 that you needed

2    to fire him?

3        A.   He -- he believed when I joined the

4    company in April of 2015 that one of my direct

11:07:51   5    reports at the time was ███████████   And he

6    expressed that I probably needed to fire ██████

7    ██████

8        Q.   He just said that.  He didn't tell you

9    why?

11:08:04  10        A.   I -- I don't recall.

11        Q.   I see.

12             Back to Exhibit 106.  Why are you asking

13    ████████████████████████   to use Signal here?

14                  MR. SOLOMON:  You've --

11:08:18  15        A.   I did not ask him to --

16                  MR. SOLOMON:  Let me just stop

17        you.  You've just been asked a whole

18        series of questions and intervening

19        questions.  If you need to look at the

11:08:26  20        document again, do it; if you don't,

21        don't.  I just want to make that clear for

22        the record.

23                  MR. TENREIRO:  That's also

24        helpful.  And let me correct my question.

11:08:32  25    BY MR. TENREIRO:

                                                        160

11:08:33  1          Q.    Why did you ask him if he uses Signal?

          2          A.    I don't recall.

          3          Q.    Okay.  And in the next page, he says "I

          4  have Telegram.  Does that do the trick?"

11:08:45  5                Do you see that?

          6          A.    I do see that.

          7          Q.    Okay.  And there seems to be like a

          8  question mark that probably is an emoji.  Do

          9  you -- originally was probably an emoji.

11:08:53 10                Do you see that?

         11          A.    I do see that.

         12          Q.    Okay.  Do you recall what emoji you

         13  responded with?

         14          A.    I do not.

11:08:58 15          Q.    Okay.  Whatever you said, he said,

         16  "Okay, Signal it is."

         17                Do you see that?

         18          A.    I do see that.

         19          Q.    After that did you communicate with him

11:09:06 20  on Signal?

         21          A.    I don't believe so.

         22          Q.    Okay.  What's the basis of that belief?

         23          A.    Sorry.  If the question is, Did I ever

         24  communicate with him after that on Signal? the

11:09:18 25  answer is probably yes.  To the extent I

                                                            161

11:09:20  1    communicated with him right after that, it looks

2    like the answer is no based upon the context of

3    this exchange.

4         Q.   Any time after.

11:09:26  5         A.   Yes.

6         Q.   All right.  Let's look --

7         A.   Actually, to be totally honest, I don't

8    know.

9         Q.   Okay.  You would have to look at that

11:09:36 10    list you might have?

11         A.   Right.  Yeah.

12         Q.   All right.  Did you ever discuss with

13    anyone on Signal the status of XRP under the

14    securities laws?

11:09:49 15         A.   I don't recall.

16         Q.   Did you ever discuss with anyone your

17    views as to whether XRP sales were securities

18    transactions on Signal?

19         A.   I don't believe so.

11:09:58 20         Q.   Did you ever discuss XRP with anyone on

21    Signal?

22         A.   Yes.

23         Q.   Who?

24         A.   I don't recall.

11:10:04 25         Q.   When?

                                                    162

```
11:10:07   1          A.    I don't recall.
           2          Q.    Anyone outside Ripple?
           3          A.    I expect, yes.
           4          Q.    Did you ever discuss XRP's use cases --
11:10:15   5    or case or cases -- using Signal?
           6          A.    I -- I don't recall.
           7          Q.    Did you ever discuss Ripple's efforts
           8    with respect to the XRP ecosystem using Signal?
           9                    MR. SOLOMON:  Objection; calls
11:10:29  10        for a legal conclusion.
          11                    Go ahead.
          12          A.    Could you repeat the question?
          13          Q.    Did you ever discuss Ripple's efforts
          14    with respect to the XRP system using Signal?  XRP
11:10:42  15    ecosystem.
          16          A.    Sorry.  Maybe one more time just to make
          17    sure I got it.
          18          Q.    Did you ever discuss Ripple's efforts
          19    with respect to the XRP ecosystem using Signal?
11:10:54  20                    MR. CERESNEY:  Objection to form.
          21          A.    I don't recall.
          22          Q.    Did you ever discuss the reasons why
          23    someone might buy XRP with anyone on Signal?
          24          A.    I don't recall.
11:11:04  25          Q.    Did you ever disclose to a third party
```

163

11:11:06  1    the advice you might have gotten from counsel as

       2    to the legal status of XRP under the securities

       3    laws?

       4                    THE REPORTER:  Could you repeat?

11:11:11  5        Q.   Did you ever disclose to a third party

       6    the legal advice you might have gotten from

       7    counsel as to the legal status of XRP under the

       8    securities laws?

       9        A.   I don't believe so.

11:11:23 10        Q.   Did you ever discuss you or Ripple's

      11    sales of XRP using Signal?

      12        A.   As we discussed earlier, with GSR, I

      13    would have facilitated to confirm appropriate

      14    wallet information to verify that we're being

11:11:43 15    secure in those transfers.  Beyond that, I don't

      16    recall.

      17        Q.   Okay.  So when you say you don't recall,

      18    would you say it's possible you just don't know

      19    sitting here today?

11:11:55 20                    MR. SOLOMON:  Objection to form.

      21        A.   When I -- when I say that I don't recall

      22    on that --

      23        Q.   On this last question.

      24        A.   Remind me what the last question was

11:12:03 25    exactly.

                                                            164

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
11:12:04   1          Q.   Which was, did you discuss you or
           2    Ripple's sales of XRP using Signal?
           3          A.   Yeah, I don't recall.  And so the answer
           4    to your second question -- I mean, generally
11:12:18   5    speaking, Ripple's sales of XRP would not have
           6    been discussed via Signal.
           7          Q.   Okay.  Is it possible you discussed them
           8    and you just don't recall?
           9          A.   It's possible and I don't recall.
11:12:32  10          Q.   Okay.  And separate from the sales, but
          11    is it possible that you discussed XRP with -- with
          12    anyone on Signal?
          13               MR. SOLOMON:  Objection; asked
          14          and answered.
11:12:46  15               You can answer.
          16          A.   Yes, it's possible.
          17          Q.   Okay.  And is it possible you discussed
          18    XRP status under the securities laws on Signal?
          19               MR. SOLOMON:  Objection; asked
11:12:56  20          and answered.
          21               You can answer.
          22          A.   I -- I don't recall.
          23          Q.   Is it possible that you discussed on
          24    Signal things like the Hinman speech on Signal?
11:13:05  25          A.   It's possible, yes.
```

                                                              165

```
11:13:07   1              Q.   Okay.  Let's look at 96.
           2                        (Whereupon, exhibit is received
           3              and marked Garlinghouse Deposition
           4              Exhibit 96 for identification.)
11:13:09   5                        THE WITNESS:  Oh, I have two.
           6                        MR. SOLOMON:  Thanks.  Sorry.
           7    BY MR. TENREIRO:
           8              Q.   So this is RPLI_SEC 533153.  It's a
           9    number of pages.  Excuse me.  It appears to me to
11:13:32  10    be a series of screenshots.  Please take a look,
          11    Mr. Garlinghouse.  I'll want you to read it, but
          12    just by browsing it, does it -- do you know what
          13    this document is?
          14              A.   Not yet.
11:13:47  15              Q.   Okay.  Go ahead.  Take a look at it.
          16                   (Pause)
          17              A.   Okay.
          18              Q.   Having looked at the document, do you
          19    know what this document is?
11:15:35  20              A.   This document appears to be screenshots
          21    of a conversation.  I don't actually know for
          22    sure, I'm assuming it's Breanne, but I don't...
          23              Q.   Is the assumption based on the reference
          24    to XRP-O?
11:15:54  25              A.   The assumption is based upon the market
```

166

11:15:57  1    maker purchases.

2        Q.    Market maker purchases of what?

3        A.    XRP.

4        Q.    Okay.  Do you see -- who took these

11:16:07  5    screenshots?

6        A.    I don't know.

7        Q.    Did you ever take screenshots of your

8    Signal communications?

9        A.    Other than for collection of -- for

11:16:16 10    purposes of this litigation, no.

11       Q.    Right.

12             So before the litigation, did you have a

13    practice of taking screenshots of the

14    conversations?

11:16:23 15       A.    No.

16       Q.    You might have taken some, but not a

17    practice of it?

18       A.    Not that I recall.

19       Q.    Okay.  Do you see that at least one of

11:16:30 20    these seems to say -- the second page says "June

21    25th, 2020," and then further down there's some

22    July dates.

23             Do you see all of that?  Turn to the

24    second page first.

11:16:46 25       A.    Yes, I see that.

167

11:16:48   1        Q.   Okay.   And there's a reference to XRP-O

         2  somewhere in here.

         3        Do you see that?

         4        A.   Yes, I saw that.

11:16:53   5        Q.   Okay.   So any reason to doubt that these

         6  conversations did not occur sometime in the summer

         7  of 2020?

         8        A.   I -- I don't have any reason to doubt

         9  that these conversations occurred in the summer of

11:17:03 10  2020.

        11        Q.   Okay.   And do you see on the first page

        12  it says "Brad Garlinghouse set disappearing

        13  message time to one week"?   Do you see that?

        14        A.   Yes, I do.

11:17:13 15        Q.   Why does that show up there, do you

        16  know, on the app?   Why does that pop up?

        17        A.   It's letting both parties -- it's

        18  letting both parties know who has set the

        19  expiration disappearing message feature.

11:17:25 20        Q.   So you change the expiration feature, it

        21  puts a notice there?

        22        A.   Correct.

        23        Q.   Okay.   And did you ask Ms. Madigan to

        24  communicate with you via Signal?

11:17:34 25        A.   I -- I don't recall.

                                                                 168

11:17:39  1        Q.   Okay.  Which -- which side of the
          2    conversation is you and which side is Ms. Madigan?
          3        A.   I believe Ms. Madigan is the dark -- the
          4    right side and I'm the light or the left side.
11:17:53  5        Q.   Okay.  So, for example, you say I just
          6    -- "I'm just off the phone with ███" -- and that's
          7    ██████████?
          8        A.   I presume, yes.
          9        Q.   You think that's you saying that to her?
11:18:02 10        A.   I believe that's correct.
         11        Q.   Okay.  On the next page, she talks about
         12    speaking with legal, Comms, tax, et cetera.
         13    "Given MMs need to execute these contracts, we
         14    will not start buybacks until earliest tomorrow."
11:18:16 15             Do you see that?
         16        A.   Yes.
         17        Q.   What is the reference to buybacks?
         18    Buybacks of what?
         19        A.   I believe this is in regard to the
11:18:26 20    buyback of XRP.  As you're probably aware, one of
         21    the things we're very cognizant of is minimizing
         22    any impact we have in the XRP markets.  As some
         23    products scaled -- at the time what we're calling
         24    XRP-Os, XRP-Origination, which is now known as
11:18:46 25    Wallet Send.  And as that demand for that grew, it

                                                              169

**GRADILLAS COURT REPORTERS**
(424) 239-2800

```
11:18:51   1    meant we were introducing XRP into the market.
           2    And in order to minimize any potential impact on
           3    the market, we were creating the ability to buy
           4    back XRP such that there wasn't an unexpected
11:19:07   5    significant increase to supply in the market.
           6         Q.   Later on she says, on page 3, "Hi Brad,
           7    hope you're well."
           8              Do you see that message?
           9              Further down, "Given ongoing regulatory
11:19:21  10    conversations, I've asked legal for an
          11    opinion - pending from ███ ."
          12              Do you see that?
          13         A.   I do see that.
          14         Q.   What regulator -- regulator
11:19:28  15    conversations are you discussing there?
          16         A.   I don't know.  She's discussing it, not
          17    me.
          18         Q.   I understand, but you're having a
          19    conversation with her.  So when you read that,
11:19:37  20    what did you understand that to mean?
          21              MR. SOLOMON:  If you did.
          22         A.   Yeah, I -- I don't know that I knew
          23    exactly what she meant.  I -- what you're
          24    describing, the conversation, I replied with
11:19:47  25    "Sounds great.  Thank you."
```

170

11:19:48  1          Q.    You didn't ask her what regulator you're

2     talking about -- are you talking about, Breanne?

3     That was not your response?

4          A.    No, that was not my response.

11:19:56  5          Q.    Okay.  Further down, if you turn a

6     couple pages, the message says "█████ came back and

7     after discussing with outside counsel" -- you're

8     going to have to flip a couple.  Yeah, there you

9     go.

11:20:10 10          Do you see that?

11          A.    Yes.

12          Q.    Who's █████?

13          A.    I don't know.

14          Q.    It says "█████ came back and after

11:20:15 15     discussing with outside counsel, they mentioned

16     some reg concerns given their SEC inquiry and

17     suggested we may want to explore other ways to do

18     this creatively that is more in line with our

19     current contract, i.e., using derivatives."

11:20:28 20          Does reading that give you a hint as to

21     who █████ is?

22          A.    It does not.

23          Q.    Okay.  All right.  And then you say to

24     her, on the next page, "Can you send around an

11:20:41 25     email update on what transpired over the weekend

171

11:20:51  1    on removing XRP-O supply from the market?"

       2                    THE REPORTER:  Can you slow

       3        down, please?

       4        Q.   "Can you send around an email update on

11:20:54  5    what transpired over the weekend on removing XRP-O

       6    supply from the market?"

       7                    Do you see that message?

       8        A.   I do see that message.

       9        Q.   Did she send around that email update?

11:21:00 10        A.   I don't recall.

      11        Q.   An email update.  To whom were you

      12    asking her to send the message to?

      13        A.   I don't believe I was specific about

      14    that.

11:21:07 15        Q.   No, but just in your mind, you know,

      16    what was the practice -- when you asked her about

      17    sending email updates, what was your sort of

      18    expectation or practice about who it would be sent

      19    to?

11:21:18 20                    MR. SOLOMON:  Objection; form.

      21        A.   My expectation would have been she's a

      22    vice president of the company.  I think maybe a

      23    senior director/vice president of the company.

      24    She would have had the knowledge to know, based

11:21:29 25    upon the content of that email, who needed to be

                                                                172

```
11:21:31   1    involved in that email.
           2         Q.   Why did you want her to send this update
           3    on what transpired over the weekend on removing
           4    XRP-O supply?
11:21:41   5         A.   I don't recall.  I presume because I
           6    wanted to make sure everyone had the same set of
           7    understanding.
           8         Q.   Everyone at Ripple?
           9         A.   Well, not everyone at Ripple.
11:21:53  10         Q.   Everyone involved in these issues about
          11    the buybacks or the XRP-O supply?
          12         A.   Yes.
          13              MR. SOLOMON:  Objection; form.
          14         Q.   Okay.  All right.  We can set that
11:22:03  15    aside.
          16              Who is ███████████?
          17         A.   I don't know.
          18         Q.   Do you know if he did any work for
          19    Ripple?
11:22:17  20         A.   Can you repeat the name?
          21         Q.   ██████████████████████.
          22         A.   I don't know.
          23         Q.   Okay.  Do you know of any relationship
          24    he had to Ripple?
11:22:30  25         A.   I do not.
```

173

```
11:22:31   1          Q.    Have you heard of an entity called
           2    ███████████████?
           3          A.    I don't believe so.
           4          Q.    Ripple has bank accounts at ██████████
11:22:43   5    ███████████?
           6                 MR. SOLOMON:  Objection to form.
           7          A.    Yes.
           8          Q.    Do you have access to those bank
           9    accounts?
11:22:49  10          A.    I believe the answer to that is
          11    technically, yes.  I'm not sure that I know how to
          12    access them.
          13          Q.    Who accesses them on a regular basis?
          14          A.    I would be speculating.
11:23:03  15          Q.    Do you have -- do you know of an entity
          16    called ███████████████?
          17          A.    I don't think I do.
          18          Q.    Okay.  And do you have to approve
          19    disbursements from Ripple's bank account or
11:23:16  20    accounts?
          21          A.    There's a threshold above which requires
          22    multiple approvals or more than one.  I don't know
          23    what that threshold is.  But there are times when
          24    I am asked to log in to approve certain wire
11:23:35  25    transfers and disbursements of some size.
```

174

| | | |
|---|---|---|
| 11:23:39 | 1 | Q.   Log into the bank account or log into |
| | 2 | some other system?  Because you just said you |
| | 3 | don't know if you have access to the bank |
| | 4 | accounts. |
| 11:23:46 | 5 | A.   I don't -- |
| | 6 | MR. SOLOMON:  Objection to form. |
| | 7 | A.   -- believe that was my exact testimony. |
| | 8 | I think I said I believe I do have access.  I |
| | 9 | don't know if I could immediately go and gain |
| 11:23:54 | 10 | access. |
| | 11 | Q.   Okay.  When you were asked to log on to |
| | 12 | approve certain wire transfers, what are you being |
| | 13 | asked to log on to? |
| | 14 | A.   A ███████████ -- |
| 11:24:02 | 15 | MR. SOLOMON:  Objection; form. |
| | 16 | A.   -- Bank website to which I would then |
| | 17 | approve or disapprove a transaction. |
| | 18 | Q.   What about checks?  Do you have to |
| | 19 | approve those, the disbursements of checks from |
| 11:24:17 | 20 | Ripple's bank accounts? |
| | 21 | A.   I don't -- I'm not aware that I've ever |
| | 22 | approved a check disbursement from Ripple's bank |
| | 23 | account.  I suppose, to be fair, when I approve a |
| | 24 | transaction, I'm not sure I really know if it's |
| 11:24:30 | 25 | going out by wire or a check or some other |

175

| | | |
|---|---|---|
| 11:24:34 | 1 | mechanism. |
| | 2 | Q.   And what is that threshold amount that |
| | 3 | you have to -- above which you have to approve? |
| | 4 | A.   I'm not sure. |
| 11:24:43 | 5 | Q.   Is it in the millions or hundreds of |
| | 6 | thousands? |
| | 7 | A.   Millions.  I -- I believe it's millions. |
| | 8 | Q.   Okay.  And did -- do -- does Ripple have |
| | 9 | more than one bank account at █████████████? |
| 11:24:54 | 10 | A.   Yes. |
| | 11 | Q.   How many? |
| | 12 | A.   I don't know. |
| | 13 | Q.   And does Ripple have banking accounts at |
| | 14 | other banks in the United States other than |
| 11:25:05 | 15 | ████████████████? |
| | 16 | A.   Yes, I believe so. |
| | 17 | Q.   What bank or banks? |
| | 18 | A.   I believe we have an account at █████████ |
| | 19 | ███████ and I believe we either have or are in the |
| 11:25:17 | 20 | process of setting up an account at ██████████████ |
| | 21 | █████. |
| | 22 | Q.   For what purpose?  Why are you setting |
| | 23 | up an account at █████████████████? |
| | 24 | MR. CERESNEY:  You're asking him |
| 11:25:34 | 25 | about today?  You're asking him a question |

176

```
11:25:37   1        about something that Ripple is doing
           2        today?
           3              MR. TENREIRO:  Yeah.
           4              MR. CERESNEY:  Why is that at all
11:25:40   5        within the scope of this deposition?
           6              MR. TENREIRO:  Are you
           7        instructing him not to answer the
           8        question?
           9              MR. CERESNEY:  Well, I'd like a
11:25:46  10        proffer from you as to --
          11              MR. TENREIRO:  I'm not going to
          12        give you one.  I'm asking you -- he's
          13        answering me where the bank accounts are
          14        and I'm asking him why he's setting it up
11:25:52  15        at ███████████████████.
          16              Are you instructing --
          17              MR. CERESNEY:  Yes.
          18              MR. TENREIRO:  Are you going to
          19        instruct him not to answer?
11:25:56  20              MR. CERESNEY:  I would like a
          21        proffer from you as to why you think this
          22        is relevant to this action.
          23              MR. TENREIRO:  Where Ripple's
          24        funds are is relevant to this action even
11:26:04  25        today.  It's relevant.  I mean, there's
```

                                                    177

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
11:26:06    1            remedies.  There's all sorts of issues why
            2            it's relevant.
            3                      MR. CERESNEY:  All right.
            4                      MR. TENREIRO:  Go ahead.
11:26:11    5                      MR. CERESNEY:  If you can answer
            6            that without discussing any discussions
            7            with counsel or revealing discussions with
            8            counsel.
            9            A.    Could you ask the question again?
11:26:18   10            Q.    Why is Ripple setting up a bank account
           11     at ████████████████?
           12            A.    Risk diversification.  Concentration of
           13     deposits at one bank, it's probably prudent to
           14     have deposits at more than one bank.
11:26:32   15            Q.    And when did the -- is it set up yet or
           16     not?
           17            A.    I don't know.
           18            Q.    Okay.  Did this process begin after
           19     December 2020?
11:26:49   20            A.    I believe so.
           21            Q.    Okay.  Before December 2020, did Ripple
           22     have bank accounts other than ███████████████
           23     and ████████████  anywhere in the world?
           24            A.    I believe yes.
11:27:00   25            Q.    Where?
```

178

| | | |
|---|---|---|
| 11:27:02 | 1 | A.   I don't know. |
| | 2 | Q.   Who would know? |
| | 3 | A.   ████████████. |
| | 4 | Q.   Okay.  Anyone else? |
| 11:27:11 | 5 | A.   We have a relatively new CFO who has |
| | 6 | been there four-plus months.  She might know.  Her |
| | 7 | name is ████████████.  On ██████████ team, |
| | 8 | who has subsequently left the company, ██████████ |
| | 9 | might know.  And then there's some people |
| 11:27:34 | 10 | underneath ██████████ that might have that |
| | 11 | knowledge. |
| | 12 | Q.   And, I'm sorry, how many bank accounts |
| | 13 | are there at ██████████████? |
| | 14 | A.   I don't know. |
| 11:27:48 | 15 | Q.   Is it more than ten? |
| | 16 | A.   I don't know. |
| | 17 | Q.   Okay.  And can you ballpark how many |
| | 18 | countries Ripple has bank accounts in outside of |
| | 19 | the United States? |
| 11:28:01 | 20 | A.   I -- I -- I don't know. |
| | 21 | Q.   Okay.  And the proceeds of Ripple's XRP |
| | 22 | sales while you were CEO, were they deposited in |
| | 23 | ██████████████ accounts or others? |
| | 24 | A.   I don't know. |
| 11:28:10 | 25 | MR. SOLOMON:  Objection; form. |

179

```
11:28:11   1          Q.    Okay.  Do you know of -- do you know
           2     where they were deposited, the proceeds of XRP
           3     sales for Ripple's XRP?
           4          A.    I don't know.
11:28:22   5          Q.    Okay.  What about the proceeds of your
           6     XRP sales?  Where were those deposited?
           7          A.    The proceeds from my XRP sales were
           8     deposited at ███████ and subsequently I would
           9     transfer those to ███████████.
11:28:37  10          Q.    Okay.  Any other bank you might transfer
          11     them to?
          12          A.    Not that I can recall.
          13          Q.    Okay.  And when you sold XRP, did you
          14     sell it for fiat or did you sell it for -- at
11:28:49  15     times for other digital assets?
          16          A.    I believe I only sold it for fiat.
          17          Q.    What fiat?
          18          A.    I believe I only sold it for U.S.
          19     dollars.
11:29:02  20          Q.    Okay.  And so are you saying that all of
          21     the -- all of the proceeds went to Bitstamp
          22     somehow, even the GSR ones?
          23          A.    Yes.
          24          Q.    Okay.  And then from there you would --
11:29:12  25     or somebody somehow would get them to ██████.
```

180

```
11:29:15   1   ███████████?

           2        A.    Yes.

           3        Q.    All right.  And when did you open the

           4   Bitstamp account?

11:29:26   5        A.    I believe I opened the Bitstamp account

           6   in the spring, kind of February/March, maybe

           7   April, of 2017.

           8        Q.    For what purpose?

           9        A.    To custody XRP.

11:29:45  10        Q.    And was selling XRP one of the reasons

          11   to open that account?

          12        A.    Not at the time I opened it.

          13        Q.    Just to custody your XRP?

          14        A.    At -- at the time I opened it, my

11:30:00  15   recollection is -- so I was receiving a

          16   distribution of XRP associated with a grant from

          17   the company.  Certain vesting provisions had been

          18   met.  And so sometime in the, I think, March/April

          19   time frame of 2017, the first distribution and

11:30:21  20   vesting of XRP occurred and, thus, was distributed

          21   to me.

          22             One of the things that in -- in risk

          23   mitigation I thought is I'm not going to send all

          24   of that XRP to one custody, one wallet.  I'm going

11:30:39  25   to distribute it.  And my recollection is I sent a
```

                                                              181

```
11:30:42   1    third to Bitstamp, a third to GateHub, and a third
           2    to a cold wallet.  GateHub was the account that
           3    was hacked and they stole all that XRP.
           4          Q.    How many units?
11:30:57   5          A.    I don't recall exactly.
           6          Q.    You divided it in thirds, equal thirds?
           7    Do you remember that?
           8          A.    Yes.
           9          Q.    Okay.  And the cold wallet, who held the
11:31:04  10    keys?
          11          A.    I did.
          12          Q.    Okay.  And the Bitstamp account that you
          13    opened was to -- at first just to custody you
          14    said?
11:31:13  15          A.    Yes.
          16          Q.    So you made a decision later in time to
          17    sell XRP?
          18          A.    Yes.
          19          Q.    When was that decision made?
11:31:26  20          A.    I don't recall.  I would have to go back
          21    and look at records from 2017.
          22          Q.    Was it sometime in 2017 that you made
          23    that decision to sell your XRP?
          24          A.    I began selling some XRP in 2017.
11:31:40  25          Q.    Why did you sell it?
```

                                                                     182

11:31:42  1          A.   I -- I don't recall specifically.  My
          2     guess is diversification of assets.
          3          Q.   When you entered -- when you opened the
          4     account at Bitstamp for the custody, did you sign
11:31:58  5     some sort of user agreement or check some box
          6     about your, you know, relationship with Bitstamp?
          7               MR. SOLOMON:  Objection to form.
          8          A.   I -- I suspect I did.
          9          Q.   Okay.  And how did you open this
11:32:09 10     account?  Was it on a computer? on your phone, or
         11     did you call them up?
         12               MR. SOLOMON:  Objection; form.
         13          A.   I don't recall specifically.
         14          Q.   Were you in the United States when you
11:32:17 15     did this or did you travel to some country to open
         16     the account?
         17               MR. SOLOMON:  Objection; form.
         18          A.   I don't recall.
         19          Q.   Okay.  And the vesting conditions that
11:32:30 20     had met -- been met, are you talking about pricing
         21     volume conditions that were in your option or
         22     granting contract with Ripple?  I'm describing it
         23     incorrectly as a "contract," but...
         24               MR. SOLOMON:  Objection; form.
11:32:43 25          A.   I mean, I think we're saying the same

                                                                    183

| | | |
|---|---|---|
| 11:32:45 | 1 | things.  I don't recall all the provisions of what |
| | 2 | had to occur in order for vesting to occur.  Some |
| | 3 | of that was time-based employment.  I thought that |
| | 4 | the other one was just volume based. |
| 11:33:00 | 5 | Q.   Uh-huh. |
| | 6 | A.   But I don't recall. |
| | 7 | Q.   Okay.  We'll look at the pricing one in |
| | 8 | a minute. |
| | 9 | Let's go back to ██████████ who you seem |
| 11:33:08 | 10 | to not recall.  Let's look at Exhibit 94. |
| | 11 | (Whereupon, exhibit is received |
| | 12 | and marked Garlinghouse Deposition |
| | 13 | Exhibit 94 for identification.) |
| | 14 | MR. TENREIRO:  All right.  Let's |
| 11:33:25 | 15 | start here. |
| | 16 | MR. SOLOMON:  We're also about |
| | 17 | five minutes away from another 90 minutes. |
| | 18 | So we can -- happy to go through whatever |
| | 19 | this line of questioning is, but at a good |
| 11:33:32 | 20 | point we may want to take another short |
| | 21 | break.  We can make this one short. |
| | 22 | MR. TENREIRO:  Let's do this. |
| | 23 | MR. SOLOMON:  Okay. |
| | 24 | MR. TENREIRO:  All right.  For |
| 11:34:08 | 25 | the record, this is a document, |

184

```
11:34:10    1            RPLI_SEC_1028005, a multipage email.  It

            2            appears to be a thread occurring --

            3            actually, it might -- yeah, it's a couple

            4            emails. Seems to be on July 11, 2018.

11:34:30    5                      (Pause)

            6    BY MR. TENREIRO:

            7        Q.   Okay.  Mr. Garlinghouse, having reviewed

            8    the email, do you see in the last page ████████

            9    writes "I would like authorization to communicate

11:36:51   10    with the SEC on Ripple's behalf"?  Do you see

           11    that?

           12        A.   I do see that.

           13        Q.   Was that authorization given?

           14        A.   I don't know.

11:36:57   15        Q.   Who would know?  So let me ask this.

           16    In -- in this email thread, I see ████████████,

           17    ████████████, yourself, some of your counsel, and

           18    ████████  copied.

           19             Do you see that at the top?

11:37:11   20        A.   I do see that.

           21        Q.   Did you forward --

           22        A.   Yeah.

           23        Q.   Sorry.

           24             Did you forward this email to anyone?

11:37:17   25        A.   I don't know.
```

                                                                  185

11:37:17  1          Q.    Did you discuss the substance of this
        2    email with anyone?
        3          A.    I don't recall.
        4          Q.    Okay.
11:37:21  5                MR. SOLOMON:  Did you read this
        6          email?
        7                THE WITNESS:  I don't know.
        8          Oops, that was not your question.  It was
        9          his question.  But I don't know.
11:37:28 10                MR. TENREIRO:  That's okay.
       11    BY MR. TENREIRO:
       12          Q.    Did you have a practice of not reading
       13    some of your emails?
       14          A.    I mean, I got a lot of email every day
11:37:37 15    and the longer the email, the less likely it is I
       16    read the whole thing.  So, you know, just by
       17    virtue of trying to prioritize and manage my
       18    inbox, there's definitely some emails that I
       19    haven't read.  I think, according to my iPhone,
11:37:52 20    there's ten thousand of them.
       21          Q.    Right.
       22                So there's some that are, like, marked
       23    as unread --
       24          A.    Yes.
11:37:57 25          Q.    -- in your iPhone.

                                                            186

```
11:37:58    1              But if you -- if you click on it --
            2    you're saying that even if you click on it, you
            3    might still not read it?  Is that what you're
            4    saying?
11:38:03    5         A.   I -- it's definitely possible.
            6         Q.   Uh-huh.
            7         A.   In part based on who the sender is.
            8         Q.   Right.
            9              Would you read an email from -- the top
11:38:13   10    of this is from ████████, right?
           11         A.   Yes.
           12         Q.   He's a legal advisor, right?
           13         A.   Yes.
           14         Q.   Okay.  And so do -- how often did you
11:38:19   15    not read your emails from your legal advisors?
           16         A.   I don't know.
           17         Q.   You can exclude Mr. Solomon if you want.
           18              But did you -- did you have a practice
           19    of not reading emails from legal advisors around
11:38:29   20    the time of this email in July of 2018?
           21              MR. SOLOMON:  That's not what
           22         he's saying.  Just ask him the questions.
           23              MR. TENREIRO:  Let me just -- let
           24         me just ask.
11:38:36   25    BY MR. TENREIRO:
```

                                                              187

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

11:38:37   1          Q.   Did you -- did you have any practice
          2    with respect to emails from your legal counsel or
          3    legal advisors?
          4          A.   Did I have any practice?  What does that
11:38:45   5    mean?
          6          Q.   Yeah.  You know, did you think to
          7    yourself, you know, if I get an email from my
          8    legal advisor, I better read those, or did you
          9    have a practice that said I don't really trust the
11:38:56  10    guy, I'm not going to ask it?  I mean, that's what
         11    I'm asking.
         12               MR. CERESNEY:  Objection; form,
         13           among other things.
         14          A.   I don't even know what the question is.
11:39:03  15    I apologize.
         16          Q.   My question is, did you have a practice
         17    of reading or not reading emails from your legal
         18    advisors?
         19          A.   I wouldn't -- I didn't have a different
11:39:10  20    practice from my legal advisors than I had from
         21    anybody else.
         22               MR. SOLOMON:  Objection.
         23          Q.   Did you consider emails from your legal
         24    advisors to be important?
11:39:17  25          A.   It depends who the legal advisor was.

                                                              188

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
11:39:20    1        Q.    What about ███████ -- ███████?
            2   Sorry.  ██████████
            3               MR. SOLOMON:  You're under oath.
            4        Just kidding.
11:39:31    5        A.    There are other lawyers I would have
            6   prioritized more highly.
            7        Q.    Than ██████████?
            8        A.    Yes.
            9        Q.    Okay.  So based on that, you can't
11:39:38   10   recall either way if you actually read the
           11   substance of this email, is that correct?
           12        A.    I don't recall this email.
           13        Q.    Okay.  Is it possible that you did read
           14   it, though?
11:39:47   15        A.    For certain.
           16        Q.    Okay.  And the authorization, you just
           17   don't know if that was given, the authorization
           18   that he requests?
           19        A.    That's correct.
11:39:56   20        Q.    Okay.  And having read the email, you
           21   know, I don't -- I'm not going to spend a lot of
           22   time on some of these things, but it appears that
           23   he's suggesting that there's some report that's
           24   going to be presented to the SEC.
11:40:06   25               Do you see that?
```

                                                              189

| | | |
|---|---|---|
| 11:40:06 | 1 | A.   I do. |
| | 2 | Q.   And there's a reference to Val.  Do you |
| | 3 | know who that is? |
| | 4 | A.   I do. |
| 11:40:10 | 5 | Q.   Who is that? |
| | 6 | A.   Val Szczepanik, as described -- although |
| | 7 | I think they spelled "czar" wrong. |
| | 8 | Q.   They did. |
| | 9 | A.   Is, I think, publicly pronounced from |
| 11:40:20 | 10 | the SEC as the Crypto Czar. |
| | 11 | Q.   And had you met Ms. Szczepanik at this |
| | 12 | point in time? |
| | 13 | A.   I believe Ms. Szczepanik was in the |
| | 14 | meetings that I attended at the SEC, but I had |
| 11:40:29 | 15 | only met her in that construct. |
| | 16 | Q.   Do you remember if she was in the |
| | 17 | Division of Enforcement back then? |
| | 18 | A.   I don't. |
| | 19 | Q.   At the top ██████ says "Got it. |
| 11:40:40 | 20 | Meanwhile let's avoid contact with Val so we can |
| | 21 | coordinate.  Andrew will be in touch with you |
| | 22 | today.  Thanks." |
| | 23 | Do you know who the reference to Andrew |
| | 24 | is there? |
| 11:40:48 | 25 | A.   Well, I'm assuming, because Andrew |

190

11:40:50  1    Ceresney is on the cc, that they're referring to
          2    Andrew Ceresney.
          3         Q.   Okay.  Did ███████████ have sort of the
          4    authority to direct Mr. Ceresney who to call back
11:41:02  5    as suggested by this email?
          6                   MR. SOLOMON:  Objection; form.
          7         A.   That's unclear.
          8         Q.   I feel like I'm missing something here
          9    about the relationship with ███████████.  So why
11:41:10 10    don't you go ahead and tell me, because there's
         11    some chuckling going on.  What --
         12         A.   ███████████ is a very -- you all have, I
         13    believe, met ███████████.  Fair?  Yes?  No?
         14         Q.   Just answer the question.
11:41:20 15                   MR. SOLOMON:  Brad is
         16      referencing -- referencing the SEC side of
         17      the table just for the record.
         18                   Go ahead, Brad.
         19         A.   ███████████ is an intelligent,
11:41:28 20    opinionated, cantankerous advisor.
         21         Q.   Uh-huh.
         22         A.   So I -- particularly in this time
         23    period, I think there were a group of people --
         24                   MR. CERESNEY:  You know what,
11:41:44 25      Brad?  Let's end the answer there.

                                                              191

**GRADILLAS COURT REPORTERS**
(424) 239-2800

```
11:41:45   1                    THE WITNESS:  Okay.
           2                    MR. CERESNEY:  I'm instructing
           3          the witness not to answer further because
           4          now he's going to tread into legal advice
11:41:51   5          and we're not going to go there.
           6                    MR. TENREIRO:  Well, I
           7          didn't think -- you should not tread into
           8          legal advice, but I thought he said there
           9          was a group of -- are you talking there
11:41:57  10          was a group of advisors -- how does that
          11          tread --
          12                    MR. CERESNEY:  He was about to
          13          tread into legal advice in his answer.
          14                    MR. TENREIRO:  Okay.
11:42:04  15   BY MR. TENREIRO:
          16          Q.   Can you explain further what
          17   relationship ███████ had to Ripple in this time
          18   period?
          19                    MR. CERESNEY:  I think he's
11:42:13  20          already explained that.  Asked and
          21          answered.
          22          Q.   Okay.  Go ahead.
          23                    MR. CERESNEY:  Objection.
          24          A.   A legal advisor to the company.
11:42:18  25          Q.   Okay.  And did he have the -- did you
```

192

```
11:42:21   1    have a belief that he was sort of acting outside
           2    of the scope of the authority you had granted him?
           3                 MR. SOLOMON:  Objection.
           4                 MR. CERESNEY:  I'm going to --
11:42:29   5        I'm going to instruct the witness not to
           6        talk about the authority he's granted
           7        ███████████ because that gets into the
           8        substance of legal advice.
           9                 MR. TENREIRO:  The authority he's
11:42:36  10        granted him gets into the substance of
          11        legal advice?
          12                 MR. CERESNEY:  Yeah, it does.
          13                 MR. TENREIRO:  Okay.
          14                 MR. CERESNEY:  And, by the way,
11:42:39  15        it's a good time for a break.  So if you
          16        want to finish this document.
          17                 MR. TENREIRO:  Sure.
          18    BY MR. TENREIRO:
          19        Q.   Did -- after -- after this email
11:42:46  20    exchange, did you avoid -- did Ripple avoid
          21    contact with Val to coordinate with ██████████?
          22        A.   I don't know.
          23                 MR. SOLOMON:  Objection.
          24                 MR. TENREIRO:  Okay.  Let's go
11:42:54  25        off.
```

193

```
11:42:55    1                THE VIDEOGRAPHER:  Okay.  Going
            2        off the record at 11:44.
            3               (Whereupon, a recess is taken.)
            4                THE VIDEOGRAPHER:  Back on the
11:57:36    5        record, 11:59.
            6   BY MR. TENREIRO:
            7        Q.   Okay.  Just to finish up on 94,
            8   Mr. Garlinghouse, do you see that the subject
            9   matter -- the subject is "Heads up:  Adverse
11:57:45   10   action by ███████████  Re:  XRP and Ripple"?  Do
           11   you see that?
           12        A.   I do.
           13        Q.   Okay.  So do you think, based on that
           14   and based on who the email is from, that you would
11:57:55   15   have read it or not read it?
           16                MR. SOLOMON:  Objection to form.
           17        A.   I think it's likely I opened this email.
           18   I think it's likely I read it.  I don't recall
           19   specifically reading it.
11:58:04   20        Q.   Okay.  Now, I --
           21        A.   I do now recall who ███████████ is, but
           22   it's not a name that I knew.
           23        Q.   Who is ████████████?
           24        A.   ████████████ was, I think, maybe
11:58:14   25   affiliated with █████, but he and two partners had a
```

194

11:58:20   1   firm that were trying to advise.  And my general

           2   view is ███████ and his partners were trying to take

           3   advantage of what they viewed as an opportunity to

           4   make money.  And I -- my experience with the group

11:58:37   5   was they embellished realities and overpromised,

           6   you know, what they were capable of.

           7        Q.   So let me try to unpack that.

           8             They were trying to advise -- you said

           9   "████████ was, I think, maybe affiliated with

11:58:52  10   ████, but he and two partners had a firm that were

          11   trying to advise."

          12             Trying to advise Ripple?

          13        A.   Yes.

          14        Q.   Okay.

11:58:58  15        A.   And I do believe we actually paid them

          16   some money to be advisors for some period of time.

          17   I was not an advocate and I found it to be -- you

          18   know, one of the things -- or particularly early,

          19   after we received the SEC letter, you know -- I

11:59:15  20   think, you know, having more people involved is

          21   not necessarily better.  And I think Chris Larsen

          22   and I didn't always agree on that.

          23             And so for me, this was yet -- yet

          24   another group that was trying to extract money

11:59:28  25   from Ripple that promised to be helpful in some

                                                               195

```
11:59:31   1    way.
           2         Q.   So when you said earlier they saw --
           3    "they were trying to take advantage of what he
           4    viewed as an opportunity to make money," are you
11:59:39   5    referring to an opportunity to make money by
           6    advising Ripple with respect to the SEC issue?
           7         A.   I believe that's correct.
           8         Q.   Okay.  And you also said you paid them
           9    some money.  How much?
11:59:54  10         A.   I don't recall.  I do recall thinking
          11    they were offensively expensive.
          12         Q.   Was it at least ███████?
          13         A.   Order of magnitude.  That would be what
          14    I would have guessed, but I don't recall.
12:00:06  15         Q.   If you thought they were offensively
          16    expensive, why did you pay them?  Why did Ripple
          17    Pay them?
          18         A.   Chris Larsen hired them.
          19         Q.   So it was Mr. Larsen's decision?
12:00:14  20         A.   I believe it was Chris Larsen's decision
          21    to engage this particular group of, the
          22    triumvirate of ██████████ and his compatriots.
          23              THE REPORTER:  Repeat.  "I
          24         believe it was Chris Larsen's..."
12:00:27  25         A.   I believe it was Chris Larsen's decision
```

                                                              196

```
12:00:27   1    to engage ████████ and him compatriots.
           2        Q.   Did you express to Mr. Larsen your
           3    differing views as to whether it was a good idea
           4    to have Shrier?
12:00:35   5                 MR. SOLOMON:  Outside the
           6            presence of counsel.
           7        A.   I -- I think Chris was aware of my view
           8    that more doesn't always equal better.  And that
           9    applied to this group and just in general our
12:00:54  10    partnership and working together at Ripple over
          11    the six and a half years that we've worked
          12    together.
          13        Q.   But Mr. Larsen had the authority to hire
          14    this group irrespective of your views on whether
12:01:05  15    you should hire that group?
          16                 MR. SOLOMON:  Objection to form.
          17        A.   Mr. Larsen's the chairman -- executive
          18    chairman of Ripple.  If he wants to hire an
          19    advisor, you know, unless I'm going to lay in the
12:01:22  20    tracks, I'm not sure that's, you know, okay.
          21        Q.   Does he ask you, like, for your
          22    permission when he wants to hire an advisor?  Has
          23    he ever done that?
          24        A.   I mean, we don't really have a dynamic
12:01:38  25    where somebody asks permission.  We discuss
```

                                                              197

12:01:43  1    professional courtesy and respect, but, you know,
        2    Chris and I don't always agree.
        3         Q.   Sure.
        4              If Mr. Larsen had wanted to file a
12:01:50  5    registration statement with the SEC for XRP sales,
        6    could he have done that?
        7                   MR. SOLOMON:  Objection; calls
        8       for speculation.
        9         Q.   As far as you know.
12:01:58 10         A.   I don't think any one individual could
       11    have filed a registration statement.  It would
       12    have taken a collaboration of lawyers, advisors,
       13    work, time.  And so I don't think Chris Larsen
       14    could have.  I don't think I could have.  I think
12:02:16 15    a team effort would have enabled that.
       16         Q.   Right.  I'm not talking about actually
       17    doing it.  I'm talking about making the decision.
       18    I'm sorry.
       19              Could he have made that decision?  Hey,
12:02:29 20    this is what we're going to do.  We're filing a
       21    registration statement.
       22         A.   I --
       23                   MR. CERESNEY:  Objection to form.
       24                   MR. SOLOMON:  Objection.
12:02:35 25         A.   I think Chris Larsen, as the executive

                                                              198

```
12:02:36   1    chairman, had immense influence.  And, by

           2    extension, if he came to me and said, you know,

           3    we're -- hey, absolutely there should be a

           4    registration statement filed, I think we would

12:02:50   5    have gotten behind that and made it happen.

           6         Q.   Did Mr. Larsen tell you why he decided

           7    to hire ████████ outside of the presence of counsel?

           8         A.   I don't recall.

           9         Q.   Okay.

12:03:03  10         A.   I didn't recall who he was.

          11         Q.   Sure.

          12              MR. TENREIRO:  Let's do 41, which

          13         is an email I think a day later than 94.

          14              (Whereupon, exhibit is received

12:03:19  15         and marked Garlinghouse Deposition

          16         Exhibit 41 for identification.)

          17              MR. TENREIRO:  And while you take

          18         a look, it's a two-page email, RPLI_SEC

          19         949371.

12:04:35  20              (Pause)

          21    BY MR. TENREIRO:

          22         Q.   Okay.  Mr. Garlinghouse, do you see that

          23    the title of the email, the subject, is "FYI:

          24    ████████ report was changed to be more

12:04:44  25    favorable"?  Do you see that?
```

                                                                199

```
12:04:45   1              A.    I do.
           2              Q.    Do you think you would have read an
           3       email that said that?
           4              A.    I don't think subject lines are a major
12:04:52   5       determinant of whether or not I read an email.  So
           6       I don't think that would have necessarily impacted
           7       whether or not I read it.
           8              Q.    How about who it's copied to?
           9              A.    Well, when you look at your inbox, you
12:05:06  10       don't see who is copied on an email.  So I don't
          11       think that would be a primary determinant.
          12              Q.    What would be the primary determinant
          13       then?
          14              A.    How busy I was that day.
12:05:16  15              Q.    Did you read this email?
          16              A.    I don't recall.
          17              Q.    Okay.  Did you -- Mr. Larsen does not
          18       appear to be copied on this email, right?
          19              A.    That's correct.
12:05:28  20              Q.    Given that Mr. Larsen had hired ███,
          21       did you convey to him what ██████ was reporting to
          22       you here?
          23                    MR. SOLOMON:  Objection to form.
          24              A.    I don't recall.
12:05:42  25              Q.    You -- you were at this time -- this is
```

200

12:05:44  1    the summer of 2018, so you were having

      2    conversations with the SEC.  I think you mentioned

      3    meetings where I was, commissioners, et cetera, et

      4    cetera, is that correct?

12:05:51  5                  MR. SOLOMON:  Objection to form.

      6        A.    Certainly in the summer -- well, I don't

      7    remember when I met with the -- you or the SEC

      8    specifically.  By virtue of the emails you've

      9    shown me today, I have seen that I apparently met

12:06:07 10    with some people at the SEC on November 9th.  But

     11    I think your question was did I meet with --

     12        Q.    Just --

     13        A.    -- in the summer of 2018?  And I

     14    think -- I don't recall the summer of 2018.

12:06:18 15        Q.    Fair to say that in late 2018, from,

     16    like, the middle to the latter part of 2018, you

     17    were having SEC meetings with SEC staff?

     18                  MR. SOLOMON:  Objection to form.

     19        A.    I don't know how many meetings we had at

12:06:31 20    the SEC in that time period.

     21        Q.    Was Val in some of the meetings?

     22    Ms. Szczepanik.

     23        A.    I'm re meeting -- I remember meeting Val

     24    Szczepanik at one of the SEC meetings.  I don't

12:06:45 25    know when that meeting took place.

                                                          201

```
12:06:47    1        Q.    And in these meetings, I think,
            2   generally -- generally speaking, you were -- one
            3   of the things you were doing was providing
            4   information about Ripple and XRP, is that right?
12:06:54    5   Educating I think you said?
            6              MR. SOLOMON:   Objection to form.
            7        A.    Answering questions, sharing
            8   perspectives about what's going on in crypto and
            9   what's going on in the XRP markets, what -- what
12:07:07   10   Ripple is doing.
           11        Q.    In any of the meetings with the
           12   commissioners, did -- or with any SEC staff, did
           13   you tell them when you were discussing what Ripple
           14   was doing that Ripple had to pay ███████   to
12:07:19   15   ██████?
           16        A.    I seriously doubt that I would have done
           17   that.  I -- I mean, even today I didn't know who
           18   ██████ was until you refreshed my memory.  I would
           19   not have considered -- what's the name of this
12:07:33   20   group?  ███████████?  ███████████ thing?  I
           21   didn't consider them a particularly relevant or
           22   impactful point in our conversations with the SEC.
           23        Q.    ███████████ references that "a negative
           24   mention of Ripple was removed - but swung to a
12:07:58   25   somewhat positive."
```

                                                            202

```
12:08:01   1                  Do you see that?
           2        A.    I do.
           3        Q.    Okay.  Did you mention that to the SEC
           4   when you met with the SEC?
12:08:06   5        A.    I am certain I would not have.  I mean,
           6   I don't consider ██████████ to be a particularly
           7   credible person, and so I wouldn't want to present
           8   not credible information to the SEC.
           9        Q.    Right.
12:08:27  10              Did you have -- did there come any time
          11   on or after 2018 where Ripple engaged in
          12   activities relating to removing negative mentions
          13   of Ripple from public statements?
          14              MR. CERESNEY:  Objection; form.
12:08:43  15        A.    Could you repeat the question?
          16        Q.    Did there come any time on or after 2018
          17   where Ripple engaged in activities relating to
          18   removing negative mentions of Ripple from public
          19   statements?
12:08:55  20              MR. SOLOMON:  Objection; form.
          21        A.    I guess the way I think about this is we
          22   engage a PR firm with the goal of educating,
          23   sharing and communicating with the world about
          24   what Ripple is doing.  To the extent a reporter
12:09:13  25   has signaled that they have a negative viewpoint
```

203

```
12:09:16   1    about X or Y or Z, would we, meaning Ripple and/or
           2    our PR firm, seek to obviate, minimize, or
           3    otherwise dampen a negative reference?  Yes, I'm
           4    sure we did that.
12:09:35   5         Q.   So, like, letters to The New York Times,
           6    for example, is that included in those efforts?
           7                   MR. SOLOMON:  Objection; form.
           8         A.   What -- what do you mean, a letter to
           9    The New York Times?
12:09:46  10         Q.   About ███████████████████████.
          11                   MR. SOLOMON:  Objection; form.
          12         A.   You mean -- maybe you could be more
          13    specific with your question if you would.
          14         Q.   Yes.  Was a letter to The New York Times
12:09:54  15    about ███████████████ a part of the efforts to --
          16    seeking to obviate, minimize or otherwise dampen
          17    negative references?
          18         A.   Well, I think what you're referencing is
          19    an email to -- to an editor to -- with whom I had
12:10:10  20    a previous -- well, I don't know exactly what
          21    you're referencing.  I didn't send a letter to The
          22    New York Times.
          23         Q.   Did you send an email to The New York
          24    Times?
12:10:18  25         A.   I sent an email to an editor on the West
```

                                                              204

```
12:10:20    1    Coast with whom -- I had known for some years

            2    seeking to sit down and talk about ███████

            3    ██████'s posture towards Ripple.

            4         Q.   Okay.  So to the extent that Ripple

12:10:31    5    hired a PR firm to, again -- the reporter has

            6    signaled that they might have a negative view

            7    about X, Y or Z, Ripple and the PR -- the PR firm

            8    might seek to obviate, minimize or otherwise

            9    dampen negative references.

12:10:47   10         To the extent Ripple did that, is that

           11    any different than what Ripple hired ██████ to

           12    do?

           13              MR. SOLOMON:  Objection; form.

           14         A.   Look, sitting here today, I can't tell

12:10:57   15    you why we hired ███████ and what he was

           16    supposed to do or what he did do.

           17         Q.   Okay.

           18         A.   I did not consider him a particularly

           19    credible person/resource.  I found his -- as I, I

12:11:05   20    think, testified earlier, I found him to

           21    embellish, overstate.  I didn't -- I didn't

           22    basically trust him.

           23         Q.   Okay.  But Ripple did hire a PR firm --

           24    and we're talking about ██████, right? -- to

12:11:17   25    dampen/obviate negative references, right?
```

                                                           205

12:11:21  1                    MR. SOLOMON:  Objection; form.

       2        A.   Well, I mean, you hire a PR firm to do

       3   lots of things.  You're -- a subset of that would

       4   be what you're describing.

12:11:28  5        Q.   Any other advisor that you might have

       6   hired for the purpose -- and understanding that

       7   you might hire an advisor for several purposes,

       8   but is there any other advisor that you hired for

       9   that purpose, seeking to obviate, minimize or

12:11:42 10   otherwise dampen negative references about Ripple?

      11        A.   I -- we definitely have other PR firms.

      12   I can't name them all.  I think we have one in --

      13   I think we might have two in Asia and one in

      14   Europe that are on some sort of retainer.  And

12:12:05 15   those are the only PR firms that -- I mean, again,

      16   it depends a little bit -- dampen, obviate,

      17   otherwise minimize -- I can't remember exactly the

      18   phrases I used, but I think my experience in

      19   Silicon Valley, my experience professionally, is

12:12:26 20   many, many, many, many companies hire PR firms to

      21   engage in reactive and proactive communication

      22   with press.

      23        Q.   But other than PR firms, did Ripple hire

      24   other advisors to either, you know, dampen

12:12:42 25   negative references or engage in reactive or

                                                          206

12:12:46    1    proactive communications with press?

2       A.   Yes.

3       Q.   Okay.  Who?

4       A.   I -- I -- I can't name all of them.  As

12:13:00    5    I said, ████ was the primary one, based in San

6    Francisco, with whom we had some relationship.  I

7    actually don't think we use ████ anymore.  I

8    don't know who replaced them.  Maybe ██████?  I'm

9    not a hundred percent sure.

12:13:15   10         We have worked with -- in Washington we

11    worked with a group called ████.  And the firms

12    outside in -- in Japan and otherwise I don't know

13    the names of.

14       Q.   Right.  But I'm asking for other

12:13:28   15    advisors who are not PR firms.

16       A.   Oh.  Oh, to work on those --

17       Q.   Yeah.

18       A.   I mean, I couldn't -- I guess the answer

19    to your question is yes.  ██████ apparently

12:13:42   20    falls in that.  As we saw earlier, I had no

21    recollection of who ██████ was until I saw

22    this email.  And so I would imagine there's

23    someone else who we may have hired during that

24    time period.  I think the answer's yes.

12:13:55   25       Q.   But you just can't recall who?

207

12:13:57  1        A.    I don't recall.

          2        Q.    Okay.  And so who -- what about -- who

          3    is ██████████ ?

          4        A.    ██████████ was a board member at Ripple.

12:14:08  5        Q.    Okay.  When did you meet him?

          6        A.    I met him as an introduction from Chris

          7    Larsen.  And I don't remember exactly when.  I

          8    guess I would -- somewhere, I'm guessing, 2017.

          9        Q.    And is he still on the board?

12:14:27 10        A.    He is not.

         11        Q.    Do you recall when he left?

         12        A.    I don't recall the exact timing.  I

         13    think it was right before the presidential

         14    election.  So probably about a year ago.  Is that

12:14:45 15    right?  Twenty -- yeah.

         16        Q.    Why did -- who asked him to join the

         17    board?

         18              THE REPORTER:  I'm sorry?

         19        Q.    Who asked him to join the board?

12:14:51 20        A.    Chris Larsen, I guess, nominated him to

         21    join the board.  I believe he met with a couple of

         22    the other board members, including myself.  And he

         23    joined the board, I think, in 2017.

         24        Q.    And does he own XRP?

12:15:14 25        A.    I believe the answer to that is yes.  I

                                                                 208

```
12:15:15   1    generally had a practice of not asking people

           2    about their personal XRP transactions outside of

           3    Ripple.

           4         Q.   Okay.  And let -- let's take a look at

12:15:34   5    Exhibit 27.

           6              And while we get that exhibit, other

           7    than being on the board, what other relationship,

           8    if any, did Mr. ████ -- sorry, ████████████████

           9    have with Ripple?

12:15:45  10         A.   I don't recall specifics.  I think he

          11    may have been an advisor to Ripple prior to -- oh,

          12    two things.  One, I think he was a -- prior to

          13    joining the board, I think he was an advisor of

          14    some sort, about which I don't remember the

12:15:58  15    specifics.

          16              He also started a website called ████

          17    ████████, of which he was -- I don't know what

          18    his role was at ████████████  Owner?  And

          19    Ripple did a sponsorship of ████████████████ for a

12:16:19  20    couple of years.

          21         Q.   Why did Ripple do that sponsorship?

          22         A.   I think -- I think having more

          23    reputable, good journalism around crypto is good

          24    for the crypto industry.  I personally have never

12:16:38  25    thought ████████ as one of the primary -- you
```

                                                              209

| | | |
|---|---|---|
| 12:16:41 | 1 | know, I think the lexicon -- you know, trade rags |
| | 2 | of the crypto industry.  I've never thought |
| | 3 | ▮▮▮▮▮ was that great.  And so to the extent |
| | 4 | that there are other more reputable outlets that |
| 12:16:57 | 5 | have financial success, that's good for the crypto |
| | 6 | industry.  And I generally think what's good for |
| | 7 | the crypto industry is probably good for Ripple. |
| | 8 | Q.   And ▮▮▮▮▮ had experience as a |
| | 9 | journalist? |
| 12:17:10 | 10 | MR. SOLOMON:  Objection; form. |
| | 11 | A.   He did.  He did have experience as a |
| | 12 | journalist.  I believe he was publisher or editor |
| | 13 | of a New York-based publication called The |
| | 14 | Observer. |
| 12:17:25 | 15 | Q.   Okay.  And ▮▮▮▮▮ offered to |
| | 16 | introduce Ripple to people connected to the Trump |
| | 17 | administration? |
| | 18 | MR. SOLOMON:  Objection; form. |
| | 19 | A.   I believe that's fair, yeah. |
| 12:17:42 | 20 | Q.   And did he? |
| | 21 | A.   Yes. |
| | 22 | Q.   Who did he introduce you to? |
| | 23 | A.   He introduced me to Jared Kushner. |
| | 24 | Q.   Okay.  You personally? |
| 12:17:53 | 25 | A.   Yes. |

210

12:17:53 1      Q.   What was the purpose of the
2      introduction?
3      A.   You know, it was, frankly, I'd say, more
4      social than it was professional.  We met on a
12:18:02 5      Sunday morning at a country club and we sat
6      informally around a pool table -- or, sorry, a
7      swimming pool at a country club and I don't
8      remember all the things we discussed.
9      Q.   So I only -- I'm only interested in
12:18:17 10      whatever part of it that was professional.
11           Do you recall what the purpose of the
12      introduction was?
13      A.   You know, I think the more we have --
14      the more there are influential senior people who
12:18:32 15      are believers in the crypto industry and how it's
16      evolving and the need for clear regulation in the
17      United States to help that industry thrive in the
18      United States, I think that's good for the crypto
19      industry.  I think it's good for Ripple.  You
12:18:44 20      know, good for the industry.
21      Q.   And so Mr. Kushner was one of those
22      people?
23      A.   One --
24      Q.   One of those people who believed in the
12:18:54 25      crypto industry and how it's evolving?

211

```
12:18:56    1           A.    No, I don't think that was my testimony.
            2    I -- I -- I think I said we wanted to evangelize
            3    and educate people of influence about --
            4           Q.    I see.
12:19:08    5           A.    And I would think many people in the
            6    room probably agree that Mr. Kushner was a person
            7    of influence.
            8           Q.    I see.
            9                 So you -- so more -- sorry.  More --
12:19:15   10    more to educate/evangelize to him about crypto?
           11    That was the professional purpose of the meeting
           12    to the extent there was one?
           13                 MR. SOLOMON:  Objection; form.
           14           A.    Yeah, again, I don't think I'd call it a
12:19:25   15    meeting.  I think I might have been wearing a
           16    swimsuit.
           17           Q.    Did you ask him to introduce you to
           18    other people?
           19           A.    No.
12:19:36   20           Q.    Did you ask him to talk to the SEC
           21    about, you know, XRP?
           22           A.    No.
           23           Q.    Did you ask -- did you or anyone at
           24    Ripple ask the staff of Senator Cotton to talk to
12:19:49   25    the SEC about XRP?
```

212

```
12:19:52    1         A.    I don't recall.  I don't know.
            2         Q.    Did you have conversations with the
            3    staff of Senator Cotton about XRP?
            4         A.    I don't recall.
12:20:01    5         Q.    And who -- what documents might refresh
            6    your recollection about that?  Would it be your
            7    meeting agenda, your calendar, or something else?
            8              MR. SOLOMON:  Objection; form.
            9         A.    I recall meeting with Senator Cotton.  I
12:20:14   10    don't recall meeting with any of his staff.  I
           11    don't recall speaking to any of his staff.  And I
           12    don't know what documents would refresh my memory.
           13         Q.    You recall meeting with him.
           14              Did you discuss Ripple or XRP at the
12:20:29   15    meeting or was it about something else?
           16              MR. SOLOMON:  Objection; form.
           17         A.    We did discuss Ripple and I don't
           18    remember the specifics.  It was, you know, I think
           19    two years ago?  I don't remember exactly.  It was
12:20:44   20    a while ago.  And he came to our office and we
           21    talked about what Ripple's doing and -- I guess it
           22    may have been more than two years ago just given
           23    COVID time.  So two and a half years ago maybe.
           24         Q.    After the SEC letter?  After you
12:20:59   25    received the SEC letter?
```

213

12:21:00  1      A.   I -- I actually don't recall, but that's

2  certainly possible.

3      Q.   Did you discuss the SEC with him?

4      A.   I don't recall.

12:21:12  5      Q.   Did anyone take notes at the meeting?

6      A.   I don't know.

7      Q.   Do you have a practice about taking

8  notes?

9      A.   Me personally?  No.

12:21:20 10      Q.   You or, you know, maybe your assistant,

11  the people who came with you to the meetings.

12      A.   Generally speaking, no.  I -- there was

13  not a practice.  Maybe one of the blessings and

14  curses of being a start-up is things don't have a

12:21:40 15  practice as opposed to you're kind of trying to

16  figure it out every day.

17      Q.   Did Mr. Kushner offer to speak with

18  anyone about Ripple?

19      A.   I suspect yes.  I -- I don't have a

12:21:55 20  specific -- well, I mean, he offered to organize

21  a -- what was largely a social visit with

22  Mr. Kushner.  I --

23      Q.   Sorry.  I asked if Mr. Kushner offered

24  to speak with anyone at Ripple.

12:22:10 25      A.   Oh, sorry.  I thought you asked

214

```
12:22:12   1   ████████   Sorry.  I apologize.
           2        Q.   No, no.  Kushner.
           3        A.   I don't recall.
           4             (Whereupon, exhibit is received
12:22:31   5        and marked Garlinghouse Deposition
           6        Exhibit 27 for identification.)
           7   BY MR. TENREIRO:
           8        Q.   Here's Exhibit 27.
           9             (Pause)
12:24:43  10        Q.   Okay.  Sorry.
          11             Mr. Garlinghouse, do you see this email
          12   thread with you, Ms. O'Gorman, and Monica Long?
          13        A.   I do.
          14        Q.   Okay.  And here Ms. O'Gorman references
12:25:08  15   ████ asking Chris Giancarlo to state certain things
          16   in an upcoming speech.
          17             Do you see that?
          18        A.   I do.  I'm not sure if your
          19   characterization is correct about who wrote that.
12:25:21  20        Q.   Who wrote it?
          21        A.   I don't know.
          22        Q.   Well, I -- I wasn't -- I wasn't saying
          23   who wrote it.  I'm simply asking you --
          24        A.   I think you asked me do you see what
12:25:35  25   Ms. O'Gorman asked as it relates to ████ asking
```

                                                                    215

| | |
|---|---|
| 12:25:39 | 1 |
| | 2 |
| | 3 |
| | 4 |
| 12:25:46 | 5 |
| | 6 |
| | 7 |
| | 8 |
| | 9 |
| 12:26:00 | 10 |
| | 11 |
| | 12 |
| | 13 |
| | 14 |
| 12:26:11 | 15 |
| | 16 |
| | 17 |
| | 18 |
| | 19 |
| 12:26:26 | 20 |
| | 21 |
| | 22 |
| | 23 |
| | 24 |
| 12:26:42 | 25 |

1    Giancarlo.  And I'm just saying I don't know.

2    Given the indented structure of this email, I'm

3    not sure who wrote the email part you're

4    referencing.

5        Q.   Right.

6            I'm simply saying there was some idea

7    going on that ███████ might ask Chris Giancarlo

8    to say certain things, is that correct?

9            MR. SOLOMON:  Objection; form.

10       A.   It looks like there's a -- I'm sorry,

11   repeat the question one more time.

12       Q.   Is there this sort of idea being

13   discussed at Ripple at this time that ███████

14   might ask Chris Giancarlo to make statement --

15   certain statements?

16       A.   It looks like there's some desire to get

17   the then-chair, I think, of the CFTC to

18   differentiate between consumer-facing digital

19   currency use cases versus institutional.

20       Q.   What is consumer facing?

21       A.   Could you elaborate on that question,

22   please?

23       Q.   What does consumer-facing digital

24   currency use cases mean?

25       A.   I mean, I don't know.  I didn't write

216

12:26:46  1    it.

2          Q.   Just generally, forget the email, what

3    is -- if you hear "consumer-facing digital

4    currency use cases," what do you understand that

12:26:57  5    to mean?

6          A.   Well, if I heard that in 2017 versus

7    2021, I might have a different answer.  In 2017,

8    when this email was written, I'm probably thinking

9    about -- you know, this is around the time when

12:27:08 10    there had been an explosion of ICO activity and

11    you had things like Bananacoin being launched and

12    you had, frankly, I think, lots of craziness going

13    on in the market.

14          Some of those had consumers in mind as

12:27:22 15    direct -- direct adopters or direct, even,

16    investors.  And so I don't know beyond that what

17    they're referencing.

18          Q.   And back in 2017, you would distinguish

19    XRP from that?  You know, you're absolutely

12:27:43 20    welcome to look at the email, but I'm just asking

21    you, if you're sitting back in 2017, would you

22    distinguish XRP from consumer-facing digital

23    currency use cases?

24          A.   When you ask that, what are you thinking

12:28:01 25    of as a consumer-facing --

217

```
12:28:02   1        Q.   It's whatever you mean as
           2   consumer-facing digital currency use cases.
           3             MR. SOLOMON:  I think those
           4        questions are -- are vague and hard for me
12:28:09   5        to follow.  I don't know if you can follow
           6        them, but...
           7        A.   I don't know what -- I don't know who
           8   wrote this.  I don't know what they meant when
           9   they said "consumer-facing digital currency use."
12:28:17  10   You're asking me a question about using the
          11   expression digital facing consumer -- or
          12   digital -- whatever the -- and I'm asking what you
          13   mean by that.
          14        Q.   Do you not understand the phrase, the
12:28:25  15   term then, "consumer-facing digital currency"?
          16        A.   I think there's lots of potential
          17   interpretations of what that means.
          18        Q.   Okay.  Is -- you also mentioned that
          19   your understanding might be different in 2017 than
12:28:37  20   in 2021.
          21             How has that evolved?
          22        A.   I think in the four years since this
          23   email was written, the crypto markets, digital
          24   currencies, have changed and evolved a lot.  You
12:28:53  25   know, there's lots of ways to measure that.  And
```

218

12:28:58  1   so, you know, without knowing who wrote it,

        2   without knowing what they meant, it's just hard

        3   for me to know how to answer the question.

        4        Q.   Again, setting the email aside, you

12:29:06  5   know, did there come times in, say, 2017 and 2018

        6   when you stated publicly your view that you did

        7   not think of the use case for digital currencies

        8   as, you know, buying things, like going to

        9   Starbucks and getting a cup of coffee?

12:29:22 10        A.   That's directionally accurate.  It's a

        11  little bit incomplete.  I -- you know, I think

        12  what I have said publicly is I more often than

        13  not, particularly in that time period, referred to

        14  these as digital assets or crypto assets.  What I

12:29:35 15  typically pointed out is to the extent you're

        16  thinking of these as fiat currencies, I had said

        17  that I view the G20 fiat currencies -- and

        18  typically I call it the dollar or euro or yen --

        19  as very effective in solving the use case and

12:29:56 20  problems that -- for consumer -- consumer-facing

        21  experiences.

        22        I have often gone on to explain there

        23  are some markets where that's less true outside

        24  the G20 where governments have effectively lost

12:30:11 25  control of their currencies already and, by

                                                            219

12:30:12  1    extension, there might be more consumer interest,

2    consumer demand, consumer usefulness.

3            But I typically have pointed out for a

4    U.S. audience, whether it be media or a panel,

12:30:28  5    that for those that are saying we're going to use

6    bitcoin to buy coffee at Starbucks or bitcoin at

7    Amazon, I've found that to be, particularly in

8    2017, less likely.

9        Q.   Has that view changed?

12:30:46 10        A.   A little bit.

11        Q.   How so?

12        A.   Maybe I'm wrong.

13        Q.   But how -- how -- how has your view

14    changed?  Do -- do you view --

12:30:56 15        A.   The adoption, usage and custody of

16    cryptocurrencies here in the United States by

17    consumers has exceeded what I might have forecast

18    four years ago.

19        Q.   In your last couple of answers, you --

12:31:09 20    you have used the word "consumers" a number of

21    times.  And I think I understand when you're using

22    that word you're talking about people who might go

23    to Starbucks with a digital currency.  Is that

24    fair?

12:31:19 25        A.   Sure.

220

```
12:31:19   1          Q.   Okay.  In this email -- I know you don't
           2    know who wrote it.  In this email, do you see a
           3    distinction between Ripple's XRP and that sort of
           4    consumer use case?
12:31:29   5                    MR. SOLOMON:  Objection; calls
           6          for speculation, asked and answered.
           7                    You can answer as best you can.
           8          A.   You know, as you're well aware, there
           9    are lots of ways that XRP is used outside of what
12:31:47  10    Ripple does with XRP.  There are today, and there
          11    were in 2017, consumer-facing experiences of how
          12    people used XRP.
          13                    Ripple's approach, both then -- well,
          14    I'll just talk about then and when it was written.
12:32:05  15    Ripple's approach and how we pri -- focused on
          16    using XRP was using XRP to solve an institutional
          17    liquidity management problem.  And so I think for
          18    purposes of this email, my guess is they're trying
          19    to make that distinction.
12:32:24  20          Q.   So Ripple's approach back then was
          21    not -- Ripple's approach was not the
          22    consumer-facing experience.  Is that fair?
          23                    MR. SOLOMON:  Objection; form.
          24          A.   I think what I said is, you know, lots
12:32:42  25    of people in the XRP ecosystem, and including
```

221

```
12:32:45   1   2017, there were certainly consumer use cases of
           2   XRP in 2017.  Ripple's focus and the customers we
           3   were targeting was more to use XRP at an
           4   institutional level for liquidity management.
12:32:59   5        Q.   Not to go to Starbucks to buy their
           6   coffee?
           7        A.   Not to go to Starbucks to buy their
           8   coffee.
           9        Q.   Okay.  And has that charged?
12:33:06  10        A.   I mean, Ripple's --
          11        Q.   I'm not talking --
          12             (Indiscernible cross talk; reporter
          13   requests one speaker.)
          14        A.   I don't think Ripple's focus has
12:33:14  15   changed.
          16        Q.   Okay.
          17        A.   As I said, to the extent my opinion
          18   about this topic has changed over the years, I
          19   have been surprised by the breadth of consumer
12:33:25  20   adoption of cryptocurrencies, including XRP, and
          21   how people are using them beyond what I might have
          22   thought given the strength of the dollar and what
          23   have you.
          24        Q.   Sure.
12:33:37  25             (Whereupon, exhibit is received
```

222

```
12:33:37   1           and marked Garlinghouse Deposition
           2           Exhibit 97 for identification.)
           3    BY MR. TENREIRO:
           4        Q.   All right. let's look at Exhibit 97.
12:34:13   5                MR. SOLOMON:  Just for the
           6           record, pages 3, 4 and 5 are something
           7           akin to an Excel spreadsheet-like chart
           8           and it is impossible for me to read and I
           9           have 20/20 vision.
12:34:26  10                So I want you to be careful
          11           about answering questions on those last
          12           four pages.
          13                MR. TENREIRO:  Sure.  And it's
          14           there for completeness.  I don't think I
12:34:34  15           have questions on those sheets.  I might.
          16                MR. SOLOMON:  Right.  And I'm not
          17           being difficult.  I just wanted to point
          18           out I just can't read it.
          19                MR. TENREIRO:  We can blow it up
12:34:58  20           on the laptop if we need to read it.
          21                MR. SOLOMON:  Yeah, that's
          22           perfect.
          23                (Pause)
          24    BY MR. TENREIRO:
12:36:14  25        Q.   Can you read the attachment?
```

                                                            223

```
12:36:15   1        A.   Not all of it.  I wear glasses, which
           2   helps.  No.
           3        Q.   Focus in on the email first.  If
           4   you're -- if you're still reading, go ahead.
12:36:44   5             MR. SOLOMON:  Why don't you
           6        just -- would it be okay if he just read
           7        the email or do you want him to make sure
           8        that he's read the whole thing?
           9             MR. TENREIRO:  I want to ask
12:36:50  10        about the email, but I don't want to stop
          11        him from reading if he wants to read it.
          12             THE WITNESS:  I'm good.
          13   BY MR. TENREIRO:
          14        Q.   Okay.  What is -- what is this email
12:36:56  15   about in your own words, Mr. Garlinghouse?
          16        A.   This is an email from ████████████
          17   soliciting a renewal of previous marketing spend
          18   on the website ███████████
          19        Q.   The -- at the bottom of the email,
12:37:10  20   there's a reference to "████████ the same as
          21   Ripple had paid over the last three years."
          22             Do you see that?
          23        A.   I do see that.
          24        Q.   Is that accurate, that Ripple --
12:37:21  25        A.   I don't actually think it is.
```

                                                            224

**GRADILLAS COURT REPORTERS**
(424) 239-2800

```
12:37:23   1          Q.    Okay.  What do you think the payments
           2     were?
           3          A.    I think that that's an increase, but I'm
           4     not sure.
12:37:27   5          Q.    Did you -- did Ripple approve this --
           6     did Ripple respond to this request?
           7          A.    I don't recall.
           8          Q.    Okay.  Would it be reflected in bank
           9     records?
12:37:43  10          A.    Well, I thought you meant did someone
          11     reply to the email.
          12          Q.    No.  Did Ripple simply respond to the
          13     request in any way?
          14          A.    I -- I think we ended up spending maybe
12:37:51  15     █████████ in 2021 on█████████████
          16          Q.    Okay.  And you referred to it as a
          17     marketing spend?
          18          A.    It would have been considered a
          19     marketing spend, yeah.
12:38:04  20          Q.    What does that mean?
          21          A.    I mean, my recollection is that we
          22     actually got ads on the website.
          23          Q.    In the -- in the email he's referencing
          24     all the stories about XRP and Ripple that he's
12:38:17  25     published.
```

225

12:38:18  1              Do you see that?

        2       A.   Well, if you look at the list, I mean,

        3   there's a bunch of stories that have nothing to do

        4   with Ripple or XRP.

12:38:25  5       Q.   I understand that.  But in the email, is

        6   he not referencing -- I mean, why don't we just go

        7   through it.

        8              "I have been able" -- "I believe we've

        9   been able to show over the course of the year that

12:38:37 10   the site has been incredibly valuable in advancing

       11   Ripple's aims.  I've attached a spreadsheet that

       12   contains almost 50 stories that align with

       13   Ripple's goals."

       14              Do you see that?

12:38:46 15       A.   Yes, I see that.

       16       Q.   Okay.  So why is he referencing stories

       17   that align with Ripple's goals in his request for

       18   funding?

       19              MR. SOLOMON:  Objection; calls

12:38:54 20    for speculation.

       21       A.   I don't know.

       22       Q.   Were the ads for Ripple or for XRP?

       23       A.   Ripple.

       24       Q.   If I -- if I clicked on the ad, what

12:39:05 25   would it take me to?

                                                        226

```
12:39:05   1          A.    I think it would take you --
           2                    MR. SOLOMON:  Objection.
           3          A.    I think it would take you to the Ripple
           4      website.
12:39:10   5          Q.    The how to buy XRP part of it?  Which
           6      part of it?
           7          A.    I don't know.
           8          Q.    Okay.  You don't know either way, so it
           9      could have been that part?
12:39:19  10          A.    I would be very surprised if that were
          11      the case.
          12          Q.    Why?
          13          A.    When Ripple thinks about its marketing
          14      of Ripple, its primary goal is signing up
12:39:31  15      financial institutions to RippleNet or other
          16      goals.
          17          Q.    And one of the ways you sign up
          18      financial institutions is ads on ██████
          19      ████████?
12:39:39  20                    MR. SOLOMON:  Objection; form.
          21          A.    We spend marketing dollars to generate
          22      leads on financial institutions globally in lots
          23      of different ways.  One of them has been spending
          24      money on ██████████
12:39:53  25          Q.    And has ████████ ever sort of given
```

227

12:39:56  1   you any, like, traffic numbers to show that

2   financial institutions are visiting his web to --

3   you know, so that it's sort of worth your money?

4        A.   I mean, if -- maybe I can save us both

12:40:06  5   some time on this.  I will stipulate up front that

6   I don't think this is the best marketing spend we

7   ever spent.  I think a board member is

8   championing -- and as I testified earlier -- the

9   creation of a new website.  It hopefully improves

12:40:22  10   the overall coverage of crypto and blockchain in a

11   way that matures the industry.

12        Even if that doesn't yield a direct

13   lead, as a board member it's probably something

14   that I'm going to be slightly more sympathetic to

12:40:40  15   than the specific measurement of how many

16   financial institution leads did we get from the

17   website.  But we also may have gotten some leads.

18   I don't know.

19        Q.   Sure.

12:40:49  20        And I guess my question is, do you have

21   any understanding as to why Mr. ██████ is giving

22   you a list of articles published about crypto as

23   opposed to a list of leads you got from the ads on

24   his website?

12:41:01  25             MR. SOLOMON:  Objection; asked

228

```
12:41:02  1         and answered.
          2      A.   I think he's trying to substantiate
          3   something that he's saying that is his opinion by
          4   providing data.  I happen to have scanned some of
12:41:12  5   the stories and I don't agree with him.
          6      Q.   You don't agree with the stories?
          7      A.   I don't agree with his
          8   characterization --
          9      Q.   Oh, I'm sorry.
12:41:20 10      A.   -- that you read earlier.
         11      Q.   You don't agree with his
         12   characterization that the site has been valuable
         13   in advancing Ripple's aims?
         14             MR. SOLOMON:  Objection; form.
12:41:31 15      A.   What he writes is "I believe we've been
         16   able to show over the course of the year that the
         17   site has been incredibly valuable in advancing
         18   Ripple's aims.  I've attached" --
         19             THE REPORTER:  You're going to
12:41:40 20         have to slow down.
         21             THE WITNESS:  Sorry.
         22             MR. SOLOMON:  Read -- read
         23         slower.
         24      A.   "I believe we have been able to show
12:41:45 25   over the course of the year that the site has been
```

229

```
12:41:47   1    incredibly valuable in advancing Ripple's aims.
           2    I've attached a spreadsheet that contains almost
           3    50 stories that align with Ripple's goals."
           4           The font size makes it challenging, but
12:42:00   5    I -- as I scan this, I have a hard time
           6    understanding how the Central Bank of the Bahamas
           7    launching the world's first central bank digital
           8    currency aligned -- sorry.
           9           MR. SOLOMON:  It's not just me
12:42:18  10       even though you're wearing glasses, just
          11       for the record.
          12    A.    That power -- tourism economy -- you
          13    know, here's a -- "The nonprofit has already
          14    joined forces with the Libra Association and Celo
12:42:27  15    Foundation to use blockchain technology to bring
          16    the" --
          17           THE REPORTER:  You're going to
          18       have to slow down when you read.
          19           THE WITNESS:  I apologize.
12:42:35  20    A.    I don't think I need to read the
          21    headlines.  My point is ███████ is seeking --
          22    he's selling.  He's seeking money from Ripple and
          23    he's creating a narrative of why it would be good
          24    for Ripple to do that.  I'm reviewing what he said
12:42:53  25    and I'm reviewing his data he's substantiating it
```

230

```
12:42:56   1    with and I'm saying I don't know.
           2         Q.   In other words, you don't think that all
           3    of these articles advance Ripple's goals?
           4         A.   Yeah.  Yeah.  I -- it's not clear to me
12:43:08   5    that what he is representing, that there's 50
           6    stories that have -- "contains almost 50 stories
           7    that align with Ripple's goals," I don't know if
           8    that's true or not.
           9         Q.   There's a story, though, referenced
12:43:20  10    about Chris Giancarlo's statement that XRP is not
          11    a security, right?
          12              MR. SOLOMON:  Let's focus in on
          13         that.  I want to see that one.
          14              MR. TENREIRO:  It's in the last
12:43:28  15         page that actually has language.
          16              MR. SOLOMON:  Okay.  Give me a
          17         minute to read that one, please.
          18              THE WITNESS:  Actually, can
          19         somebody point to me where that is?
12:43:38  20              MR. SOLOMON:  I really think you
          21         guys should put this up or give him a
          22         chance to really closely review it.  I
          23         don't think it's fair.
          24              MR. TENREIRO:  Yeah.  It's just
12:43:48  25         on the last page with text on the middle
```

231

```
12:43:49    1              of the page.  It's on 6/18/2020.  "'Crypto
            2              Dad' Chris Giancarlo."  And I'll just read
            3              it since I apparently have a little bit
            4              better vision.
12:43:59    5                      "'Crypto Dad' Chris Giancarlo:
            6              XPR is not a security."  That's the head.
            7              The subhead is "The former Commodity
            8              Futures Trading Commission chair was a
            9              leading force in removing the Scarlett
12:44:08   10              'S' from bitcoin and ether, and he
           11              remains influential.  But making the same
           12              argument for XRP is weakened as his law
           13              firm works for Ripple."
           14         BY MR. TENREIRO:
12:44:20   15              Q.   Do you see that?
           16              A.   Yes.
           17              Q.   Does that article advance Ripple's
           18         goals?
           19              A.   Yeah.
12:44:27   20              Q.   Okay.  And did you provide ██████████
           21         with talking points to share with Mr. Giancarlo
           22         before he made public statements about XRP's
           23         status under the securities laws?
           24              A.   Not that I'm aware of.
12:44:45   25              Q.   Let's look at Exhibit 108, please.
```

                                                                    232

```
12:44:48    1                    (Whereupon, exhibit is received
            2            and marked Garlinghouse Deposition
            3            Exhibit 108 for identification.)
            4    BY MR. TENREIRO:
12:44:49    5        Q.   While they get it, do you think someone
            6    who was a board member for Ripple for three years
            7    understands Ripple's goals?
            8                    MR. SOLOMON:  Objection; calls
            9            for speculation.
12:44:57   10        A.   I would hope so.
           11        Q.   Okay.  Did Mr. Larsen have any input in
           12    the decision to hire ████████████████?
           13                    MR WARD:  Object to form.
           14        A.   I don't think we hired ██████████████.
12:45:12   15        Q.   To pay ████████████?
           16        A.   Yes.
           17        Q.   What input did he have?
           18        A.   He thought we should do it.
           19        Q.   And did you think that you should do it?
12:45:25   20        A.   I didn't know.  I believe that advancing
           21    journalistic credibility and journalistic
           22    professionalism in the crypto industry is a good
           23    thing.  Whether or not ████████████ was the
           24    best way to achieve that, I don't know.
12:45:43   25        Q.   Did Ripple have involvement in ██████
```

233

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
12:45:46    1    ███████'s preparation of articles it might

            2    publish on its website related to Ripple?

            3         A.   No.  Well, wait, wait, wait.  That's not

            4    fair.  You're asking me did Ripple have

12:45:58    5    involvement?  I made myself available for

            6    interviews by reporters who worked for ████████

            7    ███████ who then wrote articles about Ripple.

            8    As he references, sometimes I didn't like them.

            9         Q.   And in terms of journalistic

12:46:12   10    professionalism, did you request that ████████

           11    ████████ disclose payments from Ripple to ████████

           12    ████████ when it was reporting on Ripple?

           13         A.   I believe -- you'd have to ask ████████

           14    ████████.  I believe ████████ did have

12:46:26   15    information on its website that disclosed that ████

           16    ████████████████████████.

           17         Q.   My question:  In terms of journalistic

           18    professionalism, did you request that ████████

           19    ████████ disclose payments from Ripple to ████████

12:46:38   20    ████████ when it was reporting on Ripple?

           21         A.   I've never heard of any company --

           22    that's a question for a journalist, not for the

           23    company.  For me to request The New York Times --

           24    I mean, I don't know.  At some point we have

12:46:53   25    sponsored things at Fortune Magazine.  When they
```

234

```
12:46:56   1    write about Ripple, do they disclose that we have
           2    spent marketing dollars on Fortune related -- you
           3    know, that's a question for a journalist.  I don't
           4    think it's a question for Ripple.
12:47:05   5         Q.   Right.  My only question, though, was
           6    whether you requested that.
           7              MR. SOLOMON:  Do you remember
           8         requesting that?
           9         A.   I don't recall ever requesting that.
12:47:12  10         Q.   Okay.  Here's Exhibit 108, which is
          11    GARL_Civil-1342.  Two-page text messages.
          12              THE WITNESS:  Sorry.  Could you
          13         make a copy available for --
          14              MR. SOLOMON:  He's bringing some
12:47:24  15         more copies.  Oh, do you have any more?
          16              MR. TENREIRO:  I gave you six.
          17         There's just one page there.
          18              THE WITNESS:  Oh, sorry.  Oh,
          19         right.  Sorry, sorry, sorry.
12:47:53  20              (Pause)
          21    BY MR. TENREIRO:
          22         Q.   Okay.  Having looked at that text chain,
          23    does that refresh your recollection as to whether
          24    you provided talking points to Mr. Giancarlo
12:48:47  25    through ███████████?
```

235

```
12:48:49   1              A.   I -- I still don't recall.  I see that
           2       on the piece of paper.
           3              Q.   So did you provide it?  I mean, do you
           4       have any reason to believe that you did not
12:49:02   5       provide talking points?
           6              A.   No, I see that I provided some
           7       information to ███████████ via text messages.  I --
           8       I don't recall doing this.
           9              Q.   Why did you provide that information to
12:49:14  10       Mr. Kurson for ideas for -- let's be clear.
          11              On the second page of the email -- of
          12       the text chain, there appears to be a text from
          13       you at 21:25:02.
          14              Do you see that?
12:49:30  15              A.   I do.
          16              Q.   Okay.  Is that -- is that your phone
          17       number?
          18              A.   It is.
          19              Q.   Okay.  And it says "Here are three ideas
12:49:37  20       for C."
          21              Do you see that?
          22              A.   I do.
          23              Q.   Is that a reference to Chris Giancarlo?
          24              A.   I presume.
12:49:42  25              Q.   Okay.  And then you have three points.
```

236

```
12:49:43   1    I'm not going to read them.
           2          Why did you provide those points to C?
           3      A.   I think I'm suggesting ideas at ███'s
           4    request as to how Giancarlo could be helpful.
12:50:10   5      Q.   Helpful to what?
           6      A.   To providing clarity in the market about
           7    the regulatory status of XRP.
           8      Q.   By removing the Scarlett S as he called
           9    it in the article on ██████████████?
12:50:23  10      A.   I --
          11          MR. SOLOMON:  Objection; form.
          12      A.   I -- I mean, you're conflating -- you're
          13    merging two things that have a lot of distance
          14    between them in my mind, but...
12:50:30  15      Q.   Well, the Scarlett S is a reference to
          16    security, right?  Is that how you understand it?
          17      A.   I -- I believe so.
          18          MR. SOLOMON:  Objection; form.
          19      A.   I'm not sure I read the article.
12:50:39  20      Q.   Okay.  And did █████████ provide these
          21    ideas to Mr. Giancarlo?
          22      A.   I don't know.
          23      Q.   In terms of advancing professional
          24    behavior in journalism, did you request to
12:50:50  25    ██████████ that he disclose in his article about
```

237

```
12:50:51   1   Giancarlo that you had provided some of the
           2   talking points?
           3                   MR. SOLOMON:  Do you remember
           4        doing that, Brad?
12:50:59   5                   THE WITNESS:  Well, hold --
           6                   MR. TENREIRO:  Please don't
           7        coach, Matt.
           8        Q.   Did you ask -- did you ask --
           9                   MR. SOLOMON:  That's the question
12:51:03  10        you just asked.
          11                   MR. TENREIRO:  No.
          12        Q.   I simply -- I asked you if you requested
          13   to Mr. Kurson that he disclose that you had
          14   provided talking points.
12:51:11  15        A.   Okay.  So the first thing, I think, is I
          16   am not aware that the article you're referencing
          17   was written by ███████████.
          18        Q.   Did you request to ██████████ that
          19   ████████████, whoever wrote it, make a
12:51:22  20   disclosure about your talking points?
          21        A.   No.  I don't think these talking
          22   points -- let's look at the date on the previous
          23   exhibit and see if --
          24        Q.   June 2020.
12:51:35  25                   THE REPORTER:  June?
```

```
12:51:35   1                    MR. TENREIRO:  2020.
           2                    MR. SOLOMON:  What's June 2020?
           3                    MR. TENREIRO:  I think he's
           4            looking for the date of the article.
12:51:46   5                    MR. CERESNEY:  Right.  The
           6            article is June 2020.  His text
           7            is January --
           8                    MR. TENREIRO:  I understand.
           9                    MR. CERESNEY:  The subsequent
12:51:51  10            email is December 2020.
          11       A.   Is your assertion that the text --
          12       Q.   I'm not making any assertions.
          13                    MR. CERESNEY:  I think you
          14            interrupted.
12:51:58  15                    MR. SOLOMON:  I think he thinks
          16            you are.  So maybe ask him questions.
          17       BY MR. TENREIRO:
          18       Q.   My question is, did you request that
          19       ███████████ disclose in the ████████████████
12:52:07  20       article about Giancarlo that you had provided
          21       talking points to ████████████?  It's a question.
          22       A.   I provided talking points to █████████████
          23       in January.  Someone at ███████████████wrote an
          24       article five months later, not ███████████  And
12:52:24  25       you're wondering if I asked ███████████to disclose
```

                                                                    239

```
12:52:29   1    in the article that I had provided talking points

           2    to a board member about a conversation with

           3    Giancarlo?  Do I have that right?

           4        Q.   Yes.

12:52:39   5        A.   No.

           6        Q.   Okay.  Did you make public comments

           7    about Mr. Giancarlo's statement about XRP?

           8        A.   I don't recall.

           9        Q.   Okay.  Did you, if you made public

12:52:50  10    comments about Mr. Giancarlo's statement about

          11    XRP, talk about ████████'s relationship to

          12    Giancarlo, for example?

          13             MR. SOLOMON:  I'm sorry.  You

          14         said if he made comments?

12:53:01  15             MR. TENREIRO:  Well, he says he

          16         doesn't recall.  But I'm asking if he

          17         made, you know, public statements about

          18         ████'s relationship to Giancarlo.

          19             MR. SOLOMON:  So, separately, do

12:53:11  20         you recall making statements about --

          21             THE WITNESS:  I don't know what

          22         ████'s relationship with Giancarlo is.

          23    BY MR. TENREIRO:

          24        Q.   Okay.  Did he provide the talking points

12:53:18  25    you suggest in your text?
```

                                                              240

12:53:20  1           A.   I believe you asked that and I said no.

          2           Q.   Have you ever --

          3           A.   I don't know.

          4           Q.   Have you ever met Mr. Giancarlo?

12:53:29  5           A.   I don't know.

          6           Q.   Have you ever spoken to him?

          7           A.   I think I might have had a phone call

          8   with him once.

          9           Q.   About what?

12:53:34 10           A.   I don't recall.

         11           Q.   And Ripple has hired his law firm?

         12           A.   I believe that's the case.

         13           Q.   Okay.  And just to -- what's -- is this

         14   for legal advice?

12:53:46 15           A.   I believe that's the case.

         16           Q.   Who -- when was the law firm hired?  Is

         17   this Willkie Farr?

         18               MR. SOLOMON:  Objection; form.

         19           A.   Had you not said the name, I wouldn't

12:53:54 20   have known the answer, but I believe that's

         21   correct.  And I would have to ask one of the

         22   people at this table for when Willkie Farr was

         23   engaged.

         24           Q.   Right.

12:54:02 25               Have you ever provided anything of value

                                                              241

```
12:54:05   1   to Mr. Giancarlo?

           2        A.   Have I personally provided anything of

           3   value --

           4        Q.   Ripple.

12:54:11   5        A.   I mean, to the extent that Ripple hired

           6   the law firm Willkie Farr, I think by extension

           7   that we provided some value to Mr. Giancarlo --

           8              MR. SOLOMON:  Objection to your

           9         use of -- of a legal term.  Anything of

12:54:25  10         value?  I'm not sure what the insinuation

          11         is.  They hired a firm.  That's what they

          12         did.

          13              MR. TENREIRO:  I asked --

          14              MR. SOLOMON:  I was

12:54:31  15         (Indiscernible cross talk;

          16         reporter requests one speaker)

          17              MR. SOLOMON:  Are you asking

          18         something apart from hiring a law firm

          19         when you say "a thing of value"?  I want

12:54:38  20         to make that clear --

          21              MR. TENREIRO:  Yeah, I --

          22              MR. SOLOMON:  -- because that's

          23         confused.  It has all kinds of legal

          24         meaning, as you know.

12:54:43  25              MR. TENREIRO:  Thank you.
```

```
12:54:43   1    BY MR. TENREIRO:
           2        Q.   Other than the hiring of the law firm,
           3    has Ripple ever, you know, paid anything for
           4    Mr. Giancarlo?  I was using "anything of value"
12:54:51   5    just to be broad.
           6        A.   Not that I can recall.
           7        Q.   Okay.  And have -- have you,
           8    Mr. Garlinghouse, directly or indirectly, ever
           9    provided anything of value to Mr. Giancarlo?
12:55:00  10        A.   Not that I'm aware of.
          11        Q.   Okay.
          12             MR. TENREIRO:  Let's do 121,
          13        which I have.  And this one, I don't know
          14        how many copies I have.
12:55:12  15             MR. SOLOMON:  That's okay.  We'll
          16        deal with it.
          17             (Whereupon, exhibit is received
          18        and marked Garlinghouse Deposition
          19        Exhibit 121 for identification.)
12:55:16  20             MR. TENREIRO:  All right.  For
          21        the record, this is an email with Bates
          22        RPLI_SEC 235028.  It appears to be around
          23        November 27, 2018.
          24    BY MR. TENREIRO:
12:55:55  25        Q.   I don't see you on the e-mail, but I'm
```

243

| | | |
|---|---|---|
| 12:55:57 | 1 | going to ask you some questions about the |
| | 2 | contents. |
| | 3 | Have you read it? |
| | 4 | A. Yes. |
| 12:56:04 | 5 | Q. Okay. Do you recall an article on |
| | 6 | ██████████████ about infighting at CoinBase and |
| | 7 | the exclusion of XRP from CoinBase? Do you recall |
| | 8 | that? |
| | 9 | A. No. |
| 12:56:20 | 10 | Q. Mr. Larsen says, "Nice. We're getting |
| | 11 | very friendly with them, by the way. Brian even |
| | 12 | apologized to me at a recent event." |
| | 13 | Do you see that? |
| | 14 | A. Yes. |
| 12:56:30 | 15 | Q. Do you know who the reference to ██████ |
| | 16 | is to? |
| | 17 | A. I assume ████████████ but I don't |
| | 18 | know. |
| | 19 | Q. Who is ██████████████? |
| 12:56:36 | 20 | A. He's the ██████ CoinBase. |
| | 21 | Q. Okay. And then it says "Yes, Brad told |
| | 22 | me that. But I didn't put it in the story because |
| | 23 | I didn't want to blow you up." |
| | 24 | Do you see that? |
| 12:56:44 | 25 | A. I do. |

244

```
12:56:45   1        Q.    Okay.  Did you tell -- what did you tell
           2   ███████████ about the relationship with ██████
           3   before the article was published?
           4        A.    I -- I don't recall.
12:56:54   5        Q.    Okay.  Were you around November of 2018
           6   getting more, you know, friendly with
           7   ███████████████?
           8        A.    No.
           9        Q.    Okay.  And do you recall a story
12:57:10  10   suggesting that there were personal reasons why
          11   CoinBase was not listing XRP?
          12        A.    Can you ask the question again?
          13        Q.    Do you recall a story in the media
          14   suggesting that there were personal reasons why
12:57:23  15   CoinBase was not listing XRP?
          16        A.    The only recollection I have is there
          17   was a meme suggesting that I had dated ████████
          18   ████████████████████ and there was somebody
          19   upset with somebody about it.  And I -- I don't
12:57:39  20   know where that came from, but I thought it was
          21   funny so I happen to remember it.
          22        Q.    Someone suggesting that and that could
          23   have been the reason why there was no listing?
          24        A.    Yeah.
12:57:47  25        Q.    All right.
```

245

| | | |
|---|---|---|
| 12:57:57 | 1 | MR. TENREIRO:  Let's look at 122. |
| | 2 | (Whereupon, exhibit is received |
| | 3 | and marked Garlinghouse Deposition |
| | 4 | Exhibit 122 for identification.) |
| 12:58:13 | 5 | MR. TENREIRO:  All right.  So |
| | 6 | this is a two-page email, RPLI_SEC 591715. |
| | 7 | And it appears to be an email between |
| | 8 | Ms. Long and ██████████ on April -- May |
| | 9 | 28, 2020. |
| 12:58:38 | 10 | BY MR. TENREIRO: |
| | 11 | Q.   Now, before I get into the email, |
| | 12 | Mr. Garlinghouse, did you have an understanding as |
| | 13 | to what sort of authority ██████████ had at ██████████ |
| | 14 | ██████████ with respect to content of articles? |
| 12:58:51 | 15 | A.   I -- I don't know. |
| | 16 | Q.   Okay.  And "XRP Facts" is the title of |
| | 17 | this email?  The subject, rather.  Do you see |
| | 18 | that? |
| | 19 | A.   Yes, I do see it. |
| 12:59:04 | 20 | Q.   Okay.  And Ms. Long says "Hi, ██████ |
| | 21 | Below are facts or arguments to these 3-4 topics. |
| | 22 | I'm stalled coming up with expert sources, but |
| | 23 | will keep thinking on it." |
| | 24 | Then he says "This is a great start for |
| 12:59:17 | 25 | our reporting, thank you.  Definitely would |

246

```
12:59:19   1    benefit from an expert who could verify some of

           2    this."

           3              Do you see that?

           4        A.   Yes.

12:59:23   5        Q.   Okay.  And what -- what is the purpose

           6    of Ms. Long, if you know, providing this

           7    information to ███████████?

           8        A.   I'm going to read the document first.

           9        Q.   Yes.

12:59:30  10              MR. SOLOMON:  He's not on this

          11         email.  It's fine to show it to him, but I

          12         just...

          13              MR. TENREIRO:  Okay.

          14              MR. SOLOMON:  What do you think?

13:00:01  15              MR. TENREIRO:  After this, let's

          16         do it.

          17        A.   Can you repeat the question?

          18        Q.   Yes.

          19              The question is, what is the

13:00:23  20         purpose of Ms. Long providing this

          21         information to ███████, if you know?

          22              MR. SOLOMON:  Objection;

          23         speculation.

          24        A.   I don't know.

13:00:30  25        Q.   Did she discuss with you providing XRP
```

247

13:00:33  1    facts to ████████ for his reporting?

        2         A.    I don't recall.

        3         Q.    Did you approve of her providing XRP

        4    facts to ████████ for her reporting?

13:00:43  5         A.    I don't recall.

        6         Q.    Were there other occasions other than

        7    this where you -- whether anyone -- sorry.

        8              Were there other occasions other than

        9    what's reflected in this email where people at

13:00:52 10    Ripple might have provided facts about XRP for

       11    reporting on ████████████?

       12              MR. SOLOMON:   Objection;

       13         speculation.

       14         A.    If ████████████ were writing a story

13:01:06 15    about Ripple, we would have cooperated with them,

       16    as we would most media outlets, to clarify,

       17    correct, educate what is Ripple, what is XRP, and

       18    the differences between.

       19         Q.    And did the -- did other media outlets

13:01:25 20    -- did other media outlets come to Ripple often to

       21    educate about what is XRP?

       22         A.    Well, they would come to us in covering

       23    Ripple and/or covering XRP.  And to the extent

       24    they had questions, we would engage with them as

13:01:45 25    constructively as we could.

                                                          248

```
13:01:46   1          Q.   But my question is, did that occur often
           2   with other media outlets other than ████████
           3   ████████?
           4          A.   Yes.
13:01:51   5          Q.   Okay.
           6          A.   There was a lot of interest in crypto.
           7   And I think Ripple as a leader in the space gets a
           8   lot of media attention.
           9          Q.   And did a lot of media outlets come to
13:02:01  10   Ripple for information about XRP other than ████████
          11   ████████?
          12          A.   Yes.
          13          Q.   Is that it?  Okay.
          14               MR. SOLOMON:  He's saying "a
13:02:15  15          lot."  If there's just something -- I just
          16          want to make sure.
          17               MR. TENREIRO:  I think he
          18          answered.
          19          A.   Yeah.  I think my -- my testimony is
13:02:22  20   Ripple has a lot of attention in the marketplace.
          21   Ripple is known as having expertise as it relates
          22   to XR -- XRP, both by virtue of our engineering
          23   resources, the fact that we use it in our
          24   technology stack.  And so to the extent people are
13:02:35  25   interested in XRP, they would come to us on
```

249

13:02:42  1    occasion.

2         Q.    When you said "people," you're referring

3    to the press, right?

4         A.    Yeah.

13:02:46  5    Q.    Okay.

6         A.    Well, press and analysts.  I mean,

7    apparently ███████████

8         Q.    Members of the public?

9         A.    Sometimes, yeah.

13:02:56 10    Q.    Okay.

11              MR. TENREIRO:  Let's go off the

12       record.

13              THE VIDEOGRAPHER:  All right.

14       Going off the record at 1:04.

13:03:14 15       (Whereupon, a luncheon recess is

16       taken.)

17

18

19

20

21

22

23

24

25

250

```
13:03:14    1              A F T E R N O O N   S E S S I O N
            2                   THE VIDEOGRAPHER:  Okay.  Back on
            3         the record at 1:53.
            4                   Go ahead.
13:52:21    5    BY MR. TENREIRO:
            6         Q.   Mr. Garlinghouse, I see you brought your
            7    phone.
            8         A.   I did, actually.
            9         Q.   Can you tell me who you communicated on
13:52:26   10    with Signal, please?
           11         A.   My -- I was -- I did communicate on
           12    Signal --
           13         Q.   No, not now.  Just generally, who have
           14    you communicated with on Signal, since you have
13:52:35   15    the list on your phone with the messages?
           16         A.   Oh, you want me to -- sorry.  You would
           17    like me to open my phone and go through who on
           18    Signal I've communicated with?
           19         Q.   Yes.
13:52:50   20         A.   ███████████ (phonetic)
           21         Q.   Why don't we do this.  Why don't you
           22    just read me the people who work at Ripple first.
           23    I don't need to know anyone -- everyone you
           24    communicated with.
13:53:00   25         A.   Okay.  ██████████████████ Monica
```

                                                              251

```
13:53:10   1    Long.
           2           I'm now back on July 3rd and I haven't
           3    hit any other names.
           4           June, Chris Larsen.
13:53:34   5               May, Asheesh Birla.  May 11th,
           6    ███████████████████
           7           I'm now back to the beginning of the
           8    year.  Do you want me to keep going?
           9    Q.    Yes.
13:54:28  10    A.    █████████████    He is no longer, but...
          11               MR. SOLOMON:  Are you able to
          12        clarify text versus phone calls versus
          13        email?
          14               THE WITNESS:  I'd have to open it
13:54:55  15        to --
          16               MR. SOLOMON:  Okay.
          17               THE WITNESS:  -- see that.
          18               MR. SOLOMON:  Do you want him to
          19        sit here and do this now?
13:54:57  20               MR. TENREIRO:  I just -- just the
          21        Ripple people.  If you want him to
          22        clarify, you can clarify.  I asked who he
          23        communicated with --
          24               MR. SOLOMON:  Okay.
13:55:05  25        Communications --
```

                                                              252

```
13:55:05   1                    (Indiscernible cross talk;
           2            reporter requests one speaker.)
           3                    MR. SOLOMON:  Communications may
           4            be either a telephone call or a
13:55:08   5            communication.  That's fine.
           6            A.   ████████████.  Now we're back in 2020, but
           7       ████████████████ Patrick Griffin, ████████████████
           8       ████████████████
           9            Q.   Just let me know when you get to 2018.
13:55:55  10            A.   Oh, geez.  ████████████████.
          11            Q.   This is the last time you communicated
          12       with these people?  Is that what it reflects?
          13            A.   To be honest with you, I don't -- well,
          14       actually, an -- an important clarification that
13:56:09  15       Mr. Solomon has brought up, the ████████████ entry
          16       does not suggest I've communicated with her.  It
          17       just says ████████████ is on Signal."
          18            So I think what happens, if you were
          19       to -- if I had your mobile number in my address
13:56:20  20       book and you started using Signal, I would get a
          21       notification.  So all it says is that "████████████
          22       is on Signal."  I apparently have never
          23       communicated with her on Signal.
          24            So some of the names I've -- I'm reading
13:56:32  25       to you the Ripple -- as you requested, I'm reading
```

253

```
13:56:35   1    to you the names of employees or those affiliated,

           2    like board members, at Ripple as they come up

           3    chronologically.

           4           I'm now back in April of 2020. ████

13:56:46   5    ████ is listed at April 2020.

           6    Q.    Okay.  Well, we'll get the rest of the

           7    information from your counsel.  Let's move --

           8    let's move on then.

           9           Thank you.

13:56:56  10    A.    Well, if I may clarify.

          11    Q.    Please.

          12    A.    I believe, as part of discovery, you

          13    have received the information that -- this is

          14    information that was collected during discovery.

13:57:12  15    Q.    Okay.

          16           MR. SOLOMON:  Yeah, I'm not quite

          17        clear on what those names are relevant to

          18        or what they signify.  We'd have to go

          19        through each of them to see whether it was

13:57:19  20        a phone call, whether it was a message,

          21        whether it was them popping up as having

          22        joined Signal.

          23           THE WITNESS:  Right.

          24           MR. SOLOMON:  We haven't done

13:57:25  25        that yet, but I think the SEC got a
```

                                                            254

```
13:57:27   1          sampling of the people in the last year or
           2          so whose names come up through your phone
           3          when you scroll through your phone.  So
           4          that's fine.
13:57:34   5                    MR. TENREIRO:  Yeah.
           6   BY MR. TENREIRO:
           7      Q.   Okay.  Sorry, when you were scrolling
           8   there, was Mr. Solomon there as well?  I know I
           9   asked you for Ripple people, but...
13:57:44  10      A.   I believe I saw his name.  I did not
          11   include him in the --
          12                    MR. SOLOMON:  Right.
          13      A.   He's sort of a Ripple person.
          14                    MR. SOLOMON:  Sure.
13:57:51  15                    MR. TENREIRO:  Okay.  Let's do
          16          Exhibit 77.
          17                    (Whereupon, exhibit is received
          18          and marked Garlinghouse Deposition
          19          Exhibit 77 for identification.)
13:58:22  20                    MR. TENREIRO:  So for the record,
          21          this is an email, RPLI_SEC 765249, two
          22          pages.  It appears to be around February
          23          of 2016.
          24                    (Pause)
13:58:58  25                    THE WITNESS:  Okay.
```

255

```
13:59:38   1    BY MR. TENREIRO:
           2         Q.   Okay.  Mr. Garlinghouse, just generally,
           3    is it fair to say that this email, one of the
           4    things that it's about, it's about a potential
13:59:46   5    how-to guide about buying XRP?
           6         A.   I believe that's fair, yeah.
           7         Q.   Okay.  You say "Echoing Monica's
           8    sentiment, a how-to guide would be very valuable."
           9
13:59:58  10              Why would it be valuable or why
          11         was it valuable in February of 2016 to
          12         have such a guide?
          13         A.   I -- I don't recall.  What the email
          14    seems to suggest is that consumers are -- well,
14:00:14  15    one point of reference.  ██████████ at that
          16    point read -- ran customer support.  And so he's
          17    getting, I'm sure, inquiries from people all over
          18    the world that -- to ██████████ and trying
          19    to address a question that I guess is coming up
14:00:33  20    frequently.  So it's answering a question.
          21         Q.   The question is how to buy XRP?
          22         A.   I believe that's what ██████ is saying,
          23    yes.
          24         Q.   ███████ references "consumers."  And I
14:00:43  25    think you just said that word, or maybe you said
```

                                                                256

14:00:45   1      customer, but -- oh, you said consumer.  Okay.

           2              So was there a practice at Ripple around

           3      February of 2016 to refer to potential purchasers

           4      of XRP as consumers?

14:00:56   5          A.   I don't know.

           6          Q.   Okay.  And so what is the reference to

           7      "consumer" here?  "If you, as a consumer, heard

           8      about XRP from the news and wanted to buy some,

           9      there's a better than average chance you'd find

14:01:07  10      the whole process too difficult and quit."

          11              What is the reference to "consumer"

          12      there?

          13          A.   We'd have to ask ████████.

          14          Q.   What did you understand it to mean when

14:01:15  15      you read the email?

          16          A.   There's another reference to consumers

          17      above that.  It says "Even though we don't serve

          18      consumers" --

          19          Q.   Uh-huh.

14:01:20  20          A.   -- "they play a role in the broader

          21      Ripple ecosystem."

          22          Q.   Right.

          23          A.   So I think consumers are individuals

          24      around the globe that may be emailing

14:01:31  25      ████████@ripple.com.

                                                                   257

14:01:33  1        Q.   And so Ms. Long says "We don't serve

       2   consumers."

       3             Do you understand that to mean "we,"

       4   Ripple, doesn't serve consumers?

14:01:40  5                  MR. SOLOMON:   Objection; form.

       6        A.   I -- I don't want to speculate what she

       7   meant.  I -- I read it as that we, Ripple, don't

       8   have consumers as a target market.

       9        Q.   Right.  And I definitely want to know

14:01:52 10   what you read it as, not what you speculate as.

      11   So that's helpful.

      12             And then the email says "Even though we

      13   don't serve consumers, they play a role in the

      14   broader Ripple ecosystem, and whether we like it

14:02:03 15   or not, they go to ripple.com to figure out how to

      16   get started."

      17             So, again, just reading that, do you

      18   have an understanding as to what she's talking

      19   about, the role that consumers play in the Ripple

14:02:15 20   ecosystem?

      21        A.   I do not.

      22        Q.   Okay.  What role do -- in -- what role

      23   in 2016 did consumers play in the Ripple

      24   ecosystem?

14:02:25 25        A.   I don't think I could give you an

                                                          258

14:02:27  1    exhaustive list.  As we've discussed during the

        2    deposition, there's many use cases for XRP.  Some

        3    of them in 2016 were consumer oriented; some of

        4    them not consumer oriented.  And so I don't know

14:02:44  5    that I have a list.  I don't remember in 2016 what

        6    consumer-facing projects existed in the XRP

        7    ecosystem.

        8          Q.    And who would know?

        9          A.    In -- who would know today or --

14:03:02 10          Q.    Yeah.  If I wanted to find out in 2016

       11    the projects that might have existed.

       12          A.    I -- I -- I don't know.

       13          Q.    Okay.  You say "We can run it by AOG to

       14    make sure we aren't overdoing/promoting."

14:03:26 15          Do you see that?

       16          A.    I do.

       17          Q.    Who's AOG?

       18          A.    I believe I'm referencing Antoinette

       19    O'Gorman.

14:03:31 20          Q.    What were you trying to run by her?  The

       21    how-to guide?

       22          A.    I believe that's what I'm suggesting,

       23    yep.

       24          Q.    Did the how-to guide actually get

14:03:39 25    published at some point by Ripple?

                                                              259

```
14:03:40   1          A.   I don't know.
           2          Q.   Did the how-to guide discuss potential
           3     use cases of XRP by the consumers that were
           4     reading the guide?
14:03:48   5          A.   I don't know if the guide existed.
           6          Q.   Fair enough.
           7               Why are you suggesting that you consult
           8     AOG?
           9          A.   I don't recall.  I have -- I mean, I
14:04:04  10     could speculate based upon, you know, what I wrote
          11     about five years ago.  More than five years ago.
          12          Q.   You talked about -- you talk about "to
          13     make sure we aren't overdoing/promoting."
          14               What are you referring to there?
14:04:15  15     Overdoing what?
          16          A.   I -- I don't recall.  I can speculate
          17     based upon what I might have meant five years ago.
          18          Q.   Go ahead.
          19          A.   So Antoinette O'Gorman was our chief
14:04:23  20     compliance officer.  We had signed a settlement
          21     with FinCEN that restricted certain activities and
          22     what have you.  And so AOG would have been making
          23     sure we were living within the framework of that
          24     settlement agreement with FinCEN.
14:04:42  25          Q.   Okay.  Was there something in the
```

260

14:04:43   1    agreement that related to overdoing something or

            2    promoting something?

            3        A.    I -- I don't recall.

            4        Q.    So Ms. O'Gorman, one of her functions

14:04:52   5    was to make sure that Ripple was complying with

            6    that -- with that settlement agreement?

            7        A.    As chief compliance officer, that would

            8    be part of her responsibilities, yes.

            9        Q.    And that settlement agreement has

14:05:05 10    expired?

         11        A.    I don't know the details.

         12        Q.    Okay.  Ms. O'Gorman -- was this how-to

         13    guide run by her?

         14        A.    I don't know if the how-to guide exists.

14:05:20 15        Q.    Understood that maybe it didn't exist,

         16    but did someone consult her with -- about a

         17    potential how-to guide?

         18        A.    Beyond this email, I don't recall.

         19        Q.    Okay.  And if typically -- I mean, were

14:05:31 20    you typically following her directive about how to

         21    comply with the FinCEN settlement, if she gave any

         22    directives?

         23        A.    Yes, I --

         24            MR. SOLOMON:  Objection.

14:05:42 25        A.    I took the advice of the chief

                                                261

14:05:46   1    compliance officer seriously.  And to the extent
           2    she felt we were acting outside the scope of the
           3    FinCEN agreement, I would certainly take that
           4    seriously.
14:05:59   5        Q.  Okay.  So would hers be emails you read?
           6    If you got emails from Antoinette O'Gorman --
           7             THE REPORTER:  Wait.
           8        Q.  If you got emails from Antoinette
           9    O'Gorman, would those be more likely to have been
14:06:12  10    read or not?
          11             MR. SOLOMON:  Objection to form.
          12        A.  I -- I -- I believe my testimony earlier
          13    was my reading of emails probably has more to do
          14    with how busy I am that day on other projects, not
14:06:26  15    filtered so much by who they're from.  I found
          16    Antoinette's emails to be not dissimilar to other
          17    emails.
          18        Q.  Okay.  Let's look at this one.
          19             MR. TENREIRO:  Exhibit 81.
14:06:44  20             MR. SOLOMON:  Can I have one?
          21             THE WITNESS:  Oh, sorry, sorry,
          22        sorry.
          23             (Whereupon, exhibit is received
          24        and marked Garlinghouse Deposition
14:06:45  25        Exhibit 81 for identification.)

                                                              262

```
14:06:51   1                    MR. TENREIRO:  For the record,
           2          RPLI_SEC 761766, two-page email.
           3                    MS. FORBES:  Which exhibit is
           4          this?
14:07:17   5                    MR. TENREIRO:  81.
           6                    MS. FORBES:  81.  Thank you.
           7                    (Pause)
           8     BY MR. TENREIRO:
           9          Q.   Okay.  This appears to be an email
14:08:35  10     thread from October 31st, 2016, Halloween.
          11               Do you see that?
          12          A.   I do.
          13          Q.   Okay.  Ms. O'Gorman says to you and
          14     Mr. Griffin -- sorry.  Mr. Griffin asks "Can XRP
14:08:46  15     be both a currency (FinCEN territory) and a
          16     commodity, (CFC territory)" -- "(CFTC)?"
          17               She responds, "Yes, it can, and more.
          18     IRS is of the opinion that virtual currency is
          19     'property.'  CFTC treats it as a 'commodity.'
14:09:05  20     FinCEN has stated their opinion that 'virtual
          21     currency operates as "real" currency in some
          22     environments' and the SEC may well come out on the
          23     side that certain cryptocurrencies are
          24     securities."
14:09:16  25               And then she says something about
```

263

```
14:09:18   1    "interesting conundrum...that begs for a more
           2    uniform regulatory approach."
           3              Do you see that?
           4         A.   I do.
14:09:24   5         Q.   Okay.  And is this some of the advice
           6    from your chief compliance officer that you took
           7    seriously?
           8         A.   I don't know.
           9              MR. SOLOMON:  Do you want to read
14:09:34  10         the rest of the sentence to him rather
          11         than read just a portion of it?
          12         Q.   It says "Interesting conundrum and one
          13    that begs for a more uniform regulatory approach
          14    at the federal and state levels, but the
14:09:42  15    probability of that ever happening is extremely
          16    low."
          17              Do you see all that?
          18         A.   I do.
          19         Q.   Okay.  And below Ms. O'Gorman -- sorry.
14:09:49  20              Below that, at the bottom, you have said
          21    that you and she had just caught up on the issue
          22    about some legal guidance.
          23              Do you see that?
          24         A.   I do.  I'm trying to understand the time
14:10:04  25    frame here because it looks like this reply
```

                                                          264

14:10:11  1    happened on October 31st, but this happened on

       2    November 1st, which doesn't really make sense.

       3    But anyway, that maybe isn't relevant to your

       4    question.

14:10:17  5        Q.   Yeah.  I think that's because of the

       6    time, you know, 1:33 a.m.  Emails report different

       7    times based on where you're sending them.

       8              MR. SOLOMON:  Maybe you were

       9         overseas or something.  That is weird.

14:10:28 10              MR. TENREIRO:  Yeah.  All right.

      11    BY MR. TENREIRO:

      12        Q.   Did you -- when you caught up with

      13    Antoinette O'Gorman on the issue here, did you

      14    discuss the possibility that different regulatory

14:10:36 15    agencies can view XRP as different things under

      16    their regimes?

      17              MR. SOLOMON:  Objection; form.

      18        A.   I don't recall.

      19        Q.   Did Ms. O'Gorman ever state to you

14:10:48 20    anything different, other than what she's stating

      21    here, that while FinCEN might have one

      22    classification for XRP, other agencies such as the

      23    IRS --

      24              THE REPORTER:  Slow down,

14:10:52 25         please.

                                                    265

14:11:00   1   BY THE REPORTER:

           2       Q.   -- such as the IRS and the SEC might

           3   have different --

           4               THE REPORTER:  You're going to

14:11:00   5         have to start the question over again.

           6               MR. TENREIRO:  Yes.

           7       Q.   Did Ms. O'Gorman ever state anything to

           8   you different other than what she's stating here,

           9   that while FinCEN might have one classification

14:11:08  10   for XRP, other agencies such as the IRS, the CFTC

          11   and the SEC, might have different classifications?

          12       A.   I don't recall.

          13       Q.   And didn't she, in fact, reiterate this

          14   view to you a few years later, after she left the

14:11:22  15   company?

          16       A.   I don't recall.

          17               MR. SOLOMON:  Objection; form.

          18       Q.   All right.  Did anyone ever tell you

          19   something contrary to what Ms. O'Gorman said here,

14:11:32  20   again, in sum and substance, that different

          21   agencies could have different classifications for

          22   XRP?

          23               MR. SOLOMON:  Objection; form.

          24       A.   I don't recall.

14:12:02  25               MR. TENREIRO:  Here we go.  This

                                                              266

```
14:12:03   1              is 44.
           2                      (Whereupon, exhibit is received
           3              and marked Garlinghouse Deposition
           4              Exhibit 44 for identification.)
14:12:04   5                      (Pause)
           6   BY MR. TENREIRO:
           7        Q.   Okay.  So, first, is it fair to say that
           8   while you were Ripple's -- as Ripple's CEO, you
           9   send periodic updates to Ripple employees and
14:17:32  10   board members and Ripple -- Ripple shareholders?
          11                   MR. SOLOMON:  Objection to form.
          12        A.   Could you ask the question one more
          13   time?
          14        Q.   Is it fair to say that as Ripple's CEO,
14:17:39  15   you send periodic updates about Ripple's business
          16   to employees, board members and shareholders?
          17        A.   Yes.
          18        Q.   Okay.  Sometimes I think you did it
          19   quarterly, sometimes maybe even weekly, is that
14:17:51  20   right?
          21                   MR. SOLOMON:  Objection to form.
          22        A.   Depends on which audience we're talking
          23   about.
          24        Q.   Well, for Ripple board members and
14:17:58  25   shareholders.
```

267

14:18:01  1          A.    I think at various times over my tenure,
          2   we've sent them monthly and sometimes we've sent
          3   them quarterly.
          4          Q.    And some of the Ripple shareholders are
14:18:10  5   also XRP holders, right?
          6          A.    I don't know.
          7          Q.    What about the board members?  Some of
          8   them are XRP holders?
          9          A.    I don't know.
14:18:16 10          Q.    Like Mr. Larsen?
         11          A.    Yes.  Mr. Larsen, I do know he has XRP.
         12          Q.    And Mr. Kurson?
         13          A.    I don't know.
         14          Q.    And yourself?
14:18:24 15          A.    Yes, I know that about myself.
         16          Q.    Okay.  So some board members are XRP
         17   holders?
         18          A.    Yes.
         19          Q.    Okay.  This email thread, Exhibit 44,
14:18:36 20   there's a -- one of these updates to investor and
         21   advisors -- do you see that? -- from you.
         22          A.    Yes.  Is that how I addressed it?
         23          Q.    "Subject:  Re:  Ripple's Q2 investor and
         24   advisor update."
14:18:52 25          A.    Okay.

                                                              268

14:18:52  1          Q.   Okay.  And Ms. O'Gorman responds.
         2               Do you see that?
         3          A.   I do.
         4          Q.   Okay.  She says -- in the middle, she
14:18:58  5     says "And please let's never say again our belief
         6     remains the same.  XRP should be regulated as a
         7     currency," and then she goes on to repeat her view
         8     that XRP will be regulated "as a property, as a
         9     commodity, as convertible virtual currency and
14:19:12 10     potentially a security, all depending on facts and
        11     circumstances."
        12               Do you see that?
        13          A.   I do see that.
        14          Q.   Okay.  So Ms. O'Gorman, in fact -- does
14:19:22 15     this refresh your memory that Ms. O'Gorman
        16     repeated to you in 2018 the advice she had given
        17     to you in 2016 about the treatment of XRP in the
        18     United States?
        19          A.   It does not refresh my memory.  I read
14:19:32 20     what she has written here.
        21          Q.   Did you -- did she ever after this point
        22     have a conversation with you where she told you
        23     anything to the contrary, that it would be only
        24     regulated as a currency and not as a security?
14:19:43 25          A.   I don't recall.

                                                              269

```
14:19:45    1            Q.   Did you have a conversation with her
            2       after this email -- about this email after this
            3       email?
            4            A.   I don't believe I spoke to her about
14:19:52    5       this email specifically.  I've spoken to
            6       Antoinette since she wrote this email.
            7            Q.   Sure.
            8                 And did you discuss -- when you've
            9       spoken to her, did you discuss the issue of --
14:20:00   10                 THE REPORTER:  Slow down.
           11            Q.   When you spoke to her, did you discuss
           12       the issue of currency versus security?
           13            A.   Not that I recall.
           14            Q.   Okay.  And in -- in your update -- I'd
14:20:08   15       like to direct you on page 3 to the part where you
           16       say "That's one of the reasons we announced the
           17       University Blockchain Research Initiative."
           18                 Do you see that?
           19            A.   I do.
14:20:21   20            Q.   Who drafted these emails for you, by the
           21       way, typically?
           22            A.   I don't recall.
           23            Q.   Did you have counsel review them?
           24            A.   I don't know.
14:20:29   25            Q.   Okay.  Whose decision was it to commit
```

                                                                    270

14:20:32   1    50 million to the UBRI?

           2          A.   The company's decision.

           3          Q.   Did you approve it?

           4          A.   Yes, I did.

14:20:42   5          Q.   Did Mr. Larsen?

           6          A.   I suspect he did.

           7          Q.   Okay.  And the purpose of this funding

           8    was what?

           9          A.   For research and innovation in

14:20:55  10    blockchain.

          11          Q.   Did any of the companies that are

          12    involved with this administrative -- sorry.

          13    Companies.

          14               Did any of the universities involved in

14:21:01  15    this initiative become -- start operating

          16    validators on the XRP Ledger?

          17          A.   I believe some of them did.

          18          Q.   Which ones?

          19          A.   I don't recall.  I think the University

14:21:14  20    of Kansas was one of them.  Just I know because

          21    I'm an alum.

          22          Q.   Did you ask them to?

          23          A.   No, I didn't.

          24          Q.   Who did?  Did someone ask them to?

14:21:22  25          A.   I don't know.

                                                            271

14:21:23  1          Q.   Okay.  Further down you say "Ripple has
        2   looked closely at this topic for several years,
        3   and our belief remains the same:  XRP should be
        4   regulated as a currency."
14:21:32  5               Do you see that?
        6          A.   I do not.
        7          Q.   Sir, there's a heading that says "Global
        8   Progress on Regulation."
        9          A.   Yep.
14:21:38 10          Q.   Two paragraphs in.
       11          A.   Yep.  I'm with you now.  Sorry.
       12          Q.   Okay.  "Ripple has looked closely at
       13   this topic for several years."
       14               Can you explain what you mean by that?
14:21:51 15          A.   I don't recall.
       16          Q.   What -- well, what had Ripple looked
       17   into for several years?
       18          A.   I don't recall.  I mean, I, as any
       19   reader of this email, could surmise, that we've
14:22:07 20   been paying attention to U.S. regulation and other
       21   countries' regulation of digital assets.
       22          Q.   For years?
       23          A.   Yeah.
       24          Q.   Does that --
14:22:19 25          A.   Yes.  Sorry.

                                                          272

14:22:19  1          Q.    Does that include you, Mr. Garlinghouse?
        2          A.    I think -- depending upon the time
        3     frame, I would say I looked at it closely at some
        4     times and less closely at other times.
14:22:32  5          Q.    When was it more times -- sorry, more
        6     closely?
        7          A.    As I indicated in my testimony this
        8     morning, I looked at it more closely after
        9     receiving a letter from the SEC in late spring of
14:22:42 10     2018.
       11          Q.    Excuse me.
       12                Sitting here today, are you aware that
       13     different agencies in the United States might
       14     treat crypto assets in different ways?
14:22:54 15                    MR. SOLOMON:   Objection to form.
       16          A.    Yes, which I think contributes to the
       17     U.S. confusion.
       18          Q.    And this belief that you state here,
       19     "Our belief remains the same:  XRP should be
14:23:06 20     regulated as a currency.  FinCEN and the DOJ
       21     confirmed this," do you see that?  And then it
       22     goes on to say "My team continues to educate the
       23     market, regulators and courts."  Finally, you say
       24     "For XRP to be a security, as some have asserted,
14:23:22 25     it would have to represent ownership in a company,

                                                           273

```
14:23:24   1   which it does not."
           2            That paragraph, do you see -- do you see
           3   that?
           4        A.   I do.
14:23:28   5        Q.   Okay.  That idea, that belief, had you
           6   expressed it internally at Ripple before this
           7   email?
           8        A.   I don't recall.
           9        Q.   Had you expressed it externally into the
14:23:40  10   market before this email?
          11        A.   I don't recall.
          12        Q.   How many times before April of 2018 did
          13   you express this view outside of Ripple?
          14             MR. SOLOMON:  Objection; asked
14:23:49  15        and answered.
          16        A.   I don't recall.
          17        Q.   And how about internally?  How many
          18   times did you express this view before April of
          19   2018?
14:23:58  20             MR. SOLOMON:  Objection; asked
          21        and answered.
          22        A.   I don't recall.
          23        Q.   Okay.  Do you recall if you did at all?
          24   You just don't remember the number of times, or --
14:24:09  25             MR. SOLOMON:  Objection --
```

                                                        274

```
14:24:09   1        Q.   -- you just don't recall at all
           2   whatsoever?
           3               MR. SOLOMON:  Objection; asked
           4        and answered.
14:24:14   5        A.   Yeah, I think the question was did I
           6   recall speaking to it publicly before 2018, and I
           7   don't recall.
           8        Q.   What about China's control -- well, what
           9   about the potential for China's control of
14:24:27  10   blockchain?  Did you speak about that publicly
          11   before 2018?
          12               MR. CERESNEY:  Objection; form.
          13        A.   Could you reask the question?
          14        Q.   Did you speak publicly about China's
14:24:37  15   potential control of blockchain before 2018?
          16               MR. CERESNEY:  Objection; form.
          17        A.   I -- I think the vagueness of the
          18   question makes it difficult to answer.
          19        Q.   What's -- what -- I'm sorry --
14:24:48  20        A.   There's lots of blockchains.
          21        Q.   How about let's start with the bitcoin
          22   blockchain.
          23               Did you speak publicly about
          24        China's potential control of the bitcoin
14:24:59  25        blockchain before 2018?
```

275

14:25:00   1          A.   I don't know.  I don't recall.
           2          Q.   Did you speak privately at Ripple about
           3     China's potential control of the bitcoin
           4     blockchain since 2018?
14:25:08   5          A.   I don't recall.
           6          Q.   Okay.  Did you have -- do you know, if I
           7     say the name "███████" what I'm referring to?
           8          A.   Yes.
           9          Q.   What is ███████?
14:25:22  10          A.   ███████ is a -- is an investment
          11     group based here in New York that invests capital
          12     typically in debt financings.
          13          Q.   Thank you.
          14               So I'm going to go back to one
14:25:33  15          thing that I forgot.  Just a second ago,
          16          we were talking about DOJ guidance or DOJ
          17          confirmation in 2015 based on your email.
          18               Do you see that?
          19          A.   I do see that.
14:25:39  20          Q.   Okay.  And you are aware that in 2020,
          21     the DOJ issued guidance about how --
          22               THE REPORTER:  I'm sorry.  You're
          23          going to have to slow down.
          24          Q.   You are aware that in 2020 the DOJ
14:25:48  25     issued guidance about how different regulators in

                                                              276

14:25:50   1    the United States could regulate digital assets?

           2              MR. SOLOMON:  Objection; form.

           3       A.   I'm aware that I think sometime about a

           4    year ago, in late Q3/early Q4, the DOJ did a

14:26:04   5    report on cryptocurrencies that enumerated many

           6    different potential agencies and regulators in the

           7    United States who may have some oversight of

           8    digital assets and who, unfortunately, don't have

           9    an aligned view on those.

14:26:19  10       Q.   And did you view that report as

          11    providing regulatory clarity or not?

          12              MR. SOLOMON:  Objection; form.

          13       A.   Well, no, I did not.

          14       Q.   Why not?

14:26:34  15       A.   I -- I believe the report indicated

          16    that, as I recall, there are seven or eight

          17    different federal agencies or departments that all

          18    looked at digital assets a little bit differently,

          19    which, in my estimation, fuels confusion in the

14:26:51  20    marketplace about the regulatory status of digital

          21    assets in the United States in contrast to other

          22    countries.

          23       Q.   And the DOJ statement in 2015, do you

          24    view that as providing regulatory clarity or not?

14:27:06  25       A.   I don't know what statement the DOJ made

                                                                277

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:27:07   1    in 2015.
           2         Q.    The DOJ settlement with -- with Ripple,
           3    do you view that as providing regulatory clarity?
           4         A.    Oh, the FinCEN settlement.
14:27:20   5         Q.    You referenced FinCEN and the DOJ
           6    confirmed this in 2015.
           7         A.    I actually don't recall the email, as I
           8    mentioned earlier.  And so I actually read that
           9    differently than now you're reading it.  I read it
14:27:31  10    as FinCEN and the DOJ separately, as two separate
          11    events.  Since I joined in 2015, I thought maybe
          12    there was some other event that happened in 2015
          13    that may have happened with the DOJ.
          14              Recognizing the FinCEN settlement was
14:27:43  15    both, I guess, stamped by FinCEN and the DOJ, then
          16    I think those two entities described XRP as a
          17    currency, as a virtual currency, I believe.
          18         Q.    And did you -- when did you find out
          19    about that settlement, by the way?
14:28:03  20         A.    Can you maybe ask the question who --
          21    when did I find out the FinCEN settlement?
          22         Q.    Yeah.
          23         A.    You know, within the first few weeks of
          24    my tenure at Ripple.
14:28:15  25         Q.    Okay.  And who told you about it?

                                                                    278

```
14:28:17   1        A.   I don't recall.
           2        Q.   Did you ask for any sort of -- within
           3   the first few weeks -- first let me ask what I
           4   asked earlier.
14:28:26   5                Did you view the FinCEN
           6           settlement as providing regulatory
           7           clarity?
           8        A.   I suppose I was so new to the company
           9   and so new to digital assets that I wasn't
14:28:39  10   thinking about the fact that there may not have
          11   been regulatory clarity at that point.  So I, at
          12   that point in time, don't think I had any thoughts
          13   about it.
          14        Q.   What about the point in time when you
14:28:51  15   write the email in 2018?  Did you view at that
          16   point in time the FinCEN settlement as providing
          17   regulatory clarity?
          18        A.   I think any time a government is
          19   speaking authoritatively through a court system
14:29:06  20   and describing something in a certain way, it
          21   provides a certain level of clarity about, well,
          22   is it this government entity, which collaborates
          23   with other parts of the government, that the
          24   government has said they view XRP as a virtual
14:29:19  25   currency?
```

                                                            279

14:29:22 1    Q.   Do you recall the public statements you
2    made about a euphemism in the digital asset crypto
3    world about when people said regulatory
4    uncertainty, what they meant was they don't like
14:29:33 5    the regulatory uncertainty and they would like for
6    it to be different?
7    A.   I made that comment in reference to
8    initial coin offerings and -- those initial coin
9    offerings that I thought were trying hard to avoid
14:29:49 10   being construed as anything other than, you know,
11   initial coin offerings that were raising capital
12   for a project that didn't exist.
13   Q.   Why -- why in your estimation were they
14   trying hard to avoid being construed as such?
14:30:03 15   A.   Because they didn't want to draw the ire
16   of the SEC.
17   Q.   Going back to -- you found out -- okay.
18        The first few weeks at Ripple, I think
19   you said you find out about the FinCEN settlement,
14:30:23 20   but you don't recall who told you about it.  Is
21   that fair?
22   A.   Yes.
23   Q.   Okay.  Did you read it?
24   A.   I don't recall.
14:30:31 25   Q.   Did you understand that the FinCEN

280

14:30:33  1    settlement was a serious thing for Ripple?

2         A.   Yes.

3         Q.   You had, for example, Ms. O'Gorman to

4    make sure you complied with the settlement, is

14:30:41  5    that right?

6              MR. SOLOMON:  Objection; form.

7         A.   With -- the role of chief compliance

8    officer we had for lots of reasons.  One of them,

9    which she took on, was making sure that we were

14:30:52 10    complying with the FinCEN settlement.  We took a

11    number of other steps obviously to make sure we

12    were complying with the FinCEN settlement,

13    including winding down a consumer-facing product

14    called Ripple Trade.

14:31:02 15        Q.   Right.  And when was that wound down?

16         A.   I mean, I believe summer of 2015.  Right

17    around there.

18         Q.   And is it fair to say you understood

19    that, you know, the FinCEN settlement arose from

14:31:13 20    essentially a dispute between Ripple and the U.S.

21    government --

22              MR. SOLOMON:  Objection; form.

23         Q.   -- that leads to a settlement of the

24    dispute?

14:31:20 25        A.   To be honest, I wasn't at Ripple when

281

14:31:22  1    all this was going on, so I really can't speak to
          2    how it came to be or how it evolved.
          3         Q.   Right.  And I'm not asking you to.  I'm
          4    just asking you for what understanding you gave
14:31:33  5    when -- when you -- you know, you find out about
          6    the settlement.  I'm trying to figure out what
          7    understanding you gained about what the settlement
          8    was.
          9         A.   I -- I don't recall.
14:31:42 10         Q.   Okay.  But you understood it was a
         11    serious thing, something to be taken seriously?
         12         A.   Yeah.  I recall there was a $700,000,
         13    maybe, fine which for us at the time was a
         14    material amount of money.
14:31:56 15         Q.   Right.
         16              At that time, when you found out that
         17    you -- you know, Ripple would have to pay a
         18    material amount of money to settle a dispute with
         19    the government, did you take any steps to ensure
14:32:05 20    that Ripple would not get in trouble with the
         21    government again?
         22         A.   I guess my reaction is that we have
         23    always sought, as I testified earlier today, to
         24    work within the clear understanding of laws around
14:32:24 25    the world and making sure we are partnering,

                                                                282

14:32:27  1   working, and collaborating with law enforcement,

2   with governments, et cetera.

3              So I guess my reaction is I don't think

4   we took any steps specifically -- I mean, the

14:32:37  5   question kind of suggests that we didn't take

6   steps beforehand that we started taking

7   afterwards.  And I guess my point is, as an

8   organization and culture, of course we've always

9   tried to live within the letter of the law.

14:32:50 10      Q.   Right.  I apologize.  I'm not trying to

11  suggest anything.

12             My question is, you know, you find out

13  that there's this settlement and you're starting

14  at Ripple -- you're starting to learn.  What steps

14:33:03 15  did you, Mr. Garlinghouse, take?  You know, did

16  you ask someone, This company's been around for a

17  few years.  I want to make sure that what we're

18  doing is all aboveboard?  Did you ask anyone

19  something like that?

14:33:14 20             MR. SOLOMON:  Objection; form.

21      A.   No.

22      Q.   Okay.  Did you ask, for example, to see

23  any legal opinions that the firm might have

24  procured with respect to the potential legal

14:33:23 25  consequences of its activities?

283

14:33:25   1          A.    No.

           2          Q.    Why not?

           3          A.    Actually, to be more precise, I don't

           4    recall.

14:33:30   5          Q.    So you might have, you might not have,

           6    you just don't recall?

           7          A.    Yeah.

           8          Q.    Okay.  Do you think you would have done

           9    that?  I mean, just knowing yourself, you started

14:33:37  10    at a new company --

          11          A.    No.

          12          Q.    I'm sorry?  You don't think you would

          13    have done that?

          14          A.    I don't think I would have done that.

14:33:52  15          Q.    Okay.  So back to ███████████.  What

          16    relationship, if any, did ███████████ have to

          17    Ripple?

          18          A.    None to my knowledge.

          19          Q.    Potential relationship?

14:34:04  20          A.    We had discussed with them participating

          21    in our Series C financing.

          22          Q.    What -- what is Project Raven?

          23          A.    I don't recall.

          24          Q.    And did ███████████ participate?

14:34:16  25          A.    Not to my knowledge.

                                                                  284

```
14:34:17    1          Q.    Why not?

            2          A.    I think we chose a different path.

            3          Q.    You chose █████████?

            4          A.    Correct.

14:34:26    5          Q.    Okay.  But why?

            6          A.    My vague recollection is the terms of

            7     the ███████ deal were more compelling to us than

            8     the terms of the deal ██████████ had offered.

            9          Q.    Was one of the terms of the ███████████

14:34:37   10     deal as offered a restrictive covenant with

           11     respect to potential regulatory action --

           12                      THE REPORTER:  Repeat.

           13                      MR. SOLOMON:  Objection.  And

           14          you've got to slow down.  I'm barely

14:34:44   15          following.

           16          Q.    Was one --

           17                      MR. SOLOMON:  You've got to slow

           18          down, too.

           19          Q.    Was one of the terms of the ███████████

14:34:47   20     deal as offered a restrictive covenant with

           21     respect to potential regulatory action by the SEC?

           22                      MR. SOLOMON:  Objection; form.

           23          A.    Sitting here today, I am aware that at

           24     some point, let's see, ██████████ included a

14:35:07   25     provision in their term sheet that that was the
```

285

14:35:11  1    case.  When we were comparing term sheets, I had
          2    no idea that was the case.
          3         Q.   Fair enough.
          4         A.   I guess my point is that was not a
14:35:23  5    relevant data point as to why we selected ███████
          6    and not ███████
          7         Q.   Okay.  With ███████ was there a
          8    covenant with respect to potential SEC action?
          9              MR. SOLOMON:  Objection; form.
14:35:45 10         A.   Not specifically the SEC, but
         11    government, yes.
         12         Q.   Government what?
         13         A.   I think the -- in the Series C
         14    financing, as it completed, there was a provision
14:35:58 15    that said, roughly, if there's an official
         16    determination by a government -- I'm not sure it
         17    said U.S. or SEC; I don't recall -- that XRP is a
         18    security on a go-forward basis, then X and Y and
         19    Z.
14:36:12 20         Q.   Right.
         21              And that was also a term in the
         22    term sheet with ███████ even though I
         23    understand you didn't enter into that
         24    deal, is that right?  Something similar?
14:36:21 25         A.   I did not know that.  I am aware of that

                                                              286

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
14:36:23  1   now based upon the ███████ litigation, but I

          2   would not have known that then and --

          3                  MR. SOLOMON:  That's what I want

          4         you to be careful of, because you've had

14:36:32  5         discussions with lawyers, including Quinn

          6         Emanuel, about ███████.  So testify about

          7         what you knew at the time --

          8                  THE WITNESS:  Yeah, okay.

          9                  MR. SOLOMON:  -- which is

14:36:37 10         perfectly fine and fair for him to ask

         11         you.  Not what you know now --

         12                  THE WITNESS:  Okay.

         13                  MR. SOLOMON:  -- from that

         14         litigation.  It was a poor question from

14:36:40 15         Mr. Tenreiro --

         16                  THE REPORTER:  I'm sorry, you're

         17         talking over one another and you're

         18         talking too fast.  I can't get that.  I

         19         don't know how else to say it.

14:36:48 20                  MR. SOLOMON:  Let me say it

         21         again.  Do not answer questions in

         22         relation to ███████ to the extent it

         23         touches on any advice you received or were

         24         party to from Quinn Emanuel, Debevoise, or

14:36:59 25         any other law firm.  It is perfectly fair
```

                                                              287

| | | |
|---|---|---|
| 14:37:02 | 1 | game for them to ask you questions about |
| | 2 | what you understood about the relationship |
| | 3 | with ████████ or this other company at the |
| | 4 | time. |
| 14:37:09 | 5 | THE WITNESS:  Yes. |
| | 6 | MR. SOLOMON:  Please don't mix |
| | 7 | the two because it's just going to make |
| | 8 | for a very confusing record.  Thank you, |
| | 9 | Brad. |
| 14:37:14 | 10 | THE WITNESS:  Yeah, okay. |
| | 11 | BY MR. TENREIRO: |
| | 12 | Q.   So take a step back. |
| | 13 | What involvement did you have with the |
| | 14 | Series C negotiations? |
| 14:37:23 | 15 | A.   Not a lot. |
| | 16 | Q.   Did you sign any agreements? |
| | 17 | A.   I don't recall. |
| | 18 | Q.   Did Mr. Larsen have involvement with the |
| | 19 | Series C funding? |
| 14:37:33 | 20 | MR. CERESNEY:  Object to form. |
| | 21 | A.   Less than I did. |
| | 22 | Q.   Okay.  And did you have involvement in |
| | 23 | poten -- in negotiations with ████████? |
| | 24 | A.   Not material. |
| 14:37:48 | 25 | Q.   Who was involved?  Mr. Will? |

288

```
14:37:52   1              A.   I actually --
           2                        MR. SOLOMON:  Objection; form.
           3              A.   I don't know who was on point to
           4      negotiate the terms of Series C financing -- our
14:37:59   5      Series C financing.
           6              Q.   You didn't select someone to be on point
           7      for that negotiation?
           8                        MR. SOLOMON:  Objection; form.
           9              A.   That would not have been something that
14:38:08  10      I would have selected, no.
          11              Q.   Who would have selected that person?
          12              A.   Probably Ron Will.
          13              Q.   Okay.  And based on your knowledge
          14      simply of the facts, without getting into, you
14:38:23  15      know, conversations with counsel, I think you've
          16      told me there was some sort of provision in the
          17      ███████   funding related to potential
          18      determinations about XRP as a security, is that
          19      right?
14:38:39  20              A.   Yes.
          21              Q.   And did you know that fact when Ripple
          22      entered into the Series C?
          23              A.   No.
          24              Q.   When was that, by the way?
14:38:47  25              A.   When was what?
```

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
14:38:48   1            Q.    The Series C.  Around 2019?
           2            A.    Our Series C financing closed I think in
           3       December of 2019.
           4            Q.    Okay.  And you're saying at the time
14:39:00   5       that it closed, you were not aware of this
           6       covenant that we're discussing?
           7            A.    That's correct.
           8            Q.    You came to find out because of the
           9       litigation or in between the funding and the
14:39:11  10       litigation?
          11            A.    I don't know exactly when I came to find
          12       out, but it would have been much, much closer to
          13       the litigation.
          14            Q.    Okay.  And did you ever ask anyone why
14:39:22  15       that covenant was in there?  Not lawyers.  You
          16       know, anyone.  Businesspeople or --
          17            A.    No.
          18            Q.    Okay.  Did you ever ask that the
          19       covenant be removed?
14:39:33  20            A.    No.
          21            Q.    Okay.  And Ripple -- you have stated
          22       Ripple's view was that XRP was a currency, not a
          23       security, correct?
          24            A.    It was also FinCEN's view, but, yes.
14:39:44  25            Q.    Why was that covenant in there?  If
```

290

```
14:39:44   1    Ripple had that view, why was it necessary?
           2                    THE REPORTER:  Repeat that.  Why
           3         was?
           4         Q.   Why was it necessary?
14:39:50   5                    MR. SOLOMON:  Objection; calls
           6         for a legal conclusion.  He's not a
           7         lawyer.  He didn't write the contract.
           8         Q.   From a business perspective, why was a
           9    covenant of that nature necessary?
14:39:59  10         A.   I think it's a covenant that ███████
          11    put in there.  You'd have to ask them.
          12         Q.   You didn't ask them to take it out?
          13         A.   I was not involved in the negotiation of
          14    the term sheet or final documents to close the
14:40:11  15    financing.
          16         Q.   Okay.  Did you have, I guess, what one
          17    might call Investor Days with Ripple shareholders
          18    from time to time?
          19         A.   Yes.
14:40:27  20         Q.   Okay.  What was the purpose of those?
          21         A.   If you were a shareholder in Ripple, you
          22    were likely interested in how the company is
          23    doing.  I also think it's good practice for
          24    Silicon Valley start-ups that might aspire to
14:40:46  25    being a public company to start practicing
```

291

```
14:40:50   1    behaviors that are more public company-esque.
           2         Q.    Was ███████ one of Ripple's
           3    shareholders before the Series C?
           4         A.    Not to my knowledge.
14:41:06   5         Q.    What about an entity called ████████
           6    ████████?
           7         A.    Not to my knowledge.
           8         Q.    When you had Investor Days from time to
           9    time, did you provide these people with truthful
14:41:18  10    and accurate information?
          11         A.    I believe so.
          12         Q.    Okay.  And would you consider the equity
          13    investors that Ripple had as sort of sophisticated
          14    players in the financial markets?
14:41:31  15         A.    Could you repeat the question?
          16         Q.    Would you consider the equity investors
          17    that Ripple had as sophisticated players in the
          18    financial markets?
          19         A.    I don't know.  I mean, Ripple has an
14:41:44  20    order of magnitude of 1- or 200 shareholders.  I'm
          21    sure some of them are sophisticated investors and
          22    I'm sure some of them are less sophisticated.
          23         Q.    The ones that you gave Investor Day
          24    presentations to, would you consider those to be
14:41:59  25    sophisticated?
```

                                                              292

14:42:00  1        A.   I don't know who attended Investor Day.

        2        Q.   Okay.  When -- did -- where were these

        3   Investor Days held, at Ripple or at their offices?

        4        A.   I mean, perhaps I'm -- the only Investor

14:42:13  5   Day I specifically remember was held at a hotel in

        6   downtown San Francisco.  I think we had more than

        7   one, but that's the one that I happen to remember.

        8        Q.   Can you ballpark the date of that?

        9        A.   I don't know.  Two to three years ago.

14:42:34 10        Q.   And what the purpose of it was, can you

       11   tell me that?

       12        A.   I think my testimony earlier, I'd have

       13   to go back and read exactly, but I think to give

       14   our shareholders more information about what's

14:42:44 15   going on with the company and to get better at

       16   practicing to being -- adopting behaviors that are

       17   more public company-esque.

       18        Q.   Okay.  Do you know who ███████ is?

       19        A.   I have met ██████.

14:43:00 20        Q.   Who is he?

       21        A.   I believe he's an associate at ██████.

       22        Q.   Okay.  And did he attend this Investor

       23   Day presentation?

       24        A.   I don't know.

14:43:07 25        Q.   Okay.  In July 2018 -- on or around July

                                                              293

14:43:11  1    2018, did you speak to Ripple's equity investors
        2    about what was going on in the company -- what was
        3    going on in the company?
        4         A.   I don't recall when, as I testified
14:43:20  5    earlier.  I -- I do recall now two different
        6    Investor Days.  There was one that was here in New
        7    York at a hotel and one was at a hotel in San
        8    Francisco.  So I remember those two, but I don't
        9    remember the dates of them.
14:43:31 10         Q.   Were they after or before the SEC letter
       11    of April 2018?
       12         A.   I don't recall.
       13         Q.   Okay.
       14         A.   No.
14:43:40 15         Q.   Did you express at invest -- at these
       16    Investor Days that you were optimistic about the
       17    SEC's investigation, but could not guarantee the
       18    outcome of the investigation?
       19              MR. SOLOMON:  Objection; form.
14:43:51 20         A.   No.
       21         Q.   Okay.  Did you express anything about
       22    the conversations with the SEC at these Investor
       23    Days?
       24         A.   That's a very different question.  The
14:44:02 25    first time you called it an investigation.

                                                            294

14:44:04  1          Q.   It's a different question.

          2          A.   Yeah.  I don't recall specifically.  I

          3    would imagine we generally would practically talk

          4    about regulatory dynamics globally.  Is it

14:44:13  5    possible what you asked was included in that?

          6    That's quite possible.

          7          Q.   Okay.  Separate from, you know, whether

          8    it's an investigation or the conversations with

          9    the SEC -- you understood that the SEC in 2018 had

14:44:30 10    not made a statement about whether it viewed XRP

         11    as a security or not, correct?

         12               MR. SOLOMON:  Objection; form.

         13          A.   Yes.  I am aware that to my knowledge

         14    the SEC had not made a determination in the summer

14:44:44 15    of 2018 as to whether or not XRP is a security.

         16          Q.   And did you understand that the SEC was

         17    considering the issue?

         18          A.   I really didn't know.

         19          Q.   You didn't know --

14:44:55 20          A.   It's -- sorry.

         21          Q.   You didn't know that the SEC was

         22    considering whether XRP was or was not a security

         23    in the summer of 2018?

         24          A.   I was very confused by the SEC's

14:45:07 25    behavior in choosing, for example, to proactively

                                                              295

14:45:12  1   come out and say that Ether was not a security.
         2   And at the time we received a letter, which I
         3   would have described as an informal inquiry, to
         4   which we were cooperating, to learn more about XRP
14:45:27  5   and to learn more about Ripple.
         6        Q.   But did you have an understanding, you
         7   know, just from attending meetings with the SEC --
         8   we've talked about some of them -- that the SEC
         9   was determining the issue about whether it was or
14:45:38 10   was not a security?
        11             MR. SOLOMON:   Objection; form.
        12        A.   I believe in the summer of 2018, which
        13   is when you're asking about, I had not had any
        14   meetings with the SEC other than with Chairman
14:45:51 15   Clayton.  And Chairman Clayton did not express a
        16   view that XRP was a security or that even it was
        17   being discussed.
        18        Q.   Okay.  And in the fall -- after you had
        19   meetings in the fall, did you have an
14:46:01 20   understanding that the SEC was considering
        21   whether maybe it was, maybe it was not a security?
        22             MR. SOLOMON:   Objection; form.
        23        A.   I -- again, I don't recall.  My
        24   viewpoint -- you know, we were having
14:46:12 25   conversations with almost entirely CorpFin.  And

                                                              296

```
14:46:20   1    given the construct around decentralization as an
           2    important tenet of the -- Director Hinman's speech
           3    about Ether, it seemed like educating the SEC
           4    about how the XRP Ledger is decentralized was a
14:46:34   5    step in the journey of -- maybe a similar journey
           6    to what Joe Rubin and metallic had done with the
           7    SEC previously.
           8        Q.   So a journey that might end with a
           9    statement publically about XRP?
14:46:46  10        A.   I think market clarity would have been
          11    helpful as soon as possible.
          12        Q.   Okay.  And so in -- in -- in or around
          13    July 2018, did you state to ██████████, or at a
          14    meeting that ████████ attended, that you felt
14:47:01  15    optimistic that the SEC will rule in XRP's favor,
          16    but could not guarantee that?
          17              MR. SOLOMON:  Objection; form.
          18        A.   I don't know what it means for the SEC
          19    to rule in XRP's favor.  I mean, there had been a
14:47:16  20    speech by Director Hinman.  I -- I -- I don't
          21    recall saying that to ████████.
          22        Q.   Do you recall saying whether -- you
          23    know, did you recall saying that you felt
          24    optimistic that the SEC could potentially conclude
14:47:32  25    that XRP was not a security, but you could not
```

297

14:47:34  1    guarantee that?

       2              MR. SOLOMON:  Objection to form.

       3         A.   I don't recall speaking to ███████ -- I

       4    don't recall meeting ██████████  I know more who he

14:47:42  5    is, but I don't recall speaking to him about the

       6    SEC's inquiry into XRP and Ripple.

       7         Q.   What about not speaking to him

       8    necessarily but speaking at an event where he's at

       9    such as an Investor Day?  Do you recall stating at

14:47:57 10    one of these Investor Days, either in the New York

      11    hotel or the San Francisco hotel, and saying

      12    something along the lines of you feel optimistic

      13    that the SEC will determine that XRP's not a

      14    security, but you could not guarantee that?

14:48:11 15              MR. SOLOMON:  Objection; form.

      16         A.   I don't recall making any statement like

      17    that.

      18         Q.   Okay.  Do you have any reason to think

      19    you did not make that statement?

14:48:22 20         A.   No.  I mean, there's some interesting

      21    timing-related things there based on information

      22    you showed me this morning which is just hard to

      23    reconcile.  And it depends a little bit when the

      24    Investor Day was.

14:48:31 25         Q.   All right.  Mr. Garlinghouse, over the

                                                              298

14:48:44  1    course of your time at Ripple, is it fair to say
          2    that Ripple has made efforts to get XRP listed on
          3    digital asset trading platforms?
          4         A.   Yes.
14:48:57  5              MR. CERESNEY:  Objection; form.
          6         Q.   And what was the purpose for making
          7    those efforts?
          8              MR. CERESNEY:  Objection; form.
          9         A.   A precondition to Ripple's product
14:49:06 10    strategy is liquidity between XRP and various fiat
         11    currencies around the world.  And if XRP doesn't
         12    have trading pairs, then you don't have that
         13    liquidity.  And so if that's a precondition to
         14    your product strategy, you want to make sure that
14:49:31 15    that exists.
         16         Q.   To -- to provide that liquidity, for
         17    example, let's say between XRP and the Mexican
         18    peso, Ripple has engaged market makers to help
         19    provide that liquidity, is that right?
14:49:41 20              MR. SOLOMON:  Objection; form.
         21         A.   I believe that's yes.
         22         Q.   Okay.  And so why didn't Ripple do that,
         23    you know, just provide that liquidity by engaging
         24    market makers as opposed to putting it on
14:49:56 25    exchanges?

                                                            299

14:49:56  1                    MR. SOLOMON:  Objection; form.

       2        A.   Well, in the example I think you're

       3   using, Bitso listed XRP independently of any work

       4   with Ripple.  So that liquidity existed there.  We

14:50:11  5   then, as we brought customer flows, wanted to make

       6   sure there was adequate liquidity to address those

       7   customer flows and so we partnered with market

       8   makers in those markets.

       9        Q.   And Ripple from time to time publicly

14:50:29 10   communicated the efforts it was making with

      11   respect to getting XRP on exchanges, is that

      12   right?

      13                    MR. SOLOMON:  Objection; form.

      14        A.   Well, what time frame are we talking

14:50:41 15   about here?

      16        Q.   You know, when -- at various times when

      17   you worked at Ripple.  Well, if -- if there was a

      18   moment when Ripple stopped, you can tell me.  But

      19   my question is:  Ripple from time to time told the

14:50:52 20   market that it was making efforts to get XRP

      21   listed, is that right?

      22                    MR. SOLOMON:  Objection; form.

      23        A.   My recollection is that XRP, I mean, as

      24   of within the last couple of years, has traded at

14:51:07 25   a couple hundred exchanges around the world, of

                                                              300

14:51:13  1    which Ripple partnered or facilitated a, you know,

        2    very small percentage of those.  Kind of less than

        3    5 percent of those did Ripple facilitate or

        4    partner in some way.

14:51:30  5            Separately, Ripple, in the interest of

        6    transparency, in the interest of trying to get

        7    what tended to be a little bit of a clandestine

        8    market, trying to encourage more transparency,

        9    trying to minimize misinformation in the market,

14:51:46 10    Ripple started years ago to proactively

       11    communicate what's our view and what's going on in

       12    the XRP markets and what we are doing in the XRP

       13    markets.

       14        Q.   And did that include proactively

14:52:00 15    communicating Ripple's engagement with exchanges

       16    to get XRP listed?

       17        A.   I think those would have included just

       18    updates on the number of exchanges XRP was listed

       19    independent of whether or not Ripple had

14:52:18 20    facilitated that.

       21        Q.   Did Ripple disclose publicly if Ripple

       22    had facilitated a listing on the exchange?

       23            MR. SOLOMON:  Objection; form.

       24        A.   I don't know.

14:52:33 25        Q.   Well, in terms of providing

                                                          301

14:52:36  1    transparency, did Ripple communicate its efforts

       2    to get XRP listed on exchanges?

       3         A.   Isn't that the same question you just

       4    asked?

14:52:47  5         Q.   I'm trying to understand how -- you're

       6    telling me that you wanted to have transparency,

       7    but you don't know if there -- if these things

       8    were communicated.

       9              So my question is, is communicating

14:52:57 10    Ripple's efforts, would that have provided

      11    transparency?

      12              MR. SOLOMON:  Objection; form.

      13         A.   I guess hypothetically -- I mean, I'm

      14    not quite sure what you're asking me now.  I

14:53:11 15    apologize.

      16         Q.   Yeah.

      17              Would communicating Ripple's

      18         efforts, to the extent they were made, to

      19         get XRP listed, would that in your view

14:53:20 20         have provided more transparency to the

      21         market?

      22              MR. SOLOMON:  Objection.

      23         A.   Sure.  I -- I don't know because, you

      24    know, we're kind of talking hypotheticals.  If we

14:53:33 25    could talk about a specific example, I'd be happy

                                                              302

14:53:35  1    to --

          2                    MR. SOLOMON:  He'll show you

          3           documents.  He's going to give you a

          4           memory test first.  Just do your best to

14:53:39  5           answer the questions.

          6           A.    Okay.  I --

          7                    MR. SOLOMON:  Qualify it however

          8           you have to.

          9           A.    I don't recall -- what I recall about

14:53:45 10    our XRP Markets Reports is we tried to provide as

         11    much information, as you're probably aware -- and,

         12    frankly, I think the SEC -- well, any regulator

         13    would be concerned.  There's a lot of

         14    misinformation out in the crypto marketplace.  And

14:53:59 15    so our goal with the Markets Report was to provide

         16    as much authoritative, clear information as

         17    possible.  Some of that involved what Ripple's

         18    activities included and some of that certainly was

         19    about observations about what we were aware other

14:54:13 20    people were doing.

         21                    You know, I guess part of your question

         22    is could we be more exhaustive in the type of

         23    information we provided in those XRP Markets

         24    Reports?  And I guess that that answer is of

14:54:25 25    course you can always include more information.

                                                                    303

14:54:29   1    At some point you want them readable and
          2    accessible and -- you know, I don't know, I think
          3    they were roughly four to five pages long and that
          4    seemed about right, the level of detail that we
14:54:39   5    provided about the markets.
          6         Q.   Thank you.
          7              I'm not just talking about Market
          8    Reports, but let's -- that's -- that's fine.
          9    Let's be clear about something.
14:54:47  10              Did Ripple provide information to the
         11    market about its activities outside of the Market
         12    Reports?
         13         A.   You mean like the shareholder updates?
         14         Q.   Anything.  The shareholder -- I'm
14:54:59  15    talking beyond just the shareholder updates.  I
         16    understand the shareholders are maybe a hundred to
         17    200 people.  I'm talking beyond that.
         18                Did Ripple from time to time
         19          while you've been CEO provide information
14:55:09  20          to the market that's not just in the
         21          Market Reports?  For example, tweets by
         22          Ripple employees.
         23         A.   Oh.
         24         Q.   Interviews, et cetera.
14:55:18  25         A.   Yes, Ripple employees and Ripple

                                                              304

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

14:55:20   1   corporate tweeted.  Yes, Ripple employees

           2   participated in panels, interviews, what have you.

           3        Q.    In the Consensus forum Ripple

           4   participated?

14:55:36   5        A.    Which one are we talking about?

           6        Q.    Let's say Ripple or its employees

           7   participated from time to time in conferences in

           8   the digital asset space.

           9        A.    For sure.

14:55:45  10        Q.    Okay.  So I just want to be sure.  The

          11   Markets Reports were not the only way in which

          12   Ripple communicated to the market, is that right?

          13        A.    That's correct.

          14        Q.    Okay.  Over the years, Ripple engaged in

14:55:58  15   attempts to get CoinBase to list XRP, correct?

          16              MR. SOLOMON:  Objection; form.

          17        A.    Over the years ripple spoke to CoinBase

          18   about listing XRP.

          19        Q.    For what purpose?

14:56:15  20        A.    Well, as I described earlier, the -- in

          21   order to achieve our product strategy, providing

          22   liquidity between XRP and fiat is foundational.

          23   It's a precondition that needs to exist.

          24              CoinBase was particularly, you know, I

14:56:35  25   think, robust in their own -- I viewed them as

                                                              305

```
14:56:39   1    kind of a white hat in the crypto space of having
           2    robust AML procedures, robust KYC procedures.
           3              And so our goal was, as I've described
           4    many times, I think the more, quote/unquote,
14:56:51   5    adults in the crypto space that were furthering
           6    the growth and expansion of the market, the
           7    better.  I think CoinBase would have met some of
           8    those criteria.  And so we sought to partner with
           9    them around our product strategy.
14:57:06  10         Q.   And so I think you said earlier over the
          11    years Ripple spoke to CoinBase about listing XRP.
          12    And was the purpose of that to eventually get them
          13    to list XRP for the, excuse me, foundational
          14    precondition that you have?
14:57:21  15         A.   Yeah.
          16         Q.   Okay.  And you yourself met with
          17    CoinBase people over the years, right?
          18         A.   Yes.
          19         Q.   And do you recall approximately your
14:57:31  20    first outreach to CoinBase was?
          21         A.   I don't.  My recollection is that
          22    ███████████ and I went over and had lunch at
          23    the CoinBase offices at some point.  And maybe we
          24    had lunch with ████████████ and I can't remember
14:57:47  25    who else.
```

306

14:57:48   1          Q.   Okay.  Separate from CoinBase, did you
           2   offer Gemini money to list XRP?
           3          A.   I did not.
           4          Q.   Did Ripple?
14:57:53   5               MR. SOLOMON:  Objection; form.
           6          A.   I actually don't know.  I've read that
           7   speculation, but I don't know if that's true or
           8   not.
           9          Q.   Okay.  Did you meet with CoinBase
14:58:15  10   officials more than once about -- I'm sorry,
          11   CoinBase, you know, employees more than once about
          12   the potential listing?
          13          A.   Yes.
          14          Q.   Okay.  And who did you meet with?
14:58:30  15          A.   My recollection -- I only remember
          16   having two live meetings and one phone call.  And
          17   I met -- the live meeting -- the first live
          18   meeting I described with ████████████, I don't
          19   remember who we met with.  I think ███████████ was
14:58:46  20   there.  I'm not sure.  Maybe he had left.  And
          21   then the other conversations were with --
          22               MR. SOLOMON:  Slow down a little
          23          bit for the court reporter, please.
          24               THE REPORTER:  Thank you.
14:58:54  25               MR. SOLOMON:  Why don't you start

                                                              307

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

| | | |
|---|---|---|
| 14:58:55 | 1 | over with your response. |
| | 2 | A.   So -- |
| | 3 | Q.   Two live meetings, one phone call. |
| | 4 | A.   Well, at least one phone call.  I -- to |
| 14:59:05 | 5 | the extent -- I believe your question was with |
| | 6 | whom did I meet.  The latter time periods, I met |
| | 7 | with ███████████████ in person once and I think by |
| | 8 | phone once.  I think I also reached out to ██████ |
| | 9 | ███████, who joined as their head of Corp Dev.  She |
| 14:59:25 | 10 | had been a Yahoo employee and someone I knew |
| | 11 | personally. |
| | 12 | Q.   And at any point in time did you offer |
| | 13 | CoinBase $5 million to list XRP? |
| | 14 | MR. SOLOMON:  Objection to form. |
| 14:59:36 | 15 | A.   They asked us to pay $5 million, to |
| | 16 | which we declined.  And as time went by, I think |
| | 17 | we went back to them and said, Was that still on |
| | 18 | the table? |
| | 19 | Q.   And what did they say? |
| 14:59:48 | 20 | A.   I believe they said no. |
| | 21 | Q.   Let's look at Exhibit 31, please. |
| | 22 | MR. SOLOMON:  It's three o'clock |
| | 23 | on the nose.  Would this -- do you want to |
| | 24 | take a break before this one or after? |
| 15:00:01 | 25 | MR. TENREIRO:  Either. |

308

```
15:00:01    1              THE WITNESS:  Let's do one more
            2        and then take a break.  Probably because
            3        the coffee is going to be here in ten
            4        minutes.
15:00:07    5              MR. SOLOMON:  You're the boss.
            6        One more document.
            7              MR. TENREIRO:  Thirty-one.
            8              THE WITNESS:  Oh, gosh, I forgot
            9        about that.
15:00:27   10              MR. SOLOMON:  What's that?
           11              THE WITNESS:  I forgot I met with
           12    ███████
           13              MR. SOLOMON:  That's all right.
           14        That's why we're doing this.
15:01:42   15              (Pause)
           16              (Whereupon, exhibit is received
           17        and marked Garlinghouse Deposition
           18        Exhibit 31 for identification.)
           19    BY MR. TENREIRO:
15:01:48   20        Q.   Okay.  Having read this email, do you
           21    see the part where you said, towards the bottom,
           22    "In order to be listed, they expect a 'listing
           23    fee' from all players to cover their costs.  (I
           24    was transparent with him that we" had
15:02:00   25    previously -- sorry, "that we have previously
```

309

|            |    |                                                        |
|------------|----|--------------------------------------------------------|
| 15:02:02   | 1  | offered $5 million U.S. to increase the                |
|            | 2  | prioritization/impact the decision about listing       |
|            | 3  | XRP)"?                                                  |
|            | 4  |                    Do you see that?                    |
| 15:02:10   | 5  |     A.   I do.                                          |
|            | 6  |     Q.   Okay.  So I'm just trying to understand,      |
|            | 7  | did you offer $5 million to CoinBase?                  |
|            | 8  |     A.   I think my previous testimony I stand         |
|            | 9  | by, which is I recall them asking us to pay them       |
| 15:02:21   | 10 | $5 million.  We then later went and said, "Hey, is    |
|            | 11 | that still on the table?"  I think what I'm            |
|            | 12 | regurgitating to ███████ is that, hey, that had       |
|            | 13 | happened.                                              |
|            | 14 |     Q.   So when the -- when they asked you            |
| 15:02:35   | 15 | originally, you declined or did not respond, or        |
|            | 16 | what occurred when you first asked?                     |
|            | 17 |     A.   When they first --                             |
|            | 18 |          MR. SOLOMON:  Objection; form.                 |
|            | 19 |     A.   My recollection is when they first            |
| 15:02:43   | 20 | asked, we didn't have the wherewithal from a           |
|            | 21 | capital point of view to meet the ask and so it       |
|            | 22 | was just kind of dismissed out of hand.                |
|            | 23 |     Q.   Okay.  And then at some point you went        |
|            | 24 | back and said "Is that still on the table"?            |
| 15:02:54   | 25 |     A.   That's my recollection, yeah.                  |

310

15:02:55  1          Q.   And that's what you're reflecting in

         2     this email?

         3          A.   I believe that's correct.

         4          Q.   Okay.  And did Mr. -- did ████ respond

15:03:00  5     to that question?

         6          A.   I can't quite tell from this email.

         7          Q.   And what about from your memory?

         8          A.   I don't recall.

         9          Q.   A little bit above, it says "Some at

15:03:17 10     Ripple felt that the criteria were designed to

        11     exclude XRP."

        12               Do you see that?

        13          A.   I do.

        14          Q.   Who at Ripple are you referring to

15:03:23 15     there?

        16          A.   I don't recall.

        17          Q.   What criteria are you referring to

        18     there?

        19          A.   My recollection is around this time, I

15:03:31 20     guess, you know, Q4 2017, CoinBase published, as I

        21     recall, an application process to have a digital

        22     asset listed on CoinBase.  And I don't remember

        23     what the criteria were.  I remember it being

        24     laudable in its objective, a little bit chaotic in

15:03:50 25     its implementation, because everybody had, you

                                                               311

15:03:53  1    know -- this is kind of the post-ICO window.  And

       2    I think CoinBase was trying to do the right thing,

       3    but didn't execute it as seamlessly as one might

       4    have hoped.

15:04:08  5         Q.   Why did you think they were designed to

       6    exclude XRP, though?

       7         A.   I don't recall what the criteria were so

       8    I don't recall why I wrote that.

       9         Q.   The email is to "Leadership."

15:04:18 10         Do you see that?

      11         A.   I do.

      12         Q.   Who is leadership?

      13         A.   Leadership is an email distribution list

      14    that, generally speaking, just includes all my

15:04:29 15    direct reports.  Chris Larsen would be included on

      16    there and at various times there might have been

      17    other people that were on that list.

      18         Q.   All right.  Eventually CoinBase listed

      19    XRP on or around February 2019, is that correct?

15:04:43 20              MR. SOLOMON:  Objection to form.

      21         A.   It sounds correct.  I -- I don't recall

      22    exactly.

      23         Q.   Speaking of not CoinBase specifically,

      24    but exchanges, did Ripple from time to time enter

15:04:56 25    into agreements with exchanges?

                                                          312

```
15:04:57   1              MR. SOLOMON:  Objection; form.
           2       A.   I think my testimony earlier was I think
           3  there were over 200 exchanges around the world
           4  with XRP of which I think five or six Ripple has
15:05:08   5  had some sort of relationship with.
           6       Q.   The relationship include agreements,
           7  contracts?
           8       A.   Yeah.  That's what I mean by
           9  "relationship."  Yes.
15:05:16  10       Q.   And, generally, some of these provide
          11  for payments to the platforms, for example, with
          12  respect to volume incentives and things of that
          13  nature?
          14              MR. SOLOMON:  Objection; form.
15:05:28  15       A.   I believe that's correct.
          16       Q.   Okay.  And what role, if any, did you
          17  have in entering into those agreements?
          18       A.   Minimal, if any.
          19       Q.   Did you have to approve or sign them on
15:05:39  20  behalf of the company?
          21       A.   That probably depends upon the
          22  materiality.  I don't recall sitting here today
          23  signing any of them or even being involved in
          24  negotiating any of them.
15:05:55  25       Q.   Back to CoinBase.  Who at CoinBase, if
```

313

```
15:06:00   1   anyone, communicated to you their decision that
           2   now they're going to list XRP?
           3                   MR. SOLOMON:  Objection.
           4       A.   I didn't know CoinBase was going to list
15:06:08   5   XRP until it was public.  I actually specifically
           6   asked ████ not to tell us or anyone at Ripple
           7   because I felt like it only invited scrutiny.
           8       Q.   By whom?
           9       A.   The media.  Anybody.  At -- you know, at
15:06:21  10   the time this was going on, every time CoinBase
          11   listed a digital asset, that tended to drive the
          12   price.  I thought the best way to mitigate any
          13   accusations, observations, was just we don't want
          14   to know.
15:06:41  15       Q.   Ripple understood that announcements
          16   about listing of XRP could have an impact on the
          17   price of XRP, right?
          18                   MR. SOLOMON:  Objection.  Are you
          19           asking him if he understood or if the
15:06:51  20           company understood or everybody at the
          21           company?
          22                   MR. TENREIRO:  No, the company.
          23       A.   Well, I mean, when you say "the
          24   company," I mean, I don't know what all the
15:07:02  25   employees at Ripple thought.
```

                                                            314

15:07:03  1          Q.    What did you think?

        2          A.    Well, it was my testimony before.  It's

        3     just that when CoinBase listed a new digital asset

        4     on its platform, my observation of the market was

15:07:15  5     that it drove the price of that digital asset.

        6          Q.    Drove the price up?

        7          A.    And sometimes down.

        8          Q.    And do you have a belief as to why it

        9     would go down?

15:07:27 10          A.    If I had had the foresight, even

       11     hindsight, to be able to explain the gyrations of

       12     the digital asset markets, I would probably be in

       13     a different job.

       14          Q.    But it moved the price in one direction?

15:07:44 15     That was your observation?

       16          A.    Well, my observation was it would drive

       17     volatility in that digital asset.  It sometimes

       18     would drive it up; sometimes it would drive it

       19     down; sometimes it would drive it up, then down.

15:07:55 20     My experience was -- I actually remember a meeting

       21     with the SEC discussing this exact point, as I

       22     recall.

       23          Q.    Did -- did Ripple ent -- enter into a

       24     custodial agreement with CoinBase?

15:08:10 25          A.    I believe so.

                                                              315

15:08:12   1          Q.   For what purpose?

        2          A.   Yeah.   I mean, similar to kind of my

        3   comments around █████████████, anything that is

        4   helping drive the maturity, expansion, growth of

15:08:24   5   the digital asset market, I view that as good for

        6   Ripple.   And so seeing robust custody providers

        7   that worked with institutions and regulators I

        8   viewed as a good thing.

        9          Q.   And did you -- a good thing just for the

15:08:42 10   market generally or for Ripple specifically?

       11          A.   Well, as I've testified, my general view

       12   is if it's good for the market, it's good for

       13   Ripple.

       14          Q.   Okay.   And what conversations did you

15:08:51 15   have with CoinBase -- you, Mr. Garlinghouse -- in

       16   connection with the custody asset -- custody

       17   agreement?

       18          A.   I don't recall having any conversations

       19   with CoinBase about the custody agreement.

15:09:02 20          Q.   Okay.   Did you sign the custody

       21   agreement?

       22          A.   I don't recall.

       23          Q.   After the listing, I think your

       24   testimony is you had asked CoinBase not to tell

15:09:14 25   you about the listing and you found out when the

                                                              316

15:09:17  1   public found out about the listing of XRP, is that
        2   right?
        3        A.   Yeah.  I -- I mean, I'm not sure I agree
        4   with exactly what you said, but I -- I didn't
15:09:29  5   want -- I didn't ask -- I didn't know they were
        6   going to list XRP.  So I think your -- I just --
        7   my answer is I don't want to know.  You guys
        8   should do what you want to do.  If it makes sense
        9   for your business, CoinBase, then you should list
15:09:45 10   XRP.  If it doesn't make sense for your
       11   business --
       12             THE REPORTER:  Wait.  Slow down.
       13             THE WITNESS:  Sorry.
       14             THE REPORTER:  "If it makes
15:09:46 15        sense for your business..."?
       16        A.   You should list XRP.  If it doesn't make
       17   sense for your business, then you shouldn't list
       18   XRP.  I said to the extent you decide to list XRP,
       19   we don't want to know.
15:10:00 20        Q.   And is it your testimony that when it
       21   was announced publicly that XRP -- that CoinBase
       22   was going to list XRP, that you, Mr. Garlinghouse,
       23   did not know that until it was announced publicly?
       24        A.   That's my recollection, yes.
15:10:12 25        Q.   Why the change between negotiating -- or

                                                        317

15:10:15  1    discussing with CoinBase $5 million, potentially

       2    listing, and going to do whatever you want?

       3         A.   You know, when those conversations first

       4    started with CoinBase, there was a lot less

15:10:29  5    liquidity in the XRP markets.  There were far

       6    fewer exchanges.  And CoinBase -- CoinBase's

       7    importance would have been more important.

       8              By the time I, you know, met with █████

       9    ████████ and much later -- you know, and kind of

15:10:53 10    this is -- I guess you said 2019.  You know, by

      11    that time XRP was listed on lots of exchanges

      12    around the world, had much, much, much more

      13    liquidity.  And so the importance of CoinBase,

      14    quite frankly, had gone down in the industry.

15:11:13 15              And I felt ultimately it's in

      16         their capitalistic interest as an

      17         exchange -- given they derive revenue

      18         from trading, it's in their interest to

      19         have more trading.  And if listing XRP

15:11:34 20         fueled that, then they would do that, or

      21         not, based upon their own self-interest.

      22         Q.   How do they derive revenue from trading

      23    of XRP?

      24              MR. SOLOMON:  Objection.

15:11:44 25         A.   How does -- is the question how does

                                                             318

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
15:11:46   1    CoinBase derive revenue from trading?
           2         Q.   Yes.
           3         A.   I'm not an expert on that.  I mean, I
           4    have a basic understanding.  I'm not the right
15:11:54   5    person to --
           6         Q.   No, just your basic understanding.
           7    That's fine.  You know, you said you viewed that
           8    at some point it would be in their capitalistic
           9    interest because they derive revenue.
15:12:06  10              So just what was your understanding of
          11    how an exchange -- you can focus on CoinBase or
          12    not, I'm just curious.  What was your
          13    understanding of how the revenue was derived?
          14              MR. SOLOMON:  Objection.
15:12:16  15         A.   I think my understanding is CoinBase
          16    takes a percentage of -- has a fee on buying or
          17    selling the digital assets they list.  And so
          18    the -- the more trading, the better.
          19         Q.   So you had an understanding that if it
15:12:33  20    was in their financial interest, they would list
          21    XRP based upon their own self-interest
          22    essentially?
          23              MR. SOLOMON:  Objection; form.
          24         A.   Right.  I think I read -- I don't know
15:12:44  25    if it's accurate -- that 17 percent -- when the
```

319

15:12:47   1   SEC decided to sue Ripple and CoinBase

  2   subsequently halted trading of XRP, I believe it

  3   represented 17 percent of their revenue.  XRP

  4   trading represented 17 percent of their revenue.

15:13:00   5   I don't know if it's accurate because I'm not with

  6   CoinBase, but that's what I read.

  7       Q.   Okay.  After CoinBase -- the decision to

  8   list was announced, did you speak to CoinBase

  9   about the decision?

15:13:11 10       A.   I don't believe -- I don't recall.

11       Q.   Is it possible you spoke to them about

12   the decision and just don't recall?

13       A.   I -- I -- I don't recall.

14       Q.   Okay.  Was the custody agreement some

15:13:29 15   sort of olive branch, say, that Ripple extended to

16   CoinBase with -- in connection with its

17   conversations about listing XRP?

18           MR. SOLOMON:  Objection.

19       A.   No.  I viewed the custody agreement as

15:13:39 20   in the interest of the crypto landscape broadly.

21   And if there's robust institutional custody,

22   even -- I mean, obviously they didn't support or

23   list XRP at the time, but the more institutional

24   custody players, the better it is for Ripple's

15:13:56 25   strategy.

320

15:13:56  1        Q.   And was Ripple -- around the time that

2    CoinBase actually did list XRP, which I'm telling

3    you is around February of 2019, was Ripple

4    disinterested in whether CoinBase would list XRP?

15:14:06  5             MR. SOLOMON:  Objection.

6        A.   Well, I think as I testified, I remember

7    speaking to ██████████ and saying "List XRP

8    or don't list XRP, you guys should do what's best

9    for you."

15:14:21 10        Q.   If you -- if you have to choose, which

11    one would you have picked back then?  Would you

12    have preferred them to list it or not?

13             MR. SOLOMON:  Objection; form.

14        A.   Clearly the more -- as I've testified,

15:14:32 15    the more liquidity in the market, the better.  So

16    to the extent CoinBase listed XRP, I viewed that

17    as a positive for the market.

18        Q.   Did the --

19             MR. TENREIRO:  Almost done, Matt.

15:14:45 20             MR. SOLOMON:  Okay.

21        Q.   Did the -- sorry.  So I think I asked

22    you, but let me just make sure I did.

23             After the listing was announced, did you

24    talk to CoinBase about their decision, the basis

15:14:58 25    for their decision?

321

```
15:14:59    1                    MR. SOLOMON:  Objection; asked
            2       and answered.
            3       A.    I don't recall speaking to them.
            4       Q.    Did anyone at CoinBase tell you that the
15:15:05    5   SEC had cleared their decision to list XRP under
            6   the securities laws?
            7                    MR. SOLOMON:  Objection; form.
            8       A.    No.  I don't recall anyone at CoinBase
            9   telling me that the SEC had cleared their
15:15:18   10   decision.
           11       Q.    Because you'd remember something like
           12   that, wouldn't you?
           13                    MR. CERESNEY:  Objection; form.
           14       A.    I -- I -- I don't recall.
15:15:26   15       Q.    My question is, do you think you would
           16   remember if somebody like a CoinBase told you
           17   something like that?
           18       A.    I don't know.
           19       Q.    Okay.  Do you think you would have made
15:15:35   20   a public statement about the SEC clearing XRP for
           21   CoinBase's listing if CoinBase had told you
           22   something like that?
           23                    MR. CERESNEY:  Objection to form.
           24                    MR. SOLOMON:  Objection; form.
15:15:47   25       A.    I -- I -- I mean, the only thing you've
```

                                                                322

15:15:48  1  refreshed in asking these questions, I remember

2  CoinBase created some sort of framework for

3  determining a scoring system for digital assets

4  and they scored XRP at four or something.  And I

15:15:59  5  don't remember what the range was.  And I believe

6  I knew before that CoinBase had met with the SEC

7  in creating that construct.

8            But, again, I think your

9       question is, simply, did I speak to -- or

15:16:14 10       would I remember?  I -- you know, I don't

11       know.

12       Q.   Did anyone tell you that CoinBase's

13  decision to list XRP had been affirmatively

14  cleared by the SEC?

15:16:25 15       A.   In what time frame?

16       Q.   At any time.

17       A.   I think that starts to encroach on

18  attorney-client privilege.

19       Q.   Other than counsel, did anyone tell you

15:16:36 20  that CoinBase's decision to list XRP had been

21  affirmatively cleared by the SEC?

22       A.   I think I read it on Twitter, so I guess

23  yes.

24       Q.   People on Twitter told you?

15:16:46 25       A.   I don't know.  I -- I don't know.

323

```
15:16:49   1                    MR. SOLOMON:  Do you understand
           2         what he means by "affirmatively cleared"?
           3         I just want to make sure you understand
           4         the questions that you're answering.  And
15:16:55   5         if you do, that's perfectly fine.  If you
           6         don't, you need to ask for clarification.
           7         A.   Can you clarify what you mean by
           8    "affirmatively cleared"?
           9         Q.   Well, did anyone tell you that the SEC
15:17:05  10    had approved of CoinBase's decision to list XRP?
          11         A.   I don't recall.
          12         Q.   Okay.  And did that include what you
          13    read on Twitter?  Did anyone on Twitter tell you
          14    that the SEC had approved CoinBase's decision?
15:17:24  15         A.   You asked me a question is there any
          16    period of time.  Certainly during the period of
          17    time -- and this is outside of attorney-client
          18    privilege conversations --
          19         Q.   Yes.
15:17:34  20         A.   -- I have read what I'm sure other
          21    people in this room have read on the Twitterverse,
          22    that people are speculating based upon various
          23    court filings that have become public about
          24    Exchange A meeting with the SEC and then
15:17:46  25    subsequently listing XRP.
```

324

15:17:49   1          Q.   At the time of the listing of XRP, were
         2   you aware of CoinBase meeting with the SEC?
         3          A.   I don't believe so, no.
         4          Q.   Okay.
15:18:00   5          A.   I don't recall, but I'm not aware that I
         6   would have known that.
         7          Q.   Okay.  When --
         8          A.   I don't know why I would have.
         9          Q.   Did CoinBase tell you "We met with the
15:18:07  10   SEC"?
        11          A.   I don't recall.
        12          Q.   Did anyone at the SEC tell you "We met
        13   with CoinBase"?
        14          A.   I don't recall.
15:18:14  15          Q.   Okay.  Did anyone at Ripple tell you
        16   "CoinBase just told us they met with the SEC"?
        17          A.   I don't recall.
        18          Q.   Did anyone at Ripple tell you "The SEC
        19   just told us we met with CoinBase"?
15:18:22  20          A.   I still don't recall.
        21          Q.   Okay.  With respect to the rating --
        22   last question and then we can go on break.
        23               With respect to the rating, do you
        24   recall whether Ripple was classified as one of the
15:18:35  25   most likely to be a security by CoinBase's ratings

                                                                325

15:18:39  1   of the assets they raised -- they rated?  I'm
        2   sorry.
        3              MR. SOLOMON:  I didn't hear that
        4        question.  I'm so sorry.  Would you ask
15:18:43  5         that one more time?
        6        Q.   With respect to the CoinBase rating, do
        7   you recall whether Ripple was classified as one of
        8   the most likely to be a security?  And maybe I
        9   should have said XRP.
15:18:52 10        A.   Yeah.
       11        Q.   Do you recall whether XRP was classified
       12   as one of the most likely to be a security of the
       13   ones they rated?
       14        A.   I remember on the scale they had, it was
15:19:03 15   on the closer to security than -- where I think
       16   they had bitcoin at the lowest point.  They had
       17   it, you know, below the threshold of where they
       18   viewed it as a security, and a whole lot of things
       19   falling to the side, but not as good as bitcoin.
15:19:17 20        Q.   And did you -- and did you find that
       21   out, that rating out, before or after the listing
       22   decision?
       23        A.   I don't recall.
       24        Q.   Okay.
15:19:25 25              MR. TENREIRO:  Let's take a

                                                        326

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
15:19:26    1            break.
            2                    THE VIDEOGRAPHER:  Okay.  Going
            3            off the record, 3:21.
            4                    (Whereupon, a recess is taken.)
09:50:31    5                    THE VIDEOGRAPHER:  Okay.  Back on
            6            at 3:39.
            7                    (Whereupon, exhibit is received
            8            and marked Garlinghouse Deposition
            9            Exhibit 127 for identification.)
15:38:10   10    BY MR. TENREIRO:
           11        Q.   Let me show you Exhibit 127,
           12    Mr. Garlinghouse.
           13                    MR. TENREIRO:  This is one of the
           14            ones I only have four copies of so I
15:38:16   15            apologize in advance.  In fact, I just
           16            gave you my copy.
           17                    (Pause)
           18    BY MR. TENREIRO:
           19        Q.   Okay.  So earlier I had asked you about
15:38:47   20    whether Ripple had offered $1 million to Gemini to
           21    list XRP.
           22            Do you recall that?
           23        A.   No.
           24        Q.   Okay.  Did Ripple offer Gemini a million
15:38:56   25    dollars to list XRP?
```

327

15:38:58 1       A.   Based upon this e-mail, it looks like

2   Patrick Griffin offered Gemini a million dollars

3   to list XRP.

4       Q.   Did Patrick -- Patrick Griffin have the

15:39:06 5   authority to do that without some sort of

6   authorization?

7       A.   I don't recall.

8       Q.   And you were copied on this e-mail,

9   correct?

15:39:26 10       A.   Yes.

11       Q.   Okay.  Setting aside the email of

12   payments for listing XRP, is it fair to say that

13   Ripple facilitated some exchanges listing XRP

14   with, like, integration services, support, things

15:39:39 15   of that nature, not necessarily monetary?

16       A.   I think that's fair.

17       Q.   Okay.  And did Ripple provide that sort

18   of help with respect to all the 200 exchanges that

19   you mentioned that listed XRP at some point or

15:39:53 20   with respect to only a fraction of them?

21               MR. SOLOMON:  Objection; form.

22       Q.   Again, not -- not the monetary stuff,

23   just helping with integrating or things of that

24   nature.

15:40:02 25               MR. SOLOMON:  Objection; form.

328

15:40:07  1        A.    My understanding is Ripple had nothing

        2    to do with the listing of XRP on the vast majority

        3    of those 200 exchanges and change that have chosen

        4    to list XRP.

15:40:17  5        Q.    That's fine.

        6              What percentage of that 200 or so did

        7    Ripple provide integration support or something of

        8    that nature that's not necessarily monetary, but

        9    some support?

15:40:28 10        A.    I don't know.

       11        Q.    And who would know?

       12        A.    I don't know.

       13        Q.    Okay.  Let's move on from that.

       14              I think earlier you testified that you

15:40:45 15    sold your XRP for fiat and only for U.S. dollars,

       16    is that correct?

       17        A.    I believe that was my testimony.  I

       18    believe -- to the best of my recollection, I only

       19    recall selling my XRP for U.S. dollars.

15:41:01 20        Q.    Okay.  And when you were CEO, what about

       21    Ripple's sales of -- of XRP?  Were those in

       22    exchange for -- for U.S. dollars or for other

       23    assets?

       24              MR. SOLOMON:  Objection; form.

15:41:15 25        A.    I don't know.  I don't recall.

                                                            329

15:41:16  1          Q.   Well, while you have been CEO, are you
        2    aware that Ripple sold its XRP for dollars?
        3          A.   Yes.
        4          Q.   Okay.  And did you approve, as Ripple's
15:41:29  5    CEO, XRP sales?
        6          A.   Yes.
        7          Q.   Okay.  And sitting here today, do you
        8    know whether XRP -- whether Ripple sold XRP for
        9    other digital assets such as bitcoin?
15:41:45 10          A.   I believe the answer's yes, but I don't
       11    really know.
       12          Q.   Would you know the order of magnitude of
       13    the amount of bitcoin Ripple sold its XRP for?
       14          A.   No.
15:41:54 15          Q.   Okay.  And since, you know -- up until
       16    today -- I think you said your last sale of XRP
       17    was around -- your personal, Mr. Garlinghouse,
       18    sale of XRP, what is the total amount in U.S.
       19    dollars that you've sold?
15:42:16 20          A.   I don't know.
       21          Q.   Ballpark.
       22          A.   My -- my ballpark estimate is from what
       23    the SEC has asserted in their litigation.
       24          Q.   So around $159 million?
15:42:31 25          A.   I believe that's the number that the SEC

                                                            330

15:42:34   1    has put forth.  I have not audited that.

2         Q.   Do you have your own -- before you, you

3    know, saw the SEC's allegation about the number,

4    did you have your own sort of ballpark of how much

15:42:47   5    you sold, or no?

6         A.   I did not.

7         Q.   You didn't keep track of it?

8         A.   I did not personally keep track of it.

9         Q.   Did you have someone keep track of it

15:42:59  10    for you?

11         A.   Indirectly I have tax professionals and

12    accounting professionals that work for me which

13    would have had that visibility.

14         Q.   Okay.  And so sitting here today, to the

15:43:17  15    best of your understanding, it -- it's around $159

16    million?

17         A.   I have no reason to doubt the accounting

18    of the SEC, but I also have never taken the time

19    to audit that information.

15:43:33  20         Q.   Why not?

21         A.   Why?

22         Q.   Okay.  That's fine.

23         A.   I'm not trying to be argumentative.

24         Q.   Why bother?  Okay.

15:43:48  25         A.   I don't think it has a bearing on

331

15:43:50  1   whether or not XRP's a security.

2        Q.   Oh, I -- I certainly didn't mean to

3   imply that.  I -- I just was asking why you had

4   never done that, if there was any particular

15:44:01  5   reason.  You know, I was too busy.  It didn't

6   matter to me.  Was there any particular reason?

7   Maybe there wasn't.

8        A.   I've never added up how much I've paid

9   in taxes for the last, you know, several years.  I

15:44:11 10   don't, you know --

11        Q.   Probably a good idea.

12             So did -- sorry.

13             Ripple's sales of XRP since you've been

14   CEO, how much has Ripple sold for -- you know, how

15:44:39 15   much in U.S. dollars has Ripple obtained for the

16   XRP it has sold?

17        A.   During my -- I don't know.

18        Q.   Could you ballpark that?

19        A.   I mean, I believe the SEC's litigation

15:44:56 20   asserts that it's order of magnitude of $600 or

21   $700 million.  I'm actually not sure about that

22   either.  But I have no reason to believe it's

23   materially different.

24        Q.   Is the -- I think you said you started

15:45:12 25   selling XRP sometime in 2017.  Is that fair?

                                                            332

15:45:15   1         A.   Yes, I believe that was my testimony.
           2         Q.   And then I think your last sale was in
           3    Dec -- around December 2020?
           4         A.   Yes.  That's -- to the best of my
15:45:27   5    recollection, yes.
           6         Q.   In that period of time, between the
           7    first and last sales of XRP for --
           8    Mr. Garlinghouse, for you, did you -- was -- were
           9    proceeds from your sales of XRP the largest source
15:45:36  10    of your income?
          11         A.   I mean, like many things in life, it's
          12    a -- subject to your perspective and how you value
          13    option grants and equity and vested equity and
          14    those types of things.  In terms of what I
15:45:57  15    reported on my tax returns, the answer to that
          16    question would be yes.
          17         Q.   And can you give me the order of
          18    magnitude, what was, like, the second largest
          19    source of your income that you reported?  Was it
15:46:08  20    your salary or was it the sale of some assets or
          21    what was it?
          22              MR. SOLOMON:  I just want to
          23         caution you at this point to just maintain
          24         fidelity with the judge's order where she
15:46:18  25         expressly said that the SEC -- it would

                                                            333

15:46:22   1          not be appropriate for the SEC to try to

           2          measure Mr. Garlinghouse's sales of XRP

           3          against other aspects of his financial

           4          portrait in order to try to build some

15:46:34   5          motive argument.

           6               I'm going to give you a little

           7          bit of latitude on this.  I just want to

           8          make sure you're not going around that

           9          order.  I'd just remind you of that.

15:46:43  10     A.   I don't know.

          11     Q.   Would that be reflected, I guess, in

          12  your tax returns or your bank records or where?

          13     A.   The first place I'd probably look is my

          14  tax returns.  My -- my salary would not have been

15:47:05  15  the second highest source of income.  But I am an

          16  investor in a bunch of private companies, in

          17  various investment funds.  Some of those have been

          18  very successful and so I don't know.

          19     Q.   Okay.  Without getting into the details

15:47:22  20  of what those investments are, I'm just trying to

          21  get order of magnitude.  Like, was it, you know, a

          22  small fraction compared to the XRP proceeds or was

          23  it about the same amount, for example, as your XRP

          24  proceeds?

15:47:41  25     A.   I -- I -- I don't know exactly how to

                                                              334

15:47:42  1    compare those, you know.  Maybe there's one, just,

2    example.  I invested in a start-up called ▇▇▇▇

3    ▇▇▇▇▇, started by a guy who used to work for me,

4    and it yielded, you know, somewhere north of $▇ to

15:47:59  5    $▇▇▇▇▇ of proceeds from a relatively small

6    investment.

7            So, you know, how does that compare in

8    any one year against XRP grants?  You know, I --

9    we'd have to go year by year and compare various

15:48:10  10   sources of income and what is sold and not sold.

11   So I don't know how to answer the question

12   exactly.

13        Q.   All right.  Fair enough.  Let's move on.

14            So going back to Ripple's sales of XRP,

15:48:22  15   is it fair to say Ripple sought to raise U.S.

16   dollars by its sales of XRP?

17        A.   With -- in what time period, I guess?

18        Q.   While you were CEO.

19        A.   So while I have been CEO, Ripple has

15:48:45  20   sold XRP to its customers and Ripple has sold XRP

21   programmatically.  As I believe the SEC is aware,

22   we no longer sell XRP programmatically.  I think,

23   as I testified earlier, we have sold XRP both for

24   dollars as well as, I think in some occasions, for

15:49:05  25   other digital assets.

335

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

15:49:06   1          Q.    And when you reference sales to
           2     customers, are you talking about customers that
           3     use a product that at some point was called ODL?
           4          A.    Yes, but a specific -- you know, there's
15:49:21   5     a piece of -- one of the exhibits earlier
           6     referenced XR -- or XRP-O, XRP-Origination.  We
           7     now call that Wallet Send.  And that would be
           8     sales of XRP to customers who are using it for
           9     payment flows.
15:49:37  10          Q.    And when did those sales begin?
          11          A.    I think the summer of 2020.
          12          Q.    Okay.  Before those sales, for example,
          13     with respect to Ripple's programmatic sales of
          14     XRP, was Ripple seeking to raise U.S. dollars in
15:49:56  15     exchange for its XRP sales -- for its XRP?
          16          A.    Ripple was seeking to sell XRP in
          17     exchange for dollars.
          18          Q.    Okay.  Do you know how many decimals a
          19     unit of XRP is divisible into?
15:50:11  20          A.    How many decimals?
          21          Q.    Yeah.  How many zeroes can you get to?
          22          A.    I don't know.
          23          Q.    Do you know what the smallest unit of
          24     XRP is called?
15:50:18  25          A.    I think it's called a drop.

                                                              336

15:50:19   1          Q.   And so do you know what fraction of one

           2   unit of XRP a drop is?

           3          A.   I don't know.

           4          Q.   Okay.  Are you -- is one unit of XRP

15:50:38   5   distinguishable from any other unit of XRP as far

           6   as you know?

           7          A.   Effectively, I think that's true.  I

           8   think -- I suppose there's some technical argument

           9   that an individual unit of XRP sits in one

15:50:55  10   specific area of a blockchain, which may

          11   distinguish it from another, but I don't know the

          12   intricacies of that.

          13          Q.   Beyond that, is there anything else that

          14   might distinguish one unit from another as far as

15:51:07  15   you know?

          16          A.   I can't think of anything right now.

          17          Q.   Okay.  When -- when there is a change in

          18   the price of XRP in the market, does that change,

          19   as far as you know, apply to all the units of XRP

15:51:19  20   or does it apply to some of them?

          21               MR. SOLOMON:  Objection; form.

          22          A.   I believe it applies to all of them.

          23          Q.   Okay.  And have you ever had any

          24   different understanding than that?

15:51:41  25          A.   I mean, I think I'm confused by the

                                                                337

15:51:45 1    question.  Are there different prices for

2    different units of XRP?

3         Q.   Yeah.

4         A.   I mean, I guess it depends a little bit

15:51:55 5    on -- I mean, there have been times in my

6    experience where some exchanges might have a

7    slightly different price than another exchange

8    despite the fact that there are effectively

9    indistinguishable units of XRP between

15:52:12 10   exchanges --

11                   THE REPORTER:  Slow down.

12               "There are effectively

13                indistinguishable"?

14        A.   Unit of XRP between the exchanges.  And

15:52:15 15   that's where you have market makers facilitate --

16   you know, they're trying to make money by trading

17   the difference.

18        Q.   Okay.  In connection with being Ripple's

19   CEO, did you approve sales targets for XRP?

15:52:43 20                   MR. SOLOMON:  Objection to form.

21        A.   I'm not sure I would characterize them

22   as targets as much as forecasts.  Maybe those are

23   similar, but...

24        Q.   Well, did Ripple ever have sales targets

15:53:01 25   with respect to sales of XRP?

338

```
15:53:02   1                    MR. SOLOMON:  Objection; form.
           2        A.   I expect there are documents which would
           3   have referred to a sales target.  I think in my
           4   mind that would have been relatively
15:53:17   5   indistinguishable from a sales forecast of what we
           6   expected to be sold of XRP in a certain time
           7   period.
           8        Q.   Programmatic sales were based on volume?
           9                    MR. SOLOMON:  Objection; form.
15:53:35  10        A.   That's correct.  Programmatic sales were
          11   based upon daily market activity of the overall
          12   XRP market.
          13        Q.   And so to the extent you might have had
          14   a sales forecast, was Ripple forecasting what they
15:53:46  15   thought the volume would be, in essence?
          16        A.   In essence.
          17        Q.   Okay.  Did Ripple grant XRP to employees
          18   from time to time when you were CEO?
          19        A.   Yes.
15:53:58  20        Q.   Did you approve those grants?
          21        A.   Yes.
          22        Q.   To whom did Ripple offer XR -- I'm
          23   sorry.
          24             To whom did Ripple grant XRP while you
15:54:08  25   were CEO that you might have approved?
```

339

15:54:13    1          A.    I wouldn't know how to start that list.

            2    I -- you know --

            3          Q.    What about your direct reports?

            4          A.    I would guess that most, if not all, of

15:54:27    5    my direct reports have an XRP grant that vests

            6    over time.

            7          Q.    To the extent that you were involved

            8    with, you know, awarding them these grants that

            9    vest over time, why did you do it?  Why did you

15:54:42   10    grant them XRP?

           11               MR. SOLOMON:  Objection; form.

           12          A.    As a compensation tool.

           13          Q.    Okay.  Why would you want to compensate

           14    them with XRP as opposed to U.S. dollars?

15:54:56   15               MR. SOLOMON:  Objection; form.

           16          A.    I think people who work at Ripple are

           17    generally interested in digital assets and sought

           18    to receive, sometimes hold, and generally

           19    participate in the XRP market.

15:55:19   20          Q.    In fact, sometimes -- I think you

           21    referenced that, but sometimes individual

           22    employees at Ripple asked you to be compensated in

           23    XRP, is that right?

           24               MR. SOLOMON:  Objection; form.

15:55:28   25          Q.    Mr. Vias?

                                                                    340

15:55:29   1                    MR. SOLOMON:  Objection; form.

           2        A.    Mr. Vias did ask to receive various

           3   compensation denominated in XRP.

           4        Q.    To the extent that you approved granting

15:55:41   5   XRP to employees, was one of the reasons to do

           6   that to closer align the employees' interests with

           7   the company's interest?

           8                    MR. SOLOMON:  Objection; form.

           9        A.    My own philosophy about compensation in

15:56:00  10   Silicon Valley is that the best way to align

          11   incentives is the long-standing kind of tradition,

          12   if you will, of using equity.

          13             And so, to my knowledge, every employee

          14   that joins Ripple receives equity either in the

15:56:17  15   form of an option or in an RSU.  And I think

          16   that's the best way to align interests between

          17   employees and shareholders.

          18        Q.    Now -- no, I understand your testimony

          19   about the best way to align interest.  My question

15:56:32  20   is slightly different, which is, to the extent

          21   that you granted employees XRP, was one of the

          22   reasons to further align their interests with the

          23   interests of the company?

          24                    MR. SOLOMON:  Objection; form.

15:56:47  25        A.    I -- I guess the distinction I'm making

                                                                    341

```
15:56:49   1    is I guess they're already fully aligned if you --
           2    they have equity.  And I don't know that it
           3    further -- if you already have kind of fully
           4    aligned incentives, can you further align it?  You
15:56:59   5    know, I viewed it as a compensation tool.
           6         Q.   Okay.  And did someone recommend to you
           7    that you grant XRP to employees from time to time
           8    as compensation?
           9         A.   I suspect, yes.
15:57:14  10         Q.   Who?
          11         A.   I don't recall.
          12         Q.   Okay.  Let's look at Exhibit 1 real
          13    quick.
          14              (Whereupon, exhibit is received
15:57:21  15          and marked Garlinghouse Deposition
          16          Exhibit 1 for identification.)
          17    BY MR. TENREIRO:
          18         Q.   This is an employment offer letter.  And
          19    I'm not going to ask you much about it -- it would
15:57:32  20    take too much time to read it, I think -- but I do
          21    want to see if you see your signature in any of
          22    these pages.
          23         A.   I do see my signature.
          24         Q.   Okay.  And do you see that on which
15:57:50  25    page?
```

342

15:58:01 1      A.   In my document they're not numbered.

2      Q.   Well, there's a Bates at the bottom

3  where it says GARL_Civil_465.  Got it?

4      A.   471.  Sorry.

15:58:08 5      Q.   What about -- okay.  471 has your

6  signature?

7      A.   As does 465.

8      Q.   Okay.  If you go to the first page, is

9  it -- does it refresh your recollection that when

15:58:28 10  you started at Ripple, you got a salary, a $▮

11  ▮▮▮▮▮▮ XRP grant structured as a four-year loan,

12  and ▮▮▮▮▮▮▮ shares of the company?

13          MR. SOLOMON:  If you're going to

14      ask him questions about the document, I'm

15:58:41 15      just going to ask that he has an

16      opportunity to read the entire document.

17      I'm not being difficult about that.  I

18      just do want him to read it, though.

19  BY MR. TENREIRO:

15:58:51 20      Q.   Yeah.  Go ahead.

21          MR. TENREIRO:  It's up to you.  I

22      don't think he needs to read the exhibit,

23      but it's a pretty straightforward front

24      page.

16:01:26 25      (Pause)

343

```
16:01:26   1    BY MR. TENREIRO:
           2         Q.   Are you reading the Appendix?
           3         A.   Yeah.  It references the exhibits, so I
           4    was going to take a quick look.
16:01:53   5         Q.   Okay.
           6              (Pause)
           7         A.   Okay.
           8         Q.   Okay.  When you started working at
           9    Ripple, is it fair to say you received a salary in
16:05:03  10    dollars, an XRP loan as it's described here, and
          11    shares in the company?
          12              MR. SOLOMON:  Objection; form.
          13         A.   No.
          14         Q.   What did you receive?
16:05:14  15         A.   I received a salary, bonus and equity.
          16         Q.   The bonus was -- the salary was the U.S.
          17    dollars and the XRP?
          18         A.   No.
          19         Q.   What was the salary?
16:05:28  20         A.   I believe it's correct.  It was
          21    $██████████
          22         Q.   And what is that ████████████ XRP
          23    structured as a four-year loan?
          24         A.   I don't know.
16:05:37  25         Q.   Did you receive that ████████████ XRP?
```

                                                              344

```
16:05:43    1            A.    Not in 2015.

            2            Q.    In the bonus pool, your bonus is based

            3     on, at least for Q1, for the year ending Q1 2018,

            4     ███ percent of XRP revenue.

16:05:53    5                  Do you see that?

            6            A.    Yes.

            7            Q.    And did you receive a bonus based on ███

            8     percent of XRP revenue?

            9            A.    I expect I did, yes.

16:06:02   10            Q.    Okay.  So the higher the XRP revenue for

           11     Ripple, the higher the bonus for you?

           12            A.    Yes.

           13            Q.    Okay.  And is it fair that in 2016 you

           14     entered into sort of an XRP unit bonus award or a

16:06:17   15     grant?  I think we talked -- touched upon it

           16     earlier briefly.

           17            A.    I -- I -- I -- nothing in this document

           18     references that.

           19            Q.    Separate from that document.  You can

16:06:31   20     forget that one.

           21                  Is it fair that at some point later in

           22     time, you entered into an agreement with Ripple

           23     whereby if you met certain metrics, you would get

           24     XRP that vested over a four-year term?

16:06:43   25            A.    I -- I recall the macro construct.  When
```

345

16:06:46  1    I was promoted to CEO, I received -- actually, to

       2    be honest, I don't know exactly when I received

       3    that, but, yes, I received a XRP grant.

       4         Q.   Who negotiated that?

16:06:58  5         A.   No one.

       6         Q.   It was just given to you by someone?

       7         A.   That's correct.

       8         Q.   By whom?

       9         A.   Chris Larsen.

16:07:04 10         Q.   You did not negotiate it with him?

      11         A.   No.

      12         Q.   Did you discuss it with him before he

      13    gave it to you?

      14         A.   No.

16:07:12 15         Q.   Did you discuss it with him at any time?

      16         A.   Yes.

      17         Q.   And what did you discuss with him about

      18    this grant?

      19         A.   Well, as the grant -- the implementation

16:07:28 20    of the grant became complicated for the company

      21    because of how taxes are accrued, earned, and paid

      22    by the company.  And so we certainly had

      23    conversations about how to mitigate those risks,

      24    challenges, to the company.

16:07:52 25         Q.   What do you mean when you say it "became

                                                              346

16:07:54  1    complicated for the company"?
          2         A.   It became complicated for the company
          3    because the dollars involved became large.
          4         Q.   Okay.  So it became complicated for the
16:08:09  5    company how it would pay taxes on these grants?
          6         A.   That's correct.
          7         Q.   Where it would get the dollars to pay
          8    the taxes?
          9         A.   Yes.
16:08:18 10         Q.   Okay.  At any point in time, did the IRS
         11    accept XRP to pay taxes, to pay your taxes?
         12         A.   Not to my knowledge.
         13         Q.   Okay.  So the macro level of the grant,
         14    it vested over four years, is that right?
16:08:35 15         A.   Yes.  My recollection, top of mind, is
         16    that the vesting construct was more complicated
         17    than that.
         18         Q.   What was the vesting construct?
         19         A.   I don't recall exactly.
16:08:45 20         Q.   Okay.  Did you have to meet a certain
         21    metric of how long you'd been at the company?
         22         A.   Yes.  My -- my recollection is part of
         23    the vesting was a construct around time-based
         24    vesting.
16:08:59 25         Q.   Okay.  And was the other part based

                                                             347

```
16:09:01   1   around volumetric -- a volume metric for XRP?
           2       A.   I -- I believe that is correct.
           3       Q.   Okay.  And what about was there a part
           4   of the vesting that had to do with a volume weight
16:09:13   5   average price for XRP?
           6       A.   You'd have to explain that a little.  I
           7   don't know.  I don't know.
           8       Q.   Sitting here today you don't know?
           9       A.   No.
16:09:28  10       Q.   Okay. Let's move on.  Well -- yeah,
          11   let's move on.
          12               MR. TENREIRO:  Let's look at
          13           Exhibit 15, please.
          14               (Whereupon, exhibit is received
16:09:54  15           and marked Garlinghouse Deposition
          16           Exhibit 15 for identification.)
          17   BY MR. TENREIRO:
          18       Q.   Here you go.  Can you pass some of
          19   those --
16:10:00  20               MR. SOLOMON:  Can we go off the
          21           record for 30 seconds --
          22               MR. TENREIRO:  Sure.
          23               MR. SOLOMON:  -- just 30 seconds?
          24               MR. TENREIRO:  Sure.
16:10:04  25               THE VIDEOGRAPHER:  Going -- going
```

348

```
16:10:04   1            off the record at 4:11.

           2                   (Pause)

           3                   THE VIDEOGRAPHER:  Okay.  Back on

           4            at 4:12.

16:11:01   5   BY MR. TENREIRO:

           6        Q.   All right.  Can you please take a look

           7   at the exhibit?

           8                   MR. TENREIRO:  And, I think,

           9            Matt, you have some of the copies that --

16:11:05  10                   MR. SOLOMON:  Oh, yeah.

          11                   MR. TENREIRO:  -- that you can

          12            pass down.  Thank you.

          13                   MR. SOLOMON:  Okay.

          14                   MR. TENREIRO:  That one is for

16:11:07  15            Bridget.

          16                   THE WITNESS:  She's got one.

          17                   MR. TENREIRO:  She's got it?

          18                   THE WITNESS:  Yeah.

          19                   MR. TENREIRO:  There's more.

16:11:16  20                   All right.  Just for the record,

          21            this is ███ 58119, a three-page

          22            document.

          23                   THE WITNESS:  Sorry?

          24                   MR. SOLOMON:  I was just saying

16:11:27  25            give it back.  Sorry.
```

349

```
16:11:34   1    BY MR. TENREIRO:

           2        Q.   Have you read it?

           3        A.   No.

           4        Q.   Okay.

16:12:49   5        A.   Do you have an extra pen?

           6        Q.   Just if you mark that --

           7        A.   You can have it.

           8        Q.   Okay.  It's better if you don't.

           9        A.   Oh.

16:13:01  10             MR. SOLOMON:  Don't --

          11        Q.   It's better if you don't.

          12        A.   All right.

          13             MR. SOLOMON:  If you want to make

          14        a check or a slash, that's fine.  Don't

16:13:07  15        put words on it.

          16             THE WITNESS:  Sorry.

          17             MR. SOLOMON:  Whatever helps you

          18        absorb it is okay.

          19             THE WITNESS:  All right.

16:13:15  20             (Pause)

          21        A.   Okay.

          22        Q.   Okay.  Mr. Garlinghouse, from time to

          23   time, is it fair to say that you provided, you

          24   know, quotes for the press with respect to Ripple

16:14:22  25   and XRP such as what we see in this exhibit?
```

                                                                 350

16:14:27    1          A.    Yes.

            2          Q.    And, again, I think we discussed this

            3    briefly, but from time to time you appeared on

            4    television -- CNN, CNBC -- to talk about Ripple

16:14:35    5    and XRP, is that right?

            6          A.    Yes.

            7          Q.    And when you spoke publicly about Ripple

            8    or XRP, you spoke truthfully, right?

            9          A.    Yes.

16:14:45   10          Q.    You spoke -- and when you stated your

           11    beliefs, you stated your true beliefs at the time,

           12    is that correct?

           13          A.    Yes.

           14          Q.    Okay.  Here you say "We have had a

16:14:55   15    significant rally in XRP prices," but is -- "but

           16    it is reflective of a lot of work we have done to

           17    make Ripple a very compelling solution."

           18                Do you see that?

           19          A.    Yes.

16:15:06   20          Q.    Okay.  Is it fair to say that in April

           21    of 2017, you expressed to your mark -- to the

           22    market your view that part of the increase in

           23    XRP's price was due to Ripple's efforts?

           24                MR. SOLOMON:  Objection; form.

16:15:21   25          A.    At -- at various times, I would say,

                                                                    351

16:15:23   1     particularly in 2017, I believed, in trying to
           2     understand the market activity, that Ripple's
           3     activity was being positively received.
           4         Q.    In trying to understand the market
16:15:46   5     activity with respect to XRP?  Is that what you're
           6     talking about?
           7         A.    Yep.
           8         Q.    Okay.  And are you talking about in part
           9     of the market activity with respect to XRP's
16:15:54  10     price?
          11         A.    In part.
          12         Q.    Okay.  And at some point did your -- did
          13     this belief change, the belief that in market
          14     activity -- that Ripple's activity was being
16:16:11  15     positively receive -- received?
          16         A.    Yes.
          17         Q.    Was that after April 2018?
          18         A.    I -- I don't recall.
          19         Q.    Do you recall if it was before April
16:16:26  20     2018?
          21         A.    I don't recall.
          22         Q.    Okay.  Do you recall what prompted the
          23     change?
          24         A.    As time has gone by in my kind of six
16:16:37  25     and a half years of watching crypto markets more

                                                              352

16:16:41   1   attentively having joined Ripple, I'm not clear

2   what drives any digital asset, including XRP.  And

3   as the article highlights, which I was going to

4   underline, you know, there's -- even

16:17:02   5   contemporaneously, obviously as evidenced by the

6   article, there's disagreement about what's driving

7   the XRP market.

8         Q.   Okay.  In the article they quote people

9   thinking there's manipulation?

16:17:20  10         A.   Well, they quote people suggesting

11   that -- a number of different things.  One of the

12   things I think there's somebody quoted -- I have

13   to go back and find it -- of saying there should

14   be a pump-and-dump.

16:17:32  15         Q.   Right.

16              But your belief in April of 2017 was

17   that there was some relationship between price

18   activity and Ripple's own efforts, correct?

19              MR. SOLOMON:  Objection.

16:17:43  20         A.   Well, first of all, I think you just

21   said 2018 and this --

22         Q.   2017.

23         A.   -- email is from 2017.

24         Q.   2017.

16:17:50  25         A.   In -- in 2017 I think I had the

353

16:17:53  1    misunderstood belief that there was some

       2    rationality to the crypto markets, of which I

       3    still am not clear there is.

       4         Q.   And what I'd asked you earlier was at

16:18:03  5    what point did that belief change?  I think you

       6    said as time has gone by, you know, you're not

       7    clear what drives any digital asset.  But what I'm

       8    trying to figure out is at what point did you go

       9    from believing that there was a relationship

16:18:18 10    between Ripple's efforts and XRP's price and

      11    discuss -- deciding that you just don't know

      12    what's clear?

      13              MR. SOLOMON:  You're building

      14         words into your question, too.  I think if

16:18:27 15         you could just put the question to him

      16         instead of the preamble and the windup

      17         with your gloss, it would be -- I think

      18         make for a clearer record.

      19    BY MR. TENREIRO:

16:18:36 20         Q.   At what point did you --

      21              MR. SOLOMON:  I don't think he

      22         ever used the words "Ripple's efforts,"

      23         for example.  I'm not trying to be

      24         difficult.  But if you just ask him

16:18:47 25         questions about what he thought, he can

                                                          354

```
16:18:49   1            explain in his own words what he believed
           2            to be the case at this point in time.
           3     BY MR. TENREIRO:
           4          Q.    You -- you testified you believed in
16:18:53   5     2017, in trying to understand the market activity,
           6     that Ripple's activity was being positively
           7     received.
           8               At what point in time did that
           9     understanding change?
16:19:05  10          A.    You asked that earlier.  I think I
          11     testified I don't know.
          12          Q.    Okay.  Can you pinpoint it at all by
          13     year?
          14          A.    No.
16:19:17  15          Q.    Okay.  The -- the article -- so you --
          16     you provided this quote to ███████, right?
          17          A.    I don't know.
          18          Q.    You were aware that this quote was
          19     provided as it was told to you by ████████
16:19:32  20     ██████?
          21               MR. SOLOMON:  Objection.
          22          A.    I have no recollection.
          23          Q.    ████████ says "I don't see any
          24     glaring inaccuracy in the piece, but let me know
16:19:43  25     if you disagree."
```

355

16:19:44  1          Do you see that?
        2      A.    Yes.
        3      Q.    And you responded "I agree on all
        4  points," right?
16:19:49  5      A.    Yes.
        6      Q.    You did not disagree that there were no
        7  glaring inaccuracies?
        8      A.    We can -- you know, I mean, as I read
        9  the article today, I identify inaccuracies.  We
16:20:03 10  can debate whether or not they're glaring.  And
       11  what I thought in 2017, I can't recall.
       12      Q.    Such as the consistent reference to
       13  Ripple instead of XRP?  Is that one of the
       14  inaccuracies you would identify today?
16:20:16 15      A.    That would be one example that, you
       16  know, market participants, particularly in 2017,
       17  had confusion around.
       18      Q.    In fact, the piece refers to "What's
       19  Driving Ripple's Price to All-Time Highs,"
16:20:28 20  correct?  That's the title?
       21      A.    That is the title, yes.
       22      Q.    And then it says, in the second
       23  paragraph of the piece, "Ripple has surged more
       24  than 1,000 percent."
16:20:42 25          Do you see that?

                                                            356

16:20:46  1        A.   No.

          2        Q.   It says "The cryptocurrency that powers

          3   the distributed Ripple Consensus Ledger, a

          4   business-focused distributed ledger technology

16:20:55  5   platform developed by San Francisco start-up

          6   Ripple, has surged more than 1,000 per over the

          7   last 30 days."

          8        A.   Correct.

          9        Q.   Is that a reference to XRP?

16:21:03 10        A.   I believe that's what the author

         11   references, yes.

         12        Q.   On the second page, right before

         13   "Growing Credibility," it says "As for the decline

         14   in price that soon followed" -- "that soon

16:21:21 15   followed, analysts said this may have marked a

         16   period of profit taking where long-term Ripple

         17   holders sold and brought back at a lower price to

         18   increase the return on their investment."

         19             Do you see that?

16:21:32 20        A.   Yes.

         21        Q.   And that reference to Ripple is a

         22   reference to XRP?

         23        A.   I -- I believe that's correct.

         24        Q.   Would you agree that it was common in

16:21:40 25   2017 for market participants to refer to XRP and

                                                            357

```
16:21:46   1   Ripple interchangeably?
           2              MR. SOLOMON:  Objection; form.
           3        A.   I think in 2017 uneducated market
           4   participants mistakenly conflated Ripple and XRP,
16:21:59   5   and Ripple worked hard to combat and clarify that.
           6        Q.   When did Ripple begin to work hard to
           7   combat and clarify that?
           8        A.   I remember in my -- I mean, earlier than
           9   2017.
16:22:13  10        Q.   And why didn't you combat it in this
          11   article, or did you?
          12              MR. SOLOMON:  Objection; form.
          13        A.   I don't recall.
          14        Q.   Okay.  But you began combating that
16:22:25  15   before 2017 is your recollection?
          16        A.   I am very confident that from the
          17   earliest days of Ripple, we sought to reduce, and
          18   ideally eliminate, the confusion through many
          19   media outlets.
16:22:44  20        Q.   The confusion about equating Ripple and
          21   XRP?  Is that what you're talking about?
          22        A.   That's correct.
          23        Q.   And when you say early Ripple days, you
          24   mean early when you joined, correct?
16:22:53  25        A.   That's correct.
```

358

16:22:54   1          Q.    And you said many --

           2          A.    Although, actually, my vague

           3     recollection is, even before I arrived, that

           4     employees had sought to clarify.  One

16:23:03   5     manifestation of that would be CoinMarketCap,

           6     which listed XRP as -- and used "Ripple" in the

           7     name.

           8          Q.    Called them Ripples?

           9          A.    I don't believe CoinMarketCap called

16:23:17  10     them Ripples.

          11          Q.    Just called them Ripple?

          12          A.    I -- I don't recall.  I remember

          13     encouraging CoinMarketCap to clarify and correct

          14     that.

16:23:25  15          Q.    In 2017, at least with respect to this

          16     article, do you recall if you engaged in that

          17     effort to make that clarification?

          18          A.    I -- I don't recall as it relates to

          19     this particular article.  I'm certain that if we

16:23:38  20     looked at contemporaneous emails, we'd find scores

          21     of emails fighting the good fight, trying to get

          22     corrections, which, frankly, persist to some

          23     degree today.

          24          Q.    That confusion persists today?

16:23:52  25          A.    I think that there are some media

                                                                359

```
16:23:55  1    outlets which incorrectly will quote a price and
          2    say Ripple when it's not a price of Ripple.
          3         Q.   Okay.  So you -- you would say there's
          4    probably scores of emails that reflect this --
16:24:17  5    these efforts?
          6         A.   I'm hazarding a guess, but, yeah.
          7         Q.   And would that be true after 2017?  So
          8    do you think Ripple engaged in scores of efforts
          9    to correct the impression in the market or the
16:24:33 10    equation of Ripple and XRP?  Do you think that's
         11    true in 2018?
         12              MR. SOLOMON:  Objection to form.
         13         Q.   Let me start again.
         14              Did Ripple in the year 2018 engage in
16:24:44 15    efforts to correct the impression in the market
         16    equating Ripple and XRP?
         17         A.   Yes.
         18         Q.   Did Ripple engage in those efforts in
         19    2019?
16:24:58 20         A.   I suspect, yes.
         21         Q.   And did Ripple engage in those efforts
         22    in 2020?
         23         A.   I believe so.
         24         Q.   To the extent that you -- I think you
16:25:07 25    said -- you said that this persists to some degree
```

360

16:25:21    1    today.

            2            Do you have any view as to why this

            3    persists today, equating Ripple and XRP?

            4        A.    Not of consequence.  I think there's

16:25:38    5    probably some people who with malintent seek to

            6    conflate and there's some that just don't take the

            7    time to correct.  Frankly, if I may, in our

            8    conversation today, you have mistakenly used

            9    Ripple instead of XRP on a couple of occasions.

16:25:56   10        Q.    If I may, you have as well --

           11        A.    Right.

           12        Q.    -- in -- in some of your conversations.

           13    We'll get to recordings, but you have as well in

           14    the past, correct?

16:26:03   15        A.    I try really, really hard not to.

           16        Q.    Okay.  To the extent that there's

           17    malintent by someone -- and I'm assuming you

           18    weren't referring to me but --

           19        A.    No.

16:26:11   20        Q.    -- to the extent you were -- to the

           21    extent there's malintent by someone, you know,

           22    conflating XRP and Ripple, why would that -- why

           23    would that reflect malintent?  To the extent

           24    that's the motivation.  I'm trying to understand.

16:26:23   25    How does it hurt Ripple if it's conflated?

                                                              361

16:26:30  1          A.   I -- I don't want to speculate as to
       2   what other people think because I don't know.  I
       3   think -- you know, one thing I think we have seen
       4   consistently in the crypto markets is there are
16:26:39  5   people who put out misinformation intentionally.
       6          Q.   Just to sort of create chaos or -- I'm
       7   just asking what you --
       8          A.   I think there was an announcement last
       9   week that Walmart was accepting Litecoin -- or,
16:26:55 10   no, Amazon.  I can't remember.  Somebody.  And it
      11   looked like a press release from Amazon or
      12   Walmart.  And the price of Litecoin for, you know,
      13   some period of hours went up a bunch.  And then I
      14   think Walmart or Amazon had to come out and
16:27:05 15   correct the record.  It would be an example.
      16          Q.   So an example might be to manipulate the
      17   price of a token?
      18          A.   I don't know.
      19          Q.   Okay.  In the quote you say "It is
16:27:14 20   reflective of a lot of work we have done."
      21               What work are you referring to?
      22          A.   I don't know.
      23          Q.   Okay.
      24               MR. TENREIRO:  Can I please have
16:27:35 25          16?  Thanks.  And 17.  Sorry.  You're

                                                            362

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

16:27:42   1          there.

           2                 (Whereupon, exhibit is received

           3          and marked Garlinghouse Deposition

           4          Exhibit 16 for identification.)

16:27:45   5   BY MR. TENREIRO:

           6          Q.   All right.  Here's Exhibit 16.

           7          A.   Thank you.

           8          Q.   Yep.

           9               So just so we're on the same page, the

16:27:56  10   prior exhibit, which was 15, was an article -- or

          11   discussing an article on April 16th, 2017.

          12   Exhibit 16 is an email from you to Mr. Larsen and

          13   others on April 7th, 2017.  The Bates stamp is

          14   SEC-████RIPPLE 10806.

16:28:20  15               Please take a look.

          16               MR. SOLOMON:  Thank you.

          17               (Pause)

          18   BY MR. TENREIRO:

          19          Q.   Mr. Garlinghouse, when was the last time

16:30:21  20   you checked the price of XRP?

          21          A.   This morning.

          22          Q.   Okay.  And how often do you check it?

          23          A.   I usually check it in the morning and

          24   then, depending upon how busy I am, you know,

16:30:34  25   maybe once or twice during the day.

                                                              363

16:30:37   1        Q.   Okay.  Do you check it on an app?

           2        A.   No.

           3        Q.   How do you check it?

           4        A.   I typically use either CryptoCompare.com

16:30:46   5   or CoinMarketCap.

           6        Q.   All right.  A website?

           7        A.   Those are both websites.

           8        Q.   They don't have an app?

           9        A.   I don't know.

16:30:54  10        Q.   Okay.  This email that I just showed you

          11   refers to the "XRP rally" at the bottom.

          12             Do you see that?

          13        A.   Yes.

          14        Q.   Okay.  When we're talking about a rally

16:31:06  15   in -- in XRP, are we talking about an increase in

          16   its price?

          17        A.   I think that's fair.

          18        Q.   You say "I don't usually address the

          19   price of the digital asset XRP," and then you

16:31:21  20   feel compelled to share some of your thoughts, et

          21   cetera.

          22             Do you see that part?  It's on the

          23   second page.

          24        A.   I do.

16:31:26  25        Q.   Okay.  Again, just to ask, again, when

                                                              364

16:31:27 1  you were talking to Ripple's investors and other
2  advisors, you were speaking your true beliefs at
3  the time, correct?
4      A.  Yes.
16:31:34 5      Q.  Okay.  You say "It's hard to pinpoint
6  what drives any market activity," but you wanted
7  to share some thoughts and then there's three
8  bullet points.
9          Do you see that?
16:31:46 10     A.  Yes.
11     Q.  One bullet point refers to bitcoin
12 capacity issues.  Do you see that?  And -- I'm
13 sorry.  Yes or no?
14     A.  Yes.
16:31:52 15     Q.  Okay.  And if you want to go back to the
16 prior CoinDesk article to refer to it, I think in
17 the CoinDesk article there's also a discussion
18 about, you know, bitcoin's capacity issues
19 potentially relating to the increase in XRP's
16:32:06 20 price.
21          Do you see that?
22     A.  I saw that in the previous document, a
23 reference to that, and I see that here in this
24 document as well.
16:32:16 25     Q.  Okay.  Is it fair to say that around

365

16:32:18  1    April of 2017, you had the belief that if things

        2    did not go well for bitcoin, that might be good

        3    for XRP?

        4              MR. SOLOMON:  Objection.

16:32:30  5        A.   I don't recall.

        6        Q.   Okay.  And isn't that sort of what you

        7    were expressing here, that people are realizing

        8    that bitcoin has limitations as a solution for

        9    transactions?  That is one of the things that

16:32:41 10    might explain the XRP price rally?

       11              MR. SOLOMON:  Objection; form.

       12        A.   I -- I think that's a reasonable

       13    interpretation of what's here.  I think, yeah,

       14    there won't be one digital asset to rule them all

16:32:53 15    and I think bitcoin can be successful and XRP can

       16    be successful and serve different use cases.

       17        Q.   That's what you think today?

       18        A.   Yes, that is what I think today.

       19        Q.   Okay.  Then you say "Investors may also

16:33:07 20    be connecting the dots that bank adoption of

       21    Ripple's solution creates the opportunity for us

       22    to deepen those customer relationships and

       23    engagement by delivering on what" -- underlined --

       24    "Project Xenon (our trial with ███ and 12 top

16:33:21 25    global banks) demonstrated.  While we are still

                                                              366

16:33:25    1    early in our work here - we are confident that we

            2    can lower liquidity costs for banks by leveraging

            3    XRP as a liquidity solution."

            4            Do you see all that?

16:33:34    5        A.   Yes.

            6        Q.   Does that refresh your recollection as

            7    to what work you were referring to in your

            8    quote -- in your quote in the ███████ article?

            9        A.   No.

16:33:43   10        Q.   Okay.  Do you have any reason to doubt

           11    that the work you were referring to in the

           12    ████████ article quote is the same work you are

           13    referring to in this email?

           14        A.   I don't recall.

16:33:51   15        Q.   Okay.  Is -- when you say "Investors may

           16    also be connecting the dots," who are you

           17    referring to?  Investors in what?

           18        A.   I -- I presume I'm referring to

           19    invest -- I mean, we can debate the use -- it's a

16:34:09   20    legal word, "investors," I think, versus

           21    "speculators" of the crypto markets.  So people

           22    who are interested in the crypto markets are

           23    speculating on various digital assets.

           24        Q.   Including XRP?

16:34:22   25        A.   I -- I think XRP was one of the most

                                                                        367

16:34:25  1    valuable digital assets at the time; if not number

       2    two, number three.  And, so, I think including

       3    XRP.

       4         Q.   Are you talking about most valuable by

16:34:34  5    market cap or by price?

       6         A.   By market cap.

       7         Q.   Okay.  And I -- I'm not interested in

       8    any sort of legal use of the word "investor."  I

       9    think -- you said you have an MBA.  So I want what

16:34:45 10    you understand as investor.  That's all I care --

      11    I care about.

      12              So when you said "investors," I want to

      13    know what -- who were you referring to?  Investors

      14    in what?

16:34:53 15         A.   I don't know.

      16         Q.   Okay.  One second.

      17              MR. TENREIRO:  Let's do -- do we

      18         have 17 here?  Let's do 17, which is an

      19         email two days later.

16:35:17 20              (Whereupon, exhibit is received

      21         and marked Garlinghouse Deposition

      22         Exhibit 17 for identification.)

      23              MR. TENREIRO:  Here you go.

      24              (Pause)

16:36:10 25    BY MR. TENREIRO:

                                                        368

16:37:41  1          Q.   So, Mr. Garlinghouse, is it fair to say
        2     that this email is an email to the board where you
        3     include the prior email we just saw and then some
        4     additional commentary on top?
16:37:51  5          A.   Yes.
        6          Q.   All right.  Here you're also discussing,
        7     in part, "the dramatic spike in XRP price and
        8     market activity."  That's the third paragraph.
        9               Do you see that?
16:38:04 10          A.   Yes.
       11          Q.   You say "It's a game-changer for us on a
       12     bunch of levels."
       13               Do you see that?
       14          A.   Yes.
16:38:10 15          Q.   Is "us" Ripple in that sentence?
       16          A.   I believe, yes.
       17          Q.   Okay.  Then you say "On an operating
       18     level, for XRP to serve the purpose of lowering
       19     liquidity costs for payments, it needs deep
16:38:21 20     liquidity across fiat currency pairs.  Speculative
       21     and market trading volume builds that
       22     liquidity - they are the catalyst to the XRP
       23     flywheel.  The recent rally has us moved that
       24     flywheel into a much higher gear, which puts us in
16:38:36 25     a much stronger position to execute on other

                                                                369

16:38:38  1    projects that continues to fuel the flywheel."

2          Do you see all of that?

3     A.   Yes.

4     Q.   Okay.  When you refer to "speculative

16:38:48  5    and market trading volume," are you talking about

6    speculative and market trading volume in XRP?

7     A.   I believe so.

8     Q.   Okay.  And can you explain in your own

9    words why speculative and market trading volume in

16:39:05 10    XRP are the catalyst to the XRP flywheel?

11     A.   Typically, the more liquidity you have

12    in a market, the tighter the spreads you would

13    have in that market.  The tighter the spreads, the

14    more efficient the market.  The more efficient the

16:39:23 15    market, the more demand for those payment flows.

16           THE REPORTER:  Those payment?

17           THE WITNESS:  Flows.

18     Q.   And payment flows is something that

19    Ripple is in the business of generally?

16:39:37 20     A.   Correct.

21     Q.   Okay.  And so to build that -- so you

22    said typically the more liquidity, the tighter the

23    spread, et cetera.

24          In other words, do you need speculative

16:39:55 25    and market trading volume in XRP to build the

370

16:39:58  1    liquidity that starts this process that you just

2    described?

3         A.    That's what the email says, yes.

4         Q.    Well, is that true?

16:40:10  5         A.    I think it's a hypothesis that we have

6    seen generally play out in the crypto markets,

7    yes.

8         Q.    And have you -- has Ripple come to no

9    longer believe in that hypothesis?

16:40:24 10         A.    No.

11         Q.    Okay.  So is this -- to catalyze the

12    XRP -- the XRP flywheel, do you still need

13    speculative and market trading volume in XRP?

14         A.    I think you need liquidity.  Anything

16:40:41 15    that drives liquidity is going to be constructive

16    to what I'm calling a flywheel.

17         Q.    Right.

18               And speculative interest in the asset

19    could drive liquidity?

16:40:53 20         A.    Yeah, I think I'm saying that it has in

21    that particular time period.

22         Q.    Today can it drive liquidity?

23         A.    Yes.

24         Q.    Okay.  And have you had any -- have you

16:41:00 25    ever had an understanding different to that, that

371

16:41:06  1    speculative trading of an asset in XRP would not
          2    drive its liquidity?
          3          A.    I can't think of an example.
          4          Q.    Okay.  Throughout your time as CEO of
16:41:20  5    Ripple, you have understood that people were
          6    buying XRP as an investment, is that right?
          7                MR. SOLOMON:  Objection; form.
          8          Q.    I'm not asking --
          9          A.    No.
16:41:30 10          Q.    -- for legal conclusions.  I'm asking
         11    for, you know, just the word "investment" as an
         12    English speaker.
         13          A.    Can you ask the question again, please?
         14          Q.    Yeah.  Throughout your time as Ripple's
16:41:39 15    CEO, you understood, did you not, that some people
         16    were buying XRP as an investment?
         17          A.    I -- I -- I don't want to speculate as
         18    to why people are buying XRP.
         19          Q.    Well, no.  No need to speculate.
16:41:53 20                Did people tell you on Twitter, in
         21    personal -- in emails that, in fact, they viewed
         22    it as an investment throughout your time as CEO?
         23          A.    I -- I can't recall a -- I don't know
         24    why people -- for me to draw a broad conclusion
16:42:11 25    about why people choose to trade XRP would be hard

                                                              372

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

16:42:18  1   to do.

2          Q.   Right.  Don't draw a broad conclusion

3   about all people.  I'm just saying, did you

4   understand that some people were buying XRP as an

16:42:25  5   investment?

6          A.   So the hypothet -- I mean, you're kind

7   of asking me a hypothetical.  Is it possible that

8   someone out there on the planet that has chosen to

9   buy XRP has chosen to buy it as an investment?  I

16:42:39 10   think the answer is yes.  I -- I don't know why

11   individuals and haven't taken the time to try to

12   dissect why each person might choose to speculate

13   in XRP.

14          Q.   The -- the XRP markets were important to

16:42:52 15   you as Ripple's CEO, to your job, right?

16          A.   The liquidity in XRP markets is very

17   important to me.

18          Q.   Right.

19               And -- and understanding what might

16:43:00 20   drive the liquidity was very important to you as

21   well?

22          A.   Yes.

23          Q.   How to get more liquidity was important

24   to you?

16:43:07 25          A.   More liquidity was better than less

                                                    373

16:43:09   1    liquidity, for sure.

         2        Q.    Is it fair to say that throughout your

         3    time as Ripple's CEO, you have made efforts to

         4    understand the XRP market?

16:43:19   5        A.    I have tried, yes.

         6        Q.    Okay.   In connection with your work and

         7    your efforts to understand the market, do you

         8    understand that some participants in the market

         9    for XRP are speculators in XRP's price?

16:43:33 10        A.    I believe that's probably true, yes.

       11        Q.    Okay.   Did you ever take any steps to

       12    restrict people from speculating on the price of

       13    XRP?

       14              MR. CERESNEY:   Objection.

16:43:48 15        A.    I can't recall.

       16        Q.    Did you ever restrict people from buying

       17    XRP as an investment?

       18              MR. CERESNEY:   Objection; form.

       19              MR. SOLOMON:   Did he -- his XRP?

16:44:01 20       Ripple's XRP?

       21              MR. TENREIRO:   Let's start with

       22       Ripple's.

       23              MR. SOLOMON:   Okay.

       24              THE WITNESS:   Could you repeat

16:44:04 25       the question, then?

                                                374

16:44:05  1    BY MR. TENREIRO:

        2        Q.    Did you ever take efforts to stop people

        3    from buying XRP to speculate on its price?

        4                  MR. SOLOMON:  Objection; form.

16:44:20  5        A.    I don't recall.

        6        Q.    Did you ever take steps to restrict

        7    people from buying Ripple's XRP as an investment?

        8                  MR. SOLOMON:  Objection.

        9        A.    I don't recall.

16:44:34 10        Q.    And did you ever take steps to restrict

       11    people from buying your XRP as an investment?

       12        A.    I don't recall.

       13        Q.    In April of 2017, was XRP being used for

       14    a payment flow?

16:44:56 15        A.    I expect yes.

       16        Q.    How?

       17        A.    I -- I -- I mean, there's hundreds of

       18    thousands, maybe millions, of people in the XRP

       19    markets.  And is there a likelihood that some of

16:45:12 20    those people were using XRP for payment flows?  I

       21    think the answer's almost certainly yes.  I don't

       22    necessarily know how.  I think your question was

       23    how were they using it for payment flows.

       24        Q.    No.  Was it being used for payment

16:45:27 25    flows?  That's all.  Yes or no, was it being used?

                                                              375

16:45:29    1            A.    I think I -- yes, I believe so.

            2            Q.    And with the hundreds of thousands,

            3    maybe millions, of people in the XRP markets, was

            4    it being used as an investment?

16:45:40    5            A.    I -- I don't know of --

            6                    MR. SOLOMON:   Objection; form.

            7            It might be helpful to ask him what

            8            "investment" means to him or to give him

            9            your definition of "investment."  I -- I

16:45:49   10            don't mean to interject.

           11            Q.    What does "investment" mean to you?

           12            A.    I mean, to me investment means, you

           13    know, people choose to invest in pork bellies,

           14    people choose to invest in oil, people choose to

16:46:06   15    invest in currencies.  So in that context do I

           16    think people are, quote, investing and speculating

           17    around digital assets including XRP?  Yes.

           18            Q.    So if I invest in pork bellies -- in

           19    other words, is it fair to draw a distinction,

16:46:17   20    from your definition, investing in pork bellies is

           21    different than buying a pork belly to eat it?

           22            A.    Yes.

           23            Q.    Okay.  So with your definition of

           24    "investment," did you understand when you were

16:46:31   25    Ripple's CEO that people in the market were

                                                                      376

16:46:34  1    investing in XRP?

       2         A.   I -- I -- like I say, I don't know --

       3    you're ask -- I don't know who those people are.

       4    I mean, if you gave me -- you said earlier, like,

16:46:48  5    are people on Twitter?  And I don't know if

       6    they're speculating.  I don't know if they're

       7    investing.  I don't know what they're doing.

       8    And -- and maybe some are buying XRP to make

       9    payments overseas or maybe they're -- I don't

16:47:00 10    know.

      11         Q.   Okay.  Do you know if people were buying

      12    XRP for payment flows in April of 2017?

      13         A.   I -- I don't know.

      14         Q.   Okay.  Was Ripple selling XRP for

16:47:11 15    payment flows in 2017?

      16              MR. CERESNEY:  Objection; form.

      17         A.   I mean, I -- I think some of our

      18    employees were accepting compensation in XRP at

      19    that time.  And so I suppose, by definition,

16:47:24 20    that's payment flows.  And I'm aware of those,

      21    but, you know, I don't know.

      22         Q.   So when you say "payment flows," that

      23    includes paying someone, like, their compensation?

      24         A.   I think that's a payment, so, yes.

16:47:35 25         Q.   Okay.

                                                          377

```
16:47:37    1                      MR. TENREIRO:  Let's do this 13
            2           and then take a break.  This will be a
            3           short one.
            4                      MR. SOLOMON:  Yeah.  It's been
16:47:42    5           over an hour.
            6                      (Whereupon, exhibit is received
            7           and marked Garlinghouse Deposition
            8           Exhibit 13 for identification.)
            9                      MR. TENREIRO:  So this is a
16:47:47   10           two-page email, RPLI_SEC 763477.
           11                      (Pause)
           12      BY MR. TENREIRO:
           13           Q.   Okay.  Who's ███████████████?
           14           A.   I don't know.
16:49:05   15           Q.   Have you ever met him?
           16           A.   I don't believe so.
           17           Q.   Okay.  Having read this email, is it
           18      fair -- what is this email about, generally, other
           19      than the colorful language?
16:49:17   20           A.   I think ██████ --
           21                      MR. SOLOMON:  Is there anything
           22           on this that's colorful language?
           23                      MR. TENREIRO:  Well, he says,
           24           "Hey, how about making it less difficult
16:49:22   25           to actually buy XRP you retards."
```

                                                              378

```
16:49:25   1        A.   I mean, I don't know how seriously to
           2   take an email that, you know, starts with a
           3   subject line that says "Fuck you."
           4        Q.   Fair enough.  But what is the email
16:49:34   5   about?
           6        A.   The email is about a gentleman who
           7   claims to be named ███████████.  I have no
           8   idea.  It's a Gmail address.  And he is expressing
           9   his frustration and viewpoints on Yahoo and AOL
16:49:51  10   and what the Ripple website looks like and thinks
          11   we need to pull our heads out of our ass to get
          12   this shit on track.
          13        Q.   Why did you respond?
          14             MR. SOLOMON:  Great question.
16:50:02  15        A.   It was 9:41 p.m. on March 22nd.  I don't
          16   know what day of the week that is.  I'm guessing
          17   it was late at night and I was on email and --
          18        Q.   It was Wednesday.
          19        A.   How do you know it's Wednesday?
16:50:11  20        Q.   Because it says it.
          21        A.   Oh, sorry.
          22             MR. SOLOMON:  I hadn't seen that
          23    too.
          24        A.   Sorry.  Sorry.  I don't know why I
16:50:20  25   replied.
```

                                                              379

16:50:20  1       Q.   And he's telling you "Please, God, bring

       2  the rain soon.  Been waiting four years on Ripple

       3  to hit."

       4            Do you see that?

16:50:28  5       A.   I did not see that one.  Where is that

       6  one?

       7       Q.   It's on number 3 of his bullets.

       8       A.   Yes, I see that.

       9       Q.   He's talking about XRP when he says

16:50:37 10  "four years on Ripple to hit," right?

      11       A.   I guess.

      12       Q.   Well --

      13       A.   I mean, as I said earlier, I think any

      14  email with the subject line "Fuck you" and that I

16:50:49 15  signed off with "FURB" --

      16       Q.   Meaning?

      17       A.   Fuck you right back.

      18       Q.   Like the song?

      19       A.   You know, that's funny you say that

16:50:57 20  because I don't know -- I don't know that

      21  reference, but I think -- I think that's right,

      22  yeah.

      23       Q.   All right.  So you responded to the

      24  email and you said "I've been personally buying

16:51:05 25  XRP in January and February (and early in March).

                                                            380

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

16:51:09  1   You are not alone in your expectations."
        2            What expectations are you talking about,
        3   Mr. Garlinghouse?
        4       A.   I -- I don't want to put too much
16:51:16  5   credibility in an email that starts with "Fuck
        6   you" that is from an anonymous person that I'm
        7   replying with a little bit, obviously,
        8   tongue-in-cheek.  And so I don't know what my
        9   assertions were.
16:51:30 10       Q.   But, I mean, you have told me today
       11   you're very busy sometimes.  You don't read every
       12   email.  You responded to this email.  So there
       13   must have been some significance to you to the
       14   email and you responded by saying "You are not
16:51:42 15   alone in your expectations."
       16            What expectations are you talking about?
       17       A.   To -- I mean, to be fair, you're asking
       18   about an email from four and a half years ago that
       19   is, again, the subject line "Fuck you" and you're
16:51:52 20   asking me what expectations I had.  I have no
       21   idea.
       22       Q.   Okay.  Did you in March of 2017 have
       23   expectations that Ripple might hit?
       24       A.   I -- I -- I have no idea.
16:52:07 25       Q.   Were you in March of 2017 treating

                                                              381

16:52:11  1  whatever holdings of XRP you had as an investment?

2                    MR. CERESNEY:  Objection to form.

3          A.   I guess in my layperson's expectations,

4  you know, I was holding XRP.  Does that mean it's

16:52:29  5  an investment?  I -- you know, I can debate the

6  meaning of that.  But, you know, again, I don't

7  know what my expectations are.  I'm not -- I don't

8  think putting a lot of weight in an email with the

9  subject line "Fuck you" is something -- again,

16:52:43 10  it's late at night.  Who knows?  Maybe it's a

11  Wednesday night I'd had three drinks at dinner and

12  I decided to speak kind of funny to engage this

13  guy.

14          Q.   Did you in March of 2017 hope that the

16:52:53 15  price of XRP that you held went up?

16          A.   Well, I think I've -- and I've said to

17  the SEC from, I think, the first meeting I had

18  with the SEC, I won't pretend not to be a

19  capitalist.  And if you own something, then you

16:53:05 20  wanted the value of that to increase.

21          Q.   Okay.

22                    MR. TENREIRO:  Let's go off the

23              record for a break.

24                    THE VIDEOGRAPHER:  Going off the

16:53:10 25              record, 4:54.

                                                        382

```
16:53:13   1                    (Whereupon, a recess is taken.)
           2                    THE VIDEOGRAPHER:  Okay.  Back on
           3           the record, 5:16.
           4    BY MR. TENREIRO:
17:14:56   5         Q.   Okay.  Mr. Garlinghouse, I think earlier
           6    today you said -- and you just correct me -- that
           7    ███████████████  owned XRP.
           8         A.   I think that was my testimony, yes.
           9         Q.   Okay.  Did you have an understanding as
17:15:09  10    to whether he was investing in XRP?
          11         A.   No.
          12         Q.   Did you discuss with him why he was
          13    buying XRP?
          14         A.   He didn't buy XRP.
17:15:19  15         Q.   Then how did he get it?
          16         A.   Predating my arrival at Ripple, he
          17    participated in one of the XRP giveaways is my
          18    understanding.
          19         Q.   Did you discuss with him why he was
17:15:29  20    holding it?
          21         A.   I think he asked me -- and this is, I
          22    think, before I had started at Ripple.  And he
          23    asked me what I thought he should do with it.  And
          24    I think I said "I would just hold on to it."
17:15:44  25         Q.   Why?  Why did you say that?
```

                                                                   383

17:15:46  1        A.   I'm not sure I knew what XRP really was

2    before I started at Ripple.  I'm not sure I had

3    any perspective other than -- I didn't know how

4    much XRP he got through giveaways.

17:15:55  5        Q.   Well, then, why did you tell him to hold

6    it? I guess is the question.

7        A.   Okay.  His options were what?  To hold

8    it or sell it?  I don't know how many he had.  I

9    don't know what it was worth.  I know enough about

17:16:10  10   ████████'s financial picture that it wasn't

11   material one way or another.

12        Q.   You do know enough about his financial

13   picture?

14        A.   I do know enough about -- enough about

17:16:18  15   his financial picture that I would be surprised if

16   whatever the giveaway he participated in would

17   have been material.

18        Q.   Okay.  So his option was to hold it or

19   sell it at the time?

17:16:30  20        A.   I think that's right.  I can't think of

21   anything else.

22        Q.   Okay.

23             MR. TENREIRO:  Let's look at

24        Exhibit 18, please.  I think I have it

17:16:41  25        here.

384

```
17:16:41    1                    Okay.  Thanks.  I have it, Mark.
            2          I have it.
            3                    (Whereupon, exhibit is received
            4          and marked Garlinghouse Deposition
17:16:53    5          Exhibit 18 for identification.)
            6    BY MR. TENREIRO:
            7          Q.   And, you know, we -- as I pass you
            8    these, we've looked at 15 and 16 -- sorry.
            9    Maybe -- sorry.  We looked at 16 and 17.  I think
17:17:04   10    those were April 2017 emails.
           11                    Exhibit 18 is May 1st, 2017, one page,
           12    SEC-███-RIPPLE -- actually, two pages -- 10934.
           13    Please take a moment to look at it.
           14                    (Pause)
17:18:54   15          Q.   Okay.  Mr. Garlinghouse, do you see the
           16    reference in this email in the fourth full
           17    paragraph to how XRP was hovering around a nickel
           18    and it was up over 800 percent from where it began
           19    the year?  Do you see that?
17:19:05   20          A.   Yes.
           21          Q.   Then it says "Interest in XRP is
           22    continuing to grow and we've only just begun our
           23    focused efforts to build its liquidity."
           24                    Do you see that?
17:19:15   25          A.   Yes.
```

385

17:19:16   1          Q.    Then you say "To this end, we recently
           2    released our Q1 2017 Markets Report, an important
           3    way that we demonstrate our commitment to the XRP
           4    ecosystem and continually improve the health of
17:19:26   5    XRP markets globally."
           6          Do you see that?
           7          A.    Yes.
           8          Q.    Is that a true statement, that the
           9    Markets Report was a way for Ripple to demonstrate
17:19:36  10    its commitment to the XRP ecosystem?
          11          A.    I think, as I testified earlier today,
          12    that the Markets Report has been a way to improve
          13    transparency, understanding, and I think as we
          14    start every Markets Report, kind of a call to
17:19:58  15    action for everybody in the industry to improve
          16    transparency.  I think we have consistently
          17    indicated our desire to improve and increase the
          18    liquidity in the XRP market.  That's good for
          19    Ripple's strategy as well as anyone who's
17:20:14  20    participating in the XRP market.
          21          Q.    But when you say demon -- is it true
          22    that the Markets Reports are a way for Ripple to
          23    demonstrate its commitment to the XRP ecosystem?
          24    Is that true?
17:20:28  25          A.    I -- I mean, I'm reading what is there.

                                                                  386

17:20:29   1    I don't recall writing this.  I -- I think, as --
           2    well, I don't know what I thought when I wrote --
           3    when this was written.
           4         Q.   Sitting here today, is one of the
17:20:37   5    purposes of the Market Report to demonstrate
           6    Ripple's commitment to the XRP ecosystem?
           7         A.   Sitting here today, as I just testified,
           8    I would say the Markets Report is to drive
           9    transparency of and clarity of information around
17:20:54  10    the XRP markets.  As I sit here today, is it -- is
          11    it a demonstration of a commitment?  It is one
          12    of -- one of many ways that we seek to make the
          13    XRP markets robust, healthy, transparent.  All of
          14    the above.
17:21:11  15         Q.   And that is true today as well, up
          16    through today?
          17         A.   I think that's fair.
          18         Q.   Okay.  Later you talk about "connecting
          19    the dots" again.  "The big takeaway with the
17:21:23  20    market is clearly connecting the dots that banks
          21    which join the Ripple network today are
          22    prospective users of XRP liquidity in the future."
          23              Do you see that?
          24         A.   I do see that.
17:21:31  25         Q.   Okay.  So is it fair to say that in May,

                                                                    387

```
17:21:34   1    just like in April, your view was that the XRP
           2    price rally in part could be derived from
           3    participants in the market responding to efforts
           4    that Ripple had made?
17:21:48   5              MR. SOLOMON:  Objection; form.
           6         A.   I -- I think -- as I testified earlier,
           7    I think in parts of 2017 in my tenure at Ripple, I
           8    believed that Ripple's activities may have an
           9    impact on the XRP market.  I'm less convinced of
17:22:13  10    that as I sit here today.
          11         Q.   Understood.
          12              And is it fair to say that in 2017 one
          13    of your specific goals at Ripple was to increase
          14    speculation in the market for XRP?
17:22:22  15              MR. SOLOMON:  Objection; form.
          16         Q.   You can look --
          17         A.   Are you taking that from this email --
          18              (Indiscernible cross talk;
          19         reporter requests one speaker.)
17:22:30  20         Q.   You are welcome to look at the email.
          21    My question is -- set aside the email -- is it
          22    true that in 2017, one of your goals was to
          23    increase speculation in the market for XRP?
          24              MR. SOLOMON:  Objection; form.
17:22:47  25         A.   I would say sitting here today, my
```

388

17:22:49  1    recollection of 2017 priorities was to increase
       2    liquidity in the XRP markets and in whatever ways
       3    that could take.  To the extent that was through
       4    speculation, I think that would drive liquidity.
17:23:02  5    So I think that's yes.
       6         Q.   All right.  And just so that we're on
       7    the same page, when we talk about speculation with
       8    respect to the market for an asset, what -- what
       9    are you -- what do you mean when you say
17:23:12 10    "speculation"?
      11         A.   Well, I think people speculate on the
      12    price of something.  And, you know, I think I used
      13    the example earlier today that the price of XRP
      14    might be, using this time period, four and a half
17:23:33 15    cents on one exchange and five cents on another
      16    exchange and people are speculating and trading
      17    that arb and seek -- seeking a -- a return.
      18         Q.   So what you just referred to as "arb,"
      19    do you mean arbitrage?
17:23:47 20         A.   Correct.
      21         Q.   Okay.  And does speculating include
      22    speculating on price movements?  For example, I
      23    could speculate that it might go down; I could
      24    speculate that it might go up?
17:23:57 25              MR. SOLOMON:  Objection; form.

                                                          389

17:23:58  1           A.   I think speculators speculate.

       2           Q.   Speculate --

       3           A.   So, yes.  Some people speculate it's

       4    going to go up; some people speculate it's going

17:24:06  5    to go down.  That's what makes the market.

       6           Q.   Right.

       7                And so isn't it fair to say there's a

       8    distinction between speculating on the asset and

       9    using the asset, such as in your pork belly

17:24:18 10    example?

      11                MR. SOLOMON:  Objection; form.

      12           A.   I was making the point that people

      13    speculate on the price of pork bellies.

      14           Q.   Right.

17:24:27 15           A.   I think -- so can you repeat the

      16    question, please?

      17           Q.   When you -- when you -- this is not a

      18    legal question or anything like that.  This is a

      19    question of you as a businessman.

17:24:35 20                When you say the word "speculating," is

      21    there a distinction in your mind between someone

      22    who speculates on price movements or price

      23    arbitrage and someone who acquires the asset to

      24    use it?  So to, like, eat the pork bellies in the

17:24:50 25    example you gave.

                                                              390

17:24:52  1          A.    So at the beginning of that question you

          2    said this isn't a legal thing.  It's hard for

          3    me -- I mean, this is a legal experience, right?

          4    I'm testifying in a legal -- and I'm being asked

17:25:03  5    to give things that will be used as legal.  So I

          6    don't know exactly what to do with that first

          7    comment.  I think it's important that we, as much

          8    as possible, have a shared understanding of some

          9    of these words.

17:25:13 10                MR. SOLOMON:  Tell him you don't

         11          understand.  Ask him to rephrase it.  If

         12          you can't answer the question, then don't

         13          answer the question.  You have to

         14          understand the question to answer the

17:25:20 15          question.

         16                THE WITNESS:  Okay.

         17          A.    Can you repeat the question?

         18          Q.    Yeah.  As a businessman, when you use

         19    the word "speculating," does that include -- if

17:25:26 20    you say that someone is speculating on an asset,

         21    does that include someone who is using the asset?

         22                MR. SOLOMON:  You're asking him

         23          today, on September 20, 2021, when he uses

         24          the word "speculate," what does he mean by

17:25:38 25          that?

                                                                   391

17:25:39  1              MR. TENREIRO:  Yes.

          2              MR. SOLOMON:  Or in prior

          3        emails or --

          4              MR. TENREIRO:  Today.

17:25:42  5        A.   I think if someone goes to the grocery

          6   store and buys bacon, they're not speculating on

          7   the price of pork bellies.

          8        Q.   Okay.  And has your understanding of

          9   speculating as a businessman changed over time?

17:25:59 10        A.   I don't know that it's changed over

         11   time.  I think I have learned, frankly, as it

         12   relates to the SEC's investigation and litigation,

         13   that there are nuances in how some of these words

         14   are used which can be consequential.

17:26:16 15        Q.   Consequential for whether something is

         16   deemed to be a security?

         17              MR. CERESNEY:  Objection; form.

         18        A.   Consequential to legal interpretations.

         19        Q.   When did you learn that?

17:26:28 20        A.   During the course of this, what started

         21   as, I think, an inquiry into an investigation,

         22   into a litigation.

         23        Q.   Can you pinpoint more precisely in time

         24   when you learned this?

17:26:41 25        A.   I -- I don't have any specific rec --

                                                              392

```
17:26:42   1    recollection.
           2          Q.    Okay.  Let's take a look at Exhibit 87,
           3    please.  This is just a one-page document.
           4                  (Whereupon, exhibit is received
17:26:54   5            and marked Garlinghouse Deposition
           6            Exhibit 87 for identification.)
           7                  MR. TENREIRO:  Here we go.
           8                  (Pause)
           9    BY MR. TENREIRO:
17:27:34  10          Q.    Okay.  What is this email?
          11          A.    This is an email from Monica Long to me
          12    on March 26th to set an agenda for our one-on-one
          13    meeting.
          14          Q.    How often did you have one-on-one
17:27:46  15    meetings with her?
          16          A.    Typically weekly.
          17          Q.    Okay.  And she says "For discussion,"
          18    and she has several bullets -- three bullets and
          19    then some sub bullets.
17:27:54  20                  Do you see that?
          21          A.    Yes.
          22          Q.    She says "XRP marketing - lessons thus
          23    far from Ethereum - plus initial thoughts on a
          24    plan."
17:28:03  25                  Do you see that?
```

393

17:28:04  1          A.   I do.

       2          Q.   What plan did you have with respect to

       3   XRP marketing?

       4          A.   I don't recall.

17:28:10  5          Q.   To the extent Ripple engaged in XRP

       6   marketing, what was the purpose of marketing XRP?

       7          A.   I don't recall.

       8          Q.   Okay.  What other participants in the

       9   XRP ecosystem, sitting here today, do you know

17:28:22 10   that market XRP?

      11          A.   In 2021?

      12          Q.   Yeah.

      13          A.   Well, I think there are companies in

      14   2021 that use XRP and, by extension, market XRP, I

17:28:44 15   suppose.

      16          Q.   So I'm asking you what companies market

      17   XRP, like the term "marketing."

      18               Is the term "marketing" here referring

      19   to sort of ad efforts or publicity experts?

17:28:59 20               MR. SOLOMON:  Objection; calls

      21          for speculation.

      22          Q.   To the extent you were talking to

      23   Ms. Long.

      24          A.   I don't know.

17:29:04 25          Q.   Okay.  What companies, sitting here

                                                    394

17:29:06  1    today, engaged in efforts to publicit -- to

        2    make -- to create publicity for XRP?

        3            A.   I mean, I think, you know, during the

        4    course of, you know, the expansion of participants

17:29:23  5    in the XRP market, there's people doing, I mean, a

        6    host of things.  When I say they're marketing XRP,

        7    I -- I don't know.  There's certainly a number of

        8    companies that use and build on top of the XRP

        9    Ledger.  Are they, like, using the XRP Ledger and

17:29:51 10    deriving usage of the XRP Ledger?  Are they

       11    marketing XRP?  I don't know.

       12            Q.   I was asking for publicity efforts now,

       13    but --

       14            A.   Oh.  Sorry.

17:30:01 15            Could you repeat the question then that

       16    you are asking me to answer?

       17            Q.   Sure.

       18            What companies, sitting here today, are

       19    you aware of engaged in publicity efforts for XRP?

17:30:12 20            A.   I don't know.

       21            Q.   What companies were engaged with

       22    publicity efforts with respect to XRP in 2017

       23    around the time of this email?

       24            A.   I don't know.

17:30:19 25            Q.   Does Ripple have engineers in its

                                                        395

```
17:30:21    1    employ?  Computer scientists?
            2         A.    Yes.
            3              MR. SOLOMON:  Objection; form.
            4         Q.    How many?
17:30:30    5         A.    How many engineers did we have in 2017
            6    or today?
            7         Q.    Let's start with 2017.
            8         A.    I would guess 60 to 70.
            9         Q.    How many employees did Ripple have in
17:30:44   10    total around that time?
           11         A.    You know, 150 to 200.
           12         Q.    So about a third of the workforce was
           13    the computer scientists?
           14         A.    Usually it's a little higher percentage
17:30:54   15    than that.
           16         Q.    What percentage is it today, roughly?
           17         A.    I hope it's over ███.
           18         Q.    Why do you hope?
           19         A.    I think, as a technology centric
17:31:06   20    company, having a talented group of engineers is
           21    foundational to success.
           22         Q.    How so?
           23         A.    If you're seeking to build technology
           24    products, if you don't have people doing the
17:31:23   25    coding, you're not going to get very far.
```

396

```
17:31:27    1          Q.   Is it fair to say that over the course
            2   of the time you've been at Ripple, Ripple
            3   engineers have worked on the code for the XRP
            4   Ledger?
17:31:41    5                  MR. SOLOMON:  Objection; form.
            6          A.   Can you repeat the question?
            7          Q.   Is it fair to say that over the course
            8   of the time you've been at Ripple, Ripple
            9   engineers have worked on the code for the XRP --
17:31:50   10   the XRP Ledger?
           11                  MR. SOLOMON:  Objection; form.
           12          A.   Yes.
           13          Q.   Have they improved it, made efforts to
           14   improve it, like the speed of it, for example?
17:32:00   15          A.   Yes.
           16          Q.   And is their work with respect to the
           17   XRP Ledger important to Ripple?
           18                  MR. SOLOMON:  Objection; form.
           19          A.   The efficiency of the XRP Ledger is
17:32:16   20   important to Ripple.  For the employees at Ripple
           21   who contribute open-source cord -- code to the XRP
           22   Ledger, those improvements are important.  There's
           23   obviously people outside of Ripple who contribute
           24   open-source code to the XRP Ledger also and their
17:32:36   25   contributions are important also.
```

                                                            397

17:32:38  1     Q.   And what -- what percentage -- how many
        2   validator nodes are on the Ledger?
        3     A.   I think it depends a little on how you
        4   define a validator node because there's some
17:32:51  5   validators that people don't pay attention to.
        6   But, typically, I have referenced that there's
        7   about 150 validators on the XRP Ledger that are of
        8   consequence, let's say.
        9     Q.   Where did you get that information from?
17:33:11 10     A.   Someone internal to Ripple.  I'm not
       11   sure who.
       12     Q.   150 now, in 2017, or at what point?
       13     A.   I -- I don't know.
       14     Q.   Okay.  When you reference 150
17:33:22 15   validators, how many of them were in China?
       16     A.   I don't know.
       17     Q.   How many of them were in the United
       18   States?
       19     A.   I don't know.
17:33:34 20     Q.   Do you know where any of the validators'
       21   nodes are?
       22     A.   Yeah.
       23     Q.   Which ones?  Ripple's?
       24     A.   No.
17:33:39 25     Q.   Where are the ones you know?

                                                          398

17:33:44   1          A.    I know there is one at a data center in

           2    Tokyo.  I know there's one at the University of

           3    Kansas.  I know there's one -- I -- you know, my

           4    familiarity is they're distributed at various

17:33:59   5    companies and data centers that have an interest

           6    in the XRP Ledger.

           7          Q.    Is it fair to say -- I won't computer

           8    science quiz you, but fair to say that on the

           9    Ripple Ledger, a node pays attention to

17:34:18  10    transactions confirmed by 80 percent --

          11                THE REPORTER:  I'm sorry.  A

          12      node?

          13                MR. TENREIRO:  A node.

          14          Q.    -- pays attention to transactions

17:34:19  15    confirmed by 80 percent of the nodes on that

          16    node's trusted nodes list?

          17                MR. SOLOMON:  Objection; form.

          18          A.    I -- I think you asked the question --

          19    if I could read it back and -- refer me.  But you

17:34:30  20    referred to it as a "Ripple Ledger" and I don't

          21    know what that is.

          22          Q.    The XRP Ledger.

          23          A.    Would you repeat the question, then?

          24          Q.    Is it fair to say that on the XRP

17:34:38  25    Ledger, a node pays attention to transactions

                                                                     399

17:34:41   1   confirmed by 80 percent of the nodes on that
           2   node's trusted nodes list or UNL?
           3       A.   I think that's fair.
           4       Q.   Okay.  So you said there were about 150
17:34:54   5   nodes that matter, quote/unquote?
           6       A.   I think that was my testimony, yes.
           7       Q.   Okay.  Quickly doing some math, times 5,
           8   750.  Okay.
           9            So if I -- what's to stop China from
17:35:08  10   putting 600 nodes on the XRP Ledger such that it
          11   would gain control over 80 percent of the now
          12   resulting 750 nodes?
          13                MR. SOLOMON:  Objection; form.
          14       A.   I mean, David Schwartz would be a better
17:35:21  15   person to ask some of these questions.  But it
          16   depends upon which nodes the other nodes are
          17   listening to.
          18       Q.   Okay.  So if China added 600 nodes to
          19   the XRP Ledger, could it not gain control over the
17:35:33  20   XRP Ledger?
          21       A.   If all -- if the other nodes listened to
          22   those 600, then, hypothetically, yes.
          23       Q.   Is there anything to stop those other
          24   nodes from listening to the 600?
17:35:48  25       A.   Yes.

                                                              400

```
17:35:48   1        Q.   What is?
           2        A.   What other nodes those nodes choose to
           3   listen to.
           4        Q.   Well, I'm sorry.  What stops one node
17:35:57   5   from deciding to listen to the new 600 nodes in my
           6   hypothetical?
           7        A.   Whoever is managing that node and what
           8   other nodes they choose to listen to.
           9        Q.   So, in other words, people can talk to
17:36:10  10   each other about what nodes they listen to?
          11        A.   I -- I -- I don't know how that happens.
          12        Q.   Okay.  Other than the individual -- each
          13   individual node selects a list of nodes they
          14   listen to, is that right?
17:36:25  15             MR. SOLOMON:  Objection; form.
          16        A.   I mean, my macro response is I'm not the
          17   best person to ask these questions of.
          18        Q.   Do -- sitting here today, do you have an
          19   understanding as to whether or not China could
17:36:35  20   take control over the XRP Ledger?
          21        A.   I feel like I have an understanding that
          22   I trust a number of very talented engineers, both
          23   inside and outside the company, that would tell
          24   you that's not possible.
17:36:48  25        Q.   Okay.  When you were engaged -- when
```

                                                              401

17:36:53  1    Ripple was talking to potential Series C
        2    investors, was there a question about whether
        3    there were nodes in the XRP Ledgers in Iran?
        4         A.   I don't recall.
17:37:05  5         Q.   Are there XRP Ledger nodes in Iran?
        6         A.   I don't know.
        7         Q.   Okay.  Is there anything that could stop
        8    the Iranian government from putting nodes on the
        9    XRP Ledger?
17:37:16 10         A.   Not that I'm aware of.
       11         Q.   Okay.  You've talked publicly about how
       12    China could potentially control the bitcoin
       13    blockchain, right?
       14         A.   Yes.
17:37:25 15         Q.   Okay.  So what is that understanding
       16    based on?
       17         A.   Articles I read.
       18         Q.   Where?
       19         A.   On the internet.
17:37:37 20         Q.   Anywhere else?  Well, articles in
       21    magazines or just the internet?
       22         A.   I don't really read magazines anymore.
       23    Just the internet.
       24         Q.   All right.  Anything else other than
17:37:48 25    articles?

                                                            402

17:37:50   1          A.    People I trust and respect who are

           2    well-versed in the technology of the bitcoin

           3    blockchain and understand 51 percent attacks.

           4          Q.    Such as whom?

17:37:59   5          A.    David Schwartz.

           6          Q.    And has he told you about whether -- in

           7    connection with these conversations, has he told

           8    you about any risk that China could take over the

           9    XRP blockchain?

17:38:12  10          A.    No.

          11          Q.    Have you discussed that with him either

          12    way?

          13          A.    I don't recall.

          14          Q.    Well, when you were discussing sort of

17:38:18  15    the potential of China to take over the bitcoin

          16    blockchain, did you say to him, "Hey, could that

          17    happen in the XRP blockchain"?

          18                MR. SOLOMON:  Objection; asked

          19          and answered.

17:38:29  20          Q.    Ripple has an interest in the XRP

          21    blockchain, generally speaking.  Is that fair?

          22                THE REPORTER:  Repeat.

          23          Q.    Ripple has an interest in the XRP

          24    blockchain.  Is that fair?

17:38:33  25                MR. CERESNEY:  Objection; form.

                                                                   403

17:38:36   1          A.    Ripple has an interest in the XRP

           2    Ledger, yes.

           3          Q.    Okay.  And to the extent that you

           4    discussed the China issue with respect to the

17:38:45   5    bitcoin blockchain with Mr. Schwartz, did you not,

           6    as the CEO of Ripple, ask him Is that a risk that

           7    the XRP Ledger faces?

           8                MR. SOLOMON:  Objection; asked

           9          and answered, form.

17:38:59  10          A.    The -- what commonly is referred to as a

          11    51 percent attack is a output of being proof of

          12    work-based.  The XRP Ledger doesn't use proof of

          13    work.  There have been successful 51 percent

          14    attacks on proof of work-based blockchains like

17:39:16  15    the Ethereum Classic blockchain.  There have not

          16    been successful attacks, to my knowledge, on what

          17    we commonly refer to as the consensus mechanism to

          18    validate transactions which other blockchains use.

          19          Q.    Well, have there been forks on that

17:39:36  20    blockchain?

          21                THE REPORTER:  Have there been?

          22                MR. TENREIRO:  Forks, F-O-R-K.

          23                MR. SOLOMON:  I'm sorry, on which

          24          blockchain?

17:39:40  25                MR. TENREIRO:  XRP blockchain.

                                                                404

17:39:41  1          XRP Ledger.
        2          A.    How do you define "fork"?
        3          Q.    However you define -- do you understand
        4    a fork on a distributed ledger?
17:39:48  5          A.    You asked me a question and I want to
        6    make sure I answer it and you used the word
        7    "fork."  I'm just asking how you're using the word
        8    "fork" to make sure I get it right.
        9          Q.    Let's start again.
17:39:55 10          Do you understand if someone speaks of a
       11    fork on a distributed ledger what that means?
       12          A.    I believe I do, yes.
       13          Q.    What does it mean to you?
       14          A.    As an example, the bitcoin blockchain
17:40:05 15    has forked a number of times.  And so that it
       16    takes all previous transactions and then there's a
       17    new fork that carries those transactions forward.
       18          Q.    Has that occurred on the XRP Ledger?
       19          A.    Not to my knowledge.
17:40:19 20          Q.    Okay.  Back to the email, is it fair to
       21    say that one of the Q2 priorities for 2017 was
       22    drive XRP speculation?
       23          A.    I see in Monica Long's agenda that she
       24    wants to talk about her future priorities and she
17:40:34 25    has listed a sub bullet called "drive XRP

                                                              405

17:40:37  1   speculation."

       2       Q.   And did you discuss it with her?

       3       A.   I don't know.

       4       Q.   Did you tell her -- did she implement

17:40:43  5   this agenda?

       6       A.   I don't know.

       7       Q.   All right.

       8            MR. SOLOMON:  Do you want to take

       9       a 30-second break?  Short break.  Just 30

17:40:51 10      seconds off the record.

      11            MR. TENREIRO:  Sure.

      12            THE VIDEOGRAPHER:  Okay.  Going

      13       off the record at 5:42.

      14            (Pause)

17:51:52 15            THE VIDEOGRAPHER:  Okay.  Back on

      16       the record, 5:53.

      17   BY MR. TENREIRO:

      18       Q.   Mr. Garlinghouse, did there come a time

      19   when you asked some of your PR people to help you

17:52:02 20   identify likes on your tweets that you went back

      21   and removed?

      22       A.   I believe, yes.

      23       Q.   And why did you do that?

      24       A.   When I got hacked in 2017, a number of

17:52:16 25   other people got hacked at the same time that were

                                                          406

17:52:21 1    connected to me in one way or another.  And it was

2    my hypothesis, belief, and I believe to be the

3    case, that the hackers went after people who were

4    associated with me, particularly as they had

17:52:35 5    seemed to discover via Twitter.

6        Q.    So your testimony is that the unliking

7    of likes was because of the hack?

8        A.    My recollection is that I went through

9    the trouble of deleting all Twitter posts that I

17:52:54 10   had posted prior to joining Ripple and, you know,

11   cleaned up my Twitter account to reduce -- to

12   remove any personal information or just things

13   that a bad actor might be able to take advantage

14   of.

17:53:14 15       Q.    Separate from that, did you go back to

16   unlike likes that you had made on Twitter?

17       A.    Not that I recall.

18       Q.    All right.  Let's take a look at Exhibit

19   36.  No, 35.  Sorry.

17:53:34 20              (Whereupon, exhibit is received

21         and marked Garlinghouse Deposition

22         Exhibit 35 for identification.)

23   BY MR. TENREIRO:

24       Q.    And this appears to be a series of

17:53:39 25   texts, GARL_Civil_ 982.  It's mostly images, but

407

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
17:53:48   1   take a look.
           2           (Pause)
           3       Q.   All right.  Do you see your phone number
           4   in this exhibit?
17:55:39   5       A.   Yes.
           6       Q.   Okay.  Fair to say it appears to be a
           7   series of texts between you and ████████?
           8       A.   Yes.
           9       Q.   And the date on the first -- on the
17:55:46  10   first page says "Saturday, 13 January 2018."
          11           Do you see that?
          12       A.   Yes.
          13       Q.   Okay.  Here you say "Can your team go
          14   through these and LMK if I've 'liked' anything
17:56:00  15   that is XRP price related?"
          16           And then, in the following message, you
          17   link her to your likes, is that correct?
          18       A.   I believe that is correct.
          19       Q.   "LMK" means let me know, right?
17:56:10  20       A.   Yes.
          21       Q.   Okay.  Why did you ask her to go look to
          22   see if you had liked anything XRP price related?
          23       A.   I don't know.
          24       Q.   Okay.  And then the next series of pages
17:56:19  25   are several tweets that you had liked.  And you
```

                                                                 408

17:56:26  1    say on the page that has 990 at the bottom,

        2    "Okay - have cleaned up the 'likes.'

        3              Do you see that?

        4         A.   I -- I see the text you're seeking --

17:56:41  5    "Okay, I cleaned up the likes."  I don't actually

        6    have the -- from what is here, I'm interpreting

        7    that these are tweets that I may have liked.

        8    That's not obvious to me from what is in front of

        9    me.  And since I don't recall, I don't know that

17:56:57 10    to be the case.

        11         Q.   Well, we can take a look at them.

        12              MR. TENREIRO:  Let's look at 36,

        13         for example.

        14         A.   Okay.

17:57:06 15              (Whereupon, exhibit is received

        16         and marked Garlinghouse Deposition

        17         Exhibit 36 for identification.)

        18              MS. BUNTING:  What exhibit is

        19         this?

17:57:28 20              MR. TENREIRO:  36.

        21              MS. BUNTING:  36.  Thank you.

        22    BY MR. TENREIRO:

        23         Q.   This appears to be a tweet that you made

        24    on October 17th about Ben Bernanke.

17:57:34 25              And then a response that says "Shitting

                                                              409

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

17:57:36   1    on Bitcoin will not increase the price of XRP.

2    Don't forget that most of us, investing in both

3    XRP and BTC."

4              Do you see that?

17:57:44   5        A.   Yes.

6        Q.   Okay.  So have you liked the "Shitting

7    on bitcoin" tweets at some point and then removed

8    the like?

9        A.   I don't know.

17:57:53  10        Q.   Okay.  Why were you removing likes from

11    anything XRP price related?

12        A.   I don't know.

13        Q.   Was there a -- I think we just saw some

14    emails earlier today to the board and to investors

17:58:04  15    where you were talking about the increase in the

16    price of XRP.  Is that fair?  If you need to go

17    back to them, go ahead.

18        A.   Can you repeat the question?

19        Q.   In -- we just saw today emails from

17:58:16  20    2017 -- I think we saw April; I think we saw

21    May -- where you were discussing the increases in

22    the price of XRP, XRP rally, et cetera, is that

23    correct?

24        A.   Yes.

17:58:26  25        Q.   You were discussing the price of XRP in

410

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

17:58:28  1    those communications, correct?

        2         A.   Yes.

        3         Q.   Including to holders of XRP, is that

        4    correct?

17:58:36  5                   MR. SOLOMON:   Objection; form.

        6         A.   I don't know -- I mean, when you say

        7    "holders of XRP," I mean, you earlier pointed out

        8    that there are -- people on the board received

        9    those communications.  And some of those people on

17:58:49 10    the board held XRP.  So, I guess, yes.

       11         Q.   And some of Ripple's shareholders also

       12    held XRP, correct?

       13         A.   I don't know.

       14         Q.   You -- have you ever come to know

17:58:57 15    whether XRP -- whether Ripple's shareholders were

       16    also holders of XRP?

       17         A.   I mean, of the 200 shareholders, do some

       18    of them hold XRP?  I think that's probably yes.  I

       19    don't -- I mean, I can think of -- well, Chris

17:59:13 20    Larsen would be an example of yes.

       21         Q.   ███?

       22         A.   I don't know if ███ still holds XRP.

       23         Q.   Back in 2017?

       24         A.   I don't know when they liquidated their

17:59:26 25    XRP.

                                                            411

```
17:59:28   1         Q.   ████████?
           2         A.   I -- I -- I don't personally know what
           3   ████████ does with his XRP.  So I don't know
           4   what he held when.
17:59:37   5         Q.   ████████████████████████
           6   (pronunciation)?
           7         A.   He would not have been on those
           8   distributions, I don't think.  He's not a
           9   shareholder.
17:59:44  10         Q.   He was not -- he was not an advisor
          11   either?
          12         A.   I -- I don't know what -- I mean, I
          13   don't -- we don't call him an advisor.  I don't
          14   know if he's on the email distribution or not.
17:59:52  15         Q.   ████████████?
          16              MR. SOLOMON:  Are you asking him
          17         whether these people who were equity
          18         shareholders also held XRP units --
          19              MR. TENREIRO:  Yes.
17:59:58  20              MR. SOLOMON:  -- to his
          21         knowledge?  Okay.
          22              I just want to make sure you
          23         understand.
          24              MR. TENREIRO:  Yeah.
18:00:02  25              MR. SOLOMON:  You were firing
```

412

```
18:00:04    1              names at him.
            2                   I just want to make sure you understand
            3    the premise of the question.
            4         A.   I don't know if ██████████ holds XRP
18:00:10    5    or --
            6         Q.   As -- I'm sorry.
            7         A.   You know, either in his fund or
            8    personally.  I -- I -- I don't know.
            9         Q.   ████?
18:00:20   10         A.   I -- ████ does -- I do know that ████ --
           11    ██████████████, the joint venture, holds some
           12    XRP.
           13         Q.   Okay.  And ████ is copied on the emails
           14    to Ripple's shareholders and advisors, correct?
18:00:34   15         A.   Yes.  The point I'm trying to make is
           16    you're asking me -- I mean, is there a -- you've
           17    highlighted of the couple hundred people that are
           18    on the shareholders distribution, there's some
           19    that I can definitely know have XRP.  The vast
18:00:48   20    majority of them, I have no idea.  I don't ask;
           21    they don't share.  It's -- it's not -- it's like
           22    asking them how much cash they have in the bank.
           23         Q.   But you definitely knew that some of
           24    them, in fact, held XRP?
18:00:59   25         A.   Yes.
```

413

```
18:01:00    1         Q.   Okay.  And in those emails, again, you
            2    were discussing the XRP rally and the price
            3    increases in XRP in 2017, right?
            4         A.   Yes.
18:01:10    5              MR. SOLOMON:  Do you want to show
            6        him the emails?
            7              MR. TENREIRO:  They're right in
            8        front of him if he wants to look at them
            9        again.
18:01:13   10         Q.   And you've looked at them.
           11              Have you -- generally speaking, there
           12    was an increase in the price of crypto assets --
           13    very generally speaking, in the year 2017, is that
           14    correct?
18:01:26   15              MR. SOLOMON:  You've got to slow
           16        down for me.
           17              THE REPORTER:  You're going too
           18        fast.
           19         Q.   Very generally speaking, there was an
18:01:27   20    increase in the price of digital assets, crypto
           21    assets, in the year 2017?
           22         A.   Yes.  My recollection is there's a very
           23    high correlation between digital assets and they
           24    all seemed to rally in 2017.
18:01:42   25         Q.   And that included XRP?
```

414

18:01:46  1          A.    That included XRP.

       2          Q.    And throughout the year 2017, you were

       3     speaking about the increases in the price of XRP,

       4     both publicly and also to Ripple's shareholders

18:01:57  5     and advisors?

       6                     MR. SOLOMON:  Objection; form.

       7          A.    I don't recall if it was throughout the

       8     year.  You've shown me examples from April and

       9     May, which are April and May.

18:02:07 10          Q.    All right.  We'll get to December.

      11                     But what prompted you, after speaking

      12     about the price of XRP at some points in 2017, to

      13     then, in January of 2018, go back to delete likes

      14     of tweets you made XRP price related?

18:02:24 15                     MR. SOLOMON:  Objection; asked

      16         and answered.

      17          A.    I -- I -- yeah, I don't recall.  I don't

      18     know.  And -- and I don't know that I did like

      19     this.

18:02:36 20          Q.    Well --

      21          A.    You have told me I liked this.  I'm not

      22     aware that I liked this.

      23          Q.    Well, I can't tell.  You -- somebody

      24     deleted the like -- you deleted some likes,

18:02:43 25     correct?

                                                                    415

```
18:02:43   1                    MR. SOLOMON:  Objection.  Don't
           2          tell him what he's done.  Ask him what he
           3          remembers doing.
           4          Q.    You deleted some likes, correct?  You
18:02:49   5   said in this text "Have cleaned up the likes."
           6          A.    I said that I cleaned up the likes, yes.
           7   I don't know if that means that I had liked this
           8   and unliked it or not.  I can't tell from this.
           9          Q.    When you say "cleaned up the likes,"
18:03:01  10   what did you mean?  Does that mean unlike?
          11          A.    I -- I --
          12                    MR. SOLOMON:  Objection; form.
          13          A.    I didn't recall the text, and so I
          14   certainly don't recall what I thought in 2017 when
18:03:12  15   I sent those texts.
          16          Q.    On the next page of the texts, if you
          17   can go back to that exhibit, which is 35, towards
          18   the -- towards the end, the second-to-last page.
          19                On the second-to-last page, you say "Can
18:03:35  20   your teams review David Schwartz tweets and likes
          21   for particularly noteworthy"?
          22                Do you see that?
          23          A.    I do see that.
          24          Q.    She asked you "When does this need to
18:03:45  25   get done?"
```

                                                               416

18:03:45   1                    And then I'm skipping one message.  You

           2      say "Prob depends on FT timing."

           3            A.   Yes.

           4            Q.   What does "FT timing" mean?

18:03:54   5            A.   When I read that the first time and I

           6      read through it, I thought to myself I wonder what

           7      that means and I don't know now what that means.

           8            Q.   Did ███████████ go through David

           9      Schwartz' tweets and likes for particularly

18:04:08  10      noteworthy?

          11            A.   I assume she did because she's pretty

          12      diligent, but I don't know.

          13            Q.   Did you instruct him to clean up likes

          14      on his Twitter account?

18:04:18  15            A.   I don't recall.

          16                    MR. SOLOMON:  Objection.

          17            Q.   At the end of the conversation, you say

          18      "I spoke to David earlier today.  He is also

          19      reviewing.  I'd like to keep traffic on this to a

18:04:25  20      minimum.  I will call you."

          21                    Why did you want to keep traffic on this

          22      to a minimum?

          23            A.   I -- I don't know.

          24            Q.   What does "this" mean in the text?  Is

18:04:33  25      it the issue of cleaning up likes?

                                                                        417

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

18:04:36  1        A.   I -- I don't know.  I don't remember
        2  these texts and I don't remember what the impetus
        3  was and I don't remember what I was thinking when
        4  I sent that.
18:04:43  5               MR. TENREIRO:  Okay.  So let's
        6        go -- are we ready or not yet?
        7               MR. BAMBERGER:  Yeah, just going
        8        to bring them out.
        9               MR. TENREIRO:  Great.  Let's go
18:04:54 10        to Exhibit 78 while we wait.
       11               (Whereupon, exhibit is received
       12        and marked Garlinghouse Deposition
       13        Exhibit 78 for identification.)
       14  BY MR. TENREIRO:
18:05:07 15        Q.   Now we're in June.
       16               (Pause)
       17        Q.   And just while you're reading, I'm going
       18  to state on the record 78 is a three-page email
       19  thread, RPLI_SEC 54397.  And it appears to be
18:06:38 20  around June 5th, 2017.
       21               (Pause)
       22        Q.   All right.  Starting with the email,
       23  this appears to be another update, is that fair to
       24  say, the email that starts in the middle -- or
18:09:00 25  towards the top of page 2, rather, another

                                                            418

18:09:03  1   investor and advisor update that you were sending?

2        A.   Yes.

3        Q.   All right.  And in this one, you also

4   talk about the increase in XRP's price so far in

18:09:12  5   2017.  You refer to a 5,000 percent increase, is

6   that correct?

7        A.   Yeah, I don't -- I didn't know if I

8   catched the 5,000 percent reference.

9        Q.   Yes.

18:09:26 10        A.   Yes, I see that now.  Yes.

11        Q.   Okay.  Further up you say "Despite a

12   proven track record of being good stewards of XRP,

13   we have continued to hear concerns in the market

14   that Ripple could (hypothetically) sell our 61

18:09:39 15   billion XRP at any time - a scenario that would

16   certainly be bad for Ripple."

17            Do you see that?

18        A.   Uh-huh.

19        Q.   And then you talk about the escrow,

18:09:45 20   right?

21        A.   Yes.

22        Q.   The proven track record, what -- what is

23   that track record?  What proved the track record

24   in your mind then?

18:10:01 25        A.   I guess, simplistically, the fact that

                                                          419

18:10:04  1    we had never dumped XRP on the market, as some
        2    said it was hypothetically at risk, some continued
        3    to feel that because that risk existed, that the
        4    fact that we have proven that over a period of
18:10:22  5    time we had not done things like that and, in
        6    fact, tried to do the opposite, there were still
        7    those who felt that risk existed.
        8         Q.   Is there anything else that proves this
        9    track record up to this point in time of being
18:10:36 10    good stewards of XRP other than the absence of the
       11    dumping?
       12         A.   I guess there's probably a myriad of
       13    examples of how we have tried to be good stewards.
       14    I think the mere fact that we started publishing a
18:10:56 15    quarterly XRP market update to try to find
       16    transparency would be an example of trying to be a
       17    good steward.
       18         Q.   What about selling XRP programmatically
       19    in ways to not affect the market for XRP?  Is that
18:11:10 20    a good -- an example of being a good steward?
       21              MR. SOLOMON:  Objection; form.
       22         A.   I think to the extent we have
       23    consistently demonstrated a track record, we're
       24    trying to make sure we don't impact the XRP
18:11:24 25    markets, would be evidence of being a good

                                                            420

18:11:26   1    steward.

           2        Q.    But that includes not impacting it with

           3    respect to your sales -- or with your sales?

           4              MR. SOLOMON:   Objection; form.

18:11:34   5        Q.    Right?

           6        A.    That's what I just said.

           7        Q.    Okay.   Sorry if I misunderstood.

           8              Was one of the reasons for the escrow to

           9    remove that concern or hypothetical that some

18:11:51  10    people threw out there?

          11              MR. SOLOMON:   Objection; form.

          12        A.    And I think what I wrote at this time

          13    was "We have given investors a predictable supply

          14    schedule and removed what skeptics" -- sorry.  "So

18:12:06  15    with the decision to lock up 55 billion XRP in

          16    escrow, we have given investors a predictable

          17    supply schedule and removed what skeptics have

          18    suggested has been a barrier to broad XRP

          19    adoption."

18:12:21  20        Q.    Right.  And -- and the email -- and

          21    absolutely you can look at or refer to.

          22              But, just generally, was one of the

          23    reasons for the escrow to remove that sort of

          24    concern that people in the market had expressed to

18:12:33  25    Ripple about potential dumping?

                                                                421

| | |
|---|---|
| 18:12:35 | 1 |

18:12:35  1       A.   I think that's what the email says.

2       Q.   And was one of the purposes of the

3  escrow to encourage speculation in XRP?

4               MR. SOLOMON:  Objection; form.

18:12:50  5               MR. CERESNEY:  Objection.

6       A.   I think the -- my recollection, as

7  consistent with what the email says, is to remove

8  the concern that had been expressed that there was

9  a risk that we would dump XRP in the market.

18:13:03 10       Q.   And was one of the purposes of removing

11  that concern to encourage speculation in XRP?

12  Again, you can look at the email or not.  I'm just

13  asking you for your memory of what was the purpose

14  behind the escrow.

18:13:15 15       A.   My recollection of the purpose of the

16  escrow is consistent with what is said here.

17       Q.   All right.  Further down you say "The

18  bottom line is that we are committed to making XRP

19  the best digital asset for payments."

18:13:27 20            Do you see that?

21       A.   Yes, I do see that.

22       Q.   How was Ripple planning on making XRP

23  the best digital asset for payments in -- when you

24  wrote this email in June of 2017?

18:13:41 25       A.   My rec -- my recollection in June of

                                                      422

18:13:44    1    2017 is that we were continuing to execute a

            2    strategy to make XRP very, very liquid and very,

            3    very fast, very, very low energy, such that it

            4    could be used both with Ripple's products and

18:14:01    5    people outside of Ripple to take advantage of XRP

            6    as a very efficient payment mechanism.

            7         Q.   And the very, very fast and very, very

            8    low energy, are those the efforts that the

            9    engineers or computer scientists were engaged in?

18:14:16   10              MR. SOLOMON:  Objection; form.

           11         A.   Ripple's engineers were engaged in a

           12    whole bunch of things.  XRP, as an open-source

           13    technology, can be contributed to by Ripple's

           14    engineers and as well as non-Ripple engineers.

18:14:30   15         Q.   Right.

           16              My question, though, was you said -- you

           17    said "My recollection in June of 2017 is that we

           18    were continuing to execute a strategy to make XRP

           19    very, very liquid and very, very fast, very, very

18:14:43   20    low energy."

           21              And my question is:  Who at Ripple was

           22    continuing to execute a strategy to make XRP very,

           23    very fast and very, very low energy in June 2017?

           24         A.   I guess to be fair, at that point XRP

18:14:56   25    already was very, very fast and very, very low

                                                                 423

18:14:58  1    energy.

          2         Q.   So you were not at that point committed

          3    to continuing those efforts?

          4         A.   No.  I would guess if we looked back at

18:15:11  5    the, you know, scalability of the XRP Ledger,

          6    there continued to be improvements in the

          7    four-plus years since this email was written.

          8         Q.   And were Ripple engineers participating

          9    in making those improvements?

18:15:24 10         A.   I don't know.

         11         Q.   Okay.  Is it true today that Ripple is

         12    committed to making XRP the best digital asset for

         13    payments?

         14         A.   I mean, I would say today, as we have

18:15:38 15    obviously spoken about here and elsewhere, you

         16    know, we want to see XRP be very, very liquid,

         17    have a lot of utility, be very trusted.  One

         18    manifestation of that is its use case around

         19    payments and Ripple's use case largely around

18:15:54 20    institutional liquidity.

         21         Q.   Okay.  The -- on the second page of the

         22    email, someone named ███████████  do you know who

         23    that is?

         24         A.   Yes.

18:16:05 25         Q.   Who is he?

                                                                424

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

```
18:16:06   1        A.    He is ████████████████████
           2        Q.    Okay.   And does he hold XRP?
           3        A.    I don't know.
           4        Q.    Okay.  ████████████  says -- I'm looking
18:16:15   5   at the second page, Mr. Garlinghouse.  He says
           6   "Congratulations," et cetera.  He talks "You will
           7   have to conduct a seminar (for me at least) on the
           8   dynamics of cryptocurrency markets and what drives
           9   the staggering appreciation and/or volatility.  I
18:16:29  10   appreciate that the appreciation is likely not to
          11   be a one-way trip."
          12              Do you see that?
          13        A.    Yes.
          14        Q.    Is it fair -- and then, on the front
18:16:39  15   page, you say "On crypto I think there are four
          16   drivers so far this year for XRP," and you list
          17   four things.
          18              Do you see that?
          19        A.    Yes.
18:16:50  20        Q.    Okay.  And were you accurately
          21   reflecting your beliefs as the time -- at the time
          22   as to the factors that went into the increase in
          23   price of XRP?
          24        A.    I think I'm accurately reflecting, as
18:17:04  25   best I can, to ███████████████████ who has
```

425

18:17:08  1   very little understanding of technology or

2   certainly the crypto market.

3       Q.   Explaining what you believed to be the

4   factors that went into the increase in price of

18:17:17  5   XRP?

6              MR. SOLOMON:  Objection; form.

7       A.   I think I'm as simplistically as

8   possible trying to, as I think he asked, "conduct

9   a seminar on the dynamics of cryptocurrency

18:17:34 10   markets and what drives the staggering

11   appreciation and/or volatility."

12              As I've testified earlier today, I think

13   that's a very, very, very hard thing to do, in

14   understanding what drives the volatility and

18:17:47 15   activity in the crypto markets even today, for

16   example.

17       Q.   In June of 2017, you had the view that

18   to the extent Ripple does well in announcing

19   customers, that could drive market interest in

18:18:02 20   buying XRP as a speculative investment, correct?

21       A.   You know, as I've testified earlier

22   today, I think there were times in 2017 that I had

23   the miscon -- the belief that -- and maybe

24   optimism perhaps -- that Ripple's activities had

18:18:26 25   in some ways touched the XRP markets.

426

18:18:29 1      Q.   And in 2017 you also believed that

2      announcements about new exchanges listing XRP also

3      created tailwinds for the XRP market, right?

4      A.   Yes.  The more exchanges that list XRP,

18:18:48 5      the more liquidity there is in the XRP market, the

6      more trading pairs there are in the XRP market.

7      And I think it's fair to call that tailwinds.

8      Q.   Well, here you're not talking about the

9      exchanges listed.  You're talking about

18:19:01 10     announcements about exchanges listed.

11          MR. SOLOMON:  Objection; form.

12     Q.   So my question is, is it fair to say

13     that in 2017 you believed that announcements about

14     exchanges listing XRP created tailwinds?

18:19:16 15     A.   I think you're making a distinction that

16     I'm not making.  Announcing a new exchange listing

17     and implementing a new exchange listing I kind of

18     view as one and the same.

19     Q.   Okay.  And tailwinds means good for the

18:19:31 20     market generally?  Or what does tailwinds mean?

21     It's your -- it's your email.

22          MR. SOLOMON:  Objection; form.

23     A.   When I use the word "tailwinds," I'm

24     usually suggesting that macro trends are positive

18:19:49 25     and constructive.  And so to the extent more

427

18:19:54  1    exchanges are listing XRP, it's creating more

2    liquidity in the XRP market, and I view that as

3    net positive for all participants in the XRP

4    market.

18:20:06  5         Q.   And, again, liquidity means, in your

6    mind, volume?

7                   MR. SOLOMON:  Objection; asked

8          and answered.

9         A.   One critical aspect of liquidity I would

18:20:14 10    say is volume.

11         Q.   And before I move on, if you can go back

12    to your original email, when you talked about the

13    over 5,000 percent increase in the price of XRP,

14    you say "Ripple is worth more than all but four

18:20:31 15    U.S. start-ups."

16              Do you see that?

17         A.   Yes.

18         Q.   How were you valuing Ripple?  Ripple's

19    shares did not have, for example, like an actively

18:20:41 20    traded market at this time, right?

21                   MR. SOLOMON:  Objection; form.

22         A.   That's correct.

23         Q.   How were you valuing Ripple when you

24    made this statement?

18:20:48 25         A.   It looks like I'm referencing a CNBC

428

18:20:52 1  article.  And so I'm looking at how CNBC may have

2  valued Ripple.

3      Q.   In -- in fact, you say, "In fact,

4  factoring in the 18 billion of XRP we own, Ripple

18:21:02 5  is worth more than all but four U.S. start-ups,"

6  right?

7      A.   That is what the email says and then it

8  links to an article that apparently I'm

9  referencing that I assume references the value of

18:21:17 10 Ripple.

11     Q.   What were Ripple's revenues from

12 software sales in June of 2017?

13     A.   I don't recall.

14     Q.   Magnitude?  Order of magnitude?

18:21:28 15    A.   In the ███████████████████

16 ████████████████ millions.

17     Q.   Okay.  Let's look at Exhibit 32.

18          (Whereupon, exhibit is received

19      and marked Garlinghouse Deposition

18:21:36 20     Exhibit 32 for identification.)

21          MR. TENREIRO:  Here you go.

22          (Pause)

23 BY MR. TENREIRO:

24     Q.   All right.  In this email, the subject

18:23:14 25 is "Memes we should push."

429

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

18:23:16  1              Do you see that?

        2      A.   Yes.

        3      Q.   Memes we should push where?

        4      A.   I don't know.

18:23:25  5      Q.   In public?

        6              MR. SOLOMON:  Objection; asked

        7       and answered.

        8      A.   I don't know.

        9      Q.   You say "There are two memes I think we

18:23:34 10 want to push aggressively (well, we really want to

       11 push the first one - maybe/maybe not the second

       12 one)."  The first one is XRP is -- now I'm not

       13 reading.  I'm -- "XRP is the best performing

       14 (digital) asset in 2017.  We are up more than

18:23:47 15 10,000 percent for the year."

       16              Do you see that?

       17      A.   Yes.

       18      Q.   Why were you instructing the Hatch

       19 Agency to aggressively push the meme that XRP was

18:23:56 20 up more than 10,000 percent for the year?

       21              MR. SOLOMON:  Objection; form.

       22      A.   I think to the extent I'm educating the

       23 market about the advantages and differences

       24 between XRP and the performance of XRP relative to

18:24:11 25 other digital assets, that is constructive in

                                                          430

```
18:24:15   1    getting more people doing things around the XRP
           2    ecosystem which drives liquidity of the whole
           3    ecosystem.
           4         Q.   So you were -- you wanted ██████████
18:24:23   5    ███████ to aggressively push the concept of XRP's
           6    rise in price in order to bring liquidity into the
           7    ecosystem, is that correct?
           8              MR. SOLOMON:  Objection.
           9         A.   I think I'm -- I mean, it's a statement
18:24:45  10    of fact, I think -- I don't remember exactly --
          11    that XRP, regardless of the reasons, outperformed.
          12    And I think highlighting the unique, as I say --
          13    "and makes XRP unique" -- I think uniquely --
          14    "position to capitalize on the many opportunities
18:25:05  15    for digital assets."
          16              I think the more people who are building
          17    on top of, contributing to, and driving liquidity
          18    in XRP markets, that's good for Ripple.  That's
          19    good for all the participants in the XRP market.
18:25:16  20         Q.   And liquidity in your answer means, in
          21    part at least, more volume of XRP trading?
          22         A.   That's correct.
          23         Q.   All right.  And then above you say, you
          24    know, you can live stream and tweet storm some of
18:25:33  25    this information.
```

431

18:25:34    1                Do you see that?

            2        A.   I do see that.

            3        Q.   Did you engage in a tweet storm about

            4    this topic?

18:25:46    5        A.   I -- this is over about four years ago.

            6    I don't know the answer to that.

            7        Q.   Above you say "At today's XRP prices,

            8    Ripple is more valuable than every other private

            9    company in Silicon Valley except for Uber."

18:25:59   10                Do you see that?

           11        A.   I do see that.

           12        Q.   How did you value Ripple in order to

           13    make that statement?

           14        A.   I presume I'm using the same -- what was

18:26:05   15    the last article you sent me?  The CNBC framework.

           16    That they're looking at Ripple's holdings of XRP.

           17        Q.   To value Ripple?

           18        A.   I -- I don't remember this email, and so

           19    I'm presuming -- I don't know what the date

18:26:23   20    comparisons are.  It's actually quite different

           21    dates.  So I -- I presume some have looked at

           22    Ripple and said Ripple owns a lot of XRP, as you

           23    saw in the CNBC article, and so I'm probably using

           24    that same logic.

18:26:40   25        Q.   Yeah.

                                                                    432

```
18:26:40   1              And that CNBC article -- by the way, did
           2    you reach out to CNBC to try to correct any
           3    confusion about, you know, linking Ripple to XRP
           4    or did you instruct anyone else to do that?
18:26:51   5         A.   I don't recall.
           6         Q.   Okay.
           7              MR. TENREIRO:  Let's take a break
           8         so --
           9              MR. SOLOMON:  Sure.
18:26:56  10              MR. TENREIRO:  Let's go off the
          11         record.
          12              THE VIDEOGRAPHER:  Okay.  Going
          13         off the record at 6:28.
          14              (Whereupon, a recess is taken.)
18:27:01  15              THE VIDEOGRAPHER:  Okay.  Back on
          16         the record, 6:41.
          17    BY MR. TENREIRO:
          18         Q.   Okay.  Do you have -- sorry, which one
          19    do you have in front of you?
18:39:49  20         A.   Exhibit 32.
          21         Q.   Okay.  This is the one where you're
          22    talking about the memes about pushing aggressively
          23    the performance of XRP, correct?  This is in
          24    December of 2017?
18:40:05  25              MR. SOLOMON:  Is that a question?
```
                                                          433

```
18:40:06   1              MR. TENREIRO:  Yes.
           2         Q.   Is this -- is this where you were
           3    discussing aggressively pushing XRP's performance
           4    in 2017?
18:40:16   5         A.   I -- I think -- your characterization,
           6    yes.
           7         Q.   All right.  Here's Exhibit 33.
           8              (Whereupon, exhibit is received
           9         and marked Garlinghouse Deposition
18:40:21  10         Exhibit 33 for identification.)
          11    BY MR. TENREIRO:
          12         Q.   While you take a look, I'll say that --
          13    please read it.  There's an attachment that I
          14    included for completeness.  I'm going to ask you
18:40:37  15    about the email, but you can read the whole thing
          16    if you need to.  The email is RPLI_SEC 866480.
          17              (Pause)
          18         Q.   Mr. Garlinghouse, in 2000 -- around
          19    December 15, 2017, did you have a meeting with
18:43:54  20    Ripple's board where you discussed their offer to
          21    help Ripple spread the word?  Bottom of the email.
          22              MR. SOLOMON:  Objection; form.
          23         A.   I -- as described, I have no
          24    recollection of that, but I believe that's the
18:44:07  25    case.
```

434

18:44:08    1        Q.    Okay.  And the purpose -- is it fair to

            2    say that the purpose of sending them the attached

            3    FAQ was to arm them with Ripple's Key Messages?

            4        A.    I'm assuming that someone asked for that

18:44:24    5    information at the board meeting, and so we were

            6    following up on a request from the board.

            7        Q.    And spread the word to whom?

            8        A.    That -- their family, their

            9    respective -- I don't know.  I mean, there's a lot

18:44:40   10    of people interested, particularly, frankly, in

           11    December of 2017, there was a lot of people

           12    interested in crypto.  And there's, you know, more

           13    interest in knowledge.  There's more interest in

           14    facts.  And so to the extent we can help our board

18:44:55   15    members particularly be -- have more expertise,

           16    more knowledge, that's probably useful.

           17        Q.    Did you restrict the board members --

           18    did you restrict to whom they might spread the

           19    word to in any way?

18:45:10   20        A.    I don't recall.

           21        Q.    Is it possible that you did?

           22        A.    I don't know how I'd do that.

           23        Q.    Well, did you ask any of the board

           24    members, you know, here's our Key Messages, but,

18:45:19   25    you know, don't discuss those with X, Y, Z types

                                                                    435

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

18:45:24   1    of people?  Did you say anything like that?

           2         A.   I -- I don't recall.

           3         Q.   Okay.  And here in the email, you

           4    discuss, again, "The price of XRP is up 200

18:45:30   5    percent since Monday."  You note that as well?

           6    You note that, correct?

           7         A.   Yes.  I also note that crypto will

           8    continue to be volatile, unpredictable, and even

           9    at times irrational.

18:45:46  10         Q.   And, in fact, you stated in your talking

          11    points that you took a longer term of the view of

          12    the market for XRP?

          13         A.   Yeah.  I think I've said publicly that I

          14    try not to pay attention to the gyrations of the

18:45:59  15    market.  I think, you know, "We're not here to

          16    pump XRP.  We can't know exactly what will happen

          17    to the price of XRP in the coming days or weeks."

          18              THE REPORTER:  Slow down.

          19              THE WITNESS:  I'm sorry.

18:46:16  20         A.   "We can't know exactly what will happen

          21    to the price of XRP in the coming days or weeks."

          22         Q.   And you stated publicly on a number of

          23    occasions that you didn't look at the XRP price

          24    over the course of the next three days or weeks

18:46:30  25    but, rather, three to five years, correct?

                                                              436

```
18:46:32   1                  MR. SOLOMON:  Objection; form.
           2        A.   Yes.  I mean, to be clear, I viewed that
           3   as kind of just -- I'm trying to take a long-term
           4   view of crypto overall, of XRP.  And, you know, my
18:46:45   5   counsel, which I think is, you know, repeated
           6   is -- for employees and otherwise, is to not let
           7   the craziness of, excuse me, the crypto markets
           8   distract us.
           9        Q.   And you've also stated publicly on
18:46:58  10   occasion that you were long XRP, correct?
          11        A.   Yes.
          12        Q.   In fact, I think you stated very, very
          13   long at some points?  There was --
          14        A.   I don't know how many verys -- I don't
18:47:09  15   know how many verys.  I -- I said publicly that I
          16   am long XRP.
          17        Q.   You stated that you know Rip -- at
          18   Ripple you're capitalists with respect to
          19   commenting on XRP?
18:47:19  20                  MR. SOLOMON:  Objection; form.
          21        A.   Could you ask that question again?
          22        Q.   With respect to discussing XRP in
          23   public, you've stated, you know -- in sum and
          24   substance; I'm not quoting you exactly -- Ripple,
18:47:32  25   we're capitalists, you know.  We want -- we are
```

437

18:47:33  1    interested in XRP.
        2        A.   I think I probably said we're interested
        3    in long-term success of the XRP markets.
        4        Q.   Okay.  And how do you measure the
18:47:42  5    long-term success of the XRP markets?
        6        A.   Liquidity, value, utility, trust.
        7        Q.   Trust from whom?
        8        A.   Anyone who's interested in -- in crypto
        9    or in the movement of financial value.
18:48:03 10    Governments.
       11        Q.   In the email, you say, "1, XRP's rise
       12    over the course of this year signals market
       13    expectations of our company."
       14             Do you see that?
18:48:13 15        A.   I do see that.
       16        Q.   What expectations was the rise
       17    signaling?
       18        A.   I don't know.
       19        Q.   Expectations that the company -- was it
18:48:23 20    expectations that the company would do something?
       21        A.   I don't know.
       22        Q.   Okay.
       23        A.   It looks to me a little bit like I'm
       24    using it as a rallying cry.  "All eyes are on us
18:48:36 25    and it's more important now than ever that we

                                                          438

18:48:38  1    execute."  There was a lot of attention around the
        2    crypto markets.  There was a lot of attention
        3    around Ripple.  It's important that we didn't get
        4    distracted by the volatile, unpredictable and, at
18:48:50  5    times, irrational markets and instead built
        6    products that benefited our customers.
        7         Q.   So when you say "execute," execute on
        8    what?
        9         A.   Execute on our product strategy, execute
18:49:06 10    on our sales efforts, execute on our development.
       11         Q.   Sometimes you described it as solving a
       12    trillion-dollar problem, is that right?
       13              MR. SOLOMON:  Objection; form.
       14         A.   I think I have described that the way
18:49:23 15    liq -- the way financial institutions move
       16    liquidity today results in trapped capital.  The
       17    system, typically referred to as Nostra/Vostro
       18    accounts --
       19              THE REPORTER:  I need that again.
18:49:39 20              THE WITNESS:  No --
       21         N-O-S-T-R-O-/-V-O-S-T-R-O.
       22         A.   And according to studies I have read,
       23    including by McKinsey, that amount sitting out
       24    there is measured in the trillions.
18:49:49 25         Q.   And the general media training FAQ,

                                                              439

18:49:54   1   what was the purpose of that document?

2          A.   To be a general media training document.

3          Q.   Was the purpose of that document to

4   provide talking points for when Ripple employees

18:50:10   5   spoke with the media?

6               MR. SOLOMON:   Objection; form.

7          A.   Well, typically we didn't -- I mean, I

8   would say the short answer is no.  I mean, we

9   didn't empower all of our employees to talk to the

18:50:20  10   media.

11          Q.   Well, to the extent that some did, to

12   the extent -- was the purpose -- was one of the

13   purposes of this document to provide talking

14   points for those Ripple employees who did speak to

18:50:30  15   the media for when they did so?

16          A.   My experience in how our Comms teams

17   worked is they would have had something that

18   wasn't general media, but specific to a specific

19   outlet or to a specific event, a specific panel.

18:50:48  20   So the general media training, you know, I think

21   is here's some information about the company that

22   might be useful.  And in this case -- again, I

23   think it was catalyzed coming out of the board

24   meeting -- I'm presuming that someone on the board

18:51:08  25   had questions about what was going on and how they

440

18:51:14  1    should be talking about the company.

          2         Q.    Talking publicly about the company?

          3         A.    That's your characterization, not mine.

          4         Q.    I'm asking you.  Was it talking

18:51:21  5    publicly?

          6         A.    I don't know.

          7         Q.    Okay.  Stepping away from the board

          8    members, again, the general media training FAQ

          9    document, was the purp -- was one of the purposes

18:51:31 10    of this document to provide talking points for

         11    public speaking about Ripple to the extent a

         12    person engaged in such public speaking?

         13         A.    I don't think it would have been this

         14    document, but a more targeted, specific document,

18:51:44 15    depending upon the audience, the panel, event,

         16    what have you.

         17         Q.    So this was -- was this maybe, then,

         18    like sort of a base document and then from them --

         19    from there you could create a more specific one

18:51:59 20    depending on the audience, event, or panel?

         21              MR. SOLOMON:  Objection; form.

         22         A.    Yeah, I think that's a fair

         23    characterization.

         24         Q.    Okay.  And having just reviewed the FAQ,

18:52:10 25    is it fair that on or around 2017, December of

                                                                    441

```
18:52:13   1    2017, these are ideas that Ripple employees might
           2    have stated publicly?
           3         A.   I don't think this was -- I mean, as
           4    I've testified earlier, I don't think this was
18:52:26   5    distributed to all of our employees.
           6         Q.   Right.
           7              So my question is, to the extent
           8    employees of Ripple spoke publicly, do you have a
           9    recollection on or around December 2017 hearing
18:52:40  10    some of these things said publicly?
          11              MR. SOLOMON:   Objection.
          12         A.   I don't recall.
          13         Q.   For example, you know, on page 2, you
          14    say "We've been strong stewards of XRP and our
18:52:48  15    interests are very much aligned."
          16         A.   Can you point to me where that is?
          17         Q.   Yeah.   The second page of the FAQ
          18    towards the bottom.   There's -- almost at the end.
          19              MR. SOLOMON:   What is the
18:53:02  20         question, please?
          21         Q.   Is it fair to say that on or around
          22    December of 2017, you or other Ripple employees
          23    might have stated publicly something similar to
          24    what's here, which is "We've been strong stewards
18:53:13  25    of XRP and our interests are very much aligned"?
```

442

18:53:16   1                    MR. SOLOMON:  Objection; calls

           2          for speculation.

           3          A.   I don't know.  I -- I, to my knowledge,

           4     haven't seen this.  I don't recall seeing this

18:53:25   5     document, so I don't know.

           6          Q.   Okay.  What about a little further up

           7     where it says "Important to note that we take a

           8     very long view of the market and don't get caught

           9     up in short-term price gyrations"?  Is that a

18:53:38  10     concept that you or other Ripple employees spoke

          11     of publicly on or around December of 2017?

          12          A.   I -- I don't know.

          13          Q.   Okay.  On the last part, it says "The

          14     SEC's guidance is no surprise."

18:53:54  15                    Are you referring -- what are you

          16     referring to there?  What guidance?

          17          A.   The header there says "What's your

          18     stance on ICOs?"  So I think I'm reacting to the

          19     ICO boom of 2017.

18:54:08  20          Q.   But what SEC guidance are you referring

          21     to?

          22          A.   I don't know.

          23          Q.   You say "It's consistent with how the

          24     law has worked for 70 years."

18:54:18  25                    Do you see that?

                                                                    443

```
18:54:18   1          A.   Yes.
           2          Q.   Okay.  And you had not hired
           3     Mr. Ceresney at that point, correct?
           4          A.   No.
18:54:22   5          Q.   Okay.  So where -- where did you get
           6     this from, that the SEC's guidance "was consistent
           7     with how the law has worked for 70 years"?
           8          A.   I don't know.
           9          Q.   How referring to the Howey test?
18:54:31  10          A.   I don't know.
          11          Q.   And -- okay.
          12               So how -- is there some document that
          13     might refresh your recollection as to what the
          14     basis was for your statement that the SEC's
18:54:44  15     guidance was no surprise and was, in fact,
          16     consistent with how the law has worked for 70
          17     years?
          18               MR. SOLOMON:  Objection; form.
          19          A.   I don't have any recollection.
18:54:57  20          Q.   Okay.  Had -- Ripple had quarterly
          21     all-hands meetings, is that right?
          22               MR. SOLOMON:  Can I just ask one
          23          clarifying question?
          24               MR. TENREIRO:  Yes.
18:55:04  25               MR. SOLOMON:  Did -- did you --
```

444

18:55:04    1           did you write these general media FAQs?

            2                    THE WITNESS:  No.

            3                    MR. SOLOMON:  Do you know who

            4           did?

18:55:10    5                    THE WITNESS:  No.

            6                    MR. SOLOMON:  Okay.

            7    BY MR. TENREIRO:

            8           Q.   Did you review them before you sent them

            9    to the board --

18:55:14   10           A.   I --

           11           Q.   -- of the company?

           12           A.   I don't think so.

           13           Q.   You don't -- you don't think you

           14    reviewed them before you sent them to the board?

18:55:19   15           A.   I don't recall, but I don't think so.

           16           Q.   Okay.  Did you ever review them?

           17           A.   I would have reviewed a more specific

           18    media briefing document to the extent I was

           19    speaking publicly in or around that time that

18:55:35   20    would have been, frankly, customized for that

           21    event.

           22           Q.   Do you recall writing to Ripple's

           23    investors that the SEC had showed leadership in

           24    regulation releasing guidance that it viewed

18:55:51   25    initial coin offerings as securities?

                                                                     445

18:55:56  1        A.    I -- I don't recall.
          2        Q.    Okay.  You had -- Ripple had what you
          3   called all-hands meetings from time to time?
          4        A.    Yes.
18:56:07  5        Q.    And what was the purpose generally of
          6   those meetings?
          7        A.    As the company grew, I think it became
          8   more and more important to share with the company
          9   kind of what's going on with the company, where
18:56:24 10   we're headed, get people excited about the future
         11   of the company.
         12        Q.    And what was the frequency of these
         13   meetings?
         14        A.    Depends on what time period we're
18:56:36 15   talking about.
         16        Q.    Let's say when you became CEO in 2017.
         17        A.    I don't know when exactly we
         18   transitioned.  We used to do them more frequently
         19   and then, as time went by, because of a certain
18:56:50 20   amount of work involved with -- I think we
         21   actually did them almost weekly when I first
         22   joined the company and maybe became CEO.  As time
         23   went by and the company grew, we transitioned to
         24   doing all-hands by each quarter.
18:57:10 25             We also have, you know, more informal

                                                              446

```
18:57:13   1    meetings more regularly, but...
           2         Q.   Right.  And there's -- let's -- let's
           3    stick to the all-hands for now.
           4              Some of the -- the all-hands meetings
18:57:21   5    were recorded in some fashion, is that correct?
           6                   MR. SOLOMON:  Objection; form.
           7         A.   I -- I -- I'm not aware.
           8         Q.   So, for example, are you aware as to
           9    whether they were videotaped?
18:57:31  10                   MR. SOLOMON:  Objection; form.
          11         A.   I -- I think some of them, particularly
          12    as we became more global, we started recording
          13    them so that people in other time zones -- if
          14    you're in Singapore and we're doing an all-hands
18:57:48  15    at, you know, 10 a.m. on a Monday, that's a pretty
          16    God-awful time for the team in Singapore.  And so
          17    we would have, I think, recorded them and
          18    encouraged the team members in Singapore to watch
          19    them.
18:58:02  20         Q.   Did you speak -- after you became CEO,
          21    did you speak at all at these all-hands meetings?
          22    As a general matter.  I understand you might have
          23    missed one, but generally speaking.
          24         A.   Generally speaking, yes.
18:58:12  25         Q.   Did Mr. Larsen speak at -- at the
```

447

```
18:58:14    1    all-hands meetings at any time?
            2         A.   At any time, yes.  Certainly, again, it
            3    depends on what time period we're talking about,
            4    but less and less, though.
18:58:24    5         Q.   What about 2017?
            6         A.   I don't recall.
            7         Q.   Okay.  What other meetings were recorded
            8    so -- sort of for this purpose of other Ripple
            9    employees, different time zones, et cetera?
18:58:38   10         A.   I -- I --
           11              MR. SOLOMON:  Objection; form.
           12         A.   I -- I don't know which ones are
           13    recorded, which ones are not recorded.
           14         Q.   Who would know?
18:58:50   15         A.   Maybe the Comms teams.  Maybe the, kind
           16    of, IT operations team that actually would have
           17    done the recording.
           18         Q.   And where are the recordings stored?
           19              MR. SOLOMON:  Objection; form.
18:58:58   20         A.   I don't know.
           21         Q.   Did you know that you were being
           22    recorded when you spoke at those meetings?
           23              MR. SOLOMON:  Objection.  I don't
           24         think he knew they were all being
18:59:09   25         recorded, but I'm sorry --
```

                                                              448

```
18:59:12   1          Q.   When you were being recorded, did you
           2     know?
           3                    MR. SOLOMON:  Okay.  Okay.
           4          A.   I -- I don't recall.
18:59:19   5          Q.   Did you ever ask anyone at Ripple not to
           6     record any of these meetings?
           7          A.   I don't believe so.  I don't recall
           8     knowing that they were always being recorded, so I
           9     don't think I would have taken the energy to say
18:59:31  10     let's not record them.
          11          Q.   Okay.  Let's do Exhibit 101.
          12                    MR. TENREIRO:  And do you want to
          13               explain or do you want me -- what do you
          14               want to do?
18:59:44  15                    MR. BAMBERGER:  Why don't I do it
          16               and you can correct.
          17                    MR. TENREIRO:  Okay.
          18                    MR. BAMBERGER:  And so there are
          19               a number of transcripts the SEC's counsel
18:59:46  20               has provided to Mr. Garlinghouse's counsel
          21               prior to the questioning of him.  They run
          22               to over 300 pages.  And so --
          23               collectively.
          24                    And so the agreement that we've
18:59:56  25               made is that Mr. Garlinghouse will not --
```

449

```
18:59:58   1          has not had the opportunity to review the
           2          transcripts in their entirety.  The SEC's
           3          counsel has pointed us to portions of the
           4          transcripts he expects to question
19:00:06   5          Mr. Garlinghouse about.  We've asked
           6          Mr. Garlinghouse to review those portions
           7          that the SEC has designated.
           8               They're, in several of them,
           9          portions prior to the portions the SEC
19:00:18  10          has designated, in which there are other
          11          discussions of other aspects of Ripple's
          12          business.  We have highlighted those
          13          portions in pen.  And to the extent those
          14          discussions are, in Mr. Garlinghouse's
19:00:29  15          mind, relevant to his answers to the
          16          questions the SEC's counsel poses to him,
          17          he should look at those portions.
          18               MR. TENREIRO:  I think that's
          19          fair.  And I will add that I also stated
19:00:39  20          to Mr. Bamberger, Bamberger
          21          (pronunciation), that to the extent that
          22          that is necessary for -- to read
          23          additional parts, we're going to seek more
          24          time because, as he said, these are over
19:00:50  25          300 pages long and it would take hours to
```

450

```
19:00:52   1              read all of them.
           2                     MR. BAMBERGER:  And we reserve
           3          our right to object to --
           4                     MR. TENREIRO:  Yeah, exactly.
19:00:56   5          Same thing.
           6                     (Whereupon, exhibit is received
           7          and marked Garlinghouse Deposition
           8          Exhibit 101 for identification.)
           9   BY MR. TENREIRO:
19:00:58  10      Q.   Okay.  So I'm going to start with 101
          11   and I'm going to tell you, Mr. Garlinghouse, that
          12   my understanding is that this was recorded on
          13   October 12th, 2017.
          14                     MR. TENREIRO:  So here's
19:01:08  15          Bridget's copy.  Here's Matt's copy.
          16          Here's the extra and yours.
          17      Q.   And, as your counsel said, there's
          18   pencil markings, which is the part that I'd like
          19   you to read now.
19:01:18  20      A.   Thank you.
          21                     MR. TENREIRO:  And so for the
          22          people that are looking at it that don't
          23          have it marked, I'm looking at the third
          24          page that says "SEC_SEC-E-10454."
19:01:45  25   BY MR. TENREIRO:
```

                                                                451

19:01:46   1          Q.   Mr. Garlinghouse, on the -- on the left
           2    side, there's sort of a page and line number.  So
           3    for the record, I'm going to ask -- I've asked you
           4    to read what's marked page 7, line 13 to page 8,
19:01:57   5    line 2.  Thank you.
           6               (Pause)
           7          A.   Okay.
           8          Q.   Okay.  Do you see here that you referred
           9    to a chart of XRP's stock price?
19:02:32  10          A.   I see that reference, yes.
          11          Q.   Okay.  And did you make that mistake
          12    often in 2017?
          13          A.   I don't think so, no.
          14          Q.   Did others at Ripple?
19:02:41  15          A.   I don't think so.
          16          Q.   Why do you think you made that mistake?
          17          A.   Without looking at the visual, I don't
          18    know.
          19          Q.   Okay.  You mean the videotape recording?
19:02:51  20          A.   No, I mean -- I think I'm referencing a
          21    chart that I think is on the screen.
          22          Q.   I see.
          23          A.   And sometimes how the data is presented
          24    in a chart could influence how one might -- it
19:03:03  25    might have looked like a, quote, stock chart.

                                                                    452

```
19:03:05    1        Q.   Sure.  Sure.

            2             And so from reading this part, you

            3   believe there was some sort of visual you were

            4   using at the meeting?

19:03:14    5        A.   Well, I think what this transcript says

            6   is "This is a chart of XRP's stock...not stock

            7   price.  Sorry.  (Laughter)."  So the chart, I'm

            8   presuming, was somehow shown to the company in a

            9   visual manifestation.

19:03:31   10        Q.   Generally speaking, when you had these

           11   all-hands meetings, did you have a visual, sort

           12   of, like PowerPoint slides or any other visual

           13   aid?

           14             MR. SOLOMON:  Hold on one second.

19:03:40   15        Hold on one second.

           16             MR. TENREIRO:  I'm sorry, do we

           17        need to go off the record?  Because I

           18        don't -- let's go off the record if you

           19        want to discuss.

19:03:49   20             THE WITNESS:  That's fine.

           21             MR. TENREIRO:  Off the record,

           22        please.

           23             THE VIDEOGRAPHER:  Going off the

           24        record at 7:05.

19:07:34   25             (Pause)
```

                                                           453

```
19:08:05   1                    THE VIDEOGRAPHER:  Back on at
           2          7:09.
           3    BY MR. TENREIRO:
           4          Q.    Okay.  Mr. Garlinghouse, I was asking
19:08:10   5    you, did you typically have visual aids like
           6    PowerPoints or other visual aids for the all-hands
           7    meetings?
           8          A.    Yes.
           9          Q.    Who prepared them for you?
19:08:21  10          A.    Multiple people, generally led by the
          11    Comms team or marketing team.
          12          Q.    Okay.  And why did you prepare them?
          13          A.    I didn't prepare them.
          14          Q.    Why did you have them prepared?
19:08:41  15          A.    Well, it's not that often -- obviously,
          16    as we talked about, it's a quarterly all-hands.
          17    It's not that often we have the whole company
          18    together.  And I think treating that -- if we're
          19    going to invest that much time in bringing
19:08:59  20    together hundreds of people, we should prepare the
          21    time and energy to make sure they're thought
          22    through a bit and communicating the information
          23    that would be most interesting and relevant to our
          24    employees.
19:09:12  25          Q.    Okay.  And what -- where are those
```

                                                          454

```
19:09:16  1    PowerPoint present -- were they PowerPoint
          2    presentations?
          3         A.   Probably not.  They're probably Google
          4    slides.
19:09:24  5         Q.   And where are they?
          6              MR. SOLOMON:  Objection.
          7         A.   I -- I don't know.  I don't -- maybe I
          8    don't understand the question.
          9         Q.   To the extent that they were electronic
19:09:33 10    files, where are they now?
         11              MR. SOLOMON:  Objection.
         12         A.   I presume they are stored on --
         13              MR. SOLOMON:  Do you know where
         14          they are?
19:09:43 15              THE WITNESS:  No, I don't know
         16           where they are.
         17         Q.   What's your best understanding as to
         18    where something like that would be?
         19         A.   Ripple predominantly, as I think you are
19:09:51 20    aware, uses Google Docs.  And so in Ripple's --
         21    directly and indirectly, Ripple's data
         22    infrastructure, some of them would be stored or
         23    maybe they've been deleted over time.  2017 is a
         24    long time ago.
19:10:07 25         Q.   Okay.  And the all-hands meetings, is
```

455

```
19:10:11   1   it -- were you discussing -- I'm trying to get a
           2   sense as to what you selected to discuss at these
           3   meetings.
           4          Was it everything under the sun that had
19:10:20   5   happened at the company or did you try to focus on
           6   the important developments since the last meeting?
           7                MR. SOLOMON:  To the extent you
           8        can answer a very general question with a
           9        very general answer, obviously do that.
19:10:31  10        A.   I mean, the first thing I'm going to say
          11   is I'm not sure I was the one selecting.  And I
          12   think given that I don't think I was the one
          13   selecting, I would have looked to others to
          14   determine what was most poignant and relevant to
19:10:48  15   our employees.
          16        Q.   And would the others be your direct
          17   reports?
          18        A.   Sorry.  Could you ask that question
          19   again?
19:10:55  20        Q.   Yeah.  Would the others you
          21   referenced -- you said "I would have looked to
          22   others to determine what was more poignant and
          23   relevant to our employees."  Would those others be
          24   your direct reports?
19:11:08  25        A.   Some of them, but not all of them.  Some
```

456

```
19:11:09   1    of the people involved would not have been my
           2    direct reports.
           3         Q.   Okay.  And did you give them any
           4    directive as to what sort of information they
19:11:15   5    should select for presentation at the all-hands
           6    meetings?
           7         A.   I -- at any of the meetings ever did I
           8    ever encourage --
           9         Q.   No.  I was asking for more general.
19:11:29  10         Did you give more general guidance to
          11    them when you started being CEO about what you
          12    wanted to present to the company?
          13         A.   I -- I don't have a specific
          14    recollection of that, but I expect that I would
19:11:40  15    have -- with their guidance and leadership, I
          16    trusted that team.  I would have collaborated with
          17    them about what should be presented.
          18         Q.   Okay.  And, generally speaking, how long
          19    did these meetings last, the all-hands?
19:11:54  20         A.   Probably 90 minutes.
          21         Q.   Okay.  And did -- again, generally --
          22    I'm not asking for a specific one.  Generally,
          23    were there occasions where different Ripple
          24    employees presented information?
19:12:09  25         A.   Generally speaking, more than one person
```

457

| | | |
|---|---|---|
| 19:12:12 | 1 | would speak.  In fact, I think oftentimes I would |
| | 2 | do the smallest amount of the total time spent. |
| | 3 | Q.  Okay.  Did you attend a meeting, a |
| | 4 | Ripple meeting, where Ms. O'Gorman and others |
| 19:12:30 | 5 | discussed the legal status of XRP under the |
| | 6 | securities laws?  I'm not asking you for the |
| | 7 | substance of the discussion.  I'm just asking for |
| | 8 | a yes or no, did you attend such a meeting? |
| | 9 | A.  Just because I'm losing the -- the |
| 19:12:41 | 10 | thread here.  Nothing to do with all-hands. |
| | 11 | Nothing to do with what's in front of me. |
| | 12 | Separate question.  Could you ask that question |
| | 13 | again that -- |
| | 14 | Q.  Did you attend a meeting, a Ripple |
| 19:12:50 | 15 | meeting, where Ms. O'Gorman and others discussed |
| | 16 | the legal status of XRP under the securities law? |
| | 17 | A.  I don't recall. |
| | 18 | Q.  Okay.  Let me ask you to take a look at |
| | 19 | 99, which I have here. |
| 19:13:13 | 20 | (Whereupon, exhibit is received |
| | 21 | and marked Garlinghouse Deposition |
| | 22 | Exhibit 99 for identification.) |
| | 23 | BY MR. TENREIRO: |
| | 24 | Q.  All right.  So 99, to my understanding, |
| 19:13:15 | 25 | is December 12th, 2017.  And, again, I marked it |

458

19:13:22    1    in pencil so let me pass it on to you.

            2         A.   Are we finished with 101?

            3         Q.   Yes.  So that's for you and then for

            4    everybody else.

19:13:37    5         A.   This is mine.

            6              MR. TENREIRO:  So here's three.

            7              MR. SOLOMON:   Thank you.

            8         A.   Oh, it was an extra one.

            9              MR. TENREIRO:  So what I asked

19:13:53   10         him to look at -- so go ahead -- is -- the

           11         Bates is 10277.  And the page on the left

           12         side is 24, 2 to 27, 7.

           13              MR. CERESNEY:  And, Jorge, can

           14         you put on the record the date of this?

19:14:12   15              MR. TENREIRO:  Yes.  I believe

           16         it's the 12th of December of 2017.

           17         A.   Just also for my macro, this is an

           18    all-hands transcript?

           19         Q.   That is my -- well, in fact -- in fact,

19:14:26   20    if you -- one second.  Yes.  I will show you.

           21    That is my understanding.

           22         A.   Sorry?  I apologize.  I was reading

           23    outside of the pencil marks just to make sure I

           24    understand what this is a transcript from and I'm

19:14:47   25    having a little trouble figuring that out.  And

                                                                    459

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

19:14:49  1    the date.

2         Q.    The date is not reflected there.  I'm

3    telling you the date based on the production from

4    counsel.

19:14:56  5         A.    And, sorry, can you tell me the date

6    again?

7         Q.    12 December 2017.

8         A.    12 December 2017?

9               And would --

19:15:04 10         Q.    Do you still have Exhibit 33 in front of

11   you?  I think it's that one.  I think it's this

12   one.

13         A.    Yep.

14         Q.    All right.  Actually -- well, this will

19:15:16 15   be relevant in a sec.  Just read the pencil part,

16   please, of the Exhibit 99.

17         A.    I'm just trying to make sure I

18   understand what I'm reading.

19         Q.    My understanding is that it's a

19:15:26 20   recording of an all -- all-hands meeting that

21   occurred on December 12th, 2017.

22         A.    At the Ripple offices?

23         Q.    You'd have to ask your counsel.  I don't

24   know where the recordings were made.  I assume so.

19:15:39 25               MR. CERESNEY:  That's not a

                                                              460

```
19:15:40  1            question for counsel.  That's a question
          2            for the witness.
          3                    MR. TENREIRO:  That's right.
          4                    MR. CERESNEY:  We produced the
19:15:46  5            documents.  Doesn't necessarily mean we're
          6            going to -- we know exactly where it was
          7            recorded.
          8    BY MR. TENREIRO:
          9        Q.    Did Ripple have all-hands meetings
19:15:52 10    outside of the Ripple office?
         11        A.    Yes.
         12        Q.    Oh, okay.  And were those recorded?
         13        A.    I believe so -- to be honest, I don't
         14    know which ones were and weren't, as I said
19:16:00 15    earlier.  So I don't know.
         16        Q.    Okay.
         17        A.    Part of the reason I was asking that
         18    question was where it was recorded would tell me
         19    if it was in our old office, new office.  It would
19:16:10 20    just help me understand the context for what's
         21    being presented, but...
         22                    MR. SOLOMON:  Why don't you read
         23            this passage.  And if there's more of it
         24            that you need to read, based on the
19:16:19 25            agreement we made with the SEC, we can
```

461

```
19:16:22   1            direct you to additional portions of the
           2            document --
           3                     THE WITNESS:  Okay.  Sounds good.
           4                     MR. SOLOMON:  -- as needed.
19:16:28   5                     MR. WARD:  And just for clarity
           6            of the record and for those of us who
           7            don't have a copy, could I ask the page
           8            and line numbers be read into the record
           9            that we're talking about?
19:16:36  10                     MR. TENREIRO:  Sure.  I already
          11            read them.
          12                     MR. WARD:  Oh, you did?
          13                     MR. TENREIRO:  Yeah.  I already
          14            read them, so --
19:16:41  15                     MR. WARD:  That's fine.
          16                     MR. SOLOMON:  Do you -- do you
          17            not have a copy?
          18                     MR. WARD:  No, we have a copy.
          19                     MR. SOLOMON:  Okay.  It's 10277,
19:17:05  20            line 1, through 10278, line -- page 27,
          21            line 7.
          22                     MR. TENREIRO:  Yeah.  That's
          23            correct, Matt.  I asked -- right now the
          24            transcript says 267, maybe this is just a
19:17:17  25            typo, but it is 277.
```

462

```
19:17:19   1              MR. SOLOMON:  Okay.  Thanks.
           2              (Pause)
           3              THE WITNESS:  Okay.
           4    BY MR. TENREIRO:
19:19:02   5         Q.   All right.  So I'm -- do you see
           6    generally that you talk about the 4,000 percent
           7    increase in the price of XRP in 2017?
           8         A.   I -- I was a little bit confused by the
           9    transcript because, you know, I don't know how the
19:19:24  10    transcript's created, but it -- it doesn't
          11    reference XRP, I don't think.  I mean, I
          12    understand why you might assume that.  But it's
          13    referencing Dash and I don't know if it's talking
          14    about a digital asset called Dash that's up 4,000
19:19:42  15    percent or it's referencing XRP.
          16         Q.   Is it fair to say that in this portion
          17    of the transcript, you are nevertheless discussing
          18    the price of XRP, for example, where you say "But
          19    if you just look at the last three months, XRP has
19:19:55  20    underperformed the market"?
          21         A.   Yeah.  Much further down -- and, again,
          22    without seeing the video itself -- much further
          23    down, separate from the 4,000 percent, which I
          24    think you attributed to the performance of XRP,
19:20:08  25    which I don't know if that's correct, I'm
```

463

```
19:20:11   1    suggesting that XRP has underperformed the market.
           2    Maybe I'm presenting a slide that talks about lots
           3    of different crypto assets and their performance
           4    and I'm showing a chart saying that XRP has
19:20:27   5    underperformed in the last three months.
           6         Q.   Okay.  And then you say "Anyway, the
           7    point I'm making here is I'm going to continue to
           8    beat the drum that it isn't about three days,
           9    three weeks or three months.  It's about three
19:20:38  10    years or five years.  If we execute our strategy
          11    successfully and we get lots of financial
          12    institutions around the world using our services,
          13    using our solutions, it's going to drive demand
          14    for XRP, and I am much more worried about that
19:20:51  15    three- to five-year arc of time than a three day."
          16         Do you see that?
          17         A.   Yes.
          18         Q.   And are you -- is this similar to
          19    statements you made publicly about your focus on
19:21:01  20    three to five years for the XRP markets?
          21         A.   Yes.
          22         Q.   Okay.  And then you say "Now I'm going
          23    to contradict some of what I just said.  It
          24    matters that we stay in the lead pack.  If people
19:21:10  25    perceive us as an after-run and kind of dropping
```

464

```
19:21:13   1    down the ranking, if you will, as measured by
           2    market capital, I do worry about that."
           3              Do you see that?
           4        A.   I do.  I'm guessing that there's a bit
19:21:22   5    of a transcription problem because I probably
           6    didn't say market capital as an example.
           7        Q.   You might have said market cap?
           8        A.   Market capitalization.
           9        Q.   Market capitalization.  Okay.
19:21:32  10              And is it -- and the market
          11    capitalization, I think we discussed earlier, you
          12    measure as price times units, right?
          13        A.   I don't know how else I would measure
          14    it.  Yeah.
19:21:44  15        Q.   I just want to have it for the record.
          16              So -- so is it fair to say that here
          17    you're worried about -- you are expressing your
          18    concern that if people perceive Ripple dropping in
          19    the ranking of market capitalization, that's not
19:21:59  20    good?
          21              MR. SOLOMON:  Objection; form.
          22        A.   I think if you meant XRP, not Ripple, I
          23    would probably agree.
          24        Q.   Okay.  So "if people perceive us" is a
19:22:11  25    reference to XRP?  "Us" is XRP in that sentence?
```

                                                            465

19:22:14  1          A.    Where are you -- where are you reading?

       2     What line?

       3          Q.    Towards the bottom.  "If people perceive

       4     us as an after-run and kind of dropping down the

19:22:21  5     ranking, if you will, as measured by market"

       6     capitalization -- I know the transcript says

       7     "capital."  So is your testimony that the "us" in

       8     that sentence is XRP?

       9          A.    I -- I think I'm referring to XRP in

19:22:32 10     that context, yes.

      11          Q.    Okay.  And why are you using "us" to

      12     refer to XRP?

      13          A.    I -- I don't know if the transcript's

      14     correctly -- correct and whether or not I actually

19:22:41 15     said that, but I -- I also could have misspoke.

      16          Q.    And then you say "I think that is, you

      17     know, the perception of Ripple, the brand

      18     perception of Ripple shifts a little bit."

      19               So is it -- were -- were you expressing

19:22:55 20     the idea that if the market capitalization of XRP

      21     went down, the brand perception of Ripple shifted?

      22               MR. SOLOMON:  Objection; form.

      23          A.    Yes.

      24          Q.    Okay.  And when you talk about the

19:23:11 25     ranking, is this a reference to sort of what we've

                                                              466

19:23:14    1    discussed earlier, the ranking, the top three, you

            2    know, when you see the market capitalizations of

            3    bitcoin and other digital assets?

            4                    MR. SOLOMON:  Objection; form.

19:23:26    5        A.   Yes.

            6        Q.   Okay.  And is it still true today that

            7    you worried that if XRP is seen as dropping in

            8    this ranking, that affects Ripple's brand

            9    negatively?

19:23:36   10                    MR. SOLOMON:  Objection; form.

           11        A.   So if XRP is not widely listed on

           12    exchanges and doesn't have robust volume, which

           13    would happen if there's fewer exchanges listing

           14    it -- exchanges are motivated to list the most

19:24:02   15    liquid digital assets because those are the ones

           16    that trade the most.  They get fees based upon

           17    trading, as we discussed earlier.

           18                    If the fees that they get from one

           19    digital asset versus another digital asset reduce,

19:24:15   20    they might be inclined to either not list XRP,

           21    which is not good for Ripple's desire to have lots

           22    of liquidity between XRP fees and fiat pairs, or,

           23    in some cases, halt trading, delist, what have

           24    you.

19:24:33   25        Q.   Okay.  Let me try again.

                                                                    467

|          |    |                                                      |
|----------|----|------------------------------------------------------|
| 19:24:35 | 1  | Is it still -- is it still true today                |
|          | 2  | that you worry that if XRP is seen as dropping in     |
|          | 3  | this ranking, that that affects Ripple's brand        |
|          | 4  | negatively?                                           |
| 19:24:42 | 5  | MR. SOLOMON:  Objection; form.                        |
|          | 6  | A.   I'm making the point that if Ripple              |
|          | 7  | can't deliver robust products, clearly that would     |
|          | 8  | affect our brand perception.  If -- if there's not    |
|          | 9  | robust liquidity in the XRP markets between as        |
| 19:24:59 | 10 | many currency pairs -- when -- when liquidity in      |
|          | 11 | XRP goes down, that isn't good for what Ripple's      |
|          | 12 | trying to do with our products.  If we can't          |
|          | 13 | execute -- and people understand this in the          |
|          | 14 | marketplace.                                          |
| 19:25:16 | 15 | And so as -- as XRP has gone from being               |
|          | 16 | number two to number three, after the SEC lawsuit,    |
|          | 17 | to number six, that's not good for Ripple's           |
|          | 18 | business.                                             |
|          | 19 | Q.   Number six in what?  Market                      |
| 19:25:35 | 20 | capitalization?                                       |
|          | 21 | A.   That's correct.                                  |
|          | 22 | Q.   Okay.  And just to pick up on what you           |
|          | 23 | just said, "When liquidity in XRP goes down, that     |
|          | 24 | isn't good for what Ripple's trying to do with our    |
| 19:25:45 | 25 | products."                                            |

468

19:25:46  1          So is it fair to say that when there are

        2   fewer buyers and sellers of XRP, that's not good

        3   for what Ripple's trying to do with the products?

        4          A.    I think my testimony was when there's

19:25:57  5   less liquidity, there could be fewer and more

        6   liquidity, right?  I mean, if you have really

        7   aggressive market makers that are trading

        8   actively, there could be lots of liquidity.

        9          Q.    Okay.

19:26:09 10                MR. TENREIRO:  Let's take a look

       11          at 129.  Actually, I'm going to have to

       12          ask Bridget to mark it because there's

       13          no -- there's no -- there's no marking on

       14          it.  Just write it?

19:26:25 15                THE REPORTER:  And I'll put a

       16          sticker on it after.

       17                MR. TENREIRO:  Okay, great.  And

       18          here's yours.

       19                MR. SOLOMON:  Okay.

19:26:28 20                (Whereupon, exhibit is received

       21          and marked Garlinghouse Deposition

       22          Exhibit 129 for identification.)

       23   BY MR. TENREIRO:

       24          Q.    This one I'm going to ask you to read

19:26:31 25   the whole thing, sir.  That's for Bridget and this

                                                              469

```
19:26:32   1    is for you and this is for your counsel.  And I
           2    need one of the rest.  This is a shorter one, but
           3    you should just read the whole thing.
           4            And in terms of -- my understanding is
19:26:42   5    this was December 14, although you'll notice in
           6    the first line you say "We just went yesterday."
           7    So possibly the 13th.  I'm not sure, but we
           8    understand this is...
           9        A.   I'm sorry, I don't -- I don't know what
19:27:00  10    the context is.  Where is -- where?  When?  I
          11    guess you said it's December --
          12        Q.   My understanding is that it's the 14th.
          13    But if you read the first line, you say "Some of
          14    you are wondering, hey, Brad, what's up?  We just
19:27:13  15    met yesterday."
          16        A.   Is this an all-hands event or a media --
          17        Q.   You'll have to tell me after you read it
          18    what you recall.
          19            MR. SOLOMON:  Just read it.  See
19:27:23  20        if you remember.
          21            THE WITNESS:  Yeah.
          22            MR. SOLOMON:  Tell him as best
          23        you can with whatever qualifications you
          24        need.
19:28:52  25            (Pause)
```

                                                                    470

19:32:42   1    BY MR. TENREIRO:

           2        Q.    Okay.  Mr. Garlinghouse, having reviewed

           3    the transcript, can you tell me why you had this

           4    meeting?

19:32:51   5        A.    My interpretation from reading the

           6    transcript is that given the craziness going on in

           7    the crypto markets, and specifically with XRP, I

           8    wanted to remind people that we have products to

           9    build, code to ship, customers to serve.  And I

19:33:06  10    was pointing out that it could be easily

          11    distracting when the volatility is what it sounds

          12    like it was.

          13        Q.    The -- the -- the rapid swings in price?

          14    That's volatility?

19:33:22  15        A.    Yes.

          16        Q.    Okay.  And you said you've "checked XRP

          17    more today than I probably have in the last week

          18    combined."

          19              Is that a reference to checking the

19:33:31  20    price charts for XRP?

          21        A.    Yes.

          22        Q.    Okay.  Towards the beginning, you say

          23    "I've been stressed because every time the price

          24    of XRP goes up, the expectations of everyone in

19:33:40  25    this room go up."

                                                                    471

19:33:41  1          Do you see that?
       2      A.   I -- I -- I saw that when I read it.  If
       3  you tell me which line, I'm happy to take another
       4  look at it.
19:33:48  5      Q.   Yeah.  It's page 3, line 6.  It actually
       6  starts at 5 -- no, page 3.  If you look on the
       7  left side, there's a little marker.
       8      A.   Oh, gotcha.  Okay.
       9      Q.   Expectations from whom?
19:34:06 10      A.   I don't know who I was referencing here.
      11      Q.   Then you say "the expectations on me go
      12  up."
      13          Whose expectations are you referencing
      14  there?
19:34:14 15      A.   Maybe the employees.  I don't know.
      16      Q.   And then you say "The expectations that
      17  everyone has about what Ripple is trying to do
      18  goes up."
      19          Whose expectations are you referring to
19:34:23 20  there?
      21      A.   Maybe our customers.  I don't know.
      22      Q.   And when you talk about your
      23  customers -- when you say your customers in that
      24  answer, what Ripple customers are you referring
19:34:33 25  to?

                                                      472

```
19:34:34    1          A.    Financial institutions.

            2          Q.    And which financial institutions were

            3    Ripple's customers in December of 2017?

            4          A.    According to Exhibit 33, ████████████

19:35:02    5    ██████

            6                THE REPORTER:  I'm sorry, I'm

            7          not getting that.  "According to Exhibit

            8          33..."?

            9          A.    According to Exhibit 33, ███████████████

19:35:04   10    █████████████████████████████████████████

           11    ██████████████████████████

           12          Q.    Was Ripple selling XRP to those

           13    institutions?

           14          A.    Some of them.

19:35:24   15          Q.    Which ones?

           16          A.    ███████████.

           17          Q.    For what purpose?

           18          A.    I don't recall.  I just know that ████

           19    has been a purchaser of XRP.

19:35:38   20                THE REPORTER:  "I just know..."?

           21                THE WITNESS:  I just -- sorry, I

           22          was covering my mouth.

           23          A.    ██████ had been a purchaser of XRP.

           24          Q.    In 2017 did you know for what purpose

19:35:41   25    they were a purchaser?
```

                                                                  473

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

19:35:42   1            A.   I don't recall.

           2            Q.   Okay.  And is it your testimony that you

           3       believe that those institutions' expectations of

           4       Ripple go up when the price of XRP goes up?

19:35:55   5                      MR. SOLOMON:  Objection; form.

           6            A.   I think the attention on Ripple, the

           7       company, is -- has been -- the attention had been

           8       correlated with the attention around the XRP

           9       markets.

19:36:12  10            Q.   Why?

          11            A.   Because people associate us with XRP.

          12            Q.   And why do they do that?

          13            A.   I would be speculating.  Depends on

          14       which audience.  Ripple owns XRP and so we are --

19:36:35  15       as we discussed earlier today, things like

          16       CoinMarketCap incorrectly listed XRP as Ripple for

          17       some period of time.

          18            Q.   In the next page of the document, on the

          19       left, it's page 4, 11, you say that what stresses

19:36:55  20       you out is "the height of the tree.  The

          21       expectations are really high.  The trunk hasn't

          22       built out and everyone in this room needs to help

          23       build out that trunk."

          24                 Do you see that?

19:37:04  25            A.   Yes.

                                                                    474

19:37:04  1     Q.   That's sort of a -- a pretty graphic

2   analogy.  Can you explain it to me?  What --

3   what's -- what's the height of the tree here?

4   What's the tree and what's the trunk?

19:37:13  5           MR. SOLOMON:  If you remember.

6     A.   Yeah.  I -- I -- I don't remember

7   specifically.  I mean, I think this -- the story

8   I'm trying to tell is that the attention on crypto

9   markets, the attention on Ripple, has gone up.

19:37:34 10   And we need to be in a position to deliver on the

11   promises we made to customers.

12     Q.   What promises did you make to customers?

13     A.   Well, when we sign a contract, we agree

14   to deliver certain things.  We've -- we're

19:37:55 15   building -- trying to build out an internet of

16   value and we have done things like the Global

17   Payments Steering Group and creating rulebooks

18   around how global payment infrastructure can and

19   should work between counterparties.

19:38:10 20     Q.   And so is it your testimony that when

21   the -- that your perception around December of

22   2017 was that if the price of XRP went up, there

23   was an increased pressure to deliver on promises

24   you had made in contracts with customers?

19:38:28 25     A.   I think my testimony was that the

475

19:38:30   1   attention on Ripple, the company, certainly has

2   some, in my experience, correlation with the

3   attention on crypto and the attention on XRP.

4        Q.   Okay.  Let's set that aside.  I'm going

19:38:46   5   to ask you to look at Exhibit 90.

6                    (Whereupon, exhibit is received

7             and marked Garlinghouse Deposition

8             Exhibit 90 for identification.)

9                    MR. TENREIRO:  Here you go.

19:38:55  10   Thank you.

11                    MS. BUNTING:  Which exhibit is

12             this?

13                    MR. TENREIRO:  90.  Nine zero.

14                    MS. BUNTING:  90.  Thank you.

19:39:53  15             (Pause)

16                    MR. TENREIRO:  This is a

17             four-page exhibit, RPLI_SEC 54005, a

18             thread around January -- early January

19             2018.

19:41:06  20             (Pause)

21                    THE WITNESS:  Okay.

22   BY MR. TENREIRO:

23        Q.   Mr. Garlinghouse, this thread appears to

24   include a markets update from Dinuka Samarasinghe,

19:41:46  25   is that right?

476

19:41:48    1          A.    I thought it was from Miguel.

            2          Q.    There's one from Miguel as well.  I was

            3    going to get to that.  If you look at the third

            4    page, on Friday, January 5th at 1:02.

19:41:58    5          A.    Oh, yep.

            6          Q.    Okay.  He talks about a series of body

            7    blows for XRP, XRP haters attacking full force,

            8    XRP price down 15 percent.

            9                Do you see that?

19:42:11   10          A.    Wait.  Which line -- oh, it's just line

           11    numbers.  Sorry.  What -- I don't see -- I saw

           12    what I read, the "body blows" reference, but I'm

           13    not seeing that now.

           14          Q.    It's like the middle of page 3.  Ripple

19:42:23   15    is --

           16          A.    Oh, yes.

           17          Q.    Okay.  All right.  And then Ms. Long, on

           18    the front page, says a number of things, but she

           19    says "Gross misinformation and FUD spreads quickly

19:42:35   20    and hurts our business."

           21                Do you see that?

           22          A.    Yes.

           23          Q.    A little bit further down, she says "We

           24    have a two" -- "two-pronged strategy:  Offense.

19:42:46   25    We need to drive the conversation - keep putting

                                                                    477

| | | |
|---|---|---|
| 19:42:49 | 1 | points on the board, back up the XRP thesis with |
| | 2 | real traction, keep educating on our strategy and |
| | 3 | progress.  We need to be omnipresent - either |
| | 4 | Ripple or our supporters, armed and dangerous." |
| 19:43:00 | 5 | And then "Defense." |
| | 6 | On the offense point, what steps, if |
| | 7 | any, did Ripple take to go on the offense with |
| | 8 | respect to the conversation about XRP after this |
| | 9 | email? |
| 19:43:13 | 10 | A.   I don't recall. |
| | 11 | Q.   You say that it "seems 100 percent on |
| | 12 | target" to you, right? |
| | 13 | A.   That is my reply. |
| | 14 | Q.   Okay.  Sitting here today, did Ripple |
| 19:43:25 | 15 | make itself omnipresent, either Ripple or with its |
| | 16 | supporters in sort of the public? |
| | 17 | A.   I don't recall. |
| | 18 | Q.   Did Ripple make attempts to drive the |
| | 19 | conversation about XRP in public? |
| 19:43:38 | 20 | A.   I don't recall. |
| | 21 | Q.   You don't recall any efforts by Ripple |
| | 22 | after January 2018 to drive the conversation about |
| | 23 | XRP?  Is that your testimony? |
| | 24 | A.   I mean, so, any -- sorry, could you |
| 19:43:50 | 25 | repeat that question? |

478

19:43:52  1        Q.   Do you recall any efforts by Ripple
        2  after January 2018 to drive the conversation about
        3  XRP?
        4        A.   Yes.
19:43:59  5        Q.   What efforts?
        6        A.   I mean, you -- you included in that
        7  question everything including last week or
        8  yesterday.  And so certainly it has always been
        9  important to Ripple, important to me, that in a
19:44:12 10  world of crypto where many people spread false
       11  information -- I highlighted the Amazon or Walmart
       12  Litecoin example earlier -- we want to correct
       13  misinformation about XRP.  We want to correct
       14  misinformation about Ripple.  We want to clarify
19:44:32 15  what is XRP and what is Ripple.
       16             So certainly since January of 2018, do I
       17  think we've tried to drive the conversation?  Yes.
       18             I interpreted your question to be
       19  contemporaneously with this in January of 2018,
19:44:49 20  did we take steps to drive the conversations?  And
       21  I don't recall three and a half years ago what we
       22  may or may not have done.
       23        Q.   Okay.  Let's look at Exhibit 68.
       24             (Whereupon, exhibit is received
19:44:59 25        and marked Garlinghouse Deposition

                                                              479

```
19:44:59    1              Exhibit 68 for identification.)
            2                      (Pause)
            3                      THE WITNESS:  Okay.
            4       BY MR. TENREIRO:
19:45:41    5          Q.    What is -- what is this document?
            6          A.    I believe these are notes to myself.
            7          Q.    It says "Thoughts for stand-up," the
            8       subject does?
            9          A.    Yes, it does.
19:45:51   10          Q.    What is "stand-up"?
           11          A.    At the beginning of COVID, because
           12       everyone was working remotely, we added, I think,
           13       two weekly meetings to the leadership team to kind
           14       of check base for 15 minutes, I think on
19:46:07   15       Wednesdays and Fridays, that we called stand-up
           16       meetings.
           17          Q.    Okay.
           18          A.    The idea is if you were the same person,
           19       you'd stand up for 15 minutes, obviously via Zoom.
19:46:16   20          Q.    On Zoom.
           21          A.    People may or may not have been standing
           22       up.
           23          Q.    And did you continue to have, like, the
           24       periodic all-hands via Zoom after COVID?
19:46:25   25          A.    Yes.
```

                                                              480

```
19:46:26   1           Q.   And were those quarterly? weekly?  What
           2      were they at that point?
           3           A.   All-hands were typically quarterly.
           4           Q.   Even after COVID I mean.
19:46:35   5           A.   Yeah.
           6           Q.   Yeah.
           7                Did you record those on Zoom?
           8           A.   I don't recall.
           9           Q.   And who would know?
19:46:42  10           A.   Same answer as before.
          11           Q.   The IT team?
          12           A.   Or Comms.
          13           Q.   Okay.  And in these notes you're talking
          14      about "I feel in this trajectory you are going to
19:46:52  15      destroy a lot of value in XRP."
          16                Do you see that?
          17           A.   No, sorry.  Point me to that.
          18           Q.   Towards the bottom.
          19           A.   Yes, I see that.
19:47:05  20           Q.   And that "you" in the sentence is you,
          21      Mr. Garlinghouse?  You're sort of talking to
          22      yourself a little bit?
          23           A.   No.
          24                MR. SOLOMON:  Objection; form.
19:47:12  25           Q.   Who's the "you"?
```

481

19:47:13  1         A.   The "you" is me, but these are notes --

       2    I mean, obviously, you know, this is just a -- a

       3    random screen that I'd opened to take notes.

       4         I believe, as I reference later on, █████

19:47:23  5    ██████ had called me and on occasion she is -- gives

       6    counsel and is strongly opinioned -- or

       7    opinionated in those -- she has strong opinions.

       8         And so I think I'm taking notes from

       9    that phone call that are interlaced with some

19:47:47 10    comments that I intend to make at stand-up.

      11         Q.   Okay.  And did she have strong opinions

      12    about, you know, the potential to destroy the

      13    value of XRP in around March 2020?

      14         A.   I -- I --

19:47:58 15              MR. SOLOMON:  Objection.

      16         A.   I don't actually recall precisely, but

      17    from these notes, I have a vague recollection of

      18    getting a call from █████ early in the age of COVID

      19    that she was very concerned about the macro

19:48:10 20    economy and what was going on, broadly speaking.

      21         Q.   And here you talk about, a little

      22    further up, "protecting the value of XRP by

      23    reducing MGI sales."

      24         Do you see that?

19:48:23 25         A.   Yes.

                                                              482

| | |
|---|---|
| 19:48:24 | 1 |

Q.   Is MGI MoneyGram?

2   A.   Yes.

3   Q.   Okay.  And --

4   A.   I believe so, yes.

19:48:30 5   Q.   Okay.  And there was a point in time

6   where there was a thing called XRP-O, is that

7   right?

8   A.   Yep.

9   Q.   Okay.  And that was sales of XRP by

19:48:38 10   Ripple?

11   A.   Yes.

12   Q.   And there came to be a concern that the

13   sales of XRP could hurt the value of XRP?

14              MR. SOLOMON:  Objection.

19:48:47 15   A.   Yeah, it's confusing because that pre --

16   well, MoneyGram never used XRP-O or what we now

17   call Wallet Send.  And I think March of 2020

18   predates the launch of XRP-O or what we now call

19   Wallet Send.

19:49:09 20              So I don't know what I mean by "reducing

21   MGI sales."

22   Q.   Okay.  After XRP-O launched, was there a

23   concern that the XRP-O sales could hurt the market

24   for XRP?

19:49:27 25   A.   Yes.  We have always, I think as you're

483

19:49:30   1   well aware, always had the concern that we don't

           2   want to impact the market, the XRP markets.  And

           3   so to the extent we are introducing XRP to the

           4   market at a rate higher than we have historically,

19:49:49   5   that would give us reason to pause and think about

           6   should we change our plan?

           7        Q.   In the notes, you say "Supply and demand

           8   equation of XRP is too high versus time frame for

           9   real demand."

19:50:04  10             Do you see that?

          11        A.   That looks like my notes from the call

          12   with ███.

          13        Q.   What does "real demand" mean?

          14        A.   I don't know.

19:50:11  15        Q.   Okay.

          16             MR. CERESNEY:  Could we have a

          17        time check?

          18             THE VIDEOGRAPHER:  You've got a

          19        few minutes.  Two, three minutes.

19:50:17  20             MR. TENREIRO:  Okay.  I'm almost

          21        finished.

          22   BY MR. TENREIRO:

          23        Q.   Mr. Garlinghouse -- we can set that

          24   aside -- has -- have you ever heard of something

19:50:26  25   called Form D?

                                                                484

```
19:50:32   1          A.   I -- I don't know for sure.
           2          Q.   Have you ever heard of something called
           3   SEC Form D?
           4          A.   I believe so, yes.
19:50:37   5          Q.   Have you ever filed an SEC Form D with
           6   respect to any of your sales of XRP?
           7          A.   Not of which I'm aware.
           8          Q.   Have you ever filed a Form D with
           9   respect to Ripple's sales of XRP?
19:50:50  10          A.   Not of which I'm aware.
          11          Q.   Have you ever taken any steps to
          12   determine whether purchasers of your XRP are
          13   accredited investors?
          14          A.   I don't know who the purchasers of my
19:51:01  15   XRP are.
          16          Q.   Have you ever taken -- is that a no, is
          17   the answer to my question?
          18          A.   I don't know who the purchasers of my
          19   XRP are.
19:51:10  20          Q.   So have you ever taken any steps to
          21   determine whether they are accredited investors?
          22          A.   I don't know who the purchasers of my
          23   XRP are.
          24          Q.   Okay.  Have you ever taken any steps to
19:51:19  25   determine whether the purchasers of Ripple's XRP
```

485

19:51:22  1   are accredited investors?

         2        A.   Yes.

         3        Q.   What steps?

         4        A.   Some of Ripple's XRP has been sold to

19:51:31  5   accredited investors.

         6        Q.   Are you talking about OTC sales?

         7        A.   Yes.

         8        Q.   Have you ever taken any steps to

         9   determine whether purchasers of Ripple's XRP and

19:51:42 10   programmatic sales are accredited investors?

        11        A.   I don't know who the purchasers of

        12   Ripple's XRP sales are.

        13        Q.   With respect to Ripple's OTC sales, has

        14   Ripple ever filed a Form D with the SEC?

19:51:57 15        A.   Not of which I'm aware.

        16        Q.   Have you ever sold XRP to investors in

        17   the United States?

        18        A.   Have I personally?

        19        Q.   Yes.

19:52:08 20        A.   Not of which I'm aware.

        21        Q.   Have you ever sold XRP to persons not in

        22   the United States?

        23        A.   I guess I -- I'm aware that GSR has used

        24   exchanges around the world.  And so I'm aware that

19:52:24 25   people around the world have purchased XRP by way

                                                              486

```
19:52:29    1    of GSR.
            2         Q.   Have you ever instructed GSR to restrict
            3    the nationality of the people to whom it sells
            4    your XRP?
19:52:37    5         A.   Yes.
            6         Q.   How so?
            7         A.   I instructed them not to sell on U.S.
            8    exchanges.
            9         Q.   When did you give that instruction?
19:52:51   10         A.   August or September 2020, I think.
           11         Q.   But --
           12         A.   I don't recall exactly.
           13         Q.   Okay.  Before that had you ever
           14    instructed GSR not to sell to U.S. persons?
19:53:03   15         A.   I don't believe so.
           16         Q.   And after that instruction, did you
           17    instruct GSR -- did GSR sell only on non-U.S.
           18    exchanges?
           19         A.   I believe so.
19:53:14   20         Q.   Okay.  Did you take any steps to
           21    restrict the resale by those purchasers of your
           22    XRP to any purchaser in the United States?
           23         A.   I don't know who the purchasers of my
           24    XRP are.
19:53:29   25         Q.   Okay.  And have you ever given anything
```

487

```
19:53:34   1    of value of your own assets to anyone to do work
           2    on behalf of Ripple?
           3         A.    Could you be more precise?
           4              MR. STU ALDEROTY:  Could we have
19:53:44   5         a time check, Andrew?
           6              MR. CERESNEY:  Yeah.
           7              MR. SOLOMON:  I think we're over
           8         and, frankly, I think you're getting into
           9         what the judge precluded you from doing
19:53:51  10         with her order on financial records
          11         anyway.  But if we're done, we're done,
          12         because it's now been 16 hours of under
          13         oath testimony of Mr. Garlinghouse.
          14              Are we done?
19:53:59  15              THE VIDEOGRAPHER:  We're over.
          16              MR. SOLOMON:  Okay.
          17              MR. CERESNEY:  We're done.
          18              MR. TENREIRO:  You're going to
          19         stop it?  You're not going to let him
19:54:05  20         answer that question?
          21              MR. SOLOMON:  No.
          22              MR. ALDEROTY:  No.
          23              MR. SOLOMON:  No, we're done.
          24              THE VIDEOGRAPHER:  Okay.  Do you
19:54:08  25         have any questions or -- you're done?
```

488

19:54:09  1              MR. SOLOMON:  I'd like to take a
        2        couple minutes.
        3              THE VIDEOGRAPHER:  All right.
        4        Going off the record at 7:55.
19:54:17  5              (Whereupon, a recess is taken.)
        6              THE VIDEOGRAPHER:  Okay.  Back on
        7        the record, 8:01.
        8              MR. SOLOMON:  We have no more --
        9        we have no questions for Mr. Garlinghouse.
19:59:59 10              THE VIDEOGRAPHER:  All right.
       11        This concludes the video deposition of
       12        Bradley Garlinghouse.  The time is 8:01
       13        and still going off the record.
       14              (Whereupon, the deposition
20:00:07 15        concluded at 8:01 p.m.)
       16
       17
       18
       19
       20
       21
       22
       23
       24
       25

                                                      489

```
 1    STATE OF NEW YORK        )

 2                             ) ss:

 3    COUNTY OF NEW YORK       )

 4              I hereby certify that the witness in the

 5    foregoing deposition, BRADLEY KENT GARLINGHOUSE, JR.,

 6    was by me duly sworn to testify to the truth, the whole

 7    truth and nothing but the truth, in the within-entitled

 8    cause; that said deposition was taken at the time and

 9    place herein named; and that the deposition is a true

10    record of the witness's testimony as reported by me, a

11    duly certified shorthand reporter and a disinterested

12    person, and was thereafter transcribed into typewriting

13    by computer.

14              I further certify that I am not interested in

15    the outcome of the said action, nor connected with nor

16    related to any of the parties in said action, nor to

17    their respective counsel.

18              IN WITNESS WHEREOF, I have hereunto set my

19    hand this 22nd day of September, 2021.

20              Reading and Signing was:

21    ___ requested    ___ waived    _X_ not requested.

22

23

24    _____

            BRIDGET LOMBARDOZZI, CSR, RMR, CRR

25                                                      490
```