# Exhibit 97

## LOAN AND PURCHASE AGREEMENT

This Loan and Purchase Agreement (the "**Agreement**") is entered into as of March 5, 2015 (the "**Effective Date**"), by and between ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ("**Seller**"), and Global Software Research 2015, an Andorra LLC, ("**Purchaser**").

For good and valuable consideration, Purchaser and Seller (each a "**Party**," and together the "**Parties**") agree as follows:

1. **Definitions**. When used in this Agreement with initial letters capitalized, in addition to terms defined elsewhere in this Agreement, the following terms have the following meanings:

    1.1 "**Applicable Law**" means all applicable U.S. and foreign, national, federal, state, provincial or local laws, statutes, regulations, rules or court orders, including without limitation: (a) state and federal laws related to money service businesses, anti-money laundering (including, but not limited to the U.S. Bank Secrecy Act), money transmission, sale of payment instruments, stored value or checks, currency exchange, electronic funds transfers, commodities and securities, including the anti-manipulation and anti-fraud provisions thereof, privacy and data security, and data breach remediation and notification; and (b) state and federal laws related to customer identity verification and screening (e.g., the Office of Foreign Assets Control's list of Specially Designated Nationals).

    1.2 "**Claim**" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against Purchaser or any of its affiliates (and/or one or more of their respective personnel, members, managers or representatives) by any person or entity.

    1.3 "**Confidential Information**" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (a) was previously known to the receiving Party free of any obligation to keep it confidential; (b) becomes generally available to the public through no wrongful act; (c) is rightfully received from a third party under no obligation of confidence to such third party; or (d) is independently developed by the receiving Party without reference to information which has been disclosed pursuant to this Agreement. For avoidance of doubt the existence of this Agreement and the terms contained herein are considered Confidential Information of both Parties.

    1.4 "**Liquidity Extraction Activity**" means the net conversion of XRP, as defined below, that has been loaned to Purchaser or other XRP chosen by Seller, its designee or its agent over a period of time specified by Seller, its designee or its agent into USD or other currency issued by a gateway or financial institution to be specified by Seller or its agent.

    1.5 "**Loaned XRP**" means XRP loaned and delivered to the Purchaser by Seller for up to three (3) months from the applicable Loan Date as set forth in the applicable Loan Delivery Schedule.

    1.6 "**Loss**" means any claim, cost, loss, damage, judgment, penalty, interest and/or expense

    1.7 "**Ripple Protocol**" means the open Internet protocol-based technology that is a common digital standard for funds settlement and can be freely adopted by financial institutions and payments networks.

    1.8 "**Site**" means the following website: http://www.ripplecharts.com/#/.

HIGHLY CONFIDENTIAL

1.9   "**Term**" means the initial term and any renewal term agreed to in writing by the Parties.

1.10  "**XRP**" means units of the decentralized, virtual currency that is native to the Ripple Protocol.

1.11  "**XRP Address**" means the unique public cryptographic key specified by Purchaser as the address to which any Loaned XRP purchased pursuant to this Agreement will be delivered.

2.  **Loans, Purpose and Terms of the Loans, and Purchases**

    2.1  Loans.  Seller will loan Purchaser a specified amount of XRP for a period of up to three months (the "Loan") from the effective date of the Loan as set forth on the relevant Loan Delivery Schedule attached hereto as Annex B.  Purchaser will use the Loaned XRP only according to the terms of this Agreement.  Any Loaned XRPs that are not liquidated within three months of delivery will be delivered back to Seller and no longer subject to the terms contained herein.

    2.2  Purpose of the Loans.  The Loans will only be used by Purchaser to fund the Liquidity Extraction Activity as defined above.

    2.3  Terms and Conditions of the Loan.  Purchaser agrees it will provide to Seller, its designee or agent any information or report Seller, its designee or agent request so that Seller can reasonably determine if Purchaser has satisfied the its obligations to provide liquidity extraction services by applying the Loaned XRP.  Purchaser agrees to and will maintain custody and control of the Loaned XRP until the Loaned XRP are actually purchased by Purchaser for sale according to the procedures described below in Section 2.5.  Purchaser shall deposit any funds or XRP compensation generated from the Liquidity Extraction Activity into accounts chosen by Seller, its designee or its agent.  The applicable Loan will automatically terminate once Purchaser has repaid the Loan, all applicable Loaned XRP have been liquidated using the process set out in Section 2.5 and Purchaser has deposited the proceeds in the applicable account or accounts as designated by Seller, its designee or its agent.

