# Exhibit 134

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**          :
                                                                                  :
                                                        **Plaintiff,**          :          **20 Civ. 10832 (AT)**
                                                                                  :
                                 **- against -**                              :          **ECF Case**
                                                                                  :
**RIPPLE LABS, INC.,**                                                :
**BRADLEY GARLINGHOUSE, and**                         :
**CHRISTIAN A. LARSEN,**                                     :
                                                                                  :
                                                        **Defendants.**    :
                                                                                  :
---------------------------------------------------------------------x

## PLAINTIFF'S FIRST SET OF REQUESTS FOR ADMISSION
## TO DEFENDANT RIPPLE LABS, INC.

Plaintiff Securities and Exchange Commission (the "SEC"), pursuant to Rules 26 and 36 of the Federal Rules of Civil Procedure (the "Rules") and the parties having conferred as required by Rule 26(f), hereby requests that Defendant Ripple Labs, Inc. ("Ripple") respond to the following Requests for Admission ("Requests") in writing and under oath within thirty (30) calendar days of the date of these Requests by serving its answers on the SEC's counsel, Jorge G. Tenreiro, 200 Vesey Street, Room 400, New York, New York 10281.

### INSTRUCTIONS AND DEFINITIONS

1.      The Uniform Definitions in Discovery Requests set forth in Local Civil Rule 26.3 of the Local Rules of Civil Procedure for the Southern and Eastern Districts of New York apply to these Requests and are incorporated herein.

2.      These Requests shall be deemed continuing, and supplemental answers shall be required if you directly or indirectly obtain further information after the initial response, as provided by Rule 26(e).

3.      Pursuant to Rule 36(a)(3): "A matter is admitted unless, within 30 days after being served, the party to whom the request is directed serves on the requesting party a written answer or objection addressed to the matter and signed by the party or its attorney."

4.      Pursuant to Rule 36(a)(4): "If a matter is not admitted, the answer must specifically deny it or state in detail why the answering party cannot truthfully admit or deny it.  A denial must fairly respond to the substance of the matter; and when good faith requires that a party qualify an answer or deny only a part of a matter, the answer must specify the part admitted and qualify or deny the rest.  The answering party may assert lack of knowledge or information as a reason for failing to admit or deny only if the party states that it has made reasonable inquiry and that the information it knows or can readily obtain is insufficient to enable it to admit or deny."

5.      Pursuant to Rule 36(a)(5): "The grounds for objecting to a request must be stated. A party must not object solely on the ground that the request presents a genuine issue for trial."

6.      If only a part of a Request is admitted, you must specify the part admitted and either qualify or deny the rest.  If an objection is made to a Request or to a part of Request, the specific ground for the objection shall be set forth clearly.  To the extent You assert that you cannot truthfully admit or deny part of a Request, you must admit or deny the remainder of the Request

7.      The relevant period for these Requests, unless otherwise stated, is January 1, 2012 through the present.

8.      These Requests shall be construed to require answers based upon Your and Your agents' and representatives' knowledge.

9.      If You claim that any Request or any application instruction or definition is ambiguous, set forth as part of the response the language You claim is ambiguous and the interpretation You have used to respond to the individual Request.

10.     The following definitions shall apply to these Requests:

2

a. "Ripple" means Ripple Labs, Inc., its predecessors, successors, affiliates, and subsidiaries, as well as its current and former officers, employees, directors, and any person acting, directly or indirectly, on its behalf including, without limitation, and XRP II LLC ("XRP II")

b. The term "XRP" means the digital asset, tokens, or coins known as "XRP," as well as the digital asset previously known as "Ripple Credits" or "Ripples."

c. The term "XRP Blockchain" means the distributed ledger originally programmed by Jed McCaleb ("McCaleb"), Arthur Britto ("Britto"), and David Schwartz ("Schwartz") and also known as the "XRP Ledger," "Ripple Consensus Ledger" or the "Ripple Protocol."

d. The term "UNL" refers to the "Unique Node List" of any given node on the XRP Blockchain.

e. The term "ODL" refers to Ripple's "On-Demand Liquidity" software, also known as "xRapid."

f. The term "xCurrent" refers to Ripple's software platform that it sells to enterprises to enable the exchange of information between counterparties.

g. The term "Consensus Protocol" refers to the mechanism by which transactions are confirmed and validated on the XRP Blockchain.

h. The term "Programmatic Sales" refers to Ripple's offers and sales of XRP on digital asset trading platforms, at times conducted via an intermediary.

i. The term "Market Makers" refers to any third party that Ripple contracted with, with respect to Ripple's Programmatic Sales.

j. The term "OTC Sales" refers to Ripple's direct offers and sales of XRP to persons including investment funds, wealthy individuals, or institutional investors.

k. The term "Drop(s) of XRP" refers to the lowest divisible unit of XRP.

l.     The term "XRP Escrow" refers to the cryptographically programmed time release of XRP that Ripple announced in May 2017 and established in December 2017.

m.    The term "Larsen" refers to Defendant Christian A. Larsen.

