# Exhibit 140

1

2     CONFIDENTIAL - PURSUANT TO PROTECTIVE ORDER

3   IN THE UNITED STATES DISTRICT COURT
    FOR THE SOUTHERN DISTRICT OF NEW YORK
4   ---------------------------------------x

5   SECURITIES AND EXCHANGE COMMISSION,

6                        Plaintiff,

7                   -against-              Civil Action
                                          No.
8   RIPPLE LABS, INC., BRADLEY            20-cv-10832
    GARLINGHOUSE and CHRISTIAN A. LARSEN,  (AT)(SN)
9
                     Defendants.
10
    ---------------------------------------x
11

12                        November 18, 2021

13                        9:29 a.m.

14

15        Videotaped Deposition of ██████████,

16   taken by Defendants, held at the offices of

17   Debevoise & Plimpton LLP, 919 Third Avenue,

18   New York, New York, before Joseph R. Danyo, a

19   Shorthand Reporter and Notary Public within

20   and for the State of New York.

21

22

23   Job No. 202259

24

25

```
 1   A P P E A R A N C E S :

 2

 3         U.S. SECURITIES and EXCHANGE COMMISSION
           Attorney for Plaintiff
 4             175 W. Jackson Boulevard
               Chicago, Illinois 60604
 5             By:   BENJAMIN HANAUER, ESQ.
                     MARK SYLVESTER, ESQ.
 6                   LADAN STEWART, ESQ.

 7

 8

 9

10         DEBEVOISE & PLIMPTON LLP
           Attorneys for Defendant Ripple Labs, Inc.
11             919 Third Avenue
               New York, New York 10022
12         By:   ANDREW CERESNEY, ESQ.
                 KYLE CHERMAK, ESQ.
13               ANNA GRESSEL, ESQ.
                 EMILY JENAB, ESQ. (Via Zoom)
14

15

16

17

18

           KELLOGG HANSEN TODD FIGER & FREDERICK
19         Attorneys for Defendant Ripple Labs, Inc.
               1615 M Street, N.W.
20             Washington, D.C. 20036
               By:   BETHAN JONES, ESQ. (Via Zoom)
21

22

23

24

25
```

1

2     A P P E A R A N C E S : (Continued)

3

       PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
4      Attorneys for Defendant Christian Larsen
          535 Mission Street
5         San Francisco, California 94105
       By:   ROBIN LINSENMAYER, ESQ.
6

7

8      CLEARY GOTTLIEB STEEN & HAMILTON LLP
       Attorneys for Defendant Bradley Garlinghouse
9         One Liberty Plaza
          New York, New York 10006
10     By:   SAMUEL LEVANDER, ESQ.
             JACKIE BRUNE, ESQ. (Via Zoom)
11

12

13

    Also Present:
14

       LARRY MOSKOWITZ, Videographer
15
                      ~oOo~
16

17

18

19

20

21

22

23

24

25

```
 1   ████████████ - Confidential Pursuant to Protective Order
 2              THE VIDEOGRAPHER:   Good morning,
 3         this is the start of media label number 1
 4         of the video-recorded deposition of ████████
 5         ████████████ in the matter of Securities and
 6         Exchange Commission versus Ripple Labs,
 7         Inc., et al.   This deposition is being
 8         held at Debevoise & Plimpton, 919 Third
 9         Avenue, New York, New York on November 18,
10         2021 at approximately 9:29 a.m.
11              My name is Larry Moskowitz, and I am
12         the legal video specialist with TSG
13         Reporting, Inc., headquartered at 228 East
14         45th Street, New York, New York.   The
15         court reporter is Joe Danyo, also in
16         association with TSG Reporting.   All
17         counsel appearances will be noted on the
18         stenographic record.
19              Will the reporter please administer
20         the oath.
21   ████████████████████████, having been first
22   duly sworn by Joseph R. Danyo, a Notary Public,
23   was examined and testified as follows:
24   EXAMINATION BY MS. GRESSEL:
25              Q.   Good morning, Mr. ████████.   My name
```

1   ████████ - Confidential Pursuant to Protective Order

2   is Anna Gressel and with me is my colleague

3   Andrew Ceresney.   We're attorneys at Debevoise &

4   Plimpton, and we represent defendant Ripple Labs

5   in this case.   This is an expert witness

6   deposition in the case of SEC versus Ripple Labs

7   pending in the Southern District of New York.

8               Before we go any further, I would

9   like to designate as confidential this transcript

10  pursuant to the protective order in this case.

11  Is there any reason why you cannot testify

12  completely and truthfully today?

13       A.   No.

14       Q.   Are you taking any medication or

15  suffering from any medical or other physical

16  condition that would prevent you from testifying

17  completely and truthfully?

18       A.   No, I'm not.

19       Q.   Please state your full name for the

20  record.

21       A.   ████████████████████.

22       Q.   Do you sometimes go by ████?

23       A.   Yes, I do.

24       Q.   What's your home address?

25       A.   ████████████████████████

Page 6

1    █████████ - Confidential Pursuant to Protective Order

2    ███████████████.

3         Q.   Alright.  Mr. ███████, your

4    testimony today is under oath.   It may be taken

5    down by a stenographer and videographer, and it

6    may be read or played at trial or used for other

7    purposes related to this lawsuit.   Is that

8    understood?

9         A.   Yes.

10        Q.   Because the court reporter is taking

11   down all of the testimony, it is important your

12   answers be verbalized.   Please always give a

13   clear spoken answer rather than nodding or

14   shaking your head.  Okay?

15        A.   Yes.

16        Q.   Great. In addition, it is important

17   that you allow me to finish my questions before

18   you begin your answer, so we don't talk over each

19   other.  Okay?

20        A.   Yes.

21        Q.   If you don't understand my question,

22   ask me to clarify.   If you answer a question, I

23   will assume you understood it.   Okay?

24        A.   Yes.

25        Q.   We will take breaks during the

1   ████████ - Confidential Pursuant to Protective Order

2   deposition.  If at any time you need one, just

3   let me know.  I will just ask that you wait

4   until the question pending has been answered and

5   we can take a momentary pause.

6          A.   Thank you so much.

7          Q.   Great.  Have you ever been deposed

8   before?

9          A.   Yes, I have.

10         Q.   How many times?

11         A.   I believe it was five or six.  It is

12  in my resumé which is attached to my report.   I

13  didn't add them up before I came, so it's

14  probably right around that number.

15         Q.   And all the times you have been

16  deposed have been disclosed in your report?

17         A.   Yes, they have.  Well, the last ten

18  years.  There may have been one or two prior to

19  the last ten years.

20         Q.   For the purpose of this deposition, I

21  am going to refer to defendant Ripple Labs as

22  Ripple.  Is that okay?

23         A.   That's fine.

24         Q.   I am also going to refer to the

25  defendants Ripple, Brad Garlinghouse or Chris

1    ████████ - Confidential Pursuant to Protective Order

2    Larsen either individually or collectively as

3    defendant or the defendants.   Okay?

4         A.   Yes.

5         Q.   What did you do to prepare for your

6    deposition today?

7         A.   Basically I went through my report in

8    great detail, looked again at whatever cites were

9    footnoted, the attachments to the report, my CV

10   to make sure it was in order.   That's basically

11   it.

12        Q.   And how long did you prepare?

13        A.   Approximately 8 hours, basically one

14   day.

15        Q.   Did you meet with counsel?

16        A.   Yes, I did.

17        Q.   With the counsel present today?

18        A.   Yes.

19        Q.   Did you speak with anyone else to

20   prepare for your deposition?

21        A.   No, I did not.

22        Q.   Did you review any documents other

23   than the ones disclosed in the appendix to your

24   report or cited in your report?

25        A.   No, I did not.

1       ███████ - Confidential Pursuant to Protective Order

2               Q.   Okay.  Did you make any notes?

3                    MR. HANAUER:   Objection.   At what

4               time did he review documents?

5               Q.   During your preparation for the

6       deposition.

7               A.   I don't believe so.

8               Q.   Did you bring any documents with you

9       today?

10              A.   No, I did not.

11              Q.   How did you come to be engaged in

12      this case?

13              A.   I received a call from the SEC.   Mr.

14      Dugan Bliss, who asked if I was interested in

15      helping out on this particular case.

16                   MR. HANAUER:   ████, I am just going

17              to instruct you not to get into any

18              specifics of what you and anyone at the

19              SEC talked about.

20                   THE WITNESS:   Sure.

21              A.   We reviewed my qualifications and so

22      on, and they go through a process of selecting

23      experts.   I don't know exactly what it is, but,

24      you know, he looked at my credentials, went back,

25      and a couple of days later I got an e-mail back

1   ███████ - Confidential Pursuant to Protective Order

2   saying they want to talk to me further, and we

3   did that, and then they retained me.

4       Q.   Do you have a written retention

5   agreement?

6       A.   I do.   I have a contract.   Yes.

7       Q.   At that point, what did you

8   understand your assignment to be?

9       A.   Well, it is in my report, but, to

10  verbalize it, it is basically to ensure that the

11  court, the jury particularly, is educated as to

12  basically what is involved in, A, the securities

13  acts overall and the importance, primarily the

14  importance of disclosures in the securities laws

15  and how over the years those concepts have been

16  applied in various circumstances.

17      Q.   Since your initial retention, has the

18  scope of your assignment changed?

19      A.   No.

20      Q.   Okay.   Have you been engaged before

21  by the SEC?

22      A.   Yes.

23      Q.   How many times before?

24      A.   I believe it is 20.

25      Q.   Were all of those engagements for

1   ████████ - Confidential Pursuant to Protective Order

2   expert witness work?

3           A.   No.   Some of it was consultancy.

4           Q.   What is the nature of the consulting

5   work you have done for the SEC?

6                MR. HANAUER:   Generally.

7           A.   Generally, they would send me

8   documents to take a look at, get my opinion as to

9   whether my opinion would jibe with their thinking

10  on possibly bringing a case, for example, so I

11  would consult with them on different -- well,

12  let's take, for example, a trading case or a

13  market manipulation case.   I would look at

14  trading data for them and make a recommendation

15  as to whether, you know, they were on the right

16  track or not basically.

17          Q.   When you say you would look at

18  trading data for them, what does that usually

19  involve?

20          A.   I'm sorry.   I have trouble hearing.

21          Q.   When you say you look at trading

22  data, what does that normally involve?

23          A.   Oh gosh, a lot of data, a lot of

24  trading records, audit trail, quotation

25  information, bids and offers.   Sometimes I look

```
1    ████████ - Confidential Pursuant to Protective Order
2    at press releases by issuers.  If there is a
3    promotion involved, I will look at that, so it is
4    a wide variety of things.
5              Q.   Did they ask you to look at any
6    trading data in this case?
7              A.   No.
8              Q.   Or any press releases?
9              A.   No.
10             Q.   Okay.  Did they retain you in each
11   of those matters, or do you have a standing
12   retention?
13             A.   Well, I believe on some cases they
14   did retain me.  In other cases based on, you
15   know, conversations back and forth.  I think they
16   elected at least in one case, maybe two, to not
17   move forward with the case, so they dropped it.
18             Q.   Okay.  What about your expert
19   testimony?  In what kinds of cases have you
20   offered expert testimony?
21             A.   Well, there are a number of different
22   venues I have offered testimony in.  FINRA
23   arbitrations.  I have done a number of work for
24   the U.S. Attorney in LA and Tampa.  When you say
25   expert, are you saying that I have been
```

1   ███████ - Confidential Pursuant to Protective Order

2   designated and approved as an expert in a court

3   or just generally?

4        Q.   I would say retained for the purpose

5   of potentially offering expert testimony in a

6   case.

7        A.   Okay.   So, you know, I have been

8   retained by law firms to take a look at certain

9   situations.   So it is a wide variety of

10  different clients.   I have worked for the London

11  stock exchange on an expert case that they had.

12  So it is, I would say the SEC constitutes maybe

13  50 percent of my engagements maybe.

14       Q.   And you work with the same SEC

15  attorneys on those matters you do for the SEC?

16       A.   There may have been an overlap in one

17  or two cases, but generally it is different

18  attorneys.

19       Q.   Did you review any documents from

20  your prior work for the SEC in connection with

21  this matter?

22       A.   I don't believe so.

23       Q.   Is the majority of your expert

24  witness work on behalf of the government?

25       A.   No.   Well, it's about 50 percent, I

Page 14

1      ███████ - Confidential Pursuant to Protective Order

2      would say.

3           Q.   50 percent for the SEC or 50 percent

4      for any government agency?

5           A.   Well, the U.S. Attorney was about

6      three cases, so slightly over 50 percent.

7           Q.   Okay.  So about 50 percent for the

8      SEC, and then just three additional cases for

9      other government agencies?

10          A.   Yes.

11          Q.   Okay.  Did anyone assist you in

12     connection with your work on this case?

13          A.   No.

14          Q.   Okay.  In general with your expert

15     witness work, does anyone ever assist you with

16     your expert witness work?

17          A.   You mean in forming an expert opinion

18     or doing clerical work or exactly what do you

19     mean by assistance?

20          Q.   Does anyone assist you in your expert

21     work with research?

22          A.   No.

23          Q.   Does anyone assist you in your expert

24     work with, you said clerical assistance?

25          A.   Yes.

```
 1   ███████ - Confidential Pursuant to Protective Order
 2          Q.   Perhaps you could tell me how you
 3   define that?
 4          A.   Well, if you want the explanation,
 5   there was a couple of cases where my daughter who
 6   is pretty good in Excel would take the massive
 7   amounts of trading data that I want to look at
 8   and put it in there while I did other things.
 9          Q.   Okay, and no one assisted you in any
10   manner with your work in this case?
11          A.   They did not.
12          Q.   Okay.   I am going to hand you what
13   has been marked as Defendant's Exhibit JC 1.
14               (Defendant Exhibit JC 1, Report of
15               ███████████ dated October 4, 2021, was
16               so marked for identification, as of this
17               date.)
18          Q.   Mr. ███████ is this a copy of the
19   report that you prepared in connection with this
20   case?
21          A.   Yes, it appears to be, sure.
22          Q.   And that is your signature on page
23   30, right?
24          A.   It is electronic.   Yes.
25          Q.   And your report is dated October 4,
```

Page 16

1    ███████ - Confidential Pursuant to Protective Order

2    2021, correct?

3         A.   It is.

4         Q.   This is the current version of your

5    report, right?

6         A.   Yes.

7         Q.   So throughout this deposition I may

8    refer to this as Exhibit JC 1 or I may just call

9    it your report.   Is that okay?

10        A.   Sure.

11        Q.   Your report lists 19 documents in

12   Exhibit A which is appended to the report at the

13   end.   Is that right?

14        A.   I didn't count them, but if you say

15   so, yes.

16        Q.   You can take a moment to look at it.

17   And you understand you are obligated to disclose

18   any facts or data that you considered in forming

19   your opinions, right?

20        A.   Yes.

21        Q.   Apart from the information contained

22   in the documents identified in the report or in

23   Exhibit A to the report, did you consider any

24   other facts or data in forming the opinions

25   stated in your report?

1    ▮▮▮▮▮▮ - Confidential Pursuant to Protective Order

2              A.    If I did, they are all documented in

3    footnotes within the report.

4              Q.    Okay, so the footnotes including the

5    footnotes and Exhibit A to your report, you

6    disclosed all of the documents and data you

7    considered?

8              A.    Yes.

9              Q.    Did you do any research that is not

10   reflected in the materials listed in Exhibit A or

11   in the footnotes to your report?

12             A.    I did.

13             Q.    What additional research did you do?

14             A.    Just general perusing of the internet

15   trying to familiarize myself more with the

16   cryptocurrency space in general just for my own

17   edification.

18             Q.    What steps did you take to do that

19   research?

20             A.    You know, basically do a search and

21   look at articles, look at certain YouTube videos

22   that purport to teach everybody about crypto and

23   so on, so there is a whole variety of things that

24   you can look at.

25             Q.    So the nature of -- it would answer

1      ████████ - Confidential Pursuant to Protective Order

2      the nature of questions like what is a block

3      chain?

4              A.   Yes.

5              Q.   What is a digital asset?

6              A.   Sure.

7              Q.   Maybe what is Ripple?   Did you do

8      any research on what Ripple is?

9              A.   Yeah, I did, just so I could

10     familiarize myself with what Ripple does and what

11     their product was and what XRP was.   I thought

12     that was important for my understanding of the

13     facts here.

14             Q.   Do you recall what sources you

15     consulted?

16             A.   For Ripple?

17             Q.   Yes.

18             A.   Mostly a website.

19             Q.   Mostly Ripple's website?

20             A.   Yes.   You know, there are certain

21     blogs that are on YouTube regarding Ripple and

22     XRP has gone to a thousand, you know, those I

23     kind of look at, but discount, I mean I don't put

24     much faith in those, but basically I would say

25     the Ripple website is the primary one.

Page 19

1    ████████ - Confidential Pursuant to Protective Order

2         Q.   So you primarily consulted Ripple's

3    website to learn more about Ripple and other

4    sources you may have looked at but discounted, is

5    that accurate?

6         A.   Right.  Yeah, I think that is

7    accurate.

8         Q.   And what websites do you consult to

9    learn about block chains generally?

10        A.   Well, if you look at my resumé, I

11   mean I have an extensive technology background in

12   addition to being a regulator, and I found it

13   interesting that the technology in fact is

14   evolving.  I think the jury is out on whether it

15   will be a success or not.  It's for the

16   marketplace to figure out, but it was kind of

17   interesting to read, you know, about

18   decentralization, cryptography and so on.  So it

19   is all up my alley and my background and so on.

20        Q.   When you say the jury is out on

21   whether it will be successful, do you mean block

22   chain technology as a whole?

23        A.   Yes.

24        Q.   When you said you read about

25   decentralization and cryptography, do you recall

Page 20

1        ███████ - Confidential Pursuant to Protective Order

2   the sources that you looked at in your research?

3           A.   Not specifically, no.

4           Q.   Prior to doing the research, were you

5   familiar with block chain technologies?

6           A.   You know, just what I read in the

7   Wall Street Journal or, you know, whatever, you

8   know, I would follow with great interest the

9   phenomenon if you would.   That's about it.

10  Just curiosity.

11          Q.   Prior to your work on this matter,

12  were you familiar with digital assets?

13          A.   Somewhat.   I wouldn't consider

14  myself an expert in digital assets, but I kind of

15  knew what they were.   Sure.

16          Q.   Prior to your work on this matter,

17  had you ever heard the term decentralization of a

18  block chain, for example?

19          A.   No.

20          Q.   Prior to your work on this matter,

21  were you familiar with cryptography?

22          A.   Generally, yes.

23          Q.   In what sense were you familiar?

24          A.   Well, you know, cryptography was

25  important to winning World War II.

1        ████████ - Confidential Pursuant to Protective Order

2             Q.   Very true.   Okay.   Great.   Prior

3    to your work on this matter, were you familiar

4    with cryptography as it was used in digital

5    assets?

6             A.   You know, I don't know what the

7    timing was, but probably either in preparation

8    for them making an offer for me to be an expert

9    because I felt I had to learn about it.   I don't

10   know if it was after the engagement, immediately

11   before the engagement, so I'm not sure of the

12   timing, but it was in the context of the

13   engagement.

14            Q.   Other than doing research on the

15   Internet or looking at Ripple's website, those

16   were the sources you mentioned, did you speak to

17   anyone about block chain technologies or digital

18   assets to learn further about them?

19            A.   No, I did not.

20            Q.   Did you ask the SEC to provide you

21   with any further resources on or explanations of

22   those technologies?

23            A.   No.

24            Q.   Okay.   Did you read any of the other

25   expert reports submitted in this matter?

Page 22

1    ████████ - Confidential Pursuant to Protective Order

2         A.   I did not.

3         Q.   Are you aware that there were other

4    expert reports submitted in this matter?

5         A.   No.   Just, you know, just because

6    you mentioned them.   Not before that.

7         Q.   Sitting here today, you wouldn't be

8    able to name any other expert?

9         A.   I would not.   No.

10        Q.   Okay.   Did any of the attorneys at

11   SEC provide you with any other documents or

12   information that are not reflected in Exhibit A

13   to your report or in the footnotes?

14        A.   No.

15        Q.   Did you request any information that

16   was not provided to you?

17        A.   No.

18        Q.   Okay.   Have you reviewed any other

19   documents or information since you signed the

20   report that are relevant to the opinions you

21   expressed since October 4?

22             MR. HANAUER:   Other than what?

23        Q.   Other than the documents listed in

24   Exhibit A or reflected in the footnotes to your

25   report?

Page 23

1    ███████ - Confidential Pursuant to Protective Order

2         A.   I don't believe so.  No.

3         Q.   Okay.  Did you create or maintain a

4    file containing your research and search history

5    related to your research?

6         A.   No.  Just what's reflected in the

7    report, in the footnotes.  I put the URL sites

8    and the Internet sites.

9         Q.   You put in the Internet sites of some

10   of your research but not other things like

11   YouTube or Ripple's?

12        A.   No.  You guys have Lexis.

13        Q.   Okay, but, just to be clear for the

14   record, you did not include the research that you

15   did on block chain or on Ripple in the footnotes

16   or Exhibit A?

17        A.   No.

18        Q.   Okay.  Mr. ███████, among the

19   documents listed in Exhibit A are the SEC's

20   amended complaint and Ripple's answer to the

21   SEC's amended complaint, correct?

22        A.   Yes.

23        Q.   Did you review the allegations in the

24   amended complaint?

25        A.   I did.

Page 24

1    ▓▓▓▓▓▓ - Confidential Pursuant to Protective Order

2         Q.   And did you review Ripple's responses

3    to those allegations and the answer to the

4    amended complaint?

5         A.   I did.

6         Q.   Have you been instructed by the SEC

7    to rely on the facts as set forth in the amended

8    complaint?

9         A.   No.

10         Q.   Okay.  Have you independently formed

11    a view as to the truth or falsity of the

12    allegations in the amended complaint?

13         A.   I have not.

14         Q.   Okay.  Did counsel for the SEC ask

15    you to make any assumptions in connection with

16    your report?

17         A.   Assumptions regarding?

18         Q.   Any facts or legal conclusions?   Did

19    they ask you to assume as true any facts for the

20    purpose of your analysis?

21         A.   No.

22              MR. HANAUER:   Objection.   Beyond

23         the ones he identifies in his report?

24         Q.   Why don't we start with that.   What

25    did the SEC ask you to assume -- sorry.   Let me

Page 25

1    ████████ - Confidential Pursuant to Protective Order

2    rephrase that.   What facts did the SEC ask you

3    to assume as true for the purpose of your report?

4              A.    What facts?

5              Q.    Um-hum.

6              A.    Facts concerning the complaint

7    itself.   Is that what you're saying?

8              Q.    Any facts underlying the report.

9    Did they ask you to assume those as true?

10             A.    All they asked me to assume was to

11   approach the report as if Ripple would have been

12   required to register.   That's basically the

13   assumption that underlies the whole report, and I

14   state that, I believe, right up front, so that

15   was, no further assumptions other than that one.

16             Q.    Okay.   Did they ask you to assume

17   any other legal conclusions to be true for the

18   purpose of your analysis?

19             A.    No.

20             Q.    Okay.  So you say in your report that

21   the SEC or you said, you testified right now that

22   the SEC asked you to assume that Ripple's sales

23   or offers of XRP would have to be registered as

24   securities.   Is that correct?

25                   MR. HANAUER:   Objection.   He states

Page 26

1    ███████ - Confidential Pursuant to Protective Order

2              the assumptions explicitly in his report.

3              If you want to take them one by one,

4              please do, but it's not a memory test.

5         Q.   Other than the attorneys for the SEC,

6    have you communicated with anyone else in

7    connection with your work on this case?

8         A.   I have not.

9         Q.   Mr. ███████, could you please

10   describe the opinions you are offering in this

11   case?

12        A.   Yeah, again, they are in the report,

13   and primarily, as I go back and restate, what the

14   SEC retained me for is primarily to provide the

15   jury with background concerning what the

16   securities acts are, how they form a framework,

17   if you will, for regulation on the industry, how

18   custom and practice and other things that are

19   typically carried out in the industry as they

20   relate, the public offerings, how that gets done,

21   what disclosures are triggered by registration,

22   both initially and ongoing, so it's how the SEC

23   has approached new and unique products over the

24   years and so on.  So it's more of a tutorial, I

25   would say, than an opinion.

1       - Confidential Pursuant to Protective Order

2       Q.   What do you mean when you say it is

3 more of a tutorial than an opinion?

4       A.   Well, as I said before, it is

5 primarily to educate the jury as to what some of

6 these concepts are and the industry practices and

7 regulations in a general state, so that there is

8 a greater understanding by them of the context of

9 what the SEC is talking about with Ripple.

10       Q.   So you view a tutorial as educational

11 for the jury, correct?

12       A.   Yes.

13       Q.   What is an opinion in contrast to

14 that?

15       A.   With respect to these particular set

16 of facts?

17       Q.   Sure.   Why not?

18       A.   You know, I mean I guess I could have

19 an opinion about a lot of things.   I mean, so,

20 you know, I could offer an opinion as I do in

21 some of the other SEC cases as to whether, you

22 know, violations had occurred or if this set of

23 facts would indicate to a seasoned regulator that

24 violations have occurred, but I did not do that

25 here.

Page 28

1      ███████ - Confidential Pursuant to Protective Order

2          Q.   So you are not offering an opinion

3      here about whether any violations of any laws

4      occurred?

5          A.   Correct.

6          Q.   And you are not offering an opinion

7      as to the specific facts of this case?

8          A.   I'm not.  No.

9          Q.   Mr. ████████, this report contains

10     all of the opinions that you intend to offer in

11     this case, correct?

12         A.   It does.

13         Q.   I see on page 30 you have reserved

14     the right to supplement your report.  As you sit

15     here today, do you have any reason to supplement

16     or revise your report?

17         A.   No, I do not.

18         Q.   Have you been asked by the SEC to

19     supplement your report in any way?

20         A.   No, I have not.

21         Q.   Sitting here today, do you intend to

22     further supplement or revise your report?

23         A.   Unless asked, no.

24         Q.   Have you been asked by the SEC to

25     perform any additional work in connection with

1   ███████ - Confidential Pursuant to Protective Order

2   this case?

3         A.   Not at the moment, no.

4         Q.   Were you asked to analyze any issues

5   that are not reflected or discussed in your

6   report?

7         A.   No.

8         Q.   Have you performed any work not

9   reflected in your report other than the

10  background research on block chain and Ripple

11  that you discussed earlier?

12             MR. HANAUER:   Related to what?

13        A.   No.

14        Q.   I can just restate the question.   In

15  the course of your engagement for this matter,

16  have you performed any work not reflected in your

17  report?

18        A.   I did not.

19        Q.   Okay.   Your report discloses in

20  Exhibit A that you received several of Ripple's

21  contracts concerning XRP sales as well as two

22  e-mails.   Why did you consider these documents

23  in the course of your work on this matter?

24        A.   Why did I consider them?

25        Q.   Um-hum.

1   ███████ - Confidential Pursuant to Protective Order

2          A.    They pertain to the disclosure

3   section where in my opinion I listed some of the

4   things if, you know, we are always going under

5   the basic assumption that if Ripple had

6   registered, okay?   So these would be some of the

7   disclosures in my opinion that would be mandated

8   by that registration.

