# Exhibit 150

**To:** Fredrickson, David R.[REDACTED]C.GOV]
**Cc:** Seaman, Michael P[REDACTED].GOV]; Ingram, Jonathan[REDACTED].GOV]; Starr, Amy[REDACTED].GOV]
**From:** Hinman, William
**Sent:** 2018-05-31T18:07:09-04:00
**Importance:** Normal
**Subject:** RE: draft
**Received:** 2018-05-31T18:07:09-04:00
Digital asset morphing 5 29 draft.vs whh.docx

;;
I did a bit of clean up and inserted an alternative that could be used on ether if we need to hedge the issue a bit at the time of the speech.

*DRAFT*
*May 31, 2018*
*Non-public*

**Digital asset morphing – May 31 draft**

There has been considerable discussion recently in the press and at legal conferences regarding whether a digital asset offered as a security can over time become something other than a security. I think framing the question that way slightly misses the point.

I think a better line of inquiry is can a digital asset or token that was originally offered in a securities offering ever be sold in a manner that does not constitute a securities offering? In the cases where the digital asset or token represents a set of rights that give the holder a financial interest in an enterprise the answer is likely no. In these cases, where the token is simply another name for an interest that looks and behaves like an equity or debt instrument, renaming it won't take it out of the purview of the U.S. securities laws. By the way, there may be situations where this is being done not to attempt to evade our laws—there are issuers who are using tokenization of these interests to create securities where ownership may be efficiently recorded on the block chain.

But what of those cases where there is no central enterprise being invested in and where the digital asset or token represents a good or service available through the network on which it was created? I believe in these cases the answer is a qualified "yes," and I'd like to share my thinking with you today about the circumstances under which that could occur.

First, I would like to start with a little background on the new world of digital assets. Most of you are no doubt quite familiar with Bitcoin and know of blockchain – or distributed ledger – technology. As I have come to learn, what may be most exciting about this technology

*DRAFT*
*May 31, 2018*
*Non-public*

is the ability to share information, transfer value, and record transactions in a decentralized digital environment. What does that mean? Payment systems, supply chain management, intellectual property rights licensing, stock ownership transfers and countless other potential applications can be conducted electronically, with a public, immutable record without the need for a trusted third party to verify transactions. These new networks record digital information packets that identify transaction details and provide users with public and private encrypted keys to facilitate transfers. These packets are sometimes called coins or tokens, and can be obtained through mining, distribution, sale or exchange by users in the network. Some people believe these new systems will forever transform the internet as we know it. There is excitement around this new technology. There is also a great deal of "irrational exuberance" and, unfortunately, many cases of t fraud.

But that is not what I want to focus on today. I am here to talk about how these digital tokens and coins are being issued, distributed and sold. In order to raise money to develop these new systems, promoters[1] often sell the tokens themselves, rather than sell shares, or issue notes or obtain bank financing. We have seen public distributions on the internet and private placements to sophisticated investors. But, in many cases, the economic substance is the same: money is raised with the expectation that the promoters will build their system and investors can earn a return on the instrument -- usually by selling their tokens in the secondary market as the value of the digital enterprise increases once the promoters create something of value with the proceeds.

[1] [I am using the term "promoters" in a broad, generic sense. The important factor in the legal analysis is that there is a person or coordinated group that is working actively to develop the infrastructure of the network. This person or group may be, variously, founders, sponsors, developers, or "promoters" in the traditional sense. The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or coordinated group of actors' efforts are essential.]



CONFIDENTIAL SEC-LIT-EMAILS-000471053

*DRAFT*
*May 31, 2018*
*Non-public*

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in SEC v. Howey.[2] As you will remember, the test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others. And it is important to reflect on the facts of Howey. A Florida hotel operator sold interests in a citrus grove to its largely out-of-state guests. The transaction was recorded as a real estate sale, together with a service contract. In theory, purchasers could arrange to service the grove themselves, but few pursued that option. In fact, the purchasers were passive, relying on Howey for a return based largely on the Howey Service Company efforts in tending to the assets. And in articulating the test for an investment contract, the Supreme Court emphasized: "Form [is] disregarded for substance and the emphasis [is] placed on economic realities."[3] So the purported real estate purchase was found to be an investment contract, and hence a security.

In the ICOs we have seen, overwhelmingly, promoters tout their ability to create some innovative application of blockchain technology. The investors are passive. Marketing efforts are rarely targeted to potential users of the application. And the viability of the application is still uncertain. At that stage, the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something that may someday be used to exchange for goods or services on the network.

Strictly speaking, the token -- or coin or whatever the digital information packet is called – all by itself may not be a security just ashe orange groves in Howey, without the service and other efforts, were not. Central to determining whether a security is being sold is how it is being

---

[2] SEC v. W.J. Howey Co, 328 U.S. 293 (1946).
[3] Id. at 298.

sold. For example, when a certificate of deposit is sold by a federally regulated bank, the CD is not a security.[4] When a CD is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and ability to profit from changes in interest rates, the CD is part of an investment contract that is a security.[5] Similarly, when someone buys a housing unit to live in – even when represented by an instrument called "stock" -- it is probably not a security.[6] When the housing unit is offered with a management contract or other services as an investment, it can be a security.[7]

And so with digital assets. The digital asset itself is simply code. But the way it is sold – as part of an investment; to non-users; by promoters to develop their idea – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need in order to make an informed decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The disclosure marries nicely with the Howey investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. The investor is relying on the third party. So learning material information about the third party – its background, financing, plans, financial stake, and so forth – is a prerequisite to making an informed investment decision. Unless the third party is

---

4 Marine Bank v. Weaver, 455 U.S. 551 (1982).
5 Gary Plastics Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985).
6 United Housing Found., Inc. v. Forman, 421 U.S. 837 (1975).
7 Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, SEC Rel. No. 33-5347 (Jan. 4, 1973).

compelled by the securities law to disclose what it alone knows of these topics and the risks associated with the venture, investors will be uninformed and are at risk.

