# Exhibit 160

## Washington University Journal of Law & Policy

Volume 61 *The Rise of Fintech*

2020

# Regulation by Selective Enforcement: The SEC and Initial Coin Offerings

James J. Park
*Professor of Law, UCLA School of Law*

Howard H. Park
*JD Candidate, UCLA School of Law Class of 2020*

Follow this and additional works at: https://openscholarship.wustl.edu/law_journal_law_policy

Part of the Banking and Finance Law Commons, Science and Technology Law Commons, and the Securities Law Commons

### Recommended Citation

James J. Park and Howard H. Park, *Regulation by Selective Enforcement: The SEC and Initial Coin Offerings*, 61 WASH. U. J. L. & POL'Y 099 (2020),
https://openscholarship.wustl.edu/law_journal_law_policy/vol61/iss1/11

This Article is brought to you for free and open access by the Law School at Washington University Open Scholarship. It has been accepted for inclusion in Washington University Journal of Law & Policy by an authorized administrator of Washington University Open Scholarship. For more information, please contact digital@wumail.wustl.edu.

# REGULATION BY SELECTIVE ENFORCEMENT:
## THE SEC AND INITIAL COIN OFFERINGS

## James J. Park[*] and Howard H. Park[**]

### INTRODUCTION

Like many other administrative agencies, the Securities and Exchange Commission (SEC) has significant power to regulate an important sector of the economy—in the SEC's case, the securities markets. Critics of the SEC have claimed that at times it has engaged in "Regulation by Enforcement," where it makes law through enforcement actions rather than by developing and passing clear rules.[1] This argument has periodically surfaced with respect to some of the most important issues addressed by the SEC over the decades—insider trading,[2] questionable foreign payments by public companies,[3] and securities fraud.[4]

The SEC has recently been faced with a new challenge, the sudden explosion of initial coin offerings (ICOs), which have raised billions of dollars through the sale of digital tokens.[5] Over the last several years,

---

[*]     Professor of Law, UCLA School of Law.

[**]    JD Candidate, UCLA School of Law Class of 2020.

1.     *See, e.g.*, James J. Park, *The Competing Paradigms of Securities Regulation*, 57 DUKE L.J. 625, 637 (2007) ("The 'Regulation by Enforcement' critique reflects a general sense that norms are best initiated by rulemaking whereas enforcement actions should merely enact previously defined rules."); *see also* WILLIAM L. CARY, POLITICS AND THE REGULATORY AGENCIES 82-84 (1967) (noting criticism that rules are preferable to administrative opinions).

2.     Harvey L. Pitt & Karen L. Shapiro, *Securities Regulation by Enforcement: A Look Ahead at the Next Decade*, 7 YALE J. ON REG. 149 (1990).

3.     ROBERTA S. KARMEL, REGULATION BY PROSECUTION: THE SECURITIES & EXCHANGE COMMISSION VERSUS CORPORATE AMERICA 146-59 (1982).

4.     Jonathan R. Macey, *The Tenth Abraham L. Pomerantz Program: Wall Street in Turmoil: Who is Protecting the Investor? State-Federal Relations Post-Eliot Spitzer*, 70 BROOK. L. REV. 117, 128 n.36 (2004) ("Rulemaking by enforcement refers to the presumptively illegitimate process by which regulators proceed with rulemaking 'ex post,' i.e. after certain conduct occurs, rather than through more legitimate formal notice-and-rulemaking procedures.").

5.     An ICO listing site that relies on self-reporting notes that ICOs raised over twenty-one billion dollars in 2018 alone. *Crypto Token Sales Market Statistics: 2018, All Types*, COINSCHEDULE,

99

PARK ARTICLE
3/31/2020

100                    Journal of Law & Policy                    [Vol. 61

promoters routinely distributed investments to investors through ICOs
without filing the registration statements typically required for the sale of
securities to the public. Blockchain technology facilitated the ability of
entrepreneurs to easily sell tokens to numerous investors, who receive a
secure digital record of their purchase.[6] ICOs for a time exceeded venture
capital in funding startup companies.[7] It was conceivable that ICOs could
disrupt a well-established regulatory scheme requiring disclosure when new
businesses raise funds from the public.[8]

Even when a token is clearly an investment, the SEC only has jurisdiction
to regulate it if it is a security.[9] Before ICOs, the definition of a security was
periodically defined on a case-by-case basis in litigation involving
investments backed by unusual assets such as pay phones or chinchillas.[10]
In these cases, courts typically ask whether an investment is a security under
the Supreme Court's *Howey* test.[11] If it is an investment contract under that
doctrine, it is a security subject to SEC disclosure and anti-fraud
requirements. If it is not, securities law does not provide the SEC a basis for
regulating the transaction.

The key question in applying the *Howey* test is whether the investment is
in a business venture whose profitability depends on the efforts of "others."
These "others" could include formal corporate managers or individuals with

---

https://www.coinschedule.com/stats/ALL?dates=Jan+01%2C+2018+to+Dec+31%2C+2018
[https://perma.cc/NP3P-U6ZG].

6.      In general, the term "coins" refers to cryptocurrencies that can operate as stand-alone
platforms, such as Bitcoin or Ethereum. Most ICOs utilize "tokens" which are crypto-assets that are
dependent on a coin platform.

7.      Arjun Kharpal, *Initial Coin Offerings Have Raised $1.2 Billion and Now Surpass Early Stage
VC Funding*, CNBC (Aug. 9, 2017, 9:17 AM EDT), https://www.cnbc.com/2017/08/09/initial-coin-
offerings-surpass-early-stage-venture-capital-funding.html [https://perma.cc/W92Z-38B7].

8.      *See, e.g.*, Saule T. Omarova, *New Tech v. New Deal: Fintech as a Systemic Phenomenon*, 36
YALE J. ON REG. 735, 744-47 (2019) (arguing that ICOs and other fintech developments are undermining
the "New Deal settlement" for finance concerning the "optimal balance of private freedom and public
control in the financial market").

9.      *See, e.g.*, Securities Act of 1933 § 5, 15 U.S.C. § 77(e) (2018) (requiring registration of
securities).

10.     *See, e.g.*, SEC v. Edwards, 540 U.S. 389 (2004) (finding leaseback contracts involving
payphones were securities); Miller v. Cent. Chinchilla Grp., Inc., 494 F.2d 414 (8th Cir. 1974) (finding
chinchilla breeding scheme involved an investment contract).

11.     SEC v. W.J. Howey Co., 328 U.S. 293, 299 (1946). *Howey* provides that "an investment
contract for purposes of the Securities Act means a contract, transaction or scheme whereby a person [1]
invests his money [2] in a common enterprise and [3] is led to expect profits [4] solely from the efforts
of the promoter or a third party." *Id.* at 298-99.

PARK ARTICLE
3/31/2020

less defined roles. Investment in a security is distinguished by the need to assess the competence and honesty of such "others." The possibility that the investment will rise in value through market forces is not enough. After all, fortunes have been made by owners of assets such as art, gold, and oil, yet none of those investments are securities.[12]

In addressing when an ICO sells a security, the SEC had little choice but to proceed through Regulation by Enforcement.[13] The *Howey* test is deliberately vague and reflects the broad definition of "security" passed by Congress.[14] There is no simple rule or formula that can easily resolve close cases.[15] On the other hand, aggressively penalizing the pioneers developing the latest transformative technology would risk sparking criticism that SEC regulation squelches valuable entrepreneurship.[16]

The SEC thus proceeded through what this article calls "Regulation by Selective Enforcement." Rather than bringing many enforcement cases seeking penalties (as it could have, given the sheer number of noncompliant ICOs[17]), the SEC has brought only a handful of carefully chosen significant actions. The SEC initially did not seek sanctions in ICO cases, giving the industry time to adjust, and perhaps increasing the chance that early cases

---

12.    Noa v. Key Futures, Inc., 638 F.2d 77 (9th Cir. 1980).

13.    Indeed, the SEC's efforts with respect to ICOs have been characterized as Regulation by Enforcement. *See, e.g.*, Wells Submission of Kik Interactive, Inc. and the Kin Ecosystem Foundation at 3, In re Kik Interactive, No. HO-13388 (Dec. 10, 2018), https://www.kin.org/wells_response.pdf [https://perma.cc/U22F-Y2J7]; Jonathan Rohr & Aaron Wright, *Blockchain-Based Token Sales, Initial Coin Offerings, and the Democratization of Public Capital Markets*, 70 HASTINGS L.J. 463, 512 (2019) ("Regulation through enforcement is necessarily piecemeal and incremental."); *see also* Recent Guidance, SEC, *Framework for "Investment Contract" Analysis of Digital Assets*, 132 HARV. L. REV. 2418, 2422 (2019) ("Through selective enforcement of the most egregious fraud cases, the SEC has prevented judges from interpreting the application of securities laws to digital assets, leading to vague and nebulous regulation.").

14.    Securities Act of 1933 § 2 A(b)(1), 15 U.S.C. § 77(b) (2018).

15.    At least initially, there was sufficient ambiguity about whether ICOs involved securities for ICO promoters to credibly claim that they did not intend to break the law. *Cf.* Elizabeth Pollman & Jordan M. Barry, *Regulatory Entrepreneurship*, 90 S. CAL. L. REV. 383 (2017) (describing startup companies with business plans based on challenging current regulations).

16.    As Professors Brummer and Yadav observe, it is difficult, if not impossible, for regulators to construct a framework that achieves clear rules, market integrity, and financial innovation. *See* Chris Brummer & Yesha Yadav, *Fintech and the Innovation Trilemma*, 107 GEO. L.J. 235 (2019).

17.    *See, e.g.,* Jay Clayton, *Statement on Cryptocurrencies and Initial Coin Offerings*, SEC (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 [https://perma.cc/U24W-E9E5] (noting that ICOs typically involve sale of securities and that no ICOs had been registered with the SEC).

PARK ARTICLE
3/31/2020

would settle rather than be litigated over a lengthy period. Over time, the SEC built a foundation of legal guidance applying *Howey* to specific cases with little court intervention.

