# Exhibit 161

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
0001
   1
   2
   3
   4
   5
   6
   7
   8      Goodwin: Perspectives on SEC Engagement Concerning Digital
   9                  Assets (Sponsored) Consensus 2019
  10                     Posted June 4, 2019
  11                     Audio Runtime:  56:34
  12
  13
  14
  15
  16
  17
  18
  19
  20
  21
  22
  23
  24
  25
0002
   1            (Beginning of Audio Recording.)
   2            MS. GOLDBERG:  Hi, everyone.  Oh,
   3      that's loud.  Okay.  Hi, my name is Tammy
   4      Goldberg.  I'll be moderating this panel.
   5      The focus of the panel is to get some
   6      perspective on how to engage the SEC's
   7      strategic hub for -- and I'm going to get
   8      this this name wrong -- but Strategic Hub for
   9      Innovation and Financial Technology,
  10      otherwise known as Spin Hub, particularly on
  11      block blockchain-based pro projects that --
  12      and where there's a particular feature of
  13      digital assets.
  14            And I am excited to have this panel.
  15      Let me introduce Amy Starr.  Oh, okay let me
  16      introduce Amy Starr to my left.  She is chief
  17      -- chief of the office of capital market
  18      trends within corporate finance division of
  19      the SEC, and she's going to offer a unique
  20      perspective on how to engage FinHub.
  21            In the center over there, that's
  22      Meghan Spillane.  Meghan is one of my
  23      colleagues at Goodwin, and she is one of the
  24      key members of the blockchain and digital
  25      currency team at Goodwin.
0003
   1            And Dorothy DeWitt general counsel for
   2      business lines and markets at Coinbase.  By
   3      way of background, my -- I mentioned my name
   4      is Tammy Goldberg.  I work at Goodwin.
   5      Particularly, my practice focuses on
   6      representing financial institutions in making
   7      Fintech investments as well as on the company
   8      side of Fintech companies that are seeking
   9      third party capital.
  10            So with that, with those
                                    Page 1
```

RPLI_SEC 1141377

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN
```
11    introductions, I want to just start off
12    saying that Amy was gracious enough to join
13    us here, but the -- the -- the comments that
14    she's -- will put forth will be her own and
15    not necessarily represent the commentary from
16    the SEC.
17            So with that, Amy, maybe you could
18    give us a sense of the motivation for for
19    FinHub the intention.
20            MS. STARR:  Sure.  So again, thank you
21    very much.  Yes, I do always have to have the
22    disclaimer.  Whatever I say represents just
23    my own views and do not represent the views
24    of members of the staff or the Commission.
25            The -- the SEC staff has for, as long
0004
1     as I've been there, which unfortunately is --
2     well, fortunately well over 25 years -- has
3     always been interested in engaging with
4     counsel and with companies who are interested
5     in -- in doing novel, unique types of
6     financings and -- and exploring new
7     opportunities to raise capital.
8             And -- and our goal is always to help
9     to the extent that we can in seeing how that
10    kind of activity can be engaged in in a
11    manner that's compliant with the -- with
12    existing law.  And -- and we've been very
13    successful over the years with, you know,
14    starting even with asset-backed securities
15    when there wasn't -- there's -- there was
16    never a form for an asset-backed security
17    when it first started.  It was as a result of
18    staff discussion and no actions and -- and
19    other activities in terms of modifying the
20    disclosure requirements in a way that it made
21    it work for that kind of product.
22            Same thing happened, you know, sort of
23    fast forward to 2009, same thing happened
24    with online marketplace lending, with Prosper
25    and Lending Club where you have a new way of
0005
1     raising capital, but you need to see how the
2     disclosure is tuned for investors such that
3     you maintain investor protection while at the
4     same time being able to allow companies and
5     enable companies to raise capital and -- and
6     to move forward with different kinds of
7     businesses.
8             Similarly, the first offering of
9     digital, securities I'm sure you're all aware
10    of Overstock offering their digital
11    securities.  That was done on a registered
12    basis.  We worked very closely with them to
13    make sure that the -- the way in which they
14    were going to offer their securities was done
15    in a compliant manner, but it still satisfied
16    what they needed to have done.
17            So we're very accustomed from a --
18    from a staff standpoint in -- in working with
19    people and and a lot of counsel and -- and
20    companies know to reach out to us.  As -- as
21    things morphed into what I'll call the
```
                                        Page 2

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
22   digital asset space, we -- we did a lot of
23   learning, just even in its infancy.  I know
24   there's some former staff here who -- who
25   were very involved.
0006
 1          And our -- our goal, obviously, was to
 2   identify new trends in the capital markets,
 3   see what was really going on.  Again, our
 4   mandate is investor protection, as well as
 5   fair and orderly markets, as well as capital
 6   formation.  And so when you have those
 7   mandates, you do have to keep all pieces of
 8   it in mind.
 9          We started working on an -- I'll call
10   it an interdivisional basis where it was the
11   Division of Corporation Finance.  We're the
12   capital markets, capital formation people.
13   You have the Division of Trading in Markets,
14   which are the folks that deal with exchanges
15   and broker-dealers.  You have Compliance and
16   Inspections.  You have the Division of
17   Investment Management, which are the fund
18   people as I call them.
19          And then the people of last resort, as
20   I like to call them, are really the Division
21   of Enforcement.  They're the people who have
22   to come in and sort of say you really didn't
23   do it right and we need to fix this to make
24   it better so that the next guy knows that
25   this is the better way to do it in a manner
0007
 1   that is compliant.
 2          And so one of the key goals I think in
 3   in terms of setting up FinHub was a central
 4   location where everybody knew where to go.
 5   They had a single spot where you can go
 6   online, you go to our website, there's a
 7   FinHub link on the website, you get into it,
 8   you can do a submission directly to us.  And
 9   when you do that submission there's a human
10   being that's looking at all the submissions
11   and saying, okay, this is a CorpFin question
12   or this is a trading and markets question.
13          And then what's going to happen is
14   that the question will be -- somebody will
15   call you, likely send you an email and then
16   call you and -- to talk about what your
17   question's about, how -- how -- how far along
18   are you with it.  Is it ripe for discussion
19   with staff?  And if, in fact, it's something
20   that we'll call it ripe for discussion with
21   staff, we'll ask you to send something into
22   us.  It's -- you request confidential
23   treatment so it's not disclosed to anybody,
24   so all your intellectual property is
25   protected, and all your ideas are protected,
0008
 1   but it gives us the ability to have, when we
 2   do have a discussion in a meeting, is to have
 3   something that's really useful and helpful
 4   for both sides where we can ask lots of
 5   questions.
 6          As some on this panel know, we ask
                    Page 3
```

