# Exhibit 176



# BITCOIN AND VIRTUAL CURRENCIES: WELCOME TO YOUR REGULATOR

*Matthew Kluchenek*[†]

## I. Introduction

Among all the U.S. regulators interested in regulating Bitcoin and virtual currencies, the Commodity Futures Trading Commission (CFTC) is determined to be at the forefront. Since the announcement by CFTC Chairman Timothy Massad in late 2014 that Bitcoin derivatives should fall within the scope of the CFTC's jurisdiction,[1] the CFTC has been aggressive in addressing not only wrongful conduct involving Bitcoin derivatives, but also wrongful conduct involving certain spot Bitcoin transactions.

The CFTC's actions are a clarion call for market participants to understand the broad breadth of the CFTC's jurisdiction, and to take notice of the requirements that may apply both to derivatives and to certain physical transactions involving Bitcoin and other virtual currencies.

## II. Scope of CFTC's Jurisdiction

The U.S. Commodity Exchange Act (CEA),[2] as amended by Title VII of the Dodd-Frank Wall Street Reform and Consumer Protection Act (the Dodd-Frank Act),[3] regulates transactions

---

[†] Partner, Global Head of Derivatives, Baker & McKenzie LLP.
[1] *The Commodity Futures Trading Commission: Effective Enforcement and the Future of Derivatives Regulation Before the S. Comm. on Agric., Nutrition, and Forestry*, 111th Cong. 55 (2014) (statement of Timothy Massad, Chairman of the Commodity Futures Trading Commission).
[2] Commodity Exchange Act of 1936, Pub. L. No. 74–675, 49 Stat. 1491 (codified as amended in scattered sections of 7 U.S.C.) (replacing the Grain Futures Act of 1922).
[3] *See generally* Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub. L. No. 111–203, 124 Stat. 1376 (2010).

1

in "commodity interests."[4] The CFTC, an independent federal agency, is charged with administering the CEA and has exclusive jurisdiction over transactions involving commodity interests.[5] Throughout the history of the CFTC, and particularly with respect to the Dodd-Frank Act, Congress has ceded broad power to the CFTC to interpret and promulgate rules regarding commodity interest products, transactions, and market participants.[6]

As a general matter, the CFTC's jurisdiction flows from the definition of a "commodity" under the CEA.[7] At bottom, if a "commodity" is not involved in a contract, agreement, or transaction, the CFTC lacks the statutory basis to regulate the contract, agreement, or transaction.[8] The definition of a "commodity," however, is exceedingly broad under the CEA. The definition delineates a laundry list of agricultural products, but also sweeps in "all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in."[9] As a result, almost anything except onions[10] and movie box office receipts[11] can constitute a "commodity" under the definition, including bottles of wine, baseball cards, reference rates, indices, mathematical permutations, services, intangibles, and contingencies that would not seemingly fall within the traditional view of a commodity.[12]

If, however, a commodity is involved, then the CFTC may only assert jurisdiction if a

---

[4] *See* 17 C.F.R. § 1.3(yy) (2016).

[5] *See* Commodity Futures Commission Trading Act of 1974 § 101, 7 U.S.C. § 2(a)(1)(A) (2012). When Congress created the CFTC in 1974, it "confer[red] on the CFTC 'exclusive jurisdiction' over commodity futures and options thereon, which means that these instruments cannot be regulated by any other federal or state agency (except in certain limited circumstances where the CEA explicitly contemplates shared authority between the CFTC and another agency)." President's Working Group on Financial Markets, Over-the-Counter Derivatives Markets and the Commodity Exchange Act (1999). The purpose of the exclusive jurisdiction provision "was to separate the functions of the new CFTC from those of the SEC and other regulators." Leist v. Simplot, 638 F.2d 283, 314 (2d Cir. 1980).

[6] *See, e.g.*, Binyamin Appelbaum, *On Finance Bill, Lobbying Shifts to Regulation*, N.Y. Times (June 26, 2010), http://www.nytimes.com/2010/06/27/business/27regulate.html? (noting that the Dodd-Frank Act is "basically a 2,000-page missive to federal agencies, instructing regulators to address subjects ranging from derivatives trading to document retention" and observing that "it is notably short on specifics, giving regulators significant power to determine its impact—and giving partisans on both sides a second chance to influence the outcome").

[7] *See* 7 U.S.C. § 1(a)(9) (2012).

[8] *See id.* at § 2(a)(1)(A).

[9] *See id.* at § 1(a)(9).

