# Exhibit 197

Testimony

# Chairman's Testimony on Virtual Currencies: The Roles of the SEC and CFTC

Chairman Jay Clayton

**Washington D.C.**

**Feb. 6, 2018**

Before the

Committee on Banking, Housing, and Urban Affairs

United States Senate

Chairman Crapo, Ranking Member Brown and distinguished senators of the Committee, thank you for the opportunity to testify before you today.[1]  I am pleased that the Committee is holding this hearing to bring greater focus to the important issues that cryptocurrencies, initial coin offerings (ICOs) and related products and activities present for American investors and our markets.

I am also pleased to join my counterpart, Commodity Futures Trading Commission (CFTC) Chairman Christopher Giancarlo, for our second time testifying together before Congress. Since I joined the Commission in May, Chairman Giancarlo and I have built a strong relationship. Cryptocurrencies, ICOs and related subjects are the latest in a host of market issues on which we and our staffs have been closely collaborating to strengthen our capital markets for investors and market participants.[2]

The mission of the SEC is to protect investors, maintain fair, orderly and efficient markets and facilitate capital formation. We do so through our enforcement of the federal securities laws and our oversight of the securities markets and their participants including (1) approximately $75 trillion in securities trading annually on U.S. equity markets; (2) the disclosures of approximately 4,100 exchange-listed public companies with an approximate aggregate market capitalization of $31 trillion; and (3) the activities of over 26,000 registered entities and self-regulatory organizations, including investment advisers, broker-dealers, transfer agents, securities exchanges, clearing agencies, mutual funds, exchange-traded funds (ETFs), the Financial Industry Regulatory Authority (FINRA) and the Municipal Securities Rulemaking Board (MSRB), among others.

For those who seek to raise capital to fund an enterprise, as many in the ICO space have sought to do, a primary entry into the SEC's jurisdiction is the offer and sale of securities, as set forth in the Securities Act of 1933.[3]  As I will explain in greater detail below, determining what falls within the ambit of a securities offer and sale is a facts-and-circumstances analysis, utilizing a principles-based framework that has served American companies and American investors well through periods of innovation and change for over 80 years.

The cryptocurrency and ICO markets, while new, have grown rapidly, gained greater prominence in the public conscience and attracted significant capital from retail investors. We have seen historical instances where such a rush into certain investments has benefitted our economy and those investors who backed the right ventures. But when our laws are not followed, the risks to all investors are high and numerous – including risks caused by or related to poor, incorrect or non-existent disclosure, volatility, manipulation, fraud and theft.

To be clear, I am very optimistic that developments in financial technology will help facilitate capital formation, providing promising investment opportunities for institutional and Main Street investors alike. From a financial regulatory perspective, these developments may enable us to better monitor transactions, holdings and obligations (including credit exposures) and other activities and characteristics of our markets, thereby facilitating our regulatory mission, including, importantly, investor protection.

At the same time, regardless of the promise of this technology, those who invest their hard-earned money in opportunities that fall within the scope of the federal securities laws deserve the full protections afforded under those laws. This ever-present need comes into focus when enthusiasm for obtaining a profitable piece of a new technology "before it's too late" is strong and broad. Fraudsters and other bad actors prey on this enthusiasm.

The SEC and the CFTC, as federal market regulators, are charged with establishing a regulatory environment for investors and market participants that fosters innovation, market integrity and ultimately confidence. To that end, a number of steps the SEC has taken relating to cryptocurrencies, ICOs and related assets are discussed below.

*Message for Main Street Investors*

Before discussing regulation in more detail, I would like to reiterate my message to Main Street investors from a statement I issued in December.[4]  Cryptocurrencies, ICOs and related products and technologies have captured the popular imagination – and billions of hard-earned dollars – of American investors from all walks of life. In dealing with these issues, my key consideration – as it is for all issues that come before the Commission – is to serve the long term interests of our Main Street investors.  My efforts – and the tireless efforts of the SEC staff – have been driven by various factors, but most significantly by the

concern that too many Main Street investors do not understand all the material facts and risks involved. Unfortunately, it is clear that some have taken advantage of this lack of understanding and have sought to prey on investors' excitement about the quick rise in cryptocurrency and ICO prices.[5]

There should be no misunderstanding about the law. When investors are offered and sold securities – which to date ICOs have largely been –they are entitled to the benefits of state and federal securities laws and sellers and other market participants must follow these laws.

