# Exhibit 199

 LAWYER

HOME / NEWS & INSIGHTS /
GLOBAL UPDATE: REGULATORS FOCUS ON INITIAL COIN OFFERINGS

# Global Update: Regulators Focus on Initial Coin Offerings

 

OCTOBER 04, 2017

Since January 2017, more than $2 billion has been raised through the rapidly growing market for so-called "token sales" or "initial coin offerings" (ICOs).[1] The U.S. Securities and Exchange Commission (SEC) announced on July 25, 2017 that some tokens issued through ICOs may be securities under the federal securities laws, and regulators in a number of jurisdictions, including the UK, Singapore and Hong Kong, have released public statements taking similar positions. China, on the other hand, has banned ICOs outright. Dechert is continuing to monitor the rapid developments by regulators globally as the market for ICOs continues to grow and take shape. The following is a discussion of the state of ICO regulation in various international jurisdictions.

## United States

**By Jeremy Senderowicz and Andrew Schaffer**



LAWYER

On July 25, 2017, the SEC's Division of Enforcement issued a Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (DAO Report). This report states that "The DAO is one example of a Decentralized Autonomous Organization, which is a term used to describe a 'virtual' organization embodied in computer code and executed on a distributed ledger or blockchain." The DAO Report concludes that the digital tokens, which were issued for the purpose of raising funds for projects, may be deemed to be securities under the federal securities laws. Accordingly, the SEC concluded that such securities must be registered with the Commission or eligible for an exemption from the registration requirements. The same day, the SEC's Office of Investor Education and Advocacy issued an Investor Bulletin, addressing the topic of ICOs more generally. The Investor Bulletin also highlights the risks of ICO investing and provides guidance for potential investors. Concurrently, the SEC's Divisions of Corporation Finance and Enforcement released a joint statement supporting the DAO Report and Investor Bulletin. In their statement, the Divisions noted that "the issue of whether a particular investment opportunity involves the offer or sale of a security – regardless of the terminology or technology used in the transaction – depends on the facts and circumstances, including the economic realities and structure of the enterprise."

Although the conclusion in the DAO Report was the result of a fact-based inquiry, the SEC described its views with respect to ICOs in terms of general applicability, indicating the SEC's intention to implement these views broadly in the future. Because they do not otherwise appear under the definition of security, the SEC sought to characterize The DAO tokens under



LAWYER

Court defined "investment contract" as a contract, transaction or scheme in which (i) a person invests money in a common enterprise; (ii) with a reasonable expectation of profits; (iii) to be derived from the entrepreneurial or managerial efforts of others.[2] Under the SEC's analysis of the *Howey* test, not all tokens are securities, and potential issuers should consider the expectations of potential investors and the rights afforded in connection with an ICO under such test. While the SEC decided not to pursue enforcement in the matter of The DAO, the DAO Report is a reminder that all offerings of tokens within the United States must be conducted in accordance with the federal securities laws or fall within an exemption. The DAO Report also raises a serious concern that, absent an exemption, platforms that operate as U.S. exchanges to trade such tokens may need to register as a national securities exchange or alternative trading system. Furthermore, any person who receives compensation from the sale of tokens may need to register as a broker-dealer, and any person who provides investment advice with respect to a token sale may need to register as an investment adviser. Further, the DAO Report warns "[t]hose who would use virtual organizations" to review their obligations under the Investment Company Act of 1940.

Shortly thereafter, on August 28, 2017, the SEC published an Investor Alert "warning investors about potential scams involving stock of companies claiming to be related to, or asserting they are engaging in, [ICOs]." The Investor Alert warns that potential scammers may use the lure of new and unfamiliar technology to convince investors to participate in what may be scams, "includ[ing] 'pump-and-dump' and market manipulation schemes" in connection with publicly traded companies trying to take advantage of the hype associated with these new technologies. The Investor Alert



LAWYER

traded companies may try to use an ICO "to affect the price of the company's common stock." According to the Investor Alert, the SEC recently halted trading in the securities of four issuers "who made claims regarding their investments in ICOs or touted coin/token related news." In addition to halting trading in the securities of issuers, at least one start-up in the process of raising money through an ICO has reported that it was contacted by the SEC.

Since the publication of the Investor Alert, several SEC officials have made public remarks regarding ICOs. Steven Peikin, Co-Director of the SEC's Enforcement Division, reportedly stated, in connection with ongoing investigations into potential fraudulent activities by companies in the blockchain and digital currency space, that some of these companies "are really just trying to steal people's money."[3] At a separate speaking engagement, Wesley Bricker, the SEC's Chief Accountant, noted that for ICOs deemed to be securities, "The SEC's registration requirements … include various requirements for filing of audited financial statements."[4] Mr. Bricker cautioned that ICO issuers should consider both accounting and reporting guidance, such as U.S. GAAP, when preparing related financial statements.

