# Exhibit 201

**To:** Cohen, Robert ▮▮▮▮@SEC.GOV]
**Cc:** ▮▮▮▮
**From:** ▮▮▮▮
**Sent:** 2018-10-23T15:06:33-04:00
**Subject:** Outline for Upcoming Meeting
**Received:** 2018-10-23T15:08:49-04:00

SEC Gatekeeper Talking Points (181023 FINAL).pdf

;;;;;

Confidential Treatment Requested Pursuant to 17 CFR §200.83

Rob,

In follow-up to our short conversation last week about setting up a potential meeting, I have attached an outline describing what ▮▮▮▮ and I would like to talk about in the meeting. I think it's self-explanatory, but feel free to reach out if you have any questions. I looked to see if your Los Angeles speech from last week was posted, and it wasn't yet, so this outline doesn't take into account anything you said there.

As I mentioned last week, ▮ and I are out of town from October 24-31. We are hoping to meet with you and whoever you believe would be appropriate shortly thereafter. Please let us know what might work.

Many thanks,

▮▮▮▮

▮▮▮▮ Confidentiality Notice:

This message is being sent by or on behalf of a lawyer. It is intended exclusively for the individual or entity to which it is addressed. This communication may contain information that is proprietary, privileged or confidential or otherwise legally exempt from disclosure. If you are not the named addressee, you are not authorized to read, print, retain, copy or disseminate this message or any part of it. If you have received this message in error. please notify the sender immediately by e-mail and delete all copies of the message.

CONFIDENTIAL TREATMENT REQUESTED
Submitted October 23, 2018

BACKGROUND INFORMATION AND PROPOSED DISCUSSION POINTS
FOR
SEC MEETING REGARDING "GATEKEEPER" ISSUES IN THE CRYPTOCURRENCY MARKETS



1. **Introduction**
   a. Thank you for meeting with us.
   b. The focus of the meeting is for ▇ and ▇ to discuss gatekeeper issues in the cryptocurrency industry.
      i. We are securities lawyers.
         1. ▇ is a securities regulatory and transactional lawyer who worked at the SEC at the beginning of his legal career, including time in the Division of Corporation Finance. His regulatory and transactional practice focuses on assisting clients to develop innovative financial products and to provide innovative financial services, in full compliance with the federal securities laws and all other applicable federal and state financial and other laws. Due to the extensive market focus on cryptocurrency over the past couple of years, he has extensive exposure to what clients are trying to accomplish using cryptocurrency and how they are trying to achieve their goals.
         2. ▇ is an SEC enforcement and corporate governance lawyer with experience in, among other areas, the comment process for SEC rulemaking. Her enforcement practice encounters cryptocurrency issues much less frequently and typically at a different stage, after clients have heard from the Enforcement Division or sometimes

CONFIDENTIAL TREATMENT REQUESTED

      when they realize they could have a problem and need help addressing it.
3. Together, we have over 6 decades of securities law experience.
4. Although our colleagues ■ and ■ may join us at the meeting, each of us will be speaking for ourselves and not for our firms, each other, or our respective colleagues or clients.

  ii. We are, we think, fairly unique in the world of gatekeepers in the cryptocurrency industry. Many other significant gatekeepers in this marketplace appear to have backgrounds focused on corporate, technology, or intellectual property law (for example).

  iii. Our views, not surprisingly, generally align with the views of the Commission and the Staff on token issues.

c. Through our practices, we each have significant exposure to what other gatekeepers are advising clients. We are concerned about some of that advice. While the Commission and the Staff have expressed their views – through enforcement actions, speeches, public statements and a 21(a) report[1] – on some aspects of the cryptocurrency markets, given what we are seeing in that market, we think the Commission and the Staff need to say considerably more, and need to say it clearly, quickly and publicly.

  i. News reports are generally consistent with our anecdotal observations that the Enforcement Division is actively investigating various participants in the cryptocurrency markets. This is important, and conceptually we fully support those efforts.

  ii. We know that Valerie's position also will enhance communication from the Commission and its Staff, and we are optimistic about that. We also saw the news last week about FinHub, which looks like it will have some overlap with cryptocurrency issues. Fostering dialogue with the market is a good thing, and we look forward to participating in that dialogue.

  iii. We think additional measures are necessary in this market, however, to avoid having the traditional enforcement process be the primary means of expressing the Commission's and Staff's views on the cryptocurrency markets.

