# Exhibit 202

## FOIA Confidential Treatment Request

June 21, 2018

*Via Federal Express*

Andrew P. Schoeffler
United States Securities and Exchange Commission
Division of Corporation Finance
100 F Street, NE
Washington, DC 20549-0213

Valerie A. Szczepanik
Senior Advisor for Digital Assets and Innovation
United States Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0213

**F.O.I.A. Confidential Treatment Requested**

Re:     Securities Law Analysis Regarding ███████████████

Dear Mr. Schoeffler and Ms. Szczepanik,

On behalf of our client, ██████████████████████, please find enclosed a memorandum regarding the above-referenced matter.

The memorandum is stamped "FOIA Confidential Treatment Requested by ███████████████ and is Bates-stamped "███-SEC-000001 through ███-SEC-000228".

**Request for Confidential Treatment**

For reasons of business confidentiality and personal privacy, our client requests confidential treatment as provided under the Freedom of Information Act for this letter and the documents and materials referred to above on Bates-stamped pages ███-SEC-000001 through ███-SEC-000228. Pursuant to this request, ██████████████████ has submitted a request for confidentiality to the Securities and Exchange Commission Office of Freedom of Information and Privacy Act Operations. All of these documents and materials contain confidential business or personal financial information concerning ███████████ and its agents. Pursuant to Rule 83 of the Securities and Exchange Commission's Rules on Information and Requests, 17 C.F.R. § 200.83 and other applicable laws and regulations, our client hereby requests that these documents and the information they contain be maintained in confidence, not be made part of any public record and not be disclosed to any person in response to a request under the Freedom of Information Act or otherwise.

4133-3175-7332.2

Confidential Treatment Requested by ████████████████        ███-SEC-000001



In light of the nature of the information contained in this letter and the enclosures herewith, such information is exempt from mandatory disclosure under 5 U.S.C. § 552(b)(4) and disclosure is prohibited under 18 U.S.C. § 1905. If any person (including any government employee who is not an employee of the Securities and Exchange Commission) requests the opportunity to inspect or copy the confidential documents or materials, our client requests that the undersigned immediately be notified of such request, be furnished with a copy of all written material pertaining to such request (including, but not limited to, the request and any agency determination with respect to such request), and be given advance notice of any intended disclosure of the documents so that our client may, if deemed necessary and appropriate, pursue any available remedies. If the Securities and Exchange Commission ("SEC") is not satisfied that the enclosed materials are exempt from disclosure pursuant to the Freedom of Information Act, our client stands ready to supply further particulars and requests a hearing on the claim of exemption.

Additionally, we respectfully request that we be notified in writing in the event that the SEC, for any reason, considers disclosing this letter or the documents or materials referred to herein, or any of the information contained therein, to a third party, and that, in all events, at least five business days prior to any such disclosure, and that all documents, materials and information submitted by ███████████████ as well as any copies made thereof, be returned to ███████████

The requests set forth in the preceding paragraphs also apply to any memoranda, notes, transcriptions or other writings of any sort whatsoever which are made by or at the request of any employee of the SEC (or any other government agency) and which (1) incorporate, include or relate to any of the information contained in any of the confidential documents provided to the SEC (or any other government agency), or (2) refer to any conference, meeting, conversation or interview between (a) ███████████████, its representatives, agents or counsel, and (b) employees of the SEC (or any other government agency).

███████████████ hereby expressly reserves all applicable privileges, including (but not limited to) the attorney-client privilege and work-product protection, and nothing in this response is intended to be a waiver of such privileges.

The information provided herein is the result of a reasonably diligent attempt to compile complete information, and we reserve the right to supplement the information, materials and documents provided. Please call me if you have any questions or if you require any additional information regarding the matters set forth in this letter.

Sincerely,

███████████████

Enclosure

cc:     Office of Freedom of Information and Privacy Act Operations (w/o enclosure)

4133-3175-7332.2

Confidential Treatment Requested by ███████████████            ██SEC-000002

HIGHLY CONFIDENTIAL                                                         SEC-LIT-EMAILS-000342637



## Memo

**To:**   Valerie A. Szczepanik, Associate Director and Senior Advisor for Digital Assets and Innovation,
U.S. Securities and Exchange Commission

Andrew P. Schoeffler, Special Counsel, Office of Capital Markets Trends,
U.S. Securities and Exchange Commission

**Copies:**

**From:**

**Date:**   June 21, 2018

**Re:**   Securities Law Analysis Regarding ███████████

**F.O.I.A. Confidential Treatment Requested**

The Staff of the Securities and Exchange Commission (the "SEC" or the "Commission") has invited
participants in the virtual currency[2] market to seek guidance regarding their plans for issuance of virtual
currencies, including cryptocurrencies and tokens. ██████████ has requested that we arrange a
meeting with the Staff of the SEC to explore questions regarding its existing technology platform and
proposed issuance of the ███████ cryptocurrency (the "Tokens") which will be critical to the
functioning of the ██████ platform. We first describe below the ██████ technology, which is further

---

[1] This memorandum does not constitute a legal opinion of ██████████
[2] As used herein, "virtual currency" means:

> a digital representation of value that can be digitally traded and functions as: (1) a medium of exchange; and/or
> (2) a unit of account; and/or (3) a store of value, but does not have legal tender status (i.e., when tendered to a
> creditor, is a valid and legal offer of payment) in any jurisdiction. It is not issued or guaranteed by any
> jurisdiction, and fulfils the above functions only by agreement within the community of users of the virtual
> currency. Virtual currency is distinguished from fiat currency (a.k.a. "real currency," "real money," or "national
> currency"), which is the coin and paper money of a country that is designated as its legal tender; circulates; and
> is customarily used and accepted as a medium of exchange in the issuing country.

Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Securities Exchange Act of
1934, Rel. No. 81207, 3 n. 5 (Jul. 25, 2017).

4128-9711-7460.13

Confidential Treatment Requested by ██████████                    ███-SEC-000003



**June 21, 2018**

described in the Whitepaper,[3] then set out a summary discussion of the key legal standards that are impacting the issuance of cryptocurrencies, which we also apply to the ████████ platform (which we sometimes refer to simply as ████) and Tokens, followed by a bullet point list of the factors we believe are particularly relevant in considering the status of the Tokens under the securities laws.

**Introduction**

*The* ████ *Platform –* ████████████████

████ is a distributed ledger platform designed to enable collaboration and to process transactions among people and entities in an efficient, safe and secure manner. Whether the platform is used for a transfer of virtual currency, an agreement to store files, a smart contract for services, or other distributed applications that may be developed on top of it, ████ is designed to quickly and securely validate and achieve consensus on the order of events and transactions using its ████████████.

████ vision is to serve as the ████████████ providing a robust distributed ledger system that allows people who do not know each other to interact directly in a trusted manner without the need for a trusted intermediary. ████████████ technology addresses the significant scalability limitations of the Bitcoin blockchain and its derivatives, such as Ethereum (slow transaction times and the high energy costs of required transaction verification activities, colloquially termed "mining" or "forging"). In addition, the ████ platform was built with regulatory compliance in mind. It incorporates robust mechanisms to facilitate "know your customer" and anti-money laundering controls, which enable financial institutions to transact with customers through ████ with confidence. In its Whitepaper, ████ explains:

████████████████████████████████████████

Founded by ████████████ vision is an open and fair system that allows individuals and communities to transact with each other without having to submit their data to advertisers and central companies such as Google, Amazon or Facebook.[5] As part of its vision, ████ has focused on both the technology and the governance needed for a secure, stable and trusted public ledger on which individual developers and major enterprises and governments can deploy meaningful

---

[3] A description of the Tokens is set forth in the whitepaper attached hereto as Exhibit A and published to ████████████████

[4] Whitepaper at 9 (emphasis omitted).

[5] An interview with ████████ about the founding ideas behind the ████ technology is available at: ████████████

2

4128-9711-7460.13



**June 21, 2018**

applications. <span></span> allows fast, secure and nearly free decentralized applications across innumerable use cases and sectors.

