# Exhibit 208

# coinbase

July 21, 2022

Vanessa A. Countryman
Secretary
U.S. Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-1090

**Re: Petition for Rulemaking – Digital Asset Securities Regulation**

Dear Ms. Countryman:

Coinbase Global, Inc. ("Coinbase") is filing this petition[1] with the U.S. Securities and Exchange Commission ("Commission" or "SEC") requesting that the Commission propose and adopt rules to govern the regulation of securities that are offered and traded via digitally native methods, including potential rules to identify which digital assets are securities. Digitally native securities are recorded and transferred using distributed ledger technology and do not rely on centralized entities or certificated forms of ownership that characterize traditional financial instruments.[2] Transactions in these securities (henceforth "digital asset securities") are executed and settled in real time, permanently recorded on blockchains, and visible with equal access to all market participants. This is a paradigm shift from existing market practices, rendering many of the Commission rules that govern the offer, sale, trading, custody, and clearing of traditional assets both incomplete and unsuitable for securities in this market.

The U.S. does not currently have a functioning market in digital asset securities due to the lack of a clear and workable regulatory regime.  Digital assets that trade today overwhelmingly have the characteristics of commodities. Coinbase, like many other exchanges, has intentionally and conscientiously steered well clear of securities to ensure that we are able to operate in full compliance with applicable laws and regulations.  However, new rules facilitating the use of digital asset securities would allow for a more efficient and effective allocation of capital in financial markets and create new opportunities for investors.

Globally, many jurisdictions are actively pursuing regulation that meets the specific needs of the crypto market, ensuring investors are well-protected. For example, the EU recently reached agreement on Markets in Crypto Assets (MiCA) regulation first proposed in 2020, and countries and markets such as Australia, Brazil, Dubai, Hong Kong, Switzerland, and the United Kingdom have taken important steps towards establishing (or have already established) regulations around crypto.[3]

---

[1] *See* 17 C.F.R. 201.192(a).

[2] In this petition we are focused on "native" digital asset securities—that is, digital asset securities that exist on a distributed ledger, only in tokenized form. Many, but not all, of the considerations discussed herein would apply similarly to digital asset securities that represent a tokenized version of a traditional security (e.g., tokenized common stock).

[3] Council of the EU, *Digital finance: agreement reached on European crypto-assets regulation (MiCA)* (June 31, 2022), https://www.consilium.europa.eu/en/press/press-releases/2022/06/30/digital-finance-agreement-reached-on-european-crypto-assets-regulation-mica/; Australian Government, The Treasury, *Crypto asset secondary service providers: Licensing and custody requirements (Consultation Paper)* (Mar. 21, 2022), https://treasury.gov.au/consultation/c2022-259046; Chamber of Deputies, Projeto de Lei Nº 4401, De 2021,

The SEC, however, has not yet taken constructive steps in this direction. Despite the well-recognized growth and rapidly developing practices in the digital asset ecosystem, and the Commission's stated view that some digital assets are securities, the Commission has yet to constructively engage with digital asset market participants on the design of a workable regulatory framework, let alone propose any new rules governing this activity. Moreover, as of the publication of its most recently updated regulatory agenda on June 22, 2022, the Commission has not indicated any intention to do so.[4]

Instead, the Commission appears to be following an enforcement-first approach to addressing crypto-related regulatory challenges. Indeed, the Commission recently announced that the Enforcement Division's Crypto Assets and Cyber Unit would soon double in size.[5] Leading with enforcement actions before ensuring regulatory clarity results in arbitrary outcomes with limited value as guiding precedent. Several parties have been the subject of extensive investigation while others—with nearly identical products or services—have apparently been subject to none. This approach has led to both confusion and the uneven treatment of market participants.

Rather than initiate new rulemaking, Chair Gensler has repeatedly stated through speeches and testimony that the vast majority of digital tokens are securities, and has asked issuers and exchanges that offer, sell, and trade them to come in and register.[6] We disagree that the majority of digital assets are securities. For those digital assets that are securities, registration under the current rules is, for many market participants, either not possible or not economically viable given the associated and unnecessary compliance burdens. Additionally, when existing regulations are unworkable, some market participants may be less willing to invest the resources necessary to follow the rules. Failure to resolve these shortcomings leaves investors unprotected due to a lack of regulatory clarity, prevents market participants from leveraging the efficiencies new technology can offer, and materially impairs capital formation in the blockchain technologies that underlie digital assets. This is wholly inconsistent with the SEC's mission.

---

(Aug. 21, 2021), https://www.camara.leg.br/propostas-legislativas/1555470; Dubai Financial Services Authority, *Consultation Paper No. 143, Regulation of Crypto Tokens* (Mar. 8, 2022), https://dfsaen.thomsonreuters.com/sites/default/files/net_file_store/CP143_Regulation_of_Crypto_Tokens.pdf; Legislative Council of Hong Kong, *Anti Money Laundering and Counter-Terrorist Financing (Amendment) Bill*, (June 24, 2022), https://www.gld.gov.hk/egazette/pdf/20222625/es32022262516.pdf; Swiss Federation, *Federal Act on the Adaptation of Federal Law to Developments in Distributed Electronic Ledger Technology* (Jan. 14, 2021), https://fedlex.data.admin.ch/eli/fga/2020/2007; HM Treasury, *Government Sets Out Plan to Make UK a Global Cryptoasset Technology Hub*, (Apr. 4, 2022), https://www.gov.uk/government/news/government-sets-out-plan-to-make-uk-a-global-cryptoasset-technology-hub

[4] The Commission submitted its agenda of rulemaking actions pursuant to the Regulatory Flexibility Act on April 26, 2022, to the Regulatory Information Service Center for inclusion on the Unified Agenda of Federal Regulatory and Deregulatory Actions.  The agenda that was published did not indicate any rulemaking actions to be considered in the current agenda (next 12 months) or the long-term agenda that relates to digital asset regulation.SEC, *SEC Announces Spring 2022 Regulatory Agenda* (June 22, 2022), https://www.sec.gov/news/press-release/2022-112.

[5] SEC, *SEC Nearly Doubles Size of Enforcement's Crypto Assets and Cyber Unit* (May 3, 2022), https://www.sec.gov/news/press-release/2022-78.

[6] *See, e.g.*, Sander Lutz, *SEC Chair Gensler Threatens Action Against Unregistered Crypto Exchanges* (May 18, 2022), https://decrypt.co/100806/sec-chair-gensler-threatens-action-against-unregistered-crypto-exchanges (stating to the House Financial Services and General Government Subcommittee that "[t]he crypto exchanges should come in and register . . ."); Public Statement, Chair Gary Gensler, SEC, *2021 Aspen Security Forum: The View from the SEC: Cryptocurrencies and National Security* (Aug. 3, 2021), https://www.youtube.com/watch?v=tusQLLCgrDs (inviting digital asset trading platforms to "come in, register, work with the SEC.").

In October 2021, we issued our *Digital Asset Policy Proposal – Safeguarding America's Financial Leadership* through which we hoped to initiate a broad and wide-ranging conversation about the role digital assets play in our economic future.[7]  As part of that proposal, we offered a bold idea to regulate digital assets under a separate framework with a single regulator as a way to ensure that investors are properly protected and innovation can occur without, what we believe, may be restricting and cumbersome labels of security and commodity.  Our proposal would require a government-wide focus to create a fundamentally new and comprehensive regime for digital assets. We remain committed to continuing the discussion about the right way to regulate digital assets. This petition, however, is more specific.  We are seeking a transparent and collaborative process to engage directly with the SEC as a means to initiate a discussion about what the SEC can do within its own authority to provide clarity and certainty regarding the regulatory treatment of digital asset securities.

Coinbase firmly believes that a new regulatory framework is needed to ensure that the SEC can fulfill its responsibility to oversee the digital asset securities markets. We respectfully petition the Commission to propose new rules for the offer, sale, registration, and trading of digital asset securities. Existing rules, unchanged, do not achieve the goals of the Commission when applied to digital asset securities.  Following the well-established rulemaking process would allow for input from a wide range of stakeholders, advance the goals of transparent and orderly policy development, and result in clear rules and fair notice to all market participants.

Now is the time for the Commission to begin a public dialogue. The recent collapse of the TerraUSD stablecoin, the bankruptcy of crypto-lenders such as Celsius, ongoing questions about the efficacy of how digital asset markets operate, and the potential onset of another crypto winter can help inform a regulatory path forward. The lessons learned can be used to reinforce the best practices, and guide the industry in building new infrastructure and product offerings. Establishing regulatory guardrails is critical to the future success of digital asset innovation in the United States.

As an initial step, the Commission should solicit input from the public. Many of the unresolved issues are complicated, and developing effective and efficient solutions will require a broad understanding of the technology underpinning developing market practices and products. We believe that we and other market participants will also benefit from an open discussion. The Commission has historically published concept releases for large, novel, or complicated issues, commensurate with the issues related to regulation of digital assets; such public engagement would be an appropriate model to follow here.[8]

As part of this process, the Commission should also consider whether appropriately tailored interpretive guidance and no-action relief could be used to facilitate new activities within existing regulatory frameworks. Doing so will provide the Commission with an opportunity to assess the efficacy of emerging market practices with the ability to later promulgate rules, if appropriate. Any such guidance and other relief must avoid imposing new requirements or exercising policy-making authority that is more appropriately conducted through notice and comment rulemaking pursuant to the Administrative Procedure Act.

---

[7] Coinbase, *Digital Asset Policy Proposal – Safeguarding America's Financial Leadership*, (Oct. 2021), https://assets.ctfassets.net/c5bd0wqjc7v0/7FhSemtQvq4P4yS7sJCKMj/a98939d651d7ee24a56a897e2d37ef30/coinbase-digital-asset-policy-proposal.pdf.

[8] SEC, *Concept Release on Equity Market Structure* (Jan. 14, 2010), https://www.sec.gov/rules/concept/2010/34-61358.pdf; SEC, *Concept Release on the U.S. Proxy System* (July 14, 2010), https://www.sec.gov/rules/concept/2010/34-62495.pdf.

It is imperative that the Commission start this process now. Digital asset securities have not yet been widely offered on regulated platforms because the existing rules do not accommodate them. Until the Commission provides regulatory certainty and a workable framework for digital asset securities, it is not feasible for market participants to "come in and register."[9] And the inability to do so risks not only stunting the development and growth of this market, but also invites those least committed to regulatory compliance to exploit existing ambiguities.

