# Exhibit 209

**To:** Fredrickson, David R.[████████@SEC.GOV]
**Cc:** Seaman, Michael P.[████████@SEC.GOV]
**From:** Szczepanik, Valerie
**Sent:** 2018-05-25T11:58:57-04:00
**Importance:** Normal
**Subject:** RE: Bill's draft "token morphing" speech
**Received:** 2018-05-25T11:58:58-04:00
<u>Digital asset morphing 5 24.vs.docx</u>

Hi David – I had some minor suggested changes, attached. Please let me know if you'd like to talk. Generally, I would add more detail where I indicated in the bubble.
I like the tone, and I almost think the less detail the better. This is introducing a concept, that will probably generate much discussion, and so leaving room for that discussion is good I think.

**From:** Fredrickson, David R.
**Sent:** Thursday, May 24, 2018 4:10 PM
**To:** Szczepanik, Valerie
**Cc:** Seaman, Michael P.
**Subject:** Bill's draft "token morphing" speech

Hi Val –

I drafted this with some input from Bill. He hasn't seen this draft, but I plan to show him a draft early next week.

I'd value your thoughts on scope, tone, detail, etc.

Thanks

David

**Digital asset morphing – May 24 draft**

There has recently been considerable discussion in the press and legal fora regarding whether digital assets offered as a security in an Initial Coin Offerings, or an ICO, can over time become something other than a security. I think the answer is "yes," under certain unique circumstances, and I'd like to share my thinking with you today.

[disclaimer]

First, I would like to start with a little background on the new world of digital assets. Many of you are no doubt familiar with Bitcoin and have heard of blockchain – or distributed ledger – technology. As I have come to learn, what may be most exciting about this technology is the ability to share information, transfer value, and record transactions in a decentralized digital environment. What does that mean? Payment systems, supply chain management, intellectual property rights licensing, stock ownership transfers and countless other potential applications can be conducted electronically, with a public, immutable record without the need for a trusted third party to verify transactions. These new networks record digital information packets that identify certain transaction details and record certain rights and obligations. These packets are sometimes called coins or tokens, and can be obtained through mining, distribution, sale or exchange by users in the network. Some people believe these new systems will forever transform the internet as we know it. There is excitement around this new technology, but also a great deal of "irrational exuberance" and some downright fraud.

But that is not what I am here to talk about today. I am here to talk about how those digital information packets -- that are sometimes called coins or tokens -- are being issued,

*DRAFT*
*May 24, 2018*
*Non-public*

distributed and sold. In order to raise money to develop these new systems, promoters[1] often sell the tokens themselves, rather than sell shares, or issue notes or obtain bank financing. We have seen public distributions on the internet and private placements to sophisticated investors. But the economic substance is the same: money is raised with the expectation that the promoters will build their system and investors can earn a return on the instrument -- usually by selling their tokens in the secondary market as the value of the digital enterprise increases once the promoters create something of value with the proceeds.

When we see that kind of economic transaction, it is easy to apply the Supreme Court's "investment contract" test first announced in SEC v. Howey.[2] As you will remember, the test requires an investment of money in a common enterprise with an expectation of profit derived from the efforts of others. And it is important to reflect on the facts of Howey. A Florida hotel operator sold interests in a citrus grove it owned to its guests. The transaction was recorded as a real estate sale with a service contract. But in articulating the test for an investment contract, the Supreme Court emphasized: "Form [is] disregarded for substance and the emphasis [is] placed on economic realities."[3]

In the ICOs we have seen, overwhelmingly, promoters tout their ability to create some innovative application of blockchain technology. The investors are passive. Marketing efforts may not be targeted to potential users of the application. And the viability of the application is still uncertain. At that stage, the purchase of a token looks a lot like a bet on the success of the

---

[1] [I am using the term "promoters" in a broad, generic sense. The important factor in the legal analysis is that there is a person or group that is working actively to develop the infrastructure of the network. This person or group may be, variously, founders, sponsors, developers, or "promoters" in the traditional sense. The presence of promoters in this context is important to distinguish from the circumstance where multiple, independent actors work on the network but no individual actor's or concerted group of actors' efforts are essential.]
[2] SEC v. W.J. Howey Co, 328 U.S. 293 (1946).
[3] Id. at 298.

CONFIDENTIAL  SEC-LIT-EMAILS-000470994

*DRAFT*
*May 24, 2018*
*Non-public*

enterprise and not the purchase of tokens to exchange for goods or services that might someday be available on the network.

So let me pause here to be a little more precise. Strictly speaking, the token -- or coin or whatever the digital information packet is called – *all by itself* is not a security. Neither was the orange grove in Howey. The important thing for determining whether a security is being sold is HOW it is being sold. For example, when a certificate of deposit is sold by a federally regulated bank, the CD is not a security.[4] When a CD is sold as a part of a program organized by a broker who offers retail investors promises of liquidity and ability to profit from changes in interest rates, the CD is part of an investment contract that is a security.[5] Similarly, when someone buys a housing unit to live in – even when represented by an instrument called "stock" -- it is probably not a security.[6] When the housing unit is offered with a management contract or other services as an investment, it can be a security.[7]

And so with digital assets. The digital asset itself is simply code. But the way it is sold – as an investment; to non-users; by promoters to develop their idea – can be, and, in that context, most often is, a security – because it evidences an investment contract. And regulating these transactions as securities transactions makes sense. The impetus of the Securities Act and its registration requirements is to remove the information asymmetry between promoters and investors. In a public distribution, the Securities Act prescribes the information investors need in order to make an informed decision, and the promoter is liable for material misstatements in the offering materials. These are important safeguards, and they are appropriate for most ICOs. The

---

[4] Marine Bank v. Weaver, 455 U.S. 551 (1982).
[5] Gary Plastics Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc., 756 F.2d 230 (2d Cir. 1985).
[6] United Housing Found., Inc. v. Forman, 421 U.S. 837 (1975).
[7] Guidelines as to the Applicability of the Federal Securities Laws to Offers and Sales of Condominiums or Units in a Real Estate Development, SEC Rel. No. 33-5347 (Jan. 4, 1973).

