# Exhibit 212



# Understanding the SEC's Guidance on Digital Tokens: The Hinman Token Standard

– The SEC's Corporation Finance Director William Hinman has suggested a regulatory framework for digital tokens based on the level of decentralization of the token network.

– A project should meet the standard for decentralization if it is more decentralized than the Bitcoin or Ethereum networks on June 14, 2018.

– Innovators should take comfort that this standard for decentralization, properly understood, is not overly burdensome or unrealistic, and seems to permit projects to have significant, necessary centralized leadership.

– The Blockchain Association urges the SEC and Congress to provide more regulatory certainty in line with this framework.

In order to realize the full potential of the token economy and all of the services it can offer, we need regulatory certainty for digital tokens. We must know when tokens qualify as securities and when they do not so that innovators know which regulatory regime applies. In 2018, the Securities and Exchange Commission (SEC) offered informal guidance on this topic in the form of enforcement activities, statements, and speeches.

The most important statement to date has come from William Hinman, director of the SEC's Division of Corporation Finance, on June 14, 2018 in a now well-known speech at the Yahoo Finance All Markets Summit. The clearest and most important takeaway from this speech was that bitcoin and ether were not considered securities by the SEC as of that date. It did so because the factual record at the time demonstrated that the networks in which the two tokens function were "sufficiently decentralized." Others have written extensively about the traditional *Howey* factors discussed in the Hinman speech, but the factors contributing to decentralization are less well understood.

Token projects can learn from the analysis Hinman applied to bitcoin and ether, with the key learning being quite simple: *tokens from a network at least as decentralized as the Bitcoin and Ethereum networks were on June 14, 2018 are not securities.* In this post we explore in detail the factual record and what qualities Bitcoin and Ethereum had on June 14, 2018 to understand more specifically what threshold is needed for a network to be "sufficiently decentralized."

Why decentralization eliminates the need for securities regulations

Securities regulations exist to reduce information asymmetries between the promoter of an investment and investors who are hoping to see a return from the investment. These regulations require expensive disclosures (and middlemen), but these disclosures are necessary because they ensure a fair marketplace. They make sense for debt or equity instruments, but not for currencies (such as the dollar, euro, or even bitcoin), nor for credits to buy software services (from gaming credits to LivePeer tokens) because there is no centralized insider information in the latter cases.

Consider an analogy between buying a share of Google and buying a gold future: in the first case, Larry Page has company-specific information he could trade on unfairly, while, with gold, an extremely "decentralized" market, everyone can access market information. Page, like any CEO or executive team, is sufficiently central to the success or failure of Google, whereas many participants contribute to the supply and demand for gold and thus its market price.

Decentralization is a theme that aligns with the Supreme Court's *Howey* Test, announced in a 1946 decision that provides a framework for determining what is an "investment contract." An investment contract is a term that is included in the definition of a security under securities laws, but itself is not defined in the law. The *Howey* Test highlights the reliance on the efforts of a small (that is, centralized) group of actors as one component of what qualifies as an investment contract (and therefore a security). A key part of the *Howey* Test is how much influence a small (that is, centralized) group of actors has on the price of the item in question — the more influence, the more likely it is that a purchase is an investment contract and therefore a security regulated by the SEC.

While decentralization isn't the only component of the *Howey* Test, the June 14, 2018 Hinman speech blessed decentralization unequivocally as a process that ensures that tokens offered as securities in initial token sales are no longer securities once the network is sufficiently decentralized. Therefore, according to this best available SEC guidance, if a token network does not rely — or transitions to stop relying — on a small, centralized group of people, tokens on that network are not securities and, therefore, disclosure rules meant to protect investors should no longer apply. We believe this is a thoughtful and reasonable policy.

How decentralized is sufficiently decentralized?

To understand the degree of decentralization needed to be sufficiently decentralized, we must look at the state of the Bitcoin and Ethereum networks as of June 14, 2018. Since the Hinman speech does not set out an exact threshold for sufficient decentralization, we aim to find it here. Of course, the standard itself possibly could be lower than this, but this helps pin down the threshold under current guidance.

