# Exhibit 213

**FOIA Confidential Treatment Reque** 

August 29, 2018

*Via Federal Express*

Amy Starr
Office of Capital Markets Trends
United States Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549-0213

**F.O.I.A. Confidential Treatment Requested**

Re:    Securities Law Analysis Regarding ▮▮▮▮▮▮▮▮▮

Dear Valerie, Amy, Andy, Cynthia and Jonathan,

On behalf of our client, ▮▮▮▮▮▮▮▮▮▮▮▮▮, please find enclosed a letter
regarding the above-referenced matter.

The letter is stamped "FOIA Confidential Treatment Requested by ▮▮▮▮▮▮▮" and is Bates-
stamped "▮▮-SEC-000236 through ▮-SEC-000259".

**Request for Confidential Treatment**

For reasons of business confidentiality and personal privacy, our client requests confidential treatment as
provided under the Freedom of Information Act for this letter and the documents and materials referred to
above on Bates-stamped pages ▮-SEC-000236 through ▮SEC-000259. Pursuant to this request,
▮▮▮▮▮▮ has submitted a request for confidentiality to the Securities and Exchange Commission
Office of Freedom of Information and Privacy Act Operations. All of these documents and materials contain
confidential business or personal financial information concerning ▮▮▮▮▮▮▮ and its agents.
Pursuant to Rule 83 of the Securities and Exchange Commission's Rules on Information and Requests, 17
C.F.R. § 200.83 and other applicable laws and regulations, our client hereby requests that these documents
and the information they contain be maintained in confidence, not be made part of any public record and
not be disclosed to any person in response to a request under the Freedom of Information Act or otherwise.

In light of the nature of the information contained in this letter and the enclosures herewith, such information
is exempt from mandatory disclosure under 5 U.S.C. § 552(b)(4) and disclosure is prohibited under 18
U.S.C. § 1905. If any person (including any government employee who is not an employee of the Securities
and Exchange Commission) requests the opportunity to inspect or copy the confidential documents or
materials, our client requests that the undersigned immediately be notified of such request, be furnished
with a copy of all written material pertaining to such request (including, but not limited to, the request and

4125-6956-3414.1

Confidential Treatment Requested by ▮▮▮▮▮▮▮▮▮                    ▮-SEC-000236

Highly Confidential



any agency determination with respect to such request), and be given advance notice of any intended disclosure of the documents so that our client may, if deemed necessary and appropriate, pursue any available remedies. If the Securities and Exchange Commission ("SEC") is not satisfied that the enclosed materials are exempt from disclosure pursuant to the Freedom of Information Act, our client stands ready to supply further particulars and requests a hearing on the claim of exemption.

Additionally, we respectfully request that we be notified in writing in the event that the SEC, for any reason, considers disclosing this letter or the documents or materials referred to herein, or any of the information contained therein, to a third party, and that, in all events, at least five business days prior to any such disclosure, and that all documents, materials and information submitted by ████████████, as well as any copies made thereof, be returned to ████████████.

The requests set forth in the preceding paragraphs also apply to any memoranda, notes, transcriptions or other writings of any sort whatsoever which are made by or at the request of any employee of the SEC (or any other government agency) and which (1) incorporate, include or relate to any of the information contained in any of the confidential documents provided to the SEC (or any other government agency), or (2) refer to any conference, meeting, conversation or interview between (a) ████████████, its representatives, agents or counsel, and (b) employees of the SEC (or any other government agency).

████████████ hereby expressly reserves all applicable privileges, including (but not limited to) the attorney-client privilege and work-product protection, and nothing in this response is intended to be a waiver of such privileges.

The information provided herein is the result of a reasonably diligent attempt to compile complete information, and we reserve the right to supplement the information, materials and documents provided. Please call me if you have any questions or if you require any additional information regarding the matters set forth in this letter.

Sincerely,

Enclosure

cc:     Office of Freedom of Information and Privacy Act Operations (w/o enclosure)

4125-6956-3414.1

Confidential Treatment Requested by ████████████

████-SEC-000237

SEC-████████████-E-0000242

SEC-LIT-EPROD-001748210

RPLI_02423727

Highly Confidential



August 29, 2018

Amy Starr
Office of Capital Markets Trends
Securities and Exchange Commission
100 F Street, NE
Washington, DC 20549

Re:  ███████████████████

Dear Valerie, Amy, Andy, Cynthia and Jonathan:

Thank you again for taking the time to meet with the ██████ team and discuss the ██████████████ platform last month. We appreciated your thoughtful questions and engagement, which we found very useful.

