# Exhibit 215

**To:**   Guidroz, John[ ███ @sec.gov]; Starr, Amy ███ @SEC.GOV]; McHugh, Jennifer
B. ███ @SEC.GOV]; McGee, Carol ███ @sec.gov]; Tao, Josephine J. ███ @SEC.GOV];
Greiner, Natasha (Vij ███ @SEC.GOV]; Maitra, Neelanjan ███ @SEC.GOV]; Baird,
Elizabeth[ ███ @SEC.GOV]; Wolfe, Mark ███ @SEC.GOV]; Ingram, Jonathan ███ @SEC.GOV];
Gold, Laura ███ @SEC.GOV]; Oh, Cindy[ ███ @SEC.GOV]; Walz, David ███ @SEC.GOV];
Schoeffler, Andrew ███ @SEC.GOV]; Hunter-Ceci, Holly L.[ ███ @sec.gov]; Haghshenas,
Parisa ███ @SEC.GOV]; Varghese, Thankam ██ t@SEC.GOV]; Vilardo,
Mark ███ @SEC.GOV]; Reedich, Michael ███ @SEC.GOV]
**From:**   Szczepanik, Valerie
**Sent:**   2018-11-30T10:10:40-05:00
**Importance:**   Normal
**Subject:**   RE: Crypto 211 followup
**Received:**   2018-11-30T10:10:40-05:00

ZEC securities law analysis.pdf

::::::::::
::::::::::
Thanks, John – they separately sent me and Lizzie their legal analysis, attached.

**From:** Guidroz, John
**Sent:** Thursday, November 29, 2018 4:54 PM
**To:** Starr, Amy; Szczepanik, Valerie; McHugh, Jennifer B.; McGee, Carol; Tao, Josephine J.; Greiner,
Natasha (Vij)); Maitra, Neelanjan; Baird, Elizabeth; Wolfe, Mark; Ingram, Jonathan; Gold, Laura; Oh,
Cindy; Walz, David; Schoeffler, Andrew; Hunter-Ceci, Holly L.; Haghshenas, Parisa; Varghese,
Thankam; Vilardo, Mark; Reedich, Michael
**Subject:** FW: Crypto 211 followup

FYI, ███ sent me this notice that ███ added ███ to its platform.

**From:** ████████████
**Sent:** Thursday, November 29, 2018 2:57 PM
**To:** Guidroz, John
**Cc:** Dan Zinn; Tao, Josephine J.
**Subject:** Re: Crypto 211 followup

John,

Fyi, ███ was added to ███ today: ████████████████████████████

I don't believe they add coins that they believe could be securities.

████████████████████████████████

**Sent:** Thursday, November 15, 2018 10:12 PM
**To:** Guidroz, John
**Cc:** Dan Zinn; Tao, Josephine J.
**Subject:** RE: Crypto 211 followup

Thanks John. Hopefully we can help connect the right parties to give brokers/issuers/investors better
clarity on these complex issues.

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

If the staff have questions they can reach out directly to: (as it is above my pay scale the intricacies and subtleties of what is in and out the securities door)



**From:** Guidroz, John
**Sent:** Thursday, November 15, 2018 5:06 PM
**To:**
**Cc:** Dan Zinn ; Tao, Josephine J.
**Subject:** [EXT] RE: Crypto 211 followup

Thank you for the email. I have sent the email on to others in the Commission who actively work on crypto issues.

John

**Sent:** Thursday, November 15, 2018 4:45 PM
**To:** Guidroz, John
**Cc:** Dan Zinn
**Subject:** Crypto 211 followup

John,

I wanted to follow up on our brief conversation about the ▮▮▮▮▮ and the risk that the underlying asset could be a security (Since only Bitcoin and Ethereum have been publicly deemed). The Trust provided the below answer to FINRA some time ago pointing out that it was a Fork from Bitcoin and not an ICO.

Either way would be good to have a more direct process for FINRA and SEC staff to share questions with the issuers and their counsel so they can get address issues in a timely manner.

"Provide a legal analysis from counsel regarding whether ▮▮▮▮▮ are or are not a "security," as defined under the Securities Act of 1933 ("Securities Act") and the Securities Exchange Act of 1934 ( "Exchange Act").

Response: The Issuer respectfully declines the Staff's request to provide a legal analysis from counsel regarding whether ▮▮▮▮▮ are or are not a "security" as defined under the Securities Act and the Securities Exchange Act.

In sponsoring the Issuer, ▮▮▮▮▮▮▮ the "Sponsor") conducted its own legal analysis as to whether ▮▮▮▮▮ are securities. The Sponsor's legal analysis concluded that there is a reasonable basis to believe that ▮▮ is not a security. In reaching this conclusion, the Sponsor relied on the remarks given by the U.S. Securities and Exchange Commission's (the "SEC") Director of Corporate Finance, William Hinman, in which he declared that the SEC does not consider Bitcoin or

Ethereum to be securities (the "William Hinman Speech").[1] The Sponsor also relied on statements from the Commodities Futures Trading Commission (the "CFTC") declaring that Bitcoin is a commodity and not a security.[2]

Bitcoin's designation as a non-security means that other digital assets that are similar enough to Bitcoin, such Bitcoin Cash, Litecoin and Zcash, would not be deemed securities either. All of these aforementioned digital assets are "forks" of Bitcoin, which means that they are new digital assets based on the Bitcoin codebase but with modifications to create new applications. These new digital assets nonetheless maintain the properties that the SEC identified in the William Hinman Speech as being key to determining whether or not a digital asset is a security, including (1) whether a central third party's efforts are a key determining factor in the enterprise and (2) whether the digital asset's network is operational and decentralized. As a fork of Bitcoin, █████████ tokens have all of these attributes and are therefore not securities.

