# Exhibit 218

## Testimony

# Testimony on "Oversight of the U.S. Securities and Exchange Commission"

## Chairman Jay Clayton

**Washington D.C.**

**June 21, 2018**

### Before the

### Committee on Financial Services

### U.S. House of Representatives

Chairman Hensarling, Ranking Member Waters and members of the Committee, thank you for the opportunity to testify today about the work of the U.S. Securities and Exchange Commission (SEC).[1]

With a workforce of over 4,500 staff in Washington and across our 11 regional offices, the SEC oversees, among other things (1) approximately $82 trillion in securities trading annually on U.S. equity markets; (2) the disclosures of approximately 4,300 exchange-listed public companies with an approximate aggregate market capitalization of $30 trillion; and (3) the activities of over 26,000 registered entities and self-regulatory organizations. These registered entities and registrants include, among others, investment advisers, broker-dealers, transfer agents, securities exchanges, clearing agencies, mutual funds and exchange-traded funds (ETFs), and employ over one million people in the United States.

Since arriving at the Commission, I have been working with my fellow Commissioners and the SEC's dedicated staff to pursue an agenda that advances the agency's mission—to protect investors, maintain fair, orderly and efficient markets and facilitate capital formation. As we pursue that tripartite mission, I believe we should focus on the interests of our long-term Main Street investors.[2]

My interactions with the SEC staff over the past year have demonstrated unequivocally that the women and men of the SEC place the interests of our long-term Main Street investors first. We recognize, and are motivated by, the fact that tens of millions of Americans are invested in our securities markets and have to make personal investment decisions—both direct decisions such as which stocks, bonds, mutual funds, ETFs and other securities to purchase and indirect investment decisions such

as which broker-dealer or investment adviser to hire. Many Americans are also invested in our markets through pension funds and other intermediaries. Main Street investors benefit from investment opportunities, fair and efficient markets and, importantly, investor protection. In turn, we believe serving these interests furthers America's broad interests.

It is our Main Street investors, and their willingness to commit their hard-earned money to our capital markets for the long term, who have ensured that the U.S. capital markets have long been the deepest, most dynamic and most liquid in the world. Their capital provides businesses with the opportunity to grow and create jobs and supplies the capital markets with the funds that give the U.S. economy a competitive advantage. In turn, our markets have provided American Main Street investors with better investment opportunities than comparable investors in other jurisdictions. We should strive to maintain and enhance these complementary positions, including by being mindful of emerging trends and related risks.

The historic performance and strength of our markets is even more striking when viewed in comparison to world markets and world population. The U.S. population is only approximately 4.4 percent of global population, but of the world's 100 largest publicly traded companies, 53 are U.S. companies, representing 62 percent of the total market capitalization of those top 100 companies. These figures demonstrate the historic importance of our capital markets to the America economy and the American people and also demonstrate that our relative contribution to the global economy is a remarkable, long-term achievement that has been driven, to a significant extent, by our capital markets.

More significantly, at least 51 percent of U.S. households are invested directly or indirectly in our capital markets.[3] This level of retail investor participation stands out against other large industrialized countries. When I engage with my international counterparts, they make it clear that they would like to replicate our capital markets' broad retail investor participation for many reasons, including the competitive advantage it provides to our economy and how our capital markets have made a broad cross section of Americans' lives better. This level of investor participation, opportunity and protection has been a decades-long endeavor involving the SEC, other regulators and market participants and should not be taken for granted.

### *Our New Strategic Plan*

The principles I have discussed—most notably the interests of our long-term Main Street investors—are integrated in our new strategic plan. With input from my fellow Commissioners, Kara Stein, Michael Piwowar, Robert Jackson, Jr. and Hester Peirce, as well as many dozens of my colleagues at the SEC, the SEC recently published a new, multi-year strategic plan that will establish a framework for the future of the agency.[4]

The plan, which is available on our website for public comment, re-affirms the SEC's tripartite mission and the values that unite us in our work, while also providing a strategic vision and path that describes where we want to be in the future and how we expect to get there.  The key priorities include (1) our commitment to Main Street investors; (2) a focus on being innovative, responsive and resilient to developments and trends in the markets; and (3) using technology, data analytics and human capital to improve our performance and manage our internal resources and risks.  We are looking forward to the additional insights we will gain from our various constituents as we finalize the plan in the coming months.  I welcome your comments on the strategic plan.

**Fiscal Year 2018 Developments**

These principles set forth in our strategic plan are embodied in our near-term Regulatory Flexibility Act rulemaking agenda.[5]  When the agenda was published, I noted that it was shorter than prior agendas and was so, principally, because it reflected what I expected us to complete during the year.[6]  We have made significant progress since the Fall 2017 Agenda, and I would like to now highlight several of the SEC's accomplishments over the past months.

*Facilitating Capital Formation and Investment Opportunities*

In executing the SEC's tripartite mission, we seek to promote a market environment conducive to capital formation while ensuring that our markets are fair and resilient and our investors remain well protected.  As I have noted on many occasions, facilitating capital formation, particularly with an eye toward encouraging promising emerging companies to enter our public capital markets, has been a focus for the past year.  While progress has been made, I believe we can and should do more to facilitate capital formation in our public and private capital markets and, particularly, for small and emerging companies.

Fewer promising emerging companies are choosing to enter our public capital markets than in the past, and, as a result, equity investment opportunities for Main Street investors are more limited.  There has been much debate about the causes and effects of this trend, but from my perspective, having a broader portfolio of quality public companies —especially those at the earlier stage of their growth cycle—ultimately will have positive results for our Main Street investors.  Because it is generally difficult and expensive for Main Street investors to invest in private companies, they will not have the opportunity to participate in the growth phase of these companies to the extent they choose not to enter our public markets or do so only later in their life cycle.  Additionally, it is my experience that companies that go through the SEC public registration and offering process often come out as better companies, providing net benefits to the company, investors and our capital markets.

While there is no silver bullet to counter the negative trend in the number of U.S. public companies, we will continue working to enhance capital formation opportunities without sacrificing the important investor

protections our public company disclosure system has provided for over 80 years.  Part of the solution, however, is to recognize that a one size regulatory structure for public companies does not fit all.  The Jumpstart Our Business Startups (JOBS) Act helped create an ecosystem whereby scaling disclosure and other regulatory requirements provided incentives for companies to conduct public offerings while maintaining the world's most robust investor protection environment.

Over the past year, our Division of Corporation Finance (Corporation Finance), under the direction of Bill Hinman, has carried out several key initiatives with a particular emphasis on capital-raising opportunities, which I will highlight below.  We also are working to identify the Commission's first Advocate for Small Business Capital Formation, who will provide additional leadership in helping small issuers raise capital.

*Simplifying the Public Capital-Raising Process*

Corporation Finance simplified the capital raising process for first-time registrants and newly public companies by expanding the confidential submission process, which provides for non-public review of certain securities offerings, including for initial public offerings (IPOs) and offerings within one year of an IPO, allowing newly public companies to raise capital with less exposure to market volatility, which benefits them and their investors.[7]  Corporation Finance also provided greater clarity about what financial information is required when submitting draft registration statements so companies can avoid the time and expense of preparing and filing interim financial information that will be superseded by the time the filing is first made publicly available.[8]  These accommodations appear to be making a positive difference for issuers; according to reports, the amount of time that it has taken for issuers to price their offerings after publicly posting their registration statement information has dropped.[9]  This gives issuers more control over their offering schedules and limits their exposure to market volatility.  At the same time, we continue to devote significant staff resources to reviewing filings for compliance with the rules that require companies to provide investors key financial information and other required disclosures.

Corporation Finance has also been encouraging companies and investors to approach our staff about impediments to raising capital and pursuing novel transactions.  For example, there are circumstances in which the Commission's reporting rules may require publicly traded companies to file financial statements for other entities, such as a probable business acquisition.  However, for some transactions this information is clearly not material to the total mix of information available to investors and is burdensome and costly to generate.  Under Rule 3-13 of Regulation S-X, issuers may request and the Commission may grant modifications to their financial reporting requirements in these situations and where consistent with investor protection.  Corporation Finance staff are placing a high priority on responding to these requests with timely guidance.

