# Exhibit 221

# Cryptocurrencies and US securities laws: beyond bitcoin and ether

iflr.com/article/b1n3apoz4n65nk/cryptocurrencies-and-us-securities-laws-beyond-bitcoin-and-ether

IFLR Correspondent

# IFLR

*By Christopher Giancarlo and Conrad Bahlke of Willkie Farr & Gallagher*

Over the past decade, cryptocurrency has evolved from an anonymous white paper circulated among a small group of cryptography enthusiasts into a several-hundred billion dollar industry. As the public's interest in cryptocurrency has grown, so too has the attention of lawmakers and regulators. With limited congressional direction thus far, state

CONFIDENTIAL

RPLI_SEC 0978755

and federal regulators are faced with the daunting task of navigating through the complex legal and policy issues posed by this novel technology, including fundamental questions of jurisdiction and the applicability, and appropriateness, of existing regulatory frameworks.

Prominent among the federal cryptocurrency regulators is the US Securities and Exchange Commission (SEC), which has become active in the space in recent years as the flood of retail investors into the cryptocurrency markets and the proliferation of initial coin offerings (ICOs) have prompted concerns of fraud, market manipulation and a lack of prudential oversight. While <u>other agencies have asserted overlapping jurisdictional claims</u>, the SEC has taken the position that some cryptocurrencies are securities and thus fall within its regulatory purview.  However, the SEC has prudently recognised that the application of the securities laws to cryptocurrencies may not be warranted in every instance. Senior SEC officials have made public statements that bitcoin and ether, the two largest cryptocurrencies by market capitalisation, are not securities. Although it would be unreasonable to expect the SEC to weigh in <u>on each of the over 5,500 cryptocurrencies in circulation</u>, noticeably absent from the agency's comments on the regulatory status of bitcoin and ether is any mention of XRP, the third largest cryptocurrency.

Much like bitcoin and ether, XRP is a digital currency supported by a distributed ledger that uses cryptography to store and transfer assets. However, XRP and the underlying XRP Ledger were designed in 2011 and 2012 specifically as a payment mechanism by software developers who later founded Ripple Labs (Ripple). Ripple today utilises XRP to address liquidity challenges faced by financial institutions, including high transaction fees, long processing times and the need for third-party monitoring interposed by traditional clearinghouses and settlement mechanisms.

What sets XRP apart from its peers is the XRP Ledger. Unlike the blockchain protocols that support many other popular cryptocurrencies, the XRP Ledger does not reward network participants for validating transactions on the ledger with coins (a process known as mining).  In the absence of mining, XRP cannot be generated by third parties. Instead, a finite supply of XRP (100 billion units) was created at the time of inception, slightly more than 50% of which is currently held in escrow by Ripple and sold periodically. While these differences enable XRP to better serve its intended purpose as a liquidity tool and settlement mechanism, they do not fundamentally set XRP apart from its peers from a legal and regulatory perspective.

**XRP is not an "investment contract"**

The <u>SEC has taken the position that certain cryptocurrencies are 'investment contracts'</u> within the definition of 'security' under the Securities Act of 1933 and the Securities Exchange Act of 1934. In the landmark *SEC v. W.J. Howey Co.* (*Howey*) case, the Supreme Court held that an investment contract exists where there is "a contract, transaction or scheme whereby a person invests his money in a common enterprise and is led to expect

CONFIDENTIAL                                                                                                                              RPLI_SEC 0978756

profits solely from the efforts of the promoter, sponsor or other third party". In addition, while not dispositive from a legal perspective, the SEC has issued guidance building upon the *Howey* framework in the context of digital assets (i.e. assets that are issued and transferred using distributed ledger or blockchain technology, including, but not limited to, cryptocurrencies), citing certain factors that the agency will consider in determining whether there is a common enterprise and a reasonable expectation of profits derived from the efforts of others. Even if XRP were to satisfy one or two of the prongs of the *Howey* test, it does not satisfy all the factors such that XRP is an investment contract subject to regulation as a security.

*No investment of money*

The first prong of the *Howey* test (an investment of money) has received little attention. This is unfortunate because it has particular relevance. The Supreme Court chose the specific word 'investment' over alternatives such as 'expenditure'. While one could argue that many outlays of money constitute an 'investment', the common understanding of the term 'investment' is the transfer of something of value in exchange for a future return rather than a present one. Yet, XRP cannot be an investment contract as there is no contract or arrangement to speak of between Ripple and the overwhelming majority of XRP holders. To the contrary, the contracts that Ripple has entered into explicitly exclude general XRP holders as third-party beneficiaries.

