# Exhibit 225

**To:** Seaman, Michael P. [███████████████]
**From:** Marvin Ammori
**Sent:** 2018-10-03T11:37:33-04:00
**Subject:** Proposed questions & title
**Received:** 2018-10-03T11:41:08-04:00
TechGC Bill Hinman Q&A.docx

;
Hi Michael,
Attached are a first stab at a title and questions. Some of the questions are long and involved to provide some context.

You'll notice there are likely too many questions for 1 hour. There might be some you don't want to answer--I figured we would include questions we'd love to see answered, but feel free to cut those you don't want to answer. Also, again, feel free to add some questions or prioritize those that you would like to make sure we get to.

If you want to make a first cut before sharing with Mr. Hinman and send our way with suggestions/cuts, feel free to do so, if that leads to more efficient use of your time and ours.

Thanks again!

SEC-LIT-EMAILS-000335176
HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY
RPLI_02765620

## TechGC National Summit
New York City
October 26

Lunch Keynote Conversation:
Tokens, Decentralized Software Networks, and Securities Offerings

**Bill Hinman,** Director of Division of Corporation Finance, Securities & Exchange Commission

**Interviewers**
Hilary Kivitz, A16z Crypto (about their thesis)
Marvin Ammori, Protool Labs (about filecoin fyi)

### Proposed Questions

1. We're here to talk about cryptocurrency, tokens, the blockchain. Just so people here have an idea, what else do you and the Division of Corporation Finance work on *other than* crypto?
    a. Are there staff in Corp Fin and Trading & Markets that are dedicated to this space? Given the relatively small dollar values involved, compared to many other areas that have proven to be high risk, is this one of the bigger challenges you face, or just the noisiest? [Implied or follow up.]

2. And let's ask where you fit in among all the crypto regulators out there. There's the SEC, CFTC, CFPB, the FTC. (There's also the Finance and Agricultural Committees in Congress, and the IRS and FinCen/Treasury.) Where does the SEC fit in, do all you agencies talk?
    a. Is there any chance of simplifying all the different touchpoints? [Implied or follow up.]

3. You have studied blockchains and cryptocurrency, what excites you most about them?

4. Mr. Hinman, you made huge news in the crypto world in your talk on June 14, 2018. Thank you, thank you for providing some guidance on your thinking through that talk. First, can you summarize the key concepts for us?
    a. Several key points--Token and offering may be distinct; token may be offered in a securities offering at some point and the future offerings may be non-securities nonetheless; the touchstone of the analysis is likely the *Howey* test prong regarding an expectation of profits solely from the efforts of others; a sufficiently decentralized network token does not rely on the efforts of others; also, big news, Ethereum and Bitcoin are not securities and would not benefit from securities regulation.

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000335177
RPLI_02765621

5. You also made some qualified positive comments about the SAFT framework in the abstract. The SAFT' seems to be very common in the US by now. Can you explain your view as expressed then, or now?

6. We thank you very much for the guidance. Now that everyone is level set--let me tell you, there remains some uncertainty. It's not your fault--you couldn't clarify everything at once. But every GC in this room can tell you the same story about an uncertain area of law. You call 10 different law firms and they give you 10 different answers. Each of them has their own particular spin. It's like the white light of your speech went through a prism and came out in 10 different colors of legal advice. One prominent lawyer told me that the meaning of your speech is that Ethereum and Bitcoin are not securities--but everything else is and everything new will be! Is that somehow what you what you were trying to convey? [I hope this is a softball.]
    a. Another issue is that projects and their lawyers go into to see your staff in private meetings--and we so appreciate that SEC staff are willing to spend time on this space and make themselves available. But no good deed goes unpunished. Because then the lawyers come out having spoken to different people and hearing different things. For a general counsel, that has resulted in a legal framework comprised of rumors, best guesses, and conflicting secondhand interpretations from different lawyers. Now insights are based on who can get a meeting or which lawyer says they "know someone" in the right office. There have been some efforts to avoid this, and to try to bring the conversations on this topic into an open forum and find consensus on best practices.People are afraid of inconsistent interpretations, lack of guidance, retroactive enforcement actions, and just confusion in the market. Have you considered a more open approach where you shine white light directly on the people? [Less of a softball.]
    b. It seems that the Corporation Finance Division has stated that it will hear facts and circumstances arguments, without publishing more direct guidance. Policy-making by rule or instead by adjudication each has strengths and weaknesses, so neither is perfect. But the stakes are high of acting without guidance, as SEC penalties after the fact can be severe and nobody knows how long or involved the no-action letter process may take before the fact, and projects going in are getting different signals. Could you explain why you think policy-making by adjudication is the best course? [Gives you a platform to explain.]

7. As a result of the perceived uncertainty, we increasingly hear that token sales are going abroad, excluding the US, and that countries like Singapore and Switzerland are angling to beat the US in this new space and be the homes for the financial and Internet innovation tokens make possible. How much does that worry you and influence your approach to policymaking here?  [Less of a softball.]

8. The biggest problem in the token sale space, from the industry point of view, may be all the fraud out there. There are people selling tokens when they lack the technical ability and after plagiarizing other technical white papers; they list as so-called advisers people

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000335178
RPLI_02765622

who are not actually advising them. The legitimate (ie risky but not fraudulent) projects and investors would love to see those guys out the market. Do you believe the securities law and disclosure are even needed in this space or could usual fraud laws (state statutes, common law, FTC rules etc) handle the biggest issues out there?

9. The biggest ambiguity left might be to determine when a token is "decentralized" enough to launch as a non-security. Many groups aim to create decentralized open source protocols, so the law actually reinforces that goals of pursuing decentralization. But there is no clear line, just many different factors to consider. We do know that, this summer, Ethereum and Bitcoin were sufficiently decentralized under those factors. Everyone has been studying how decentralized Ether and Bitcoin were on the day of your speech, so thank you for that! But are there any particular factors that you mentioned that are more important than other factors in our analysis? [This would be particularly useful.]

10. The SEC Chairman has suggested that private practice attorneys advising projects in the space are "gatekeepers." Can you clarify what general counsels of companies and projects should expect from outside counsel as we assess risks associated with a token offering and what kind of personal risks they take in advising projects?

11. Chairman Clayton made his first statement that at least some tokens are securities nearly a year ago. Despite that, not a single Reg A+ offering or Form S-1 has been qualified or taken effective. Why haven't we seen something on this front?

12. On September 13, Chairman Clayton reminded the word that "all staff statements are nonbinding and create no enforceable legal rights or obligations of the Commission or other parties." Several people sent that to me with the line, "Don't count on Hinman's speech!!!!" as though Chairman Clayton's statement was a specific repudiation of your speech. Then I was told by someone --who talked to someone at the SEC-- that Chairman Clayton's statement *wasn't* about your speech but about something else. What do you think, was it a specific repudiation? [Maybe you can't answer.]

HIGHLY CONFIDENTIAL - ATTORNEYS' EYES ONLY

SEC-LIT-EMAILS-000335179
RPLI_02765623