# Exhibit 228

FOIA CONFIDENTIAL TREATMENT REQUEST
Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by
███████████████████

> *Pursuant to Rule 83 of the Securities & Exchange Commission's Rules of Practice (17 C.F.R. 200.83),* ███████████████ *hereby requests that confidential treatment be afforded to this document and its contents (pages* ████████████ *through* ████████ ██████████ *inclusive) and that this document and its contents be withheld when requested under the Freedom of Information Act.*

### Status Under Federal Securities Laws of Digital Assets in
### ████████████████████

Presentation to the Staff of the Securities & Exchange Commission
December 15, 2017

## Introduction

*Background*

- ████████████████████ (the "Fund") is an investment fund that holds a market-weighted group of digital assets, initially bitcoin, ether and XRP (the digital currency of the Ripple Network).

- The Fund is currently managed by ███████████████████████ ████") and, prior to or contemporaneously with effectiveness of the registration statement, will be managed by ██████████████████████████, a subsidiary of ████████████ holding company and formerly referred to as ████ ████████████████ and ████ are collectively referred to as the "Manager."

- Among other portfolio construction criteria, the Fund will not invest in digital assets that the Manager believes may be considered "securities" under the federal securities laws.

- In response to the Fund's filing of a confidential draft registration statement on November 29, 2017, the Staff sent a letter requesting that the Manager:

   1. Provide a detailed analysis explaining why the Manager believes that bitcoin, ether, XRP and any other digital assets that are likely to be held by the Fund are not securities as defined in Section 2(a)(1) of the Securities Act of 1933 and

   2. Provide a detailed description of the process and framework that the Manager will use for making a determination that a digital asset is not a security under the federal securities laws.

*Summary of Response*

- Today, most digital assets generally do not clearly fall into any of the specific enumerated types of instruments within the definition of "security," such as notes, stock, or bonds. However, as the SEC concluded in its Section 21(a) report analyzing tokens issued by The DAO, some digital assets and the transactions in

████████████████-1

**Confidential Treatment Requested**
Pursuant to 17 C.F.R. 200.83 by

which they are distributed may involve "investment contracts" – the catchall category for nontraditional securities.

- Consistent with the Section 21(a) report, the Manager, with the assistance of internal and external counsel, analyzes whether a digital asset is a security for federal securities law purposes based on the Supreme Court's *Howey* test for "investment contracts" and subsequent cases. For this analysis, the Manager considers (i) the features and terms of each digital asset, (ii) the facts and circumstances surrounding its original development and distribution and (iii) its current functionality, usage and role of the digital asset's promoters, if any.

- The *Howey* test defines an "investment contract" as a contract or scheme that involves all of the following features:

  o **Investment of money**: The investor must give up some tangible and definable consideration;

  o **Common enterprise**: The investor's fortunes must be interwoven with those of other investors (horizontal commonality) and/or, the efforts of the promoter of the investment (vertical commonality);

  o **Expectation of profits**: The investment must be purchased with the expectation that the value of the investment will increase or that the investor will receive earnings from the investment; and

  o **Entrepreneurial and managerial efforts of others**: The investor's expectation of profits must be based solely on the entrepreneurial or managerial efforts of the promoter or other third parties.

- As we will explain, under this analysis, the Manager has concluded that none of bitcoin, ether or XRP should be considered an investment contract and none should therefore be treated as a security under the federal securities laws:

  o Bitcoin is not a security because it is not issued in return for any payment and its decentralized nature is incompatible with there being a common enterprise, or the expectation of profits, from any entrepreneurial or managerial efforts of particular persons.

  o Ether is not a security because, like bitcoin, the Ethereum Network is sufficiently decentralized to lack a common enterprise or the expectation of profits from the entrepreneurial or managerial efforts of others. In addition, ether has extensive current functionality to operate smart contract technology on the Ethereum Network. Although ether was initially issued in an "initial coin offering" or "ICO," ether's subsequent development and current use case provide the necessary factual predicate for the conclusion that ether is not a security.

  o XRP is not a security because the purchase of XRP generally does not provide the expectation of profits and like ether, XRP exists primarily as a necessary input for use of the Ripple Network. Similarly, although XRP

-2

**Confidential Treatment Requested**
Pursuant to 17 C.F.R. 200.83 by

was initially issued in an ICO, its subsequent development and current use case provide the necessary factual predicate for the conclusion that XRP is not a security.

- Although the Fund and many other parties purchase digital assets for investment purposes, as with central-bank issued currencies, metals and energy, the fact that investors may speculate in commodities does not cause the commodities to become subject to the securities laws.

- We also point out that to declare the Fund's registration statement effective, the SEC need not take a position on whether ether or XRP is a security. This is because in light of the Fund's investment strategy of investing in a basket of digital assets weighted by market capitalization, the Fund's bitcoin holdings are expected to make up more than 60% of asset value, and as a result the Fund would not be required to register as an "investment company" under the Investment Company Act of 1940.

