# Exhibit 230

█████████ .com

November 14, 2019

**VIA FEDERAL EXPRESS No.**: 7769 8639 7792

█████████

       **RE:**    **The Regulatory Environment Surrounding Digital Assets and Certain Activities Relating to Digital Assets.**

██████████ :

We are providing this letter to you, ████████████ , a New Jersey limited liability company ("█████ ████ "), for the purpose of providing ██████████ with some guidance of the current regulatory environment surrounding digital assets. In addition, and at your request, our research was designed to answer the following question: whether it is reasonable for ████████ to determine that it does not need to register with the Securities and Exchange Commission ("**SEC**") due to its dealings in the virtual currency of Ripple Labs Inc. ("**Ripple**") - XRP.

At your direction, we have performed no primary source due diligence with respect to the operations of ████████ . We do not purport to be familiar with the business and activities of ████████ .

Notwithstanding the lack of due diligence conducted to date, you have requested that we set forth certain points related to the potential legal and regulatory implications associated with ████████ dealings in XRP, with respect to the Securities and Exchange Act (the "**Exchange Act**"), regulations thereunder and SEC staff guidance. For this purpose, we have relied, and based our conclusions herein solely on facts conveyed to us by you and reproduced herein (the "**Factual Assumptions**").

**I.    Assumptions and Facts**

    A.    Assumptions

In rendering the analysis expressed below, we have assumed and/or relied upon, without any additional inquiry, the accuracy of the information provided by ████████ , the accuracy of the facts and descriptions set forth herein, and the accuracy and adequacy of the statements and representations made to us with respect to the factual matters set forth herein. For all purposes of this letter, we have assumed that the Factual Assumptions are true and accurate as of the date of this letter, and this office has taken, and will take, no independent steps to verify the accuracy of those statements.

Furthermore, the analysis as expressed herein is based upon an interpretation of, and is limited to: SEC staff guidance, all of the Exchange Act, its regulations, judicial cases and administrative actions, which are subject to change at any time by legislation, further administrative action or judicial decision.



B.     Factual Assumptions

The Factual Assumptions attested to by [REDACTED] are as follows.

1.   [REDACTED] is a New Jersey limited liability company and is registered with the U.S. Financial Crimes Enforcement Network ("**FinCEN**") as a money transmitter under the U.S. Bank Secrecy Act ("**BSA**").

2.   [REDACTED] is registered as a money services business ("**MSB**") in New Jersey and in states where [REDACTED] does business to the extent those states require registration for the services being offered.

3.   [REDACTED] is a Saint Vincent entity and is registered with FinCEN as a money transmitter.

4.   [REDACTED] provides programmatic technology and account operation services to [REDACTED] in that conducts the KYC and AML procedures for [REDACTED].

5.   [REDACTED] provides account operation services to [REDACTED].

6.   [REDACTED] provides programmatic execution services to Ripple.

7.   Ripple sends XRP to a designated [REDACTED] wallet, where [REDACTED] takes custody of XRP for liquidation purposes.

8.   [REDACTED], through both Crypto-Systems' technology and exchange accounts, converts XRP into fiat currency directly or through an order management system directly.

9.   Fiat currency is transmitted to Ripple via transfer through a wallet or through a fiat bank account at a U.S. bank. Ripple cannot withdraw without [REDACTED] completing the process.

10.  [REDACTED] and [REDACTED] solely engage in activities relating to and deal in Ripple's XRP.

## II.     **Discussion**

A.     General Overview

In conducting an analysis of the regulatory landscape around digital assets and virtual currencies, it is important to note the various definitions listed below:

- **Digital Asset** – An asset that is issued and transferred using distributed ledger or blockchain technology, including, but not limited to, so-called "virtual currencies," "coins," and "tokens".

- **Digital Currency** - A medium of monetary exchange in which value is both stored and transferred electronically. It has all the characteristics of fiat currency, but is only found in electronic form.

- **Virtual Currency ("VC")** - A subset of digital currency that is internet based and operates like currency, but does not have legal tender status in most jurisdictions. VC can include:

RPLI_SEC 1094844

- o **Closed/non-convertible VC** - Operates only within a self-contained virtual environment (for example, Pokécoins or frequent flyer miles). These currencies are unidirectional, which means the VC may be purchased but cannot be exchanged back into fiat currency.

- o **Open/convertible VCs** - Have an equivalent value in real currency (for example, Bitcoin). These bidirectional VCs can be bought and sold according to prevailing exchange rates and may be used to purchase both real and virtual goods and services.

- **Cryptocurrency** - A subset of digital and virtual currencies that uses cryptography and can be used as a medium of exchange and store of value.

The characterization of an asset, as well as the regulatory treatment of those activities involving the asset, will depend on the facts and circumstances underlying an asset, activity or service, including its economic reality and use (whether intended or organically developed or repurposed).[1]

B.      Background on Current Regulatory Framework

On October 14, 2019, the CFTC, FinCEN and the SEC released a joint statement ("**Joint Statement**") detailing the registration requirements and obligations of entities conducting activities relating to, or involving, digital assets. In particular, the Joint Statement addressed anti-money laundering and countering the financing of terrorism ("**AML/CFT**") obligations under the BSA.[2]

The nature of the digital asset-related activities a person engages in is a key factor in determining whether and how that person must register with the CFTC, FinCEN, or the SEC. For example, certain "commodity"-related activities may trigger registration and other obligations under the Commodity Exchange Act ("**CEA**"), while certain activities involving a "security" may trigger registration and other obligations under the federal securities laws. If a person falls under the definition of a "financial institution," its AML/CFT activities will be overseen for BSA purposes by one or more of the SEC, CFTC, and/or FinCEN (and potentially others). For example, the AML/CFT activities of a futures commission merchant will be overseen by the CFTC, FinCEN, and the National Futures Association; those of an MSB will be overseen

