# Exhibit 241

1

2

3

4

5

6

7

8          SEC Commissioner Robert Jackson Fireside Chat

9            New York Financial Writers Association

10   https://www.youtube.com/watch?app=desktop&v=pOIM0y4Hti4&fea
                            ture=youtu.be

11
                     Audio Runtime:  1:21:15

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RPLI_SEC 1141266

 1          (Beginning of Audio Recording.)

 2          MR. PODKUL:  -- everyone.  While

 3   people are people are still settling down,

 4   we'll get started with some brief

 5   introductory remarks and housekeeping, just

 6   to get started.

 7          Thank you all for coming out tonight.

 8   My name is Cezary Podkul.  I'm a reporter on

 9   the Wall Street Journal's financial

10   investigations team, and I'm president of the

11   New York Financial Writers Association.

12   Thanks.

13          On behalf of our board and our

14   membership, we're very happy to have all of

15   you here, both existing members and -- and

16   guests and others who have come out for this

17   event, so really -- it's a great pleasure to

18   host you here tonight, and we're very excited

19   to have Commissioner Jackson with us tonight.

20   And we want to thank you for making the time

21   to spend the evening with us and share your

22   views on a wide variety of subjects.

23          And we also want to thank our

24   executive director, Britt Tunick.  Britt, can

25   you please stand up?  Oh, there she is, yeah.

1    I want to thank Britt for putting on this

2    event, getting this excellent space, and if

3    any of you have questions about membership or

4    becoming a member, she is the person to

5    contact.

6         Before we get started, I just wanted

7    to quickly get a couple of housekeeping items

8    out of the way.  For those of you who are new

9    to our events, just want to briefly say a

10   word or two about the association.

11        You may not know this, but the New

12   York Financial Writers Association is the

13   oldest organization devoted to business and

14   financial journalism in the country.  We were

15   founded in 1938, and each year we do lots of

16   events, just like this one, where you get a

17   chance to network, meet newsmakers, attend

18   book talks, and lots more.  If you're into

19   free apps and drinks, this is your place.

20        We also give out scholarships to

21   students who are interested in pursuing

22   careers in business and financial journalism.

23   I'm a former recipient of a scholarship, and

24   I think we have a couple more of you in the

25   room here.  So raise your hand.  There we go.

1          So each each year we pay out -- this

2    year I think it's twenty five thousand

3    dollars to five students, so it's a pretty

4    hefty scholarship.  If you haven't applied

5    yet, please do, if you're in journalism

6    school, and we hope to increase that in

7    future years as our programming allows.

8          And you can help us with all of this

9    by getting involved.  Dues are $60 a year,

10   but if you pay today, you can still catch the

11   early bird pricing, which goes until tax day,

12   April 15th, today, of $50 a year.  If you're

13   interested in becoming a member, again, talk

14   to Britt, grab one of the postcards in the

15   back, or just check our Twitter at NYFWA.  We

16   just tweeted the link on how to sign up and

17   become a member on there, and you can follow

18   us on Twitter, on Facebook, and on our

19   website for additional information about our

20   newest events and happenings.

21          So with that piece of housekeeping out

22   of the way, I'm pleased to introduce

23   Commissioner Jackson and welcome him to

24   tonight's event.

25          Since his appointment to the

 1   Securities and Exchange Commission in January
 2   2018, Commissioner Jackson has been an
 3   outspoken advocate of bringing greater
 4   transparency and oversight to U.S. capital
 5   markets.  He has been a vocal proponent of
 6   the SEC's efforts to study the impact of
 7   limiting stock trading fees and rebates
 8   offered by exchanges, ensuring that exchanges
 9   charge fair and reasonable prices for their
10   data feeds, and boosting disclosure on dark
11   pool operators.
12          He has also called on the SEC to
13   review rules governing stock buybacks by
14   company insiders.  He did that after doing
15   some research and finding that the percentage
16   of insiders selling shares more than doubled
17   immediately following their company's buyback
18   announcements as many of the stocks popped,
19   and it's that kind of analysis that has
20   earned Rob a reputation for trying to bring
21   rigorous, data-driven, fact-based discussion
22   to our collective dialogue over the nation's
23   securities regulations and the SEC's role
24   overseeing capital markets.
25          It comes from Rob's previous

1    experience in academia at New York University

2    and Columbia Law School, where he headed up

3    Columbia's program on corporate law and

4    policy and has spent a lot of time thinking

5    about these subjects before being selected by

6    President Trump to join the Commission last

7    year.

8            So we're eager to hear your views on a

9    wide variety of subjects today, and we'll

10   structure this basically as a fireside chat,

11   although the fire is out, but let's not --

12   it's probably a good thing on a day like

13   today.

14           I'll ask a few questions to get the

15   conversation started, and then we'll open it

16   up to all of you to jump in with your

17   questions.  Commissioner Jackson gets quizzed

18   by second graders whenever he sits in on his

19   mother's second-grade classroom and fields

20   many tough questions that are on their mind,

21   probably some a lot tougher than what we're

22   going to ask here.  So he's used to tough

23   questions, so start thinking about those now

24   as we get started with a little bit of Q&A.

25           And one last piece of housekeeping,

1    we'll be keeping this conversation on

2    background for now.  The Commissioner has

3    said he is happy to go on record with

4    anything he says here tonight, but he just

5    asks any press in the room to please contact

6    him before you run a story on his remarks

7    tonight.  And we'll also post a video on our

8    website of the remarks tonight and all that

9    will be on our website within a couple of

10   days it'll be on record then.

11          So that's a bit of housekeeping out of

12   the way, and with that we'll just get started

13   with a couple of prepared questions, and then

14   we'll jump right into discussion from you all

15   because we're definitely very eager to hear

16   what's on all of your minds.

17          So just to kind of kick things off,

18   very curious before you became an SEC

19   Commissioner, you were, of course, on the

20   outside looking in as a legal scholar, as a

21   professor, academic.  From now the year plus

22   that you've been on the commissioner and

23   having seen the agency from the inside

24   looking out, what is the thing you've learned

25   or a few things you've learned in terms of

1   you didn't realize before about how the

2   agency thinks, how it acts, how it reacts to

3   the environment outside?

4         MR. JACKSON:  Well, first of all thank

5   you for that extremely kind introduction.

6   I'm thrilled to be here --

7         MR. PODKUL:  Microphone a little

8   closer.

9         MR. JACKSON:  Is that okay?

10         MR. PODKUL:  Perfect.  Yep. A

11         MR. JACKSON:  I'm thrilled to be here,

12   and I was telling some of you earlier during

13   the cocktails that, you know, I started my

14   career on Wall Street a long time ago at a

15   firm called Bear Stearns.  Not my fault.  A

16   great place, I was very lucky to have great

17   mentors there, and I remember in the

18   orientation they would mention the New York

19   Financial Writers Association, and especially

20   the follies.  And your goal on Wall Street

21   was to stay out of the follies.

22         MR. PODKUL:  It's true.

23         MR. JACKSON:  So I don't know what to

24   make of the fact that I ended up here.  We

25   could talk about that over cocktails.

RPLI_SEC 1141273

 1            I want to just note that the -- you'll

 2    -- you'll see I'm not long for politics, and

 3    the reason is I wanted to have a very candid

 4    conversation tonight, which is why I had

 5    Cezary give the the caveat he did.  Matter of

 6    fact, a couple of weeks ago -- oh did you see

 7    this?  CQ did a very nice background on my

 8    fam -- I come from a big Irish Catholic

 9    family, and they described it.  We could talk

10    more about that, if you like.

11            And in the profile -- I sat down with

12    the guy, and he said something to me, and I

13    kind of would -- just said to him, yeah, I

14    couldn't (bleeped) believe it, and he printed

15    it.  Now normally, that wouldn't be that big

16    a problem, except my mother's still upset

17    that I didn't become a priest.  So -- so

18    anyway, that's why I like to take a look

19    whenever I -- whatever I -- make sure I'm not

20    getting in trouble with my mother.

21            MR. PODKUL:  Understood.

22            MR. JACKSON:  So you said what are the

23    things I've learned since I got to the SEC.

24    So I'll give you -- I'll give you three

25    things.  The first is the place is full of

RPLI_SEC 1141274

1   people who dedicated their whole life to

2   trying to help financial markets work better.

3   And the reason I start with that is if you're

4   in this room, you probably have too.  I know

5   a lot of the journalists in this room shine

6   light on the things they do because they

7   believe that those things need to be talked

8   about.  And this organization -- but everyone

9   in the room has seen something in our markets

10  that's interesting or maybe it's troubling or

11  maybe it's just something that you didn't

12  understand and learned about, and you felt

13  like the -- sort of the Americans that the

14  market's supposed to work for should

15  understand that.

16          And you share a lot with the people

17  who go to work at the SEC every day, and let

18  me just say there's 4,000 plus staffers.

19  They were there before I got there.  They

20  will be there long after I got there.  These

21  are the people who really do that work, and

22  they're really -- they go to work every day

23  trying to do the right thing, number one.

24          Number two, it's an organization built

25  by and designed for lawyers, and it is proof

1   that lawyers should not design the world

2   because it's built in a way that is unlike

3   any other building I've ever worked in in my

4   life.  And like I said, I worked on the

5   Street, I worked at Wachtell Lipton for a

6   while.  It's built in a way that is designed

7   to minimize the risk that people in it take.

8       What I mean by that is it's a building

9   that systematically it's -- it's -- it's a

10  place that systematically favors inaction

11  over action, that takes as gospel that the

12  fact that we did it this way before is a

13  reason to do it that way again, and all I'll

14  say is that haven't worked -- my problem is I

15  went to business school before I went to law

16  school.  Like those two things -- those two

17  points I just made if you spend any time in

18  business sound insane right?  It's not the

19  way a business runs.

20      From a business point of view, if

21  someone's already doing it that way, it

22  probably means it's not profitable for you to

23  do it that way.  All right?  From a business

24  point of view, doing nothing can be just as

25  expensive or more expensive than doing

RPLI_SEC 1141276

1    something.  And one of the things I try to do

2    in the -- in the -- okay, let me give you one

3    example.

4           Any of you ever come to the

5    headquarters at the SEC, you ever been to the

6    building?  Yeah, all right.  So the

7    management of the building, the

8    commissioners, where do we sit?  Yeah, we sit

9    on the top floor.  Now any other business

10   I've ever worked for, all right, if you're --

11   if you work in that business and you run it,

12   you want to be with the people who make

13   decisions.  Like at Bear, Ace -- Ace

14   Greenberg used to work on the trading floor,

15   and he would tell us the reason I do that is

16   so if I can bump in someone in the bathroom

17   or on the way to coffee or whatever, I can

18   say, hey, what do you see in the market

19   today, what are you learning.  Like, that's

20   how you run a place.

