# Exhibit 242

Page 1

1

2

3

4

5

6

7       Robert Jackson, Commissioner of the SEC

8             Future of Fintech Conference

9             June 13, 2019 New York City

10  https://www.youtube.com/watch?app=desktop&v=5j9Pu9JQuTQ

11           Video Runtime:  18:40

12

13

14

15

16

17

18

19

20

21

22

23

24

25

RPLI_SEC 1141354

1          (Beginning of Audio Recording.)

2          MR. ARMSTRONG:  Morning, everyone, and

3    I know the schedule got a little bit

4    rearranged, but here we are.

5          I'm very pleased to be talking with

6    Commissioner Robert Jackson of the SEC, and

7    obviously there's a lot to discuss.  Robert,

8    if I can call you Robert, is one of the

9    crucial figures in the -- in market

10   regulation, and there's a lot to talk about.

11         I know many members of the audience

12   will be itching to talk about cryptocurrency,

13   but I'm going to start with a topic that's a

14   little closer to -- to my own interests.

15   You've written a great deal in -- about

16   securities markets and issues of fairness and

17   equity.  You've talked about low competition

18   and market makers charging rents, issues like

19   public versus private feeds and broker

20   rebates.

21         This is a technology conference.  Do

22   you think technology can help us solve some

23   of those problems you see in security markets

24   or is this purely a regulation problem and

25   needs to be solved by better and clearer

RPLI_SEC 1141355

1  regulation?

2       MR. JACKSON:  Oh, so I think

3  technology really is the key to solving these

4  problems.  So first of all, thanks so much

5  for having me.  Thanks so much, Rob, for --

6  for moderating.  I am delighted to have the

7  chance to talk with this group.  I feel like

8  if you're in this room, you're on the cutting

9  edge of the questions we're going to be

10 talking about, and that's why I wanted to be

11 here.

12      Let me answer your question directly.

13 I think a lot of the issues that plague our

14 capital markets today can be solved, will be

15 solved by technology, and the question isn't

16 if they will be solved by technology.  The

17 question is when.  So let me give a specific

18 example.

19      When I was -- before I became a

20 regulator, I was an investment banker.  I was

21 at Bear Stearns back in the day, not my

22 fault, and I pitched IPOs in 1998, 1999, and

23 2000.  That was my job.  I raised money.  And

24 when I did that, we had a fee that we charged

25 to take companies public, and it was seven

RPLI_SEC 1141356

 1  percent of the value of the firm.  It was not

 2  seven and a half percent, it was not six and

 3  a half percent, it was seven percent on the

 4  nose.

 5        And I remember being an investment

 6  banker -- my recollection was that at the

 7  time I didn't have an iPhone, I had a pager

 8  when I would go page (inaudible).  I remember

 9  thinking technology's going to solve this

10  problem.  And by the time I become, you know,

11  more senior in the firm, we're not going to

12  charge seven percent because people are going

13  to compete over taking companies public.

14        So I got to the SEC about a year ago,

15  and I had my economist run a study.  I said

16  I'd like to know what the fees are for taking

17  companies public in this country, and they

18  took a look at the data, and it turns out if

19  you take your company public today and you

20  raise less than a billion dollars if you're

21  not Facebook, you pay seven percent.

22  Everything in America has gotten cheaper --

23  phones, technology has advanced on every

24  possible front except for going public.

25  That's proof to me that we still have a long

1  way to go in the ways technology can help us

2  with our capital markets.  My -- my --

3         MR. ARMSTRONG:  And it was years ago

4  when Google tried to subvert some of that

5  process with its own offering and do its own

6  auction and cut some of the -- the high fee

7  bankers out.

8         MR. JACKSON:  Yep.

9         MR. ARMSTRONG:  But it didn't work.

10        MR. JACKSON:  That's exactly right.

11  What Rob is referring to is back in 2004,

12  Google took a very different approach to

13  their IPO process, and a lot of people hoped,

14  myself included, that that might lead to some

15  change.  But I don't need to tell all of you

16  that the interests in finance that want to

17  collect those fees are entrenched and

18  powerful, and that kind of change takes time.

19        But I don't think you -- it's credible

20  to tell American investors that an IPO should

21  cost the same amount today and we should use

22  the same process for going public today that

23  we did in 1998, and because eventually

24  technology will provide those solutions, it's

25  going to be easier for companies to go public

1  and raise capital, and in my view that's the

2  future of finance.

