# Exhibit 243

# Speech

# Remarks at the "SEC Speaks" Conference 2022



**Commissioner Mark T. Uyeda**

**Washington D.C.**

**Sept. 9, 2022**

Good morning and thank you, Gurbir [Grewal, Director, SEC Division of Enforcement], for that kind introduction.[1] I am pleased to join you for the first SEC Speaks Conference to be conducted in-person since the start of the pandemic.

During the past two-and-a-half years, we have used new methods to communicate and work with each other. Our ability to improvise, adapt, and overcome has allowed our economy to sustain itself during this period. Importantly, robust and efficient capital markets have played a key role in fostering innovation and creativity, which has resulted in new services and products to address the challenges of the pandemic.

While I have attended SEC Speaks in the past, today is the first where I have the privilege of addressing you. With this appearance coming slightly over two months since I was sworn into office as a Commissioner, it is an opportune time to describe the factors and principles that will guide how I will approach upcoming policy decisions.

My views have been shaped by my professional experience. For nearly nine years, I was in private practice drafting securities offering disclosures as well as preparing periodic reports and proxy statements. As a state securities regulator, I witnessed some of the most egregious retail-level frauds and their impact on investors, but I also observed firsthand inspiring stories of entrepreneurs seeking capital. For nearly 16 years at the Commission, I have been involved in rulemaking, ensuring that such efforts complied with the Administrative Procedure Act, including a robust consideration of all public comments and a comprehensive economic analysis.

***The SEC's Tripartite Mission is My Foundation***

Maintaining a focus on investor protection, capital formation, and fair and orderly markets will promote high quality regulatory standards. Although

capital markets have grown increasingly complex, our mission remains the same as it did when the SEC was first created.[2] Ferdinand Pecora, an early architect of the SEC, put the following question to the Convention of the Farmers Union of Iowa while speaking in 1934: "[w]hat are the objectives of the Securities Act of 1933?" His response was: "[t]o see it that those who issue securities and offer them for sale to the public, shall first tell the truth and the whole truth to the public with respect to these securities." This observation remains true today and should guide our regulatory responses through both calm and turbulent markets.

### Prioritize Effective and Cost-Efficient Regulations

I analyze regulations using a two-by-two matrix. One axis is labeled whether a regulation is effective or ineffective. The other axis is labeled whether a regulation is costly or not costly. Thus, one can categorize a regulation into one of four boxes.

The Commission – and any regulator – should strive for regulations that are effective and not costly. This box contains regulations that address the identified problem and do so at the lowest possible cost.

The second box contains regulations that are effective, but costly. These regulations may resolve the identified problem, but at a significant cost. The goal of a responsible regulator should be to modify these types of regulations and shift them to the first box. A solid economic analysis can enable a regulator to distinguish between approaches that are effective and efficient, on the one hand, and effective but costly, on the other.

The third box contains regulations that are ineffective but not costly. Given the thousands of pages of SEC rules contained in the Code of Federal Regulations, many of which have not been scrutinized for effectiveness for decades, I fear that a large number may fall within this box.[3] However, as the rules are not particularly costly from a compliance perspective, further reform or removal may not be at the top of the regulatory agenda.

That brings us to the final box – regulations that are ineffective and costly. These rules must be avoided. The ultimate cost of such rules falls not on Wall Street or corporations, but on investors and the public. More importantly, investors and the public will still remain vulnerable to the very concern that such rules were intended to address.

As I evaluate the proposals on the Commission's regulatory agenda, and the various choices presented thereunder, this two-by-two matrix will frame my analysis.

### Limited Scope and Regulator Independence

Financial regulators – including the SEC, the Commodity Futures Trading Commission, and the Federal Trade Commission – have a unique place in our constitutional structure. Although part of the Executive Branch, they are not subject to direct control by the President in the same manner as the Department of Justice, the Department of Labor, or the Department of

Commerce.

The Commission is structurally designed to promote regulation that is the product of consideration by five individuals with different perspectives. The underlying statute that created the Commission requires that the commissioners come from different political parties, with no more than three being from the same party.[4]

I view this arrangement as creating a basic bargain that the SEC will enjoy a degree of independence and insulation from political accountability to the voters, but in return, will have a narrow scope of responsibilities.

The lack of political accountability, however, can make it tempting to use the federal securities laws to alter or influence general business conduct or to resolve pressing societal concerns, in the absence of financial materiality. Taken to an extreme, "everything everywhere is securities fraud."[5]

I disagree with that view. The Commission best serves the American public when it works within the statutory framework enacted by Congress and the limitations imposed by the courts. The Commission is not well-suited, nor should it attempt to resolve, complex societal questions that do not relate to financial market practices. Those questions are best addressed by the legislature.

### *Economic Analysis is Important and Should Consider the Effects of Multiple Overlapping Rule Proposals*

Final rules should result from careful and thoughtful analysis, including sufficient time for the public to comment on a proposal. The Commission should ensure that rulemakings consider all known economic impacts, including the cumulative impact of concurrent rulemakings. While individual regulations may not be costly, when aggregated they may impose significant compliance costs for firms and individuals.

