# Exhibit 244

# Speech

# Paper, Plastic, Peer-to-Peer


**Commissioner Hester M. Peirce**

**March 15, 2021**

## Remarks at the British Blockchain Association's Conference
## "Success Through Synergy: Next generation Leadership for Extraordinary Times"

Thank you to the British Blockchain Association for including me in today's conference. I will begin with my standard disclaimer that the views that I represent are my own and not necessarily those of the Securities and Exchange Commission or my fellow Commissioners.

Talking about government money may not be the best way to start remarks at a blockchain conference, but that is exactly where I am going to begin. In 2017, the United Kingdom began issuing a plastic ten pound note with an image of author Jane Austen on the back. The Bank of England's website explains that she "provided astute insights into 19th century life, often praising the virtues of reason and intelligence and highlighting some of the barriers that society erected against the progression of women."[1]

The United States also is readying a new bill featuring a prominent, establishment-challenging woman—Harriet Tubman will soon grace our $20 bill. Born several years after Jane Austen died, Ms. Tubman's stand against barriers 19th century American society erected against the progression of Black Americans and women was literal, and not merely literary, although she was a noted speaker. She brought herself and many other enslaved Americans to freedom through a remarkable combination of intelligence, courage, faith, boldness, diverse expertise, fearlessness, hard-won experience, strength, resilience, and cooperation with others active in the abolitionist movement.[2] These traits and experiences later equipped her to serve in the Civil War as a scout, nurse, cook, and even military expedition leader. Tubman's commitment to liberty was not abstract, but personal and life-changing to each of the individuals whom

she led on a grueling march to freedom.

It is going to be wonderful to have Harriet Tubman's likeness on our paper money. Individual liberty, something to which she was so deeply committed, also is being memorialized in non-sovereign money. Tubman died almost a hundred years before bitcoin's birth, but had crypto been around when she was alive, could it have benefited her and others in similar life- and liberty-threatening situations? Getting money quickly was often a matter of life or death for the people whom Tubman was trying to save or support. Moving money around was difficult, expensive, and risky. Tubman was often traveling—back to the Eastern Shore of Maryland to liberate more people, to Canada to visit family and friends she had helped to freedom, around the Northeast to raise money to fund living expenses, future trips, and humanitarian relief efforts, or to the South to work for the Union Army.[3] People, some of them overseas, sent money to friends they thought she was going to visit on these travels. There were delays and risks associated with transmitting money in the 19th century, including risks of the money not reaching its intended recipient because it was lost or stolen along the way. Getting money to her family and friends back in Maryland was probably difficult, impossible, or illegal. Carrying a lot of money around was risky. A peer-to-peer tool that enabled easy-to-store money to reach people almost instantaneously where they were, without having to pass through the hands of an untrustworthy or expensive intermediary could have been helpful.

It is common to hear government officials worrying about crypto's use by criminals, even though the numbers suggest that it is used for illicit purposes less often than cash is.[4] Perhaps, government officials should pause to consider the flip side of crypto—its value in protecting people from illicit activity. Because of its ability to reach people without intermediaries and its ease of storage, transport, and access, crypto can be an important part of the survival story of people living under the threat of harm by their families, people in their communities, or repressive governments.[5]

The disproportionate focus on illicit uses and the underestimation of the protective uses of crypto is one example of how evidence-based rulemaking is not yet the norm in crypto-regulation. We can do better, and I hope that this year will mark a turning point for the United States, which in turn may spur other countries similarly to take a more sensible approach to crypto regulation. The SEC faces several challenges and corresponding opportunities in regulating blockchain-based assets and technologies. While the specifics will not be the same for other jurisdictions, some of the general regulatory principles likely are applicable despite jurisdictional differences.

To start, remembering first principles can help us to focus our efforts on the appropriate objectives. The role of government should be to serve people, not to surveil and curtail people's everyday activities. Of course, government has an important role in setting regulatory guardrails to ensure that people do not harm one another, but these guardrails should

support people's ability to exercise their liberty in a way that serves them, their families, and their communities. To the extent crypto and decentralizing technologies allow people to do these things without harming others, we as regulators should work so that they have the freedom to experiment with these technologies. Many experiments with any new technology will fail, but failures can help point the way to future successes, so broad room for experimentation—with appropriate protective measures to reduce and mitigate harm—is paramount. Experimentation can teach both regulators and market participants important lessons.

