# Exhibit 246

# Speech

# Lawless in Austin



**Commissioner Hester M. Peirce**

**Oct. 8, 2021**

Thank you to the Texas Blockchain Summit for the chance to be here today. I have to start with my disclaimer that my views are my own and not those of the Securities and Exchange Commission or my fellow Commissioners. I am interested, however, in what my colleagues have to say, which is why Chair Gensler's habit of calling the cryptoverse the "Wild West" has captured my attention.[1] He is not alone in referring to the crypto landscape as the Wild West, a place we imagine to have been lawless—a society in which the gunslinger with the best reflexes and worst morals wins at everyone else's expense. Merriam-Webster defines the "Wild West" as "the western U.S. in its frontier period characterized by roughness and lawlessness."[2] Bringing government into that kind of an environment to establish some order seems like a no-brainer. Today, however, I will offer a different take on the Wild West and, with that picture in mind, suggest a way forward in crypto regulation.

The West of the past called to people who were chafing against the staid and stale societies of the East and looking to throw themselves into building a new future in a more promising place. The Western frontier was a place for the adventurous, the rough around the edges, the idealists, the free-thinkers, and the restless. I am from Ohio, which was once what the West meant to people coming from the states on the Eastern seaboard. Reflecting that history, the part of Ohio I am from is called the "Western Reserve."[3] My alma mater, not a military academy as some think, still carries the name of the region—Case Western Reserve University. People from Connecticut settled the region in the early decades of the 19th century. These settlers left the relatively well-populated and well-ordered Connecticut and moved West with big dreams to a stunningly beautiful and bountiful part of the country, but also one replete with dangers, disappointments, and difficulties. Western life was rough at first, as described in <u>The Western Reserve: The Story of New Connecticut in Ohio</u>: "conditions were wretched during the first quarter of a century, and [] no improvement was likely to come without a transportation system and a supply of cash."[4] Those things did come, and "[t]he enterprise and boundless energy which brought Moses Cleaveland[5] and his men to survey the wilderness and sustained the

first settlers through the hard years in their clearings among the forests have never lagged or faltered."[6]  That spirit and energy became the basis for a thriving industrial, educational, and cultural hub in Ohio.[7]

I recently read a fascinating book by David McCullough, The Pioneers, which discusses the post-Revolutionary War settlement of another part of Ohio—Marietta—this time by people from Massachusetts.  He tells the story of the difficult journey West and the successes, disasters, dangers, and failures that shaped what eventually became a thriving community.  To these immigrants, the West offered hope and promise in contrast to the East, as McCullough explains:

Unprecedented financial panic had gripped the new nation since the end of the Revolutionary War.  The resources and credit of the government were exhausted.  Money, in the form of scrip issued by the government, was nearly worthless.  . . . Trade was at a standstill. . . . Farmers were being imprisoned for debt. . . . As it was, the severe economic depression that followed the war would last even longer than the war.  But out west now there was land to be had as never imagined—vast land, rich     land . . . West was opportunity.  West was the future.[8]

The settlers who moved West came not only with high expectations, but with a whole range of talents and professions.  They cultivated other skills by necessity after they had arrived.  The society was rougher than the one they had left, but nevertheless it was governed by the societal norms they had carried with them, by law, and by mutual concern heightened by the difficult conditions in the early years.  Even if they emulated the old Eastern society in many ways, these new frontier societies were created by their inhabitants.  McCullough describes, for example, the work by Marietta's leading citizens to ensure that Ohio was a free state and to develop educational institutions and make them accessible to the general population.  It was not, of course, all good in the West.  Ohio's very name—Iroquois for "Great River"—and the Native American names of many other places in Ohio serve as a reminder of the inhabitants who were forced out as immigrants from the East arrived.

