# Exhibit 250



Monetary Authority of Singapore

**A GUIDE TO DIGITAL TOKEN OFFERINGS**

[Last updated on 26 May 2020]

## A GUIDE TO DIGITAL TOKEN OFFERINGS

## 1      PURPOSE

1.1      This paper provides general guidance on the application of the relevant laws administered by MAS in relation to offers or issues of digital tokens in Singapore.

1.2      For purposes of this guide, the securities laws refer to the Securities and Futures Act (Cap. 289) ("**SFA**") and the Financial Advisers Act (Cap. 110) ("**FAA**").

1.3      This guide will also refer to the Payment Services Act 2019 (Act 2 of 2019) ("**PS Act**").

1.4      The contents of this guide are not exhaustive, have no legal effect and do not modify or supersede any applicable laws, regulations or requirements.

## 2      APPLICATION OF SECURITIES LAWS ON OFFERS OR ISSUES OF DIGITAL TOKENS IN SINGAPORE

2.1      Offers or issues of digital tokens may be regulated by MAS if the digital tokens are capital markets products[1] under the SFA. Capital markets products include any securities, units in a collective investment scheme, derivatives contracts and spot foreign exchange contracts for purposes of leveraged foreign exchange trading.

<u>Digital tokens which constitute capital markets products</u>

2.2      MAS will examine the structure and characteristics of, including the rights attached to, a digital token in determining if the digital token is a type of capital markets products under the SFA.

---

[1] Under section 2(1) of the SFA, "capital markets products" includes any securities (which includes shares, debentures and units in a business trust), units in a collective investment scheme, derivatives contracts (which includes derivatives of shares, debentures and units in a business trust), spot foreign exchange contracts for the purposes of leveraged foreign exchange trading, and such other products as MAS may prescribe as capital markets products.

**A GUIDE TO DIGITAL TOKEN OFFERINGS**

2.3    For instance, a digital token may constitute –

2.3.1    a share[2], where it confers or represents ownership interest in a corporation[3], represents liability of the token holder in the corporation[4], and represents mutual covenants with other token holders in the corporation *inter se*[5];

2.3.2    a debenture, where it constitutes or evidences the indebtedness[6] of the issuer of the digital token in respect of any money that is or may be lent to the issuer by a token holder;

2.3.3    a unit in a business trust[7], where it confers or represents ownership interest in the trust property of a business trust;

2.3.4    a securities-based derivatives contract[8], which includes any derivatives contract of which, the underlying thing is a share, debenture or unit in a business trust; or

2.3.5    a unit[9] in a collective investment scheme[10] ("**CIS**"), where it represents a right or interest in a CIS, or an option to acquire a right or interest in a CIS.

---

[2] Under section 2(1) of the SFA, read with section 4(1) of the Companies Act (Cap. 50), "share" means "a share in the share capital of a corporation and includes stock except where a distinction between stocks and share is expressed or implied.".

[3] *Halsbury Laws of Singapore* vol 6, (LexisNexis, 2010) at paragraph 70.343

[4] *Ibid.*

[5] *Ibid.*

[6] *Ibid.,* at paragraph 70.394

[7] As defined under section 2(1) of the SFA, read with section 2 of the Business Trusts Act (Cap. 31A). Under section 2 of the Business Trust Act, a "unit", in relation to a business trust, means "a share in the beneficial ownership in the trust property of the business trust".

[8] Under section 2(1) of the SFA, "securities-based derivatives contract" includes any derivatives contracts of which the underlying thing or any of the underlying things is a security or securities index, but does not include any derivatives contract that is, or that belongs to a class of derivatives contracts that is, prescribed by regulations made under section 341 of the SFA. Please see section 2(1) of the SFA for the definition of "derivatives contract".

[9] Under section 2(1) of the SFA, a "unit", in relation to a collective investment scheme, means "a right or interest (however described) in a collective investment scheme (whether or not constituted as an entity), and includes an option to acquire any such right or interest in the collective investment scheme.

[10] Under section 2(1) of the SFA, a "collective investment scheme" includes an arrangement in respect of any property:

   a)    Under which the participants do not have day-to-day control over management of the property, whether or not the participants have the right to be consulted or to give directions in respect of such management;

   b)    Under which either or both of the following characteristics are present:
    (i) the property is managed as a whole by or on behalf of a manager;
    (ii) the contributions of the participants, and the profits or income out of which payments are to be made to the participants, are pooled; and

   c)    The effect (or the purpose, purported purpose or purported effect) of the arrangement is to enable participants to participate in or receive profits, income or other payments or returns arising from acquisition, holding, management or disposal of, the exercise of, the redemption of, or the expiry of any right, interest, title or benefit in the property or any part of the property; or to receive sums paid out of such profits, income, or other payments or return.

---

Please also note that the characteristics described in paragraph 2.3 are not exhaustive.

