**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

SECURITIES AND EXCHANGE COMMISSION,

                    Plaintiff,

    v.

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

                    Defendants.

Case No. 20-CV-10832 (AT) (SN)

**DEFENDANTS' REPLY IN SUPPORT OF**
**MOTION FOR SUMMARY JUDGMENT**

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................................ iv

PRELIMINARY STATEMENT ...................................................................................................... 1

ARGUMENT .................................................................................................................................... 5

I.     THE SEC HAS FAILED TO PROVE THE EXISTENCE OF ANY INVESTMENT
CONTRACTS GOVERNING DEFENDANTS' OFFERS AND SALES OF XRP ............. 5

II.    DEFENDANTS' XRP TRANSACTIONS WERE NOT OFFERS AND SALES OF
INVESTMENT CONTRACTS UNDER THE *HOWEY* TEST ......................................... 13

      A.    The SEC's Brief Confirms It Cannot Prove an "Investment of Money".................... 13

      B.    The SEC's Brief Confirms It Cannot Prove a Common Enterprise .......................... 16

            1.    Controlling Precedent Forecloses the SEC's Claims......................................... 16

            2.    The SEC Cannot Prove Horizontal Commonality ............................................. 18

            3.    Vertical Commonality Is Insufficient, and the SEC Cannot Prove It ............... 22

            4.    The SEC's Remaining Common-Enterprise Arguments Attack Strawmen ...... 25

      C.    XRP Holders Do Not Reasonably Expect Profits from Defendants' Efforts ............ 30

            1.    There Can Be No Reasonable Expectation of Profits from Defendants'
Efforts in the Absence of Any Obligations to XRP Holders ............................. 30

            2.    XRP Holders Cannot Reasonably Expect Profits from Ripple When
Profits Are Attributable to Market Forces ........................................................ 38

III.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY
JUDGMENT ON OFFERS TO SELL AND SALES ON FOREIGN EXCHANGES ....... 40

      A.    The SEC Has Raised No Genuine Dispute of Material Fact as to the Individual
Defendants' XRP Sales on Foreign Exchanges ....................................................... 41

            1.    The Individual Defendants' Transfers of XRP to GSR Were Not Sales,
Did Not Pass Title, and Did Not Create Irrevocable Liability ........................... 43

            2.    The SEC's Remaining Arguments That the Individual Defendants' Sales
Were Somehow Domestic Are Likewise Foreclosed by the Facts and
the Law .............................................................................................................. 46

    3.   The SEC Ignores That GSR Is a Foreign Entity ................................................. 48

  B.   The SEC Has Not Raised a Genuine Dispute of Fact as to the Individual
       Defendants' Offers on Foreign Exchanges ................................................................ 48

  C.   The SEC Cannot Revive Its Failed Argument That *Morrison* Does Not Apply
       to Section 5 ................................................................................................................ 52

IV.  LARSEN IS ENTITLED TO SUMMARY JUDGMENT ON OFFERS AND
     SALES OF XRP BEFORE SEPTEMBER 1, 2015 ............................................................ 52

V.   THE SEC'S *AMICI* DO NOT SUPPORT ITS CASE ......................................................... 53

CONCLUSION ...................................................................................................................................... 55

**TABLE OF AUTHORITIES**

**CASES**                                                                Pages

*Absolute Activist Value Master Fund Ltd. v. Ficeto*,
    677 F.3d 60 (2d Cir. 2012) ........................................................... 43, 46, 47

*Aldrich v. McCulloch Props., Inc.*,
    627 F.2d 1036 (10th Cir. 1980) ........................................................... 37

*Anderson v. Binance*,
    2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ..................................... 47, 52

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ........................................................................... 42

*Audet v. Fraser*,
    2022 WL 1912866 (D. Conn. June 3, 2022) ..................................... 22, 26

*Balestra v. ATBCOIN LLC*,
    380 F. Supp. 3d 340 (S.D.N.Y. 2019) ................................................. 21

*Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*,
    849 F. App'x 289 (2d Cir. 2021) ......................................................... 41

*Beranger v. Harris*,
    2019 WL 5485128 (N.D. Ga. Apr. 24, 2019) ..................................... 13

*BitConnect Sec. Litig., In re*,
    2019 WL 9104318 (S.D. Fla. Aug. 23, 2019) ..................................... 13

*Brodt v. Bache & Co.*,
    595 F.2d 459 (9th Cir. 1978) ............................................................... 24

*Campbell v. Castle Stone Homes, Inc.*,
    2011 WL 902637 (D. Utah Mar. 15, 2011) ....................................... 27

*Cohens v. Virginia*,
    19 U.S. (6 Wheat.) 264 (1821) ............................................................. 7

*Cornwell v. Credit Suisse Grp.*,
    729 F. Supp. 2d 620 (S.D.N.Y. 2010) ............................................... 46, 48

*De Luz Ranchos Inv., Ltd. v. Coldwell Banker & Co.*,
    608 F.2d 1297 (9th Cir. 1979) ........................................................... 32, 33

*Demarco v. LaPay*,
    2009 WL 3855704 (D. Utah Nov. 17, 2009) ..................................... 34

*Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*,
  147 F.3d 118 (2d Cir. 1998) ................................................................................. 52

*Fletcher v. Atex, Inc.*,
  68 F.3d 1451 (2d Cir. 1995) ................................................................................. 43

*Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  756 F.2d 230 (2d Cir. 1985) ................................................................ 31, 39, 40

*Glen-Arden Commodities, Inc. v. Costantino*,
  493 F.2d 1027 (2d Cir. 1974) ............................................................... 15, 28, 31

*Gugick v. Melville Cap., LLC*,
  2014 WL 349526 (S.D.N.Y. Jan. 31, 2014) ......................................................... 22

*Hall v. Hall*,
  138 S. Ct. 1118 (2018) ........................................................................................... 6

*Happy Inv. Grp. v. Lakeworld Props., Inc.*,
  396 F. Supp. 175 (N.D. Cal. 1975) ...................................................................... 33

*Hart v. Pulte Homes of Mich. Corp.*,
  735 F.2d 1001 (6th Cir. 1984) ............................................................................. 19

*Holsworth v. BProtocol Found.*,
  2021 WL 706549 (S.D.N.Y. Feb. 22, 2021) ........................................................ 52

*Hunssinger v. Rockford Bus. Credits, Inc.*,
  745 F.2d 484 (7th Cir. 1984) ........................................................................ 31, 54

*Illinois v. Lidster*,
  540 U.S. 419 (2004) ................................................................................................ 7

*J.P. Jeanneret Assocs., Inc., In re*,
  769 F. Supp. 2d 340 (S.D.N.Y. 2011) .................................................................. 22

*Jobanputra v. Kim*,
  2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022) ..................................................... 26

*King v. Time Warner Cable Inc.*,
  894 F.3d 473 (2d Cir. 2018) ................................................................................... 5

*Landreth Timber Co. v. Landreth*,
  471 U.S. 681 (1985) ....................................................................................... 14, 25

*Lehman Bros Com. Corp. v. Minmetals Int'l Non-Ferrous Metals Trading Co.*,
  179 F. Supp. 2d 159 (S.D.N.Y. 2001) .................................................................. 39

*Loginovskaya v. Batratchenko*,
    764 F.3d 266 (2d Cir. 2014) .......................................................................... 41, 46, 50

*Marine Bank v. Weaver*,
    455 U.S. 551 (1982) ................................................................................................. 14

*Marini v. Adamo*:
    812 F. Supp. 2d 243 (E.D.N.Y. 2011) ....................................................... 22, 23, 24

    995 F. Supp. 2d 155 (E.D.N.Y. 2014) ......................................................................... 9

*McGill v. Am. Land & Expl. Co.*,
    776 F.2d 923 (10th Cir. 1985) .................................................................................... 27

*McKinney v. Panico*,
    2022 WL 4551695 (N.D. Ill. Sept. 29, 2022) .............................................................. 9

*Miami Metals I, Inc., In re*,
    603 B.R. 727 (S.D.N.Y. Bankr. 2019) ........................................................................ 45

*Miller v. Cent. Chinchilla Grp., Inc.*,
    494 F.2d 414 (8th Cir. 1974) ...................................................................................... 28

*Moreland v. Dep't of Corps.*,
    194 Cal. App. 3d 506 (1987) ....................................................................................... 11

*Morrison v. National Australia Bank Ltd.*,
    561 U.S. 247 (2010) ........................................................ 4, 41, 42, 46, 47, 50, 51, 52

*Myun-Uk Choi v. Tower Rsch. Cap. LLC*,
    890 F.3d 60 (2d Cir. 2018) ......................................................................................... 41

*New Prime Inc. v. Oliveira*,
    139 S. Ct. 532 (2019) ..................................................................................................... 6

*Niz-Chavez v. Garland*,
    141 S. Ct. 1474 (2021) ................................................................................................... 5

*Noa v. Key Futures, Inc.*,
    638 F.2d 77 (9th Cir. 1980) ........................................................................................ 23

*Nycal Corp. v. Inoco PLC*,
    988 F. Supp. 296 (S.D.N.Y. 1997) ............................................................................. 44

*Petrobras, Sec., In re*,
    862 F.3d 250 (2d Cir. 2017) ................................................................................. 43, 47

*Poindexter v. Merrill Lynch, Pierce, Fenner & Smith*,
    684 F. Supp. 478 (E.D. Mich. 1988) .......................................................................... 24

*Revak v. SEC Realty Corp.*,
    18 F.3d 81 (2d Cir. 1994) ................................................. 3, 10, 16, 17, 18, 19, 20, 22, 23, 26, 28

*Rocky Aspen Mgmt. 204 LLC v. Hanford Holdings, LLC*,
    230 F. Supp. 3d 159 (S.D.N.Y. 2017)....................................................... 22

*Rodriguez v. Banco Cent. Corp.*,
    990 F.2d 7 (1st Cir. 1993) ........................................................... 25, 32, 34

*Salameh v. Tarsadia Hotel*,
    726 F.3d 1124 (9th Cir. 2013) ....................................................... 37

*SEC v. Ahmed*,
    308 F. Supp. 3d 628 (D. Conn. 2018)................................................... 47

*SEC v. Aqua-Sonic Prods. Corp.*,
    687 F.2d 577 (2d Cir. 1982)........................................................... 31

*SEC v. Belmont Reid & Co.*,
    794 F.2d 1388 (9th Cir. 1986) ....................................................... 23

*SEC v. C.M. Joiner Leasing Corp.*,
    320 U.S. 344 (1943) ............................................................... 31

*SEC v. Edwards*,
    540 U.S. 389 (2004)............................................................... 12

*SEC v. Energy Grp. of Am., Inc.*,
    459 F. Supp. 1234 (S.D.N.Y. 1978)..................................................... 15

*SEC v. Feng*,
    935 F.3d 721 (9th Cir. 2019) ......................................................... 28

*SEC v. Goldman Sachs & Co.*,
    790 F. Supp. 2d 147 (S.D.N.Y. 2011)................................................. 50, 51

*SEC v. Kik Interactive Inc.*,
    492 F. Supp. 3d 169 (S.D.N.Y. 2020)........................................ 18, 21, 22, 26, 39, 40

*SEC v. Koscot Interplanetary, Inc.*,
    497 F.2d 473 (5th Cir. 1974) ....................................................... 31, 32

*SEC v. LBRY, Inc.*,
    2022 WL 16744741 (D.N.H. Nov. 7, 2022) ................................... 23, 29, 34, 35, 55

*SEC v. Merchant Cap., LLC*,
    483 F.3d 747 (11th Cir. 2007) ....................................................... 31

*SEC v. Mut. Benefits Corp.*:
  323 F. Supp. 2d 1337 (S.D. Fla. 2004), *aff'd*, 408 F.3d 737 (11th Cir. 2005) ........................ 39

  408 F.3d 737 (11th Cir. 2005) ............................................................................................. 38

*SEC v. Pac. W. Cap. Grp., Inc.*,
  2015 WL 9694808 (C.D. Cal. June 16, 2015) .................................................................... 39

*SEC v. Scoville*,
  913 F.3d 1204 (10th Cir. 2019) ............................................................................................ 9

*SEC v. SG Ltd.*,
  265 F.3d 42 (1st Cir. 2001) ............................................................................................. 9, 20

*SEC v. Shields*,
  744 F.3d 633 (10th Cir. 2014) .............................................................................................. 31

*SEC v. Sierra Brokerage Servs., Inc.*,
  608 F. Supp. 2d 923 (S.D. Ohio 2009) ................................................................................. 13

*SEC v. Telegram Grp. Inc.*,
  448 F. Supp. 3d 352 (S.D.N.Y. 2020) .................................................. 15, 16, 21, 22, 26, 31, 36

*SEC v. Traffic Monsoon, LLC*,
  245 F. Supp. 3d 1275 (D. Utah 2017), *aff'd sub nom. SEC v. Scoville*,
  913 F.3d 1204 (10th Cir. 2019) ............................................................................................ 9

*SEC v. United Benefit Life Insurance Co.*,
  387 U.S. 202 (1967) ............................................................................................................ 31

*SEC v. W.J. Howey Co.*,
  328 U.S. 293 (1946) ..................................................................................................... *passim*

*Sinva, Inc. v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*,
  253 F. Supp. 359 (S.D.N.Y. 1966) ................................................................................. 23, 54

*Solis v. Latium Network, Inc.*,
  2018 WL 6445543 (D.N.J. Dec. 10, 2018) .......................................................................... 13

*Stoyas v. Toshiba Corp.*,
  2022 WL 220920 (C.D. Cal. Jan. 25, 2022) ........................................................................ 45

*Sturm v. Boker*,
  150 U.S. 312 (1893) ............................................................................................................ 45

*Taggart v. Lorenzen*,
  139 S. Ct. 1795 (2019) .......................................................................................................... 6

*United States v. Aleynikov,*
    676 F.3d 71 (2d Cir. 2012) ................................................................................ 33

*United States v. Leonard,*
    529 F.3d 83 (2d Cir. 2008) ................................................................................ 26

*United States v. Naftalin,*
    441 U.S. 768 (1979) .......................................................................................... 50

*Wals v. Fox Hills Dev. Corp.,*
    24 F.3d 1016 (7th Cir. 1994) .......................................................... 18, 19, 20, 25

*Walther v. Maricopa Int'l Inv. Corp.,*
    1998 WL 186736 (S.D.N.Y. Apr. 17, 1998) ..................................................... 22

*Wieboldt v. Metz,*
    355 F. Supp. 255 (S.D.N.Y. 1973) .................................................................... 11

*Wildes v. BitConnect Int'l PLC,*
    25 F.4th 1341 (11th Cir. 2022) .................................................................... 13, 51

**STATUTES**

Securities Act of 1933, 15 U.S.C. § 77a *et seq.* .................................. 1, 5, 6, 7, 8, 11, 50

    § 2(a)(3), 15 U.S.C. § 77b(a)(3) ................................................................ 45, 49, 51

    § 5, 15 U.S.C. § 77e ..................................................................... 2, 14, 15, 50, 52

    § 5(a), 15 U.S.C. § 77e(a) ................................................................................. 15

    § 5(c), 15 U.S.C. § 77e(c) ................................................................................. 15

    § 17(a)(1), 15 U.S.C. § 77q(a)(1) ..................................................................... 50

**RULES AND REGULATIONS**

17 C.F.R. § 230.903(b)(ii) ....................................................................................... 51

31 C.F.R. § 1010.100(ff) ......................................................................................... 43

**OTHER AUTHORITIES**

*Black's Law Dictionary* (3d ed. 1933) ..................................................................... 9

Compl., *SEC v. Crystal World Holdings, Inc.*, No. 1:19-cv-2490-CJN, ECF No. 1
    (D.D.C. Aug. 19, 2019) ...................................................................................... 53

*Webster's New International Dictionary* (2d ed. 1937) ....................................... 9, 30

## PRELIMINARY STATEMENT

The SEC's opposition brief confirms that Defendants' Motion for Summary Judgment should be granted.  The SEC cannot show that any offer or sale of XRP – much less *every* one from 2013 to 2020, as it alleges and bears the burden to demonstrate – was an offer or sale of an "investment contract and therefore a security [under] the federal securities laws."  ECF No. 46 (Am. Compl.) ¶ 231.

This case turns on statutory interpretation:  specifically, whether the SEC can misapply the statutory phrase "investment contract" to cover transactions that have none of the essential ingredients – in particular, the bundle of ongoing rights and obligations – that define an "investment contract."  It is a longstanding principle that legal terms of art used in statutes retain their established meaning.  In *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), the Supreme Court applied that principle to construe the term "investment contract," which had a "crystallized" meaning before Congress passed the Securities Act.  *Id.* at 298.  As Defendants showed in their Motion, and as a comprehensive analysis provided by *amicus* Paradigm Operations LP (*see* ECF No. 707) confirms, *every* pre-*Howey* case finding an investment contract, *Howey* itself, and every Supreme Court and Second Circuit case following *Howey* involved one or more contracts imposing post-sale rights and obligations on the parties.

