UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------------------------------------- x

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    -against-

RIPPLE LABS INC., BRADLEY
GARLINGHOUSE, and CHRISTIAN A.
LARSEN,

        Defendants.

----------------------------------------------------------------- x

No. 20 CV 10832 (AT) (SN)

**DEFENDANTS' RESPONSES TO PLAINTIFF'S COUNTER-STATEMENT OF
UNDISPUTED FACTS PURSUANT TO LOCAL RULE 56.1(b)**

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Ripple Labs

Inc. ("Ripple"), Christian A. Larsen, and Bradley Garlinghouse (the "Individual Defendants,"

and collectively, "Defendants") respectfully submit this response to Plaintiff U.S. Securities and

Exchange Commission's ("SEC") Rule 56.1 Counter-Statement of Undisputed Facts (the

"Counter-Statement" or "56.1 Counter-Stmt").[1]  This response is not, and should not be deemed,

an admission for any other purpose.

## I.    PRELIMINARY STATEMENT

As an initial matter, Defendants note that Local Civil Rule 56.1 does not require

Defendants to respond to the Counter-Statement.  Defendants are submitting this response to aid

in the Court's evaluation of the Counter-Statement and do not undertake any supplemental

obligations by doing so.

The Counter-Statement does not comply with Local Civil Rule 56.1.  It is improper on

multiple grounds and the Court can and should disregard it, in whole or in part.

*First*, the Counter-Statement drastically exceeds the length and detail contemplated under

Local Rule 56.1 or called for by the substance of the SEC's motion.  *See Holtz v. Rockefeller &*

*Co.*, 258 F.3d 62, 74 (2d Cir. 2001) ("The purpose of Local Rule 56.1 is to streamline the

consideration of summary judgment motions by freeing district courts from the need to hunt

---

[1] Together with this response, Defendants submit the Declaration of Erol Gulay, dated November 30, 2022 (the "Gulay Declaration"), which contains as exhibits documents that are cited in this response and in Defendants' Reply In Support Of Motion for Summary Judgment.  References to Defendants' exhibits ("Ex. __") correspond to the exhibits attached to (1) the Declaration of Michael K. Kellogg in Support of Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, dated September 13, 2022 (as to Exs. 1–106); (2) the Declaration of Christopher S. Ford, dated October 18, 2022 (as to Exs. 107–166); (3) the Declaration of Erol Gulay, dated October 18, 2022 (as to Exs. 167–279); and (4) the Gulay Declaration, dated November 30, 2022 (as to Exs. 280-299), unless otherwise indicated.  The SEC's exhibits ("PX") are attached to declarations submitted by the SEC.

through voluminous records without guidance from the parties.").  In addition to the 1,602 statements included in the SEC's original Statement of Undisputed Facts (ECF No. 629, dated September 13, 2022), the Counter-Statement now purports to assert over 450 additional, supposedly undisputed facts, many of which are duplicative of the SEC's prior statements, *see, e.g.*, 56.1 Counter-Stmt. ¶¶ 1, 18, 56, 59, 134, 186-88, 193-202, 213—bringing its total number of allegedly "undisputed" facts to well over 2,000.  The SEC's immaterial, duplicative, and gratuitous assertions fall well outside the permissible bounds of Local Rule 56.1 and should be disregarded.  *See* Local Rule 56.1(a); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394–95 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019) (finding plaintiffs' Rule 56.1 statement, which was "998 paragraphs long and [was] supported by 11 declarations and 370 exhibits," to be "unnecessarily lengthy" and redundant, and advising it would disregard all "repetitive or incomprehensible statements"); *Union Carbide Corp. v. Montell N.V.*, 179 F.R.D. 425, 428 (S.D.N.Y. 1998), *as amended* (May 18, 1998) (striking 86-page 56.1 statement based on its "outrageous length").

*Second*, the Counter-Statement improperly mixes factual averments with rhetoric, legal argument, and subjective or self-serving characterizations of the underlying documents.  *See, e.g.*, 56.1 Counter-Stmt. ¶ 25 (misleadingly attributing a statement to Schwartz by connecting two disparate portions of Schwartz's testimony that Schwartz did not himself connect); ¶¶ 27, 235,  273, 275-77 (improperly characterizing Ripple's actions as legal conclusions concerning its "efforts" or "promotional" activities).  These statements are improper, and do nothing more than add "argumentative and often lengthy narrative" and "'spin' the impact of the admissions" or documents.  *Goldstick v. The Hartford, Inc*., 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002);

*see also Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 226 (S.D.N.Y. 2007), *aff'd* 354 F. App'x 496 (2d Cir. 2009) (criticizing "deeply misleading selective quotation" in party's Rule 56.1 statement); *Ramgoolie v. Ramgoolie*, 2018 WL 5619959, at *2 (S.D.N.Y. Aug. 3, 2018) ("[O]pinions or legal conclusions . . . have no place in a Rule 56.1 statement."), *report and recommendation adopted as modified*, 2018 WL 4266015 (S.D.N.Y. Sept. 6, 2018); *Simmons v. Woodycrest Ctr. for Hum. Dev., Inc.*, 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (criticizing as materially deficient plaintiff's 56.1 statement, including because "several of its 'facts' are, in actuality, legal conclusions"). The SEC's characterizations, legal arguments, and cherry-picked quotes fail "to follow the simple mandates of Local Rule 56.1" and must be disregarded. *See Jessamy v. City of New Rochelle,* 292 F. Supp. 2d 498, 509 n.12 (S.D.N.Y. 2003) (no heed given to legal conclusions in Rule 56.1 statement); *Am Gen. Life Ins. Co. v. Diana Spira 2005 Irrevocable Life Ins. Trust,* 2014 WL 6694502, at *1 (S.D.N.Y. Nov. 25, 2014) (granting motion to strike "as to argumentative statements in the [56.1 statement] and as to purported factual statements which are unsupported by any citation to record evidence").

 *Third*, the Counter-Statement includes many purported facts covering undefined terms or time periods, such that Defendants cannot fairly determine whether they are disputed. These statements are also often vague and ambiguous, and lack sufficient support by citations to the underlying evidence. *See, e.g.*, 56.1 Counter-Stmt. ¶ 63 (SEC statement that "XRP was available for U.S. parties to trade using crypto trading platforms" is temporally unbounded, vague, and unsupported by the cited evidence); ¶ 289 (asserting that Schwartz told investors XRP was a "substitute for currency," when that vague phrase was not used in the cited testimony). They are therefore improper. *See* Local Rule 56.1(d); *Watson v. Grady*, 2015 WL 2168189, at *1 n.2 (S.D.N.Y. May 7, 2015) ("A Local Rule 56.1 statement is not itself a vehicle for making factual

assertions that are otherwise unsupported in the record.") (quoting *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001)).

*Fourth*, even if Defendants were obligated to respond to the Counter-Statement, that obligation would not extend to the section headers within the Counter-Statement (as opposed to its numbered paragraphs), which are unsupported by any citation to evidence in the record. *See* Local Rule 56.1(a). Defendants note that many of those section headers are argumentative, inaccurate, or misleading and should not be taken as statements of fact. *See, e.g.*, 56.1 Counter-Stmt. at 166, Heading B(vi) ("Ripple's Reporting of its XRP Distributions Online and in Quarterly XRP Markets Reports Obscured the True Amount of XRP Supply Entering the Market"). Local Rule 56.1 neither requires Defendants to respond to, nor permits the Court to deem as admitted, any purported facts asserted through the SEC's argumentative headers. *See* Local Rule 56.1(d); Fed. R. Civ. P. 56(c); *Watson*, 2015 WL 2168189, at *1 n.2; *Congregation Rabbinical Coll. of Tartikov*, 138 F. Supp. 3d at 396 (disregarding "headings to sections of Plaintiffs' Rule 56.1 Statements [which] contain impermissible argument or legal conclusion").

*Fifth*, the SEC impermissibly attempts to rely on documents, testimony, or other material that cannot be presented in a form admissible at trial. *See, e.g.*, 56.1 Counter-Stmt. ¶¶ 12, 18, 79, 140, 175, 220, 241, 242, 250, 258, 263, 269-70, 273, 275, 277, 280, 389, 402 (hearsay statements of third parties not presented in admissible form). A court may rely only on admissible evidence at the summary judgment stage. *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169–70 (2d Cir. 2014) ("Materials submitted in support of or in opposition to a motion for summary judgment must be admissible themselves or must contain evidence that will be presented in admissible form at trial.") (internal quotation marks and citation omitted). Defendants do not concede that the evidence cited by the SEC could be presented in admissible form at trial, and it

is not readily apparent that such evidence would be admissible for the purposes for which the SEC offers it.  In particular, the SEC relies extensively on statements by third parties to this litigation, and it appears in the context of the SEC's summary judgment motion that the SEC may seek to impermissibly rely on these hearsay statements for the truth of the matter asserted— including with respect to third-party views or business practices that Defendants do not have sufficient information to confirm or deny.  *See, e.g.*, 56.1 Counter-Stmt. ¶¶ 250, 258, 269-70, 280 (Angelilli testimony concerning the truth of MoneyGram International's internal views or business practices).  Defendants do not purport to address every evidentiary deficiency here and preserve all evidentiary objections to the materials cited by the SEC to be raised, if necessary, at a later date and through the appropriate motions.

## II.   RESPONSES TO THE SEC'S COUNTER-STATEMENT

For the purposes of this Response, Defendants have reproduced each Statement of Fact included in the SEC's Counter-Statement.  Subject to the Preliminary Statement set forth above, Defendants hereby respond as follows:

1.       The people who created the XRP Ledger and XRP are also part of the group that founded Ripple. PX 6 (Schwartz Dep. Tr.) at 23:20-24:10, 43:17-24, 53:2-13, 55:23-56:13.

**Response:**      Disputed.  The SEC's statements in Paragraph 1 are contradicted by evidence in the record.  Though Schwartz acknowledged that he helped develop the code for what would become the XRP Ledger, Schwartz explained that he did not have a role in founding Ripple.  PX 7 at 21:5-7 (answering "I don't believe so" when Schwartz was asked if he had any involvement with the formation of Ripple); *see also* PX 6 at 23:20-23.  The SEC acknowledges as much in Paragraph 8 of the Counter-Statement, in which it refers to "Ripple's founders" as the three individuals (Arthur Britto, Jed McCaleb, and Christian Larsen) who signed an agreement for the initial allocation of XRP between themselves.  *See* 56.1 Counter-Stmt. ¶ 8; *see also* PX

557 at RPLI_SEC 0956688 (agreement identifying "Chris Larsen, Jed McCaleb and Arthur Britto" as "the 'Founders'").  Defendants dispute that Paragraph 1 sets forth an independent statement of material fact because it is duplicative of Paragraph 8 of the SEC's Rule 56.1 Statement (ECF No. 629).  Defendants incorporate by reference their response to Paragraph 8 of the SEC's Rule 56.1 Statement.

2.      Schwartz, one of the programmers of the XRP Ledger, testified under oath that it is "not really possible to answer" when XRP was created. PX 6 (Schwartz Dep. Tr.) at 25:11-14; PX 7 (Schwartz Inv. Tr.) at 61:1-8.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 and 7, because Paragraph 2 omits additional context necessary to understand the quoted testimony.  Schwartz explained that he could not answer the question "when was XRP created?" because "the term XRP is not precisely defined," and that he believed that "the final reset" of the XRP Ledger which created the XRP in existence today occurred in late 2012, before OpenCoin was formed.  PX 6 at 25:11-21; PX 7 at 61:1-18.  Additionally, Schwartz testified that Jed McCaleb exclusively ran the XRP Ledger validators at the time the XRP Ledger was created, PX 6 at 34:2–5, and that his understanding was that "the current instance of the XRP token was created by Jed McCaleb when he deployed the XRP Ledger code to the actual servers that ran the . . . live instance," PX 7 at 14:1–5.

3.      Each time the XRP Ledger resets, there is a new "genesis" (or first) block for the XRP Ledger was created. PX 6 (Schwartz Dep. Tr.) at 26:8-15.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6, to the extent it implies that there are multiple "XRP Ledgers" or that a reset could create multiple separate "genesis" blocks for the "XRP Ledger."  Schwartz testified as to resets of "the ledger that [he was] working on," but "hesitate[d]" to use

the term "XRP" Ledger in connection with any 'reset' ledger, because the term "XRP Ledger" as used today would not apply to those earlier iterations.  PX 6 at 26:8-22.

4.      As the native asset to the XRP Ledger, the 100 billion units of XRP created were originally represented in the XRP Ledger's genesis block. PX 6 (Schwartz Dep. Tr.) at 26:3-7.

**Response:**      Undisputed.

5.      The XRP Ledger was reset at least once in late 2012, and some of its original blocks or ledgers were lost at or around that time. PX 6 (Schwartz Dep. Tr.) at 32:17-33:10.

**Response:**      Undisputed.

6.      XRP had no use when it was created other than to validate transactions on the XRP Ledger and since no one was using the XRP Ledger when it was created, even that was not a use for XRP. PX 7 (Schwartz Inv. Tr.) at 60:12-25; PX 36 (Garlinghouse Inv. Tr.) at 186:17-187:4.

**Response:**      Disputed.  None of the SEC's cited evidence supports the characterizations in Paragraph 6.  Defendants do not dispute that, from the time the XRP Ledger was created, it could not be operated without the use of XRP, and that the cited testimony establishes that, at the time the XRP Ledger was created, XRP had "no established price."  PX 7 at 60:12-25.  Defendants dispute that the cited testimony from PX 7 establishes that XRP had no use at the time the XRP Ledger was created, and further dispute that the cited testimony from PX 36 relates in any way to the origin of XRP, as Garlinghouse was describing "the beginning of Ripple Net" – Ripple's suite of products – not the beginning of the XRP Ledger.  PX 36 at 186:17-187:4.  Garlinghouse only joined Ripple in April 2015, after the XRP Ledger was completed.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 140-41.

7.      The version of the XRP Ledger that was made open to the public went live in two phases in late 2012 and early 2013, at which point the XRP Ledger was operated by Jed McCaleb on three servers operating through Amazon's infrastructure. PX 7 (Schwartz Inv. Tr.)

63:13-64:19, 88:6-17; PX 6 (Schwartz Dep. Tr.) at 25:3-7, 32:17-35:13; PX 8 (Ripple RFA Responses) Nos. 10, 169.

**Response:**     Undisputed, except insofar as the allegations in Paragraph 7 that the XRP Ledger was operated solely by Jed McCaleb during the time period described in Paragraph 7 conflicts with the SEC's allegations in Paragraph 1.

8.     An agreement between Ripple's founders for the allocation of the initial 100 billion units of XRP dated on or about September 17, 2012, states: "It is anticipated that a total of 100 billion credits shall be recorded on the Official [XRP] Ledger." PX 557.

**Response:**     Undisputed that PX 557 contains the quoted text, exclusive of any alterations, omissions or additions by the SEC; however, Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 557, as misleading to the extent it implies that the agreement was "between Ripple's founders," as the entity now known as Ripple did not exist at the time.  Defendants do not dispute that the agreement set forth in PX 557 was entered into between Jed McCaleb, Arthur Britto, and Christian Larsen.

9.     Schwartz would not characterize who "owned" XRP at its inception because he believed the concept of "ownership" did not apply to that situation. PX 7 (Schwartz Inv. Tr.) at 149:12-150:19.

**Response:**     Disputed.  The cited testimony does not contain the word "owned" and does not contain any testimony by Schwartz as to "who 'owned' XRP at its inception."  PX 7 at 149:12-150:19.  Defendants further dispute the SEC's characterization of Schwartz's cited testimony, because it was offered in response to a hypothetical question ("Q: Aren't there multiple versions of the software r[u]nning all over the world? So even though your version is closed, couldn't there -- I mean, the tokens could exist on someone else's computer and someone else who is running that software?").  PX 7 at 149:12-17.

10.     Ripple stated publicly in decks distributed to investors that "Ripple Labs is the creator of Ripple," and that 100 billion units of XRP were created with the XRP Ledger. PX 53 at p. 17; PX 30.

**<u>Response:</u>**     Disputed.  Defendants do not dispute that PX 53 contains the quoted text; however, Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 53 and 30, to the extent it implies that "Ripple stated publicly" that "Ripple Labs is the creator of Ripple," and that 100 billion units of XRP were created with the XRP Ledger.  PX 30 references distribution of the document to a single individual, which does not constitute a "public[]" distribution or a distribution to multiple "investors."  PX 30 at RPLI_SEC 0337822. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 53 and PX 30, including because the term "investors" as used in Paragraph 10 is vague and implies a legal conclusion not substantiated by the cited evidence.

11.     Ripple represented to British regulators that Ripple developed XRP. PX 556; PX 19 (Zagone Dep. Tr.) at 60:6-61:12.

**<u>Response:</u>**     Disputed.  In response to a call for information regarding digital currencies, Ripple informed HM Treasury of the UK Government that "The Ripple protocol enables payment in any fiat or virtual currency, including the math-based virtual currency developed by Ripple Labs, XRP."  PX 556.  Defendants dispute the SEC's characterization of this fact insofar as the SEC omits that HM Treasury determined that XRP (like bitcoin and ether) is an "exchange token" that is not a security because XRP is "primarily used as a means of exchange."  Ex. 281, United Kingdom HM Treasury, *UK Regulatory Approach to Cryptoassets and Stablecoins: Consultation and Call for Evidence* (Jan. 2021)..

12.     Ripple represented to New York state regulators that Ripple created the XRP Ledger. PX 47 at RPLI_SEC 0532027.

**<u>Response:</u>**     Disputed.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document cited is a hearsay statement of

a third party and not a statement by Ripple or the Individual Defendants. Defendants further dispute Paragraph 12 to the extent the SEC incorrectly attributes a statement in an "Independent" audit document prepared by ████████████ to "Ripple," which the cited evidence does not support.

13.     Ripple provided technical support for people who are building on top of the XRP Ledger. PX 7 (Schwartz Inv. Tr.) at 133:19-134:9.

**Response:**     Disputed insofar as Paragraph 13 does not state a fact with particularity, because it is vague as to timeframe and the "people" to whom Ripple provided "technical support." Defendants do not dispute that, at times, Ripple provided technical assistance relating to the XRP Ledger to third parties.

14.     The XRP Ledger was in its "infancy" in 2013. PX 14 (Griffin Dep. Tr.) at 101:19-102:1; PX 53.

**Response:**     Disputed. Defendants do not dispute that Griffin offered the cited testimony; however, Defendants dispute that Griffin's personal belief or characterization establishes the fact set forth in Paragraph 14 for all purposes in this litigation, or that Griffin's characterization can be attributed to Ripple or the Individual Defendants. Defendants further dispute the SEC's characterizations in Paragraph 14 because record evidence establishes that the XRP Ledger was fully functional after its public launch in 2012. *See, e.g.*, PX 6 at 37:5-19.

15.     Ripple and its team of engineers continued to work on improving the functionality, stability, and security of the XRP Ledger software, including by maintaining the XRP Ledger software with 16-17 full-time engineers, work on finding bugs, adding a long list of new features including security features added in response to various defects in the software that affected usability, performance, and security, including a complete rewrite of the payment engine on the XRP Ledger, and engineers working on the ledger that would prevent a takeover of the ledger by China. PX 7 (Schwartz Inv. Tr.) at 179:16-183:15; PX 6 (Schwartz Dep. Tr.) at 112:2-18; PX 81 (Garlinghouse Dep. Tr.) at 395:25-397:25, 399:7-401:24.

**Response:**     Disputed. Defendants do not dispute that Ripple has employed a team of engineers who have contributed to the XRP Ledger's open-source code repository; however,

Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 7, PX 6, and PX 81, including because Paragraph 15 omits additional context necessary to understand the cited testimony, as it ignores evidence about the involvement of non-Ripple parties working on the XRP Ledger's open-source software.  In particular, Defendants note that Garlinghouse testified within the cited page range that "[t]here's obviously people outside of Ripple who contribute open-source code to the XRP Ledger also and their contributions are important."  PX 81 at 397:16-25.

16.     Ripple engineers developed the time-lock/escrow feature on the XRP Ledger that was used to create Ripple's escrow of XRP. PX 7 (Schwartz Inv. Tr.) at 227:4-228:16.

**Response:**     Undisputed that Ripple's engineers contributed the code to the XRP Ledger's open-source code repository relating to the XRP Ledger's cryptographic escrow functionality, and that Ripple used that feature to escrow some of its XRP; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 7, including because Paragraph 16 omits additional context necessary to understand the cited testimony. Defendants dispute the SEC's characterizations in Paragraph 16 insofar as they imply that Ripple could unilaterally add features to the XRP Ledger, which is not supported by the cited evidence. In particular, Schwartz testified that Ripple "need[ed] to get consensus from the community to add" the escrow feature.  PX 7 at 228:14–16.

17.     Schwartz and Ripple's programmers have changed the amount of XRP that must be "burned" to effect transactions. PX 6 (Schwartz Dep. Tr.) at 36:7-37:4.

**Response:**     Disputed.  The cited evidence does not establish that "Schwartz and Ripple's programmers" were at any time able to unilaterally effect any changes to the XRP Ledger's software or functionality.  Schwartz's testimony establishes only that he designed an idea for a modification to the XRP Ledger's underlying open-source software and Ripple

engineers assisted in drafting the code, not that Schwartz or Ripple could implement that change

to the XRP Ledger's open-source software. *See* PX 6 at 36:7-37:4.

18.     Ripple has a financial and reputational interest in the proper functioning of the

Ledger. PX 6 (Schwartz Dep. Tr.) at 126:24-127:5; PX 47 at RPLI_SEC 532027 (Ripple's

auditor noting "Ripple Labs created and maintains" the XRP ledger, and noting "presently, XRP

has limited commercial use and is mainly held as a speculative investment by companies and

individuals that expect it to rise in value as the ripple network expands" and also that "XRP

represents one method by which ripple labs raises working capital.").

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 6, including because Paragraph 18 omits additional

context necessary to understand the cited testimony, as Schwartz only testified that he "think[s]"

Ripple has a financial and reputational interest in the XRP Ledger functioning correctly, as set

forth in PX 6 at 126:24-127:5.  Defendants further dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 6, including to the extent the SEC implies that

Schwartz's personal opinion or belief could be attributed to Ripple or the Individual Defendants

and that a statement by a single employee is sufficient to establish the underlying fact set forth in

Paragraph 18 at all times and for all purposes in this litigation.  As to PX 47, pursuant to Fed. R.

Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as

the document cited is a hearsay statement of a third party and not a statement by Ripple or the

Individual Defendants.  Defendants further dispute Paragraph 18 to the extent the SEC

incorrectly attributes a statement in an "Independent" audit document prepared by third party

███████████████ to "Ripple," which the cited evidence does not support.  Defendants dispute

that Paragraph 18 sets forth an independent statement of material fact because it is duplicative of

Paragraphs 38, 89, and 714 of the SEC's Rule 56.1 Statement (ECF No. 629).  Defendants

incorporate by reference their responses to Paragraphs 38, 89, and 714 of the SEC's Rule 56.1

Statement.

19.     Ripple provides a pathway for people interacting with the Ledger, such as crypto trading platforms, to easily contact a Ripple employee with the expertise to address issues, and the number of people with his level of expertise over the Ledger is small, limited to Ripple employees. PX 6 (Schwartz Dep. Tr.) at 170:14-171:24.

**Response:**     Disputed.  Defendants dispute that Paragraph 19 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, insofar as its use of the present tense implies that it is setting forth a fact as of October 2022, which is irrelevant.  Defendants further dispute Paragraph 19 as vague and ambiguous to the extent its reference to "his" is undefined in the text of the paragraph.  To the extent the SEC intended to refer to David Schwartz, Defendants dispute the SEC's characterizations in Paragraph 19, as Schwartz testified that there are two third-party companies with expertise that address issues faced by people interacting with the Ledger.  PX 6 at 171:2-18.  Defendants further dispute the SEC's assertion in Paragraph 19 that Schwartz indicated that the people with his level of expertise is "limited to Ripple employees," as Schwartz specifically testified that ▮▮▮▮▮▮▮▮ and "at least three other people" who are not Ripple employees also have his level of expertise as to the XRP Ledger.  PX 6 at 172:7-13.

20.     Ripple pays bounties for people to find bugs on the XRP Ledger, and is the only person that Schwartz is aware to offer such rewards. PX 6 (Schwartz Dep. Tr.) at 186:15-187:15.

**Response:**     Disputed.  Defendants dispute that Paragraph 20 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, insofar as its use of the present tense implies that it is setting forth a fact as of October 2022, which is irrelevant.  Defendants further dispute that the cited evidence establishes that Ripple currently pays bounties for people to find bugs on the XRP Ledger.  Defendants do not dispute that, in the past, Ripple offered and paid bounties to individuals who identified bugs in the XRP Ledger's open-source software, and that David Schwartz testified that he personally is not aware of any other company that has offered such rewards.  Defendants

dispute Paragraph 20 to the extent the SEC implies that Schwartz's unrefreshed recollection can be attributed to Ripple or the Individual Defendants.

21.     In order for the XRP Ledger to properly function for a subset of nodes on the XRP Ledger, there needs to be overlap of somewhere between 80-90% of the nodes listed in each nodes "UNL." PX 6 (Schwartz Dep. Tr.) at 183:16-184:1.

**<u>Response:</u>**     Disputed.  The cited evidence establishes only that Schwartz personally agreed with certain "probabilistic" conclusions from an unpublished, non-peer-reviewed paper, and Defendants accordingly dispute that the cited evidence supports or establishes the broad and unqualified assertion of fact set out in Paragraph 21.  *See* PX 6 at 182:6–183:4.

22.     Ripple publishes a default list of nodes ("dUNL") that nodes on the XRP Ledger should listen to, this list is the default list programmed into the software, and the other two entities that publish UNL lists—Coil and the XRP Ledger Foundation—publish substantially the same list as Ripple's dUNL, and Ripple has commercial relationships or investments with those two entities, as well as at least informal arrangements with other entities on the list, including the universities. PX 6 (Schwartz Dep. Tr.) at 125:8-134:5; PX 8 (Ripple RFA Responses) No. 178.

**<u>Response:</u>**     Disputed.  Defendants dispute that Paragraph 22 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, insofar as its use of the present tense implies that it is setting forth a fact as of October 2022, which is irrelevant.  Defendants do not dispute that Ripple has, at times, made publicly available a unique node list ("UNL") that XRP Ledger nodes and validators may freely choose whether or not to adopt as their own UNL.  Defendants dispute the characterization of Ripple's UNL as something that either Ripple or the Individual Defendants believe nodes "should listen to," as this characterization is not supported by the cited evidence.  Defendants further dispute the characterization in Paragraph 22 that Coil and the XRP Ledger Foundation are the only "other two" entities that publish a UNL, as that fact is not established by the cited evidence.  Defendants further dispute the characterization in Paragraph 22 that the UNLs published by Coil and the XRP Ledger Foundation are "substantially the same" as Ripple's, as

that fact is not established by the cited evidence, including because the cited testimony does not establish with specificity the contents of each of those three UNLs as they may have changed over time.  Defendants further dispute Paragraph 22 insofar as the cited evidence does not establish that Ripple has a "commercial relationship[] or investment[] in" the XRP Ledger Foundation, as the cited testimony only establishes that Ripple has made a donation to the XRP Ledger Foundation, which donation was not an investment and did not establish a commercial relationship.  PX 6 at 128:12-17.  Defendants further dispute Paragraph 22 insofar as its references to unspecified "at least informal arrangements" with unnamed "other entities" and "universities" on an unspecified "list" are not stated with sufficient particularity to set forth a material fact and additionally are not supported by the cited evidence.

23.     Ripple and two entities Ripple funded (Coil & Gatehub) provided the capital to establish the XRP Ledger Foundation. PX 742 (Ripple RFA Responses) No. 616.

**Response:**     Disputed.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 742, because the SEC's statements that Ripple funded Gatehub are unsupported by the cited evidence.  Nothing in the cited RFA Response indicates the sources of Gatehub's funding or that Ripple was such a source.  Defendants further dispute Paragraph 23 as unsupported by the cited evidence to the extent it implies a commercial relationship between Ripple and the XRP Ledger Foundation by its use of the phrase "provided the capital to establish the XRP Ledger Foundation."  Defendants do not dispute that Ripple, along with Coil and Gatehub, "provided an initial *donation* to help support the work of the XRP Ledger Foundation."  PX 742 at No. 616; PX 6 at 128:12-17.

24.     Ripple funded Coil with XRP. PX 24 (Beard Dep. Tr.) at 66:12-20, 125:6-126:17; PX 740; PX 2 (Larsen Dep. Tr.) at 405:6-409:1.

**Response:**     Disputed.  Defendants do not dispute that Coil received XRP from Ripple; however, Defendants dispute the SEC's characterizations of, and inferences purportedly drawn

from, PX 24, including because Paragraph 24 omits additional context necessary to understand the cited exhibit, including that Ripple partnered with Coil to "work with them on building technology . . . [p]rimarily [the] Interledger Protocol," as set forth in PX 24 at 125:17-126:1.

25.     Even though historically there has been a concern over Ripple's stash of XRP and the "overhang" it creates on the price of XRP, there has never been a move by other nodes on the XRP Ledger to try to burn Ripple's 50 billion units of XRP, and Ripple does not even take any steps to prevent that from happening because it's "outrageous" to think that any participant in the XRP Ledger could try in part because Ripple has always acted in ways that has not harmed XRP holders in the market. PX 6 (Schwartz Dep. Tr.) at 201:8-207:25.

**Response:**     Disputed.  Defendants dispute that the cited evidence establishes the vague and unqualified assertion in Paragraph 25 that "there has been a concern over Ripple's stash of XRP and the 'overhang' it creates on the price of XRP" as unsupported by the cited evidence. Evidence in the record establishes that Ripple employees understood the "overhang concern" to be the result of misinformation promulgated by "bitcoin maximalists."  PX 14 at 72:16-73:15. Defendants further dispute the SEC's misleading characterizations of Schwartz's testimony in Paragraph 25 insofar as the SEC connects two disparate pieces of Schwartz's testimony that were not connected by Schwartz himself: first, that it would be "outrageous" for third parties to attempt to forcibly "burn" Ripple's XRP; and second, that Ripple has not acted to "harm[] XRP holders in the market," when Schwartz's testimony does not establish or imply the link the SEC implies in Paragraph 25.  *See* PX 6 at 203:23-204:5, 205:18-206:9.  Defendants further dispute that the cited evidence establishes that Schwartz's personal testimony can be attributed to Ripple or the Individual Defendants.

26.     XRP is still likely to remain Ripple's largest asset for years, Ripple will almost certainly hold a significant share of XRP for years, and the market does not expect Ripple to walk away from the XRP Ledger or XRP any time soon. PX 6 (Schwartz Dep. Tr.) at 297:3-298:19; 325:3-24.

**Response:**     Disputed.  Defendants dispute that Paragraph 26 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offer and sales of XRP prior

to December 22, 2020, and accordingly facts and circumstances as of October 2022 and years to

come are irrelevant.  Defendants also dispute that a statement by a single employee at a

particular point in time is sufficient to establish the underlying fact set forth in Paragraph 26 at

all times and for all purposes in this litigation, or that Schwartz's personal testimony can be

attributed to Ripple or the Individual Defendants.

27.     As of May 2021, Ripple was engaged in efforts to potentially increase the use for
XRP, including with a team of engineers, which could increase demand for XRP. PX 6
(Schwartz Dep. Tr.) at 349:1-351:20.

**Response:**     Disputed.  Defendants dispute that Paragraph 27 sets out a material fact to

any claims or defenses in this case, which relate solely to Ripple's offer and sales of XRP prior

to December 22, 2020, and accordingly facts and circumstances as of May 2021 are irrelevant.

Defendants also dispute Paragraph 27 to the extent it sets forth legal conclusions unsupported by

citations to evidence, including the SEC's statement that Ripple was "engaged in efforts" to

potentially increase the use for XRP.  Defendants also dispute that a statement by a single

employee at a particular point in time is sufficient to establish the underlying fact set forth in

Paragraph 27 at all times and for all purposes in this litigation.

28.     People have used the price of XRP as a proxy for the success of Ripple as a
company and for the value of Ripple. PX 7 (Schwartz Inv. Tr.) at 117:25:119:4, 125:10-130:10.

**Response:**     Disputed.  Defendants dispute the SEC's characterizations of, and

inferences purportedly drawn from, PX 7, including because Paragraph 28 omits additional

context necessary to understand the cited testimony.  Schwartz specifically testified that "some

people," at a specific point of time, used the price of XRP "as sort of a proxy" for the success of

Ripple as a company.  PX 7 at 130:2-10.  In addition, the SEC omits the fact that Schwartz

explained that there was only one time when the price of shares in Ripple and the price of XRP

"appear[ed] to be correlated," not that such a correlation has existed at all times.  PX 7 at 118:5-

7.  To the contrary, evidence in the record establishes that the price of shares in Ripple and the price of XRP have been uncorrelated, and Schwartz testified that "Ripple's valuation has been doing very well, as reflected in both the secondary market in the investment round," while "the price of XRP hasn't . . . moved significantly." PX 7 at 118:9-16.  Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 28 at all times and for all purposes in this litigation.

29.     Ripple had a copyright for the code for the XRP Ledger. PX 6 (Schwartz Dep. Tr.) at 23:16-24:21; https://xrpl.org/faq.html.

**Response:**     Disputed.  Schwartz testified only as to his layperson's "understanding" of copyright, which was derived from "various intellectual property issues that" Schwartz has been "involved with." PX 6 at 24:19-25:2.  Schwartz, who is not an attorney, did not testify that Ripple in fact held a copyright for the code for the XRP Ledger.  Defendants also dispute the SEC's characterizations of, and inferences purportedly drawn from, the cited link to a website maintained by the XRP Ledger Foundation, which has not been offered into evidence as an exhibit, because the cited evidence does not support the SEC's statement in Paragraph 29.  As of the date of the SEC's filing, there was no mention on the cited webpage of a copyright held by Ripple for the code of the XRP Ledger.  Defendants accordingly dispute that the cited evidence establishes the SEC's assertion of fact as set forth in Paragraph 29.

30.     Ripple patented the consensus algorithm and other features of, or pertaining to, the XRP Ledger. PX 639 at RPLI_SEC 102764; https://uspto.report/patent/app/20160224949 (patent for "temporary consensus subnetwork in a distributed network for payment processing"); https://uspto.report/patent/app/20190251007 (patent for "Byzantine Agreement in Open Networks").

**Response:**     Disputed.  Defendants do not dispute that Ripple owns patent application no. US20190251007A1 (which is not an active patent); however, Ripple does not own patent no. US20160224949A1.  Defendants further dispute the SEC's characterization in Paragraph 30 that

these are patents "of" the XRP Ledger as unsupported by the cited evidence (which were not

offered as exhibits, and which are websites maintained by an unknown third party and not

official government records of which the Court may appropriately take judicial notice).

Defendants further dispute Paragraph 30 to the extent it suggests the XRP Ledger itself has been

patented by Ripple, as Defendants dispute that a statement without citation in an undated draft of

a third-party tax advice memorandum is competent evidence of that fact.  Moreover, the cited

exhibit (which does not contain a page with the Bates number provided by the SEC in Paragraph

30) establishes that the source code for the XRP Ledger is open-source and "the general public

[has] the ability to make any necessary changes" to that code in a process that requires that

changes be "accepted and adopted" by XRP Ledger validators, because Ripple "does not have

control of the software code."  PX 639 at RPLI_SEC 1027264.

31.    Ripple owned a trademark for "XRP." https://uspto.report/TM/85935696; PX 2
(Larsen Dep. Tr.) at 216:10-217:10.

**Response:**    Disputed.  Defendants dispute the SEC's unqualified characterization in

Paragraph 31 as unsupported by the cited evidence, including because the cited website was not

offered as an exhibit and is a website maintained by an unknown third party and not an official

government record of which the Court may appropriately take judicial notice.  Defendants do not

dispute that, on December 31, 2013, Ripple was granted trademark registration no. 4,458,993 for

the mark "XRP" in International Class 36 for "Financial services, namely, providing secure

payment options to members of an online community via a global computer network through the

use of traditional currency and virtual currency," and that Ripple continued to hold that

registration through December 22, 2020.  Defendants dispute Paragraph 31 insofar as it implies

that this trademark registration for specifically defined "services" is a trademark of the digital

asset XRP.

32.     The only validators that have any consequence to the stable operation of the ledger are those on the "Unique Node List" or "UNL." PX 641 (Transcript of RPLI_SEC 114103, February 5, 2018 Internal Weekly Company meeting) at Tr. 20:18-23 ("So when you heard 500 validators or whatever, there's hundreds of validators on the network currently. But the ones that really kind of are…designed to make sure that the network is operating stability [sic]…are the sub net that's on the UNL").

**Response:**     Disputed.  The SEC's characterizations in Paragraph 32 are not supported by the cited evidence, as the SEC's own quoted text makes clear.  Defendants further dispute Paragraph 32's vague references to "any consequence" and "stable operation of the ledger," which are not phrases used by the cited evidence.  Defendants further dispute that the cited evidence establishes that a single statement in an internal meeting by a single Ripple employee could establish the cited fact at all times and for all purposes in this litigation, or that the statement could be attributed to Ripple or the Individual Defendants.  Defendants further dispute the SEC's characterizations in Paragraph 32 insofar as record evidence establishes that any participant who runs a validator can contribute to the stable operation of the XRP Ledger network.  *See* PX 6 at 165:13-166:24.

33.     As of February 2018, the UNL was "maintained by Ripple" and that "transitioning the trust from Ripple to an external…broader kind of list of external validators… is pretty intense because you have to, essentially…verify that the people are who they say they are and that they're actually able to run a validator…reliably." PX 641 at Tr. 20:09-20:16.

**Response:**     Disputed.  Defendants do not dispute that Ripple maintained a UNL as of February 2018; however, the cited evidence does not establish that Ripple's UNL was "the" UNL, as the SEC's misleading characterization in Paragraph 33 states (including because the phrase "maintained by Ripple" does not appear within the cited text).  Record evidence establishes that each validator on the XRP Ledger network is at all times able to voluntarily choose or change its own UNL.  *See* PX 6 at 175:8-176:5 (describing how, within the XRP Ledger's software code, validators may "provide their own UNL rather than pull it from somebody else").  Defendants further dispute that the cited evidence establishes that a single

statement in an internal meeting by a single Ripple employee could establish the cited fact at all

times and for all purposes in this litigation, or that the statement could be attributed to Ripple or

the Individual Defendants.

34.     As of December 2018, Ripple was "still a gatekeeper for the XRP Ledger open
source code repository (merge access)," which meant that only Ripple could integrate potential
changes to the code of the XRP Ledger. " PX 682 at RPLI_SEC 0574093; PX 457 (transcript of
RPLI_SEC 1141099, December 10, 2019, Leadership Offsite meeting) at Tr. 23:3-17 (Schwartz
stated: "[T]he market is looking to us to signal through our actions. And to be brutally
honest…our actions have signaled to the market that we're converting our XRP to dollars as
quickly as we can. I mean that's -- I don't want to over index on what negative people say,
positive people are like we're in this for the long term. But like we're -- we're turning a lot of
XRP into cash and we're using that -- that cash for all kinds of different things. And I think we
need this kind of commitment to -- because we're the only people it can come from. Like, there's
no other place where predictability and stability about supply and long term health can come
from. There just -- because we just have this giant pile of XRP."); PX 457 at Tr. 12:1-10 (Ripple
employee stated: "[R]ight now, there are people on the Ripple D team who are responsible for
every single commit…yes, we do want to be in control of those commits for a while now.").

**Response:**     Undisputed that the cited documents contain the quoted language,

exclusive of any alterations, omissions, or additions by the SEC (including through the apparent

erroneous inclusion of a second close-quotation mark in the first sentence).  Defendants dispute

the SEC's misleading characterizations in Paragraph 34 insofar as the cited statements in PX

457, which were made almost a year after the statements in PX 682, do not have any relationship

to the quoted language in Paragraph 34 and do not support or clarify the meaning of the cited text

in Paragraph 34.  Defendants further dispute that the cited evidence establishes that a single

statement from a single presentation from December 2018 establishes any fact at all times and

for all purposes in this litigation, or that the statement could be attributed to Ripple or the

Individual Defendants.  Defendants further dispute any implication the SEC may seek to draw

from Paragraph 34 that the ministerial function of committing code to an open source code

repository has any relevance to the claims or defenses in this action, or any bearing on the actual

transactions in XRP that are the subject of the SEC's claims.

35.     As of December 2018, Ripple validators still made up more than 80% of the validators on the Unique Node List, which meant that Ripple could unilaterally approve changes to the XRP Ledger as well as "prevent a supermajority [of validators] from activating an amendment" to change the XRP Ledger. PX 682 at RPLI_SEC 0574093.

**Response:**     Disputed.  None of the SEC's statements in Paragraph 35 are supported by the cited evidence.  Defendants dispute the SEC's characterizations of the cited evidence in Paragraph 35 because record evidence establishes that each validator maintained a separate UNL, and accordingly the SEC's reference to "the" UNL is vague, misleading, and unsupported by the cited evidence.  Defendants further dispute the SEC's statements in Paragraph 35 insofar as the cited evidence establishes that, as of December 2018, Ripple controlled only 27% of the validators on Ripple's UNL.  PX 682 at RPLI_SEC 0574086.  The slide referenced by the SEC in Paragraph 35 discusses further reductions of Ripple validators on Ripple's UNL to below 20% of the total validators.  PX 682 at RPLI_SEC 0574093.

36.     Ripple first proposed the so-called 'Checks Amendment' from June 2020 and "developed it." PX 6 (Schwartz Dep. Tr.) at 151:15-22; 210:17-19.

**Response:**     Undisputed that Ripple initially proposed an amendment to the XRP Ledger's open-source software code that would have enabled a feature known as "checks," and that Ripple ultimately opposed that amendment, but it was nonetheless incorporated into the XRP Ledger's software code over Ripple's objection because it was approved by a sufficient number of validators to be accepted.  PX 6 at 151:15-22; 212:4-5 ("We were trying to secure 'no' votes at the time.").

37.     By the time the Checks Amendment was passed, Ripple developer ████████ tweeted the following on or about June 12, 2020: "as [David Schwartz] and I said before, there are no reasons for voting against the Checks amendment; it was just the conservative position to take, in response to no exchanges/wallets having support for the feature." PX 670.

**Response:**     Disputed.  Defendants do not dispute that PX 670 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute

that a single statement by a single employee is sufficient to establish the underlying fact set forth

in Paragraph 37, including as to any belief or understanding held by other Ripple employees,

Ripple as an entity, or the Individual Defendants.  In particular, Defendants dispute that

█████'s statement provides a complete statement of Schwartz's views, as Schwartz testified

that "our position at the time was that – that the amendment had not had sufficient testing and

that there were serious questions about whether its usefulness exceeded its risk and that we were

advising against the amendment."  PX 6 at 211:20-24.

38.     In a tweet on or about June 6, 2020, Schwartz stated that Ripple didn't have "any significant reason" to vote against the Checks amendment. PX 678. Schwartz described his reaction to the amendment having been passed as: "Ripple didn't get its way, but we said whatever." PX 6 at 151:15-22.

**Response:**     Undisputed that Schwartz sent the quoted tweet and offered the quoted

testimony.  Defendants dispute the SEC's characterization of the facts in question as incomplete

and misleading as set forth in Paragraph 38, insofar as Schwartz testified that "our position at the

time was that – that the amendment had not had sufficient testing and that there were serious

questions about whether its usefulness exceeded its risk and that we were advising against the

amendment."  PX 6 at 211:20-24.

39.     Ripple originated the domain xrpl.org. PX 6 (Schwartz Dep. Tr.) at 163:11-22.

**Response:**     Disputed.  Defendants do not dispute that, at one time, Ripple controlled

the registration for the domain <xrpl.org>; however, Defendants dispute that the cited evidence

establishes that Ripple "originated" that domain, as the cited evidence does not establish the

entire history of registrations for the domain <xrpl.org> and only sets forth Schwartz's

unrefreshed recollection that he "believe[d]" the domain was at one time a "Ripple website."  PX

6 at 163:11-22.

40.     In 2019, Ripple replaced the website https://developers.ripple.com with https://xrpl.org because the previous website "confused developers into thinking they were building on Ripple, not XRP Ledger." PX 640 at RPLI_SEC 0602120.

**Response:**     Disputed.  Defendants do not dispute that PX 640 contains the quoted text; however, Defendants dispute that the quoted language from a single email sets forth Ripple's entire reasoning for taking the actions described in PX 640, which is not supported by the cited evidence.  Defendants further dispute the SEC's implication in Paragraph 40 that Ripple controlled the contents of the https://xrpl.org website, as the cited evidence establishes that website was "open source and community-driven, meaning anyone can submit a pull request with proposed changes or comments on ███████" PX 640 at RPLI_SEC 0602120.

41.     The website xrpl.org states: Ripple will still play a significant role in managing and providing content for xrpl.org." https://xrpl.org/blog/2019/welcome-to-xrpl-org.html.

**Response:**     Disputed.  Defendants dispute that Paragraph 41 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, insofar as its use of the present tense implies that it is setting forth a fact as of October 2022, which is irrelevant.  Defendants further dispute the SEC's characterizations of the website in question, which was not submitted as an exhibit by the SEC, because the SEC misleadingly excerpts the entire quotation to omit relevant context, as the entire sentence reads: "While Ripple will still play a significant role in managing and providing content for xrpl.org, so will the many other dedicated developers, designers, writers and business leaders that interact with the XRP Ledger every day."  Ex. 282 (XRP LEDGER PROJECT, *Welcome to xrpl.org!*, https://xrpl.org/blog/2019/welcome-to-xrpl-org.html (last visited Nov. 21, 2022)).

42.     Ripple provided funding and other "support" to the XRP Ledger Foundation. PX 642 (Transcript of RPLI_SEC 1100529, September 11, 2020 Ripple X All Hands meeting) at Tr. 19:7-20:5 ("Another initiative that we're really excited to push on for the rest of Q4 -- or Q3 -- and Q4 is the XRP Ledger Foundation...We're essentially…being…a resource as well as a kind of advisory consultant of sorts in order to help them ... grow and be more of an active participant in the community. So, what we've done is we've helped them set up funding for them to run

infrastructure for the ledger…We're also…supporting them, with donation as well as advice on kind of what their strategic roadmap looks like.").

> **Response:** Disputed. The record evidence establishes that Ripple donated funds to the XRP Ledger Foundation, which donation was not an investment and did not establish a commercial relationship between Ripple and the XRP Ledger Foundation. PX 6 at 128:12-17. As set forth in PX 642, Ripple's role was only to be an "advisory consultant" "supporting" the XRP Ledger Foundation's work. Defendants accordingly dispute the SEC's characterizations in Paragraph 42 insofar as they are inconsistent with the cited evidence.

43. Ripple funded efforts to create potential uses for XRP through Ripple's xPring initiative. PX 658; PX 457 (transcript of RPLI_SEC 1141099, October 10, 2019, Ripple Leadership Offsite) at 17:10-18:16 ("I think a big framework we want to think about is like what does this do for XRP overall, specifically around creating demand for XRP. So not just kind of like providing XRP to supply the market, but that they're going to use the XRP as like part of their application, generate more demand off of it through that initial supply of XRP and when you're providing the XRP, you're sort of getting a fly wheel started around liquidity and volume versus just providing funding. So I -- I think we're trying to kind of orientate some of our partnerships in the future around that as well.").

> **Response:** Disputed. Defendants dispute Paragraph 43 to the extent that it sets forth a legal conclusion, including the SEC's statement that Ripple funded "efforts." Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 457, including because Paragraph 43 omits additional context necessary to understand Paragraph 43. Paragraph 43 omits that the quoted statement was in direct response to a question "mostly about accountability of how [the partners] use the XRP." Undisputed that PX 457 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

44. Ripple funded efforts to create potential uses for XRP through an entity called Coil. PX 90 at 0392729-30; PX 643 (Transcript of RPLI_SEC 1141204), April 30, 2018 Weekly Company meeting) at Tr. 8:3-6 (▮▮▮▮▮and Ripple are going to be creating a new entity. It's going to be called Coil. A ton of work has gone into this and it's really going to focus on some of the other use cases around micropayments ...."); PX 644 (Transcript of RPLI_SEC 1141059, February 4, 2019 Weekly Company Meeting) at Tr. 14:1-14:14 ("COIL is a company that was

spun out of Ripple and is … building out one of the really important Interledger use cases, which is streaming micropayments.").

**Response:**      Disputed.  Defendants dispute Paragraph 44 to the extent that it sets forth a legal conclusion, including the SEC's statement that Ripple funded "efforts."  Defendants further dispute the characterizations in Paragraph 44 that Ripple "funded efforts . . . through an entity called Coil," insofar as the cited evidence establishes that Coil was a separate entity from Ripple and not a Ripple subsidiary.  Otherwise, Defendants do not dispute that PX 643 and PX 644 contain the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

45.      Ripple is a shareholder of Coil. PX 657.

**Response:**      Defendants dispute that Paragraph 45 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, insofar as its use of the present tense implies that it is setting forth a fact as of October 2022, which is irrelevant.  Defendants do not dispute that Ripple purchased shares in Coil on November 1, 2018.  PX 657 at NY-9875_T_00012222, NY-9875_T_00012243.  Defendants dispute any further characterization of Ripple's ownership of Coil shares as unsupported by the cited evidence.

46.      Ripple entered into agreements with seven exchanges whereby Ripple agreed to provide XRP and/or cash incentives in exchange for making XRP available for trading to exchange users. PX 715, Ex. 13; PX 716, PX 717, PX 718, PX 719, PX 720, PX 721, PX 722.

**Response:**      Disputed because the SEC's statement in Paragraph 46 is contradicted by evidence in the record and Paragraph 499 of the SEC's Rule 56.1 Statement.  In fact, "Ripple contracted with only *six* cryptocurrency exchanges" and only one of these exchanges received "one-time set up fees" in exchange for making XRP available for trading to exchange users.  PX 715 (Report of Allen Ferrell, Ph.D.) at 65 (emphasis added); PX 720 at RPLI_SEC 0511334.  The other five exchanges received incentive payments that were tied to XRP trading volume or

user trading activity and passed on to exchange users. *See* PX 716, PX 717, PX 718, PX 719, PX 721. Further, "XRP . . . has traded at a couple hundred exchanges around the world, of which Ripple partnered or facilitated a . . . very small percentage of those [listings]." PX 81 at 300:23–301:2. "[M]ost of the listing[s] didn't have anything to do with [Ripple] . . . . [M]ost XRP listings happened organically." PX 20 at 97:5–7.

47.      Breanne Madigan, Ripple's Head of XRP Markets, admitted that one of her responsibilities included a "mandate" around "liquidity" and "liquidity partnerships … focusing on engaging with market participants, like – like exchanges or lenders or prime brokers around XRP liquidity broadly speaking." PX 25 (Madigan Dep. Tr.) at 30:13-31:7.

**Response:**      Undisputed that Madigan testified that her "team's mandate" during the period she was responsible for the XRP Markets team included "liquidity broadly defined" and that the "liquidity partnerships team . . . focus[ed] on engaging with market participants, like -- like exchanges or lenders or prime brokers around XRP liquidity broadly speaking." PX 25 at 30:19-31:7.

48.      Madigan admitted that Ripple wanted "XRP trade[d] on more exchanges" and that having "many on ramps, off ramps" for XRP to trade was beneficial for the XRP market. PX 25 (Madigan Dep. Tr.) at 235:5-12; 147:19-148:7.

**Response:**      Undisputed.

49.      The XRP Markets team set specific "goals" to "list" and "integrate" XRP or an XRP-related product on specific exchanges in 2019 and 2020. PX 376; PX 530; PX 548.

**Response:**      Disputed.  Defendants do not dispute that, in October 2019, one member of the XRP Markets team sent an email discussing certain "[l]istings/[i]ntegrations," but otherwise dispute the SEC's characterizations in Paragraph 49 as unsupported by the cited evidence.

50.      Ripple employees attributed 25 new XRP listings on exchanges as "big achievements" for Ripple, acknowledging the work performed by Ripple's engineering team to

integrate XRP on exchanges. PX 645 (Transcript of RPLI_SEC 1100505, Q2 2017 Company All Hands meeting, July 20, 2017) at Tr. 30:20-31:6.

**Response:**     Disputed.  Defendants do not dispute that PX 645 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 645, as misleading.  The complete quote stated: "Other big achievements, 25 new exchange listings."  PX 645 at 30:20-21.  The quote further explained that Ripple only worked with "some exchanges . . . to get this done."  PX 645 at 30:22-23.  Defendants accordingly dispute that the cited evidence establishes that these were achievements "for Ripple" or that Ripple's engineering team worked on integrating XRP on all 25 exchanges discussed in this passage.

51.     Garlinghouse tweeted the following on December 21, 2017: "$XRP is now on 50 exchanges around the world! Team Ripple will continue to champion additional listings to foster a vibrant and healthy XRP ecosystem and help deepen liquidity across fiat currencies. https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/"). PX 506.106.

**Response:**     Undisputed that PX 506.106 contains the quoted text, however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 506.106 to the extent it implies anything about what role Ripple had, if any, in the 50 exchange listings for XRP, which is unsupported by the exhibit.  PX 506.106.  Paragraph 51 omits additional context necessary to understand the quoted language regarding Garlinghouse's view of the role of exchange listings for XRP.  Garlinghouse explained that "maximizing liquidity by having XRP listed at as many global … exchanges as possible is a critical component of delivering on [Ripple's] vision for the internet of value[,]" as set forth in PX 41.  Defendants further note that of the hundreds of exchanges globally that listed XRP, only six had contracts with Ripple related to their listing of XRP.  Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 65-66.  Defendants dispute that the exhibit referenced in Paragraph 51 contains a complete or accurate

representation of the original source in which it appears, because the document includes the

SEC's own annotations and characterizations.

52.     Ripple tweeted the following on December 21, 2017: "It's a priority for Ripple to have $XRP listed on top digital asset exchanges, making it broadly accessible worldwide. Excited to share $XRP is now listed on 50 exchanges and counting." PX 506.107.

**Response:**     Undisputed.

53.     In its Q4 2017 XRP Markets Report, Ripple stated the following: "XRP also became available across more than 50 exchanges globally" and "[t]his increased global reach is the result of Ripple's continued investment in the XRP ecosystem...." PX 501.05.

**Response:**     Undisputed that PX 501.05 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 501.105, as misleading,

including because Paragraph 53 omits additional context necessary to understand the quoted

language, because the Q4 2017 XRP Markets Report goes on to say that XRP's availability on

exchanges "will more easily allow financial institutions to source liquidity for international

payments through XRP going forward."  PX 501.105 at ECF p. 34.

54.     On May 18, 2017, Ripple published an article titled XRP Liquidity to Deepen with Listings on Six New Exchanges that stated: "Today we are pleased to share we have expanded our partnership with BitGo…which will see XRP listed on several leading digital asset exchanges…By working with a greater number of exchanges across different countries to list XRP, we can better serve the growing demand for global payments in both major currency corridors and emerging markets." PX 500.11.

**Response:**     Undisputed that PX 500.11 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 500.11, as misleading including

because Paragraph 54 omits additional context necessary to understand the quoted language,

because the article also says that "[l]isting XRP on several new exchanges reduces the friction

for our customers to send payments into these rapidly growing markets," "[a]s XRP liquidity

increases through these additional exchange listings, cross-border payments become easier for

financial institutions to make," "XRP is a digital asset with a clear use case," and "the continued

demand for XRP via these new exchange listings . . . ultimately enables us to provide our

customers one frictionless experience to send money around the globe."  PX 500.11 at ECF p.

43.

55.      On December 21, 2017, Ripple published an article titled XRP Now Available on
50 Exchanges Worldwide that stated: "[W]e're proud to announce that XRP has gone from being
listed on six exchanges earlier this year to more than 50 worldwide." PX 500.18.

**Response:**      Undisputed that PX 500.18 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 500.18, as misleading including

because Paragraph 55 omits additional context necessary to understand the quoted language.

The article explains that "it's a top priority for Ripple to have XRP listed on top digital asset

exchanges" because of the "need for a fast and scalable asset that serves as a reliable liquidity

tool for financial institutions through the product xRapid."  PX 500.18 at ECF p. 60.  The article

continues, "[t]o serve that role in cross-border flows, XRP needs deep liquidity across fiat

currencies."  *Id.*  Defendants further dispute that the exhibit referenced in this paragraph contains

a complete or accurate representation of the original source in which it appears, because the

document includes the SEC's own annotations and characterizations and because it selectively

quotes from the website it purports to reflect.

56.      On January 18, 2018, Ripple published an article titled Top 9 Frequently Asked
Questions About Ripple and XRP that stated: "In order to maintain healthy XRP markets, it's a
top priority for Ripple to have XRP listed on top digital asset exchanges" and "Ripple has
dedicated resources to the initiative so you can expect ongoing progress toward creating global
liquidity." PX 500.20.

**Response:**      Disputed.  Defendants do not dispute that PX 500.20 contains the quoted

text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants

dispute Paragraph 56 insofar is it omits relevant text, including that "Ripple does not endorse, recommend, or make any representations with respect to the gateways and exchanges that appear on that page." PX 500.20 at ECF p. 69.  Defendants dispute that Paragraph 56 sets forth an independent statement of material fact because it is duplicative of Paragraph 482(a) of the SEC's Rule 56.1 Statement (ECF No. 629).  Defendants incorporate by reference their response to Paragraph 482(a).  Defendants further dispute that the exhibit referenced in this paragraph contains a complete or accurate representation of the original source in which it appears, because the exhibit includes the SEC's own annotations and characterizations and because it selectively quotes from the website it purports to reflect.

57.    On December 14, 2017, in a video posted on Ripple's website, Garlinghouse stated "[i]t's a very high priority for us to be listed more broadly." PX 500.28 (Transcript of Ripple Livestream, Ask Me Anything with Brad, December 14, 2017).

**Response:**       Undisputed that PX 500.28 contains the quoted text, exclusive of any alterations, omissions, or additions; however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 500.28, including because Garlinghouse was not talking about listing XRP in a vacuum, but rather explained that liquidity is "critical" for Ripple because of its enterprise use case for XRP in cross-border payments.  *See* PX 500.28 at 2.  Garlinghouse added: "When you think about what we're trying to do, if we don't have good liquidity between fiat and XRP and I mean that on a global basis, then it's going to be hard for us to be successful. … Clearly we want XRP to be listed in more exchanges that are reputable and regulated in those appropriate markets.  So it's a very high priority for us to be listed more broadly."  PX 500.28 at 2-3.  Defendants dispute that the exhibit referenced in Paragraph 57 contains a complete or accurate representation of the

original source in which it appears, because the document includes the SEC's own annotations and characterizations.

58.     In its Q2 2019 XRP Markets Report, Ripple stated that "XRP listings increased as Ripple has partnered with the top digital asset brokers and used inventory to serve as a backstop for XRP liquidity." PX 501.11.

**Response:**     Undisputed.

59.     Ripple posted on its website a list of exchanges where "XRP is available for purchase." PX 500.20; PX 506.092.

**Response:**     Disputed.  Defendants do not dispute that PX 500.20 contains the quoted text; however, Defendants dispute Paragraph 59 insofar is it omits relevant text, including that "Ripple does not endorse, recommend, or make any representations with respect to the gateways and exchanges that appear on that page."  PX 500.20 at ECF p. 69.  Defendants further dispute that PX 500.20 and PX 506.092 are sufficient to establish the underlying fact set forth in Paragraph 59 at all times and for all purposes in this litigation.  Defendants dispute that Paragraph 59 sets forth an independent statement of material fact because it is duplicative of Paragraph 482(a) of the SEC's Rule 56.1 Statement (ECF No. 629).  Defendants incorporate by reference their response to Paragraph 482(a).  Defendants further dispute that PX 500.20 contains a complete or accurate representation of the original source in which it appears, because the exhibit includes the SEC's own annotations and characterizations and because it selectively quotes from the website it purports to reflect.

60.     Ripple touted the number of XRP listings in its quarterly XRP Markets Reports and regularly tweeted about new XRP listings on exchanges. PX 501.06; PX 501.09; PX 501.10; PX 501.11; PX 501.12; PX 501.13; PX 506.046; PX 506.047; PX 506.086; PX 506.087; PX 506.089; PX 506.097.

**Response:**     Undisputed that in 2017, Ripple posted the cited tweets about new XRP listings on exchanges and that five of the six quarterly XRP Markets Reports referenced in Paragraph 60 mentioned, at the time each of those reports was issued, the number of XRP

listings on exchanges that had occurred in a given quarter or in general. However, Defendants

dispute Paragraph 60 because it sets forth legal conclusions, inferences, or assertions

unsupported by citations to evidence, including the SEC's statement that Ripple "touted" the

number of XRP listings in the referenced reports and tweets, when the evidence shows that to the

extent the listings were referenced in Ripple's tweets or XRP Markets Reports, it was due to the

"need for a fast and scalable asset that serves as a reliable liquidity tool for financial institutions

through the product xRapid." PX 500.18 at ECF p. 60. Defendants further dispute the SEC's

assertion that tweets "about new XRP listings on exchanges" were "regularly" posted by Ripple

when the SEC cites to just six individual tweets from 2017 and Ripple had tweeted over 7,300

times as of December 22, 2020. Ex. 283 (Ripple (@Ripple), TWITTER (Dec. 22, 2020), *available

at* WAYBACK MACHINE, https://web.archive.org/web/20201222195636/https:/twitter.com/ripple

(last accessed Nov. 18, 2022)).

61.     Prior to December 2020, XRP was available for U.S. parties to trade using the
XRP Ledger, and on certain digital asset trading platforms that permitted trading by U.S.
persons. https://xrpl.org/decentralized-exchange.html; PX 16 (Birla Inv. Tr.) at 57:2-15; PX
500.27 (screenshot of https://xrpcharts.ripple.com/#/xrp-markets showing XRP trading volume
on Kraken and other U.S. digital asset trading platforms); PX 564; PX 565; PX 566.

**Response:**     Undisputed.

62.     XRP is currently available for U.S. persons to trade using the XRP Ledger.
https://xrpl.org/decentralized-exchange.html.

**Response:**     Undisputed that XRP is currently available for U.S. persons to trade using

the XRP Ledger; however, Defendants dispute Paragraph 62 to the extent the SEC implies that

XRP is available for purchase or sale in the United States, since nearly every exchange

accessible to United States parties de-listed XRP or blocked United States parties' access to it.

Ex. 20 (Long Decl.) at ¶ 5.

63.     XRP was available for U.S. parties to trade using crypto trading platforms. PX 585.

**Response:**     Disputed because the SEC's assertion that XRP was available for U.S. parties to trade using crypto trading platforms in Paragraph 63 is unsupported by PX 585, which relates to the availability of the digital asset DOT on crypto trading platforms as of September 2020 and does not mention XRP.  Defendants further dispute Paragraph 63 because the SEC's assertion of fact—that "XRP was available"—is temporally unbounded and vague.

64.     Ripple's founders (Larsen, McCaleb, and Britto) committed to distribute XRP totaling 20 billion to themselves, referenced internally at Ripple as "founders shares." PX 649, PX 557.

**Response:**     Undisputed that Larsen, McCaleb, and Britto committed to distribute a combined 20 billion units of XRP to themselves upon the creation of the XRP Ledger; however, Defendants dispute the SEC's characterization of Larsen, McCaleb, and Britto as "Ripple's founders" as unsupported by the cited evidence, since neither PX 649 nor PX 557 describe Larsen, McCaleb, and Britto as *the Company's* founders.  Defendants do not dispute that PX 649 contains the quoted language "founders shares," exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that statements made by the individual employees in PX 649 are sufficient to establish the underlying fact set forth in Paragraph 64 at all times and for all purposes in this litigation.

65.     Ripple committed to distribute XRP totaling ███████ XRP to ██████████ and ███████████████████ PX 650; PX 715, Ex. C.3 and Notes to Ex. 9.

**Response:**     Undisputed that PX 650, an email from Ripple's controller dated May 5, 2017, listed ███████ XRP "[a]llocated to ████████ donation" and ███████ XRP "[a]llocated to back ███████ option," and PX 715 identifies an "outflow of ███████ XRP" to a Reserved account titled "Custody – ██ & ████████."  However, Defendants dispute Paragraph 65 because its use of the phrase "committed to distribute" is undefined, vague and

unclear, including that it is temporally unbounded as to when such "commitment" was made. PX 650 refers to both "commitments" and "contingent commitments" and does not indicate which apply to the ██████ and ██████ allocations, and PX 715 reflects an outflow to a "Reserved account" but does not indicate whether the outflow was distributed to ██████ or ██████

66.     Ripple committed to distribute XRP totaling 1.08 billion XRP to ██████. PX 715, Ex. C.3 and Notes to Ex. 9.

**Response:**     Undisputed that PX 715, Notes to Ex. 9 lists "1.08B XRP to ██████ custody account in November 2015" as an example of a "[l]arge flow[] of XRP in 2015-2016," and PX 715 Ex. C.3 indicates 1,088,862,713 XRP in "Flow related to ██████ Custody Account"; however, the cited evidence does not indicate whether such "flow[s]" reflect a "commit[ment] to distribute XRP" to ██████ Defendants further dispute Paragraph 66 because its use of the phrase "committed to distribute" is undefined, vague and unclear, including that it is temporally unbounded as to when such "commitment" was made.

67.     Ripple committed to distribute XRP totaling ██████ XRP to Coil Technologies, Inc. PX 651 at 3, 5.

**Response:**     Undisputed that on November 1, 2018, Ripple and Coil Technologies Inc. entered into a Services and Marketing Agreement whereby Ripple agreed to pay Coil compensation of ██████ XRP.  PX 651 at NY-9875_T_00012116.  The remaining amount ██████ XRP) was "set aside, in a separate account…for Third-Party projects" and contingent on Coil satisfying certain contractual conditions, including, among other things, "approval by Ripple" for certain projects, and therefore did not represent a firm commitment by Ripple to distribute such amount unless Coil satisfied the contractual conditions.  PX 651 at ██████ ██████ Defendants further dispute Paragraph 67 to the extent that its use of the



phrase "committed to distribute" is undefined, vague and unclear, including that it is temporally

unbounded as to when such "commitment" was made.

68.     Ripple committed to distribute XRP totaling up to ██████ XRP to ████████
████. PX 652 at RPLI_SEC 0609222; PX 653; PX 650.

**Response:**     Undisputed that PX 652 is a September 26, 2016 Option to Purchase XRP

whereby ████████████ was entitled "to purchase from [Ripple] up to ████████████

████████"  However, Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from the cited evidence as misleading, including because Paragraph 68 omits

additional context included in PX 653, including that the Option to Purchase XRP cited in PX

652 was "superseded and replaced in its entirety" and "of no further force and effect" as of

September 3, 2018, when ████████████ entered into an agreement with XRP II LLC,

memorialized in PX 653, to purchase a lesser amount:  up to ████████ XRP in "Unrestricted

XRP" and ████████ XRP in "Restricted XRP."  PX 653 at RPLI_SEC 0863819.  Defendants

further dispute Paragraph 68 to the extent that its use of the phrase "committed to distribute" is

undefined, vague and unclear, including that it is temporally unbounded as to when such

"commitment" was made.

69.     Ripple considered XRP as "distributed" as of the date Ripple incurred the
commitment to distribute the XRP, which was the date of the agreement between Ripple and the
intended recipient of the XRP. PX 715 ¶ 13.

**Response:**     Disputed.  The SEC's assertion in Paragraph 69 is unsupported by the

cited evidence, PX 715 ¶ 13.  Insofar as the SEC meant to refer to PX 715, Appendix C ¶ 13,

Defendants further dispute the SEC's characterization drawn from PX 715, since PX 715

Appendix C ¶ 13 describes the "date of each distribution in the data [as] calculated" by

Defendants' expert Allen Ferrell for purposes of conducting the analysis in his report, not the

date on which "Ripple considered XRP as 'distributed.'"  Paragraph 69 also misstates Ferrell's

methodology, which does not rely on or even mention "the date of the agreement between Ripple

and the intended recipient of the XRP;" instead, Ferrell's methodology calculated distribution

dates as follows: "For transfers involving Ripple's Main Balance, the date on which the transfer

occurred is used.  For transfers and adjustments…missing an exact date, the first date of the

month on which the distributions occurred is used.  For transfers involving a Reserved or

Custody account, the date on which the transfer first occurred is used."  PX 715 Appendix C ¶

13.

70.     Ripple's non-monetary sales of XRP included transactions where Ripple delivers
XRP to customers for consideration other than cash or other monetary consideration. PX 750 at
11.

**Response:**     Undisputed.

71.     Ripple's non-monetary XRP sales accounted for approximately ██% and ██% of
Ripple revenue for 2019 and 2020 respectively. PX 202 at 34, Figure 9, PX 750, PX 751.

**Response:**     Disputed because the SEC's statement that "non-monetary XRP sales

accounted for approximately ██% and ██% of Ripple revenue for 2019 and 2020" is unsupported

by the cited evidence and vague, imprecise, and overstated.  Ripple's audited financial

statements list revenues from non-monetary XRP transactions of $206,137,000 and total

revenues of $██████ in 2019, or ███% of Ripple revenue for 2019; and revenues from non-

monetary XRP transactions of $227,829,000 and total revenues of $██████ in 2020, or

███% of Ripple revenue for 2020.  PX 751 at RPLI_SEC 0920433.

72.     Ripple tracked XRP supply entering in the market by Ripple and third parties. PX
656; PX 659.

**Response:**     Defendants do not dispute that PX 656 and PX 659 summarized the

introduction of XRP supply into the market by Ripple and certain third parties, but dispute the

SEC's characterization in Paragraph 72 as broad and temporally unbounded because two

individual "XRP Supply" documents from April 20, 2020 (PX 656) and August 20, 2020 (PX

659) cannot be generalized to establish Ripple's conduct at all times and for all purposes in this litigation.

73.    Ripple tracked XRP supply entering in the market on a weekly, monthly, and quarterly basis, which included XRP sold and distributed by Ripple to Ripple's founders, Ripple employees, Ripple partners, and other third parties in connection with its XRP sales, non-monetary XRP sales, investments, employee compensation, vendors, charitable donations, strategic promotions, and other outflows. PX 704; PX 705; PX 646; PX 647.

**Response:**    Disputed.  Undisputed that the cited evidence includes certain weekly, monthly, and quarterly XRP transaction data from Ripple; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, the cited evidence, because it does not support the SEC's broad, unqualified, and temporally unbounded assertions of fact as set forth in Paragraph 73.  Notably, the cited evidence does not reflect that Ripple "tracked XRP supply entering in the market" on any date prior to 2019; contains no document tracking "weekly" XRP transaction information prior to June 29, 2020; contains no document tracking "monthly" XRP transaction information prior to November 2020; and contains no document tracking "quarterly" XRP transaction information prior to the first quarter of 2019.

74.    Ripple sold and distributed a total of approximately 1.163 billion XRP from May through October 2020. PX 646.

**Response:**    Undisputed that PX 646 at RPLI_SEC 0653281 contains "a brief analysis of historical usage and usage forecast" of Ripple's XRP transactions, which shows combined totals from "Net Sales," "Xpring and BD," "ODL," and "Other Expenses" for May through October 2020 of approximately 1.163 billion XRP.  PX 646 at RPLI_SEC 0653278.  However, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 646, as misleading, because the cited document is not meant to be a complete, fully-developed, or independently audited document representing Ripple's XRP transactions.

75.     Total net outflows of XRP as of August 2020 was approximately 45 billion XRP. PX 715, Ex. 10.

**Response:**     Disputed.  Defendants dispute the SEC's characterizations of, and inferences drawn from, PX 715, including because the phrase "total net outflows of XRP" is undefined, vague, and unclear.  Paragraph 75 does not make clear to whom these "total net outflows" relate, and PX 715, Ex. 10 is a chart of "XRP Total Distributions and Circulating Supply" and not "Total net outflows of XRP."  More specifically, the cited PX 715, Ex. 10 is a chart of "CoinMarketCap Circulating Supply" of XRP and "Total XRP Distribution per Ripple API."

76.     Ripple's programmatic sales of XRP exceeded 0.5% of total XRP trading volume prior to Q1 2017, exceeded 2% of total XRP trading volume for nine out of the twelve months in 2015, exceeded 2% of total XRP trading volume for six out of the twelve months in 2016; and generally exceeded 1% of total XRP trading volume from Q1 2015 through Q2 2016. PX 398 (Declaration of Christopher Ferrante ("Ferrante Decl."), dated October 18, 2022) ¶ 8, Exhibit 2; PX 703.

**Response:**     Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).  Defendants dispute the SEC's characterizations in Paragraph 76, which are unsupported by PX 398, the Ferrante Declaration. The assertion in Paragraph 76 that "Ripple's programmatic sales of XRP exceeded 0.5% of total XRP trading volume prior to Q1 2017" is vague and unclear because it does not define time parameters of measurement: for example, it is unclear whether Paragraph 76 is meant to assert that Ripple's programmatic sales of XRP exceeded 0.5% of total XRP trading volume as measured each day, month, or quarter prior to Q1 2017, or in sum total before Q1 2017.  The SEC's assertion that "Ripple's programmatic sales of XRP…generally exceeded 1% of total XRP trading volume from Q1 2015 through Q2 2016" is also vague and undefined.  It also lacks

defined time parameters of measurement, and use of the vague term "generally" is imprecise.

The SEC's assertion of fact as set forth in Paragraph 76 is further unsupported by PX 398,

Exhibit 2, which illustrates that in the months of June 2015 and July 2015, Ripple's XRP

Programmatic Sales were below 1% of total XRP trading volume.  Defendants otherwise dispute

Paragraph 76 because the SEC's cited percentages are not supported by PX 703, which does not

include figures for "total XRP trading volume" necessary to calculate those percentages.

Defendants further dispute the SEC's characterization of, and inferences purportedly drawn

from, PX 703, as misleading, because the cited document contains only internal tracking of

Ripple's programmatic sales of XRP and is not meant to be a complete, fully-developed, or

independently audited document representing Ripple's XRP transactions.

77.     Ripple held in "reserve" amounts of XRP that it was committed to distribute
pursuant to contractual agreements. PX 648; PX 650.

**Response:**     Undisputed that PX 648 and PX 650 describe specific XRP "reserves" that

were "put…aside for *some* key commitments."  PX 648 at RPLI_ESC 0653278 (emphasis

added).  However, Defendants dispute the SEC's characterization in Paragraph 77 as broad and

temporally unbounded because two individual emails from Ripple's Controller dated May 5,

2017 (PX 650) and October 29, 2020 (PX 648) cannot be generalized to establish Ripple's

conduct at all times and for all purposes in this litigation

78.     Ripple held in "reserve" amounts of XRP that was released from escrow but were
unused. PX 648; PX 706.

**Response:**     Disputed because the SEC's statements in Paragraph 78 are contradicted

by the cited evidence.  PX 648 shows that, in October 2020, Ripple's Controller made a proposal

to "return 900m to escrow and set that as the new normal (rather than the 800m we've been at

recently)."  PX 648 at RPLI_SEC 0653278.  Undisputed that Ripple maintained certain amounts

of XRP released from the escrow for use in its future business development.

79.     According to Ripple's Controller, in January 2018, Ripple's marketing officer Monica Long stated that she had "minor reservations about the reserve, particularly because of language in our announcement (We'll then return whatever is unused at the end of each month to the back of the escrow rotation.)." PX 655.

**Response:**     Undisputed that PX 655 contains the quoted text.  Pursuant to Fed. R. Civ.

P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the

document quoted is a hearsay statement of a third party (Ripple's Controller) about what Monica

Long purportedly stated, and not a statement by Long, Ripple or the Individual Defendants.

80.     Ripple periodically distributed XRP held in reserve as opposed to XRP released from the escrow. PX 455; PX 648.

**Response:**     Defendants dispute the SEC's characterization in Paragraph 80 that the

cited evidence demonstrates that Ripple distributed XRP held in reserve as opposed to XRP

released from the escrow "periodically," since the cited evidence consists of two individual

emails from 2020 (PX 455 (June 9, 2020) and PX 648 (October 29, 2020)) and there is no

document from before 2020 or any document reflecting that such distributions occurred before

2020 or on a "periodic" basis.  Undisputed that on June 9, 2020, Ripple's CFO approved

"returning 800M XRP to escrow – down from 900M recently."  PX 455 at RPLI_SEC 0475771.

However, Defendants dispute that the cited evidence demonstrates that any such "distributions"

from "XRP held in reserve as opposed to XRP released from the escrow" were actually made.

81.     A member of Ripple's XRP Markets team stated that "our sales numbers [in the XRP Markets Report] are not a good proxy for XRP put into the market by Ripple…Also, there are starting to be commentary regarding the discrepancy between Ripple published sales numbers and Ripple distribution of XRP." PX 654.

**Response:**     Undisputed that PX 654 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC, from a member of Ripple's XRP Markets team;

however, Defendants dispute Paragraph 81 to the extent the SEC implies that the member of

Ripple's XRP Markets team's personal opinion or belief could be attributed to Ripple or the

Individual Defendants, as the SEC cites no evidence to establish that fact.

82.     Ripple periodically distributed XRP held in reserve so Ripple could "maintain market positioning around the escrow" (PX 335), avoid "very bad optics from a dramatic change to our escrow return" and reflect "a more consistent usage and escrow pattern" (PX 455), and "reinforce[] the message we are sending to the market that our purchases are offsetting supply introduction." PX 648.

**Response:**     Disputed.  Undisputed that the cited evidence contains the quoted text,

exclusive of any alterations, omissions, or additions by the SEC; however, the quoted language

in Paragraph 82 is derived from different emails from different Ripple employees across

different years, with omissions of relevant statements and context, and therefore, misleading and

inaccurate.  For example, PX 335 and PX 648 related to "proposals" only and not actual

distributions of XRP held in reserve, and therefore do not establish that Ripple periodically

distributed XRP held in reserve for the stated reasons.

83.     The distinction between the "reserves" included versus excluded from Ripple's online reporting of XRP distributed was "somewhat arbitrary," reflecting Ripple's preferences. PX 650.

**Response:**     Disputed.  Defendants do not dispute that PX 650 contains the quoted text,

exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute

the SEC's characterization of, and inferences purportedly drawn from, PX 650, because the cited

evidence does not support the SEC's assertions of fact as set forth in Paragraph 83.  In particular,

the cited document does not establish Ripple's views, as opposed to the personal views of an

individual employee, Ripple's Controller, at the time he sent the email.  Defendants further

dispute that a statement by a single employee is sufficient to establish the underlying fact set

forth in Paragraph 83 at all times and for all purposes in this litigation, including as to any belief

or understanding held by other Ripple employees, Ripple as an entity, or the Individual

Defendants.  Defendants also dispute Paragraph 83 as unsupported by PX 650, which does not

mention "*Ripple's* preferences."

84.     At times, Ripple contemplated decreasing the amount of XRP it reported as "distributed" by crediting that number with XRP Ripple held in reserve. PX 706.

**Response:**     Defendants dispute that PX 706 supports the assertion made by the SEC in

Paragraph 84, since PX 706 does not discuss proposals to decrease the amount of XRP Ripple

reported as "distributed" or "crediting that number with XRP Ripple held in reserve."

Defendants further dispute the SEC's characterization in Paragraph 84 that the cited evidence

demonstrates any of Ripple's actions were taken "at times" because PX 706 contains only

discussions of a single set of proposals from Ripple's Controller in November 2018.

85.     In or around November 2018, Ripple and Coil Technologies, Inc. ("Coil") entered into a Services and Marketing Agreement ("November 2018 Coil Agreement"), in which Ripple agreed, among other things, to pay a bi-monthly development service fee of ███████XRP to Coil because "Ripple desire[d] for Coil to perform certain development services to promote technologies of interest to Ripple." PX 651 at 1, 3.

**Response:**     Undisputed.

86.     In the November 2018 Coil Agreement, Ripple also agreed, among other things, to set aside███████XRP for marketing services for third-party projects that "utilize and/or promote the Interledger Protocol (the technology underlying components of Ripple's xCurrent, xRapid and xVia products) and XRP." PX 651 at 5.

**Response:**     Undisputed.

87.     Garlinghouse signed the November 2018 Coil Agreement on behalf of Ripple. PX 651 at 13.

**Response:**     Undisputed, however, Defendants dispute the SEC's characterization of,

and inferences purportedly drawn from, PX 651 to the extent it implies what role, if any,

Garlinghouse had related to the agreement beyond signing it, which role is unsupported by the

exhibit.

88.     In or around August 2018, Ripple entered into a Master XRP Custody Agreement with ███████████████████, in which Ripple agreed, among other things, to custody ████████████ XRP, free of charge to ██████████. PX 737 at 1, 8.

**Response:**     Undisputed.

89.     In or around January 2016, Ripple entered into a memorandum of understanding with █████████████████ in which a joint venture company formed by the parties would be appointed by Ripple as the exclusive distributor of Ripple Connect within a defined territory of the company and the company would be primarily focused "on those lines of business related to the Ripple Connect." PX 735 at 1-3.

**Response:**     Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 735 including because Paragraph 89 omits additional context necessary to understand the memorandum of understanding, namely that the joint venture company would "be focused mainly on those lines of business related to the Ripple Connect *for a period of one (1) year. . . following the establishment of the JVC*" (emphasis added).  PX 735 at RPLI_SEC 0612005-0612006.

90.     In or around March 2016, Ripple entered into a Joint Venture Agreement with ████ in which the parties agreed, among other things, to appoint a joint venture company as the exclusive distributor of Ripple Connect in a defined territory, and to make reasonable efforts to "provide an exchange and custody for Xmarket XRP trading" through ██████ 'retail and institutional financial services platform." PX 736 at 1-2.

**Response:**     Undisputed that PX 736 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 736 because Paragraph 90 omits additional context necessary to understand the quoted language, including that "the business scope of the [joint venture company] will not be limited to the sales and marketing of the RIPPLE's products and services including the Ripple Connect."  PX 736 at RPLI_SEC 0764389.

91.     In or around November 2018, Ripple entered into a Development and Integration Agreement with ████████████████ "November 2018 ████ Agreement") because "Ripple desire[d] to work with █████████ to promote ecosystem adoption of the XRP Ledger, XRP,

… and [Interledger Protocol] by having ▓▓▓▓ integrate XRP … and [Interledger Protocol] into ▓▓▓▓▓ Components." PX 738 at RPLI_SEC 0266000.

**Response:**     Undisputed that PX 738 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 738 to the extent Paragraph 91 implies that the stated language encompasses the only reasons that Ripple entered into the Development and Integration Agreement with ▓▓▓▓

92.     In the November 2018 ▓▓▓ Agreement, ▓▓▓ agreed to use its best efforts to, among other things, develop and integrate XRP into its company products, and in exchange, Ripple agreed to pay ▓▓▓ in XRP worth up to $▓▓▓▓▓▓ PX 738 at RPLI_SEC 0266000-01.

**Response:**     Undisputed that the November 2018 ▓▓▓ Agreement contains those provisions. Disputed that "Ripple agreed to pay ▓▓▓ in XRP" when the November 2018 ▓▓▓ Agreement provides that Ripple would pay ▓▓▓ "up to US$▓▓▓▓ in XRP or United States Dollar[.]" PX 738 at RPLI_SEC 0266001. Defendants further dispute that Ripple agreed to pay ▓▓▓ solely "in exchange" for ▓▓▓▓ agreement to "use its best efforts, among other things, develop and integrate XRP into its company products" when the November 2018 ▓▓▓ Agreement provides that Ripple's payment was in exchange for other ▓▓▓ promises as well, including offering company products to users and third party developers. PX 738 at RPLI_SEC 0266000-01.

93.     A slide entitled "Ripple Supply Introduction (in mm XRP, through 4/12)"—contained in a Ripple document dated April 20, 2020 and titled "XRP Supply – deeper dive" ("April 2020 XRP Supply Deck")—"br[oke] out all Ripple XRP distributions impacting circulating supply" although it "omit[ted] fulfillment of certain commitments." PX 656 at 1, 3.

**Response:**     Undisputed.

94.     The April 2020 XRP Supply Deck stated that, from the first quarter of 2019 through the second quarter of 2020, Ripple distributed ▓▓▓▓▓ n XRP to ▓▓▓ PX 656.

**Response:**     Undisputed.

95.     In the "Xpring and BD total" subsection, the April 2020 XRP Supply Deck stated that, from the first quarter of 2019 through the second quarter of 2020, Ripple distributed ████ ████ XRP to Coil Development Fund, ████ n XRP to ██████████ XRP to █████████████, and 94 million to "Investment." PX 656 at 3.

**Response:**     Undisputed.

96.     In the "ODL total" subsection, the April 2020 XRP Supply Deck stated that, from the first quarter of 2019 through the second quarter of 2020, Ripple distributed ████████ XRP to "Loan" "[p]rimarily [for] liquidity support"; ████████ XRP to MGI, including "[i]ncentives, milestone payments and FX rebates"; and ████████ XRP to pay or support users of ODL including "[l]iquidity, exchanges, vol and FX incentives." PX 656 at 3.

**Response:**     Undisputed that PX 656 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's

characterization that the April 2020 XRP Supply Deck stated that from the first quarter of 2019

through the second quarter of 2020, Ripple distributed ████████ XRP "to pay or support users

of ODL" as unsupported by PX 656 at RPLI_SEC 0590775, since the document merely lists

"ODL" as the line item.

97.     In the "Other total" subsection, the April 2020 XRP Supply Deck stated that, from the first quarter of 2019 through the second quarter of 2020, Ripple distributed a total of ████ ████ XRP for "[r]outine payroll, bonuses and Q2 exec comp, ████████ domain loan settlement, and Ripplenet customer, product testing, [and] vendors." PX 656 at 3.

**Response:**     Disputed.  Undisputed that PX 656 contains the quoted text, exclusive of

any alterations, omissions, or additions by the SEC; however, Defendants dispute that these

components comprise the entirety of the ████████ XRP in the "Other total" subsection of the

April 2020 XRP Supply Deck.  The April 2020 XRP Supply Deck identifies a total of ████

████ XRP distributed from the first quarter of 2019 through the second quarter of 2020

attributed to categories with these descriptions.  An additional ████████ XRP, the additional

component of the ████████ total, is allocated to the category "Donations."  PX 656 at

RPLI_SEC 0590775.

98.    In a slide entitled "Other Supply Introduction (in mm XRP, through 4/12)," the April 2020 XRP Supply Deck stated that, from the first quarter of 2019 through the second quarter of 2020, Ripple distributed a total of ▮▮▮▮▮ XRP in Coil scheduled payments, ▮▮▮▮ XRP to ▮▮▮▮▮ XRP to ▮▮▮▮▮ XRP in other options, and ▮▮▮ XRP to ▮▮▮▮▮ PX 656 at 4.

**Response:**    Undisputed.

99.    The April 2020 XRP Supply Deck described volume incentives Ripple agreed to pay ▮▮▮, in ▮▮▮▮ XRP, "for hitting various targets of XRP transacted on ▮▮▮ platforms." PX 656 at 9.

**Response:**    Undisputed.

100.    The April 2020 XRP Supply Deck described discounted sales of XRP Ripple made to ▮▮▮ PX 656 at 12.

**Response:**    Undisputed.

101.    Ripple tracked its 2020 "Supply Introduction" of XRP in connection to distributions related to market maker lease, market maker fees, MGI – volume incentive, MGI – FX rebate, other incentives and FX rebates, adoption marketing, and ODL lease under the category of "ODL total." PX 646.

**Response:**    Undisputed that PX 646 at RPLI_SEC 0653281 contains a chart titled "Ripple Supply Introduction" with amounts listed for "MM Lease," "MM Fees," "MGI – Volume incentive," "MGI – Fx rebate," "Incentive," "Fx rebate," "Adoption marketing," and "ODL Lease," under the category of "ODL total" for the months of January 2020 through October 2020.  The cited evidence does not establish that Ripple "tracked its 2020 'Supply Introduction' of XRP" for the months of November and December 2020.

102.    Ripple distributed approximately ▮▮▮▮▮ XRP from May 2020 through October 2020 for Xspring and BD. PX 646.

**Response:**    Undisputed that PX 646 shows an allocation of ▮▮▮▮▮ XRP to "Xpring and BD" for the dates May 2020 through October 2020.  PX 646 at RPLI_SEC 0653281.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn

from, PX 646 as misleading because the cited document is not meant to be a complete, fully-developed, or independently audited document representing Ripple's XRP transactions.

a.      Ripple did not prohibit recipients of XRP in the xPring initiative from reselling the XRP to obtain their own funds for their endeavors." PX 6 (Schwartz Dep. Tr.) at 392:18-393:2.

**Response:**      Disputed.  The SEC's statements in Paragraph 102.a are unsupported by the cited evidence in PX 6, whereby Schwartz testified that he did not have knowledge whether the assertion in Paragraph 102.a was true.  Specifically, when asked "[d]id Ripple permit these companies to sell their own XRP to obtain funds for their…endeavors," Schwartz responded, "I don't know that we prohibited them from doing so."  PX 6 at 392:23-393:2.  When asked "[w]as Ripple aware that the companies might be selling the XRP to fund their endeavors," Schwartz again responded "I would have to speculate."  PX 6 at 393:3-5.  Defendants further dispute that Paragraph 102.a sets forth a statement of undisputed material fact because it is inconsistent with the SEC's own statements of material fact from Paragraphs 838 and 839 of their Rule 56.1 Statement that Ripple's XRP distributions in connection with xPring were "generally subject to sales restrictions," and because it is duplicative of Paragraph 139 of the SEC's Counter-Statement.  Defendants further dispute that a statement by a single employee at a particular point in time is not sufficient to establish the underlying fact set forth in Paragraph 102.a at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

103.     Ripple tracked its 2020 "Supply Introduction" of XRP in connection to distributions related to market maker lease, market maker fees, MGI – volume incentive, MGI – FX rebate, adoption marketing, and ODL lease under the category of "ODL total." PX 646.

**Response:**      Disputed.  Paragraph 103 is duplicative of Paragraph 101, except omits the phrase "other incentives and FX rebates"; Defendants refer to their response to Paragraph 101.

104.    Ripple's net sales totaled approximately 1.7 billion XRP in 2019. PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 lists 1,737,590,460 XRP total net sales in 2019.  PX 704 at RPLI_SEC 0304725.

105.    Ripple sold approximately 1.255 billion XRP in 2020. PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 shows 1,255,464,112 XRP in gross sales in 2020.  PX 704 at RPLI_SEC 0304725.  However, Defendants dispute the SEC's assertion of fact in Paragraph 105 as misleading because Ripple's net sales amount—which deducts "XRP Purchase[s]"—was 941,555,257 XRP in 2020.  PX 704 at Summary 1.

106.    Ripple sold to ██ approximately 761 million XRP in 2019 and approximately 465 million XRP in 2020. PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 lists 761,683,211 XRP sold to ████ in 2019, and 465,516,700 XRP sold to ██ in 2020.  PX 704 at RPLI_SEC 0304725.

107.    Ripple sold approximately 180 million XRP in connection with institutional over-the-counter sales in 2019. PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 lists 180,757,249 XRP in "Sales" in 2019; however, Defendants dispute the SEC's characterization in Paragraph 107, as PX 704 at Summary 1 does not support the SEC's assertion that this figure represents, "institutional over-the-counter sales."

108.    Ripple sold approximately ██████ XRP in connection with its Wallet Send (formerly known as XRP-O or "XRP Origination") program in 2020. PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 lists ██████ XRP in "Wallet Send" sales in 2020.  PX 704 at RPLI_SEC 0304725.

109.    Ripple sold approximately 795 million XRP in connection with Programmatic Sales in 2019. PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 lists 795,150,000 XRP in "Programmatic" sales in 2019.  PX 704 at RPLI_SEC 0304725.

110.    Ripple distributed approximately ██████ XRP in 2019 in connection with its xPring initiative (renamed RippleX). PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 lists ██████ XRP in "RippleX total" distributions in 2019.  PX 704 at RPLI_SEC 0304725.  However, Defendants dispute the SEC's characterization in Paragraph 110 that the "xPring initiative" was "renamed RippleX" as unsupported by the cited evidence, since RippleX is a new division within Ripple, not a renaming of xPring.

111.    Ripple distributed approximately ██████ XRP in 2020 in connection with its xPring initiative (renamed RippleX). PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 lists ██████ XRP in "RippleX total" distributions in 2020.  PX 704 at RPLI_SEC 0304725.  However, Defendants dispute the SEC's characterization in Paragraph 111 that the "xPring initiative" was "renamed RippleX" as unsupported by the cited evidence, since RippleX is a new division within Ripple, not a renaming of xPring.

112.    Ripple distributed to Coil Development Fund approximately ██████ XRP in 2019 and approximately ██████ XRP in 2020. PX 704 at Summary 1.

**<u>Response:</u>**    Undisputed that PX 704 at Summary 1 lists ██████ XRP in "Coil Development Fund" distributions in 2019, and ██████ XRP in "Coil Development Fund" distributions in 2020.  PX 704 at RPLI_SEC 0304725.

113.    Ripple distributed to ███ and the ████████ approximately ███ ███ XRP in 2019 and approximately ████ XRP in 2020. PX 704 at Summary 1.

**Response:**    Undisputed that PX 704 at Summary 1 lists ████ XRP in "███ Incentive" distributions in 2019, ████ XRP in "███████" distributions in 2019, ████ XRP in "███ Incentive" distributions in 2020, and ████ XRP in "████████" distributions in 2020. PX 704 at RPLI_SEC 0304725.

114.    Ripple distributed to █████ approximately ████ XRP in 2019 and approximately ████ XRP in 2020. PX 704 at Summary 1.

**Response:**    Undisputed that PX 704 at Summary 1 lists ████ XRP in "███ distributions in 2019, and ████ XRP in "████" distributions in 2020. PX 704 at RPLI_SEC 0304725.

115.    Ripple distributed to ████ approximately ████ XRP in 2019. PX 704 at Breakout 1.

**Response:**    Undisputed that PX 704 at Breakout 1 lists ████ XRP in "████" "Investment" in 2019. PX 704 at RPLI_SEC 0304725.

116.    Ripple distributed to ████████ approximately ████ XRP in 2019 and approximately ████ XRP in 2020. PX 704 at Breakout 1, Breakout 4.

**Response:**    Undisputed that PX 704 at Breakout 1 lists ████ XRP in ████████" "Investment" in 2019, and PX 704 at Breakout 4 lists ████ XRP in ████████ distribution in 2020. PX 704 at RPLI_SEC 0304725.

117.    Ripple distributed to C███ approximately ████ XRP in 2019. PX 704 at Breakout 1.

**Response:**    Undisputed that PX 704 at Breakout 1 lists ████ XRP in "████" "Investment" in 2019. PX 704 at RPLI_SEC 0304725.

118.     Ripple distributed to Gatehub approximately ███████ XRP in 2019. PX 704 at Breakout 1.

**<u>Response:</u>**     Undisputed that PX 704 at Breakout 1 lists ███████ XRP in "Gatehub" "Investment" in 2019.  PX 704 at RPLI_SEC 0304725.

119.     Ripple distributed in connection with "other investments" approximately ███████ XRP in 2019 and approximately ███████ XRP in 2020. PX 704 at Breakout 1, Breakout 4.

**<u>Response:</u>**     Undisputed that PX 704 at Breakout 1 lists ███████ XRP in "Other" investment in 2019, and ███████ XRP in "Other" investment in 2020.  PX 704 at RPLI_SEC 0304725.

120.     Ripple distributed in connection with "ODL" approximately ███████ XRP in 2019 and approximately ███████ in 2020, which excludes XRP leases but includes fees paid to market makers and incentive, rebate, bonus, and marketing payments. PX 704 at Summary 1.

**<u>Response:</u>**     Undisputed that PX 704 at Summary 1 lists ███████ XRP in "ODL total" distributions in 2019, which, when excluding the ███████ XRP in "MM Lease" and ███████ XRP in "ODL Lease" categories, amounts to approximately ███████ XRP in "ODL" distributions in 2019; and that PX 704 at Summary 1 lists ███████ XRP in "ODL total" distributions in 2020, which, when excluding the ███████ XRP in "MM Lease" and ███████ XRP in "ODL Lease" categories, amounts to approximately ███████ XRP in "ODL" distributions in 2020.  PX 704 at RPLI_SEC 0304725.

121.     Ripple distributed to MGI approximately ███████ XRP in 2019 and approximately ███████ XRP in 2020 in connection with "volume incentive," "Fx rebate," and "bonus" payments. PX 704 at Summary 1.

**<u>Response:</u>**     Undisputed that PX 704 at Summary 1 lists ███████ XRP in "MGI – Volume Incentive" distributions in 2019, ███████ XRP in "MGI – Fx rebate" distributions in 2019, ███████ XRP in "MGI – Bonus" distributions in 2019, ███████ XRP in "MGI –

Volume Incentive" distributions in 2020, and ███████ XRP in "MGI – Fx rebate"

distributions in 2020.  PX 704 at RPLI_SEC 0304725.

122.    Ripple distributed approximately ██████ XRP as incentive payments in 2019 to
Bittrex, ████████ and others. PX 704 at Breakout 2.

**Response:**    Undisputed that PX 704 at Breakout 2 lists 2,560,250 XRP in "Bittrex"

"Incentive" distributions in 2019, ███████ XRP in "████████" "Incentive" distributions in 2019,

and ████████ XRP in "Other" "Incentive" distributions in 2019.  PX 704 at RPLI_SEC

0304725.

123.    Ripple distributed approximately ███████ XRP as incentive payments in 2020
to ███████████████████, Coins.ph, and others. PX 704 at Breakout 5.

**Response:**    Undisputed that PX 704 at Breakout 5 lists ████████ XRP in "████████

distributions in 2020, ███████ XRP in "████████" distributions in 2020, ████████ XRP in

████████████" distributions in 2020, 16,319,617 XRP in "Coins.ph" incentive distributions in 2020,

and ████████ XRP in "Other" distributions in 2020; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 704, as misleading, because PX

704 at Breakout 5 does not identify these distributions as "incentive payments."  PX 704 at

RPLI_SEC 0304725.

124.    Ripple distributed to ████████████████ and others approximately ███████ XRP
as Fx rebates in 2019 and approximately ████████ XRP in 2020. PX 704 at Breakout 2.

**Response:**    Undisputed that PX 704 at Breakout 2 lists ████████ XRP in "████████"

"Fx rebate" distributions in 2019, and ████████ XRP in "Other" "Fx rebate" distributions in 2019,

and that PX 704 at Breakout 5 lists ████████ XRP in "████████" "Fx rebate" distributions in

2020, ████████ XRP in "████████" "Fx rebate" distributions in 2020, and ████████ XRP in

"Other" Fx rebate distributions in 2020.  PX 704 at RPLI_SEC 0304725.

125.    Ripple distributed to , and others approximately XRP in 2019 and approximately in 2020 for "Adoption Marketing." PX 704 at Breakout 2, Breakout 5.

**Response:**    Undisputed that PX 704 at Breakout 2 lists XRP in "



Warrant" "Adoption marketing" distributions in 2019, and XRP in "Other" "Adoption marketing" distributions in 2019, and that PX 704 at Breakout 5 lists XRP in

Warrant" distributions in 2020, XRP in " distributions in 2020, and XRP in "Other" distributions in 2020; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 704, as misleading, because PX

704 at Breakout 5 does not identify the " Warrant," " ," and "Other"

distributions as "Adoption marketing distributions."  PX 704 at RPLI_SEC 0304725, Breakout 5.

126.    Ripple distributed approximately XRP to in 2020. PX 704 at Breakout 5.

**Response:**    Undisputed that PX 704 at Breakout 5 lists XRP in "

distributions in 2019.  PX 704 at RPLI_SEC 0304725.

127.    Ripple distributed approximately XRP as compensation and bonuses to Ripple employees from May 2014 through December 2018. PX 752 at 3, 4, 5, 7, 8.

**Response:**    Undisputed that PX 752 lists XRP distributed to Ripple

employees from May 2014 through December 2018; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 752, as misleading, because the

cited document reflects internal tracking of XRP transactions by Ripple's Controller and others

for internal use, and is not meant to be a complete, fully-developed, or independently audited

document representing Ripple's XRP transactions.  PX 752 at RPLI_SEC 0236675, RPLI_SEC

0236676, RPLI_SEC 0236677, RPLI_SEC 0236679, RPLI_SEC 0236680.

128.    Ripple distributed as compensation and bonuses to Ripple employees approximately ████████ XRP in 2019 and approximately ███████ XRP in 2020. PX 704 at Breakout 1, Breakout 5.

**Response:**    Undisputed that PX 704 at Breakout 1 lists ██████ XRP in "Employee" distributions in 2019, and PX 704 at Breakout 5 lists ████████ XRP in "Employee" distributions in 2020.  PX 704 at RPLI_SEC 0304725.

129.    Ripple distributed approximately █████ XRP to ██ in 2019. PX 704 at Breakout 3.

**Response:**    Undisputed that PX 704 at Breakout 3 lists ███████ XRP in ██ distributions in 2019.  PX 704 at RPLI_SEC 0304725.

130.    Ripple distributed to Coil approximately ██████ XRP in 2019 and approximately ████████ XRP in 2020 as compensation for "development services." PX 704 at Breakout 3, Breakout 6; PX 651 at 1.

**Response:**    Disputed because the cited evidence does not support the SEC's assertion of fact as set forth in Paragraph 130; PX 704 shows only "Coil Scheduled Payments" and does not reflect any payments for "development services," and PX 651 does not support any distributions from Ripple to Coil having taken place, nor does PX 651 support the specific amounts of any distributions.  Undisputed that PX 704 at Breakout 3 lists ███████ XRP in "Coil" distributions in 2019, and PX 704 at Breakout 6 lists ███████ XRP in "Coil" distributions in 2020.  PX 704 at RPLI_SEC 0304725.

131.    Ripple distributed to ██████████████ approximately █████████ XRP in 2019 and approximately ███████ XRP in 2020. PX 704 at Summary 1, Breakout 6.

**Response:**    Undisputed that PX 704 at Summary 1 lists ███████ XRP in '██████████████' distributions in 2019, and ██████ XRP '██████████████' distributions in 2020.  PX 704 at RPLI_SEC 0304725.

132.     Ripple distributed to ▮▮▮▮ approximately ▮▮▮ XRP in 2015 and approximately ▮▮▮ XRP in 2017. PX 739.

**Response:**     Undisputed that PX 739 at RPLI_SEC 0248118 lists a November 25, 2015

"Transfer" of ▮▮▮▮ XRP to "Recipient" ▮▮▮▮ and a February 1, 2017

"Commitment" of ▮▮▮▮ XRP to "Recipient" "▮▮▮▮"  However, PX 739 does

not support the SEC's assertion of fact in Paragraph 132 that approximately ▮▮▮ XRP was

"distributed to ▮▮▮▮" in 2017 because the document does not reflect a "Date of Transfer"

for the ▮▮▮▮ XRP that was committed to ▮▮▮▮ in February 1, 2017 and only

shows a "Date of Commitment."  Defendants further dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 739, as misleading, because the cited document reflects

internal tracking of XRP transactions by Ripple's Controller and others for internal use, and is

not meant to be a complete, fully-developed, or independently audited document representing

Ripple's XRP transactions.  PX 739 at RPLI_SEC 0248118.

133.     Ripple gave away XRP to advance its interest of having XRP distributed widely so that more people would sign on to Ripple's blockchain technology. PX 10 (Rapoport Dep. Tr.) at 58:8-23.

**Response:**     Disputed.  The cited testimony by Rapoport is insufficient to support the

SEC's assertion of fact as set forth in Paragraph 133 because Rapoport testified that Ripple's

giveaways were distributions of XRP "sometimes indiscriminately for anyone signed up, and

sometimes as a specific incentive for something, like signing up for a new account or some other

goal," and were often intended "[t]o get XRP into the hands of more people" to enable XRP to

act as an anti-spam mechanism with respect to utilization of the network.  PX 10 at 125:1-23.

Furthermore, Rapoport testified that he was not always aware of the goals of XRP giveaways.

*Id.* at 125:24-127:10.  Defendants further dispute Paragraph 133 because it is not an undisputed

statement of material fact since it is inconsistent with the SEC's own statements that Ripple gave

away XRP "to increase trading liquidity in the XRP market," to "create and increase liquidity in XRP," and to create an ecosystem" that "would be good for [XRP's] utility, [and] liquidity," among other reasons. *See, e.g.,* ECF No. 629 ¶¶ 594-598.  Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 133 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

134.    Ripple's giveaways were part of Ripple's strategy to get XRP off of its balance sheet and into the hands of market participants, to create liquidity in the XRP markets and in the trading of XRP on the XRP Ledger. PX 10 (Rapoport Dep. Tr.) at 124:2-126:12; PX 44 at RPLI_SEC 0461860.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 including because Paragraph 134 omits additional context necessary to understand the testimony, including that increasing liquidity was "[t]he goal for *certain* types of giveaways" and that Ripple distributed XRP also to enable XRP to act as an anti-spam mechanism with respect to utilization of the network.  PX 10 at 125:1-126:5 (emphasis added).  Furthermore, Rapoport testified that he was not always aware of the goals of XRP giveaways, and could not recall any giveaways where the goal was to increase the liquidity of XRP, other than "market maker compensation," though he stated it is "debatable" whether such compensation should be called a giveaway.  *Id.* at 125:24-127:10.  Defendants further dispute that a statement in a deposition by a single employee at a particular point in time is sufficient to establish "Ripple's strategy" as set forth in Paragraph 134 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.  Defendants further dispute that Paragraph 134 sets forth an independent statement of material fact because it is duplicative of Paragraphs 136, 141, 594-

598, and 602 of the SEC's Rule 56.1 Statement.  *See* ECF No. 629 ¶¶ 136, 141, 594-598, 602.

Defendants incorporate by reference their responses to Paragraphs 136, 141, 594-598, and 602.

135.    Senior members of Ripple viewed the free giveaways as important to the company's business strategies. PX 10 (Rapoport Dep. Tr.) at 148:22-149:19.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 10 as misleading.  Rapoport's testimony, relating to PX

44, was that he "interpret[ed]" PX 44 as reflecting a "desire to distribute XRP into the

marketplace" but that there was "some disagreement about what the best strategy is to do that,"

and Rapoport did not "recall specific discussions clearly."  PX 10 at 149:13-150:10.  Defendants

further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10,

including because the term "senior members of Ripple" is undefined, vague and unclear.

Defendants further dispute that a statement by a single employee at a particular point in time is

sufficient to establish the underlying fact set forth in Paragraph 135 at all times and for all

purposes in this litigation, including as to any belief or understanding held by other Ripple

employees (including unidentified "senior members of the company"), Ripple as an entity, or the

Individual Defendants.

136.    The goal of giving away XRP was to increase trading liquidity in the XRP market. PX 10 (Rapoport Tr.) at 125:24-127:5; PX 14 (Griffin Dep. Tr.) at 117:2-118:19.

**Response:**    Disputed.  Defendants dispute that Paragraph 136 sets forth an

independent statement of material fact because it is identical to Paragraph 594 of the SEC's Rule

56.1 Statement of Material Facts (September 13, 2022).  *See* ECF No. 629 ¶ 594.  Defendants

incorporate by reference their response to Paragraph 594.  Defendants further dispute that a

statement by a single employee at a particular point in time is sufficient to establish the

underlying fact set forth in Paragraph 136 at all times and for all purposes in this litigation,

including as to any belief or understanding held by Ripple as an entity or the Individual

Defendants.

137.    Ripple gave away XRP in order to create and increase liquidity in XRP. PX 14 (Griffin Tr.) at 117:2-12.

**Response:**    Disputed.  Defendants dispute that Paragraph 137 sets forth an

independent statement of material fact because it is identical to Paragraph 595 of the SEC's Rule

56.1 Statement.  *See* ECF No. 629 ¶ 595.  Defendants incorporate by reference their response to

Paragraph 595.  Defendants further dispute that a statement by a single employee at a particular

point in time is sufficient to establish the underlying fact set forth in Paragraph 137 at all times

and for all purposes in this litigation, including as to any belief or understanding held by Ripple

as an entity or the Individual Defendants.

138.    When Ripple gave XRP to a company to build a business, it did so to extract value from the company and these distributions were valuable to Ripple in the context of the broader crypto markets. PX 7 (Schwartz Inv. Tr.) at 79:18-80:18, 163:21-164:24.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 7 as misleading, including because the cited evidence

does not support the SEC's assertions of fact as set forth in Paragraph 138.  Schwartz testified

about "what [he said] in [a] post," and his testimony about "extracting value" was offered as a

hypothetical and did not purport to reflect Ripple's business strategy.  He testified, "for example,

Ripple could—if Ripple gave somebody XRP to—to build some business, that is a greater

incentive [to the recipient] if [the XRP] has value than if it doesn't."  PX 7 at 79:14-80:18.

Defendants further dispute Paragraph 138 as misleading and omitting context because it implies

that Ripple gave XRP to companies for the stated reasons only, when Schwartz testified that

Ripple's Xpring strategy and distributions of XRP had several goals, including to "get access to

deal flow," "make some investments in companies that were interested in building things on the

XRP Ledger or otherwise inside the cryptocurrency space," "building products that make it easier for people to interact with technologies like Interledger, cryptocurrencies generally and the XRP Ledger," "encouraging development in the space," and "encouraging [market participants] to adopt platforms that were more open, such as in a ledger." PX 7 at 163:23-165:9. Schwartz further testified that another goal of Xpring was to encourage alternate use cases of XRP outside of payments. *Id.* at 165:10-13. Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 138 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

139.     Ripple did not prohibit the companies to which it gave XRP from re-selling it to obtain the funds they needed to run their business. PX6 (Schwartz Dep. Tr.) at 392:9-393:2.

**Response:**     Disputed because the cited testimony does not support the SEC's assertions of fact as set forth in Paragraph 139. Schwartz testified that he "[did]n't know" whether Ripple prohibited companies in the Xpring initiative from re-selling their XRP and "would have to speculate" whether Ripple was aware that the companies might be selling XRP to fund their businesses. PX 6 at 392:23-393:5. Defendants further dispute that Paragraph 139 sets forth a statement of undisputed material fact because it is inconsistent with the SEC's own statements of material fact from Paragraphs 838 and 839 of their Rule 56.1 Statement that Ripple's XRP distributions in connection with Xpring were "generally subject to sales restrictions." *See* ECF No. 629 ¶¶ 838-839. Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 139 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

140.     The companies that received XRP through the xRapid initiative as well as other recipients of XRP from Ripple simply resold it to fund themselves. PX 196; PX 195; PX 634 ¶ 12.

**Response:**        Disputed.  Defendants dispute Paragraph 140 as unsupported by the cited evidence; none of the cited exhibits relate to the xRapid initiative (PX 195 and PX 196 relate to the Xpring initiative, not xRapid, and PX 634 relates to ODL).  Defendants further dispute Paragraph 140 because it is unsupported by PX 634 ¶ 12, which relates to Ripple's purchases of MoneyGram common stock and contains no reference to MoneyGram reselling XRP to fund itself.  Defendants further dispute Paragraph 140 because it is unsupported by PX 196, because the document reflects an employee of a third party expressing that he would "expect most developers to want to liquidate during development phases"; pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants. Defendants further dispute Paragraph 140 because it states that "companies that received XRP through the xRapid initiative as well as other recipients of XRP from Ripple simply resold it to fund themselves" when this is contradicted in PX 196, where the third-party employee stated that developers "potentially hold a substantial portion of XRP in post-launch milestones" and "it's possible we'll be pleasantly surprised even in the development funding phase."  PX 196. Defendants dispute SEC's characterization of, and inferences purportedly drawn from, PX 195 as unsupported by the evidence to the extent it implies that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 140 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants. Defendants further dispute Paragraph 140 because the phrase "companies that received XRP through the xRapid

initiative as well as other recipients of XRP from Ripple" is undefined, vague and unclear and

does not appear in the cited documents.

141.     In its 2019 Audited Financial Statements, Ripple explained that its "[n]on-monetary XRP transactions revenue consists of transactions where the Company delivers XRP to customers for consideration other than cash or other monetary consideration and is recognized upon delivery of XRP." PX 751 at 11.

**Response:**     Undisputed that PX 751 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC.

142.     Ripple describes itself as a "software" company. PX 15 (Birla Dep. Tr.) at 56:8-22.

**Response:**     Undisputed that Ripple has described its business activities as including,

in part, software development; however, Defendants dispute that Paragraph 142 sets out a

material fact to any claims or defenses in this case, which relate solely to Ripple's activities prior

to December 22, 2020, and accordingly facts and circumstances after that date are irrelevant.

Defendants further dispute the SEC's characterization of, and inferences purportedly drawn

from, PX 15, as misleading, including to the extent the SEC implies that Birla's personal opinion

or belief could be attributed to Ripple, because Birla only testified as to his own understanding of

Ripple's activities rather than how Ripple described itself.  *See* PX 15 at 56:21-22 ("To my

knowledge, we're a technology company/software company."); *id.* at 56:8-9 ("Q: Mr. Birla, is

Ripple a software company?  A: Yes, I believe so.").

143.     In 2014, Larsen stated publicly in an interview that Ripple is a software company. PX 504.14.

**Response:**     Disputed.  Paragraph 143 does not contain any statement by Larsen

because the cited exhibit, PX 504.14, is a retweet by Patrick Griffin of a tweet by David

Schwartz, not Larsen.  The tweet itself also does not refer to Ripple as a software company.  It

states: "All circulating XRP is now worth more than 1/3 of all circulating bitcoin – XRP's value represents 17.5% of the value of the entire space." PX 504.14.

144.    Unlike other software companies, Ripple's software sales do not provide value to Ripple Labs, Inc.'s shareholders and are inherently loss leaders. PX 23 (Will Dep. Tr.) at 298:19-299:19; PX 537 at RPLI_SEC 269618.

**Response:**    Disputed.  The cited evidence does not support the SEC's assertions of fact in Paragraph 144 as to which the SEC has the burden of proof, because the SEC does not cite any evidence for comparing Ripple to "other software companies," nor does it specify to which software companies it is referring.  Moreover, the cited phrase about "loss leaders" is drawn from one email, by one former employee who testified that he "[didn't] recall what [he] specifically meant there," PX 23 at 299:10-19, which is insufficient to establish the underlying fact set forth in Paragraph 144 at all times and for all purposes in this litigation.

145.    Not all users of RippleNet use ODL. PX 17 (Long Dep. Tr.) at 142:3-9.

**Response:**    Undisputed.

146.    RippleNet software does not use the XRP Ledger. PX 6 (Schwartz Dep. Tr.) at 236:9-12.

**Response:**    Undisputed.

147.    RippleNet users who do not use ODL do not transact in XRP—xVia and xCurrent do not involve XRP. PX 17 (Long Dep. Tr.) at 142:5-13; PX 8 (Ripple RFA Responses) Nos. 85, 238.

**Response:**    Disputed.  Defendants do not dispute that Long offered the cited testimony, and that, from their inception through December 22, 2020, xVia and xCurrent did not require the use of XRP to operate; however, Defendants dispute Paragraph 147 to the extent that the SEC implies that "RippleNet users who do not use ODL" never "transact[ed] in XRP" outside the context of RippleNet, as Defendants lack independent knowledge sufficient to establish that fact.  Defendants further dispute Paragraph 147 because it is not supported by PX

8, in which Ripple only admitted that xVia and xCurrent "did not require the use of XRP to operate" but did not admit the SEC's assertion of fact as set forth in Paragraph 147 that "RippleNet users who do not use ODL do not transact in XRP."  Defendants further dispute that Paragraph 147 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's activities prior to December 22, 2020, and accordingly facts and circumstances after that date are irrelevant.

148.    RippleNet does not need XRP to function. PX 15 (Birla Dep. Tr.) at 49:25-50:8.

**Response:**    Undisputed.

149.    Customers first started using ODL, then known as xRapid, in late 2018. PX 15 (Birla Dep. Tr.) at 195:5-21.

**Response:**    Undisputed that xRapid, the prior commercial name for Ripple's product currently known as ODL, became publicly available in October 2018.  *See* PX 8 at No. 89.

150.    Ripple did not sell any product that involved XRP when Vias joined Ripple in November 2016. PX 20 (Vias Dep. Tr.) at 27:13-15.

**Response:**    Undisputed that Vias offered the cited testimony; however, Defendants dispute Paragraph 150 because Ripple is unable to discern which products the SEC contends "involved XRP," as that phrase is vague and ambiguous.  Defendants further dispute that a statement by a single employee, who was testifying solely as to his own understanding and not on behalf of Ripple, is sufficient to establish the underlying fact set forth in Paragraph 150 at all times and for all purposes in this litigation, including as to any belief or understanding held by Ripple as an entity or the Individual Defendants.

151.    Nobody was using XRP for cross-border transactions in or around March 2017. PX 20 (Vias Dep. Tr.) at 116:9-19.

**Response:**    Disputed because Vias testified only as to his own knowledge as of March 2017, stating in response to the question "Was anybody using XRP at the time for cross-border

payments," "Not that I knew of." Defendants further dispute that a statement by a single

employee, who was testifying solely as to his own understanding and not on behalf of Ripple, is

sufficient to establish the underlying fact set forth in Paragraph 151 at all times and for all

purposes in this litigation, including as to any belief or understanding held by Ripple as an entity

or the Individual Defendants. Defendants further lack independent knowledge sufficient to

establish the SEC's assertion set forth in Paragraph 151 as to how an undefined group of people

used XRP; for example, Defendants lack knowledge as to whether unknown third parties used

XRP for cross-border transactions during this period of time.

    152.    ODL (formerly known as xRapid) was the only product Ripple sold that used
XRP but Ripple did not sell XRP for ODL when it launched. PX 19 (Zagone Dep. Tr.) at 98:10-
99:5.

    **Response:**    Disputed, because Zagone also testified that Ripple "had variants of

xRapid leading up to the product that we were selling when I left that also used XRP" and that

Ripple sold a product in "the early days" called Ripple Connect that incorporated XRP as "part

of the early platform." PX 19 at 98:10-99:21; *see also* PX 15 at 44:19-45:18 (Birla testifying

about Ripple's early products incorporating XRP, including among other products "RippleCard"

and "Ripple Connect"). Defendants further dispute the SEC's broad, unqualified, and temporally

unbounded assertion that "Ripple did not sell XRP for ODL when it launched"—which is also

unclear due to the SEC's confusing use of the connecting term "for"—as unsupported by PX 19.

Defendants further dispute that a statement by a single employee, who was testifying solely as to

his own understanding and not on behalf of Ripple, is sufficient to establish the underlying fact

set forth in Paragraph 152 at all times and for all purposes in this litigation, including as to any

belief or understanding held by Ripple as an entity or the Individual Defendants.

153.     Ripple's products xVia and xCurrent did not use XRP or the XRP Ledger and each made no more than $▮▮▮▮▮ in revenue total throughout Garlinghouse's tenure at Ripple. PX 36 (Garlinghouse Inv. Tr.) at 67:7-73:6.

**Response:**     Undisputed, except that, from their respective inceptions through December 22, 2020, xVia and xCurrent did not *require* the use of XRP or the XRP Ledger to operate.  Defendants dispute that Paragraph 153—which relates to whether xVia and xCurrent "did not use XRP or the XRP Ledger," and to these products' revenue figures, "throughout Garlinghouse's tenure at Ripple," which is continuing – sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's activities prior to December 22, 2020, and accordingly facts and circumstances after that date are irrelevant.

154.     Ripple's early strategy for finding a "use" for XRP was to use it as an intermediary asset on the Ledger, but while banks were *testing* the XRP Ledger, they weren't actually using it for live payments. Later, Ripple developed a product, xCurrent, that did not use XRP. PX 7 (Schwartz Inv. Tr.) at 189:5-191:15.

**Response:**     Disputed that Ripple's early use of XRP was limited to XRP being an intermediary asset on the XRP Ledger, because Ripple considered using XRP in various additional ways, and third parties used XRP in a myriad of ways known and unknown to Ripple. *See, e.g.*, PX 7 at 26:17-27:9 (Schwartz testifying that the "primary utility for XRP was to pay transaction fees"); 27:10-28:10 (Schwartz noting that Ripple discussed pitching XRP to pay for "goods and services").  Defendants further dispute Paragraph 154 because it is vague and ambiguous as to what constitutes an "early" strategy.  Defendants further dispute Paragraph 154, because Defendants lack independent knowledge sufficient to establish how banks were using the XRP Ledger, and Schwartz testified only about banks' usage of the XRP Ledger "as far as [he knew]."  PX 7 at 191:13-15.  Defendants further dispute that a statement by a single employee is sufficient to establish any "strategy" Ripple had regarding the use of XRP at all times and for all purposes in this litigation.  Defendants do not dispute that, from its inception

through December 22, 2020, xCurrent did not require the use of XRP to operate.  PX 8 at No. 238.

155.    Ripple began developing a product, ODL, in 2017, that could use XRP for the payment settlement, which did not launch commercially until late 2018. PX 7 (Schwartz Inv. Tr.) at 194:12-195:13; PX 539 (late 2015 discussion between Long and Larsen noting there is no "articulated case for XRP" and discussing a "working group" to find potential use cases).

**<u>Response:</u>**        Disputed.  Defendants do not dispute that xRapid, the prior commercial name for Ripple's product currently known as ODL, was being developed in 2017; became publicly available in October 2018; and that the ODL product functioned, in part, by trading certain fiat currencies for XRP, and XRP for certain fiat currencies, on certain third-party digital asset exchanges.  *See* PX 8 at Nos. 89, 100.  However, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 539 as misleading, because Paragraph 155 omits additional context necessary to understand the quoted text, including that PX 539 is a draft email to the board sent by Long to Larsen and Larsen did not respond; the reference to the working group regarded "evaluat[ing]," rather than finding, use cases for XRP; and, contrary to the SEC's assertion that there was no use case for XRP in late 2015, Long noted that the "group ultimately concluded the most viable use of XRP is as a bridge currency to drive efficiencies in market making."  PX 539 at RPLI_SEC 0484565.

156.    Ripple did not sell XRP for the use cases that XRP may have had outside of ODL. PX 17 (Long Dep. Tr.) at 35:22-37:7.

**<u>Response:</u>**        Disputed, because the SEC's broad, unqualified, and temporally unbounded assertion set forth in Paragraph 156—which is also unclear due to the SEC's confusing use of the connecting term "for"—is unsupported by PX 17; Long was only asked about whether "Ripple [sold] any XRP . . . in connection with the *three use cases that we just mentioned*," and Long responded that she did not "recall."  PX 17 at 37:2-7 (emphasis added).

Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 156 at all times and for all purposes in this litigation.

157.     Ripple paid certain market makers █████████ on certain ODL volume they facilitated at certain times prior to December 22, 2020. PX 85 (Ripple RFA Responses) No. 595.

**Response:**     Undisputed.

158.     Ripple paid certain ODL customers ████████ to cover certain trading fees and spreads incurred during certain ODL transactions. PX 85 (Ripple RFA Responses) No. 596.

**Response:**     Undisputed.

159.     Ripple paid market makers GSR and ████████ to provide and create markets on the MXN/XRP side of the ODL trade. PX 25 (Madigan Dep. Tr.) at 277:5-278:20.

**Response:**     Undisputed that Madigan offered the cited testimony, except that her testimony was limited to GSR and ████████ market-making activities on the Bitso exchange.  PX 25 at 277:5-278:20.

160.     Ripple's market makers purchased Mexican pesos as part of their support of the ODL product. PX 25 (Madigan Dep. Tr.) at 311:10-312:21, 315:21-316:12.

**Response:**     Disputed.  The SEC's assertion of fact in Paragraph 160 is not supported by the cited testimony.  When Madigan was asked by the SEC whether "market makers purchase[d] Mexican pesos as part of their support of the ODL product to Ripple," Madigan merely responded "I believe so," and Madigan was "not sure" and "d[id] not know" whether the market makers "purchase[d] those pesos using traditional SWIFT systems," "using XRP," or "using traditional fiat currencies like U.S. dollars."  PX 25 at 312:7-313:2.  When the SEC further asked Madigan whether market makers "sell the XRP to obtain working fiat," Madigan replied "[m]y understanding is they need both XRP and fiat.  I don't know what bounds they -- how they manage their own accounting."  *Id.* at 316:8-12.  This is not sufficient evidence to support the assertion of fact in Paragraph 160 as to which the SEC has the burden of proof, nor

are such statements by a single employee at a particular point in time sufficient to establish the

underlying fact set forth in Paragraph 160 at all times and for all purposes in this litigation.

161.     Ripple entered into an agreement with GSR Markets to provide market making services, including between XRP and the Mexican Peso. PX 8 (Ripple RFA Responses) No. 101.

**Response:**     Undisputed, except that Defendants aver that the agreement with GSR

Markets referenced in PX 8 at No. 101 was specifically in connection with Ripple's ODL

product. *See id.*

162.     Ripple needed to pay market makers to support developing liquidity in the XRP markets or the XRP markets would have been insufficiently liquid for ODL to function. PX 25 (Madigan Depo. Tr.) at 326:22-327:13.

**Response:**     Disputed.  Defendants do not dispute that Madigan testified that "market

makers['] support on developing liquidity" was utilized by Ripple in certain corridors for the

ODL product; however, Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from, PX 25 including because Paragraph 162 omits additional context

necessary to understand cited testimony.  Madigan's cited testimony was solely in reference to

"the early days looking at volume on . . . Bitso before we started the MGI flow," and she further

clarified that "over time, as crypto matures and exchanges mature and volumes increases and

liquidity increases, we would expect less reliance on market makers.  And depending upon the

individual corridor, that's – you know, more or less support may be required in order to ensure

the payments go through."  PX 25 at 327:1-20.  Madigan further testified in response to the

question, "Today, without the market makers providing liquidity, can ODL function?" that "it

depends on the individual corridor," and therefore did not testify, as the SEC asserts in Paragraph

162, that "Ripple needed to pay market makers to support developing liquidity in the XRP

markets or the XRP markets would have been insufficiently liquid for ODL to function" across

all ODL corridors.  *Id.* at 328:15-18.  Defendants further dispute that a statement by a single

employee is sufficient to establish the underlying fact set forth in Paragraph 162 at all times and for all purposes in this litigation.

163.    Without Ripple's market makers, there would not have been sufficient liquidity in XRP markets in the most consequential corridor (the Mexican peso) for ODL (formerly known as xRapid) to function properly. PX 36 (Garlinghouse Inv. Tr.) at 115:24-116:21.

**<u>Response:</u>**      Disputed because the question posed to Garlinghouse was whether there was "sufficient liquidity on ODL receiv[ing] exchanges" without market makers, to which Garlinghouse responded that it "[d]epends on which corridor we're talking about, which currency pair we're talking about, but to my knowledge, the most consequential one of those is the Mexican peso and no is the answer."  PX 36 (Garlinghouse Inv. Tr.) at 115:24-116:5. Garlinghouse did not testify that there "would not have been sufficient liquidity in XRP markets," as set forth in Paragraph 163.  Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 to the extent it implies that ODL not "function[ing] properly" means that ODL was not functioning at all.  *See* PX 36 (Garlinghouse Inv. Tr.) at 116:10-21 (Q: "So xRapid would not function properly?"  A: "Correct."  Q: "The transaction could not be completed because there would be no person who would be willing to buy XRP in exchange for the local fiat currency?"  A: "Actually, I would not say that.  What you would probably have is very wide spreads, and you would actually reduce the efficiencies of these markets.  And, you know, your question I think was you would have no buyer – I think what you would find is you would have a buyer at some price but it would actually decrease the efficiency of the market to not have market makers there.").  Defendants further dispute Paragraph 163 because it is vague as to timing.

164.    Ripple did not publicly disclose, including in its markets reports, all of the payments it made to market makers to support ODL. PX 25 (Madigan Dep. Tr.) at 324:1-326:12.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25 because the cited evidence does not support the SEC's broad, unqualified, and temporally unbounded assertions of fact as set forth in Paragraph 164.  Specifically, when asked whether "Ripple provide[d] information, for example, about the payments that it makes to market makers to provide ODL liquidity," Madigan testified that she "saw no attempts to, like, hide that at all" and that she "[didn't] recall it being publicly disclosed, like in a markets report."  PX 25 at 326:5-12.  Madigan also testified that she did not know whether Ripple provided information to the market about its relationships with market makers in the context of their ODL relationship with Ripple, stating that "it's possible" and "Ripple may very well have" disclosed such information, but that she did not recall being involved in efforts to share that information.  *Id.* at 324:10-325:9.  Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 164 at all times and for all purposes in this litigation.

165.    In January 2020, members of Ripple's XRP Markets and Data teams developed an "Average Cost of Liquidity Metric," so that Ripple could "track the costs that Ripple pays for the exchange liquidity that ODL requires." PX 620; *see also* PX 621 ¶ 48.

**Response:**    Undisputed that PX 620 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 620 including to the extent the SEC implies that members of Ripple's XRP Markets and Data Teams' personal opinions or beliefs as to the purpose of creating the "Average Cost of Liquidity metric" could be attributed to Ripple or the Individual Defendants, or that Ripple or the Individual Defendants approved, adopted, or used the "Average Cost of Liquidity metric," including for the reason quoted in Paragraph 165, when PX 620 does not support that assertion.

166.    Ripple created this "Average Cost of Liquidity Metric" because "[c]ontrolling costs as [Ripple] scale[s] ODL is essential to healthy growth." PX 620; *see also* PX 621 ¶ 48.

**Response:**    Disputed.  Defendants do not dispute that PX 620 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 620 including to the extent the SEC implies that members of Ripple's XRP Markets and Data Teams' personal opinions or beliefs as to the purpose of creating the "Average Cost of Liquidity metric" could be attributed to Ripple or the Individual Defendants, or that Ripple or the Individual Defendants approved, adopted, or used the "Average Cost of Liquidity metric," including for the reason quoted in Paragraph 166, when PX 620 does not support that assertion.

167.    RESERVED.

**Response:**    Defendants object to Paragraph 167 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

168.    As of January 2020, Ripple's "Average Cost of Liquidity Metric" included: (i) transaction fees, including "the originating and destination exchanges' fees and the XRP Ledger fee"; (ii) incentives that Ripple paid to customers and exchange partners, including "rebates to cover slippage (when the quoted price and the executed price differ) and FX difference (when the ODL and spot rate differ) for customers, as well as volume incentives for exchanges"; and (iii) incentives Ripple paid to market makers, including "fixed fees as well as variable fees based on the ODL volume" to which the market makers were counterparties. PX 620; *see also* PX 621 ¶ 48.

**Response:**    Undisputed that PX 620 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 620 including to the extent the SEC implies that members of Ripple's XRP Markets and Data Teams' personal opinions or beliefs as to the fees and costs included in the "Average Cost of Liquidity metric" could be attributed to Ripple or the Individual Defendants, or that Ripple or the Individual Defendants approved, adopted, or used the methodology of the "Average Cost of Liquidity

metric" or themselves understood the "Average Cost of Liquidity metric" to includes the fees and costs identified in PX 620 and no others, when PX 620 does not support that assertion.

169.    As of January 2020, Ripple's "Average Cost of Liquidity Metric" "knowingly omit[ted]" other ODL-related costs borne by Ripple that were "not explicitly related to liquidity, such as customer volume incentives" and "loans to market makers." PX 620; *see also* PX 621 ¶ 48.

**Response:**    Undisputed that PX 620 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 620 including to the extent the SEC asserts in Paragraph 169 that these were "ODL-related costs borne by Ripple," when that is not supported by PX 620, and to the extent the SEC implies that members of Ripple's XRP Markets and Data Teams' personal opinions or beliefs as to the fees and costs excluded from the "Average Cost of Liquidity metric" could be attributed to Ripple or the Individual Defendants, or that Ripple or the Individual Defendants approved, adopted, or used the methodology of the "Average Cost of Liquidity metric" or themselves understood the "Average Cost of Liquidity metric" to exclude the fees and costs identified in PX 620 and no others, when PX 620 does not support that assertion.

170.    As of January 2020, Ripple incurred a cost of ███ % of the each ODL transaction in its corridor with the highest volume of transactions (USD/MXN). PX 620; *see also* PX 621 ¶ 49 & Table 5.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 620 as misleading, including because Paragraph 170 omits additional context necessary to understand the cited text, including that PX 620 and PX 621 in fact show that, as of January 2020, Ripple incurred $ ███ in "Average Liquidity Cost per Dollar Volume" in the USD/MXN corridor during the period August 1, 2019 to January 29, 2020.  PX 620 at RPLI_SEC 0550288.

171.     In or around January 2017, Garlinghouse stated that Ripple does not get paid for cross-border payments. PX 528.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 528 as misleading.  First, Garlinghouse's email says "Ripple does not get paid altcoins for a cross-border payment," which indicates that Ripple gets paid for its cross-border payment software in other ways such as fiat currency, even if not in "altcoins," which is different than suggesting that Ripple "does not get paid for cross-border payments" at all, as in Paragraph 171, for which the SEC offers no evidence.  PX 528.  In fact, Garlinghouse testified that Ripple receives "onboarding … fees" from xRapid (now ODL) customers.  *See* PX 36 (Garlinghouse Inv. Tr.) at 111:2-5.  In addition, the language about Ripple not getting paid altcoins for cross-border payments in Garlinghouse's email is in quotation marks, indicating the language is not Garlinghouse's own words, but rather, that he was copying language quoted from a prior email written by a different Ripple employee in the same exhibit. PX 528.

172.     In connection with its work to support and service ODL, GSR bought fiat from an FX broker using working capital provided by Ripple. PX 26 (█ Dep. Tr.) at 18:24-22:13.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, █ testimony because when asked whether GSR used "working capital from Ripple to purchase the fiat inventory which [was] then later exchange[d] for XRP," █ replied that the answer was "more nuanced," and that "sometimes that fiat component of the working capital loan [GSR] receive[d] from Ripple to service ODL oftentimes is used to purchase *XRP*, but it – oftentimes it sits unused.  Which particular currency it gets exchanged into is determined by the ODL flows."  PX 26 at 21:8-22:13 (emphasis added).  Defendants further dispute that a single statement by a third party in deposition testimony is sufficient to support the SEC's unqualified assertions of fact as set forth in Paragraph 172.

173.     The ODL product does not eliminate the use of the legacy financial system. PX 25 (Madigan Dep. Tr.) at 402:14-23.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, Madigan's testimony because in response to the question "does the ODL product eliminate the use of the legacy financial system," Madigan responded "not to my knowledge," and then testified that she lacked knowledge of "what components of the legacy financial system [market makers are] using or not using" and did not know "how they use the legacy financial system in connection with their services on ODL."  PX 25 at 402:14-403:3, 404:4-10.  Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 173 at all times and for all purposes in this litigation.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from Madigan's testimony because the term "legacy financial system" is undefined, vague, and unclear.

174.     Ripple's market makers use the legacy financial system in connection with their ODL functions. PX 25 (Madigan Dep. Tr.) at 402:14-23.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, Madigan's testimony because when asked whether market makers use "the legacy financial system in connection with their ODL functions," Madigan responded "I believe so.  *I'm not sure exactly how they operate all the components of the payments*," and then testified that she lacked knowledge of "what components of the legacy financial system [market makers are] using or not using" and did not know "how they use the legacy financial system in connection with their services on ODL."  PX 25 at 402:14-403:3, 404:4-10 (emphasis added).  Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 174 at all times and for all purposes in this litigation.  Defendants further dispute the SEC's characterization of, and

inferences purportedly drawn from Madigan's testimony because the term "legacy financial system" is undefined, vague, and unclear.

175.   ODL transactions required the use of traditional cross-border and local payment rails to complete the transaction. PX 22 (Samarasinghe Dep. Tr.) at 54:19-55:11, 228:2-230:20; PX 145; PX 621 ¶ 28 & n.25; PX 559; PX 145; PX 456; *see also* PX 562 (internal Western Union email questioning the utility of fast inter ledger transfer of XRP if "you are still dependent on how long it takes the local payment rails, ie: 'the last mile' to process the payment").

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, the cited evidence because it does not support the SEC's broad assertion of fact that "ODL transactions *required* the use of traditional cross-border and local payment rails to complete the transaction" (emphasis added).  For example, Samarasinghe never testified that ODL "required" the use of traditional cross-border and local payment rails to complete transactions, and only testified that traditional rails are "typically" used.  PX 22 at 230:17-20.  Nor does PX 621 support the SEC's assertion of fact—the SEC's own expert acknowledged that ODL did not require the use of traditional cross-border payment rails.  *See* PX 621 at 15 ("[T]he market maker *at times* needed to execute a traditional wire transfer to convert U.S. Dollars into Mexican Pesos and send them across the border to its account in Mexico.") (emphasis added).  PX 562—emails from employees of a third-party company who were reacting to an online news article about ODL—also does not support the SEC's assertions of fact; nowhere do the third party employees indicate that ODL *required* the use of traditional cross-border payment rails; nor would they be in a position to make such a representation. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants also object that the SEC cannot present PX 562 in admissible form, as the document quoted is a hearsay statement of a third party offered for the truth of the fact asserted, and not a statement by Ripple or the Individual Defendants.

176.    If an ODL customer paid more using ODL to effect a transfer than it would have paid using the interbank FX markets, Ripple paid the ODL customer the difference between the ODL rate and the interbank FX rate. PX 15 (Birla Dep. Tr.) at 214:12-17.

**Response:**    Disputed, because the factual assertion is unlimited to any point in time and unsupported by the cited testimony.  Birla testified that Ripple would pay customers the difference between the ODL rate and the interbank FX rate "*in early versions* of the product" and "then later on …we started to create a feature so the customers didn't have to worry about that at all."  PX 15 at 213:1-6.  Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 176 at all times, for all ODL customers, and for all purposes in this litigation.

177.    Garlinghouse stated that Ripple's goal in paying incentives to MoneyGram was to increase volume in usage of ODL. PX 36 (Garlinghouse Inv. Tr.) at 130:13-135:12.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 as misleading.  Garlinghouse did not testify that incentives were paid with a goal to "increase volume in usage of ODL" as set forth in Paragraph 177.  Rather, Garlinghouse testified that "[o]ur general thesis with incentives is to have some incentive to get live quickly and to get things moving as quickly as possible and then to have a declining scale of incentives as volumes grow."  PX 36 (Garlinghouse Inv. Tr.) at 133:21-24.  In addition, Garlinghouse explained that the general idea behind the partnership with MoneyGram was "evidence of use" of ODL and that the partnership could lead to "getting other customers in the Americas signed up, you know, we want to talk about the momentum we have in getting customer usage and demonstrate that the ability to use some of these capabilities are not – have gone beyond just experiments but to enabling real flows."  PX 36 (Garlinghouse Inv. Tr.) at 130:13-132:6.  Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 to the extent it implies that Ripple's goal with respect to the MoneyGram

77

partnership had anything to do with XRP holders in the secondary market.  *See* PX 36

(Garlinghouse Inv. Tr.) at 132:7-15 (Q: "Did you want to create momentum by XRP holders or

momentum for people who were looking to buy XRP on the secondary market?"  A: "No."  Q:

"Why not?"  A: "That wasn't my goal.  I don't think we see the relationship between what's

going on with ODL and XRP at those two things – you're asking me to correlate two things I

don't see as correlated."); 133:1-6 (Q: "…did you believe that an increase in demand for xRapid

would increase the demand for XRP and therefore –"  A: "No.").  Finally, Defendants dispute the

SEC's characterization of, and inferences purportedly drawn from, PX 36 to the extent it implies

anything untoward about Ripple having paid incentives to MoneyGram in connection with ODL,

which is unsupported by any evidence.

178.    Schwartz explained that Ripple was still paying incentives to market makers to
make markets in certain ODL-related corridors, but that when you are paying such incentives
people are "suffering" your product, "you are not really proving that the use case is viable," you
only "get the appearance of activity and growth and progress, and you don't actually have it."  PX
7 (Schwartz Inv. Tr.) at 212:2-216:17.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 7 because when asked whether Ripple had to pay

incentives to market makers, Schwartz replied that "[t]here have been times where we have

incentivized market makers," but when asked whether "Ripple still need[ed] to incentivize

market makers," he replied "Yes and no" adding "if [Ripple] didn't incentive[ize] market

makers, those corridors would still work."  PX 7 at 212:2-10, 213:12-214:2.  Defendants further

dispute the second clause of Paragraph 178 because the statement is based on a

mischaracterization and misstatement of Schwartz's testimony in response to hypothetical

questions; specifically, Schwartz's comment about "suffering your product" was in reference to a

hypothetical scenario in which Ripple *gave away* XRP to ODL customers, as opposed to Ripple

"paying incentives to market makers," as the SEC incorrectly states in Paragraph 178.

179.    ODL customers are not banks, but rather primarily remittance companies. PX 16 (Birla Inv. Tr.) at 182:19-183:25.

**Response:**    Disputed.  Defendants incorporate by reference their response to

Paragraph 94 of the SEC's Rule 56.1 Statement (ECF No. 629).  Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 16 because Birla was asked

whether "banks were using XRP to conduct cross-border payments *prior to the introduction of*

*xRapid*," to which he responded, "I do not believe banks were using [the] XRP ledger and

exchanges and gateways," at the time in question.  PX 16 at 182:19-23 (emphasis added).  In

addition, Birla also offered testimony contrary to the SEC's statement of fact in Paragraph 179:

when asked whether "[b]anks use ODL for cross-border payments," Birla testified, "there are a

few banks that use ODL or xRapid for cross-border payments or have in the past" and noted that

he recalled meeting with "███████████" and "getting customer feedback directly" about their

experience with the product.  PX 15 at 206:10-21.

180.    Banks are not the target users for ODL and they never used XRP as a bridge currency on ODL. PX 7 (Schwartz Inv. Tr.) at 192:17-194:20; PX 6 (Schwartz Dep. Tr.) at 42:11-43:16.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 7 and PX 6 because the assertion in Paragraph 180 is not

supported by the cited evidence.  Schwartz never testified that banks were not the "target users"

for ODL; rather he testified that banks "were always a potential customer" of ODL and Ripple

"always had the vision that banks might use xRapid or something like it."  PX 7 at 192:20-193:6.

Nor did Schwartz testify that banks "never used XRP as a bridge currency on ODL"; his

testimony was that "as far as [he] kn[e]w," banks were not using XRP as a bridge currency

"today"—not "ever," as the SEC asserts.  PX 6 at 43:11-16.  In addition, Birla offered testimony

contrary to the SEC's statement of fact in Paragraph 180:  when asked whether "[b]anks use

ODL for cross-border payments," Birla testified, "there are a few banks that use ODL or xRapid

for cross-border payments or have in the past" and noted that he recalled meeting with "███████

███████" and "getting customer feedback directly" about their experience with the product.

PX 15 at 206:10-21.  Defendants further dispute that a statement by a single employee is

sufficient to establish the "target users for ODL" as set forth in Paragraph 180 at all times and for

all purposes in this litigation, including as to any belief or understanding held by other Ripple

employees, Ripple as an entity, or the Individual Defendants.  Defendants also incorporate by

reference their response to Paragraph 94 of the SEC's Rule 56.1 Statement (ECF No. 629).

      181.   Historically, the majority of ODL customers have been money transmitters. PX
15 (Birla Dep. Tr.) at 204:2-206:9.

    **Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 15 because Birla testified that "some" ODL customers

"were not money transmitters," including "e-commerce companies," and "a few banks."  PX 15

at 205:18-206:14.  In the context of that discussion, Birla also testified that "believed" that

"historically" the "majority of ODL/xRapid customers [have] been money transmitters."  PX 15

at 206:6-9.  Defendants further dispute that testimony by a single employee is sufficient to

establish the assertion of fact as set forth in Paragraph 181 at all times and for all purposes in this

litigation, including as to any belief or understanding held by Ripple as an entity or the

Individual Defendants.  Defendants further dispute Paragraph 181 to the extent the use of the

term "money transmitters" is undefined, vague, and unclear because the SEC does not specify

whether this term includes other types of entities, such as remittance companies.

      182.   Money transmitters, and not banks, were Ripple's target audience for ODL
(formerly known as xRapid). PX 21 (Vias Inv. Tr.) at 298:16-299:6.

    **Response:**    Disputed.  Paragraph 182 is contradicted by Schwartz's testimony, who

testified that banks "were always a potential customer" of ODL and Ripple "always had the

vision that banks might use xRapid or something like it." PX 7 at 192:20-193:6. Defendants do not dispute that Vias testified that banks were "not the target audience" for Ripple's xRapid/ODL product during Vias's employment at Ripple, PX 21 at 298:16-20; however, Defendants dispute Paragraph 182 to the extent the use of the term "money transmitters" is undefined, vague and unclear because the SEC does not specify whether this term includes other types of entities, such as remittance companies. Indeed, while Vias stated that he "felt like the *money remitters or the money transmitters* were lower hanging fruit," he testified "*remittance companies were the target audience*," for the xRapid/ODL product. PX 21 at 298:22-299:1 (emphasis added). Defendants object that Paragraph 182 does not set forth an independent statement of material fact because it is substantially similar to Paragraphs 179 and 180 of the SEC's Counter-Statement and therefore duplicative; Defendants incorporate by reference their responses to Paragraphs 179 and 180 of the SEC's Counter-Statement as well as to Paragraph 94 of the SEC's Rule 56.1 Statement (ECF No. 629). Defendants further dispute that a statement by a single employee is sufficient to establish Ripple's "target audience" as set forth in Paragraph 182 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

183. Ripple's direct ODL customers prior to December 22, 2020 were corporate entities. PX 8 (Ripple RFA Responses) No. 90.

**Response:** Undisputed.

184. Ripple did not sell any products that individuals would use, instead, Ripple's target audience for its marketing efforts was institutional, particularly financial institutions. PX 17 (Long Dep. Tr.) at 73:1-74:25.

**Response:** Disputed. Contrary to the SEC's assertions in Paragraph 184, Long testified about a Ripple product "that individuals would use" that was made available in 2013. PX 17 at 73:24-74:3. Birla also testified that certain of Ripple's early products and partnerships

were geared toward individual customers.  *See, e.g.*, PX 15 at 45:20-46:8 (testifying about the

"RippleCard" that allowed individuals to "spend and draw down on different balances on the

XRP ledger, including XRP, bitcoin, gold, U.S. dollars, and other digital assets."); *id.* at 250:24-

252:11 (explaining Ripple's partnership with ███████ and ███████ to allow cross-border

payments at retail locations).  Defendants further dispute that a statement by a single employee is

sufficient to establish Ripple's "target audience" as set forth in Paragraph 184 at all times and for

all purposes in this litigation, including as to any belief or understanding held by other Ripple

employees, Ripple as an entity, or the Individual Defendants.

185.    Long stated, in or around August 2017, that the statement "many banks are using
XRP" put Ripple at "high risk" and needed correction, and "[i]f Brad [Garlinghouse] is saying
banks are using XRP, that's a problem" and Long and Ripple's public relations agency would
need to "manage him on that." PX 631.

**Response:**    Undisputed that PX 631 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC.  Defendants dispute that a secondhand statement

by a single employee repeating a statement from a reporter is sufficient to establish the

underlying fact as set forth in Paragraph 185, including what Garlinghouse allegedly said, at all

times and for all purposes in this litigation, including as to any belief or understanding held by

other Ripple employees, Ripple as an entity, or the Individual Defendants.

186.    Ripple was not selling XRP to ODL customers in or around May 2019. PX 25
(Madigan Dep. Tr.) at 47:17-21.

**Response:**    Defendants dispute that Paragraph 186 sets forth an independent statement

of material fact because it is duplicative of Paragraph 748 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 748.

187.     Ripple's customers who used the ODL product from 2019 through May 2020 were not required to purchase XRP from Ripple. PX 8 (Ripple RFA Responses) No. 94.

**Response:**     Defendants dispute that Paragraph 187 sets forth an independent statement

of material fact because it is duplicative of Paragraph 743 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 743.

188.     Before approximately May 2020, Ripple did not sell XRP to ODL customers for their use in ODL transactions. PX 8 (Ripple RFA Responses) No. 95; PX 81 (Garlinghouse Dep. Tr.) at 336:1-11.

**Response:**     Defendants dispute that Paragraph 188 sets forth an independent statement

of material fact because it is duplicative of Paragraph 744 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 744.

189.     Ripple had concerns that introducing XRP into the market via XRP-O "at any significant scale" would be expected "to have a negative impact on XRP price." PX 25 (Madigan Dep. Tr.) at 340:19-351:17; PX 630; PX 185.

**Response:**     Disputed, because the cited evidence does not support the SEC's

assertions.  Madigan testified that the draft email quoted in Paragraph 189 was written by another

employee who was "only speaking for himself in this e-mail and not the whole [XRP Markets]

[T]eam").  PX 25 at 349:17-21.  Madigan further testified that she was concerned about XRP-O

to the extent it "can have a drying up effect on liquidity" but "not with respect to price."  PX 25

at 343:18-344:3, 351:11-17.  Similarly inadequate are PX 630 (which merely reflects edits to the

same draft email that, as Madigan testified, reflected an employee's personal views) and PX 185

(in which Ripple employees speculated on what Larsen's and Garlinghouse's views "seem[ed]

like").  These citations are insufficient to establish the assertion of fact in Paragraph 189 of what

concerns *Ripple* had.  Defendants further dispute that a statement by a single employee is

sufficient to establish the underlying fact set forth in Paragraph 189 at all times and for all

purposes in this litigation, including as to any belief or understanding held by other Ripple

employees, Ripple as an entity, or the Individual Defendants.

190.    Garlinghouse and others at Ripple were concerned after XRP-O launched that XRP-O sales could hurt the market for XRP. PX 81 (Garlinghouse Dep. Tr.) at 482:11-484:6.

**Response:**    Undisputed that Garlinghouse offered the cited testimony; however,

Defendants do not concede that Paragraph 190 is the entirety of, a representative selection of, or

a fair characterization of Garlinghouse's testimony, including because Garlinghouse also

testified that Ripple has always been concerned about potentially impacting the XRP markets

generally, and not just with respect to XRP-O, as set forth in PX 81 (Garlinghouse Dep. Tr.) at

483:25-484:6 ("We … always had the concern that we don't want to impact the market, the XRP

markets. And so to the extent we are introducing XRP to the market at a rate higher than we have

historically, that would give us reason to pause and think about should we change our plan?").

191.    Ripple had concerns that selling a large amount of XRP at a low price could push XRP "over a cliff," and regarding other ways in which Ripple's sales of XRP might hurt XRP's price absent purchasing XRP. PX 632.

**Response:**    Disputed, because the cited evidence does not support the SEC's broad,

unqualified, and temporally unbounded assertions in Paragraph 191, including because the SEC

claims that PX 632 reflected Ripple's concerns, when that email was in fact drafted by ███████

███████ on behalf of himself and ████████, who were advisors to Ripple and not employees.

Further, Ripple disputes that PX 632 reflects any concerns by Ripple, as the email noted it

contained only "preliminary conclusions," and "none … would pass a test of theoretical rigor,"

and regarding XRP being pushed "over a cliff," █████ wrote, "*we did not find many others who*

*shared this fear.*" PX 632 at RPLI_SEC 0479913 (emphasis added). Defendants further dispute

that a statement by a single individual is sufficient to establish the underlying fact set forth in

Paragraph 191 at all times and for all purposes in this litigation, including as to any belief or understanding held by Ripple employees, Ripple as an entity, or the Individual Defendants.

192.    Ripple intended to balance three primary concerns with respect to its sales of XRP via XRP-O: the stability of XRP, the "client experience" with ODL, and "corp[orate] cash needs," with the latter goal in and around July 2020 targeting total net annual XRP sales of $100 million. PX 25 (Madigan Dep. Tr.) at 382:10-388:8; PX 190; PX 626 at 5 (April 2020 internal Ripple presentation noting plan to "[u]se MGI ODL flows to help achieve XRP Origination revenue targets for 2020 (███████)").

**Response:**    Disputed, as the cited evidence does not support the SEC's assertions in Paragraph 192. Whereas Paragraph 192 makes an assertion about Ripple's purported "concerns with respect to its *sales* of XRP via XRP-O," the cited evidence in PX 190 relates to XRP "*purchases*" via XRP-O, not sales. PX 190 at RPLI_SEC 0504020 (emphasis added). The SEC's assertion in Paragraph 192 is based on the SEC's misreading or mischaracterization of the document, and the SEC's citations to PX 25 and PX 626 do not support the asserted facts in this paragraph. Defendants further dispute that PX 190, a "preliminary" document with "recommendations" that appears to have been sent only to Madigan (who herself did not "recognize it," PX 25 at 383:25-384:2), is sufficient to establish what "Ripple intended" as set forth in Paragraph 192 at all times and for all purposes in this litigation.

193.    Because of its concerns about the impact of sales of XRP in connection with XRP-O on the XRP market, Ripple decided to execute purchases of XRP in the market. PX 22 (Samarasinghe Tr.) at 268:3-273:8.

**Response:**    Defendants dispute that Paragraph 193 sets forth an independent statement of material fact because it is duplicative of Paragraph 765 of the SEC's Rule 56.1 Statement (ECF No. 629). Defendants incorporate by reference their response to Paragraph 765.

194.     Ripple instructed GSR to make purchases of XRP on digital asset trading platforms in 2020. PX 85 (Ripple RFA Responses) No. 566.

**Response:**     Defendants dispute that Paragraph 194 sets forth an independent statement

of material fact because it is duplicative of Paragraph 770 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 770.

195.     Ripple purchased approximately $█████████ n XRP during the third quarter of 2020. PX 80 (Ripple Ans.) ¶ 220.

**Response:**     Defendants dispute that Paragraph 195 sets forth an independent statement

of material fact because it is duplicative of Paragraph 771 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 771.

196.     Ripple engaged GSR to purchase XRP on its behalf. PX 26 ███ Dep. Tr.) at 177:7-182:15.

**Response:**     Defendants dispute that Paragraph 196 sets forth an independent statement

of material fact because it is duplicative of Paragraph 772 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 772.

197.     In or around July 2020, Ripple Labs Singapore Pte. Ltd. entered into a master purchase agreement with GSR Markets Pte. Ltd., which stated the purpose of the agreement was that Ripple Labs Singapore Pte. Ltd. "may seek to purchase XRP from [GSR Markets Pte. Ltd.] to offset amounts of XRP that [Ripple Labs Singapore Pte. Ltd.] is selling to its own customers for their use in cross board payments via [Ripple Labs Singapore Pte. Ltd.]'s On Demand Liquidity product." PX 187.

**Response:**     Defendants dispute that Paragraph 197 sets forth an independent statement

of material fact because it is duplicative of Paragraph 774 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 774.

198.    In or around July 2020, Ripple executed a trial period of XRP purchases in which it bought back ███% of the XRP volume that it sold in connection with XRP-O. PX 188.

**Response:**    Defendants dispute that Paragraph 198 sets forth an independent statement

of material fact because it is duplicative of Paragraph 775 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 775.

199.    Ripple's purchases and sales of XRP were part of its efforts to have and maintain "fair and orderly markets" in XRP. PX 26 ███ Tr.) at 90:6-25, 131:14-132:8.

**Response:**    Defendants dispute that Paragraph 199 sets forth an independent statement

of material fact because it is duplicative of Paragraph 784 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 784.

200.    According to GSR, Ripple bought XRP to have "fair and orderly" XRP markets and publicly made itself the buyer or seller "of last resort" for XRP. PX 26 (███ Dep. Tr.) at 90:9-25, 131:14-132:8, 167:17-25.

**Response:**    Defendants dispute that Paragraph 200 sets forth an independent statement

of material fact because it is duplicative of Paragraph 586 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 586.

201.    Ripple stated in its second quarter 2020 XRP markets report:  "As more financial institutions leverage RippleNet's ODL service, more liquidity is added into the XRP market. That said, Ripple has been a buyer in the secondary market and may continue to undertake purchases in the future at market prices." PX 501.15, available at https://ripple.com/insights/q2-2020-xrp-markets-report/ (2Q20 Market Report).

**Response:**    Defendants dispute that Paragraph 201 sets forth an independent statement

of material fact because it is duplicative of Paragraph 780 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their response to Paragraph 780.

202.    Ripple stated in its third quarter 2020 XRP markets report: "Ripple is purchasing – and may continue to purchase – XRP to support healthy markets." PX 501.16, available at https://ripple.com/insights/q3-2020-xrp-markets-report/ (3Q20 Market Report).

**Response:**    Defendants dispute that Paragraph 202 sets forth an independent statement of material fact because it is duplicative of Paragraph 781 of the SEC's Rule 56.1 Statement (ECF No. 629).  Defendants incorporate by reference their response to Paragraph 781.

203.    Among the deposits and payments in the second half of 2020, Ripple's bank accounts at ███████████ show deposits of proceeds from Ripple's XRP sales through ████ and ███████ while Ripple was making payments of $██████ to GSR to purchase XRP. PX296; PX 759; PX 754; PX 763.

**Response:**    Disputed, because the cited exhibits are insufficient to establish a relationship between Ripple's payments of approximately $██████ to GSR to purchase XRP and Ripple's bank accounts at ███████████ showing deposits of proceeds from Ripple's XRP sales through ████ and ███████ in the second half of 2020.  Defendants do not dispute the remainder of Paragraph 203 except to note that PX 763 indicates that Ripple made payments of *approximately* $██████ to GSR during the second half of 2020.

204.    XRP II, LLC Account No. ████ (PX 296) shows that between June and December 2020, Ripple received approximately $█████ from ████ and $█████ from ███████, and during that period on September 30, 2020 transferred $█████ to Ripple Services, Inc. Account No. ████ PX 759.

**Response:**    Undisputed, except that PX 759 indicates that on September 30, 2020, approximately $██████ was transferred to Ripple Services Inc. Account No ████

205.    Ripple Services Inc., Account No. ████ (PX 759) received a September 30, 2020 deposit of $█████ from XRP II, LLC, which is immediately transferred to Ripple Labs Account No. ████ PX 754.

**Response:**    Undisputed, except that PX 754 indicates that on September 30, 2020, approximately $██████ was transferred to Ripple Labs Inc. Account No. ████



206.     Ripple Labs Account No.▮▮▮▮ PX 754) received a September 30, 2020, $▮▮▮ deposit from Ripple Services Inc. Account No.▮▮▮▮ and between July and November 2020, transferred $▮▮▮▮ to Ripple Labs Singapore Account No.▮▮▮ (PX 763).

**Response:**     Undisputed, except that PX 754 indicates that on September 30, 2020, approximately $▮▮▮▮ was transferred to Ripple Labs Inc. Account No▮▮▮ and PX 763 indicates that between July and November 2020, Ripple Labs Account No.▮▮▮ transferred approximately $▮▮▮▮ to Ripple Labs Singapore Account No▮▮▮.

207.     Ripple Labs Singapore Account No.▮▮▮ received $▮▮▮▮ from Ripple Labs Bank Acct▮▮▮ between July and November 2020, and during that time made multiple payments to GSR totaling $▮▮▮▮ for Ripple's repurchases of XRP. PX 763.

**Response:**     Disputed because PX 763 is insufficient to establish a relationship between Ripple's payments of approximately $▮▮▮ to GSR to purchase XRP and Ripple Labs Singapore Account No.▮▮▮ receiving $▮▮▮ from Ripple Labs Bank Acct▮▮▮ between July and November 2020.  Defendants do not dispute the remainder of Paragraph 207, except to note that PX 763 indicates that Ripple Labs Account No▮▮▮ transferred approximately $▮▮▮▮ to Ripple Labs Singapore Account No.▮▮▮ between July and November 2020, and that Ripple Labs Singapore Account No.▮▮▮ made payments to GSR totaling approximately $▮▮▮▮ between July and November 2020.

208.     From the fourth quarter of 2018 through the fourth quarter of 2020, quarterly XRP trading volume attributable to ODL as a percent of total quarterly XRP trading volume never exceeded 1%, and was under 0.5% for every quarter except for the second quarter of 2020. PX 398 (Ferrante Decl.) ¶¶ 5-6, Exhibit 1 at 4.

**Response:**     Disputed.  Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).  Defendants dispute Paragraph 208 to the extent the SEC has not provided any methodology for the figures

cited in the paragraph, such as which XRP trading amounts were "attributable to ODL," as that

phrase is vague and ambiguous, or a source for "total quarterly XRP trading volume." The

assertions of fact in Paragraph 208 are vague and unclear because the SEC does not define time

parameters of measurement: for example, it is unclear whether Paragraph 208 is meant to assert

that quarterly XRP trading volume attributable to ODL never exceeded 1%, and was under 0.5%

of quarterly XRP trading volume, as measured each day, month, or quarter from the fourth

quarter of 2018 through the fourth quarter of 2020, or in sum total for that period.

209.    The total volume attributable to ODL, from October 2018 through December
2020, was 0.12% of total XRP market volume from August 2013 through December 2020. PX
398 (Ferrante Decl.) ¶ 9, Exhibit 3.

**Response:**      Disputed.  Defendants object that the Declaration of Christopher Ferrante

submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to

Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can

be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).  Defendants

dispute Paragraph 209 to the extent the SEC has not provided any methodology for the figures

cited in the paragraph, such as which XRP trading amounts were "attributable to ODL," as that

phrase is vague and ambiguous, or a source for "total XRP trading volume."  The assertions of

fact in Paragraph 209 are vague and unclear because the SEC does not define time parameters of

measurement: for example, it is unclear whether Paragraph 209 is meant to assert that total XRP

trading volume attributable to ODL was 0.12% of total XRP market volume as measured each

day, month, or quarter from August 2013 through December 2020, or in sum total for that period.

210.    In or around January 2020, the U.S.-based money transfer company called
MoneyGram International, Inc. ("MGI" or "MoneyGram") accounted for approximately 90% of
all ODL volume. PX 499 at RPLI_SEC 552757.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 499, as misleading, including because the cited

document reflects that a Ripple employee concluded, "[a]s of 1/1/20, MGI represents 94% of ODL $ value and 86% of ODL transactions."  PX 499 at RPLI_SEC 0552757.

211.   In 2019, Ripple made equity investments in MGI for $50 million. PX 8 (Ripple RFA Responses) No. 106.

**Response:**   Undisputed.

212.   Ripple invested $50 million in MGI and included additional investment incentives to incentivize MGI to use ODL. PX 36 (Garlinghouse Inv. Tr.) at 133:7-134:12.

**Response:**   Undisputed that in 2019, Ripple made equity investments in MGI of $50 million and also made additional payments to MGI in connection with ODL.  PX 8 at No. 106. Defendants dispute the SEC's implication in Paragraph 212 that Ripple's equity investment in MGI included or was tied to any investment incentives in the ODL program as misleading, because Ripple's investment in MGI and MGI's use of ODL were "two separate discussions," as MGI itself understood.  PX 624 (Angelilli Dep. Tr.) at 16:24-25, 17:12-17 ("Q. So, essentially, this is two separate transactions that you entered into, correct?  A.  Yes.  Q.  You viewed those as two separate issues, basically?  A.  Yes.").  Defendants further dispute that a witness's recollection provides the best evidence of the terms of Ripple's contractual agreements with MGI and direct the Court to the true and correct contents of the Share Purchase Agreement among MoneyGram International, Inc. and Ripple Labs Inc., dated June 17, 2019, which states that the "Commercial Agreement" for the use of ODL is a condition of closing the Share Purchase Agreement, but that the terms of the two agreements are separate.  Ex. 284 (SEC-LIT-EPROD-000082455) at SEC-LIT-EPROD-000082466 (Commercial Agreement is not a "Transaction Agreement" related to the equity investment); *id*. at SEC-LIT-EPROD-000082468 ("a copy of the Commercial Agreement, duly executed" is a condition of closing).

213.    In or around February 2020, Birla confirmed publicly on Twitter that Ripple paid MGI over $11 million to use ODL. PX 506.118; PX 623.

**Response:**    Disputed.  Defendants dispute that the cited exhibits support the SEC's assertion of fact that Birla "confirmed . . . that Ripple paid MGI over $11 million to use ODL"; the cited Twitter posts indicated that Ripple made payments to MGI in connection with ODL, but Birla did not confirm the amount that Ripple paid MGI.  Defendants further dispute Paragraph 213 because the cited evidence does not support the SEC's assertion of fact that Ripple paid MGI "to use ODL," because Birla wrote that "Ripple and MGI are strategic partners," and described the payments as "network incentives" similar to those offered in connection with other payment networks.  PX 623; *see also* response to Paragraph 212 (setting forth evidence distinguishing between ODL incentives and Ripple's equity investment in MGI); Ex. 11 (Ferrell Report) at 77-80 (providing examples of similar incentive programs to encourage adoption, including by Visa and Mastercard for adoption of their payment systems).  Defendants further dispute Paragraph 213 because Birla testified that, while he posted this text to his Twitter account, he did not recall authoring it himself.  *See* PX 15 at 235:2-21.  Defendants also dispute that Paragraph 213 sets forth an independent statement of material fact because it is duplicative of Paragraph 253 of the SEC's Rule 56.1 Statement (ECF No. 629).  Defendants incorporate by reference their response to Paragraph 253 of the SEC's Rule 56.1 Statement.

214.    Ripple placed restrictions on MoneyGram's sales of XRP it received as incentive payments to use ODL to avoid such sales having an impact on the XRP market, including on its price and volume. PX 36 (Garlinghouse Inv. Tr.) at 144:3-145:2.

**Response:**    Disputed because Garlinghouse testified that restrictions were placed on XRP sales by MoneyGram to "mitigat[e] the risk of unexpected impacts on the market" and not "to avoid" having any impacts generally, as set forth in PX 36 at 144:16-24.  Garlinghouse also testified that it is Ripple's intention generally to make sure Ripple's activities "don't have an

impact on the [XRP] market," and that he saw the restrictions placed on MoneyGram's sales as an extension of that objective.  *Id.*  In addition, the SEC's statements in Paragraph 214 are unsupported by evidence in the record, because Garlinghouse testified that he did not recall the specifics of restrictions placed on MGI's sales of XRP.  PX 36 at 144:7-13.  Finally, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 to the extent it implies anything untoward about Ripple having paid incentives to MoneyGram in connection with ODL, which is unsupported by any evidence.

215.    Garlinghouse viewed "MoneyGram an extension of Ripple's activities by virtue of using XRP as an incentive" and accordingly placed restrictions on MoneyGram's sales of XRP. PX 36 (Garlinghouse Inv. Tr.) at 144:3-145:2.

**Response:**        Undisputed that Garlinghouse offered the quoted testimony; however, Defendants do not concede that Paragraph 215 is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 including because Paragraph 215 omits additional context necessary to understand the testimony about the restrictions placed on MoneyGram's XRP sales, including that Garlinghouse also testified that restrictions were placed on MoneyGram's sales of XRP to minimize any unexpected impact on the XRP market. PX 36 at 144:16-24 ("It's our intention to make sure that the impact of Ripple's activities – and I would call MoneyGram an extension of Ripple's activities by virtue of using XRP as an incentive – that we don't have an impact on the market.  And so by putting restrictions – when I say the market, I'm referring to the XRP market.  By putting restrictions on their sales, we're mitigating the risk of unexpected impacts on the market through Ripple or its extended players like MoneyGram.").  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 to the extent it implies anything untoward about Ripple having paid incentives to MoneyGram in connection with ODL, which is unsupported by any evidence.

In addition, the SEC's statements in Paragraph 215 are unsupported by evidence in the record, because Garlinghouse testified that he did not recall the specifics of restrictions placed on MGI's sales of XRP.  PX 36 at 144:7-13.

216.    MoneyGram is among the top three money remitters in the world. PX 624 (Angelilli Dep. Tr.) at 30:18-25.

**Response:**    Undisputed that Angelilli offered the cited testimony; however, Defendants dispute the SEC's use of the term "top three money remitters," because it is undefined, vague and unclear, and is unsupported by the cited testimony.  PX 624 at 30:21-25 ("Q.  [H]ow do you rank as a money remitter?  A. . . . [W]e're usually considered the second largest or third largest depending on what metric you use.").  Defendants dispute that a statement by a single third-party deponent concerning an unspecified point in time is sufficient to establish the underlying fact set forth in Paragraph 216 at all times and for all purposes in this litigation.

217.    MoneyGram conducted a series of pilot tests of ODL from February 2018 through March 2019. PX 634 (Decl. of Lawrence Angelilli, dated Mar. 14, 2021 ("Angelilli Decl.")) ¶ 6.

**Response:**    Undisputed that PX 634 contains the cited text; however, Paragraph 217 omits additional context necessary to understand MGI's pilot testing of the ODL product, including that MGI began pilot testing on its own before speaking with Ripple about using ODL in 2019.  PX 624 at 12:16-15:9 (MGI began testing on its own, "not in conjunction with Ripple. I'm not sure Ripple had any knowledge that we did that.  It was really something that we did through -- any person in the public could do."); *id.* at 142:15-18 (testifying to the start of relationship with Ripple in 2019, after start of tests in February 2018, as described in Paragraph 217).  Given Angelilli's testimony that his declaration contained material errors that were never corrected during discovery, Defendants dispute that the declaration sets forth any undisputed material fact or can be relied upon to establish any undisputed material fact.  *See, e.g.*, PX 624 at 171:18-177:23 (demonstrating that MGI's own calculation for a $1,000 transaction from the U.S.

to Mexico using ODL in the Angelilli Declaration is incorrect, and that, using the correct math, ODL would be cheaper than traditional transfer methods); *compare* PX 634 (Angelilli Decl.) ¶ 42 (stating that MGI's financial benefits from using ODL were "entirely due to the substantial incentive payments provided by Ripple to MGI.") *with* PX 624 at 115:18-19 & 115:3-5 (testifying that ODL beneficially reduced MGI's capital requirements).  Defendants further dispute the credibility of the Angelilli Declaration because it was drafted by the SEC, not Angelilli, and any determinations about its credibility cannot be made at summary judgment but instead must be made by the trier of fact.  *See id.* at 21:24-23:7 ("The SEC drafted the first draft of this document based on my response or the company's response to questionnaires that they had provided.  So what they did is there was a series of questionnaires.  They took those answers and crafted them into the first draft of this document."); *id.* at 25:5-26:5 ("Q. How extensive were your edits?  A.  That's a really hard -- I don't know what extensive means.  Q.  Right.  Would you say that it was a heavily edited document from what they initially drafted?  A.  I don't know what heavily edited means.").

218.    MoneyGram's pilot tests of ODL showed that, although the speed of cross-border transactions was faster using ODL than traditional FX transactions, MGI experienced significantly higher trading costs using ODL than it did in using traditional FX trading and as a result, MoneyGram "concluded that the use of XRP in the ODL platform was cost prohibitive to MGI's business." PX 634 (Angelilli Decl.) ¶¶ 7-9.

**Response:**    Disputed.  Defendants do not dispute that PX 634 contains the quoted text; however, Defendants dispute that the results of MGI's pilot testing in 2018 and 2019 are sufficient to establish facts concerning ODL costs or profitability for all times and purposes in this litigation.  *See, e.g.*, Ex. 11 (Ferrell Report) at 75, 76 & Exhibit 18 (transaction failure rate declined to below 1% across all corridors by March 2020, 0.15% of the 12,675 transactions in Nov. 2020, and 0.00% of transactions in Dec. 2020, based on "[d]etailed ODL transaction data received from MoneyGram," while the cost to use ODL decreased over time as well).

Defendants further dispute that MGI experienced significantly higher trading costs using ODL than it did in using traditional FX trading and that the use of ODL was cost-prohibitive. *See* PX 634 at ¶¶ 39-40; PX 624 at 171:18-177:23 (demonstrating that MGI's own calculation for a $1,000 transaction from the U.S. to Mexico using ODL in the Angelilli Declaration is incorrect, and that, using the correct math, ODL would be cheaper than traditional transfer methods). Defendants incorporate by reference their objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

219.    After MoneyGram piloted the use of ODL to effect cross-border transfers of fiat currencies, MoneyGram concluded that ODL's "technology wasn't mature or sufficient to support [MoneyGram's] needs" and MoneyGram did not "view it as a viable product" for MoneyGram's purposes. PX 624 (Angelilli Dep. Tr.) at 14:7-24.

**Response:**    Disputed.  Paragraph 219 misstates Angelilli's testimony, which was not about MGI's use of ODL in connection with the 2019 pilot tests referenced in Paragraph 218, but about MGI's first "tests" conducted before Ripple's involvement.  *See* PX 624 at 14:14-24 (testifying that after six test transactions, "we continued to watch the technology, assuming that it was immature.  But at the time we didn't view it as a viable product for MoneyGram.  And I think that we, at the time after the end of the six transactions, viewed that it was probably the end of the test.  It was not in conjunction with Ripple.  I'm not sure Ripple had any knowledge that we did that.  It was really something that we did through -- any person in the public could do."). The testimony cited by the SEC does not support its broad assertions in Paragraph 219, which are broad, unqualified and temporally unbounded, as Angelilli's testimony does not concern any later uses of ODL by MGI conducted in cooperation with Ripple.

220.    MoneyGram was responsible for the vast majority of all ODL activity from late 2018 through December 2020. *See* PX 621 ¶ 29 & Figure 2; PX 624 (Angelilli Dep. Tr.) at 76:19-77:8 (testifying that "[s]tarting in the spring of 2020, and through the end of the

relationship" between MoneyGram and Ripple, MoneyGram determined that MoneyGram's ODL transactions constituted in excess of 90 to 95 percent of …total volume on ODL").

**Response:**   Undisputed that MGI was responsible for a majority of monthly ODL transaction volume during the stated period.  Defendants object pursuant to Fed. R. Civ. P. 56(c)(2) that the SEC has not offered the evidence set forth in this paragraph in a form that would be admissible at trial, as the testimony of ▇▇▇▇▇ is inadmissible for the reasons set forth in Defendants' motion to exclude (ECF No. 544.), and the cited testimony is a hearsay statement of a third party relayed by Angelilli and not a statement by Ripple or the Individual Defendants.  PX 624 at 76:21-22, 77:9-13 (Angelilli testifying that the basis for his estimate was "a couple public Web sites that you can go to that show ODL volume" that "we started to become aware of," and that he was "constantly made aware of -- of that [trading volume] stat").

221.   Lawrence Angelilli is the Executive Vice President and Chief Financial Officer (CFO) of MoneyGram. PX 634 (Angelilli Decl.) ¶ 1.

**Response:**   Undisputed that Angelilli was Executive Vice President and Chief Financial Officer of MoneyGram as of March 14, 2021, the date of the declaration in PX 634; however, Defendants dispute that Angelilli currently holds that position.  *See* Ex. 285 (MoneyGram International, Inc., Current Report (Form 8-K) (Aug. 5, 2022), Ex. 99.1 (Press release dated Aug. 5, 2022), https://www.sec.gov/Archives/edgar/data/1273931/00012739 3122000094/mgi2022q2earningsrelease.htm) ("As announced yesterday, Brian Johnson, who currently serves as Head of Corporate Finance and Global Treasurer, has been named Chief Financial Officer, effective September 1, 2022. He succeeds Larry Angelilli . . . .").  Defendants incorporate by reference their objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

222.     As part of his role as MoneyGram's CFO, Angelilli became familiar with Ripple, ODL, MoneyGram's transactions with Ripple, and MoneyGram's experiences using ODL to effect cross-border transfers of fiat currencies. PX 634 (Angelilli Decl.) ¶¶ 1, 5-44.

**Response:**     Undisputed that Angelilli, as MoneyGram's CFO during the relevant time, was generally familiar with MGI's use of ODL.  Defendants incorporate by reference their objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

223.     In a meeting with Ripple executives, MoneyGram officials explained to ███████, then Ripple's Senior Vice President of Institutional Markets, Corporate & Business Development, that it was familiar with ODL and "that it was not economically viable." PX 624 (Angelilli Dep. Tr.) at 14:25-15:24.

**Response:**     Undisputed that Angelilli's testimony contains the quoted text; however, Defendants dispute the SEC's characterization of Angelilli's testimony because Angelilli was referring to MGI's first tests using ODL without Ripple's involvement, not ODL generally or MGI's subsequent pilot tests of ODL conducted in cooperation with Ripple.  PX 624 at 15:20-25 ("[H]e [Garlinghouse] introduced his team. ████████████ was introduced to us as sort of a lead.  And at that time we explained to █████ that we had already had familiarity with the product, that it was not economically viable.  And we were told that -- you know, that we should take another look at it . . . ."); *id.* at 142:15-18; *id.* at 65:13-17 ("We did two separate pilots.  We did that one that I described previously, which was before Ripple even knew about us.  And then we did a subsequent pilot of 6 transactions that was done, I think, probably in conjunction with what you're looking at.").

224.     Ripple offered to invest in MoneyGram, and entered into an equity investment agreement in or around June 2019, pursuant to which Ripple ultimately purchased $50 million worth of MoneyGram stocks and warrants. PX 624 (Angelilli Dep. Tr.) at 16:21-17:4, 179:21-180:6; PX 634 (Angelilli Decl.) ¶ 12.

**Response:**     Undisputed; however, Defendants note that this paragraph is duplicative of Paragraphs 211 and 212, and Defendants incorporate by reference their responses to those

paragraphs. Defendants also incorporate by reference their objection to the use of the Angelilli

Declaration to establish any undisputed material fact, as set forth in the response to Paragraph

217.

225.    In or around June 2019, MoneyGram and Ripple also entered into a commercial
agreement, in which Ripple agreed to make a number of payments to MoneyGram in connection
with MoneyGram's use of ODL. PX 634 (Angelilli Decl.) ¶¶ 13-16.

**Response:**    Undisputed; however, Defendants incorporate by reference their objection

to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the

response to Paragraph 217. Defendants further note that this paragraph is duplicative of

Paragraphs 226 and 227, and Defendants incorporate by reference their responses to those

paragraphs.

226.    Pursuant to its commercial agreement with MoneyGram, Ripple agreed to
"reimburse MGI sufficiently to be within 5 basis points of the prevailing Reuters Benchmark
spot FX rate … on each transaction," which meant MGI would not incur the excessive costs of
trading XRP that MGI had previously experienced in its pilots of ODL. PX 634 (Angelilli Decl.)
¶ 14.

**Response:**    Undisputed that Ripple agreed to "provide[] to [MGI] make-whole

payments in XRP . . . to bring such rates within five (5) basis points (0.05%) of the FX Spot Rate

at the time of the transaction . . . ." *See* Ex. 286 (RPLI_SEC 0239684) at RPLI_SEC 0239685.

Defendants dispute the remainder of Paragraph 226, including its use of the phrase "excessive

costs," which is argumentative, vague, ambiguous, and not fairly supported by the underlying

documents. Defendants incorporate by reference their objection to the use of the Angelilli

Declaration to establish any undisputed material fact, as set forth in the response to Paragraph

217.

227.    In order to ensure that the exchange rates charged by the ODL platform will be
within 5 basis points of the prevailing Reuters Benchmark spot FX rate, Ripple agreed in the

commercial agreement to pay "make-whole" payments if necessary, in XRP and withdrawn by MGI daily from a designated digital asset wallet. PX 634 (Angelilli Decl.) ¶ 22.

**Response:**    Undisputed that Ripple agreed to "provide[] to [MGI] make-whole

payments in XRP . . . to bring such rates within five (5) basis points (0.05%) of the FX Spot Rate

at the time of the transaction . . . ." Ex. 286 at RPLI_SEC 0239685. Defendants incorporate by

reference their objection to the use of the Angelilli Declaration to establish any undisputed

material fact, as set forth in the response to Paragraph 217. Defendants further note that this

paragraph is duplicative of Paragraph 226, and Defendants incorporate by reference their

response to that paragraph.

228.    Pursuant to its commercial agreement with MoneyGram, Ripple agreed to make the ODL platform available to MoneyGram Payment Systems ("MPSI"), a wholly-owned subsidiary of MGI, and to provide support services, both free of charge. PX 634 (Angelilli Decl.) ¶ 15.

**Response:**    Undisputed; however, Defendants incorporate by reference their objection

to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the

response to Paragraph 217.

229.    MGI did not pay any compensation to Ripple and had no obligation to do so under the commercial agreement with Ripple. PX 634 (Angelilli Decl.) ¶ 19.

**Response:**    Undisputed; however, Defendants incorporate by reference their objection

to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the

response to Paragraph 217.

230.    Pursuant to its commercial agreement with MoneyGram, Ripple agreed to pay MPSI certain amounts of XRP based on the volume of USD equivalent purchases that MPSI transacted using ODL: "Effectively, MPSI is compensated [by Ripple] for developing and bringing liquidity to the XRP marketplace." PX 634 (Angelilli Decl.) ¶ 16.

**Response:**    Disputed. Defendants do not dispute that PX 634 contains the quoted text,

exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute

that Ripple compensated MPSI for "developing and bringing liquidity to the XRP marketplace,"

since the agreements between Ripple and MGI linked such payments to the volume of MPSI's

ODL transactions only, not creating liquidity in the XRP marketplace. *See* Ex. 286 at

RPLI_SEC 0239688 (linking incentive payments to use of the ODL product); *see also* Ex. 11

(Ferrell Report) at 77-80 (providing examples of similar incentive programs to encourage

adoption, including by Visa and Mastercard for adoption of their payment systems); PX 624

(Angelilli Dep. Tr.) at 83:12-24 ("Q.  Is that a phenomenon, of providing those types of

incentives to get big headline customers, is that something that you're familiar with in the

business world?  A.  Yes.  Q.  Can you think of other companies that -- that do that these days?

A.  You know, in Internet commerce you see it all the time, where people will lead with a low

price or even lose money in the initial phases of their growth curve.  Q.  Was it your

understanding that some of the incentives that Ripple was providing to you was because of that

dynamic?  A.  Yes.").  Defendants incorporate by reference their objection to the use of the

Angelilli Declaration to establish any undisputed material fact, as set forth in the response to

Paragraph 217.

231.    Ripple initially agreed to pay MPSI an amount of XRP equal to $3.5 million if
MPSI's XRP transaction volume using ODL met or exceeded $30 million before March 31,
2020. PX 634 (Angelilli Decl.) ¶ 23.

**Response:**    Undisputed; however, Defendants incorporate by reference their objection

to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the

response to Paragraph 217.

232.    An amendment to the commercial agreement executed in or around September
2019 accelerated the bonus from March 2020 to September 2019 if MPSI reached a transaction
volume of $15 million. PX 634 (Angelilli Decl.) ¶ 25.

**Response:**    Undisputed that the amendment to the commercial agreement provided

that "Ripple will pay Customer an amount of XRP equal to US$3,500,000 if the Transaction

Volume equals or exceeds US$15,000,000 on or before September 30, 2019."  Ex. 287 (SEC-

LIT-EPROD-000077210).  Defendants dispute this represents an "accelerat[ion]," as such term

is not fairly supported by the underlying documents, and the term is vague and ambiguous.

Defendants further dispute that Angelilli's declaration provides the best evidence of the terms of

Ripple's contractual agreements with MPSI and direct the Court to the true and correct contents

of Amendment #1 to Ripple Master Hosted Services Agreement and Ripple Work Order #1

among Ripple Services, Inc. and MoneyGram Payment Systems, Inc., dated September 25, 2019,

which contains the provision referred to in Paragraph 232.  *See* Ex. 287 (SEC-LIT-EPROD-

000077210).  Defendants incorporate by reference their objection to the use of the Angelilli

Declaration to establish any undisputed material fact, as set forth in the response to Paragraph

217.

233.    An amendment to the commercial agreement executed in or around December
2019 added new bonus opportunities, adjusted certain bonus thresholds, and added a $5 million
bonus payable to MGI at the end of 2019, as well as identifying MGI not as a customer of
Ripple, but as Ripple's "Service Provider." PX 634 (Angelilli Decl.) ¶ 28.

**Response:**      Undisputed that PX 634 and the underlying amended commercial

agreement (PX 629) contain the cited text, including a description of MGI as a "service

provider"; however, Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from, PX 634, as misleading because MGI requested the change to "Service

Provider" to address MGI's concern about "an arcane accounting rule regarding vendors."  PX

624 at 145:17-147:16 ("Q.  That amendment to the commercial agreement that now identified

MGI as a service provider, who requested that amendment?  A.  I did.  Q.  Why did you request

that amendment?  A.  Part of the confusion around our accounting treatment was the

interpretation under the contract that Ripple was a vendor of MoneyGram, which was making us

subject to an arcane accounting rule regarding vendors.  And it was our hope that by changing

the definition of the agreement, it would clear up any ambiguity around that issue."); *see also id.*

at 155:22-25 ("Q.  So the question about whether you were a service provider versus a customer, that wasn't really relevant to you?  A.  I didn't care.").  Defendants further dispute that Angelilli's declaration provides the best evidence of the terms of Ripple's contractual agreements with MPSI and direct the Court to the true and correct contents of the Amended and Restated Ripple Work Order #1 among Ripple Services Inc. and MoneyGram Payment Systems, Inc., signed December 30-31, 2019, which contains the provision referred to in Paragraph 233. *See* PX 629 (MONEYGRAM_SEC_0000658) at MONEYGRAM_SEC_0000662-670 (describing provisions of "Market Development Services" and "Market Development Performance Bonus").  Defendants incorporate by reference their objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

234.    MoneyGram sold the XRP it received as payments from Ripple within one trading day of receipt or as soon as practicable. PX 634 (Angelilli Decl.) ¶ 24.

**Response:**     Disputed.  Undisputed that PX 634 purports to assert that MGI sold its XRP within one trading day of receipt or as soon as practicable, but Defendants do not have an independent basis to admit or deny the truth of the statements set forth in Paragraph 234. Defendants incorporate by reference their objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

235.    Ripple represented to MoneyGram that "the majority of [Ripple's] efforts" were "focused on trying to increase liquidity in the markets" in which MoneyGram transacted. PX 624 (Angelilli Dep. Tr.) at 19:15-25.

**Response:**     Disputed.  Defendants dispute that Angelilli's testimony is sufficient to establish the SEC's assertion of fact as to what Ripple represented to MGI, since Angelilli is a third party who cannot speak for Ripple as an entity.  Defendants further dispute Paragraph 235 to the extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to

evidence, including the SEC's statement that Ripple's "efforts" were directed toward a particular goal. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 624, as misleading, including because Paragraph 235 omits additional context necessary to understand the cited testimony, including that Angelilli was opining about Ripple's efforts under the agreements with MGI to make ODL more functional for MGI's use case—not Ripple's efforts more generally. PX 624 at 19:18-25 ("We [MGI] had established a list of currencies that were the most advantageous for MoneyGram, where we would be able to provide the most liquidity on our side. We compared notes with them. We gave them a list. And they had a team diligently trying to establish counterparties in those markets."); *see also, e.g.*, PX 629 (MONEYGRAM_SEC_0000658) (Amended and Restated Ripple Work Order #1 between MoneyGram Payment Services, Inc. and Ripple Services Inc., dated Dec. 31, 2019) at MONEYGRAM_SEC_0000658 (allowing Ripple to "suspend or terminate" MGI's use of a payment corridor "if it is not commercially reasonable to operate the Ripple ODL Platform in such Corridor," but incentivizing Ripple to build liquidity to keep corridors functioning).

236.     MoneyGram's view, as expressed by its CFO, is that ODL was "not viable from its effectiveness as a … product" because it "wasn't viable from a – a commercial standpoint, where [MoneyGram] would use it as an alternative to traditional foreign exchange markets." PX 624 (Angelilli Dep. Tr.) at 20:2-12.

**Response:**     Disputed. Defendants do not dispute that Angelilli offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC, but Defendants do not have an independent basis to admit or deny statements concerning MGI's state of mind or opinion as set forth in Paragraph 236. Defendants dispute the SEC's characterization insofar as it seeks to establish facts concerning ODL for all times and purposes in this litigation, because Angelilli was testifying concerning his impressions in 2019 at the start of MGI's use of ODL and did not testify that ODL could not one day become commercially viable. PX 624 at 20:10-15

("A…. it wasn't viable from a – a commercial standpoint, where we would use it as an alternative to traditional foreign exchange markets.  Q.  And was that a possibility over time, that it could become --  A.  That was the hope.  That was the expectation.").  Defendants further dispute that MGI did not find ODL viable or effective, because Angelilli's testimony is contradicted by other evidence in the record, including Angelilli's testimony that ODL had other benefits leading MGI to enter into its agreement with Ripple.  PX 624 at 217:9-20 ("Q.  I think you said -- I just want to make sure the record is clear on this – besides the make-whole payments, there were other reasons why MoneyGram thought the use of the ODL product has promise; is that fair?  A.  Yes.  Q.  And just for the purpose of the record here, can you state what those reasons were?  A.  We were genuinely interested in being on the forefront of blockchain technology.  And we wanted to -- if -- use any technology to reduce the size of our balance sheet.  And the fact that this checked both of those boxes, it made this more interesting to us."); *id*. at 115:18-19 ("[T]he benefit of being in the cash market was the principal benefit at that time regardless" of benefits from the contract with Ripple); *id*. at 115:3-5 (testifying that ODL benefitted MGI by "shortening the time from basis risk, [so] that [MGI] w[as] buying the currency at the time that [it] needed it rather than on a T+2 sell"); *id*. at 89:15-89:22 ("Q.  And so the concept here is the ODL product would allow you to use the cash market, which has benefits over the spot market?  A.  From a working capital and from a basis risk perspective.  Q.  And that was a positive aspect of -- of the ODL product, as you understood it at the time?  A.  Yes."); *id*. at 119:15-19 ("Q.  So some of the benefits that might flow from ODL you couldn't necessarily point to a place on the balance -- on the balance sheet or income statement that might show that benefit, but it still would exist?  A.  Yes.").

237.    Foreign exchange markets are typically very deep and liquid. PX 624 (Angelilli Dep. Tr.) at 31:16-23; PX 621 ¶ 27.

**Response:**    Disputed.  Defendants dispute the SEC's use of the term "foreign exchange markets," because it is undefined, vague and unclear.  Defendants further dispute Paragraph 237 because it mischaracterizes Angelilli's testimony, since Angelilli offered additional testimony under oath that contradicts and qualifies the testimony cited in Paragraph 237, including testimony acknowledging higher costs and lower liquidity in certain thinly traded foreign exchange markets.  PX 624 at 55:17-21 ("[I]n certain like thinly traded currencies, every trade can be different.  And we just look at it as a spread to the index.  We don't know how much they're taking for themselves or how much is just due to liquidity factors in the market").  Defendants object pursuant to Fed. R. Civ. P. 56(c)(2) that the SEC has not offered the evidence set forth in this paragraph in a form that would be admissible at trial, as the testimony of ███ ███ is inadmissible for the reasons set forth in Defendants' motion to exclude (ECF No. 544) and is in any event contradicted by Angelilli's testimony quoted in this response to Paragraph 237.

238.    MoneyGram's transaction size permits it to have large efficient transactions in the foreign exchange markets. PX 624 (Angelilli Dep. Tr.) at 31:16-23.

**Response:**    Disputed.  Undisputed that Angelilli offered the cited testimony. Defendants dispute the SEC's use of the term "foreign exchange markets," because it is undefined, vague and unclear.  Defendants further dispute that a statement by a single third-party deponent concerning an unspecified point in time is sufficient to establish the underlying fact set forth in Paragraph 238 at all times and for all purposes in this litigation.

239.    When it began using ODL, MoneyGram theorized that ODL might not need to tie up capital to fund the settlement of transactions, but "[i]n practice, it didn't work that way" because "the introduction of [crypto asset] exchanges into the ODL process … was actually

extremely inefficient in terms of its impact on [MoneyGram's] working capital." PX 624 (Angelilli Dep. Tr.) at 41:3-19.

**Response:**     Undisputed that Angelilli offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, Angelilli's testimony as misleading, because Angelilli also testified that MGI did not consider capital costs to be a significant issue, *see* PX 624 at 44:19-21 ("The working capital argument was a secondary argument that we thought was -- if I could just use a common term -- like frosting on the cake."); that MGI was aware of Ripple-proposed solutions to ODL capital costs, but chose not to pursue any of them, PX 624 at 43:13-21; and that capital costs are extremely large for traditional remittances, *see* PX 634 (Angelilli Decl.) ¶ 3 (MoneyGram typically needs to hold over $250 million in working capital at all times for traditional remittances).

240.     Even if exchange costs were theoretically lowered, MoneyGram's CFO believed that ODL would remain less efficient than traditional payment rails, both because trading on digital asset exchanges was expensive and the exchanges required MoneyGram to post collateral, so there was "no benefit to using the ODL service." PX 624 (Angelilli Dep. Tr.) at 41:23-42:18.

**Response:**     Undisputed that Angelilli offered the cited testimony, but Defendants do not have an independent basis to admit or deny statements concerning Angelilli's state of mind or opinion as set forth in Paragraph 240.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, Angelilli's testimony as misleading, because Angelilli conceded that he was aware that the need to post collateral would have been eliminated had MGI purchased XRP from Ripple, as Ripple had proposed.  *See* PX 624 at 43:13-21; *see also* PX 634 at ¶¶ 39-40; PX 624 at 171:18-177:23 (demonstrating that MGI's own calculation for a $1,000 transaction from the U.S. to Mexico using ODL in the Angelilli Declaration is incorrect, and that, using the correct math, ODL would be cheaper than traditional transfer methods); *id*. at 119:10-19 ("Q.  So some of the benefits that might flow from ODL you couldn't necessarily

point to a place on the balance -- on the balance sheet or income statement that might show that

benefit, but it still would exist?  A.  Yes.").

241.    MoneyGram employees had "repeated conversations" with Ripple employees
"about the lack of cost-effectiveness" of ODL. PX 624 (Angelilli Dep. Tr.) at 44:4-45:11.

**Response:**      Disputed.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the

SEC cannot present the facts asserted in Paragraph 241 in admissible form on the basis of

Angelilli's testimony, as the quoted testimony is a hearsay statement of a third party relayed by

Angelilli and not a statement by Ripple or the Individual Defendants.  PX 624 at 44:8-14 ("I was

not a direct party to those discussions.  We had been having repeated conversations with them

about the lack of cost-effectiveness.").

242.    MoneyGram shared with Ripple its "observations about higher costs incurred
doing foreign doing foreign currency exchanges using the ODL product" "on numerous
occasions," as it was a "regular agenda item" discussed "frequently" during Ripple's weekly
meetings with MoneyGram. PX 624 (Angelilli Dep. Tr.) at 190:2-15.

**Response:**      Undisputed that Angelilli offered the quoted testimony; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

Angelilli's testimony as misleading, because Angelilli testified only that in meetings with Ripple

the efficiency of ODL payment corridors was regularly discussed and merely agreed with the

SEC's statement that "higher costs incurred doing foreign currency exchanges using the ODL

product" were discussed.  PX 624 at 190:2-15 ("I wasn't party to all the meetings that were

taking place, but there was a weekly meeting between our treasury function and -- and the Ripple

staff.  And progress on the efficiency of those markets was a regular agenda item that was

discussed, probably ad hoc, but frequently.").  Defendants object that the SEC cannot present the

facts asserted in Paragraph 242 in admissible form on the basis of Angelilli's testimony, as the

quoted testimony is a hearsay statement of a third party relayed by Angelilli and not a statement

by Ripple or the Individual Defendants.

243.     According to MoneyGram's CFO, Ripple was "highly motivated" to solve the problem of ODL's lack of cost-effectiveness because it was obligated to reimburse MoneyGram for certain ODL-related expenses as part of the parties "make-whole agreement," and as ODL "transactions became less and less efficient, the amount of the make-whole [that Ripple was obligated to pay MoneyGram] was going up." PX 624 (Angelilli Dep. Tr.) at 44:4-45:11; PX 626 (Ripple April 2020 ODL Account Review stating "Ripple is incurring $2 of liquidity cost for every $1 of incentives we pay MGI").

**Response:**     Undisputed that Angelilli offered the quoted testimony; however,

Defendants dispute that the testimony of a third party can establish whether Ripple was "highly

motivated."  Defendants further dispute Paragraph 243 because PX 626 is misleadingly and

inaccurately quoted and in fact contradicts the SEC's purported assertion of fact in Paragraph

243.  In particular, PX 626 at RPLI_SEC 0688736 shows the MGI ODL agreement cost Ripple

1.55% per dollar of MGI's ODL transactions to cover exchange fees, market maker fees and "FX

rebate," and 0.91% for incentives paid to MGI, thus accounting for nearly twice as much in costs

for Ripple in fees as in incentives.  The "FX rebate," which is the "make-whole" referenced in

Paragraph 261 (*see* Paragraph 254 and response to Paragraph 253) is listed as 0.74% of the cost,

under 50% of Ripple's total expenses per dollar of ODL transactions, not 67% as incorrectly

stated by Paragraph 243.

244.     According to MoneyGram's CFO, ODL's "reliability decreased over time, and it tended to become less reliable the more volume that [MoneyGram] w[as] putting through it." PX 624 (Angelilli Dep. Tr.) at 47:11-17.

**Response:**     Undisputed that Angelilli offered the quoted testimony, exclusive of any

alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, Angelilli's testimony as misleading,

because Angelilli agreed that ODL "work[ed] in terms of the speed that it promises" and the

"24/7 ability to do trades," and he testified that ODL was "extremely effective in getting those

trades through…seven days a week."  PX 624 at 45:17-47:10.  Defendants further dispute the

accuracy of Angelilli's statement that the reliability of ODL decreased over time, which is

contradicted by other evidence in the record.  *See* Ex. 11 (Ferrell Report) at 75 ("ODL technical

efficiency improved over MoneyGram's tenure.  For example, during MoneyGram's tenure, the

percentage of failed transactions decreased: approximately 11% of transfers failed during the

first month of operation of the USD-MXN corridor, and no transfers failed during December

2020.  Across all corridors, approximately 10% of transactions failed in May 2019, but the

number and percentage of failed transactions decreased.  By December 2019, the failure rate was

on average below 1% across all corridors."); *id.* at 101 (transaction failure rate declined to below

1% across all corridors by March 2020, to 0.15% of the 12,675 transactions in Nov. 2020, and to

0.00% of transactions in Dec. 2020, based on "[d]etailed ODL transaction data received from

MoneyGram").

245.    The FX cost associated with MoneyGram's cross-border transfers using traditional payment rails was approximately a half a basis point to one basis point for G10 countries, and between one and five basis points for non-G10 countries "[a]nd probably much closer to one." PX 624 (Angelilli Dep. Tr.) at 53:23-56:5.

**Response:**    Undisputed that Angelilli offered the quoted testimony, exclusive of any

alterations, omissions, or additions by the SEC.  Defendants dispute that a statement by a single

third-party deponent concerning an unspecified point in time is sufficient to establish the

underlying fact set forth in Paragraph 245 at all times and for all purposes in this litigation.

246.    MoneyGram also incurs banking fees, including a wire transfer fee of approximately $15, in effecting cross-border transfers using traditional payment rails, where "the value of aggregation" is evident in that "if [MoneyGram is] trading $10 million of foreign exchange in one day and [it is] not having costs per transaction, [banking fees] can be de minimis, because [MoneyGram is] spreading the cost of those transactions across one large trade." PX 624 (Angelilli Dep. Tr.) at 56:6-57:6, 58:5-11.

**Response:**    Undisputed that Angelilli offered the quoted testimony, exclusive of any

alterations, omissions, or additions by the SEC, but Defendants do not have an independent basis

to admit or deny the truth of the statements set forth in Paragraph 246 because they pertain to

MoneyGram's internal business practices.  Defendants dispute that a statement by a single third-

party deponent concerning an unspecified point in time is sufficient to establish the underlying fact set forth in Paragraph 246 at all times and for all purposes in this litigation.

247.     Normally, all money remitters aggregate transactions transferring money across jurisdictions, in the way that MoneyGram does. PX 624 (Angelilli Dep. Tr.) at 79:8-12.

**Response:**     Undisputed that Angelilli offered the cited testimony, but Defendants do not have an independent basis to admit or deny the truth of the statements set forth in Paragraph 247 because they pertain to the business practices of third parties.  Defendants dispute that a statement by a single third-party deponent concerning an unspecified point in time is sufficient to establish the underlying fact set forth in Paragraph 247 at all times and for all purposes in this litigation.

248.     A money transmitter would not be able to effect remittance-by-remittance transfers through ODL because of ODL trade failures and higher cost structure. PX 624 (Angelilli Dep. Tr.) at 79:16-80:15.

**Response:**     Disputed because the cited evidence does not support the SEC's broad, unqualified, and temporally unbounded assertion that, at all times, ODL has suffered from "trade failures and higher cost structure."  *See* Ex. 11 (Ferrell Report) at 75-76, 101 & Exhibit 18 (transaction failure rate declined to below 1% across all corridors by March 2020, to 0.15% of the 12,675 transactions in Nov. 2020 and to 0.00% of transactions in Dec. 2020, based on "[d]etailed ODL transaction data received from MoneyGram," while the cost to use ODL decreased over time as well).  Defendants further dispute the accuracy of MGI's calculations and accuracy of the purported fact asserted by the SEC in Paragraph 248 that ODL had an inherently more expensive cost structure than MGI's traditional remittance operation.  *See* PX 634 at ¶¶ 39-40; PX 624 at 171:18-177:23 (demonstrating that MGI's own calculation for a $1,000 transaction from the U.S. to Mexico using ODL in the Angelilli Declaration is incorrect, and that, using the correct math, ODL would be cheaper than traditional transfer methods).

249.   Even if ODL's failure rate were reduced, another money transmitter using ODL to effect remittance-by-remittance transfers would not be able to compete with MoneyGram because MoneyGram's foreign exchange rate would always be more favorable due to the larger size of its foreign exchange transactions. PX 624 (Angelilli Dep. Tr.) at 80:16-82:2.

**<u>Response:</u>**   Undisputed that Angelilli offered the cited testimony; however, Angelilli's

testimony was speculation or hypothetical testimony, and Defendants accordingly dispute that

Paragraph 249 sets forth an undisputed material fact.  To the extent the SEC seeks to rely on this

speculation or hypothetical testimony, Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, Angelilli's testimony as misleading because Angelilli later

testified that multiple smaller ODL transactions could be more efficient and competitive against

MGI and its aggregated foreign exchange transactions.  *See* PX 624 at 110:17-111:4 ("Q…. so

doing a number of smaller transactions throughout the day, which would allow you to dollar-cost

average the cost of those, could be actually as beneficial as doing one transaction that has

efficiencies because it's a large transaction?  A.  Theoretically, yes.  Q.  And that was something

you thought was possible at the time?  A.  Yes."); s*ee also* Ex. 288 (SEC-LIT-EPROD-

000084345) at SEC-LIT-EPROD-000084345 (Aug. 21, 2019 internal MGI email acknowledging

that "spread is always going to be bigger with higher clip sizes, given the weighted exchange

fees.").

250.   When Western Union publicly stated that it had tried out Ripple and its product did not work, MoneyGram's CFO surmised that Western Union likely arrived at the same result that MoneyGram had when it piloted the use of ODL, "but [MoneyGram] signed a commercial agreement that had indemnifications in it that shielded [MoneyGram] from those losses." PX 624 (Angelilli Dep. Tr.) at 89:23-90:23; *see also* PX 562.

**<u>Response:</u>**   Undisputed that Angelilli offered the quoted testimony; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

Angelilli's testimony as misleading because Angelilli testified he was generally speculating, and

the SEC's statement is therefore not a fact supported by the record.  PX 624 at 207:2-5 ("Until

this statement, we had no knowledge of their activity with Ripple.  And so it was merely my

presumption that their tests would have been the same as ours, but we don't know that.").

Moreover, the SEC's purported assertion of fact in Paragraph 250 is contradicted by evidence in

the record, specifically that MGI's press FAQs at the time indicated that the company believed

Western Union's experience was not generalizable or relevant to MGI.  Ex. 289 (SEC-LIT-

EPROD-000082865) at SEC-LIT-EPROD-000082871 ("We cannot speak to Western Union's

experience, but what we can tell you is that for the duration of our initial partnership announced

in January 2018, Ripple has been an outstanding partner and has had a positive impact on our

business.  This is one of the reasons why we have decided to enter into the partnership

announced today.").  Defendants further object that the SEC cannot present the purported fact

that "Western Union publicly stated that it had tried out Ripple and its product did not work"

asserted in Paragraph 250 in admissible form on the basis of Angelilli's testimony, as Angelilli

offered a hearsay statement of a third party and not a statement by Ripple or the Individual

Defendants.  PX 624 at 90:11-14 ("On an earnings call, where their chairman and CEO was

responding to a question about their interest in blockchain and cryptocurrencies, he made a

statement that said, well, we tried out Ripple and it doesn't work.").  Defendants further dispute

that PX 562 supports the SEC's statement in Paragraph 250, as the document only shows

Western Union employees discussing potential downsides of ODL, while noting employees "are

meeting with Ripple in NYC next week."  PX 562 at WU_RIPPLE0007260.

251.    MoneyGram use of ODL, because it was indemnified by Ripple, was a "sort of a
no-downside agreement" for MoneyGram. PX 624 (Angelilli Dep. Tr.) at 90:24-91:8.

**Response:**    Undisputed that Angelilli offered the quoted testimony.

252.    XRP was not functioning as a currency as part of ODL, and rather "was functioning as …a digital unit of measure that wasn't a currency." PX 624 (Angelilli Dep. Tr.) at 113:22-114:5.

**Response:**    Undisputed that Angelilli offered the quoted testimony; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

Angelilli's testimony as misleading because Angelilli was describing how the rapid movement of

XRP through ODL mitigated the risk stemming from the volatility of XRP price.  PX 624 at

113:12-21 ("Q.  What do you mean by 'using cryptocurrency as a unit of measure'?  A.  One of

the concerns among regulators, banks and the market in general was the volatility of the token.

And what I was attempting to describe here is that there was a period of time between where we

had to buy crypto and sell crypto, that that window was so short, that it was really serving as a

mechanism to transfer from one exchange to the other rather than posing a volatility risk to the

company.").  Moreover, even by Angelilli's own description of XRP as a unit of measure, XRP

and ODL had utility as a tool for foreign currency exchange transactions.  PX 624 at 114:6-8

("Q.  So it had utility as a digital transfer mechanism?  A.  Yes.").  Defendants further dispute

Paragraph 252 to the extent it sets forth legal conclusions, inferences, or assertions unsupported

by citations to evidence, including the SEC's statement that XRP did not function as a currency.

253.    MoneyGram benefitted from using ODL only because they "were actually making money doing it because of the make-whole and the incentives" paid to MoneyGram by Ripple. PX 624 (Angelilli Dep. Tr.) at 115:6-22.

**Response:**    Disputed, because the SEC's statement in Paragraph 253 that MGI

benefited from ODL "only" from incentives is contradicted by evidence in the record, including

Angelilli's testimony that the primary benefit of ODL was the ability to engage in cheaper

foreign currency transactions (the "cash market") than MGI's standard transactions (the "T+2

sell").  PX 624 at 115:18-19 ("the benefit of being in the cash market was the principal benefit at

that time regardless" of benefits from the contract with Ripple); *id.* at 115:3-5 (testifying that

114

ODL benefitted MGI by "shortening the time from basis risk, [so] that [MGI] w[as] buying the currency at the time that [it] needed it rather than on a T+2 sell."); *id*. at 88:9-89:22 (explaining the difference in FX market types and testifying: "Q.  And so the concept here is the ODL product would allow you to use the cash market, which has benefits over the spot market?  A.  From a working capital and from a basis risk perspective.  Q.  And that was a positive aspect of -- of the ODL product, as you understood it at the time?  A.  Yes."); *id*. at 217:9-20 ("Q….I think you said -- I just want to make sure the record is clear on this -- besides the make-whole payments, there were other reasons why MoneyGram thought the use of the ODL product has promise; is that fair?  A.  Yes.  Q.  And just for the purpose of the record here, can you state what those reasons were?  A.  We were genuinely interested in being on the forefront of blockchain technology.  And we wanted to -- if -- use any technology to reduce the size of our balance sheet.  And the fact that this checked both of those boxes, it made this more interesting to us."); *id*. at 119:10-19 ("Q.  So some of the benefits that might flow from ODL you couldn't necessarily point to a place on the balance -- on the balance sheet or income statement that might show that benefit, but it still would exist?  A.  Yes.").  Defendants further dispute that MoneyGram could "make money" from the make-whole payments as Angelilli asserted, because the payments would, at most, reimburse MGI for ODL transactions to within five basis points of the cost had MGI transferred the funds by traditional means, and Defendants direct the Court to the true and correct contents of Ripple Work Order #1 among Ripple Services and MoneyGram Payment Services, Inc., dated June 17, 2019, which contains the "make-whole" provision referred to in Paragraph 253.  *See* Ex. 286 at RPLI_SEC 0239685-86 ("Ripple shall satisfy its obligation by providing to Customer make-whole payments in XRP (each a 'Net Rebate') to bring such rates within five (5) basis points (0.05%) of the FX Spot Rate at the time of the transaction (including

any associated XRP volatility and exchange fees)…").  Defendants further note that this

paragraph is duplicative of Paragraphs 267, 268, 271 and 272, and Defendants incorporate by

reference their responses to those paragraphs.

254.    Ripple paid "make-whole payments" to MoneyGram "to make MoneyGram whole for any additional costs …from the ODL transaction over and above what it would cost MoneyGram to do that transaction for the traditional payment route." PX 624 (Angelilli Dep. Tr.) at 149:5-11.

**Response:**    Disputed.  Defendants do not dispute that PX 624 contains the quoted

testimony; however, Defendants dispute that a witness's recollection provides the best evidence

of the terms of Ripple's contractual agreements with MGI and direct the Court to the true and

correct contents of Ripple Work Order #1 among Ripple Services and MoneyGram Payment

Services, Inc., dated June 17, 2019, which contains the provisions referred to in Paragraph 254.

*See* Ex. 286 at RPLI_SEC 0239685.

255.    The "make-whole" payments that Ripple made to MoneyGram included both the costs for using crypto trading platforms and paying fees and traditional foreign currency trading costs. PX 624 (Angelilli Dep. Tr.) at 149:12-20.

**Response:**    Disputed.  Defendants do not dispute that PX 624 contains the quoted

testimony; however, Defendants dispute that a witness's testimony provides the best evidence of

the terms of Ripple's contractual agreements with MGI.  Defendants direct the Court to Ex. 286,

which contains the provisions referred to in Paragraph 255.  *See* Ex. 286 at RPLI_SEC 0239685

(Ripple agreed to "provide[] to [MGI] make-whole payments in XRP…to bring such rates within

five (5) basis points (0.05%) of the FX Spot Rate at the time of the transaction.").

256.    Ripple's agreement to pay "make-whole payments" were "a deal point in the agreement" from MoneyGram's perspective and MoneyGram "would never have executed the agreement without it." PX 624 (Angelilli Dep. Tr.) at 191:8-14.

**Response:**    Undisputed that Angelilli offered the quoted testimony; however,

Defendants dispute Paragraph 256 because Angelilli testified that the make-whole payments

were not the only reason why MGI was interested in its agreement with Ripple, and other

reasons included advancing blockchain payments technology, lowering MGI's foreign exchange

costs, and reducing MGI's capital costs.  PX 624 at 217:9-20 ("Q….I think you said -- I just

want to make sure the record is clear on this -- besides the make-whole payments, there were

other reasons why MoneyGram thought the use of the ODL product has promise; is that fair?  A.

Yes.  Q.  And just for the purpose of the record here, can you state what those reasons were?  A.

We were genuinely interested in being on the forefront of blockchain technology.  And we

wanted to -- if -- use any technology to reduce the size of our balance sheet.  And the fact that

this checked both of those boxes, it made this more interesting to us."); *id*. at 115:18-19 ("[T]he

benefit of being in the cash market [for FX transactions, *see* response to Paragraph 236] was the

principal benefit at that time regardless" of other benefits of using ODL); *id*. at 115:3-5

(testifying that ODL benefitted MGI by "shortening the time from basis risk, [so] that [MGI]

w[as] buying the currency at the time that [it] needed it rather than on a T+2 sell."); *id*. at 88:9-

89:22 ("Q.  And so the concept here is the ODL product would allow you to use the cash market,

which has benefits over the spot market?  A.  From a working capital and from a basis risk

perspective.  Q.  And that was a positive aspect of -- of the ODL product, as you understood it at

the time?  A.  Yes."); *id*. at 119:10-19 ("Q.  So some of the benefits that might flow from ODL

you couldn't necessarily point to a place on the balance -- on the balance sheet or income

statement that might show that benefit, but it still would exist?  A.  Yes.").

257.    Ripple paid "volume incentives" to MoneyGram, in the form of a "$110 million
pool of incentives that were paid out based on a sliding scale of basis points against the volume
of trading that we did on ODL." PX 624 (Angelilli Dep. Tr.) at 151:2-14.

**Response:**    Disputed.  Defendants do not dispute that PX 624 contains the quoted

testimony; however, Defendants dispute that a witness's recollection provides the best evidence

of the terms of Ripple's contractual agreements with MGI, and direct the Court to the true and

correct contents of Ripple Work Order #1 among Ripple Services and MoneyGram Payment

Services, Inc., dated June 17, 2019, which contains the provisions referred to in Paragraph 257.

*See* Ex. 286 at RPLI_SEC 0239688 ("Ripple will pay Customer transaction incentive fees in

XRP in an amount not to exceed US$110,000,000 over the Incentives Period," provided, among

other things, MGI achieved specified volumes transferred using ODL).  Defendants further

dispute the SEC's purported assertion of fact in Paragraph 257 as lacking context.  Such

incentives are a typical feature of encouraging large industry players to adopt new payment

systems.  *See* Ex. 11 (Ferrell Report) at 77-80 (providing examples of similar incentive programs

to encourage adoption, including by Visa and Mastercard for adoption of their payment systems);

PX 624 (Angelilli Dep. Tr.) at 83:12-24 ("Q.  Is that a phenomenon, of providing those types of

incentives to get big headline customers, is that something that you're familiar with in the

business world?  A.  Yes.  Q.  Can you think of other companies that -- that do that these days?

A.  You know, in Internet commerce you see it all the time, where people will lead with a low

price or even lose money in the initial phases of their growth curve.  Q.  Was it your

understanding that some of the incentives that Ripple was providing to you was because of that

dynamic?  A.  Yes.").

258.    MoneyGram did not use RippleNet—which was "not ODL and didn't involve
foreign exchange trades"—because RippleNet "didn't function satisfactorily." PX 624 (Angelilli
Dep. Tr.) at 117:16-118:21.

**Response:**    Undisputed that Angelilli offered the quoted testimony, exclusive of any

alterations, omissions, or additions by the SEC; however, Paragraph 258 omits that Angelilli

testified that he did not ever personally discuss using RippleNet and he was not familiar with the

operations, uses, or purposes of RippleNet.  PX 624 at 118:10-14; 126:11-127:2 (Angelilli

testifying, "I wasn't a party to that technology.  That was outside of my scope.  I knew that we

had our IT department and operations department trying to implement and integrate that product"

and he lacked familiarity with the details of RippleNet).  Defendants further dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 624, including because the

purported assertion of fact in Paragraph 258 is not relevant to any claim or defense in this action.

*See* ECF No. 668 (SEC Response to Defs.' Rule 56.1 Stmt.) at ¶¶ 41-45 (SEC does not dispute

that "RippleNet today does not need XRP to function, but a feature known as ODL…does…

RippleNet customers can settle cross-border transactions using fiat currency only, or they can opt

to use a feature of RippleNet known as ODL") (internal quotation marks, paragraph breaks, and

quotations omitted).  Defendants further object that the SEC cannot present the facts asserted in

Paragraph 258 in admissible form on the basis of Angelilli's testimony, as the quoted testimony

is a hearsay statement of a third party relayed by Angelilli and not a statement by Ripple or the

Individual Defendants.

259.    In or around June 2020, Ripple expressed a desire to further amend the
commercial agreement to significantly reduce the volume transacted by MGI because "[t]he
inability of Ripple to support the volume of [MGI's] trading, especially in [Philippine Pesos] and
[Australian Dollars], resulted in widening of spreads required by counterparties to accept the
higher volumes," which in turn "increased the costs of the make-whole payments to MGI" paid
by Ripple. PX 634 (Angelilli Decl.) ¶ 30.

**Response:**      Undisputed that PX 634 contains the quoted text.  Defendants incorporate

by reference their objection to the use of the Angelilli Declaration to establish any undisputed

material fact, as set forth in the response to Paragraph 217.

260.    In or around June 2020, the parties amended the commercial agreement, in which
MPSI agreed to the XRP volume reduction and Ripple agreed to increase the percentage of
transaction volume to be paid as fees to MGI. PX 634 (Angelilli Decl.) ¶ 31.

**Response:**      Disputed.  Defendants dispute that a witness's recollection provides the

best evidence of the terms of Ripple's contractual agreements with MGI, and direct the Court to

the true and correct contents of the Letter Amendment among Ripple Services Inc. and

MoneyGram Payment Systems, Inc., dated June 16, 2020.  *See* Ex. 290 (SEC-LIT-EPROD-

000077212) (Transaction Volume would not exceed US$500,000,000, and incentive fees would

equal 4% of Transaction Volume). Defendants incorporate by reference their objection to the

use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the

response to Paragraph 217.

261. In or around June 2020, MGI understood based on its conversations with Ripple
that the amendment was intended to significantly reduce Ripple's costs under the make-whole
provision of the commercial agreement. PX 634 (Angelilli Decl.) ¶ 30; PX 626 at 4 (April 2020
internal Ripple presentation acknowledging "ODL is costly for Ripple" and "Ripple is incurring
$2 of liquidity cost for every $1 of incentives we pay MGI").

**Response:**     Undisputed that PX 634 contains the cited evidence, but Defendants do

not have an independent basis to admit or deny statements concerning MGI's state of mind or

opinion as set forth in Paragraph 261. Defendants do not dispute that PX 626 at RPLI_SEC

0688736 contains the quoted text, exclusive of any alterations, omissions, or additions by the

SEC; however, Defendants dispute that PX 626 supports the SEC's assertions in Paragraph 261

concerning the state of mind or opinion of a third party, MGI. Defendants incorporate by

reference their objection to the use of the Angelilli Declaration to establish any undisputed

material fact, as set forth in the response to Paragraph 217.

262. From approximately January 1, 2020 through November 30, 2020, Ripple paid
approximately $38.6 million in XRP to MPSI in fees and approximately $10.1 million in make
whole payments. PX 634 (Angelilli Decl.) ¶ 33.

**Response:**     Disputed because the SEC's assertion in Paragraph 262 is unsupported by

any citation to admissible evidence and Defendants incorporate by reference their objection to

the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the

response to Paragraph 217.

263. As of December 16, 2020, MoneyGram had reduced its ODL trading volume by
approximately 90% at Ripple's request because Ripple viewed the payments it was making

under the make-whole agreement as "problematic." PX 624 (Angelilli Dep. Tr.) at 130:18-132:22.

**Response:**    Undisputed that Angelilli offered the quoted testimony; however,

Defendants object that the SEC cannot present this fact about Ripple's views as to the make-whole agreement in admissible form on the basis of Angelilli's testimony, as the cited testimony is a hearsay statement by Angelilli and not a statement by Ripple or the Individual Defendants.

264.    MoneyGram ultimately suspended its trading using ODL during December 2020 after MoneyGram hit the maximum under its quota system and would no longer earn any incentive for ODL trades conducted during the remaining month of December. PX 624 (Angelilli Dep. Tr.) at 130:18-132:22.

**Response:**    Undisputed that Angelilli offered the cited testimony; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 624, because Paragraph 264 omits additional context necessary to understand the cited testimony, including that Angelilli testified that MGI intended to revise the terms of its agreement with Ripple and continue the partnership in 2021.  PX 624 at 133:11-17.  Angelilli further testified that MGI ultimately ended the agreement with Ripple in early 2021 because U.S. exchanges stopped listing XRP after the SEC filed this action on December 20, 2020.  *Id.* at 182:10-20.

265.    In or around December 2020, ODL was still "immature and not cost-effective" for MoneyGram. PX 624 (Angelilli Dep. Tr.) at 134:25-135:9.

**Response:**    Disputed.  Undisputed that Angelilli offered the quoted testimony; however, Paragraph 265 misstates Angelilli's testimony, because Angelilli offered additional testimony under oath that contradicts and qualifies the testimony quoted in Paragraph 265, including testimony agreeing that ODL "could be a tremendous transformative product for the industry" and about the benefits of ODL for MGI (such as FX advantages and non-balance sheet considerations).  PX 624 at 135:10-12; 129:4-23 (testifying that ODL was able to handle all

MGI's flows between the U.S. and Mexico and the U.S. and the Philippines, that it had financial

benefits "from a dollar-trading perspective," and that declining exchange rates in the U.S.-

Mexico corridor were making ODL more cost-effective as well); *id*. at 119:15-19 ("Q.  So some

of the benefits that might flow from ODL you couldn't necessarily point to a place on the

balance -- on the balance sheet or income statement that might show that benefit, but it still

would exist?  A.  Yes.").

266.    In or around December 2020, MoneyGram's CFO believed that "nothing had
changed in terms of that [ODL] was immature and not cost-effective." PX 624 (Angelilli Dep.
Tr.) at 134:25-135:9.

**Response:**    Disputed.  Undisputed that Angelilli offered the quoted testimony;

however, Paragraph 266 misstates Angelilli's testimony, because Angelilli offered additional

testimony under oath that contradicts and qualifies the testimony quoted in Paragraph 266,

including testimony agreeing that ODL "could be a tremendous transformative product for the

industry" and about the benefits of ODL for MGI (such as FX advantages and non-balance sheet

considerations).  PX 624 at 135:10-12; 129:4-23 (testifying that ODL was able to handle all of

MGI's flows between the U.S. and Mexico and the U.S. and the Philippines, that it had financial

benefits "from a dollar-trading perspective," and that declining exchange rates in the U.S.-

Mexico corridor were making ODL more cost-effective as well); *id*. at 119:15-19 ("Q.  So some

of the benefits that might flow from ODL you couldn't necessarily point to a place on the

balance -- on the balance sheet or income statement that might show that benefit, but it still

would exist?  A.  Yes.").  Defendants further note that this paragraph is duplicative of Paragraph

265, and Defendants incorporate by reference their response to that paragraph.

267.    MGI did not realize any cost savings from any reduction in working capital needs, or any other transaction-related cost savings, from its arrangement with Ripple. PX 634 (Angelilli Decl.) ¶ 36.

**Response:**    Undisputed that PX 634 contains the cited text; however, Defendants

dispute the SEC's statement in Paragraph 267 that MGI did not have any savings from using

ODL, because Angelilli offered other contradictory testimony under oath that MGI recognized

financial benefits from using ODL.  *See* PX 624 at 115:18-19 ("[T]he benefit of being in the cash

market [for FX transactions, *see* response to Paragraph 236] was the principal benefit at that time

regardless" of other benefits of using ODL); *id.* at 115:3-5 (testifying that ODL benefitted MGI

by "shortening the time from basis risk, [so] that [MGI] w[as] buying the currency at the time

that [it] needed it rather than on a T+2 sell."); *id.* at 88:15-88:19 ("Q.  And so the concept here is

the ODL product would allow you to use the cash market, which has benefits over the spot

market?  A.  From a working capital and from a basis risk perspective.  Q.  And that was a

positive aspect of -- of the ODL product, as you understood it at the time?  A.  Yes."); *id.* at

217:9-20 ("Q…I think you said -- I just want to make sure the record is clear on this -- besides

the make-whole payments, there were other reasons why MoneyGram thought the use of the

ODL product has promise; is that fair?  A.  Yes.  Q.  And just for the purpose of the record here,

can you state what those reasons were?  A.  We were genuinely interested in being on the

forefront of blockchain technology.  And we wanted to -- if -- use any technology to reduce the

size of our balance sheet.  And the fact that this checked both of those boxes, it made this more

interesting to us."); *id.* at 119:15-19 ("Q.  So some of the benefits that might flow from ODL you

couldn't necessarily point to a place on the balance -- on the balance sheet or income statement

that might show that benefit, but it still would exist?  A.  Yes.").  Defendants further note that

this paragraph is duplicative of Paragraphs 253, 268, 271 and 272, and Defendants incorporate

by reference their responses to those paragraphs.  Defendants incorporate by reference their

objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

268.     MGI did not realize any such cost savings because of the off-market execution of FX trading on the ODL platform and the high level of fees required for each ODL transaction. PX 634 (Angelilli Decl.) ¶ 37.

**Response:**     Undisputed that PX 634 contains the cited text; however, Defendants dispute the SEC's statement in Paragraph 268 that MGI did not have any savings from using ODL, because Angelilli offered additional testimony under oath that MGI recognized financial benefits from using ODL. *See* PX 624 at 115:18-19 ("the benefit of being in the cash market [for FX transactions, *see* response to Paragraph 236] was the principal benefit at that time regardless" of other benefits of using ODL); *id*. at 115:3-5 (testifying that ODL benefited MGI by "shortening the time from basis risk, [so] that [MGI] w[as] buying the currency at the time that [it] needed it rather than on a T+2 sell."); *id*. at 88:15-88:19 ("Q.  And so the concept here is the ODL product would allow you to use the cash market, which has benefits over the spot market? A.  From a working capital and from a basis risk perspective.  Q.  And that was a positive aspect of -- of the ODL product, as you understood it at the time?  A.  Yes."); *id.* at 217:9-20 ("Q…I think you said -- I just want to make sure the record is clear on this -- besides the make-whole payments, there were other reasons why MoneyGram thought the use of the ODL product has promise; is that fair?  A.  Yes.  Q.  And just for the purpose of the record here, can you state what those reasons were?  A.  We were genuinely interested in being on the forefront of blockchain technology.  And we wanted to -- if -- use any technology to reduce the size of our balance sheet. And the fact that this checked both of those boxes, it made this more interesting to us."); *id.* at 119:15-19 ("Q.  So some of the benefits that might flow from ODL you couldn't necessarily point to a place on the balance -- on the balance sheet or income statement that might show that benefit, but it still would exist?  A.  Yes.").  Defendants further note that this paragraph is

duplicative of Paragraphs 253, 267, 271 and 272, and Defendants incorporate by reference their responses to those paragraphs.  Defendants incorporate by reference their objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

269.    MGI repeatedly communicated to Ripple the lack of transaction-related cost savings from the ODL platform, without including Ripple's incentive payments. PX 634 (Angelilli Decl.) ¶ 41.

**Response:**       Disputed.  Undisputed that PX 634 contains the cited text; however, Paragraph 269 contradicts Angelilli's testimony at PX 624, because Angelilli testified only that the efficiency of the payment corridors was regularly discussed in meetings and merely agreed with the SEC's statement, but did not affirmatively testify, that "higher costs incurred doing foreign currency exchanges using the ODL product" were discussed.  PX 624 at 190:2-15 ("I wasn't party to all the meetings that were taking place, but there was a weekly meeting between our treasury function and -- and the Ripple staff.  And progress on the efficiency of those markets was a regular agenda item that was discussed, probably ad hoc, but frequently."). Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants further object that the SEC cannot present this fact in admissible form on the basis of Angelilli's declaration, as the cited evidence is a hearsay statement of a third party relayed by Angelilli and not a statement by Ripple or the Individual Defendants.  Defendants incorporate by reference their objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

270.    Ripple was also repeatedly made aware of the lack of transaction-related cost savings from the ODL platform due to the large amount that Ripple was required to pay in make-

whole payments to MGI, which it was tracking and proactively trying to reduce. PX 634
(Angelilli Decl.) ¶ 41.

**Response:**      Undisputed that PX 634 contains the cited text.  Pursuant to Fed. R. Civ.

P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form on the

basis of Angelilli's declaration, as the cited evidence is a hearsay statement of a third party

relayed by Angelilli and not a statement by Ripple or the Individual Defendants.  Defendants

incorporate by reference their objection to the use of the Angelilli Declaration to establish any

undisputed material fact, as set forth in the response to Paragraph 217.

271.    MGI's financial benefits from using ODL were "entirely due to the substantial
incentive payments provided by Ripple to MGI." PX 634 (Angelilli Decl.) ¶ 42.

**Response:**      Undisputed that PX 634 contains the quoted text; however, Defendants

dispute the SEC's statement in Paragraph 271 that MGI's financial benefits from ODL were due

solely to incentive payments from Ripple, because Angelilli offered contradictory testimony

under oath that MGI recognized financial benefits from using ODL.  PX 624 at 115:18-19 ("the

benefit of being in the cash market [for FX transactions, *see* response to Paragraph 236] was the

principal benefit at that time regardless" of other benefits of using ODL); *id.* at 115:3-5

(testifying that ODL was beneficial by "shortening the time from basis risk, that we were buying

the currency at the time that we needed it rather than on a T+2 sell."); *id.* at 88:15-88:19 ("Q.

And so the concept here is the ODL product would allow you to use the cash market, which has

benefits over the spot market?  A.  From a working capital and from a basis risk perspective.  Q.

And that was a positive aspect of -- of the ODL product, as you understood it at the time?  A.

Yes."); *id.* at 217:9-20 ("Q…I think you said -- I just want to make sure the record is clear on

this -- besides the make-whole payments, there were other reasons why MoneyGram thought the

use of the ODL product has promise; is that fair?  A.  Yes.  Q.  And just for the purpose of the

record here, can you state what those reasons were?  A.  We were genuinely interested in being

on the forefront of blockchain technology.  And we wanted to -- if -- use any technology to reduce the size of our balance sheet.  And the fact that this checked both of those boxes, it made this more interesting to us."); *id.* at 119:15-19 ("Q.  So some of the benefits that might flow from ODL you couldn't necessarily point to a place on the balance -- on the balance sheet or income statement that might show that benefit, but it still would exist?  A.  Yes.").  Defendants further note that this paragraph is duplicative of Paragraphs 253, 267, 268, and 272, and Defendants incorporate their responses to those paragraphs by reference.  Defendants incorporate by reference their objection to the use of the Angelilli Declaration to establish any undisputed material fact, as set forth in the response to Paragraph 217.

272.    MGI's CFO stated under oath that MGI's financial benefits from using ODL were "entirely due to the substantial incentive payments provided by Ripple to MGI." PX 634 (Angelilli Decl.) ¶ 42.

**Response:**        Undisputed that PX 634 contains the quoted text; however, Defendants dispute the SEC's statement in Paragraph 272 that MGI's financial benefits from ODL were due entirely to incentive payments from Ripple ODL, because Angelilli offered other contradictory testimony under oath that MGI recognized financial benefits from using ODL.  PX 624 at 115:18-19 ("the benefit of being in the cash market [for FX transactions, *see* response to Paragraph 236] was the principal benefit at that time regardless" of other benefits of using ODL); *id.* at 115:3-5 (testifying that ODL was beneficial by "shortening the time from basis risk, that we were buying the currency at the time that we needed it rather than on a T+2 sell."); *id.* at 88:15-88:19 ("Q.  And so the concept here is the ODL product would allow you to use the cash market, which has benefits over the spot market?  A.  From a working capital and from a basis risk perspective.  Q.  And that was a positive aspect of -- of the ODL product, as you understood it at the time?  A.  Yes."); *id.* at 217:9-20 ("Q...I think you said -- I just want to make sure the record is clear on this -- besides the make-whole payments, there were other reasons why

127

MoneyGram thought the use of the ODL product has promise; is that fair?  A.  Yes.  Q.  And just

for the purpose of the record here, can you state what those reasons were?  A.  We were

genuinely interested in being on the forefront of blockchain technology.  And we wanted to -- if -

- use any technology to reduce the size of our balance sheet.  And the fact that this checked both

of those boxes, it made this more interesting to us."); *id.* at 119:15-19 ("Q.  So some of the

benefits that might flow from ODL you couldn't necessarily point to a place on the balance -- on

the balance sheet or income statement that might show that benefit, but it still would exist?  A.

Yes.").  Defendants further note that this paragraph is duplicative of Paragraphs 253, 267, 268

and 271, and Defendants incorporate their responses to those paragraphs by reference.

Defendants incorporate by reference their objection to the use of the Angelilli Declaration to

establish any undisputed material fact, as set forth in the response to Paragraph 217.

273.    When MoneyGram negotiated its agreement with Ripple, Ripple executives told
MoneyGram that Ripple was "actively involved in promoting the use of XRP and making
attempts to increase its value," "[m]eaning the price of XRP." PX 624 (Angelilli Dep. Tr.) at
165:7-166:15.

**Response:**    Undisputed that Angelilli offered the quoted testimony; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX

624 including because the cited evidence does not support the SEC's assertion that unidentified

"Ripple executives" made the quoted statement to Angelilli or MGI; rather, Angelilli merely

testified that this was "explained to" him, but did not testify as to the source of that explanation.

PX 624 at 166:3-6.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants further object that the SEC

cannot present this fact in admissible form on the basis of Angelilli's testimony, as the cited

testimony is a hearsay statement of a third party relayed by Angelilli and not necessarily a

statement by Ripple or the Individual Defendants.  Defendants dispute Paragraph 273 to the

extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to

evidence, including the SEC's statement that Ripple was "promoting the use of XRP."

274.    Ripple explained to MoneyGram Ripple's theory that "by increasing the utility of
XRP, it would result in a higher price of XRP" and that Ripple was "interested in working to
increase the price of XRP." PX 624 (Angelilli Dep. Tr.) at 166:16-22.

**Response:**    Disputed.  Undisputed that Angelilli offered the quoted testimony;

however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn

from, PX 624 including because the cited evidence does not support the SEC's assertion that

"Ripple" made the quoted statement to Angelilli or MGI; rather, Angelilli merely testified that

this was "put forward to us" and did not identify who did so.  PX 624 at 166:16-22.  Pursuant to

Fed. R. Civ. P. 56(c)(2), Defendants further object that the SEC cannot present this fact in

admissible form on the basis of Angelilli's testimony, as the cited testimony is a hearsay

statement of a third party relayed by Angelilli and not necessarily a statement by Ripple or the

Individual Defendants.  *See* PX 624 at 166:18-20.  Defendants further note that this paragraph is

duplicative of Paragraph 273, and Defendants incorporate their response to that paragraph by

reference.

275.    Ripple executives communicated to MGI that in order to increase the utility and
impact the price of XRP, Ripple had "a series of investor conferences," "had a very active public
relations campaign," and was "very aggressive in terms of their wanting to promote the Ripple
and MoneyGram alliance," and explained to MoneyGram that this would "increase the value of
XRP." PX 624 (Angelilli Dep. Tr.) at 166:23-167:8.

**Response:**    Defendants do not dispute that Angelilli offered the quoted testimony;

however, pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this

fact about what Ripple communicated at investor conferences and to the public in admissible

form on the basis of Angelilli's testimony, as the cited testimony is a hearsay statement of a third

party relayed by Angelilli and not necessarily a statement by Ripple or the Individual

Defendants.  Defendants further dispute Paragraph 275 because the cited evidence does not

support the SEC's assertion that unidentified "Ripple executives" made the quoted statement to

Angelilli or MGI; rather, Angelilli did not testify as to the source of that explanation. PX 624 at

166:3-167:8 (Angelilli's testifying "it was explained to us," "there was a theory put forward to

us," and "they have a series of investor conferences," without specifying who he was referring

to). Defendants further dispute Paragraph 275 to the extent it sets forth legal conclusions,

inferences, or assertions unsupported by citations to evidence, including the SEC's statement that

Ripple wanted to "promote" XRP and "increase the value of XRP."

276.    ███████████ stated at a MoneyGram board of directors meeting that Ripple
was "actively attempting as part of [its] overall strategy to increase the price of XRP." PX 624
(Angelilli Dep. Tr.) at 198:24-199:25.

**Response:**    Undisputed that Angelilli offered the quoted testimony; however,

Defendants dispute that Angelilli's recollection years later during his deposition of a statement

by a third person, ███████, is sufficient to establish what ███████ said verbatim or that

Ripple had an "overall strategy to increase the price of XRP," at all times and for all purposes in

this litigation. Defendants further dispute the SEC's characterization of, and inferences

purportedly drawn from, PX 624, because Paragraph 276 omits additional context necessary to

understand the cited testimony, because to the extent ███████ purported statement was made,

it was made in the context of the underlying commercial agreement between Ripple and MGI,

which assumed a $0.30 minimum price for XRP, which XRP was trading below, and ███

███ purported comment was limited to addressing that issue. PX 624 at 199:15-25 ("At one

point during the relationship, the price of XRP had fallen dramatically and was trading below 20

cents, which was having a direct impact on MoneyGram's ability to earn its incentives. One of

the board members asked ███████ in a board meeting was there anything, you know, that they

could do about it…she expressed frustration and said that…they were essentially very concerned

about it…"); see Ex. 286 at RPLI_SEC 0239685 ("for any transfer of XRP from Ripple to

Customer described in amount as USD will be the greater of: 1) The conversion rate of XRP as traded against USD on the Primary Market at approximately 9:00 a.m. PST on the payment date… 2) US $0.30 per single unit of XRP"). Defendants further dispute Paragraph 276 to the extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including the SEC's statement that Ripple was "actively attempting" to increase XRP's price. Defendants further dispute that a purported statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 276 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

277.    During the course of negotiations between Ripple and MoneyGram, Garlinghouse stated that Ripple was "actively promoting the value" of XRP and "trying to make sure that the price of XRP increased." PX 624 (Angelilli Dep. Tr.) at 200:3-14.

**Response:**    Undisputed that Angelilli offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 624, because the underlying commercial agreement between Ripple and MGI was predicated on a price floor for XRP, which Angelilli testified was the context for Garlinghouse's purported comments. *See* Ex. 286 at RPLI_SEC 0239685 ("for any transfer of XRP from Ripple to Customer described in amount as USD will be the greater of: 1) The conversion rate of XRP as traded against USD on the Primary Market at approximately 9:00 a.m. PST on the payment date… 2) US $0.30 per single unit of XRP"). Defendants further dispute Paragraph 277, insofar as it misstates Angelilli's testimony, because Angelilli could not recall what terms Garlinghouse used, and did not know if Garlinghouse used the term "value" or "price." PX 624 at 215:23-216:15 ("Q….Do you recall Mr. Garlinghouse specifically using the term 'price' or 'value,' or do you not recall one way or the other what term he used? A. I couldn't determine what term he used."). Defendants further

dispute Paragraph 277 to the extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including the SEC's statement that Ripple was "actively promoting" XRP and XRP's price.  Defendants further dispute Paragraph 277 because, at most, the exhibit contains a secondhand account from a third-party of what Garlinghouse allegedly said.  PX 624.  It is insufficient to establish what Ripple was doing, what Garlinghouse said, or what Garlinghouse meant to convey if he did say any of the alleged quotes.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

278.    Ripple never disputed MoneyGram's assessment of the additional costs involved in using ODL. PX 624 (Angelilli Dep. Tr.) at 191:15-19.

**Response:**    Disputed.  Defendants do not dispute that PX 624 contains the cited text; however, Defendants dispute the SEC's use of the term "assessment," because it is undefined, vague and unclear, and is unsupported by the cited testimony.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 624, including because Paragraph 278 misstates Angelilli's testimony, because Angelilli testified "no" in response to the question "[d]id Ripple ever deny MoneyGram's explanation of the increased costs or challenge them or insist that MoneyGram was wrong in the way it was calculating the additional costs involved in using ODL?"  PX 624 at 191:15-19.  This testimony, in response to a compound question, supports only that Ripple did not dispute the calculation of costs under their agreement with MGI, not that Ripple "never disputed" MGI's assessment of the costs and benefits of ODL at all times and in all contexts, as asserted by the SEC in paragraph 278.

279.    MoneyGram's CFO was aware of Ripple's "active Tweeting program," and Ripple at times made public statements that MoneyGram "believe[d] reflected inaccuracies on

the MoneyGram relationship" and "mischaracterized the pricing effectiveness or the utility of ODL." PX 624 (Angelilli Dep. Tr.) at 198:13-23.

**<u>Response:</u>**      Disputed.  Undisputed that Angelilli offered the quoted testimony;

however, Defendants dispute Paragraph 279 because it is contradicted by additional testimony by

Angelilli, including that he could think of no Ripple tweet that related to MoneyGram, and it

would be fair to conclude the tweets may have related to ODL customers other than MGI.  PX

624 at 215:3-22.  Defendants further dispute the SEC's characterization of, and inferences

purportedly drawn from, PX 624, as misleading, including because Angelilli's testimony

provides no basis to characterize Ripple's tweets as an "active Tweeting program" directed

toward any particular goal.

280.    MoneyGram employees saw Ripple's "Tweets or other public statements touting the cost-effectiveness of ODL" during the time that the size of the make-whole payments Ripple was making to MoneyGram was increasing. PX 624 (Angelilli Dep. Tr.) at 203:3-13.

**<u>Response:</u>**      Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC

cannot present the facts asserted in Paragraph 280 in admissible form on the basis of Angelilli's

testimony, as the quoted testimony is a hearsay statement of a third party relayed by Angelilli

and not a statement by Ripple or the Individual Defendants.  PX 624 at 203:9-13 ("*We* were

seeing Tweets or other public statements…") (emphasis added).

281.    ODL would not have been viable for MoneyGram's business without the subsidies that Ripple paid MoneyGram. PX 624 (Angelilli Dep. Tr.) at 207:24-208:9.

**<u>Response:</u>**      Disputed.  Defendants do not dispute that Angelilli offered the cited

testimony; however, Angelilli was responding to a compound question and it is not clear to

which portion of the question he was responding.  In addition, Paragraph 281 omits additional

context necessary to understand the cited testimony, including that Angelilli further testified that

incentive payments were a "bridge" to help reach a more profitable and efficient broad use of

ODL.  PX 624 at 209:17-21 ("We, at this point, expected our relationship with Ripple to extend

beyond that.  And what we're describing here is what we thought was the long-term benefits of incorporating this technology into MoneyGram and the incentive payments were a bridge to get us there.").

282.   In an agreement between Ripple and MGI dated in or around December 2019, Ripple agreed to create a "slippage pool" to compensate MGI any time the quoted prices deviated from their realized trade prices, paid in XRP approximately every three days. PX 621 ¶ 46; PX 629.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 629, as misleading, including because the slippage pool was designed to correct for any differences between quoted prices for ODL transactions and actual realized proceeds, including in circumstances where the ODL user realized a *better* price, and not, as Paragraph 282 erroneously implies, only to compensate the user for *losses*.  *See* PX 629 at MONEYGRAM_SEC_0000662 and MONEYGRAM_SEC_0000673 (providing both for the covering of "Beneficiary Balances" and the deposit of "Beneficiary Surplus.").  Defendants also object pursuant to Fed. R. Civ. P. 56(c)(2) that the SEC has not offered the evidence set forth in this paragraph in a form that would be admissible at trial, as the testimony of █████ █████ is inadmissible for the reasons set forth in Defendants' motion to exclude.  (ECF No. 544.)

283.   In addition to payments Ripple made directly to MoneyGram, ODL FX spreads were made artificially low because Ripple paid fixed and variable fees to market makers to minimize FX spreads for XRP trading pairs at ODL corridors, and without such payments, those FX spreads would have been higher. PX 621 ¶ 47; PX 620.

**Response:**    Disputed.  Undisputed that incentives were paid to market makers that "include fixed fees as well as variable fees based on the ODL volume they are a counterparty for," PX 620 at RPLI_SEC 0550287; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 621 and PX 620, as misleading, because the cited evidence does not support the SEC's broad, unqualified, and temporally unbounded assertions of

fact that without market makers, in all situations, spreads would have been higher.  Defendants

further dispute Paragraph 283's use of the phrase "artificially," which is not fairly supported by

the underlying documents, as well as vague and ambiguous.  Defendants object pursuant to Fed.

R. Civ. P. 56(c)(2) that the SEC has not offered the evidence set forth in this paragraph in a form

that would be admissible at trial, as the testimony of ███████████ is inadmissible for the

reasons set forth in Defendants' motion to exclude.  (ECF No. 544.)

284.    A Ripple internal document stated that Ripple's payments to market makers for
artificially reducing ODL FX spreads cost an additional 0.73% of transaction volume in the case
of MoneyGram's usage of ODL. PX 621 ¶ 47; PX 626.

**Response:**    Disputed.  Defendants dispute Paragraph 284 as unsupported by the cited

evidence because PX 626 does not discuss any impact, let alone "artificial reduction" by market

makers on ODL FX spreads.  Defendants further note that to the extent this paragraph is

duplicative of Paragraph 283, Defendants incorporate their response to that paragraph by

reference.  Defendants object pursuant to Fed. R. Civ. P. 56(c)(2) that the SEC has not offered

the evidence set forth in this paragraph in a form that would be admissible at trial, as the

testimony of ██████████ is inadmissible for the reasons set forth in Defendants' motion to

exclude.  (ECF No. 544.)

285.    When asked whether "Ripple's ability to do those trades 24/7 was a major plus of
the ODL product," MGI's CFO responded that 24/7 trading "was particularly interesting to us in
the beginning" and that MGI was "doing trades on Saturdays and Sundays and holidays when the
banks were closed" but "stopped doing that because the trades became actually very expensive
for [MGI]." PX 624 (Angelilli Dep. Tr.) at 46:16-47:2.

**Response:**    Undisputed that Angelilli offered the quoted testimony; however,

Defendants dispute that this is the entirety of, a representative selection of, or a fair

characterization of Angelilli's testimony, because the SEC's purported statement of fact omits

relevant context that, while Angelilli testified that for technical reasons "24/7" trading was

expensive and not efficient, he also testified that the greater flexibility of ODL allowed for a

wider period when MGI could settle trades on the same day.  PX 624 at 46:12-15 ("What Ripple did was provide the ability to cash trades after noon, and then what it did was extended the window for cash trades in those markets because we didn't have a new deadline."); *see also id.* at 106:4-17 (Angelilli agreeing with CEO's sentiment in an interview that "we know what this product has the capability to do is actually completely streamline and transform our back-end capabilities and for the first time, I think ever really, actually enable money to move instantly or as close to instantly -- to instant as humanly possible.").

286.    In or around April 2020, Garlinghouse proposed a plan that would increase use and adoption of XRP in part to "demonstrate (to people [l]ike the SEC) that XRP is not a security. PX 625.

**<u>Response:</u>**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 625 including because Paragraph 286 omits additional context necessary to understand the testimony, including that PX 625 is an email chain between Garlinghouse and a Ripple employee about Garlinghouse's friend's idea for "an 'XRP cash back' credit card" that Ripple may have already considered before Garlinghouse joined Ripple. PX 625 (a "friend pinged me today and asked why Ripple didn't offer an 'XRP cash back' credit card.  Didn't you all try something like this in the early days?").  Later in the same email chain, Garlinghouse explains that this idea, which is a consumer use case, could be a "way to further distribute XRP, increase[] consumer adoption / usage of XRP, and demonstrate to (people [l]ike the SEC) that XRP is not a security."  PX 625.  Defendants dispute the characterization of Garlinghouse's opinion about the credit card as a "plan," and as one that he "proposed," which is unsupported by the exhibit.  Paragraph 286 also omits that Garlinghouse understood, based on SEC guidance and prior enforcement actions, that because XRP had utility it was distinguishable from tokens involved in ICOs, which were securities offerings, and generally lacked utility.  PX 503.06 at 7:18-22 ("ICOs, these initial coin offerings where people are issuing tokens that are

really more like securities than actually have a token that has utility the way, you know, XRP

solves a problem, it has utility in solving a payments problem."). Undisputed that PX 625

contains the quoted language.

287.    Ripple's former senior manager for XRP markets believed that ODL was not
scalable because it requires partnering with low-quality exchanges with relatively poor
technology in destination countries. PX 22 (Samarasinghe Dep. Tr.) at 35:7-14, 38:9-39:2;
282:1-283:25; PX 633.

**Response:**      Disputed, because the cited evidence does not support the SEC's broad

and temporally unbounded assertions of fact as set forth in Paragraph 287; Samarasinghe

testified only that at a specific point during his tenure, he made the observation that Ripple was

"partnering with low-quality exchanges." PX 22 at 38:13-39:2; 283:16-22. Defendants dispute

that ODL "*require[d]*" such partnerships and was not "scalable," since that was not

Samarasinghe's testimony. Defendants further dispute that a statement by a single employee is

sufficient to establish the underlying fact set forth in Paragraph 287 at all times and for all

purposes in this litigation.

288.    Ripple does not make money from ODL. PX7 (Schwartz Inv. Tr.) at 218:24-
220:22.

**Response:**      Disputed.  The SEC's assertion that "Ripple does not make money from

ODL" is not supported by the cited evidence. Schwartz did not testify that Ripple does not make

money from ODL. When asked about xRapid in January 2020, he stated that "Ripple makes

money from xRapid" because it "increases the value of RippleNet, the value of xCurrent." PX 7

at 219:1-4. The SEC has also elsewhere admitted in this case that Ripple's ODL product

generated revenue. *See, e.g.*, SEC Rule 56.1 Statement, Paragraph 750 (ECF No. 629) (noting

that Ripple made revenue from xRapid). Defendants further dispute that Paragraph 288 sets out

a material fact to any claims or defenses in this case, which relate solely to Ripple's activities

prior to December 22, 2020, and accordingly facts and circumstances after that date are irrelevant.

289.    In 2012 when Schwartz was pitching Ripple to investors, "it would have been impossible to" pitch XRP as a substitute for currency "with any credibility," "there was just no reason to think that that would happen at that time." PX 7 (Schwartz Inv. Tr.) at 22:17-28:10.

**<u>Response:</u>**    Disputed.  Paragraph 289 mischaracterizes Schwartz's testimony, which was provided only in reference to using "XRP *like a Bitcoin 2.0*," PX 7 at 27:23-28:10 (emphasis added), and not as a "substitute for currency," a vague phrase that Schwartz never used. Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 289 at all times and for all purposes in this litigation.

290.    In 2017 Schwartz stated publicly on XRP Chat that Ripple was not pursuing the digital cash, peer to peer value exchange use case for XRP. PX 6 (Schwartz Dep. Tr.) at 68:7-70:17; 78:2-10; PX 743.

**<u>Response:</u>**    Disputed, because Paragraph 290 misstates Schwartz's testimony and mischaracterizes PX 743, neither of which concern any use cases for XRP that Ripple was or was not pursuing in 2017.  PX 743 contains a post on the social media forum XRP Chat where Schwartz responded to another user's statement that Ripple had previously "[f]ailed to *promote* XRP as a digital currency" by stating: "We didn't think it made sense to take on Bitcoin head on at its strength."  PX 743 at ECF p. 2 (emphasis added).  In his deposition, Schwartz similarly testified that Ripple's strategy was not to position XRP as peer-to-peer digital cash leading up to his 2017 post on XRP Chat because "anyone could do that.  There was no particular reason why Ripple would do that.  It was something anyone could do.  It didn't play to our strengths."  PX 6 at 69:2-7.

291.    After the 2015 settlement with the Financial Crimes Enforcement Network, pursuing a use case for XRP as a currency was "impossible." PX 6 (Schwartz Dep. Tr.) at 78:8-79:18; 86:4-87:25; PX 744.

**Response:**    Disputed.  There is evidence that XRP had a number of use cases, including as a currency.  *See* Ex. 221 at RPLI_SEC 0978762; PX 6 at 242:18–243:1; Ex. 167 (collection of more than 3,000 affidavits by individual XRP purchasers, more than 700 of which state:  "I have acquired XRP . . . [a]s a form of currency for payment for goods and/or services I provided; and/or . . . [a]s a substitute for fiat currency, utilized as a store of value, and/or to purchase everyday items such as food, clothing, and other retail purchases"); Ex. 3, Osler Rep. ¶ 13 ("XRP can be used to pay for physical goods through online platforms including Bitcoin Superstore and Shopify and travel through Travala."); Ex. 5, Adriaens Rep. ¶ 130 (XRP can be used to pay for travel); App'x C (XRP can be used to pay for TOCA Coffee and Beliani Furniture, amongst other things); Ex. 9, Birla Tr. at 257:21-259:2 (using an early Ripple product, "in essence, you could go to this cafe next door and pay for your coffee in," among others, "XRP"); Ex. 20, Long Decl. ¶ 7 (several major charities currently do or have accepted XRP for donations); Ex. 2, D. Schwartz Decl. ¶ 9; ECF No. 124 (proposed intervenors' non-exhaustive list of publicly available use cases for XRP); Ex. 3, Osler Rep. ¶ 42 (noting that ODL has been commercially available since 2019); Affidavit of Eugene Kesselman in Support of Amicus Brief, Oct. 14, 2022, ECF No. 661-1 ¶¶ 18-19, 21 (TapJets Founder and CEO explaining that TapJets began accepting XRP as payment after May 2018); Brief of Amicus Curiae TapJets, Inc. In Support of Defendant Ripple Labs Inc. Motion for Summary Judgment, Oct. 14, 2022, ECF No. 661 at ECF pp. 4-5, 7-8 (same).  Defendants further dispute the use of the quoted term "impossible" in Paragraph 291, because it does not appear in the cited portions of Schwartz's testimony or in PX 744.  Defendants further dispute that a statement by a single employee at a

particular point in time is sufficient to establish the underlying fact set forth in Paragraph 291 at all times and for all purposes in this litigation.

292.    Schwartz stated publicly it did not make sense for people to hold crypto assets as currency or to "use them as money," a view he held up until his deposition in May 2021. PX 6 (Schwartz Dep. Tr.) at 80:13-81:10; 86:4-87:25; PX 745; PX 508.32.

**Response:**    Disputed, because the SEC mischaracterizes Schwartz's testimony and the cited documents, which do not reflect that Schwartz ever held this view.  The documents only show that Schwartz publicly commented that another user on the social media forum XRP Chat had made "*a good argument* that it doesn't make sense for ordinary people to hold crypto-currencies yet."  PX 745 at ECF p. 2 (emphasis added).  Schwartz's public comment explained that this argument was one of the factors that led Ripple to pursue a different use case from bitcoin.  PX 6 at 80:20-81:10; PX 745 at ECF p. 2.  Defendants further dispute Paragraph 292 to the extent that the SEC intended to cite to PX 500.32 rather than PX 508.32, which does not exist; PX 500.32 concerns Ripple's programmatic sales and does not relate to the facts asserted in Paragraph 292.  PX 500.32, ECF No. 626-17, at p. 63-64.  Defendants further dispute that Paragraph 292 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's activities prior to December 22, 2020, and accordingly facts and circumstances after that date are irrelevant.

293.    Ripple did not know what buyers were going to do with their XRP. PX 6 (Schwartz Dep. Tr.) at 38:18-39:4.

**Response:**    Undisputed.

294.    Garlinghouse stated publicly that he did not view crypto assets as "currencies" with which you could buy goods or services, such as coffee at Starbucks. PX 503.13, 503.18, 503.19; PX 81 (Garlinghouse Dep. Tr.) at 219:4-222:15.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 503.13, 503.18, 503.19, and 81 as misleading.

Garlinghouse testified regarding what he meant by this statement about crypto assets being currencies. Garlinghouse was not and could not have been stating a legal position about whether under the securities laws XRP, or any other digital asset, was then a "currency." Rather, Garlinghouse testified that he did not think digital assets would replace fiat currencies in G20 countries specifically because they could not be used for all of the same purposes as a fiat currency; he did not testify that digital assets were not "currencies" generally, or even outside of G20 countries at that time. PX 81 (Garlinghouse Dep. Tr.) at 219:4-220:2 (Q: "… did there come times in, say 2017 and 2018 when you stated publicly your view that you did not think of the use case for digital currencies as, you know, buying things, like going to Starbucks and getting a cup of coffee?" A: "That's directionally accurate. It's a little bit incomplete. I – you know, I think what I have said publicly is I more often than not, particularly in that time period, referred to these as digital assets or crypto assets. What I typically pointed out is to the extent you're thinking of these as fiat currencies, I had said that I view the G20 fiat currencies – and typically I call it the dollar or euro or yen – as very effective in solving the use case and problems … for consumer-facing experiences. I have often gone on to explain there are some markets where that's less true outside the G20 where governments have effectively lost control of their currencies already and, by extension, there might be more consumer interest, consumer demand, consumer usefulness."). In addition, Garlinghouse also explained that his view about consumer use of digital assets in the United States has changed, and there has been more adoption than he initially expected. PX 81 (Garlinghouse Dep. Tr.) at 220:3-18 ("But I typically have pointed out for a U.S. audience, whether it be media or a panel, that for those that are saying we're going to use bitcoin to buy coffee at Starbucks or bitcoin at Amazon, I've found that to be, particularly in 2017, less likely." Q: "Has that view changed?" A: "A little bit." Q:

"How so?"  A: "Maybe I'm wrong … The adoption, usage and custody of cryptocurrencies here in the United States by consumers has exceeded what I might have forecast four years ago."). Garlinghouse had also previously testified that he considered XRP to be a "currency" in the context in which Ripple uses it.  PX 36 (Garlinghouse Inv. Tr.) at 192:10-19 ("… I can use XRP as a consumer currency. … In general, though I think those who claim and believe that cryptocurrencies are going to replace fiat currencies of G20 markets, I don't buy it. … Now, for purposes of how Ripple is using XRP as an institutional bridge currency, yeah, it's a currency.); 192:24-193:3 (Q: "So is it your understanding that the use of XRP and xRapid is – you know, in that context, XRP is a currency?"  A: "Yes, I believe in that context, it would fit a classic definition of a currency."); 193:8-17 ("As I was just describing, I think those who consider cryptocurrencies to be solving a consumer use case, in G20 markets, the dollar, the euro, the yen, pick your favorite, but I don't really see what problem a digital asset is solving in that context. So in the consumer kind of parlance, layperson's use of the word currency, I don't think about any cryptocurrency as a currency.  I think as you have seen the way Ripple is using XRP is unequivocally a bridge currency as we discussed through the ODL flows.").  Therefore, Defendants further note that the ultimate fact is in dispute because Garlinghouse does, at times, refer to XRP as a "currency."  *See, e.g.*, PX 81 (Garlinghouse Dep. Tr.) at 66:2-9 ("The former generally wasn't because I didn't think of it as an important, critical issue, because it seemed so obvious to me that [XRP] was a currency and is being regulated as a currency by many governments around the world."); 290:21-24 (Q: "And Ripple – you have stated Ripple's view was that XRP was a currency, not a security, correct?"  A: "It was also FinCEN's view, but, yes.").  Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 503.13, 503.18, 503.19, and 81 to the extent it implies that by stating that he does not

use the expression "currency" to describe XRP, Garlinghouse somehow meant to suggest that

XRP is a security, for which there is no evidence anywhere in the entire record of this case.

Defendants also dispute that Paragraph 294 sets forth an independent statement of material fact

because it is duplicative of Paragraphs 85-86, 90-92, and 1167 of the SEC's Rule 56.1 Statement

(ECF No. 629).  Defendants incorporate by reference their responses to Paragraphs 85-86, 90-92,

and 1167 of the SEC's Rule 56.1 Statement.

295.    Garlinghouse stated publicly that XRP was not a currency because G20 countries
do not need a substitute for their currencies. PX 36 (Garlinghouse Inv. Tr.) at 189:7-192:17.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 36 as misleading.  First, the cited testimony does not

support the SEC's assertion of fact that Garlinghouse offered a "public[]" statement about

substitutes for the currencies of G20 countries.  Further, Garlinghouse testified regarding his

understanding of the word currency in a limited context, "as a nonlawyer, when I think about the

word currencies, I think about the consumer use case of being able to spend currency."  PX 36

(Garlinghouse Inv. Tr.) at 192:6-9; *see also id.* at 192:20-23 ("I think there is, you know, kind of

semantic definitional issues in terms of how I, as a layperson, think about the word currencies

and how some in the crypto community think cryptocurrencies are going to evolve.").

Garlinghouse also testified that XRP is a currency in the way Ripple uses it, even if he did not

believe that cryptocurrency generally would replace fiat currencies in G20 countries.  PX 36

(Garlinghouse Inv. Tr.) at 192:10-19 ("…I can use XRP as a consumer currency. … In general,

though I think those who claim and believe that cryptocurrencies are going to replace fiat

currencies of G20 markets, I don't buy it. … Now, for purposes of how Ripple is using XRP as

an institutional bridge currency, yeah, it's a currency.); 192:24-193:3 (Q: "So is it your

understanding that the use of XRP and xRapid is – you know, in that context, XRP is a

143

currency?"  A: "Yes, I believe in that context, it would fit a classic definition of a currency.");

193:8-17 ("As I was just describing, I think those who consider cryptocurrencies to be solving a

consumer use case, in G20 markets, the dollar, the euro, the yen, pick your favorite, but I don't

really see what problem a digital asset is solving in that context. So in the consumer kind of

parlance, layperson's use of the word currency, I don't think about any cryptocurrency as a

currency.  I think as you have seen the way Ripple is using XRP is unequivocally a bridge

currency as we discussed through the ODL flows.").  Therefore, Defendants further note that the

ultimate fact is in dispute because Garlinghouse does, at times, refer to XRP as a "currency."

*See, e.g.*, PX 81 (Garlinghouse Dep. Tr.) at 66:2-9 ("The former generally wasn't because I

didn't think of it as an important, critical issue, because it seemed so obvious to me that [XRP]

was a currency and is being regulated as a currency by many governments around the world.");

290:21-24 (Q: "And Ripple – you have stated Ripple's view was that XRP was a currency, not a

security, correct?"  A: "It was also FinCEN's view, but, yes.").  In addition, Paragraph 295 omits

that Garlinghouse believes that cryptocurrency can play a different role outside of G20 countries.

*See* PX 503.19 at 9:16-24 ("Now, people often point out that you have economies where you

don't have a strong [f]iat currency, and I think that's a different story.").  Defendants also dispute

the SEC's characterization of, and inferences purportedly drawn from, PX 36 to the extent it

implies that by stating that he does not use the expression "currency" to describe XRP,

Garlinghouse somehow meant to suggest that XRP is a security, for which there is no evidence

anywhere in the entire record of this case.  Defendants further dispute that Paragraph 295 sets

forth an independent statement of material fact because it is duplicative of Paragraphs 85 and 91

of the SEC's Rule 56.1 Statement (ECF No. 629).  Defendants incorporate by reference their

responses to Paragraphs 85 and 91 of the SEC's Rule 56.1 Statement.

296.    Larsen sold his XRP for U.S. Dollars because you cannot use XRP to pay your taxes, and used less than 1% of his 9 billion units of XRP in exchange for goods and services. PX 2 (Larsen Dep. Tr.) at 92:20-94:22.

**Response:**    Undisputed that Larsen sold XRP for U.S.D., taxes cannot be paid in XRP, and less than 1 percent of Larsen's XRP was used to purchase goods or services.  Ex. 8 at 93:6–22; 91:20-25.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 2, including to the extent the SEC implies Larsen sold XRP only to pay taxes or that other individuals did not use XRP to purchase goods and services.

297.    There were no uses for XRP as a "currency" that buys goods and services (i.e., there was no "consumer use case" for XRP), such that Ripple was not focused on the "consumer" use case for XRP because all the consumer could do with XRP was "hold it or sell it for fiat"; in other words, consumers can only use XRP as a vehicle for speculation. PX 533 at RPLI_SEC 95174, 95218; PX 529; PX 538; PX 24 (Beard Dep. Tr.) at 110:15-112:7, 118:18-123:17.

**Response:**    Disputed.  Paragraph 297 contains a confusing and incoherent assertion that appears to be missing one or more words needed to render it an intelligible statement of fact, and it is also unsupported by cited evidence insofar as it mischaracterizes the documents and testimony it cites.  None of the cited documents and testimony concern "uses for XRP" or whether "consumers can only use XRP as a vehicle for speculation."  *See* PX 533 (RPLI_SEC 0095167) at RPLI_SEC 0095174; PX 529 (RPLI_SEC 0431365) at RPLI_SEC 0431365; PX 538 (RPLI_SEC 0453728) at RPLI_SEC 0453728; PX 24 at 111:20-112:7; *cf.* PX 24 at 124:21-125:4 (describing the statement that consumers could only "hold [XRP] or sell it for fiat" as "a broad generalization.").  Defendants further dispute Paragraph 297 as inaccurate because XRP was used as currency to purchase goods and services in a number of ways.  Ex. 221 at RPLI_SEC 0978762; PX 6 at 242:18-243:1; Ex. 167 (collection of more than 3,000 affidavits by individual XRP purchasers, more than 700 of which state:  "I have acquired XRP . . . [a]s a form of currency for payment for goods and/or services I provided; and/or . . . [a]s a substitute for fiat

145

currency, utilized as a store of value, and/or to purchase everyday items such as food, clothing, and other retail purchases"); Ex. 3, Osler Rep. ¶ 13 ("XRP can be used to pay for physical goods through online platforms including Bitcoin Superstore and Shopify and travel through Travala."); Ex. 5, Adriaens Rep. ¶ 130 (XRP can be used to pay for travel); App'x C (XRP can be used to pay for TOCA Coffee and Beliani Furniture, amongst other things); Ex. 9, Birla Tr. at 257:21-259:2 (using an early Ripple product, "in essence, you could go to this cafe next door and pay for your coffee in," among others, "XRP"); Ex. 20, Long Decl. ¶ 7 (several major charities currently do or have accepted XRP for donations); Ex. 2, D. Schwartz Decl. ¶ 9; ECF No. 124 (proposed intervenors' non-exhaustive list of publicly available use cases for XRP); Ex. 3, Osler Rep. ¶ 42 (noting that ODL has been commercially available since 2019); Affidavit of Eugene Kesselman in Support of Amicus Brief, Oct. 14, 2022, ECF No. 661-1 ¶¶ 18-19, 21 (TapJets Founder and CEO explaining that TapJets began accepting XRP as payment after May 2018); Brief of Amicus Curiae TapJets, Inc. In Support of Defendant Ripple Labs Inc. Motion for Summary Judgment, Oct. 14, 2022, ECF No. 661 at ECF pp. 4-5, 7-8 (same).  Defendants further dispute the SEC's assertion that holding or selling XRP for fiat was "in other words" the same as "only us[ing] XRP as a vehicle for speculation," because these are two distinct concepts.

298.    Larsen entered into an agreement with GSR on or about March 5, 2015. PX 610.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 610, because the cited evidence does not support the SEC's assertion of fact as set forth in paragraph 298.  The agreement states that it was effective "as of March 5, 2015," but the signature page is not dated.  PX 610.

299.    The 2015 agreement between Larsen and GSR provides that once Larsen transferred the XRP to GSR, "title to and risk of loss of" the XRP passes to GSR. PX 610 at § 2.7(b).

**Response:**    Disputed.  Read in its entirety, PX 610's provisions demonstrate that title and risk of loss passed to GSR upon sale of the XRP to a third-party end user of the XRP.  *See* PX 610 §§ 1.4, 2.1-2.5, 2.7(b).  Defendants dispute the SEC's characterization of, and inferences drawn from, PX 610 to the extent the SEC implies that any transfer of XRP to GSR pursuant to this Agreement constituted a sale.  In addition, that Agreement was superseded in 2017.  PX 612 and 614.

300.    The 2015 agreement between Larsen and GSR identifies GSR as the "purchaser" of the XRP that GSR would then resell on Larsen's behalf. PX 610 at Preamble (GSR000008433).

**Response:**    Disputed.  While GSR is identified as the "Purchaser," PX 610's provisions demonstrate that XRP was transferred to GSR and any purchase of XRP by GSR occurred upon sale of the XRP to a third-party end user of the XRP.  *See* PX 610 §§ 1.4, 2.1-2.5, 2.7(b).  Defendants dispute the SEC's characterization of, and inferences drawn from, PX 610 to the extent the SEC implies any transfer of XRP pursuant to the Agreement constituted a sale and omits additional context necessary to understand the exhibit.  In addition, that Agreement was superseded in 2017.  PX 612 and 614.

301.    The 2015 agreement between Larsen and GSR provides that Larsen and his "affiliates" do not have any obligation to redeem any XRP for any monetary value, or goods and services. PX 610 at § 2.7.2.

**Response:**    Undisputed that Section 2.7.2 of PX 610, the Loan and Purchase Agreement with GSR, includes the quoted language.  Defendants dispute the SEC's characterization of, and inferences drawn from, PX 610 to the extent the SEC implies any transfer of XRP pursuant to the Agreement constituted a sale and omits additional context

necessary to understand the exhibit.  In addition, that Agreement was superseded in 2017.  PX 612 and 614.

302.    Larsen entered into agreements with GSR on or about October 4, 2017 and January 24, 2020. PX 614; PX 612. Larsen was in the United States at the time he entered into those two agreements with GSR. PX 393 at 7-8.

**Response:**    Disputed.  Defendants dispute that Larsen entered into agreements with GSR on October 4, 2017 and January 24, 2020.  Undisputed that the ███████████████████ ██████████████████████████ entered into an agreement with GSR which was effective as of January 24, 2020 and that Larsen was the signatory.  PX 612.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 612, because the cited evidence does not support the SEC's assertion of fact as set forth in Paragraph 302.  The agreement states that it was effective "as of January 24, 2020," but the signature page is not dated.  PX 612.  Undisputed that ████████████████████████ entered into an agreement with GSR and that Larsen was the signatory.  PX 614.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 614, because the cited evidence does not support the SEC's assertion of fact as set forth in Paragraph 302.  The agreement states that the contract was effective "as of October 4, 2017," but the signature page is not dated.  PX 614.  Therefore, the agreement only supports that Larsen was in the United States when the agreement became effective, not when it was signed.  PX 614 & PX 393.  Defendants dispute the inference the SEC tries to draw that Larsen's physical location at the time of entering into any such agreement is relevant to the question of whether Larsen's sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the federal securities laws. As explained in Defendants' Motion for Summary Judgment, offers to sell and sales occurred on the foreign exchanges notwithstanding the physical location of the Defendants at the time of the offer to sell

or sale, let alone at the time of entering into an agreement with GSR, which itself did not

constitute either an offer to sell or sale. *See* Defs.' MSJ at 58-74.

303.    Garlinghouse entered into an agreement with GSR on or about December 18, 2017. PX 615 (together with PX 612 and PX 614, the "XRP liquidation agreements"). Garlinghouse was in the United States at the time he entered into that agreement with GSR. PX 454 at 7.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PXs 615 and 454 because the cited evidence does not

support the SEC's assertions of fact as set forth in Paragraph 303 that Garlinghouse was in the

United States when he "entered into an agreement with GSR."  The agreement says "… the

Parties have caused this Agreement to be executed as of the Effective Date," which is December

18, 2017, but Garlinghouse's signature is not dated.  PX 615.  Therefore, the cited evidence only

supports that Garlinghouse was in the United States when the agreement became effective, but

not when Garlinghouse entered into it.  Defendants also dispute the term "XRP liquidation

agreements" as used in Paragraph 303 because the titles of the documents in the cited exhibits

are "Continuing Liquidity Extraction Agreement" and "Liquidity Extraction Agreement."

Defendants dispute the inference the SEC tries to draw that Garlinghouse's physical location at

the time of entering into such an agreement is relevant to the question of whether Garlinghouse's

sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the

federal securities laws.  As explained in Defendants' Motion for Summary Judgment, offers to

sell and sales occurred on the foreign exchanges notwithstanding the physical location of the

Defendants at the time of the offer to sell or sale, let alone at the time of entering into an

agreement with GSR, which itself did not constitute either an offer to sell or sale.  *See* Defs.'

MSJ at 58-74.  Defendants dispute Paragraph 303 to the extent it implies that the Individual

Defendants' sales or offers to sell occurred domestically, or that transfer of title occurred or

irrevocable liability was incurred within the United States.  Defendants note that PXs 612 and

614 are not agreements between GSR and Garlinghouse, but are agreements between GSR and

Larsen.

304.    Under the XRP liquidation agreements, Larsen and Garlinghouse instructed GSR
"to liquidate XRP and extract maximum value in bitcoins or US Dollars." PX 614 at Preamble;
*see also id.* § 1.3; PX 612 at Preamble & § 1.3; PX 615 at Preamble & § 1.3.

**Response:**    Disputed because PX 612 does not contain the language as quoted in

Paragraph 304.  Rather, it says "… to liquidate such Crypto from time to time and extract

maximum value in US Dollars ("USD") or other currency."  In addition, Defendants dispute that

Larsen and Garlinghouse "instructed" GSR to do this, which is unsupported by the exhibits that

merely show what the final executed agreement reflected.  Defendants dispute the term "XRP

liquidation agreements" as used in Paragraph 304 because the titles of the documents in the cited

exhibits are "Continuing Liquidity Extraction Agreement" and "Liquidity Extraction

Agreement."  Finally, Defendants dispute Paragraph 304 to the extent it implies that the

Individual Defendants' sales or offers to sell occurred domestically, or that transfer of title

occurred or irrevocable liability was incurred within the United States.  Undisputed that PX 614

contains the quoted text, exclusive of any alterations, omissions, or additions, and that PX 615

contains substantially similar language, except that Paragraph 304 omits the word "either"

between the words "in" and "bitcoins"; however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the documents' complete

contents.

305.    The XRP liquidation agreements provide: "GSR will sell [the XRP]…in a series
of liquidation transactions … at a price to be chosen at GSR's sole discretion," with the
Individual Defendants "agree[ing] to hold GSR harmless and not dispute the price of any such

sales made by GSR," and "direct[]" GSR where to deposit proceeds from the sales. PX 612 §
2.5; *see also* PX 614 § 2.5; PX 615 § 2.5.

 **Response:**  Disputed because the cited provisions of PXs 614 and 615 do not contain

the language quoted in Paragraph 305 "at a price to be chosen at GSR's sole discretion" and

"agree[ing] to hold GSR harmless and not dispute the price of any such sales made by GSR."

PX 614 § 2.5; PX 615 § 2.5.  Defendants also dispute the term "XRP liquidation agreements" as

used in Paragraph 305 because the titles of the documents in the cited exhibits are "Continuing

Liquidity Extraction Agreement" and "Liquidity Extraction Agreement."  Defendants dispute

Paragraph 305 to the extent it implies that the Individual Defendants' sales or offers to sell

occurred domestically, or that transfer of title occurred or irrevocable liability was incurred

within the United States.  Undisputed that PX 612 contains the remainder of the quoted text,

exclusive of any alterations, omissions, or additions; however, Defendants do not concede that

this is the entirety of, a representative selection of, or a fair characterization of the document's

complete contents.

 306. The XRP liquidation agreements provide: "GSR agrees to and will maintain
custody and control of the [XRP] until the [XRP] are actually purchased according to the
procedures described below…GSR will deposit any funds or Tokens compensation
generated…into accounts at Bitstamp.com chosen by Customer. The applicable Loan will
automatically terminate once GSR has repaid the Loan, all applicable Loaned Tokens have been
liquidated using the process set out in Section 2.5 and GSR has deposited the proceeds in such
applicable account or accounts." PX 614 § 2.3; *see also* PX 612 § 2.3; PX 615 § 2.3.

 **Response:**  Disputed because PX 612 does not contain the language "into accounts at

Bitstamp.com chosen by Customer" as reflected in Paragraph 306, but rather says "into accounts

of Customer's choosing."  PX 612 § 2.3.  Defendants note that when the Individual Defendants

transferred XRP to GSR, GSR only had temporary custody of the XRP for the sole purpose of

selling it on behalf of the Individual Defendants.  *See, e.g.*, Defs.' Rule 56.1 Statement (ECF No.

623) ¶ 275; PX 612 § 1.4, 614 § 1.4, and 615 § 1.4 (GSR agreements explaining that a customer

"loan[s]" a token "for up to twelve (12) months"); PX 612 § 1.5, PX 614 § 1.5, PX 615 § 1.5

(GSR agreements defining "loss"); PX 612 § 1.6, PX 614 § 1.6, PX 615 § 1.6 (GSR agreements

defining "Token" to include XRP); PX 612 § 2.1, PX 614 § 2.1, PX 615 § 2.1 (GSR agreements

explaining that customers "loan GSR a specified amount of Tokens for a period of up to twelve

(12) months … Any Loaned Tokens that are not liquidated within twelve (12) months of delivery

will be delivered back to Customer[.]").  Defendants also dispute the term "XRP liquidation

agreements" because the titles of documents in the cited exhibits are "Continuing Liquidity

Extraction Agreement" and "Liquidity Extraction Agreement."  Defendants dispute Paragraph

306 to the extent it implies that the Individual Defendants' sales or offers to sell occurred

domestically, or that transfer of title occurred or irrevocable liability was incurred within the

United States.  Undisputed that PXs 614 and 615 contain the remaining quoted text, exclusive of

any alterations, omissions, or additions; however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the documents' complete

contents.

307.    The XRP liquidation agreements provide:  "As consideration for providing the
Liquidity Extraction Activity, GSR will receive ███████████ of the [XRP]. GSR's right to
payment vests once GSR takes custody of the [XRP]." PX 612 § 2.6; PX 614 § 2.6; PX 615 §
2.6.

**Response:**     Disputed because PX 612 does not contain the language "…takes

custody…" as reflected in Paragraph 307, but rather says "…has custody…."  PX 612 § 2.6.

Defendants also dispute the term "XRP liquidation agreements" as used in Paragraph 307

because the titles of documents in the cited exhibits are "Continuing Liquidity Extraction

Agreement" and "Liquidity Extraction Agreement."  Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PXs 612, 614, and 615 to the extent

it implies that the moment at which GSR's right to payment in connection with offering to sell

and selling the relevant XRP on foreign digital asset exchanges vested is relevant to the question

of whether the Individual Defendants' sales and offers to sell on foreign digital asset exchanges

were within the territorial scope of the federal securities laws.  Defendants also dispute

Paragraph 307 to the extent it implies that the Individual Defendants' sales or offers to sell

occurred domestically, or that transfer of title occurred or irrevocable liability was incurred

within the United States.  Undisputed that PXs 614 and 615 contains the quoted text, exclusive of

any alterations, omissions, or additions; however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the documents' complete

contents.

308.     The XRP liquidation agreements provide that "GSR is responsible for all customer service related to the distribution or resale" of the XRP. PX 612 § 5; PX 614 § 5; PX 615 § 5.

**Response:**     Undisputed that PXs 612, 614, and 615 contain the quoted text, exclusive

of any alterations, omissions, or additions; however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the documents' complete

contents.  Defendants dispute the term "XRP liquidation agreements" as used in Paragraph 308

because the titles of the documents in the cited exhibits are "Continuing Liquidity Extraction

Agreement" and "Liquidity Extraction Agreement."  Finally, Defendants dispute Paragraph 308

to the extent it implies that the Individual Defendants' sales or offers to sell occurred

domestically, or that transfer of title occurred or irrevocable liability was incurred within the

United States.

309.     The XRP liquidation agreements provide that GSR is "not purchasing any [XRP] from [the Individual Defendants] to use such [XRP] as an End User." PX 612 § 6(e); PX 614 § 6(e); PX 615 § 6(e).

**Response:**     Undisputed that PXs 612, 614, and 615 contain the quoted text, exclusive

of any alterations, omissions, or additions; however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the documents' complete

contents.  In fact, GSR was expressly not permitted to be an "End User" of the XRP transferred

to it by the Individual Defendants.  *See* PX 612 § 4.1, 614 § 4.1, and 615 § 4.1 (GSR agreements

recognizing an "End User" or "End User Buyer" of the XRP and that "GSR will not use the

Loaned Tokens as an End User.").  Defendants also note that GSR's custody of the XRP while it

sought buyers "did not represent a right to make any demand" on the Individual Defendants.  PX

612 § 4.2, PX 614 § 4.2, and PX 615 § 4.2 (GSR agreements stating "Tokens do not represent a

right to make any demand on Customer or any of its affiliates[.]").  Defendants dispute the term

"XRP liquidation agreements" as used in Paragraph 309 because the titles of the documents in

the cited exhibits are "Continuing Liquidity Extraction Agreement" and "Liquidity Extraction

Agreement."  Finally, Defendants dispute Paragraph 309 to the extent it implies that the

Individual Defendants' sales or offers to sell occurred domestically, or that transfer of title

occurred or irrevocable liability was incurred within the United States.

310.    The XRP liquidation agreements provide that if GSR "decides to sell the Loaned
Tokens it purchases it will collect relevant Know Your Customer information." PX 612 § 6(g);
PX 614 § 6(g); PX  615 § 6(g).

**<u>Response:</u>**      Undisputed that PXs 612, 614, and 615 contain the quoted text, exclusive

of any alterations, omissions, or additions; however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the documents' complete

contents.  Defendants dispute the term "XRP liquidation agreements" as used in Paragraph 310

because the titles of the documents in the cited exhibits are "Continuing Liquidity Extraction

Agreement" and "Liquidity Extraction Agreement."  Finally, Defendants dispute Paragraph 310

to the extent it implies that the Individual Defendants' sales or offers to sell occurred

domestically, or that transfer of title occurred or irrevocable liability was incurred within the

United States.

311.     The XRP liquidation agreements provide that Larsen or Garlinghouse can terminate the agreements "upon sixty (60) days' advance written notice to GSR" or "immediately upon notice to GSR if GSR breaches any of its obligations" under the agreements. PX 612 §§ 10.2, 10.3; PX 614 §§ 9.2, 9.3; PX 615 §§ 9.2, 9.3.

Undisputed that PXs 612, 614, and 615 contain the quoted text, exclusive of any alterations, omissions, or additions; however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the documents' complete contents. Defendants dispute the term "XRP liquidation agreements" as used in Paragraph 311 because the titles of the documents in the cited exhibits are "Continuing Liquidity Extraction Agreement" and "Liquidity Extraction Agreement." In addition, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 612, 614, and 615 to the extent it implies that the Individual Defendants could not require that GSR return their XRP or that GSR stop the trading algorithm notwithstanding these provisions regarding terminating the agreement. In fact, ███ testified that unless and until GSR sold the Individual Defendants' XRP on exchanges, the Individual Defendants could require that GSR return their XRP or that GSR stop the trading algorithm. PX 26 (███ Dep. Tr.) at 291:22-293:8 (before a trade is accepted, "[a]s soon as a client says stop, return the funds, we stop the bots"); 285:14-23 (Q: "So when the client sends GSR XRP to a GSR designated wallet, at that moment, who owns the XRP?" A: "I think the XRP is still owned by the client." Q: "In fact, does GSR ever take ownership of the XRP through the entire trading process?" A: "Not to the best of my knowledge."); 288:7-17 (Q: "At this point …when the XRP is in a GSR designated wallet, could the client decide that it didn't want to trade its XRP for any other currency at all?" A: "Of course." Q: "A client could say, actually, give me back my XRP?" A: "Yes." Q: "Okay. And GSR couldn't refuse at that point, right?" A: "No. I can't imagine, no."); 289:6-11 (Q: "And, at that point, when the XRP is in a receiving address wallet at the exchange, who owns the XRP?" A: "I believe – nothing's

changed. The XRP is still owned by the client."). Finally, Defendants dispute Paragraph 311 to

the extent it implies that the Individual Defendants' sales or offers to sell occurred domestically,

or that transfer of title occurred or irrevocable liability was incurred within the United States.

312.   The XRP liquidation agreements provide: "[I]n order to perform its obligations under this Agreement GSR will be required to engage the services of certain third-party online platforms (including but not limited to Bitstamp.com) that allow trading of XRP and other digital assets…In the event any sum of Customer's funds are lost due to an insolvency issue at any such online trading platform, which insolvency issue occurred through no fault of GSR, which shall be deemed to occur wherein such online trading platform will not return funds within ninety (90) days of a request made in writing by GSR, GSR will have the right to transfer to Customer any claim or portion of a claim it has against such trading platform as such claim relates to Customer's funds." PX 614 § 11.1; PX 615 § 11.1; *see also* PX 612 § 10.1.

**Response:**      Disputed because PX 612 does not contain the language as quoted in

Paragraph 312, because it says "… certain third-party online platforms that allow trading of

Crypto and other digital assets," PX 612 § 10.1, and does not mention Bitstamp or platforms

"that allow trading of XRP." Defendants dispute the term "XRP liquidation agreements" as used

in Paragraph 312 because the titles of the documents in the cited exhibits are "Continuing

Liquidity Extraction Agreement" and "Liquidity Extraction Agreement." Defendants dispute

Paragraph 312 to the extent it implies that the Individual Defendants' sales or offers to sell

occurred domestically, or that transfer of title occurred or irrevocable liability was incurred

within the United States. Undisputed that PXs 614 and 615 contain the remaining quoted text,

exclusive of any alterations, omissions, or additions; however, Defendants do not concede that

this is the entirety of, a representative selection of, or a fair characterization of the documents'

complete contents. Defendants note that Paragraph 312 omits that the agreements state that in

order to perform its obligations under the agreements, GSR needs to place the "Loaned Tokens"

"temporarily [] into the custody of such third-party online platforms," which is why the

remainder of the quoted clause addresses loss of a customer's funds. PX 614 § 11.1; PX 615 §

11.1; PX 612 § 10.1.

313.    The XRP liquidation agreements provide: "Nothing in this Agreement shall be construed as creating an employer-employee or agency relationship, a partnership or a joint venture between the parties. Neither party will have any right, power or authority to bind the other party." PX 612 § 11.2; PX 614 § 12.2; PX 615 § 12.2.

**Response:**    Undisputed that PXs 612, 614, and 615 contain the quoted text, exclusive

of any alterations, omissions, or additions; however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the documents' complete

contents.  Defendants note that ████ testified that GSR was the "execution agent" of the Individual

Defendants.  PX 26 (███ Dep. Tr.) at 281:19-25.  Defendants dispute the term "XRP liquidation

agreements" as used in Paragraph 313 because the titles of the documents in the cited exhibits

are "Continuing Liquidity Extraction Agreement" and "Liquidity Extraction Agreement."  PX

612 § 11.2; PX 614 § 12.2; PX 615 § 12.2.  Defendants also dispute Paragraph 313 to the extent

it implies that the Individual Defendants' sales or offers to sell occurred domestically, or that

transfer of title occurred or irrevocable liability was incurred within the United States.

314.    Pursuant to these contracts, Larsen transferred 1.5 billion XRP ($495 million) and Garlinghouse transferred 167 million XRP ($104 million), from accounts at a U.S.-based crypto platform Bitstamp U.S.A., to GSR. PX 202 at 27-31 (¶¶ 36-40); PX 81 at 180:5-23; PX 394; PX 732.

**Response:**    Disputed.  Defendants dispute the assertions contained in Paragraph 314

on the grounds that the assertions are not supported by citation to evidence which would be

admissible.  The material cited to support the facts asserted, the ████Report, is not admissible

for the reasons set forth in Defendants' Motion to Exclude (ECF No. 538), and the assertions are

opinions of a purported expert and not facts.  Defendants also dispute the SEC's assertion in

Paragraph 314 that Larsen and Garlinghouse transferred XRP "from accounts at a U.S.-based

crypto platform Bitstamp U.S.A."  First, the cited exhibits do not support that Larsen and

Garlinghouse made transfers to GSR from Bitstamp.  PX 202 reflects that the Individual

Defendants made transfers to GSR from "Identified XRP Addresses," but not that these bear any

relationship to Bitstamp.  PX 81 is Garlinghouse's testimony that his proceeds from completed

XRP sales were deposited in his Bitstamp account, but Paragraph 314 is about the amount of

XRP transferred to GSR to then be sold.  Similarly, PX 732 reflects communications between

Larsen and Bitstamp about withdrawing XRP sale proceeds.  Therefore, the cited evidence does

not show that Larsen or Garlinghouse made XRP transfers to GSR from Bitstamp accounts.

Second, the cited exhibits do not support that Bitstamp was "U.S.-based" or that Larsen's or

Garlinghouse's accounts on Bitstamp were "U.S.-based" for the entirety of the period that the

Individual Defendants transferred XRP to GSR.  Nor does Paragraph 314 define the term "U.S.-

based." PX 394, which is Larsen's Bitstamp account record, shows that Larsen made

withdrawals from UK-based Bitstamp Limited.  PX 394.  PX 411, which is Garlinghouse's

Bitstamp account record, likewise shows that Garlinghouse made withdrawals from UK-based

Bitstamp Limited, and that the first withdrawal from Bitstamp USA was on August 4, 2020.  PX

411 (Bitstamp USA_00000001 at '0009-0010) (showing London address for Bitstamp Limited).

The undisputed evidence shows that Bitstamp Limited has no indicia of being based in the

United States.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) at ¶¶ 205-209.  And the

undisputed evidence further shows that Garlinghouse and Larsen's Bitstamp accounts at

Bitstamp Limited were not migrated to a U.S.-based Bitstamp USA account until April 2020.

Ex. 147 (BS-LTD-00000005) at BS-LTD-00000011.  Defendants dispute that the location of the

Individual Defendants' Bitstamp accounts is relevant to determining where sales and offers to

sell XRP took place or to the question of whether the Individual Defendants' sales and offers to

sell on foreign digital asset exchanges were within the territorial scope of the federal securities

laws.  Defendants additionally dispute that offers to sell and sales executed through GSR on

foreign exchanges are within the territorial scope of the federal securities laws because they are

not domestic.  *See* Defs.' MSJ at 58-74.  Defendants further dispute Paragraph 314 because it is vague as to the timing of the transfers.  GSR never owned the XRP that the Individual Defendants transferred to GSR to sell on their behalf, but rather, ownership remained with the Individual Defendants until a sale was completed.  PX 26 (███ Dep. Tr.) at 285:14-23 (Q: "So when the client sends GSR XRP to a GSR designated wallet, at that moment, who owns the XRP?"  A: "I think the XRP is still owned by the client."  Q: "In fact, does GSR ever take ownership of the XRP through the entire trading process?"  A: "Not to the best of my knowledge."); 289:6-11 (Q: "And, at that point, when the XRP is in a receiving address wallet at the exchange, who owns the XRP?"  A: "I believe—nothing's changed. The XRP is still owned by the client."); 291:22–293:8 ("As soon as a client says stop, return the funds, we stop the bots"); 288:7-17 (Q: … "when the XRP is in a GSR designated wallet, could the client decide that it didn't want to trade its XRP for any other currency at all?"  A: "Of course."  Q: "A client could say, actually, give me back my XRP?"  A: "Yes."  Q: "Okay. And GSR couldn't refuse at that point, right?"  A: "No. I can't imagine, no.").  Defendants dispute Paragraph 314 to the extent it implies that the Individual Defendants' sales or offers to sell occurred domestically, or that transfer of title occurred or irrevocable liability was incurred within the United States.

315.     Each of the Individual Defendants' transfers of XRP was reflected on the XRP Ledger. PX 202 at App'x E.

**Response:**     Disputed.  Defendants dispute the assertions contained in Paragraph 315 on the grounds that the assertions are not supported by citation to evidence which would be admissible.  The material cited to support the facts asserted, the ███ Report, is not admissible for the reasons set forth in Defendants' Motion to Exclude (ECF No. 538), and the assertions are opinions of a purported expert and not facts.  In addition, Defendants dispute Paragraph 315 as vague because it does not define "transfers of XRP."  Defendants further dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 202 as misleading because sales of XRP made on an exchange are not recorded on the XRP Ledger.  *See* PX 26 (██Dep. Tr.) at 299:3-5 (Q: "If a sale of XRP is done on an exchange, is that sale recorded on the XRP Ledger?" A: "No."); Ex. 41 (Yadav Rep.) ¶¶ 91-93 ("It has become common industry practice to settle exchange trades off-chain and to avoid publishing information to blockchains in real-time.").  In addition, off-chain or off-ledger transactions become final and binding when the offers are matched on an exchange in the geographic location of the exchange.  Ex. 41, Yadav Rep. ¶¶ 67-68 ("To better assure a workable, active, and liquid exchange, permitting the rapid flow of transactions, most centralized cryptocurrency exchanges offer users a custody function for their wallets and private keys to enable rapid 'off-chain' settlement."); 86-98 ("To summarize, offers to buy and sell cryptocurrencies that occur on an exchange and are matched in accordance with exchange rules become final and binding on the exchange.  Exchanges mostly settle their transactions off-chain.  Even so, the settlement process merely follows from the fact of transactions becoming final and binding as soon as offers are matched on the exchange. …  By becoming final and binding within an exchange and not requiring settlement on a blockchain … transactions become binding in the geographic location of the exchange upon which trades are made.").  Finally, Defendants dispute Paragraph 315 to the extent it implies that the Individual Defendants' sales or offers to sell occurred domestically, or that transfer of title occurred or irrevocable liability was incurred within the United States.

316.    In October 2020, Garlinghouse's financial consultants determined that his Bitstamp account is an account with Bitstamp U.S.A. that is not a "foreign financial institution" and that the "wallet [he] hold[s] via GSR is not a foreign financial account." PX 438 at GARL_Civil_000806.

**Response:**    Undisputed that PX 438 contains the quoted text, exclusive of any alterations, omissions, or additions; however, Defendants do not concede that this is the entirety

of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 438 to the extent it sets forth legal conclusions that the determination that Garlinghouse's Bitstamp account or the wallet he holds via GSR are not foreign financial accounts for the purpose of filing tax returns with the Internal Revenue Service would have any significance outside the tax reporting context, which is unsupported by any evidence.  Specifically, Defendants dispute any inference that Garlinghouse's Bitstamp account or the wallet he holds via GSR not being foreign financial accounts for tax reporting is relevant to the question of whether Garlinghouse's sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the federal securities laws.  *See* Defs.' MSJ at 58-74.  Further, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 438 to the extent it implies anything about Garlinghouse's Bitstamp account or the wallet he holds via GSR prior to October 2020, which would not be established by the cited exhibit.  PX 438.  Defendants additionally dispute that offers to sell and sales executed through GSR on foreign exchanges are within the territorial scope of the federal securities laws because they are not domestic.  *See* Defs.' MSJ at 58-74.

317.    To transfer their XRP to GSR, the Individual Defendants used their private cryptographic keys to digitally sign the transaction to transfer the XRP from the "address" they controlled to the "address" supplied by GSR. *See* XRPL.org, *Cryptographic Keys* (2021) *available at* https://xrpl.org/cryptographic-keys.html.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, the linked webpage because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 317.  The linked webpage does not mention GSR, the Individual Defendants, or details about how the Individual Defendants transferred XRP to GSR.  Instead, the linked webpage contains only general information about

161

cryptographic keys.  Defendants dispute Paragraph 317 to the extent it implies that the Individual

Defendants' sales or offers to sell occurred domestically, or that transfer of title occurred or

irrevocable liability was incurred within the United States.

318.    A private key with respect to an address on a blockchain is a lengthy password
known only to the person who controls a crypto asset which is tied to the address they control.
PX 12 (Expert Report of ███████████ ("█████ Report")) at 11-12 (§ 3.2). "As a
fundamental principle, whoever controls the private keys corresponding to a given address,
controls [the crypto asset] pertaining to that address." *Id.*

**Response:**      Defendants do not dispute the statement of fact set forth in Paragraph 318,

except object that the assertions are not supported by citation to evidence which would be

admissible.  The material cited to support the facts asserted, the ████ Report, is not

admissible for the reasons set forth in Defendants' Motion to Exclude (ECF No. 541), and the

assertions are opinions of a purported expert and not facts.

319.    The Bitcoin blockchain validation process is called "Proof-of-Work," and it
consists of a "miner node" performing a "very large number of operations" in order to transmit a
new block for the blockchain to all the other nodes. PX 12 at 11-15 (§ 3.2.1).

**Response:**      Defendants do not dispute the statement of fact set forth in Paragraph 319,

except object that the assertions are not supported by citation to evidence which would be

admissible.  The material cited to support the facts asserted, the ████ Report, is not

admissible for the reasons set forth in Defendants' Motion to Exclude (ECF No. 541), and the

assertions are opinions of a purported expert and not facts.

320.    The Ethereum blockchain validation process was at the time of ████ Report
"very similar" to Bitcoin's, and was also "Proof-of-Work." PX 12 at 18 (§ 3.3.1).

**Response:**      Defendants do not dispute the statement of fact set forth in Paragraph 320,

except object that the assertions are not supported by citation to evidence which would be

admissible.  The material cited to support the facts asserted, the ████ Report, is not

admissible for the reasons set forth in Defendants' Motion to Exclude (ECF No. 541), and the

assertions are opinions of a purported expert and not facts.  In addition, the Ethereum blockchain has now changed to a proof-of-stake validation process.  *See* Ex. 291, ETHEREUM, *The Merge*, https://ethereum.org/en/upgrades/merge/ (last visited November 22, 2022).

321.   The XRP Ledger validation process is called a "Byzantine fault-tolerant (BFT) protocol," PX 12 at 21 (§ 4.1.2), and the process works iteratively by validator nodes sending messages to each other to propose transactions, and transactions becoming "confirmed" for a particular node when it receives a message from at least 80% of the nodes in that node's "unique node list." *Id.* at 34-35 (App'x B).

**Response:**      Undisputed except that the XRP Ledger uses a "consensus protocol" requiring a supermajority of validators, 80%, to validate transactions on the Ledger.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 24, 28, 56.  Defendants object that the assertions in Paragraph 321 are not supported by citation to evidence which would be admissible.  The material cited to support the facts asserted, the ███ Report, is not admissible for the reasons set forth in Defendants' Motion to Exclude (ECF No. 541), and the assertions are opinions of a purported expert and not facts.

322.   The XRP Ledger's list of "default" unique node lists includes 19 nodes run by Ripple or entities with which Ripple has a commercial relationship, including U.S.-based universities and entities. PX 12 at 32-33 (App'x A, Figures 2, 3).

**Response:**      Disputed.  Defendants dispute that the XRP Ledger contains a "list of 'default' unique node lists," as Paragraph 322 states.  To the extent that Paragraph 322 references the unique node list published by Ripple that was contained within the XRP Ledger's code as an option for validators to choose to adopt, Defendants dispute that the cited evidence establishes the contents of Ripple's unique node list at any point during the time period at issue in this case, as the cited evidence only described the contents of Ripple's unique node list "as of [the] July 16, 2021 update," and the SEC's allegations in this case do not relate to offers and sales after December 22, 2020.  Defendants further dispute the assertions contained in Paragraph 322 on the grounds that the assertions are not supported by citation to evidence which would be admissible.

The material cited to support the facts asserted, the ███████ Report, is not admissible for the reasons set forth in Defendants' Motion to Exclude (ECF No. 541), and the assertions are opinions of a purported expert and not facts.  Defendants also dispute Paragraph 322 as being vague because it is does not define the terms "commercial relationship" or "U.S.-based." Accordingly, Defendants dispute that the cited evidence supports the SEC's assertion of fact as set forth in Paragraph 322 that Ripple had a "commercial relationship" with all nineteen of these entities.  In addition, Defendants dispute that the cited evidence supports the SEC's assertion of fact as set forth in Paragraph 322 that all nineteen of these universities and entities can be described as "U.S.-based."  They include, for example, Bitso (a cryptocurrency exchange founded in Mexico), the University of Korea (a school located in Seoul, South Korea), and the Australian National University (a school located in Canberra, Australia), among others.  PX 12 at 32-33 (App'x A, Figures 2, 3); Ex. 292, Nina Bambysheva & Maria Abreu, *Mexican Bitcoin Exchange Bitso Raises $250 Million, Becomes Latin America's First Crypto Unicorn*, FORBES (May 5, 2021), https://www.forbes.com/sites/ninabambysheva/2021/05/05/mexican-bitcoin-exchange-bitso-raises-250-million-becomes-latin-americas-first-crypto-unicorn/?sh=479962c64af5; Ex. 293, KOREA UNIVERSITY, *Current Status*, https://www.korea.edu/mbshome/mbs/en/subview. do?id=en_010106000000 (last visited November 22, 2022); Ex. 294, AUSTRALIAN NATIONAL UNIVERSITY, *Our History*, https://www.anu.edu.au/about/our-history (last visited November 22, 2022).  Finally, Defendants dispute Paragraph 322 to the extent it implies that the Individual Defendants' sales or offers to sell occurred domestically, or that transfer of title occurred or irrevocable liability was incurred within the United States.

323.     The publication "How Bitcoin Functions As Property Law," by Eric D. Chason, published in the William & Mary Law School Scholarship Repository in 2019, states: "Owners

of Bitcoin establish their ownership by what lawyers would call a 'chain of title,' or what [the creator of Bitcoin] called 'a chain of digital signatures.' Each transfer of Bitcoin resembles a deed of real estate, as the 'grantor' refers to the prior transaction under which she holds. Modern cryptography allows users to replace legal names and handwritten signatures with alphanumeric public addresses and digital signatures." PX 638 (Chason, 49 SETON HALL L. REV. 129, 138 (2019)) at 138.

**Response:**     Undisputed.

324.    When the XRP Ledger "advances," (i.e., there is a new state of the ledger with changes in transactions that occur on the ledger) that occurs physically *"in each individual node participating in or moderating or participating in the process"*—each server advances the ledger for its own purposes, each individual server has to make the decision of advancing the XRP Ledger for its own purposes. PX 6 (Schwartz Dep. Tr.) at 61:4-62:23 (emphasis added).

**Response:**     Undisputed that Schwartz testified that when the XRP Ledger advances it

occurs physically "[i]n each individual node participating in or moderating or participating in the

process.  That's an individual decision that each server makes" and a "server will advance its

own state where that server is for its own purposes."  PX 6 (Schwartz Dep. Tr.) at 61:6-8, 62:15-

16.  However, Defendants do not concede that this is the entirety of, a representative selection of,

or a fair characterization of Schwartz's testimony.

325.    Larsen and Garlinghouse used U.S. domestic means to sell XRP with GSR. PX 81(Garlinghouse Dep. Tr.) at 139:5-10, 140:4-22 (Garlinghouse used Signal to communicate with GSR); PX 732 (Larsen's communications with Bitstamp re transfer of his XRP to GSR logging in from the United States).

**Response:**     Disputed.  First, Defendants dispute Paragraph 325 as vague because it

does not define the term "U.S. domestic means" nor is it clear what this term means.  Second,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81

because the cited evidence does not support the SEC's apparent suggestion that using Signal

constitutes using so-called "U.S. domestic means."  PX 81 consists of Garlinghouse's testimony

that he had certain communications with GSR via the Signal application, which includes both

messaging and phone call features.  PX 81 (Garlinghouse Dep. Tr.) at 139:5-10 (Q: "… did you

have communications on Signal with GSR?"  A: "Yes."); 140:4-22.  Third, Defendants dispute

that PX 732 shows Larsen communicating with Bitstamp "re transfer of his XRP to GSR" as set

forth in Paragraph 325 because Larsen was communicating with Bitstamp regarding a

withdrawal request and provided documentation about the origin of the funds.  PX 732.

Defendants also dispute the inference that communicating about XRP via Signal or via electronic

communications with GSR is relevant to the question of whether the Individual Defendants'

sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the

federal securities laws.  *See* Defs.' MSJ at 58-74.  Defendants additionally dispute that offers to

sell and sales executed through GSR on foreign exchanges are within the territorial scope of the

federal securities laws because they are not domestic.  *See* Defs.' MSJ at 58-74.  To the extent

the SEC seeks to draw any inferences about Larsen's sales prior to September 2015, Larsen

claims such transactions are barred by the statute of limitations.  *See* Defs.' MSJ at 74-75.

Finally, Defendants dispute Paragraph 325 to the extent it implies that the Individual Defendants'

sales or offers to sell occurred domestically, or that transfer of title occurred or irrevocable

liability was incurred within the United States.

     326.     Larsen has used his U.S.-based Bitstamp account to sell XRP. PX 2 (Larsen Dep.
Tr.) at 157:2-158:7; PX 394.

     **Response:**     Undisputed that Larsen at times used a Bitstamp account to sell XRP, but

disputed that it was a "U.S.-based Bitstamp account."  Defendants also dispute Paragraph 326

because "U.S.-based" is not a defined term.  Larsen's Bitstamp account was migrated from a

U.K.-based Bitstamp account to a U.S.-based Bitstamp USA account in April 2020, Ex. 272, BS-

LTD-00000005 at 011.  PX 394, which is Larsen's Bitstamp account record, shows that Larsen

made withdrawals from UK-based Bitstamp Limited, and Larsen only interacted with the U.K.-

based entity during the period in which he sold XRP on Bitstamp.  *See* PX 394 at 0074; Ex. 166

(RPLI_SEC 0053572) at RPLI_SEC 0053573.  Defendants further dispute the SEC's

characterization of, and inferences purportedly drawn from PX 394, to the extent the SEC

implies that Larsen primarily sold XRP on Bitstamp, that Larsen sold XRP on Bitstamp outside

of certain months in 2013 and 2017, that Bitstamp was located in the United States when Larsen

conducted trades on Bitstamp, or that Larsen's offers or sales of XRP on Bitstamp were

domestic.  PX 394 at -0079–0080.  Defendants dispute that the location of the Individual

Defendants' Bitstamp accounts is relevant to determining where sales and offers to sell XRP

took place or to the question of whether the Individual Defendants' sales and offers to sell on

foreign digital asset exchanges were within the territorial scope of the federal securities laws.

Defendants additionally dispute that offers to sell and sales executed through GSR on foreign

exchanges are within the territorial scope of the federal securities laws because they are not

domestic. *See* Defs.' MSJ at 58-74. Defendants further dispute Paragraph 326 because it is vague

as to the timing of the transfers.

     327.    Larsen has a Gatehub address and sold XRP through that address. PX 2 (Larsen Dep. Tr.) at 159:10-23.

    **Response:**    Undisputed that Larsen has a Gatehub address and at times has sold XRP

through his Gatehub account.  Defendants dispute the SEC's characterization of, and inferences

drawn from, PX 2 to the extent the SEC implies that Larsen sold XRP through Gatehub

frequently, that he used Gatehub throughout the entire relevant time period, that Gatehub was

located in the United States when Larsen traded on Gatehub, or that Larsen's offers or sales of

XRP on Gatehub were domestic.  Defendants dispute that the location of Larsen's Gatehub

account is relevant to determining where sales and offers to sell XRP took place or to the

question of whether the Individual Defendants' sales and offers to sell on foreign digital asset

exchanges were within the territorial scope of the federal securities laws.  Defendants

additionally dispute that offers to sell and sales executed through GSR on foreign exchanges are

within the territorial scope of the federal securities laws because they are not domestic.  *See*

Defs.' MSJ at 58-74.  Defendants further dispute Paragraph 327 because it is vague as to the

timing of the transfers.

328.    Larsen has a Coinbase account that he opened in the U.S. PX 2 (Larsen Dep. Tr.)
at 158:24-159:8.

**Response:**       Undisputed that Larsen opened a Coinbase account in the United States.

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 2

to the extent the SEC implies Larsen sold XRP through his Coinbase account throughout the

relevant time period or that Coinbase was located in the United States when Larsen traded on

Coinbase, or that Larsen's offers or sales of XRP on Coinbase were domestic.  Defendants

dispute that the location of Larsen's Coinbase account is relevant to determining where sales and

offers to sell XRP took place or to the question of whether the Individual Defendants' sales and

offers to sell on foreign digital asset exchanges were within the territorial scope of the federal

securities laws. Defendants additionally dispute that offers to sell and sales executed through

GSR on foreign exchanges are within the territorial scope of the federal securities laws because

they are not domestic.  *See* Defs.' MSJ at 58-74.  Defendants further dispute Paragraph 328

because it is vague as to the timing of the transfers.

329.    In or around March 2018, Garlinghouse explained to his tax advisers that he
received XRP from Ripple, held it in wallets under his control and then moved his XRP to other
wallets for the purpose of selling his XRP, including to the "GSR cold wallet which they then
access to sell" the XRP, and that GSR then "move[s] USD to [his] bitstamp account – and [he]
wire[s] $$ to [his] ███ bank account." PX 573.

**Response:**       Undisputed that Garlinghouse received XRP from Ripple in wallets under

his control and that PX 573 contains the quoted language; however, Defendants do not concede

that this is the entirety of, a representative selection of, or a fair characterization of the

document's complete contents.  Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from, PX 573 to the extent it implies that Garlinghouse moved all of his XRP "to other wallets for the purpose of selling his XRP." Garlinghouse made clear in his email that prior to January 1, 2018, he would only move "some [XRP] to bitstamp as needed for sales" and that since January 1, 2018, Garlinghouse sold his XRP "exclusively" through GSR. PX 573. For these sales, Garlinghouse "hold[s] XRP in [his] cold wallet and then periodically send[s] ███ XRP to the GSR cold wallet[.]" *Id.* Defendants dispute the inference that the location of the bank account ultimately receiving the XRP sale proceeds after the sales were finalized is relevant to the question of whether Garlinghouse's sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the federal securities laws. *See* Defs.' MSJ at 58-74. Defendants additionally dispute that offers to sell and sales executed through GSR on foreign exchanges are within the territorial scope of the federal securities laws because they are not domestic. *See* Defs.' MSJ at 58-74.

330.    To sell the Individual Defendant's XRP, GSR "take[s] claim" of the XRP in a cold wallet constructed on the XRP Ledger, and from there GSR transfers it to accounts that *GSR* holds on crypto asset trading platforms, not the clients. PX 26 (███ Dep. Tr.) at 284:1-289:21; PX 573.

**Response:**    Disputed. Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PXs 26 and 573 because they are misleading. GSR does not "take claim" of the XRP sent to them by customers to be sold, nor is the wallet in question "constructed on the XRP Ledger." Rather, as ███ testimony made clear, GSR receives XRP in a particular type of wallet from customers in order to conduct sales on their behalf: "… it's called a Ripple wallet but it's basically some software that allows you to take claim, if you will, or be able to operate some XRP. It's a construct on the Ledger," as set forth in PX 26 (███ Dep. Tr.) at 284:15-18. The SEC omits that ███ also explained in his deposition testimony that GSR did not come to own the XRP that GSR sold on the Individual Defendants' behalf. *See* PX 26

169

(█████ Dep. Tr.) at 291:22-293:8 (before a trade is accepted, "[a]s soon as a client says stop, return the funds, we stop the bots"); 285:14-23 (Q: "So when the client sends GSR XRP to a GSR designated wallet, at that moment, who owns the XRP?"  A: "I think the XRP is still owned by the client."  Q: "In fact, does GSR ever take ownership of the XRP through the entire trading process?" ...  A: "Not to the best of my knowledge."); 288:7-17 (Q: "At this point ... when the XRP is in a GSR designated wallet, could the client decide that it didn't want to trade its XRP for any other currency at all?"  A: "Of course."  Q: "A client could say, actually, give me back my XRP?"  A: "Yes."  Q: "Okay. And GSR couldn't refuse at that point, right?"  A: "No. I can't imagine, no."); 289:6-11 (Q: "And, at the point, when the XRP is in a receiving address wallet at the exchange, who owns the XRP?" ...  A: "I believe -- nothing's changed.  The XRP is still owned by the client.").  Defendants further dispute Paragraph 330 because it relates to GSR's internal business practices and processes and Defendants lack sufficient knowledge to confirm or dispute the purported facts.  Finally, Defendants dispute Paragraph 330 to the extent it implies that the Individual Defendants' sales or offers to sell occurred domestically, or that transfer of title occurred or irrevocable liability was incurred within the United States.  Undisputed that GSR transferred the Individual Defendants' XRP to a GSR account on exchanges before offering to sell or selling the XRP.

331.    To sell Individual Defendants' XRP, GSR sent the XRP from its Ripple "cold wallet" to a wallet maintained at the crypto trading exchange for the account of GSR, and all the proceeds of these sales were commingled with Ripple's sales proceeds until 2018. PX 26 (█████ Dep. Tr.) at 141:5-144:11.

**Response:**      Disputed.  The cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 331 because the allegation that "[t]o sell Individual Defendants' XRP, GSR sent the XRP from its Ripple 'cold wallet' to a wallet maintained at the crypto trading exchange for the account of GSR" does not appear in PX 26 at the portion cited by the SEC, but

instead appears at 284:1-289:21.  Defendants further dispute Paragraph 331 because it relates to

GSR's internal business practices and processes and Defendants lack sufficient knowledge to

confirm or dispute the purported facts.  Defendants further dispute the SEC's characterizations

of, and inferences purportedly drawn from, PX 26 to the extent the SEC implies that GSR's

handling of Ripple's, Larsen's, and Garlinghouse's XRP and the proceeds of the sales of their

XRP deviated from GSR's ordinary course of business.  The quoted testimony was an illustrative

example of how GSR handled its customers' digital assets and proceeds from sales of those

assets and ███ did not testify that this method was only used for these clients.  Defendants further

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26 to the

extent it implies that GSR, a third-party, "commingl[ing]" XRP sales proceeds for technological

reasons would be relevant to the analysis of whether Defendants sold XRP as an investment

contract.

332.    From time to time, the Individual Defendants directed GSR from within the
United States to pause or restart their sales of XRP and otherwise provided approval on how
GSR administered the bots for Ripple and IDs. PX 728; PX 729 (Sept. 18, 2018 email from GSR
to Garlinghouse stating "your bots will stay on unless you instruct us otherwise."); PX 730; PX
731 (Dec. 18, 2017 GSR asks Larsen if he agrees "to pause the bots and monitor until
tomorrow?"); PX 733 (Aug. 15, 2016, ███████ tells GSR "Chatted with Chris and Brad. Let's
change 2t from neutral to selling 1.5%."); PX 239 at RPLI_SEC 307781, PX 385, PX 386, PX
387 at RPLI_SEC 205601, PX 388, PX 389, PX 390; PX 2 (Larsen Dep. Tr.) at 157:17-25; PX
393 at 7-8; PX 454 at 6-9.

**Response:**    Disputed.  Defendants dispute that PXs 239, 387, and 733 establish that

Garlinghouse "directed GSR from within the United States."  PX 454 provides dates on which

Garlinghouse travelled internationally only beginning as of April 24, 2017 and the

correspondence in PXs 239, 387, and 733 predates that time.  *See* PX 454.  Defendants also

dispute the inference the SEC attempts to draw that the Individual Defendants had control over

the programming of the bots, as the cited evidence only supports that they provided instruction

regarding sales targets or to pause or resume selling.  *See also* PX 26 (███ Dep. Tr.) at 292:13-21

(A: "The client has no bearing over our algorithms, which are proprietary in nature. The client gives us instructions to buy or sell or pause, and we execute that.").  Defendants also dispute the inference the SEC tries to draw that the physical location of the Individual Defendants when they communicated with GSR about the bots is relevant to the question of whether the Individual Defendants' sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the federal securities laws.  As explained in Defendants' Motion for Summary Judgment, offers to sell and sales occurred on the foreign exchanges notwithstanding the physical location of the Defendants at the time of the offer to sell or sale, or in the case of Paragraph 332, at the time of cherry-picked correspondence regarding the operations of sales bots.  *See* Defs.' MSJ at 58-74 (citing various paragraphs in Defs.' Rule 56.1 Statement).  Defendants additionally dispute that offers to sell and sales undertaken by GSR on foreign exchanges are within the territorial scope of the federal securities laws because they are not domestic.  *See id.*  Finally, Defendants dispute Paragraph 332 to the extent it implies that the Individual Defendants' sales or offers to sell occurred domestically, or that transfer of title occurred or irrevocable liability was incurred within the United States.  Undisputed that GSR executed trades on behalf of the Individual Defendants using bots, that the Individual Defendants occasionally provided instruction to GSR regarding sales targets or to pause or restart the bots, and that at times, the Individual Defendants communicated with GSR regarding Ripple's sales of XRP while they were physically located in the United States.

333.    When it came time to return trading proceeds to Larsen and Garlinghouse, GSR issued Bitstamp IOUs on the XRP Ledger, *i.e.*, "Bitstamp would issue an IOU on the Ripple Consensus Ledger for X amount of dollars, which Ripple or Mr. Larsen or whoever could redeem using Bitstamp." PX 26 (█ Dep. Tr.) at 144:14-22.

**Response:**    Undisputed that █ offered the quoted testimony; however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of

▮ testimony.  Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 26 because the statement that "GSR issued Bitstamp IOUs" is not supported by

the cited testimony, which states "Bitstamp would issue an IOU …"  PX 26 (▮ Dep. Tr) at

144:20.  Defendants also dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 26 to the extent it implies that trading proceeds were always returned to the

Individual Defendants in this manner, which is not supported by the exhibit.  PX 26 (▮ Dep.

Tr.) at 144:23-145:14 (Q: "Beginning in Q3 2017, where you could -- going back to that -- the

IOUs on Bitstamp, during what time period did that happen?"  A: "Honestly, I don't recall most

of it.  In fact, for Ripple, I think that's how we did all the payouts." … Q: "… at some point did

you start sending proceeds for the individuals … to a bank account?"  A: "It's possible, yes.").

Defendants further dispute Paragraph 333 because it is vague as to timing.  Defendants also

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26 to the

extent it implies that the IOUs are relevant to determining where the offer to sell and sales, which

predate the IOUs and any transfer of trading proceeds, occurred.  Finally, Defendants dispute

Paragraph 333 to the extent it implies that the Individual Defendants' sales or offers to sell

occurred domestically, or that transfer of title occurred or irrevocable liability was incurred

within the United States.

    334.    Garlinghouse deposited the proceeds from his XRP into his account at Bitstamp
and Garlinghouse would transfer those proceeds as U.S. dollars to his ▮▮▮
account in the U.S. Garlinghouse only ever traded his XRP for U.S. dollars. PX 81
(Garlinghouse Dep. Tr.) at 180:5-182:11.

**Response:**    Disputed.  Garlinghouse did not testify that "[he] deposited the proceeds

from his XRP into his account at Bitstamp."  Instead, Garlinghouse testified that "[t]he proceeds

from my XRP sales were deposited at Bitstamp," as set forth in PX 81 (Garlinghouse Dep. Tr.) at

180:7-9.  Undisputed that Garlinghouse would then transfer his XRP sale proceeds from

Bitstamp to his bank account at ███████████████ and that Garlinghouse only sold XRP in exchange for U.S. dollars. Defendants dispute the inference that the location of the ultimate bank account that would receive XRP sale proceeds after sales took place and became final is relevant to the question of whether Garlinghouse's sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the federal securities laws. *See* Defs.' MSJ at 58-74. Defendants additionally dispute that offers to sell and sales executed through GSR on foreign exchanges are within the territorial scope of the federal securities laws because they are not domestic. *See id.*

335.   Larsen directed GSR to wire his trading proceeds in U.S. dollars to his U.S. bank account. PX 725; PX 575.

**Response:**   Undisputed that at times Larsen requested GSR withdraw his U.S.D. trading proceeds to a U.S. bank account. Nothing in the cited exhibit establishes that Larsen's bank account is "a U.S. bank account," which the SEC does not define. Defendants dispute the inference that the location of the bank account ultimately receiving the XRP sale proceeds after the sales occurred and became final is relevant to the question of whether Larsen's sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the federal securities laws. *See* Defs.' MSJ at 58-74. Defendants additionally dispute that offers to sell and sales executed through GSR on foreign exchanges are within the territorial scope of the federal securities laws because they are not domestic. *See* Defs.' MSJ at 58-74.

336.   Garlinghouse directed GSR to wire his trading proceeds in U.S. dollars to his U.S. bank account. PX 726.

**Response:**   Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 726 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 336. PX 726 contains no "direct[ion]" from Garlinghouse to GSR about where, or in what form, to wire his trading proceeds after the sales

174

took place.  Instead, PX 726 contains a request from GSR to Garlinghouse to provide his wire

information.  Further, in subsequent correspondence from Garlinghouse to GSR, he asks for

payment to be made "through ███████" and GSR indicates that certain wires were made in

U.S. dollars to Garlinghouse's bank account.  PX 726.  Nothing in the cited exhibit establishes

that Garlinghouse's bank account is "a U.S. bank account," which the SEC does not define.

Defendants dispute the inference that the location of the bank account ultimately receiving the

XRP sale proceeds after the sales occurred and became final is relevant to the question of

whether Garlinghouse's sales and offers to sell on foreign digital asset exchanges were within the

territorial scope of the federal securities laws.  *See* Defs.' MSJ at 58-74.  Defendants additionally

dispute that offers to sell and sales executed through GSR on foreign exchanges are within the

territorial scope of the federal securities laws because they are not domestic.  *See id.*

337.    All proceeds of Garlinghouse's sales of XRP were deposited into Garlinghouse's
bank accounts in the United States. PX 86 (Garlinghouse RFA) No. 192.

**Response:**    Undisputed that Garlinghouse's XRP sale proceeds were deposited in his

bank accounts in the United States.  Defendants dispute the inference that the location of the

bank account ultimately receiving the XRP sale proceeds after the sales occurred and became

final is relevant to the question of whether Garlinghouse's sales and offers to sell on foreign

digital asset exchanges were within the territorial scope of the federal securities laws.  *See* Defs.'

MSJ at 58-74.  Defendants additionally dispute that offers to sell and sales executed through

GSR on foreign exchanges are within the territorial scope of the federal securities laws because

they are not domestic.  *See id.*

338.    Larsen and Garlinghouse sold XRP on U.S.-based trading platforms. DX 81 (D.E.
624-81); DX 82 (D.E. 624-82) (listing sales on Bittrex, Coinbase, Kraken, and Poloniex).

**Response:**    Disputed.  Defendants dispute Paragraph 338 as being vague because it

does not define the term "U.S.-based trading platforms."  In addition, Defendants dispute the

SEC's characterization of, and inferences purportedly drawn from, PXs 81 and 82 because the

cited evidence provides no support for the SEC's assertions of fact as set forth in Paragraph 338

that Bittrex, Coinbase, Kraken, and Poloniex are "U.S.-based trading platforms."  Undisputed

that Larsen and Garlinghouse sold XRP on Bittrex, Coinbase, Kraken, and Poloniex.  But,

Defendants note that only 12.89% of Larsen's XRP and only 5.14% of Garlinghouse's XRP was

sold on these four exchanges between 2017 and December 2020.  *See* Defs.' Rule 56.1 Statement

(ECF No. 623) ¶¶ 299-301, 307-310.  To the extent the SEC seeks to draw any inferences about

Larsen's sales prior to September 2015, Larsen claims such transactions are barred by the statute

of limitations.  *See* Defs.' MSJ at 74-75.

339.    GSR sold XRP for both Larsen and Garlinghouse on platforms that accepted U.S.
customers. *Compare* DX 81 (D.E. 624-81) & DX 82 (D.E. 624-82) *with* PX 564, PX 565, PX
566 (listing platforms that accepted U.S. customers).

**Response:**    Disputed.  Defendants dispute the SEC's characterizations of, and

inferences purportedly drawn from, Ex. 81, Ex. 82, PX 564, PX 565, and PX 566, as misleading

and irrelevant in the absence of a connection to a specific transaction.  The cited evidence does

not show that any individual sale was made by GSR on Larsen's or Garlinghouse's behalf on an

exchange at a time when that exchange accepted customers located in the U.S.  Defendants

dispute Paragraph 339 to the extent it implies that Larsen and Garlinghouse were actively

selecting the purchasers for their XRP, rather than engaging a foreign market maker with a

significant amount of discretion to conduct sales on their behalf to anonymous purchasers on

trading platforms. *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 268-269, 276-283.

Defendants further dispute Paragraph 339 to the extent the SEC implies that restricting sales of

Larsen's and Garlinghouse's XRP to specific types of purchasers was even possible.  When XRP

is sold on exchanges through GSR, the transaction is anonymous, and the buyer's identity is not

known. *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 169-170.  Defendants additionally

dispute that offers to sell and sales executed through GSR on foreign exchanges are within the

territorial scope of the federal securities laws because they are not domestic.  *See* Defs.' MSJ at

58-74.

340.   When Garlinghouse sold XRP on Bitstamp or through GSR, he could not know, and did not ask, to whom he was selling. PX 81 (Garlinghouse Dep. Tr.) at 24:24-25:15.

**Response:**   Undisputed; however, Defendants dispute Paragraph 340 to the extent the

SEC implies that restricting sales of Garlinghouse's XRP to specific purchasers or purchasers

who wished to use it for specific purposes was even possible.  When XRP is sold on exchanges,

including through GSR, the transaction is anonymous, and the buyer's identity is not known.  *See*

Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 169-170.  Defendants additionally dispute that

offers to sell and sales executed through GSR on foreign exchanges are within the territorial

scope of the federal securities laws because they are not domestic.  *See* Defs.' MSJ at 58-74.

341.   Garlinghouse did not instruct GSR to restrict sales of his XRP to crypto platforms that did not accept U.S. purchasers until September 2020. PX 81 (Garlinghouse Dep. Tr.) at 487:2-15.

**Response:**   Disputed.  Garlinghouse did not testify that he "did not instruct GSR to

restrict sales of his XRP to crypto platforms that did not accept U.S. purchasers until September

2020."  Rather, he testified that he "instructed [GSR] not to sell on U.S. exchanges" in " August

or September 2020[.]"  PX 81 (Garlinghouse Dep. Tr.) at 487:2-10.  Defendants dispute

Paragraph 341 to the extent it implies Garlinghouse was actively selecting the purchasers for his

own XRP, rather than engaging a foreign market maker with a significant amount of discretion to

conduct sales on his behalf to anonymous purchasers on trading platforms.  *See* Defs.' Rule 56.1

Statement (ECF No. 623) ¶¶ 268-269, 276-283.  Defendants dispute Paragraph 341 to the extent

the SEC implies that restricting sales of Garlinghouse's XRP to specific types of purchasers was

even possible.  When XRP is sold on exchanges through GSR, the transaction is anonymous, and

the buyer's identity is not known.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 169-170.

Defendants additionally dispute that offers to sell and sales executed through GSR on foreign

exchanges are within the territorial scope of the federal securities laws because they are not

domestic.  *See* Defs.' MSJ at 58-74.

342.    Garlinghouse sold XRP anonymously on the crypto platforms. PX 86
(Garlinghouse RFA Responses) No. 176.

**Response:**    Undisputed that Garlinghouse sold XRP anonymously on trading

platforms.  Defendants dispute Paragraph 342 to the extent it implies Garlinghouse purposefully

concealed his identity.  When XRP is sold on exchanges, including through GSR, the transaction

is inherently anonymous, and the buyer's identity is not known.  *See* Defs.' Rule 56.1 Statement

(ECF No. 623) ¶¶ 169-170.  Therefore, Garlinghouse – as with every other participant – could

not know the identity of XRP buyers and could not sell XRP in any other way but anonymously

on trading platforms.

343.    Garlinghouse did not know the identity of all persons to whom he sold XRP. PX
86 (Garlinghouse RFA Responses) No. 179.

**Response:**    Undisputed that Garlinghouse offered the cited testimony; however,

Defendants dispute Paragraph 343 to the extent it implies Garlinghouse was actively selecting

the purchasers for his own XRP, rather than engaging a foreign market maker with a significant

amount of discretion to conduct sales on his behalf to anonymous purchasers on trading

platforms.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 268-269, 276-283.  Defendants

also dispute Paragraph 343 to the extent the SEC implies that Garlinghouse knew the identity of

some of the people who purchased his XRP because he testified clearly that he did not.  PX 81

(Garlinghouse Dep. Tr.) at 485:11-15 (Q: "Have you ever taken any steps to determine whether

purchasers of your XRP are accredited investors?"  A: "I don't know who the purchasers of my

XRP are.").  In addition, when XRP is sold on exchanges through GSR, the transaction is

anonymous, and the buyer's identity is not known.  *See* Defs.' Rule 56.1 Statement (ECF No.

623) ¶¶ 169-170.  Defendants additionally dispute that offers to sell and sales executed through

GSR on foreign exchanges are within the territorial scope of the federal securities laws because

they are not domestic.  *See* Defs.' MSJ at 58-74.

344.    Garlinghouse opened certain digital asset trading accounts in order to sell his XRP
while he was located in the United States. PX 86 (Garlinghouse RFA Responses) No. 190.

**Response:**       Disputed.  Defendants dispute that Garlinghouse opened certain digital

asset trading accounts "in order to sell his XRP," which is unsupported by PX 86 because

Garlinghouse's admission does not provide any reason for why he opened certain digital asset

trading accounts.  Defendants dispute the inference the SEC tries to draw that Garlinghouse's

physical location while opening digital asset trading accounts is relevant to the question of

whether Garlinghouse's sales and offers to sell on foreign digital asset exchanges were within the

territorial scope of the federal securities laws.  As explained in Defendants' Motion for Summary

Judgment, offers to sell and sales occurred on the foreign exchanges notwithstanding the

physical location of the Defendants at the time of the offer to sell or sale, let alone at the time of

opening trading accounts.  *See* Defs.' MSJ at 58-74.  Defendants additionally dispute that offers

to sell and sales executed through GSR on foreign exchanges are within the territorial scope of

the federal securities laws because they are not domestic.  *See* Defs.' MSJ at 58-74.

345.    Larsen did not know where GSR sold his XRP, and assumed it was on overseas
platforms but did nothing to confirm his assumption. PX 2 (Larsen Dep. Tr.) at 94:23-96:9.

**Response:**       Disputed.  Defendants dispute the SEC's characterizations of, and

inferences purportedly drawn from, PX 2, because it omits context necessary to understand the

cited testimony.  Larsen stated that "GSR is an overseas institution, and by far and away, the

majority—vast majority of volume in the XRP markets and crypto markets in general is overseas

and has been overseas." Ex. 8 at 87:16-20.  Defendants additionally dispute that offers to sell

and sales executed through GSR on foreign exchanges are within the territorial scope of the

federal securities laws because they are not domestic.  *See* Defs.' MSJ at 58-74.

346.    Larsen took no steps to ensure that his XRP did not land in the hands of U.S.
investors. PX 2 (Larsen Dep. Tr.) at 88:22-89:2.

**Response:**    Disputed.  Defendants dispute the SEC's characterizations of, and

inferences purportedly drawn from, PX 2, to the extent the SEC implies that XRP was in fact

sold to U.S.-based purchasers because the cited evidence does not support that fact.  Defendants

further dispute the SEC's characterizations of, and inferences purportedly drawn from PX 2, to

the extent Paragraph 346 characterizes potential U.S.-based purchasers as "U.S. investors," or

suggests that Larsen's offers or sales of XRP were domestic.  Defendants also dispute Paragraph

346 to the extent it implies Larsen was actively selecting the purchasers for his own XRP, rather

than engaging a foreign market maker with a significant amount of discretion to conduct sales on

his behalf to anonymous purchasers on trading platforms.  *See* Defs.' Rule 56.1 Statement (ECF

No. 623) ¶¶ 268-269, 276-283.  Defendants dispute Paragraph 346 to the extent the SEC implies

that restricting sales of Larsen's XRP to specific types of purchasers was even possible.  When

XRP is sold on exchanges through GSR, the transaction is anonymous, and the buyer's identity

is not known.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 169-170. Defendants

additionally dispute that offers to sell and sales executed through GSR on foreign exchanges are

within the territorial scope of the federal securities laws because they are not domestic.  *See*

Defs.' MSJ at 58-74.

347.    Larsen took no steps to prevent the buyers of his XRP from reselling to U.S.
investors, and did not restrict how the buyers of his XRP could resell his XRP. PX 2 (Larsen
Dep. Tr.) at 88:22-89:2; 94:23-96:09; 102:19-103:6; 154:11-155:2.

**Response:**    Disputed.  Defendants dispute the SEC's characterizations of, and

inferences purportedly drawn from, PX 2, to the extent the SEC implies that XRP was in fact

resold to U.S.-based purchasers because the cited evidence does not support that fact.

Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn

from PX 2, to the extent Paragraph 347 characterizes potential U.S.-based purchasers as "U.S.

investors," or suggests that Larsen's offers or sales of XRP were domestic.

348.    Larsen never instructed GSR to limit sales of his XRP to overseas platforms that
prohibited U.S. purchasers. PX 2 (Larsen Dep. Tr.) at 102:19-103:6.

**Response:**    Disputed.  Defendants dispute the SEC's characterizations of, and

inferences purportedly drawn from, PX 2, to the extent the SEC implies that XRP was in fact

sold to U.S.-based purchasers because the cited evidence does not support that fact, or suggests

that Larsen's offers or sales of XRP were domestic.  Defendants also dispute Paragraph 348 to

the extent it implies Larsen was actively selecting the purchasers for his own XRP, rather than

engaging a foreign market maker with a significant amount of discretion to conduct sales on his

behalf to anonymous purchasers on trading platforms.  *See* Defs.' Rule 56.1 Statement (ECF No.

623) ¶¶ 268-269, 276-283.  Defendants dispute Paragraph 348 to the extent the SEC implies that

restricting sales of Larsen's XRP to specific types of purchasers was even possible.  When XRP

is sold on exchanges through GSR, the transaction is anonymous, and the buyer's identity is not

known. *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 169-170. Defendants additionally

dispute that offers to sell and sales executed through GSR on foreign exchanges are within the

territorial scope of the federal securities laws because they are not domestic.  *See* Defs.' MSJ at

58-74.

349.    ▮▮▮ could not recall an occasion where the Individual Defendants instructed him
to sell XRP to people who would commit not to resell to U.S. persons, and did not think that had
occurred. PX 26 (▮▮▮ Dep. Tr.) at 155:15-25.

**Response:**    Undisputed that PX 26 contains the cited testimony; however, Defendants

do not concede that the cited testimony is the entirety of, a representative selection of, or a fair

characterization of the document's complete contents.  Defendants dispute the SEC's

characterizations of, and inferences purportedly drawn from, PX 26, to the extent the SEC

implies that XRP was in fact resold to U.S.-based purchasers because the cited evidence does not

support that fact.  Defendants also dispute Paragraph 349 to the extent it implies Larsen and

Garlinghouse were actively selecting the purchasers for their XRP, rather than engaging a

foreign market maker with a significant amount of discretion to conduct sales on their behalf to

anonymous purchasers on trading platforms.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶

268-269, 276-283.  Defendants dispute Paragraph 349 to the extent the SEC implies that

restricting sales of Larsen's and Garlinghouse's XRP to specific types of purchasers was even

possible.  When XRP is sold on exchanges through GSR, the transaction is anonymous, and the

buyer's identity is not known.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 169-170.

Defendants additionally dispute that offers to sell and sales executed through GSR on foreign

exchanges are within the territorial scope of the federal securities laws because they are not

domestic.  *See* Defs.' MSJ at 58-74.

    350.    GSR could choose to trade on exchanges that did not accept U.S. purchasers,
"[b]ut if [GSR] sell[s] XRP to Joe Block on this exchange and Joe Block turns around and
withdraws it and sells it to an American, [GSR has] no way of controlling that." PX 26 (██ Dep.
Tr.) at 157:4-7.

    **Response:**    Undisputed that ██ offered the quoted testimony exclusive of any

alterations, omissions, or additions; however, Defendants note that ██ gave this testimony in

response to a hypothetical question from the SEC and was only explaining his "understanding"

that GSR could not restrict the XRP it sold from being sold to a U.S. person in the context of a

hypothetical.  *See* PX 26 (██ Dep. Tr.) at 156:23-157:7 (Q: "If you wanted to -- could you

restrict the XRP you sold from being purchased by a U.S. person?" A: "GSR? No. Because -- in

the sense that we would operate on exchanges that would not allow U.S. persons or entities to

onboard, so it's our understanding that if we're trading XRP there, it's not with a U.S. person. But if we sell XRP to Joe Block on this exchange and Joe Block turns around and withdraws it and sells it to an American, I have no way of controlling that.").

351.    Before sometime in 2018, GSR did not segregate XRP sales according to customer for Ripple, Larsen, and Garlinghouse. PX 26 (█ Dep. Tr.) at 141:5-144:11.

**Response:**    Disputed because the cited evidence does not support the assertion that accounts were not segregated until sometime in 2018, which appears on an uncited page of the transcript. █ testified that GSR was able to "segregate accounts" for its clients as of "summer of 2017, in Q3 of 2017" and it took "about six months" to "start[] using the new tech stack in Q1 of 2018" allowing for segregation.  PX 26 (█ Dep. Tr.) at 142:24-143:4; 145:20-24. Defendants further dispute Paragraph 351 because it relates to GSR's internal business practices and processes and Defendants lack sufficient knowledge to confirm or dispute the purported facts.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 26 to the extent the SEC implies that GSR's handling of Ripple's, Larsen's, and Garlinghouse's XRP and the proceeds of the sales of their XRP deviated from GSR's ordinary course of business.  The quoted testimony was an illustrative example of how GSR handled its customers' digital assets and proceeds from sales of those assets, and █ did not testify that this method was only used for these clients.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26 to the extent it implies that GSR, a third-party, commingling XRP sales proceeds for technological reasons would be relevant to the analysis of whether Defendants sold XRP as an investment contract.

352.    All XRP to be sold by GSR on behalf of Ripple, Larsen, and Garlinghouse was in a single pot distributed across exchanges, the proceeds from XRP sales were pooled at GSR, and GSR then allocated the proceeds among Ripple, Larsen, and Garlinghouse pursuant to each of their XRP selling programs: "[D]ifferent clients had different sales targets that were all different percentages of the total trading volume. So, say, for example, Ripple was targeting 1 percent, and Mr. Larsen was targeting 1 percent, then they're both 50/50, and we would split the proceeds

50/50. If it was 1 percent and .1 percent, Ripple would get ten-elevenths, Mr. Larsen would get one-eleventh of the proceeds." PX 26 (██ Dep. Tr.) at 141:5-144:11.

**Response:**   Disputed. Defendants dispute that GSR always handled Ripple, Larsen, and Garlinghouse's XRP and XRP proceeds in this manner because the cited evidence does not support that assertion since ██ testified that GSR was able to "segregate accounts" for its clients as of "summer of 2017, in Q3 of 2017" and it took "about six months" to "start[] using the new tech stack in Q1 of 2018" allowing for segregation. PX 26 (██ Dep. Tr.) at 142:24-143:4, 145:20-24. Defendants further dispute Paragraph 352 because it relates to GSR's internal business practices and processes and Defendants lack sufficient knowledge to confirm or dispute the purported facts. Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 26 to the extent the SEC implies that GSR's handling of Ripple's, Larsen's, and Garlinghouse's XRP and the proceeds of the sales of their XRP deviated from GSR's ordinary course of business. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26 to the extent it implies that GSR, a third-party, commingling XRP sales proceeds for technological reasons would be relevant to the analysis of whether Defendants sold XRP as an investment contract.

353.   All of GSR's XRP sales on behalf of Larsen and Garlinghouse used the same overall algorithmic sales strategy as used for Ripple sales and GSR "didn't favor anybody. It was always the same." PX 26 (██ Dep. Tr.) at 142:12-23.

**Response:**   Disputed. Defendants dispute that the cited testimony supports the allegations in Paragraph 353 because the SEC omits that the quoted text was referring to the fact that the "net execution price that they each received was identical," not the strategy. *See* PX 26 at 142:12-23. Defendants further dispute that GSR always employed the same overall algorithmic sales strategy for Larsen, Garlinghouse, and Ripple because the cited evidence does

not support that assertion. ▮ testified that there were "deviations" in strategy. PX 26 at 141:21-143:4.

354.    Using its trading algorithms, GSR placed orders to sell with the crypto trading platform to be matched by offers to buy. If GSR's offers to sell XRP on behalf of Larsen and Garlinghouse were matched, the exchange would withdraw the XRP from GSR's wallet and return to GSR proceeds of the sale. PX 26 (▮ Dep. Tr.) at 311:2-13.

**Response:**    Undisputed.

355.    When GSR was selling XRP on behalf of Ripple, Larsen, and Garlinghouse, GSR was placing continuous offers to sell using an algorithm, 24 hours a day, seven days a week. PX 26 (▮ Dep. Tr.) at 312:5-12.

**Response:**    Disputed. The cited evidence does not support the SEC's characterizations of the GSR algorithm because the SEC omits that there were times when GSR would not sell XRP in the manner described in Paragraph 355. ▮ stated that if any client "says stop, we stop." PX 26 at 312:19-20.

356.    While GSR assigned Larsen and Garlinghouse their own bots, GSR traded XRP on behalf of all Defendants consistently with each other. PX 26 (▮ Dep. Tr.) at 142:12-23.

**Response:**    Disputed. The cited evidence does not support the SEC's characterizations of PX 26 because the evidence supports that the Defendants' sales were made simultaneously, but not necessarily utilizing the same strategy. PX 26 at 142:12-143:14. Defendants further dispute that GSR "traded XRP on behalf of all Defendants consistently with each other" at all times because the cited evidence does not support that assertion. *See* PX 26 at 142:24-143:14. ▮ testified that the GSR could use "different execution algorithms for the different individual accounts." PX 26 at 143:7-11.

357.    GSR executed its trading algorithms to disguise Defendants' XRP liquidation program to get best execution and prevent other market participants from front running trades which would lower execution price. PX 26 (▮ Dep. Tr.) at 251:16-253:22.

**Response:**    Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26 as misleading because the cited evidence does not

185

support that the GSR's trading algorithms were used to "disguise Defendants' XRP liquidation program." PX 26 at 252:13-253:10.

358.    GSR bought XRP to improve execution price on sales for defendants, and provided passive orders for a lower cost, and spread its orders over multiple exchanges. PX 26 (██ Dep. Tr.) at 251:16-253:22.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26, including to the extent the SEC suggests that, by improving the execution price, GSR sought to increase the price of XRP. ██ testified that, by making passive offers, GSR sought to avoid higher transaction costs that certain exchanges imposed on "take orders" and thereby reduce fees for consumers.  PX 26 at 252:21-253:3. Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from PX 26, including to the extent that GSR took the actions described in Paragraph 358 only for Defendants and not for other clients as well because the cited testimony makes it clear that GSR took these actions "on behalf of other clients" as well.  PX 26 at 251:16-19.

359.    Because GSR was doing XRP sales on behalf of all Defendants and other Ripple employees, GSR "didn't want to let people -- or have people tripping over themselves and trying to get ahead of the rest. [GSR] [h]ad to do it in some kind of a controlled fashion." PX 26 (██ Dep. Tr.) at 249:3-250:9.

**Response:**    Undisputed that PX 26 contains the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 26 to the extent the SEC suggests that GSR sold XRP only on behalf of "all Defendants and other Ripple employees" or that GSR attempted to sell XRP in a particular manner due to its relationship with Defendants and Ripple employees.

360.    ██ was Larsen's and Garlinghouse's primary contact for their XRP sales. PX 26 (██ Dep. Tr.) at 278:8-13.

**Response:**    Undisputed.

361.    Larsen, or his executive assistant ██████ on his instruction, would transfer his XRP to GSR's wallet for sales. PX 724; 727; PX 734.

**Response:**        Undisputed that at times, Larsen or his executive assistant would transfer

XRP to a GSR wallet.  Defendants dispute the SEC's characterizations of, and inferences

purportedly drawn from PX 724, 727, and 734 to the extent the SEC implies that all of the XRP

transferred to GSR was for purposes of sales and actually sold because the cited evidence does

not support that fact.  PX 610 at GSR00008434.  Defendants further dispute the SEC's

characterizations of, and inferences purportedly drawn from PX 724, 727, and 734 to the extent

the SEC implies that these transfers to GSR's wallet were themselves offers or sales of XRP to

GSR.  GSR paid no consideration to Larsen upon transfer and any consideration was contingent

on the XRP being sold.  *See* Ex. 100, GSR00000681 (§§ 2.1-2.7); Ex. 97, GSR00008433 (§§ 2.1-

2.7); PX 26 (██ Tr.) at 284:1-21, 285:14-288:6.  Defendants additionally dispute that offers to

sell and sales executed through GSR on foreign exchanges are within the territorial scope of the

federal securities laws because they are not domestic.  *See* Defs.' MSJ at 58-74.

362.    Garlinghouse used Signal to confirm his transfers of XRP to GSR and the logistics of administering his sales. PX 81 (Garlinghouse Dep. Tr.) at 140:4-22.

**Response:**        Undisputed that Garlinghouse offered the cited testimony; however,

Defendants do not concede that this is the entirety of, a representative selection of, or a fair

characterization of Garlinghouse's testimony.  Defendants note that Garlinghouse testified that

he used Signal to communicate with GSR to "share via Signal wallet information to … make

sure that various transfers were done securely."  PX 81 (Garlinghouse Dep. Tr.) at 140:11-14;

*see also* Ex. 295 (GSR00019936) (email from Garlinghouse to GSR asking for confirmation via

Signal that a prior email from GSR relating to a "test transaction" requiring Garlinghouse to

confirm receipt of $1 USD in his Bitstamp account from a specified wallet address was "real"

because "[Garlinghouse] never received one of these emails before.").  Defendants dispute the

SEC's characterization of, and inferences purportedly drawn from, PX 81 to the extent it implies that Garlinghouse only or principally communicated with GSR via Signal, because Garlinghouse also communicated with GSR via other means, such as email. *See, e.g.*, PX 726 (email from Garlinghouse to GSR). In addition, Paragraph 362 omits additional context necessary to understand the cited language, including that Garlinghouse testified that "about 95-plus percent of my Signal activity consists of communication with either my executive assistant or the security team that -- with whom I work," as set forth in PX 81 (Garlinghouse Dep. Tr.) at 134:1-4. Defendants also dispute any implication that Garlinghouse did anything improper by communicating with GSR via Signal. Paragraph 362 also omits that Garlinghouse testified, after having received the document preservation notice related to the SEC's investigation into Ripple, that "I generally follow the same practices I had been practicing. I continued to make phone calls. I continued to write emails. I continued to use Signal." PX 81 (Garlinghouse Dep. Tr.) at 145:10-14.

363.    In or around June 2019, Garlinghouse told GSR that "I sent 10m Xrp yesterday. Pls confirm the balance is correct." PX 574.

**Response:**      Undisputed that PX 574 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 574 to the extent it implies that GSR owned the 10 million XRP because Garlinghouse sent it to GSR to be sold. GSR did not ever come to own the XRP that GSR sold on Garlinghouse's behalf. *See* PX 26 (█ Dep. Tr.) at 291:22-293:8 (before a trade is accepted, "[a]s soon as a client says stop, return the funds, we stop the bots"); 285:14-23 (Q: "So when the client sends GSR XRP to a GSR designated wallet, at that moments, who owns the XRP?"  A: "I think the XRP is still owned by the client."  Q: "In fact, does GSR ever take ownership of the XRP through the entire trading process?"  A: "Not to the best of my knowledge."); 288:7-17 (Q: "At this point … when

the XRP is in a GSR designated wallet, could the client decide that it didn't want to trade its XRP for any other currency at all?"  A: "Of course."  Q: "A client could say, actually, give me back my XRP?"  A: "Yes."  Q: "Okay. And GSR couldn't refuse at that point, right?"  A: "No. I can't imagine, no."); 289:6-11 (Q: "And, at the point, when the XRP is in a receiving address wallet at the exchange, who owns the XRP?"  A: "I believe -- nothing's changed.  The XRP is still owned by the client.").

364.    Ripple knew that its market makers—which were the same as the Individual Defendants'—were selling their XRP on platforms that were not registered as "national securities exchanges" under the Securities Exchange Act of 1934. PX 8 (Ripple RFA Responses) No. 235.

**Response:**    Disputed.  Defendants dispute Paragraph 364 as vague and ambiguous because it does not identify which "market makers" are referenced and is temporally unbounded as to when the purported XRP sales were made.  Defendants further dispute Paragraph 364 as setting forth legal conclusions, inferences, or assertions.  Defendants do not dispute that the third-party entities that sold XRP on Ripple's behalf during the relevant period were not selling XRP on platforms registered as "exchanges" under the Securities Act of 1934.

365.    Traditional securities exchanges must comply with a number of requirements of the Securities Exchange Act of 1934 ("Exchange Act") and SEC rules including rules governing fraud, manipulation, and dissemination of data. 15 U.S.C. § 78f, 78k-1; 70 Fed. Reg. 45529 (Jun. 29, 2005) (Regulation NMS).

**Response:**    Disputed.  Paragraph 365 sets forth legal conclusions, inferences, or assertions, not material facts supported by citations to evidence.  Defendants dispute Paragraph 365 as vague because it does not define "traditional exchanges."  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, 15 U.S.C. § 78f, 78k-1; 70 Fed. Reg. 45529 (Jun. 29, 2005) (Regulation NMS) to the extent that the SEC suggests cryptocurrency exchanges do not share many structural features in common with "traditional" exchanges.

366.    Traditional securities exchanges are self-regulatory organizations ("SROs"), 15 U.S.C. § 78c(a)(26).

**<u>Response:</u>**    Disputed.  Paragraph 366 sets forth legal conclusions, inferences, or assertions, not material facts supported by citations to evidence.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, 15 U.S.C. § 78c(a)(26) to the extent that the SEC suggests cryptocurrency exchanges do not share many structural features in common with "traditional" exchanges.

367.    Traditional exchanges are required to have rulebooks and enforce their own rules on their members and persons associated with their members, subject to SEC appellate review. 15 U.S.C. § 78f(b); 78s.

**<u>Response:</u>**    Disputed.  Paragraph 367 sets forth legal conclusions, inferences, or assertions, not material facts supported by citations to evidence.  Defendants dispute Paragraph 367 as vague because it does not define "traditional" exchanges.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, 15 U.S.C. § 78f(b); 78s to the extent that the SEC suggests cryptocurrency exchanges do not share many structural features in common with "traditional" exchanges.

368.    All SRO rulebooks must be filed with the SEC and most changes to those rulebooks must be approved by the SEC. 15 U.S.C. §78s.

**<u>Response:</u>**    Disputed.  Paragraph 368 sets forth legal conclusions, inferences, or assertions, not material facts supported by citations to evidence.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, 15 U.S.C. §78s to the extent that the SEC suggests cryptocurrency exchanges do not share many structural features in common with "traditional" exchanges.

369.    The SEC can bring an enforcement action against an SRO for failing to follow or enforce its own rules. 15 U.S.C. §78s(g).

**Response:**     Disputed.  Paragraph 369 sets forth legal conclusions, inferences, or assertions, not material facts supported by citations to evidence.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, 15 U.S.C. §78s(g) to the extent that the SEC suggests cryptocurrency exchanges do not share many structural features in common with "traditional" exchanges.

370.     Membership in traditional securities exchanges is limited to registered broker-dealers. 15 U.S.C. § 78f(c).

**Response:**     Disputed.  Paragraph 370 sets forth legal conclusions, inferences, or assertions, not material facts supported by citations to evidence.  Defendants dispute Paragraph 370 as vague because it does not define "traditional exchanges."  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, 15 U.S.C. § 78f(c) to the extent that the SEC suggests cryptocurrency exchanges do not share many structural features in common with "traditional" exchanges.

371.     Registered broker-dealers have a number of obligations, including capital requirements (17 CFR § 240.15c3-1), an obligation to safeguard customer assets and securities (17 CFR § 240.15c3-3), record keeping obligations (15 U.S.C. §78q-1), best execution obligations (Rule Regulation NMS, Rule 605), obligations to make disclosures about order routing and handling (Regulation NMS, Rule 606), and obligations to address conflicts (17 CFR 240 (Regulation Best Interest)).

**Response:**     Disputed.  Paragraph 371 sets forth legal conclusions, inferences, or assertions, not material facts supported by citations to evidence.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, 17 CFR § 240.15c3-1, 17 CFR § 240.15c3-3, 15 U.S.C. §78q-1, Rule Regulation NMS, Rule 605, Regulation NMS, Rule 606 or 17 CFR 240 (Regulation Best Interest) to the extent that the SEC suggests cryptocurrency exchanges do not share many structural features in common with "traditional" exchanges.

372.     There are currently sixteen securities exchanges registered with the SEC as a "national securities exchange" under the Exchange Act. *See* https://www.sec.gov/divisions/marketreg/mrexchanges.shmtl *last visited* Oct. 16, 2022.

**Response:**     Disputed.  Paragraph 372 sets forth assertions, not material facts supported

by citations to evidence because the website link leads to a page with an error message.

Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn

from, https://www.sec.gov/divisions/marketreg/mrexchanges.shmtl to the extent that the SEC

suggests that appearing on this website means cryptocurrency exchanges do not share many

structural features in common with "traditional" exchanges.

373.     The publication "Banking in the shadow of Bitcoin? The institutional adoption of cryptocurrencies," by the Monetary and Economic Department of the Bank for International Settlements, dated May 2022, states: "[Crypto exchanges] provide platforms on which participants can trade and store cryptocurrencies and remain largely unregulated to date, essentially forming a 'shadow crypto financial system.'  Compared to existing regulated exchanges for 'traditional' financial assets, the regulatory and supervisory oversight of crypto exchanges – encompassing consumer protection, market integrity, trading, disclosure, prudential and addressing anti-money laundering (AML), combatting the financing of terrorism (CFT) – remains patchy at best." PX 635 at 2.

**Response:**     Undisputed that PX 635 contains the quoted text, exclusive of any

alterations, omissions, or additions; however, Defendants do not concede that this is the entirety

of, a representative selection of, or a fair characterization of the document's complete contents.

Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn

from, PX 635 to the extent that the SEC suggests that this publication suggests cryptocurrency

exchanges do not share many structural features in common with "traditional" exchanges.

374.     The publication entitled "Assessment of Risks to Financial Stability from Crypto-assets" by the Financial Stability Board, dated February 16, 2022, states: "In many instances, these [crypto trading] platforms are operating outside the jurisdiction's regulatory perimeter, or are not in compliance with applicable regulatory requirements. Thus, these activities could fail to

provide the market integrity, investor protection or transparency seen in appropriately regulated and supervised financial markets." PX 636 at 18.

**Response:**    Undisputed that PX 636 contains the quoted text, exclusive of any

alterations, omissions, or additions; however, Defendants do not concede that this is the entirety

of, a representative selection of, or a fair characterization of the document's complete contents.

Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn

from, PX 636 to the extent that the SEC suggests that this publication suggests cryptocurrency

exchanges do not share many structural features in common with "traditional" exchanges.

375.    The publication entitled "Global Financial Stability Report" by the International Monetary Fund, dated October 2021, states: "[M]any countries do not have conduct or prudential regulations in place that encompass the activities of crypto asset service providers. And even though some jurisdiction require some type of registration or authorization process, the scope of such regulations in many cases is limited to AML/CFT. The absence of effective supervision and regulatory frameworks can create regulatory arbitrage and curtail enforcement." PX 637 at 47.

**Response:**    Undisputed that PX 637 contains the quoted text, exclusive of any

alterations, omissions, or additions; however, Defendants do not concede that this is the entirety

of, a representative selection of, or a fair characterization of the document's complete contents.

Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn

from, PX 637 to the extent that the SEC suggests that this publication suggests cryptocurrency

exchanges do not share many structural features in common with "traditional" exchanges.

376.    Crypto trading platforms typically accept trades from or interaction with retail or natural persons, whereas registered national securities exchanges permit trading only by members (i.e., broker dealers and those associated with broker dealers). *See* SEC.gov | Statement on Potentially Unlawful Online Platforms for Trading Digital Assets, *available at* https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading; SEC.gov | Chairman's Testimony on Virtual Currencies: The Roles of the SEC and CFTC, *available at* https://www.sec.gov/news/testimony/testimony-virtual-currencies-oversight-role-us-securities-and-exchange-commission

**Response:**    Disputed.  Paragraph 376 sets forth legal conclusions, inferences, or

assertions, not material facts supported by citations to evidence because testimony or statements

about potential risks are not evidence.  Defendants further dispute the SEC's characterizations of,

and inferences purportedly drawn from SEC.gov | Statement on Potentially Unlawful Online

Platforms for Trading Digital Assets and SEC.gov | Chairman's Testimony on Virtual

Currencies: The Roles of the SEC and CFTC to the extent that the SEC suggests that these

statements suggest cryptocurrency exchanges do not share many structural features in common

with "traditional" exchanges.

377.    Of the platforms in which Larsen and Garlinghouse sold XRP and which they
claim are "foreign," the following are registered as "money service businesses" in the United
States with the U.S. Department of the Treasury's Financial Crimes Enforcement Network
("FinCEN") with registration addresses in the United States listed in parenthesis: BitMart
(California); AscendEX/BitMax (New York); Bitstamp (New York), Korbit (Colorado), OKEx
(Colorado). *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-
registrant-search.

**Response:**     Undisputed that entities with the names listed in Paragraph 377, or an

affiliate or subsidiary of those entities, appear to be registered as "money service businesses"

with FinCEN.  Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, any FinCEN registration to the extent the SEC implies that Larsen or Garlinghouse

offers or sales of XRP on platforms operated by these entities were domestic and within the

territorial scope of the federal securities laws since any such implication is unsupported by the

evidence.  In addition, Defendants note that more than 650 foreign entities are currently

registered with FinCEN as MSBs.  *See* Ex. 298, FinCEN, "MSB Registrant Search,"

https://www.fincen.gov/msb-registrant-search.

378.    In or around May 2017, a Florida resident used a Ripple.com contact form to ask
Ripple where to buy XRP. PX 578.

**Response:**     Disputed.  Defendants do not dispute that PX 578 contains a May 2017

email stating "I am interesting [sic] to buy ripple But [sic] I don't know how I live in Florida usa

[sic]"; however, Defendants dispute Paragraph 378 to the extent the SEC implies that PX 578 is

an example of an inquiry from a "U.S. investor," since there is no evidence this person, whose full name is not provided, actually lived in Florida or was interested in purchasing XRP from Ripple for investment purposes.

379.    In or around May 2017, a Washington state resident asked Ripple when they will be able to purchase XRP from Washington state. PX 579.

**Response:**        Disputed.  Defendants do not dispute that PX 579 contains a May 2017 email stating "Blocked in WASHINGTON STATE – Please explain.  I began registering to purchase XRP…but then was told that your SERVICE NOT PROVIDED IN THIS STATE.  Is there a work around for me.  If not, when will residence [sic] of WA be allowed to purchase?"; however, Defendants dispute Paragraph 379 to the extent the SEC implies that PX 579 is an example of an inquiry from a "U.S. investor," since there is no evidence this person, whose full name is not provided, actually lived in Washington state, or was interested in purchasing XRP from Ripple for investment purposes.

380.    In or around April 2017, an individual asked Ripple whether they could buy XRP from New York state through Bitstamp and whether Bitstamp was the only way to purchase XRP. PX 580.

**Response:**        Disputed.  Defendants do not dispute that PX 580 contains an April 2017 email stating "Can I purchase xrp us in new york state?  If yes, I've created an account on bitstamp.  Is that the only way to purchase?"; however, Defendants dispute Paragraph 380 to the extent the SEC implies that PX 580 is an example of an inquiry from a "U.S. investor," since there is no evidence this person, whose full name is not provided, actually lived in New York state, or was interested in purchasing XRP from Ripple for investment purposes.

381.    In or around January 2018, an individual asked Ripple "what is the best platform to purchase XRP with an American bank account? My next question is can I easily transfer my XRP to CoinBase when it becomes available on the CoinBase platform?" PX 606.

**Response:**    Disputed.  Defendants do not dispute that PX 606 contains the quoted text,

exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute

Paragraph 381 to the extent the SEC implies that PX 606 is an example of an inquiry from a

"U.S. investor," since there is no evidence this person, whose full name is not provided, actually

lived in the United States, or was interested in purchasing XRP from Ripple for investment

purposes.

382.    In or around January 2018, an individual told Ripple that they have tried to open accounts with Bitstamp and Gatehub and that "I want you guys to know and understand that the XRP buying experience is horrible." The individual explained:  "Though I like the XRP concept, I do not like the idea of not being able to purchase it easily from an American broker. Please fix this inaccessibility issue." PX 581.

**Response:**    Disputed.  Defendants do not dispute that PX 581 contains the quoted text,

exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute

Paragraph 382 to the extent the SEC implies that PX 581 is an example of an inquiry from a

"U.S. investor," since there is no evidence this person actually lived in the United States, or was

interested in purchasing XRP from Ripple for investment purposes.  Defendants further dispute

the SEC's characterization of, and inferences purportedly drawn from, PX 581, as misleading

including because Paragraph 382 omits additional context necessary to understand the quoted

language, including that PX 581 describes that the "horrible" part of the experience was the

process of activating the Bitstamp and Gatehub accounts, and that "[a]fter a month of waiting on

their account activation I'm finally giving up."  PX 581 at RPLI_SEC 0010590.

383.    In or around March 2018, Ripple's head of investor relations emailed notes of a meeting with venture capital investors in the San Francisco Bay area, noting that investors asked

"Will you list on CoinBase?" and "You seem to have two pieces to your company - the products vs XRP (that speculators are interested in)? How do they fit together?" PX 588.

**Response:**     Disputed.  Defendants do not dispute that PX 588 contains the quoted text,

exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute

the SEC's characterization of, and inferences purportedly drawn from, PX 588, as misleading

including because Paragraph 383 attributes the quoted language to Ripple's head of investor

relations rather than the actual author, an employee in Corporate Communications.  Defendants

further dispute Paragraph 383 to the extent the SEC implies that PX 588 is an example of an

inquiry from a "U.S. Investor" since there is no support in PX 588 for the implication that any of

the venture capital investors were interested in purchasing XRP from Ripple.

384.    In or around May 2017, an individual asked Ripple "Is there a U.S. based exchange where I can purchase or trade XRP?" PX 593.

**Response:**     Disputed.  Defendants do not dispute that PX 593 contains the quoted text,

exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute

Paragraph 384 to the extent the SEC implies that PX 593 is an example of an inquiry from a

"U.S. investor," since there is no evidence this person, whose full name is not provided, actually

lived in the United States, or was interested in purchasing XRP for investment purposes.

385.    In or around March 2017, Griffin asked Vias to reach out to a U.S. investor to see if he was a "good candidate for XRP II" as in institutional OTC investor. That U.S. based investor explained that opening an account with Bitstamp requires sending funds "from a USA bank to a[n] East European bank that is very small and unfamiliar" and recommended that Ripple "list itself with guys like Coinbase and Gemini.Com for those of us who have 5+ figure accounts for trading crypto." PX 583.

**Response:**     Undisputed that PX 583 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC; however, Defendants note that the statement that

the person "may be a good candidate for XRP II" was made by ███████████ not Patrick

Griffin.  PX 583 at RPLI_SEC 0018325.  Defendants dispute Paragraph 385 to the extent the

SEC implies that PX 583 is an example of an inquiry from a U.S. investor on how to buy XRP,

since PX 583 does not support that assertion, as the individual who reached out to Ripple

Support did not indicate that he was interested in purchasing XRP for investment purposes.

386.     In or around December 2016, a U.S. based investor asked Ripple "What is the
easiest way to buy XRP and transfer it to our GateHub account? I tried doing it through the
tutorial on the Ripple site and its [sic] telling me I cant [sic] buy XRP for Tier O users at
Kraken." Griffin responded: "Gatehub put this 'how to buy XRP at Gatehub' tutorial together by
request. It's self-serve (but let me know if you have any trouble!)." PX 584.

**Response:**      Defendants do not dispute that PX 584 contains the quoted text, exclusive

of any alterations, omissions, or additions by the SEC, from in or around November and

December 2016; however, Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from PX 584 as misleading, including because Griffin first responded to the

message by asking if the potential purchaser had a "sense of the order size [they would] be

purchasing" as Ripple "sell[s] OTC to qualified buyers," "[b]efore [he] sen[t] over the instruction

to by [sic] XRP in the market."  PX 584 at RPLI_SEC 0056805.  Defendants further dispute

Paragraph 386 to the extent the SEC implies that PX 584 is an example of an inquiry from a U.S.

investor, since PX 584 does not reflect that the individual was interested in purchasing XRP for

investment purposes.  Defendants further dispute Paragraph 386 because it states "a U.S. based

investor asked Ripple," when in fact the email was sent to Griffin; Defendants dispute that

statements made to the single employee in PX 584 are sufficient to establish the underlying fact

set forth in Paragraph 386 at all times and for all purposes in this litigation.

387.     In or around October 2016, Zagone asked another Ripple employee how to
respond to U.S. investor inquiries on how to buy XRP and the other Ripple employee responded,
"I would direct them to the 'How to Buy XRP' page" and the "Kraken flow of funds through
bitcoin is far from ideal, but we're working on improving it." PX 590.

**Response:**      Undisputed that PX 590 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 387's

characterization of PX 590 as an example of "U.S. investor inquiries," since there is no evidence

this person actually lived in the United States, or was interested in purchasing XRP from Ripple

for investment purposes.

388.    In or around April 2017, a Ripple employee asked Long to edit a proposed "XRP
Marketing Plan - Q2 2017" to "emphasize how the ease of buying and storing XRP is important
for speculators." PX 604.

**Response:**    Undisputed.

389.    In or around August 2017, Samarasinghe and ▮▮▮▮ discussed a U.S. investor
complaint that some platforms restrict New York state residents entirely and that XRP was not
available on platforms that did allow New York state residents to trade, and that this individual
has to buy Bitcoin through Coinbase and then trade into XRP through Bittrex. ▮▮▮▮ described
this as presenting "megaaaaa headwinds" and Samarasinghe agreed, stating "We have to find a
way to make it easier!" PX 586.

**Response:**    Defendants do not dispute that PX 586 contains the quoted text; however,

Defendants dispute Paragraph 389's characterization of PX 586 as an example of a discussion

about a complaint by a "U.S. investor," since there is no evidence the "guy" with whom ▮▮▮▮

spoke, who is not named, lived in the United States, or was interested in purchasing XRP for

investment purposes.  Further, PX 586 says, contrary to the assertions in Paragraph 389, that

"Bittrex does allow NY residents."  PX 586 at RPLI_SEC 1082334.  Pursuant to Fed. R. Civ. P.

56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the

document quoted is a hearsay statement from ▮▮▮▮ about statements purportedly made by a

third party.

390.    In or around December 2017, Ripple's marketing team communicated with
Fortune Magazine about its December 27, 2017 article titled "This Is Your Guide to Buying
Ripple" and retweeted the link to the article:  "Have questions about how to buy $XRP?
@Theledger has you covered. PX 582.

**Response:**    Undisputed.

391.    In or around March 2017, in a response to an individual asking why Ripple's
website was not updated with a current news section for investors to get info about listing XRP
(like Bittrex and Poloniex) and that such information would be valuable to "people [who] have

no idea XRP can be traded on those exchanges," Long responded "Open to calling out the availability of XRP at other exchanges with compliance' blessing. Remember it got us in trouble when we'd 'advertise' unlicensed exchanges in the past." Griffin inquired "what the traffic metrics are to 'buy xrp' on our website?" PX 587.

**Response:**     Defendants do not dispute that PX 587 contains the quoted text, exclusive

of any alterations, omissions, or additions by the SEC; however, Defendants note that the

statements by Long were not made in response to the individual asking about Ripple's website;

Long's statements were made to fellow Ripple employees and the individual was not on the

email chain.  Defendants further dispute that a statement by a single employee is sufficient to

establish the underlying fact set forth in Paragraph 391 at all times and for all purposes in this

litigation, including as to any belief or understanding held by other Ripple employees, Ripple as

an entity, or the Individual Defendants.

392.    In or around January 2018, Ripple autoreplied to inquiries from individuals seeking to buy XRP and included information on how to buy XRP from within the United States. PX 589.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 589, because the cited evidence does not support the

SEC's assertions of fact as set forth in Paragraph 392, including because the autoreply reflected

in PX 589 does not in fact "include[] information on how to buy XRP from within the United

States."  Defendants further dispute the SEC's characterization that the autoreply shown in PX

589 responded to "inquiries from individuals seeking to buy XRP"; the cited evidence does not

support this, but rather the autoreply was sent "when people contact XRPContact@ripple.com."

PX 589 at RPLI_SEC 0203416.

393.    Ripple's web site provided instructions on how to buy XRP through Bitstamp, Kraken, Gatehub Coinone, and btcxIndia. PX 595; PX 500.13.

**Response:**     Undisputed that the cited exhibits show that Ripple's website at one point

provided instructions on how to buy XRP through Bitstamp, Kraken, Gatehub, Coinone, and

btcxIndia.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from these exhibits because they do not support the SEC's temporally unbounded assertion of fact set forth in Paragraph 393 because they reflect snapshots of Ripple's website at a specific point in time and do not factually support that Ripple's website provided instructions on how to buy XRP through Bitstamp, Kraken, Gatehub Coinone, and btcxIndia at any other point in time.

394.    Ripple's website contained a page entitled "Ripple Sales XRP FAQ," which included the following information in response to questions about "how to buy XRP" and "who provides markets … to buy and sell XRP": "The best resource for how to buy XRP can be found on Ripple's How to Buy XRP page;" "Digital currency exchanges have the most liquid XRP markets" to buy and sell XRP; and "Here is a list of the most liquid XRP exchanges: https://xrpcharts.ripple.com/#/xrp-markets." PX 597; PX 113 ("let's put out the tweets. I'm also happy to add to the 'how to buy XRP' page on Ripple.com. Lastly, in future - let's have visibility into what's coming down the pike so that we can promote 'to the moon'").

**Response:**    Disputed.  Defendants do not dispute that PX 597 and PX 113 contain the quoted text; however, Defendants dispute the SEC's characterization of PX 597 as "Ripple's website," as PX 597 appears to be an internal document that is not public-facing, including a section of "Key Links to Share with Clients."  PX 597.  Defendants further dispute the SEC's characterization of PX 113 because a statement by a single employee is not sufficient to establish the underlying fact set forth in Paragraph 394 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

395.    In or around July 2019, Ripple's Q2 2019 XRP Markets Report directed readers to "How to Buy XRP (https://www.ripple.com/xrp/buy-xrp/)." PX 598 at RPLI_SEC 1114455.

**Response:**    Disputed, because the SEC's assertion in Paragraph 395 is unsupported by any evidence in the record, as the Q2 2019 XRP Markets Report contains no references whatsoever to the "How to Buy XRP" webpage.  *See* PX 598 at RPLI_SEC 1114447-54.  To the extent the SEC is referring to the default website footer, which around the time the Q2 2019 XRP Markets Report was published contained hyperlinks to more than twenty other webpages on the

201

Ripple website, including "https://www.ripple.com/xrp/buy-xrp/," Defendants dispute that the

default website footer was part of Ripple's Q2 2019 XRP Markets Report such that readers could

be "directed" there by that Report.  *Id.* at RPLI_SEC 1114454-55.

396.    In or around September 2016, an internal Ripple document entitled "Ripple.com Report" stated "Google AdWords helps drive traffic to Ripple.com. The goal is to catch potential clients in the moment as they search for relevant Ripple terms. Ad reach was expanded from North America to Western Europe, Japan, Singapore & Thailand." PX 591 at RPLI_SEC 0701618.  This document described "Ripple.com XRP Portal Goals" as including "drive buyer interest" and "segment XRP buyer audience from bank audience." PX 591 at RPLI_SEC 0701621.

**Response:**    Undisputed that PX 591 contains the quoted text; however, Defendants

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 591, as

misleading, because Paragraph 396 omits additional context necessary to understand the quoted

language, including that the document stated that the "Target Audiences" for Ripple.com were

"Financial institutions, channel partners, liquidity providers. . . . Prospective employees &

interns. . . . [and] Banking, fintech, blockchain industry."  PX 591 at RPLI_SEC 0701616.  PX

591 also described "Position XRP as the best bridge currency" as one of the "XRP Portal Goals."

PX 591 at RPLI_SEC 0701621.

397.    In or around September 2017, a Ripple employee told Garlinghouse that "'How to buy XRP' has been the most common type of request, and has grown through the year as an overall piece of the pie. Right now it makes up about a third of all requests." PX 592

**Response:**    Undisputed that PX 592 contains the quoted text; however, Defendants

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 592, as

misleading, because Paragraph 397 omits additional context necessary to understand the quoted

language, which was provided in response to Garlinghouse's request for an explanation as to

how Ripple was "triaging" customer support tickets, which were generally responded to

"automatically."  PX 592 at RPLI_SEC 0646875-76.  Defendants further dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 592 to the extent it implies

anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse after the email containing the language quoted in Paragraph 397.

398.    In or around January 2017, a Ripple employee told Griffin the announcement that XRP is now available on Bitstamp resulted in uptick of interest by Ripple subscribers, higher than average views of a related Ripple Insights article, a doubling of average XRP Portal daily traffic, and a record number of twitter retweets. Griffin responded, asking "where do we focus on the volume incentive (vs the fee rebate)?" PX 607.

**Response:**    Undisputed that PX 607 contains the quoted text from Griffin.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 607, as misleading, because Paragraph 398 omits additional context from that exhibit, including that it did not indicate that the announcement "resulted in uptick of interest by Ripple subscribers," and only indicated that an email sent to Ripple subscribers about the announcement was opened by a certain percentage of those subscribers, not that this reflected an "uptick."  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 607, because it says that the retweets of the Bitstamp's news from Ripple's handle was "almost record-breaking," not that it was in fact a "record number of twitter retweets," as the SEC indicates.  PX 607 at RPLI_SEC 0049542.

399.    In or around March 2017, a Ripple employee told Long that she had been working with Bitstamp to outline instructions on how to buy XRP in order "to add [the instructions] to the XRP Portal" and working to "identify ways to change it [to] Google's search." The employee noted that Vias was pushing hard to change the query to "How to Access XRP," which she rejects "given the impact on SEO." Long agreed, stating that "I see these guides as customer support," and "Totally agree about 'buy XRP' for SEO." PX 596.

**Response:**    Undisputed that PX 596 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC, including the addition of "[to]" in the quoted text, which changes the meaning of the phrase; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 596, because Long's statement

that "I see these guides as customer support" was not in response to the discussion about SEO,

but rather in regards to who at Ripple would have process ownership over the guides. *See* PX

596. Defendants further dispute that a statement by a single employee is sufficient to establish

the underlying fact set forth in Paragraph 399 at all times and for all purposes in this litigation,

including as to any belief or understanding held by Ripple as an entity or the Individual

Defendants.

400.    In or around April 2019, Ripple distributed internally an article stating that "more
people in the US Googled "how to buy XRP" than "how to buy Bitcoin" last year. PX 594.

**Response:**      Disputed, because the SEC's statement that Ripple distributed the

referenced article is unsupported by any evidence in the record; PX 594 shows that a single

Ripple software engineer sent a Slack message containing a link to the referenced article to

recipients in a single company Slack channel.  PX 594 at RPLI_SEC 1121277-78.  PX 594 also

shows that no other Ripple employees commented on or discussed the article in response to the

message. *Id.*

401.    In or around January 2017, Vias announced internally within Ripple Bitstamp's
listing of XRP/USD and XRP/EUR trading pairs, explaining that this launch "also marks the
introduction of our XRP Volume Incentive Program, specifically meant to bootstrap volume and
tighten spreads in support of payments. As a result of the program top market makers on
Bitstamp, and other qualified exchanges, will add liquidity to newly listed fiat XRP pairs.
Currently GSR and ███ are providing liquidity in XRP/EUR on Bitstamp, and we expect
volume to grow steadily as market makers increase participation over the next few weeks. In the
first 24-hours of trading on Bitstamp, XRP saw approximately $80K worth of volume traded
https://charts.ripple.com/#/external-markets, surpassing Kraken (XRP/BTC). Importantly, this
exclusively fiat volume, no XRP/BTC, already represents 16% of XRP's total fiat volume. Also,
while Bitstamp's BTC volume profile is 90/10 USD/EUR, XRP's volume breakdown has been
roughly 50/50 USD/EUR, a clear indication that our incentive program is driving volume where
we need it." PX 608.

**Response:**      Undisputed that PX 608 contains the quoted text; however, Defendants

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 608, because

PX 608 also emphasized that the listing was "significant because it allows payment originators in

European markets to use XRP liquidity (supply) on Bitstamp for cross-border payments to

emerging markets." Defendants further dispute that a statement by a single employee is

sufficient to establish the underlying fact set forth in Paragraph 401 at all times and for all

purposes in this litigation, including as to any belief or understanding held by Ripple as an entity

or the Individual Defendants.

402.    In or around October 2017, Vias told a Bloomberg reporter that Ripple's goal was
to increase XRP liquidity by increasing the number of exchange listings and increasing listings
on OTC markets. PX 609 at ███████ 0163736.

**Response:**      Disputed because the cited evidence is insufficient to establish the factual

assertion set forth in Paragraph 402. The only evidence cited by the SEC to support the assertion

is an email that was written by neither Vias nor the Bloomberg reporter, but rather "rough" notes

by a third person who was not a Ripple employee, which is both insufficient and inadmissible

hearsay. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this

fact in admissible form, as the document quoted is a hearsay statement of a third party and not a

statement by Ripple, its employees, or the Individual Defendants. Defendants further dispute the

SEC's assertion of fact because Vias was purportedly asked "[y]ou talk about continuing to

increase liquidity of XRP. How?" and Vias responded "[i]ncrease exchanges, increase listings

on OTC markets," and that "[t]he goal is to see XRP solve problems [traditional payment

methods] can't currently solve." PX 609 at ███████ 0163736. Vias therefore did not state

"Ripple's goal was to increase XRP liquidity," as stated in Paragraph 402.

403.    In or around November 2017, a Ripple employee recommended to Griffin that
"we could do more to direct XRP fans to petition for Coinbase listing… Not only US investors,
but also overseas investors are interested in this because 1) they could buy XRP on Coinbase by
wiring money from overseas or using creditcard, and 2) more importantly, they want to see a
price increase by getting XRP more exposed on major exchanges like Coinbase. The idea is to
utilize our *strong* fan base more since Coinbase needs to listen to user voice. I think we could
potentially do something like this for bitflyer too." Long responded:  "Yesterday was entirely
dedicated to brainstorming for our 2018 plan. We spent a portion of our 'XRP demand gen'

brainstorm thinking about how we can pressure Coinbase publicly." PX 541 at RPLI_SEC 0055020-21.

**Response:**     Undisputed that PX 541 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 541, which does not reflect that the Ripple employee "recommended" anything to Griffin. Defendants further dispute that a purported statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 403 at all times and for all purposes in this litigation, including as to any belief or understanding held by Ripple as an entity or the Individual Defendants.

404.   ██ testified: "If you try to sell a large amount of XRP on one exchange that have insufficient liquidity, the price of XRP on that exchange would suffer as a result." PX 26 (██ Dep. Tr.) at 130:13-131:1.

**Response:**     Undisputed that PX 26 contains the quoted testimony; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from ██ testimony, since ██ was testifying on the topic of whether he would "ever recommend that Ripple sell all its XRP on one exchange" and he stated that he would not for several reasons, which are omitted by the SEC in Paragraph 404. These reasons include that most exchanges "exhibit all sorts of risks…[so] it would be very risky to put everything on any one given exchange" and "there might not be sufficient liquidity . . . if there's a large volume that you're trying to sell." PX 26 at 130:5-19. ██ also testified that he did not know the factors Ripple considered when deciding which exchanges to sell XRP on and was testifying only as to "the factors that we [GSR] considered important." PX 26 at 131:3-9. Defendants further dispute that a statement by a third party is sufficient to establish the underlying fact set forth in Paragraph 404 at all times and for all purposes in this litigation, including as to any belief or understanding held by Ripple as an entity or the Individual Defendants.

405.   ██ testified, referencing Ripple's programmatic XRP sales, "the sales program was something that was a long-term program, right. We're trying to maintain fair and orderly markets during this time. We're trying to introduce a supply that is appropriate, proportional to the trading volume and interest in the market at the time." PX 26 (██ Dep. Tr.) at 131:17-25.

**Response:**      Undisputed that PX 26 contains the quoted testimony; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from ██ testimony as quoted in Paragraph 405, since ██ was not testifying about Ripple or his understanding of Ripple; he testified that he did not know the factors Ripple considered when deciding which exchanges to sell XRP on and was testifying only as to "the factors that we [GSR] considered important." PX 26 at 131:3-9. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from ██ testimony as quoted in Paragraph 405, because ██ was testifying in the broader context of recommending to Ripple that they not trade on certain digital asset trading platforms, in particular ones that "grossly inflated the trading volumes that they reported." PX 26 at 132: 1-8. Defendants further dispute the SEC's use of the term "programmatic XRP sales" as unclear, vague, and ambiguous. The SEC has put forward multiple definitions of the term "programmatic sales" in this litigation, including in Paragraph 626 of the SEC's Rule 56.1 Statement. *See* SEC's Rule 56.1 Statement (ECF No. 629) ¶ 626; First Amended Complaint, ECF No. 46 ¶ 99; Ex. 134 (Plaintiff's First Set of Requests for Admission to Defendant Ripple Labs, Inc.), No. 10(h). The use of the term "programmatic XRP sales" is neither defined nor used in the cited testimony and it is unclear which of the SEC's prior definitions of "programmatic sales," if any, the term relates to or differs from. Defendants further dispute that a statement by a third party is sufficient to establish the underlying fact set forth in Paragraph 405 at all times and for all purposes in this litigation, including as to any belief or understanding held by Ripple as an entity or the Individual Defendants.

207

406.     GSR and Ripple wanted exchanges that reported real, as opposed to fake, volume and to ensure quick verifiable execution of XRP trades. PX 26 (████ Dep. Tr.) at 131:11-132:19.

**Response:**     Disputed because the cited evidence is insufficient to establish the factual

assertion set forth in Paragraph 406 because ████ testified that he did not know the factors Ripple

considered when deciding which exchanges to sell XRP on and was testifying only as to "the

factors that we [GSR] considered important," and further testified that he "probably"

recommended that Ripple not sell on exchanges with "fake volume," not that he did in fact make

such a recommendation, or that Ripple "wanted exchanges that reported real, as opposed to fake,

volume," as the SEC suggests.  PX 26 at 131:3-132:12.  Defendants further dispute that a

statement by a third party is sufficient to establish the underlying fact set forth in Paragraph 406

at all times and for all purposes in this litigation, including as to any belief or understanding held

by Ripple as an entity or the Individual Defendants; this testimony by a third party is insufficient

to establish what "Ripple wanted."

407.     Garlinghouse testified that speculative interest in XRP and market trading volume drives liquidity. In answering whether speculative trading volume in XRP was important, Garlinghouse replied: "I think you need liquidity. Anything that drives liquidity is going to be constructive to what I'm calling a flywheel," and speculative interest in XRP drives liquidity. PX 81 (Garlinghouse Dep. Tr.) at 371:11-23.

**Response:**     Undisputed that PX 81 contains the quoted text, exclusive of any

alterations, omissions, or additions; however, Defendants do not concede that this is the entirety

of, a representative selection of, or a fair characterization of the document's complete contents

because in PX 66, Garlinghouse says, and in PX 81, Garlinghouse testifies that, liquidity in XRP

was needed for Ripple's product offerings, and that "speculative and market trading volume"

could promote liquidity.  PX 66 ("[F]or XRP to serve the purpose of lowering liquidity costs for

payments, it needs deep liquidity across fiat currency pairs. Speculative and market trading

volume builds that liquidity…"); PX 81 (Garlinghouse Dep. Tr.) at 371:12-16 (Q: "… [D]o you

208

still need speculative and market trading volume in XRP?"  A: "I think you need liquidity.

Anything that drives liquidity is going to be constructive to what I'm calling a flywheel"); PX 81

(Garlinghouse Dep. Tr.) at 371:18-21 (Q: "And speculative interest in the asset could drive

liquidity?"  A: "Yeah, I think I'm saying that it has in that particular time period.").

   408. Garlinghouse testified that Ripple offered volume incentive and payments to at
least six crypto exchange platforms. For example, Garlinghouse offered $5 million to Coinbase,
a U.S. based exchange, to list XRP and Ripple offered $1 million to Gemini to list XRP. PX 81
(Garlinghouse Dep. Tr.) at 310:6-20; 312:23-313:15; 327:24-328:10.

   **Response:**  Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 81 as misleading.  Garlinghouse did not testify that he

"offered $5 million to Coinbase," as set forth in Paragraph 408.  Instead, Garlinghouse testified

that he recalled Coinbase asking Ripple to pay $5 million in exchange for Coinbase listing XRP.

PX 81 (Garlinghouse Dep. Tr.) at 310:8-13 ("I think my previous testimony I stand by, which is I

recall [Coinbase] asking us to pay them $5 million.  We then later went and said, 'Hey, is that

still on the table?' I think what I'm regurgitating to ██████ is that, hey, that had happened.").  In

fact, Ripple declined to pay Coinbase the $5 million.  PX 81 (Garlinghouse Dep. Tr.) at 308:12-

18 (Q: "And at any point in time did you offer CoinBase (sic) $5 million to list XRP?" … A:

"They asked us to pay $5 million, to which we declined.").  Ultimately, Coinbase listed XRP on

its own, and it is not one of the six exchanges Ripple had a contract with related to the listing of

XRP.  *See* Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 65-66.  In addition, Garlinghouse also

did not testify that "Ripple offered volume incentive and payments to at least six crypto

exchange platforms," as set forth in Paragraph 408.  Instead, Garlinghouse testified that Ripple

had a "relationship" with only about five or six exchanges – and by "relationship," Garlinghouse

meant agreements – and the SEC then asked whether some of the agreements provide for volume

incentives, which Garlinghouse believed was correct.  PX 81 (Garlinghouse Dep. Tr) at 313:2-15

(A: "I think my testimony earlier was I think there were over 200 exchanges around the world with XRP of which I think ███ Ripple has had some sort of relationship with."  Q: "The relationship include agreements, contracts?"  A: "Yeah. That's what I mean by 'relationship.' Yes."  Q: "And, generally, some of these provide for payments to the platforms, for example, with respect to volume incentives and things of that nature?"  A: "I believe that's correct."). Defendants further note that of the hundreds of exchanges globally that listed XRP, only ███ had contracts with Ripple related to their listing of XRP.  Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 65-66.  In addition, Defendants dispute Paragraph 408 as being vague because it is does not define the term "U.S.-based exchange," nor does PX 81 support the SEC's assertion of fact that Coinbase is a "U.S.-based exchange."  Finally, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81 to the extent it implies anything untoward about Ripple having provided volume incentives to ██ exchanges, which is unsupported by any evidence.  Undisputed that Garlinghouse testified that, although he did not recall Ripple offering $1 million to Gemini to list XRP, "[b]ased upon this e-mail, it looks like [a Ripple employee] offered Gemini a million dollars to list XRP," as set forth in PX 81 (Garlinghouse Dep. Tr.) at 327:19-328:3.

409.    Garlinghouse believed that adding Coinbase as an exchange that listed as XRP provided more liquidity and was a "positive for the market." PX 81 (Garlinghouse Dep. Tr.) at 321:10-17.

**Response:**    Undisputed that Garlinghouse offered the quoted testimony; however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony.  Defendants note that Garlinghouse testified that more liquidity in the market generally was better than less liquidity, including for Ripple's product offerings, and a listing on Coinbase would be positive as an additional source of liquidity in that context.  PX 81 (Garlinghouse Dep. Tr.) at 321:10-17 ("… [A]s I've testified, the more

liquidity in the market, the better.  So to the extent Coinbase listed XRP, I viewed that as a positive for the market."); 370:11-15 ("Typically, the more liquidity you have in a market, the tighter the spreads you would have in that market.  The tighter the spreads, the more efficient the market.  The more efficient the market, the more demand for those payment flows.").

410.    In or around December 2016, Ripple asked Bitstamp "to provide [Ripple] with instructions on how to manually buy/sell XRP on Bitstamp in advance of the launch" and stated that Ripple "would like to post the instructions on Ripple's XRP Portal on the day of the launch as well." PX 600.

**Response:**        Undisputed that PX 600 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that a statement by a single Ripple employee is sufficient to establish the underlying fact set forth in Paragraph 410 at all times and for all purposes in this litigation, including as to any belief or understanding held by Ripple as an entity or the Individual Defendants.

411.    In or around January 2017, a Ripple employee informed Bitstamp about marketing plans to announce Bitstamp's new listing of XRP. Ripple planned to "update [its] current Ripple Insights article," to "highlight [Bitstamp's] participation in the XRP Incentive Program and reduced fee schedule, including 0% until Feb 10, 2017." Ripple planned to "send an email to our Ripple Insights and XRP Portal subscribers (via our newsletter)," "[p]romote via Ripples Twitter, Reddit, Facebook and LinkedIn (XRP Chat will pick it up immediately)," and would "re-promote any of [Bitstamp's] social promotion as well." The Ripple employee also stated that Ripple would create a new "'How to Buy XRP on Bitstamp' page on [Ripple's] XRP Portal," and inquired whether there are "other opportunities for us to promote on your Web site (sic) (the fees in particular?)" PX 602.

**Response:**        Undisputed that PX 602 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.  However, Defendants dispute that a statement by a single Ripple employee is sufficient to establish the underlying fact set forth in Paragraph 411 at all times and for all purposes in this litigation, including as to any belief or understanding held by Ripple as an entity or the Individual Defendants.

412.    In or around February 2017, Long congratulated Griffin, attaching a Bitstamp announcement that: "Today we are launching XRP/BTC trading on our exchange, yet another pair to add to our roster. A digital asset that is native to the Ripple Consensus Ledger, XRP can

now be traded with BTC, USD and EUR. To get things off to the best possible start for your XRP/BTC trades, we will be offering 0% fees until 28 February 2017, a 50% discount on fees until 31 March, and a 25% discount on fees until 30 April. The XRP fee schedule will revert to normal as of midnight on 1 May 2017. Check out Ripple's handy guide on how to buy XRP on Bitstamp here 'How to buy XRP on Bitstamp.'" PX 603.

**Response:**     Undisputed.

413.     In or around October 2017, in response to Exmo.com proposing to list XRP on its platform and seeking a mention on Ripple's "how to buy XRP" webpage, Vias explained that "we unfortunately aren't able to make announcements for each individual exchange we list. However, you're able to make any announcements you'd like and we can help with providing exposure on some of our social media accounts (i.e. Twitter re-tweets). Once we see volume we can also discuss adding Exmo to the How to Buy XRP page." PX 605.

**Response:**     Undisputed that PX 605 contains the quoted text; however, Defendants

dispute that Vias made the referenced statement since he is not included on the email chain in PX

605 and a different Ripple employee made the referenced statements.  Defendants further dispute

that a statement by a single Ripple employee is sufficient to establish the underlying fact set forth

in Paragraph 413 at all times and for all purposes in this litigation, including as to any belief or

understanding held by Ripple as an entity or the Individual Defendants.

414.     In or around July 2017, a Ripple senior web developer emailed Vias noting that "the 'how to buy XRP on Kraken' site page is out dated and may be on bitstamp or other exchanges too. https://ripple.com/xrp/how-to-buy-xrp-on-kraken/  You no longer need to buy bitcoin on kraken, you just need to select the XRP/USD pair or whatever fiat pair you want then trade for XRP! That's a lot easier and people will find it a whole lot easier to buy, which makes it easier for you guys to sell XRP to the masses!  Do you think we could get updated copy and screenshots for these how to buy guides?" PX 601.

**Response:**     Undisputed that PX 601 contains the quoted text; however, Defendants

dispute the implication that this individual "emailed Vias" when the email was sent directly to a

different Ripple employee and Vias was one of three individuals on the cc line of the referenced

email.  PX 601 (RPLI_SEC 0048597) at RPLI_SEC 0048597.  Defendants further dispute that an

email written by a single Ripple technical employee reflected any belief or understanding held by

other Ripple employees, Ripple as an entity, or the Individual Defendants.

415.   In or around November 2017, Garlinghouse tweeted that "Team Ripple is absolutely committed to building XRP liquidity" and "excited to share that Houbi (3rd largest exchange in China) is listing BTC I XRP tomorrow on Huobi Pro." PX 599; PX 561 (March 22, 2020 email from Samarasinghe to a market maker stating "our goal is to have redundant XRP sales presence on basically every major exchange that sells XRP, with priority for exchanges that we don't have a presence on").

**Response:**     Undisputed that PX 599 contains the quoted text; however, Defendants

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 599 to the

extent it implies anything about Ripple having a role in the Huobi XRP listing, which is

unsupported by the exhibit.  In PX 599, Garlinghouse says that Ripple's "strateg[y] has been to

get XRP listed on more exchanges … I think we want to share with the world anytime another

exchange … is listing XRP. … To be clear, I am not suggesting the language of a tweet would

'endorse' Huobi[,]" as set forth in PX 599.  PX 561 does not support that Ripple had any role in

the XRP listing on Huobi because the conversation in that email about "getting sales running on

Huobi" took place four months after Garlinghouse's tweet from PX 599.  *See* PXs 561 and 599.

Defendants further note that of the hundreds of exchanges globally that listed XRP, only six had

contracts with Ripple related to their listing of XRP.  *See* Defs.' Rule 56.1 Statement (ECF No.

623) ¶¶ 65-66.  Huobi is not one of those six exchanges.  *Id.*

416.   Larsen testified that "there are millions of people all over the world" who are passionate about XRP. PX 2 (Larsen Dep. Tr.) at 329:21-330:4.

**Response:**     Undisputed that Larsen offered the quoted testimony; however,

Defendants do not concede that this is the entirety of, a representative selection of, or a fair

characterization of Larsen's testimony.  Larsen testified that "there are millions of people all

over the world" in the XRP ecosystem that are "very passionate."  Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 2 to the extent the SEC implies

that individuals' passion about XRP reflects the views or priorities of the Defendants, and to the

extent the SEC implies that individuals passionate about XRP regarded XRP as a security.

417.    An internal Ripple spreadsheet dated in or around November 2019 listed XRP volume tracked by ███████████ attributable to exchanges that did not permit U.S. customers.  After including Bithumb and Korbit (identified by Ripple's market maker as exchanges that permit U.S. customer, see PX 564), more than 75% of all exchange traded XRP was available to U.S. purchasers. PX 565 at 1.

**Response:**    Disputed.  The statement in Paragraph 417 that Bithumb and Korbit

permitted U.S. customers to use their trading platforms in 2019 is contradicted by evidence in the

record, specifically PX 565.  *Compare* PX 565 at RPLI_SEC 0807008, *with* PX 564 at SEC-

███████-E-0048727, *and* PX 577 at SEC-████████-E-0050754 ("With regard to South

Korean exchanges (Bithumb, Coinone, Korbit) . . . the gov of South Korea banned all non-South

Korean residents from setting up and maintaining accounts.").  Defendants further dispute the

SEC's statement that "more than 75% of all exchange traded XRP was available to U.S.

purchasers" as unsupported by evidence in the record because neither PX 565 nor PX 564

purport to comprehensively list all XRP trading volume over any time period and accordingly

cannot establish the proposition stated in Paragraph 417.  PX 565 sets forth 2019 year-to-date

XRP trading volume as of November 14, 2019 at "B or Better Rated Exchanges Only" that were

listed on the website ███████████ and accordingly by its terms does not purport to be

comprehensive.  *See* PX 565 at RPLI_SEC 0807008.  Additionally, the phrases "exchange traded

XRP," "available," and "U.S. purchasers" are undefined, vague, and unclear, and do not appear

in the cited documents.  *Id.*  Defendants further dispute the characterization that any market

maker was "Ripple's market maker" as vague and unsupported by evidence in the record.

418.    Defendants were also able to sell on exchanges that purportedly did not accept U.S. investors. PX 577.

**Response:**    Disputed.  The email exchange set forth at PX 577 does not establish the

allegation of fact that "Defendants" were "able to sell on exchanges" as set forth in Paragraph

418, and in particular, Defendants dispute the allegation in Paragraph 418 because the cited

evidence contains no mention of sales relating to the Individual Defendants.  Defendants further

dispute the characterization in Paragraph 418 that individuals who transact on digital asset

exchanges are "investors" as vague and, insofar as it sets forth a legal conclusion, unsupported

by evidence in the record.

419.  ▮▮▮▮▮▮▮▮ opened trading accounts to trade XRP on three South Korean
Exchanges—Bithumb, Coinone and Korbit—in October 2018, many months after South Korea
prohibited all non-South Korean residents from setting up and maintaining accounts on South
Korean exchanges effective Jan 30, 2018. When a Ripple employee asked ▮▮▮▮▮▮▮s in
September 2019 how it had "been able to continue trading on these exchanges?" Ripple's
programmatic XRP trader at ▮▮▮▮▮▮▮ responded "ugh..not sure how to answer this ...
basically we signed up Oct 2018 and have not been prompted to get off." PX 577.

**Response:**   Disputed.  Defendants do not dispute that PX 577 contains the quoted text;

however, Defendants dispute that the email exchange set forth in PX 577 establishes the date on

which ▮▮▮▮▮▮▮ set up accounts on each of the three exchanges identified in Paragraph

419, or supports the characterization that ▮▮▮▮▮▮▮ was speaking as "Ripple's

programmatic XRP trader" in connection with the referenced email, as that characterization is

not supported by the cited evidence.  Defendants further dispute the allegation in Paragraph 419

that ▮▮▮▮▮▮▮ "responded" to Ripple at all, as the quoted language from PX 577 comes

from an email internal to ▮▮▮▮▮▮▮s that was not sent to any Ripple employee.  PX 577 at

SEC-▮▮▮▮▮▮▮-E-0050754.

420.  ▮▮▮▮▮▮▮ understood that part of the reason GSR sold XRP for Defendants on
multiple exchanges was that "Ripple wanted to have a larger user base and to be known
globally." PX 26 (▮▮ Dep. Tr.) at 55:23-56:7.

**Response:**   Disputed.  Defendants do not dispute that PX 26 contains the quoted text;

however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn

from, PX 26, as misleading including because Paragraph 420 omits additional context necessary

to understand the quoted testimony. ▮▮▮ clarified that he "suspect[ed]" that "Ripple wanted to

have a larger user base and to be known globally" and immediately after the quoted testimony

███ stated "I don't know what Ripple wanted." PX 26 at 56:4-21. The cited testimony

accordingly does not establish what ███ "understood" as to Ripple, and contains no testimony

relating to the Individual Defendants.

421.   Ripple decided on which exchanges GSR should sell XRP, and the number of exchanges on which Ripple could sell XRP increased significantly in 2017, which was something that Ripple wanted. PX 26 (███ Dep. Tr.) at 128:12-129:9.

**Response:**   Disputed. The SEC's assertions of fact in Paragraph 421 are contradicted

by evidence in the record. ███ testified that if he "remember[ed] correctly, [GSR] would propose

which exchanges we thought were . . . [a]ppropriate" in the first instance, while "the final

decision was Ripple's." PX 26 at 128:12-17. ███ further testified that the number of exchanges

on which Ripple could sell XRP increased "[b]y definition . . . because it started at zero or one."

PX 26 at 128:18-22. When asked whether Ripple wanted "to increase the number of platforms it

sold XRP on," ███ responded "I mean, generally, I guess so, yes." PX 26 at 129:5-9. Defendants

further dispute that a statement by a single third-party individual is sufficient to establish the

underlying facts set forth in Paragraph 421 at all times and for all purposes in this litigation,

including as to any belief or understanding held by Ripple employees, Ripple as an entity, or the

Individual Defendants.

422.   GSR also purchased XRP in the market for Ripple in connection with Ripple's ODL product. GSR purchases were meant to counteract ODL flows that added XRP supply—a way to return ODL to "XRP neutral" to prevent new supply from dragging down the price of XRP. PX 26 (███ Dep. Tr.) at 181:16-182:2.

**Response:**   Disputed. Defendants do not dispute that ███ offered the quoted

testimony, however, Defendants dispute that ODL flows increased the supply of XRP as

contradicted by evidence in the record, and further dispute the SEC's characterizations in

Paragraph 422 to the extent that they conflict with other purported facts in the SEC's Rule 56.1

Statement (ECF No. 629), including Paragraph 20 ("the 100 billion XRP created was a fixed,

finite supply"), Paragraph 25 ("[t]he long-term supply of XRP is limited to the 100 billion

already in existence"), and Paragraph 761.

423.    ███ testified that GSR likely bought XRP back on Binance and OkEx because they had significant XRP trading volume. Binance is a U.S. exchange with a significant percentage of XRP trading volume. PX 26 (███ Dep. Tr.) at 191:12-192:2; PX 565

**Response:**    Disputed.  The statement that GSR likely bought XRP back on Binance

and OkEx is unsupported by the cited evidence.  When asked whether GSR "purchase[d] XRP

on Binance and OKEx on behalf of Ripple," ███ testified that "[i]t's entirely possible.  I can't

confirm."  PX 26 at 191:12-15.  Defendants further dispute the statement that "Binance is a U.S.

exchange with a significant percentage of XRP trading volume" as unsupported by evidence in

the record because Binance operates two distinct, separate exchanges – Binance and Binance.US

– and ███ testimony does not establish that he was referring to the U.S.-based Binance in PX 26

at 191:12-192:2.  Defendants further object to the SEC's characterizations in Paragraph 423

because PX 565 does not purport to list the percentage of XRP trading volume attributable to

"Binance" at all times relevant to this litigation, and does not establish that "Binance" is a U.S.

exchange at any time.  PX 565 only lists 2019 year-to-date XRP trading volume as of November

14, 2019 at "B or Better Rated Exchanges Only" that were listed on the website ███████,

and accordingly does not support the SEC's allegations in Paragraph 423.  *See* PX 565 at

RPLI_SEC 0807008.

424.    In or around May 2019, ███████ emailed Samarasinghe, Vias, and others at Ripple, stating: "Per our conversation, I have worked on compiling some data on exchanges associated with our Ripple liquidation program. In the attached PDF file you will find a list which includes exchange names, corresponding 2018 Ripple liquidation volumes, and whether the exchanges allow US customers or not." The attachment to this email listed exchanges that allowed U.S. customers. PX 564.

**Response:**    Undisputed that PX 564 contains the quoted text; however, Defendants

dispute the SEC's characterization of the attachment to PX 564, as it contains a chart listing

exchanges with a column "Allows U.S. Customers," which states "No" for 6 of the 18 listed

exchanges.  PX 564 at SEC-CSCAPITAL-E-0048727.

425.    Internal Ripple spreadsheets tracked which exchanges accepted U.S. customers.
PX 565, PX 566.

**Response:**    Undisputed.

426.    In or around October 2019, Samarasinghe sent a slack message to another Ripple
employee stating that Garlinghouse wanted to know "[w]hat percentage of total XRP sales are to
US and non-US partners" and "what % of total sales to partners that allows US customers,"
purportedly because "We are exploring our tax treatment of XRP sales. If we sell XRP on
exchanges without US customers, our tax basis is different than our tax basis on exchanges that
allow US customers." PX 567.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 567 because the cited evidence does not support the

SEC's assertion of fact as set forth in Paragraph 426 that Garlinghouse wanted to know "[w]hat

percentage of total XRP sales are to US and non-US partners" and "what % of total sales to

partners that allows US customers."  In PX 567, Samarasinghe asks another Ripple employee a

series of questions, without saying that any of them originated with Garlinghouse.  Then, at the

end of the conversation, Samarasinghe writes, "I'll update my numbers for Breanne and Brad[.]"

PX 567.  That Samarasinghe said he would subsequently update "numbers" for Garlinghouse is

not evidence that Garlinghouse "wanted to know" anything, as Samarasinghe may have decided

to provide an update to Ripple's then-CEO on his own initiative.  Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 567 to the extent it implies

anything about whether Garlinghouse received an update, and if so, what he understood it to

mean, or what, if any, reaction he had to it since that is unsupported by the exhibit.  Undisputed

that PX 567 contains the quoted text, exclusive of any alterations, omissions, or additions;

however, Defendants do not concede that this is the entirety of, a representative selection of, or a

fair characterization of the document's complete contents.

427.    GSR was trying to give Defendants "best execution" and to sell XRP at the best possible price. PX 26 (█ Dep. Tr.) at 150:12-19.

**Response:**    Undisputed that █ offered the quoted testimony.

428.    █ testified: "If you try to sell a large amount of XRP on one exchange that have insufficient liquidity, the price of XRP on that exchange would suffer as a result." PX 26 (█ Dep. Tr.) at 130:13-131:1.

**Response:**    Disputed.  Undisputed that PX 26 contains the quoted text; however, the

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX

26, as misleading including because Paragraph 428 omits additional context necessary to

understand the quoted testimony, including that █ offered the quoted testimony in response to a

general, hypothetical question of whether he would "ever recommend that Ripple sell all of its

XRP on one exchange," and █ qualified his testimony by stating that he was only able to say

what would happen "in all likelihood."  PX 26 at 130:5-131:1.

429.    In or around May 2019, a █████ employee emailed Ripple employees, stating: "Per our conversation, I have worked on compiling some data on exchanges associated with our Ripple liquidation program. In the attached PDF file you will find a list which includes exchange names, corresponding 2018 Ripple liquidation volumes, and whether the exchanges allow US customers or not." PX 564.

**Response:**    Defendants dispute that Paragraph 429 sets forth a unique statement of

undisputed fact, as it is entirely duplicative of Paragraph 424, but do not dispute that PX 564

contains the quoted text.  Defendants incorporate by reference their response to and dispute of

Paragraph 424.

430.    According to the attachment to the email sent by █████ in or around May 2019, Ripple sold XRP on the following exchanges that allowed U.S. customers: Binance, Bithumb, Bitstamp, Bittrex, Coinone, Korbit, Kraken, Poloniex, ZB, ZBG, BW, and Coinbase. PX 564.

**Response:**    Undisputed that the attachment sets forth █████ view of the

exchanges listed in Paragraph 430 as of May 2019.  Defendants dispute that PX 564 establishes

the facts alleged in Paragraph 430 at all times and for all purposes in this litigation.

431.    Ripple tracked which exchanges accepted U.S. customers.  PX 565; PX 566.

**Response:**    Defendants dispute that Paragraph 431 sets forth a unique statement of

undisputed fact, as it is entirely duplicative of Paragraph 425, but otherwise do not dispute

Paragraph 431.

432.    In or around October 2019, Ripple employee Samarasinghe sent a slack message
to another Ripple employee stating that Garlinghouse wanted to know "[w]hat percentage of
total XRP sales are to US and non-US partners" and "what % of total sales to partners that allows
US customers," purportedly because "[w]e are exploring our tax treatment of XRP sales. If we
sell XRP on exchanges without US customers, our tax basis is different than our tax basis on
exchanges that allow US customers." PX 567.

**Response:**    Disputed.  Defendants dispute Paragraph 432 as not being material

because it is duplicative of Paragraph 426.  Defendants incorporate by reference their response to

and dispute of Paragraph 426.

433.    In or around October 2019, Ripple employee Samarasinghe estimated in an email
sent to Ripple employee Madigan that 75% of Ripple's OTC and programmatic (on exchange)
sales were sales to partners who accepted U.S. customers, making "the assumption that all sales
of XRP on such exchanges are to US persons in the absence of more conclusive data." PX 576.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 576, as misleading and unsupported by the cited

evidence, including because PX 576 notes that "75.26%" made up the "% of TOTAL Sales to

partners w US customers," PX 576 at RPLI_SEC 0550552, however, that figure comes from a

table showing only data on "exchanges and OTC partners that allow US customers."  PX 576 at

RPLI_SEC 0550551.  Defendants further dispute the assertions set forth in Paragraph 433

because Paragraph 433 omits additional context necessary to understand the document, including

that a "number of the counted exchanges, however, probably have a significant % of foreign

investors which means that significant % of our XRP sales are to foreign persons."  PX 576 at

RPLI_SEC 0550551.  Defendants further dispute that a statement by a single employee is

sufficient to establish the underlying fact set forth in Paragraph 433 at all times and for all

purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants. Defendants further dispute Paragraph 433 to the extent that it sets forth a legal conclusion, including the SEC's inference that physical location is relevant to the question of whether sales and offers to sell on foreign digital asset exchanges were within the territorial scope of the federal securities laws. As explained in Defendants' Motion for Summary Judgment, offers and sales occur on foreign exchanges notwithstanding the physical location of the seller. *See* Defs.' MSJ at 58-74.

434.     In or around September 2019, ▮▮▮▮▮▮▮ reported to Ripple that notwithstanding South Korean law barring non-South Korean residents from opening accounts on South Korean exchanges effective Jan 30, 2018, ▮▮▮▮▮▮ was permitted to open accounts on Bithumb, Coinone and Korbit exchanges "and have not been prompted to get off." PX 577.

**Response:**     Defendants dispute that Paragraph 434 sets forth a unique statement of undisputed fact, as it is duplicative of Paragraph 419. Defendants incorporate by reference their response to and dispute of Paragraph 419. Defendants do not dispute that PX 577 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 577 as unsupported by the evidence. In particular, the cited evidence does not establish that ▮▮▮▮▮▮ "reported to Ripple" any of the information set forth in Paragraph 434, as the quoted language from PX 577 comes from an email internal to ▮▮▮▮▮▮ that was not sent to any Ripple employee. PX 577.

435.     In or around September 2020, Samarasinghe explained in an internal Ripple Slack message how U.S. investors can circumvent trading restrictions on crypto asset exchanges that purport to exclude U.S. customers. PX 585.

**Response:**     Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 577 as unsupported by the cited evidence and misleading. Defendants object to the SEC's characterization that Samarasinghe "explained" "how U.S. investors can circumvent trading restrictions" as unsupported by the cited evidence, in which

Samarasinghe answers a question from a single Ripple employee—not as to U.S. investors

broadly—about how he may purchase DOT without providing his social security number.  PX

585 at RPLI_SEC 1084074.  Defendants further object to the SEC's use of the term

"circumvent" as undefined, vague and unclear, and does not appear in the cited document.

Defendants further dispute the characterization in Paragraph 435 that individuals who transact on

digital asset exchanges are "investors" as vague and, insofar as it sets forth a legal conclusion,

unsupported by evidence in the record.

436.    Garlinghouse, Larsen and Ripple's Board of Directors possessed the authority to
file a registration statement to register their sales of XRP, but none of them did so. PX 2 (Larsen
Dep. Tr.) at 143:5-144:17 (Ripple's board of directors could have limited how Larsen sold his
XRP); PX 81 (Garlinghouse Dep. Tr.) at 26:19-27:11 (Garlinghouse and Ripple's board of
directors had the authority to decide whether Ripple should file a registration statement); PX 81
(Garlinghouse Dep. Tr.) at 198:19-199:5 (Larsen had the power and authority as Executive
Chairman of Ripple's board of directors to seek the filing of a registration statement); PX 81
(Garlinghouse Dep. Tr.) at 485:5-487:24 (Garlinghouse did not make any Reg D filings to
exempt his sales of XRP).

**Response:**    Disputed.  Defendants dispute Paragraph 436 because it sets forth legal

conclusions, inferences, or assertions to the extent it implies that such sales were required to be

covered by a registration statement.  PX 80 explicitly states that "Ripple did not file a

registration statement for XRP with the SEC because none was required," PX 80 (Ripple Ans.) ¶

2; *see also* PX 201 (Garlinghouse Ans. stating the same) ¶ 2; PX 1 (Larsen Ans. stating the

same) ¶ 2.  PX 80 further states that "… Ripple denies that its transactions in XRP have ever

been subject to registration under the Securities Act, or to the requirements under the Exchange

Act."  PX 80 (Ripple Ans.) ¶ 30; *see also* PX 201 (Garlinghouse Ans.) ¶ 30 (Garlinghouse

denying the same); PX 1 (Larsen Ans.) ¶ 30 (Larsen denying the same).  Defendants also dispute

the SEC's characterization of, and inferences purportedly drawn from, PX 81 because the cited

evidence does not support the SEC's assertions of fact as set forth in Paragraph 436.

Garlinghouse testified that he had the "power" to decide that Ripple should file a registration

statement but did not use the word "authority" in his testimony, and only testified that the board

of directors could "act in some manner to facilitate that."  PX 81 (Garlinghouse Dep. Tr.) at

26:19-27:11.  Further, Garlinghouse did not testify that Larsen had the "power and authority to

seek the filing of a registration statement."  PX 81 (Garlinghouse Dep. Tr.) at 198:19-199:5 (Q:

"Could [Larsen] have made that decision? … We're filing a registration statement."  A: "I think

Chris Larsen, as the executive chairman had immense influence.  And by extension, if he came

to me and said, you know, we're -- hey, absolutely there should be a registration statement filed,

I think we would have gotten behind that and made it happen.").  In fact, the SEC has not put

forth any evidence supporting that Larsen or Garlinghouse could have unilaterally approved the

filing of a registration statement on behalf of Ripple.

    437.    Garlinghouse conceded that while Ripple sometimes verified that it was selling
XRP to accredited investors, he did not take any steps to verify the accredited status, if any, of
purchasers of his offered XRP. PX 81 (Garlinghouse Dep. Tr.) at 485:5-487:24.

    **Response:**    Disputed.  Defendants dispute Paragraph 437 because it sets forth legal

conclusions, inferences, or assertions to the extent it implies that Ripple was required to verify

the accredited status of XRP purchasers.  Defendants also dispute the SEC's characterization of,

and inference purportedly drawn from, PX 81 as misleading. Garlinghouse did not "concede"

that "Ripple sometimes verified that it was selling XRP to accredited investors," as set forth in

Paragraph 437.  Rather, Garlinghouse testified that he – like every participant in trading on a

digital asset exchange – did not know the identities of the purchasers of his XRP, or those who

purchased programmatically from Ripple.  PX 81 (Garlinghouse Dep. Tr.) at 485:11-15 (Q:

"Have you ever taken any steps to determine whether purchasers of your XRP are accredited

investors?"  A: "I don't know who the purchasers of my XRP are."); 486:8-12 (Q: "Have you

ever taken any steps to determine whether purchasers of Ripple's XRP and programmatic sales

are accredited investors?"  A: "I don't know who the purchasers of Ripple's XRP sales are.").

Garlinghouse only testified that he took steps to determine whether purchasers are accredited investors in the context of Ripple's OTC XRP sales.  PX 81 (Garlinghouse Dep. Tr.) at 485:24-486:7 (Q: "Have you ever taken any steps to determine whether the purchasers of Ripple's XRP are accredited investors?"  A: "Yes"  Q: "What steps?"  A: "Some of Ripple's XRP has been sold to accredited investors."  Q: "Are you talking about OTC sales?"  A: "Yes.").  Defendants further dispute Paragraph 437 to the extent it implies Ripple and Garlinghouse were actively selecting the purchasers for their XRP, rather than engaging a foreign market maker with a significant amount of discretion to conduct sales on their behalf on anonymous trading platforms.  See Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 268-269, 276-283.  Defendants dispute Paragraph 437 to the extent the SEC implies that restricting sales of Ripple's and Garlinghouse's XRP to purchasers who wished to use it for specific purposes or restricting sales to specific types of purchasers was even possible.  When XRP is sold on exchanges through GSR, the transaction is anonymous, and the buyer's identity is not known.  See Defs.' Rule 56.1 Statement (ECF No. 623) ¶¶ 169-170.

438.    In June 2017, Long, Larsen, and others at Ripple discussed the possibility of trying to claim that Ripple's sales of XRP were the first "Initial Coin Offering" of a crypto asset. PX 526; PX 741.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 526 as misleading, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 438.  When one employee discussed whether Ripple engaged in an Initial Coin Offering in reference to a Wikipedia article, Larsen merely answered that employee's question about when Ripple first sold XRP, and did not suggest or imply that he agreed with the employee's characterizations.  PX 526 at ████0051663.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 741 as misleading, because it omits additional context necessary to

understand the exhibit, including that Long and others expressly disagreed with that same

employee's "idea of positioning XRP as the first ICO." PX 741 at ██████0070706.  Rather,

they wanted to "poo-poo" the idea because it was "technically more accurate[] to not claim the

first ICO." *Id.*  Defendants further dispute that the comments of a single employee set forth in

PX 526 reflected a belief of Ripple or the Individual Defendants.

439.    In its commentary to a final rule published on June 5, 2020, the Consumer
Financial Protection Bureau ("CFPB") referred to Ripple's "payments messaging platform to
support cross-border money transfers as well as a virtual currency, XRP, which can be used to
effect settlement of those transfers." Final Rule, Remittance Transfers Under the Electronic Fund
Transfer Act, 85 Fed. Reg. 34,870, 34,880 (June 5, 2020), available at
https://www.federalregister.gov/documents/2020/06/05/2020-10278/remittance-transfers-under-
the-electronic-fund-transfer-act-regulation-e.

**Response:**    Undisputed.

440.    Referring to the exchange of information, the report also stated that the CFPB
"believe[d] that expanded adoption of SWIFT's gpi product or Ripple's suite of products could
similarly allow banks and credit unions to know the exact final amount that recipients of
remittance transfers will receive before they are sent." The report also stated that based on the
CFPB's "market monitoring and experience as well as feedback the Bureau has received from
banks, credit unions, and their trade associations …, the Bureau in the 2019 Proposal stated that
it did not believe that it was likely in the short-to-medium term that the developments described
above would be able to fully eliminate reliance on the correspondent banking network as the
predominant method for banks and credit unions to send remittance transfers." The CFPB
believed this shift was unlikely because "[t]here are thousands of financial institutions worldwide
that could receive remittance transfers with new financial institutions being added to the network
(or leaving the market) on regular basis," and "[i]t may be costly, excessively time-consuming,
or otherwise difficult to enroll all or even most of these institutions, especially the smaller ones"
in new approaches like SWIFT's gpi product or Ripple's suite of products. Final Rule,
Remittance Transfers Under the Electronic Fund Transfer Act, 85 Fed. Reg. 34,870, 34,880
(June 5, 2020), available at https://www.federalregister.gov/documents/2020/06/05/2020-
10278/remittance-transfers-under-the-electronic-fund-transfer-act-regulation-e.

**Response:**    Undisputed that 85 Fed. Reg. 34,870, 34,880 contains the quoted text,

exclusive of any alterations, omissions, or additions by the SEC.

441.    In or around August 2017, Ripple Markets Inc. and ████████████
████████████ entered into a Programmatic Market Activity Agreement, in which,
among other things, ████ agreed to transact in XRP according to the programmatic schedule

225

provided by Ripple ("Programmatic Market Activity"), as such schedule may be amended from time to time (the "████████ Agreement"). PX 660.

**Response:**    Undisputed.

442.    In the ████████ Agreement, ████████ agreed to maintain a segregated wallet or wallets with locations on the Ripple Consensus Ledger to be used by ████████ solely to transact Programmatic Market Activity. PX 660 at 0063397.

**Response:**    Undisputed.

443.    Per the ████████ Agreement, ████████ may maintain accounts at other third party digital asset exchanges and ledgers in order to transact Programmatic Market Activity, if Ripple approved. PX 660 at 0063397.

**Response:**    Undisputed.

444.    In the ████████ Agreement, Ripple agreed to fund ████████ segregated wallet or wallets in XRP amounts at Ripple's sole discretion for ████████ use in connection with the Programmatic Market Activity, and ████████ agreed to remit proceeds back to Ripple. PX 660 at 0063397.

**Response:**    Undisputed.

445.    In or around February 2017, Ripple Markets Inc. entered into a Market Maker and Programmatic Market Activity Agreement with ████████████████████████████████████ ("████████ Agreement"). PX 661.

**Response:**    Undisputed.

446.    In the ████████ Agreement, Ripple agreed to maintain a segregated wallet with XRP to be used by ████████ to transact Programmatic Market Activity as outlined in this Agreement. PX 661 at 006553.

**Response:**    Undisputed.

447.    In the ████████ Agreement, Ripple agreed to fund an XRP amount at its sole discretion and consistent with the Programmatic Market Activity plan, which Ripple would provide monthly. PX 661 at 006553.

**Response:**    Undisputed.

448.    In the ████████ Agreement, ████████ agreed to determine the specifics of each transaction that together or separately satisfy the Programmatic Activity Plan, and would be not be required to use any particular exchange, gateway or location off the Ripple Consensus Ledger or any External Digital Asset Exchange. PX 661 at 006553.

**Response:**    Undisputed.

449.    In or around March 2018, Ripple Markets Inc. and ███████████ ████████ executed an Amendment to ███████ Programmatic Market Activity Agreement ("███████████ Amendment"). PX 662.

**Response:**    Disputed.  The SEC's statements that Ripple Markets Inc. and ██████ ████████████████ "executed" an amendment on or around March 2018 is unsupported by

the cited evidence, which is a draft amendment that was not signed by either party.  PX 662 at

SEC-████████-E-0052940.

450.    In the ████████████ Amendment, the parties agreed that Ripple may, at any time and in its sole discretion, direct ██████████ to remit any portion of or all of the proceeds of ███████████ Programmatic Market Activity, to Ripple in a payment method(s) directed by Ripple in its sole discretion, provided that ███████████ shall transfer a portion of the proceeds, which constituted its fee, to its own wallet or account. PX 662.

**Response:**    Disputed.  Undisputed that PX 662 contains the provision described in

Paragraph 450; however, Defendants dispute that PX 662 establishes that the "parties agreed" to

this provision because PX 662 is a draft amendment that was not signed by either party.  PX 662

at SEC-███████-E-0052940.

451.    In the ███████████ Amendment, the parties agreed that ███████████ fee would constitute ██% of the proceeds, for the first $████████ in proceeds in the then-calendar month; ██% of the proceeds, for proceeds greater than $███████ but less than $████████ in the then-calendar month; and ██% of the proceeds, for any proceeds of $████████ or more in the then-calendar month. PX 662.

**Response:**    Disputed.  Undisputed that PX 662 contains the provision described in

Paragraph 450; however, Defendants dispute that PX 662 establishes that the "parties agreed" to

this provision because PX 662 is a draft amendment that was not signed by either party.  PX 662

at SEC-███████-E-0052940.

452.    In or around June 2017, Ripple Markets Inc. and GSR Holdings Limited entered into a Programmatic Market Activity Agreement ("GSR 2017 Agreement").  PX 663.

**Response:**    Undisputed.

453.    In the GSR 2017 Agreement, GSR agreed to maintain a segregated wallet or wallets with locations on the Ripple Consensus Ledger to be used by GSR solely to transact

Programmatic Market Activity, GSR was permitted to maintain accounts at other third party digital asset exchanges and ledgers in order to transact Programmatic Market Activity, provided that Ripple approved. PX 663 at 0008373.

**Response:**     Undisputed.

454.     In the GSR 2017 Agreement, Ripple agreed to fund GSR's segregated wallet or wallets in XRP amounts at Ripple's sole discretion for GSR's use in connection with the Programmatic Market Activity, and GSR agreed to remit sale proceeds back to Ripple. PX 663 at 0008373-74.

**Response:**     Undisputed that PX 663 contains provisions described in Paragraph 454;

however, Defendants dispute Paragraph 454 to the extent it purports to suggest that GSR agreed

to require all sales proceeds, rather than retain a portion of the proceeds for itself, as the cited

evidence establishes that GSR retained a portion of the sale proceeds.  PX 663 at SEC- █████

E-0008374.

455.     Ripple recognized revenues in connection with non-monetary XRP transactions of approximately $175 million in 2018, approximately $206 million in 2019, and approximately $227 million in 2020. PX 750 at RPLI_SEC 0301117; PX 751 at RPLI_SEC 0920433. "Non-monetary XRP transactions revenue consists of transactions where the Company delivers XRP to customers for consideration other than cash or other monetary consideration and is recognized upon delivery of XRP. Revenue for non-monetary XRP transactions is determined based on the value of consideration expected to be received from the customer. This is typically the value of the XRP delivered to the customer." PX 750 at RPLI_SEC 301125.

**Response:**     Defendants dispute Paragraph 455 to the extent it sets forth an incomplete

definition of non-monetary XRP transactions by omitting language from the cited documents that

is included in the definition of the term, namely: "Gains from certain XRP transactions with non-

customers, including XRP charitable donations, are included in non-monetary XRP transactions.

The Company recognized $25.2 million and $69.8 million in gains related to non-customer

transactions during the years ended December 31, 2019 and 2018, respectively."  PX 750 at

RPLI_SEC 301126; *see also* PX 751 at PRLI_SEC 0920441 (including the same definition).

456.    Ripple produced to the SEC its audited financial statements for the years 2014-2020. PX 746, PX 747, PX 748, PX 749, PX 750, PX 751.

**Response:**    Defendants dispute that the fact of Ripple's production of documents in this litigation is relevant to any claim or defense in this case, however, Defendants do not dispute that PX 746–751 are Ripple's audited financial statements for the years ending December 31, 2014–2015 and December 31, 2017–2020; however, the cited evidence does not include Ripple's audited financial statements for 2016.

457.    Ripple held bank accounts at ▮▮▮▮▮▮▮▮▮▮▮ through which it received sales proceeds from programmatic and over-the-counter (or institutional) sales, and made payments to GSR to for its XRP repurchases, and incentive payments. PX 296 (transaction details for XRP II, LLC Account No.▮▮▮▮), PX 753 (transaction details for Ripple Labs Inc. Account No. ▮▮▮▮); PX 754 (transaction details for Ripple Labs Account No.▮▮▮▮); PX 755 (transaction details for Ripple Labs Inc. Account No▮▮▮▮); PX 756 (transaction details for Ripple Labs Inc. Account No.▮▮▮▮; PX 757 (transaction details for Ripple Labs Inc. Account No.▮▮▮▮ PX 758 (transaction details for Ripple Markets Inc. Bank Acct ▮▮▮▮; PX 759 (Ripple Services Inc., Account No▮▮▮▮); PX 760 (transaction details for Ripple Labs Inc. Account No.▮▮▮▮); PX 761 (transaction details for Ripple Labs Inc. Account No.▮▮▮▮); PX 762 (transaction details for Ripple Labs Inc. Account No.▮▮▮▮); PX 763 (transaction details for Ripple Labs Singapore Account No.▮▮▮▮).

**Response:**    Disputed.  Defendants do not dispute that PX 296 and 753–763 are documents that contain "transaction details" for accounts belonging to Ripple; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from the cited documents because they do not support the SEC's assertion that the transactions related to sales proceeds from "programmatic" and "institutional" sales, which are not terms used by the documents or defined by the SEC in connection with its allegations in Paragraph 457.  Rather, the cited documents contain minimal "descriptions" of the transactions, not containing the terms "programmatic" or "institutional" sales.  Defendants also dispute that the cited documents support the SEC's assertion that Ripple made "payments to GSR for its XRP repurchases" and "incentive payments," because the documents do not contain the terms "repurchase" or "incentive" in connection with transactions with GSR.  Defendants further dispute the SEC's

allegations in Paragraph 457 because each Ripple subsidiary that sold XRP at various times

maintained a separate bank, digital asset exchange, and/or XRP Ledger account to receive

proceeds from its XRP sales, and deposited or received revenues from its sales of XRP into its

own separate account.  Ex. 170 at ¶ 4.  Defendants dispute the inference that the location of the

bank account ultimately receiving the XRP sale proceeds after the sales were finalized is relevant

to the question of whether sales and offers to sell on foreign digital asset exchanges were within

the territorial scope of the federal securities laws.  *See* Defs.' MSJ at 58-74.

458.    The article BusinessWire, CB Insights Reveals the Fintech 250 List at Future of
Fintech, Bloomberg is dated June 29, 2017, which pre-dates the launch of ODL.
https://perma.cc/Z56N-6CSN

**Response:**    Undisputed.

459.    Ripple's press release regarding Ripple Labs Awarded as Technology Pioneer by
World Economic Forum is dated August 5, 2015, , which pre-dates the launch of ODL.
https://perma.cc/NLL6-PRY5

**Response:**    Undisputed.

460.    The article American Banker, 20 Fintech Companies to Watch is dated October
12, 2015, which pre-dates the launch of ODL. https://perma.cc/2VWN-7UNC

**Response:**    Disputed.  The link provided in Paragraph 460 is non-functional and

therefore cannot support Paragraph 460.

461.    The article Blockchain 50: Billion Dollar Babies, Forbes refers to use of Ripple's
products by "banks," which never used the ODL product.  https://perma.cc/99AP-LEZ5, PX 16
(Birla Inv. Tr.) at 182:19-183:25, PX 7 (Schwartz Inv. Tr.) at 192:17-194:20; PX 6 (Schwartz
Dep. Tr.) at 42:11-43:16, PX 15 (Birla Dep. Tr.) at 206:10-207:7, PX 21 (Vias Inv. Tr.) at
298:16-299:6; *see also* PX 560.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from the cited Forbes article because the cited document does not

mention banks' use of ODL, but rather the suite of products called "RippleNet," which was

described in the cited article as a product that would "disrupt Swift, the messaging system the

worlds' banks use to transfer" funds.  *See also* PX 16 at 74:13–17 (Birla testifying "MoneyGram, ███████, everyone just joins RippleNet.  And a subset of those, for example, the MoneyGram's of the world use the On Demand Liquidity service that's a component of RippleNet."); PX 6 at 243:24–244:1 (Schwartz testifying that Ripple was "growing RippleNet, which means xCurrent and today mostly around xRapid"); PX 560 at SEC-████-E-0032889 ("Ripple said that ███████ was still using some of its software in the payment services and was 'one of our largest and most important customers.'").

462.    Between August 10 and December 6, 2020, Garlinghouse sold XRP through GSR. PX 765.

**Response:**    Undisputed; however, Defendants dispute that offers to sell and sales executed through GSR on foreign exchanges are within the territorial scope of the federal securities laws because they are not domestic.  *See* Defs.' MSJ at 58-74.

463.    When Ripple conveyed XRP to market participants, the contracts specified that "[v]irtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections." *See, e.g.*, PX. 329 (███████ Master XRP Commitment to Sell Agreement); PX 769 (GSR Master XRapid Market Maker Services Agreement); PX 770 (██████████████ Master XRP Commitment to Sell Agreement); PX 771 (████████ Master XRP Commitment to Sell Agreement).

**Response:**    Undisputed that PX 329 and 769–771 contain the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from those documents including because "conveyed XRP to market participants" is vague and unclear.  Defendants further dispute that these four documents are sufficient to establish the underlying fact set forth in Paragraph 463 at all times and for all purposes in this litigation.

464.    In February 2019, Ripple proposed writing a letter to a major financial publication in which it would clarify "points of confusion [it] run[s] into with many publications" about who created XRP and the XRP Ledger. An employee of the publication provided feedback to the draft letter, including: noting "the people who created the XRP ledger created a 'digital asset' … that

became popularly known as a ripple"; that the letter by Larsen and Schwartz "established that two people involved in creating the cryptocurrency ripple/xrp then moved to start a company that later became known as Ripple"; and that "anyway, regardless, the people who created the 'digital' asset xrp contributed 80% to a new company" such that "it [didn't] feel to [the employee] like [the people who created XRP, and Ripple] are separate at all."  PX 409 at RPLI_SEC 971233-971235.

**Response:**     Undisputed that PX 409 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC, however, Defendants dispute that the expressed

"feel[ing]" of a single third-party individual can be attributed to Ripple or the Individual

Defendants, or establish any fact at all times or for all purposes in connection with this litigation.

465.     In response to the draft letter's suggestion that Ripple had "decided to rebrand to Ripple Labs, intentionally adding 'Labs' to the end to make sure there was clear separation between the private company and the digital asset," the financial publication's employee responded: "Okay, that's clear as mud. If you wanted to create clear separation between a private company founded by the same people who created the digital asset of the same name, you might have chosen a completely different name for the company, like, say, pancakes. Pancakes and Ripple don't sound anything alike" and noted that Ripple was "the same name as the popular name for XRP." PX 409 at RPLI_SEC 971233-971235.

**Response:**     Undisputed that PX 409 contains the quoted text, exclusive of any

alterations, omissions, or additions by the SEC, however, Defendants dispute that the expressed

statements of a single third-party individual can be attributed to Ripple or the Individual

Defendants, or establish any fact at all times or for all purposes in connection with this litigation.

Date:  November 30, 2022

/s/ Michael K. Kellogg
Michael K. Kellogg
Reid M. Figel
Gregory G. Rapawy
Bradley E. Oppenheimer
Bethan R. Jones
KELLOGG, HANSEN, TODD, FIGEL,
& FREDERICK, P.L.L.C.
Sumner Square
1615 M Street, N.W., Suite 400
Washington, D.C. 20036
+1 (202) 326-7900
mkellogg@kellogghansen.com
rfigel@kellogghansen.com
grapawy@kellogghansen.com
boppenheimer@kellogghansen.com
bjones@kellogghansen.com

DEBEVOISE & PLIMPTON LLP
919 Third Avenue
New York, NY 10022
+1 (212) 909-6000

*Counsel for Defendant Ripple Labs Inc.*

Respectfully submitted,

CLEARY GOTTLIEB STEEN &
HAMILTON LLP
2112 Pennsylvania Avenue, N.W.
Washington, D.C. 20037
+1 (202) 974-1680

*Counsel for Defendant Bradley Garlinghouse*

PAUL, WEISS, RIFKIND, WHARTON &
GARRISON LLP
1285 Avenue of the Americas
New York, NY 10019
+1 (212) 373-3000

*Counsel for Defendant Christian A. Larsen*