UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------------------------------- x

SECURITIES AND EXCHANGE                      :
COMMISSION,
                                             :     No. 20 CV 10832 (AT) (SN)
                          Plaintiff,         :
                                             :
            -against-                        :
                                             :
RIPPLE LABS, INC., BRADLEY                   :
GARLINGHOUSE, and CHRISTIAN A.               :
LARSEN,                                      :
                                             :
                          Defendants.        :

------------------------------------------------------------- x


# DEFENDANTS' RESPONSES TO PLAINTIFF'S LOCAL RULE 56.1 STATEMENT AND STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(b) IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and Local Civil Rule 56.1, Ripple Labs Inc. ("Ripple"), Christian A. Larsen, and Bradley Garlinghouse (the "Individual Defendants," and collectively, "Defendants") respectfully submit this response to Plaintiff U.S. Securities and Exchange Commission's ("SEC") Rule 56.1 Statement of Material Facts ("56.1 Statement" or "56.1 Stmt.").[1]  This response is submitted solely for the purpose of complying with Local Rule 56.1, and is not, and should not be deemed, an admission for any other purpose.

---

[1] Together with this response, which includes Defendants' Statement of Additional Material Facts (*see infra* at ¶¶ 1602-1802), Defendants submit the Declaration of Christopher S. Ford, dated October 18, 2022 (the "Ford Declaration"), and the Declaration of Erol Gulay, dated October 18, 2022 (the "Gulay Declaration"), which contain as exhibits documents, transcripts, and declarations that are cited in this response and in Defendants' Opposition to Plaintiff's Motion for Summary Judgment.  References to Defendants' exhibits ("Ex. __") correspond to the exhibits attached to (1) Declaration of Michael K. Kellogg in Support of Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment, dated September 13, 2022 (as to Exs. 1–106); (2) the

## I.     PRELIMINARY STATEMENT

The SEC's 56.1 Statement does not comply with Local Civil Rule 56.1.  The SEC's 56.1 Statement is improper, and the Court can and should disregard it, in whole or in part, on multiple grounds.

*First*, the SEC's 56.1 Statement drastically exceeds the length and detail called for by the substance of its motion.  "The purpose of Local Rule 56.1 is to streamline the consideration of summary judgment motions by freeing district courts from the need to hunt through voluminous records without guidance from the parties." *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 74 (2d Cir. 2001).  In direct contravention of Local Civil Rule 56.1(a), which permits only a "short and concise statement" of material facts, the SEC's 56.1 Statement contains over 1,600 separately numbered paragraphs (many with additional numbered subparagraphs), spanning over 250 pages, and supported by over 900 separate exhibits.[2]  Moreover, not only are many of the SEC's statements nearly identical, *see, e.g.*, 56.1 Stmt. ¶¶ 14 & 34; 181(a) & 682; 308 & 309; 345, 349 & 360; 132 & 476; 478 & 587, but over 600 are *not even cited* in its summary judgment brief.[3]  The SEC's

---

Ford Declaration (as to Exs. 107–166); and the Gulay Declaration (as to Exs. 167–279), unless otherwise indicated.

[2] The SEC's exhibits ("PX") are attached to four declarations submitted by the SEC.  *See* Waxman Decl. (ECF No. 626) (398 exhibits); Tenreiro Decl. (ECF No. 627) (111 exhibits); Stewart Decl. (ECF No. 630) (199 exhibits); Sylvester Decl. (ECF No. 631) (200 exhibits).  Some of the SEC's exhibits are themselves declarations that have further exhibits appended.  *See, e.g.*, PX 45, Ferrante Decl. (ECF No. 630-45) (3 exhibits).

[3] *See* 56.1 Stmt. ¶¶ 2–4, 7–9, 13, 16, 21, 24–31, 33–35, 37, 39, 46–56, 84, 87–89, 94–95, 112, 155, 157–58, 189, 204, 237, 240, 275, 288, 292–93, 313–15, 338–44, 347–48, 353–55, 368–70, 372, 376, 380, 382, 384–85, 388, 390, 391–99, 410, 435, 443–44, 446–48, 450, 453–54, 460, 463, 471, 502, 504–06, 512-14, 555, 580, 615, 642–44, 646, 661, 711–12, 714–16, 719–20, 722, 724–30, 732–33, 741–42, 745–48, 754, 758–59, 769–78, 782–83, 785, 789, 796, 817, 819–20, 822, 824–25, 844-50, 852–59, 914, 916–19, 933, 982–85, 1030, 1039, 1089, 1090, 1100, 1106, 1115–25, 1158, 1163, 1165, 1169, 1182, 1187, 1189, 1191–92, 1201–21; *id.* ¶¶ 1222–1599 (discussed further *infra*).

immaterial, duplicative, and gratuitous assertions fall far outside the permissible bounds of Local Rule 56.1 and should be disregarded.  *See* Local Rule 56.1(a); *Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona*, 138 F. Supp. 3d 352, 394–95 (S.D.N.Y. 2015), *aff'd sub nom. Congregation Rabbinical Coll. of Tartikov, Inc. v. Vill. of Pomona, NY*, 945 F.3d 83 (2d Cir. 2019) (finding plaintiffs' Rule 56.1 statement, which was "998 paragraphs long and [was] supported by 11 declarations and 370 exhibits," to be "unnecessarily lengthy" and redundant, and advising it would disregard all "repetitive or incomprehensible statements"); *Union Carbide Corp. v. Montell N.V.*, 179 F.R.D. 425, 428 (S.D.N.Y. 1998), *as amended* (May 18, 1998) (striking 86-page 56.1 statement based on its "outrageous length").

*Second*, the SEC's 56.1 Statement improperly mixes factual averments with rhetoric and legal argument, improperly serving as "essentially a recitation of [the SEC's] case-in-chief, rather than a short statement of the undisputed material facts."  *Ramgoolie v. Ramgoolie*, 2018 WL 5619959, at *2 (S.D.N.Y. Aug. 3, 2018) ("[O]pinions or legal conclusions . . . have no place in a Rule 56.1 statement."), *report and recommendation adopted as modified*, 2018 WL 4266015 (S.D.N.Y. Sept. 6, 2018).  Indeed, the SEC's 56.1 Statement is replete with misleading, pejorative, or subjective characterizations based on quotations cherry-picked from documents and deposition testimony.  *See, e.g.*, 56.1 Stmt. ¶ 678 (quoting the phrase "current user" as if to suggest that Ripple was referring to XRP purchasers as its users, when in fact the phrase was referring to a prototypical user of a specific software product, Ripple Client); ¶ 1014 (attributing to a Ripple employee the opinion that XRP appeared to have certain "securities-type characteristics," even though the witness expressly testified that she was merely relaying a third-party's view and that she personally disagreed with that view).  These statements are improper, as they do little more than add "argumentative and often lengthy narrative" or "'spin' the impact of the admissions" or

documents. *Goldstick v. The Hartford, Inc.*, 2002 WL 1906029, at *1 (S.D.N.Y. Aug. 19, 2002); *see also Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 226 (S.D.N.Y. 2007), *aff'd* 354 F. App'x 496 (2d Cir. 2009) (criticizing "deeply misleading selective quotation" in party's Rule 56.1 statement). The SEC also attempts to inject its purported "facts" with express or implied legal conclusions, which are not statements to which Defendants can properly respond. *See, e.g.*, 56.1 Stmt. ¶ 670 (in lieu of fact, alleging legal conclusion that "Ripple understood that some XRP purchasers were speculating on XRP as an investment"). *See also Simmons v. Woodycrest Ctr. for Hum. Dev., Inc.*, 2011 WL 855942, at *1 n.1 (S.D.N.Y. Mar. 9, 2011) (criticizing as materially deficient plaintiff's 56.1 statement, including because "several of its 'facts' are, in actuality, legal conclusions"). The SEC's characterizations, legal arguments, and cherry-picked quotes fail "to follow the simple mandates of Local Rule 56.1" and must be disregarded. *See Jessamy v. City of New Rochelle,* 292 F. Supp. 2d 498, 509 n.12 (S.D.N.Y. 2003) (no heed given to legal conclusions in Rule 56.1 statement); *Am Gen. Life Ins. Co. v. Diana Spira 2005 Irrevocable Life Ins. Trust,* 2014 WL 6694502, at *1 (S.D.N.Y. Nov. 25, 2014) (granting motion to strike "as to argumentative statements in the [56.1 statement] and as to purported factual statements which are unsupported by any citation to the record"); *Yien-Koo King v. Wang*, 2020 WL 6875403 at *27 (S.D.N.Y. Nov. 23, 2020) (disregarding 56.1 statements that are "improperly asserted or argumentative" or that would be "inadmissible"); *cf. Giannullo v. City of New York*, 322 F.3d 139, 142 (2d Cir. 2003) (vacating order granting summary judgment, in part, because district court relied on misleadingly quoted deposition testimony).

*Third*, the SEC's 56.1 Statement includes many purported facts covering undefined terms or time periods, such that Defendants cannot fairly determine whether they are disputed. *See, e.g.*, 56.1 Stmt. ¶¶ 614(a) & 789 (presenting conflicting definitions of the term "Institutional Sales");

*id*. ¶ 485 (stating "XRP purchasers were asking Ripple to make XRP more readily available" without any reference to relevant time period).  These statements are also often vague and ambiguous, and lack sufficient support by citations to the underlying evidence.  They are therefore improper.  *See* Local Rule 56.1(d); *Watson v. Grady*, 2015 WL 2168189, at *1 n.2 (S.D.N.Y. May 7, 2015) ("A Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.") (quoting *Holtz*, 258 F.3d at 74).

*Fourth*, pursuant to Local Rule 56.1, Defendants are obligated to respond to the SEC's numbered paragraphs, and not their section headers, which are unsupported by any citation to evidence in the record.  *See* Local Rule 56.1(a).  Defendants note that many of those section headers are argumentative, inaccurate, or misleading and should not be taken as statements of fact.  *See, e.g.*, 56.1 Stmt. at 150, Heading G ("XRP Purchasers Reasonably Viewed XRP as an Investment in Ripple's Entrepreneurial Efforts"); *id* at 169, Heading J ("Defendants Knew that their XRP Transactions Could Violate Section 5").  Local Rule 56.1 neither requires Defendants to respond to, nor permits the Court to deem as admitted, any purported facts asserted through the SEC's argumentative headers.  *See* Local Rule 56.1(d); Fed. R. Civ. P. 56(c); *Watson*, 2015 WL 2168189, at *1 n.2; *Congregation Rabbinical Coll. of Tartikov*, 138 F. Supp. 3d at 396 (disregarding "headings to sections of Plaintiffs' Rule 56.1 Statements [which] contain impermissible argument or legal conclusion").

*Fifth*, the SEC's 56.1 Statement improperly attempts to authenticate hundreds of documents, which is an evidentiary and not a factual issue material to the SEC's motion for summary judgment.  *See* 56.1 Stmt. ¶¶ 1222–1599.  Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 1222-1599, set forth *infra*.  The Court should strike or disregard those paragraphs for the reasons stated in that Global Response.

*Sixth*, the SEC impermissibly attempts to rely on documents, testimony, or other material that cannot be presented in a form admissible at trial.  *See, e.g.*, 56.1 Stmt. ¶¶ 877, 879–905, 912, 919-20 (hearsay statements of third parties not presented in admissible form).  A court may rely only on admissible evidence at the summary judgment stage.  *See Delaney v. Bank of Am. Corp.*, 766 F.3d 163, 169–70 (2d Cir. 2014) ("Materials submitted in support of or in opposition to a motion for summary judgment must be admissible themselves or must contain evidence that will be presented in admissible form at trial.") (internal quotation marks and citation omitted).  Defendants do not concede that the evidence cited by the SEC could be presented in admissible form at trial, and it is not readily apparent that such evidence would be admissible for the purposes for which the SEC offers it.  In particular, the SEC relies extensively on statements by third parties to this litigation, and it appears in the context of the SEC's summary judgment motion that the SEC may seek to impermissibly rely on these hearsay statements for the truth of the matter asserted.  Defendants do not purport to address every evidentiary deficiency here and preserve all evidentiary objections to the materials cited by the SEC to be raised, if necessary, at a later date and through the appropriate motions.

## II.   RESPONSE TO THE SEC'S 56.1 STATEMENT

For the purposes of this Response, Defendants have reproduced each Statement of Fact included in the SEC's 56.1 Statement.  Subject to the Preliminary Statement set forth above, Defendants hereby respond as follows:

1.   From 2006 to 2012, Defendant Christian Larsen ("Larsen") was the co-founder and CEO of a startup company called Prosper Marketplace Inc., which the SEC sued for offering and selling unregistered investment contracts in violation of Section 5. PX 1 (Answer of Def. Christian A. Larsen (D.E. 463) ("Larsen Ans.")) ¶ 18; SEC Order Instituting Proceedings Against Prosper Marketplace, Inc., dated Nov. 24, 2008) at § III; III.A, *available at* https://www.sec.gov/litigation/admin/2008/33-8984.pdf; PX 2 (Larsen Tr.) at 34:13-39:23.

**Response:**        Undisputed that Larsen was the co-founder and CEO of Prosper Marketplace and that the SEC instituted an administrative proceeding against Prosper Marketplace Inc.   Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 1 ¶ 18, Ex. 8 at 33:13-38:23,[4] the SEC Order Instituting Proceedings Against Prosper Marketplace, Inc., dated Nov. 24, 2008) at § III; III.A, available at https://www.sec.gov/litigation/admin/2008/33-8984.pdf; to the extent the SEC implies that Prosper did in fact offer and sell unregistered securities because, as Larsen testified, "[t]here was a consent agreement where [the company] neither admitted or denied that involved securities, but we consented to it so we could move forward with our S1 for Prosper."   In addition, these alleged facts are inadmissible under Federal Rule of Evidence 404(b).

2.    Ripple Labs, Inc. is a Delaware corporation with its principal place of business in San Francisco and an office in Manhattan. PX 80 (Amended Answer of Defendant Ripple Labs, Inc. (D.E. 51) ("Ripple Ans.") ¶ 16.

**Response:**        Undisputed, except that the name of the corporate entity is "Ripple Labs Inc."

3.    Ripple's predecessor entity, New Coin, Inc., was founded in September 2012. *Id.*

**Response:**        Undisputed.

4.    Ripple is a for-profit company that builds financial services products. It holds a digital asset today known as "XRP," and as of 2020 was working on building a payment network.  PX 3 (Griffin Inv. Tr.) at 17:13-17.

**Response:**        Undisputed.

---

[4] The SEC uploaded a version of the Larsen deposition transcript that has different page numbers than the deposition Larsen reviewed and submitted corrections to on an errata sheet.  As a result, the SEC did not upload the final version of the transcript.  In any applicable responses, Defendants have cited to Ex. 8, which is the final version of the Larsen transcript with the correct pages.

5.      XRP II, LLC is Ripple's wholly-owned subsidiary, was founded in 2013, and has been organized as a New York limited liability company since 2016. PX 80 (Ripple. Ans.) ¶ 19.

**Response:**      Disputed.  XRP II, LLC is the former corporate name of a wholly-owned subsidiary of Ripple that was founded in 2013 as a New York limited liability company and reincorporated as a limited liability company in Delaware and renamed Ripple Markets DE LLC on December 3, 2021.  *See* Ex. 107 (Certificate of Merger dated December 3, 2021, by which XRP II, LLC, merged with and into Ripple Markets DE LLC (File No. 6440887).

6.      XRP II, LLC was formed by Ripple in July 2013 to sell units of XRP directly to institutional and other accredited investors in wholesale transactions. PX 4.

**Response:**      Undisputed.  However, to the extent the SEC attempts to characterize or draw further inferences about Ripple's business from PX 4, Defendants dispute that attempt; XRP II, LLC was one of a number of entities in Ripple's corporate structure and the SEC's attempted inference ignores that XRP II, LLC's function is just one component of Ripple's business, which involves the development and sale of financial services products.  *See* PX 5 at RPLI_SEC 0001158; PX 3 at 17:13-17.

7.      According to its application for a money services license to the New York State Department of Financial Services ("NYDFS"), XRP II has two business lines: (1) enterprise sales of XRP (*i.e.*, sales to institutional XRP investors) and (2) asset custody for registered/licensed investment funds. PX 5 at RPLI_SEC 0001157–158, 0001169.

**Response:**      Undisputed that XRP II had the two business lines cited in Paragraph 7 as of the date of the cited document.  To the extent the SEC attempts to characterize or draw further inferences about Ripple's business from PX 4, however, Defendants dispute that attempt; XRP II, LLC was one of a number of entities in Ripple's corporate structure and the SEC's attempted inference ignores that XRP II, LLC's function

is just one component of Ripple's business, which involves the development and sale of financial services products. *See* PX 5 at RPLI_SEC 0001158; PX 3 at 17:13-17.

8.    The people who created the XRP Ledger and XRP (defined below)—David Schwartz ("Schwartz") and Arthur Britto ("Britto")—are also part of the group that founded Ripple. PX 6 (Schwartz Dep. Tr.) at 23:20-24:10, 43:17-24, 53:2-13, 55:23-56:13; PX 501.121, *available at* https://twitter.com/joelkatz/status/1306438693176049665.

**Response:**      Disputed. Schwartz was not "part of the group that founded Ripple." PX 7 at 21:5-7 (answering "I don't believe so" when asked if he had any involvement with the formation of Ripple). The SEC's suggestion that Schwartz and Britto were the only "people who created the XRP Ledger and XRP" is also incorrect. *See* PX 6 at 34:2-5; 118:17-20 (identifying Jed McCaleb as having significant involvement in the creation of both the XRP Ledger and XRP).

9.    In addition to Schwartz and Britto, that group of founders consists of Jed McCaleb ("McCaleb") (who also helped create XRP and the XRP Ledger) and Defendant Larsen. PX 7 (Schwartz Inv. Tr.) at 13:16-21, 20:13-22:21.

**Response:**      Disputed. Schwartz was not part of the "group of founders" of Ripple. PX 7 at 21:5-7 (answering "I don't believe so" when asked if he had any involvement with the formation of Ripple).

10.    In 2012, McCaleb, Britto, and Schwartz programmed a cryptographically-secured blockchain they called the Ripple Network or Ripple Protocol (now the "XRP Ledger"), which records transactions and exists across a network of peer to peer servers. PX 80 (Ripple Ans.) ¶¶ 38, 39; PX 8 (Resps. and Objs. of Def. Ripple Labs, Inc. to Pl.'s First Set of Requests for Admissions ("Ripple RFA Responses")) Nos. 1, 2.

**Response:**      Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 80 and PX 8 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 10. McCaleb, Britto, and Schwartz were involved in programming the software code for the blockchain protocol that

was used to create the XRP Ledger beginning in 2011, not 2012.  *See* PX 7 at 11:2-11. Defendants further dispute the assertion that McCaleb, Britto, and Schwartz each called the XRP Ledger "the Ripple Network" and "Ripple Protocol" in 2012, which is not supported by the evidence cited in Paragraph 10.  Defendants further dispute the description of the XRP Ledger set forth in Paragraph 10 as incomplete and unsupported by the evidence cited in Paragraph 10.  Among other things, the SEC's description misleadingly omits that the XRP Ledger records transactions and is powered by a decentralized network of peer-to-peer servers that is not controlled or owned by any one party, including Ripple.  *See* PX 8, No. 2.

11. The "XRP Ledger" is a digital ledger that tracks accounts and balances, including for "XRP."  It contains a native digital asset and has similar principles to a "blockchain." PX 6 (Schwartz Dep. Tr.) at 28:3-28:20; PX 7 (Schwartz Inv. Tr.) at 10:23-11:1, 13:22-24.

**Response:**  Disputed.  Paragraph 11 misstates Schwartz's testimony, which stated: "The XRP Ledger is a public, decentralized – it is technically a blockchain that stores and processes transactions to move XRP and other digital assets."  PX 6 28:2-5.  The SEC's description misleadingly omits that the XRP Ledger records transactions and is powered by a decentralized network of peer-to-peer servers that is not controlled or owned by any one party, including Ripple.  *See* PX 8, No. 2.

12. The term "blockchain" generally refers to groups or "blocks" of data, each of which includes accounts, balances, and transactions, which are tied together in a "chain," meaning that every block has a cryptographically secure reference to the prior block. PX 6 (Schwartz Dep. Tr.) at 28:6-20.

**Response:**  Undisputed.

13. The code for the XRP Ledger was written by Schwartz and Britto, with McCaleb leading the project and also writing some of the code for the XRP Ledger. PX 7 (Schwartz Inv. Tr.) at 11:23-13:21.

**Response:**  Disputed.  The SEC misleadingly omits that "there were some consultants who were involved" in writing the original code for the XRP Ledger, *see* PX 7

at 12:6-16, and that changes to the XRP Ledger have subsequently been made by persons other than Schwartz, Britto, and McCaleb, *see* PX 6 23:16-19 (stating "several hundred people" were involved in writing the code for the public version of the XRP Ledger).

14.     Schwartz, Britto, and McCaleb also created 100 billion units of a "native token," which has been previously called Ripple Credits (or "Ripples") and today are called XRP. PX 8 (Ripple RFA Responses) ¶¶ 1, 3; PX 80 (Ripple Ans.) ¶¶ 48, 49; PX 6 (Schwartz Dep. Tr.) at 25:22-26:7.

**Response:**          Disputed.  The cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 14.  Other evidence also establishes that the SEC's assertions are incorrect.  Schwartz testified that McCaleb alone created XRP "when he deployed the XRP Ledger code to the actual servers that ran the . . . live instance."  *See* PX 7 at 13:25-14:14.  When McCaleb did so, 100 billion units of XRP were created automatically by the XRP Ledger's software.  *Id.*

15.     Larsen retained 9 billion units of the XRP created, McCaleb retained 9 billion units of the XRP created, Britto retained 2 billion units of the XRP created, and Ripple retained the remaining 80 billion units. PX 1 (Larsen Ans.) ¶¶ 18, 20; PX 80 (Ripple Ans.) ¶¶ 18, 20, 22, 46; PX 2 (Larsen Dep. Tr.) at 67:18-20.

**Response:**          Undisputed that Larsen retained 9 billion units of XRP, McCaleb retained 9 billion units of XRP, and that Britto retained 2 billion units of XRP after donating 80 billion units of XRP to Ripple.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 1 ¶¶ 18, 20, PX 80 ¶¶ 18, 20, 22, 46, Ex. 8 at 66:18-20, to the extent the SEC implies Ripple received the XRP directly, as opposed to being gifted the XRP by Larsen, McCaleb, and Britto.  Ex. 14, Larsen Declaration, at 2-3. Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 1 ¶¶ 18, 20, PX 80 ¶¶ 18, 20, 22, 46, Ex. 8 at 66:18-20, as misleading because the SEC omits that the founders of Ripple kept approximately 20% of the XRP based on their

understanding that Bitcoin founder Satoshi Nakamoto also kept approximately 20% of the

Bitcoin in existence. Ex. 8 at 67:22-68:3.

16.    "XRP" is a unit of value that resides within the XRP Ledger and is the ledger's
       native token. PX 6 (Schwartz Dep. Tr.) at 22:22-23:2.

       **Response:**        Undisputed that XRP is the digital asset native to the XRP Ledger.

*See* PX 8, No. 1.

17.    XRP is divisible up to six (6) decimal points (or into one million subunits), meaning
       the smallest unit of XRP is 0.000001 XRP, also known as a "drop" of XRP. PX 6
       (Schwartz Dep. Tr.) at 25:22-26:7, 323:15-22.

       **Response:**        Undisputed.

18.    Each unit of XRP is indistinguishable from and fungible with any other unit, and
       each drop of XRP is indistinguishable from and fungible with any other drop. PX
       8 (Ripple RFA Responses) Nos. 24, 25.

       **Response:**        Undisputed.

19.    In order to transact on the XRP Ledger, one must "burn," or destroy, 10 or 20 one-
       millionths of XRP. PX 6 (Schwartz Dep. Tr.) at 35:16-36:19, 323:9-22; PX 7
       (Schwartz Inv. Tr.) at 18:12-20:4, 26:23-27:9.

       **Response:**        Undisputed that transactions on the XRP Ledger have at all times

required the user submitting the transaction to use a certain amount of XRP in connection

with the submission of the transaction, which XRP is destroyed when the transaction is

completed.  Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 6 and PX 7, specifically because they do not establish the amount of XRP

needed to transact on the XRP Ledger at all times since its inception, or that such amount

was fixed and uniform at all times and for all transactions, and because the cited evidence

does not support the SEC's assertions of fact as set forth in Paragraph 19, including because

Schwartz made clear later in his testimony that he could not recall at that time the exact

amount of XRP required to transact on the XRP Ledger, *see* PX 6 at 323:23–324:1.

12

20.     At its inception, the 100 billion XRP created was a fixed, finite supply, meaning that "no more [XRP] can ever be 'printed,'" a fact which Ripple stated publicly. PX 9 at RPLI_SEC 539481, 539487; PX 501.13 (4Q19 Market Report) at 1 (stating "100 billion units of XRP were created, with the stipulation that no more XRP will ever be created"); PX 10 (Rapoport Tr.) at 185:21-186:22.

**Response:**     Undisputed that 100 billion units of XRP were created at the inception of the XRP Ledger and that the quoted text appears in PX 9 and PX 501.13. Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 9 and PX 10, to the extent it implies that "Ripple stated publicly" that no more XRP could be created.  PX 9 was distributed to investors and a limited set of visitors to the Ripple website who were required to enter their personal information.  PX 10 (Rapoport Tr.) at 186:10-22.

21.     When asked if more XRP could be created, Ripple Chief Technology Officer "CTO") David Schwartz responded:  "Not easily.  It's a software defined system. So if you could get all of the people using the system to agree to change the software, nothing would prevent them from doing that.  But there's no defined process to do such a thing." According to Schwartz, the result of this approach is that "it's extremely unlikely" any more XRP will be created and "every effort has been made to make it as difficult as possible to do that." Schwartz noted that Ripple had made "statements to the effect that systems' rules don't allow additional XRP to be created." PX 7 (Schwartz Inv. Tr.) at 14:13-15:14.

**Response:**     Undisputed that Schwartz offered the quoted testimony.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 7, including the SEC's characterization that Ripple "had made 'statements to the effect that systems' rules don't allow additional XRP to be created,'" as misleading.  Schwartz specifically stated that he "think[s]" Ripple has made such statements, but his testimony did not confirm or establish the existence of any such statements.  PX 7 at 14:24-15:7.

22.     Schwartz has an online pseudonym, Joel Katz, and he publicly explains Ripple's plans from time to time. PX 6 (Schwartz Dep. Tr.) at 43:25-44:20.

**Response:**        Undisputed that Schwartz has, in the past, used certain social media platforms under the username "Joel Katz," however Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 at 43:25-44:20, to the extent it implies that any and all online posts using the pseudonym "Joel Katz" are necessarily statements by Schwartz, to the extent it implies that all statements by Schwartz are statements by Ripple.  Schwartz testified that he often speaks in his personal capacity.  *See, e.g.*, PX 6 at 44:14-20.

23.    Schwartz admits that he explains information about Ripple publicly because it is something he "should do" as a "well known employee of the company." PX 6 (Schwartz Dep. Tr.) at 100:23-101:2.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 at 100:23-101:2 to the extent it implies that Schwartz is always a spokesperson or otherwise speaking for Ripple.  Schwartz testified that he often speaks in his personal capacity, *see, e.g.*, PX 6 at 44:14-20, and that, in response to the SEC's question as to why Schwartz was "talking publicly about the strategy Ripple ha[d]" at the time of the displayed exhibit, he explained that when "people say something that [he] know[s] the truth on that's not correct," he corrects them.  PX 6 at 100:13-17.

24.    Schwartz stated in a tweet on or about March 7, 2020 that "[t]here's no mechanism in the software to create XRP and safeties prevent it from being created by a bug or trick."        PX        506.120,        *available        at* https://twitter.com/JoelKatz/status/1236389439221297152).

**Response:**        Undisputed that PX 506.120 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

25.    Ripple's proffered expert, Carol Osler, states that "[t]he long-term supply of XRP is limited to the 100 billion already in existence. No additional units of XRP can be

created without changing the XRP ledger itself." PX 11 (Expert Report of Carol Osler ("Osler Rep.") at 8.

**Response:**   Undisputed that PX 11 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

26.   To make changes on the accounts and balances tracked on the XRP Ledger, at least certain of the "nodes" on the XRP Ledger have to agree as to what accounts and balances any potential new iteration (or "state") of the ledger will recognize. PX 9 at 0539475; PX 12 (Expert Report of ▮▮▮▮▮▮▮▮) at 19-22; PX 513.

**Response:**   Undisputed.  Defendants object pursuant to Fed. R. Civ. P. 56(c)(2) that the SEC has not offered the evidence set forth in this paragraph in a form that would be admissible at trial, as the testimony of ▮▮▮▮▮▮▮ is inadmissible for the reasons set forth in Defendants' motion to exclude.  (ECF No. 541.)

27.   The XRP Ledger has previously been known as the "Ripple Consensus Ledger" or the "Ripple ledger." PX 7 (Schwartz Inv. Tr.) at 10:3-19.

**Response:**   Disputed.  Defendants object that Paragraph 27 fails to state any fact with sufficient particularity for Defendants to respond, because it does not identify with specificity what person or persons who "previously…kn[ew]" the XRP Ledger by either name set out in Paragraph 27 or the time period during which such purported alternative name was used.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 7 to the extent it implies that "Ripple ledger" was ever the XRP Ledger's official name.  The SEC's broad and unqualified statement that "[t]he XRP Ledger has previously been known as the 'Ripple ledger'" is contradicted by evidence in the record, specifically Schwartz's Investigation testimony, in which he only stated that "[p]eople have called it the Ripple ledger at times," as set forth in PX 7 at 10:3-11.

28.   In the context of the XRP Ledger, a "validator" is a node that coordinates with other nodes in the "consensus process" for the XRP Ledger, *i.e.*, the process by which nodes connected to the ledger come to agreement on a single view on what transactions on the XRP Ledger becomes accepted as the XRP Ledger adds blocks to its chain. PX 6 (Schwartz Dep. Tr.) at 30:1-31:25, 117:1-118:4.

**Response:**   Undisputed.

29.   As it was programmed, the XRP Ledger's "consensus process" requires that a particular node on the XRP Ledger have a "unique node list" or "UNL," which is the list of nodes whose proposed transactions on the XRP Ledger will "trust" when that node is determining what new state of the XRP Ledger it will agree to. PX 6 (Schwartz Dep. Tr.) at 30:1-31:25, 125:8-13.

**Response:**   Undisputed that each node on the XRP Ledger selects a "unique node list" or "UNL" that the node trusts when determining the state of the XRP Ledger to which it will agree. Defendants dispute the SEC's statement that the UNL is a "list of nodes" that a node will trust because it is contradicted by evidence in the record, specifically Schwartz's own deposition testimony, in which he states that the UNL is a list of validators (not nodes more generally). *See* PX 6 at 125:8-13.

30.   When the XRP Ledger launched, only three validator nodes—all operated by Ripple—confirmed transactions on the XRP Ledger. PX 6 (Schwartz Dep. Tr.) at 33:22-34:9.

**Response:**   Disputed.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 30.   Schwartz testified that McCaleb "exclusively" ran the three validator nodes, not Ripple.   PX 6 at 34:4-5.   Defendants further dispute that any evidence could establish that Ripple operated validator nodes at the time of the XRP Ledger's launch, as neither Ripple nor any of its corporate predecessors existed at that time, as set forth in PX 80 at ¶ 16 (stating that NewCoin was founded in September 2012) and Ex. 108 ("XRPL's Origin: Provide a Better Alternative to Bitcoin," *available at* https://xrpl.org/history.html) (stating that the XRP Ledger was launched in June 2012).

Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 to the extent it implies that Ripple at any time controlled the confirmation of transactions on the XRP Ledger.

31.     From the inception of the XRP Ledger until June 2018, all XRP Ledger validators and their servers were based in the U.S. From June 2018 to December 22, 2020, the majority of XRP Ledger validators and those validators' servers were located in the U.S. PX 13 (Rebuttal Report of ▮▮▮▮▮▮) ¶ 136 & Figure 20 & Appendix; PX 511.

**Response:**     Disputed.  Defendants object pursuant to Fed. R. Civ. P. 56(c)(2) that the SEC has not offered the evidence set forth in this paragraph in a form that would be admissible at trial, as the testimony of ▮▮▮▮▮▮ is inadmissible for the reasons set forth in Defendants' motion to exclude.  (ECF No. 544.)  Moreover, even if ▮▮▮ testimony were admissible, the SEC points only to his *rebuttal* opinion, which cannot be used to support a fact on which the SEC bears the burden of proof.  Furthermore, PX 511 is merely ▮▮▮▮ untimely-produced declaration saying he wrote his report; it is not substantive, and inadmissible for the same reasons his opinions are inadmissible.  Defendants dispute that the cited evidence establishes the facts asserted in Paragraph 31 because ▮▮▮ analysis by its terms only addresses "validators on the default Ripple UNL" (PX 13 at App'x C, ¶ 175) and not "all XRP Ledger validators and their servers" or "the majority of XRP Ledger validators and those validators' servers" as alleged in Paragraph 31.  Neither ▮▮▮ analysis, nor any other evidence cited by the SEC, establishes that the "validators on the default Ripple UNL" included "all" validators or that an analysis of the "validators on the default Ripple UNL" could support any conclusion about "a majority" of validators.

32.     The XRP Ledger was launched publicly sometime in late 2012 or early 2013.  PX 6 (Schwartz Dep. Tr.) at 25:3-7.

**Response:**      Undisputed that Schwartz offered the cited testimony.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Schwartz's testimony.  In particular, Defendants further note that the core code of the XRP Ledger was completed in June 2012, as set forth in Ex. 108 ("XRPL's Origin: Provide a Better Alternative to Bitcoin," *available at* https://xrpl.org/history.html).

33.    When the XRP Ledger launched publicly, the only thing one could do with XRP was "burn" XRP to confirm transactions on the XRP Ledger, relying on the infinitesimal amounts of XRP required to do so—described by Ripple's chief programmer Schwartz as a "microscopic fraction of a penny." PX 7 (Schwartz Inv. Tr.) at 60:12-25, 74:9-20.

**Response:**      Disputed.  The SEC's assertion that "infinitesimal amounts of XRP" are required to operate the XRP Ledger is incorrect and not supported by the source cited in Paragraph 33.  Defendants note that the cost in XRP to take different actions on the XRP Ledger depends on the action in question.  *See* Ex. 109 ("Transaction Cost," *available at* https://xrpl.org/transaction-cost.html) (XRPL.org reference page for XRP Ledger transaction fees ranging from 10 drops to 2,000,000 drops for fixed-cost transactions, and further identifying other variable-cost transactions).  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 7 insofar as the SEC asserts that the "only thing" one could do with XRP was confirm transactions, because it is inaccurate and because the SEC's phrasing tries to trivialize or dismiss XRP's fundamental utility from the moment of launch for processing transactions on the XRP Ledger.  The XRP Ledger was fully operational upon launch, and everyone who had or received XRP could use that XRP to operate the ledger or for any other uses they had for XRP.  *See* Ex. 2, D. Schwartz Decl. ¶ 4.

34.    XRP has been referred to as "Ripples" and as "Ripple credits." PX 6 (Schwartz Dep. Tr.) at 110:8-12; PX 63.

**Response:**         Undisputed that on some occasions XRP has been referred to as "Ripples" or as "Ripple credits."  Defendants dispute any further inference that may be drawn from Paragraph 34 because it does not identify any person or persons who "referred to" the XRP by either name set out in Paragraph 34 or the time period during which such purported alternative names were used.  Defendants further note that this paragraph is duplicative of Paragraph 14, and Defendants incorporate their response to that paragraph by reference.

35.    As of the date of David Schwartz's deposition in May 2021, Ripple held approximately 50 billion of the 100 billion XRP created. PX 6 (Schwartz Dep. Tr.) at 23:10-13.

**Response:**         Undisputed that Schwartz testified that Ripple held "roughly 50 billion XRP" as of May 2021, but Defendants dispute that Paragraph 35 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly facts and circumstances as of May 2021 are irrelevant.

36.    As of the date of David Schwartz's deposition in May 2021, Ripple was still the largest single holder of XRP. PX 6 (Schwartz Dep. Tr.) at 143:5-7.

**Response:**         Undisputed, but Defendants dispute that Paragraph 36 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly facts and circumstances as of May 2021 are irrelevant.

37.    Ripple's cost basis in the 80 billion units of XRP Ripple had from its inception was zero—Ripple did not have to expend any funds to purchase or obtain the XRP. PX 7 (Schwartz Inv. Tr.) at 81:1-82:21.

**Response:**         Disputed that Ripple held XRP from "its inception."  It is unclear whether the SEC asserts that Ripple "had" 80 billion units from the "inception" of Ripple or of XRP; but under either interpretation, the SEC has not cited any evidence to support that

assertion. Undisputed that Ripple received 80 billion units of XRP from Britto, Larsen, and McCaleb after Ripple's founding in 2012 (and after the inception of XRP) for no consideration, and that Ripple held those 80 billion units of XRP at a zero cost basis on its balance sheet. PX 23 at 120:14-21; *see* Ex. 14 (Larsen Declaration) at 2-3.

38.     Ripple has a reputational and financial interest in the XRP Ledger functioning properly. PX 6 (Schwartz Dep. Tr.) at 126:9-127:5, 169:8-170:5.

**Response:**      Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 because the cited evidence does not support the SEC's assertion of fact as set forth in Paragraph 38. In PX 6, David Schwartz stated at his deposition only that he "think[s]" Ripple has such a reputational and financial interest. Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 38 at all times and for all purposes in this litigation.

39.     As of the date of Schwartz's deposition in May 2021, there was no expectation from individuals who follow the digital asset space that Ripple would walk away from its efforts to maintain the XRP Ledger. PX 6 (Schwartz Dep. Tr.) at 194:9-196:4.

**Response:**      Disputed. Defendants dispute that Paragraph 39 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly facts and circumstances as of May 2021 are irrelevant. Defendants further dispute the statements in Paragraph 39 because they are based on a mischaracterization and misstatement of Schwartz's testimony in response to hypothetical questions; Schwartz never testified about the actual beliefs of a large, and largely unknown, group of individuals and entities. To the extent the SEC seeks to rely on speculation or hypothetical testimony, Schwartz's testimony undermines the fact the SEC asserts rather than support it. Schwartz affirmatively stated that a "gradual reduction" in

Ripple's involvement with the XRP Ledger "might be in accord with people's expectation." PX 6 at 196:1-9. That testimony does not support the SEC's assertion of fact in Paragraph 39, and there is no evidence in the record to support the SEC's assertion that "there was no expectation from individuals who follow the digital asset space that Ripple would walk away from its efforts to maintain the XRP Ledger." Defendants also dispute Paragraph 39 to the extent it sets forth factual or legal conclusions unsupported by citations to evidence, including the SEC's statement that Ripple is engaged in "efforts to maintain" the XRP Ledger. Defendants also dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 39 at all times and for all purposes in this litigation.

40. Schwartz first was Ripple's chief cryptographer until July 2018 and as of his deposition in May 2021 was its chief technology officer. PX 7 (Schwartz Inv. Tr.) at 8:4-9:5; PX 6 (Schwartz Dep. Tr.) at 19:22-20:4; PX 80 (Ripple. Ans.) ¶ 21.

**Response:** Undisputed.

41. In September 2012, McCaleb, Britto, and Larsen founded "NewCoin, Inc." or "OpenCoin," Defendant Ripple's predecessor, and Larsen served as Ripple's CEO (a post he held until December 2016). PX 80 (Ripple Ans.) ¶¶ 16, 18, 20, 44; PX 94 (Ripple RFA Responses) No. 719; PX 2 (Larsen Tr.) at 49:16-50:18; PX 6 (Schwartz Dep. Tr.) at 43:17-20, 53:2-13, 55:23-56:13.

**Response:** Undisputed that NewCoin, Inc. was founded in September 2012, that it was Ripple's predecessor entity, that it was at a different point in time named OpenCoin, and that Larsen was the CEO of Ripple and its predecessor entities through December 2016. Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 80, PX 2, and PX 6, to the extent that the SEC suggests that the company was named NewCoin Inc. and OpenCoin at the same time, as the cited evidence does not support that assertion.

42.     Defendant Brad Garlinghouse ("Garlinghouse") joined Ripple as its Chief
        Operating Officer ("COO") sometime in 2015 and became its CEO on January 1,
        2017. PX 201 (Garlinghouse Ans.) ¶ 17; PX 80 (Ripple Ans.) ¶¶ 6, 17.

        **Response:**        Undisputed.

43.     Garlinghouse—the self-described "face" of Ripple and its "most important
        spokesperson" appeared about twice a month on major news networks like CNBC
        and CNN, while using his increasing Twitter following to amplify Ripple's
        message. PX 36 (Garlinghouse Inv.) 39:25-47:1, 50:19-52:21; PX 503.06,
        PX 503.10, PX 503.21, PX 503.23.

        **Response:**        Disputed. Garlinghouse did not describe himself as the "face" of

Ripple; although he testified that "for many people, I'm the face of Ripple," he also noted in

response to the question, "did you believe that you were the face of Ripple as CEO?" that he

"d[oesn't] have a clear answer to that" and listed other Ripple employees that, depending on

the audience, could be considered the "face" of Ripple. *See* PX 36 at 47:1-12. In addition,

Garlinghouse did not testify that he appeared "twice a month on major news networks;"

rather, he testified that he appeared in a mix of well-known and lesser-known programs as

set forth in PX 36 at 40:24-41:2. "… [T]he average of both panels and press … I said it was

a couple times a month … I don't think I did two panels a month." PX 36 at 44:16-21. In

addition, Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 36, as misleading because Garlinghouse did not testify that he made public

statements to "amplify Ripple's message" as set forth in Paragraph 43; rather, he made public

statements to educate people in a "nascent industry" about what Ripple was trying to

accomplish in that industry, and to correct misinformation about XRP, as set forth in PX 36

at 42:6-43:5 (Q: "[W]hat was the primary purpose of discussing Ripple's products and

services on these panels or TV programs?" A: "To help the company succeed, to help raise

awareness by customers and overall market participants. As I mentioned, it was a very

nascent industry and educating people about the industry and what Ripple was trying to do

within the industry helped us build the brand of Ripple and increased customer awareness and interests and engagement."); (Q: "Did you want to raise awareness for XRP purchasers?" A: "I wanted to raise awareness about XRP as a digital asset and how it is and is not similar to other digital assets. As you're probably aware, there is a lot of misinformation in the crypto industry. … And so I felt there was value in clarifying and correcting misinformation about XRP."). And, Garlinghouse testified that he used his "personal Twitter account to educate, clarify, correct and at times, frankly opine on things that were certainly outside of just Ripple, Ripple's business and Ripple's products" and not to "amplify Ripple's message" as set forth in Paragraph 43. *See* PX 36 at 52:9-14. Undisputed that Garlinghouse spoke publicly on behalf of Ripple and has appeared on news networks, including CNBC and CNN, and that he testified he was Ripple's "most important spokesperson."

44.     Patrick Griffin ("Griffin") worked at Ripple from 2013 to 2018, at all times was one of its most senior executives, and one of his duties including [*sic*] managing Ripple's XRP sales, and always reported directly to Larsen or Garlinghouse. PX 14 (Griffin Dep. Tr.) at 19:18-21:6, 74:23-76:20, 336:4-6; PX 3 (Griffin Inv. Tr.) at 29:24-30:25, 38:4-23.

**Response:**     Undisputed that Griffin worked at Ripple from 2013 to 2018 and that he reported directly to either Larsen or Garlinghouse at all times during his employment with Ripple.  Defendants dispute the characterization of, and inferences purportedly drawn from, PX 14 to the extent it characterizes Griffin as "at all times" being one of Ripple's "most senior executives," a term that is not defined or used in the cited documents, in which Griffin testified only that he had been "a senior executive."  In particular, Griffin explained at his deposition that he was not on Ripple's leadership team toward the end of his employment, as set forth in PX 14 at 336:3-17.  Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 3 because Paragraph 44 omits additional context necessary to understand the referenced testimony about him being "a senior executive,"

including that Griffin had duties unrelated to Ripple's XRP sales, including establishing a sales team around enterprise software products, overseeing corporate development efforts to secure acquisitions, raising venture funding for Ripple, and focusing on xPring, as set forth in PX 14 at 74:23-75:23, 336:15-19.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 14, to the extent the SEC implies that Griffin reported to Larsen after Larsen stepped down as CEO in December 2016.  Griffin testified that he started reporting to Garlinghouse in approximately "2015 or [20]16," and there is no evidence that he reported to Larsen after January 2017.  PX 14 at 20:5-21:6.

45.     Griffin's official titles included Executive Vice President of Business Development and Senior Vice President of Business Development. PX 80 (Ripple Ans.) ¶ 24.

**Response:**     Undisputed that Griffin held those titles.  Defendants dispute any inference suggested by Paragraph 45 that he held both titles at the same time, which the document cited in Paragraph 45 does not support.

46.     Asheesh Birla ("Birla") started at Ripple in 2013, was one of its longest-tenured employees, his responsibilities at times included being the head of developing Ripple products, and he always reported directly to Larsen or Garlinghouse. PX 15 (Birla Dep. Tr.) at 18:11-20:25; PX 16 (Birla Inv. Tr.) at 37:24-39:9.

**Response:**     Undisputed, except Defendants aver that Birla's employment at Ripple ended in 2022.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 15, to the extent the SEC implies that Birla reported to Larsen after Larsen stepped down as CEO in December 2016.  Birla testified that when he reported to Larsen, Larsen was Ripple's CEO.  PX 15 at 21:18-22:3.

47.     Monica Long ("Long") started at Ripple in 2013 as director of communications, is one of its longest-tenured employees, and later was promoted to vice-president of marketing, and was responsible for both internal and external communications for Ripple, reporting at all times directly to Larsen or Garlinghouse. PX 17 (Long Tr.) at 12:13-13:3, 18:1-20:20, 29:17-21.

**Response:**   Undisputed that Long started at Ripple in 2013 as Director of Communications, was later promoted to Vice President of Marketing, and has reported to either Larsen or Garlinghouse at all times during her employment.  Defendants dispute that Long's responsibilities set forth in Paragraph 47 accurately set forth her responsibilities at all times during her employment with Ripple up to the present day.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 17, to the extent the SEC implies that Long reported to Larsen after Larsen stepped down as CEO in December 2016.  Long testified that she reported to Larsen when he was CEO, and thereafter reported to Garlinghouse.  PX 17 at 29:12-30:11.

48.   Phil Rapoport ("Rapoport") worked as a consultant for Ripple in the summer of 2013 then as a full-time employee from 2013 to 2015, with the title "director of markets and trading" and later "head of markets and trading," reporting at all times directly to Griffin. PX 10 (Rapoport Tr.) at 26:22-27:41, 36:3-37:6.

**Response:**   Undisputed.

49.   Antoinette O'Gorman ("O'Gorman") was Ripple's Bank Secrecy Act officer and Chief Compliance Officer from February 2015 through May 2018, always reporting directly either to Larsen or Garlinghouse. PX 18 (O'Gorman Tr.) at 26:7-26:9, 32:18-35:25.

**Response:**   Undisputed. Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 17, to the extent the SEC implies that O'Gorman reported to Larsen after Larsen stepped down as CEO in December 2016.   O'Gorman testified that she reported to Larsen until "Brad Garlinghouse assumed the CEO role."  PX 18 at 33:9–21.

50.   Ryan Zagone ("Zagone") joined Ripple in late 2014 and was its head of business development, reporting to Griffith, and became the director of regulatory relations in 2015, a job he had through July 2019, while reporting to O'Gorman. PX 19 (Zagone Tr.) at 19:17-20, 24:11-26:20.

**Response:**      Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 19 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 50.  Zagone joined Ripple as Head of Research on the Business Development team, not as Head of Business Development.  *See* PX 19 at 25:9-12.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 19 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 50, as there is no employee named "Griffith" to whom Zagone reported.

51.      Miguel Vias ("Vias") worked at Ripple November 2016 to April 2020 as its head of XRP markets, reporting to Griffin and others, whose job goal was to grow liquidity in XRP. PX 20 (Vias Inv. Tr.) at 26:6-27:15; PX 21 (Vias Dep. Tr.) at 35:4-19, 85:11-14.

**Response:**      Undisputed, except that Vias testified that his "role" and not his "goal" was to grow liquidity in XRP, and that he "couldn't do anything I wanted" in his role. PX 21 at 26:10-17.  Defendants further aver that, although the substance of Paragraph 51 is undisputed except as set forth in the prior sentence, the cited evidence does not support the facts set forth in Paragraph 51; an accurate citation would be to PX 20 at 35:4-19, 85:11-14 and PX 21 at 26:6-27:15.

52.      Dinuka Samarasinghe ("Samarasinghe") was Ripple's senior manager for XRP markets from June 2017 until late 2020, reporting either to Vias or Breanne Madigan. While in that role, he managed programmatic sales, helped build out XRP over-the-counter trading and developing XRP lending programs. Before working for Ripple he worked for ████████████████ one of the market makers Ripple hired to sell XRP, and after leaving Ripple in 2020, he began working at GSR, another market maker Ripple hired to sell XRP. PX 22 (Samarasinghe Tr.) at 25:1-28:7, 31:5-33:25, 34:09-35:8.

**Response:**      Undisputed.

53.      Ron Will ("Will") was Ripple's CFO from November 2017 through September 2020, reporting at all times directly to Garlinghouse. PX 23 (Will Dep.) at 14:14-22, 105:3-6.

**Response:**       Undisputed.

54.    Ethan Beard ("Beard"), who was employed by Ripple from 2018 through 2020 as Senior Vice President heading up an initiative called "xPring," described below, and reported at all times directly to Garlinghouse. PX 24 (Beard Tr.) at 37:5-17, 41:9-15.

**Response:**       Undisputed, except Defendants dispute the assertion that Beard was employed by Ripple for the entirety of 2018 and 2020, which is not supported by the cited evidence.

55.    Breanne Madigan ("Madigan") started working at Ripple in May 2019 as its global head of institutional markets during which time she reported to Long and Garlinghouse. PX 25 (Madigan Tr.) at 20:1-21:9.

**Response:**       Undisputed that Madigan started working at Ripple in May 2019 as its Global Head of Institutional Markets.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 55 that Madigan reported to both Long and Garlinghouse, or only those two individuals, at all times during her employment at Ripple.

56.    GSR Markets is a firm that engages in algorithmic trading "that specializes in crypto," and has had a relationship with Ripple since the fourth quarter of 2013, providing a variety of services, including selling XRP on behalf of Ripple in exchange for cash; ██████████ is one of GSR's founders and its Chairman, and been employed by GSR since 2013. PX 26 (███ Tr.) at 11:22-12:6, 27:6-9, 29:21-36:23, 50:6-51:13; PX 85 (Ripple RFA Responses) No. 566; *see also* LinkedIn, ████████ https://www.linkedin.com/in████████████; GSR.IO https://www.gsr.io/our-team/#

**Response:**       Undisputed that ████████ testified that he has been employed by GSR since 2013 and that his social media profiles and GSR's public website cited in Paragraph 56 identify ███ as the Chairman and "Co-Founder" of GSR; undisputed that ████████ testified that GSR Markets is a firm that engages in algorithmic trading "that specializes in crypto"; and undisputed that ████████ offered the quoted testimony that

27

GSR Markets has had a relationship with Ripple since the fourth quarter of 2013 and that ▓▓▓▓▓ testified that GSR has provided a variety of services to Ripple.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of ▓▓▓▓▓ testimony.  Otherwise disputed.  The cited evidence does not support the SEC's assertion in Paragraph 56 that GSR Markets sold XRP on behalf of Ripple "in exchange for cash."  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 26, including to the extent they rely on that unsupported assertion by the SEC.

57.     In 2013 and 2014, one of Ripple's business goals was to create value for XRP by the "digitization of as many assets as possible" on the XRP Ledger, or by getting "all sorts of digital payment types" to occur on the XRP Ledger. PX 3 (Griffin Inv. Tr.) at 58:11-61:10.

**Response:**        Disputed.  The SEC's assertion that "one of Ripple's business goals was to create value for XRP" is unsupported by the cited evidence.  Griffin's testimony was that Ripple was trying to make the "XRP Ledger sort of the de facto clearing and settlement system for all sorts of digital payment types," which could have the effect of "mak[ing] [XRP] more useful as sort of a bridge currency."   PX 3 at 58:21-59:2, 60:25-61:10.  Defendants further dispute Paragraph 57 to the extent that its use of the phrase "create value" implies anything about price of XRP.  Griffin testified that his "understanding" of the phrase "gaining value" referred to "liquidity, utility, usefulness," and that he did not have an understanding that XRP gaining "value" meant an increase in *price. Id.* at 55:19-56:3.

58.     A January 2020 presentation for Ripple's Board of Directors ("Board"), entitled "2020 Annual Plan," which was prepared by Ripple's employees, agents, or personnel, and contained truthful and accurate information, stated that Ripple was "more confident than ever that the ***Internet of Value – enabling the world to move value like information moves today*** – is a huge vision that will create value both for Ripple and its customers" and that "***enabling payments everywhere, every way, for everyone*** is the right place to start." PX 84 (Ripple RFA Responses) Nos. 650-51; PX 27 at RPLI_SEC 477677.

**Response:**        Undisputed that PX 27 contains the quoted text.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

59.    Sometime in 2013, Rapoport put together a document called "Ripple: A Primer" (the "Primer"), which was a document to "explain the very basic concepts of the Ripple technology" and was aimed at "financial institutions." PX 10 (Rapoport Tr.) at 61:20-66:18 (testifying about PX 28, PX 29, PX 30).

**Response:**        Undisputed.

60.    In approximately August or September 2014, Ripple employees created an "industry report" "to clarify Ripple's role in the financial ecosystem." The title of the document was "The Ripple Protocol: A Deep Dive For Finance Professionals," and it was accessible through Ripple's website at the address https://ripple.com/ripple-deep-dive/ (the "Deep Dive"). PX 9 at RPLI_SEC 539461, 465; PX 31 at RPLI_SEC 842467.

**Response:**        Undisputed except insofar as Paragraph 60 erroneously states the title of the document, which is "The Ripple Protocol: A Deep Dive For *Finance* Professionals."  PX 9 at RPLI_SEC 539465 (emphasis added).

61.    The Deep Dive stated that Ripple was attracting a "diverse set of talented individuals with experience in relevant technology and financial services companies" to help pursue its business plans, and that Ripple's "business model [was] predicated on a belief that demand for XRP will rise (resulting in price appreciation) if the Ripple protocol becomes widely adopted." PX 9 at RPLI_SEC 539481, 539487.

**Response:**        Undisputed that PX 9 contains the quoted text.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 9 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 61, as PX 9 makes no reference to Ripple attracting a diverse set of talented individuals "to help pursue its business plans."  Defendants further dispute the SEC's characterizations in Paragraph 61 because they omit relevant

testimony that the beliefs about "price appreciation" quoted above were merely a "theory."

PX 3 at 161:2-6.

62.　　According to Larsen, the objective of Ripple at its inception, when it was OpenCoin, was to "build a team that can develop applications across a number of different technologies," to develop applications that had market fit, all of which would require "domain expertise in technology, compliance and capital markets" which Ripple would acquire by "hiring team members." PX 2 (Larsen Dep. Tr.) at 163:21-165:5, 185:12-19, 187:24-188:8.

**Response:**　　　　Undisputed that Ex. 8 contains the quoted text at 164:1-5, 184:12-

19, 187:1-8.  Defendants dispute the SEC's characterizations of, and inferences purportedly

drawn from, PX 2, as misleading because it omits that Larsen testified that while some of the

applications contemplated by Ripple would use the XRP Ledger, others would not.  Ex. 8 at

160:21-161:20.  Larsen further testified that the company was searching for the product-

market fit, which is "when you found the best application for a product or service and you

have a good solution to that – that problem," and "product market fit is something that

happens down the road in most-start-ups."  *Id.* at 163:21-165:5, 185:12-19, 187:24-188:8 at

162:4-20.  Defendants further dispute that the Ripple was known as "OpenCoin" at its

inception and incorporate the response to Paragraph 41.

63.　　Ripple admits that it "has worked to develop products that utilize XRP to allow financial institutions to effect currency transfers." PX 80 (Ripple Ans.) ¶ 67.

**Response:**　　　　Undisputed.

64.　　Ripple admits that it launched an initiative to "support development of new applications of XRP and the XRP Ledger." *Id.* ¶ 147.

**Response:**　　　　Undisputed.

65.　　Larsen testified that in the early years, part of what Ripple was doing was developing products that would use XRP. PX 2 (Larsen Dep. Tr.) at 187:15-22.

**Response:**　　　　Undisputed that Larsen testified that Ripple was trying to develop

products "not limited just to XRP" while working to obtain product market fit.  Ex. 8 at

186:15-22; *see also* Ex. 8 at 184:21-185:1 (the products "could be . . . using the technology of the XRP Ledger, which may or may not involve XRP 'cause XRP Ledger is also a decentralized exchange, or ILP, the Interledger Protocol, or Codius for a time as well."). Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 2, to the extent the SEC implies XRP did not have a use until Ripple developed one, because Larsen testified XRP had "utility from the moment it began" and it had the same "utility Bitcoin had, Ethereum later had, around being a currency without a counterparty, without a government." Ex. 8 at 182:24-183:14.

66.    Birla testified about efforts that Ripple undertook to develop uses for XRP and the XRP Ledger in 2013 and 2014, including to develop applications for bridging conversions of one "fiat" currency (the circulating currency of a country, such as the U.S. Dollar) into another. PX 15 (Birla Dep.) at 250:14-259:2.

**Response:**    Disputed.  The cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 66, as Birla did not testify that Ripple "undertook" "efforts" of any sort.  Paragraph 66 improperly sets forth a legal conclusion.  Defendants do not dispute that Ripple developed products in 2013 and 2014 utilizing the XRP Ledger, including to facilitate cross-border payments.  *See* PX 15 at 250:14-259:2.

67.    Zagone admitted that Ripple was promoting products, including payment networks, that "used XRP as a liquidity tool." PX 19 (Zagone Dep. Tr.) at 67:13-20.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 19 including because Paragraph 67 misstates and mischaracterizes the testimony.  Zagone testified that Ripple was trying to promote Ripple's various products, one of which "used XRP as a liquidity tool."  PX 19 at 67:13-20 (emphasis added).

68.    In its 2020 Annual Plan, presented to the Ripple Board in January 2020, Ripple continued to discuss its objectives of, and its planned expenditure of budget resources to, continuing to "Drive XRP velocity" through a Ripple software

platform, and "Creat[ing] use cases on RippleNet that increase XRP's utility" in addition to that software platform. PX 27 at RPLI_SEC 477680, 477705.

**Response:**        Undisputed that PX 27 contains the quoted text. Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 27 including because Paragraph 68 omits additional context necessary to understand the quoted language in the exhibit, including that one of Ripple's objectives was to "Drive XRP velocity *outside of RippleNet* through a robust developer ecosystem." PX 27 at RPLI_SEC 477680 (emphasis added). Defendants further dispute the SEC's suggestion that PX 27 represents a "continued" discussion, as the source cited in Paragraph 68 does not indicate the existence of prior discussions that were "continued" in this document.

69.    For example Schwartz admitted that he had and continues to hold a view that increasing use cases for XRP could lead to an increase in the demand for XRP and that Ripple continued to be engaged in such efforts up to the day of his deposition. PX 6 (Schwartz Dep. Tr.) at 349:3-350:1.

**Response:**        Disputed. Paragraph 69 misstates Schwartz's testimony in asserting that "he had and continues to hold" the view ascribed by the SEC. To the contrary, Schwartz testified that this view "*is not currently true and hasn't been* in most – in the past." PX 6 at 349:9-11 (emphasis added). In addition, the SEC's statement that "Ripple continued to be engaged in such efforts up to the day of his deposition" is contradicted by evidence in the record, specifically Schwartz's deposition testimony, in which the SEC asked whether Ripple was "still engaged in efforts to potentially increase the use of XRP itself" and Schwartz disagreed with the suggestion that this was an appropriate way to characterize Ripple's efforts. *Id.* at 350:25-351:5. Defendants further dispute the SEC's characterization of and inferences purportedly drawn from PX 6 as an "example" of anything. Defendants further

dispute Paragraph 69 to the extent that it sets forth legal conclusions through its use of the term "efforts."

70.     In public statements, Schwartz explained that if "XRP has more utility and more people are aware of the utility and more people are using the XRP Ledger, that will generate demand that will affect the price." PX 7 (Schwartz Inv. Tr.) at 132:3-20.

**Response:**     Disputed.  The SEC's assertion that Schwartz made the statement quoted in Paragraph 70 publicly is incorrect, because the statement in question was made during his non-public investigation testimony.  The SEC has identified no public statement by Schwartz containing the quoted text.  *See* PX 7 at 132:3-20.  Accordingly, the cited evidence does not support the SEC's assertions of fact as set out in Paragraph 70.

71.     Griffin testified that in 2013, Ripple believed that the more use, or "utilization," of the system, the more volume would accrue to XRP, which would, given the fixed supply of XRP, increase its price, and that he personally worked on finding use cases that would increase adoption of Ripple's technology, because the more XRP was used "the more valuable and useful" it would become. PX 14 (Griffin Dep. Tr.) at 104:12-105:20, 138:6-139:2; 298:19-299:5.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14, including because Paragraph 71 suggests the quoted testimony reflected a belief of Ripple, when the testimony cited in Paragraph 71 demonstrates that Griffin was testifying about his own personal beliefs in response to hypothetical questions, and not any belief held by Ripple as an entity.  *See, e.g.*, PX 14 at 104:12-105:20,138:6-139:2, 298:19-299:5.  Defendants further dispute Paragraph 71 to the extent it suggests that Griffin "personally worked on finding use cases" and that he did so "because" that would make XRP "more valuable and useful"; the cited evidence does not support those assertions.

72.     In 2013, Ripple pitched to outside potential investors its business model as: if the Ripple network "takes off there's a possibility that the asset [XRP] will gain in value" which would "be accredited to the asset holdings of Ripple Inc." PX 3 (Griffin Inv. Tr.) at 48:11-50:8.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of the testimony as relating to statements made "[i]n 2013," because Griffin testified that he could not recall the dates of the relevant discussions.  *See* PX 3 at 48:18-20 ("it's hard for me to parse which conversations happened when, if this is Series B or Series A").  Defendants further dispute Paragraph 72 because the SEC altered the quotation by changing the phrase "will gain value" to "will gain *in* value."  PX 3 at 49:9 (emphasis added).  Defendants further dispute Paragraph 72 to the extent the SEC implies that Paragraph 72 sets forth the entirety of Griffin's testimony about Ripple's business model, because Griffin testified that Ripple's business model also included "APIs and services around them that we could build and sell." PX 3 at 49:1-4.

73.    In the Primer, Ripple explained that it hoped to "make money from XRP if the world finds the Ripple network useful and broadly adopts the protocol" and that Ripple was going to "retain a portion of" XRP "with the hope of creating a robust and liquid trading marketplace in order to monetize" XRP "sometime in the future." PX 30 at RPLI_SEC 337841; PX 10 (Rapoport Tr.) at 77:6-17, 144:7-18 (admitting accuracy of this statement through his employment at Ripple and his belief that efforts could increase XRP's price).

**Response:**        Disputed.  PX 30 does not support the SEC's assertion in Paragraph 73, including because the SEC altered the quotation it purports to draw from that document through the unmarked insertion of the word "trading," which does not appear in the original text.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 10, including the statement that Rapoport admitted "his belief that efforts could increase XRP's price," because Paragraph 73 omits additional context necessary to understand the quoted testimony, including Rapoport's testimony that "it's my belief that those actions could lead to an increase in XRP price, but I don't think that that's a given . . . I don't believe the company had a direct goal to influence the price of XRP." PX 10 at 144:7-

18.  Paragraph 73 also sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence.

74.     Rapoport testified that Ripple had a "vision," as reflected in the Primer, that "if the technology was adopted broadly, there may be an increase in the price of XRP, which would benefit the company as a holder of XRP." PX 10 (Rapoport Tr.) at 77:6-78:15.

**Response:**     Undisputed that Rapoport offered the quoted testimony.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Rapoport's testimony.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 including because Paragraph 74 omits additional context necessary to understand the quoted testimony, including that Rapoport further testified that "that thesis may not be correct; that -- that that asset may or may not appreciate in value."  PX 10 at 77:21-78:11.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 10, including the statement that Rapoport admitted "his belief that efforts could increase XRP's price," because Paragraph 74 omits additional context necessary to understand the quoted testimony, including Rapoport's testimony that "it's my belief that those actions could lead to an increase in XRP price, but I don't think that that's a given and that's an ancillary effect that is my belief.  And so I don't believe the company had a direct goal to influence the price of XRP."  PX 10 at 144:7-18.  Defendants further dispute the SEC's characterization of the quoted "vision" as belonging to Ripple.  Rather, Rapoport's testimony stated that "there was a vision" (he was not asked whose it was) "that this technology was interesting and had potential to be adopted."  *Id.* at 77:25-78:2.  Accordingly, the evidence cited does not support the characterization or inferences the SEC attempts to draw from it.

75.     The Deep Dive explained the several potential "Sources for XRP Demand," including two sources that Ripple would work to increase—demand for products

and services that operate on the XRP Ledger and demand if "XRP becomes more useful as a bridge currency," and that "[i]f the Ripple protocol becomes the backbone for global value transfer, Ripple expects the demand for XRP to be considerable," and tying this concept to the "market capitalization" of XRP. PX 9 at RPLI_SEC 539487-489.

**Response:**      Disputed.  Defendants dispute that PX 9 contains the quoted text. Defendants further dispute that the cited evidence supports the SEC's assertion that Ripple would work to increase the "demand for products and services that operate on the XRP Ledger" or work to increase the demand for XRP "as a bridge currency," as that fact is not established by the evidence the SEC cites.

76.     Rapoport also testified that the contents of the "Sources of XRP Demand" portion of Ripple's Deep Dive were accurate and reflected Ripple's plans to "further develop the Ripple protocol [which] … may result in demand for XRP and that asset on Ripple Labs' balance sheet may appreciate," and that these explanations were written to answer frequent questions that came up during meetings. PX 10 (Rapoport Tr.) at 194:16-201:6.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 including because Paragraph 76 omits additional context necessary to understand the cited testimony.  Contrary to the SEC's assertion, Rapoport did not testify "that the contents of the 'Sources of XRP Demand' portion of Ripple's Deep Dive were accurate"; he testified only that a single sentence from that section was accurate, and offered that testimony only with respect to a particular time period.  PX 10 at 195:15-196:5 (sentence accurate "[a]t the inception of the company").  Defendants further dispute Paragraph 76 to the extent it asserts that the quoted testimony represented "Ripple's plans"; to the contrary, Rapoport's testimony establishes that what the SEC calls "Ripple's plans" were neither Ripple's nor plans:  they were the beliefs of Ripple's "earliest investors."  *See* PX 10 at 196:13:19 ("I think *the earliest investors in the company believed that* Ripple Labs was going to develop a – further develop the Ripple protocol and that that

*may* result in demand for XRP and that the asset on Ripple Labs' balance sheet *may* appreciate.") (emphasis added). Moreover, the SEC's statement that "these explanations were written to answer frequent questions that came up during meetings" is inaccurate and misleading because Rapoport gave that testimony in connection with explaining the purpose of drafting a separate and unrelated section of Ripple's Deep Dive document. *Id.* at 200:4:19.

77.     On or about August 8, 2016, Schwartz posted on XRP Chat, an online forum described as "The Largest XRP Crypto Community Forum," http://www.xrpchat.com, that for Ripple: "Holding on to sufficient XRP was essential to ensure the company would eventually be able to monetize any significant increase in the price of XRP that it was able to achieve." PX 508.05, *available at* https://www.xrpchat.com/topic/1794-how-did-the-vcs-value-ripple-labs/?do=findComment&comment=16496.

**Response:**     Undisputed that PX 508.05 contains the quoted text. Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 508.05 including because Paragraph 77 omits additional context necessary to understand the quoted exhibit, including that Schwartz was providing his view as to "several reasons not to fund [Ripple] entirely on XRP." PX 508.05. Defendants also dispute Paragraph 77 as unsupported by the evidence to the extent it implies that Schwartz's statements are attributable to Ripple or to the Individual Defendants.

78.     Vias admitted that when he joined Ripple the price of XRP was below a penny but that the company believed that XRP "[o]ver time … would increase in price as it gained in adoption," and expressing [*sic*] his opinion that the increase in price of XRP in late 2017 was not due to Ripple's "primary use case" but the "general idea that over time as [XRP] became more useful...and possibly used for other things besides this particular use case, there could be appreciation." PX 21 (Vias Inv. Tr.) at 184:18-185:4, 189:7-190:4.

**Response:**     Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 21 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 78. The quoted text related to XRP's

"primary use case" does not appear in PX 21 at the cited pages.  Defendants further dispute

Paragraph 78 to the extent the SEC implies that Vias' personal opinion or belief could be

attributed to Ripple.  Defendants further dispute Paragraph 78 insofar as it is intended to

assert that changes in the price of XRP in late 2017 were attributable to increasing uses for

XRP.  Record evidence demonstrates that long-term changes in XRP's price are attributable

to movement in the broader virtual currency market.  *See, e.g.*, PX 6 at 115:2-18; Ex. 12

(Rebuttal Expert Report of Allen Ferrell, Ph.D.) at pp. 30-31.

79.     In an October 2017 email, Vias told Griffin and others at Ripple that "XRP has
        been on quite a roll," referring in part to its "+10.2%" price movement in 24 hours,
        and explaining "we think the primary driver of that rally was anticipation around
        commercial use of XRP and xRapid" as well as another set of announcements by
        Ripple. PX 32 at RPLI_SEC 645510-511.

**Response:**        Undisputed that, in an October 2017 email, Vias told Griffin and

others at Ripple that "XRP has been on quite a roll," referring in part to its "+10.2%" price

change in the preceding 24 hours; however, Defendants dispute that this is the entirety of, a

representative selection of, or a fair characterization of the document's complete contents.

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

PX 32 as misleading because the statement that "'we think the primary driver of that rally

was anticipation around commercial use of XRP and xRapid' as well as another set of

announcements by Ripple" was in reference to activity "on October 4th," not the price

changes in the preceding 24 hours to which the SEC inaccurately attributes that text.  PX 32

at RPLI_SEC 645510.  In contrast to the SEC's statements in Paragraph 79, the October 2017

email states that "[i]nterestingly however, the last 24-28 hours have seen XRP continue to

move higher on very little news, outpacing almost every other digital currency."  *Id.* at

RPLI_SEC 645511.  Defendants further dispute Paragraph 79 insofar as it is intended to

assert that changes in the price of XRP at a given time were attributable to the factors

identified by Vias.  Record evidence demonstrates that long-term changes in XRP's price are attributable to movement in the broader virtual currency market.  *See, e.g.*, PX 6 at 115:2-18; Ex. 12 (Rebuttal Expert Report of Allen Ferrell, Ph.D.) at pp. 30-31.

80.   Ripple's CFO Ron Will admitted that in his view, increasing the demand for an asset like XRP "will increase the price of the asset," and that over his "time at Ripple," starting in 2018, one of the company's business strategies "was to make sure there was liquidity and utility for XRP, and that would drive the value of XRP." PX 23 (Will Tr.) at 220:21-221:20, 254:10-21.

**Response:**   Undisputed that Will offered the quoted testimony.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Will's testimony.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 23 including because Paragraph 80 omits additional context necessary to understand the quoted testimony, including that Will testified "[a]s a finance executive, [he] believe[d] that increased demand, all other things being equal, will increase the price of that asset" and that "[a]s CFO, [he] believed [Ripple's] efforts should be focused on increasing volume of activity on RippleNet and the value of [Ripple's] other investments." PX 23 at 221:18-222:6.

81.   In July 2019, Ripple employees discussed with a U.S.-based crypto exchange the belief that, with respect to a software product Ripple was developing, "volumes also drive market demand and speculative interest" for XRP onto the order books of digital asset trading platforms. PX 33 at RPLI_SEC 223540.

**Response:**   Undisputed that PX 33 contains the quoted language; however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

82.   Zagone admits that he understood that an increased use of XRP would result in an appreciation in its value, and that "greater adoption" of XRP leads to "greater demand," which is a factor in XRP's price. PX 19 (Zagone Tr.) at 64:21-65:19.

**Response:**        Disputed.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 19 to the extent Paragraph 82 states that "Zagone admits that he understood that an increased use of XRP *would* result in an appreciation in its value," because the SEC  only asked Zagone whether he "[understood] that XRP *could* appreciate in value as the use of XRP increased."  PX 19 at 64:21-24 (emphasis added). Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 19 including because Paragraph 82 omits additional context necessary to understand the quoted testimony including that Zagone testified that "[i]t's a big hypothetical.  There's so many variables in what's guiding price."  *Id.* at 65:15-16.

83.    On or about November 12, 2017, in public statements on the online forum Quora, a social question and answer website based in California, Schwartz stated:

> If Ripple is successful getting XRP used as an vehicle asset in
> international payments, new corporates like Uber and AirBNB
> (who make payments all over the globe and want to make them as
> quickly and cheaply as possible) could significantly add to the
> demand for XRP…These forces could be expected to increase the
> price of XRP. This same logic can apply to all kinds of companies
> that make payments around the world. At least, that's what
> Ripple's betting on. After all, the reason we're doing this is to
> increase demand for XRP to increase the value we can extract from
> our stash of XRP.  PX 509.01, *available at*
> https://www.quora.com/Considering-that-the-banks-dont-use-
> XRP-coins-for-their-transactions-how-can-the-XRP-price-go-high-
> even-if-the-banks-adopt-the-Ripple-platform; PX 7 (Schwartz Inv.
> Tr.) at 119:20-121:24.

**Response:**        Undisputed that PX 509.01 contains the quoted text exclusive of any alterations, omissions, or additions by the SEC.  However, Defendants dispute Paragraph 83 as unsupported by the evidence to the extent it implies that Schwartz is a spokesperson or otherwise speaking for Ripple or the Individual Defendants in connection with the quoted text, that the quoted text represents a statement by Ripple or the Individual Defendants, or that the quoted text represents a belief held by Ripple or the Individual Defendants, which is

not established by the SEC's cited evidence.  Defendants further dispute Paragraph 83 insofar as it omits other statements or disclaimers by Schwartz that appear on the same webpage, including that Ripple's business "can work without XRP and without any blockchain tech" and that XRP "won't necessarily" "play a role" in banking transactions.  PX 509.01.

84.     Ripple did not actively pursue a "use case" for XRP as a currency used to buy goods and services and has not promoted XRP as a currency used to buy goods and services. PX 6 (Schwartz Dep. Tr.) at 67:7-73:7; 77:7-79:18; 99:20-25; PX 508.04 at 12-13; PX 508.04.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 because Paragraph 84 omits additional context necessary to understand the quoted testimony, including that the SEC asked Schwartz whether it was "fair to say that Ripple did not promote XRP as a digital currency" in or around 2017, without mentioning "goods and services," to which Schwartz responded that he thought "Ripple was not actively pursuing that use case" at the time, again without mentioning "goods and services."  PX 6 at 70:11-17.  Moreover, Schwartz testified that Ripple is, at least "a little bit," "pursuing that use case today," which at a minimum creates a fact dispute about whether Ripple "actively pursue[d]" the use case described in Paragraph 84. *Id.* at 70:19-21.  Defendants further dispute the SEC's assertion in Paragraph 84 because there is contrary evidence in the record, including (among other things) Ripple's 2013 presentation to various regulators, including the SEC, which described XRP as "a new currency" and discussed the ability to use XRP as a bridge currency.  Ex. 110 (RPLI_SEC 344269) at RPLI_SEC 344270, 84.

85.     On or about November 12, 2019, in an interview sponsored by the Fintech Forum, Garlinghouse stated:

> I don't typically refer to XRP as a cryptocurrency, and frankly I don't refer to Bitcoin as a cryptocurrency also because I did happen to go to Starbucks earlier today, and it's about two stores

over, and I used, actually I used a Visa card to pay for it. I could have used my Starbucks app, I could have used dollars. But the challenge sometimes in Silicon Valley is the echo chamber I was referring to earlier. You have technologies in search of a problem versus a problem in search of a technology. I think for tier one economies, let's say the G-20, it's not clear to me that the currencies in those markets - you know, the dollar works well, the yen works well.  I don't see these things as penetrating consumer use cases at scale anytime soon.

PX 503.19, *available at* https://rollcall.com/events/fintech-week-2019/.

**Response:**        Undisputed that PX 503.19 contains the quoted text, exclusive of

any alterations, omissions, or additions, however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the document's complete

contents. Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 503.19 because the cited evidence does not support the SEC's assertions of

fact as set forth in Paragraph 85 that the interview took place on November 12, 2019 because

it took place on October 23, 2019. PX 503.19. Defendants also dispute Plaintiff's

characterization of, and inferences purportedly drawn from, PX 503.19, including because

Paragraph 85 omits additional context necessary to understand the quoted language,

including that Garlinghouse explains that although there might be no "consumer use case"

for "tier 1 economies," his view does not extend to other types of economies. PX 503.19 at

9:16-21. "Now, people often point out that you have economies where you don't have a

strong fiat currency, and I think that's a different story." *See* PX 503.19 at 9:22-24.

Defendants further note that the ultimate fact is in dispute because Garlinghouse does, at

times, refer to XRP as a "cryptocurrency," as set forth in PX 81 at 66:2-6 ("The former

generally wasn't because I didn't think of it as an important, critical issue, because it seemed

so obvious to me that [XRP] was a currency and is being regulated as a currency by many

governments around the world."); 290:21-24 (Q: "And Ripple – you have stated Ripple's

42

view was that XRP was a currency, not a security, correct?" A: "It was also FinCEN's view, but, yes.").

86.　　On or about October 8, 2019, in an interview at the Economic Club of New York and in response to a question "about how somebody used Ripple to buy or sell something?" Garlinghouse stated that this was not what XRP was for, explaining: "XRP, in my judgment, and really any crypto, I don't think the use case is a consumer use case today." PX 503.18, *available at* https://econclubny.org/documents/10184/109144/2019GarlinghouseTranscript.pdf.

**Response:**　　　　Undisputed that PX 503.18 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.18, including because Paragraph 86 omits additional context necessary to understand the quoted language, including that Garlinghouse qualifies his answer that in other countries that "have lost control of their currencies," cryptocurrencies could solve a problem and that XRP has a use case, which is to "help banks solve a payments problem," as set forth in PX 503.18 at 12:12-25; 13:20-21.

87.　　Madigan testified that as of May 18, 2021, one still could not buy coffee with crypto. PX 25 (Madigan Tr.) at 401:4-14.

**Response:**　　　　Disputed.  The SEC has mischaracterized the cited testimony in PX 25, which does not support the SEC's assertions of fact as set forth in Paragraph 87.  In the cited testimony, Madigan described a hypothetical question she used to hear from prospective market participants during "the early days of crypto"; she was not describing anything "as of May 18, 2021."  Further, Defendants dispute that Paragraph 87 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and

sales of XRP prior to December 22, 2020, and accordingly facts and circumstances as of May 2021 are irrelevant.

88.     Larsen never restricted his sales of XRP to people who "had a use for XRP"; "wish[ed] to use XRP as a medium of exchange"; "wish[ed] to use XRP as a store [of] value"; "wished to use XRP as a unit of account"; or those who "wish[ed] to use XRP for cross-border payments." PX 2 (Larsen Dep.) 149:16-150:20.

**Response:**          Disputed.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 2, as misleading because it omits that when Larsen was asked "[h]ave you ever restricted your sales of XRP to persons who had a use for XRP," Larsen testified "No  . . . [I]t's a currency, and has all the attributes of a currency."  Ex. 8 at 148:16-21.  A currency is a medium of exchange, store of value, a unit of account, and it has the utility or use of a currency.  Ex. 8 at 183:9-14.  The SEC also omitted that Larsen's "assumption is that everyone has a use for [XRP.]"  Ex. 8 at 154:10-11.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 2, as misleading to the extent the SEC implies that Larsen could have instituted these restrictions on his sales.  Larsen sold XRP on exchanges where participants are anonymous and where sellers cannot target specific buyers.  *See* Defs.' 56.1 ¶¶ 169-170.  To the extent the SEC seeks to draw any inferences about Larsen's sales prior to September 2015, Larsen claims such transactions are barred by the statute of limitations.  *See* Defendants' Memorandum of Law in Support of Their Motion for Summary Judgment ("Defs.' MSJ") (ECF No. 622) at 74-75.

89.     In September 2016, XRP had "limited commercial use" and was "mainly held as a speculative investment by companies and individuals that expect it to rise in value as the Ripple network expands." PX 47 at 0532020, 27.

**Response:**          Undisputed that PX 47 contains the quoted text.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form,

as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

90.      In an interview on or about March 14, 2018, Garlinghouse stated:

> I almost never use the expression cryptocurrency.  And the reason is today, these aren't currencies.  I can't go down to Starbucks and buy a coffee with Bitcoin.  I can't buy -- I can't buy coffee with XRP.  I'm using Starbucks as a random example. Currencies, traditionally, are something you can use to transact efficiently and broadly.  Very few people, even in the crypto community have used the, you know, Bitcoin or XRP to buy something.  That doesn't mean that they won't ever be currencies, but today I call them digital assets because that's I think what they are.

PX 503.13, *available at* https://www.youtube.com/watch?v=JOAuXEYu9Pg .

**Response:**      Undisputed that PX 503.13 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.13 to the extent it implies that Garlinghouse meant that XRP is a security by stating that he doesn't use the expression "cryptocurrency" to describe XRP. Defendants further note that the ultimate fact is in dispute because Garlinghouse does, at times, refer to XRP as a "cryptocurrency." *See, e.g.*, PX 81 at 66:2-9 ("The former generally wasn't because I didn't think of it as an important, critical issue, because it seemed so obvious to me that [XRP] was a currency and is being regulated as a currency by many governments around the world."); 290:21-24 (Q: "And Ripple – you have stated Ripple's view was that XRP was a currency, not a security, correct?" A: "It was also FinCEN's view, but, yes.").

91.      In an interview on or about October 8, 2019, Garlinghouse stated:

> XRP, in my judgment, and really any crypto, I don't think the use case is a consumer use case today…You know I imagine some

45

percentage of people in the room before coming this morning stopped at Starbucks and you had no trouble paying. You used a Visa, maybe you had dollars in your pocket, I don't know. But it worked. And so when people talk about using crypto for a consumer use case, I go to the, well, what problem are we trying to solve? You know if there's not a problem, then like let's not force change. People aren't going to adopt a new thing unless it's helping you in some way. So I think in First World countries like the United States, the euro, the yen, the dollar, the RMB, I don't see the consumer use case for crypto anytime soon.

PX 503.18, *available at* https://www.youtube.com/watch?v=1U6ZiOyX2TA

**Response:**       Undisputed that PX 503.18 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.18 including because Paragraph 91 omits additional context necessary to understand the quoted language, including that Garlinghouse qualifies his answer that in other countries that "have lost control of their currencies," cryptocurrencies could be solving a problem and that XRP's use case is to "help banks solve a payments problem" as set forth in PX 503.18.

92.       On or about July 7, 2017, in a post on Reddit, Schwartz stated: "Ripple, the company, is not pursuing a "retail" use case for XRP. There are a lot of reasons for this but from my point of view, the biggest ones are the legal obstacles. See, for example: https://www.federalreserve.gov/bankinforeg/regecg.htm   Other companies are, of course, free to pursue whatever use cases for XRP and Ripple's public ledger that they wish. XRP has sufficient value and liquidity to be used for many applications beyond the use cases Ripple is focusing on. Compared to the other major cryptocurrencies, XRP provides faster confirmations, higher transaction volumes, and lower transaction costs. It doesn't support on-chain smart contracts like Ethereum does, but it does support a native distributed exchange, powerful cross-currency payments, token issuance, and sophisticated account and asset security features like native multisign, rotatable keys, and so on. One big thing that we do lack is a robust ecosystem of developers working on a variety of different use cases." PX 509.32, *available at* https://www.reddit.com/r/Ripple/comments/6lv8r0/how_ripple_supposed_to_be_mass_adopted_without_a/djwut3a/.

**Response:**        Disputed.   The quoted text does not appear in PX 509.32.

Defendants do not concede that this is the entirety of, a representative selection of, or a fair

characterization of the complete contents of the Reddit post that the SEC incorrectly claims

appears in PX 509.32.  (Defendants direct the Court to PX 509.39, which contains the quoted

text.)  Defendants further dispute Paragraph 92 as unsupported by the evidence to the extent

it implies that Schwartz is a spokesperson or otherwise speaking for Ripple or the Individual

Defendants in connection with the quoted text, that the quoted text represents a statement by

Ripple or the Individual Defendants, or that the quoted text represents a belief held by Ripple

or the Individual Defendants.  As Schwartz wrote later in the same Reddit discussion, which

the SEC misleadingly omits from their excerpt of the discussion shown in PX 509.39: "I am

only speaking for myself. . . .  I do occasionally get things factually wrong and my view

doesn't always coincide with the view of others in the company, sometimes even where I

think it does."  Ex. 111 ("How Ripple supposed to be mass adopted without a proper wallet

in   place?"   *available   at*   https://www.reddit.com/r/Ripple/comments/6lv8r0/comment/

%20(showing%20all%20comments)/).

93.    Larsen admitted his and Ripple's understanding since 2013 that Ripple's ideas to
       develop applications that could use XRP involved "extremely complex
       technologies that would take a lot of resources to produce" and that each application
       could be "extremely expensive," costing in the tens of millions of dollars. PX 2
       (Larsen Tr.) at 186:21-190:6.

**Response:**        Disputed.  Defendants dispute the SEC's characterizations of, and

inferences purportedly drawn from, PX 2, as unsupported by the evidence because Larsen

testified that while some of the applications contemplated by Ripple would use XRP and the

XRP Ledger, others would not.  Ex. 8 at 160:21-161:9.  Defendants further dispute the SEC's

characterizations of, and inferences purportedly drawn from, PX 2, as misleading because

they omit the full context of the testimony that the "range of dollar amounts that it might cost

to build a particular application that used XRP. . . would greatly depend on the complexity of the application that one was planning," and that the language quoted was referencing the "outer bounds of the most expensive idea"  Ex. 8 at 187:19-24;188:19-189:6.

94.    Ripple attempted to develop XRP as a bridge currency for banks, but this potential "use" did not actually come to fruition. PX 6 (Schwartz Dep. Tr.) at 41:22–43:16.

**Response:**    Disputed.  Other witnesses offered testimony contrary to the SEC's statement of fact in Paragraph 94.  *See, e.g.*, PX 15 at 206:10-14 (Asheesh Birla, when asked whether "[b]anks use ODL for cross-border payments," testified, "I believe there are – I believe there is – there are a few banks that use ODL or xRapid for cross-border payments or have in the past.").  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 including because Paragraph 94 omits additional context necessary to understand the quoted testimony, including that the SEC asked Schwartz whether the idea that banks might use XRP as a bridge currency has "actually come to fruition," to which Schwartz replied, "[n]ot as far as I know." PX 6 at 43:11:16.

95.    Ripple has never earned revenue from anyone "using" XRP to move between assets on the XRP Ledger. PX 6 (Schwartz Dep. Tr.) at 97:14–99:2.

**Response:**    Disputed.  The cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 95.  In the testimony cited by the SEC to support its assertion in Paragraph 95, the SEC asked Schwartz only whether Ripple has earned revenue from the "*decentralized exchange*" that is one component of the XRP Ledger's software.  PX 6 at 98:24-99:2 (emphasis added).

96.    Birla, Ripple's head of product development, admitted that "[d]eveloping products for financial institutions is … super complicated, [and] … very resource-intensive," that "the global nature of [Ripple's] business and the unfamiliarity with local markets and participants … adds an additional layer of complexity into building a product," and that building a particular Ripple product required "a lot of work and effort," including a number of "product managers and engineering resources." PX 15 (Birla Dep. Tr.) at 140:13-23, 166:9-167:3, 236:5-21.

**Response:**    Disputed.   While it is uncontested that Birla gave testimony discussing various challenges and complexities for launching products, the quoted language in Paragraph 96 is a combination of different portions of snippeted deposition transcript excerpts with numerous omissions of relevant statements and context, and therefore misleading and inaccurate.   The attempt to bridge these different interview segments misleadingly removes relevant context.

97.    On or about April 30, 2018, Garlinghouse wrote an email in which he stated that Ripple's "vision for XRP is ambitious," and that "it's the right time to aggressively encourage the growth of new businesses and use cases for XRP alongside RippleNet." PX 34 at RPLI_SEC 624456.

**Response:**    Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 34 as misleading. Garlinghouse did not state in PX 34 that Ripple's "vision for XRP is ambitious," and or that "it's the right time to aggressively encourage the growth of new businesses and use cases for XRP alongside RippleNet." PX 34 is an email from Garlinghouse to Beard in which Garlinghouse copies notes into the body of an email, noting that he is "not sure the[y] are up to date" and "did not re-read to audit[.]" *See* PX 34.  There is no indication in PX 34 that Garlinghouse himself wrote the language quoted in Paragraph 97.

98.    On or about October 18, 2017, in a video posted by Ripple on its YouTube channel, Garlinghouse stated: "I have no qualms saying definitively if we continue to drive the success we're driving, we're going to drive a massive amount of demand for XRP because we're solving a multitrillion dollar problem." PX 503.04, *available at* https://www.youtube.com/watch?v=bXYvGVcAwcQ.

**Response:**    Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.04, including because Paragraph 98 omits additional context necessary to understand the quoted language.  In particular, Garlinghouse clarified why he takes a long-term view of the XRP market: "I think I've said publicly that I

49

try not to pay attention to the gyrations of the market. I think, you know, '[w]e're not here to pump XRP. We can't know exactly what will happen to the price of XRP in the coming days or weeks[.]'" PX 81 at 436:13-17; *see also id.* at 437:2-8 ("Yes. I mean, to be clear, I viewed that as kind of just – I'm trying to take a long-term view of crypto overall, of XRP. And, you know, my counsel, which I think is, you know, repeated is – for employees and otherwise, is to not let the craziness of, excuse me, the crypto markets distract us."). Further, Garlinghouse is referring to Ripple's customers and its cross-border payments products in saying that "we're solving a multi-trillion dollar problem," as set forth in PX 503.04 7:11-17 ("These payment flows are obviously very, very large and to the extent we continue to drive success of signing up more banks, introducing them to how we can solve not just a connectivity question with xCurrent, but a liquidity problem, a multitrillion dollar problem around liquidity called xRapid, I'm very confident about that longer arch (sic) of time."). Undisputed that PX 503.04 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

99.  On or about December 27, 2017, in an interview with Bloomberg, Garlinghouse stated: "Ripple has been very focused on, how do we create real utility, and solve a real problem? And in this case, it's for cross border payments, which is a multi-trillion dollar problem." PX 503.08, *available at* https://www.youtube.com/watch?v=5TtaF3D6G2Y.

**Response:**     Undisputed that PX 503.08 contains the quoted text, exclusive of any alterations, omissions, or additions.

100.  On or about March 12, 2018, in an interview on Bloomberg, Garlinghouse stated: "From the get go, Ripple has worked with regulators. And we have worked with regulated institutions. . . we have found that part of the reason why XRP has performed well, is because people realize. . . if we work with the system to solve this problem, and we can solve that problem at scale, a problem measured in the trillions of dollars, then there is a lot of opportunity to create value in XRP." PX

503.12       at       5:8-5:19,       *available*       *at* https://www.youtube.com/watch?v=8s11kNLXXAU.

**Response:**      Undisputed that PX 503.12 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.12 including because Paragraph 100 omits additional context necessary to understand the quoted language, including that Garlinghouse goes on to explain that the problem Ripple is solving is the "cross-border payment transaction" as set forth in PX 503.12 7:5-7.

101.      Garlinghouse's reference to the "trillion dollar" problem was a reference to the amount of capital "financial institutions move" through the financial system, which Ripple was hoping to attract to his technology. PX 81 (Garlinghouse Dep. Tr.) at 439:7-439:24.

**Response:**      Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81 as misleading because Garlinghouse's reference to the "trillion dollar" problem is actually a reference to "the way financial institutions move liquidity today results in trapped capital" and "according to studies … that amount … is … in the trillions," and not to the amount of capital that financial institutions move as set forth in Paragraph 101. *See* PX 81 at 439:14-24. And, further, Ripple was hoping to solve this problem by "execut[ing] on [its] product strategy, execut[ing] on [its] sales efforts, execut[ing] on [its] development" to eliminate trillions of dollars in trapped capital, as set forth in PX 81 at 439:9-10, and not to attract trillions of dollars to its technology as set forth in Paragraph 101. Defendants also note that the operative subject in the SEC's reference to "his technology" is unclear.

51

102.    ████████████ worked for **Ripple** as Chief Technology Officer from June 2012
through May 2018. *See* ████████████ Founder & CEO, LinkedIn, *available at*
https://www.linkedin.com/in ████████████

**Response:**    Disputed.  While it is undisputed that ████████████ worked for

Ripple as Chief Technology Officer, Paragraph 102 incorrectly states ██████ that started

this position in "June 2012."  The cited evidence does not support that assertion; it states that

Thomas started this position in June 2013, and that he originally began working for Ripple

(or its predecessor) in a different role in October 2012.

103.    On or about May 21, 2013, ██████ emailed McCaleb and Griffin and explained
his view that OpenCoin [Ripple's predecessor] was uniquely positioned to
"maximize XRP's value," that it would be able to sell XRP to fund its business, and
that OpenCoin will "need to spend a billion dollars … to succeed." PX 35 at
RPLI_SEC 322029-030.

**Response:**    Disputed.  Defendants dispute Paragraph 103's use of the phrase

"uniquely positioned," which is not used in or fairly supported by the underlying document

(PX 35).  Defendants further dispute Paragraph 103 because it misquotes PX 35.  Defendants

further dispute Paragraph 103 as unsupported by the evidence to the extent it implies that

Thomas is a spokesperson or otherwise speaking for Ripple or the Individual Defendants in

connection with the quoted text, that the quoted text represents a statement by Ripple or the

Individual Defendants, or that the quoted text represents a belief held by Ripple or the

Individual Defendants.

104.    When XRP was created it had no trading market and no trading price. PX 7
(Schwartz Inv.) at 60:2-25.

**Response:**    Undisputed that Schwartz testified in PX 7 that, at some point in

time, XRP had no market and no established price; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from PX 7 including because

Paragraph 104 omits additional context necessary to understand the testimony, including that

Schwartz testified he was "not sure of the exact time frame" for this statement, as set forth in PX 7 at 60:15-16.

105.   When Griffin joined Ripple in 2013 there was a "very small" XRP market as measured by volume and price, but he and the company's founders had an "aspirational" view that one day there could be a market. PX 14 (Griffin Dep. Tr.) at 102:21-103:12.

**Response:**       Undisputed that Griffin offered the quoted testimony.  Defendants dispute that Paragraph 105 sets forth a fair characterization of the entirety of Griffin's testimony.  Specifically, Griffin's testimony was not that "he and the company's founders had an 'aspirational' view that one day there could be a market" (as the SEC asserts), but rather that the possibility that there "would ever be a market around XRP" was "aspirational at best" (i.e., extremely unlikely).  PX 14 at 103:7-10.

106.   When Rapoport joined the company in 2013, any trading market in XRP was "de minimis," and the price of XRP was "fractions of a penny." PX 10 (Rapoport Tr.) at 50:16-51:15.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 including because Paragraph 106 omits additional context necessary to understand the quoted testimony, including that Rapoport's reference to a "de minimis" amount of XRP was in reference to a question from the SEC regarding the *daily trading volume* of XRP and not a characterization of the market as a whole.  PX 10 at 50:20-51:6.

107.   When Vias joined the company in late 2016, the XRP trading "volume was minuscule," XRP "wasn't [listed] on many platforms," and "the price was … half a penny." PX 21 (Vias Inv. Tr.) at 15:17-16:7.

**Response:**       Undisputed that Vias offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Vias's testimony.

108.   Garlinghouse admitted that at the beginning of the Ripple Ledger "[t]here was no way to use XRP." PX 36 (Garlinghouse Inv. Tr.) at 186:17-187:4.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 as misleading because Garlinghouse testified that "at the beginning of RippleNet, there was no ODL product. There was no way to use XRP," as set forth in PX 36 at 186:22-23, and not at the "beginning of the Ripple Ledger" as set forth in Paragraph 108.

109.   Ripple "admits that the existence of a market for XRP against those certain fiat currencies was required for the operation of" a software product Ripple developed, called "On-Demand Liquidity" or "ODL." PX 8 (Ripple RFA Responses) No. 100.

**Response:**      Undisputed.

110.   Garlinghouse admitted that Ripple has made efforts to get XRP listed on digital asset trading platforms because liquidity between XRP and various fiat currencies around the world was a "precondition" to Ripple's product strategy. PX 14 (Garlinghouse Dep. Tr.) at 298:25-299:19.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14 because the cited evidence does not support the SEC's assertions of fact regarding Garlinghouse as set forth in Paragraph 110 since the quoted language does not appear in the exhibit nor is it Garlinghouse's deposition transcript. Additionally, Defendants dispute Paragraph 110 to the extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including the SEC's statement that "Ripple made efforts to get XRP listed on digital asset trading platforms." Defendants dispute Paragraph 110 as not being material because it is duplicative of Paragraph 471. Defendants incorporate by reference their Response to and Dispute of Paragraph 471.

111.   On or around April 9, 2017, Garlinghouse emailed Ripple's Board members that a recent "dramatic spike in XRP price and market activity" was the "most significant" development for Ripple in the past quarter, and that "[s]peculative and market trading volume build[] [the] liquidity" needed for Ripple's planned use for XRP,

such that speculative and market trading volume are the "catalyst to the XRP flywheel." PX 37 at RPLI_SEC 352161.

**Response:**    Undisputed that PX 37 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 37 including because Paragraph 111 omits additional context necessary to understand the quoted language, including that Garlinghouse was referring to liquidity in the context "for XRP to serve the purpose of lowering liquidity costs for payments," as set forth in PX 37.

112.    On or about October 19, 2019, Garlinghouse stated in an interview: "You know, on XRP itself, and really I would say crypto broadly, I have publicly said before, you know, 99.9 percent of all crypto trading is speculation today. The amount of real utility you're talking about is very, very low and I – that's true within the XRP community, as well." PX 503.25, *available at* https://www.youtube.com/watch?v=xTsRJNxqsco.

**Response:**    Undisputed that PX 503.25 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.25, including because Paragraph 112 omits additional context necessary to understand the quoted language, including that elsewhere in the interview Garlinghouse qualifies this answer by discussing the "utility" of XRP, and that when crypto trading dropped "by about 50% over the summer[,]" volume of transactions between XRP and the Mexican Peso using Ripple's ODL product "grew by more than 50 percent" so that there was a "growing amount of traffic."  *See* PX 503.25 at 7:15-17 ("You know, with XRP, and what – how Ripple uses XRP, it is really solving – it's a utility.  It's solving a real problem.");

22:25-23:4 ("[A]nd you can see that the volume of transactions between XRP and the Mexican peso at a time when crypto trading dropped by about 50 percent over the summer, that volume grew by more than 50 percent. That's because there's really utility.").

113.  Schwartz understands that speculative and market trading volume build the liquidity of the XRP market. PX 6 (Schwartz Dep. Tr.) at 267:6-10.

**Response:**      Undisputed that Schwartz testified that he agreed with the SEC's statement that "speculative and market traded volume builds the liquidity of the XRP market."  PX 6 at 267:6-8.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Schwartz's testimony, or that Schwartz's personal understanding can be attributed to Ripple or the Individual Defendants, as the SEC offers no evidence to establish that fact.

114.  Schwartz admitted that Ripple cares for there to be a market for XRP so that Ripple's software products work. PX 6 (Schwartz Dep. Tr.) at 216:11-217:6.

**Response:**      Disputed.   The SEC's assertions of fact in Paragraph 114 mischaracterize and go beyond Schwartz's testimony.  Schwartz's cited testimony was that "ODL works *best*" with a "market for XRP," PX 6 at 217:2-6 (emphasis added), and that Ripple has taken steps to make sure an XRP market exists "[i]n ODL corridors," *id.* at 217:10. Schwartz did not address any Ripple products beyond ODL (as the SEC misleadingly asserts in Paragraph 114).

115.  Schwartz admitted that in May 2021 "a major focus" at Ripple was ensuring the existence of "liquidity" in certain trading pairs, including XRP to U.S. Dollars, because Ripple's product "won't work without that liquidity." PX 6 (Schwartz Dep. Tr.) at 242:9-243:22.

**Response:**      Defendants dispute that Paragraph 115 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly facts and circumstances as of May 2021 are

irrelevant.  Otherwise, undisputed as to Ripple's xRapid/ODL product (which was the subject of Schwartz's testimony).  To the extent the SEC's assertion in Paragraph 115 suggests that any other Ripple product(s) "won't work without that liquidity," the quoted source does not support such a proposition.

116.   Schwartz admitted that the "price and market activity of XRP affects people's ability to use it … as an intermediary asset." PX 6 (Schwartz Dep. Tr.) at 264:8-25.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 including because Paragraph 116 omits additional context necessary to understand the quoted testimony, including that Schwartz was specifically testifying about the use of XRP in connection with Ripple's ODL product, and not people's ability to use XRP in general, when he made the quoted statement.  PX 6 at 264:23-25 ("The price and market activity of XRP affects people's ability to use it *for ODL* as an intermediary asset." (emphasis added)).

117.   On or about May 12, 2013, Schwartz posted on "Bitcoin Forum," an online chat forum with various message boards discussing topics relating to crypto assets, https://bitcointalk.org, that Ripple was "legally obligated to maximize shareholder value," which with Ripple's then-current "business model" meant "acting to increase the value and liquidity of XRP," which would happen if the "Ripple network is widely adopted," an outcome Ripple was "pursuing." PX 507.04, *available                                                                           at* https://bitcointalk.org/index.php?topic=148278.msg2123720#msg2123720.

**Response:**        Undisputed that PX 507.04 contains the quoted text.  However, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 507.04 including because the exhibit is misleadingly incomplete.  PX 507.04 and Paragraph 117 omit additional context necessary to understand the quoted language in the exhibit, including Schwartz's statement that Ripple was "pursuing multiple avenues at once" related to its business

strategy, PX 507.04, and his statement that "I think we've been pretty clear that we are not making any promises to manage XRP as a currency with any particular target value. The XRP that OpenCoin holds will be given away as OpenCoin thinks is appropriate to drive adoption or sold as OpenCoin thinks is appropriate for its financial needs and interests. We absolutely make no promises or representations about the value of XRP to the world in general." *See* Ex. 112 ("How the Ripple payment network and XRP are different from Bitcoin," *available at* https://bitcointalk.org/index.php?topic=148278.msg2123720 #msg2123720).  Defendants further dispute Paragraph 117 to the extent it implies that Schwartz's statements can be attributed to Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

118.    Griffin admitted that the depth of liquidity in the XRP market was a "function of usefulness," and that there needed to be liquidity to "take advantage" of Ripple's "large holdings" of XRP. PX 3 (Griffin Inv. Tr.) at 51:12-53:12, 212:8-24.

**Response:**        Undisputed that Griffin offered the quoted testimony (except that Griffin's testimony concerned a "large *holding*," not "large *holdings*").  However, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Griffin's testimony.

119.    Griffin admitted that Ripple's ideas for XRP-related products to work require "a healthy and robust market of trading price discovery for XRP and that requires market participants like market makers to be actively in the system buying and selling and making markets for – against XRP," and he admits that throughout his tenure at Ripple he and others took steps to increase the trading liquidity around XRP. PX 14 (Griffin Dep. Tr.) at 110:3-113:8.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14 including because Paragraph 119 includes only partial excerpts of testimony but omits other text that is part of the same sentence or passage and that is necessary to understand the quoted testimony.  For example, Griffin's testimony

related to "open-source technology, the Ripple consensus ledger," PX 14 at 110:23-111:18,

as opposed to "Ripple's ideas for XRP-related products" as misstated by the SEC.  Indeed,

Griffin corrected the SEC on that very issue in his testimony, *see id.*, but Paragraph 119 omits

it.  Defendants further dispute that Griffin's testimony described his and others' "steps to

increase the *trading liquidity around XRP*," as this statement is unsupported by the cited

evidence.  Defendants further dispute Paragraph 119 as unsupported by the evidence to the

extent it implies that Griffin is a spokesperson or otherwise speaking for Ripple or the

Individual Defendants in connection with the quoted text, that the quoted text represents a

statement by Ripple or the Individual Defendants, or that the quoted text represents a belief

held by Ripple or the Individual Defendants.

> 120.    Griffin admits that one of Ripple's goals was to create a use for XRP. PX 14 (Griffin Dep. Tr.) at 113:9-15.

**Response:**        Disputed.  The assertion of fact goes beyond the cited testimony,

which was that Griffin "understood that one of the company's goals was to create a use for

. . . XRP *as a facilitator of asset-to-asset transactions*." PX at 14 at 113:9-15 (emphasis

added).  Defendants further dispute Paragraph 120 as unsupported by the evidence to the

extent it implies that Griffin is a spokesperson or otherwise speaking for Ripple or the

Individual Defendants in connection with the quoted text, that the quoted text represents a

statement by Ripple or the Individual Defendants, or that the quoted text represents a belief

held by Ripple or the Individual Defendants.

> 121.    Birla, a member of Ripple's team that developed XRP-related products, admitted that "building liquidity" in XRP markets was one of the focuses of his job. PX 15 (Birla Dep. Tr.) 87:13-20.

**Response:**        Disputed.  Paragraph 121 mischaracterizes Birla' testimony.  Birla

did not testify that "'building liquidity' in XRP markets" in general was a focus of his job.

Rather, he testified that: "In my function, product development for enterprise solutions, I was fixed -- focused on getting liquidity at destinations and origin points to enable a cross-border payment between one currency and another" and that "building liquidity helped improve the product experience for our customers and that was my product focus."  PX 15 at 87:7-20. Defendants further dispute the SEC's statement in Paragraph 121 that Birla was "a member of Ripple's team that developed XRP-related products" to the extent it implies that this Ripple team exclusively developed XRP-related products, when in fact it also developed products that did not use XRP.  *See, e.g.*, PX 8 (Ripple RFA Responses) No. 238 (noting that, "from its inception through December 22, 2020, xCurrent did not require the use of XRP to operate"); PX 7 at 190:20-23 ("xCurrent doesn't . . . care how the payment is settled. You could use XRP to settle it, but you don't have to.").

122. Birla also admitted that "helping build liquidity into [XRP trading] corridors that our customers wanted provided a better experience for our customers," and that "building natural liquidity at exchanges … was advantageous to the product experience and benefited [Ripple's] customers." PX 15 (Birla Dep. Tr.) at 145:10-146:1.

   **Response:**      Undisputed.

123. Birla also admitted that the existence of XRP speculative trading and liquidity would improve the experience for customers using Ripple's products. PX 15 (Birla Dep.) at 101:25-104:1.

   **Response:**        Disputed.  Paragraph 123 mischaracterizes Birla's testimony, and the testimony cited does not support the SEC's assertion.  Birla, in the portion of testimony cited, did not make the admission described in Paragraph 123.  Rather, he testified that, "[f]or xRapid and ODL products, the more liquid those fiat pairs that are part of the XRP experience, that is a better product experience for [Ripple's] customers," and that there are two types of liquidity in his view – "Ripple-contracted market making" and "natural liquidity." PX 15 at 102:22-103:21.  When then asked whether "speculative trading" (a term

the SEC introduced in its question without defining it) falls into the natural liquidity bucket, Birla testified: "I have in – in the past heard folks refer to natural liquidity in other terms, including speculative liquidity." *Id.* at 103:22-104:1.  Defendants further dispute Paragraph 123 because the phrase "speculative trading" is vague and ambiguous as used by the SEC in its questioning of Birla.

124.     Birla also admitted that "as a priority for [Ripple's] product we want more liquidity" in XRP trading, which includes "speculative" liquidity. PX 16 (Birla Inv. Tr.) at 168:17-172:8 (testifying about RPLI_SEC 43124).

**Response:**          Disputed.  The testimony cited does not support the SEC's assertion in Paragraph 124.  When asked about a document he did not write, Birla testified, "*I can imagine that* as a priority for the product we want more liquidity."  PX 16 at 172:5-6 (emphasis added).  Birla's speculative answer to the question asked of him does not provide an admissible basis for the SEC's assertion about what Ripple's supposed "priority" actually was.

125.     Rapoport admitted that Ripple wanted to build XRP liquidity for its products, which requires trading volume, and that speculative trading creates trading volume. PX 10 (Rapoport Tr.) at 106:20-107:2.

**Response:**          Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 as misleading because Rapoport did not testify that "Ripple wanted to build XRP liquidity," as stated in Paragraph 125.  Rather, the SEC asked Rapoport whether it was "fair to say that speculation was also *helpful* in building liquidity for XRP," to which Rapoport testified regarding building liquidity in general terms. PX 10 at 106:20-107:2 (emphasis added).  Defendants further dispute Paragraph 125 because Rapoport testified that he recalled a "specific desire to focus our discussions on the technology itself and *away from speculation on XRP*" because Ripple "*viewed speculation*

*on XRP to be a distraction* from the core technology and the use of the core technology." *Id.*

at 106:13-19 (emphasis added).

126. Rapoport admitted that Ripple "had an interest in increasing liquidity and developing a liquid market for all assets on the Ripple Ledger, including XRP." PX 10 (Rapoport Tr.) at 52:3-8.

**Response:**      Undisputed that Rapoport offered the quoted testimony. Defendants

do not concede that this is the entirety of, a representative selection of, or a fair

characterization of Rapoport's testimony.

127. Rapoport admitted that given that Ripple "had an interest in seeing a growth in the number of users using the [Ripple] protocol, it was important for XRP to be broadly distributed in the hands of people globally, people and entities globally." PX 10 (Rapoport Tr.) at 58:8-23.

**Response:**      Undisputed that Rapoport offered the quoted testimony absent the

SEC's alteration, and disputed that the SEC's insertion of "[Ripple]" is an accurate

characterization of Rapoport's testimony. The testimony cited does not support the SEC's

insertion or the resulting characterization the SEC offers.

128. Vias, Ripple's head of XRP Markets starting in late 2016, described the XRP markets as having three components—exchanges and market makers, commerce, and speculative traders—and admitted that his team engaged in activity that would promote speculative trading in XRP. PX 21 (Vias Inv. Tr.) at 73:10-76:13.

**Response:**      Undisputed that Vias was Ripple's head of XRP Markets starting in

late 2016 and that he described the XRP Markets as having three components. Defendants

do not concede that this is the entirety of, a representative selection of, or a fair

characterization of Vias's testimony. Defendants dispute that Vias testified that "exchanges"

were one of the three components; Vias's testimony was that exchanges were part of the

infrastructure of the market. *See* PX 21 at 74:6-19. Defendants further dispute the SEC's

asserted fact that Vias's team "engaged in activity that would promote speculative trading in

XRP" because Vias specifically denied that Ripple worked to encourage "speculative trading" during his deposition. *See* PX 20 at 177:10-13.

129.   Vias admitted that Ripple engaged in activity to promote speculative trading in XRP because "we need[ed] to get to that … to put in place the kind of longer-term vision of the company," again describing the various participants of a "robust market" that Ripple worked to attract. PX 20 (Vias Inv. Tr.) at 76:14-77:15.

**Response:**   Disputed.   Paragraph 129 misquotes Vias's testimony; the SEC altered the quotation by changing "to put in place the kind of longer-term vision of *a* company" to "to put in place the kind of longer-term vision of *the* company."   PX 21 at 76:23-24 (emphasis added).   The SEC further asked Vias about a "robust *OTC* market," as opposed to a "robust market" as stated in Paragraph 129. *Id.* at 76:14-16.   In addition, Vias specifically denied that Ripple worked to encourage "speculative trading" during his deposition. *See* PX 20 at 177:10-13.

130.   In April 2017, a Ripple employee emailed a group of Ripple "leadership," which included Birla, stating that among the "Requirements for wider adoption of XRP in the future" was "Liquidity," that Ripple had launched "incentive programs" on "exchanges that list XRP … aimed at getting XRP liquidity flywheel moving," and that the "number one XRP priority for Q2 internally is higher speculative volume which will help with XRP liquidity." Ex. PX 38 at RPLI_SEC 43124-125; PX 16 (Birla Inv. Tr.) at 168:17-172:8.

**Response:**   Undisputed that PX 38 contains the quoted text.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

131.   Zagone admitted you "would need a liquid market for" XRP, for one of Ripple's products "to work," and that Ripple had a "markets team that worked … to ensure the liquidity" needed was available. PX 19 (Zagone Tr.) at 102:20-103:10.

**Response:**   Undisputed that Zagone offered the quoted testimony in reference to Ripple's xRapid/ODL product.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Zagone's testimony.

132.     In January 2018, Long emailed Larsen, Garlinghouse, and other Ripple Board members, to inform them about two upcoming media articles—one in the New York Times and one in the Financial Times—expressing "skepticism" about "customers' interest in using XRP." Long distributed to this group "key talking points" to respond to the stories, which included reminding the public that Ripple would continue its efforts to attract the "[s]peculators" it viewed as "play[ing] an important role in building XRP liquidity," which was "important for XRP" to have a function in Ripple's strategy. PX 39 at RPLI_SEC 221962-963.

**Response:**     Disputed.   The SEC's statement that the New York Times article

was an "upcoming media article[]" is contradicted by evidence in the record because PX 39

states that, at the time of the email, the New York Times had already "*published* a story."

PX 39 at RPLI_SEC 221962 (emphasis added).   Defendants further dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 39 to the extent Paragraph

132 suggests that Long emailed that the article in the Financial Times was "expressing

'skepticism' about 'customers' interest in using XRP."   The document cited does not support

that characterization.   Defendants further dispute the SEC's characterization of, and

inferences purportedly drawn from the "key talking points" in PX 39 because the underlying

document does not contain any reference to Ripple "continu[ing] its efforts" or that Ripple

would undertake "efforts" of any kind.   Defendants further dispute the SEC's

characterization of, and inferences purportedly drawn from PX 39 to the extent it implies

anything about whether the Individual Defendants read this email, what they understood it

to mean, or what, if any, reaction they had to it, as the cited document contains no

communication from either of the Individual Defendants.

133.     Madigan, who began working at Ripple in 2019, admitted that liquidity in the XRP market was something Ripple wanted to achieve to "ensur[e] the smooth operation of" a Ripple product, ODL. PX 25 (Madigan Tr.) at 42:19-43:1; *see also id.* 22:6-23:7, 395:25-397:1, 402:2-7 (in order for Ripple's "products to function smoothly, there's a requirement for XRP liquidity to be present," that Madigan had a "mandate of helping support XRP liquidity" for that reason, and that she did in fact engage in efforts to support XRP liquidity as part of her job).

**Response:**      Undisputed that Madigan offered the quoted testimony that her team was "[m]ainly focused on ensuring the smooth operation of the ODL product." PX 25 at 42:24-25.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants note that the remainder of Paragraph 133 appears at 62:10-12, which is not cited by the SEC.

134.   Samarasinghe testified that Ripple "undertook OTC Sales" "in order to contribute to building XRP liquidity for its products," and that Ripple "had a goal of increasing liquidity" in XRP trading, for its products. PX 22 (Samarasinghe Tr.) at 301:2-5, 301:25-302:4.

**Response:**      Undisputed that Samarasinghe offered the quoted testimony. However, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 22 including because the remainder of Paragraph 134 omits additional context necessary to understand the quoted testimony, including that Samarasinghe was testifying about "a goal of increasing liquidity for *ODL*" as opposed to the SEC's incorrect assertion that Ripple's goal was "'increasing liquidity' in XRP trading, for its products" broadly.  Defendants further dispute Paragraph 134 as unsupported by the evidence to the extent it implies that Samarasinghe is a spokesperson or otherwise speaking for Ripple or the Individual Defendants in connection with the quoted text, that the quoted text represents a statement by Ripple or the Individual Defendants, or that the quoted text represents a belief held by Ripple or the Individual Defendants.

135.   ████ Ripple's principal market maker, testified that "natural liquidity" with respect to XRP would come from "[a]ny market participant on the exchange who may be purchasing or selling for any number of different reasons," and that this could come from participants who included "investors, speculators" in XRP. PX 26 (██Tr.) at 214:5-215:3, 216:7-218:7.

**Response:**      Undisputed that ████ offered the quoted testimony, but disputed because Paragraph 135 erroneously refers to "████ as "Ripple's principal market maker."

Ripple had no contract with ██ personally and never employed him personally to provide services to Ripple. *See, e.g.*, PX 187 (Ripple contract with GSR, to which ██ is not a party). Defendants also do not concede the quoted text is the entirety of, a representative selection of, or a fair characterization of ██ testimony.

136.   Since 2013, Ripple's goal was to "get[] XRP off [its] books without immediately flooding the market with XRP supply / price pressure," and Ripple, including Larsen, discussed various ways in which the company could do so. PX 44 at RPLI_SEC 461857-859.

**Response:**   Undisputed that, on November 24, 2013, Rapoport sent an email that contains the quoted text from PX 44, exclusive of any alterations, omissions, or additions by the SEC. Defendants dispute that the quoted text was "Ripple's goal." Rapoport testified only as to his personal beliefs as to one of Ripple's goals, and the SEC cites no evidence to establish that Rapoport's beliefs were accurate or held by others at Ripple. Defendants further dispute Paragraph 136 to the extent it suggests that Ripple held this alleged goal "[s]ince 2013," which is unsupported by the cited evidence. Defendants further dispute that "Ripple, including Larsen" were discussing the quoted text from Paragraph 136, as this statement is unsupported by the cited evidence. To the extent the SEC implies that PX 44 contains information about Larsen's mental state, Defendants dispute that Larsen's mental state can be inferred from the statements of a third party.

137.   Schwartz admitted that it has "always been an objective for both Ripple and [him] to distribute XRP," and that one of the principal ways in which Ripple achieved such objective was free giveaways in 2013, but, after, sales of XRP for cash or distributing XRP to the public by giving it to third parties to sell for cash, as incentives or to invest in projects, which he admits Ripple views as interchangeable with sales. PX 6 (Schwartz Dep. Tr.) at 364:22-366:22.

**Response:**   Undisputed that Schwartz offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC. Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Schwartz's

testimony.   Defendants dispute Paragraph 137 to the extent that its use of the phrase "principal ways" is not supported by the cited testimony.   Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 137.   In particular, the cited testimony does not establish Ripple's views, as opposed to Schwartz's personal views, as to Ripple's objectives regarding its distributions of XRP over time.

138.   Schwartz admitted that in 2013, a Ripple objective was to have XRP go "from not having a price to having a price." PX 6 (Schwartz Dep. Tr.) at 246:18-248:21.

**Response:**   Disputed.  Schwartz testified that, in 2013, he posted on a public forum and discussed a hypothetical question regarding whether XRP would go "from there not being a price to there being a price."  PX 6 at 248:20-21.  Defendants further dispute Paragraph 138 to the extent that the SEC suggests that having "XRP go 'from not having a price to having a price'" (which in any event was not Schwartz's testimony) was a "Ripple objective," which is not supported by the cited testimony.   Defendants further dispute Paragraph 138 because it omits additional context necessary to understand the quoted testimony, specifically that Schwartz was testifying in response to hypothetical questions about a post on a public forum that stated "[o]ne would expect increased demand to increase price."  PX 507.04.

139.   In November 2013, Rapoport and Griffin created a PowerPoint presentation called "XRP Distribution Framework.pptx," which discussed the "Distribution Discussion Themes" for XRP and described these distribution themes as having the goals of "Network Growth" and "Rais[ing] funds for Ripple Labs operations," and that Ripple's "biggest goal" with respect to distributing XRP was "existential." PX 82 at RPLI_SEC 337667-68, 337670; *see also* PX 10 (Rapoport Tr.) at 99:22-101:25 (explaining that this document discusses a "framework around how the company could distribute its XRP"); PX 3 (Griffin Dep. Tr.) at 122:10-123:18 (explaining origin of this PowerPoint presentation and its purpose as discussing distribution "themes" and ideas for XRP with a trusted Ripple advisor).

**Response:**　　　Undisputed that PX 82 contains the quoted text and that Rapoport offered the quoted testimony, however disputed insofar as the SEC's statements that "Rapoport and Griffin created a PowerPoint presentation," are unsupported by evidence in the record.  Rapoport testified that the presentation "appears to be a document that Patrick [Griffin] put together," PX 10 at 99:18-21, and Griffin testified that he did not recognize the presentation and did not know if he put it together.  PX 3 at 122:19:24. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 3 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 139, including that PX3 does not precisely explain the origins of this PowerPoint presentation, but rather Griffin's general speculation about what topics were potentially discussed.  PX 3 122:10-123:18.

140.　The XRP Distribution Framework presentation explained that holders of XRP would want Ripple to retain XRP and that XRP "Speculators are speculating on Ripple Labs." PX 82 at RPLI_SEC 337672; *see also* PX 3 (Griffin Dep. Tr.) at 129:7-16 (admitting that "speculators" in this document refers to speculators in XRP).

**Response:**　　　Undisputed that PX 82 contains the quoted text.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute that Griffin was 'admitting' anything in his testimony because Griffin was asked about the meaning of the word "speculators" in the PX 82 at RPLI_SEC 337672 and testified that he did not know what the phrase meant, but "could venture a guess."  PX 3 at 129:7-13.

141.　Rapoport admits that a November 2013 internal Ripple email, including him, Griffin, Britto, Larsen, discussing these XRP distribution options, reflects a "discussion on how to get XRP off of Ripple's books and into the market in various different ways," to meet Ripple's goals. PX 10 (Rapoport Tr.) at 147:25-149:19. This email refers to one of the potential strategies to get XRP off of Ripple's books as "give-aways," and another as "auctions and pump priming." PX 44 at RPLI_SEC 461857.

**Response:**        Disputed.  Defendants do not dispute that PX 10 and PX 44 contain the quoted text, however, Defendants dispute Paragraph 141 to the extent the phrase "these XRP distribution options" intends to incorporate by reference the previous paragraphs, which Defendants dispute in part.  Defendants also dispute Paragraph 141 to the extent it suggests that "Ripple's goals" are "to get XRP off of Ripple's books and into the market in various ways," because the cited testimony does not establish Ripple's views, as opposed to Rapoport's personal views, as to Ripple's objectives.

142.    Rapoport admitted that in 2013 Ripple was "thinking about the most effective ways to get XRP into the world and distribute it." PX 10 (Rapoport Tr.) at 101:3-10.

**Response:**        Undisputed that Rapoport offered the quoted testimony, however Defendants dispute the SEC's characterization that Rapoport offered the quoted testimony from the perspective of "Ripple," which is not supported by the cited testimony.

143.    Ripple raised approximately ███████ from seed-round financing. PX 7 (Schwartz Inv. Tr.) at 44:2-9.

**Response:**        Disputed.  Defendants dispute Paragraph 143 to the extent that its use of the phrase "seed-round financing" is vague and ambiguous.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 7 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 143, as PX 7 makes no reference to Ripple's "seed-round financing."  Indeed, Schwartz's testimony cited in Paragraph 143 was in response to the SEC's question about Ripple's "first funding round," not Ripple's "seed-round financing," and further Schwartz responded only that his "recollection" unrefreshed by any documents or contemporaneous evidence was "that we raised ███████ dollars." PX 7 at 44:2-7.  Defendants aver that Ripple raised $3.5 million in seed funding, as established by contemporaneous statements by the company. *See* Ex. 113 ("Ripple Labs Announces $3.5 Million Investment Round" dated November 12,

2013, *available* *at* https://www.globenewswire.com/fr/news-release/2013/11/12/1146606/0/en/Ripple-Labs-Announces-3-5-Million-Investment-Round.html).

144. Ripple raised approximately ▮▮▮▮▮ from selling Ripple equity in a Series A funding that closed in September 2015, approximately ▮▮▮▮▮ from selling Ripple equity in a Series B funding that closed in August 2016, and approximately ▮▮▮▮▮ from selling Ripple equity in a Series C funding that closed in December 2019, PX 80 (Ripple Ans.) ¶ 78, for a total of ▮▮▮▮▮ in additional funding via the sale of Ripple equity securities.

**Response:** Undisputed.

145. From 2013 through 2020, Ripple's operating costs and expenses were ▮▮▮▮▮ PX 45 (Declaration of Christopher Ferrante ("Ferrante Decl.")) Ex. 2.

**Response:** Undisputed that Ripple's operating costs and expenses according to its authoritative financial statements from 2013 through 2020 were ▮▮▮▮▮ but Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).

146. From 2013 through 2020, Ripple had ▮▮▮▮▮ in revenues from software and service revenues. *Id.*

**Response:** Undisputed that Ripple's authoritative financial statements from 2013 through 2020 identify ▮▮▮▮▮ in combined revenues from the separate categories of software and service revenues. But Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).

147.    From 2013 through 2020, Ripple had $609,275,000 in revenues from non-monetary XRP transactions. *Id.*

**Response:**       Undisputed that Ripple's authoritative financial statements from 2013 through 2020 identify $609,275,000 in revenues from non-monetary XRP transactions. But Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).

148.    From 2013 through 2020, Ripple had $1,509,919,695 in revenues from monetary XRP transactions, combined with the $609,275,000 non-monetary XRP transactions, totaling $2.118 billion. *Id.*

**Response:**       Undisputed that Ripple's authoritative financial statements from 2013 through 2020 identify $1,509,919,695 in revenues from monetary XRP transactions, and $609,275,000 in revenues from non-monetary XRP transactions.  But Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).

149.    From 2013 through 2020, Ripple raised approximately ███████ from non-XRP related sources (equity financing, *supra* ¶¶ 143, 144, plus software sales, *supra* ¶ 146), and $2.118 billion from XRP-related sources, or over ████. *Id.*

**Response:**       Disputed.  Defendants dispute the SEC's calculations in Paragraph 149 to the extent they rely on the evidence cited in Paragraph 143, which Defendants dispute as inaccurate for the reasons set forth in Ripple's Response to Paragraph 143.  Defendants further dispute the SEC's statement "or over ████ because the SEC presents this figure without explanation of what number is "over ████ of what other number.  Defendants

further object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).

150.    In or around November 2017, the majority of Ripple's revenue was from sales of XRP, with revenue from software sales constituted "a small portion of revenue." PX 23 (Will Tr.) at 14:19-20, 34:15-43:9.

**Response:**        Undisputed that Will offered the quoted testimony.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Will's testimony, in particular because Will testified "I don't specifically recall the financial statements I reviewed in late 2017, but in general, at that time, I recall that software revenue was a small portion of revenue."

151.    In or around November 2017 and through 2018, Ripple did not generate enough revenue from software sales to cover its expenses, and relied on revenue from XRP sales to cover its expenses. PX 23 (Will Tr.) at 14:19-20, 42:2-43:9, 248:19-249:5.

**Response:**        Undisputed that Will testified that, in or around November 2017, Ripple did not generate enough revenue from software sales to cover its expenses. Defendants dispute that Ripple relied solely "on revenue from XRP sales to cover its expenses," because Will testified that Ripple relied on a "[c]ombination of venture capital fundraising" and "software revenue" as well.  PX 23 at 42:10-13.  Defendants further dispute that Will testified that "through 2018" Ripple did not generate enough revenue from software sales to cover its expenses because Will testified that he "[didn't] recall that they covered the full expenses of the company" during this time period.  *Id.* at 43:5-9.

152.    In or around May 2021, Ripple's ability to keep the lights on was funded in part through XRP sales. PX 6 (Schwartz Dep. Tr.) at 238:2-6.

**Response:**        Defendants dispute that Paragraph 152 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly Ripple's activities in May 2021 are irrelevant. Undisputed that Schwartz agreed with the question posed during his testimony in May 2021 that "today, the company's ability to keep the lights on, what revenues from XRP sales is one source, correct?"  PX 6 at 238:2-5.

153.   Ripple's software product, xCurrent, did not require the use of XRP or the XRP Ledger to operate. PX 8 (Ripple RFA Responses) Nos. 85, 238; PX 16 (Birla Inv. Tr.) at 76:21-84:25.

**Response:**        Undisputed.

154.   Ripple's software product, xVia, did not use blockchain technology. PX 36 (Garlinghouse Inv. Tr.) at 72:12-73:6.

**Response:**        Undisputed.

155.   In or around June 2021, Ripple's software sales revenues were not sufficient to support Ripple's operating expenses and product development costs. PX 15 (Birla Dep. Tr.) at 51:21-24, 82:24-83:4.

**Response:**        Defendants dispute that Paragraph 152 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly Ripple's activities in June 2021 are irrelevant. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 15 at 51:24 because Birla did not definitively answer the SEC's question whether Ripple's software sales revenues were sufficient to support its operating expenses and product development costs.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 15 at 82:24-83:4 because the SEC asked Birla a hypothetical question about the price of XRP, rather than a question about Ripple's software sales revenues.

156.  Ripple "admits that its cash and cash-equivalent assets were used to fund its operations, and that certain of those assets, at times, were obtained through sales of XRP, and that Ripple's operations, at times, have included, but were not limited to, the development of software products that use XRP." PX 8 (Ripple RFA Responses) No. 32; *see also id.* No. 131 (admitting "XRP transactions have been a source of Ripple funding"); PX 80 (Ripple Ans.) ¶ 294 (Ripple "admits that proceeds from Ripple's sales of XRP were used to support Ripple's operations").

**Response:**      Undisputed that PX 8 and PX 80 contain the quoted text.

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 8 to the extent that Paragraph 156 misquotes PX 8 No. 131 by changing the word "revenue" to "funding" and removing the phrase "at times during the Relevant Period" from the quotation. Defendants do not dispute that XRP transactions have been a source of Ripple's revenue at times prior to December 22, 2020.

157.  Griffin admitted that in the early days of Ripple "the most clear way that it would make money was with XRP" by "selling it." PX 3 (Griffin Inv. Tr.) at 72:13-73:10, 137:15-138:14.

**Response:**      Undisputed that Griffin offered the quoted testimony.

158.  Griffin admitted that Ripple marketed XRP to investment funds because having such entities purchase XRP was a "means to generate cash flow for Ripple's business," and also to "circulate the XRP outside of Ripple." PX. 14 (Griffin Dep. Tr.) at 192:2-195:25 (testifying about XRP fund marketing materials at PX 46).

**Response:**      Disputed. Although Defendants do not dispute that Griffin offered the quoted testimony, Defendants dispute the SEC's statement that "Griffin admitted that Ripple marketed XRP to investment funds" because it is unsupported by the record, specifically because the SEC asked Griffin whether "Ripple want[ed] to have people invest in XRP such as through a[n] [investment] fund" and Griffin replied that "we were interested in having -- finding entities or people that wanted to purchase XRP," as set forth in PX 14 at 195:8-13. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14 because the cited testimony does not establish Ripple's

objectives regarding its distributions of XRP over time, as opposed to Griffin's personal views of those objectives.

159.    Schwartz admitted that, from 2014 to 2020, Ripple used sales of XRP as the principal way in which it funded its operations. PX 7 (Schwartz Inv. Tr.) at 108:20-109:4; PX 6 (Schwartz Dep. Tr.) at 238:2-23.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 7 to the extent that Paragraph 159 characterizes the sales of XRP as "the principal way in which [Ripple] funded its operations."  Defendants dispute the SEC's statement that Schwartz testified about Ripple's sales "from 2014 to 2020" because it is unsupported by evidence in the record, specifically Schwartz's deposition testimony, in which the SEC asked whether "Ripple use[d] XRP to fund operations" after the 2014 time period, as set forth in PX 7 at 108:20-25.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 159, in particular because the phrase "principal way" does not appear in either PX 6 or PX 7 and the SEC's characterization of Schwartz's testimony is accordingly unsupported by the cited evidence.

160.    Schwartz admitted that, Ripple, as a company, was built around future revenue sources that, as of May 2021, Ripple had not discovered, and Ripple's XRP sales have served as "a funding source to permit [Ripple] to pursue those future models." PX 6 (Schwartz Dep. Tr.) 237:17-25.

**Response:**        Defendants dispute that Paragraph 160 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly Ripple's activities in May 2021 are irrelevant. Defendants further dispute the SEC's characterization of Schwartz's testimony in Paragraph 160 insofar as Schwartz testified about his personal views that "I would say the company's been built around future revenue sources that we have not discovered yet. But the sales of

XRP has been a funding source to permit us to pursue those future models." PX 6 at 237:17-25. Defendants further dispute the SEC's statements in Paragraph 160 insofar as they do not account for all of the evidence in the record, specifically, among other financial information, Ripple's software and service revenues.

161.   In or around 2013, Ripple told potential investors that its "business mod[el] was predicated on XRP and the holdings of XRP" and "based on the success of XRP," and that it planned to sell XRP to fund itself. PX 3 (Griffin Inv. Tr.) at 48:11-49:4, 66:11-67:10; PX 55.

**Response:**        Undisputed that Griffin offered the quoted testimony that, at some point in time, he participated in discussions with potential investors and noted that Ripple's "business mod[el] was predicated on XRP and the holdings of XRP." PX 3 at 48:11-49:4. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 3 at 66:11-67:10 to the extent that Paragraph 161 implies that Griffin testified that Ripple told potential investors that its entire business model was "'based on the success of XRP,' and that it planned to sell XRP to fund itself." Rather, Griffin specifically testified that the company's business model also involved "APIs and services around them that [Ripple] could build and sell." PX 3 at 49:1-4. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 55 including because Paragraph 161 omits additional context necessary to understand the cited exhibit, specifically that the document states only that Ripple will "occasionally sell to wholesale MSB's to fund itself." PX 55 at RPLI_SEC 0087922.

162.   Long admits that from 2013 to 2015, Ripple sold XRP to "cover basically operational costs" and, in later periods, XRP sales constituted the majority of Ripple's revenues. PX 17 (Long Tr.) at 26:10-27:14.

**Response:**        Undisputed that Long offered the quoted testimony that she understood Ripple sold XRP "to cover basically operational costs" in the "2013, 2014, 2015"

time frame.  The SEC's statement that "in later periods, XRP sales constituted the majority of Ripple's revenues," is unsupported by evidence in the record, specifically Long's deposition testimony, in which she stated only that her understanding was that "[l]ater in time, [her] understanding was that more revenue came from XRP than from the software sales business." PX 17 at 27:5-7.  Defendant's further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 17 at 27:12-15 because Long responded "I don't know exactly" in answering the SEC's question as to whether "later in time, it [was] fair to say XRP sales constituted the majority of Ripple's revenues."

163.   On or about January 31, 2017, Ripple submitted an independent audit of its wholly-owned subsidiary, XRP II, to the NYDFS, copying its then-Assistant General Counsel ▆▆▆▆▆▆▆ and its Chief Compliance Office O'Gorman, where it explained that: "Ripple Labs created and maintains the Ripple protocol, the Ripple Consensus Ledger," and that "XRP II's sales of XRP represent one method by which Ripple Labs raises working capital," the other being "funding from outside investors." PX 47 at RPLI_SEC 532018, 532027.

**Response:**       Undisputed that PX 47 contains the quoted text.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 47 to the extent that it implies "funding from outside investors" was one of only two methods by which Ripple raised working capital because the independent audit drafted by a third-party states only that "Ripple Labs *has also* received funding from outside investors."   PX 47 at RPLI_SEC 532027 (emphasis added).

164.   Vias described XRP sales as part of the "treasury function," meaning selling XRP to raise cash for Ripple's operations. PX 20 (Vias Inv. Tr.) at 30:23-31:18.

**Response:**       Undisputed, except insofar as the quoted text and supporting testimony appear in PX 21 at 30:23-31:18.

165.   Ripple's Code of Conduct as of December 2015, prepared by O'Gorman to comply with legal and regulatory requirements, explained that Ripple "reserves approximately ▆▆▆▆▆▆ XRP to fund its operations, and distributes the balance." PX 42 at RPLI SEC 887967, 887972.

**Response:**      Undisputed that PX 42 contains the quoted text.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

166.   A 2017 iteration of Ripple's Code of Conduct states: "Ripple reserves approximately ▮▮▮▮▮ XRP to fund its operations, and distributes the balance. Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity in XRP." PX 83 at RPLI_SEC 0885530.

**Response:**      Disputed.  The accurate text of the document states "Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity in Ripple."  PX 83 at RPLI_SEC 0885530.

167.   Vias admitted that Ripple sold XRP to fund its operations. PX 20 (Vias Dep. Tr.) at 41:22-25.

**Response:**      Undisputed that Vias agreed with the SEC's question whether "Ripple sold XRP to fund operations."  PX 20 41:22-25.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 20, because Paragraph 167 omits additional context necessary to understand the cited testimony, including that Vias was testifying about Ripple's sales of XRP during the limited time period "while [he] [was] at Ripple" and he ended his employment at Ripple in approximately April 2020. *Id.*

168.   In or around June 2018, "Ripple's main business model/source of income [was] XRP sales." PX 146 at 0261294.

**Response:**      Undisputed that PX 146 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  In particular, Defendants aver that the next sentence of the quoted email states "XRP utility is a core thesis of the company."  PX 146 at 0261294.

169.    Birla admitted that from in or around June 2018 to in or around June 2021, XRP sales were Ripple's main source of income. PX 15 (Birla Dep. Tr.) at 70:23-73:19; PX 146.

**Response:**        Defendants dispute that Paragraph 169 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly Ripple's activities after that date are irrelevant. Undisputed that Birla testified that, on June 26, 2018, he believed that XRP sales were Ripple's main source of income.  PX 15 at 71:17:20; PX 146.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Birla's testimony because Birla stated that he did not "know for certain" in response to the SEC's question whether Ripple's main source of income has changed since June 26, 2018.  PX 15 at 71:21:25.

170.    Birla admitted that Ripple used proceeds from selling XRP to "further develop the ecosystem" and "build products around the XRP ledger."  PX 16 (Birla Inv. Tr.) at 118:23-120:20.

**Response:**        Disputed.   The cited testimony does not support the SEC's characterization that Birla testified that Ripple used "proceeds from selling XRP" because Birla testified that, at some point, he "learned that" "XRP would be used to further develop the ecosystem" and "build Ripple products around the XRP ledger," and Birla did not adopt the SEC questioner's phrasing of "proceeds from sales of XRP" in his testimony.  PX 16 at 118:23-119:4.  Defendants also dispute Paragraph 170 because the SEC altered Birla's testimony by changing the accurate testimony of "build *Ripple* products around" to "build products around."  *Id.* (emphasis added).

171.    For its early promotional efforts, Ripple created three documents—a "Gateways" brochure, a "Ripple Primer," and a "Deep Dive for Financial Professionals"— which it distributed to various market participants including potential XRP buyers. PX 52 (Gateways); PX 53 (Ripple Primer); PX 9 (Deep Dive); PX 14 (Griffin Dep.

Tr.) at 34:7–35:11; *see also supra* ¶ 59 (describing Primer); ¶ 60 (describing Deep Dive).

**Response:**     Disputed.  Defendants do not dispute that the three cited documents, or versions of them, were distributed by Ripple; however, Defendants dispute the SEC's characterization and implication that Defendants "distributed" PX 52, 53, and 9 as "promotional efforts" to "XRP buyers."  For example, Griffin testified that he distributed "these sorts of documents" "to explain what the technology was and what it meant to different participants in our ecosystem around the technology," PX 14 at 32:11-13, and that he sent the Gateways brochure (PX 52) and "a document similar to [the Gateways brochure]" to "potential participants in the ecosystem."  PX 14 at 34:7-35:11.  Defendants also dispute Paragraph 171 to the extent it sets forth legal conclusions unsupported by citations to evidence, including the SEC's statement that Ripple engaged in "promotional efforts." Defendants also incorporate their responses to Paragraphs 59 and 60 by reference.

172.    Ripple distributed the Gateways brochure to more than 100 third parties starting around May 2013. PX 14 (Griffin Dep. Tr.) at 29:12–32:21; PX 54; PX 55.

**Response:**     Disputed.  The SEC's assertion of fact in Paragraph 172 is not supported by the cited testimony.  Griffin testified only that "these sorts of documents" were distributed to "more than 100" third parties outside of Ripple but did not specify that he was speaking about PX 52.  PX 14 at 32:14-21.  Indeed, Griffin testified that there were "hundreds of iterations [of the Gateways brochure (PX 52)], if not thousands, so [he] [couldn't] remember exactly what the purpose of this document was."  PX 14 at 31:1-4.

173.    The "Gateways" brochure explained that "XRP is valued by its usefulness to Internet commerce" and that "Ripple's business plan is based on the success of" XRP, which Ripple "will sell wholesale … to fund itself." PX 52 at 17, 19; PX 14 (Griffin Dep. Tr.) at 49:13–50:6.

**Response:**        Disputed.  Defendants do not dispute that PX 52 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC as further set forth below; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14 and PX 52, to the extent the SEC impliedly equates "value" and "price" because Griffin testified that value and price are distinct concepts.  *See* PX 3 at 49:19-50:1, 55:19-56:3, 83:1-8, 139:13-18, 155:24-156:8.  Defendants further dispute Paragraph 173 because the SEC altered the quotations by changing the phrase "Ripple's business *model*" to "Ripple's business *plan*," and omitting the word "to" in the phrase "will sell *to* wholesale."  PX 52 at RPLI_SEC 0070371 (emphasis added).

174.     Ripple distributed the Gateways brochure "to explain what the technology was and what it meant to different participants in our ecosystem." PX 14 (Griffin Dep. Tr.) at 30:17–32:13; *id.* at 47:16-49:10.

**Response:**        Disputed.  The SEC's assertion of fact in Paragraph 174 is not supported by the cited testimony.  Griffin testified that there were "hundreds of iterations [of the Gateways brochure (PX 52)], if not thousands, so [he] [couldn't] remember exactly what the purpose of this document was."  PX 14 at 31:1-4.  Defendants further dispute the SEC's inaccurate characterization of the quoted excerpt of Griffin's testimony in Paragraph 174 because his testimony was about "these sorts of documents" and not the Gateways brochure in particular, as the SEC asserts in Paragraph 174.  Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 174 at all times and for all purposes in this litigation.

175.     The Gateways brochure included a graphical representation of the increase in price of XRP from March 31, 2013 to June 4, 2013, under the text, "Can a virtual currency really create and hold value? *Bitcoin proves it can.*" PX 52 at 19.

**Response:**        Disputed.  The assertion of fact in Paragraph 175 is unsupported by the cited evidence, and is inaccurate and misleading.  The graph on page 19 of PX 52 does

not portray anything concerning XRP or XRP price; rather the cited graph concerns the price

of *bitcoin*.  *See* PX 52 at RPLI_SEC 0070371.

176.    This graph in the Gateways brochure was included "to show…that there's value in cryptocurrency." PX 14 (Griffin Dep. Tr.) at 30:17–32:13; *id.* at 56:2-11.

**Response:**         Disputed.  Defendants dispute the SEC's use of the phrase "[t]his

graph" in Paragraph 176 as vague and ambiguous, as Griffin testified that there were

"hundreds of iterations, if not thousands" of versions of the Gateways brochure.  *See* PX 14

at 31:1-4.  Griffin's testimony is therefore insufficient to establish the SEC's assertion in

Paragraph 176 concerning the alleged purpose of including "[t]his graph" in the Gateways

brochure, as Griffin's testimony establishes that different types of graphs were included in

the Gateways brochure over time.  *Compare* PX 14 at 50:21-51:24 (Griffin being shown an

exhibit containing the Gateways document, which included a graph showing the change in

price over time of XRP to U.S. dollars), *with id.* at 36:25-37:15 (Griffin being shown a

different exhibit containing the Gateways document, which included a graph showing the

change in price over time of bitcoin to U.S. dollars (*see* PX 52)).  Defendants further dispute

Paragraph 176 because it omits additional context necessary to understand Griffin's quoted

testimony, including Griffin's testimony that he did not know why graphs showing the

change in price over time of either bitcoin or XRP to U.S. dollars were included in the

Gateways brochure.  *See* PX 14 at 36:25-37:15, 51:7-10.

177.    The Primer was intended "to explain the very basic concepts of the Ripple technology" to "financial institutions." PX 10 (Rapoport Tr.) at 62:2–64:9.

**Response:**         Disputed.  Defendants do not dispute that Rapoport offered the

quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however,

Defendants dispute Paragraph 177 because it omits additional context necessary to

understand the quoted testimony, including Rapoport's testimony that the document "can be broadly read by anybody" and not merely financial institutions.  PX 10 at 62:2-64:9.

178.    The Primer was widely distributed. PX 3 (Griffin Inv. Tr.) at 147:2–8.

**Response:**        Disputed.  The cited testimony is insufficient to support the assertion of fact in Paragraph 178.  The SEC did not define the term "widely distributed" here or when it questioned Griffin, and when the SEC asked Griffin "[i]s it fair to say that [PX 53] had widespread distribution," Griffin merely answered "I think so."   This is not sufficient evidence to support the assertion of fact in Paragraph 178 as to which the SEC has the burden of proof, nor is such a statement by a single employee at a particular point in time sufficient to establish the underlying fact set forth in Paragraph 178 at all times and for all purposes in this litigation.

179.    Rapoport, who created the Primer in 2013, sent the draft Primer to Larsen and Griffin. PX 29; PX 28.

**Response:**        Undisputed that on October 17, 2013, Rapoport emailed Larsen with an attachment called "Ripple_Primer.pdf."  PX 29, and undisputed that on October 9, 2013, Rapoport emailed an attachment called "Ripple Primer.pdf" to Griffin.  PX 28.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from PX 29 and 28 as misleading since it omits that the Primer referred to XRP as the "math based currency . . . that is native to the Ripple network," explained that users of the Ripple network were not required to use XRP, and stated that the purpose of XRP was to protect the network from abuse and operate as a bridge currency.  PX 29 at RPLI_SEC 0328427-29.  Defendants further dispute Paragraph 179 to the extent it implies Larsen reviewed, edited, or approved the Primer, which is not established by the SEC's cited evidence.

180.    The Primer explained that Ripple "hope[d] to make money from XRP if the world finds the Ripple network useful," and would "retain a portion [of XRP] with the

hope of creating a robust and liquid marketplace in order to monetize its only asset." PX 53 at 17.

**Response:**     Disputed.  Defendants do not dispute that PX 53 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that PX 53 is an accurate description of Ripple's actual or contemplated business activities because PX 53 references actions that were not ultimately undertaken by Ripple, such as Ripple's "plans to gift ███████ XRP to charitable organizations, users, and strategic partners in the ecosystem over time."  PX 53 at ECF p. 20.  Ripple envisioned several methods to generate revenue that are not reflected in this document, including selling software-related services and collecting software and integration fees.  *See, e.g.,* PX 7 at 24:3-15; PX 14 at 49:1-16.

181.    Ripple provided the Primer to ███████, a reporter at the ███████ PX 30.

(a)    ███████ described himself "the greatest Ripple evangelist on the East Coast" and stated, "I look forward to XRP = $1." *Id.*

**Response:**     Undisputed.

182.    Ripple also provided the Primer to ███████ PX 405. ███████ was the founder and CEO of ███████, a seed investor in Ripple. PX 10 (Rapoport Tr.) at 173:20–174:6.

**Response:**     Disputed.  As to the first sentence of Paragraph 182, Defendants do not dispute that PX 405 is an email from Griffin copying ███████.com, which attaches a file named "Ripple_Primer.pdf" that was not included in PX 405.  As to the second sentence, the cited evidence is insufficient to support the SEC's assertion of fact.  Rapoport testified that he "believe[d]" ███████ was the CEO of ███████ and that his "understanding" was that ███████ was a seed investor in Ripple Labs.  PX 10 at 173:20-174:6.  The SEC cites no evidence in Paragraph 182 confirming that Rapoport's understanding or belief were correct, and Defendants do not concede that a single employee's

testimony is sufficient evidence to support the assertion of fact in Paragraph 182 at all times and for all purposes in this litigation.

183.     The Deep Dive was "a more in-depth primer" that was "intended for an audience...that works in financial markets...or banking." PX 10 (Rapoport Tr.) at 182:17–83:8.

**Response:**     Undisputed that Rapoport gave the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC.

184.     Rapoport was the primary author of the Deep Dive but a number of people, including Griffin, collaborated on it in 2014. PX 10 (Rapoport Tr.) at 183:18–84:23; PX 31; PX 56.

**Response:**     Disputed.  Defendants do not dispute that Rapoport testified that he "was the primary author [of the Deep Dive], but a number of people collaborated on it" and that Griffin "provided feedback and input on the document," PX 10 at 183:20-184:16; however, Defendants note that Griffin testified that a consultant to Ripple, ▮▮▮▮▮▮, was the primary author of the Deep Dive document.  *See* PX 3 at 160:5-23.  Defendants dispute that PX 31 or 56 support the SEC's assertions of fact set forth in Paragraph 184, as neither document provides any information about the authorship of the Deep Dive.

185.     The Deep Dive was posted on Ripple's website in or around 2014. PX 500.05.

**Response:**     Undisputed that a version of the Deep Dive was posted on Ripple's website in 2014.

186.     In addition to posting this document on its website, Ripple also actively distributed it to over a hundred people. PX 10 (Rapoport Tr.) at 185:21–188:13.

**Response:**     Disputed.  Paragraph 186 is misleading because Rapoport testified that "over a hundred" was only "an estimate given how much time has passed."  PX 10 at 186:19-22.  The cited testimony is therefore insufficient to establish the SEC's assertion of fact, as to which it bears the burden of proof.

187.    The Deep Dive included the following statements by Ripple:

(a)    Ripple's "business model is predicated on a belief that demand for XRP will increase (resulting in price appreciation) if the Ripple protocol becomes widely adopted" and that "if the Ripple protocol becomes widely adopted, demand for XRP may increase, leading to an increase in price." PX 9 at 23, 45.

(b)    The Ripple protocol "could in fact be monetized through its native currency, XRP." *Id.* at 17.

(c)    "Increased exposure and a more global network of Ripple gateways could result in increased speculative interest, which may have significant impacts on price. Speculative demand and bullish expectations for the future were enough to send XRP and BTC total market capitalizations to over $6 billion and $23 billion in Q4 2013, respectively. If the Ripple protocol becomes the backbone of global value transfer, Ripple Labs expects the demand for XRP to be considerable." *Id.* at 25.

(d)    Ripple "plans to retain ▮▮▮▮ of all XRP issued to fund operations (and hopefully turn a profit)." *Id.* at 17.

(e)    Ripple "continues to attract a diverse set of talented individuals with experience in relevant technology and financial services companies." *Id.*; *see also* PX 10 (Rapoport Tr.) at 190:4-191:25, 193:6-200:25; 203:25-205:3 (testifying about these portions of the Deep Dive document).

**Response:**        Disputed.  Defendants do not dispute that PX 9 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute as misleading any characterization or suggestion by the SEC based on PX 9 that Ripple's focus at the time of this document was on driving XRP price appreciation; to the contrary, Rapoport testified concerning these statements in the Deep Dive, stating they reflected Ripple's view "that wide adoption of the Ripple protocol may *or may not* involve XRP price appreciation" and that the "use of the Ripple protocol as a settlement layer may *or may not* lead to an increase in XRP price," PX 10 at 205:9-14 (emphasis added); that the Deep Dive document did not include discussion of whether increased speculative interest in XRP would impact price positively *or negatively*, *id.* at 199:7-8 (emphasis added); and that,

"in meetings [at that time], the narrative we used very specifically tried to focus only on the technology and *de-emphasize any discussion of XRP and digital assets*" which Rapoport testified "was a distraction from what we viewed to be applicable use cases in the real world," *id.* at 68:23-70:2 (emphasis added).

188.   Ripple made similar statements to the foregoing statements in the Primer, Gateways, and Deep Dive, in its communications with investors and potential investors. For example:

(a)   Ripple told potential investors that the more valuable XRP was, the more Ripple, as the largest holder of XRP, would benefit. PX 3 (Griffin Inv. Tr.) at 63:17-23.

**Response:**   Disputed.   The SEC's characterization of, and inferences purportedly drawn from, PX 3 are inaccurate to the extent the SEC impliedly equates "value" and "price" because Griffin testified that value and price are distinct concepts. *See* PX 3 at 49:19-50:1, 55:19-56:3, 83:1-8, 139:13-18, 155:24-156:8.   Defendants also dispute Paragraph 188(a) because it omits context necessary to understand Griffin's testimony regarding Ripple's alleged "benefit."  Griffin testified that the price of XRP had "very little impact" on how much revenue Ripple could obtain from XRP sales due to a lack of liquidity and volume in the XRP market from 2013 through "most of 2017."  PX 14 at 277:5-278:3. Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 188(a) at all times and for all purposes in this litigation.

(b)   Ripple discussed with a potential investor Ripple's "possible revenue models" including the "appreciation" of XRP. PX 7 (Schwartz Inv. Tr.) at 23:13-25:18.

**Response:**   Disputed.   Paragraph 188(b) is misleading and mischaracterizes Schwartz's testimony.   In the cited evidence, Schwartz testified that during a mid-2012 investor meeting, Ripple discussed a number of potential, future revenue models that were

"entirely speculative" as "[w]e did not have a [solid] idea what the revenue model would be at that time," and that one of the numerous revenue models discussed was "[t]he possibility of the appreciation of the tokens."  PX 7 at 24:10-15.  Paragraph 188(b) misleadingly suggests that Ripple in fact had a revenue model at the time based on the price increase in XRP.  Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 188(b) at all times and for all purposes in this litigation.

> (c)     Ripple told potential investors that its business model was "predicated on XRP and the holdings of XRP, which was primarily…an asset appreciation play." PX 3 (Griffin Inv. Tr.) at 48:11-25.

**Response:**     Disputed.  Defendants dispute Paragraph 188(c) to the extent the SEC implies that it sets forth the entirety of Griffin's testimony about Ripple's business model, because Griffin testified that Ripple's business model also included "APIs and services around them that we could build and sell."  PX 3 at 49:1-4.  Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 188(c) at all times and for all purposes in this litigation.

> (d)     Ripple's distribution strategy, as communicated to investors on its website, stated: "Distributing value is a powerful way to incentivize certain behaviors…Our goal in distributing XRP is to incentivize actions that build trust, utility and liquidity in the network. If we distribute XRP with these goals in mind, over time we expect to see an increase in demand for XRP that more than offsets the additional supply we inject into market. Said another way, we will engage in distribution strategies that we expect will result in a stable or strengthening XRP exchange rate against other currencies." PX 500.4.

**Response:**     Disputed.  Defendants do not dispute that PX 500.04 purports to be a copy of a website called web.archive.org that purports to show a website hosted by www.ripplelabs.com titled "XRP Distribution" dated July 31, 2014 containing the quoted

88

text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants

dispute the SEC's assertion in Paragraph 188(d) that this information was "communicated to

investors," as that fact is unsupported by the evidence.  The SEC cites no evidence at all

sufficient to identify any person or persons who viewed this website; whether such persons

were or were not investors in Ripple; whether such persons did or did not hold XRP; why

such persons viewed the website; or the time period during which such website was publicly

available with the text in question.

> (e)    Ripple told third parties that it was "trying to recruit and onboard [other third parties] to provide liquidity" for XRP. PX 10 (Rapoport Tr.) at 120:25–123:14.

**Response:**        Disputed.  Defendants do not dispute that Rapoport offered the

quoted testimony exclusive of any alterations, omissions, or additions by the SEC; however,

Defendants dispute Paragraph 188(e) because Rapoport further testified "I don't think [the

third parties] believed that Ripple exclusively was responsible for building liquidity in the

network."  PX 10 at 122:3-5.  Defendants further dispute that a statement by a single

employee at a particular point in time is sufficient to establish the underlying fact set forth in

Paragraph 188(e) at all times and for all purposes in this litigation.

189.    Griffin suggested the following language for a blog post in or around November 2017: "XRP is a 'value play' because it's [sic] price has been held back by fake stigma (that it's centralized, that it's closed-source, that the supply is unrestricted, and that it's a private/permissioned blockchain)" and "[t]here is a fantastically-managed company, Ripple Inc., with a singular enterprise focus to make XRP the de facto digital asset to replace dormant capital in treasury operations." PX 59; *see also* PX 60.

**Response:**        Disputed.  Defendants do not dispute that PX 59 contains the quoted

text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants

dispute any implication in Paragraph 189 that the quoted language in PX 59 or 60 was ever

published in a blog post or otherwise, and the SEC has not cited any evidence that this language was in fact posted on a blog or website.

190.     When an investor told Long in 2013 that he "plann[ed] on continuing to invest in Ripple through additional acquisition of XRP as there is no stock etc.," Long responded "I encourage you to track the network's growth and progress via Ripple Charts. We're growing *fast*. Ripple now has 50k accounts and XRP is trading at about $0.03. These are super positive indicators of the future for the network." PX 62.

**Response:**      Disputed.   Paragraph 190 misleadingly and inaccurately suggests that Long responded to and endorsed an individual's statement, in an unsolicited email, that he planned to "invest in Ripple through additional acquisition in XRP."  That is not what PX 62 reflects, and the cited evidence does not support the SEC's misleading assertion.  In fact, Long did not respond at all to the quoted sentence by the individual and she never called him an "investor" (in Ripple or otherwise).  Rather, Long responded to the sender by generally addressing developments in the XRP "network" and encouraging him to track the "network's growth and progress via Ripple Charts."  PX 62 at RPLI_SEC 0636333.  The only direct response Long provided was to a "business idea" for using XRP for payment processing by car dealerships.  *Id.*

191.     Schwartz stated publicly that XRP's "price and demand could be influenced by what Ripple was doing to build a use case for XRP." PX 6 (Schwartz Dep. Tr.) at 363:2-12.

**Response:**      Disputed.   Defendants do not dispute that Schwartz testified that "[t]here were times when I believed that – that the price and demand could be influenced by what Ripple was doing to build a use case for XRP," PX 6 at 363:6-8; however, Defendants dispute Paragraph 191 because it misleadingly implies that it is quoting a public statement by Schwartz, when it is not.  The statement in question was made during his non-public deposition testimony, and the SEC has identified no public statement by Schwartz containing

the quoted text.  *See* PX 7 at 132:3-20.  Defendants do not concede that Schwartz's personal

understanding can be attributed to Ripple or the Individual Defendants, as the SEC offers no

evidence to establish that fact.

192.    Ripple also used Twitter, Facebook, and other social media to communicate about XRP with the public. PX 17 (Long Tr.) at 52:5-24-53:14.

**Response:**        Undisputed.

193.    On or about April 16, 2013, Ripple tweeted: "#Ripple is what happens when money finally meets the internet." PX 506.002, *available at* https://twitter.com/Ripple/status/324234937056251904?s=20.

**Response:**        Undisputed.

194.    On or about October 7, 2013, Ripple tweeted: "Larsen: @RippleLabs will give away more than 50% #XRP. Keep rest to build team to contribute code, build apps, promote #Ripple. #money2020" PX 506.007, *available at* https://twitter.com/Ripple/status/387363931422851072?s=20.

**Response:**        Undisputed that PX 506.007 contains the quoted text.  Defendants

dispute the SEC's characterizations of, and inferences purportedly drawn from PX 506.007.

Among other things, Larsen testified that Ripple did not ultimately give away more than 50%

of its XRP to the public because such an action "opened you up to too much abuse and

spamming" including "too many fake accounts posing to be different individuals."  Ex. 8 at

173:24 –174:10.

195.    On or about November 8, 2013, Ripple tweeted:  "Check out Ripple Price in the App Store. Real-time XRP pricing for iOS devices. Made by @RippleLabs. http://bit.ly/17ku4NG." PX 506.009, *available at* https://twitter.com/Ripple/status/398947941081448448?s=20.

**Response:**        Undisputed.

196.    On or about November 25, 2013, Ripple re-tweeted: "RT@RippleLounge The current price of Ripple(@SnapSwap) stands at 40 XRPs for 1 USD - Ripplemania has officially arrived!!!" PX 506.010, *available at* https://twitter.com/Ripple/status/405034860412411905?s=20.

**Response:** Undisputed; however, Defendants do not concede that a re-tweet by Ripple's Twitter account was necessarily intended or understood to be an endorsement of that tweet's contents.

197. Schwartz was a "highly respected" and important "spokesperson" for XRP purchasers. PX 36 (Garlinghouse Inv. Tr.) at 47:2-50:6.

**Response:** Disputed. The SEC's assertion is not supported by the cited evidence. Garlinghouse testified that Schwartz was a spokesperson *for Ripple* "for *certain audiences*" and "in *some contexts*," including specifically to "technology-centric conferences or audiences that are keenly interested in the underlying technology," PX 36 at 47:4-48:12 (emphasis added). Garlinghouse never testified that Schwartz was a "'spokesperson' for XRP purchasers." Furthermore, Schwartz testified that he often speaks in his personal capacity, and not as a spokesperson for anyone else. *See* PX 6 at 44:14-20,

198. On or about February 22, 2013, in a post on Bitcoin Forum, Schwartz stated:

> The design of Ripple doesn't require a central authority. But until it is decentralized, it will effectively have one… We're not claiming it is decentralized now. We're claiming it requires no central authorities and we are committed to decentralizing it… I would say we would also have to wait until a significant fraction of the operating servers aren't under OpenCoin's direct (or perhaps even indirect) control…

PX 507.01, *available at*

https://bitcointalk.org/index.php?topic=144471.msg1548391#msg1548391.

**Response:** Disputed. Defendants do not dispute that PX 507.01 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that this statement can be read to suggest that Ripple is in fact a "central authority" with respect to the XRP Ledger, as Schwartz testified in his deposition that he did not view Ripple as a "central authority." PX 6 at 115:19-116:14.

199. On or about April 14, 2013, in a post on Bitcoin Forum, Schwartz explained Ripple's financial incentive as tied to the value of XRP going up and stated: "Our financial interest is in seeing the value of XRP go up and the primary way for us to achieve that is broad adoption of Ripple as a payment system." PX 507.02, *available                                                                                    at* https://bitcointalk.org/index.php?topic=176077.msg1836865#msg1836865.

**Response:**        Disputed.  Defendants do not dispute that PX 507.02 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 507.02 in Paragraph 199 as misleading because Schwartz testified that "value" as used in this post also refers to "utility."  PX 6 at 239:23-240:6. Defendants therefore dispute Paragraph 199 to the extent it purports to suggest that "Ripple's financial incentive" is "tied to the value of XRP going up," as Schwartz clarified in his testimony that the statement quoted in Paragraph 199 could be read to mean "[o]ur financial interest is that the *utility* of XRP go up, and the primary way for us to achieve that is broad adoption of Ripple as a payment system," *id.* at 240:8-12 (emphasis added), and also testified that he was "less confident in [the statement quoted in Paragraph 199] today" because "there's less of a demonstrated connection between the utility of XRP and Ripple's financial interest," *id.* at 241:9-16.

200. On or about May 12, 2013, in a post on Bitcoin Forum, Schwartz stated, referring to Ripple: "As a corporation, we are legally obligated to maximize shareholder value. With our current business model, that means acting to increase the value and liquidity of XRP. We believe this will happen if the Ripple network is widely adopted as a payment system. We are pursuing multiple avenues at once. One would expect increased demand to increase price." PX 507.04, *available at* https://bitcointalk.org/index.php?topic=148278.msg2123720#msg2123720.

**Response:**        Disputed.  Defendants do not dispute that that PX 507.04 contains the quoted text; however, Defendants dispute Paragraph 200 to the extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including with respect to any actions that Ripple was or was not "legally obligated" to take.  Defendants

further dispute Paragraph 200 to the extent it implies that Schwartz's statements can be attributed to Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.  Defendants further dispute Paragraph 200 because it omits additional context necessary to understand the quoted language "acting to increase the value and liquidity of XRP," as Schwartz testified that the term "value" meant "utility" and not price.  PX 6 at 248:3-6.

201.   On or about May 16, 2013, in a post on the Bitcoin Forum, Schwartz stated: "We will do what we can to drive adoption. Most of that will probably involve encouraging and assisting others. We plan to continue to develop client and server software for as long as necessary. PX 507.06, *available at* https://bitcointalk.org/index.php?topic=201794.msg2172628#msg2172628.

**Response:**       Undisputed that PX 507.06 contains the quoted text.  Defendants dispute Paragraph 201 to the extent it implies that Schwartz's personal understanding can be attributed to Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

202.   On or about May 16, 2013, in a post on Bitcoin Forum, Schwartz stated: "The price of XRP is just a matter of supply and demand. We believe that broad adoption of Ripple as a payment platform will drive demand…We don't currently plan to do anything but develop and promote the Ripple payment network." PX 507.05, *available at* https://bitcointalk.org/index.php?topic=201794.msg2171771#msg2171771.

**Response:**       Undisputed that PX 507.05 contains the quoted text.  Defendants dispute Paragraph 202 to the extent it implies that Schwartz's statements can be attributed to Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

203.   On or about May 28, 2013, in a post on Bitcoin Forum, Schwartz stated: "That's a large part of the reason we designed it so that we wouldn't be running it. Ultimately, we think it's adoption of Ripple as a payment network that will drive demand for XRP. We're willing to take the risk that we're wrong on that, as we've taken so many other risks. If we fail because Ripple is successful as a payment network and demand for XRP just doesn't arise, well, of all the many ways we could fail, that's not too bad. Our primary strategy is to remove every possible drag on adoption of Ripple as a payment network and do everything we can to drive adoption." PX

507.07 *available at* https://bitcointalk.org/index.php?topic=210634.msg2297107#msg2297107.

**Response:**    Undisputed that PX 507.07 contains the quoted text.  Defendants dispute Paragraph 203 to the extent it implies that Schwartz's statements can be attributed to Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

204.   In an email dated on or about June 10, 2013 to a professor at the University of Georgia, Schwartz wrote: "[A]ll the XRP were initially controlled by the Ripple network founders.  Some of those will be held by OpenCoin to finance itself and some of them will be given away to promote the payment network.  We believe that adoption of the payment network will increase the value of XRP because the easiest way to make an asset liquid is to provide liquidity to and from XRP and people who don't know what asset they might need may hold XRP." PX 63.

**Response:**    Disputed.  Defendants do not dispute that PX 63 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that the cited evidence supports the assertions of fact as set forth in Paragraph 204, including that the recipient of the email in PX 63 was a professor at the University of Georgia. Defendants further dispute Paragraph 204 because it omits important context from the first part of the quoted sentence, which reads in full: "*Because [the Ripple protocol] doesn't use mining (double spends are prevented by a distributed consensus protocol)*, all the XRP were initially controlled by the Ripple network founders."   PX 63 at RPLI_SEC 0321984 (emphasis added).

205.   Schwartz testified that Ripple had a legal obligation to maximize the value of XRP. PX 6 (Schwartz Dep. Tr.) at 246:23-250:1. When asked at his deposition in 2021 if Ripple is legally obligated to maximize shareholder value today, Schwartz responded "[y]es." PX 6 (Schwartz Dep. Tr.) at 246:23-247:15.

**Response:**    Disputed.  The SEC's statement in Paragraph 205 that Schwartz testified that Ripple had a legal obligation to maximize the value of XRP is incorrect and misleading, as   Schwartz only testified that Ripple is "legally obligated to maximize *shareholder value*," not the value of XRP.   PX 6 at 246:24-247:15 (emphasis added).

Schwartz clarified that by "shareholders" he meant "Ripple's shareholders." *Id.* at 247:2-3.

Further, Schwartz clarified that he was "not a lawyer" and that his statements did not "imply

that Ripple is obligated to do anything that makes the shareholders money." *Id.* at 257:24-

258:18.   Schwartz also clarified that, to the extent this obligation involved increasing the

"value and liquidity of XRP," the term "value" meant "utility." *Id.* at 248:3-6.  Defendants

dispute that Paragraph 205 sets out a material fact to any claims or defenses in this case,

which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and

accordingly Schwartz's views as to Ripple's "obligation[s]" in 2021 are irrelevant.

Defendants further dispute the suggestion in Paragraph 205 that the quoted testimony

reflected a belief of Ripple or the Individual Defendants, when the record cited in Paragraph

205 demonstrates that Schwartz was testifying about his own personal beliefs.  Defendants

dispute Paragraph 205 to the extent "legal obligation," "legally obligated," "maximize," and

"value" are terms that are not defined with particularity.

206.   XRP are digital assets that are all identical or fungible to one another. PX 8 (Ripple
RFA Responses) Nos. 24, 25.

**Response:**        Undisputed.

207.   The market price increases or decreases for all units of XRP together and equally.
PX 81 (Garlinghouse Dep. Tr.) at 337:17-22.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 81 as misleading because it omits that Garlinghouse

testified that "there have been times in my experience where some exchanges might have a

slightly different price than another exchange despite the fact that there are effectively

indistinguishable units of XRP between exchanges[.]"  PX 81 at 338:1-10.

208.   Garlinghouse admitted: "We [Ripple] own a lot of XRP. If the price goes up, the
value of the assets we own goes up" and "Ripple owns a lot of XRP and as

capitalists, we benefit if the price of XRP goes up." PX 36 (Garlinghouse Inv. Tr.) at 95:22-96:18.

**Response:**        Undisputed that Garlinghouse offered the quoted testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony. Further, Defendants dispute the SEC's characterization of Garlinghouse's statement as something that was "admitted," as he stated the basic principle that all companies with significant holdings of an asset, *e.g.*, oil, diamonds, will benefit when the asset's value appreciates.

209.    Garlinghouse "general view" is "if it's good for the [XRP] market, it's good for Ripple." PX 81 (Garlinghouse Dep.) 316:9-13.

**Response:**        Disputed. Garlinghouse testified that he views "anything that is helping drive the maturity, expansion, growth of the digital asset market" as good for Ripple, *see* PX 81 at 316:2-13. Then, the SEC asked Garlinghouse "…a good thing just for the market generally or for Ripple specifically?" to which, Garlinghouse responded that his "general view is if it's good for the market, it's good for Ripple." *Id.* The market Garlinghouse referred to is the digital asset market generally. Therefore, the SEC's addition of "[XRP]" to the quoted language in Paragraph 209 is incorrect and misleading.

210.    Rapoport testified: "Ripple Labs certainly had a preference for the price [of XRP] to rise rather than fall given that it was a significant holder" [of XRP]. And so in a similar way to how ExxonMobil doesn't want to have its actions collapse the price of oil since it's a significant holder of oil, Ripple Labs was cognizant of the fact that its actions in the marketplace could have adverse consequences for its balance sheet." PX 10 (Rapoport Tr.) at 151:2-152:4; *see also* PX 44 at 0461857.

**Response:**        Disputed.  Defendants do not dispute that PX 10 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Rapoport's testimony.  Defendants dispute the SEC's citation to PX 44

because this document does not support the SEC's assertions of fact as set forth in Paragraph

210.

211.   Rapoport also testified that "just like [he] preferred the price of XRP to go up rather
than down, the firm [Ripple] would have benefitted from the price of XRP growing
up rather than down." PX 10 (Rapoport Tr.) at 52:9-21.

**Response:**   Disputed.  Defendants do not dispute that PX 10 contains the quoted

text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants

dispute Paragraph 211 because it omits additional context necessary to understand the quoted

testimony, including that Rapoport testified that "I think the firm would have viewed it as a

success if the Ripple network, Ripple ledger, developed liquidity for *other assets excluding*

*XRP.*" PX 10 at 52:14-17 (emphasis added).  Defendants dispute the suggestion in Paragraph

211 that the quoted testimony reflected a belief of Ripple or the Individual Defendants, when

the record cited in Paragraph 211 demonstrates that Rapoport was testifying about his own

personal beliefs and preferences.

212.   Garlinghouse texted Larsen in October 2017: "Nice to see Xrp have a great week
and weekend! Volume and price." PX 64.

**Response:**   Undisputed that PX 64 contains the quoted text, exclusive of any

alterations, omissions, or additions, however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the full conversation

between Garlinghouse and Larsen. To the extent the SEC implies that Ripple's actions

impacted XRP's price, Garlinghouse testified "I'm not clear what drives any digital asset,

including XRP." PX 81 at 353:1-7.

213.   Responding to an XRP holder complaining that he had "been waiting 4 years on
Ripple to hit," (a colloquial term referring to an investment doing well)
Garlinghouse wrote in a March 2017 email: "I've been personally buying XRP in
Jan and Feb (and earlier in March). You are not alone in your expectations." PX 65
at 0763477.

**Response:**      Undisputed that PX 65 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 65, including because Paragraph 213 omits additional context necessary to understand the quoted language including that the XRP holder in question was referring to "liquidity" in the context of "waiting 4 years on [R]ipple to hit," *see* PX 65. And, in particular, Garlinghouse testified that he "ha[s] no idea" who the author of the original email to him is, PX 81 at 379:6-8, and Garlinghouse does not know, and cannot know, what the author meant by this email since Garlinghouse did not write it.

214.   Garlinghouse told Ripple Board members in April 2017: "I think we will all agree that the most significant Q1 development came at the end of the quarter in the form of a dramatic spike in XRP price and market activity. As I noted in my more informal note that I sent to a broader list of investors and advisors…it's a game-changer for us on a bunch of levels. On an operating level, for XRP to serve the purpose of lowering liquidity costs for payments, it needs deep liquidity across fiat currency pairs. Speculative and market trading volume builds that liquidity – they are the catalyst to the XRP flywheel. The recent rally has us [sic] moved that flywheel into a much higher gear which puts us in a much stronger position to execute on other projects that continues to fuel the flywheel." PX 66 at 0361257.

**Response:**      Undisputed that PX 66 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 66 to the extent it implies that Ripple needed speculative trading; rather, in PX 66, Garlinghouse says, and in PX 81, Garlinghouse testifies that, liquidity in XRP was needed for Ripple's product offerings, and that "speculative and market trading volume" could promote liquidity.  PX 66 ("for XRP to serve the purpose of lowering liquidity costs

for payments, it needs deep liquidity across fiat currency pairs.  Speculative and market trading volume builds that liquidity…"); PX 81 at 371:12-16 (Q: "do you still need speculative and market trading volume in XRP?" A: "I think you need liquidity.  Anything that drives liquidity is going to be constructive to what I'm calling a flywheel"); *id.* at 371:18-21 (Q: "And speculative interest in the asset could drive liquidity?" A: "Yeah, I think I'm saying that it has in that particular time period.").

215.    When asked how an increase in price in XRP would benefit Ripple, Vias responded: "We own 50 billion XRP. It's our primary asset. So an increase in value would help the company be more valuable." PX 20 (Vias Inv. Tr.) at 353:20-24.

**Response:**      Disputed.  The quoted text does not appear in PX 20.  To the extent the SEC intended to instead cite to PX 21, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 21, including because the text of Paragraph 215 improperly equates "value" and "price," when the evidence establishes that Ripple employees understood that value and price were distinct concepts.  *See, e.g.*, PX 3 at 49:19-50:1, 55:19-56:3, 83:1-8, 139:13-18, 155:24-156:8 (Griffin testifying that value did not equate to price).  Defendants further dispute that Vias's testimony establishes the ultimate fact at issue, because Ripple's CFO testified that he did not consider XRP to be the most important piece of Ripple's valuation.  PX 23 at 120:7-121:18 (Will testifying that XRP was only "a piece of the valuation of [Ripple]" but that he "did not think it was the most important piece," because Ripple's equity "investors . . . put value on RippleNet as well as [Ripple's] portfolio of investments").

216.    Vias also told Griffin in May 2017 that he wanted Ripple to grant him an option for ███████ XRP because he wanted the "opportunity to significantly participate in [XRP's] appreciation." PX 67 at 0070426.

**Response:**        Disputed.  Defendants dispute Paragraph 216 because Vias testified that he asked for compensation in XRP because it was "easier for the company to pay in XRP because it has more of it than cash or shares."  PX 21 at 378:6-10.

217.    Ripple disbursed the following amounts of units of XRP to its employees and executives as compensation and bonuses: approximately ███████ units of XRP in 2014; approximately ██████ units of XRP in 2015; approximately ████████ units of XRP in 2016; approximately ███████ units XRP in 2017; approximately ████████ units of XRP in 2018; and approximately ██████ units of XRP in 2019. PX 85 (Ripple RFA Responses) Nos. 419–424.

**Response:**        Disputed.  Defendants dispute that the SEC's approximate sums set forth in Paragraph 217 were distributed to "employees and executives as compensation and bonuses" because the cited evidence does not support this assertion of fact.  Rather, Ripple distributed "as compensation" the following quantities of XRP: ██████ in 2014; ██████ in 2015; ██████ in 2016; ██████ in 2018; ██████ in 2018; and ██████ in 2019.  *See* PX 85 Nos. 419-424.

218.    In addition, Garlinghouse received ██████ units of XRP as part of his December 2016 compensation agreement. PX 86 (Garlinghouse RFA Responses) No. 66. Garlinghouse received an additional ██████ units of XRP as part of his May 2019 compensation agreement. *Id.* at No. 67; *see also* PX 73 at 0070426; PX 74; PX 75.

**Response:**        Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 86, 73, 74, and 75 as misleading, because Garlinghouse did not receive XRP units in December 2016 and May 2019, he executed XRP grant agreements and XRP wallet transfer agreements on those dates, to vest in installments over time, subject to certain conditions. *See* PXs 86, 73, 74, and 75. Defendants do not concede that the ██████ and the ██████ units of XRP take into account the amounts withheld by Ripple, or the amounts sold by Garlinghouse in order to pay Garlinghouse's income taxes.

219.   At the time of his deposition in September 2021, Garlinghouse had "by virtue of [his] ownership in Ripple [equity]…indirect ownership of…three and a half billion units of XRP…as a rough estimate." PX 81 (Garlinghouse Dep. Tr.) at 21:19-22:14.

**Response:**   Undisputed that Garlinghouse offered the quoted testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony.

220.   In addition, "most, if not all, of [Garlinghouse's] direct reports have an XRP grant that vests over time." PX 81 (Garlinghouse Dep. Tr.) at 339:17-340:19.

**Response:**   Undisputed that Garlinghouse offered the quoted testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony.

221.   Compensation in the form of XRP allowed Ripple employees to "take the risk of the price in XRP, both upside and downside." PX 29 (Will Tr.) at 77:24-78:11.

**Response:**   Disputed.  The quoted text does not appear in PX 29.  To the extent the SEC intended to instead cite to PX 23, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 23 as misleading because Will's testimony makes clear that his statement quoted in Paragraph 221 pertains only to *executive* compensation, not employee compensation.  *See* PX 23 at 77:24-78:11.  Furthermore, when asked by the SEC about whether there was a "benefit to Ripple to providing XRP as part of an executive's compensation package," Will responded that "as CFO, I viewed it as the same as dollars." *Id.* at 76:21-77:2.  As to employee compensation, Will testified that he "couldn't really speak to [employees'] individual desires" with respect to being compensated in XRP, *id.* at 75:4-6, but that, from the perspective "in the payroll department and the accounting department, we viewed [XRP compensation as] equal to giving an employee cash.  It was priced the same way.  The employee received no specific economic benefit to receiving XRP," *id.* at 73:17-21.

102

222.    An increase in the price of XRP benefits Ripple, its employees, and XRP investors. PX 14 (Griffin Dep. Tr.) at 240:11-17; PX 21 (Vias Inv. Tr.) at 351:23-352:5.

**Response:**        Disputed.  The quoted testimony reflects only Griffin's and Vias's personal beliefs that were provided in response to hypothetical questions from the SEC, and not a belief held by Ripple as an entity, its employees, or XRP purchasers, and is otherwise insufficient to establish the underlying fact set forth in Paragraph 222 at all times and for all purposes in this litigation.  Defendants further dispute Paragraph 222 to the extent it sets forth legal conclusions unsupported by citations to evidence with respect to the use of the term "XRP investors."

223.    On or about September 5, 2017, Schwartz tweeted that a "higher price for #XRP would help @Ripple several ways."  He noted that the "most obvious benefit to Ripple of an increased price for XRP is that it increases the value of Ripple's XRP. This means that Ripple has a greater ability to incentivize partners and liquidity.  It also means that Ripple can raise more revenue by selling XRP."  Whether it makes sense or not, XRP's price is seen as a measure of Ripple's success or likelihood of future success." PX 506.123 (David Schwartz, @joelkatz, TWITTER (Sept. 5, 2017), https://twitter.com/joelkatz/status/905152430035238912?lang=en.

**Response:**        Disputed.   The quoted language in Paragraph 223 other than a "higher price for #XRP would help @Ripple several ways" appears in an image posted by the Twitter handle @JoelKatz and there is no evidence to establish that image was written by Schwartz.  Defendants further dispute Paragraph 223 to the extent it implies that any of these statements can be attributed to Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

224.    "If the price of XRP increased … Ripple's holdings of XRP [were] more valuable." PX 19 (Zagone Tr.) at 94:15-95:6.

**Response:**        Disputed.  Defendants do not dispute that PX 19 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that Zagone's personal understanding can be attributed to Ripple or the Individual

Defendants, as the SEC offers no evidence to establish that fact.  To the extent the SEC purports to suggest in Paragraph 224 that any increase in the price of XRP would necessarily lead to an increase in the value to Ripple of its XRP holdings, Defendants dispute that suggestion, including because Griffin disagreed with the SEC's assertion that "a higher XRP price" meant "potentially more revenue for Ripple from selling XRP" and testified that "in early 2013 . . . through most of 2017, the price moving really had no ability for – very little impact on what Ripple could sell as far as – as measured in dollar terms . . . because of a lack of volume in the market and . . . liquidity in the market." PX 14 at 277:5-278:3.

225. "[O]ver the long term, an increase in [XRP's] price would benefit both XRP holders and Ripple." PX 22 (Samarasinghe Tr.) at 187:20-188:6.

**Response:**        Disputed.  Defendants do not dispute that PX 22 contains the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 225 because it omits additional context necessary to understand the quoted testimony, including because Samarasinghe only testified about such a benefit existing "[i]n [his] mind."  PX 22 at 187:20-188:6.  Defendants dispute the suggestion in Paragraph 225 that the quoted testimony reflected a belief of Ripple or the Individual Defendants, when the evidence cited in Paragraph 225 demonstrates that Samarasinghe was testifying only about his own personal beliefs in response to hypothetical questions.  Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 225 at all times and for all purposes in this litigation.

226. "[I]f Ripple had a choice, Ripple would prefer the long-term price [of XRP] to go up." PX 6 (Schwartz Dep. Tr.) at 234:15-235:4.

**Response:**        Disputed.  Defendants do not dispute that PX 6 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants

dispute Paragraph 226 because it omits additional context necessary to understand the quoted testimony, including that Schwartz was asked in his deposition whether "Ripple would prefer the long-term price of XRP to *go up or go down*" to which Schwartz responded, "I mean, *if Ripple had a choice*, Ripple would prefer the long-term price to go up." PX 6 at 235:1-4 (emphasis added). Defendants dispute the suggestion in Paragraph 226 that the quoted testimony reflected a belief of Ripple or the Individual Defendants, when the evidence cited in Paragraph 226 demonstrates that Schwartz was only testifying in response to hypothetical questions. Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 226 at all times and for all purposes in this litigation.

227.    In the context of Ripple selling XRP to fund its operations, "a higher price [for XRP] could be helpful." PX 25 (Madigan Tr.) at 54:15-25.

**Response:**        Disputed. Defendants do not dispute that PX 25 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 227 because it omits context necessary to understand the quoted testimony, including that Madigan testified that she did not have direct knowledge of Ripple's use of XRP sales to fund its operations, and her testimony quoted in Paragraph 227 was elicited in response to an SEC hypothetical ("In the context of Ripple selling XRP to fund its operations, does a higher price of XRP benefit Ripple") to which Madigan answered: "In the context you described, I suppose a higher price could be helpful if it's funding operations." PX 25 at 49:3-50:8, 54:20-25. Defendants further dispute the suggestion in Paragraph 227 that the quoted testimony reflected a belief of Ripple or the Individual Defendants, when the evidence cited in Paragraph 227 demonstrates that Madigan was testifying only about her own personal beliefs in response to hypothetical questions.

228.   As an XRP holder, Griffin hoped that the volume and price of XRP would rise so that he could "make money."  PX 14 (Griffin Dep. Tr.) at 136:10-137:11, 208:5-15.

**Response:**       Disputed.  Defendants do not dispute that PX 14 contains the quoted text; however, Defendants dispute Paragraph 228 because it omits additional context necessary to understand the quoted testimony, including that Griffin stated that he "personally" hoped for "more liquidity" and that the "volume" would rise.  PX 14 at 136:10-137:3.

229.   Rapoport "certainly preferred it to go up than down," referring to the price of the ██████████████████ he owned. PX 10 (Rapoport Tr.) at 44:4-10.

**Response:**       Undisputed.

230.   Ripple's head of regulatory affairs purchased XRP on the open market in hopes that XRP would rise in value. PX 19 (Zagone Tr.) at 28:5-29:16.

**Response:**       Disputed.  Defendants do not dispute that Zagone offered the cited testimony; however, Defendants dispute that  Paragraph 230 sets forth he entirety of Zagone's testimony on the topic, as Zagone also testified that he purchased XRP because "the whole crypto market was going up" and he "wanted exposure to that" whole market.  PX 19 at 28:22-23.

231.   A "declining XRP price would have an impact on Ripple's balance sheet first" and would be "detrimental or damaging to the focus around building liquidity around XRP." PX 3 (Griffin Inv. Tr.) at 264:22-265:8. Further, a decline in XRP's price is "not necessarily the greatest signal for the health of the [XRP] ecosystem and the technology underpaying [sic] it." *Id.* at 256:6-23.

**Response:**       Disputed.  Defendants do not dispute that PX 3 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 231 because it omits additional context necessary to understanding the quoted testimony, including that Griffin also disagreed with the SEC's assertion that that "a higher XRP price" meant "potentially more revenue for Ripple from selling XRP" and

testified that "in early 2013 . . . through most of 2017, the price [of XRP] moving really had

. . . very little impact on what Ripple could sell as far as – as measured in dollar terms . . .

because of a lack of volume in the market and . . . liquidity in the market." PX 14 at 277:5-

278:3. Defendants further dispute the SEC's suggestion in Paragraph 231 that "declining

XRP price would have an impact on Ripple's balance sheet," as Ripple's CFO testified that

"XRP did not appear on the balance sheet of Ripple." PX 23 at 120:7-8.

232. As Vias testified, "[w]hen you own 55 billion XRP [as Ripple does], it's pretty obvious you don't want [the price of XRP] to go down." PX 21 (Vias Inv. Tr.) at 385:10-23.

**Response:** Disputed. Defendants do not dispute that PX 21 contains the quoted

text, exclusive of any alterations, omissions, or additions by the SEC, including the

misleading and unmarked change of the starting word in the quoted testimony from "[i]f" to

"[w]hen." Defendants dispute that a statement by a single employee at a particular point in

time is sufficient to establish the underlying fact set forth in Paragraph 232 at all times and

for all purposes in this litigation.

233. In a January 2017 email, Vias wrote to other Ripple employees including Garlinghouse and Larsen: "Over the last few weeks we've seen an impressive rally in digital assets, a rally in which XRP has not significantly participated. For the sake of some of our large XRP investors, and for our own sanity, it's important to take stock of what's happened, why it's happened, and what this means for our XRP strategy." PX 68 at 0353469.

**Response:** Undisputed that PX 68 contains the quoted text. Defendants dispute

the SEC's characterization of, and inferences purportedly drawn from PX 68 to the extent it

implies anything about whether the Individual Defendants read this email, what they

understood it to mean, or what, if any, reaction they had to it since the exhibit contains no

communication from either of the Individual Defendants.

234. In a November 2017 email to Griffin, Samarasinghe wrote: "[T]oday, ETH rallied more than XRP, with ETH up 8.33%, and XRP only up 4.2%...It is disheartening

to see few speculators jumping into XRP." PX 69 at 0319273. In a follow-up email, Samarasinghe added that Ripple's "[m]essaging should aim to cultivate the XRP speculator community, which is very important to us." *Id.* at 0319272.   When Griffin forwarded her this email, Long responded: "Yep – aware of all points and doing our best!" *Id.*

**Response:**        Undisputed that PX 69 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

235.    Like Ripple and its employees, other XRP holders benefited from increased liquidity and price of XRP, as holders of an asset, including XRP, in general would prefer more liquidity for that asset, as it lowers the cost to enter or exit a position. PX 22 (Samarasinghe Tr.) at 75:17-76:8.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 22 as misleading, including because Samarasinghe's testimony did not discuss the "benefit" to an "XRP holder" of an "increased . . . price," but only discussed whether "[h]olders of an asset, in general . . .would prefer greater liquidity for that asset." PX 22 at 75:17-76:8.  Defendants further dispute Paragraph 235 because the quoted testimony reflected that Samarasinghe was testifying solely about his own personal beliefs in response to hypothetical questions, and not any belief of "Ripple and its employees" or "other XRP holders."

236.    For example, Madigan admitted that as a holder of XRP she wanted there to be healthy XRP liquidity so she could sell her XRP and that Ripple "cares to see that XRP has deep liquidity to the support the scaling of [its] flagship" product. PX 25 (Madigan Tr.) at 165:20-166:23.

**Response:**        Disputed.  Defendants dispute that PX 25 supports the SEC's assertions of fact as set forth in Paragraph 236, including that Madigan offered such testimony "as a holder of XRP" because she testified that she "can't speak for other XRP holders" when asked by the SEC "whether XRP holders in the market care about XRP's liquidity health and development." PX 25 at 166:7-12.  Defendants further dispute that any

statement made by an individual in their personal capacity represents the views of Ripple, the Individual Defendants, or any other XRP holder.

237.    Samarasinghe told a third-party exchange that Ripple's "goal is to have redundant XRP sales presence on basically every major exchange that sells XRP, with priority for exchanges that we don't have a presence on." PX 70 at 00303-04.

**Response:**    Disputed.  Defendants do not dispute that PX 70 contains the quoted text, exclusive of any alterations, omissions, or additions; however, Defendants dispute that Samarasinghe provided the quoted statement to a "third-party exchange" when the underlying document was an email between Samarasinghe and an individual employee of ███████████ which did not operate an exchange.  PX 70 at ███████ 000303. Defendants further dispute that Samarasinghe's statement in PX 70 concerning "our goal," which was omitted in part by the SEC in Paragraph 237, can be attributed to Ripple as an entity, as the SEC offers no evidence to establish that fact.

238.    Samarasinghe admitted that listing XRP on new exchanges could "benefit XRP speculators in that it could possibly provide a new avenue for demands for XRP or liquidity for XRP." PX 22 (Samarasinghe Tr.) at 172:23–173:5. For example, "[t]he rumors that XRP would be listed on Coinbase were a factor that market speculators attributed the price rise of XRP." *Id.* at 180:15-23; PX 71 at 0198978.

**Response:**    Disputed.  Defendants do not dispute that PX 22 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 238 insofar as it omits additional context necessary to understand the quoted testimony, including that Samarasinghe did not view the Coinbase listing rumors "as a factor, in [his] view, in the total price increase" of XRP at that time, but rather only considered it to be a "rumor that was going on during . . . the price rise." PX 22 at 178:6-21. Defendants dispute the suggestion in Paragraph 238 that the quoted testimony reflected a belief of Ripple or the Individual Defendants, when the evidence cited in Paragraph 238

demonstrates that Samarasinghe was testifying only about his own personal beliefs in response to hypothetical questions.

239.   As Schwartz testified, the incentives of holders of XRP subject to lock-ups are aligned with Ripple's incentives because "[i]f you are guaranteed to hold an asset over a period of time, the long-term price becomes…more important to you. You would be more concerned with the long-term price than the short-term price." PX 6 (Schwartz Dep. Tr.) at 287:23-289:22.

**Response:**        Disputed.  Defendants do not dispute that PX 6 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the suggestion in Paragraph 239 that the quoted testimony reflected a belief of Ripple or the Individual Defendants, because Schwartz was testifying only about his own personal beliefs in response to hypothetical questions.

240.   In January 2020, Will emailed the Ripple leadership team that crypto trading platform Binance would list a "perpetual swap contract" between XRP and the crypto token "USDT," which permitted "speculators as well as hedgers alike an efficient form to trade." PX 40 at RPLI_SEC 476871.

**Response:**        Disputed.  Will wrote that "[p]erpetual swaps" in general, not swaps between XRP and USDT specifically, allowed "speculators as well as hedgers alike an efficient form to trade."  PX 40 at RPLI_SEC 0476871.

241.   Ripple's XRP markets team monitored the XRP market on a daily basis, including monitoring the price and volume of XRP. PX 14 (Griffin Dep. Tr.) at 226:11-17; PX 21 (Vias Dep. Tr.) at 40:8-14; *see also* PX 80 (Ripple Ans.) ¶¶ 193, 198.

**Response:**        Disputed.  Paragraph 241 omits additional context necessary to understand the quoted testimony, including that Griffin testified only that he "believe[d]" that it was "fair to say that the market team . . . monitor[ed] the price and volume [of XRP]," PX 14 at 226:11-17, and Vias testified that the purpose of this monitoring was to "look[] for anomalies," PX 20 at 40:15-41:1.  Defendants further dispute that PX 80 supports the

statements in Paragraph 241, as Ripple admitted only "that Ripple employees at times observed the trading price and volume of XRP."  PX 80 ¶ 193.

242.   Ripple monitored the XRP markets on a daily basis, and Ripple employees expressed disappointment over unfavorable XRP price movements and vice-versa. PX 68 at 0353469; PX 69 at 0319273; PX 14 (Griffin Dep. Tr.) at 242:24-243:14.

**Response:**       Disputed.   Ripple incorporates by reference its response to Paragraph 241.  The SEC's cited evidence does not support its suggestion in Paragraph 242 that Ripple employees were "disappoint[ed]" over "unfavorable" XRP price movements and "vice-versa" because the evidence establishes that Ripple employees were trying to "take stock of what's happened," "be careful not to obfuscate [Ripple's] messaging," and "understand what was going on . . . with the whole market" after a significant change in price.  PX 68 at RPLI_SEC 0353469; PX 69 at RPLI_SEC 0319272; PX 14 at 242:20-243:14.

243.   Ripple employees discussed at weekly sales meetings the price, volume, spread, volatility and other components of liquidity as part of assessing the "health" of the XRP market. PX 25 (Madigan Tr.) at 37:3-10, 38:20-39:6, 40:20-42:18, 123:16-24, 131:25-132:9, 273:21-274:21.

**Response:**       Disputed.  The cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 243, because it relates to Madigan's testimony that she attended weekly Friday meetings with Ripple's leadership – not weekly "sales" meetings – and that the price of XRP "wasn't a focus" at those meetings, but rather "a number of metrics" were "all important components of liquidity overall in assessing market health." PX 25 at 35:2-37:18.

244.   Samarasinghe produced daily market snapshots that compared the liquidity and price of XRP to other digital assets and reported on his analyses at Ripple's weekly sales meetings. PX 22 (Samarasinghe Tr.) at 66:21-70:19.

**Response:**      Disputed.  Paragraph 244 omits context necessary to understand the quoted testimony, including that Samarasinghe testified that he monitored a "large number of quantitative metrics" concerning XRP, and "[t]here was a stretch of time" when he would produce a "daily market snapshot on the digital asset markets" and "contribute to the weekly XRP markets presentation at the sales meeting every week."   PX 22 at 66:1-69:17. Samarsinghe further testified that he was not a part of these weekly meetings for at least the last year of his employment. *See id.* at 70:17-19.

245.   Long monitored public sentiment around XRP by reviewing press articles about XRP and social media conversations related to XRP. PX 17 (Long Tr.) at 39:17-40:4.

**Response:**      Undisputed.

246.   In August 2016, Griffin emailed GSR's ███████: "█████ can you verify if GSR was behind the price moves this morning? We saw the price was bid up pretty aggressively. Fantastic." PX 76 at 00014722.

**Response:**      Disputed.  Defendants do not dispute that PX 76 contains the quoted text; however, Defendants dispute Paragraph 246 because it omits additional context necessary to understand the quoted language, including that Griffin clarified in his testimony that he contacted ███ because "[w]e were trying to understand what was going on . . . [w]ith the whole market," PX 14 at 242:24-243:4, and ███ testified that he replied to Griffin that "the price [of XRP] was already on the way up by the time we [GSR] started buying,"  PX 26 at 255:9-10.

247.   In a November 2016 email, Griffin told Garlinghouse: "[I]'m VERY disappointed by the price response to the █████ news today. I think it's a combination of how XRP is perceived but also just that there are a bunch of large holders who endlessly sell into good news (just my gut from having watched the price for 5 years). By contrast, IOTA is up 20% today and LISK is up 30% on some bullshit news. .meanwhile we're already retracing back down to yesterday's price." PX 77 at 0395081.

**Response:**         Disputed.  PX 77 is an email from November 16, 2017.  Defendants do not dispute that the November 2017 email contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

248.    In September 2019. Madigan stated in an internal Ripple communication: "v worried about xrp at 0.20 and lower otherwise. i DREAD q3 [XRP Markets] report if we dont take swift, creative action now (!)." PX 78 at 0295507.

**Response:**         Disputed.  Defendants do not dispute that PX 78 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 248 because it omits additional context necessary to understand the quoted language, including that Madigan testified that these comments were in reference to the potential renegotiation of Ripple's contract with a business counterparty and its implications for XRP liquidity.  PX 25 at 171:16-176:9.  Defendants dispute that the quoted language reflected a belief of Ripple because the cited evidence establishes that Madigan was speaking as to her own personal beliefs and not about a belief held by Ripple or the Individual Defendants.

249.    It is common knowledge that Ripple is XRP's largest holder. PX 21 (Vias Inv. Tr.) at 385:10-23.

**Response:**         Disputed.  The cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 249, including because Vias only testified that he believed "[i]t was common knowledge that we had 55 billion XRP," and Vias's subjective testimony does not establish the unqualified fact asserted in Paragraph 249.  Defendants further dispute any inference that may be drawn from Paragraph 249 because it does not identify any person or persons to whom it was "common knowledge" that Ripple was the "largest holder" of XRP, nor the time period during which such alleged "common knowledge" existed.

250.    Ripple disclosed its XRP holdings on its website. PX 23 (Will Tr.) at 171:2-174:14.

**Response:**         Disputed.  Defendants do not dispute that Ripple, at times, has disclosed its XRP holdings on its website; however, Defendants dispute that the cited evidence establishes the fact asserted in Paragraph 250 at all times relevant to this litigation.

251.    The Deep Dive stated: "Ripple Labs believe that its incentives are aligned with those of the protocol's users." PX 9 at p. 17; PX 10 (Rapoport Tr.) at 194:6-195:14.

**Response:**         Disputed.  Defendants do not dispute that PX 9 contains the quoted text; however, Defendants dispute Paragraph 251 because the full quote is "Ripple Labs believe that its incentives are aligned with those of protocol's users – *both want the protocol to reach its full potential and scale*."  PX 9 at PRLI_SEC 0539481 (emphasis added). Defendants further dispute that PX 9 or PX 10 are sufficient to establish the underlying facts set forth in Paragraph 251 at all times and for all purposes in this litigation.  *See* PX 10 at 189:7-11 (Rapoport testifying that he believed the Deep Dive "was a living document and that there was a continued iteration after the first publicly released version").

252.    On or about August 13, 2020, in an interview with Financial Times, Garlinghouse stated: "We are a capitalist, we own a lot of XRP.  So do I care about the overall XRP market?  100 per cent."  PX 502.06, *available at* https://www.ft.com/content/7d9c934f-3840-4285-96a7-4bdf7fee9286.

**Response:**         Undisputed that PX 502.06 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

253.    Birla, who described himself as "one of the spokesperson [sic] for Ripple," tweeted in February 2020: "Ripple and MGI are strategic partners – we are building new infrastructure together. This market development requires a ton of work, effort, and resources."  PX 506.118 *available at* http://twitter.com/ashgoblue/status/1232480844847017985?s=20; PX 16 (Birla Inv. Tr.) at 12:1-21.

114

**Response:**      Disputed.  Defendants dispute the SEC's characterization in the first clause of Paragraph 253 as incomplete and misleading, as Birla testified that he also uses Twitter in his personal capacity.  *See* PX 16 at 11:16-25.  Defendants further dispute Paragraph 253 because Birla testified that, while he posted this text to his Twitter account, he did not recall authoring it himself.  *See* PX 15 at 235:2-21.

254.   Ripple represented to ████████ "All sales of XRP conducted by XRP II are for the benefit of Ripple Labs, its ultimate parent company, and represents the method by which Ripple Labs raises working capital." PX 87 at RPLI_SEC 0095178.

**Response:**      Disputed.  The SEC has altered the original text, the accurate version of which reads as follows in PX 87:  "All sales of XRP conducted by XRP II are for the benefit of Ripple Labs, its ultimate parent company, and represents ***one*** method by which Ripple Labs raises working capital."  PX 87 at RPLI_SEC 0095178 (emphasis added).  To the extent the SEC's change to the document's language was intended to create the misleading impression that XRP II's XRP sales were the sole or primary "method by which Ripple Labs raise[d] working capital" – instead of only one such method – Defendants note that Paragraph 254 also omits additional context necessary to understand the quoted language from PX 87, including that "Ripple Labs' primary business consists of (1) professional services related to business use cases development, technology deployment and systems integration; and (2) building and licensing software to help financial institutions interact with the protocol," PX 87 at RPLI_SEC 0095168, and that "Ripple Labs generates revenues by providing professional services and products for connecting to Ripple, including integrations, licensing software and building custom applications for users," *id*. at RPLI_SEC 0095169.  *See also* PX 23 at 42:7–13 (Will testifying that "the funds to cover Ripple's expenses" were raised through venture capital investments, software revenue, and

XRP sales).  Undisputed that XRP II LLC was a wholly-owned subsidiary of Ripple, and

that XRP II LLC has sold XRP, *see* PX 8 (Ripple RFA Responses) Nos. 229, 240.

255.   Ripple's May 8, 2018 "Key Messages, FAQ and Fast Facts" stated: "What
differentiates us is that we also have XRP – so we also make money through XRP
sales, which we highlight every quarter in our Markets report." PX 88 at RPLI_SEC
0735394.

**Response:**        Undisputed  that  PX  88  contains  the  quoted  text;  however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

PX 88 including because Paragraph 255 omits additional context necessary to understand the

quoted language, including that PX 88 also states that Ripple "make[s] money" through

"software enterprise sales – no different than Oracle or Salesforce."  PX 88 at RPLI_SEC

0735394.

256.   Ripple's May 8, 2018 "Key Messages, FAQ and Fast Facts" also stated: "We own
just over 60% of XRP and we use it to grow our team and our business. We also
use it to build the ecosystem." *Id.* at RPLI_SEC 0735397.

**Response:**        Undisputed, except insofar as the quoted language appears in PX 88

at RPLI_SEC 735396;  however, Defendants dispute Paragraph 256 to the extent the SEC

purports to suggest that Ripple "gr[e]w" their team or business or "buil[t] the ecosystem"

only by selling XRP because Ripple's CFO explained that the funds Ripple obtained from a

"combination of venture capital raising[,]…software revenue[,]" and sales of XRP were used

to hire "engineering and product talent to build out RippleNet."  PX 23 at 42:7–13; 244:22–

245:9.

257.   The talking points also further instructed employees to say that Ripple "employees
can choose to receive payment of their salary in XRP." *Id.*; *see also* PX 19 (Zagone
Tr.) at 183:8-184:23, 191:16-192:22.

**Response:**        Disputed.  Although Defendants do not dispute that PX 88 contains

the  quoted  text,  Defendants  dispute  that  the  cited  evidence  establishes  that  Ripple

"instructed" any employees to communicate the quoted language from PX 88, as PX 88 merely describes itself as a "go-to resource" for networking and business conversations during BlockchainWeek NYC in May 2018.  PX 88 at RPLI_SEC 0441723.  The SEC's assertion of fact in Paragraph 257 is also not supported by the cited testimony in PX 19.

258.    Ripple's "General Media Training FAQ" stated: "We've been strong stewards of XRP and our interests are very much aligned." PX 89 at RPLI_SEC 0376175.

**Response:**          Undisputed that PX 89 contains the quoted text; however, Defendants dispute that a single version of a document titled "General Media Training FAQ," which is an attachment to an email dated December 7, 2017, is sufficient to establish the underlying fact set forth in Paragraph 258 at all times and for all purposes in this litigation. *See* PX 89 at RPLI_SEC 0376173.

259.    When asked what it means that Ripple has "been strong [a] steward[] of XRP and [its] interests are very much aligned," Griffin testified: "That Ripple, as an XRP owner, has similar interests with other XRP owners." PX 14 (Griffin Dep. Tr.) at 313:19-314:13.

**Response:**          Undisputed that Griffin offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the suggestion in Paragraph 259 that the quoted testimony reflected a belief of Ripple or the Individual Defendants, when the evidence cited in Paragraph 259 demonstrates that the SEC only asked Griffin "[w]hat does [this language] mean to you sitting here today," and Griffin's testimony in response merely represented his personal beliefs as of the date of his deposition.

260.    On May 8, 2018, Garlinghouse sent an email which stated: "As responsible stewards of the XRP ecosystem wanting to help unlock XRP's full potential and further build the liquidity and usefulness of XRP, Ripple launched Xpring." PX 90 at 0392729.

    (a)    Ripple distributed at least 776 million units of XRP as part of the so-called "xPring" initiative launched in 2018 to fund third parties that would support development of new applications of XRP and the XRP ledger. PX 80 (Ripple Ans.) ¶ 147.

(b)   Ripple publicly described the xPring initiative as part of Ripple's efforts to "develop use cases for XRP." PX 501.11 (2Q19 XRP Markets Report) at 3.

**Response:**   Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 90 to the extent it implies that Garlinghouse made these statements or drafted this document because the email subject line specifies that the content in the body of the email is an "internal document on xpring." *See* PX 90. Defendants further note that the ultimate fact is in dispute because it appears that another Ripple employee authored this document, not Garlinghouse, who merely commented on it, as set forth in Ex. 114 (RPLI_SEC 0392750). Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 80, including because it describes Xpring as "a Ripple initiative to partner with companies and support development of new applications of XRP and the XRP ledger," *see* PX 80 (Ripple Ans.) at ¶ 147, and not merely to "fund," as set forth in Paragraph 260(a). Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 501.11, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 260(b) since the quoted language appears on an uncited page in the exhibit.  PX 501.11 at 5. Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 501.11, including because Paragraph 260(b) omits additional context necessary to understand the quoted language, including that Ripple publicly described Xpring as an "initiative to support the open source community of developers, building on the decentralized XRP Ledger and use cases for XRP on that ledger," as set forth in PX 501.11 at 5. Additionally, Defendants dispute Paragraph 260(b) to the extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including that Ripple made "efforts" to develop use cases for XRP.

Undisputed that Ripple distributed at least 776 million units of XRP in connection with certain projects as part of the xPring initiative.

261.   In a July 23, 2019 email, Birla described an "additional area[] of focus" as "XRP stewardship (trust, liquidity, price, etc.)." PX 91 at 0200714.

**Response:**   Undisputed that PX 91 contains the quoted text; however Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 91 including because Paragraph 261 because it omits additional context necessary to understand the quoted language, including that Birla testified that in the context of this email "XRP stewardship" would have meant "ensuring that there is liquidity at the exchanges that are leveraged by ODL and xRapid" and that he did not understand any meaning of this term with respect to price. PX 15 at 179:6–25; *see also id.* at 181:2-9 ("Q. Do you understand what to mean -- to be a steward of XRP is? … A. In the context of -- in the context of my products, that would -- and my product team, that would mean to ensure there were -- there was sufficient liquidity in the corridors that xRapid had as part of its product experience.").

262.   In a September 2019 email to other Ripple employees regarding Ripple's approach to its dealings with an institutional XRP holder, Madigan proposed that Ripple "explain our role as stewards" of XRP and "position ourselves as responsible market leaders by addressing this volumes problem head-on." 92 at 0463382.

**Response:**   Disputed.  Defendants do not dispute that PX 92 contains the quoted text; however, Paragraph 262 omits relevant context needed to understand the quoted text, specifically that the "volumes problem" Madigan referred to was not related to XRP sales or Ripple's activities, but rather "bad data" produced by a third party that was "falsely inflating volume numbers."  PX 25 at 166:24-167:23, 170:14-171:4.

263.   On or about October 8, 2019, in an interview at the Economic Club of New York, Garlinghouse stated: "Ripple owns a lot of XRP. We own about 55% of all XRP, so clearly we're very interested in the health and success of that ecosystem, but it is an open source technology that Ripple uses in its technical stack.[…]we own a lot of this digital asset. Anything we do that's good for that digital asset is good for

us."   PX   503.18   at   8:19-23,   19:   *available   at* https://www.youtube.com/watch?v=1U6ZiOyX2TA.

**Response:**        Undisputed that PX 503.18 contains the quoted text, exclusive of

any alterations, omissions, or additions, however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the document's complete

contents.   Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 503.18 to the extent it implies that XRP did not have a use case because

Garlinghouse discusses at length XRP's use case to facilitate cross-border payments as part

of Ripple's technical stack, and to the extent it implies that Ripple was solely dependent on

its XRP holdings for revenue because Garlinghouse explains that Ripple's revenue also

comes in part from selling software to banks. *See* PX 503.18 at 8-19; PX 503.18 at 11:5-7

("So we are using XRP to help banks, to help regulated financial institutions facilitate cross

border transations … Ripple's very focused on using it for that"); PX 503.18 at 19:1-15 ("We

sell a software license, we have transaction fees, we have professional service fees.").

264.    On or about October 18, 2019, in its 3Q19 XRP Markets Report that Ripple posted
        on its website, Ripple stated: "As a stakeholder of XRP Ripple is an interested party
        in its success. We are aligned with other XRP stakeholders and focused on
        supporting a healthy XRP community…Ripple will continue to take proactive steps
        to address misinformation and FUD while being a responsible and transparent
        stakeholder of XRP." PX 501.12 at 3, 5, *available at* https://ripple.com/insights/q3-
        2019-markets-report/.

**Response:**        Undisputed that PX 501.12 contains the quoted text, exclusive of

any alterations, omissions, or additions by the SEC.

265.    On or about April 30, 2020, in its 2Q19 XRP Markets Report that Ripple posted on
        its website, Ripple stated: "Ripple publishes the quarterly XRP Markets Report to
        voluntarily provide transparency and regular updates on the company's views on
        the state of the XRP market, including quarterly programmatic and institutional
        sales update relevant XRP-related announcements such as Xpring and RippleNet
        partnerships and commentary on previous quarter market developments. As an
        XRP holder, Ripple believes proactive communication is part of being a responsible
        stakeholder. Moreover, Ripple urges others in the industry to follow its lead to build

trust, foster open communication and raise the bar industry-wide." PX 501.14 at 1, *available at* https://ripple.com/xrp/q1-2020-xrp-markets-report/.

**Response:**          Undisputed that PX 501.14 contains the quoted text, exclusive of unmarked alterations to the text by the SEC insofar as the original text reads "including quarterly programmatic sales and institutional sales updates, relevant XRP-related announcements such as Xpring . . ." PX 501.14 at ECF p. 94.

(a)      The 2Q17 XRP Market Report stated that Ripple's "team" of developers was "best in the world" and that Ripple had been a steward of XRP. PX 501.03.

**Response:**          Disputed.  The quoted text does not appear in Ripple's 2Q17 XRP Markets Report.  *See* PX 501.03.

266.     On or about July 24, 2019, Garlinghouse tweeted: "In this nascent industry, we need to be transparent and urge others to do the same. As a responsible stakeholder of XRP, @Ripple is confronting this issue by updating the benchmark for market volume and reducing future sales of XRP." PX 506.115, *available at* https://twitter.com/bgarlinghouse/status/1154064322475233280?s=20.

**Response:**          Undisputed that PX 506.115 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents because Paragraph 266 omits from the tweet a link to the Q2 2019 XRP Markets Report that Garlinghouse was commenting on. PX 506.115.

267.     In its 3Q2019 XRP Markets Report that Ripple posted on its website on or about October 18, 2019, Ripple stated: "Ripple publishes the quarterly XRP Markets Report to voluntarily provide unparalleled transparency and regular updates on the state of the XRP market, including quarterly programmatic and institutional sales updates, relevant XRP-related announcements such as Xpring and RippleNet partnerships, and commentary on previous quarter developments. As an owner of XRP, Ripple believes proactive communication is part of being a responsible stakeholder." PX 501.12 at 1, *available at* https://ripple.com/insights/q3-2019-markets-report/.

**Response:**          Undisputed.

268. In its Q4 2019 XRP Markets Report that Ripple posted on its website on or about January 22, 2020, Ripple stated: "Ripple publishes the quarterly XRP Markets Report to voluntarily provide transparency and regular updates on the company's views on the state of the XRP market, including quarterly programmatic and institutional sales updates, relevant XRP-related announcements such as Xpring and RippleNet partnerships and commentary on previous quarter market developments. As an XRP holder, Ripple believes proactive communication is part of being a responsible stakeholder. Moreover, Ripple urges others in the industry to follow its lead to build trust, foster open communication and raise the bar industry-wide." PX 501.13 at 1, *available at* https://ripple.com/insights/q4-2019-xrp-markets-report/.

**Response:**     Undisputed.

269. On or about October 19, 2019, in an interview sponsored by the DC Fintech, Garlinghouse stated: "We own a lot of XRP so we are certainly interested in success of that broadly defined." PX 503.24 at at 27:14-16, *available at* https://www.youtube.com/watch?v=AkEA_YqaCnw.

**Response:**     Disputed. The cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 269 since the quoted language does not appear in PX 503.24. Instead, the quoted language appears in PX 503.25 at 27:14-16, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. In addition, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.25, including because Paragraph 269 omits additional context necessary to understand the quoted language including that Garlinghouse made this comment while discussing misinformation in the public domain about the distinction between Ripple and XRP, and was not expressing Ripple's interest in XRP in a vacuum. *See* PX 503.25 at 27:10-22 ("… Ripple is an enterprise software company that sells software to banks and financial institutions. We use as part of our tech stack a – a (sic) open source digital asset called XRP. We own a lot of XRP, and so we are certainly interested in the success of that broadly defined. But you know, I think there's a lot of intentional misinformation and sometimes just confusion in the marketplace

about what is Ripple versus what is XRP? You know, and that has, I think the misinformation

or the FUD that gets sprayed (sic), I think it's kind of bad for the whole industry and makes

it harder.").

270.     In a January 2018 email, Garlinghouse told an XRP investor: "Ripple obviously
         has a vested interested [sic] in the success of the XRP ecosystem – and we invest
         in the XRP ecosystem in many ways." PX 93 at 0394442-43.

**Response:**        Undisputed that PX 93 contains the quoted text, exclusive of any

alterations, omissions, or additions, however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the document's complete

contents. Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 93, including because Paragraph 270 omits additional context necessary to

understand the quoted language, including that Garlinghouse made this statement in the

context of differentiating Ripple and XRP, and not in a vacuum, explaining that Ripple

"work[s] hard to clarify (every day!) that Ripple is the company - XRP is the digital asset

native to the XRP Ledger," as set forth in PX 93 at 9-10.

271.     Garlinghouse stated publicly that he is "very long XRP as a percentage of [his]
         personal balance sheet." PX 80 (Ripple Ans.) ¶ 7.

**Response:**        Undisputed that PX 80 contains the quoted text, exclusive of any

alterations, omissions, or additions, however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the document's complete

contents. Defendants note that Paragraph 271 omits additional context necessary to

understand the quoted language, including that Garlinghouse received XRP from Ripple as

employment compensation.   PX 73 (April 2015 Employment Agreement); PX 74,

RPLI_SEC 0259758 (December 2016 XRP Unit Bonus Award); PX 75, RPLI_01708774

(May 2019 XRP Ledger Address Award). In addition, Garlinghouse testified that when he

made statements about being "long XRP" he "was answering the question that was being asked by a reporter" and meant to convey that he "had economic exposure" in XRP. PX 36 at 174:15-18; 175:3-6; 177:4-7.

272.   Vias stated on an XRP forum: "Most of you are not Ripple employees. You are most definitely on the team, some only because you're long XRP." PX 508.35. Vias testified that an XRP holder who is "long XRP" wants XRP to go up in price. PX 20 (Vias Dep. Tr.) at 124:4-24.

**Response:**        Disputed.   As to the first sentence of Paragraph 272, although Defendants do not dispute that PX 508.35 contains the quoted text, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 508.35 including because Paragraph 272 omits additional context necessary to understand the quoted language, including that the full text of the quoted sentence in Paragraph 272, which the SEC misleadingly excerpts, reads as follows: "Though most of you are not Ripple employees, you are most definitely on the team, some only because you're long XRP, but many because, just like me, know that what Arthur and David created is a transformational piece of software that has the potential to change history." PX 508.35.  As to the second sentence of Paragraph 272, Defendants dispute the SEC's characterization of the quoted testimony in Paragraph 272, as it omits that Vias testified that being "long XRP" only "usually" meant "you want it to go up in price." PX 20 at 124:21–24.

273.   Similarly, Schwartz noted publicly that "the ideal situation for Ripple would be an increasing [XRP] price over the long term with few downward spikes" to "maximize" Ripple's revenue from XRP sales, that both Ripple and XRP holders want more use for the XRP Ledger and XRP, and that even a small increase in XRP's price would make Ripple "massively profit." PX 6 (Schwartz Dep. Tr.) at 271:8-275; 353:4-355:7; *see also* PX 508.18, 508.28 (publicly stating the foregoing).

**Response:**        Disputed.   Undisputed that Schwartz wrote a post on social media stating that "[t]he ideal situation for Ripple would be an increasing [XRP] price over the long

term with few downward spikes," exclusive of any alterations, omissions, or additions by the

SEC. *See* PX 6 at 353:4–11.   Defendants dispute the remainder of Paragraph 273 as

unsupported by the cited evidence, including because the remaining statements in Paragraph

273 were not "noted publicly" but rather were made during Schwartz's non-public deposition

testimony, and the SEC has identified only selective and unrelated quotations from public

statements by Schwartz containing the quoted language.   *See* PX 508.18 (containing the

quotation "massively profit"); PX 508.28 (stating "[t]he ideal situation for Ripple would be

an increasing price over the long term with few downward spikes").   Defendants further

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 508.28

because Schwartz testified that the "ideal scenario" was "not that [price] necessarily be

increasing," but rather that if the holding cost for XRP went down, "[t]here would be no

obstacle [to] using XRP as a payment source." PX 6 at 353:5-355:7.

274.   On or about July 6, 2017, in a post on XRP Chat, Schwartz stated: "There is a huge
advantage to having one entity that holds a significant fraction of an asset. Ripple
could spend $100 million on something that has no conventional way of creating
revenue, but if it pushed the price of XRP up by one penny over the long term,
Ripple would massively profit. Nobody has that kind of concentrated interest in any
coin distributed primarily by mining. The money that would have gone to pay for
ASICs and electricity to mine the asset instead goes to building the liquidity and
technology to make XRP attractive for the use case Ripple is focused on. There are
things an asset that isn't mined can do that an asset that's mined cannot do because
of this difference. Let me give you a stark example. The Bitcoin foundation has
been trying to raise funds to combat New York's BitLicense regulation. On April
10, 2017, they announced that they needed to raise between $100,000 and $200,000
and that the first hearing was May 4. Likely these efforts would benefit many
bitcoin users and holders, but nobody has a concentrated enough interest to pay the
bulk of the funds. This a clear example of a public good free rider problem –
everybody is worse off if nobody contributes, but nobody has a strong individual
incentive to contribute. Everyone wants to be the only one who doesn't contribute.
As of today, more than one month past that hearing, they've raised about 3 BTC.
How much do you think Ripple can (and does) spend on regulatory issues critical
to using XRP for its use case? The reason is obvious – keeping the regulatory way
clear for XRP's use for settlement makes a huge difference to Ripple, the company,
specifically." PX 508.18, *available at* <u>https://www.xrpchat.com/topic/7054-how-</u>

do-you-like-your-misinformation-please-feel-free-to-correct-him/?do=findComment&comment=67173.

    **Response:**    Undisputed.

275.    On or about December 1, 2017, in a post on XRP Chat, Schwartz stated: "A higher price tends to correlate with more liquidity. It's not really a direct cause and effect relationship, but they tend to move in tandem. The ideal situation for Ripple would be an increasing price over the long term with few downward spikes. This would increase Ripple's value and revenue which not only makes Ripple's stockholders and Board of Directors happy but also increase Ripple's ability to deploy resources to incentivize partnerships and build the ecosystem. This would also reduce the cost of holding XRP. If the upside is worth more than the downside, FIs can hold XRP and give someone else both the upside and the downside of the volatility, giving them zero holding cost. This could lead to tremendously increased demand if Ripple is successful in promoting XRP as a vehicle currency. Imagine if XRP is an intermediary for payments in many different corridors and the cost of holding XRP is zero or negative. Now, companies like AirBNB, Uber, and Amazon can make international payments as follows: 1) They receive assets all over the world. 2) When people need to make payments into places where they have assets, the provide the fiat currency and take the XRP. This lets them buy XRP at zero or negative cost because they are being paid by whoever is making the payment. 3) When they need to make payments, they only have to do half the payment because they already hold XRP, the preferred intermediary payment. So they would only pay about half the normal cost. This is kind of my dream scenario for XRP. Companies that have to make payments around the world buy XRP at below market by facilitating other people's payments and use their XRP to make payments at below market because they only have to pay for the "from XRP" half. All those piles of XRP people are holding increase demand, increasing price, reducing the holding cost of XRP to zero or negative. You can also imagine traders doing the same thing. They hold piles of XRP because this lets them be opportunistic and take other assets that people are trying to make payments with since they'll need XRP to buy the asset they're trying to deliver. Whether it will happen is, of course, certainly not guaranteed. But Ripple's preferred price of XRP is as high as possible, preferably increasing, so long as sharp and/or steep drops are minimized." PX 508.28 *available at* https://www.xrpchat.com/topic/12335-ripple-the-fundamental-value-of-xrp/?do=findComment&comment=127965.

    **Response:**    Undisputed.

276.    Larsen believed that people in the global marketplace considered the amount of XRP that Ripple's founders held "to be high and sort of overhang, and that it would be constructive if that overhang was decreased over time." PX 2 (Larsen Tr.) at 92:20-93:17.

**Response:**        Undisputed that Ex. 8 contains the quoted text at 91:20-92:5. Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from PX 2 as misleading, since that Larsen continued to testify that it would be constructive if the "overhang was decreased over time and didn't have an impact on the market." Ex. 8 at 92:5-6.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from PX 2 to the extent the SEC seeks to imply that this statement has anything to do with the escrow of XRP in 2017 as unsupported by the record.

277.    In or around November 2013, an internal Ripple presentation acknowledged that there existed "[o]verhang [c]oncerns" due to the XRP holdings of Ripple and its founders. PX 101 at RPLI_SEC 0012365.

**Response:**        Undisputed.

278.    Griffin came to learn during the course of his tenure at Ripple—including directly from XRP market participants, as well as from cryptocurrency media, forums, Twitter, and other social media—that there was "overhang concern," in other words, third parties had concerns regarding the amount of Ripple's holdings of XRP.  PX 14 (Griffin Dep. Tr.) 72:16-73:19; PX 3 (Griffin Inv. Tr.) 198:1-200:4.

**Response:**        Disputed.  Griffin testified that understood the "overhang concern" arose not from "XRP market participants," but from "a contingent" of "bitcoin maximalists" who disseminated "misinformation" and "talking points . . . Ripple could sell its XRP at any given moment, and that represented an overhang of supply." PX 14 at 72:16–73:15.

279.    In or around 2013, Griffin believed that "overhang" concern related to XRP, which he thought was "just the possibility of a large supply entering the market," was "a theme or reoccurring criticism of XRP" that was a "headwind" that could be "a reason why people would not want to buy XRP."  PX 3 (Griffin Inv. Tr.) 126:9-127:18.

**Response:**        Disputed.  Undisputed that Griffin offered the quoted testimony, however, Defendants dispute the SEC's characterizations in Paragraph 279 insofar as Griffin also testified during his deposition that he understood the "overhang" concern to in fact be

"misinformation" that "a contingent of cryptocurrency adopters" would use to attack other cryptocurrencies.  PX 14 at 72:16–73:19.

280.  In or around August 2014, Ripple employees, including Larsen, expressed concern about "downward pressure" on XRP prices created by large sales of XRP and internally debated possible solutions to this "downward pressure." PX 100.

**Response:**     Disputed.  Defendants do not dispute that on July 10, 2014, Greg Kidd wrote an email discussing potential "downward pressure" on XRP sales from several causes, as well as potential steps that could be taken in response.  PX 100 at RPLI_SEC 0516477–79.   Defendants dispute that Larsen "expressed concern about 'downward pressure' on XRP prices," or that "large sales of XRP" were the only cause of this downward pressure, as this assertion in Paragraph 280 is not supported by the cited evidence. Defendants further dispute the SEC' unsupported implication that this document from 2014 has anything to do with Ripple's escrow of XRP in 2017.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 100 because the SEC misleadingly omits that XRP was repeatedly referred to as a "currency" in the cited document.  *See* PX 100 at RPLI_SEC0516477, RPLI_SEC0516478.  To the extent the SEC implies that PX 100 contains information about Larsen's mental state, Defendants dispute that Larsen's mental state can be inferred from the statements of a third party.

281.  Ripple made efforts to eliminate "overhang" as to XRP or otherwise minimize any disruption caused by large XRP sales. PX 6 (Schwartz Dep.) 326:12-329:8; PX 14 (Griffin Dep.) 199:17-200:4.

**Response:**     Disputed.  Paragraph 281 mischaracterizes Schwartz's testimony, which states that Ripple's escrow "could reduce that overhang effect," PX 6 at 328:16-19, and not that Ripple made "efforts to eliminate" the overhang.  Defendants further dispute Paragraph 281 to the extent it sets forth legal conclusions unsupported by citations to evidence, including the SEC's statement that Ripple engaged in "efforts."   Further,

Defendants also dispute Paragraph 281's citation to PX 14; to the extent that the SEC instead intended to cite PX 3 (Griffin Inv. Tr.), Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 3, including because it omits that Griffin discussed a third-party's concerns about XRP overhang, but testified he did not know if their opinion was widespread.  PX 3 197:4–199:5.

282.   On or about May 8, 2014, Griffin emailed Larsen and another Ripple employee with the subject line "xrp injections": "what can we do? i'm concerned that we lose speculator interest given that xrp will never rise with someone always ready to flood the supply anytime there is good news. the speculators are good for liquidity and provide 'fumes' for volume and market making. losing them entirely could cause problems for us. we need a solution." PX 95 at 72:23-73:19.

**Response:**     Undisputed that PX 95 contains the quoted text; however, Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 95 including because Paragraph 282 omits additional context necessary to understand the quoted language, including that when Griffin was asked about this email during his deposition, he explained that this email was "really focused on liquidity" and "facilitating the cross currency transactions and cross asset transactions and being able to seamlessly move from one payment system to another payment system."  PX 14 at 133:1-135:5.

283.   In response to the announcement by Ripple co-founder McCaleb of the sale of a large block of XRP shares, in May 2014, Ripple stated in a statement by Britto: "Many of you are concerned about what impact these sales will have on the market…We've heard and shared your concern about the founders' XRP allotment. Prior to today, we've been working on a founders' XRP lock up plan, which Chris [Larsen] and I are participating in. You can rest assured that a dumping event like this won't happen from other co-founders." PX 96 at 0000903.

**Response:**     Undisputed that PX 96 contains the quoted text, except for any alterations, omissions, or additions by the SEC.   Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 96, including whether this document has anything to do with the escrow of XRP in 2017.

284.    In April 2014, Ripple employees discussed with Larsen over email what the "company line" was if Ripple was "asked to explain what's happening to the price of XRP" and noted concerns regarding McCaleb's movement of XRP into accounts that signaled he would continue to sell XRP. PX 109 at 0644286-7.

**Response:**        Disputed.  Although Defendants do not dispute that PX 109 contains the quoted text, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 109 as misleading, because it omits additional context necessary to understand the quoted language, including Larsen's response dated April 2, 2014 that explained various factors that might have affected the price of XRP: "pretty much has tracked the decline in BTC as the market digests the news from China and the new IRS ruling. Also, keep in mind that last year at this time also saw a sell off - likely US BTC owners selling BTC." PX 109 at RPLI_SEC 0644286.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 109, including whether this document has anything to do with the escrow of XRP in 2017.

285.    In June 2014, Larsen wrote McCaleb, a Ripple founder, re "Resolving your XRP issue," and Larsen stated his intention to take steps "[t]o shield XRP holders, including many early believers in Ripple, from a short-term price shock, which will inevitably result from [McCaleb's] mass XRP sale set to occur" at a specified future date. PX 108 at RPLI_SEC 0867637-38.

**Response:**        Undisputed that PX 108 contains the quoted text.  Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 108, including whether this document has anything to do with the escrow of XRP in 2017.

286.    In approximately July 2014, after McCaleb announced his plan to increase his XRP sales, Ripple negotiated—and by August 2014 was able to announce—an agreement requiring McCaleb to slow down his sales in order to minimize any negative impact on XRP's price. PX 110 at 1, 2, *available at* https://archive.ph/cuEoz.

**Response:**        Disputed.  PX 110 states that, "[f]ollowing Jed's stated intention to sell his XRP, Ripple Labs reengaged Jed to ensure responsible distribution of his XRP stake

in a way that helps grow the Ripple ecosystem"; and states that "[a]fter extensive discussions, Jed has agreed to lock-up terms for his XRP."  PX 110 at ECF p. 2.  Defendants otherwise dispute Paragraph 286 as unsupported by the cited evidence. Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 110, including whether this document has anything to do with the escrow of XRP in 2017.

287.  According to Long, Ripple's "overall goal" in announcing its agreement with McCaleb restricting his XRP sales was "to assure the market [Ripple was] resolving the founders' XRP responsibly." PX 111 at RPLI_SEC 0530022.

**Response:**    Undisputed that PX 111 contains the quoted text, excluding any alterations, omissions, or additions    by the SEC.    Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 111, including whether this document has anything to do with the escrow of XRP in 2017.

288.  Larsen was aware that there was "some concern that Ripple could dump its XRP holdings and that would be a bad thing." PX 2 (Larsen Tr.) 376:12-377:10.

**Response:**    Undisputed that Ex. 8 contains the quoted text at 376:6-10. Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.   Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from PX 2 as misleading.   It omits that Larsen testified that "*a small number of people*" may have unfounded concerns. Ex. 8 at 376:9-10.

289.  In an email pitching an XRP purchase to a large institutional investor sent in July 2014, Rapoport, copying Larsen, explained that the "settlement deal" with McCaleb meant XRP's "price could go [up] +50-80% from here very easily." PX 58 at ████████Ripple_0002423.

**Response:**    Disputed.  Rapoport's statement was a response to a hypothetical question posed by a third party about the potential effects if McCaleb "dump[ed] [XRP] in the market," before any such settlement with McCaleb was finalized.   PX 58 at

███████Ripple_0002422–23.  Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 58, including whether this document has anything to do with the escrow of XRP in 2017.

290.   In describing a September 2016 meeting Griffin and Garlinghouse had with potential investor ████████ and his team at ██████████████("██"), a venture capital company based in Connecticut focused on the crypto markets and which owns, among others, ████████ and ██████████ Griffin summarized feedback from ███ and his team including:

(a)   "Jed [McCaleb] Settlement - Ripple can do more to make clearer how Jed's [McCaleb's] XRP are controlled. One idea is to provide an overview of the selling constraints/plan for founders and executive, wherein we can reemphasize Jed's [McCaleb's] lockups."

(b)   "Founders and executive team - Ripple needs to be more transparent about who owns what, when it will be released, and what liquidation controls are in place. We need to hold ourselves accountable to a public schedule."

(c)   "Escrow – 'Ripple is a central bank of XRP' and should be looking into innovative ways to guarantee distribution with a predictable and public schedule. Consider moving the companies [sic] XRP into escrow." PX 97 at RPLI_SEC 0378114.

**Response:**   Undisputed that PX 97 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 97 to the extent the SEC implies that Ripple or the Individual Defendants endorsed or agreed with ████'s views, which the cited evidence does not support.  *See* PX 97 at PLI_SEC 0378113 (Garlinghouse commenting that they should "digest" ████'s feedback alongside other customers' and "our own thesis about the opportunity").  Defendants otherwise dispute Paragraph 290, as the further assertions of fact in Paragraph 290 are not supported by the cited testimony. Defendants further dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 97, including whether this document has anything to do with the escrow of XRP in 2017.

291.    ▮▮▮▮ expressed concerns to Garlinghouse and other Ripple employees that "[a]n obstacle to getting new money into XRP is predictability of supply," and because "[i]nvestors need certainty and stability to evaluate risk and price accordingly," "[w]ithout a clearly defined distribution plan, it will be difficult/impossible to attract new money to XRP." PX 97 at RPLI_SEC 0378114; PX 14 (Griffin Dep. Tr.) at 329:10-332:9.

**Response:**     Disputed. Although Defendants do not dispute that PX 97 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 97 to the extent the SEC implies that Ripple or the Individual Defendants endorsed or agreed with ▮▮▮▮ 's views, which cited evidence does not support. *See* PX 97 at PLI_SEC 0378113 (Garlinghouse commenting that they should "digest" ▮▮▮▮ 's feedback alongside other customers' and "our own thesis about the opportunity"). Defendants further dispute that PX 14 provides support for the assertions of fact stated Paragraph 291, as Griffin testified that he did not recall the meeting with ▮▮▮▮ . PX 14 at 329:24-5, 332:10-18.

292.    In November 2016, Griffin emailed Larsen and Garlinghouse: "In preparation for our negotiations with ▮▮▮▮ next week, we will need to have alignment from you on the main deal consideration: a more predictable distribution of XRP. While ▮▮▮▮ is the impetus for these considerations, the underlying premise—that a more predictable distribution of XRP is needed to attract institutional investors to XRP— is applicable to all investors and users of XRP." PX 98 at 1027131.

**Response:**     Undisputed that PX 98 contains the quoted text. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 98 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse.

293.    In the same email, Griffin also requested approval of a proposal for a 3-year plan wherein a total of 19 billion XRP would be available to Ripple for distribution and "[e]nforcement by escrow: Suspended Payments (smart contract available in [Ripple Consensus Ledger] next month). At the end of year 3, the remaining 45B of our holdings are unlocked." PX 98 at 1027131.

**Response:**      Undisputed, except that Defendants aver that Larsen testified that he believed that the proposal in Griffin's email was different from the escrow Ripple ultimately entered into.  PX 2 at 374:22–375:20.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 98 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse.

294.   In or around March 2017, Schwartz wrote on XRP Chat that if Ripple opted not to lock up XRP, "people will fear that if things aren't going well, [Ripple will] be tempted to sell lots of XRP, precisely the fear [Ripple] want[s] to eliminate."  PX 508.37.

**Response:**      Disputed.  Paragraph 294 does not contain an accurate statement of the quoted language, the accurate version of which reads as follows in PX 508.37:  "Now I think we should probably lock up as much as we think we can for as long as we think we can. If we don't people will fear that if things aren't going so well, <u>we'll</u> be tempted to sell lots of XRP, precisely the fear <u>we</u> want to eliminate."  Defendants dispute that Schwartz's statements can be attributed to Ripple or the Individual Defendants, because Schwartz started his post by stating "[m]y position on this has evolved lately," suggesting that the post represented only his personal views. PX 508.37.

295.   On or around March 27, 2017, Ripple held an internal "XRP Escrow Meeting," the goal of which "was to come to an agreement that: 1. there is a problem with market uncertainty regarding Ripple's XRP holdings 2. there is a solution to create more certainty around Ripple's XRP holdings." PX 99 at RPLI_SEC 0025512.

**Response:**      Undisputed.

296.   At the internal Ripple meeting held on or around March 27, 2017, there was "[g]eneral agreement on [the] Ripple team that there is a problem" with "market uncertainty regarding Ripple's XRP holdings." PX 99 at RPLI_SEC 0025512.

**Response:**      Undisputed.

297.    On the agenda for the internal Ripple meeting held on or around March 27, 2017, there was a "proposed solution to create more certainty around Ripple's XRP holdings," which included: "Lock-up company XRP using Escrow, a feature on [the Ripple Consensus Ledger] that allows a user to 'lock-up' an amount of XRP with an expiration date." PX 99 at RPLI_SEC 0025512.

**Response:**        Undisputed.

298.    At the internal Ripple meeting held or around March 27, 2017, there was "[g]eneral agreement on Ripple team" that locking up a portion of Ripple's XRP was "a viable solution." PX 99 at RPLI_SEC 0025512.

**Response:**        Undisputed.

299.    Ripple's decision to put some of its XRP into escrow was in part a response to the "overhang concern" third parties had regarding the amount of Ripple's holdings of XRP. PX 14 (Griffin Tr.) 72:16-73:19, 321:11-322:1, 333:6-14; PX 3 (Griffin Inv. Tr.) 128:22-129:6.

**Response:**        Disputed.  Defendants do not dispute that Griffin testified "yes" in response to the SEC question "was the XRP escrow in part a response to that sort of overhang concern," PX 14 at 72:16-19; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14 including because Paragraph 299 omits additional context necessary to understand his testimony, including that Griffin testified that he understood the "overhang concern" arose from "a contingent" of "bitcoin maximalists" who disseminated "misinformation" and "talking points . . . Ripple could sell its XRP at any given moment, and that represented an overhang of supply."  PX 14 at 72:16–73:15. Defendants dispute that Griffin's testimony can be attributed to Ripple or the Individual Defendants because the SEC cites no evidence to establish that fact.

300.    Rapoport believed that Ripple "put a significant portion of its [XRP] holdings into escrow in part to address the market's perception of an overhang."  PX 10 (Rapoport Tr.) 302:22-303:5.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 as misleading, including because Paragraph 300

135

omits that Rapoport testified that he was no longer with Ripple at the time the escrow was implemented. *See* PX 10 at 303:4-10 ("Q. Okay. And -- and why was Ripple trying to address the market's perception of an overhang?" "A. I was no longer with the company at the time so it's hard -- not -- not really my place to say.").

301.    In April 2017, the co-founder and managing partner of ▮▮▮▮▮▮▮ emailed Garlinghouse and Griffin that "the prevailing consensus in the crypto investing/trading community is that XRP is uninvestable because most people know that Ripple has the flawed model of owning most of the [XRP] tokens and that Ripple sells $XRP to keep the large head count / burn rate afloat." PX 102 at 0352285.

**Response:**    Undisputed that PX 102 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.    Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 102 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse.

302.    In or around April 2017, a Ripple Board member met with other Ripple employees and she agreed that "there [wa]s a supply perception issue for speculators." PX 103 at 0026955

**Response:**    Undisputed that PX 103 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that PX 103 is sufficient to establish the Ripple Board member's views or understandings, because PX 103 merely contains a Ripple employee's summary of the meeting in question.

303.    In April 2017, Vias circulated to other senior Ripple employees an XRP escrow proposal with the objective of enhancing Ripple's efforts to create "more XRP liquidity" and to respond to "the clear message we're getting [] that the supply of XRP in the market is too uncertain for speculators to be comfortable being more active." PX 105 at 2-3.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 105 as misleading, including because the email states

that "[t]he goal of the document is to clearly describe the rationale behind cryptographically restricting access to our XRP and make evident that the risks of doing so are very small, especially when compared to the possible benefits." PX 105 at ECF p. 2. Defendants further dispute Paragraph 303 because it mischaracterizes the "objectives" of the escrow proposal, which the cited document sets forth as including to "make XRP a liquidity tool for cross-border payments" and "accelerate needed liquidity to support payment flows[.]" PX 105 at ECF p. 3.

> 304.   In May 2017, the XRP escrow proposal with the objective of enhancing Ripple's efforts to create "more XRP liquidity" and to respond to "the clear message we're getting [] that the supply of XRP in the market is too uncertain for speculators to be comfortable being more active" was sent to Garlinghouse. PX 106 at 3-5.

**Response:**      Disputed.   Defendants do not dispute that, in May 2017, Garlinghouse was sent an email containing a link to a document titled "Plan to Escrow Ripple's XRP." PX 106 at ECF p. 4-9. However, Defendants dispute that Paragraph 304 accurately sets forth "the objective" of the escrow proposal, as other evidence cited by the SEC establishes additional objectives, including to "make XRP a liquidity tool for cross-border payments" and "accelerate needed liquidity to support payment flows[.]" PX 105 at ECF p. 3.

> 305.   In May 2017, Griffin sent Garlinghouse and other Ripple employees a proposal to escrow Ripple's XRP intended to "address[] some structural headwinds facing XRP liquidity." PX 104 at RPLI_SEC 0026844.

**Response:**      Disputed.  Defendants do not dispute that the cited document states that it "addresses some structural headwinds facing XRP liquidity." PX 104 at RPLI_SEC 0026844.  However, Defendants dispute that Paragraph 304 accurately sets forth what the escrow proposal was "intended" to do, as other evidence cited by the SEC establishes

additional objectives, including to "make XRP a liquidity tool for cross-border payments" and "accelerate needed liquidity to support payment flows[.]"  PX 105 at ECF p. 3.

306.    Rapoport noted that the "main goal" of a statement regarding Ripple's settlement with a Ripple founder, McCaleb, governing the sale of his XRP was "to restore confidence in the market that founders won't dump, so people feel comfortable owning XRP." PX 107 at 0882487; PX 10 (Rapoport Tr.) 282:19-284:5, 302:3-21.

**Response:**        Disputed.  Defendants dispute that the quoted language in Paragraph 306 reflected a belief of Ripple or the Individual Defendants, when PX 107 instead pertains to Rapoport's comments on a draft document reflecting his own beliefs and understanding. PX 107 at RPLI_SEC 0882487.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 including because Paragraph 306 omits additional context necessary to understand the exhibit, including that Rapoport testified that his comment about making "people feel comfortable" was in reference to McCaleb's prior announcement that he would sell XRP holdings at a specific price, which was "done in a deliberately destructive way to market confidence."  PX 10 at 283:12–284:5.

307.    In a Bitcoin Talk post on or about May 27, 2017, Schwartz posted that Ripple had "consistently defended the XRP market from dumping by insiders." PX 507.16. Schwartz admitted in testimony this meant that Ripple "wouldn't be a bad actor," because Ripple would be the largest holder of XRP for many years. PX 6 (Schwartz Dep. Tr.) at 321:17-325:13.

**Response:**        As to the first sentence on paragraph 307, undisputed that PX 507.16 contains the quoted text.  As to the second sentence on paragraph 307, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 because Schwartz testified that "defend[ing] the XRP market" meant attempting to prevent "people who had very large amounts of XRP" from "spam[ing] the XRP Ledger with large numbers of transactions or other nefarious purposes."  PX 6 at 322:3–8, 323:1–5.

308.    In May 2017, with Garlinghouse's and Larsen's approval, Ripple announced it would place 55 billion XRP into an escrow account that released 1 billion a month

and to which Ripple would return any unsold XRP on a monthly basis. PX 80 (Ripple Ans.) ¶¶ 223, 24; PX 36 (Garlinghouse Inv. Tr.) at 216:10-21; PX 2 (Larsen Tr.) 376:12-21.

**Response:**      Undisputed, except insofar as Paragraph 308 implies that only Garlinghouse and Larsen's approval was sufficient to approve the escrow of Ripple's XRP.

309.   On or about May 16, 2017, Ripple announced that it would place 55 billion XRP into an escrow on the XRP Ledger. PX 80 (Ripple Ans.) ¶ 223,

**Response:**      Defendants dispute that Paragraph 309 sets forth a statement of material fact insofar as it is in sum and substance duplicative of Paragraph 308. Defendants do not dispute the substance of Paragraph 309.

310.   Garlinghouse and Larsen were involved in Ripple's decision to escrow 55 billion XRP. PX 80 (Ripple Ans.) ¶ 224; PX 36 (Garlinghouse Inv. Tr.) at 216:10-21.

**Response:**      Undisputed that Garlinghouse and Larsen had some involvement in Ripple's decision to escrow 55 billion XRP. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 80 and PX 36, including the suggestion that Larsen took a substantial role in the decision to escrow 55 billion XRP. Beginning in January 2017, Larsen transitioned from his operational role as CEO of Ripple to Executive Chairman of the Board of Directors to spend more time with his family. *See* Ex. 75 (RPLI_SEC 0042736).

311.   As Chairman of Ripple's Board, Larsen was part of the Board's approval of Ripple's decision to escrow 55 billion XRP. PX 2 (Larsen Tr.) 376:12-21.

**Response:**      Undisputed that Ex. 8 contains the cited text at 375:19-21. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 2, to the extent it implies that Larsen had substantial involvement in the decision to escrow XRP beyond his role on the Board.

312.   Ripple and Garlinghouse made public statements regarding the formation of the XRP escrow. PX 80 (Ripple Ans.) ¶¶ 228, 277.

**Response:**        Undisputed.

313.    Ripple admits that, in May 2017, Ripple publicly announced that it would place 55 billion XRP into a cryptographically-secured escrow account by the end of 2017. PX 8 (Ripple RFA Responses) No. 78.

**Response:**        Defendants dispute that Paragraph 313 sets forth a statement of material fact insofar as it is in sum and substance duplicative of Paragraphs 308 and 309. Defendants do not dispute the substance of Paragraph 313.

314.    In a May 7, 2017 email, Vias wrote that XRP's recent price increase "seem[ed] to be driven by speculation around the lock up"—with "lock up" meaning Ripple's consideration of "cryptographically restricting access to [Ripple's] XRP"—and that "chatter around the lock up ha[d] played a very important role in XRP's appreciation" in the previous six to seven weeks. PX 112 at 0032680-81.

**Response:**        Disputed.  Defendants do not dispute that PX 112 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Paragraph 314 omits additional context necessary to understand the quoted language, including that Vias observed that certain XRP price activity around that time was "likely due to broad based digital asset appreciation."  PX 112 at RPLI_SEC 0032680.  Defendants further dispute the SEC's characterizations and selective quotations in Paragraph 314 because Vias testified that he did not know whether Ripple believed the escrow would impact the price of XRP.  *See* PX 20 at 162:20–25.

315.    Vias and Schwartz mentioned the possibility of the escrow publicly in or around March 2017 in a podcast and on social media, and Vias believed that the "markets took much comfort in" Schwartz' comments and he observed that the price of XRP increased after his podcast comments.  PX 21 (Vias Inv. Tr.) at 207:9-211:24.

**Response:**        Disputed.  Paragraph 315 omits that Vias testified "looking back on it now, there were a lot of other things happening at the same time with respect to crypto markets."  PX 21 at 206:16-20.  When asked by the SEC whether Schwartz's "comfort" had "an effect on the price of XRP," Vias answered "I don't know" and only that he "thought it

did" at the time, PX 21 at 212:12–213:6.  When asked "what created the confidence in the news that Ripple was disseminating," Vias answered "I don't know that there was confidence," PX 21 at 213:25–214:2.

316.   Larsen believed that Ripple's escrow of 55 billion of its XRP enhanced trust in Ripple, by allaying any concerns that Ripple would dump its holdings of XRP.  PX 2 (Larsen Tr.) at 376:12-380:23.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 2 as misleading. The SEC omits the testimony that Larsen believed this was an unfounded concern of a small number of people, and that Ripple would not suddenly "dump" its XRP holdings into the market.  Since Ripple would not dump its XRP, there was no downside to placing it in a cryptographically secure escrow to address the unfounded concern.  Ex. 8 at 376:12-380:23.

317.   Larsen believed that any concern that Ripple would dump its holdings of XRP was unfounded in light of Ripple's "very good track record that should have mitigated any concern like that." PX 2 (Larsen Tr.) at 376:12-377:6.

**Response:**       Undisputed that PX 2 contains the quoted text at 375:12-376:6. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 2 as misleading.  The SEC omits the testimony that, although Larsen believed this was an unfounded concern held by a small number of people, it was not difficult to put the XRP in escrow.  Ex. 8 at 378:2-8.

318.   Larsen believed it "seemed constructive, from a point of view of driving trust" in Ripple to put some of Ripple's XRP into escrow. PX 2 (Larsen Tr.) at 376:12-380:23.

**Response:**       Undisputed that Ex. 8 contains the quoted text at 375:12-379:23. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 2 to the extent the SEC implies that there was a concern from a significant number of

individuals. Larsen testified that he believed putting the XRP in escrow would "alleviate any concerns that a small number of people might have had."  Ex. 8 at 376:7-10.

319.    According to Garlinghouse, Ripple's purpose in escrowing a portion of its XRP was "to remove the concern that had been expressed that there was a risk that [Ripple] would dump XRP in the market." PX 81 (Garlinghouse Tr.) at 421:20-422:1.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 81 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 319 since the quoted language appears in an uncited excerpt in the exhibit.  PX 81 at 422:6-9. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81 including because Paragraph 319 omits additional context necessary to understand the quoted testimony, including that another purpose of the escrow was to have "a predictable supply schedule," as set forth in PX 81 421:12-422:9. Garlinghouse also testified that doing the escrow would "remove[] some of the misinformation" about "Ripple's behavior and potential impact on the XRP market," and "it was important to [him] that [Ripple] remove that kind of speculation." PX 36 at 216:24-217:17.

320.    According to Samarasinghe, Ripple's purpose in escrowing a portion of its XRP was "to provide surety to digital assets speculators that Ripple, the company, would not flood the market with XRP." PX 22 (Samarasinghe Tr.) at 78:23-79:3.

**Response:**        Disputed.  Defendants dispute the suggestion in Paragraph 320 that the quoted language reflected a belief of Ripple, because the evidence cited in Paragraph 320 demonstrates that Samarasinghe was speaking as to his own personal beliefs and not about a belief held by Ripple as an entity or Individual Defendants.  Defendants do not dispute that Samarasinghe provided the quoted testimony; however, Defendants dispute the SEC's characterizations in Paragraph 320 because Samarasinghe testified that he did not view

Ripple's placing the XRP in escrow "as a way to support or stabilize the market price."  PX 22 at 79:19–21.

321.    On or around June 5, 2017, Garlinghouse sent an email to third parties addressing notable Ripple events from the previous month, including Ripple's announcement of its commitment to escrow some of its XRP, describing Ripple's decision to escrow 55 billion of its XRP as "giv[ing] investors a predictable supply schedule." PX 114 at RPLI_SEC 0054398-99.

**Response:**        Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 114 to the extent it characterizes Garlinghouse's email as being addressed to "third parties," because PX 114 clearly indicates that Garlinghouse was writing to Ripple investors and Ripple advisors since the subject line reads "Ripple's May Investor and Advisor Update," which explains why he was informing this audience of notable company events, as set forth in PX 114. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 114 including because Paragraph 321 omits additional context necessary to understand the quoted language, including that Ripple had escrowed its XRP holdings partly because they "… continued to hear concerns in the market that Ripple could (hypothetically) sell [its] 61 billion XRP at any time," as set forth in PX 114. Paragraph 321 also omits that another purpose of the escrow was to "remove[] some of the misinformation" about "Ripple's behavior and potential impact on the XRP market," and "it was important to [him] that [Ripple] remove that kind of speculation." PX 36 at 216:24-217:17. Undisputed that PX 114 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

322.    According to Zagone, Ripple escrowed a portion of its XRP to "give assurance to the market that [Ripple was] going to be a responsible player" and "would not flood the market with its XRP holdings."  PX 19 (Zagone Tr.) at 88:22-89:17.

143

**Response:**       Disputed.   Defendants do not dispute that Zagone provided the quoted testimony, exclusive of any alterations, omissions, or additions; however, Defendants dispute the SEC's characterizations in Paragraph 322 because Zagone testified that the concern about "flood[ing]" the cryptocurrency markets was not specific to Ripple and the "market became concerned across all the cryptocurrencies that this could happen." PX 19 at 90:13-18.

323.   According to Zagone, "[w]hen [Ripple] announced the escrow program," XRP's "price went up," and the "market had more certainty around how [Ripple was] going to use or dispose of the XRP." PX 19 (Zagone Tr.) at 91:9-15.

**Response:**       Disputed.   Defendants do not dispute that Zagone provided the quoted testimony, exclusive of any alterations, omissions, or additions; however, Defendants dispute that Zagone believed Ripple implemented the escrow to increase the price of XRP, because Zagone further testified that "the guiding factor for Ripple was *not* to have an impact on the price." PX 19 at 91:20-21 (emphasis added).

324.   Larsen observed that the market reacted favorably to Ripple's announcement of its intent to escrow a portion of its XRP, and that XRP's price increased after the announcement. PX 2 (Larsen Tr.) at 376:12-381:18.

**Response:**       Disputed.  Defendants dispute Paragraph 324 as unsupported by PX 2.  Larsen testified that "[i]t's always hard to tell what is a cause of a reaction in the market, but I believe that that was looked at favorably," and "[i]t's my understanding that the price increased after that announcement. Whether or not that's tied to that announcement, again, it's very difficult to tell, especially since most of the moves, by overwhelming amount of moves in the cryptocurrency markets are correlated with each other." Ex. 8 at 379:16-380:23.

325.   Vias believed that Ripple's implementation of the escrow would have a positive impact on XRP's price. PX 20 (Vias Dep. Tr.) at 160:5-163:22; PX 21 (Vias Inv. Tr.) at 348:25-349:6.

**Response:**        Undisputed that Vias testified that he believed the implementation of the escrow would be "beneficial," PX 20 at 163:2-5; however, Defendants dispute the remainder of Paragraph 325 as unsupported by the cited evidence.

326.    In a proposal that Ripple implement the escrow sent to Garlinghouse, Griffin explained that this effort was "geared towards securing speculative liquidity" and to "build liquidity and build confidence in XRP, which would then be liquidity around the asset." PX 3 (Griffin Inv. Tr.) at 201:19-207:5; PX 104.

**Response:**        Disputed.  Defendants dispute Paragraph 326 to the extent it sets forth legal conclusions unsupported by citations to evidence, including with respect to any purported "efforts" undertaken by Ripple.  Defendants further dispute Paragraph 326 because it mischaracterizes the "objectives" of the escrow proposal, including because other evidence cited by the SEC sets forth the objectives as including to "make XRP a liquidity tool for cross-border payments" and "accelerate needed liquidity to support payment flows[.]"  PX 105 at ECF p. 3.  Defendants do not dispute that, on May 2, 2017, Griffin sent Garlinghouse an email containing a link to a document titled "Plan to Escrow Ripple's XRP."  PX 104.  However, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 3 including because Paragraph 326 omits that Griffin testified that "speculative liquidity" was "just a function of providing liquidity which could be utilized for a range of things," including "payments liquidity needed to support the XRP related products and sort of the overall product."  PX 3 at 202:19–203:8.

327.    The purpose of the escrow was to "build confidence" because "the overhang of XRP that Ripple held was…keeping people on the sidelines from participating in the XRP ecosystem as speculators or developers." PX 3 (Griffin Inv. Tr.) at 199:17-200:4.

**Response:**        Disputed.  Defendants do not dispute that Griffin offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

PX 3 including because Paragraph 327 omits additional context necessary to understand his testimony, including that Griffin testified that he did not know if Ripple had any concern about XRP overhang. *See* PX 3 at 125:23-126:2. Defendants dispute that Griffin's testimony can be attributed to Ripple or the Individual Defendants because the SEC cites no evidence to establish that fact.

328.    Ripple publicized its escrow of 55 billion XRP in an effort to "dispel" the "fear" that "Ripple was selling a lot of [of XRP] into the market. PX 17 (Long Tr.) 86:1-87:17.

**Response:**        Disputed.  Defendants dispute Paragraph 326 to the extent it sets forth legal conclusions unsupported by citations to evidence, including with respect to any purported "efforts" undertaken by Ripple.  Defendants do not dispute that Long offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that the quoted statements establish the SEC's characterizations set forth in Paragraph 328.

329.    According to Vias, the purpose of the escrow was "to alleviate concerns by speculators," for the purpose of "increase[ing] speculation, which would help liquidity," and the purpose of the "liquidity that comes from the more active speculation" was, "in the long run" for XRPs use in payments. PX 21 (Vias Inv. Tr.) at 198:3-200:6; PX 115.

**Response:**        Disputed.   Vias testified that "alleviat[ing] the concerns by speculators" was only "[o]ne of the objectives" of the escrow, not "*the* purpose of the escrow" as suggested by the SEC in Paragraph 329. PX 21 at 199:18–20. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 115 including because Paragraph 329 omits additional context necessary to understand the alleged "purpose" of the escrow, including that the document provides other "objective[s,]" including "mak[ing] XRP a liquidity tool for cross-border payments" and "accelera[ing] needed liquidity to support payment flows[.]"  PX 115 at RPLI_SEC 0025374.

330.     Garlinghouse described the escrow as consistent with Ripple's "proven track record of being good stewards of XRP," contrasting any uncertainty that Ripple might sell billions of XRP with the reality that Ripple's "self-interest is aligned with building and maintaining a healthy XRP market." PX 116.

**Response:**     Undisputed that PX 116 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

331.     One of Ripple's objective in announcing its escrow program was to "create a second wave of excitement about the lock up amongst speculators." PX 118 at 0376309-10.

**Response:**     Undisputed.

332.     Schwartz explained in a public chat forum in or around November 2017 that when Ripple releases XRP, "the overhang of XRP Ripple can release in the future is reduced." PX 6 (Schwartz Tr.) 326:12-329:8; PX 508.26 *available at* https://www.xrpchat.com/topic/11874-can-the-first-usage-of-xrapid-actually-flood-the-market-with-xrp/?do=findComment&comment=121864.

**Response:**     Undisputed.

333.     As part of its efforts surrounding the announcement of its XRP escrow's effectiveness in or around late 2017, Ripple's market team aimed to "leverage influencers" who would feel "compel[led] to share the news" of the escrow, including a list of "XRP retail/institutional evangelists." PX 118 at 0376309.

**Response:**     Disputed.  Defendants dispute Paragraph 333 to the extent it sets forth legal conclusions unsupported by citations to evidence, including to the extent SEC's implies that Ripple engaged in "efforts" surrounding the announcement of the "escrow's effectiveness."  Defendants further dispute Paragraph 333 because the SEC has changed certain of the quoted language, the accurate version of which reads as follows in 118: "LOVE leveraging influencers – both the vocal supporters and skeptics – but let's give them word once the transfers are done and as we go live with our posts. I think they'd feel special hearing from us directly and will compel them to share the news."  PX 118 at RPLI_SEC 0376309.

To the extent the SEC's extensive alterations to, and omissions from, the document's text was intended to create the misleading impression that "influencers" would feel "compelled" to share the news of the XRP escrow, this as unsupported by the cited evidence.   Long testified that she could not recall Ripple ever asked influencers to make public statements about specific issues.  PX 17 at 113:5–7.  Defendants also dispute Paragraph 333 to the extent it implies that Ripple actually contacted any "influencers," as the SEC cites no evidence to establish that fact.

334.   Around the time that Ripple announced the implementation of its XRP escrow in or around December 2017, Ripple's head of marketing emailed other Ripple marketing employees and Ripple's public relations agency (the "P.R. Agency") regarding "XRP rally – fast action needed," noting that "XRP is rallying" and asked them to draft a series of public statement "to make hay while the sun shines."  PX 119.

**Response:**        Disputed.  Although Defendants do not dispute that PX 119 contains the quoted text, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 119 because Long provided several reasons for why "XRP is rallying," including that the "[b]uzz on Twitter is: 1. Coinbase is listing XRP, 2. ██████ is going to start using XRP, 3. Korean banks aim to use XRP[.]"  Further, Long testified that "XRP is rallying" meant that volumes, and not just price, had increased.  PX 17 at 258:1–7.

335.   In January 2018, Ripple's Head of Investor Relations wrote to Garlinghouse and other senior Ripple employees re "Uptick in Inbound XRP Interest," noting that "[s]ince the escrow announcement in early Dec," and especially after XRP's price passed 90 cents, "the traffic on the 'How to buy XRP' page has increased exponentially with inbound requests to XRPcontact@ripple.com surging."  PX 120 at 1049291; *see also* PX 85 (Ripple RFA Responses) Nos. 605, 606 (admitting Ripple maintained the email address XRPcontact@ripple.com).

**Response:**        Undisputed that PX 120 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; and that at certain times Ripple maintained the email address xrpcontact@ripple.com.  PX 85 Nos. 605, 606.  Defendants dispute the

SEC's characterization of, and inferences purportedly drawn from PX 120 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse.

336.   In her January 2018 email re "Uptick in Inbound XRP Interest," Ripple's Head of Investor Relations further explained that visitors to Ripple's website users reach XRPcontact@ripple.com" from the "How to buy XRP" section" on Ripple's website, which sends visitors to a link to contact Ripple and displays "the list of exchanges" on which to purchase XRP. PX 120.

**Response:**      Undisputed.

337.   Having observed an increase in XRP's price, Larsen texted a Ripple Board member "good response to our lock up news so far" and texted another Ripple employee "They liked our xrp lock up!" PX 2 (Larsen Tr.) at 380:16-383:1; PX 121; PX 122.

**Response:**      Disputed.  Defendants dispute Paragraph 337 as unsupported by PX 2, PX 121, and PX 122.  Larsen testified that "[i]t's always hard to tell what is a cause of a reaction in the market," Ex. 8 at 379:16-380:23, and neither PX 121 and PX 122 say that there was any increase in price or volume of XRP.  Defendants further dispute that PX 121 and 122 can be read together because PX 121 was sent on May 16, 2017, and PX 122 was sent more than six months later on December 7, 2017.

338.   Schwartz believed that "[i]f that overhang is priced in, having a downward effect, then the absence of that overhang could eliminate the downward effect," and that the escrow was designed in part to "reduce that overhang effect." PX 6 (Schwartz Dep. Tr.) at 326:12-329:8.

**Response:**      Undisputed that Schwartz offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC.

339.   If Ripple crashed the market for XRP by selling a huge amount of XRP, it would hurt Ripple more than any other market actor, because a negative impact on the long-term price of XRP would mean that Ripple could not use its XRP for revenue or developing uses. PX 6 (Schwartz Dep. Tr.) at 345:7-348:3.

**Response:**        Disputed.  In response to a question about why crashing the price of XRP would hurt Ripple, Schwartz testified, "[t]hat could impact the long-term price, which would mean that we couldn't use our XRP for any of the business purposes that we talked about," including but not limited to revenue and uses.  PX 6 at 346:18-24.  Defendants dispute the SEC's characterizations in Paragraph 339 as inconsistent with this testimony.

340.   Ripple historically has acted in its own interest in not doing damage to the XRP ecosystem, because it has the incentive not to do so. PX 6 (Schwartz Dep. Tr.) at 345:7-348:3.

**Response:**        Undisputed.

341.   Ripple described itself as a "good steward" of XRP, because it did not dump XRP on the market or sold XRP in ways not to impact the XRP market, as Garlinghouse stated in an investor and adviser update he authored. PX 81 (Garlinghouse Dep. Tr.) at 418:17-421:1; PX 114 at 0054398-99.

**Response:**        Undisputed that Garlinghouse described Ripple as being a "good steward" of XRP, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony. Defendants dispute the SEC's characterization of, and inferences that Ripple was a good steward only because it did not dump XRP or sell XRP in ways not to impact the maket purportedly drawn from, PX 81, including because Paragraph 341 omits additional context necessary to understand the testimony, including that Garlinghouse also testified as to other reasons that Ripple is a good steward for XRP, such as that Ripple publishes XRP Markets Reports quarterly to add transparency to the industry, and that Ripple tries not to interfere with the XRP markets, as set forth in PX 81 at 420:12-421:1 ("I think the mere fact that we started publishing a quarterly XRP market update to try to find transparency would be an example of trying to be a good steward. … I think to the extent we have consistently demonstrated a track record, we're trying to make sure we don't impact the XRP markets,

would be evidence of being a good steward."). Defendants note that the "investor and adviser" update referenced in Paragraph 341 was sent to Ripple investors and Ripple advisors since the subject line reads, "Ripple's May Investor and Advisor Update," as set forth in PX 114.

342.     On or about February 28, 2018, Will emailed Garlinghouse and proposed that Ripple use XRP reserves to satisfy its contractual and other obligations to deliver XRP through the xPring initiative in order to "maintain market positioning around the escrow so there isn't additional overhang."  PX 335.

**Response:**     Disputed.  Defendants do not dispute that PX 355 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 335 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 342.  PX 335 is a discussion between Will, Garlinghouse, and Ripple's Controller about how to allocate XRP that was to be released from escrow to meet Ripple "forecast[ed]" needs in March 2018, including "funding programmatic partners," "funding loans," and "operating XRP."  PX 335 at RPLI_SEC 0393676.   Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 335 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse.

343.     On or about June 9, 2020, Will emailed Garlinghouse and Ripple's comptroller at the time and recommended measures to "offset other XRP distributions" from Ripple's escrow to satisfy Ripple's contractual and other obligations to deliver XRP to third parties in light of what Ripple's controller described as "very bad optics from a dramatic change to our escrow return." PX 455.

**Response:**     Undisputed that PX 455 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 455 because it omits additional context necessary to understand the exhibit, including

that Will testified that he and Ripple's controller would make recommendations on how much XRP Ripple would move from the escrow and return to the escrow. PX 23 at 172:20–173:1. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 455 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse.

344. According to Schwartz, one difference between "XRP and other [crypto] assets" was that "there was an entity [Ripple] that held a significant amount of XRP that it didn't have to expend funds to acquire." PX 7 (Schwartz Inv. Tr.) at 131:8-18. In other words, "Ripple's advantage was that it was gifted the XRP and didn't have to spend capital or other types of funds in order to acquire it." PX 6 (Schwartz Dep. Tr.) at 275:7-21.

**Response:** Disputed. Although Defendants do not dispute that Schwartz offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC (including the unmarked modification of "is" to "was" in the third quotation), Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 7 because Schwartz specifically stated that his statements were limited to circumstances as of 2017, as set forth in PX 6 at 131:8-16. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 6 as misleading because Schwartz was not rephrasing testimony he gave in PX 7, as the SEC misleadingly suggests, but rather discussing a separate hypothetical involving an entity that sold Bitcoin, not making a comparison between XRP and any other digital asset.

345. Schwartz publicly stated that what "really set[s] XRP apart from any other digital asset" was the "amazing team of dedicated professionals that Ripple has to amass to develop an ecosystem around XRP." PX 509.88, *available at* https://www.reddit.com/r/IAmA/comments/80ppfl/i_am_david_schwartz_chief_c ryptographer_at_ripple/duxgy6g/?context=1.

**Response:**      Undisputed that PX 509.88 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 509.88 because Paragraph 345 omits additional context necessary to understand the quoted language, including that Schwartz was responding to a question asking about differences between "XLM and XRP/Stellar and Ripple," as set forth in PX 509.88.

346.   On or about February 25, 2016, in a post on XRP Chat, Schwartz stated: "Ethereum has very little in common with Ripple. Ethereum is much like Bitcoin (blockchain, mining) except it acts like a platform that you can easily write code for. The code can constrain how objects on the Ethereum blockchain behave and interact. It's extremely cool technically, but it's still not quite clear what the use cases will be." PX 508.01, *available at* https://www.xrpchat.com/topic/1019-what-is-ethereum/?do=findComment&comment=9111.

**Response:**      Undisputed.

347.   On or about June 11, 2017, in a post on XRP Chat, Schwartz stated: "There are really two separate issues. One is whether Ethereum competes with XRP generally. The other is whether Ethereum competes with XRP for the specific use case that Ripple, the company, is targeting. While the former is a complicated question. The latter is much simpler. Settling international payments requires a vast pool of liquidity and somebody has to finance creating that pool of liquidity. Ripple holds 60% of the XRP supply and has the ability to use as much of that as is needed to bootstrap the liquidity to target that use case. It's hard to imagine anyone spending huge amounts of their own money to do that for Ethereum. If you just need a pool of liquidity, and someone else is building it, why should you pay to build it?" PX 508.33, *available at* https://www.xrpchat.com/topic/6233-ripple-vs-ethereum-not-the-price-but-the-merits/?do=findComment&comment=59437.

**Response:**      Undisputed.

348.   On or about November 14, 2017, in a post on Reddit, Schwartz stated: "One thing we're definitely missing is a robust and inspired community of developers. Bitcoin obviously has that because of its adoption and the way it first ignited people's imagination about what blockchain could do. Ethereum has that because tremendous effort was put into communicating the idea that it was a programmable blockchain that could make anyone's distributed application real. We don't have that." PX 509.69 *available at* https://www.reddit.com/r/Ripple/comments/7cwa2n/check_out_sjoelkatzs_great_dissection_of_this_fud/dptl0pj/

**Response:**        Undisputed.

349.    On or about February 27, 2018, in a post on Reddit, Schwartz stated: "I think three things really set XRP apart from any other digital asset. One is the amazing team of dedicated professionals that Ripple has managed to amass to develop an ecosystem around XRP. The other is a focused use case for XRP and a coherent strategy to drive adoption for that use case. Last, the set of real customers finding business value in it. The history of technological innovation around the XRP Ledger speaks        for        itself."        PX        509.88        *available        at* https://www.reddit.com/r/IAmA/comments/80ppfl/i_am_david_schwartz_chief_c ryptographer_at_ripple/duxgy6g/?context=1

**Response:**        Defendants dispute that Paragraph 349 sets forth an independent statement of material fact as required by Local Civil Rule 56.1, insofar as it is duplicative of Paragraph 345. While Defendants do not dispute that PX 509.88 contains the quoted text, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 509.88 because Paragraph 345 omits additional context necessary to understand the quoted language, including that Schwartz was responding to a question asking about differences between "XLM and XRP/Stellar and Ripple," as set forth in PX 509.88.

350.    Samarasinghe admitted that he was not aware of "any other actors in the crypto space that puts out on a regular basis – besides Ripple – detailed information about its holdings or sales in digital assets." PX 22 (Samarasinghe Dep. Tr.) at 305:7-306:5.

**Response:**        Undisputed.

351.    In or around 2016, Griffin explained that there was no way for the U.S.-based crypto trading platform Kraken to charge someone to list Bitcoin or Ethereum on the platform, because, unlike XRP, those tokens lack a "central corporate administrator" (Ripple). PX 392.

**Response:**        Disputed. On August 3, 2016, ▮▮▮▮▮ sent an email to Patrick Griffin in which ▮▮▮▮ stated his view that "there is no way Kraken could charge Bitcoin or Ethereum for listing, since there's no central corporate administrator for those coins." PX 392 at RPLI_SEC 0010401. Defendants further dispute Paragraph 351 to the extent it

implies that Kraken "charge[d]" Ripple to list XRP, as ███████'s email in PX 392 stated that "Kraken's already listing XRP." *Id.*

352.   In or around 2017, Schwartz publicly explained that there was "no player that plays Ripple's role in XRP for Bitcoin or Ether," meaning there was no known party that "both holds that larger fraction of the native asset and is sort of a participant." PX 6 (Schwartz Dep. Tr.) at 293:10-14, 295:16-24, 325:13-24.

**Response:**   Undisputed.

353.   In or around 2017, Schwartz publicly stated that it was easier for Ripple to make efforts with respect to XRP because it had acquired XRP at no cost, as opposed to someone who wanted to acquire bitcoin and make efforts with respect to bitcoin, which would have to be mined. PX 6 (Schwartz Dep. Tr.) at 272:8-21, 275:7-21.

**Response:**   Disputed.   Schwartz did not state publicly "that it was easier for Ripple to make efforts with respect to XRP" and the SEC's cited evidence does not support the statements of fact contained in Paragraph 353.

354.   In and around 2017, Schwartz publicly stated that "[o]ne big advantage [Ripple has] is [Ripple] control[s] a lot of XRP and [Ripple is] heavily focused on promoting [XRP] in this way," referencing Ripple's promotion of XRP in connection with payments, and contrasting XRP with Bitcoin, where "[n]obody" had the kind of focus Ripple did vis-à-vis XRP in promoting Bitcoin in connection with payments. PX 6 (Schwartz Dep. Tr.) at 270:12-271:22.

**Response:**   Undisputed that Schwartz offered the quoted testimony and made the quoted statements, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of the cited testimony because Paragraph 354 omits that Schwartz testified that his statements meant that Ripple was "working on building a payment system around XRP and nobody was – nobody was currently doing that for Bitcoin." PX 6 at 271:18-20.

355.   In a discussion on or about November 27, 2017, regarding a potential blog post by Ripple, Griffin stated that "it seems like there's an opportunity to specifically call out why XRP as opposed to, say BTC or ETH." One of the reasons he suggested to support this distinction was the fact that "[t]here is a fantastically-managed company, Ripple Inc., with a singular enterprise focus to make XRP the de facto digital asset to replace dormant capital in treasury operations." PX 59.

**Response:**        Undisputed that PX 59 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

356.    In a set of internal talking points distributed in advance of an upcoming interview of Vias by a major news publication, Ripple's P.R. Agency included a section entitled "Bitcoin vs. ETH vs. XRP."  The talking points highlight as one difference: "Governance: we've proven responsible stewardship of XRP and are very transparent about how it is distributed.  BTC and ETH are controlled by miners with competing interests, leading to less predictability (hard forks, potential for a few miners to greatly impact the price, etc.)." PX 439 at RPLI_SEC 0200193.

**Response:**        Undisputed that PX 439 contains the quoted text; however, Defendants dispute that the cited evidence establishes that these talking points were ever used or distributed externally to Ripple and its public relations agency, as Paragraph 356 correctly characterizes the document in question as "internal talking points."

357.    OpenCoin's Whitepaper included a list of its founders and team members as well as their prior experience including some members who had a prior relationship with Bitcoin. PX 158 at RPLI_SEC 0098238).

**Response:**        Disputed.  RPLI_SEC0098238 is a slide from a presentation called "Ripple 6.1.pptx" dated June 2013, and the cited evidence accordingly does not support the SEC's characterization of that document as "OpenCoin's Whitepaper."  PX 158.

(a)    OpenCoin's Whitepaper contained a slide labeled "Business Model [,]Value of the Ripple Currency," that displayed a graph of XRP/USD on the digital asset platform Bitstamp, and stated above the graph:  "Early XRP results prove the viability of this model."  PX 158 at RPLI_SEC 0098251.

**Response:**        Disputed.  RPLI_SEC0098251 is a slide from a presentation called "Ripple 6.1.pptx" dated June 2013, and the cited evidence accordingly does not support the SEC's characterization of that document or the quoted text as contained in "OpenCoin's Whitepaper."  PX 158.

358.    In Ripple's Deep Dive brochure for September 2014, Ripple touted that it "continues to attract a diverse set of talented individuals with experience in relevant technology and financial services companies." PX 365 at 17.

**Response:**      Undisputed that PX 365 contains the quoted text, however Defendants dispute the SEC's characterization of PX 365 as a "Deep Dive brochure for September 2014," as the document in question is merely dated September 2014.  Defendants further dispute the SEC's characterization of the Deep Dive as having "touted" anything, to the extent that phrasing suggests a legal conclusion.

359.    Schwartz posted on social media: "Ripple has a team of talented developers working on improving the scalability and reliability of the XRP Ledger." PX 6 (Schwartz Dep. Tr.) at 337:11-340:7.

**Response:**      Undisputed that Schwartz posted the quoted statement on Reddit in February 2018.

360.    On or about February 27, 2018, David Schwartz made a post on Reddit, under the pseudonym Joel Katz, which stated:

> I think three things really set XRP apart from any other digital asset. One is the amazing team of dedicated professionals that Ripple has managed to amass to develop an ecosystem around XRP. The other is a focused use case for XRP and a coherent strategy to drive adoption for that use case. Last, the set of real customers finding business value in it. The history of technological innovation around the XRP Ledger speaks for itself.

PX 509.88 *available at* https://www.reddit.com/r/IAmA/comments/80ppfl/i_am_david_schwartz_chief_cryptographer_at_ripple/duxgy6g/?context=1.

**Response:**      Defendants dispute that Paragraph 349 sets forth an independent statement of material fact as required by Local Civil Rule 56.1, insofar as it is duplicative of Paragraph 345 and 349.  While Defendants do not dispute that PX 509.88 contains the quoted text, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 509.88 because Paragraph 345 omits additional context necessary to understand the quoted language, including that Schwartz was responding to a question asking about differences between "XLM and XRP/Stellar and Ripple," as set forth in PX 509.88.

361.     Ripple's various codes of conduct recognized that its employees might buy XRP "due to general confidence in Ripple Labs team members, and confidence in [Ripple] itself." PX 79 at RPLI_SEC 03921184, PX 83 at RPLI_SEC 0885531.

**Response:**         Undisputed that PX 79 and PX 83 contain the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

362.     In addition to other public statements listed above, *see supra* § B, Ripple made statements referencing use cases for XRP, PX 80 (Ripple Ans.) ¶ 243, including the "use" cases Ripple would pursue.

**Response:**         Defendants dispute that Paragraph 362 sets forth an independent statement of material fact as required by Local Civil Rule 56.1, insofar as it is duplicative of Section B, and Defendants incorporate by reference their responses to the paragraphs contained in Section B.  Undisputed that Ripple made statements referencing use cases for XRP and use cases for XRP that Ripple pursued.

363.     Ripple's talking points, distributed by email by its general counsel in or around 2017, for how Ripple employees should talk about XRP stated that employees "can absolutely (and should talk!) about all of the use cases for XRP that Ripple is supporting – and how [Ripple] efforts are directed towards those use cases." PX 125 at RPLI_SEC 0624332. *See also supra* § B.

**Response:**         Disputed.  Defendants dispute the SEC's characterization of PX 125 as "Ripple's talking points," when the cited document describes the material as an "internal draft message."  PX 125 at RPLI_SEC 0624327.  Defendants further dispute the SEC's characterization that the document in question in PX 125 was "distributed," as the cited document contains only an email from Ripple's then-general counsel to Ripple's public relations agency, cc'ing certain Ripple employees.  *Id.*  Defendants do not dispute that the "internal draft message" contained the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

364.     A 2019 XRP Market Report published on Ripple's website announced an initiative called "xPring," which was launched to "develop use cases for XRP." PX 501.11 (2Q19 XRP Markets Report).

158

**Response:**        Disputed.  Ripple's 2Q19 XRP Markets Report stated that Xpring was launched "to support the open source community of developers, building on the decentralized XRP Ledger and use cases for XRP on that ledger," and further stated that "Xpring is building a developer platform to support open source developers to leverage these protocols," meaning both the XRP Ledger and the Interledger Protocol.  PX 501.11 at p. 5.

365.    Based upon a Ripple Legal Department "cheat sheet" on "How we Talk About XRP," including to influence regulators, Ripple's 2017 talking points commanded employees that they "should talk … about all the use cases for XRP that Ripple is supporting – and how [Ripple] efforts are directed towards those use cases." PX 125 at 6.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of PX 125 as "a Ripple Legal Department 'cheat sheet'," when the cited document describes the material as an "internal draft message."  PX 125 at RPLI_SEC 0624327.  Defendants do not dispute that the "internal draft message" contained the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

366.    In April 2020, Ripple posted that it was looking to boost XRP liquidity "through new use cases for XRP outside of cross-border payments." PX 501.14 (1Q20 XRP Markets Report).

**Response:**        Disputed.  Ripple's 1Q20 XRP Markets Report stated:  "In addition to being bolstered through new use cases for XRP outside of cross-border payments, liquidity is increased by the variety and diversity of exchange tradable instruments. In the case of XRP, Q1 saw the integration of XRP into a number of additional exchanges and liquidity instruments."  PX 501.14 at p. 5.  The cited document accordingly does not support the SEC's characterization in Paragraph 366 of the quoted text as relating to what Ripple "was looking" to do, insofar as it did not describe Ripple's activities or plans, but rather the historical activities of third parties such as exchanges.

367.   According to Vias, the purpose of Ripple trying to get an XRP derivatives product established, when that product was not used in connection with a Ripple product, was to attract more volume to XRP, including speculative and hedging volume. PX 21 (Vias Inv. Tr.) 268:12-269:24.

**Response:**   Disputed.   Vias testified that Ripple tried to get an XRP futures product established because "[i]t's a critical component of a well-established or mature market.  It's a hedging product.  So it's important for market development." PX 21 at 268:14-17.  Further, Vias specifically testified that "creat[ing] more speculative value" was "[n]ot precisely" the goal of a futures product.  PX 21 at 269:20-22.

368.   Ripple publicly announced its expansion of partnerships. PX 501.04 (3Q17 XRP Markets Report).

**Response:**   Disputed.  The cited document does not support the SEC's general and unqualified statement of fact in Paragraph 368.  Defendants do not dispute that, in its 3Q17 XRP Markets Report, Ripple publicly announced partnerships for its On-Demand Liquidity product.  PX 501.04 at p. 5.

369.   Ripple publicly stated that XRP was being used to "support" or "invest" in XRP "ecosystem" or "marketplace." PX 501.10 (1Q19 XRP Markets Report).

**Response:**   Disputed.   The cited document does not support the SEC's statements of fact in Paragraph 369.  Defendants do not dispute that the 1Q19 XRP Markets Report states that "In Q1 2019, three billion XRP were again released out of escrow (one billion each month). Additionally, 2.30 billion XRP were returned and put into new escrow contracts. The remaining 700 million XRP not returned to escrow are being used in a variety of ways to help support the XRP ecosystem," and "Q1 saw significant developments from key companies focused on projects building and utilizing XRP, the XRP Ledger and ILP. These companies, which Xpring invested in and supports, include" ██████████ and ████████. PX 501.10. at p. 1.

370.    Ripple publicly stated that an XRP escrow release was to "help support the XRP marketplace." PX 501.08 (2Q18 XRP Markets Report).

**Response:**        Disputed.   The cited document does not support the SEC's statements of fact in Paragraph 370, and specifically do not support the SEC's assertion that releases from the XRP escrow had any particular purpose.  Defendants do not dispute that the 2Q18 XRP Markets Report stated "In Q3 2018, 3 billion XRP was again released from escrow (1 billion each month).   2.6 billion XRP was subsequently put into new escrow contracts.  The remaining 400 million XRP not returned to escrow is being used in a variety of ways to help support the XRP ecosystem."  PX 501.08 at p. 2.

371.    In a February 2014 interview, Larsen stated:

> We could have chosen to have a mining system but our belief is it would be better to funnel that money back into Ripple Labs, keep Ripple Labs well-funded so we keep hiring incredible cryptographers and engineers that can increasingly improve the protocol. That's actually good for everybody. We have been incenting market makers with XRP forgivable loans. It incents big currency traders, high frequency traders to actually be active market makers on Ripple that provides liquid markets that's good for everybody, gives them an incentive in the long term success of the network.

PX 503.01 *available at* https://www.youtube.com/watch?v=_SpdX36p6ao

**Response:**        Defendants do not dispute that PX 503.01 contains the quoted text, excluding any omissions, alterations, or additions by the SEC.  Defendants note that the SEC omits several sentences of the interview, without indicating the information was cut, specifically the text at lines 18:3-7 in PX 503.01.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 503.01 as misleading because the SEC omits that these actions were described as similar to the practice that Visa used to get banks to participate in its network, PX 503.01 at 18:14-17, and that the interview also

explained that the XRP Ledger is similar to the Bitcoin protocol, XRP is a math-based currency like Bitcoin, and that Ripple does not require individuals to use XRP.  PX 503.01.

372.    Ripple publicly stated that it was using the XRP not returned to escrow "in a variety of ways to help support the XRP ecosystem, including the RippleNet Accelerator Program and Xpring investments like Securitize." PX 501.09 (4Q18 XRP Markets Report).

**Response:**        Undisputed that Ripple's 4Q18 XRP Markets Report contains the quoted text; however, Defendants dispute the SEC's characterization of that text in Paragraph 372 to the extent it suggests that Ripple's statements from its 4Q18 XRP Markets Report applied to all XRP not returned to escrow at all times, as such an unqualified characterization is not supported by the cited evidence.

373.    Ripple publicly stated that that the supply of XRP was fixed and finite, such that "no more XRP will ever be created." PX 501.11 (3Q19 XRP Markets Report).

**Response:**        Undisputed that Ripple's 3Q19 XRP Markets Report, which is the document exhibited at PX 501.12, contains the referenced and quoted text.

374.    Rapoport explained that it is logically true that "[g]iven that there is a finite number of XRP, as demand for XRP grows, the value of XRP should appreciate." PX 10 (Rapoport Tr.) 193:25-194:5.

**Response:**        Disputed.  Defendants do not dispute that Rapoport offered the quoted testimony, however Defendants dispute the SEC's characterization of the testimony in Paragraph 374 because Rapoport did not testify that this is true in practice with respect to XRP, but rather only that it is a "logically true sentence."  PX 10 at 194:3-5.

375.    Ripple explained that "demand for XRP may increase, leading to an increase in price." PX 266 at 17, 45.

**Response:**        Disputed.  The cited evidence does not support the SEC's statement of fact in Paragraph 375.  Defendants do not dispute that PX 266 states "as demand for XRP grows, the value of XRP should appreciate," at p. 17, and "[o]ver time, if the Ripple protocol

becomes widely adopted, demand for XRP may increase, leading to an increase in price," at

p. 45.   Defendants further dispute Paragraph 375 to the extent it suggests without

qualification that "Ripple explained" the quoted text, when PX 266 solely establishes that

the quoted language was contained in a document sent to ██████ of ██████ in

October 2015.  PX 266 at RPLI_SEC 0082311.

376.   Ripple further stated that: "Ripple Labs' business model is predicated on a belief
that demand for XRP will increase, (resulting in price appreciation) if the Ripple
protocol becomes widely adopted." PX 365 at 23.

**Response:**        Disputed.   Defendants dispute the SEC's characterization of the

document in PX 365 as being a "further" statement of any kind, and because PX 365 does

not establish that the document in question was "stated" to any person at any time.

Defendants do not dispute that PX 365 contains the quoted text, exclusive of any alterations,

omissions, or additions by the SEC.

377.   On or about May 22, 2014, Larsen stated in an interview: "why is that important is
that if the protocol is successful that digital asset will almost definitionally be
successful as well…Long term primary use is something that enables market
making which is helping to facilitate a medium of exchange and we think that's
probably like any currency or anything of value probably the most important source
of            demand."        PX            503.02        *available            at*
https://www.youtube.com/watch?v=KkaS2G07NzQ.

**Response:**        Defendants do not dispute that PX 503.01 contains the quoted text,

excluding any omissions, alterations, or additions by the SEC.  Defendants note that the SEC

omits several questions and responses, specifically the questions from 25:4-29:11, to present

a misleading impression of the interview.  Defendants dispute the SEC's characterization of,

and inferences purportedly drawn from PX 503.02 as misleading because it omits that the

interview repeatedly refers to XRP as a currency and states that users of the protocol do not

have to use XRP.  PX 503.03.

378.    In or around May 2015, in response to concerns about XRP's price, Ripple publicly
        articulated in an internet post its "vision" and stated that "[w]hat affects XRP price
        long-term is adoption of the [Ripple] protocol and growth of the ecosystem." PX
        96.

**Response:**        Disputed.  Defendants dispute that PX 96 contains a post written in

May 2015 "in response to concerns about XRP's price," when the cited document establishes

that the post was written in response to an announcement in May 2014 by Jed McCaleb "that

he plans to sell his XRP stake in the next two weeks."  PX 96 at ████Ripple_0000903.

Defendants do not dispute that Arthur Britto of Ripple Labs posted in May 2014 that "Ripple

is unique. It is the only distributed protocol that enables value to move like information

moves today.  Our vision is for an inclusive value web, built by enterprise financial services

firms and innovative developers. It greatly improves, rather than replaces, the incumbent

system.  Many of you are concerned about what impact these sales will have on the market.

What affects XRP price long-term is adoption of the protocol and growth of the ecosystem.

As the value of the protocol (i.e. utility) increases, so does the value of XRP.  The price of

XRP doesn't impair the functionality of the Ripple protocol or network. Similarly, the short-

term price of XRP does not hinder our ability to execute on the vision.  Our company is well-

funded.  We're not dependent on XRP."  PX 96 at ████Ripple_0000903.

379.    Larsen summarized this post as explaining that the "[l]ong-term price of XRP is
        affected by adoption of the protocol and growth of the ecosystem" and that Ripple
        had "made tremendous progress against [its] strategy of late, which is the real driver
        of value of the protocol and network." PX 96.

**Response:**        Disputed.  Defendants do not dispute that PX 96 contains the quoted

text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants

dispute the SEC's misleading and selective quotation of the document, which contains an

email from Larsen summarizing a post by Arthur Britto of Ripple Labs in May 2014, in

which Larsen stated: "Our vision is for an inclusive value web, built by enterprise financial

164

services firms and developers.  Long-term XRP price is affected by adoption of the protocol

and growth of the ecosystem.  Short-term XRP price doesn't hinder our ability to execute on

the vision.  We've been working on a founders' XRP lock up plan for some time. Arthur and

I are participating in it, so you won't see a dumping event from us. We tried to include Jed in

the plan.  We've made tremendous progress against our strategy as of late, which is the real

driver of value of the protocol and network."   PX 96 at ████ Ripple_0000903.

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from

PX 96 to the extent it implies Larsen distributed this summary externally, as PX 96 was sent

to Larsen's assistant.

380.   In or around 2017, Schwartz believed XRP's price was responsive or would be
responsive to specific Ripple projects. PX 6 (Schwartz Dep. Tr.) at 345:7-348:3.

**Response:**      Disputed.  Schwartz testified that, in 2017, he believed that XRP

prices "were responsive or would be responsive to specific factors of the individual projects."

PX 6 at 348:1-3.

381.   Schwartz noted that if more people want to use XRP, then its price will go up, that
XRP's value depended on Ripple's good "stewardship," perhaps as high as $20 or
$120 or higher, depending on "how big you want to dream." PX 509.19, 509.25,
509.01.

**Response:**      Disputed.   Defendants dispute that Schwartz's comments in

response to hypothetical questions on social media represented statements of what "will"

happen.  *See* PX 509.19, 509.25, and 509.01.

382.   Schwartz publicly stated that "[i]f Ripple [wa]s successful getting XRP used as a
vehicle asset" that "could significantly add to the demand for XRP." PX 509.01;
PX 6 (Schwartz Dep. Tr.) at 355:8-356:11.

**Response:**      Disputed.  Schwartz publicly stated in November 2017 that "[if]

Ripple is successful in getting XRP used as a vehicle in international payments, new

corporates like Uber and AirBNB (who make payments all over the globe and want to make

them as quickly and cheaply as possible) could significantly add to the demand for XRP."

PX 509.01.

383.   In March 2017, Ripple told a potential investor: "There is a strong correlation between the usefulness/value of XRP and the adoption usage of Ripple's technology." PX 46 at RPLI_SEC 0156978.

**Response:**      Disputed.   Defendants do not dispute that RPLI_SEC 0156798 contains the quoted text, however Defendants dispute the SEC's unqualified characterization that these statements were made to "a potential investor," as that characterization is not supported by the cited evidence.

384.   Ripple also told the potential investor: "At the moment, liquidity is a limiting factor in XRP's usefulness for financial institutions. We believe that by making XRP more liquid, the utility of XRP for payment providers and financial institutions will grow, thus increasing its value as a digital asset for value transfer." PX 46 at RPLI_SEC 0156978.

**Response:**      Disputed.   Defendants do not dispute that RPLI_SEC 0156798 contains the quoted text, however Defendants dispute the SEC's unqualified characterization that these statements were made to a "potential investor," as that characterization is not supported by the cited evidence.

385.   Ripple also told the potential investor: "Demand for XRP currently comes from three types of market participants: 1) speculators who buy XRP in the market from exchanges or OTC, 2) payment providers, who are also natural hedgers, looking to use XRP for liquidity, and 3) liquidity providers, looking to make markets and earn spreads." *Id*. at RPLI_SEC 0156979.

**Response:**      Disputed.   Defendants do not dispute that RPLI_SEC 0156798 contains the quoted text, however Defendants dispute the SEC's unqualified characterization that these statements were made to a "potential investor," as that characterization is not supported by the cited evidence.

386.   On or about June 22, 2017, Schwartz made a post on Reddit, which stated:

It all depends how big you want to dream.  What if Ripple captures
bitcoin's current market share?  $2[.]  What if Ripple captures the
value of all high-friction International payments that are now
occurring?  $20 (You could add a multiplier to this for additional
demand from people holding XRP to make or facilitate the
payments in the future.)

PX 509.25 *available at*
https://www.reddit.com/r/Ripple/comments/6irqhs/mathematically_speaking_what_is_the_highe
st_price/.

> **Response:**    Undisputed.

387.    On or about July 26, 2017, in an interview on Bloomberg, Garlinghouse stated:
"XRP which is Ripple's digital asset, I think the more utility you can derive from
that the more use case you can derive, the more valuable they'll be and some of
these token offerings that was really unclear." PX 503.03 *available at*
https://www.youtube.com/watch?v=j7jW_c4qyo8.

**Response:**        Undisputed that PX 503.03 contains the quoted text, exclusive of

any alterations, omissions, or additions, however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the document's complete

contents. Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 503.03 including because Paragraph 387 omits additional context necessary

to understand the quoted language, including that Garlinghouse was discussing the fact that

SEC guidance has addressed ICOs being securities offerings, and that tokens involved in

ICOs generally lacked utility, as set forth in PX 503.03, which he believed distinguished

XRP from ICOs. PX 503.03.

388.    On or about November 12, 2017, Schwartz made a post on Quora which stated:

If Ripple is successful getting XRP used as an vehicle asset in
international payments, new corporates like Uber and AirBNB (who
make payments all over the globe and want to make them as quickly
and cheaply as possible) could significantly add to the demand for
XRP. Why?

1. They can buy XRP at below market cost. Say they want to buy
   with USD. They just wait for someone to make a payment that's

167

bridged with XRP that delivers USD. They can provide the USD for delivery and take the XRP from the other side of the payment. Since they're providing someone else liquidity, they'll pay below market rate.

2. They can make payments funded from XRP at roughly half cost. Say they want to pay into a corridor that's bridged by XRP. Since they already have XRP, they can save the cost of the "to XRP" half of the payment.

This means they'll save money by holding piles of XRP sufficient to adapt the timing of these two operations, and they'll be adding to XRP demand. These forces could be expected to increase the price of XRP. This same logic can apply to all kinds of companies that make payments around the world.

At least, that's what Ripple's betting on. After all, the reason we're doing this is to increase demand for XRP to increase the value we can extract from our stash of XRP.

PX 509.01 *available at* https://www.quora.com/Considering-that-the-banks-dont-use-XRP-coins-for-their-transactions-how-can-the-XRP-price-go-high-even-if-the-banks-adopt-the-Ripple-platform.

**Response:**     Undisputed.

389.   On or about September 8, 2017, Schwartz made a post on Reddit, under the pseudonym Joel Katz, which stated:

The usual rule is to think of all the value in existence that could be captured. So if XRP is targeted at removing inefficiency of international payments, then perhaps XRP could capture all the inefficiency in international payments as its value. That gets you roughly $20.

However, there are two ways I can imagine it going higher:

1)     Ripple is targeting XRP at eliminating inefficiency in international payments. But if XRP is highly liquid and efficient, other people might use it for other things. Ripple might even target other use cases. Thus XRP could capture other value.

2)     If international payments become more efficient, there will be more of them, meaning there will be more value that XRP could capture.

PX 509.60, *available at* https://www.reddit.com/r/Ripple/comments/6yruti/can_someone_elaborate_on_this/.

**Response:**         Undisputed.

390.    On or about October 25, 2019, Madigan tweeted: "New (and notable) data shows that although overall XRP trading volume was down nearly 65%, XRP/MXN volumes on Bitso went up more than 25% – during the same period of time that MoneyGram payments into Mexico using XRP went live. A real use case driving real volume."   PX   506.116   *available*   *at* https://twitter.com/bremadigan/status/1164708850458595328.

**Response:**         Disputed.  Defendants do not dispute that Madigan sent a tweet containing the quoted text on August 22, 2019.

391.    Ripple monitored XRP Chat used by the "XRP community," which included "[v]arious parties engaged with XRP. PX 17 (Long Tr.) 43:13-45:2

**Response:**         Disputed.  Defendants do not dispute that Ripple monitored an internet form called XRP Chat, however Defendants dispute that the cited evidence establishes who the members of XRP Chat were or included, as Long testified that it was "hard to tell" who the members of XRP Chat were, and she was "not sure" whether XRP Chat included purchasers of XRP and could not reach any conclusion about who used XRP Chat without "reviewing the forum or seeking more information from folks there," and that she did not "know how you'd find that out."  PX 17 at 44:19-45:25.

392.    XRP Chat was a forum where people discussed XRP and voiced "opinions on what was happening with XRP," and was "a little bit like a finger on the pulse" to Vias. PX 21 (Vias Tr.) 118:1-119:8.

**Response:**         Disputed.  Defendants do not dispute that the quoted text appears in PX 20.

393.    XRP Chat hosted "discussions about what was happening with respect to XRP broadly, [and] specifically anything [Ripple] was doing." PX 21 (Vias Dep. Tr.) at 118:1-24; PX 508.01.

**Response:**         Disputed.  Defendants do not dispute that the quoted text appears in PX 20, exclusive of any alterations, omissions, or additions by the SEC.

394.     Vias posted on XRP Chat during the time he was a Ripple employee. PX 20 (Vias Dep. Tr.) at 119:13-19; PX 508.07, PX 508.09, PX 508.20, PX 508.34, PX 508.35, PX 508.36.

**Response:**     Disputed.  Vias testified that he posted on XRP Chat only "[i]n the beginning" of his time at Ripple, and even then, only "a little bit."  PX 20 at 119:13-16.

395.     For example, on or about February 24, 2017, Vias posted on XRP Chat: "Quick question. Outside of banks using XRP, and higher prices, if there was one thing you would want us to do for XRP, what would it be? Can't promise anything, but as someone who is responsible for driving our XRP strategy, I'm curious about what this group thinks." PX 508.34 available at https://www.xrpchat.com/topic/3085-what-would-you-like-for-xrp/.

**Response:**     Defendants do not dispute that PX 508.34 contains the quoted text, but dispute the SEC's characterization in Paragraph 395 that this text is an "example" of anything.

396.     On or about March 19, 2017, Vias posted on XRP Chat: "Hey guys. Can't give too many details, but I agree supply uncertainty is a big issue, and we're working on a few things that are going to help clear things up. Good suggestions in here though. Must admit I love how much this community is constantly thinking of ways to help. It's very refreshing. Thank you!" PX 508.07, available at https://www.xrpchat.com/topic/3290-countering-the-%E2%80%98damocles-effect%E2%80%99/?do=findComment&comment=30956.

**Response:**     Undisputed.

397.     In or around 2016, a Ripple employee emailed senior Ripple employees, including Garlinghouse, assessing "market reaction to XRP allocation announcement" in part by observing "robust discussion activity on the XRPchat thread." PX 178.

**Response:**     Undisputed that PX 178 is an email from August 16, 2016, that contains the quoted text, however Defendants dispute that this email was "assessing" anything, as that characterization is not supported by the cited document.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 178 to the extent it implies anything about whether Garlinghouse read this email, what he understood

it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse.

398.   Griffin told Garlinghouse in November 2017: "I think we should be doing more to show XRP is a superior store of value. Just like blue chip stocks, it's a question of fundamentals." PX 61.

**Response:**   Undisputed, except insofar as Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 61 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no further reply from Garlinghouse after Griffin said this.

399.   Griffin testified that the purpose of sending out communications about recent developments with XRP was "to continue to point to the growth of this technology and to continue to...show the momentum of the technology and the adoption of it" and that the activity around the XRP price is "part and parcel to that." PX 14 (Griffin Tr.) at 268:19-271:10; 314:14-316:20, 317:18-319:3.

**Response:**   Disputed.  Defendants do not dispute that Griffin offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC, however Griffin testified that the quoted language was only what he "think[s]," and accordingly the cited evidence is insufficient to establish the purpose of any particular communication.  PX 14 at 271:2.  Defendants further dispute that Griffin's testimony as to "a communication," PX 14 at 270:23-24, suffices to establish the purpose of any other "communications."

400.   In 2017, XRP's price increased from $0.0064 to $2.3. PX 45 (Ferrante Decl.) Ex. 1.

**Response:**   Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).

Defendants otherwise dispute the general and unqualified statements in Paragraph 400, however Defendants do not dispute that the price of XRP on certain third-party digital asset exchanges was approximately $0.0064 on January 1, 2017 and approximately $2.30 on December 31, 2017.

401.  In March 2017, Garlinghouse tweeted that XRP was "at [a] two year high!," and the next month that XRP was "up nearly 500% to date." PX 506.062 *available at* https://twitter.com/twitter/status/851588873780158465.

**Response:**  Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 506.062, both because Paragraph 401 attributes the statements to Garlinghouse, whereas Vias tweeted these statements, and Garlinghouse merely retweeted them, *see* PX 506.062, and because the cited evidence does not include the statement that XRP was "at [a] two year high!," as asserted in Paragraph 401.

402.  On or about March 24, 2017, Ripple tweeted: "[the] price of #XRP continues to surge, showing that people are looking for #bitcoin alternatives via @CharlesLBovaird" and linked to the article on coindesk.com 'Ripple Prices Surge to 4-Month High The price of Ripple's XRP token surged to a more-than four-month high overnight, sparking trader notice.' https://t.co/Okbc71gKpk." PX 506.056 *available at* https://twitter.com/Ripple/status/845347809830195200?s=20.

**Response:**  Undisputed that PX 506.056 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

403.  On or about April 6, 2017, Ripple tweeted: "@bgarlinghouse on recent #XRP price rally. http://www.coindesk.com/use-or-speculation-whats-driving-ripples-price-to-all-time-highs/via @CharlesLBovaird at @CoinDesk.pic.twitter.com/Z4QPOeZnW6." PX 506.059 *available at* https://twitter.com/Ripple/status/850030287891255296?s=20

**Response:**  Undisputed that PX 506.059 contains the quoted text.

404.  On or about April 10, 2017, Vias tweeted: "#XRP up nearly 500% year to date. April volume already $700 million! https://cointelegraph.com/news/investors-who-missed-bitcoin-rally-go-for-ether-monero-litecoin #xrpthestandard @xrpchat." PX 506.063 *available at* https://twitter.com/miguelvias/status/851576182411739136?s=20.

**Response:**       Undisputed that PX 506.063 contains the quoted text.

405.    On or about April 10, 2017, Garlinghouse tweeted: "Retweeted @miguelvias, '2) #XRP up nearly 500% year to date. April volume already $700 million! https://cointelegraph.com/news/investors-who-missed-bitcoin-rally-go-for-ether-monero-litecoin    #xrpthestandard  @xrpchat'." PX 506.062 *available at* https://twitter.com/twitter/status/851588873780158465.

**Response:**       Undisputed that PX 506.062 contains the quoted text.

406.    On or about May 4, 2017, Vias tweeted: "This move is clearly not only about #xrpthestandard but great to watch the markets include it in the rally. All coming together.       @xrpchat."     PX     506.070     available     at https://twitter.com/miguelvias/status/860210746621407232?s=20.

**Response:**       Undisputed that PX 506.070 contains the quoted text.

407.    RESERVED

**Response:**       Defendants object to Paragraph 407 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

408.    On or about May 16, 2017, Garlinghouse tweeted: "What appears to have finally tipped bitcoin below the 50% mark is the 24% surge of XRP, the token of the Ripple network."     PX     506.083     *available     at* https://twitter.com/bgarlinghouse/status/864682891812290560?s=20.

   (a)    On or about December 22, 2017, Garlinghouse tweeted: "I'll let the headline speak for itself. $xrp bloomberg.com Bitcoin is So 2017 as Ripple Soars at Year End: Chart The rout in cryptocurrencies isn't sinking all boats." PX 506.118, *available at* Brad Garlinghouse on Twitter: "I'll let the headline speak for itself. $xrp https://t.co/RqtnvZWd0d" / Twitter.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 506.118 because the quoted text does not appear in PX 506.118 but in PX 506.108. Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 506.083 and 506.108 to the extent it implies that the statements in quotation marks are Garlinghouse's words. Garlinghouse's tweet in PX 506.083 was quoted language from an article shared by the @laurashin twitter account. And,

Garlinghouse's own words in PX 506.108 are limited to "I'll let the headline speak for itself. $xrp" and the remainder of the quoted language in Paragraph 408(a) is taken from the headline and a preview of a Bloomberg article.

409.    In December 2017, Ripple's "internal draft message re how we talk about XRP" instructed Ripple employees to say: "XRP is up __% today." PX 125 at RPLI_SEC 0624330.

**Response:**    Disputed.   PX 125 contains an "internal draft message" sent to Ripple's public relations agency, and accordingly the cited evidence does not establish that PX 125 "instructed Ripple employees." PX 125. Defendants further dispute that PX 125 contained affirmative instructions to Ripple employees about what they were required to say under any circumstances.

410.    The internal message document was created in response to "a large rally across crypto" in December 2017. PX 17 (Long Tr.) at 286:7-287:16.

**Response:**    Disputed.   To the extent the reference in Paragraph 410 to an "internal message document" is intended to reference the document contained at PX 125, Long testified that she did not recall specifically why the document was created, and she "can't speak to the intent at the time." PX 17 at 286:9-10.

411.    That same month, Griffin emailed a potential XRP investor: "Wanted to share the article below about ███s largest stock rally in 9-years on the Nikkei driven by their ████XRP exposure from their Ripple equity ownership…Great validation that the public markets value XRP and exposure to XRP through Ripple equity." PX 126.

**Response:**    Disputed.   Defendants do not dispute that, in December 2017, Griffin sent an email to ██████ of ███████ containing the quoted text, exclusive of any alterations, omissions, or additions by the SEC, however Defendants dispute the SEC's characterization of the recipient in PX 126 as "a potential XRP investor," as that characterization is not supported by the cited evidence.

412.  Also in December 2017, Griffin tweeted an article entitled "Virtual currency 'Ripple' effect takes ███ to 9-year high." PX 127.

**Response:**      Undisputed.

413.  That same month, Long told the P.R. Agency: "XRP is rallying…We need to make hay while the sun shines," and asked the P.R. Agency to draft: (1) a tweet by an institutional XRP investor noting the "rally," (2) a tweet for Garlinghouse to announce that XRP would be listed on another exchange, (3) a press release noting the addition of a "BADASS!" Ripple employee to Ripple's Board, and (4) a "customer announcement." PX 119; *see also* PX 17 (Long Tr.) at 258:9-260:25.

**Response:**      Disputed.  Defendants do not dispute that PX 119 contains the

quoted text, exclusive of any alterations, omissions, or additions by the SEC; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from

PX 119 to the extent it characterizes "███████" as "an institutional XRP investor."

414.  In a December 2017 email, Garlinghouse told the P.R. Agency to "push aggressively" the "meme" that "XRP is the best performing (digital) asset in 2017. We are up more than 10,000% for the year." PX 128.

**Response:**      Undisputed that PX 128 contains the quoted text, exclusive of any

alterations, omissions, or additions, however, Defendants dispute that this is the entirety of,

a representative selection of, or a fair characterization of the document's complete contents.

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

PX 128 to the extent the SEC implies based on this excerpt that XRP's market performance

was a primary focus of Garlinghouse's, when it wasn't. *See* PX 81 at 438:23-439:10 ("There

was a lot of attention around the crypto markets.  There was a lot of attention around Ripple.

It's important that we didn't get distracted by the volatile, unpredictable and, at times,

irrational markets and instead built products that benefited our customers."); 436:13-17 ("I

think I've said publicly that I try not to pay attention to the gyrations of the market.  I think,

you know, 'we're not here to pump XRP.  We can't know exactly what will happen to the

price of XRP in the coming days or weeks'"); 437:2-8 ("Yes.  I mean, to be clear, I viewed

that as kind of just – I'm trying to take a long-term view of crypto overall, of XRP.  And, you know, my counsel, which I think is, you know, repeated is – for employees and otherwise, is to not let the craziness of, excuse me, the crypto markets distract us."). Paragraph 414 also omits additional context necessary to understand the quoted language, including that Garlinghouse explains XRP's increase in value is due, in part, to the fact that "XRP's performance (speed, cost, throughput) stands head and shoulders above the landscape -- and makes XRP unique (sic) positioned to capitalize on the many opportunities for digital assets," as set forth in PX 128. In addition, Paragraph 414 also omits that XRP was not the only digital asset that increased in value, and Garlinghouse explained in his email that 2017 was the "year of crypto" meaning that all digital assets had increased in value generally. *See* PX 128.

415.    He added: "one more point: at today's XRP prices, Ripple is more valuable than every other private company in silicon valley except Uber." *Id.*

**Response:**        Undisputed that PX 128 contains the quoted text, exclusive of any alterations, omissions, or additions.

416.    In December 2017, Garlinghouse told the Ripple Board (which included XRP holders): "I feel great about our market position and am proud of the team we've built…This week…has been extraordinary! The price of XRP is up ~200% since Monday, trading volumes have exceeded $6 billion over the past couple of days and with XRP's market cap at ~$75 billion, Ripple is the most valuable private company in Silicon Valley behind Uber Uh, wow!...<u>XRP is the best performing of any other digital asset</u> – up more than 12,000% in 2017. In fact it is almost certainly the best performing asset in any asset class!" PX 134 (emphasis in original). Garlinghouse added: "XRP's rise over the course of this year signals market expectations of our company." *Id.*; *see also* PX 135 (explaining rising "expectations on Ripple" from increased XRP price).

**Response:**        Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 134 and 135 including because Paragraph 416 omits additional context necessary to understand the quoted language, including that XRP was not

the only digital asset that increased in value, and Garlinghouse specifies that 2017 "has been the year of crypto" and the "overall market" of digital assets has gone from $20 billion to well over $500 billion, as set forth in PX 134. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 134 and 135 to the extent the SEC implies based on this excerpt that XRP's market performance was a primary focus of Garlinghouse's, when it wasn't. *See* PX 81 at 438:23-439:10 ("There was a lot of attention around the crypto markets.  There was a lot of attention around Ripple.  It's important that we didn't get distracted by the volatile, unpredictable and, at times, irrational markets and instead built products that benefited our customers."); 436:13-17 ("I think I've said publicly that I try not to pay attention to the gyrations of the market.  I think, you know, 'we're not here to pump XRP.  We can't know exactly what will happen to the price of XRP in the coming days or weeks'"); 437:2-8 ("Yes.  I mean, to be clear, I viewed that as kind of just – I'm trying to take a long-term view of crypto overall, of XRP.  And, you know, my counsel, which I think is, you know, repeated is – for employees and otherwise, is to not let the craziness of, excuse me, the crypto markets distract us."). Paragraph 416 also omits additional context necessary to understand the quoted language, including that Garlinghouse testified in his deposition that when he said "[t]he expectations that everyone has about what Ripple is trying to do goes up," he may have been referring to the expectations of Ripple's customers.  PX 81 at 472:16-473:1; *see also* PX 406 at 5:6-10 ("[W]e have customers.  We have products that need to ship.  We have, you know, finance needs to be done.  Legal stuff that needs to be done.  What I worry about is this distracts us from the mission.  This distracts us from what we're trying to get done.").  Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 134 and 135 because the cited evidence does not

support the SEC's assertions that the Ripple Board includes XRP holders, as set forth in Paragraph 416. Undisputed that PX 134 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

417.   The 1Q18 XRP Market Report noted XRP was up 100% from December 11, 2017. PX 501.06 at 2.

**Response:**   Disputed.   Defendants do not dispute that the 1Q18 XRP Markets Report stated: "XRP began the quarter at $1.91 and finished the quarter at $0.51, a 73 percent drop from January 1. On March 31, 2018, XRP was up exactly 100 percent from the rally that began December 11." PX 501.06 at ECF p. 41.

418.   The 3Q18 XRP Market Report noted a price "rally."   PX 501.12 *available at* https://ripple.com/insights/q3-2019-markets-report/.

**Response:**   Disputed.   Defendants do not dispute that the 3Q18 XRP Markets Report, which is PX 501.08, stated: "The total market capitalization of digital assets fell again in the third quarter, declining 12.0 percent.   Most of the major assets, including XRP, traded in a continued tight correlation, though XRP price rallied at quarter end." PX 501.08 at ECF p. 55.

419.   The 2Q19 XRP Market Report noted XRP's "28.2%" price increase during the prior quarter. PX 501.11 *available at* https://ripple.com/insights/q2-2019-xrp-markets-report/.

**Response:**   Undisputed.

420.   In March 2017, a representative of the P.R. Agency emailed Long and Garlinghouse: "We're going to publish the following Tweet from Ripple to take advantage of the continued XRP increase." PX 124 at RPLI_SEC 0461957.

(a)   The referenced Tweet stated: "The price of XRP continues to surge, showing that people are looking for bitcoin alternatives…" *Id.*

(b)     In response, Long proposed asking an individual "who has significant positions in XRP who's respected in the world of Bitcoin or trading more generally" to "comment on Twitter too." *Id.*

(c)     Long also asked: "Can we get any of our exchanged partners…to comment." *Id.* Long proposed comments that "could be neutral or more of an endorsement" including: "Encouraged by #XRP's rally." *Id.*

(d)     Garlinghouse responded: "LOVE the idea!" *Id.* at RPLI_SEC 0461956.

**Response:**     Disputed. ███████████, who sent the email referenced in Paragraph 420, was a Ripple employee. PX 124. Defendants further dispute Paragraph 420 because SEC altered the text of Paragraph 402(c) from "exchange" to "exchanged." *Id.* at RPLI_SEC 0461957.

421.   The 1Q17 XRP Markets Report stated: "On March 23, XRP rallied from $0.0072 to $0.0112, a 56% price increase on an impressive $19.7M in volume." Ripple noted that "a few key developments may have had an impact" in this "powerful shift in sentiment" including that "[t]hroughout the quarter, Ripple, became more vocal…about its commitment to XRP…and the Ripple Consensus Ledger (RCL) as part of its long term strategy," "Ripple announced a new relationship with Bitgo" and "Ripple continued to sign up banks to commercially deploy its enterprise blockchain solution." PX 501.02; *see also* PX 85 (Ripple RFA Responses) No. 429 (admitting this report was posted on Ripple's website).

**Response:**     Undisputed that PX 501.02 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC. *See also* PX 85, No. 429.

422.   The 2Q17 XRP Markets Report highlighted the "dramatic" and "stunning" XRP price increase of 1,159% from the prior quarter, and noted that the market had "responded favorably to [Ripple's] escrow and decentralization announcements in particular. They both laid out clear plans for Ripple to address the top concerns about XRP, building the market's trust in Ripple and XRP." PX 501.03 at 2; *see also* PX 85 (Ripple RFA Responses) No. 432 (admitting this report was posted on Ripple's website).

**Response:**     Undisputed that PX 501.03 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC, however Defendants dispute that the quoted text was "highlighted" in any way by or within the 2Q17 XRP Markets Report. PX 501.03 at ECF p. 16.

423.     The 3Q17 XRP Markets Report noted XRP was "still up 2,963%" from the previous year despite a recent drop, and attributed the price increase to Ripple's "campaign around Swell," an annual Ripple event. PX 501.04 at 2–4.

**Response:**          Disputed.  Defendants do not dispute that PX 501.04 contains the quoted text, but dispute that the 3Q17 XRP Markets Report "attributed the price increase" to Swell.  The 3Q17 XRP Markets Report only observed that "the lack of correlation" between XRP prices and ETH prices began on August 21, 2017, "when Ripple began its campaign around Swell."  PX 501.04 at ECF pp. 25–27.

424.     The 4Q17 XRP Markets Report reported that XRP increased "29,631 percent" year-over-year price, noting that "XRP markets began to connect the dots once again," referencing Ripple's announcements of business partnerships and the activation of the XRP escrow. PX 501.05 at 1–2.

**Response:**          Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 501.05 including because Paragraph 424 omits additional context necessary to understand the exhibit, including that it does not mention that the exhibit's discussion of "connect[ing] the dots again" specifically refers to activity witnessed in Q4 of 2017, though the SEC misleadingly characterizes the statement as related to the year-over-year change.  PX 501.05 at ECF p. 33.

425.     On or about January 11, 2017, in a post on Reddit, Schwartz stated: "Whether or not XRP is decentralized depends on what you mean by decentralized. Yes, Ripple holds more than half the XRP in existence. In that sense, XRP is not decentralized. But that means that Ripple can justify spending $100 million dollars on something if it would be expected to increase the long term price of XRP by a penny." PX 509.04, *available at* https://www.reddit.com/user/sjoelkatz/comments/?sort=new&after=t1_dmwurxl&count=275.

**Response:**          Undisputed as to the contents of a post Schwartz made on Reddit, although Defendants dispute that PX 509.04 establishes the date of the post in question. Defendants dispute that the post described in Paragraph 425 is a complete statement of Schwartz's views on decentralization, for example because Schwartz testified regarding his

view that the XRP Ledger was decentralized "as soon as the source code was generally available outside the company." PX 6 at 101:25-102:3.

426.     On or about January 18, 2017, David Schwartz made a post on BitcoinTalk.org, under the pseudonym Joel Katz, which stated:

> On the other hand, we do hold an awful lot of XRP. We could, for example, crash the market for XRP by selling a huge amount in a short period of time. That would hurt us more than anyone else. And our conduct has demonstrated to date precisely the opposite – we've worked to lock up XRP and we've discussed our plans for how we'll release XRP to the world. But, of course, we remain free to follow our own interests as we see them. That is a big difference between XRP and many other assets. If you think we will be good stewards and our plans are likely to build demand, then you will tend to expect the price to go up. If you think we will screw it up, abandon XRP, or fail for some reason, then you will tend to expect the price to go down.

PX 507.13, *available at* https://bitcointalk.org/index.php?topic=1752760.msg17542422#msg17542422).

**Response:**     Undisputed that Paragraph 426 contains a partial quotation of a post Schwartz made on BitcoinTalk.org.

427.     In February 2017, Vias emailed an XRP investor: "As for the price [of XRP] I have no idea in the short to medium term. The truth is our market is too small right now to have a good sense of where the price is going in the short term. What I can tell you is that if we execute this year I will be really surprised if the price stays where it is." PX 179. Vias also told the investor about the Ripple team: "The team is SO strong…They work so hard and are so smart sometimes it feels like there is no way we can lose." *Id.*

**Response:**     Disputed.   Defendants do not dispute that, Vias sent an email containing the quoted text, exclusive of any alterations, omissions, or additions by the SEC, to ███████████████ in February 2017; however, Defendants dispute that email address belongs to "an XRP investor," as the cited document does not provide admissible evidence to establish that fact.

428.     In March 2017, in response to an inquiry by a crypto publication about "the recent surge in market capitalization of Ripple,["] Vias suggested the following response: "While the recent surge in XRP is certainly influenced by BTC scalability issues,

clearly much of the recent momentum is do [sic] to the announcement that ███████ joined Ripple's steering group, GPSG." PX 136.

**Response:**      Undisputed.

429.   In March 2017, Vias told a reporter asking about XRP's "sharp gains" in price "79% over the last 24 hours": "Interest from Asia in the last 24 hours…seems to stem from the ████ announcement." PX 137.

**Response:**      Disputed.  The reporter's email set forth in PX 137 contained several

questions, including "Any idea what is driving these sharp gains?" and a description of the

fact that XRP, "Dash and Ethereum have all jumped sharply. I think traders may have simply

turned their attention to XRP as the latest digital currency they want to buy. Does that sound

accurate?"  Vias' March 2017 email in response stated: "I think the rally last week was

largely BTC [Bitcoin] inspired.  Interest from Asia in the last 24 hours however seems to

stem from the ████ announcement."  PX 137 at ██████0057431.

430.   On or about April 2, 2017, CoinTelegraph published an article which stated: "Ripple Head of XRP Markets, Miguel Vias, tells Cointelegraph: 'While the recent surge in XRP is certainly influenced by Bitcoin's scalability issues, much of the recent momentum is due to the announcement that MUFG joined Ripple's steering group, GPSG. Unlike other digital assets, XRP has a clear use case and people are beginning      to      recognize      that."      PX      502.01,      *available      at* https://cointelegraph.com/news/ripple-price-surge-continues-altcoin-takes-advantage-of-bitcoin-scaling-troubles

**Response:**      Undisputed.

431.   In April 2017, Garlinghouse was interviewed by a crypto news site for an article entitled "Use or Speculation: What's Driving Ripple's Price to All Time Highs?" In the article, Garlinghouse explained his view that the "significant rally in XRP prices" was "reflective of a lot of work we have done to make Ripple a very compelling      solution."      PX      502.08,      *available      at* https://www.coindesk.com/markets/2017/04/06/use-or-speculation-whats-driving-ripples-price-to-all-time-highs.

**Response:**      Undisputed that PX 502.08 contains the quoted text, exclusive of

any alterations, omissions, or additions, however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the document's complete

contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 502.08, including because Paragraph 431 omits additional context necessary to understand the quoted language, including that the article also indicates that "not all market participants" agree there is a correlation between Ripple's work and the price of XRP, as set forth in PX 502.08. In addition, Paragraph 431 omits that Garlinghouse explained "that another major development that helped provide tailwinds for XRP prices is bitcoin's ongoing scaling dilemma" as set forth in PX 502.08. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 502.08 to the extent it implies that Garlinghouse's use of the word "reflective" indicates that he believed that the work Ripple had done to make "Ripple a very compelling solution" caused the "significant rally in XRP prices."

432.   In April 2017, Vias shared "some commentary on the recent XRP rally" with a potential investor, noting that XRP "had a record-setting week…It traded at a high of $0.075 on April 2nd and then held at $0.03 through the latter half of the week….At $0.03, XRP is approximately five times greater than it was just two weeks ago….Year to date, XRP is up 520%." PX 129.

**Response:**   Disputed.   Defendants do not dispute that Vias sent an email containing the quoted text, exclusive of any alterations, omissions, or additions by the SEC, to ██████████ of ████████████ in April 2017, however Defendants dispute that ████ was "a potential investor," as the cited evidence does not establish that fact, either in general or as to any specific asset.

433.   In April 2017, Ripple sent similar commentary to others.  PX 130 at RPLI_SEC 0030279–80; *see also* PX 131, 132, 102, 133.

**Response:**   Disputed.  Defendants dispute Paragraph 433 insofar as it does not describe "similar commentary" or "others" with particularity sufficient to state a fact to which a response can be provided, and further dispute Paragraph 433 insofar as its reference

to "others" is intended to refer to the recipients as "potential investor[s]," as the cited evidence does not establish that fact, either in general or as to any specific asset.

434. On or about May 3, 2017, Ripple tweeted: "#Ripple adoption is sparking interest in XRP 'which has had an impressive rally in the last two months' via @Nasdaq http://www.nasdaq.com/article/altcoins-steal-the-spotlight-as-bitcoin-reaches-new-highs-cm782930."              PX          506.069,      *available          at* https://twitter.com/Ripple/status/859904105916923904?s=20.

   **Response:**       Undisputed.

435. On or about May 3, 2017, David Schwartz made a post on BitcoinTalk.org, which discussed XRP's increase in price and stated: "I have devoted the last five years of my life to Ripple, and now work together with over 100 full-time employees who are devoted to making global payments work better. While I concede I can't prove that this increase in price isn't a bubble or isn't the result of some pump and dump attempt, to me it feels like recognition for the effort the team has put in all these years."          PX          507.20,          *available          at* https://bitcointalk.org/index.php?topic=1381669.msg18859629#msg18859629

   **Response:**       Undisputed.

436. On or about June 27, 2017, Garlinghouse tweeted:  #XRP has remained fairly steady while some digital assets plummet this week. Shows it matters to have real-world      use      cases."      PX          506.094,      *available          at* https://twitter.com/bgarlinghouse/status/879693042420137984?s=20.

   **Response:**       Undisputed that PX 506.094 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents because Paragraph 436 omits from the tweet a Wall Street Journal piece that Garlinghouse was reacting to. PX 506.094.

437. On or about July 1, 2017, in a post on Reddit, Schwartz stated:

   What's important is to use an asset with deep pools of liquidity. It's unlikely that banks will build them at their own expense (they aren't now, that's why corporations have to keep nostro accounts all over the place). Ripple has a huge incentive to build them for XRP though -- Ripple can justify spending $100 million to build a pool of liquidity even if there's no direct profit for Ripple if it can

reasonably be expected to raise the price of XRP by a penny over the long term.

PX 509.35, *available at*
https://www.reddit.com/r/Ripple/comments/6kmtwv/as_much_as_i_love_xrp/djnv4xf/

> **Response:**        Undisputed.

438.    On or about July 6, 2017, in a post on XRP chat, Schwartz stated:

> There is a huge advantage to having one entity that holds a significant fraction of an asset. Ripple could spend $100 million on something that has no conventional way of creating revenue, but if it pushed the price of XRP up by one penny over the long term, Ripple would massively profit. Nobody has that kind of concentrated interest in any coin distributed primarily by mining. The money that would have gone to pay for ASICs and electricity to mine the asset instead goes to building the liquidity and technology to make XRP attractive for the use case Ripple is focused on.  There are things an asset that isn't mined can do that an asset that's mined cannot do because of this difference. Let me give you a stark example. The Bitcoin foundation has been trying to raise funds to combat New York's BitLicense regulation. On April 10, 2017, they announced that they needed to raise between $100,000 and $200,000 and that the first hearing was May 4. Likely these efforts would benefit many bitcoin users and holders, but nobody has a concentrated enough interest to pay the bulk of the funds. This a clear example of a public good free rider problem -- everybody is worse off if nobody contributes, but nobody has a strong individual incentive to contribute. Everyone wants to be the only one who doesn't contribute. As of today, more than one month past that hearing, they've raised about 3 BTC. How much do you think Ripple can (and does) spend on regulatory issues critical to using XRP for its use case? The reason is obvious -- keeping the regulatory way clear for XRP's use for settlement makes a huge difference to Ripple, the company, specifically.

PX 508.18, *available at* https://www.xrpchat.com/topic/7054-how-do-you-like-your-misinformation-please-feel-free-to-correct-him/?do=findComment&comment=67173

> **Response:**        Undisputed.

439.    On or about September 12, 2017, David Schwartz made a post on Reddit, under the pseudonym Joel Katz, which stated:

> It's important to understand that Ripple is primarily VC financed and while we do sell XRP, we primarily use our XRP as a strategic

185

asset to incentivize partners. It is clearly in our economic interest to do things that will increase the value of XRP over the long term.

We've explained clearly why we believe that our payment network will create a tremendous need for a new intermediary asset, why that asset is likely to be a digital asset, why XRP is well-positioned to be that asset, how Ripple will work to get XRP adopted for this purpose, and why that would be expected to create demand for XRP.

It's perfectly fair, of course, to disagree with any part of that logic or to question the likelihood of the plan as a whole succeeding. I would suggest people look closely at our history of successful execution and the amazing group of people we've managed to put together.

PX 509.09, *available at*
https://www.reddit.com/user/sjoelkatz/comments/?sort=new&after=t1_dmwurxl&count=275.

> **Response:**   Undisputed, except Defendants dispute that the cited URL contains the text cited in Paragraph 439 or set forth in PX 509.09.

440.   On or about July 15, 2017, in a post on Reddit, Schwartz stated:

It is theoretically possible that Ripple could pivot in some way away from XRP. The company has not made any kind of formal commitment to XRP in perpetuity. However, Ripple is currently the largest holder of XRP and likely to remain so for the foreseeable future. Ripple can justify spending $100 million on a project if it could reasonably be expected to increase the price of XRP by one penny over the long term. So unless you think Ripple is attempting the impossible, it's hard to give any credibility to the possibility that Ripple would abandon its most valuable asset. Ripple's interest closely (but, yes, not perfectly) align with those of other XRP holders.

PX 509.41, a*vailable at*
https://www.reddit.com/r/Ripple/comments/6ng5km/for_people_asking_about_coin_vs_protocol/dk9nh7e/.

> **Response:**   Undisputed.

441.   In August 2017, Vias noted on an investor forum: "Our vision is literally world changing, and the last thing we are worried about is the price going up. That's a forgone conclusion if we continue to focus on the work, which is exactly what we're doing." PX 508.20, *available at* https://www.xrpchat.com/topic/8282-is-miguel-

vias-in-xrpchat/?do=findComment&comment=79213; PX 20 (Vias Dep. Tr.) at 129:6-132:21.

**Response:**    Disputed.  Defendants do not dispute that Vias posted the quoted text on XRP Chat in August 2017, however Defendants dispute that XRP Chat is "an investor forum," as the cited evidence does not establish that fact.

442.    In an October 8, 2019 interview, Garlinghouse stated: "Ripple owns a lot of XRP. We own about 55 percent of all XRP, so clearly we're very interested in the health and success of that ecosystem, but it is an open-source technology that Ripple uses in its technical stack … We also…own a lot of this digital asset. Anything we do that's good for that digital asset is good for us." PX 503.18, *available at* https://www.youtube.com/watch?v=1U6ZiOyX2TA.

**Response:**    Disputed. Defendants dispute Paragraph 442 as not being material because it is duplicative of Paragraph 263. Defendants incorporate by reference their Response to and Dispute of Paragraph 263.

443.    On or about October 18, 2017, in an interview hosted by Ripple and posted on Ripple's youtube channel, Garlinghouse stated: "I'm not focused on the price of XRP over three days or three weeks or three months.  I'm focused on the price of XRP over three years and five years. I have no qualms saying definitively if we continue to drive the success we're driving, we're going to drive a massive amount of demand for XRP, because we're solving a multi-trillion dollar problem."  PX 503.04, *available at* https://www.youtube.com/watch?v=bXYvGVcAwcQ .

**Response:**    Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.04, including because Paragraph 443 omits additional context necessary to understand the quoted language.  In particular, Garlinghouse clarified why he takes a long-term view of the XRP market: "I think I've said publicly that I try not to pay attention to the gyrations of the market.  I think, you know, 'we're not here to pump XRP.  We can't know exactly what will happen to the price of XRP in the coming days or weeks'" PX 81 at 436:13-17; *see also id.* at 437:2-8 ("Yes.  I mean, to be clear, I viewed that as kind of just – I'm trying to take a long-term view of crypto overall, of XRP.  And, you know, my counsel, which I think is, you know, repeated is – for employees and

otherwise, is to not let the craziness of, excuse me, the crypto markets distract us."). Further, Garlinghouse is referring to Ripple's customers and its cross-border payments products in saying that "we're solving a multitrillion dollar problem," as set forth in PX 503.04 at 7:11-17 ("These payment flows are obviously very, very large and to the extent we continue to drive success of signing up more banks, introducing them to how we can solve not just a connectivity question with xCurrent, but a liquidity problem, a multitrillion dollar problem around liquidity called xRapid, I'm very confident about that longer arch (sic) of time."). Undisputed that PX 503.04 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

444.    In an interview on or about November 1, 2017 on CNBC, Garlinghouse stated: "On a personal basis, I'm long BTC, Bitcoin. I guess technically I'm long Bitcoin cash, but I'm also long XRP." PX 503.06, *available at* https://www.youtube.com/watch?v=xFcnETkL2J8.

**Response:**       Undisputed that PX 503.06 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants note that Paragraph 444 omits additional context necessary to understand the quoted language, including that Garlinghouse received XRP from Ripple as employment compensation. PX 73 (April 2015 Employment Agreement); PX 74, RPLI_SEC 0259758 (December 2016 XRP Unit Bonus Award); PX 75, RPLI_01708774 (May 2019 XRP Ledger Address Award). And, Paragraph 444 also omits that Garlinghouse made these statements in response to a question from his interviewer, *see* PX 503.06 at 13:9-12 ("Do you personally invest in other cryptocurrencies?"), and Garlinghouse testified that

when he made statements about being "long XRP" he meant to convey that he "had economic

interest" in XRP, *see* PX 36 175:3-6; 177:4-7.

445.    On or about November 20, 2017, David Schwartz made an XRP Chat post which stated: "When Ripple gets cash for XRP, that increases Ripple's ability to execute on its plans for XRP. If the probability of Ripple's successful execution of its XRP strategy is part of the price of XRP, then growth in Ripple's war chest should put upward    pressure    on    the    price."    PX    508.26,    *available    at* https://www.xrpchat.com/topic/11874-can-the-first-usage-of-xrapid-actually-flood-the-market-with-xrp/?do=findComment&comment=121864).

>    **Response:**        Undisputed.

446.    In an interview on or about December 14, 2017 on Bloomberg, Garlinghouse stated: "I'm long XRP, I'm very, very long XRP as a percentage of my personal…balance sheet… if you're solving a real problem, if it's a scaled problem, then I think you have a huge opportunity to continue to grow that. We have been really fortunate obviously, I remain very, very, very long XRP, there is an expression in the industry HODL [Hold On for Dear Life], instead of hold, its HODL . .. I'm on the HODL side." PX 503.07, *available at* https://www.youtube.com/watch?v=iS8_C615Pg0 ("HODL" refers to a crypto investing term that means "Hold on for Dear Life"— meaning an investor is holding the asset for the long-term despite volatile price gyrations).

>    **Response:**        Undisputed that PX 503.07 contains the quoted text, exclusive of

any alterations, omissions, or additions, however, Defendants do not concede that this is the

entirety of, a representative selection of, or a fair characterization of the document's complete

contents. Defendants dispute the SEC's definition of "HODL" in Paragraph 446 because it

is unsupported by any evidence. Defendants note that Paragraph 446 omits additional context

necessary to understand the quoted language, including that Garlinghouse made these

statements in the context of explaining his digital asset holdings and said that he is also long

bitcoin, but he does not own other digital assets because he does not believe they have utility,

as set forth in PX 503.07 at 9:10-10:6 ("I'm also long Bitcoin. I'm not long some of the other

assets, because it is not clear to me, you know, what's the real utility. What problem are they

really solving?"). And, Paragraph 446 also omits that Garlinghouse made these statements

in response to a question from his interviewer, *see* PX 503.07 at 9:5-6 ("…are you personally invested in XRP?"), and Garlinghouse testified that when he made statements about being "long XRP" he meant to convey that he "had economic exposure" in XRP, *see* PX 36 at 174:15-18; 175:3-6; 177:4-7. Finally, Paragraph 446 omits additional context necessary to understand the quoted language, including that Garlinghouse received XRP from Ripple as employment compensation.   PX 73 (April 2015 Employment Agreement); PX 74, RPLI_SEC 0259758 (December 2016 XRP Unit Bonus Award); PX 75, RPLI_01708774 (May 2019 XRP Ledger Address Award).

447.   Garlinghouse testified: "I'm going to parse the word investment there in that some people consider holding dollars an investment. Some people consider holding the Japanese yen investment. In that context, I consider my holdings in bitcoin an investment and I consider my holdings of XRP something that I have economic interest in and therefore an investment." PX 36 (Garlinghouse Inv. Tr.) at 174:24-175:6.

**Response:**        Undisputed that Garlinghouse offered the quoted testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 to the extent it implies that Garlinghouse was expressing the view that XRP is a security, when he clearly explained that he considers his digital asset holdings to hold value the same way any "investment" in fiat currencies hold value, as set forth in PX 36 at 174:24-175:6.

448.   Garlinghouse publicly stated that he was "long XRP …very, very long XRP as a percentage of [his] personal …balance sheet," meaning that he "had economic exposure to the underlying asset XRP and was a long-term believer and holder of the potential appreciation of [XRP]." PX 36 (Garlinghouse Inv. Tr.) at 174:4-175:6.

**Response:**        Undisputed that Garlinghouse offered the quoted testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony. Defendants note that Paragraph 448

omits additional context necessary to understand the testimony, including that Garlinghouse also testified that he owns Bitcoin too. PX 36 at 175:3-6. In addition, Garlinghouse testified that when he made statements about being "long XRP" he "was answering the question that was being asked by a reporter" *see* PX 36 174:15-18; 175:3-6; 177:4-7. Finally, Paragraph 448 omits that Garlinghouse received XRP from Ripple as employment compensation. PX 73 (April 2015 Employment Agreement); PX 74, RPLI_SEC 0259758 (December 2016 XRP Unit Bonus Award); PX 75, RPLI_01708774 (May 2019 XRP Ledger Address Award). Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 because the evidence that Garlinghouse stated the quoted language publicly as set forth in Paragraph 448 appears in an uncited excerpt in the exhibit. PX 36 at 173:21-25.

449.    An article in August 2018 in the Financial Times quoted Garlinghouse as saying: "We are a capitalist, we own a lot of XRP." PX 502.06, *available at* https://www.ft.com/content/7d9c934f-3840-4285-96a7-4bdf7fee9286.

**Response:**    Undisputed that PX 502.06 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

450.    On or about January 5, 2018, Griffin tweeted: "Retweeting @WSJ [Wall Street Journal] stating, 'While sharp price moves have become the norm among virtual currencies, Ripple's 1,184% surge is surprising because of its differences with bitcoin.'" PX 504.36, *available at* https://twitter.com/WSJ/status/949320212079370241.

**Response:**    Undisputed, except insofar as the cited tweet appears in PX 504.37 and not 504.36.

451.    In a March 12, 2018 interview, Garlinghouse stated:

I don't think about the price of XRP every 3 days, or 3 weeks, or 3 months. What Ripple is doing in enabling an internet of value, this is a 3 plus year journey. What I know for certain is that if we

191

> continue to build the momentum of costumer usage, that continues
> to drive the velocity and demand for XRP, over a 3 plus year time
> frame, I feel very comfortable about the opportunity to grow the
> value of the XRP ecosystem. In an interview on or about
> September 10, 2020, a Ripple employee stated that investing in the
> top tier cryptos are "moonshot opportunities" where "it could go to
> 0 or you could make 100x."

PX 503.22 at 8:25-9:11, *available at* https://www.youtube.com/watch?v=bp25ZkbMwlU.

    **Response:**    Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 503.22 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 451, since the quoted language attributed to Garlinghouse in the first two sentences does not appear in PX 503.22. The only quoted text contained in this exhibit is that of another Ripple employee stating, "I look at those crypto investments and I believe in diversified investments as moonshot opportunities where your investment can go to zero or you can make one hundred X, if that world continues to grow." PX 503.22. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.22, including because Paragraph 451 omits additional context necessary to understand the quoted language including that the Ripple employee specified that for the "moonshot opportunities" "it is rational to have 1 to 5 percent [in diversified investments] … but not just Bitcoin and not just XRP but the top contenders" as set forth in PX 503.22.

452.    In another interview on or about March 12, 2018, Garlinghouse stated:

> [O]ur goal is to develop an incredibly healthy XRP ecosystem. We
> own about 60 percent of all XRP. I am the most interested person,
> as CEO of Ripple, in making sure the XRP ecosystem is
> successful, making sure that not just Ripple is successful building
> tools to leverage the liquidity and leverage the velocity of XRP,
> but also looking at other use cases to leverage the XRP
> ledger…know for certain is if we can continue to build a
> momentum of customer usage that continues to drive the velocity
> and demand for XRP over a three-plus-year timeframe, I feel very

comfortable about the opportunity to continue to grow the value of the XRP ecosystem, which is good for all of the participants in the XRP ecosystem.

PX 503.11, *available at* https://www.youtube.com/watch?v=u3LT9xSwbp0.

> **Response:**      Undisputed that PX 503.11 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.11, including because Paragraph 452 omits additional context necessary to understand the quoted language, including that Garlinghouse also discusses "invest[ing] in support and partner[ing] with companies going after those other vertical use cases" for the XRP Ledger, such that Ripple is not the only participant in the "XRP ecosystem." PX 503.11 at 16:17-17:4.

453.    On or about August 22, 2019, Madigan made a post on Twitter which stated: "New (and notable) data shows that although overall XRP trading volume was down nearly 65%, XRP/MXN volumes on Bitso went up more than 25% - during the same period of time that MoneyGram payments into Mexico using XRP went live. A real use case driving real volume." PX 506.116, *available at* https://twitter.com/BreMadigan/status/1164708850458595328.

> **Response:**      Undisputed.

454.    On or about October 25, 2019, Madigan tweeted: "Oh Hello, Friday rally !" PX 506.117, *available at* https://twitter.com/BreMadigan/status/1187759022683967488?s=2.

> **Response:**      Undisputed.

455.    On or about December 7, 2020, Madigan stated that XRP could "outperform" other investments by 15% if it achieved "3% exposure" to the trillions that XRP is "solving for." PX 502.07, *available at* https://www.cointrust.com/market-news/ripple-global-head-breanne-madigan-xrp-addresses-real-world-fund-transfer-issues.

> **Response:**      Disputed.   PX 502.07 does not contain the quoted statements. Defendants do not dispute that, in December 2020, Madigan gave an interview in which she discussed the digital asset space, but dispute the SEC's characterizations in Paragraph 455,

because Madigan's comments were not specific to XRP, as she stated that "taking just a 3% exposure to the asset class should result in at least a 15% outperformance versus a traditionally managed portfolio that's non-crypto."

456.   Schwartz understood that his public statements about potential increases in XRP's price could make XRP more attractive to speculators. PX 6 (Schwartz Dep.) at 355:2-14.

**Response:**      Disputed.   The cited evidence does not relate in any way to the SEC's statements in Paragraph 456.

457.   Ripple stated that it would depend on XRP because it would sell the token to fund itself and would "massively profit" if XRP's price went up. PX 14 (Griffin Dep. Tr.) at 35-36, 47-50; PX 265 at 19; PX 52 at 20.

**Response:**      Disputed.   Griffin's cited testimony does not establish any statements by Ripple that it "would depend on XRP" or "massively profit" under any circumstances.  The document cited at PX 265 contains no statements at page 19 that Ripple "would depend on XRP" or "massively profit" under any circumstances. PX 265 at RPLI_SEC 0016828.  The document cited at PX 52 contains no statements at page 20 that Ripple "would depend on XRP" or "massively profit" under any circumstances. PX 52 at RPLI_SEC 0070372.

458.   On or about July 6, 2017, Schwartz made an XRP Chat post, stating:

> There is a huge advantage to having one entity that holds a significant fraction of an asset. Ripple could spend $100 million on something that has no conventional way of creating revenue, but if it pushed the price of XRP up by one penny over the long term, Ripple would massively profit. Nobody has that kind of concentrated interest in any coin distributed primarily by mining. The money that would have gone to pay for ASICs and electricity to mine the asset instead goes to building the liquidity and technology to make XRP attractive for the use case Ripple is focused on.

PX 508.18, *available at* https://www.xrpchat.com/topic/7054-how-do-you-like-your-misinformation-please-feel-free-to-correct-him/?do=findComment&comment=67173.

194

**Response:**        Undisputed.

459.    Schwartz testified that if Ripple spent $100 million in pushing the price up by one penny, "[t]hat could lead to increase in Ripple's profits, both from sales and from other means of using XRP on its balance sheet." PX 6 (Schwartz Dep. Tr.) at 274:15-275:2.

   **Response:**        Disputed.  Defendants do not dispute that Schwartz offered the cited

testimony, however Defendants dispute the SEC's characterization of the testimony because

Schwartz testified that his answer required that he "speculat[e]" about what would happen

"in the future over the long term."  PX 6 at 274:25-275:2.

460.    On or about December 14, 2017, during an internal all company meeting, Garlinghouse stated:

> I've been stressed because every time the price of XRP goes up, the expectations on everyone in this room go up.  The expectations on me go up.  The expectations that everyone has about what Ripple is trying to do goes up.  Now, to be clear, I do not think what's going on in the XRP markets is a direct reflection of everything going on at Ripple.  That is not a one to one thing, right?  The XRP markets get excited about some stuff, you're like, okay, you know. Crypto Kitties?  Not sure what to do with that. But the way I think about this is, you know, I'd say five years ago the company started.  We planted a seed that we wanted to grow into an internet of value. A few years ago we decided hey, it's not just an internet of value but it's also, let's really focus on banks. And that tree has started to grow.  What has happened now is the height of that tree has gotten really high.  But the trunk of the tree hasn't grown as fast as the height of the tree.  This happens in Silicon Valley, right?  Companies grow really quickly but the infrastructure underneath those companies doesn't necessarily scale as quickly as the business and as, you know, some reflection of the business, externally ….  So what stresses me out is the height of the tree, the expectations are really high.  The trunk hasn't built out, and everybody in this room needs to help build out that trunk. We've got to invest in the trunk.  We've got to invest in the pieces to make sure that we're in a position to deliver on those high expectations.  The good news is we are trying to do something pretty profound, and the expectations can and maybe even should be really high, because we're making great progress.

PX 135 (Transcript of RPLI 1100541) at Tr. 4:11-4:20.

**Response:**        Undisputed that PX 135 contains the quoted text exclusive of any alterations, omissions, or additions, however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 135, including because Paragraph 460 omits additional context necessary to understand the quoted language, including that XRP wasn't Garlinghouse's main priority.  Garlinghouse says that Ripple "can't let the XRP markets be a constant reflection of how [they] think [they] are performing" and reminds Ripple employees that they have customers to serve. PX 135. In fact, Garlinghouse clarified in his deposition what he meant to convey with the tree trunk analogy: "the attention on Ripple has gone up" so it "need[s] to be in a position to deliver on the promises we made to customers" per the contracts Ripple signed with them, as set forth in PX 81 at 475:1-476:3. Paragraph 460 also omits that when Garlinghouse testified in his deposition that "[t]he expectations that everyone has about what Ripple is trying to do goes up," he may have been referring to the expectations of Ripple's customers.  PX 81 at 472:16-473:1; *see also* PX 135 at 5:6-10 ("[W]e have customers.  We have products that need to ship.  We have, you know, finance needs to be done.  Legal stuff that needs to be done.  What I worry about is this distracts us from the mission.  This distracts us from what we're trying to get done.").

461.    On or about February 19, 2014, in an interview sponsored by Money and Tech, Larsen stated:

Ripple Labs, because we do not have to reimburse validators, started off with the biggest chunk of XRP and one of our key roles is to make sure we distribute it broadly in a way that adds as much utility and liquidity as we possibly can.

I think our incentives are very well-aligned…that for Ripple Labs to do well, we have to do a very good job in protecting the value of XRP and the value of the network. And that really is the guiding principle here. In our distribution of XRP, which is kind of a short term thing…that will run its course; it's kind of the initial distribution -- the objective is, how do you bring as many market makers, gateways, market places, bridges, incentive partners, bring

as many consumers as you possibly can, hosted wallets as you can.
And we think that's actually a really good tool that Ripple Labs
has to add value.

You know, for those that are skeptical, I would just say, it's a different
approach. Give us time. Hopefully we will earn their trust over time, that
we are doing this in a way that adds the most value to the protocol.

PX 503.01, *available at* https://www.youtube.com/watch?v=_SpdX36p6ao.

**Response:**      Defendants do not dispute that PX 503.01 contains the quoted text,

excluding any omissions, alterations, or additions by the SEC.  Defendants note the SEC

made several alterations, including eliminating contractions, without identifying the changes.

PX 503.01 at 14:7-10.  Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from, PX 503.01, as misleading because it omits that the interview also

explained that the XRP Ledger is similar to the Bitcoin protocol, XRP is a math-based

currency like Bitcoin, and that Ripple does not require individuals to use XRP.  PX 503.01

at 6:22-25, 7:3-5, 7:9-14.

462.    On or about July 15, 2017, in a post on Reddit, Schwartz stated:

XRP is XRP. If Ripple is successful in positioning XRP as a
settlement asset, it will be the same XRP that circulates now.

It is theoretically possible that Ripple could pivot in some way
away from XRP. The company has not made any kind of formal
commitment to XRP in perpetuity. However, Ripple is currently
the largest holder of XRP and likely to remain so for the
foreseeable future. Ripple can justify spending $100 million on a
project if it could reasonably be expected to increase the price of
XRP by one penny over the long term. So unless you think Ripple
is attempting the impossible, it's hard to give any credibility to the
possibility that Ripple would abandon its most valuable asset.
Ripple's interest closely (but, yes, not perfectly) align with those of
other XRP holders.

PX 509.41, *available at*
https://www.reddit.com/r/Ripple/comments/6ng5km/for_people_asking_about_coin_vs_protocol
/dk9nh7e/.

**Response:**      Undisputed.

463.    In testifying about the above July 15, 2017, Reddit post, Schwartz admitted that this meant was that "there is some alignment of incentives between Ripple and other XRP holders," that they would both have "interests in price" over different time horizons, and "both would want more liquidity for XRP." PX 6 (Schwartz Dep. Tr.) at 296:4-22.

**Response:**      Disputed.  Defendants do not dispute that Schwartz offered the cited

testimony, however Defendants dispute the SEC's characterization of Schwartz's testimony

Schwartz explained that the alignment also had to do with an interest in the "utility of the

ledger." PX 6 at 296:15-22.

464.    On or about November 21, 2017, in a post in Reddit, Schwartz stated:

I'll tell you what I think the biggest risks are:

Someone else does almost exactly the same thing Ripple does, but does it better. This is mitigated by the fact that Ripple has such talented people and has a lead. But you never know.

Unfavorable regulatory changes make Ripple's business model impractical. Perhaps some regulators deem XRP to be a security and therefore only salable to sophisticated investors or something like that. This is mitigated by the fact that Ripple can target friendlier jurisdictions, but losing big ones would be damaging.

Some serious technical problem is found in the XRP ledger system and neither Ripple or anyone else is able to fix it. This seems unlikely to me, but again, you never know.

Some horrible personal or business scandal affects key Ripple people such as Chris Larsen or Brad Garlinghouse or the company itself and the company becomes too toxic for FIs to do business with. Again, I don't think this is likely, but you never know.

Someone comes up with a better way to bridge international payments than using a digital asset and Ripple is unable to position XRP for another use case and abandons XRP. I don't know of any better way, but as with the others, you never know.

PX 509.78, *available at*
https://www.reddit.com/r/Ripple/comments/7ehy33/xrp_will_go_to_0_because/dq6c8bw/.

**Response:**      Undisputed.

465.    Schwartz also admitted that it remained true at the time of his deposition in 2021, as he had stated in the July 15, 2017, Reddit post, that XRP is likely to remain Ripple's largest asset for years and would almost certainly hold the largest share of XRP for years. PX 6 (Schwartz Dep. Tr.) at 297:5-11.

**Response:**    Undisputed.

466.    Schwartz also admitted that XRP market participants' expectation is that, for the foregoing reasons, Ripple would not abandon XRP or the XRP Ledger "suddenly, or … for no rational reason." PX 6 (Schwartz Dep. Tr.) at 298:4-19.

**Response:**    Disputed.  The cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 466 that the quoted testimony related to any "foregoing reasons," which are not set forth with specificity in Paragraph 466.  Schwartz testified was that there was an expectation that Ripple would not abandon the XRP Ledger "suddenly, or … for no rational reason."  PX 6 at 298:15-19.

467.    On or about December 14, 2017, Ripple posted a video on its YouTube channel in which Garlinghouse stated:

> We are just getting started. We're in the early innings. . . I'm incredibly excited by the progress we made in 2017. We had an "All Hands" [meeting] earlier today talking about how it's the earliest innings. And you know the progress we've made in cross border payments is one piece of that internet of value puzzle. And I look ahead and I can see many many years of growth in the core of what we're doing as well as other vertical opportunities."

> Priority one is definitely around volume. Priority two, I would say, is XRP liquidity. Making sure that on a global basis, as we continue to work with exchanges globally and market makers, making sure we are doing everything we can to make XRP successful on a liquidity basis. Priority three which admittedly is kind of a newer priority and something we'll work on more in 2018, is investing in other use cases for the XRP ledger.

PX 500.28, *available at* https://ripple.com/insights/ask-anything-brad/.

**Response:**    Disputed. There is almost an additional page of text between these two paragraphs, which is not made clear in Paragraph 467.  *See* PX 500.28. Therefore, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

PX 500.28 including because Paragraph 467 omits additional context necessary to understand the quoted language including that prior to discussing Ripple's priorities, Garlinghouse is talking about gaining additional financial instution clients as well as related volume, and is making these remarks in that context, as set forth in PX 500.28 at 3 ("The first segment, kind of top priority, we need more active nodes and when I talk about active nodes, in this case, I'm thinking about financial institutions doing more volume. So, we now have over 100 active customers that we've talked about publically (sic). We're getting more both traditional banks, as well as financial payment providers. … we stand apart in that we have real customers, real volume. We want to keep that going and even accelerate it. … as more banks go live, you get kind of an exponential growth in volume. So priority one is definitely around volume.").

468.   On or about December 27, 2017, in an interview sponsored by Bloomberg, Garlinghouse stated: "There's 100 billion units of XRP that were created. We own about 61% of them. I think you know there's no doubt that 2017 has been amongst other things the Year of Crypto. And within the Year of Crypto, XRP has outperformed every other digital asset out there. So year to date as that chart showed we are up about twenty thousand percent. [Interviewer:] That gives you, what, about $75 billion worth of coin right now? [Garlinghouse:] That gives us a huge strategic asset to go invest in and accelerate the vision we see for an internet of value that I was describing earlier. For me this is all about you know an opportunity to participate and accelerate a vision we've had for some time." PX 503.08, *available at* https://www.youtube.com/watch?v=5TtaF3D6G2Y.

**Response:**   Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.08 to the extent it implies that that XRP was the only digital asset that increased in value because Garlinghouse also discusses that "there's been excitement around digital assets broadly," as set forth in PX 503.08 at 31:15-16.

469.   On or about March 14, 2018, Garlinghouse stated at a press conference: "I point out that Ripple is very, very interested in the success and the health of the ecosystem and will continue to invest in the ecosystem."   PX 503.13, *available at* https://www.youtube.com/watch?v=JOAuXEYu9Pg.

**Response:**      Undisputed that PX 503.13 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 503.13, including because Paragraph 469 omits additional context necessary to understand the quoted language, including that Garlinghouse was explaining that he does not spend his time "forecast[ing] the price of XRP" rather, Ripple will continue to "invest" in the "XRP ecosystem" because it is a software business "cross-selling different products to the same customers to  solve a global payments problem," including xRapid (Ripple's cross-border payments product now named ODL) that utilizes XRP for that purpose, as set forth in PX 503.13 at 14:14-15:6.  Paragraph 469 also omits that Ripple is only "one stakeholder…in the XRP ecosystem," as set forth in PX 81 at 98:16-17.

470.   Garlinghouse said in interviews that Ripple would "continue to invest" in the XRP ecosystem and that Ripple was "just getting started" in its efforts. PX 506.119; PX 503.13.

**Response:**      Disputed because the quoted text about Ripple "just getting started" does not appear in PX 506.119 or PX 503.13 and because Paragraph 470 sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including the SEC's statement that "Ripple was 'just getting started' in its efforts." Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 506.119 and 503.13, including because Paragraph 470 omits additional context necessary to understand the quoted language, including that Garlinghouse was explaining that he does not "forecast the price of XRP" rather, Ripple will "continue to invest" in the "XRP ecosystem" because it is a software business "cross-selling different products to the same customer to solve a global payments problem," including xRapid (Ripple's cross-border payments product now

named ODL) that utilizes XRP for that purpose, as set forth in PX 503.13 at 14:14-15:6. Paragraph 470 also omits that Ripple is only "one stakeholder…in the XRP ecosystem," as set forth in PX 81 at 98:16-17.

471.    A "precondition" to Ripple's product strategy was having liquidity between XRP and various fiat currencies. PX 81 (Garlinghouse Dep. Tr.) at 298:25-299:21, 305:14-308:20.

**Response:**    Undisputed that Garlinghouse offered the cited testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81 including because Paragraph 471 omits additional context necessary to understand the cited testimony, including that the product strategy that Garlinghouse was referring to is Ripple's cross-border payments product and what is required for it to function, "if XRP doesn't have trading pairs, then you don't have that liquidity," as set forth in PX 81 at 299:9-15.

472.    In 2015, a Ripple employee wrote a paper which stated: "XRP's value is tied directly to its liquidity…XRP becomes more valuable as its liquidity increases." PX 57 at RPLI_SEC 0364717-20.

**Response:**    Undisputed that PX 57 contains the quoted text, exclusive of any alterations, omissions, or additions; however, Defendants dispute that the quoted text in Paragraph 472 represents the views of any Ripple employee besides the one who authored it. Defendants further dispute that the allegations in Paragraph 472 establish that the paper in question was viewed by any particular person within or outside of Ripple, in particular because, on June 26, 2017, the author of the paper described PX 57 as having "no real audience" and noted that "[a] few people have read these within Ripple but the ideas didn't get much traction," as set forth in Ex. 115 (RPLI_SEC 0350045).

473.    RESERVED.

**Response:**          Defendants object to Paragraph 473 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

474.    On or about June 26, 2016, Griffin emailed Birla: "My end-of-week leadership note is designed to restate the role of XRP in our company strategy and projects currently underway to build liquidity for XRP." PX 464 at 0042714.

**Response:**          Undisputed that PX 464 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC, including the SEC's unmarked omission of the word "the" which appears before "projects currently underway" in the original document.

475.    Ripple devoted an "XRP markets team," led by Vias from November 2016 through April 2020, to grow XRP market liquidity.  PX 80 (Ripple Ans.) ¶¶ 23, 198; PX 21 (Vias Inv. Tr.) at 14:4-15:21; PX 20 (Vias Dep. Tr.) at 21:14-22:15, 141:13-15; PX 14 (Griffin Dep. Tr.) at 251:11-253:2; PX 153.

**Response:**          Disputed.  Defendants do not dispute that Ripple had an XRP Markets Team that was led by Miguel Vias from November 2016 through April 2020; however, Defendants dispute that the XRP Markets Team was "devoted" to "grow[ing] XRP market liquidity," as Vias specifically disputed this characterization in his testimony: when asked whether the XRP Markets Team was "responsible for [the] increase in off-ledger trading volume" that occurred during his tenure at Ripple, Vias responded: "No."  PX 20 at 85:15–86:1.  Defendants further dispute the SEC's characterizations in Paragraph 475 because record evidence establishes that the XRP Markets Team had a variety of purposes during Vias' tenure, including publishing the XRP Markets Report, forming and maintaining "relationships and partnerships" with "payment processor[s]," and providing "commentary to leadership regarding the XRP markets."  PX 20 at 34:8–12; 37:23–25; 39:22–40:1.  To the extent the SEC purports to suggest in Paragraph 475 that Ripple had any control over the growth of XRP market liquidity, Defendants dispute that allegation because record evidence

establishes that, among other things (1) "the primary driver" of "the growth of the XRP trading market" was "the fact that the whole industry burgeoned over four years," PX 20 (M. Vias Deposition) at 90:1–9; (2) "Ripple's sales of XRP were generally no more than a fraction of a percent of daily XRP trading volume," PX 80 (Answer) ¶ 198; (3) "Ripple partnered or facilitated a . . . very small percentage of" the exchanges on which XRP was traded, PX 81 (B. Garlinghouse Deposition) at 300:16-301:2; and (4) Ripple hired Vias to "build[] the market for XRP" only "to the extent that [Ripple] could . . . do that." PX 14 (P. Griffin Deposition) at 252:10–22.

476. On or about January 10, 2018, Long wrote an email to Ripple's Board of Directors which stated: "Liquidity across currency pairs is important for XRP to function as a highly-efficient settlement asset in cross-border payment flows" and "Speculators play an important role in building XRP liquidity." PX 39 at 221962-63.

**Response:** Undisputed that PX 39 contains the quoted text; however, Paragraph 476 omits additional context necessary to understand the quoted testimony, including that the quoted text was part of a set of responsive talking points drafted in connection with an article in the Financial Times. PX 39 at RPLI_SEC 221962.

477. RESERVED.

**Response:** Defendants object to Paragraph 477 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

478. Ripple touted the "liquid and robust markets" for XRP as late as August 2020. PX 501.15.

**Response:** Disputed that Ripple "touted" the "'liquid and robust markets' for XRP," including because PX 501.15 only referenced the future "*development*" of such markets as being "key to the success of ODL." PX 501.15 at 3 (emphasis added). Additionally, Paragraph 478 sets forth legal conclusions, inferences, or assertions

unsupported by citations to evidence, including the SEC's statement that Ripple "touted" XRP.  Defendants further dispute that the allegations in Paragraph 478 establish that the document in question was viewed by any particular person within or outside of Ripple.

479.     Crypto trading platforms that offered XRP for trading were a "pillar" of Ripple's products because they provide liquidity. PX 16 (Birla Inv. Tr.) at 215:13-216:1.

**Response:**          Disputed.  Defendants do not dispute that Birla testified that digital asset exchanges were "a pillar" of the xRapid/ODL product (in that, as he testified, they provided an "on-ramp" and an "off-ramp" for XRP in specific corridors at specific times), *see* PX 16 at 215:17–21; however, Defendants dispute Paragraph 479 in that it inaccurately characterizes Birla's testimony as having been about multiple of "Ripple's *products*" when the quoted testimony concerned a single Ripple product, xRapid/ODL.  *See* PX 16 at 215:17–216:1 (exchanges that provided on-ramps and off-ramps for xRapid were "a pillar of the product").  Defendants further dispute that a single statement by an employee is sufficient to establish the fact cited in Paragraph 479 at all times and for all purposes in this litigation.

480.     Ripple's "needed liquidity and liquidity [was] facilitated by crypto exchanges." PX 15 (Birla Dep. Tr.) at 86:15-24.

**Response:**          Disputed, because Paragraph 480 contains a confusing and incoherent assertion that appears to be missing one or more words needed to render it an intelligible statement of fact, and it is also unsupported by cited evidence insofar as it mischaracterizes Birla's testimony.  Birla testified that, "in my function, for the xRapid/ODL product to work, we needed liquidity and liquidity is facilitated by crypto exchanges."  PX 15 at 86:15–24.  He additionally explained that the "need" for liquidity was product-specific and in the context of specific corridors at specific times: for instance, a product that "facilitate[d] payments in Mexico" would need a "Mexican-based exchange that provided liquidity into local fiat and local rail payment services."  PX 15 at 86:20–24.  To the extent

Paragraph 480 asserts that Ripple as a general matter and unrelated to xRapid/ODL "needed" liquidity facilitated by crypto exchanges generally, that assertion is unsupported. Defendants further dispute that a single statement by an employee is sufficient to establish the fact cited in Paragraph 480 at all times and for all purposes in this litigation.

481.    In an email to Long and Griffin in December 2017, Garlinghouse noted that he preferred to state publicly that "exchange listings are critical" for a "healthy XRP ecosystem," and that "having XRP listed at as many global … exchanges as possible is a critical component of delivering on our vision." PX 41 at RPLI_SEC 54865.

**Response:**    Undisputed that PX 41 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 41, including because Paragraph 481 omits additional context necessary to understand the quoted language, including that Garlinghouse wrote that he "like[s] being proactive to say that [Ripple] care[s] deeply about a healthy XRP ecosystem and thus exchange listing are critical" and that for "maximizing liquidity" having XRP listed on as many global exchanges "is a critical component of delivering on [Ripple's] vision for the internet of value," as set forth in PX 41.

482.    Ripple wanted to list XRP on crypto trading platforms so that it would be easier to purchase XRP. PX 18 (O'Gorman Tr.) at 343:23-346:13.

**Response:**    Disputed, because the assertion of fact in Paragraph 482 goes beyond the cited evidence, and because a statement in a deposition by a single Ripple employee about a particular point in time, and who was answering a question about a single digital asset exchange, is insufficient to establish the underlying fact broadly set forth in Paragraph 482 at all times and for all purposes in this litigation. *See* PX 18 at 344:12–20

(O'Gorman answering a question about Kraken, in response to being shown a particular email that she received on a particular date).

> (a)    In approximately January 2018, Ripple posted on its website the "Top 9 Frequently Asked Questions About Ripple and XRP," with the first question being "How do I buy XRP?" and the following answer: "XRP is available for purchase on more than 60 digital asset exchanges worldwide, many of which are listed on this page [link provided]." PX 500.20. The post also stated: "In order to maintain healthy XRP markets, it's a top priority for Ripple to have XRP listed on top digital asset exchanges." *Id.*

**Response:**        Disputed.  Defendants do not dispute that PX 500.20 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 482 insofar is it omits relevant text, including that "Ripple does not endorse, recommend, or make any representations with respect to the gateways and exchanges that appear on that page."  PX 500.20.

483.    Around 2017, Ripple's XRP markets team understood that the majority of trading on crypto trading platforms was speculative trading, which is why one of the efforts Vias made to increase XRP liquidity was to try to get XRP listed on such platforms. PX. 21 (Vias Inv. Tr.) at 76:14-80:24; *see also id.* 95:4-16 (explaining the volume and liquidity reasons why Ripple attempted to get U.S.-based crypto platform Gemini to list XRP).

**Response:**        Disputed.  The assertion of fact in Paragraph 483 is unsupported by the cited evidence and mischaracterizes the testimony of Vias.  Vias, who was then-head of Ripple's XRP Markets Team, never testified that he or the XRP Markets Team "understood that the majority of trading on crypto trading platforms was speculative trading."  Rather, Vias testified that the XRP markets only "had *a little bit* of speculation," PX 21 at 77:1–15 (emphasis added), and as to "[t]he bulk of *Bitcoin* volume [that] happen[ed] on these exchanges. . . . It was our understanding, at the time, the majority of *that volume* was speculative."  PX 21 at 80:1-5 (emphasis added).  Defendants further dispute the SEC's characterization that Vias "attempted to get . . . Gemini to list XRP" in order to increase

speculative trading; Vias testified that the importance of the Gemini listing was, in the short

term, that it "would increase better volume," and in the long term that it would "be another

on-ramp for xRapid."  PX 21 at 95:9–11.

484.    Madigan admitted that "Ripple in general is interested in seeing XRP trade on more
        exchanges, not less," because it would be "helpful for liquidity" as to XRP. PX 25
        (Madigan Tr.) at 234:24-235:12.

**Response:**        Undisputed.

485.    XRP purchasers were asking Ripple to make XRP more readily available. PX 545
        at RPLI_SEC 0041027 (investor asking Ripple to get XRP listed on Coinbase); PX
        140 at RPLI_SEC 0622801 (investor complaining to Ripple that current XRP
        vendors have bad reviews); PX 144 at RPLI_SEC 1048433 (investor looking for
        exchange other than Kraken which is unreliable).

**Response:**        Disputed.  The cited evidence does not support the SEC's broad

assertion of fact as set forth in Paragraph 485.  The assertion of fact in Paragraph 485 is not

limited to any specified time period; yet, it is supported by citations to only three isolated

emails, two from 2017 and one from 2018.  None of the referenced emails are from

individuals "asking Ripple to make XRP more readily available"; rather, each of the emails

raises specific concerns about particular digital asset exchanges and certain of the emails

include proposals in the context of those concerns.  *See, e.g.*, PX 545 at RPLI_SEC 0041207

(expressing concern that "Kraken stole my money!" and suggesting that the sender had a

better experience purchasing other digital assets on Coinbase); PX 140 at RPLI_SEC

0622801 (suggesting that buying XRP from Ripple would solve that individual's issues with

other exchanges because they didn't want to "risk $$$" and "get robbed").  Defendants

further dispute the SEC's characterization of the email senders as "XRP purchasers" and

"investor[s]," given that two of them expressed an interest in potentially purchasing XRP,

but suggested they had not yet done so.  PX 140 at RPLI_SEC 0622801; PX 144 at

RPLI_SEC 1048433.  Defendants further dispute Paragraph 485 to the extent the SEC asserts

that individuals considering a purchase of XRP are potential "investor[s]" in Ripple. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the cited documents contain hearsay statements of third parties and not statements by Ripple or the Individual Defendants.  Defendants further dispute that statements by the referenced individuals are sufficient to establish the underlying fact set forth in Paragraph 485 at all times and for all purposes in this litigation.

486.    RESERVED.

**Response:**    Defendants object to Paragraph 486 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

487.    Because XRP's "liquidity overall is impacted by…the breadth and the number of platforms it's traded on," Ripple wanted to have XRP listed on crypto trading platforms. PX 25 (Madigan Tr.) at 43:10-44:13.

**Response:**    Disputed.  Defendants do not dispute that PX 25 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 487 because the SEC mischaracterizes Madigan's testimony and omits relevant portions and context, including that Madigan provided the excerpted testimony in response to questions about her own understanding and what she wanted to achieve: her testimony demonstrates that she answered those questions on behalf of herself and did not speak to what "Ripple wanted," as asserted in Paragraph 487. PX 25 at 40:20–24, 42:19–22 ("Does -- is liquidity something that *you've* wanted to achieve with respect to the XRP market?" (emphasis added)).  Paragraph 487 also omits relevant context, including that, throughout the quoted section, Madigan made clear that issues of liquidity were important for "ensuring the smooth operation of the ODL product," and "better liquidity for XRP in

209

the market would ensure smoother operations for ODL."  PX 25 at 42:19–43:1, 44:14–18. Defendants further dispute Paragraph 488 because it is unbounded by time.

488.    For Ripple's XRP markets team, there was a "priority" of getting XRP listed on U.S. exchanges, particularly for the XRP to U.S. Dollar listing pair, in part because, without such listings, it was "going to be pretty challenging to launch a remittance-based use case," and Ripple needed a "massive amount of liquidity" to get this done. PX 20 (Vias Inv. Tr.) at 49:17-50:6.

**Response:**        Disputed that PX 20 contains the quoted text at the cited pages, but insofar as the SEC intended to cite PX 21, Defendants do not dispute that Vias's testimony contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC. Defendants further dispute Paragraph 488 because the SEC omits relevant portions and context of Vias's testimony, including that the XRP-USD listing pair "was a priority *for xRapid*" to the extent USD was an on-ramp for other currencies to use that platform, PX 21 at 49:17–24 (emphasis added), and that "*the U.S. market* [had a] massive amount of liquidity broadly in every asset class commodity," not that Ripple needed a massive amount of liquidity. PX 21 at 49:25–50:6 (emphasis added).  Defendants further dispute Paragraph 488 because it is unbounded by time.

489.    Because "Coinbase has solid banking relationships" and "money transmission licenses in 50 states," getting XRP "listed" (i.e., made available for buying and selling) on Coinbase "potentially could be advantageous" to Ripple's ODL product. PX 16 (Birla Inv. Tr.) at 199:14-23.

**Response:**        Disputed.  Defendants do not dispute that PX 16 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 489 because a statement in a deposition by a single Ripple employee about his own views is insufficient to establish the underlying fact broadly set forth in Paragraph 482 at all times and for all purposes in this litigation.  *See, e.g.*, PX 16 at 199:11-13 (Birla testified that he did not know if Garlinghouse ever discussed listing XRP on Coinbase's

platform with Coinbase's then-CTO).  In particular, Paragraph 489 omits relevant context insofar as Birla's testimony solely related to his views at the time of an August 20, 2018 meeting with Coinbase's then-CTO; notably, Coinbase ultimately did not list XRP until February 28, 2019, as set forth in Ex. 116 at RPLI_SEC_1094562 (Feb. 28, 2019 Coinbase blog post reporting that "XRP is now available on Coinbase").  Defendants further dispute Paragraph 488 because it is unbounded by time.

490.    One reason that Ripple wanted to list XRP on Coinbase is because it would increase speculative trading of XRP. PX 21 (Vias. Inv. Tr.) at 102:4-103:24, 110:20-113:21.

**Response:**        Disputed.  Defendants do not dispute that Vias agreed that an XRP listing at Coinbase would "help with speculative trading in XRP," PX 21 at 102:11–13; however, Defendants dispute Paragraph 490 because a statement in a deposition by a single Ripple employee about his own views is insufficient to establish the underlying fact broadly set forth in Paragraph 490 at all times and for all purposes in this litigation. Vias further testified that a successful listing would provide "[v]olume [and] liquidity," not an increase in "speculative trading" as asserted in Paragraph 490.  PX 21 at 102:4–13, 113:15–17. Defendants further dispute Paragraph 488 because it is unbounded by time.

491.    Ripple wanted Kraken to list XRP to make it easier for people to buy XRP on exchanges. PX 18 (O'Gorman Tr.) 343:23-345:20.

**Response:**        Disputed because a statement in a deposition by a single Ripple employee about a particular point in time, and who was answering a question about a single digital asset exchange, is insufficient to establish the underlying fact broadly set forth in Paragraph 491 at all times and for all purposes in this litigation. *See* PX 18 at 344:12–20 (O'Gorman was discussing a particular email that she received on a particular date). Defendants further dispute Paragraph 491 because O'Gorman's testimony at most sets forth her personal views and not those of Ripple or the Individual Defendants, and Defendants

note that contemporaneous evidence establishes that others within Ripple had differing views about the value of listing XRP on Kraken's trading platform. *See, e.g.*, Ex. 117 at RPLI_SEC 0377213 (M. Vias email noting "Product wants to better understand" whether Kraken could be "a good alternative [to another digital asset exchange] for . . . xRapid"). Defendants further dispute Paragraph 488 because it is unbounded by time.

492.   In March 2017, members of the XRP market team reported to Vias that they had a call with Bittrex, a crypto trading platform that then-permitted trades between XRP and bitcoin, to discuss Bittrex permitting trades between XRP and other assets, and noting that the team believed this could "help [Ripple] get to the $1B speculative volume target" for the next quarter. PX 43 at RPLI_SEC 49126.

**Response:**   Disputed. Defendants do not dispute that, in March 2017, certain Ripple employees had a call with Bittrex that included a discussion about "listing additional XRP/fiat pairs." PX 43 at RPLI_SEC 49126. However, Defendants dispute that Ripple undertook efforts to encourage Bittrex to "permit[] trades between XRP and other assets" to meet a "speculative volume target." The cited evidence does not establish that such a target was actually adopted by Ripple.

493.   ███ a representative of Ripple's principal market maker, explained that "XRP trading volumes took off" in "staggering" amounts "as XRP started getting listed on cryptocurrency exchanges worldwide." PX 26 ███ Tr.) at 121:6-122:25.

**Response:**   Disputed. Defendants do not dispute that PX 26 contains the quoted text, exclusive of any alterations, omissions, or additions; however, Defendants dispute the characterization that any market maker was "Ripple's principal market maker" as vague and unsupported by evidence in the record.

494.   Ripple took steps to increase the trading volume and liquidity of XRP vis-à-vis particular fiat currencies, even before Ripple had anyone signed up to use any Ripple products, because a potential client would want to see the existence of such volume and liquidity in advance of signing up to use the software product. PX 23 (Will Tr.) at 227:18-229:11.

**Response:**        Disputed.  Defendants dispute that the cited evidence establishes that Ripple "took steps to increase the trading volume and liquidity of XRP"; Will, whose testimony is cited in Paragraph 494, specifically denied recalling whether "Ripple engage[d] in efforts to increase liquidity and volume of XRP in certain corridors."  PX 23 at 229:12–18.  Defendants further dispute the SEC's assertions of fact as set forth in Paragraph 494, including that the cited evidence establishes what "a potential client" would want, to the extent the SEC suggests that all potential Ripple clients held the same views about Ripple's products.

495.   Vias's role at Ripple included leading Ripple's "exchange strategy," in which Ripple entered into agreements to list XRP on as many reputable crypto exchanges as possible, and provided incentive payments to certain of those exchanges, in order to increase XRP liquidity and trading volume. PX 20 (Vias Dep. Tr.) at 93:11-96:14, 180:7-17.

**Response:**        Disputed.  Defendants dispute that Ripple "entered into agreements to list XRP on as many reputable crypto exchanges as possible" when, in fact, "XRP . . . has traded at a couple hundred exchanges around the world, of which Ripple partnered or facilitated a . . . *very small percentage* of those [listings]."  PX 81 at 300:16–301:2 (emphasis added).  Record evidence establishes that "most of the listing[s] didn't have anything to do with [Ripple]. . . . [M]ost XRP listings happened organically." PX 20 at 97:4–7.  Defendants further dispute that Ripple "provided incentive payments to certain of those exchanges, in order to increase XRP liquidity and trading volume"; rather, Ripple made payments to a handful of exchanges for a number of reasons including "cover[ing] some of [their] integration costs," and to "help engender a popular launch."  PX 20 at 95:3–10.

496.   On or about January 20, 2017, Vias sent a representative of Coinbase an email describing a rebate program, volume incentive program, and minimum volume guarantees that Ripple could offer Coinbase if Coinbase listed XRP on its crypto exchange. PX 486.

**Response:**      Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 486 as misleading, because the referenced email describes programs that Ripple previously offered to Bitstamp, not Coinbase, and described only being "open to" a proposed "framework" for a relationship with Coinbase.  PX 486 at RPLI_SEC 0027078.  To the extent the SEC intends to rely on Paragraph 496 to assert that PX 486 is relevant to Coinbase's decision to list XRP, Defendants note that XRP was not listed on Coinbase until more than two years later on February 28, 2019, as set forth in Ex. 116 at RPLI_SEC_1094562 (Feb. 28, 2019 Coinbase blog post reporting that "XRP is now available on Coinbase").

497.   On or about November 29, 2017, Griffin made a post on Twitter which stated: "Ripple: Get Ripple on Coinbase – Sign the Petition!" PX 504.29.

**Response:**      Undisputed.

(a)   In November 2017, Ripple circulated internally an online petition for Coinbase to list XRP and noted that "[n]ot only US investors, but also overseas investors are interested in this" because "they want to see a price increase by getting XRP more exposed on major exchanges like Coinbase." PX 541.

**Response:**      Disputed.  Undisputed that PX 541 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization that an email from a single Ripple employee to another single Ripple employee containing links to an online petition website reflects "Ripple" as an entity "circulat[ing] internally an online petition."  To the extent the SEC purports to suggest in Paragraph 497 that Coinbase was influenced by the referenced email or the petitions it describes, Defendants note that XRP was not listed on Coinbase until more than two years later on February 28, 2019, as set forth in Ex. 116 at RPLI_SEC_1094562 (Feb. 28, 2019 Coinbase blog post reporting that "XRP is now available on Coinbase").

498.    Ripple offered crypto exchanges incentives to list XRP. PX 85 (Ripple RFA Responses) No. 584; PX 80 (Ripple Ans.) ¶¶ 161, 163.

**Response:**        Disputed insofar as Paragraph 498 does not state a fact with particularity, because it is vague as to timeframe and the number of exchanges to which Ripple "offered … incentives." Defendants do not dispute that Ripple made certain incentive payments to six digital asset exchanges. *See* PX 460.

499.    In or about 2017, Ripple entered into six agreements with crypto exchanges, and also offered two U.S.-based crypto exchanges $1 million and $5 million, respectively, to list XRP as part of Ripple's efforts to increase liquidity between XRP and various fiat currencies. PX 460; PX 21 (Vias Inv. Tr.) at 43:19-44:10, 140:2-25; PX 437; PX 436; PX 81 (Garlinghouse Dep. Tr.) at 298:25-299:21, 305:14-308:20, 327:24-328:16.

**Response:**        Disputed.  Defendants do not dispute that, in 2017, Ripple entered into six agreements with digital asset exchanges to make XRP available for trading to each platform's customers, and that Ripple offered a $1 million cash payment to a single U.S.-based digital asset exchange, PX 460, PX 436; however, Defendants dispute that Ripple offered a U.S.-based digital asset exchange $5 million to list XRP.  As Garlinghouse testified, employees of the referenced exchange "asked [Ripple] to pay $5 million, to which we declined. And as time went by, I think we went back to them and said, was that still on the table?" PX 81 at 308:15–18.  The referenced exchange did not list XRP in connection with this outreach.  PX 460.  Defendants further dispute that Ripple's agreements with six digital asset exchanges were part of any "efforts" to increase XRP liquidity as a general matter and unrelated to Ripple's products, or that Ripple's actions had a broader impact on XRP liquidity.  Indeed, "XRP . . . has traded at a couple hundred exchanges around the world, of which Ripple partnered or facilitated a . . .  very small percentage of those [listings]."  PX 81 at 300:16–301:2.    "[M]ost of the listing[s] didn't have anything to do with [Ripple]. . . . [M]ost XRP listings happened organically."  PX 20 at 97:4–7.

215

500.   Ripple published on its website "XRP Market Reports," the first one with respect to the fourth quarter of 2016 (4Q16 XRP Markets Report). PX 80 (Ripple Ans.) ¶ 103; PX 8 (Ripple RFA Responses) No. 232; PX 85 (Ripple RFA Responses) No. 426.

**Response:**      Undisputed.

501.   One of Ripple's purposes for issuing the XRP Markets Reports was to "build a robust successful market" for XRP. PX 21 (Vias Inv. Tr.) at 178:18-180:2.

**Response:**      Disputed.  Defendants do not dispute that PX 21 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 21 as misleading, because Paragraph 501 omits additional context necessary to understand PX 21, specifically that Vias testified that the XRP Markets Reports were intended to provide "clarity and visibility" about "Ripple's market activities."  PX 21 (M. Vias testimony) at 179:2–180:2.  Vias' reference to "build[ing] a robust successful market" was hypothetical and offered merely as an example of something that visibility could help achieve.  PX 21 at 179:1–5 ("[I]f you want to build a robust successful market, the more visibility you can give, the better.").  Defendants further dispute Paragraph 501 to the extent it purports to suggest that the purpose of the XRP Markets Reports was static over the entire time that the Reports were issued, and applied equally to each of the Reports.

502.   One of Ripple's purposes for issuing the XRP Markets Reports was to increase liquidity in XRP's trading. PX 3 (Griffin Inv. Tr.) at 245:1-248:5, PX 81 (Garlinghouse Dep. Tr.) at 385:15-387:17.

**Response:**      Disputed, because the SEC's statement that Ripple issued the XRP Markets Reports to "increase liquidity in XRP's trading" is unsupported by evidence in the record; while Patrick Griffin testified that the XRP Markets Reports included information about XRP liquidity, he never testified that the XRP Markets Reports were themselves meant to "increase liquidity in XRP's trading," as the SEC suggests.  PX 3 at 247:10–248:5. Defendants further dispute Paragraph 502 to the extent it purports to suggest that the purpose

of the XRP Markets Reports was static over the entire time that the Reports were issued, and applied equally to each of the Reports, as the cited testimony does not establish those facts.

503.     RESERVED.

**Response:**        Defendants object to Paragraph 503 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

504.     One of Ripple's purposes for issuing the XRP Markets Reports was to "correct the misinformation and provide some visibility into what Ripple [] was doing." PX 3 (Griffin Inv. Tr.) at 244:16-246:1.

**Response:**        Disputed.  Defendants do not dispute that PX 3 contains the quoted text, exclusive of any alterations, omissions, or additions.  Defendants dispute Paragraph 504 to the extent it purports to suggest that the purpose of the XRP Markets Reports was static over the entire time that the Reports were issued, and applied equally to each of the Reports, as the cited testimony does not establish those facts.

505.     Ripple's intended readers of the XRP Markets Reports included people who held XRP for speculative purposes. PX 25 (Madigan Tr.) at 111:17-112:16; 116:6-25, 293:22-294:4.

**Response:**        Defendants dispute the SEC's assertions in Paragraph 505, because they are unsupported by the record, including because Madigan testified that the XRP Markets Reports were posted by Ripple on its public website to "provid[e] information to . . . *[a]nybody who was publicly interested in receiving it*." PX 25 at 111:17–21 (emphasis added).  Defendants further dispute that Ripple could identify "people who held XRP for speculative purposes" such that it could intend for those people to read the XRP Markets Reports, as asserted in Paragraph 505.  Defendants further dispute Paragraph 505 to the extent it purports to suggest that the purpose of the XRP Markets Reports was static over the

entire time that the Reports were issued, and applied equally to each of the Reports, as the cited testimony does not establish those facts.

506.    On or about May 1, 2017, Garlinghouse sent an email to XRP investors with the subject "Ripple's April Investor and Advisor Update": "Interest in XRP is continuing to grow and we've only just begun our focused efforts to build its liquidity. To this end, we recently released our Q1 2017 Markets Report, an important way that we demonstrate our commitment to the XRP ecosystem and continually improving the health of XRP markets globally." PX 404 at 0010934.

**Response:**        Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 404 because the cited evidence does not support the SEC's assertions of fact that Garlinghouse sent this email to "XRP investors" as set forth in Paragraph 506 when PX 404's subject line clearly indicates the email was sent to Ripple investors and Ripple advisors. *See* PX 404 ("Ripple's April Investor and Advisor Update"). Defendants also note that Garlinghouse testified that he did not recall writing PX 404.  PX 81 at 386:25-387:3. Undisputed that PX 404 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

507.    Ripple's 4Q2016 XRP Markets Report stated: "In order to continually improve the health of XRP markets globally, we will share regular updates on the state of the market including quarterly sales, commentary on previous quarter price movement and announcements of new third-party wallets, exchanges, validators and third party liquidity providers." PX 501.01 at 1, *available at* https://web.archive.org/web/20170603164903/https://ripple.com/insights/q4-2016-xrp-markets-report/ (archived in June 2017); *see also* PX 85 (Ripple RFA Responses) No. 426 (admitting this report was posted on Ripple's website).

**Response:**        Undisputed that PX 501.01 contains the quoted text; however, Defendants dispute as unsupported by the cited evidence the SEC's characterization in Paragraph 507 that the XRP Markets Report for Q4 of 2016 was "archived" in June 2017. Defendants further dispute the SEC's characterization in Paragraph 507 of Ripple's RFAs,

as Ripple only "admitt[ed] this report was posted on Ripple's website" on approximately

January 24, 2017.  PX 85 (Ripple RFA Responses) No. 426.

508.   Ripple's 1Q 2017 XRP Markets Report stated: "We've put our ear to the ground
and have been listening to important feedback from the XRP community. This
includes the need for greater visibility and transparency into Ripple's vision,
strategic use cases for XRP, and plans to increase liquidity and decentralization. To
that end, we plan to increase our communications cadence to address this
feedback."        PX        501.02       at       4,       *available       at*
https://web.archive.org/web/20170712084015/https://ripple.com/insights/q1-
2017-xrp-markets-report/ (archived in July 2017).

**Response:**        Undisputed that PX 501.02 contains the quoted text; however,

Defendants dispute as unsupported by the cited evidence the SEC's characterization in

Paragraph 508 that the XRP Markets Report for Q1 of 2017 was "archived" in July 2017.

509.   Ripple's 2Q 2017 XRP Markets Report stated: "We are looking into formalizing
the lending program we mentioned in the Q4 report (https://ripple.com/insights/q4-
2016-xrp-markets-report/), building out our OTC markets by bolstering our
broker/dealer networks, and finding more ways to provide greater transparency to
markets. Most importantly, we are accelerating the pace of our investment in the
XRP Ledger to build on its speed, uptime, and scalability, to ensure XRP is the
most trusted enterprise-grade digital asset." PX 501.03 at 7.

**Response:**        Undisputed.

510.   Ripple's 1Q 2018 XRP Markets Report stated: "To continue to provide
transparency to the XRP ecosystem globally, we share regular updates on the state
of the market, including quarterly sales, relevant XRP-related announcements and
commentary on previous quarter market developments." PX 501.06 at 2, *available
at* https://ripple.com/insights/q1-2018-xrp-markets-report/.

**Response:**        Undisputed.

511.   In its XRP Markets Reports, Ripple described the availability of XRP on crypto
exchanges, including describing when a new exchange listed XRP or an existing
exchange increased XRP's availability. PX 501.04, PX 501.09, PX 501.10, PX
501.11, PX 501.12, PX 501.13, PX 501.14, PX 501.15 (3Q17 Report; 4Q18 Report;
1Q19 Report; 2Q19 Report, 3Q19 Report, 1Q20 Report; 2Q20 Report).

**Response:**        Undisputed that the eight XRP Markets Reports referenced in

Paragraph 511 mentioned, at the time each of those Reports was issued, that XRP was made

available on certain digital asset exchanges or that XRP would trade with new asset pairs on certain exchanges; however, Defendants dispute that the XRP Markets Reports were intended to be or actually were a complete or comprehensive list of such exchanges.

512.   Ripple made a document titled Ripple 2015: A Year in Review, a true and accurate copy of which bears bates numbers SEC-LIT-EPROD-001110625-SEC-LIT-EPROD-001110632, available on its public website on approximately December 28, 2015. PX 85 (Ripple RFA Responses) No. 489.

**Response:**       Undisputed.

513.   Ripple made a document titled Ripple 2016: A Year in Review, a true and accurate copy of which bears bates numbers bates numbers SEC-LIT-EPROD-001110633-SEC-LIT-EPROD-001110637, available on its public website on approximately December 28, 2016. PX 85 (Ripple RFA Responses) No. 492.

**Response:**       Undisputed.

514.   Ripple made a document titled The Most Popular Ripple Insights Posts of 2017, a true and accurate copy of which bears bates numbers SEC-LIT-EPROD-001110676-SEC-LIT-EPROD-001110681, available on its public website on approximately December 28, 2017. PX 85 (Ripple RFA Responses) No. 495.

**Response:**       Undisputed.

515.   Ripple made a document titled XRP Liquidity to Deepen with Listings on Six New Exchanges, a true and accurate copy of which bears bates numbers SEC-LIT-EPROD-001110695-SEC-LIT-EPROD-001110698, available on its public website on approximately May 18, 2017. PX 85 (Ripple RFA Responses) No. 498.

**Response:**       Undisputed.

516.   At any time from January 1, 2012 to December 22, 2020, Ripple maintained the website https://ripple.com/xrp/buy-xrp/. PX 85 (Ripple RFA Responses) No. 607.

**Response:**       Disputed.  Defendants do not dispute that there were times between January 1, 2012 and December 22, 2020, that Ripple maintained the referenced website, however Defendants dispute the allegation in Paragraph 516 that Ripple maintained the website "[a]t any time" insofar as it is intended to suggest that the website was available from January 1, 2012 to December 22, 2020 as unsupported by the cited evidence.

517.   At any time from January 1, 2012 to December 22, 2020, Ripple published on the
website  https://ripple.com/xrp/buy-xrp/  a list of digital asset trading platforms
where XRP could be bought, sold, and traded by individuals, including platforms
in the United States. PX 85 (Ripple RFA Responses) No. 608.

**Response:**        Disputed.  Defendants do not dispute that there were times between

January 1, 2012 and December 22, 2020, that Ripple maintained the referenced website,

however Defendants dispute the allegation in Paragraph 517 that Ripple maintained the

website "[a]t any time" insofar as it is intended to suggest that the website was available from

January 1, 2012 to December 22, 2020 as unsupported by the cited evidence.

518.   At any time from January 1, 2012 to December 22, 2020, Ripple maintained the
website  https://xrpcharts.ripple.com/#/xrp-markets.  PX 85 (Ripple RFA
Responses) No. 609.

**Response:**        Disputed.  Defendants do not dispute that there were times between

January 1, 2012 and December 22, 2020, that Ripple maintained the referenced website,

however Defendants dispute the allegation in Paragraph 518 that Ripple maintained the

website "[a]t any time" insofar as it is intended to suggest that the website was available from

January 1, 2012 to December 22, 2020 as unsupported by the cited evidence.

519.   Ripple publicly stated it was focused on growing XRP liquidity. PX 501.02 (2Q17
XRP Markets Reports); *see also* PX 85 (Ripple RFA Responses) No. 429
(admitting this report was posted on Ripple's website).

**Response:**        Disputed, because the SEC's statement that "Ripple publicly stated

it was focused on growing XRP liquidity" is unsupported by the cited evidence; the 2Q17

XRP Markets Report does not include any statements regarding Ripple's focus, let alone

statements about that focus being "growing XRP liquidity." *See* PX 501.02.

520.   Ripple made efforts to correct misinformation in the market about Ripple and XRP.
PX 2 (Larsen Tr.) at 213:5-214:8; PX 3 (Griffin Inv. Tr.) at 259:8-260:3; PX 17
(Long Tr.) at 49:15-50:3; 58:19-25.

**Response:**        Defendants dispute that Ripple took "efforts" with respect to misinformation in the market generally.  Rather, as the cited evidence establishes, at times and as it became aware of misinformation about XRP, Ripple worked to "convey correct, accurate information about XRP."  PX 17 at 81:2–15.

521.    Ripple made efforts to combat what it considered to be "FUD" [Fear, Uncertainty, and Doubt] about XRP. PX 17 (Long Dep.) at 81:2-84:24; PX 20 (Vias Dep. Tr.) at 111:7-25; PX 25 (Madigan Tr.) at 258:12-262:11; PX 467; PX 468.

**Response:**        Defendants dispute that Ripple took any "efforts to combat" FUD; rather Ripple worked to "convey correct, accurate information about XRP" at times and as it became aware of misinformation about XRP.  PX 17 at 81:2–15.  Defendants further dispute Paragraph 521 to the extent the SEC suggests that there was a consistent understanding within Ripple of what was considered to be FUD, as that is not supported by the cited evidence.

522.    Ripple made efforts to combat "misinformation" in the XRP markets. PX 3 (Griffin Inv. Tr.) at 224-25; PX 268 at 1; PX 269 at 1; PX 270 at 1.

**Response:**        Defendants dispute that Ripple "made efforts to combat" misinformation in the XRP markets generally, given that each document reflects a particular situation that Ripple was made aware of and responded to specifically.  See PX 3 at 224:13–15 (addressing "the amount of information that's propagated about Ripple Inc., XRP, [and] the conflation of the two"); PX 268 at RPLI_SEC 0957434 (addressing rumors about Jed McCaleb's "XRP holdings"); PX 269 (addressing rumors about "XRP supply"); PX 270 (addressing an article about Ripple's relationship with the charitable foundation Rippleworks).  Further, Monica Long, Ripple's Director of Communications at the time, specifically told Ripple's public relations firm at the time that they should "correct misinformation only if needed."  PX 268 at RPLI_SEC 0957433.

523.    Ripple wanted there to be positive market sentiment with respect to the XRP market. PX 25 (Madigan Tr.) at 191:20-23.

**Response:**        Disputed.  Defendants do not dispute that Madigan offered the cited testimony; however, Defendants dispute that Madigan's testimony established what "Ripple wanted" at all times and for all purposes, when that characterization is not supported by the cited evidence.  Defendants further object that "positive market sentiment with respect to the XRP market" is vague and ambiguous, especially insofar as Paragraph 523 is unbounded by time.

524.    Ripple at times relied on XRP investors—the "XRP Army" as they were colloquially known—to disseminate Ripple's preferred messaging about XRP. *E.g.*, PX 48 at RPLI_SEC at 1108318 (Ripple employees internally commenting "what a blessing it is to have the "XRP-army" to say the things we legally shouldn[']t").

**Response:**        Disputed.  Defendants do not dispute that PX 48 contains the quoted text in the parenthetical, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute: (1) the SEC's statements in Paragraph 524 that XRP had "investors" and that Ripple "relied" on those "investors," because those statements are legal conclusions; (2) the SEC's assertion that the term "XRP Army" was "colloquially" used in this context, because that assertion is conclusory and unsupported by any evidence in the record, *see* PX 17 (M. Long Testimony) at 115:11–15 ("XRP Army" merely refers to "a hash tag on Twitter"), 116:12–21 (Ripple employees "don't spend much time talking about the XRP Army."); (3) the SEC's assertion that Ripple had "preferred messaging about XRP" and that it "relied" on anyone to "disseminate" such messaging, because this assertion is vague and unsupported by any evidence in the record, and a legal conclusion; and (4) the SEC's characterization of PX 48 in the parenthetical in Paragraph 524 as misleading, because it characterizes a single message sent over the messaging application Slack by a single

individual as "Ripple employees internally commenting," and omits that the word immediately following the quoted text is "ha," which suggests the message was a joke or sarcasm, PX 48 at RPLI_SEC 1108318.  Defendants further dispute Paragraph 524 to the extent that the SEC implies that a single message by a single employee can be attributed to Ripple or the Individual Defendants, as the cited evidence is insufficient to support that fact.

525.  On or about July 17, 2019 Madigan sent an email which referenced an upcoming XRP Markets Report and which stated: "This report is a big opportunity for us to shift the narrative here – and sentiment move markets." PX 469 at 0200554-55.

**Response:**     Disputed.  Defendants to do not dispute that PX 469 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 469 as misleading, because Paragraph 525 omits additional context necessary to understand PX 469, specifically that the subsequent email from ███████████ reveals that the discussion concerned misinformation regarding Ripple "dump[ing]" XRP.  PX 469 at RPLI_SEC 0200554.

526.  In January 2018, Ripple's guidance regarding insider trading included the statement: "Ripple operates with the imperative that employees must act ethically and transparently with respect to XRP transactions to avoid perceptions that could impair the integrity or reputation of the XRP market.  We have internal guidelines that prohibit using material non-public information when trading XRP." PX 470 at 0276974.

**Response:**     Disputed.  Defendants do not dispute that PX 470 contains the quoted text; however, Defendants dispute that PX 470 sets forth "Ripple's guidance regarding insider trading."  Rather, PX 470 is an email containing a draft response to a journalist's inquiry about XRP transactions by Ripple employees.

527.  Ripple's Code of Conduct included policies prohibiting insider trading in XRP by Ripple employees. *See, e.g.,* PX 471 at 0888156, 160; PX 2 (Larsen Dep. Tr.) at 148:8-14; PX 472.

**Response:**      Defendants dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 471, PX 2, and PX 472 as misleading to the extent it characterizes the policies contained in Ripple's Code of Conduct on "Insider Purchase, Sale and Holdings of XRP" as "prohibiting insider trading in XRP," because that characterization is not supported by the cited evidence.  PX 471 at 5.

528.   On or about March 19, 2013, Griffin sent an email in which he discussed distributing XRP with "a set price (a 'backstop') to keep the price from collapsing." PX 473 at 0017082-83.

**Response:**      Undisputed that PX 473 contains the quoted text; however, Paragraph 528 omits additional context necessary to understand the quoted text, including that, when asked about PX 473, Griffin stated it was his "attempt to understand how all of this would play out" as well as "also just the dynamics of how markets work in general," PX 3 at 79:4-18, and in response to Griffin's statement in PX 473 that he was "[j]ust thinking through" the quoted text, Britto responded, "[w]e don't want to be setting prices or controlling the market."  PX 473 at 0017082-83.

529.   Griffin understood that a surge in supply of XRP into the market would cause the price of XRP to decrease. PX 3 (Griffin Inv. Tr.) at 77:6-17.

**Response:**      Disputed.  The facts asserted in Paragraph 529 conflict with the SEC's statement in Paragraph 20 that "the 100 billion XRP created was a fixed, finite supply" and "no more XRP will ever be created."  Griffin testified only that "a surge in supply would come with a surge in selling," and hypothesized that "if there's a lot of selling, then the price would *assumably* go down."  PX 3 at 77:8-17 (emphasis added).  This testimony does not establish the fact asserted in Paragraph 529.

530.   Senior leadership at Ripple was concerned about the market impact of giving away XRP for free, including because recipients of the free XRP quickly sold that XRP which lowered XRP's price and liquidity. PX 10 (Rapoport Tr.) at 150:2-154:9.

**Response:**     Disputed.     Defendants   dispute   the   SEC's   misleading characterization of Rapoport's testimony, in which he only testified that he recalled some discussions about the market impact of "*selling or* giving away" XRP, and that this concern was in the context of "if Ripple Labs were to *indiscriminately* give away or donate *all* the XRP versus employing other tactics."  PX 10 at 150:11-151:1.  Defendants further dispute that a statement in a deposition by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 530 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, "senior leadership" at Ripple, Ripple as an entity, or the Individual Defendants.  Defendants further note the SEC's asserted fact in Paragraph 530 is contradicted by the SEC's asserted facts in Paragraphs 599 and 655.

531.   Rapoport understood that when Ripple sold XRP at a discount to market price, the purchaser could quickly sell it at market price, which in turn had a negative impact on XRP's liquidity and price. PX 10 (Rapoport Tr.) at 153:25-154:9.

  **Response:**     Undisputed.

532.   On or about January 16, 2014, Griffin sent Larsen at text which stated: "The whole program can really only support about $1-$2k per day of XRP without tanking the price of XRP."  PX 483.

  **Response:**     Undisputed.

533.   On or about July 10, 2014, Larsen received an email from a Ripple consultant which stated:

  I'll have this conversation with just the two of you as the follow up to the investigation of the dumping (and recent trashing) of XRP pricing. This is not a Jed phenomena.

  Here's what's happened. We've continued to sell XRP wholesale at a discount to market (a practice you are well aware of that is disfavor) instead of selling at the market. In this case, ███████ is buying at a ███ discount to market. ███████ turns around and does the same thing we are doing: "wholesaling" the currency to its best users (just as we do). They shave the discount down to ███ in

the case of ▨▨▨▨▨ selling to their best users. Those traders, in turn, if they sell as soon as they get XRP are "ahead" of the market (like any high frequency trader) and arbitrage the differential while trashing the marketplace.

Basically, supply exceeds demand, whether through Jed's dumping or our own discounting (and subsequent re-discounting). The worst part of all this is that anyone in the know (myself included) who is willing to get paid in XRP knows that holding (as long as dumping and wholesaling are going on) is a losing strategy, and the incentive is to sell as well (to minimize my holding losses -- which have been substantial incidentally since the XRP I receive are break even to payout 1:1 costs I'm incurring in New Zealand dollars and British sterling). All of this creates downward pressure as a matter of pure supply and demand -- independent of any other intrinsic fundamentals.

Without addressing these issues, its really hard for us to reverse the dynamic and avoid the Zimbabawe spiral. Because we've neutered any sort of consumer demand for XRP, the only utility is as a lubricant for traders. Well that's fine if XRP was a closed loop system (like the oil for your car), but if there's a leak, then there's going to be no stoppage to prevent a loss of oil pressure. You can keep pouring oil in, but as long as its pouring out, the system will run dry as soon as you stop pouring it on. Unfortunately for us, the more we pour on, the more we need to poor on as long as there is a material overhang and no known (even if arbitrary) distribution strategy.

As it stands, our controlled (and uncontrolled) monetary policy remains loose. And what I have argued (and will continue to argue) is that there will not be an effective monetary policy unless:

-- we stop insider trading

-- we stop wholesaling at a discount for XRP that can be spot sold

-- we ignore the complimentary effects of retail and wholesale demand

PX 100 at 0516477-48.

**Response:**       Undisputed.  Defendants do not concede that this is the entirety of,

a representative selection of, or a fair characterization of the document's complete contents.

534.   Larsen responded to the July 10, 2014 email by writing:  "OK – it's time to set strong monetary policy." *Id.*

**Response:**      Undisputed that the PX 100 contains the quoted text.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 100.  To the extent the SEC implies that a monetary policy was implemented, Defendants dispute that a monetary policy was implemented, as this fact is not supported by the cited evidence.

535.  On or about November 20, 2015, GSR sent Ripple a document titled "XRP Sales Optimization" which stated:

> Given current levels of money entering the RN [Ripple Network], it is very difficult to continue selling XRP at the current pace without affecting the value of XRP.

> By switching from a static selling formula to the dynamic one proposed, and adopting the improved execution measures outlined, we believe RL [Ripple Labs] can expect at least a 4% better execution price.

> More importantly, we believe this new selling formula will have a less detrimental effect on XRP price, so the net cumulative effect of the daily savings will be much larger.

PX 458 at 11398-99, 11404.

**Response:**      Undisputed that PX 458 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC, and that a GSR employee sent the document referenced in Paragraph 535 to two Ripple employees.

536.  On or about May 8, 2014, Griffin wrote Larsen an email which stated: "what can we do? I'm concerned that we lose speculator interest given that xrp will never rise with someone always ready to flood the supply anytime there is good news. the speculators are good for liquidity and provide 'fumes' for volume and market making. losing them entirely could cause problems for us. we need a solution." PX 95.

**Response:**      Undisputed that the PX 95 contains the quoted text.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 95.  To the

extent the SEC implies that the quoted text represents Larsen's opinions or that he agreed

with it, the email is sent by Griffin and reflects his personal opinion.  Defendants further note

that PX 95 does not reflect a response from Larsen.

537.    For Programmatic Sales, Ripple's strategy was to "sell what we could sell without
impacting the market," specifically, without "impact[ing] the price and . . . volatility
of the market." PX 21 (Vias Inv. Tr.) at 32:1-33:7, 35:4-18.

**Response:**        Undisputed that PX 21 contains the quoted text, exclusive of any

alterations, omissions, or additions, however, Defendants dispute that a statement in a

deposition by a single employee at a particular point in time is sufficient to establish

"Ripple's strategy" for "Programmatic Sales" as set forth in Paragraph 537 at all times and

for all purposes in this litigation, including as to any belief or understanding held by other

Ripple employees, Ripple as an entity, or the Individual Defendants.

538.    Ripple determined the volume of its Programmatic Sales by looking at overall
volume and settling on a percentage of daily volume to sell on exchanges with the
goal to "have a very light touch on the market." PX 21 (Vias Inv. Tr.) at 59:17-
60:24.

**Response:**        Undisputed insofar as the SEC intended to cite PX 20, which

contains the quoted testimony.

539.    Griffin presented to Ripple's Board of Directors on occasion, including regarding
"what was happening with the XRP markets."  PX 14 (Griffin Dep. Tr.) at 142:5-
143:9.

**Response:**        Undisputed that Griffin testified that he presented to Ripple's Board

of Directors on occasion about "Partnerships, what's -- what was happening within the XRP

market, investments, how the sort of -- the financing was going with the business, with

venture capital. Corporate development updates, possible acquisition targets."  PX 14 at

142:12-15.

540.   Griffin's role including "working to understand … the impact that [Ripple's] sales in open order books were having in the [XRP] market." PX 14 (Griffin Dep. Tr.) at 152:2-12.

**Response:**   Undisputed that PX 14 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

541.   Griffin and other Ripple employees had concerns that Ripple's Programmatic Sales could negatively impact XRP's price. PX 14 (Griffin Dep. Tr.) at 223:11-224:22; PX 3 (Griffin Inv. Tr.) at 139:6-10, 141:16-142:18.

**Response:**   Disputed.   The SEC mischaracterizes and omits context from Griffin's testimony, including that Griffin did not testify that "other Ripple employees" had concerns about Ripple's sales negatively impacting the price of XRP, and Griffin testified that Ripple's programmatic sales of XRP were not his "central area of focus" and that Ripple's sales of XRP "could cause a lot of things."  PX 14 at 224:6-225:16.

542.   In or around December 2015, Griffin questioned other Ripple employees as to whether additional sales of XRP would impact XRP's price. PX 492.

**Response:**   Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 492, in which certain Ripple employees discussed monitoring a "large XRP buyer," contrary to the SEC's broad assertion in Paragraph 542. PX 492 at RPLI_SEC 0306354.

543.   In or around April 2016, a Ripple employee conveyed to senior Ripple employees, including Garlinghouse and Larsen, an assessment of whether and how Ripple's programmatic sales affected XRP price. PX 463.

**Response:**   Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 463, because the sender wrote that the email was merely "summarizing recent large sellers."   Defendants further dispute the SEC's characterization of PX 463 insofar as it also stated that programmatic sales "activity does not have a major correlation to price moves."  PX 463 at RPLI_SEC 0363344.

544. In or around May 2016, Griffin inquired of other Ripple employees whether a contemplated approach for Ripple's programmatic sales of XRP "add more pressure on the price of XRP." PX 493.

**Response:** Undisputed.

545. In or around June 2016, Ripple employees considered pausing Ripple's programmatic sales in light of observations of a decrease in XRP volume and "some small declines in price." PX 494.

**Response:** Undisputed.

546. Ripple discussed minimizing any negative impact of sales on XRP's price with GSR. PX 26 ▮▮ Tr.) at 58:3-59:4.

**Response:** Disputed, because the assertion of fact in Paragraph 546 does not specify any time period that any purported discussion took place, and because the cited evidence does not support the SEC's broad assertion of fact as ▮▮ only testified that he "probably" discussed "[t]he impact of selling on price of XRP" but did not remember any specific discussions. PX 26 at 58:14-59:17. Defendants further dispute that ▮▮'s purported conversations with unspecified employees at unspecified points in time are sufficient to establish the underlying fact set forth in Paragraph 546 at all times and for all purposes in this litigation, including as to any belief, action, or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

547. Ripple set targets for its Programmatic Sales to minimize "footprint" of XRP sales in the market. PX 18 (Griffin Inv. Tr.) at 141:16-142:18; PX 14 (Griffin Dep. Tr.) 153:23-154:25, 162:13-163:1, 217:21-218:13.

**Response:** Undisputed that PX 14 contains the quoted text, exclusive of any alterations, omissions, or additions; however, the quoted text does not appear in PX 18 and PX 18 does not support the assertions set forth in Paragraph 547. Defendants further dispute that a statement in a deposition by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 547 at all times and for all purposes in

this litigation, including as to any belief, action, or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

548.    Ripple's intent with respect to Programmatic Sales was to "algorithmically control the market impact" of its XRP sales, in order to minimize the effect of Ripple's sales on XRP's price. PX 476; PX 10 (Rapoport Tr.) at 273:7-277:22.

**Response:**      Disputed.  Defendants do not dispute that PX 476 contains the quoted text; however, the Defendants dispute that cited evidence supports the SEC's assertions of fact as set forth in Paragraph 548, as the quoted text from PX 476 refers to a specific XRP sales bot developed by GSR, not "Ripple's intent with respect to Programmatic Sales." Defendants further dispute that statements by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 548 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

549.    Ripple's head of institutional markets was concerned that a lot of XRP sell orders would negatively impact liquidity of XRP. PX 25 (Madigan Tr.) at 66:6-11.

**Response:**      Undisputed that Madigan provided the cited testimony; however, Defendants dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 549 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

550.    Ripple designed Programmatic Sales to "minimize the amount of market impact" on XRP's price, volume, and liquidity by selling a small amount of XRP over a period of time. PX 25 (Madigan Tr.) at 66:24-68:6;

**Response:**      Disputed.  Defendants do not dispute that Madigan offered the quoted testimony; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25 as misleading, because Madigan testified that the

design of programmatic sales occurred "before my time" and claimed only to offer "the general gist" of which she was aware.  PX 25 at 67:10-17 Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 550 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

551.    Ripple sought to prevent Ripple's activities from negatively impacting the price of and/or liquidity of XRP. PX 85 (Ripple RFA Responses) Nos. 561-63.

**Response:**        Undisputed that, at times, Ripple sought to prevent Ripple's activities from negatively impacting the price of XRP and sought to prevent Ripple's activities from negatively impacting the liquidity of XRP.  PX 85 Nos. 561-63.

552.    Ripple wanted to ensure that its participation in the XRP market was "[a]dditive to liquidity" and did not impact XRP's price.  PX 36 (Garlinghouse Inv. Tr.) at 94:10-95:21.

**Response:**        Undisputed that Garlinghouse offered the quoted testimony; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 36 including because Paragraph 552 omits additional context necessary to understand the quoted language, specifically that "99.X percent of all XRP trading doesn't involve Ripple and we wanted to make sure that our participation in the market was constructive and not harmful to the market."  PX 36 at 95:1-21.  Defendants further dispute Paragraph 552 because Garlinghouse's testimony is insufficient to establish the underlying fact set forth in Paragraph 552 at all times and for all purposes in this litigation.

553.    At times, Ripple provided specific instructions to market makers to stop sales or take other steps to protect XRP prices, including buying XRP. PX 14 (Griffin Tr.) at 232:10-239:25; PX 477 at 00004437-4442; PX 478 at 00005366-68; PX 479.

**Response:**          Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14, PX 477, and PX 478 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 553, as Griffin testified that he recalled a Ripple employee instructing GSR to buy XRP "once or twice," but that he was "not really sure.  This wasn't like a big part of anything we really did."  PX 14 at 238:7-16.  Defendants further dispute the SEC's assertions in Paragraph 553 that Ripple took "steps to protect XRP prices," because it is unsupported by evidence in the record; when Griffin was asked about the purpose of any purported instructions, he testified that he "can't recall."  PX 14 at 238:17-19.  Defendants further dispute the SEC's characterization of PX 478 as Ripple providing specific instructions to market makers; rather one Ripple employee messaged a GSR employee that "I would say we should turn the bots off for the weekend," but when the GSR employee "recommend[ed] to leave the bots on this weekend," the Ripple employee agreed that they should "leave it on."  PX 478.  Defendants do not dispute that Ripple employees at times instructed a market maker to stop and start XRP sales, but dispute that individual instances of instruction to GSR can be generalized to encompass Ripple's conduct at all times or with respect to all market makers, as such a characterization is not supported by the cited evidence.

554.    At times, Ripple instructed GSR to protect a price floor for XRP or stabilize its price. PX 480 at 00005000; PX 14 (Griffin Tr.) at 238:20-239:9-25; PX 495 at 00004967; PX 496 at 0057022; PX 26 (███Tr.) at 108:12-110:5, 124:14-125:14; PX 465 at 0205600-02.

**Response:**          Disputed.  The cited evidence establishes differing recollections from the cited witnesses as to the SEC's assertions of fact as set forth in Paragraph 554.  *See, e.g.*, PX 26 at 108:12-15 ███ testifying that he did not "recall" if "Ripple ever direct[ed] GSR at any other time to purchase in order to maintain a certain price floor for XRP"

although "it's possible."). Defendants further dispute that the terms "price floor" and "stabilize [XRP] price" are undefined, vague and unclear. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 480 and PX 495, as PX 495 is a more complete email chain of PX 480 that does not support the SEC's assertions of fact as set forth in Paragraph 554, as a Ripple employee "noticed that we are currently below" the purported price floor and did not instruct GSR to take any action as a result. PX 495 at GSR00004966; PX 480. In PX 496, while GSR "recommend[ed] that they buy XRP consistently over a longer period of time," PX 26 at 125:5-6, Ripple "didn't take the recommendation," PX 26 at 126:5-6, and did not give GSR direct instructions.

555.    Ripple's reasons for protecting the price of XRP included preserving Ripple's "ability to compete" and attracting developers and other businesses to the Ripple ecosystem. PX 14 (Griffin Tr.) at 234:7-236:21.

**Response:**        Disputed. Undisputed that Griffin offered the quoted testimony; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14, because Griffin's testimony was offered in response to questioning about a particular email, about which Griffin testified that he was "not even sure" what he was suggesting in the initial email and that "[w]hen I read that, I'm not totally sure I understand that." PX 14 at 234:7-14. Defendants further dispute that a statement in a deposition by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 555 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants. Defendants further dispute that the term "Ripple ecosystem" is undefined, vague and unclear. Insofar as such term is derived from Griffin's testimony, the SEC mischaracterizes his testimony, which refers to the "ecosystem" around XRP, not Ripple. PX 14 at 67:21-68:16 (Griffin discussing the "ecosystem" and then correcting questioner

235

when asked how that worked on "Ripple's network," by responding "for the technology underpinning the XRP" Ledger).

556.    GSR advised Ripple to reduce sales during "adverse market conditions" to avoid impacting XRP's prices. PX 26 (█ Tr.) at 75:7-77:10.

**Response:**        Disputed.  Defendants do not dispute that █ offered the quoted testimony; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26 as misleading, because █ testified only that he "*presume[d]* [a recommendation to reduce sales] would have been during a moment in time when the adverse market conditions," and when asked if the recommendation was made "in order for Ripple's sales not to have an impact on XRP price," █ testified, "[T]hat isn't exactly correct."  PX 26 at 75:24-76:5; *see also id.* at 76:22-25 ("You know, when the market is very weak, it doesn't make sense to be hammering it and adding supply. It's not constructive."). Defendants further dispute Paragraph 556 because the SEC cites no evidence that any "advice" was communicated to Ripple.  Defendants further dispute that a lone statement by a third party in deposition testimony is sufficient to support the SEC's unqualified assertions of fact as set forth in Paragraph 556.

557.    At times, Ripple instructed GSR to buy XRP in an attempt to stabilize its price.  PX 26 (█ Tr.) 90:6-92:1.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 557, as █ testified that "it's possible that that was the objective, but *I can't know with any certainty* that that's – any given instant that's why they were doing it."  PX 26 at 91:17-20 (emphasis added).  Further, █ testified that he could not specifically recall any time that Ripple shared its objectives with GSR.  PX 26 at 91:22-25.

236

558.   At times, at GSR's recommendation, Ripple instructed GSR to purchase XRP shortly after Ripple public announcements. PX 497 at 00004555; PX 26 ███ Tr.) at 95:5-96:2.

**Response:**        Disputed.  Defendants dispute Paragraph 558's use of the phrase "Ripple public announcements" as undefined, vague, and unclear.  Defendants do not dispute that GSR sometimes purchased XRP on Ripple's behalf shortly after certain online publications involving Ripple; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 497 and PX 26 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 558.  ███ testified that he had "no idea" whether PX 497 referred to a Ripple "announcement," and when asked whether "other than this instance, did Ripple instruct GSR to purchase XRP following certain announcements" ███ testified "I don't recall."  PX 26 at 94:4-95:3.  Neither cited evidence establishes that "Ripple instructed" GSR to make purchases of XRP after Ripple public announcements.

559.   At times, when XRP's price was on a downward trajectory, GSR recommended to Ripple that it reduce or delay its XRP sales. PX 481 at 00009169; PX 26 ███ Tr.) at 97:17-102:2.

**Response:**        Undisputed, except insofar as the SEC implies from the cited text that this recommendation was acted on by Ripple at any time, which is not supported by the cited text.

560.   Ripple was concerned that its programmatic XRP sales could negatively impact XRP's price. PX 6 (Schwartz Dep. Tr.) at 315:14-316:14; PX 482 at 17/26; PX 463 at 0363344.

**Response:**        Disputed.  Defendants dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 560 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual

Defendants.  Specifically, Schwartz testified that he was offering his "own personal view" and that he did not "know that it was shared by other people at the company."  PX 6 at 316:22-25.   Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 482 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 560, as Schwartz's testimony did not state that Ripple was concerned about a negative impact on XRP price.  Similarly, Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 463 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 560, as ▆▆▆▆ offers an analysis of the impact of Ripple's XRP sales, not a statement of concern of the impact of those sales.  PX 463 at RPLI_SEC 0363344 ("To inform our potential bot selling/buying strategy, I attached an analysis that shows the XRP price moves every day…Conclusion: At a daily market level, our bot activity does not have a major correlation to price moves.").

561.   Larsen and Garlinghouse participated in regular weekly "XRP Markets Meetings" in which adjustments to Ripple's sales strategy were discussed and decisions were made regarding the amount of Ripple's XRP sales for the following week. PX 484; PX 36 (Garlinghouse Inv. Tr.) at 89:23-91:9; PX 421 at 0223873-74; PX 25 (Madigan Tr.) at 34:23-36:16, 88:12-18; PX 21 (Vias Tr.) at 54:4-55:2, PX 20 (Vias Inv. Tr.) at 155:10-160:23; PX 1 (Larsen Ans.) ¶ 424; PX 201 (Garlinghouse Ans.) ¶ 424.

(a)   In its quarterly XRP Market Reports, Ripple stated that its Programmatic Sales represented a "small percentage of overall exchange volume," noted that a pause in XRP sales in 2019 was a reflection of the company's role as a "disciplined, responsible stakeholder[ ]," and highlighted the continued pause in Programmatic Sales in early 2020. PX 501.04 at 2; PX 501.13 at 2; PX 501.14 at 2.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 1, 20, 25, 36, 201, and 484. Among other things, they do not support the SEC's assertion that the goal of the meetings was to discuss and to

make decisions as to the amount of Ripple's XRP sales for the following week, nor do the cited exhibits establish that Larsen regularly participated in these meetings.  As set forth in PX 25, these meetings were held to provide "a general update on what's going on in crypto markets, what's going on in XRP, updates on liquidity with respect to ODL, and any other topical issues in the markets" and only "sometimes" involved Larsen, who attended "periodically" after "the first year or so."  PX 25 (Madigan Tr.) at 35:1-15, 36:6-11; *see also* PX 20 (Vias Tr.) at 54:4-10 (Vias only had "[i]nfrequent" contact with Larsen, "about once a month, maybe"); PX 36 (Garlinghouse Inv. Tr.) at 90:23-91:14 (Larsen participated when he was CEO and "on occasion" after he stepped down.).  None of the exhibits state or even suggest that Larsen was involved in decisions regarding XRP sales at these meetings.  *See* PX 20 (Vias Tr.) at 57:15-18 (Larsen "was mostly a listener.  He didn't -- wasn't a ton of participation by Chris in those meetings.").   Other evidence in the record further demonstrates that Larsen did not attend the XRP Markets Meetings every week.  *See, e.g.,* Ex.118, LARSEN-SEC-LIT-00003195 ("XRP sale call, join or skip?"); Ex. 119, LARSEN-SEC-LIT-00003196 ("Skip"); Ex. 120, LARSEN-SEC-LIT-00003197; Ex. 121, LARSEN-SEC-LIT-00003198 (same); Ex. 122, LARSEN-SEC-LIT-00003203; Ex. 123, LARSEN-SEC-LIT-00003204 (same); Ex. 124, LARSEN-SEC-LIT-00003241; Ex. 125, LARSEN-SEC-LIT-00003242 (same); Ex. 126, LARSEN-SEC-LIT-00003254; Ex. 127, LARSEN-SEC-LIT-00003255 (same); Ex. 128, LARSEN-SEC-LIT-00003274; Ex. 129, LARSEN-SEC-LIT-00003275 (same); Ex. 130, LARSEN-SEC-LIT-00003276; Ex. 131, LARSEN-SEC-LIT-00003277 (same). In addition, the exhibits do not establish that Garlinghouse attended every XRP Markets Meeting and Garlinghouse testified that decisions related to Ripple's XRP sales "ultimately became [his] decision" upon becoming CEO. See PX 484

(Garlinghouse is not in the list of attendees); PX 201 (Garlinghouse Ans.) ¶ 424.
(Garlinghouse "sometimes" attended XRP Markets Meetings); PX 36 (Garlinghouse Inv.
Tr.) at 93:23-94:1 ("… when I became CEO, [decisions regarding selling posture] ultimately
became my decision.").

562.    In or around November 2014, Rapoport described Ripple's strategy to direct
        potential purchasers into the public market to purchase XRP, instead of directly
        from Ripple, in order to increase XRP's price and volume. PX 462.

**Response:**        Disputed.  Defendants dispute that PX 462, which is an email from

one Ripple employee to another, is evidence of "Ripple's strategy" in or around November

2014 or at any other time.  PX 462 specifically describes an "idea" that Ripple and a hedge

fund were "working…to design" and not any strategy undertaken by Ripple as an entity.  PX

462.

563.    On or about November 16, 2017, Griffin sent Garlinghouse an email which stated:
        "I know we are focused on getting the price of XRP up by attracting more interest
        to it. Im not sure how all these deals we have in flight will be helpful to that
        objective in the short term considering the added pressure on the sell side of the
        order book." PX 77 at 0395081.

**Response:**        Disputed.  Defendants do not dispute that PX 77 contains the quoted

text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 77 as

misleading, because Paragraph 563 omits additional context necessary to understand PX 77,

specifically that Garlinghouse reacted by stating "I was not aware you think things like

████████████ and ███████s fund might be bad for the XRP ecosystem" and Griffin

responded "yeah, i've [*sic*] never been super excited about the sell-side dynamics (and have

been consistent on this point)."  PX 77 at RPLI_SEC 0395081.  This exchange indicates that

the issue being discussed was not the price of XRP, as the SEC's misleadingly excerpted

quotation attempts to indicate, but rather the overall XRP ecosystem.

564. In or around August 2018, Ripple's head of XRP markets expressed concerns about OTC purchaser ██████████████████ "aggressive[] selling [of XRP] on exchanges," stating that "that kind of selling will continue to drive the price [of XRP] lower, possibly in a very destructive way." PX 459.

**Response:**    Disputed.    Undisputed that PX 459 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the characterization in Paragraph 564 that Ripple or any of its employees determined that ██████ was in fact selling XRP, as PX 459 makes clear that "we can't prove it was" ██████ causing the observed activity.  PX 459.

565. Ripple's XRP markets team was concerned about downward pressure on XRP price caused by XRP sales into the market by ██████ and ██████. PX 22 (Samarasinghe Tr.) at 207:4-210:13, 213:1-214:20.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 22, that Ripple's XRP Markets Team was "concerned about downward pressure on XRP price" that was "caused by XRP sales into the market by ██████ and ██████" because Samarasinghe testified instead about "XRP inflation" and "a decrease in XRP ratio versus other assets," and explicitly disclaimed interest in "necessarily [] a decrease in the price of XRP."  PX 22 at 209:4-10  Defendants further dispute Paragraph 565 because "concern" is undefined, vague and unclear, and because Paragraph 565 attributes Samarasinghe's testimony about his personal views to the entire "XRP markets team," which is not supported by the cited testimony.

566. Rapoport expressed concerns that Institutional Sales would soak up demand that would otherwise go into XRP markets, and increase XRP's price. Rapoport believed that Ripple's OTC sales had a negative impact on XRP market liquidity and the price of XRP, and agreed with another Ripple employee's statement that Ripple was "trying to serve two types of [XRP] purchasers:  One, bulk purchasers for investment; [and] two, bulk purchasers for resale." PX 461; PX 10 (Rapoport Tr.) at 242:17-244:19, 156:21-158:2, 160:4-161:6.

**Response:**      Disputed.  Defendants do not dispute that PX 461 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 as misleading.  Rapoport's testimony reflected what he "logically" thought could be "true" based on reviewing PX 461 at the time of his deposition, not testimony regarding what he believed at the time.  PX 10 at 160:12-17.  Paragraph 566 also omits additional context necessary to understand the cited document, including that PX 461 refers to a single, small proposed sale of XRP, not a discussion of "Institutional Sales" (however defined) generally.  PX 461 at RPLI_SEC 0425895.  Defendants also incorporate by reference their disputes concerning the use of the SEC's defined term "Institutional Sales" in response to Paragraphs 614(a) and 789.

567.   In or around May 2019, Madigan explored avenues for Ripple to limit OTC purchaser███'s ability to purchase and resell "very large quantities" of XRP, which concerned her and others at Ripple, including Garlinghouse, because of the sales' potential to have a "negative impact on liquidity." PX 25 (Madigan Tr.) at 86:16-87:5, 119:10-21; PX 172.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25 including because Paragraph 567 omits additional context necessary to understand the testimony, including that Madigan testified that her "concern" was generally about that "large one-sided flow in either direction can impact liquidity," and stemmed from only what she "understood" of the "lengthy ████ contract" that "predated" her.  PX 25 at 86:23-87:19.  Defendants further dispute Paragraph 567 because the term "explored avenues" is undefined, vague and unclear, and does not appear in the cited documents.  Defendants further dispute that a statement by a single employee is sufficient to establish the concerns of any other Ripple employee.

568.   Ripple employees, including Madigan, were concerned that OTC purchaser █'s immediate resale of large dollar amounts of XRP into the market would have a negative effect on XRP market liquidity, and considered steps to stop or "throttle" (slow down) resales. PX 25 (Madigan Tr.) at 125:5-127:12, 137:3-22.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25 including because the cited evidence does not establish what Madigan meant by "throttle" in the quoted exhibit.  PX 25 at 126:6-12. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25 as misleading, including because Madigan testified only that she "recall[ed] that we were asked to look at what █ was doing."  PX 25 at 126:3-24.  Defendants further dispute that a statement by a single employee is sufficient to establish the concerns of any other Ripple employee.

569.   In or around June 2019, Samarasinghe stated that the "XRP Markets team is very concerned" about █'s XRP purchases because "it has the potential to add up to a billion dollars of XRP supply into the market," and asked to talk about this concern soon in light of XRP's "dire" performance in 2019. PX 424.

**Response:**      Disputed.  Defendants do not dispute that PX 424 contains the quoted text; however, Defendants dispute the SEC's characterization, as the document states that the "XRP Markets team is very concerned *about this deal*" with █ PX 424 at RPLI_SEC 0182614 (emphasis added)—which Samarasinghe had discovered included a "structural problem," PX 22 at 213:16-214:15.  The cited evidence accordingly does not establish anything "about █'s XRP purchases" generally, as Paragraph 569 alleges.

570.   To address the concern that █'s resales of XRP would hurt the XRP market, Ripple employees discussed the possibility of renegotiating Ripple's contract with █ which imposed daily sales restrictions on █ PX 498.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 498 including because Paragraph 570 omits additional context necessary to understand the exhibit, including about the "structural

problem" within the ████ deal wherein the amount of XRP ████ could purchase was defined in dollar terms, not in XRP unit terms, and not any "concern that ██'s resales of XRP would hurt the XRP market," as Paragraph 570 alleges.  PX 22 at 213:16-214:15.

571.    In August 2019, a Ripple employee wrote an email to ████ that conveyed that "Ripple is committed to protecting the XRP market ecosystem" and "[a]s part of the commitment, Ripple recently announced … the plan to sell less XRP in order to reduce the XRP supply in the market." PX 466 at 0181129.

**Response:**        Disputed.  Defendants do not dispute that PX 466 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 466 including because Paragraph 571 omits additional context necessary to understand the quoted language, specifically that the quoted language is a translated, "quick summary" of "a long email with a lot of nuances and context" that was originally written in Japanese. *See* PX 466 at RPLI_SEC 0181129.

572.    In or around March 2020, Samarasinghe noted that OTC purchasers who bought XRP from Ripple at a discount were "monetizing" the discount by reselling the XRP into the market, and Ripple employees took steps to compare XRP's performance with the performance of other digital assets on the days that OTC purchasers sold. PX 487.

**Response:**        Disputed.  Defendants do not dispute that PX 487 contains the quoted text, however, Defendants dispute the assertion that "Ripple employees took steps to compare" XRP's performance, including because Paragraph 572 omits additional context necessary to understand the document, specifically that the document draws from a regularly compiled XRP supply spreadsheet.  PX 487.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 487 to the extent it implies that additional OTC purchasers beyond ████ and ████ were discussed, as the cited evidence does not

establish any broader fact about "OTC purchasers who bought XRP from Ripple at a discount," as Paragraph 572 alleges.

> (a)  Samarasinghe stated that OTC purchaser ████████ "immediately monetize[ed] the discount by selling directly into the market." *Id.*

**Response:**  Undisputed.

> (b)  Samarasinghe stated that OTC purchaser ████ "monetize[ed] this discount by selling the full amount they could purchase with sales restrictions daily." *Id.*

**Response:**  Undisputed.

573.  Ripple conducted a sales impact analysis which concluded that cumulative past XRP sales had a "longer impact" on the XRP/BTC ratio than expected. PX 444.

**Response:**  Disputed.  Defendants do not dispute that PX 444 contains the quoted text; however, Defendants dispute that this document represents what Ripple "concluded" because PX 444 by its terms states that it represents only "some *preliminary* conclusions" created by two outside individuals who "emphasize[d] that none of these [analyses] would pass a test of theoretical rigor." PX 444 at RPLI_SEC 0479912 (emphasis added).  Defendants dispute that this analysis by individuals who did not work for Ripple can establish the belief or understanding of Ripple, any Ripple employees, or the Individual Defendants.

574.  Larsen and others at Ripple generally preferred to have a lockup term limiting an OTC purchaser's ability to resell XRP to mitigate the risk that "large holders buying at a discount" could resell their purchased XRP at market price, which might thwart Ripple's preference that "the price of XRP [] rise rather than fall." PX 10 (Rapoport Tr.) at 151:13-152:4, 252:19-254:5.

**Response:**  Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 10 as misleading, including because Paragraph 574 omits additional context necessary to understand the quoted language.  For example, Rapoport testified that Ripple's preference regarding XRP's price was "in a similar way to

how ExxonMobil doesn't want to have its actions collapse the price of oil since it's a significant holder of oil, Ripple Labs was cognizant of the fact that its actions in the marketplace could have adverse consequences for its balance sheet." PX 10 at 151:23-152:4. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 10 as misleading to the extent it characterizes Larsen as having a preference about a lockup term, rather than Rapoport speculating as to what Larsen may have preferred, and to the extent it characterizes Larsen and Ripple "generally" preferring certain terms as opposed to what Rapoport thought Larsen and others preferred in one specific transaction. *See* PX 10 at 252:19-254:5.

575.   Rapoport negotiated discount and lockup terms as part of an eventual OTC sale of XRP to Institutional Sales purchase█████ PX 10 (Rapoport Tr.) at 241:6-24, 242:9-248:3; PX 441, PX 490.

**Response:**   Undisputed, except insofar as Defendants incorporate by reference their disputes concerning the use of the SEC's defined term "Institutional Sales" in response to Paragraphs 614(a) and 789.

576.   Ripple expressed its intention to stop OTC sales after a funding round closed, to avoid negative impact on XRP's price and liquidity. PX 10 (Rapoport Tr.) at 242:9-244:19; PX 441.

**Response:**   Disputed.  Defendants dispute the SEC's asserted characterization in Paragraph 576 that the intention of the discussion in PX 441 was "to avoid negative impact on XRP's price and liquidity" because Rapoport wrote that it was "[o]ur intention to completely stop these OTC transactions after our funding round closes and, and we generally view xrp to be undervalued at these levels."  PX 441 at ██████_0002320.  Moreover, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10, including because Paragraph 576 omits additional context necessary to understand the cited testimony, including that Rapoport testified that he did not recall the exchange in

PX 441 but his concern for OTC sales was not about liquidity but that "in a hypothetical scenario, if a hundred percent of buyers purchase from an entity and only sellers went to the market, there's no mechanism for the price to ever go up. It could only go down." PX 10 at 243:8-9, 21-25.  Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 576 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

577.    Rapoport believed that closing the OTC window and pushing potential XRP purchasers to purchase XRP on the open market—instead of directly from Ripple— would have a "bullish effect on [XRP's] price." PX 441; PX 10 (Rapoport Tr.) at 243:10-244:3.

**Response:**      Undisputed, except insofar as a statement by a single employee at a particular point in time is not sufficient to establish the underlying fact set forth in Paragraph 577 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

578.    Ripple proposed a resale lockup period to a large Institutional Sales Buyer to "prevent the discounted [XRP] buyer from harming both the liquidity and the price in the market." PX 58 at 1-3 & PX 10 (Rapoport Tr.) at 176:16-177:16.

**Response:**      Disputed.  Defendants incorporate by reference their disputes concerning the use of the SEC's defined term "Institutional Sales" in response to Paragraphs 614(a) and 789.  Defendants do not dispute that PX 10 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC, however Defendants dispute a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 578 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the

Individual Defendants.  In particular, Rapoport explained that he was testifying only to "my understanding of the purpose of this type of lockup."  PX 10 at 177:13-16.

579.   Ripple at times imposed trading volume restrictions in its OTC sales of XRP. PX 475; PX 14 (Griffin Tr.) 179:11-184:23.

**Response:**       Disputed.   Defendants dispute the SEC's characterization that Ripple "at times" imposed trading volume as unsupported by the cited evidence, which establishes only one proposed trading volume restriction in relation to a single purchaser. *See* PX 475.

580.   In or around April 2017, Ripple encouraged potential purchasers of less than $250,000 worth of XRP to purchase from the open market instead of from Ripple. PX 491.

**Response:**       Disputed.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 491, to the extent it characterizes Ripple as having "encouraged potential purchasers," as the evidence only establishes a conversation between one Ripple employee and one individual in response to the individual's inquiry as to whether it was possible to purchase XRP at a discounted rate from Ripple.  PX 491.

581.   In another instance, Rapoport told a potential purchaser of XRP that "we now only sell at spot (no discount)" PX 441.

**Response:**       Undisputed.

582.   Some restrictions on XRP sales were limited to percentage daily volume. PX 475; PX 14 (Griffin Tr.) at 182:5-6, 183:7-184:23.

**Response:**       Disputed.  The broad and unqualified assertions in Paragraph 582, which are not specific to any person or entity or time, are unsupported by the cited evidence.

583.   Lockup provisions on certain of Ripple's OTC sales of XRP were implemented to restrict resales on the open market.  PX 14 (Griffin Tr.) at 180:7-24.

**Response:**       Undisputed.

584.   Ripple emphasized the existence of active, liquid trading markets for XRP and detailed the steps it would take to maximize liquidity. PX 267.

**Response:**   Disputed.   PX 267 does not contain any statements that "Ripple emphasized" and the SEC cites no evidence to establish that Ripple was "emphasiz[ing]" anything in PX 267.  In addition, PX 267 does not "detail[] the steps [Ripple] would take to maximize liquidity;" rather, the document describes that the "continued growth of ODL has led to an expanding number of financial institutions, payment providers, and market-makers to trade in XRP" and that that increase in trading volume "has helped to bring further liquidity to XRP."  PX 267 at RPLI_SEC 0807784.  Defendants further dispute that this single document from April 2020 is sufficient to establish the facts set forth in Paragraph 584 at all times and for all purposes in this litigation.

585.   For example, Ripple stated that a "healthy, orderlXRP market is required to minimize cost and risk for customers, and Ripple plays a responsible role in the liquidity process. As more financial institutions leverage RippleNet's ODL service, more liquidity is added into the XRP market."  As part of its efforts relating to the XRP market, Ripple also noted that it "has been a buyer in the secondary market and may continue to undertake purchases" of XRP in the future. PX 501.15 (2Q2020 XRP Markets Report).

**Response:**   Disputed.  Defendants do not dispute that PX 501.15 contains the quoted text, however Defendants dispute the SEC's characterization of the asserted facts contained in Paragraph 585 as an "example" of anything.  Defendants further dispute the assertion that the quoted language was "part of [Ripple's] efforts relating to the XRP market" as unsupported by the cited document and improperly suggesting a legal conclusion.

586.   According to Ripple's primary market maker, Ripple bought XRP to have "fair and orderly" XRP markets and publicly made itself the buyer or seller "of last resort" for XRP. PX 26 ███ Dep.) 90:9-25, 131:14-132:8, 167:17-25

**Response:**   Disputed.  Defendants do not dispute that ███ offered the quoted testimony; however, Defendants dispute that the SEC's characterization of PX 26 as

misleading, because ▮ testified that "we [GSR] tried to have fair and orderly markets," not related to Ripple's purchases of XRP as asserted by the XRP; and that he "wasn't part of the internal conversations at Ripple." PX 26 at 90:19, 131:7-9. The cited evidence accordingly does not support the SEC's characterizations as to Ripple's purposes for buying XRP at any time. Defendants further dispute the SEC's characterization of ▮ as "Ripple's primary market maker," as unsupported conjecture that the underlying testimony does not support. Defendants further dispute the SEC's assertion that Ripple "publicly made itself the buyer or seller 'of last resort' for XRP as misleading; rather, ▮ testified that his "high level" "understanding" or "maintaining an orderly market" meant "at the extreme, people talk about being the buyer of last resort of the seller of last resort." PX 26 at 166:12-21.

587.   Ripple touted the "liquid and robust markets" for XRP as late as August 2020. PX 501.15 (2Q20 XRP Markets Report).

   **Response:**   Defendants dispute that Paragraph 587 complies with Local Civil Rule 56.1 insofar as it is entirely duplicative of Paragraph 478. Disputed that Ripple "touted" the "'liquid and robust markets' for XRP," including because PX 501.15 only referenced the future "development" of such markets as being "key to the success of ODL." PX 501.15 at 3 (emphasis added). Additionally, Paragraph 587 sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including the SEC's statement that Ripple "touted" XRP. Defendants further dispute that the allegations in Paragraph 587 establish that the document in question was viewed by any particular person within or outside of Ripple.

588.   In its 4Q 2019 XRP Markets Report, under a section titled "Disciplined, Responsible Stakeholders: Continued Pause in XRP Sales," Ripple stated: "Ripple further reduced XRP sales and paused programmatic sales. Ripple maintained this approach throughout the entirety of Q4." PX 501.13 at 1/8.

   **Response:**   Undisputed.

589.   In its 1Q 2020 XRP Markets Report, under a section titled "Disciplined, Responsible Stakeholders: Continued Pause in XRP Sales," Ripple stated that in Q4 2019 "Ripple further reduced XRP sales and paused programmatic sales. Ripple maintained this approach throughout the entirety of Q1 2020." PX 501.14 (1Q20 XRP Market Report) at 1.

**Response:**   Undisputed.

590.   In its 3Q 2017 XRP Markets Report, Ripple stated that its subsidiary XRP II, LLC "sold $32.6 million worth of XRP programmatically as a small percentage of overall exchange volume" and that "For Q3, the sales represented 0.20 percent (20 basis points) of the total $16.50 billion traded, an 11 basis-point increase from Q2 2017's 0.09 percent (9 basis points)." PX 501.04 at 1/7)

**Response:**   Undisputed.

591.   In January 2018 Schwartz made a public post on XRP Chat which stated: "Ripple employs third party market makers to execute these XRP sales to ensure that we can't control the timing or volume to manipulate the markets or benefit from inside information and also to ensure that Ripple insiders (including me) can't use intimate knowledge of the sales strategy to their own advantage. These are professional market makers who understand that we don't want to kill rallies or engineer the price but want to sell with minimal impact." PX 482 at 17/26.

**Response:**   Disputed.   Defendants do not dispute that PX 482 contains the quoted text; however, Defendants dispute the SEC's characterization of PX 482 including because Paragraph 591 omits additional context necessary to understand the quoted language, including that Schwartz was responding to a question about whether "the term 'programmatic' impl[ied] that this was more or less pre-determined, or against pre-determined rules." PX 482.   Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 591 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.   Defendants further dispute that a statement made by Schwartz on an online forum represents the views of Ripple or the Individual Defendants.   The SEC has not put

forward any evidence to establish that Schwartz spoke as a representative of Ripple or the Individual Defendants in connection with PX 482.

592.   In or around 2013, the XRP market was "very small," such that, according to Ripple's executive vice president of business development in 2013, "it was sort of aspirational at best that there would ever be a market around XRP." PX 14 (Griffin Tr.) 20:5-11, 102:21-103:14.

**Response:**        Defendants dispute that Paragraph 592 complies with Local Civil Rule 56.1, insofar as it is duplicative of Paragraph 105.  Defendants do not dispute that Griffin offered the quoted testimony; however, Defendants dispute that Paragraph 592 sets forth a fair characterization of the entirety of Griffin's testimony.  Specifically, Griffin's testimony was not that "he and the company's founders had an 'aspirational' view that one day there could be a market" (as the SEC asserts), but rather that the possibility that there "would ever be a market around XRP" was "aspirational at best" (i.e., extremely unlikely). PX 14 at 103:7-10.

593.   Almost immediately after the XRP Ledger was launched publicly, Ripple "started a series of giveaways [of XRP] so that people could ask for XRP." PX 7 (Schwartz Inv. Tr.) at 70:19–71:8.

**Response:**        Undisputed.

594.   The goal of giving away XRP was to increase trading liquidity in the XRP market. PX 10 (Rapoport Tr.) at 126:20-127:5; PX 14 (Griffin Dep. Tr.) at 117:2-118:19.

**Response:**        Disputed.  Rapoport testified that "there were some giveaways that were intended to increase liquidity in the marketplace and *there were others with presumably other goals irrespective of liquidity*."  PX 10 at 127:1-5 (emphasis added); *see also* PX 14 at 117:16-118:2 (Griffin testifying that, with respect to his understanding of the giveaway goals, "[t]he more liquidity around XRP, the more useful the network was for any participant," which would help "streamline[]" the "operation of cross asset or cross currency flows"). Defendants further dispute that statements by two Ripple employees at particular points in

time are sufficient to establish the underlying fact set forth in Paragraph 594 at all times and for all purposes in this litigation.

595.   Ripple gave away XRP in order to create and increase liquidity in XRP.  PX 14 (Griffin Tr.) 117:2-12.

**Response:**      Disputed.  Undisputed that Griffin testified, in response to the question "for what purpose" did Ripple give away XRP in 2013, "I think, again, just to gen -- to create and help to create more liquidity around XRP."  PX 14 at 117:8-12.  Defendants dispute that a statement by a single employee relating to at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 595 at all times and for all purposes in this litigation, in particular because Rapoport testified that "there were some giveaways that were intended to increase liquidity in the marketplace and there were others with presumably other goals irrespective of liquidity."  PX 10 at 127:1-5.

596.   Ripple gave away XRP "find ways in which to build the liquidity and usefulness of XRP." PX 3 (Griffin Inv. Tr.) 73:11-22.

**Response:**      Undisputed.

597.   Ripple's XRP giveaways were intended to "create an ecosystem" that "would be good for [XRP's] utility, [and] liquidity." PX 2 (Larsen Tr.) 172:25-173:25.

**Response:**      Disputed.  Defendants do not dispute that Larsen offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 2 because Paragraph 597 omits additional context necessary to understand the quoted testimony, including that Larsen testified that Ripple's giveaways of XRP were to distribute XRP "as widely as possible . . . [w]hether that would be a good thing for the ecosystem and for developers, users, *basically any purpose*."  PX 2 at 173:10-16 (emphasis added).

253

598.     In or around 2013, Ripple's strategy for distributing XRP was to give it away, and Ripple's goal with respect to certain XRP giveaways was to increase XRP's liquidity. PX 10 (Rapoport Tr.) 26:22-24, 54:12-55:2, 124:2-126:5.

**Response:**     Disputed.   The cited testimony by Rappaport is insufficient to support the SEC's assertion of fact because Rapoport testified that Ripple's giveaways were distributions of XRP "sometimes indiscriminately for anyone signed up, and sometimes as a specific incentive for something, like signing up for a new account or some other goal," and were often intended "[t]o get XRP into the hands of more people" to enable XRP to act as an anti-spam mechanism with respect to utilization of the network.   PX 10 at 125:1-23. Furthermore, Rapoport testified that he was not always aware of the goals of XRP giveaways, and he could not recall any giveaways where the goal was to increase the liquidity of XRP, other than "market maker compensation," though he stated it is "debatable" whether such compensation should be called a giveaway.  *Id.* at 125:24-127:10.

599.     According to Ripple's director of markets and trading in 2013, a Ripple XRP giveaway was successful if the gifted XRP "gets traded around between many accounts, presumably getting more users involved in Ripple and also improving network volume metrics." PX 138.

**Response:**     Disputed.  Defendants do not dispute that that Rapoport offered the quoted statement in an email dated October 13, 2013, and that he was Ripple's Director of Markets and Trading at the time.  *See* PX 138; Ex. 132 (RPLI_SEC 0842643) at RPLI_SEC 0842644.   However, Defendants dispute the SEC's characterization or implication in Paragraph 599 that this was the only way Rappaport would regard an XRP giveaway as successful because in PX 138, Rapoport articulated other potential factors for a "successful" giveaway, including if "[t]he receiving account generates a lot of (non spam) entries in the ledger over time.  Even if the giveaway recipient 'hoards' the free XRP and never sells any,

it is still a positive outcome if he/she is actively buying more, creating balances in other currencies, trading on the network, etc." PX 138 at RPLI_SEC 0012820.

600.    In November 2013, Griffin raised with Larsen the opportunity to give XRP to a charity and then direct prospective XRP buyers to the charity to purchase the donated XRP. PX 139.

**Response:**    Disputed.  Paragraph 600 misleadingly characterizes the text of PX 139, in which Griffin raised the possibility that Rapoport could "point" XRP buyers to the charity, not "direct" them as the SEC asserts. PX 139.  Defendants dispute Paragraph 600 to the extent that the SEC's use of the phrase "direct" is vague and ambiguous, and is not supported by the underlying evidence.

601.    Once XRP began having an economic value, Ripple giveaways of XRP "became no longer practical" because "[p]eople participated in giveaways just to sell the XRP on the market" or "spam the giveaways and all the funds wound up in a single wallet," and it therefore "quickly became impossible to make the giveaways work." PX 7 (Schwartz Inv. Tr.) at 126:13–127:19; 140:7–18; PX 49.

**Response:**    Disputed.  Defendants do not dispute that Schwartz offered the quoted testimony and statements, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's assertion in Paragraph 601 as to when this occurred because Schwartz's testimony was uncertain as to timing and contradicts the SEC's assertion that this occurred "[o]nce XRP began having an economic value."  When asked by the SEC whether the size of Ripple's giveaways dropped "because XRP started to have value and people were trading XRP," Schwartz responded: "I don't think there was that at that time. But it might have been that people anticipating that, were sort of getting other people to participate in the giveaway for them . . . There certainly -- that certainly became a concern later.  But I don't think that was a concern that early." PX 7 at 124:3-125:9.  Defendants also dispute that Schwartz's testimony is sufficient to establish the underlying fact set forth in Paragraph 601 at all times and for all purposes in this litigation.

602.    Ripple distributed XRP to market makers in order to have the market makers trade XRP against other assets and create price quotes. PX 10 (Rapoport Tr.) 53:13-54:9, 59:3-11, 83:1-86:1, 126:6-12.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 to the extent it characterizes Ripple's goal in distributing XRP to market makers as having the market makers "create price quotes," because such characterization is not supported by the cited testimony.  *See, e.g.*, PX 26 at 41:21-42:11 (role of market maker is to "provide the necessary conditions for more frictionless trading" by "reduc[ing] the size between the bid and offer"); PX 10 at 85:13-17 ("the agreements were very similar across market makers and required each market maker to quote XRP pair -- pairs against XRP, as well as other pairs, like bitcoin dollar and gold dollar").  Defendants further dispute that Rapoport's testimony about the general behavior of market makers is sufficient to establish the underlying fact set forth in Paragraph 602 at all times and for all purposes in this litigation, including as to specific market makers with which Ripple had specific contractual agreements.  *See, e.g.*, Ex. 133 (SEC-LIT-EPROD-000786925) (Market Maker and Programmatic Market Making Activity Agreement with ███████████████████, dated March 1, 2018) at SEC-LIT-EPROD-000786926 ("Market Maker agrees to . . . engage in efforts to promote liquidity for the buying and selling of XRP . . . The purpose of this market making activity is to promote and encourage the liquidity of XRP to support a healthy market.").

603.    Ripple "loaned" XRP to market makers and forgave the loans once they "los[t] XRP to the market," to establish the "building blocks" of an XRP market. PX 344 at RPLI_SEC 0038399; PX 10 (Rapoport Tr. 137:2-140:20, 145:2-146:18; PX 26 ██ Tr. 38:9-43:22, 117:12-119:6) (describing such trading on XRP Ledger and in open markets in 2013 and 2014).

**Response:**        Disputed.  The assertion of fact in Paragraph 603 is unsupported by the cited evidence, and is inaccurate and misleading, as Paragraph 603 erroneously attributes

the "building blocks" quote to Ripple, when it was written by a third party (█████████)

and because the cited evidence in PX 26 does not support the SEC's assertions of fact as set

forth in Paragraph 603, as ██'s cited testimony does not discuss XRP loans.  Defendants

further dispute that PX 344, PX 10, and/or PX 26 are sufficient to establish the underlying

fact Ripple loaned XRP to market makers so the XRP could be "los[t]" to market, as set forth

in Paragraph 603 at all times and for all purposes in this litigation, including with respect to

Ripple's contractual agreements with any other party or for any periods or instances outside

those to which Rapoport specifically testified.  *See* PX 10 at 146:22-24 ("I'm not aware of

this type of trading strategy being conducted again after this one instance.").

604.   On or about April 1, 2018, in a presentation to the Tuck School of Business at
       Dartmouth University, Ripple's VP of Business Operations stated: "Right now I
       think most people know that the activity happening with digital assets almost all
       speculation. I mean there is very little real use case and we would think that this
       XRapid example is one of the first true use cases for that.  It's an infinitesimal
       amount of the trading volume that happens each day and people say don't you think
       that the speculative volume that is being created is harmful and at some level, yes,
       I mean it is very risky.  We don't want people to go and spend their life's savings
       but it's sort of in making a market and currency like this is a necessary first step.
       You need to prime the pump and get volume started so it starts building initial
       volume and then certainly we think that the more commercial specific use case
       volume will grow there and create much more robust markets." PX 503.15,
       *available at* https://www.youtube.com/watch?v=CLUUMtLsROk..

       **Response:**       Undisputed.

605.   Garlinghouse testified: "The payments to customers are meant to incentivize
       activity on the network, activity -- I think any time you're starting a network, you're
       trying to have a flywheel start moving and, as I described earlier, the more liquidity
       going into a market, the tighter the spreads you're going to see exist. Before there
       is any liquidity, you need to jumpstart that flywheel.  And so, as is the case with
       many other payment network types of players, Ripple has used incentives to get
       that flywheel started." PX 36 (Garlinghouse Inv. Tr.) at 121:7-122:21.

       **Response:**       Disputed. Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 36 to the extent it implies that Ripple is sustaining

the flywheel with incentives because Garlinghouse testified that the catalyst for the flywheel

is "speculative and market trading volume" in XRP because that leads to more liquidity, tighter spreads, a more efficient market, and more payment flows, as set forth in PX 81 at 370:8-15. Garlinghouse also testified that the "hypothesis" that speculative and market trading is one "that we have seen generally play out in the crypto markets" and "[a]nything that drives liquidity is going to be constructive to what I'm calling a flywheel." PX 81 at 371:14-16. Undisputed that Garlinghouse offered the quoted testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony.

606.   Ripple ultimately began to sell XRP. PX 10 (Rapoport Tr.) 54:19-56:8.

**Response:**        Undisputed.

607.   Defendants offered and sold XRP in exchange for fiat money or other currencies. PX 80 (Ripple Ans.) ¶¶ 1, 72, 76, 77, 80, 81; PX 8 (Ripple RFA Responses) No. 29.

**Response:**        Disputed.  The cited evidence is insufficient to support the assertion of fact in Paragraph 607 as to the Individual Defendants, because the cited evidence only concerns sales of XRP by Ripple.  PX 8 No. 29; PX 80 (answering the SEC's allegations on behalf of Ripple Labs).  Defendants do not dispute that Ripple sold XRP, a virtual currency, in exchange for fiat or other currencies.  *Id*.  Defendants dispute any suggestion, implication, or legal conclusion or characterization that Ripple engaged in any "offer[ing]" of XRP to investors.

608.   Ripple directed "investment' inquiries" to its "guide to getting XRP" webpage, which contained links on "how to buy XRP." PX 50 at RPLI_SEC 0530297.

**Response:**        Disputed.  Defendants do not dispute that PX 50 contains the quoted text; however, Defendants dispute the misleading implication by the SEC that Ripple was "direct[ing] 'investment' inquiries" in Ripple to purchase XRP, as Long made clear in PX

50 that buying XRP was not the same as investing in Ripple: "If by chance, the inquirer wants to invest in Ripple Labs, you can let them know we are not currently fundraising." PX 50 at RPLI_SEC 0530297.

609.   At times from in or around January 2012 to in or around December 2020, Ripple maintained the website https://ripple.com/xrp/buy-xrp/. PX 85 (Ripple RFA Responses) No. 607.

**Response:**     Undisputed.

610.   At times from in or around January 2012 to in or around December 2020, Ripple published on the website, https://ripple.com/xrp/buy-xrp/, a list of digital asset trading platforms where XRP could be bought, sold, and traded by individuals, including platforms in the United States. PX 85 (Ripple RFA Responses) No. 608.

**Response:**     Undisputed.

611.   Ripple's "intention" in or around August 2016 with respect to its "new guide on buying XRP" was "to make buying XRP more accessible and as easy as possible." PX 157.

**Response:**     Disputed.   Defendants do not dispute that PX 157 contains the quoted text; however, Defendants dispute Paragraph 611 to the extent it implies that Willis's statements can be attributed to an "intention" by Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

612.   Ripple, emphasized that XRP would be (and was) tradable on secondary crypto exchanges. PX 85 (Ripple RFA Responses) Nos. 608; PX 501.04.

**Response:**     Disputed.   Defendants do not dispute that at times Ripple communicated that XRP was tradeable on certain digital asset trading platforms, *see* PX 85 No. 608; PX 501.04  at 3 (stating on October 19, 2017 that XRP was listed on 30 exchanges, as compared to six months prior, when XRP was listed on seven exchanges); however, Defendants dispute the SEC's added characterization that Ripple "emphasized" XRP listings on digital asset trading platforms to any person or persons at any point in time as unsupported by the cited evidence. *See id*.

259

613.    In or around August 2016, Ripple was engaging in a "concentrated effort into drumming up buyer interest in XRP." PX 157.

**Response:**        Disputed.  Defendants do not dispute that PX 157 contains the quoted text; however, Defendants dispute Paragraph 613 because it omits additional context necessary to understand the quoted language from PX 157, including because Long further stated that "[t]here really is no easy, convenient way to buy [XRP] today" and "[o]ur goal then is to minimize friction to buy XRP."  PX 157 at RPLI_SEC 0052598.

614.    As part of Ripple's efforts to "drum[] up buyer interest in XRP" in or around August 2016, Ripple "t[ook] the initiative to write and host a 'how to get XRP' guide on the XRP Portal on Ripple.com." PX 157.

**Response:**        Disputed.  Defendants do not dispute that PX 157 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of the activities discussed in PX 157 as "Ripple's efforts" to the extent that phrasing suggests a legal conclusion unsupported by the text of the document.

(a)    Ripple formed XRP II, a wholly-owned subsidiary of Ripple, in 2013, and XRP II sold XRP in what it called "over-the-counter" transactions to large institutional investors, hedge funds, and market makers, through its wholly-owned subsidiary XRP II ("Institutional Sales"). PX 8 (Ripple RFA Responses) Nos. 229, 239-40.; PX 14 (Griffin Dep. Tr.) at 148:11-25; PX 19 (Zagone Tr.) at 68:22-69:10.

**Response:**        Disputed.  Defendants do not dispute that XRP II LLC was a wholly-owned subsidiary of Ripple, that Ripple formed XRP II LLC in 2013, and that XRP II LLC has sold XRP.  *See* PX 8 Nos. 229, 239-40.  Defendants otherwise dispute Paragraph 614(a) as not supported by the cited evidence.  Defendants dispute that "XRP II sold XRP . . . through its wholly-owned subsidiary XRP II," as XRP II LLC has no such subsidiary and the SEC cites no evidence to establish that fact.  Defendants further dispute Paragraph 614(a)'s use of the defined term "Institutional Sales" because this phrase is vague and

ambiguous, because it conflicts with another purported definition of the same term in Paragraph 789, and because it is unclear whether the SEC's defined term is intended to encompass anything other than XRP sales to "large institutional investors, hedge funds, and market makers."

615. Ripple's chief compliance officer had compliance responsibilities in connection with XRP II's sales of XRP. PX 18 (O'Gorman Tr.) at 35:4-10.

**Response:** Undisputed.

616. Ripple made over-the-counter XRP sales pursuant to an agreement between Ripple and XRP II. PX 3 (Griffin Inv. Tr.) at 149:4-6.

**Response:** Disputed. The SEC's assertion of fact in Paragraph 616 is not supported by the cited testimony. When Griffin was asked by the SEC "[w]ere the OTC sales pursuant to an agreement between Ripple and XRP 2 [*sic*]," Griffin merely responded "I believe so, yes." PX 3 at 149:4-6. This is not sufficient evidence to support the assertion of fact in Paragraph 616 as to which the SEC has the burden of proof, nor is such a statement by a single employee at a particular point in time sufficient to establish the underlying fact set forth in Paragraph 616 at all times and for all purposes in this litigation.

617. Ripple's over-the-counter XRP sales transactions with which its former head of markets and trading was familiar "tended to be larger transactions," in contrast with the amounts of XRP required to confirm transactions on the XRP Ledger, which were "very small amounts that [we]re designed to be low in value in dollar terms." PX 10 (Rapoport Tr.) at 163:24-165:15, 165:20-166:2.

**Response:** Disputed. Defendants do not dispute that PX 10 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute that PX 10 provides sufficient evidence to support the assertion of fact in Paragraph 617 concerning the transactions with which Rapoport would have been "familiar," because Rapoport further testified that "I didn't have responsibility for Ripple's transactions with third parties. And so I saw and knew about a limited number of what I believe to be the total

number of transactions." PX 10 at 159:22-25. Furthermore, in response to the SEC's question concerning Ripple's over-the-counter XRP transactions, Rapoport clarified "[a]gain, I don't feel that I have the information at the time even -- and I certainly don't remember today, but didn't -- at the time did not have enough visibility into the totality of Ripple's transactions to understand that." *Id.* at 165:2-14.

618.   Certain over-the-counter purchasers of XRP functioned as XRP liquidity providers. PX 21 (Vias Inv. Tr.) at 40:2-43:2.

**Response:**   Disputed. Defendants do not dispute that Vias testified that there were "over-the-counter liquidity providers" for XRP, PX 21 at 41:11-14; however, Defendants dispute that a single statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 618 at all times and for all purposes in this litigation.

619.   XRP II sold XRP to institutional investors, including institutional funds, and market makers. PX 19 (Zagone Tr.) at 68:22-70:19.

**Response:**   Undisputed.

620.   XRP II sold XRP to accredited investors, and individuals who were not accredited investors were unable to purchase XRP from XRP II. PX 18 (O'Gorman Tr.) at 345:22-346:11.

**Response:**   Undisputed.

621.   Ripple engaged certain entities, including GSR Markets, ██████████ ████████████████████████████████████ to sell XRP programmatically on Ripple's behalf. PX 8, PX 85 (Ripple RFA Responses) Nos. 51, 56, 571-72.

**Response:**   Undisputed.

622.   In or around July 2016, listing XRP/fiat pairs on Kraken was a top priority for Ripple. PX 141.

**Response:**   Disputed. The cited evidence is insufficient to establish the SEC's assertion of fact in Paragraph 622. While Defendants do not dispute that PX 141 contains a

262

sentence by a single Ripple employee that "[l]isting XRP/fiat pairs at Kraken is a top priority

for us," this statement does not establish that the employee was speaking about Ripple's

priorities as an entity.  PX 141 at RPLI_SEC 0019152.  Defendants dispute that the cited

evidence provides an accurate description of Ripple's priorities, and the SEC cites no

evidence to establish that fact.  *See id.*

623.   In or around July 2016, Ripple's then senior vice president of business development
       observed that after Ripple completed a deal to list XRP on Kraken, "XRP will be
       waaaay [sic] easier to purchase." PX 3 (Griffin Inv. Tr.) at 21:9-16; PX 141.

**Response:**       Undisputed.

624.   In or around March 2017, Ripple's business development personnel were "racing
       to get Kraken live for easier XRP buying." PX 142; PX 14 (Griffin Tr.) at 275:8-
       21.

**Response:**       Disputed.  Defendants do not dispute that PX 142 contains the

quoted text; however, Defendants dispute Paragraph 624 because it omits additional context

necessary to understand the quoted language, including that Griffin testified that this

language meant "getting XRP listed at Kraken and Kraken integrating into the XRP ledger,"

PX 14 at 275:17-21, and that he was unsure if PX 142 represented more than merely "an

iteration of a plan," *id.* at 274:10-12.

625.   Ripple first engaged GSR in late 2013 or early 2014 to provide liquidity on the
       Ripple Consensus Ledger (now known as the XRP Ledger) and then engaged GSR
       to make Programmatic Sales of XRP. PX 26 ████ Tr.) at 29:19-32:9; PX 7
       (Schwartz Inv. Tr.) at 10:3-19.

**Response:**       Undisputed that ██ offered the cited testimony that GSR first

engaged with Ripple no later than 2014 "in the context of providing liquidity to the Ripple

Consensus Ledger," and at a later date engaged in "programmatic sales of XRP."  PX 26 at

31:25-32:9, 142:5-143:4; *see also* PX 85 No. 248.

626. The term "programmatic sales" references Ripple's use of market makers to use algorithms to sell XRP on digital asset exchanges.  PX 22 (Samarasinghe Tr.) 45:14-20.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 22 as misleading because the SEC presents testimony from Samarasinghe as to what the term "mean[t] to [him]" as an authoritative definition.  PX 22 at 45:14-20.  Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact in Paragraph 626 at all times and for all purposes in this litigation.  Defendants also note that the SEC has put forward multiple definitions for the term "programmatic sales" in this litigation, none of which are equivalent to the definition asserted in Paragraph 626.  *See* First Amended Complaint, ECF No. 46 ¶ 99; Ex. 134 (Plaintiff's First Set of Requests for Admission to Defendant Ripple Labs, Inc.), No. 10(h).

627. GSR sold a portion of Ripple's XRP on Kraken. PX 26 ███ **Tr.**) at 158:14-22; PX 143.

**Response:**        Undisputed.

628. On or about October 10, 2013, Ripple tweeted:  "Going on break at the Ripple Dev Con & we have breaking news: @krakenfx is now trading #XRP http://bit.ly/19D36AS."        PX        506.008,        *available        at* https://twitter.com/Ripple/status/388364210641440768?s=20.

**Response:**        Undisputed.

629. According to Ripple's chief technology officer, when crypto exchanges receive XRP from XRP sellers or transmit XRP to XRP buyers, "those transactions take place on the XRP Ledger." PX 6 (Schwartz Dep. Tr.) at 82:17-83:6.

**Response:**        Disputed.  Defendants do not dispute that Schwartz testified that certain transactions with exchanges "take place on the XRP Ledger," PX 6 at 82:17-83:6; however, the cited testimony does not establish the unqualified assertion in Paragraph 629 that all transactions by which exchanges "receive XRP from XRP sellers or transmit XRP to XRP buyers," at all times, have taken place on the XRP Ledger.  Defendants further dispute

this suggestion as misleading and factually incorrect because Schwartz also testified that "[t]he exchange between XRP and fiats, that takes place *off ledger*."  PX 07 at 191:19-20 (emphasis added).

630.  Validation of transactions on the XRP Ledger takes place via nodes, which are physically located all over the world, including in the United States. PX 6 (Schwartz Dep. Tr.) at 61:4-15.

**Response:**      Disputed.   Defendants do not dispute that Schwartz testified validation of transactions takes place in those XRP Ledger nodes configured to operate as validators.  PX 6 at 61:4-8.  Defendants dispute that all nodes on the XRP Ledger participate in the validation process, as Paragraph 630 implies.  Defendants further dispute Paragraph 630 because the cited evidence does not establish, as the SEC broadly asserts, that nodes are located "all over the world," nor does the cited evidence from Schwartz's deposition testimony suffice to establish the location of any node at any time.  In particular, Schwartz's testimony in May 2021 responded to questions as to whether "today" there were nodes engaging in validation in various locations, and Defendants accordingly dispute that Paragraph 630 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, making the facts and circumstances as of May 2021 irrelevant.

631.  Ripple entered into contracts with certain entities to conduct sales of XRP on certain global digital asset exchanges on Ripple's behalf. PX 8 (Ripple RFA Responses) No. 44.

**Response:**      Undisputed.

632.  Ripple provided XRP to market makers for sale on digital asset trading platforms. PX 85 (Ripple RFA Responses) No. 573.

**Response:**      Undisputed.

633.   The entities that sold XRP on digital asset exchanges on Ripple's behalf, including market makers like GSR, did so using trading algorithms. PX 8 (Ripple RFA Responses) Nos. 46-47; PX 14 (Griffin Dep. Tr.) at 229:1-12.

**Response:**          Disputed insofar as the cited evidence is not sufficient to establish the underlying facts set forth in Paragraph 633 at all times and for all purposes in this litigation.  Defendants do not dispute that the third-party entities that sold XRP on third-party digital asset exchanges on Ripple's behalf did so using trading algorithms, PX 8 No. 46, that the third-party entities that sold XRP on Ripple's behalf did so on third-party digital asset exchanges, PX 8 No. 47, and that Griffin testified that GSR was a market maker that sold XRP programmatically on Ripple's behalf, PX 14 at 229:1-12.

634.   Ripple discussed sales targets as a percentage of market volume with certain market makers. PX 85 (Ripple RFA Responses) No. 578.

**Response:**          Undisputed.

635.   In structuring its programmatic sales of XRP, Ripple "wanted to have as little detectable presence in the market as possible." PX 14 (Griffin Dep. Tr.) at 217:21-218:13

**Response:**          Undisputed.

636.   One of the reasons Ripple's market makers employed trading algorithms to sell Ripple's XRP was to minimize the price impact of those sales. PX 14 (Griffin Dep. Tr.) at 229:1-12.

**Response:**          Undisputed.

637.   Ripple's sales of XRP consistently constituted a very small portion of XRP trading volume. PX 80 (Ripple Ans.) ¶ 99.

**Response:**          Undisputed.

638.   Ripple's sales of XRP were generally no more than a fraction of a percent of daily XRP trading volume. PX 80 (Ripple Ans.) ¶ 198.

**Response:**          Undisputed.

639.   In instructing market makers as to how much of Ripple's XRP to sell, Ripple provided market makers with a target percentage of daily XRP volume. PX 22 (Samarasinghe Tr.) at 61:16-62:16.

**Response:**   Disputed.   Undisputed that Samarasinghe testified that "Ripple provided a target percentage of daily volume for market makers to liquidate," PX 22 at 62:2-8; however, Defendants dispute that the cited evidence establishes the allegation of fact in Paragraph 639 as to each instruction by Ripple to a market maker that sold Ripple's XRP.

640.   Ripple employees believed that, if the targeted percentage of traded volume was sufficiently low, Ripple's sales would have relatively low or minimal market impact. PX 22 (Samarasinghe Tr.) at 61:16-62:16.

**Response:**   Undisputed that Samarasinghe provided the cited testimony; however, Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 640 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

641.   Ripple had an incentive to increase the volume of XRP trading because its programmatic sales of XRP were a based on volume. PX 21 (Vias Inv. Tr.) at 51:5-15.

**Response:**   Disputed.   The SEC's assertions in Paragraph 641 about Ripple's alleged "incentive to increase the volume of XRP trading" is unsupported conjecture that is not supported by the underlying testimony.   *See, e.g.*, PX 21 at 48:21-51:15 (Vias listing various reasons why Ripple sought to increase listings of XRP, including as an "on-ramp" to facilitate xRapid usage in the U.S. and "we could increase volume which would help our sales increase without impacting the market.").

642.   In 2013, Ripple had no revenues. PX 7 (Schwartz Inv. Tr.) at 89:20-92:10.

**Response:**   Disputed.  Defendants do not dispute that Schwartz offered the cited testimony; however, Defendants dispute that Schwartz's unrefreshed recollection provides

the best evidence of Ripple's revenues in 2013. Defendants further dispute Paragraph 642 to the extent it is inconsistent with the SEC's own proffered evidence. See PX 45 (Ferrante Decl.) Ex. 2 (showing $███████ in 2013 revenues).

643.    In 2014, Ripple had no revenues other than from the sale of XRP. PX 7 (Schwartz Inv. Tr.) at 105:4-17.

**Response:**        Disputed. Defendants do not dispute that Schwartz offered the cited testimony; however, Defendants dispute that Schwartz's unrefreshed recollection provides the best evidence of Ripple's revenues in 2013. Defendants further dispute Paragraph 643 to the extent it is inconsistent with the SEC's own proffered evidence. See PX 45 (Ferrante Decl.) Ex. 2 (showing $█████ from "service" revenues in 2014).

644.    Ripple earned approximately $2.1 billion in revenues from its sales and distributions of XRP. PX 45 (Ferrante Decl.) Ex. 2.

**Response:**        Disputed. Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2). Defendants dispute Paragraph 644 to the extent it does not provide any time period for the purpose of calculating Ripple's revenues.

645.    Ripple's programmatic sales of XRP were Ripple's "life-blood." PX 145 at SEC-█████████-E-0048590.

**Response:**        Disputed. Defendants do not dispute that on July 1, 2019, Samarasinghe wrote an email titled █████████reference" containing the quoted language, PX 145; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 145, including because Paragraph 645 attributes a phrase written by a single employee in a draft recommendation letter written on behalf of a

market maker to represent a belief or understanding held by Ripple or the Individual Defendants. Defendants further dispute that a statement by a single employee at a particular point in time is sufficient to establish the underlying fact set forth in Paragraph 645 at all times and for all purposes in this litigation.

646. During Larsen's tenure as CEO, Ripple's revenues were overwhelmingly driven by XRP sales. PX 2 (Larsen Tr.) at 268:8-14.

**Response:** Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from Ex. 8 at 267:8-14. The SEC did not include the information from the errata sheet which clarified that Larsen testified XRP is a "significant" source of revenue, not "overwhelming." Ex. 135 (Errata Sheet for the Deposition of Christian Larsen, dated October 25, 2021).

647. Between November 2014 and September 2019, Ripple sold $757.6 million of XRP in Programmatic Sales using the same market maker the Individual Defendants used (GSR). PX 45 (Ferrante Decl.) Ex. 3.

**Response:** Disputed. Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 45, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 647. In particular, the cited evidence does not mention GSR or the Individual Defendants, and no programmatic sales are reflected for November and December 2014. Defendants further object pursuant to Fed. R. Civ. P. 56(c)(2) that Exhibit 3 of Ferrante's declaration is inadmissible as a summary within the meaning of Fed. R. Evid. 1006, because (i) the summary is facially not complete (see blank cells for 2017-2020 for

information not covered in the market reports) and (ii) does not summarize "voluminous writings . . . that cannot be conveniently examined in court. *See* Fed. R. Evid. 1006. Because the SEC's purported statements of fact premised on Exhibit 3 of Ferrante's declaration are unreliable and potentially misleading, they should be disregarded by the Court. *See U.S. ex rel. Feldman v. van Gorp*, 2010 WL 2911606, at *6 (S.D.N.Y. July 8, 2010) ("Rule 1006 does not require the fact finder to accept the information present on the summary charts as true.") (citation omitted); *cf. United States v. Ray*, 2022 WL 558146, at *21 (S.D.N.Y. Feb. 24, 2022) ("A chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error.") (quoting *United States v. Conlin*, 551 F.2d 534, 539 (2d Cir. 1977).

648.   For its Programmatic Sales, Ripple specifically targeted speculators. PX 147; PX 14 (Griffin Dep. Tr.) at 270-76.

**Response:**   Disputed.   Defendants dispute Paragraph 648 because it conflicts with the SEC's undisputed allegations in Paragraphs 653 and 654 that Ripple did not know the identity of any person who purchased XRP that Ripple sold programmatically, and accordingly Ripple cannot have "targeted" its programmatic sales of XRP to persons with any particular intent or motivation.   Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 147 and PX 14, because the cited evidence does not support the SEC's broad, unqualified, and temporally unbounded assertions of fact as set forth in Paragraph 648.   PX 147 discusses understanding the motivations of XRP purchasers in "thinking through [Ripple's] brand architecture," PX 147 at RPLI_SEC 0542678, not any attempt to "target speculators."   PX 14 at 270-76 contains testimony concerning PX 147, and similarly does not support an inference Ripple "specifically targeted speculators."

649. From the start of GSR's retention to sell XRP for Ripple through in or around 2017, GSR did not segregate accounts for Ripple and its employees. PX 26 ███ Tr.) at 141:5-143:4.

**Response:** Defendants do not dispute that ███ offered the cited testimony, but do not have an independent basis to admit or deny the truth of the statements set forth in Paragraph 649.

650. From the start of GSR's retention to sell XRP for Ripple through in or around 2017, the net execution price received for GSR's XRP sales on behalf of Ripple and Ripple employees was identical, and the XRP sales proceeds were pooled in one account. PX 26 ███ Tr.) at 141:5-143:4.

**Response:** Defendants do not dispute that ███ offered the cited testimony, but do not have an independent basis to affirm the truth of the statements set forth in Paragraph 650.

651. In or around 2017, GSR began segregating Ripple and Ripple employee accounts in connection with GSR's XRP sales on behalf of Ripple and Ripple employees. PX 26 (███ Tr.) at 141:5-143:4.

**Response:** Defendants do not dispute that ███ offered the cited testimony, but do not have an independent basis to affirm the truth of the statements set forth in Paragraph 651.

652. Ripple's Programmatic Sales were made through market makers, whose business model involved both buying and selling XRP on-ledger and on exchanges through "blind" bid/ask transactions. PX 80 (Ripple Ans.) ¶¶ 93-95; PX 442 at 11.

**Response:** Undisputed.

653. Ripple does not know the identity of any person who purchased XRP sold by market makers on behalf of Ripple through Programmatic Sales. PX 8 (Ripple RFA Responses) No. 111.

**Response:** Undisputed.

654. Ripple was unaware of the identities of purchasers of its XRP sold by market makers on crypto exchanges, and did not impose any restrictions on its market makers as to who could purchase Ripple's XRP. PX 25 (Madigan Tr.) 52:10-15, 212:25-214:3

**Response:**        Undisputed Ripple was unaware of the identities of purchasers of its XRP

sold by market makers on crypto exchanges; however, Defendants dispute the SEC's assertion in

Paragraph 654 that Ripple did not impose any restrictions on its market makers as to who could

purchase XRP held by market makers as inconsistent with other evidence in the record. *See* Defs.'

56.1 Statement ("Defs.' 56.1") (ECF No. 623) Paragraph 283; *see also* PX 26 at 151:17-22 (███

testimony) ("Q. Did Ripple ever ask you to make sure U.S. persons were not buying XRP from

GSR? A. I think that -- I don't remember the exact details, but I do know that at some point, some

moment in time, we stopped selling XRP on exchanges that catered to U.S. persons."); 305:8-12

("[W]e've always had a very light footprint in the U.S., and we started trading on Coinbase much

later than everybody else. A lot of our business was driven out of Asia in the earlier years.").

655.    Griffin did not know why certain brokers who approached Ripple's XRP markets
team to purchase large blocks of XRP wanted to purchase XRP, and he could not
recall any occasion where he or anyone else at Ripple inquired as to why a potential
purchaser wanted to buy XRP. PX 14 (Griffin Dep. Tr.) 158:23-162:2.

**Response:**        Disputed. Defendants do not dispute that Griffin testified that he

did not know why certain brokers who approached Ripple's XRP markets team to purchase

large blocks of XRP wanted to purchase XRP, *see* PX 14 at 158:16-159:11; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

PX 14 concerning Griffin's recollection of "occasion[s] where he or anyone else at Ripple

inquired as to why a potential purchaser wanted to buy XRP," because Griffin instead

testified he no longer remembered the facts, not that he recalled that no such inquiry took

place. PX 14 at 158:23-159:6 ("Q. Did you have it at that time and just don't remember, or

you never had an understanding? . . . A. I don't -- I don't -- I don't know what -- why people

were buying XRP or what their reasons were. Q. Did you ever ask any XRP purchaser what

they were buying XRP for? A. I don't remember.").

656.    Ripple did not restrict its distributions of XRP to persons who may utilize XRP as a universal asset. PX 8 (Ripple RFA Responses) No. 39.

**Response:**        Disputed.  The SEC's broad and temporally unbounded assertions in Paragraph 656 are not supported by Ripple's RFA Response No. 39.  Specifically, Ripple objected in its response to RFA 39 that the request was "vague and ambiguous…because it uses quotation marks around the phrase 'universal asset' without either specifying a source of the quotation or explaining the meaning of that phrase." PX 8 No. 39.  The SEC's asserted fact in Paragraph 656 about XRP sales to those who did not use XRP as a "universal asset" is therefore unsupported conjecture that the underlying RFA response does not support.  Defendants do not dispute that, at certain times, Ripple did not restrict its distributions of XRP "to persons who may utilize XRP as a universal asset." PX 8 No. 39.

657.    Ripple did not instruct the market makers who sold XRP on its behalf to restrict offers or sales of XRP to persons who would consume XRP. PX 8 (Ripple RFA Responses) No. 48.

**Response:**        Undisputed.

658.    Garlinghouse could not recall any steps he took to restrict anyone from buying his or Ripple's XRP as an investment. PX 81 (Garlinghouse Dep. Tr.) at 374:6-15, 375:2-12.

**Response:**        Undisputed that in his deposition, Garlinghouse offered the cited testimony.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81, including because Paragraph 658 omits additional context necessary to understand the cited testimony.  In particular, Garlinghouse also testified that as Ripple's CEO, he did not have an understanding that people were buying XRP as an investment, PX 81 at 372:4-9, 377:5-10 ("And I don't know if they're speculating.  I don't know if they're investing.  I don't know what they're doing.  And – and maybe some are buying XRP to make payments overseas or maybe they're – I don't know."), and Garlinghouse did not

"know why individuals and [he hasn't] taken the time to try to dissect why each person might choose to speculate in XRP," *id.* at 373:10-13. Defendants further dispute Paragraph 658 to the extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including that people purchased Ripple's or Garlinghouse's XRP "as an investment" in Ripple.

659.   Garlinghouse does not know whether purchasers of XRP were buying it in connection with payment flows in or around April 2017. PX 81 (Garlinghouse Dep. Tr.) at 377:11-24.

**Response:**      Undisputed that Garlinghouse offered the cited testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony.

660.   Ripple did not make efforts to determine the identities of purchasers and sellers of XRP, and made no efforts to restrict how purchasers of XRP could use the XRP they purchased. PX 15 (Birla Dep. Tr.) at 127:6-128:10.

**Response:**      Disputed.   Defendants dispute Paragraph 660 because it is inconsistent with the SEC's other allegations that Ripple did impose restrictions on how purchasers of XRP could use the XRP they purchased. *See, e.g.*, Paragraphs 575, 579, 582, 583, 661, and 800. Defendants dispute Paragraph 660 because it covers all purchases and sales of XRP, regardless of seller, purchaser, forum, or time period, and aver that Ripple was aware of the identities of certain counterparties who purchased of XRP over the counter and, in certain circumstances, imposed restrictions on those purchasers. *See, e.g.*, PX 301 at RPLI_SEC 0609541-546 (Ripple ███████ XRP purchase agreement that contractually provided that further sales of the purchased XRP limited to 0.5% of average daily trading volume); *see also* Paragraph 800. Defendants further dispute Paragraph 660 to the extent that it sets forth legal conclusions through its use of the term "efforts."

661.   Other than resale restrictions, Ripple did not place restrictions on how OTC purchasers of XRP could use the purchased XRP. PX 20 (Vias Dep. Tr.) at 47:10-17.

**Response:**     Disputed.   Defendants dispute Paragraph 661 because "OTC purchasers" is undefined, vague and unclear.   To the extent Paragraph 661's reference to "OTC purchasers" includes third-party purchasers of XRP directly from Ripple through ordinary purchase and sale agreements, Defendants dispute Paragraph 661 because certain of Ripple's sales of XRP for use in connection with its ODL product included restrictions as to the use of purchased XRP.  *See, e.g.*, PX 329 at ███████ SEC00013522, § 3(a) (XRP to be used "for the sole purpose of completing a payment transaction over On-Demand Liquidity").

662.   Ripple did not ask market makers to restrict sales of XRP to certain categories of individuals, including non-U.S. persons or those buying for a purpose other than speculation. PX 22 (Samarasinghe Tr.) at 58:25-59:4

**Response:**     Disputed.  Defendants do not dispute that Samarasinghe testified that Ripple did not, "to [his] knowledge," ask market makers to restrict sales, PX 22 at 58:25-59:4; however ███ testified that GSR, "at some point, some moment in time, [] stopped selling XRP on exchanges that catered to U.S. persons."  PX 26 at 151:17-22.  Defendants further dispute Paragraph 662 because the cited evidence does not establish the allegation of fact in Paragraph 662 as to each communication by Ripple to a market maker that sold Ripple's XRP.

663.   Ripple did not direct market makers to impose any resale restrictions on anyone to whom the market makers sold Ripple's XRP. PX 22 (Samarasinghe Tr.) at 59:24-60:19.

**Response:**     Undisputed.

664.   Ripple did not direct market makers to impose any restriction on who purchased Ripple's XRP, how much they purchased, or the reason for which they purchased. PX 14 (Griffin Dep. Tr.) at 219:9-221:16, 222:17-20.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 664, as Griffin testified he recalled "some period of time where there was more explicit instruction over where to sell versus not, but I don't recall."  PX 14 at 221:19-21.  Defendants further dispute Paragraph 664 because ▮ testified that GSR, "at some point, some moment in time, [] stopped selling XRP on exchanges that catered to U.S. persons."  PX 26 at 151:17-22.  Defendants further dispute Paragraph 664 because the cited evidence does not establish the allegation of fact in Paragraph 664 as to each communication by Ripple to a market maker that sold Ripple's XRP.

665.    Other than efforts to avoid scams, Larsen could not recall any efforts by Ripple to determine what recipients of free XRP did with their gifted XRP.  PX 2 (Larsen Tr.) at 191:9-192:7

**Response:**        Undisputed that Larsen testified that he could not recall any additional steps than "making sure that those were not scams or false identities or duplicative recipients of giveaways."  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 2.  Among other things, the SEC omits that Larsen testified that these giveaways were a distribution system like "Bitcoin's faucet or the Ethereum process of distribution."  Ex. 8 at 191:3-7.

666.    Ripple did not choose which buyers purchased XRP in its programmatic sales made through market makers and did not instruct its market makers to sell its XRP only to those who would use XRP as money.  PX 6 (Schwartz Dep. Tr.) at 81:15-82:16.

**Response:**        Undisputed.

667.    Ripple did not track information about the purpose for which buyers were purchasing XRP and did not have a policy to inquire for what reason potential buyers were interested in purchasing XRP.  PX 10 (Rapoport Tr.) at 142:18-143:21, 297:23-301:20.

**Response:**         Disputed. Defendants dispute Paragraph 667 because it covers all purchases and sales of XRP, regardless of seller, purchaser, forum, or time period, because for some XRP sales, including those related to ODL operations, Ripple was aware of the uses of the XRP. *See, e.g.*, PX 329 at ██████ SEC00013522, § 3(a) (XRP to be used "for the sole purpose of completing a payment transaction over On-Demand Liquidity").

668.   Ripple did not take any steps to stop people from purchasing XRP for speculative reasons. PX 6 (Schwartz Dep. Tr.) at 294:18-20.

**Response:**         Disputed.  Defendants do not dispute that Schwartz offered the cited testimony, however, Defendants dispute that Schwartz's unrefreshed recollection suffices to establish the broad and unqualified statement in Paragraph 668, insofar as record evidence submitted by the SEC establishes that Ripple's sales of XRP to ODL customers in connection with XRP-O were solely for use in connection with the ODL product.  *See, e.g.*, Paragraph 751 and PX 81 at 335:13-336:11.

669.   Ripple was generally unaware of how XRP purchasers would use their purchased XRP. PX 6 (Schwartz Dep. Tr.) at 38:25-39:4.

**Response:**         Disputed.  Defendants do not dispute that Schwartz offered the cited testimony; however, Defendants dispute Paragraph 669 because it is vague as to the meaning of "generally" and by its terms covers all purchases of XRP, regardless of seller, purchaser, forum, or time period.  Ripple accordingly disputes Paragraph 669 because for certain XRP sales, including those related to ODL operations, Ripple was aware of the uses of the purchased XRP. *See, e.g.*, PX 329 at ██████ SEC00013522, § 3(a) (XRP to be used "for the sole purpose of completing a payment transaction over On-Demand Liquidity").

670.   Ripple understood that some XRP purchasers were speculating on XRP as an investment. PX 25 (Madigan Tr.) at 82:2-14, 212:1-18.

**Response:**        Disputed.  Defendants dispute Paragraph 670 because it covers all purchases of XRP, regardless of seller, purchaser, forum, or time period, and to the extent that it sets forth legal conclusions through its use of the term "investment."  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 670, specifically because Madigan did not testify that she – let alone Ripple or the Individual Defendants – understood that XRP purchasers were purchasing XRP "as an investment" as Paragraph 670 alleges.  Madigan testified only to her own understanding of XRP purchasers, and explicitly did not speak on behalf of Defendants' understandings.  See PX 25 at 212:15-24 ("Q.  Do you, Ms. Madigan, understand that XRPs sold on behalf of Ripple by market makers could be sold to speculators on these exchanges? . . . A. Yes.  Q. Did Garlinghouse -- does Garlinghouse have that understanding? A. I can't . . . speak to Garlinghouse's understandings."); 217:19-218:1 ("Q. Okay. Is it your sense that it's widely understood by, say, Ripple's leadership that the XRP market is actively traded by speculators? . . . A. Yeah, I can't comment on speculating around individual members of leadership teams' view on the markets.").

671.    Ripple targeted speculative purchasers of XRP. PX 147.

**Response:**        Disputed.  Defendants dispute Paragraph 671 because it conflicts with the SEC's undisputed allegations in Paragraphs 653 and 654 that Ripple did not know the identity of any person who purchased XRP that Ripple sold programmatically, and accordingly Ripple cannot have "targeted" its programmatic sales of XRP to persons with any particular intent or motivation.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 147, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 671.  PX 147 discusses

understanding the motivations of XRP purchasers in "thinking through [Ripple's] brand architecture," PX 147 at RPLI_SEC 0542678, not any attempt to "target[] speculative purchasers of XRP" as suggested by the SEC. Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact in Paragraph 671 at all times and for all purposes in this litigation.

672.    In or around the second quarter of 2017, Ripple's "number one XRP priority" was "higher speculative volume." PX 148.

**Response:**        Disputed.  Defendants do not dispute that PX 148 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 148 as misleading, including because Paragraph 672 omits additional context necessary to understand the quoted language, including that the quoted language is contained in an email from a lower-level employee to Ripple's leadership, reflecting her "key takeaway[s]" from "talk[s] [with] over a dozen MSBs (money service businesses), both in San Francisco and London, which provide cross-border payment services." PX 148 at RPLI_SEC 0528863.  Defendants therefore dispute the SEC's inference in Paragraph 672 that the quoted language represents "Ripple's 'number one XRP priority,'" as the cited evidence makes clear that this language reflects discussions with third parties, not the institutional view of Ripple, its leadership, or the Individual Defendants.

673.    It was "widely understood" within Ripple's XRP markets team that speculators were a key part of the XRP market.  PX 25 (Madigan Tr.) at 217:1-12.

**Response:**        Disputed.  Defendants dispute the SEC's statement in Paragraph 673 as misleading, as Madigan testified that "[m]y sense is that it's widely understood that the crypto markets are actively traded by speculators."  PX 25 at 216:11-14.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25, because the cited evidence does not support the SEC's assertion that speculators were a "key"

part of the XRP market.  Madigan testified only that it was her "sense that it's widely understood at Ripple's markets team that the XRP market is actively traded by speculators," but did she did not testify as to the actual understanding of any member of Ripple "XRP markets team" or any other person or persons, including the Individual Defendants.  PX 25 at 217:8-219:2.

> 674.   Although Ripple did not know who bought XRP, Ripple's head of XRP markets assumed Programmatic Sales included sales to retail investors, who were trading in XRP primarily for speculation, and Institutional Sales to speculators. PX 20 (Vias Dep. Tr.) at 29:1-2, 42:16-43:16, 45:11-46:2.

**Response:**        Disputed.  Defendants dispute Paragraph 674 to the extent it claims Vias testified concerning "Institutional Sales to speculators," a phrase does not appear in the cited testimony.  Defendants incorporate by reference their dispute concerning the use of the defined term "Institutional Sales" as appears in response to Paragraphs 614(a) and 789. Defendants further dispute that the cited testimony establishes the facts set forth in Paragraph 674 at all times and for all purposes in this litigation.

> 675.   Ripple desired to have a tight spread in XRP, and the functions of a market maker including providing tighter spreads that "reduce the cost for speculators to enter or exit a position."  PX 22 (Samarasinghe Tr.) 107:17-108:18, 168:16-169:23.

**Response:**        Disputed.  The cited evidence sets forth Samarsinghe's recollection that, before he joined Ripple, he had an "understanding or impression that Ripple desired to have a tight spread in XRP."  PX 22 at 31:22-32:2, 33:10-23, 108:15-18.  Defendants accordingly dispute that the cited evidence establishes what "Ripple desired" at any time. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 22, as misleading, including because Paragraph 675 omits additional context necessary to understand that tighter spreads are needed for reasons other than to "reduce the cost for speculators to enter or exit a position," as Samarasinghe himself testified.  *See* PX

22 at 74:11-12 ("Ripple did pay market makers to provide a spread, as an example, in OTC markets"); 169:9-12 ("By providing tighter bid ask spreads in general, I believe that is made it easier for market participants to enter or exit an XRP position."). Defendants further dispute that a statement by a single employee is sufficient to establish the underlying fact set forth in Paragraph 675 at all times and for all purposes in this litigation, including as to any belief or understanding held by other Ripple employees, Ripple as an entity, or the Individual Defendants.

676. Ripple engaged GSR to serve as liquidity providers in the XRP market, which included GSR making efforts to reduce bid/ask spreads and provide better prices, which in turn "facilitated the development of the ecosystem" such that "there was more XRP trading interest globally." PX 26 (█ Tr.) 41:21-42:11.

**Response:**      Disputed. Defendants do not dispute that █ offered the quoted testimony; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26, including because █ testified that "better prices in turn 'facilitated the development of the ecosystem' such that 'there was more XRP trading interest globally," and because █ explicitly disclaimed the SEC's proffered causal relationship. PX 26 at 116:23-117:7 ("Q. Did the market making activity facilitate the sales activity in any way?   A. I don't see the direct link.   I mean, the market making activity facilitated the development of the ecosystem, right, and there was more XRP trading interest globally. And the XRP sales program sold XRP globally. So yes, they're connected, but I don't see the -- is the right term 'causality'?").

677. In or around November 2013, with respect to XRP distribution, Ripple "prefer[red] to attract speculators who take a long term view and believe XRP demand will overwhelm supply as commercial use of the network increases." PX 101.

**Response:**      Disputed.      Defendants dispute the SEC's misleading characterization of PX 101 as representing any view or preference on behalf of Ripple,

because the cover email from Griffin characterizes the attached document from which the quoted language is drawn as "a summary of themes we touched on during [a] call" with an individual who was not an employee of Ripple at the time, PX 101 at RPLI_SEC 0012359. *See also* PX 14 at 62:24-64:5 (Griffin testifying that this document is "summarizing [a] conversation," and therefore he "would have been capturing a discussion that we had where we were effectively going to her to seek out her -- her expertise and her views. And this would have just basically been a rehashing of what she had said. She wasn't working at the company at the time.").

678. In a presentation to its Board in or about December 2013, Ripple noted that its "current user" was typically a "[m]ale in his 20s" who "[t]hinks he can make money from investing in XRP, and the price is right." PX 149 at RPLI_SEC 0646504.

**Response:**        Disputed.  Undisputed that PX 149 includes the quoted statement; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 149, as misleading, including because Paragraph 678 omits additional context necessary to understand the quoted language, specifically that the prototypical "current user" being illustrated is a user of the Ripple Client (a proprietary Ripple product) not a purchaser of Ripple's XRP, and that this current user was a "computer science student at a Chinese university" who used the Ripple Client to also trade CNY (a Chinese digital currency) and Bitcoin.  PX 149 at RPLI_SEC 0646504.

679. In or around March 2013, Griffin understood that there were speculators in XRP. PX 3 (Griffin Inv. Tr.) at 86:2-87:11.

**Response:**        Disputed.  Undisputed that Griffin testified that in 2013 "I understood there were speculators in the market," PX 3 at 86:2-86:10; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 3 because Paragraph 679 omits additional context necessary to understand the quoted language,

including that Griffin further testified: "Well, to be honest with you, it's sort of a definitional challenge. People trading XRP, exactly what they were doing with that XRP, I don't know. I don't know if they were speculating or what they were doing. But people were trading XRP and that's kind of – I probably made an assumption that they were speculating; but I honestly couldn't know."  PX 3 at 87:20-88:2.

680.    In or around November 2013, Griffin understood that because "in the earliest days" when "the ecosystem" is not yet "built out," the "source of liquidity [in XRP] may largely come from speculators." PX 3 (Griffin Inv. Tr.) at 122:7-123:24.

**Response:**    Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 3, as misleading, because the testimony concerns the meaning of a document, not Griffin's personal understanding in general.  That document is PX 101, and as Defendants disputed in response to Paragraph 677 also discussing PX 101, Griffin testified that this document is "summarize[ed] [a] conversation" with an individual who was not an employee of Ripple at the time and "would have just basically been a rehashing of" the discussion.  PX 14 at 62:24-64:5.  Defendants therefore dispute that PX 101 or the cited testimony establishes any understanding or belief on behalf of Griffin, Ripple, or the Individual Defendants as unsupported by the cited evidence or PX 101.

681.    In or around 2013, Rapoport believed that people speculated on the price of XRP, in part because some people emailed or spoke to Ripple employees and "indicat[ed] they're speculating on the price of XRP." PX 10 (Rapoport Tr.) at 81:8-25, 103:3-15.

**Response:**    Disputed.  Undisputed that Rapoport testified that "people would email us indicating they're speculating on the price of XRP," PX 10 at 103:19-25; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 because Paragraph 681 omits additional context necessary to understand the quoted

language, including that Rapoport testified that he received these emails "[d]espite our efforts to focus the conversation on the protocol and not the digital asset." *Id*.

682.   In or around October 2013, an XRP holder told Rapoport and Griffin that he was a "Ripple evangelist" and planned to respond to skeptics "when my ripples make me so rich that I can cover myself in gold plating."  PX 30.

**Response:**       Undisputed, except insofar as Paragraph 682 does not comply with Local Civil Rule 56.1 because it is duplicative of Paragraph 181(a).

683.   In or around November 2013, Ripple "prefer[red] to attract speculators who take a long term view and believe XRP demand will overwhelm supply as commercial u se of the network increases." PX 150.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 150, as misleading, because the email and quoted language characterize themes discussed on a call, not Ripple's views as a company.  *See* PX 150 (email from Griffin to Rapoport with draft slides for someone who "is working on an email for Chris and a broader distribution thesis and I want to recap our phone call"); PX 101 at RPLI_SEC 0012359 (attached presentation is "a summary of themes we touched on during our call"); PX 14 at 62:24-64:5 (Griffin testifying that this document is "summarizing [a] conversation" and therefore he "would have been capturing a discussion that we had where we were effectively going to her to seek out her -- her expertise and her views. And this would have just basically been a rehashing of what she had said. She wasn't working at the company at the time.").

684.   Persons interested in buying XRP reached out to Ripple to inquire as to how to purchase XRP, and in or around November 2014, Ripple used a bot to fill orders requesting to buy XRP.  PX 10 (Rapoport Tr.) at 297:23-298:14; PX 151.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 and 151 concerning the purported fact that "[p]ersons interested in buying XRP reached out to Ripple to inquire as to how to purchase

XRP," including because Paragraph 684 omits additional context necessary to understand the cited language and testimony, including that these "cold" emails came in through a contact form on Ripple's website. PX 10 at 238:11-12. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 10 and PX 151 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 684 that "in or around November 2014, Ripple used a bot to fill orders requesting to buy XRP." Rapoport in fact states in PX 151 "we do not sell XRP directly[.]" PX 151 at RPLI_SEC 0054770. Insofar as the SEC's assertions in Paragraph 684 rely on a sentence in the cited exhibit that ██████ showed me the bot he's using to fill these orders," the SEC cannot establish that the "████" in question is a Ripple employee, because "████s" was a reference to ██████████████████████, an unrelated third party entity that Rapoport discussed in PX 151. *See* Ex. 136 (██████████████████████████████

██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████
██████████████████████████████████████████████████████████████

685.   In or around November 2014, in noting that Ripple used a bot to fill orders requesting to buy XRP, a Ripple employee added "to the moon!" in response to Rapoport's message that Ripple was "growing volume + rising price." PX 151.

**Response:**   Disputed.   Defendants do not dispute that PX 151 contains the quoted text, exclusive of any alterations, omissions, or additions.   Defendants dispute that, in or around November 2014, Ripple used a bot to fill orders requesting to buy XRP, because the cited evidence does not support that assertion of fact. Rapoport in fact states in PX 151 "we do not sell XRP directly[.]" PX 151 at RPLI_SEC 0054770. Insofar as the SEC's assertions in Paragraph 685 rely on a sentence in the cited exhibit that ████ showed me the bot he's using to fill these orders," the SEC cannot establish that the ████ in question is

a Ripple employee, because ██████ was a reference to ████████████████████,

an unrelated third party entity that Rapoport discussed in PX 151. *See* Ex. 136 ████████



686.    In or around May 2014, Ripple viewed XRP as "an investment asset" and was pitching it to investors as such. PX 152.

**Response:**        Disputed.  Defendants dispute Paragraph 686 to the extent that it sets

forth legal conclusions through its use of the terms "investment asset" and "investors."

Defendants further dispute that cited evidence establishes that Ripple was "pitching [XRP]

to investors" in any way, in particular because Paragraph 686 omits additional context

necessary to understand the quoted language, including that Long corrected a reporter from

the Wall Street Journal: "I suggest not encouraging readers to buy XRP, given that it is more

of an enabler than an investment asset." PX 152 at RPLI_SEC 0842618.  Furthermore,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

PX 152, including because the statements are insufficient to establish any views or beliefs

held by Ripple or the Individual Defendants because the SEC cites no evidence to establish

that fact.

687.    In or around July 2019, Ripple told a digital asset trading platform that the "primary use case for XRP today is speculative" and that digital asset trading platforms are "the main enabler[s] of this use case." PX 8 (Ripple RFA Responses) No. 126.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 8, because the cited evidence does not support the

SEC's assertions of fact as set forth in Paragraph 687.  *See* PX 8 No. 126 ("[T]he quoted

language in Request No. 126 appears in a July 5, 2019 email sent by Ethan Beard, a former

Ripple employee, to ███████ Chief Executive Officer at Binance.US, and otherwise denies Request No. 126."). The quoted language in Paragraph 687 is misleadingly paraphrased, omitting additional context from the underlying document that the Ripple employee was laying out his personal understanding, and further stated that "[t]he primary use case for XRP today is speculative and the exchanges (along with wallets, traders, custody providers) are the main enabler of this use case." PX 154 at ████-000144.

688.    In or around July 2016, Ripple was actively recruiting an "XRP manager" who would be "responsible for building the market for XRP," which the head of XRP markets believed would include "leverag[ing] liquidity to draw in speculators." PX 153.

**Response:**       Disputed. Defendants do not dispute that PX 153 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 153 because Paragraph 688 omits additional context necessary to understand the quoted language "leverag[ing] liquidity to draw in speculators," as Griffin was specifically referring to the candidate's prior experience building a "market for the Black Sea wheat" in Europe. PX 153.

689.    In or around March 2017, Ripple's second-quarter plan, which was conveyed to Garlinghouse via email, included the "goal" of "driv[ing] XRP speculative trading volume," which included among several planned steps, Ripple's marketing department undertaking "customer research to understand speculator motivations." PX 142.

**Response:**       Disputed. Defendants do not dispute that PX 142 contains the quoted language; however, Defendants dispute the SEC's characterizations in Paragraph 689 because it omits that Griffin testified that he was unsure if PX 142 represented anything other than merely "an iteration of a plan," PX 14 at 274:10-12. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 142 to the extent it implies

anything about Garlinghouse's understanding of, thoughts about, or reaction to Griffin's email, since PX 142 is at most a secondhand account from another Ripple employee about what Garlinghouse allegedly thought, and the exhibit contains no communication from Garlinghouse.

690.    Ripple targeted U.S.-based exchanges as part of its efforts to increase speculative trading. PX 3 (Griffin Inv. Tr.) at 217:6-9.

**Response:**        Disputed.  Defendants dispute Paragraph 648 to the extent that it sets forth legal conclusions through its use of the terms "targeted" and "efforts."  Defendants also dispute Paragraph 690 because the terms "targeted" and "efforts" are ambiguous and vague insofar as the alleged fact does not specify particular actions, steps, or strategies or any time periods at issue, and the context of the cited testimony was specific to a particular narrow window of time.  *See* PX 3 at 215:7-11, *id.* at 217:13-15 (SEC questioner noting that they were only asking about "the time period that the company was discussing the XRP [escrow] proposal").

691.    In or around April 2017, Ripple had a "target goal" to increase "speculative volume" in XRP. PX 3 (Griffin Inv. Tr.) at 218:13-219:19; PX 14 (Griffin Dep. Tr.) at 272:3-276:15.

**Response:**        Disputed.  Defendants do not dispute that Griffin offered the quoted testimony; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 3 as misleading, including because Paragraph 691 omits additional context necessary to understand the quoted testimony, including that Griffin stated he understood "speculative volume" to be "a catch all for just trading activity in general." PX 3 at 219:17-19.  Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 14 as misleading, including because Paragraph 691 omits additional context necessary to understand the quoted testimony, including that Griffin stated

he was unsure if there actually was a plan to increase "speculative volume," or merely a point for discussion. PX 14 at 273:25–274:7 ("[B]ut there's questions about what's achievable and what's not. So I'm not really -- when I look at this, I'm not sure what -- where this ends up.").

692.   In or around July 2019, the "primary use case for XRP" was speculation and crypto exchanges were "the main enabler of this use case." PX 154; PX 24 (Beard Tr.) at 190:18-192:21, 205:13-213:1.

**Response:**   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 24, which is misleadingly paraphrased and omits additional context necessary to understand Beard's testimony, including that Beard further testified he included all exchanges and their users when he referred to "speculative use cases." *See* PX 24 at 191:21-24 ("So for me, when I say 'speculative use case,' it's around the users of the digital asset exchanges -- the exchanges themselves and their users."); 194:13-16 ("As I've defined in this, I'm saying the speculative -- my words -- speculative developers are: Exchanges, custody providers, trading platforms, traders and holders."). Defendants dispute Paragraph 692 to the extent it implies that one employee's statements can be attributed to a belief held by Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

693.   In or around July 2019, the primary users of XRP were "speculative developers," including "[e]xchanges, custody providers, trading platforms, traders and holders/whales." PX 24 (Beard Tr.) at 192:2-193:25.

**Response:**   Disputed. Defendants do not dispute that Beard offered the quoted testimony, exclusive of any alterations, omissions, or additions; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 24 because Paragraph 693 omits additional context necessary to understand the quoted testimony, including that Beard further testified he included all exchanges and their users when he

referred to "speculative use cases."  *See* PX 24 at 191:21-24 ("So for me, when I say 'speculative use case,' it's around the users of the digital asset exchanges -- the exchanges themselves and their users."); 194:13-16 ("As I've defined in this, I'm saying the speculative -- my words -- speculative developers are: Exchanges, custody providers, trading platforms, traders and holders.").  Defendants dispute Paragraph 693 to the extent it implies that one employee's statements can be attributed to a belief held by Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

694.   In or around April 2017, Ripple believed that listing XRP on a crypto exchange, Bitfinex, could contribute to Ripple's "speculative volume target." PX 155.

**Response:**        Disputed.   Undisputed that PX 155 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 694 to the extent it implies that one employee's statements can be attributed to a "belief" held by Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

695.   In or around April 2020, Ripple understood that in 2017, "when crypto exchanges began to list XRP[,] XRP then became much more accessible to digital asset speculators." PX 156 at RPLI_SEC 0567375.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 156, because Paragraph 695 omits additional context necessary to understand the quoted language, including that the analysis was offered by one Ripple employee in the context of explaining XRP's historic correlations with Bitcoin's market dynamics.  Defendants dispute Paragraph 695 to the extent it implies that one employee's statements can be attributed to an "understanding" or belief by Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

696.     In or around August 2016, Ripple wanted to get XRP listed on a crypto exchange, Kraken, to make it easier for non-accredited investors to buy XRP.   PX 18 (O'Gorman Tr.) 344:5-347:21 & PX 157.

**Response:**        Disputed.   Defendants do not dispute that O'Gorman offered the cited testimony regarding PX 157; however, Defendants dispute Paragraph 694 to the extent it implies that O'Gorman's recollection can be attributed to Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

697.     Ripple's senior manager of XRP markets in 2017 understood that purchasers of XRP on digital asset exchanges were "retail speculators." PX 22 (Samarasinghe Tr.) at 33:19-25, 45:11-46:1.

**Response:**        Disputed.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 22, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 697.   Specifically, when the SEC asked Samarasinghe who he understood was purchasing XRP from Ripple through programmatic sales, Samarasinghe responded "retail speculators," PX 22 at 45:11-46:1; however, the SEC omits that when asked "[t]o the best of your knowledge, were any of Ripple's instructions to market makers to sell or buy XRP done to encourage speculative investment," Samarasinghe testified "not to my knowledge."  PX 22 at 62:23-63:1.

698.     In or around March 2017, Ripple's marketing department undertook research in service of determining how to "attract[] speculators," including interviewing an "[e]xisting 'average Joe' XRP speculator," and "[i]nstitutional" XRP speculator, and an " 'average Joe' …speculator" in bitcoin or other cryptocurrencies who had not yet purchased XRP. PX 159 at RPLI_SEC 0461977-78.

**Response:**        Disputed.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 159, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 698.   Specifically, PX 159 indicates intent by Monica Long to undertake interviews, but the SEC's cited evidence does not establish that any research in fact took place.  *See* PX 159 at RPLI_SEC 0461977 ("Can we interview

a few candidates… Happy to talk more and we can reprioritize the list if need be."); *see also*
PX 17 at 200:10-19 (Q. Do you recall conducting any interviews with, say, your average Joe
XRP speculator?  A. I don't.  Q. Do you remember conducting any interviews with any key
or target buyers of XRP?  A. I don't…I recall having conversations, but not necessarily as
part of this.).

699.    In or around March 2017, demand for XRP came from three sources, including
"speculators who buy XRP in the market from exchanges or OTC" and market
makers in XRP. PX 46 at RPLI_SEC 0156979.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 46 as misleading, including because Paragraph 699

omits additional context necessary to understand the quoted language, which suggests the

sources of XRP demand come from "three types of market participants" and reads in full as

follows: "l) speculators who buy XRP in the market from exchanges or OTC, 2) payment

providers, who are also natural hedgers, looking to use XRP for liquidity, and 3) liquidity

providers, looking to make markets and earn spreads."  PX 46 at RPLI_SEC 0156979.

700.    In or around June 2016, Ripple's goals included increasing speculative volume in
XRP and increasing XRP's price. PX 17 (Long Tr.) at 184:8-185:7; PX 160.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 160 as misleading, including because Paragraph 700

omits additional context necessary to understand the cited document, including because the

document describes "goals" or "tactics" to be adopted to implement Ripple's broader "XRP

strategy," which was to "reduce FX and liquidity costs by making XRP a liquid institutional

bridge currency."  PX 160 at RPLI_SEC 0040947.  Defendants further dispute that a

statement by a single employee is sufficient to establish the underlying fact in Paragraph 700

at all times and for all purposes in this litigation.  Defendants further dispute that the

statements of a single employee can be attributed to Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 17, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 700, specifically because Long only agreed that the content of PX 160 appeared on the exhibit when presented to her, and testified that she did not recall increasing trade and speculative volume in XRP to be a key area of focus at the time. *See* PX 17 at 185:3-12 ("I don't recall – you know, trying to think back to that time, I don't recall it being a key area of focus.").

701.    In or around March 2017, Ripple's head of marketing conveyed to Garlinghouse Q2 2017 priorities including: "Drive XRP speculation." PX 161.

**Response:**    Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 161 as misleading, including because Paragraph 701 omits additional context necessary to understand the quoted document, including because the document reflects only Long's proposed agenda for a "1:1" meeting with Garlinghouse, not any decisions reached. Defendants therefore dispute Paragraph 701 to the extent it implies that Long's agenda can reflect any "priorities" held by Ripple or Garlinghouse, as the SEC cites no evidence to establish that fact. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 161 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it since the exhibit contains no communication from Garlinghouse.

702.    In or around April 2017, Ripple's head of marketing conveyed to Garlinghouse a list tasks to undertake to "[g]enerate speculative interest in XRP." PX 162.

**Response:**    Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 162 as misleading, including because Paragraph 702 omits additional context necessary to understand the quoted document, including that the

tasks related to "generating speculative interest" listed in this document included "clarify[ing] XRP's use case and product vision" and "show[ing] off technical superiority." PX 162 at RPLI_SEC 0577767.

703. In or around March 2017, Ripple undertook market research efforts in connection with the XRP markets team's view that speculative liquidity driven by retail investors would lead to institutional liquidity. PX 17 (Long Tr.) 201:13-202:20; PX 163.

**Response:**   Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 163, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 703. Specifically, PX 163 and PX 17 both indicate an intent by Monica Long to undertake market research efforts, not that the marketing department in fact did so. *See* PX 163 at RPLI_SEC 0425936 ("Can we interview a few candidates… Happy to talk more and we can reprioritize the list if need be."); PX 17 at 200:10-19 (Q. Do you recall conducting any interviews with, say, your average Joe XRP speculator? A. I don't. Q. Do you remember conducting any interviews with any key or target buyers of XRP? A. I don't…I recall having conversations, but not necessarily as part of this.).

704. In or around May 2020, Ripple's markets team suggested Ripple communications that "should lead towards the building of credibility with sophisticated digital asset speculators." PX 164.

**Response:**   Disputed. Defendants do not dispute that PX 164 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 164 as misleading because Paragraph 704 omits additional context necessary to understand the quoted language, including that the quoted language is contained in summary minutes from a meeting among lower-level Ripple employees, and

the context indicates the quoted language articulated of a general conceptual view, not a specific plan.  PX 164 at RPLI_SEC 0478900.

705.    In or around October 2020, Ripple contemplated conducting an XRP giveaway on a crypto exchange so that "[m]ore customers would trade/purchase XRP." PX 165.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 165, including because Paragraph 705 attributes the quoted language of a single employee to Ripple as whole.  In fact, after the suggestion of a giveaway was made in response to Long's request to "Think freely and creatively. :)," PX 165 at RPLI_SEC 0505984, and Long further responded with respect to an XRP giveaway: "I think, isn't something we'd want to do." PX 165 at RPLI_SEC 0505983.  Defendants therefore dispute Paragraph 705 to the extent it implies that Long's agenda reflects any "priorities" held by Ripple or the Individual Defendants, as the SEC cites no evidence to establish that fact.

706.    In or around December 2018, Ripple signed a business development agreement with Revolut, and as part of the agreement, Revolut intended to "source the XRP sold through their mobile app to mom and pop crypto investors." PX 166.

**Response:**        Disputed.  Defendants do not dispute that PX 166 contains the quoted language in an email from a Ripple employee to other Ripple employees; however, Defendants dispute that the cited evidence establishes that the Ripple employee in question accurately set forth the intent of a third-party company.  Defendants further dispute that the cited evidence establishes what was "part of the agreement" between Ripple and Revolut, as PX 166 does not set forth the text of any agreement between Ripple and Revolut or any communication between Ripple and Revolut.

707.    In or around April 2019, Beard stated that the "primary use case for crypto at this point is for speculation." PX 167.

**Response:**        Undisputed.

708.   On or about May 3, 2017, using the pseudonym Joel Katz, David Schwartz made a post on BitcoinTalk.org, which discussed XRP's increase in price and stated:

> I have devoted the last five years of my life to Ripple, and now work together with over 100 full-time employees who are devoted to making global payments work better. While I concede I can't prove that this increase in price isn't a bubble or isn't the result of some pump and dump attempt, to me it feels like recognition for the effort the team has put in all these years. PX 507.20.

**Response:**       Undisputed.

709.   Ripple took steps to market XRP specifically to speculators. PX 147; PX 14 (Griffin Tr.) 270:6-76:22; PX 142.

**Response:**       Disputed.  Defendants dispute Paragraph 709 because it conflicts with the SEC's undisputed allegations in Paragraphs 653 and 654 that Ripple did not know the identity of any person who purchased XRP that Ripple sold programmatically, and accordingly Ripple cannot have "market[ed] XRP specifically" to persons with any particular intent or motivation.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 147 and PX 14, because the cited evidence does not support the SEC's broad, unqualified, and temporally unbounded assertions of fact as set forth in Paragraph 709.  PX 147 discusses understanding the motivations of XRP purchasers in "thinking through [Ripple's] brand architecture," PX 147 at RPLI_SEC 0542678, not any attempt to "market XRP specifically to speculators."  PX 14 at 271-76 contains testimony concerning PX 142, and similarly does not support an inference Ripple "market[ed] XRP specifically to speculators," including because Griffin testified he was unsure if this was a finalized plan.  PX 14 at 274:4-12 ("[B]ut there's questions about what's achievable and what's not.  So I'm not really -- when I look at this, I'm not sure what -- where this ends up… Plans -- it seems to be, you know – it's always an iterative process. So it seems to be an iteration of a plan.").

710.   RESERVED.

**Response:**        Defendants object to Paragraph 710 because it is not a purported

statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no

response is required.

711.   Ripple put together its cash budget needs for each year to determine how much
       XRP needed to be sold, and the planned amount of XRP sales was determined by
       how much cash Ripple needed to execute the activities it wanted to achieve in a
       given year, as well as XRP market dynamics, including volume of XRP trading);
       PX 23 (Will Tr.) 58:12-60:22, 210:19-212:4.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 23 including because Paragraph 711 misleadingly

omits additional context necessary to understand the paraphrased testimony, including that

Will further testified that XRP was only one source of funds considered by Ripple, which

also included "fundraising" activities.  *See* PX 23 at 61:4-13.

712.   In or around December 2016, Vias described a plan to move to a "more formulaic
       programmatic sales strategy" based on "average daily XRP price change" that
       would require shifting from a percentage of daily volume target to a daily dollar
       target. PX 274; PX 275.

**Response:**        Disputed.  The quoted language concerning "a more formulaic

programmatic sales strategy" was not written by Vias.  PX 274 at RPLI_SEC 0763300.

Defendants further dispute the SEC's characterization of, and inferences purportedly drawn

from, PX 275, because the cited evidence does not support the SEC's assertions of fact as set

forth in Paragraph 712.  Defendants further dispute that the cited evidence establishes "a

plan" insofar as Vias' email notes that he planned to send "a more detailed proposal" in the

future.  PX 274 at RPLI_SEC 0763300.

        (a)    Vias explained this proposal would "eliminate ambiguity around our XRP
               sales and purchases, both internally and externally." PX 274

**Response:**        Undisputed.

(b)     In response to Vias's proposal, another Ripple employee explained that Ripple needed to balance Vias's proposal with Ripple's cash flow needs, including dollar amounts budgeted for revenues from XRP sales. PX 274.

**Response:**     Undisputed.

(c)     Vias stated that Ripple would determine every week how much XRP needed to be sold per week, and convey that information to the market makers. PX 20 (Vias Inv. Tr.) 56:1-59:18.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 20, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 712(c), as Vias does not testify in the cited transcript range that "Ripple would determine every week how much XRP needed to be sold per week, and convey that information to the market makers," as suggested by the SEC.  Insofar as the SEC intended to cite PX 21, Vias testified that they would email market makers what "we want you guys to sell," PX 21 at 56:9–11, but would not convey what "needed to be sold" as alleged in Paragraph 712(c).  Defendants further dispute Paragraph 690 because the SEC's characterization "how much XRP needed to be sold" is ambiguous, vague, and does not appear in the cited testimony.

713.    For its Institutional Sales, Ripple sold XRP to venture capital firms and other types of "accredited investors" who were "purchasing XRP for speculative purposes." PX 168.

**Response:**     Undisputed that PX 168 contains the quoted text; however, however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 168, including because Paragraph 713 omits additional context necessary to understand the quoted language, because PX 168 further states that "XRP II, LLC does not promote, market or encourage speculative investment in XRP," and rather "Ripple Labs' longer-term strategy for the growth of the Ripple Network primarily focuses on offering payments and settlement services to financial institutions." PX 168 at RPLI_SEC 0001205.

Defendants also incorporate by reference their disputes concerning the use of the SEC's

defined term "Institutional Sales" in response to Paragraphs 614(a) and 789.

714.    In or around January 2017, Ripple told the New York Department of Financial Services that "XRP has limited commercial use and is mainly held as a speculative investment by companies and individuals that expect it to rise in value as the Ripple network expands." PX 47 at RPLI_SEC 0532027.

**Response:**     Disputed.  Defendants do not dispute that PX 47 contains the quoted

text; however, Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, PX 47, including because Paragraph 714 attributes the quoted text to Ripple,

but the text is taken from an Anti-Money Laundering and Bank Secrecy Act audit report

conducted for XRP II, LLC by third party ████████████ and dated September

13, 2016.

715.    Ripple directed GSR to increase XRP sales following an announcement with the purpose of taking advantage of higher sales volume and "tak[ing] more money off the table." PX 276; PX 277 at 2; PX 26 ██ Tr.) at 104:2-106:11 (May 2017 email to market maker explaining desire to "take some serious money off the table on the back of" a Ripple announcement, by selling XRP); *id.* at 73:12-24 (explaining that Ripple set the targets for sales based on needed proceeds);PX 278 (at times when the price of XRP increased, Ripple instructed GSR to extract more U.S. Dollars from the market); PX 6 (Schwartz Dep. Tr.) at 218:5-8 (explaining point of Ripple's sales of XRP was at times just to raise revenue).

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 276 and PX 277, because the cited evidence does not

support the SEC's assertions of fact as set forth in Paragraph 715, as PX 276 is dated May

2017, whereas PX 277 is dated October 2016, and do not refer to the same events.

Defendants further dispute the SEC's characterization of, and inferences purportedly drawn

from, PX 26 at 104:2-106:11, because the quoted language from Paragraph 715 is not

contained within the transcript or the underlying document, PX 277.  Defendants further

dispute the SEC's characterization of, and inferences purportedly drawn from, PX 26 at

73:12-24, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 715, specifically in that the cited testimony states that "in the beginning, the first several weeks or months, we might have -- I think there may have been dollar targets. And then over time, it moved to be a function of the real total trading volume of XRP," not that Ripple set the targets for sales based on needed proceeds.   PX 26 at 73:19-24. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 278, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 715, specifically that the cited evidence does not contain any instruction from Ripple to "GSR to extract more U.S. Dollars from the market," (or any email from Ripple employees whatsoever), but in fact contains two emails from ▮▮▮ to employees at Ripple.  Defendants do not dispute that Schwartz offered the cited testimony from PX 6.

716.   Between late 2013 and the end of 2020, Ripple sold approximately $728.9 million of XRP in Institutional Sales. PX 45 (Ferrante Decl.) Ex. 3.

**Response:**      Disputed.  Defendants object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).  Defendants dispute Paragraph 716 to the extent that its use of the phrase "Institutional Sales" is vague and ambiguous, as the SEC defines "Institutional Sales" in two different ways in their 56.1 Statement (*see* Paragraph 614(a); Paragraph 789).   Defendants further dispute that the figures set forth in Paragraph 716 are accurate, because the SEC defines "Institutional Sales" in Paragraph 614(a) as transactions by which Ripple sold XRP "to large institutional investors, hedge funds, and market makers, through its wholly-owned subsidiary XRP II," but the Ferrante Declaration cited in support of Paragraph 716 arrives at its calculation of "Institutional direct sales" by including

"institutional direct sales, wholesale revenue, and ODL-related sales," which are not identical categories of revenue. *See* PX 45 Ex. 3. Defendants further dispute that the Ferrante declaration sets forth Ripple's accurate revenue figures, insofar as it relies on sources other than Ripple's audited financial statements. Defendants further object pursuant to Fed. R. Civ. P. 56(c)(2) that Exhibit 3 of Ferrante's declaration is inadmissible as a summary within the meaning of Fed. R. Evid. 1006, because (i) the summary is facially not complete (see blank cells for 2017-2020 for information not covered in the market reports) and (ii) does not summarize "voluminous writings . . . that cannot be conveniently examined in court." *See* Fed. R. Evid. 1006. Because the SEC's purported statements of fact premised on Exhibit 3 of Ferrante's declaration are unreliable and potentially misleading, they should be disregarded by the Court. *See U.S. ex rel. Feldman*, 2010 WL 2911606, at *6 ("Rule 1006 does not require the fact finder to accept the information present on the summary charts as true.") (citation omitted); *cf. Ray*, 2022 WL 558146, at *21 ("A chart which for any reason presents an unfair picture can be a potent weapon for harm, and permitting the jury to consider it is error.") (quoting *Conlin*, 551 F.2d at 539).

717.    For its Institutional Sales, Ripple targeted venture capital firms and other types of "accredited investors" who were "purchasing XRP for speculative purposes" and holding it as a "speculative investment" that they "expect[ed] to rise in value as the Ripple network expands." PX 168 at RPLI_SEC 0001203; PX 47 at 10.

**Response:**    Disputed. Defendants dispute Paragraph 717 to the extent that its use of the phrase "Institutional Sales" is vague and ambiguous, as the SEC defines "Institutional Sales" in two different ways in their 56.1 Statement (see Paragraph 614(a); Paragraph 789). The SEC's characterizations in Paragraph 717 are not consistent with the SEC's characterizations in Paragraphs 721 and 737, and Defendants accordingly dispute that Paragraph 717 sets forth an undisputed material fact. Defendants do not dispute that XRP II was formed to sell XRP "to institutional and other accredited investors," but otherwise dispute the SEC's characterizations in

301

Paragraph 717 as unsupported by the evidence.  PX 168 at RPLI_SEC 0001203.  Defendants

further dispute Paragraph 717 to the extent it suggests that Ripple's sales of XRP "targeted" entities

who were holding XRP as a "speculative investment" that they "expect[ed] to rise in value as the

Ripple network expands," as the cited evidence does not support that fact.  *See* PX 47 at RPLI_SEC

0532027 (third party AML Audit Services report describing, without support or citation, its view

on XRP).  Defendants dispute that Ripple knew the intentions or motivations of purchasers of XRP

sold by Ripple, including whether they were speculating as to the price of XRP, because that

information was not necessarily disclosed to Ripple either before or after Ripple's sales.  PX 8 No.

40.

> 718.    "Information Regarding XRP II, LLC's History and Business," a document
> submitted as part of XRP II's application to register as a money services business
> with the State of New York, stated that XRP II's customer base includes "accredited
> institutional investors who are purchasing XRP for speculative purposes" PX 80
> (Ripple Ans.) ¶¶ 19, 105, 166, 235; PX 168.

**Response:**    Disputed.  Defendants do not dispute that that PX 168 is a document titled

"Information Regarding XRP II, LLC's History and Business" and contains the quoted text,

however Defendants dispute the SEC's characterization of, and inferences purportedly drawn

from, PX 168 including because Paragraph 718 omits context necessary to understand the quoted

text, specifically the prefatory statement from the document that XRP II's customer base consists

"*primarily of companies, and in limited cases*, accredited institutional investors who are

purchasing XRP for speculative purposes."  PX 168 at RPLI_SEC 0001205 (emphasis added).

> 719.    An attorney for XRP II wrote to the New York State Department of Financial
> Services: "XRP is not intended to be used as a currency." PX 169.

**Response:**    Undisputed that PX 719 states, in response to a request for "[d]etails of the

amount of digital currency held by XRP II": "XRP II and Ripple consider XRP a digital asset, not

a currency. XRP is used within Ripple as a security mechanism and a liquidity tool. XRP is not

intended to be used as a currency." PX 169 at ECF p. 3.  To the extent the SEC seeks to rely on

this characterization as establishing the appropriate legal characterization of XRP under any legal

regime, Defendants dispute that the statement in question represents anything more than a response

to the New York State Department of Financial Services' question about "the amount of digital

currency held by XRP II."  PX 169 at ECF p. 3.

> 720.  ~~In or around~~ October 2013, Ripple employees met with a group of individuals at ███████████ and expressed interest in "strik[ing] a deal" that included the sale of XRP. PX 14 (Griffin Dep. Tr.) at 89:18-91:22 & PX 53.

**Response:**    Disputed.   Defendants do not dispute that Ripple employees met with

representatives of ██████████ in October 2013 and that, following that meeting, Griffin sent an

email stating that "[t]here are a few areas we can work together but as a first step we want to strike

a deal that includes XRP," PX 53 at ECF p. 2, however Defendants dispute that the cited evidence

establishes that the deal in question necessarily included "the sale of XRP" as the SEC sets forth

in Paragraph 720.  When the SEC asked Griffin whether he worked on behalf of Ripple "to secure

potential deals that included the sale of XRP," he replied "I don't – I don't remember."  PX 14 at

91:11-16.

> 721.  OTC purchasers of XRP included wealthy individuals, investment firms, hedge funds, and market makers. PX 14 (Griffin Dep. Tr.) at 163:2-164:14.

**Response:**    Disputed.   Defendants do not dispute that Griffin offered the cited

testimony, however Defendants dispute SEC's characterizations in Paragraph 721 because they

are not consistent with the SEC's characterizations in Paragraphs 717 and 737, and Defendants

accordingly dispute that Paragraph 721 sets forth an undisputed material fact.

> 722.  Griffin surmised that OTC purchasers bought XRP in connection with "different investment strategies …that a professional investment firm would employ." PX 14 (Griffin Dep. Tr.) at 164:15-166:22.

**Response:**     Disputed.   Griffin testified that he did not know why over-the-counter

("OTC") purchasers bought XRP.  PX 14 at 165:5-22 (repeatedly answering "I don't know" when

asked about the reasons behind OTC purchases of XRP).

> 723.    XRP II sold XRP to companies and accredited institutional investors, at least some
> of whom were buying XRP to "speculat[e] on the value of XRP going up."  PX 14
> (Griffin Dep. Tr.) at 150:8-152:2.

**Response:**        Disputed.  The quoted text does not appear in PX 14, and Griffin

testified that he did not know why OTC purchasers bought XRP.   PX 14 at 165:5-22

(repeatedly answering "I don't know" when asked about the reasons behind OTC purchases

of XRP).  Defendants dispute that Ripple knew the intentions or motivations of purchasers

of XRP sold by Ripple, including whether they were speculating as to the price of XRP,

because that information was not necessarily disclosed to Ripple either before or after

Ripple's sales.  PX 8 No. 40.

> 724.    Rapoport understood that a buyer of approximately $1 million worth of XRP in or
> around September 2014 was an XRP speculator. PX 10 (Rapoport Tr.) at 246:25-
> 248:3.

**Response:**     Disputed.  Rapoport testified that he did not recall the purchaser in question

expressing "what his intent was with – with the XRP he purchased."   PX 10 at 247:10-12.

Rapoport testified solely that his personal understanding was that the buyer was "a speculator."

*Id.* at 247:16.

> 725.    Ripple received inbound requests to purchase XRP, and sold XRP to, funds or
> "professional pools of capital" who were buying XRP for "speculative" purposes,
> "to make money."  PX 21 (Vias Inv. Tr.) at 68:22-70:8.

**Response:**        Disputed.  Defendants do not dispute that Vias testified that Ripple received

inbound requests to purchase XRP and that funds and "[p]rofessional pools of capital" were among

the buyers of XRP, however Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from, PX 21 because Vias testified that he "[didn't] know" why these entities

bought XRP.  *See* PX 21 at 69:24-70:1.  Defendants dispute that Ripple knew the intentions or motivations of purchasers of XRP sold by Ripple, including whether they were speculating as to the price of XRP, because that information was not necessarily disclosed to Ripple either before or after Ripple's sales.  PX 8 No. 40.

726.    In or around mid-2017, Ripple employed an OTC XRP sales strategy to promote speculative activity in XRP. PX 21(Vias Inv. Tr.) at 71:25-76:24.

**Response:**    Disputed.  When asked whether Ripple "work[ed] to encourage speculative trading" or whether Ripple "promote[d] XRP as a speculative investment," Vias replied "No" to both questions.  PX 20 at 177:10-17.

727.    Ripple sold XRP to funds to raise cash and generate additional speculative volume in XRP. PX 21 (Vias Inv. Tr.) at 141:20-142:16,

**Response:**    Disputed.  Defendants do not dispute that Vias testified that Ripple sold XRP to funds "to raise cash," however, Defendants dispute that Vias testified that Ripple "sold XRP to … generate additional speculative volume in XRP."  Vias testified only that Ripple's sales to funds would generate speculative volume, not that doing so was an objective of Ripple's XRP sales to funds.  PX 21 at 141:20-142:4.

728.    In or around 2018, Ripple sold tens of millions of dollars' worth of XRP to ▆▆▆▆▆▆, a hedge fund who purchased XRP, at a discount to the market price, on behalf of a ▆▆▆▆▆ investor, who "end[ed] up just buying [XRP] and selling it and monetizing the discount."  PX 21 (Vias Inv. Tr.) at 168:13-172:20; PX 180.

**Response:**    Undisputed.

729.    Vias believed that Ripple's OTC sales increased XRP's liquidity and speculative trading in XRP. PX 20 (Vias Dep. Tr.) at 50:18-24.

**Response:**    Disputed.  Defendants dispute the SEC's statement that "Vias believed" these facts were true because the SEC asked Vias whether "over-the-counter sales from Ripple increase[d] XRP liquidity," to which he only replied "I think, eventually, it was

helpful." PX 20 at 50:18-20. The SEC also asked Vias whether over-the-counter sales increased speculative trading in XRP, and Vias responded only "I think so." *Id.* at 50:21-24.

730.    Ripple sold XRP to sophisticated entities, and certain of such sales were made at discounted prices. PX 80 (Ripple Ans.) ¶ 107.

**Response:**    Disputed. Ripple does not dispute that it sold XRP to sophisticated entities, PX 80 ¶ 107, but the cited evidence does not establish that certain of Ripple's sales of XRP to sophisticated entities were made at discounted prices.

731.    When pitching an XRP sale of two to three million dollars' worth of XRP to an institutional buyer in or around July 2014, Larsen stated that Ripple was selling "large blocks of XRP," "view[ed] XRP as pretty undervalued," and provided a report "on XRP and Ripple that might be helpful from an investment perspective." PX 58 at ███████ Ripple_0002427.

**Response:**    Undisputed that PX 58 contains the quoted text, exclusive of any alterations, omissions, or additions. Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 58 as misleading. The SEC omits the report and omits that the email chain explains that ████ is "contemplating replicating the ██████████████ [] model for XRP," Ex. 137, RPLI_SEC 0057441, and that the SEC stated publicly that it has determined Bitcoin is not a security.

732.    Ripple was interested in "provid[ing] a vehicle for people to get exposure to the price of XRP," and Rapoport was involved in discussions with a number of firms about a "vehicle which would allow a number of hedge fund investors to get exposure to the price of XRP." PX 10 (Rapoport Tr.) at 174:7-180:13.

**Response:**    Disputed. The cited testimony relates only to Rapoport's "vague and general recollection" regarding transactions that he testified he did not believe "ever move[d] forward." PX 10 at 174:24-175:2. Defendants accordingly dispute that this testimony establishes what "Ripple was interested in" doing at any point in time.

733. In or around April 2016, Ripple proposed to sell XRP in an OTC transaction to a party who had received "a market order" for XRP that it was trying to "fulfill and satisfy." PX 170; PX 14 (Griffin Dep. Tr.) at 173:14-178:4.

**Response:**   Disputed.  PX 170 does not contain any proposal by Ripple to sell XRP to a third party, but only an inquiry by a third party and internal discussions about how to respond to that inquiry.  The cited testimony by Griffin similarly does not establish that a proposal to sell XRP was sent to the third party.  *See* PX 170; PX 14 at 173–178.

734. Rapoport believed that Ripple's OTC sales hurt XRP's market liquidity and price, explaining to one OTC purchaser that "[p]eople buy[ing] from [Ripple] and eventually sell[ing] into the market" "creates a bad price dynamic" and "[i]f Ripple were not selling OTC all this time, the price could probably be way higher." PX 171; PX 10 (Rapoport Tr.) at 248:21-251:13.

**Response:**   Undisputed, except insofar as the SEC altered the quotation from PX 171 by changing "[i]f *we* were not selling OTC all this time" to "[i]f *Ripple* were not selling OTC all this time."  PX 171 at ███████ 0001489 (emphasis added).

735. In or around May 2019, it was clear to Ripple that a large institutional buyer of XRP, ███, was selling its XRP "pretty instantaneously" after receipt, "ie routing 90-95% straight selling to exchanges."  PX 172; PX 92; PX 25 (Madigan Tr.) at 52:16-53:25, 119:10-21, 126:13-127:2.

**Response:**   Disputed.  Undisputed that Madigan testified that, in or around May 2019, she believed a large institutional buyer of XRP ███, was selling its XRP "pretty instantaneously" after receipt.  PX 25 at 119:13-16.  Defendants dispute Paragraph 735 to the extent it suggests this statement "was clear to Ripple" as unsupported by the cited testimony.  Defendants further dispute that the statement "ie routing 90-95% straight selling to exchanges," which is taken from a September 2019 email, was clear to Ripple in May 2019 as suggested by Paragraph 735.  PX 92 at RPLI_SEC 02463382.

736. Some Institutional Sales buyers were buying XRP as brokers, while others simply resold it as part of their trading strategies. PX 173 (Decl. of Karen Zhou, dated August 22, 2022 (Zhou Decl.)) ¶ 8; PX 543 (Decl. of John Harris, dated September 13, 2022) ¶ 9.

307

**Response:**        Disputed.  Defendants dispute Paragraph 716 to the extent that its use of the phrase "Institutional Sales" is vague and ambiguous, as the SEC defines "Institutional Sales" in two different ways in their 56.1 Statement (see Paragraph 614(a); Paragraph 789).  Defendants dispute that the cited evidence establishes that "[s]ome" buyers of XRP did so "as brokers," as alleged in Paragraph 736, because neither of the cited declarations support such the SEC's characterization of the respective entities' activity as "buying XRP as brokers."  Defendants do not dispute that ███████████████ ("████") purchased XRP from Ripple and that "in almost all instances" ███████ subsequently sold the XRP that it purchased as part of ██████ "various trading strategies." PX 173 at ECF p. 4 (Declaration of Keren Zhou).  Defendants do not dispute that ███████ ("████") purchased XRP from Ripple and that ██████ purchased XRP "when engaging in arbitrage trading strategies on digital asset trading platform or in connection with trades facilitated by ██████'s over-the-counter trading desk." PX 543 at ECF p. 2.

737.    Ripple's OTC sales were "sales of XRP to typically digital asset brokers" who contacted Ripple if and when they had an interest in purchasing a certain quantity of XRP. PX 22 (Samarasinghe Tr.) at 46:2-47:2.

**Response:**        Disputed.  The SEC's characterizations in Paragraph 737 are not consistent with the SEC's characterizations in Paragraphs 717 and 721, and Defendants accordingly dispute that Paragraph 737 sets forth an undisputed material fact.  Defendants do not dispute that Samarasinghe offered the quoted testimony, except insofar as the SEC omitted the word "OTC" from the quotation "sales of XRP to typically digital asset *OTC* brokers." PX 22 at 46:6-7 (emphasis added).

738.    Vias discussed with another Ripple employee the possibility of selling XRP to a retail broker who was "interest[ed] in offer XRP to [its] clients ASAP." PX 174.

**Response:**        Disputed.  The SEC mischaracterizes the entity as a "retail broker" when the cited document makes clear that the entity in question is a "retail FX brokerage," meaning an entity that provides access to trading in foreign currencies.  PX 174 at RPLI_SEC 0762086 (emphasis added).  Defendants further dispute Paragraph 738 to the extent the SEC altered the quotation in the document by changing "offering XRP" to "offer XRP."  *Id.*

739.    In October 2018, xRapid, the prior commercial name for the product later known as "On Demand Liquidity" ("ODL"), became publicly available. PX 8, PX 85 (Ripple RFA Responses) Nos. 89, 587.

**Response:**        Undisputed.

740.    ODL facilitated converting one fiat currency (e.g., U.S. dollars) into another fiat currency (e.g., Mexican pesos) by exchanging the first fiat currency for XRP and then using the XRP to purchase the second fiat currency. PX 8 (Ripple RFA Responses) No. 100.

**Response:**        Undisputed.

741.    xRapid was moving into commercial production in or around November 2018, and Ripple did not have any xRapid deals signed until 2018. PX 175; PX 23 (Will Tr.) at 225:4-227:4; PX 176.

**Response:**        Undisputed.

742.    There were 37 xRapid transactions in Ripple's fiscal year 2018. PX 177.

**Response:**        Undisputed.

743.    Ripple's customers who used the ODL product from 2019 through May 2020 were not required to purchase XRP from Ripple. PX 8 (Ripple RFA Responses) No. 94.

**Response:**        Undisputed.

744.    Before approximately May 2020, Ripple did not sell XRP to ODL customers for their use in ODL transactions. PX 8 (Ripple RFA Responses) No. 95.

**Response:**        Undisputed.

745.    From January 1, 2012 through December 22, 2020, Ripple did not sell XRP to MGI, the entity doing business as MoneyGram International.  PX 8 (Ripple RFA Responses) No. 105.

**Response:**        Undisputed.

746.   When Ripple's first xRapid customers began using xRapid in 2018, Ripple did not generate revenues from xRapid.  PX 15 (Birla Dep. Tr.) at 195:14-197:22

**Response:**        Disputed.  The cited testimony does not establish Ripple's revenues from the xRapid product at any time, as Birla testified that his team "was not focused on generating profits or revenue from the product," and that he did not "believe" Ripple generated revenue from xRapid in 2018, PX 15 at 197:7-22, and Defendants accordingly dispute that the cited evidence establishes the facts stated in Paragraph 746.

747.   Prior to Ripple's introduction of Wallet Send (also known as XRP-O or XRP-Origination) ODL customers bought their XRP through crypto exchanges and not from Ripple. PX 17 (Long Tr.) at 144:9-145:17; PX 81 (Garlinghouse Dep. Tr.) at 336:1-7.

**Response:**        Undisputed.

748.   Ripple was not selling XRP to ODL customers as of May 2019.  PX 25 (Madigan Tr.) at 47:17-21.

**Response:**        Disputed.  When asked if Ripple sold XRP "in May of 2019 to ODL customers," Madigan responded, "I don't recall.  I don't think so because it was just getting launched as I was arriving."  PX 25 at 47:17-21.  Defendants dispute that this testimony, which by its terms related solely to the month of May 2019, is sufficient to establish any fact, and specifically insufficient to establish Ripple's activities at all times prior to and during the month of May 2019, as the SEC's characterizations in Paragraph 748 suggests.

749.   Ripple's sales of XRP to "customers who are using it for payment flows" began in the summer of 2020. PX 81 (Garlinghouse Dep. Tr.) at 335:13-336:11.

**Response:**        Undisputed.

750.   In or around September 2020, Ripple made a "de minimis amount of revenue" from xRapid but "th[ought] about the value creation of xRapid as driving the liquidity in the XRP markets." PX 36 (Garlinghouse Inv. Tr.) 110:19-112:22.

**Response:**        Disputed.  Defendants do not dispute that Garlinghouse offered the

quoted testimony, but dispute the SEC's misleadingly selective quotation of the testimony in

Paragraph 750, as Garlinghouse testified in September 2020 that Ripple "charg[ed] fees for

integration" and "fees of getting people launched" in connection with the xRapid product,

and while Ripple "ma[de] de minimis amounts of [revenue] from xRapid directly" at the

time, Ripple viewed "the value creation of xRapid as driving the liquidity in the XRP

markets."  PX 36 at 111:2-16.

751.    Between May and December 2020, Ripple sold XRP to money services businesses
        in connection with ODL, in transactions it called "XRP-O" or "XRP Origination."
        PX 80 (Ripple Ans.) ¶¶ 373, 378; PX 81 (Garlinghouse Dep. Tr.) at 335:13-336:11.

**Response:**        Undisputed.

752.    Ripple publicly described sales of XRP to ODL customers as "over-the-counter
        (OTC)" sales. PX 501.14, *available at* https://ripple.com/insights/q1-2020-xrp-
        markets-report/, PX 501.15, *available at* https://ripple.com/insights/q2-2020-xrp-
        markets-report/, PX 501.16, *available at* https://ripple.com/insights/q3-2020-xrp-
        markets-report/. (1Q20 Report, 2Q20 Report, 3Q20 Report).

**Response:**        Undisputed.

753.    Ripple's CFO stated that "XRPO is just Programmatic/OTC 2.0," explaining that
        Ripple was "selling XRP – but now as part of the 'flow' of ODL" and using the
        sales proceeds to "pa[y] bills or … put it in the bank." PX 181 at RPLI_SEC
        1102142-43.

**Response:**        Disputed.  Defendants do not dispute that Will made the quoted

statements, however dispute the SEC's characterization of the statements in Paragraph 753

because the SEC misleadingly represents Will's statements out of order in a manner that

alters their meaning.  Defendants do not dispute that, as Will stated in PX 181, "when we do

XRPO – we are increasing liquidity by providing a customer … with the ability to source

XRP efficiently – by buying it from us."  PX 181 at RPLI_SEC 1102142.

754.    ODL effects cross-border payments by converting fiat currency in the sender
        jurisdiction into XRP, transferring XRP to the destination jurisdiction, and then

converting XRP to fiat currency in the destination jurisdiction. PX 80 (Ripple Ans.) ¶ 360.

**Response:**   Undisputed.

755.   Ripple does not place any restrictions on what a purchaser of XRP at the destination jurisdiction can do with their XRP. PX 15 (Birla Dep. Tr.) at 219:12-20

**Response:**   Disputed.  Defendants dispute Paragraph 755 to the extent that its use of the phrases "restrictions," "purchaser of XRP," and "destination jurisdiction"  are not defined with particularity or limited temporally.  Defendants do not dispute that, in a standard ODL transaction, XRP is converted to fiat currency in the destination jurisdiction via a transaction on a digital asset exchange that does not result in any contract or other agreement of any kind between Ripple and the purchaser that would impose obligations or restrictions on Ripple or the purchaser.  *See* PX 15 at 219:12-20.

756.   ODL transactions can take 90 seconds or less. PX 80 (Ripple Ans.) ¶ 360.

**Response:**   Undisputed.

757.   ODL transactions can take place "in as little as three seconds."  PX 11 (Osler Rep.) ¶ 44.

**Response:**   Undisputed.

758.   At least two of Ripple's top four ODL customers received incentives from Ripple. PX 15 (Birla Dep. Tr.) at 237:21-240:14.

**Response:**   Disputed.  Defendants dispute Paragraph 758 because it does not define what metric by which Ripple's "top four ODL customers" would be ranked or determined, and Defendants are accordingly unable to fairly respond to the SEC's characterizations.  Defendants further dispute that the cited evidence establishes the SEC's allegation of fact in Paragraph 758, because Birla repeatedly testified that he did not "know for certain" which of Ripple's ODL customers received incentives. PX 15 at 237:21-240:14.

759.   In contrast to a typical ODL transaction, in which the net XRP introduced into the market is zero, in XRP-O, the amount of XRP that is introduced into the market is the size of the payment, resulting from the sale of the XRP (purchased from Ripple) for fiat currency at the destination exchange. PX 22 (Samarasinghe Tr.) at 238:7-241:1.

**Response:**      Disputed.  Defendants dispute that the SEC's characterizations in Paragraph 759 are accurate "in XRP-O" without further specificity, however Defendants do not dispute that, in an XRP-O transaction, the net XRP introduced into the market is the amount of XRP sourced from Ripple via XRP-O.

760.   In the version of ODL "where the XRP comes from Ripple wallets," this "represents straight selling of XRP and pure supply increase of XRP into the open market." PX 182 at RPLI_SEC 0502502.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of Paragraph 760 and the quoted statements insofar as they suggest that the "version of ODL" in question was available to the public, because Samarasinghe's quoted statements from January 2020 related solely to a hypothetical "Phase 3 ODL origination" product.  PX 182 at RPLI_SEC 0502502.

761.   In contrast to the version of ODL that was "XRP neutral," Ripple's use of XRP-O "start[ed] increasing the supply of XRP." PX 26 (█ Tr.) at 177:7-182:15.

**Response:**      Disputed.  Defendants do not dispute that █ offered the quoted testimony, however, Defendants dispute that XRP-O increased the supply of XRP and further dispute the SEC's characterizations in Paragraph 761 to the extent that they conflict with the SEC's other statements of fact, including Paragraph 20 ("the 100 billion XRP created was a fixed, finite supply") and Paragraph 25 ("[t]he long-term supply of XRP is limited to the 100 billion already in existence").

762.   Before Ripple implemented "XRP-O," it worried that the resulting resales of XRP could negatively impact the XRP markets. PX 443 at RPLI_SEC 0479912; PX 22 (Samarasinghe Tr.) at 238:7-241:1, 270:3-270:13; PX 182 at RPLI_SEC 0502502; PX 25 (Madigan Tr.) 355:12-362:1; PX 183 at RPLI_SEC 0302048.

313

**Response:**          Disputed.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 443, PX 22, PX 182, and PX 183 to the extent Paragraph 762 suggests that Ripple as an entity "worried" about anything, which characterization is not supported by the cited evidence.   Defendants further dispute Paragraph 762 to the extent it characterizes all of the cited evidence as relating to the time "[b]efore Ripple implemented 'XRP-O,'" because the cited exhibits (and the associated testimony) are from different timeframes.

763.   After XRP-O launched, Ripple remained concerned that XRP-O sales could hurt the XRP market. PX 81 (Garlinghouse Dep. Tr.) at 483:22-484:6.

**Response:**          Undisputed that Garlinghouse offered the cited testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81, including because Paragraph 763 omits additional context necessary to understand the testimony, including that Garlinghouse also testified that Ripple has always been concerned about interfering with the XRP markets generally, as set forth in PX 81 at 483:25-484:6 ("We … always had the concern that we don't want to impact the market, the XRP markets.").

764.   Ripple's head of XRP markets sent a presentation to Garlinghouse stating that "XRP selling via XRP-O has led to negative pressure on XRP" and that XRP's underperformance compared to Bitcoin "has accelerated with the launch of XRP-O." PX 184 at RPLI_SEC 0301745.

**Response:**          Undisputed.

765.   Because of its concerns about the impact of sales of XRP in connection with XRP-O on the XRP market, Ripple decided to execute purchases of XRP in the market. PX 22 (Samarasinghe Tr.) 268:3-273:8.

**Response:**          Disputed.   Defendants do not dispute that Ripple, at times, purchased XRP from the open market, however dispute the SEC's characterizations in

Paragraph 765 that these purchases occurred "because of" any "concerns," because the cited evidence does not establish that fact, in particular because Samarasinghe testified that he was not present at any meeting at which the topic was discussed.  PX 22 at 269:23-25.

766.    Larsen and Garlinghouse were concerned that selling XRP to ODL customers could negatively affect XRP markets. PX 185 at RPLI_SEC 0504550, 52; PX 184.

**Response:**         Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 184 and PX 185.  PX 185 makes it clear only that other Ripple employees thought that it "seem[ed] like" Larsen and Garlinghouse were "concerned," PX 185 at RPLI_SEC 0504550, and Larsen is not on PX 184.

767.    Garlinghouse sent a presentation he received from Ripple's head of XRP markets addressing "XRP-O Supply Concerns" to Larsen. PX 186.

**Response:**         Undisputed.

768.    Larsen gave "an almost directive" to Garlinghouse that Ripple start buying back XRP. PX 185 at RPLI_SEC 0504551.

**Response:**         Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 185.  It was the interpretation of other Ripple employees, not a quote from Larsen.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 185 to the extent the SEC implies the buy-back was contemplated anywhere other than one exchange, Bitso.  PX 185 at RPLI_SEC 0504551.

769.    In or around June 2020, Garlinghouse reached out to the head of XRP markets regarding his concerns about new XRP supply in the market related to XRP-O. PX 184.

**Response:**         Disputed because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 769 that Garlinghouse reached out to the head of the XRP markets regarding his concerns about new XRP supply in the market. The exhibit

contains no communication from Garlinghouse but only an email from the head of XRP markets to Garlinghouse, which cannot establish what Garlinghouse did or thought. Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, PX 184 to the extent it implies anything about whether Garlinghouse read this email, what he understood it to mean, or what, if any, reaction he had to it, since the exhibit contains no communication from Garlinghouse.

770.   Ripple instructed GSR to make purchases of XRP on digital asset trading platforms in 2020. PX 85 (Ripple RFA Responses) No. 566.

   **Response:**   Undisputed.

771.   Ripple purchased approximately $45.55 million in XRP during the third quarter of 2020. PX 80 (Ripple Ans.) ¶ 220.

   **Response:**   Undisputed.

772.   Ripple engaged GSR to purchase XRP on its behalf.  PX 26 (█Dep.) 177:7-182:15.

   **Response:**   Undisputed.

773.   A GSR employee believed that Ripple wanted to purchase XRP to counteract the price impact of additional supply of XRP being introduced to the market by XRP-O.  PX 26 (█Dep.) at 177:7-182:15.

   **Response:**   Disputed. █testified during his deposition that Ripple did not disclose its purpose for engaging GSR to purchase XRP and he could only speculate. *See, e.g.*, PX 26 at 178:7-10 ("[T]here are multiple reasons. I don't know what was going through Ripple's – they didn't tell me specifically why."); *id.* 179:21-23 ("Again, it's speculation on my part because I wasn't told, this is why we're doing the buyback program....").

774.   In or around July 2020, Ripple Labs Singapore Pte. Ltd. entered into a master purchase agreement with GSR Markets Pte. Ltd., which stated the purpose of the agreement was that Ripple Labs Singapore Pte. Ltd. "may seek to purchase XRP from [GSR Markets Pte. Ltd.] to offset amounts of XRP that [Ripple Labs Singapore Pte. Ltd.] is selling to its own customers for their use in cross board

payments via [Ripple Labs Singapore Pte. Ltd.]'s On Demand Liquidity product. PX 187.

**Response:**     Undisputed that PX 187 contains the quoted text, except for any alterations, omissions, or additions by the SEC, including that the original text refers to "use in cross bord**er** payments."  PX 187 at RPLI_SEC 878012.

775.     In or around July 2020, Ripple executed a trial period of XRP purchases in which it bought back 100% of the XRP volume that it sold in connection with XRP-O. PX 188.

**Response:**     Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 188 as misleading to the extent Paragraph 775 suggests that Ripple "bought back" any XRP that had been sold in connection with XRP-O, which characterization is not supported by the cited evidence.  *See* PX 188 at RPLI_SEC 0301861.

776.     Ripple's plan to purchase XRP to offset the market impact of sales related to XRP-O entailed "balancing three primary concerns," including "corp cash needs" and "stability of XRP."  PX 190.

**Response:**     Disputed.  The document cited by its terms contains only "XRP Purchases + XRPO Preliminary Observations and Recommendations" and Defendants accordingly dispute the SEC's characterization in Paragraph 776 that the quoted sentences relate to "Ripple's plan to purchase XRP to offset the market impact of sales related to XRP-O," as the cited evidence does not establish that such a plan existed as of July 21, 2020 (the date of the document in PX 190), or that the "three primary concerns" identified in the document related to such a plan.  *See* PX 190.

777.     Garlinghouse called Ripple's head of XRP markets and asked her team to consider the option that Ripple purchase XRP to address supply concerns related to XRP-O. PX 25 (Madigan Tr.) 359:23-364:10.

**Response:**      Disputed because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 777 that Garlinghouse called the head of XRP markets rearding any concerns, because PX 25 is at most a secondhand account from another Ripple employee of what Garlinghouse allegedly did and thought.

778.   Garlinghouse, who had spoken about the topic to Larsen, made the decision to launch Ripple's XRP purchase program in or around July 2020. PX 25 (Madigan Tr.) 359:23-364:10, 370:10-371:2.

**Response:**      Disputed because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 778 that Garlinghouse made the decision to launch Ripple's "XRP purchase program" and had spoken about it to Larsen. The exhibit is at most a secondhand account from another Ripple employee of what Garlinghouse allegedly did and thought. In addition, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 25, including because, to the extent the testimony is credited, Paragraph 778 omits additional context necessary to understand the cited testimony, including that the decision to launch the purchase program was made by "Brad," "legal," and "a bunch of people were involved"; and even though "Brad mentioned he spoke with Chris" the deponent did not know "the extent to which Chris was involved in the decision," as set forth in PX 25 at 363:19-364:2.

779.   Ripple disclosed its purchases of XRP that began in or around July 2020 in its XRP markets reports. PX 25 (Madigan Tr.) 364:3-17.

**Response:**      Undisputed.

780.   Ripple stated in its second quarter 2020 XRP markets report:  "As more financial institutions leverage RippleNet's ODL service, more liquidity is added into the XRP market. That said, Ripple has been a buyer in the secondary market and may continue to undertake purchases in the future at market prices." PX 501.15, *available at* https://ripple.com/insights/q2-2020-xrp-markets-report/ (2Q20 Market Report).

**Response:**      Undisputed.

781.    Ripple stated in its third quarter 2020 XRP markets report: "Ripple is purchasing – and may continue to purchase – XRP to support healthy markets." PX 501.16, *available at* https://ripple.com/insights/q3-2020-xrp-markets-report/ (3Q20 Market Report).

**Response:**    Undisputed.

782.    In or around November 2020, Ripple employees were worried about a customer's request to double the volume of XRP purchased from Ripple for XRP-O. PX 189.

**Response:**    Disputed.  The document cited does not establish that any Ripple employee was "worried" about any fact or circumstances.  *See* PX 189.  To the extent PX 189 discusses "doubl[ing] ███████████ wallet send volume from $██ to $██ per week," that statement was made by a Ripple employee about what "[w]e're looking to" do, and Defendants accordingly further dispute that the cited evidence establishes that "a customer's request" of any kind.  *Id.* at RPLI_SEC 0505412.

783.    A GSR official believed it was possible that Ripple had told him that Ripple's purpose in purchasing XRP was to stabilize XRP's price. PX 26 (██ Tr.) 90:6-8.

**Response:**    Disputed.  In response to the SEC asking whether Ripple ever disclosed its purpose in purchasing XRP, ██ testified "I don't recall." *See, e.g.*, PX 26 at 91:22-92:1.  Defendants further dispute Paragraph 783 because ██ testified during his deposition that Ripple did not disclose its purpose for engaging GSR to purchase XRP and he could only speculate. *See, e.g.*, PX 26 at 178:7-10 ("[T]here are multiple reasons.  I don't know what was going through Ripple's – they didn't tell me specifically why."); id. 179:21-23 ("Again, it's speculation on my part because I wasn't told, this is why we're doing the buyback program….").

784.    Ripple's purchases and sales of XRP were part of its efforts to have and maintain "fair and orderly markets" in XRP. PX 26 (██ Tr.) 90:6-25, 131:14-132:8.

**Response:**    Disputed.  Defendants dispute Paragraph 784 because the testimony of a third party is insufficient to establish Ripple's purpose or goals in taking any action.

Defendants further dispute that Ripple undertook "efforts," to the extent the SEC's characterization in Paragraph 784 is intended to suggest a legal conclusion. Defendants further dispute the SEC's characterization in Paragraph 784 because ██ testified that "[w]e tried to have fair and orderly markets," PX 26 at 90:19, and "[w]e're trying to maintain fair and orderly markets during this time," PX 26 at 131:21-22, and the testimony does not establish that ██ meant "Ripple" when he said "we".

785.   Ripple publicized its efforts to maintain orderly markets for XRP in its quarterly XRP markets reports. PX 26 (██ Tr.) 167:17-25.

**Response:**      Disputed. Defendants dispute Paragraph 785 because the testimony of a third party is insufficient to establish Ripple's purpose or goals in taking any action. Defendants further dispute Paragraph 785 because it is unsupported by the cited evidence, specifically because when asked "Were Ripple's efforts publicly known -- Ripple's efforts to maintain orderly markets for XRP publicly known, as far as you're concerned?" ██ answered (following the objection of counsel for both GSR and Ripple) that "Ripple published a – I believe a quarterly report where they summarized their activities as way of being transparent. So if that's what you mean, then yes." PX 26 at 167:17-25.

786.   Investors took note of Ripple's repurchases as something that could "increas[e] demand and therefore price." PX 440, *available at* https://www.reddit.com/r/Ripple/comments/i3r0o2/no_one_is_talking_about_the_fact_that_ripple_is/; PX 191.

**Response:**      Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 440 and PX 191, to the extent they imply that a single statement by an anonymous third party is a statement by an investor or multiple investors in any asset, as that characterization is not supported by the cited evidence. Defendants further dispute Paragraph 786 to the extent it suggests that a single statement by an anonymous third party stating a view of Ripple's repurchases represented a view by more than one person or

the view of "[i]nvestors" in any asset, as that characterization is not supported by the cited evidence. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

787.   In order for the providers to effect cross border transactions, however, the XRP utilized by ODL customers had to be sold into the market for fiat—immediately, without the providers having any economic exposure to XRP.

**Response:**   Defendants object that Paragraph 787 does not comply with Local Civil Rule 56.1(d) because it is not followed by citation to evidence which would be admissible, as required by Fed. R. Civ. P. 56(c). For the avoidance of doubt, although no response is required to Paragraph 787, Defendants dispute the SEC's characterizations in Paragraph 787, including because it is unbounded temporally; does not define "the providers" or the "cross border transactions" at issue; and accordingly is not an accurate statement of fact.

788.   As ████████ explained in an engineering all hands meeting in 2020 in the context of these cross-border transactions: "So, initially, receivers of XRP right now, the feedback that we're getting is they don't -- their risk teams don't want them to hold XRP on their balance sheets, so they're going to want to immediately sell XRP on open order books once it lands in their exchange account, or within their wallet." PX 192 (transcript lines 4-12).

**Response:**   Disputed insofar as Paragraph 788 is vague and ambiguous as to "the context of these cross-border transactions," but Defendants do not dispute that ████ made the quoted statement, which appears at PX 192 at 24:20–25:1.

789.   From 2013 to 2020, Ripple sold XRP purchasers in bulk quantities (through its wholly-owned subsidiary XRP II) in its "Over the Counter" program using a variety of different contracts with a variety of discounts and/or commission structures ("Institutional Sales"). PX 80 (Ripple Ans.) ¶ 107.

**Response:**   Undisputed that XRP II, LLC was a wholly-owned subsidiary of Ripple Labs Inc. that executed "a variety of different contracts" with different purchasers of

XRP.  To the extent the SEC purports to suggest in Paragraph 789 that Ripple sold XRP to certain purchasers in "bulk" or at a "discount," Defendants dispute Paragraph 789 because each contract contains particular terms with particular purchasers who bought XRP from XRP II, each of whom did so for their own reasons, including to lend or engage in market making activity in XRP and on behalf of their own customers.  PX 20 at 46:15-20; PX 14 at 165:23-166:22.  Defendants further dispute that the quoted text appears in PX 80 or that Ripple had an over-the-counter sales "program" as opposed to merely engaging in over-the-counter sales that were unique to their circumstances.  PX 20 at 46:8-48:1.  Ripple's over-the-counter sales involved different entities, contract types, discounts, and quantity thresholds over time.  PX 20 at 46:8-11, 47:7-9, 47:18-22; PX 14 at 156:24–157:9.  Defendants further dispute Paragraph 789's definition and use of the defined term "Institutional Sales," to the extent that its use of the phrase is vague and ambiguous, because it competes with another use of the same defined term in Paragraph 614(a), and Paragraph 789's purported definition is unclear as to whether the phrase is limited to 2013-2020 sales, or only to sales "in its 'Over the Counter' program" and/or those "using a variety of different contracts with a variety of discounts and/or commission structures."

790.  Institutional Sales purchasers who bought XRP from Ripple at a price discounted from then-prevailing market prices had an incentive to resell that XRP in the market. PX 279 at RPLI_SEC 1077339 (Samarasinghe discussing that Ripple's sales of XRP at a ▮% discount to ▮, stating that ▮ "absolutely … dump[s] [the XRP] into the market").

**Response:**        Disputed.  Defendants do not dispute that PX 279 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.  Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants further dispute that all "Institutional Sales

purchasers," however defined, had uniform and consistent "incentives" under each of their distinct purchase-and-sale contracts with Ripple, and the SEC's cited evidence of one employee's impression of one purchaser of XRP does not establish the fact as set forth in Paragraph 790.

791.   Ripple also made Institutional Sales to resellers who bought XRP from Ripple at the market price and received ███ % of commissions on these purchases. PX 280 at RPLI_SEC 0259410 (calling ███ control person of one such bulk buyer and whole reseller a "selling agent."); PX 281 at RPLI_SEC 0957364-RPLI_SEC 0957368 (discussing how resellers dump XRP into the market and Larsen proposal to "pay wholesalers a ██ % commission on all purchases (whether resold or not) at month end)."); PX 290 at RPLI SEC 0304133 (████████ July 21, 2014 Side letter for ██ % commissions); PX 291 at RPLI_SEC 0676720-721 (████████ July 14, 2014 Side Letter for ██ % commissions).

**Response:**   Disputed.   Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 280 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 791, specifically that the cited evidence does not specify a commission or delineate all the final conditions of the discussed XRP sale. Moveover, the SEC inaccurately quotes the document, imposing the term "selling agent" when the document reads "sales agent."  Similarly, Paragraph 791 sets forth a legal conclusion or assertions unsupported by citations to evidence, including the SEC's statement that the correspondent in PX 280 was the "control person" of the entity purchasing XRP.

792.   Certain Ripple Institutional Sales contracts provided that the Institutional Sales purchaser was obligated to indemnify Ripple for any claim or loss based on the Purchaser's "use, distribution or resale of the Purchased Ripple Currency." PX 282 at RPLI_SEC 0188059- RPLI_SEC 0188071 (June 10, 2017 ████████ Purchase Agreement (████████ to indemnify Ripple); PX 283 at RPLI_SEC 0373425-442 (Oct. 12, 2017 ████████ Financial Purchase Agreement (same)); PX 284 at RPLI_SEC 0208928-942 (Feb. 22, 2018 ████████ Purchase Agreement

(same)); PX 285 at RPLI_SEC 0233556-568 (Aug. 6, 2018, ████ Purchase Agreement (same)).

**Response:**      Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not dispute that PX 282, PX 283, PX 284 and PX 285 contain the quoted text, exclusive of any alterations, omissions, or additions by the SEC, including that some of the contracts refer to "Purchased XRP" rather than "Purchased Ripple Currency."

793.   Certain Ripple Institutional Sales contracts provided that the Institutional Sales purchaser was buying XRP "solely to resell or otherwise distribute the Purchased Ripple Currency to Purchasers, and not to use the Purchased Ripple Currency as an End User or for any other purpose." PX 286 at RPLI_SEC 0329661-665 (Bitstamp Mar. 6, 2013 Invoice signed by Larsen); PX 287 at RPLI_SEC 0891636-640 (████ ████ Apr. 25, 2014 Invoice signed by Larsen); PX 288 at RPLI_SEC 0891241-245 (████████ Jan. 30, 2015 Invoice signed by Larsen).

**Response:**      Disputed.  Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not dispute that PX 286, PX 283, PX 287 and PX 288 contain the quoted text.

794.   Certain Ripple Institutional Sales contract provided that any resale of purchased XRP must be ██████████████████████████ *E.g.*, PX 289 at RPLI_SEC 0891065.

**Response:**      Disputed.  Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants further dispute Paragraph 794 to the extent the SEC seeks to imply that more than one "contract" contained the asserted term, since such an implication is not supported by the cited evidence, which is a single contract.

795. ███████████████ is an entity to which Ripple made Institutional Sales of XRP (through XRP II) between 2014 and 2016, at times at a ██████ % discount from then-prevailing market prices, and other times in exchange for a resale commission to ████████ paid in U.S. Dollars or XRP.  PX 292 at RPLI_SEC 0965535 XRP Wholesale Orders  (XRP Wholesale Orders 2014 final; XRP Wholesale Orders 2015; XRP Wholesale Orders 2016);  PX 293 at RPLI_SEC 0052953 (December 3, 2014 email describing discount and commissions owed to █████████ based on its XRP purchases); PX 294 at RPLI_SEC 0891070 (May 29, 2015, ████████████████████████ and Chris Larsen on behalf of Ripple purchase letter providing ███ % commissions on ████████ monthly purchases of XRP and requiring █████████ to resell at or below ██████ % of then-prevailing market price); PX 295 at RPLI_SEC 0609706-710 (June 2015 purchase order noting █████████ is purchasing XRP "to resell or otherwise distribute"); PX 292 at RPLI_SEC 0965535 XRP Wholesale Orders (XRP Wholesale Orders 2014 final; XRP Wholesale Orders 2015; XRP Wholesale Orders 2016).

**Response:**    Disputed.  Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not dispute that Ripple sold XRP to ███████████████ between 2014 and 2016, at times at a discount from then-prevailing market prices, and other times in exchange for a resale commission to █████████ paid in U.S. Dollars or XRP

796. Ripple received at least $███████████ from ██████████ and paid ████████ at least $██████.  PX 296  at lines 21, 23, 25-31, 33-40, 43, 45, 47, 52, 74-79, 80, 82-83, 86-90, 93-97, 99-102, 104, 107-116, 118-119, 121-123, 125-128, 130-132, 134, 136-37, 140, 142-145, 148-155, 157, 159-160, 162, 164-166, 168, 170-172, 174, 177-181, 183-185, 187, 191-194, 199-200, 206).

**Response:**    Undisputed that Ripple received at least $█████████ from ████████████ and paid at least $████████ to ████████████; however, Defendants dispute the SEC's characterization of PX 296 because the exhibited document does not contain numbered rows.

797. ████████████████ is an entity to which Ripple made Institutional Sales of XRP (through XRP II) between 2013-2015, at times at a discount from then-prevailing market prices between ██████ % and other times in exchange for a resale commission to ████████ paid in U.S. Dollars or XRP, through at least 85 sales invoices. PX 292 at RPLI_SEC 0965535 XRP Wholesale Orders  (XRP Wholesale Orders 2014 final; XRP Wholesale Orders 2015); PX 292 at RPLI_SEC 0965535 XRP Wholesale Orders (XRP Wholesale Orders 2014 final; XRP Wholesale Orders

2015); PX 298 at RPLI_SEC 0328194-195 (October 29, 2013 email documenting payment of ▮% commission in exchange for ▮▮▮▮▮▮▮▮ XRP purchases); PX 299 at RPLI_SEC 0890994 (July 21, 2014, ▮▮▮▮▮▮▮▮ to receive monthly a commission of ▮% on total monthly purchases).

**Response:**      Disputed.   Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not dispute that Ripple sold XRP to ▮▮▮▮▮▮▮▮ between 2013 and 2015, at times at a discount from then-prevailing market prices, and other times in exchange for a resale commission to ▮▮▮▮▮▮▮ paid in U.S. Dollars or XRP.

798.    In April through June 2015, Ripple received at least $▮▮▮ from ▮▮▮▮▮▮▮ and paid ▮▮▮▮▮ it at least $▮▮▮ PX 296 at lines 56, 59-60, 62-64, 66-67, 69-73, 81, 84-85.

**Response:**      Undisputed that Ripple received at least $▮▮▮ from ▮▮▮▮ and paid at least $▮▮▮ to ▮▮▮▮▮; however, Defendants dispute the SEC's characterization of PX 296 because the exhibited document does not contain numbered rows.

799.    Larsen understood that ▮▮▮▮▮▮ was buying XRP from Ripple to resell it, emailing the company's CEO on July 26, 2013: "As I understand Bitstamp's retail price from their site, looks like they sell at a ▮% premium or so. We would entertain a ▮% discount from the market price—that would give you a ▮% mark up total." PX 297 at RPLI_SEC 0328631-636.

**Response:**      Defendants do not dispute that the quotes text appears at PX 297 at RPLI_SEC 0328631-636.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 297 as misleading to the extent it characterizes Larsen as understanding "that ▮▮▮▮▮▮ was buying XRP from Ripple to resell it."  The text of the document itself reveals that the goal was for ▮▮▮▮▮ "to become a Gateway" PX 297 at RPLI_SEC 0328631 and Larsen testified that he understood ▮▮▮▮▮ "to the best of [his] understanding is equivalent to an exchange or fund." Ex. 8 at 151:11-17.

800.  Ripple at times used "XRP Purchase Agreements" to make Institutional Sales of XRP (through XRP II), specifying that the XRP could not be transferred or resold within a set period of time, or limiting resales to amounts relating to the XRP trading volume. PX 300 at RPLI_SEC 0000626-631 (limiting resales by ██████████ for ██████ in exchange for ██% discount and then for limiting resales to ██% of average daily trading volume); PX 301 at RPLI_SEC 0609541-556 (██████████ agreement with six month lockup and then resales limited to ██% of average daily trading volume).

**Response:**     Disputed.   Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not dispute that certain of Ripple's XRP Purchase Agreements included provisions that prohibited resale of the purchased XRP for specific periods of time, and limits on resale based on overall XRP market volume.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 300 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 800, specifically that resale limitations were "in exchange for a ██% discount," because the cited evidence does not establish that one contractual term was provided "in exchange for" any other.

801.  Certain "XRP Purchase Agreements" specified that the resale restrictions would be determined when the Purchaser submitted the required form called "XRP II Summary of XRP Purchase." Such forms as submitted specifically indicated that the XRP being purchased was not subject to any resale lockup or restriction. *Compare, e.g.,* PX 302 at RPLI_SEC 0233556-568 (██████ Master Purchase Agreement stating that lockup and resale restriction to be determined in Summary of XRP Purchase form) *with* PX 303 at SEC-██████████-E-0000673 (██████ Summary of XRP Purchase form stating there is no lockup or resale restriction on purchased XRP); PX 304 at RPLI_SEC 0208928-942 (██████████ Master Purchase Agreement) *with* PX 305 at RPLI_SEC 0172196-197 (██████ Summary of XRP Purchase); PX 306 at RPLI_SEC 0000608 (June 20, 2017 ██████████ Summary of XRP Purchase Order); PX 307 at RPLI_SEC 0000608 (Feb.12, 2018 ██████████ Summary of XRP Purchase Order).

**Response:**     Undisputed.

802.  A Ripple employee explained in an email to one of the Institutional Sales buyers that the omission of resale restrictions was deliberate, and that though the XRP

Purchase Agreements "reference[] lockups and trading restrictions, we will specify that there are none on the actual order confirmations. We just like to have the terms defined in the agreement." PX 308 at RPLI_SEC 0108630.

**Response:**        Disputed.    Defendants dispute that the SEC's use of the term

"Institutional Sales" sets forth a fact that can be responded to with particularity, given the

SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not

dispute that PX 308 contains the quoted text, exclusive of any alterations, omissions, or

additions.    Defendants further dispute that a single example suffices to establish the

unqualified fact set forth in Paragraph 802 that "the omission of resale restrictions was

deliberate" in any instances other than the transaction referenced in PX 308.

803.    By selling XRP without lockups or resale restrictions, Ripple understood and
        facilitated the purchaser's ability to further distribute XRP. PX 309 at RPLI_SEC
        0926193- RPLI_SEC 0926194 (Vias telling Garlinghouse that "as business matter
        it is BD's position not to include our usual transfer restrictions in this agreement
        with ██████████ and, instead, to rely on ██████████ own lock-up policies. Note
        that ██████████ is free revise/remove its internal policies any time, and there may
        be market conditions where a massive sale of XRP may be in ██████████ s best
        interests."); PX 310 at RPLI_SEC 0389883-895 (September 18, 2017 final
        agreement and side letter between Ripple and ██████████ providing ██ % discount
        and no resale restrictions).

**Response:**        Disputed.    Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 309 and PX 310 because the cited evidence does not

support the SEC's assertions of fact as set forth in Paragraph 803.  Specifically, Ripple did

not negotiate concerning the third party's subsequent business activities and the business

agreement between Ripple and third parties therefore neither "facilitate[]" nor hindered the

third party's activities.  Defendants further dispute that the cited evidence suffices to establish

the unqualified fact set forth in Paragraph 803 as to "the purchaser's ability to further

distribute XRP" in all circumstances.

804.    On or about August and September 2018, Ripple sold more than $83 million of XRP to a U.S. based purchaser, ███████████████, in 18 transactions at a ██% discount.

**Response:**    Disputed, including but not limited to because Paragraph 804 does not comply with Local Civil Rule 56.1 insofar as it is unsupported by any citation to evidence.

805.    On August 2, 2018, Vias informed Garlinghouse that "████████████ would like to purchase $30M worth of XRP over the next 30 days at a █% discount." PX 311 at RPLI_SEC 0131475.

**Response:**    Undisputed.

806.    ██████████ Institutional Sales purchases of XRP in fact was on behalf of another entity, ███████████, with ███████ retaining █% of the discount as a commission. *See* PX 312 at SEC-████-E-0000355; PX 313 at SEC-████-E-0000576-597 (chat between █████ and █████ in which █████ promises that upon receipt of XRP from Ripple, █████ would "send immediately to your address.").

**Response:**    Disputed.   Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not dispute that PX 313 contains the quoted text, exclusive of any alterations, omissions, or additions.  Defendants lack independent knowledge sufficient to establish the facts set forth in Paragraph 806 as to agreements or conversations between two third parties.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 312 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 806, including because the cited evidence does not establish an agreement between █████ and "█████."

807.    On August, 6, 2018, █████ signed a subscription agreement for $█ for the issuance of Class A limited partnership interest in ████████ and █████ signed a master purchase agreement with Ripple. PX 302 at RPLI_SEC 0233556; PX 314 at SEC-████-E-0000111.

**Response:**        Undisputed as to ███████ agreement with Ripple; Defendants otherwise lack independent knowledge sufficient to establish the facts set forth in Paragraph 807 as to activities between two third parties.

808.    Between August and September 2018, ███████ sent funds to ███████ who used those funds to purchase XRP from Ripple, and sent the purchased XRP to ███████ keeping █% of the purchased XRP as arranged with ███████ *See* PX 313 at SEC-███████E-0000576-597; PX 315 at SEC-███████-E-0000635-669 (same)

**Response:**        Defendants lack independent knowledge sufficient to establish the facts set forth in Paragraph 808 as to activities between two third parties.

809.    None of the 18 forms executed by Ripple and ███████ contained any lockups or resale restrictions with respect to XRP. PX 316 (composite exhibit).

**Response:**        Undisputed that the receipts and summaries of XRP purchases contained in PX 316 do not contain lockup or resale restrictions.

810.    Garlinghouse and Larsen knew about and reacted favorably to ███████ purchases. PX 317 at RPLI_SEC 0221269 (Ron Will informed Garlinghouse that ███████ was wiring $9.2 million to execute his purchase, and Garlinghouse Responding "wow. Nice."); PX 318 at RPLI_SEC 0221297 (Garlinghouse informing Larsen that ███████ had purchased $10m of XRP over the past two days, and Larsen responding "That's good.").

**Response:**        Undisputed that the quoted text appears in PX 318 and PX 317. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 317 and PX 318, including to the extent the SEC implies that Larsen and Garlinghouse were involved with coordinating the sale, PX 317 and PX 318 do not support that proposition.

811.    On August 20, 2018, Vias informed Garlinghouse that ███████ wanted to purchase another $30 million of XRP at the same █% discount. Garlinghouse discussed with Ripple CFO Ron Will what signal these sales would send to the market in the upcoming Q3 XRP Markets Report, and Will responded: "We can spin this positively in talking about institutional investors showing increased interest in XRP in Q3," and that "Given the volatility in the space, I think that this validation will play well and gives us the ability to lower the programmatic % if we chose at quarter-end (which I would recommend)." PX 319 at RPLI_SEC 0200421.

**Response:**        Undisputed.

812.    On August 29, 2018, Vias informed Garlinghouse that ███████ wanted to purchase another $30 million of XRP which "would put total ███████ purchases at $83.7M and total XRP sales at $120M for Q4," and recommended immediately halting programmatic trading until Q4 which for Q3 "would leave our programmatic sales percentage at 12.4bps, approximately the same as the previous quarter," and Garlinghouse forwarded the email to Larsen who responded "That's great!" PX 320 at RPLI_SEC 0221255.

**Response:**        Undisputed.

813.    By mid-September 2018, Ripple observed an uptick in XRP trading volume surrounding ███████ purchases. PX 321 at RPLI_SEC 0261049 (Samarasinghe tells Will that "Large spikes of [Bitfinex] volume share correspond to ███████ ███████ purchases."); PX 322 at RPLI_SEC 0053327 (Samarasinghe tells Garlinghouse that "Large spikes of volume share correspond to ███████ purchases."); PX 323 at RPLI_SEC 492574 (Samarasinghe explaining that "███████ entered into an arrangement with Ripple to purchase XRP at a discount schedule. The discount increased the more XRP they purchased. It became apparent that ███████ was purchasing the XRP and then immediately monetizing the discount by selling directly into the market. These purchases were in the order of $5M, $ 10M, or $15M worth of XRP sold into the market on specific days. We can compare XRP's performance on these specific days versus the performance of other digital assets.").

**Response:**        Disputed.  Defendants do not dispute that PX 321, PX 322 and PX 323 contain the quoted text, exclusive of any alterations, omissions, or additions.  Defendants dispute Paragraph 813 to the extent that its use of the word "uptick" is vague and unclear, implying a conclusion and intent not supported by the cited documents.  Defendants further dispute Paragraph 813 as unsupported by the evidence to the extent it implies that Samarasinghe was a spokesperson or otherwise speaking for Ripple or the Individual Defendants in connection with the cited text, that the quoted text represents a statement by Ripple or the Individual Defendants, or that the quoted text represents a belief held by Ripple or the Individual Defendants.

814.    On September 18, 2017 Ripple agreed to sell XRP to ███████, later called ███████ at a ██% discount in 2017 and

for a ▮% discount in 2018. PX 324 at RPLI_SEC 0000861-RPLI_SEC 0000873; PX 80 (Ripple Ans.) ¶ 114; PX 328 at RPLI_SEC 0237627- 630.

> **Response:**      Undisputed.

815.   That month ▮▮▮▮▮ executed three Summary of XRP Purchase forms to purchase $2,100,000 of XRP.  PX 296 at lines 278, 281; PX 325 at RPLI_SEC 0577050; PX 326 at RPLI_SEC 0000858; PX 327 at RPLI_SEC 0000860.

> **Response:**      Undisputed; however, Defendants dispute the SEC's characterization of PX 296 because the exhibited document does not contain numbered rows.

816.   Between October 2018 and February 2018, ▮▮▮▮▮▮▮▮ purchased $3,995,000 of XRP without lockup or resale restrictions at discounts between ▮▮%. PX 292 at RPLI_SEC 0965535 (Wholesale XRP Orders 2017 and Wholesale XRP Orders 2018); PX 296 at lines 298, 302, 309, 311, 315, 318, 321, 327, 334-335.

> **Response:**      Undisputed that PX 292 indicates that ▮▮▮▮▮ ▮▮▮▮▮ purchased $3,995,000 of XRP, but Defendants dispute the SEC's characterization of PX 296 because the exhibited document does not contain numbered rows.

817.   ▮▮▮▮▮ is an entity to which Ripple made Institutional Sales of XRP via a "Master XRP Commitment to Sell Agreement" starting in May 2020, in which Ripple agreed to deposit XRP in a designated ▮▮▮▮ wallet to be used "for the sole purpose of completing a payment transaction over On-Demand Liquidity," with the purchased XRP was then converted into a USD purchase price based on ▮▮▮ acceptance of a mutually agreed upon market rate quote.  PX 329 at ▮▮▮▮ SEC00013519-533.

> **Response:**      Disputed.  Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not otherwise dispute the allegations of fact set forth in Paragraph 817.

818.   On May 26, ▮▮▮▮ made its first purchase of $▮▮▮▮▮ orth of XRP under the agreement.  PX 330 at ▮▮▮▮ SEC00017941 ▮▮▮▮ Summary of XRP Commitment); PX 331 at RPLI_SEC 0583587 (Ripple receipt for purchase).

**Response:** Disputed. ████████ purchased ████████ units of XRP, and the cited evidence does not establish that this represented "████████ worth of XRP." PX 330, PX 331.

819. In the coming weeks, Ripple sold additional XRP to ████████ on a weekly basis. PX 332 at RPLI_SEC 0776134 (Ripple email to ████████ documenting XRP drawdowns during week of August 16, 2020); PX 333 (tracking spreadsheet); PX 334 at (Ripple invoices ████████ for ████████ for week of August 16, 2020); PX 296 at line 736.

**Response:** Undisputed Ripple sold XRP to ████████ on a recurring basis as needed for ████████'s use of Ripple's ODL product. *See* PX 333 (documenting numerous small XRP transactions on multiple days); PX 329 (XRP to be used "for the sole purpose of completing a payment transaction over On-Demand Liquidity"). Defendants dispute the SEC's characterization of PX 296 because the exhibited document does not contain numbered rows.

820. ████████ is an entity to which Ripple made Institutional Sales of XRP starting around May 2020. PX 336 at RPLI SEC 0300993 (May 1, 2020 ████████ Master XRP Commitment to Sell Agreement); PX 337 at SEC-UKFCA-E-0001412 (████████ Summary of XRP Commitment); 338 at RPLI_SEC 0585417 (Ripple receipt for ████████ purchase); PX 339 at RPLI_SEC 0584845 (Ripple invoices ████████ ████████ for the week of May 31, 2020); PX 296 at line 693 (████████ June 11, 2020 deposit of ████████ in Ripple's ████████ account)

**Response:** Disputed. Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789. Defendants do not dispute the particular facts relating to Ripple's sales of XRP to ████████ set forth in Paragraph 820; however, Defendants dispute the SEC's characterization of PX 296 because the exhibited document does not contain numbered rows.

821. Between June 30, 2020 and January 31, 2021, Ripple sold more than ████████ of XRP through ████████. PX 296 at lines 688-689, 691, 693, 696, 698, 701, 709, 712, 714, 717, 724, 726, 728, 732, 737, 740, 742, 744,  751, 756-757, 762, 764, 771,



773, 776, 778, 780, 785, 789, 794, 798, 808, 811, 814, 818, and more than █ █████████ of XRP through███████████, *id.* at lines 694, 697, 700, 705, 710, 713, 716, 722, 725, 727, 730, 736, 738, 741, 743, 747, 755, 758-759, 763, 765, 772, 775, 777, 781-782, 786, 791, 799, 802-803, 809, 812, 815-817, 819.

**Response:**      Undisputed that PX 296 indicates that Ripple sold more than █ ████████ f XRP to ██████ and ██████████; however, Defendants dispute the SEC's characterization of PX 296 because the exhibited document does not contain numbered rows. Defendants also dispute Paragraph 821 insofar as the cited transactions with ██████ occurred between June 3, 2020, and January 25, 2021.

822.   Like the other XRP sold in Institutional Sales, the XRP Ripple sold to ██████████ and ██████ was meant to and did immediately end up in the hands of XRP investors in the secondary market, with Ripple aiding ██████████ and ██████ in reselling the XRP.

**Response:**      Disputed, including but not limited to because Paragraph 804 does not comply with Local Civil Rule 56.1 insofar as it is unsupported by any citation to evidence. Defendants further dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789. Defendants further dispute the SEC's unsupported and uncited characterization in Paragraph 822 that Ripple "aid[ed] ██████████ and ██████ in reselling the XRP" insofar as Ripple's sales of XRP to ██████████ and ██████ were for use in connection with Ripple's ODL product and did not involve 'resale' of XRP.

823.   In an internal meeting in 2020, a Director of Ripple Product explained, referring to these sales of XRP through the "On-Demand Liquidity" or "ODL" product, referred to as "XRP-O" or "XRP Origination": So, right now, we're doing a lot of work of XRP origination and XRP termination, which you'll hear more about on the send and receive side, but ultimately what's happening is we'll be able to do -- facilitate an ODL transaction without an exchange within that flow. However, we'll then have receivers with XRP on their balance sheet, and they'll need -- they are asking for services to enable them to intelligently sell that XRP on open markets. So, initially, receivers of XRP right now, the feedback that we're getting is they don't -- their risk teams don't want them to hold XRP on their balance sheets, so they're going to want to immediately sell XRP on open order books once it lands in their

exchange account, or within their wallet. PX 192; *see also* PX 340 at RPLI_SEC 0682567- RPLI_SEC 0682581 (Ripple's Receivers Product Story H2 2020 presented at Engineering All-Hands Meeting on June 16, 2020, stating that "[t]he goal of XRP Liquidation feature is to provide the receivers with fast, flexible, and cost-efficient execution service to sell (liquidate) XRP via ███████ connected exchanges and market makers. ███████ will optimize liquidation experience for the receivers by ensuring the best execution price available on all liquidity venues, and provide options for receivers to minimize exposure to XRP volatility.")

**Response:**       Disputed.  Defendants do not dispute that ███████ made the quoted statements, however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 192 in Paragraph 823 because it omits additional context necessary to understand the quoted language, including by quoting from disparate sections of the presentation, and thereby alters the intended meaning of the statements without supporting evidence that the SEC's reformulation accurately conveys the intention of the speaker.  *See* PX 192 at 23:4-12 and 24:20-25:1.

824.   Another Product Manager at Ripple explained at another internal meeting in 2020: "We launched XRPO this quarter, and as part of XRPO volume, we ended up doing just over 30 million in volume.  That's crucial because that's 30 million in volume, but that also represents 30 million in XRP sales, which is revenue to the firm, and it is what powers the firm's ability to do investments and you, know, pay people and stuff. PX 341 at p. 4, lines 12-18.

**Response:**       Undisputed.

825.   Brad Garlinghouse knew about these weekly XRP sales to ███████ and ███████. PX 342 at RPLI_SEC 0582537 (Garlinghouse thanking ███████ for the update, stating "very valuable for me in keeping track."); PX 343 at RPLI_SEC 0521044 (Garlinghouse thanking ███████ stating "Best weekly ODL update I've read!").

**Response:**       Disputed because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 825 that Garlinghouse "knew about" "weekly XRP sales," which is too vague to properly address, and the exhibits do not mention XRP sales, but only forecasted XRP-O revenue and ODL volume, as set forth in PXs 342 and 343.

826.   Ripple knew that the "XRP-O" Institutional Sales, like the other Institutional Sales, were sales into public markets through conduits. As Ripple employees explained

internally: "Now, on the supply side, I think it's -- it is important to know that, you know, with things like XRPO, there is supply being added to the market in terms of Ripple selling XRP in the market. PX 192 at p. 36, lines 21-24; PX 341 at p. 25, lines 19-24 and p. 26, lines 1-4 ("[O]ne of the things that we have done with ███████ that is something that we're doing because we need to kind of manage as we launch XRPO and sell XRP to the market, we also want to manage the supply a little more.").

**Response:**     Disputed.  Defendants dispute that the SEC's use of the term "Institutional Sales" sets forth a fact that can be responded to with particularity, given the SEC's conflicting definitions of the term in Paragraphs 614(a) and 789.  Defendants do not dispute that PX 192 and PX 341 contain the quoted text, exclusive of any alterations, omissions, or additions by the SEC. Defendants dispute Paragraph 826 as unsupported by the evidence to the extent it implies that the quoted Ripple employees were spokespersons or otherwise speaking for Ripple or the Individual Defendants in connection with the quoted text, that the quoted text represents a statement by Ripple or the Individual Defendants, or that the quoted text represents a belief held by Ripple or the Individual Defendants, as those facts are not established by the cited evidence.  Defendants further dispute Paragraph 826 to the extent that its use of the word "conduits" is argumentative and misleading, implying a conclusion and intent not supported by the cited documents.  Defendants further dispute Paragraph 826 to the extent the SEC seeks to imply that Ripple's XRP-O sales added to the supply of XRP, as such an implication would be inconsistent with the SEC's allegations that the total supply of XRP is a "fixed, finite supply" and "no more XRP will ever be created."  Paragraph 20.

827.   Ripple made certain payments in connection with its operations in XRP instead of fiat currency. PX 80 (Ripple Ans.) ¶ 125.

**Response:**     Undisputed.

828.   In connection with ODL, Ripple made certain payments in XRP instead of fiat currency, including to ODL customers and market makers. PX 80 (Ripple Ans.) ¶ 131.

**Response:**       Undisputed.

829.   At times, Ripple distributed XRP to individuals and/or entities that provided services to Ripple. PX 8 (Ripple RFA Responses) No. 33.

**Response:**       Undisputed.

830.   Through the end of 2020, Ripple recognized revenue of $609 million from these types of distributions. PX 45 (Ferrante Decl.) Ex. 2.

**Response:**       Disputed.  Defendants dispute Paragraph 830 as overly vague to the extent it refers to "these types of distributions" without defining the specific distributions in question, and Defendants are accordingly unable to fairly respond as to Ripple's recognized revenue figures.  Defendants further object that the Declaration of Christopher Ferrante submitted by the SEC is improper expert testimony that was not properly disclosed pursuant to Fed. R. Civ. P. 26(a)(2), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).

831.   Ripple distributed at least 776 million units of XRP as part of the so-called "xPring" initiative launched in 2018 to fund third parties that would support development of new applications of XRP and the XRP ledger. PX 80 (Ripple Ans.) ¶ 147.

**Response:**       Disputed.  Defendants do not dispute that Xpring was a Ripple initiative to partner with companies and support development of new applications of XRP and the XRP Ledger, and that Ripple distributed at least 776 million XRP in connection with certain projects of this initiative.  Defendants otherwise dispute Paragraph 831 because the cited evidence does not support the SEC's assertions of fact.

832.   One of the purposes of xPring was to incentivize the development of uses for XRP. PX 90; PX6 (Schwartz Dep. Tr.) 392:9-12.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 90 as misleading including because Paragraph 832 omits additional context necessary to understand the purposes of Xpring, including that

Xpring was an initiative intended to benefit Ripple by "incubat[ing], acquir[ing] and provid[ing] grants to companies and projects run by proven entrepreneurs that use the XRP ledger and XRP."  PX 90 at RPLI_SEC 0392729.

833.   xPring goals included "trying to build an ecosystem of companies that were using XRP."  PX 24 (Beard Tr.) 76:2—77:5

**Response:**       Undisputed.

834.   Xpring was focused on supporting companies that were looking at new use cases for XRP.   PX 25 (Madigan Tr.) 59:13-60:19; PX 501.10, *available at* https://ripple.com/insights/q1-2019-xrp-markets-report/   (1Q19   XRP   Markets Report).

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 501.10 as misleading including because Paragraph 834 omits additional context necessary to understand the purposes of Xpring, including that Xpring was an initiative intended to be "focused on projects building and utilizing XRP, the XRP Ledger and ILP [inter-ledger protocol]."  PX 501.10 at 1.  Defendants do not dispute that Madigan offered the cited testimony, however Madigan also testified that she "obviously d[idn't] run that team and [was] not intimately aware of [their] mandate" and could offer only her "broad understanding," of the purposes of Xpring, which does not suffice to establish the facts set forth in Paragraph 834 at all times and under all circumstances.  PX 25 at 59:23-25, 60:21-22.

835.   Ripple touted the amount of money (in U.S. Dollars, not XRP) that it had invested to boost XRP. PX 193; PX 194.

**Response:**       Disputed.  Defendants do not dispute that Ripple, at times, publicly stated its investments through Xpring in dollar amounts.  Defendants dispute Paragraph 835 to the extent that its use of the phrases "invested" and "touted" are vague, ambiguous, and suggest a legal conclusion that is not supported by the cited evidence.  Defendants further

dispute that the cited evidence establishes that Ripple had "invested to boost XRP," as this characterization is unsupported by the cited evidence.

836. Ripple understood that these "partner" companies would sell the XRP into public markets in order to monetize it "immediately." PX 195.

**Response:**    Disputed.  Defendants dispute Paragraph 836 as unsupported by the evidence to the extent it implies that a single Ripple employee was a spokesperson or otherwise speaking for Ripple or the Individual Defendants in connection with the quoted text, that the quoted text represents a statement by Ripple or the Individual Defendants, or that the quoted text represents a belief held by Ripple or the Individual Defendants. Defendants further dispute Paragraph 836 to the extent that its use of the quotations around the word "partner" is misleading, as the cited document uses the term "developers." PX 195 at RPLI_SEC 0472187.

837. Ripple required, as a condition of funding, that a company report to Ripple on its sales of XRP.  PX 196.

**Response:**    Disputed.  Defendants do not dispute that Ripple's agreement with Forte included a provision relating to the company's sales of XRP.  PX 196.  Defendants dispute that the cited evidence establishes that this provision was "a condition of funding" as opposed to a contractual term in an agreement between two companies, as the cited evidence does not establish that fact.  Defendants further dispute that the cited evidence establishes the unqualified statements in Paragraph 837 beyond the undisputed fact set forth above.

838. Ripple's XRP distributions in connection with xPring were "generally subject to sales restrictions."  PX 501.11, *available at* https://ripple.com/insights/q2-2019-xrp-markets-report/ (2Q19 Report).

**Response:**    Undisputed.

839. Ripple also placed restrictions in an agreement with a xPring partner that restricted how much XRP the partner and its developers could sell, based upon XRP liquidity in the market over a given period of time. PX 24 (Beard Tr.) 176:25-180:2.

**Response:** Undisputed.

840. Ripple also took steps to manage the pace at which xPring partners sold XRP through restrictions in their agreements because of concerns about "downward pressure on the price" caused by "developers …immediately selling the XRP." PX 195.

**Response:** Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 195 because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 840.  Specifically, PX 195 does not discuss implementation of any "steps to manage the pace at which xPring partners sold XRP." Defendants further dispute Paragraph 840 as unsupported by the evidence to the extent it implies that a single Ripple employee was a spokesperson or otherwise speaking for Ripple or the Individual Defendants in connection with the quoted text, that the quoted text represents a statement by Ripple or the Individual Defendants, or that the quoted text represents a belief held by Ripple or the Individual Defendants.

841. Ripple's head of XRP markets was interested in how XRP was being used by xPring partners, including whether and how much XRP was being sold by xPring partners, because of the potential to disrupt XRP market liquidity.  PX 25 (Madigan Tr.) 61:7-63:19, 72:7-16.

**Response:** Undisputed, except insofar as Paragraph 841 is unbounded in time, and Defendants dispute that Madigan's views can be imputed to any other "head of XRP markets" at Ripple as unsupported by the cited evidence.

842. Ripple's head of XRP markets took specific steps when she started working at Ripple in or around June 2019 to understand all of the existing XRP sales orders and that she wanted to "lower[] [Ripple's] sales [numbers] ASAP." PX 25 (Madigan Tr.) 89:12-93:5; PX 198.

**Response:** Undisputed that Madigan offered the cited testimony and that PX 198 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

843. An internal Ripple presentation prepared in or around April 2020 about "XRP Supply" showed Ripple included sales to and other distributions in connection with

340

xSpring within "all Ripple XRP distributions impacting circulating supply." PX 199 at RPLI_SEC 0590775.

**Response:**        Undisputed, insofar as the SEC intended to refer to Ripple's Xpring program, as the cited evidence does not refer to or establish any program called "xSpring".

844.    Ripple granted Garlinghouse ███████ units of XRP as a part of his compensation agreement in or around December 2016.  PX 86 (Garlinghouse RFA Responses) No. 66.

**Response:**        Undisputed that Garlinghouse received a grant of ███████ XRP, to vest over time subject to certain conditions, in December 2016, however, Defendants do not concede that the ███████ and the ███████ units of XRP take into account the amounts withheld by Ripple, or the amounts sold by Garlinghouse in order to pay Garlinghouse's income taxes.

845.    Ripple granted Garlinghouse ███████ units of XRP as part of his compensation agreement in or around May 2019. PX 86 (Garlinghouse RFA Responses) No. 67.

**Response:**        Undisputed that Garlinghouse received a grant of ███████ XRP, to vest over time subject to certain conditions, in May 2019 however, Defendants do not concede that the ███████ and the ███████ units of XRP take into account the amounts withheld by Ripple, or the amounts sold by Garlinghouse in order to pay Garlinghouse's income taxes.

846.    Garlinghouse sold some of the XRP he received from Ripple. PX 86 (Garlinghouse RFA Responses) No. 174.

**Response:**        Undisputed.

847.    Garlinghouse's employment offer letter of April 1, 2015 stated that his compensation included ███████ XRP, structured as a four-year loan. PX 73.

**Response:**        Undisputed that PX 73 contains the cited text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete

contents. Defendants also do not concede that Garlinghouse in fact received compensation exactly as outlined in his employment offer letter dated April 1, 2015.

848.    Ripple granted Garlinghouse XRP in or around May 29, 2019. PX 74.

**Response:**    Undisputed.

849.    Ripple granted Garlinghouse XRP in or around December 2016. PX 75.

**Response:**    Undisputed.

850.    Schwartz made over $████ by selling XRP and held about ████ units of XRP in or around May 2021. PX 6 (Schwartz Dep. Tr.) 94:19-95:25.

**Response:**    Defendants dispute that Paragraph 850 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly Schwartz's holdings of XRP in May 2021 are irrelevant. Defendants do not dispute that Schwartz offered the cited testimony, with the exception that Schwartz testified he received "about" $████ "in exchange" for his XRP, not "over $████ by selling XRP." PX 6 at 95:4-8.

851.    Griffin received XRP as a bonus grant when he joined the company, which he later sold for over $████████████████ PX 3 (Griffin Inv. Tr.) 184:12-185:3, 191:14-192:8; PX 14 (Griffin Dep. Tr.) 21:21-23:13.

**Response:**    Undisputed that Griffin offered the cited testimony, with the exception that Griffin testified he received "about" $████ "in proceeds" for his XRP, not that he "sold [his XRP] for over $████." PX 3 at 192:7-8.

852.    Rapoport received ████ XRP units and sold them for about $████. PX 10 (Rapoport Tr.) 40:8-42:23.

**Response:**    Undisputed that Rapoport offered the cited testimony, with the exception that Rapoport testified that he "believe[d]" he received "a total of ████ XRP," but his "memory on the exact number [was] fuzzy." PX 10 at 40:14-16.

853.   Long was paid bonuses in XRP and sold some of the XRP she was paid. PX 17 (Long Tr.) 103:4-104:10.

**Response:**   Undisputed that Long offered the cited testimony.   Defendants dispute the SEC's characterization of, and inferences from, Paragraph 853 to the extent it is intended to imply that Long received bonuses solely in XRP, as Long testified that she also received bonuses in U.S. dollars.  *See* PX 17 at 103:9-12.

854.   Birla was entitled by agreement with Ripple to receive ████ units of XRP in bonuses over ████████ and held ████████ units of XRP in or around June 2021. PX 15 (Birla Dep. Tr.) 54:23-55:12; PX 16 (Birla Inv. Tr.) 48:10-50:19.

**Response:**   Defendants dispute that Paragraph 854 sets out a material fact to any claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020, and accordingly activities in 2021 and later are irrelevant.  Defendants do not dispute that Birla offered the cited testimony, with the exception that Birla testified he is entitled to XRP grants of ████ units each in each January from 2020 to 2023, not that "Birla was entitled by agreement" to receive bonuses at some time in the past.  PX 16 at 45:12-18.



855.   ████████, received a bonus in XRP after ███ agreed to take on the ████████████████ at Ripple. PX 18 ████████████████████

**Response:**   Undisputed that ████████ offered the cited testimony, with the exception that ████████ testified ███ received XRP as a "signing bonus." ████████████

856.   Vias, Ripple's head of XRP markets from November 2016 to April 2020, received XRP for his employment and during company-wide bonus at the end of 2018.  PX 21 (Vias Inv. Tr.) 360:12-361:18.

**Response:**   Undisputed that Vias offered the cited testimony, with the exception that Vias testified he received XRP "in three ways . . . my initial signing bonus . . . I took [reimbursement of] my expenses in XRP.  And then the only other time was the end-of-year

bonus that was company-wide," not that Vias "received XRP for his employment." PX 21 at 360:19-361:8.

857.   Will, Ripple's CFO through 2020, received an XRP bonus of ███████ units, which he sold for less than $████. PX 23 (Will Dep. Tr.) 47:18-49:24, 51:23-53:10.

**Response:**   Undisputed.

858.   Beard, who worked for Ripple through October 2020 received approximately ██████ units of XRP as a bonus, which he later sold. PX 24 (Beard Tr.) 37:25-39:15; PX 200.

**Response:**   Disputed. The SEC's statements that Beard received approximately ██████ units of XRP as a bonus are contradicted by evidence in the record, specifically Beard's draft employment offer letter (PX 200, cited in support of Paragraph 858), which states "you will receive ██████ XRP annually on the anniversary of your Start Date for the years 2019, 2020, 2021 and 2022 . . . provided you are continuously employed full-time by the Company on such anniversary dates." PX 200 at RPLI_SEC 0431917; *see also* PX 24 at 39:5-10 (Q. Okay. And how much did you receive in XRP during your entire time at Ripple? . . . A. I don't know the exact numbers.).

859.   Madigan, Ripple's head of institutional markets starting in May 2019, received approximately $████ worth of XRP, which she sold. PX 25 (Madigan Tr.) 24:17-25:9..

**Response:**   Undisputed.

860.   Larsen was Ripple's CEO from its inception until the end of 2016. PX 1 (Larsen Ans.) ¶ 6; PX 2 (Larsen Tr.) 49:16-18.

**Response:**   Undisputed.

861.   Since 2013, he has also been the Chairman (and, as of January 1, 2017, Executive Chairman) of Ripple's Board. PX 149; PX 1 Larsen Ans. ¶ 6; PX 8 (Ripple RFA Responses) No. 225.

**Response:**        Undisputed that Larsen was Chairman through December 2016 and was thereafter Executive Chairman.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 1 ¶ 6 and PX 8 No. 225, to the extent the SEC implies Larsen had the same level of involvement as Executive Chairman that he had as CEO.  Larsen testified that Ripple has "always been very careful that people didn't view the chairman as sort of a second CEO.  There's one CEO.  They're the ones who are leading, building the team and ensuring all the proper requirements for the company are executed."  Ex. 8 at 262:9-13.

862.    Larsen has been a Ripple shareholder since its founding, and he owns just over 50% of voting. PX 1 (Larsen Ans.) ¶¶ 6, 172; PX 2 (Larsen Tr.) at 58:16-60:8.

**Response:**        Undisputed that Larsen has been a Ripple shareholder since its founding.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 2 to the extent the SEC implies that the percentage of "voting" applies to any vote, such as that of the Board of Directors.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 2 to the extent the SEC implies Larsen always had over 50% of the shareholder vote as that is contradicted by the record.  Ex. 8 at 58:21-59:19.  Defendants also dispute that either ¶ 6 or ¶ 172 in PX 1 provides support for Paragraph 862.

863.    As CEO, Larsen was involved in and had authority regarding Ripple's business decisions. All employees reported to him, and he provided reports to the Board of Directors. Larsen has the ability to appoint directors to the Board; PX 1 (Larsen Ans.) ¶¶ 6, 172; PX 2 (Larsen Tr.) at 50:16-51:4, 52:1-53:7;   PX 8 (Ripple RFA Responses) No. 225.

**Response:**        Disputed.   Defendants dispute that all the employees directly reported to Larsen.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 2, to the extent the SEC implies Larsen reported to the Board

345

members every decision or every report, Larsen testified that he gave reports "from time to time."  Ex. 8 at 51:7-9.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 2 to the extent the SEC suggests that Larsen could appoint members to the Board of Directors at any point, that is unsupported by the record because Larsen testified there were times when he could not appoint directors, although he could appoint his replacement.  Ex. 8 at 52:21-53:13.  Larsen additionally testified that even once he gained the ability to appoint directors, he would not and did not do so without agreement.  Ex. 8 at 54:3-13.  Defendants further dispute Paragraph 863 as vague and ambiguous with respect to the phrase "business decisions."

864.  Garlinghouse was Ripple's COO from around April 2015 through December 2016, and has been Ripple's CEO from since on or around January 1, 2017 to the present; Garlinghouse had the power to make decisions on behalf of Ripple, the authority to manage Ripple's activities, and the power to direct Ripple policies. PX 80 (Ripple Ans.) ¶¶ 6, 17.

**Response:**        Undisputed that Garlinghouse was COO and then CEO of Ripple, however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 80, because the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 864 that Garlinghouse had the power to make decisions on behalf of Ripple, authority to manage Ripple's activities, and the power to direct Ripple policies, because PX 80 at ¶¶ 6, 17 only establishes that Garlinghouse was COO from April 2015 to December 2016 and has been CEO from January 2017 to the present. PX 80 at ¶¶ 6, 17.

865.  CEO, Garlinghouse was involved in and had authority regarding Ripple's business decisions. Garlinghouse had the power to make decisions on behalf of Ripple, the authority to manage Ripple's activities, and the power to direct Ripple policies. PX 81 (Garlinghouse Dep. Tr.) at 26:3-15; PX 201 (Garlinghouse Ans.) ¶¶ 6, 426.

**Response:**        Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 81 and 201 because the cited evidence does not

346

support the SEC's assertions of fact as set forth in Paragraph 865. Garlinghouse admitted to

being "involved in and ha[ving] authority regarding certain of Ripple's business decisions,"

as set forth in PX 201 at ¶ 426, but not all business decisions generally. In addition,

Garlinghouse testified that, as CEO, he had "the authority to make decisions on behalf of

Ripple," as set forth in PX 81 at 26:5-6, but not the "power" to do so. Similarly, Garlinghouse

testified that, as CEO, he had the "authority" to direct Ripple's policies, as set forth in PX 81

at 26:7-15, but not the "power" to do so. Undisputed that Garlinghouse testified that, as CEO,

he had the authority to manage Ripple's activities.

866.    Garlinghouse has had the ability to direct Ripple's activities since 2017. PX 80
        (Ripple Ans.) ¶¶ 6, 17; PX 94 (Ripple RFA Responses) Nos. 720-21; PX 201
        (Garlinghouse Ans.) ¶¶ 6, 424-26.

**Response:**       Disputed because the cited evidence does not support the SEC's

assertions of fact as set forth in Paragraph 866 that Garlinghouse had the ability to direct

Ripple's activities.

867.    As CEO, Garlinghouse responsibilities included all aspects of product, company
        strategy, execution of company strategy, Ripple's growth and investment in Ripple,
        including efforts to raise capital.  Garlinghouse regularly updated Ripple's Board
        of Directors and Ripple shareholders about Ripple. PX 36 (Garlinghouse Inv. Tr.)
        36:10-39:1.

**Response:**       Undisputed that Garlinghouse offered the cited testimony, however,

Defendants do not concede that this is the entirety of, a representative selection of, or a fair

characterization of Garlinghouse's testimony.

868.    Having received 9 billion units of XRP upon Ripple's founding, Larsen began his
        own sales in 2013 and continued selling XRP into public markets through 2020,
        making approximately $450 million from his sales. PX 2 (Larsen Tr.) 67:14-68:12,
        71:4-12, 77:16-78:20, 79:13-79:24; PX 202 (Amended Expert Report of ███████
        ███████ Rep. ("███████ Rep.")) ¶¶ 37-38, Fig. 7, Tbl. 2; PX 514.

**Response:**       Disputed.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 2 as misleading to the extent it characterizes Larsen

as conducting "his own sales" rather than "using programmatic selling" and "relying on the advice of professional market makers" to do so.  Ex. 8 at 70:14-20.  Defendants further dispute that Larsen "received" 9 billion units of XRP or that Larsen's receipt of XRP occurred "upon Ripple's founding," as these allegations are unsupported by the cited evidence.  Larsen received 45 billion units of XRP, donated eighty percent of his XRP to the company now known as Ripple after its founding, and retained 9 billion units of XRP.  Ex. 14, Larsen Decl. ¶ 2.  To the extent the SEC seeks to draw any inferences about Larsen's transactions prior to September 2015, Larsen claims such transactions are barred by the statute of limitations.  *See* Defs.' MSJ at 74-75.

869.   Larsen sold XRP after learning of the SEC's investigation. PX 2 (Larsen Tr.) at 19:6-21:22, 79:8-17.

**Response:**      Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 2 as misleading to the extent it characterizes Larsen's sales of XRP as related in any way to the SEC's investigation.  Defendants further dispute the SEC's characterization and implication that selling XRP while the SEC was investigating was at all improper.  Larsen began programmatic, i.e., automatic and algorithmic, sales of his own XRP in 2013, and Ripple was operating openly in the marketplace for five years before the SEC began investigating Ripple in connection with its sales of XRP.  To the extent the SEC seeks to draw any inferences about Larsen's transaction prior to September 2015, Larsen claims such transactions are barred by the statute of limitations.  *See* Defs.' MSJ at 74-75.

870.   Garlinghouse sold approximately $150 million in XRP from 2017 through 2020. PX 202 (████ Rep.) ¶¶ 39-40, Fig. 8, Tbl. 3; PX 81 (Garlinghouse Dep. Tr.) 330:15-333:5; PX 203 [GARL00000001-1].

**Response:**        Undisputed that Garlinghouse sold XRP from 2017 through 2020, however, Defendants do not concede that $150 million is an accurate estimation of the proceeds Garlinghouse received from the sales, or that it takes into account the fees and taxes paid in connection with the receipt and sale of the XRP. *See, e.g.,* PXs 73 and 74 (indicating that Garlinghouse was responsible for income taxes on his XRP grants); Ex. 97, GSR00008433 (§ 2.6) (indicating fees paid in connection with the sale of the XRP); Ex. 100, GSR00000681 (§ 2.6) (same); Ex. 99, GSR00000689 (§ 2.6) (same); Ex. 25 at 286:12-287:3 ( █ testified the same).

871.    Some of Garlinghouse's sales of XRP occurred on the crypto exchange known as Kraken. PX 86 (Garlinghouse RFA Responses) No. 193.

**Response:**        Undisputed, however, Defendants note that Garlinghouse's XRP sales on Kraken represent approximately 0.58% of all the XRP he sold. *See* Ex. 82 (Summary Exhibit of Garlinghouse Trading Data).

872.    Garlinghouse continued to sell XRP through the end of 2020—after he was personally named in a lawsuit accusing him and Ripple of unregistered sales of XRP in May 2018 and after SEC staff informed Ripple it was likely to conclude Ripple's offers and sales of XRP were securities transactions.  PX 86 (Garlinghouse RFA) 221; PX 81 (Garlinghouse Dep. Tr.) 115:6-118:25, 330:15-333:5.

**Response:**        Undisputed that Garlinghouse continued to sell XRP through the end of 2020 after he was personally named in a lawsuit in May 2018 and after Ripple was informed by SEC staff that "it was likely to conclude Ripple's offers and sales of XRP were securities transactions," however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PXs 81 and 86 to the extent it implies Garlinghouse was either present when SEC staff informed Ripple of this, or that Garlinghouse was personally aware of this. Garlinghouse was not present at the meeting in question and testified that he was not aware that SEC staff told Ripple in September 2019 it was likely to view Ripple's

offers and sales of XRP as securities transactions in his deposition. *See* PX 81 at 46:3-8 ("Q: My question is: Are you aware – yes or no. Are you aware that in September of 2019, SEC staff informed Ripple that the SEC staff was likely to conclude that it viewed Ripple's offers and sales of XRP as securities transactions?   A: My testimony is no."). Defendants also dispute any implication that Garlinghouse was aware that the SEC "was likely to conclude that Ripple's offers and sales of XRP were securities transactions," as set forth in Paragraph 872, when he sold XRP after these dates. In fact, in August 2018, Garlinghouse voiced to then-Chair Clayton and Director Hinman that "Ripple was in 'purgatory' due to uncertainty as to whether XRP … is or is not a security. In response, Chairman Clayton immediately stated that the meeting was not the proper forum for a discussion about that topic. He then asked Garlinghouse to 'back up' from that issue and steered the meeting back to a discussion about Ripple's business and technology" and "encourag[ed] the Ripple executives to continue its ongoing discussion with the staff of the Division of Corporation Finance." Ex. 138 (SEC-LIT-EMAILS-000456558). In addition, Garlinghouse testified that during his multiple meetings with the SEC, nobody told him that XRP was a security, as set forth in PX 81 at 56:25-57:16 ("In none of these meetings did … anyone ever say they viewed that XRP was a security.").

873.   Garlinghouse's sales of XRP have been his largest source of income. PX 81 (Garlinghouse Dep. Tr.) 333:6-16.

**Response:**        Disputed. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81, including because Paragraph 873 omits additional context necessary to understand the testimony, including that Garlinghouse specified that his XRP sales were his largest source of income "in terms of what [he] reported on [his] tax returns" only, but were not necessarily his largest source of income when

considering option grants and vested equity, as set forth in PX 81 at 333:11-16 ("Q: In that period of time, between the first and last sales of XRP … were proceeds from your sales of XRP the largest source of your income? A: I mean, like many things in life, it's a – subject to your perspective and how you value option grants and equity and vested equity and those types of things. In terms of what I reported on my tax returns, the answer to that question would be yes.").

874.   Garlinghouse admits that none of his sales of XRP were covered by a registration statement. PX 201 (Garlinghouse Ans.) ¶ 60.

**Response:**   Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 201 as misleading to the extent it implies that such sales were required to be covered by a registration statement.  PX 201 explicitly states that "Ripple did not file a registration statement for XRP with the SEC because none was required," PX 201 ¶ 2.  PX 201 further states that "Garlinghouse denies that his transactions in XRP have ever been subject to registration under the Securities Act, or to the requirements under the Exchange Act."  PX 201 ¶ 30.

875.   Larsen admits that none of his sales of XRP were covered by a registration statement PX 1 (Larsen Ans.) ¶ 60.

**Response:**   Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 1 as misleading to the extent it implies that such sales were required to be covered by a registration statement.  PX 1 explicitly states that "During Larsen's tenure at Ripple as CEO, no securities regulator in the world—much less the SEC—at any time claimed that transactions in XRP must be registered as securities," PX 1 Preliminary Statement ¶ 3, and that "Ripple did not file a registration statement for XRP with the SEC because none was required," PX 1 ¶ 2.  PX 1 further states that "Larsen denies that his transactions in XRP have ever been subject to registration under the Securities Act, or to

the requirements under the Exchange Act." PX 1 ¶ 30. To the extent the SEC seeks to draw any inferences about Larsen's transactions prior to September 2015, Larsen claims such transactions are barred by the statute of limitations. *See* Defs.' MSJ at 74-75.

876.   Garlinghouse admitted he and Larsen both had the power to have Ripple file a registration statement for offers and sales of XRP. PX 81 (Garlinghouse Dep. Tr.) at 26:3-28:2.

**Response:**   Undisputed that Garlinghouse offered the cited testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 81, including because Paragraph 876 omits additional context necessary to understand the testimony, including that Ripple's Board of Directors could facilitate the filing of a registration statement if one was required, of which Larsen is a member, as set forth in PX 81 at 27:9-28:2. Paragraph 876 also omits that Garlinghouse's testimony was limited to "after January 1st, 2017," and Defendants further dispute Paragraph 876 as vague as to timing. PX 81 at 27:6-7.

**Defendants' Global Response to and Dispute of Paragraphs 877-925**

The SEC placed each of Paragraphs 877-925 under a subheader in which the SEC asserted that "XRP Purchasers Reasonably Viewed XRP as an Investment in Ripple's Entrepreneurial Efforts." While this subheader is appropriately disregarded by the Court as inappropriate SEC argument, to the extent the SEC implies that Paragraphs 877-925 are examples of XRP purchasers "reasonably" viewing XRP as an investment in Ripple's "efforts," Defendants dispute each of these Paragraphs for the reasons set out below, including because the cited evidence does not support that any XRP purchaser had this view or that such a view was reasonable.

Even if any of Paragraphs 877-925 could be viewed as examples of the SEC's assertion that XRP purchasers "reasonably" viewed XRP as an investment in Ripple's "efforts," evidence

in the record establishes views of XRP holders that run contrary to this assertion by the SEC, and accordingly the ultimate determination must be made by a trier of fact. Specifically, a collection of over 2,000 affidavits signed by individual XRP holders (some of whom signed more than one affidavit) each states, in sum and substance: "when I acquired XRP I did not rely on any statements, promises, or inducements from Ripple, its executives or affiliates"; "when I acquired XRP I did not believe I was acquiring any legal or financial interest in Ripple"; and "when I acquired XRP, I was not relying on the efforts of Ripple or its management team for any purpose." Ex. 168 (Decl. of John Deaton), (Supp. Decl. of John Deaton ¶ 14) (emphasis added); Ex. 167 (collected affidavits of XRP holders). This evidence demonstrates the existence of a substantial number of XRP holders who did not view XRP as an investment in Ripple, contrary to the SEC's unqualified assertion of fact in its subheader; accordingly, the SEC cannot show that its assertion is, in whole or in part, a statement of undisputed fact that could serve as an appropriate basis for summary judgment in the SEC's favor.

877. On or about November 26, 2014, a representative from ████████████ (which had invested in Ripple) emailed Larsen and another Ripple employee stating "[w]hen we bought XRP at .0037, we thought this Jed thing would pass and the TEAM is what we bet on…we believe in the TEAM." PX 360.

**Response:**      Undisputed that PX 360 contains the quoted text exclusive of any alterations, omissions, or additions by the SEC. Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925. Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 360, including to the extent the SEC implies that this is a representative view of all XRP holders. Defendants further dispute that Paragraph 877 as

vague and ambiguous with respect to the phrase "the TEAM is what we bet on" or "believe in the TEAM."

878.   On or about September 12, 2016, Griffin emailed Ripple employees including Larsen and Garlinghouse "feedback" from an investor [█████] regarding Ripple's XRP "distribution." Referencing Ripple's "Escrow," the email stated that "Ripple is a central bank of XRP." PX 445.

**Response:**      Disputed.    Defendants incorporate by reference their Global

Response to and Dispute of Paragraphs 877-925.    Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from PX 445.    To the extent it

characterizes █████ as an "investor" rather than a "purchaser" of XRP, █████ was not an

investor in Ripple.  Defendants further dispute the SEC's characterization of, and inferences

purportedly drawn from PX 445 to the extent it implies that Griffin, Ripple employees,

Larsen, or Garlinghouse viewed Ripple as "a central bank of XRP."  Defendants further

dispute the SEC's characterization of, and inferences purportedly drawn from PX 445 to the

extent it implies that XRP was already escrowed.  Defendants further dispute the SEC's

characterization of, and inferences purportedly drawn from PX 445 to the extent the SEC

implies the email provides information about Larsen's or Garlinghouse's mental state, as

Defendants dispute that Larsen or Garlinghouse's mental state can be inferred from the

statements of a third party.  .

879.   Similarly, Ripple received inquiries about investing in XRP, with many explicitly viewing it as an investment in Ripple. For example, on or about October 14, 2016, an individual emailed Ripple to note that he was "[l]ooking to buy XRP shares, very intelligent company and can go very far.  I am looking to invest some money in you guys." PX 197.

**Response:**      Disputed.    Defendants incorporate by reference their Global

Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 197

contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC;

however, Defendants dispute the SEC's assertion in Paragraph 879 that "many" individuals "explicitly view[ed XRP] as an investment in Ripple" as conclusory and unsupported by any evidence in the record, including because the reference to "many" is vague and non-specific and is not supported by the single communication the SEC cites in support of Paragraph 879. Defendants further dispute Paragraph 879 to the extent the SEC implies that PX 197 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  Defendants further dispute that the cited evidence establishes the intended meaning of the individual in question's reference to "XRP shares," which is an asset that does not exist to Defendants' knowledge and which the SEC has not established exists.  The SEC has not met its burden to show that the reference to "XRP shares" supports the SEC's conclusory assertion as to Paragraph 879, including because the SEC has not cited any evidence that would provide context to this individual's views.  Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Defendants also dispute the SEC's characterizations of, and inferences purportedly drawn from, PX 197 to the extent it characterizes Paragraph 879 as "[s]imilar[]" to any preceding Paragraph without explanation or support.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

880.   An individual "from New England" contacted Ripple on or about May 7, 2017, to note that he was a "ripple investor with 19500 shares to date.  I am very excited to invest further in Ripple and believe in your product." PX 204.

**Response:**      Disputed.   Defendants  incorporate  by  reference  their  Global

Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 204

contains the quoted text; however, Defendants dispute Paragraph 880 to the extent the SEC

implies that PX 204 is an example of an XRP purchaser viewing XRP as an investment in

Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the

overall  views  of  the  third-party,  nor  does  it  indicate  whether  that  third  party  actually

purchased XRP, or whether they are actually "from New England" as the SEC alleges.  The

SEC has not met its burden to show that the individual's use of the term "ripple investor"

and "shares" in the cited exhibit supports the SEC's conclusory assertion as to Paragraph

880, including because the SEC has not cited any evidence that would provide context to this

individual's views.  Defendants further dispute that this statement by a third-party individual

represents or is characteristic of the views or beliefs held by any other individual, as the SEC

cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants

object that the SEC cannot present this fact in admissible form, as the document quoted is a

hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

881.   On or about May 24, 2017, an individual emailed Ripple that "I want to purchase
       XRP. what i need to invest in your coin?" PX 205.

**Response:**      Disputed.   Defendants  incorporate  by  reference  their  Global

Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 205

contains the quoted text; however, Defendants dispute Paragraph 881 to the extent the SEC

implies that PX 205 is an example of an XRP purchaser viewing XRP as an investment in

Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the

overall  views  of  the  third-party,  nor  does  it  indicate  whether  that  third  party  actually

purchased XRP.  The SEC has not met its burden to show that the reference to "invest[ing]"

in the cited exhibit supports the SEC's conclusory assertion as to Paragraph 881, including

because the email itself is internally inconsistent in switching from "purchase" to "invest"

with respect to obtaining XRP, and the SEC has not adduced any evidence that would resolve

that inconsistency.  Further, the SEC has not cited any evidence that would provide context

to this individual's views.  Defendants further dispute that this statement by a third-party

individual represents or is characteristic of the views or beliefs held by any other individual,

as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2),

Defendants object that the SEC cannot present this fact in admissible form, as the document

quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual

Defendants.

> 882.    On or about June 4, 2017, an individual "based out of New York City" emailed
> Ripple to note that he "would like to purchase XRP (ripple) with my USA Bank
> account." PX 207.

**Response:**        Disputed.    Defendants  incorporate  by  reference  their  Global

Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 207

contains the quoted text; however, Defendants dispute Paragraph 882 to the extent the SEC

implies that PX 207 is an example of an XRP purchaser viewing XRP as an investment in

Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the

overall views of the third-party, nor does it indicate whether that third party actually

purchased XRP.  The SEC has not met its burden to show that the reference to "XRP (ripple)"

in the cited exhibit supports the SEC's conclusory assertion as to Paragraph 882, including

because the SEC has not cited any evidence that would provide context to this individual's

views.  Defendants further dispute that this statement by a third-party individual represents

or is characteristic of the views or beliefs held by any other individual, as the SEC cites no

evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that

the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

883.   On or about June 7, 2017, an individual with a cell phone number based in New York City emailed Ripple stating that "I WOULD LIKE TO BUY XRP STOCK." PX 208.

**Response:**   Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.   Defendants do not dispute that PX 208 contains the quoted text; however, Defendants dispute Paragraph 883 to the extent the SEC implies that PX 208 is an example of an XRP purchaser viewing XRP as an investment in Ripple.   The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP, or establish that they have "a cell phone number based in New York City" as the SEC alleges.   Defendants further dispute that the cited evidence establishes the intended meaning of the individual in question's reference to "XRP STOCK," which is an asset that does not exist to Defendants' knowledge and which the SEC has not established exists.   The SEC has not met its burden to show that the reference to "XRP STOCK" in the cited exhibit supports the SEC's conclusory assertion as to Paragraph 883, including because the SEC has not cited any evidence that would provide context to this individual's views. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.   Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

884.   On or about June 18, 2017, an individual with an area code from Alaska emailed Ripple stating that he "would like to expand my portfolio and purchase Ripple/XRP

. . . I really like what Ripple/XRP is trying to accomplish and would like to start out with investing $50,000." PX 209.

**Response:**     Disputed.   Defendants   incorporate   by   reference   their   Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 209 contains the quoted text; however, Defendants dispute Paragraph 884 to the extent the SEC implies that PX 209 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP, or establish that they have "an area code from Alaska" as the SEC alleges. The SEC has not met its burden to show that the reference to "Ripple/XRP" in the cited exhibit supports the SEC's conclusory assertion as to Paragraph 884, including because the SEC has not cited any evidence that would provide context to this individual's views. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

885.    On or about July 8, 2017, an individual emailed Ripple to note that "[w]e have invested heavily in XRP and want to invest more . . . But we keep hearing disturbing noises that Ripple and XRP are to be seen as two different companies . . . We love XRP but without reassurance that Ripple and XRP will keep working together it's not a good idea to invest any more fiat into the project.  Can you please ease our minds and reassure us Ripple and XRP will never split up?" PX 210.

**Response:**     Disputed.   Defendants   incorporate   by   reference   their   Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 210 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 885 to the extent the SEC implies that PX 210 is an

example of an XRP purchaser viewing XRP as an investment in Ripple as that implication is contradicted by the exhibit itself, which notes that "Ripple and XRP are to be seen as two different companies." The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

886.  On or about August 19, 2017, an individual emailed Ripple to ask "How do I buy Ripple (XRP) stock listed at $0.16?" PX 213.

**Response:**      Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925. Defendants do not dispute that PX 213 contains the quoted text; however, Defendants dispute Paragraph 886 to the extent the SEC implies that PX 213 is an example of an XRP purchaser viewing XRP as an investment in Ripple. The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP. The SEC has not met its burden to show that the reference to "Ripple (XRP) stock" in the cited exhibit supports the SEC's conclusory assertion as to Paragraph 886, including because the SEC has not cited any evidence that would provide context to this individual's views. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants

object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

887.    On or about August 21, 2017, an individual emailed Ripple stating that "I was looking for a US based exchange where I would be able to purchase XRP as a NY resident." PX 214.

**Response:**        Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 214 contains the quoted text; however, Defendants dispute Paragraph 887 to the extent the SEC implies that PX 214 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

888.    On or about August 27, 2017, an individual emailed Ripple stating that "I am very interested in purchasing $XRP.X stock.  However my current broker abd [sic] others i have searched do not have your symbol or company available.  Is there any direction you can give me?" PX 216.

**Response:**        Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 216 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 888 to the extent the SEC implies that PX 216 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party,

nor does it indicate whether that third party actually purchased XRP. Defendants further dispute that the cited evidence establishes the intended meaning of the individual in question's reference to "$XRP.X stock," which is an asset that does not exist to Defendants' knowledge and which the SEC has not established exists. The SEC has not met its burden to show that the reference to "$XRP.X stock" in the cited exhibit supports the SEC's conclusory assertion as to Paragraph 888, including because the SEC has not cited any evidence that would provide context to this individual's views. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

889.    On or about September 1, 2017, an individual emailed Ripple to ask "how can i buy XRP Stocks and why is not showing up in Nasdaq?" PX 217.

**Response:**    Disputed.  Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 217 contains the quoted text; however, Defendants dispute Paragraph 889 to the extent the SEC implies that PX 217 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  Defendants further dispute that the cited evidence establishes the intended meaning of the individual in question's reference to "XRP Stocks," which is an asset that does not exist to Defendants' knowledge and which the SEC has not established exists.  The SEC has not met its burden to show that the reference to "XRP Stocks" in the cited exhibit

362

supports the SEC's conclusory assertion as to Paragraph 889, including because the SEC has

not cited any evidence that would provide context to this individual's views.  Defendants

further dispute that this statement by a third-party individual represents or is characteristic of

the views or beliefs held by any other individual, as the SEC cites no evidence to establish

that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present

this fact in admissible form, as the document quoted is a hearsay statement of a third party

and not a statement by Ripple or the Individual Defendants.

> 890.    On or about September 30, 2017, an individual emailed Ripple stating that "I'm
> looking to buy stock in XRP I use the trading app 'Robinhood', but have been
> unable to find a service or app to buy the stock.  Any help would be appreciated."
> PX 219.

**Response:**        Disputed.  Defendants incorporate by reference their Global

Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 219

contains the quoted text; however, Defendants dispute Paragraph 890 to the extent the SEC

implies that PX 219 is an example of an XRP purchaser viewing XRP as an investment in

Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the

overall views of the third-party, nor does it indicate whether that third party actually

purchased XRP.  The SEC has not met its burden to show that the reference to "stock in

XRP" in the cited exhibit supports the SEC's conclusory assertion as to Paragraph 890,

including because the SEC has not cited any evidence that would provide context to this

individual's views.  Defendants further dispute that this statement by a third-party individual

represents or is characteristic of the views or beliefs held by any other individual, as the SEC

cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants

object that the SEC cannot present this fact in admissible form, as the document quoted is a

hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

891.    On or about October 7, 2017, an individual emailed Ripple stating that "I would like to invest in your company and purchase XRP as business. please let me know what your requirements are and how can I do that directly without using Kraken bitstamp etc…?" PX 220.

**Response:**    Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 220 contains the quoted text; however, Defendants dispute Paragraph 891 to the extent the SEC implies that PX 220 is an example of an XRP purchaser viewing XRP as an investment in Ripple, or that any such view could be considered "reasonable," including because the individual stated that they "would like to invest in [Ripple] *and* purchase XRP as business," PX 220 (emphasis added).  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

892.    On or about October 20, 2017, an individual emailed Ripple to ask: ". . . Am I correct that XRP is basically the 'stock symbol' for Ripple? And that buying XRP is like buying shares of Ripple? Therefore if I buy it at .30 and it's [sic] value rises to .50 I've made that much profit on all the 'shares' I've accumulated? . . ." PX 222.

**Response:**    Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 222 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 892 to the extent the SEC implies that PX 222 is an

example of an XRP purchaser viewing XRP as an investment in Ripple, or that any such view could be considered "reasonable," including because the email itself suggests this individual was inquiring about whether their understanding was "correct," rather than claiming to have any definitive view, as suggested by the SEC. The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

893.   On or about October 20, 2017, an individual emailed Ripple stating that he was "new to cryptocurrency, have done research & like the look of your company. Am looking to buy shares but I believe I can also buy xrp currency, is that correct. What other information can you provide me ie, the best way to buy XRP, previous performance (history), direction of Ripple company, how do i get company reports, how much does the CEO get paid (is his interest in the company or the very healthy pay check). . ." PX 158.

**Response:**      Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925. The quoted text does not appear in PX 158 and the cited evidence does not support the SEC's assertions of fact as set forth in Paragraph 893. The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, insofar as the quoted text distinguishes between "shares" in Ripple and, separately, "xrp currency," nor does it indicate whether that third party actually purchased XRP.

(a)      On or about November 20, 2017, an individual emailed Ripple to ask "How can buy the Ripple (XRP) stock in USA." PX 223.

365

**Response:**        Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 223 contains the quoted text; however, Defendants dispute Paragraph 893(a) to the extent the SEC implies that PX 223 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  The SEC has not met its burden to show that the reference to "Ripple (XRP) stock" in the cited exhibit supports the SEC's conclusory assertion as to Paragraph 893(a), including because the SEC has not cited any evidence that would provide context to this individual's views.  Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

894.    On or about December 5, 2017, an individual emailed Ripple stating that "I have invested in ripple xrp every unexpected coins are gaining but except ripple.  I am planning to buy 100000 xrp please update me your goals." PX 224.

**Response:**        Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 224 contains the quoted text; however, Defendants dispute Paragraph 894 to the extent the SEC implies that PX 224 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  Defendants further dispute that the cited evidence establishes the intended meaning of the individual in question's reference to "ripple xrp," which is an asset that does

not exist to Defendants' knowledge and which the SEC has not established exists.  The SEC

has not met its burden to show that the reference to "ripple xrp" in the cited exhibit supports

the SEC's conclusory assertion as to Paragraph 894, including because the SEC has not cited

any evidence that would provide context to this individual's views.  Defendants further

dispute that this statement by a third-party individual represents or is characteristic of the

views or beliefs held by any other individual, as the SEC cites no evidence to establish that

fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this

fact in admissible form, as the document quoted is a hearsay statement of a third party and

not a statement by Ripple or the Individual Defendants.

895.   On or about December 5, 2017, an individual emailed Ripple stating "Would like
to buy xrp ripple stock.  Cannot get through to any dealers." PX 225.

**Response:**      Disputed.   Defendants incorporate by reference their Global

Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 225

contains the quoted text; however, Defendants dispute Paragraph 895 to the extent the SEC

implies that PX 225 is an example of an XRP purchaser viewing XRP as an investment in

Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the

overall views of the third-party, nor does it indicate whether that third party actually

purchased XRP.  Defendants further dispute that the cited evidence establishes the intended

meaning of the individual in question's reference to "xrp ripple stock," which is an asset that

does not exist to Defendants' knowledge and which the SEC has not established exists.  The

SEC has not met its burden to show that the reference to "xrp ripple stock" in the cited exhibit

supports the SEC's conclusory assertion as to Paragraph 895, including because the SEC has

not cited any evidence that would provide context to this individual's views.  Defendants

further dispute that this statement by a third-party individual represents or is characteristic of

the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

896.   On or about December 5, 2017, an individual emailed Ripple noting that "I've invested in XRP and want to see this succeed. I'll continue investing at a rate I can afford. Is XRP currently the only way I can invest in Ripple?" PX 226.

**Response:**   Disputed. Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925. Defendants do not dispute that PX 226 contains the quoted text; however, Defendants dispute Paragraph 896 to the extent the SEC implies that PX 226 is an example of an XRP purchaser viewing XRP as an investment in Ripple. The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

897.   On or about December 11, 2017, an individual emailed Ripple: "I just wanted to tell you that I believe in your company. After being retired from the FDNY for four years because of a disabling injury, I found myself wondering what the next part of my life was going to be like. That's when I found Ripple. I have invested in your company because I see great potential in your vision and future. I decided to buy XRP to support your company by selling some items that I owned in my garage that I didn't use anymore. it was the only way to find extra money to purchase it since we live pay check to pay check . . . I've finally purchased XRP and will hold onto it with the confidence that your company will become extremely successful." PX 227.

**Response:**        Disputed.    Defendants  incorporate  by  reference  their  Global

Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 227

contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC;

however, Defendants dispute Paragraph 897 to the extent the SEC implies that PX 227 is an

example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by

the SEC does not support the SEC's attempt to describe the overall views of the third-party.

Defendants further dispute that this statement by a third-party individual represents or is

characteristic of the views or beliefs held by any other individual, as the SEC cites no

evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that

the SEC cannot present this fact in admissible form, as the document quoted is a hearsay

statement of a third party and not a statement by Ripple or the Individual Defendants.

898.    On or about January 3, 2018, a US citizen emailed Ripple to note that he was
"considering 'investing' in Ripple . . . I see I need to buy XRP, which seems to
offer a number of possible choices, but it's not clear to me what choice I should
make, meaning the most secure, or how I go about that." PX 228.

**Response:**        Disputed.    Defendants  incorporate  by  reference  their  Global

Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 228

contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC;

however, Defendants dispute Paragraph 898 to the extent the SEC implies that PX 228 is an

example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by

the SEC does not support the SEC's attempt to describe the overall views of the third-party,

nor does it indicate whether that third party actually purchased XRP, or whether they are in

fact a "US citizen" as the SEC alleges.  Defendants further dispute that this statement by a

third-party individual represents or is characteristic of the views or beliefs held by any other

individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P.

56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

899.    On or about January 6, 2018, an individual emailed Ripple to "suggest that appointing and [sic] XRP Support Team would deliver great benefits for Ripple's XRP . . . You are blessed with a dedicated group of XRP holders who believe in Ripple Labs & what the company represents. They spend countless hours dedicated to showing their love & support.  Showing them some genuine appreciation, respect, love & returning support in this way, I believe, will work wonders while truly cementing XRP as the peoples token.  I'm not aware of any other offering such support or demonstrating their appreciation of their token holders in the trenches in such meaningful, genuine ways . . ." PX 229.

**Response:**        Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Paragraph 899 misquotes the individual's email to Ripple; the SEC altered the quotation by changing "would deliver great benefits for *Ripple & XRP*" to "would deliver great benefits for *Ripple's XRP*."  PX 229 (emphasis added).  Defendants further dispute Paragraph 898 to the extent the SEC implies that PX 229 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

900.    On or about January 12, 2018, an individual emailed Ripple to inform it "that an exchange you have listed where you can buy XRP has gone down and people can not access their money or any of those digital assets . . . I'm writing this because kraken is an exchange suggested on your website and perhaps you might be able to Find out what is going on with the exchange you have listed on your website.  I am

not a wealthy person an[d] put money into XRP because I truly believe in ripple." PX 230.

**Response:**   Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 230 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 900 to the extent the SEC implies that PX 230 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

901.   On or about January 12, 2018, an individual emailed Ripple stating that "I have invested in Ripple for and bought 24.626 XRP using the website of Kraken…" PX 231.

**Response:**   Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 231 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 901 to the extent the SEC implies that PX 231 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party. Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that

the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

902. On or about January 14, 2018, an individual emailed Ripple and stated that it "seems like your XRP is a fancy way of offering shares in an pre IPO.  If I have XRP tokens and you do decide to trade on a public platform and do an IPO one day, will I be able to convert by XRP tokens to real shares? . . ." PX 232.

**Response:**       Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 232 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC; however, Defendants dispute Paragraph 902 to the extent the SEC implies that PX 232 is an example of an XRP purchaser viewing XRP as an investment in Ripple including because the email itself suggests this individual was inquiring about whether their understanding was correct, rather than claiming to have any definitive view, as suggested by the SEC.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  Defendants further dispute that this statement by a third-party individual represents or is characteristic of the views or beliefs held by any other individual, as the SEC cites no evidence to establish that fact.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

903. On or about April 4, 2018, Laura Shin tweeted: "Yes^ + unlike bitcoin or ether, where the success isn't dependent upon any particular entity but token users and developers contribute to the value of the system, with XRP, its success depends on Ripple getting banks & FIs to use it. An XRP holder can't convince a bank to use XRP" PX 506.113, *available at* https://twitter.com/laurashin/status/981675304711110656.

**Response:**       Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Undisputed that PX 506.113 contains the quoted text.

Defendants further dispute Paragraph 903 to the extent the SEC implies that PX 506.113 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.  In fact, according to Shin's LinkedIn profile, she "do[es] not invest in crypto projects."  *See* Ex. 139 (LinkedIn profile of Laura Shin, *available at* https://www.linkedin.com/in/laurashin/).  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

904.    On or about May 22, 2018, a blogger called "xrphodor" posted an article called "XRP: The Best Crypto Choice for Long-Term Investors." PX 488, *available at* https://xrphodor.wordpress.com/2018/05/22/xrp-the-best-crypto-choice-for-long-term-investors/.

**Response:**        Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Undisputed that, on or about May 22, 2018, an article called "XRP: The Best Crypto Choice for Long-Term Investors" was posted at the URL referenced in Paragraph 904.  Defendants further dispute Paragraph 904 to the extent the SEC implies that PX 488 is an example of an XRP purchaser viewing XRP as an investment in Ripple. The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

905.    The May 22, 2018 article included the subheadings "A DEDICATED INTERNAL RIPPLE TEAM" and "Ripple's Track Record," and stated:

> Is there any doubt in your mind which digital asset that astute financial analysts and investors will be investing in?  Do your homework; and after doing your own research, see for yourself if you agree with me: XRP is the only cryptocurrency with the characteristics that are necessary to support global levels of commerce for a wide variety of use cases and applications.  Yes, it's the best cryptocurrency for settlement, but something tells me that speculators will soon prefer this digital asset over others for a store of value as well.

*Id.* at 2, 6.

**Response:**        Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Undisputed that PX 488 contains the quoted text.  Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

906.    On or about May 22, 2018, Garlinghouse forwarded a link to the "hodor" article to Will, Long, and another Ripple employee and stated in the subject line that "hodor is one of us!" PX 446.

**Response:**        Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Undisputed that, on or about May 22, 2018, Garlinghouse forwarded a link to an article cited in PX 446; however, defendants dispute the SEC's characterization of that link as "the 'hodor' article" as the SEC cites no evidence for such a characterization.

907.    In 2019, Ripple discussed a potential engagement with a reputable investment bank to consider selling Ripple's equity to the public. PX 447 (Declaration of Neil A. Kell, dated September 8, 2022 ("Kell Decl.")) at ¶ 3.

**Response:**        Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Undisputed, except insofar as Defendants object that the Declaration of Neil A. Kell submitted by the SEC is improper testimony of a witness who was not disclosed pursuant to Fed. R. Civ. P. 26(a)(1), and the contents of his declaration are

accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed.

R. Civ. P. 56(c)(2).

908. Based on its expertise, publicly available information, information about transactions in the securities of comparable companies, and information Ripple provided, the bank prepared a presentation for Ripple that included a framework for determining Ripple's valuation. PX 447 (Kell Decl.) at ¶ 5.

**Response:**      Defendants incorporate by reference their Global Response to and

Dispute of Paragraphs 877-925.  Undisputed, except insofar as Defendants object that the

Declaration of Neil A. Kell submitted by the SEC is improper testimony of a witness who

was not disclosed pursuant to Fed. R. Civ. P. 26(a)(1), and the contents of his declaration are

accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed.

R. Civ. P. 56(c)(2).

909. The bank's analysis explicitly tied Ripple's value to XRP's value and explained that any investment in Ripple assumed that Ripple had the financial incentive to continue to engage in efforts to increase XRP's price. PX 447 (Kell Decl.), Ex. A at 6-10.

**Response:**      Disputed.   Defendants incorporate by reference their Global

Response to and Dispute of Paragraphs 877-925.   Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 447, Ex. A because the cited

evidence does not support the SEC's assertions of fact as set forth in Paragraph 909; rather,

the bank included multiple factors in its preliminary valuation analysis, including RippleNet

and Xpring, and referenced XRP in terms of its utility, contrary to the SEC's assertion in

Paragraph 909 that the analysis "explicitly tied Ripple's value to XRP's value."  Defendants

further dispute Paragraph 909 to the extent the SEC implies that PX 447 is an example of an

XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does

not support the SEC's attempt to describe the overall views of the third-party, nor does it

indicate whether that third party actually purchased XRP.  Defendants further dispute

Paragraph 909 to the extent that it sets forth legal conclusions through its use of the term "efforts." Defendants further object that the Declaration of Neil A. Kell submitted by the SEC is improper testimony of a witness who was not disclosed pursuant to Fed. R. Civ. P. 26(a)(1), and the contents of his declaration are accordingly not evidence that can be presented in a form admissible at trial pursuant to Fed. R. Civ. P. 56(c)(2).

910.    Ripple's CFO and at least one other sophisticated valuation firm also valued Ripple based on Ripple's efforts to increase the value of XRP. PX 233 at 7-10.

**Response:**        Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  The cited evidence in PX 233 does not support the SEC's assertions of fact as set forth in Paragraph 910, as PX 233 (which is the same document as PX 447, Ex. A) makes no reference to "Ripple's CFO" or a "sophisticated valuation firm." Defendants further dispute Paragraph 910 to the extent the SEC implies that PX 233 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP. Defendants further dispute Paragraph 910 to the extent that it sets forth legal conclusions through its use of the term "efforts."

911.    In discussions with Ripple during November 2018, for example, the sophisticated valuation firm "made the point that it will be difficult to achieve the valuation that we want based on software revenues" and as a result, the firm's presentation to potential Ripple investors "goes very heavily towards XRP trading volumes."  PX 234.

**Response:**        Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 234 contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 234 including because Paragraph 911 attributes the

quoted text to discussions with a "sophisticated valuation firm," when in fact the text was contained in an email written by a Ripple employee, who at most set forth his personal views and not those of Ripple or the Individual Defendants. Defendants further dispute the SEC's characterization of and inferences purportedly drawn from PX 234 as an "example" of anything without explanation or support. Defendants further dispute Paragraph 911 to the extent the SEC implies that PX 234 is an example of an XRP purchaser viewing XRP as an investment in Ripple. The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP.

912.   The valuation firm's presentation from November 2018 highlighted the fact that "Ripple is Uniquely Positioned to Build Upon this Momentum" in the cryptocurrency market because "Ripple is One of the Largest Holders of Digital Assets in the World," with holdings of XRP worth approximately $28 billion. PX 235 at 6.

**Response:**      Disputed. Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925. Defendants do not dispute that PX 235 contains the quoted text; however, Defendants dispute Paragraph 912 to the extent the SEC implies that PX 235 is an example of an XRP purchaser viewing XRP as an investment in Ripple. The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party, nor does it indicate whether that third party actually purchased XRP. Pursuant to Fed. R. Civ. P. 56(c)(2), Defendants object that the SEC cannot present this fact in admissible form, as the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

913.   Ripple CFO Ron Will stated in an internal email from on or about December 18, 2018, that "our holding of XRP is our 'North Star' – and THE key driver of Ripple valuation." PX 206. Will also noted that "the long-term value of XRP is a component of the value of Ripple." PX 23 (Will Dep. Tr.) at 254:10-14.

**Response:**     Disputed.     Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that Will offered the quoted testimony, however Defendants dispute that a statement in an email by a single Ripple employee about a specific request from another Ripple employee "for an increase in his compensation" is sufficient to establish the facts set forth in Paragraph 913 at all times and for all purposes in this litigation.  PX 23 at 297:22-298:18; *see also id.* at 301:9-16 ("It appears in this [email] I was trying to reduce sales compensation costs by reducing the compensation of ███ team.  And that was the intent of this email.").

914.   At times, the market treated the terms "XRP" and "Ripple" as synonymous. For example, Ripple's Head of Regulatory Relations Ryan Zagone stated that around 2018 "there was confusion in the market on Ripple versus XRP and the difference between the two," and he "grew concerned and – and frustrated when there was just incorrect press reports conflating XRP and Ripple . . ." PX 19 (Zagone Dep. Tr.) at 176-77.

**Response:**     Disputed.     Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that Zagone offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC, however Defendants dispute Paragraph 914 because the SEC's use of the vague and ambiguous terms "[a]t times" and "the market" are vague and ambiguous, and therefore the assertion of fact in Paragraph 914 is not limited to any specified time period or individuals. Defendants further dispute that a statement by a single Ripple employee about a particular time is sufficient to establish the underlying fact broadly set forth in Paragraph 914 at any other time and for all purposes in this litigation.

915.   Similarly, in December 2017, Ripple's legal department circulated internally a document entitled "How We Talk About XRP email and confluence 12212017" that provided guidance to Ripple employees as to how to publicly discuss XRP and Ripple in an effort to clarify the purported distinction between XRP and the company. PX 125 at 4.

**Response:**      Disputed.   Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 125 as misleading, because it suggests that the document was sent as "guidance" and an "effort to clarify the purported distinction between XRP and the company," neither of which is supported by any evidence in the record, and particularly by the SEC's citation to PX 125 at 4, which contains only an email signature.  Defendants further dispute the SEC's pejorative implication the distinction between XRP and Ripple was a "purported" one as unsupported by the cited evidence, which establishes precisely the opposite—that XRP and Ripple were in fact separate.

916.   Monica Long noted that there was "confusion" in the marketplace "between the asset [XRP] and our brand and our company," such as when the press "would write stories about XRP, but they would call it Ripple." Such Ripple-XRP confusion was a problem throughout her tenure in the marketing department. PX 17 (Long Dep. Tr.) at 206-07.

**Response:**      Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.   Undisputed that Long offered the quoted testimony, exclusive of any alterations, omissions, or additions by the SEC.  Defendants dispute that a statement by a single Ripple employee as to a specific period in time is sufficient to establish the underlying fact broadly set forth in Paragraph 916 at all times and for all purposes in this litigation.

917.   Garlinghouse noted that "people associate us with XRP." As he explained, "market participants, particularly in 2017, had confusion around" the distinction between Ripple and XRP and that "in 2017 uneducated market participants mistakenly conflated Ripple and XRP . . ." According to Garlinghouse, Ripple engaged in persistent efforts to address this market confusion from at least 2017 through 2020, but the conflation between Ripple and XRP continued to persist even after that time. PX 81 (Garlinghouse Dep. Tr.) at 356:12-17, 357:24-358:5, 360-61, 474:2-11.

**Response:**      Disputed.  Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.   Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, PX 81 as misleading, because Garlinghouse testified that he is confident "from the earliest days of Ripple" that the company sought to reduce or eliminate confusion about equating Ripple and XRP and not only as of 2017, and Garlinghouse also testified that he believes the conflation only "persists to some degree today." PX 81 at 358:16-359:23. Additionally, Defendants dispute Paragraph 917 to the extent it sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including the SEC's statement that Garlinghouse and Ripple made "efforts." Undisputed that Garlinghouse offered the quoted testimony, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of Garlinghouse's testimony.

918.     During a January 2018 discussion about the establishment of an XRP investment trust, Garlinghouse requested that the trust not use the name "Ripple," to which the CEO of the firm behind the proposed trust responded: "If you are not using 'Ripple' in the context of XRP, we won't either. But everybody else seems to be making that association . . .  I just think we might be a ways off from the market knowing 'XRP' versus Ripple."  When Garlinghouse noted that "while we have a lot more work to do, I think people are coming around to using XRP over 'Ripple', the CEO responded that "we do need to recognize that literally every reference we can find to XRP also include (and usually starts with) 'Ripple'." PX 93 at 5-8.

**Response:**        Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Undisputed that PX 93 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 93, including because Paragraph 918 omits additional context necessary to understand the quoted language, including that Garlinghouse requested that the trust not use the name Ripple because it "is a vehicle for XRP (and not Ripple shares)" and

Ripple "work[s] hard to clarify (every day!) that Ripple is the company - XRP is the digital asset native to the XRP Ledger," as set forth in PX 93 at 9-10.

919.   On or about May 1, 2018, Ripple reached out to a journalist in an attempt to change references in an article to "Ripple's XRP." The journalist responded to Ripple: "[I] am not going to make the change.  I get why you guys care but average reader doesn't know or care about the distinction.  It is referred to as Ripple everywhere." PX 236 at 1.

**Response:**        Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Undisputed, except insofar as Defendants object, pursuant to Fed. R. Civ. P. 56(c)(2), that the SEC cannot present this fact in admissible form, as the portion of the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

920.   When in March 2018 Ripple tried to convince ███████████ to remove from an article a statement that XRP is "the only popular coin that is run by a company," the reporter rejected Ripple's request because it was "pretty absurd to dispute that XRP is run by a company." PX 237 at 1-2.

**Response:**        Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants do not dispute that PX 237 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC, however the SEC has not cited any evidence that would provide context to this quoted journalist's views, including whether or why the reporter allegedly "rejected" anything. Defendants object, pursuant to Fed. R. Civ. P. 56(c)(2), that the SEC cannot present this fact in admissible form, as the portion of the document quoted is a hearsay statement of a third party and not a statement by Ripple or the Individual Defendants.

921.   One XRP purchaser "understood that Ripple's mission was to facilitate global transactions in *Ripple*" and "hoped to make a profit from investing in XRP and then by selling XRP on a digital asset platform at an opportune time." PX 542 (Declaration of Hilary Zuckerman) ¶¶ 10-12. "The fact that that there was a company behind XRP" was a "distinguishing factor" in this individual's "decision to purchase XRP." *Id.*

**Response:**      Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants dispute Paragraph 921 to the extent the SEC implies that PX 542 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party.  Further, Defendants dispute that this single declaration suffices to establish the views or intentions of XRP purchasers in light of the thousands of affidavits submitted by XRP holders contradicting the impressions of the individual who signed PX 544.  *See* Ex. 168 (Decl. of John Deaton and Supp. Decl. of John Deaton); Ex. 167 (collected affidavits of XRP holders).

922.    Another XRP purchaser "did not purchase XRP for any consumptive use" but rather "as an investment with the expectation that [he] would be able to profit from that purchase by selling XRP at a higher price," which "expectation was based on Ripple's promotional activity" including "repeated representations that adoption of XRP by financial institutions would increase demand for XRP." PX 544 (Declaration of Bradly Sostack) ¶¶ 4-5.

**Response:**      Disputed.    Defendants incorporate by reference their Global Response to and Dispute of Paragraphs 877-925.  Defendants dispute Paragraph 922 to the extent the SEC implies that PX 544 is an example of an XRP purchaser viewing XRP as an investment in Ripple.  The source cited by the SEC does not support the SEC's attempt to describe the overall views of the third-party.  Further, Defendants dispute that this single declaration suffices to establish the views or intentions of XRP purchasers in light of the thousands of affidavits submitted by XRP holders contradicting the impressions of the individual who signed PX 544.  *See* Ex. 168 (Decl. of John Deaton and Supp. Decl. of John Deaton); Ex. 167 (collected affidavits of XRP holders).

923.    RESERVED.

**Response:**     Defendants object to Paragraph 923 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

924.   RESERVED.

**Response:**     Defendants object to Paragraph 924 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

925.   RESERVED.

**Response:**     Defendants object to Paragraph 925 because it is not a purported statement of undisputed material fact compliant with Local Civil Rule 56.1 and state that no response is required.

926.   On or about August 27, 2019, for example, Garlinghouse tweeted that "@Ripple continues to set industry standards in reporting and transparency (one example is our quarterly markets report).  We lay it all out, and it's not our "view" but fact." PX 506.122, *available at* https://twitter.com/bgarlinghouse/status/1166455844172525568.

**Response:**     Undisputed that PX 506.122 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 506.122, including because Paragraph 926 omits additional context necessary to understand the quoted language, including that Garlinghouse's tweets were discussing misinformation being spread about Ripple, and Garlinghouse clarifies that "it's clear XRP is not a security" and that "XRP sales are about helping expand XRP's utility" and in this context, mentions the quoted language regarding Ripple's quarterly markets reports, as set forth in PX 506.122.

383

927. On or about October 9, 2019, Garlinghouse claimed on a podcast that Ripple is "ten or a hundred times more transparent than anyone in the crypto community." Marie Huillet, *Ripple CEO: Our Transparency Has Opened Us Up To Attack*, Cointelegraph (Oct. 11, 2019), *available at* https://cointelegraph.com/news/ripple-ceo-our-transparency-has-opened-us-up-to-attack.

**Response:**     Undisputed that the linked article contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the article's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, the linked article, including because Paragraph 927 omits additional context necessary to understand that Garlinghouse explained in the article linked by the SEC that Ripple's "transparency has opened [them] up to attack" and said that the "bunch of misinformation" about Ripple is, in part, due to the fact that Ripple is more transparent than others in the crypto community. *See* https://cointelegraph.com/news/ripple-ceo-our-transparency-has-opened-us-up-to-attack.

928. Defendants never filed a registration statement with the SEC in connection with their offers and sales of XRP. PX 80 (Ripple Ans.) ¶¶ 2, 4, 8, 60, 72, 222, 393; PX 1 (Larsen Ans.) ¶ 60; PX 201 (Garlinghouse Ans.) ¶ 60.

**Response:**     Undisputed that Defendants never filed a registration statement with the SEC in connection of their offers and sales of XRP because none was required, because XRP was not and is not a security.  PX 80 at ¶¶ 2, 4, 8, 60, 72, 222, 393; PX 1 at ¶ 60; PX 201 at ¶ 60.

929. Nor has Ripple ever filed or made public the sort of information otherwise required by the federal securities laws as to Ripple or XRP.  PX 238 (████ Rep.) at 28-29; PX 510.

**Response:**     Disputed.  Defendants dispute that Paragraph 929 contains an alleged statement of fact as required by Local Civil Rule 56.1.  Defendants further object pursuant to Fed. R. Civ. P. 56(c)(2) that the SEC has not offered the evidence set forth in this

paragraph in a form that would be admissible at trial, as the testimony of ████████ is inadmissible for the reasons set forth in Defendants' motion to exclude.  (ECF No. 533.)  In particular, Defendants dispute that PX 238 does not support the SEC's assertion of fact in Paragraph 929, because ████████ testified during his deposition that he did not undertake any research concerning what information was *actually* provided to purchasers of XRP.  *See, e.g.*, Ex. 140, ECF No. 534-2 (Dep. of ████████, Nov. 18, 2021) at 119:10-14 ("Q. Did you do any research concerning what information was actually provided to purchasers of XRP other than looking at those XRP market reports we talked about earlier? A. I did not.").  Accordingly, the SEC's assertion in Paragraph 929 is no more than unsupported speculation that ████████ report does not support because, other than reviewing Ripple contracts with two counterparties, two Ripple emails, and several unspecified XRP Markets Reports available on Ripple's website, ████████ admitted that he did not (i) examine the "facts or circumstances specific to Ripple or XRP"; (ii) determine what information was publicly available to XRP purchasers concerning Ripple's products or services, or its sales of XRP or equity stock; (iii) speak with anyone who purchased XRP; (iv) review any materials reflective of XRP purchasers' views or opinions; or (v) analyze what information is available on the XRP Ledger to assess what purchasers could determine from that public source.  *See* Ex. 140, ECF No. 534-2 at 29:19-30:8, 114:25-115:25, 120:23-122:11, 127:19-132:4.  Because the evidence cited in Paragraph 929 was not made with the personal knowledge of the declarant within the meaning of the Federal Rules of Evidence, it is therefore not admissible and properly relied upon by the SEC.  *See* Local Civil Rule 56.1(d) ("Each statement by the movant or opponent pursuant to Rule 56.1(a) and (b), including each statement controverting any statement of material fact, must be followed by citation to

evidence which would be admissible, set forth as required by Fed. R. Civ. P. 56(c)."); Fed. R. Evid. 602 (personal knowledge required for fact testimony).  Finally, Defendants further dispute Paragraph 929 because whether Ripple "ever filed or made public the sort of information otherwise required by the federal securities laws as to Ripple or XRP" presents a legal conclusion, and therefore is not properly part of the SEC's 56.1 statement, nor the permissible subject of its expert's testimony.

930.    For example, Ripple has never made any EDGAR filings with the SEC for Ripple or for XRP, including the filing of a Form 10-Q, Form 10-K, or Form 8-K relating to XRP.  PX 8, (Ripple RFA Responses) Nos. 227-28, 736; PX 94 (Ripple RFA Responses) No. 736.

**Response:**        Undisputed.

931.    Ripple has never publicly filed any reports – including financial statements or other periodic filings – required under the Securities Exchange Act of 1934. PX 8 (Ripple RFA Responses) Nos. 230; PX 94 (Ripple RFA Responses) No. 732.

**Response:**        Undisputed.

932.    Ripple did not release its annual financial statements to the general public prior to December 22, 2020, nor did it provide such statements to all XRP purchasers. PX 94 (Ripple RFA Responses) Nos. 733-35.

**Response:**        Undisputed.

933.    Ripple has not always publicly provided complete information about its business activities. PX 540; PX 130.

**Response:**        Disputed.   Defendants dispute that Paragraph 933 contains an alleged statement of fact as required by Local Civil Rule 56.1.  Defendants are unable to evaluate the meaning of "always" or "publicly provided" or "complete information" as they are used in Paragraph 933, which is vague, ambiguous, and unclear; this Section 5 case does not turn on Ripple's disclosures concerning its "business activities."  *See generally* ECF No. 441 (Order Denying Individual Defs.' Mots. to Dismiss) at 15 n. 8 ("violation of Section 5 is a strict liability offense").  Moreover, because only the disclosure of "material" facts is

386

generally required under the federal securities laws, insofar as the SEC seeks to establish any

fact relevant under those laws, Defendants object to the SEC's implication in Paragraph 933

that Ripple did not provide "complete information" because it presents a legal conclusion.

*See, e.g.*, 17 CFR § 230.408(a) ("In addition to the information expressly required to be

included in a registration statement, there shall be added such further material information,

if any, as may be necessary to make the required statements, in the light of the circumstances

under which they are made, not misleading."); 17 CFR § 243.100 ("Reg FD") ("Whenever

an issuer, or any person acting on its behalf, discloses any material nonpublic information

regarding that issuer or its securities to any person…the issuer shall make public disclosure

of that information…").   Defendants further dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 130 and PX 540, which do not support the SEC's

assertion in Paragraph 933 concerning Ripple's purported nondisclosure of "complete

information about its business activities."

934.   For example, the XRP Markets Reports that Ripple provides to investors on its
website do not disclose all of Ripple's XRP distributions and, in the words of a
Ripple employee, are thus "not a good representation of the XRP that was
introduced into the market." PX 22 (Samarasinghe Tr.) at 265-66.

**Response:**   Disputed.   Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 22 because the cited evidence does not support the

SEC's assertion of fact as set forth in Paragraph 934.   Samarasinghe's complete quote notes

that "the sales numbers [in the market reports] *were accurate*." PX 22 at 265:7-11 (emphasis

added).

935.   As one Ripple employee noted in an internal email: "I think it's critical we help
████ [] understand that their timing [of distributing almost ██████████ units of XRP
in a single week] has a real and deleterious effect on Ripple," and that these sales
"get noticed," including by people on "twitter" that are going to "call the transaction
out." PX 240.

**Response:**        Undisputed that PX 240 contains the quoted text, exclusive of any alterations, omissions, or additions by the SEC.

936.    CFO Will acknowledged that Ripple never disclosed any related-party transactions; trading activity by Ripple executives; risks relating to its business; or information about executive compensation. PX 23 (Will Dep. Tr.) at 25-27.

**Response:**        Disputed.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 23, because the cited testimony does not establish that Ripple never "disclosed" to anyone any of the information set forth in Paragraph 936.

937.    Defendants claim Ripple has no obligation to provide full information about its business, because it is a "private company" that takes "significant measures to safeguard" the confidentiality of its financial condition. D.E. 562 at 2; PX 23 (Will Dep. Tr.) at 303 (Ripple CFO noting that "[a]s a private company, Ripple is under no obligation to provide, broadly, its financial statements").

**Response:**        Defendants dispute that Paragraph 937 contains an alleged statement of fact, as required by Local Civil Rule 56.1, because by its terms it contains only the SEC's legal assertions relating to what Defendants "claim" in connection with their legal defenses in this action.  Defendants do not dispute that Ripple is a private company, or that Will offered the quoted testimony.  Defendants dispute that the document filed at ECF 562 supports the statement of fact in Paragraph 937, because the ECF 562 does not purport to provide any facts concerning Defendants' legal obligations to make certain information publicly available.

938.    On July 25, 2017, the SEC issued a *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, regarding the issuer of a "decentralized" digital token that sold the token to public investors in order to fund its business operations.  SEC Rel.  No.  81207, *available at* https://www.sec.gov/litigation/investreport/34-81207.pdf ("DAO Report") at 1, 4.

**Response:**        Undisputed that the SEC issued the DAO Report on July 25, 2017; however, Defendants dispute that the DAO Report characterizes "DAO tokens" or any other digital assets as "decentralized."  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, the DAO Report as misleading to the extent it characterizes the DAO as selling tokens "in order to fund its business operations" when the DAO Report describes how the DAO offered and sold "DAO tokens to raise capital" but "never commenced its business operations." DAO Report at 1 n.1, 6, 10.

939.    The DAO Report considered the offer and sale of "DAO tokens" and concluded they were investment contracts under the standards articulated in *SEC v. W.J. Howey Co.*, 328 U.S. 293 (1946), and subsequent decisions applying *Howey*. DAO Report at 11-15.

**Response:**       Undisputed that the DAO Report considered the offer and sale of "DAO tokens" and concluded they were investment contracts under the federal securities laws; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, the DAO Report as misleading because Paragraph 939 omits additional context necessary to understand the DAO Report, as set forth in Ex. 141, Press Release, SEC, *SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities* (July 25, 2017), https://www.sec.gov/news/press-release/2017-131;  Ex. 142, Investor Bulletin: Initial Coin Offerings (July 25, 2017), https://www.investor.gov/introduction-investing/general-resources/news-alerts/alerts-bulletins/investor-bulletins-16;  Ex. 143, Statement by the Divisions of Corporation Finance and Enforcement on the Report of Investigation on The DAO (July 25, 2017), https://www.sec.gov/news/public-statement/corpfin-enforcement-statement-report-investigation-dao.   Paragraph 939 also omits additional context necessary to understand the DAO Report, including that it classified ether and bitcoin as "virtual currenc[ies]," DAO Report at 2–3, 4, 11, in the same way that XRP was classified a "virtual currency" by the United States Government Accountability Office ("GAO") in 2014 and the United States Department of Justice ("DOJ") and Financial Crimes Enforcement Network ("FinCEN") in 2015, as set forth in Ex. 144 at

RPLI_SEC_1079990-1080045; Ex. 145, Ripple Labs Inc. Resolves Criminal Investigation (May 5, 2015), https://www.justice.gov/usao-ndca/pr/ripple-labs-inc-resolves-criminal-investigation. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, the DAO Report, including because Paragraph 939 omits additional context necessary to understand the DAO Report, including that the DAO Report discussed the treatment of digital assets as securities when tokens are sold "to raise capital" in what "have been referred to, among other things, as 'Initial Coin Offerings.'" DAO Report at 10. The DAO Report also notes that the "DAO Tokens" associated with the DAO "would permit the participant to vote and entitle the participant to 'rewards.' [One of the founders of the DAO] likened this to 'buying shares in a company and getting . . . dividends.'" DAO Report at 4. Unlike the conduct contemplated by the DAO Report, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits or voting rights to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146, RPLI_SEC 0376143, at -46 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2, D. Schwartz Decl. ¶¶ 4, 6, 8; Ex. 20, Long Decl. ¶ 8; Ex. 40 (Expert Report of Alan Schwartz) ("A. Schwartz Report") at 12-18, 24, 33-36; Ex. 11 (Report of Allen Ferrell, Ph.D.) ("Ferrell Report") at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").

940.   The DAO Report stated: "The Commission deems it appropriate and in the public interest to issue this report of investigation ('Report') pursuant to Section 21(a) of

the Exchange Act to advise those who would use a Decentralized Autonomous Organization ('DAO Entity'), or other distributed ledger or blockchain-enabled means for capital raising, to take appropriate steps to ensure compliance with the U.S. federal securities laws." *Id.* at 1-2.

**<u>Response:</u>**    Undisputed that the DAO Report contains the quoted text; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

the DAO Report as misleading because Paragraph 940 omits additional context necessary to

understand the DAO Report, specifically that the quoted text in Paragraph 940 omits

Footnote 2 of the DAO Report included with that sentence and stating in part that "[t]his

Report does not constitute an adjudication of any fact or issue addressed herein, nor does it

make any findings of violations by any individual or entity."  DAO Report at 2 n.2.

941.    The DAO Report stated: "This Report reiterates these fundamental principles of the U.S. federal securities laws and describes their applicability to a new paradigm— virtual organizations or capital raising entities that use distributed ledger or blockchain technology to facilitate capital raising and/or investment and the related offer and sale of securities." *Id.* at 2.

**<u>Response:</u>**    Undisputed that the DAO Report contains the quoted text; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

the DAO Report, including because Paragraph 941 omits additional context necessary to

understand the DAO Report, including that the DAO Report discussed the treatment of

digital assets as securities when tokens are sold "to raise capital" in what "have been referred

to, among other things, as 'Initial Coin Offerings.'"  DAO Report at 10.  The DAO Report

also notes that the "DAO Tokens" associated with the DAO "would permit the participant to

vote and entitle the participant to 'rewards.'  [One of the founders of the DAO] likened this

to 'buying shares in a company and getting . . . dividends.'"  DAO Report at 4.  Unlike the

conduct contemplated by the DAO Report, Ripple never held an "ICO"; never offered or

contracted to sell future tokens as a way to raise money to build an ecosystem; never

explicitly or implicitly promised profits or voting rights to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").

942. The DAO Report stated:

> The Commission is aware that virtual organizations and associated individuals and entities increasingly are using distributed ledger technology to offer and sell instruments such as DAO Tokens to raise capital. These offers and sales have been referred to, among other things, as "Initial Coin Offerings" or "Token Sales." Accordingly, the Commission deems it appropriate and in the public interest to issue this Report in order to stress that the U.S. federal securities law may apply to various activities, including distributed ledger technology, depending on the particular facts and circumstances, without regard to the form of the organization or technology used to effectuate a particular offer or sale. In this Report, the Commission considers the particular facts and circumstances of the offer and sale of DAO Tokens to demonstrate the application of existing U.S. federal securities laws to this new paradigm.

*Id.* at 10.

**Response:**       Undisputed that the DAO Report contains the quoted text; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, the DAO Report, including because Paragraph 942 omits additional context necessary to understand the DAO Report, including that the DAO Report specifically discussed the treatment of digital assets as securities when tokens are sold "to raise capital" in what "have

been referred to, among other things, as 'Initial Coin Offerings.'" DAO Report at 10. The

DAO Report also notes that the "DAO Tokens" associated with the DAO "would permit the

participant to vote and entitle the participant to 'rewards.' [One of the founders of the DAO]

likened this to 'buying shares in a company and getting . . . dividends." DAO Report at 4.

Unlike the conduct contemplated by the DAO Report, Ripple never held an "ICO"; never

offered or contracted to sell future tokens as a way to raise money to build an ecosystem;

never explicitly or implicitly promised profits or voting rights to any XRP holder; never

offered or sold XRP as an investment; and has no relationship at all with the vast majority of

XRP holders today, nearly all of whom purchased XRP from third parties on the open market.

*See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long

before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A.

Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP

represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not

purchased directly from Ripple but are traded anonymously at the cryptocurrency

exchanges.").

943. The DAO Report stated: "Foundational Principles of the Securities Laws Apply to
Virtual Organizations or Capital Raising Entities Making Use of Distributed Ledger
Technology." *Id.* at 11.

**Response:** Undisputed that the DAO Report contains the quoted text; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

the DAO Report, including because Paragraph 943 omits additional context necessary to

understand the DAO Report, including that the DAO Report specifically discussed the

treatment of digital assets as securities when tokens are sold "to raise capital" in what "have

been referred to, among other things, as 'Initial Coin Offerings.'" DAO Report at 10. The

DAO Report also notes that the "DAO Tokens" associated with the DAO "would permit the

participant to vote and entitle the participant to 'rewards.' [One of the founders of the DAO]

likened this to 'buying shares in a company and getting . . . dividends.'" DAO Report at 4.

Unlike the conduct contemplated by the DAO Report, Ripple never held an "ICO"; never

offered or contracted to sell future tokens as a way to raise money to build an ecosystem;

never explicitly or implicitly promised profits or voting rights to any XRP holder; never

offered or sold XRP as an investment; and has no relationship at all with the vast majority of

XRP holders today, nearly all of whom purchased XRP from third parties on the open market.

*See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long

before this trend."); Ex. 2, D. Schwartz Decl. ¶¶ 4, 6, 8; Ex. 20, Long Decl. ¶ 8; Ex. 40 ("A.

Schwartz Report") at 12–18, 24, 33–36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP

represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not

purchased directly from Ripple but are traded anonymously at the cryptocurrency

exchanges.").

944.     The DAO Report stated:

> Whether or not a particular transaction involves the offer and sale of
> a security— regardless of the terminology used—will depend on the
> facts and circumstances, including the economic realities of the
> transaction. Those who offer and sell securities in the United States
> must comply with the federal securities laws, including the
> requirement to register with the Commission…These requirements
> apply to those who offer and sell securities in the United States,
> regardless whether the issuing entity is a traditional company or a
> decentralized autonomous organization, regardless whether those
> securities are purchased using U.S. dollars or virtual currencies, and
> regardless whether they are distributed in certificated form or
> through distributed ledger [also known as "blockchain"] technology.

*Id.* at 17-18.

**Response:**     Undisputed that the DAO Report contains the quoted text; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from

the DAO Report to the extent it implies that the DAO Report provided fair notice that the federal securities laws applied to XRP.   Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, the DAO Report, including because Paragraph 943 omits additional context necessary to understand the DAO Report, including that the DAO Report specifically discussed the treatment of digital assets as securities when tokens are sold "to raise capital" in what "have been referred to, among other things, as 'Initial Coin Offerings.'"   DAO Report at 10.   The DAO Report also notes that the "DAO Tokens" associated with the DAO "would permit the participant to vote and entitle the participant to 'rewards.'   [One of the founders of the DAO] likened this to 'buying shares in a company and getting . . . dividends.'"   DAO Report at 4.   Unlike the conduct contemplated by the DAO Report, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits or voting rights to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.   *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.   In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").

945.   Between September 2017 and December 2020, the SEC filed at least 35 actions where it alleged unregistered distribution of digital assets violated Section 5 of the Securities Act of 1933 ("Securities Act").

**Response:**   Disputed.   Paragraph 945 sets forth legal conclusions, inferences, or assertions unsupported by citations to evidence, including the SEC's statement that certain

unidentified and undefined "actions" related to "digital assets" or "alleged unregistered distribution of digital assets violated Section 5 of the Securities Act of 1933." Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, these unidentified actions to the extent that the SEC implies that they would have given fair notice to Defendants' about the applicability of the federal securities laws to offers and sales of XRP, since such cases each pertain to a unique set of facts, circumstances, and parties. Defendants also dispute the implication that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

946. On September 29, 2017, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. REcoin Group Foundation, LLC, et al.*, No. 17-cv-5725 (E.D.N.Y. Sept. 29, 2017).

**Response:**        Undisputed that the SEC filed the referenced complaint against REcoin Group Foundation, LLC and certain other defendants on September 29, 2017; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies, such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was created and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP. Compl. ¶ 1, *SEC v. Recoin Group Foundation, LLC, et al.*, No. 17-CV-5725 (E.D.N.Y. Sept. 29, 2017), ECF No. 1. Unlike the enforcement action at issue in Paragraph 946, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to

build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Further, the SEC does not allege that Defendants engaged in fraudulent conduct. Defendants also dispute the SEC's characterization of this complaint as alleging that certain "offers and sales of a digital asset violated Section 5 of the Securities Act" when the offers and sales were, in fact, part of two "initial coin offerings" purportedly involving digital assets "backed" by "real estate investments" or "hedged by physical diamonds" and neither the digital assets nor the underlying investments at issue actually existed. Compl. ¶¶ 1, 37–40, 46–48, 75–76, 81–82. Paragraph 946 also omits that this complaint classified ether and bitcoin as "virtual currenc[ies]," Compl. ¶ 22, in the same way that XRP was classified a "virtual currency" by the United States Government Accountability Office ("GAO") in 2014 and the United States Department of Justice ("DOJ") and Financial Crimes Enforcement Network ("FinCEN") in 2015, as set forth in Ex. 144, RPLI_SEC_1079990-1080045; Ex. 145, Ripple Labs Inc. Resolves Criminal Investigation (May 5, 2015), https://www.justice.gov/usao-ndca/pr/ripple-labs-inc-resolves-criminal-investigation.

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 946 omits additional context necessary to

understand it, including that this complaint was the first case brought by the SEC relating to the sale of a digital asset and was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 946 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

947.  On December 1, 2017, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. PlexCorps, et al.*, No. 17-cv-7007 (E.D.N.Y. Dec. 1, 2017).

**Response:**      Undisputed that the SEC filed the referenced complaint against PlexCorps and certain other defendants on December 1, 2017; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies, such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP.  Compl. ¶ 1, *SEC v. PlexCorps et al.,* No. 17-CV-7007 (E.D.N.Y. Dec. 1, 2017), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 947, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18,

24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 947 states  that certain "offers and sales of a digital asset violated Section 5 of the Securities Act" when the offers and sales were, in fact, part of an "Initial Coin Offering" where PlexCorps "guarantee[d] a profit margin during the pre-sale to [its] founding members" independent of any increase in the value of the digital asset at issue, but conducted "no meaningful project development" to that end.  Compl. ¶ 76, 84.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 947 omits additional context necessary to understand it, including that this complaint was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 947 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

948.    On Dec. 11, 2017, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of Munchee Inc.*, Administrative Proceeding File No. 3-18304 (Dec. 11, 2017), *available at* https://www.sec.gov/litigation/admin/2017/33-10445.pdf.

**Response:**        Undisputed that the SEC issued the referenced order against Munchee Inc. on December 11, 2017; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain

technologies, such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional, or the promised "ecosystem" existed whatsoever – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP. Order at 7, *In the Matter of Munchee Inc.*, File No. 3-18304 (Dec. 11, 2017). Unlike the enforcement action at issue in Paragraph 948, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 948 omits additional context necessary to understand it, including that this complaint was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 948 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets. Order at 1, *In the Matter of Munchee Inc.*, File No. 3-18304 (Dec. 11, 2017).

949.    On January 25, 2018, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Arisebank, et al.*, No.18-cv-186 (N.D. Tex. Jan. 25, 2018).

**Response:**        Undisputed that the SEC filed the referenced complaint against Arisebank and certain other defendants on January 25, 2018; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies, such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was created and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP.  Compl. ¶¶ 1–3, *SEC v. Arisebank, et al.*, No.18-cv-186 (N.D. Tex. Jan. 25, 2018), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 949, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants also dispute the SEC's characterization of this complaint as alleging that certain "offers and sales of a digital asset

violated Section 5 of the Securities Act" when the offers and sales were, in fact, part of an "initial coin offering" purportedly involving a digital asset that facilitated revenue-sharing connected to an FDIC-insured bank, when neither the digital asset nor the bank at issue actually existed.  Compl. ¶¶ 3, 27, 35–37.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 949 omits additional context necessary to understand it, including that this complaint was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 949 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

950.    On April 2, 2018, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Sharma, et al.*, No. 18-cv-2909 (S.D.N.Y. Apr. 2, 2018).

**Response:**        Undisputed that the SEC filed the referenced complaint against Sohrab Sharma and certain other defendants on April 2, 2018; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies, such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP.  Compl. ¶ 1, *SEC v. Sharma, et al.*, No. 18-cv-2909 (S.D.N.Y. Apr. 2, 2018), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 950, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly

promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 950 omits additional context necessary to understand it, including that this complaint was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants' also dispute the implication in Paragraph 950 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

951.   On May 22, 2018, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Titanium Blockchain Infrastructure Services, Inc.*, *et al.*, No. 18-cv-4315 (C.D. Cal. May 22, 2018).

**Response:**        Undisputed that the SEC filed the referenced complaint against Titanium Blockchain Infrastructure Services, Inc. and certain other defendants on May 22, 2018; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies, such as XRP, since the

complaint related to the sale of a token in an ICO before the respective token was functional and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP.  Compl. ¶ 4, *SEC v. Titanium Blockchain Infrastructure Services, Inc.*, *et al.*, No. 18-cv-4315 (C.D. Cal. May 22, 2018), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 951, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 951 omits additional context necessary to understand it, including that this complaint was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 951 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

952.   On August 14, 2018, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated

Section 5 of the Securities Act. *See In the Matter of Tomahawk Exploration LLC, et al.*, Administrative Proceeding File No. 3-18641 (Aug. 14, 2018), *available at* https://www.sec.gov/litigation/admin/2018/33-10530.pdf.

**Response:**        Undisputed that the SEC issued the referenced order against Tomahawk Exploration LLC and certain other respondents on August 14, 2018; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies, such as XRP, since the order related to the sale of a token, which was convertible to equity, in an ICO before the respective token was functional and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP. Order at 1, *In the Matter of Tomahawk Exploration*, File No. 3-18641 (Aug. 14, 2018). Unlike the enforcement action at issue in Paragraph 952, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Further, the SEC does not allege that Defendants engaged in fraudulent conduct. Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, this order, including because Paragraph 952 omits additional context necessary to understand it, including that this order was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 952 that a settlement order, in which one of the respondents neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets. Order at 1, *In the Matter of Tomahawk Exploration*, File No. 3-18641 (Aug. 14, 2018).

953. On October 3, 2018, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Blockvest, LLC, et al.*, No. 18-cv-2287 (S.D. Cal. Oct. 3, 2018).

**Response:** Undisputed that the SEC filed the referenced complaint against Blockvest, LLC and certain other defendants on October 3, 2018; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP. Compl. ¶ 1–2, *SEC v. Blockvest, LLC, et al.*, No. 18-cv-2287 (S.D. Cal. Oct. 3, 2018), ECF No. 1. Unlike the enforcement action at issue in Paragraph 953, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC

0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 953 omits additional context necessary to understand it, including that this complaint was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 953 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

954.    On November 16, 2018, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of CarrierEQ, Inc.*, Administrative Proceeding File No. 3-18898 (Nov. 16, 2018), *available at* https://www.sec.gov/litigation/admin/2018/33-10575.pdf.

**Response:**      Undisputed that the SEC issued the referenced order against CarrierEQ, Inc. on November 16, 2018; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP.  Order at 2, *In the Matter of CarrierEQ (AirFox)*, File No. 3-18898 (Nov. 16, 2018).  Unlike the enforcement action at issue in

Paragraph 954, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 954 omits additional context necessary to understand it, including that this order was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 954 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets.  Order at 2, *In the Matter of CarrierEQ (AirFox)*, File No. 3-18898 (Nov. 16, 2018).

955.   On November 16, 2018, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of Paragon Coin, Inc.*, Administrative Proceeding File No. 3-18897 (Nov. 16, 2018), *available at* https://www.sec.gov/litigation/admin/2018/33-10574.pdf.

**Response:**      Undisputed that the SEC issued the referenced order against Paragon Coin, Inc. on November 16, 2018; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants

about the applicability of the federal securities laws to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional or the promised "ecosystem" existed whatsoever – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP. Order at 1–2, *In the Matter of Paragon Coin, Inc.*, File No. 3-18897 (Nov. 16, 2018). Unlike the enforcement action at issue in Paragraph 955, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 955 omits additional context necessary to understand it, including that this order was filed more than six years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 955 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets. Order at 1, *In the Matter of Paragon Coin, Inc.*, File No. 3-18897 (Nov. 16, 2018).

956.    On February 20, 2019, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of Gladius Network LLC*, Administrative Proceeding File No. 3-19004 (Feb. 20, 2019), *available at* https://www.sec.gov/litigation/admin/2019/33-10608.pdf.

**Response:**        Undisputed that the SEC issued the referenced order against Gladius Network LLC on February 20, 2019; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional or the promised "ecosystem" existed whatsoever – facts and circumstances that are not alleged here and did not apply to Defendants' conduct or to XRP. Order at 1–2, *In the Matter of Gladius Network LLC*, File No. 3-19004 (Feb. 20, 2019). Unlike the enforcement action at issue in Paragraph 956, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 956 omits additional context necessary to understand

410

it, including that this order was filed more than six years after the SEC alleges that Ripple

began sales of XRP in violation of Section 5.  Defendants also dispute the implication in

Paragraph 956 that a settlement order, in which the respondent neither admitted nor denied

the Commission's findings, constitutes authoritative guidance as to the applicability of the

securities laws to digital assets.  Order at 1, *In the Matter of Gladius Network LLC*, File No.

3-19004 (Feb. 20, 2019).

957.  On May 13, 2019, the SEC filed a complaint in which the SEC alleged that offers
and sales of a digital asset violated Section 5 of the Securities Act.  *See SEC v.
Natural Diamonds Investment Co., et al.*, No.19-cv-80633 (S.D. Fla. May 13,
2019).

**Response:**  Undisputed that the SEC filed the referenced complaint against

Natural Diamonds Investment Co. and certain other defendants on May 13, 2019; however,

Defendants dispute the SEC's characterization of, and inferences purportedly drawn from,

this complaint to the extent that the SEC implies that this complaint would have given fair

notice to digital asset market participants about the applicability or the SEC's interpretation

of the federal securities laws as to fully functional blockchain technologies such as XRP,

since the complaint related to the sale of a token in an ICO before the respective token was

functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive

investors – facts and circumstances not alleged here and that did not apply to Defendants'

conduct or to XRP.  Compl. ¶¶ 7–12, *SEC v. Natural Diamonds Investment Co., et al.*, No.19-

cv-80633 (S.D. Fla. May 13, 2019), ECF No. 1.  Unlike the enforcement action at issue in

Paragraph 957, Ripple never held an "ICO"; never offered or contracted to sell future tokens

as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits

to any XRP holder; never offered or sold XRP as an investment; and has no relationship at

all with the vast majority of XRP holders today, nearly all of whom purchased XRP from

third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 957 omits additional context necessary to understand it, including that this complaint was filed more than six years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants' also dispute the implication in Paragraph 957 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

958.    On June 4, 2019, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Kik Interactive Inc.*, No.19-cv-5244 (S.D.N.Y. June 4, 2019).

**Response:**        Undisputed that the SEC filed the referenced complaint against Kik Interactive Inc. on June 4, 2019; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Compl. ¶¶ 1, 8-12, *SEC v. Kik Interactive Inc.*, No.19-cv-5244 (S.D.N.Y. June 4, 2019), ECF

No. 1.  Unlike the enforcement action at issue in Paragraph 958, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 958 omits additional context necessary to understand it, including that this complaint was filed more than six years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 958 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

959.    On August 12, 2019, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act.  *See SEC v. Middleton, et al.*, No.19-cv-4625 (E.D.N.Y. Aug. 12, 2019).

**Response:**    Undisputed that the SEC filed the referenced complaint against Reginald Middleton and certain other defendants on August 12, 2019; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's

interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Compl. ¶ 1, *SEC v. Middleton, et al.*, No.19-cv-4625 (E.D.N.Y. Aug. 12, 2019), ECF No. 1. Unlike the enforcement action at issue in Paragraph 959, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Further, the SEC does not allege that Defendants engaged in fraudulent conduct. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 959 omits additional context necessary to understand it, including that this complaint was filed more than five years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 959 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

960.    On August 12, 2019, the SEC issued an Order Instituting Administrative
Proceedings in which the SEC alleged that offers and sales of a digital asset violated
Section 5 of the Securities Act. *See In the Matter of SimplyVital Health, Inc.*,
Administrative Proceeding File No. 3-19332 (Aug. 12, 2019), *available at*
https://www.sec.gov/litigation/admin/2019/33-10671.pdf.

**Response:**    Undisputed that the SEC issued the referenced order against

SimplyVital Health, Inc. on August 12, 2019; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, this order to the extent that the

SEC implies that this order would have given fair notice to digital asset market participants

about the applicability of the federal securities laws or the SEC's interpretation of the federal

securities laws as to fully functional blockchain technologies such as XRP, since the order

related to the sale of a token in an ICO before the respective token was functional – facts and

circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.

Order at 1-4, *In the Matter of SimplyVital Health, Inc.*, Administrative Proceeding File No.

3-19332 (Aug. 12, 2019).  Unlike the enforcement action at issue in Paragraph 960, Ripple

never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money

to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder;

never offered or sold XRP as an investment; and has no relationship at all with the vast

majority of XRP holders today, nearly all of whom purchased XRP from third parties on the

open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP

existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.)

¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's

sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP

are not purchased directly from Ripple but are traded anonymously at the cryptocurrency

exchanges.").  Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, this order, including because Paragraph 960 omits additional context necessary

to understand it, including that this order was filed more than six years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 960 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets.  Order ¶ 1, *In the Matter of SimplyVital Health, Inc.*, Administrative Proceeding File No. 3-19332 (Aug. 12, 2019).

961.    On August 29, 2019, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act.  *See SEC v. Bitqyck, Inc., et al.,* No. 19-cv-2059 (N.D. Tex. Aug. 29, 2019).

**Response:**        Undisputed that the SEC filed the referenced complaint against Bitqyck, Inc. and certain other defendants on August 29, 2019; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.  Compl. ¶ 1, *SEC v. Bitqyck, Inc., et al.,* No. 19-cv-2059 (N.D. Tex. Aug. 29, 2019), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 961, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and

416

XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long

Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68

("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a

majority of XRP are not purchased directly from Ripple but are traded anonymously at the

cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in

fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from, this complaint, including because Paragraph 961 omits additional

context necessary to understand it, including that this complaint was filed more than six years

after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants

also dispute the implication in Paragraph 961 that factual allegations in a complaint constitute

guidance on the SEC's interpretation of the federal securities laws or a determination of

liability.

962.　On September 18, 2019, the SEC filed a complaint in which the SEC alleged that
offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC
v. ICOBox, et al.*, No. 19-cv-8066 (C.D. Cal. Sept. 18, 2019).

**Response:**　　　Undisputed that the SEC filed the referenced complaint against

*ICOBox* and certain other defendants on September 18, 2019; however, Defendants dispute

the SEC's characterization of, and inferences purportedly drawn from, this complaint to the

extent that the SEC implies that this complaint would have given fair notice to digital asset

market participants about the applicability of the federal securities laws or the SEC's

interpretation of the federal securities laws as to fully functional blockchain technologies

such as XRP, since the complaint related to the sale of a token in an ICO before the respective

token was functional, and unregistered broker activity – facts and circumstances not alleged

here and that did not apply to Defendants' conduct or to XRP.  Compl. ¶ 1–2,  *SEC v.

ICOBox, et al.*, No. 19-cv-8066 (C.D. Cal. Sept. 18, 2019), ECF No. 1.  Unlike the

enforcement action at issue in Paragraph 962, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 962 omits additional context necessary to understand it, including that this complaint was filed more than six years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 962 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

963.   On September 20, 2019, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Lucas*, No. 19-cv-8771 (S.D.N.Y. Sept. 20, 2019).

**Response:**   Undisputed that the SEC filed the referenced complaint against Jonathan C. Lucas and certain other defendants on September 20, 2019; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies

such as XRP, since the complaint related to the sale of a token in an ICO before the respective

token was functional, and alleged ongoing fraudulent conduct and misstatements designed

to deceive investors – facts and circumstances not alleged here and that did not apply to

Defendants' conduct or to XRP.  Compl. ¶ 1–2, *SEC v. Lucas*, No. 19-cv-8771 (S.D.N.Y.

Sept. 20, 2019), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 963, Ripple

never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money

to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder;

never offered or sold XRP as an investment; and has no relationship at all with the vast

majority of XRP holders today, nearly all of whom purchased XRP from third parties on the

open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP

existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.)

¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's

sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP

are not purchased directly from Ripple but are traded anonymously at the cryptocurrency

exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent

conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, this complaint, including because Paragraph 963 omits additional context

necessary to understand it, including that this complaint was filed more than six years after

the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also

dispute the implication in Paragraph 963 that factual allegations in a complaint constitute

guidance on the SEC's interpretation of the federal securities laws or a determination of

liability.

964.   On September 30, 2019, the SEC issued an Order Instituting Administrative
Proceedings in which the SEC alleged that offers and sales of a digital asset violated

Section 5 of the Securities Act. *See In the Matter of Block.one*, Administrative Proceeding File No. 3-19568 (Sept. 30, 2019), *available at* https://www.sec.gov/litigation/admin/2019/33-10714.pdf.

**Response:**       Undisputed that the SEC issued the referenced order against Block.one on September 30, 2019; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Order at 1-2, *In the Matter of Block.one*, Administrative Proceeding File No. 3-19568 (Sept. 30, 2019). Unlike the enforcement action at issue in Paragraph 964, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 964 omits additional context necessary to understand it, including that this order was filed more than six years after the SEC alleges

420

that Ripple began sales of XRP in violation of Section 5.   Defendants also dispute the

implication in Paragraph 964 that a settlement order, in which the respondent neither

admitted nor denied the Commission's findings, constitutes authoritative guidance as to the

applicability of the securities laws to digital assets.   Order at 1, *In the Matter of Block.one*,

Administrative Proceeding File No. 3-19568 (Sept. 30, 2019).

965.   On October 11, 2019, the SEC filed a complaint in which the SEC alleged that
offers and sales of a digital asset violated Section 5 of the Securities Act.   *See SEC
v. Telegram Group Inc., et al.*, No. 19-cv-9439 (S.D.N.Y. Oct. 11, 2019).

**Response:**   Undisputed that the SEC filed the referenced complaint against

Telegram Group Inc. on October 11, 2019; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, this complaint to the extent that

the SEC implies that this complaint would have given fair notice to digital asset market

participants about the applicability of the federal securities laws or the SEC's interpretation

of the federal securities laws as to fully functional blockchain technologies such as XRP,

since the complaint related to the sale of a token in an ICO before the respective token was

functional or the promised "ecosystem" existed – facts and circumstances not alleged here

and that did not apply to Defendants' conduct or to XRP.   Compl. ¶¶ 1–3, *SEC v. Telegram

Group Inc., et al.*, No. 19-cv-9439 (S.D.N.Y. Oct. 11, 2019), ECF No. 1.   Unlike the

enforcement action at issue in Paragraph 965, Ripple never held an "ICO"; never offered or

contracted to sell future tokens as a way to raise money to build an ecosystem; never

explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an

investment; and has no relationship at all with the vast majority of XRP holders today, nearly

all of whom purchased XRP from third parties on the open market.   *See* Ex. 146 at RPLI_SEC

0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D.

Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18,

24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 965 omits additional context necessary to understand it, including that this complaint was filed more than six years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 965 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

966.    On December 11, 2019, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Eran Eyal, et al.*, No. 19-cv-11325 (S.D.N.Y. Dec. 11, 2019).

**Response:**        Undisputed that the SEC filed the referenced complaint against Eran Eyal and certain other defendants on December 11, 2019; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Compl. ¶ 1, *SEC v. Eyal, et al.*, No. 19-cv-11325 (S.D.N.Y. Dec. 11, 2019), ECF No. 1. Unlike the enforcement action at issue in Paragraph 966, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder;

never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 966 omits additional context necessary to understand it, including that this complaint was filed more than six years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 966 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

967.    On December 18, 2019, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act.  *See In the Matter of Blockchain of Things, Inc.*, Administrative Proceeding File No. 3-19621 (Dec. 18, 2019), *available at* https://www.sec.gov/litigation/admin/2019/33-10736.pdf.

**Response:**        Undisputed that the SEC issued the referenced order against Blockchain of Things, Inc. on December 18, 2019; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the order

related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Order ¶ 1, *In the Matter of Blockchain of Things, Inc.*, Administrative Proceeding File No. 3-19621 (Dec. 18, 2019). Unlike the enforcement action at issue in Paragraph 967, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 967 omits additional context necessary to understand it, including that this order was filed more than six years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 967 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets. Order at 1, *In the Matter of Blockchain of Things, Inc.*, Administrative Proceeding File No. 3-19621 (Dec. 18, 2019).

968.   On January 21, 2020, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Grybniak, et al.*, No. 20-cv-327 (E.D.N.Y. Jan. 21, 2020).

**Response:**      Undisputed that the SEC filed the referenced complaint against Sergii Grybniak and certain other defendants on January 21, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.   Compl. ¶ 1, *SEC v. Grybniak, et al.*, No. 20-cv-327 (E.D.N.Y. Jan. 21, 2020), ECF No. 1.   Unlike the enforcement action at issue in Paragraph 968, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.   *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.   In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").   Further, the SEC does not allege that Defendants engaged in fraudulent conduct.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 968 omits additional

context necessary to understand it, including that this complaint was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 968 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

969.    On February 19, 2020, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of Enigma MPC*, Administrative Proceeding File No. 3-19702 (Feb. 19, 2020), *available at* https://www.sec.gov/litigation/admin/2020/33-10755.pdf.

**Response:**        Undisputed that the SEC issued the referenced order against Enigma MPC on February 19, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.  Order at 1–2, *In the Matter of Enigma MPC*, Administrative Proceeding File No. 3-19702 (Feb. 19, 2020). Unlike the enforcement action at issue in Paragraph 969, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz

Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 969 omits additional context necessary to understand it, including that this order was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 969 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets.  Order at 1, *In the Matter of Enigma MPC*, Administrative Proceeding File No. 3-19702 (Feb. 19, 2020).

970.    On March 16, 2020, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act.  *See SEC v. Meta 1 Coin Trust, et al.*, No. 20-cv-273 (W.D. Tex. Mar. 16, 2020).

**Response:**        Undisputed that the SEC filed the referenced complaint against Meta 1 Coin Trust and certain other defendants on March 16, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional and defendants never distributed the actual token, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and  that did not apply to Defendants' conduct or to XRP. Compl. ¶¶ 1–2, *SEC v. Meta 1 Coin Trust, et al.*, No. 20-cv-273 (W.D. Tex. Mar. 16, 2020),

ECF No. 1.  Unlike the enforcement action at issue in Paragraph 970, Ripple never held an

"ICO"; never offered or contracted to sell future tokens as a way to raise money to build an

ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered

or sold XRP as an investment; and has no relationship at all with the vast majority of XRP

holders today, nearly all of whom purchased XRP from third parties on the open market.  *See*

Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before

this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A.

Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP

represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not

purchased directly from Ripple but are traded anonymously at the cryptocurrency

exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent

conduct.  Defendants also dispute the SEC's characterization of this complaint as alleging

that certain "offers and sales of a digital asset violated Section 5 of the Securities Act" when

the offers and sales were, in fact, part of an "initial public offering of the Coin" purportedly

involving digital assets "backed" by "$1 billion in fine art" and later "$2 billion in gold," and

the underlying investments at issue never actually existed.  Compl. ¶¶ 20–21.  Defendants

dispute the SEC's characterization of, and inferences purportedly drawn from, this

complaint, including because Paragraph 970 omits additional context necessary to

understand it, including that this complaint was filed more than seven years after the SEC

alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the

implication in Paragraph 970 that factual allegations in a complaint constitute guidance on

the SEC's interpretation of the federal securities laws or a determination of liability.

971.    On April 23, 2020, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act.  *See SEC v. Dropil Inc., et al.*, No. 20-cv-793 (C.D. Cal. Apr. 23, 2020).

**Response:**        Undisputed that the SEC filed the referenced complaint against Dropil Inc. and certain other defendants on April 23, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.  Compl. ¶¶ 4–5, *SEC v. Dropil Inc., et al.*, No. 20-cv-793 (C.D. Cal. Apr. 23, 2020), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 971, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences

429

purportedly drawn from, this complaint, including because Paragraph 971 omits additional context necessary to understand it, including that this complaint was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 971 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

972.     On May 28, 2020, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of BitClave PTE Ltd.*, Administrative Proceeding File No. 3-19816 (May 28, 2020), *available at* https://www.sec.gov/litigation/admin/2020/33-10788.pdf.

**Response:**     Undisputed that the SEC issued the referenced order against BitClave PTE Ltd. on May 28, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Order at 1–2, *In the Matter of BitClave PTE Ltd.*, Administrative Proceeding File No. 3-19816 (May 28, 2020). Unlike the enforcement action at issue in Paragraph 972, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP

existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.)

¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's

sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP

are not purchased directly from Ripple but are traded anonymously at the cryptocurrency

exchanges.").  Defendants dispute the SEC's characterization of, and inferences purportedly

drawn from, this order, including because Paragraph 972 omits additional context necessary

to understand it, including that this order was filed more than seven years after the SEC

alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the

implication in Paragraph 972 that a settlement order, in which the respondent neither

admitted nor denied the Commission's findings, constitutes authoritative guidance as to the

applicability of the securities laws to digital assets.  Order at 1, *In the Matter of BitClave*

*PTE Ltd.*, Administrative Proceeding File No. 3-19816 (May 28, 2020).

973.    On June 25, 2020, the SEC filed a complaint in which the SEC alleged that offers
and sales of a digital asset violated Section 5 of the Securities Act.  *See SEC v.*
*Abramoff*, No. 20-cv-4190 (N.D. Cal. June 25, 2020).

**Response:**          Undisputed that the SEC filed the referenced complaint against Jack

Abramoff and certain other defendants on June 25, 2020; however, Defendants dispute the

SEC's characterization of, and inferences purportedly drawn from, this complaint to the

extent that the SEC implies that this complaint would have given fair notice to digital asset

market participants about the applicability of the federal securities laws or the SEC's

interpretation of the federal securities laws as to fully functional blockchain technologies

such as XRP, since the complaint related to the sale of a token in an ICO before the respective

token was functional, and alleged ongoing fraudulent conduct and misstatements designed

to deceive investors – facts and circumstances not alleged here and that did not apply to

Defendants' conduct or to XRP.  Compl. ¶¶ 1–2, *SEC v. Abramoff*, No. 20-cv-4190 (N.D.

Cal. June 25, 2020), ECF No. 5.  Unlike the enforcement action at issue in Paragraph 973, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 973 omits additional context necessary to understand it, including that this complaint was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 973 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

974.    On June 25, 2020, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act.  *See SEC v. NAC Foundation, LLC, et al.*, No. 20-cv-4188 (N.D. Cal. June 25, 2020).

**Response:**        Undisputed that the SEC filed the referenced complaint against NAC Foundation, LLC and certain other defendants on June 25, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital

asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.  Compl. ¶¶ 1–2, *SEC v. NAC Foundation, LLC, et al.*, No. 20-cv-4188 (N.D. Cal. June 25, 2020), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 974, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 974 omits additional context necessary to understand it, including that this complaint was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 974 that factual allegations

in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

975.    On August 13, 2020, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of Kelvin Boon, LLC, et al.*, Administrative Proceeding File No. 3-19913 (Aug. 13, 2020), *available at* https://www.sec.gov/litigation/admin/2020/33-10817.pdf.

**Response:**        Undisputed that the SEC issued the referenced order against Kelvin Boon, LLC on August 13, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.  Order at 1–2, *In the Matter of Kelvin Boon, LLC, et al.*, Administrative Proceeding File No. 3-19913 (Aug. 13, 2020).  Unlike the enforcement action at issue in Paragraph 975, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency

434

exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 975 omits additional context necessary to understand it, including that this order was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 975 that a settlement order constitutes authoritative guidance as to the applicability of the securities laws to digital assets. Order at 1, *In the Matter of Kelvin Boon, LLC, et al.*, Administrative Proceeding File No. 3-19913 (Aug. 13, 2020).

976. On September 10, 2020, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. FLiK, et al.*, No. 20-cv-3739 (N.D. Ga. Sept. 10, 2020).

**Response:** Undisputed that the SEC filed the referenced complaint against FLiK and certain other defendants on September 10, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Compl. ¶¶ 1–2, *SEC v. FLiK, et al.*, No. 20-cv-3739 (N.D. Ga. Sept. 10, 2020), ECF No. 1. Unlike the enforcement action at issue in Paragraph 976, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties

on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and

XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long

Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68

("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a

majority of XRP are not purchased directly from Ripple but are traded anonymously at the

cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in

fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from, this complaint, including because Paragraph 976 omits additional

context necessary to understand it, including that this complaint was filed more than seven

years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.

Defendants also dispute the implication in Paragraph 976 that factual allegations in a

complaint constitute guidance on the SEC's interpretation of the federal securities laws or a

determination of liability.

977.    On September 11, 2020, the SEC issued an Order Instituting Administrative
Proceedings in which the SEC alleged that offers and sales of a digital asset violated
Section 5 of the Securities Act. *See In the Matter of Clifford Harris, Jr.*,
Administrative Proceeding File No. 3-19990 (Sept. 11, 2020), *available at*
https://www.sec.gov/litigation/admin/2020/33-10836.pdf.

**Response:**        Undisputed that the SEC issued the referenced order against Clifford

Harris, Jr. on September 11, 2020; however, Defendants dispute the SEC's characterization

of, and inferences purportedly drawn from, this order to the extent that the SEC implies that

this order would have given fair notice to digital asset market participants about the

applicability of the federal securities laws or the SEC's interpretation of the federal securities

laws as to fully functional blockchain technologies such as XRP, since the order related to

the sale of a token in an ICO before the respective token was functional – facts and

circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.

Order at 1–3, *In the Matter of Clifford Harris, Jr.*, Administrative Proceeding File No. 3-19990 (Sept. 11, 2020).  Unlike the enforcement action at issue in Paragraph 977, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 977 omits additional context necessary to understand it, including that this order was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 977 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets.  Order at 1, *In the Matter of Clifford Harris, Jr.*, Administrative Proceeding File No. 3-19990 (Sept. 11, 2020).

978.   On September 15, 2020, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of Unikrn, Inc.*, Administrative Proceeding File No. 3-20003 (Sept. 15, 2020), *available at* https://www.sec.gov/litigation/admin/2020/33-10841.pdf.

**Response:**       Undisputed that the SEC issued the referenced order against Unikrn, Inc. on September 15, 2020; however, Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.  Order at 1-2, *In the Matter of Unikrn, Inc.*, Administrative Proceeding File No. 3-20003 (Sept. 15, 2020).  Unlike the enforcement action at issue in Paragraph 978, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 978 omits additional context necessary to understand it, including that this order was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 978 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to

digital assets.  Order at 1, *In the Matter of Unikrn, Inc.*, Administrative Proceeding File No. 3-20003 (Sept. 15, 2020).

979.　　On September 25, 2020, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of SoluTech, Inc., et al.*, Administrative Proceeding File No. 3-20071 (Sept. 25, 2020), *available at* https://www.sec.gov/litigation/admin/2020/33-10853.pdf.

**Response:**　　　Undisputed that the SEC issued the referenced order against SoluTech, Inc. on September 25, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Order at 2, 4, *In the Matter of SoluTech, Inc., et al.*, Administrative Proceeding File No. 3-20071 (Sept. 25, 2020).  Unlike the enforcement action at issue in Paragraph 979, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market.  *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency

exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 979 omits additional context necessary to understand it, including that this order was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 979 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets. Order at 1, *In the Matter of SoluTech, Inc., et al.*, Administrative Proceeding File No. 3-20071 (Sept. 25, 2020).

980.   On September 30, 2020, the SEC issued an Order Instituting Administrative Proceedings in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See In the Matter of Salt Blockchain Inc., f/k/a Salt Lending Holdings, Inc.*, Administrative Proceeding File No. 3-20106 (Sept. 30, 2020), *available at* https://www.sec.gov/litigation/admin/2020/33-10865.pdf.

**Response:**        Undisputed that the SEC issued the referenced order against Salt Blockchain Inc., f/k/a Salt Lending Holdings, Inc. on September 30, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order to the extent that the SEC implies that this order would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP, since the order related to the sale of a token in an ICO before the respective token was functional – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP. Order at 1–2, *In the Matter of Salt Blockchain Inc., f/k/a Salt Lending Holdings, Inc.*, Administrative Proceeding File No. 3-20106 (Sept. 30, 2020). Unlike the enforcement action at issue in Paragraph 980, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered

or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this order, including because Paragraph 980 omits additional context necessary to understand it, including that this order was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5. Defendants also dispute the implication in Paragraph 980 that a settlement order, in which the respondent neither admitted nor denied the Commission's findings, constitutes authoritative guidance as to the applicability of the securities laws to digital assets. Order at 1, *In the Matter of Salt Blockchain Inc., f/k/a Salt Lending Holdings, Inc.*, Administrative Proceeding File No. 3-20106 (Sept. 30, 2020).

981. On December 9, 2020, the SEC filed a complaint in which the SEC alleged that offers and sales of a digital asset violated Section 5 of the Securities Act. *See SEC v. Elmaani*, No. 20-cv-10376 (S.D.N.Y. Dec. 9, 2020).

**Response:**      Undisputed that the SEC filed the referenced complaint against Amir Elmaani on December 9, 2020; however, Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint to the extent that the SEC implies that this complaint would have given fair notice to digital asset market participants about the applicability of the federal securities laws or the SEC's interpretation of the federal securities laws as to fully functional blockchain technologies such as XRP,

since the complaint related to the sale of a token in an ICO before the respective token was functional, and alleged ongoing fraudulent conduct and misstatements designed to deceive investors – facts and circumstances not alleged here and that did not apply to Defendants' conduct or to XRP.  Compl. ¶¶ 1–2, 41, *SEC v. Elmaani*, No. 20-cv-10376 (S.D.N.Y. Dec. 9, 2020), ECF No. 1.  Unlike the enforcement action at issue in Paragraph 981, Ripple never held an "ICO"; never offered or contracted to sell future tokens as a way to raise money to build an ecosystem; never explicitly or implicitly promised profits to any XRP holder; never offered or sold XRP as an investment; and has no relationship at all with the vast majority of XRP holders today, nearly all of whom purchased XRP from third parties on the open market. *See* Ex. 146 at RPLI_SEC 0376146 ("Ripple is not an ICO; Ripple and XRP existed long before this trend."); Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6, 8; Ex. 20 (Long Decl.) ¶ 8; Ex. 40 (A. Schwartz Report) at 12-18, 24, 33-36; Ex. 11 (Ferrell Report) at 68 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP.  In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges.").  Further, the SEC does not allege that Defendants engaged in fraudulent conduct.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, this complaint, including because Paragraph 981 omits additional context necessary to understand it, including that this complaint was filed more than seven years after the SEC alleges that Ripple began sales of XRP in violation of Section 5.  Defendants also dispute the implication in Paragraph 981 that factual allegations in a complaint constitute guidance on the SEC's interpretation of the federal securities laws or a determination of liability.

982.   On May 3, 2018, a proposed class action complaint against Ripple, Garlinghouse, and others was filed in California state court, in which the plaintiff alleged that

Ripple's and Garlinghouse's unregistered offers and sales of XRP violated Section 5 of the Securities Act. *See Coffey v. Ripple Labs, Inc.*, No. CGC-18-566271 (Cal. Sup. Ct., San Francisco Cty., May 3, 2018).

**Response:**        Undisputed that Ryan Coffey filed the referenced complaint against

Ripple, Garlinghouse, and others on May 3, 2018; however, Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from, this complaint to the extent that

the SEC implies that this complaint would have given fair notice to Defendants about the

applicability of the federal securities laws or the SEC's interpretation of the federal securities

laws as to offers and sales of XRP, since factual allegations in a complaint, particularly one

filed in state court by a private party, are not and do not purport to be guidance from the SEC

on the interpretation of the federal securities laws or regulations.  Paragraph 982 also omits

additional context necessary to understand the significance of the referenced complaint,

including that this case was removed to federal court and voluntarily dismissed on August

22, 2018, without a ruling on any dispositive motions, as set forth in Ex. 148, *Coffey v. Ripple*

*Labs, Inc.*, No. 18-CV-03286 (N.D. Cal. August 22, 2018), ECF No. 29.

983.    On approximately June 14, 2018, then-SEC Director of the Division of Corporation Finance, Bill Hinman, delivered a speech titled "Digital Asset Transactions: When Howey Met Gary (Plastic)." PX 241.

**Response:**        Undisputed.

984.    In his speech, Hinman mentioned Bitcoin and Ether, but did not mention XRP. *Id.*

**Response:**        Undisputed that Director Hinman did not mention XRP in his June

14, 2018 speech; however, Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from the speech with respect to its import as to XRP.  Many market

participants reasonably understood the speech to indicate that the SEC would not regard XRP

as a security given the current market conditions for XRP and its similarities to bitcoin and

ether, and additional digital asset exchanges listed XRP after the speech. *See, e.g.*, Ex. 149,

Press Release, OKCoin, OKCoin Lists Five New Cryptocurrencies Trading Against USD, BTC and ETH: XRP, Cardano, Stellar, Zcash and 0x (Sept. 19, 2018), https://www.prweb.com/releases/okcoin_lists_five_new_cryptocurrencies_trading_against _usd_btc_and_eth_xrp_cardano_stellar_zcash_and_0x/prweb15770395.htm (Sept. 2018 press release noting that OKCoin listed five new cryptocurrencies trading against USD, BTC and ETH, including XRP, described as "[a]n independent, *decentralized* digital asset.") (emphasis added); Ex. 116 at RPLI_SEC_1094562 (Feb. 28, 2019 Coinbase blog post reporting that "XRP is now available on Coinbase"). Hinman's speech indicated, among other things, that "a digital asset offered as a security can, over time, become something other than a security," and that ether was not presently a security even though it had been launched through an ICO. PX 241 at ECF p. 2. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, ether's inclusion in the speech, including because whether and to what extent ether would be included was a matter of significant debate within the SEC prior to the speech. For example, on May 31, 2018, after ether's initial inclusion in the draft alongside bitcoin as examples of digital assets that no longer were securities drew opposition from within the SEC, Hinman "inserted an alternative" to the proposed ether language which "could be used on ether if we need to hedge the issue a bit at the time of the speech." Ex. 150 at SEC-LIT-EMAILS-000471051. On June 4, Hinman shared a draft of the speech with SEC division heads and wrote that the proposed language about ether "is in brackets and would be used if we all are in agreement" and adding "We also have a call with Buterin later this week to confirm our understanding of how the Ethereum Foundation operates," suggesting that the draft did not reflect Hinman's "understanding of how the Ethereum Foundation operates." Ex. 151 at SEC-LIT-EMAILS-000470685. On June 12,

the SEC's Office of General Counsel ("OGC") proposed deleting the draft's language about ether in its entirety, writing, "[w]e still have reservations about including a statement directly about Ether in the speech," in part because the statement would make it "difficult for the agency to take a different position on Ether in the future."  Ex. 152 at SEC-LIT-EMAILS-000471404.  The OGC also wrote that "Buterin likely has far more information that [sic] retail purchasers of Ether," which highlighted their concern that "it does not follow that there is no longer an [information] asymmetry once a network becomes decentralized."  *Id.* at SEC-LIT-EMAILS-000471403.  Notwithstanding the OGC's express concerns and proposal to remove the language about ether from the draft, the final version of the speech included a discussion about ether.

985.   In that speech, Hinman stated:

> What are some of the factors to consider in assessing whether a digital asset is offered as an investment contract and is thus a security? Primarily, consider whether a third party – be it a person, entity or coordinated group of actors – drives the expectation of a return. That question will always depend on the particular facts and circumstances, and this list is illustrative, not exhaustive:
>
> 1.  Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?
>
> 2.  Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?

*Id.* at 4.

**Response:**   Undisputed that the referenced speech contains the quoted text, which is one excerpt from the speech and not a fair characterization of the document's complete contents.  Among other things, Paragraph 985 omits additional context necessary

to understand the speech, including Hinman's focus on ICOs, and his statement that "[i]f the network on which the token or coin is to function is *sufficiently decentralized* . . . [then] the assets may not represent an investment contract."  PX 241 at ECF p. 4 (emphasis added).  The term "sufficiently decentralized" does not appear in any relevant statute, regulation, or case law, Hinman's speech did not define or explain it, and the SEC has not offered any definition of or guidance for the application of that term.  Defendants further note that in preparing the speech, the SEC went through dozens of drafts reflecting different formulations of the "sufficiently decentralized" concept, with a June 11 draft referring to Bitcoin as having "been *highly* decentralized from its inception," removing the word "sufficiently"; the final version of the speech refers to Bitcoin only as "decentralized," with no modifier.  Ex. 153 at SEC-LIT-EMAILS-000470940; PX 241 at ECF p. 4.  On June 12, the SEC OGC raised additional concerns about the "sufficiently decentralized" term, writing: "While we agree that a central purpose of the Securities Act is to address an information asymmetry, I think we worry that it does not follow that there is no longer an asymmetry once a network becomes decentralized . . . .  The fact that tokens on a sufficiently decentralized network are no longer securities – and no longer are required to register, with all the benefits to investors of registration – seems to point out what might be considered the 'regulatory gap' that exists in this space."  Ex. 152 at SEC-LIT-EMAILS-000471403.  In the absence of guidance from the SEC regarding the meaning of "sufficiently decentralized," many market participants of ordinary intelligence believed that XRP was "sufficiently decentralized."  *See, e.g.*, Ex. 154 at RPLI_SEC_1080003-04 (May 29, 2014 Government Accountability Office report explaining, "Other virtual currencies that have been created are not based on the bitcoin protocol.  One of the more prominent examples is XRP, which is used within a ***decentralized***

payment system called Ripple.") (emphasis added); Ex. 149, Press Release, OKCoin, OKCoin Lists Five New Cryptocurrencies Trading Against USD, BTC and ETH:  XRP, Cardano,      Stellar,      Zcash      and      0x      (Sept.      19,      2018), https://www.prweb.com/releases/okcoin_lists_five_new_cryptocurrencies_trading_against _usd_btc_and_eth_xrp_cardano_stellar_zcash_and_0x/prweb15770395.htm (press release noting that OKCoin listed five new cryptocurrencies trading against USD, BTC and ETH, including XRP, described as "[a]n independent, *decentralized* digital asset.") (emphasis added); Ex. 116 at RPLI_SEC_1094562 (Feb. 28, 2019 Coinbase blog post reporting that "XRP is now available on Coinbase").  Defendants further note that the factors that appear in Paragraph 985 were the subject of significant debate and revision before the speech was delivered.  On June 6, 2018, the SEC's Division of Trading and Markets ("TM") provided feedback on these particular factors, urging that Hinman and his team "consider tying these factors more closely and explicitly to the *Howey* analysis," and questioning: "Why is [the second] factor relevant and how would it be applied?"  Ex. 155 at SEC-LIT-EMAILS-000471124, SEC-LIT-EMAILS-000471133.  On June 8, OGC proposed deleting the first portion of the second factor completely ("Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset?"), commenting "This does not seem relevant."  Ex. 156 at  SEC-LIT-EMAILS-000471184,  SEC-LIT-EMAILS-000471192.   The  OGC  again proposed deleting that section of the second factor on June 12, in part because "The SEC has rejected that view" in prior guidance.  Ex. 152 at SEC-LIT-EMAILS-000471395, SEC-LIT-EMAILS-000471406.  On June 12, TM again raised a concern about the second factor as well as other factors, writing "We appreciate your efforts to link these more closely to the

factors in the Howey test.  However, because the list of factors is so extensive – and appears to include things that go beyond the typical Howey analysis (e.g., hoarding) – we have concerns this might lead to greater confusion on what is a security."  Ex. 157 at SEC-LIT-EMAILS-000471315, SEC-LIT-EMAILS-000471318.  Despite the repeated concerns raised by OGC and TM, the second factor was included in the final version of the speech.

986.   In February 2012, certain of Ripple's founders, including Larsen, received a memorandum (the "February 2012 Memo") from the law firm Perkins Coie analyzing the "legal risks" associated with the digital token that would eventually be called XRP. PX 242; PX 80 (Ripple Ans.) ¶¶ 44, 56; PX 8 (Ripple RFA Responses) Nos. 13, 14.

**Response:**        Disputed.  Defendants do not dispute that Larsen received the February 2012 Perkins Coie memo. PX 80 (Ripple Ans.) ¶ 56.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 242 to the extent it suggests that the February 2012 Perkins Coie memo was limited to "analyzing the 'legal risks' associated with the digital token that would eventually be called XRP." The February 2012 Perkins Coie memo sought to "review the proposed product and business structure, analyze the legal risks associated with NewCoin, and recommend steps to mitigate these risks." PX 242 at RPLI_SEC02878.  Perkins Coie provided several conclusions and recommendations on a broad range of topics, and stated, among other things, that "if sold to Investors [in NewCoin] who provide Founders with the capital necessary to launch and operate NewCoin, Coins will likely be considered securities."  PX 242 at RPLI_SEC02879 (emphasis added).  The memo further advised that "[t]o the extent that Founders' issuance of Coins does not involve an investment of money, then there is a low risk that the Coins will be considered an investment contract."  PX 242 at RPLI_SEC02886.  Defendants also dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 to the extent it suggests

that the February 2012 Perkins Coie memo was addressed to Larsen or that Larsen received

it in February 2012.  Ex. 8 at 237:2-3.

987.    In October 2012, Larsen, OpenCoin, and others received another Perkins Coie
        memorandum (the "October 2012 Memo") providing "recommendations for
        mitigating relevant legal risks" associated with "Ripple Credits," a predecessor
        name to XRP. PX 243.

**Response:**          Disputed.   Defendants do not dispute that Larsen received the

October 2012 Perkins Coie memo.  Defendants dispute the SEC's characterization of, and

inferences purportedly drawn from PX 243 to the extent, among other things, it suggests that

the October 2012 Perkins Coie memo was limited to providing "recommendations for

mitigating relevant legal risks" associated with "Ripple Credits."  The October 2012  Perkins

Coie memo sought to "review the proposed features of the Ripple Network and Ripple

Credits and to provide recommendations for mitigating relevant legal risks." PX 243 at

RPLI_SEC0099463.    Defendants further dispute the SEC's characterization of, and

inferences purportedly drawn from, PX 243 to the extent it mischaracterizes the findings and

conclusions of the October 2012 Perkins Coie memo.  Perkins Coie concluded, among other

things, that there "was some risk, albeit small" that the SEC would view sales of Ripple

Credits as an investment contract "given the lack of applicable case law."  *See* PX 243 at

RPLI_SEC 0099466.    Perkins Coie also stated that because "the primary reason for

purchasing Ripple Credits is to facilitate online commerce, not to engage in speculative

investment trading . . . given the commercial nature here, Ripple Credits should not be

considered securities."  *See* PX 243 at RPLI_SEC 0099478.

988.    Both the February 2012 Memo and the October 2012 Memo cite *Howey* and
        analyze XRP's precursor token using *Howey*'s guidance for determining the
        existence of offers and sales investment contracts. PX 242 at 0287886-89; PX 243
        at 0099477-80.

**Response:**        Undisputed that PX 242 and PX 243 cite *Howey*, however Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 and PX 243 as misleading, since the memoranda, citing regulatory ambiguity due to the novel characteristics of the proposed tokens (*see* PX 242 at RPLI_SEC 0287878 (analyzing proposed "Coins," defined as "units of value … that may be used as a payment method for Internet commerce"); PX 243 at RPLI_SEC 0099463 (analyzing proposed "Ripple Credits," defined as "a new crypto currency")), both analyze the proposed tokens pursuant to numerous legal frameworks, and with respect to the *Howey* analysis, the October 2012 Memo advised that the "compelling" conclusion of that analysis is "that [XRP units] do not constitute securities under the federal securities laws."  PX 243 at RPLI_SEC 0099466.   Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 and PX 243 as misleading, including because Paragraph 988 omits that the October 2012 Memo also advised that there was a "lack of applicable case law" on how or whether the *Howey* analysis applied to the proposed tokens.  *Id.*  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 and PX 243 as misleading, including because Paragraph 988 states that the February 2012 Memo "analyze[d] XRP's precursor token" when in fact the February 2012 Memo analyzed a preliminary, proposed token and business plan that was ultimately not pursued.  *See, e.g.*, *id.* at RPLI_SEC 0099463 (noting that Ripple provided a "revised business plan"). Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from, PX 242 and PX 243 to the extent it implies that those memoranda provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memoranda did not conclude that the federal securities laws applied to XRP, indicating

instead that the risk was "low" or "small" that the SEC would interpret the law to consider XRP a security and that there was a "lack of applicable case law" on this issue, notwithstanding the *Howey* analysis.  *Id.* at RPLI_SEC 0099466; PX 242 at RPLI_SEC 0287886-87.   Defendants dispute that Paragraph 988 represents the entirety of, a representative selection of, or a fair characterization of the documents' complete contents.

989.   The February 2012 Memo stated: "If sold to Investors, [the tokens] are likely to be securities," that tokens "not initially sold may still constitute securities if sold at a later date," and "[t]o the extent that these [tokens] are purchased with an expectation of profit because of the efforts of [persons] promoting the [tokens], there is a risk that [the tokens] will constitute investment contracts and be subject to federal securities regulation." PX 242 at 0287879.

**Response:**        Undisputed that PX 242 contains the quoted text, exclusive of any alterations, omissions, or additions, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.   Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 242, as misleading, including because Paragraph 989 omits additional context necessary to understand this exhibit and mischaracterizes the conclusions of the memorandum, which advised that if the individuals who later founded Ripple "sold [XRP] to Investors who provide . . . the capital necessary to launch" XRP and the XRP Ledger, XRP "will likely be considered securities and subject to regulation under federal securities laws."  PX 242 at RPLI_SEC 0287879.  It is undisputed that Ripple's founders did not sell XRP to finance the launch of the XRP Ledger.  Defs.' 56.1 at ¶¶ 18-20; Ex. 2 (D. Schwartz Decl.) ¶¶ 4, 6.  Ripple's founders launched the XRP Ledger before the formation of Ripple, and before making sales of XRP to anyone.  Defs.' 56.1 at ¶¶ 20, 32; Ex. 2 (D. Schwartz Decl.) ¶¶ 6, 8; Ex. 14 (Larsen Decl.) ¶ 3.  Under those circumstances, the memorandum advised that "there is a low risk that [XRP] will be considered an investment

contract." PX 242 at RPLI_SEC 0287886.  Accordingly, Defendants did not engage in the financing conduct identified in the February 2012 memorandum; and the February 2012 memorandum did not suggest that liability was likely with respect to the course of action that Ripple and its founders actually did undertake.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 and PX 243 as misleading, including because Paragraph 989 states that the February 2012 Memo "analyze[d] XRP's precursor token" when in fact the February 2012 Memo analyzed a preliminary, proposed token and business plan that was ultimately not pursued. *See, e.g.*, PX 243 at RPLI_SEC 0099463 (noting that Ripple provided a "revised business plan"). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 242 to the extent it implies that the memorandum provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan that was ultimately not implemented. *See, e.g.*, *id.* (noting that Ripple provided a "revised business plan").

990.    The February 2012 Memo stated:  "Do not sell [the tokens]" because the "sale of [the tokens] to Investors increases the risk that [the tokens] will be considered investment contracts and will therefore be regulated as securities." *Id.* at 0287881.

**Response:**        Undisputed that PX 242 contains the quoted text, exclusive of any alterations, omissions, or additions, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 242, as misleading, because Paragraph 990 omits that the term "Investors" as used in the February 2012 Memo is a defined term that refers to "individuals who invest in NewCoin," and therefore the February 2012 Memo advised that if the

452

individuals who later founded Ripple "sold [XRP] to Investors who provide . . . the capital necessary to launch" XRP and the XRP Ledger, XRP "will likely be considered securities and subject to regulation under federal securities laws." PX 242 at RPLI_SEC 0287878-79. It is undisputed that Ripple's founders did not sell XRP to finance the launch of the XRP Ledger. Defs.' 56.1 at ¶¶ 18-20 (no XRP sold before launch of XRP ledger, and XRP ledger fully operational upon launch); Ex. 2 (Schwartz Decl.) ¶¶ 4, 6. Ripple's founders launched the XRP Ledger before the formation of Ripple, and before making sales of XRP to anyone. Defs.' 56.1 at ¶¶ 20, 32; Ex. 2 (Schwartz Decl.) ¶¶ 6, 8; Ex. 14 (Larsen Decl.) ¶ 3. Under those circumstances, the memo advised that "there is a low risk that [XRP] will be considered an investment contract." PX 242 at RPLI_SEC 0287886. Accordingly, Defendants did not engage in the financing conduct identified in the February 2012 memo; and the February 2012 memo did not suggest that liability was likely with respect to the course of action that Ripple and its founders actually did undertake. Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 and PX 243 as misleading, including because Paragraph 990 states that the February 2012 Memo "analyze[d] XRP's precursor token" when in fact the February 2012 Memo analyzed a preliminary, proposed token and business plan that was ultimately not pursued. *See, e.g.*, PX 243 at RPLI_SEC 0099463 (noting that Ripple provided a "revised business plan"). Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 242 to the extent it implies that the memo provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan

that was ultimately not implemented.  *See, e.g.*, *id.* (noting that Ripple provided a "revised business plan").

991.   The February 2012 Memo stated: "profit motivates purchasers of…crypto currencies," and "[t]he claim that there is no expectation of profit is weakened to the extent that Founders sell [tokens] to Investors for a specified amount of money." *Id.* at 0287887.

**Response:**         Undisputed that PX 242 contains the quoted text, exclusive of any alterations, omissions, or addition, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 as misleading because Paragraph 991 omits that the term "Investors" as used in the February 2012 Memo is a defined term that refers to "individuals who invest in NewCoin," and therefore the February 2012 Memo advised that if the individuals who later founded Ripple "sold [XRP] to Investors who provide . . . the capital necessary to launch" XRP and the XRP Ledger, XRP "will likely be considered securities and subject to regulation under federal securities laws."  PX 242 at RPLI_SEC 0287878-79.  It is undisputed that Ripple's founders did not sell XRP to finance the launch of the XRP Ledger.  Defs.' 56.1 at ¶¶ 18-20 (no XRP sold before launch of XRP ledger, and XRP ledger fully operational upon launch); Ex. 2 (Schwartz Decl.) ¶¶ 4, 6.  Ripple's founders launched the XRP Ledger before the formation of Ripple, and before making sales of XRP to anyone.  Defs.' 56.1 at ¶¶ 20, 32; Ex. 2 (Schwartz Decl.) ¶¶ 6, 8; Ex. 14 (Larsen Decl.) ¶ 3.  Under those circumstances, the memo advised that "there is a low risk that [XRP] will be considered an investment contract."  PX 242 at RPLI_SEC 0287886.  Accordingly, Defendants did not engage in the financing conduct identified in the February 2012 memo; and the February 2012 memo did not suggest that liability was likely with respect to the course of action that Ripple and its

founders actually did undertake.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 and PX 243 as misleading, including because Paragraph 991 states that the February 2012 Memo "analyze[d] XRP's precursor token" when in fact the February 2012 Memo analyzed a preliminary, proposed token and business plan that was ultimately not pursued.  *See, e.g.*, PX 243 at RPLI_SEC 0099463 (noting that Ripple provided a "revised business plan").  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 242 to the extent it implies that the memorandum provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan that was ultimately not implemented.  *See, e.g.*, *id.* (noting that Ripple provided a "revised business plan").

992. The February 2012 Memo stated "Founders…should not provide Coins to Investors in exchange for their investment and should not participate in the sale of Coins in order to reduce the risk that Coins will be considered securities and regulated by the Securities Act of 1933 and the Securities Exchange Act of 1934." *Id.* at 287888.

**Response:**        Undisputed that PX 242 contains the quoted text, exclusive of any alterations, omissions, or additions, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 242, as misleading, because Paragraph 992 omits that the term "Investors" as used in the February 2012 Memo is a defined term that refers to "individuals who invest in NewCoin," and therefore the February 2012 Memo advised that if the individuals who later founded Ripple "sold [XRP] to Investors who provide . . . the capital necessary to launch" XRP and the XRP Ledger, XRP "will likely be considered securities and subject to regulation under federal securities laws."  PX 242 at RPLI_SEC 0287878-79.

It is undisputed that Ripple's founders did not sell XRP to finance the launch of the XRP Ledger.  Defs.' 56.1 at ¶¶ 18-20 (no XRP sold before launch of XRP ledger, and XRP ledger fully operational upon launch); Ex. 2 (Schwartz Decl.) ¶¶ 4, 6.  Ripple's founders launched the XRP Ledger before the formation of Ripple, and before making sales of XRP to anyone. Defs.' 56.1 at ¶¶ 20, 32; Ex. 2 (Schwartz Decl.) ¶¶ 6, 8; Ex. 14 (Larsen Decl.) ¶ 3.  Under those circumstances, the memo advised that "there is a low risk that [XRP] will be considered an investment contract."  PX 242 at RPLI_SEC 0287886.  Accordingly, Defendants did not engage in the financing conduct identified in the February 2012 memo; and the February 2012 memo did not suggest that liability was likely with respect to the course of action that Ripple and its founders actually did undertake.  Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 242 and PX 243 as misleading, including because Paragraph 992 states that the February 2012 Memo "analyze[d] XRP's precursor token" when in fact the February 2012 Memo analyzed a preliminary, proposed token and business plan that was ultimately not pursued.  *See, e.g.*, PX 243 at RPLI_SEC 0099463 (noting that Ripple provided a "revised business plan").  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 242 to the extent it implies that the memorandum provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan that was ultimately not implemented. *See, e.g.*, *id.* (noting that Ripple provided a "revised business plan").

993.    The October 2012 Memo stated:

> Although we believe that a compelling argument can be made that Ripple Credits do not constitute "securities"… given the lack of applicable case law, we believe that there is some risk, albeit small,

456

> that the Securities and Exchange Commission ("SEC") disagrees with our analysis. The more that Founders and Company promote Ripple Credits as an investment opportunity, the more likely it is that the SEC will take action and argue that Ripple Credits are "investment contracts" and thus securities….to the extent that Ripple Credits are purchased with an expectation of profit because of the efforts of Company, Founders and/or others promoting the Ripple Credits, there is a risk that Ripple Credits will constitute investment contracts and be subject to federal securities regulation…

PX 243 at 0099466.

    **Response:**    Undisputed that PX 243 contains the quoted text, exclusive of any alterations, omissions, or additions, however, Defendants dispute any characterization or inference by the SEC that the October 12 Memo provided actual notice to Defendants that Defendants' later conduct in selling XRP was prohibited, when the October 12 Memo in fact advised Ripple that its current business strategy would *not* result in a finding that XRP was a security, concluding: "Given the commercial nature [of XRP], [XRP] should not be considered securities."  PX 243 at RPLI_SEC 0099478.  The October 2012 Memo also advised that the "compelling" conclusion of the *Howey* analysis is "that [XRP units] do not constitute 'securities' under the federal securities laws."  *Id.* at RPLI_SEC 0099466.  The October 2012 Memo also highlighted the heightened level of regulatory uncertainty and confusion given the SEC's silence and inaction: the memorandum advised that there was a "lack of applicable case law" and pointed to the "small" risk that the SEC might "disagree[] with [its] analysis."  *Id.*  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 243 to the extent it implies that the memorandum provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan that was ultimately not implemented.  *See id.* at

RPLI_SEC 0099463 (noting that it was analyzing "Ripple Credits"); Ex. 8 at 253:7-8 (Larsen testimony that Defendants "made changes based on the memo").  Defendants dispute that Paragraph 993 is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

> 994.    The October 2012 Memo stated:  "Actively promoting the trading of Ripple Credits as an investment opportunity or its potential to increase in value could result in regulatory scrutiny or accusations that Ripple Credits are investment contracts, and hence securities subject to the federal securities laws." *Id.* at 0099469.

**Response:**    Undisputed that PX 243 contains the quoted text, however, Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 243, including because Paragraph 994 omits additional context necessary to understand this exhibit, including that the October 2012 Memo advised Ripple that its current business strategy would not result in a finding that XRP was a security, concluding: "Given the commercial nature [of XRP], [XRP] should not be considered securities."  PX 243 at RPLI_SEC 0099478.  The October 2012 Memo also advised that the "compelling" conclusion of the *Howey* analysis is "that [XRP units] do not constitute 'securities' under the federal securities laws."  *Id.* at RPLI_SEC 0099466.  The October 2012 Memo also highlighted the heightened level of regulatory uncertainty and confusion given the SEC's silence and inaction: the memo advised that there was a "lack of applicable case law" and pointed to the "small" risk that the SEC might "disagree[] with [its] analysis."  *Id.*  In light of the regulatory uncertainty, the October 2012 Memo stated that XRP could be regulated under other legal frameworks, including as a commodity.  *Id.* at RPLI_SEC 0099465-67.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 243 to the extent it implies that the

memorandum provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan that was ultimately not implemented.  *See id.* at RPLI_SEC 0099463 (noting that it was analyzing "Ripple Credits"); Ex. 8 at 253:7-8 (Larsen testimony that Defendants "made changes based on the memo").

995.　　The October 2012 Memo stated:  "The Ripple Network has a greater risk of being seen as a common enterprise because there will be a specific entity, Company, which is responsible for the distribution of Ripple Credits and the promotion and marketing functions of the Ripple Network." *Id.* at 0099479.

**Response:**　　　Undisputed that PX 243 contains the quoted text, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 243, including because Paragraph 995 is misleading and omits additional context necessary to understand this exhibit, including that the October 2012 Memo continued with respect to the common enterprise analysis:  "[h]owever, Ripple Credits themselves promise nothing and it appears that neither the Founders nor Company will be collecting or retaining funds from the distribution of Ripple Credits, meaning that the Ripple Credit's users' funds will not likely be pooled." PX 243 at RPLI_SEC 0099479.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 243, including because Paragraph 995 omits that the October 2012 Memo advised Ripple that its current business strategy would not result in a finding that XRP was a security, concluding: "Given the commercial nature [of XRP], [XRP] should not be considered securities."  *Id.* at RPLI_SEC 0099478.  The October 2012 Memo also advised that the "compelling" conclusion of the *Howey* analysis is "that [XRP units] do not constitute 'securities' under the federal securities laws."  *Id.* at RPLI_SEC

0099466.   The October 2012 Memo also highlighted the heightened level of regulatory uncertainty and confusion given the SEC's silence and inaction: the memo advised that there was a "lack of applicable case law" and pointed to the "small" risk that the SEC might "disagree[] with [its] analysis."  *Id.*  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 243 to the extent it implies that the memorandum provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan that was ultimately not implemented.  *See id.* at RPLI_SEC 0099463 (noting that it was analyzing "Ripple Credits"); Ex. 8 at 253:7-8 (Larsen testimony that Defendants "made changes based on the memo").

996.   The October 2012 Memo stated: "Founders and NewCo, therefore, should steer clear of promoting Ripple Credits as an investment opportunity or as a speculative investment trading vehicle."  *Id.* at 0099478.

**Response:**        Undisputed that PX 243 contains the quoted text, however, Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 243, including because Paragraph 996 is misleading and omits additional context necessary to understand this exhibit, including the statement "[w]e understand that the primary reason for purchasing Ripple Credits is to facilitate online commerce, not to engage in speculative investment trading. As such, given the commercial nature here, Ripple Credits should not be considered securities."  PX 243 at RPLI_SEC 0099478.  The October 2012 Memo also advised that the "compelling" conclusion of the *Howey* analysis is "that [XRP units] do not constitute securities under the federal securities laws."  *Id.* at RPLI_SEC 0099466.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 243 to the extent

it implies that the memorandum provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan that was ultimately not implemented. *See id.* at RPLI_SEC 0099463 (noting that it was analyzing "Ripple Credits"); Ex. 8 at 253:7-8 (Larsen testimony that Defendants "made changes based on the memo").

997.   Under a heading "Ways to Diminish the Risk that Ripple Credits are Deemed to be Securities," the October 2012 Memo stated: "obtaining a no-action letter [from the SEC] would provide further comfort that Ripple Credits are not securities under the federal securities laws." *Id.* at 0099480.

**Response:**   Undisputed that PX 243 contains the quoted text, exclusive of any alterations, omissions, or additions, however Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 243 to the extent that the SEC implies that the no-action letter avenue was a viable path in 2012, particularly given that the SEC did not issue any no-action letter related to the offer or sale of digital assets until April 2019, Ex. 159, Pl.'s Amended Answers & Objs. to Defs.' Fourth Set of Reqs. for Admis., SEC Answer to RFA Nos. 465, and there is factual evidence that requests for no-action letters related to digital assets were submitted to the SEC in the years before 2019 and did not yield any response from the SEC. Ex. 158, Pl.'s Answers & Objs. to Defs.' Fourth Set of Reqs. for Admis., SEC Answer to RFA Nos. 475, 480, 481. Defendants also dispute Paragraph 997 because the ultimate fact is in dispute because the SEC's own expert witness, █████████, ██████████, repeatedly cast doubt on the viability of no-action relief during his testimony on the subject at his deposition. Ex. 140, ████████ Tr. at 174:22-185:5. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 243 to the extent it implies that the memorandum provided notice to Defendants that Defendants' later conduct

in selling XRP was prohibited, since the memorandum did not conclude that the federal securities laws applied to XRP, and analyzed a proposed token and business plan that was ultimately not implemented. *See* PX 243 at RPLI_SEC 0099463 (noting that it was analyzing "Ripple Credits"); Ex. 8 at 253:7-8 (Larsen testimony that Defendants "made changes based on the memo"). Defendants also dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

998.   Larsen reviewed both the February 2012 Memo and October 2012 Memo in 2012, and discussed them with Perkins Coie attorneys. PX 2 (Larsen Tr.) at 237:7-238:21, 241:10-244:9).

**Response:**      Undisputed that Larsen discussed the Perkins Coie memo with attorneys. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 2 to the extent the SEC implies that the discussion conveyed that it was likely XRP would be considered a security, particularly since the October 2012 Perkins Coie memo conveyed that there was "a compelling argument . . . that Ripple Credits do not constitute 'securities' under the federal securities laws." PX 243 at -9466.

999.   In May 2014, Larsen wrote in an email that "analysis from Perkins Coie was that investors and employees could not receive XRP, could risk SEC designation [as] a security." Larsen also wrote that certain of Ripple's founders "assumed risk of [being] issuers which persists today" and received "comp" for "personally assuming this risk." PX 244 at 0057498; PX 2 (Larsen Tr.) at 237:7-244:9; PX 1 (Larsen Ans.) ¶ 56.

**Response:**      Undisputed that PX 244 contains the quoted text, exclusive of any alterations, omissions, or additions. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from, PX 244, including to the extent it implies that Ripple's founders assumed the risk of being issuers of securities. In fact, Larsen testified that the reference contained in PX 244 at 0057498 is a reference to the potential risk of being considered issuers under money transmitter laws and that he was not referring to any other

risk. Ex. 8 at 176:21-177:4 ("Q. Why is it important that the company was not the issuer? A. Because being an issuer of prepaid access is against the money transmission laws as regulated by FinCEN and Treasury, which is the key regulator in this industry and always has been the key industry -- regulator of this industry. Q. Okay. Any other reason? A. No."). Defendants further dispute the SEC's characterization of, and inferences purportedly drawn from PX 244 to the extent it implies that Larsen read the Perkins Coie memo to warn him that all investors and employees could not receive XRP under any circumstance. The memos stated that employees needed to be compensated "in compliance with wage and hour requirements," and noted that "state wage and hour laws . . . can not generally be paid in anything other than legal tender." PX 242 at -896–896-897; PX 243 at -9490. Neither memo addresses providing XRP to employees for purposes other than hourly wages or base compensation. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 244 to the extent it implies investors in Ripple could never own XRP. Both memos focus on the risk that could spring from Ripple's providing digital assets to investors in Ripple as direct consideration for their investment. See, e.g., PX 242 at -886 ("To the extent that Founders' issuance of Coins does not involve an investment of money, then there is a low risk that the Coins will be considered an investment contract. However, the current model, which contemplates that at least 15% of Coins will be given out in exchange for investment creates a high risk that the Coins will be treated as investment contracts and regulated as securities."); PX 243 at -478 ("If a person obtains Ripple Credits primarily to purchase goods or services, then they are less likely to be deemed securities.").

1000.   The Paul Hastings law firm prepared a memorandum (the "Paul Hastings Memo") for Ripple, dated February 27, 2015, which analyzed whether XRP falls under the definition of a "security" under federal and state securities laws and is subject to regulation by federal and state securities agencies. PX 245; PX 246.

**Response:**        Undisputed that the Paul Hastings law firm prepared a memorandum for Ripple dated February 27, 2015, however, Defendants dispute any characterization or inference by the SEC that PX 245 provided actual notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum in fact advised and concluded that "XRP [i]s [l]ikely [n]ot [g]oing [t]o [b]e [d]eemed [a] [s]ecurity [u]nder [f]ederal [l]aw." PX 245 at RPLI_SEC 1002121.

1001.  The Paul Hastings Memo analyzes XRP under an application of the *Howey* test. PX 245 at 1002121-25.

**Response:**        Undisputed that the Paul Hastings law firm prepared a memorandum for Ripple which analyzed XRP under the *Howey* test, however, Defendants dispute any characterization or inference by the SEC that PX 245 provided actual notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum in fact advised that "XRP does not appear to be a security under the *Howey* test" and concluded that "XRP [i]s [l]ikely [n]ot [g]oing [t]o [b]e [d]eemed [a] [s]ecurity [u]nder [f]ederal [l]aw."  PX 245 at RPLI_SEC 1002121, '2123.

1002.  The Paul Hastings Memo (a) "concludes that XRP likely should not be treated as a security under federal and state law," (b) "notes that XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP" and (c) "suggests steps that Ripple Labs may take in promoting and selling XRP to reduce this risk. *Id.* at 1002118.

**Response:**        Undisputed that PX 245 contains the quoted text, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 245, including because Paragraph 1002 omits additional context necessary to understand this exhibit, including that the memorandum concluded "XRP does not appear to be a security under the *Howey* test,"

PX 245 at RPLI_SEC 1002123, and stated: "[t]o date, the Securities and Exchange Commission has not taken a public position on whether virtual currencies are securities within the meaning of federal securities law," and that the "data points" that did exist regarding SEC action were "not definitive by any stretch," but that the approach the SEC had taken to date was "[c]onsistent [w]ith [t]he conclusion [t]hat XRP [i]s [u]nlikely [t]o [b]e [r]egarded [a]s [a] [s]ecurity." *Id.* at RPLI_SEC 1002125-26.  Defendants dispute any characterization or inference by the SEC that PX 245 provided actual notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum in fact advised that "XRP does not appear to be a security under the *Howey* test" and concluded that "XRP [i]s [l]ikely [n]ot [g]oing [t]o [b]e [d]eemed [a] [s]ecurity [u]nder [f]ederal [l]aw." *Id.* at RPLI_SEC 1002121, '2123.

> 1003.   The Paul Hastings Memo stated that Ripple would face an "uphill argument" to overcome the burden of establishing that XRP is exempt from the securities laws on the grounds that it is a "currency." *Id.* at 1002121-22 n.12.

**Response:**      Undisputed that PX 245 contains the quoted text, however Defendants dispute the SEC's characterization of, and inferences purportedly drawn from the brief footnote in PX 245, which the SEC selectively quotes.  Paragraph 1003 is misleading and omits additional context necessary to understand the Paul Hastings Memo, since the brief footnote in question also states that "one could make the argument that virtual currency is a 'currency' and exempt from the reach of the federal securities acts," and notes an absence of legal precedent on the issue, noting that "courts have largely ignored this language in interpreting the Securities Exchange Act of 1934," and elsewhere the memorandum also advised: "[t]o date, the Securities and Exchange Commission has not taken a public position on whether virtual currencies are securities within the meaning of federal securities law."  PX 245 at RPLI_SEC 1002121, '2125.  The Paul Hastings Memo

stated that XRP was a "virtual currency" and did not conclude that if XRP were not a virtual currency, it was therefore a security.  *Id.* at RPLI_SEC 1002119, '2121.  The memorandum concluded in a header: "The Approach Taken to Date by the SEC is Consistent With The Conclusion that XRP Is Unlikely To Be Regarded As A Security."  *Id.* at RPLI_ SEC 1002125.  Paragraph 1003 also omits that in May 2015, after the preparation of the Paul Hastings Memo, the U.S. Department of Justice ("DOJ") and the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), determined that XRP was the "currency of the Ripple network," a "virtual currency," and a "convertible virtual currency." Settlement Agreement, Attach. A ¶¶ 2-3, 22, U.S. Dep't of Justice (May 5, 2015), https://perma.cc/382H-K4LC.  Defendants dispute any characterization or inference by the SEC that PX 245 provided actual notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum in fact advised that "XRP does not appear to be a security under the *Howey* test" and concluded that "XRP [i]s [l]ikely [n]ot [g]oing [t]o [b]e [d]eemed [a] [s]ecurity [u]nder [f]ederal [l]aw."  PX 245 at RPLI_SEC 1002121, '2123.

1004.   The Paul Hastings Memo stated: "it is possible to build a superficial argument that, at first blush, would seem to support a conclusion that XRP satisfies the second and third prongs of *Howey*. Ripple Labs has a much closer connection to XRP than the participants in the Bitcoin ecosystem have to Bitcoin or the Bitcoin Foundation. At least initially, Ripple Labs and the founders of Ripple Labs owned all XRP. Moreover, Ripple Labs pools the money that it receives from the sale of XRP, and it uses those funds to promote and expand the Ripple ecosystem. At various times, Ripple Labs has also claimed that its value is tied to the value of XRP, and it has used XRP to compensate early employees of Ripple Labs. It also exercised some control over the sale of XRP, restricting the ability of the founders to dispose of XRP to protect, at least in part, the value of XRP." *Id.* at 1002124.

**Response:**      Undisputed that PX 245 contains the quoted text, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from PX 245, including because Paragraph 1004 omits additional context necessary to understand this exhibit, including that the memorandum also stated that "XRP should not satisfy the common enterprise prong of the *Howey* test [because] [p]urchasers of XRP do not pool their assets in a common enterprise such that 'all share in the profits and risks of the enterprise,'" PX 245 at RPLI_SEC 1002123-24; and that "XRP should also fail the third prong of the *Howey* test.  Although purchasers of XRP would profit from an increase in its value, buyers do not necessarily purchase XRP with the expectation that XRP will rise in value," *id.* at RPLI_SEC 1002124; and ultimately "conclude[d] that XRP likely should not be treated as a security," noting that "XRP does not appear to be a security under the *Howey* test," *id.* at RPLI_SEC 1002118, '2123.  Defendants dispute any characterization or inference by the SEC that PX 245 provided actual notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum in fact advised that "XRP does not appear to be a security under the *Howey* test" and concluded that "XRP [i]s [l]ikely [n]ot [g]oing [t]o [b]e [d]eemed [a] [s]ecurity [u]nder [f]ederal [l]aw." *Id.* at RPLI_SEC 1002121, '2123.

1005.   The Paul Hastings Memo stated: "The relationship between XRP and Ripple Labs distinguishes XRP from certain other virtual currencies. Bitcoin, for example, does not have a single identifiable promoter. Rather, Bitcoin relies on miners to create and introduce new currency into the ecosystem. The Ripple ecosystem's reliance on the efforts of Ripple Labs-the single largest holder of XRP-to promote and expand the ecosystem, creates greater risk that XRP might be deemed a security as compared to other virtual currencies." *Id.* at 1002124 n.36.

**Response:**      Undisputed that PX 245 contains the quoted text, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 245, including because Paragraph 1005 omits additional context necessary to understand this exhibit, including that

467

the memorandum ultimately "conclude[d] that XRP likely should not be treated as a security," noting that "XRP does not appear to be a security under the *Howey* test." PX 245 at RPLI_SEC 1002118, '2123. Defendants dispute any characterization or inference by the SEC that PX 245 provided actual notice to Defendants that Defendants' later conduct in selling XRP was prohibited, since the memorandum in fact advised that "XRP does not appear to be a security under the *Howey* test" and concluded that "XRP [i]s [l]ikely [n]ot [g]oing [t]o [b]e [d]eemed [a] [s]ecurity [u]nder [f]ederal [l]aw." *Id.* at RPLI_SEC 1002121, '2123.

1006. The Paul Hastings Memo stated: "In order to help mitigate the risk of XRP being deemed a security, Ripple Labs should be extremely careful in promoting and selling XRP. Regulators will look to Ripple Lab's public documents and documents provided to potential purchases of XRP in applying the *Howey* test. As such, statements touting XRP as an investment opportunity and the potential profits that buyers may derive from XRP's appreciation in value would tend to support the argument that XRP functions as a security. In drafting these documents, Ripple Labs should focus instead on promoting XRP's intrinsic utility as instrument of trade." *Id.* at 1002125.

**Response:**        Undisputed that PX 245 contains the quoted text, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents. Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 245 as misleading, since the memorandum stated that "Ripple Labs' public documents do not support a conclusion that XRP is a security" and "largely tout the utilitarian attributes of XRP" and "do not discuss the potential benefits to users from future increases in the value of XRP," concluding that the "relationship between purchasers of XRP and Ripple Labs is more analogous to the owners of a common commodity." PX 245 at RPLI_SEC 1002124. The Paul Hastings Memo concluded: "[o]n balance, it seems unlikely that a court would conclude that XRP is a security under the *Howey* test. XRP has value independent of a common enterprise and utility

independent of an investment purpose.  And, Ripple's public materials that serve to attract

purchasers largely reflect and promote these two attributes of XRP."  *Id.* at RPLI_SEC

1002125.  Defendants dispute any characterization or inference by the SEC that PX 245

provided actual notice to Defendants that Defendants' later conduct in selling XRP was

prohibited, since the memorandum in fact advised that "XRP does not appear to be a security

under the *Howey* test" and concluded that "XRP [i]s [l]ikely [n]ot [g]oing [t]o [b]e [d]eemed

[a] [s]ecurity [u]nder [f]ederal [l]aw."  *Id.* at RPLI_SEC 1002121, '2123.

1007.   The Paul Hastings Memo stated: "the SEC has viewed virtual currencies,
        particularly Bitcoin, as sources of value rather than securities under the Federal
        securities laws. However, the SEC appears to be monitoring this area very closely,
        and has even established a Digital Currency Working Group. While the agency is
        generally restricted from deviating outside the bounds of the federal statutory and
        case law outline above, it could always take a more aggressive position on virtual
        currencies, particularly regarding those, like XRP, that raise more regulatory
        questions than Bitcoin." *Id.* at 1002126-27.

**Response:**        Undisputed that PX 245 contains the quoted text, exclusive of any

alterations, omissions, or additions, however Defendants dispute that this excerpted text is

the entirety of, a representative selection of, or a fair characterization of the document's

complete contents.  Defendants dispute the SEC's characterization of, and inferences

purportedly drawn from PX 245, including because Paragraph 1007 omits additional context

necessary to understand this exhibit, including that the memorandum notes "regulatory

sources [were found] to be of little help for purposes of characterizing bitcoin for purposes

of federal securities law."  PX 245 at RPLI_SEC 1002126.  Defendants dispute the SEC's

characterization of, and inferences purportedly drawn from PX 245 as misleading to the

extent it implies the memorandum provided notice to Defendants that Defendants' later

conduct in selling XRP was prohibited or that the SEC would ever interpret the law to

consider SEC a security, since the memorandum advised: "[t]o date, the Securities and

Exchange Commission has not taken a public position on whether virtual currencies are securities within the meaning of federal securities law" and that the "data points" that did exist regarding SEC action were "not definitive by any stretch," but that the approach the SEC had taken to date was "[c]onsistent [w]ith [t]he conclusion [t]hat XRP [i]s [u]nlikely [t]o [b]e [r]egarded [a]s [a] [s]ecurity." *Id.* at RPLI_SEC 1002125-26.

1008. By March 2015, Ripple was contemplating the formation of the "Long Term Ripple Fund, LP," an investment vehicle that would invest in XRP and be offered to "accredited investors" under Regulation D of the Securities Act. PX 247 at 0287566-67, 572, 576; PX 247 at 0287556; PX 249 at 0199559; PX 10 (Rapoport Tr.) at 254:8-257:7.

**Response:**        Undisputed that Ripple in 2015 was contemplating the formation of the "Long Term Ripple Fund, LP," however Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 247, PX 249 and PX 10, to the extent it implies that the Long Term Ripple Fund, LP, was ever established, which it was not.  PX 10 at 255:19-20.  Defendants do not concede that this is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

1009. A March 2015 draft of a Private Placement Memorandum for the Long Term Ripple Fund, LP contained the following statements in a section titled "Risks Relating to Government Oversight":

Regulatory changes or actions may alter the nature of an investment in the Interests or restrict the use of XRPs or the operation of the Ripple protocol in a manner that adversely affects an investment in the Interests.

As virtual currencies, such as Bitcoin, Litecoin, Dogecoin and XRP, have grown in both popularity and market size, the U.S. Congress and a number of U.S. federal and state agencies (including the Financial Crimes Enforcement Network of the U.S. Department of the Treasury **("FinCEN")** the **SEC**, the Commodities Futures Trading Commission **("CFTC")**, the Financial Industry Regulatory Authority **("FINRA")**, the Consumer Financial Protection Bureau **("CFPB")**, the Department of Justice, the Department of Homeland Security, the Federal Bureau of investigation, the U.S. Internal Revenue

Service **("IRS")**, and state financial institution regulators) have begun to examine the operations of the virtual currency networks and virtual currency related businesses, their users and the exchange markets, with particular focus on (i) the extent to which virtual currencies can be used to launder the proceeds of illegal activities or fund criminal or terrorist enterprises, (ii) the safety and soundness of exchanges or other service providers that hold or transmit virtual currency for users and (iii) other risks to investors and consumers who hold and use virtual currency. On-going and future regulatory actions may alter, perhaps to a materially adverse extent, the nature of an investment in the Interests, the value of XRP or the ability of the Fund to continue to operate.

\* \* \*

Currently, neither the SEC nor the CFTC has formally asserted regulatory authority over XRP, the virtual currency networks or XRP trading and ownership. On May 7, 2014, the SEC published an investor alert that highlighted fraud and other concerns relating to certain investment opportunities denominated in virtual currency and fraudulent and unregistered investment schemes targeted at participants in online bitcoin forums. A CFTC Commissioner stated publicly that the CFTC should consider regulating bitcoins. On October 9, 2014, the CFTC held a hearing on bitcoin that focused on the benefits of the Bitcoin Network and on the launch of TeraExchange, a platform for bitcoin derivative contracts that was approved by the CFTC. Although the SEC has taken action indicating that it has jurisdiction over securities that relate to bitcoin (for example, with respect to the Interests in this Fund), and the CFTC has taken action indicating that it has jurisdiction over certain bitcoin derivatives with respect to TeraExchange's platform, as of the date of this Memorandum, the Investment Manager is not aware of any rules that have been proposed to regulate virtual currency as a commodity or a security. To the extent that virtual currencies are determined to be a security, commodity or other regulated asset, or to the extent that a U.S. or foreign government or quasi-governmental agency exerts regulatory authority over virtual currency networks or virtual currency trading and ownership, trading or ownership in XRP or the Interests may be adversely affected.

\* \* \*

If regulatory changes require the regulation of virtual currencies under the Commodity Exchange Act, as amended

471

(the "CEA"), by the CFTC and/or under the Securities Act and the Investment Company Act by the SEC, the Fund and the Manager may be required to register and comply with such regulations. To the extent that the Manager decides to continue the Fund, the required registrations and regulatory compliance steps may result in extraordinary, recurring, and/or non-recurring expenses to the Fund. The Manager may also decide to terminate the Fund. Termination of the Fund in response to the changed regulatory circumstances may be at a time that is disadvantageous to investors.

Current and future legislation, CFTC and SEC rulemaking and other regulatory developments may impact the manner in which virtual currencies are treated for classification and clearing purposes. In particular, XRPs may not be excluded from the definition of "commodity" for CFTC purposes or XRPs may become a "security" for future SEC purposes. As of the date of this Memorandum, the Manager is not aware of any rules that have been proposed to regulate XRPs as a commodity or a security. Although several United States federal district courts have recently held for certain purposes that virtual currencies are currency or a form of money, these rulings are not necessarily indicative of the characterization of XRPs for other purposes and the Manager and the Fund cannot be certain as to how future regulatory developments will impact the treatment of XRPs under the law.

* * *

To the extent that XRPs are deemed to fall within the definition of a security for SEC purposes, the Fund and the Manager may be required to register and comply with additional regulation under the Investment Company Act of 1940. Moreover, the Manager may be required to register as an investment adviser under the Investment Adviser Act of 1940 and register the Fund as an investment company. Such additional registrations may result in extraordinary, recurring and/or non-recurring expenses of the Fund, thereby materially and adversely impacting the Interests. If the Manager determines not to comply with such additional regulatory and registration requirements, the Manager will terminate the Fund. Any such termination could result in the liquidation of the Fund's XRPs at a time that is disadvantageous to an investor in the Interests.

* * *

> The relationship between XRP and Ripple Labs distinguishes XRP from certain other virtual currencies. Bitcoin, for example, does not have a single identifiable promoter. Rather, Bitcoin relies on miners to create and introduce new currency into the ecosystem. The Ripple ecosystem's reliance on the efforts of Ripple Labs-the single largest holder of XRP-to promote and expand the ecosystem, creates greater risk that XRP might be deemed a security as compared to other virtual currencies and Ripple Labs might be deemed to be operating as an unregistered securities exchange, broker, or dealer under federal and State securities laws.

PX 247 at 0287581-587.

**Response:**       Undisputed that PX 247 contains the quoted text, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 247, which is a draft document that was never finalized or executed, to the extent it implies that the Long Term Ripple Fund, LP was ever established, which it was not.  PX 10 at 255:19-20.  Defendants dispute the SEC's characterization of, and inferences purportedly drawn from PX 247 as misleading to the extent it implies that the document provided notice to Defendants that Defendants' later conduct in selling XRP was prohibited or that the SEC would ever interpret the law to consider SEC a security, since PX 247 highlights the substantial regulatory uncertainty that existed at the time, disclosing that: "Currently, neither the SEC nor the CFTC has formally asserted regulatory authority over XRP, the virtual currency networks or XRP trading and ownership," and "As of the date of this Memorandum, the Manager is not aware of any rules that have been proposed to regulate XRPs as a commodity or a security."  PX 247 at RPLI_SEC 0287583, '7586.

1010.   On October 31, 2016, Ripple Chief Compliance Officer, Antoinette O'Gorman responded to an email from a Ripple employee asking her: "Can XRP be both a

currency (FinCEN territory) and a commodity (CFTC territory)?" PX 250 at 0761766.

**Response:**　　　Undisputed that PX 250 contains the quoted text, however Defendants dispute that this excerpted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

1011.　In her email, which copied Garlinghouse, O'Gorman wrote: "Yes, it can, and more. IRS is of the opinion that virtual currency is 'property', CFTC treats it as a 'commodity,' FinCEN has stated their opinion that 'virtual currency operates as 'real' currency in some environments' and the SEC may well come out on the side that certain crypto-currencies are securities." *Id.* at 0761766; PX 18 (O'Gorman Tr.) at 179:8-181:21.

**Response:**　　　Undisputed that PX 250 contains the quoted text, however Defendants dispute any characterization of inferences purportedly drawn by the SEC from this excerpt of PX 250 that it constituted notice to Defendants or awareness by Defendants that their sales of XRP were prohibited by securities laws, since O'Gorman's email does not reach the conclusion that the securities laws applied to XRP and expressly highlights the substantial regulatory uncertainty and confusion that existed at the time, stating: "it's an interesting conundrum and one that begs for a more uniform regulatory approach at the federal (and state) level(s) but the probability of that ever happening is extremely low."  PX 250 at RPLI_SEC 0761766.  O'Gorman also was not an attorney and was not requested to provide, nor did she provide, legal advice to Garlinghouse.  PX 18 at 15:16-17.  Defendants thus also dispute that this excerpt is the entirety of, a representative selection of, or a fair characterization of the document's complete contents.

1012.　By early 2017, Ripple's Director of Regulatory Relations, Ryan Zagone, was aware that the SEC could determine that XRP was a security and subject to its jurisdiction. PX 30 (Zagone Tr.) at 129:23-130:9.

**Response:**　　　Undisputed that, in response to a question, Zagone testified that he first became aware that the SEC could determine that XRP was a security and subject to its

jurisdiction "In late 2016, early – or in 2017, I believe," PX 19 at 129:23-130:9, but Defendants dispute the SEC's characterization of, and inferences purportedly drawn from this testimony, because awareness that the SEC "could" theoretically take a position in the future is not an adequate substitute for fair or actual notice of what conduct *is* prohibited, *see Upton v. S.E.C.*, 75 F.3d 92, 98 (2d Cir. 1996), and Zagone never testified to being aware that unregistered sales of XRP *were* prohibited or that the SEC had made any such determination.   Paragraph 1012 also omits additional context necessary to understand Zagone's testimony, including that Zagone went on to testify that to the extent he became aware, his understanding came not from the SEC but from "the media and the market," which were "talking more and more about how to classify digital assets," and how the media and market addressed the "uncertainty around the framework in the U.S."  PX 19 at 130:5-9, 133:19-22.

1013.   On January 3, 2017, O'Gorman emailed Zagone and directed him to add as one of his priorities for the first quarter of 2017:  "XRP as NOT a Security."  PX 251 at 0908880; PX 30 (Zagone Tr.) at 139:7-140:9.

**Response:**        Undisputed that PX 251 contains the quoted text; however, Defendants dispute that the quoted text is the entirety of, a representative selection of, or a fair characterization of the document's complete contents, because Paragraph 1013 omits additional context necessary to understand this exhibit, including that Zagone identified as one of his top five priorities, "Drive Regulatory Clarity on XRP," due to the substantial regulatory uncertainty and confusion that existed in the United States, PX 251 at RPLI_SEC 0908881, and Zagone testified during his deposition that to the extent this was one of his priorities for the first quarter of 2017, his role would have been to "assist legal in their analysis of the issue."  PX 19 at 140:3-4.  Moreover, Zagone could not recall what efforts he undertook that quarter regarding this issue, PX 19 at 141:8-9, and reiterated that "we didn't