    2.4  Market Maintenance.   Purchaser will use best efforts to ensure the sales of the Loaned XRP do not undermine or interfere with a fair and orderly market for XRP.  After Purchaser has custody and control of the Loaned XRP pursuant to a Loan Delivery Schedule signed by both parties, it will sell the Loaned XRP in a controlled manner taking care not to de-stabilize the global XRP market or cause a ten (10) percent decline in the weighted average interday price of XRP, as posted on the Site.  Specifically, Purchaser will be limited to the total amount of Loaned XRP it can sell on a given day and cannot exceed, without clear written instructions from Seller, its designee or its agent (an email may satisfy this requirement of a writing), five (5) percent of the total network XRP trading volume in the twenty-four (24) hour period immediately preceding any sale of Loaned XRP as shown on the Site.  The decision about the volume of Loaned XRP that will be sold on a given day will be Purchaser's, but Purchaser is required to take the reaction of the global XRP market to its sales activities into account as it sells the Loaned XRPs.

    2.5  Purchases of Loaned XRP.  Purchaser will purchase and Seller will sell the Loaned XRP in the following manner.  The Purchaser will sell up to and including the total Loaned XRP in conformance with Section 2.4 of this Agreement (Market Maintenance) in a series of liquidation transactions spread throughout the period it draws upon the amount of Loaned XRPs in order to maximize the execution price of each liquidation transaction. Purchaser will receive compensation for providing the Liquidity Extraction Activity, as described below in Section 2.6 of this Agreement ("Purchaser's Compensation").  Purchaser will take the proceeds from the sale of the Loaned XRPs,

less any Purchaser's Compensation as described below, and deposit them as directed by Seller, its designee or its agents.

2.6 Purchaser's Compensation.  As consideration for providing the Liquidity Extraction Activity, Purchaser will be compensated in the following manner for each consecutive twenty four (24) hour period (the "XRP Sale Period") by either:

(a)    For each XRP Sale Period where total traded volume in XRP on the main Ripple network gateways is less than ▮▮▮▮▮ the Purchaser will be entitled to deduct from the gross proceeds from the sale of the Loaned XRP an amount equal to ▮▮▮ percent of the total proceeds (the "Low Volume Daily Compensation Payment") liquidated by the Purchaser during such XRP Sale Period after the proceeds have been deposited into the applicable or designated account; or

(b)    For each XRP Sale Period where total traded volume in XRP on the main Ripple network gateways exceeds ▮▮▮▮▮ the Purchaser will be entitled to deduct from the gross proceeds from the sale of the Loaned XRP an amount equal to ▮▮▮ percent of the total proceeds (the "High Volume Daily Compensation Payment") liquidated by the Purchaser during such XRP Sale Period after the proceeds have been deposited into the applicable or designated account.

2.7 Taxes and Transfer of Risk.

(a) The Purchase Price for Loaned XRP purchased pursuant to Agreement is exclusive of any applicable taxes.  To the extent any taxes are applicable on the sale of the Loaned XRP purchased under this Agreement, Purchaser will pay all applicable taxes.  To the extent Seller does not collect any applicable taxes but it is later determined that Seller should have withheld taxes on behalf of Purchaser, Purchaser will pay such taxes to Seller upon receiving notice of such taxes.  Seller is not liable for any taxes that Purchaser is legally obligated to pay, in any jurisdiction, which are incurred or arise in connection with or related to Purchaser's business activities (under this Agreement or otherwise), and all these taxes will be the financial responsibility of Purchaser.

(b) Once Purchaser has purchased the Loaned XRP, title to and risk of loss of the Loaned XRP passes to Purchaser. Purchaser acknowledges and agrees that Seller and any of its agents have no liability to Purchaser or to any third party for any loss, theft or misuse of any Loaned XRP after purchase pursuant to this Agreement.  Seller has no obligation under this Agreement to monitor or investigate the use or distribution of any of the Loaned XRP purchased by Purchaser pursuant to the procedures set forth above.

2.7 Limitations and Acknowledgements.

2.7.1. No Right to Use as End User.  Purchaser will use the Loaned XRP solely pursuant to the terms of this agreement.   Purchaser will not use the Loaned XRP as an End User.

2.7.2. Purchaser Acknowledgement.  Purchaser acknowledges and agrees that: (a) XRP do not represent a right to make any demand on Seller or any of its affiliates; (b) Seller and its affiliates have no obligation to redeem or exchange XRP for monetary value, goods, services, or any other item; and (c) Seller or any of its affiliates are not the "issuer" or "provider" of XRP, does not set terms of use applicable to End Users of XRP, does not otherwise administer XRP, and does not exercise oversight and control over either XRP or the Ripple Network in which it is used.