n.     The term "Garlinghouse" refers to Defendant Bradley Garlinghouse.

o.     The term "Securities Act" refers to the federal statute known as the Securities Act of 1933 and codified at 15 U.S.C. § 77a *et seq.*

p.     The term "currency" refers to the term used in Section 2(a) of the Securities Act.

q.     The term "Regulation D" refers to the regulation issued by the SEC under the Securities Act, codified at 17 C.F.R. § 230.500 *et seq.*

r.     The term "Regulation S" refers to the regulation issued by the SEC under the Securities Act, codified at 17 C.F.R. § 230.901 *et seq.*

s.     The term "FinCEN" means the United States Financial Crimes Enforcement Network.

t.     The term "NYDFS" means the New York Department of Financial Services.

u.     The term "MGI" means the entity doing business as MoneyGram International.

v.     The term "EDGAR" means the SEC's Electronic Data Gathering, Analysis, and Retrieval system.

w.    The term "XRP Market Reports" refers to the periodic reports published on Ripple's websites with respect to XRP beginning in early 2017.

x.     The term "use case" means any use of an asset other than to pay fees to effect transactions on the XRP Blockchain, including but not limited to speculation, investment, trading, or to bridge transactions between two fiat currencies.

        y.      The term "principal use case" means the primary, most prominent, most

common, or most salient use case for an asset.

        z.      The terms "You" and "Your" mean Ripple.

        aa.      The terms "Request" and "Requests" mean these Requests for Admission.

        bb.      The term "Relevant Period" refers to the dates January 1, 2012 to June 4,

2021, inclusive.

## REQUESTS FOR ADMISSION

**Request No. 1:**
Admit that "XRP" is the digital token native to the XRP Blockchain.

**Request No. 2:**
Admit that the XRP Blockchain is an electronic, cryptographically secure ledger operating across a network of computers.

**Request No. 3:**
Admit that 100 billion units of XRP were created on the XRP Blockchain.

**Request No. 4:**
Admit that McCaleb hired Larsen in 2012 to serve as the CEO of Ripple.

**Request No. 5:**
Admit that in June 2012, Britto programmed the XRP Ledger to allocate the 100 billion units of XRP as follows: 80 billion XRP to Ripple, 9 billion XRP to Larsen, 9 billion XRP to McCaleb, and 2 billion XRP to Britto.

**Request No. 6:**
Admit that Ripple was founded as a Delaware corporation in September of 2012 under the name OpenCoin, Inc.

**Request No. 7:**
Admit that the public version of the XRP Blockchain launched in early 2013.

**Request No. 8:**
Admit that the XRP Blockchain was reset more than once until its public launch in early 2013.

**Request No. 9:**
Admit that each time the XRP Blockchain was reset, new versions of XRP were created.

**Request No. 10:**
Admit that at the time of the public launch of the XRP Blockchain, Ripple controlled and operated all of the computer nodes proposing and confirming new states of the XRP Blockchain under the Consensus Protocol.

**Request No. 11:**
Admit that at the time of the public launch of the XRP Blockchain, effecting a transaction on the XRP Blockchain required destroying 10 Drops of XRP.

**Request No. 12:**
Admit that at the time of the public launch of the XRP Blockchain, no actual use existed for XRP (other than users needing 10 Drops of XRP to effect transactions on the XRP Blockchain).

**Request No. 13:**
Admit that in February 2012, McCaleb and Jesse Powell sought and obtained a legal memorandum from the law firm Perkins Coie LLP addressing certain regulatory risks of Ripple and XRP.

**Request No. 14:**
Admit that in October 2012, Larsen and McCaleb sought and obtained a legal memorandum from the law firm Perkins Coie LLP addressing certain regulatory risks of Ripple and XRP.

**Request No. 15:**
Admit that in 2013 and 2014, Ripple distributed approximately 12.5 billion XRP to members of the public.

**Request No. 16:**
Admit that Ripple's 2013 and 2014 distributions of XRP were meant, in part, to create a trading market for XRP.

**Request No. 17:**
Admit that the individuals who created XRP, together with Larsen, are the same individuals who created Ripple.

**Request No. 18:**
Admit that Ripple was created in part to distribute XRP to the public.

**Request No. 19:**
Admit that, when it was incorporated, Ripple had less than $10 million in cash or cash equivalent assets.

**Request No. 20:**
Admit that, when it was incorporated, Ripple's principal asset was 80 billion units of XRP.

**Request No. 21:**
Admit that, from its founding through the end of 2018, Ripple sold equity in Ripple for approximately $███████

**Request No. 22:**
Admit that, in 2019, Ripple sold another $███████ in equity in Ripple.

**Request No. 23:**
Admit that, throughout the Relevant Period, Ripple raised $███████ from the sale of equity in Ripple.

**Request No. 24:**
Admit that each Drop of XRP is fungible with any other Drop of XRP.

**Request No. 25:**
Admit that each unit of XRP is fungible with any other unit of XRP.

**Request No. 26:**
Admit that each unit of XRP that is purchased on digital asset trading platforms is immediately transferable or salable without restrictions the moment it is purchased.