9          Q.    Your opinion, and we can --

10         A.    So that one relates to --

11               MR. HANAUER:    Hold on, ████.    Let

12         her ask a question.

13               THE WITNESS:    I'm sorry.

14         Q.    Why did you think those contracts

15   were relevant to that part of your opinion?

16         A.    Because I think it, as I said before

17   on these, it provides the basis for my comment

18   and the particular disclosure that it relates to.

19         Q.    And which comment is that?

20         A.    So, for example, the last one, Ripple

21   sales of XRP to institutional investors at

22   substantial discounts to current XRP market

23   price, for example.

24               So that set of e-mails and other

25   disclosures were the ones that would support

1  ███████ - Confidential Pursuant to Protective Order

2  making -- my opinion of making that disclosure.

3      Q.   Were you asked to provide any opinion

4  concerning Ripple's over-the-counter sales of

5  XRP?

6      A.   I have not, no.

7      Q.   Were you asked to provide an opinion

8  concerning the provisions in Ripple's contracts

9  related to sales of XRP?

10     A.   No.

11     Q.   Were you asked to provide an opinion

12 concerning Ripple's relationships with market

13 makers?

14     A.   No.

15     Q.   Were you asked to provide any other

16 opinion concerning Ripple's sales or offers of

17 XRP?

18     A.   No.

19     Q.   Let's turn to page 34 of your report

20 which is entitled Exhibit B, and there is a

21 heading CV and resumé.

22     A.   Yes.

23     Q.   Is that an accurate and current

24 statement of your resumé?

25     A.   It is.

```
 1   ███████ - Confidential Pursuant to Protective Order
 2            Q.    Okay.   Let's turn back --
 3            MR. HANAUER:    Excuse me one second.
 4            (Discussion off the record between
 5       witness and his counsel.)
 6            THE WITNESS:    Just to make the
 7       record clear, there is an error.
 8            Q.    Sure.
 9            A.    In my background in the report
10   actually.    It says that from, and this is on
11   page 3 of my report, qualifications.   It says
12   from -- bottom of the page, last paragraph, "From
13   1999 to 2004, I was senior vice president of
14   regulation and controls for NASDAQ, but, if you
15   look at the resumé, that is incorrect.
16            My tenure at NASDAQ started in
17   February of 2001 to 2004.   From January of '99 to
18   February 2001, and again I'm in the next to last
19   page of my resumé where I talk about professional
20   experiences and selected accomplishments.    From
21   1999 to 2001 I was senior vice president of
22   regulatory technology at NASD regulation.
23            Q.    Okay.   Thank you for the correction.
24            A.    Sure.
25            Q.    Under page 5 of your report and
```

Page 33

1  ███████ - Confidential Pursuant to Protective Order

2  continuing to page 6, you have the heading

3  "Testimony and publications last ten years."  Is

4  that a complete and accurate listing of your

5  experiences giving testimony over the past ten

6  years?

7        A.   Yes, it is.

8        Q.   Have you testified in any other

9  matters since you signed your report?

10       A.   No, I have not.

11       Q.   You previously testified you have

12  been engaged on numerous occasions by the SEC,

13  correct?

14       A.   I'm sorry, would you repeat that.

15       Q.   You previously testified that you

16  have been engaged on numerous occasions by the

17  SEC, correct?

18       A.   Yes.

19       Q.   Okay.  How many times have you

20  testified on behalf of defendants charged with

21  violations of the securities laws?

22       A.   No testimony, but there was -- there

23  is three engagements.  One had a deposition.

24  It is not on here, because it was prior to ten

25  years.

1    ████████ - Confidential Pursuant to Protective Order

2         Q.   So how many times have you been

3    engaged on behalf of defendants charged with

4    violations of the securities laws?

5         A.   Three.

6         Q.   Okay.   What percentage roughly would

7    you say that is compared to all the times you

8    have been engaged to work as an expert witness on

9    a case?

10        A.   Probably 10 percent.

11        Q.   Mr. ████████, how would you describe

12   your areas of expertise as an expert witness?

13        A.   Areas of expertise?

14        Q.   Um-hum.

15        A.   Wow.   That is a good question.   You

16   know, I've been in the industry a long time.   I

17   was at NASDAQ and NASD for approximately 32 years

18   and have been consulting ever since, so the range

19   of my engagements relate, you know, I think it's

20   in my resumé, but, you know, it is a wide

21   spectrum of expertise.

22             I have testified on best execution,

23   market maker compensation, sales credits, insider

24   trading, you know, I can keep going, but it's a

25   wide variety.

1   ███████ - Confidential Pursuant to Protective Order

2               Most recently I testified in a court

3   case for the SEC in Tampa this summer where it

4   was rule 15c2-11 which is market-making rules.

5   So it's a wide spectrum of NASD and FINRA

6   regulations.

7           Q.   Is it accurate to say that most of

8   your prior testimony in the securities context

9   has involved cases alleging market manipulation

10  or fraud?

11          A.   There have been a number of those,

12  yes.

13          Q.   What percentage of the total would

14  you say?

15          A.   Oh, boy.   I didn't count them up.

16  Can I take a quick look?

17          Q.   Sure.

18          A.   Are you talking the ones where I gave

19  testimony?

20          Q.   Yeah, why don't we talk about the

21  ones where you gave testimony.

22          A.   Excuse me.

23               (Discussion off the record between

24          witness and his counsel)

25          A.   If you want to go one by one, I can,

1    ██████ - Confidential Pursuant to Protective Order

2    because not all of them are trading cases.   As I

3    said before, you know, maybe there's some nuances

4    to what you call a trading case, so, you know,

5    there are pump and dumps, there is a portfolio

6    pumping case, there is a corporate identity theft

7    case, so it is generally in the fraud area.

8            Q.    Generally in the fraud area?

9            A.    Yeah.   Um-hum.

10           Q.    And you would say what percent of the

11   total of all of your cases where you have

12   testified involved fraud?

13               MR. HANAUER:   Over the last ten

14           years or ever?

15           Q.    Let's do over the last ten years, and

16   then I will ask you ever.

17           A.    Are you including the FINRA

18   arbitrations in that?

19           Q.    Sure.

20           A.    I would say 80 percent of them,

21   90 percent of them.

22           Q.    90 percent involved some allegations

23   of fraud?

24           A.    Yes.

25           Q.    And how many, over your lifetime, how

1  ██████ - Confidential Pursuant to Protective Order

2  many cases in which you have testified as an

3  expert over your lifetime involved some

4  allegations of fraud?

5       A.   You know, I can't recall

6  specifically.   I would say that obviously many

7  of the SEC cases would, but, you know, I have

8  done a lot more than just the SEC cases, you

9  know, so probably a similar percentage, you know,

10  somewhere between 40 and 50 percent if we go

11  strictly on a guess of the math.

12       Q.   How many cases over the last ten

13  years in which you have testified involved

14  disclosure obligations?

15       A.   I would say disclosure as part of the

16  overall case, even if there is fraud involved,

17  there is a disclosure aspect of them, so I would

18  say the majority really.

19       Q.   What about how many cases involved

20  disclosure obligations where there were no

21  allegations of fraud present?

22       A.   Where there were no allegations of

23  fraud present, in the ones that I have testified

24  in?

25       Q.   Yes.

1    ████████  - Confidential Pursuant to Protective Order

2           MR. HANAUER:    Are we back at ten

3        years or lifetime?

4        Q.    Let's do ten years.

5        A.    Probably not as a standalone context.

6    They were all in connection with as I look at

7    them now.

8        Q.    And what about over the course of

9    your lifetime?

10        A.    Give me a moment to think.  I just

11    can't recall.

12        Q.    Sitting here today you can't recall a

13    case?

14        A.    Right.

15        Q.    In which you testified that involved

16    disclosure obligations under the securities laws,

17    but no allegations of fraud?

18        A.    Right.    There may have been one.    I

19    don't know.  I would have to go back and look.

20        Q.    Mr. ████████, is it accurate that the

21    SEC has not alleged any fraud in connection with

22    this litigation against Ripple?

23        A.    I don't recall.    It has been a while

24    since I read the complaint.  I'm not sure.

25        Q.    Okay.  Is it also accurate that the

1    ███████ - Confidential Pursuant to Protective Order

2    SEC is not alleging that Ripple engaged in any

3    market manipulation, wash sales or pump and dump

4    schemes?

5         A.   I believe that is true.  Yeah.

6         Q.   Have you ever offered expert

7    testimony on what constitutes material

8    disclosures under the Securities Act or the

9    Exchange Act?

10        A.   Specifically or in connection, again

11   in connection with other activities?

12        Q.   In connection is fine.

13        A.   Probably in connection with.

14        Q.   Have you ever testified as an expert

15   concerning whether an entity was obligated to

16   file disclosures under the Securities Act or

17   Exchange Act for a private offering of

18   securities?

19        A.   For private offerings, so have I ever

20   testified?  No.

21        Q.   Have you ever testified as an expert

22   concerning whether an entity was obligated to

23   file disclosures under the Securities Act or

24   Exchange Act for a public offering of securities?

25        A.   You know, it's all interwoven at

1    ███████ - Confidential Pursuant to Protective Order

2    times, if you know what I mean.   There could be

3    aspects of a particular case which touches on

4    that.   Standalone, probably no.

5         Q.   Have you ever testified as to whether

6    an asset or a financial instrument was a security

7    under the Securities Act or the Exchange Act?

8         A.   I have not.

9         Q.   Have you ever rendered an opinion

10   that a company's public disclosures were

11   sufficient under the Securities Act or the

12   Exchange Act?

13        A.   I have not.

14        Q.   Has a court ever disagreed with an

15   opinion you expressed?

16        A.   I'm sorry, I didn't hear you.

17        Q.   Sorry.   Has a court ever disagreed

18   with an opinion you expressed?

19             MR. HANAUER:   Objection.

20        Foundation.

21             Only that you are aware of.

22        A.   Yeah.   Not that I am aware of.

23        Q.   To your knowledge, has a court ever

24   precluded or limited your testimony in a case

25   pursuant to a Daubert motion?

1    ███████████ - Confidential Pursuant to Protective Order

2              A.   Yes.

3              Q.   What was that case?

4              A.   Okay.   Actually coincidentally it

5     was one of the ones where I was on the other side

6     of the case from the SEC, believe it or not, and

7     that was SEC versus LEK Securities, and there was

8     a Daubert -- well, to give you the background,

9     the law firm came to me and said, look, we are

10    not happy with our expert.   We want to hire you.

11              MR. HANAUER:   ██████, you can't be

12              talking about communications with a law

13              firm on another case.

14              A.   I just want to give the background to

15    the Daubert, which was the judge wouldn't allow

16    them a second bite at the apple, so they said Mr.

17    ██████████ cannot substitute for this guy.   You

18    have already made your choice, and you have to

19    live by it.   So it was a technical kind of

20    thing.

21              Q.   Have you ever testified as a fact

22    witness?

23              A.   No.

24              Q.   Have you ever been arrested?

25              A.   No.

Page 42

1    ▇▇▇▇▇▇ - Confidential Pursuant to Protective Order

2         Q.   On page 5, it says that you have not

3    authored any publications in the last ten years.

4    Is that accurate?

5         A.   That is accurate, yes.

6         Q.   To the best of your memory, what was

7    the last article or publication that you

8    authored?

9         A.   Wow.  It had to be back, that I

10   authored?  Probably -- I don't recall any.

11        Q.   Okay.  How much are you being

12   compensated for your work on this case?

13        A.   $400 an hour.

14        Q.   Is that contingent on the outcome of

15   the case?

16        A.   No, it is not.

17        Q.   Do you generally charge on an hourly

18   basis for your expert witness work?

19        A.   Yes, I do.

20        Q.   Mr. ▇▇▇▇▇▇, I am going to ask you

21   some questions about your personal background.

22   Where did you attend college?

23        A.   I went to St. Francis College in

24   Brooklyn, New York.

25        Q.   Did you earn a degree?

1      ███████  - Confidential Pursuant to Protective Order

2              A.   Yes, I did.

3              Q.   What was your degree?

4              A.   Bachelor of arts in English.

5              Q.   Did you attend graduate school?

6              A.   I did.

7              Q.   Did you earn a degree?

8              A.   I did not.

9              Q.   Did you ever go to law school?

10             A.   I did not.

11             Q.   Have you ever been licensed to

12    practice law?

13             A.   I have not.

14             Q.   Have you ever been admitted to any

15    state or federal bar?

16             A.   I have not.

17             Q.   Your CV states that you worked at the

18    NASD from 1972 to 2001.   Is that accurate, or

19    maybe that should be 2004.   My apologies.

20             A.   NASD, excuse me, one second.   Let me

21    just take a quick look if I may refresh my

22    recollection here.

23             Q.   Yep.

24             A.   I worked at NASD up until 2001.

25    February 2001, and then I went over to NASDAQ.

Page 44

1      ███████ - Confidential Pursuant to Protective Order

2           Q.   Okay.   Then NASD was charged with

3      supervising NASDAQ's market operations, correct?

4           A.   I'm sorry.

5           Q.   Then NASD was charged with

6      supervising NASDAQ's market operations?

7           A.   Yes.

8           Q.   What did this market supervision

9      activity entail?

10          A.   Well, I was head of market regulation

11     for 15 years, and we had a responsibility for all

12     of the over-the-counter market in terms of

13     surveillance, examination, enforcement at that

14     time, and the surveillance was both realtime of

15     the NASDAQ market where I had day-to-day

16     responsibility for realtime surveillance and

17     trading halts actually in the NASDAQ market, and

18     then market, what I call market maker compliance

19     rules, you know, and then we got into things like

20     insider trading, market manipulation, fraud, and

21     so on.

22               So it entailed a wide variety of

23     online and offline surveillance, and it entailed

24     a lot of technology as well.

25          Q.   During your time at NASD, did you

Page 45

1    ███████ - Confidential Pursuant to Protective Order

2    ever work with security exchanges other than

3    NASDAQ?

4         A.    Explain work with.

5         Q.    Did you ever do any market

6    surveillance activities with respect to any

7    markets other than NASDAQ?

8         A.    Let me think.  We did contract with

9    a few other exchanges, but that was when I had

10   moved over to the technology space, and now FINRA

11   actually does surveillance for every market

12   including New York Stock Exchange.

13        Q.    And you --

14        A.    Not during my tenure I guess is the

15   point.

16        Q.    You left NASD before it became FINRA,

17   correct?

18        A.    Yes.

19        Q.    So you never worked at FINRA?

20        A.    No.

21        Q.    Your report frequently refers to your

22   experience as a regulator.  Is that a reference

23   to your work at NASD?

24        A.    It is.

25        Q.    Mr. ███████, have you ever worked at

Page 46

1   ████████ - Confidential Pursuant to Protective Order

2   the SEC?

3         A.   I have not.

4         Q.   Your CV states that from 1986 to 1999

5   you were senior vice president of market

6   regulation for NASD, correct?

7         A.   Yes.

8         Q.   What were your responsibilities in

9   that role?

10        A.   As I mentioned before, I was head of

11   the department, and so I had the entire

12   responsibility for surveillance and regulation of

13   the over-the-counter market including NASDAQ at

14   the time, which was not as yet registered as a

15   national securities exchange.

16        Q.   And your report states you

17   established a dedicated fraud unit to focus on

18   issues of market manipulation.  So from 1986 to

19   1999 how much of your work at NASD involved

20   identifying fraud or market manipulation?

21        A.   You know, it really depends on the

22   periods of time you are talking about.  You

23   know, in the late 80's it occupied a lot of my

24   time, because you had a penny stock issue in the

25   industry with, you know, household names, First

Page 47

1   ████████ - Confidential Pursuant to Protective Order

2   Jersey Securities, Stratton Oakmont, you know, if

3   you've ever watched The Wolf of Wall Street,

4   you'll know what I'm talking about, so I wanted

5   Brad Pitt to play me in a movie, but that never

6   happened.

7           So, you know, at that time it

8   occupied quite a bit of time.  Other times we

9   had, you know, kind of, as head of the

10  department, you had to manage resources, okay?

11  And so like the SEC, you know, we were limited in

12  resources to address issues.

13          So part of my job was to allocate

14  resources where the most pressing regulatory

15  issues were.  So it could be fraud during a

16  period, two or three years, and then it could be

17  market maker conduct of some type, trading ahead,

18  not protecting limit orders, whatever the flavor

19  of the day was.  So it is kind of hard to

20  allocate specific time.

21          Q.   If you look back on that period of

22  time, what percentage of that work involved some

23  sort of conduct that was alleged to be deceptive?

24          A.   I would say most of it.  Yeah.

25          Q.   In your time at NASD, so outside of

Page 48

1   ▓▓▓▓▓▓ - Confidential Pursuant to Protective Order

2   those roles as well, were you responsible for

3   making a final determination about required

4   disclosures under the securities laws?

5        A.   Yes.

6        Q.   What was that work?

7        A.    Well, let's start with the realtime

8   surveillance.   Part of my responsibility was to

9   initiate trading halts in NASDAQ securities, and

10  the reason why we would halt trading is to permit

11  dissemination of material news to the

12  marketplace.   Once the news was absorbed, it was

13  generally a 30-minute time frame that we halted

14  the stock.   So we presume that the news was out,

15  and we would reopen the stock, so I would say on

16  an average of four to six times a day, I was

17  looking at press releases and talking to NASDAQ

18  issuers and making decisions as to materiality of

19  those announcements.

20           Then in the offline space, again, in

21  the investigatory and, you know, other issues

22  that we were dealing with on a non- realtime

23  basis, again I would say I was part of the mix of

24  everything that we looked at.

25        Q.   And what sources of authority did you

1    ███████ - Confidential Pursuant to Protective Order

2    look to to determine whether those disclosures

3    were material?

4         A.    We had within our listing agreement

5    for NASDAQ, there was a definition of what we

6    viewed to be material news, and it tracked pretty

7    much with what the standard concept, industry

8    concept is for materiality, and, as a matter of

9    fact, I think it is footnoted somewhere.

10              If you look at footnote 6, as

11   background to SEC adopting regulation FD, they

12   define materiality, and that is kind of the

13   standard.

14              MR. HANAUER:   ██████, you are talking

15        of footnote 6 of your report?

16              THE WITNESS:   Of my report.   Yes.

17        A.    That is kind of the standard

18   approach.   If it's something that investors think

19   it is important to the mix of overall

20   information, then it would be material, but I had

21   to bring my judgment obviously.   There could be

22   disputes as to and often there were with the

23   issuer concerning materiality of the release, and

24   I can give you some anecdotal stories but

25   probably bore you, but some of them were kind of

Page 50

1     ████████ - Confidential Pursuant to Protective Order

2     funny actually.

3          Q.   Maybe during a break we can chat

4     about those.

5          A.   Yes.

6          Q.   So you said that you were looking at

7     that time at NASD policies or guidance to

8     determine materiality?

9          A.   No, I said that we had within our

10    listing agreement an obligation for issuers to

11    disclose material news, and there was a

12    definition in there, I can't quote it verbatim,

13    but the definition would track pretty much to

14    what that footnote says based on, you know, that

15    particular SEC quote there.

16         Q.   So you were basing your

17    determinations roughly on the standard in that

18    Supreme Court case?

19         A.   Yeah, you know, I kind of brought my

20    own judgment to bear, but, with that as a

21    backdrop and whether it had been important to

22    investors, whether it would move the market was

23    another consideration.   We also would halt the

24    stock if, you know, the stock could be moving.

25    There might not be news on the wire, and we would

1   ████████ - Confidential Pursuant to Protective Order

2   want to know why.

3            We would contact the issuer and

4   sometimes there was news that needed to be

5   disclosed.   We had halted the stock, and we

6   essentially recommended that they -- strongly

7   recommended that they put that news out.

8        Q.   And your CV states that you employed

9   significant legal and technological staff at

10  NASD.   What were the responsibilities of your

11  legal staff?

12       A.   When I was there, the legal staff,

13  they had not yet, Mary Shapiro had not yet

14  created the Department of Enforcement, so

15  enforcement of market regulation rules were

16  contained within my department, so I had a number

17  of, I had a head lawyer, and he had about, we had

18  maybe five lawyers reporting up through him and

19  him into me, and they did, you know, they drafted

20  the complaints.   They did depositions.   They

21  did hearings and so on.   So anything that related

22  to the disciplinary function, that was the role

23  of the legal department.

24       Q.   Did they also interpret relevant

25  statutes and regulations?

1  ███████ - Confidential Pursuant to Protective Order

2          A.   They may have in the context of

3  writing a complaint, for example.

4          Q.   After you were at NASD, you went to

5  NASDAQ as the senior vice president of regulation

6  and controls.   What did that role entail?

7          A.   Well, let me give you a little bit of

8  background.   NASDAQ elected to spin off from the

9  NASD, as you probably know, and become its own

10  separate self-regulatory organization, and they

11  contracted with NASD to carry out -- they didn't

12  have their own regulatory staff.   They

13  contracted with NASD to do regulation of the

14  market, and, in doing so, they wanted to ensure

15  that there was a Chinese wall between what the

16  marketplace was doing and what the regulators

17  were doing, and so I kind of sat in the middle of

18  the Chinese wall and then was the liaison to NASD

19  for regulatory issues that related to the NASDAQ

20  market.

21              It could work both ways.  I mean

22  NASDAQ might say, hey, you know, there is a

23  particular market maker practice we want NASD to

24  look at.   Go tell them to look at that, and it

25  could work this way.  NASD would say, you know,

Page 53

1   ██████████  - Confidential Pursuant to Protective Order

2   NASDAQ market makers are right, go tell NASDAQ to

3   promulgate a rule to stop that.

4            So it was that, plus I had

5   responsibility for overseeing the contractual

6   commitment with NASD making sure that they were

7   doing their role, negotiating regulatory budgets

8   with them and so on.

9        Q.   And other than your time at NASD or

10  NASDAQ, do you have any other experience serving

11  in a regulatory or self-regulatory role?

12       A.   No, not specifically.

13       Q.   Your CV states you're currently

14  employed as the president of ███████ Consulting.

15  Is that accurate?

16       A.   Yes.

17       Q.   What is ████████ Consulting?

18       A.    It's a consulting firm that I formed

19  in May of 2004.  As I said before, I've done, I'm

20  pretty much a sole proprietor on my own, and I've

21  done a number of engagements for a lot of people

22  in the areas that are noted in my CV, resumé and

23  elsewhere.

24       Q.   And I am going to call ██████████

25  Consulting ████████.   Is that okay?

```
 1   ████████ - Confidential Pursuant to Protective Order
 2          A.   Yes.
 3          Q.   Does ████████ have any employees?
 4          A.   No.
 5          Q.   How many hours a week do you say you
 6   devote to your work at ████████?
 7          A.   Sometimes zero and sometimes a lot
 8   depending on whether I'm doing one case, two
 9   cases at a time or no cases or depending on how
10   big the case is, so I could be spending a lot of
11   hours or no hours.
12          Q.   Since 2004, have you been employed by
13   any other entity outside of ████████?
14          A.   No, other than, you know, I don't
15   consider consulting employment, but I have been
16   retained by other people.
17          Q.   Is your consulting work through
18   ████████?
19          A.   Yes.
20          Q.   Have you ever provided services to a
21   client in connection with filing an IPO?
22          A.   No.
23          Q.   Have you ever provided services to a
24   client in connection with seeking no action
25   letters from the SEC?
```

1   ████████ - Confidential Pursuant to Protective Order

2        A.   No.

3        Q.   Have you ever provided services to a

4   client in connection with a client's

5   investigation by the SEC?

6        A.   Could you clarify that for me.

7        Q.   Sure.   Have you ever provided

8   services to a client that had been or was in the

9   process of being investigated by the SEC?

10       A.   When you say services, are you

11  meaning consultancy services?

12       Q.   Let's say consultancy or expert

13  witness services.

14       A.   Well, not specifically the SEC, but I

15  have in other cases, yes.

16       Q.   When you say not specifically the SEC

17  bur other cases, do you mean other government

18  agencies?

19       A.   No.

20       Q.   Sorry.   Can you clarify what you

21  mean, please.

22       A.   Sure.   I was retained by a law firm

23  to assist them in a criminal case which was a

24  very complex market maker compensation case

25  involving foreign equity markets, and it was

1    ███████ - Confidential Pursuant to Protective Order

2    complicated, and so it was a criminal -- the U.S.

3    Attorney was coming after an individual, and I

4    consulted with the law firm on addressing that

5    issue.

6         Q.   And that case was not brought by the

7    SEC, correct?

8         A.   I believe there was a plea bargain.

9         Q.   Have you ever provided services to a

10   client including through a law firm in connection

11   with an investigation by the SEC under section 5?

12        A.   No.

13        Q.   Of the Securities Act?

14        A.   No.

15        Q.   Have you ever provided services to a

16   client in connection with reviewing disclosures

17   made pursuant to the securities laws?

18        A.   Let me think for a second.  Would

19   you just repeat that.  I want to make sure I

20   give you the proper answer.

21        Q.   Of course.  Have you ever provided

22   services to a client in connection with reviewing

23   disclosures made pursuant to the securities laws?

24             MR. HANAUER:  Objection.  Are we

25             back to all clients, or are we just

```
 1  ████████ - Confidential Pursuant to Protective Order
 2          talking about nongovernment clients?
 3               MS. GRESSEL:   All clients.
 4          A.   Well, you know, that case I just
 5  mentioned, I mean, involved disclosure, and there
 6  was a disclosure aspect to it, so I guess the
 7  answer would partially be yes.
 8          Q.   The case you mentioned is the one
 9  brought by the U.S. Attorney in which you were
10  engaged by a law firm?
11          A.   Yes.   There I was on the defendant's
12  side.
13          Q.   Got it.   Have you ever provided
14  services to a client in connection with a
15  litigation brought by the SEC?
16          A.   By the SEC?
17          Q.   Um-hum.
18          A.   Yes.
19          Q.   And what case was that?
20          A.   Well, it's not on the sheet because
21  it was more than ten years ago, but that was a
22  case down in Florida brought by the Miami
23  regional office.   It was SEC versus Zacharia.
24  It was an insider trading case, and I was on the
25  defendant's side.   I submitted an expert report,
```

1    ██████ - Confidential Pursuant to Protective Order

2    but did not testify.

3         Q.   How was that case resolved?

4         A.   I believe the defendant prevailed

5    over the SEC.

6         Q.   Do you now hold or have you ever

7    previously held any other professional licenses

8    or certifications?

9         A.   In any field?

10        Q.   Sure.

11        A.   I'm a certified personal trainer.

12        Q.   Oh, great.  Impressive.   Have you

13   ever had any other licensures or certifications?

14        A.   No.

15        Q.   Okay.  Have you ever had any

16   disciplinary or ethics complaints filed against

17   you?

18        A.   No.

19        Q.   I want to circle back to block chain

20   technology briefly.   I know we talked about that

21   earlier.   When did you first become aware of

22   block chain technology?

23        A.   Well, again, you know, I have

24   throughout my career a great interest in

25   technology in that I was the main officer in NASD

Page 59

1   ███████ - Confidential Pursuant to Protective Order

2   that dealt with all the surveillance systems and

3   the evolution of trying to keep up with the

4   explosion of NASDAQ trading and trying to get

5   your arms around the data that we needed to get

6   our arms around, so I always had an interest in

7   technology.