But this also points the way to when a digital asset may no longer represent a security. When the efforts of the third party are no longer a key determining factor for the enterprise's success, material information asymmetries recede. Moreover, as a network becomes truly decentralized, the ability to identify an issuer to make the disclosure becomes difficult, and perhaps meaningless.

And so, when we look at Bitcoin, we do not see a third party whose efforts are a key determining factor in the enterprise. The value of Bitcoin turns on the efforts of decentralized miners and independent market participants' assessments of an open-source payment mechanism. Applying the disclosure provisions of the securities laws in this situation would seem to add little value. [Likewise, based on our understanding of the present state of Ether and the Ethereum network, regulating Ether as a security does not seem to be warranted.] [There may be other decentralized networks where regulating the tokens that function on them as a security may not be warranted. [ And of course there continue to be systems that rely on central actors whose efforts are key to the success of the enterprise. In those cases, application of the securities laws can protect the investors who purchase coins that may function on those networks in that there will be requirements for disclosures and trading by regulated entities in those tokens will fall under our supervision.

As I have tried to point out, the analysis is not static and the nature of a security does not inhere to the instrument.[8] Like CDs – which when issued by a federally regulated bank are not securities but when repackaged as part of an investment strategy can be securities – even digital assets with utility in an existing eco-system could be packaged and sold as an investment strategy that can be a security. A promoter could place Bitcoin in a fund or trust and sell interests, creating a new security. Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize that simply labeling a digital asset a "utility token" does turn the asset into something that is not a security.[9] True, the Supreme Court has acknowledged that if someone is purchasing an asset for consumption only, it is likely not a security.[10] But the economic substance of the transaction determines the legal analysis, not the labels.[11] The oranges in Howey had utility. Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[12] Promoters sold the receipts to US investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and, for some, had exquisite utility. But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption. They were selling investments and the purchasers were expecting a return.

---

[8] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Howey, at 299.

[9] "[T]he name given to an instrument is not dispositive." Forman, at 850.

[10] Forman, at 853.

[11] See above

[12] SEC Rel. No. 33-5018 (Nov. 4, 1969); Investment in Interests in Whisky, SEC Rel. No. 33-5451 (Jan 7, 1974).

*DRAFT*
*May 31, 2018*
*Non-public*

We expect issuers and market participants will want to understand whether transactions in a particular digital asset involve the sale of a security. We're not trying to play "regulatory gotcha." We are happy to help promoters and their counsel work through these issues. We stand prepared to provide more formal interpretive or no action guidance to market participants about the proper characterization of a digital asset in a proposed use.

What are some of the factors we would look to? Whether a digital asset is offered as an investment contract and is thus a security will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

1. Is there a person or organized group that has sponsored or promoted the creation and sale of the digital assets, the efforts of which play a significant role in the development and maintenance of the asset and its potential increase in value?

2. Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would third party purchasers have a reasonable basis to believe such efforts will be undertaken and may result in a return on their investment in the digital asset? Does this group continue to expend proceeds from the funding of the enterprise or funds generated by its operations to enhance the functionality and/or value of the system within which the token operate?

3. Is the instrument marketed and sold to potential users of the network for a price that [is commensurate] [has a reasonable correlation] with the market value of the good or service in the network?

4. Does application of Securities Act protections make sense? Is there a person or entity others are relying on, or a promoter, that plays a key role in the profit-making of the enterprise such that disclosure of the promoter's activities and plans would be helpful to investors? Do informational asymmetries exist between the promoter/sponsors and potential purchaser/investors in the digital asset?

In the meantime, are there contractual or technical ways to structure digital assets so they are less likely to act like a security? I believe so. Again, these are certainly not "get out of jail free" cards, and we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other, possible features. This list is not intended to be exhausted and by no means do I believe each and every one of these factors need to be present of establish a case that a token is not be offered as a security.

1. Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?

2. Can tokens be hoarded or are they distributed in ways to meet users' needs? Are the tokens structured in such a way that purchase for use, not investment is compelling? Examples of these structural details could be a token that degrades in value over time or which can only be held or transferred in amounts that correspond to a purchaser expected use?

3. Are the assets dispersed across a diverse user base and not concentrated in the hands of a few that can exert influence over the application?

4. Have purchasers made representations as to their consumptive, as opposed to their investment, intent?
5. Is the promoter supporting the secondary market for the assets or are independent actors setting the price?
6. Is the application fully functioning?
7. Is the asset marketed and distributed to potential users or the general public?

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate the federal securities laws.



CONFIDENTIAL