While the SEC's enforcement is inherently selective because it does not have the resources to pursue every violation, the SEC's effort with respect to ICOs was distinctively selective because it left some significant violations of the securities laws unaddressed. Not all insider trading and securities fraud cases spur an SEC action, but such malfeasance is typically hidden and requires substantial effort to uncover.

Regulation by Selective Enforcement was possible in part because the SEC is not the only enforcer of the securities laws.[18] Private parties, for example, have powerful remedies when they purchase an unregistered token that turns out to be a security. They have the right to rescind the transaction under Section 12 of the Securities Act of 1933 if it does not fall within an exemption to the registration requirement.[19] Because security purchasers can enforce the securities laws, the SEC can devote its limited enforcement resources to the most important cases while allowing most investors to exercise self-help. In addition, state securities regulators independently brought many cases targeting ICOs, protecting investors without the resources to bring a suit.[20]

The SEC's Regulation by Selective Enforcement strategy has been successful in establishing the agency's authority over ICOs—and has done so with limited involvement of the courts. The SEC has moved decisively with these cases, considering their complexity and its reputation for taking years to resolve enforcement matters.[21] At the same time, it has been thoughtful in applying the law to a new setting. The SEC's various enforcement releases have effectively communicated basic parameters to

---

18.     As one of this Article's authors has written elsewhere, the various enforcers of the securities laws can play distinct roles. James J. Park, *Rules, Principles, and the Competition to Enforce the Securities Laws*, 100 CALIF. L. REV. 115 (2012).

19.     *See* Securities Act of 1933 § 12(a)(1), 15 U.S.C. § 77(l) (2018).

20.     On the role of state securities regulators in protecting retail investors, see Carlos Berdejó, *Small Investments, Big Losses: The States' Role in Protecting Local Investors from Securities Fraud*, 92 WASH. L. REV. 567 (2017).

21.     *See, e.g.*, Park, *supra* note 18, at 147.

the industry with respect to when ICO tokens are securities.[22] As a result, the number of unregistered ICOs available to U.S. investors has quickly declined.[23]

On the other hand, a danger of Regulation by Selective Enforcement is that it can create the illusion that the major legal issues have been resolved, when there is still a great deal of uncertainty as to when a token is a security. The SEC's settlement releases only represent the agency's view that a particular token was a security. Though administrative interpretation of a statute is entitled to some weight,[24] courts may still disagree. Some of the SEC's most important ICO cases have turned on fine distinctions. Slightly different facts could merit different results. Yet the SEC has acted at times as if the issue of when a token is a security has been so clearly resolved that subsequent violations deserve significant sanction. Such a position is troubling.

Another danger is that by only bringing cases against more recent ICOs, the SEC risks conferring monopoly power to early movers. The ICO of Ether, the token associated with the Ethereum smart contracts platform, at least initially was the sale of a security, but the SEC has taken the position that Ether is no longer a security. Ethereum thus has a significant advantage over newer smart contract platforms that will have to comply with SEC regulation.

The challenge of responding to ICOs illustrates the difficulty of regulating innovation. For the most part, the SEC has effectively applied old

---

22.    For an analysis of the ways administrative guidance can influence private parties, see Blake Emerson, *The Claims of Official Reason: Administrative Guidance on Social Inclusion*, 128 YALE L.J. 2122, 2156-63 (2019).

23.    ICO numbers dropped from 674 successful ICOs in the first half of 2018 (with 84 based in the U.S.), to 379 in the second half of 2018 (with 33 based in the U.S.), down to 94 successful ICOs in the first half of 2019 (with 7 based in the U.S.). *Crypto Token Sales Market Statistics*, *supra* note 5.

Much ICO activity originates outside the United States. In one case involving a Canadian ICO that had some U.S. investors, the SEC acknowledged a $520,000 penalty levied by Canadian securities regulators in imposing a smaller penalty of $25,000. *See* Nextblock Global Ltd., Securities Act Release No. 10638, 2019 WL 2103138 (May 14, 2019). The SEC also levied a penalty of $24 million for an unregistered ICO involving an offshore company that marketed the ICO to U.S. investors and did not adequately prevent U.S. investors from purchasing tokens. *See* Block.one, Securities Act Release No. 10714, 2019 WL 4793292 (Sept. 30, 2019).

24.    *See, e.g.*, Skidmore v. Swift & Co., 323 U.S. 134 (1944).

legal standards to a new problem.[25] Though it should be congratulated for its work, the SEC should not assume that its Regulation by Selective Enforcement program has completely resolved the legal issue of when a token is a security.

## I. THE MECHANICS OF ICOS

The unprecedented success of the ICO in raising funds can be partly attributed to its efficiency in distributing digital assets. The value of a token is far from certain, but an investor in a reputable token has some confidence that his purchase has been documented in a rigorous manner.[26] Rather than rely on a paper stock certificate that can be forged or lost, blockchain technology permits entrepreneurs to create a secure record of token transactions.

ICOs essentially create a set of smart contracts between the investor and a project.[27] One ICO contract governs the exchange of some consideration for the token. Another ICO contract may give the token purchaser the right to access a service, often in the future when it becomes functional. Just as a corporate charter can be likened to a contract between shareholders and the corporation,[28] an ICO establishes a contractual arrangement between the token purchaser and a project.[29] Unlike a corporate contract, ICO smart contracts are self-executing and thus could better protect the rights of token purchasers.

---

25.    *See, e.g.*, Thomas Lee Hazen, *Tulips, Oranges, Worms, and Coins—Virtual, Digital, or Crypto Currency and the Securities Laws*, 20 N.C. J.L. & TECH 493, 526 (2019) (arguing that decisions finding that "initial coin offerings involve an offering of securities . . . are headed in the right direction.").

26.    Of course, the promoter could simply lie and never create a smart contract program that would record the transaction.

27.    For an overview of smart contracts and ICOs, see Nareg Essaghoolian, *Initial Coin Offerings: Emerging Technology's Fundraising Innovation*, 66 UCLA L. REV. 294, 306-14 (2019).

28.    *See, e.g.*, Michael Klausner, *Fact and Fiction in Corporate Law and Governance*, 65 STAN. L. REV. 1325, 1327–28 (2013) ("The contractarian logic is clearest at the point of a company's initial public offering (IPO).").

29.    Many ICOs publish a white paper describing the features of this relationship. One study finds that ICOs with a white paper are more likely to increase employment and are less likely to fail. *See* Sabrina T. Howell, Marina Niessner & David Yermack, *Initial Coin Offerings: Financing Growth with Cryptocurrency Token Sales* 3 (Nat'l Bureau of Econ. Research, Working Paper No. 24774, 2019), https://ssrn.com/abstract=3201259.

PARK ARTICLE
3/31/2020

### A. Securities Transactions and Trust

When investors buy stock in a public company today, they do not receive a physical document. Instead, a record of the transaction is made in a ledger kept by a third-party depository institution that holds the stock on behalf of its owner.[30] When the investor sells the stock, the depository institution makes adjustments in the ledger to reflect the change in ownership. Thus, stock transactions are not like the exchange of currency where physical bills go from one party to another.

This system replaced a system where paper stock certificates were transferred from person to person. The problem with relying on physical evidence of ownership was that it became difficult to keep track of the certificates. While there may have been comfort in receiving an official company document representing a share of stock, there was a risk that such a document could be misplaced. One journalist writing in the early 1970s described the dangers to investors associated with the transfer of stock certificates:

> Not infrequently he was sent the wrong stock; when he was sent the right certificate, it arrived late. Often he would not receive it at all. If he left his stock in a Street name—with his broker—there was a good chance he would never receive his dividends – a sure sign that there was no record of ownership at his broker's office. . . . If he was unlucky enough to die his securities, dividends and cash might well be kept by the broker instead of being delivered to the proper authorities to be held for the investor's heirs.[31]

Just a few decades ago, the securities industry had not resolved the basic concern that an investor's stock purchase could be stolen or lost. ICOs have rightly been criticized for their potential for fraud,[32] but it is important to

---

30. *See, e.g.*, George S. Geis, *Traceable Shares and Corporate Law*, 113 Nw. U. L. Rev. 227, 232-35 (2018) (describing creation of the Depository Trust & Clearing Corporation, which holds stock ownership records).

31. Christopher Elias, Fleecing the Lambs 8 (1971).

32. *See, e.g.*, Shane Shifflett & Coulter Jones, *Buyer Beware: Hundreds of Bitcoin Wannabes Show Hallmarks of Fraud*, Wall St. J. (May 17, 2018, 12:05 PM),

PARK ARTICLE
3/31/2020

remember that not too long ago the system for transferring traditional securities was not completely reliable.

Blockchain technology, which was first widely used in connection with the virtual currency Bitcoin,[33] can be understood as a natural extension of a world where transactions are increasingly just entries recorded in an electronic ledger. Rather than relying upon a single ledger, with blockchain an ownership record can be memorialized in multiple digital ledgers. Whenever a new transaction occurs, a decentralized network of "miners" will compete to verify the validity of the transaction by solving an arbitrary mathematics problem.[34] Once a transaction is verified, it is added as a block that is connected to a chain of prior verified transactions, hence the term "blockchain."[35] Importantly, the miner that is the first to confirm a cryptocurrency transaction receives compensation in the form of that cryptocurrency.[36] For example, a Bitcoin miner will receive Bitcoin for verifying a transfer of Bitcoin. This incentive is necessary because solving the math associated with a transaction requires significant computer processing power that uses expensive hardware and electricity.[37]

ICOs utilize blockchain technology to address the basic problem that a stock purchaser must trust that his funds have purchased an investment. While this is not typically a problem for public companies, where a reputable third party records the transactions, it could be an issue for some

---

https://www.wsj.com/articles/buyer-beware-hundreds-of-bitcoin-wannabes-show-hallmarks-of-fraud-1526573115 [https://perma.cc/GQF9-Z58C].

33.    For an overview of blockchain technology, see PRIMAVERA DE FILIPPI & AARON WRIGHT, BLOCKCHAIN AND THE LAW: THE RULE OF CODE (2018).