RPLI_SEC 1141379

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
 7  lots and lots of questions because the key
 8  for us is understanding exactly what's going
 9  on, what's your product, what's your company,
10  what's your business, how do you plan on it
11  really working.
12         Because what what we find is that
13  people will think along a certain path, but
14  they may not have veered off, and sometimes
15  we like to veer off and ask that tough
16  question.  And -- and what -- what happens
17  and what has happened a lot is people will
18  say, huh, that's an interesting question.
19  Let us get back to you on that.  And then
20  they may come back with a a slight change in
21  their -- in their business plan or their
22  structure, not because it's a matter of
23  compliance with the securities laws, but it's
24  because it raised an interesting business
25  issue for them.
0009
 1         So FinHub started because we didn't
 2  want it to be an enforcement.  It really was
 3  a matter of looking at things on a proactive
 4  basis and saying how do we get this to work
 5  in a way that people can feel comfortable,
 6  that they can raise capital in a compliant
 7  manner, that they can operate their
 8  businesses in a compliant manner, that
 9  they're not always looking over their
10  shoulders, and that's really, I think, the --
11  the -- the real basis for why this was set up
12  and why the chairman set it up that way.
13         And -- and Val just happens to be
14  housed in CorpFin, but she's the head of --
15  of the FinHub.
16         MS. GOLDBERG:  Great, thank you.  And
17  so do you find that when you do -- when
18  companies engage you and is it -- at what
19  stage in their -- in -- in their -- in their
20  progression and -- and do you often turn --
21  turn people away and say, you know what, you
22  need to come back and think this through a
23  little bit more?
24         MS. STARR:  So we don't -- we don't
25  weigh in on whether somebody has a good or a
0010
 1  bad idea.  We're not regulators.  We don't
 2  say you can't sell something.  You could --
 3  you know, if you were just a brick and mortar
 4  company and you wanted to, you know, buy
 5  widgets and you had no way to buy the widgets
 6  at all, you could raise capital to buy
 7  widgets so long as you said I have no
 8  business plan at all, I have no experience at
 9  all in this, but if you want to give me your
10  money, go ahead.
11         So again, we don't stop that.  For us,
12  it's full and fair disclosure.  So when
13  people come to us, what we have found it does
14  run along the spectrum.  Some people will
15  have very detailed, involved business plans,
16  and it generally will be their counsel who
17  will be reaching out to us to talk about it,
```
                         Page 4

RPLI_SEC 1141380

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN
```
18    and then, you know, they may provide us a
19    submission either with the initial outreach
20    through FinHub or after the phone call, and
21    then we'll set up a meeting.
22          There are times when it's the business
23    guy, the engineer, the guy with the great
24    idea who'll call and say I've heard about
25    this.  Do you think you can help us?  And
0011
1     what we try to do is say, well, we can't
2     provide you legal advice, but we would
3     suggest, you know, if this is something that
4     you think will work, you know, see about
5     finding a lawyer who might be able to help
6     you get through this process because you
7     don't want to be put in a position where, you
8     know, you have what I call the footfall,
9     where you -- where you really are -- are not
10    in a good position.  So -- so it does run --
11    run the gamut, and it -- you don't have to
12    have a big law firm, you know, and -- and it
13    -- the staff is -- if you go through, say, a
14    no action process, the staff is there and
15    we'll literally walk you through.  Well, what
16    about this question or what about this, and
17    you would need to say XYZ and -- and how --
18    how is this really going to work?
19          So you know, I mean, the -- the
20    TurnKey no-action letter I think is a good
21    example, where it really lays out is a small
22    firm in Florida, and they just had sent in a
23    no action request.  That was not even
24    preceded by, as far as I know, was not even
25    preceded by a phone call.
0012
1          MS. SPILLANE:  So Amy, I know -- we
2     have the first no-action letter through
3     TurnKey, but you've been engaging with
4     hundreds of companies over the past year.
5     What are the other ways that people engage
6     that doesn't result in getting or seeking a
7     formal no-action letter?
8          MS. STARR:  So a lot of times what
9     people will do is literally just come in to
10    talk and to see whether or not what they have
11    -- if -- if there's a likelihood that it is a
12    security, you don't need a no-action letter.
13    They'll go ahead with a process of raising
14    capital through an exemption -- using an
15    exemption, or we do have a number of
16    companies who have filed form 1-A's to -- to
17    rely on the Reg A plus exemption.  We have
18    companies who file bigger registration
19    statements.  Some of them are confidential,
20    but some of them are public, and the ones
21    that are public you can find on our Edgar
22    (phonetic) system, which is, okay, I will
23    admit an amazingly antiquated filing system
24    that was created about in the early 90s.
25          So if you think about it that way,
0013
1     right, it I'm not sure how much it really has
2     changed -- those in the room who have used it
```
                              Page 5

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN
```
 3    -- I don't know -- we've -- it's changed but
 4    it -- it -- it's a -- it's a -- it's
 5    definitely an old-time system.  However, if
 6    you go to our website, there's a place that
 7    you can search for -- you know, you can even
 8    just put in a keyword search like, you know,
 9    digital token, digital asset, initial coin
10    offering, and the names of the filings will
11    come up.  And then you'll be able to see,
12    wow, here's a company who's actually filed
13    something, and they have disclosure, and they
14    talk about their business, and they talk
15    about the token and what it represents and
16    what it doesn't represent.
17         And -- and so there are paths that you
18    can take, and that's what we -- we help
19    people with is -- is sort of indicating --
20    you don't have to say it's not a security for
21    you to move forward.  It's okay.  It's okay
22    if it's a security.  There are ways to still
23    move forward if it is a security.
24         MS. STARR:  That's great.  So I've --
25    I've gotten to know Amy well over the past
0014
 1    year because I've gone before her on behalf
 2    of several of Goodwin's clients.
 3         MS. STARR:  No, we've -- we've sat in
 4    meetings together around a round table --
 5         MS. SPILLANE:  That's right.
 6         MS. STARR:  -- where we've had a lot
 7    of interaction.
 8         MS. SPILLANE:  But -- but what I've
 9    realized through these interactions is that a
10    lot of my clients don't really understand
11    what FinHub is.  Everyone knows about the
12    website, and everyone hears the announcements
13    but kind of what does it look like if I were
14    to choose to engage?  What does no action
15    relief look like?  How -- what's the timeline
16    for getting something like that?  What
17    happens if I engage and then decide to stop
18    engaging?  These are the kind of questions
19    that are on my clients' mind and that's a
20    little bit of how we brought together this
21    panel with -- with the aim to kind of answer
22    some of the practical questions.
23         We all hold -- heard Val talking about
24    -- I think she's in here somewhere -- talking
25    about FinHub -- hello -- on a high level and
0015
 1    -- and hopefully we can get a little bit more
 2    granular based on Dorothy's experience and
 3    engaging and our experience on behalf of
 4    Goodwin, but Amy is obviously a tremendous
 5    resource for all of this.
 6         So you were also going to issue a
 7    disclaimer about seeking to engage and not
 8    actually getting a no-action letter.
 9         MS. STARR:  Okay, so it's -- what
10    happens a lot is people will come in with
11    great ideas, and then they'll have really
12    good counsel as well, securities counsel.
13    And how the securities laws work is Val and
```
                                    Page 6

-13 www.youtube.com watch v 1-7Qyfkpe6O Perspectives on SEC Engagement concerning digital assets (TRAN