[10] In 1958, as a result of rife manipulations in the onion market, Congress enacted the Onion Futures Act to ban futures trading in onions. *Id.* at § 13-1; *see also* Bd. of Trade of Chi. v. SEC, 677 F.2d 1137, 1142 n.9 (7th Cir. 1982) (discussing the onion carve out from the CEA).

[11] As part of the Dodd-Frank Act, Congress banned—at the urging of associations representing the motion picture industry—the trading of derivatives on motion picture box office receipts. *See* 7 U.S.C. § 13-1 (2006), *amended by* the Dodd-Frank Wall Street Reform and Consumer Protection Act, Pub.L. No. 111-190, § 721(e)(10), 124 Stat. 1376, 1672 (2010); *see also* Daniel Frankel, *10 Key Moments in the Life of Movie Derivatives*, The Wrap (Aug. 13, 2010, 6:53 PM), http://www.thewrap.com/movies/article/10-key-moments-life-movie-derivatives-20122.

[12] *See* 7 U.S.C. § 1a(9).

"commodity interest" is based on the commodity.[13] A "commodity interest" refers to the types of instruments that are subject to the CFTC's regulation, which are: (i) futures contracts, (ii) options on futures contracts, (iii) swaps, (iv) leveraged retail foreign exchange contracts, (v) leveraged retail commodity transactions, and (vi) certain other leveraged products.[14] Importantly, the CFTC's jurisdiction is thus not—as many assume—limited to "derivatives," but rather also extends to certain spot, or physical market, transactions.

As a result, in seeking to assert jurisdiction over a contract, agreement, or transaction involving a commodity, the CFTC's jurisdictional hook is premised upon whether a commodity interest is involved. If so, and assuming that no exclusions or exemptions apply, the CFTC has a basis to assert regulatory authority.

### III.   Bitcoin as a "Commodity" under the Commodity Exchange Act

In the context of Bitcoin (and other virtual currencies), the threshold issue is whether Bitcoin is a "commodity." If Bitcoin is a commodity, then the CFTC may regulate commodity interests based on the commodity. If Bitcoin is not a commodity, then the CFTC lacks the authority to so regulate.

In December 2014, CFTC Chairman Timothy Massad telegraphed the CFTC's intent to regulate Bitcoin *derivatives*, stating that "derivatives contracts based on a virtual currency represent one area within [the Commission's] responsibilit[ies]."[15] Little elucidation was given. However, in September 2015, the CFTC took a significant step in asserting jurisdiction when it issued an order determining that "Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities."[16]

The CFTC's determination did not arise out of a rulemaking or an interpretation, but rather via an enforcement action against an online Bitcoin trading platform called "Derivabit," which was owned by Coinflip, Inc.[17] Coinflip operated the trading platform, which was designed for risk management purposes, in an effort to bring together buyers and sellers of Bitcoin option

---

[13] *See* 7 U.S.C. § 2(a)(1)(A).

[14] *See* 17 C.F.R. § 1.3(yy) (2016) ("Commodity interest . . . means (1) Any contract for the purchase or sale of a commodity for future delivery [a futures contract]; (2) Any contract, agreement or transaction subject to a Commission regulation under section 4c [commodity options] or 19 of the Act [leveraged contracts]; (3) Any contract, agreement or transaction subject to Commission jurisdiction under section 2(c)(2) of the Act [retail foreign exchange and commodity transactions]; and (4) Any swap as defined in the Act, by the Commission, or jointly by the Commission and the Securities and Exchange Commission [a swap as defined in CFTC Rule 1a(47)].").

[15] *The Commodity Futures Trading Commission: Effective Enforcement and the Future of Derivatives Regulation Before the S. Comm. on Agric., Nutrition, and Forestry*, 111th Cong. 55 (2014) (statement of Timothy Massad, Chairman of the Commodity Futures Trading Commission).

[16] *In re* Coinflip, Inc., CTFC No. 15-29, 2015 WL 5535736, at *3 (Sept. 17, 2015).

[17] *Id.* at *2.

contracts.[18] Coinflip was not registered with the CFTC.

In making the pronouncement that Bitcoin is a commodity, the CFTC effectively determined that Bitcoin is not a currency. According to the CFTC, "Bitcoin and other virtual currencies are distinct from 'real' currencies, which are the coin and paper money of the United States or another country that are designated as legal tender, circulate, and are customarily used and accepted as a medium of exchange in the country of issuance."[19]

Importantly, the CFTC's determination is not limited to Bitcoin, but extends to "other virtual currencies," which the CFTC broadly defines as "a digital representation of value that functions as a medium of exchange, a unit of account, or a store of value, but does not have legal tender status in any jurisdiction."[20] Thus, the definition of "virtual currency" could also engulf Litecoin and Dogecoin, among others yet to be created.