Yes, we do ask our investors to use common sense, and we recognize that many investment decisions will prove to be incorrect in hindsight. However, we do not ask investors to use their common sense in a vacuum, but rather, with the benefit of information and other requirements where judgments can reasonably be made.

This is a core principle of our federal securities laws and is embodied in the SEC's registration requirements. Investors should understand that to date no ICOs have been registered with the SEC, and the SEC also has not approved for listing and trading any exchange-traded products (such as ETFs) holding cryptocurrencies or other assets related to cryptocurrencies. If any person today says otherwise, investors should be especially wary.

Investors who are considering investing in these products should also recognize that these markets span national borders and that significant trading may occur on systems and platforms outside the U.S. Investors' funds may quickly travel overseas without their knowledge. As a result, risks can be amplified, including the risk that U.S. market regulators, such as the SEC and state securities regulators, may not be able to effectively pursue bad actors or recover funds.

Further, there are significant security risks that can arise by transacting in these markets, including the loss of investment and personal information due to hacks of online trading platforms and individual digital asset "wallets." A recent study estimated that more than 10% of proceeds generated by ICOs – or almost $400 million – has been lost to such attacks.[6]  And less than two weeks ago, a Japanese cryptocurrency market lost over $500 million in an apparent hack of its systems.[7]

In order to arm investors with additional information, the SEC staff has issued investor alerts, bulletins and statements on ICOs and cryptocurrency-related investments, including with respect to the marketing of certain offerings and investments by celebrities and others.[8] If investors choose to invest in these products, they should ask questions and demand clear answers. I would strongly urge investors – especially retail investors – to review the sample questions and investor alerts issued by the SEC's Office of Investor Education and Advocacy.[9]

These warnings are not an effort to undermine the fostering of innovation through our capital markets – America was built on the ingenuity, vision

and spirit of entrepreneurs who tackled old and new problems in new, innovative ways. Rather, they are meant to educate Main Street investors that many promoters of ICOs and cryptocurrencies are not complying with our securities laws and, as a result, the risks are significant.

With my remaining testimony, I would like to provide the Committee an overview of the Commission's ongoing work on cryptocurrencies and ICOs.

*Cryptocurrencies and Related Products and Trading*

Speaking broadly, cryptocurrencies purport to be items of inherent value (similar, for instance, to cash or gold) that are designed to enable purchases, sales and other financial transactions. Many are promoted as providing the same functions as long-established currencies such as the U.S. dollar but without the backing of a government or other body. While cryptocurrencies currently being marketed vary in different respects, proponents of cryptocurrencies often tout their novelty and other potential beneficial features, including the ability to make transfers without an intermediary and without geographic limitation and lower transaction costs compared to other forms of payment. Critics of cryptocurrencies note that the purported benefits highlighted by proponents are unproven and other touted benefits, such as the personal anonymity of the purchasers and sellers and the absence of government regulation or oversight, could also facilitate illicit trading and financial transactions, as well as fraud.

The recent proliferation and subsequent popularity of cryptocurrency markets creates a question for market regulators as to whether our historic approach to the regulation of sovereign currency transactions is appropriate for these new markets. These markets may look like our regulated securities markets, with quoted prices and other information. Many trading platforms are even referred to as "exchanges." I am concerned that this appearance is deceiving. In reality, investors transacting on these trading platforms do not receive many of the market protections that they would when transacting through broker-dealers on registered exchanges or alternative trading systems (ATSs), such as best execution, prohibitions on front running, short sale restrictions, and custody and capital requirements. I am concerned that Main Street investors do not appreciate these differences and the resulting substantially heightened risk profile.