Most recently, on September 25, 2017, the SEC announced the creation of a Cyber Unit within the SEC's Enforcement Division, which is intended to build on the Division's "ongoing efforts to address cyber-based threats and protect retail investors."[5] The Cyber Unit will focus on, among other things, "[m]anipulation schemes involving false information spread through electronic and social media" and "[v]iolations involving distributed ledger technology and initial coin offerings."

10/15/22, 9:12 PM
Case 1:20-cv-10832-AT-SN   Document 831-58   Filed 06/13/23   Page 6 of 20
Global Update: Regulators Focus on Initial Coin Offerings


LAWYER

thus not surprising that the SEC, along with regulators in a growing number of foreign jurisdictions, are sharpening their focus on the rapidly developing market for ICOs. For additional information regarding considerations in determining whether an ICO is a security, please refer to *Dechert OnPoint*, [SEC Focuses on Initial Coin Offerings: Tokens May Be Securities Under Federal Securities Laws.](#)

## Footnotes

1) [CoinDesk ICO Tracker.](#)

2) *SEC v. W.J. Howey Co.*, 328 U.S. 293, 301 (1946); *see also SEC v. Edwards*, 540 U.S. 389, 393 (2004).

3) *See* SEC Chief Says Cyber Crime Risks Are Substantial, Systemic, *New York Times* (Sept. 5, 2017).

4) [Remarks before the AICPA National Conference on Banks & Savings Institutions: Advancing High-Quality Financial Reporting in Our Financial and Capital Markets](#) (Sept. 11, 2017).

5) [SEC Announces Enforcement Initiatives to Combat Cyber-Based Threats and Protect Retail Investors](#) (Sept. 25, 2017).

6) CoinDesk ICO Tracker, *supra* fn 1.

# Singapore

**By Dean Collins and Timothy Goh**

Following the SEC's report on July 25, 2017, which concluded that certain digital token sales could be deemed securities under the U.S. federal securities law, the Monetary Authority of Singapore (MAS) issued a statement on August 1, 2017 clarifying its regulatory position on the offer of digital tokens in Singapore.



holder's rights to receive a benefit or to perform specified functions" and virtual currency, as "one particular type of digital token, which typically functions as a medium of exchange, a unit of account, or a store of value." The MAS goes on to state that if the new digital token represents securities (as opposed to mere virtual currency), the initial coin offering and the subsequent trading of the new coins will likely need to meet the requirements set out in the Securities and Futures Act and the Financial Advisers Act, as well as the anti-money laundering and counter financing of terrorism requirements.

It is evident that the MAS has adopted a similar position to the SEC – that it is focused on the substance of the transaction, and where the digital tokens are essentially equivalent to securities, it should fall under the same regulatory procedures as if such tokens were conventional securities. In practice, this means that companies looking to issue digital tokens that are in effect structured as forms of securities must issue a prospectus as part of the offer unless applicable exemptions apply.

The MAS went on further to state that platforms facilitating secondary trading of such tokens would also have to be approved or recognised by MAS as an approved exchange or recognised market operator, respectively.

Given the nascent development of the ICO industry, the MAS has declined to make any definitive conclusions on ICOs (or, interestingly, any earlier ICOs by Singapore companies), instead putting the onus on issuers and intermediaries to obtain independent legal advice and consult the MAS where appropriate.

 LAWYER

By Li Zhaohui

While the SEC has signalled greater scrutiny of ICOs and the issuance of digital tokens, the People's Bank of China has taken this one step further by announcing, on September 4, 2017, an immediate ban on ICO funding by Chinese banks, issuers and investors, and requiring that those who have already raised money pursuant to an ICO provide refunds. The statement from the Chinese regulator states that it will strictly punish ICO offerings in the future while penalizing legal violations in those already completed.

In conjunction with the ban on ICOs, the Chinese regulator has also declared that:

- Digital token financing and trading platforms are prohibited from conducting conversions of coins with fiat currencies;

- Digital tokens cannot be used as currency on the market; and

- Banks are forbidden from offering services to initial coin offerings.

It is important to note that the Chinese government has chosen to specifically target the ban at digital token financing and exchange platforms, rather than the digital currency (e.g., bitcoin) itself given that prior to the ban, a significant amount of total global bitcoin exchange volume was exchanged through the three largest bitcoin exchanges in China. Following the ban, one of the three exchanges announced on September 14, 2017 that it would shut down its operations by September 30, 2017.