-2-

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342984

RPLI_02773425

CONFIDENTIAL TREATMENT REQUESTED

    iv. There are several reasons for our view, including that the enforcement process by its nature takes time, and that the enforcement process – at least in the case of cryptocurrency issues – likely can highlight only a fraction of the significant regulatory and gatekeeper issues present in the cryptocurrency market. We will discuss some of these issues below.

d. From a practitioner's perspective, the situation in the cryptocurrency markets is extremely unusual.

    i. Token issuers can speak to two different well-regarded, experienced law firms, and get diametrically opposite views on the current and future applicability of the federal securities laws, and on what steps the token issuer needs to take to engage in a "compliant" token offering.

    ii. To be clear, a token issuer that <u>wants</u> to do the right thing and comply with the law may get advice from a well-known and well-regarded gatekeeper that is (we believe) simply wrong. Even if that token issuer speaks to two gatekeepers that provide different advice, that token issuer often has great difficulty determining which gatekeeper is correct.

    iii. This is not normal, and in fact this is largely unprecedented in our experience.

        1. Law firms as a whole, and even lawyers within law firms, often disagree about the application in practice of particular securities law provisions (e.g., does a company need to disclose a particular fact, does a particular activity cause a person to become an unregistered broker-dealer, etc.)

        2. Lawyers, law firms and other gatekeepers, however, do not typically disagree on, for example, whether the federal securities laws apply at all, or what the analysis is for determining whether instruments are securities.

    iv. That, however, is the state of play among gatekeepers in the cryptocurrency markets today. We want to discuss with you how we as responsible gatekeepers can better work in this environment, and things we think the Commission and the Staff

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342985

RPLI_02773426

CONFIDENTIAL TREATMENT REQUESTED

      can do (in addition to enforcement actions) to promptly and publicly better support responsible gatekeepers.
  e. We want to highlight why speed is so important.
     i. We are aware of a large number of cryptocurrency issuers – or "token issuers" – that are receiving and often following what we consider to be bad securities law advice.
     ii. Obviously, this poses the danger of harming investors (accredited and non-accredited investors alike).
     iii. Perhaps less obviously, it also poses a significant potential burden on competition, on long-term capital formation prospects, and on technological innovation.
     iv. In our view, and based on our experience, many well-meaning token issuers (and other companies) that are following the advice of some other gatekeepers will find that they are unable to ever transition to an operating token platform and market, even though their technology and business concepts may be viable.
     v. The longer that gatekeepers continue to provide (in our view) poor advice:
        1. The more investors will be hurt through possible non-compliance with the federal securities laws;
        2. The more investors will be hurt because they invested in promising technology and businesses that may fail not for business reasons, but because the token issuers are relying on bad advice;
        3. The fewer promising technologies and business concepts may successfully come to market; and
        4. The fewer companies in the long term will be able to successfully raise capital, compete and innovate in the token marketplace.
     vi. In addition, as we discuss below, some of the issues on which gatekeepers are providing differing advice is not easily capable of being clarified through traditional enforcement actions. For example, market participants seem to hold a widespread view that the SEC, after having repeatedly cautioned that many tokens are securities, is on the verge of issuing a no-action letter or other

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342986

RPLI_02773427

CONFIDENTIAL TREATMENT REQUESTED

guidance to the effect that tokens uniformly are not securities. As another example, market participants frequently assert that some of Director Hinman's recent statements signaled that tokens that have some modicum of utility stop being securities. Gatekeepers are among those making these statements.

f. We are, perhaps, fairly uniquely familiar with the opportunities to communicate more clearly when we can combine the perspectives of an enforcement lawyer with those of a regulatory/transactional lawyer. We also are, perhaps, uniquely aware of the fact that enforcement lawyers and regulatory/transactional lawyers often can read the same words but take away different meanings.

   i. We view this meeting as an opportunity to share with the Staff our combined views, informed from two different perspectives in the securities bar that do not always interact with each other as much as they should.

   ii. We hope that this meeting will involve a dialogue between you and us.