A key feature of all distributed ledger technologies is the consensus mechanism by which the nodes on the network come to agreement regarding transactions and their timing. The process by which the nodes determine consensus is the critical differentiator of this algorithm.

consensus mechanism



*Function of Tokens on the* <span></span>

Tokens on the <span></span> have a number of important functions.  Most significantly, they serve as a necessary element for governing the security of the network and serve as a medium of exchange or store of value for transactions on the network.

The protocol described above is how the nodes in the network arrive at consensus. As described, each node in the network votes on questions related to the order of events in the network. When more than <span></span> of the nodes agree, consensus is reached. In private networks, each node in the network has a single vote. The weight of each vote is the same for every node. However, to secure a public ledger, one must take a different approach. In a public ledger, anyone can add a node at any time. If there are 1,000 nodes in the network, an attacker could simply add 3,000 nodes to the network, bringing the total to 4,000 nodes. If an attacker can control more than <span></span> of the voting weight, then the attacker can corrupt the network and violate all of the security requirements. To prevent this type of attack, one must require each node in the network to purchase a scarce resource to participate as a node. The voting weight of the node is then directly proportional to the amount of the scarce resource the node acquires. Traditional blockchain introduces scarcity by requiring "proof-of-work", which requires every node to use vast

---

[6] See the Whitepaper appended as Exhibit A *infra* for more information about <span></span>. We understand that it is a very high standard for security and that consensus has been difficult to achieve efficiently enough for commercial applications.

4128-9711-7460.13

Confidential Treatment Requested by <span></span>                                    <span></span>-SEC-000005

HIGHLY CONFIDENTIAL                                                                    SEC-LIT-EMAILS-000342640

**June 21, 2018**



computing resources to solve a cryptographic puzzle[7] (used in Bitcoin and Ethereum). In "proof-of-work" models, the influence of nodes on transaction order is directly proportional to the amount of money miners spend attempting to solve the cryptographic puzzle. In ███ there is no proof-of-work, and no mining, and no expenditure of significant (and wasted) computing power or electrical resources. Instead, ███ employs a proof-of-stake system where the vote of a given node is weighted by the number of platform tokens held by that node. The community of nodes achieves consensus when more than ██ of the weighted votes are in agreement. A potential attacker must purchase at least ██ of all tokens to prevent the network from coming to consensus, and must purchase more than ██ of all tokens to successfully corrupt the operation of the system. To prevent such an attack, there must be a limited number of Tokens available (i.e. a scarce resource). The number of Tokens that can be issued by ███ is limited to ████. As the value of the Token increases, it becomes increasingly difficult for an attacker to purchase enough Tokens to mount a successful attack.

All proof-of-stake ledgers are vulnerable if an attacker gains control of 1/3 of the stake (tokens) and of a malicious firewall around many of the participants. In that case, the attacker could either shut down the network, or corrupt it, or both. Corruption can include causing different people to see different results from programs (smart contracts), seeing different contents in a stored file, seeing different cryptocurrency balances, or experiencing other violations of the rules of the network. That is why it is critical that it be difficult for an attacker to obtain control of 1/3 of the tokens. This is the central security concern for any such ledger. This has two important implications when considering the ███████ status: 1) It is crucial to have a large proportion of Tokens initially held by a ███████ to ensure that a malicious actor cannot attack the network in the early stages, and 2) tokens with floating prices are critical to the very operation and security of the network and consensus mechanism. The governance model is described below.

███ Tokens also serve as an efficient medium of exchange that is necessary for very small transactions to be paid for easily and for the benefits of the hashgraph technology to be fully realized. Because of the dramatic improvements in performance and efficiency, ███████ directly enables micro-payments, which in turn enables innovative applications and new economic models. The ███ Token is essential to delivering on the promise of this technology.  Applications built on the platform use the platform services by making micro-payments for each API call. These micro-payments are then distributed to the nodes to compensate them for their contribution in processing the API calls (including bandwidth, storage, CPU). The platform token provides the mechanism for making micro-payments that simply is not achievable with fiat currency. This consensus algorithm, combined with the proof-of-stake protection, makes transaction processing dramatically faster, more efficient, and more environmentally sound (lower energy requirements) than proof-of-work models. As an example of the efficiencies at scale, a transaction in Bitcoin costs $1.00-$2.00 and in Ethereum $0.30-$0.50, but in ███ the cost will be approximately ████████.

---

[7] As used herein, "proof of work" means a mechanism for consensus validation established to verify blockchain transactions where network participants, or "miners", are in competition with one another to add the next block of transactions to a blockchain by expending resources in order to solve a complex and difficult cryptographic puzzle. As a reward for work, miners earn transaction fees. Proof of Work, Investopedia https://www.investopedia.com/terms/p/proof-work.asp (last visited June 19, 2018).

4128-9711-7460.13

Confidential Treatment Requested by ███████                    ███-SEC-000006

HIGHLY CONFIDENTIAL                                                    SEC-LIT-EMAILS-000342641



**June 21, 2018**

██ *Governance Model*

While the consensus mechanism and underlying function of the network is fully distributed, ████ has modeled its corporate governance after the ████ system, and will be owned and operated by a group ██ ████████████████████████ from all continents and from ████████ ███████ sectors (█████████████████████████████████████████████ and many others) serving ███████████████████████████ o set policy and to manage the evolution of the ████ ████████ platform. In order to guarantee the security of the network from the start, ██████ will initially hold a large majority of the Tokens, effectively making it impossible for an attacker to purchase 1/3 of the total Token supply. Over time, ██████ will sell the Tokens held in reserve into the eco-system. This will only be done as the Token increases in value, in order to ensure that the cost to an attacker of buying 1/3 of the Tokens will exceed the benefit they could obtain by corrupting the operation of the network.

We are aware that others have argued that the absence (or perceived absence) of a governing body should be one of the principle elements in the analysis of whether token holders are "profiting from the efforts of others", which is a key element in a cryptocurrency's status as a security or not. Although we can certainly understand that argument as it applies to some projects, and understand that the type of governance that ██████ is starting with may on first glance raise concerns about the extent of control, this is a prime example of why it is important to review the facts and circumstances of each case.

██████ believes that the distributed nature of its governance structure, while it contains central control elements, in fact still does not cause the Tokens to be securities. While ███████████████ are tasked with ensuring the stability and security of the network, the value of the Tokens themselves will develop over time based on the increased functionality and distribution of the network and the many applications that others develop to run on it. ██████ has purposefully built a system that is truly decentralized in application, without some of the downside risks of forks and confusion seen in connection with other platforms such as Ethereum, and other blockchains such as Bitcoin (which has spawned many progeny). As ██████ sets out in its Whitepaper:



████████████████████████████████████████████████ *See supra* note 3 and accompanying text.

5

4128-9711-7460.13

HIGHLY CONFIDENTIAL      SEC-LIT-EMAILS-000342642



**June 21, 2018**

*The* ▮▮▮ *Vision*

The founders of ▮▮▮ are committed to making the platform work in the United States. Although various advisors and individuals interested in the ▮▮▮ technology have suggested that they take the technology offshore and operate only outside the United States due to current U.S. regulatory uncertainty, ▮▮▮ founders think it is critically important that the United States be a leader in this distributed ledger and virtual currency space. They want to work with regulators here to ensure that the technology they have invented – as well as other distributed ledger technologies – can come to market from the United States. We think that it is important that the Staff talk to them directly, to better understand their vision and approach and how they envision the network evolving over time.