If the U.S. fails to act alongside the efforts of other jurisdictions, global market practices will conform to rules tailored to the preferences of foreign authorities. And once market participants begin implementing foreign rules, the regulatory options available to the Commission will become more limited in order to avoid substantially raising compliance costs of U.S. firms operating internationally.  The U.S. has historically been the world's leader in maintaining and regulating unparalleled capital markets; action is needed to preserve that position for the digital asset securities market.

As the only U.S. public company that operates a digital asset trading platform, Coinbase understands the value of market oversight through clear and workable regulation, and we welcome opportunities to work with policymakers to build a safe, open, and fair crypto ecosystem. We believe appropriately tailored regulation is essential to encouraging capital formation in the digital asset industry, protecting digital asset customers and investors, and facilitating the wider adoption of digital asset technology. We do not currently trade or facilitate trading in digital asset securities because of a lack of clear and workable regulation. But we would consider doing so through our SEC-registered securities broker-dealer subsidiaries[10] once rules are in place that can accommodate the technological manner in which digital asset securities would be offered, sold, traded, custodied, and cleared.

In petitioning the Commission for rulemaking we recognize that existing regulatory questions will be challenging to solve. We know because we have spent more than a year thinking about how to do it. Last October we published a set of principles that we believe should underpin a regulatory framework.[11] And now we offer views on a set of detailed questions that we believe should be answered as part of the process necessary to implement an effective regulatory framework for digital asset securities that promotes the SEC's mission, achieves key regulatory objectives, and encourages innovation that benefits market participants.

Our petition focuses only on areas in which we believe we have expertise, and should not be viewed as a comprehensive list of issues and questions related to the regulation of digital asset securities. For example, regulation pertaining to the Investment Company Act of 1940 and the Investment Advisers Act of 1940 would benefit from consideration through a similar process that solicits the input from knowledgeable market participants. We encourage the Commission to initiate a process to solicit input from areas of the market not covered by our petition.

---

[9]  Gary Gensler, *Prepared Remarks of Gary Gensler On Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022), https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422.

[10] Coinbase Securities, Inc. and Coinbase Capital Markets Corp.

[11] See, e.g., Coinbase's Digital Asset Policy Proposal (#dApp) at https://assets.ctfassets.net/c5bd0wgjc7v0/7FhSemtQvq4P4yS7sJCKMj/a98939d651d7ee24a56a897e2d37ef30/coinbase-digital-asset-policy-proposal.pdf.

**Key Considerations**

There are three primary challenges when applying existing rules to digital asset securities:

1. Lack of clarity regarding how to determine whether a digital asset is a security;

2. Requirements that are fundamentally incompatible with the operation of digital asset securities; and

3. Requirements that are technically possible, but unnecessary or overly burdensome as compared to potential alternative and more efficient rules.

Although Coinbase, and other digital asset trading venues, have identified a number of digital assets that are clearly not securities, and therefore may trade without SEC registration, there are other assets that are harder to classify relying on the SEC's application of the *Howey* and *Reves* tests. Many of the questions we ask below highlight the challenge of identifying which of these digital assets, if any, fall within the Commission's jurisdiction, the lack of clarity with existing regulatory requirements, and the ways in which the existing regulatory requirements are fundamentally incompatible with the operation of digital asset securities.

Other questions reflect requirements for which compliance is possible, but otherwise not well-suited to digital asset securities premised on distributed-ledger technology. For example, custody requirements contemplate a broker-intermediated model—such as national securities exchanges use today—that is unnecessary for real-time settlement on blockchains. Each of the questions is also fundamentally tied to the determination of whether a digital asset is a security. Certainty on the applicable regulatory framework would not only provide greater protection for investors, but also permit the formation of an efficient digital asset market environment.

Finally, in addressing these questions, we believe the Commission should consider the following:

*1. Not All Digital Assets Are Securities*

Most digital assets are designed to enable simple functions that provide economic gates to commercial applications and services. They are not securities. Their value is determined by adoption and use, and the disclosures that token holders need are materially different from those of a public company. The issuer registration, disclosure, and listing requirements for securities are currently tailored to the issuers of debt and equity in public companies. But most digital assets—coins and tokens that trade on exchanges like Coinbase—do not represent ownership stakes in complicated public companies or pay a return to investors through dividends or interest.

The Commission should provide clarity regarding which digital assets, if any, are securities.The lack of clarity creates a risk that issuers of non-security digital tokens will feel compelled to comply with public company reporting requirements that are unnecessary, may lead to investor confusion, and may render innovative blockchain projects not economically viable despite the value they could bring to users and the broader economy.

*2. Needed Disclosures Are Different*

The SEC disclosure regime has historically focused on ensuring that investors have material information necessary to make an informed investment decision. Current disclosure

requirements, however, do not cover a number of features unique to digital assets that would undoubtedly be considered important when making an investment decision. For example, investors would likely find information about the risk of a network attack, what kind of governance rights are embedded in which tokens, who has the ability to change the code underlying the assets or the network, and other features that do not exist with respect to traditional securities to be material. Additionally, investors would benefit from comparable disclosures across each digital asset security to assist in identifying differences among investment opportunities. At the same time, the operations of a digital asset issuer are typically less complex than those of a large public company, so investors would likely not require the same level of disclosure in several areas relevant to traditional public companies to make an informed decision.

3. *Real-Time Settlement of Financial Transactions is Possible*

Digital assets and blockchain technology hold the promise of a more efficient and resilient plumbing for financial transactions. This new infrastructure is being built, from the start, to enable peer-to-peer operability with straight-through-processing between different types of service providers. The decentralized structure prevents any one service provider from being the sole gate between market participants. The result is enhanced competition, more seamless services, faster settlements, greater transparency, and the opportunity to automate complex financial transactions. The opportunity to eliminate unnecessary gates and layers of intermediation should ultimately lead to enhanced investor protections (for example by improving market transparency by recording transactions on a public blockchain), improved functionality, and lower transaction costs.

Today's rules, however, do not allow for securities markets to take advantage of these improvements. For example, existing custody rules do not contemplate real-time settlement of transactions on blockchains. They are tailored for trades that typically take two days to settle through a series of intermediaries who must manage default during that period. Real-time settlement on blockchains obviates this need, allowing counterparties to redeploy their capital immediately, improving the allocative efficiencies of markets relative to current practices. Other rules, particularly those promulgated by Regulation National Market System ("NMS"), do not contemplate digitally native securities, and do not provide a clear compliance path for blockchain transactions.

4. *Fewer Market Intermediaries Are Required*

Another important innovation of digital asset markets is the ability to conduct reliable transactions without the need for third-party intermediaries. Trading platforms like Coinbase offer direct access to both retail and institutional traders, letting them execute transactions 24 hours a day, seven days a week. However, rules designed for securities markets trading predate blockchain technology, when the only way to create trust in the financial system was to require the use of separate intermediaries, such as brokers, custodians, exchanges, market makers, transfer agents, and clearing agencies, each with conflicting interests and incentives. Ensuing regulations were premised on the existence of, and need to regulate these intermediaries, enshrining them and their role in law.[12]

---

[12] For additional exploration of the existing regulatory framework, and why it is not properly tailored for digital asset markets, *see* Coinbase's Digital Asset Policy Proposal (#dApp) at https://assets.ctfassets.net/c5bd0wqjc7v0/7FhSemtQvq4P4yS7sJCKMj/a98939d651d7ee24a56a897e2d37ef30/coinbase-digital-asset-policy-proposal.pdf.

Historical intermediation models should be permitted where they continue to add value, but not required when they do not or other methods achieve the same goal. For example, intermediaries should not be required when a transaction can be completed through alternative technological means that achieve the same regulatory objective. Just as regulatory and legislative developments were necessary to address the transition from a paper-based financial system to a computer-based system, a modernization effort is needed today to address the novel features and benefits of blockchain technology.

## Key Questions

Each of these goals cannot be achieved without rethinking and reframing specific parts of existing securities regulation so that it is more efficient and effective for digital asset securities in the context of distributed-ledger technology.  In the following sections, we provide an outline to frame the topic and follow with a number of questions that we believe are important to consider as part of any rulemaking exercise. We have views with respect to each and over time will seek to further share our perspectives. We strongly encourage other market participants to do the same. Our "answers" are just one of many relevant voices, and we hope for and expect a robust discussion that productively informs the Commission and its Staff.

### I.    Classification of Digital Assets as Securities

The threshold question in the development of a regulatory framework for digital asset securities is the determination of whether a particular digital asset is in fact a security, and thus subject to the Commission's jurisdiction and the securities laws.[13] The Commission has taken the view that if a digital asset is a security, its regulatory oversight applies to all aspects of the lifecycle of the security and the parties that are involved in it, including the initial offering of that digital asset as well as any subsequent trading by investors and their dealings with intermediaries.[14]

The determination of whether a non-traditional asset (such as a digital asset) is a security relies heavily on legal tests developed by case law and ultimately Supreme Court decisions. Where the characteristics of an instrument do not clearly fit into one of the well-settled terms, the SEC and federal courts typically analyze whether the instrument is a "security" through the lens of the

---

[13] A "security" is defined in the federal securities laws by reference to lists of instruments that include, for example, stocks and notes like bonds issued by companies. *See* Section 2(a)(1) of the Securities Act (defining a security as "[A]ny note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim.") Despite differences, the Supreme Court has indicated that the definitions of "security" under the Securities Act and the Exchange Act are treated the same. *SEC v. Edwards*, 540 U.S. 389, 393 (2004), citing *Reves v. Ernst & Young*, 494 U.S. 56, 61 n.1 (1990). In addition, the "elements of *Howey* are also applicable to the [Investment Company Act]." *SEC v. Banner Fund Int'l*, 211 F.3d 602, 614 n.* (D.C. Cir. 2000).

[14] *See* U.S. Sec. & Exch. Comm'n, Chair Gary Gensler Letter to Sen. Warren (Aug. 5, 2021), https://www.warren.senate.gov/imo/media/doc/gensler_response_to_warren_-_cryptocurrency_exchanges.pdf.