3

CONFIDENTIAL                                                                                                    SEC-LIT-EMAILS-000470995

*DRAFT*
*May 24, 2018*
*Non-public*

disclosure marries nicely with the Howey investment contract element about the efforts of others. As an investor, the success of the enterprise – and the ability to realize a profit on the investment – turns on the efforts of the third party. The investor is *relying* on the third party. So learning about the third party – its background, financing, plans, financial stake, and so forth – is key to making an informed investment decision.

But this also points the way to when a digital asset may no longer represent a security. When the efforts of the third party are no longer a key determining factor for the enterprise's success, the importance of the information about the third party recedes. Accordingly, as a network becomes truly decentralized, the ability to identify an issuer to make the disclosure becomes difficult, and perhaps meaningless.

And so, when we look at Bitcoin, we do not see a third party whose efforts are a key determining factor in the enterprise. The value of Bitcoin turns on the efforts of decentralized miners and independent market participants' assessments of an open-source payment mechanism. Applying the disclosure provisions of the securities laws in this situation would seem to add little value. As we understand the present state of Ether, it seems a similar conclusion may be warranted. But other systems we see still appear to rely on central actors whose efforts are key to the success of the enterprise.

As I have tried to point out, the analysis is not static and the nature of a security does not inhere to the instrument.[8] Like CDs – which when issued by a federally regulated bank are not securities but when repackaged as part of an investment strategy can be – even digital assets with utility in an existing eco-system could be packaged and sold as an investment strategy that can be

---

[8] The Supreme Court's investment contract test "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of profits." Howey, at 299.

4

CONFIDENTIAL  SEC-LIT-EMAILS-000470996

*DRAFT*
*May 24, 2018*
*Non-public*

a security. A promoter could place Bitcoin in a fund or trust and sell interests, creating a new security. Similarly, investment contracts can be made out of virtually any asset (including virtual assets), provided the investor is reasonably expecting profits from the promoter's efforts.

Let me emphasize that simply labeling a digital asset a "utility token" does turn the asset into something that is not a security.[9] True, the Supreme Court has acknowledged that if someone is purchasing as asset for consumption, it is likely not a security.[10] But the economic substance of the transaction determines the legal analysis, not the labels.[11] The oranges in Howey had utility. Or in my favorite example, the Commission warned in the late 1960s about investment contracts sold in the form of whisky warehouse receipts.[12] Promoters sold the receipts to US investors to finance the aging and blending processes of Scotch whisky. The whisky was real – and probably had exquisite utility. But Howey was not selling oranges and the warehouse receipts promoters were not selling whisky for consumption. They were selling an investment.

We expect issuers and market participants will want to understand whether transactions in a particular digital asset involve the sale of a security. We're not trying to play "regulatory I gotcha." And we are happy to help promoters and their counsel work through these issues. We stand prepared to provide more formal interpretive or no action guidance to market participants about the proper characterization of a digital asset in a proposed use.

What are some of the factors we would look to? The presence of a security will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:

---

[9] "[T]he name given to an instrument is not dispositive." Forman, at 850.
[10] Forman, at 853.
[11] See above
[12] SEC Rel. No. 33-5018 (Nov. 4, 1969); Investment in Interests in Whisky, SEC Rel. No. 33-5451 (Jan 7, 1974).

5

CONFIDENTIAL　　　　　　　　　　　　　　　　　　　　　　　　　　　　　SEC-LIT-EMAILS-000470997

---
*DRAFT*
*May 24, 2018*
*Non-public*

1. Is there a person or organized group that has sponsored or promoted the creation and sale of the digital assets, the efforts of which play a significant role in the development and maintenance of the asset and its potential increase in value?

2. Has this person or group retained a stake or other interest in the digital asset such that it would motivated to expend efforts to cause an increase in value in the digital asset? Would third party purchasers have a reasonable basis to believe such efforts may result in a return on their investment in the digital asset?

3. Is the instrument marketed and sold to potential users of the network for a price that is commensurate with the market value of the good or service in the network?

4. Does application of Securities Act protections make sense? Is there a person or entity others are relying on, or a promoter who can be identified, that plays a key role in the profit-making of the enterprise such that disclosure of the promoter's activities and plans would be helpful to investors?

In the meantime, are there contractual or technical ways to structure digital assets so they are less likely to act like a security? I believe so. Again, these are certainly not "get out of jail free" cards, and we would look to the economic substance of the transaction, but promoters and their counsels should consider these, and other, possible features.

- Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?
- Can tokens be hoarded or are they distributed in ways to meet users' needs?
- Have purchasers made representations as to their investment or consumptive intent?

6

CONFIDENTIALSEC-LIT-EMAILS-000470998

*DRAFT*
*May 24, 2018*
*Non-public*

These are exciting legal times and I am pleased to be part of a process that can help promoters of this new technology and their counsel navigate the federal securities laws. [Be mindful, that I have no qualms about working with my colleagues in the SEC's Division of Enforcement and other regulatory agencies in stamping out fraud in this market.]

CONFIDENTIAL                                                                                              SEC-LIT-EMAILS-000470999