The speech outlines a multi-factor test without fleshing out its substance or setting forth the factors that are most important. This is a common approach among regulators, and it gives the SEC flexibility to handle the unexpected and keep learning. Someone reading a list of a dozen factors might reasonably think that the SEC's standard is scary and impossible to meet. But looking at the standard in the context of the underlying facts reveals that the SEC's application of the standard is in fact minimal and commonsense, not restrictive.

As you will see in the chart below, as of June 14, 2018, Bitcoin and Ethereum were decentralized in many ways, but they also had considerable centralization and necessary leadership of their projects. In its simplest form, the standard seems to ask whether a token network has some basic level of functionality, whether its governance is more open and distributed than a single centrally-organized team, and whether at least some purchasers are users rather than speculators. This is the Hinman Token Standard.

The SEC cannot arbitrarily apply a lower standard to bitcoin and ether than it would apply to all other tokens, permitting bitcoin and ether to thrive while hobbling all subsequent projects. If the SEC deemed a token more decentralized than bitcoin and ether to be a security, it would be applying its own proposed guidance arbitrarily. The SEC is unlikely to do this, especially after publicly laying out the criteria that bitcoin and ether met.

Of course, this legal standard for decentralization is likely even lower, as the SEC never said that Bitcoin and Ethereum on June 14 were barely "decentralized" enough to pass the "Hinman Token Standard" test. So less decentralized networks may pass as well.

The table below shows our best understanding of the factors Director Hinman laid out and the factual record for bitcoin and ether on June 14, 2018, the day of this seminal speech. The SEC has invited conversation on this important topic, and we believe sharing this analysis publicly with the best minds can only improve our collective thinking.