Consistent with the timeframe we described when we met, ██████ completed its SAFT financing ████████ ███, has subsequently stood up its network and is rolling toward its first developer conference. The ████ team is moving forward with their plan for distributing tokens to developers in the coming months, and the eventual issuance of tokens to SAFT holders in an orderly manner ████████████ ███, and is hopeful that we will be able to work with you to bring better clarity to the tokens' legal situation in the meantime.

As requested, we have re-examined Director Hinman's *Gary Plastic* speech and other statements of the Staff and prepared further thoughts, which we have outlined below. There are a few areas where your guidance would be much appreciated. We are hopeful that this interactive dialogue will lead to the issuance of a no-action letter before the end of 2018.

In particular, we would welcome additional in-person meetings or conference calls to carefully review the outstanding issues. It would be helpful to understand from you what you believe would be a viable schedule and how best to address your questions. Can we set up a conference call in the coming week or so to lay out a path forward?

In addition, the founders and other members of the executive team will be in New York both next week and the second week of September. If Valerie's schedule permits, we might suggest arranging a time for

4147-6685-3654.2
37366-3

Confidential Treatment Requested by ██████████████████          ██ SEC-000238

SEC-██████████-E-0000243

SEC-LIT-EPROD-001748211

RPLI_02423728

Highly Confidential



August 29, 2018
Page 2

her to meet them in person to discuss the technology, the applications it enables, and the implications in more technical detail. We appreciate your interest in understanding the specifics of how the platform works and think that an in-person meeting with Valerie would be useful in furthering that understanding.

We understand that you may need more information in addition to the legal memorandum and materials already presented in order to provide your considered views. To move the process forward, we have summarized below some of the most important issues presented when Director Hinman's speech is applied to the ▇▇▇▇ platform and tokens. We are mindful that you asked for creative applications of that guidance to come to a solution that reflects its spirit. We have also attached a more detailed point by point analysis of the Hinman factors, but think that the points below are the key areas for discussion.

A critical question that Director Hinman's speech leaves unanswered is how a platform can move from the period of network launch to a mature and distributed network, if a freely tradable token is required at the outset for that network growth to occur. ▇▇▇▇ believes that there remains fundamental uncertainty for new entrants on how to achieve a necessary distribution of tokens prior to network launch and a measured rollout of the network to ensure its safety and stability, if the token will be deemed a security until the network is fully decentralized. As we've discussed it internally, we think of the transition from security to functional non-security crypto-token as a chasm that must be crossed as ▇▇▇▇ deploys its network. On one side is a security (in our case, the SAFT and embedded token, prior to network launch), and on the other a widely distributed and clearly functional non-security token on a fully deployed network. ▇▇▇▇ has no doubt that its network would be firmly on the other side of the chasm when it is at scale. But a platform does not launch already at scale. Somehow a bridge over the chasm must be built to allow for safe crossing during the period of growth. We have put considerable thought into a blueprint for that bridge that we think works for ▇▇▇▇ and potentially other platforms as well.

In that light, below we point out a few areas that we think merit specific discussion of how ▇▇▇▇ is proposing to address the Staff's concerns. We would greatly appreciate any feedback or suggestions you have along those lines.

1) **Transition of tokens from being embedded in the SAFT to free-standing functional tokens**.