The Issuer further notes that while the underlying ████ tokens held by the Trust are not securities, the shares in the Trust are securities, and those are the class of security for which the Issuer is seeking FINRA approval pursuant to SEC Rule 15c2-11."



SEC-LIT-EMAILS-000466558

RPLI_02896949



CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000466559

RPLI_02896950

coinbase

**CONFIDENTIAL**

████████

**COINBASE ANALYSIS**

*Last Update: November 29, 2018*

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000466560

RPLI_02896951

coinbase

**CONFIDENTIAL**

████████████

**INTERNAL SECURITIES LAW ANALYSIS**

## I.      Introduction

The following is an analysis of whether ████████████ meets the definition of a "security" under the federal securities laws.  Specifically, this document examines whether ████ meets the definition of an "investment contract," and is therefore a security as defined under Section 2(a)(1) of the Securities Act of 1933 ("Securities Act") and Section 3(a)(10) of the Securities Exchange Act of 1934 ("Exchange Act").[1]  This analysis uses the four-prong test promulgated by the Supreme Court in SEC v. Howey and its progeny.[2]

This analysis also evaluates the asset against the factors identified by the SEC Division of Corporation Finance Director Hinman in his recent speech, Digital Asset Transactions: When Howey Met Gary (Plastic).[3]  In that speech, Director Hinman identified a series of questions to help determine if (1) an asset is offered as an investment contract and is therefore a security; and (2) if the asset is being offered for consumptive purposes and is therefore not a security.  Director Hinman emphasized that the questions set forth in his speech are not intended to be exhaustive, and that not all of his factors must be satisfied to establish that the asset is not a security.[4]  Moreover, each prong of Howey must be satisfied in order for the asset to meet the Howey test, and therefore to be deemed to be an investment contract.[5]

---

[1]       Although the Securities Act and the Exchange Act have slightly different definitions of a security, the Supreme Court has indicated that the two definitions are sufficiently similar in scope as to be treated as functionally identical.  See Reves v. Ernst & Young, 494 U.S. 56, 61 n.1 (1990) ("We have consistently held that 'the definition of a security in § 3(a)(10) of the 1934 Act . . . is virtually identical [to the definition in the Securities Act of 1933] and, for present purposes, the coverage of the two Acts may be considered the same.'  We reaffirm that principle here.") (quoting United Housing Foundation, Inc. v. Forman, 421 U.S. 837, 847 n.12 (1975)).

While the definition of a security in both the Securities Act and the Exchange Act include a number of other instruments, such as stocks, security futures, and debentures, we believe that the concept of an investment contract is most relevant here.  For that reason, this analysis focuses on whether the asset meets the definition of an investment contract.

[2]       328 U.S. 293 (1946).  See also United Housing Foundation, Inc. v. Forman, 421 U.S. 837 (1975); SEC v. Edwards, 540 U.S. 389 (2004).

[3]       https://www.sec.gov/news/speech/speech-hinman-061418

[4]       Id.

[5]       See Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994).

2

coinbase

## II.   Summary of Asset[6]

█████████) is the native digital currency of the ███ network, similar to how bitcoin (BTC) is the native digital currency of the Bitcoin network.  ███ is a privacy-focused digital asset that is designed to be used as a method of value transfer.  Established by ██████ ██████████████████████████████████ grew out of the ██████ project, which was initially created in 2013 as an extension to Bitcoin.  In 2014, developers created an upgraded protocol, ████████, which was no longer an extension of Bitcoin, but one that utilized its own separate blockchain, albeit based on Bitcoin's source code.  The "genesis block" of ██ was mined on October 28, 2016, the same day the ███ blockchain was created.

█████ uses an encrypted open ledger similar to Bitcoin's open ledger, but with more emphasis on privacy.  For example, while ████ payments are published on a public blockchain, the sender, recipient, and amount of the transaction may remain private.  ███ accomplishes this by utilizing a zero-knowledge proof to verify transactions (zk-SNARK) without providing any additional information about them.  More specifically, the █████ network supports two kinds of transactions: transparent and shielded.  Transparent transactions (t-addr) operate similarly to Bitcoin: the balance and the amounts of the transaction are publicly visible on the blockchain.  By contrast, shielded transactions utilize z-addresses (z-addr) and are entirely private.  The sender, the recipient and value on the blockchain may be hidden, so transactions associated with z-addresses do not appear on the public blockchain.  There also may be partial shielding in a transaction, so that the ████ payment that is sent from a shielded address to a transparent address reveals the shielded balance, and vice versa.  Users are assigned a view key that corresponds to their payment address that they may provide to others to unshield the transaction.  The viewing key may be used to selectively disclose data from a specific transfer, or disclose all transactions for a given shielded address.  Once the viewing key or transaction disclosure is shared with one party, it may be further shared with other parties or be made public.