With regard to future Commission actions, I anticipate that the

Commission will soon consider adopting final amendments to the "smaller reporting company" definition, which would expand the number of issuers eligible to provide scaled disclosures.  In light of comments received during that rulemaking process, we are also taking a fresh look at the thresholds that trigger the requirement contained in Section 404(b) of the Sarbanes-Oxley Act to have an auditor provide an attestation report on internal control over financial reporting.

Corporation Finance also is exploring additional ideas to encourage more companies to enter our public equity markets.  For example, the JOBS Act provided an exemption for Emerging Growth Companies (EGCs) to communicate with potential investors prior to or following the filing of a registration statement to "test the waters" for an offering, and our current near-term agenda includes a proposal to extend the "test the waters" provision to non-EGCs.

*Improving Disclosure Effectiveness*

Another important component of improving our public company regulatory regime is Corporation Finance's initiative to improve public company disclosure by reviewing our disclosure requirements and considering ways to improve the disclosure regime for the benefit of both investors and companies.  I believe we should regularly review whether we have disclosure requirements that are outdated, duplicative or can otherwise be improved.

In October 2017, the Commission proposed amendments, as required by the Fix America's Surface Transportation (FAST) Act, to modernize and simplify certain disclosure requirements in Regulation S-K and related rules and forms in a manner that reduces the costs and burdens on registrants while continuing to provide all material information to investors.[10]  Corporation Finance is preparing recommendations for the Commission to finalize these amendments.  Further, Corporation Finance is developing recommendations for updating certain Industry Guides to modernize industry-specific disclosure requirements, specifically for mining and bank holding company issuers.  Corporation Finance is also developing recommendations for final rules to update and simplify disclosure requirements that may have become outdated, overlapping or duplicative with other Commission rules or U.S. GAAP.

Corporation Finance is developing recommendations for the Commission for proposed changes to the requirements in Rules 3-05, 3-10 and 3-16 of Regulation S-X (which provides requirements for financial statements) to improve those requirements for both investors and registrants.  While our disclosure requirements in Regulation S-K (which provides requirements for public company disclosure) often receive more attention, many Regulation S-X rules are more prescriptive and more costly for issuers.  I anticipate that Corporation Finance's work in this area will yield significant benefits for public issuers without adversely affecting the availability of material financial information or adversely affecting investor protection.

*Exempt Offerings and Small Business Initiatives*

As the number of public offerings has declined, a significant and growing amount of capital is being raised pursuant to non-registered offering exemptions. Congress and the Commission have taken notable steps in recent years to further develop a capital formation ecosystem that includes a scaled disclosure regime and provides small- and medium-sized businesses additional capital raising avenues while maintaining robust investor protections.

Since the Commission adopted amendments to Regulation A in 2015, the number of qualified offerings and the aggregate amount sought in those offerings has substantially increased relative to the pre-amendment numbers. Eighty-nine issuers in 221 qualified offerings raised a total of approximately $798 million through March 31, 2018. I directed the staff to continue monitoring this market and gathering additional information about the use of Regulation A by issuers, investors and other market participants. I also requested that the staff accelerate the next statutory review of the current Regulation A offering limit to 2019. Further, enacted last month, the Economic Growth, Regulatory Relief, and Consumer Protection Act requires the Commission to amend Regulation A to allow reporting companies to use the exemption, and that rulemaking project is underway.

In addition to Regulation A, in 2017, $147 billion was raised using Rule 506(c), which permits the use of general solicitation in exempt offerings. We are also seeing early-stage businesses use crowdfunding as a securities offering method. Between May 2016, when Regulation Crowdfunding went into effect, and March 2018, there were 778 offerings initiated under the regulation's exemption, with a reported total amount raised of $68.7 million.

As the exempt offering market grows and evolves, the SEC staff continues to monitor developments, gather and examine data and assess the effectiveness of these new exemptions in terms both of their ability to raise capital for smaller companies as well as providing appropriate protections for investors in these markets. Staff will be conducting reviews of the impact of Regulation Crowdfunding and Regulation A on capital formation and investor protection and will provide recommendations to the Commission.

The Economic Growth, Regulatory Relief, and Consumer Protection Act also requires the Commission to revise Securities Act Rule 701, which provides an exemption from registration for securities issued by non-reporting companies pursuant to compensatory arrangements. Specifically, the Commission is required to increase from $5 million to $10 million the aggregate sales price or amount of securities able to be sold during any consecutive 12-month period before an issuer is required to deliver additional disclosures to investors. Work on that rule amendment is underway, and staff is considering additional ways that Rule 701 might be modernized.

We recognize that as new and enhanced exemptions provide additional

avenues for capital formation, small companies and their investors also could benefit from reduced regulatory complexity. Corporation Finance is considering ways to harmonize and streamline the Commission's exempt offering rules in order to enhance their clarity and ease of use.

*Shareholder Engagement and the Proxy Process*

Given the core role of the proxy process in public company governance, I believe the Commission should examine this area to determine whether the needs of shareholders and companies are being adequately and efficiently addressed. Over the years, participants in the proxy process —companies and shareholders alike—have expressed concerns about a variety of proxy matters. In 2010, the SEC solicited input on several proxy matters in a concept release on the U.S. proxy system.[11] It is clear that opportunities for improvement exist, and I am interested in obtaining updated feedback on the 2010 "Proxy Plumbing" concept release from market participants.[12]

There are a number of issues that this should address, including the quality and mix of information provided to shareholders and how that information is provided, shareholder proposals, the role of proxy advisory firms and the costs and burdens of the proxy system on companies and shareholders. One area in particular I believe we should analyze is whether the voices of long-term retail investors are being underrepresented, misrepresented or selectively represented in corporate governance.

### Cybersecurity

As a general matter, it is critical that investors be informed about the dependence of our economy on the storage, transmission and protection of data and the related material threats that issuers, market participants and our markets themselves face. The Commission recently provided greater clarity on disclosure obligations related to cybersecurity. In February 2018, the Commission issued a statement and interpretive guidance to assist public companies in preparing disclosures about cybersecurity.[13] This guidance provides the Commission's views about public companies' disclosure obligations under our laws and regulations with respect to matters involving cybersecurity risk and incidents. It also describes the importance of comprehensive policies and procedures related to cybersecurity events. This includes appropriate disclosure controls and having insider trading policies and procedures that guard against corporate insiders trading during the period between a company's discovery of a cybersecurity incident and public disclosure. It also addresses the importance of selective disclosure prohibitions in the cybersecurity context. We are continuing to examine whether public companies are taking appropriate action to inform investors about material cyber-related information, including after a breach has occurred, and we will investigate issuers that mislead investors about material cybersecurity risks or data breaches.

In the area of enforcing our disclosure rules and their application to cyber

intrusions, we recently announced charges against the company formerly known as Yahoo! in the first enforcement action that the Commission has brought against a public company for disclosure failures relating to a cyber breach.[14]  As one of the Co-Directors of our Enforcement Division said, companies can face difficult choices when deciding whether and how to disclose information about cyber incidents, and we should hesitate before second-guessing reasonable judgments on these issues.[15]  But the Yahoo! case should serve as an example that, in today's world, companies must have adequate policies and procedures in place to ensure that they respond appropriately to—and, where necessary, adequately disclose—material cyber risks and incidents.

Turning to cybersecurity at the SEC, in August 2017, shortly after my arrival at the Commission, I learned about an intrusion into the SEC's EDGAR system that occurred in 2016.  We promptly disclosed this intrusion to the public and this Committee.[16]  As you may recall, the intrusion concerned the test filing component of our EDGAR system.  The intruders gained unauthorized access to EDGAR filing information that was not yet public, which may have provided a basis for illicit trading.

Upon learning of this intrusion last August, after consulting with my colleagues, I initiated a number of different work streams to assess the nature, cause and scope of the intrusion; the potential factors that may have led to the intrusion; the agency's response at the time; and the extent to which cybersecurity enhancements are needed at the SEC.[17]  Personnel from across the agency—including members of the Office of Information Technology (OIT), Division of Enforcement (Enforcement), Office of the General Counsel (OGC) and the Office of the Inspector General (OIG)—as well as outside advisors and other authorities,[18] have been involved in these efforts.  We have made progress on these fronts; and while much remains to be done, I believe it is appropriate to provide a brief update on the status of our work.