> **"The mere fact that an individual holds XRP does not create any relationship, rights or privileges with respect to Ripple"**

While the Supreme Court has never held that an investment contract requires a formal agreement, case law and the economic reality of these transactions do not support the assertion that there is somehow a contractual or other relationship between Ripple and members of the general public that acquire XRP on the secondary market. The mere fact that an individual holds XRP does not create any relationship, rights or privileges with respect to Ripple any more than owning ether would create a contract with the Ethereum Foundation, the organisation that oversees the Ethereum architecture. However, even if a relationship were to exist between XRP holders and Ripple and the purchase of XRP were to constitute an investment, XRP still cannot be considered an investment contract as it does not satisfy the remaining prongs of the *Howey* test.

*No common enterprise*

CONFIDENTIAL                                                                                                                           RPLI_SEC 0978757

In determining whether there is a common enterprise under the *Howey* test, federal courts have required there to be horizontal or vertical commonality between the parties. Horizontal commonality focuses on the relationship between investors in an economic venture. Courts have found such commonality where there is a "tying of each individual investor's fortunes to the fortunes of the other investors through the pooling of assets, usually combined with the pro-rata distribution of profit". No horizontal commonality exists with respect to XRP, either among third-party XRP holders or between XRP holders and Ripple. Though broad price fluctuations uniformly affect those who hold XRP, the currency is not pooled in any sense, much less by Ripple or another central party.

Further, as discussed above, ownership of XRP does not, and does not purport to, give the holder any rights with respect to Ripple and a holder of XRP is not entitled to share in the profits and losses of Ripple. The same is true as to individual XRP holders, none of whom are in privity by mere ownership of XRP any more than two people who hold bitcoin or ether can be said to have "tied their fortunes" to one another. To the contrary, given the juxtaposition between XRP's intended use as a liquidity tool, its more general use to transfer value and its potential as a speculative asset, XRP holders who utilise the coins for different purposes have divergent interests with respect to XRP.

Vertical commonality examines the relationship between the investor and the promoter. While circuit courts are split between broad and narrow approaches, vertical commonality generally requires the fortunes of the investor to be linked with those of the success of the promoter. Under either approach, there is no vertical commonality because XRP and Ripple exist independently of one another, such that the XRP Ledger would continue to function even without Ripple's involvement. Unlike equities and other traditional securities, XRP does not represent an interest in Ripple and the performance of Ripple has no bearing on the price of XRP. This separation can be observed in the price of XRP, which historically has been unresponsive to Ripple developments and instead generally has tracked broad movements of other cryptocurrencies like bitcoin and ether. If there is neither horizontal nor vertical commonality, XRP cannot be a common enterprise and therefore cannot be a security under *Howey*.

*No reasonable expectation of profits derived from the efforts of Ripple*

The third and fourth prongs of the *Howey* test (a reasonable expectation of profits derived from the efforts of others) are also absent given Ripple's marketing forbearance and the autonomy of the XRP architecture. The expectation of profits derived from the efforts of others must be reasonable. Ripple has not marketed XRP as an investment product, nor has it promised XRP holders any sort of profit or return on investment. To the contrary, Ripple has repeatedly emphasised the functionality of XRP as a liquidity tool and a settlement mechanism. The fact that certain parties may acquire XRP with the hope that it may appreciate in value cannot be dispositive as the same is equally true of the large number of bitcoin and ether speculators.

In <u>non-binding guidance aimed primarily at ICOs</u>, the SEC has suggested that the two main areas of focus when determining whether there is "reliance on the efforts of others" are the expectations of the investor and whether the efforts of the promoter are essential managerial efforts which affect the failure or success of the enterprise. With respect to XRP, purchasers cannot reasonably rely on the efforts of Ripple as the XRP architecture is fully autonomous and exists entirely independently of Ripple. Were Ripple to cease its involvement in XRP entirely, the XRP Ledger would still function through third-party validators and XRP would continue to trade freely on exchanges.