*About the Manager*



-3

**CONFIDENTIAL**

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Confidential Treatment Requested**
Pursuant to 17 C.F.R. 200.83 by



*About the Fund*



CONFIDENTIAL

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

_0000089

SEC-LIT-EPROD-000738404

RPLI_02002655

**Confidential Treatment Requested**
Pursuant to 17 C.F.R. 200.83 by



I.      **Analysis of Bitcoin, Ether and XRP**

    A.  **Bitcoin**

       1.   *The Bitcoin Network*

- Bitcoin is intended to be a synthetic currency that may be transmitted over the open-source, permissionless, decentralized peer-to-peer payment system known as the Bitcoin Network.

    o **Unbacked**: Bitcoin does not entitle the holder to any ownership, interest or right in any other commodity, good or service. No government or corporation promises to accept bitcoin for payment, to continue its development or to stand behind it.

    o **Permissionless**: No permission is required to join the Bitcoin Network, and anyone can participate by downloading freely available software.

    o **Open-source**: Bitcoin was developed and continues to be improved by a community of unaffiliated volunteer developers who coordinate using the open-source collaboration tool GitHub. The code is released under a license that permits anyone to copy, modify, merge, publish, distribute, sublicense and/or sell copies of the software.

    o **Decentralized**: No centralized authority controls or operates the Bitcoin Network. Its functionality is controlled by a protocol, which has been programmed into different pieces of software. A disparate group of network participants makes decisions impacting bitcoin through open

-5

CONFIDENTIAL

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Confidential Treatment Requested**
Pursuant to 17 C.F.R. 200.83 by
███████████

consensus.

- ▪ The most commonly used implementation of bitcoin software and the disparate group of developers that maintains it, is known as Bitcoin Core. This software is available on GitHub. There are other implementations as well, all of which follow the bitcoin Protocol.

- ▪ Although developers or others can make changes to the software these changes do not automatically become part of "bitcoin." Participants on the network can ignore or reject updates.

- ▪ The lack of centralization is evidenced by "forks." A fork occurs when major changes are adopted by some network participants but not by others; in that case the system bifurcates into mutually incompatible networks.

- o **Peer-to-peer**: No trusted third-party intermediary is required to execute transactions on the Bitcoin Network. Transactions are recorded on a cryptographically secure public ledger that is shared by all network participants.

- o **Payment network**: The core function of the Bitcoin Network is to permit the transfer of value represented by bitcoin from one participant to another.

- ▪ All bitcoins are initially generated, rather than sold, in the first instance by "miners" who perform computationally intense cryptographic functions to validate transactions. The validation algorithm automatically rewards miners with units of bitcoin for their contribution to the network. Units of bitcoin (currently 12.5) are awarded to a miner, on average, once every 10 minutes with the number awarded halving every four years. Because of these two properties, enforced by the protocol, there will never be more than 21 million bitcoins in existence.

- ▪ The concept of "mining" bitcoin is intended to be analogous to mining a precious metal: miners of bitcoin, like miners of gold, expend resources to unearth a valuable commodity, which they may hold or sell to others.

2.    *Initial Development and Use*

- • In November 2008, a whitepaper describing bitcoin was released under the pseudonym "Satoshi Nakamoto," simultaneously with the initial source code that implemented the ideas in the whitepaper.

- • The first miners and developers were cryptography enthusiasts, not investors or financial professionals.

- • Early participants were hobbyists and supporters of alternatives to central-bank

-6

CONFIDENTIAL

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

**Confidential Treatment Requested**
Pursuant to 17 C.F.R. 200.83 by
████████████████████████

issued currencies. These participants treated bitcoin as a new type of currency, rather than an investment.

- o   In one famous transaction in 2010, a developer purchased two pizzas in exchange for 10 thousand bitcoins – a quantity that would be worth over $100 million at bitcoin's 2017 peak price.

- Bitcoin never had a sale of any kind to fund development of a venture. All bitcoin in circulation were originally generated through mining. Developers that work on maintaining or improving the code are volunteers or individuals paid by their employers whose businesses rely on the Bitcoin Network.

3.   *Analysis of Bitcoin Under the* Howey *Test*

- **Investment of money**: Although secondary-market purchasers may purchase bitcoin for money from sellers, each bitcoin that exists or will exist was awarded to a miner for contributing computational power to secure the network. Bitcoins are not initially issued in exchange for money. While under some circumstances the contribution of an item of value other than money satisfies this prong of the *Howey* test, under the relevant caselaw the contribution must be made in such a way as to subject the investor to the risk of financial loss due to the efforts of others. In mining bitcoin, miners purchase durable goods (computers) and electricity in order to run the software that generates bitcoin. Any financial risk is associated with the independent decision to sell, hold or use the generated bitcoin, or the failure of their own entrepreneurial efforts to mine for bitcoin.

- **Common enterprise**: The decentralized nature of the Bitcoin Network prevents there from being any horizontal commonality among the network participants or vertical commonality with promoters.