---

[1] *See United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 848 (1975) (quoting *Tcherepnin v. Knight*, 389 U.S. 332, 336 (1967)) ("[I]n searching for the meaning and scope of the word 'security' in the [U.S. securities laws], form should be disregarded for substance and the emphasis should be on economic reality."); *SEC v. W.J. Howey Co.*, 328 U.S. 293, 298 (1946) ("Form was disregarded for substance and emphasis was placed upon economic reality."); *United Housing*, 421 U.S. at 849 ("Because securities transactions are economic in character, Congress intended the application of these statutes to turn on the economic realities underlying a transaction, and not on the name appended thereto."); *Haekal v. Refco, Inc.*, CFTC No. 93-109, 2000 WL 1460078, at *4 (Sept. 29, 2000) ("[T]he labels that parties apply to their transactions are not necessarily controlling. Because such labels are often illusory, a decision maker must evaluate those labels in the context of the parties' actual conduct."); *In re Stovall*, CFTC No. 75-7, 1979 WL 11475, at *5 (Dec. 6, 1979) (holding that the CFTC "will not hesitate to look behind whatever label the parties may give to the instrument"); see also FIN-2019-G001, "Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies" (May 9, 2019) (available at https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-certain-business-models) (discussing the distinction between "business models" and "labels"); see also https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (Framework for "Investment Contract" Analysis of Digital Assets).

[2] *See* Leaders of CFTC, FinCEN, and SEC Issue Joint Statement on Activities Involving Digital Assets (Oct. 11, 2019) (available at https://www.sec.gov/news/public-statement/cftc-fincen-secjointstatementdigitalassets).

RPLI_SEC 1094845

by FinCEN; and those of a broker-dealer in securities will be overseen by the SEC, FinCEN and a self-regulatory organization ("**SRO**"), primarily the Financial Industry Regulatory Authority ("**FINRA**").

Certain BSA obligations that apply to a broker-dealer in securities, mutual fund, futures commission merchant, or introducing broker, such as developing an anti-money laundering program ("**AML Program**")[3] or reporting suspicious activity, apply very broadly and without regard to whether the particular transaction at issue involves a "security" or a "commodity" as those terms are defined under the federal securities laws or the CEA.

### 1.   FinCEN

FinCEN regulates, among other persons, money transmitters and other MSBs.[4] FinCEN's BSA regulations define a "money transmitter" as a person engaged in the business of providing money transmission services or any other person engaged as a business in the transfer of funds.[5] The term "money transmission services" means "the acceptance of currency,[6] funds or other value that substitutes for currency from one person and the transmission of currency, funds or other value that substitutes for currency to another location or person by any means."[7]

FinCEN requires that persons who accept "convertible virtual currency" ("**CVC**") from a person for the purpose of transmitting it to another person or location to register as a **MSB**, unless an exemption applies. In May 2019, FinCEN issued guidance clarifying that CVCs, or VCs that have an equivalent as currency or act as a substitute for currency, are subject to FinCEN regulation regardless of: whether the CVC is represented by a physical or digital token; whether a centralized or distributed ledger is used to record the transactions; or the type of technology used for the transmission of value.[8]

FinCEN's BSA regulations also provide that any person "registered with, and functionally regulated or examined by, the SEC or the CFTC,"[9] would not be subject to the BSA obligations applicable to MSBs, but instead it would be subject to the BSA obligations of such a type of regulated entity. Accordingly, even if an introducing broker, futures commission merchant, broker-dealer or mutual fund acts as an exchanger

---

[3] *See* 31 C.F.R. § 1022.210 (MSBs); 31 C.F.R. § 1023.210 (brokers or dealers in securities); 31 C.F.R. § 1024.210 (mutual funds); 31 C.F.R. § 1026.210 (futures commission merchants and introducing brokers in commodities). An AML Program must include, at a minimum, (a) policies, procedures, and internal controls reasonably designed to achieve compliance with the provisions of the BSA and its implementing regulations; (b) independent testing for compliance; (c) designation of an individual or individuals responsible for implementing and monitoring the operations and internal controls; and (d) ongoing training for appropriate persons. Rules for some financial institutions refer to additional elements of an AML Program, such as appropriate risk-based procedures for conducting ongoing customer due diligence.

[4] *See* generally 31 CFR § 1010.100(ff). An MSB includes a money transmitter, a dealer in foreign exchange, a check casher, an issuer or seller of traveler's checks or money orders, or a seller or provider of prepaid access.

[5] 31 CFR § 1010.100(ff)(5).

[6] "Currency" is defined at 31 CFR § 1010.100(m) as "[t]he coin and paper money of the United States or of any other country that is designated as legal tender and that circulates and is customarily used and accepted as a medium of exchange in the country of issuance."

[7] 31 CFR § 1010.100(ff)(5)(i)(A).

[8] *See* Application of FinCEN's Regulations to Certain Business Models Involving Convertible Virtual Currencies, FIN-2019-G001 (May 9, 2019) (available at https://www.fincen.gov/resources/statutes-regulations/guidance/application-fincens-regulations-certain-business-models) (summarizing FinCEN guidance interpreting the term "value that substitutes for currency").

[9] 31 CFR § 1010.100(ff)(8)(ii).

of digital assets and provides money transmission services for the purposes of the BSA, it would not qualify as a money transmitter or any other category of MSB and would not be subject to BSA requirements that are applicable only to MSBs. Instead, these persons would be subject to FinCEN's regulations applicable to introducing brokers, futures commission merchants, broker-dealers and mutual funds, respectively. These obligations include the development of an AML program and suspicious activity reporting requirements[10], as well as requirements under applicable CFTC or SEC rules. Furthermore, regardless of federal functional regulator, all financial institutions dealing in digital assets meeting the definition of "securities" under federal law must comply with federal securities law.