21          But we at the SEC, the commissioners

22   sit on the top floor because we're in charge

23   and don't want you to forget it.

24          MR. PODKUL:  It's like that with most

25   government agencies.  The top floors.

1          MR. JACKSON:  Yeah, and the problem

2   with that is that if you're like me and you

3   want to know what (bleep) is going on, it's

4   kind of hard to find out because the staff

5   who make the decisions and sit on the floors

6   below you don't come up to the tenth floor

7   that often because nothing good happens to

8   them when they do.

9          So another thing to know about the SEC

10  is it's a building built by lawyers over 80

11  plus years.  It's a wonderful place, but it's

12  built in a way that is designed to be

13  reactive, and that can be tricky on our

14  financial markets, second.

15         And third, whatever you think about

16  what's happening in Washington right now, the

17  SEC in my opinion -- I'm a biased guy because

18  I'm working there -- but in my opinion, it's

19  working as well right now as it has for

20  years.  And the reason is that the Chairman I

21  have, the chairman I work with Jay Clayton,

22  who I -- I don't always agree with, but I

23  have great respect for -- is taking the job

24  as a way to make sure that government runs as

25  it should.

 1            There's just basic things we do at the

 2    SEC that have to happen.  If you submit a

 3    registration statement, you need to get

 4    prompt comments.  If you are trying to figure

 5    out -- if an exchange wants to make a filing

 6    and understand what the rules of the game are

 7    going to be for whether we're going to

 8    approve it, they need to get a prompt answer.

 9    The government needs to set obvious, clear

10    expectations for the market so the market can

11    respond and without -- I don't speak for Jay,

12    but I think that's a big part of what he

13    brings to the job, and because of that the

14    trains do run at the SEC.

15            And frankly, that makes me a very

16    fortunate guy in Washington because, like I

17    said, I don't agree with everything the

18    Chairman does, but I always get heard.  I get

19    a chance to make my pitch.  And look, as a

20    former banker, that's all you could ask for.

21    You know, I didn't get every mandate either,

22    but at a minimum I get to go in and say

23    here's the things I'm focused on, here's why

24    we should care about them, and at the moment

25    in the government, I think we can all agree

1    that's not bad, and it's the kind of agency

2    the markets deserve.

3            MR. PODKUL:  So last year, one of the

4    pitches you made and said one of the things

5    we should be focusing on was looking at the

6    rules surrounding corporate stock buybacks,

7    and it kind of goes to that point I mentioned

8    in my introductory remarks about the data-

9    driven mindset that you bring to the job as a

10   former academic and really studying the data,

11   understanding it, and crafting rules from

12   from that.

13           So I understand you've recently asked

14   your staff to review data on companies'

15   restatement announcements and how they bundle

16   some of those with (inaudible).  Could you

17   tell us more about that analysis and what you

18   found?

19           MR. JACKSON:  Sure, yeah, happy.

20   Maybe I'll talk about both things.

21           MR. PODKUL:  Sure.

22           MR. JACKSON:  So one thing I do -- so

23   like basically the way to think about my job

24   is I'm a fulltime (bleep), and here's the way

25   I go about that.  So because I was a banker

 1   and a corporate lawyer, I remember a lot of
 2   the stuff I saw that maybe wouldn't come into
 3   the mind of someone in the government because
 4   they weren't in the markets.  So they don't
 5   -- you know what I mean?  Like -- and the
 6   people -- trust me the people who come to DC
 7   on behalf of the banks, they don't tell you
 8   -- they give you one side of that story.
 9   They don't tell you all the things that
10   really go on in the market.
11          So one thing I do is I just document
12   like obvious things that everyone on Wall
13   Street knows, and then I give a speech where
14   I say, hey, this is a thing that's happening,
15   and you know, I care about it, you should too
16   because like -- all I'm doing is pointing to
17   it -- so I'll give you an example.
18          My first speech -- one of my first
19   speeches when I joined the SEC, when I was a
20   banker, I took a company public.  Everybody
21   on Wall Street charged.  The fee they charged
22   for taking a company public was exactly seven
23   percent of the value of the company.  It's a
24   seven percent spread.  Everyone's known this
25   like forever in the history of Wall Street.

1    And you know, if the company was worth less

2    than a billion dollars and all the companies

3    I was doing the dotcom boom of the 90s, so

4    all the companies I were doing were three,

5    four, five hundred million.  You just paid

6    seven percent.

7          And I remember going out with my

8    friends on Wall Street in my 20s and being

9    like this cannot continue.  First of all,

10   there's going to be technological change,

11   it's going to get cheaper to bring a company

12   public.  But forget about -- this is like --

13   it's weird it's not seven and a half percent,

14   it's not six and a half percent, it doesn't

15   vary by deal.  It's seven percent.  I was

16   like that's weird.

17          So when I got to the SEC, I had my

18   economist look into it.  I was like, hey man,

19   what's the IPO spread these days.  He comes

20   back, and he tells me last year in 2017 the

21   IPO spread ninety-seven percent of the time

22   was exactly seven percent.  So I gave a

23   speech, and I was like that's weird because

24   you guys are capitalists, and it doesn't

25   sound -- this doesn't sound like competitive

1   pricing to me.  So they were like, shh, like

2   stop telling people (bleep).  Yeah, this is

3   how I get myself in trouble.

4         So I gave a speech -- then stock

5   buybacks, like, that's a big thing right now.

6   So forever, everyone on Wall Street has known

7   for years that the day of a stock buyback

8   it's very common for the executives at the

9   company to choose that day to sell their

10  stock.  I always thought that was a little

11  weird because you're saying two different

12  things at the same time.

13        On the one hand, you're saying, look,

14  the stock is cheap.  That's why the

15  shareholders should spend their money buying

16  it.  On the other hand, my personal shares

17  I'm going to sell them, and CEOs don't sell

18  cheap things -- expensive things cheaply.  So

19  they're sending two different signals about

20  the value the company.  In fact, this has

21  been known since there's a paper about this

22  back in 1992.

23        So when the buybacks issue arose, I

24  just said, look, let's see -- you know, we

25  got all these buybacks happening because of

1    the tax cuts.  Let's see what's happening

2    with executive selling, and it turns out that

3    executives sell on average more than twice as

4    much stock on the day they announce a buyback

5    as any other day during the year.  And what

6    they're doing, of course, is they're taking

7    advantage of the fact that the stock pot --

8    stock price pops after their announcement and

9    they're capturing the gains.

10           So I got a question from a US senator

11   -- and by the way, whenever I do this, I put

12   the data online.  I'm like, look, if you want

13   to take a look and come to a different

14   conclusion, 100 percent, take a look.  Like

15   just tell me what you think, and it's a funny

16   thing because everyone calls me up and

17   they're like, you know, you suck, stop

18   telling people this.  I go on Squawk Box, and

19   I talk about it, and they're like shh.

20           But I'm like, look man, the data is

21   online, just -- just take a look, and tell me

22   if I'm wrong.  I'm very open to that.  And

23   nobody does that, you know what I mean.

24   Like, so it's kind of  -- I don't do -- do

25   they do that with you?

```
 1          MR. PODKUL:  Well, we like to put our
 2   data online too, and we do a massive data
 3   analysis.  That's -- that's certainly the
 4   trend in data journalism.
 5          MR. JACKSON:  But they never, like, do
 6   their own -- I'm like, why don't you run your
 7   own thing and call me up and be like, see, I
 8   found something different.  That would be
 9   compelling.  Just you suck -- that's not an
10   argument.
11          MR. PODKUL:  Yeah, and then Twitter
12   wars are legendary.
13          MR. JACKSON:  Yeah.  So then -- then
14   they asked me to rerun the analysis, and I
15   did something else, which I always thought
16   would be interesting, which is when the CEO
17   sells at the time of a buyback what the CEO
18   is sometimes saying is, look, I don't like
19   the long-run prospects of the company.  Not
20   every CEO is saying that when they sell
21   stock.  They get stock as compensation;
22   they've got lots of reasons.
23          But a lot of the time, a CEO who's
24   selling shares is saying I don't love the
25   long-run prospects of the company.  If I did,
```

1    I would hold the stock.  So the Senator asked

2    us to run this new analysis, and we did.  We

3    showed that in the cases where they do a

4    buyback and the CEO sells, 90 days after the

5    -- after this -- after the buyback, the gains

6    from the buyback disappear.  And in fact, the

7    company underperforms.

8         Whereas, when a buyback is conducted

9    and the CEO holds the shares, in the long run

10   the company outperforms.  Now again, you

11   could look at this and say this is totally

12   unremarkable.  All it shows is that CEOs know

13   a lot about the future of the company, right,

14   and that's not news to anybody in this room.

15        But I put it out there -- and again I

16   got -- you saw you know, like stop -- stop

17   putting data out there.  I think this might -

18   - what's that?  Well, so I think there are

19   folks who would rather not have these facts

20   out in the ether.

21        MR. PODKUL:  Yeah.

22        MR. JACKSON:  So no one at the SEC

23   says this to me, but the CEOs do, and

24   basically their lobbyists, right.  And again,

25   I just -- they'd do better -- they should

1    hire you.  Like get us some -- a data guy to

2    take a look.

3          So I did another recent thing I

4    thought you might find interesting, and I

5    wanted to -- you know, man, whenever I come -

6    -

7          MR. PODKUL:  Yeah.

8          MR. JACKSON:  -- to something like

9    this --

10          MR. PODKUL:  Of course, yes.

11          MR. JACKSON:  -- I like to have

12    something new to talk about.  So I've been

13    working on this for a couple of weeks, you

14    could tell me.  Yeah, I got a chart and

15    everything.

16          MR. PODKUL:  Yeah.

17          MR. JACKSON:  So one of the

18    interesting things that's happening in

19    corporate America right now is when a company

20    has to disclose that they did that they had a

21    restatement, like the corrective disclosure

22    -- hey, we gave you a number a couple of

23    years ago.  It was wrong.  A lot of the time

24    -- so you know, when they disclose that, the

25    stock price will respond.  And in the last 10

RPLI_SEC 1141287

1  or 15 years have become very clear that the

2  stock's drop, to the degree there is one,

3  will be the measure of damages in a lawsuit

4  that follows.  Does that make sense?