3       MR. ARMSTRONG:  And so how do you

4  release competition not only among investment

5  banking firms but among market making firms

6  that -- that is another deadweight cost, as

7  it were, that investors have to pay?

8       MR. JACKSON:  Yeah.  Well, one of the

9  most astonishing things that I've noticed in

10 my time at the SEC is the state of our stock

11 markets.  So here's an interesting fact about

12 American stock markets.  There are 13 public

13 lit what are called public stock exchanges in

14 the United States, which makes it sound like

15 there's a lot of competition, right?  I mean,

16 13 competitors.  You know, these days in

17 America, that's a lot of competition.

18      MR. ARMSTRONG:  Yeah.

19      MR. JACKSON:  Of those 13, 12 of them

20 are owned by three conglomerates.  Now, it is

21 a very interesting model for a former M&A

22 banker for you to buy all the competition in

23 your industry and keep running those

24 businesses.  That's a strange thing.  Usually

25 what you do is consolidate it --

RPLI_SEC 1141359

```
 1            MR. ARMSTRONG:  Yeah.
 2            MR. JACKSON:  -- and you shut them
 3  down, economies of scale in scope and such.
 4  But in our stock markets what happened is the
 5  exchanges continue to operate those small --
 6  those smaller lit exchanges, and the reason
 7  is because investors pay fees to access, to
 8  connect, to get data from those exchanges,
 9  and those fees are extremely profitable for
10  the exchanges.
11            MR. ARMSTRONG:  Yes, and they're
12  duplicative.
13            MR. JACKSON:  Exactly.
14            MR. ARMSTRONG:  You have to pay for
15  each one.
16            MR. JACKSON:  Exactly.  So one of the
17  -- I -- when I got to my job, I sort of
18  looked at the state of the stock market and
19  said, given the technology we have and given
20  that we are the most -- the deepest, most
21  liquid capital markets in the world, is this
22  really the best we can do in terms of the
23  kinds of competition we want to see on things
24  like the fees that are charged investors?
25            I'm very proud of the fact that we at
```

1    the SEC have, for the first time, pushed back

2    on stock exchanges trying to raise those

3    fees.  I mean, after all, it's called the

4    Securities and Exchange Commission.  We're

5    supposed to oversee what the exchanges do,

6    and for years we more or less gave approval

7    to almost anything they wanted to do.

8         But last year for the first time, we

9    took off the kid gloves, and we forced them

10   to show that competition was leading them to

11   increase prices, not their market power.  I'm

12   very proud of that work, and it's still

13   ongoing.  We're doing a lot to make sure

14   exchanges have to prove that they're adding

15   value for investors.

16        MR. ARMSTRONG:  Are there other things

17   you think the SECOND -- or for that mother

18   matter, other regulators -- can do to improve

19   the -- to turn up the dial on competition in

20   markets?

21        MR. JACKSON:  Yes, so a couple of

22   quick things about that.  First of all, we

23   are doing at the SEC an experiment I'm very

24   proud of.  It's called the transaction fee

25   pilot, and what we're studying is the fees

1    that are paid to certain market participants

2    for bringing their business to a particular

3    exchange.  And here's what I like about that.

4    It's a data-driven project.  We're not

5    speculating about whether the fees are good

6    or bad.  We're experimenting to see how they

7    affect liquidity, and using those data, we

8    may or may not make the policy changes that

9    folks have been calling for.

10        I think the answer to your question is

11   given the technology we have, it's -- the big

12   data is so powerful, we have a responsibility

13   as regulators to let the facts drive our

14   choices.  So that's a project that we're

15   doing.  We announced it a few months -- it's

16   subject to litigation so I can't say too much

17   more, but I'm very proud of it and I expect

18   that it's going to move forward soon.

19        MR. ARMSTRONG:  I know that you at the

20   SEC, in cooperation with the Financial

21   Stability Oversight Council, have been having

22   a close look at what happened in the markets

23   in December, and we had a pretty rocky couple

24   of weeks there in the equity market, and

25   there are still a lot of questions about

1    whether quant funds, automated trading, all

2    of that, contributed to the market

3    turbulence.  Have you come to any

4    conclusions, have any thoughts?  Give us an

5    update on what you found in the kind of anti-

6    market events part -- part of your job.