The Commission staff's guidance on economic analysis sheds light on how to carry out this exercise. That guidance states that an economic analysis compares "the current state of the world, including the problem that the rule is designed to address, to the expected state of the world with the proposed regulation (or regulatory alternatives) in effect."[6] The guidance further states that proposing releases should include "a discussion of any existing studies or data that bear on the proposal so that the public knows what studies or data we are relying on, can comment on it, and can provide additional data relevant to the topic."[7] This is an important component of the rulemaking process, and one that should underpin our decision-making.

### *Don't Take Steps that Deter Robust Public Comment*

Several rulemaking proposals issued by the Commission in 2021 and in early 2022 had a comment deadline of only 30 days after publication in the Federal Register, which I view as insufficient under the

circumstances. The 30-day comment period stands in contrast to executive orders issued by the administrations of President Clinton, President Obama, and President Biden, all of which recognized the importance of a 60-day comment period.[8] A comment period of *at least* 60 days is also endorsed by the Administrative Conference of the United States for significant regulatory actions.[9]

The Commission recently finalized a proposal that had a short 30-day comment period.[10] In that case, the Commission proposed amendments on November 18, 2021 and comments were due by December 27 of that year.[11] This period overlapped with major holidays. It also fell during the first holiday season since the rollout of COVID vaccines, which allowed families to gather for the first time since the start of the pandemic.

The short comment period likely deterred some interested persons from submitting comment letters. It may have also resulted in the Commission seeing a narrower picture of the public concerns and failing to capture relevant data and perspectives. Short comment periods are also inappropriate when the Commission is asking for public comment on multiple proposals affecting the same stakeholders at the same time or in short order.

### *Don't Take Rulemaking Shortcuts*

As a rulemaking convention, staff practice has been generally to recommend re-proposal if more than five years have elapsed since the original proposal. Yet, the Commission has instead recently decided to simply reopen the comment period for several proposals that were past the five-year expiration date.[12]

These reopening notices went even further and introduced new regulatory alternatives. The reopening notices, however, did not provide any accompanying economic analysis or examine the effects that such alternatives may have on smaller entities. In other words, the Commission used procedural shortcuts that undercut the robust notice-and-comment process required by the Administrative Procedure Act.[13]

One example was the proposal to implement the Dodd-Frank Act's pay versus performance requirement, initially issued on April 29, 2015.[14] On January 27, 2022, the Commission reopened the comment period on the proposed rule.[15] The reopening notice did not update any economic analysis, benefits and costs discussion, or analysis required by the Paperwork Reduction Act[16] and the Regulatory Flexibility Act.[17]

The failure to update the economic analysis from the 2015 proposal was problematic because significant parts of the data justifying the original proposal were from 2010 and 2012, while other data was from the period between 1997–2008.[18] Yet, the adopting release contained an economic analysis using data from 2020 – one that the public had never seen, or been given the chance to comment on.[19]

### *Avoid Issuing New Interpretations through Enforcement Actions*

Rulemaking can be challenging and time-consuming. It may be tempting to develop "new" interpretations of existing statutes and rules and apply them through enforcement action. This temptation should be avoided.

One significant shortcoming of regulation by enforcement is that it fails to provide a mechanism for the Commission to consider the views by market participants, which can result in a myopic approach. In contrast, through the rulemaking process, the public can provide their perspectives on market practices and developments, leading to an informed regulatory response. Regulation through litigation fails to provide these important inputs that result in better crafted rules.

Additionally, regulation by enforcement fails to provide the nuanced and comprehensive guidance that allows market participants to tailor their practices, and instead requires regulated entities to divine how the facts and circumstances of another case apply to their own business model. Market participants should be able to look to the Commission's rules rather than compare how their particular facts and circumstances may differ from those in a specific enforcement case. This principle, while often requiring a longer timeline, and more deliberation, often results in a more transparent and understandable regulatory framework.

### *Be Willing to Tackle the Big, Difficult, and Complex Issues*

Today, one big, difficult, and complex issue that is conspicuously absent from the Commission's published regulatory agenda is how to regulate crypto assets and related services. Market participants have expressed significant concerns regarding the lack of regulatory guidance in this space. There is a widespread concern that the lack of predictability with regard to our regulation may encourage crypto firms to relocate to other jurisdictions.

There are two major issues and areas of uncertainty: does the crypto asset constitute a security and, if so, how do market participants comply with the federal securities laws and the Commission's rules. To date, the Commission's views in this space have been more often expressed through enforcement action. This is an example of a situation where regulation through enforcement does not yield the outcomes achievable through a process that involves public comment.

Without the benefit of comments from crypto investors and other market participants, the Commission is unable to consider their perspectives in developing an appropriate regulatory framework. To the extent that crypto assets raise unique issues not otherwise addressed in the current rule book, the Commission should consider proposing rules or issuing interpretive releases.