Recently, the SEC initiated a pilot program that seeks to facilitate innovation with respect to digital asset securities.[6] For a period of five years, a broker-dealer operating under specified conditions, including limiting its business to digital asset securities, will be able to take physical possession or control of customer digital asset securities for the purposes of Rule 15c3-3(b), which is the customer protection rule under the Securities Exchange Act.[7] Along with providing this relief, we asked a number of questions "to gain additional insight into the evolving standards and best practices with respect to custody of digital asset securities."[8] This experiment is limited because of the differences between the way digital asset securities and traditional securities are issued, held, and transferred and the unique challenges in demonstrating control over digital asset securities. Some of the conditions on the relief are relatively straightforward and should not be too burdensome. For example, the broker-dealer would have to assess "the characteristics of a digital asset security's distributed ledger technology and associated network,"[9] have policies for establishing exclusive control over the digital asset securities, and have a plan for safeguarding the digital asset securities in the event of the broker-dealer's liquidation. Other limitations are less workable. Participating broker-dealers, for example, cannot hold digital assets unless they are securities, which means that people cannot pay for the digital asset securities with stable coins, bitcoin, ether, or some other crypto currency. We have gotten early feedback in response to the request for comments that accompanied the announcement of the pilot program, and I hope we will get more so that we can craft a more workable long-term way for broker-dealers to interact with digital assets.[10]

While regulators need to understand and scrutinize new asset classes and technologies, excessive conservatism can impede competition, distort the market, and harm investors. The SEC, for example, has hesitated to greenlight investment products that incorporate bitcoin—let alone other cryptocurrencies. This approach is inconsistent with our limited role as a *disclosure* regulator, rather than a more interventionist merit regulator. Although well-intentioned, our wariness with regard to crypto deprives investors of access to products and services that they want. Moreover, caution-motivated delay makes it more difficult for us to change course should we decide to do that. If we have said no to one product sponsor, how can we say yes to another seeking to offer a similar

product? Meanwhile, the market engineers around our denials by creating substitutes that do not require SEC approval.

The example of this phenomenon about which I am most often asked is the bitcoin exchange-traded product ("ETP"). To date, the SEC has not approved an ETP, although a growing list of sponsors has sought approval. As noted in my statements following the disapproval of these requests, rather than applying the fairly straightforward standard that we have typically applied in approving other ETP filings—including for precious metals like palladium and platinum—we have insisted on increasingly sophisticated analyses of the relationship between the underlying spot market and the futures market to determine the susceptibility of these markets to fraud and manipulation. Not only is it unclear whether prior non-crypto ETP filings could have passed muster under this more rigorous approach, the ever-shifting goalposts are unfair to innovators who spend ever-increasing amounts of money on attorneys and quantitative experts only to find that they have failed to hit a target that has moved once again. Will we now apply those same standards to other types of ETPs too? In the meantime, investors looking for crypto exposure have gotten creative; they have invested in other securities products with crypto underliers that trade over the counter and on non-U.S exchanges and perhaps even in the stock of public companies that hold crypto or engage in crypto-related business activities.

The problem, however, is broader than exchange-traded products devoted exclusively to bitcoin. In addition to repeatedly rejecting applications to list and trade ETPs focused on bitcoin or bitcoin futures, the agency also—through less formal mechanisms—has stymied attempts by investment companies subject to the Investment Company Act of 1940 (such as mutual funds and exchange-traded funds) to invest substantially in these assets. A January 2018 SEC staff letter explained why cryptocurrencies are "unlike the types of investments that registered funds currently hold in substantial amounts" and laid out "a number of significant investor protection issues [including valuation, liquidity, custody, arbitrage, and manipulation] that need to be examined before sponsors begin offering these funds to retail investors."[11] The letter warned that it was not "appropriate for fund sponsors to initiate registration of funds that invest substantially in cryptocurrency and related products," that existing registration statements for such products should be withdrawn, and that if a sponsor were to register such a fund the staff "would view that action unfavorably and would consider actions necessary or appropriate to protect Main Street investors, including recommending a stop order to the Commission."[12] The Division invited people to weigh in on those issues, an invitation, incidentally, to which few people have responded.[13] Three years later, the Commission has done nothing to resolve the legal and practical ambiguity around whether and in what amount it will "allow" Investment Company Act funds to hold crypto or crypto futures.[14]