Ohio was the frontier in the early 19th century, but later in the century people were still looking West, further West, for opportunity.  John Soule wrote in the Indiana Express in 1851, "Go west, young man."[9]  Horace Greeley picked up this phrase fifteen years later, when he wrote: "Washington is not a place to live in.  The rents are high, the food is bad, the dust is disgusting and the morals are deplorable.  Go West, young man, go West and grow up with the country."[10]

Texas may come to mind more readily than my native Ohio when we think of the old West.  Here too, though, the Wild West was marked by more order than the movies would have us believe.  Andrew Morriss, who, after a stint at Case Western Reserve University, moved West and eventually ended up in Texas, researched the Wild West and identified numerous forms of effective private regulation, which were effective precisely because they faced competition.  He explained, for example, that Texas

cattlemen, whose ranches were delineated by clear property lines, were able to "creat[e] order on their ranches."[11]  One ranch's code "prohibited cowboys from gambling, carrying six-shooters, keeping private horses, running game with [ranch] horses, drinking, and stealing cattle from other ranches."[12]  As detailed in an article titled "The -Not So Wild, Wild West," western order was not limited to ranchers imposing gambling bans on their cowboys, but also included an array of private organizations dedicated to maintaining order:

> [I]t appears in the absence of formal government, that the western frontier was not as wild as legend would have us believe. The market did provide protection and arbitration agencies that functioned very effectively, either as a complete replacement for formal government or as a supplement to that government.[13]

These accounts do not paint a picture of perfect order, but they suggest that societal order does not always come from the public sector.  Morriss explained that frontiers foster private order: "The frontier is a difficult place.  Conditions are harsh, social capital is spread thin, and many of the institutions we take for granted are missing or scarce."[14]  Morriss then gives a shout-out to a noted economist and political philosopher Friedrich Hayek, noting that "Hayekian legal institutions flourished on the frontier, and were lost as civilization advanced.  This suggests that current frontiers are likely to foster Hayekian legal institutions."[15]

History did not allow us to see how these private arrangements would evolve to meet new challenges over time, for as Morriss further notes, "once there was wealth in the West, government's arrival was inevitable."[16]  Perhaps, then, it is inevitable on the crypto frontier too.

Let us turn our attention there now.  The crypto frontier, like the Wild West, appears pretty wild at first glance:  home to lots of codeslingers and speculators and some hucksters too, this new West also has its inter- and intra-protocol fights, friendships forged through shared difficulties and successes, colorful personalities, passions, dreams, hardships, spectacular failures, and remarkable victories.  But as in the West of the past, there is order and discipline in all of that rough and tumble.  Because crypto is built on code, the code itself serves as a governor of conduct.  But crypto is built on people too, and these people hold each other accountable not only through unbridled public discourse, but through using or not using a protocol.  Protocol users, competitors, bug bounty hunters, and sophisticated skeptics monitor protocols for hints of centralization, administrator keys vulnerable to compromise, slow speed, high costs, lax security, and so forth. A system outage, rugpull, insider trading incident, or exposed flaw in the code gives rise to an inevitable firestorm.  Decentralized communities collectively figure out how to deal with unanticipated problems.  These cooperative and competitive disciplining mechanisms have helped to clean up the crypto frontier though there is more work to be done.  The persistence of both self-regulation and calls by the crypto community for clarity from government

regulators suggest that lawlessness is not the prevailing culture of the crypto frontier.

On the other hand, ironically, our gunslinging ways in the old, supposedly staid, government regulatory world back East are causing people to question our commitment to the rule of law.  Let me explain by raising several questions about our regulatory approach to date.  I will conclude by suggesting that it is not too late for government regulators to set clear rules that respect the unique attributes and challenges of life on the crypto frontier.

# I. Is There Really Legal Clarity Around Digital Assets?

A fundamental area of conflict between the SEC and the public is how much legal clarity there is around digital assets.  The safe harbor I proposed for token distribution events acknowledges there is uncertainty about when crypto asset offerings implicate the securities laws,[17] but the prevailing attitude at the SEC is that there is clarity, so why bother with a safe harbor?