<u>Offerors of digital tokens which constitute securities, securities-based derivatives contracts or units in a CIS</u>

2.4     Offers of digital tokens which constitute securities [11], securities-based derivatives contracts or units in a CIS are subject to the same regulatory regime under Part XIII of the SFA, as offers of securities[12], or securities-based derivatives contracts[13] or units in a CIS[14] respectively made through traditional means.

2.5     A person may only make an offer of digital tokens which constitute securities, securities-based derivatives contracts or units in a CIS ("**Offer**"), if the Offer complies with the requirements under Part XIII of the SFA[15]. This includes the requirements that the Offer must be made in or accompanied by a prospectus that is prepared in accordance with the SFA and is registered with MAS ("**Prospectus Requirements**").

2.6     In addition, where an offer is made in relation to units in a CIS, the CIS is subject to authorisation or recognition requirements [16] ("**Authorisation / Recognition Requirements**"). An authorised CIS or a recognised CIS under the SFA must comply with investment restrictions[17] and business conduct requirements[18]. Please refer to the Securities and Futures (Offers of Investments) (Collective Investment Schemes) Regulations 2005 ("**SF(OI)(CIS)R**"), the Code on Collective Investment Schemes ("**Code on CIS**") and the Practitioner's Guide to the CIS Regime under the SFA, for details.

2.7     An Offer may nevertheless be exempt from the Prospectus Requirements and, in the case of units in a CIS, the Authorisation/ Recognition Requirements, where, amongst others –

---

[11] Includes shares, debentures and units in a business trust. Please see section 2(1) of the SFA for the definition of "securities" under the SFA.
[12] Division 1 of Part XIII of the SFA
[13] Division 1 of Part XIII of the SFA
[14] Division 2 of Part XIII of the SFA
[15] Please see sections 240 and 296 of the SFA.
[16] Please see sections 286 and 287 of the SFA. Please also refer to Part II of the Securities and Futures (Offers of Investments)(Collective Investment Schemes) Regulations 2005.
[17] Please refer to Appendix 1 of the Code on CIS.
[18] Please refer to the Code on CIS.

2.7.1   the Offer is a **small (personal) offer**[19] that does not exceed S$5 million (or its equivalent in a foreign currency) within any 12-month period, subject to certain conditions;

2.7.2   the Offer is a **private placement** offer[20] made to no more than 50 persons within any 12-month period, subject to certain conditions;

2.7.3   the Offer is made to **institutional investors**[21] only; or

2.7.4   the Offer is made to **accredited investors**[22], subject to certain conditions.

The exemptions for a small (personal) offer, a private placement offer and an offer made to accredited investors, are respectively subject to certain conditions which includes advertising restrictions[23].

<u>Intermediaries[24] who facilitate offers or issues of digital tokens</u>

2.8   MAS has observed that one or more of the following types of intermediaries typically facilitate offers or issues of digital tokens:

2.8.1   a person who operates a platform on which one or more offerors of digital tokens may make primary offers or issues of digital tokens ("**primary platform**");

2.8.2   a person who provides financial advice in respect of any digital tokens;

---

[19] Please see sections 272A and 302B of the SFA. A small offer must be a personal offer that satisfies section 272A(3) and 302B(3) respectively. A personal offer is one that is made to a pre-identified person, which includes offers made to persons who have previous professional or other connection with the offeror. As the word "personal" suggests, each personal offer must be made personally by the offeror, or by a person acting on its behalf, to the pre-identified person, and may only be accepted by the pre-identified person to whom the offer was made. Please refer to the Guidelines on Personal Offers made pursuant to the Exemption for Small Offers for further details.

[20] Please see sections 272B and 302C of the SFA.

[21] Please see sections 274 and 304 of the SFA. Please refer to section 4A(1)(c) of the SFA for the definition of "institutional investor".

[22] Please see sections 275 and 305 of and the Sixth Schedule to the SFA. Please refer to section 4A(1)(a) of the SFA for the definition of "accredited investor" and regulation 2 of the Securities and Futures (Prescribed Specific Classes of Investors) Regulations 2005.

[23] Please refer to section 272A(10) and 302B(10) of the SFA for the definition of "advertisement". For more information on the advertising restrictions with respect to offers of shares and debentures, please refer to the Guidelines on the Advertising Restrictions in Sections 272A, 272B and 275 (Guideline No. SFA13-G15).

[24] A corporation that wishes to apply for a capital markets services licence  may refer to the Guidelines on Criteria for the Grant of a Capital Markets Services Licence (Guideline No. SFA 04-G01) and the Guidelines on Licence Applications, Representative Notification and Payment of Fees (Guideline No. CMG-G01).

---

2.8.3   a person who operates a platform at which digital tokens are traded ("**trading platform**").

2.9     A person who operates a primary platform in Singapore in relation to digital tokens which constitute any type of capital markets products, may be carrying on business in one or more regulated activities[25] under the SFA. Where the person is carrying on business in any regulated activity, or holds himself out as carrying on such business, he must hold a capital markets services licence for that regulated activity under the SFA, unless otherwise exempted[26].