The SEC nominally protests, claiming to have found some cases where the essential ingredients of an investment contract discussed in *Howey* were not present.  But that claim does not hold up to scrutiny; the SEC simply mischaracterizes its cases.  Ultimately, the SEC cannot point to a single case finding an investment contract without the "essential ingredients" identified in *Howey*.  And it is undisputed that this case has none of them.  *See* SEC 56.1 Resp.[1] ¶ 99

---

[1] This brief uses the following citation conventions:  "Defendants' Motion" or "Defs.' MSJ" refers to ECF No. 622.  "SEC's Motion" or "SEC MSJ" refers to ECF No. 628.  "Defs.'

(undisputed that "Ripple undertook no contractual obligations to exchange-based purchasers"); *id.* ¶ 117 (undisputed that Ripple had no contractual "post-sale obligations" to buyers); *id.* ¶ 118 (undisputed that buyers had no contractual rights to receive any form of payment from Ripple). These concessions are fatal to the SEC's case. The point of the *Howey* test is to determine whether such contractual rights and obligations amount to an investment contract. Without them, *Howey* cannot be applied coherently, as the SEC's own briefs illustrate.

The SEC has, in any event, failed to carry its burden as to each of the three *Howey* elements. On the first element, investment of money, the SEC concedes that billions of units of XRP distributed by Defendants involved no investment of money at all. The SEC urges this Court to find that Defendants' failure to register these distributions still violated Section 5 because Section 5 prohibits "indirectly" selling securities to the public. But that sidesteps the threshold question – whether these transactions involved an investment contract (which requires an investment of money) in the first place. At the very least, the SEC's concession entitles Defendants to partial summary judgment and requires denial of the SEC's Motion. It also has a critical implication that the SEC does not acknowledge: because all XRP is fungible, the SEC's

---

56.1" refers to Defendants' Local Rule 56.1 Statement filed in support of their Motion for Summary Judgment, ECF No. 623. "SEC 56.1" refers to the SEC's Local Rule 56.1 Statement filed in support of its Motion for Summary Judgment, ECF No. 629. "Defs.' Opp." refers to Defendants' Opposition to the SEC's Motion for Summary Judgment, ECF No. 662. "Defs.' 56.1 Resp." and "Defs.' 56.1 Supp." respectively refer to Defendants' Response to the SEC's Local Rule 56.1 Statement and Defendants' supplemental statement of facts included therewith, ECF No. 663. "SEC Opp." refers to the SEC's Opposition to Defendants' Motion for Summary Judgment, ECF No. 667. "SEC 56.1 Resp." and "SEC 56.1 Supp." respectively refer to the SEC's Response to Defendants' Local Rule 56.1 Statement and the SEC's supplemental statement of facts included therewith, ECF No. 668. "Defs.' 56.1 Supp. Resp." refers to Defendants' Response to the SEC's supplemental statement of facts. Exhibits attached to Defendants' Local Rule 56.1 Statement or Response (ECF Nos. 623, 663, 724) are identified as "Ex." Exhibits previously filed by the SEC in connection with its Local Rule 56.1 Statement or Response (ECF Nos. 629, 668) are identified as "PX."

position would lead to a completely unworkable result in which purchasers and sellers would have no way of knowing whether they were transacting in "registered" or "unregistered" XRP.

Even for transactions that involved an exchange of money, the SEC has failed to show that purchasers invested that money in a common enterprise, as *Howey* requires, rather than simply buying an asset. Defendants' Motion explained that the SEC has never identified any viable common enterprise in this case. The SEC's opposition brief still does not even try to do so. Instead, it embarks on various tangents to suggest that it can establish a common enterprise without ever pointing to one. That is wrong as a general principle, and it is wrong as to each of the SEC's theories regarding the common-enterprise element. None can be squared with settled law – including *Howey* itself and the Second Circuit's binding precedent, *Revak v. SEC Realty Corp.*, 18 F.3d 81 (2d Cir. 1994).

On the final element, expectation of profits based solely on the efforts of others, the SEC cannot overcome two fundamental flaws. *First*, no reasonable expectation can exist absent actual obligations undertaken by the promoter, and the SEC has pointed to none. The SEC claims (at 3) that Defendants made "promises," but that empty claim does not hold up: no evidence of any "promise" appears anywhere in the SEC's fact statements, and, indeed, the only mention of a "promise" that the SEC cites is a clear statement that Ripple was *not* making any. SEC 56.1 ¶ 395 (citing forum post by Ripple employee warning readers that he "[c]an't promise anything"); PX 508.34. The SEC also relies extensively on non-public statements that are irrelevant because no XRP buyer could have seen them.[2] The hodgepodge of statements on

---

[2] *See, e.g.*, SEC Opp. at 4 (citing SEC 56.1 ¶¶ 136, 141, 397-398 (internal Ripple communications); *id.* ¶¶ 139-140, 355-356, 361, 363, 365, 409 (internal documents); *id.* ¶¶ 351, 413-415, 420 (non-public communications with market markers or P.R. agencies); *id.* ¶¶ 137-138, 142-143, 344, 350, 367, 374, 380, 399, 410 (Ripple witness testimony)).

which the SEC relies – some public and some private – does not suffice to create any legal obligations, as Ripple itself told XRP holders.  The undisputed truth, as the SEC is forced to concede in its Rule 56.1 response, is that Ripple owed no obligations to XRP holders.  SEC 56.1 Resp. ¶ 117.  *Second*, as a matter of law, there can be no reasonable expectation of profits from others' efforts when market forces (rather than the alleged promoter) determine an asset's value.  Here, the SEC's own expert concedes that, from mid-2018 onward, bitcoin and ether returns "can explain as much as almost 90% of XRP returns."  *Id*. ¶ 123.  The SEC offers no serious response and simply denies that the cases say what they say in establishing this legal rule.

Together, these undisputed points demonstrate that the SEC cannot satisfy the *Howey* test.  That requires summary judgment in Defendants' favor.  If that were not enough, the undisputed facts also show that the SEC cannot prove that the vast majority of the Individual Defendants' sales or offers to sell (or many of Ripple's) were domestic.  The SEC has now conceded (*see infra* p. 42) that the digital asset exchanges on which the Individual Defendants conducted the vast majority of their transactions were foreign.  That concession extinguishes its claims because federal securities laws do not reach foreign sales and offers.  The SEC's contrary arguments are nothing more than an attempt to re-litigate points it already lost at the motion-to-dismiss stage and, indeed, lost more than a decade ago when the Supreme Court decided *Morrison v. National Australia Bank Ltd*., 561 U.S. 247 (2010).

In short, the SEC is asking the Court to rewrite the statutes that define its authority.  For the SEC to prevail in its opposition, the Court would have to endorse the SEC's theory that there can be an "investment contract" without any contract, without any investor rights, and without any issuer obligations.  It would have to endorse the SEC's theory that there can be a "common enterprise" even if the SEC cannot say what the enterprise is or prove any of the elements that

define such enterprises.  And it would have to endorse the SEC's theory that purchasers could reasonably have expected profits from Ripple's efforts even though Ripple never promised to make any efforts, even though it expressly disavowed any obligation to do so, and even though profits were overwhelmingly due not to Ripple's efforts, but to market forces.  The Court would also have to conclude that all the *amici* that have expressly said they did not join a common enterprise or expect profits from Ripple's efforts are wrong about their own beliefs and actions.  The SEC's position boils down to a view that any time someone buys an asset hoping to make money, and the seller's interests are even partly aligned with the buyer's, it is a security subject to registration.  That is not the law, even if the seller uses the sales proceeds to run its business.  If Congress wants to expand the securities laws that way, it can do so; but this Court should not.[3]

## ARGUMENT

## I.    THE SEC HAS FAILED TO PROVE THE EXISTENCE OF ANY INVESTMENT CONTRACTS GOVERNING DEFENDANTS' OFFERS AND SALES OF XRP

"Every exercise in statutory construction must begin with the words of the text."  *King v. Time Warner Cable Inc.*, 894 F.3d 473, 477 (2d Cir. 2018).  The Securities Act includes the term "investment contract" in the definition of "security."  Courts "normally seek[ ] to afford [a] law's terms their ordinary meaning at the time Congress adopted them," even where "the government might advance" a "conflicting reading."  *Niz-Chavez v. Garland*, 141 S. Ct. 1474, 1480 (2021).

---

[3] In fact, Congress has been actively considering legislation to address the proper regulatory treatment (and the appropriate regulator) for digital assets.  *See* ECF No. 683, Br. of *Amici Curiae* Investor Choice Advocs. Network & Phillip Goldstein at 7-11.  "Until a consensus is reached, the SEC has no authority to fill what it apparently perceives as a vacuum."  *Id*. at 11.  The SEC itself recognized this week in its *Strategic Plan for 2022-2026* that "the SEC must pursue new authorities from Congress where needed" to address areas such as "the rapid growth in crypto assets."  Ex. 299 at 11, SEC, *Strategic Plan – Fiscal Years 2022-2026*, https://www.sec.gov/files/sec_strategic_plan_fy22-fy26_draft.pdf.  The SEC may refer to unrelated events coincident with the filing of its brief, but that would provide no basis for the SEC to claim power that Congress has not granted the agency.

Further guidance comes from the "longstanding interpretive principle" that a statutory term "'obviously transplanted from another legal source' . . . 'brings the old soil with it.'" *Taggart v. Lorenzen*, 139 S. Ct. 1795, 1801 (2019) (quoting *Hall v. Hall*, 138 S. Ct. 1118, 1128 (2018)). Both of those principles counsel against "freely invest[ing] old statutory terms with new meanings," to avoid the "risk" of "judges . . . amending legislation outside the single, finely wrought and exhaustively considered, procedure the Constitution commands." *New Prime Inc. v. Oliveira*, 139 S. Ct. 532, 539 (2019) (internal quotation marks omitted).

The Securities Act, like all other federal statutes, is construed according to those principles. *Howey* itself, interpreting the phrase "investment contract," directed courts to look at the blue sky cases that "crystallized" the meaning of the term:

> By including an investment contract within the scope of § 2(1) of the Securities Act, Congress was using a term the meaning of which had been crystallized by this prior judicial interpretation. It is therefore reasonable to attach that meaning to the term as used by Congress, especially since such a definition is consistent with the statutory aims.

328 U.S. at 298. And, consistent with those cases, *Howey* recognized the "essential ingredients" of the term "investment contract." *Id.* at 301. One or more contracts establishes the rights and obligations of the parties. *See id.* at 295-97 (describing the "land sales contract" and "service contract" that performed that function in *Howey*). The investors "provide the capital and share in the [enterprise's] earnings and profits." *Id.* at 299-300. The promoter "manage[s], control[s] and operate[s] the enterprise" for the investors' benefit and provides "a return on their investments" based on "[t]heir respective shares." *Id.* at 300.

The SEC declines to call these ingredients essential. Yet it concedes (at 14) that "*Howey* recognized that the term 'investment contracts' had become 'crystallized' in state blue sky laws," and it admits (at 19) that "each pre-*Howey* state law case involved a contract." Further, the SEC nowhere disputes either that every pre-*Howey* blue sky case finding an investment contract

involved a contract that imposed post-sale obligations on the promoter and gave the investor a right to share in the profits, *see* Defs.' MSJ at 18-21; or that every post-1933 Supreme Court and Second Circuit case finding an investment contract, including *Howey* itself, had the same ingredients, *see id.* at 21-23.  But the SEC asks the Court to ignore all of that precedent.  It suggests that the case law's unanimity on the features of an "investment contract" is mere coincidence rather than a reflection of the settled meaning of the term established by the blue sky cases.  And it insists (at 18) that only a single "paramount sentence" from *Howey* matters.

The SEC is wrong.  You cannot interpret a statute without considering its words.  You cannot interpret words in a statute that "crystallize[s]" prior cases without considering those cases.  And you cannot take a single sentence from *Howey* (even by calling it "paramount") and apply it out of its context.  *See Cohens v. Virginia*, 19 U.S. (6 Wheat.) 264, 399 (1821) (Marshall, C.J.) ("It is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used."); *Illinois v. Lidster*, 540 U.S. 419, 424 (2004) (courts "must read . . . general language in . . . judicial opinions" with reference to their "context").  *Howey* itself suggests that such an approach would be improper.  *Howey* instructs that the "crystallized" common-law meaning of "investment contract" is what Congress meant when it used those words in the Securities Act.  328 U.S. at 298.  That common-law meaning is not present here:  it is undisputed that offers and sales of XRP granted no post-sale rights to recipients as against Defendants, and that offers and sales of XRP imposed no post-sale obligations on Defendants to act for the benefit of those recipients.  SEC 56.1 Resp. ¶¶ 117-118; Ex. 23, SEC Answers to RFA Nos. 57-64, 66, 69-72, 75-78.[4]

---

[4] It is also undisputed that, at least in many cases, there were no contracts between Defendants and the purchasers of XRP.  SEC 56.1 Resp. ¶¶ 94, 99.  Contradicting its own Rule 56.1 response, the SEC incorrectly claims (at 19 n.10) that "every single sale here" involved "the

Unable to dispute those points, the SEC attacks strawmen.  Defendants nowhere suggest (as the SEC claims, at 11) that "the Court should restrict the term 'investment contract' only to the investment products that existed prior to 1933."  New products can be and are securities if they have the required essential ingredients.  But Defendants' offers and sales of XRP did not, and XRP itself certainly does not.  Nor have Defendants said (as the SEC claims, at 13) "that the Court's 'investment contract' analysis should look only at pre-1933 state law decisions."  Later cases can and do provide guidance.  But the blue sky cases have special significance because *Howey* pointed to them as crystallizing the definition of "investment contract."  And no case, new or old, has extended that definition as broadly as the SEC now asks this Court to do.

The SEC argues (at 17-18) against even the basic requirement – both plain on the face of the Securities Act and uniformly supported by the blue sky cases – that a *contract* must exist for an investment *contract* to exist.  It relies on *Howey*'s use of the phrase "contract, transaction or scheme."  But as Defendants explained in their Motion (at 25-26), that language merely directs courts to look beyond the four corners of the contract to evaluate the entire relationship between

---

presence of a written contract."  That claim is sophistry.  The "written contract" that the SEC asserts was "presen[t]" in exchange-based sales was not between Ripple and the purchasers of XRP; it was between Ripple and Ripple's market makers.  *See* SEC 56.1 Supp. ¶¶ 441-454.  The SEC could as well say that there is a written contract "presen[t]" when a McDonald's franchisee sells hamburgers to customers, because McDonald's stores are run under written franchise agreements.  The undisputed point remains:  there were no contracts (much less written contracts) between the Defendants and a single exchange-based purchaser of XRP, just as there is no contract with the McDonald's Corporation when people buy Big Macs.  The SEC retreats to arguing (at 9 n.7) that "the sale of any asset necessarily involves a contract, as long as the requirements of offer, acceptance, and consideration are met," and that such contracts "may be written or implied."  But that argument fails for the same reasons:  even if exchange-based purchasers can be said to have entered into contracts with market makers, they have never entered into any contracts with Defendants.  It is worth stressing, moreover, that the SEC has not presented any of these supposed contracts to the Court, and it has developed no evidence as to the existence or contents of any of the supposed implied contracts it belatedly invokes.  The SEC cannot prove "investment contracts" without introducing a single contract.

the parties; no court has ever interpreted that phrase to mean that a contract is completely unnecessary. The SEC responds (at 17-18) that the Supreme Court *did* mean to eliminate the requirement that any contract exist, but it cites nothing to support that interpretation.[5] Instead, the SEC pivots to arguing (at 19-21) that "many . . . cases exist" in which there was no *written* contract. But Defendants' argument does not turn on any need for a written contract as opposed to an oral or implied-in-fact contract. The point is that some sort of contract is necessary for an "investment contract," and the SEC has failed to prove any contract, whether written, oral, or implied between Ripple and those purchasing XRP. The cases that the SEC cites either involved contracts or did not present the issue.[6] At bottom, despite its claim otherwise, the SEC has not

---

[5] Revealingly, the SEC (at 18) faults Defendants for failing to invoke dictionary definitions of the words in *Howey* (even though *Howey* is not a statute), yet declines to do so itself. That is because, contrary to the modern usage, with its negative connotation, the word "scheme" in *Howey*'s day merely meant a formal business arrangement. *See, e.g.*, *Black's Law Dictionary* 1584 (3d ed. 1933) ("[A] scheme is a document containing provisions for regulating the management or distribution of property rights, or for making an arrangement between two persons having conflicting rights."); *Webster's New International Dictionary* 2234 (2d ed. 1937) ("A plan or program of something to be done; an enterprise; a project; as, a business *scheme*; an irrigation *scheme*."). That definition confirms Defendants' reading and disproves the SEC's.