3. **Other Obligations of Purchaser**.

3.1 <u>Applicable Laws</u>.  Purchaser will comply with all Applicable Laws, including, but not limited to, Applicable Laws related to its resale or distribution of Loaned XRP.  Purchaser also acknowledges that it has a duty to comply with any applicable securities or commodities laws, including but not limited to, the anti-manipulation and anti-fraud rules and regulations of the United States Securities and Exchange Commission and the United States Commodities Futures Trading Commission.

3.2 <u>Regulatory Approvals</u>.  Purchaser will obtain and keep in full force and effect, at its expense, any permits, licenses, consents, approvals, registrations or authorizations ("**Regulatory Approvals**") necessary to purchase, resell or otherwise distribute the Loaned XRP purchased under this Agreement to End User Buyers, including without limitation any applicable money transmitter or money service business Regulatory Approvals.  Upon Seller's request, Purchaser will provide to Seller evidence of any Regulatory Approvals required for Purchaser to purchase, resell or otherwise distribute the Loaned XRP it has purchased to End User Buyers.

3.3 <u>Responsibility to End User Buyers</u>.  As between Purchaser and Seller, Purchaser will be fully responsible for any use or distribution of the Loaned XRP it has purchased by any End User Buyer.  Purchaser is responsible for all customer service or other issues or claims that relate to the distribution or resale of Loaned XRP it purchased from Purchaser to End User Buyers.  Purchaser will not make any representations or warranties to any other party on behalf of or concerning Seller.

4. **Purchaser Representations and Warranties**.  Purchaser hereby represents and warrants to the Seller that: (a) it has all right, power, and authority necessary to enter into and perform this Agreement; (b) when executed and delivered, this Agreement will constitute its legal, valid and binding obligation enforceable against it in accordance with its terms; (c) it is in compliance with all Applicable Laws, including without limitation any such laws that may apply to Purchaser's resale or distribution of Loaned XRP it purchases to End User Buyers; (d) it is familiar with open source decentralized virtual currencies and understands the nature and uses of XRP; (e) it is not purchasing any XRP from Seller to use such XRP as an End User; (f) it is not and has not been a party to any current, pending, threatened or resolved enforcement action of any government agency, any consent decree or settlement with any governmental agency, or any lawsuit or settlement with any private person or entity regarding the distribution or resale of any type of currency, prepaid access, or other items of monetary value; (g) if it decides to sell the Loaned XRP it purchases that it will collect all the Know Your Customer information required by Applicable Law, including but not limited to the United States Patriot Act and the United States Office of Foreign Assets Control, including at a minimum: (i) the customer/end user buyer's name, (ii) the customer/end user buyer's address or where appropriate their national identity number, or date and place of birth; (iii) it will verify the identity of any customer/end user buyer that purchasers more than $1000 or 1000 euros in one or more transactions; and (iv) it will, upon written request, provide Seller with a copy of its AML policy and identification of its banking relationship[s].

5. **Publicity**.  Neither Party may issue any press release or other public statement with respect to this Agreement or its terms unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other Party, which approval may be withheld at the other Party's sole discretion.

6. **Confidentiality.**

   6.1 Confidential Information is the confidential and proprietary information of the disclosing Party, and each Party will maintain all Confidential Information it receives in strict confidence and not disclose any Confidential Information to any third party or use any Confidential Information for any purpose other than the performance of this Agreement.  Each Party shall

notify the other party immediately upon discovery of any unauthorized use or disclosure of the Confidential Information of the other party, and shall cooperate with the other party in every commercially reasonable way to help the other party regain possession of its Confidential Information and to prevent any further unauthorized use thereof. Each Party may disclose the Confidential Information of the other party solely: a) pursuant to any law or regulation, or order of any governmental or regulatory authority exercising applicable jurisdiction over the party or in compliance with legal process, or b) to prosecute or defend any action or proceeding to which it is a party. Each party shall use commercially reasonable efforts to cause its directors, officers, managers, employees, agents, consultants and any other person its controls to comply with the obligations of such party under this Section. The obligations in this Section are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreements between the Parties.

6.2 Consent to Injunctive Relief. Each party hereby agrees that, in the event of a breach by either party of its obligations to the other party under the Confidentiality Section of this agreement, the other party may suffer irreparable harm and shall therefore have the right to seek injunctive and other equitable relief.

7. **Term; Termination**.

(a) Term. This Agreement will commence on the Effective Date and will continue until the Purchaser completely pays for the Loaned XRP or until the conditions of subsections (b) or (c) of this Section 7 are satisfied.

(b) Termination for Convenience. Seller reserves the right to terminate this Agreement for convenience upon sixty (60) days' advance written notice to Purchaser.