**Request No. 27:**
Admit that Ripple sold at least 3.9 billion XRP for at least $763 million throughout the Relevant Period in Programmatic Sales.

**Request No. 28:**
Admit that Ripple sold at least 4.9 billion XRP for at least $624 million throughout the Relevant Period in OTC Sales.

**Request No. 29:**
Admit that Ripple sold XRP throughout the Relevant Period in exchange for cash and other consideration.

**Request No. 30:**
Admit that Ripple's OTC Sales included a contract between Ripple and each OTC Sales buyers.

**Request No. 31:**
Admit that Ripple used proceeds from Programmatic Sales and OTC Sales of XRP in part to fund its operations.

**Request No. 32:**
Admit that Ripple employed proceeds from its sales of XRP to develop uses for XRP.

**Request No. 33:**
Admit that Ripple exchanged some XRP throughout the Relevant Period for non-cash consideration.

**Request No. 34:**
Admit that Ripple has distributed at least ███████ XRP for non-cash consideration during the Relevant Period.

7

**Request No. 35:**
Admit that in approximately May 2013, Ripple circulated to third parties a document describing Ripple's "business model" as "based on the success" of XRP.

**Request No. 36:**
Admit that Ripple seeks to make XRP a "universal asset" to effect money transfers.

**Request No. 37:**
Admit that an active, liquid trading market in XRP is necessary in order for XRP to be a "universal asset" to effect money transfers.

**Request No. 38:**
Admit that speculative trading in the XRP market is necessary in order for XRP to be a "universal asset" to effect money transfers.

**Request No. 39:**
Admit that Ripple did not restrict its offers and sales of XRP to persons who may utilize XRP as a "universal asset."

**Request No. 40:**
Admit that Ripple offered and sold XRP to persons speculating as to the price of XRP.

**Request No. 41:**
Admit that Ripple offered and sold XRP to persons investing in XRP.

**Request No. 42:**
Admit that Ripple took steps to increase speculative trading in the XRP market.

**Request No. 43:**
Admit that Ripple intended that persons to whom Ripple offered and sold XRP would engage in speculative trading in the XRP market.

**Request No. 44:**
Admit that Ripple contracted with Market Makers for Ripple's Programmatic Sales of XRP.

**Request No. 45:**
Admit that the Market Makers utilized trading algorithms to offer and sell XRP on behalf of Ripple.

**Request No. 46:**
Admit that the Market Makers utilized trading algorithms to offer and sale XRP on behalf of Ripple in consultation with Ripple.

**Request No. 47:**
Admit that the Market Makers offered and sold XRP for Ripple on digital asset trading platforms.

**Request No. 48:**
Admit that Ripple did not instruct the Market Makers to restrict offers or sales of XRP to persons who would consume XRP.

**Request No. 49:**
Admit that Ripple knew that the Market Makers did not restrict offers or sales of XRP on behalf of Ripple to persons who use XRP.

**Request No. 50:**
Admit that Ripple's "XRP Markets Team" reviewed the price and volume of XRP on a daily basis.

**Request No. 51:**
Admit that GSR was one of the Market Makers that Ripple engaged for Ripple's Programmatic Sales.

**Request No. 52:**
Admit that Ripple instructed GSR to pause sales of XRP in 2019.

**Request No. 53:**
Admit that Ripple instructed GSR to increase, stop, or decrease GSR's sales of XRP on a periodic basis.

**Request No. 54:**
Admit that Ripple instructed GSR to make purchases of XRP on digital asset trading platforms in 2016.

**Request No. 55:**
Admit that Ripple gave periodic instructions to GSR about the volume and price of GSR's sales and purchases of XRP on digital asset trading platforms.

**Request No. 56:**
Admit that ██████████ was one of the Market Makers that Ripple engaged for Ripple's Programmatic Sales.

**Request No. 57:**
Admit that Ripple instructed GSR to sell no more than 10 to 25 basis points of XRP's trading volume on any given day starting in 2017.

**Request No. 58:**
Admit that in 2015 Ripple instructed GSR to sell no more than 10 to 25 basis points of XRP's trading volume on any given day in order to avoid causing the price of XRP to drop.

**Request No. 59:**
Admit that Ripple instructed ██████████ to sell no more than 10 to 25 basis points of XRP's trading volume on any given day.

**Request No. 60:**
Admit that Ripple instructed ██████████ to sell no more than 10 to 25 basis points of XRP's trading volume on any given day in order to avoid causing the price of XRP to drop.

**Request No. 61:**
Admit that in mid-2019, Ripple instructed GSR to stop Programmatic Sales of XRP out of concern that the sales were decreasing the price of XRP.

**Request No. 62:**
Admit that Ripple never sold XRP for consumption (other than certain sales to ODL customers starting in 2020).

**Request No. 63:**
Admit that Ripple bought back in the market at least some of the XRP it sold to ODL users starting in 2020.