8               I managed a number of really, really

9   big technology projects such as OATS, for

10  example.  That was the Order Audit Trail System.

11  So technology always interested me.  So, when the

12  crypto phenomenon started, just like anybody

13  else, I mean it naturally piqued my curiosity, so

14  I started reading a little bit about it.

15          Q.   When was that?

16          A.   Oh, gosh.  You know, I can't give

17  you a specific date, but probably several years

18  ago.

19          Q.   Like ballpark five years ago, ten

20  years ago?

21          A.   I would say more three to five years

22  probably.

23          Q.   How familiar are you with block chain

24  technologies?

25          A.   It depends on what you mean by how

Page 60

1   ██████ - Confidential Pursuant to Protective Order

2   familiar.   You know.   I can't do code for it,

3   for example, but, you know, I kind of know, have

4   a general understanding of what it is.

5           Q.   Are you familiar with what the term

6   "ledger" means with respect to block chain

7   technologies?

8           A.   Yes.

9           Q.   What does the term "ledger" mean?

10          A.   Well, a ledger is, and again I'm not

11  an expert, and I'm not offering an opinion on

12  block chain technology, but my understanding is

13  that that is the block that constitutes the block

14  chain, so that there is a ledger of all the

15  individual blocks in the chain.

16          Q.   Are you familiar with the information

17  that is recorded on a ledger?

18          MR. HANAUER:   Objection to form.

19          A.   Again, you know, my very general

20  understanding and I'm not an expert, I'm not

21  offering an opinion, but I know, for example,

22  that each one has its own unique cryptographic

23  designation that can't be tampered with, and I

24  think, you know, from what I've read that is the

25  key ingredient in the block chain technologies

Page 61

1    ████████ - Confidential Pursuant to Protective Order

2    that it's kind of foolproof.

3         Q.   And are you familiar with what

4    information is publicly visible on a block chain

5    ledger generally?

6         A.   No.

7              MR. HANAUER:   Objection to form.

8         Q.   Have you ever transacted on a block

9    chain ledger?

10        A.   I have not.

11        Q.   Okay.  When did you first become

12   aware of digital assets?

13        A.   Probably around the same time.

14        Q.   For the purpose of this deposition, I

15   may use the term digital asset and virtual

16   currency interchangeably.  Is that okay with

17   you?

18        A.   Yes.

19        Q.   Alright.  Are you involved in any

20   professional groups whose work have involved

21   digital assets?

22        A.   No.

23        Q.   Did your work at NASD or NASDAQ

24   involve block chain technologies?

25        A.   It did not.

1    ████████ - Confidential Pursuant to Protective Order

2            Q.    Did your work at NASD or NASDAQ

3    involve digital assets?

4            A.    It did not, no.

5            Q.    Has any of your prior consulting or

6    expert work involve the applicability of

7    securities laws to digital assets?

8            A.    No.

9            Q.    When did you first become aware of

10   XRP?

11           A.    I believe it was when the SEC was

12   making inquiry regarding my retention.

13           Q.    So, prior to the SEC calling you, you

14   would not have known what XRP referred to?

15           A.    I don't believe so.  No.

16           Q.    Prior to the SEC calling you, had you

17   heard of the company Ripple?

18           A.    No.

19           Q.    Is it an accurate statement that you

20   have never offered expert testimony in an

21   enforcement action involving block chain

22   technologies?

23           A.    That's correct.

24           Q.    Is it an accurate statement you have

25   never offered expert testimony in a case or

1    ████████ - Confidential Pursuant to Protective Order

2    enforcement action involving digital assets?

3         A.   That's correct.

4         Q.   Have you ever represented a client

5    before the SEC in an attempt to seek regulatory

6    clarity on digital assets?

7         A.   No.

8         Q.   Have you ever authored any

9    scholarships, articles or any other written

10   materials related to digital assets or block

11   chain technologies?

12        A.   No.

13        Q.   Are you familiar with digital asset

14   exchanges?

15        A.   Somewhat.   Yes.   Generally.

16        Q.   When did you first become aware of

17   digital asset exchanges?

18        A.   Again, probably, you know, as I was

19   learning and as I was, you know, my curiosity was

20   piqued.  I know that there were a number of

21   articles, for example, on Coinbase going public,

22   so I read about that.   Generally.

23        Q.   So Coinbase is an example of a

24   digital asset exchange.   Are you familiar with

25   any other digital asset exchanges?

1   ████████ - Confidential Pursuant to Protective Order

2          A.   I know there are more than people

3   think.

4          Q.   And do you have any expert or

5   consulting experience involving digital asset

6   exchanges?

7          A.   No.

8          Q.   Do you have any experience concerning

9   what constitutes speculative trading in digital

10  asset markets?

11         A.   Would you repeat that again.  I just

12  want to make sure.

13         Q.   Sure.  Do you have any experience

14  concerning what constitutes speculative trading

15  in digital asset markets?

16              MR. HANAUER:  Objection to the form.

17         A.   I mean, you know, I could -- just say

18  it one more time.  I'm sorry.

19         Q.   No problem.  Do you have any

20  experience concerning what constitutes

21  speculative trading in digital asset exchanges?

22              MR. HANAUER:  Just objection, and I

23              will make it clear the term "speculative

24              trading."  You may need to help him out

25              with that.

Page 65

1      ███████ - Confidential Pursuant to Protective Order

2              A.    Yeah.

3              Q.    What do you understand the term

4      "speculative trading" to mean?

5              A.    Well, you know, it depends on what

6      aspect that you're looking at.    I mean, you

7      know, if you ask Warren Buffett, he thinks there

8      is a lot of speculative trading, so I don't know.

9      You know, there has been talk that there is a

10     bubble, and, you know, I discount all that stuff.

11     I'm not really offering an opinion on any of

12     that.

13              So, you know, do I believe personally

14     there may be speculative trading?    You know, I'm

15     sure that, you know, the volatility in crypto has

16     hurt people, so I mean I don't know if that

17     answers your question, but, as I said before, I'm

18     not really offering any opinions on speculation

19     or anything like that.

20              Q.    I just want to ask a question to make

21     sure I understand.    Do you think there is an

22     agreed upon definition of what constitutes

23     speculative trading?

24              A.    I don't think so.   No.

25              Q.    Okay, and are you familiar with what

1    ▮▮▮▮▮ - Confidential Pursuant to Protective Order

2    might or might not constitute speculative trading

3    with respect to digital assets?

4              MR. HANAUER:   Objection.   Form.

5         Counsel, why don't you ask him what

6         speculative trading means to him.

7         Q.   I'm just going to repeat that

8    question again.

9         A.   Okay.

10        Q.   Are you familiar, or do you have an

11   understanding of what speculative trading means

12   with respect to digital assets?

13        A.   Well, you know, it's a wide-open

14   question.   I mean by whose standards, for

15   example?   I mean, you know, somebody defined

16   speculative trading?   I don't think so.   Not

17   that I know of.   As I said before, I'm sure that

18   there's some highly speculative trading going on

19   somewhere, you know, but maybe people in Robin

20   Hood shouldn't be buying crypto.   I don't know.

21             So, again, I don't know if there's a

22   defined standard.   I don't think so.   I haven't

23   heard of one.

24        Q.   Okay, and have you ever purchased any

25   digital assets?

1   ███████ - Confidential Pursuant to Protective Order

2              A.   I have not.

3              Q.   Okay.  Have you ever sold any digital

4   assets?

5              A.   I have not.

6              MS. GRESSEL:   Is now a good time for

7         a break?

8              THE WITNESS:   I was just looking at

9         my watch.

10             MS. GRESSEL:   Okay.

11             THE VIDEOGRAPHER:   We are going off

12        the record.   The time is 10:38 a.m.

13             (Recess taken)

14             THE VIDEOGRAPHER:   We are back on

15        the record.   The time is 10:56 a.m.

16   BY MS. GRESSEL:

17             A.   I have a quick question for you.   I

18   would like to go back and correct the record.   I

19   believe that, when I was speaking about the time

20   I was not approved by the court as an expert that

21   I characterized it as a Daubert.   It wasn't a

22   Daubert.   It was just an order from the judge

23   saying I'm not reopening discovery.   These two

24   experts can hit the road.

25             Q.   Understood.   Thank you.

Page 68

1    ████████ - Confidential Pursuant to Protective Order

2         A.   Okay.

3         Q.   Mr. ██████, I would like to turn

4    back to your report briefly.

5         A.   Sure.

6         Q.   There are two sets of bullets one on

7    page 1 and one on page 29 to 30 of your report.

8    Can you take a look at those two lists of bullets

9    briefly?

10        A.   Sure.

11        Q.   I am going to point you to a bullet

12   in each list.   So looking at those two lists on

13   page 1 and pages 29 to 30, only the last bullet

14   in each list pertains to Ripple, correct?

15             MR. HANAUER:   Can you give him some

16        time to review the list?

17             MS. GRESSEL:   Of course.

18        A.   Yes.

19        Q.   Do you want to look at the other

20   bullet?

21        A.   I'm sorry.

22        Q.   The other set of bullets is pages 29

23   to 30, and I will ask you the same question.

24   Only the last bullet in that list pertains to

25   Ripple, correct?

1    ████████ - Confidential Pursuant to Protective Order

2              A.   Yes.  That's right.

3              Q.   Okay.  Would it be fair to summarize

4    your opinion as follows:   If Ripple were

5    required to register its offers or sales of XRP,

6    it would have been required to make substantial

7    and meaningful disclosures to investors?

8              MR. HANAUER:   Objection to the form.

9         Are you talking about his opinion, his

10        entire opinion?

11             Q.   Your opinion in those two bullets.

12             A.   Yeah.  With the caveat of assuming

13   Ripple had to register its offers and sales of

14   XRP, yes.

15             Q.   Okay.  With that assumption?

16             A.   With that assumption, yes.

17             Q.   So that seems like a pretty basic

18   premise.  If a company is offering a security, it

19   needs to comply with the various disclosures and

20   SEC reporting obligations that apply to

21   securities offerings, right?

22             A.   Yes.

23             Q.   And, conversely, if a company is not

24   offering a security, then it does not need to

25   comply with the disclosure and SEC reporting

1    ███████ - Confidential Pursuant to Protective Order

2    obligations that apply to securities offerings?

3    Is that accurate?

4           A.    That was a long sentence.

5           Q.    Sure.  So the converse point would

6    be, if a company is not offering a security, then

7    it does not need to comply with the disclosure

8    and SEC reporting obligations that apply to

9    securities offerings.  Is that accurate?

10          A.    If it's not a security, is that what

11   you said?

12          Q.    Um-hum.

13          A.    You know, I don't think I can offer

14   an opinion on that, but probably not.  You know,

15   I would need more information as to what they

16   would be doing or not doing.

17          Q.    How about as a general proposition.

18          A.    In general, okay.

19          Q.    If companies are not offering

20   securities, they generally do not need to comply

21   with the disclosures and SEC reporting

22   obligations that apply to securities offerings?

23          A.    I would say that is a general

24   assumption, yes.

25          Q.    Okay, and that is not a particularly

1    ███████ - Confidential Pursuant to Protective Order

2    complicated statement, is it?

3         A.   No.

4         Q.   Okay.  It's pretty straightforward?

5         A.   I think so, yeah.

6         Q.   Okay.  We just spoke about the

7    amended complaint a moment ago.   You understand

8    the SEC is alleging that Ripple sales or offers

9    of XRP constituted investment contracts under the

10   securities laws, correct?

11        A.   Correct.

12        Q.   And you understand that the ultimate

13   legal issue for the court or the jury to decide

14   in this litigation is whether Ripple's sales or

15   offers of XRP constituted investment contracts

16   under the securities laws, correct?

17        A.   I believe that is the central tenet

18   of the case, yes.

19        Q.   Okay.  Let's look briefly at page 1

20   of your report.   Could you please read out loud

21   the sentence beginning with "This report takes no

22   position."

23        A.   Page 1.

24        Q.   I will point you to it.   Apologies.

25   It is page 2.  Thank you for correcting me.

Page 72

1   ████████ - Confidential Pursuant to Protective Order

2          A.   Yes.

3          Q.   So at the bottom of page 2, can you

4   read the sentence that starts, "This reports

5   takes no position"?

6          A.   "This report takes no position as to

7   whether defendants' XRP transactions involved

8   offers and sales of securities as defined by the

9   '33 Act or '34 Act."

10         Q.   Okay.   Great.   Let's take a look at

11  page 28 as well.   Under the header "Potential

12  Disclosures by Ripple," you have a sentence that

13  starts midway through the first paragraph, "To be

14  clear, I have not been asked to provide."

15              Do you see that?

16         A.   Yes.

17         Q.   Could you please read out loud that

18  sentence?

19         A.   "To be clear, I have not been asked

20  to provide, and I am not providing an opinion as

21  to whether Ripple's XRP transactions constituted

22  offers and sales of securities."

23         Q.   Could you please read the following

24  sentence?

25         A.   "For purposes of this section of my

1    ███████ - Confidential Pursuant to Protective Order

2    report, I have been asked to assume that these

3    transactions were in fact offers and sales of

4    securities and to provide an opinion on what

5    disclosures Ripple would typically be required to

6    make to the investing public if that was the

7    case."

8         Q.   Thank you.  I want to spend a moment

9    just clarifying what you meant by those

10   statements.  You're not offering an opinion in

11   this matter about whether XRP itself is a

12   security, correct?

13        A.   I am not.

14        Q.   And you're not offering an opinion in

15   this matter about whether XRP itself is an

16   investment contract, correct?

17        A.   That's correct.

18        Q.   You're also not offering an opinion

19   in this matter about whether Ripple's

20   transactions of XRP constituted sales or offers

21   of investment contracts under the securities

22   laws, correct?

23        A.   Correct.

24        Q.   You are also not offering an opinion

25   in this matter about whether defendant Chris

1   ███████ - Confidential Pursuant to Protective Order

2   Larsen's transactions of XRP constituted sales or

3   offers of investment contracts under the

4   securities laws, correct?

5          A.    Correct.

6          Q.    You're also not offering an opinion

7   in this matter about whether defendant Brad

8   Garlinghouse's transactions of XRP constituted

9   sales or offers of investment contracts under the

10  securities laws, correct?

11         A.    That's correct.

12         Q.    You're not offering an opinion that

13  defendant Chris Larsen's sales or offers of XRP

14  are within the territorial reach of the U.S.

15  securities laws, correct?

16         A.    I am not, no.

17         Q.    You're not offering an opinion that

18  defendant Brad Garlinghouse's sales or offers of

19  XRP are within the territorial reach of the U.S.

20  securities laws, correct?

21         A.    Correct.

22         Q.    Okay.  We can agree that the

23  securities laws governing registration would

24  apply in this case only if Ripple's XRP

25  transactions were found to constitute offers or

Page 75

1      ██████ - Confidential Pursuant to Protective Order

2      sales of securities, is that right?

3           A.   I would agree with that, yes.

4           Q.   Do you agree that, if the court were

5      to determine that XRP itself is not a security or

6      an investment contract, then none of the

7      securities laws governing registration would

8      apply to those sales or offers of XRP?

9                MR. HANAUER:   Objection to the form

10               and the term "XRP" itself.

11          A.   Yeah.   I think if the court

12     determines it's not a security, then as far as I

13     know, there would be no requirement to register.

14          Q.   Okay.   I will just ask that slightly

15     differently.   If the court were to determine

16     that Ripple's sales and offers of XRP did not

17     constitute an investment contract or security,

18     then none of the securities laws governing

19     registration would apply to those sales and

20     offerings, correct?

21          A.   I think that's reasonable.

22          Q.   Okay, and then in that event you

23     would not be offering any opinion about what

24     disclosure obligations apply to defendants in

25     connection with XRP, correct?

1    ███████ - Confidential Pursuant to Protective Order

2         A.   Right.

3         Q.   Okay.  So, Mr. ███████, several

4    times in your report you state you're basing your

5    opinion on industry custom and practice, right?

6         A.   Yes.

7         Q.   Which industry's customs and

8    practices are you referring to?

9         A.   The securities industry.

10        Q.   And why did you elect to use that

11   term, industry custom and practice, in your

12   report?

13        A.   Why?  I think it's a customary term

14   that experts use in kind of defining their role.

15   You know, sometimes you come close to -- let me

16   make sure I state this okay before he objects.

17   Sometimes you come close to either stating a law

18   or stepping into where the trier of fact is the

19   real authority there, so you have to be, you

20   know, you want to look at what the customs and

21   practices are in the industry rather than making

22   a legal conclusion, for example.

23        Q.   So your purpose in speaking about

24   industry custom and practice is to avoid making

25   any legal conclusions in your opinion?

1  ███████ - Confidential Pursuant to Protective Order

2          A.   No.   Not solely, but there are, the

3  way it usually works is that, you know, the law

4  is there, correct, and that trickles down or

5  feeds, if you will, the customs and practices and

6  procedures that the industry adopts to, you know,

7  stay in compliance with that law, so it's more

8  underneath the law that I'm talking about.

9          Q.   So industry custom and practice is

10 generally based on the law?

11         A.   Yes.

12         Q.   And industry custom and practice

13 would also be based on things like SEC guidance

14 or other regulations that would be promulgated

15 under the law?

16         A.   It could be part of the mix that the

17 industry considers in, you know, adopting those

18 customs, practices.  Best practices is another

19 term that's frequently used and so on.

20         Q.   So I just want to -- go ahead,

21 please.

22         A.   But it starts with the law, and then

23 the law feeds down.

24         Q.   And I just want to go back to a

25 question I asked before.  I asked you, I'll ask

1      ███████   - Confidential Pursuant to Protective Order

2      it in a slightly different way.

3                   Was one of the purposes in using the

4      term industry custom and practice in your report

5      to avoid drawing legal conclusions?

6           A.   You know, I think as an expert, you

7      have to do that anyway.  You know.  I don't want

8      to hook the two together permanently, because

9      there are differences, but it's a consideration.

10          Q.   When you say you have to do that

11     anyway, do you mean you have to draw legal

12     conclusions anyway?

13          A.   No.  I have to avoid drawing legal

14     conclusions.

15          Q.   I see.  So one of your purposes in

16     writing this report was to avoid drawing a legal

17     conclusion, correct?

18                   MR. HANAUER:   Objection.   Misstates

19          his testimony.

20          A.   Yeah, I would state it another way.

21          Q.   Sure.  How would you state it?

22          A.   I would state it that in writing this

23     report I have to avoid having a legal conclusion

24     in mind.

25          Q.   And is that true of your testimony in

1   ███████ - Confidential Pursuant to Protective Order

2   this deposition today as well?

3          A.   Yeah, I would say so.

4          Q.   Okay.   So, going back to industry

5   customs and practices, how did you come to be

6   aware of industry customs and practices for the

7   securities industry?

8          A.   Oh, my gosh.   That's a really broad

9   question, and I will give you a broad answer.

10  You know, I've been at this a long time, and you

11  know, there are so many different sources,

12  conversations, examinations, research,

13  enforcement actions, talking with firms,

14  reviewing compliance procedures with firms.

15          One of the things I did, which is

16  again in a consultancy role is I worked with

17  Boston Consulting in a review of BNP, Paribas, of

18  their risk management procedures.

19          MR. HANAUER:   Don't get into the

20          specifics of that.

21          A.   Yeah, no, just as an example.   So,

22  in talking with the practitioners, okay, we come

23  to know what their expectations and practices and

24  norms are for that particular firm.   So it's a

25  whole variety of things.

Page 80

1      ▮▮▮▮▮ - Confidential Pursuant to Protective Order

2           Q.   And when you say the practitioners,

3      do you mean lawyers?

4           A.   No.  I mean people in the securities

5      industry that are transacting business.

6           Q.   So generally people who operate

7      within the securities industry?

8           A.   Yeah, right.

9           Q.   Have you ever offered expert

10     testimony on industry custom and practice?

11          A.   All the time.

12          Q.   All the time.  Okay.  Has your

13     testimony ever included opinions on whether an

14     entity should register securities offerings on

15     the basis of industry custom and practice?

16          A.   Well, let me put it this way.  A lot

17     of my testimony and opinions relate to the space

18     that relates to unregistered distributions and

19     offerings and so on.

20               So, in the context of things like

21     unregistered distributions, removal of restricted

22     legends to sell stock, roles of transfer agents,

23     broker dealers as gatekeepers for fraud.  I mean

24     there is a whole variety of things that relate to

25     that.

```
 1   ████████  - Confidential Pursuant to Protective Order
 2              Q.   In the securities industry, where
 3   would someone look if they wanted to find a
 4   respected source for industry customs and
 5   practices?
 6              A.   Well, as I point out in my report,
 7   there's a whole, it depends on, you know, what
 8   you want to do.   I mean there's a whole industry
 9   around helping out the brokerage industry in
10   terms of compliance, and so, you know, I'm sure
11   you guys have broker-dealer clients.   I'm sure
12   the accounting firm up the street has
13   broker-dealer clients.   So there's, you know,
14   legal advice.   There's accounting advice.
15   There's consultancy advice relating to best
16   practices around an issue.
17              So there's a lot, and, as I said
18   before, you could probably add the SEC to that
19   mix.
20              Q.   In your report on pages 9 to 10 you
21   state, "In such a heavily regulated industry such
22   as the securities markets, industry custom and
23   practice including activities of companies
24   offering securities and their management is
25   influenced strongly by the relevant statutes,
```

1   ███████ - Confidential Pursuant to Protective Order

2   rules and their interpretation by the SEC and the

3   courts."

4            Do you see that sentence?

5        A.   Let me take a minute to read that,

6   please.

7        Q.   Sure.

8        A.   Yeah.  I think --

9            MR. HANAUER:   Let her ask you a

10   question.

11            THE WITNESS:   I'm sorry.  Go ahead.

12        Q.   Is that statement accurate?

13        A.   Yeah, I think it summarizes what I

14   just said prior to that.

15        Q.   In the securities industry, are there

16   industry customs and practices that are not

17   strongly influenced by relevant statutes, rules

18   and their interpretation by the SEC and the

19   courts?

20        A.   I'm sure there could be.  Yeah.  By

21   that, I mean it may not be tied to a specific SEC

22   or FINRA rule.  So how to consolidate how a audit

23   trail gets built or, you know, where you have a

24   industry-wide endeavor, the industry is good at

25   coming together to solve those problems on a

1   ███████ - Confidential Pursuant to Protective Order

2   collaborative basis often with, you know,

3   different firms and different systems and

4   different technology, but still coming together

5   on a best practice basis to collaborate in a

6   nonregulatory fashion.

7        Q.   If someone were to deviate from those

8   industry customs and practices, would they be in

9   violation of the law?

10       A.   It would depend.

11            MR. HANAUER:   Objection to the form.

12       A.   Yeah.  I mean it is all facts and

13  circumstances.   I can't express an opinion on

14  that.

15       Q.   Does the violation of industry custom

16  and practices alone amount to a violation of the

17  law?

18            MR. HANAUER:   Objection to the form.

19       A.   I have no opinion on that I mean

20  without delving into what the particular facts

21  are.

22       Q.   In the securities industry who is

23  generally responsible for determining what

24  constitutes industry custom and practice?

25       A.   Well, you know, sometimes there are

1    ████████ - Confidential Pursuant to Protective Order

2    various committees and so on, so, as I mentioned

3    before, it could be a collaborative thing, and

4    other times it can be done through osmosis, so to

5    speak.   You know, it's just that this is just

6    what everybody does.  You know, firms talk to one

7    another, and they share these kinds of things, as

8    I said before, particularly best practices in

9    that area, and, you know, there is a I don't want

10   to say a system, but there is a whole, you know,

11   as I said before, firms talk to one another.

12   There is a whole, it is not a process, but it is

13   an informal arrangement amongst compliance

14   directors, technology directors, heads of firms,

15   and they explore that through organizations like

16   SIFMA, STA and so on to come up with, you know,

17   practices that the industry can, you know, live

18   by.

19               I'm sure you guys have gone to

20   conferences, for example, of SIFMA, and I've

21   spoken at many conferences where we talk about

22   best practice in the market regulation area.

23               So it's that kind of whole spectrum

24   of things that develops that, standards, norms,

25   customs, assisting one another to aid in

1     ███████  - Confidential Pursuant to Protective Order

2     compliance, because generally I would say the

3     industry is very compliance-focused.

4          Q.   So I just want to make sure I

5     understand.   You talk a lot about best practices

6     and compliance.   Do you mean best practices for

7     compliance with the securities laws?

8          A.   It could be.  Sure.  That could be

9     part of it.   It could be something else too.

10         Q.   What's an example of something else

11    it could be?

12         A.   Back office administration,

13    communication protocols, I mean you name it.

14         Q.   So, as relevant to your report, let's

15    just take your report as a standalone, not the

16    full industry.   When you're talking about

17    industry customs and practices, are you really

18    talking about best practices for compliance with

19    the securities laws?

20         A.   I'm talking about how the industry

21    would generally approach something based on a

22    rule or a regulation.   It may not be best

23    practices per se, but it's how it's generally in

24    my experience approached.

25         Q.   So general approaches towards

1    ██████████ - Confidential Pursuant to Protective Order

2    compliance with laws and regulations?

3         A.    Yes.  I would say that is a fair

4    characterization.

5         Q.    Okay.   Mr. ██████████, isn't it fair

6    to say the question of whether an asset or other

7    financial instrument is a security or investment

8    contract is a legal question?

9         A.    A determination of that?

10        Q.    I'll just repeat it.

11        A.    Yeah.

12        Q.    Mr. ██████████, is it fair to say that

13   the question of whether an asset or other

14   financial instrument is a security or an

15   investment contract is a legal question.

16             MR. HANAUER:   Objection to form.

17        A.    If somebody is trying to make a

18   determination whether or not it's a security, it

19   can be a legal question.

20        Q.    Are there situations in which the

21   question of whether an asset or other financial

22   instrument is a security or an investment

23   contract is not a legal question?

24        A.    I think the ultimate determination is

25   a legal question, but certainly you could figure

Page 87

1    ███████ - Confidential Pursuant to Protective Order

2    that out without coming to a legal conclusion.

3         Q.   So you could figure out whether

4    something is a security or investment contract

5    without consulting a lawyer?

6         A.   If you know the law, sure.

7         Q.   You could -- go ahead.

8         A.   You know, if you know what the

9    elements of what constitutes an investment

10   contract is, if I'm a compliance director and I

11   know I'm familiar with how and somebody brings a

12   new product to me, I want to make sure that, you

13   know, I don't have to go any further with it in

14   terms of recognizing a potential that it could be

15   an investment contract.

16        Q.   And can you determine whether an

17   asset or other financial instrument is a security

18   or investment contract without consulting the

19   SEC?

20             MR. HANAUER:   Can who determine?

21        Q.   A company or person.

22        A.   I think they can make a

23   determination, an initial determination, as to

24   whether or not it is, sure, because they know

25   what the elements of that particular thing is.

1   ████████ - Confidential Pursuant to Protective Order

2                   So we have a saying in compliance and

3   regulation, and it is called the duck theory.

4        Q.    What's the duck theory?

5        A.    The duck theory is by a poet James

6   Whitcomb Reilly from Indiana who said, if it

7   walks like a duck, looks like a duck, it quacks

8   like a duck, it's probably a duck, and we

9   regulators like to spout that once in a while.

10                  So, if somebody is looking at a set

11  of facts or circumstances, and it looks like a

12  Howey duck, then you've got to proceed with

13  caution, but I don't need a judge or a jury to

14  tell me that is what I'm saying.