34.    Anyone with a sufficient computer and internet connection can be a miner for networks like Bitcoin, *Download Bitcoin Core*, BITCOIN CORE, https://bitcoin.org/en/download [https://perma.cc/G5MY-3FH6], or Ethereum, *Download Geth*, GO ETHEREUM, https://geth.ethereum.org/downloads [https://perma.cc/7UUQ-4SVL].

35.    The Bitcoin protocol dictates that the longest known blockchain is the authentic copy. Because each link requires solving a problem, the longest blockchain has also had the most computational work put into it. This means that the security of the decentralized ledger can be maintained as long as no one gains the majority of the computer processing power because they would be outpaced by the rest of the network. This form of security is known as a proof-of-work system. *See* SATOSHI NAKAMOTO, BITCOIN: A PEER-TO-PEER ELECTRONIC CASH SYSTEM 3 (2008) https://bitcoin.org/bitcoin.pdf [https://perma.cc/3XXJ-XUTL].

36.    *Id.* at 4.

37.    The electrical power required to maintain the Bitcoin network has been compared to that of a small country. *Bitcoin Energy Consumption Index*, DIGICONOMIST, https://digiconomist.net/bitcoin-energy-consumption [https://perma.cc/P9JR-BWW7] (tracking Bitcoin's estimated power usage and finding that it currently resembles that of Austria).

PARK ARTICLE
3/31/2020

private companies. A private company has the option of issuing physical stock certificates, or it can record the transactions in a ledger it maintains.[38] While an investor can trust a reputable private company to accurately and honestly record a transaction, not all start-up companies are trustworthy. With blockchain technology, an investor in a new venture can receive some additional assurance that transactions in a digital asset are accurately and securely memorialized.[39]

### B. ICOs as Smart Contracts

Unlike Bitcoin, an ICO is somewhat more complicated than the simple transfer of an asset to an investor. Because a token is more than a basic currency, code must specify the various functions associated with the token. An ICO creates various smart contracts that define the relationship between the token holder and the blockchain project.[40] Just as stock confers rights to the shareholder, a token confers rights to the token holder. Rather than specify such rights in a written corporate charter, blockchain enables those rights to be memorialized in the code that creates the digital asset.

Most ICOs use Ethereum, a blockchain platform that offers users the ability to construct smart contracts permitting access to various applications programmed onto the platform.[41] Smart contracts can be set up so that a

---

38.    *See, e.g.*, DEL. CODE ANN. tit. 8, § 158 (2019) (permitting uncertificated shares).

39.    For an overview of the various implications blockchain recording of stock transactions can have for corporate law, see Geis, *supra* note 30.

40.    For example, one ICO described a set of four smart contracts:

> The main contract is called 'DAO'. It defines the inner workings of the DAO and it derives the member variables and functions from 'Token' and 'TokenCreation'. Token defines the inner workings of the DAO Token and Token-Creation defines how the DAO token is created by fueling the DAO with ether. In addition to these three contracts, there is the 'ManagedAccount' contract, which acts as a helper contract to store the rewards which are to be distributed to the token holders. . . . The contract 'SampleOffer' . . . is an example of what a proposal from a contractor to the DAO could look like.

Christopher Jentzsch, Decentralized Autonomous Organization to Automate Governance 3 (2015) (unpublished manuscript) (on file with the Washington University Journal of Law & Policy).

41.    *White Paper: A Next Generation Smart Contract & Decentralized Application Platform*, GITHUB, https://github.com/ethereum/wiki/wiki/White-Paper [https://perma.cc/84LK-XWPM] (describing Ethereum as "the ultimate abstract foundational layer: a blockchain with a built-in Turing-complete programming language, allowing anyone to write smart contracts and decentralized applications. . . ."). For a tutorial on deploying smart contracts on Ethereum, see Mercury Protocol, *How to: Deploy Smart Contracts onto the Ethereum Blockchain*, MEDIUM (Dec. 21, 2017),

108                    Journal of Law & Policy                    [Vol. 61

digital ledger documents events that trigger contractual obligations. When an investor sends a digital asset to an account, that action creates an obligation to send a token to that investor. Moreover, when an investor decides to use a token, the investor can send the token to a digital address to trigger access to some service. Smart contracts can automatically fulfill various obligations without human intervention.[42]

Like Bitcoin, Ethereum requires miners to verify transactions that are recorded on a digital ledger.[43] Such transactions can be initiated through use of a cryptocurrency called Ether. The payment of Ether is necessary for individuals who want to use Ethereum to set up a smart contract. Whenever verification is necessary with respect to an Ethereum smart contract, the party wishing to execute the contract must pay an Ether transaction fee to the miners. Without such a fee, there would not be sufficient incentive for third parties to spend computing time and resources to verify the transaction. Ether is often described as the "gas" that permits the Ethereum blockchain to function.[44] The price of Ether thus depends largely on the underlying demand for creating and using smart contracts on Ethereum.[45]

The first step in an ICO on a platform like Ethereum is to open an account that permits the user to code various smart contracts.[46] Such an account can be used to create a token, which is essentially a digital record that can be programmed with various features. Perhaps the most basic aspect of such a token is that it can be transferred from one user to another.  As the Ethereum White Paper explained, "a currency, or token system, fundamentally is a database with one operation: subtract X units from A and give X units to B. . . ."[47]

---

https://medium.com/mercuryprotocol/dev-highlights-of-this-week-cb33e58c745f [https://perma.cc/GYE7-D3ZL];   *see   also   Ethereum   Mist   Readme*,   GITHUB, https://github.com/ethereum/mist/releases [https://perma.cc/7TPA-EXTF].

    42.    *See, e.g., White Paper: A Next Generation Smart Contract & Decentralized Application Platform*, *supra* note 41 (describing smart contracts as "systems which automatically move digital assets according to arbitrary pre-specified rules.").

    43.    *See id.*

    44.    *See, e.g., id.* at 13 (describing Ether as "the main internal crypto-fuel of Ethereum . . . used to pay transaction fees.").

    45.    In addition, the supply of individuals willing to mine Ether will also affect the price.

    46.    *See, e.g., White Paper: A Next Generation Smart Contract & Decentralized Application Platform*, *supra* note 41, at 13.

    47.    *Id.* at 19.

PARK ARTICLE
3/31/2020

2020]            Regulation by Selective Enforcement            109

The Ethereum Foundation provides a basic token format called ERC20 that provides token creators with a standard form that can be tailored to each project's needs.[48] The ERC20 standard is governed by several mandatory rules. It has a standardized method for token creators to set their token's names and symbols.[49] It requires that a token user be permitted to look up the total token supply and the token balance of any particular user.[50] When an ERC20 token is transferred, such "transfer events" must be broadcasted to other users of the network.[51] The ERC20 standard also provides for a number of optional functions that the creator can choose to implement. For example, a token creator can specify methods of generating new tokens or removing tokens from circulation.[52]

When the ICO is ready to launch, another smart contract can govern the process by which the token is sold. For example, a contract can specify the price of the token. It can specify how many tokens will be distributed. It can set a minimum funding goal that must be met before the ICO proceeds become available to the ICO venture.[53]

Finally, a smart contract can govern the services that can be accessed by the token holder. For example, an individual could purchase a token that allows access to the image of a unique cartoon kitten.[54] The CryptoKitties token is programmed with unique characteristics concerning a kitten's

---

48.     Fabian Vogelsteller & Vitalik Buterin, *ERC-20 Token Standard*, GitHub (Nov. 19, 2015), https://github.com/ethereum/EIPs/blob/master/EIPS/eip-20.md [https://perma.cc/UDW4-H65G].

49.     *Id.*

50.     *Id.*

51.     *Id.*

52.     *See    OpenZeppelin/openzeppelin-contracts/.../ ERC20Mintable.behavior.js*, GitHub, https://github.com/OpenZeppelin/openzeppelin-contracts/blob/489d2e85f10c68ff977bdd983360b361c4422423/test/token/ERC20/behaviors/ERC20Mintable.behavior.js [https://perma.cc/7UQ6-LA9B] (example of ERC20 code which adds the ability to create new tokens through a "minting" function). *See also OpenZeppelin/openzeppelin-contracts/.../ERC20Burnable.behavior.js*, GitHub, https://github.com/OpenZeppelin/openzeppelin-contracts/blob/489d2e85f10c68ff977bdd983360b361c4422423/test/token/ERC20/behaviors/ERC20Burnable.behavior.js [https://perma.cc/7Z7J-Z3JP] (example of ERC20 code which adds the ability to remove tokens from circulation through a "burning" function).

53.     For an overview and empirical analysis of such provisions in ICOs, see Shaanan Cohney, David A. Hoffman, Jeremy Sklaroff & David A. Wishnick, *Coin-Operated Capitalism*, 119 Colum. L. Rev. 591 (2019).

54.     CryptoKitties, https://www.cryptokitties.co (last visited July 28, 2019).

110                    Journal of Law & Policy                [Vol. 61

appearance and breeding characteristics.[55]  Owning the token gives the user the right to view a website that shows images of the CryptoKitties.

In addition to the creation of digital kittens, tokens could provide access to services provided by a more ambitious business venture.[56] One proposed project would set up a cloud computing network "allowing users to ask others to carry out computations and then optionally ask for proofs that computations at certain randomly selected checkpoints were done correctly."[57] A token essentially would give the user the ability to pay for computing services provided by a decentralized network.

While smart contracts provide investors with security with respect to some issues, they do not provide complete security with respect to the value of a token. Even if a token can be programmed to automatically access a service, the smart contract does not ensure that the service will be built and widely used. Blockchain projects require investments of time and money to eventually function. If a project does not succeed in creating a valuable service, the token associated with the project will be essentially worthless. ICOs are thus structured in a way that addresses some but not all of the trust issues inherent in investing.

## II. THE REGULATORY RESPONSE TO ICOS

The unprecedented fundraising success of ICOs was made possible by a system that provided investors with comfort that their transactions would be securely recorded. Bitcoin showed that transfers could be reliably memorialized on a digital ledger.[58] Because Bitcoin rose astronomically in value as it became more widely used, investors reasoned that ICO tokens could follow a similar path.

---

55.    More specifically, it is an ERC721 non-fungible token. *See Technical Details*, CRYPTOKITTIES, https://www.cryptokitties.co/technical-details (last visited July 28, 2019) (technical details for CryptoKitties stating ERC721 usage).