```
14   others have said whether something is or is
15   not a security is a facts and circumstances
16   determination and analysis.
17           There are times when people will come
18   in and they'll talk through with us, and
19   they'll no-action letter to get themselves
20   comfortable or for counsel to get comfortable
21   that it's not a security this it's not
22   unusual actually even outside the digital
23   space for this to happen, for people to
24   think, well, maybe I need a no-action letter
25   in order for me to move forward.
0016
1           And so as you talk through it, what
2   happens a lot of times is it may not be
3   because of the the legal analysis.  It may be
4   a timing issue.  It -- because of the fact
5   that when we put a no-action letter out,
6   people look at the specific facts and
7   circumstances that are laid out in it, and we
8   sort of have -- have a pretty detailed way
9   that we operate before we issue a no-action
10   letter and -- and where we get comfortable
11   because people do look at it, even though
12   it's not law, people do look at it as
13   precedent because it means we're not
14   recommending enforcement action, which means
15   that people will go -- you know, are freer
16   and more comfortable to go ahead without
17   worry that the enforcement division will call
18   them.
19           So sometimes it might -- it -- it
20   might be because of particular business
21   reasons that people won't go forward, and
22   then I think at the end of the day when that
23   happens, they may look to their counsel and
24   say, are you comfortable going without
25   getting a letter from them.
0017
1           And it becomes a a balancing question
2   for the client and -- and the lawyer as well
3   as, you know, what is the risk.  And it
4   again, as I say, I mean, we -- we have this
5   both in the digital space as well as in other
6   space.  There are many times that companies
7   will, as we call it, go on your own, where
8   you've -- you've gotten a comfort level that,
9   you know, it's more likely than not that, you
10   know, I can do it this way, and nothing's
11   going to happen.
12           And -- and again, that -- that happens
13   all the time in -- in, you know, capital
14   formation transactions and not unusual.
15           You know, I think there are other
16   situations where the staff may not be
17   entirely comfortable because we may not have
18   all the facts.  That -- that's a very
19   difficult issue, and particularly, I think,
20   in the digital space, you know, if you have
21   somebody other than, say, the -- the sponsors
22   or the promoters behind a particular project
23   who come in and want to say can you tell us
24   this is not a security, what we're getting is
                                    Page 7
```

RPLI_SEC 1141383

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN
```
      25  the same information we can find publicly,
    0018
       1  but that's not giving us the information that
       2  we need, right?  Because as -- as -- as our
       3  framework has pointed out, a lot of -- of
       4  what you're looking at is what is the role of
       5  the promoters and the sponsors, and what's
       6  their continuing role, and what's really
       7  going on behind the scenes.
       8          You can get that information when
       9  you're dealing with -- with the people who
      10  run the business, as I -- as I call it.  Not
      11  -- not saying that it is business, but sort
      12  of the -- the people behind the scenes.  You
      13  -- you can get that when you have that direct
      14  conversation.  But when you have third
      15  parties you don't necessarily get it, so it
      16  becomes more difficult to -- to get to a
      17  point where, you know, you could issue a no-
      18  action, for example.
      19          So it -- it -- it doesn't mean there's
      20  anything wrong, it just means that we didn't
      21  have enough information to be able to say,
      22  okay, we're comfortable.  But there are --
      23  you know, there are other, you know, TurnKey
      24  I will say, was the first no-action letter;
      25  it's not the last.
    0019
       1          So understand that it's something that
       2  the staff is actively working with people on,
       3  and things are at different stages.  You
       4  know, it's like when people file a
       5  registration statement, we issue comments,
       6  and sometimes it takes a while for people to
       7  get back to us, and so that's a timing issue.
       8  It's -- you know, we -- we try to be as
       9  responsive as we can in as timely manner as
      10  we can, and then sometimes we wait, so.
      11          MS. GOLDBERG:  That's great.  So
      12  Dorothy, maybe you could share your
      13  perspective on how you've engaged Amy and her
      14  team at Coinbase.
      15          MS. DEWITT:  Sure.
      16          MS. SPILLANE:  And people -- most
      17  people probably have a good background about
      18  your business, but if you could just give a
      19  little description.
      20          MS. DEWITT:  Sure.  Coinbase is a --
      21  is an exchange and also has a state chartered
      22  New York DFS regulated custodian, and we
      23  have, you know, several other elements of our
      24  business like wallets and merchant and so on
      25  and so forth.
    0020
       1          But primarily, it's an exchange.  It's
       2  a -- it's a large exchange.  We have about
       3  800 people, having doubled our staff size
       4  last year, and 30 million -- we -- we support
       5  30 million users and have traded over 300
       6  billion in digital assets on our exchange.
       7          So as a larger -- one of the larger
       8  players in the marketplace, we decided very
       9  early on -- in fact before I joined -- to
                                        Page 8
```

RPLI_SEC 1141384

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
    10  come to the SEC and talk to them about what
    11  we were doing and how we were doing it.
    12          Keep in mind that throughout all of
    13  this conversation, we have always been and
    14  you should be clear that by talking to the
    15  SEC, simply by talking they're not giving us
    16  approval.  No-action relief is approval but
    17  talking is not.
    18          However, we felt it was important to
    19  speak with them, and we -- and to tell them
    20  about what we're doing and who we were.  I
    21  mean, the basic premise is coming to your
    22  regulator or a potential regulator means that
    23  you're welcoming sunshine as opposed to
    24  shadows, and I think that's just a very basic
    25  concept that I think may not be as obvious to
0021
     1  -- in all industries as it is in more
     2  traditionally regulated industries where I've
     3  spent most of my career.
     4          So we -- we had numerous conversations
     5  with them.  Some were just Coinbase and the
     6  SEC.  Of course we had conversations with
     7  other regulators, as well, because we wanted
     8  to make sure we had contacts and
     9  communications with all the various actual
    10  and potential regulators so that we were, you
    11  know, reaching out in the marketplace to make
    12  sure we were known.
    13          We also have had meetings with counsel
    14  and sometimes they aren't necessarily very
    15  particularly correlated with, you know, the
    16  significance of the issue at hand.  I think
    17  one time we brought in counsel and I think it
    18  may have signaled that there was a problem,
    19  so there were a lot of people in attendance
    20  and it was more random.  But you know, we --
    21  so sometimes it's individual, and sometimes
    22  it's with counsel.
    23          We have engaged counsel along the way,
    24  and we also have a, you know, quality legal
    25  team that does analysis.  What we found early
0022
     1  on and as time evolved is that it's no
     2  surprise to you, but this industry evolves
     3  very quickly.  The technology evolves
     4  quickly, the facts evolve quickly, the
     5  business plans evolve quickly, so on and so
     6  forth.
     7          And so having reached out to the
     8  regulator, we now have an active line of
     9  communication either directly or through
    10  counsel, and that's really helpful and
    11  helpful in a number of ways.  First of all,
    12  it just, as I said before, it builds
    13  credibility.  Also as the SEC has learned
    14  more about this asset class and as the
    15  industry has evolved and we have, as well,
    16  internally, it's very complex, and it's
    17  fantastic having different sets of eyes and
    18  different views on particular issues.
    19          There may -- in our conversations,
    20  there may be questions or insights or issues
```