Based on its determination that Bitcoin is a commodity, the CFTC applied the CEA's provisions to the Derivabit trading platform, finding that Coinflip unlawfully offered commodity options by operating a facility for the trading of such options without being registered as a designated contract market (that is, a futures exchange) or a swap execution facility (SEF).[21] Importantly, because Coinflip offered commodity options, which are derivatives, the CFTC had an ostensibly clear basis to assert jurisdiction once the agency determined that Bitcoin is a commodity.[22]

Just one week after the Coinflip settlement, and armed with its determination that Bitcoin is a commodity, the CFTC brought its second Bitcoin-related enforcement action, this time against TeraExchange, LLC (Tera), an SEF.[23] In the action, the CFTC alleged that Tera failed to enforce its prohibition on wash trades by facilitating the prearrangement of a single Bitcoin swap transaction.[24]

As with the Coinflip matter, the CFTC's enforcement action against Tera involved a derivative—that is, here, swaps based on Bitcoin. The presence of the swap, coupled with Tera's provisional registration with the CFTC as an SEF, provided the CFTC with an unambiguous pathway to assert jurisdiction. Soon thereafter, however, the CFTC's path would take a different,

---

[18] *Id.*
[19] *Id.* at *n.2.
[20] *Id.*
[21] *Id.* at *3–4. A swap execution facility is a trading system or platform, other than a designated contract market, in which multiple participants have the opportunity to enter into swaps by accepting bids and offers made by multiple participants on the facility. *See* Commodity Exchange Act of 1936 § 1a(50), 7 U.S.C. § 1a(50) (2012).
[22] *See id.* at *5 (explaining that under the terms of settlement, the defendants agreed to cease and desist from future violations of the CEA and the CFTC's rules, but no financial penalty was imposed).
[23] *In re* TeraExchange LLC, CFTC No. 15-33, 2015 WL 5658082 (Sept. 24, 2015).
[24] Like the *Coinflip* matter, the CFTC and the defendants agreed to a settlement involving a cease and desist order, but no financial penalty. *Id.* at *8–9.

...

and more aggressive, turn.

## IV. The CFTC's Enforcement Action Against Bitfinex

In June 2016, the CFTC filed charges against a Hong Kong-based company called Bitfinex, which operates an online platform for trading in cryptocurrencies, including Bitcoin.[25] Unlike Coinflip and Tera, however, Bitfinex did not list or permit the trading of derivatives, such as futures, options, or swaps.[26] Rather, Bitfinex merely facilitated *spot* transactions in cryptocurrencies.[27] Generally, a "spot" transaction is the everyday transaction of buying and selling a good, much like one does when purchasing an item on eBay. Payment is made for the item, and the item is promptly delivered to the buyer. The CFTC is generally not authorized to regulate spot transactions.[28] However, by adding a couple of characteristics to an otherwise vanilla spot transaction, the transaction can be transformed into a commodity interest transaction subject to the full panoply of provisions under the CEA.

The basis for the CFTC's authority to regulate certain spot transactions derives from the jurisdictional hook that the agency has used so successfully to prosecute retail precious metals transactions[29]—the so-called "retail commodity transaction" provision under the CEA.[30] The retail commodity transaction provision is a relatively short provision set forth in CEA section 2(c)(2)(D). It provides:

> (D) Retail commodity transactions
>
> > (i) Applicability[.] Except as provided in clause (ii), this subparagraph shall apply to any agreement, contract, or transaction in any commodity that is—

---

[25] *In re* BFXNA Inc., CFTC No. 16-19, 2016 WL 3137612 (June 2, 2016).

[26] *See id.* at *2.

[27] *See id.* at *3.

[28] The CFTC staff has defined a spot transaction as one where immediate delivery of the product and immediate payment for the product are expected on or within a few days of the trade date. *See* CFTC No-Action Letter, CFTCLTR No. 98-73, 1998 WL 754623 (Oct. 8, 1998). The Supreme Court has defined a spot transaction as a purchase or sale agreement for a commodity that is intended to settle in the period that is ordinary for dealings in the relevant type of commodity. *See* Dunn v. CFTC, 519 U.S. 465, 472 (1997). As noted by the Sixth Circuit, "because the CEA was aimed at manipulation, speculation, and other abuses that could arise from the trading in futures contracts and options, as distinguished from the commodity itself, Congress never purported to regulate 'spot' transactions (transactions for the immediate sale and delivery of a commodity) or 'cash forward' transactions (in which the commodity is presently sold but its delivery is, by agreement, delayed or deferred)." CFTC v. Erskine, 512 F.3d 309, 321 (6th Cir. 2008). Spot transactions are, however, subject to the anti-manipulation provisions under the CEA and the CFTC's rules to the extent that such attempted or actual manipulations affect prices in commodity interests. *See, e.g.*, 7 U.S.C. §§ 9, 15 (2012); 17 C.F.R. § 180.1(a) (2016); *see also* CFTC v. Atlantic Bullion & Coin, Inc.*,* C.A. No. 8:12-1503-JMC (D.S.C. 2010), http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfatlanticcomplaint060612.pdf.