It appears that many of the U.S.-based cryptocurrency trading platforms have elected to be regulated as money-transmission services. Traditionally, from an oversight perspective, these predominantly state-regulated payment services have not been subject to direct oversight by the SEC or the CFTC. Traditionally, from a function perspective, these money transfer services have not quoted prices or offered other services akin to securities, commodities and currency exchanges. In short, the currently applicable regulatory framework for cryptocurrency trading was not designed with trading of the type we are witnessing in mind. As

Chairman Giancarlo and I stated recently, we are open to exploring with Congress, as well as with our federal and state colleagues, whether increased federal regulation of cryptocurrency trading platforms is necessary or appropriate. We also are supportive of regulatory and policy efforts to bring clarity and fairness to this space.

The SEC regulates securities transactions and certain individuals and firms who participate in our securities markets. The SEC does not have direct oversight of transactions in currencies or commodities, including currency trading platforms.

While there are cryptocurrencies that, at least as currently designed, promoted and used, do not appear to be securities, simply calling something a "currency" or a currency-based product does not mean that it is not a security. To this point I would note that many products labeled as cryptocurrencies or related assets are increasingly being promoted as investment opportunities that rely on the efforts of others, with their utility as an efficient medium for commercial exchange being a distinct secondary characteristic. As discussed in more detail below, if a cryptocurrency, or a product with its value tied to one or more cryptocurrencies, is a security, its promoters cannot make offers or sales unless they comply with the registration and other requirements under our federal securities laws.[10]

In this regard, the SEC is monitoring the cryptocurrency-related activities of the market participants it regulates, including brokers, dealers, investment advisers and trading platforms. Brokers, dealers and other market participants that allow for payments in cryptocurrencies, allow customers to purchase cryptocurrencies (including on margin) or otherwise use cryptocurrencies to facilitate securities transactions should exercise particular caution, including ensuring that their cryptocurrency activities are not undermining their anti-money laundering and know-your-customer obligations.[11]  As I have stated previously, these market participants should treat payments and other transactions made in cryptocurrency as if cash were being handed from one party to the other.

Finally, financial products that are linked to underlying digital assets, including cryptocurrencies, may be structured as securities products subject to the federal securities laws even if the underlying cryptocurrencies are not themselves securities. Market participants have requested Commission approval for new products and services of this type that are focused on retail investors, including cryptocurrency-linked ETFs. While we appreciate the importance of continuing innovation in our retail fund space, there are a number of issues that need to be examined and resolved before we permit ETFs and other retail investor-oriented funds to invest in cryptocurrencies in a manner consistent with their obligations under the federal securities laws. These include issues around liquidity, valuation and custody of the funds' holdings, as well as creation, redemption and arbitrage in the ETF space.

Last month, after working with several sponsors who ultimately decided to

withdraw their registration statements, the Director of our Division of Investment Management issued a letter to provide an overview of certain substantive issues and related questions associated with registration requirements and to encourage others who may be considering a fund registered pursuant to the Investment Company Act of 1940 to engage in a robust discussion with the staff concerning the above-mentioned issues.[12]  Until such time as those questions have been sufficiently addressed, I am concerned about whether it is appropriate for fund sponsors that invest substantially in cryptocurrencies and related products to register. We will continue engaging in a dialogue with all interested parties to seek a path forward consistent with the SEC's tripartite mission.

*ICOs and Related Trading*

Coinciding with the substantial growth in cryptocurrencies, companies and individuals increasingly have been using so-called ICOs to raise capital for businesses and projects. Typically, these offerings involve the opportunity for individual investors to exchange currency, such as U.S. dollars or cryptocurrencies, in return for a digital asset labeled as a coin or token. The size of the ICO market has grown exponentially in the last year, and it is estimated that almost $4 billion was raised through ICOs in 2017. Note that this number may understate the size of the ICO market (and the potential for loss) as many ICOs "trade up" after they are issued.

These offerings can take different forms, and the rights and interests a coin is purported to provide the holder can vary widely. A key question all ICO market participants – promoters, sellers, lawyers, officers and directors and accountants, as well as investors – should ask: "Is the coin or token a security?"  As securities law practitioners know well, the answer depends on the facts. But by and large, the structures of ICOs that I have seen involve the offer and sale of securities and directly implicate the securities registration requirements and other investor protection provisions of our federal securities laws. As noted above, the foundation of our federal securities laws is to provide investors with the procedural protections and information they need to make informed judgments about what they are investing in and the relevant risks involved. In addition, our federal securities laws provide a wide array of remedies, including criminal and civil actions brought by the DOJ and the SEC, as well as private rights of action.