LAWYER

enact a blanket ban on ICOs. It is likely that this ban is a temporary one to allow the Chinese regulators to enact appropriate regulations for ICOs. Another possibility is that China may consider creating its own version of digital tokens.

## Hong Kong

**By Michael Wong and Kennan Castel-Fodor**

Much as with regulators in other jurisdictions, the recent influx of ICOs in Hong Kong has prompted the Hong Kong Securities and Futures Commission (SFC) to provide guidance on the regulatory status of such issuances. On 5 September 2017, the SFC issued a statement on ICOs, which discusses the applicability of the securities laws of Hong Kong to the new token issuances (Statement).[1]

The SFC, continuing the pattern established by other regulators, did not take a bright-line position on whether digital tokens are "securities" as defined in the Securities and Futures Ordinance (SFO), instead noting that the determination depends on the "facts and circumstances" of an ICO. In Hong Kong, unless authorised by the SFC, it is an offence under the SFO for a person to distribute to the public in Hong Kong advertisements, invitations or documents for securities or regulated investment agreements, subject to certain exemptions. In the event that an ICO is determined to be an offer of securities, the marketing of such digital tokens to the public in Hong Kong would be subject to the securities laws of Hong Kong; further, the advertisements, invitations or documents relating to the ICO must either be authorised by the SFC or fall within one of the relevant exemptions. In the



not a security, and those "terms and features" that may render the tokens to be a security (e.g., shares, debentures, and collective investment schemes).

In addition, the SFC notes that activities conducted by service providers related to the ICO may constitute "regulated activities" under the SFO with respect to "dealing in or advising on the digital tokens, or managing or marketing a fund investing in" such digital tokens. An SFC licence or registration is needed if (1) a business in a "regulated activity" is actually being carried on in Hong Kong (or a person holding himself out to carry on such business) or (2) a business in a regulated activity is being carried on outside Hong Kong but such business has been actively marketed to the Hong Kong public. It is an offence under the SFO to carry on business in any regulated activity without being licensed by or registered with the SFC. For the purpose of regulation in Hong Kong, regulated activities include (among other activities): Type 1 (dealing in securities); Type 4 (advising on securities); Type 7 (providing automated trading services); and Type 9 (asset management).

Similar to the other regulators evaluating the implications of ICOs, the SFC has expressed significant concerns, particularly given the anonymity often associated with such issuances and trading, as well as issues relating to money laundering, terrorist financing, and investor protection. According to the SFC, the nature of the primary and secondary markets for ICOs creates heightened risks of investor fraud and misrepresentation. While the Statement provides some guidance as to the Hong Kong regulator's view of ICOs, such regulatory determinations cannot be completely divorced from the PRC's recent prohibition of ICOs, and may lead to an informal prohibition on such issuances in Hong Kong.


LAWYER

1) See Securities and Futures Commission of Hong Kong, Statement on Initial Coin Offerings.

# UK

By Richard Heffner and Nora Bullock

On September 12, 2017, following a recent SEC statement relating to offerings of digital tokens, the UK Financial Conduct Authority (FCA) published its own statement[1] warning investors to be conscious of the risks involved in investing in ICOs. It advised that investments should be made only by experienced investors who are confident in the quality of the specific ICO project and are prepared to lose their entire investment.

The FCA highlighted a number of general risks facing ICO investments. These include the fact that most ICOs are not regulated by the FCA and/or are based overseas, rendering it unlikely that they will have access to UK regulatory protections. Additionally, ICO projects do not tend to issue regulated prospectuses – instead, they usually provide only a "white paper", which can often be incomplete or misleading. Other risks include: the volatile nature of token values (as with cryptocurrencies generally); the potential for fraud; and the experimental business models used for ICO projects.

As with other regulators, whether or not an ICO falls within the FCA's regulatory scope can only be decided on a case-by-case basis. Many will not fall within this scope, however – depending on their structure, some ICOs may involve "regulated investments" and firms assisting with ICOs may be considered to be "conducting regulated activities." Businesses


LAWYER

investments or another FCA-regulated activity. It is an offence to carry on regulated activities in the UK without FCA authorisation unless an exemption applies. Promoters and digital currency exchanges facilitating the exchange of certain tokens should consider whether they need to obtain FCA authorisation in order to continue delivering their services.

The FCA has indicated that, at the end of the year, it plans to publish further information following on from its Discussion Paper DP17/3 on distributed ledger technology (DLT) of April 2017. The questions to be addressed in the upcoming paper will include whether there is a viable case for the use of DLT in the context of asset management, "where should responsibility lie in fully decentralised applications such as the DAO" and "what governance arrangements do firms plan to have in place when using applications on public, permissioned networks." The answers to these questions are likely to influence the FCA's future regulation of this fast-developing sector.