       1. We are not here to "tip" to the Enforcement Division about particular bad actors.

       2. We are not here to try to convince any Division that tokens are not securities, or that the securities laws are incompatible with a token economy. In fact, we fundamentally disagree with those notions.

       3. We are here to inform the Staff about what we consider to be bad, and often dangerous, advice being provided by important cryptocurrency gatekeepers, and to discuss with the Staff ways in which we believe the Commission and the Staff can: (i) support and reinforce gatekeepers who are acting responsibly; and (ii) help gatekeepers who may be providing bad advice to revise the advice they are providing.

g. Structure of this document:

   i. Section 2 compares and contrasts some of our views and advice with the views and advice of other prominent gatekeepers.

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342987

RPLI_02773428

CONFIDENTIAL TREATMENT REQUESTED

- ii. Section 3 identifies important questions and considerations gatekeepers such as us face when advising clients, and when speaking with potential clients and others in the token industry.
- iii. Section 4 is a set of proposed discussion points for our meeting. We are, of course, happy to discuss any other topics the Staff would like to discuss.

h. Disclaimers:
  - i. We understand that the legal and regulatory analysis as to whether any particular token is a security is fact-specific.
  - ii. The views we express in this document and in our discussions with you are each of ours alone, and they do not necessarily represent the views of our respective law firms, our respective partners and colleagues, or our respective clients.
  - iii. We will not, and we don't intend to, violate any client confidences or reveal any privileged information. We have, however, given a great deal of thought to what we will discuss and are hoping it will be helpful to the Staff.

2. **Our views and advice as gatekeepers, as compared to the apparent views and advice of other gatekeepers.**
   a. Tokens as securities
      i. Our view: Most tokens are securities, at least for some time after they are initially offered and for some time after the platform becomes "operational."
         1. The SEC staff has strongly indicated that, with the exception of Bitcoin and Ether, it views most tokens as securities.[2]
         2. We believe that the key issue under *Howey* is that often token holders will rely on the token issuer for some time to, for example, develop and improve the platform, to market the platform to users of the platform, and to drive adoption of the tokens and the token platform by service providers and others.
         3. In many cases, the token issuer also will have significant practical control over the platform and indirectly the value of the tokens, through (for example) holding a substantial

-6-

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342988

RPLI_02773429

CONFIDENTIAL TREATMENT REQUESTED

> > > number of tokens and having superior knowledge about the platform.
> > 4. Tokens generally do not become non-securities simply because the platform on which they are used has some modicum of utility.[3]
> > 5. Usually, tokens may be non-securities only under limited circumstances, such as certain tokens that represent the prepaid purchase of identifiable goods and services.
> ii. View of other gatekeepers: Many tokens are not securities, at least by the time the related token platform is operational, often regardless of the extent of those operations or the amount of token usage on the platform.
> > 1. It appears that the extent of the token holders' reliance on the token sponsor for potential profits, and the continuing role and influence of the token sponsor on the token ecosystem, are not critical elements to this analysis.
> > 2. On a related point, other gatekeepers appear to advise clients that they may issue tokens outside of the United States, purportedly under Regulation S, and that the tokens become non-securities that can be brought back into the United States after the related platform becomes operational.
> > 3. Certain gatekeepers also appear to take the position that a token issuer can avoid US regulations if the issuer is organized as a foreign entity or foreign foundation, and/or if the related platform is operated by a foreign company or foreign foundation.
> > > a. Our view is that, with minor exceptions, the federal securities laws are equally applicable to a foreign entity and to a domestic entity, when either entity issues tokens or operates a related platform in the US.
> b. Trading of Tokens
> > i. Our view: Tokens generally can be widely traded only on an exchange or alternative trading system ("**ATS**") authorized by the SEC and FINRA specifically to trade tokens that are securities.[4] To