It is easy to imagine the sale of security tokens such as in the DAO Report,[10] or tokens representing a right to share in the profits of an enterprise, being registered under the Securities Act of 1933 (the "Securities Act") and subject to the securities disclosure requirements of the Securities Exchange Act of 1934 (the "Exchange Act"). In contrast, ▮▮▮ makes a compelling case that the ▮▮▮ platform in fact simply could not function as designed under a full securities regulatory regime, and that the protections of the securities regulatory framework are neither needed nor useful in this instance. The founders are particularly concerned that if the Token were regulated as a security, the tremendous benefit and innovation made possible by the ▮▮▮ technology would be lost. As noted above, because of the efficiencies that may be realized by use of the ▮▮▮, it is particularly well suited to micro-transactions, an underserved area, where it is especially important to keep transaction costs manageable. Therefore, while the ▮▮▮ team is committed to protecting the investing public through appropriate controls around any capital raising transactions, they are also committed to demonstrating that once the network is up and running, the Tokens should not be considered securities.

▮▮▮ has been under development for a number of years. The underlying ▮▮▮ data structure and consensus algorithm already have been tested and used by enterprise clients including ▮▮▮ ▮▮▮, in a permissioned setting, and the remaining development needed to deploy the technology for a public "permissionless" setting is nearly complete. Test nets are currently running with potential ▮▮▮ partners and developers standing up nodes to participate in this testing. ▮▮▮ has more than 15 developers working directly on its platform, and has a list of nearly 100 distributed applications that have approached the team to build on the platform as soon as it releases the

---

[9] Whitepaper at 5 (emphasis added).
[10] *See* Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO, Securities Exchange Act of 1934, Rel. No. 81207 (Jul. 25, 2017) (hereinafter the "DAO Report").

6

June 21, 2018



public APIs and allows broad developer access. Several major projects have announced an intent to deploy applications on ████████████████

In addition, the platform will support distributed applications written in Solidity, the language used to program smart contracts on Ethereum, giving immediate access to the very large and active community of Ethereum developers. ██████████████ is recognized as a very important new entrant into the market, even before its public launch, and many believe that it could be a viable alternative to blockchain technology.[12]

██████████ <b>and the SEC</b>

Based on our discussions with the ███████ team and their discussions with other industry leaders, ████ is of the view that the current U.S. regulatory environment does not provide the clarity necessary to definitively determine which virtual currencies will be deemed securities by the SEC – or more importantly, which will not. Understanding that there are long-standing principles of law that are being applied by the Staff, ███████ respectfully submits that there are certain situations, such as the ████████ ██████████ where the interpretation as to what is a security is quite uncertain. Many tokens do not appear to fit neatly into a "security or not-security" framework. If (some) tokens have mixed attributes, or have attributes that change over time, the industry may need additional help from the SEC to find a way forward that permits the technology to function while providing appropriate controls within a more consistent and predictable framework. We are of course aware of the dialog between the Staff and other industry participants, and have reviewed the ████████ memo and presentations to the Staff from March 2018. We were also pleased to see Director Hinman's recent comments providing additional clarity around the status of ether, which, like ██████████ Tokens, serves as the facilitating fuel of a distributed network platform. ████ is not requesting comments from the Staff on each element of its business plan, but rather would like to engage in a mutually beneficial interactive discussion of the challenges presented.

The Staff and some Commissioners have made public statements that, although not controlling law, suggest that they broadly interpret the legal definition of a "security" to cover most virtual currencies available to the market. The most recent statements (as of this writing) seem to acknowledge that certain cryptocurrencies that function as true alternatives to fiat currency may not be regarded as securities, and that there may be virtual currencies that start as securities but later cease being securities. At the same time, the public statements do not provide clarity about the path for a new platform to achieve such distribution and use of a new cryptocurrency. As a result, ████ looks forward to a frank and open

---

[11] These projects include: ███████████████████████ building a cross-border payments platform; ████████ the operating system that powers critical infrastructure like stock markets and nuclear power plants; ████████, a medical credentialing platform; ████, a music industry project from a former band member of ███████ (formerly ████████████, a multi-billion dollar gaming company ██████████████ a messaging and ecommerce project; and ████████, a smart contract resolution ecosystem, among others.

4128-9711-7460.13

Confidential Treatment Requested by ████████████                                      ███-SEC-000009

HIGHLY CONFIDENTIAL                                                                     SEC-LIT-EMAILS-000342644



**June 21, 2018**

discussion of its platform, the sale of its SAFTs and its plan for distribution of the Tokens, in an effort to gain better clarity from the Staff as to its views.

As all lawyers know, bad facts make bad law. We think that the facts presented by the ████ platform are good facts. They are good facts because there is a consistent, good faith case to be made that the Tokens are not securities. At the same time, it must be acknowledged that there are some somewhat difficult facts that must be addressed (such as (i) the governing ████, (ii) that a substantial number of Tokens will be held by ████████████████████, for a significant period of time and (iii) that Tokens may be sold by ████ from time to time in the future), that require both ████ and the Staff to grapple with how the law should be applied in a holistic manner to all currently known facts taken together. We are not proposing to take a narrow view of the "*Howey Test*", as defined below, or to apply a formalistic analysis that shows ████ failing one or more elements of the test for being a security. Rather, ████ requests the Staff to carefully consider the whole picture. We suggest that ████ could serve as a "book end" on the other end of the shelf from the DAO and *Munchee* matters (both discussed below). We invite the Staff to help set out a viable path forward for the industry with an earnest, careful and thoughtful company that has designed its platform to work in the way best suited for users over the long term.

We discuss below our view that, notwithstanding the lack of authoritative precedent, there is a reasonable basis to conclude that the Tokens, as sold and expected to be used, should not be deemed securities under U.S. law.

In this memorandum, we are attempting to follow Gary Gensler's[13] philosophical guidance, and looking at all of the facts and circumstances in our application of the "duck test". We would submit that the ████ ████ Token does not in fact look like a security, swim like a security nor fly like a security, but instead, acts as the facilitating fuel of a robust platform meant to improve the way the world interacts, forms relationships and conducts its business, and that it would not be appropriate to regulate the ████ Token as a security when used as it is currently intended to be used. We look forward to discussing the facts and circumstances of this case with the Staff.

First, we present an analysis of the most relevant case law and Staff statements setting out the test for determining whether an instrument is a security, followed by an analysis of the ████ SAFT sale and Token issuance.

## Summary of Relevant US Law

The Securities Act and the Exchange Act define a "security" to include a long list of traditional financial instruments, such as any note, stock or bond.[14] The definition also includes other more amorphous

---

[13] Gary Gensler, Senior Lecturer, MIT Sloan School of Mgmt., Address at the Ethics and Governance in the Blockchain Era (Apr. 23, 2018), https://www.technologyreview.com/video/610981/the-blockchain-duck-test/.

[14] 15 U.S.C. §77b(a)(1); 15 U.S.C. §78c(a)(10).  The U.S. Supreme Court has stated that despite some technical differences between the definitions of "security" under the Securities Act and the Exchange Act, the definitions should be treated as being the same. Notably, this finding does not address the definitions of "security" provided in the Investment Company Act of 1940 or the

4128-9711-7460.13

June 21, 2018



financial instruments, most notably an "investment contract."[15] The U.S. Supreme Court has interpreted the Exchange Act definition of a "security" to be "quite broad" and meant to include "the many types of instruments that in our commercial world fall within the ordinary concept of a security[, including] . . . the countless and variable schemes devised by those who seek to use the money of others on the promise of profits."[16]

### Investment Contracts under Howey

In *SEC v. W.J. Howey Co.*,[17] the U.S. Supreme Court established what has become the most widely used test (the *"Howey Test"*) for determining what constitutes an investment contract in the case of instruments that do not fall "plainly within the statutory definition."[18] The Court in *Howey* specifically defined an "investment contract" to mean:

> [A] contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect profits solely from the efforts of the promoter or a third party. . . .[19]

The U.S. Supreme Court has held that the standard enunciated in *Howey* "embodies the essential attributes that run through all of the Court's decisions defining a security,"[20] and that "in searching for the meaning and scope of the word 'security' . . . form should be disregarded for substance and the emphasis should be on economic reality."[21]

The *Howey Test* has typically been broken down into four distinct elements: (i) an investment of money; (ii) in a common enterprise; (iii) with the expectation of profits; (iv) based on the significant or essential managerial efforts of others.[22] Though numerous regulatory actions and statements by the Staff have applied the *Howey Test* to various transactions, we are not aware of any judicial decisions that have applied the *Howey Test* to a cryptocurrency.[23] (See "Recent SEC Statements and Actions," below.) As a result, any legal analysis of the characteristics of a particular virtual currency must rely on a review of decisions related to financial instruments that may have little similarity to virtual currencies. Despite this limitation, the following concepts gleaned from such cases may be applicable to an analysis of a virtual currency under *Howey*.