*Howey*[15] and *Reves*[16] tests. However, these tests were developed before the emergence of digital assets and are not tailored to their unique properties and use.  As a result, application of these existing tests to digital assets fails to take into account the unique characteristics of digital assets.

The differences between traditional securities and digital assets underscore the challenges with applying these tests to digital assets. While traditional securities typically represent a claim to the assets and profits of a specific corporate issuer, whose management makes choices that influence the success of the company and therefore the return on investment in its securities, digital assets often have decentralized groups of developers whose involvement with a project may ebb and flow over time. The extent to which digital asset holders reasonably rely on the efforts of particular promoters, or the extent to which those efforts are "undeniably significant ones"[17] is much less clear with regard to digital assets.

Further, while many may purchase digital assets with the hope of price appreciation, unlike traditional securities, digital assets typically have functional non-investment uses within a protocol—making them much more akin to real property, which is also often purchased with the hope of price appreciation, but nevertheless is fundamentally a commodity intended for usage.[18] Non-investment use cases include, for example: paying transaction, or "gas" fees; voting on governance proposals related to the operation of the protocol; serving as a medium of exchange for native applications; and helping secure a network.

Coinbase has developed a rigorous process to analyze and review each digital asset, before making any digital asset available on its platforms. These processes ensure that Coinbase is not facilitating transactions in or providing trading infrastructure for digital asset securities. Due to today's substantial regulatory uncertainty, Coinbase is over-inclusive in what it views as a potential security, out of an abundance of caution to ensure that its practices comply with existing applicable law. Coinbase therefore often excludes digital assets based on the mere possibility that they might be securities.

Not all market participants have the resources to apply the same rigorous process. This in turn can result in significant burdens in meeting the Commission's expectation that each market participant conduct and document its own legal analysis for each and every digital asset with which it interacts.[19]

Applying the *Howey* and *Reves* tests piecemeal to an entire market sector has proven itself to be an unworkable solution. The SEC needs to provide clarity on the question of what, in the context of digital assets, constitutes a security. This may be achieved by defining a digital asset security through rulemaking, through the creation of a digital asset security offering exemption, or through other regulatory actions.  In particular, such a rule should be objective and clear such that it

---

[15] *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946) (resulting in the so-called "*Howey* test").

[16] *Reves v. Ernst & Young*, 494 U.S. 56 (1990) (resulting in the so-called "*Reves* test").

[17] *SEC v. Glenn W. Turner Enter., Inc.*, 474 F.2d 476, 482 (9th Cir.).

[18] *Cf. United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

[19]*See* SEC Strategic Hub for Innovation and Financial Technology Letter to the New York State Department of Financial Services (Jan. 27, 2020), https://www.sec.gov/files/staff-comments-to%20nysdfs-1-27-20.pdf ("Market participants should not rely on a model framework, whitelist, or state license when evaluating compliance with the federal securities laws – without also undergoing careful legal analysis under the federal securities laws" supported by, for example, "opinion[s] of securities counsel.").

produces predictable, consistent and replicable results, and can be applied by all market participants.

For example, the rule should address, consistent with applicable case law, when an "investment of money" has or has not occurred. If the SEC is of the view that airdrops (i.e., digital assets provided free of payment) constitute an investment of money—a position that is likely irreconcilable with case law[20]—it should clearly state that position and clarify in which circumstances that would be the case. Similarly, unlike traditional securities whose sole purpose is to represent an investment, digital assets often provide functionality, utility, or a consumptive use, aside from any speculative value. The Supreme Court has noted that "when a purchaser is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply."[21] Further, even if the value of an asset, like a dwelling or precious metal, may appreciate, and even if some purchasers may purchase the asset with speculative intent, that does not necessarily convert the consumable asset into a security. The proposed SEC rulemaking therefore should be explicit, in the digital asset context, as to the Commission's view on how the presence or lack of functionality, consumability, and/or utility of the digital asset impacts (and negates) its status as a security.

Given the complexity of the issue, the Commission should seek public input on the classification of digital assets as securities in advance of, or as part of, any proposed rulemaking related to these issues.

*Key questions for the Commission to consider and seek public input on*:

1) Are the *Howey* and *Reves* tests the appropriate tests for determining whether digital assets are securities?

   a) What risks were these tests designed to identify and are those risks consistently presented in digital asset securities?

   b) How should the use and utility of a digital asset, apart from any potential investment purpose, impact the analysis?

   c) Are these tests capable of consistent application to digital assets by issuers, intermediaries, and other market participants? Does this application lead to results that are conducive to advancing the SEC's mission and promoting innovation? Does the application of the *Howey* and *Reves* tests to the specific facts and circumstances of each

---

[20] *SEC v. Rubera*, 350 F.3d 1084, 1090 (9th Cir. 2003), quoting *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). While in the context of analyzing whether a "sale" of a particular security occurred, there may be arguments that any form of benefit to an issuer could be sufficient consideration to constitute a sale subject to Section 5 of the Securities Act. *See, e.g.*, SEC, SEC Brings First Actions to Halt Unregistered Online Offerings of So-Called "Free Stock" (July 22, 1999), https://www.sec.gov/news/headlines/webstock.htm. The question under *Howey*, however, is whether the asset is a security in the first place, which requires there to be an investment of money, not that the distribution of the asset provided a non-monetary benefit to the issuer. See also Joseph A. Hall, Howey, Ralston Purina and the SEC's Digital Asset Framework, 52 REV. OF SEC. & COMMODITIES REG. 137 (June 19, 2019), https://www.davispolk.com/files/howey_ralston_purina_sec_digital_asset_framework.pdf (questioning the Digital Asset Framework's "seemingly contradictory" assertion that the "investment of money" prong of *Howey* can be satisfied without an investment of money).
[21] *United Hous. Found., Inc. v. Forman*, 421 U.S. 837, 849 (1975).

digital asset result in inefficient markets, an inconsistent application of the law, and/or other adverse consequences?

2) Should the SEC use its exemptive authority under Section 28 of the Securities Act of 1933 (the "Securities Act") and Section 36 of the Securities Exchange Act of 1934 (the "Exchange Act") to exempt certain transactions (e.g., those for consumptive use) in certain digital assets that may otherwise be securities but for which—for the reasons explained in the remaining sections of this petition—the existing regulatory regime is inappropriate?[22] If such transactions are exempted, should an alternative regime be applied and what should that regulation look like?

  a) Should the Staff reconsider the view in the Digital Asset Framework that receipt of tokens without investing money may nonetheless satisfy the "investment of money" prong under *Howey*?

    i) If not, how does the Staff reconcile this position with existing case law, which requires a recipient to "commit his assets to the enterprise in such a manner as to subject himself to a financial loss"?[23]

  b) How should digital assets that provide significant non-investment use cases (e.g., paying transaction, or "gas" fees; voting on governance proposals related to the operation of the protocol; serving as a medium of exchange for native applications; and helping secure a network) be analyzed under the "reasonable expectation of profits" prong of *Howey*?

    i) Would a finding that such digital assets satisfy this prong conflict with Supreme Court precedent, which has stated that where a purchaser is not "'attracted solely by the prospects of a return' on his investment . . . [but] is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply"?  More generally, how should "consumption" factor into the investment contract analysis, giving due regard to the Court's decision in *United Housing v. Forman*?[24]

    ii) How should market participants regard digital assets that provide both investment uses and non-investment-based consumptive uses, in light of *Howey* case law that explains the existence of speculative purchasers of an asset and the potential to sell an asset for more than you paid for it does not, on its own, mean that the asset is an investment contract under *Howey*?

---

[22] Section 28 of the Securities Act provides that "[t]he Commission, by rule or regulation, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this subchapter or of any rule or regulation issued under this subchapter, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors." Section 36 of the Exchange Act provides that, subject to certain exceptions inapplicable here, "the Commission, by rule, regulation, or order, may conditionally or unconditionally exempt any person, security, or transaction, or any class or classes of persons, securities, or transactions, from any provision or provisions of this chapter or of any rule or regulation thereunder, to the extent that such exemption is necessary or appropriate in the public interest, and is consistent with the protection of investors."

[23] *See supra* note 19.

[24] 421 U.S. 837.

     iii)  How should the "efforts of others" prong of the Howey test be understood with respect to the "expectation of profits" prong?  How relevant is the presence of price fluctuations on secondary trading platforms to the *Howey* analysis, given that the price may fluctuate based on the supply and demand of the digital asset for its consumptive use?

     iv)  How should the "expectation of profits" prong be understood to ensure that it does not include digital commodities, where even if bought by a particular buyer with the hope of profit, any such profit is based on supply and demand for the commodity, not the performance of the issuer?

  c)  What efforts may be properly classified as "essential managerial efforts" for digital assets that operate on permissionless blockchains or protocols, where independent, unaffiliated nodes are responsible for processing transactions, securing the network, and approving software implementations, or where such separate parties may be involved in proposing or implementing changes to the network or system?

     i)  How can purchasers be reliant upon the efforts of others in the case of digital assets that have no identifiable central party that could be recognized as an "issuer"?

3)  Recognizing the importance of creating a predictable framework for market participants, how can the SEC provide greater clarity and certainty on which digital assets constitute securities? Should the Staff revisit the Digital Asset Framework and provide bright-line rules that could be applied more consistently and predictably?

4)  Following a reconsideration of, or an exercise of exemptive authority for, the application of the *Howey* and *Reves* tests to digital assets, should the SEC conduct formal or informal public evaluations, such as through a no-action letter or other consultative process, to decide whether a digital asset is a security? Who should be able to seek, and rely on, such a determination?

5)  Should other parties, such as the original promoters, be able to make similar determinations that—absent a formal disagreement from the SEC—third-party market participants could rely on?  Should those determinations have to follow a particular process?  If so, should there be a timeline during which the Commission must respond?

6)  Should a digital asset be viewed independently from the transaction in which it was initially sold—such that the sale may have been a securities transaction, but the asset is not a security? In a traditional company, the company may produce a product that it sells, and from which it derives its profits.  The shareholders share in these profits.  A digital asset issuer, however, may sell its tokens to raise capital to develop the network on which those same tokens will be used.  The product and the security are represented by the same digital asset, creating a unique coincidence of investment, on the one hand, and use and consumption, on the other.

7)  Does the current manner in which the *Howey* test is applied result in or promote the maintenance of fair, orderly, and efficient markets consistent with the SEC's tripartite mission?