| Decentralization feature mentioned in Hinman speech | Ether tokens and/or the Ethereum network on June 14, 2018 | Bitcoin tokens and/or the Bitcoin network on June 14, 2018 | Threshold for sufficient decentralization |
|---|---|---|---|
| Are purchasers "investing," that is seeking a return?<br><br>"Is the instrument marketed and sold to the general public instead of to potential users of the network?" | Originally marketed primarily to users, but sold to anybody.<br><br>More recently, bought and sold by the general public on exchanges. | Originally marketed to potential users (cryptography enthusiasts) and not sold by a promoter at all.<br><br>More recently, bought and sold by the general public on exchanges. | Digital tokens can be traded on secondary markets, as well as initially sold to at least some non-users, where some purchasers of the token are aiming to make a profit. |
| Is it marketed and sold "for a price that reasonably correlates with the market value of the good or service in the network"? | Likely sells at a premium vs. network use cases. | May sell at a premium vs. network use cases because property-tax treatment, transaction costs, congestion, and volatility can make it impractical as a medium of exchange (though it is useful as a store of value). | Digital tokens can be traded at prices higher than their intrinsic value. |
| Is there "a central third party whose efforts are a key determining factor in the enterprise"? | The most central parties appear to be Vitalik Buterin and a small number of core developers, client developers, and organizations, such as ConsenSys. Buterin began making efforts to distance himself from centralized project leadership about two and a half years after the Ethereum network went live. | The most central parties appear to be roughly a dozen or so core developers across different organizations. | Central third parties can play a leadership role in the ongoing development of the network. |
| "Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?" | The Ethereum Foundation expends funds to improve the protocol, conduct protocol research, maintain a core client, and promote adoption. It is funded by ether ---probably mostly from appreciation at this point, not sale proceeds. | No. (It's not clear to us that there has ever been a "promoter" for Bitcoin – we welcome input on the issue.) | Promoters of tokens may continue to fund development and promote adoption. |
| "Do persons or entities other than the promoter exercise governance rights or meaningful influence?" | Defining "governance" is more complex for a token network than for a company. The Ethereum Foundation and the creators of Ethereum are heavily involved in developing the rules of the network, though others have influence. | Yes – again, even if there is a "promoter" for Bitcoin, governance and influence are highly dispersed and not tied to any initial group. | Promoters may continue to be prominent in governance so long as they are not in exclusive control of the direction of the project. |
| "Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?" | Partially the former. The Ethereum-mining process grants tokens as a reward for securing the network, which is a user need.<br><br>Many purchasers of the tokens initially sold in the presale were likely speculating on the future value of those tokens. (This is a question of purchaser intent, and most Ethereum presale purchasers did not spend a significant amount of the ether they purchased on transaction fees.) | Yes, the token is integral to a critical user need (security). If you help secure the network, you get tokens. | The token model adopted by many projects (pre-sell a reasonable initial allocation, including to speculators, and mine the remainder) is acceptable. |
| "Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?" | Probably independent, although the factors the SEC applied to its analysis of the Bitcoin exchange-traded fund (ETF) and the lack of market surveillance is likely equally applicable to ether. | Probably independent, although the SEC has stated that a Bitcoin ETF is inappropriate because the price is not sufficiently transparent and therefore potentially subject to manipulation. | No real additional information gained. |
| "Can the tokens be held or transferred only in amounts that correspond to a purchaser's expected use?" | Yes, if a purchaser's expected use is speculation. No, as they can be held or transferred in almost any amount. Smaller uses are sometimes tricky due to transaction fees. | Yes, if a purchaser's expected use is speculation. No, otherwise, as they can be held or transferred in almost any amount. Smaller uses are sometimes tricky due to transaction fees. | Tokens can be transferred in amounts larger than the purchaser's expected use. |
| "Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?" | Assets are fairly concentrated, potentially among project leadership, but it's difficult to specify. | Assets are fairly concentrated, potentially among project leadership, but it's difficult to specify. | Tokens can be somewhat concentrated among product leadership. |
| "Is the application fully functioning or in early stages of development?" | Development is ongoing, but it is fully functioning. A handful of actors are actively working on major additional features (sharding, PoS, major Solidity features, etc.). | Development is ongoing, but it is fully functioning. A handful of actors are relatively more influential in in core protocol development (e.g., Blockstream), and a few others are leading development of "Layer 2" projects (e.g., Lightning Labs). | A network with at least basic functionality is highly preferred and potentially necessary to pass the test, but not all planned features must be implemented. |

### The Hinman Token Standard should be the foundation of future policy making

We at the Blockchain Association are calling on the SEC to issue more formal guidance — or for Congress to provide the statutory clarity. Without more formal guidance, the SEC can change policy with a rule, or even another speech. This uncertainty has a stifling effect on investment, and we are already seeing innovative projects moving overseas to try to avoid regulatory uncertainty. Investors, entrepreneurs, and innovators need certainty to pursue the full potential of open blockchain technology.

In the meantime, developers of open source, public blockchain networks and those in the community that help foster their development should work with counsel to understand that the announced Hinman Token Standard likely *has not set an impossibly or unreasonably high standard for decentralization.* Open-source and cryptocurrency projects often need or choose to have *some* centralized leadership, and at times considerable centralized leadership on their path to decentralization. As demonstrated by both bitcoin and ether, the Hinman guidance has established that having some level of centralized leadership will not condemn a token to being classified as a security on that basis alone.

*This post does not constitute legal advice and should not be relied on by any person. It is designed for general informational purposes. Developers, purchasers, investors, and any other participant in a token system should consult their own counsel.*

GET IN TOUCH

PH: (202) 715 - 2270

CONTACT@THEBLOCKCHAINASSOCIATION.ORG

1701 RHODE ISLAND AVENUE NW,
WASHINGTON, DC 20036

200 SOUTH BISCAYNE BOULEVARD,
MIAMI, FL 33131

©2020 BLOCKCHAIN ASSOCIATION. THE BLOCKCHAIN ASSOCIATION IS A 501C6 REGISTERED IN WASHINGTON, DC.

BACK TO TOP

RPLI_SEC 1093409