▇▇▇▇ was encouraged to hear the Staff confirm that tokens issued under the SAFT may themselves not be securities at some point, even though the SAFT is. There remains substantial uncertainty among market participants about how to achieve this transition from SAFT to a token that is not a security, but ▇▇▇▇ has given this careful thought from the outset and conducted its financing accordingly. As Amy noted when we met, we are treating the original capital raising transaction as a "unified transaction" where the investment contract is the SAFT

4147-6685-3654.2
37366-3

Confidential Treatment Requested by ▇▇▇▇▇▇, LLC

▇-SEC-000239

SEC-▇▇▇▇▇▇-E-0000244

SEC-LIT-EPROD-001748212

RPLI_02423729

Highly Confidential



August 29, 2018
Page 3

purchase agreement and the embedded token. Our proposed solution to this fundamental issue has been to:

a.  raise capital selling a security (the SAFT) in a private placement to accredited investors at a fixed price per token that does not reference or ensure a discount to a later market price;

b.  eschew a public ICO;

c.  commence the launch of the ███████ network in ████ and begin issuing tokens to users and developers, which we are not treating as securities because they are clearly being issued for use, testing and application development on the network to a small group of users.  We are thinking of the ███████ network launch as a functional beta test that rolls out to full deployment.  ██████ has been doing alpha testing for more than a year on their test networks, and now will let the initial programs go live, enable developers to begin deploying distributed applications ("dapps"), and allow the network ecosystem to start growing; and

d.  wait ██ months after launch of the network to begin to release the tokens embedded in the SAFT, which are not all released at once, but over time, because of the tokens' role in securing the safety of the network, with the ancillary effect of preventing SAFT holders from "dumping" all of their tokens at first issuance.  We believe that six months is sufficient time to ensure that the demand for the tokens will be driven by use on the network rather than for speculative purposes.  During that ██ month period, ████████ also will hold conferences and events for the large community of interested developers, as it is their deployment of dapps that will fuel the growth and value of the network.

We would like your concurrence that the ██ month period from network launch to issuance of tokens, assuming the network is up and running with dapps developed and deployed, serves as a reasonable period to demonstrate that there is a fully functional network.  Alternatively, if a demonstration of network functionality after ██ months does not suffice, we would ask for your clear guidance on the factors that you would consider dispositive at the token release point to demonstrate that the network is sufficiently developed and operational from which ██████ can draw a reasonable inference that enough purchasers of tokens are purchasing them primarily for use on the network.  ███████ has developed a maturation process for the network to dampen speculation as best it can, while acknowledging that there will always be a mix of speculative purchasers and users, just as there are with Ethereum.

---

[1] Though the network will continue to be refined and improved over time in response to user suggestions or requests.

4147-6685-3654.2
37366-3

Confidential Treatment Requested by ████████████████          ████-SEC-000240

SEC-████████████-E-0000245

SEC-LIT-EPROD-001748213

RPLI_02423730

Highly Confidential



August 29, 2018
Page 4

In addition, we would request your concurrence that the network can be further developed and refined after the network launch without calling into question the status of the tokens that were previously distributed.

2) **Governance model.**

████ believes that the ████████ distributed governance model provides sufficient decentralization to satisfy concerns about there being central control over the network and, by inference, over the value of its tokens, without abdicating responsibility for governing the safety of the network. We would like to further explore your views on distributed governance, while applying a materiality standard to the degree of dependence on the efforts of the ████ ████ as it relates to the value of the tokens, both in the startup phase and at fully deployed steady state. We discussed during our meeting the fact that the ████████████ ████████████████████, during the start-up phase but that after the startup stage, the ████████ decisions will be made by the ██████ at large. Although ████ believes that its existing governance model reasonably satisfies the decentralized governance standard articulated by Director Hinman and the Staff, we would like to share all of the details and nuances of the model to get your feedback.

3) **Efforts of the ████████████ as it relates to functionality**.

At our meeting, we discussed the fact that Ethereum provides a great deal of functionality to its users, and that its functionality as a network is conceded to drive the value of Ether, and thus supports the conclusion that Ether at this time is not a "security." By next spring, ██████ believes that its network will offer equivalent (or better) functionality as Ethereum in a "set it and forget it mode" – that is, even if no further development were done, the network would be self-sustaining and would be able to continue to develop. Notwithstanding the network's ability to continue to operate without intervention, ████████ intends to continue innovating and adding new functionality to its network. (Our understanding is that Ethereum does the same.) We would like to confirm that the fact that those innovations are being effected ████████ ████, as well as driven by the community, does not cause us to veer too much in your eyes into the "efforts of others" prong of the *Howey* analysis. We would like your concurrence that updates and upgrades to a platform (as ████████████ mentioned at our meeting – this is like updates to a Windows operating system), would not themselves be viewed as necessarily driving token price as much as the applications that the many users develop and deploy over time.