████ is mined and, like Bitcoin, is limited to 21 million ZEC.  10% of all mined ████ will be allocated to the "Founders Reward," pursuant to which 5.72% of all ████ will be allocated to founders, employees and advisors, 1.65% to investors, 1.19% to the ████████████ strategic reserve, and 1.44% to the non-profit █████████████.  The Founders Reward address is specified in the source code of the ████ network, and is changed periodically to maintain security.  The specific allocations of the Founders Reward to the eligible recipients will be overseen by the ███████████.

Initially, 50 ████ will be created every ten minutes, with 80% of the newly created ████ being allocated to the miners, and 20% of the ███ allocated to the Founders Reward.  Every four years, the rate of ████ being created will halve, so that, after the first four years, the amount

---



[6]   The factual statements that are contained in this memo, and the corresponding legal conclusions, are based on publicly available information and on statements made by the issuer.

3

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

coinbase

of ▉ created every ten minutes will be 25 ▉ The Founders Reward ceases after the first four years, and 100% of ▉ that is mined after that point will be allocated to the miners.  In order to promote a more diverse ▉ ecosystem, the ▉ encouraged the development of open-source mining software that would be widely accessible, and an open-source CPU mining guide is available on GitLab.

To assist in scaling the ▉ network, the network was implemented with a "slow-start" mining mechanism, so that the first 20,000 blocks of ▉ would have a block mining reward beginning with 0 ▉ per block, gradually and linearly increasing until reaching the full block mining reward of 12.5 ▉ at the 20,000 block.  This was anticipated to occur approximately 34 days after the launch of the ▉ network.  With the exception of the predetermined allocation of the Founders Reward, the ▉ does not control the mining or distribution of ▉ and has no special access to transactions.

The "genesis block" of ▉ was mined on October 28, 2016 as part of the creation of the ▉ blockchain.  This version 1.0 of the ▉ blockchain was known as "Sprout," which featured zero-knowledge privacy, a new Proof-of-Work algorithm, and an Application Programming Interface (API).  Following the genesis block, the ▉ network underwent a series of incremental upgrades, generally related to fixing bugs or vulnerabilities or increasing usability.  A significant upgrade to the ▉ network occurred in March 2018 with ▉ Overwinter, an upgrade which strengthened the ▉ protocol for future ▉ network upgrades, including the "Sapling" network upgrade that occurred in October 2018.  Among other things, the Sapling upgrade increased the performance of shielded addresses and thereby expanded the parties that could support them, decoupled the hardware that signs a shielded transaction from the hardware that constructs the cryptographic proof, and extended the capability of the viewing key to include visibility into outgoing transactions for a shielded address.

There was no public sale of ▉; however, the ▉ raised capital through two private rounds of financing.  As of September 2016, the ▉ had completed two rounds of financing totalling $3M.  As part of those financings, investors received equity in the ▉ and a portion of ▉ (1.65% of all ▉ through the Founders Reward.  The Founders Reward allocation was paid out to those investors in the first year of mining.

Currently, approximately 5.3M ▉ have been mined, and the ▉ blockchain is at Block 436,195.  The network hashrate is approximately 2.1B Sols (solutions per second), and approximately 4.1M transactions have been recorded to date, with approximately 2.8M all-time seen accounts.

▉ is accepted by businesses, vendors and other organizations, and the ▉ community has posted a list of over 90 vendors, services and non-profit organizations that currently accept payment in ▉ Users of the ▉ network may also send ▉ to one

4



another.  To facilitate the use of ██████ several independent third parties have created software or services for use with ██████.  For example, developers have created several web-based and hardware wallets that support the ██████ transparent address, and local wallets that support both transparent and shielded addresses.  ██████ also is supported by several virtual currency platforms for purchase and sale in the secondary market.  One of those platforms is the ████████████████████ a limited purpose trust company chartered under New York State Banking Law, which was authorized by the New York State Department of Financial Services to offer custody and trading for ██████ in May 2018.

██████ operates on an open-source protocol that is available on GitHub; while Company offers updates to the ██████ protocol, anyone may offer improvements to the protocol.  For example, users may submit ██████ Improvement Proposals (ZIPs) through GitHub, pursuant to which ZIPs are submitted, reviewed and potentially approved by other members of the ██████ community.  Currently, GitHub lists approximately 385 unique contributors, 1,140 closed "pull requests"[7] and 12,000 "commits"[8] for the ██████ network.

In addition to ████████████████████ has been created as a non-profit Delaware corporation that "provide[s] a natural locus for voluntary governance" by supporting the development of the ██████ protocol and blockchain, supporting technology research into cryptocurrency, providing leadership for the ██████ protocol, and promoting the ██████ community.  The ████████████ was established in March 2017, and consists of a five-person Board of Directors and three employees; only one of those people is an employee of ██████ In both funding and governance, the ████████████ was designed to be independent of the ████████████████████ founders at the time of its inception.  In addition to the 1.44% of the Founders' Reward that is allocated to the ████████████, some of the ████████████ stakeholders pledged their portion of the Founders reward (approximately 10% of the total Founders reward) to the ████████████████

In addition to the ████████████████ and its employees, the ██████ ██████ maintains a "Community Governance Panel", which will ultimately be comprised of approximately 200 members of the ████████████.  Any ██████ member may submit nominations for vacant ████████████ seats, and any ██████ member may submit a ballot for consideration by the Community Governance Panel and the ████████████ ██████ For example, the 2018 Q2 ████████████████████████████ election provided for the election of up to three candidates to the ████████████, and featured voting on five substantive questions relating to the strategic direction of the ██████ ████████ Ballots were voted on by members of the Community Governance Panel.