OGC has informed me that its internal review of the 2016 intrusion is in its final stages.  Upon its completion, I expect to provide this Committee with additional information resulting from that review.  The OGC review is focused on understanding the nature, cause and scope of the intrusion.

With regard to the 2016 intrusion itself, we believe that cyber threat actors were able to exploit a defect in our EDGAR system and access information in certain test filings (e.g., from a company checking the formatting of a draft earnings release to be filed on a Form 8-K) before the information became public through a subsequent live filing. Enforcement continues to investigate potential illicit trading that may be related to the intrusion.

As a result of this review, technical, process and organizational deficiencies were identified.  It appears that these deficiencies, taken together, contributed to internal delays in both the recognition of the intrusion itself and the internal appreciation of its scope and impact.  We are working hard to address these issues.  Although substantial work

remains to be done, I will outline our principal efforts to date.

- Governance and oversight.  The OGC review has identified the need for better IT governance and oversight.  We have created a new enterprise-level position of Chief Risk Officer, which will be responsible for coordinating efforts to identify, monitor and mitigate risks across the agency.[19]  We are in the process of reorganizing our IT security office to provide additional resources in our cybersecurity operations branch, including additional management personnel to provide dedicated focus and expertise.  In addition, we have launched an initiative to install Information System Security Officers in various functions to facilitate and improve collaboration between information system owners and business personnel, and to help ensure that each information system has operational security commensurate with the sensitivity of its information.

- Security controls.  The OGC review has made it clear that the SEC would have benefitted from more robust preventative and detective cybersecurity controls, and we are working to improve our control environment.  The reorganization described above is designed to provide for increased focus on preventative and detective security and controls.  Our new standalone EDGAR Business Office, established in 2017, has been working with OIT to implement technological enhancements and improve security monitoring, protections and compliance.  On that front we have made technological enhancements, including to our security monitoring processes, and implemented additional data protection technologies.

  We have expanded our use of penetration testing on our systems, including EDGAR, and we have undertaken additional efforts to analyze EDGAR's source code.  In addition, we are working with outside experts and have partnered with other government agencies to assess the SEC's critical systems more broadly.

- Risk awareness.  The OGC review also makes it clear that SEC could have benefitted from improved awareness across the agency of the sensitivity and risks related to data collection and storage.  We have enhanced cyber-incident information sharing across Enforcement, OIG and OIT, and we have improved reporting protocols for cyber security risks and exposures.

  It is very important to me to foster a culture that recognizes the great responsibility we have with respect to the data entrusted to us by our registrants and the public.  We are closely scrutinizing how we can reduce any potential exposure of personally identifiable information contained in SEC systems, including EDGAR.  In this regard, earlier this year, the Commission has

SEC.gov | Testimony on "Oversight of the U.S. Securities and Exchange...

10/14/2022, 1:55 AM

Case 1:20-cv-10832-AT-SN   Document 831-77   Filed 06/13/23   Page 11 of 30

acted to eliminate the collection of social security numbers and dates of birth on a number of EDGAR forms where we concluded that the information was not necessary to our mission.[20]

Similarly, with respect to market sensitive data, we are looking into whether we can reduce the data we take in or reduce its sensitivity (including, for example, by taking certain market sensitive data in on a delayed basis). For our systems that hold sensitive data, we have engaged an outside expert to help us assess our efforts to secure those systems.

- Incident response. The OGC review highlighted the need to ensure that we have comprehensive incident response and escalation plans in place. We have revised the agency's incident management plan, which addresses reporting procedures and escalation protocols for cyber security events or incidents, and we expect to further improve the plan as we test it. And we have conducted multiple cyber incident response exercises to help prepare appropriate decision makers for various threat scenarios.

- Legacy systems. The OGC review confirmed that we need to continue and improve upon our efforts to modernize key legacy information systems, especially EDGAR, and address risks associated with bespoke systems. We have increased the focus and resources on our legacy systems, particularly with respect to maintenance and replacement of those systems. The increased funding provided to us by Congress for fiscal year 2018 will allow us to accelerate our transition away from certain legacy systems and functionalities towards systems that have additional security enhancements.

To be sure, no system can be 100 percent safe from a cyber intrusion, particularly in a world where cyber threat actors are backed by substantial resources. More needs to be done to strengthen the SEC's cybersecurity posture. Indeed, our uplift efforts have revealed additional areas that have required attention. But we are working through recommendations from our internal offices and several outside experts to improve, and we expect more recommendations to come. The review I requested by OIG, which is focused on the factors that led to the intrusion and the agency's response, similarly is ongoing. I appreciate OIG's efforts to help improve our knowledge and address risks, and I expect to receive a final report from OIG later this year. We look forward to reviewing the report and working with OIG to implement their recommendations.

We are greatly appreciative of the support given by the Committee in our efforts in this ongoing process. The additional funding Congress have given us, and the feedback that members of this Committee have given me, will go a long way to helping us upgrade our security posture to better protect against the persistent threats that continue.

***Standards of Conduct for Broker-Dealers and Investment Advisers***

In early 2017, as I moved through the confirmation process, it became apparent that a wide range of market participants, including retail investors, and policymakers believed that standards of conduct for investment professionals (e.g., investment advisers and broker-dealers) were a matter where Commission action, including coordination with our fellow regulators, would be both appropriate and timely.  In one of my first actions as Chairman, in June 2017, I issued a request for information, seeking input from the public on a range of potential issues, and since then, I have had a number of meetings with investors, consumer groups, industry participants and others across the full spectrum of these issues.

In particular, the candid comments of retail investors in Missouri, Montana, Illinois and California, as well as those who travelled to New York for a roundtable, on what they expect and do not expect from investment professionals resonated with me in considering the appropriate course of action.  These interactions, including consultations with my fellow Commissioners and staff, led me to the conclusion that the Commission should lead—but not dictate—our federal and state regulatory efforts in this area in order to (1) address investor confusion regarding the roles of, and the differences between, broker-dealers and investment advisers; (2) establish standards of conduct that meet reasonable investor expectations and adequately address conflicts of interest; and (3) minimize the effects of regulatory complexity, and potentially inconsistent legal standards applied to financial advice, due to the number of regulators in this space.[21]

In April, the Commission voted to issue for public comment a comprehensive package designed to close the gaps between the reasonable expectations of retail investors, on the one hand, and market and legal realities on the other hand.[22]  The package is a multi-pronged solution, enhancing or clarifying obligations of broker-dealers and investment advisers to their retail clients, as well as requiring disclosure designed to increase investor understanding.  Our rulemaking package would significantly enhance retail investor protection and understanding while preserving retail investor access, in terms of both availability and cost, to a variety of types of investment services, in particular, the "pay as you go" broker-dealer model.[23]

First, to address conflicts of interest and establish a relationship standard that reflects reasonable retail investor expectations, we proposed enhancing the standard of conduct for broker-dealers.  Under proposed Regulation Best Interest, a broker-dealer, when making a recommendation of a securities transaction or investment strategy to a retail customer, would be prohibited from placing their financial or other interest ahead of the interest of the retail customer.  To add clarity for all participants, the proposal would require the broker-dealer to comply with a disclosure obligation, a care obligation and two conflict of interest obligations.

Under current standards, it has been argued that broker-dealers are permitted to recommend to their retail customer a product that is

"suitable" for the customer but not as good for the customer as another product that the broker-dealer offers because the first product makes the broker-dealer more money. No reasonable retail investor thinks that makes sense. Most broker-dealers say they do not do this. I believe our regulations should prohibit this. Let me be clear: our proposed Regulation Best Interest would address this.

What would the broker-dealer have to do to act in the retail customer's best interest? First, the broker-dealer would need to disclose material facts relating to the scope and terms of their relationship with the retail customer, including all material conflicts associated with the recommendation. Second, the broker-dealer would need to exercise reasonable diligence, care, skill and prudence to make recommendations that are in the best interest of the retail customer. Among other things, this standard would put greater emphasis on cost and financial incentives as factors in evaluating the facts and circumstances of a recommendation and whether it is in the customer's best interest. Third, and the most significant, the broker-dealer would need to establish, maintain and enforce policies and procedures to eliminate, or mitigate and disclose, material conflicts of interest related to financial incentives. To be clear, disclosure alone would not be sufficient. Even if a broker-dealer has mitigated and disclosed its conflicts, its recommendations to the client cannot place the broker-dealer's interests ahead of the retail customer's interests.