That market participants recognise the separation between XRP and Ripple is evidenced by the fact that the price of XRP is generally unresponsive to developments regarding Ripple and instead follows the movements of other cryptocurrencies. Though Ripple maintains a sizable stake of the XRP supply and certainly has a pecuniary interest in the value of its holdings, it is not enough to suggest that a mutual interest in the value of an asset gives rise to an expectation of profits as contemplated by *Howey*. Moreover, most of Ripple's XRP is held in escrow and Ripple's ability to access its XRP holdings is restricted by programmatic limits on the amount of XRP that may be released from escrow each month. In light of Ripple not marketing XRP as an investment and the autonomy and relative immutability of the XRP Ledger, there is no reasonable basis for purchasers to expect profits derived from the efforts of Ripple, and thus XRP does not meet each of the prongs of the *Howey* test.

**XRP is sufficiently decentralised to avoid regulation as a security**

SEC division of corporate finance director, William Hinman, <u>opined that a digital asset's status as a security may be subject to change over time</u> if the network on which the token or coin is to function becomes sufficiently decentralised, a sentiment reflected in the subsequently released digital asset guidance. Consistent with statements from other SEC officials, director Hinman named bitcoin and ether as examples of cryptocurrencies that were, or had become, sufficiently decentralised networks such that "regulating the tokens or coins that function on them as securities may not be required". If bitcoin and ether are sufficiently decentralised, the case for decentralisation of XRP is even stronger.

While decentralisation is an inherently difficult concept to quantify, director Hinman cited a number of factors that the SEC may consider in making this determination, including several analogous to the *Howey* elements already discussed above.

CONFIDENTIAL

RPLI_SEC 0978759

**"Even though Ripple holds a large stake of XRP in escrow and funds its operations through the sale of XRP, this is no different than bitcoin miners selling mined tokens"**

One consideration laid out by director Hinman, and later reflected in the digital asset guidance, is whether a promoter has raised an amount of funds in excess of what may be needed to establish a functional network and continues to expend funds from proceeds to enhance the functionality and/or value of the system which the tokens operate. This factor appears to be directed primarily towards digital assets that were offered through an ICO, which would be inapplicable to XRP as XRP and the XRP Ledger were fully operational in 2012 when the XRP Ledger launched. However, even though Ripple holds a large stake of XRP in escrow and funds its operations through the sale of XRP (as well as the sale and licensing of software), this is no different than bitcoin or ether miners selling mined tokens or the Ethereum Foundation using its ether holdings to develop and support the Ethereum architecture.

Another consideration is whether informational asymmetries exist between the promoters and purchasers, such that application of the protections offered by the Securities Act makes sense and disclosure of the promoter's activities and plans would be important to investors. If the SEC has found that bitcoin and ether satisfy this prong, so too should XRP. In fact, fewer information asymmetries exist with XRP given that Ripple's activity in XRP is publicly disclosed through, among other things, voluntary quarterly reports divulging Ripple's activities in the XRP market.

Further, application of the Securities Act's disclosure regime would offer little value as it has become clear from the lack of significant correlation between XRP's market value and Ripple's performance that disclosure of Ripple's business activities have little impact on XRP holders' expectations or decisions. Further, while Ripple may have insider information about its own activities (as all privately held companies do), this would not constitute material, non-public information with respect to XRP given the absence of any meaningful relationship between Ripple's operations and the price of XRP.

The third and final consideration is whether there are persons or entities other than the promoter that exercise governance rights or meaningful influence. There are no third parties that exercise governance rights or meaningful influence over XRP. Further, unlike bitcoin and ether, which could be subject to a '51% attack' where miners that control a majority of the computer power on the network could re-write the ledger, the XRP Ledger requires an 80% 'supermajority' consensus to verify transactions and amend the ledger, and thus there is even less of a risk of a third party taking control of the network.

CONFIDENTIAL

RPLI_SEC 0978760

**A utility token for liquidity**

In recent years, the SEC has begun to explore the concept of 'utility tokens', digital assets that represent a right to a product or service offered by the issuer. In certain circumstances, the agency has taken the view that utility tokens do not represent an investment contract and has allowed ICOs of utility tokens to proceed without registration under the Securities Act.

While the SEC has issued limited formal guidance on the distinction between utility token offerings and other ICOs, two no-action letters issued in 2019 offer valuable insight into the agency's analysis. In concluding that the utility tokens were not securities, the SEC cited the following factors in both no-action letters: (i) the network, platform and applications on which the tokens exist were fully developed and operational at the time of issuance and funds from the sale of tokens would not be used for development of the foregoing; (ii) the tokens were immediately useable at the time of sale; (iii) the tokens were restricted to the network and could not be transferred to external wallets; (iv) the value of the tokens was fixed at a pre-determined rate and represented a corresponding obligation by the issuer or other parties on the platform to provide services in the value of such amount; (v) tokens could only be repurchased by the issuer at face value, and (vi) the tokens were marketed in a manner that emphasised their functionality and not the potential for appreciation in value. In addition, the no-action letter issued to Pocketful of Quarters specifically noted that service providers were subject to initial and ongoing anti-money laundering (AML) and know your customer (KYC) checks and that service providers were able to liquidate the tokens for ether at a predetermined exchange rate.