- o   *Horizontal commonality*: Those courts that view *Howey* as requiring horizontal commonality focus on whether parties have pooled their money to fund a venture in which they will share in profits and losses on a *pro rata* basis. For bitcoin, no funds (or computational power) have been pooled and although bitcoin owners benefit *pro rata* in price increases, the decentralization of the Bitcoin Network means there is no "common enterprise" responsible for generating these profits or losses. The lack of any centralized organization or coordination in the Bitcoin Network prevents horizontal commonality from existing.

  - ▪   The value of bitcoin is based on supply and demand; what purchasers are willing to pay for it and sellers are willing to accept. There is no profit generated by bitcoin as a venture in which holders share. The supply and demand may be impacted by the extent to which participants believe bitcoin may become widely accepted and used.

  - ▪   Bitcoin proceeds are not pooled together for the use of a central development company.

████████████-7

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by

- Although a community of bitcoin users and developers has developed and their actions may impact the value of bitcoin – such as by creating new use cases and creating mainstream acceptance – these independent actions by disparate self-motivated and unaffiliated actors are not the sort of horizontal commonality that gives rise to a security under the *Howey* test.

   o *Vertical commonality*: Those courts that view *Howey* as requiring vertical commonality generally focus on whether the fortunes of a purchaser are tied to the efforts of the seller or promoter. The fact that bitcoin is initially generated by miners, rather than issued and sold, together with the decentralized nature of the Bitcoin Network and lack of any identifiable promoter or centralized manager, prevents bitcoin from exhibiting vertical commonality.

   - Miners who generate bitcoin have not purchased bitcoin from any promoter and therefore have no one with whom to have vertical commonality.

   - Those that purchase bitcoin directly or indirectly from a miner may rely on the existence of miners, as a group, to ensure that the Bitcoin Network continues to function. But, given its decentralized nature, the value of bitcoin does not depend on the existence or actions of any particular miner, nor are a bitcoin holder's fortunes in any way linked to the particular miner who mined the bitcoin.

   - Purchasers also do not have vertical commonality with bitcoin's initial or continuing developers. Bitcoin purchasers may continue to use the network as it existed at the time they purchased bitcoin and are neither promised nor rely upon any future development efforts.

- **Expectation of profits**: Purchasers and miners of bitcoin may hold bitcoin for a variety of reasons.

   o Although many current users of bitcoin have a profit motive, including speculators who buy bitcoin in the secondary market hoping that its value will increase, bitcoin's core functionality is not structured to generate profit, rather it was it designed to be used as an internet commerce-enabling money, or as an intermediary currency to facilitate cheaper and faster cross-border remittances.

   - Like precious metals and energy commodities, bitcoin has its own native and inherent uses, although many may decide to hold it as an investment. The existence of speculators hoping for profit, however, does not convert a commodity into a security.

- **Entrepreneurial and managerial efforts of others**: Purchasers of bitcoin do not solely or primarily rely upon the efforts of any particular third party or organized group of third parties. A large, amorphous group of individuals, companies and events impact bitcoin's value.

 -8

_0000093

SEC-LIT-EPROD-000738408

RPLI_02002659

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by ▮▮▮▮▮

○ The only third parties that bitcoin holders could arguably be relying upon are the miners, in order to validate transactions on the Bitcoin Network, or the developers of the protocol. These groups are not identifiable third parties, but rather categories of participants acting on their own, in their own self-interest, detached from one another and each bitcoin holder.

○ Although bitcoin users rely on the existence of miners as a class, they do not rely on any particular miner and the efforts of miners are undertaken for their own self-interest in earning rewards, not to increase the value of bitcoin. Because the bitcoin protocol adjusts the difficulty of the mining problem automatically based on the number of participating miners and their collective computer power, having more or fewer miners beyond a minimum threshold does not directly impact the success of the network or bitcoin's value. In other words, there must be miners, but their entrepreneurial and managerial decisions regarding whether to mine or increase the extent of their mining should not impact the value of bitcoin.

○ Additionally, owners of bitcoin do not rely on any organized group of developers to act as centralized managers whose efforts are expected to impact bitcoin's value. The developers are a loosely organized community of otherwise-unaffiliated persons that continues to maintain and improve the software. The identity of these developers is constantly in flux as individual developers drop in and out of the project.

○ Any entrepreneurial or managerial discretion developers might have is significantly constrained and therefore could not be relied on, as their changes must be generally adopted by network participants to take effect and their suggestions can and have been rejected in the past. Developers can do no more than suggest a change to the software, while network participants independently choose whether or not to adopt any suggested improvements. Further, holders of bitcoin cannot rely on the continued efforts of developers, as they are under no commitment to engage in any development efforts.

**B. Ether**

1. *The Ethereum Network*

• Ether is in many ways similar to bitcoin. The backbone of the Ethereum Network is a permissionless, open source, decentralized, peer-to-peer, digital asset transfer system that uses a secure public ledger to record the transfer of a native coin called ether, which can be mined using a process similar to bitcoin mining.