### 2.    SEC

The SEC has jurisdiction over securities and securities-related conduct. Persons engaged in activities involving digital assets that are securities have registration or other statutory or regulatory obligations under the federal securities laws.[11]

The SEC oversees the key participants in the securities markets, some of which may engage in digital asset activities.[12] Key participants in the securities markets include but are not limited to national securities exchanges, securities brokers and dealers, investment advisers, and investment companies. Market participants receiving payments or engaging in other transactions in digital assets should consider such transactions to present similar or additional risks, including AML/CFT risks, as are presented by transactions in cash and cash equivalents. With regard to SEC regulated entities, broker-dealers and mutual funds are defined as "financial institutions" in rules implementing the BSA. A "broker-dealer" is defined in rules implementing the BSA as a person that is registered or required to register as a broker or dealer under the Exchange Act,[13] while a "mutual fund" is defined as an investment company that is an "open-end company" and that is registered or required to register under the Investment Company Act of 1940.[14]

---

[10] *See* 31 C.F.R. § 1022.320 (MSBs), 31 C.F.R. § 1023.320 (brokers or dealers in securities), 31 C.F.R. § 1024.320 (mutual funds), and 31 C.F.R. § 1026.320 (futures commission merchants and introducing brokers in commodities). A suspicious transaction must be reported if it is conducted or attempted by, at, or through the financial institution and the amount involved exceeds a certain threshold.

[11] *See, e.g.,* https://www.sec.gov/news/public-statement/statement-clayton-2017-12-11 (Statement on Cryptocurrencies and Initial Coin Offerings); https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets (Framework for "Investment Contract" Analysis of Digital Assets); https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading (Statement on Potentially Unlawful Online Platforms for Trading Digital Assets); https://www.sec.gov/news/public-statement/digital-asset-securites-issuuance-and-trading (Statement on Digital Asset Securities Issuance and Trading).

[12] Issuers of securities are required to register the offer and sale of securities pursuant to the Securities Act of 1933 unless an exemption from registration is available. *See* 15 U.S.C. 77e. To the extent the issuer meets certain thresholds related to size or has a class of securities listed on a national securities exchange, that issuer is required to file reports pursuant to the Securities Exchange Act of 1934 ("Exchange Act") with the Commission, under Section 13(a) of the Exchange Act. See 15 U.S.C. 78m. Generally, an issuer of securities is not, solely by virtue of offering or selling securities, or solely by registering a class of securities, "a person registered with, and functionally regulated or examined by, the SEC ...," such that the issuer would fall within the exemption from MSB status contained in 31 CFR 1010.100(ff)(8)(ii).

[13] 31 CFR §§ 1010.100(h), 1023.100(b).

[14] 31 C.F.R. § 1010.100(gg).

Broker-dealers and mutual funds are required to implement reasonably-designed AML Programs and report suspicious activity.[15] These rules are not limited in their application to activities involving digital assets that are "securities" under the federal securities laws.[16]

### 3.  CFTC

The CFTC regulates key participants in the derivatives markets, including boards of trade, futures commission merchants, introducing brokers, swaps dealers, major swap participants, retail foreign exchange dealers, commodity pool operators, and commodity trading advisors pursuant to the CEA. An "introducing broker" or "futures commission merchant" is defined in BSA regulations as a person that is registered or required to register as an introducing broker or futures commission merchant under the CEA.[17] Introducing brokers and futures commission merchants are required to report suspicious activity and implement reasonably-designed AML Programs.[18] These requirements are not limited in their application to activities in which digital assets qualify as commodities or are used as derivatives. The rules would also apply to activities that are not subject to regulation under the CEA.

The CFTC has classified VC as a commodity and this subjects VCs to CFTC oversight.[19] The CFTC has also stated that under certain circumstances a digital asset may be a security or a derivative. In the latter context, the CFTC has broad authority that extends to fraud or manipulation in derivatives markets and the underlying spot markets. On July 16, 2018, in *Commodity Futures Trading Comm'n v. McDonnell, et al.*, a federal judge in the Eastern District of New York reaffirmed a previous order finding that the CFTC has enforcement authority over fraud related to VCs sold in interstate commerce (321 F. Supp. 3d 366 (E.D.N.Y. 2018); *see* Legal Update, CFTC v. McDonnell, et al.: Court Reaffirms CFTC Authority Over Virtual Currency Fraud). However, also on July 16, 2018, the CFTC published a customer advisory which stated that "[d]epending on the facts and circumstances, if initial buyers are told that the developers or promoters will bring them a return on their investments, or if the buyers are promised a share of future returns of the project, the digital coins may be securities and the offer and sale would be subject to federal securities laws. Digital tokens and coins can also be derivatives or commodities, depending on how they are structured."

### C.  FinCEN

As noted above, the term "virtual currency" refers to a medium of exchange that can operate like currency but does not have all the attributes of "real" currency, as defined in 31 CFR § 1010.100(m), including legal tender status.[20] CVC is a type of VC that either has an equivalent value as currency, or acts as a substitute for currency, and is therefore a type of "value that substitutes for currency."

---

[15] 31 C.F.R. §§ 1023.210 and 1023.320 (broker-dealers); 31 C.F.R. §§ 1024.210 and 1024.320 (mutual funds). For a compilation of key laws, rules, and guidance applicable to broker-dealers and mutual funds, *see* https://www.sec.gov/about/offices/ocie/amlsourcetool.htm (Anti-Money Laundering (AML) Source Tool for Broker-Dealers) and https://www.sec.gov/about/offices/ocie/amlmfsourcetool.htm (Anti-Money Laundering (AML) Source Tool for Mutual Funds).