5       So like if there's a stock drop, the

6  lawyer's going to say, well, that -- the

7  restatement caused that drop, so those are my

8  damages.  So this hasn't been true for that

9  long.

10       So what companies have started to do

11  is bundle good news and bad -- good news and

12  bad news together, and you all know this

13  because I'm sure you've had sources over the

14  years who came to tell you something really

15  bad but like wrapped it in some good news.

16  Like they're trying to be like, yeah, I think

17  I'm getting fired, but you know, time with my

18  family.  You know like -- like -- like -- so

19  what we -- we did a study where we basically

20  looked to see how often, when a company

21  announces a restatement in corporate America,

22  how often do they wrap it in good news like

23  the fact that they have new earnings and they

24  beat expectations.

25       In the year 2000, the answer was less

1  than 5 percent of the time.  Last year in

2  2017, they did it 20 percent of the time, and

3  it's just a straight increase.  They wrap bad

4  news in good, and the reason they do it is

5  they think if I wrap bad news in good, the

6  stock won't fall and the damages will be

7  zero.

8        And one of the things I'm pushing for

9  and calling for in the SEC is not to let

10  corporate managers do this because what I

11  want is a clean signal from the market.  Some

12  -- look, things go wrong in companies.  But

13  when you disclose it, the market will tell

14  you what damage was caused, and we shouldn't

15  let corporate managers control that, right?

16  Those things should have to be disclosed

17  separately so you get a clean signal from the

18  market about what damages have been caused.

19        And if we did that, if we forced

20  companies when they have a restatement to

21  come out and say it clean, rather than wrap

22  it in good news, I think we'd have a much

23  better functioning market.

24        MR. PODKUL:  And we can't do that in

25  the news business.  Our editor would tell us,

RPLI_SEC 1141289

1    you know, you're burying the lead.  You know,

2    you got to always lead with the most

3    important.  You can't bundle, you know, too

4    much stuff in the -- in the lead paragraph.

5         But -- so this is pretty fascinating.

6    What are you proposing the SEC should do

7    about this?

8         MR. JACKSON:  So we should have a

9    rule, in my opinion, and you know, I'm open

10   to all kinds of -- in the details, but we

11   should have a rule that says you can't stuff

12   bad news -- wrapped -- in good wrapping.  If

13   you have a restatement you need to make,

14   you've got to come out with a clean

15   disclosure that provides that bad news to the

16   market to see what it's worth.

17        If you want later to add some good

18   news, okay, but first come out -- come out

19   with these things separately so we get a

20   clean signal from the market as to what the

21   damages really are.

22        Look, another approach, if you really

23   want to go further, is not to use the stock

24   price reaction as the measure of damages.

25   Does that make sense?  Because then

1    executives wouldn't have this reason to

2    bundle this all together.  But I'll tell you

3    that idea is not going to be too popular with

4    my colleagues.  They really like the idea of

5    using this measure.  I got feelings about

6    that.

7          But the short version is if you --

8    look, this is what bothers me about this.  If

9    you tell corporate managers we're going to

10   measure the damages by the stock price drop,

11   then they're going to do things to prevent

12   the stock price from dropping.  I'm not mad

13   at them.  They're just doing what the -- the

14   incentives are under the law that we have.

15   That's why we have to change the law to give

16   them incentives to tell the market the news

17   cleanly so that we can actually respond to

18   what's -- what's happened.

19          MR. PODKUL:  And on that point while

20   we're talking about corporate disclosures,

21   are you a fan of not requiring companies to

22   report quarterly but making -- maybe making

23   them report just half a year, every half year

24   so that managers can focus more in the long

25   run as opposed to the short term thinking, as

1    the theory goes?

2        MR. JACKSON:  Long-termism, short-

3    termism.  What do you guys think of this?

4    You guys don't get to see this.  It's very

5    funny, but someone in the back just literally

6    went.

7        So did you first of all, did you guys

8    see -- the President himself tweeted on the

9    subject.

10       MR. PODKUL:  Yes.

11       MR. JACKSON:  He met with the CEO of

12   Pepsi, whom I know -- she's an extraordinary

13   leader, actually.  He met with her, and she

14   mentioned it, and so he tweeted, you know,

15   the short-termism quarterly thing might be a

16   real problem.  SEC needs to look into it.

17       And of course, like, it was a funny

18   thing because for the next three days, my

19   phone was -- like people were like he tweeted

20   about -- about the SEC.  But you know, it's

21   unbelievable the news that this guy creates -

22   - it just -- it's incredible, yeah.

23       Now, the good news is the SEC had been

24   looking into this subject for a long time,

25   and we've been studying for a long time

```
 1   whether we should change the frequency of
 2   reporting.  Here's my two cents.
 3          MR. PODKUL:  Sure.
 4          MR. JACKSON:  I think, in general, if
 5   you're going to convince me that quarterly
 6   reporting is leading to a problem like this,
 7   you have to convince me there's a market
 8   failure.  In other words, you have to
 9   convince me that giving people information
10   causes them to make bad decisions, and that
11   is not my intuition, right?  My intuition is
12   you give people information to make better
13   decisions,  and that -- you know, that's --
14   that's not me that's like Brandeis.
15          But I will say the following -- one
16   thing has happened that we should all think
17   about, and people in this room -- because
18   this organization has great history -- should
19   think about it.  Remember that earnings --
20   quarterly -- forgetting about the 10-q and
21   quarterly reporting, I don't think that's
22   actually the important -- where -- where the
23   action is here.  I think where the action is
24   is in the quarterly earnings guidance and the
25   earnings call that happens.
```

1          Remember, guys, this is not always how

2     this worked, right?  It wasn't always that

3     the CEO guided to it multiple times a quarter

4     and then you had the call and you kind of

5     tried to get a sense on the call how

6     confident does this guy feel and does he

7     really feel like he's doing well.  It wasn't

8     always like that.  This practice grew up over

9     time partly because investors wanted it.

10    They wanted to know are you going to hit this

11    bogey that you've set.

12          But we haven't looked at that at the

13    SEC in a long time.  Also remember the

14    analyst settlements from 2003 are now 15

15    years old.  We haven't looked for a long time

16    at how well that's working, whether analysts

17    still have conflicts, what kind of feedback

18    they give at the earnings call, how much

19    earnings pressure there is.  I'm open to

20    looking at that.

21          I will say something does disappoint

22    me in the journalistic coverage of this.  So

23    in my office, the thing we talked about the

24    day the President tweeted about it was the

25    incredible irony of describing a problem of

1   short-termism on Twitter, and nobody wrote

2   about that.  Come on, man.

3         MR. PODKUL:  I -- I -- I'm a long-term

4   focus journalist so I'm very sorry, I -- my

5   stories take months.

6         But speaking of bringing information

7   to people so they can make better decisions,

8   you know, the SEC is doing an exercise like

9   that of its own.  It's called the transaction

10  fee pilot, which for any of you in the room

11  who aren't familiar with it, it's a huge

12  first-of-its-kind data gathering and analysis

13  exercise that the SEC plans to use to gauge

14  the impact of fees and rebates that stock

15  exchanges impose on brokers for taking and

16  making liquidity available on their venues.

17        Now, this has been the subject of much

18  debate from both sides of the issue, and it

19  often turns into a he-said/she-said

20  discussion over whether rebates and fees are

21  good for investors or not.

22        You know, putting your data hat on,

23  what do you think is the objective truth of

24  this rebate make-or-take system as it stands

25  today?  Do you think it opens investors to

1   conflicts of interest with brokers and

2   exchanges that may cost them when it comes to

3   best execution, or do you think it benefits

4   them through tighter spreads and better

5   execution?

6          MR. JACKSON:  So just -- I thought

7   maybe we'd give a little background --

8          MR. PODKUL:  Sure.

9          MR. JACKSON:  -- for those who have --

10          MR. PODKUL:  Definitely.  This is one

11   of those issues that needs background, for

12   sure.

13          MR. JACKSON:  Yeah, man.  It took me

14   like six months to under --

15          MR. PODKUL:  Oh, same here.

16          MR. JACKSON:  Yeah.  So the way this

17   basically works is the major exchanges make

18   payments or charge fees to investors who

19   bring trading to them.  And the degree to

20   which this -- this has been a subject of

21   study for a long time.  There's an argument

22   that this causes a conflict.  The conflict it

23   causes is that the person who's made doing

24   the stock trading is going to bring the

25   transaction to the place where they get paid

1   the most instead of the place where the

2   investor is going to get the best price.  And

3   that's going to be true except in -- to the

4   degree the law forces them to get the best

5   price.

6         And we have a rule about this.  It's

7   the best execution or the order of

8   protection.  These -- these rules are meant

9   to work together to ensure investors get the

10  best price.  The problem is that they don't

11  -- they're not very binding.  So there's a

12  lot of room, within best price there's a lot

13  of room to make those judgments, and the fear

14  is that there's this conflict of interest.

15        Now the question she's already asked

16  me is what's the truth of this, is this

17  really good or bad, and the answer -- the

18  truthful answer is I don't know.  I have no

19  idea, which is why we're doing the

20  transaction fee pilot because the question

21  really is do -- are those payments necessary

22  to create the kind of liquidity that we need

23  to run a good stock market?  The exchanges

24  are -- have argued that it -- they are

25  necessary.  Others have argued -- powerfully,

1   I think -- that they're not necessary.  We're

2   going to test it.

3        And remember, I said earlier that

4   because the Chairman is -- is so focused on

5   running the place that the trains are running

6   on time?  This is something we should have

7   done a long time ago, and we didn't because

8   it is hard.  It's hard for the SEC to come

9   out and say, hey, we don't know whether this

10  is good or bad for investors.  We're going to

11  -- we're going to get some data and find out.

12  That's a hard thing for a chairman to say,

13  but it was the right thing for him to say,

14  and he did.

15        MR. PODKUL:  Yeah.

16        MR. JACKSON:  And I'll say something

17  else, he brought in a guy, Brett Redfern,

18  who's the director of division of trading and

19  markets, who left -- gave up a lot here in

20  New York to come down to Washington and run

21  this.  And he's -- look, he's trying very

22  hard to get this right, and sometimes he goes

23  further than I'd like; sometimes he doesn't

24  go as far as I like.  You don't agree every

25  night, but at the end of the day he is trying

1    to get to the truth of do you need -- what

2    kind of transaction fee, what kind of

3    payments do you need to create the liquidity

4    we want.  And once he understands that truth,

5    he can come up with a rule that makes more

6    sense for investors.