7         MR. JACKSON:  Sure.  So this is a --

8    this is an area where technology has allowed

9    us to do things we could never have done

10   before.  So when we study a market event at

11   the SEC, we have tremendous staff.  We're

12   able to dive into the data and try and figure

13   out what happened.

14        Like for example, in December when

15   people were moving toward quality and out of

16   certain kinds of securities, what market

17   makers stepped up, which ones didn't, why and

18   how did their exit affect the rest of the

19   market?

20        MR. ARMSTRONG:  I'm sure it was the

21   same market makers who always step up.  None

22   of them.

23        MR. JACKSON:  Yeah, that's what market

24   makers do for a living.

25        MR. ARMSTRONG:  Yes.

1           MR. JACKSON:  Yeah, no.  So I think

2    fundamentally, the answer to your question is

3    we're able to understand this in a way we

4    couldn't because we had big data at our

5    disposal.

6           Now, here's one thing I want to say

7    about this.  You guys remember the flash

8    crash a few years back.  After the flash

9    crash, we -- the SEC stepped up and said we

10   need a way to audit on a position by position

11   basis who did what in these kinds of events

12   so we can understand what happened, why there

13   was a flash crash.

14          We announced what was called the

15   consolidated audit trail several years ago.

16   It's still not complete.  I have to say that

17   the chairman I work with, Jay Clayton, has

18   done great work in pushing it forward.  We

19   have to get that stood up because all of you

20   know that if something happens in the market

21   and our answer is not, oh, we don't have the

22   data to study this, you'll all be skeptical

23   because we have data on everything in the

24   world right now.  And saying you don't have

25   the data is no longer good enough.

 1   Regulators have to be able to have their

 2   hands on exactly what happened.

 3         MR. ARMSTRONG:  So how close are we on

 4   the consolidated audit trail?

 5         MR. JACKSON:  So I believe -- my -- my

 6   current sense, we have somebody we've just

 7   brought into the agency who's sort of in the

 8   job of being the cat czar, and I think she's

 9   doing tremendous work.  She's been pushing

10   them forward.  I'm hoping that by the end of

11   the year, we'll have some good news on that

12   front, and then in 2020 I think we're going

13   to have a more complete data set we'll be

14   able to use.

15         MR. ARMSTRONG:  Very good.  Now, I

16   don't want to bring up a sensitive topic, but

17   one of your colleagues a little while ago

18   described you as a helicopter parent when she

19   was describing your attitude towards the

20   question of whether cryptocurrencies should

21   be regulated as securities, how they should

22   be regulated.  How do you -- as speaking as a

23   helicopter parent or perhaps a tiger mom, how

24   do you -- how do you respond to that point

25   that you've been a bit of a wet blanket in

1  this -- now I'm really piling on the insults.

2  I'm sorry.  But how do you respond to that?

3        MR. JACKSON:  So first of all, it just

4  so happens I'm getting married a week from

5  today.

6        MR. ARMSTRONG:  Congratulations.

7        MR. JACKSON:  Thanks, man, thank you.

8  Is it that surprising?  I'm getting married a

9  week from today, so I'm not a parent at all,

10  unless you know something I don't.

11        MR. ARMSTRONG:  Yeah.

12        MR. JACKSON:  The comment -- the

13  comment you're referring to, it's -- it's

14  really an interesting question, such an

15  exciting time to be in this room and to be at

16  the SEC because a lot of new technologies, a

17  lot of new ways to raise money have come

18  before us, and the question that's being

19  asked is what should our view be about, take

20  for example, an ETF that's going to have as

21  an underlying asset cryptocurrency.  Or how

22  should I think about an ICO? A

23        And one of the things that's fun about

24  that is we have to take principles that are

25  80 years old, 90 years old, and apply them to

1   this brand-new technology.  And we often

2   disagree about exactly how to do that.

3        I do have a colleague who has been

4   sort of forthright about her view we should

5   let a thousand flowers bloom, and regulatory

6   involvement can skew the choices markets make

7   et cetera.

8        My own view -- that -- that's --

9   that's true, but in my view, an unhelpful

10  observation in terms of making decisions

11  because we fundamentally have to make choices

12  about what Americans can and should invest

13  in.  And that doesn't make us a merit

14  regulator.  That doesn't make us -- we don't

15  choose exactly the choices the markets make.