* * * * *

Thank you for listening to my thoughts this morning, even if you will not be receiving CLE credit for it! I want to acknowledge the many hard-working members of the SEC staff who have contributed to the presentations and materials for this conference. It has been a privilege

and an honor to call them colleagues and friends. I have seen firsthand their dedication to serve the public by creating robust, dynamic, and resilient markets that work for all Americans.

---

[1] The views I express today are my own and do not necessarily reflect those of the Commission or my fellow Commissioners.

[2] *See, e.g.,* Act of June 6, 1934, Public Law No. 73-291, 48 STAT 881 ("to provide for the regulation of securities exchanges and of over-the-counter markets operating in interstate and foreign commerce and through the mails, to prevent inequitable and unfair practices on such exchanges and markets, and for other purposes.")

[3] The 2021 version of Title 17 of the Code of Federal Regulations for Commission rules covers 922 pages in volume3, 798 pages in volume 4, and 574 pages in volume 5. *See* https://www.govinfo.gov/app/collection/cfr/2021/.

[4] 15 U.S. Code § 78d.

[5] Matt Levine, Bloomberg News, *Everything Everywhere Is Securities Fraud* (June, 26, 2019) (discussing views of U.S. federal securities laws that treat any negative event affecting a U.S. public company as securities fraud) available at https://www.bloomberg.com/opinion/articles/2019-06-26/everything-everywhere-is-securities-fraud.

[6] Memorandum from the Division of Risk, Strategy, and Financial Innovation and the Office of the General Counsel, Current Guidance on Economic Analysis in SEC Rulemakings (Mar. 16, 2012), at 21, available at https://www.sec.gov/divisions/riskfin/rsfi_guidance_econ_analy_secrulemaking.pdf.

[7] *Id*. at 16.

[8] Executive Order 13563, Improving Regulation and Regulatory Review (Jan. 18, 2011) [76 Fed. Reg. 3821 (Jan. 21, 2011)]; *see also* Executive Order 12866, Regulatory Planning and Review (Sept. 30, 1993) [58 Fed. Reg. 51735 (Oct. 4, 1993)] ("each agency should afford the public a meaningful opportunity to comment on any proposed regulation, which in most cases should include a comment period of not less than 60 days"); Memorandum for the Heads of Executive Departments and Agencies, Modernizing Regulatory Review (Jan. 20, 2021) [86 Fed. Reg. 7223 (Jan. 26, 2021)] ("This memorandum reaffirms the basic principles set forth in [Executive Order 12866] and in Executive Order 13563 of January 18, 2011 (Improving Regulation and Regulatory Review), which took important steps towards modernizing the regulatory review process. When carried out properly, that process can help to advance regulatory policies that improve the lives of the American people.").

[9] *See* Administrative Conference of the United States, Rulemaking Comments, Recommendation No. 2011-2 (June 16, 2011), available at https://www.acus.gov/recommendation/rulemaking-comments.

[10] Mark T. Uyeda, Statement on Final Rule Amendments on Proxy Voting Advice (July 13, 2022), available at https://www.sec.gov/news/statement/uyeda-statement-amendments-proxy-voting-advice-071322.

[11] *See* Proxy Voting Advice, Release No. 34-93595 (Nov. 17, 2021) [86 FR 67383 (Nov. 26, 2021)].

[12] *See* Reopening of Comment Period for Pay Versus Performance, Release No. 34-94074 (Jan. 27, 2022) [87 FR 5751 (Feb. 2, 2022)], available at https://www.sec.gov/rules/proposed/2022/34-94074.pdf; Reopening of Comment Period for Listing Standards for Recovery of Erroneously Awarded Compensation, Release No. 33-10998 (Oct. 14, 2021) [86 FR 58232 (Oct. 21, 2021)], available at https://www.sec.gov/rules/proposed/2021/33-10998.pdf; Reopening of Comment Period for Universal Proxy, Release No. 34-91603 (Apr. 16, 2021) [86 FR 24364 (May 6, 2021)] available at https://www.sec.gov/rules/proposed/2021/34-91603.pdf (collectively, "reopening notices").

[13] *Id.*

[14] Pay Versus Performance, Release No. 34-74835 (Apr. 29, 2015) [80 FR 26329 (May 7, 2015)] ("2015 Proposal"), available at https://www.sec.gov/rules/proposed/2015/34-74835.pdf.

[15] Reopening of Comment Period for Pay Versus Performance, Release No. 34-94074 (Jan. 27, 2022) [87 FR 5751 (Feb. 2, 2022)] available at https://www.sec.gov/rules/proposed/2022/34-94074.pdf.

[16] 44 U.S.C. 3501 et seq.

[17] 5 U.S.C. 603(a).

[18] 2015 Proposal at n. 132 (the 2015 Proposal acknowledges the data may not reflect practices at the time the 2015 Proposal was published).

[19] Pay Versus Performance, Release No. 34-95607 (Aug. 25, 2022) [87 FR 55134 (Sept. 8, 2022)], available at https://www.sec.gov/rules/final/2022/34-95607.pdf.