The SEC's reluctance to permit traditional investment vehicles to hold

bitcoin or bitcoin futures has contributed to investors seeking more expensive, less convenient, or less direct substitutes, but it also has heightened the stakes of any regulatory approval for a mainstream retail product we might one day grant. By waiting we also have magnified the first-approved advantage in the bitcoin ETP or registered fund space.[15] Moreover, because we have comported ourselves like merit regulators, investors might view any approvals as an official blessing by the Commission about the quality of the products we approve. That would be the wrong inference to draw; investors, alone or with the help of an investment professional, need to think carefully about whether any particular security—crypto-based or not—is right for them.

Regulators should commit themselves to providing regulatory clarity so that traditional financial market participants can engage with crypto with confidence that they are complying with their regulatory obligations. For example, under the eye of our sister regulator, the Commodity Futures Trading Commission, a healthy bitcoin futures market has developed, and an ether-based futures market recently initiated trading.[16] Another federal financial regulator, the Office of the Comptroller of the Currency ("OCC"), has opened the door for the banks and thrifts it supervises to participate in independent node verification networks and to use stablecoins for payment activities.[17] SEC staff has issued guidance, including, most recently, a risk alert from our Division of Examinations designed to help investment advisers, broker-dealers, transfer agents, and exchanges craft policies and procedures for digital asset securities.[18] We need to do more, and I look forward to working to provide that clarity with our incoming Chairman and my other fellow Commissioners.

One important area in need of clarity is custody. Consider the staff's recently issued response[19] to the state of Wyoming's determination that a particular Wyoming-chartered public trust company approved to provide custodial services for digital and traditional assets under Wyoming law is a qualified custodian under the Investment Advisers Act and the SEC's Custody Rule.[20] This classification matters because registered investment advisers generally have to use a qualified custodian to safeguard client assets. The staff's response made clear that the SEC is not "bound by statements or views expressed by state regulators [including] statements or interpretations regarding custody of digital assets as well as more traditional securities and whether any entity is a 'qualified custodian.'"[21] The staff's letter then proceeds to ask a series of questions, including whether "state chartered trust companies possess characteristics similar to those of the types of financial institutions the Commission identified as qualified custodians" and whether there are "entities that currently satisfy the definition of qualified custodian under the Custody Rule that should not be included within that definition because they do not meet the policy goals of the rule."[22] This response not only fails to provide clarity for investment advisers seeking to find a qualified custodian for crypto, but it also introduces new ambiguity about when a state-regulated financial institution can serve as a qualified

custodian for any kind of asset. To assess whether a state-supervised and -examined trust company or bank is a qualified custodian, the statutory and regulatory text should govern. Together they state that if a substantial portion of the business of that trust company or bank consists of exercising fiduciary powers similar to those permitted to national banks supervised by the OCC, that entity can serve as a qualified custodian.[23] That is pretty straightforward, albeit fact-dependent. As one commenter to the staff's letter responded, "If Congress had not intended state-chartered entities to be treated on a par with national banks, it would not have specifically included both state banks and state trust companies in the definition of 'bank' in the Advisers Act."[24]

Rather than raising fundamental questions about custody under the Advisers Act in the crypto context, the SEC should assist advisers in navigating custody in the crypto context and save the larger questions for a more holistic review of the custody rule. Meanwhile, tailored relief with respect to crypto custody might be appropriate. One firm has called for relief permitting self-custody given that "maintaining digital assets with a third-party custodian may not, at least in the current state of the market, be the most effective means for an adviser to discharge its fiduciary duty to safeguard client assets and put clients' interests first – and may even give rise to adverse collateral consequences for network developments critical to preserving the value of a client's holdings of digital assets."[25]

A talk about crypto regulation in the United States would not be complete without a mention of one of the main questions posed to the SEC: when is a digital asset a security? Despite the frequency with which this question is asked, clear answers are rare. The breadth of our statutory definition of the term "security" and the complexity of the guidance the Commission has provided contribute to this lack of clarity.[26] People planning to distribute digital assets have to determine whether the federal securities laws apply to those distributions. The SEC staff has provided guidance to help people make these determinations, but the guidance is difficult to apply.[27] The guidance lists numerous factors designed to assess whether a so-called "Active Participant" provides essential managerial efforts, whether the token purchasers expect to make a profit, and whether purchasers are buying the tokens to use them.[28] Supplementing the staff guidance are settled enforcement actions and judicial opinions in litigated cases. Neither complex staff guidance nor enforcement actions are a satisfactory way to guide people who are eager to comply with the law, but unsure how to do so. Accordingly, I look forward to working with our incoming Chairman and my fellow Commissioners on a safe harbor along the lines that I have proposed[29] or some other Commission-level regulatory guidance.