The idea that there is clarity as to when crypto assets are securities must come as a surprise to the lawyers advising crypto projects that have struggled with this issue for years.  Take, for example, the public feedback we received relating to the Commission's statement regarding the custody of digital asset securities by broker-dealers, which distinguishes between "digital asset securities" and "non-security digital assets," the latter of which we will not permit to be custodied by special purpose broker-dealers.[18]  In response, many commenters asked for clarity on what constitutes a "digital asset security" and asserted that it would be unfair to expect a broker-dealer to conduct the analysis given the lack of clarity.[19]  Moreover, if clarity means that essentially all tokens are to be deemed securities, then why even establish a Commission positon on special purpose broker-dealers at all?

# II. Are We Enforcing Rules by Settling or Settling for Ambiguity?

The SEC points to Supreme Court precedent[20] and our own growing list of enforcement actions and says the case is closed—most digital assets are securities.  Even if we were to accept enforcement as a proper way to provide clarity, it is not working.  Definitive determinations of security-ness have only occurred in the few instances in which a court (rather than the Commission) has decided the matter.[21]  Even in those instances, a determination that a token was offered initially as a security does not say anything about the token itself being a security, either at the time of the initial sale or in secondary transactions.

Most of our crypto enforcement actions, however, have not been litigated actions; rather they have ended in settlements, which are not good

vehicles for careful legal analysis.  When a party settles an SEC enforcement action, it often is trying to get the case wrapped up so it can move on.  It has no incentive to force the SEC, as a condition of the settlement, to lay out a clear legal analysis.  In cases when a platform is involved, the SEC generally states only that some of the digital assets were securities without specifying which ones are or why.  Commissioner Elad Roisman and I raised this issue in conjunction with the Coinschedule settlement.[22]  Perhaps this approach is understandable since the parties to the settlement might not include the parties with the keenest interest in the security/non-security status of that token.  Nevertheless, if the SEC cannot easily articulate an unassailable legal theory for why particular assets are securities, is the line as clear as the SEC maintains it is?  The ambiguity ultimately serves us well because it effectively forces any actor with any connection to digital assets into our regulatory jurisdiction.

## III. Are We Fighting for Investors or Fighting for Jurisdiction?

As stablecoins grow in popularity, they are drawing increasing interest from an array of regulators jockeying for regulatory position.  Should stablecoin issuers be registered as banks?  Should stablecoins be backed by deposit insurance?  Should stablecoins be designated as systemically important by the Financial Stability Oversight Council?  Are stablecoins money market funds?  Should the Consumer Financial Protection Bureau step in to protect consumers?

Given the stunning growth of stablecoins, regulators understandably are asking whether they fit into an existing regulatory framework and what their consumer protection and long-term financial stability implications are.  As they undertake this inquiry, however, I hope they will do so with an appreciation for the following:

1. Many people find stablecoins to be a convenient payments tool that facilitates the movement and exchange of cryptocurrencies, so any regulatory step that would curtail the use of stablecoins must be justified by a benefit that outweighs the lost convenience.
2. Regulators should be careful with broad generalizations since stablecoins are not uniform in operation, peg, underlying reserves, or transparency.
3. Overly broad application of the law to capture stablecoins inadvertently might capture other products and services.
4. Attempts to dismiss stablecoins by drawing on the experience with 19th century private bank notes are based on a misunderstanding of both.[23]
5. While trying to understand stablecoins is fine, stablecoin fear is unwarranted.  As Federal Reserve Vice Chair Randal Quarles explained:

[W]e do not need to fear stablecoins. The Federal Reserve has traditionally supported responsible private-sector innovation. Consistent with this tradition, I believe that we must take strong account of the potential benefits of stablecoins, including the possibility that a U.S. dollar stablecoin might support the role of the dollar in the global economy.[24]

## IV. Are We Protecting Investors or Denying Investors Opportunity?

Embedded within the negative Wild West analogy for the crypto-frontier is a concern that unwitting and unwilling investors are being harmed by participating in the crypto markets.  To those who do not view the opportunity to participate in these markets as valuable, the lack of regulatory clarity in the United States could actually be a way of protecting investors from harm: If ambiguity prevents them from participating, so much the better!  From this perspective, that some projects and platforms, for example, exclude Americans because of regulatory uncertainty is actually a good thing.  It is only the projects that fail to keep Americans out that face enforcement actions.[25]

Widespread geoblocking of Americans should concern American regulators even if it does lighten their regulatory load.  Consider, for example, recent well-publicized examples of airdrops that excluded Americans.  An airdrop is essentially a free allocation of tokens to, for example, participants in a network.  These tokens are a way of rewarding network participants.  Why would we want US participants to be excluded from receiving the reward due them?  Take a look at Twitter after one of these airdrops— the SEC is not being thanked.