2.10    A person who provides any financial advice[27] in Singapore in respect of any digital token that is an investment product[28], must be authorised to do so in respect of that type of financial advisory service by a financial adviser's licence, or be an exempt financial adviser[29], under the FAA[30].

2.11    A person who establishes or operates a trading platform in Singapore in relation to digital tokens which constitute securities, derivatives contracts or units in a CIS, may be establishing or operating an organised market[31]. A person who establishes or operates an organised market, or hold himself out as operating a market, must be approved by MAS as an approved exchange or recognised by MAS as a recognised market operator under the SFA[32], unless otherwise exempted.

Extra-territoriality of the SFA and the FAA

---

[25] Please see the Second Schedule to the SFA for the types of activities regulated as "regulated activities" under the SFA.

[26] Please section 82 of the SFA.

[27] Please see section 6, read with the definition of "financial adviser" under section 2(1), of the FAA. Please note that a financial adviser does not include any person specified in the First Schedule to the FAA.

[28] Under section 2(1) of the FAA, an "investment product" means (a) any capital markets products as defined in section 2(1) of the SFA; (b) any spot foreign exchange contracts other than for the purposes of leveraged foreign exchange trading; (c) any life policy; or (d) any other product as may be prescribed.

[29] Please see section 6 of FAA.

[30] A corporation that wishes to apply for a FA licence may refer to the Guidelines on Criteria for the Grant of a Financial Adviser's Licence (Guideline No. FAA-G01) and the Guidelines on Licence Applications, Representative Notification and Payment of Fees (Guideline No. CMG-G01).

[31] Please refer to Part I of the First Schedule to the SFA for the definition of an "organised market".

[32] A person operating a platform facilitating secondary trading of tokens which constitute securities may refer to the Guidelines on the Regulation of Markets (Guideline No. SFA02-G01) for guidance on whether it should apply to be an approved exchange or a recognised market operator under the SFA.

2.12    Where a person operates a primary platform, or trading platform, partly in or partly outside of Singapore, or outside of Singapore, the requirements of the SFA may nevertheless apply extra-territorially to the activities of that person under section 339 of the SFA[33]. Please refer to the Guidelines on the Application of Section 339 (Extra-Territoriality) of the SFA (Guidelines No. SFA15-G01), for details.

2.13    Where a person who is based overseas, engages in any activity or conduct that is intended to or likely to induce the public, or a section of the public, in Singapore to use any financial advisory service provided by the person, the person is deemed to be acting as a financial adviser in Singapore[34].

## 3    APPLICATION OF ANTI-MONEY LAUNDERING AND COUNTER FINANCING OF TERRORISM LAWS

3.1    MAS emphasises that the relevant MAS Notice on Prevention of Money Laundering and Countering the Financing of Terrorism ("**AML/CFT requirements**") will apply if the person is deemed to be an intermediary conducting one or more of the regulated activities identified in paragraphs 2.8 – 2.11 and is a:

- 3.1.1    holder of a capital markets services licence under the SFA;
- 3.1.2    fund management company[35] registered under paragraph 5(1)(i) of the Second Schedule to the Securities and Futures (Licensing and Conduct of Business) Regulations (Rg. 10) ("**SF(LCB)R**");
- 3.1.3    person exempted under paragraph(s) 3(1)(d), 3A(1)(d) and/or 7(1)(b) of the Second Schedule to the SF(LCB)R from the requirement to hold a capital markets services licence;
- 3.1.4    licensed financial adviser under the FAA[36];
- 3.1.5    registered insurance broker which is exempt under section 23(1)(c) of the FAA from holding a financial adviser's licence to act as a financial adviser in Singapore in respect of any financial advisory service[36]; or

---

[33] Please refer to the Guidelines on the Application of Section 339 (Extra-Territoriality) of the SFA (Guideline No. SFA15-G01).
[34] Please see section 6(2) of the FAA.
[35] Please note that the SFA was amended on 8 October 2018 and the definition of "fund management" in the Second Schedule to the SFA has been expanded to include management of CIS.
[36] Please refer to the Notice to Financial Advisers on Prevention of Money Laundering and Countering the Financing of Terrorisim (MAS Notice FAA-N06) for the scope of persons covered and the applicable AML/CFT requirements.

3.1.6   person exempt under section 23(1)(f) of the FAA read with regulation 27(1)(d) of the Financial Advisers Regulations (Rg. 2) from holding a financial adviser's licence to act as a financial adviser in Singapore in respect of any financial advisory service[36].