[6] *SEC v. Scoville*, 913 F.3d 1204 (10th Cir. 2019), involved a fraudulent internet advertising service. Purchasers were "entitled" to receive "visits to [their] website[s]" and an opportunity to "share" in the promoter's revenue. *Id.* at 1210. As the district court decision in that case makes clear, the promoter was "contractually obliged to remit" money to the purchasers. *SEC v. Traffic Monsoon, LLC*, 245 F. Supp. 3d 1275, 1300 (D. Utah 2017), *aff'd sub nom. Scoville*, 913 F.3d 1204. *SEC v. SG Ltd.*, 265 F.3d 42 (1st Cir. 2001), involved the sale of "shares" in "eleven different 'virtual companies' listed on the [promoter's] 'virtual stock exchange.'" *Id.* at 44. The opinion describes in detail the promoter's "guarantee[s]," "assur[ances]," and "pledge[s]" to purchasers, indicating a contractual relationship. *Id.* at 44-45. In *McKinney v. Panico*, 2022 WL 4551695 (N.D. Ill. Sept. 29, 2022), the defendants "drew up paperwork for a fake partnership" (a contract) to convince an investor "that he had a legitimate and recognized interest in" the properties in which the partnership had invested his money in exchange for a percentage of their profits. *Id.* at *4. Finally, in *Marini v. Adamo*, 995 F. Supp. 2d 155 (E.D.N.Y. 2014), *aff'd*, 644 F. App'x 33 (2d Cir. 2016), the parties "stipulated that the transactions at issue in this case 'constitute securities transactions,'" so the district court had no reason to apply *Howey* to determine whether the case involved investment contracts. *Id.* at 185.

cited a single case finding an investment contract where there was no contract between the parties. This Court should not be the first.

The SEC also makes no showing on the second and third essential ingredients, which concern the rights and obligations of the parties. *See* Defs.' MSJ at 30-34. These "other two . . . requirements" are not, as the SEC claims (at 13), "fabricated." Post-sale rights and obligations are necessary to create "a common enterprise" and an "expectation of profits from the efforts of others." *See*, *e.g.*, *Revak*, 18 F.3d at 89 (no investment contract existed where there was "no collateral agreement" to create rights and obligations accompanying simple asset sale). *Howey* explained that investment contracts require "something more than fee simple interests," 328 U.S. at 299, and those other two requirements are what make the difference, *see*, *e.g.*, *Revak*, 18 F.3d at 87. Defendants' argument is buttressed by *amicus* Paradigm Operations, which notes that, based on its exhaustive survey of the case law, "[i]n every application of *Howey* where an investment contract was found, there was some identifiable *legal relationship* between an ostensible 'issuer' and the 'investor' providing investment capital." ECF No. 707 at 2.

The point of the *Howey* test is to determine whether that bundle of rights and obligations amounts to an "investment contract." To do that, it is necessary to know what those rights and obligations are. Because no such rights or obligations exist here, the SEC lapses into incoherence in its attempt to apply *Howey*. As discussed below, after nearly two years of pleadings, discovery, and motion practice, the SEC still cannot identify the alleged "common enterprise," cannot explain how XRP holders can meaningfully expect profits from Ripple's efforts, and cannot respond to the point that many XRP recipients invested no money at all.

The SEC contends (at 8) that contractual rights and obligations that satisfy the *Howey* test are unnecessary as long as Ripple conducted (what the SEC calls) a "capital raise through selling

XRP." But it cites no authority to support its sweeping contention that, if a business funds its operations (even in part) by selling an asset, that asset must be a security. Nor could it. The Securities Act offers a specific definition of "securities," and it is not, as the SEC suggests, any assets a company sells to raise capital. It also defies common sense: *all* business revenue that is not distributed to equity holders goes toward operations in some manner, so the SEC's position would transform every asset sale into a security. If Ford uses revenue from car sales to build a new assembly plant, neither its cars nor its sales of cars thereby become securities; likewise for computers from IBM, oil from Chevron, gold from Newmont, or shoes from Nike – even if the buyer hopes to turn a profit off the purchase. *See also infra* p. 19 n.13.

Nor can the SEC's suggested "capital raise" theory be squared with precedent. No Supreme Court or Second Circuit case has ever adopted it. And a court of this District has rejected a similar argument as "an unwarranted extension of the Securities Act" by federal courts. *Wieboldt v. Metz*, 355 F. Supp. 255, 259 (S.D.N.Y. 1973) (rejecting argument that "all franchises should be treated as securities" under a "'risk capital' approach" simply because the franchisee's "monetary contribution" to a common enterprise operated by the franchisor "constitutes part of its initial capitalization"); *see also Moreland v. Dep't of Corps.*, 194 Cal. App. 3d 506, 522 (1987) (expressly rejecting capital raise theory, under state law standard more permissive than *Howey*).

The SEC also argues (at 45-46 nn.25-26), in substance, that the Court should ignore its lack of statutory authority because registration of digital assets as securities is (supposedly) good policy and (supposedly) not burdensome to potential registrants. In fact, registration itself is currently not possible given various requirements in SEC regulations. *See*, *e.g.*, ECF No. 711, Br. of *Amicus Curiae* Crypto Council for Innovation at 18-26 (discussing this impossibility);

ECF No. 706, Br. of *Amicus Curiae* Blockchain Ass'n at 3-4, 24-26 (same).  But even if Ripple

could somehow register XRP, no digital asset exchange in the United States is registered to trade

digital asset securities with the SEC, so XRP would be effectively illiquid in the United States –

as it has been since the SEC chilled the market by filing this lawsuit.  *See* Defs.' MSJ at 9-10.  In

addition, contrary to the SEC's insistence that products like On Demand Liquidity ("ODL")

would be unaffected, ODL transactions would need to be conducted on registered exchanges by

registered brokers or dealers.  Such registration would add time and cost to these transactions,

destroying the use case for XRP, which depends upon it being a frictionless and low-cost asset.

*See*, *e.g.*, ECF No. 661, Br. of *Amicus Curiae* TapJets, Inc. at 6 (used for instantaneous

settlement); ECF No. 710, Br. of *Amicus Curiae* Reaper Fin. LLC at 7 (used for "tens of

thousands of transactions" with cumulative transaction costs below $0.20); ECF No. 684, Br. of

*Amicus Curiae* Spend The Bits, Inc. at 2, 6 (used for rapid settlement and low transaction costs).

      Finally, the SEC's attempt (at 11) at a rhetorical contrast between "Defendants['] . . .

technologically advanced investment product" and supposed "rel[iance] on stale jurisprudence

that was supplanted by federal laws" falls flat.  The pre-1933 blue sky cases are not "stale" –

they are the source for the statutory term "investment contract," and the Supreme Court has

continued to cite them in cases construing that term, such as *SEC v. Edwards*, 540 U.S. 389, 394

(2004).  Unless and until the SEC obtains new authority from Congress, it has authority only to

regulate offers and sales of assets (digital or otherwise) that fit within the definition of

"investment contract."[7]  This Court should reject the SEC's invitation to rewrite the statute and

expand the SEC's jurisdiction.  Only Congress can do that.

---

[7] The SEC also errs in its characterization of the digital asset cases.  As noted previously, those digital asset cases finding an investment contract in fact *all* involved contracts with post-sale rights and obligations.  *See* Defs.' MSJ at 34-36; Defs.' Opp. at 38-39.  Nor do the SEC's

## II.    DEFENDANTS' XRP TRANSACTIONS WERE NOT OFFERS AND SALES OF INVESTMENT CONTRACTS UNDER THE *HOWEY* TEST

Even setting aside the absence in this case of the essential ingredients of any investment contract, the SEC still lacks evidence that XRP purchasers (a) invested money, (b) in a "common enterprise," and (c) were "led to expect profits solely from the efforts of the promoter or a third party." *Howey*, 328 U.S. at 298-99.  The SEC has not shown – and has not even tried to show – that *any* specific transactions (much less *all* of them) meet the requirements of the *Howey* test.

### A.    The SEC's Brief Confirms It Cannot Prove an "Investment of Money"

Defendants' Motion identified many XRP transactions that did not involve an exchange of money, or any other financial consideration, including the more than 500 million units of XRP Ripple gave away to early adopters and developers.  *See* Defs.' MSJ at 36-38.  The SEC now gives up (at 26 n.15) any claim that Defendants should have registered these distributions, or those in connection with Ripple's "bounty" program, as securities,[8] and concedes that these

---

additional, out-of-circuit cases show otherwise.  *See, e.g.*, *Solis v. Latium Network, Inc.*, 2018 WL 6445543, at *3 (D.N.J. Dec. 10, 2018) (tokens represented "equity in the company" and promoter promised "financial returns"); *Beranger v. Harris*, 2019 WL 5485128, at *1 (N.D. Ga. Apr. 24, 2019) (tokens came with rights to access issuer-sponsored events and website areas, and promoter expressly promised tokens would be redeemable at specified prices on specified future dates); *In re BitConnect Sec. Litig.*, 2019 WL 9104318, at *1 (S.D. Fla. Aug. 23, 2019) (formal token-lending arrangement in which promoter undertook to create and distribute future profits from borrowed tokens); *Wildes v. BitConnect Int'l PLC*, 25 F.4th 1341, 1343 (11th Cir. 2022) (appeal from *BitConnect*), *cert. denied*, No. 22-267 (U.S. Nov. 14, 2022).  The SEC's assertion (at 23) that *BitConnect* contained "no allegations regarding a relationship between any of the Plaintiffs [investors] and [defendant promoters]" (SEC's alterations) is misleading.  The *BitConnect* court observed that there were no allegations of a relationship between the plaintiffs and the *individual directors* alleged to have controlled the issuer – not that there was no such relationship between the plaintiffs and the issuer itself.

[8] The SEC asserts that, even though it "did not charge these transactions," *Howey* would "support[] doing so" if "these would-be gifts may be characterized as a subterfuge to evade registration."  SEC Opp. at 26 n.15 (quoting *SEC v. Sierra Brokerage Servs., Inc.*, 608 F. Supp. 2d 923, 941 (S.D. Ohio 2009)).  But the SEC nowhere alleges, much less offers evidence of, any such subterfuge.  It has thus conceded that XRP given away is not a security.

distributions did not involve payment of any form of consideration to Ripple. SEC 56.1 Resp. ¶ 92. But it does not address the deeper problem with its case that this concession reveals.

The SEC relies in substantial part (*e.g.*, at 55-56) on the supposed views of secondary market purchasers to argue that Defendants' XRP transactions involved an investment contract with Ripple, and it further contends (at 26, 45 n.25) that XRP remains an investment contract with Ripple when traded in the secondary market. But XRP is fungible. Defs.' 56.1 ¶ 15; Ex. 8 at 233:5-12. The SEC offers no way that a secondary market purchaser of XRP could distinguish between units of XRP that the SEC concedes do not satisfy all the elements of the *Howey* test (due to the absence of any investment of money) and those it contends do. That unworkable outcome is a clear indication that the SEC is misapplying the *Howey* test. Indeed, the Supreme Court has expressly rejected an interpretation of *Howey* in which "coverage by the Acts would in most cases be unknown and unknowable to the parties" to a transaction. *Landreth Timber Co. v. Landreth*, 471 U.S. 681, 696 (1985) (citing *Marine Bank v. Weaver*, 455 U.S. 551, 559 n.9 (1982)). As *Landreth* explained, such "uncertainties . . . would hardly be in the best interests of either party to a transaction." *Id.*

Defendants also showed that there was no exchange of money for the more than 4 billion XRP that Defendants donated to various charities and the more than 775 million XRP that Ripple gave away to companies building new technologies, through a project called xPring. *See* Defs.' MSJ at 37-38. The SEC concedes Defendants' donations were for no consideration. SEC 56.1 Resp. ¶ 94. Its attempts to minimize that concession lack factual support – such as when the SEC argues (at 27 n.16), with no citation at all, that Ripple's distributions through xPring benefited Ripple by "enroll[ing]" other entities in "projects that benefited Ripple." Indeed, the SEC goes so far as to assert that donations and giveaways were the "first step in a public dist[ri]bution," pointing to Section 5's bar on "'directly or *indirectly*' offering or selling

14

securities without filing a registration statement."  SEC Opp. at 26 (quoting 15 U.S.C. § 77e(a),

(c)).  But the SEC's complaint does not allege that recipients of this XRP, such as these charities,

were Ripple's underwriters – likely recognizing that such a claim would be absurd.  In any event,

the SEC's argument puts the cart before the horse.  Section 5 applies to offers of *securities*, so

the SEC must first establish the existence of securities before asking whether Defendants

violated Section 5 through offers or sales of those securities.  To do that, the SEC has to prove an

investment of money and, for Defendants' donations and giveaways, it cannot do so.  The cases

the SEC cites to avoid that consequence (at 26) are inapposite because they concern the

distribution of stock; there was no dispute that the stock was a security and thus no need to apply

*Howey* and find an "investment of money."

As to Defendants' transactions that did involve an exchange of money, the SEC still has

not proved that buyers "invest[ed]" that money.  *See* Defs.' Opp. at 19.  The SEC tries to avoid

this burden by arguing (at 25) that there is no "distinction" between a "payment" and an

"investment."  Courts have rejected that argument and this Court should as well.  *See, e.g.*, *SEC*

*v. Energy Grp. of Am., Inc.*, 459 F. Supp. 1234, 1239-40 (S.D.N.Y. 1978) (finding the SEC's

argument that payment of a $10 fee satisfied *Howey*'s "investment of money" prong "strain[ed]

the ordinary meaning of words"); Defs.' Opp. at 17-19.  Nor do the cases the SEC cites (*Howey*,

*Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974), and *SEC v.*

*Telegram Group Inc.*, 448 F. Supp. 3d 352 (S.D.N.Y. 2020)) support it.[9]  In sum, the SEC has

not proved and cannot prove that each XRP transaction involved an "investment of money."

---

[9] In *Howey*, the Court observed that purchasers "provide[d] the capital *and share[d] in*
*the earnings and profits*."  328 U.S. at 300 (emphasis added).  The SEC omits (at 25) the second
half of the quote, but it is critical:  the Court emphasized that purchasers were not merely buying
"fee simple interests in land" but investing "in the profits of a large citrus fruit enterprise."  328
U.S. at 299.  Similarly, *Glen-Arden* held that "investors put up their money not so much to
secure casks of Scotch whisky *but to participate in an enterprise which was virtually guaranteed*

**B.      The SEC's Brief Confirms It Cannot Prove a Common Enterprise**

The SEC asks the Court (at 27-46) to hold that the evidence not only supports a common-enterprise finding but affirmatively requires it, all while refusing to say what the supposed common enterprise is.  Nor does it acknowledge the contradictory positions it took on this issue previously.  *See* Defs.' MSJ at 40-41; Defs.' Opp. at 20-21.  The reason for that continued omission is obvious:  the SEC has no factual support for any legally cognizable common-enterprise claim.  Its actual theory is the "broad vertical commonality" approach that the Second Circuit rejected in *Revak*.  To distract from that reality, the SEC switches between different common-enterprise theories from paragraph to paragraph in its brief.  The Court should not endorse the SEC's efforts to trade on ambiguity.

Defendants are entitled to summary judgment on the common-enterprise element for two reasons: *first*, the SEC's common-enterprise theory runs afoul of *Revak*, and, *second*, the SEC cannot (and does not seriously try to) prove the two forms of "pooling" required under *Revak*.  Instead, the SEC releases a spray of irrelevant alternative legal theories, mostly focusing on what the SEC argues it *doesn't* have to prove.  We address those points in turn below, but they are all unnecessary:  all that matters is whether the SEC can satisfy the controlling standard that the Second Circuit articulated in *Revak*, and the undisputed evidence shows it cannot.

**1.      Controlling Precedent Forecloses the SEC's Claims**

The SEC repeatedly reverts (*e.g.*, at 4, 38) to a theory foreclosed by the Second Circuit's decision in *Revak*:  that XRP purchasers were "invest[ing]" in Ripple's "efforts."  *See also* SEC MSJ at 11, 18-20, 26, 39, 42, 68 (arguing that the "enterprise" here was an "investment in

---

*to 'double their money' in four years*."  493 F.2d at 1034 (emphasis added).  The SEC again (at 25) omits the relevant portion of the quote.  And in *Telegram*, as Defendants have previously pointed out, *see* Defs.' Opp. at 19 & n.8, the "investment of money" element was never disputed.