(c) Termination for Cause. Without limiting any other rights or remedies that Purchaser may have at law or otherwise, Seller may terminate this Agreement immediately upon notice to Purchaser if Purchaser breaches any of its obligations under this Agreement.

(d) Effect of Termination. If Seller terminates this Agreement, Purchaser will be required to pay any outstanding amounts due under all executed Loan Delivery Agreements.

(e) Survival. In the event of any termination or expiration of this Agreement, except as otherwise provided in Section 7(c) of this Agreement, the following provisions will survive: Sections 3, 4, 6, 7, 8, 9, 10.

8. **Indemnification**

8.1 Indemnity. Purchaser will defend, indemnify and hold harmless Seller (and its employees, shareholders, directors representatives and affiliates) (each an "**Indemnified Party**") from and against any Claim or Loss to the extent any Claim or Loss is based on (a) any breach of any representation, warranty or covenant of this Agreement by Purchaser or caused by Purchaser's employees, contractors or agents, (b) any use, distribution or resale of the Loaned XRP purchased by Purchaser pursuant to this Agreement or Purchaser's employees, contractors or agents, and all associated marketing and promotional activities undertaken by Purchaser (including without limitation any activities related to any sweepstakes or contests), or (c) any taxes that Purchaser is legally obligated to pay in any jurisdiction, which are incurred or arise in connection with or related to its business activities (under this Agreement or otherwise).

8.2 Indemnification Procedure. In connection with any Claim or Loss described in Section 8.1, Seller will: (a) give Purchaser prompt Notice of the Claim or Loss (however, any delay in notification

HIGHLY CONFIDENTIAL
GSR00008437

will not relieve Purchaser of its obligations under Section 8.1 except and solely to the extent that the delay materially impairs Purchaser's ability to defend the Claim or Loss), (b) cooperate reasonably with Purchaser (at Purchaser's expense) in connection with the defense and settlement of the Claim or Loss, and (c) permit Purchaser to control the defense and settlement of the Claim or Loss, except that Purchaser will not enter into any settlement or compromise of any Claim or Loss without Seller's prior written consent if such settlement or compromise arises from or is part of any criminal action, suit or proceeding or contains a stipulation to or admission or acknowledgment of, any liability or wrongdoing (whether in contract, tort or otherwise) on the part of Seller or otherwise requires Seller to take or refrain from taking any material action (such as the payment of fees). Seller (at its cost) may participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

9. **Disclaimers; Limitations.**

    9.1 EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, SELLER MAKES NO REPRESENTATIONS OR WARRANTIES IN RELATION TO THE LOANED XRP, THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

    9.2 SELLER WILL NOT BE LIABLE TO PURCHASER FOR ANY INCIDENTAL, INDIRECT OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT, EVEN IF SELLER HAS BEEN ADVISED OF THE POSSIBILITY OF THESE DAMAGES (AND NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY REMEDY). SELLER'S ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED THE TOTAL AMOUNT OF FUNDS PAID TO SELLER UNDER THIS AGREEMENT.

10. **Miscellaneous**

    10.1 Time of Essence. Time is of the essence with respect to the performance of the obligations of Seller and Purchaser under this Agreement.

    10.2 Relationship of the Parties. Nothing in this Agreement will be construed as creating an employer-employee or agency relationship, a partnership or a joint venture between the parties. Neither party shall have the any right, power or authority to bind the other party.

    10.3 No Third Party Beneficiaries. This Agreement is only for the benefit of, and will be enforceable only by, Seller and Purchaser. This Agreement is not intended to confer any right or benefit on any third party, and no action may be commenced or prosecuted against a Party by any third party claiming as a third-party beneficiary of this Agreement or any of the transactions contemplated by this Agreement.

    10.4 Notices. Any notice or other communication under this Agreement given by either Party to the other Party will be in writing and must be sent to the intended recipient by registered letter, receipted commercial courier, or electronically receipted facsimile transmission (acknowledged in like manner by the intended recipient) at its notice address as specified below:

HIGHLY CONFIDENTIAL
GSR00008438

|  **Seller:** | **Purchaser** |
|---|---|
| Attention: ▇ | Attention: ▇ |
| Address: | Address: |
| ▇ | ▇ |

Either Party may from time to time change such address or individual by giving the other Party written notice of such change.