**Request No. 64:**
Admit that in September 2016, Ripple directed GSR to place XRP buy and sell orders around the time of public announcements Ripple made that month.

**Request No. 65:**
Admit that, throughout the Relevant Period, Ripple published on its website the amount of XRP Ripple owned.

**Request No. 66:**
Admit that, throughout the Relevant Period, Ripple included on its website a link to where someone could buy XRP.

**Request No. 67:**
Admit that, throughout the Relevant Period, Ripple undertook efforts to create uses of XRP.

**Request No. 68:**
Admit that, throughout the Relevant Period, Ripple undertook efforts to develop uses of XRP.

**Request No. 69:**
Admit that, throughout the Relevant Period, Ripple employed individuals with experience in technical matters involving cryptography or blockchain technology.

**Request No. 70:**
Admit that, throughout the Relevant Period, Ripple's employees worked to develop uses for XRP.

**Request No. 71:**
Admit that, throughout the Relevant Period, Ripple has continued to undertake efforts to improve the XRP Ledger.

**Request No. 72:**
Admit that Ripple took steps to increase the liquidity of the XRP market.

**Request No. 73:**
Admit that Ripple took steps to maintain the liquidity of the XRP market.

**Request No. 74:**
Admit that the existence of a liquid market for XRP was one of Ripple's goals throughout the Relevant Period.

**Request No. 75:**
Admit that you took steps to increase the trading price of XRP.

**Request No. 76:**
Admit that, at times, you took steps to prevent the decline of the trading price of XRP.

**Request No. 77:**
Admit that Ripple viewed itself as a "responsible steward" of XRP throughout the Relevant Period.

**Request No. 78:**
Admit that Ripple publicly announced its intent to establish the XRP Escrow in May 2017.

**Request No. 79:**
Admit that, by 2017, Ripple was aware of XRP holders' concern that Ripple could sell a large portion of its own XRP into the market.

**Request No. 80:**
Admit that, by 2017, Ripple was aware of XRP holders' concern that if Ripple were to sell a large portion of its own XRP into the market, that could cause XRP's price to drop.

**Request No. 81:**
Admit that according to an internal Ripple memo, Ripple established the XRP Escrow to assuage XRP investor concerns that Ripple could sell a large portion of its own XRP into the market.

**Request No. 82:**
Admit that according to an internal Ripple memo, Ripple established the XRP Escrow to maintain "speculative liquidity" in XRP, as an internal Ripple memo in 2017 stated.

**Request No. 83:**
Admit that Ripple established the XRP Escrow to "drive a material increase in XRP trading volume/liquidity" in XRP, as an internal Ripple memo in 2017 stated.

**Request No. 84:**
Admit that Ripple has earned approximately $█████████ from selling licensing fees with respect to xCurrent through the Relevant Period.

**Request No. 85:**
Admit that from its inception through December 22, 2020, xCurrent did not require the use of XRP to operate.

**Request No. 86:**
Admit that, throughout the Relevant Period, Ripple took no steps to determine whether a potential XRP purchaser had a desire to consume XRP.

**Request No. 87:**
Admit that, throughout the Relevant Period, Ripple took no steps to determine whether a potential XRP purchaser had a desire to use XRP.

**Request No. 88:**
Admit that, throughout the Relevant Period, Ripple took no steps to determine whether a potential XRP purchaser had a desire to treat XRP as a "currency."

**Request No. 89:**
Admit that the ODL product was launched commercially in late 2018.

**Request No. 90:**
Admit that the ODL product is not used by individuals.

**Request No. 91:**
Admit that the ODL product is not intended for use by individuals.

**Request No. 92:**
Admit that the ODL product is not used by banks.

**Request No. 93:**
Admit that the ODL product is used by enterprises that are money transmitters.

**Request No. 94:**
Admit that clients who used the ODL product from 2019 through May 2020 were not required to obtain XRP from Ripple in connection with ODL.

**Request No. 95:**
Admit that Ripple sold no XRP directly for use on the ODL platform until early 2020.

**Request No. 96:**
Admit that Ripple bought back the XRP used by certain ODL customers in mid-2020.

**Request No. 97:**
Admit that from the launch of ODL through December 22, 2020, Ripple entered into an agreement with GSR to create or increase liquidity with respect to certain trading pairs needed to make ODL function.

**Request No. 98:**
Admit that from the launch of ODL through December 22, 2020, Ripple paid ODL customers rebates and volume incentive payments to be ODL customers.

**Request No. 99:**
Admit that the payments Ripple makes to GSR with respect to ODL, together with the amounts Ripple pays to users of the ODL platform, has, through the Relevant Period, exceeded Ripple's revenues from the ODL product.

**Request No. 100:**
Admit that the ODL platform requires the existence of a liquid trading market between XRP and whatever fiat currency is the subject of the ODL platform.

**Request No. 101:**
Admit that Ripple paid GSR to create liquidity in the trading market between XRP and the Mexican Peso.