15       Q.    And you're saying any compliance

16  officer could sit down with Howey to make a

17  determination about whether something is an

18  investment contract or a security?

19                  MR. HANAUER:    Objection.    Misstates

20       his testimony.

21       A.    Well, first of all, we would hope

22  that the compliance director knows what Howey is,

23  but he can bring some judgment to bear on those

24  facts, yes.

25       Q.    Okay.   So let me continue going.

Page 89

1      ██████████ - Confidential Pursuant to Protective Order

2      Whether a company, is it fair to say, Mr.

3      ████████, that whether a company must register

4      its sales or offers of a security is a legal

5      question, correct?

6           A.   You know, at the end of the day, it

7      probably is.  I think, again, they can figure

8      that out probably without, depending on facts and

9      circumstances, they might be able to figure it

10     out before they have to, you know, go to a lawyer

11     or a legal conclusion, but I would say in

12     general, yes.

13          Q.   And whether a company's sales or

14     offers of securities qualify for any exemptions

15     from registration is a legal question, correct?

16          A.   Yeah, as long as that is the last

17     step.  Again, somebody who has the training and

18     knowledge and in this business the securities

19     business as heavily compliance-oriented as this,

20     you would expect somebody to know if they are

21     offering sales in a private offering exemption

22     space they should know what they're doing

23     irrespective of somebody concluding that this

24     complies with Reg S or Reg A or whatever.

25          Q.   And whether a person or an entity is

Page 90

1     ███████ - Confidential Pursuant to Protective Order

2     a company insider or affiliate is a legal

3     question, correct?

4              MR. HANAUER:   Objection to form.

5         A.   Yeah.  I wouldn't characterize it as

6     a legal question or not.   I mean somebody should

7     know if they're a control person or affiliate.

8     They might have to look at Rule 144, but a CEO

9     should know he's a control person, right?

10        Q.   But it's based on an understanding of

11    what the laws and regulations say.  Correct?

12        A.   Yeah.   Again, I think any CEO that

13    is knowledgeable or worth his salt and this is

14    particularly, you know, in a public company

15    should know what his obligations are as a control

16    person.

17        Q.   And if they didn't know, where would

18    they look to find out?

19        A.   You know, I find it hard in this day

20    and age to find somebody who didn't know, but

21    obviously they would go to in-house counsel or

22    outside counsel or whatever.

23        Q.   Okay, and whether sales of securities

24    are being offered to the public or to an

25    accredited investor is a legal question.

1     ██████ - Confidential Pursuant to Protective Order

2     Correct?

3               MR. HANAUER:   Objection to form.

4          A.   I guess it's the same answer.

5          Q.   Whether public disclosures must be

6     filed with the SEC in connection with an offering

7     or sale of securities is a legal question.

8     Correct?

9          A.   Say it again.   I'm sorry, I lost my

10    train of thought.

11         Q.   Sure.   Is the question of whether

12    public disclosures must be filed with the SEC in

13    connection with an offering or sale of securities

14    a legal question?

15         A.   Public disclosures meaning what?   A

16    registration statement?

17         Q.   That's a good example.

18         A.   You know, again, I think that before

19    you get to a set of facts or circumstances where

20    a judge or a jury makes that determination, which

21    I agree is the ultimate determination, that there

22    are degrees along the way which somebody should

23    recognize that they need to do something.

24         Q.   So someone might have an

25    understanding that they would have to make

Page 92

1    ████████  - Confidential Pursuant to Protective Order

2    disclosures even if the ultimate legal question

3    of whether they are obligated to do so rests with

4    a court or a jury?

5         A.   Yeah.

6              MR. HANAUER:   Objection to form,

7         and, ████, please wait for her to finish

8         asking her question.

9         A.   Yeah.  Okay.

10        Q.   Okay, and whether certain information

11   must be disclosed in a company's public filings

12   is a legal question, right?

13             MR. HANAUER:   Objection to form.

14        A.   Same answer.  You know, it could be

15   a legal determination down the road, but, if I'm

16   your compliance director, I'm telling you, you

17   know, before it needs to become a legal question.

18        Q.   Right.  So someone could make that

19   determination about a company on whether it has

20   to publicly disclose certain information, but the

21   ultimate question of whether they are obligated

22   to is a legal question, right?

23        A.   Yeah.  I would say that's right.

24        Q.   So you mentioned the Securities Act

25   of 1933 and the Securities and Exchange Act of

1    ▮▮▮▮▮▮ - Confidential Pursuant to Protective Order

2    1934 several times, right?

3         A.   Yes.

4         Q.   Okay.  I just want to go through the

5    terminology.  By Securities Act or '33 Act, if I

6    use those terms, you'll understand I'm referring

7    to the Securities Act of 1933, correct?

8         A.   Yes.

9         Q.   And, by the Exchange Act or the '34

10   Act, you understand I'm referring to the

11   Securities and Exchange Act of 1934, correct?

12        A.   Yes.

13        Q.   Okay.  You testified that you served

14   as a regulator at NASD.  Is your opinion that

15   regulators can bring securities enforcement

16   actions based solely on alleged violations of

17   industry custom and practice?

18        A.   Again, you know, it depends on the

19   facts and circumstances, what the customs and

20   practices involve, whether there was a rule

21   violation involved, so I don't have enough

22   information to answer that correctly I don't

23   think.

24        Q.   If there is a rule violation involved

25   and a regulator brings a securities enforcement

Page 94

1      ████████ - Confidential Pursuant to Protective Order

2      action, is that based on a violation of industry

3      custom and practice?

4                 MR. HANAUER:   Objection to form.

5            Q.   I'll retract that one.   Mr.

6      ████████, when the SEC brings an enforcement

7      action, can they do so based solely on alleged

8      violation of industry custom and practice?

9            A.   It would have to be, you know, a rule

10     violation also.   Sure.

11           Q.   Okay.   So they have to have a

12     violation of an underlying law or regulation?

13           A.   They have to have a basis.   It has

14     to be, I would agree with that.   It would have

15     to be tied to some type of regulation, although

16     the industry custom and practice may have,

17     whatever that was may have been in the mix of

18     facts that you would need to consider.

19           Q.   Okay.   Let's turn to page 25 of your

20     report.   So, at the top of the page, the last

21     sentence of that paragraph, do you see that?   It

22     says, "Based on custom and practice"?

23           A.   Yeah.

24           Q.   Can you read that sentence out loud

25     for us, please.

1        ███████ - Confidential Pursuant to Protective Order

2        A.    "Based on custom and practice in the

3    securities industry, the issuer cannot not shift

4    its responsibility for compliance to the

5    regulator."

6        Q.    What do you mean when you say an

7    issuer cannot shift its responsibility for

8    compliance to the regulator?

9        A.    That means that the responsibility

10   for compliance with the securities laws do not

11   rest with the government.  It rests with the

12   entity that's involved.  You know, it's my

13   responsibility, and the government really does

14   not have the responsibility for whether I'm in

15   compliance or not.   That's my responsibility,

16   and I can't say to the government, oh, it's your

17   fault that I'm in this pickle.

18       Q.    And why did you include this

19   observation in your report?

20       A.    Why?   I think it's in the -- can I

21   look at the context real quick?

22       Q.    Sure.

23       A.    I believe it's in the context of

24   firms spending an awful lot of money for

25   compliance, legal and accounting advice, because

Page 96

1      ███████████ - Confidential Pursuant to Protective Order

2      it's their responsibility to ensure that they're

3      in compliance with the rules, and so, you know,

4      what follows is part of what I call the safety

5      net where they can rely on advice of counsel such

6      as you guys or accounting firms and so on,

7      because they have the responsibility to spend

8      that money and bring in that safety net of

9      advisors to ensure that they're in compliance.

10           Q.   So firms can spend a lot of money to

11     make sure that they're in compliance with laws

12     and regulations, and your view is that it is

13     custom and practice for them to do so, correct?

14           A.   No, I don't think that was my

15     testimony.   I think what I said was they're

16     responsible for it, and they spend a lot of money

17     because of that.

18           Q.   And would you agree that a regulator

19     should be clear about what conduct amounts to a

20     violation of law?

21           A.   Repeat that again.   It's clear that?

22           Q.   Would you agree that a regulator

23     should be clear about what conduct amounts to a

24     violation of law?

25           A.   You know, as I said before, it's not

1   █████████ - Confidential Pursuant to Protective Order

2   their responsibility.  Now they could be, you

3   know, they could be asked.  They could put out

4   statements regarding the view of the commission,

5   for example.  They could put out, you know,

6   other proposed rule changes, releases where they

7   explain rationale.  So there's a lot of different

8   areas that they could speak to that, but it's not

9   their responsibility to do so, if they choose not

10  to.

11       Q.   So your testimony is that, if a

12  regulator chooses to be unclear about laws and

13  regulations, it's entitled to do so?

14            MR. HANAUER:   Objection, misstates

15       his testimony.

16       A.   Yeah.  No.   I think what it says is

17  that most of the regulators in the securities

18  industry are really good about doing that.  So

19  FINRA, for example, will put out release after

20  release after news release and so on to keep the

21  industry apprised of what is going down.

22            The SEC does that at times as well

23  through different bulletins, through, well,

24  there's different ways that the SEC can

25  communicate, as I said before.  It could be a

1    ██████  - Confidential Pursuant to Protective Order

2    bulletin.   It could be a no action letter.   It

3    could be a rule filing.   It could be an

4    enforcement action.

5              So there's a whole, you know, there's

6    a whole system.   I wouldn't even call it a

7    system, but there's a lot of interaction between

8    the regulator and the securities industry that it

9    regulates in terms of what the expectations are

10   for compliance with certain rules.

11        Q.   Mr.██████, your report discusses

12   the costs associated with initial public

13   offerings or IPOs, correct?

14        A.   Yes.

15        Q.   Do you have any personal or

16   professional experience working on IPOs?

17        A.   I don't.

18        Q.   Have you ever consulted for a company

19   concerning an IPO?

20        A.   I have not.

21        Q.   Have you ever represented a client in

22   connection with an IPO?

23        A.   I have not.

24        Q.   Have you ever been responsible for

25   estimating costs associated with an IPO?

1   ██████ - Confidential Pursuant to Protective Order

2          A.   I have not.

3          Q.   Do you have any other training or

4   experience related to costs associated with IPOs?

5          A.   No.

6          Q.   Okay.  Isn't it the case that some

7   large companies have decided to remain private

8   rather than engaging in an IPO?

9          A.   Yes.

10          Q.   And isn't that because companies

11   don't necessarily need to raise capital through

12   an IPO?

13          A.   Well, I don't know what their

14   individual decisions might be, but I think the

15   one that's most generally used is that IPOs are

16   expensive, and they find ways to try and avoid

17   that expense through different means.

18          Q.   Isn't it the case that companies can

19   also raise money in the private market?

20          A.   Yes.   That's one of them.

21          Q.   What are some other reasons that a

22   company might choose to not engage in an IPO?

23          A.   Well, ironically enough, NASDAQ, when

24   it went public, did not engage in an IPO.   They

25   just went to an exchange listing.   SPACs are

1    ███████ - Confidential Pursuant to Protective Order

2    very popular now, and that's a way of raising

3    capital without going the IPO route, although at

4    some point there will be a registration statement

5    made.

6             So private offerings is probably

7    where the most capital lies, but there are other

8    ways.

9       Q.   Based on your review of the amended

10   complaint and the other materials cited in your

11   report, are you aware that as of today Ripple has

12   not conducted an IPO?

13      A.   Say it again.   I missed the first

14   part.

15      Q.   Sure.   Based on your review of the

16   amended complaint and the other materials cited

17   in your report, are you aware that as of today

18   Ripple has not conducted an IPO?

19      A.   I believe that's true.

20      Q.   Okay.   I'm going to be looking at

21   page 21 of your report.

22      A.   Okay.

23      Q.   So on the bottom of page 1, you say,

24   "had Ripple sought to raise that capital via a

25   traditional IPO rather than" --

1     ██████████ - Confidential Pursuant to Protective Order

2                   MR. HANAUER:   1?  You said 21.

3          A.    Excuse me.  Yeah.

4          Q.    21.  21.   Why don't you read it

5     actually.  That's probably easier.  So the second

6     sentence of the last paragraph starts with

7     "Assuming this."  Do you see that?

8          A.    Yes.

9          Q.    Can you just read that sentence for

10    me, please?

11         A.    "Assuming this figure is accurate and

12    based on the estimation tool available on PWC's

13    website, had Ripple sought to raise that capital

14    via a traditional IPO, rather than selling XRP on

15    an unregistered basis, this could have placed

16    their estimated IPO costs, excluding underwriting

17    fees, the largest component of a traditional

18    IPO's cost, in excess of $10 million."

19         Q.    I just want to make sure I understand

20    what you mean by that sentence.

21         A.    Sure.

22         Q.    Do you mean that, if Ripple had

23    structured its sales of XRP as an IPO rather than

24    selling XRP over time, these XRP -- this

25    XRP-related IPO would have cost Ripple over $10

1   ████████ - Confidential Pursuant to Protective Order

2   million to complete?

3       A.   You know, again, it depends on the

4   facts and circumstances, but, if you look at the

5   beginning of that sentence, I say assuming these

6   estimations are accurate on PWC's website just

7   based on that particular set of tools, that's

8   what it calculated out to be.

9       Q.   And I just want to just look at one

10  particular part of this.  You say, had Ripple

11  sought to raise that capital via a traditional

12  IPO rather than selling XRP on an unregistered

13  basis.

14      A.   Right.

15      Q.   Do you mean that, had Ripple engaged

16  in an IPO with respect to its XRP, or do you

17  mean, had Ripple engaged in a traditional IPO

18  with respect to its -- to equity stock in the

19  company Ripple?

20      A.   No.  That would be XRP.

21      Q.   XRP.  So you're talking about an IPO

22  related to XRP?

23      A.   Yes.

24      Q.   Okay.  Sitting here today, is it your

25  opinion that Ripple did not register its sales of

1     ███████ - Confidential Pursuant to Protective Order

2     XRP as a public offering in order to avoid the

3     costs associated with an IPO?

4          A.   I have no opinion on that.  I don't

5     have the facts.

6          Q.   Okay.  So you're not drawing any

7     opinion either way about why Ripple did not

8     conduct an IPO?

9          A.   I am not.

10          Q.   Okay.  Did you consider any

11     explanations as to why Ripple might have decided

12     to not conduct an IPO?

13          A.   Did I consider?  I'm sorry.  Could

14     you repeat that again.

15          Q.   That's okay.  I'll just retract that

16     question.  Okay.  Mr. ██████, in your report

17     you opine on the registration requirements

18     applicable to both public and private offerings

19     of securities under the securities laws.

20     Correct?

21          A.   Yes.  There's a portion in there.  I

22     don't know if I'm opining about anything in

23     particular.  It's just merely a recounting

24     philosophically of how those work.

25          Q.   So you're talking just at a

1     ███████  - Confidential Pursuant to Protective Order

2     philosophical level about the securities laws?

3                    MR. HANAUER:    Objection, misstates

4          his testimony.

5          A.    Yeah.    General overview.

6          Q.    Okay.

7          A.    Comparing, and I think I say that in

8     the report that it's not meant to be a detailed

9     discussion of what private offering exemption

10    applies where, but contrasting public versus

11    private offering and what's involved.

12         Q.    Okay.    During your career at NASD or

13    NASDAQ, were you responsible for advising

14    companies on how to comply with the registration

15    requirements under the securities laws?

16         A.    Not advising, but certainly involved

17    from the regulatory standpoint.

18         Q.    And were you responsible for advising

19    companies or individuals on which exemptions or

20    safe harbors would apply to their sales or offers

21    of securities?

22         A.    I'm trying to think.    You know, I

23    don't recall any specific instance, but it's not

24    beyond the realm of possibility where a firm

25    would come in, and, you know, seek guidance from

1   ████████ - Confidential Pursuant to Protective Order

2   NASD.  We had our own corporate finance division,

3   and CorpFin may work with that, may have worked

4   with that company to ensure that compliance

5   offering exemption was appropriate.

6            We also policed our member firms, our

7   broker-dealer firms, in terms of whether they

8   complied with private offering exemptions, and so

9   we review things like offering memorandum and

10  those types of things, so, you know, that's my

11  familiarity with it.

12           It's more from the regulatory

13  standpoint as opposed to the business standpoint.

14      Q.   And when you said we at NASD did

15  this, was that part of your role personally?

16      A.   I could be involved, sure, but it was

17  mostly CorpFin, and if there was an issue that

18  they wanted to bring market regulation in on

19  either from a consultant standpoint or refer to

20  us for further inquiry from a regulatory

21  standpoint, then we would get involved.

22      Q.   And, when they brought you in or

23  referred issues to you, what would you be asked

24  to consult on?

25      A.   It would depend again on the

1 ███████ - Confidential Pursuant to Protective Order

2    circumstances or facts, you know.  You know, it

3    could be a number of different things from what's

4    my opinion on something.   I mean the lawyers

5    were forever coming in to me and saying, you

6    know, what do you think of this approach, that

7    approach.

8              So, even though I'm not a lawyer, I

9    at times directed them in certain ways.

10       Q.   And what about specifically with

11    respect to companies' compliance with

12    registration requirements under the securities

13    laws?  What were you brought in to consult on?

14       A.   Well, again, that was mostly our work

15    dealing with unregistered distributions, and, if

16    it was, you know, I had a lot of responsibility

17    and wore a lot of hats, but, you know, if it was

18    a major issue or a major firm or a giant fraud or

19    something, they would bring me in and make sure I

20    was kept apprised of the most visible types of

21    actions that we were working on, and it could

22    involve and often did involve unregistered

23    offerings.

24       Q.   Mr. ███████, do companies typically

25    hire lawyers to determine whether they need to

1      ███████ - Confidential Pursuant to Protective Order

2      register with the SEC in connection with their

3      sales or offers of securities?

4              A.   I don't know if it's typical or not,

5      but it's certainly a resource that's available to

6      them, and, you know, if I was unsure about

7      something, as I've said before, if I was standing

8      in somebody's shoes, I would certainly bring in

9      counsel.

10             Q.   And this is a relatively specialized

11     area of the law, isn't it?

12             A.   Yeah.   I think it's, you know,

13     securities, a firm that, you know, specializes in

14     the securities industry.   Sure.

15             Q.   Are you aware of the credentials of

16     the legal experts who focus on securities

17     registration or exemptions?

18             A.   The credentials?

19                  MR. HANAUER:   And which experts?

20             A.   Yeah.

21             Q.   Of legal experts that are focused on

22     securities registration or exemptions.

23             A.   Not every one.   You know, I'm

24     assuming that they're qualified to offer opinions

25     in the securities area.   I'm sure you guys go

1    █████████ - Confidential Pursuant to Protective Order

2    through different interviewing techniques to see

3    if you're bringing on a securities expert, right?

4          Q.   Mr. ████████, what regulations

5    provide exemptions and safe harbors from

6    registration under the Securities Act or the

7    Exchange Act?

8          A.   What rules or regulations?   I'm

9    sorry.

10          Q.   What regulations provide the

11   exemptions and safe harbors from registration

12   under the Securities Act or the Exchange Act?

13          A.   Well, there's a whole variety of

14   regulations that the commission has put out.

15   You know, it's all in the report.   It's a

16   very -- it can be a very complex area, so I'm not

17   opining on any of those rules or regulations, but

18   you have, you know, Regulation A, Regulation D

19   are the two primary ones.   You have regulation

20   crowd funding.   You have Regulation S, and you

21   can be afforded an exemption without, you know.

22   Those are kind of safe harbor kind of rules, so,

23   if you're within the characteristics or the

24   details of Reg D, it's pretty much sure that

25   you're not engaged in unregistered distribution,

1     ████████ - Confidential Pursuant to Protective Order

2     because you can do a private offering without

3     saying I'm complying with reg D or reg A, but it

4     gives you the comfort or safe harbor that you are

5     in compliance with the exemption.

6          Q.   And, Mr. ████████, you're not

7     providing testimony or an opinion about the

8     applicability of any exemptions or safe harbors

9     from registration in this case?

10         A.   I am not, and I state that I think in

11    my report.

12         Q.   Okay.  Aside from the Section 4

13    exemptions you note in your report, are you aware

14    of any other exemptions from registration under

15    the '33 Act?

16         A.   Not off the top of my head.  I mean

17    there may be one I missed.  I don't remember.

18         Q.   Are you familiar with the exemption

19    provisions in Section 3 of the '33 Act?

20         A.   Not off the top of my head, no.  I

21    would have to look at it.

22         Q.   Okay.  Are you offering an opinion in

23    this case about whether any of Ripple's sales or

24    offers of XRP including its over-the-counter XRP

25    sales would qualify for the private placement

1   ██████  - Confidential Pursuant to Protective Order

2   exemption in Section 4A2?

3          A.   I have no opinion on that.

4          Q.   Okay.  Are you offering an opinion

5   about whether Ripple implemented any holding

6   periods in its over-the-counter contracts to

7   prevent immediate resale to downstream purchasers

8   of XRP?

9          A.   I have no opinion.  No.

10          Q.   Are you offering an opinion as to

11   whether Ripple implemented any other deterrents

12   on immediate resale of XRP?

13          A.   No, I'm not.

14          Q.   Okay.  Are you offering any opinion

15   about whether Brad Garlinghouse or Chris Larsen

16   are or were Ripple affiliates or insiders as

17   defined by the securities laws?

18          A.   I am not.

19          Q.   Are you offering any opinion on

20   whether Ripple placed any rules on insider or

21   affiliate sales of XRP?

22          A.   I am not.

23          Q.   Okay.  Do you want to take a break?

24          A.   A lunch break?   What time do you

25   generally break?

1   ██████████ - Confidential Pursuant to Protective Order

2              MR. HANAUER:   We've been going for

3         about 40 minutes.

4         A.   I'm fine for another ten or 15

5    minutes.

6         Q.   Okay.  Great.

7         A.   Thank you.

8         Q.   Mr. ██████, you state in your

9    report that registration provides for full and

10   fair disclosure to investors that they may have

11   the pertinent -- so that they may have the

12   pertinent facts necessary to make informed

13   decisions.

14              MR. HANAUER:   Are you reading from

15        his report?

16              MS. GRESSEL:   I am.  I can direct

17        you to the page.

18        Q.   So it's page 29.   It's the second

19   bullet in the second set of bullets on page 29.

20   Maybe you could read it out loud for us.

21        A.   The second set of bullets.

22   "Registration provides for full and fair

23   disclosure to investors in order that they may

24   have the pertinent facts necessary to make

25   informed investment decisions."

1   ▮▮▮▮ - Confidential Pursuant to Protective Order

2          Q.   Isn't it accurate that the relevant

3   legal standard for what information must be

4   publicly disclosed by registrants is materiality?

5               MR. HANAUER:   Objection to form.

6          A.   Say it again.  I want to make sure I

7   answer you properly.

8          Q.   Let me start slightly differently.

9          A.   Okay.

10         Q.   Are you familiar with the materiality

11  standard for public disclosures under the

12  securities laws?

13         A.   Yes.

14         Q.   And how did you become familiar with

15  that materiality standard?

16         A.   I think we testified, I testified

17  earlier as to what constituted materiality in the

18  NASDAQ world and my familiarity with it.   There

19  are actually specific rules relating to

20  disclosure in the IPO world.   Form S1,

21  regulation S-K I believe and S-X.

22               So, you know, whether that gets to,

23  there can be those disclosures, but there can be

24  other disclosures, for example, where CorpFin

25  when they review an offering prior to its

1   ████████ - Confidential Pursuant to Protective Order

2   becoming effective will work with the company to

3   clean up disclosure or make them make other

4   disclosures based on the facts and circumstances.

5   So hopefully that answers your question.

6        Q.   And so the facts and circumstances

7   are very important in determining what is

8   material, correct?

9        A.   I would say so, yes.

10       Q.   And you cite, we talked earlier about

11  the Supreme Court case you cite on page 15 of

12  your report, which provides that legal standard

13  for materiality, correct?

14       A.   Yes.

15       Q.   Why don't you read what you have in

16  that parenthetical on page 15 in the footnote.

17       A.   Okay.   "Information is material if

18  there is a substantial likelihood that a

19  reasonable shareholder would consider it

20  important in making an investment decision.   To

21  fulfill the materiality requirement, there must

22  be a substantial likelihood that a fact would

23  have been viewed by the reasonable investor as

24  having significantly altered the total mix of

25  information made available."

1  ███████ - Confidential Pursuant to Protective Order

2       Q.   So we can agree based on this Supreme

3  Court standard you quoted it's important to look

4  at the total mix of information available to a

5  reasonable investor to determine what is

6  material?

7       A.   I think that's right.

8       Q.   Okay, and undertaking the analysis

9  for your report, what steps, if any, did you take

10  to determine the total mix of information

11  available to potential XRP purchasers?

12       A.   You know, just say it one more time.

13       Q.   In undertaking the analysis for your

14  report, what steps, if any, did you take to

15  determine the total mix of information available

16  to potential XRP purchasers?

17       A.   None.

18       Q.   None.  Why not?

19       A.   Well, it's not the purpose of my

20  report.  I don't have an opinion on that, nor am

21  I offering an opinion.

22       Q.   So you didn't view it as part of your

23  assignment?

24       A.   Right.

25       Q.   Okay.  So, sitting here today, you

1    ███████ - Confidential Pursuant to Protective Order

2    have not done research into the total mix of

3    information concerning either XRP or Ripple

4    that's publicly available to potential XRP

5    purchasers?

6         A.   Not totally.  I have looked at some

7    of their marketing reports that are available

8    online.  I don't know if that is what you're

9    talking about.

10        Q.   Do you recall which market reports

11   you looked at?

12        A.   I believe it was several years ago.

13        Q.   And what information did you look at

14   in those market reports?

15        A.   Just how they were reporting their

16   sales of XRP and some of the other information

17   that was available on there like I think there

18   were trending prices and had other disclosures

19   regarding what was happening at the company and

20   so on.

21        Q.   And did those, your review of those

22   XRP market reports inform your opinion about what

23   information would be material about Ripple or

24   XRP?

25        A.   No, it did not.

1   ████████ - Confidential Pursuant to Protective Order

2          Q.    It did not.  Sitting here today, are

3   you offering an opinion about what information

4   would be material to purchasers of XRP under the

5   standard we discussed from the Supreme Court and

6   relevant SEC regulations?

7          A.    Well, I think that, if this is what

8   you're asking me, I think we have to go back to

9   the presumption that drives everything else is

10  that this is based on an assumption that XRP

11  would have registered, right?  So the material

12  disclosures, some of which I list, you know, on

13  page 29, so.

14         Q.    So, sitting here today, you are

15  offering the opinion that the disclosures you

16  list on page 29 would be material to purchasers

17  of XRP under the legal standard set forth by the

18  Supreme Court and relevant SEC regulations?

19         A.    I would say it would be important to

20  investors to know that.  Yes.

21         Q.    In your mind, is there a difference?

22         A.    I think I wouldn't have put them in

23  here unless they were material in my view.