56.    Sudhir Khatwani, *Top 10 Cryptocurrencies With Practical Use Cases*, COINSUTRA (Oct. 13, 2018), https://coinsutra.com/cryptocurrencies-practical-usecases/ [https://perma.cc/Q9BH-M6XX].

57.    *See, e.g., White Paper: A Next Generation Smart Contract & Decentralized Application Platform*, *supra* note 41, at 25.

58.    *See generally Bitcoin Price Chart (BTC)*, COINBASE, https://www.coinbase.com/price/bitcoin [https://perma.cc/EB3G-8SMV] (Bitcoin's market capitalization valued at $167.2 billion as of Oct. 27, 2019).

2020]                    Regulation by Selective Enforcement                    111

Because the SEC did not regulate Bitcoin as a security,[59] there was hope that tokens could also avoid classification as securities. A token differs from Bitcoin because it permits access to some service that is often developed using the funds raised from the sale of the token. But if the token is essentially the pre-purchase of a service, it might not involve the type of investment that would be considered a security. Just as the advance purchase of a video game that may or may not be developed is not a purchase of a security, the advance purchase of tokens that will be used on a platform that may or may not be developed might not be the purchase of a security.

There were thus nontrivial arguments that needed to be resolved with respect to the status of ICO tokens. Securities laws passed in the 1930s did not anticipate the sale of tokens recorded on digital ledgers, but they did anticipate that securities could take many forms. The question was whether the tokens sold through ICOs were currencies like Bitcoin or securities subject to SEC regulation.

The SEC was very careful to build a strong foundation supporting the argument that ICOs sold securities subject to its jurisdiction. It chose cases where it could convincingly apply the basic principles of *Howey*. Rather than insist on a penalty, it often offered the opportunity to settle the case with only a promise to refrain from violating the law in the future. It issued detailed explanations for why particular token sales involved securities that could serve as a roadmap for the industry. Rather than bringing hundreds of similar cases, the SEC instead focused on bringing a small number of high-impact cases.

This selective enforcement strategy was enabled in part by the knowledge that other enforcers could supplement the SEC's work.[60] Purchasers of tokens could bring civil suits seeking a refund and rely upon SEC enforcement releases to convince courts that such tokens were securities. Federal and state prosecutors could seek criminal and civil sanctions for some of the worst ICOs that basically involved simple theft. Decentralized

---

59.    One early enforcement case involved the investment of Bitcoin into a fund that claimed it would pay one percent each day to investors. *See* SEC v. Shavers, No. 4:13-CV-416, 2013 WL 4028182, at *1 (E.D. Tex. Aug. 6, 2013).  In that case, the security was the shares in the fund rather than the Bitcoin. *Id.* at *2.

60.    *See supra* note 18 and accompanying text.

PARK ARTICLE
3/31/2020

112                    Journal of Law & Policy                [Vol. 61

enforcement of the securities laws gave the SEC the option of moving deliberately in responding to ICOs.

In addition to developing the law through enforcement, the SEC has attempted to provide guidance with respect to when it considers tokens to be securities. However, such guidance has been unclear and there are still significant questions about the security status of ICOs. The difficulty of creating a simple test specifying when an ICO token is a security shows why some form of Regulation by Enforcement was a necessary part of the SEC's approach.

*A. Enforcement*
*1.SEC Enforcement*
*a. Initial Efforts*
*i. The DAO*

The SEC first asserted its jurisdiction over ICOs by issuing a report of investigation in the summer of 2017.[61] The securities laws permit the SEC to issue a public report describing its findings from an investigation.[62] Issuing such a report allowed the SEC to test the waters with respect to a novel issue. The SEC could publish an extensive opinion-like discussion of the facts and relevant law rather than hope for an informed and favorable ruling from a court.  Such administrative guidance can effectively have the force of law.

The Report detailed the SEC's views on the DAO, a $150 million ICO fund that issued tokens to raise funds to invest in other blockchain projects.[63] The DAO was governed by a set of smart contracts built on the Ethereum platform permitting its investors to vote to fund proposals and choose when they received profits from its successful investments.[64]

An investment fund is typically structured so that the investors rely on the efforts of investment advisers to generate profits, making the shares of the fund a security. The DAO token holders had a right to profit distributions, satisfying one element of the *Howey* test. But the DAO argued

---

61.    SEC. & EXCH. COMM'N, REPORT OF INVESTIGATION PURSUANT TO SECTION 21(A) OF THE SECURITIES EXCHANGE ACT OF 1934: THE DAO (2017) [hereinafter DAO REPORT].
62.    Securities Exchange Act, 15 U.S.C. § 21(a) (2012).
63.    DAO REPORT, *supra* note 61, at 3.
64.    *Id.* at 4.

that its investors did not rely on the efforts of others because it was a decentralized autonomous organization, which would operate on its own without central management.[65] Entrepreneurs seeking funding from the fund would submit smart contract project proposals that DAO token holders would vote on.[66] If the investors participated in the success of the fund by selecting its investments, they would not be relying on the efforts of "others." Instead of passive shareholders, they would be more like partners participating in the venture.[67]

The SEC concluded, however, that while on its face, the arrangement looked like a partnership, it was more similar to a limited partnership where the limited partners rely on the efforts of a general partner, making the limited partnership interests securities.[68] A small group of individuals selected by the founders of the DAO controlled which projects could be put up for a vote.[69] They had the "ultimate discretion as to whether or not to submit a proposal for voting" and "could impose subjective criteria for whether the proposal should be whitelisted."[70] Thus, the owners of DAO tokens relied substantially on the efforts of the project's founders.[71]

The DAO tokens differed from Bitcoin, which was launched through active participation from its initial investors. The first participants in Bitcoin earned currency through mining, essentially investing in the currency by spending computing power to verify transactions. Because they are both investors and participants in the venture, miners do not rely on the efforts of "others," making it difficult to argue that they invested in a security.

---

65.     The DAO's creators "took great pains to ensure that it was, in fact, decentralized." Usha R. Rodrigues, *Law and the Blockchain*, 104 IOWA L. REV. 679, 700 (2019).
66.     DAO REPORT, *supra* note 61, at 2.
67.     General partnership interests have long been understood to not involve securities. In contrast, limited partnership interests have often been found to be securities because the limited partners do not participate in the partnership's management. *See, e.g.,* Masel v. Villarreal, 924 F.3d 734, 744 (5th Cir. 2019) (explicating this distinction).
68.     Prior case law instructed that courts should investigate the substance of a potential investment contract rather than defer to its form. *See* United States v. Leonard, 529 F.3d 83 (2d Cir. 2008).
69.     DAO REPORT, *supra* note 61, at 10.
70.     *Id.* at 5.
71.     *Id.* at 11. The SEC also highlighted the difficulty of DAO token holders organizing to exercise control because of the dispersion of the tokens and difficulty of uncovering the identity of the holders. *Id.* at 11. This suggests that if an individual or group controlled a substantial percentage of DAO tokens, such tokens would be less likely to be a security.

114 Journal of Law & Policy [Vol. 61

In choosing the DAO for its first enforcement case, the SEC signaled that it was willing to delve into the details of ICOs and take positions on close cases. The determination that DAO tokens were securities rested on the contestable position that the ability of a small group to screen proposals meant that DAO token purchasers would rely on the efforts of others.[72] One could imagine a different version of the DAO that could potentially avoid classification as a security under *Howey*. Rather than pre-screen proposals, the founders could issue recommendations with respect to the proposals. Would token holders then have sufficient involvement with selecting investments in such an arrangement so they would not be relying on the efforts of "others"?

Perhaps the DAO was targeted because it was associated with scandal. About a year before the SEC issued its report, a third of the Ether raised through the sale of DAO tokens was diverted to the account of an unknown attacker because of a flaw in the project's code.[73] The SEC's initial interest was probably piqued by this high profile incident where investor assets were simply lost.

The Ethereum Foundation facilitated a private ordering solution to the diversion. A consensus of participants on the network agreed to essentially erase the transactions where DAO tokens were stolen by starting a new chain that began before the theft.[74] The SEC's determination not to bring an enforcement case against the DAO may have been justified by the fact that private parties agreed to make investors whole.

---

72.     There are factual questions about the true extent of the powers of the DAO curators who whitelisted the various projects. *See, e.g.*, Randolph A. Robinson II, *The New Digital Wild West: Regulating the Explosion of Initial Coin Offerings*, 85 TENN. L. REV. 897, 940-43 (2018).

73.     Nathaniel Popper, *A Hacking of More Than $50 Million Dashes Hopes in the World of Virtual Currency*, N.Y. TIMES (June 17, 2016), https://www.nytimes.com/2016/06/18/business/dealbook/hacker-may-have-removed-more-than-50-million-from-experimental-cybercurrency-project.html [https://perma.cc/FN78-C5CK].

74.     DAO REPORT, *supra* note 61, at 9. It took more than a month for the Ethereum community to come to a consensus about remedying the harm. *See* DE FILIPPI & WRIGHT, *supra* note 33, at 188-89. Even then, this consensus was incomplete. A new cryptocurrency called "Ethereum Classic" was formed by those who split from the majority. *See* Matthew Beck, *Into the Ether with Ethereum Classic*, at 3 (Mar. 2007) https://ethereumclassic.org/assets/etc-thesis.pdf [https://perma.cc/6AMT-DMJR].