RPLI_SEC 1141385

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN
```
     21  spotted by the SEC that we hadn't fully
     22  thought of, and that's helpful to make sure
     23  we're thinking through everything.  They're
     24  very -- as Val has indicated through her
     25  experience, they're very experienced in
0023
      1  dynamic developing marketplaces that are sort
      2  of at the forefront or frontier.
      3         Also, we've been able to try to help
      4  the SEC understand the marketplace and the
      5  technology and -- and -- and the issues at
      6  hand, hopefully.  We've hopefully built some
      7  credibility in doing that, and the open
      8  dialogue is -- is -- is just really useful
      9  overall.
     10         Not too long ago, because we have an
     11  open dialogue, we -- we heard from the SEC
     12  they had a couple questions about something
     13  they read in the press, and we engaged in a
     14  dialogue around that.  And that's -- that's
     15  sort of -- it's nice when that is kind of a
     16  normal and consistent part of doing business,
     17  and we, you know, have an open line of
     18  communication with one another.
     19         MS. STARR:  Right, and I -- and I
     20  think that it's important to point out that
     21  in -- in these meetings, it's highly, highly,
     22  highly unusual that you would ever have
     23  anybody from enforcement there.  Okay.  So --
     24  so you don't you you don't go in thinking, oh
     25  no, I've got an enforcement guy sitting in
0024
      1  the corner.  We don't let them in the room,
      2  okay.  If you want to -- I mean, if we're
      3  going to have an honest, open discussion and
      4  dialogue, we need to be able to have trust
      5  from the client and from the lawyer as well,
      6  so we can -- I think it really is a two-way
      7  street where, you know, you can develop the
      8  relationships and you know, you know -- you
      9  know, if something comes up, it's easy to
     10  pick up the phone and say, hey, we read this,
     11  can you guys tell us about this.  I -- you
     12  know, we want to make sure you -- you're not
     13  doing something that could be an issue.  You
     14  know, we -- we heard about it.  So let's talk
     15  about this more.
     16         And -- and that happens, as I said,
     17  that happens in the digital space, it happens
     18  in the brick and mortar space too.  I think
     19  the funny thing that you said about the
     20  number of people, I -- I like to say so the
     21  Division of Trading and Markets has all these
     22  different offices, and they like -- there's
     23  always somebody from it -- one or two people
     24  from each of those offices that have to be in
     25  meetings.
0025
      1         So we end up -- we've got -- we've got
      2  actually a very large team on the FinHub
      3  because it's, as I said, it's Trading and
      4  Markets, it's Division of Corporation
      5  Finance, it's our economists, it's our -- our
```

RPLI_SEC 1141386

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
 6    fund people, our 40 Act people.  It's our
 7    investor protection people.  And so I would
 8    say I don't know, Val, 30, 40 at least from
 9    all the divisions.  From CorpFin alone we
10    have eight people.
11         So it -- it -- it -- it sometimes can
12    be a little bit intimidating when you walk
13    into a conference room and there are all
14    these people there, but just ignore it
15    because it's just sort of -- it's true
16    because they've got to hear it, and it's
17    easier if they hear it firsthand.  Sometimes
18    what we'll try to do is say we're going to
19    have people on the phone so that it's not as
20    intimidating with that many people in the
21    room.  We're trying to be sensitive but again
22    also have the people -- the right people
23    hearing the right things because it might be
24    the broker-dealer people, it might be the net
25    capital people, it might be the custody
0026
 1    people, it might be the clearance and
 2    settlement, or the ATS, or the capital
 3    formation or the fund.
 4         So we sort of go down this list.
 5    There's like, oh, who -- who needs to be
 6    here.  So that -- that's what we try to do
 7    because we also think it's important that the
 8    discussions start out with everybody in the
 9    room so that we don't waste your time and --
10    and the -- the meetings become more
11    productive, and we don't constantly have to
12    follow up.  Oh, TM had this question and
13    CorpFin had this question.  We try to do it
14    in a way that -- that's the most productive.
15         MS. GOLDBERG:  That's great.  Oh,
16    sorry, go ahead.
17         MS. DEWITT:  We welcome as many people
18    as possible in the room.  We just will bring
19    more handouts yeah, paper.
20         MS. GOLDBERG:  So, Meghan, that's a
21    great lead into, you know, asking about your
22    interactions with Amy and her team, and I'm
23    curious like what, you know, in terms of the,
24    you know, what has been the client feedback
25    when you've initially suggest engaging FinHub
0027
 1    and in terms of, like, the process, what has
 2    been the -- are they, despite Amy's advice
 3    and not being intimidated, are they
 4    incredibly intimidated getting into that
 5    room?
 6         MS. SPILLANE:  Well, I think there are
 7    two things and probably a lot of people in
 8    the room can relate that -- that create some
 9    healthy skepticism, no offense, about
10    engaging on the front end.  One is just the
11    uncertainty.  Given that there's only been
12    one no-action letter so far, will I get one?
13    Are there going to be others?  Does my model
14    even fit in a schema that the SEC would ever
15    approve?
16         But probably first and foremost, it's
                      Page 11
```

RPLI_SEC 1141387

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
17  timing.  Everything moves so fast, especially
18  where more and more platforms are building,
19  using equity investment on the front end
20  because we know that that is a very
21  protective factor, you have investors to
22  answer to, you need to get things to market,
23  and that creates some real tension with a
24  process that is necessarily going to take
25  some time.
0028
 1          So I think to set reasonable
 2  expectations on the front end, we are very
 3  forthright about the fact that it will be a
 4  process that will be months, not weeks, not
 5  days.  You're not going to get a thumbs up at
 6  the first meeting, just to make sure that --
 7  that no one has that expectation.
 8          And despite saying that, I think
 9  especially where we've had some positive
10  meetings, some clients leave it thinking that
11  they are very close to a thumbs up.  So we --
12  we have submitted kind of the preliminary ask
13  through the FinHub website, and the first
14  thing you usually get is a ping to submit
15  something in writing.  So this is kind of
16  different than a white paper and is more of
17  like a fleshed-out analysis of your -- your
18  business but also which parts of it implicate
19  the securities laws and not like a full-
20  fledged Howey analysis but rather like a
21  practical business perspective as to how
22  these factors are likely to play out.
23          And that ends up -- that process is
24  actually very helpful for clients because we
25  have to ask them all these different
0029
 1  questions and flesh out parts of their model
 2  that they perhaps hadn't thought through all
 3  the way.  But it's all really important
 4  fodder for that first meeting because you
 5  know what kind of questions you're going to
 6  get, and you want to make sure that your
 7  clients have actually thought through those
 8  things in a way that's holistic so that, one,
 9  they have an answer, and, two, they have an
10  answer that -- that is actually what they
11  plan to do and not subject to change because
12  that's very important.  Your -- your -- your
13  approval is only as good as your model stays
14  the same.
15          MS. STARR:  Yes, yes.
16          MS. GOLDBERG:  And so, Dorothy and
17  Meghan, have you -- how have you utilized or
18  -- or changed models, for instance, when in
19  -- in response to feedback?  Is it a pretty
20  fluid process and -- and with the no-action
21  letter out there has that been enlightening
22  in terms of how you've -- how you, you know,
23  changed your internal process in going
24  forward?
25          MS. SPILLANE:  I think kind of two
0030
 1  places that -- well, I -- I think I've
                          Page 12
```