[29] *See, e.g.*, CFTC v. Hunter Wise Commodities, 21 F. Supp. 3d 1317 (S.D. Fl. 2014); CFTC v. Palm Beach Capital, No.14-cv-80636 (S.D. Fl. 2014), http://www.cftc.gov/idc/groups/public/@lrenforcementactions/documents/legalpleading/enfpbeachorderdf073114.pdf.

[30] *See* 7 U.S.C. § 2(c)(2)(D).

(I) entered into with, or offered to (even if not entered into with), a person that is not an eligible contract participant or eligible commercial entity; and

(II) entered into, or offered (even if not entered into), on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.[31]

The elements of a retail commodity transaction are thus threefold—the agreement, contract, or transaction must:

(1)  involve a commodity;

(2)  be entered into with, or offered to, a person that is not an eligible contract participant (ECP);[32] and

(3)  be entered into, or offered, on a leveraged, margined or financed basis.[33]

All three elements must be present for there to be a retail commodity transaction. Any person that deals in commodities subject to the retail commodity transaction provision is required to be registered with the CFTC as a futures commission merchant (FCM).[34]

While a retail commodity transaction is a form of commodity interest, such a transaction is fundamentally different from a derivatives transaction, the latter of which derives its value from an underlying commodity and contains an element of futurity. Critically, where a derivative is not involved, market participants are often caught off-guard with respect to the broad scope of the CFTC's jurisdiction.

---

[31] *Id.*

[32] An ECP is defined to include, among others, (i) an organization with total assets in excess of $10 million; (ii) a corporation that (a) has a net worth in excess of $1 million and (b) uses commodity interests in connection with its business or to hedge commercial risk; (iii) an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $10 million; or (iv) an individual who has amounts invested on a discretionary basis, the aggregate of which is in excess of $5 million, where such individual is using the instrument in order to manage the risk associated with an asset owned or liability incurred, or reasonably likely to be owned or incurred, by the individual. 7 U.S.C. § 1a(18). An eligible commercial entity is defined in § 1a(17).

[33] The CFTC takes a broad view of the scope of this element. Essentially, if the purchaser of the commodity is not required to fully pay for the commodity upon purchase, then the CFTC will likely presume that leverage or financing is involved in the transaction. *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52,426, 52,426 (Aug. 23, 2013) (to be codified in 17 C.F.R. pt.1) ("New CEA section 2(c)(2)(D) of the CEA *broadly* applies to any agreement, contract, or transaction in any commodity that is entered into with, or offered to (even if not entered into with), a non-eligible contract participant or non-eligible commercial entity on a leveraged or margined basis, or financed by the offeror, the counterparty, or a person acting in concert with the offeror or counterparty on a similar basis.") (emphasis added).

[34] *See* 7 U.S.C. § 6d.

Like so many requirements under the CEA, however, there are exceptions to the retail commodity transaction provision. One such exception involves the timely "actual delivery" of a commodity to the buyer.[35] If a seller offers to enter, or enters into, a commodity transaction with a non-ECP on a leveraged basis, the transaction will not fall under the retail commodity transaction provision if the seller actually delivers the commodity to the buyer within 28 days of the date that the contract is entered into.[36] The meaning of "actual delivery" has been the subject of extensive interpretation by the CFTC.[37]

In determining that Bitfinex violated the CEA, the CFTC's order found that the transactions executed on the Bitfinex platform fell within the purview of the retail commodity transaction provision, and that no "actual delivery" occurred. According to the CFTC:

- Bitcoin is a commodity;

- Bitfinex did not limit its customers to ECPs, but rather sold Bitcoins to retail persons;

- Bitfinex facilitated the financing of Bitcoin transactions;[38] and

- Bitfinex did not actually deliver Bitcoins to the buyers.[39]

In addressing the most controversial aspect of the order—whether actual delivery of the Bitcoins occurred—the CFTC explained that Bitfinex held its customers' Bitcoins in an omnibus private wallet that was controlled solely by Bitfinex, not the customers.[40] Through the use of a private key, only Bitfinex had access to the omnibus wallet.[41] Consequently, because Bitfinex solely controlled access to the wallet, the CFTC found that Bitfinex's customers did not actually receive delivery of any Bitcoins.[42] The CFTC's explanation seems to suggest that satisfying the requirement of "actual delivery" would require that virtual currencies be delivered to a deposit wallet for which the recipient controls the private key.[43] However, neither the CEA, the CFTC's

---

[35] *See* Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52,426, 52,426 (Aug. 23, 2013) (to be codified in 17 C.F.R. pt.1).