The Commission previously urged market professionals, including securities lawyers, accountants and consultants, to read closely an investigative report it released. On July 25, 2017, the Commission issued a Report of Investigation pursuant to Section 21(a) of the Securities Exchange Act of 1934[13] regarding an ICO of DAO Tokens.[14]  In the Report, the Commission considered the particular facts and circumstances presented by the offer and sale of DAO Tokens and concluded that DAO Tokens were securities based on longstanding legal principles, and therefore that offers and sales of the DAO Tokens were subject to the federal securities laws. The Report also explained that

issuers of distributed ledger or blockchain technology-based securities must register offers and sales of such securities unless a valid exemption from registration applies, and that platforms that provide for trading in such securities must register with the SEC as national securities exchanges or operate pursuant to an exemption from such registration.

The Commission's message to issuers and market professionals in this space was clear: those who would use distributed ledger technology to raise capital or engage in securities transactions must take appropriate steps to ensure compliance with the federal securities laws. The Report and subsequent statements also explain that the use of such technology does not mean that an offering is necessarily problematic under those laws. The registration process itself, or exemptions from registration, are available for offerings employing these novel methods.

The statement I issued in December that was directed to Main Street investors and market professionals provided additional insight into how practitioners should view ICOs in the context of our federal securities laws. Certain market professionals have attempted to highlight the utility or voucher-like characteristics of their proposed ICOs in an effort to claim that their proposed tokens or coins are not securities. Many of these assertions that the federal securities laws do not apply to a particular ICO appear to elevate form over substance. The rise of these form-based arguments is a disturbing trend that deprives investors of mandatory protections that clearly are required as a result of the structure of the transaction. Merely calling a token a "utility" token or structuring it to provide some utility does not prevent the token from being a security.[15] Tokens and offerings that incorporate features and marketing efforts that emphasize the potential for profits based on the entrepreneurial or managerial efforts of others continue to contain the hallmarks of a security under U.S. law. It is especially troubling when the promoters of these offerings emphasize the secondary market trading potential of these tokens, *i.e.*, the ability to sell them on an exchange at a profit. In short, prospective purchasers are being sold on the potential for tokens to increase in value – with the ability to lock in those increases by reselling the tokens on a secondary market – or to otherwise profit from the tokens based on the efforts of others. These are key hallmarks of a security and a securities offering.

On this and other points where the application of expertise and judgment is expected, I believe that gatekeepers and others, including securities lawyers, accountants and consultants, need to focus on their responsibilities. I have urged these professionals to be guided by the principal motivation for our registration, offering process and disclosure requirements: investor protection and, in particular, the protection of our Main Street investors.[16]

I also have cautioned market participants against promoting or touting the offer and sale of coins without first determining whether the securities laws apply to those actions. Engaging in the business of selling securities generally requires a license, and experience shows that excessive touting

in thinly traded and volatile markets can be an indicator of "scalping," "pump and dump" and other manipulations and frauds. Similarly, my colleagues and I have cautioned those who operate systems and platforms that effect or facilitate transactions in these products that they may be operating unregistered exchanges or broker-dealers that are in violation of the Securities Exchange Act of 1934.

I do want to recognize that recently social media platforms have restricted the ability of users to promote ICOs and cryptocurrencies on their platforms. I appreciate the responsible step.

*Enforcement*

A number of concerns have been raised regarding the cryptocurrency and ICO markets, including that, as they are currently operating, there is substantially less investor protection than in our traditional securities markets, with correspondingly greater opportunities for fraud and manipulation. The ability of bad actors to commit age-old frauds with new technologies coupled with the significant amount of capital – particularly from retail investors – that has poured into cryptocurrencies and ICOs in recent months and the offshore footprint of many of these activities have only heightened these concerns.