### Footnotes

1) *See* Initial Coin Offerings, FCA (Sept. 12, 2017).

## Germany

**By Angelo Lercara and Hans Stamm**

Unlike other financial regulators (such as the SEC or the FCA), the German Financial Regulator BaFin *(Bundesanstalt für Finanzdienstleistungsaufsicht)* has not specifically addressed regulatory requirements for ICOs. However BaFin has assessed questions related to the regulatory classification of virtual currencies, generally, on various occasions and has published a


LAWYER

requirement in and of itself because it is simply a form of technology. However, according to BaFin, depending on the business model or business activities associated with the use of blockchain technology, an authorization may be required.

With regard to virtual currencies, BaFin has classified bitcoins as being "units of accounts" *(Rechnungseinheiten)*, similar to IMF special drawing rights, and hence as "financial instruments" and has stated that this classification applies to all virtual currencies. The fact that virtual currencies are created through a decentralized open source technology, and no central issuer exists, is not relevant in this respect. By contrast, bitcoins are not legal tender and therefore are not currencies, foreign notes or coins.

The situation is different for digital means of payment which are backed by a central entity that issues and manages the units. Such companies usually carry out e-money business pursuant the German payment services supervisory act. Operators of platforms that act as "currency exchanges" offering to exchange legal tenders ("fiat currency") against virtual (crypto) currencies (or such currencies against legal tenders), depending on the respective business model, carry out financial services or banking business. And, if such platform operators also target German customers, they will require a financial services or banking license. BaFin recently issued a cease and desist order against a Spanish entity that operated a trading platform where bitcoins and other instruments were traded. Since the operator of the platform purchased and sold the bitcoins in its own name but for the account of customers, the service qualified as a financial commission business which is considered a banking business and which was subject to an authorization by BaFin.

 LAWYER

regulatory classification of bitcoins and of the blockchain technology, and depending on the characteristics of the tokens issued under an ICO, the offering could be subject to an authorization under the German banking act, the securities trading act, the investment code, the securities prospectus act or the payment services supervisory act. If, however, as with some recent ICOs, no freely transferable instruments are issued to investors, but only notional "tokens" are recorded in a blockchain ledger (and which do not create or represent rights in a company or in another financial instrument), no securities prospectus should be required if such ICO is targeting German investors. Furthermore, German product intervention rules may be applied by BaFin (e.g., in the interest of investor protection concerns to ban or restrict the offering of such investments). In any event, the use of the blockchain technology and the specific business model or offering would need to be assessed against the applicable German regulatory framework. Also, the German tax treatment of transactions within a blockchain ledger is still evolving.

Return to main page

# Related Professionals

SEARCH BY:  Select Location





LAWYER

**PARTNER**

# Dean Collins

Singapore +65 6730 6988

VISIT BIO



**PARTNER**

# Timothy Goh

Singapore +65 6730 6960

VISIT BIO



 LAWYER

### Angelo Lercara LL.M. EuR

Munich +49 89 21 21 63 15

Frankfurt +49 69 77 06 19 4228

**VISIT BIO**



PARTNER

### Hans Stamm

Munich +49 89 21 21 63 42

Frankfurt +49 69 7706194253

**VISIT BIO**





LAWYER

Hong Kong +852 3518 4738

VISIT BIO



OF COUNSEL

# Richard L. Heffner Jr

London +44 20 7184 7665

VISIT BIO

**VIEW ALL**

# Related Services

> Financial Services and Investment Management

> Regulatory Compliance

>

  LAWYER

> Private Funds

> Fintech

## Subscribe to Dechert Updates

SUBSCRIBE

## Related News & Insights

Resources relating to **Global Update: Regulators Focus on Initial Coin Offerings**



EVENTS & WEBINARS

Private Funds COO and Operations

LAWYER

VIEW ALL



**EVENTS & WEBINARS**

fintechNEXT Webinar Series: Bankruptcy and Cryptocurrencies

*November 8, 2022*

VIEW ALL



**EVENTS & WEBINARS**

Los Angeles Investment Management Symposium



VIEW ALL

VIEW ALL

Follow

Contact

Locations

Subscribe to Updates

繁體    简体    English

Cyber Bits

DAMITT Hub

Dechert Direct

Box Portal

World Compass

World Passport

Disclaimer & Other Legal Notices

US Online Privacy Policy

Cookie Policy

Data Protection Privacy Notice

California Notice at Collection & Privacy Notice

Slavery & Human Trafficking Statement

Copyright © Dechert LLP 2022