-7-

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342989

RPLI_02773430

CONFIDENTIAL TREATMENT REQUESTED

   our knowledge, currently no such exchanges or ATSs have been authorized.
  ii. View of other gatekeepers: Among the apparent views of other gatekeepers on this topic are:
   1. Tokens can be traded on an unauthorized platform as long as a law firm issues an opinion to the effect that the tokens are not securities.
   2. An ATS that has been authorized to trade other securities, such as stocks or bonds, can without additional SEC or FINRA authority also trade tokens, even if they are securities.
 c. Resales of Tokens
  i. Our view: In general, tokens sold pursuant to Regulation D cannot be resold for at least a year and a day, under both Regulation D and Rule 144.
  ii. View of other gatekeepers: Apparently, other gatekeepers advise token issuers that they may permit token holders to resell tokens even within a year of the initial sale of the tokens, and that token issuers may take affirmative steps to list their tokens on trading platforms (inside and outside the US) that do not reasonably prevent participation by US persons.
   1. Some gatekeepers also appear to advise token issuers that a "de minimis" provision or concept permits resales of nominal amounts of tokens. This view may be based on the "dribble out" provisions of Rule 144, although our view is that those provisions do not apply in most token resale cases.
 d. Distribution of Tokens
  i. Our view: In general, a person who or entity that receives payment for distributing, marketing, and/or promoting tokens must be a registered broker-dealer (or, under certain circumstances, a registered investment adviser).[5]
   1. In addition, our view is that token issuers that promote the platforms of other token issuers can inadvertently become broker-dealers or investment advisers.

HIGHLY CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342990
RPLI_02773431

CONFIDENTIAL TREATMENT REQUESTED

    ii. View of other gatekeepers: Other gatekeepers appear to take a variety of views on distribution issues, including that "advisers" and other independent contractors who provide distribution services to a token issuer do not need to register as broker-dealers, even if those advisers and independent contractors do not comply with the safe harbor provided by Rule 3a4-1 under the 1934 Act.

        1. In addition, some gatekeepers seem to take the position that a currently registered broker-dealer authorized to trade other securities (such as stock) may distribute, promote or even make markets in tokens that are securities without additional SEC or FINRA authority.

e. Operation of Token Platforms

    i. Our view: A token issuer that operates a token platform generally must consider whether the platform is, among other things, acting as a broker-dealer or an ATS, and acting in compliance with SEC rules such as Regulation M under the 1934 Act.

    ii. View of other gatekeepers: Other gatekeepers appear to take the position, as noted above, that as soon as a platform has even a modicum of utility, the related tokens are not securities and the various SEC trading and other rules are not applicable.

f. Airdrops and other free distributions

    i. Our view: Token issuers that provide tokens for free (such as through airdrops), and that issue tokens to users, developers, employees and others as compensation or incentives, are engaged in a securities offering that must be made in compliance with the 1933 Act.[6]

    ii. View of other gatekeepers: Other gatekeepers appear to take the position that tokens offered for free or as compensation, perhaps especially when offered in small amounts, may be distributed in ways that are not consistent with the requirements of the 1933 Act.

        1. For example, some gatekeepers appear to take the position that such token giveaways or awards can be made to non-accredited investors, without compliance with, for example

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342991

RPLI_02773432

CONFIDENTIAL TREATMENT REQUESTED

        Regulation D, Rule 701, Regulation CF, Regulation A+, or the public offering requirements.
      2. Some gatekeepers also appear to take the position that these tokens become freely tradeable upon issuance.
  g. Private Offerings of Tokens
    i. Our view:  Private placements of tokens generally should be accompanied by a disclosure statement and risk factors that provide tailored and detailed information about, among other things, the token issuer, the tokens, the related platform, how the token issuer will support the platform and the tokens, and how the token issuer intends to move to a fully functional platform.
    ii. View of other gatekeepers:  Other gatekeepers apparently support private placements using either largely "form" disclosure documents that are not tailored, or no offering documents at all.
      1. We are aware of the argument that Regulation D does not technically require the delivery of any disclosure document as long as offers and sales are made solely to accredited investors.
      2. We assume, however, that many of these token offerings also include, among other things, circulation of a "white paper" or other marketing document prepared by the token issuer and perhaps conversations between the token issuer and certain purchasers.  We therefore assume that Rule 10b-5 and similar anti-fraud provisions do require disclosure of all material information needed to make any of those other written or oral statements not misleading.