---

Investment Advisers Act of 1940 which the SEC and its Staff consider to be broader in scope. Consequently, for purposes of this memorandum, it is assumed that any virtual currency that is deemed to be a "security" under the Securities Act and the Exchange Act would also be deemed to be a "security" under these other laws.

[15] 15 U.S.C. §77b(a)(1); 15 U.S.C. §78c(a)(10).

[16] *Marine Bank v. Weaver*, 455 U.S. 551, 555-56 (1982) (first quoting H.R.Rep.No.85, 73d Cong., 1st Sess., 11 (1933); then quoting *SEC v. W. J. Howey, Co.*, 328 U.S. 239, 299 (1946)).

[17] 328 U.S. 293 (1946).

[18] *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 690 (1985).

[19] 328 U.S. at 298-99 (citation omitted).

[20] *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 852 (1975).

[21] *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967) (citation omitted).

[22] *Howey*, 328 U.S. at 301.

[23] In *U.S. v. Zaslavskiy*, oral argument was heard on May 8, 2018 on a motion to dismiss the criminal case against defendant Zaslavskiy on the basis that the cryptocurrency in question is not a security.  No. 1:17-cr-00647 (E.D.N.Y. filed Nov. 31, 2017).

4128-9711-7460.13

Confidential Treatment Requested by ███████████████     ███-SEC-000011

HIGHLY CONFIDENTIAL     SEC-LIT-EMAILS-000342646

June 21, 2018



<u>Investment of Money</u> – Several cases have held that an investment of money may include the provision of not only capital, assets, and cash, but also goods, services and other financial instruments.[24] These cases suggest a broad definition of the term "money" such that cryptocurrencies purchased with other digital assets such as bitcoin, ether, etc., (as opposed to fiat currency) meet the standard. In some cases, simply spending the time and effort to register on a website was consideration enough.[25] Many cases analyzing the existence of a security, however, note that the specific consideration being provided was in return for a financial interest with the characteristics of a security.[26]

<u>Common Enterprise</u> – There is disagreement among the federal courts as to how to apply this factor, but most courts look to either horizontal or vertical commonality.[27]

Horizontal commonality focuses on whether investor funds are pooled together such that the value of all or most investments rise and fall together.[28] In the context of virtual currencies, this requirement is typically easy to meet because tokens are fungible and, if traded, trade without regard to any unique elements of a particular token, and therefore investors "share in the profits and risks of the enterprise" equally.[29] ██████ does not intend to pursue a classic "initial coin offering" (known as an "ICO") but will have a network launch, after which Tokens are expected to be available to be earned by network participants. These Tokens will also be fungible and presumably would be available to trade as fungible commodities, meeting the test.

Vertical commonality generally focuses on whether the investor's returns are correlated to the returns or efforts of those offering the investment, such that their collective fortunes rise and fall together.[30] In the context of virtual currencies, this inquiry necessitates a close analysis of the token issuer, including its motivations, efforts, and potential returns from the project. Vertical commonality can be more easily found with virtual currencies supported by a centralized development team or community, particularly when developers hold on to tokens during an ICO or are otherwise incentivized to hold them after the ICO in anticipation of an increase in their price. ██████ does not believe that vertical commonality is a feature of the economics of its network, as the economic benefits of the platform will principally flow to those who provide services to the network.

---

[24] *See, e.g., Int'l Bhd. Of Teamsters v. Daniel*, 439 U.S. 551, 560 n.12 (1979) (stating that an "investment" need not take the form of cash or money); *Hector v. Wiens*, 533 F.2d 429, 432-33 (9th Cir. 1976) (commitment of a promissory note considered an "investment of money"); *Popovice v. Milides*, 11 F. Supp. 2d 638, 643 (E.D. Pa. 1998) (noting that an exchange of services for stock constitutes an investment of money); *SEC v. Shavers*, 2013 WL 4028182, at *2 (E.D. Tex. Aug. 6, 2013) (noting that usage of Bitcoin to invest is deemed an "investment of money"); *but see SEC v. Int'l Heritage Inc.*, 4 F. Supp. 2d 1378, 1382-83 (N.D. Ga. 1998) (noting that an exchange for services with no entitlement to profits was not an "investment of money").
[25] *See* Simplystocks.com, SEC No-Action Letter, 1999 WL 51836 (Feb. 4, 1999); *see also* Vanderkam & Sanders, SEC No-Action Letter, 1999 WL 38281 (Jan. 27, 1999).
[26] *See, e.g., Int'l Bhd. Of Teamsters*, 439 U.S. at 559.
[27] *See SEC v. SG Ltd.*, 265 F.3d 42, 49-51 (1st Cir. 2001) (describing the disarray regarding the legal rules used to ascertain "common enterprise").
[28] *Id.* at 49.
[29] *Id.*
[30] *Id.* (noting that vertical commonality has two variants—broad vertical commonality requires the well-being of all investors to "be dependent upon the promoter's expertise" whereas narrow vertical commonality requires that investors' fortunes be essentially interwoven and dependent upon the effort and success of those seeking investment).

4128-9711-7460.13

Confidential Treatment Requested by ██████████                    ██-SEC-000012

HIGHLY CONFIDENTIAL                                                      SEC-LIT-EMAILS-000342647



June 21, 2018

Expectation of Profits – This inquiry focuses on the expected return of the investor and not necessarily the potential success of the enterprise; for example, a Ponzi scheme investment is a security even though the enterprise is destined to fail.[31] Profits can be in the form of capital appreciation and do not necessarily need to be in the form of dividends or interest.[32] This factor requires a close analysis of the promises of the issuer and the motivation of investors. Even when the instrument at issue has dual purposes, it can be considered a security. In particular, the fact that a virtual currency token may have some non-investment related utility on a particular network does not necessarily mean that investors are not primarily motivated by expectation of profits. To determine the extent to which investors are motivated by profit, evidence may come in the form of the degree to which token holders are using the network for its designed purpose or whether developers are marketing the investment case for a token in connection with an ICO.

One fundamental question we have grappled with is how to deal with token holder intent in the "expectation of profits" analysis, particularly where some individuals may seek tokens for investment purposes, while others have a bona fide intent to use the tokens to participate in the network ecosystem. In *Teague v. Bakker*, the Fourth Circuit affirmed that "[t]he subjective intention of a given purchaser cannot control whether something is a 'security'" for purposes of the *Howey Test*, otherwise "some might have purchased securities while others did not."[33] Rather, "[t]he proper focuses of the inquiry are on the transaction itself and the manner in which it is offered" which would tend to place emphasis on objective evidence and considerations such as marketing materials, communications and transaction documents.[34]

In our view, the "expectation of profits" factor requires that the profits expected be material to prospective purchasers under all of the facts and circumstances presented, *i.e.*, there is a substantial likelihood that a reasonable investor would attach significance to the prospect of realizing a profit from acquiring a Token.[35]

Reliance on Others – The fourth requirement for an investment contract is that investor returns be significantly dependent on the efforts of others. Similar to vertical commonality, the inquiry focuses on the relationship between investor and issuer. However, whereas vertical commonality asks if their fates are correlated (e.g., they both profit together), this factor asks whether the investor's returns are dependent significantly on the efforts of others. A key factor in determining that pre-functional sales of tokens are generally securities sales has been the fact that prior to the launch of a fully functional network, by definition any future value will be determined principally through the efforts of others, the sponsors of the

---

[31] *See SEC v. Shavers*, No. 4:13-CV-416, (E.D. Tex. Sept. 18, 2014).
[32] *See SEC v. Edwards*, 540 U.S. 389, 389-90 (2004).
[33] 139 F.3d 892, at *3 (4th Cir. 1998) (unpublished table decision), *cert. denied* 525 U.S. 929 (1998).
[34] *Id.*
[35] This formulation is consistent with the longstanding definitions of "materiality" applied by the Commission and the courts in actions based upon alleged fraudulent disclosures in securities transactions. The rules under the Securities Act and the Exchange Act, *i.e.*, Rule 405 and 12b-2, respectively, define "the term *material*, when used to qualify a requirement for the furnishing of information as to any subject," as limiting "the information required to those matters to which there is a substantial likelihood that a reasonable investor would attach importance in determining whether to [purchase], [buy,] [or sell] the security registered." 17 C.F.R. § 230.405; 17 C.F.R. § 240.12b-2; *see also TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976) ("An omitted fact is material if there is a *substantial likelihood that a reasonable shareholder would consider it important*" when making a voting decision) (emphasis added).