8) Does the current manner in which the *Howey* test is applied result in sufficient certainty and consistency to protect investors in a manner that is consistent with the SEC's jurisdiction and tripartite mission?

9) Does the current manner in which the *Howey* test is applied result in sufficient certainty and consistency to facilitate capital formation in a manner that is consistent with the SEC's jurisdiction and tripartite mission?

10) In practice, how does a digital asset security transition to be a non-security digital asset? What constitutes "sufficient decentralization" for purposes of transitioning from a security to a non-security?[25] How would that determination be made and what would be the mechanism for converting a digital asset from a security to a non-security?

   a) Is there a difference, or should there be one, depending on whether the digital asset was initially sold in an offering that did not comply with the federal securities laws, or was instead initially sold pursuant to a registration exemption (such as Regulation D or Regulation S)?

   b) Must the path to sufficient decentralization be predetermined at the time of the digital asset's launch, or may decentralized attributes be introduced over time?

11) Even if initially sold in a securities offering, can uses of a digital asset for non-investment purposes (e.g., to use the asset for its actual technological purpose), including transactions on the secondary market to acquire the digital asset for such non-investment purposes, be deemed to be non-securities transactions?

## II.   Issuance of Digital Asset Securities

### A.   Registration and Exemptions

The federal securities laws require that the offer or sale of any security be registered with the Commission, unless an exemption is available.

Registration under Section 5 and Section 12 must be sought by the issuer of the security.[26] Given the nature of digital securities, however, it may not be either feasible or necessary to identify an "issuer" as required under the securities laws.  When an issuer registers an offering, it provides a number of disclosures about the operation of the issuer, its financial statements, its leadership, what risks it may face, and information about various other parts of the business.  The purpose behind registration, and therefore requiring these disclosures, is to ensure that investors have the material information they need to make informed decisions.  The insiders of the issuer, such as management, have information about the issuer that will affect the value of its securities and therefore the disclosure rules require the insiders to make material information public.

---

[25] William Hinman, *Digital Asset Transactions: When Howey Met Gary (Plastic)* (Jun. 14, 2018) https://www.sec.gov/news/speech/speech-hinman-061418 (expressing the view that "current offers and sales of Ether are not securities" because Ether had become "sufficiently decentralized.").

[26] *See, e.g.*, Form S-1, Form 10 (each requiring execution by a representative of the prospective registrant).

In many cases, however, the value of a digital asset—unlike the value of stocks and bonds—is not dependent on the operations of the issuer or the issuer's financial condition. Rather, the value of a digital asset routinely depends on the general supply and demand for using the digital asset. In such cases, there is little information possessed by the issuer that is unavailable to the public or that impacts the value of the digital asset, making traditional securities disclosures about the issuer irrelevant to holders of digital assets. In fact, the typical information that the federal securities laws require public companies to disclose presents the risk of misleading investors in digital assets, who may believe this information to be material to their investment decision because the SEC mandated its disclosure.

There are, additionally, digital assets that are created or managed by a diffuse group of individuals, who are not a central "team" at all. Some digital assets are developed by dispersed groups of individuals who may not even know each other's true identities. Current application of existing securities regulations may treat this group as the "issuer" but there is little insider information that this group has, and requiring them to coordinate and assume liability for disclosures would be both impracticable and futile.  In such circumstances, the kind of information asymmetries that the federal securities laws are designed to remedy do not exist.[27]

Mandated disclosures serve a regulatory purpose when there is material information to be pushed out into the market.  A diffuse collection of individuals may not have such information to disclose.  The SEC's Digital Asset Framework suggests that these dispersed groups may be "Active Participants," or "APs," whose efforts are relevant for determining whether the digital asset is itself a security. But the framework does not itself provide a determinative test for identifying who qualifies as an AP, or specify if these APs are subject to the registration requirements of Section 5 and Section 12.[28]

If the digital asset is a security, then failure to register would violate Section 5 and subject the "issuer" to penalties. But failure to register does not only impact the issuer—it also makes it effectively impossible for national securities exchanges and other secondary markets to lawfully facilitate trading of the digital asset security. U.S. digital asset securities markets, like on that Coinbase may develop, that seek to comply with the U.S. federal securities laws therefore may not facilitate trading in these assets; instead, trading for these assets occurs on less well-regulated and/or offshore platforms where there is little oversight or investor protections. Exceedingly few issuers have successfully registered a digital asset security under Section 5 and Section 12,[29] with many others having failed in attempts to do so.[30] As a result, very few digital

---

[27] *Hinman*, *supra* note 24.
[28] SEC Staff, Framework for "Investment Contract" Analysis of Digital Assets, https://www.sec.gov/files/dlt-framework.pdf.

[29] *See* INX Limited, *Prospectus Supplement*, https://www.sec.gov/Archives/edgar/data/1725882/000121390020023202/ea125858-424b1_inxlimited.htm.

[30] *See, e.g.*, American CryptoFed DAO, Filings, https://www.sec.gov/edgar/browse/?CIK=1881928 (SEC staff rejecting S-1 filing for "serious deficiencies" relating to requirements to comply with the form, resulting in withdrawal); Monster Products, Inc., Filings, https://www.sec.gov/edgar/browse/?CIK=1675583 (same). *See also* Carrier EQ, LLC (f/k/a Airfox), Form 8-K (noting the issuer would discontinue the development of AirTokens because "[c]urrent laws and regulatory regimes do not provide for the Company to utilize the AirTokens as envisioned by the Company. . . ."); Paragon Coin, Paragon Coin Update (explaining that the issuer was filing for bankruptcy after its "plans were impossible to achieve due to several legal mistakes"); Jamie Chacon, Gladius Network shuts down as ICO investors cry foul (Nov. 25, 2019), https://decrypt.co/12044/gladius-network-shuts-down-ico-investors-cry-foul (issuer shutting down after settling an SEC enforcement action that required the issuer to register).

asset securities are available for trading in the U.S. This is despite the fact that the lack of information that would have been mandated through the registration process would not have provided material information to the market even if the process had been successfully completed. *Key questions for the Commission to consider and seek public input on:*

12) Given the potential non-investment uses of digital assets that the Commission today seems to believe may be securities as described in Section II.A, and that digital asset securities typically operate on decentralized and open-source blockchains that are publicly accessible to all, what should be the goal of any registration regime for digital asset securities?

   a)  What risks do digital asset securities present that may not be presented by traditional securities?

   b)  What risks might digital asset securities mitigate, or not present, and how should these changes in risk profile be recognized in the kind of disclosures provided to investors?

   c)  Who, if anyone, should be responsible for registration when there is no identifiable central entity that controls the token or protocol, or when the issuer does not believe registration requirements apply?

      i)    If an entity does serve as an issuer for purposes of a registration of an offering of digital assets, how long should the "issuer" be responsible for the ongoing disclosure requirements that may be required?

      ii)   Are Active Participants responsible for these ongoing disclosure requirements? What if the persons who may be properly treated as APs change over time?

      iii)  Would such a digital asset security have a means to be offered on a regulated digital asset securities trading platform? Should that digital asset still be categorized as a security and should it be subject to SEC regulation?

      iv)   What regulatory goal would such registration accomplish?  Is there a way that regulation could be tailored to achieve this goal?

      v)    Should the concept of "active participant" exist at all?  How does it promote the goals of the federal securities laws in reducing information asymmetries?

13) Taking into consideration that a digital asset team's operations and relationship to the digital asset security may differ meaningfully from the relationship between traditional issuers and the securities they issue, for example, if they are not receiving any proceeds of an offering, should the Commission use its exemptive power under Section 28 of the Securities Act and Section 36 of the Exchange Act to exempt certain developers or promoters of digital asset securities from registration, and/or ongoing disclosure requirements if the SEC were to determine they are subject to its regulatory reach?

14) Should platforms be able to facilitate trading in digital asset securities if the initial offer or sale was not registered under Section 5, or the "issuer" of the digital asset security has not complied with the requirements of Section 12?

a) If there is no central entity that controls the token or protocol, or no one that views themselves as an issuer willing or realistically able to comply with the registration requirements, should trading platforms be permitted to facilitate the trading of the digital asset security if sufficient information about a digital asset security is otherwise available to potential investors without mandatory disclosures?

b) What responsibility and potential liability, if any, would a platform have for the accuracy and completeness of the disclosures?

15) Are digital asset "investment contract" securities "equity" securities under Section 12(g)?

16) May a broker-dealer be permitted, under certain circumstances, to facilitate the resale of digital asset securities, even if they were initially sold without registration or an available exemption?

## B. Relevant Disclosures

The existing registration process for securities offerings requires a number of disclosures designed to ensure that the market has the same material information about the company as company insiders have. There are also exemptions from registration for offerings by entrepreneurs and small companies, but they too have their own regulatory disclosure requirements. While the required disclosures are fewer and different, they rest on the same assumptions and the belief that insider information is more limited in type or scope, or that the investors participating in these exempt offerings have superior access to the insiders and their information.

Aside from the difficulties with registration, discussed in the section above, there is also a mismatch between the disclosures required for traditional securities offerings and what investors in digital asset securities need. As a result, existing disclosure requirements are not well-designed to meet the regulatory goals of ensuring that the market has the information it needs about the securities being offered or traded.

Disclosure requirements are the hallmark of the federal securities laws. Rather than judge the suitability of investments for public investors, the federal securities laws are designed to protect investors by requiring issuers to provide material information about the securities they issue, and the risks associated with investing in them, that are both accurate and not misleading.

But the Commission's disclosure requirements for the offer and sale of securities and ongoing disclosure requirements are designed for traditional corporate entities that typically issue and register equity and debt securities. The disclosure requirements under the federal securities laws focus on disclosure about companies, their management and their financial results—topics that poorly fit the decentralized and open-source nature of blockchain-based digital asset securities. Digital asset securities that are not tokenized versions of traditional securities raise different investor disclosure considerations than ordinary corporate securities. For example, even if these assets have value primarily based on the promoter's efforts, they generally do not provide holders any rights over the residual value of the issuer, or a claim on the issuer's assets. They are neither equity nor debt.