4) **Secondary markets**.

We anticipate that there will be trading of the tokens on secondary markets. Such trading is necessary to make the network function and to get tokens into the hands of users. Further, we recognize that in this environment, secondary trading is likely whether ██████ wants it to occur or not. ████████ intention is to publicly discuss secondary selling in the context of network

4147-6685-3654.2
37366-3

Confidential Treatment Requested by ████████████████████         ████-SEC-000241

SEC-████████████-E-0000246

SEC-LIT-EPROD-001748214

RPLI_02423731

Highly Confidential



August 29, 2018
Page 5

function and proof of stake benefits, as well as token availability to general users.  We are mindful of the language in *Munchee* and in Director Hinman's remarks about promotion of secondary trading as evidence of speculative intent.  There may well be speculative buying and selling, especially in the initial phase of the project as early backers are able to receive some liquidity and as those who have been waiting for tokens to use on the network but unable to purchase tokens via the SAFTs are able to finally purchase them.  We have considered the point raised in Director Hinman's taxonomy about whether tokens may only be transferred in amounts that correspond to a purchaser's expected use.  Other than the release schedule under which SAFT holder may sell their tokens, we have not imposed limits on the number of tokens that holders may sell.  Given our proof of stake model, where users will be able to gain value by staking tokens to a node or eventually setting up their own node, users who "hold" tokens by staking them to the network (versus holding them in cold storage wallets off the network) are participating in the network by ensuring its safe functioning.  Further, as the promise of micropayments is realized across a range of applications, it would be very difficult for ▮ to anticipate or dictate the amount of tokens that would correspond to any particular participant's intended use.  In light of this, it does not seem practical to us to have an arbitrary limit on the number of tokens users may buy or sell.  If there are other specific steps that you would regard as providing a reasonable basis to conclude that the intent to use predominates, we would like to discuss those with you.  We think that the case law is quite clear that ▮ is not required to eliminate any risk of speculation in the secondary market, though we share with the Staff the desire to dampen speculation, and have attempted to do so by not setting up any kind of escalating price mechanism.  The distribution scheme is engineered to allow the market to find the market price over time based on network functionality.

We think these are the most fundamental points to discuss at this time.  We would welcome hearing from you regarding any other issues we should be addressing and your views as to the resolutions proposed to the issues raised above.

I believe you have them already, but I've attached a copy of the slides that we walked through during our meeting.

Many thanks again for the time you spent not just in meeting with us, but in preparation for the meeting so that it could be productive.  We look forward to continuing our discussion and receiving your further guidance.

Confidential Treatment Requested by ▮                                    ▮-SEC-000242

SEC-▮-E-0000247

SEC-LIT-EPROD-001748215

RPLI_02423732

Highly Confidential



August 29, 2018
Page 6

Very truly yours,

4147-6685-3654.2
37366-3

Confidential Treatment Requested by ████████████████

█-SEC-000243

SEC█████████-E-0000248

SEC-LIT-EPROD-001748216

RPLI_02423733

Highly Confidential

Director Hinman's Illustrative Factors As Applied To █████

Recognizing that the SAFT is an investment contract, and that █████ has treated it as such, we have focused primarily on the characteristics of the token, the network, and the project as of the date of token issuance under the SAFT.

First set of factors

1. *Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?*

   █████ (together with ████████████████████████████████) has played and will continue to play a significant role in the development and maintenance of the <u>network</u> and promoted the creation and sale of the SAFT, by which the █████ tokens were sold to investors. █████ recognizes that the SAFT is an investment contract and conducted its SAFT offerings in accordance with US securities laws.

   █████, will remain involved in continuing to develop and maintain the base layer platform and to ensure the stable rollout of the network. The network was officially launched in ████████████, and applications will be developed over the coming months. However, after this network launch and as the ecosystem develops, the value of the digital asset – i.e., the token -- will be derived from the variety of distributed applications and use cases that third-party developers create on top of the network.