---

[7]   A pull request is a proposed change to a repository that is submitted by a user and accepted or rejected by a repository's collaborators.  Each pull request has its own discussion forum.

[8]   A commit is an individual change to a file or a set of files, which usually contains a message which describes the changes that were made as part of the commit.

5

coinbase

### III.    Howey Test

### A.    Investment of Money

Courts have found that this prong is satisfied where the investor "commits his assets to the enterprise in such a manner as to subject himself to financial loss."[9]  In evaluating whether a transaction constitutes a sale for purposes of Section 5 of the Securities Act, the SEC has previously found that this prong may be satisfied even if there is a lack of monetary consideration, if the purposes of the offering or gift is to "advance the donor's economic objectives rather than to make a gift for simple reasons of generosity."[10]

As noted above, the █████████████ announced in September 2016 that it had completed approximately $3M in funding, pursuant to which investors received equity in the ████████████ and a portion of mined █████ (1.65% of all █████ through the Founders Reward. The Founders Reward allocation was paid out in the first year of mining.  This allocation appears to satisfy the "investment of money" prong, since those investors committed capital in return for █████ (in addition to equity in the ██████████████.

For the remaining 98.35% of █████ that is mined, however, we do not believe that mining satisfies the "investment of money" test for that █████ when it is mined.  Mining is more akin to a network operating service, where miners engage in activity (mining) for the immediate return of value █████, which they then may liquidate.  We believe that mining is more properly characterized in this manner even for the blocks that comprised part of the "slow start" of the █████ network, where the mining reward for the first 20,000 blocks of █████ gradually and linearly increased until reaching the full block mining reward of 12.5 █████ at the 20,000 block (approximately 34 days after the launch of the genesis block).

We also note that, in the secondary market for █████, most purchasers of █████ are not miners.  Although these purchasers are buying █████ from an exchange or other platform and not from the issuer, this exchange of money in return for █████ on the secondary market appears to meet the "investment of money" test.

---

9       See SEC v. Rubera, 350 F.3d 1084, 1090 (9th Cir. 2003) (citing Hector v. Wiens, 533 F.2d 429, 432 (9th Cir. 1976)); Payton v. Flynn, 2006 U.S. Dist. LEXIS 81346 (N.D. Ill. 2006).

10      See In re Joe Loofbourrow, Securities Act Release No. 7700 (July 21, 1999) (File No. 3-9934) (give-away of "free" stock still constituted a sale for purposes of Section 5 of the Securities Act where the "free" stock give-away "attracted additional people to [defendant's] web site and increased the chances that members of the public would invest capital" in defendant's company.).

6

coinbase

### B.    In a Common Enterprise

Courts have applied three separate tests in evaluating the "common enterprise" prong. Some courts have used the "horizontal commonality" test, which focuses on the relationship among investors.  Horizontal commonality requires that the fortunes of each investor be tied together in the success of the overall venture through the pooling of funds, often combined with a pro-rata distribution of profits.[11]  Other courts have used the concept of vertical commonality, which focuses on the relationship between the investor and the promoter.  Some courts have used the "broad vertical commonality" test, which exists when the investors are dependent on the expertise or efforts of the promoter.[12]  Other courts have used the "strict vertical commonality" test, which exists when the fortunes of investors are tied to the fortunes of the promoter.[13]



We do not believe that ▮▮▮ meets any of the commonality tests set forth above, because the "fortunes" of ▮▮▮ holders are not linked to other ▮▮▮ holders or to the ▮▮▮ ▮▮▮▮ in the manner required by the various tests.

First, ownership of ▮▮▮ only confers the right to use ▮▮▮ as a transfer of value, similar to Bitcoin, and does not confer any other right with respect to the ▮▮▮ ecosystem or the ▮▮▮ Company.  Ownership of ▮▮▮ does not confer any ownership right or stake, or any right to receive future shares, intellectual property rights or any other form of participation related to the ▮▮▮ Company or the ▮▮▮ ecosystem.  Holders of ▮▮▮ are not entitled to any kind of profit-sharing, either as part of a collective distribution among all ▮▮▮ holders, or as part of a

---

[11]    See Revak v. SEC Realty Corp., 18 F.3d 81, 87 (2d Cir. 1994); Newmyer v. Philatelic Leasing, Ltd., 888 F.2d 385, 394 (6th Cir. 1989); In re J.P. Jeanneret Assocs., 769 F. Supp. 2d 340, 359 (S.D.N.Y. 2011).

[12]    See SEC v. ETS Payphones, Inc., 408 F.3d 727, 732 (11th Cir. 2005); see also SEC v. Sg Ltd., 265 F.3d 42, 49 (1st Cir. 2001) (citing cases); cf. Revak, 18 F.3d at 87-88 (rejecting the broad vertical commonality test as insufficient to satisfy the second prong of the Howey test, and finding that, "[i]f a common enterprise can be established by the mere showing that the fortunes of investors are tied to the efforts of the promoter, two separate questions posed by Howey -- whether a common enterprise exists and whether the investors' profits are to be derived solely from the efforts of others -- are effectively merged into a single inquiry.").