The proposed broker-dealer best interest obligation draws from the principles underlying an investment adviser's fiduciary duty, recognizing that both broker-dealers and investment advisers often provide advice in the face of conflicts of interest. These common principles are easier to compare given that as another part of our reform package we issued a proposed interpretation reaffirming—and in some cases clarifying—the fiduciary duty that investment advisers owe to their client. The interpretation is designed to provide advisers with a reference point for understanding their obligations to clients and reaffirms that an investment adviser must act in the best interests of its client.

While the two standards draw from common principles, some obligations of broker-dealers and investment advisers will differ because the relationship types of these investment professionals differ. This is a practical necessity. But the principles are the same, and I believe the outcomes in both cases should be the same: retail investors expect high-quality advice where their investment professional is not placing their interest ahead of the investor's interest—I believe our proposals are designed to make sure they get just that.

Second, the rulemaking package would help retail investors understand who they are dealing with, what that means and why it matters. Our proposal would (1) require broker-dealers and investment advisers to clearly state what they are; and (2) prohibit stand-alone broker-dealers from using the terms "adviser" or "advisor" as part of their names or title. Also, firms would be required to provide investors with a new, distinct

disclosure that we call a "Relationship Summary" that would highlight key differences between broker-dealers and investment advisers, and also provide relevant questions for investors to ask. We have already received helpful suggestions from commenters, including retail investors, on how we can improve the proposed Relationship Summary via a "feedback flyer" available on our website and look forward to even more engagement on how we get this disclosure right.

I believe that our framework will allow investment professionals to provide high-quality advice while maintaining a range of options for retail investors. More pointedly, and importantly for investors, this approach allows for further engagement with our fellow federal and state regulators to seek consistency and cohesion across the spectrum of investment professionals and products—and we intend to work closely with them to promote regulatory harmonization and reduce duplication and inconsistency.

The Commission and staff have been thinking about these issues for over 20 years and about this rulemaking for many years. I urge commenters —particularly Main Street investors—to review the proposed rules thoroughly and engage with us on it during the 90-day comment period. In order to provide as much opportunity for that engagement as possible, I also announced several investor roundtables across the country to hear directly from those the proposal is designed to serve—Main Street investors.[24]  I, along with others at the SEC, have since met in person with retail investors in Houston and Atlanta and look forward to hearing from others at additional roundtables to come.

### *Digital Assets and ICOs*

The digital asset and initial coin offering (ICO) markets are areas where the Commission has been focusing a significant amount of attention and resources. I am very optimistic that developments in financial technology, including distributed ledger technology, will help facilitate capital formation, providing promising investment opportunities for institutional and Main Street investors alike. At the same time, regardless of the promise of this technology, those who invest their hard-earned money in opportunities that fall within the scope of the federal securities laws deserve the full protections afforded under those laws. This ever-present need comes into focus when enthusiasm for obtaining a profitable piece of a new technology "before it's too late" is strong and broad. Fraudsters and other bad actors prey on this enthusiasm and sense of urgency.

My efforts—and the tireless efforts of the SEC staff—have been driven by various factors, but most significantly by a desire to see to it that Main Street investors understand all the material facts and risks involved, particularly with ICOs.[25]  Unfortunately, it is clear that nefarious actors have sought to prey on investors' excitement about the quick rise in cryptocurrency and ICO prices.[26]

There has been significant interest and many questions about the SEC's role in this space, particularly relating to ICOs. Some say we are slow to

regulate in this area while others have requested an unprecedented relaxation of our regulations. These requests have, on occasion, been cast as a need for guidance. We have been clear—we are not relaxing our requirements that apply to the offer, sale and trading of securities. We also have discussed in detail how our laws define what is a security.[27]  Determining what falls within the ambit of a securities offer and sale is a facts-and-circumstances analysis, utilizing a principles-based framework that has served American companies and American investors well through periods of innovation and change for over 80 years. If you are attempting to fund a project—whether it be opening a new manufacturing plant or creating an application on a distributed network—by inviting others to invest in the enterprise based on the expectation that they will profit from other people's efforts, the same laws and standards apply: register the securities offering or use an exemption from registration. Issuing a "token" rather than a share certificate does not change that approach. Concluding otherwise would ignore the fundamental tenets of over 80 years of securities regulation and put other businesses seeking to raise capital at a competitive disadvantage.

Overall, I believe the Commission is taking a balanced regulatory approach to distributed ledger technology (and FinTech more generally) that both fosters innovation and protects investors. For example, in the area of ICOs, the Commission issued a Report of Investigation in July 2017 regarding the application of the federal securities laws to those products.[28]  Our Corporation Finance Division Director recently further outlined the approach staff takes to evaluate whether a digital asset is a security.[29]  Our staff meets regularly with entrepreneurs and market professionals interested in developing new and innovative investment products in compliance with the federal securities laws. We are also encouraging issuers and other market participants to contact SEC staff at our dedicated email address, FinTech@sec.gov.

We established a dedicated Distributed Ledger Technology Working Group which focuses on emerging applications of distributed ledger technology in the financial industry, and a FinTech Working Group. We recently named a new Associate Director in Corporation Finance to serve as the Senior Advisor for Digital Assets and Innovation and coordinate efforts in this area across the agency.[30]  We are also meeting regularly with other regulatory agencies to coordinate efforts and identify any areas where additional regulatory oversight may be needed, particularly through efforts led by the Department of the Treasury. Divisions across the Commission have worked together, as well as with other regulators, to issue public statements regarding ICOs and virtual currencies.[31]  And importantly, we have acted swiftly to crack down on allegedly fraudulent activity in this space, particularly fraud and other violations that have targeted Main Street investors.[32]

### Enforcement

Dedicated staff of the Division of Enforcement (Enforcement), led by Co-Directors Stephanie Avakian and Steven Peikin, continues its work

safeguarding investors and the capital markets through the vigorous enforcement of our federal securities laws. Since I was last before the Committee, the Commission has taken a number of significant enforcement-related actions that, when considered together, demonstrate our commitment to protecting investors, deterring, detecting and punishing wrongdoing and rooting out fraud and bad actors in our financial markets. I believe that the net effect of Enforcement's efforts over the past year has been to make our capital markets a safer place for investors to put their hard-earned money to work.

After more than a year on the job, I continue to firmly believe that Enforcement's work is essential to protecting investors and maintaining confidence in the integrity and fairness of our capital markets. While some point to particular statistics to claim that the SEC and more specifically Enforcement are pulling back their investor protection efforts, I want to make absolutely clear that is not the case. As noted by Enforcement's Co-Directors in their Annual Report, our success is best judged both quantitatively and qualitatively and over various periods of time.[33] Based on such an evaluation, including bringing actions for the most serious violations, obtaining punishments to deter unlawful conduct and returning money to investors, Enforcement has been successful. I can assure you that our Enforcement Division will continue its vigorous enforcement of the federal securities laws and hold bad actors accountable.

One area where the Enforcement staff has redoubled its focus is on protecting Main Street investors. Looking out for these investors has always been a core tenet of the Commission's enforcement program, and the last year has been no exception. To bolster our capabilities and focus on protecting Main Street investors, Enforcement formed a new Retail Strategy Task Force, which concentrates resources and draws on expertise from across the Commission to develop strategies and techniques for addressing the types of misconduct that most affect retail investors.[34] Going forward, Enforcement will continue to place a priority on misconduct that harms retail investors, such as offering frauds, Ponzi schemes, conflicts of interest and inappropriate or excessive fees.[35]

Enforcement has also continued to focus its efforts on addressing cyber-related threats to investors and the financial markets. Since I was last before the Committee, these threats have only increased in magnitude and frequency, and I believe that they present some of the greatest risks that we must confront today. In response to these risks, last year Enforcement created a new Cyber Unit, which focuses the Division's resources and expertise on, among others things, hacking to obtain material, non-public information, violations involving distributed ledger technology and cyber intrusions.[36] The resources we have dedicated to the Cyber Unit's important work demonstrate the high priority that we continue to place on cyber-related issues affecting investors and our markets.