XRP, given its intended purpose as a liquidity and settlement tool for financial institutions, could be considered a utility token with respect to the specific use of XRP for Ripple's On-Demand Liquidity solution (ODL). ODL enables banks, financial institutions and payment providers to utilise XRP as a bridge-asset for fiat transactions by providing near-instantaneous liquidity. Instead of transacting through a currency exchange, clearinghouse or other financial intermediary, the sender converts the payment into XRP and transfers the XRP across the XRP Ledger to the receiver, who can then liquidate the XRP on an exchange for local currency.

While XRP utilized for ODL is not entirely analogous to the utility tokens for which the SEC has previously issued no-action letters (namely, XRP is neither restricted to the ODL platform nor inherently fixed to a set price), most factors are present. Both the network (XRP Ledger) and the platform (ODL) are currently fully functional and developed such that Ripple does not need to use the sale of XRP for further development and accordingly, the tokens (XRP) are immediately useable at the time of acquisition. Throughout the transaction, the value of XRP is essentially fixed, though it is possible that there may be price fluctuations during the few seconds that it takes for the transaction to complete.

CONFIDENTIAL                                                                                              RPLI_SEC 0978761

Ripple has also marketed XRP with respect to ODL in a manner that emphasises its functionality (secure and near-instantaneous liquidity without the transaction fees or delays imposed by traditional financial intermediaries) and has not marketed XRP as an asset that may appreciate in value, though the latter half of this factor is moot given the limited time during which the counterparties hold XRP by design. Finally, with respect to AML and KYC considerations, XRP II, the subsidiary through which Ripple conducts its sales of XRP, is registered with the Financial Crimes Enforcement Network (FinCEN) and operates a robust AML/KYC/OFAC compliance programme. In addition, Ripple also conducts due diligence on its customers.

> **"There is strong evidence that the specific use of XRP for ODL constitutes a utility token and, in this capacity, should not be subject to regulation as a security."**

In any event, there is limited cause for concern given that Ripple's ODL customers are themselves regulated financial institutions and further diligence will be performed either by the exchanges on which the XRP is converted into fiat currency or by the banks to which the resulting funds are transferred. The fungibility of XRP used for ODL and XRP used for other purposes distinguishes XRP from other digital assets that the SEC has deemed to be utility tokens, but the brief time during which ODL counterparties hold XRP must be taken into consideration as the platform is designed to allow users to liquidate their XRP holdings into local currency almost immediately after coming into possession. As discussed above, XRP fundamentally falls outside of the definition of an investment contract under the *Howey* test. Moreover, there is strong evidence that the specific use of XRP for ODL constitutes a utility token and, in this capacity, should not be subject to regulation as a security.

### If not a security, then what?

Ultimately, under a fair application of the *Howey* test and the SEC's presently expanding analysis, XRP should not be regulated as a security, but instead considered a currency or a medium of exchange, consistent with [interpretations](#) offered by other [federal regulators](#). As the [SEC Chairman noted](#), certain cryptocurrencies are "replacements for sovereign currencies, replace the dollar, the euro, the yen with bitcoin. That type of currency is not a security". This is no less true for XRP as it is for bitcoin or ether, which the SEC has explicitly stated fall outside the definition of a security. The increased adoption of XRP as a

CONFIDENTIAL                                                                                               RPLI_SEC 0978762

medium of exchange and a form of payment in recent years, both by consumers and in the business-to-business setting, further underscores the utility of XRP as a *bona fide* fiat substitute.

Christopher Giancarlo is senior counsel, and Conrad Bahlke is counsel, at Willkie Farr & Gallagher. Mr. Giancarlo previously served as the thirteenth chairman of the US Commodity Futures Trading Commission. The authors wish to acknowledge the assistance of VelaSusan Park and Graham Pittman, associates at Willkie. Willkie is counsel to Ripple on certain matters and relied on certain factual information provided by Ripple in the preparation of this article.

Share this article

CONFIDENTIAL	RPLI_SEC 0978763