• The main differences between the bitcoin and Ethereum protocols are:

○ Aside from ether, the Ethereum blockchain can track other data or assets that are described in smart contracts.

○ These smart contracts also define the behaviors of these assets – i.e., how


-9

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by

and when they are created, how and to whom they can be sent and how they can be used or consumed.

- Smart contracts automatically execute on the occurrence of a verifiable event, such as the receipt of payment, or a video file reaching a certain number of views. Through smart contracts, the Ethereum Network allows the automation of a wide variety of economic relationships that previously have relied on the participation of trusted third-party intermediaries.

- Smart contracts are compiled into code that is understandable by a virtual computer made up of all the computers running the Ethereum Network, together known as the Ethereum Virtual Machine, or EVM.

- In return for using the EVM's computational power, users must pay small quantities of ether, often analogized to "gas" powering an engine. The gas cost varies according to the computational complexity of the code to be executed and demand for computational power.

2.  *Initial Development and Use*

- The early history of ether is somewhat different from the history of bitcoin.

- In December 2013, Vitalik Buterin published a "whitepaper" describing the feasibility of Ethereum technology.

- In response to the whitepaper, a group of interested developers gathered and made a plan for creating the Ethereum Network.

- In April 2014, Gavin Wood published a document that provided detailed technical specifications for the EVM. Anyone who followed the specifications was able to develop a compatible Ethereum client, leading eventually to seven different client implementations by different groups of developers.

- In June 2014 the Ethereum Foundation was formed as a Swiss non-profit foundation to manage the Ethereum pre-sale. The terms of the pre-sale agreement provided that anyone who delivered bitcoin during a particular window between July and September 2014 would receive a given quantity of ether when the network officially launched. Approximately 60 million ether were exchanged for approximately 30,000 bitcoins. An additional 12 million ether were retained by the Foundation.

- The Ethereum Foundation used the funds from the pre-sale and the retained ether to repay legal fees incurred in forming the Foundation and to reward the early developers who were instrumental in developing the technology. The remaining funds were dedicated to promoting continued development and improvements to the Ethereum Network.

CONFIDENTIAL

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

_0000095

SEC-LIT-EPROD-000738410

RPLI_02002661

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by ███████

- Ongoing funding for the Ethereum Foundation is provided by donations, which can be made by contributing ether or bitcoin to the appropriate blockchain address. The Ethereum Foundation has no ability to create new ether other than through mining, like other market participants.

o The Ethereum Foundation's operations after the pre-sale have included organizing an annual developer conference, providing a bounty program that offers rewards to for finding vulnerabilities in Ethereum technology, and making grants to fund developers working on projects to improve Ethereum.

- The first developer's conference was hosted in Berlin shortly after the ether pre-sale. In one presentation, it was noted that the developer base had grown exponentially, with 81 Ethereum meetups and hack-a-thons happening from New York to Tehran, and over 6000 members worldwide.

- The Ethereum Network officially launched on June 30, 2015 and ether were released to pre-sale purchasers.

- The second developer conference, held in November 2015, showcased that the community of people interested in using Ethereum technology for their own business purposes had grown significantly beyond the early developers. The conference hosted more than 400 participants, comprised of developers, entrepreneurs, and executives from major technology companies and financial firms.

3.  *Analysis of Ether Under the* Howey *Test*

a.  *Pre-Sale*

- Because there may not have been sufficient facts at its inception to determine whether or not ether should be characterized as a security under the federal securities laws, it is useful to distinguish between the initial sale of ether and the current state of the Ethereum Network and usage of ether.

- There is some question as to whether the pre-sale agreement to deliver ether in the future in return for advance payment of bitcoin was an investment contract under the *Howey* test, in light of the fact that the utility of ether at that time might have been dependent upon the efforts of the group working to finish development of the Ethereum Network.

- Although we do not believe it necessary to the analysis, there are significant arguments that the pre-sale agreement was not an investment contract because there was no expectation of profits (as early purchasers likely planned to use ether in the network once developed).

- However, even if the analysis of the pre-sale agreement pointed in favor of treating the pre-sale agreement as an investment contract, the "contract" was for delivery of

-11

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by ███████

ether at the time of network launch. Ether itself did not represent that contract, and no ether or other digital asset was delivered at the time of the pre-sale. The ether digital asset is separate from the contract entered into by the pre-sale purchasers.

- o By way of analogy to the *Howey* facts, if an investor in a portion of a citrus grove invests money in return for the right to receive a share of the oranges that will grow in the grove, that investor may have entered into an investment contract. However, if the oranges that grow are delivered to the investor as promised, the oranges themselves are not securities.

    b.   <u>*Current State*</u>

- Whether or not the pre-sale agreement involved an investment contract, ether itself as analyzed under *Howey*, based on the facts and circumstances as they exist today, is not a security.

- **Common enterprise**: The Ethereum Network is sufficiently decentralized to prevent holders of ether from participating in a common enterprise.