[16] Broker-dealers have other obligations, such as financial responsibility rules, that are relevant to digital assets. *See* https://www.sec.gov/news/public-statement/joint-staff-statement-broker-dealer-custody-digital-asset-securities (Joint Staff Statement on Broker-Dealer Custody of Digital Asset Securities).

[17] 31 C.F.R. §§ 1010.100(x), 1010.100(bb), 1026.100(f), and 1026.100(g).

[18] 31 C.F.R. §§ 1026.210 and 1026.320.

[19] On September 26, 2018, the U.S. District Court for the District of Massachusetts, in *Commodity Futures Trading Comm'n v. My Big Coin Pay, Inc.*, found that VC and Bitcoin are "commodities" within the meaning of the CEA and are therefore subject to CFTC regulation (334 F.Supp.3d 492 (D. Mass. 2018)).

[20] 2013 VC Guidance, at 1.

RPLI_SEC 1094848

The label applied to any particular type of CVC (such as "digital currency," "cryptocurrency," "crypto asset," "digital asset," etc.) is not dispositive of its regulatory treatment under the BSA. Similarly, as money transmission involves the acceptance and transmission of value that substitutes for currency *by any means*, transactions denominated in CVC will be subject to FinCEN regulations regardless of whether the CVC is represented by a physical or digital token, whether the type of ledger used to record the transactions is centralized or distributed, or the type of technology utilized for the transmission of value.

The 2011 MSB Final Rule made clear that persons accepting and transmitting value that substitutes for currency, such as VC, are money transmitters. Persons accepting and transmitting CVC are required (like any money transmitter) to register with FinCEN as an MSB and comply with the AML Program, recordkeeping, monitoring, and reporting requirements (including the filing of suspicious activity reports and currency transaction reports). These requirements apply equally to domestic and foreign-located CVC money transmitters doing business in whole or in substantial part within the U.S., even if the foreign-located entity has no physical presence in the U.S.

On March 18, 2013, FinCEN issued interpretive guidance on the application of FinCEN's regulations to transactions involving the acceptance of currency or funds and the transmission of CVC ("**2013 VC Guidance**").[21] The 2013 VC Guidance described what CVC is for purposes of FinCEN regulations, and reminded the public that persons not exempted from MSB status that accept and transmit either real currency or anything of value that substitutes for currency, including VC, are covered by the definition of money transmitter.

The 2013 VC Guidance also identified the participants to generic CVC arrangements, including an "exchanger," "administrator," and "user," and further clarified that exchangers and administrators generally qualify as money transmitters under the BSA, while users do not. An *exchanger* is a person engaged as a business in the exchange of VC for real currency, funds, or other VC, while an *administrator* is a person engaged as a business in issuing (putting into circulation) a VC, and who has the authority to redeem (to withdraw from circulation) such VC.[22] A *user* is "a person that obtains VC to purchase goods or services" on the user's own behalf.[23]

The 2013 VC Guidance explained that the method of obtaining VC (e.g., "earning," "harvesting," "mining," "creating," "auto-generating," "manufacturing," or "purchasing") does not control whether a person qualifies as a "user," an "administrator" or an "exchanger."[24] In addition, it confirmed that exchangers are subject to the same obligations under FinCEN regulations regardless of whether the exchangers are directly brokering the transactions between two or more persons, or whether the exchangers are parties to the transactions using their own reserves, in either CVC or real currency.[25] The 2013 VC Guidance further discussed the appropriate regulatory treatment of administrators and exchangers under three common

---

[21] *See* FIN-2013-G001, "Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies," Mar. 18, 2013.

[22] *See* 2013 VC Guidance, at 2.

[23] *Ibid.*

[24] *See also* FIN-2014-R001, "Application of FinCEN's Regulations to Virtual Currency Mining Operations," Jan. 30, 2014 (clarifying that a *user* is a person that obtains VC to purchase goods or services on the user's own behalf).

[25] *See* FIN-2014-R012, "Request for Administrative Ruling on the Application of FinCEN's Regulations to a Virtual Currency Payment System," Oct. 27, 2014. *See also*, FIN-2014-R011, "Request for Administrative Ruling on the Application of FinCEN's Regulations to a Virtual Currency Trading Platform," Oct. 27, 2014.

scenarios: brokers and dealers of e-currencies and e-precious metals; centralized CVCs; and decentralized CVCs.[26]

The 2013 VC Guidance also clarified that FinCEN interprets the term "another location" broadly. The definition of money transmitter includes a person that accepts and transmits value that substitutes for currency from one person to another person or to "another location." For example, transmission to another location occurs when an exchanger selling CVC accepts real currency or its equivalent from a person and transmits the CVC equivalent of the real currency to the person's CVC account with the exchanger. This circumstance constitutes transmission to another location because it involves a transmission from the person's account at one location (e.g., a user's real currency account at a bank) to the person's CVC account with the exchanger.[27]

1.     **FinCEN Guidance as to the Regulation of Certain Business Models Involving the Transmission of CVC**

FinCEN's guidance provided examples of how FinCEN's money transmission regulations apply to several common business models involving transactions in CVC.[28] The description of each business model does not intend to reflect an industry standard or cover all varieties of products or services generally referred by the same label, but only highlight the key facts and circumstances of a specific product or service on which FinCEN based its regulatory interpretation.

a.     CVC Wallets

CVC wallets are interfaces for storing and transferring CVCs. There are different wallet types that vary according to the technology employed, where and how the value is stored, and who controls access to the value. Current examples of different types of CVC wallets that vary by technology employed are mobile wallets, software wallets, and hardware wallets. Wallets may store value locally, or store a private key that will control access to value stored on an external server. Wallets may also use multiple private keys stored in multiple locations. Wallets where user funds are controlled by third-parties are called "hosted wallets" whereas wallets where users control the funds are called "unhosted wallets."