7         So I really admire them, and I've been

8    very supportive of this.  I came out

9    aggressively in favor of it, and the reason I

10   did that is Jay and Brett are trying to do

11   the right thing, and I want to support that.

12        Let me say one more thing about that.

13   There's one move in this debate that really

14   makes me mad because I just think it's wrong.

15   The argument is to say this is a debate, this

16   is a -- a -- a -- a food fight among very

17   wealthy people.  The exchange is on the one

18   side who are doing great, it's the banks on

19   the other side who are doing great, who

20   cares?  I do, and here's why.

21        Everyone in this room knows that those

22   fees that get charged, they get taken bit by

23   bit from investors because if you spent 15

24   minutes on Wall Street you know if they

25   charge a fee, whoever's paying that fee, it's

1    not them.  You know that.  That's getting

2    passed on to an investor, and my problem is

3    I'm a kid who wasn't supposed to have a job

4    like this or go to law school, and the reason

5    I did is because my parents put money away,

6    and I can see that the system we have today

7    is meant to take bit by bit -- you don't

8    notice it, but little by little, and then you

9    look up and it's 20 years later and you want

10   to send your kid to college or you want to

11   retire, and that number's not as big as it

12   should be.

13          And for me -- that's why I care.  This

14   is not a food fight among among rich kids.

15   This is a fundamental question over do we

16   have a system that's fair to the Americans

17   the markets are supposed to work for, and I

18   think Brent and Jay are doing the right

19   thing, and that's why I support it.

20          MR. PODKUL:  Now on March 20th, the

21   SEC unexpectedly halted part of the

22   transaction fee pilot as the US Court of

23   Appeals for the District of Columbia is

24   considering legal challenges to the proposal,

25   the big exchanges.  NYSE, NASDAQ, and CBOE

1    have sued.  They're trying to obviously stop

2    the pilot from going forward, and I guess

3    there's two ways to look at it.  Either this

4    is a big win for the exchanges, or it's a

5    savvy move by the agency to basically go

6    ahead with the least controversial part of

7    the pilot, the data gathering, while the

8    courts decide on the more controversial

9    aspects of it.  What are your thoughts on the

10   SEC's move to lit?

11        MR. JACKSON:  This is the part of my

12   job that I hate because it's ongoing

13   litigation, so I really can't say much about

14   it.  I'm just going to say --

15        MR. PODKUL:  Still got to ask.

16        MR. JACKSON:  Yeah.  No, ask for sure.

17   I'm happy to be asked.  I just wish I could

18   say more.  I legitimately, seriously wish I

19   could say more.

20        It's ongoing litigation.  I think I

21   understand -- look, the key to me is to do

22   it, and I can tell you, there are powerful

23   forces who would like to wait us out.  Like I

24   said, we have a few key people in good spots

25   right now who are trying to do the right

1   thing, and I -- my concern would be delay

2   because I don't think it's healthy for people

3   to say, you know what, we don't really like

4   the policy you came up with.  So we're going

5   to hire a law firm to hold you up for the

6   next two years, and we hope we get someone

7   else who does -- who does something we like

8   better.  I don't think that's a good way for

9   the railroad to run.

10          As you pointed out, a very important

11  point here is that we're still going to be

12  able to collect the data.

13          MR. PODKUL:  Right.

14          MR. JACKSON:  So we haven't actually

15  slowed down the process, and in a way that

16  worries me yet.  And I'll leave the rest to

17  the courts and to our general counsel to work

18  through, but fundamentally from me -- my view

19  on the transaction fee pilot is we should

20  have done this a long time ago.  It's time to

21  test these payments and how they really work,

22  these fees and how they really work, and I'm

23  going to be a guy who pushes very hard that

24  that happens soon.

25          MR. PODKUL:  One more question, and

1   we'll open it up to the Q&A from the

2   audience.  You mentioned that there's some

3   people are saying this is just an argument

4   between rich people on Wall Street about who

5   should make more money, and that's almost

6   exactly the same thing I heard when I went to

7   the SEC in October for the roundtable on data

8   feeds.

9           I forget who it was, but one of the

10  round tables someone mentioned that this is

11  -- this is not about apple pie and hotdogs.

12  This is about BMWs versus whatever car make

13  was -- I think it was a Maserati or whatever.

14  But you know, that was within context of data

15  feeds, which are another hugely controversial

16  issue, and you know the the cost of

17  connecting to data and acquiring data from

18  the exchanges just keeps going up and up and

19  up.

20          IEX has publicly disclosed its cost to

21  provide market data and connectivity.  I'm

22  just wondering do you think other exchanges

23  should do the same?

24          MR. JACKSON:  So again I -- without

25  commenting too specifically on things that

RPLI_SEC 1141303

1   might come before me, we have said some

2   things that are still subject to litigation

3   about data, so I don't want to say too much

4   about data.

5          Here's what I will say.  I'm -- like I

6   said, I started my career on Wall Street.

7   When someone tells you, don't worry, this is

8   not about you, I'm stealing for -- I'm

9   fighting with somebody else over here,

10  usually they're taking from you.  And what

11  they prefer you do is focus on this other

12  thing over here like Mercedes and BMWs,

13  right?

14         Like -- so to me, what frustrates me

15  about this argument is that it's not engaging

16  with the facts.  Like if you want to say we

17  are doing the right thing for investors, say

18  that.  This is the right system.  We believe

19  it and defend it.  Instead of turning it into

20  a political game about these are two sets of

21  rich people fighting so don't pay any

22  attention.

23         Look, here's my problem.  Right now in

24  our country, we have a moment where there are

25  a lot of people who feel like what we do in

 1    finance does not work for them.  It's a game

 2    that's rigged against them.  It's not meant

 3    to include them, and it is driving enormous

 4    -- I mean, even in my own family, it is

 5    driving an enormous divide between people who

 6    feel like they're part of that club and

 7    people who aren't.

 8         And to me, there's no more hurtful

 9    argument to the progress of debate in this

10    country than to say, don't worry about it,

11    this is just rich people fighting.  Like I

12    don't -- I don't -- that's not an argument

13    about whether or not we are doing the right

14    thing for you, whether we have created a

15    system that works for you, whether you have

16    the market you deserve as the American

17    public.

18         So to me, that's -- that's not an

19    argument.  That's a claim about -- that's

20    like a political smokescreen.  It's not a

21    serious argument about the -- about the

22    degree to which investors deserve the markets

23    -- are getting the markets they deserve.

24    Bless you.

25         MR. PODKUL:  And with that, questions

1   from the audience.  Myron, please introduce

2   yourself who you are.

3       MR. KANDEL:  I'm Myron Kandel,

4   formerly of CNN.  I have a question Cezary

5   mentioned that you were appointed by

6   President Trump.  What he didn't say is that

7   he had to appoint a Democrat because the

8   Commission is usually two people in the

9   minority party and three in the White House

10  party, right?  If President Trump was sitting

11  here tonight he would disagree with

12  everything you said.  Okay.

13      We know very well from what we read

14  and hear about his influence or his

15  unhappiness with the Federal Reserve, which

16  all of us journalists know was previously

17  considered untouchable by politics.  So my

18  question to you is are you feeling the

19  influence of President Trump on the work of

20  the SEC.

21      MR. JACKSON:  So we're starting with

22  an easy one.  So Myron, I -- I remember

23  sitting in an audience like this watching a

24  guy like -- in a job like mine talk, and I

25  saying to myself, I wish they'd just give a

RPLI_SEC 1141306

 1   straight answer.  So you asked a

 2   straightforward question, am I feeling the

 3   pressure of a particular White House view,

 4   and there's a yes or no answer to that

 5   question.  The answer is no.

 6         And I understand from the outside

 7   looking in why you might think that.  I'm

 8   here to tell you that that does not influence

 9   my day-to-day work.  I'm not saying it never

10   will.  I'm saying I am very fortunate to work

11   in a building where the independence of the

12   regulators is taken very seriously, and I

13   work for a chairman who has a deep reservoir

14   of respect on both sides, and I don't

15   speculate, but also I believe at the White

16   House so that we are permitted to make the

17   decisions that we think are best for the

18   market.

19         Now, if you're wondering more

20   generally about this president's view about

21   financial regulators' independence, et

22   cetera, I'm happy to talk about that, but you

23   asked about my experience, whether or not I

24   have felt that influence, and the answer to

25   that, Myron, is no.

 1          MS. ZOBERMAN:  Is this on?  Yeah, I
 2    guess it is.  Gail Zoberman (phonetic), I'm
 3    retired.  But when you talked about
 4    separating signals good news not being
 5    wrapped in bad news et cetera, et cetera,
 6    have you had the argument, and if so, what do
 7    you say to somebody says you're infringing
 8    upon my First Amendment right to say what I
 9    want?
10          MR. JACKSON:  Yeah, I get that a lot,
11    yeah.  So it's a great question.  Her
12    question basically is, look, doesn't the
13    First Amendment permit companies to speak as
14    they wish, and my answer to that is no.
15          In 1934, in response to the Great
16    Depression, we made a decision that
17    fraudulent speech was going to be limited,
18    prohibited by federal financial regulators,
19    and we can debate whether that was the right
20    bargain to strike or not.  I think over the
21    last 85 years, it has served American
22    investors and companies well.
23          But I'll put it to you this way, if
24    the First Amendment stops me from prohibiting
25    companies from committing fraud against the

RPLI_SEC 1141308

 1   American public, nine guys in robes are going

 2   to have to tell me that.  And I don't think

 3   they will.  I don't think they will because

 4   fundamentally, if you look at the history of

 5   the First Amendment's jurisprudence, the

 6   Court is very careful to judge to -- to make

 7   sure we abide the limits of regulating

 8   commercial speech.  But it's been very clear

 9   for a very long time that the 34 Act, the 40,

10   I mean, all the statutes that empower the SEC

11   to act arguably infringe the freedom of

12   speech.

13         Look, fundamentally getting someone to

14   come out and say that they did something

15   wrong when they'd rather not infringes their

16   freedom of speech, but I'm okay with that.

17   And in fact, I don't think a very thoughtful

18   conception of speech includes that.  In other

19   words, I think of what everyone in this room

20   does as crucial speech, central to the

21   bargain of the Constitution.  I think of

22   political speech as very -- I mean,

23   infringement of this, I think the courts

24   would not abide and they're right.