16  We let the markets do that.

17       But there are basic requirements of

18  markets that are not yet met in those -- in -

19  - in some of those spaces.  So you need to be

20  able to have enough liquidity that the market

21  can't be manipulated with a very small amount

22  of money.  You need to have enough

23  transparency in the kinds of trading that's

24  happened -- happening to make sure investors

25  understand what they're getting.

1          You have to have enough market making

2     so that you know that people are getting a

3     fair price when they buy and sell, and that's

4     why I think we have not -- we've been

5     forceful about not approving every

6     application that's come before us.

7          We had one ETF Bitcoin proposal last

8     year where some folks wanted to have an

9     exchange-traded fund underlying Bitcoin, and

10    we denied the application.  My colleague

11    dissented and those -- that was in connection

12    with some of the remarks you mentioned.  But

13    I didn't think that was a difficult case, and

14    I'll say why.

15         There was not a tremendous amount of

16    transparency in the market where -- it was

17    being traded overseas.  There was not a lot

18    of liquidity in those markets, and I didn't

19    have the least bit of confidence that someone

20    trading in that ETF would know that they were

21    getting the right price for what they -- for

22    when they bought and sold.

23         When the markets reach that stage, I

24    fully believe you'll have an SEC that's ready

25    to move forward with them.

1          MR. ARMSTRONG:  So there's nothing in

2     the nature of a cryptocurrency, the nature of

3     the asset itself, that gives you pause.  It's

4     the structure of the markets those assets are

5     traded in rather than features of the asset

6     itself?  Is that fair to say?

7          MR. JACKSON:  Well, that's exactly

8     right.  That's very fair, Rob, and let me add

9     one more about crypto in particular.  The

10    other question we face that is very

11    challenging is is this a security and to what

12    degree is it a security under the securities

13    laws.

14          And I think -- I'll be honest.  I

15    think my colleagues have done a great job

16    about this.  The director of our division of

17    corporation finance is a man named Bill

18    Henman who did an -- he gave a speech where

19    he laid out here's how we think about this

20    and gave a set of principles that the market

21    can follow in understanding here's how you

22    know if you have a security or if you don't.

23          Now, we haven't answered every

24    particular question, but we've answered a

25    lot, and I'll say one more thing about this.

1    Early in this market, some lawyers out on the

2    West Coast, in my view, got out ahead of

3    their skis.  They gave advice that these

4    things were not securities, and candidly my

5    reaction as a lawyer and human was reading

6    that advice, it was aggressive.

7           As a result of that, the regulator has

8    a job to do, which is to say to the bar you

9    know the principles here, you know the rules

10   of the game, and you should apply them

11   carefully and faithfully to the advice you're

12   giving.  And I think we -- Henman's speech

13   and -- and the Chairman's work in this has

14   moved the market forward a great deal.

15          MR. ARMSTRONG:  I want to talk about

16   another application of the underlying block

17   -- blockchain technology that we haven't

18   discussed, which is there's a lot of

19   optimism, and I don't know to the degree

20   you're concerned about this -- that

21   distributed ledger technology will make it

22   possible to both shorten the time and expense

23   of clearing and settling trades.  Are -- are

24   clearing and settling costs and time, is that

25   within your ambit as a regulator, and do you

1  think that the new technologies have

2  potential to bring -- take those costs out of

3  the market?

4      MR. JACKSON:  Yes and yes.  So I think

5  -- you know, one funny thing about blockchain

6  and -- and the technology underlying virtual

7  currency, for example, is as an -- as an

8  admirer of technology, I think it's

9  extraordinary, and the potential is

10  incredible.  I mean, you mentioned settlement

11  and clearing.  For sure, that will be in our

12  ambit, but let's talk about other -- I mean,

13  think about its applications for audit, for

14  tracking and dealing with voting, for smart

15  contracting.

16      I mean, when you think about the power

17  of this technology, about having objective

18  verification of steps and trends, it's

19  enormously powerful.  And I have to be honest

20  with you, speaking just as a -- as an

21  observer of technology, it wasn't obvious to

22  me the best application of this technology

23  would be money.  I mean, I'm cool with that,

24  but it wasn't obvious to me that that would

25  be the most powerful application.  I would --

1   I would think these other applications would

2   be powerful.