The crypto asset class and the industry that has grown up around it have developed very quickly. Bitcoin was first mined in January 2009, and, as of yesterday, its price was just over $60,000. In the meantime, other blockchains, such as Ethereum and Polkadot, have emerged with their own native tokens and vibrant communities growing around them. The

growth to date has challenged us regulators, but bigger challenges lie ahead regardless of the fate of any particular blockchain project. The pressure on us to grapple with the difficult questions through rulemaking and guidance will intensify rapidly along with institutional interest in crypto.[30] Legacy financial institutions and traditional investors that have sat on the sidelines until now are likely to push us to allow them to play a more active role. Meanwhile, some crypto-native firms are now large companies that are woven into the fabric of the broader economy and so also will command more regulatory attention. A final regulatory lesson then is that the regulatory work is only just beginning.

Thank you for the chance to join you for this conference. Of course, I would have preferred to be with you all in person, but we can celebrate the technology that enables remote participation and also makes possible other international collaborations that would have been unthinkable to Tubman and Austen. As regulators seek to build frameworks that facilitate people's ability to use technology, including blockchain technology, to engage freely with one another, competition from—and cooperation with—other jurisdictions can be a healthy way of spurring regulators to do better. We have much to learn from one another, and I look forward to continuing the conversation with friends and colleagues from all over the world.

---

[1] *Banknotes: £10 note*, Bank of England, https://www.bankofengland.co.uk/banknotes/polymer-10-pound-note (last visited Mar. 12, 2021).

[2] For a brief, but engaging biography, *see* Sarah H. Bradford, Scenes in the life of Harriet Tubman (Bald Cypress Books, 2021). For a longer biography that provides more historical context, *see* Kate Clifford Larson, Bound for the Promised Land (Random House Pub. Group, 2004). *See also* Melanie Solly, *The True Story behind Harriet Tubman*, Smithsonian Magazine (Oct. 30, 2019, 10:06 AM) https://www.smithsonianmag.com/smithsonian-institution/true-story-harriet-tubman-movie-180973413/.

[3] *See* Larson, *supra* note 2.

[4] *See Chainalysis, Crypto Crime Summarized: Scams and Darknet Markets Dominated 2020 by Revenue, But Ransomware Is the Bigger Story,* https://blog.chainalysis.com/reports/2021-crypto-crime-report-intro-ransomware-scams-darknet-markets (Jan. 19, 2021) (reporting that, in 2020, criminal activity was 0.34% of total crypto transaction volume, or $10 billion in transaction volume). One estimate places the size of the underground economy at between $2.25 and $2.5 trillion dollars per year, or between 11 and 12 percent of annual GDP. Andrew Bloomenthal, *Underground Economy*, Investopedia (last updated Apr. 30, 2020), https://www.investopedia.com/terms/u/underground-economy.asp#:~:text=As%20of%20early%202020%2C%20the,or%20roughly%20%242.5%20trillion%20total. The St. Louis Federal Reserve Bank estimates that the average size of the informal

economy in developed countries was 13 percent of GDP in 2002-2003. Paulina Restrepo-Echavarria, *Measuring Underground Economy Can Be Done, but It Is Difficult*, Fed. Res. Bank of St. Louis: Regional Economist (Jan. 26, 2015), https://www.stlouisfed.org/publications/regional-economist/january-2015/underground-economy. A common assumption is that most of this activity consists of cash transactions. *See id*. Even when these transactions involve activity that is not itself illegal, conducting them in cash may permit the participants to avoid or evade tax laws and other legal requirements. *See* Kenneth Rogoff, *The Curse of Cash*, Milken Institute Review (Jan. 21, 2019), https://www.milkenreview.org/articles/the-curse-of-cash (stating that "[t]he largest holdings and use of cash in the domestic underground economy likely derive from residents of all types . . . who are broadly engaged in legal activities but who are avoiding taxes, regulations or employment restrictions").