Whether by slow-walking product approvals or directly disapproving products using creatively applied standards, regulators can make certain products unavailable to investors.  The Commission's approach to pooled crypto investment vehicles illustrates the problem.[26]  The currently available product offerings—including over-the-counter products and mutual funds with limited exposure to crypto futures, ETFs with exposure to the crypto industry, and public companies holding crypto on their balance sheets—are less direct, less convenient and more expensive for investors than the spot-crypto-based exchange-traded products offered in other countries.  From the perspective of a regulator who does not really like the product anyway, nothing is lost.  The investor, however, loses an opportunity to participate that is worth something to her even if she chooses not to buy the particular product; just having the option of doing so is valuable.  As C.S. Lewis noted, "Of all tyrannies, a tyranny sincerely exercised for the good of its victims may be the most oppressive . . . This very kindness stings with intolerable insult."[27]

## V. Are We Going to Pretend Everything is Centralized So We Can Regulate It?

Chair Gensler has pointed out correctly that labeling something

decentralized does not necessarily make it so.  We saw this phenomenon at play in a recent purported DeFi enforcement action, which charged a company and two top executives that ran an illegal offering.[28]  And maybe it was at play to a lesser degree in a case from several years ago against the creator of a decentralized trading venue that had some centralized features.[29]

But what happens when we are dealing with a protocol that facilitates peer-to-peer or person-to-code transactions without a centralized intermediary?  Is there anyone who could be held liable in a manner consistent with the rule of law and our constitutional principles? Can we hold responsible the developer of an open-source protocol for how others use it or what others layer on top of it?

Perhaps we should not even get to these questions.  After all, if people avail themselves of an automated market maker to exchange crypto, have they not done so with an appreciation that it is the code that determines how that trade will happen and that nobody stands ready to reverse a bad trade?  Truly decentralized platforms do not mesh well with a regulated approach designed for centralized finance.  As one commentator observed, "So, every time they say 'the platform must do this' 'the platform must do that'—[what] does it mean?! Implicitly, the only way of understanding these comments is an interpretation of securities market regs as being about what kind of software is allowed to be written—this won't fly."[30]

As it turns out, lots of people want to deal with centralized intermediaries in the crypto space.  We can regulate those entities if they engage in securities activities (assuming, of course, we make it possible for them actually to do business within our regulatory framework), but DeFi protocols with which people choose to interact ought to be viewed through a different lens.  Treating DeFi differently would, in the words of attorney Collins Belton, make "[t]he SEC [] probably the best motivator of making something truly decentralized."[31]  And that would not be a bad thing for crypto, which, after all, prides itself on decentralization.

## VI. Are We Catching Bad Actors or Creating a Catch 22?

The good actors want to know which digital assets are securities so they can figure out how to comply with the securities laws, but we have done little during my nearly four years on the Commission to explain what that would look like.  I lay the blame on myself and my colleagues on the Commission.  We simply have not allowed staff the latitude to consider the hard questions around how crypto can operate within the securities framework.  The way forward is not to drag entities in to the Commission through enforcement actions and brute force them into a regulatory regime that is not actually well-suited for them.  Rather, we should take a methodical approach, one that provides answers to the key questions to which market participants need answers.

In a dissent in an enforcement action against crypto trading platform Poloniex, I laid out a paradox—deeming digital assets to be securities means that platforms that trade them and entities that intermediate them have to register with us, but they cannot operate as a registered entity under our existing rules so they would not be able to register.[32]  In that dissent, I called for answers to a number of questions, which I think bear repeating here because they give a sense of the complexity that arises once at least one digital asset trading on a platform is deemed to be a security:

1. Can the platform custody client assets, a feature typical of centralized crypto trading platforms?  If so, how, given our concerns about custody of digital asset securities?