3.2   Applicable AML/CFT requirements on such persons broadly include the following:

3.2.1   take appropriate steps to identify, assess and understand their money laundering and terrorism financing (ML/TF) risks;

3.2.2   develop and implement policies, procedures and controls – including those in relation to the conduct of customer due diligence and  transaction monitoring, screening, reporting suspicious transactions and record keeping – in accordance with the relevant MAS Notices, to enable them to effectively manage and mitigate the risks that have been identified;

3.2.3   perform enhanced measures where higher ML/TF risks are identified, to effectively manage and mitigate those higher risks; and

3.2.4   monitor the implementation of those policies, procedures and controls, and enhance them if necessary;

3.3   Digital tokens that perform functions which may not be within MAS' regulatory purview may nonetheless be subject to other legislation for combating ML/TF.  MAS would like to highlight in particular the following which all persons would have to abide by:

3.3.1   Obligations to report suspicious transactions with the Suspicious Transaction Reporting Office, Commercial Affairs Department of the Singapore Police Force pursuant to section 39 of the Corruption, Drug Trafficking and Other Serious Crimes (Confiscation of Benefits) Act (Cap. 65A) (**"CDSA"**); and

3.3.2   Prohibitions from dealing with or providing financial services to designated individuals and entities pursuant to the Terrorism (Suppression of Financing) Act (Cap. 325) (**"TSOFA"**) and various regulations giving effect to United Nations Security Council Resolutions (**"UN Regulations"**).

**A GUIDE TO DIGITAL TOKEN OFFERINGS**

3.4     The Payment Services Act ("**PS Act**") came into effect on 28 January 2020. A person carrying on a business of providing any service of dealing in digital payment tokens or any service of facilitating the exchange of digital payment tokens must be licensed and will be regulated under the PS Act for AML/CFT purposes only and will be required to put in place policies, procedures and controls to address its ML/TF risks. For more information relating to the PS Act, you may refer to our website here.

# 4 ILLUSTRATIONS OF APPLICATION OF THE RELEVANT LAWS TO OFFERS OR ISSUES OF DIGITAL TOKENS

4.1     The case studies below illustrate how the relevant laws administered by MAS may apply. MAS emphasises that these case studies are for the purpose of illustration only. They are not indicative or conclusive of how the relevant laws will apply to a particular case involving an offer or issue of digital tokens. The illustrations in the case studies are also not exhaustive and deliberately avoid labelling using terms like "utility token" or "stablecoin".

4.2     If you wish to offer digital tokens in Singapore or operate a platform involving digital tokens in Singapore, you are encouraged to seek professional advice from qualified legal practitioners to ensure that your proposed activities are in compliance with all applicable laws, rules and regulations in Singapore. When applying the law to your case, you and your legal advisers should look beyond labels and examine the features and characteristics of each token.

Case study 1

Company A plans to set up a platform to enable sharing and rental of computing power amongst the users of the platform. Company A intends to offer digital tokens ("**Token A**") in Singapore to raise funds to develop the platform. Token A will give token holders access rights to use Company A's platform. The token can only be used to pay for renting computing power provided by other platform users. Token A will not have any other rights or functions attached to it and is not or is not intended to be, a medium of exchange accepted by the public, or a section of the public, as payment for goods or services or for the discharge of a debt. Company A intends to offer Token A to any person globally, including in Singapore.

Application of relevant laws administered by MAS in relation to an offer of Token A

- A holder of Token A will only have rights to access and use Company A's platform, and the right to use Token A to pay for rental of computing power provided by other users. Token A will not provide its holder any other rights or functions attached to it. Hence, Token A will not constitute capital markets products under the SFA.

- Company A's offer of Token A will not be subject to any requirement under the SFA or the FAA. However, Company A must abide by all Singapore laws, including the CDSA, the TSOFA and the UN Regulations, in the conduct of its business.
- Token A is not considered a digital payment token under the PS Act as it is not or is not intended to be, a medium of exchange accepted by the public, or a section of the public, as payment for goods or services or for the discharge of a debt.

Case study 2

Company B is in the business of developing properties and operating commercial buildings. It plans to raise funds to develop a shopping mall by offering digital tokens ("**Token B**") to any person globally, including in Singapore. Token B will be structured to represent a share in Company B, and will be a digital representation of a token holder's ownership in Company B. Company B also intends to provide financial advice in relation to its offer of Token B.

Application of relevant laws administered by MAS in relation to an offer of Token B

- Token B will be a share and constitute securities under the SFA.
- The offer of Token B will need to comply with Prospectus Requirements, unless the offer is otherwise exempted under the SFA.
- Holders of a capital markets services licence that carry on business in dealing in tokens that are securities are required to comply with AML/CFT requirements under MAS Notice SFA04-N02.
- Company B will not require a capital markets services licence for dealing in capital markets products that are securities  under the SFA if (a) it is not in the business of dealing in capital markets products that are securities or (b) it is in the business of dealing in capital markets products that are securities, but an applicable exemption applies. For example, if it is carrying on business in dealing in capital markets products that are securities for his own account through certain financial institutions regulated by MAS[37], such as a holder of capital markets services licence to deal in capital markets products that are securities.
- To provide financial advice in relation to its offer of Token B, Company B will need to be a licensed financial adviser, unless otherwise exempted[38].