Ripple's efforts"). *Revak* squarely held that the common-enterprise element in *Howey* is "not . . . satisfied" by a "mere showing that the fortunes of investors are tied to the efforts of the promoter." 18 F.3d at 88. Yet that is the theory the SEC advanced in its prior pleadings and interrogatory responses, *see* Defs.' MSJ at 40-44, and even in its own Motion for Summary Judgment, *see* Defs.' Opp. at 20-21. The SEC is left to argue against its own prior statements and sworn interrogatory responses: rather than admit that it advanced a legally erroneous theory, it claims (at 39 n.22) that, when it identified "the enterprise(s)" at issue as "Ripple's efforts" in response to an interrogatory specifically asking the SEC to identify the common enterprise it alleges in this case, it was actually talking about "the 'reasonable expectation of profits based on the efforts of others' part of the analysis" – *i.e.*, that the SEC, in verified responses, mistakenly addressed the wrong *Howey* element when asked to identify the alleged "enterprise." That claim not only underscores that the SEC cannot point to any common enterprise, but is also belied by the agency's assertions throughout its brief. *E.g.*, SEC Opp. at 38 (pointing to Ripple's "claim[ ]" that it would "expend efforts to develop XRP's value" as "the essence of a common enterprise"). *Revak* controls, and the SEC's claim is impossible to square with it.

The SEC's argument also runs afoul of Supreme Court precedent. As *Howey* explained, the common enterprise must have "all the elements of a profit-seeking business venture" in which "[t]he investors provide the capital and share in the earnings and profits; the promoters manage, control and operate the enterprise." 328 U.S. at 300; *see* Defs.' MSJ at 38. The SEC fails to identify any such "profit-seeking business venture." Its perfunctory argument (at 31) that ongoing obligations between the promoter and investors are not required to prove a common enterprise, citing no authority, is wrong. As Defendants demonstrated, a common enterprise requires an ongoing relationship between the promoter and the investor; without that, there is

nothing that can fairly be called an "enterprise" in which the investor holds a share.  Defs.' MSJ at 42-46.[10]  The SEC concedes that XRP holders had no rights to receive anything from Ripple and that Ripple had no obligation to do anything for them.  SEC 56.1 Resp. ¶¶ 117-118; Ex. 23, SEC Answers to RFA Nos. 57-64, 66, 69-72, 75-78.  That concession is fatal to its argument. The Court need go no further.

### 2.    The SEC Cannot Prove Horizontal Commonality

As Defendants have previously explained, horizontal commonality requires both a pooling of investors' assets and a "pooling of profits," and neither is present here.  Defs.' MSJ at 44-47 (citing *Revak*, 18 F.3d at 87, and *Wals v. Fox Hills Dev. Corp.*, 24 F.3d 1016, 1019 (7th Cir. 1994)).  The SEC claims it can prove horizontal commonality, but does not even attempt to establish either of those two required facts with record evidence.  That is another independently fatal flaw in its claim.  *See also* Defs.' Opp. at 22-29 (discussing SEC's failure of proof).

On the pooling of investors' assets, the SEC misstates the legal standard, arguing (at 32) that "[w]hat is required is that the *promoter or issuer* pool the proceeds of *its* sales" (SEC's emphasis) – in other words, that pooling requires only that a seller deposit proceeds from multiple asset sales into one bank account.  That is incorrect as a matter of law.[11]  Horizontal

---

[10] *See also* ECF No. 707 at 11-12 (comprehensive survey demonstrating this legal requirement); ECF No. 708, Br. of *Amici Curiae* XRP Holders at 25 ("before this Court can evaluate the entirety of the parties' understandings and expectations, it requires some level of privity to exist between Ripple and the purchaser" as no case exists "where an investment contract was found when there existed absolutely no contact or privity between the promoter/seller and the purchaser"); ECF No. 706 at 15 ("The lack of any privity or contractual rights between the original seller and downstream purchasers extinguishes the possibility of any common enterprise between token holders.").

[11] The SEC's sole legal citation is to *SEC v. Kik Interactive Inc.*, 492 F. Supp. 3d 169 (S.D.N.Y. 2020).  But *Kik* simply noted, as a factual matter, that the promoter deposited funds into a bank account; it did not hold that this was sufficient to prove the required pooling, and it cited no authority at all on the issue.  *Id*. at 178.

"commonality requires a pooling of funds *among investors*."  *Hart v. Pulte Homes of Mich. Corp.*, 735 F.2d 1001, 1003 (6th Cir. 1984) (cited in *Revak*) (emphasis added); *see Wals*, 24 F.3d at 1018 ("'horizontal commonality' . . . is[] a pooling of interests not only between the developer or promoter and each individual 'investor' but also among the 'investors' . . . [–] in short, a wheel and not just a hub and a spoke").  Sales to individual buyers, even if the proceeds are combined, are not enough.  *See Hart*, 735 F.2d at 1005 ("[P]laintiffs purchased from a common developer, but they have not shown that they are participants in a common development enterprise.").

The SEC has not tried to, and cannot, make the required showing that assets were pooled among investors.  *See* Defs.' MSJ at 44-47.[12]  Indeed, the SEC cannot even show that Ripple itself put the assets in a common bank account.  Defs.' Opp. at 22-23.  Its sole factual citation accompanying that assertion (at 27-28) falls far short, as it shows only that a third-party market-maker, GSR, held proceeds from both Ripple's and certain of Ripple employees' foreign exchange-based sales in a single account before disbursing the proceeds to Ripple or the employees – and that it ceased that practice and started segregating those proceeds around 2017.  Defs.' 56.1 Resp. ¶¶ 647-651.[13]

---

[12] Separately, *Revak* also requires for horizontal commonality that "the fortunes of each investor depend upon *the profitability of the enterprise as a whole*."  18 F.3d at 87 (emphasis added).  Because it has failed to identify any "enterprise," the SEC cannot show that each investor's fortunes were dependent on the "profitability" of an enterprise "as a whole."  The SEC also ignores undisputed evidence that the proceeds of the Individual Defendants' sales of XRP were never intermingled with Ripple's corporate accounts, despite its claim (at 45 n.25) that such transactions involved investment contracts with Ripple.  *See* Defs.' MSJ at 11-12.

[13] Elsewhere, when the SEC tries to allege (at 27) that Ripple "spent [investor cash] to find use and value for XRP, which benefited all XRP holders equally," it cites fact statements establishing only that Ripple put the revenues it earned from some XRP sales toward *its own* operations, not those of some broader enterprise.  Defs.' 56.1 Resp. ¶¶ 150-152, 162-170.  As explained above, the SEC's attempt to conjure some sort of capital raise test fails.

On the pooling of profits, the SEC misses the point in contending (at 29-31) that profits need not take a particular form.  What is required, and what the SEC never addresses, is that "investors" receive "an undivided share in the same pool of assets and profits."  *Wals*, 24 F.3d at 1019; *see Revak*, 18 F.3d at 88 (no horizontal commonality where assets and profits "were not shared or pooled in any manner, but were instead the sole responsibility of the unit owner"); *SG Ltd.*, 265 F.3d at 50 ("horizontal commonality requires more than pooling alone; it also requires that investors share in the profits and risks of the enterprise").

Again, the SEC has never attempted to, and cannot, show that XRP holders owned any "undivided interest" in a shared pool of assets or profits.  *See* Defs.' MSJ at 44-47.  An "undivided interest" is an interest in a collective pool of assets, no part of which is directly traceable to the holder.  *See* Defs.' Opp. at 23 n.11.  For example, in *Howey*, investors had an interest in the net proceeds from the enterprise's sale of oranges, not in specific pieces of fruit. In contrast, someone who owns a specific asset and receives rents or proceeds from that asset does not own an undivided interest.  *See Wals*, 24 F.3d at 1018-19 (discussing this difference). XRP holders own their own XRP; they have no undivided interest in any broader pool of assets. *E.g.*, SEC 56.1 Resp. ¶¶ 94, 99, 117-118; Ex. 23, SEC Answers to RFA Nos. 57-64, 66, 69-72, 75-78; *see also* ECF No. 708 at 26-28 (XRP holders using their XRP to earn profits individually through lending operations).  This precludes any finding of horizontal commonality.

The SEC's attempt to suggest (*e.g.*, at 29) that increases in the price of XRP can take the place of pro-rata distributions is wrong because the SEC does not, and cannot, specify any "profit-seeking business venture" whose profits are supposedly distributed through the vehicle of XRP price changes.  Without such a business enterprise, the SEC's theory is no more viable than

a theory that every gold bar, coin, or necklace represents an interest in a "gold ecosystem." Defs.' MSJ at 42-43.  The SEC has no answer to that point.

Finally, the SEC again misses the point in arguing (at 30) that it is "irrelevant" that the XRP Ledger was operational before a single unit of XRP was sold because *Howey* rejected "the distinction between 'established' and 'new businesses.'"  The SEC's problem is not that the alleged XRP enterprise (whatever it is) is not new, but that the rationale of the digital asset cases on which the SEC relies does not apply to sales of tokens on an existing blockchain.  Those cases reason that a token sold in an ICO represents an interest in a pooled group of funds because those funds are exchanged for a stake in the creation of a blockchain that is still yet to be built by the promoters.  In *Balestra v. ATBCOIN LLC*, the promoters sold ATB Coins in order "to enable Defendants to create and launch a new blockchain."  380 F. Supp. 3d 340, 347 (S.D.N.Y. 2019).  Similarly, in *Telegram* and *Kik*, the promoters sold rights to receive digital tokens – Grams and Kins, respectively – that did not yet exist.  The funds received were to be used to create new blockchains on which the digital tokens could then be created and traded.  Only upon the creation of that blockchain would tokens come into existence so that the investors could receive the returns on investment to which they were contractually entitled.

Here, the XRP Ledger and the units of XRP already existed when Ripple sold XRP. Ripple might or might not have received money from a particular XRP holder; in most cases, it did not.  *See* Defs.' MSJ at 9.  If it did, it might or might not have used that money on a project that involved XRP, but had no obligation to do so.  *Id.* at 30-34.  Regardless of what Ripple did, XRP had functionality the moment the XRP holder received it.  Further, even if a purchaser wanted to treat XRP as a speculative investment (as they might bitcoin, ether, or some other digital asset), that purchaser could resell it immediately; hold it for as long or as short a time as

desired; or do anything else he or she wanted to do with it.  No similar facts were present in *Balestra*, *Kik*, or *Telegram* because the tokens in those cases were dependent on the promised creation of the underlying blockchains.  The SEC ignores this critical distinction.

### 3. Vertical Commonality Is Insufficient, and the SEC Cannot Prove It

The SEC argues (at 32-35) that this Court should endorse a "strict vertical commonality" theory.  That is an invitation to error.  The Second Circuit has never endorsed vertical commonality.  The SEC argues (at 33 & n.20) that those appellate courts that have criticized it have criticized the theory generally rather than in the specific application the SEC wishes to invoke, which is hardly promising.[14]  And it cites (at 33) a handful of non-binding district court decisions, most of which did not actually rely on strict vertical commonality.[15]

Even if strict vertical commonality could suffice, the SEC cannot prove it; its binding admissions that Ripple and XRP holders can experience vastly different financial outcomes foreclose any attempt (at 34) to do so.  *See* Ex. 23, SEC Answers to RFA Nos. 31-34.  Strict vertical commonality requires a "one-to-one relationship" between the investor and the promoter in which there is "an interdependence of both profits and losses."  *Marini v. Adamo*, 812 F. Supp. 2d 243, 256 (E.D.N.Y. 2011) (citation and emphasis omitted); *see* Defs.' MSJ at 47-48 (collecting cases).  The SEC does not even try to prove that "interdependence," which is fatal to

---

[14] The SEC (at 33) incorrectly criticizes Defendants' statement that there is a circuit split about whether strict vertical commonality suffices, and most circuits have rejected it (Sixth, Seventh) or declined to say whether it could suffice (First, Second, Third, Fourth, D.C.), while only one (Ninth) has adopted it.  *See* Defs.' MSJ at 47-49.  The SEC changes the quotation from "circuits" to "courts," but Defendants never purported to conduct a district-by-district survey, and the SEC has not either.  Regardless, it is undisputed that the Second Circuit has never endorsed vertical commonality.  *See Revak*, 18 F.3d at 88.

[15] The SEC cites eight cases.  Four (*Gugick*, *Marini*, *Balestra*, and *Audet*) found vertical commonality absent or declined to reach the question.  Two (*Rocky Aspen* and *Telegram*) found horizontal commonality present; alternative comments about vertical commonality were dicta.  The final two (*Walther* and *J.P. Jeanneret*) rely on a line of pre-*Revak* district court decisions.

its strict vertical commonality claim.  Instead, it merely argues (at 28, 34) that, because XRP is

fungible and because Ripple owns a lot of XRP, "the fortunes of XRP investors rise and fall with

those of Ripple."[16]  The case law rejects that theory.  *See Marini*, 812 F. Supp. 2d at 257 ("[T]he

Court disagrees with plaintiffs that [defendant's and investors'] ownership of the same types of

coins necessarily links their fortunes together for purposes of the strict vertical commonality

analysis.") (cited in SEC Opp. at 20 n.12, 33).[17]  The SEC itself knows this theory is legally

irrelevant:  its own Office of General Counsel explained that whether a "person or group retained

a stake or other interest in the digital asset such that it would be motivated to expend efforts to

cause an increase in value in the digital asset" is not "relevant" to "[w]hether a digital asset is

offered as an investment contract and is thus a security."  *See* Ex. 156 at SEC-LIT-EMAILS-

000471192.  Yet it does not acknowledge that well-established point.[18]

Because Ripple's mere holdings of XRP are legally insufficient, the SEC has nothing to

prove its contention that the "fortunes" of Ripple and "XRP investors" are "linked."  Notably,

despite insisting repeatedly (at 27-28, 32 n.19, 34, 35 n.21) that this link must exist, the SEC

---

[16] The SEC says (at 34) that "Defendants do not dispute" that those "fortunes" are "tied."
That is false.  *See*, *e.g.*, Defs.' MSJ at 47-48; Defs.' 56.1 ¶¶ 119-122; Ex. 23, SEC Answers to
RFA Nos. 31-34.  The SEC cannot overcome its own failure of proof by mischaracterizing
Defendants' positions.

[17] *See also* Defs.' MSJ at 43-44 (citing *SEC v. Belmont Reid & Co.*, 794 F.2d 1388, 1391
(9th Cir. 1986); *Noa v. Key Futures, Inc.*, 638 F.2d 77, 80 (9th Cir. 1980); *Sinva, Inc. v. Merrill,
Lynch, Pierce, Fenner & Smith, Inc.*, 253 F. Supp. 359, 367 (S.D.N.Y. 1966)).

[18] The recent decision in *SEC v. LBRY, Inc.*, 2022 WL 16744741 (D.N.H. Nov. 7, 2022),
supports Defendants, not the SEC, in that regard:  the common-enterprise element there was
uncontested (as was the "investment of money" element), so the court examined alignment of
interests only in connection with the final *Howey* element.  *Id.* at *3 ("Here, only the third
component of the *Howey* test is in dispute.").  If an alignment of interest could establish both a
common enterprise *and* a reasonable expectation of profits based on the efforts of others, those
two distinct *Howey* elements would improperly collapse into one.  *Cf. Revak*, 18 F.3d at 87
(rejecting attempt to find "common enterprise" based on the "efforts of the promoter").

never cites any fact, disputed or undisputed, to support it.[19]  To the contrary, it has admitted that

Ripple's fortunes (*i.e.*, its profits and its equity value) can significantly diverge from those of

XRP holders':  Ripple can make money while XRP holders lose money, and vice versa.  *See* Ex.

23, SEC Answers to RFA Nos. 31-34.  The SEC's own exhibits show that Ripple itself told the

world that its fortunes were disconnected from those of XRP holders.[20]

            As a matter of law, that divergence is fatal to the SEC's claim.  *See* Defs.' MSJ at 48-49;

*see also Brodt v. Bache & Co.*, 595 F.2d 459, 461 (9th Cir. 1978) (rejecting vertical commonality

for discretionary commodity-trading account because the broker could "be characterized as

successful, while the individual [investors'] accounts could be wiped out"); *Marini*, 812 F. Supp.

2d at 257-58 (no strict vertical commonality where coin dealer owned many of the same coins as

investors, because dealer had "no obligation to sell his coins at the same time that [the customer]

sold his"; "because [plaintiff] was free to direct the sale of his coins separate and apart from

[defendant's] decision to sell his coins, the[ir] fortunes . . . clearly were not directly linked").

            The SEC incorrectly suggests (at 34) that Ripple's "separate businesses" should not count

toward the "fortunes" analysis.  To the contrary, the fact that Ripple's operations included

---

            [19] The only fact citation accompanying the SEC's assertions is (at 28) to SEC 56.1
¶¶ 251-274.  But the SEC cites those paragraphs only as evidence that Ripple "touted" its
alignment of interests with XRP holders; they do not show that the "fortunes of XRP investors"
were "tied" to those of Ripple.  As Defendants have shown repeatedly, mere alignment of
interests is not a common enterprise.  *E.g.*, Defs.' Opp. at 14-15, 30-31; *Poindexter v. Merrill
Lynch, Pierce, Fenner & Smith*, 684 F. Supp. 478, 481 (E.D. Mich. 1988) ("[A] common
enterprise is not created by virtue of the statement that all accounts do the same thing.").