10.5 <u>Assignment</u>. This Agreement will be binding on and inure to the benefit of the Parties and their respective permitted successors and assigns, provided that Purchaser will not assign this Agreement or any of its rights or obligations hereunder or under any Loan Delivery Schedule (including by operation of law or by virtue of a Change of Control, which for purposes of this Section, will be deemed an assignment) without the prior written consent of Seller. "**Change of Control**" means the occurrence of any of the following events: (a) a change in the beneficial ownership, directly or indirectly, of more than 50% of the total voting power or the voting securities of Purchaser, whether as a result of the issuance of securities, a merger, consolidation, recapitalization, tender offer or exchange offer, reclassification, liquidation or dissolution or otherwise; (b) the sale of all or substantially all of the assets of Purchaser; or (c) the merger or consolidation of Purchaser with or into another entity if the voting securities of Purchaser that are outstanding immediately prior to such transaction and that represent 50% or more of the aggregate voting power of the voting securities of Purchaser are changed into or exchanged for cash, securities or property, unless, pursuant to such transaction, such securities are changed into or exchanged for, in addition to any other consideration, securities of the surviving entity or transferee that represent immediately after such transaction at least a majority of the aggregate voting power of the voting securities of the surviving entity or transferee or an entity controlling such surviving entity or transferee, such that control of Purchaser is not transferred away from the current beneficial owners.

10.6 <u>Non-waiver; Remedies Cumulative</u>. The failure of either Party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the Party's rights to subsequently enforce the provision or exercise those rights or remedies. The remedies specified in this Agreement are in addition to any other remedies that may be available in law.

10.7 <u>Choice of Law; Forum</u>. This Agreement will be governed by the laws of the state of South Carolina, U.S.A., without reference to any applicable conflict of laws rules or provisions. Each Party irrevocably consents to the non-exclusive jurisdiction and venue of the federal and state courts located at San Francisco County, California, U.S.A. with respect to any claim, action or proceeding arising out of or in connection with this Agreement or the transactions contemplated in this Agreement, and Purchaser agrees not to commence or prosecute any such claim, action or proceeding other than in the aforementioned courts. The U.N. Convention on Contracts for the International Sale of Goods will not apply to this Agreement.

10.8 <u>Entire Agreement; Amendment; Severability</u>. This Agreement represents the entire agreement between the Parties with respect to the subject matter hereof and supersedes any previous or

HIGHLY CONFIDENTIAL

contemporaneous oral or written agreements regarding such subject matter.  Except as expressly set forth in this Agreement, this Agreement may not be modified or amended except by an instrument or instruments in writing signed by the Party against whom enforcement of any such modification or amendment is sought.  If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions.  Each Loan Delivery Schedule becomes a part of and is incorporated into this Agreement upon execution thereof by the Parties. In the event of any conflict between the terms in the body of this Agreement and the terms in any Loan Delivery Schedule, the terms of this Agreement will prevail to the extent that such a conflict exists, unless specifically stated otherwise in any Loan Delivery Schedule.

10.9 <u>Counterparts</u>.  This Agreement may be executed in multiple counterparts, each of which will be an original, but all of which taken together will constitute one instrument.

[*Remainder of page left intentionally blank - signature page to follow*]

IN WITNESS HEREOF, the Parties have caused this Agreement to be executed as of the Effective Date.

**Purchaser:**
**Global Software Research 2015**

**Signature:** _____

**Printed Name:** _____

**Title:** _____

**Seller:**
███████████████████████████████

**Signature:** _____

**Printed Name:** ███████████

Title:     Trustee

HIGHLY CONFIDENTIAL

GSR00008441

# EXHIBIT A

## FORM OF THE LOAN DELIVERY SCHEDULE

This Loan Delivery Schedule is entered into as of the "Loan Date" specified on this Loan Delivery Schedule below, and is part of and is governed by the Loan and Purchase Agreement entered into by and between ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ("**Seller**") and Global Software Research 2015 LLC ("**Purchaser**") dated March 19, 2015 (together with any exhibits attached thereto, the "**Agreement**"). After three months from the Loan Date, Purchaser agrees that, upon written demand, to return any unsold Loaned XRP to Seller. Unless otherwise defined herein, capitalized terms used in this Loan Delivery Schedule will have the same meaning as set forth in the Agreement.

| Loan Date: | |
|---|---|
| Number of Loaned XRP: | |
| Purchaser's XRP Address: | ▮▮▮▮▮▮▮▮▮▮▮▮ |

|  |  |
|---|---|
| ▮▮▮▮▮▮▮▮▮▮▮▮ | **Global Software Research 2015, LLC** |
| Signature: | Signature: |
| Printed Name: ▮▮▮▮▮▮ | Printed Name: ▮▮▮▮▮▮ |
| Title:   Trustee | Title:   Sole Administrator |

HIGHLY CONFIDENTIAL