**Request No. 102:**
Admit that, from 2018 through 2020, without GSR's market-making activities, there was insufficient liquidity between XRP and the Mexican Peso for ODL to function on that corridor.

**Request No. 103:**
Admit that between early 2019 and June 2020, MGI was the principal user of ODL.

**Request No. 104:**
Admit that MGI is no longer a user of ODL.

**Request No. 105:**
Admit that Ripple never sold XRP to MGI.

**Request No. 106:**
Admit that in 2019 Ripple made equity investments in MGI for $50 million.

**Request No. 107:**
Admit that, between 2019 and 2020, Ripple paid MGI 200 million XRP for MGI's use of ODL.

**Request No. 108:**
Admit that MGI resold the XRP paid to it by Ripple for at least $52 million.

**Request No. 109:**
Admit that, throughout the Relevant Period, Ripple was the largest single holder of XRP.

**Request No. 110:**
Admit that Ripple does not know of any other person who has held as much XRP as Ripple throughout the Relevant Period.

**Request No. 111:**
Admit that Ripple does not know the identity of any person who purchased XRP sold by Market Makers on behalf of Ripple through Programmatic Sales.

**Request No. 112:**
Admit that, throughout the Relevant Period, one of Ripple's goals has been to create a market for trading in XRP.

**Request No. 113:**
Admit that Ripple's XRP holdings are Ripple's most valuable asset.

**Request No. 114:**
Admit that, throughout the Relevant Period, Ripple wanted the price of XRP to be higher over the long term.

**Request No. 115:**
Admit that a long-term increase in the price of XRP is economically beneficial to Ripple.

**Request No. 116:**
Admit that, throughout the Relevant Period, a long-term increase in the price of XRP was economically beneficial to Ripple.

**Request No. 117:**
Admit that, throughout the Relevant Period, Ripple wanted the market for XRP to be liquid.

**Request No. 118:**
Admit that, as of July 2014, Ripple stated on its website that trading was "rapidly become the number one use case of XRP."

**Request No. 119:**
Admit that as of July 2014, Ripple considered trading to be the principal use case of XRP.

**Request No. 120:**
Admit that as of December 2014, Ripple considered trading to be the principal use case of XRP.

**Request No. 121:**
Admit that as of December 2015, Ripple considered trading to be the principal use case of XRP.

**Request No. 122:**
Admit that as of December 2016, Ripple considered trading to be the principal use case of XRP.

**Request No. 123:**
Admit that as of December 2017, Ripple considered trading to be the principal use case of XRP.

**Request No. 124:**
Admit that as of December 2018, Ripple considered trading to be the principal use case of XRP.

**Request No. 125:**
Admit that as of December 2019, Ripple considered trading to be the principal use case of XRP.

**Request No. 126:**
Admit that in July 2019 Ripple told a digital asset trading platform that "[t]he primary use case for XRP today is speculative" and that digital asset trading platforms are "the main enabler of this use case."

**Request No. 127:**
Admit that as of December 2020, Ripple considered trading to be the principal use case of XRP.

**Request No. 128:**
Admit that Ripple, from at least 2015 until December 2020, undertook efforts to make XRP available for trading on digital asset trading platforms in the United States.

**Request No. 129:**
Admit that Ripple's general practice, throughout the Relevant Period, was to not segregate proceeds from its XRP sales based upon the identity of XRP purchasers.

**Request No. 130:**
Admit that Ripple's general practice, throughout the Relevant Period, was to pool the proceeds from its sales of XRP into non-segregated accounts.

**Request No. 131:**
Admit that Ripple, throughout the Relevant Period, used proceeds from different XRP sales to pay for Ripple's operating expenses and research and development costs.

**Request No. 132:**
Admit that Ripple, throughout the Relevant Period, did not establish separate accounts to segregate proceeds from different sales of XRP.

**Request No. 133:**
Admit that Ripple's revenue for fiscal year 2013 was $ 

**Request No. 134:**
Admit that Ripple's revenue from the sales of XRP for fiscal year 2013 was $4,490,322.

**Request No. 135:**
Admit that Ripple's total operating expenses for fiscal year 2013 were $ 

**Request No. 136:**
Admit that Ripple's revenue for fiscal year 2014 was $ 

**Request No. 137:**
Admit that Ripple's revenue from the sales of XRP for fiscal year 2014 was $13,415,081.

**Request No. 138:**
Admit that Ripple's total operating expenses for fiscal year 2014 were $ 

**Request No. 139:**
Admit that Ripple's revenue for fiscal year 2016 was $ 

**Request No. 140:**
Admit that Ripple's revenue from the sales of XRP for fiscal year 2016 was $15,636,000.

**Request No. 141:**
Admit that Ripple's revenue from Programmatic Sales of XRP for fiscal year 2016 was $4,766,000.

**Request No. 142:**
Admit that Ripple's revenue from OTC Sales of XRP for fiscal year 2016 was $10,733,000.

**Request No. 143:**
Admit that Ripple's revenue from distributions of XRP to vendors, strategic partners, and employees in lieu of cash payments for fiscal year 2016 was $