24         Q.    Okay.  So your opinion is that that

25  list of disclosures on page 29 would be material

Page 117

```
 1   ████████  - Confidential Pursuant to Protective Order
 2   to purchasers of XRP?
 3           A.   Right.   As I said in the report, the
 4   list is by no means exhaustive or, you know,
 5   cherry-picked for whatever reason.
 6           Q.   Okay.   Do you understand the
 7   question of what is material information under
 8   the securities laws to be a legal issue?
 9           A.   Certainly when I was making those
10   determinations at NASD, I don't recall, it may
11   have been one or two occasions where I consult my
12   counsel before I made a determination on issuing
13   a trading halt, and so again I was making the
14   calls on materiality based on facts and
15   circumstances, and, you know, I think generally
16   somebody can figure out on their own what's
17   important, what's not important.
18           Q.   Do companies normally consult lawyers
19   on what's considered sufficiently material that
20   it should be disclosed in the company's SEC
21   filings?
22           A.   I would say that would be typical.
23   Yeah.
24           Q.   Mr. ████████, let's take a closer
25   look at that list you have on page 29.   So you
```

1    ███████ - Confidential Pursuant to Protective Order

2    conclude your report on page 29 with a statement

3    -- well, it's above the title Conclusion.   Why

4    don't you read that statement to us, that last

5    paragraph right above the conclusion header?

6              A.   "Without the benefit"?

7              Q.   Um-hum.

8              A.   "Without the benefit of registration

9    and further periodic and current reporting,

10   investors were deprived of what I believe were

11   important disclosures, which could have shone

12   substantial light on the nature of XRP, Ripple

13   and Ripple's key employees."

14             Q.   Did you write that sentence?

15             A.   I did.

16             Q.   What's your basis for your statement

17   that XRP purchasers were deprived of what you

18   believe were important disclosures concerning

19   XRP, Ripple or Ripple's employees?

20             A.   Okay.   Again let's go back to the

21   presumption, right?   The presumption is, if they

22   were required to register, then these would be

23   important disclosures to investors.

24             Q.   And what's your basis for concluding

25   that they would be important disclosures to

1    ███████  - Confidential Pursuant to Protective Order

2    investors?

3              A.   Again, my own personal experience in

4    dealing with thousands of material disclosures

5    over the years as well as the standards that we

6    employed at NASDAQ, the Supreme Court decision,

7    which I cited.  So the concept of materiality is

8    one that's pretty well generally accepted

9    throughout the industry.

10             Q.   Did you do any research concerning

11   what information was actually provided to

12   purchasers of XRP other than looking at those XRP

13   market reports we talked about earlier?

14             A.   I did not.

15             Q.   Okay.  You state on page, let's turn

16   back to page 28, just back one page.

17             A.   Um-hum.

18             Q.   So I'm looking at the second to last

19   paragraph, the last sentence in that that starts

20   "Without periodic."

21             A.   Oh, in the middle of the paragraph.

22             Q.   Can you read Starting from "Without

23   periodic" to the end of that paragraph.

24             A.   "Without periodic reporting, as

25   Ripple continued to offer and sell, XRP investors

1   ███████ - Confidential Pursuant to Protective Order

2       would not be alerted to the ongoing status of the

3       enterprise, the company's financial statements,

4       MD&A, recent sales of securities, insider

5       transactions and new products or services."

6           Q.   What was your basis for that

7       statement?

8           A.   Okay.   Again, we go back to the

9       presumption that, if they were registered, these

10      are the important disclosures that would flow

11      from that registration process, so, as I say in

12      the sentence before that, which I didn't read, is

13      that the prospectus and registration statement

14      would be the customary way for the investing

15      public to learn about Ripple, for example, if in

16      fact they had registered as a security.

17          Q.   So is it correct, is it generally

18      correct that you view those disclosures in that

19      last sentence you read as being typical of what

20      is generally in a prospectus or registration

21      statement?

22          A.   Yes.

23          Q.   Okay.   Did you conduct any research

24      into what information was publicly available to

25      XRP purchasers concerning Ripple's enterprise?

```
 1  ███████████ - Confidential Pursuant to Protective Order

 2          A.   No, I did not, other than those

 3   market reports that I mentioned.

 4          Q.   Did you conduct any research into

 5   what information was publicly available to XRP

 6   purchasers concerning Ripple sales of equity

 7   stock?

 8          A.   No.

 9          Q.   Did you conduct any research into

10   what information was publicly available to XRP

11   purchasers concerning Ripple sales of XRP?

12          A.   Just the market reports which I think

13   report sales.

14          Q.   Did you conduct any research into

15   what information was publicly --

16              MR. HANAUER:   Anna, do you mind

17          slowing down a little bit?

18              MS. GRESSEL:   I do not mind.

19          Q.   So I'll just let me start that one

20   again.   Did you conduct any research into what

21   information was publicly available to XRP

22   purchasers concerning sales of XRP by Brad

23   Garlinghouse?

24          A.   No.

25          Q.   Did you conduct any research into
```

1    ███████ - Confidential Pursuant to Protective Order

2    what information was publicly available to XRP

3    purchasers concerning sales of XRP by Chris

4    Larsen?

5         A.    No.

6         Q.    Okay.   Did you conduct any research

7    into what information was publicly available to

8    XRP purchasers concerning Ripple's products or

9    services?

10        A.    No, other than those market reports

11   again.

12        Q.    Okay.   Now let's go back to 29 to

13   the bullets you have there.   Mr. ████████, in

14   order to determine what specific disclosure

15   obligations apply to a sale or offer of

16   securities, isn't it important first to determine

17   which disclosure obligations are -- let me take

18   that question back.

19             In order to determine what disclosure

20   obligations apply to a sale or offer of

21   securities, isn't it important first to determine

22   what type of offer or sale of securities is at

23   issue?

24        A.    I'm not understanding the question.

25        Q.    So let me just take an example.   An

1      ███████ - Confidential Pursuant to Protective Order

2      IPO contains different disclosure requirements

3      than other public or private offerings of

4      securities, correct?

5            A.   It may or may not.   I mean I've seen

6      some private offering memorandums that are as

7      detailed as any prospectus you want to see.

8            Q.   Are you providing an opinion in this

9      case about which registration requirements apply

10     to Ripple sales or offers of XRP?

11           A.   I think the theme, and it may be

12     stated somewhere, is that it's the IPO.  So it

13     would be full registration.

14           Q.   So your view is, if Ripple were

15     required to register its sales or offerings as a

16     security, it would be required to do so as an

17     IPO?

18           A.   No.   That's not what I'm saying.

19     I'm saying that the context of the report is,

20     assuming that Ripple registered as an IPO, this

21     is what would fall.  Okay.  I'm not saying Ripple

22     should have done a private placement or should

23     have done an IPO or anything.

24           Q.   And there are other frameworks for

25     disclosure that could apply other than an IPO,

1      ███████   - Confidential Pursuant to Protective Order

2      correct?

3               A.   For example, what?

4                    (Discussion off the record between

5               witness and counsel)

6               Q.   For example, Section 12G of the

7      Exchange Act.

8               A.   Right.

9               Q.   Okay.

10              A.   So, when I say IPO as I said before,

11     I think it's in the report, it is registration

12     generally, you know.  Those terms are

13     interchangeable, but it relates to the

14     registration process, and, yes, they could avail

15     themselves of other methods of going public or

16     you know.  The thing is, though, even with the

17     series of Section 12, that triggers other

18     reporting down the road.

19              Q.   But the disclosure requirements are

20     different under Section 12G than they would be

21     for an IPO, correct?

22              A.   I'd have to look at more information

23     on that.  I can't answer honestly off the top of

24     my head.

25              Q.   Okay.  So I just want to go back to

Page 125

1   ██████████ - Confidential Pursuant to Protective Order

2   these bullets.   You mentioned that you -- I

3   don't want to characterize your testimony.

4           MR. HANAUER:   What page are we on,

5       Counsel?

6           Q.   The top of 29.   The top set of

7   bullets in 29.   Is it your opinion that these

8   bullets are typical of the information that would

9   be required to be disclosed on a Form S1

10  registration statement with respect to an IPO?

11          A.   If the facts and circumstances are

12  similar, sure.

13          Q.   Similar to what?

14          A.   Similar to other things that, you

15  know, similar to what the company is doing.   You

16  know, so, if you look at an S1, for example, you

17  will see a lot of these things, you'll see

18  insider sales, you'll see whether the lockup

19  periods or dilution factors are in there, how

20  insiders are compensated, so these are general,

21  the use of proceeds, so these are general

22  disclosures that are made in a typical

23  prospectus.

24          Q.   The second to last of these bullets

25  references "Ripple's use of promotions,

Page 126

1    ████████ - Confidential Pursuant to Protective Order

2    incentives and payments to Ripple's customers and

3    third parties in developing its products and uses

4    for XRP."   Do you see that, the second to last

5    of the bullets?

6            A.   Yes.

7            Q.   Is it your opinion that incentives

8    and payments to a company's customers and third

9    parties in developing products is information

10   required to be disclosed in a company's public

11   SEC filings?

12           MR. HANAUER:   Objection to form.

13           A.   Again, I'll fall back on facts and

14   circumstances.   I'd have to look at the

15   individual facts.   You know, certainly I have

16   seen these disclosures many times as I said

17   before in a prospectus.   It goes to the nature

18   of the market for the securities, for example.

19   It goes to the dilution factor.   It goes to how

20   vendors are being compensated, which I think is

21   an important disclosure.   So it pretty much is

22   pretty standard.

23           Q.   Maybe I'll ask that a different way.

24   Is information concerning incentives and payments

25   to a company's customers and third parties in

1   ██████████ - Confidential Pursuant to Protective Order

2   developing products typically called for in a

3   form S1?

4           A.   It can be called for depending on

5   what the circumstances are.  Yes.

6           Q.   And, when you say depending on what

7   the circumstances are, do you mean depending on

8   whether that information is material?

9           A.   Yeah.

10          Q.   Okay.  Are you drawing a conclusion,

11  perhaps you testified to this earlier, but are

12  you drawing a conclusion that each of these

13  bullets on the top of 29 would be material to XRP

14  purchasers?

15          A.   Should it have been registered, I

16  think these disclosures in my opinion should have

17  been in there, sure.

18          Q.   And what is your basis?

19          A.   As I said before, my basis is that

20  these are typically seen in, you know, S1's, and

21  I'm not familiar enough, you know, it has been a

22  while since I looked at regulation S-K and S-X,

23  for example, which detailed the disclosures, but

24  certainly where an issue rises to, as you

25  suggested, to the level of materiality that's

1   ▮▮▮▮▮ - Confidential Pursuant to Protective Order

2   involved based on the particular facts and

3   circumstances of that individual company, then,

4   you know, it should be disclosed, and that

5   determination can be made by the company, through

6   its counsel, through conversations with CorpFin

7   at the SEC.

8          So it's not -- I wouldn't say it's an

9   automatic thing, but certainly I have seen it

10  many, many times in different offerings or

11  prospectuses.

12       Q.   And did you undertake any research

13  concerning the facts and circumstances specific

14  to Ripple or XRP?

15       A.   I did not.

16       Q.   You did not, so have you ever spoken

17  to a purchaser of XRP?

18       A.   I have not.

19       Q.   Have you ever reviewed any material

20  reflective of the views and opinions of

21  purchasers of XRP?

22       A.   I have not.

23       Q.   Have you ever reviewed any material

24  reflecting the views of purchasers of digital

25  assets more generally?

1     ███████ - Confidential Pursuant to Protective Order

2              MR. HANAUER:   Beyond what is cited

3          in his report?

4          Q.   Beyond what is cited in your report.

5          A.   I have not.

6          Q.   In your opinion, would the same

7     information be material for a purchaser of

8     Bitcoin as for a purchaser of XRP?

9              MR. HANAUER:   Objection to form.

10         A.   I have no opinion on that.

11         Q.   Okay.

12         A.   I do have an opinion regarding a

13    break, though, if you don't mind, either a break

14    or break for lunch or however you want to handle

15    it.

16             MS. GRESSEL:   Yep.   Let's go off

17         the record and take at least a ten-minute

18         break.

19             THE VIDEOGRAPHER:   We are going off

20         the record.   The time is 12:10 p.m.

21             (Recess taken:   12:10 p.m.)

22             THE VIDEOGRAPHER:   We are back on

23         the record.   The time is 12:24 p.m.

24    BY MS. GRESSEL:

25         Q.   Mr. ███████, have you ever heard the

1      ████████  - Confidential Pursuant to Protective Order

2      term "XRP ledger"?

3              A.   Yes.

4              Q.   What is your understanding of what

5      that term means?

6              A.   Well, again, I'm not an expert in

7      cryptocurrency, but I believe that is, correct me

8      if I'm wrong, that is the block chain component

9      of what they do maybe.

10             Q.   So, if I said the XRP ledger is the

11     underlying block chain to which the digital asset

12     XRP is native, would you understand what that

13     was?

14             A.   I think that's what I said, yeah.

15             Q.   Okay.  Do you know what information

16     is publicly recorded on the XRP ledger?

17             A.   No, I don't.   Not specifically.

18             Q.   Are you aware that the XRP ledger

19     publicly records information concerning addresses

20     in digital wallets that transact on the XRP

21     ledger?

22             A.   I'm not aware of that, no.

23             Q.   Are you aware that the XRP ledger

24     publicly records information concerning balances

25     of those digital wallets?

1   ▮▮▮▮▮▮ - Confidential Pursuant to Protective Order

2         A.   I'm not aware of that either.

3         Q.   Are you aware that the XRP ledger

4   publicly records information concerning the

5   transaction history related to digital wallets?

6         A.   No.

7         Q.   Are you aware that as publicly

8   recorded information on the XRP ledger this

9   information is actually available to the public

10  on websites like XRPscan.com?

11        A.   I'm not aware of that.

12        Q.   Have you ever visited the website

13  XRPscan.com?

14        A.   No.

15        Q.   Are you aware that certain

16  individuals analyze the XRP ledger to determine

17  what sales of XRP or other assets are being

18  recorded on the ledger?

19        A.   Not specifically, no.

20        Q.   Are you aware that individuals

21  analyze the XRP ledger to determine who may be

22  engaging in transactions of XRP?

23        A.   I'm not aware of that, no.

24        Q.   Okay.  Are you aware that certain

25  information regarding sales by Ripple's founders

1    ████████ - Confidential Pursuant to Protective Order

2    is publicly available by virtue of being recorded

3    on the XRP ledger?

4         A.   I'm not aware of that.

5         Q.   Okay.  Mr. ████████, your report

6    states that section 2A1 of the Securities Act

7    provides the definition of a security, which

8    includes the concept of an investment contract,

9    is that correct?

10        A.   Yes.

11        Q.   Okay, and whether or not something

12   qualifies as an investment contract under this

13   definition is a legal conclusion, correct?

14             MR. HANAUER:   Objection to form.

15        A.   I'll go to my prior answer earlier

16   on, and that's ultimately it could be determined

17   in a legal conclusion, but, you know, there are

18   steps, or there could be some recognition either

19   through compliance or counsel or whatever that

20   possibly we could be dealing with an investment

21   contract here without the legal conclusion.

22             So, again, it's what I testified this

23   morning, kind of grades with the legal conclusion

24   being the ultimate determination.

25        Q.   And your report states the term

```
1    ███████   - Confidential Pursuant to Protective Order

2    "investment contract" is purposefully broad.   Is

3    that statement accurate?

4         A.   Yeah.   That's very accurate, and,

5    you know, as an aside, and I don't mean to get,

6    put my professor hat on again, but that's the

7    purpose of this report.

8              So, you know, Congress in its wisdom

9    crafted two very important areas to be as broad

10   as possible.   One is the investment contract

11   concept, which I thought was brilliant in the

12   definition section, and, as you know, 10(b)5 is a

13   fraud statute, and that's purposefully broad,

14   because there is all kinds, there's flexibility

15   needed for all kinds of new and innovative

16   products and services and activities and actions

17   and everything else that comes down the road, so

18   that it can be encompassed in either the

19   investment contract definition or in the

20   anti-fraud provision, so there are certain ones

21   that are purposefully broad to take that into

22   consideration.

23        Q.   What sources would someone in the

24   securities field look to as authoritatively

25   answering the question of whether a statutory
```

1   ███████ - Confidential Pursuant to Protective Order

2   term such as investment contract is broad or

3   narrow?

4        A.   You know, I guess they can ask their

5   counsel or, you know, again, I go back to the

6   safety net where, if these questions come up,

7   there's a bunch of people you can ask including

8   the SEC.

9        Q.   And are there court cases

10  interpreting whether terms like investment

11  contract are broad or narrow?

12       A.   Whether they're broad or narrow, I

13  think there are some language which points to the

14  fact that investment contract is purposefully

15  broad.  I can't cite the exact, you know, legal

16  decision, but I think that's mentioned in a

17  couple of decisions or footnoted at least that

18  I've seen.

19       Q.   And, if lawyers had a dispute about

20  whether a term like investment contract from a

21  statute is broad or narrow, is that something

22  that a court might be asked to weigh in on?

23       A.   Depending on facts and circumstances,

24  sure.

25       Q.   Okay.  Do you have any expertise in

1    ███████ - Confidential Pursuant to Protective Order

2    determining whether an asset or financial

3    instrument is an investment contract?

4         A.    That what kind of financial

5    instrument?

6         Q.    An asset or a financial instrument is

7    an investment contract.

8         A.    Specifically, no, but I do have, you

9    know, the principles that have been, you know,

10   put forth in Howey, for example, which is the

11   industry guiding principle in that space.

12        Q.    So you look to guiding principles

13   from Supreme Court cases?

14        A.    Sure.

15        Q.    And you're not a lawyer, right?

16        A.    No.

17        Q.    Okay.   If a company wants to

18   determine whether their assets or financial

19   instruments are investment contracts, they

20   generally hire lawyers to provide them with legal

21   advice on this question, right?

22        A.    They could, sure.

23        Q.    And those lawyers would consult legal

24   sources like statutes, regulations and case law,

25   right?

1     ███████ - Confidential Pursuant to Protective Order

2            A.   I presume so, sure.

3            Q.   Are you aware of whether Ripple hired

4     lawyers to provide them with advice on whether

5     XRP might be considered an investment contract?

6            A.   I believe there's a portion, and

7     again I feel bad because it has been a while

8     since I read the complaint, but I think there is

9     a portion in the complaint where it said that

10    they had consults with attorneys regarding that

11    question.   Yes.

12           Q.   Did you review any of the legal memos

13    concerning XRP in connection with your work on

14    this case?

15           A.   I did not.

16           Q.   Okay, and your report states you

17    received a copy of the answer to the amended

18    complaint in the course of preparing your report,

19    correct?

20           A.   I did.

21           Q.   Did you read that document?

22           A.   I did a while ago.   Um-hum.

23           Q.   Okay, and it's included in the list

24    of materials reviewed in Appendix A to your

25    report, correct?

```
 1  ███████████ - Confidential Pursuant to Protective Order

 2          A.    Say it again.

 3          Q.    It's included in the list of

 4  materials reviewed in Appendix A to your report?

 5          A.    Yes.  I'm sorry.

 6          Q.    I would like to show you what has

 7  been marked as Exhibit JC 3.

 8                (Defendant Exhibit JC 3, Amended

 9          complaint, was so marked for

10          identification, as of this date.)

11          Q.    Please turn to paragraph 53 of the

12  answer to the amended complaint.  I will give

13  you a moment to get to paragraph 53.

14                Did you find it?

15          A.    Yes.

16          Q.    Could you please read out loud the

17  first two sentences of that paragraph?

18          A.    "Ripple denies the allegations in

19  paragraph 53, which selectively quote and

20  mischaracterize portions of a legal memorandum

21  dated February 8, 2012 from a law firm that was

22  addressed to co-founder and another individual

23  and a second legal memorandum dated October 19,

24  2012 from the same law firm that was addressed to

25  Mr. Larsen, co-founder, and OpenCoin."
```

1      ████████ - Confidential Pursuant to Protective Order

2              Next one?   "Ripple avers that any

3      reasonable reader of the true and accurate

4      contents of the memorandum dated October 19, 2012

5      would understand that counsel's ultimate

6      conclusion was that Ripple Credits as described

7      did not constitute securities under the federal

8      securities laws.   The documents speak for

9      themselves, and Ripple respectfully refers the

10     Court to the full text of the documents for an

11     accurate and complete record of their contents."

12         Q.   Mr. ████████, do you recall reading

13     this paragraph in your review of the answer to

14     the amended complaint?

15         A.   Not specifically, but I've read it.

16         Q.   Do you know what Ripple Credits are?

17         A.   No.

18         Q.   Is it correct that the answer to the

19     amended complaint states that Ripple's founders

20     received legal advice as early as 2012 with the

21     ultimate conclusion XRP did not constitute

22     securities under the federal securities laws?

23              MR. HANAUER:   Objection.  Ripple's

24              answer speaks for itself.

25         A.   I mean that's what it says, so I'm

Page 139

1    ███████ - Confidential Pursuant to Protective Order

2    assuming that's correct.

3            Q.   Okay.  You understand that whether or

4    not Ripple sales or offers of XRP constituted an

5    investment contract is a legal issue in this

6    litigation?

7            A.   I think that's right.

8            Q.   And that's why you're not providing

9    an opinion today on whether Ripple sales or

10   offers of XRP constituted an investment contract,

11   right?

12           A.   That's right.  It's not my role.

13           Q.   And you understand the question of

14   whether XRP the token itself is an investment

15   contract is a legal question in this litigation,

16   right?

17           A.   In this litigation, yes.

18           Q.   And that's why you're not providing

19   an opinion today on whether XRP is an investment

20   contract, correct?

21           A.   That's right.

22           Q.   Okay.  In your report, you mention

23   the Supreme Court case SEC versus W.J. Howey,

24   right?

25           A.   Yes.

Page 140

1    ████████ - Confidential Pursuant to Protective Order

2          Q.   Are you offering an opinion on how

3    Howey applies to the facts of this case?

4          A.   No.

5          Q.   Okay.  You have stated the SEC has

6    brought 75 or more enforcement actions related to

7    digital assets by the end of 2012, right?  Oh.

8    2020.

9          A.   Yeah.  No.  That was in the context

10   of a report that I footnote in my report.  A

11   Cornerstone report.  That wasn't me.

12         Q.   Did you read the Cornerstone report

13   in preparing your report?

14         A.   I glanced through it.  Yeah.

15         Q.   Okay.  Were you personally involved

16   in any of those enforcement actions brought by

17   the SEC?

18         A.   I was not.

19         Q.   What have you done in connection with

20   your assignment in this case to review those

21   enforcement actions?

22         A.   I have reviewed some of the

23   enforcement actions, not all of them.  Kick

24   Interactive rings a bell.  There was one more

25   that I don't recall offhand.  Kick was the

1   ████████ - Confidential Pursuant to Protective Order

2   primary one.

3       Q.   Okay.   So you read the Kick

4   Interactive case, and your testimony is

5   potentially one other enforcement action.

6           Did you read any other enforcement

7   actions or just those two?

8           MR. HANAUER:   Objection to form.

9       Are you still talking about the

10      Cornerstone report?

11      Q.   Yes, of the 75 enforcement actions

12  cited in that report that you referred to.

13      A.   No.   I believe those were the only

14  ones.   I think they're in there.   I did read

15  the SEC litigation release regarding the first

16  one, which was the Ponzi scheme, and I forget the

17  name of the case, but I didn't read the

18  complaint.   I read the summary of the SEC.

19      Q.   The SEC's first enforcement action

20  regarding digital assets, is that correct?

21      A.   That's correct.

22      Q.   Okay.   How did you select which of

23  those enforcement actions to review?

24      A.   I had no specific reason to do that.

25  I think in my overall research I picked that up

1    ████████ - Confidential Pursuant to Protective Order

2    somewhere in a footnote or whatever.   As a

3    matter of fact, I think I read Kick prior to my

4    retention at the SEC as background for they were

5    interviewing me as a potential expert, so I

6    wanted to bone up on what was involved.

7         Q.   So you had previously -- you read

8    Kick prior to your engagement on this matter, and

9    then, in the course of reading the Cornerstone

10   report, you selected one other case to read?

11        A.   Yeah, just to see what was going on,

12   right.

13        Q.   Okay.  Are you aware of how many of

14   those 75 enforcement actions involved a

15   determination that a digital asset is an

16   investment contract under Howey?

17        A.   Not specifically, no.

18        Q.   Okay.  Do you have a rough estimate

19   of how many?

20             MR. HANAUER:   Objection.  A

21             determination by who?

22        Q.   A legal determination that a digital

23   asset is an investment contract.

24             MR. HANAUER:   Same objection.  By

25             who?

1  ███████ - Confidential Pursuant to Protective Order

2       Q.   Are you aware -- I'll just rephrase

3  the question.   How many of those 75 enforcement

4  actions involved a finding in the order that a

5  digital asset was an investment contract under

6  Howey?

7            MR. HANAUER:   Objection to form.

8       What order?

9       Q.   In the administrative order filed as

10 part of the settlement.

11           MR. HANAUER:   Again, objection to

12      form.

13      Q.   In the administrative order filed as

14 part of the settlement with the SEC.

15           MR. HANAUER:   Are you talking about

16      all 75 actions?

17           MS. GRESSEL:   Yes.

18      Q.   Within the universe of all those 75

19 actions, how many involved a determination that a

20 digital asset is an investment contract or an

21 allegation by the SEC?

22      A.   I don't know.

23      Q.   Okay.   So, to avoid a similar

24 objection, I'm just going to tell you, I'm still

25 talking about the 75 enforcement actions, and I'm

1    ████████ - Confidential Pursuant to Protective Order

2    still talking about allegations.   So just up

3    front or findings.

4              So how many of those 75 enforcement

5    actions had findings or allegations that focused

6    on initial coin offerings or ICOs?

7         A.   I don't know.

8         Q.   Okay.  Isn't it the case that --

9    well, Mr. ████████, do you recall whether the

10   Cornerstone report spoke to that question?

11        A.   Whether there was a determination by

12   somebody about a security for a digital asset?

13        Q.   Did the Cornerstone report in your

14   recollection speak to how many of those 75

15   enforcement actions had allegations or findings

16   focused on initial coin offerings or ICOs?

17        A.   I don't have a specific recollection,

18   but I think there was a breakdown, I don't know

19   if it was by date or subject matter, there was a

20   breakdown that was in there.   I mean, you know,

21   and again I go back to the purpose of my report

22   was not to read all those cases.   It was that

23   the only point is that the SEC was active in the

24   enforcement area.

25        Q.   Mr. ████████, what is your

1   ███████  - Confidential Pursuant to Protective Order

2   understanding of the term "initial coin

3   offering"?

4          A.   An ICO?

5          Q.   Um-hum.

6          A.   Again, it may not be the correct one,

7   but, you know, it's a, and, again, you probably

8   know better than I do, correct me if I'm wrong,

9   it's an initial coin offering, so it's a sale of

10  a digital asset or a coin by somebody.

11         Q.   Isn't it the case that ICO -- that

12  enforcement actions focused on allegations or

13  findings regarding ICOs would not provide

14  guidance to individuals that are not engaged in

15  ICOs, but seek instead to determine whether a

16  digital asset is a security?

17              MR. HANAUER:   Objection to form.

18         A.   I'm not aware.   You know, again, I

19  don't have an opinion on that.

20         Q.   Mr. ███████, isn't it the case that,

21  when people look at enforcement actions to seek

22  guidance from them, they generally focus on

23  enforcement actions with similar facts and

24  circumstances?