PARK ARTICLE
3/31/2020

### ii. Munchee

In addition to several cases seeking injunctions against clearly fraudulent ICOs,[75] which typically did not generate lengthy opinions applying the *Howey* test, the DAO Report was followed by an SEC administrative release towards the end of 2017 directed at a token that did not give its owner the right to profits associated with a venture. The *Munchee* case involved a company with an app where individuals could write reviews of particular food dishes they ordered at a restaurant (rather than a general review of the restaurant).[76] Munchee sought to issue a token that could be earned for writing a review and used to make "in-app" purchases and potentially food at participating restaurants.[77]

*Munchee* was notable because it showed that even though a token could be used as a currency rather than an investment in a business, it could be a security if the promoter emphasized the token's profit potential. The SEC's complaint described the way that Munchee had marketed the possibility that the price of the tokens would appreciate.[78] As the platform increased in popularity, Munchee might take tokens out of circulation, and the combination of demand and reduced supply would increase the price of the token. Investors would thus rely on the efforts of Munchee to increase the

---

75.    *See, e.g.*, SEC v. PlexCorps, No. 17-7007, 2017 WL 6398722 (E.D.N.Y. Dec. 14, 2017) (granting preliminary injunction, asset freeze, and other interim relief); Press Release, Sec. & Exch. Comm'n, SEC Halts Alleged Initial Coin Offering Scam (Jan. 30, 2018), https://www.sec.gov/news/press-release/2018-8. These cases were spearheaded by the SEC's new Cyber Unit focusing on securities law violations involving ICOs. *See* Press Release, Sec. & Exch. Comm'n, SEC Announces Enforcement Initiatives to Combat Cyber-Based Threats and Protect Retail Investors (Sept. 25, 2017), http://www.sec.gov/news/press-release/2017-176 [https://perma.cc/5RXC-L8HN]. In addition to bringing cases against issuers, the SEC brought cases against celebrities who promoted a fraudulent ICO for failing to disclose compensation they received for their services. *See, e.g.*, Mayweather, Securities Act Release No. 10578, 2018 WL 6266203 (Nov. 29, 2018) (requiring disgorgement and $300,000 penalty); *see also* Khaled, Securities Act Release No. 10579, 2018 WL 6266204 (Nov. 29, 2018) (requiring disgorgement and $100,000 penalty). Notably, claims by private parties against these celebrities seeking to hold them liable for the failure to register the securities have failed. *See* Rensel v. Centra Tech, Inc., No. 17-24500-Civ-Scola, 2019 WL 2085839 (S.D. Fla. May 13, 2019).

76.    Munchee Inc., Securities Act Release No. 10445, 2017 WL 10605969 (Dec. 11, 2017).

77.    *Id.* at *3; Sanjeev Verma, Nghi Bui & Chelsea Lam, *Munchee Token: A Decentralized Blockchain Based Food Review/Rating Social Media Platform*, THE VENTURE ALLEY (Oct. 16, 2017), https://www.theventurealley.com/wp-content/uploads/sites/24/2017/12/Munchee-White-Paper.pdf [https://perma.cc/J7Y6-ZGL2].

78.    *Munchee Inc.*, 2017 WL 10605969, at *4-*6.

PARK ARTICLE
3/31/2020

value of their investment. *Munchee* was relevant to a wide number of ICOs that issued utility tokens conferring the right to access services or products.

The *Munchee* release established that the way an ICO offers a token to the public is an important factor in assessing whether it must be registered as a security.[79] As *Howey* noted, the Securities Act of 1933 not only prohibits the sale of unregistered securities, it also prohibits offering an investment opportunity with the basic characteristics of a security, even if the investor does not ultimately purchase a security. In *Howey*, it was "enough that the [defendants] merely offer[ed] the essential ingredients of an investment contract" for the registration requirement to be triggered.[80] The fact that some investors ended up buying an investment that was not technically a security did not excuse the violation because such investors were offered a security. In a case decided more than a decade before the ICO wave, "virtual shares" that were used as part of a fictional trading game were found to be investment contracts in part because of a representation that purchasers could "firmly expect a 10% profit monthly" on the investment.[81] Even if the Munchee token was arguably not a security because it mainly offered access to a service, if it was offered with the "essential ingredients" of a security, SEC registration was required.

Munchee had referenced the DAO Report in its white paper and proceeded on the belief that the token was a utility token that would not trigger *Howey*.[82] After the SEC contacted it, the company discontinued the token and returned the proceeds within a few hours.[83] Because of its prompt response and cooperation, the SEC did not require it to pay a penalty to resolve the case.[84]

Unlike the DAO Report, *Munchee* set forth a fairly clear rule with respect to the distribution of ICOs. The promotion of the profit potential of a token, along with the promise by the venture to make efforts to increase the token's value, would likely mean that the token is a security.

_____

79.    *See, e.g.*, Michael Segal, *Cryptocurrency Regulation Under U.S. Securities Laws and Proposed Amendments*, 26 PIABA B.J. 97, 112 (2019) ("Cryptocurrencies looking to raise capital who follow similar advertising practices will likely face similar scrutiny from the SEC.").
80.    SEC v. W.J. Howey Co., 328 U.S. 293, 301 (1946).
81.    SEC v. SG Ltd., 265 F.3d 42, 48-49 (1st Cir. 2001).
82.    *Munchee Inc.,* 2017 WL 10605969, at *3.
83.    *Id.* at *6.
84.    *Id.* at *9.

PARK ARTICLE
3/31/2020

2020]                 Regulation by Selective Enforcement                 117

### b. A Second Wave of Enforcement

For the next half a year, the SEC continued to actively investigate ICOs,[85] but did not announce significant enforcement settlements. The SEC seemed to be waiting to see how ICO markets had processed its earlier enforcement. Even after the DAO Report and *Munchee* release, the number of ICOs raising funds rose during the first half of 2018.[86]

The most notable development was a speech by William Hinman, the head of the SEC's Division of Corporate Finance, on the question of whether Ether is a security.[87] That speech stated that a token would not be a security when "there is no longer any central enterprise being invested in." Hinman noted that "current offers and sales of Ether are not securities transactions" because of the "decentralized structure" of the "Ethereum network."[88]

The speech took the position that for a network to be sufficiently decentralized to avoid security status, it must be functional in that "purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts."[89] Tokens associated with projects that might eventually become decentralized would not qualify. At the "outset" of a project, when "the business model and very viability of the application is still uncertain . . . [, t]he purchaser usually has no choice but to rely on the efforts of the promoter to build the network and make the

---

85.     It initiated over one hundred investigations of cryptocurrency organizations. *See* Dave Michaels, *SEC Warns Investors on Cryptocurrency Exchanges*, WALL ST. J. (Mar. 7, 2018, 4:15 PM), https://www.wsj.com/articles/sec-warns-investors-on-cryptocurrency-exchanges-1520457355.

86.     There were 356 ICOs during the second half of 2017 (85 based in the U.S.) and 626 during the first half of 2018 (86 based in the U.S.). *See Crypto Token Sales Market Statistics: July-December 2017, All Types*, COINSCHEDULE, https://www.coinschedule.com/stats-geo/ALL?dates=Jul%2001,%202017%20to%20Dec%2031,%202017 [https://perma.cc/G24A-826Y]; *Crypto Token Sales Market Statistics: January–June 2018, All Types*, COINSCHEDULE, https://www.coinschedule.com/stats-geo/ALL?dates=Jan%2001,%202018%20to%20Jun%2030,%202018 [https://perma.cc/3YW6-5Z4N].

87.     William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, SEC. & EXCH. COMM'N (June 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418 [https://perma.cc/VER4-5ZYY].

88.     *Id.*

89.     *Id.*

PARK ARTICLE
3/31/2020

118                    Journal of Law & Policy                    [Vol. 61

enterprise a success."[90] It would thus fall within the *Howey* test because "the purchase of a token looks a lot like a bet on the success of the enterprise and not the purchase of something used to exchange for goods or services on the network."[91]

### c. Penalties Without Fraud

The Hinman speech's position on Ether raised questions about the degree of functionality necessary for a network to be decentralized. In two settlements announced towards the end of 2018, the SEC sanctioned two projects with insufficient functionality for their tokens to avoid security status.[92] The cases were significant because they were the first time the SEC imposed a significant penalty ($250,000) on a pair of ICOs where the only securities law violation was the failure to register the offering.

The first case was against Paragon Coin, which raised twelve million dollars by selling tokens to the public through an ICO to fund new projects relating to the cannabis industry.[93] Much of the funds were marked for "real-estate acquisition" for "co-working spaces" that could be paid for with tokens.[94] The Paragon Coin white paper highlighted the skills of management (its CEO was a former contestant on the Amazing Race),[95] showing that the value of the tokens was tied to the success of a management team.[96]

The second case was against AirFox, which was seeking to develop a system where token purchasers could earn free cellular airtime or data by viewing advertisements on their phone and using such tokens for

---

90.     *Id.*
91.     *Id.*
92.     In addition, the SEC continued to bring cases against fraudulent ICOs. *See, e.g.*, Tomahawk Expl. LLC, Securities Act Release No. 10530, Exchange Act Release No. 83839, 2018 WL 3854604, at *5-*6 (Aug. 14, 2018) (describing false statements relating to acquisition of oil lease). The Tomahawk token was easily a security. As its white paper explained: "The more Tomahawkcoins owned, the more equity a person has in Tomahawk Exploration." TOMAHAWK EXPL. LLC, TOMAHAWKCOIN WHITE PAPER 3 (2017), https://drive.google.com/file/d/0B3p647q2sdaEUjJGQTNjMDlIckU/view [https://perma.cc/9KKR-G868].
93.     Paragon Coin, Inc., Securities Act Release No. 10574, 2016 WL 6017663 (Nov. 16, 2018).
94.     *Id.* at *3.
95.     PARAGON, WHITEPAPER VERSION 1.0 34 (2017), https://icosbull.com/eng/ico/paragon-coin/whitepaper [https://perma.cc/DUS2-5B98] (hereinafter PARAGON WHITEPAPER).
96.     *Paragon Coin*, 2018 WL 6017663, at *6.

payments.[97] The tokens would be used to build this functionality and like Paragon Coin, AirFox highlighted the quality of its management.