RPLI_SEC 1141388

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
 2   advised all of my clients that you have to go
 3   into those meetings understanding that you'll
 4   have to be flexible, not, you know, the core
 5   of your business and what it really stands
 6   for but rather with bits and pieces that the
 7   staff may express some concern about and
 8   maybe have a different proposal.  So you have
 9   to kind of go in there with that spirit.
10           If you have a fully baked model that
11   isn't subject to any change whatsoever,
12   that's -- it's going to hit a roadblock
13   pretty quickly.
14           Two of the areas that I think we've
15   had a lot of productive discussions around
16   are transfer restrictions.  I'm sure that
17   doesn't come as any surprise.  I think when
18   we first started engaging with you, I was
19   very impressed with how knowledgeable the
20   members of your team are on, you know, for
21   example, all of the restrictions that can be
22   put on to an Ethereum coin and things like
23   that.
24           So our clients have to think through
25   them and -- and be ready to respond, you
0031
 1   know, if they're amenable to that kind of
 2   restriction or not.
 3           But then the other -- the other thing
 4   is kind of if you're not going to have a
 5   transfer restriction, what can you point to
 6   that really show that the economic realities
 7   are aligned such that someone is not buying
 8   this coin with, you know, an intense
 9   speculate, and that can take a lot of
10   different forms from the way you market it to
11   price certainty that you put around the coin.
12   It's really like a combination of a bunch of
13   different factors in a toolbox.
14           But I think that those are the two
15   areas where we've pivoted a little and
16   readjusted models in direct response to
17   feedback.
18           MS. STARR:  And I the one -- the one
19   thing I would say, just -- I don't care what
20   you call it.  You can call it an apple.  You
21   can call it a stable coin.  You can call it a
22   token.  We're all going to look at really the
23   economic reality of what's going on.  So it
24   doesn't -- it doesn't matter.  You can call
25   it Token X when you send something in.  So
0032
 1   just --
 2           MS. DEWITT:  Just don't call it a non-
 3   exempt unregistered security token.
 4           MS. STARR:  There you go.
 5           MS. DEWITT:  So going back to the
 6   basics, I'll answer your question just a
 7   little bit indirectly.  I imagine many of you
 8   in the audience are, you know, maybe issuers
 9   of tokens, wondering how to engage and maybe
10   some may be exchanges like us and -- and
11   other types of participants in the -- in the
12   crypto economy.
```

                              Page 13

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
13          But I think, just going back to the
14  fundamentals, if you're going to reach out to
15  a regulator, it will be well worth your time
16  and effort, whether you do it directly or
17  through counsel, to write down in very clear
18  language the area in which you're looking to
19  create something and the, you know, purpose
20  and technology and business plan and so on
21  and so forth around your potential offering
22  that you're looking to discuss with them.
23          Your mother should be able to
24  understand what you're asking for, why, and
25  how, but after reading this paper.  And that
0033
1  will just -- that will just serve you well.
2  It'll save you legal costs.  It will get you
3  to -- to not no faster.  You never get to
4  yes.  And so on and so forth.
5          And we recently had a call with the
6  SEC where one of our really knowledgeable
7  people on the phone was just speaking so
8  fast, and I was literally texting him saying
9  slow down.  So start with the basics, build
10  it up, be methodical, and you know, we --
11  young people talk fast.  So slow it down and
12  make sure you're talking slowly and you're --
13  and appropriately and you're hearing and
14  you're listening and you're having an
15  interchange.
16          So I think, you know, as a real
17  fundamental level, is that fair to say that
18  might be helpful?
19          MS. STARR:  No, I -- I -- I think it's
20  fair.  I think the other thing is is when you
21  have to write it in what we call plain
22  English, it actually is harder because you
23  really have to understand what you're doing.
24          There -- before we started the FinHub,
25  we would have meetings with people, and we'd
0034
1  sit down and they would talk about this great
2  idea using big words, and then we'd say okay
3  tell us in English what are you really doing
4  and they couldn't.  And then you said, okay,
5  well maybe you guys need to go back to the
6  drawing board a little bit here because
7  you're -- you're talking, you know, real tech
8  terms, but I don't see anything really there,
9  you know, so.
10          And -- and their counsel would look at
11  me and they'd be like, oh yeah, or -- you
12  know, and -- and then surprise --
13  surprisingly or not surprisingly in some
14  cases, we would not hear from them for two
15  months, three months --
16          MS. SPILLANE:  In addition to on the
17  tech side, I've also had recent experience
18  with you or -- you know, I think especially
19  where a lot of models are now trying to
20  achieve some level of stabilization, it
21  involves a lot of economic theory and
22  algorithms and things like that, and you have
23  -- you're bringing in your Ph.D.s to look
```

                                    Page 14

RPLI_SEC 1141390

-13 www.youtube.com watch v 1-7Qyfkpe6O Perspectives on SEC Engagement concerning digital assets (TRAN

```
      24    under the hood of those models as well.
      25          MS. STARR:  Yeah, we -- at the SEC we
0035
       1    have a Division of Risk and Analysis, which
       2    are all Ph.D. economists.  And -- and what'll
       3    happen is people will say, well, this is --
       4    that's exactly right.  This is how the
       5    algorithm will work, and we send it to our
       6    guys, and I get -- get an email, this makes
       7    no sense.  It doesn't work.  And then he'll
       8    say let me check with someone else.  They run
       9    it.  He had the same reaction.
      10          So it's funny because we -- you know,
      11    you have a lot of professionals and lawyers
      12    are not necessarily economists, and people
      13    will say algorithm, and they'll think, great,
      14    it's an algorithm.  Well, when you really run
      15    the traps on this algorithm, until you put it
      16    in plain English as to really how it really
      17    works, looking at a formula is nice, but our
      18    guys are going to run it and say this doesn't
      19    make any sense, right?
      20          Or it makes sense and that it works
      21    this way.  I think that's -- that's fair.  I
      22    think the other point I wanted to raise, too,
      23    was even though we've got, you know,
      24    economists and we've got lawyers, we have
      25    people who really understand the technology
0036
       1    and really have dug in deep to, you know,
       2    understand how the various blockchains and
       3    platforms work and -- and how the different
       4    consensus mechanisms work.
       5          So I think the other thing that we,
       6    you know, always like people to understand is
       7    we understand, we get it.  So you're not
       8    talking to a bunch of rubes, right, we do --
       9    we do understand because we can't do our job
      10    if we didn't.  And that's something that we
      11    learned early on is we had to really develop
      12    an expertise as to, you know, how does this
      13    thing work and keep learning just as everyone
      14    else is learning about it.
      15          And -- and we -- we participate
      16    internationally, as well, and so --
      17          MS. DEWITT:  And a lot of what -- what
      18    I think is key is not just what's your
      19    business model and what are you trying to
      20    achieve and basically how are you trying to
      21    do that, I think, you know, that's something
      22    that can be understood relatively easily.
      23          But as you dig into deeper into the
      24    implementation and how that works factually,
      25    that becomes the facts and circumstances upon
0037
       1    which the SEC can make better analysis and
       2    decisions.  So we have, you know, we've had
       3    lots and lots of discussions with -- with our
       4    -- with our actual potential regulators, and
       5    we've learned over time that starting up
       6    front with a higher level and then coming
       7    back with more implementation detail is -- is
       8    not as time effective for anyone, that we
                                    Page 15
```