[36] *See id.* at 52,427.

[37] *See* Retail Commodity Transactions Under Commodity Exchange Act, 76 Fed. Reg. 77,670 (Dec. 14, 2011) (to be codified in 15 C.F.R. pt. 922); Retail Commodity Transactions Under Commodity Exchange Act, 78 Fed. Reg. 52,426 (Aug. 23, 2013) (to be codified in 17 C.F.R. pt.1).

[38] The Bitfinex platform permitted maximum leverage of 3.33-to-1 (that is, a 30% initial margin requirement). *See In re* BFXNA Inc., CFTC No. 16-19, 2016 WL 3137612, at *2 (June 2, 2016).

[39] *Id.* at *5.

[40] *Id.*

[41] A "private key" is a secret number associated with a deposit wallet that allows Bitcoins in that wallet to be accessed and spent. The private keys, which are randomly assigned, are mathematically related to all Bitcoin addresses generated for the wallet. *See Private Key*, BITCOIN WIKI, https://en.bitcoin.it/wiki/Private_key (last visited Oct. 26, 2016).

[42] *See In re* BFXNA Inc., 2016 WL 3137612, at *5.

[43] *See* Letter from Steptoe & Johnson LLP to Commodity Futures Trading Comm'n (July 1, 2016) (on file with

rules, nor the CFTC's guidance on "actual delivery" discuss or contemplate the delivery requirements of virtual currencies.[44]

Nonetheless, based on the satisfaction of the elements of the retail commodity transaction provision, coupled with the absence of actual delivery, the CFTC found that Bitfinex violated the CEA's retail commodity transaction provision by failing to register as an FCM.[45] The CFTC's action against Bitfinex marks the agency's initial foray into the regulation of Bitcoin via the retail commodity provision transaction. If the history involving the CFTC's regulation of retail precious metals transactions is any guide, more enforcement actions should be expected.

## V. What's Next?

In at least one respect, the CFTC should be given credit for taking the lead in seeking to regulate a novel product under its jurisdiction. With such an effort, however, comes responsibility. The CFTC should clearly articulate, through an interpretation rather than ad hoc enforcement actions, the manner in which the agency intends to apply the actual delivery exception to virtual currencies. Such an interpretation is necessary so as not to stymie innovation.

At the same time, the CFTC should strive to coordinate the regulation of virtual currencies with other federal agencies, some of which have shown an interest in regulating such products.[46] For example, if the Securities and Exchange Commission were to classify Bitcoin or another virtual currency as a "security," market participants could be compelled to comply with two fundamentally different, and in some ways redundant, regulatory regimes. We have seen dual jurisdiction applied to certain other products—security futures and mixed swaps come to mind—and the outcomes have not been ideal. Here, as before, the CFTC should be aggressive in seeking to address regulatory harmonization.

Finally, for market participants, the CFTC has sounded the bell. In offering virtual currencies to customers, market participants must understand and be sensitive to the scope of the CFTC's jurisdiction. If a swap or futures contract is involved—including a seemingly innocuous embedded option in which the customer has the right to cancel or offset a purchase—or a retail spot transaction involves any form of financing, margin or leverage, the CFTC has shown its willingness to take action—even in the absence of allegations of fraud or other wrongdoing.

---

author).
    [44] *Cf. In re* BFXNA Inc., 2016 WL 3137612. The Bitfinex order prompted a petition that requests the CFTC to clarify the "actual delivery" requirements in the context of virtual currencies. *See* Letter from Steptoe & Johnson LLP to Commodity Futures Trading Comm'n (July 1, 2016) (on file with author).
    [45] Under the terms of the settlement, Bitfinex agreed to pay a civil money penalty of $75,000 and cease and desist from further violations of the subject CEA provisions. *Id.* at *6.
    [46] *See, e.g.*, *Investor Alert: Bitcoin and Other Virtual Currency-Related Investments*, U.S. Sec. & Exch. Comm'n (May 7, 2014), https://www.sec.gov/oiea/investor-alerts-bulletins/investoralertsia_bitcoin.html.