In September 2017, the Division of Enforcement established a new Cyber Unit focused on misconduct involving distributed ledger technology and ICOs, the spread of false information through electronic and social media, brokerage account takeovers, hacking to obtain nonpublic information and threats to trading platforms.[17] The Cyber Unit works closely with our cross-divisional Distributed Ledger Technology Working Group, which was created in November 2013. We believe this approach has enabled us to leverage our enforcement resources effectively and coordinate well within the Commission, as well as with other federal and state regulators.

To date, we have brought a number of enforcement actions concerning ICOs for alleged violations of the federal securities laws. In September 2017, we brought charges against an individual for defrauding investors in a pair of ICOs purportedly backed by investments in real estate and diamonds.[18]  According to the SEC's complaint, investors provided approximately $300,000 in funding and were told they could expect sizeable returns despite neither company having real operations. In December 2017, we obtained an emergency asset freeze to halt an alleged ICO fraud that purportedly raised up to $15 million from thousands of individual investors beginning in August 2017.[19] According to the complaint, the scam was operated by a recidivist securities law violator and promised investors a more than 1,300 percent profit in under 29 days. As another example, after being contacted by the SEC last December, a company halted its ICO to raise capital for a blockchain-based food review service, and then settled proceedings in which we determined that the ICO was an unregistered offering and sale of securities in violation of the federal securities laws.[20] Before tokens were delivered to investors, the company refunded investor proceeds

after the SEC intervened.

And most recently, we halted an allegedly fraudulent ICO that targeted retail investors promoting what it portrayed as the world's first decentralized bank.[21] We were able to freeze some of the allegedly ill-gotten cryptocurrency assets and obtained a receiver to try to marshal these assets back to harmed investors.

I also have been increasingly concerned with recent instances of public companies, with no meaningful track record in pursuing distributed ledger or blockchain technology, changing their business models and names to reflect a focus on distributed ledger technology without adequate disclosure to investors about their business model changes and the risks involved. A number of these instances raise serious investor protection concerns about the adequacy of disclosure especially where an offer and sale of securities is involved. The SEC is looking closely at the disclosures of public companies that shift their business models to capitalize on the perceived promise of distributed ledger technology and whether the disclosures comply with the federal securities laws, particularly in the context of a securities offering.

With the support of my fellow Commissioners, I have asked the SEC's Division of Enforcement to continue to police these markets vigorously and recommend enforcement actions against those who conduct ICOs or engage in other actions relating to cryptocurrencies in violation of the federal securities laws. In doing so, the SEC and CFTC are collaborating on our approaches to policing these markets for fraud and abuse.[22]  We also will continue to work closely with our federal and state counterparts, including the Department of Treasury, Department of Justice and state attorneys general and securities regulators.

*Conclusion*

Through the years, technological innovations have improved our markets, including through increased competition, lower barriers to entry and decreased costs for market participants. Distributed ledger and other emerging technologies have the potential to further influence and improve the capital markets and the financial services industry. Businesses, especially smaller businesses without efficient access to traditional capital markets, can be aided by financial technology in raising capital to establish and finance their operations, thereby allowing them to be more competitive both domestically and globally. And these technological innovations can provide investors with new opportunities to offer support and capital to novel concepts and ideas.

History, both in the United States and abroad, has proven time and again that these opportunities flourish best when pursued in harmony with our federal securities laws. These laws reflect our tripartite mission to protect investors, maintain fair, orderly and efficient markets and facilitate capital formation. Being faithful to each part of our mission not in isolation, but collectively, has served us well. Said simply, we should embrace the pursuit of technological advancement, as well as new and innovative

techniques for capital raising, but not at the expense of the principles undermining our well-founded and proven approach to protecting investors and markets.

Thank you for the opportunity to testify before you today and for your support of the Commission and its workforce. I stand ready to work with Congress on these issues and look forward to answering your questions.