3. **Confusion in the Token Markets**
   a. We note that the Division of Enforcement has brought a number of actions against token issuers, although the vast majority of those cases have involved "garden variety" fraud cases.
   b. There are a large number of token issuers, many of them well known, that have followed practices described above, apparently with the support of other gatekeepers.
   c. Gatekeepers such as us are often asked questions such as:

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342992

RPLI_02773433

CONFIDENTIAL TREATMENT REQUESTED

    i. If you are right, why do other gatekeepers say just the opposite, and why are so many token issuers and others apparently following the advice of those other gatekeepers with apparent impunity?

    ii. Isn't the SEC about to issue a no-action letter stating that tokens are not securities? (This is apparently a wide-spread expectation in many parts of the cryptocurrency markets.)

    iii. Has the SEC decided to "grandfather" token issuers that may not have complied with the federal securities laws when offering their tokens, as long as there was no fraud?

    iv. In any event, has the SEC in effect determined to grandfather tokens that are widely traded and held, much as the Staff has apparently decided that Bitcoin and Ether are not securities?

    v. Has the SEC decided to permit unregistered exchanges to continue trading tokens, at least until the SEC and FINRA approve a token ATS?

    vi. Has the SEC, especially after Director Hinman's Gary Plastic Speech, determined that many tokens are in fact not securities?

    vii. Since the SEC reportedly has issued subpoenas to a number of token issuers but has not taken widespread enforcement actions against many of those issuers, has the SEC determined either to generally not bring actions except in the case of fraud, or that most of those tokens in fact are not securities?

    viii. If it is illegal for registered brokers to trade or make markets in tokens without specific authorization to do so, why hasn't the SEC taken action against brokers that do?

    ix. Is the SEC waiting for the approval of an ATS before it approves any Regulation A+ offerings? Is the SEC waiting for the approval of a Regulation A+ offering before it approves an ATS? Will the SEC ever approve either?

        1. As gatekeepers, we advise our clients (among other things) that they generally must do a Regulation A+ or a public offering to publicly sell tokens in the US, none of which have yet been approved, and that the tokens generally can be widely sold only if and when an ATS is authorized.

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342993

RPLI_02773434

CONFIDENTIAL TREATMENT REQUESTED

2. While we have faith that the Staff will eventually start approving Regulation A+ offerings, and will eventually approve an ATS, the Commission and Staff have not given many public statements or reassurances in this regard.
3. We expect that the likely cost of a Regulation A+ offering is between $1.5 million and $2 million. The likely cost of an S-1 is significantly higher.
4. It is difficult to convince many rational token issuers that they should undertake such an expensive process given the uncertainties involved in the Regulation A+ and ATS processes.

4. **Proposed Discussion Points: Options for the Commission and the Staff**
   a. There appear to be at least three issues that the Commission and the Staff may wish to clarify for gatekeepers, to help reduce the unnecessary confusion in the token markets:
      i. Clarification of the Commission's and Staff's views on the legal and regulatory issues identified in Section 2.
      ii. Clarification of the implications from the lack of Commission and Staff actions identified in Section 3.
      iii. Clarification of the role of, and perhaps the potential liability of, gatekeepers in advising token issuers and other participants in the token markets.
   b. One way the Commission and the Staff might think about addressing those issues is in one or more 21(a) reports, following on the groundwork provided by the DAO Report.
   c. Other potential topics to discuss:
      i. To the extent the Staff feels comfortable commenting, are the views we have expressed in section 2 different from those of the Staff, and are any of our views, from the Staff's standpoint, more conservative than they need to be?
      ii. How we answer the questions identified in section 3 (all of these are versions of questions we regularly are asked), and whether the Staff has any suggestions for additional or different responses.

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342994

RPLI_02773435

CONFIDENTIAL TREATMENT REQUESTED

   iii. The potential for the Commission and the Staff to further and more fully support and educate gatekeepers in the cryptocurrency markets.
   iv. Our view of the need for more guidance from Divisions and Offices other than the Division of Enforcement.
   v. The effect of Chairman Clayton's recent statement about the ability to rely on Staff statements, and the likely unintentional adverse conclusions from that statement drawn by some gatekeepers in the cryptocurrency markets.
   vi. How do we, as gatekeepers, best help clients that have taken improper steps in good faith based upon bad advice from other gatekeepers?  This issue goes beyond self-reporting issues.  For example:
      1. Can a token issuer that improperly sold tokens to retail investors do a recission offer, or must it in effect cancel all tokens held by retail investors and refund their money?
      2. How do we do that if the retail investors have sold some or all of their tokens?
      3. How do we even identify secondary token holders, and determine if they are accredited (or US investors, for that matter), if the only record is their ownership on the blockchain? Do considerations like this cause us to simply cancel the whole offer and return funds?
      4. Should there be some type of "amnesty" program for token issuers that have made good-faith but improper token offerings, which could give them a path forward short of rescinding their entire transaction?
         a. In this regard, many of the token issuers that may be candidates for such an amnesty program may have believed they were acting properly based on advice of well-known, experienced counsel.
         b. Of course, any amnesty program focusing in part on advice of counsel raises privilege issues that must be navigated carefully.