11

4128-9711-7460.13

June 21, 2018



project. This will be a key factor we examine to distinguish between sales of the ████ SAFT, which we believe is a security, and the subsequent issuance of Tokens after full network functionality, which we believe there is a reasonable basis to conclude should not be deemed to be securities.

### Other Applicable Standards

*Howey* specifically addresses "investment contracts," but the Supreme Court has held that a similar analysis is necessary when analyzing other types of assets that may closely resemble securities instruments. For example, in *Reves v. Ernst & Young*, the Supreme Court identified certain characteristics that may make a "note" a security, including the motivation of the seller and buyer, the plan of distribution of the instrument, and the reasonable expectations of the investing public.[36] Several cases support the general proposition stated in *Reves* that:

> [I]f the seller's purpose is to raise money for the general use of a business enterprise or to finance substantial investments and the buyer is interested primarily in the profit the note is expected to generate, the instrument is likely to be a security. If the note is exchanged to facilitate the purchase and sale of a minor asset or consumer good . . . or to advance some other commercial purpose, on the other hand, the note is less sensibly described as a "security."[37]

The question of whether the purpose of the transaction is to purchase an investment interest or a usable consumer product is fundamental to most analyses of whether a unique instrument constitutes a security. The Supreme Court in *United Housing Foundation, Inc. v. Forman* ("*Forman*")[38] held that "when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply."[39] Specifically, the Court held that the co-op shares in question were not securities because the purchasers were motivated "solely by the prospect of acquiring a place to live, and not by financial returns on their investments."[40] Cases like *Forman* provide a sensible basis for the argument that certain virtual currencies that can be used to purchase a service or application (so-called "utility tokens") are not securities.[41] However, it is important to note that the co-op shares in *Forman* could not be transferred or sold for profit, so the Court did not have to wrestle with balancing whether purchasers were motivated more by the desire to use or to profit.[42]

In *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,[43] a certificate of deposit ("CD"), though an exempt security under Section 2(a)(1) of the Securities Act, was nevertheless found to be subject to the securities laws when sold as part of a CD program offered by brokers promising liquidity

---

[36] *See* 494 U.S. 56, 66-67 (1990).
[37] 494 U.S. 56, 66 (1990) (citation omitted).
[38] 421 U.S. 837, 852 (1975).
[39] *Id.* at 852–53 (citation omitted).
[40] *Id.* at 853.
[41] *See. Id.* at 853 n. 17 (stating that in some transactions where the securities laws did not apply, the investor was offered both a commodity and an expectation of profits).
[42] *See* Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, Securities Act Release No. 5347, 38 Fed. Reg. 1735 (Jan. 18, 1973).
[43] 756 F.2d 230 (2d Cir. 1985) (hereinafter "*Gary Plastic*").

4128-9711-7460.13

Confidential Treatment Requested by ████████████        ███-SEC-000014

HIGHLY CONFIDENTIAL                                    SEC-LIT-EMAILS-000342649

June 21, 2018



and potential profit to retail investors.[44] It is fair to say that the *Gary Plastic* case refocuses the application of the *Howey Test* analyses by considering the entire transactional package through which a digital asset is offered and sold.[45] Depending on the specific facts and circumstances we agree that it may be possible to have a digital asset that is originally considered to be part of a security, and that, over time, loses the characteristics of a security when considered alone. Accordingly, an asset considered a non-security may nevertheless have been a part of a transaction subject to the securities laws when combined or coupled within an investment contract.

**The SAFT and the concept of an embedded utility token**

SAFTs (Simple Agreement for Future Tokens) have become a very frequent road to capital raising in the cryptocurrency space. A pre-functionality token sale agreement to deliver a specified number of tokens at a specified price on a future date has many of the characteristics of a forward contract for the future tokens. A sales contract normally does not entail an investment contract. For example, the Ninth Circuit stated that:

> Commodity futures contracts are considered not to be securities per se…. They are investments to be sure. The investment, however, *is not in an enterprise* but is in the underlying commodity, and we may assume, arguendo, that a conventional option to buy or sell a futures contract takes on the character of the contract that is the subject of the option and is no more a security than is that underlying contract.[46]

However, a token purchased under a SAFT may be different from conventional forward contracts in that it typically involves a to-be-created novel product or service with no established market or value, which may cause the investment to be deemed an "investment in the enterprise" of creating an operating token rather than an investment in just the token. This is the key difference in analyzing SAFTs as contrasted to options on securities or commodities contracts. Equity fundamentally represents a right to a share of the profits of the issuer, so equity securities never are "transformed" from a security to a non-security because their fundamental nature does not change. Oranges are always oranges, so a forward contract to purchase oranges might be a security whereas the oranges are not. We submit that something that could be sold as a security at the very beginning of a network, can transform with the passage of time so that the underlying property is not viewed independently as a security. This is a question of great import, given the number of token pre-sale contracts (whether called SAFTs or otherwise) that represent the right to receive tokens in the future with the expectation that those tokens will not necessarily be securities once the network is fully functional and operating freely.

The treatment of the SAFT as an investment contract (security), should be based on a test that is driven by the facts and circumstances at the time of the offer and sale and by the economic realities of the facts of such offering. Thus, it is possible for a contract for the sale of tokens to be an investment contract

---

[44] *Id.* at 240.
[45] *See* discussion of recent presentation by William Hinman, Director of the Division of Corporation Finance of the SEC, *infra* note 54.
[46] *SEC v. Commodity Options Intern., Inc.*, 553 F.2d 628, 632 (9th Cir. 1977) (emphasis added) (citation omitted).

4128-9711-7460.13

Confidential Treatment Requested by ▮▮▮▮▮▮▮

HIGHLY CONFIDENTIAL

▮-SEC-000015

SEC-LIT-EMAILS-000342650

**June 21, 2018**



under one set of circumstances, while a subsequent contract for the sale of the same tokens alone is not an investment contract when sold under different circumstances. In the case of tokens, we are of the view that a contract for the future delivery of a token is likely to be deemed a security prior to the launch of the network on which the token will have utility because the value of the token is entirely dependent on the efforts of the issuer in creating and launching the network. Once the network is launched, however, the token, on a standalone basis, generally has value that is not entirely dependent on the efforts of the issuer. In effect, when the right to acquire the token is sold together with the "services" of the issuer under a SAFT, the combined instrument is likely to be deemed a security, but the token might very well not be a security once its value is no longer predominantly dependent on the issuer's services.