Digital assets that the SEC may claim are securities often function on decentralized protocols with many contributors, and every holder of a digital asset security can typically examine for

themselves the functionality and governance structure of the asset. As a result, the existing disclosure requirements are both under-inclusive and overinclusive of the information that is relevant to an investor in a digital asset security.[31] For example, information that may be relevant to digital asset security investors, such as its "tokenomics" (e.g., the supply schedule of the digital asset security),[32] or on-chain governance (rather than traditional boards of directors), are not specifically captured by existing disclosure requirements.[33]

The result of applying existing disclosure requirements to digital asset securities offerings would be to leave investors exposed.  They would be led to believe that information that is irrelevant is actually important to their decision, while missing several pieces of information that could significantly affect the value of the digital assets they hold.

*Key questions for the Commission to consider and seek public input on:*

17) What disclosures should be required for digital asset securities, given their different features as compared to traditional securities?

   a)  What information about the digital asset security, the underlying platform, and those responsible for the development of the digital asset security and the platform should be shared with those who are considering acquiring the digital asset security?

   b)  What existing disclosure requirements are not applicable to digital asset securities? For example, should certain disclosures required under the Williams Act and Section 16 of the Exchange Act be modified or exempted for digital asset securities?

   c)  What new disclosures should be required?

18) If it is necessary to provide those that are transacting in a digital asset security certain information about the digital asset security and related matters on an ongoing basis, how should relevant information be disclosed so that it is accessible and useful, taking into account the fact that traditional methods of disclosure may be less effective for digital asset security investors?

19) Even if the relevant assets were registered or exempt from registration, how would Rule 15c2-11 apply to broker-dealers facilitating trading in digital asset securities?[34] The same

---

[31] Chris Brummer, *Disclosure, Dapps and DeFi*, Forthcoming, Stanford Journal of Blockchain Law and Policy (Mar. 24, 2022), https://papers.ssrn.com/sol3/papers.cfm?abstract_id=4065143#:~:text=Disclosure%20in%20decentralized%20finance%20is,know%20what%20they're%20buying.

[32] *See* Robert Stevens, *What Is Tokenomics and Why Is It Important?* (Apr. 11, 2022), https://www.coindesk.com/learn/what-is-tokenomics-and-why-is-it-important/#:~:text=A%20portmanteau%20of%20%E2%80%9Ctoken%E2%80%9D%20and,like%20what%20utility%20it%20has.

[33] *See, e.g.*, Disclosure, Dapps and DeFi, *supra* note 30 ("[T]he base layer disclosure documents for securities law fail to anticipate the particular technological features of decentralized technologies and infrastructures . . . they assume and inquire only into governance, technology, and other operational features inherent to industrial economies, and which are often different, or altogether absent in digital and blockchain-based economies.").

[34] Rule 15c2-11 generally requires, before a broker-dealer may publish a quotation for a security or submit a quotation into a quotation medium, that the broker-dealer must have in its possession specified

challenges noted above with respect to registration—the difficulty in obtaining information about the issuer and the over- and under-inclusive relevancy of the information—apply to the information sought by Rule 15c2-11.

20) Should the SEC preempt state blue sky requirements under Section 18 of the Securities Act, for example, by determining that for certain transactions, investors are "qualified purchasers"? If not, given the limited number of digital asset securities that would be listed on a national securities exchange, could a secondary market develop if state-by-state qualification is required?

### III.    Trading Digital Asset Securities on National Securities Exchanges

One of the central innovations of digital asset trading technology is the ability of both retail and institutional traders to have direct access to platforms that execute transactions 24 hours a day, seven days a week. Transactions settle in real time. And broker-dealer intermediaries are no longer needed as the digital asset market infrastructure has developed so that exchange and trading services, clearing, settlement, and custody can be provided effectively and more efficiently by the same entity.

However, registering a trading platform for digital asset securities faces a series of significant challenges. Notably, Chair Gensler has suggested that such platforms should register as national securities exchanges ("NSEs"), rather than alternative trading systems ("ATSs").[35] But existing NSE regulation does not contemplate the existence of, or need for, disintermediated trading. Exchanges require membership to trade directly, and such membership is available only to broker-dealers.[36] Moreover, methods of trading securities outside of a NSE—either on ATSs or over the counter ("OTC")—also require the use of a broker-dealer. ATSs are themselves registered as broker-dealers while OTC trading is facilitated by a network of broker-dealers. None of these models is designed to accommodate direct investor access to a trading venue, which is wholly inconsistent with the current models of digital asset trading and inserts unnecessary layers of intermediation.

Another challenge with Chair Gensler's approach is that it does not contemplate the side-by-side trading, on the same platform, of digital assets securities and digital assets that are not securities. This is problematic because trading in digital assets that are securities would entail trading many that are not. Unlike traditional securities, which are typically purchased using fiat currency, given the 24/7 trading market, digital assets are often traded for digitally native currencies such as stablecoins, or a cryptocurrency like Bitcoin, which is a commodity. For example, a trader might buy U.S. dollar-backed stablecoins and then use these assets as a store of value for purchases of various other digital assets. We anticipate, given existing practices and preferences in the

---

information about the security and its issuer that it believes are reliable and materially accurate, and much of that information be publicly available.

[35] Gary Gensler, *Prepared Remarks of Gary Gensler On Crypto Markets Penn Law Capital Markets Association Annual Conference* (Apr. 4, 2022), https://www.sec.gov/news/speech/gensler-remarks-crypto-markets-040422.

[36] Under Section 6(c) of the Exchange Act, only registered broker-dealers may be admitted as members of a national securities exchange. Further, under Section 6(b) and 19(g), national securities exchanges are self-regulatory organizations ("SROs"), and are required to enforce their member broker-dealers' compliance with the securities laws. As they currently operate and under current law, it is not clear that digital asset trading platforms could comply with these requirements, nor is it clear there is a regulatory benefit of requiring that they restructure to do so.

market, that investors in digital asset securities would buy those assets in the same way, using a stablecoin or other digital store of value.

To register as an exchange, a person must first meet the definition of "exchange"—including that it brings together purchasers and sellers of *securities*.[37] Its registration must also be approved by the Commission, which must consider, by statute, whether the exchange is "so organized and has the capacity to be able to carry out the purposes of the Exchange Act."[38]  Facilitating the trading of non-security digital assets, such as Bitcoin, has not yet been recognized as furthering the purposes of the Exchange Act.  For a platform to register as a securities exchange, while also listing non-securities digital assets, the Commission may need to clarify that registered exchanges may facilitate trading in both security and non-security digital assets. Finally, securities on NSEs do not currently trade 24/7, but open and close each day through an auction process on their listing venue. They must also comply with a number of other regulations, including most notably Regulation NMS, that may require clarification before they can be easily applied to digital asset securities exchanges. Regulation NMS, for example, assumes the existence of a national market for each listed security, and imposes a number of requirements to harmonize pricing and fees across venues. Digital assets, however, trade on a global scale, with around-the-clock trading.  It is not clear how various provisions of these rules would work in a global, 24/7 market.

*Key questions for the Commission to consider and seek public input on:*

21) Recognizing the difficulties in determining which digital assets should be properly classified as securities under existing legal tests,[39] should a platform be permitted to register with the SEC as a national securities exchange on the basis that some of the assets on the platform may be securities, without making a definitive determination with regard to any particular asset?

22) If an asset-by-asset determination must be made, should a single platform be permitted to register with the SEC for trading both security and non-security digital assets?

   a) Could such a platform meet the definition of "exchange," and be organized to carry out the purposes of the Exchange Act, even for the non-securities?

   b) Would its rules relating to non-securities be subject to the same requirements as those relating to securities?

   c) Would the Commission provide exchanges with legal certainty regarding its security versus non-security determinations?

23) Could a national securities exchange facilitating trading in digital asset securities be permitted to follow the typical non-intermediary model used by existing non-security digital asset exchanges?[40]

   a) If intermediaries are required:

---

[37] Exchange Act § 3(a)(1).

[38] Exchange Act § 6(b)(1).

[39] *See supra* Section I.

[40] As discussed in Section IV.A below, this model is critical to the operation of digital asset markets and an improvement from traditional market structures.

     i)   How would this impact the viability of these platforms, particularly given the challenges of operating a broker-dealer for digital asset securities?[41]

     ii)  Would the introduction of intermediaries potentially result in increased fees for consumers?

     iii)  How could the introduction of new digital asset trading technologies provide better investor protections? How should the Commission consider these potential benefits as part of any rulemaking?

b)  If intermediaries are not required:

     i)   How would traditional exchange responsibilities, such as operating as an SRO, apply in the context of non-broker-dealer (including retail) users?

     ii)  Would more limited regulatory requirements, such as engaging in market surveillance as an operator of the market, be more appropriate?

24) Would the SEC permit a digital asset security exchange to list digital asset securities that are also traded on unregulated platforms, notwithstanding its Section 6(b)(5) concerns raised in the spot Bitcoin ETF context?

a)  If not, and given the ease in operating an unregulated trading platform and supporting digital asset securities thereon, would such a prohibition have the practical effect of applying to virtually all digital asset securities, and thereby harm investors by depriving them of any regulated platforms to acquire such assets?

25) Would the full scope of NSE requirements apply to an exchange trading digital asset securities? If so:

a)  What would be the appropriate listing standards for digital asset securities? Existing listing standards typically consider, among other things, quantitative and qualitative standards that are more relevant for corporate securities than digital asset securities.

b)  Could any national securities exchange grant unlisted trading privileges to a digital asset security listed on another exchange?

c)  The rules of NSEs generally require that all transactions effected on the exchange be cleared through a registered clearing agency; would this be required for digital asset securities? See also Section IV.D.

d)  How would the various NMS plans apply?

     i)   Should there be different NMS plans specifically designed and more appropriate for digital asset securities?

     ii)  Would the SROs need to amend their Consolidated Audit Trail rules to contemplate digital asset securities?

---

[41] *See infra* Section VI.B.

e)  Would Regulation SCI apply? How would its references to "industry standards" be interpreted—as applying to the traditional securities industry or the digital asset industry?