2. *Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?*

   █████ will retain ownership of approximately █████ of the total supply of tokens in the early years of the network. This percentage is determined by the safety requirements of proof-of-stake networks, which necessitate that no malicious actor own █████ of the total supply. The network is at its most vulnerable in the initial phase of growth, when the value of the token will be most uncertain. █████ has publicly stated that it will hold its █████ of the supply for an initial five years or until the circulating supply of tokens is sufficiently distributed and stable, at which time it will slowly release more tokens into circulation. This is a measured, long-term approach to network stability. It does not lend itself to SAFT holders or future token holders reasonably believing that █████ will take action to increase their return on investment.

   █████ believes that the primary driver of token value – and the expectation of purchasers about the primary driver of token value – will not be █████ efforts in protecting the network from malicious attacks, which is necessary but not sufficient for a useful platform.

Confidential Treatment Requested by █████████████

█-SEC-000244

SEC-█████████-E-0000249

SEC-LIT-EPROD-001748217

RPLI_02423734

Highly Confidential

Rather, the token's value will be driven by the range of distributed applications and new use cases developed by others on top of the network, particularly in the area of microtransactions, and the potential value to users for staking their tokens on the network.

3. *Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise? Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?*

Given the uncertainty of the industry worldwide, ▮▮▮▮ has raised substantial funds to support business operations, including potentially setting aside a reserve for insurance; funds to address ongoing and cross-border legal, regulatory and compliance activities; funds for improvements to enhance the stability and security of the network; and funds to continue educating and supporting developers who seek to bring new applications and use cases to the network.

4. *Are purchasers "investing," that is seeking a return? In that regard, is the instrument marketed and sold to the general public instead of to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?*

▮▮▮▮ recognizes that investors in the SAFT believe in the value of the project and seek a return for their early support. However, ▮▮▮▮ structured its SAFT as a fixed price instrument, such that investors are not guaranteed a return, i.e., they were not guaranteed a discount off a future market price. In addition, SAFT holders receive their tokens over an extended schedule, dampening expectation of "flipping" the investment for a quick return.

With respect to the <u>token</u> rather than the SAFT, because ▮▮▮▮ aims to be a general purpose public ledger and to facilitate micropayments on the internet for the public at large, there is no meaningful way to distinguish between "the general public" and "potential users of the network." ▮▮▮▮ intends to market the <u>network</u> to the public at large; the tokens are required for use of the network. With respect to token price, one of the benefits of distributing tokens via the SAFT and allowing SAFT holders to begin selling ▮▮ months after network launch – after developers and early users have begun to receive tokens through activity and dapp deployment on the network – is that the market itself will determine what is a reasonable price based on the market value for the token's use on the network.

We do not believe that ▮▮▮▮ can eradicate all speculation in the token when it becomes available to the public, but ▮▮▮▮ has structured the SAFT and token release schedule in order to mitigate the risk of speculation-fueled pricing.

5. *Does application of the Securities Act protections make sense? Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be important to investors? Do informational*

Confidential Treatment Requested by ▮▮▮▮▮▮▮▮▮

▮-SEC-000245

SEC-▮▮▮▮▮▮-E-0000250

SEC-LIT-EPROD-001748218

RPLI_02423735

Highly Confidential

*asymmetries exist between the promoters and potential purchasers/investors in the digital asset?*

With respect to the SAFT, ███ has complied with the Securities Act.

With respect to the tokens, at the time the tokens become available for purchase by the general public, after the network has launched and applications are already available on it, ███ does not believe that applying the Securities Act protections to the sale of tokens would make sense. Purchasers of the tokens will be able to use the tokens to access services offered by developers on the network, or to stake their tokens to a node to participate in the network ecosystem. The system is a public ledger and all of those transaction costs, fees and rewards will be transparent, such that users can fairly determine the value of the token based on either current use or their own view of how they expect the network to grow over time.

Tokens are not currently available for purchase by the general public. The network has been launched and tokens will be distributed to various developers. The general public will not be able to purchase tokens until the network has been fully operational for a number of months.

6. *Do persons or entities other than the promoter exercise governance rights or meaningful influence?*

During the period between network launch and general availability of the tokens, the ███ will continue to be formed. The ███ will exercise governance over the network. The ███ is described in our prior memo to the Staff, and will at scale be made up of ███ ███ but the decision-making and governance rights will be distributed equally among all of the ███.