In its recent Report of Investigation Pursuant to Section 21(a) on the Decentralized Autonomous Organization, the SEC did not undertake a separate "common enterprise" analysis, which suggests that it implicitly adopted the broad vertical commonality test and, as predicted by the Revak court, conflated that analysis with the "efforts of others" prong.  See https://www.sec.gov/litigation/investreport/34-81207.pdf

[13]    See Hocking v. Dubois, 885 F.2d 1449, 1459 (9th Cir. 1989) (accepting either horizontal commonality or, where no pooling of investors is present, strict vertical commonality).

7

SEC-LIT-EMAILS-000466566

RPLI_02896957



specific relationship or agreement with the ██████████[14]  Because there is no profit-sharing with other ████ holders or with the ██████████ we do not believe that either horizontal or strict vertical commonality is satisfied.

We also do not believe that broad vertical commonality is satisfied for the 98.35% of ████ that is mined and was not paid to investors as part of the Founders Reward, because the fortunes of those ████ holders are not dependent on the efforts of the ██████████ ████ is a privacy-focused digital asset that is designed to be used as a method of value transfer.  The technical core of the ████ network -- the ability to use the ████ network to send shielded and unshielded ████ transactions -- was functional at the time of the genesis ████ block.  Moreover, the ██████████ does not have special access or control over ████ transactions that occur on the ██████████

Additionally, all ████ is produced through mining, and, with the exception of the predetermined allocation of the Founders Reward, ██████████ does not control the mining or distribution of ████.  That mining process is conducted by a diverse group of miners and mining pools, and mining activity can influence the direction of the network, regardless of the interest of the network founder.  For example, in the context of a soft fork, if miners choose to switch to a new code on a forked version of the network, and if there are insufficient nodes and miners on the old code to process transactions, the old nodes would be forced to accept the new code.  In contrast, if a new soft fork is unpopular and an insufficient number of miners adopt it, that new fork may fail due to insufficient miner support.  The hash rate for ████, which is an indication of the level of mining activity on the ████ network, has increased from approximately 1700 KSols (thousand solutions per second) at Block 1000 to 2.8M KSols at Block 435601.

While the ██████████ has released enhancements to the ████ network, the existing functionality of the ██████████ was such that there are no significant efforts required by either the ██████████ or anyone else to maintain it.  Moreover, ████ operates on an open-source protocol that is available on GitHub; while ██████████ offers updates to the ████ protocol, anyone may offer improvements to the protocol.  Currently, GitHub lists

---

[14]       As noted above, certain investors were allocated ████ as part of the Founders Reward.  Even if this allocation of ████ could be deemed to be profit-sharing, however, it is the result of an investment in the ████ Company, and not the acquisition of ████.

[15]       For the 1.65% of ████ that was allocated to investors as part of the Founders' Reward, those investors may satisfy the broad vertical commonality test for time following their investment (which was announced in September 2016) and the time when the ████ genesis block was launched, which occurred on October 28, 2016.  Following the launch of the ████ genesis block, however, we believe that the extent to which the fortunes of those investors as it related to their allocation of ████ through the Founders Reward became more comparable to the fortunes of other ████ users and miners, given that the ████ network was live and mining was occurring independently of the ██████████.

8

CONFIDENTIAL
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

coinbase

approximately 386 unique contributors, 1,140 closed "pull requests"[16] and 12,000 "commits"[17] for the ███ network.

Finally, governance of the ███ network is transitioning to the non-profit ███ ███, which currently provides for the election of representatives to the ███████ █████████ ███, and voting on questions relating to the strategic direction of the ███████.

### C.      With a Reasonable Expectation of Profits

Under the Howey test, the "reasonable expectation of profits" prong may be satisfied where "the investor is 'attracted solely by the prospects of a return'" on the investment" as opposed to instances where the purchaser "is motivated by a desire to use or consume the item purchased."[18] Some courts, including the Fourth Circuit, have held that this prong may be satisfied if the opportunity or asset "tended to induce purchases by emphasizing the possibility of profits."[19] This prong may be satisfied where the investor receives capital appreciation resulting from the development of the initial investment, or a participation in earnings resulting from the use of the investors' funds,[20] or where the investment promises a fixed rate of return.[21] In contrast, when a purchaser "is motivated by a desire to use or consume the item purchased . . . the securities laws do not apply."[22]

Notwithstanding that there is and will continue to be an active secondary market in ███ and that some portion of market participants may be purchasing ███ with a reasonable expectation of profits, the strong utility case of ███ and the circumstances of its actual use support the view that purchasers do not tend to acquire ███ "solely [for] the prospects of a return."

### D.      From the Entrepreneurial or Managerial Efforts of Others

---

[16]     A pull request is a proposed change to a repository that is submitted by a user and accepted or rejected by a repository's collaborators. Each pull request has its own discussion forum.

[17]     A commit is an individual change to a file or a set of files, which usually contains a message which describes the changes that were made as part of the commit.

[18]     See United Housing Found., Inc. v. Forman, 421 U.S. 837, 852 (1975) (quoting Howey, 328 U.S. at 300).

[19]     See Teague v. Baker, 35 F.3d 978, 987 (4th Cir. 1994).

[20]     See United Housing Found., Inc. v. Forman, 421 U.S. 837, 852 (1975).