*Returning Funds to Main Street Investors*

In my view, protecting retail investors also means, whenever possible, putting money back in their pockets when they are harmed by violations of the federal securities laws.  Last fiscal year, the Commission returned a record $1.07 billion to harmed investors.[37]  We remain committed to this important part of our work, and we expect to return a substantial amount this year as well.

The recent unanimous Supreme Court decision in Kokesh v. SEC, however, has impacted our ability to return funds fraudulently taken from Main Street investors.  In Kokesh, the Supreme Court found our use of the disgorgement remedy to be a penalty, which time-limited the ability of the Commission to seek disgorgement of ill-gotten gains beyond a five-year statute of limitations applicable to penalties.  I do not believe it is productive to debate the merits of the Kokesh decision.  I agree that statutes of limitation serve many important functions in our legal system, and remedies should have reasonable limitations periods.  Civil and criminal authorities, including the SEC, should do everything in their power to bring appropriate actions swiftly.  But, as I look across the scope of our remedial powers, I am troubled by the substantial amount of losses that we may not be able to recover for retail investors.  Said simply, if the fraud is well-concealed and stretches beyond the five-year limitations period applicable to penalties, it is likely that we will not have the ability to recover funds invested by our retail investors more than five years ago.  Allowing clever fraudsters to keep their ill-gotten gains at the expense of our Main Street investors—particularly those with fewer savings and more to lose—is inconsistent with basic fairness and undermines the confidence that our capital markets are fair, efficient and provide Americans with opportunities for a better future.

I would welcome the opportunity to work with Congress to address this issue to ensure defrauded retail investors can get their investment dollars back.  I believe that any such authority should be narrowly tailored to that end while being true to the principles embedded in statutes of limitations.

### *Examination Priorities*

Earlier this year, our Office of Compliance Inspections and Examinations (OCIE), led by Director Peter Driscoll, published its 2018 examination priorities with a continued focus on the SEC's commitment to protecting retail investors.[38]  In particular, OCIE will look closely at products and services offered to retail investors, the disclosures they receive about those investments and the financial services professionals who serve them.  OCIE will also focus its attention on several other areas that present heightened risks, including: (1) compliance and risks in critical market infrastructure, such as exchanges and clearing agencies; (2) the continued growth of cryptocurrencies and initial coin offerings; (3) cybersecurity; and (4) anti-money laundering programs.

OCIE conducts risk-based examinations of registered entities, including broker-dealers, investment advisers, investment companies, municipal advisors, national securities exchanges, clearing agencies, transfer

agents and FINRA, among others.  Our examination program is one of many areas where we have focused on doing more with our available resources.  In FY 2017, OCIE completed nearly 2,900 examinations—an increase of more than 450 examinations from the prior year.  As of late May, OCIE has completed more than 1,700 examinations thus far in FY 2018, representing an increase of approximately nine percent over last year at this time.

OCIE has also made significant strides to keep pace with the continued growth of investment advisers by increasing its examination of these registrants by more than 40 percent in FY 2017 over FY 2016—to approximately 15 percent of all SEC-registered investment advisers. OCIE achieved this result through the reallocation of resources, advancements in OCIE's use of technology, targeted examination initiatives and other efficiencies.  Although this increase in examination coverage has been a very positive step, more needs to be done to continue to increase investment adviser examination coverage levels, while at the same time conducting high quality risk-based examinations to ensure that our mission is met.  We will also continue to strive to do more with existing resources to improve our risk-based examination program.

One way to help us achieve our goals is through enhancing technological tools and continuing to use data analytics to allow our examination teams to more efficiently and effectively focus on higher risk areas and registrants.  Leveraging technology helps our front line examiners analyze information better and faster than ever before.  Some of our in-house developed tools scan arrays of data fields to help analyze and identify potentially problematic activities and registrants.  These tools, and others employed in OCIE, have become essential to our continued advancement in identifying risks to investors and the markets, and effective deployment of examination resources to address these risks to have the greatest impact.

### *Equity Market Structure*

One of the few certainties of trading markets is that they continually evolve.  The SEC's responsibility as the capital markets regulator is to ensure that our regulations continue to drive efficiency, integrity and resilience as technology changes.[39]  Our Division of Trading and Markets, under the leadership of Brett Redfearn, has continued to address market structure issues.

For example, in March, the Commission proposed a transaction fee pilot in National Market System (NMS) stocks,[40] which would provide the Commission with data to help us analyze the effects of exchange fees and rebates on order routing behavior, execution quality and our market structure generally.  This issue has received much attention ever since Regulation NMS was implemented, and more recently, development of a pilot program on transaction fees was one of the SEC's Equity Market Structure Advisory Committee's (EMSAC's) most prominent recommendations.[41]  In my view, the proposed pilot, if adopted, would

lead to a more thorough understanding of these issues, which would help the Commission make more informed and effective policy decisions in the future, all to the benefit of retail investors.

Another potential issue presented by the complex U.S. equity market structure is the need for improved public transparency about alternative trading system (ATS) operations and the order-routing practices of brokers. Responding to the Commission's 2010 Concept Release on Equity Market Structure, a broad range of investors and market participants urged the SEC to address a lack of transparency in this area. The SEC published proposals to improve ATS transparency in 2015 and order routing transparency in 2016. I expect that the Commission will consider adopting final rules for the ATS initiative and the order routing initiative in the coming months. Both of these transparency initiatives highlight the traditional approach of empowering the marketplace to address problems through disclosure. Investors and market participants armed with more robust information about ATS operations and broker order routing practices should be able to make more informed decisions that reward those market participants who advance their customers' interests.

Beyond these initiatives, the Commission and staff will continue to evaluate other equity market structure issues impacting investors, issuers and other market participations. While the EMSAC's charter expired in January 2018, the staff is organizing targeted roundtables among market participants on discrete equity market structure issues, which will feature experts representative of a broad diversity of viewpoints and will provide further opportunities for discussions about critical issues affecting our equity markets. In April, the staff held its first roundtable focused on market structure issues for thinly-traded exchange-listed securities—an important issue as smaller companies, the securities of which are often relatively illiquid, play an essential role in our economy and may be the larger companies of tomorrow. Indeed, it is in these less active securities —where the challenges are greatest—that the potential benefits of a tailored market structure are most significant. We should continue to examine whether the current equity market structure—which is uniform for all companies, large and small, liquid and illiquid—meets the needs of all types of companies.

### *Fixed Income Market Structure*

When I last testified before this Committee, I stated my belief that the time is right for the Commission to broaden its review of market structure to include our fixed income markets, where, historically, less attention has been focused relative to our equity markets. The fixed income markets are critical to our economy and Main Street investors. The U.S. corporate bond market has experienced significant growth since the early 2000s as issuance hit record highs and the increase in the value of corporate bonds outstanding outpaced the growth in U.S. equity market cap between 2006 and 2016.[42] Similarly, the municipal bond market continues to be a large and vital market.

To address these issues, in November 2017, the Fixed Income Market Structure Advisory Committee (FIMSAC) was established to provide diverse perspectives on the structure and operations of the U.S. fixed income markets, as well as advice and recommendations on fixed income market structure.  The FIMSAC has held two public meetings and recently provided a recommendation for a pilot program to study the market implications of changing the public dissemination regime for block-size trades in corporate bonds.

FIMSAC members have prioritized their work around key topic areas in the corporate and municipal bond markets, including the extent to which the current pre-trade and post-trade transparency regimes are serving the markets, the implications of the recent growth in the number of registered mutual funds and ETFs active in our fixed income markets and the impact of increased electronic trading systems on these markets.  I am acutely aware that our interconnected and constantly evolving financial markets produce a dynamic risk landscape.  As technological advancements continue to have an increasing impact on the operations of fixed income markets, the work of the FIMSAC will assist our efforts to identify emerging market developments and risks and ensure that our regulations promote efficiency, transparency and resiliency, as well as investment opportunity.

### *Consolidated Audit Trail*

Another important market structure initiative is the implementation of the Consolidated Audit Trail (CAT).  When implemented, the CAT will provide a single, comprehensive database allowing regulators to more efficiently and accurately track trading in equities and options throughout the U.S. markets.  This enhanced ability will allow the Commission to better carry out its tripartite mission by improving our ability to reconstruct trading activity during a market disruption, which in turn would allow us to more quickly understand the causes behind such disruption and respond with measures to help detect and prevent a recurrence.