    - o *Horizontal commonality*: Initial participants in the pre-sale did pool their funds together for use by the Ethereum Foundation. However, unlike other centralized projects and more similar to bitcoin, currently (i) new ether is issued to miners in the system (rather than to any investor) and (ii) the initial pooling of resources is extremely attenuated from the factors that today would lead to profit or losses from holding ether. The fortunes of holders of ether are not dependent on the deployment of what remains of that pool of capital.

        - ▪ This is markedly different from the enterprise formed by the sale of DAO tokens, where "holders of DAO Tokens stood to share in the anticipated earnings from the. . .projects as a return on their investment in DAO Tokens."

    - o *Vertical commonality*: Apart from the initial pre-sale, as with bitcoin, there is no current promoter with whom owners of ether are in vertical commonality.

        - ▪ Given its decentralization, neither the Ethereum Foundation nor anyone else has effective control over the continued development of the protocol. Further, there is no developer or group of developers whose absence would prevent the continued functionality of the Ethereum Network.

- **Expectation of profit**: Many digital assets, and ether in particular, grant holders access to some capability provided by a network. There will always be speculators who attempt to profit from fluctuations in the value of these assets (as is the case with most commodities), but the key question is whether the digital asset exists in order to provide actual functionality, or solely as a means to share in the profits generated by the venture.

CONFIDENTIAL

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by

- o In the case of ether, even at the time of the launch of the Ethereum Network, there was already widespread interest in using ether to power smart contracts on the network. That interest continues to grow as developers and businesses research and test new implementations of smart contracts on the Ethereum Network – activities that require the purchase and use of ether. Reported examples include:

  - The French insurance company AXA is reportedly using Ethereum smart contracts to offer travel delay insurance smart contracts, taking advantage of the public information regarding flight delays to automatically trigger the insurance policy.

  - Toyota is reportedly working on a proof-of-concept for an Ethereum smart contract based alternative to ride-sharing services such as Uber and Lyft.

  - UBS is reportedly leading a project in collaboration with Barclays, Credit Suisse, KBC, SIX, and Thompson Reuters, that will allow banks to securely coordinate and share reference data using the Ethereum Blockchain.

  - The island of Aruba is reportedly developing a tourism marketplace on the Ethereum blockchain that the central bank of Aruba hopes will allow local tourism-based businesses to compete with large travel firms such as Expedia and Priceline.

  - There is a growing interest in using Ethereum as a gaming platform, triggered by a game allowing users to buy and sell collectable cartoon cats using Ethereum smart contracts that went "viral."

  - o As with other commodities, investors have speculated that ether may become more valuable if the Ethereum Network becomes more widely in-demand. But this speculative interest does not convert ether from being a functional part of the Ethereum Network into being a security.

- **Entrepreneurial and managerial efforts of others**: Although the original pre-sale purchasers of ether may have relied on the entrepreneurial and managerial efforts of the Ethereum Foundation and the original developers, this centralization was eliminated when the network launched.

  - o Just as with bitcoin, original and new developers can suggest changes, but miners and other participants need not adopt them. Rather than a centralized management group, the developers and users of the Ethereum Network are a widely dispersed group of actors with divergent interests.

  - o Unlike the "curators" of The DAO, upon whom DAO token holders relied to evaluate potential investments, holders of ether do not rely on the discretionary managerial efforts of anyone to make the network functional or successful.

CONFIDENTIAL

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by

o   Notwithstanding its original coordination of the network development, the Ethereum Foundation is now more akin to a trade organization than a promoter.

▪   The Ethereum Foundation's current primary function is to host an annual conference where people interested in the development of the network can gather to share ideas.

▪   The dissolution of the Ethereum Foundation would have a minimal impact on the continued functionality of the Ethereum Network and the usefulness and value of ether.

## C.  XRP

### 1.   *The Ripple Network*

- Although some of the technology and ideas in the Ripple Network are older than bitcoin, the Ripple Network was created as a response to bitcoin.

  o   Ripple technology allows transfer and exchange of multiple currencies instead of just one (e.g., bitcoin on the Bitcoin Blockchain) and has faster transaction times and reduced electricity usage.

  o   Ripple technology is also designed to facilitate enterprise usage, including by banks and other financial intermediaries.

- The Ripple Network allows participants to transmit money on a peer-to-peer basis over the internet without trusted third-party intermediaries. Transactions typically settle in seconds, rather than in minutes or hours as on the Bitcoin Network.

  o   The network supports a digital asset native to the network, called Ripple or XRP, but can also be used to transfer any other currency or asset, such as USD.

  o   The protocol and software used to access the Ripple Network and to participate on the network in various capacities is free and open source.