The regulatory interpretation of the BSA obligations of persons that act as intermediaries between the owner of the value and the value itself is not technology-dependent. The regulatory treatment of such intermediaries depends on four criteria: (i) who owns the value; (ii) where the value is stored; (iii) whether the owner interacts directly with the payment system where the CVC runs; and, (iv) whether the person acting as intermediary has total independent control over the value.

*Hosted and Unhosted Wallet Providers*

Hosted wallet providers are account-based money transmitters that receive, store, and transmit CVCs on behalf of their accountholders, generally interacting with them through websites or mobile applications. In this business model, the money transmitter is the host, the account is the wallet, and the accountholder is the wallet owner. In addition, (i) the value belongs to the owner; (ii) the value may be stored in a wallet or represented as an entry in the accounts of the host; (iii) the owner interacts directly with the host, and not

---

[26] *See* 2013 VC Guidance, at 4-5 (discussing centralized and decentralized payment systems).

[27] *See* 2013 VC Guidance, at 4.

[28] In describing a business model, this analysis may use a label by which the general type of product or service may be commonly known, the interpretation provided herein applies only to the business model the guidance describes, and may not apply to any other variety or combination of factors that falls under the same generic label.

RPLI_SEC 1094850

with the payment system; and (iv) the host has total independent control over the value (although it is contractually obligated to access the value only on instructions from the owner).

The regulatory framework applicable to the host, including the due diligence or enhanced due diligence procedures the host must follow regarding the wallet owner, varies depending on: (i) whether the wallet owner is a non-financial institution (in this context, a user, according to the FinCEN 2013 VC Guidance), agent, or foreign or domestic counterparty; and (ii) the type of transactions channeled through the hosted wallet, and their U.S. dollar equivalent.

When the wallet owner is a user, the host must follow the procedures for identifying, verifying and monitoring both the user's identity and profile, consistent with the host's AML program. When the wallet owner is an agent of the host, the host must comply with regulations and internal policies, procedures and controls governing a principal MSB's obligation to monitor the activities of its agent.[29] When the wallet owner is a financial institution other than an agent, the host must comply with the regulatory requirements applicable to correspondent accounts (or their MSB equivalents).[30]

Similarly, the regulatory requirements that apply to the transactions that host channels from or for the wallet owner will depend on the nature of the transaction. For example, where the transactions fall under the definition of "transmittal of funds," the host must comply with the Funds Travel Rule based on the host's position in the transmission chain (either as a transmittor's, intermediary, or recipient's financial institution), regardless of whether the regulatory information may be included in the transmittal order itself or must be transmitted separately.[31]

Unhosted wallets are software hosted on a person's computer, phone, or other device that allow the person to store and conduct transactions in CVC. Unhosted wallets do not require an additional third-party to conduct transactions. In the case of unhosted, single-signature wallets, (a) the value (by definition) is the property of the owner and is stored in a wallet, while (b) the owner interacts with the payment system directly and has total independent control over the value. In so far as the person conducting a transaction through the unhosted wallet is doing so to purchase goods or services on the user's own behalf, they are not a money transmitter.

        b.      Multiple-signature wallet providers

Multiple-signature wallet providers are entities that facilitate the creation of wallets specifically for CVC that, for enhanced security, require more than one private key for the wallet owner(s) to effect transactions. Typically, multiple-signature wallet providers maintain in their possession one key for additional validation, while the wallet owner maintains the other private key locally. When a wallet owner wishes to effect a transaction from the owner's multiple-signature wallet, the wallet owner will generally submit to the provider a request signed with the wallet owner's private key, and once the provider verifies this request, the provider validates and executes the transaction using the second key it houses. With respect to an un-hosted multiple-signature wallet, (a) the value belongs to the owner and is stored in the wallet; (b) the owner interacts with the wallet software and/or payment system to initiate a transaction, supplying part of the

---

[29] *See* FIN-2016-G001, "Guidance on Existing AML Program Rule Compliance Obligations for MSB Principals with Respect to Agent Monitoring," Mar. 11, 2016.

[30] *See* 31 CFR § 1010.610, "Due diligence programs for correspondent accounts for foreign financial institutions." *See also* "Guidance - (Interpretive Release 2004-1) Anti-Money Laundering Program - Requirements for Money Services Businesses with Respect to Foreign Agents or Foreign Counterparties," Dec. 14, 2004.

[31] *See* 31 CFR § 1010.410(f).

RPLI_SEC 1094851

credentials required to access the value; and (c) the person participating in the transaction to provide additional validation at the request of the owner does not have total independent control over the value.

If the multiple-signature wallet provider restricts its role to creating un-hosted wallets that require adding a second authorization key to the wallet owner's private key in order to validate and complete transactions, the provider is not a money transmitter because it does not accept and transmit value.[32] On the other hand, if the person combines the services of a multiple-signature wallet provider and a hosted wallet provider, that person will then qualify as a money transmitter. Likewise, if the value is represented as an entry in the accounts of the provider, the owner does not interact with the payment system directly, or the provider maintains total independent control of the value, the provider will also qualify as a money transmitter, regardless of the label the person applies to itself or its activities.

### D.     SEC's Regulation of Digital Assets

The SEC has acknowledged that each of Bitcoin and Ether are not securities.[33] SEC Chairman Jay Clayton explained that there are two different areas of crypto assets: (i) a pure medium of exchange (e.g., Bitcoin); and (ii) tokens, which are used to finance projects. The former acts as a replacement for currency that, as Chairman Clayton noted, "has been determined by most people not to be a security." In contrast, tokens can be determined to be a security through applying the *Howey* test below.