25   Journalism, same thing.

RPLI_SEC 1141309

1        But fraudulent speech, telling you

2   something that's not true, this has never

3   been entitled to the kind of profound

4   protection that I think we have in mind.  So

5   when people make this argument, I want to be

6   respectful of the First Amendment.  I don't -

7   - I think it's important that the SEC not

8   cross those boundaries, but I'm very

9   comfortable that rules forcing companies to

10  cleanly say we have bad news rather than

11  bundling it with good would be within those

12  bounds.

13       You guys are tough, so it's funny.  He

14  mentioned this.  I said in a speech once that

15  my mother teaches the second grade.  As a

16  matter of fact, this is  -- she's -- 31st

17  year she's retiring in three months.  Yeah,

18  it's crazy.  What a story.  And every year I

19  go and I sit on the magic carpet, and the

20  rule on the magic carpet is you can say --

21  you just have to tell -- you just have to

22  tell the truth.  That's the rule on the magic

23  carpet.

24       My guess is all of you would love to

25  have a -- we could get a magic carpet, yeah.

1    Yeah, yeah.

2        So it's funny, over the years I go up

3    and I get questions from the second graders,

4    and over the years I get the -- the two --

5    the two questions I get every year that are

6    so hard are are you married and why not.  And

7    I figured it out.  I think my mom was

8    planting those questions.  So if I could

9    survive that, I'm happy to answer any

10   questions you guys have.

11       MR. FRIEDMAN:  Hi, William Friedman,

12   freelance.  I write mostly for Global Finance

13   Magazine and HFM.

14       You said that you were involved in

15   bringing public of a lot of IPOs during the

16   dotcom boom, and now it seems like we have an

17   echo of that with the digital asset boom, the

18   ICOs and the cryptocurrencies and such.  I

19   appreciate your -- your sense of what's

20   different this time, what's the same this

21   time, and what the SEC's response is and what

22   it might be if you could wave a magic wand.

23       MR. JACKSON:  Yeah, what a great

24   question.  So he's saying you lived through

25   the 90s dotcom boom.  Now you're seeing, from

1    a different perspective, the ICO market,

2    what's similar, what's different.  So a few

3    things.

4         So -- oh sorry.  So first of all, one

5    of the things the SEC -- so I got to say,

6    like just spoiler alert, I'm very proud of

7    the stuff the chairman and our enforcement

8    guys have done on the ICO front.  Say what

9    you want, man, they have been aggressive.

10   Like they came out, even before I joined the

11   Commission, and said we think many of these

12   fit the definition of a security.  There were

13   lawyers out there saying this is not even a

14   security.  You don't have to obey the

15   securities laws.  They don't even apply.  And

16   the SEC came out, I thought, really clearly

17   and -- and said that's -- we don't -- we're

18   not sure that's right.  We're, you know,

19   flagging this for you that you -- if you have

20   a security, you have to follow the law.

21        They've done good work.  I'll give you

22   an example.  One of my favorite things that I

23   remember from when I was on the street and

24   when I -- one of my favorite things since

25   I've been with the SEC.

RPLI_SEC 1141312

 1          During the 90s dotcom boom -- I don't

 2     know if you -- there's no reason to remember

 3     this.  The SEC at the time, which was led by

 4     Arthur Levitt, brilliant chairman, was a

 5     concern that people were not reading the

 6     prospectus.  They weren't reading the -- the

 7     IPO documents.  They weren't looking at it

 8     carefully.

 9          So the SEC at the time did a fake IPO,

10     like put up a registration statement that was

11     about a fake company, and like people were

12     calling up being like, hey, how do I invest.

13     This sounds great.  And what the SEC did was

14     they used it as an education -- they said

15     here are the signs that this was not real.

16     You know, there's no earning, there's no

17     intellectual property, there's no idea.  It

18     just says dotcom.  It doesn't have anything

19     to do with the internet.  Like, that's not a

20     thing.

21          I'm very proud of this.  They said --

22     it wasn't my -- this is -- staff are

23     unbelievable.  They did like three months

24     into my time at the SECOND, they did a fake

25     ICO, a fake initial coin offering.  Now,

1   there's no reason for you to know this, but

2   there's a little legal detail here that the

3   definition of a security -- secure -- an

4   investment contract is defined by, yeah, the

5   Supreme Court case called Howie.  And if

6   you're a securities -- no offense, but if

7   you're a securities nerd, you know -- right,

8   I mean, come on.  Let's -- yeah.  I feel like

9   the -- they know, man.

10        MALE VOICE:  (Inaudible).

11        MR. JACKSON:  So we named it Howie

12   coin, and we did a fake ICO, and I'm telling

13   you, man, if you google this, look on reddit

14   there's people like, hey, this is this great

15   idea.  And then they're like, wait, maybe

16   it's fake.  And the guy -- the picture of

17   like the -- we had a white paper describing

18   the idea, and the picture is like the -- the

19   guy the SEC staffer who ran it.

20        So they looked at his picture and then

21   they compared it to LinkedIn and they're like

22   the LinkedIn thing is like his SEC pay it

23   was, like, I think it's the same guy.  So

24   first of all, there are a lot of

25   similarities.  I will say one difference is I

1   remember raising money in that environment,

2   and it was -- you know, it was easier than it

3   should have been.  People weren't diligencing

4   everything the way they should.

5           But today with the internet and social

6   media, it's a different world, man.  I mean,

7   look, without judging any particular matter

8   and being care -- you know, my lawyers would

9   be upset, you know, like, there's -- I think

10  a guy who like did something called fake

11  coin.  I mean, he named -- it was right there

12  in the name, and I think he raised like 50

13  million.  I mean, like, it's unbelievable.

14          I feel like right now it's a moment

15  where people -- and this is what I was trying

16  to say before, not that artfully -- people

17  feel like there's another game out there that

18  they're not in.  Does that make sense?  And

19  feel like that's a big part of what tempts

20  people to get in this kind of thing.  I'm

21  missing out because I'm not -- I don't have

22  the right friend or I don't know the right

23  thing or I didn't go to the right school, but

24  here, I can get in on it so I'm going to try.

25          And there's a level at which I don't

1    -- it's hard to blame them.  I understand

2    what that feels like.  I understand that.  My

3    job -- our job at the SEC is to educate them

4    and make clear that, you know, if there's an

5    offer that would give you twice as many

6    securities if you buy them in the next 15

7    minutes, that -- be skeptical of that.  Like

8    that's not how Wall Street works.

9         So I think we've done a pretty good

10   job on it.  I think there are a lot of echoes

11   in the two -- in the two eras, but one thing

12   I'm really proud of is I think we've -- we've

13   -- we've stepped out -- up and gotten ahead

14   of this.  I think we have a lot more work to

15   do, but I think we're doing okay so far.

16        MR. FRIEDMAN:  (Inaudible).

17        MR. JACKSON:  How much time you got?

18        MR. PODKUL:  Not that long.

19        MR. JACKSON:  Yeah.  So there are a

20   number of sort of -- there's a number of -- a

21   lot of background on this.  I personally --

22   to me, the most help -- we just put out some

23   guidance on this a week or two ago.  The most

24   helpful thing, I think, our director of

25   corporation finance, Bill Henman, gave a

1   speech about a year and a half ago that

2   describes this.  You might know the speech I

3   have in mind.

4        Let me just quickly summarize the

5   intellectual problem.  Tell me if you

6   disagree.  The intellectual problem is to the

7   degree that you sell a token that is meant to

8   let somebody use existing infrastructure,

9   many times in our past we have assumed or

10  concluded that that's not a security.

11       Let me give you an example.  Airline

12  miles.  Airline miles, you get them, they're

13  -- they can be sold sometimes, right, like

14  there's a way to sell them or transfer them.

15  There's limits on that, but you can hold them

16  with the expectation that they'll go up or

17  down in value, but because you're using them

18  on an existing infrastructure, which is the

19  existing airline that you work on, and

20  there's rules of that game, we typically tend

21  not to think of that as a security on the one

22  extreme.

23       On the other extreme, you have a

24  situation where someone sells a token for

25  infrastructure that doesn't even exist yet.

1    Does that make sense?  And says give me this
2    money so I can build this thing, and then you
3    can use a token to use that thing.  It's a
4    different case.  Why?  Because look, man, I'm
5    not against you selling a thing to raise
6    money to build something.  I just got a name
7    for that.  That's a security, like it has
8    been thought to be a security in many -- not
9    in every case but in many cases for a long
10   time.  That's it.
11           So the question is where do we draw
12   that line, and how we test and the guidance
13   we put out in this area hasn't formed that
14   difference.
15           Now, one more thing.  You -- you
16   mentioned cryptocurrency.  What's important
17   about that is to realize that the way that
18   cryptocurrency works when it -- and this is
19   what Bill Henman's speech says, so I'm not
20   adding too much -- depends fundamentally on
21   how centralized or decentralized the
22   underlying network is that -- that supports
23   that currency.  And that's -- that's also
24   true in the ICO context.  Bill has said a lot
25   about that, about ways that practitioners can

1    look in that area and get a sense for whether

2    or not we should think of that as a security,

3    and I point people to that speech.

4         Do you think we've been clear enough

5    about that?

6         MR. FRIEDMAN:  No.

7         MR. JACKSON:  Yeah, yeah, I expected

8    you'd say that.  No, let me ask you this.

9    No, no, no, seriously, I've heard that a lot.

10   What could we do that would be more clear?

11        MR. FRIEDMAN:  (Inaudible).

12        MR. JACKSON:  So let me just -- I'm --

13   I'm -- I want to be clear because a lot of

14   people have come in and asked us for more

15   guidance on this, and it's not that I -- we

16   don't want to be -- I don't want to speak my

17   -- not that I don't want to be responsive.

18   It's that I worry that if we make a rule

19   today, it will make a lot less sense to the

20   marketplace in six months in this space.  Do

21   you see what I'm worried about?  And for

22   better, for worse, the machinery of the

23   bureaucracy of the U.S. Government works in a

24   fashion where if I were to pitch a rule and

25   know exactly what it was -- exactly what we

RPLI_SEC 1141319

1    were -- if you and I could get a beer and

2    agree what the rule should be, by the time it

3    became law it'd be a year later.  And by that

4    time, the ground will have moved underneath

5    us.

6         So that if you sense at least from my

7    point of view of wanting to give this some

8    time to figure out and do it by guidance as

9    opposed to rule, that's what's driving us.

10        Now, you might say, Jackson, that's

11   the problem.  Why don't you move more

12   quickly?  And from your lips to God's ears,

13   man.