3          I think that what we're going to see

4   in the next three to five years is people

5   taking that technology and moving it to

6   places where it can be even more powerful,

7   like settlement and clearing, for example,

8   where the days' long process it sometimes

9   takes to clear a transaction can be shortened

10  to not just hours, seconds.

11         MR. ARMSTRONG:  Yeah.

12         MR. JACKSON:  And that will make our

13  financial markets much more liquid, and I

14  think it'll add a lot of value for investors.

15         MR. ARMSTRONG:  Very good.  CEOs of

16  publicly traded companies (inaudible) are

17  communicating in different ways, and there

18  was a now famous back-and-forth last year

19  between Elon Musk and his conversation on

20  Twitter and so forth.

21         Now you weren't happy with the

22  settlement -- publicly unhappy with the

23  settlement.  Can you lay  -- that -- that was

24  reached with Mr. Musk.  Can you lay out some

25  principles for us or guardrails that you

1    think are appropriate for CEOs who are now

2    communicating on social media?  And they

3    don't show any signs of stopping either.

4        MR. JACKSON:  Right.

5        MR. ARMSTRONG:  So we're going to have

6    to think about this some more. I

7        MR. JACKSON:  It's a great, great

8    question, Rob.  I mean, so about, you know,

9    the particular -- I can't say much about

10   particular matters.  I will say that what's

11   important to me is that the legal principles

12   we've always had in the securities markets

13   apply to all the sort of innovative things

14   that are happening, including CEO

15   communications by social media.

16        And candidly, I think it might be time

17   for some guidance there.

18        MR. ARMSTRONG:  Yes.

19        MR. JACKSON:  It might be time for the

20   SEC -- I'm -- you know, without prejudging

21   any particular matter, might be time for us

22   to come forward and say here are some

23   principles of this game.

24        Now, in the meantime, let me say we

25   have some.  The principles that have always

 1   governed public communications about material

 2   information related to the firm apply to

 3   Twitter and -- and social media

 4   communications, as well, and I think we've

 5   made that clear in that and other cases.

 6        Your question, which is very fair, is

 7   okay, but Twitter is a little different.

 8   It's immediate, it's informal, it can be

 9   responsive.  There can be retweets, there can

10   be a conversation in ways that are not

11   contemplated by every single rule that the

12   SEC has put out.  And that's why I think you

13   might be right that it might be time for us

14   to step up and set some clearer rules of the

15   game for when a CEO gets on Twitter.

16        MR. ARMSTRONG:  Yes.

17        MR. JACKSON:  Because what I hear from

18   the marketplace is investors want to hear

19   from their -- from CEOs and of course they

20   should.

21        MR. ARMSTRONG:  Yes.

22        MR. JACKSON:  CEOs want to share what

23   they can within the bounds of the law, and of

24   course they should.  The question is how can

25   we do that in a way that protects investors

1   and I think you might be right, it's time to

2   say more about that.

3          MR. ARMSTRONG:  You have been a strong

4   voice on a lot of these issues, and those of

5   us who cover the markets have appreciated

6   that.  Your term has expired technically; am

7   I right about that?  Can you tell me anything

8   about your plans?  I know you've been a

9   little tight-lipped about it, but I'm curious

10  to hear, what's -- are you -- are you going

11  to hang around at the SEC?  Are you on to new

12  things?

13         MR. JACKSON:  I'm just getting

14  married, man.  I mean, get me past that, and

15  I'll be a happy guy.

16         MR. ARMSTRONG:  Okay, no, that's --

17  that's absolutely -- absolutely fair enough.

18  Well, on that extremely happy note, please

19  join me in thanking Commissioner Robert

20  Jackson for speaking.

21         MR. JACKSON:  Thanks so much, folks.

22  Enjoy the conference.  Thank you.  Oh thanks,

23  Rob.  That was very -- thank you.

24         (End of Audio Recording.)

25

1                        CERTIFICATE

2

3          I, Wendy Sawyer, do hereby certify that I was

    authorized to and transcribed the foregoing recorded
4
    proceedings and that the transcript is a true record, to
5
    the best of my ability.
6

7

8          DATED this 25th day of August, 2021.

9

10

11          _____

12          WENDY SAWYER, CDLT

13

14

15

16

17

18

19

20

21

22

23

24

25

RPLI_SEC 1141376