[5] *See, e.g.*, Alex Gladstein, *Bitcoin Is Protecting Human Rights Around the World*, Reason Foundation (Feb. 5, 2021 12:33 PM), https://reason.com/video/2021/02/05/bitcoin-is-protecting-human-rights-around-the-world/; Carlos Hernández, *Bitcoin Has Saved My Family*, The New York Times Co. (Feb. 23, 2019), https://www.nytimes.com/2019/02/23/opinion/sunday/venezuela-bitcoin-inflation-cryptocurrencies.html. *See also* Letter from Eric R. Ervin, CEO and President, Realty Shares Advisors, to Dalia Blass, Director, Div. of inv. Mgmt., SEC, *Re: Reality Shares Advisors Response to Engaging on Fund Innovation and Cryptocurrency-related Holdings*, 2 (Apr. 9, 2019), https://www.sec.gov/divisions/investment/reality-shares-innovation-cryptocurrency.pdf. ("Along with significantly reducing transaction costs, the peer-to peer functionality of a bitcoin transaction also removes a significant amount of friction from the remittance process, therefore making bitcoin a cheaper and more effective option for electronic monetary transactions, especially amongst those in developing markets with no, or limited access to, banking facilities, or distrust of traditional remittance intermediaries.").

[6] Custody of Digital Asset Securities by Special Purpose Broker-Dealers, Exchange Act Release No. 34-90788, 86 Fed. Reg. 11,627 (effective Apr. 27, 2021), https://www.sec.gov/rules/policy/2020/34-90788.pdf.

[7] 17 CFR 240.15c3-3 (2019).

[8] Press Release, SEC, SEC Issues Statement and Requests Comment Regarding the Custody of Digital Asset Securities by Special Purpose Broker-Dealers (Dec. 23, 2020), https://www.sec.gov/news/press-release/2020-340.

[9] Custody of Digital Asset Securities by Special Purpose Broker-Dealers, *supra* note 6, at 8.

[10] Submitted Comments for SEC Policy Statement: Customer of Digital Asset Securities by Special Purpose Broker-Dealers, Exchange Act Release No. 34-90788, 86 Fed. Reg. 11,627 (modified Feb. 22, 2021), https://www.sec.gov/comments/s7-25-20/s72520.htm.

[11] Staff Letter, Dalia Blass, Director, Div. of Inv. Mgmt., SEC, Engaging on Fund Innovation and Cryptocurrency-related Holdings (Jan. 18, 2018), https://www.sec.gov/divisions/investment/noaction/2018/cryptocurrency-011818.htm [hereinafter Staff Letter].

[12] *Id.*

[13] *Id.* The responses to the Staff Letter are available here: https://www.sec.gov/investment/fund-innovation-cryptocurrency-related-holdings.

[14] Some funds appear to be moving forward with holding bitcoin futures in small amounts.

[15] *See, e.g.*, Frank Chaparro, *Bloomberg's ETF whisperer says the SEC could approve a BTC ETF*, The Block (Feb. 26, 2021 5:23 PM), https://www.theblockcrypto.com/post/96507/bloombergs-etf-whisperer-sec-btc-etf (discussing first-mover advantage concerns).

[16] See, e.g., Bitcoin Futures, TD Ameritrade, Inc., https://www.tdameritrade.com/investment-products/futures-trading/bitcoin-futures.page (last visited Mar. 15, 2021); *see* Aislinn Keely, *CME's first week of Ether futures trading sees $34 million in daily volumes*, The Block (Feb. 17, 2021 6:00 PM), https://www.theblockcrypto.com/linked/95217/cme-first-week-eth-futures-trading.

[17] *Federally Chartered Banks and Thrifts May Participate in Independent Node Verification Networks and Use Stablecoins for Payment Activities*, Office of the Comptroller of the Currency (Jan. 4, 2021), https://www.occ.gov/news-issuances/news-releases/2021/nr-occ-2021-2.html.

[18] SEC Division of Examinations, *Risk Alert: The Division of Examinations' Continued Focus on Digital Asset Securities*, SEC (Feb. 26, 2021), https://www.sec.gov/files/digital-assets-risk-alert.pdf.