2. If not, could a sufficient number of broker-dealers navigate the registration process to make a liquid market?

3. Would the conditions placed on their registration permit them to function as market makers or to facilitate trading on behalf of retail investors?

4. Can the platform trade non-securities alongside securities? If not, how can the platform, using two entities—a broker-dealer entity for digital asset securities, and an affiliated non-broker-dealer entity for non-securities, offer a seamless, or at least serviceable, trading platform to customers, who are likely, for example, to want to trade both digital assets and digital asset securities and pay for transactions in digital asset securities using non-security digital assets?

5. How can a trading platform and its customers determine whether a particular digital asset is a security?

6. If a token was sold in a securities offering as part of an investment contract, how long must secondary transactions in that token be deemed to be securities transactions by platforms trading the tokens?

7. What are the mechanics of registering tokens sold as part of an investment contract as a class of "equity security" under the Exchange Act?

And there are others that I did not mention in that dissent.  For example: How can a broker-dealer or trading venue work with digital asset securities alongside non-security digital assets and non-digital securities?[33]  How does Securities Investor Protection Act coverage work when a broker-dealer engages in digital assets?  What is the appropriate role, if any, of a transfer agent with respect to digital asset securities?  Who can custody digital assets consistent with the securities laws?  Should the Financial Accounting Standards Board address crypto accounting issues?  How does a platform that finds itself trading securities, due to new definitional clarity around digital asset securities (assuming that clarity comes at some point), finds itself trading digital asset securities come into compliance?

If we intend to demand registration of entities in the crypto space, we have to give our staff the permission to do the hard work of figuring out how the rules will apply given the unique aspects of the business and to seek broad public input through a transparent regulatory (not enforcement) process in doing so.

## Conclusion

These questions are intended to spur a deeper cross-government commitment to searching for sensible regulatory solutions. The stakes are high because the government is riding into crypto town with the promise that it can do a better job than the existing informal disciplinary mechanisms. We do have regulatory experience that we can bring to bear here, but we have to do so carefully. As government agencies consider how to regulate, they ought to take their lead from Congress, work collaboratively with one another, and actively consult the public who will be subject to and protected by the rules. I might approach this whole endeavor with a less strict hand than some of my fellow regulators, but the real question is not what I or any other regulator wants, but what you the people—the intended beneficiaries of this regulation—want. I am eager to see what you accomplish on the crypto frontier once we set some sensible, clear regulatory parameters.

To paraphrase the standard closing words of a popular crypto podcast, which follow an appropriate warning about the riskiness of the space, "[You] are headed West. This is the frontier. It's not for everyone. . ."[34] Thank you for allowing me to drop in on your journey West.

---

[1] *See, e.g.*, Chair Gary Gensler, *Remarks Before the Aspen Security Forum*, SEC (Aug. 3, 2021), https://www.sec.gov/news/public-statement/gensler-aspen-security-forum-2021-08-03 ("Right now, we just don't have enough investor protection in crypto. Frankly, at this time, it's more like the Wild West.").

[2] *Wild West*, merriam-webster (11th ed. 2003).

[3] *See, e.g.*, @Petrarch1603, *A Map of the Connecticut Western Reserve (1798)*, Reddit (Mar. 10, 2019), https://www.reddit.com/r/Ohio/comments/azglji/a_map_of_the_connecticut_western_reserve_1798/.

[4] Harlan Hatcher, The Western Reserve: The Story of New Connecticut in Ohio 73 (1949).

[5] The City of Cleveland bears his name minus the extraneous "a".

[6] Hatcher, *supra* note 4, at 307.

[7] *Id.* at 307-8.

[8] David McCullough, The Pioneers: The Heroic Story of the Settlers Who Brought the American Ideal West 8-9 (2019).

[9] John Bartlett, Bartlett's Familiar Quotations 554 (15th ed. 1980).

[10] *Id.*; *Go West, young man,* Wikipedia, [https://en.wikipedia.org/wiki/Go_West,_young_man](https://en.wikipedia.org/wiki/Go_West,_young_man) (last modified June 30, 2021) (attributing "Go west, young man" to Horace Greeley, New-York Daily Tribune, July 13, 1865).