---

[37] Please refer to paragraph 2(1)(a) of the Second Schedule to the Securities and Futures (Licensing and Conduct of Business) Regulations (Rg 10).
[38] If Company B holds a capital markets services licence for dealing in capital markets products under the SFA, Company B is exempt from holding a financial adviser's licence to act as a financial adviser in Singapore in respect of any financial advisory service.  Instead, Company B will be subject to certain reporting requirements, including the requirement under regulation 37(1) of the Financial Advisers Regulations (Rg2) to lodge a notification to MAS that it is commencing business in a financial advisory service under the FAA.

- Licensed financial advisers are required to comply with AML/CFT requirements under MAS Notice FAA-N06.

Case study 3

Company C intends to offer digital tokens ("**Token C**") to any person globally, including in Singapore. Company C will pool funds raised from the offer of Token C and use the funds to invest in shares in FinTech start-up companies as well as in mining equipment or real estate for purpose of diversification ("**Portfolio**"). Company C will also manage the Portfolio. Holders of Token C will not have any powers relating to the day-to-day operations of Company C or the management of the Portfolio. Profits arising from the Portfolio will be pooled and distributed as payments to the token holders. The purpose of this arrangement is to enable token holders to receive profits arising from the Portfolio.

Application of relevant laws administered by MAS in relation to an offer of Token C

- The arrangement established by Company C in relation to Token C will be a CIS ("**Arrangement**").
- On this basis, the Arrangement will have to be authorised under section 286 of the SFA, or recognised under section 287 of the SFA depending on whether the arrangement is constituted in Singapore or outside Singapore, unless otherwise exempted under the SFA. The Arrangement will also be subject to the applicable requirements under Division 2 of Part XIII of the SFA, the SF(OI)(CIS)R and the Code on CIS, unless otherwise exempted under the SFA.
- On this basis, Token C will be a unit in a CIS under the SFA.
- Company C will likely require a capital markets services licence for carrying on business in the regulated activity of fund management under the SFA, unless otherwise exempted.
- Holders of a capital markets services licence are required to comply with AML/CFT requirements under MAS Notice SFA04-N02.
- As no financial advisory service will be provided by Company C in respect of Token C, the FAA will not apply in relation to the offer of Token C.

Case study 4

Company D is a Singapore-incorporated company with operations in Singapore. It intends to offer digital tokens ("**Token D**") to members of the public, but the offering will not be accessible by persons in Singapore. Company D will pool the funds raised

from the offer and use the funds to invest in a portfolio of shares in FinTech start-up companies. Company D will manage the portfolio of shares. Holders of Token D will not have any powers relating to the day-to-day operations of Company D or the management of the portfolio of shares. Profits arising from the portfolio of shares will also be pooled and distributed as payments to holders of Token D. The purpose of this arrangement is to enable token holders to receive profits arising from the portfolio of shares.

Application of relevant laws administered by MAS in relation to an offer of Token D

- As the offer of Token D will only be made to persons based overseas (i.e. Token D will not be offered to any person in Singapore), Part XIII of the SFA will not apply to the offer.
- Company D may nevertheless be carrying on the business of fund management in Singapore for example, if it operates the management of the portfolio of shares in Singapore. If so, Company D will require a capital markets services licence for carrying on business in fund management, unless otherwise exempted.
- Holders of a capital markets services licence are required to comply with AML/CFT requirements under MAS Notice SFA04-N02.
- As no financial advisory service will be provided by Company D in respect of Token D, the FAA will not apply in relation to the offer of Token D.

Case study 5

Company E plans to set up a platform that helps start-ups raise funds from investors through digital token offerings ("**Offerings**"). To facilitate the Offerings, Company E will set up one entity ("**Entity**") which will be used as a vehicle to make investments into a start-up, for every start-up that will make Offerings. Investors who wish to invest into a start-up will provide a loan to the respective Entity ("**Loan**"). In return, the Entity will issue to the investors, digital tokens that are unique to the start-up ("**Token E**"). Token E will be offered to any person globally, including in Singapore. Token E will represent the rights of an investor as a creditor of the Loan provided to the Entity. Company E's platform will also operate as a market to facilitate secondary trading of Token E among investors using Company E's platform. In addition, Company E intends to provide financial advice to investors on the Offerings.

Application of relevant laws administered by MAS in relation to an offer of Token E

- Token E will be a debenture, and constitute securities under the SFA.