            [20] *See, e.g.*, PX 501.07 at 3 (Q2 2018 XRP Markets Report:  "despite Ripple having its
best quarter ever in Q2 . . . XRP's price continued to decline with those of other digital assets,
underscoring XRP's independence from Ripple"); PX 501.12 at 3 (Q3 2019 XRP Markets
Report:  "XRP exists independently of Ripple. . . .  If Ripple went away tomorrow, the Ledger
would continue to exist and XRP would continue to trade."); *see also* Ex. 296, Twitter statement
by David Schwartz ("Ripple had its best quarter ever in Q1 and the price of XRP dropped
significantly").

business activities that did not depend on the value of XRP goes to show that it was not engaged in a common enterprise with XRP holders.  In any event, the SEC's binding admissions that Ripple's fortunes can diverge from XRP holders' do not invoke separate business lines at all. *See* Ex. 23, SEC Answers to RFA Nos. 31-34.  Thus, the undisputed evidence contradicts the SEC's unsupported claim:  XRP holders' "fortunes" do not depend on Ripple's, nor vice versa.

### 4. The SEC's Remaining Common-Enterprise Arguments Attack Strawmen

The SEC ends its common-enterprise section (at 35-46) with a litany of arguments attacking contentions that Defendants do not make.

### a. Investment Contracts Must Have the Economic Properties of a Debt or Equity Security

The term "investment contract" is not a wildcard that captures any alignment of interest; it means an instrument that creates an economic interest in a "profit-seeking business venture," which the "common enterprise" element of *Howey* targets.  328 U.S. at 300; *see, e.g.*, *Wals*, 24 F.3d at 1018 ("The statutory language . . . suggests that the term 'investment contract' has the limited purpose of identifying unconventional instruments *that have the essential properties of a debt or equity security*." (emphasis added)); *Rodriguez v. Banco Cent. Corp.*, 990 F.2d 7, 10 (1st Cir. 1993) ("the substance of an investment contract [must be] a security-like interest in a 'common enterprise' "); *Howey*, 328 U.S. at 300 (investment contracts were stand-ins for "shares in [the common] enterprise"); *Landreth*, 471 U.S. at 690 ("[I]f the Acts were to apply in [*Howey*] cases at all, it would have to have been because the economic reality underlying the transactions indicated that the instruments were actually of a type that falls within the usual concept of a security.").  The SEC cannot prove that XRP has the economic properties of a debt or equity security in any enterprise, in no small part because it can point to no common enterprise at all. *See* Defs.' MSJ at 38-44.

The SEC has no answer to that point.  Instead, it attempts to confuse the issue by arguing (at 36) that the investment contracts in *Howey* came with "no right to the dividends of either corporation or to inspect their books, no voting rights, and no rights to appoint directors."  But those rights are all *legal* rights incidental to *common stock* ownership.  What matters here are the *economic* properties of securities, and in particular the interest they create in the holder to receive certain cash flows from the business enterprise.  That is true of common stock, preferred stock and other equity securities, and debt securities.  But it is not true of XRP.

The SEC cites no authority to the contrary, and it does not seriously address the authority Defendants cite.  The SEC's contention (at 36) – that Defendants' argument that investment contracts must have the properties of a debt or equity security cannot be right because no such properties existed in "*Revak*, *Leonard*, *Telegram*, *Kik*, *Balestra*, *Audet*, and *Jobanputra*[,] and all the other cases applying *Howey*" – again mischaracterizes those cases.  Several found no common enterprise in the first place;[21] and in the cases where courts did find a common enterprise, the interests sold to investors had the economic properties of debt or equity securities in a business enterprise.  Here, the SEC cannot even point to a business enterprise, much less an interest in such an enterprise with the economic properties of a debt or equity security.

**b.  The Common-Enterprise Element Requires Control by the Promoter**

*Howey* makes clear that "the promoters [must] manage, control and operate the enterprise."  328 U.S. at 300; *see also id.* (describing "a common enterprise managed by" the promoter as "essential").  Once again, because the SEC cannot and does not point to any

---

[21] *Revak* found no common enterprise at all; *Jobanputra v. Kim*, 2022 WL 4538201 (S.D.N.Y. Sept. 28, 2022), did not even apply the *Howey* test; *United States v. Leonard*, 529 F.3d 83 (2d Cir. 2008), did not address the common-enterprise element because the only dispute was on the "efforts" element of the *Howey* test.

particular enterprise, it cannot and does not show that Defendants "manage[d], control[led,] and operate[d]" any such enterprise.  *See* Defs.' MSJ at 41-44.

The SEC again builds a strawman, arguing (at 37-39) that the promoter need not control the entire "market" for an asset with "monopolistic, all controlling" behavior.  But that is not Defendants' argument; Defendants' argument is that the SEC cannot show that Defendants "manage[d], control[led,] and operate[d]" any common enterprise, as *Howey* requires.[22]  Further, the SEC bases its argument (at 37-38) on a single 55-year-old case from the Tenth Circuit treating the entire "domestic beaver industry" as a common enterprise.  But the Tenth Circuit does not require *any* showing of commonality, whether horizontal or vertical, so Tenth Circuit authority does not establish the applicable test in the Second Circuit.[23]  The SEC's reliance on a case applying so divergent a rule only underscores how far it has strayed from controlling law.

### c.    The SEC's Argument Has No Principled Limits

Defendants demonstrated that the SEC's extreme position in this case threatens to turn all manner of ordinary assets, such as soybeans, pork, or gold, into "investment contracts," largely because the SEC's "common enterprise" theory would (erroneously) require nothing more than having fungible assets with a uniform market price.  Defs.' MSJ at 42-44.  The SEC yet again has no answer; it offers no principled distinction that would rescue those ordinary commodities.

---

[22] If the SEC wants to take the unsupportable position (after reply briefs have been filed) that the supposed common enterprise here is the entire XRP market, then it would have to show under *Howey* that Defendants managed, controlled, and operated the entire market.  It cannot; and that theory would also fail for the other reasons described above and in Defendants' Motion.

[23] *See McGill v. Am. Land & Expl. Co.*, 776 F.2d 923, 924-25 (10th Cir. 1985) ("The rigid 'horizontal commonality' requirement that the district court imposed has never been a part of the law of this circuit"); *Campbell v. Castle Stone Homes, Inc.*, 2011 WL 902637, at *4 (D. Utah Mar. 15, 2011) (stating that Tenth Circuit has rejected both horizontal and vertical commonality).

Instead, the SEC pretends (at 39-41) that Defendants argued there must be some *exception* to the *Howey* test for "ordinary assets." Defendants made no such argument. "[O]rdinary assets" can be offered and sold as part of an investment contract in a case presenting the right facts. But *Howey* itself explained that investment contracts require "*something more* than fee simple interests*" in ordinary assets. 328 U.S. at 299 (emphasis added). In *Howey*, that "something more" was "an opportunity to contribute money and to share in the profits of a large citrus fruit enterprise managed and partly owned by respondents." *Id*. at 299-300; *see Revak*, 18 F.3d at 87. Such an opportunity – or any equivalent – is missing here.

Relatedly, the SEC presents (at 41-46) a lengthy argument that purchasing assets for use does not mean they are not securities. As *amici* I-Remit, TapJets, and Spend The Bits explain, that is not true. To be clear, Defendants' Motion does not depend on a factual conclusion that XRP was purchased for use – though such a conclusion, as shown by *amici*, would foreclose the SEC's claims.[24] In any event, the SEC grossly mischaracterizes the case law to resist *amici*'s argument.[25] It also misconstrues *amici*'s argument. *Amici* do not appear to contend that assets purchased for use can *never* be securities. Rather, their argument is that *their own XRP purchases* were not made with any expectation that they would profit from Ripple's efforts,

_____

[24] Accordingly, the Court need not address the "three factors" that the SEC asserts (at 42), without citation, are "typically" used to evaluate whether assets are sold for "use."

[25] *Compare, e.g.*, SEC Opp. at 44 ("investors in *Glen-Arden*, 493 F.2d at 1031, who technically bought only whiskey, could have drunk it") *with Glen-Arden*, 493 F.2d at 1032 ("investors never contemplated taking actual physical possession of the whisky"); SEC Opp. at 44-45 ("the investors in *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414, 417-18 (8th Cir. 1974), who bought live chinchillas, could have made coats from them") *with Miller*, 494 F.2d at 417 n.1 (investors were obligated "[t]o sell 100% of his [chinchillas] [to the promoter], with the exception that he may choose . . . to keep . . . a certain percentage . . . for his herd expansion"); SEC Opp. at 45 ("as explained in *SEC v. Feng*, the prong is satisfied even when 'the investors' primary reason to participate' in a scheme was consumptive. 935 F.3d 721, 730-31 (9th Cir. 2019)") *with Feng*, 935 F.3d at 729 (common-enterprise prong was not contested).

because they intended to use their XRP rather than hold it as an investment.  That point does not require a categorical exception for usable objects; instead, it shows that, in this particular case, there was no "common enterprise" of XRP purchasers and Ripple working together toward any investment-related goal, and no reasonable expectation among XRP purchasers of profits from Ripple's efforts.  It is worth remembering that the SEC's theory is that every sale of XRP was a sale of an investment contract.  Sales to *amici* (both those involving Ripple and those not involving Ripple) plainly were not.  And because XRP is fungible, the SEC cannot sensibly argue that some units of XRP are investment contracts but others are not.  *See supra* pp. 2-3, 14.

The recent *LBRY* decision is not to the contrary.  There, the court (addressing only *Howey*'s third element) held that a mere possibility that "some unknown number of purchasers may have acquired LBC in part for consumptive purposes" was insufficient to say categorically that the token was never sold as an investment contract.  2022 WL 16744741, at *7.  Here, in contrast, there is non-speculative evidence of an enormous number of XRP purchases for use: more than $10 *billion* worth of XRP that has been used for ODL transactions.  Defs.' MSJ at 7. Thus, for *billions* of the units that the SEC claims were sold as investment contracts, the SEC is undisputedly wrong.  The SEC (at 8) challenges the $10 billion figure on the grounds that it includes sales made after the SEC filed its complaint, but it cannot dispute the fundamental point:  unlike every other digital asset case the SEC has brought, there is undisputed evidence here that billions of units were sold for use and not as investments.  *See also* ECF No. 660, Br. of *Amicus Curiae* I-Remit at 2-3, 5-6, 8 (describing purchases of XRP for use in ODL transactions).

C.     **XRP Holders Do Not Reasonably Expect Profits from Defendants' Efforts**

1.     **There Can Be No Reasonable Expectation of Profits from Defendants' Efforts in the Absence of Any Obligations to XRP Holders**

i.     As a matter of law, there can be no reasonable expectation of profits from Defendants' efforts without some obligation by Defendants to undertake efforts in the first place. That principle runs through every case in which the Supreme Court or the Second Circuit has found an investment contract. *See* Defs.' MSJ at 22-23, 55-56 & n.36.  The SEC's response mischaracterizes Defendants' argument, saying that there is no rule that "investors' expectations [must] be derived from representations *in written agreements*."  SEC Opp. at 47 (emphasis added; capitalization omitted).  Defendants never made such a narrow argument; they instead acknowledged *Howey*'s central teaching that a court should look not only within the four corners of each contract, but also to the broader context surrounding those contracts.  *See* Defs.' MSJ at 25; *id.* at 54 (SEC cannot identify "any contractual *or other*" obligation (emphasis added)).  The SEC's problem is not just that it has failed to identify any promise in Ripple's written contracts that Ripple would make efforts to return a profit to XRP holders, but also that it has failed (after exhaustive discovery) to identify any such promise *at all*.  *See supra* pp. 3-4, 7, 18.

The SEC does not, and cannot, cite any authority suggesting that there can be a reasonable expectation of profits from a promoter's efforts in the absence of any commitment by the promoter to undertake any efforts (whether in a contract or outside of it).  It is such a commitment that distinguishes offers and sales of securities – which convey "evidence of debt or of property" and "giv[e] the holder the right to demand and receive property not in his possession," *Webster's New International Dictionary* 2263 (2d ed. 1937) – from ordinary sales of non-security assets, which do not have those features.  Hence, for an asset sale to be a security, the purchaser must be buying, "in addition" to the asset, a commitment from the

30

promoter to take actions to return a profit to the purchaser. *Glen-Arden*, 493 F.2d at 1035; *see* Defs.' Opp. at 33 & n.19 (collecting cases); *see also Hunssinger v. Rockford Bus. Credits, Inc.*, 745 F.2d 484, 490 (7th Cir. 1984) ("The [Supreme] Court [has] defined an expectation of profits in terms of a residual claim on an entity's assets and earnings."). There was nothing "in addition" to the XRP sold here, so the securities laws do not apply.

The SEC cites cases (at 47-49) to show that it can look to "promotional materials" to find the requisite obligations. Those cases support Defendants' position, not the SEC's, because they confirm that an affirmative obligation to the buyer is essential. In *SEC v. C.M. Joiner Leasing Corp.*, 320 U.S. 344 (1943) (cited in SEC Opp. at 47-48), sales of oil leases were conditioned on the promoters' express undertaking to drill an exploratory well. As the Court explained, "the undertaking to drill a well [ran] through the whole transaction as the thread on which everybody's beads were strung." *Id.* at 348. Likewise, *Telegram* (cited in SEC Opp. at 49) concerned a promised undertaking to develop a new blockchain. Indeed, *Telegram* was not even a case about extra-contractual statements – the undertaking there was in a contract. *See* 448 F. Supp. 3d at 370 ("Failure to launch the [new] [b]lockchain by the *contractual* deadline would require Telegram to return any unspent funds to the Initial Purchaser." (emphasis added)). The SEC's other cases likewise confirm that an obligation to the buyer is crucial.[26] It has not cited a single authority counter to the legal rule Defendants articulated. Defs.' MSJ at 49-58.

---

[26] As Defendants showed in their Motion (at 22, 56 & n.36), the alleged promoters in *United Benefit Life Insurance*, *Glen-Arden*, *Aqua-Sonic*, *Gary Plastic*, and *Leonard* (all of which the SEC cites at 48), promised similar profit-generating efforts either within or accompanying a contract. The same is true of the other cases the SEC cites. *See SEC v. Shields*, 744 F.3d 633, 636 (10th Cir. 2014) (promoter's promises accompanied "Joint Venture Agreements" with investors); *SEC v. Merchant Cap., LLC*, 483 F.3d 747, 752 (11th Cir. 2007) (promises accompanied "partnership agreement"); *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 475 (5th Cir. 1974) (promises accompanied formal distributorship arrangements described at length in opinion). The SEC's reliance on *Koscot* is particularly striking in light of *Koscot*'s criticism

ii.      Defendants have cited a string of cases showing that, without such promises, there

can be no investment contract.  *See* Defs.' MSJ at 49-50, 55-56 (citing authority); *De Luz*

*Ranchos Inv., Ltd. v. Coldwell Banker & Co.*, 608 F.2d 1297, 1300-01 (9th Cir. 1979) (finding

no reasonable expectation of profits from promoter's efforts, even when promoter marketed land

as "a passive investment" that "would appreciate in value as a result of [the promoter's]

development of common facilities," because "the land sale contracts obligate[d] [the promoter] to

do no more than transfer title" and the promoter had not "promise[d] to distribute profits");

*Rodriguez*, 990 F.2d at 8-11 (finding no reasonable expectation of profits, even when promoter

"touted" undeveloped land "as an excellent investment" based in part on the promoter's

"prospective development" of the land, because "the evidence did not show that the promoter or

any other obligated person or entity was promising the buyers to build or provide anything").  In

a series of no-action letters, the SEC itself has recognized that sales of commodities do not

constitute the sale of securities – even when made for investment purposes – where the seller

undertakes no post-sale obligations to the buyer.  *See* Defs.' MSJ at 27 & n.16.  The SEC makes

no attempt to address those letters and its about-face in this case.

      The SEC ignores its own prior no-action guidance (which did not involve real estate) and

attempts (at 49-51) to distinguish the cases cited by Defendants because they involved "real

estate," which the SEC says "has 'inherent value,'" whereas "XRP had no intrinsic value when it

was created."  The SEC is wrong both on the law and on the economics.  On the law, *Howey*

itself expressly said that it is "immaterial . . . whether there is a sale of property with or without

intrinsic value."  328 U.S. at 301.  Consistent with that guidance, the cases cited turned not on

_____

of "idolatrous adherence to the *Howey* language."  497 F.2d at 478; *id.* at 481 ("the *Howey* test is
not possessed of the talismanic quality ascribed to it"); *cf.* SEC Opp. at 18 (emphasizing "the key
words from *Howey*'s paramount sentence").

whether the purchased land had intrinsic value, but on whether the seller had promised to increase that value. As a matter of economics, intangible assets can have just as much inherent value as tangible ones, and the SEC cites nothing to suggest either that real estate necessarily has inherent value or that XRP does not.[27] Whether an asset is a security should not turn on whether a government agency is able to (or chooses not to) understand its economic value.