**Request No. 144:**
Admit that Ripple's revenue from the sale of software and services for fiscal year 2016 was $

**Request No. 145:**
Admit that Ripple's total operating expenses for fiscal year 2016 were $ ▮

**Request No. 146:**
Admit that Ripple's revenue for fiscal year 2017 was $ ▮

**Request No. 147:**
Admit that Ripple's revenue from the sales of XRP for fiscal year 2017 was $186,079,000.

**Request No. 148:**
Admit that Ripple's revenue from Programmatic Sales of XRP for fiscal year 2017 was $114,763,000.

**Request No. 149:**
Admit that Ripple's revenue from OTC Sales of XRP for fiscal year 2017 was $69,381,000.

**Request No. 150:**
Admit that Ripple's revenue from distributions of XRP to vendors, strategic partners, and employees in lieu of cash payments for fiscal year 2017 was $

**Request No. 151:**
Admit that Ripple's revenue from the sale of software and services for fiscal year 2017 was $ ▮

**Request No. 152:**
Admit that Ripple's total operating expenses for fiscal year 2017 were $ ▮ .

**Request No. 153:**
Admit that Ripple's revenue for fiscal year 2018 was $ ▮

**Request No. 154:**
Admit that Ripple's revenue from the sales of XRP for fiscal year 2018 was $552,145,000.

**Request No. 155:**
Admit that Ripple's revenue from Programmatic Sales of XRP for fiscal year 2018 was $356,068,000.

**Request No. 156:**
Admit that Ripple's revenue from OTC Sales of XRP for fiscal year 2018 was $174,932,000.

**Request No. 157:**
Admit that, for fiscal year 2018, Ripple's revenue from distributions of XRP to vendors, strategic partners, and employees in lieu of cash payments was $██████

**Request No. 158:**
Admit that Ripple's revenue from the sale of software and services for fiscal year 2018 was $██████

**Request No. 159:**
Admit that Ripple's revenue from the sales of XRP for fiscal year 2019 was $1,032,710,000.

**Request No. 160:**
Admit that Ripple's revenue from the sale of software and services for fiscal year 2019 was $██████

**Request No. 161:**
Admit that Ripple, during the Relevant Period, did not promote XRP as a "currency."

**Request No. 162:**
Admit that XRP has never had the financial or monetary policy of a central government or central banking authority.

**Request No. 163:**
Admit that XRP is not legal tender in any jurisdiction.

**Request No. 164:**
Admit that XRP has never been adopted by any banking institution as a "bridge currency" to effect money transfers.

**Request No. 165:**
Admit that Ripple does not accept payment for fees and services in XRP.

**Request No. 166:**
Admit that on March 9, 2016, Ripple told the NYDFS that Ripple considers XRP to be "a digital asset, not a currency" and that "XRP is not intended to be used as a currency."

**Request No. 167:**
Admit that in January 2015, Ripple was informed by the lawyer for an OTC Sale purchaser of XRP that "one certainly can create a security by packaging virtual currency."

**Request No. 168:**
Admit that by January 2015, Ripple understood that "one certainly can create a security by packaging virtual currency."

**Request No. 169:**
Admit that when the XRP Blockchain was publicly launched, Ripple controlled all the nodes operating the XRP Blockchain.

17

**Request No. 170:**
Admit that Ripple controlled all the nodes operating the XRP Blockchain through 2015.

**Request No. 171:**
Admit that new states of the XRP Blockchain are confirmed by the Consensus Protocol.

**Request No. 172:**
Admit that, under the Consensus Protocol, a node confirms a new state of the XRP Blockchain when 80% or more of the nodes on that node's UNL agree as to the new state of the XRP Blockchain.

**Request No. 173:**
Admit that Ripple controlled all the nodes operating the XRP Blockchain through 2015.

**Request No. 174:**
Admit that, to avoid unintentional forks of the XRP Blockchain, the nodes confirming the new state of the XRP Blockchain must have at least 80% overlap in their respective UNLs.

**Request No. 175:**
Admit that, to avoid the XRP Blockchain stalling from moving forward into new states, the nodes confirming the new state of the XRP Blockchain must have at least 80% overlap in their respective UNLs.

**Request No. 176:**
Admit that Ripple has published UNL throughout the Relevant Period.

**Request No. 177:**
Admit that Ripple has encouraged XRP Blockchain node operations to adopt Ripple's UNL throughout the Relevant Period.

**Request No. 178:**
Admit that the default UNL for any new node on the XRP Blockchain is the UNL Ripple publishes.

**Request No. 179:**
Admit that only two entities other than Ripple have ever published a proposed UNL.

**Request No. 180:**
Admit that the two entities other than Ripple who have published a proposed UNL did so in 2020.

**Request No. 181:**
Admit that when a new state of the XRP Blockchain is confirmed by the nodes that reach consensus as to that state, that operation physically occurs on all the computers running those nodes.

**Request No. 182:**
Admit that Ripple is not aware of any announcement, statement or guidance by the SEC that a virtual currency is not a "security" under the Securities Act.