25         A.   They can.   Sure.

1      ████████  - Confidential Pursuant to Protective Order

2          Q.   Okay, and, if the facts and

3      circumstances are very different, is it the case

4      that they would provide less guidance?

5          A.   If it was not applicable to their

6      particular facts and circumstances, sure.

7          Q.   Okay.  Again, we're going back to

8      the Cornerstone report.

9          A.   Um-hum.

10         Q.   Do you recall how many of those 75

11     enforcement actions had findings or orders,

12     findings or allegations involving fraud?

13         A.   Almost certainly the Ponzi scheme one

14     did, but that's the only one that I know of.

15         Q.   So you don't know either way?

16         A.   No.  I mean, like I said, I didn't

17     look at all 75.

18             MR. HANAUER:   Counsel, is this a

19             memory test?  Do you want to just put the

20             report in front of him and see what it

21             says?

22             MS. GRESSEL:   No, I'm okay, I think.

23             MR. HANAUER:   Okay.

24         Q.   Mr. ████████ isn't it the case that

25     enforcement actions involving fraud allegations

1      ███████ - Confidential Pursuant to Protective Order

2      would not necessarily provide guidance in cases

3      that don't involve allegations of fraud?

4                MR. HANAUER:   Objection to form.

5           A.   You know, I don't know.   They could.

6      They couldn't.   Again, it's a hypothetical that

7      I really can't answer.

8           Q.   Mr. ███████, of those 75 enforcement

9      actions, are you aware of how many were resolved

10     through settlements?

11          A.   No.   It may have been one of those

12     breakdowns I talked about, but, again, I'm going

13     from memory now, which is not too good.

14          Q.   Is it your view that settlements

15     provide the same type of binding precedent as

16     court opinions?

17          A.   They can.   Sure.

18          Q.   Isn't it the case that settlements

19     only reflect what an alleged securities violator

20     agreed constituted a violation of the securities

21     laws?

22          A.   Say it again, please.

23          Q.   Isn't it the case that settlements

24     only reflect what an alleged securities law

25     violator agreed constituted a violation of the

1    ████████  - Confidential Pursuant to Protective Order

2    securities laws?

3                    MR. HANAUER:   Objection to form.

4            A.   Certainly you could say that, but

5    I've seen SEC pronouncements that or releases

6    that show that an offer of settlement has been

7    accepted and provides specific rationale, well,

8    actually they'll describe the conduct and say the

9    specific rationale that they're accepting, why

10   they're accepting the settlement, what was

11   involved.

12                   So it depends on how detailed the

13   decision is.   I've seen some very detailed ones.

14           Q.   But it's the case that those

15   settlements don't necessarily reflect what an

16   independent factfinder determined to have been

17   the facts at issue in the case, correct?

18           A.   Well, as you stated earlier, it's a

19   settled case.  So the parties are agreeing on

20   what the facts are and for whatever reason

21   agreeing to accept whatever SEC sanctions or

22   conclusions or censures are involved, so I don't

23   know.   I can't offer an opinion on an

24   independent factfinder.

25           Q.   Okay.  Is it your opinion that the

1   ████████ - Confidential Pursuant to Protective Order

2   SEC's prior enforcement actions provide guidance

3   to the market about whether a digital asset that

4   was not the subject of those actions should be

5   considered an investment contract?

6         A.   I'm not following.  I don't even know

7   if there is such a thing.

8         Q.   Is such a thing as what?

9         A.   As a decision that points to.  You

10  had better read it again.

11        Q.   Okay.  Is it your opinion that the

12  SEC's prior actions, prior enforcement actions,

13  provide guidance to the market about whether a

14  digital asset that was not the subject of that

15  action or those actions should be considered an

16  investment contract?

17        A.   But how would they do that?  Through

18  an aside or if it's not the subject of the

19  action, why would they reference another asset?

20  I'm not following.

21        Q.   Are you offering an opinion on how

22  many of the SEC's prior enforcement actions

23  involved facts, circumstances or transactions

24  similar to Ripple and XRP?

25        A.   No.

1    ███████ - Confidential Pursuant to Protective Order

2         Q.   Are you aware of the ways in which

3    the SEC versus Ripple litigation differs

4    significantly from the SEC's prior enforcement

5    actions?

6         A.   I'm not aware of any.  No.

7         Q.   Okay.  So you have not analyzed the

8    differences between the SEC's prior enforcement

9    actions and this litigation?

10             MR. HANAUER:   Objection.   What SEC

11        enforcement actions?

12        Q.   Sorry.   Sitting here today, Mr.

13   ████████, you have not analyzed the differences

14   between the SEC's 75 prior enforcement actions

15   cited in the Cornerstone report and this SEC

16   versus Ripple litigation, correct?

17        A.   That's right.

18        Q.   Alright.  You mentioned you're

19   familiar with the Kick case.   Are you offering

20   an opinion today on how the SEC versus Ripple

21   litigation is similar to or different from the

22   Kick case?

23        A.   I'm not.

24             MS. GRESSEL:   Okay.  Do you want to

25        break for lunch now?

1 ███████ – Confidential Pursuant to Protective Order

2        THE WITNESS:   Yeah.   That would be

3 terrific.

4        MS. GRESSEL:   Alright.   Great.

5        THE VIDEOGRAPHER:   We are going off

6 the record.   The time is 12:48 p.m.

7        (Lunch recess:   12:48 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    ████████ - Confidential Pursuant to Protective Order
 2                        Afternoon Session
 3                             1:49 p.m.
 4    ██████████████████████, having been
 5    previously duly sworn, was examined and testified
 6    further as follows:
 7                        THE VIDEOGRAPHER:  We are back on
 8            the record.  The time is 1:49 p.m.
 9    EXAMINATION (Continued)
10    BY MS. GRESSEL:
11            Q.    Mr. ████████, I would like to refer
12    you to page 24 of your report.  I would like you
13    to take a look at under header B the second
14    paragraph.  Could you please read the sentence
15    that starts "The SEC in my observation"?
16            A.    "The SEC, in my observation over many
17    years, has been particularly adept at keeping up
18    with new and dynamic products both in the past
19    and now in the digitally driven world."
20                  You said two sentences?
21            Q.    Just that one.
22            A.    Okay.  That's fine.
23            Q.    Thank you.  Mr. ████████, you state
24    this is your observation based on many years.
25    What's your basis for this statement?
```

1   ███████████ - Confidential Pursuant to Protective Order

2          A.   Well, you know, we have personal

3   experience of interaction between NASD and the

4   SEC and how to regulate, you know, new products.

5   I can give you a specific example if you want,

6   but, you know, there's no end to Wall Street's

7   creativity and how they package products, market

8   them and so on.

9          So I think the most vivid one that I

10  can recall is when the concept of an index fund

11  or an index option was introduced, and somebody

12  said, well, you know, why would you want to buy

13  that?  Don't you want to buy a company, and

14  doesn't this go against capital raising which is

15  the purpose of the capital markets and so on?

16  There was a whole big debate as to what the

17  product was, how do we get it regulated, and now

18  they are in everyone's 401K, so this just is par

19  for the course.  I mean, you know, Wall Street

20  innovates.  I think I say something in there

21  about that.  They innovate, and then we have to

22  regulate.

23          Q.   And what in your view has the SEC

24  done that you see as particularly adept at

25  keeping up with new and dynamic products?

1   ███████ - Confidential Pursuant to Protective Order

2           A.   As I said before, they, as the

3   government agency that is in charge of securities

4   markets, they have to ensure that they have a

5   regulatory approach to anything that, you know,

6   can meet the definition of a security, investment

7   contract, whatever their jurisdiction is, right?

8                So, you know, they have, as I said

9   before, they have an obligation to do that as the

10  government agency in charge, and I think I say

11  somewhere in the report that, you know, they have

12  been, although, by its very nature, regulation

13  catches up, and sometimes you have enforcement

14  predating rulemaking, for example.

15               It doesn't mean that they're not

16  carrying out their obligation to protect the

17  investor.

18          Q.   With respect to digital assets in

19  particular, have you seen the SEC do anything

20  that you view as particularly adept by keeping

21  up?

22          A.   Well, we talked earlier about the

23  enforcement actions.   We talked about a whole

24  mix of information from investor.gov releases to

25  speeches by individual commissioners and other

1    █████████ - Confidential Pursuant to Protective Order

2    things that as -- I like to call it a mix of

3    different information that you can take bits and

4    pieces of or the whole thing, but it alerts the

5    public that they are interested in a particular

6    set of circumstances or a particular product and

7    that, you know, they are going to regulate it

8    even before there are statutes on the books that

9    address that particular course of conduct.

10          Q.    And why do you view that as adept?

11          A.    As what?   I'm sorry.

12          Q.    As adept.   You used the word

13   "adept," particularly adept in your report.

14          A.    Because I think that, because their

15   first approach is usually enforcement, that they

16   are usually on top of new or different types of

17   investment scams, for example.   I think the 2013

18   Bitcoin or whatever it was, Ponzi scheme, the

19   first enforcement action, is a good indicator of

20   that, because here was a new product, a new

21   technique that was being foisted on the public

22   and, you know, yet they still brought the

23   enforcement action, even though it involved the

24   digital assets, and they didn't shy away or turn

25   their back on the fact that this was a new

1   ▮▮▮▮▮ - Confidential Pursuant to Protective Order

2   investment product that was being foisted on the

3   public.

4        Q.   And you mentioned that this

5   enforcement sometimes precedes regulation, right?

6        A.   Yes.

7        Q.   Is it difficult for the public to

8   understand or expect how enforcement actions will

9   evolve, if there's no regulation on the books?

10       A.   Well, that's, again, again, the SEC

11  is adept at putting out notification of that

12  enforcement action, putting out investor beware

13  kind of things.

14            So, in that regard, I don't know if

15  they did or not, but as an example they may have

16  said, look, we just brought an enforcement action

17  in the digital asset space.  Here's what

18  investors need to know about.  A, you know, do

19  you understand anything about the digital

20  product?  B, if it sounds too good to be true, it

21  probably is.  You know, so they would lay out,

22  and that is typically what they do, and

23  investor.gov is a great resource for the

24  investing public.

25       Q.   It sounds like that you see those as

1    ███████ - Confidential Pursuant to Protective Order

2    guidance that's provided to investors.   What

3    about to companies that might engage in those

4    activities?  Is the SEC particularly adept at

5    providing guidance to them?

6           A.   You know, I don't want to

7    characterize it as good or bad, but, you know, I

8    think we had that discussion a little bit this

9    morning where the obligation falls on the company

10   to, and not the government, to ensure that

11   they're keeping up, you know.   SEC goal number 1

12   is investor protection.   I'm not sure, you know,

13   I'm not sure, and I'm not speaking for the SEC,

14   trust me, but, you know, in my view and I think

15   it's their view that the obligation would fall on

16   the company itself.

17           Now that doesn't mean that they turn

18   their back and don't do anything for them.   I

19   think we went over some of the things this

20   morning that I testified to that there's a total

21   mix of information, there's a safety net of

22   advisors, lawyers, accountants, SEC releases, SEC

23   enforcement actions and so on.

24           So it's not like they turn their back

25   totally and say ah-ha I got you.

1   ███████ - Confidential Pursuant to Protective Order

2          Q.   And, if the SEC wanted to provide

3   more clarity to companies about what they were

4   doing, what would you expect them to do?

5          A.   You know, again, I don't feel that

6   that's their primary role.   You know, I would

7   put the shoe back on the company to say, okay,

8   SEC, here's a set of facts, here's a set of

9   circumstances.   Assuming or presuming or

10  hypothetically, if we go forward with this, what

11  would be your feeling, and that's essentially,

12  you know, a no action position if it gets to

13  that.   Certainly before the no action position,

14  they can go to the SEC informally and talk and

15  get some indication, although, you know, if they

16  want a more formal response, then the no action

17  way is the way to go.

18          Q.   So, in your view, companies can

19  engage in some compliance activities, and then,

20  if they want assurances from the SEC, they can go

21  to the SEC and seek those assurances that what

22  they're doing is in compliance with the law?

23          A.   Yes, and they can do that formally or

24  informally, although the informal assurances are

25  not, you know, certainly not binding, neither is

1   ████████ - Confidential Pursuant to Protective Order

2   a no action letter for that matter, because

3   there's a disclaimer, but, you know, it's a

4   little bit more formal response, and you have a

5   response back in writing.

6           Q.   And what does that disclaimer say on

7   the no action letter?

8           A.   You know, it's been a while since

9   I've looked at one, but I think it says --

10          MR. HANAUER:   Don't speculate.

11          A.   Okay.  I'm speculating.  Generally, I

12  think it says, you know, this doesn't preclude,

13  you know, an enforcement action down the road or

14  whatever, you know.

15          Q.   And that is based on no action

16  letters you've seen in the past?

17          A.   Sure.

18          Q.   Okay.  Mr. ████████, I would like you

19  to turn to page 1 of your report.   So this is,

20  looking at the bullets, this is the fourth bullet

21  down.   Can you read that for us.   It starts

22  with "There are various best practices."

23          A.   "There are various best practices for

24  practitioners to ensure compliance with the

25  securities laws, including by working with

```
 1   ████████  - Confidential Pursuant to Protective Order

 2       regulators and others to achieve a high degree of

 3       comfort that their actions are in keeping with

 4       the securities industry's high standards of

 5       investor protection."

 6              Q.   Mr. ████████, did you write this

 7       sentence?

 8              A.   I did.

 9              Q.   What's your basis for this opinion?

10              A.   Again, you know, it's basically my

11       experience and knowledge over the years as to

12       what firms do and what the best practice is in

13       this area in terms of getting advice and what the

14       industry norm is.   The industry norm is, you

15       know, working with regulators and others.

16              Q.   And, when you say firms in that

17       sentence, you mean companies, not law firms,

18       correct?

19              A.   Well, I mean companies or broker

20       dealers or whoever is, you know, whoever is

21       seeking the advice.

22              Q.   What do you mean there by high degree

23       of comfort?

24              A.   Well, rather than speculating

25       themselves as to whether they should move forward
```

Page 161

1    ████████ - Confidential Pursuant to Protective Order

2    with a transaction, they can, you know, they do

3    have some comfort in that, you know, hey, I've

4    got this from the SEC now, and this is what

5    they're saying, and, you know, I would view that

6    as some form of comfort that, you know, they're

7    proceeding on the right way if the SEC has said

8    that they would not recommend enforcement action

9    based on a set of circumstances.

10        Q.   And what types of statements or

11   indications from the SEC do you think gives

12   companies that sense of high degree of comfort?

13        A.   Just that, that, you know, we would

14   not recommend enforcement action if you do ABC

15   and D.

16        Q.   And those would be statements in

17   writing?

18        A.   Yeah.

19        Q.   Would they also be statements during

20   meetings?

21        A.   It could be.

22        Q.   What about statements with

23   disclaimers like we discussed before?

24        A.   Well, like I said, it's a boilerplate

25   response in any no action letter.

1   ██████ - Confidential Pursuant to Protective Order

2        Q.   Are there other steps that a company

3   could take to get a high degree of comfort that

4   their actions are in keeping with the securities

5   laws?

6        A.   Yes.  So I go back to my safety net

7   comment, you know.   That's why you guys have

8   this big building, very nice, because people hire

9   you to do things.   That's why Ernst & Young and

10  Price Waterhouse have their big buildings, and,

11  you know, there are advisors, there are attorneys

12  and, you know, just even talking to other

13  practitioners, I mentioned this morning, other

14  companies, hey, what are you guys doing, how are

15  you guys addressing this new rule, what systems

16  have you put in place.

17            So granted I'm coming from the

18  broker-dealer point of view, but I think it would

19  work too with a company or an issuer.

20       Q.   And does the term "high degree of

21  comfort" have a generally accepted meaning in the

22  securities industry?

23       A.   That's my own words.   You know, I

24  could have chose other words maybe, but some

25  recognition that they've made the inquiry that

1    ████████ - Confidential Pursuant to Protective Order

2    they have some guidance and that's the proper way

3    to do it.

4         Q.   So they have inquired of their

5    lawyers, and their lawyers have told them, okay,

6    we think, you know, you have minimal risk here?

7              MR. HANAUER:   Objection to form.

8         A.   I don't know, you know, what their

9    lawyers would tell them under any, you know,

10   specific circumstances, but I think they can

11   certainly heed a lawyer's advice.

12             And, by the way, the safety net again

13   does not relieve their obligation for compliance,

14   you know.   They still have to do that, but they

15   can use tools and other resources to mitigate

16   that somewhat.

17        Q.   Well, let me ask you this.   Does

18   having a high degree of comfort the way you

19   understand it mean that there has to be zero risk

20   that their actions don't comply with the

21   securities laws?

22        A.   No, and, you know, that's totally the

23   decision of the company.   Okay?   They can

24   determine and take on a lot of risk, or they can

25   determine not to do any risk at all and not do

Page 164

1   ███████ - Confidential Pursuant to Protective Order

2   the transaction.   So that's up to the board of

3   directors, the CEO, and whoever else is the

4   decision makers.

5          Q.   How much risk is too big to have a

6   high degree of comfort that a company's actions

7   comply with the securities laws?

8              MR. HANAUER:   Objection to form.

9          A.   You know, I don't want to quantify

10  it.

11         Q.   Is it quantifiable?

12         A.   I don't know.   Probably not.   I

13  mean I guess the highest amount of risk is if you

14  want to commit a fraud and hope you don't get

15  caught.   So, you know.   Then we go down from

16  there.

17         Q.   And then the lowest amount of risk is

18  what?

19         A.   Not doing the deal.

20         Q.   Right, and then what is a high degree

21  of comfort that you're compliant?

22         A.   I've got this statement from my

23  lawyer.   I've got this statement from my

24  accountant.   I've got this conversation with the

25  SEC.   I have this no action letter.   You know.

1    ████████ - Confidential Pursuant to Protective Order

2    You have a file this thick of why you make a

3    decision on behalf of the corporation.

4                   Now you're absolutely right.   Can a

5    corporation put other factors ahead of that?

6    They might, but at least they've got the file to

7    show whoever wants to see it as they proceed. So.

8         Q.   Does a company have to obtain a no

9    action letter from the SEC to have a high degree

10   of comfort that they're complying with the

11   securities laws?

12        A.   They may not.   They may not.   I

13   contend it's the best way to do it, but that may

14   not be their decision.

15        Q.   Do most companies seek no action

16   letters from the SEC before they embark on a

17   business decision?

18                   MR. HANAUER:   Objection to form.

19        A.   I don't know, you know, if most do or

20   not.  The enlightened ones do.  The best

21   companies do.

22        Q.   The best companies do?

23        A.   Well, the most compliance-conscious

24   or however you want to in my experience.

25        Q.   Do you have any experience advising

1    ████████ - Confidential Pursuant to Protective Order

2    clients on how to get a high degree of comfort

3    their actions are in keeping with the standards

4    of the industry?

5         A.   You know, over my long career I'm

6    sure people have come to me and said, you know,

7    ██, what do you think of this circumstance, and,

8    you know, ██, you know, this is the way we're

9    going to set up, this is a hypothetical example,

10   this is the way we're going to set up our

11   automated interface that captures the spread and,

12   you know, pays the rep, you know, two cents

13   commission.  What do you think of that?

14             Well, you know, I can say, well, gee,

15   I don't know.  You know, I don't know if it

16   comports with 11Ac1 or whatever SEC rule.   I

17   said, you know, you may want to go down there and

18   ask.  I'm sure that has happened, you know,

19   quite a few times when I was running market

20   regulation, because, in those days, you know, I

21   had relationships with almost every head of every

22   NASDAQ trading desk on the Street.

23             So I was getting constant calls and

24   constant inquiries about new things or new

25   products or new systems or new approaches.

1    ███████ - Confidential Pursuant to Protective Order

2          Q.   And your response was call the SEC

3    and ask them and have a conversation?

4          A.   If it was appropriate, yes.

5          Q.   Were there situations in which it

6    wasn't appropriate?

7          A.   If we could resolve it within the

8    NASD and in the context of NASD rules and if I

9    felt that they were going down the right path, I

10   would say, you know, I think you guys are doing

11   the right thing.

12             Now the fact that I said it again

13   does not absolve them.  They can't shift the

14   burden to me and say, you know, ███████ told

15   me it was alright to do this.  No, you know, it's

16   still their burden.

17         Q.   And, just to be clear, were any of

18   these people who were coming to you clients of

19   yours?

20         A.   They weren't clients.  They were

21   member firms of the NASD.

22         Q.   Okay, and do you have any experience

23   advising clients on how to get a high degree of

24   comfort that their activities with respect to

25   digital assets are specifically in keeping with

1    ███████  - Confidential Pursuant to Protective Order

2    the securities laws?

3         A.   In relation to my consulting

4    business?  Is that what you're saying?

5         Q.   Ever.

6         A.   Well, just in the context that I

7    mentioned of me dealing with NASD member firms.

8         Q.   And did those questions ever involve

9    digital assets?

10        A.   No.

11        Q.   Okay.  So you've talked several times

12   about this idea that you have about a safety net

13   of advisors that involve lawyers and accountants

14   and others to manage risks, that companies are

15   operating in the framework of the law.  Is that

16   correct?

17        A.   Yes.

18        Q.   So lawyers are part of that safety

19   net.  You've mentioned that.  Does that include

20   outside counsel?

21        A.   Sure.

22        Q.   Okay, and outside counsel are law

23   firms, right?

24        A.   Sure.

25        Q.   How about in-house counsel?

1   ███████ - Confidential Pursuant to Protective Order

2          A.    Sure.

3          Q.    Those are lawyers at the company,

4   right?

5          A.    Yes, absolutely.

6          Q.    Why does it include in-house counsel?

7   What role do they play?

8          A.    I think in-house counsel is your

9   first go-to person.   You know, and assuming that

10   you've hired somebody who is competent, they are

11   really the go-to initial person to run something

12   by.   He may come back with some very good

13   advice.   He may come back with very bad advice,

14   or he may come back and say let's check with our

15   outside counsel, but in-house counsel is your

16   first line of defense, so to speak, when you're

17   seeking information.

18          Q.    What about outside counsel?   What

19   role do they play?

20          A.    Well, I think, as the next step, if

21   in-house counsel is doing his job right, if he's

22   not satisfied with, you know, whatever he's

23   telling his client which happens to be, you know,

24   the boss of his company or whoever, then I think

25   outside counsel would certainly play a role.

1    ████████ - Confidential Pursuant to Protective Order

2    They would bring him in when the issue can't get

3    resolved internally.

4         Q.   So outside counsel comes in you said

5    when the issue can't get resolved internally?

6         A.   I would think so.   I think that's a

7    good example.

8         Q.   What work do you do, if any, in this

9    case to evaluate whether lawyers, including

10   outside or in-house counsel, experienced

11   uncertainty or confusion about how the securities

12   laws applied to digital assets between 2013 and

13   December 20, 2021?

14        A.   I don't have an opinion on that.

15        Q.   Did you undertake any work to form an

16   opinion on that?

17        A.   No.

18        Q.   Okay.   Did you undertake any research

19   related to that question?

20        A.   Not specifically, no.

21        Q.   Okay.   Were you asked by the SEC to

22   undertake any research related to that question?

23        A.   No.

24        Q.   Okay.   What work did you do, if any,

25   as part of your work in this case to evaluate

1   ███████   - Confidential Pursuant to Protective Order

2   whether accountants experienced uncertainty or

3   confusion about how the securities laws applied

4   to digital assets between 2013 and December 20,

5   2021?

6          A.   None.

7          Q.   Okay.   Mr. ███████, let's look at

8   pages 26 to 27 of your report.   I want you to

9   look at the very last sentence that begins on 26,

10  but continues on to the top of 27 starting "The

11  no action letter process."   Can you please read

12  that out loud?

13         A.   Sure.   "The no action letter process

14  is a routine and common practice for market

15  participants to get an understanding of whether

16  their proposed activity complies with federal

17  securities laws including whether offers and

18  sales of an instrument involves an investment

19  contract."

20         Q.   What personal or professional

21  experiences have you had with the SEC's no action

22  letter process?

23         A.   Oh, gosh.   You know, over the years,

24  lots.   I mean, if you go back early in my career

25  with NASD, one of the major issues for the

1   ████████ - Confidential Pursuant to Protective Order

2   industry then was net capital and how not only

3   net capital, but the customary protection rule,

4   how that all intertwined, and I don't know if you

5   know, Andy probably knows Mike Macciarole.  I

6   mean he was dealing with these things day in and

7   day out, and, you know, we had a slew of no

8   action letters in the Capitol area back in those

9   days in the 15C33 area, so I mean I've looked at

10  tons.

11       Q.    Mr. ███████, what personal or

12  professional experiences have you ever had with

13  the SEC's no action letter process in the context

14  of registration of securities?

15       A.    I can't recall one specifically.  It

16  may have been over the years, but I don't recall

17  them.

18       Q.    Have you ever made a no action letter

19  request to the SEC for yourself?

20       A.    No.

21       Q.    Have you ever assisted a client with

22  a no action letter request to the SEC?

23       A.    What do you mean assist?  I mean I've

24  recommended, as I said before, that people go to

25  the SEC and seek no action relief.

Page 173

1    ▮▮▮▮▮▮ - Confidential Pursuant to Protective Order

2         Q.    What about a client of yours in a

3    consulting relationship or any other client

4    you've had over the years?   Have you ever

5    assisted them with a no action letter request to

6    the SEC?

7         A.    No.

8         Q.    Okay.  Specifically with respect to

9    the digital asset space, what personal or

10   professional experience have you had with the

11   SEC's no action letter process?

12        A.    Right.  None.

13        Q.    Okay.  So you've never consulted or

14   worked with a company in the digital asset space

15   in connection with obtaining a no action letter?

16        A.    No.

17        Q.    Okay.  What work have you done in

18   this case to assess how well the no action letter

19   request procedure has worked with respect to

20   digital assets?

21        A.    I'm not following.

22        Q.    Well, let me rephrase that.   Have

23   you done any work in this case to assess how well

24   the no action letter request process has worked

25   with respect to digital assets?

1    ███████ - Confidential Pursuant to Protective Order

2         A.   No.   Not specifically.

3         Q.   Okay.  Do you know when the SEC

4    issued its first no action letter in the digital

5    asset space?

6         A.   I know I footnote it there, but it's

7    a while since I had looked at that cite, so I'm

8    not, it must have been, you know, I wrote 2002,

9    so I think that was probably it, but I would have

10   to go back and look at the cite.  I apologize

11   for that.

12        Q.   That's fine.  Do you have a

13   recollection of the case that you're thinking of?

14        A.   No, I don't.

15        Q.   And can you point me to the footnote

16   that you're referring to?

17        A.   32.

18        Q.   I see.  So it's at the link that you

19   cite here, www.sec.gov/corpfin/corpfin-no-action-

20   letters#2a1?

21        A.   Right.

22        Q.   Okay.  Are you aware that the SEC --

23   that the first SEC no action letter related to

24   digital assets was not issued until April 3rd,

25   2019?

1   ████████ - Confidential Pursuant to Protective Order

2        A.   Can you give me more information.   I

3   might be.

4        Q.   Sure.   Why don't we actually show

5   you what we have marked as Exhibit 15.   JC 15.

6             (Defendant Exhibit JC 15, No action

7             letter, was so marked for identification,

8             as of this date.)

9        Q.   Take a moment to read that document.

10       A.   Okay.

11       Q.   Mr. ████████, does this refresh your

12  recollection that the first no action letter that

13  the SEC issued with respect to digital assets was

14  on April 3rd, 2019?

15       A.   Not specifically, but I'll take your

16  word for it.   I don't recall reading this

17  release either.

18            MR. HANAUER:   I would just state for

19            the record this exhibit is not an SEC

20            release.

21            MS. GRESSEL:   No.   This exhibit is

22            a news article titled "SEC issues first

23            ever no action letter for digital token

24            sales."

25       A.   Right.

1   ████████ - Confidential Pursuant to Protective Order

2         Q.    Have you heard of the no action

3   letter with respect to TurnKey Jet Incorporated?

4         A.    No, I haven't.

5         Q.    Okay.  Do you know how many entities

6   or persons in the digital asset space sought no

7   action relief from the SEC prior to April 2019?

8         A.    I don't.

9         Q.    Did you ask the SEC for any

10  information on how many persons have sought no

11  action relief from the SEC related to digital

12  assets?

13        A.    No.

14        Q.    Why not?

15        A.    You know, my reference again in the

16  report is not to laser focus on the no action

17  process, but to characterize it as a place where

18  again people can go for comfort, and, you know,

19  there's a lot of other places besides no action

20  letters which, you know, I list and talk about as

21  resources, so basically a no action letter my

22  point is that it's a resource that you can

23  utilize.

24              You know, I never intended to get

25  into the nitty-gritty of who did what.  I'm just

Page 177

1   ███████ - Confidential Pursuant to Protective Order

2   putting it forward as a resource.

3        Q.   And so did you undertake any analysis

4   of no action letters with respect to digital

5   assets for your report?

6             MR. HANAUER:   Objection.   Asked and

7        answered.

8        A.   You know, the answer is no, because

9   it wasn't my intent in making the point in my

10  report.  I didn't think I needed to do that.

11       Q.   Okay.   Let's take a look at page 26

12  of your report.   So you say here, well, we've

13  already read this quote, but I'll read it back,

14  "The no action letter process is a routine and

15  common practice for market participants to gain

16  an understanding of whether their proposed

17  activity complies with the federal securities

18  laws."

19             In making that statement, is it fair

20  to say you're making a general statement not

21  specific to how the no action relief process has

22  worked in the digital asset space?

23             MR. HANAUER:   Objection to form.

24       A.   So again help me out here.   Can you

25  just repeat that.

1   ███████ - Confidential Pursuant to Protective Order

2          Q.   So I'll just read this sentence back

3   to you.   It's at the bottom of 26 up to the top

4   of 27.   You say, "The no action letter process

5   is a routine and common practice for market

6   participants to gain an understanding of whether

7   their proposed activity complies with the federal

8   securities laws, including whether offers or

9   sales of an instrument involves an investment

10  contract."

11          And my question is, is it fair to say

12  that in that sentence you're making a general

13  statement not specific to how the no action

14  relief process has worked in the digital asset

15  space?

16          A.   Yeah, I would say it's a general

17  statement, and I would say again it's putting

18  forth a tool or a process or a custom in the

19  industry as to what they do when they need, when

20  they seek advice.

21          Q.   And does this general statement

22  assume that the SEC always engages with the

23  requester on a relief, on a request for no action

24  relief?

25          A.   Not necessarily.

1    ███████ - Confidential Pursuant to Protective Order

2         Q.   Are you familiar with whether how

3    often the SEC has engaged with no action requests

4    related to digital assets?

5         A.   No, but, you know, that's, you know,

6    their call.   I know some they answer, and some

7    they don't.   What their criteria is I don't know

8    specifically.

9         Q.   And a requester of no action relief

10   can only gain an understanding of the SEC's

11   views, as you wrote, if the SEC engages with

12   them, right?

13        A.   By engage, you mean talk about no

14   action letter and eventually produce it?  Is that

15   what engage means or call them on the phone?

16        Q.   Any kind of response to the no action

17   request.

18             MR. HANAUER:   Objection to form.

19        A.   So I'm sorry.   You had better repeat

20   it again.

21        Q.   I'll repeat it.  No problem.   The

22   requester of a no action letter can only gain an

23   understanding of the SEC's views if the SEC

24   engages with the requester, right?

25             MR. HANAUER:   Objection to form.

1    ████████ - Confidential Pursuant to Protective Order

2            A.   Are you talking strictly about the no

3    action process, or are you talking overall in

4    general?

5            Q.   The no action process.

6                 MR. HANAUER:   Same objection.

7            A.   Right.  Well, presumably, if they're,

8    you know, seeking the no action letter, I guess

9    it would be important for that to occur, yes.

10           Q.   For that to occur, you mean for the

11   SEC to respond?

12           A.   Right.  Now, you know, if they don't

13   respond, then, you know, they can take other

14   action again.  They can have their in-house or

15   outhouse counsel, you know, put some pressure on

16   them or find out the reason.  I mean there's

17   other forms of engagement other than, you know,

18   if it was me and the SEC is not acting on my no

19   action request, I would bring in some resources

20   to bear to find out why and then see if I can get

21   some kind of response.  I don't just walk away

22   and say okay, have a nice day.

23           Q.   So you would open up other avenues,

24   create back-channel communications?

25           A.   That's what I would do, yes.

1    ███████ - Confidential Pursuant to Protective Order

2          Q.   That's what you would do.  Put some

3    pressure on the SEC to respond?

4          A.   Exactly.

5          Q.   You state on page 27, we can actually

6    look at this, it's in the footnote there,

7    footnote 32, "Based on industry custom and

8    practice."  Can you read that sentence for me.

9          A.   "Based on industry custom and

10   practice, a prime means of ascertaining the SEC's

11   position regarding their XRP transactions would

12   have been for defendants to submit a no action

13   letter request to the SEC."

14         Q.   What custom and practice are you

15   referring to here?

16         A.   The one that we were, you know,

17   talking about this afternoon, and that is, you

18   know, if it was me and I was unsure and, you

19   know, at the recommendation of in-house or

20   outhouse counsel, and I do not have the degree of

21   comfort I would want, the best avenue to pursue

22   is the SEC no action letter.

23         Q.   And what work have you done in this

24   case, if any, to determine whether there was an

25   industry custom and practice for block chain

1  ██████ - Confidential Pursuant to Protective Order

2  technology companies to seek no action relief

3  from the SEC?

4       A.   Well, I think that, are you talking

5  block chain technology specifically, or are you

6  talking the digital world generally?

7       Q.   Block chain technology specifically.

8       A.   I'm not aware of any.

9       Q.   Okay, and you used this term here

10  "prime means."   What do you mean by "prime

11  means"?

12       A.   You know, I guess prime probably in

13  that context means the most definitive, you know,

14  being number 1.  Prime means number 1, so.

15       Q.   So, in your view, it's the best

16  option?

17       A.   The SEC, right, putting a stamp on

18  it.

19       Q.   Okay, and this sentence makes an

20  assumption that the SEC would have provided its

21  position in response to questions about XRP

22  transactions, correct?

23            MR. HANAUER:   Objection to form.

24       A.   I think it says for defendants to

25  submit the no action request.  I don't think I

1      ███████ - Confidential Pursuant to Protective Order

2      speculate on whether the SEC would answer it or

3      not.

4            Q.   You just testified that prime to you

5      means that the SEC puts a stamp on it.   What did

6      you mean by that?

7            A.   That again, and I testified before

8      that the no action request says under these set

9      of circumstances we will not recommend an

10     enforcement action, and I think that's a high

11     degree of comfort for a company to have a

12     statement from the SEC that they can put in their

13     folder with anything else they got, but it's the

14     number one and prime, because it's from the SEC

15     directly.

16           Q.   Right, so one can only get that prime

17     means of ascertaining the SEC's position if the

18     SEC responds to the request, right?

19           A.   Yeah.   Maybe prime is wrong.   Maybe

20     I should have said optimal or something like

21     that.

22           Q.   And the SEC's position can only be

23     ascertained if the SEC provides a position?

24           A.   That's correct.

25           Q.   Okay.   So what work have you done in

1    ████████ - Confidential Pursuant to Protective Order

2    this case to determine whether the SEC was

3    willing to answer questions about its position on

4    XRP at any time before December 22, 2020?

5            A.   None.

6            Q.   Okay.  Have you reviewed any

7    inquiries made to the SEC about XRP?

8            A.   No.

9            Q.   Did you ask the SEC to provide you

10   any inquiries that it received about XRP?

11           A.   No.

12           Q.   Why not?

13           A.   Because that's not what the report is

14   all about.  I'm not offering an opinion on XRP

15   or what they did or didn't do.  I'm just stating

16   that there is a practice, a general practice in

17   the industry to take these steps to gain comfort

18   and a high degree of confidence about moving

19   forward without running afoul of the rules and

20   regulations.

21           Q.   So you just said you're not offering

22   an opinion on XRP or what they did or didn't do.

23           A.   Right.

24           Q.   So in that sentence that we just read

25   in footnote 32, you're not offering an opinion

1    ████████ - Confidential Pursuant to Protective Order

2    there on what Ripple should or shouldn't have

3    done with respect to obtaining a no action

4    letter?

5         A.   No.  Right.

6         Q.   Okay.  Are you aware that as late as

7    October 2020 the SEC was still informing market

8    participants it had not yet decided whether XRP

9    was or was not a security?

10        A.   I'm not aware of that.

11        Q.   Okay, and that is because you haven't

12   seen any document saying that either way?

13        A.   Right.

14        Q.   Okay.  I would like to show you what

15   has been marked as Exhibit JC 10.

16             (Defendant Exhibit JC 10, e-mail

17             chain between Mr. Frank Mossmann and SEC's

18             Office of Investor Education and Advocacy,

19             was so marked for identification, as of

20             this date.)

21        Q.   Would you take a moment to review

22   this document.

23             THE WITNESS:   Excuse me.   One

24             second.

25             MR. HANAUER:   I was actually going

1    ███████ - Confidential Pursuant to Protective Order

2         to say what you just said.

3         A.   Should I go back to front or front to

4    back?

5         Q.   I would go back to front.  The last

6    message is the earliest, and the first message on

7    page 1 is the most recent.

8         A.   Okay.  Is there a difference between

9    the first two here?  They look the same unless

10   I'm missing something.

11        Q.   You're correct.  There is some

12   portions here that have been redacted, and it

13   appears that some of these messages were repeated

14   or replicated.

15        A.   Okay.  Is it appropriate to ask who

16   Frank Mossmann is?  Okay.  It doesn't matter.

17        Q.   He's an individual.

18        A.   Okay.  I gathered that.  Okay.  I

19   think I get it.

20        Q.   Mr. ███████, do you recognize this

21   document to be an e-mail chain between a Mr.

22   Frank Mossmann and the SEC's Office of Investor

23   Education and Advocacy?

24        A.   I don't.

25        Q.   You don't recognize this to be an