In both cases, the SEC emphasized the fact that the underlying blockchain project was not completely operational. The Paragon Coin venture was a vague promise to use blockchain to support cannabis sales. The SEC noted that "no one was able to buy any good or service" with the token at the time of the offering.[98] The Paragon Coin white paper linked the value of the tokens to Paragon Coin's ability to complete the planned project.[99] AirFox had only developed a basic digital wallet application where funds could be transferred between mobile phones prior to the ICO. The tokens were sold to "enhance the functionality of the wallet, allowing users to choose between a broader [arr]ay of services."[100] While the token purchasers agreed they were buying the token for their utility, the app was only a prototype without "any real users."[101]

Like the *Munchee* case, both projects emphasized the profit potential of the tokens. The Paragon Coin white paper noted that the token was "designed to appreciate in value."[102] The AirFox token was not marketed to potential users but to investors.[103]

These two cases established that even tokens that could eventually be used primarily to access a service could be securities if: (1) the proceeds from their sale would be used to build the service; and (2) the tokens were marketed for their profit potential. Furthermore, the SEC showed it was willing to punish companies that sold such tokens without complying with the securities laws. Because many ICOs were based on a model similar to that of Paragon Coin and AirFox, it was now clear that many ICOs could not proceed without registration or an exemption.

---

97.    Carriereq, Inc., Securities Act Release No. 10575, 2018 WL 6017664 (Nov. 16, 2018).
98.    *Paragon Coin*, 2018 WL 6017663, at *4.
99.    *Id*. at *6.
100.   AIRFOX, AIRTOKEN: A TOKEN TO POWER MORE INCLUSIVE FINANCIAL SERVICES 10 (Apr. 3, 2019), https://airfox.com/images/uploads/airtoken-white-paper-updated-april-2019.pdf [https://perma.cc/5YGV-2LSX].
101.   *Carriereq, Inc.*, 2018 WL 6017664, at *3.
102.   PARAGON WHITEPAPER, *supra* note 95, at 30.
103.   AIRFOX, *supra* note 100, at 16.

PARK ARTICLE
3/31/2020

120                    Journal of Law & Policy                [Vol. 61

### d. Intermediaries

In addition to enforcement involving ICOs, the SEC announced several settlements involving cryptocurrency intermediaries in autumn 2018. A couple of cases were brought against exchanges that facilitated token transactions.[104] Because any securities exchange must register with the SEC,[105] a token exchange is subject to SEC jurisdiction if some of the tokens trading on it are securities. In addition to exchanges, a case was brought against an investment fund that raised money from public investors to purchase tokens.[106] To the extent that some of the tokens the fund invests in are securities, the fund must also comply with registration requirements.

Token exchanges were especially important to the SEC's efforts to protect retail investors from fraudulent token sales because they permitted individuals to exchange traditional currency for digital assets.[107] At least initially, much of the investment in ICOs was by investors who had the good fortune to invest in Bitcoin at a low price and could reinvest their Bitcoin gains in tokens. Because Bitcoin's price has fluctuated significantly, an investor's gains in Bitcoin were at risk regardless of whether he reinvested those gains in tokens or held on to his Bitcoin investment.

The SEC faced the challenge of moving against intermediaries facilitating investments in tokens that were likely securities but had not been determined to be securities by a court or even through a prior enforcement action. The SEC dealt with this issue in its case against TokenLot by not specifying which of the tokens traded on the exchange were securities, and instead declaring vaguely that it "sold digital tokens that included securities under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the

---

104.   *See, e.g.*, TokenLot, LLC, Securities Act Release No. 10543, Exchange Act Release No. 84075, Investment Company Act Release No. 33221, 2018 WL 4329662 (Sept. 11, 2018); Coburn, Exchange Act Release No. 84554, 2018 WL 5840155 (Nov. 8, 2018).

105.   Securities Exchange Act, 15 U.S.C. § 78(a) (2018).

106.   Crypto Asset Management, LP, Securities Act Release No. 10544, 2018 WL 4329663 (Sept. 11, 2018).

107.   Cryptocurrency exchanges facilitate coin and token trades between users. Exchanges can also facilitate transactions between fiat currencies and cryptocurrencies, which allow many new users to make their first purchases of Ether. Exchanges also manage the holdings of digital assets for users. *Where Can I Find the Keys for My Wallet?*, COINBASE, https://support.coinbase.com/customer/portal/articles/1526452-where-can-i-find-the-private-keys-for-my-wallet [https://perma.cc/SKW6-2E6D].

https://openscholarship.wustl.edu/law_journal_law_policy/vol61/iss1/11

PARK ARTICLE
3/31/2020

Exchange Act."[108] TokenLot and its founders were required to disgorge profits and its founders each were subject to a civil penalty.[109] Similarly, the SEC generally alleged that a digital asset investment fund, Crypto Asset Management, was "in the business of investing, holding, and trading certain digital assets that were investment securities" without specifying which of those assets were securities.[110] Crypto Asset Management and its founder also agreed to pay a penalty.[111]

### e. Pending Enforcement

After the Paragon Coin and AirFox cases, the SEC's major enforcement efforts quieted again for about six months. The silence was broken by the announcement that the SEC had filed a complaint against a messaging company, Kik.[112] Earlier, Kik had submitted an extensive response to an SEC Wells Notice informing it that charges might be filed against it. Kik argued against enforcement with respect to its ICO token (which it called the Kin token) that would fund a decentralized ecosystem where token owners could purchase services on its messaging platform.[113] It argued that any increase in the token's value would be linked to the efforts of the token purchasers, who would have incentive to increase activity on the platform.[114]

The SEC strongly denied this characterization in its complaint.[115] It argued that the one-hundred-million-dollar token sale was motivated by the poor performance of Kik's core messaging business. It was thus akin to a

---

108.   *TokenLot*, 2018 WL 4329662, at *2.

109.   *Id*. at *7.

110.   *Crypto Asset Management*, 2018 WL 4329663, at *2.

111.   *Id*. at *4.

112.   *SEC Charges Issuer with Conducting $100 Million Unregistered ICO*, SEC. & EXCH. COMM'N, https://www.sec.gov/news/press-release/2019-87 [https://perma.cc/K3J4-KR2Q].

113.   *See* Wells Submission of Kik Interactive, Inc., *supra* note 13. One example of such a service would be access to premium VIP groups. *See also Kin: A Decentralized Ecosystem of Digital Services for Daily Life*, KIK INTERACTIVE, INC. (May 2017), https://www.kin.org/static/files/Kin_Whitepaper_V1_English.pdf [https://perma.cc/7XNQ-YH6Y].

114.   *See* Wells Submission of Kik Interactive, Inc., *supra* note 13, at 6.

115.   Complaint, SEC v. Kik Interactive Inc., No. 19-cv-5244 (S.D.N.Y. June 4, 2019), ECF No. 1. [hereinafter Kik Complaint].

securities sale to fund a declining business.[116] The SEC argued that Kik highlighted the profit potential of the token and its efforts to create a successful product.[117]

Perhaps with the Hinman speech in mind, Kik had produced a basic version of the new app. It argued that unlike other ICOs, it had created a "minimum viable product" that was functional.[118] But the SEC argued that this app was far from functional because it was only capable of producing an emoji of a cartoon honey badger.[119] The SEC also noted that an earlier private placement to institutional investors set an aggressive timetable for the ICO to the general public that resulted in a public distribution before the project was complete.[120]

Finally, rather than being managed through a decentralized network, a foundation was formed to support the cryptocurrency.[121] A substantial percentage of the Kin token was issued to Kik, giving the company an incentive to orchestrate an increase in the price of the token.[122]

### 2. Other Enforcers

The SEC has not been alone in policing ICOs. Its efforts have been supplemented by other government actors and private investors in tokens. Some of these cases have generated judicial rulings on the issue of whether ICOs involve securities.

The SEC enforcement cases that have provided extensive guidance on when a token is a security have generally not involved outright frauds. ICOs involving simple theft or self-dealing have often been targeted by other government entities.[123] Many of the cases involved simple fact patterns where the token clearly had the characteristics of a security. State regulators

---

116.   *Id.* at 3. Kik had argued that the token was sold not to raise funds but to create a broad community. *See* Wells Submission of Kik Interactive, Inc., *supra* note 13, at 10.
117.   Kik Complaint, *supra* note 115, at 29-39.
118.   *See* Wells Submission of Kik Interactive, Inc., *supra* note 13, at 11.
119.   Kik Complaint, *supra* note 115, at 26-28.
120.   *Id.* at 24.
121.   *Id.* at 13.
122.   *Id.* at 30-31.
123.   Addressing unjust enrichment by individuals is an important goal of securities law. *See* James J. Park, *Rule 10B-5 and the Rise of the Unjust Enrichment Principle*, 60 DUKE L.J. 345 (2010).

https://openscholarship.wustl.edu/law_journal_law_policy/vol61/iss1/11

have brought dozens of cases, typically citing state securities laws.[124] In the fall of 2018, the Financial Industry Regulatory Authority (FINRA) filed a complaint against a broker-dealer who sold tokens said to be "backed by marketable securities."[125] Federal prosecutors also brought a criminal case against an individual who sold cryptocurrencies which he falsely said would be backed by real assets that he would select, namely real estate and diamonds.[126] The court denied the defendant's motion to dismiss the indictment, holding that a jury could find that the cryptocurrencies were securities.

Securities class actions have presented some more challenging applications of securities law.[127] Purchasers of major cryptocurrencies such as Tezos and Ripple have filed such suits.[128] Tezos is associated with a new smart contract-supporting blockchain platform (like Ethereum) with a formal updating process that allows for the platform to self-amend.[129]

---

124. *See, e.g.*, Crystal Token, slip op at 5, (N.D. Sec. Dep't Oct. 1, 2018) (seeking penalty for ICO promising up to two-percent daily return), http://www.nd.gov/securities/sites/default/files/enforcement/Crystal%20Token%20Cease%20and%20 Desist%20Order%20and%20Certificate%20of%20Service%20.pdf   [https://perma.cc/ESU5-WFLY]; DavorCoin, No. ENF-18-CDO-1757, 2018 WL 818566, at *1 (Tex. State Sec. Bd. Feb. 2, 2018) (targeting scheme promising up to forty-eight percent monthly return for lending token); Global Pay Net, No. 2018-CDS-052, 2018 WL 6592762, at *1 (Colo. Div. Sec. Aug. 10, 2018) (alleging fraud against ICO funding international financial platform); Pink Ribbon ICO, No. E-2018-0029, 2018 WL 1616678 (Mass. Sec. Div. Mar. 27, 2018) (stopping ICO purporting to support women and families facing financial burdens from cancer).