RPLI_SEC 1141391

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN
```
 9    really need to provide them with upfront
10    information that's higher level and then
11    talks about all the technology and
12    implementation because that's the facts and
13    circumstances that they -- that they really
14    need to know.  But it has to be done in a way
15    that's efficient, understandable, coherent,
16    and -- and well thought out and -- and --
17    and, you know, hopefully defensible.
18            MS. STARR:  But it's still okay, if
19    you still just have an idea and think would
20    this even get off the ground, it's okay to
21    ping us.  Because you know, one of -- one of
22    the staff either from my office or from one
23    of our other offices -- it likely will be a
24    lawyer -- will call and say, so walk me
25    through what you're thinking.  You know, have
0038
 1    you thought about X or Y?  Do you have
 2    counsel?
 3            And a lot of times it -- it does give
 4    somebody a little bit more comfort, like, oh,
 5    I guess I need to get counsel, or oh, yeah, I
 6    guess so, all right.  But don't be afraid.  I
 7    mean, I think that's really important.  You
 8    don't have to have counsel to start with.
 9    You know, we'll -- we'll give you a little
10    bit of hand holding.  We do that.  We always
11    have.  Small business, that's really
12    important.
13            MS. DEWITT:  Tammy, you asked how we
14    evolved our approach based on regulatory
15    feedback, and a lot of it is with the SEC,
16    but we're also a bit licensee and, you know,
17    have a regulated custodial trust with the New
18    York DFS, and you know, we're in contact with
19    other regulators as well.
20            And I think, in general, we found as
21    -- as an exchange that we needed to analyze
22    tokens to ensure that they're not securities
23    before we list them in the U.S., obviously,
24    because if they were, we would be violating
25    the 34 Act, among other things.
0039
 1            And so we found over time that we were
 2    looking at each token one by one.  It's very
 3    facts and circumstances.  And although the
 4    law has -- or -- or the SEC's approach and
 5    the law have developed a bit over time, it's
 6    still a fairly murky area.  There are
 7    enforcement actions that have been announced.
 8    There's a, you know, a no-action letter,
 9    which in our areas is -- is not especially
10    helpful.  It's just related to, you know,
11    kind of a different area and so on and so
12    forth.
13            So what we found is that this wasn't
14    especially scalable, and we wanted to make
15    sure we were doing as robust an analysis as
16    possible.  So we developed a framework -- we
17    love that word -- the SEC came up with a
18    framework with the same word later -- that --
19    that basically went through the Howey
                                    Page 16
```

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
20    analysis and case law and the enforcement
21    actions as they came through and -- and
22    developed, you know, a list of potential
23    questions or actual questions, and with some
24    waiting alongside that to help us have a much
25    more robust scalable and -- and what we hope
0040
 1    to be ultimately defensible framework in
 2    determining whether to list digital assets in
 3    the United States and under the federal --
 4    consistent with the federal securities laws.
 5          And so that was one change that we did
 6    over the last six to nine months and -- and
 7    continue to update that.  We worked very hard
 8    with outside counsel.  We think we have the
 9    best -- I mean, we think we have a great
10    framework, and we think it's effective.
11    We're not very modest about it.  We like it,
12    sorry.
13          MS. GOLDBERG:  She's selling
14    frameworks, everyone.
15          MS. DEWITT:  Yeah, exactly.
16    Frameworks are useful, they really are.  And
17    -- and we -- we didn't -- you know, we did
18    not ask for nor did we get approval from any
19    regulator.  It's a business decision as to
20    whether you go for -- go forward with or
21    without a no-action letter, request for
22    approval, so on and so forth.  We went --
23    implemented it, we felt very confident in the
24    robustness of the analysis and constantly,
25    you know, ensure that it's -- A, constantly
0041
 1    ensure that it's as up-to-date as possible
 2    and B, run our digital assets list
 3    against it on a periodic basis as a part of
 4    their lifestyle management.
 5          So -- so we did that, and we -- we
 6    feel like we've done as robust a job as we
 7    can to work within a quickly evolving
 8    industry and identify tokens that we can
 9    list.  And we -- using that framework, we
10    have also rejected tokens.  So we have done
11    both, and we've been transparent about that
12    framework and the process, you know, with our
13    actual and potential regulators.
14          MS. GOLDBERG:  So in early April, as
15    many of you know, the SEC came up with a
16    framework, as well, on digital assets, which
17    was really a thorough analysis of -- of -- of
18    whether digital assets fall within the
19    meaning of securities.
20          And so, Dorothy, did you -- how did
21    that affect the framework that was already --
22    seemed pretty underway your -- your
23    framework, and what -- what specific aspects
24    did you find helpful in the SEC guidance?
25          MS. STARR:  Sure, so our framework, in
0042
 1    general, reflected the considerations that
 2    the SEC set out.  So nothing was a surprise,
 3    but the framework the SEC set out was -- was
 4    very helpful.  It has -- if you haven't seen
```

                                             Page 17

RPLI_SEC 1141393

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
  5  it, you should look at it.  It has a number
  6  of -- a few dozen issues to consider, and it
  7  reinforced the view that's been stated in the
  8  Dow 12-A report and others that, you know, in
  9  general, the SEC has a view that token -- you
 10  know, most tokens are -- are securities, even
 11  if they have a utility function.  In my
 12  opinion, that was the reinforcement.
 13       It also reinforced Hinman's view that
 14  a token can be a security and then, you know,
 15  evolve into a nonsecurity, and it also stated
 16  by its own, you know, words that any one
 17  factor was not determinative, but it's a
 18  facts and circumstances analysis that has to
 19  take place.
 20       There were a couple -- well, there
 21  were -- we found the framework extremely
 22  helpful.  The framework itself identifies
 23  sort of things to consider.  It doesn't
 24  identify weightings of those.  And what we do
 25  in our framework is things to consider and
0043
  1  weightings, and that helps us get to a kind
  2  of numerical analysis that, you know, we work
  3  in.  If it's here, it's a security; if it's
  4  here, it's not, and there's something in
  5  between.  And we implement that using our --
  6  using our framework.
  7       You know, we would have loved for it
  8  to have weightings, but I understand that's
  9  hard to do.
 10       MS. STARR:  But aren't -- are your
 11  weightings more of a risk analysis?
 12       MS. DEWITT:  That's right, yeah, and
 13  that's -- that's unique to the business and a
 14  very fair point.  Thank you for pointing that
 15  out.  There were a couple of things that we
 16  hadn't necessarily thought of specifically.
 17  For example, we had thought of, you know,
 18  what's the size of the issuance and is the
 19  size of the issuance consistent with the cost
 20  of, you know, that they need to implement
 21  with their business model.
 22       What the SEC indicated is what's the
 23  incrementation of the digital asset.  For
 24  example, if each digital asset is basically
 25  a, you know, kind of like a one element of
0044
  1  using a platform, like one widget worth, is
  2  it trading on exchanges in the incrementation
  3  of one widget, or is it just wildly
  4  different?  And so that was very helpful for
  5  us to think through.  It was consistent with,
  6  you know, kind of our thinking, but it was
  7  additive to our thinking.  There were several
  8  other areas like that as well, so it was very
  9  helpful in that way.
 10       MS. GOLDBERG:  Meghan, perhaps you
 11  could share some -- some feedback on -- on
 12  the framework and how you've worked that into
 13  your advice to clients.
 14       MS. SPILLANE:  Sure I will reiterate
 15  that it was welcome and very helpful, and it
```