## APPENDIX

Press Release: SEC Halts Alleged Initial Coin Offering Scam (Jan. 30, 2018)

Statement by SEC Chairman Jay Clayton and CFTC Chairman J. Christopher Giancarlo: Regulators Are Looking at Cryptocurrency (Jan. 25, 2018)

Joint Statement by SEC and CFTC Enforcement Directors Regarding Virtual Currency Enforcement Actions (Jan. 19, 2018)

Statement of Chairman Jay Clayton and Commissioners Kara M. Stein and Michael S. Piwowar on "NASAA Reminds Investors to Approach Cryptocurrencies, Initial Coin Offerings and Other Cryptocurrency-Related Investment Products with Caution" by NASAA (Jan. 4, 2018)

Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017)

Press Release: Company Halts ICO after SEC Raises Registration Concerns (Dec. 11, 2017)

Press Release: SEC Emergency Action Halts ICO Scam (Dec. 4, 2017)

Statement on Potentially Unlawful Promotion of Initial Coin Offerings and Other Investments by Celebrities and Others (Nov. 1, 2017)

Investor Alert: Celebrity Endorsements (Nov. 1, 2017)

Press Release: SEC Exposes Two Initial Coin Offerings Purportedly Backed by Real Estate and Diamonds (Sept. 29, 2017)

Investor Alert: Public Companies Making ICO-Related Claims (Aug. 28, 2017)

Statement by the Divisions of Corporation Finance and Enforcement on the Report of Investigation on The DAO (July 25, 2017)

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017)

Investor Bulletin: Initial Coin Offerings (July 25, 2017)

Investor Alert: Bitcoin and Other Virtual Currency-Related Investments (May 7, 2014)

Investor Alert: Ponzi Schemes Using Virtual Currencies (July 23, 2013)

[1] The views expressed in this testimony are those of the Chairman of the Securities and Exchange Commission and do not necessarily represent the views of the President, the full Commission, or any Commissioner.

[2] See Jay Clayton and J. Christopher Giancarlo, *Regulators are Looking at Cryptocurrency*, Wall St. J. (Jan. 24, 2018), *available at* https://www.wsj.com/articles/regulators-are-looking-at-cryptocurrency-1516836363?mod=searchresults&page=1&pos=2.

[3] Under Section 2(a)(1) of the Securities Act and Section 3(a)(10) of the Exchange Act, a security includes, among other items, "an investment contract." *See* 15 U.S.C. §§ 77b-77c.  An investment contract is an investment of money in a common enterprise with a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others. *See SEC v. Edwards*, 540 U.S. 389, 393 (2004); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *see also United Housing Found., Inc. v. Forman*, 421 U.S. 837, 852-53 (1975).

[4] In December, I issued a statement that provided my general views on the cryptocurrency and ICO markets.  The statement was directed principally at two groups: 1) Main Street investors and 2) market professionals – including, for example, broker-dealers, investment advisers, exchanges, lawyers and accountants – whose actions impact Main Street investors.  *See* Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), *available at* https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.

[5] In one instance, the SEC brought an enforcement action against a purported bitcoin mining company that claimed to have a product "so easy to use that it is 'Grandma approved.'"  In this case, in less than six months, the company allegedly raised more than $19 million from more than 10,000 investors.  The SEC charged that company with operating a Ponzi scheme.  *See* Press Release 2015-271, SEC Charges Bitcoin Mining Companies (Dec. 1, 2015), *available at* https://www.sec.gov/news/pressrelease/2015-271.html; SEC Obtains Final Judgment Against Founder of Bitcoin Mining Companies Used to Defraud Investors (Oct. 4, 2017), *available at* https://www.sec.gov/litigation/litreleases/2017/lr23960.htm.

[6] *See* EY Research: Initial Coin Offerings (ICOs) (Dec. 2017), *available at* http://www.ey.com/Publication/vwLUAssets/ey-research-initial-coin-offerings-icos/%24File/ey-research-initial-coin-offerings-icos.pdf.

[7] *See* Reuters, *Japan Raps Coincheck, Orders Broader Checks after $530 Million Cryptocurrency Theft*, Jan. 28, 2018, *available at* https://www.reuters.com/article/us-japan-cryptocurrency/japan-raps-coincheck-orders-broader-checks-after-530-million-cryptocurrency-theft-idUSKBN1FI06S.