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342995

RPLI_02773436

CONFIDENTIAL TREATMENT REQUESTED

5. We look forward to speaking with you and are happy to address any additional issues you believe would be fruitful.

---

[1] *Cf.* Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934 with respect to the DAO token, SEC Rel. No. 81207 (Jul. 25, 2017) ("**DAO Report**").

[2] *See, e.g.*, Director William Hinman, Division of Corporation Finance, *Digital Asset Transactions: When Howey Met Gary (Plastic)*, Remarks at Yahoo Finance All Markets Summit: Crypto (June 14, 2018) ("**Gary Plastic Speech**"), https://www.sec.gov/news/speech/speech-hinman-061418 .

[3] *See* Gary Plastic Speech (citing *United Housing Found., Inc. v. Forman*, 421 U.S. 837 (1975)) (stating "the economic substance of the transaction always determines the legal analysis not the labels" and that many investment contracts, such as the oranges in *Howey,* are sold in connection with goods or services with utility); *see also* Testimony of SEC Chairman Jay Clayton before the U.S. Senate Banking, Housing and Urban Affairs Committee (Feb. 6, 2018) (citing *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344, 351 (1943)) ("Merely calling a token a 'utility' token or structuring it to provide some utility does not prevent the token from being a security.").

[4] *See* Statement on Potentially Unlawful Online Platforms for Trading Digital Assets, Divisions of Enforcement and Trading and Markets (Mar. 7, 2018), https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (stating that "[i]f a platform offers trading of digital assets that are securities and operates as an 'exchange,' as defined by the federal securities laws, then the platform must register with the SEC as a national securities exchange or be exempt from registration").

[5] *See e.g., In the Matter of Tokenlot, LLC*, et. al, SEC Admin. Proc. File No. 3-18739 (Sept. 11, 2018) (finding, among other things, a violation of Section 15(a) for failing to register as a broker-dealer when the respondent received compensation for the promotion and sale of digital assets). *See also In the Matter of Crypto Asset Management, LP*, SEC Admin. Proc. File No. 3-18740 (Sept. 11, 2018) (finding, among other things, that respondent (1) failed to register as an investment company when engaged in the business of investing and trading certain digital assets that were investment securities having a value exceeding 40% of the value of the fund's total assets and (2) violated anti-fraud provisions of the Investment Advisers Act); *FINRA, Department of Enforcement v. Timothy Tilton Ayre, Disciplinary* Pro. No. 2016049307801 (Sept. 11, 2018) (alleging fraud and unlawful distribution of an unregistered security). In the DAO Report, the Commission raised but did not analyze the question of whether "Curators" who controlled which projects that could be funded through the DAO might have registration obligations under the Investment Advisers Act of 1940 ("**Advisers Act**"). See DAO Report, n. 38 ("Because, in part, The DAO never commenced its business operations funding projects, this Report does not analyze the question whether anyone associated with The DAO was an "[i]nvestment adviser" …. Those who would use virtual organizations should consider their obligations under the Advisers Act.")

[6] *See e.g., In the Matter of Joe Loofbourrow*, SEC Admin. Proc. File No. 3-9934 (July 21, 1999) (finding that gifting of stock is a 'sale' within the meaning of the Securities Act when the purpose of the 'gift' is to advance the donor's economic objectives rather than to make a gift for simple reasons of generosity); *Capital General Corporation*, 54 SEC Docket 1714, 1728-29 (July 23, 1993) (Capital General's "gifting" of securities constituted a sale because it was a disposition for value, the "value" arising "by virtue of the creation of a public market for the issuer's securities").

HIGHLY CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000342996

RPLI_02773437