Even if the seller in a typical forward contract engages in significant promotional efforts, such efforts often would be expected to have only a marginal impact on the product's price and any resulting profits from the forward contract, particularly as the economic activity around the item sold increases and the value becomes more a function of such activity. Such promotional efforts would not be "undeniably significant [efforts], i.e., essential managerial efforts which affect the failure or success of the enterprise."[47] However, in other cases, such as pre-functional tokens, the tokens underlying the SAFT have yet to be fully developed or to demonstrate their functionality and typically are associated with an entirely novel application where the ultimate range of prices to be paid by end users is speculative. Any eventual profits from the pre-functionality token sale agreement may therefore depend on the successful development of the application using the tokens and on the seller's success in launching the application. In some circumstances, this may elevate the seller's efforts to the "undeniably significant" level required under *Glenn W. Turner.*

Applying the concept of "efforts of others" to tokens, the SEC in *Munchee* found that:

> 32. Investors' profits were to be derived from the significant entrepreneurial and managerial efforts of others – specifically Munchee and its agents – who were to revise the Munchee App, create the "ecosystem" that would increase the value of MUN (through both an increased demand for MUN tokens by users and Munchee's specific efforts to cause appreciation in value, such as by burning MUN tokens), and support secondary markets. Investors had little choice but to rely on Munchee and its expertise. At the time of the offering and sale of MUN tokens, no other person could make changes to the Munchee App or was working to create an "ecosystem" to create demand for MUN tokens.[48]

We would like to discuss in particular this part of the *Munchee* analysis regarding efforts of others. We question whether it is really reasonable to conclude that providing ongoing software updates and upgrades would predominantly affect the failure or success of the secondary market price, particularly

---

[47] *SEC v. Glenn W. Turner Enters., Inc.,* 474 F.2d 476, 482 (9th Cir. 1973); *see, e.g., Bender v. Continental Towers Ltd. P'ship,* 632 F. Supp. 497, 501 (S.D.N.Y. 1986) ("Here, plaintiffs allege that Continental influenced the value of the condominium units through its marketing efforts and its own buying and selling strategies. But these efforts by Continental would have at most only a marginal effect on the value of the condominium units.").
[48] *Munchee,* Securities Act of 1933 Release No. 10445, 2017 WL 6276364 (Dec. 11, 2017) (hereinafter, "*Munchee*").

4128-9711-7460.13

Confidential Treatment Requested by ███████████        ███-SEC-000016

HIGHLY CONFIDENTIAL                                              SEC-LIT-EMAILS-000342651

**June 21, 2018**



compared to the other market dynamics affecting price in the trading market post-functionality. We note, for instance, that the Yankees organization provides substantial "entrepreneurial and managerial efforts" to the development of a "product" – a Yankees ticket – that can be and is freely bought and sold on lively secondary markets. We do not believe that those tickets are generally considered securities. This is one of the challenges of trying to apply case law to distributed ledgers and tokens – it may be difficult to separate out those factors which affect the market price (e.g., applications developed by the community, perceived advantages of the hashgraph platform over blockchain) from those essential functions that do not predominantly affect the market price, even though conducted by the developer (e.g., software updates, educational outreach to the community, maintenance and organization of the ████ network). We would like to discuss with the Staff in detail the implications of paragraphs 31-33 of the *Munchee* order, and ways in which those tests could be refined to better fit the actual facts and circumstances of virtual currencies.

<u>**Recent SEC Statements and Actions**</u>

As of the date of this memorandum, the SEC has filed various enforcement actions that provide insight into the SEC's view of which cryptocurrencies fit within the legal definition of a "security." We have not discussed those that were primarily aimed at outright fraud, though the number of fraudulent token sales seems distressingly high.

On July 25, 2017, the SEC issued a Report of Investigation under Section 21(a) of the Exchange Act which described an SEC investigation of the DAO, a virtual organization that used blockchain technology to facilitate the offer and sale of DAO Tokens to raise capital.[49] The SEC applied existing U.S. securities laws to this new paradigm, determining that DAO Tokens were securities. The SEC asserted that DAO Tokens constituted securities because, among other reasons, they represented interests in an enterprise to investors who received them in exchange for payment with a virtual currency, and which could be held as an investment with certain voting and ownership rights. The SEC issued the report in part to put the cryptocurrency industry on notice and stress that those who offer and sell securities in the United States are required to comply with the U.S. securities laws, regardless of whether those securities are purchased with virtual currencies or distributed with blockchain technology.[50]

On December 11, 2017, the SEC announced that it had issued an order instituting cease-and-desist proceedings pursuant to Section 8A of the Securities Act, making findings, and imposing a cease-and-desist order against Munchee Inc. in connection with its token offering ("Munchee Order"). The SEC stated in the Munchee Order that, among other things: (i) Munchee Inc.'s promotion of its token as an opportunity to profit; (ii) the development of an "ecosystem" to support Munchee Inc.'s token; and (iii) its support and promotion of secondary markets to enable trading of its tokens, created a reasonable expectation of profit derived from the significant entrepreneurial and managerial efforts of others among

---

[49] *See* DAO Report, *supra* note 9.
[50] Press Release, Sec. and Exch. Comm'n, SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities (Jul. 25, 2017), *available at*: https://www.sec.gov/news/press-release/2017-131.

4128-9711-7460.13

Confidential Treatment Requested by ████████████

HIGHLY CONFIDENTIAL                                                                ████-SEC-000017

                                                                                   SEC-LIT-EMAILS-000342652

June 21, 2018



purchasers of the token, and as a result, the SEC concluded that such tokens are securities subject to registration under applicable securities laws (unless an exemption from registration is available).

On December 11, 2017, SEC Chairman Jay Clayton issued a statement on cryptocurrencies and ICOs, which stated, among other things, the following:

> It has been asserted that cryptocurrencies are not securities and that the offer and sale of cryptocurrencies are beyond the SEC's jurisdiction. Whether that assertion proves correct with respect to any digital asset that is labeled as a cryptocurrency will depend on the characteristics and use of that particular asset . . . By and large, the structures of initial coin offerings that I have seen promoted involve the offer and sale of securities and directly implicate the securities registration requirements and other investor protection provisions of our federal securities laws.[51]

Taken together, these SEC actions and statements indicate that the Staff is applying a broad definition of security and is closely scrutinizing virtual currencies, particularly those sold to investors in "crowd sales" under Rule 506(c) of Regulation D under the Securities Act, and is looking closely at how and to whom tokens are being marketed. The Staff's focus is clearly on the economic substance of transactions, not on their form or the terminology used to describe the tokens (*e.g.* "utility"), including the instruments or schemes under which they are offered and sold. Although the SEC's settlements and pending actions do not constitute binding precedent, any court wrestling with the legal issues embedded in the definition of a "security" is likely to give significant deference to the position of the primary regulator tasked with overseeing the securities market.[52]

More recently, SEC Commissioner Hester Peirce commented favorably on the potential for products and services based upon distributed ledger technology while recognizing the challenges of applying the securities laws to the variety of products that are being brought to market. Of importance to developers of these new products, she emphasized the benefits of frank discussions with regulators regarding these issues and encouraged such dialogue.[53]

Most recently, Chairman Jay Clayton and William Hinman, Director of the Division of Corporation Finance of the SEC, publicly expressed their views as to the status of digital assets under the federal securities laws. On June 6, the Chairman spoke on CNBC and commented favorably regarding the potential applications of distributed ledger technology and responded to questions as to whether digital assets, such as Bitcoin, constituted securities under the federal securities laws.[54] On June 14, Director Hinman, in prepared remarks, struck a similar tone at the Yahoo Finance All Markets Summit and articulated an

---

[51] Public Statement from Jay Clayton, Chairman, Sec. and Exch. Comm'n, Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11.
[52] *See Chevron, U.S.A., Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 844 (1984).
[53] Hester Peirce, Comm'r, Sec. and Exch. Comm'n., Remarks before the Medici Conference, Los Angeles, Cal. (May 2, 2018).
[54] Interview by Bob Pisani with Jay Clayton, Chairman, Sec. and Exch. Comm'n., in New York, N.Y. (Jun. 6, 2018).

16

4128-9711-7460.13

Confidential Treatment Requested by ▮▮▮▮▮▮▮                                   ▮-SEC-000018

HIGHLY CONFIDENTIAL                                                        SEC-LIT-EMAILS-000342653



**June 21, 2018**

analytical framework for determining when the federal securities laws should be applied to digital assets.[55]

We have taken all of these considerations into account in presenting this analysis.