26) Would digital asset securities traded on an exchange be deemed NMS securities, and therefore NMS stock? NMS stock is defined as any NMS security (generally all exchange-listed securities) other than an option. If so:

a)  How would the various requirements under Regulation NMS, which are designed for traditional corporate stock and shares of stock, apply?

b)  Would there be a national best bid and offer ("NBBO") for a digital asset security?

c)  Given 24/7 markets, should non-U.S. trading platforms be included in the NBBO?

d)  What would constitute a "round lot" under Regulation NMS, where digital asset securities are not measured in "shares?" Would all orders for and transactions in digital assets that are investment contracts be "odd lots" and thus excluded from various aspects of Regulation NMS?

e)  How would Rule 611—i.e., the Order Protection Rule, which generally prohibits "trade-throughs"—and the relevant exceptions apply?

f)  What data would be required to be reported to the tape as "core data"?

g)  How would the various other reporting requirements, such as under Rules 605 and 606, which contemplate shares of stock, apply?

h)  What pricing increment(s) would be permitted under Rule 612, which prohibits sub-penny quotations for stocks priced at $1.00 or more per share?

27) How would Regulation SHO apply?

a)  Would exchange-listed digital asset investment contracts be considered equity securities for purposes of Rule 200(g), Rule 203, and Rule 204?

b)  Would exchange-listed digital asset investment contracts be "covered securities," by virtue of being "NMS stocks," for purposes of Rule 201?

### IV.    Custody of Digital Asset Securities

#### A.  Digital Asset Trading Platforms

One of the most significant innovations of digital assets is the ability to conduct "real-time" or T+0 settlement. Existing regulations regarding the custody of securities, however, make it impossible to realize this considerable benefit. While custody rules for traditional securities are appropriately motivated by a clear regulatory interest—ensuring that customers can rely on their assets being held securely—they allow trades to settle on a T+2 timeframe. This delay permits third-party intermediaries to settle transactions. But if the settlement timeframe is compressed to seconds, reliance on third parties becomes impossible.

Traditional securities are typically held on behalf of investors by a custodial bank or broker-dealer (themselves holding through the Depository Trust Company). This facilitates post-trade settlement through existing channels and permits an investor to centralize their cash and securities with third-party custodians, making trading on multiple venues more capital-efficient. However, it means that real-time settlement (i.e., "t-zero" settlement) is not possible given that the third-party custodians must facilitate post-trade settlement.

The structure of existing digital asset trading platforms is different. Real-time settlement is expected because it is inherent to blockchain technology. Transfers of digital assets do not require intermediaries. But in order to provide real-time settlement off-chain, existing digital asset trading platforms must settle transactions on their own books—as opposed to the books of third-party custodians. Digital asset trading platforms can only settle transactions on their own books if they custody the digital assets themselves, which explains the difference in market structure.

The need to provide custody services to customers means that digital asset trading platforms may wish to register as a broker-dealer, or register an affiliate as a broker-dealer.[42] For the real-time settlement model to work, all users of the platform would in turn be required to custody their assets with that custodian, through the same broker-dealer. Once again, existing rules present a roadblock.

First, real-time settlement means that clearing is not necessary. Clearing exists because there is a risk that, between the time the trade is made and when it settles, one party may fail to deliver either the money or the assets. That risk diminishes as the time lag disappears.  Without the risk created by the time lag between execution and settlement, many of the rules related to clearing may not be necessary.  On the other hand, new rules may be required to account for a unique feature of the blockchain—that entries are immutable. Whereas traditional markets can unwind transactions that are completed in error, fraudulently, or without proper authorization, this is not possible with digital asset securities. Reversing a transaction would require a new transaction.

The direct-trading model, and its need for exchange-based custody, also raises questions under Section 6(b)(2) of the Exchange Act, the "fair access" rule.  This rule generally requires exchanges to allow any broker-dealer to become a member. This requirement may prohibit a digital asset security exchange from limiting membership to that one broker-dealer (i.e., itself or its affiliate). The alternative, admitting several broker-dealers as members that each separately handle custody of its own customers' securities, again prevents real-time settlement because it would require the introduction of post-trade netting and a clearing agency (to settle all of the trades of the various brokers).  If digital asset platforms register as exchanges, they must, under current rules, allow other brokers to access the platform. This requirement has the effect of requiring clearing, and therefore eliminating the ability to effectuate real-time settlement, which was the purpose of the exchange custodying assets in the first place.

---

[42] Although "mere custody" of securities, on its own, may not itself require a firm to register as a broker-dealer, the Commission and its Staff have regularly viewed custody combined with transaction execution or other services as potentially requiring registration under Section 15(a). *See, e.g.,* Transfer Online, SEC Denial of No-Action Request (May 3, 2000) (transfer agent may be subject to broker-dealer registration when, in addition to custody services, it brings buyers and sellers of securities together, receiving a fee based on the completion of a transaction); M&A Brokers, SEC No-Action Letter (Jan. 31, 2014); GlobalTec Solutions, LLP, SEC No-Action Letter (Dec. 28, 2005); Swiss American Securities, Inc., Streetline, Inc., SEC No-Action Letter (in each case, granting relief from broker-dealer registration where the proposed services did not also include custodying investors funds or securities).

Additionally the SEC has traditionally been hesitant to allow an exchange, or an affiliate of an exchange, to act as a full-service broker for customers on the exchange because of (i) the potential unfair advantage that one broker-dealer would have, and (ii) conflicts of interest the exchange would face in regulating its affiliated broker-dealer member.[43]  When there are only a handful of large exchanges, these concerns are valid.  In the digital assets markets, however, because trading platforms also serve as custodians and because most trades occur directly, without an intermediary, the competition for customers is between exchanges, not between brokers.  This structure, in which customers trade directly on the platform, also significantly mutes any risk that a platform could provide undue advantage to its own broker-dealer; the broker and the platform operate as one service for the customer.  It is a fundamentally different business model and therefore presents a different set of risks, necessitating a different regulatory regime.

*Key questions for the Commission to consider and seek public input on:*

28) Can a digital asset securities exchange provide custody of digital asset securities without also being subject to registration as a broker-dealer?

29) If broker-dealer registration would be required, would a digital asset securities exchange be permitted to limit membership to one affiliated broker-dealer?

30) Would a digital asset securities exchange be permitted to custody both digital asset securities and non-security digital assets?

31) Given the differences in business models between traditional securities markets and digital asset markets, what risks might be presented by a digital securities trading platform that do not exist for traditional platforms or exchanges?  What risks exist for traditional trading venues that would not exist for digital asset security trading venues?

### B.  Broker-Dealers

Custody rules present a second major hurdle for digital asset securities markets.  As noted above, custody requirements embrace the traditional intermediated model, and provide detailed requirements for how intermediaries may safeguard customer assets, making them difficult to apply to digital asset markets.  But these requirements are based on the assumption that assets–or more accurately the proof that a person holds the asset–takes a certain physical form.  Proof of ownership of digital assets is represented differently.  The Commission has not yet put

---

[43] *See, e.g.*, Order Approving Proposed Rule Change by the Pacific Exchange, Inc., as Amended, and Notice of Filing and Order Granting Accelerated Approval to Amendment Nos. 4 and 5 Concerning the Establishment of the Archipelago Exchange as the Equities Trading Facility of PCX Equities, Inc., Exchange Act Release No. 44983  (Oct, 25, 2001) ("The Commission recognizes that the potential for unfair discrimination may be heightened if a national securities exchange or its affiliate owns or operates a broker dealer. This is because the financial interests of the national securities exchange may conflict with its responsibilities as an SRO regarding the affiliated broker-dealer. For this reason, the national securities exchange must not serve as the self-regulatory organization that is primarily responsible for examining its affiliated broker-dealer.  Moreover, a conflict of interest would arise if the national securities exchange (or an affiliate) provided advantages to its broker-dealer that are not available to other members, or provided a feature to all members that was designed to give its broker-dealer a special advantage"). The Commission has also required national securities exchanges to implement rules prohibiting such exchanges from being affiliated with a broker-dealer member without prior SEC approval. *See, e.g.*, New York Stock Exchange Rule 2B; Nasdaq Stock Market, General Rule 2, Section 4(a); Cboe BZX Exchange Rule 2.10.

forward a workable means of achieving the regulatory goal of broker-dealer custody rules: ensuring that customer assets are securely held while facilitating the trading in which customers wish to engage.

Rule 15c3-3, known as the "Customer Protection Rule," is central to this issue. The rule requires that a broker-dealer maintain "physical possession" or "control" over customers' fully paid and excess margin securities in particular ways set out in the rule, such as by holding the paper security certificate (physical possession) or holding through a bank or clearing agency (control). Rule 15c3-3, originally adopted in 1972, does not list holding blockchain private keys as a permitted method of physical possession or control, and the SEC Staff's general position has been that holding blockchain private keys does not qualify as good physical possession or control.[44]

Rather, the staff has suggested that broker-dealers effectively must avoid becoming subject to the rule, by only facilitating transactions in digital asset securities that do not involve the broker-dealer maintaining custody.[45] Furthermore, even though, by its terms, Rule 15c3-3 applies to cash and securities, the Staff has suggested that broker-dealers would be required to comply with the possession or control obligations even when custodying digital assets that are not securities.

The SEC has attempted to provide a path forward.  These attempts, however, are time-limited, not enshrined in final rules, and have ultimately proved not to be workable. In September 2020, the SEC Staff approved a process by which ATSs could facilitate transactions in digital asset securities, where custody is maintained by a third-party custodian (the "Three-Step No-Action Letter"),[46] and in December 2020, the Commission released a time-limited conditional no-action position related to broker-dealer custody of digital assets (the "Commission No-Action Position").[47] Both documents required significant limitations on the business activities of broker-dealers who custody digital assets, and do not present a workable solution.  We are not aware of any firms that have sought to rely on the Commission no-action position. As a result, even if a digital asset security exchange were to adopt a broker-intermediated model, there appear to be *no* broker-dealers that could act as members because of Rule 15c3-3 and the limitations of the SEC's current "special purpose" digital asset security custody position.[48]

As part of issuing its December 2020 no-action position, the Commission requested comment from the public on its approach.[49]  Despite receiving dozens of comment letters in response to its request, the Commission has not revised its position or used these comments to inform

---

[44] SEC, *Joint Staff Statement on Broker-Dealer Custody of Digital Asset Securities* (July 8, 2019), https://www.sec.gov/news/public-statement/joint-staff-statement-broker-dealer-custody-digital-asset-securities (the "Joint Staff Statement").

[45] *Id*.