Second set of factors regarding use tokens.

1. *Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?*

The tokens themselves are required so that developers and users can access the ███ system via micropayments for submitting and processing transactions, as well as to provide the staking mechanism that secures the system against certain types of attacks to which all distributed ledgers are vulnerable.

As detailed above, the creation and distribution of tokens, including the manner in which ███ structured the SAFT and scheduled the release of tokens to SAFT holders, was intentionally geared to use on the network, rather than to speculation.

SAFTs were offered at a fixed price, rather than a discount to an eventual market price. SAFT holders may sell only twenty percent of their tokens at initial issuance, which is delayed until six months after network launch to give the ecosystem an opportunity to develop. The remainder of SAFT holders' tokens become unrestricted over a period

Confidential Treatment Requested by ███                   ███-SEC-000246

SEC-███-E-0000251

SEC-LIT-EPROD-001748219

RPLI_02423736

Highly Confidential

ranging from eight months following initial issuance to four years following initial issuance.

Over the first ███ months, which is the period between network launch and issuance to SAFT holders, tokens will be distributed to developers and early users for their testing and early use of the network.

████ itself will hold a majority of tokens for the initial few years, to ensure network stability and prevent malicious attacks (such as Sybil attacks). The percentage of tokens held by ████, ████, management and employees and investors, and the estimated release schedule for the tokens, has been shared publicly.

2. *Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?*

████ expects that the token will be traded on the secondary market, as people who want to obtain tokens seek to purchase them from people who hold them. ████ has explained to the Staff that it needs to work behind the scenes with "exchanges" because the token is based on a new protocol, unlike Ethereum tokens.

However, ████ has not promoted secondary trading, has refused to permit secondary sales of the SAFT, and has consistently stated that it will not speculate about the price of tokens on exchanges. In response to questions in its social media channels, ████ has stated that it does not control whether or when the token will be listed.

Our expectation is that there may be a period of price discovery when the token is first issued to SAFT holders free of sale restrictions, but that the value of the token will be set by the market as developers deploy applications and build out new use cases that determine the value of the token on the network.

3. *Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment? Have purchasers made representations as to their consumptive, as opposed to their investment, intent? Are the tokens available in increments that correlate with a consumptive versus investment intent?*

████ believes that the "primary motivation" question will be a difficult one for any new protocol or token to answer with certainty. Particularly in the early stages of deployment, some individuals may purchase the tokens purely for use on the network, others may purchase the tokens purely to stake them on the network, others still may purchase them solely for investment purposes, while many may have a combination of motivations for their purchase.

████ has no doubt that developers and users will purchase tokens for use on the network. It has created a program for early adopters to begin receiving tokens for their early participation in the months following network launch.

Confidential Treatment Requested by ███████████        ██-SEC-000247

SEC-████████-E-0000252

SEC-LIT-EPROD-001748220

RPLI_02423737

Highly Confidential

Tokens will be available for use in denominations that are consistent with what ▮▮▮▮
views as one of the most significant use cases: microtransactions costing a fraction of a
cent, which we view as consistent with a consumptive rather than an investment intent.

4. *Are the tokens distributed in ways to meet users' needs? For example, can the tokens be
held or transferred only in amounts that correspond to a purchaser's expected use? Are
there built-in incentives that compel using the tokens promptly on the network, such as
having the tokens degrade in value over time, or can the tokens be held for extended
periods for investment?*

We respectfully suggest that the framing of this factor is not entirely applicable to the
▮▮▮▮ network and tokens. Tokens on the ▮▮▮▮ network have a dual function. One
function is that tokens are the facilitating fuel for the network. They are the means by
which developers pay for API calls and charge for services, and they enable transactions
and microtransactions on the network. The other function is to perform a "staking" role,
adding weight to the nodes to which they are staked to participate in the network
functioning and secure the network as a whole against certain classes of malicious attacks.
When staked (or ▮▮▮▮▮▮), they earn rewards for the node in return for the node's
participation in the network. Both functions are important for use of the network.