[21]     See SEC v. Edwards, 540 U.S. 389, 397 (2004). In Edwards, the Court noted that the concept of "profits" was used by the Court in Howey "in the sense of income or return, to include, for example, dividends, other periodic payments, or the increased value of the investment." Id. at 394.

[22]     See United Housing Found., Inc. v. Forman, 421 U.S. 837, 852-53 (1975).

9

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000466568

RPLI_02896959

coinbase

This prong has been interpreted by courts to require that the efforts of others are "those essential managerial efforts which affect the failure or success of the enterprise."[23]  We do not believe that the ███████ currently exercises sufficient control over the ██████████ and, by extension, ████ or has the ability to determine the future failure or success of the network, to meet this standard.

First, as noted above, the technical core of the █████████ -- the ability to send ███ through shielded and unshielded transactions -- was functional at the time of the genesis ███ block.  As described above, the number of recorded Zcash transaction indicates an active ecosystem of users and activity.  The ██████ network was deployed as open-source, rather than as proprietary software, so that anyone may suggest changes to the ██████ source code, and developers may utilize the ███████ network code to develop new applications for ████, such as web-based and hardware ██ wallets.  As noted above, the level of community involvement in the ongoing development of the ██████ network code, as evidenced by the number of unique contributors, pull requests and commits on ██████ is significant.  The ██████ Company retains the ability to make technical changes to the ██████ network, and has implemented a series of upgrades since the ████ genesis block.  Given the existing functionality of the ██████ network, however, there are not significant efforts required by either the ██████████ or anyone else to maintain it.

Second, apart from the allocation of the Founders Reward, the ██████████ does not control the mining or distribution of ██████  As noted above, that mining process is conducted by a diverse group of miners and mining pools, and mining activity can influence the direction of the network, regardless of the interests of the network founder.  The number of ████ is fixed at 21M ████, and open-source mining software is available.  The hash rate for ████, which is an indication of the level of mining activity on the ██████ network, has increased from approximately 1700 KSols (thousand solutions per second) at Block 1000 to 2.8M KSols at Block 435601.  The ██████████ itself receives only a small percentage (1.19%) of ████ mining activity.

Finally, governance of the ██████ network is transitioning to the non-profit ██████ ██████  The ██████████████ maintains a "Community Governance Panel", which will ultimately be comprised of approximately 200 members of the ██████████  The ██████████ Foundation currently provides for the election of representatives to the ██████████ and voting on questions relating to the strategic direction of the ██████████

## IV.    Hinman Factors

### A.    Was the Asset Offered as an Investment Contract?

---

[23]    See Hocking v. Dubois, 885 F.2d 1449, 1455 (9th Cir. 1989) (citing SEC v. Glenn W. Turner Enterprises, Inc., 474 F.2d 476, 483 (9th Cir. 1973)); Long v. Shultz Cattle Co., 881 F.2d 129, 133 (5th Cir. 1989) (same); see also SEC v. Life Partners, Inc., 87 F.3d 536, 545 (D.C. Cir. 1996) (profits must be generated "predominantly" from the efforts of others).

10

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

This series of questions seeks to determine whether a third party, either a third person, entity or coordinated group of actors, drives the expectation of a return.

**1.     Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?**

Upon the launch of the genesis block, ██ was a finished, functional privacy-focused asset that was designed as a mode of value transfer.  While the ██████████ has subsequently introduced a series of upgrades designed to improve efficiency and usability, the ████ network does not require the ████ or any other party to further develop or maintain it.  Moreover, the ████ network was deployed as open-source, rather than as proprietary software, so that anyone may suggest changes to the ████ source code, and developers may utilize the ████ network code to develop new applications for ████, such as web-based and hardware ████ wallets.  As noted above, the level of community involvement in the ongoing development of the ████ network code, as evidenced by the number of unique contributors, pull requests and commits on ████ is significant.  Because it is open-source, developers are free to incorporate ██████████ network code into their platforms.

As noted above, the ████ network is a large, decentralized community.  The number of ████ is fixed at 21M ████ and approximately 5.3M ████ have been mined to date.  Mining is spread across multiple miners and mining pools, and open-source mining software is available.  There is significant public contribution to the ████ source code on ████ in the form of unique contributors, pull requests and commits.  The hash rate for ████, which is an indication of the level of mining activity on the ████ network, has progressively increased to its current level.  Approximately 4.1M ████ transactions have been recorded to date, with approximately 2.8M all-time seen accounts.

The ████ Company does retain the ability to make technical changes to the ████ network.  However, given the existing functionality of the ████ network and the decentralized community of ████ miners and users, we do not believe that the ████ Company plays a significant role in developing and maintaining the ████ network.  We believe that the large and growing number of ████ miners and users have substantially more influence over future ████ value than the ████ Company or any other party.