Under the CAT NMS Plan, the self-regulatory organizations (SROs)—the national securities exchanges and FINRA—are responsible for developing and implementing the CAT and were required to begin reporting data to the CAT by November 15, 2017.  The SROs missed that deadline, and they remain out of compliance with the CAT NMS Plan today.  Progress is being made.  But the process remains slow and cumbersome, due largely to what I believe are issues relating to governance and project management by the SROs.  We are actively encouraging the SROs to set forth a timeline of detailed, objective and achievable milestones, clearly defined progress objectives for the SROs and Thesys (the plan processor) and a comprehensive description of the functionality that will be developed by specified dates.

I know there are substantial concerns about the protection of investors' personally identifiable information (PII) that would be stored in the CAT.  I have the same concerns and continue to make the protection of CAT

data, particularly any form of PII, a paramount issue.  Additionally, I have made it clear that the SEC will not retrieve sensitive information from the CAT unless we need it and believe appropriate protections to safeguard it are in place.

In November, I asked the Commission staff to evaluate the need for PII in the CAT.  This evaluation includes consideration of, among other things, what PII data elements need to be collected and retained in the CAT in order to achieve the regulatory goals of the CAT, and how PII in the CAT would be used by the SEC and the SROs.  We are considering alternatives to the current scope of PII that would be collected and retained by the CAT under the current plan that can provide the Commission and the SROs with the market surveillance and reconstruction data needed to conduct our regulatory and enforcement functions.  More generally, as I have stated before, I believe that the Commission, the SROs and the plan processor must continuously evaluate the approach to the collection, retention and protection of PII and other sensitive data, as we continue to progress in the development and operation of the CAT.

### Security-Based Swaps

With respect to our security-based swap regime, the staff of the Commission continues to work to develop recommendations for final rules required by Title VII of the Dodd-Frank Act.  Additionally, the staff has been actively engaged with our counterparts at the Commodity Futures Trading Commission (CFTC) to find ways to further harmonize our respective rules with those of the CFTC, where appropriate, to increase effectiveness as well as reduce complexity and costs.  Staff is initially focusing on a number of different rule sets, but more generally remains committed to consulting and coordinating to the benefit of our respective agencies and the markets and market participants we oversee.

### Improving the Investor Experience

We live in a world that has become rich with information and ways to present it.  The Division of Investment Management (Investment Management), led by Dalia Blass, is leading a long-term project to explore modernization of the design, delivery and content of fund disclosures and other information for the benefit of investors.  These initiatives are an important part of how the Commission can serve investors in the 21st century.  Fund disclosures are especially important because millions of Americans invest in funds to help them reach personal financial goals, such as saving for retirement and their children's educations.  As of the end of 2017, over 100 million individuals representing nearly 60 million households, or 45 percent of U.S. households, owned funds.[43]

Earlier this month, the Commission issued a request for comment on enhancing disclosures by mutual funds, exchange-traded funds and other types of investment companies to improve the investor experience and to help investors make more informed investment decisions (Fund

Disclosure RFC).[44]  The Fund Disclosure RFC seeks input from retail investors, experts and others on how they use fund disclosures and how they believe funds can improve disclosures to aid investment decision-making.  In order to facilitate retail investor engagement and comment on improving fund disclosure, the Commission has provided a short Feedback Flier on Improving Fund Disclosure, which can be viewed and submitted at www.sec.gov/tell-us.

Earlier this month, the Commission also adopted a new rule that creates an optional "notice and access" method for delivering fund shareholder reports.[45]  The reforms include protections for those without internet access or who simply prefer paper by preserving the ability to easily continue to receive reports in paper.  Under the rule, a fund may deliver its shareholder reports by making them publicly accessible on a website, free of charge, and sending investors a paper notice of each report's availability by mail.  To inform investors in advance of this new delivery method, there is an extended transition period so that the earliest a fund could begin to rely on the rule would be January 1, 2021.  During this time, funds that choose to implement the new delivery method must provide prominent disclosures in prospectuses and certain other shareholder documents that will generally notify investors of the upcoming change in delivery format on a recurring basis for a period of two years.

### Modernizing Asset Management Regulations

Investment Management is seeking ways to modernize and streamline rules under the Investment Company Act and Investment Advisers Act, many of which were adopted decades ago and have not been amended, notwithstanding significant changes in practices and products in the asset management industry.

Investment Management is working on a recommendation to replace the process of individually-issued exemptive relief for certain exchange-traded funds (ETFs) with a rule to create a consistent, transparent and efficient regulatory framework for ETFs and to facilitate greater competition and innovation among ETFs.  This work is a high priority, as we have an ETF market of over $3.4 trillion operating under more than 300 individually issued exemptive orders.[46]  It is not ideal for such an important segment of the asset management market to operate under so many individual exemptive orders.

This May, the Commission also proposed rules in furtherance of the mandate of the Fair Access to Investment Research Act of 2017.[47]  These proposed rules would promote research on mutual funds, ETFs, registered closed-end funds, business development companies (BDCs) and other covered investment funds.  The proposal is intended to provide investors with greater access to research to aid them in making investment decisions and would reduce obstacles to providing research on investment funds by harmonizing the treatment of such research with research on other public entities.

In 2016, the Commission adopted a new rule designed to promote effective liquidity risk management practices among open-end funds.  As with any new rule, the staff's work did not end with adoption.  After hearing from interested parties about the implementation of this requirement, in 2018, the Commission provided a delay for the classification elements of the rule and proposed targeted amendments to the aggregate public reporting requirements.[48]  These amendments are designed to enhance the disclosure funds provide to investors about liquidity risks and reduce the risk that investors may be misled about the comparability of certain fund liquidity metrics.  I anticipate that the Commission will soon consider adopting this proposal.

Additionally, the Small Business Credit Availability Act directs the Commission to revise certain securities offering and proxy rules in order to harmonize existing registration and reporting requirements to allow BDCs to be treated in the same manner as public corporate issuers.  The Economic Growth, Regulatory Relief, and Consumer Protection Act similarly directs the Commission to issue rules to allow certain registered closed-end funds to use the securities offering and proxy rules that are available to public corporate issuers.  Investment Management is working to develop rule recommendations related to these two bills.

### Dodd-Frank Act

Almost eight years after the enactment of the Dodd-Frank Act, the Commission still has outstanding mandates.  Earlier this year, I addressed how I plan to prioritize and tackle the remaining mandates from the Dodd-Frank Act.[49]  Generally speaking, there are four categories of Dodd-Frank Act rules remaining:

1. the remaining rules to stand-up the security-based swap regime, which I believe should be done holistically as a coherent package due in large part to the interrelated nature of the rules;

2. executive compensation rules for both public companies and SEC-regulated entities, for which, as a result of the complexity and scope of the existing executive compensation disclosure regime, as well as the nature of the mandates, I believe a serial approach is likely to be most efficient and best serve the SEC's mission;

3. specialized disclosure rules, such as resource extraction disclosure, which pose additional challenges, including how the SEC can meet its obligations under the Administrative Procedure Act and, in the case of resource extraction, the Congressional Review Act; and

4. mandates, some of which overlap with examples above, for which market developments—including developments resulting from shareholder engagement—have, at least in part, mitigated

some of the concerns that motivated the statutory requirements.[50]  Our rulemaking priorities, as well as the rules themselves, should reflect these observable developments.

All that said, it is the SEC's obligation to complete the rules mandated by Congress in Dodd-Frank, and I intend to do so.

### Investor Education and Outreach

Beyond our rulemaking agenda, we are very focused on efforts to educate Main Street investors to help empower them to make informed investment decisions – so that they have the best chance of protecting and growing their life's savings.  We place great importance on in-person outreach efforts, including regional roundtable meetings with investors and events specifically targeting seniors.  We also have a website at Investor.gov with a great deal of information geared specifically toward older Americans.  And of course, our investor advocacy team at the SEC is just a phone call away for those Americans that don't have access to the Internet.