- **Trust lines**: While XRP can be sent natively over the Ripple Network, all other currencies are represented as amounts due from particular counterparties. Participants set up "trust lines" indicating which institutions they are willing to have credit exposure to.

  o   For example, imagine two users, a U.S. user and an E.U. user. The U.S. user has a USD trust line extended to her U.S. bank, indicating her willingness to have credit exposure to the U.S. bank (as would be the case with an uninsured deposit). After creating that trust line, the U.S. user would follow the U.S. bank's procedures to deposit USD and receive a USD Ripple balance in her account. The E.U. user has a USD trust line to Bitstamp, an E.U.-based digital asset exchange, indicating a willingness to have credit exposure Bitstamp. If the U.S. user sends USD to the E.U. user,

-14

_0000099

SEC-LIT-EPROD-000738414

RPLI_02002665

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by
████████████████████

the E.U. user will receive USD that are in the form of an amount due from Bitstamp. Assuming that Bitstamp has extended trust to the U.S. bank and XRP was not used as a bridge currency in the transaction, Bitstamp would have a USD amount due from the U.S. bank. The E.U. user does not need to trust the U.S. user, because there is a chain of trusted parties between them.

- The Ripple Network finds the most efficient and cheapest path from sender to recipient. Original versions of the protocol required all participants to have extended trust to each other (except with respect to XRP transactions) but later versions introduced market makers who were willing to take credit risk to multiple parties and also make exchanges between different currencies. These market makers facilitate complex, multi-participant hops between sender and receiver.

- **Gateways**: Institutions that allow users to add liquidity to the Ripple Network are called gateways.

  - The prototypical gateway is a bank that allows users to deposit USD and then receive a USD balance in their Ripple wallet (represented as an amount due from that bank).

  - Gateways also have procedures to allow non-XRP assets to be removed from the Ripple Network. For example, a user that has extended USD trust to Bitstamp and receives USD in the form of a Bitstamp receivable can follow Bitstamp's procedures to withdraw the USD (typically by engaging in a transfer to an account at another financial institution).

- **Distributed Ledger and Validation**: Like bitcoin, Ethereum and other distributed ledger technologies, the Ripple Network relies on a consensus process for certain participants in a peer-to-peer network to agree on a single ledger that shows account balances (for XRP and all other currencies) for all participants.

  - Like other blockchain-based technologies, Ripple creates a new block, called a "ledger" in Ripple Network terminology, that certain participants in the peer-to-peer network agree upon, along with a reference to the previous block. The block or ledger contains not only transactions but also includes the complete ledger account balances (called the last-closed ledger).

  - Whereas miners in bitcoin are financially incentivized to compete to find the next block, validators in Ripple receive no financial reward. A supermajority of validators must agree on transactions and ledgers for them to be approved.

- XRP primarily functions to facilitate transactions on the Ripple Network, including non-XRP transactions:

  - A small amount of XRP is needed to open new accounts and dispatch transactions, as an anti-spam measure; i.e., to act as a safeguard against

-15

████_0000100

SEC-LIT-EPROD-000738415

RPLI_02002666

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by

the Ripple Network being overwhelmed by an attack conducted by a participant effecting a very large number of transactions at once (e.g., a DDoS attack). These transactions fees are generally very low (e.g., $0.001), but have been sufficient to prevent an attempt to overwhelm the network.

o   XRP also functions as a "bridge currency" to facilitate currency transactions where no direct exchange is available, for example, between lightly traded currency pairs, or between parties that do not have intervening institutions between them that are willing to extend credit to one another.

o   Despite XRP's function being to facilitate transactions on the Ripple Network and not necessarily as a currency itself, it is traded on various virtual currency exchanges as its market price fluctuates against USD, euro, yen, bitcoin and other digital and non-digital assets.

   ▪   In recent iterations of the Ripple Network, some participants may be able to use USD or other fiat currencies to pay account creation or transaction fees. Nevertheless, XRP will continue to serve as a bridge currency.

2.   *Initial Development; Creation, Sale and Marketing of XRP*

- Ripple was founded in 2012 as OpenCoin, which later changed its name to Ripple Labs and then to Ripple (referred to here as "Ripple Labs," to distinguish from the network and XRP).

- Ripple Labs is a for-profit corporation with its own shareholders and securities— Ripple Labs has been financed through several rounds of angel investment and venture capital funding, with approximately $93 million invested in exchange for Ripple Labs securities (and not XRP).

- Unlike other digital assets, XRP is not generated through a mining process, but instead 100 billion XRP were created all at once by Ripple Labs in 2012. Under the Ripple Network protocol, no further XRP can be created.

- Out of these 100 billion XRP, 20 billion were given to the two founders and the balance went to Ripple Labs. Ripple Labs received its allotment of XRP to, among other things, fund continued development and improvement of the Ripple Network.

- Ripple Labs' stated goals in distributing XRP have been primarily to incentivize more participants to join and use the Ripple Network.

- Ripple Labs has distributed XRP since 2012 in a number of ways:

   o   It has given XRP away to users for free to encourage adoption of its platform.

 -16

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by

- o It has sold XRP at a discount to market makers and financial institutions to incentivize them to participate in the Ripple Network.

- o It has given XRP to developers as part of bug bounty programs.

- o Ripple Labs also provides rebates and other benefits to merchants that accept payment in XRP.