The SEC may consider VCs to be securities based on the facts and circumstances of the sale. The SEC uses the "*Howey* Test," first adopted by the U.S. Supreme Court in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), to determine whether the sale of digital assets falls under securities laws. Under the *Howey* test, an "investment contract" exists (i.e., the asset is a security) when there is the investment of money in a common enterprise with a reasonable expectation of profits to be derived from the efforts of others. Sales made on decentralized networks without a third-party promoter are not considered securities transactions.

The SEC has provided further guidance, through publishing a framework, as to how the SEC will analyze whether a digital asset is an investment contract and whether offers and sales of a digital asset are securities transactions (the "**Framework**").

### 1.     **The Framework**

#### a.     The Investment of Money

The first prong of the *Howey* test is typically satisfied in an offer and sale of a digital asset because the digital asset is purchased or otherwise acquired in exchange for value, whether in the form of government issued (i.e., fiat) currency, another digital asset, or other type of consideration.

---

[32] 31 CFR § 1010.100(ff)(5)(ii)(A).

[33] *See* Agrawal, Neeraj. "SEC Chairman Clayton: Bitcoin is not a security." Coin Center, April 27, 2018, https://coincenter.org/link/sec-chairman-clayton-bitcoin-is-not-a-security; *see* Shieber, Johnathan, "SEC says Ether isn't a security, but tokens based on Ether can be." TechCrunch, https://techcrunch.com/2018/06/14/sec-says-ether-isnt-a-security-but-tokens-based-on-ether-can-be/; *see* SEC Staff Letter to Cipher Technologies Management LP (October 1, 2019), available at https://sec.report/Document/9999999997-19-007180/ (SEC Staff disagreeing with conclusion that bitcoin is a security).

      b.      Common Enterprise

Courts generally have analyzed a "common enterprise" as a distinct element of an investment contract. In evaluating digital assets, the SEC has found that a "common enterprise" typically exists.

      c.      Reasonable Expectation of Profits Derived from Efforts of Others

Usually, the main issue in analyzing a digital asset under the *Howey* test is whether a purchaser has a reasonable expectation of profits (or other financial returns) derived from the efforts of others. A purchaser may expect to realize a return through participating in distributions or through other methods of realizing appreciation on the asset, such as selling at a gain in a secondary market. When a promoter, sponsor, or other third-party (or affiliated group of third-parties) (each, an "**Active Participant**" or "**AP**") provides essential managerial efforts that affect the success of the enterprise, and investors reasonably expect to derive profit from those efforts, then this prong of the test is met. Relevant to this inquiry is the "economic reality" of the transaction and "what character the instrument is given in commerce by the terms of the offer, the plan of distribution, and the economic inducements held out to the prospect." The inquiry, therefore, is an objective one, focused on the transaction itself and the manner in which the digital asset is offered and sold.

*Reliance on the Efforts of Others*

The inquiry into whether a purchaser is relying on the efforts of others focuses on two key issues:

    (i)     Does the purchaser reasonably expect to rely on the efforts of an AP?

    (ii)    Are those efforts "the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise," as opposed to efforts that are more ministerial in nature?

In evaluating whether a digital asset previously sold as a security should be reevaluated at the time of later offers or sales, there would be additional considerations as they relate to the "efforts of others," including but not limited to:

- Whether or not the efforts of an AP, including any successor AP, continue to be important to the value of an investment in the digital asset.

- Whether the network on which the digital asset is to function operates in such a manner that purchasers would no longer reasonably expect an AP to carry out essential managerial or entrepreneurial efforts.

- Whether the efforts of an AP are no longer affecting the enterprise's success.

*Reasonable Expectation of Profits*

An evaluation of the digital asset should also consider whether there is a reasonable expectation of profits. Profits can be, among other things, capital appreciation resulting from the development of the initial investment or business enterprise or a participation in earnings resulting from the use of purchasers' funds. Price appreciation resulting solely from external market forces (such as general inflationary trends or the economy) impacting the supply and demand for an underlying asset generally is not considered "profit" under the *Howey* test.

RPLI_SEC 1094853

In evaluating whether a digital asset previously sold as a security should be reevaluated at the time of later offers or sales, there would be additional considerations as they relate to the "reasonable expectation of profits," including but not limited to:

- Purchasers of the digital asset no longer reasonably expect that continued development efforts of an AP will be a key factor for determining the value of the digital asset.

- The value of the digital asset has shown a direct and stable correlation to the value of the good or service for which it may be exchanged or redeemed.

- The trading volume for the digital asset corresponds to the level of demand for the good or service for which it may be exchanged or redeemed.

- Whether holders are then able to use the digital asset for its intended functionality, such as to acquire goods and services on or through the network or platform.

- Whether any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.

- No AP has access to material, non-public information or could otherwise be deemed to hold material inside information about the digital asset.

        d.      Other Relevant Considerations

When assessing whether there is a reasonable expectation of profit derived from the efforts of others, federal courts look to the economic reality of the transaction. In doing so, the courts also have considered whether the instrument is offered and sold for use or consumption by purchasers.

Even in cases where a digital asset can be used to purchase goods or services on a network, where that network's or digital asset's functionality is being developed or improved, there may be securities transactions if, among other factors, the following is present: the digital asset is offered or sold to purchasers at a discount to the value of the goods or services; the digital asset is offered or sold to purchasers in quantities that exceed reasonable use; and/or there are limited or no restrictions on reselling those digital assets, particularly where an AP is continuing in its efforts to increase the value of the digital assets or has facilitated a secondary market.