14        MR. WENIK:  Hey Commissioner, Ian from

15   -- Ian Wenik from City Wire.  So you've been

16   a pretty persistent critic of the economic

17   analysis underlying regulation vest interest,

18   the broker conduct package.  Does it concern

19   you to see states get so frustrated with the

20   pace of rulemaking that they've started

21   introducing their own rules?  Nevada had

22   regulation off books and now New Jersey just

23   saw (inaudible).

24        MR. JACKSON:  So I'm sorry, what was

25   your name?

1          MR. WENIK:  Ian.

2          MR. JACKSON:  So Ian's question is

3     we're working on this -- do you guys know the

4     regulation best interest backdrop?  Are you

5     familiar with this?  So the basic question is

6     what obligations does a broker owe you when

7     they -- when they sell you financial advisory

8     services.

9          And the problem is that it's grown up

10    over time in a way that investment advisors

11    have one standard under the 1940 Investment

12    Company Act and broker dealers have a

13    different standard under the 34 Act, and the

14    question is what should the standard be.

15         And we proposed a rule last year that

16    -- called Regulation Best Interest -- that

17    attempts to raise the bar for broker dealers

18    for what obligations they owe you when they

19    advise you and also clarifies the standard

20    for investment advice.

21         I think your question is -- I have

22    been critical of the economic analysis there,

23    and I think your question fundamentally is to

24    what degree do I expect -- how do I expect

25    this rule to unfold and what do I think the

RPLI_SEC 1141321

1    economic advice would look like.

2         So here's my thing about this.

3    Suppose I were to say to you all we are going

4    to raise the standard so that when a broker

5    talks to a client, they have to be clearer

6    about what they're selling and what it costs.

7    Is that going to affect those people's

8    behavior, both the broker and the client?

9    What's your reaction?

10        See it's funny you should say that.

11   So I'm going to say about half of you shook

12   your head because you're cynics, fair enough,

13   and said it won't change anything.  People

14   won't understand, and the brokers will dance

15   their way around it because that's what

16   brokers do right?  Is that a fair summary?

17   Okay.

18        The other half of you said, well,

19   actually, maybe it would because a lot of

20   brokers want to do the right thing.  They're

21   going to ask people what the rules of this

22   are, and they're going to say -- they're only

23   going to make a pitch that they're allowed to

24   make.  It is what a guy like me likes to say

25   an empirical question.  This -- science can

RPLI_SEC 1141322

1    answer this question, right?  What you --

2    what you should do, I think, is test it.

3    Take a bunch of brokers, tell them this is

4    the law, and tell another bunch that this is

5    the law, and see how they respond.  Talk to a

6    bunch of customers.  Say here's the

7    disclosure.  Give another group a different

8    disclosure.  Choose them randomly if you want

9    to get close to the level of science

10   required, for example, by a medical trial and

11   see what the effects are.

12          That is what I have said we should be

13   trying to do with regulation best interest.

14   Not necessarily -- look, everyone who comes

15   into my office swears they know the answer to

16   this question.  They say this won't do

17   anything or it's too strong or it's too weak,

18   and the hard -- the more they yell, the more

19   I know you don't know.  You don't know.

20          And by the way, what makes you think

21   it's going to be the same for people in New

22   York as it's going to be for people in

23   Florida as in Nevada, and I'm making one rule

24   for the entire nation.  How am I supposed to

25   be confident about the way those people

1    respond?  And that gets to the question you

2    really wanted to ask me, sir.  He said how do

3    you feel about the fact that states are

4    moving forward with their own rules, in part

5    because they're impatient about the SEC?

6            Now, I'm not sure I grant the premise

7    that their impatience with us is what's

8    driving their action.  I think what's driving

9    their action is they think they need to take

10   steps to protect investors.  And my view has

11   always been that the states should do

12   whatever -- I mean, that's -- we have a

13   federal system.  States should do whatever

14   they think necessary to protect their

15   investors.

16           Do I think if we came out with a

17   strong regulation best interest that everyone

18   in the marketplace was convinced was good

19   enough, do I think states might defer to us?

20   They might, but that's on us to come out with

21   a regulation best interest that people think

22   is the -- is really going to protect people.

23   And my goal is to come back to you in a year

24   with a rule that's so strong that even a room

25   of skeptics like this could agree that we did

 1  a good job.  So wish me luck.

 2          NATALIA:  Hi, my name is Natalia.  I'm

 3  a radio journalism student at New York

 4  University, Forbes contributor, and CNN

 5  business intern.  My question is about

 6  collateralized loan obligations.  The market

 7  for CLO is expanded over the past few years

 8  so my question is from your point of view, is

 9  there anything that should be done in terms

10  of ratings for CLO.

11          MR. JACKSON:  Ratings for CLOs.

12          MR. PODKUL:  (Inaudible).  What do you

13  mean?

14          NATALIA:  (Inaudible).

15          MR. JACKSON:  Okay, so I'll take those

16  -- I'll take the last question first -- oh, I

17  always forget to do this.  You didn't remind

18  me.  So my lawyers are going to be all --

19  it's on tape.  So these are only my views.

20  It's not the other commissioners' views or

21  the Chairman's views or my mother's views.

22  They're only my views.  I always -- it pisses

23  me off that they make me say this because

24  everything I've ever said in my life is just

25  my view, like what does that even mean.

RPLI_SEC 1141325

1           MR. PODKUL:  (Inaudible).

2           MR. JACKSON:  And of course I'm going

3    to try and convince them, so whenever they --

4    the lawyers make me give this caveat, these

5    -- you can tell what kind of guy I am to work

6    with, this is the problem with hiring a kid

7    from the Bronx.

8           So they say I have to say these are

9    only my views, not the views of the other

10   commissioners.  I say given enough time and

11   wisdom, they're going to realize I was right

12   all along.

13          So CLOS.  First of all, am I concerned

14   about the leverage implicit in the CLO market

15   in that lending centers got loose, yes, yes.

16   And in particular, I think -- in fact, my

17   experience, when I talk to people on the

18   street about it, I think that asset class

19   actually did experience a little bit of a

20   pause, a breather, about a year ago, and that

21   was, I think, a very healthy market response

22   to people feeling like they didn't fully

23   understand what was in the box and understand

24   the ratings.

25          Now, you asked a question about

1    ratings that I think I need to address very

2    clearly.  One of the biggest challenges in

3    the work of the SEC right now is how little

4    competition we have in crucial areas of our

5    markets.

6           How many rating agencies are there?

7           MR. PODKUL:  (Inaudible).

8           MR. JACKSON:  How many rating

9    agencies?

10          FEMALE VOICE:  (Inaudible).

11          MR. JACKSON:  You know bid two-and-a-

12   half, ask five, it's in between, right?  It's

13   surprising to me that a market as deep as

14   ours doesn't have more competition in that

15   space.  Stock exchanges, how many do we have?

16   We've got 13 lit stock exchanges, public

17   stock exchanges.  Twelve of them are owned by

18   three conglomerates.  Only one actually

19   independent stock exchange.

20          My answer to you, does it concern me

21   what's happening -- here's what does concern

22   me.  In a -- in an industry where there's

23   only two-and-a-half competitors, three

24   competitors, I'm not sure there's enough

25   competition to get investors what they

1    deserve, which is an accurate rating.

2           Now, we have an office of credit

3    rating agency of credit ratings created by

4    Dodd-Frank.  These people are tremendous;

5    they do great work.  What they do is examine

6    the credit rating. They go in, they ask some

7    questions.  They ask all the hard things that

8    people felt should have been asked in '06 and

9    '07.  And they do great work.

10          But fundamentally, do I think

11   questions from Washington will do as good a

12   job as competition in disciplining these guys

13   and making them give the right ratings?  No,

14   no, I think competition would do a better

15   job, and we don't have any, and fundamentally

16   the question we needed to ask, which is how

17   do we get -- go from a world with three

18   credit rating agencies to a world with ten,

19   we didn't answer.  We didn't answer.

20          Here's -- I gave a speech about this a

21   little while ago.  It's a funny thing because

22   you think back to the creation of the -- of

23   the SEC back to the Depression, people don't

24   know this.  The SEC was created in 1934, but

25   the Securities Act that nerds like us think

RPLI_SEC 1141328

1   about a lot, the Securities Act was passed

2   the year before in 1933.  So the regulation

3   of securities had to go somewhere else.  Do

4   you know where it went, which agency ran

5   securities regulation in this country before

6   mine existed? The Federal Trade Commission,

7   the antitrust enforcement.

8          In fact, if you look at the enabling

9   statute of the SEC, we are supposed to

10  consider among all the things that we

11  regulate competition as among our priorities,

12  but you don't ever hear us talk about the

13  ways that the choices we made led to having

14  fewer bulge bracket investment banks.

15         I went shopping for a job 15, 20 years

16  ago, there were a dozen.  Not anymore.  Two

17  and a half credit rating agencies, three

18  conglomerates that run most of our stock

19  exchanges.  So my answer to you is what

20  concerns me about this, what concerns me

21  about ratings and CLOs but more generally is

22  that we don't have ten people fighting like

23  hell to get it right.  Because if we did, I'd

24  be more confident.

25         Instead, we rely on the system we

1  have, which is just two, three, four credit

2  rating agencies overseen by Washington, and

3  the people there do great work, but they're

4  not perfect.  They're people.  And I do worry

5  that we might wonder about whether they got

6  the ratings right a few years from now.

7         MR. PODKUL:  (Inaudible).

8         MR. JACKSON:  Sure, so here's what I'd

9  say about that.  I'm a guy who worries a lot

10  about conflicts, but there -- like, conflicts

11  are all around us in the world, right?  You

12  go to -- after this, I'm going to dinner with

13  my fiance, assuming she's still dating me.

14  Yeah, such an embarrassing mistake.  I'm a

15  corporate lawyer.  I left too much time

16  between signing and closing.  I got engaged

17  like a year and a half ago, and I'm giving

18  her a lot of time to think this thing over.

19  It's bad.

20         I'm going to dinner with her.  I'm

21  going to ask the waiter to recommend a bottle

22  of wine.  All right.  Now, the guy gets 20

23  percent of what he sells.  So is it going to

24  be astonishing to me when he likes the --

25  when he thinks the best bottle of wine is one

1    of the most expensive?  It is not, but I

2    understand that's the deal, and if I ask him

3    for a recommendation, that's where this is

4    headed.

5          Their -- issuer pays is a basic --

6    there's conflicts all over them.  And I

7    actually -- here's my -- my problem.  I don't

8    want to be the guy who criticizes every

9    possible way to do something.  I'm not saying

10   issuer pays is the right model.  I'm saying

11   someone's got to pay, right, so let's figure

12   out who that is and make sure every American

13   investor understands that conflict's in our

14   market.