[19] Public Statement, SEC, Div. of Inv. Mgmt. Staff in Consultation with FinHub Staff, *Staff Statement on WY Division of Banking's "NAL on Custody of Digital Assets and Qualified Custodian Status,"* SEC (Nov. 9, 2020), https://www.sec.gov/news/public-statement/statement-im-finhub-wyoming-nal-custody-digital-assets [hereinafter SEC Staff Statement on WY].

[20] Wyo. Div. of Banking, *No-Action Letter on Custody of Digital Assets and Qualified Custodian Status* (Oct. 23, 2020), http://wyomingbankingdivision.wyo.gov/home/pressreleases/twooceannoactionletterdigitalassetcustodyqualifiedcustodianstatus.

[21] SEC Staff Statement on WY, *supra* note 19 at n.4.

[22] SEC Staff Statement on WY, *supra* note 19.

[23] The Custody Rule, 17 CFR 275.206(4)-2, defines "qualified custodian" as, among other things, "a bank as defined in section 202(a)(2) of the Advisers Act," which, in turn, is defined to include "…(C)

any other banking institution, savings association, as defined in section 1462(4) of title 12, or trust company, whether incorporated or not, doing business under the laws of any State or of the United States, a substantial portion of the business of which consists of receiving deposits or exercising fiduciary powers similar to those permitted to national banks under the authority of the Comptroller of the Currency, and which is supervised and examined by State or Federal authority having supervision over banks or savings associations, and which is not operated for the purpose of evading the provisions of this subchapter … ." Advisers Act Rule 206(4)-2, 17 C.F.R. § 275.206(4)-2 (2019).

[24] Letter from Tom Jessop, President, Fidelity Digital Assets, to Vanessa Countryman, Secretary, SEC, *Re: Custody Rule and Digital Assets*, 2 (Jan. 22, 2021), https://www.sec.gov/files/fidelity-digital-asset-services-012221.pdf.

[25] Letter from Ruby G. Sekhob, General Counsel & CCO, Polychain Capital, to Div. of Investment Mgmt., SEC, *Re: Custody Rule and Digital Assets*, 5-6 (July 16, 2019), https://www.sec.gov/files/polychain-capital-lp-071619.pdf.

[26] *See* Section 2(a)(1) of the Securities Act of 1933, 15 U.S.C. § 77b(a); Section 3(a)(10) of the Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10); Section 2(a)(36) of the Investment Company Act of 1940, 15 U.S.C. § 80a-2(a)(36); and Section 202(a)(18) of the Investment Advisers Act of 1940, 15 U.S.C. § 80b-2(a)(18).

[27] *Framework for "Investment Contract" Analysis of Digital Assets*, SEC (modified Apr. 3, 2019), https://www.sec.gov/corpfin/framework-investment-contract-analysis-digital-assets.

[28] *Id.*

[29] Hester Peirce, Commissioner, SEC, *Running on Empty: A Proposal to Fill the Gap Between Regulation and Decentralization*, SEC (Feb. 6, 2020), https://www.sec.gov/news/speech/peirce-remarks-blockress-2020-02-06.

[30] *See, e.g.*, *Markets Update: Cryptocurrency Trading*, Exchanges at Goldman Sachs (Mar. 5, 2021), https://www.goldmansachs.com/insights/podcasts/episodes/03-05-2021-mathew-mcdermott.html (discussing growing interest of institutional investors in crypto and regulatory barriers to traditional firms serving these clients); *Acuiti Special Report: Institutional Adoption of Digital Asset Trading*, Acuiti (Mar. 2020), https://www.acuiti.io/wp-content/uploads/2020/03/Institutional-Adoption-of-Digital-Asset-Trading.pdf (reporting results of a survey about institutional adoption of digital assets and market characteristics that affect adoption); Ria Bhutoria, *The Role of Prime Brokerage in Digital Assets*, Fidelity Digital Assets (Oct. 1, 2020), https://www.fidelitydigitalassets.com/articles/digital-asset-prime-brokerage (reporting that "44% of traditional hedge funds surveyed expect to have a bitcoin allocation of more than 1% in the next five years" and discussing

what prime brokerage looks like for digital assets).