[11] Andrew P. Morriss, *Hayek and Cowboys: Customary Law in the American West*, 1 N.Y.U. J. of L. & Liberty 35, 46 (2005).

[12] *Id*. at n.52 (citing J. Evetts Haley, *The XIT Ranch of Texas and the Early Days of the Llano Estacado* 116 (1953)).

[13] Terry L. Anderson & P.J. Hill, *An American Experiment in Anarcho-Capitalism: The -Not So Wild, Wild West*, 3 The J. of Libertarian Stud. 9, 27 (1979).

[14] Morriss, *supra* note 11, at 63.

[15] *Id.*

[16] *Id.* at 62.

[17] Commissioner Hester M. Peirce, *Token Safe Harbor Proposal 2.0*, SEC (Apr. 13, 2021), [https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0](https://www.sec.gov/news/public-statement/peirce-statement-token-safe-harbor-proposal-2.0).

[18] *Custody of Digital Asset Securities by Special Purpose Broker-Dealers*, 17 C.F.R. §240 Release No. 34-90788 (Apr. 27, 2021), [https://www.sec.gov/rules/policy/2020/34-90788.pdf](https://www.sec.gov/rules/policy/2020/34-90788.pdf).

[19] *See e.g.*, Letter from Charles De Simone, Securities Industry and Financial Markets Association (May 20, 2021) ("The Statement places a burden on SPBDs to find evidence or arguments for why a digital asset is or is not a security where there is unlikely to be a definitive answer, as the SEC has acknowledged by not itself providing unequivocal guidance as to how determine when a digital asset is a security."), [https://www.sec.gov/comments/s7-25-20/s72520-8819436-238123.pdf](https://www.sec.gov/comments/s7-25-20/s72520-8819436-238123.pdf); Letter from Ron Quaranta, The Wall Street Blockchain Alliance (Apr. 27, 2021) ("We encourage the SEC to formally propose rulemaking that would clarify for all participants engaged in digital asset securities, the role of marketing activities in determining whether a product is in fact a security, and which would provide further guidance on the treatment and classification of digital assets."), [https://www.sec.gov/comments/s7-25-20/s72520-8734174-237103.pdf](https://www.sec.gov/comments/s7-25-20/s72520-8734174-237103.pdf); Letter from Benjamin Kaplan, Prometheum (Apr. 26, 2021) ("As a result, we believe clarity is needed for Special Purpose Broker-Dealers, issuers, ATS' and other market Participants . . . to understand the regulatory framework they must comply with. Therefore, we respectfully request that the Commission provide further clarification on the definition of digital asset securities.), [https://www.sec.gov/comments/s7-25-20/s72520-8734178-237104.pdf](https://www.sec.gov/comments/s7-25-20/s72520-8734178-237104.pdf).

[20] *See* Reves v. Ernst & Young, 494 U.S. 56 (1990); SEC v. W.J. Howey Co., 328 U.S. 293 (1946).

[21] *See* SEC v. Kik Interactive Inc., 492 F. Supp. 3d 169 (S.D.N.Y. 2020); SEC v. Telegram Grp. Inc., 448 F. Supp 3d. 352 (S.D.N.Y. 2020).

[22] Commissioner Hester M. Peirce & Commissioner Elad L. Roisman, *In the Matter of Coinschedule*, SEC (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-coinschedule.

[23] For a discussion of these issues, *see* George Selgin, *The Fable of the Cats*, Alt-M (July 6, 2021), https://www.alt-m.org/2021/07/06/the-fable-of-the-cats/; David Beckworth, *Larry White on Stablecoins, Money Market Funds, and the History of Free Banking*, Mercatus Ctr. (Aug. 2, 2021),  https://www.mercatus.org/bridge/podcasts/08022021/larry-white-stablecoins-money-market-funds-and-history-free-banking.

[24] Randal K. Quarles, *Parachute Pants and Central Bank Money*, Fed. Rsrv. (June 28, 2021), https://www.federalreserve.gov/newsevents/speech/quarles20210628a.htm.