A GUIDE TO DIGITAL TOKEN OFFERINGS

- An Entity will need to comply with Prospectus Requirements in respect of an Offering, unless otherwise exempted under the SFA.
- Company E, in facilitating the purchase or sale of Token E on its platform, may require a capital markets services licence for dealing in capital markets products that are securities under the SFA, unless otherwise exempted.
- Depending on the business activities that an Entity undertakes on Company E's platform, the Entity may require a capital markets services licence for dealing in capital markets products that are securities under the SFA, unless otherwise exempted.
- Holders of a capital markets services licence are required to comply with AML/CFT requirements under MAS Notice SFA04-N02.
- To provide financial advice to investors in relation to an offer of Token E by an Entity, Company E must be a licensed financial adviser unless otherwise exempted[39].
- Licensed financial advisors are required to comply with AML/CFT requirements under MAS Notice FAA-N06.
- Company E is likely be operating an organised market in relation to the secondary trading of Token E. On this basis, Company E will have to be approved by MAS as an approved exchange or recognised by MAS as a recognised market operator under the SFA, unless otherwise exempted.

Case study 6

Company F is planning to set up a digital payment token exchange platform that allows users to exchange digital payment tokens (such as Bitcoin) that do not constitute securities, derivatives contracts or units in CIS, to fiat currencies. In its initial years of operation, the platform will be configured such that trading of digital tokens constituting securities, derivatives contracts or units in CIS will not be allowed. This restriction may be lifted after a few years.

Application of relevant laws administered by MAS in relation to Company F's digital payment token exchange

- On the basis that Company F's digital payment token exchange will not allow trading of any products regulated under the SFA, the SFA will not apply.

---

[39] If Company E holds a capital markets services licence for dealing in capital markets products under the SFA, Company E is exempt from holding a financial adviser's licence to act as a financial adviser in Singapore in respect of any financial advisory service. Instead, Company E will be subject to certain reporting requirements, including the requirement under regulation 37(1) of the Financial Advisers Regulations (Rg2) to lodge a notification to MAS that it is commencing business in a financial advisory service under the FAA.

- Company F should re-assess its position should it intend to trade in any digital tokens that constitute securities, derivatives contracts or units in CIS under the SFA. For instance, upon lifting the abovementioned restriction, Company F will likely be operating an organised market in relation to the trading of digital tokens that constitute securities, derivatives contracts or units in CIS. On this basis, Company F will then need to be approved by MAS as an approved exchange or recognised by MAS as a recognised market operator under the SFA, unless otherwise exempted.
- The activity of establising or operating a digital payment token exchange is regulated by MAS under the PS Act. Entities licensed under the PS Act to perform such activities are required to comply with AML/CFT requirements, including those relating to identification and verification of customer, ongoing monitoring, screening for ML/TF concerns, suspicious transaction reporting,  record keeping, and ongoing business conduct, regulatory reporting and technology risk management requirements. Company F must also abide by all Singapore laws, including the CDSA, the TSOFA and the UN Regulations, in the conduct of its business.

Case study 7

Company G is incorporated and has its principal place of business in the United States of America. Company G intends to offer digital tokens ("**Token G**") to any person globally, including in Singapore. Token G is governed by a Simple Agreement for Future Tokens ("**SAFT**") and is an "investment contract" (and therefore constitute securities) under US laws (or the "Howey Test"[40]). Token G will be tradeable in the secondary market on an over-the-counter basis or on third party cryptocurrency exchanges.

Application of relevant laws administered by MAS in relation to an offer of Token G

- The ability for a digital token to be traded on the secondary market alone does not result in a digital token being construed as capital markets products under the SFA.
- The treatment of a token under the Howey Test is not a consideration for deciding whether a token is a product regulated under the SFA.
- Company G must separately assess whether its offer of Token G in Singapore would comply with the securities laws administered by MAS despite its assessment of Token G under US laws.
- Token G may be considered a digital payment token under the PS Act if it is, or is intended to be, a medium of exchange accepted by the public, or a section of the public, as payment for goods or services or for the discharge of a debt.

---

[40] *Securities and Exchange Commission v W. J. Howey Co. 328 U.S. 293 (1946)*

- If Token G is a digital payment token, then Company G may be carrying on a business of providing the service of dealing in digital payment tokens.
- Company G should consider whether its services are regulated under the PS Act, and if so, to apply for the relevant licence under the PS Act.

Case study 8

Company H plans to build a decentralised platform to collect user data on consumer spending on various e-commerce websites. This forms an ecosystem where retailers rely on consumer behaviour data to execute targeted advertisements. To fund the development of the platform, Company H intends to raise funds from investors through an offering of digital tokens ("**Token H**"). Token H only gives rights to investors to vote on features of the platform. There are no other rights attached to Token H. Company H will also distribute Token H as rewards to investors for participating in surveys on consumer spending. The amount of Token H to be rewarded to an investor is based only on his or her usage and activity on the Platform, and not through further investment in the platform.