The SEC incorrectly argues (at 49) that *De Luz* is distinguishable because the seller "retained no interest in th[e] parcels" of land (SEC's alteration), while, here, Ripple retained an interest in XRP. The SEC misquotes *De Luz*, which noted only that the promoter "retained no interest in *those* parcels" that it sold to the plaintiff; it said nothing about retaining other parcels, which the promoter presumably did in order to work on developing the "common facilities." 608 F.2d at 1300-01 (emphasis added). Ripple, too, did not retain any interests in the units of XRP it sold. *See*, *e.g.*, Ex. 45 at RPLI_SEC 0668887 (purchaser receives "all title to" the XRP sold). Even if the SEC's alteration of *De Luz*'s facts were correct, that would do no more than establish a common interest in market prices, which does not create any "obligation" to act for the purchaser's benefit and thus remains insufficient. Defs.' MSJ at 56.[28]

---

[27] *Cf.*, *e.g.*, *United States v. Aleynikov*, 676 F.3d 71, 79 (2d Cir. 2012) (acknowledging "the value of . . . intangible [computer] code"); Ex. 297, Kraken Intelligence, *Bitcoin and Intrinsic Value* (Sept. 2020) (discussing "intrinsic value" of bitcoin). Indeed, SEC officials previously agreed that digital assets like XRP have intrinsic value, before it became more convenient for them to pretend otherwise in this litigation. *See* PX 241 at 1 ("There is real value in creating [blockchain] applications").

[28] The SEC's attempt to distinguish *Happy Investment Group v. Lakeworld Properties, Inc.*, 396 F. Supp. 175 (N.D. Cal. 1975), is similarly unavailing. Like the SEC here, the purchasers there claimed that, "because they relied upon defendants' efforts as experts in the resort land business to create a 'viable' and successful recreational subdivision, a simple land sale was turned into an investment contract and a security." *Id*. at 179-80. But the court rejected that argument because the defendants "had no service or managerial contracts of any nature with any plaintiff" and had made "no actual commitments to perform specific services" to improve the land. *Id.* at 179-81. Defendants here likewise undertook no "actual commitments" to do anything to benefit XRP purchasers. *See* SEC 56.1 Resp. ¶¶ 117-118.

33

The SEC claims (at 50) that here it has found the "package of commitments" absent in *Rodriguez*, 990 F.2d at 11 – indeed, the SEC purports (at 53) to have identified an "avalanche of public written and oral promises." Yet it does not include a single citation for either assertion. Nowhere in the SEC's 56.1 statement has the agency alleged *any* "promise" by Ripple of any sort. The only time the word "promise" appears in connection with Ripple in the SEC's 56.1 statement is in a quote of an online forum post by a Ripple employee stating that he "*[c]an't promise anything*" to the post's readers. SEC 56.1 ¶ 395 (emphasis added). Once again, all the SEC has is its generalized claim (at 47, 53) that Ripple "touted" and "marketed XRP as an investment." The SEC is wrong on the facts, as even its own putative *amicus* admits. *See* ECF No. 698, Proposed Br. of *Amicus Curiae* Accredify, Inc. d/b/a InvestReady at 7 ("Ripple took pains not to include expectation of profits in any of their marketing").[29] In any event, alleged "marketing and advertising hooks do not change the character of the transaction, nor are they generally representations upon which a purchaser can reasonably rely." *Demarco v. LaPay*, 2009 WL 3855704, at *8 (D. Utah Nov. 17, 2009).

Nor can the SEC save its case by pointing to *LBRY*. Setting aside all that was uncontested in *LBRY*, the promoter there expressly confirmed that the "long-term value proposition of LBRY" was "dependent on our team." 2022 WL 16744741, at *7 (internal quotation marks omitted). In this case, to the contrary, the SEC admits that XRP prices were *not* dependent on Ripple: "the fair market value of a unit of XRP could increase while Ripple reduces its XRP-related business efforts." Ex. 23, SEC Answer to RFA No. 31; *see also* PX

---

[29] Proposed *amicus* Accredify did not file its brief after the Court granted it leave to do so. Accordingly, the Court should disregard Accredify's proposed arguments. Defendants have addressed Accredify's arguments here only to address the possibility that Accredify might subsequently seek leave to file its brief out of time, and reserve all rights.

501.12 at 3 ("Ripple cannot control XRP price.  XRP is traded on a fully functioning and independent digital asset market, including over 140 exchanges, in which Ripple plays a very limited role."); Ex. 280 ("[T]he price of XRP seems to be driven by the crypto market generally and price movements seem to come from exchange and regulatory news more than anything else.").[30]  And several *amici* demonstrate numerous use cases for XRP that are not dependent on Ripple.  *See*, *e.g.*, ECF No. 716, Br. of *Amicus Curiae* Cryptillian Payment Systems, LLC at 1, 3, 5 (using XRP as a payment method akin to credit-card purchases with lower fees than Visa or MasterCard); ECF No. 661 at 2-3 (using XRP to more quickly book private jet travel); ECF No. 722, Br. of *Amicus Curiae* Valhil Capital, LLC at 3 (using XRP as a settlement mechanism to replace traditional central clearinghouses and as store of value for excess cash reserves).

      **iii.**     Even if the SEC could properly rely on Defendants' "public statements touting XRP" to prove the final *Howey* element, its case still fails for two additional reasons.  *First*, as Defendants explained, for Ripple's distributions that did involve a contract, those contracts often contained integration clauses and express disclaimers specifying that Ripple had no obligations beyond the contracts.  *See* Defs.' MSJ at 55.  Those unambiguous provisions further preclude any reasonable expectation of profits from Ripple's efforts.  *Id.* (collecting cases).  Indeed, the SEC concedes (at 54) that disclaimers are relevant to whether a buyer reasonably expected profits.[31]

---

[30] The *LBRY* court suggests that, "by retaining hundreds of millions of LBC for itself, LBRY . . . signaled that it was motivated to work tirelessly to improve the value of its blockchain for itself and any LBC purchasers."  2022 WL 16744741, at *6.  But the court cites nothing to support that proposition, and relying on any such "tacit signaling" is so contrary to the many cases cited above (not to mention the SEC's own internal documents) – and would be a test virtually impossible to apply – that not even the SEC argues for it.  *See supra* pp. 32-33.

[31] The SEC argues (at 54) that "XRP investors in the public markets never saw" the disclaimers in Ripple's contracts.  That fact helps Defendants, not the SEC:  the reason those XRP holders never saw the disclaimers is because they were not counterparties to any contract with Ripple.  That only confirms that those XRP holders could not reasonably have expected profits from Ripple, because they had no relationship with Ripple at all.  *See supra* pp. 8-9.

The SEC errs in relying on *Telegram*'s reasoning that disclaimers "are not dispositive" if "contrary to the apparent economic reality of a transaction."  SEC Opp. at 49 (quoting *Telegram*, 448 F. Supp. 3d at 365).  To make that argument, the SEC would need evidence of an "economic reality" to which Ripple's contracts are contrary, and it has none.  In *Telegram*, the promoter expressly undertook a contractual obligation to develop a blockchain and a use for the token (and was on the hook if it failed to do so), then tried to include a nominal disclaimer of any such efforts.  448 F. Supp. 3d at 358.  That disclaimer was inconsistent with the contractual obligations at the heart of the deal.  Here, no such inconsistency exists because Ripple undertook no such obligations.  At most, the SEC has shown that Ripple was acting to build its own innovative financial products, with no commitments to XRP holders.  Indeed, to the extent the SEC relies on Ripple's "touting" of its own interest in XRP, a desire to act in one's own self-interest is consistent with disclaiming any obligation to act for the benefit of other XRP holders.

*Second*, just as it mixes and matches different categories of Defendants' transactions with different *Howey* elements, *see* Defs.' Opp. at 16, the SEC also fails to distinguish between public statements made *before* a sale or offer of XRP and those made *after* it, *see* Defs.' MSJ at 57.  The SEC claims (at 55) that Defendants "promoted XRP as an investment contract" "from the very beginning."  But, again, it relies only on a selection of statements by different people in different fora over an eight-year period and makes no attempt to tie those statements to any particular transactions.  Nor does it demonstrate that any purchaser actually encountered the public statements it cites, such as sporadic blog posts made by a Ripple employee in 2013.  *See* SEC Opp. at 55 (citing SEC 56.1 ¶¶ 198-203; PX 507.01-.02, .04-.07).  There is no reason to think that a purchaser on an exchange in 2020 would have even known about, much less read, those 2013 blog posts on which the SEC relies.  Indeed, many XRP purchasers were unaware of

Ripple's existence.  Defs.' 56.1 Resp. ¶ 1606; Ex. 167, Purchaser Affs.  The SEC fails to bridge

the gap, despite bearing the burden of proof.  *See also* ECF No. 708 at 23 (explaining that SEC's

reliance on a brochure sent to "at least 100 people" in 2013 and 2014 to describe expectations of

thousands of unknown XRP purchasers up through 2020 is nonsensical (citation omitted)).[32]

      The SEC tries to write off that failure by arguing (at 55) that it "need not show reliance"

in an enforcement action.  That misses the point, which is that the statements the SEC cites

cannot be relevant unless those statements formed part of "the basis of the sale" for XRP

purchasers.  *Aldrich v. McCulloch Props., Inc.*, 627 F.2d 1036, 1039 (10th Cir. 1980); *see also*

*Salameh v. Tarsadia Hotel*, 726 F.3d 1124, 1131-32 (9th Cir. 2013) (extra-contractual

representations that were not made *to the purchasers* before the sale were "irrelevant").  Such a

showing is particularly important in a case like this where the only evidence from XRP holders

shows many of them had never even heard of Ripple.  Defs.' 56.1 Resp. ¶ 1606; Ex. 167,

Purchaser Affs.  But the SEC totally fails to link any particular promotional effort to any

particular offer or sale of XRP by either Ripple or the Individual Defendants.  The SEC's citation

to a handful of documents from 2013 to 2015, none widely disseminated to the public, is

irrelevant to transactions that occurred in 2016 through 2020.  Similarly, a so-called promotional

statement made in 2020 cannot form the basis of transactions that occurred from 2013 through

2019.  The SEC's failure to show which, if any, purchasers even saw or received the statements

it cites (as distinct from whether purchasers relied on them) is a failure of proof.

---

[32] The SEC's reliance on this brochure is particularly misplaced because the brochure
was "focus[ed] on" technical aspects of "[the XRP Ledger's] payment network" and
"downplay[ed]" XRP, consistent with Ripple's goal of "explain[ing] the Ripple technology to
interested parties" in its early brochures.  PX 52 (email attaching the brochure); PX 10 (Rapoport
Tr. 68:7-69:4) (describing Ripple's goal of explaining XRP Ledger technology); *see also* PX 9
(second brochure, intended to "clarify Ripple's role in the financial ecosystem" and explaining
Ripple's "decentralized transaction protocol" that can be leveraged by financial institutions).

### 2. XRP Holders Cannot Reasonably Expect Profits from Ripple When Profits Are Attributable to Market Forces

Defendants' Motion also showed that, to the extent XRP owners have obtained profits, uncontested evidence shows that those profits resulted primarily from market forces of supply and demand. *See* Defs.' MSJ at 50-54. In other words, undisputed data shows that the market does not believe that profits for XRP holders stem from Ripple's efforts. The SEC does not seriously dispute that fact,[33] but claims that independent market forces are "irrelevant." That is wrong: those forces are relevant as a matter of law, and they are devastating to the SEC's case.

As numerous courts have made clear, "[i]f the realization of profits depends significantly on the post-investment operation of market forces, . . . [this] would not satisfy *Howey*'s third prong." *SEC v. Mut. Benefits Corp.*, 408 F.3d 737, 744 n.5 (11th Cir. 2005) (internal quotation marks omitted); *see also* Defs.' MSJ at 50-52 & n.30 (collecting cases).[34] The SEC calls (at 51) such a rule "patently absurd." But it makes no attempt to address "[t]he obvious reason for" distinguishing between profits derived from the activities of the promoter and profits resulting

---

[33] While conceding that market forces dictated most XRP returns after mid-2018, the SEC asserts (at 51), without support, that "Ripple's activities purportedly accounted for over 50% of XRP returns until mid-2018." That statement is at best disputed. *E.g.*, Ex. 11 ¶ 90 ("Variation in long-run XRP price return can be explained by exogenous cryptocurrency market factors that are outside Ripple's control."). Although Defendants anticipate they would prevail on the question before a jury, they did not make this argument on summary judgment as to the period before mid-2018. But it is undisputed that, from mid-2018 onward, XRP returns were driven overwhelmingly by market forces, not by Ripple's activities. SEC 56.1 Resp. ¶ 123; Ex. 74 ¶ 121 & Fig. 40. The Court should (if it does not dismiss this case for the other reasons cited in Defendants' Motion) grant partial summary judgment in Defendants' favor for that period.

[34] The SEC says (at 51) that *Mutual Benefits* does not suggest that the existence of market forces affecting the price of an asset means *Howey* cannot be satisfied," because it held only "that pre-purchase efforts also counted so long as there were still some promised post-purchase efforts by the promoter." *Mutual Benefits* itself directly refutes the SEC's misreading. *See* 408 F.3d at 744 & n.5 ("[T]he 'solely on the efforts of the promoter or a third party' prong of the *Howey* test may not be met where an investment relies predominantly on market speculation."). But the SEC's misreading does not help it in any event, because it is undisputed that there were no "promised post-purchase efforts by" Defendants here. *See supra* pp. 3-4, 7.

from external market forces:  "disclosure requirements will only protect investments that depend

on the efforts of promoters, not those that depend on the operation of external market forces."

*SEC v. Mut. Benefits Corp.*, 323 F. Supp. 2d 1337, 1342 (S.D. Fla. 2004), *aff'd*, 408 F.3d 737

(11th Cir. 2005).[35]  The SEC cannot wish away a rule of law recognized for decades by courts

across the country, including in this District.[36]

The SEC also claims (at 51), incorrectly, that this rule is limited to cases in which the

promoter has not "touted" its efforts.  The SEC unsuccessfully made a similar argument in *SEC

v. Pacific West Capital Group, Inc.*, 2015 WL 9694808 (C.D. Cal. June 16, 2015), "point[ing] to

the fact that defendants touted their activities and expertise in promotional literature, leading

investors to expect that the success or failure of the enterprise depended on defendants."  *Id.* at

*6.  But the court rejected that argument.  It found that "a defendant's touting of its expertise" is

"not determinative of defendant's crucialness to the success or failure of the enterprise."  *Id*. at

*7.  And it denied the SEC's motion for a preliminary injunction because the SEC had not

demonstrated "whether the success or failure of Pacific West's life settlement arrangements were

predicated on [its] efforts, or rather, on [external factors]."  *Id*. at *6.

The SEC also points (at 52-53) to *Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce,

Fenner & Smith, Inc.*, 756 F.2d 230 (2d Cir. 1985), and *Kik* to argue that Defendants "publicly

held themselves out as" a "'buyer[] of last resort' with respect to XRP."  That is a patent

---

[35] Nor do the disclosure requirements make sense as applied to XRP for investor-
protection purposes.  *See* ECF No. 711 at 18-26; ECF No. 706 at 3-4, 24-26.

[36] The SEC has no answer to *Lehman Brothers Commercial Corp. v. Minmetals
International Non-Ferrous Metals Trading Co.*, 179 F. Supp. 2d 159 (S.D.N.Y. 2001).  It tries
(at 52 n.27) to write that case off as "an application of state law," but ignores that the "state law"
at issue was New York's Martin Act, which follows *Howey* and its progeny to determine what is
an "investment contract."

misrepresentation of the facts of record.[37]  The issuer in *Gary Plastic* promised investors that it would repurchase their CDs at face value if they could not be sold otherwise; the SEC does not, and cannot, point to any remotely equivalent promise by Ripple, as it does not exist.  *Kik* is likewise distinguishable for the reasons explained in Defendants' Motion, which the SEC does not address.  *See* Defs.' MSJ at 35.  Most notably, in *Kik* the promoter undertook an obligation to develop the blockchain; here, the XRP Ledger and all units of XRP already existed before Ripple distributed even a single unit.  Neither case saves the SEC from the uncontested point, conceded by the SEC's own expert, that XRP holders' profits come from the broader cryptocurrency market, not from Ripple.

## III.   THE INDIVIDUAL DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON OFFERS TO SELL AND SALES ON FOREIGN EXCHANGES

The SEC cannot contest that it has the burden to prove that each of Defendants' specific offers to sell and sales of XRP occurred within the United States.  Nor can the SEC dispute that virtually all of Garlinghouse's (95%) and Larsen's (87%) XRP sales occurred on Foreign Exchanges.[38]  Defs.' 56.1 ¶¶ 299-301, 306-10.  Nor does it meaningfully dispute that the Foreign Exchanges are foreign.  The SEC's failure to dispute these facts is dispositive.  The Court should grant the Individual Defendants summary judgment as to their offers to sell and sales on Foreign Exchanges.