**Request No. 183:**
Admit that Ripple is not aware of any announcement, statement or guidance by FinCEN that a "virtual currency" is exempt from being a "security" under the Securities Act.

**Request No. 184:**
Admit that Ripple is not aware of any announcement, statement or guidance by the U.S. Department of the Treasury that a virtual currency is exempt from being a "security" under the Securities Act.

**Request No. 185:**
Admit that Ripple is not aware of any announcement, statement or guidance by the U.S. Department of Justice that a virtual currency is not a "security" under the Securities Act.

**Request No. 186:**
Admit that Ripple is not aware of any announcement, statement or guidance by the U.S. government that a virtual currency is not a "security" under the Securities Act.

**Request No. 187:**
Admit that Ripple is not aware of any announcement, statement or guidance by the SEC that a determination by any governmental authority outside the U.S. that an asset is not a "security" under the laws of that non-U.S. jurisdiction precludes a determination that the asset is a "security" under the Securities Act.

**Request No. 188:**
Admit that Ripple is not aware of any announcement, statement or guidance by the U.S. government that a determination by any governmental authority outside the U.S. that an asset is not a "security" under the laws of that non-U.S. jurisdiction precludes a determination that the asset is a "security" under the Securities Act.

**Request No. 189:**
Admit that no government outside the U.S. ever told Ripple that the legal status of XRP under the laws of that government's jurisdiction precluded or exempted XRP from being considered a "security" under the Securities Act.

**Request No. 190:**
Admit that Ripple never sought or received legal advice as to the status of XRP under the Securities Act from the attorneys that advised Ripple with respect to the 2015 settlement between Ripple and FinCEN.

**Request No. 191:**
Admit that the digital asset trading platforms Bittrex, Coinbase, HBUS, SFOX, Bitstamp and CME requested legal opinions from Ripple as to the status of XRP under the Securities Act.

**Request No. 192:**
Admit that the Crypto Trading Council rated XRP a "4" on a scale of 1 to 5, ranging from 1 (least likely to be deemed a security) to 5 (most likely to be deemed a security).

**Request No. 193:**

Admit that Ripple knew that the Crypto Trading Council rated XRP a "4" on a scale or 1 to 5, ranging from 1 (least likely to be deemed a security) to 5 (most likely to be deemed a security).

**Request No. 194:**
Admit that a rating of "5" by the Crypto Trading Council indicates the highest likelihood of a digital asset being deemed a security under the federal securities laws.

**Request No. 195:**
Admit that Ripple knew that a rating of "5" by the Crypto Trading Council indicated the highest likelihood of a digital asset being a security under the federal securities laws.

**Request No. 196:**
Admit that the SEC never told Ripple that its offers and sales of XRP did not constitute offers and sales of securities under the Securities Act.

**Request No. 197:**
Admit that no SEC employee ever told Ripple that he or she thought Ripple's offers and sales of XRP did not constitute offers and sales of securities under the Securities Act.

**Request No. 198:**
Admit that no SEC employee ever told Ripple that the SEC did not consider Ripple's offers and sales of XRP as offers and sales of securities under the Securities Act.

**Request No. 199:**
Admit that no Ripple representative was present during any meeting that took place between former SEC Chairman Jay Clayton and Coinbase in 2018.

**Request No. 200:**
Admit that no Coinbase representative conveyed to Ripple the substance of the meeting between Coinbase and former SEC Chairman Jay Clayton.

**Request No. 201:**
Admit that the June 14, 2018 speech by the SEC's then-Director of Corporation Finance, Bill Hinman, titled *"Digital Asset Transactions: When Howey Met Gary (Plastic),"* did not mention either Ripple or XRP.

**Request No. 202:**
Admit that Ripple does not know if the SEC ever told any third party that Ripple's offers and sales of XRP did not constitute offers and sales of investment contracts under the Securities Act.

**Request No. 203:**
Admit that Ripple does not know if any SEC employee ever told any third party that Ripple's offers and sales of XRP did not constitute offers and sales of investment contracts under the Securities Act.

**Request No. 204:**

Admit that Ripple does not know if any SEC employee ever told any third party that, in his or her opinion, Ripple's offers and sales of XRP did not constitute offers and sales of investment contracts under the Securities Act.

**Request No. 205:**
Admit that Ripple never filed a registration statement with the SEC with respect to any of its offers or sales of XRP during the Relevant Period.

**Request No. 206:**
Admit that no registration statement has ever been in effect as to any of Ripple's offers and sales of XRP during the Relevant Period.

**Request No. 207:**
Admit that Ripple never sought a determination that the SEC would take "No Action" with respect to any of its offers and sales of XRP during the Relevant Period.

**Request No. 208:**
Admit that Ripple did not contact any SEC employee to discuss the legal status of Ripple's offers and sales of XRP under the United States securities laws from the beginning of the Relevant Period through April 2018.