```
 1   ███████ - Confidential Pursuant to Protective Order

 2      e-mail chain between someone named --

 3              MR. HANAUER:  Objection, foundation.

 4          Q.   Mr. ███████ --

 5              MR. HANAUER:  You're asking him to

 6          authenticate an e-mail he has never seen

 7          before and he's not on?

 8          Q.   Mr. ███████, this is an e-mail chain

 9      between Mr. Frank Mossmann and the SEC's office

10      of investor education and advocacy.  Have you

11      ever seen this document before?

12          A.   I have not.

13          Q.   Were you aware that the SEC produced

14      this document to Ripple in discovery in this

15      litigation?

16          A.   No.

17          Q.   Alright.  Mr. ███████, do you know

18      what the SEC's office of investor education and

19      advocacy is?

20          A.   Generally, yes.

21          Q.   What is it?

22          A.    It's a separate, I don't know if it's

23      a division or department of the SEC, which deals

24      with investor kind of issues for the general

25      public.
```

Page 188

1   ████████ - Confidential Pursuant to Protective Order

2          Q.   And are you aware that members of the

3   public can contact the office of investor

4   education and advocacy with questions?

5          A.   Yes.

6          Q.   Okay.   Let's turn to page 5 of this

7   document.   This is the e-mail chain below all of

8   the redactions.

9          A.   Okay.

10         Q.   Is it accurate that this e-mail

11  states that Mr. Mossmann originally e-mailed the

12  SEC Chairman Jay Clayton on August 21st, 2020

13  asking whether the SEC had determined that

14  cryptocurrency XRP (Ripple) and other digital

15  currencies are considered securities?

16             MR. HANAUER:   Objection.   Are you

17             asking if you just read the e-mail

18             correctly?

19             MS. GRESSEL:   Yes.

20         A.   You said the e-mail was dated

21  August 21st, 2020?

22         Q.   Why don't you read that sentence that

23  begins, "Thank you for your August 21st, 2020

24  e-mail."

25         A.   "Dear Mr. Mossmann:   Thank you for

1   ███████ - Confidential Pursuant to Protective Order

2   your August 21, 2020 e-mail to the U.S.

3   Securities and Exchange Commission Chairman Jay

4   Clayton."

5              I was looking for a date in the

6   header.   That's why I didn't see it.

7         Q.   And you see in the next sentence it

8   says that his correspondence was forwarded to the

9   SEC's office of investor education and advocacy

10  for response?

11        A.   Right.

12        Q.   Okay, and then, in the following

13  sentence it says that Mr. Mossmann's question is

14  whether the cryptocurrency XRP (Ripple) and other

15  digital currencies are considered securities,

16  correct?

17        A.   Right.

18        Q.   Okay.   Now the e-mail chain

19  continues, and I want to -- actually I want to

20  look at just the next sentence right there.

21        A.   Um-hum.

22        Q.   Can you read the SEC's response

23  beginning with "Whether," just that sentence?

24        A.   Yeah.   "Whether a cryptocurrency is

25  considered a security will depend on the

1       ████████ - Confidential Pursuant to Protective Order

2       characteristics and use of the cryptocurrency."

3               Q.   Did the SEC provide a direct response

4       to Mr. Mossmann's question concerning whether XRP

5       is considered a security?

6                    MR. HANAUER:   In this specific

7                    e-mail at the bottom of the chain?

8               Q.   Yes, in the specific e-mail at the

9       bottom of the chain.

10              A.   That specific sentence or the whole

11      e-mail?

12              Q.   In that whole e-mail.

13              A.   Give me one second, so I can read it

14      again, please.

15              Q.   Sure.

16              A.   Your question was?

17              Q.   My question was did the SEC provide a

18      direct response to Mr. Mossmann's question

19      concerning whether XRP was considered a security?

20              A.   You know, I'm not going to

21      characterize the response.   The response speaks

22      for itself.   You know, it did refer him to other

23      websites and other information, so I'm not going

24      to characterize it.   It's their response.

25              Q.   There is no yes or no answer in here

Page 191

1     ██████████ - Confidential Pursuant to Protective Order

2     as to the SEC's view, correct?

3               MR. HANAUER:   Objection.

4               Argumentative.  The e-mail speaks for

5               itself, Counsel.

6               MS. GRESSEL:   That's okay.   He can

7               answer.

8          A.   Yeah.  Again, I'm not going to

9     characterize it.  I think it speaks for itself.

10    You know.  The SEC may consider it in direct

11    response.

12         Q.   Okay.  Mr. Mossmann, can you keep

13    reading --

14              MR. HANAUER:   Mr. ██████████?

15         Q.   I'm sorry.  Mr. ██████████.

16         A.   I didn't write this e-mail.

17         Q.   Can you please keep reading from the

18    next sentence which starts, "For additional

19    information" through the end of the e-mail,

20    please.

21              MR. HANAUER:   Into the record or to

22              himself?

23              MS. GRESSEL:   Into the record.

24         A.   "For additional information on this

25    topic, we suggest that you review Chairman

1   ███████ - Confidential Pursuant to Protective Order

2   Clayton's statement on Cryptocurrencies and

3   Initial Coin Offerings at" blah, blah, blah blah.

4   Do you want me to read the whole --

5         Q.   Sure.

6         A.   -- "www.sec.gov/news/public-

7   statement/statement-clayton-2017-12-11.

8   Additionally, the SEC has created a spotlight

9   section on its website to help address questions

10  and concerns about the rising interest in ICOs

11  and other digital assets

12  (see:https://www.sec.gov/ICO).   The spotlight

13  section contains ICO updates, which provide

14  information about recent SEC's actions involving

15  ICOs.   You may also wish to review the SEC's

16  spotlight on Initial Coin Offerings and Digital

17  Assets which also has links to investor alerts

18  and investor bulletins regarding cryptocurrency.

19  You can find this information at

20  https://www.investor.gov/additional-resources/

21  specialized-resources/spotlight-initial-coin-

22  offerings-digital-assets.   Once again, thank you

23  for contacting the SEC.   If you have any

24  questions , please call an OIEA staff member at

25  202.551.6327.   Sincerely."

1     ██████████ - Confidential Pursuant to Protective Order

2          Q.    Thanks, Mr. ██████████.    In all of

3     what you read, do you see any yes or no response

4     to whether XRP was considered to be a security by

5     the SEC?

6               MR. HANAUER:    Objection.    Asked and

7          answered.

8          A.    Again, I'll go back and say, you

9     know, it's not appropriate for me to characterize

10    their response.   Their response is their

11    response.

12         Q.    So you're not going to say whether

13    you see a yes or a no in this e-mail chain you

14    just read into the record?

15         A.    No.   You know, I think that the

16    e-mail is the e-mail.   It speaks for itself.

17         Q.    Alright.   Let's turn to the bottom

18    of page 3 which is the page ending in 000214.

19         A.    Yeah, I have it.

20         Q.    Could you please read Mr. Mossmann's

21    response at the bottom of the page starting with

22    "Thanks for your answer."

23         A.    "Thanks for the answer to my

24    question, but it really, it isn't really answer,

25    but it isn't really answer.   I want to know when

Page 194

1   ███████ - Confidential Pursuant to Protective Order

2   there will be regulatory clarity especially for

3   XRP.   The statement from Jay Clayton is three

4   years old and not really actual?   It would be

5   really nice to hear that there will be clarity

6   this year or the next year?   Regards, Frank

7   Mossmann."

8              You want me to read the German?

9        Q.   No.   Thanks.   Is it fair to say that

10  in this communication Mr. Mossmann expresses to

11  the SEC that he does not perceive there's

12  regulatory clarity around XRP and then asks when

13  the SEC will provide that clarity?

14             MR. HANAUER:   Objection.   The

15             document speaks for itself.

16       A.   Would you state your question again.

17  I just want to make sure.

18       Q.   Sure.   Is it fair to say in this

19  communication Mr. Mossmann expresses to the SEC

20  that he does not perceive there is regulatory

21  clarity around XRP and asks when the SEC will

22  provide that clarity?

23             MR. HANAUER:   Same objection.

24       A.   The way I read it, it is objecting

25  that there's not really an answer.   I don't

1  ███████ - Confidential Pursuant to Protective Order

2  know.  I think he's asking when there will be

3  regulatory clarity, but you can read it yourself.

4  I mean.

5       Q.   Well, how do you read it?

6       A.   Again, it sounds like he feels that

7  he didn't get an answer and was wondering when

8  there will be regulatory clarity.  I mean that's

9  how I read it.

10      Q.   Okay.  Let's go to the next page

11  over, like the middle message on that page.

12  Starting with "Dear Mr. Mossmann."  It is the

13  response dated 10/20/2020.

14      A.   Okay.  You want me to read the whole

15  thing?

16           MR. HANAUER:  Well, read it to

17           yourself first.

18      Q.   Yeah.  Read it to yourself first.

19      A.   Okay.

20      Q.   I would like you to read the two

21  sentences that begin, "As we explained

22  previously."

23      A.   "As we explained previously, the SEC

24  has not issued a determination on whether the

25  cryptocurrency XRP is a security.  Also, this

1  ███████ - Confidential Pursuant to Protective Order

2  office cannot comment on whether the SEC will

3  make a determination as to whether XRP is a

4  security or otherwise provide a timeframe for

5  which any determination might be made.   Thank

6  you for contacting the SEC.   Sincerely, Amy

7  Rosenthal, investor assistant specialist, office

8  of investor education and advocacy U.S.

9  Securities and Exchange Commission."

10       Q.   That's fine.   Thanks, and looking up

11  the chain, is it fair to say Mr. Mossmann

12  responds, but that's the last response in the

13  chain from the SEC, correct?

14       A.   This is his response.

15            MR. HANAUER:   Objection to the form

16       of the question.   Objection, foundation.

17       Q.   After this message, which is dated

18  October 20, 2020, do you see any further

19  communications from the SEC to Mr. Mossmann?

20            MR. HANAUER:   On this exhibit?

21       Q.   On this exhibit.

22       A.   That would be the one in the front,

23  right, you're talking about?

24       Q.   I believe the e-mail message on the

25  front is from Mr. Mossmann to the SEC.

1   ███████ - Confidential Pursuant to Protective Order

2          A.   Right, and you asked if there were

3   any others from the SEC that I see?

4          Q.   That are more recent than October 20,

5   2020.

6          A.   I don't see any.

7          Q.   Okay.   So is it accurate that the

8   SEC stated it had not yet determined whether XRP

9   was a security as of the date of that message on

10  October 20, 2020?

11         A.   That's what it appears to say.   Yes.

12         Q.   Okay.   Now let's assume, this is a

13  hypothetical, let's assume the SEC received

14  dozens of similar outreach messages over a period

15  of years asking for guidance on whether XRP is a

16  security, and the SEC each time provided a

17  response it had not yet issued a determination on

18  whether the cryptocurrency XRP is a security and

19  could not provide a time frame for when that

20  determination might be made.

21              Assuming that's true, would that

22  change your opinion on whether the SEC provides

23  guidance on the application of the securities

24  laws to digital assets to individuals who contact

25  them directly?

1 ██████████ - Confidential Pursuant to Protective Order

2          A.   You know, I can't characterize what

3    the SEC response or nonresponse is, you know.

4    There may be privileged reasons why.  You know,

5    there could be a thousand reasons why they can't

6    respond at this point, and I'm sure they have

7    their reason, but you would have to ask them what

8    it was, so I can't characterize that for you.

9          Q.   So let's take that as an assumption

10   that the SEC for some reason can't respond.   Is

11   it the case then that people who have asked for

12   guidance received it?

13             MR. HANAUER:   Objection.   Form.

14        Foundation.

15        A.   You know, I'll just stay with my

16   first answer.  If the SEC does not respond, I'm

17   sure there's pretty good reasons why they're not

18   doing that.

19             Now, you know, is Mr. Mossmann upset

20   about that?   You know, it sounds like he is,

21   but, you know, as an agency of course they have

22   to weigh what they're doing behind closed doors

23   versus what they're public with, and I don't know

24   what's going on here.

25             Obviously you feel that or Mr.

1    ███████ - Confidential Pursuant to Protective Order

2    Mossmann rather feels that he's not getting a

3    straight answer, but again the agency has to

4    weigh what they say and not say and have reasons

5    for it.

6         Q.   Mr. ███████, so, putting aside why

7    the SEC might or might not have commented on

8    requests that they received and focusing on what

9    guidance was issued to members of the public who

10   sought further responses and clarity, is it the

11   case that, if the SEC did not provide guidance in

12   response to these requests, that members of the

13   public would not have received that clarity?

14             MR. HANAUER:   Objection to the form.

15        Objection to the hypothetical.

16        Q.   Putting this objection to the

17   hypothetical aside, staying with the

18   hypothetical, you say in your report, Mr.

19   ███████, that "for market participants uncertain

20   of whether their conduct or proposed conduct

21   implicates the securities laws, input may be

22   sought from the SEC staff directly."

23        A.   Um-hum.

24        Q.   If the SEC declines to provide that

25   input, are market participants left with

1      ███████ - Confidential Pursuant to Protective Order

2      uncertainty about whether their conduct might

3      violate the securities laws?

4                MR. HANAUER:   Objection.   Are you

5           going back to these e-mails, or are you

6           talking about the statements in his

7           report?

8                MS. GRESSEL:   I'm talking about the

9           statement in your report.

10          A.   Again, I think that's where, if it

11     was me and my firm, that's where the escalation

12     would take place.   By the way, just glancing

13     down here, I mean there is some guidance here.

14     The guidance is whether cryptocurrency is a

15     security will depend on characteristics and the

16     use of cryptocurrency.   That's guidance, right?

17     I think.

18               So it depends on the facts and

19     circumstances of that individual asset, and then

20     you may want to review Jay Clayton's speech.

21     That's guidance, right?   And then their public

22     statement on cryptocurrency is guidance.

23               So, if they're not getting the

24     satisfaction of what they feel is an appropriate

25     answer, they've got a couple of channels that

1   ████████ - Confidential Pursuant to Protective Order

2   they can do.   They can back-channel.   They can

3   ask their attorneys to contact the SEC, or,

4   barring that, they can go back, weigh all the

5   factors in their decision and make their own

6   decision, because at the end of the day it's not

7   the SEC who's going to determine, you know, their

8   compliance or not.   That burden rests with them.

9            So they've got to make the best

10  decision that they possibly can.   I mean it

11  might be unfortunate that -- let me put it

12  another way.   It might be the case where they

13  would like a lot more information and a lot more

14  guidance, but they may choose to, you know, move

15  forward on another basis, but at the end of the

16  day it's them, and they can't point to the SEC

17  and say it's your fault.

18            Q.   And for,  you know, members of the

19  public who don't have back-channel options to the

20  SEC and who might not have big law firms

21  representing them, is their only option to read

22  this kind of guidance and draw whatever

23  conclusions they can draw?

24            MR. HANAUER:   Objection to the form

25       of the question.

Page 202

1   ███████ - Confidential Pursuant to Protective Order

2          A.   You know, if the member of the public

3   is unhappy with the SEC and what the SEC is doing

4   and the guidance or no guidance, I would pick up

5   the phone and call my congressman.

6          Q.   Fair enough.   So you're saying, for

7   people who are unhappy with what the SEC is

8   doing, it makes sense to call for legislative

9   action and additional legislative clarity?

10         A.   Or put a bug in some congressman's

11  ear and have them get on the phone with, I don't

12  know whether Jay Clayton was there or not, you

13  know.   That's the only way I think in my mind the

14  public can escalate it.   So.

15         Q.   Okay.   Your report talks a lot about

16  custom and practice.   We've talked about that

17  before.

18         A.   Um-hum.

19         Q.   Do you have an opinion on whether

20  between 2013 and 2020 there was a custom and

21  practice for XRP to be sold on the secondary

22  market by market participants without registering

23  under Section 5?

24         A.   You've got to repeat that because

25  that's a new twist.   Secondary market.   And I

```
 1   ████████ - Confidential Pursuant to Protective Order

 2   want to make sure I understand what you're

 3   saying.

 4        Q.   Yeah.  It's a question about the

 5   secondary market.

 6        A.   Right.

 7        Q.   Do you have an opinion on whether

 8   between 2013 and 2020 there was a custom and

 9   practice for XRP to be sold on the secondary

10   market by market participants without registering

11   under Section 5"?

12             MR. HANAUER:   Objection to form.

13        Objection, vague.

14        A.   You know, I'm sorry.  It must be me,

15   but I'm having trouble understanding.

16             Are you saying am I aware that XRP

17   was traded on a secondary market without

18   registration?

19        Q.   Let's start with that.   Are you

20   aware?