125. Dep't of Enf't v. Ayre, Disciplinary Proceeding No. 2016049307801 (FINRA Sept. 11, 2018).

126. U.S. v. Zaslavskiy, No. 17 CR 647 (RJD), 2018 WL 4346339, at *2-4 (E.D.N.Y. Sept. 11, 2018).

127. They have also resulted in findings that tokens are securities with respect to simple fact patterns. *See, e.g.*, Beranger v. Harris, Order, No. 1:18-CV-05054-CAP, slip op at 6 (N.D. Ga. Apr. 23, 2019) (sufficiently alleging that tokens relating to the funding of an online entertainment platform qualified as securities); Solis v. Latium Network, Inc., No. 18-10255, 2018 WL 6445543, at *2-*3 (D.N.J. Dec. 10, 2018) (sufficiently alleging that tokens for a tasking platform qualified as securities).

128. In litigation involving Tezos, a court rejected personal jurisdiction and extraterritoriality arguments raised by the defendants. *See* In re Tezos Sec. Litig., No. 17-cv-06779-RS, 2018 WL 4293341, at *6 (N.D. Cal. Aug. 7, 2018). In the Ripple litigation, early proceedings have determined that the case will be decided in federal rather than state court. *See* Coffey v. Ripple Labs Inc., 333 F. Supp. 3d 952, 966 (N.D. Cal. 2018).

129. L.M. GOODMAN, TEZOS-A SELF-AMENDING CRYPTO-LEDGER WHITE PAPER (2014), https://tezos.com/static/white_paper-2dc8c02267a8fb86bd67a108199441bf.pdf [https://perma.cc/C4ZN-T3BY].

PARK ARTICLE
3/31/2020

124                    Journal of Law & Policy                    [Vol. 61

Ripple is a blockchain platform built for traditional financial institutions.[130] These cases have not yet generated any major decisions applying the *Howey* test, but may do so in the future.

Perhaps the most notable decision arose out of a class action by purchasers of a token called ATB Coin.[131] They brought claims in the Southern District of New York under section 12 of the Securities Act of 1933, arguing for rescission. ATBCOIN LLC raised funds to develop a system for making payments that would be more efficient than other cryptocurrencies like Bitcoin.[132] Under the principles set forth in the Hinman speech, such a project had the potential to escape security status if it became sufficiently decentralized.[133] However, the district court found that at the time of its ICO, ATB Coin was a security. Citing the SEC's *Munchee* release, the court noted that a formal distribution of profits to token holders was not a prerequisite for token status.[134] The court cited the marketing campaign for ATB Coin, which highlighted the profit potential of the digital currency.[135] It found that the plaintiff-investors relied on the efforts of others because the "success of ATB Coins was entirely dependent on Defendants' following through on their promise to launch and improve the ATB Blockchain."[136] When it did not deliver, "the value of the ATB Coins plummeted."[137]

The *ATBCOIN* case broke new ground because at the time, the SEC had never brought an enforcement action against an ICO funding the development of a new payment system that aspired to become like Bitcoin. *ATBCOIN* thus shows that while the securities laws do not regulate established cryptocurrencies, they will now be a consideration for those who wish to fund new cryptocurrencies through public sales.

---

130.   DAVID SCHWARTZ ET AL., THE RIPPLE PROTOCOL CONSENSUS ALGORITHM (2018), https://ripple.com/files/ripple_consensus_whitepaper.pdf [https://perma.cc/PV9X-W2JA].   RIPPLE, SOLUTION   OVERVIEW,   https://ripple.com/files/ripple_solutions_guide.pdf   [https://perma.cc/JD7Y-VCQC].
131.   Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340 (S.D.N.Y. 2019).
132.   *Id.* at 347.
133.   *See supra* notes 87-91 and accompanying text.
134.   *Balestra*, 380 F. Supp. 3d at 354.
135.   *Id.* at 355.
136.   *Id.* at 355-56.
137.   *Id.* at 356.

PARK ARTICLE
3/31/2020

Private parties have also brought concurrent cases against entities targeted by SEC enforcement. For example, in addition to its SEC case, Paragon Coin is facing a securities class action by token purchasers seeking rescission.[138] This private suit alleged not only that the tokens were securities sold without registration, but that funds were misappropriated to solicit other investors and enrich the promoter.[139]

## B. Guidance

In addition to enforcement documents, the SEC staff has attempted to provide guidance to the industry with respect to when a token is a security. Various staff members have given notable speeches clarifying the SEC's approach. As noted earlier, a June 2018 speech by Corporate Finance Director Hinman took the position that Ether was not a security. A September 2018 speech by the co-head of the SEC's Enforcement Division reviewed recent cases and noted the "need to protect investors from [the] risks [associated with ICOs] while balancing the potential this technology could have for capital formation."[140] It explained how "the Enforcement Division has approached ICO and digital asset matters—with a focus on bringing cases that deliver broad messages and have an impact beyond the individual cases."[141]

The SEC's most notable effort to provide clarity has been its publication of a *Framework for "Investment Contract" Analysis of Digital Assets*.[142] This document discussed the *Howey* test and its potential application to tokens. Unsurprisingly, rather than provide a simple framework, the document discussed a wide range of factors that might be considered in

---

138.  Second Amended Class Action Complaint at 7, Holland v. Paragon Coin, Inc., No. 4:18-cv-00671-JSW (N.D. Cal. June 10, 2019), ECF No. 101.
139.  *Id.*
140.  Stephanie Avakian, *Measuring the Impact of the SEC's Enforcement Program*, SEC. & EXCH. COMM'N (Sept. 20, 2018), https://www.sec.gov/news/speech/speech-avakian-092018 [https://perma.cc/7AFT-XN9X].
141.  *Id.*
142.  *Framework for "Investment Contract" Analysis of Digital Assets*, SEC. & EXCH. COMM'N (April 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets [https://perma.cc/HLC8-5WMQ].

126                    Journal of Law & Policy                    [Vol. 61

determining whether a token is a security.[143] For example, the section describing "reliance on the efforts of others" contained twenty different bullet points, while noting that "[a]lthough no one of the following characteristics is necessarily determinative, the stronger their presence, the more likely it is that a purchaser of a digital asset is relying on the 'efforts of others.'"[144]

The SEC also published a no-action letter where it determined that a token sold by TurnKey Jet was a utility token. The TurnKey Jet token could be used to access a "fully developed and operational" air charter service that would be "immediately usable" and "marketed in a manner that emphasizes the functionality of the Token, and not the potential for the increase in the market value of the Token."[145]

Though somewhat helpful in setting the outer boundaries for the definition of a security, the SEC's guidance has done little to help provide meaningful clarity with respect to close cases. Enforcement is essential in illustrating how various factors will be weighed by the SEC.

## III. EVALUATING REGULATION BY SELECTIVE ENFORCEMENT

About two years after it released the DAO Report, the SEC appears to have brought unregistered ICOs under control. It did so without sparking substantial criticism that it had unduly hindered entrepreneurship. Though it has largely been successful, there are also potential problems with the SEC's approach. This Part discusses some of the lessons that can be drawn from the SEC's Regulation by Selective Enforcement strategy.

### A. The Effectiveness of Selective Enforcement

For at least the foreseeable future, the law on whether a token is a security will largely be defined by the DAO Report and the various SEC settlement releases. The SEC's enforcement efforts generated extensive, fact-specific

---

143.   The SEC took a similar approach with respect to defining when financial misstatements are material. *See, e.g.*, James J. Park, *Assessing the Materiality of Financial Misstatements*, 34 J. CORP. L. 513, 526-28 (2009).

144.   *Framework for "Investment Contract" Analysis of Digital Assets*, *supra* note 142.

145.   Turnkey Jet, Inc., SEC No-Action Letter, 2019 WL 1471132 (Apr. 3, 2019).

PARK ARTICLE
3/31/2020

2020]                    Regulation by Selective Enforcement                    127

analysis of particular ICOs much more quickly than the judicial system. Litigation can take years and most cases will settle before a judge can issue a decision.

By pursuing selective enforcement, the SEC was able to devote time to cases with complex fact patterns requiring sophisticated analysis to resolve. Though it brought only a small handful of ICO cases, those cases generated extensive analysis on the application of the *Howey* test. The quality of enforcement can be more important than its quantity.[146] The lengthy discussion of the facts and law detailed in the SEC's pronouncements show that they were the result of a thoughtful application of the SEC's expertise and deserve some deference by the courts.[147] Indeed, federal courts have cited the SEC releases in court rulings finding that certain ICOs involved securities.[148]

Selective enforcement also permitted the SEC to wait and see how a quickly moving industry was developing. By waiting some time to impose serious penalties on unregistered ICOs, the SEC largely avoided the criticism that it was prematurely squelching entrepreneurship before it could develop. After some time, it became clear that there are challenges in developing successful blockchain projects. Many ICOs involved outright frauds or poorly conceptualized ideas with little chance of success. If ICOs had generated dozens of worthwhile ventures, the SEC might have adjusted its enforcement approach.

The SEC's experience with ICOs shows that in certain circumstances, it can effectively regulate without bringing a large number of enforcement cases. The SEC can quickly establish a legal framework through a small number of high-quality settlement releases that put an industry on notice about the agency's expectations.

---

146.    As Professor Velikonja has shown, SEC reports on the number of cases it brings can be misleading. *See* Urska Velikonja, *Reporting Agency Performance: Behind the SEC's Enforcement Statistics*, 101 CORNELL L. REV. 901 (2016).

147.    *See, e.g.*, Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944) (noting that the "weight" of an administrative interpretation "will depend upon the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade, if lacking power to control.").

148.    *See, e.g.*, Balestra v. ATBCOIN LLC, 380 F. Supp. 3d 340, 354 (S.D.N.Y. 2019) (citing SEC's *Munchee* order).

PARK ARTICLE
3/31/2020

128                    Journal of Law & Policy                    [Vol. 61

### B. The Dangers of Selective Enforcement

While it was effective in asserting control over ICOs, there are also reasons to question the SEC's Regulation by Selective Enforcement strategy.