Page 18

-13 www.youtube.com watch v 1-7Qyfkpe6O Perspectives on SEC Engagement concerning digital assets (TRAN
```
16    kind of took, you know, all of the advice
17    that we've been gathering and digesting over
18    the past few years and put it in one place in
19    a really succinct way that is really user
20    friendly.
21          I have a couple of questions or
22    clarifications for the next version of the
23    frameworks.  One that I think is on a lot of
24    our clients' minds are the idea of using the
25    proceeds from the token sales to improve the
0045
1     functionality of the platform.  I think
2     Goodwin does a lot of work in the tech space,
3     and we have a lot of companies that are
4     startups and have model number one and then
5     improve it over time, make it better as their
6     business becomes more successful.
7           So there was something in the
8     frameworks weighing whether the proceeds were
9     being used to develop the platform, and I
10    think that there should be a place for
11    proceeds to be used to make platforms better,
12    and that would be consistent --
13          MS. STARR:  Right, and I --
14          MS. SPILLANE:  -- emerging tech
15    companies.
16          MS. SPILLANE:  Sure.  I think the
17    thing to keep in mind, and I think that one
18    of the things that the framework kept trying
19    to point out was the efforts of others
20    aspect, and you know, if what you're looking
21    to is a question of when are you no longer
22    relying on the efforts of others as one of
23    the elements -- I think there's some
24    misunderstanding or misconception that
25    decentralization is the answer to a morphing,
0046
1     as we call it.  That's just one element,
2     right?  But -- but that really does go to the
3     question of whether or not it's the efforts
4     of others that are still involved in
5     enhancing the value and from which you're
6     going to obtain the value.  And that -- I
7     think that is an important question as it
8     relates to, you know, software companies.  We
9     see that all the time with software
10    companies.  Yeah, you -- you need to
11    constantly improve and develop or, you know
12    -- but is it, you know, the one team that's
13    doing it and directing it versus the
14    community that's voting through their
15    consensus mechanism and nobody -- no one
16    person's controlling dollars.
17          MS. SPILLANE:  Makes sense.  The other
18    one, which is kind of in a similar vein, I
19    think there was a factor in there that talked
20    about whether the appreciation and value of
21    the token is incidental, which -- which I
22    read to suggest that there are circumstances
23    where you can have a token becoming more
24    valuable, for example, as a platform develops
25    and becomes more useful, and that there's a
0047
```

RPLI_SEC 1141395

-13 www.youtube.com watch v 1-7Qyfkpe6O Perspectives on SEC Engagement concerning digital assets (TRAN

```
 1    place for that in this framework.
 2          So the idea of something ever going up
 3    in value is not necessarily a bad word or a
 4    bad concept.
 5          MS. STARR:  Oh, I -- I think that's
 6    right.  I think that's right, and I think,
 7    you know, again, as -- as Director Hinman's
 8    speech had mentioned, but I think that
 9    everyone wants to remember from a legal side
10    is the -- there's -- there's this case called
11    Gary Plastics, where what you may be -- what
12    you may have in your hand is in and of itself
13    is not a security, but all the things around
14    it and everything that you're doing turn it
15    into an investment contract.
16          And so, you know, the secondary
17    market, increase in value, but if you've
18    built the best platform in the world and, you
19    know, people really need that token in order
20    for them to participate in that platform, and
21    it's a true supply and demand for purposes
22    of, you know, that -- that particular thing,
23    I think that's -- I -- I think the -- the
24    plan -- the -- the framework recognizes that
25    --
0048
 1          MS. SPILLANE:  So that's like a secret
 2    one.  It's just a matter of -- you know --
 3          MS. STARR:  Well, sure, but you know,
 4    again, the securities laws are facts and
 5    circumstances, they're principles-based.
 6    You're not going to get a checklist that
 7    says, yes, okay, no, okay, you know, it's
 8    just not the way it works.
 9          And so there is a lot of judgment that
10    goes into it.  It is an economic reality
11    test, and I think Dorothy is here pointing
12    out there are business calls that -- that
13    people have to make.  And -- and as I say,
14    that's true in the digital space as well as
15    it's true in your -- your brick and mortar
16    corporate space.  I -- I don't see, you know,
17    those business choices really being that
18    different, other than it's easier to know
19    that you have stock that you're trading or
20    debt that you're trading versus something
21    what -- what is this that I'm trading.
22          MS. GOLDBERG:  Great.  And so -- so
23    you mentioned -- just go back to TurnKey --
24    for a moment.  So you mentioned that was a
25    small law firm in Florida that reached out to
0049
 1    you guys.  And so what -- if you could share
 2    what is the -- you mentioned that there was
 3    some -- some additional no-action letters in
 4    the pipeline.  Is that -- do you envision
 5    them to be --
 6          MS. STARR:  I couldn't speak on that.
 7    What I -- what I can tell you is that they
 8    arise as a result of the kind of interaction
 9    that Meghan's been talking about.
10          MS. GOLDBERG:  An iterative process.
11          MS. STARR:  Oh, it's a very iterative
```
                                      Page 20