[8] Statement on Potentially Unlawful Promotion of Initial Coin Offerings and Other Investments by Celebrities and Others (Nov. 1, 2017),

*available at* https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos; Investor Alert: Public Companies Making ICO-Related Claims (Aug. 28, 2017), *available at* https://www.sec.gov/oiea/investor-alerts-and-bulletins/ia_icorelatedclaims; Investor Bulletin: Initial Coin Offerings (July 25, 2017), *available at* https://www.sec.gov/oiea/investor-alerts-and-bulletins/ib_coinofferings; Investor Alert: Bitcoin and Other Virtual Currency-Related Investments (May 7, 2014), *available at* https://www.investor.gov/additional-resources/news-alerts/alerts-bulletins/investor-alert-bitcoin-other-virtual-currency; Investor Alert: Ponzi Schemes Using Virtual Currencies (July 23, 2013), *available at* https://www.sec.gov/investor/alerts/ia_virtualcurrencies.pdf.

[9] *See* Sample Questions for Investors Considering a Cryptocurrency or ICO Investment Opportunity (Dec. 2017), *available at* https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11#_ftnref8.

[10] It is possible to conduct an offer and sales of securities, including an ICO, without triggering the SEC's registration requirements. For example, just as with a Regulation D exempt offering to raise capital for the manufacturing of a physical product, an ICO that is a security can be structured so that it qualifies for an applicable exemption from the registration requirements.

[11] I am particularly concerned about market participants who extend to customers credit in U.S. dollars – a relatively stable asset – to enable the purchase of cryptocurrencies, which, in recent experience, have proven to be a more volatile asset.

[12] *See* Staff Letter: Engaging on Fund Innovation and Cryptocurrency-related Holdings (Jan. 18, 2018), *available at* https://www.sec.gov/divisions/investment/noaction/2018/cryptocurrency-011818.htm.

[13] Section 21(a) of the Exchange Act authorizes the Commission to investigate violations of the federal securities laws and, in its discretion, to "publish information concerning any such violations." The Report does not constitute an adjudication of any fact or issue addressed therein, nor does it make any findings of violations by any individual or entity.

[14] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017), *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf.

[15] *See SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943) ("[T]he reach of the [Securities] Act does not stop with the obvious and commonplace. Novel, uncommon, or irregular devices, whatever they appear to be, are also reached if it be proved as matter of fact that they were widely offered or dealt in under terms or courses of dealing which established their character in commerce as 'investment contracts,' or as 'any interest or instrument commonly known as a 'security'."); *see also Reves v. Ernst & Young*, 494 U.S. 56, 61 (1990) ("Congress' purpose in enacting the securities laws was to regulate investments, in whatever form they are made and by whatever name they are called.").

[16] *See* Opening Remarks at the Securities Regulation Institute (Jan. 22, 2018), *available at* https://www.sec.gov/news/speech/speech-clayton-012218.

[17] *See* Press Release 2017-176, SEC Announces Enforcement Initiatives to Combat Cyber-Based Threats and Protect Retail Investors (Sept. 25, 2017), *available at* https://www.sec.gov/news/press-release/2017-176.

[18] Press Release 2017-185, SEC Exposes Two Initial Coin Offerings Purportedly Backed by Real Estate and Diamonds (Sept. 29, 2017), *available at* https://www.sec.gov/news/press-release/2017-185-0.

[19] Press Release 2017-219, SEC Emergency Action Halts ICO Scam (Dec. 4, 2017), *available at* https://www.sec.gov/news/press-release/2017-219.

[20] Press Release 2017-227, Company Halts ICO After SEC Raises Registration Concerns (Dec. 11, 2017), *available at* https://www.sec.gov/news/press-release/2017-227.

[21] Press Release 2018-8, SEC Halts Alleged Initial Coin Offering Scam (Jan. 30, 2018), *available at* https://www.sec.gov/news/press-release/2018-8.

[22] *See* Joint Statement by SEC and CFTC Enforcement Directors Regarding Virtual Currency Enforcement Actions (Jan. 19, 2018), *available at* https://www.sec.gov/news/public-statement/joint-statement-sec-and-cftc-enforcement-directors.