### The ▇▇▇▇ Token and Applying the Law to the Facts

Virtual currencies may be said to constitute a new form of financial instrument or asset class. As the discussion above demonstrates, many virtual currencies in their current form, taking into account the manner in which they have been issued, certainly would meet the definition of a security under the *Howey Test*. However, we set out below our understanding of some of the relevant facts underlying the Token and why we believe it is reasonable to conclude that they should not be deemed to be securities under US law.

▇▇▇▇ has raised, and will continue to raise, substantial capital to develop the network through the issuance of SAFTs. Not all SAFTs are created equal, however, and attached are the forms of SAFT used by ▇▇▇▇ for your review. We believe that the ▇▇▇▇ SAFTs are securities, and, accordingly, ▇▇▇▇ has sold them in private placements to "accredited investors" pursuant to Regulation D under the Securities Act. ▇▇▇▇ thinks it has provided full and fair disclosure of the benefits and the risks of the SAFTs and care has been taken to establish a reasonable basis to conclude that the purchasers of the SAFTs believe in the long-term value of ▇▇▇▇ through the lockup mechanism discussed below.

However, ▇▇▇▇ also has taken care to separate the purchase of the SAFT as a security from the eventual delivery of the commodity purchased through the SAFT, the ▇▇▇▇▇▇▇. It is worth noting that the right to receive the Tokens has been offered only at a fixed price (not a discount to some eventual public sale price). The Tokens will not be issued until at least ▇▇ months after network launch, which serves two important purposes: (1) We believe it limits the likelihood that the SAFT issuance will be integrated under Regulation D with either the sale or distribution of Tokens at the network launch or with the eventual Token issuance under the SAFT; and (2) it enforces the reality that the value of the Tokens is dependent upon network utility once it is fully up and running rather than financial engineering, since there is no fixed offering price and assured return upon issuance.

We believe that the combined "expectation of profits from the efforts of others" test is critical to analyzing the ▇▇▇▇▇▇▇ business plan under the standards enunciated by the Staff in *Munchee*. For example, as quoted above, investors in the case of *Munchee* were focused on "Munchee's specific efforts to cause appreciation in value [of the MUN tokens], such as by burning MUN tokens, and support[ing] secondary markets."[56] This is not the case with respect to ▇▇▇▇

---

[55] William Hinman, Dir., Sec. and Exch. Comm'n., Remarks at the Yahoo Finance All Markets Summit: Crypto (Jun. 14, 2018), https://www.sec.gov/news/speech/speech-hinman-061418.
[56] *See Munchee supra* note 47.

4128-9711-7460.13

Confidential Treatment Requested by ▇▇▇▇▇▇▇                    ▇▇-SEC-000019

HIGHLY CONFIDENTIAL                                                          SEC-LIT-EMAILS-000342654



June 21, 2018

In ███████ case, the company is setting up the technology, but a widely distributed group of ████ ████████ will be tasked with governing the overall ecosystem, which itself will be developed through the efforts of widely distributed and independent developers and users. The value of the Tokens in the ecosystem will be driven predominantly, if not solely, by the users of Tokens and their ability to find proper use cases. Nonetheless, in the interest of full disclosure, it is important to note that ████████ ████ will maintain control over the technological framework of the ████████████ to the extent required for stability and security, and may take specific actions, as necessary, to prevent malicious attacks on the network, specifically by controlling the release of Tokens and potentially repurchasing Tokens to avoid concentrations of ownership.

████████ will have a fixed supply of Tokens and will not burn Tokens to increase value. It does not intend to have a public sale with a ticking countdown clock and escalating prices. It does intend to distribute Tokens initially to its developer community and active network participants. There will be hack-a-thons with Tokens awarded to the winning applications. ████████ has not, and does not intend to, actively or publicly promote secondary trading. It is important to note, however, that there will in fact be trading expected – participants with more Tokens can increase their influence on the ████████ network, and increase their ability to offer valuable services, which in turn allows them to earn more Tokens. We would anticipate that trading will be conducted on various trading platforms or exchanges on which the Tokens will be listed (note that to the extent Tokens are not deemed to be securities, the trading platforms will likely not be fully compliant securities exchanges). In order to list the Tokens, ████ may be required to enter into listing agreements with exchanges requiring ████ to provide certain information regarding its operations. The functioning of the network actually requires the free transferability of Tokens, and assumes that over time Tokens will flow from people who value fiat or other virtual currencies more highly than Tokens they have earned by hosting nodes on the network. Over time, people earning Tokens who do not value an increasing stake, would be expected to sell the Tokens to someone who values their use more highly.

Tokens will only be valuable if market forces determine that they are valuable – ████ believes that their value will not be determined to any material extent by its marketing or pricing efforts.

We set out below some of the key facts we have considered and think are material to the securities law analysis.

A.   The ████████ SAFTs are likely securities:

1.   SAFTs were sold as securities to accredited investors, in compliance with Rule 506(b) or Rule 506(c) of the Securities Act.

2.   SAFTs are not transferrable (with certain customary limited exceptions).

3.   The network is not currently fully functional, so the value of the SAFT and the Tokens that may be issued pursuant to the SAFTs is still substantially dependent upon the efforts of ████ and its team to develop and implement the network and governance model.

18

4128-9711-7460.13

June 21, 2018



4.  The value of the Tokens that may be issued is currently entirely speculative, and will be based on future market forces.

5.  ██████ has been vigorously enforcing limits on its sales of SAFTs to accredited investors only, returning funds that appear to be improper "syndicates" or "pools" of unaccredited investors being formed to invest.

**B.   It is reasonable to determine that the Tokens should not be deemed to be securities:**

1.  There will be no public ICO. At network launch, the Tokens held by ██████ will be ██████ staked to the nodes run by ████████████ and possibly to nodes operated by other ████████████, to begin the consensus mechanism. In addition, approved developers may earn Tokens by establishing nodes and providing services to and through the network. Later, there may be periodic Token sales to effect the broader distribution of Tokens to the ██████ community. ██████ will review the facts and circumstances of any such sales within the framework discussed with the Staff, and ensure that such sales do not cause the Tokens being sold to be considered securities.

2.  Tokens will be issued under the SAFT only if a number of hurdles are first overcome that are intended to demonstrate that the Tokens are not securities, but are instead functional tokens whose value is dependent on the overall success of the network and the ██████ community, rather than on the centralized efforts of the ██████ team.

    a.  The network must launch and have been fully functional for ██ months prior to the first issuance of Tokens to SAFT holders, at which time they will receive twenty percent (20%) of their Tokens free of use restrictions. Their remaining Tokens will be issued free of use restrictions over a scheduled time period ranging from an additional ██ months to an additional ██ years. One speculative feature of other SAFTs has been the practice that the tokens under the SAFT were purchased at a discount to the public ICO price, assuring a substantial return to the early investors. ██████ rejected this approach as not in keeping with the ██████ philosophy. Therefore, ██████ SAFT holders purchased their right to future tokens at various fixed prices. Whether the Tokens are eventually worth more than the price paid will be entirely dependent on the perceived overall value of the network well after the initial launch date.

    b.  The Tokens must be issued in accordance with law. From the start of this project, the team has been committed to follow the rules, leading to this approach to the Staff to attempt to receive a level of comfort regarding the status of Tokens under the law. If the Tokens were determined to be securities, ██████ could explore registering the Tokens for sale under the Securities Act. Indeed, ██████ has discussed this potential scenario several times in considering what alternatives it would have if the Tokens were deemed to be securities.