[46] FINRA, SEC No-Action Letter at 2 (Sept. 25, 2020), https://www.sec.gov/divisions/marketreg/mr-noaction/2020/finra-ats-role-in-settlement-of-digital-asset-security-trades-09252020.pdf.

[47] Custody of Digital Asset Securities by Special Purpose Broker-Dealers, Exchange Act Release No. 34-90788, 86 Fed. Reg. 11,627 (effective Apr. 27, 2021), https://www.sec.gov/rules/policy/2020/34-90788.pdf.

[48] *See, e.g.*, Hester M. Peirce, Statement, *In the Matter of Poloniex, LLC* (Aug. 9, 2021), https://www.sec.gov/news/public-statement/pierce-statement-poloniex-080921 (noting the limited usefulness of the SEC's no-action relief).

[49] Commission No-Action Position, *supra* note 46 at 16–17.

rulemaking.[50]  We urge the Commission to reengage on this issue to find a workable solution that provides robust customer protection while also enabling investors to access the digital asset securities markets.

Broker-dealers are also subject to Rule 15c3-1, known as the "Net Capital Rule." The Net Capital Rule is designed to ensure that broker-dealers maintain sufficient unencumbered, liquid capital available at all times to satisfy customer claims promptly. A broker-dealer's net capital is calculated by starting with its net worth under generally accepted accounting principles ("GAAP"),[51] and then making various adjustments prescribed by the rule, in particular, deducting non-allowable assets such as those not readily convertible into cash.[52] While customer assets custodied by a broker-dealer are typically not recorded on a broker-dealer's balance sheet, recent SEC Staff guidance ("SAB 121")[53] announced the SEC accounting Staff's view that certain entities that hold custody of customers' digital assets should account for their obligation to safeguard the digital assets by recording (i) a liability on their balance sheet for their obligation to return the digital assets, and (ii) an offsetting asset "similar in nature to an indemnification asset," but "separate and distinct from the crypto-asset itself"—i.e., essentially a "stub" accounting entry.[54]

While by its terms aimed at issuers of securities and SEC reporting companies, it is not clear the extent to which the SEC Staff would view SAB 121 as applicable to broker-dealers that hold custody of digital asset securities for customers, where those broker-dealers are not issuers or reporting companies.[55] If SAB 121 applies to a broker-dealer's financial accounting, all digital assets and digital asset securities custodied by a broker-dealer for its customers would be added to the broker-dealer's liabilities, thus decreasing the broker-dealer's net worth under GAAP. And on the other side of the balance sheet, although the broker-dealer would be able to add some type of offsetting stub asset entry, such an asset would likely be deemed "not readily convertible into cash" under the Net Capital Rule, as there is no market for this accounting stub. For purposes of computing a broker-dealer's net capital, therefore, its liabilities would increase by the fair value of the digital asset securities held in custody, while its allowable assets would not increase by a corresponding amount. Accordingly, for every dollar worth of digital asset securities custodied, the broker-dealer would have a dollar reduction in its net capital, which the broker-dealer would need to replace with allowable assets. In effect, the parent company of the broker-dealer would need to contribute a dollar of cash as additional equity into the broker-dealer for every dollar worth of digital asset security custodied by the broker-dealer. Such a business model would, of course, be non-economic and unsustainable, and no broker-dealers would be able to offer custody services in digital asset securities.

*Key questions for the Commission to consider and seek public input on:*

32) Is it practical for digital asset security trading platforms to operate in a non-custodial manner as suggested by the Joint Staff Statement or the Three-Step No-Action Letter?

---

[50] SEC, *SEC Policy Statement: Custody of Digital Asset Securities by Special Purpose Broker-Dealers* (last modified May 3, 2022), https://www.sec.gov/comments/s7-25-20/s72520.htm.
[51] See Exchange Act Rule 15c3-1(c)(2) and Interp. /01.
[52] See Exchange Act Rule 15c3-1(c)(2)(iv).
[53] SEC, Staff Accounting Bulletin No. 121, https://www.sec.gov/oca/staff-accounting-bulletin-121.
[54] Id. at n.8.
[55] SAB 121 by its terms applies to "crypto-assets," which would appear to include digital asset securities, as SAB 121 defines the term broadly as "digital asset[s] that [are] issued and/or transferred using distributed ledger or blockchain technology using cryptographic techniques." *Id.* at n.3.

33) How should "possession" and "control" be understood with regard to custody of digital asset securities?

34) Should banks or trust companies, to the extent permitted to provide custody services pursuant to their applicable regulatory regime, be eligible to act as "good control locations" through which broker-dealers could maintain custody of their customers' digital asset securities (and non-security digital assets) in compliance with Rule 15c3-3?

   a) Under the existing Customer Protection Rule, banks can serve as good control locations for securities under Rule 15c3-3;[56] is there any basis to treat digital asset securities custodied with a bank differently?

35) How should Rule 15c3-3 be amended to explicitly consider its application to digital assets?

36) What protections or structures would be appropriate to adequately protect customers in the event of the insolvency of a broker-dealer that custodies digital assets for customers (whether securities or not)?

37) Should non-security digital assets be subject to Rule 15c3-3 at all, given that they are neither cash nor securities?

38) What best practices exist for the custodying of digital assets that should be adopted as requirements through securities regulation?

39) What benefits does distributed ledger technology offer with respect to transparency of transaction activity that might address risks addressed through regulation for traditional securities?  What new risks does the technology introduce regarding mistaken or unauthorized transactions, and how can these risks be mitigated through regulation?

40) How should Rule 15c3-1 be amended to explicitly consider its application to digital assets, including with regards to digital assets held by customers, in inventory, or used as collateral?

41) If a broker-dealer holds custody of digital asset securities, would SAB 121 apply to the broker-dealer's capital requirement calculations? If SAB 121 does apply:

   a) Would the SEC consider adjusting net capital calculations under Rule 15c3-1 so that broker-dealers with material custody business are not effectively prevented from meeting their net capital requirements?

42) Would the SEC permit the offsetting stub asset to be allowable for purposes of a broker-dealer's net capital, even though it may not be readily convertible into cash?

### C.  Requirement for and Role of Transfer Agents

Distributed ledger technology provides an unchangeable record of transactions, visible to all. This could revolutionize how transfer agents can facilitate securities trades.  Before the advent of blockchain technology, there was no way to ensure that transactions were recorded accurately and records were properly maintained without the use of third parties. To facilitate the traditional

---

[56] Exchange Act Rule 15c3-3(c)(5).

intermediated market structure, transfer agents were established to record changes of ownership, maintain the issuer's security holder records, cancel and issue certificates, and distribute dividends. Some transfer agents are required to be registered with the SEC, or if the transfer agent is a bank, with a bank regulatory agency.  Blockchain technology offers to improve this process, performing most if not all of these tasks, with limited labor costs, and without the risks of human error.

It is not clear, however, that existing rules will permit the use of this new technology. We understand that the Commission has only been willing to approve offerings of securities involving a transfer agent where that transfer agent has ultimate control over the official stockholder registry of a security, including the ability to unilaterally make changes to it (e.g., per a court order or to correct errors).[57]  Based on structures that have been approved, it appears that the SEC has not permitted a registered transfer agent to look to a blockchain as its official stockholder registry, and has required that the transfer agent know the identity of each registered owner.[58]  This position prevents the securities markets from realizing the efficiencies offered by the new blockchain technology, harming investors, markets, and issuers alike.

*Key questions for the Commission to consider and seek public input on:*

43) Is a transfer agent necessary for digital asset securities, where records of ownership, at least pseudonymously, are publicly available?

44) How may a person properly act as a transfer agent of a digital asset security, given the nature of blockchain-based assets?

45) Are there circumstances under which a registered transfer agent should be able to look to the blockchain as its official records?

### D.   Clearing Agency Status of Blockchains

There is currently uncertainty surrounding whether the blockchain, the nodes, miners, or validators on the blockchain, or others involved in facilitating the blockchain, are acting as a "clearing agency" and subject to registration with the SEC.  A person who engages in "clearing" activities must generally register with the SEC as a clearing agency.  A person is a "clearing agency" if, among other things, it acts as an "intermediary in making payments or deliveries or both in connection with transactions in securities," it "acts as a custodian of securities in connection with a system for the central handling of" fungible securities, or it "otherwise permits or facilitates the settlement of securities transactions . . . without physical delivery of securities certificates."[59]

---

[57] *See, e.g.*, Arca U.S. Treasury Fund, Form N-2, https://www.sec.gov/Archives/edgar/data/1758583/000121465920005869/s624200n2a2.htm ("Although records of peer-to-peer transactions are viewable on Ethereum, record and beneficial ownership of the Fund's shares is reflected on the records of DTAC, LLC, the Fund's transfer agent (the 'Transfer Agent'). The Transfer Agent is regulated by the Securities and Exchange Commission ('SEC'). The Transfer Agent's records constitute the official shareholder records of the Fund and govern the record ownership of ArCoins in all circumstances.").

[58] *See id.*

[59] Exchange Act § 3(a)(23).

Given the functionality of various components of blockchain technology, it is possible that any or all of these components may be erroneously labeled "clearing agencies."  Because a blockchain and each of its components operates without central control, it is not clear how it or any part of it could register as a clearing agency.  Nor is the relevance or workability of clearing agency rules evident in the context of digital asset trading occurring on blockchain technology.  Many of the rules applicable to clearing agencies are designed to ensure that there is clarity regarding how trades are settled, ensuring it operates fairly and in good faith with respect to all parties, and establishing it as a means of promoting compliance throughout the market.  Once again, blockchain technology is specifically designed to mitigate many of the risks that regulation of clearing agencies is intended to address, such as ensuring trades settle, in an open, transparent, and provably final way.  Therefore, not only is it unclear how the blockchain or other similar technology could register, it is not clear that the rules applicable to clearing agencies are needed with respect to digital asset securities.

*Key questions for the Commission to consider and seek public input on*:

46) Does the Commission view a blockchain on which digital asset securities may be transferred to be acting as a clearing agency?  What risks does a blockchain present that would justify the application of these regulations?  What risks does a blockchain mitigate that are presented by traditional clearing agencies?  What new risks does blockchain present?