Because users who hold tokens can stake (or ▮▮▮▮▮▮) them to nodes, and earn more
tokens for doing so, there is no benefit or incentive for "holding" tokens off-network, e.g.,
in cold storage wallets. Rather, there is incentive for users to stake their tokens to a node,
which constitutes use of the token on the network as it contributes to the network stability
as a whole. Given the proof of stake model, it would not make sense for ▮▮▮▮ to
penalize or disincentivize holding tokens, provided that they are held "on network" by
staking or ▮▮▮▮▮▮. In addition, as applications using micropayments are deployed
and new use cases develop, it would be very difficult for ▮▮▮▮ to determine or dictate
the amount of tokens that would reasonably correspond to a particular participant's
intended use. In light of this, it does not seem practical to have an arbitrary limit on the
number of tokens that can be held or transferred.

5. *Is the asset marketed and distributed to potential users or the general public?*

Because ▮▮▮▮ is designed to be a mainstream platform for all users, this factor also does
not appear to be applicable. In the initial months of the network, tokens will be distributed
only to developers and early users. When tokens are released to SAFT holders to sell,
▮▮▮▮▮▮ expectation is that they will become available to the general public, but ▮▮▮▮
also expects that the general public will be the potential users of the platform and the
variety of distributed applications deployed on top of it.

6. *Are the assets dispersed across a diverse user base or concentrated in the hands of a few
that can exert influence over the application?*

We note that the framing of this factor appears to contemplate an application rather than a
base layer platform. In the context of a base layer platform, this factor also appears to be
in tension with the preceding one.

4160-5876-4822.1

Confidential Treatment Requested by ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮-SEC-000248

SEC-▮▮▮▮▮▮-E-0000253

SEC-LIT-EPROD-001748221

RPLI_02423738

Highly Confidential

███ expects its platform and token to be available to a diverse user base. ███ intent has been to distribute tokens broadly, while balancing that against the requirements of the Securities Act to offer the SAFT (prior to network launch) only to accredited investors. ███ will distribute tokens to developers and early adopters during the ███ month period following network launch. When tokens are distributed to SAFT holders, ███ expectation is that they will become available to anyone who wishes to participate in the ███ network or the applications available on it.

7. *Is the application fully functioning or in early stages of development?*

The ███ platform is not a single application, but a base layer platform. The network is in the late stages of development. The network was launched ███████████████, with initial access to developers and early users ███████, and expanding ███████.

That said, ███ intends to continue adding functionality as developers test the network, and as ███████ and eventually others stand up nodes. As with any platform or product ███ is likely to add functionality and upgrades on a continuous basis, but the network itself will be fully functional ████████████████████ before tokens are issued to SAFT holders or resold by them to the general public. These services are currently available, but not yet fully utilized ███ ███████.

4160-5876-4822.1

Confidential Treatment Requested by ███████████

███-SEC-000249

SEC-███████-E-0000254

SEC-LIT-EPROD-001748222

RPLI_02423739

Highly Confidential



Confidential Treatment Requested by ███████████

███SEC-000250

Highly Confidential

# The Founders



Confidential Treatment Requested by ███████████   ██-SEC-000251

Highly Confidential

 vision

Confidential Treatment Requested by █████████                                                    █-SEC-000252

SEC-███████-E-0000257

SEC-LIT-EPROD-001748225

RPLI_02423742

Highly Confidential



████ network attributes

Confidential Treatment Requested by ████████

██-SEC-000253

Highly Confidential

██████ at scale



Confidential Treatment Requested by ██████████   ██-SEC-000254

SEC-██████████-E-0000259
SEC-LIT-EPROD-001748227
RPLI_02423744

Highly Confidential

█████████ : the most decentralized platform



Confidential Treatment Requested by ████████████

█ -SEC-000255

SEC- ████████ -E-0000260
SEC-LIT-EPROD-001748228

RPLI_02423745

Highly Confidential



█████ token required

Confidential Treatment Requested by ███████████   ██-SEC-000256

Highly Confidential

National security



Confidential Treatment Requested by ███████████

██-SEC-000257

Highly Confidential

# The path from launch to full decentralization



Confidential Treatment Requested by ████████████

████-SEC-000258



Highly Confidential

Confidential Treatment Requested by ███████████ ███-SEC-000259

SEC-████████-E-0000264
SEC-LIT-EPROD-001748232
RPLI_02423749