**2.     Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset?  Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?**

11

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY



The number of ▉ is fixed at 21M ▉, all of which will be mined.  Approximately 5.3M ▉ have been mined to date.  10% of all mined ▉ will be allocated to the "Founders Reward," of which 5.72% of all ▉ will be allocated to founders, employees and advisors, 1.65% to investors, 1.19% to the ▉ strategic reserve, and 1.44% to the non-profit ▉  Upon the occurrence of the genesis block, ▉ was a finished, functional privacy-focused asset that was designed as a mode of value transfer. Given the ▉'s limited financial interest in ▉ going forward, and the fact that ▉ was generated as a finished, functional digital token designed to facilitate the transfer of value, we do not believe that it would have been reasonable for individuals who acquired ▉ following the genesis block, whether by mining or otherwise, to believe that the ▉ Company's future efforts, if any, would be motivated to increase the value of ▉

**3.     Has the promoter raised an amount of funds in excess of what may be needed to establish a functional network, and, if so, has it indicated how those funds may be used to support the value of the tokens or to increase the value of the enterprise?  Does the promoter continue to expend funds from proceeds or operations to enhance the functionality and/or value of the system within which the tokens operate?**

Apart from the two investment rounds pursuant to which investors obtained both an equity stake in the ▉ and an allocation of ▉ (1.65% of all ▉, the Company did not raise funds through selling ZEC.  At the time of the ▉ genesis block, the ▉ network was fully functional.  Additionally, the ▉ has a limited financial interest in ▉ going forward -- the ▉ will receive 1.19% of all ▉ as part of the Founders Reward, and the ▉ a non-profit that is dedicated to advancing the ▉ ecosystem, will receive 1.44% of all ▉ through the Founders Reward.  Because the ▉ network code is open-source, other users and application developers are free to suggest changes to the ▉ network code or incorporate ▉ and the ▉ network code into their platforms.  While the ▉ may use its portion of the Founders Reward towards the ongoing maintenance of the ▉ network, and has updated the ▉ network following the genesis block, we believe that the ▉ network and use cases for ▉ will continue to develop independent of the efforts of the ▉ .

**4.     Are purchasers "investing," that is seeking a return?  In that regard, is the instrument marketed and sold to the general public instead of to potential users of the network for a price that reasonably correlates with the market value of the good or service in the network?**

Apart from the investment rounds pursuant to which investors obtained both an equity stake in the ▉ and an allocation of ▉ (1.65% of all ▉), the ▉ did not raise funds through selling ▉, and therefore did not publicly market ▉ for sales purposes.  Apart from purchasing mined ▉ on the secondary market, the only

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000466571

RPLI_02896962



means of obtaining ████ is to mine it.  Anyone with the necessary technology may mine ████ and the greater number of miners increases the diversity and stability of the ████ ecosystem. In order to promote a more diverse ████ ecosystem, the ███████████ encouraged the development of open-source mining software that would be widely accessible, and an open-source CPU mining guide is posted on GitLab.  The statements and actions of the █████████ in connection with mining ████ are consistent with its stated desire to develop a decentralized community of ████ miners to the benefit of the ████ ecosystem.

We also believe that holders of ████ are not seeking a "return," since ████ holders are not entitled to any profit sharing or distributions, and do not have rights in the ████ network or the ██████████.  We believe that ████ has a market value that is reasonably related to user demand and adoption of the ████ network, and to ████ intended use as a privacy-focused digital asset that acts as a mode of value transfer.  User demand for ████ to use in conjunction with the ████ network is demonstrated by the continued growth in hash rates and transactions.

**5.     Does application of the Securities Act protections make sense?  Is there a person or entity others are relying on that plays a key role in the profit-making of the enterprise such that disclosure of their activities and plans would be important to investors?  Do informational asymmetries exist between the promoters and potential purchasers/investors in the digital asset?**

We believe that the application of the Securities Act protections is unnecessary in the context of ████ and the ████ network. This is because ████ intended use case and value derives from the decentralized network of users that utilize ████ as a method of value transfer.  Since ████ and the ████ network are open-source software, relevant information about ████ is not tied to the ██████████████.  We do not believe that the ████████████ has significant market information that is superior to the users that utilize and thereby maintain the value of ████.  As a result, the types of disclosures that are required under the Securities Act in the context of securities would not be beneficial to ████ users.

**6.     Do persons or entities other than the promoter exercise governance rights or meaningful influence?**

Governance of the ████ network is transitioning to the non-profit ██████████.  The ██████████ maintains a "Community Governance Panel", which will ultimately be comprised of approximately 200 members of the ████ community.  The ██████████ currently provides for the election of representatives to the ████████████, and voting on questions relating to the strategic direction of the ██████████.

**B.     Was the Asset Offered for Consumptive Purposes?**

13

coinbase

**1.      Is token creation commensurate with meeting the needs of users or, rather, with feeding speculation?**

The number of ████ fixed at 21M ████, all of which will be mined. Approximately 5.3M ████ have been mined to date. Of this amount, 90% of ████ will be allocated to miners, and 10% will be allocated to the various recipients of the Founders Reward. Of the Founders Reward, 1.44% is allocated to the non-profit ████████████ which exists to help promote the ████ ecosystem. To assist in scaling the ████ network, the network was implemented with a "slow-start" mining mechanism, so that the first 20,000 blocks of ████ would have a block mining reward beginning with 0 ████ per block, gradually and linearly increasing until reaching the full block mining reward of 12.5 ████ at the 20,000 block.

Based on ████ network activity to date, the rate at which ████ is currently being mined, and the allocation of mining proceeds, we believe this amount of ████ is commensurate with meeting the needs of the current users of ████ who utilize ████ for transactional purposes. Given that it was expressly designed for these transactional uses, we believe that ████ is not likely to be perceived as a speculative asset that will accumulate in value.