My fellow Commissioners and I also participate in investor education and outreach efforts with military servicewomen and men, seniors and other retail investors.  Last week, all five of us, along with staff from across the agency, were in Atlanta for an investor town hall where Main Street investors heard directly from, and shared feedback with, the Commission on issues important to them.[51]

Earlier this year, we launched a new online search tool designed to empower retail investors to make better-informed investment decisions, the SEC Action Lookup for Individuals—or SALI.[52]  SALI enables anyone to find out if the individual he or she is dealing with on an investment has been sanctioned as a result of SEC enforcement actions, for both registered and unregistered individuals.  It is part of our ongoing efforts to help investors research financial professionals who they are entrusting with their savings.  SALI continues to be updated on an ongoing basis, making it an ever better resource for Main Street investors.

### Conclusion

I would like to thank this Committee and its members, especially the Chairman and Ranking Member, for their continued support of the SEC, its mission and its staff.  And most important, I thank you all for supporting our efforts to ensure that America's capital markets continue to provide quality, long-term investment opportunities that will enhance the lives and futures of our long term Main Street investors.

I look forward to answering any questions you may have.

---

[1] The views expressed in this testimony are those of the Chairman of the Securities and Exchange Commission and do not necessarily

represent the views of the President, the full Commission or any
Commissioner.

[2] My remarks in connection with our recent Investor Advisory Committee
in Atlanta discussed in detail this principle—focusing on the interest of our
long term Main Street investors—and the steps we have taken to further
those interests.  See Remarks to the SEC Investor Advisory Committee
(June 14, 2018), available at https://www.sec.gov/news/public-statement
/clayton-statement-investor-advisory-committee-061418.

[3] See Jesse Bricker et al. (2017), "Changes in U.S. Family Finances
from 2013 to 2016: Evidence from the Survey of Consumer Finances,"
Federal Reserve Bulletin, vol. 103 (September), available at
https://www.federalreserve.gov/publications/files/scf17.pdf; see also Rel.
No. 34-83063, Form CRS Relationship Summary; Amendments to Form
ADV; Required Disclosures in Retail Communications and Restrictions on
the use of Certain Names or Titles (Apr. 18, 2018) (for statistics except
the mutual fund data); 2018 Investment Company Fact Book (ICI, 58th
ed. 2018) (mutual fund statistics).

[4] See U.S. Sec. and Exch. Comm'n Strategic Plan: Fiscal Years
2018-2022, Draft for Comment (June 2018), available at
https://www.sec.gov/files/sec-strategic-plan-2018-2022.pdf.  The SEC's
plan was prepared pursuant to the Government Performance and Results
Act (GPRA), as amended, which requires agencies to publish a strategic
plan once every four years (see 5 USC § 306).

[5] See U.S. Sec. and Exch. Comm'n, Agency Rule List (Spring 2018),
available at https://www.reginfo.gov/public
/do/eAgendaMain?operation=OPERATION_GET_AGENCY_RULE_LIST&
currentPub=true&agencyCode=&showStage=active&agencyCd=3235&
Image58.x=84&Image58.y=13&Image58=Submit.

[6] Over the past 10 years, the Commission has completed, on average,
only a third of the rules listed on the near-term agenda.  As examples, 18
rules were listed as to-be-adopted in 2008, and 32 rules were listed in the
same category for 2016; in each case, about 27 percent of the rules were
adopted in each year.

[7] See Draft Registration Statement Processing Procedures Expanded,
Division of Corporation Finance Announcement (June 29, 2017)
[Supplemented Aug. 17, 2017], available at https://www.sec.gov/corpfin
/announcement/draft-registration-statement-processing-procedures-
expanded.

[8] See Securities Act Forms Compliance and Disclosure Interpretation
101.04 and 101.05, available at https://www.sec.gov/divisions/corpfin
/guidance/safinterp.htm.

[9] See Brandon Kochkodin and Alex Barinka, IPO Timelines Are Cut by
80% After SEC's Private Filing Decision, Bloomberg (Dec. 22, 2017),
available at https://www.bloomberg.com/news/articles/2017-12-22/ipo-
timelines-are-cut-by-80-after-sec-s-private-filing-decision.

[10] See Press Release 2017-192, SEC Proposes Rules to Implement FAST Act Mandate to Modernize and Simplify Disclosure (Oct. 11, 2017), available at https://www.sec.gov/news/press-release/2017-192.

[11] Concept Release on the U.S. Proxy System, Release No. 34-62495 (July 14, 2010) [75 FR 42982 (July 22, 2010)].

[12] See Remarks at the PLI 49th Annual Institute on Securities Regulation (Nov. 8, 2017), available at https://www.sec.gov/news/speech/speech-clayton-2017-11-08.

[13] See Press Release 2018-22, SEC Adopts Statement and Interpretative Guidance on Public Company Cybersecurity Disclosures (Feb. 21, 2018), available at https://www.sec.gov/news/press-release/2018-22.

[14] See Press Release 2018-71, Altaba, Formerly Known as Yahoo!, Charged With Failing to Disclose Massive Cybersecurity Breach; Agrees To Pay $35 Million (Apr. 24, 2018), available at https://www.sec.gov/news/press-release/2018-71.

[15] See also Remarks at the Economic Club of New York (July 12, 2017), available at https://www.sec.gov/news/speech/remarks-economic-club-new-york ("Being a victim of a cyber penetration is not, in itself, an excuse.  But, I think I need to be cautious about punishing responsible companies who nevertheless are victims of sophisticated cyber penetrations.  Said another way, the SEC needs to have a broad perspective and bring proportionality to this area that affects not only investors, companies and our markets, but our national security and our future").

[16] See Press Release 2017-170, SEC Chairman Clayton Issues Statement on Cybersecurity:  Discloses the Commission's Cyber Risk Profile, Discusses Intrusions at the Commission, and Reviews the Commission's Approach to Oversight and Enforcement (Sept. 20, 2017), available at https://www.sec.gov/news/press-release/2017-170; Statement on Cybersecurity (Sept. 20, 2017), available at https://www.sec.gov/news/public-statement/statement-clayton-2017-09-20; Testimony on "Examining the SEC's Agenda, Operation, and Budget" (Oct. 4, 2017), available at https://www.sec.gov/news/testimony/testimony-examining-secs-agenda-operation-and-budget.

[17] See Testimony on "Examining the SEC's Agenda, Operation, and Budget," supra note 16.

[18] For example, OGC has retained an outside technology and cybersecurity consultant with extensive expertise in cyber intrusion investigations, and OIT has engaged outside technology and cybersecurity experts to advise on cybersecurity uplift efforts.

[19] We have named Julie Erhardt as the acting Chief Risk Officer while we complete our search.  Julie is a Deputy Chief Accountant at the agency and has an M.S. in management from Stanford University.

Through her 14 years at the Commission and prior work as an auditor, Julie has substantial experience in internal controls, auditing and risk management.

[20] Amendments to Forms and Schedules To Remove Provision of Certain Personally Identifiable Information, Rel. Nos. 33–10486, 34–83097, IC–33077 (Apr. 24, 2018), available at https://www.sec.gov /rules/final/2018/33-10486.pdf.

[21] For example, if you have a portfolio with a few stocks, a couple of mutual funds in a 401(k) and an annuity, then your relationship with your investment professional could be subject to regulation by the SEC, FINRA, the Department of Labor, state insurance regulators, state securities regulators, state attorneys general, and, if the investment professional is associated with a broker-dealer or investment adviser or both that is part of a bank, federal and/or state banking regulators.

[22] See Press Release 2018-68, SEC Proposes to Enhance Protections and Preserve Choice for Retail Investors in Their Relationships with Investment Professionals (Apr. 18, 2018), available at https://www.sec.gov/news/press-release/2018-68.

[23] See The Evolving Market for Retail Investment Services and Forward-Looking Regulation—Adding Clarity and Investor Protection while Ensuring Access and Choice (May 2, 2018), available at https://www.sec.gov/news/speech/speech-clayton-2018-05-02.

[24] See Statement on Public Engagement Regarding Standards of Conduct for Investment Professionals Rulemaking (Apr. 24, 2018), available at https://www.sec.gov/news/public-statement/public-engagement-standards-conduct-investment-professionals-rulemaking.

[25] In December, I issued a statement that provided my general views on the cryptocurrency and ICO markets.  The statement was directed principally at two groups: (1) Main Street investors and (2) market professionals—including, for example, broker-dealers, investment advisers, exchanges, lawyers and accountants—whose actions impact Main Street investors.  See Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), available at https://www.sec.gov /news/public-statement/statement-clayton-2017-12-11.