- At the time of the first sales and giveaways, the Ripple Network was functional, not a venture to be developed with funding from the proceeds of the sale. The software was free and open source. Participants could create wallets and purchase XRP and send it to other users, and participants could also establish trust lines and new assets and allow others to send those assets.

- Although XRP were given and sold to members of the public, the distribution differed significantly from recent ICOs.

  - o Sales were not time-limited in a manner designed to pressure purchasers.

  - o Sales were not marketed as an investment or profit-making opportunity.

  - o As far as the Manager has been able to determine, Ripple Labs did not arrange for immediate secondary market trading of XRP outside the Ripple Network and no secondary market outside of the Ripple Network listed XRP until 2016.

  - o To our knowledge, Ripple Labs' sales materials have never indicated that XRP reflects the value of Ripple Labs and Ripple Labs has avoided giving any indication of an approximate or expected price or value for XRP.

  3.  *Analysis of XRP Under the* Howey *Test*

- **Investment of money**: Many initial users or owners of XRP received it for free from Ripple Labs as part of Ripple Labs' efforts to encourage use of the Ripple network. Even those participants that purchased XRP directly from Ripple Labs were expected to be purchasing XRP for use, not for "investment."

- **Common enterprise**: Similar to bitcoin and ether, the free and open source nature of the Ripple software and protocol prevents there from being a common enterprise under the horizontal or vertical tests. Each holder of XRP and Ripple Labs act independently of one another with no commitment to engaging in activities to increase the value of XRP. Although Ripple Labs does maintain a more central role in further development and maintenance of the software and network than is the case for the original developers of the Bitcoin and Ethereum Networks (as far as the Manager has been able to determine, a large portion of Ripple developers and transaction validators are employed by or otherwise contracted by Ripple Labs, and Ripple Labs actively promotes the use of the network through outreach and consulting services to financial institutions) the Ripple Network would likely continue to function and XRP would continue to have value even if Ripple Labs ceased to have any continuing involvement. This is

-17

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by

significantly different from the tokens at issue in the SEC's recent Munchee enforcement action, where the value of the MUN tokens were entirely dependent on continuing efforts of Munchee to support and grow the enterprise, as Munchee had central and exclusive control over the Munchee app, its development and expansion.

- **Expectation of profits**: Although the value of XRP may be impacted by the efforts of Ripple Labs to grow and expand the utility of the Ripple Network, XRP is marketed and sold by Ripple Labs as a product to be consumed and expended through its use on the Ripple Network and not as an investment with an expectation of profit.

  o XRP is a necessary component of a system that uses blockchain technology for transfers of traditional government currencies and other assets. Users of the Ripple Network purchase XRP to facilitate transfers of other currencies, not for investment with the expectation of profits.

    ▪ XRP functions as an anti-spam device and cross-currency settlement mechanism.

    ▪ Appreciation in the value of XRP actually causes the Ripple Network to be less useful.

  o The primary purpose of early XRP distributions was to secure valuable network effects, i.e. to ensure that enough users were pre-committed to using the network to make the network useful.

  o Over 100 banks and financial institutions, including Santander, UniCredit, UBS, Standard Chartered, BBVA and MUFG have joined the Ripple Network to facilitate faster payments and remittances. The first pilot project using XRP as a bridge currency is reportedly being conducted by Cuallix, a Mexican payment processing and remittance firm.

  o Based on the Manager's research, it does not appear that Ripple Labs marketed XRP as an investment for which purchasers could expect a profit. Unlike the tokens at issue in the SEC's recent Munchee enforcement action, Ripple Lab's marketing materials (such as its "white paper") focus on the technological aspects of the Ripple Network and its potential use by finance professionals as a fast, inexpensive system for the transfer of value, as an alternative to other interbank transfer systems – rather than any potential profit from the purchase of XRP.

  o Notwithstanding that XRP is intended to facilitate transactions over the Ripple Network, some speculators have purchased XRP with the hope that it rises in value. These purchasers may be speculating that if the Ripple Network sees an increase in usage, the limited maximum quantity of XRP could be below the level of demand, causing XRP to increase in value – even if that was not its developer's intent.

    ▪ This sort of purchase would be similar to a speculator purchasing a

-18

_0000103

SEC-LIT-EPROD-000738418

RPLI_02002669

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by ███████

large quantity of wine in the hope that the vintage increases in value. The wine was not intended by the vineyard to be held as an investment, even if unrelated third parties determine to speculate on its future value.

- **From the managerial and entrepreneurial efforts of others**: Although the speed of transactions, the number of participants, and other functionality of the Ripple Network may be impacted by continued development by Ripple Labs, holders and users of XRP are relying primarily on the collective activity of such holders and users to enhance the utility and liquidity of XRP on the Ripple Network, and only secondarily, if at all, on the efforts of Ripple Labs or any other entity.

## II.    Process and Framework for Determining Whether a Digital Asset Is a Security

- Consistent with the SEC's approach in The DAO Section 21(a) report, when vetting new digital assets for the Fund in order to determine whether or not they are "securities," the Manager intends to analyze each digital asset under the *Howey* test, with the assistance of internal and external counsel, to determine whether it is likely to be considered an "investment contract" (unless the digital asset more clearly fits under another specific category of the Securities Act of 1933 definition of "security").