        **2.**      **In re Ripple Labs Inc. Litigation**

To date, there is an on-going class action matter against Ripple, XRP II and Bradley Garlinghouse (the CEO of Ripple) (collectively, the "**Defendants**") in the District Court of the Northern District of California, Oakland Division.  The matter, as it stands, is currently in the pleading stages in that the lead plaintiff, on November 4, 2019, filed a Memorandum of Points and Authorities in Opposition to Motion to Dismiss Consolidated Complaint for Violation of Federal and California law.[34]

---

[34] *See* Plaintiff's Opposition to Motion to Dismiss Consolidated Compliant, November 4, 2019, Case 4:18-cv-06753-PJH.

Despite various pleadings being filed by parties of the matter, the Defendants are avoiding the need to conduct a detailed analysis of whether or not Ripple's VC, XRP, is considered a security by arguing the matter should be dismissed due to technicalities under the Securities Act of 1933 (the "**Securities Act**"). In particular, the Defendants are arguing that the matter should be dismissed based on: (i) the statute of repose under Section 9 of the Securities Act; (ii) there being no issuer transactions under Section 12 of the Securities Act; and (iii) there being no control person liability under Section 15 of the Securities Act.[35] In sum, by the Defendants arguing the matter should be dismissed on technicalities, the court has not had reason to substantively address, through applying Framework, whether or not Ripple's XRP is a security. *See* discussion *supra* Part II.D.

### 3.    Crypto Rating Council

Recently, a diverse group of crypto related financial services firms formed the Crypto Rating Council ("**CRC**") to create a framework to consistently and objectively assess whether any given crypto asset has characteristics that make it more or less likely to be classified as a security under the U.S. federal laws.[36] The CRC's analytical framework is based on relevant law and statements from the SEC relating to digital assets, including the Framework.[37] *See* discussion *supra* Part II.D.

In applying its framework, the CRC has created a scale from 1 to 5 that reads as follows:

- A **score of 1** means the CRC's analysis found that an asset has few or no characteristics consistent with treatment as a security.

- A **score of 5** means the CRC's analysis found that an asset has many characteristics strongly consistent with treatment as a security.

- **Scores in between** reflect the relative strength and presence of characteristics relevant to the CRC's framework.[38]

As of the date of this letter, the CRC has assigned Ripple's XRP a score of 4.00, indicating that the CRC itself, after substantive review, has found that Ripple's XRP is not definitively a security (i.e., the CRC has not given Ripple's XRP a score of 5) when applying the CRC's framework.[39]

### 4.    Customer Protection Rule

On July 8, 2019, the SEC and FINRA issued joint guidance on the regulation on the custody of digital asset securities.[40] Therein, the SEC and FINRA discuss concerns relating to the safeguarding of customer securities and funds.

---

[35] *See* Defendants' Motion to Dismiss Consolidated Complaint, September 19, 2019, Case 4:18-cv-06753-PJH.

[36] About Us, *Who We Are*, Crypto Rating Council (Nov. 11, 2019), https://www.cryptoratingcouncil.com/#about-us.

[37] About Us, *Our Rating Framework*, Crypto Rating Council (Nov. 11, 2019)
https://www.cryptoratingcouncil.com/#about-us.

[38] Asset Ratings, *CRC Securities Framework Asset Ratings*, Crypto Rating Council (Nov. 11, 2019)
https://www.cryptoratingcouncil.com/asset-ratings.

[39] *Id.*

[40] *See* "Joint Staff Statement on Broker-Dealer Custody of Digital Asset Securities", Division of Trading and Markets, SEC, Office of General Counsel, FINRA, July 8, 2019.

An entity that buys, sells, or otherwise transacts or is involved in effecting transactions in digital asset securities for customers or its own account is subject to the federal securities laws, and may be required to register with the SEC as a broker-dealer and become a member of and comply with the rules of a SRO, which in most cases is FINRA. Importantly, if the entity is a broker-dealer, it must comply with broker-dealer financial responsibility rules, including, as applicable, custodial requirements under Rule 15c3-3 under the Exchange Act, which is known as the "**Customer Protection Rule**".

The purpose of the Customer Protection Rule is to safeguard customer securities and funds held by a broker-dealer, to prevent investor loss or harm in the event of a broker-dealer's failure, and to enhance the SEC's ability to monitor and prevent unsound business practices. Put simply, the Customer Protection Rule requires broker-dealers to safeguard customer assets and to keep customer assets separate from the firm's assets, thus increasing the likelihood that customers' securities and cash can be returned to them in the event of the broker-dealer's failure.

As noted, some entities contemplate engaging in broker-dealer activities involving digital asset securities that would not involve the broker-dealer engaging in custody functions. Generally speaking, noncustodial activities involving digital asset securities do not raise the same level of concern among the SEC and FINRA, provided that the relevant securities laws, SRO rules, and other legal and regulatory requirements are followed. The following are examples of some of the business activities of this type that have been presented or described to the SEC and FINRA.

(i). One example is where the broker-dealer sends the trade-matching details (e.g., identity of the parties, price, and quantity) to the buyer and issuer of a digital asset security—similar to a traditional private placement—and the issuer settles the transaction bilaterally between the buyer and issuer, away from the broker-dealer. In this case, the broker-dealer instructs the customer to pay the issuer directly and instructs the issuer to issue the digital asset security to the customer directly (e.g., the customer's "digital wallet").

(ii). A second example is where a broker-dealer facilitates over-the-counter secondary market transactions in digital asset securities without taking custody of or exercising control over the digital asset securities. In this example, the buyer and seller complete the transaction directly and, therefore, the securities do not pass through the broker-dealer facilitating the transaction.