15         They go to buy a car, they go to

16   dinner, they live in the economy, they know

17   that fundamentally people can be conflicted.

18   That's not fatal to the system.  What's fatal

19   is telling people that they're not

20   conflicted, that you're their friend, that

21   you're going to help them, that you have

22   their interests at heart, when in fact,

23   you're trying to get paid.  That's when

24   people, in my experience, actually feel

25   defrauded.

RPLI_SEC 1141331

```
 1              MR. KNUCKLE:  Hi, my name is John
 2   Knuckle.  I'm a financial adviser and a
 3   freelance writer.  I'm also a fiduciary, so
 4   the question is about the fiduciary rule and
 5   the push to lower commissions and the
 6   increased technology within -- my colleagues,
 7   we all look at it as something that's going
 8   to kill the small investment.
 9              And the reason is fiduciary structure
10   as gets paid for assets under management,
11   percentage of assets under management, now
12   the standard's about one percent.  Technology
13   is making three-quarters of 1 percent, a half
14   of 1 percent, which means that if a client
15   has $500,000, you can make $2,500 all year.
16              What is happening is -- and it's
17   happened with my own firm -- is they're, in a
18   very compliant way, saying we don't want
19   clients with less than $500,000.  Now, these
20   people are being -- going to be -- and it's
21   going to increase.  They're going to be
22   pushed off to the automated systems, and on
23   the current automated systems you can't pick
24   up the phone and talk to a financial adviser
25   when the market's crashing.  You have to have
```

1  an appointment, and that's why they can

2  afford to charge so little money.

3          So I look at this as almost like a

4  looming crisis where -- and you're talking

5  about, you know, cops and firemen with

6  $400,000 in their pension who can't get a

7  broker because it's the Goldmans and the

8  Merrills of the world that are put it down to

9  a quarter of one percent or maybe for free,

10 just so they have the money that they could

11 use as leverage.

12         So they're going to -- these small

13 investors, if there's a crisis or something's

14 wrong, they're going to have no one to speak

15 to, they're going to have no one to help

16 them, no one to guide them, and they're going

17 to act irrationally, and on a day when the

18 market should go down a thousand points, it's

19 going to go down 3,000 points.  So that's --

20 I was wondering about that.

21         MR. PODKUL:  (Inaudible).

22         MR. JACKSON:  No, no, no, I think

23 that's fair.  I don't mind -- no, no, no,

24 that's fair, man.  Look, let me just capture

25 the point you -- what's your name?  John.  So

1    here's John's point basically.

2         Look, as it is right now, it's very

3    difficult for an average American family who

4    doesn't have $4 million to invest but has got

5    400 grand to invest to get good financial

6    advice.  Don't make it harder.  I agree.  I

7    agree, man.

8         Here's the question.  What can I do to

9    get them better financial advice so that they

10   don't take that money into an office where

11   they get sold something that they're not --

12   they're not suitable for.  And I believe that

13   if we do this the right way -- look, just

14   saying you have to recommend the absolute

15   perfect product for this person, I agree with

16   you, people will exit the business, and

17   that's bad.

18        And by the way, even before I was at

19   Bear Stearns, I was at a broker -- I was at

20   Smith Barney.  Remember them?  Smith Barney.

21   I used -- what's that?  Yeah, I used to work

22   for a broker at Smith Barney.  I got this job

23   and the guy I interned for -- I used to

24   (inaudible), like -- just like in the movie.

25   I'd write down on the postcards, you know,

1    I'd give it to him.  The guy, when I got this

2    job, emailed me, said congratulations, don't

3    come after me.

4         Look, I -- I think you're right about

5    this.  Here's my belief -- I believe we can

6    come up with a rule that gets a lot of the

7    practices out of the market that don't belong

8    there with making sure that the people you're

9    talking about can still get good financial

10   advice.  I believe you could do that.

11        Let me just give one -- one example,

12   something I think is happening that I don't

13   like that really worries me.  You guys know

14   lever -- what levered ETFs are?

15        All right, so the pitch here is, you

16   know, instead of getting the S&P 500, get

17   three times the S&P 500.  Okay, now I have

18   seen data suggesting that a lot of cops and

19   firefighters and people who are 57-plus are

20   in those products on a buy-in whole basis.

21   They shouldn't be.  They shouldn't be.  The

22   reason they shouldn't be is that the way the

23   products get you that leverage is they're

24   rebalanced every day, and I can show you -- I

25   gave a statement on this not that long ago.

RPLI_SEC 1141335

 1    I can show you in the math that even if

 2    you're right, the market goes up, you lose

 3    half your money just on the erosion alone on

 4    the rebalancing every day.

 5            So here's my concern, John.  One of

 6    these cops you're talking about goes into an

 7    office, says, look, I've got four hundred,

 8    I'm short.  I'm getting ready to retire,

 9    okay?  Four hundred is not going to make it.

10    I don't need the S&P.  I need three times.

11    So he buys it, and lo and behold, it's a nine

12    year bull run.  And the guy opens his

13    envelope in eight years, he turns to his wife

14    and says we're in great shape, and he looks

15    at  it, it's half the money.

16            My view is we can and should say

17    that's not appropriate for that guy, and that

18    doesn't mean he can't get financial advice,

19    but we can and should come out and say this

20    is not a product he should be in.  And I

21    think that's the SEC's job.  A hundred

22    percent?  Just because you can't sell them a

23    3x?

24            So look, here's what I'll say.  You've

25    had to do that on the law we have now.  It's

1   not because of regulation best interest or

2   the fiduciary rule.  What you're saying to me

3   is be care -- pay attention to the costs of

4   providing this advice because if -- his point

5   is a very powerful one.  See what he's

6   saying.  What he's saying is if those costs

7   rise, it's not -- rich people are still going

8   to get financial advice.  Those aren't the

9   people you hurt, he's saying.  He's saying

10  you hurt people who really need it, and I

11  hear you, and I think everyone on the

12  Commission does actually.

13          MR. CARROLL:  I'm Larry Carroll

14  (phonetic) of (inaudible) Investor's Business

15  Daily, and I was curious, a lot of companies

16  have tried to have Bitcoin ETFs, and the SEC

17  keeps shooting them down, and I was wondering

18  what's the main reason that the SEC doesn't

19  like Bitcoin ETFs.

20          MR. JACKSON:  Bitcoin ETFs, so I got

21  in trouble about -- like you can tell a lot,

22  yeah.  So we had a proposal from the

23  Winklevoss brothers to -- to do a Bitcoin

24  ETF, and we rejected that proposal.  One of

25  my colleagues dissented and said, you know,

1   we should let a thousand flowers bloom, and

2   if investors don't like this product, then

3   you know, if they invest and lose money you

4   know, them's the breaks.

5          I thought that was a very easy case,

6   and let me say why.  The -- at the market we

7   looked at in that particular ETF was the

8   underlying asset was traded offshore in a

9   very untransparent market with very thin

10  volume, and we said in our decision -- I

11  thought this was right -- that when you look

12  at volume that thin such that the price can

13  be manipulated and pushed around by someone

14  with not a lot of money, that's an investor

15  protection problem that we're not prepared to

16  let an ordinary American investors get

17  exposed to.

18         And the thing to understand about

19  ETFs, the benefit and the downside of ETFs,

20  is they are very easy to trade, right, that's

21  the whole idea.  Are you -- you don't even

22  need to set up a separate fidelity account,

23  nothing like that, right.  BD account, seven

24  bucks, you're in, you're out.  That's what an

25  ETF is, and I was a very uncomfortable.

1          Now, people -- someone asked me once

2     how do you think about that, and I said the

3     way I think about it is imagine my -- my mom

4     and dad, it's the Bronx, it's like 1979,

5     they've taken that 20 bucks and putting it in

6     whatever.  And what I have -- you know, that

7     was the money that was going to eventually

8     send me to college.  Would I have wanted that

9     in a Bitcoin ETF, and I said hell no.

10          And then apparently I -- I said hell

11    no, and my mother, Robert, stop cursing.  But

12    I got to be honest with you, man, like do I

13    really think that's a product that that

14    market is at a stage of maturity where we

15    should be putting ordinary American investors

16    in?  I'm not convinced of that.

17          Let me say something else, though.

18    I'm willing to be convinced of it.  So if you

19    show me a transparent market that trades

20    Bitcoin on a liquid basis that is always that

21    -- sort of easy to oversee where I understand

22    the value of the asset, where it's like an

23    equity or fixed income instrument, I'm not

24    saying we should pick and choose the products

25    people can invest in.  That's not what we do.

1          What we do is we make sure that

2    they're not going to get manipulated against,

3    that they're not going to get taken advantage

4    of, and that the things they trade are going

5    to be reflected in prices that actually

6    reflect the value of the thing that they own,

7    and that's what, in my view, that proposal

8    didn't do.

9          But if someone brings a proposal like

10   that to us that does that, I believe we'll

11   approve it.

12         MALE VOICE:  Thanks.  My name is

13   (inaudible) with the Columbia Journalism

14   School.  This is more a down-to-earth

15   question, but I was looking at the 2020

16   (inaudible) appropriations and you guys are

17   counting with like a 30 percent increase in

18   securities trading, but you guys are going to

19   get only like a five percent budget increase.

20   Do you think that like your agency's, like

21   increasingly underfunded, and like, you know,

22   if so, like, what the -- what way does that

23   affect you?

24         MR. JACKSON:  So the question is are

25   we underfunded.  So again, I try to be as

1    straightforward a guy as I can, and you can

2    tell them I'm not long for politics.  Are we

3    underfunded?  Yes, end of answer.  Yes.

4         So we oversee trillions upon trillions

5    of dollars in securities trading.  The people

6    that we oversee are some of the smartest,

7    fastest, most strongly financially motivated

8    people on earth.  The idea that we should be

9    able to do that with staff cuts makes no

10   sense.

11        I think our Chairman has done a very

12   admirable job in very difficult budget

13   circumstances -- I mean, a lot of agencies

14   CFTC, for example, have faced significant

15   cuts at a time where they really do need as

16   much support as they can get.