[25] *See, e.g.*, *In the Matter of Blotics Ltd. f/d/b/a Coinschedule Ltd.*, Securities Act Release No. 10956 (July 14, 2021), https://www.sec.gov/litigation/admin/2021/33-10956.pdf.

[26] The following podcast offers a helpful primer on the different types of pooled vehicles: Greg Xethalis, *The Encrypted Economy with Eric Hess*: *How Are Crypto Funds Regulated In The U.S.?* (Oct. 4, 2021), https://theencryptedeconomy.com/podcast/how-are-crypto-funds-regulated-in-the-u-s-greg-xethalis-general-counsel-for-multicoin-capital/.

[27] C.S. Lewis, God in the Dock: Essays on Theology and Ethics (1970) ("It would be better to live under robber barons than under omnipotent moral busybodies.  The robber baron's cruelty may sometimes sleep, his cupidity may at some point be satiated; but those who torment us for our own good will torment us without end for they do so with the approval of their own conscience.").

[28] *In the Matter of Blockchain Credit Partners d/b/a DeFi Money Market*, Securities Act Release No. 10961 (Aug. 6, 2021), https://www.sec.gov/litigation/admin/2021/33-10961.pdf.

[29] *In the Matter of Zachary Coburn*, Exchange Act Release No. 84553 (Nov. 8, 2018), https://www.sec.gov/litigation/admin/2018/34-84553.pdf.

[30] Gabriel Shapiro (@lex_node), Twitter (Sept. 1, 2021, 8:20AM), https://twitter.com/lex_node/status/1433042004984881153.

[31] Collins Belton, *Unchained Podcast: How the Greatest Decentralizing Force for Crypto Projects Is the SEC* (Oct. 5, 2021), https://unchainedpodcast.com/how-the-greatest-decentralizing-force-for-crypto-projects-is-the-sec/.

[32] Commissioner Hester M. Peirce, *In the Matter of Poloniex, LLC*, SEC (Aug. 9, 2021), https://www.sec.gov/news/public-statement/pierce-statement-poloniex-080921.   CFTC Commissioner Dawn Stump recently raised similar concerns about the need for clarity about how the rules will

apply if the CFTC is going to require registration. *See* Commissioner Dawn D. Stump, *Concurring Statement Regarding Enforcement Action Against Payward Ventures, Inc. (d/b/a Kraken)*, CFTC (Sept. 28, 2021), https://www.cftc.gov/PressRoom/SpeechesTestimony/stumpstatement092821b ("I believe that if the Commission is going to hold an exchange liable for operating as an unregistered FCM with respect to retail commodity transactions, it is incumbent upon the Commission to explain in a transparent manner the relevant legal requirements for such an entity that seeks to register as an FCM and how the Commission will apply them in enabling the entity to conduct business with U.S. customers.").

[33] *See e.g.*, Letter from Amy Kim, Digital Chamber of Commerce (Apr. 5, 2021)("Precluding broker-dealers from custodying non-security digital assets will impinge the ability of firms to settle trades in digital asset securities and make it more costly for them to interact with digital asset securities on-chain."), https://www.sec.gov/comments/s7-25-20/s72520-8634796-230930.pdf; Letter from Alan Konevsky, tZERO Group, Inc. (Apr. 7, 2021) ("We suggest that the Commission not create unusual and unnecessary product-specific industry silos, and, instead, permit special purpose broker-dealers to offer their customers access to traditional and digital asset securities."), https://www.sec.gov/comments/s7-25-20/s72520-8648975-231028.pdf; Letter from Charles De Simone, Securities Industry and Financial Markets Association (May 20, 2021) ("The establishment of an SPBD goes further, resulting in a trifurcated market between digital and traditional securities, and further, non-security digital assets. This trifurcation creates obstacles for broker-dealers and customers alike."), https://www.sec.gov/comments/s7-25-20/s72520-8819436-238123.pdf.

[34] *Bankless: Weekly Rollup*, YouTube, (Oct. 8, 2021), https://www.youtube.com/watch?v=TA_Oqoo6qWs.