Application of relevant laws administered by MAS in relation to an offer of Token H

- Token H is not a share as it does not represent any legal or beneficial title in the shares of any company. As the rewards are distributed in proportionate to investor's usage and activity on the platform, it does not represent a right to claim dividends or return on capital.
- Token H is not a debenture as it does not create or acknowledge debt on the part of Company H.
- Token H is not a unit in a CIS as there is no management of property by a manager ("**Scheme Property**"), and investors are rewarded based on their participation on the platform with new Token H and not profits, income or other payments or returns relating to Scheme Property. Token H also does not involve pooling of contributions, or income or profits from which payments are to be made to the investors.
- As Token H does not constitute capital markets products under the SFA or an investment product under the FAA, the requirements under the SFA or the FAA will not apply to Company H's offer of or dealings in Token H.
- That said, Company H must abide by all Singapore laws, including the CDSA, the TSOFA and the UN Regulations, in the conduct of its business. Company H may also wish to seek legal advice on the applicability of the Personal Data Protection Act 2012 (Act 26 of 2012) on its business model.

Case study 9

Company I provides advisory services on the entire digital token offering process from pre-offering to post-offering. These services include reviewing whitepapers and suitability of concept and goals, introducing lawyers and developers, advising on token security protocol and post-offering delivery of tokens. Company I's clients ("**Clients**") are companies that raise funds by offering digital tokens ("**Token I**") to support the development of the products and services that the Clients intend to offer. Company I has strict client selection criteria, and will only offer their services to Clients who issue Token I that can only be used in exchange for the products or services offered by the Clients without entitling the holder of Token I to receive payments of any kind from any person. Apart from redeeming the Client's products and services, there are no other functions or rights attached to the Token I. Company I does not provide legal advice on the application of Singapore laws to the digital token offerings. In addition, Company I does not advise on the risks or suitability of the digital token offerings to investors or make any recommendations on which digital token offerings to invest. The services that Company I provide to investors of the digital tokens are operational in nature, such as conducting training and seminars on how to participate in the offerings, creation and encryption of wallets, token transfers etc.

Application of relevant laws administered by MAS in relation to digital token offering advisory services

- Token I is unlikely to constitute capital markets products under the SFA, as it can only be used to redeem the Clients' products or services.
- Company I is unlikely to be conducting the regulated activity of advising on corporate finance as its advisory services do not relate to the raising of funds involving securities, units in a CIS or specified securities-based derivatives contracts.
- As Company I is not providing financial advice to the Clients or the investors of digital token offerings, the FAA will not apply.
- That said, Company I must abide by all Singapore laws, including the CDSA, the TSOFA and the UN Regulations, in the conduct of its business.
- Token I may be considered a digital payment token under the PS Act if it is, or is intended to be, a medium of exchange accepted by the public, or a section of the public, as payment for goods or services or for the discharge of a debt.
- If Token I is a digital payment token, then Company I may be carrying on a business of providing the service of dealing in digital payment tokens.
- Company I should consider whether its services are regulated under the PS Act, and if so, to apply for the relevant licence under the PS Act.

Case study 10

Company J plans to set up a platform that allows investors to invest in physical diamonds through the tokenisation of physical diamonds. Company J intends to offer digital tokens ("**Token J**") in Singapore to raise funds to develop the platform. Token J will give holders the right to use the platform and to sell their Tokens J back to Company J at any time. Token J does not represent a right to physical diamonds or any other functions or rights other than the use of the platform. All unsold Tokens J will be destroyed.

Application of relevant laws administered by MAS in relation to an offer of Token J

- As Company J is under an obligation to buy-back Token J from the holders, Token J may constitute a debenture if Token J represents Company J's indebtedness to the holder to pay back the holder a certain amount.
- Depending on the business activities of Company J and whether Token J is a debenture, Company J may require a capital markets services licence for dealing in capital markets products that are securities under the SFA, unless otherwise exempted.
- Holders of a capital markets services license are required to comply with AML/CFT requirements under MAS Notice SFA04-N02.
- As no financial advisory service will be provided by Company J in respect of Token J, the FAA will not apply in relation to the offer of Token J.

Case study 11

Company K intends to offer digital tokens ("**Token K**") to any person globally, including in Singapore, for US$1 per Token K. Company K aims to achieve a relatively constant price for Token K by pegging its value to the US dollar. To do so, Company K will only accept payments for Tokens K in the form of electronic deposits of US dollars into its US-dollar denominated bank account. These deposits will serve as a fiat currency reserve to back the purported US$1 value of each Token K in circulation. Holders of Tokens K will have the right to exchange Tokens K with Company K for US$1 per Token K. Company K will not have any rights to cancel or redeem Token K from token holders. Company K may consider future tie-ups with retail shops to enable Token K to be used to pay for purchases.