---

[37]  The SEC cites (at 52) SEC 56.1 ¶¶ 586, 784, and 786.  None of those paragraphs reference any statement by any Defendants "publicly h[olding] themselves out as" anything.  The only one that even mentions the concept of a buyer "of last resort" is paragraph 586, and the testimony there is merely that of a third party, GSR, explaining that "maintain[ing] orderly markets" may "at the extreme" involve "people talking about" "being the buyer of last resort or the seller of last resort."  *See* Defs.' 56.1 Resp. ¶ 586; PX 26 at 166:4-21.  That statement in the (non-public and not contemporaneous) deposition of a third party in no way supports the SEC's assertion that Defendants "publicly held themselves out as" buyers of last resort.

[38]  This term is defined in Defendants' Motion.  *See* Defs.' MSJ at 62.

Unable to dispute the core critical facts, the SEC shifts its theory.  For the first time, the SEC argues that the Individual Defendants' transfers of XRP to their foreign execution agent, GSR, for later sale constituted the relevant offers and sales.  This argument ignores the economic realities of those transfers.  The Individual Defendants did not sell or offer to sell XRP (or anything) to GSR – they transferred custody of their XRP to GSR, which then sold the XRP on Foreign Exchanges to anonymous purchasers on the Individual Defendants' "*behalf*," as the SEC admits.  SEC Opp. at 62-63 (emphasis added); *see* Defs.' 56.1 ¶¶ 275, 285.  GSR had no rights to payment until after sale to the ultimate purchaser, and GSR was obligated to return unsold XRP to the Individual Defendants at their discretion.  Defs.' 56.1 ¶¶ 275, 284, 287.  Plainly no irrevocable liability was incurred as a result of these transfers.  The SEC's argument is, at best, a wrongheaded effort to transform steps preparatory to making or attempting to make an offer to sell or a sale into the offer or sale itself, which fails as a matter of law.  *See*, *e.g.*, *Loginovskaya v. Batratchenko*, 764 F.3d 266, 275 (2d Cir. 2014) (wire transfers "were actions needed to carry out the transactions, and not the transactions themselves," and therefore were insufficient to make the transactions domestic under *Morrison*).

### A.     The SEC Has Raised No Genuine Dispute of Material Fact as to the Individual Defendants' XRP Sales on Foreign Exchanges

In the context of trades on exchanges, the Second Circuit has repeatedly held that irrevocable liability attaches where "the two sides of the transaction are matched."  *See* ECF No. 441 at 23; *Banco Safra S.A.-Cayman Islands Branch v. Samarco Mineracao S.A.*, 849 F. App'x 289, 293 n.2 (2d Cir. 2021) ("[A] transaction is domestic when two sides of the transaction are 'matched' – thus forming a binding contract – on an electronic exchange system within the United States."); *Myun-Uk Choi v. Tower Rsch. Cap. LLC*, 890 F.3d 60, 67 (2d Cir. 2018) (parties incurred irrevocable liability "at the moment of matching" on the exchange because,

according to the exchange's rules, the parties could not "unilaterally revoke acceptance following matching"). There is no dispute of material fact that matches of buy and sell orders occurred on the relevant Foreign Exchanges and became irrevocable on those Exchanges. Defs.' MSJ at 65-67. Thus, sales on the Foreign Exchanges occurred outside the United States.

The SEC has not meaningfully contested these facts. Indeed, the SEC concedes that the Foreign Exchanges are, in fact, foreign. *See* SEC 56.1 Resp. ¶¶ 177, 181, 184, 189, 193, 196, 200, 204, 209, 213, 218, 221, 224, 229, 233, 237, 240, 242, 248, 251, 254, 257, 260, 266 (confirming that "[t]he SEC does not contend that [any Foreign Exchange] is a 'domestic exchange' as that term is used in *Morrison*"). And the SEC makes no serious effort to show that any offers to sell or sales on the Foreign Exchanges "matched" and thus became final in the United States. Its concessions, coupled with its lack of any affirmative evidence, are fatal and require summary judgment for the Individual Defendants as to their sales on Foreign Exchanges. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

Instead, the SEC criticizes (at 60-61) the opinions of Defendants' expert, Professor Yesha Yadav. Those criticisms rehash the SEC's meritless *Daubert* arguments that Defendants have already addressed. *See* ECF No. 596 at 86-96. In any event, the SEC's attack on Professor Yadav is nothing more than a distraction. Professor Yadav's opinion that the Foreign Exchanges bear "no significant indicia of being located in the United States" rests on underlying factual material that the SEC does not, and cannot, challenge, such as the Exchange's user agreements, terms of use, public filings, and press coverage. *See, e.g.*, Ex. 41 ¶ 106 & Tbl. A. Nor does the SEC attempt to put forth any contrary factual material, other than certain irrelevant and trivial connections between the Foreign Exchanges and the United States, such as certain of their registrations with the U.S. Department of Treasury and U.S. customers' ability to access their

42

foreign trading platforms.[39]  Nothing that the SEC has put forward changes the conclusion that transactions on the Foreign Exchanges became final and binding there.

### 1. The Individual Defendants' Transfers of XRP to GSR Were Not Sales, Did Not Pass Title, and Did Not Create Irrevocable Liability

Rather than actually contesting the fact that sales on the Foreign Exchanges become final there – which it cannot do – the SEC attempts (at 62-63) to manufacture a "sale" of XRP between GSR and the Individual Defendants.  This argument ignores the relevant testimony, the terms of the relevant contracts, the economic reality of GSR's role as an execution agent, and common sense.  The Court can and should reject this attempt to manufacture a dispute of fact. *See Fletcher v. Atex, Inc.*, 68 F.3d 1451, 1456 (2d Cir. 1995) ("[A] party may not 'rely on mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment.'" (citation omitted)).

The Individual Defendants did not in any sense "sell" their XRP to GSR.  Rather – as the SEC admits – the Individual Defendants sold their XRP "through GSR" to third parties on the Foreign Exchanges.  SEC 56.1 Supp. ¶¶ 340, 345; Defs.' 56.1 ¶¶ 275, 285.  As ███████, the Individual Defendants' principal point of contact at GSR, explained, ownership of the XRP remained with the Individual Defendants until a sale was finalized.  Defs.' 56.1 ¶¶ 275, 284; Defs.' 56.1 Supp. Resp. ¶ 314; *see* PX 26 at 285:14-23 ("Q.  So when the client sends GSR XRP

---

[39] Registration as a money services business ("MSB") with FinCEN does not transform a foreign entity into a domestic trading platform.  *See* 31 C.F.R. § 1010.100(ff) (defining a "money services business" as "a person *wherever located*" engaging in certain forms of business (emphasis added)); Ex. 41 ¶¶ 70-71.  More than 650 foreign entities are registered with FinCEN as MSBs.  *See* Defs.' 56.1 Supp. Resp. ¶ 377; Ex. 298, FinCEN, "MSB Registrant Search," https://www.fincen.gov/msb-registrant-search.  And a "party's residency or citizenship is irrelevant to the location of a given transaction."  *Absolute Activist Value Master Fund Ltd. v. Ficeto*, 677 F.3d 60, 70 (2d Cir. 2012); *see also In re Petrobras Sec.*, 862 F.3d 250, 262 (2d Cir. 2017) (the location of the buyer does not necessarily establish the situs of the transaction); Defs.' MSJ at 67 & n.48.

to a GSR designated wallet, at that moment, who owns the XRP?  A.  I think the XRP is still

owned by the client.  Q.  In fact, does GSR ever take ownership of the XRP through the entire

trading process?  A.  Not to the best of my knowledge.") (cleaned up), 289:6-11 ("Q.  And, at

that point, when the XRP is in a receiving wallet address at the exchange, who owns the XRP?

A.  I believe – nothing's changed.  The XRP is still owned by the client.") (cleaned up).

The terms of the Liquidity Extraction Agreements between the Individual Defendants and

GSR confirm that the Individual Defendants did not "sell" XRP to GSR.  *See Nycal Corp. v.*

*Inoco PLC*, 988 F. Supp. 296, 298 (S.D.N.Y. 1997) (holding that the court may interpret contracts

as a matter of law), *aff'd*, 166 F.3d 1201 (2d Cir. 1998).  Those agreements make clear that the

Individual Defendants were giving GSR temporary custody of the XRP for the purpose of selling

on their behalf to end users.  *See, e.g.*, Defs.' 56.1 ¶ 275; Defs.' 56.1 Supp. Resp. ¶ 306; PX 612

§§ 1.4, 1.6, 2.1; PX 614 §§ 1.4, 1.6, 2.1; PX 615 §§ 1.4, 1.6, 2.1.  GSR's custody of the XRP

while it sought buyers explicitly "did not represent a right to make any demand" on the

Individual Defendants.  Defs.' 56.1 Supp. Resp. ¶ 309; PX 612 § 4.2; PX 614 § 4.2; PX 615

§ 4.2.  To the extent GSR did not sell the XRP on the Individual Defendants' behalf, it was

obligated to return those units with no compensation paid.  Defs.' 56.1 ¶¶ 275, 284, 287; Defs.'

56.1 Supp. Resp. ¶¶ 306, 314; *see* PX 612 §§ 1.4, 2.1; PX 614 §§ 1.4, 2.1; PX 615 §§ 1.4, 1.5,

2.1.[40]  GSR was expressly *not* permitted to be an End User buyer of XRP.  *See* Defs.' 56.1 Supp.

Resp. ¶ 309; PX 612 § 4.1; PX 614 § 4.1; PX 615 §§ 4.1, 5, 6 (agreements recognizing an "End

---

[40] GSR confirmed that the Individual Defendants could ask for their XRP back *at any time*, and GSR was obligated to comply.  *See* Defs.' 56.1 ¶ 284; Defs.' 56.1 Supp. Resp. ¶ 314; PX 26 at 291:22-293:5 ("as soon as a client says stop, return the funds, we stop the bots"), 288:7-17 ("Q.  . . . [W]hen the XRP is in a GSR designated wallet, could the client decide that it didn't want to trade its XRP for any other currency at all?  A.  Of course.  Q.  A client could say, actually, give me back my XRP?  A.  Yes.  Q.  Okay.  And GSR couldn't refuse at that point, right?  A.  No.  I can't imagine, no.").

User" or "End User Buyer" of the XRP and the End User *could not be GSR*); *see also* SEC 56.1

Supp. ¶ 309.  Under these circumstances, there was no irrevocable liability attached to the transfer

between the Individual Defendants and GSR, but rather only upon the matching of bid and offer

on the Foreign Exchanges.  *See In re Miami Metals I, Inc.*, 603 B.R. 727, 735 (S.D.N.Y. Bankr.

2019) ("[W]hen the identical article is to be returned in the same or in some altered form, the

contract is one of bailment, and the title to the property is not changed.") (quoting *Sturm v.*

*Boker*, 150 U.S. 312, 329 (1893)); *Stoyas v. Toshiba Corp.*, 2022 WL 220920, at *3-4 (C.D. Cal.

Jan. 25, 2022) (applying the Second Circuit's *Absolute Activist* test and holding that no

irrevocable liability was incurred when plaintiff placed buy order with broker because plaintiff

could have "elected to cancel" the order prior to execution).

 Nor was there any "disposition . . . for value" at the moment of transfer of the XRP from

the Individual Defendants to GSR.  15 U.S.C. § 77b(a)(3).  The SEC asserts (at 62) that GSR's

"right to payment vested" when it took custody of the XRP.  First of all, that is factually

incorrect.  The only compensation to which GSR was entitled was a commission once a sale was

finalized on the Foreign Exchange, not on initial transfer.  Defs.' 56.1 ¶¶ 275, 287; PX 612 § 2.5;

PX 614 § 2.5; PX 615 § 2.5.  More fundamentally, though, the SEC's argument is focused on the

wrong party.  GSR made no payment of any kind *to the Individual Defendants* to take custody of

their XRP for the simple reason that it was not purchasing any XRP from them.  Defs.' 56.1

¶¶ 275, 287; PX 26 at 286:12-20.  GSR remitted sale proceeds to the Individual Defendants only

after it completed sales on the Foreign Exchanges (if such a sale occurred).  *Id.*  Even so, the

SEC cites no authority for the proposition that sending XRP to GSR "in exchange for the

promise of payment" qualifies as a "disposition[ ] . . . for value," SEC Opp. at 63-64, and it is

contrary to binding authority holding that a sale occurs at the moment that "irrevocable liability" passes, and not upon an inchoate possibility of payment, *Absolute Activist*, 677 F.3d at 66-70.[41]

So what were the Individual Defendants' transfers of XRP to GSR?  The answer is simple:  they "were actions needed to carry out the transactions, and not the transactions themselves."  *Loginovskaya*, 764 F.3d at 275 (direction to wire transfer money to the United States is insufficient to demonstrate a domestic transaction).  The SEC effectively concedes this point (at 66 n.34), stating that, "[o]f course, GSR still had to perform certain acts to sell" the XRP.  These preparatory steps are irrelevant to where irrevocable liability was incurred in the eventual sales.  *See Morrison*, 561 U.S. at 266; *Cornwell v. Credit Suisse Grp.*, 729 F. Supp. 2d 620, 624 (S.D.N.Y. 2010) (rejecting an attempt "to carve out" of the rule in *Morrison* "a purchase or sale of securities on a foreign exchange because some acts that ultimately result in the execution of the transaction abroad take place in the United States," as this "amounts to nothing more than the reinstatement of the conduct test" repudiated by *Morrison*).

## 2. The SEC's Remaining Arguments That the Individual Defendants' Sales Were Somehow Domestic Are Likewise Foreclosed by the Facts and the Law

The SEC puts forth a grab bag of additional arguments as to why irrevocable liability for sales on the Foreign Exchanges should be considered to have occurred in the United States. Each is easily dismissed as contrary to the facts and foreclosed by the law.

---

[41] Although the SEC suggests (at 65) that a 2015 agreement between GSR and Larsen (*see* PX 610) supports its claim that title passed to GSR, read in its entirety, that agreement makes clear that transfer of title and risk of loss occurred only once GSR had already sold the XRP to a third-party end user of the XRP.  Defs.' 56.1 Supp. Resp. ¶ 299; *see* PX 610 §§ 2.4, 2.5, 2.7(b).  In any event, that agreement was superseded in 2017 and the Liquidation Extraction Agreements that governed Larsen's relationship with GSR from 2017 forward did not include any passing of title.  Defs.' 56.1 Supp. Resp. ¶ 299; PX 612; PX 614.

*First*, the SEC claims that the "Individual Defendants were . . . in the United States when they carried out the individual transfers of XRP to GSR," arguing in a footnote that the fact that "the Individual Defendants typically 'functioned out of United States offices . . . lends some support for the SEC's claims that the transactions themselves also occurred domestically.'" SEC Opp. at 63 & n.33 (citation omitted; first ellipsis added). Second Circuit precedent forecloses this argument: the physical location, citizenship, and residency of parties are all irrelevant to where irrevocable liability is incurred. *See* Defs.' MSJ at 67 n.48; *Absolute Activist*, 677 F.3d at 70 ("[A] party's residency or citizenship is irrelevant to the location of a given transaction."); *In re Petrobras Sec.*, 862 F.3d at 262 (the "location or residency of the buyer, seller, or broker will not necessarily establish the situs of the transaction").[42]

*Second*, the SEC argues (at 75) that "purely electronic matching of orders occurs at the physical location of the trading platform's computer servers." This argument fails as a matter of law, as the Individual Defendants previously explained. *See Anderson v. Binance*, 2022 WL 976824, at *4 (S.D.N.Y. Mar. 31, 2022) (rejecting argument that location of servers that host "blockchain computers" was sufficient under *Morrison*); Defs.' MSJ at 67. In any event, this argument only highlights the SEC's failure to put in any evidence as to the location of the Foreign Exchanges. Even if somehow relevant, the SEC has only suggested that two of the Foreign Exchanges have servers in the United States; it does not show that any of Defendants'

---

[42] *SEC v. Ahmed* does not help the SEC because the SEC there adduced evidence regarding the general practices of where the defendants' sales were negotiated, approved, and completed. 308 F. Supp. 3d 628, 665-69 (D. Conn. 2018). Here, the SEC has adduced no such evidence, nor could it. Instead, the SEC is asking the Court to assume the domesticity of the GSR transfers based solely on the Individual Defendants' presence in the United States "the vast majority of [the] time," SEC Opp. at 63 n.33, despite having failed to develop any evidence as to where the sales were made final. Meanwhile, Defendants have proved that GSR was operating abroad and that there is no evidence that the Individual Defendants even interacted with any U.S.-based GSR personnel. Defs.' 56.1 ¶¶ 270-274. The SEC fails to dispute these facts. *See* SEC Opp. at 10-11.

transactions touched servers in the United States, much less that any such contact would have been decisive to liability becoming irrevocable or title passing in the United States.  *See* Defs.' MSJ at 67.