**Request No. 209:**
Admit that Ripple's discussions with the SEC regarding the legal status of Ripple's offers and sales of XRP under the U.S. securities laws did not begin until after the SEC had informed Ripple that an SEC investigation had been opened to determine whether Ripple's offers and sales of XRP violated the U.S. securities laws.

**Request No. 210:**
Admit that Ripple sold XRP utilizing the means and instrumentalities of U.S. interstate commerce during the Relevant Period.

**Request No. 211:**
Admit that Ripple offered XRP utilizing the means and instrumentalities of U.S. interstate commerce during the Relevant Period.

**Request No. 212:**
Admit that Ripple took no steps to restrict the resale of XRP by any XRP purchaser, other than with respect to certain resale restrictions as to certain XRP OTC Sales.

**Request No. 213:**
Admit that, in its application to conduct OTC Sales through XRP II, Ripple told the NYDFS that Ripple planned to sell XRP to "institutional and other accredited investors" who are "purchasing XRP for speculative purposes."

**Request No. 214:**
Admit that Ripple took no steps to restrict the resale of XRP by any purchaser not located in the U.S. to any purchaser located in the U.S.

**Request No. 215:**
Admit that Ripple took no steps to determine whether any XRP purchaser was an "accredited investor" as that term is used under Regulation D issued under the Securities Act.

**Request No. 216:**
Admit that Ripple took no steps to determine whether any of its offers or sales of XRP during the Relevant Period were exempt from the requirements of the Securities Act under Regulation D.

**Request No. 217:**
Admit that Ripple took no steps to determine whether any of its offers or sales of XRP during the Relevant Period were exempt from the requirements of the Securities Act under Regulation S.

**Request No. 218:**
Admit that Larsen has been an affiliate of Ripple from January 1, 2013 through the June 4, 2021.

**Request No. 219:**
Admit that Larsen has had authority to make decisions on behalf of Ripple from January 1, 2013 through the June 4, 2021.

**Request No. 220:**
Admit that Garlinghouse has been an affiliate of Ripple from May 1, 2015 through June 4, 2021..

**Request No. 221:**
Admit that Garlinghouse has had authority to make decisions on behalf of Ripple from May 1, 2015 through June 4, 2021.

**Request No. 222:**
Admit that Newcoin was founded as a predecessor to Ripple in May 2011.

**Request No. 223:**
Admit that Ripple makes periodic changes to the software code for the XRP Blockchain.

**Request No. 224:**
Admit that Ripple is the principal contributor to the software code for the XRP Blockchain.

**Request No. 225:**
Admit that Larsen has been a control person of Ripple from January 1, 2013 through June 4, 2021.

**Request No. 226:**
Admit that Garlinghouse has been a control person of Ripple from May 1, 2015 through June 4, 2021.

**Request No. 227:**
Admit that Ripple has never made any EDGAR filings for Ripple with the SEC.

**Request No. 228:**
Admit that Ripple has never made any EDGAR filings for XRP.

**Request No. 229:**
Admit that XRP II is a wholly-owned subsidiary of Ripple.

**Request No. 230:**
Admit that Ripple does not publicly file financial statements or other periodic filings required under the Securities Exchange Act of 1934.

**Request No. 231:**
Admit that XRP Market Reports are authored by Ripple.

**Request No. 232:**
Admit that Ripple has sole and exclusively authority to decide what information is included in the XRP Market Reports.

**Request No. 233:**
Admit that Ripple never filed Regulation D or Regulation S forms.

**Request No. 234:**
Admit that Ripple never claimed its XRP offerings were exempt under the securities laws.

**Request No. 235:**
Admit that Ripple knew that the Market Makers were not selling XRP on platforms registered as "exchanges" under the Securities Act of 1934.

**Request No. 236:**
Admit that Ripple knew that the Market Makers were not registered broker-dealers.

**Request No. 237:**
Admit that xCurrent uses the Interledger Protocol, which operate independently of the XRP Ledger.

**Request No. 238:**
Admit that xCurrent does not use XRP.

**Request No. 239:**
Admit that Ripple formed XRP II in 2013.

**Request No. 240:**
Admit that Ripple sells XRP directly to market participants through XRP II.

**Request No. 241:**
Admit that Ripple loans XRP directly to market participants through XRP II.

**Request No. 242:**
Admit that Ripple makes XRP available to institutions for withdrawals through XRP II and the institution is obligated to pay XRP II the market price of the XRP at the time of the withdrawal.

Dated:        New York, New York
              June 4, 2021

/s/ Jorge G. Tenreiro
Jorge G. Tenreiro
Mark R. Sylvester
Daphna A. Waxman
Jon A. Daniels
Ladan Stewart
SECURITIES AND EXCHANGE
    COMMISSION
New York Regional Office
Brookfield Place
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-9145 (Tenreiro)
tenreiroj@sec.gov

Robert Moye
Benjamin Hanauer
SECURITIES AND EXCHANGE
    COMMISSION
Chicago Regional Office
175 W. Jackson Blvd., Suite 1450
Chicago, Illinois  60604

Attorneys for the Plaintiff