21        A.   I think I know.  You know, I know

22   that it trades on a secondary market.  I just

23   don't know offhand what the dates would be.  I'm

24   sure you're right in saying it's between this and

25   this, but I don't know the exact date.
```

1   ███████ - Confidential Pursuant to Protective Order

2          Q.   Did you do any research in the course

3   of your work on this matter to examine the

4   secondary market for XRP?

5          A.   I did not.

6          Q.   Okay.  Did you request any documents

7   from the SEC concerning the secondary market for

8   XRP?

9          A.   I did not.

10          Q.   Okay.  Have you ever provided

11   consultation services that involved directly

12   contacting the SEC on whether a proposed

13   transaction involved the offer or sale of a

14   security?

15          A.   Not that I can recall.

16          Q.   Okay.  Have you ever provided expert

17   testimony in connection with a matter that

18   involved directly contacting the SEC on whether a

19   proposed transaction involved the offer or sale

20   of a security?

21          A.   Not that I recall.

22          Q.   Have you ever secured meetings with

23   the SEC to discuss their views on the legality of

24   any conduct related to digital assets?

25          A.   I have not.

1      ███████ - Confidential Pursuant to Protective Order

2           Q.   Okay.  Have you ever secured meetings

3      with the SEC concerning their views on whether a

4      particular digital asset was a security?

5           A.   I have not.

6           Q.   Are you aware that in this litigation

7      the SEC was ordered by the court to produce all

8      communications with distributed ledger

9      stakeholders or groups concerning XRP, Bitcoin

10     and Ether?

11          A.   I'm not aware of that.

12          Q.   Okay.  Are you aware that in response

13     to that order the SEC has produced certain

14     communications in which individuals requested

15     guidance on digital asset regulation?

16          A.   If you say so.

17          Q.   You were not previously aware of

18     that?

19          A.   No.

20          Q.   Okay.  Have you reviewed any

21     communications in which individuals requested

22     guidance on digital asset regulations from the

23     SEC?

24               MR. HANAUER:   Beyond the e-mails you

25          have shown him?

```
 1   ██████████ - Confidential Pursuant to Protective Order

 2                MS. GRESSEL:   Yes.

 3        A.    Beyond this, no.  No, I have not.

 4        Q.    In the process of working on the

 5   report, did you request from the SEC to see any

 6   communications between the SEC and individuals or

 7   companies trying to or concerning the application

 8   of the securities laws to digital assets?

 9        A.    No, I did not.

10        Q.    Mr. ████████, at any point did the

11   SEC make you aware it maintained records of such

12   communications?

13        A.    No, it did not.

14        Q.    What other research, if any, have you

15   conducted concerning whether market participants

16   have been able to obtain meaningful guidance on

17   the regulation of digital assets through meetings

18   with SEC commissioners or staff members?

19                MR. HANAUER:   Beyond what is in his

20           report?

21                MS. GRESSEL:   Including what's in

22           his report.

23        A.    Can I take a look at my report real

24   quick?

25        Q.    Sure.
```

1   ████████ - Confidential Pursuant to Protective Order

2           A.   You know, other than what's in the

3   report and what we've discussed here today in

4   detail, I don't recall any offhand.   There may

5   have been a few.

6           Q.   My apologies if I've forgotten this,

7   but maybe I will just ask it more broadly.   Have

8   you conducted any research about whether market

9   participants have been able to obtain meaningful

10  guidance on the regulation of digital assets

11  through meetings with SEC commissioners or staff

12  members?

13          MR. HANAUER:   Objection to form.

14          A.   Yeah, just repeat it, because I want

15  to make sure I'm answering correctly, because --

16  go ahead.

17          Q.   Sure.   Have you conducted any

18  research concerning whether market participants

19  have been able to obtain meaningful guidance on

20  the regulation of digital assets through meetings

21  with SEC commissioners or staff members?

22          MR. HANAUER:   Same objection.

23          A.   I have not conducted research, no.

24          Q.   Okay.   In preparing your report on

25  this case, did you review any evidence reflecting

1   ███████  - Confidential Pursuant to Protective Order

2   the content of meetings between third parties and

3   the SEC?

4           A.   I did not.

5           Q.   Okay.  So you can't speak to whether

6   the SEC in the course of any such meetings

7   provided useful guidance to any market

8   participant on issues concerning how the

9   securities laws applied to digital assets?

10          A.   Not directly, no.

11          Q.   Alright.  What do you mean not

12  directly?  Did you indirectly speak to them?

13          A.   You know, I didn't sit in the

14  meetings with them or look at correspondence or

15  you know.

16          Q.   Do you have any basis --

17          A.   I think -- I'm sorry.

18          Q.   Go ahead.

19          A.   I want to finish the question, but I

20  do recall seeing that I believe some of the

21  principals of Ripple, and I don't know if it was

22  in, it may have been in your answer.  Again, I

23  know that there were some meetings by Ripple

24  executives.  So, you know.  I'm aware from that

25  standpoint.

1  ███████ - Confidential Pursuant to Protective Order

2        Q.   Okay, but you're not aware of any

3  other meetings with the SEC about digital assets?

4        A.   No, I didn't research that which is

5  what your question was.

6        Q.   Did you review any evidence in this

7  case reflecting that sophisticated market

8  participants who obtained legal advice from

9  outside counsel told the SEC they did not

10  consider XRP to be a security and shared the

11  basis for their determinations with the SEC?

12        A.   I'm not aware of that.

13        Q.   Did you review any evidence in this

14  case reflecting that, even after the SEC received

15  this information from sophisticated market

16  participants, the SEC never told those

17  participants that the XRP was a security or that

18  the SEC's position was that it was a violation of

19  securities laws to engage in transactions

20  involving XRP?

21        A.   That was a long sentence.   I'm

22  sorry.

23        Q.   Okay.  I'll take it more slowly.

24  Did you review any evidence in this case

25  reflecting that, even after the SEC received this

1      ███████  - Confidential Pursuant to Protective Order

2      information from sophisticated market

3      participants, the SEC never told those market

4      participants that XRP was a security or that the

5      SEC's position was that it was a violation of the

6      securities laws to engage in transactions

7      involving XRP?

8              A.   I'm not aware of that.  No.

9              Q.   Did you review any evidence in this

10     case reflecting that, before and after such

11     meetings between the SEC and sophisticated market

12     participants to discuss XRP, these market

13     participants transacted in XRP and did not stop

14     those transactions after their meetings with the

15     SEC?

16             A.   No.

17             Q.   Okay.  Is it accurate that your

18     opinion doesn't take into account any SEC

19     communications at all from individuals or

20     companies seeking guidance on the applicability

21     of the securities laws to digital assets?

22                  MR. HANAUER:   Objection to form.

23             A.   Are you speaking in general or with

24     respect to Ripple?  I don't understand.

25             Q.   In general.  Is it accurate that

1    ███████  - Confidential Pursuant to Protective Order

2    your opinion does not take into account any SEC

3    communications from individuals or companies

4    seeking guidance on the applicability of the

5    securities laws to digital assets?

6              MR. HANAUER:   Beyond what's in his

7         report?

8         Q.   You can identify something in your

9    report.

10        A.   Well, certainly with no individuals,

11   and I'm trying to think about others, but, you

12   know, other than what's in my report, probably

13   not.

14        Q.   Okay, and you can't think of anything

15   in your report off the top of your head?

16        A.   No.

17        Q.   Okay.  Did you review any specific

18   SEC statements or speeches in preparing your

19   report?

20        A.   Yes.

21        Q.   Which statements or speeches did you

22   review?

23        A.   Jay Clayton.  I read, I don't know,

24   I think his name is pronounced Hinman, William

25   Hinman.  Did you say SEC releases too or

1    ███████ - Confidential Pursuant to Protective Order

2    statements?

3            Q.   I said statements or speeches.

4            A.   Or speeches specifically?   Those are

5    the two I recall.

6            Q.   Okay.  You stated that it's industry

7    custom and practice to place less weight on

8    public statements of SEC officials, is that

9    right?

10           A.   What was the context of that?

11                MR. HANAUER:   Less weight than what?

12           Q.   It's in your report on page 27.   I

13   can direct you to that statement.   So you say

14   it's in the second sentence in the second --

15   well, the first full paragraph.   It says, "That

16   said, based on industry custom and practice,

17   market participants typically place less" --

18           A.   Hang on.   I'm not with you.   Where

19   is it?

20           Q.   Okay.  Top of the page, first full

21   paragraph, second sentence.

22           A.   Got it.

23           Q.   Why don't you read that into the

24   record.

25           A.   Okay.   "That said, based on industry

1   ███████ - Confidential Pursuant to Protective Order

2   custom and practice market participants typically

3   place less weight on the views of individual

4   commissioners or staff members who lack the

5   authority to speak to the SEC or bind the

6   commission to their position."

7       Q.   And what's your basis for this

8   opinion?

9       A.   Well, I mean I think we can start

10  with the standard SEC disclaimer in any public

11  speech or statement which says I am speaking on

12  behalf of my own individual opinions and not on

13  behalf of the commission, and that's standard in

14  every speech that I've ever read, so, you know,

15  that's the start of it, and again it takes 3 out

16  of 5 commissioners to establish policy or enact

17  an enforcement action or whatever.

18           So it's the majority of the

19  commission rather than one individual.   The

20  individual is stating his or her own views.

21      Q.   But people still do place some weight

22  on those statements, right?

23      A.   Sure.   It's just, you know, if it was

24  me, it would be interesting and again another

25  part of the mix of information that's out there,

1      ███████ - Confidential Pursuant to Protective Order

2      but, you know, not binding.

3           Q.   And you mentioned that you're

4      familiar with the speech given by William Hinman

5      on June 14, 2018 who was at that time the SEC's

6      director of the division of corporate finance,

7      correct?

8           A.   You know, I read it a while ago.

9           Q.   Okay.

10          A.   The same thing with Jay Clayton.   I

11     mean it was one of the first things I read in the

12     case.

13          Q.   So you read those after you were

14     engaged on the case?

15          A.   I think I read Jay Clayton before

16     that.  I think I read Hinman afterwards.

17          Q.   Is it okay if I call the speech the

18     Hinman speech as a shorthand?

19          A.   Sure.

20          Q.   So you weren't present when Mr.

21     Hinman give the Hinman speech on June 14, 2018?

22          A.   I was not.

23          Q.   Okay.  Do you recall the first time

24     you read it when it was?

25          A.   Maybe August.

```
1     ███████  - Confidential Pursuant to Protective Order

2              Q.   August of 2021?

3              A.   Yeah.

4              Q.   Have you written any articles or

5     publications relating to the Hinman speech?

6              A.   I have not.

7              Q.   Have you advised any clients on the

8     meaning of the Hinman speech?

9              A.   I have not.

10             Q.   In this case, are you offering an

11    opinion on the meaning of the Hinman speech?

12             A.   I am not.

13             Q.   Do you recall that in the speech that

14    Mr. Hinman used the term "sufficiently

15    decentralized" when talking about block chain

16    technology?

17             A.   Not specifically.

18             Q.   Okay, and do you know what that term

19    "sufficiently decentralized" means in the context

20    of Mr. Hinman's speech?

21                  MR. HANAUER:   Objection.   A term in

22             a speech that is not in front of him that

23             he didn't recall reading?

24             Q.   Okay.   You don't really recall that

25    term.
```

1    ████████ - Confidential Pursuant to Protective Order

2         A.   No.

3         Q.   Okay.  As part of your assignment in

4    this case, what work did you do, if any, to

5    assess the weight market participants gave to the

6    Hinman speech?

7         A.   None.

8         Q.   Okay.  As part of your work in the

9    case, what did do you, if anything, to assess the

10   meaning that market participants gave to the

11   Hinman speech?

12        A.   None.

13        Q.   Did the SEC give you to review their

14   communications with market participants that were

15   produced in this litigation about the Hinman

16   speech?

17        A.   No.

18        Q.   Were you aware that the SEC had

19   produced those documents to Ripple?

20        A.   No.

21        Q.   Did you ask the SEC to review any

22   communications with market participants

23   concerning digital asset regulation?

24        A.   No.

25        Q.   How about communications with market

1    ███████ - Confidential Pursuant to Protective Order

2    participants concerning XRP?

3         A.    No.

4         Q.    Okay.  So, when you wrote on page 27

5    of your report, we just read that sentence, that

6    market participants typically place less weight

7    on the views of individual commissioners or staff

8    members and the same holds true for public

9    statements by SEC officials, you meant that as a

10   general statement, correct?

11        A.    Yes.

12        Q.    And you wrote typically, not always?

13        A.    Right.

14        Q.    Do you think certain speeches by SEC

15   officials can have more weight than others in the

16   minds of market participants?

17        A.    Yes and no.  Some do, some don't.

18   I can give you a perfect example.  Back I forget

19   the dates exactly.  Commissioner Aquilar gave a

20   speech.  The disclaimer was there, and it was

21   about a SEC proposed rule governing transfer

22   agents, and there was a 128-page release, and he

23   laid out I thought very beautifully in a speech

24   why the need to amend the transfer agent

25   regulations was critical.  Well, guess what?

1   ███████ - Confidential Pursuant to Protective Order

2   They never got done.

3           So some commissioners get listened

4   to, and others don't.  So it just depends.

5       Q.   So, even if a commissioner gives a

6   speech, it's not necessarily the case that it

7   leads directly to a new regulation or a new rule,

8   correct?

9       A.   Right.  It doesn't compel on anything

10  on the other end.   He's just stating his opinion

11  or her opinion.

12      Q.   Do you know either way whether the

13  SEC's chairman pointed to the Hinman speech in

14  his communications with Congress?

15          MR. HANAUER:   Which chairman?

16          THE WITNESS:  I believe Clayton.

17          MR. HANAUER:   It's your question.

18      A.   I'm not aware of that.  No.

19      Q.   Do you know whether the SEC itself

20  directed market participants to analyze whether

21  digital assets were securities under the factors

22  that Hinman outlined in the Hinman speech?

23      A.   The SEC in general or somebody at the

24  SEC or who at the SEC?

25      Q.   That staff members at the SEC.

1    ███████ - Confidential Pursuant to Protective Order

2         A.   I'm not aware of any.  No.

3         Q.   Are you offering any opinion in this

4    case as to how much weight market participants

5    gave to the Hinman speech?

6         A.   No.

7         Q.   Are you offering any opinion about in

8    this case about how the SEC used the Hinman

9    speech in its communications with market

10   participants?

11        A.   No.

12        Q.   Okay.  In your report you cite a

13   client --

14             THE WITNESS:   We might take a break

15        for a moment if you don't mind.

16             MS. GRESSEL:   No problem.

17             THE VIDEOGRAPHER:   We are going off

18        the record.   The time is 3:10 p.m.

19             (Recess taken)

20             THE VIDEOGRAPHER:   We are back on

21        the record.   The time is 3:29 p.m.

22   BY MS. GRESSEL:

23        Q.   Mr. ███████, on page 25 of your

24   report, you cite a client alert written by the

25   prominent law firm of Latham & Watkins.  Is that

1   ███████ - Confidential Pursuant to Protective Order

2   correct?

3        A.   Yes.

4        Q.   How did you come to select this

5   client alert to cite in your report?

6             MR. HANAUER:   I'm sorry if I missed

7        it.   Which alert are you talking about?

8        A.   The first one, right?

9        Q.   Actually, you know, both of them for

10  that question.   These client alerts.   How did you

11  select these client alerts to cite in your

12  report?

13       A.   Just through my own search efforts.

14       Q.   So was this part of a broader review

15  you conducted about law firm analysis of digital

16  assets?

17       A.   Yeah.   I could characterize it as

18  that.   You know, I was looking at what

19  pronouncements were out there in the legal

20  community that dealt with not only digital

21  assets, but the need for clients to gear up and

22  be careful in the crypto space.

23       Q.   Do you recall what steps you took in

24  that research?

25       A.   Not specifically, but, you know, it

1          ███████ - Confidential Pursuant to Protective Order

2     could be as basic as using, I used duckduckgo,

3     and they're pretty good, and I keep, you know,

4     I'm a fairly good researcher, so I keep plugging

5     away and following different threads and lines

6     and so on.

7          Q.   And, just for the record, duckduckgo

8     is a search engine, correct?

9          A.   Yes.

10         Q.   Did you review any client alerts by

11    any other law firms concerning digital asset

12    regulation?

13         A.   Not that I recall.

14         Q.   So this is the only, these two Latham

15    & Watkins alerts were the only two alerts you

16    recall reading by law firms that relate to

17    regulation?

18         A.   Yeah, that relate specifically to

19    regulation and the need for, you know, linking it

20    to a cautionary tale for, you know, for those who

21    are venturing into that space.

22         Q.   Did you look for any, whether any law

23    firms provided client alerts that didn't express

24    that same cautionary tale?

25         A.   I didn't look for that specifically,

1    ███████ - Confidential Pursuant to Protective Order

2    no.

3            Q.   Okay.  So you sought out law firm

4    client alerts that spoke to the need for caution

5    in this regard?

6            A.   Yeah.  There may have been others.

7    I just don't recall.  You know, I used these two

8    because they were spot on, and Latham & Watkins

9    is, you know, one of the biggest firms in the

10   country, as you know probably.

11           Q.   And are you aware of other law firms

12   that have written on the SEC's regulation of

13   digital assets?

14           A.   Not sitting here trying to remember.

15   There may be, but I can't recall at the moment.

16           Q.   Okay.  So no other law firms come to

17   mind sitting here right now?

18           A.   They don't come to mind.  Right.

19           Q.   Okay, and do you view Latham &

20   Watkins as having specialized knowledge

21   concerning SEC regulation that other law firms

22   don't possess?

23           A.   I don't know if I can compare them to

24   other law firms.  So I really can't answer that

25   question.  I know they're prominent in the

```
 1   ███████  - Confidential Pursuant to Protective Order
 2   securities field.   They hired me for LEK
 3   Securities, so they must know what they're doing.
 4   No, I'm only kidding.   So, yeah, I mean it's
 5   just the weight of the name, and they have a
 6   robust securities practice.
 7           Q.   Are you aware of any other law firms
 8   with a robust securities practice?
 9           A.   Oh, sure.
10           Q.   What firms?
11           A.   Yours, for example.  Sidley.  Wilmer
12   Cutler, Greenberg Traurig.  I could name, you
13   know, a half-dozen, some of which I've worked
14   for.
15           Q.   So Latham & Watkins, you didn't
16   choose Latham & Watkins because you viewed them
17   as an author -- a solely authoritative voice on
18   securities laws issues?
19           A.   I think it was a two-step process.
20   I think the quotes really fit with the point that
21   I was trying to make and put forward and secondly
22   that they were of enough weight and repute to be
23   meaningful.
24           Q.   Okay.  So I want to take, well, I'm
25   not going to take a look at it, but I just want
```

1    ▮▮▮▮▮▮ - Confidential Pursuant to Protective Order

2    to mention, I'm clarifying which one of these

3    alerts I'm talking about to Ben's helpful point.

4    So in footnote 27 you cite a client alert called

5    "The Yellow Brick Road for Consumer Tokens:  The

6    Path to SEC and CFTC Compliance," which is

7    written by Latham & Watkins, correct?

8         A.   Yes.  Actually, this was a conference

9    over in London, and, in addition to Latham &

10   Watkins, there were other discussions that were

11   not on point, but, if you go and look at the

12   global legal insight block chain cryptocurrency

13   cite, you'll see a whole bunch of discussion.

14        Q.   Did you attend that conference in

15   person?

16        A.   No.

17        Q.   Did you attend that conference

18   virtually?

19        A.   No, I did not.

20        Q.   You read the reports from the

21   conference?

22        A.   I read the reports.  That's right.

23        Q.   Okay, and are you aware that that

24   client alert or conference report titled The

25   Yellow Brick Road for Consumer Tokens refers to

1    ███████ - Confidential Pursuant to Protective Order

2    Director Hinman's speech?

3         A.   I don't recall that.   Not

4    specifically, no.

5         Q.   Are you aware that Latham & Watkins

6    stated that Director Hinman's speech indicated a

7    possible path for token transactions to no longer

8    be characterized exclusively as security

9    transactions?

10        A.   Are you saying that that was part of

11   this report?

12        Q.   Yes, that that was quoted in that

13   Latham article.

14        A.   Yeah.   I guess, you know, at that

15   point I was really focused on --

16             MR. HANAUER:   Hold on.   She's

17             asking if you know if what's in, if that's

18             in the report.

19        A.   I don't know for sure, because I was

20   focused on the regulatory issue and the

21   appropriate quote to put in here, so either I

22   read it and didn't think twice about it, or I

23   missed it.

24        Q.   Okay.   I'm just going to mention a

25   few other things in that piece.   Are you aware

1   ██████ - Confidential Pursuant to Protective Order

2   that Latham & Watkins stated the Director Hinman

3   speech said that a digital asset offered as a

4   security can over time become something other

5   than a security?

6        A.   I'm not aware of that.

7        Q.   Do you recall that from reading

8   Director Hinman's speech?

9        A.   I do recall that.  Yes.

10        Q.   Okay.  Are you aware that Latham &

11   Watkins also stated that Director Hinman's speech

12   indicated that digital assets are not necessarily

13   securities?

14        A.   That specifically I don't recall.

15        Q.   Okay.  Are you aware that Latham &

16   Watkins believed Director Hinman's speech

17   indicated that there's less of a public policy

18   need to correct information asymmetries that the

19   securities laws aim to prevent when digital

20   assets are sufficiently decentralized?

21        A.   I don't recall that portion either.

22        Q.   Okay.

23        A.   And again it's not because I didn't

24   read it, but I wasn't focused on it.

25        Q.   Okay.  So you were focused on the

1    ██████ - Confidential Pursuant to Protective Order

2    quote that you put into your report, but not on

3    the other quotes?

4         A.   Right, and that portion I'm trying to

5    remember, yeah, it could have occurred later on

6    after I decided to put this quote in, you know,

7    what I'm saying, later on in the article, so

8    that's maybe why I missed it, because I stopped

9    right there.

10        Q.   Okay.  Do you mean that, once you

11   found that quote, that --

12        A.   I didn't go any further.

13        Q.   Meaning you're not sure you read the

14   whole article?

15        A.   Exactly.

16        MS. GRESSEL:   Okay.  Alright.  I

17        think we're done.

18   EXAMINATION BY MR. HANAUER:

19        Q.   Mr. ██████, do you remember being

20   asked questions whether you did work representing

21   clients related to IPOs?

22        A.   Yes.

23        Q.   During your time at the NASD, did you

24   have experience working with IPOs?

25        A.   Oh, yes, sure.

1    ███████ - Confidential Pursuant to Protective Order

2         Q.    Approximately how many?

3         A.    Well, if you want to say that, you

4    know, we had a regulatory interest in every IPO

5    that traded on NASDAQ from day 1, so it ranged

6    from ensuring that, for example, no trades were

7    taking place prior to SEC effectiveness, so even

8    though, you know, the SEC could declare effective

9    at noon we wanted to make sure there were no

10   transactions between 9:30 and 12, so from that

11   standpoint, that was one.

12               You know, the other SEC and FINRA,

13   NASD rules that pertain to trading of IPOs,

14   10(b)16, short sales, there is a bunch.  So we

15   policed all those IPOs, and of course IPO trading

16   could be very volatile as well, so we often had

17   to contact the company and make sure everything

18   was copacetic with them.

19        Q.    So --

20        A.    In terms of the trading and so on.

21        Q.    So you worked on a lot of IPOs when

22   you were at NASD?

23        A.    Every one that traded on NASDAQ, yes.

24        Q.    I want to refer you to page 29 of

25   your report.  Do you remember counsel asking you

1    ▮▮▮▮▮▮▮ - Confidential Pursuant to Protective Order

2    some questions about what assumptions you made

3    when you were stating things that Ripple would

4    have been required to disclose if those

5    assumptions were true?

6         A.   Sure.   Quite a few.

7         Q.   I just want to clarify.   Was the

8    assumption that Ripple filed a registration

9    statement and conducted an IPO or that Ripple

10   filed a registration statement period?

11        A.   I think it goes to the latter.   You

12   know, you could be registered and not do an IPO I

13   guess is the answer.   There would be a variety

14   of reasons for that, not the least of which is

15   market conditions, for example.

16        Q.   And then the last question I want to

17   ask about is do you recall counsel asking you

18   questions about an investor making inquiries to

19   the SEC about the status of XRP?

20             MS. GRESSEL:   Objection.

21        A.   Yes.

22        Q.   And, in your experience, if the SEC's

23   enforcement division is conducting an enforcement

24   investigation, does the enforcement division

25   typically disclose the existence of that

```
 1   ██████████ - Confidential Pursuant to Protective Order

 2       investigation to the public?

 3               A.   No.

 4                    MR. HANAUER:   Thank you, Mr.

 5           ████████.

 6                    THE WITNESS:   Thank you.

 7                    MS. GRESSEL:   Nothing else from us.

 8           Thanks, Mr. ████████.

 9                    THE WITNESS:   Thank you so much.

10                    THE VIDEOGRAPHER:   We are going off

11           the record.   The time is 3:42 p.m.

12                    (Time noted:   3:42 p.m.)

13

14                              _____

15                              ████████████████████

16       Subscribed and sworn to

17       before me this____day of_____, 2021.

18

19       _____

20       Notary Public

21

22

23

24

25
```

1

2                C E R T I F I C A T I O N

3

4            I, JOSEPH R. DANYO, a Shorthand

5    Reporter and Notary Public, within and for the

6    State of New York, do hereby certify:

7            That I reported the proceedings in

8    the within entitled matter, and that the within

9    transcript is a true record of such proceedings.

10           I further certify that I am not

11   related, by blood or marriage, to any of the

12   parties in this matter and that I am in no way

13   interested in the outcome of this matter.

14           IN WITNESS WHEREOF, I have hereunto

15   set my hand this 19th day of November, 2021.

16

17   _____

18                JOSEPH R. DANYO

19

20

21

22

23

24

25

1

2                          I N D E X

3  Witness                                            Page

4  ███████████████████                                   4

5

6                        E X H I B I T S

7  Defendant                                          Page

8    Exhibit JC 1   Report of ████████████ dated        15
                    October 4, 2021
9
     Exhibit JC 3   Amended complaint                  137
10
   Exhibit JC 15   No action letter                    175
11
   Exhibit JC 10   e-mail chain between Mr. Frank       185
12                  Mossmann and SEC's Office of
                    Investor Education and Advocacy
13

14                        ~oOo~

15

16

17

18

19

20

21

22

23

24

25

```
 1    NAME OF CASE:

 2    DATE OF DEPOSITION:

 3    NAME OF WITNESS:

 4    Reason Codes:

 5          1.  To clarify the record.

 6          2.  To conform to the facts.

 7          3.  To correct transcription errors.

 8    Page _____ Line _____ Reason _____

 9    From _____ to _____

10    Page _____ Line _____ Reason _____

11    From _____ to _____

12    Page _____ Line _____ Reason _____

13    From _____ to _____

14    Page _____ Line _____ Reason _____

15    From _____ to _____

16    Page _____ Line _____ Reason _____

17    From _____ to _____

18    Page _____ Line _____ Reason _____

19    From _____ to _____

20    Page _____ Line _____ Reason _____

21    From _____ to _____

22    Page _____ Line _____ Reason _____

23    From _____ to _____

24

25                              _____
```