Because it determines whether the SEC has jurisdiction, the issue of whether an investment is a security deserves careful scrutiny. Ideally, review by impartial judges would ensure that the SEC's position is correct and the agency is not exceeding its authority. In at least one case, a federal court initially concluded that the SEC had not sufficiently established that an ICO involved the sale of a security.[149] The court later reversed its order,[150] but the episode raised the possibility that the SEC is not infallible in its assessment of the facts. On the other hand, Congress made the definition of a security expansive, giving the SEC broad authority over a wide range of investments. If the SEC obviously reached beyond its jurisdiction, defendants would litigate and courts would check any abuse.

Despite the care with which it has drafted guidance, reports, and settlement releases, there is still significant ambiguity about when a token will be considered a security. As noted earlier, the DAO Report found that the power of a central group to approve projects was enough to conclude that token investors relied on the efforts of "others."[151] But this was a close call. One could argue that the investors were more actively involved than the limited partner of a typical investment fund. Yet this issue was never litigated because the SEC did not bring a case against the DAO. Because the DAO did not face a sanction, it did not have the incentive to fully test the SEC's theories in court.

Rather than squarely acknowledging the confusing state of the law, the SEC has recently taken the position that the law is clear enough that ICO entrepreneurs should be subject to sanction. In the complaint filed against Kik, the SEC cited its issuance of the DAO Report as a reason to conclude that Kik should have been aware that its tokens needed to be registered.[152]

---

149.   *See* SEC v. Blockvest, LLC, No. 18CV2287-GPB, 2018 WL 6181408 (S.D. Cal. Nov. 27, 2018) (order granting preliminary injunction).

150.   *See* SEC v. Blockvest, LLC, No. 18CV2287-GPB, 2019 WL 625163 (S.D. Cal. Feb. 14, 2019) (order granting plaintiff's motion for partial reconsideration).

151.   *See supra* notes 66-67 and accompanying text.

152.   Kik Complaint, *supra* note 115, at 6, 28-29.

PARK ARTICLE
3/31/2020

This is a troubling position given that the DAO Report's conclusion relied upon fine factual distinctions that were resolved by the SEC itself.[153]

The fact that the SEC was able to piece together a string of settlements in cases where defendants were not willing to fight does not mean that the issue of when a token is a security has been resolved. For example, consider a situation where the project being funded is close to finished. Would the project be functional enough so that its tokens are not securities? The SEC's enforcement actions have all involved tokens that were promoted for their investment potential. What if a project is not yet functional but there are no marketing efforts promising investment returns?[154] The SEC has made progress through its selective enforcement program, but there are still substantial gaps in the law.[155]

Because it is not comprehensive, selective enforcement can result in the uneven distribution of regulatory burdens. Consider the example of Ethereum. Because it did an ICO and established a successful platform before the SEC targeted ICOs, Ether was able to evolve into a coin that is considered to be a currency rather than a security. While the SEC has essentially taken the position that Ether is currently not a security, it is unclear why it is not. The value of Ether fluctuates based on the performance of the Ethereum platform. The more projects that choose to launch on the platform, the greater the demand for the Ether necessary for those projects

---

153.    The SEC's position may reflect an attempt to punish those companies that seek to resist its enforcement. In contrast, a company that voluntarily reported its violations was able to settle its case without penalty. *See* Gladius Network LLC, Securities Act Release No. 10608, 2019 WL 697993 (Feb. 20, 2019). A company that halted its ICO before sales were made also escaped penalty. *See* SimplyVital Health, Inc., Securities Act Release No. 10671, 2019 WL 3780055 (Aug. 12, 2019).

154.    Experience has shown that ICOs highlight their profit potential in their marketing material. For a decentralized blockchain community to flourish, individuals need an incentive to invest resources in that community.

155.    Another challenge is that blockchain projects do not fit neatly within the disclosure regulation envisioned by the securities laws. Unlike an initial public offering for a traditional company, ICOs do not necessarily fund projects that are expected to generate earnings over time. Chris Brummer, Trevor I. Kiviat & Jai Massari, *What Should Be Disclosed in an Initial Coin Offering?*, *in* CRYPTOASSETS: LEGAL, REGULATORY, AND MONETARY PERSPECTIVES (Chris Brummer ed., 2019). While disclosure at the initial stages of a blockchain project can inform investors about the probability that the project will eventually be functional, it is unclear whether continuing disclosure would be useful after the project is functional. If the blockchain project is truly decentralized at some point, its tokens may no longer be considered securities. *See supra* notes 87-91 and accompanying text. Thus, disclosure might be appropriate for an ICO, but periodic disclosure obligations could cease once sufficient decentralization has been achieved.

130                    Journal of Law & Policy                    [Vol. 61

to function. To continue to attract projects, the Ethereum network must continue to evolve and improve. Though it does not have a central management team, the Ethereum Foundation remains the guiding force for maintaining the network and improving it.[156] Ethereum might pass what Professors Henderson and Raskin call the "Bahamas Test," where the "project is still capable of existing" even though the sellers have "fled to the Bahamas."[157] But to the extent that the continued value of Ether depends on improvements by a central entity, there is an argument that Ether should be considered a security.[158]

A consequence of the SEC's efforts against ICOs is that early entrants will be protected by a barrier to entry. The framework set forth in Hinman's speech only provides a narrow way for tokens associated with entrepreneurial projects to avoid security status. They must be associated with a system that is sufficiently functional so that it is run by a decentralized community of miners and users. As one of the authors of this Article noted in an earlier paper, the Hinman framework presents a paradox. A token can be distributed without regulation by the securities laws if it is functional, but many tokens "are only functional if they are distributed widely enough so that a decentralized system arises."[159] In a recent complaint against a company that sought to develop a currency that could be transferred through its messaging app, the SEC acknowledged that wide distribution of a token is required for a decentralized community to arise. It explained: "Defendants knew . . . that to actually implement the TON Blockchain in the real world, the project would require 'numerosity': a

---

156.    Indeed, the price of Ether plummeted upon a false report of the death of its founder. *See* Nick Paumgarten, *The Stuff Dreams Are Made Of*, THE NEW YORKER, Oct. 22, 2018, at 72-73.

157.    M. Todd Henderson & Max Raskin, *A Regulatory Classification of Digital Assets: Toward an Operational* Howey *Test for Cryptocurrencies, ICOs and Other Digital Assets*, 2019 COLUM. BUS. L. REV. 443, 461 (2019).

158.    Major changes to the underlying Ethereum protocol or changes to the blockchain ledger require that the entire network reach a consensus. While individual users have the option to join an updated protocol or reject it, the Ethereum Foundation is highly influential in orchestrating updates. Users who don't follow the majority risk being left behind or diluting their cryptocurrency's worth. After funds were diverted from the DAO, the Ethereum Foundation was fundamental in reversing the transactions.

159.    James J. Park, *When Are Tokens Securities? Some Questions from the Perplexed*, LOWELL MILKEN INST. POLICY REPORT (2018), https://lowellmilkeninstitute.law.ucla.edu/wp-content/uploads/2018/12/When-are-Tokens-Securities.pdf [https://perma.cc/H5EH-CW3C].

PARK ARTICLE
3/31/2020

widespread distribution [of its token] across the globe."[160] Unless an ICO project is functional without wide distribution, the Hinman framework does not provide an avenue for a token to avoid classification as a security. Under the Hinman paradox, it is unlikely that the path available to Ethereum, which did an initial public distribution of Ether, will be available to new ambitious blockchain projects, which will need to register their tokens with the SEC or find an exemption to the securities laws.

For better or worse, as a result of the SEC's efforts, rather than being developed by entrepreneurs, new blockchain projects in the U.S. will be more likely to be financed by large corporations such as Facebook and JPMorgan. The prospect of large technology and banking companies controlling digital asset networks creates the risk of undue concentration of power over the technology in a few large corporations. Resolving a threat to investors may result in problems that other regulators will have to address in the future.

CONCLUSION

For the last several decades, the SEC's most visible enforcement efforts have targeted securities fraud and insider trading relating to established public corporations. As a national regulator, the SEC focused its limited resources on misconduct that threatened the integrity of national markets. Efforts to protect retail investors from novel investment schemes, while important, did not define the SEC's national reputation.

The sudden rise of the ICO was unique because it not only raised issues of investor protection but threatened to eventually disrupt the scheme regulating public offerings. While technology has often affected securities markets, the ability to easily sell digital assets to willing investors could radically change the ability of entrepreneurs to raise funds. The sheer amounts raised through unregistered ICOs reflected the possibility that a new economy that would escape regulation would arise.

The most effective way of addressing the problem of ICOs was through enforcement of well-established standards in individual cases. Rulemaking cannot provide clear answers to questions such as the precise degree of

---

160.    Complaint, SEC v. Telegram Group Inc., 19 Civ. 9439 ¶ 104 (S.D.N.Y. Oct. 11, 2019).

PARK ARTICLE
3/31/2020

132                    Journal of Law & Policy                [Vol. 61

control that must be retained by an ICO's promoters for a token to be a security. The SEC needed to apply the *Howey* test to concrete situations, but it could not wait years for cases to wind through the courts.

The SEC thus utilized a strategy of Regulation by Selective Enforcement. It carefully chose the right cases in building a foundation of decisions that supported its claim that most tokens were securities. It made a significant concession in taking the position that Ether was not a security despite a substantial argument that its value depends on the success of the Ethereum platform, which is maintained by an entity. It defined two types of practices that would likely trigger classification as a security—the use of token proceeds to complete a project and highlighting the profit potential of the token. It did not insist on penalties in many of its initial settlements, but gradually imposed penalties on ICOs that did not clearly involve a fraud.

Without the assistance of private securities class actions and state securities regulators, the SEC's work would have been much more difficult. Because investors can help themselves, the SEC did not have to devote as many resources responding to ICOs that would likely harm public investors. Instead, it could focus on cases that would develop its understanding of the *Howey* test.

Despite the general success of its ICO efforts, the SEC should acknowledge that many questions remain with respect to when a digital asset is a security. For some ICOs, there could be a substantial argument that the *Howey* test does not apply. Rather than deem the issue resolved, the SEC has more work to do in clarifying the boundaries of its jurisdiction.