RPLI_SEC 1141396

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
12   process, and what will -- the -- the -- and
13   this is not secret sauce.  So what will
14   happen is if a no-action letter comes in, we
15   have a team, and they go through it, and then
16   we sit down, and we say, okay, we've got all
17   -- these kinds of questions.  And we'll put
18   together a list of questions, and then two or
19   three staff will get on the phone with
20   counsel and with company and walk through
21   them  We don't put anything in writing.  It's
22   all oral, but we'll walk through each one of
23   the questions.
24        And so if -- if they can -- they'll
25   have a dialogue about the questions, if
```
0050
```
1    there's any question about what it means and
2    what we're looking for, but I think that's a
3    way -- Meghan, you've been through this.
4        MS. SPILLANE:  Yes.
5        MS. STARR:  But it's not like a huge
6    team.  It's like two or three people will
7    literally be on the phone, generally someone
8    from my office and someone from the chief
9    counsel's office, just to walk through.  And
10   it's -- it's nonconfrontational and it's --
11   it's intended really to move the ball
12   forward.
13        MS. SPILLANE:  But that's something I
14   don't think I really appreciated until I was
15   directly involved.  You'll notice I think the
16   TurnKey Jet no-action letter was dated like
17   April 2nd, and then, you know, the approval
18   from the SEC came the following day.  That's
19   not an accident.  That letter was an
20   iterative letter that -- that came over time
21   and a lot of feedback and back and forth,
22   such that by the time it was actually
23   finalized and submitted, they had a lot of
24   confidence in what the answer is going to be,
25   so --
```
0051
```
1        MS. STARR:  Oh absolutely, absolutely.
2    People -- you may submit a no-action letter,
3    but that's not ultimately what's going to go
4    out the door, and we don't make you put
5    anything publicly out until we're ready to
6    say, okay, put it in formally now because you
7    can always send in drafts, but put it
8    informally now.  And there are times we'll
9    issue the letter the same day.  It's not -- I
10   mean I think TurnKey, that's unusual.  There
11   was like a day lag, but normally when -- we
12   actually issue our response the same day
13   because we say, okay, send it in because it's
14   sent in electronically, and then we'll do the
15   response.  But we will have gotten totally
16   comfortable with what's in that letter.
17        MS. SPILLANE:  So I know you can't
18   share anything about the other ones in the
19   pipeline, but I think when TurnKey Jet came
20   out -- and you know, it's a completely closed
21   loop platform --
22        MS. STARR:  Yes.
```
                              Page 21

-13 www.youtube.com watch v 1-7Qyfkpe6O Perspectives on SEC Engagement concerning digital assets (TRAN

```
23          MS. SPILLANE:  They're not doing
24    anything with the money other than having it
25    sit basically in a pot of equity --
0052
 1          MS. STARR:  Yes.
 2          MS. SPILLANE:  -- transfer
 3    restrictions redemption is at a value less
 4    than you pay.  There -- there are a lot of
 5    aspects of that model that seemed very
 6    specific to that business and are not
 7    necessarily --
 8          MS. STARR:  No-action letter --
 9          MS. SPILLANE:  -- something that would
10    translate --
11          MS. STARR:  Yes, no-action letters are
12    specific to businesses.  So they're not class
13    letters.  It's not if you do this, then this
14    this and this.  So there is -- there is more
15    specificity, but you know, I mean, as time
16    goes on, you know -- as I said, I think
17    TurnKey Jet, from my own personal side, is
18    really on one end of the spectrum.
19          But I'm sure there will be others that
20    -- that start moving a little bit more
21    because that's business reality.  Not
22    everybody's going to be in a closed loop.
23          MS. SPILLANE:  Yep.
24          MS. STARR:  Right?
25          MS. GOLDBERG:  I think we're about to
0053
 1    wrap up.  Maybe, Amy, you could share your
 2    thoughts on how you hope FinHub evolves with
 3    with the market and --
 4          MS. STARR:  Sure.  I mean, I think the
 5    -- the level of interaction that we have had
 6    from industry has been great.  Val actually
 7    has been doing these P2P meetings when she's
 8    been traveling around the country, and just
 9    the more engagement that -- that the industry
10    has with us through FinHub -- because that's
11    your best way to get to the right people and
12    not feel, oh no, I don't know who to call.
13    You just send it in to FinHub, and we'll be
14    right back at you.
15          And I -- and I think the more -- it's
16    -- the more interaction and willingness that
17    people have to engage with us, the happier we
18    are because we want this to work.  We want
19    there to be innovation in these markets.  We
20    want there to be change because the -- the
21    securities laws are written to be dynamic,
22    and engaging with us to help facilitate that
23    is the only way that it works.
24          MS. GOLDBERG:  That's great.  So
25    that's -- that's a very positive perspective
0054
 1    on things, and so, Meghan, maybe you can
 2    share to your prospective clients out there
 3    what is -- what -- what do you think is the,
 4    you know, top two, three things that you
 5    would get from engagement like that?
 6          MS. SPILLANE:  Well, I -- I really
 7    think this panel has been a great
```

                                           Page 22

RPLI_SEC 1141398

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

```
 8     representation of all there is to gain, just
 9     the open dialogue. It improves your ability
10     to go forward with a successful platform that
11     you can be confident is not going to be the
12     subject of scrutiny. Maybe not certain but
13     more confident. And it forces you to tease
14     through some aspects of your business that
15     you might not have had at the forefront of
16     your mind that are really going to, you know,
17     play out whether you like it or not.
18          So I've had an incredibly positive
19     experience, and I hope this panel has
20     inspired some other people to consider
21     engaging.
22          MS. GOLDBERG: Dorothy, any final
23     thoughts?
24          MS. DEWITT: Not a lot of grass grows
25     under the feet of this industry, and so we're
0055
 1     looking forward to having -- we appreciate
 2     very much everything that the SEC has done.
 3     It's been a, you know, quickly developing
 4     industry, but we're looking forward to
 5     further developments and further clarity, in
 6     particular, on different functionality as
 7     well as, you know, the ability to trade and
 8     -- and custody registered security tokens.
 9     We're supporting some efforts, you know, we
10     bought a broker dealer in, and we're
11     supporting -- and an ATS and so we're
12     supporting efforts to see if we can help
13     facilitate that evolution of the marketplace
14     where there actually are registered tokens.
15          MS. STARR: And I would say if you
16     have any specific ideas, please give me a
17     call.
18          MS. DEWITT: Okay, will do.
19          MS. GOLDBERG: Okay, thank you
20     everyone.
21          MS. STARR: Thank you.
22          (End of Audio Recording.)
23
24
25
0056
 1                    CERTIFICATE
 2
            I, Wendy Sawyer, do hereby certify that I was
 3
     authorized to and transcribed the foregoing recorded
 4
     proceedings and that the transcript is a true record, to
 5
     the best of my ability.
 6
 7
 8
            DATED this 28th day of August, 2021.
 9
10
11     _____
```

                    WENDY SAWYER, CDLT
                         Page 23

-13 www.youtube.com watch v 1-7Qyfkpe60 Perspectives on SEC Engagement concerning digital assets (TRAN

                12
                13
                14
                15
                16
                17
                18
                19
                20
                21
                22
                23
                24
                25

RPLI_SEC 1141400