19

4128-9711-7460.13

Confidential Treatment Requested by ████████████        ██-SEC-000021

HIGHLY CONFIDENTIAL                                                    SEC-LIT-EMAILS-000342656

June 21, 2018



    c.   The ▮▮▮▮ team believes that registering under the U.S. securities laws functional tokens like the Token, which does not reflect any ownership interest in the network, would frankly not work. We do not see how sales and information requirements under the Exchange Act would work in this instance, where the ability to freely and frequently transfer fractional Tokens as micro-payments is fundamental to the operation of the network. In truth, if the Tokens were deemed to be securities, the more likely result would be that ▮▮▮▮ would not be able to operate in, or be accessible from, the United States.

    d.   These Tokens will help to support liquidity and are essential in the proper functioning of the ▮▮▮▮▮▮▮ over time, as there is a limited number of Tokens that will be generated.

3.   As it is launched, ▮▮▮▮ will be a decentralized ledger platform with policies that will be governed by ▮▮▮▮▮▮. It is currently anticipated that there will be ▮▮▮▮▮, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ is balancing decentralization with the importance of long-term network security and stability. It is important to note that the mechanism for achieving consensus on the ordering of transactions, i.e., the distributed ledger technology itself, is decentralized and not controlled by ▮▮▮▮▮ In addition, although Bitcoin and Ether purport to be fully decentralized, some studies have suggested that approximately 1600 holders of Bitcoin hold about 33% of the available total[57] and the top 10 addresses for Ether control nearly 50% of its total supply.[58] Decentralization is all relative.

4.   Day to day functioning of the network will be fully decentralized, with consensus driven solely by nodes based on the Tokens staked (or ▮▮▮▮▮ to them by holders of Tokens. The Tokens are a fundamental and essential feature of the network, and over time will contribute to its decentralized nature as Tokens will be gradually released into the ecosystem, and flow to network participants, from ▮▮▮▮▮▮

5.   Tokens will be earned by participants who establish nodes on the network, so that their value will heavily depend upon the efforts of broadly distributed network participants and on the actions of hosts of nodes who have earned Tokens. It is expected that nodes will generally be established by persons who intend to use the ▮▮▮▮▮ platform to facilitate transactions.

6.   Tokens are required in order for the network to function as follows:

    a.   The network consensus mechanism is based on a staking protocol, where nodes' influence on consensus is weighted by the number of Tokens in the node's wallet, thus

---

[57] See Hannah Murphy, *'Bitcoin Whales' Control Third of Market with $37.5bn Holdings*, Financial Times (Jun. 9, 2018), https://www.ft.com/content/c4b68aec-6b26-11e8-8cf3-0c230fa67aec.
[58] See Olga Kharif, *Crypto Whales Own Almost Half of Tokens From Biggest Ever ICO*, Bloomberg News (Jun. 6, 2018), https://biglawbusiness.com/crypto-whales-own-almost-half-of-tokens-from-biggest-ever-ico/.

4128-9711-7460.13

Confidential Treatment Requested by ▮▮▮▮▮▮▮      ▮-SEC-000022

HIGHLY CONFIDENTIAL         SEC-LIT-EMAILS-000342657

June 21, 2018



  securing the network against "Sybil attacks" whereby a malicious actor stands up numerous nodes to improperly influence or prevent consensus.

  b. Tokens are used to reward nodes for participating on the network, with the amount of payment proportional to the number of Tokens in each node's wallet. This encourages Token holders to host a node, increasing the number of nodes in the network, further securing the network against attacks by malicious actors.

  c. Users and developers make micro-payments to use the platform, such as when they transfer cryptocurrency coins or add items to the public ledger. Those micro-payments cover the costs of operating the network, such as the costs to nodes for the computing, bandwidth and storage resources they use in providing services on the network. Because of the efficiency of the ▮▮▮▮▮▮ technology, the fees are expected to be small, requiring the ability to make micro-payments. The ▮▮▮▮ Token will enable such micro-payments, which are not feasible using ordinary fiat currency.

  d. Tokens will also be used as a store of value on the network.

7. The Tokens do not have voting rights, other than through the weighting they provide when staked to nodes that participate in the consensus mechanism.

8. The Tokens have no rights to distributions, income or other characteristics of equity securities.

9. Token holders have no rights to the assets of any business – Tokens merely reflect the right to "stake" and thereby participate in the consensus mechanism of the network, and support the smart contracts and payment of micro-payment fees driving the network's functionality.

10. ▮▮▮▮ has made no representations that the Tokens will increase in value. In fact, in the SAFT, ▮▮▮▮ goes out of its way to remind investors that the Tokens could decrease in value or have no value.

11. Purchasers of the SAFTs or the Tokens should not have an expectation of the right to sell Tokens purchased at a significant discount to a public ICO in that ICO. Many of the original SAFTs offered by other issuers gave holders the right to receive tokens at a substantial discount – as much as 80% discount off the public price -- and then to sell those tokens immediately into the public ICO. ▮▮▮▮ has greatly reduced, if not eliminated, a reasonable expectation of profit from the purchase of its SAFTs.

12. The ▮▮ month period from network launch serves as a buffer, and also as a clear period that significantly weakens, if not eliminates, the possible integration under Regulation D of the offering of Tokens at network launch from the termination of the ▮▮▮▮ SAFTs and the issuance of the Tokens. In the ▮▮▮▮ case, there is a double barrier, as, in fact, the issuance of Tokens at and after network launch should not be treated as a sale of securities because those Tokens will be

21

4128-9711-7460.13

Confidential Treatment Requested by ▮▮▮▮▮▮▮▮▮▮▮     ▮-SEC-000023

HIGHLY CONFIDENTIAL             SEC-LIT-EMAILS-000342658



**June 21, 2018**

issued to network participants in exchange for their efforts on behalf of the network, and not in a classic ICO.

13. The Tokens are required for the network or protocol to function as intended. Their ultimate value will be determined by the value of the underlying activity on the networks.

14. There is a fixed supply of ███████ Tokens, and no provision for "burning" of Tokens to artificially increase their value. Over time, if the network usage expands, and as developers continue to add valuable use cases on top of the ██████████████ platform, presumably the Tokens will become more valuable.

15. Even if there is some speculative buying and selling of Tokens by individuals who do not intend to use the Tokens on the network, that should not cause the Tokens to be securities. As we noted above, in *Teague*, the court discussed the objective and reasonable expectations of the purchasers. ██████ has tamped down speculation in the Tokens, and regardless of any speculative intent of purchasers, ██████ thinks that a reasonable purchaser will only purchase Tokens either to use them or if they believe that over time as the network develops and is more widely adopted, that the value of the Tokens required for the network to function will increase in value.

*[Remainder of page intentionally left blank]*

4128-9711-7460.13

Confidential Treatment Requested by ████████████████   ███-SEC-000024

HIGHLY CONFIDENTIAL                                                      SEC-LIT-EMAILS-000342659

**June 21, 2018**



**<u>Conclusion</u>**

Fundamentally, the ▮▮▮▮▮ team is motivated by a desire to bring about a fast, secure and efficient decentralized network, where participants can interact without being at the mercy of a centralized intermediary, and where the wisdom of the crowd will determine the value and functionality of the network. The ability for parties who do not know each other to smoothly and easily transact with confidence is one of the hallmarks of a market economy. Cryptocurrencies and distributed ledger technology is the next step in the evolution of markets and related interactions.

Markets do not work for free, however, and the expectation of profit is at the core of our free enterprise system. Just because it may be possible for Token purchasers to profit, and just because there are activities by the central organizing ▮▮▮▮ team that will support the network, those factors alone should not cause the Tokens to be securities.

With a careful examination of the facts and circumstances of this project, we believe that it would be reasonable to conclude that the Tokens should not be deemed to be securities once the network is launched, assuming that ▮▮▮▮ proceeds as set forth above.

Please contact ▮▮▮▮▮▮ General Counsel, ▮▮▮▮▮▮▮▮ ▮▮▮▮▮ and ▮▮▮▮▮▮▮▮▮▮▮▮▮, at ▮▮▮▮▮▮ with any questions or comments.

4128-9711-7460.13

Confidential Treatment Requested by ▮▮▮▮▮▮▮                    ▮-SEC-000025

HIGHLY CONFIDENTIAL                                                    SEC-LIT-EMAILS-000342660