47) If so, who would be required to register? Each node, miner, or validator? A group representing them? Would this be practical, considering the often highly distributed nature of nodes, miners, and validators?

    a) How would nodes, miners and validators satisfy the requirements to assure fair representation of their members and participants in the selection of their directors and the administration of their affairs, particularly where there are no formalized members, participants, or directors?[60]

    b) Would nodes, miners, and validators be required to become SROs like other clearing agencies?[61]  If so, would changes to the network require filings with and approval by the SEC under Rule 19b-4?

    c) Would nodes, miners, and validators be required to establish, implement, maintain and enforce the detailed written policies and procedures mandated by Exchange Act Rule 17Ad-22(e)?

    d) Would Regulation SCI apply to nodes, miners, and validators?[62] How would its references to "industry standards" be interpreted—as applying to the traditional securities industry or the digital asset industry?

    e) Would nodes, miners, and validators be subject to examination by the Office of Compliance Inspections and Examinations' Office of Clearance and Settlement?

---

[60] Exchange Act § 17A(b)(3)(C).
[61] Exchange Act § 3(a)(28).
[62] 17 CFR 242.1000 (including registered clearing agencies in the definition of "SCI SROs").

48) Given the typical permissionless nature of blockchains, how could registration be effected or enforced?

49) Could a broker-dealer or exchange facilitate trading of a digital asset security that could, or must, be settled over a blockchain that is not registered as a clearing agency?

50) In light of the difficulties described above with any potential registration, would the Commission offer a class exemptive order excluding blockchains from clearing agency registration? What conditions would be appropriate?

## V.    Necessary Preconditions to Rulemaking

The questions and challenges in this petition highlight the difficult and complex legal, policy, and technical considerations relating to the application of the existing federal securities law regime to digital asset securities. To properly weigh the costs and benefits raised by digital asset security activities, and to understand the market, practices, and needs of investors and market participants, the SEC should engage with all relevant stakeholders to inform the rulemaking we suggest above. We believe the Commission should take the following steps:

First, the SEC needs to seek input from market participants.  The SEC has not yet obtained widespread public input, as it frequently does for novel and significant rulemakings. Rather, to date, the SEC has primarily engaged through non-public, bilateral discussions with particular industry members, or through enforcement investigations. It also does not appear that the SEC has engaged with, or solicited input from, retail investors. There is also no representation from the digital asset community on the Investor Advisory Committee or any of the SEC's other advisory committees.

The Commission has frequently used requests for comment, concept releases, advisory committees, and public roundtables to obtain useful public input prior to proposing specific rulemaking items. For example, the SEC first solicited public comment on climate disclosure in March 2021, a full year before proposing climate disclosure rules and, similarly, the SEC issued a concept release on the harmonization of securities offering exemptions in 2019, over a year before adopting rules.[63] The SEC has also pursued these forms of public engagement to obtain information about many other areas of potential rulemaking, including with regard to equity market structure, fixed income market structure, transfer agent regulation, "proxy plumbing," and emerging market considerations, among others. Banking regulators have similarly solicited public input on digital assets, for example by issuing requests for information.[64]

---

[63] Acting Chair Allison Herren Lee, *Public Input Welcomed on Climate Change Disclosures* (Mar. 15, 2021), https://www.sec.gov/news/public-statement/lee-climate-change-disclosures; SEC, *The Enhancement and Standardization of Climate-Related Disclosures for Investors* (Mar. 21, 2022), https://www.sec.gov/rules/proposed/2022/33-11042.pdf; SEC, *Concept Release on Harmonization of Securities Offering Exemptions* (June 18, 2019), https://www.sec.gov/rules/concept/2019/33-10649.pdf (Concept Release; Request for Comment); SEC, *Facilitating Capital Formation and Expanding Investment Opportunities by Improving Access to Capital in Private Markets* (Nov. 2, 2020), https://www.sec.gov/rules/final/2020/33-10884.pdf (Final Rule).

[64] FDIC, *FDIC Issues Request for Information on Digital Assets* (May 17, 2021), https://www.fdic.gov/news/press-releases/2021/pr21046.html.

One of the key reasons to conduct public outreach is to ensure that the rules proposed will actually function as intended when put into practice.  Given the considerable differences in how digital assets operate, such input would help the Commission to understand the risks and how best to mitigate them. Thoughtful digital asset security rulemaking will require input from professionals with a deep technical expertise in the operation of digital assets and markets.

Second, the SEC's approach to digital asset regulation should be informed by ongoing developments in the executive and legislative branches. The Biden Administration has commissioned a number of reports on digital assets from various agencies in its March 2022 Executive Order,[65] and this work has only just begun. The Commission itself is requested to contribute to two of these reports, and the knowledge that the Commission gains through this process will be critical to any Commission rulemaking. Congress is also actively working on legislation that could materially affect the regulatory landscape.[66]

Third, coordination between the SEC and other agencies, most notably the CFTC, is critical. CFTC Commissioner Pham and SEC Commissioner Peirce have recently recommended such joint collaboration, noting that "crypto is still early in its development," and such cooperation "would benefit the capital markets, not just the crypto markets."[67]

*          *          *

The core question is how best to achieve the SEC's mission and promote the innovation and application of digital assets and blockchain technology within the capital markets and our economy more broadly.  How best to regulate digital asset securities raises complex and novel issues, and will require thoughtful and rigorous engagement with all stakeholders. We appreciate the opportunity to provide input to the Commission on these important matters and hope the Commission will seek broad public input on how digital asset securities markets can be appropriately regulated in a manner that facilitates investor protection, capital formation, and efficient markets with the integrity investors and other market participants have come to expect. For that reason, we respectfully petition the Commission to solicit broader input from the public to address all relevant questions and challenges related to the regulation of digital asset securities with the goal of informing an important rulemaking on this subject.  As noted above, we are

---

[65] Biden Administration, *Executive Order on Ensuring Responsible Development of Digital Assets* (March 9, 2022), https://www.whitehouse.gov/briefing-room/presidential-actions/2022/03/09/executive-order-on-ensuring-responsible-development-of-digital-assets/.

[66] *See, e.g.*, Lummis-Gillibrand Responsible Financial Innovation Act (released June 7, 2022), https://www.lummis.senate.gov/wp-content/uploads/Lummis-Gillibrand-Responsible-Financial-Innovation-Act-Final.pdf.

[67] Caroline D. Pham and Hester M. Peirce, *Making progress on decentralized regulation — It's time to talk about crypto together* (May 26, 2022), https://thehill.com/blogs/congress-blog/3503277-making-progress-on-decentralized-regulation-its-time-to-talk-about-crypto-together/ ("As an initial step, we are calling on our agencies to hold a joint set of public roundtables to evaluate recent market events and risks, and to discuss how to regulate crypto responsibly. These roundtables would be open to the public, and panelists would include crypto users, investor and customer advocates, industry members, and other regulators. The goal would be to assess whether new regulations are necessary to protect the public and the markets, how existing regulations might be modernized to better account for innovation, and how technology is likely to reshape our markets. We could start with topics such as digital asset trading platforms, crypto derivatives, stablecoins, decentralized finance, and the balance between privacy and anti-money laundering measures.").

committed to this endeavor as well, and expect to submit our thoughts on how to address some of these challenges in a series of follow-up responses to this petition.

We would be pleased to answer any questions the Commission or its Staff may have regarding our petition. We appreciate the Commission's continuing attention to this important matter and for allowing us an opportunity to present our views.

Sincerely,

Paul Grewal

Chief Legal Officer

Coinbase Global, Inc.

cc:
Hon. Gary Gensler, Chair
Hon. Hester Peirce, Commissioner
Hon. Caroline Crenshaw, Commissioner
Hon. Mark Uyeda, Commissioner
Hon. Jaime Lizárraga, Commissioner

coinbase

**Appendix**

**A Brief Overview of *Howey* and *Reves***

*Howey*

Whether an instrument constitutes an "investment contract" is determined by reference to a test articulated by the Supreme Court in *SEC v. W.J. Howey Co.*[68] In 1946, the Supreme Court articulated the *Howey* test in a case involving speculative investments by purely financially motivated parties in a Florida citrus grove profit-generating enterprise—activity plainly within the scope of the federal securities laws. The Court held that the investments amounted to "investment contracts" and thus "securities" because they involved each of the following features:

> (1) an investment of money;
>
> (2) in a common enterprise;
>
> (3) made with a reasonable expectation of profits; and
>
> (4) based predominantly upon the entrepreneurial or managerial efforts of the promoter or other third parties.[69]

In analyzing whether a particular instrument is an investment contract, the Supreme Court has emphasized that "form should be disregarded for substance and the emphasis should be on economic reality."[70] The SEC has adopted a similar position, indicating that "[d]etermining whether a transaction involves a security does not turn on labelling . . . but instead requires an assessment of the economic realities underlying a transaction . . . . All of the relevant facts and circumstances are considered in making that determination."[71] An asset must meet each requirement of the *Howey* test to be an investment contract.

*Reves*

The *Reves* test was articulated by the Supreme Court in 1990 to interpret the term "any note." It is unreasonable to think Congress intended to apply federal securities regulation to every "note"—otherwise a homeowner would have to file a registration statement with the SEC when signing a mortgage note and could only refinance that note through a broker-dealer. Accordingly, the Court laid out a test that considers:

> (1) the motivations of the buyer and seller;

---

[68] 328 U.S. 293, 301 (1946).

[69] *Id.* ("The test [for an investment contract] is whether the scheme involves an investment of money in a common enterprise with profits to come solely from the efforts of others."); *see also Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 558–62 (1979); *SEC v. Edwards*, 540 U.S. 389, 393 (2004).

[70] *United Housing Found., Inc. v. Forman*, 421 U.S. 837, 848–49 (1975) (internal quotation marks and citations omitted).

[71] *In re Munchee, Inc.*, Securities Act Release No. 10445, at 9 (Dec. 11, 2017).

(2) the plan of distribution of the instrument;

(3) the reasonable expectations of the investing public; and

(4) the presence of an alternative regulatory or other risk-reducing regime.[72]

Unlike the *Howey* test, which requires satisfaction of each of its requirements for an asset to be deemed a security, the *Reves* test is simply a set of factors that a court should consider in making its decision, with no one factor being dispositive or entitled to a particular weighting.

---

[72] *Reves v. Ernst & Young*, 494 U.S. 56, 66–67 (1990).

A-2