**2.      Are independent actors setting the price or is the promoter supporting the secondary market for the asset or otherwise influencing trading?**

The price of ████ is related to the use of ████ for purposes of shielded or unshielded transactions on the ████ network, and may also be influenced by the activity of third parties in the secondary market.

**3.      Is it clear that the primary motivation for purchasing the digital asset is for personal use or consumption, as compared to investment? Have purchasers made representations as to their consumptive, as opposed to their investment, intent? Are the tokens available in increments that correlate with a consumptive versus investment intent?**

Apart from two investment rounds pursuant to which investors obtained both an equity stake in the ████████ and an allocation of ████ (1.65% of all ████, the ████ ████ did not raise funds through selling ████, and therefore did not publicly market ████ for sales purposes. The only means of obtaining ████ is to mine it, apart from purchasing mined ████ on the secondary market. Apart from the two investment rounds, there were therefore no purchasers whom ████ could require to submit representations of their consumptive, versus investment, intent.

Notwithstanding the lack of opportunities to obtain statements about the intent in acquiring ████, we believe that ████ is made available in increments that corresponds to consumptive, as opposed to investment, invent. The number of ████ is fixed at 21M ████, all of which will be mined. Approximately 5.3M ████ have been mined to date. Of this amount, 90%

14

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000466573

RPLI_02896964



of ▮▮ will be allocated to miners, and 10% will be allocated to the various recipients of the Founders Reward. Of the Founders Reward, **1.44%** is allocated to the non-profit ▮▮ Foundation, which exists to help promote the ▮▮ ecosystem. To assist in scaling the ▮▮ network, the network was implemented with a "slow-start" mining mechanism, so that the first 20,000 blocks of ▮▮ would have a block mining reward beginning with 0 ▮▮ per block, gradually and linearly increasing until reaching the full block mining reward of 12.5 ▮▮ at the 20,000 block. Based on ▮▮ network activity to date, the rate at which ▮▮ is currently being mined, and the allocation of ▮▮ mining proceeds, we believe this amount of ▮▮ is commensurate with meeting the needs of the current users of ▮▮ who utilize ▮▮ for transactional purposes.

Moreover, given that it was expressly designed for transactional uses, we believe that ▮▮ is not likely to be perceived as a speculative asset that will accumulate in value.

**4.     Are the tokens distributed in ways to meet users' needs? For example, can the tokens be held or transferred only in amounts that correspond to a purchaser's expected use? Are there built-in incentives that compel using the tokens promptly on the network, such as having the tokens degrade in value over time, or can the tokens be held for extended periods for investment?**

All ▮▮ is mined, and apart from the allocation of the Founders Reward, the ▮▮ ▮▮ does not play a role in the mining or distribution of ▮▮ The number of ▮▮ is fixed at 21M ▮▮ and approximately 5.3M ▮▮ have been mined to date. To assist in scaling the ▮▮ network, the network was implemented with a "slow-start" mining mechanism, so that the first 20,000 blocks of ▮▮ would have a block mining reward beginning with 0 ▮▮ per block, gradually and linearly increasing until reaching the full block mining reward of 12.5 ▮▮ at the 20,000 block. In order to function effectively as a mode of funds transfer, ▮▮ must have a relatively stable price tied to its use case. We believe that this mining protocol produces ▮▮ at a rate that is commensurate with meeting the needs of the current users of ▮▮ who utilize ▮▮ for transactional purposes.

**5.     Is the asset marketed and distributed to potential users or the general public?**

Apart from two investment rounds pursuant to which investors obtained both an equity stake in the ▮▮ and an allocation of ▮▮ (1.65% of all ▮▮, the ▮▮ ▮▮ did not raise funds through selling ▮▮, and therefore did not publicly market ▮▮ for sales purposes. Apart from purchasing mined ▮▮ on the secondary market, the only means of obtaining ▮▮ is to mine it. The ▮▮ does not play a role in the mining or distribution of ▮▮, apart from the allocation of the Founders Reward. Anyone with the necessary technology may mine ▮▮, and a greater number of miners increases the diversity and stability of the ▮▮ ecosystem. To that end, the ▮▮ encouraged the development of open-source mining software that would be widely accessible, and an open-source CPU mining guide is posted on GitLab. While the ▮▮ did not

15



publicly market ██ for sales purposes, the statements and actions of the █████████ in connection with mining ███ are consistent with its stated desire to develop a decentralized community of ███ miners to the benefit of the ████ ecosystem.

**6.     Are the assets dispersed across a diverse user base or concentrated in the hands of a few that can exert influence over the application?**

██ is broadly dispersed across a diverse user base, with approximately 4.1M transactions to date and 2.8M all-time seen accounts.  Moreover, ████s mined, and is intended to be used on the ████ network to transfer value.  Given the structure and use case of ██, holding a large amount of ███ would not necessarily enable the holder to exert influence over the ███ network.

**7.     Is the application fully functioning or in early stages of development?**

Upon the launch of the genesis block, ███ was a finished, functional privacy-focused asset that was designed as a mode of value transfer using either shielded or unshielded transactions.  While the █████████████ has subsequently introduced a series of upgrades designed to improve efficiency and usability, the ████ network does not require the ████ Company or any other party to further develop or maintain it.

16

CONFIDENTIAL

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000466575

RPLI_02896966