[26] In one instance, the SEC brought an enforcement action against a purported bitcoin mining company that claimed to have a product "so easy to use that it is 'Grandma approved.'"  In this case, in less than six months, the company allegedly raised more than $19 million from more than 10,000 investors.  The SEC charged that company with operating a Ponzi scheme.  See SEC Obtains Final Judgment Against Founder of Bitcoin Mining Companies Used to Defraud Investors (Oct. 4, 2017), available at https://www.sec.gov/litigation/litreleases/2017/lr23960.htm; Press Release 2015-271, SEC Charges Bitcoin Mining Companies (Dec. 1, 2015), available at https://www.sec.gov/news/pressrelease /2015-271.html.

[27] See Testimony on "Oversight of the SEC's Division of Enforcement" (May 16, 2018), available at https://www.sec.gov/news/testimony /testimony-oversight-secs-division-enforcement; Testimony on "Oversight of the SEC's Division of Corporation Finance" (Apr. 26, 2018), available at https://www.sec.gov/news/testimony/testimony-oversight-secs-division-corporation-finance; Joint Statement by Divisions of Enforcement and Trading and Markets on Potentially Unlawful Online Platforms for Trading Digital Assets (Mar. 7, 2018), available at https://www.sec.gov /news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading; Testimony on "Virtual Currencies: The Roles of the SEC and CFTC" (Feb. 6, 2018) available at https://www.sec.gov /news/testimony/testimony-virtual-currencies-oversight-role-us-securities-and-exchange-commission; Statement by SEC Chairman Jay Clayton and CFTC Chairman J. Christopher Giancarlo: Regulators Are Looking at Cryptocurrency (Jan. 25, 2018), available at https://www.sec.gov /news/public-statement/statement-clayton-giancarlo-012518; Joint Statement by SEC and CFTC Enforcement Directors Regarding Virtual Currency Enforcement Actions (Jan. 19, 2018), available at https://www.sec.gov/news/public-statement/joint-statement-sec-and-cftc-enforcement-directors; Statement on Cryptocurrencies and Initial Coin Offerings (Dec. 11, 2017), available at https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11; SEC Statement Urging Caution Around Celebrity Backed ICOs (Nov. 1, 2017), available at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos; Statement by the Divisions of Corporation Finance and Enforcement on the Report of Investigation on The DAO (July 25, 2017), available at https://www.sec.gov/news/public-statement /corpfin-enforcement-statement-report-investigation-dao; see also U.S. Sec. and Exch. Comm'n, Cybersecurity Enforcement Actions, available at https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.

[28] Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO (July 25, 2017), available at https://www.sec.gov/litigation/investreport/34-81207.pdf.

[29] See William Hinman, Digital Asset Transactions: When Howey Met Gary (Plastic): Remarks at the Yahoo Finance All Markets Summit: Crypto (June 14, 2018), available at https://www.sec.gov/news/speech /speech-hinman-061418.

[30] See Press Release 2018-102, SEC Names Valerie A. Szczepanik Senior Advisor for Digital Assets and Innovation (June 4, 2018), available at https://www.sec.gov/news/press-release/2018-102.

[31] Statement by the Division of Enforcement and Office of Compliance, Inspections and Examinations on Potentially Unlawful Promotion of Initial Coin Offerings and Other Investments by Celebrities and Others (Nov. 1, 2017), available at https://www.sec.gov/news/public-statement/statement-potentially-unlawful-promotion-icos; Joint Statement by SEC and CFTC Enforcement Directors Regarding Virtual Currency Enforcement Actions (Jan. 19, 2018), available at https://www.sec.gov/news/public-statement

/joint-statement-sec-and-cftc-enforcement-directors; Statement by Divisions of Enforcement and Trading and Markets on Potentially Unlawful Online Platforms for Trading Digital Assets (Mar. 7, 2018), available at https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading.

[32] See U.S. Sec. and Exch. Comm'n, Cybersecurity Enforcement Actions, available at https://www.sec.gov/spotlight/cybersecurity-enforcement-actions.

[33] See U.S. Sec. & Exch. Comm'n, Div. of Enforcement, Annual Report: A Look Back at Fiscal Year 2017 at 3 (Nov. 15, 2017), available at https://www.sec.gov/files/enforcement-annual-report-2017.pdf [hereinafter Enforcement Annual Report].

[34] See Press Release 2017-176, SEC Announces Enforcement Initiatives to Combat Cyber-Based Threats and Protect Retail Investors (Sept. 25, 2017), available at https://www.sec.gov/news/press-release/2017-176.

[35] For example, Enforcement's Share Class Selection Disclosure Initiative reflects our continuing commitment to protecting and compensating retail investors whenever possible. The initiative encourages self-reporting and self-remediation by investment advisers who received compensation for putting retail clients in more-expensive mutual fund share classes when identical, less-expensive share classes were available, without disclosing the conflict of interest.  The initiative represents an effort by Enforcement to efficiently leverage its resources to expose widespread misconduct in the investment advisor industry while, at the same time, quickly and efficiently compensating harmed investors.

[36] See SEC Announces Enforcement Initiatives to Combat Cyber-Based Threats and Protect Retail Investors, supra note 34.

[37] Enforcement Annual Report, supra note 33, at 6-11.

[38] U.S. Sec. & Exch. Comm'n, Off. of Compliance Inspections and Examinations, 2018 Nat'l Exam Program Examination Priorities (Feb. 7, 2018), available at https://www.sec.gov/about/offices/ocie/national-examination-program-priorities-2018.pdf.

[39] Remarks at the Equity Market Structure Symposium Sponsored by the University of Chicago and the STA Foundation (Apr. 10, 2018), available at https://www.sec.gov/news/speech/speech-clayton-2018-04-10.

[40] See Press Release 2018-43, SEC Proposes Transaction Fee Pilot for NMS Stocks (Mar. 14, 2018), available at https://www.sec.gov/news/press-release/2018-43.

[41] EMSAC, Recommendation for an Access Fee Pilot (July 8, 2016), available at https://www.sec.gov/spotlight/emsac/recommendation-access-fee-pilot.pdf.

[42] See Opening Remarks at the Inaugural Meeting of the Fixed Income Market Structure Advisory Committee (Jan. 11, 2018), available at https://www.sec.gov/news/public-statement/opening-remarks-inaugural-meeting-fixed-income-market-structure-advisory.

[43] Investment Company Institute, 2018 Investment Company Fact Book, at ii (2018), available at https://www.ici.org/pdf/2018_factbook.pdf.

[44] See Investment Company Act Release No. 33113, Request for Comment on Fund Retail Investor Experience and Disclosure (June 5, 2018), available at https://www.sec.gov/rules/other/2018/33-10503.pdf.

[45] See Securities Act Release No. 10506, Optional Internet Availability of Investment Company Shareholder Reports (June 5, 2018), available at https://www.sec.gov/rules/final/2018/33-10506.pdf.

[46] This market figure is based on data obtained from Bloomberg; see also Investment Company Act Notices and Orders, Category Listing, available at https://www.sec.gov/rules/icreleases.shtml.

[47] See Press Release 2018-92, SEC Proposes FAIR Act Rules to Promote Research Reports on Investment Funds (May 23, 2018), available at https://www.sec.gov/news/press-release/2018-92.

[48] See Press Release 2018-42, SEC Proposes Targeted Changes to Public Liquidity Risk Management Disclosure (Mar. 14, 2018), available at https://www.sec.gov/news/press-release/2018-42.

[49] See Opening Remarks at the Securities Regulation Institute (Jan. 22, 2018), available at https://www.sec.gov/news/speech/speech-clayton-012218.

[50] For example, several companies already have made public their policies regarding compensation clawbacks.  Some of these policies go beyond what would be required under Dodd-Frank. We have seen a few companies attempt to claw back compensation from their executives under these policies.

[51] See Investing in America: The SEC Comes to You, available at https://www.sec.gov/investing-america.

[52] See Press Release 2018-78, SEC Launches Additional Investor Protection Search Tool (May 2, 2018), available at https://www.sec.gov/news/press-release/2018-78.