- In addition, prior to introducing a new digital asset into the Fund's portfolio, the Manager intends to contact the Staff on an informal basis and share the results of its *Howey* analysis, in order to get the benefit of the Staff's latest thinking on the application of *Howey* to the particular facts and circumstances of the new digital asset.

- Because the *Howey* test is a facts-and-circumstances analysis, the Manager will not be able to employ a prescriptive set of rules to determine whether a digital asset is an investment contract. However, in order to inform its *Howey* analysis, the Manager will gather and consider available facts regarding the digital asset and will consider a broad range of factors, including the following, each of which may be weighed differently depending on the facts and circumstances:

  - o Whether or not there is an identifiable central enterprise whose efforts are funded by the sale of the digital assets, and whose efforts are necessary for the development or utility of the digital asset.

  - o The features of the digital asset, such as:

    - ▪ The uses for which the asset is currently available,

    - ▪ whether ownership or use of the digital asset allows its holders to access a system,

    - ▪ if the digital asset relates to use of a system, what that system's existing functionality is, and

    - ▪ whether ownership of the digital asset grants the holder any rights or



███████-19

Confidential Treatment Requested
Pursuant to 17 C.F.R. 200.83 by
█████████████████

privileges, including any right to share in any profit or vote on any matter.

- o The operational state of the system in which the digital asset functions, or will function, and whether the system is currently operational or was operational at the initial time of sale, and whether the system is actually used by parties unaffiliated with the developers or promoters.

- o The extent to which continuing managerial efforts of the developers or promoters of the digital asset following its initial sale are or were necessary for the digital asset to have value.

- o How the digital asset is primarily and actually used in practice.

- o The circumstances around the initial development of the digital asset.

- o The circumstances and statements made by the developers or promoters of the digital asset (if any), both in connection with any initial sale and subsequently.

- o Any efforts by the developers or promoters to foster an expectation that the digital asset may increase in value independently of the value of the service (if any) that the digital asset provides access to, or their endorsement of others' statements in this regard.

- o Whether efforts by developers or promoters to promote the digital asset (if any) were targeted at potential users of the digital asset, or groups expected to speculate on the digital asset's value.

- o Efforts by the developers or promoters (if any) to arrange for secondary-market trading of the digital asset.

- o If the digital asset was initially sold in an ICO (rather than entirely mined, as in bitcoin), what the stated and actual use of the funds raised were.

- o What factors appear to the Manager to impact the market value of the digital asset, and the extent to which the market value is tied to the activities of an identifiable group of persons involved in promoting the digital asset.

- o The Manager's view of the reasonable expectations of purchasers of the digital asset.

- o The degree of control or centralization over the digital asset by promoters or any other party.

- The Manager may take into consideration any legal analysis or memoranda about the status of the digital asset prepared by persons associated with the digital asset or other commentators. While the Manager's views may be informed by these materials, it will not consider these materials to be conclusive. The Manager will

CONFIDENTIAL

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

████_0000105

SEC-LIT-EPROD-000738420

RPLI_02002671

**Confidential Treatment Requested**
Pursuant to 17 C.F.R. 200.83 by

weigh the expertise of the authors and any potential incentives that the authors have to reach their viewpoint, and the Manager will ultimately reach its own conclusion.

CONFIDENTIAL

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

_0000106

SEC-LIT-EPROD-000738421

RPLI_02002672





CONFIDENTIAL

December 12, 2017

Re:    FOIA Confidential Treatment Request

Securities and Exchange Commission
FOIA Office
100 F Street NE
Mail Stop 2736
Washington, DC 20549
*Via facsimile to: (202) 772-9337*

Ladies and Gentlemen:

On the date hereof and on behalf of our client ███████████████, the
undersigned emailed a document entitled "Status Under Federal Securities Laws of Digital
Assets in ██████████████/Presentation to the Staff of the Securities &
Exchange Commission/December 15, 2017," with consecutively numbered pages ███████
██████-1 through ██████████████21, to Sonia Barros, Assistant Director, and
Rahul Patel, Staff Attorney, AD Office 8, Division of Corporation Finance, containing the following
written request:

> *Pursuant to Rule 83 of the Securities & Exchange Commission's Rules of*
> *Practice (17 C.F.R. 200.83),* ████████████████ *hereby*
> *requests that confidential treatment be afforded to this document and its*
> *contents (pages* ██████████████*-1 through* ████████
> ██████*-21 inclusive) and that this document and its contents be withheld*
> *when requested under the Freedom of Information Act.*

We understand that ████████████████████ and the undersigned will be given the
opportunity to substantiate this request for confidential treatment should the FOIA Office receive
a FOIA request covering this document or its contents.

Very truly yours,

HIGHLY CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER

████_0000107

SEC-LIT-EPROD-000738422

RPLI_02002673