(iii). Another example is where a secondary market transaction involves a broker-dealer introducing a buyer to a seller of digital asset securities through a trading platform where the trade is settled directly between the buyer and seller. For instance, a broker-dealer that operates an alternative trading system ("**ATS**") could match buyers and sellers of digital asset securities and the trades would either be settled directly between the buyer and seller, or the buyer and seller would give instructions to their respective custodians to settle the transactions. In either case, the ATS would not guarantee or otherwise have responsibility for settling the trades and would not at any time exercise any level of control over the digital asset securities being sold or the cash being used to make the purchase (e.g., the ATS would not place a temporary hold on the seller's wallet or on the buyer's cash to ensure the transaction is completed).

In consideration of the above provided examples, those entities operating similar business models would not likely be subject to the Customer Protection Rule.

## 5.  Broker-Dealer Regulation

Under the Exchange Act, Section 15(a) prohibits any broker that is a natural person not associated with a broker or dealer from using the mails or any other means of interstate commerce to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security," unless he or she is registered with the SEC as a broker in accordance with Section 15(b).

However, Section 15(a) of the Exchange Act does not apply extraterritorially. *SEC v. Benger*, 934 F. Supp. 2d 1008, 1016 (N.D. Ill. 2013). While the Dodd-Frank Wall Street Reform and Consumer Protection Act extended the scope of application for claims brought under Section 17(a) of the Securities Act and Section 10(b) of the Exchange Act, as noted by the court in *Benger*, through applying analysis from *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010):

> While registration under Section 15(a) is, in its most basic aspect, a local event, where the failure to register occurs in connection with a foreign sale of a non-U.S. security, the considerations that underlay Morrison cannot be disregarded. Nor can the limited Congressional intent regarding the reach of the [Exchange] Act generally and Section 15(a), in particular, and the overarching regulatory scheme of the [Exchange] Act be ignored.[41]

Section 3(a)(4)(A) of the Exchange Act defines a "broker" as "any person engaged in the business of effecting transactions in securities for the account of others." Although the Exchange Act does not define what constitutes being "engaged in business," courts have interpreted the phrase to connote "a certain regularity of participating in securities transactions at key points in the chain of distributions." *SEC v. Hansen*, 1984 U.S. Dist. LEXIS 17835, *25 (S.D.N.Y. Apr. 6, 1984) (quoting *Massachusetts Financial Services, Inc. v. Securities Investor Protection Corp.* 411 F. Supp. 411, 415 (D. Mass.), *aff'd*, 545 F.2d 754 (1st. Cir. 1976), *cert. denied*, 431 U.S. 904 (1977)).

## III.   Analysis

Based on the foregoing facts, representations, statements and assumptions being correct at all relevant times and based on the discussion and analysis above, and subject to the comments, assumptions, reservations and qualifications in this letter, it is our understanding that, under presently reported rulings and statutes applicable to cases involving digital assets, securities and broker-dealers, it is more likely than not that Ripple's XRP will not be considered to be a security and, thus, not be subject to regulatory oversight by the SEC. Additionally, the SEC has yet to officially declare whether or not XRP is a security under the Framework (*see* discussion *supra* Part II.D) and, thus, is subject to SEC regulation.

Therefore, based on the same, it is our further understanding that it is reasonable for ███████ to determine that it is not required to register with the SEC under the Exchange Act and can continue to, without registration with the SEC, conduct the activities listed above in New Jersey.

This letter is limited in all respects to the Exchange Act, case law, and regulatory guidance relating thereto, and we assume no responsibility as to the applicability thereto, or the effect thereon, of any other laws or the laws of any other jurisdiction. We note that the question of whether the activities of ███████ would require registration with the SEC under the Exchange Act may in part depend on the future actions of ███████ which we cannot predict. We cannot provide analysis as to what action a court will take in the future when reviewing actions that have not occurred as of the date hereof.

---

[41] *SEC v. Benger*, 934 F. Supp. 2d 1008, 1016 (N.D. Ill. 2013).

I, the undersigned, am an attorney admitted to practice in the state of New York and the District of Columbia. The analysis expressed herein is only with respect to the cited federal law, and not a guaranty as to what any particular court would actually hold, but an analysis as to the decision a court or administrative proceeding would more likely than not reach if the issues are properly presented to it and the court followed existing precedent as to legal and equitable principles applicable in cases concerning digital assets, securities and broker-dealers. In this regard, we note that analyses on securities regulations unavoidably have inherent limitations that generally do not exist in respect of other issues on which analyses to third-parties are typically given. These inherent limitations exist primarily because of the pervasive equity powers of the SEC and federal courts, the potential relevance to the exercise of judicial discretion of future arising facts and circumstances, and the complex regulatory structure governing futures trading. The recipients of this letter should take these limitations into account in analyzing the risks associated with the activities described herein. Further, we express no analysis with respect to the availability of a preliminary injunction or other temporary relief pursuant to the broad equitable powers granted to a federal court or the SEC pending a final determination on the merits.

This letter addresses the legal consequences of only the facts existing or assumed on the date hereof. The analyses expressed herein are based on an analysis of existing laws, court decisions and regulatory guidance and cover certain matters not directly addressed by such authorities. Such analyses may be affected by actions taken or omitted, events occurring, or changes in the relevant facts, after the date hereof. We express no analysis as to circumstances or events that may occur subsequent to the date hereof. We have not undertaken to determine, or to inform any person of, the occurrence or non- occurrence of any such actions, events or changes.

This letter is limited to the subject matter and conclusions set forth above and may be used only by the addressee hereof. No other person or entity may rely or claim reliance upon this letter without our prior written consent. This letter and the substance thereof may not be disclosed to any other person, entity or transferee, or filed with a governmental agency, or quoted, cited or otherwise referred to, without our prior written consent. The analyses expressed above are delivered on the date hereof and we disclaim any responsibility to update this letter at any time following the date hereof.

Very truly yours,