17        Fundamentally, I'll tell you we were

18   shut down back in January, and without saying

19   anything about the shutdown, here's what I'll

20   say.  It is fundamentally not a good thing

21   that the SEC shuts down in this way, and you

22   can ask any company that wanted to go public

23   during that window or anybody who faced

24   enforcement action or anybody who's in our

25   markets during that window --

RPLI_SEC 1141341

```
 1          MALE VOICE:  (Inaudible).

 2          MR. JACKSON:  That was a bad thing,

 3   destructive for the agency, bad for the

 4   markets, and here's what I'll say about it.

 5   It raises in my mind a real question about

 6   whether the SEC shouldn't be funded

 7   independently of the appropriations process

 8   and in the style of the Fed.  I wouldn't be

 9   the first person to say that.  I'm saying

10   it's a question.  I'm not the first person to

11   raise it.

12          But I can tell you if you want to know

13   my experience with it, what I saw was a

14   market, by the way, that was in December a

15   very volatile place to be, and I saw 4,000

16   amazing public servants who wanted to engage

17   in all the things we needed to do but who

18   couldn't come to work.  And I saw that very

19   up close and personal in a way that changed

20   my mind about -- I mean, the appropriations

21   process has its benefits.  I'm all for

22   accountability.  But I saw those costs up

23   close, man, and it's got me thinking about

24   whether we should be independently funded.

25          MALE VOICE:  (Inaudible).
```

1            MR. JACKSON:  Or the Fed, which is

2     funded on an independent, ongoing basis by

3     fees.  You know, and I can think of lots of

4     models for this, and this is above my

5     paygrade, and the budget request is really

6     the Chairman -- and I have to say. I saw the

7     article -- there was an article that pointed

8     to the increase in securities trading and the

9     relatively small increase in our budget.  I

10    totally hear you guys.

11            I think we have managed to do

12    reasonably well if you compare us to other

13    agencies in the government, and one reason

14    that is, by the way, is that I think our

15    value proposition has become clearer and

16    clearer, especially with the chair we have

17    now.  I think we've --  we've done -- he's

18    done really well there.

19            But if I'm being honest, do I think

20    that the financial markets and the -- their

21    principal overseer should be subject to the

22    whims of the appropriations process, I think

23    that's -- that can be dangerous, and I saw

24    that up close, man.  So I'm wondering whether

25    that's something we should be thinking about

1    reforming.

2         MS. KELLER:  I know we're very short

3    on time here and probably this has to be the

4    very last question, so just very briefly

5    Laura Keller (phonetic), former Bloomberg and

6    board member here at Financial Writers.

7         So maybe this touches on some of the

8    themes that you've talked about tonight,

9    which is a lot about retail investors.  I

10   feel like you've been kind of figuring out

11   the gray zones whether it's ICOs or the

12   broker protocol.

13        But one thing I haven't heard you talk

14   much about is the sort of world of the more

15   shrouded, the investor market, you know where

16   you have, whether you talk about securities

17   that aren't securities.  So loans, for

18   example.  What are you trying to do to kind

19   of eliminate some of the gray areas in, say,

20   hedge funds or private debt markets where

21   you're not really seeing that retail investor

22   be harmed, but there are other people who

23   might be?

24        MR. JACKSON:  It's a great question.

25   I'll wrap up.  So her question is there are a

1  lot of markets out there that aren't so

2  retail-centric but still really matter to the

3  markets, and I actually would say just to

4  push back a little on the premise of the

5  question, fundamentally if a pension fund

6  gets hurt or reach -- someone -- a person

7  gets hurt, right, if an institution gets hurt

8  end up -- whether it's a hedge fund,

9  whatever, someone's the claimant to that

10  money.

11        FEMALE VOICE:  (Inaudible).

12        MR. JACKSON:  Yeah.

13        FEMALE VOICE:  (Inaudible).

14        MR. JACKSON:  Yeah.  I think about

15  this a lot, and there are whole segments of

16  the market that we don't oversee as a formal

17  matter, and we ought to be thinking -- and I

18  -- we are thinking about the degree to which

19  those markets are really working right.

20        Let me give you an example of an area

21  where I think we did really good work.  So

22  for years, you did distress debt, but I don't

23  know if there are private equity reporters

24  here.  But for years, private equity funds

25  charged their portfolio companies a

1   monitoring fee.  You don't remember those,

2   monitoring fees?

3           It's like we invested money and now

4   we're going to watch it and charge you, the

5   company.  And those fees were very common in

6   the market for like ten years until our asset

7   management unit, not that long ago, probed

8   the degree to which they were disclosed and

9   people really understood them.  And we got

10  better information out into the marketplace,

11  investors began to say, really, you're

12  charging me to watch your money, no, and the

13  market worked -- and I think there's a lot of

14  stuff like that we can and should be doing.

15          And I would say I'm a guy who very

16  much thinks that if you don't deter those

17  kinds -- if you don't deter fraud in those

18  markets, you're missing a big part of the

19  story that really affects ordinary retail

20  investors.  It's very easy to -- it's not

21  very easy.  These cases are really important,

22  but when you have an obvious retail victim to

23  understand why you have to go after that --

24  that case, it's a little harder to understand

25  why it's really important to send a big

1   message to the marketplace when an

2   institution does something wrong.

3        But to me, actually, that's the case

4   for really hitting somebody hard.  Because if

5   you're a sophisticated institution and you

6   know it's a gray area and you know what the

7   right thing to do is and what the market

8   expects and you don't get it right, that

9   should be costly at the SEC.  We should leave

10  no doubt in your mind whether it was

11  profitable to walk that line.

12        And I'm actually -- I've been a guy --

13  I haven't said too much about this yet, but I

14  plan to give a speech on it in the coming

15  months.  I'm a guy who is very much in favor

16  of aggressive penalties, and this is why

17  because my experience is people follow their

18  incentives.  And if you catch somebody

19  stealing a little bit of the time and go

20  light on them when you do, you make it

21  profitable to steal.

22        And again, I don't get mad at the guy

23  for stealing.  That's not his fault.  He's

24  got kids too right?  No, he's just doing what

25  your allowing him to do.  To me, one thing we

1    have to get better at is when we catch an
2    institution doing something wrong to make it
3    hurt, to make them feel like, look, who knows
4    if they'll get us this time, but if they do,
5    man, it'll be painful.
6         And I think -- look, to the great
7    credit of the people I work with now, they
8    understand that.  They want to do -- they
9    want to make that clear, but every time we
10   get -- send any mixed message to the market
11   about whether we're going to be serious about
12   penalizing large institutions or gray areas
13   of the market, I think we do investors a
14   disservice.
15        MR. PODKUL:  There's a great book on
16   that subject the Chicken Shit Club, and one
17   could write a book on many of the things we
18   talked about tonight, but of course we don't
19   have time for that tonight.  So one last
20   closing thought from you is since you're in a
21   room full of financial journalists in the
22   world's financial capital, what is -- is
23   there any one or two subjects that you think
24   aren't being covered enough that financial
25   journalists should be paying attention to,

1    writing more of?  What would you -- what

2    would that be?

3          MR. JACKSON:  So the question is if I

4    could get you guys to cover one thing that's

5    not getting enough ink.

6          MR. JACKSON:  That's not getting

7    enough ink.  Tesla.  No, just kidding.

8          MR. PODKUL:  Who is it that said

9    Tesla?  Tesla did come up?

10         MR. JACKSON:  Tesla's not the correct

11   answer to that question.

12         MALE VOICE:  (Inaudible).

13         MR. JACKSON:  Dark pool --

14   interesting.  I feel like that's gotten some.

15         So cybersecurity, and I say with all

16   respect to the people in the room, to me this

17   is the thing we'll look back at ten years

18   from now and be like why didn't we, I think,

19   talk more about this.  I go to every

20   boardroom I talk to these guys are concerned

21   about it.  Like these are boards who are

22   trying to do the right thing, and the thing

23   you need to understand is that every single

24   American public company is under attack for

25   its data 24 hours a day, 7 days a week, 365

RPLI_SEC 1141349

1    days a year, and if they lose, millions of

2    Americans' data's lost in a way that will

3    seriously hurt them in their day to day lives

4    and more importantly will undermine their

5    confidence in giving information about who

6    they are and what they want to companies.

7            Companies are trying to fight this

8    every day, and there are state-sponsored

9    actors, there are people who are trading on

10   information based when they -- when they

11   hack.  And to me, how companies will be able

12   to address this is like the defining

13   challenge in the boardroom for the next five

14   years.  And the reason I think it's hard to

15   write about is that when you write about it,

16   typically what happens is someone gets

17   hacked.  And you write about the hack, and

18   it's a lot less interesting to talk about

19   what they could do to prevent it or what the

20   -- what as a nation we should be thinking

21   about doing in order to deal with these

22   problems.

23            Let me say -- I know we're over but

24   one more thing about this.  Like here's a

25   thought to go home.  We have a bunch of very

1    large companies that have lots of data on who

2    we are, and those are the stories -- I

3    understand those stories get print -- they

4    make sense.  But the way the data is used in

5    the American economy, if a midsized company

6    is hacked, that could hurt ordinary Americans

7    just as much, or small companies hacked, they

8    could have access to just as much important

9    data.  That's what's scary to me.

10          Google, I'm sure, without speaking of

11   Google -- a hypothetical company like Google

12   -- is on the cutting edge of protecting

13   itself.  I'm not so worried -- I'm worried

14   about the mid or small-sized company that's

15   got people's Social Security numbers that

16   could get hurt, and they are not going to be

17   able to make the investment that Google can

18   in protecting that information.

19          And my question for all of you is

20   shouldn't we be thinking as like a

21   marketplace about what we want to ask those

22   companies to do to protect themselves.  I

23   think in a few years we'll look back and say,

24   boy, we should have been more demanding about

25   getting company -- getting answers to those

1   questions, like what are you doing about

2   this, what are the investments, what are you

3   worried about, what are the risks?  We should

4   be getting more disclosures about when

5   companies get hacked and how that affects

6   ordinary people.

7           I've been a guy that's pushed very

8   hard for that and I'm -- I hope the press

9   will continue to dig into it because I think

10  it's going to be very important.

11          MR. PODKUL:  And with that, we'll

12  leave it there.  Thank you so much for

13  joining us.  We really appreciate it.  Yeah,

14  with that we're out of time, but the -- but

15  the open bar remains open for business.  So

16  please continue to mingle and network and see

17  you at our next event.  Thanks.

18          (End of Audio Recording.)

19

20

21

22

23

24

25

1                             CERTIFICATE

2

3              I, Wendy Sawyer, do hereby certify that I was

authorized to and transcribed the foregoing recorded

4

proceedings and that the transcript is a true record, to

5

the best of my ability.

6

7

8              DATED this 25th day of August, 2021.

9

10             _____

11

             WENDY SAWYER, CDLT

12

13

14

15

16

17

18

19

20

21

22

23

24

25