Application of relevant laws administered by MAS in relation to an offer of Token K

- As Company K is under an obligation to the buy-back of Token K from the holders, Token K may constitute a debenture if Token K represents Company K's indebtedness to the holder to pay back the holder US$1 per Token K. However, if Token K falls within the definition of "e-money" under the PS Act, MAS' general regulatory stance is to not regulate Token K as a debenture.
- Token K may be considered "e-money" under the PS Act. Company K should consider if Token K also meets the other elements of "e-money" as defined in the PS Act, and whether it is carrying on a business of providing "e-money issuance service" as defined in the PS Act. If Company K is carrying on a business providing e-money issuance services, it must be licensed under the PS Act, unless the person is exempted from holding such a licence to provide the specific payment service in question.

## 5 APPLICATION OF SANDBOX CRITERIA ON DIGITAL TOKENS THAT ARE REGULATED BY MAS

5.1 Any firm that is applying technology in an innovative way to provide financial services that are regulated by MAS can apply for the regulatory sandbox. MAS expects that interested firms would have done their due diligence, such as testing the proposed financial service in a laboratory environment and knowing the legal and regulatory requirements for deploying the proposed financial service, prior to submitting an application. Please refer to the evaluation criteria outlined in the "FinTech Regulatory Sandbox Guidelines".

5.2 If an application is approved, MAS will provide the appropriate regulatory support by relaxing specific legal and regulatory requirements prescribed by MAS, which the applicant would otherwise be subject to, for the duration of the sandbox.

## 6 DIGITAL TOKEN OFFERINGS ENQUIRIES

6.1 You should read this Guide carefully to assess if you are required to comply with the relevant laws administered by MAS. You should also answer all the Critical Questions in **Appendix 1,** which will help you determine if it is necessary to write to us**.** MAS will only review legal opinions and engage digital token offering issuers where the structure of the proposed digital token, or the proposed business model is not similar to that described in the case studies in this Guide. Going through all the case studies and answering all the Critical Questions will guide you in considering whether there is a need to contact the MAS.

6.2 If it is still necessary to write to us after going through the Guide and the Critical Questions, you may submit an application to us enclosing all the information stated in the Checklist in **Appendix 2**. MAS reserves the right to ask for more information as may be necessary for us to consider whether the digital token offerings are subject to MAS' regulations. MAS wishes to clarify that we do not have a digital token offerings registration or approval regime. Our reply is not an endorsement of your proposed digital token, offering or business model. Our reply also does not preclude us from taking any enforcement action against you for a contravention of any provision in any

**A GUIDE TO DIGITAL TOKEN OFFERINGS**

legislation administered by us. This includes situations where there are omissions in or changes to the facts represented in your correspondence with us.

**Appendix 1**

**CRITICAL QUESTIONS (YES/NO)**

- Have I sought independent legal advice from a Singapore-qualified lawyer who is familiar with MAS-administered laws?
  (*If 'No', please consider doing so before proceeding further.*)

- Is the structure of my proposed digital token or my proposed business model similar to that described in the case studies?
  (*If 'Yes', no need to approach MAS.*)

- Do the rights and entitlements attached to the digital tokens in this case contain characteristics and features of "capital markets products" under section 2(1) of Securities and Futures Act (Cap. 289) or "investment product" under section 2(1) of the Financial Advisers Act (Cap. 110)?
  (*If 'No', no need to approach MAS.*)

- Are my activities subject to the regulatory requirements in Singapore pursuant to the extra-territorial legislation in paragraphs 2.12 and 2.13 of the Guide?
  (*If 'No', no need to approach MAS.*)

**<u>Appendix 2</u>**

**CHECKLIST**

Please provide all the information below to MAS for the digital token offering enquiry.

<u>Case identification</u>

- ☐ Project name and token name
- ☐ Issuer's name, legal form, country of constitution, unique entity/identification number, address and website
- ☐ Issuer's contact(s), including names, emails, telephone numbers

<u>Offering details</u>

- ☐ Target start and end dates of offering
- ☐ Target offering size, if any (optional)
- ☐ Whether the offering will be accessible by any person in Singapore (Yes/No), and if 'No', reasons explaining how such access will be effectively blocked
- ☐ Nature and scope of project to be funded by offering
- ☐ Whether the token represents any value, function, rights or benefits (Yes/No respectively), and if 'Yes' to any of these, a detailed description of each
- ☐ Whether fiat currency will be used to purchase the token (Yes/No), and if 'Yes', names of the fiat currency(ies)

<u>Documents</u>

- ☐ Terms and conditions of offering that will be executed and be legally binding on issuer and token holders
- ☐ Whitepaper
- ☐ Other relevant information e.g., screenshots of websites or social media showing information to be disseminated for the purpose of the offering
- ☐ Legal opinion from a Singapore-qualified lawyer applying all relevant laws administered by MAS to the facts of the offering and of the issuer's business. The opinion should cross-reference or cite specific clauses in accompanying supporting documents which are relevant.
- ☐ Brief description of AML/CFT policies (if any)

<u>Specific issues for MAS to address</u>

- ☐ Specific actions sought from MAS, i.e., clarification on applicability of specific aspects of the law, application  for licences, request for exemptions or waivers