*Third*, the SEC claims (at 64) that each of the Individual Defendants' transfers of XRP to GSR were domestic because they were "independently and simultaneously validated by each of the U.S. nodes of the ledger, because of how the ledger is programmed."  This argument fails for similar reasons.  The SEC proffers no evidence showing that approval by any U.S.-based nodes actually happened with respect to the transfers between the Individual Defendants and GSR, or that it reflected the moment when any such actual sales became "irrevocable."  In any event, recordings of the transfer of XRP from the Individual Defendants to GSR (pre-sale transfers on-ledger) are irrelevant to domesticity of where later sales (off-ledger sales by GSR on the Foreign Exchanges) occur.  Defs.' 56.1 Supp. Resp. ¶ 315; Ex. 41 ¶¶ 67-68, 86-98.

### 3.    The SEC Ignores That GSR Is a Foreign Entity

Setting aside all these irrelevant arguments, the SEC also ignores a critical fact:  GSR was a foreign-domiciled entity, the relevant GSR personnel were located abroad, and the actions GSR took on behalf of the Individual Defendants took place abroad.  Defs.' MSJ at 63-64; Defs.' 56.1 ¶¶ 272-274.  The SEC is silent as to these uncontroverted facts; even accepting its counter-factual theory that the Individual Defendants "sold" XRP to GSR, it makes no effort to show that irrevocable liability for those "sales" occurred in the United States given that GSR is foreign.

### B.    The SEC Has Not Raised a Genuine Dispute of Fact as to the Individual Defendants' Offers on Foreign Exchanges

The Individual Defendants have also demonstrated that offers to sell on Foreign Exchanges are made on the Exchanges, as if the parties had "figuratively traveled" there to transact.  Defs.' MSJ at 61-63, 70; *Cornwell*, 729 F. Supp. 2d at 626.  There is no meaningful

dispute that (1) the offers to sell XRP could not have been perceived or accepted until they were published on the Foreign Exchanges, Defs.' MSJ at 69-70; and (2) unless and until the offers are published, no information about the offers is communicated to the market, *id.* at 69. In view of these incontrovertible facts, the SEC is forced to yet again focus on the Individual Defendants' preparatory step of engaging GSR to transact on their behalf overseas in a vain attempt to establish domestic "offers."

The SEC argues (at 58-59 & n.30) that the Individual Defendants "attempted to dispose" of their XRP by engaging and instructing GSR to sell their XRP and transferring it to GSR for that purpose. This argument fails for the reasons described above: These steps – for example, transferring XRP to GSR – were merely preliminary to the offers to sell XRP and were of course not the offers themselves. The agreements between the Individual Defendants and GSR did not instruct GSR to engage in specific offers to sell XRP. *See* SEC 56.1 Resp. ¶ 283 (conceding that Individual Defendants did not "instruct GSR to execute specific offers and sales at precise times on designated exchanges"). Instead, they provided GSR with the *discretion* to sell (or not sell) XRP on the Individual Defendants' behalf *at a later time*. Defs.' MSJ at 64; PX 612 § 2.5; *see also* PX 614 § 2.5; PX 615 § 2.5.

As with any "sale," any "offer to sell" must be "for value." 15 U.S.C. § 77b(a)(3). As explained above, any engagement of or instruction to GSR, as well as any XRP transfer to GSR, was not "for value," such that none of these actions independently or collectively constituted an "offer to sell," because the value could only be realized later, *after* GSR successfully sold XRP.

Finally, the SEC elicits no evidence showing that the offers to sell were made in the United States. Instead, the SEC again points (at 58-59) to the Individual Defendants' general presence in the United States and the fact that the transfers of XRP were purportedly from the

Individual Defendants' Bitstamp USA accounts.[43]  But these facts say nothing about where any

offers to sell were made.  *See Loginovskaya*, 764 F.3d at 275 (use of accounts based in the

United States is not the same as execution of sales in the United States, and a "direction to wire

transfer money to the United States is insufficient"); Defs.' MSJ at 71-72 (location of seller is

irrelevant to location of offer on exchanges).  That is particularly so where GSR – the entity that

Individual Defendants were purportedly making offers to – is foreign, and provided no relevant

services to Individual Defendants from within the United States.[44]  *See* Defs.' MSJ at 72-73.

The SEC's argument is, at bottom, an effort to resurrect an argument it lost on the

motions to dismiss:  that the Court should consider the "entire selling process" to determine an

offer's location.[45]  The Court already found that this test would be contrary to *Morrison*'s

repudiation of the conduct-and-effects test and Second Circuit precedent holding that the

anti-fraud provisions of the securities laws have broader territorial reach than Section 5.

ECF No. 441 at 25-26.

*United States v. Naftalin*, 441 U.S. 768 (1979), supports this conclusion.  There, the

question was whether, under the anti-fraud provision of Section 17(a)(1) of the Securities Act,

a defendant could defraud brokers by making false or misleading statements to them while

---

[43] The undisputed facts show that the Individual Defendants' accounts were with the U.K.-based entity Bitstamp Limited until April 2020, when their accounts were migrated to Bitstamp USA.  *See* Defs.' 56.1 Resp. ¶¶ 1112, 1801.

[44] The SEC misconstrues the Individual Defendants' argument with respect to *SEC v. Goldman Sachs & Co.*, 790 F. Supp. 2d 147 (S.D.N.Y. 2011).  The argument is not, as the SEC suggests (at 60), that an offer cannot occur other than where there are direct negotiations between the buyer and the seller, but rather that the location where an offer is made may be different depending on whether the trades are bilateral or exchange-based.  *See* Defs.' MSJ at 68-74.

[45] In a footnote, the SEC refers (at 58 n.30) to certain unspecified "undisputed facts" purportedly showing that "the Individual Defendants were in the U.S. when they offered XRP through press releases, media interviews, social media posts, and other public statements touting XRP to investors."  The SEC makes no attempt to show that these were in fact offers to sell and, in any event, it is another effort by the SEC to resurrect its "entire selling process" argument.

offering them securities.  The Court said yes, because, there, the fraud was directed *at the brokers*, not at the market more generally.  *Id.* at 774-77.  But, here, there was no offer to sell to GSR; rather, the only offers to sell, offers to dispose, or solicitations of offers to buy XRP were made to users of the Foreign Exchanges *on the Foreign Exchanges*.[46]  *See* 15 U.S.C. § 77b(a)(3); *Wildes*, 25 F.4th at 1346 (a solicitation must be "convey[ed]" to the purchaser).[47]  And, of course, there is no allegation of fraud at all.

In sum, the "offers to sell" occurred on the Foreign Exchanges, where GSR directed they be published and where they were capable of acceptance by buyers on the Foreign Exchanges.  To allow the SEC to regulate such foreign offers would run contrary to *Morrison*'s exhortation that the U.S. federal securities laws were not "intended to 'regulat[e]' *foreign* securities exchanges" and that the Court "kn[e]w of no one . . . who even believed that . . . Congress had the power to do so."  *Morrison*, 561 U.S. at 267.  Were it otherwise, courts would be faced with the perverse situation of the SEC being barred from regulating a consummated sale on a Foreign Exchange, but free to regulate certain constituent pieces of those sales – namely, the bids and offers – that directly result in their consummation.

---

[46] *Goldman* supports this conclusion.  The court rejected the "entire selling process" standard as contrary to *Morrison*, 790 F. Supp. 2d at 158-60, and found that the defendant's offers to sell were domestic because he made them from the United States directly over the phone to potential buyers in Germany, *id*. at 163-65.  Here, the Individual Defendants' offers were perceptible only on the Foreign Exchanges, not in any direct solicitation of purchasers.  Defs.' 56.1 ¶¶ 165-170.

[47] While Regulation S does not apply for the reasons explained below, it is notable that, under the SEC's own regulation, U.S.-based preparatory conduct – the exact type of conduct that the SEC now says should form an on-shore offer – does not transform that conduct into a cognizable offer.  For example, under Regulation S, the issuers can be located in the United States, the executives can be located in the United States, and communications concerning offers to sell and sales may occur in the United States, as long as, among other things, "[t]he securities are offered and sold in an overseas directed offering."  17 C.F.R. § 230.903(b)(ii).

### C.     The SEC Cannot Revive Its Failed Argument That *Morrison* Does Not Apply to Section 5

The Court should summarily reject the SEC's attempt (at 70) to exhume its argument that a non-transactional test for domesticity governs Section 5 – namely, Rule 901 of Regulation S and *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London*, 147 F.3d 118 (2d Cir. 1998).  The Court already correctly held, in deciding the Individual Defendants' motions to dismiss, that "Regulation S does not govern the Court's analysis of whether the Individual Defendants' offers and sales occurred domestically for the purposes of Section 5" and that "the transactional domesticity test set out in *Morrison*, and clarified by *Absolute Activist*, governs this analysis" of whether sales occurred domestically.  ECF No. 441 at 24.  As the Court has already recognized, *see id.*, the *Banque Paribas* case on which the SEC relies was explicitly abrogated by *Morrison*, 561 U.S. at 258-61.  It would also flaunt Congress's determination not to reinstate the conduct-and-effects test for purposes of Section 5 when it did so for Section 10(b).  This Court should reject the SEC's attempts to circumvent clear Supreme Court and Second Circuit precedent to create a new test.[48]

## IV.     LARSEN IS ENTITLED TO SUMMARY JUDGMENT ON OFFERS AND SALES OF XRP BEFORE SEPTEMBER 1, 2015

Larsen demonstrated in Defendants' Motion that summary judgment should be granted on the SEC's claim for monetary relief related to offers and sales of XRP before September 1, 2015 because any such claim is barred by the applicable five-year statute of limitations.  Defs.'

---

[48] The SEC also halfheartedly argues (at 56-57) that the Supreme Court was concerned merely with "registered" securities exchanges and not cryptocurrency exchanges.  That is simply wrong.  We are aware of no case where a court held that the application of *Morrison* turned on whether a foreign exchange was "registered."  To the contrary, courts in this District have applied *Morrison* to "unregistered" foreign cryptocurrency exchanges like the ones at issue in this case.  *See, e.g.*, *Anderson*, 2022 WL 976824, at *3-4; *Holsworth v. BProtocol Found.*, 2021 WL 706549, at *1, *3 (S.D.N.Y. Feb. 22, 2021).

MSJ at 74-75.  The SEC has conceded that any such claims are time-barred, *see* ECF No. 182 at 59, and instead contends (at 75 n.40) that Larsen's Motion should be "denied as an improper attempt to obtain an advisory opinion."  This argument is without merit given that the SEC's Amended Complaint seeks relief related to pre-September 2015 offers and sales.  *See*, *e.g.*, ECF No. 46 ¶ 86 (alleging that "Larsen and his wife netted at least $450 million USD" "[f]rom 2015 through at least March 2020"); *id.* ¶ 433 ("Larsen violated Sections 5(a) and 5(c) of the Securities Act by, from 2013 through the present, [selling] 1.7 billion XRP"); *id.* ¶ 437 ("Defendant[] Larsen . . . knowingly or recklessly provided substantial assistance to Ripple, who, from 2013 through the present, [sold] 14.6 billion XRP without a registration statement in effect as to XRP"); *id.*, Prayer for Relief II, at 79 (seeking disgorgement).  Accordingly, summary judgment should be granted dismissing the SEC's claims against Larsen for monetary relief related to any pre-September 2015 offers and sales.

## V.     THE SEC'S *AMICI* DO NOT SUPPORT ITS CASE

Two *amici*, New Sports Economy Institute ("NSEI") and Accredify, submitted proposed briefs in support of the SEC.  *See* ECF Nos. 698, 717.[49]  Neither brief supports the SEC's case; in fact, both support granting Defendants' Motion for Summary Judgment and denying the SEC's Motion.

*First*, NSEI raises a policy argument to suggest that cryptocurrencies *should* be regulated by the SEC in order to promote investor "protection."  ECF No. 717 at 2-7.[50]  It does not identify

---

[49] As noted above, *supra* p. 34 n.29, Accredify has not formally filed its proposed brief.

[50] NSEI does not disclose to the Court that it is presently a defendant in an ongoing enforcement action by the SEC.  *See SEC v. Crystal World Holdings, Inc.*, No. 1:19-cv-2490-CJN (D.D.C.).  The SEC alleges in that case that NSEI is merely an "alter ego" for its principal, who funneled funds NSEI received through his own PayPal and bank accounts.  *See* Compl. ¶¶ 8, 18-19, *SEC v. Crystal World Holdings, Inc.*, No. 1:19-cv-2490-CJN, ECF No. 1 (D.D.C. Aug. 19, 2019).  Although the founder has filed a responsive pleading in that case, NSEI has not and

any "protections" or other benefits that registration would confer on purchasers of digital assets. That is because there are none. As other *amici* explain, registration would only impose significant burdens on digital asset holders and increase the costs of transactions. *See*, *e.g.*, ECF No. 708 at 11; ECF No. 711 at 18-26; ECF No. 706 at 3-4, 24-26. Moreover, in making this policy argument, NSEI makes clear that the SEC cannot prevail on existing law. As NSEI expressly admits, "cryptocurrencies are, for the most part, *not* cash flow generating assets. Thus, people cannot *invest* in them, they can just speculate on them." ECF No. 717 at 2. That is one of the many reasons why XRP purchasers could not reasonably have expected profits from Defendants, defeating *Howey*'s third element. A speculative motive "on the part of the purchaser or seller does not evidence the existence of an 'investment contract' within the meaning of the securities acts." *Sinva*, 253 F. Supp. at 367. Instead, "[t]he [Supreme] Court [has] defined an expectation of profits in terms of a residual claim on an entity's assets and earnings." *Hunssinger*, 745 F.2d at 490. It is undisputed that XRP holders had no such claim on Ripple's assets or cash flows, *see supra* p. 18, as NSEI concedes when it observes that no such cash flows could be associated with XRP.

 *Second*, Accredify argues that Ripple's fair notice defense should fail, but its argument only proves that the law in this area is hopelessly ambiguous. For example, it discusses at length the concept of "decentralization," arguing on the basis of the Hinman Speech that, if an asset's ownership is decentralized, it should not be considered a security (and even putting forth its own four-factor test to "delineate[]" the "path to decentralization and non-security status"). *See* ECF No. 698 at 11-12. That only underscores why Defendants (and other market participants) lacked

---

appears to have defaulted, meaning all that remains is a penalty determination. NSEI's founder appears to have made the calculation that using his alter ego to support the SEC in this case might help his prospects in his own case.

fair notice:  the SEC has never offered clear guidance on when a digital asset is sufficiently "decentralized" to no longer constitute a security and, based on its positions in this litigation, appears to have abandoned the concept of decentralization entirely.  *See* Defs.' Opp. at 50-53. That the SEC's own *amicus* thinks the legal regime that applies is different from the one the SEC is applying here only shows that the SEC has created hopeless confusion in this area that deprives Ripple and other market participants of fair notice.

In any event, even if Accredify's test of "whether one or few centralized entities control 50% or more of the total issuance of the asset," ECF No. 698 at 12, were the governing law, that would mean XRP has attained "non-security status," *id.* at 11.  Ripple today owns less than 50% of XRP – notwithstanding Accredify's incorrect statements to the contrary, which are supported by no citations to any evidence.  Defs.' 56.1 Resp. ¶ 194.

The recent decision in *LBRY* also does not help the SEC with respect to fair notice. There, the court rejected the defendant's fair notice defense because it was "nothing more" than a "bald claim" without any supporting evidence behind it.  2022 WL 16744741, at *8.  Here, Defendants have demonstrated, in exacting detail supported by extensive evidence, that market participants did not believe XRP was a security, that they lacked guidance as to what the law prohibited in this area (and told the SEC as much), and that the SEC knowingly injected further confusion into the marketplace through its contradictory "guidance," all of which confirmed in any event that XRP should not be considered a security.  Defs.' Opp. at 43-54.

## CONCLUSION

The Court should grant Defendants' Motion and should deny the SEC's Motion.

Date:  November 30, 2022

/s/ Michael K. Kellogg
Michael K. Kellogg
Reid M. Figel
Gregory G. Rapawy
Bradley E. Oppenheimer
Bethan R. Jones
KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
+1 (202) 326-7900
mkellogg@kellogghansen.com
rfigel@kellogghansen.com
grapawy@kellogghansen.com
boppenheimer@kellogghansen.com
bjones@kellogghansen.com

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
+1 (212) 909-6000

*Counsel for Defendant Ripple Labs Inc.*

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
+1 (202) 974-1680

*Counsel for Defendant Bradley Garlinghouse*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
+1 (212) 373-3000

*Counsel for Defendant Christian A. Larsen*