**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

-------------------------------------------------------------------------x

**SECURITIES AND EXCHANGE COMMISSION,**    :

   :

                   **Plaintiff,**    :      **20 Civ. 10832 (AT) (SN)**

   :

         **- against -**    :      **ECF Case**

   :

**RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,**    :
**and CHRISTIAN A. LARSEN,**

   :

              **Defendants.**    :

   :

-------------------------------------------------------------------------x

**PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RESPONSE AND COUNTER-STATEMENT TO DEFENDANTS' LOCAL RULE 56.1 STATEMENT, IN OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

Jorge G. Tenreiro
Jon A. Daniels
Elizabeth Goody
Benjamin H. Hanauer
Ladan F. Stewart
Mark R. Sylvester
Daphna A. Waxman

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

# TABLE OF CONTENTS

SEC RESPONSE TO DEFENDANTS' 56.1 STATEMENT ................................................................ 2

SEC COUNTER-STATEMENT OF UNDISPUTED FACTS ...................................................... 154

    A.  Ripple, XRP, and the XRP Ledger ........................................................................................ 154

        (i)   The Creation of XRP and the XRP Ledger ........................................................ 154

        (ii)  Ripple's Continued Work on the XRP Ledger ................................................ 155

        (iii) Ripple's Copyrights, Trademarks, and Patents for XRP and the XRP Ledger ................................................................................................................ 158

        (iv) Ripple Validators on the Unique Node List and Ripple's Control Over Changes to the XRP Ledger ................................................................................ 158

        (v)  Ripple's Origination and Continued Contributions to the Domain XRPL.org ................................................................................................................ 160

        (vi) Ripple Funded and Supported the Growth of the XRP Ledger Foundation ............................................................................................................. 160

    B.  Ripple Made Efforts to Create Value for XRP .................................................................... 161

        (i)   Ripple Created and Funded xPring and Coil to Help Promote Uses for XRP Other than for Cross Border Payments ..................................................... 161

        (ii)  Ripple Engaged in Efforts to Get XRP Listed on Exchanges ......................... 161

        (iii) Ripple Touted its Efforts to Get XRP Listed on Exchanges .......................... 162

        (iv) Ripple Tracked its XRP Distributions and XRP Supply Entering the Market ................................................................................................................... 164

        (v)  Ripple Held XRP in Reserve ............................................................................. 166

        (vi) Ripple's Reporting of its XRP Distributions Online and in Quarterly XRP Markets Reports Obscured the True Amount of XRP Supply Entering the Market ............................................................................................. 166

        (vii) Ripple's Other Distributions of XRP ............................................................. 167

    C.  Ripple's Distributions of XRP Provided Value to the Company ........................................ 173

    D.  Ripple's "On-Demand Liquidity" Software Product ........................................................... 174

        (i)   ODL Was Ripple's Only Product that Involved XRP ..................................... 174

        (ii)  Ripple Incurred Significant Expenses in Connection with ODL Without Which ODL Would Not Have Functioned ...................................................... 176

        (iii) ODL Still Requires Use of Traditional Software Rails to Convert One Fiat Currency into Another Fiat Currency ....................................................... 178

        (iv) Ripple Compensated ODL Customers for ODL's Greater Cost than Using Traditional Payment Rails to Effect Cross-Border Transactions .................... 178

(v) ODL Customers Are Primarily Money Transmitters. ................................... 179

(vi) Ripple Did Not Sell XRP for ODL Until Mid-2020 and then Bought Back XRP Sold. ...................................................................................................... 180

(vii) XRP Trading Volume Attributable to ODL Was a Small Fraction of Total XRP Trading Volume. ................................................................................... 183

(viii) Ripple Paid MoneyGram to Use ODL. ......................................................... 183

(ix) Miscellaneous .................................................................................................. 195

E. Ripple Did Not Treat XRP as a "Currency" to Buy Goods or Services. ............................ 195

F. The Individual Defendants Offered and Sold XRP in the United States. .............................. 196

(i) The Individual Defendants Used GSR to Offer and Sell Their XRP. ...................... 196

(ii) The Individual Defendants Used Domestic Means to Transfer Their XRP to GSR and to Obtain the Sale Proceeds from GSR. ..................................... 199

(iii) GSR Sold XRP on Crypto Trading Platforms in the United States and/or that Allowed U.S. Customers. ..................................................................... 203

(iv) GSR Did Not Segregate the XRP It Sold on Behalf of Ripple, Larsen, or Garlinghouse. ............................................................................................... 204

(v) The Crypto Exchanges Through Which GSR Sold the Individual Defendants' XRP Are Unregulated and Differ from Traditional Securities Exchanges in Important Ways. .............................................................. 206

G. Defendants Fostered U.S. Investor Interest in XRP and Took Steps to Develop a Secondary Market that Would Allow U.S. Investors to Trade XRP and Provide Sufficient Liquidity for Defendants to Monetize their XRP. ...................................... 209

(i) U.S. Investors Contacted Ripple About How to Buy XRP. ......................... 209

(ii) Ripple Responded to Direct Inquiries from U.S. Investors by Instructing them How to Buy XRP. .................................................................................. 210

(iii) Ripple Understood Investors in the United States Were Trying to Buy XRP and Sought to Make that Process Easier. ............................................. 211

(iv) Ripple's Website Provided Instructions for How Purchasers Could Buy XRP, Including Purchasers in the U.S. .......................................................... 211

(v) Ripple's XRP Market Reports Directed People Interested in Buying XRP to Ripple's Website, and Ripple Tracked Traffic to Its Website. ................. 212

(vi) From 2016 to 2019, Defendants Worked to Get XRP Listed on Crypto Exchanges Worldwide to Increase Liquidity of the Secondary Trading Market for XRP. ............................................................................................ 213

(vii) Ripple and GSR Sought to Increase the Number of Exchanges on which XRP Traded. ................................................................................................. 215

(viii)    Ripple Publicly Announced When New Exchanges Began to List XRP
and Included Instructions on its Website Regarding Trading on Some of
Those New Exchanges................................................................................. 216

(ix)    Between 2013 and 2020, Many of the Largest and More Established
Crypto Exchanges Offered XRP Trading to U.S. Customers...................... 218

(x)    Ripple Tracked, at Garlinghouse's Instruction, which Exchanges
Prohibited U.S. Customers. ........................................................................ 219

(xi)    Defendants in Fact Sold XRP on Numerous Exchanges that Allowed U.S.
Customers. .................................................................................................. 220

(xii)    Ripple and the Individual Defendants Had the Authority to Register Their
XRP Offering in the United States, or, in the Alternative, Could Have
Ensured that XRP Sold by Them Would Not Land in the Hands of U.S.
Investors Through Restrictions on Sales and Resales—but they Did Not. ............... 221

I.    Miscellaneous ........................................................................................................ 222

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, and Section III.C.iii of this Court's Individual Practices, Plaintiff Securities and Exchange Commission ("SEC"), submits this Response to Defendants Ripple Labs, Inc. ("Ripple"), Christian A. Larsen ("Larsen"), and Bradley Garlinghouse's ("Garlinghouse," together "Defendants") Local Rule 56.1 Statement (D.E. 623) in Support of their Motion for Summary Judgment (D.E 621).[1]

---

[1] Citations to "SEC 56.1 ¶ __" are to the SEC's statement of undisputed facts (D.E. 629) in Support of its Motion for Summary Judgment.

Citations to "Def. 56.1 ¶ __" are to Defendants' statement of undisputed facts (D.E. 623).

Citations to "SEC Counter 56.1 ¶ __" are to the SEC's Counter-Statement of Undisputed Facts, below.

Citations to PX 1 to PX 200 are to Exhibits to the Declaration of Ladan F. Stewart in Support of the SEC's Motion for Summary Judgment dated September 13, 2022 (D.E. 630).

Citations to PX 201 to PX 400, PX 540, and PX 545 are to Exhibits to the Declaration of Mark. R. Sylvester in Support of the SEC's Motion for Summary Judgment dated September 13, 2022 (D.E. 631).

Citations to PX 401 to PX 498, PX 515 to PX 523, and PX 541 to PX 544 are to Exhibits to the Declaration of Jorge G. Tenreiro in Support of the SEC's Motion for Summary Judgment dated September 13, 2022 (D.E. 627).

Citations to PX 500 to PX 509 are to Exhibits to the Declaration of Daphna A. Waxman in Support of the SEC's Motion for Summary Judgment dated September 13, 2022 (D.E 626).

Citations to PX 113, 398, 409, 456, 457, 499, 500, 505, 525, 526, 528, 529, 530, 532, 533, 535, 537, 538, 539, and PX 547 to PX 644 are to Exhibits to the Declaration of Ladan F. Stewart in Opposition to Defendants' Motion for Summary Judgment, dated October 18, 2022 and submitted together herewith.

Citations to PX 645 to PX 771 are to the Exhibits to the Declaration of Mark R. Sylvester in Opposition to Defendants' Motion for Summary Judgment, dated October 18, 2022 and submitted together herewith.

Citations to "[Last Name] Dep. __" are to the deposition transcripts, as indicated, of various witnesses, the full transcripts of which are also attached as Exhibits to D.E. 630.

Citations to "[Last Name] Inv. Tr. __" are to the transcripts of the investigative testimony of various witnesses, taken during the SEC's investigation into this matter before the filing of the complaint, the full transcripts of which are also attached as Exhibits to the Stewart Declaration.

To the extent the SEC does not controvert particular assertions by Defendants, the SEC does not thereby concede that any such uncontroverted assertion constitutes a material or relevant fact, or that the cited evidence would be admissible at trial. Nor does it thereby admit the truth of those assertions for purposes other than resolution of this Motion. To the extent that the SEC does not controvert assertions that a witness testified to a particular fact, the SEC does not thereby concede that the witness is credible on that point or that the fact to which the witness testified is not disputed. The SEC does not hereby respond to the assertions of fact made in the subheadings.

## SEC RESPONSE TO DEFENDANTS' 56.1 STATEMENT

**A.      Creation of XRP**

**Paragraph No. 1:** A blockchain is a system for securely recording information. Each transaction is recorded as a "chunk[ ] of information" known as a block on the digital ledger, and each block, in turn, "has a cryptographically secure reference to the prior block," resulting in an immutable timeline of transactions. Ex. 1, Dep. Tr. of David Schwartz ("D. Schwartz Tr.") 28:14-20; see also Ex. 2, Decl. of David Schwartz ("D. Schwartz Decl.") ¶ 2.

**Response:** The SEC disputes the assertions in ¶ 1 to the extent they imply that the XRP Ledger results in an "immutable" timeline of transactions on the grounds that the XRP Ledger has been reset more than once by Ripple and its founders, resulting in new iterations of that blockchain and of XRP. *See infra* SEC Counter 56.1 ¶¶ 3-5.  The SEC does not otherwise dispute the assertions contained in ¶ 1.

**Paragraph No. 2:** A blockchain database is typically recorded across a network of computer systems. See Ex. 2, D. Schwartz Decl. ¶ 2; Ex. 1, D. Schwartz Tr. 29:9-11.

**Response:** SEC does not dispute the assertions contained in ¶ 2.

---

Citations to "XQYY XRP Markets Report" are to the quarterly "XRP Markets Report" that Ripple published on its website starting in January 2017, indicating the number of the quarter and the year, the full copies of which are also attached as Exhibits to the Waxman Declaration.

All other capitalized terms not defined herein shall have the meaning ascribed to them in the SEC's Brief in Support of its Motion for Summary Judgment (D.E. 628).

**Paragraph No. 3:** The distributed nature of the blockchain helps make it difficult, if not impossible, for would-be bad actors to alter past transactions. See, e.g., Ex. 2, D. Schwartz Decl. ¶ 2; Ex. 3, Expert Report of Carol Osler (Oct. 4, 2021) ("Osler Rep.") ¶ 48 ("Computers can be taken over by corrupt parties, and falsely label invalid transactions as valid. A consensus mechanism identifies when the signals from a set of computers can be trusted. This represents a version of the 'Byzantine Generals Problem' in computer science: How can one verify information from multiple sources, without knowing which are trustworthy?"); id. ¶ 49 (detailing Bitcoin's "solution to the Byzantine Generals Problem").

**Response:** The SEC disputes the assertions in ¶ 3 on the grounds that the XRP Ledger has been reset more than once by Ripple and its founders, resulting in new iterations of that blockchain and of XRP, and that some blocks of the XRP Ledger have been lost. *See infra* SEC Counter 56.1 ¶¶ 3-5.  The SEC further disputes the assertions in ¶ 3 on the grounds that the term "bad actors" is vague and ambiguous and that certain actors such as Ripple can and have proposed changes to the XRP Ledger. *See infra* SEC Counter 56.1 ¶¶ 32-38.

The SEC further disputes the assertions contained in ¶ 3 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the expert report of Carol Osler ("Osler Report") is not admissible for the reasons set forth in the SEC's motion to exclude (D.E. 536, "Motion to Exclude"), and the Osler Report, in describing the features of blockchain technology, or the operations and capabilities of Bitcoin and Ether, cites only a few popular and industry publications, or to no sources at all, such that these opinions lack foundation and constitute inadmissible hearsay.

**Paragraph No. 4:** The first blockchain ledger, Bitcoin, launched in 2009. See Ex. 2, D. Schwartz Decl. ¶ 3.

**Response:** The SEC does not dispute the assertions contained in ¶ 4.

**Paragraph No. 5:** The Bitcoin blockchain records transactions through a "proof of work" process, using large amounts of computing power to solve complex mathematical problems that verify which transactions will be added to the blockchain. See Ex. 4, Dep. Tr. of Dinuka Samarasinghe ("Samarasinghe Tr.") 141:4-142:16 (explaining Bitcoin's "proof of work" process and distinguishing it from the XRP Ledger's validation process); see also Ex. 2, D. Schwartz Decl. ¶ 3.

**Response:** The SEC does not dispute the assertions contained in ¶ 5.

3

**Paragraph No. 6:** Although it ordinarily takes about 10 minutes to validate a transaction using the Bitcoin proof-of-work algorithm, this time can vary dramatically. See Ex. 3, Osler Rep. ¶ 50 & Fig. 8 ("The average time to verify a Bitcoin transaction is generally about ten minutes, as shown in Figure 8. The time occasionally rises when transaction volumes are high, as happened when the price fell dramatically in May of 2021."); see also Ex. 2, D. Schwartz Decl. ¶ 5.

**Response:** The SEC does not dispute the assertions contained in ¶ 6.

**Paragraph No. 7:** The Bitcoin ledger can process 4.6 transactions per second. See Ex. 3, Osler Rep.¶ 55.

**Response:** The SEC does not dispute the assertions contained in ¶ 7.

**Paragraph No. 8:** Bitcoin transactions have, in the past, cost up to $60 per transaction. See Ex. 3, Osler Rep. ¶ 50 ("Bitcoin transaction fees over approximately the past year have been at least $2 and can range up to $60 per transaction.").

**Response:** The SEC disputes the assertion contained in ¶ 8 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Osler Report, which is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the Osler Report, in describing the features of blockchain technology, or the operations and capabilities of Bitcoin and Ether, cites only a few popular and industry publications, or no sources at all, such that these opinions lack foundation and constitute inadmissible hearsay.

**Paragraph No. 9:** By 2012, other small cryptocurrencies had copied the Bitcoin ledger's open- source code with minimal alterations, but none deviated in any significant way from the structure of the Bitcoin ledger. See Ex. 2, D. Schwartz Decl. ¶ 3; see also Ex. 5, Expert Report of Peter Adriaens (Oct. 4, 2021) ("Adriaens Rep.") ¶ 36 ("As Bitcoin increased in popularity and the idea of decentralized and encrypted currencies caught on, the first alternative cryptocurrencies appeared. Sometimes known as 'altcoins,' these cryptocurrencies generally tried to improve on the original Bitcoin design by offering greater speed, anonymity, or other advantages (such as energy requirements for validation).").

**Response:** The SEC disputes the assertions in ¶ 9 on the grounds that the term "minimal alterations" is vague and ambiguous. The SEC further disputes the assertion contained in ¶ 9 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the expert report of Peter Adriaens ("Adriaens Report"),

4

is not admissible for the reasons set forth in the SEC's Motion to Exclude, including that the Adriaens Report copies popular and industry publications without attribution, or to no sources at all; Adriaens did not write large swaths of his report; and Adriaens did not have the technical expertise or understanding to compare the relative strengths and weaknesses of bitcoin, Ethereum, and XRP; such that these opinions lack foundation and constitute inadmissible hearsay.

**Paragraph No. 10:** When the XRP Ledger launched, all known existing blockchains relied on proof-of-work mechanisms. Today, most major blockchains (including the two largest, Bitcoin and Ethereum) still do (though developers of the Ethereum blockchain are moving to a different approach called "proof of stake"). See Ex. 2, D. Schwartz Decl. ¶ 4; Ex. 5, Adriaens Rep. ¶ 37 ("There are thousands of digital currencies (including, for example, Einsteinium, Litecoin, Dash, Zcash, and Novacoin) that use the Bitcoin blockchain codebase, with developers changing a few minor details."); id. ¶¶ 38-41 (explaining proof-of-work mechanism and noting that the XRP Ledger was "the second ledger to be created").

**Response:** The SEC disputes the assertions in ¶ 10 on the grounds that the term "major blockchains" is vague and ambiguous. The SEC further disputes the assertion contained in ¶ 10 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Adriaens Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including that the Adriaens Report copies popular and industry publications without attribution, or to no sources at all; Adriaens did not write large swaths of his report; and Adriaens did not have the technical expertise or understanding to compare the relative strengths and weaknesses of bitcoin, Ethereum, and XRP; such that these opinions lack foundation and constitute inadmissible hearsay.

**Paragraph No. 11:** In 2011 and early 2012, three individuals – David Schwartz, Jed McCaleb, and Arthur Britto – developed the source code for an alternative blockchain, now known as the XRP Ledger. See Ex. 1, D. Schwartz Tr. 23:16-24:7 (in "2011/2012," the "two primary developers were" Messrs. Schwartz and Britto); id. 118:15-20 ("Jed McCaleb had the original idea to replace -- to take something Bitcoin-like and replace Proof of Work with some sort of distributed agreement algorithm"); Ex. 6, Dep. Tr. of Phillip Rapoport 73:2-14 ("Jed McCaleb, Arthur Britto, and David Schwartz . . . were the primary architects of . . . the method by which the network, the network of computers, reaches consensus about the state of the ledger."); see also Ex. 2, D. Schwartz Decl. ¶ 3.

5

**Response:** The SEC does not dispute the assertions contained in ¶ 11.

**Paragraph No. 12:** These individuals intended to create a better blockchain than Bitcoin by increasing the speed of transactions, reducing their cost, and minimizing energy consumption. See Ex. 2, D. Schwartz Decl. ¶ 3; Ex. 7, Osler Dep. Ex. 11 (David Schwartz, The Environmental Impact: Cryptocurrency Mining vs. Consensus (July 8, 2020), https://ripple.com/insights/the-environmental-impact-cryptocurrency-mining-vs-consensus/) (explaining that the XRP Ledger was "designed with sustainability in mind; it is an inherently green currency"); Ex. 8, Dep. Tr. of Christian A. Larsen ("Larsen Tr.") 233:5-21 ("[The XRP Ledger is] substantially faster. It's substantially lower cost. It has much higher throughput [I]t produces a small fraction of the energy consumption and is carbon neutral").

**Response:** The SEC does not dispute the assertions contained in ¶ 12.

**Paragraph No. 13:** XRP is the "native currency" of the XRP Ledger. See Ex. 9, Dep. Tr. of Asheesh Birla ("Birla Tr.") 248:23-25; Ex. 10, Dep. Tr. of Miguel Vias 206:22-24; Ex. 11, Expert Report of Allen Ferrell (Oct. 4, 2021) ("Ferrell Rep.") ¶ 16 ("XRP is the native digital asset of the XRP Ledger, an open-source, decentralized blockchain technology."); Ex. 3, Osler Rep. ¶ 62 ("XRP is the native currency of the XRP Ledger.").

**Response:** The SEC does not dispute that XRP is the "native *token*" of the XRP Ledger, but disputes the assertion that XRP is a "currency" like the legal tender of a country or a mechanism to buy goods and services. *See infra* SEC Counter 56.1 ¶¶ 289-97; SEC 56.1 ¶¶ 84-92, 719.

**Paragraph No. 14:** XRP is required in order to operate the XRP Ledger. See Ex. 1, D. Schwartz Tr. 35:16-36:19 (each transaction costs a fraction of a unit of XRP; that fraction is destroyed); Ex. 2, D. Schwartz Decl. ¶ 5.

**Response:** The SEC does not dispute the assertions contained in ¶ 14.

**Paragraph No. 15:** XRP is fungible. See Ex. 8, Larsen Tr. 233:7-12; see also Ex. 12, Rebuttal Expert Report of Allen Ferrell (Nov. 12, 2021) ¶ 53 ("XRP is a fungible virtual currency.").

**Response:** The SEC does not dispute the assertions contained in ¶ 15.

**Paragraph No. 16:** The core code for the XRP Ledger was completed in June 2012. See Ex. 2, D. Schwartz Decl. ¶ 8.

**Response:** The SEC disputes the assertions in ¶ 16 on the grounds that the term "core code" is vague and ambiguous. The SEC further disputes the assertions in ¶ 16 on the grounds that Ripple and its team of engineers, including Schwartz, have continued to make changes to the code

for the XRP Ledger through at least the filing of this litigation. *See infra* SEC Counter 56.1 ¶¶ 15, 27, 32-38.

**Paragraph No. 17:** The XRP Ledger launched in 2012. See Ex. 2, D. Schwartz Decl. ¶ 9.

**Response:** The SEC disputes the assertions in ¶ 17 on the grounds that Schwartz testified that the XRP Ledger launched and reset a number of times in late 2012, and the public version did not launch until sometime in late 2012 or early 2013. *See infra* SEC Counter 56.1 ¶¶ 5, 7.

**Paragraph No. 18:** Upon the launch of the XRP Ledger in 2012, the XRP Ledger's code automatically generated a fixed supply of 100 billion XRP. See Ex. 1, D. Schwartz Tr. 26:5-7 ("That code placed 100 billion units, each divisible into one million subunits, into the genesis block."); Ex. 7, Osler Dep. Ex. 11 ("All XRP is already in existence"); Ex. 13, RPLI_SEC 0258174 at -199 ("All XRP that will ever exist already exists (100 billion)").

**Response:** The SEC does not dispute the assertions contained in ¶ 18.

**Paragraph No. 19:** The XRP Ledger was fully operational upon launch, and everyone who had or received XRP could use that XRP to operate the ledger or for other uses. See Ex. 2, D. Schwartz Decl. ¶ 4.

**Response:** The SEC disputes the assertions in ¶ 19 on the grounds that the term "fully operational" and the term "other uses" are vague and ambiguous. The SEC further disputes the assertions in ¶ 19 on the grounds that Ripple and its team of engineers, including Schwartz, have continued to make changes to the code for the XRP Ledger through at least the filing of this litigation *See infra* SEC Counter 56.1 ¶¶ 15, 27, 32-38.  The SEC further disputes the assertions in ¶ 19 on the grounds that XRP had no "uses" when the XRP Ledger was launched, and on the ground that Ripple never sold XRP in connection with any purported use until mid-2020 and at that point bought the XRP it sold for "use." *See infra* SEC Counter 56.1 ¶¶ 186-207.

**Paragraph No. 20:** No XRP was sold before the launch of the XRP Ledger. See Ex. 2, D. Schwartz Decl. ¶ 6.

**Response:** The SEC does not dispute the assertions contained in ¶ 20.

**Paragraph No. 21:** Rather, the original recipients of XRP (Larsen, McCaleb, and Britto) granted 80 billion units of XRP to a newly formed corporate entity, now called Ripple, while

retaining 20 billion among themselves. Larsen and McCaleb each retained approximately 9 billion; Britto received the remaining 2 billion. See Ex. 2, D. Schwartz Decl. ¶ 6; Ex. 14, Decl. of Christian Larsen ("Larsen Decl.") ¶ 2; Ex. 15, O'Gorman Dep. Ex. AO-26, RPLI_SEC 0624327 at -331 ("[T]he creators of XRP gifted much of [the original 100 billion] XRP to the Company."); Ex. 8, Larsen Tr. 66:14-20, 67:18-68:3 (Larsen retained 9 billion XRP; Larsen, McCaleb, and Britto retained this amount of XRP based on their understanding that Bitcoin founder Satoshi Nakamoto also kept approximately 20% of the Bitcoin in existence); id. 165:24-166:3 (Ripple was gifted 80 billion XRP); Ex. 16, LARSEN_NAT_00000165 (explaining that Larsen, McCaleb, and Britto retained this amount of XRP based on their understanding that Bitcoin founder Satoshi Nakamoto also kept approximately 20% of the Bitcoin in existence).

      **Response:** The SEC does not dispute the assertions contained in ¶ 21.

      **Paragraph No. 22:** Ripple never owned the 20 billion XRP retained by Larsen, McCaleb, and Britto. See Ex. 2, D. Schwartz Decl. ¶ 7.

      **Response:** The SEC does not dispute the assertions contained in ¶ 22.

      **Paragraph No. 23:** When those three individuals have sold any of their 20 billion XRP since 2012, the proceeds from those sales were never held by Ripple or commingled in Ripple accounts with Ripple-owned assets (including any proceeds Ripple earned from selling XRP). See Ex. 2, D. Schwartz Decl. ¶ 7; Ex. 14, Larsen Decl. ¶ 2; Ex. 17, Decl. of Bradley Garlinghouse ("Garlinghouse Decl.") ¶ 3; see also, e.g., Ex. 8, Larsen Tr. 67:18-69:2 (explaining that Larsen, McCaleb, and Britto decided to retain 20% of the initial 100 billion).

      **Response:** The SEC disputes the assertions in ¶ 23 on the grounds that GSR, Ripple's and

the Individual Defendants' principal market maker and sales agent for XRP, testified that GSR

commingled the proceeds from sales of Ripple's and all Ripple employees' XRP until mid-2018. *See*

*infra* SEC Counter 56.1 ¶¶ 331, 352.

      **Paragraph No. 24:** The XRP Ledger uses a "consensus protocol" to verify transactions. Ex. 3, Osler Rep. ¶ 53 ("The XRP Ledger . . . relies on a 'consensus protocol.'"); see also Ex. 18, D. Schwartz Dep. Ex. DS-15 at 5-10; Ex. 7, Osler Dep. Ex. 11.

      **Response:** The SEC does not dispute the assertions contained in ¶ 24.

      **Paragraph No. 25:** A "validator" is a node that coordinates with other nodes in the consensus process. See Ex. 1, D. Schwartz Tr. 30:1-31:3 (explaining that, "[i]n the context of the XRP Ledger, a validator is a node that coordinates with other nodes in the consensus process," and that doing so "ensure[s] there's a -- that it's possible to have a single view on how the ledger makes forward progress"); Ex. 18, D. Schwartz Dep. Ex. DS-15 at 9-10; Ex. 3, Osler Rep. ¶ 53.

      **Response:** The SEC does not dispute the assertions contained in ¶ 25.

**Paragraph No. 26:** The consensus mechanism of the XRP Ledger is much faster, more reliable, and less costly than Bitcoin's proof-of-work mechanism. See Ex. 2, D. Schwartz Decl. ¶ 5; Ex. 8, Larsen Tr. 233:5-21; Ex. 3, Osler Rep. ¶ 50 & Fig. 8 ("The average time to verify a Bitcoin transaction is generally about ten minutes, as shown in Figure 8. The time occasionally rises when transaction volumes are high, as happened when the price fell dramatically in May of 2021. Ten minutes is certainly speedy relative to the days or weeks required for traditional currency conversion channels. However, time is now measured in microseconds in financial markets, which makes even ten minutes an extremely long time. If each microsecond were a full second, a 'ten-minute delay' would be 57 years."); id. ¶ 53 ("The consensus mechanism in the XRP Ledger is faster, less costly, and less energy-intensive than proof-of-work because its solution to the Byzantine Generals Problem is based on voting.").

**Response:** The SEC disputes the assertion contained in ¶ 26 on the ground that the term

"more reliable" is vague and ambiguous and that the assertions are not supported by citation to

evidence which would be admissible. The material cited to support the fact asserted, the Osler

Report, which is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the

Osler Report, in describing the features of blockchain technology, or the operations and capabilities

of Bitcoin and Ether, cites only a few popular and industry publications, or to no sources at all, such

that these opinions lack foundation and constitute inadmissible hearsay.

**Paragraph No. 27:** The XRP Ledger ordinarily can process 1,500 transactions per second. See Ex. 3, Osler Rep. ¶ 55 ("The XRP Ledger has had far greater capacity" than the Bitcoin and Ethereum blockchains "for years – it could handle 500 transactions per second in 2015. By now it can readily process 1,500 transactions per second.") (footnote omitted); Ex. 19, RPLI_SEC 0537730 at -753; Ex. 2, D. Schwartz Decl. ¶ 5.

**Response:** The SEC disputes the assertion contained in ¶ 27 on the ground that the term

"ordinarily" is vague and ambiguous and that the assertions are not supported by citation to

evidence which would be admissible. The material cited to support the fact asserted, the Osler

Report, which is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the

Osler Report, in describing the features of blockchain technology, or the operations and

capabilities of Bitcoin and Ether, cites only a few popular and industry publications, or to no

sources at all, such that these opinions lack foundation and constitute inadmissible hearsay.

**Paragraph No. 28:** Transactions on the XRP Ledger ordinarily settle in 3 to 5 seconds. See Ex. 2, D. Schwartz Decl. ¶ 5; see also XRP Ledger Found., XRPL / XRP Ledger Overview, https://perma.cc/ME9L-BUGA (last visited Sept. 12, 2022) ("XRPL uses a consensus protocol, in which designated servers called validators come to an agreement on the order and outcome of XRP transactions every 3-5 seconds."); Ex. 3, Osler Rep. ¶ 54 (citing same and explaining that "[t]he XRP Ledger's verification protocol requires just a few seconds, less than 1% of the 10 minutes required by proof-of-work").

**Response:** The SEC disputes the assertion contained in ¶ 28 on the ground that the term

"ordinarily" is vague and ambiguous and that the assertions are not supported by citation to

evidence which would be admissible. The material cited to support the fact asserted, the Osler

Report, which is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the

Osler Report, in describing the features of blockchain technology, or the operations and

capabilities of Bitcoin and Ether, cites only a few popular and industry publications, or to no

sources at all, such that these opinions lack foundation and constitute inadmissible hearsay.

**Paragraph No. 29:** Transactions on the XRP Ledger typically cost 0.00001 XRP – a fraction of a penny. That XRP is destroyed and does not go to Ripple or to any other entity. See Ex. 2, D. Schwartz Decl. ¶ 5; Ex. 1, D. Schwartz Tr. 323:9-14 (in 2017, fee for a transaction was "a hundred-thousandth of an XRP"); see also Ex. 3, Osler Rep. ¶ 54 ("A Bitcoin transaction fee of $10 (which appears to be a bit below the average of the past year, according to Figure 9) would be roughly 1 million times the cost of an XRP transaction."); XRP Ledger Found., Transaction Cost, https://perma.cc/9VWY-8WGQ (last visited Sept. 12, 2022) ("The transaction cost is not paid to any party: XRP is irrevocably destroyed.").

**Response:** The SEC does not dispute the assertions contained in ¶ 29.

**Paragraph No. 30:** The XRP Ledger is more energy efficient than the Bitcoin ledger (i.e., each transaction on the XRP Ledger consumes less than 0.002% of the energy consumed by a transaction on the Bitcoin ledger), making the XRP Ledger significantly more environmentally friendly. See Ex. 8, Larsen Tr. 233:5-21 (XRP "produces a small fraction of the energy consumption and is carbon neutral, whereas Bitcoin, as [the SEC] know[s], it produces 80 -- roughly megatons of CO2 per year, using 100 trillion-watt hours of power."); Ex. 2, D. Schwartz Decl. ¶ 5; Ex. 7, Osler Dep. Ex. 11 ("The unsustainable mining practices and Proof-of-Work mechanism behind Bitcoin and Ethereum are massive barriers for the more widespread adoption of cryptocurrencies. But not all blockchains are made equally. For example . . . , for every 1 million transactions, XRP could power 79,000 lightbulb hours. In contrast, for every 1M transactions, Bitcoin could power 4.51 billion lightbulb hours. This means that the energy consumption of XRP is 57,000x more efficient.").

**Response:** The SEC disputes the assertion contained in ¶ 30 on the ground that the terms "more energy efficient" and "significantly more environmentally friendly" are vague and ambiguous and that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Osler Report, which is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the Osler Report, in describing the features of blockchain technology, or the operations and capabilities of Bitcoin and Ether, cites only a few popular and industry publications, or to no sources at all, such that these opinions lack foundation and constitute inadmissible hearsay.

**B.    Ripple Founding**

**Paragraph No. 31:** Ripple is a privately held financial technology company employing more than 700 people in 15 offices worldwide. See Ex. 20, Decl. of Monica Long ("Long Decl.") ¶ 2.

**Response:** The SEC does not dispute the assertions contained in ¶ 31.

**Paragraph No. 32:** Ripple was founded in 2012, after the core code for the XRP Ledger was already completed. See Ex. 2, D. Schwartz Decl. ¶ 8; Ex. 15, O'Gorman Dep. Ex. AO-26, at RPLI_SEC 0624331 ("100 billion XRP were created before the Company was created, and after Ripple was founded the creators of XRP gifted much of that XRP to the Company.") (second emphasis added).

**Response:** The SEC does not dispute that Ripple was founded in 2012.  The SEC disputes that Ripple was founded "after the core code for the XRP Ledger was already completed" on the grounds that:  (i) the term "core code" is vague and ambiguous; (ii) the cited evidence does not address the timing of the completion of the XRP Ledger's "core code" and therefore does not support the assertion; and (iii) after Ripple's founding in September 2012 (see Def. 56.1 ¶ 33), the XRP Ledger was entirely reset in or around December 2012, which entailed the loss of some of its original blocks or ledgers.  PX 6 (Schwartz Dep. Tr.) at 32:17-33:10; PX 563, available at https://archive.ph/ebzud.

**Paragraph No. 33:** Ripple was initially named NewCoin, Inc. and incorporated under California law in September 2012. See California Sec'y of State, Articles of Incorporation of

NewCoin, Inc. (Sept. 19, 2012), https://perma.cc/7NHN-T9RP. It was promptly renamed
OpenCoin Inc. in October 2012. See California Sec'y of State, Certificate of Amendment to Articles
of Incorporation of NewCoin, Inc. (Oct. 3, 2012), https://perma.cc/7HZB-DW97 (rename to
OpenCoin Inc.). It was renamed Ripple Labs Inc. in 2013 and incorporated under Delaware law in
2014. See California Sec'y of State, Certificate of Amendment of the Articles of Incorporation of
OpenCoin Inc. (Oct. 18, 2013), https://perma.cc/RR9G-72SS (rename to Ripple Labs Inc.);
Delaware Sec'y of State, Certificate of Ownership and Merger (Sept. 15, 2014),
https://perma.cc/X5SG-2GE2.

     **Response:** The SEC does not dispute the assertions contained in ¶ 33.

     **Paragraph No. 34:** Ripple has raised investment capital through multiple funding rounds in
which it sold the company's stock to investors. See Ex. 11, Ferrell Rep. ¶¶ 20-32 & Ex. 1.

     **Response:** The SEC does not dispute the assertions contained in ¶ 34.

     **Paragraph No. 35:** Since its early days, Ripple's mission has been to realize an "Internet of
Value" – using technology to enable value to move as seamlessly as information does today over the
Internet. More particularly, Ripple seeks to modernize international payments by developing a global
payments network for international currency transfers. See Ex. 21, Dep. Tr. of Ethan Beard ("Beard
Tr.") 45:10-13 ("So it was very much around building cross-border payments, trying to fix a broken
payments industry, trying to build a global technology business."); Ex. 8, Larsen Tr. 232:19-234:4
("Ripple wants to be part of what we consider to be an internet of value. We think what is
happening here is exactly the same thing that happened with the internet of data, which now
dominates global communications. We think being part of an internet of value is going to be the
future of the way value moves around the world."); Ex. 22, Dep. Tr. of Ryan Zagone ("Zagone Tr.")
64:6-8 ("[t]he goal of the company was we were building a payment network"); Ex. 3, Osler Rep. ¶
19; see also id. ¶ 43 (noting Ripple's stated "goal" of "'[e]nabling the world to move value like it
moves information today' ") (alteration in Osler Rep.); id. ¶¶ 43- 44 (describing Ripple's "ambition .
. . to modernize international payments" and that "Ripple's ODL service," described below, "is
designed to provide a cost-effective and efficient alternative to the cross-border payments market").

     **Response:** The SEC does not dispute the assertions contained in ¶ 35.

     **Paragraph No. 36:** Many traditional cross-border payment rails still depend on mid-20th-
century payment technologies. See Ex. 3, Osler Rep. ¶ 25.

     **Response:** The SEC disputes the assertions contained in ¶ 36 on the grounds that the cited

evidence does not support the assertions because it consists of expert opinion and not record facts

and Osler's opinions should be excluded for the reasons set forth in the SEC's Motion to Exclude.

The SEC states further that ODL at times also required the use of traditional cross-border payment

rails.  PX 628 ¶ 28 & n.25; PX 559; PX 145; PX 456 at Slide 5.

**Paragraph No. 37:** Cross-border payments constitute a nearly $20 trillion market worldwide. See Ex. 3, Osler Rep. ¶ 43 ("In 2020 [payments associated with international trade in goods and services] were worth $17.6 trillion.").

**Response:** The SEC disputes the assertions contained in ¶ 37 on the ground that the cited evidence does not support the assertions and because the cited evidence consists of expert opinion and not record facts, and Osler's opinions related to ODL should be excluded for the reasons set forth in the SEC's Motion to Exclude.

**Paragraph No. 38:** Cross-border remittances on traditional payment rails can take several days to reach their intended recipients – particularly in parts of the world that do not have technological infrastructure like that of the United States. See Ex. 3, Osler Rep. ¶ 25.

**Response:** The SEC disputes the assertions contained in ¶ 37 on the ground that the cited evidence does not support the assertions and because the cited evidence consists of expert opinion and not record facts, and Osler's opinions related to ODL should be excluded for the reasons set forth in the SEC's Motion to Exclude.

**Paragraph No. 39:** Traditional cross-border remittance transfers are costly: in 2020, the worldwide average total cost to remit $200 by traditional channels was estimated to be 6.7%. See Ex. 3, Osler Rep. ¶ 26. The cost to remit $200 through a bank was greater than 10%. See id. ¶ 27 & Fig. 3.

**Response:** The SEC disputes the assertions contained in ¶ 39 on the ground that the cited evidence consists of expert opinion and not record facts, and Osler's opinions related to ODL should be excluded for the reasons set forth in the SEC's Motion to Exclude.

**Paragraph No. 40:** Traditional cross-border payment rails are opaque: during a standard funds transfer, neither sender nor receiver knows the status of the transfer. See Ex. 3, Osler Rep. ¶ 25.

**Response:** The SEC disputes the assertions contained in ¶ 40 on the grounds that the cited evidence consists of expert opinion and not record facts, and Osler's opinions related to ODL should be excluded for the reasons set forth in the SEC's Motion to Exclude.

**Paragraph No. 41:** RippleNet is a software product developed by Ripple that allows customers to clear and settle cross-border financial transactions on terms upon which the customers

mutually agree. See Ex. 1, D. Schwartz Tr. 265:2-4 ("[W]e always imagined that the goal of RippleNet would be to allow XRP settlement."); Ex. 20, Long Decl. ¶ 2; see generally Ripple, Cross-Border Payments, https://perma.cc/8W42-7XRX (last visited Sept. 12, 2022) (describing service).

**Response:** The SEC does not dispute the assertions contained in ¶ 41.

**Paragraph No. 42:** RippleNet has hundreds of customers who are financial institutions and payment providers across more than 55 countries and six continents. See Ex. 20, Long Decl. ¶ 2.

**Response:** The SEC does not dispute the assertions contained in ¶ 42.

**Paragraph No. 43:** Ripple's customers currently send more than ▇▇▇▇▇ across RippleNet every month, and that number generally has been increasing over time. See Ex. 20, Long Decl. ¶ 2.

**Response:** The SEC does not dispute the assertions contained in ¶ 43.

**Paragraph No. 44:** Some, but not all, of Ripple's products and services rely on the XRP Ledger and XRP. See Ex. 9, Birla Tr. 44:14-50:8 (RippleNet today does "not need XRP to function," but a feature known as ODL, discussed below, does); see also Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answers to RFA Nos. 31-34.

**Response:** The SEC does not dispute the assertions contained in ¶ 44.

**Paragraph No. 45:** RippleNet customers can settle cross-border transactions using fiat currency only, or they can opt to use a feature of RippleNet known as ODL, or "on demand liquidity" (formerly known as xRapid). See Ex. 20, Long Decl. ¶ 3; Ex. 4, Samarasinghe Tr. 48:9-11, 228:15-16; Ex. 24, Dep. Tr. of Monica Long ("Long Tr.") 220:7-8 ("xRapid . . . later became on-demand liquidity."); Ex. 9, Birla Tr. 41:14-22 ("Over the years the precursor to ODL was called a number of different things at Ripple. One name was xRapid."); id. 263:24-264:3 ("you can have fiat settlement with xCurrent, . . . now known as RippleNet").

**Response:** The SEC does not dispute the assertions contained in ¶ 45.

**Paragraph No. 46:** ODL leverages the inherent properties of XRP – fast settlement and low transaction costs – to allow cross-border transactions to settle in nearly real time rather than in days that traditional means require. See Ex. 9, Birla Tr. 43:10-17 ("the way" xRapid, now ODL, "works is that it facilitates the liquidity or the settlement portion from one currency to another by leveraging exchanges around the world"); Ex. 25, Dep. Tr. of ▇▇▇▇▇▇ ("▇ Tr.") 238:11- 239:9 ("My understanding is that ODL is supposed to significantly reduce the time and cost involved in sending FX payments, overseas or from overseas to onshore. . . I think when ODL came about, and even today, it facilitated the movement, small amounts of fiat from one currency to another. And that is something that, today, you simply cannot do using the normal banking system. So it was innovative then, and in some ways, it still is today."); Ex. 24, Long Tr. 145:18-146:6 (ODL is "the part of the [RippleNet] product that sends the payment through XRP"); *see also* Ex. 26, Pl.'s Answers & Objs. to Defs.' Third Set of Reqs. for Admis., SEC Answer to RFA No. 217 ("certain entities made cross border transactions using XRP" using Ripple's "xRapid product"); *see also* Ex. 3, Osler

Rep. ¶¶ 54-64; Ex. 27, Dep. Tr. of Patrick Griffin 110:22-111:18 ("the value proposition for" XRP was that it "could be utilized to facilitate cross-currency, cross-asset transactions"); *id.* 112:1-3 (the XRP Ledger's "value proposition was to facilitate seamless transactions from one currency or one system to another system").

**Response:** The SEC disputes the assertions contained in ¶ 46 on the grounds that: (i) the cited evidence does not support the assertions; (ii) the cited evidence consists in part of expert opinion and not record facts and Osler's opinions related to ODL should be excluded for the reasons set forth in the SEC's Motion to Exclude; and (iii) on the basis of the facts set forth at SEC Counter 56.1 Section D, *infra*.

**Paragraph No. 47:** ODL also enables transactions during hours and weekends when traditional banks are closed. See Ex. 28, Dep. Tr. of Lawrence Angelilli 46:16-47:2 ("[W]hat was particularly interesting [about ODL] to us in the beginning was that it was 24/7, and for a while, we were doing trades on Saturdays and Sundays and holidays when the banks were closed. [T]he blockchain was extremely effective in getting those trades through when -- on seven days a week."); Ex. 4, Samarasinghe Tr. 231:1-5 ("XRP allows movement of value from one, essentially borderless and close to free 24 hours a day. If a market maker can deliver Filipino peso, they can still support orders, say, over weekends and holidays where banks may be closed.").

**Response:** The SEC does not dispute the assertions contained in ¶ 47.

**Paragraph No. 48:** Since its launch, ODL has experienced tremendous growth. To date, more than $10 billion in ODL payments have been made – which means more than $10 billion in XRP has been used to facilitate cross-border transactions using Ripple's products. See Ex. 20, Long Decl.¶ 3.

**Response:** The SEC disputes the assertions in ¶ 48. *See infra* SEC Counter 56.1 Section D.

**Paragraph No. 49:** Ripple's product successes have earned it accolades from publications such as Forbes FinTech 50, CBInsights FinTech 250, the World Economic Forum, and American Banker. See Michael del Castillo, Blockchain 50: Billion Dollar Babies, Forbes (Apr. 16, 2019), https://perma.cc/99AP-LEZ5; BusinessWire, CB Insights Reveals the Fintech 250 List at Future of Fintech, Bloomberg (June 29, 2017), https://perma.cc/Z56N-6CSN; Press Release, Ripple, Ripple Labs Awarded as Technology Pioneer by World Economic Forum (Aug. 5, 2015), https://perma.cc/NLL6-PRY5; American Banker, 20 Fintech Companies to Watch (Oct. 12, 2015), https://perma.cc/2VWN-7UNC.

**Response:** The SEC disputes the assertions in paragraph 49 on the grounds that "product successes," "earned," and "accolades" are vague and ambiguous. *See also infra* SEC Counter 56.1 ¶¶ 458-61.

15

**Paragraph No. 50:** The Consumer Financial Protection Bureau has stated it "believe[d] that expanded adoption of . . . Ripple's suite of products could . . . allow banks and credit unions to know the exact final amount that recipients of remittance transfers will receive before they are sent," contrary to the current state of play. Final Rule, Remittance Transfers Under the Electronic Fund Transfer Act, 85 Fed. Reg. 34,870, 34,880 (June 5, 2020).

**Response:** The SEC does not dispute the assertions in ¶ 50.

## C.   Community Involvement in the XRP Ledger and XRP Transactions

**Paragraph No. 51:** Ripple does not own the XRP Ledger. See Ex. 2, D. Schwartz Decl. ¶ 9.

**Response:** The SEC disputes the assertions in ¶ 51 on the grounds that: (i) Ripple had a

copyright for the code for the XRP Ledger (PX 6 (Schwartz Dep. Tr.) at 23:16-24:21;

https://xrpl.org/faq.html); (ii) Ripple patented the consensus algorithm and other features of, or

pertaining to, the XRP Ledger (PX 639; PX 766; PX 767;

https://uspto.report/patent/app/20160224949 (patent for "temporary consensus subnetwork in a

distributed network for payment processing"); https://uspto.report/patent/app/20190251007

(patent for "Byzantine Agreement in Open Networks")); and (iii) Ripple owned a trademark for

"XRP" (PX 768; https://uspto.report/TM/85935696; PX 2 Larsen Dep. Tr. 217:10-219:3).

**Paragraph No. 52:** The XRP Ledger's underlying code, known as "rippled," is open-source. See Ex. 2, D. Schwartz Decl. ¶ 9.

**Response:** The SEC does not dispute the assertions contained in ¶ 52.

**Paragraph No. 53:** The ledger is operated by an independent network of validators. See Ex. 2, Schwartz Decl. ¶ 9.

**Response:** The SEC disputes the assertions in ¶ 53 on the grounds that: (i) the term

"network of validators" is vague and ambiguous; and (ii) Ripple does not provide any supporting

evidence for the conclusory assertion that these validators are "independent."  The SEC further

disputes the assertions on the grounds that Ripple admitted that the only validators that have any

consequence to the stable operation of the ledger are those on the "Unique Node List" or "UNL."

PX 641 (transcript of RPLI_SEC 114103, February 5, 2018 Internal Weekly Company meeting) at

Tr. 20:18-23 ("So when you heard 500 validators or whatever, there's hundreds of validators on the network ... But the ones that really kind of are ... designed to make sure that the network is operating stability [sic] are the -- are the sub net that's on the UNL").  The SEC further disputes the assertions on the grounds that Ripple admitted that in February 2018, the UNL was "maintained by Ripple" and that "transitioning the trust from Ripple to an external ...broader kind of list of external validators ... is pretty intense because you have to, essentially, you know, verify that the people are who they say they are and that they're actually able to run a validator, you know, reliably." *Id.* at Tr. 20:09-20:16.

**Paragraph No. 54:** Anyone can use the XRP Ledger, submit transactions to the XRP Ledger, host a node to contribute to the validation of transactions, propose changes to the XRP Ledger's source code, or develop applications that run on the XRP Ledger. See Ex. 26, Pl.'s Answers & Objs. to Defs.' Third Set of Reqs. for Admis., SEC Answer to RFA No. 197 (admitting "that rippled's source code has been open source since September 26, 2013"); Ex. 2, D. Schwartz Decl. ¶ 9; see also XRP Ledger Found., Tutorials, https://perma.cc/X4RT-ZT4W (last visited Sept. 12, 2022) (compendium of "step-by-step guidance to perform common tasks with the XRP Ledger," such as creating and trading tokens, building applications, and "running businesses that interface with the XRP Ledger"); XRP Ledger Found., Contribute Code to the XRP Ledger, https://perma.cc/GN33-9LUX (last visited Sept. 12, 2022) ("The software that powers the XRP Ledger is open-source, so anyone can download, modify, extend, or explore it."); XRP Ledger Found., XRP Ledger Servers, https://perma.cc/SKU2-K8B2 (last visited Sept. 12, 2022) ("Anyone can run instances of [the] types of servers [that power the XRP Ledger] based on their needs."); XRP Ledger Found., FAQ, https://perma.cc/3W72-43EA (last visited Sept. 12, 2022) (the XRP Ledger does not have "a formal process for adding validators," "because it is a system with no central authority").

**Response:** The SEC does not dispute the assertions in ¶ 54.

**Paragraph No. 55:** Ripple cannot unilaterally force through changes to the XRP Ledger. See Ex. 29, D. Schwartz Dep. Ex. DS-70, RPLI_SEC 0526578 (July 6, 2020 email from D. Schwartz to Ripple leadership explaining that Ripple lacks "any ability to unilaterally make arbitrary changes").

**Response:** The SEC disputes the assertion contained in Paragraph 55 that Ripple "cannot unilaterally force through changes to the XRP Ledger" on the grounds that Ripple admitted in December 2018 that Ripple was "still a gatekeeper for the XRP Ledger open source code repository (merge access)," which meant that only Ripple could integrate potential changes to the code of the

17

XRP Ledger.  PX 682 at RPLI_SEC 0574093.  In December 2018, Ripple also acknowledged that

Ripple validators still made up more than 80% of the validators on the UNL, which meant that

Ripple could unilaterally approve changes to the XRP Ledger as well as "prevent a supermajority [of

validators] from activating an amendment" to change the XRP Ledger. *Id.*

**Paragraph No. 56:** The XRP Ledger's consensus protocol requires a supermajority of
validators to validate transactions. See Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for
Admis., SEC Answer to RFA No. 28; Ex. 1, D. Schwartz Tr. 62:17-23 ("[Y]ou need . . . 80 percent
of the servers that particular server has chosen to listen to."); see also Ex. 2, D. Schwartz Decl. ¶ 4.

**Response:** The SEC does not dispute the assertions contained in ¶ 56.

**Paragraph No. 57:** Other operators of XRP Ledger validators can implement changes to
the XRP Ledger's code without Ripple's input and indeed even over Ripple's express objections.
That has happened in practice: in June 2020, over Ripple's objection, the XRP Ledger's code was
modified to introduce a "check-writing" feature, which allows one account to claim funds from
another. See Ex. 1, D. Schwartz Tr. 151:15-22 (Ripple "opposed [the Checks Amendment] and it
was accepted anyway"); Ex. 29, D. Schwartz Dep. Ex. DS-70 ("A few weeks ago, community
support started gathering for [the Checks Amendment]. Enough validators voted in favor of it that it
activated on the network despite no Ripple-operated validator voting for it and over Ripple's veto.");
see also Ex. 2, D. Schwartz Decl. ¶ 10.

**Response:** The SEC disputes the assertion contained in ¶ 57 that changes to the XRP

ledger's code can occur "without Ripple's input and indeed even over Ripple's express objections."

To the contrary, the example in ¶ 57 cited to support this assertion—the so-called "Checks

Amendment" from June 2020—directly relied on Ripple's input because Ripple had first proposed

the amendment and "developed it."  PX 6 (Schwartz Dep. Tr.) at 151:15-22; *see also* PX 681.  By the

time the Checks Amendment was passed, Ripple had publicly adopted what was essentially a neutral

position on the proposal rather than publicly stating "express objections."  According to Ripple

developer ████████, for example, "as [David Schwartz] and I said before, there are no reasons

for voting against the Checks amendment; it was just the conservative position to take, in response

to no exchanges/wallets having support for the feature." PX 670.  Schwartz similarly acknowledged

that Ripple did not have "any significant reason" to vote against the amendment, PX 678, and when

the amendment was passed he noted that "Ripple didn't get it's way, but we said whatever." PX 6

(Schwartz Dep. Tr.) at 151:16-17.

**Paragraph No. 58:** Ripple funded companies as part of its Xpring initiative to incentivize the development of other use cases on the XRP Ledger by investing money in or providing grants to (sometimes in U.S. dollars and sometimes in the form of XRP) promising new companies that were developing them. See Ex. 21, Beard Tr. 57:8-16 ("The Xpring initiative was an initiative to build an ecosystem of companies that were building on the XRP Ledger [O]ur goal was to have a lot of companies building on XRP Ledger."); Ex. 1, D. Schwartz Tr. 390:3-9 ("Initially, the Xpring initiative was like a venture capital arm of -- for Ripple to get us access to being close so we could see what was going on in the industry, perhaps steer projects in better directions, perhaps combat projects."); id. 392:9-22 (agreeing that "one of the purposes of the Xpring initiative [was] to potentially incentivize the development of other uses for XRP"); Ex. 30, Dep. Tr. of Alan Schwartz 174:6-19 (explaining that the Xpring program was "a program under which Ripple made investments in other companies and which [Ripple] exchanged either cash or XRP for [other companies'] equity or services").

**Response:** The SEC does not dispute the assertions contained in ¶ 58.

**Paragraph No. 59:** Many other developers with no connection to Ripple have built software products that use the XRP Ledger, such as a range of payment-processing applications including micropayments. See Ex. 2, D. Schwartz Decl. ¶ 9; ECF No. 124 (proposed intervenors' non- exhaustive list of publicly available use cases for XRP).

**Response:** The SEC disputes the assertions contained in ¶ 59 on the grounds that: (i) the

cited evidence does not support the assertion that "many other developers ... have built software

products that use the XRP Ledger" and that such developers had "no connection to Ripple"; and (ii)

the cited evidence offered by proposed intervenors' (D.E. 124) is inadmissible as the Court has ruled

the proposed *amici* cannot offer evidence.  D.E. 372 at 10-11.  The SEC further disputes the

assertions on the ground that Garlinghouse admitted that "99.9 percent of all crypto trading is

speculation today" and "that's true within the XRP community."  PX 503.25 at 22:12-17, available at

https://www.youtube.com/watch?v=xTsRJNxqsco.  The SEC further states that Ripple funded

efforts to create potential uses for XRP (other than for cross border payments) through Ripple's

xPring initiative and through an entity called Coil. PX 658; PX 90 at 0392729; PX 643 at Tr. 8:3-8:6

("███ and Ripple are going to be creating a new entity.  It's going to be called Coil.  A ton of work

has gone into this and it's really going to focus on some of the other use cases around

micropayments."); PX 644 at Tr. 14:1-14:14 ("Coil is a company that was spun out of Ripple ...

which is streaming micropayments.").  Ripple is also a shareholder of Coil.  PX 657.

**Paragraph No. 60:** Before the SEC filed this lawsuit, various individuals and businesses
independent of Ripple accepted XRP as a form of payment for goods and services ranging from
coffee to furniture to travel. See Ex. 5, Adriaens Rep. ¶ 130 (travel) & App'x C (TOCA Coffee,
Beliani); Ex. 3, Osler Rep. ¶ 13 ("XRP can be used to pay for physical goods through online
platforms including Bitcoin Superstore and Shopify and travel through Travala."); see also Ex. 22,
Zagone Tr. 303:7-9 ("It is an open-source technology. You could access it on an exchange and use it
however you'd like. So as a currency."); Ex. 9, Birla Tr. 257:21-259:2 (using an early Ripple product,
"in essence, you could go to this cafe next door and pay for your coffee in," among others, "XRP").

**Response:** The SEC disputes the assertion contains in ¶ 60 on the grounds that: (i) the cited

evidence does not support the assertions; (ii) the cited evidence consists in part of expert opinion

and not record facts; (iii) Adriaens's opinions related to XRP should be excluded for the reasons set

forth in the SEC's Motion to Exclude, including because the cited report consists solely of

conclusory claims without any factual support; and (iv) Osler's opinions related to XRP should be

excluded for the reasons set forth in the SEC's Motion to Exclude, including because the cited

report consists solely of conclusory claims without any factual support other than self-serving

statements from Ripple's own promotional materials.  The SEC further states that Ripple admitted

that XRP was "not intended to be used as a currency," and Garlinghouse admitted that he does not

view XRP as currency.  PX 169; PX 503.13 at 24:8-25:2; PX 503.18 at 20:10-22; PX 503.19 at 8:25-

10:1, 17:1-14.

**Paragraph No. 61:** Several major charities have accepted XRP for donations, including the
American Red Cross, American Cancer Society, St. Jude Children's Research Hospital, and Fidelity
Charitable. See Ex. 20, Long Decl. ¶ 7; American Red Cross,
https://web.archive.org/web/20201001214144/https://bitpay.com/520663/donate (last visited
Sept. 10, 2022); BitPay, Donate bitcoin to American National Red Cross, https://perma.cc/F5QB-
L42F (last visited Sept. 12, 2022); BitPay, American Red Cross, https://perma.cc/4T9Y-E4H4 (last
visited Sept. 12, 2022); BitPay, American Cancer Society, https://perma.cc/8P6S-JC89 (last visited
Sept. 12, 2022); St. Jude Children's Rsch. Hosp., Giving for the future with cryptocurrency (2021),
https://web.archive.org/web/20210729150656/

https://www.stjude.org/donate/crypto.html#e9873e2ce6da1d8c2fac3611e94e1fb1c6ebe04ad2b6f
2ab38d3735900a1278e=4; Yogita Khatri, Fidelity's charity unit includes XRP to its list of accepted
cryptos for donation; hits $100 million-mark, Yahoo Finance (Aug. 19, 2019),
https://perma.cc/44SS-ZXPP.

**Response:** The SEC disputes the assertions in ¶ 61 on the grounds that the charities listed

do not accept direct donations of XRP and that as a prerequisite to any donation, the XRP must be

first sold for fiat.  *See* https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-

4544474f5631-683996a61f944fe9&q=1&e=118a8954-e3ec-4c09-843e

3f6d02c40908&u=https%3A%2F%2Fwww.fidelitycharitable.org%2Fgiving-account%2Fwhat-you-

can-donate%2Fdonating-bitcoin-to-charity.html (stating that "many charities are not able to accept

direct donations" and that any donated digital assets are "sold and the funds are deposited into" a

donor-advised fund for distribution to charity in the future);

https://www.stjude.org/donate/crypto.html#649d3a72dc0370d48eb4fbd0a8451cf3fd3625635bbdf

9db029747e698f990bd=1 (explaining that digital asset donations are "converted to U.S. dollars as

soon as possible"); https://www.cancer.org/involved/donate/donate-crypto.html (stating that

supported cryptocurrencies are accepted through the portal The Giving Block, which is "built upon

our Gemini exchange account."); https://www.stjude.org/donate/crypto.html (stating that

donations of supported cryptocurrencies are accepted through a "collaboration with The Giving

Block and the Gemini Trust Exchange.") The SEC further disputes the assertions on the grounds

that the American Red Cross, American Cancer Society, St. Jude Children's Research Hospital, and

Fidelity Charitable do not currently accept XRP donations.  The SEC further disputes the assertions

on the grounds that charities, including the American Red Cross, Fidelity Charitable, the American

Cancer Society and St. Jude's Children's Research Hospital, accept stock for donations.  See

https://protect2.fireeye.com/v1/url?k=31323334-50bba2bf-3132d782-4544474f5631-

2881a2b2f29c223c&q=1&e=4a9e4664-1844-49c8-a490-

adea30eda2fb&u=https%3A%2F%2Fwww.fidelitycharitable.org%2Fgiving-account%2Fwhat-you-can-donate.html; https://www.redcross.org/donations/ways-to-donate/stocks-mutual-funds.html; https://www.cancer.org/involved/donate/more-ways-to-give.html; https://www.stjude.org/give/planned-giving/stock-donations.html.

**Paragraph No. 62:** The exact number of individuals and businesses that use or have used the XRP Ledger or XRP is unknown and unknowable to Ripple. See Ex. 2, D. Schwartz Decl. ¶ 11.

**Response:** The SEC does not dispute the assertions contained in ¶ 62.

**Paragraph No. 63:** As of December 21, 2020, more than 9 million distinct accounts existed on the XRP Ledger; as of September 1, 2022, the number of distinct accounts increased to more than 22 million. See Ex. 2, D. Schwartz Decl. ¶ 11.

**Response:** The SEC disputes the assertions in ¶ 63 on the grounds that: the terms "account" and "distinct" are vague and ambiguous; the evidence cited does not support with any facts the assertion that 9 million accounts (even if accurate) existed as of December 21, 2020; and the assertion that the 9 million accounts are "distinct" is conclusory without any factual basis. The SEC further states that the 9 million figure is over-inclusive because: it assumes every unique destination tag, source tag, and address reflects activity by an unique user and that every unique user is an "account"; and the figure includes addresses and tags used in failed transactions and deleted destination tags. When taking the above into account, only 6.5 million accounts existed existed on the XRP Ledger as of December 20, 2020, some of which may or may not be distinct. This figure is calculated using XRP blockchain data from two sources: i) an application programming interface (API) provided by Ripple (Ripple Data API v2), available at https://data.ripple.com/v2/transactions/{transaction_hash}, https://data.ripple.com/v2/exchanges/{base_currency}+{base_issuer}/{counter_currency}+{counter_issuer} and

22

https://data.ripple.com/v2/accounts/{address}/exchanges; and ii) the full history of the XRP

Ledger for use in Google's BigQuery data warehouse, available at

https://github.com/WietseWind/fetch-xrpl-transactions.

**Paragraph No. 64:** XRP is also part of a worldwide market for the exchange of currencies,
including trades between XRP and various other currencies (both traditional fiat currencies and
cryptocurrencies). See Ex. 20, Long Decl. ¶ 4.

**Response:** The SEC disputes the assertions in ¶ 64 on the grounds that the evidence cited

does to support the assertion.  The SEC further states that Ripple admitted that its  sales to

institutional investors were "not intended to be used as a currency" and that Garlinghouse admitted

that he does not view XRP as a currency.  PX 169 at 0846193; PX 503.13 at 24:8-25:2; PX 503.18;

PX 503.19.

**Paragraph No. 65:** Scores of exchanges chose to list (and sometimes de-list) XRP with no
involvement from Ripple. See Ex. 20, Long Decl. ¶ 6; Ex. 8, Larsen Tr. 390:19-392:23 (Ripple gave
only "a handful of exchanges of the hundreds that trade XRP" incentives to list it); see also XRP
Ledger Found., List XRP as an Exchange, https://perma.cc/2JC7-8DK4 (last visited Sept. 12, 2022)
(explaining how to list XRP as an exchange, without mentioning any contract with Ripple).

**Response:** The SEC disputes the assertions in ¶ 65 on the grounds that: (i) the terms

"scores of exchanges," "list" and "de-list," and "handful of exchanges" are vague and ambiguous;

(ii) the evidence cites does not support the conclusory assertion that Ripple had "no involvement"

with exchanges that made XRP available for trading to exchange users; and (iii) Ripple entered into

agreements with seven exchanges whereby Ripple agreed to provide XRP and/or cash incentives in

exchange for making XRP available for trading to exchange users. PX 715, Ferrell Rep. Ex. 13; PX

716, PX 717, PX 718, PX 719, PX 720, PX 721, PX 722.  The SEC further states that Ripple

publicly promoted Ripple's efforts to increase XRP's liquidity, which included efforts to get XRP

listed on exchanges.  PX 506.106 (Garlinghouse December 21, 2017 tweet: "$XRP is now on 50

exchanges around the world! Team Ripple will continue to champion additional listings to foster a

vibrant and healthy XRP ecosystem and help deepen liquidity across fiat currencies.

https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/"); PX 506.107 (Ripple

December 21, 2017 tweet: "It's a priority for Ripple to have $XRP listed on top digital asset

exchanges, making it broadly accessible worldwide. Excited to share $XRP is now listed on 50

exchanges and counting."); PX 501.05, Q4 2017 XRP Market Report ("XRP also became available

across more than 50 exchanges globally" and "[t]his increased global reach is the result of Ripple's

continued investment in the XRP ecosystem...."; PX 500.11, May 18, 2017 Ripple Insights Article

titled XRP Liquidity to Deepen with Listings on Six New Exchanges ("Today we are pleased to

share we have expanded our partnership with BitGo, which will see XRP listed on several leading

digital asset exchanges...By working with a greater number of exchanges across different countries to

list XRP, we can better serve the growing demand for global payments in both major currency

corridors and emerging markets."); PX 500.18, December 21, 2017 Ripple Insights Article titled

XRP Now Available on 50 Exchanges Worldwide ("[W]e're proud to announce that XRP has gone

from being listed on six exchanges earlier this year to more than 50 worldwide."); PX 500.20,

January 18, 2018 Ripple Insights Article titled Top 9 Frequently Asked Questions About Ripple and

XRP ("In order to maintain healthy XRP markets, it's a top priority for Ripple to have XRP listed

on top digital asset exchanges" and "Ripple has dedicated resources to the initiative so you can

expect ongoing progress toward creating global liquidity"; PX 500.28, Transcript of Ripple

Livestream, Ask Me Anything with Brad, December 14, 2017 (Garlinghouse: "[i]t's a very high

priority for us to be listed more broadly."); PX 501.11, Q2 2019 XRP Market Report ("XRP listings

increased as Ripple has partnered with the top digital asset brokers and used inventory to serve as a

backstop for XRP liquidity.").  Ripple also posed on its website a list of exchanges where "XRP is

available for purchase" (PX 500.20; PX 506.092), touted the number of XRP listings in its quarterly

XRP Market Reports, and tweeted about new XRP listings on exchanges.  PX 501.06; PX 501.09; PX 501.10; PX 501.11; PX 501.12; PX 501.13; PX 506.046; PX 506.047; PX 506.086; PX 506.087; PX 506.089; PX 506.097.  Internally, Breanne Madigan, Ripple's Head of XRP Markets admitted that one of her responsibilities included a "mandate" around "liquidity" and "liquidity partnerships … focusing on engaging with market participants, like – exchanges or lenders or prime brokers around XRP liquidity broadly speaking."  PX 25 (Madigan Dep. Tr.) at 30:13-31:7.  Madigan also admitted that Ripple was "interested in seeing XRP trade on more exchanges" and to have "many on ramps, off ramps" for XRP to trade. Id. at 235:5-12; 147:19-148:7.  To that end, the XRP Markets team set specific "goals" to "list" and "integrate" XRP or an XRP-related product on specific exchanges in 2019 and 2020. PX 376.  Ripple employees also attributed 25 new XRP listings on exchanges as "big achievements" for Ripple, acknowledging the work performed by Ripple's engineering team to integrate XRP on exchanges.  PX 645 at Tr. 30:20-31:6.  The SEC further states that Ripple: originated the domain xrpl.org (PX 6 Schwartz Dep. Tr. 163:11-22); replaced the Ripple website developers.ripple.com with xrpl.org because the previous website "confused developers into thinking they were building on Ripple, not XRP Ledger"; and controlled the domain xrpl.org, and its content through the date the SEC's filed its complaint (PX 640; https://xrpl.org/blog/2019/welcome-to-xrpl-org.html (stating that "Ripple will still play a significant role in managing and providing content for xrpl.org …")).

**Paragraph No. 66:** Only six of the exchanges that listed XRP as of December 2020 had contracts with Ripple relating to their listing of XRP. See Ex. 11, Ferrell Rep. ¶ 137 ("Ripple contracted with only six cryptocurrency exchanges, which represents less than 4% of the more than 150 exchanges that listed XRP as of December 2020."); id. Ex. 13 (identifying "Effective and Termination Dates of Ripple's Contracts with Exchanges") (citing Ex. 31, RPLI_SEC 0507279 and sources identified in Appendix B as Ex. 32, RPLI_SEC 0153866; Ex. 33, RPLI_SEC 0066688; Ex. 34, RPLI_SEC 0154338; Ex. 35, RPLI_SEC 0511334; Ex. 36, RPLI_SEC 0507292; and Ex. 37, RPLI_SEC 0847167).

**Response:** The SEC disputes the assertions in ¶ 66 on the grounds that: the phrase "relating to their listing of XRP" is vague and ambiguous and; the evidence cited shows that Ripple contracted with more than "six cryptocurrency exchanges" as of December 2020.  PX 715, Ferrell Rep. Ex. 13; PX 716, PX 717, PX 718, PX 719, PX 720, PX 721, PX 722.  The SEC further states that Ripple publicly promoted Ripple's efforts to increase XRP's liquidity, which included efforts to get XRP listed on exchanges.  PX 506.106 (Garlinghouse December 21, 2017 tweet: "$XRP is now on 50 exchanges around the world! Team Ripple will continue to champion additional listings to foster a vibrant and healthy XRP ecosystem and help deepen liquidity across fiat currencies. https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/"); PX 506.107 (Ripple December 21, 2017 tweet: "It's a priority for Ripple to have $XRP listed on top digital asset exchanges, making it broadly accessible worldwide. Excited to share $XRP is now listed on 50 exchanges and counting."); PX 501.05, Q4 2017 XRP Market Report ("XRP also became available across more than 50 exchanges globally" and "[t]his increased global reach is the result of Ripple's continued investment in the XRP ecosystem...."; PX 500.11, May 18, 2017 Ripple Insights Article titled XRP Liquidity to Deepen with Listings on Six New Exchanges ("Today we are pleased to share we have expanded our partnership with BitGo, which will see XRP listed on several leading digital asset exchanges...By working with a greater number of exchanges across different countries to list XRP, we can better serve the growing demand for global payments in both major currency corridors and emerging markets."); PX 500.18, December 21, 2017 Ripple Insights Article titled XRP Now Available on 50 Exchanges Worldwide ("[W]e're proud to announce that XRP has gone from being listed on six exchanges earlier this year to more than 50 worldwide."); PX 500.20, January 18, 2018 Ripple Insights Article titled Top 9 Frequently Asked Questions About Ripple and XRP ("In order to maintain healthy XRP markets, it's a top priority for Ripple to have XRP listed

on top digital asset exchanges" and "Ripple has dedicated resources to the initiative so you can expect ongoing progress toward creating global liquidity"; PX 500.28, Transcript of Ripple Livestream, Ask Me Anything with Brad, December 14, 2017 (Garlinghouse: "[i]t's a very high priority for us to be listed more broadly."); PX 501.11, Q2 2019 XRP Market Report ("XRP listings increased as Ripple has partnered with the top digital asset brokers and used inventory to serve as a backstop for XRP liquidity.").  Ripple also posted on its website a list of exchanges where "XRP is available for purchase" (PX 500.20; PX 506.092), touted the number of XRP listings in its quarterly XRP Market Reports, and tweeted about new XRP listings on exchanges.  PX 501.06; PX 501.09; PX 501.10; PX 501.11; PX 501.12; PX 501.13; PX 506.046; PX 506.047; PX 506.086; PX 506.087; PX 506.089; PX 506.097. Ripple employees also attributed 25 new XRP listings on exchanges as "big achievements" for Ripple, acknowledging the work performed by Ripple's engineering team to integrate XRP on exchanges.  PX 645 at Tr. 30:20-31:6.

**Paragraph No. 67:** On September 4, 2013, a Ripple subsidiary that engaged in the sale of XRP elected to register with the Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"). See Settlement Agreement, Attach. A ¶¶ 22, 24, U.S. Dep't of Justice (May 5, 2015), https://perma.cc/382H-K4LC.

**Response:** The SEC does not dispute the assertions contained in ¶ 67.

**Paragraph No. 68:** In 2015, Ripple settled with the Department of Justice ("DOJ") and FinCEN, both of which determined that XRP was a "virtual currency." See Settlement Agreement, Attach. A 2 & Attach. B ¶¶ 2-3, U.S. Dep't of Justice (May 5, 2015), https://perma.cc/382H-K4LC.

**Response:** The SEC does not dispute the assertions contained in ¶ 68.

**Paragraph No. 69:** In 2015, FinCEN and the DOJ determined that XRP is a "virtual currency" and described it as "the second-largest largest cryptocurrency by market capitalization, after Bitcoin." Settlement Agreement, Attach. A ¶¶ 2-3, 17, U.S. Dep't of Justice (May 5, 2015), https://perma.cc/382H-K4LC; see also DOJ, Ripple Labs Inc. Resolves Criminal Investigation (May 5, 2015), https://perma.cc/A3YG-FG5Z; FinCEN, FinCEN Fines Ripple Labs Inc. in First Civil Enforcement Action Against a Virtual Currency Exchanger (May 5, 2015), https://perma.cc/N5PN-CD5F.

**Response:** The SEC does not dispute the assertions contained in ¶ 69.

27

**Paragraph No. 70:** As a result of the settlement, Ripple was required to sell XRP through a registered "money services business" pursuant to federal money transmission laws. See DOJ, Ripple Labs Inc. Resolves Criminal Investigation (May 5, 2015), https://perma.cc/A3YG-FG5Z; FinCEN, Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies (Mar. 18, 2013), https://perma.cc/22YK-DHSE; FinCEN Director Jennifer Shaskey Calvery, Speech at West Coast AML Forum (May 6, 2015), https://perma.cc/4D8R-5GNN.

**Response:** The SEC does not dispute the assertions contained in ¶ 70.

**Paragraph No. 71:** In June 2016, a Ripple subsidiary was one of the first entities ever to receive a "BitLicense" – a business license to conduct virtual currency activities – from the New York State Department of Financial Services ("NYDFS"). See Ex. 22, Zagone Tr. 297:12-298:23; see also Ripple, Ripple Receives New York's First BitLicense for an Institutional Use Case of Digital Assets (June 13, 2016), https://perma.cc/RQB2-JXG8 ("While previous approvals were for consumer-facing businesses, Ripple's BitLicense is the first granted for an additional institutional use case for digital assets."); Press Release, NYDFS, DFS Grants Virtual Currency License to XRP II, LLC, an Affiliate of Ripple (June 13, 2016), https://perma.cc/DCN6-2VTT.

**Response:** The SEC does not dispute the assertions contained in ¶ 71.

**Paragraph No. 72:** At the time the SEC brought this lawsuit, XRP was the third-largest cryptocurrency in terms of market capitalization (behind Bitcoin and Ether), with a total asset value of around $50-60 billion. See CoinMarketCap, Historical Snapshot – 13 December 2020, https://perma.cc/QR5X-2AXN (last visited Sept. 12, 2022) (price on December 13, 2020 was $0.5115, which implies a total value of approximately $51 billion when multiplied by approximately 100 billion units of XRP); CoinMarketCap, Historical Snapshot – 06 December 2020, https://perma.cc/8M8R-WWSB (last visited Sept. 12, 2022) (price on December 6, 2020 was $0.6199).

**Response:** The SEC disputes the assertions in ¶ 72 on the grounds that the evidence cited does not support the assertion. In fact, CoinMarketCap calculates XRP's market capitalization at around $23.2 billion as of December 13, 2020, and not "$50-60 billion."  https://perma.cc/QR5X-2AXN.  The SEC further disputes the assertions on the grounds that Ripple's figures overstate XRP's market capitalization by more than half because it includes the 45.5 billion XRP held by Ripple in escrow as of that date even though Ripple admitted that the purpose of the escrow is to alleviate "uncertainty surrounding our ongoing XRP distribution" and that "[t]he root of this uncertainty is the notion that Ripple might one day sell its 61.68B XRP in the market at any time,"

28

recognizing that if an additional 45.5 billion XRP were dumped into the market, XRP's price and

market capitalization would decline significantly.  PX 500.10.

Paragraph No. 73: Before the SEC filed this lawsuit, XRP was listed on more than 200 exchanges globally. See Ripple, Q4 2020 XRP Markets Report (Feb. 5, 2021), https://perma.cc/XC4R- 7KWE ("For eight years, XRP has been trading on the open market and has grown to a massive scale – trading more than $1B per day on some 200 exchanges."); see also Ex. 20, Long Decl. ¶ 4.

Response: The SEC disputes the assertions in ¶ 73 on the grounds that the evidence cited

does not support the assertion with any facts but instead consists solely of a conclusory claim

without any factual support.  As discussed above, the SEC further disputes the assertions on the

grounds that Ripple engaged in significant efforts to increase XRP's liquidity, which included efforts

to get XRP listed on exchanges.  PX 506.106 (Garlinghouse December 21, 2017 tweet: "$XRP is

now on 50 exchanges around the world! Team Ripple will continue to champion additional listings

to foster a vibrant and healthy XRP ecosystem and help deepen liquidity across fiat currencies.

https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/"); PX 506.107 (Ripple

December 21, 2017 tweet: "It's a priority for Ripple to have $XRP listed on top digital asset

exchanges, making it broadly accessible worldwide. Excited to share $XRP is now listed on 50

exchanges and counting."); PX 501.05, Q4 2017 XRP Market Report ("XRP also became available

across more than 50 exchanges globally" and "[t]his increased global reach is the result of Ripple's

continued investment in the XRP ecosystem...."; PX 500.11, May 18, 2017 Ripple Insights Article

titled XRP Liquidity to Deepen with Listings on Six New Exchanges ("Today we are pleased to

share we have expanded our partnership with BitGo, which will see XRP listed on several leading

digital asset exchanges...By working with a greater number of exchanges across different countries to

list XRP, we can better serve the growing demand for global payments in both major currency

corridors and emerging markets."); PX 500.18, December 21, 2017 Ripple Insights Article titled

29

XRP Now Available on 50 Exchanges Worldwide ("[W]e're proud to announce that XRP has gone from being listed on six exchanges earlier this year to more than 50 worldwide."); PX 500.20, January 18, 2018 Ripple Insights Article titled Top 9 Frequently Asked Questions About Ripple and XRP ("In order to maintain healthy XRP markets, it's a top priority for Ripple to have XRP listed on top digital asset exchanges" and "Ripple has dedicated resources to the initiative so you can expect ongoing progress toward creating global liquidity"; PX 500.28, Transcript of Ripple Livestream, Ask Me Anything with Brad, December 14, 2017 (Garlinghouse: "[i]t's a very high priority for us to be listed more broadly."); PX 501.11, Q2 2019 XRP Market Report ("XRP listings increased as Ripple has partnered with the top digital asset brokers and used inventory to serve as a backstop for XRP liquidity.").  The SEC further disputes the assertions on the grounds that Ripple also posted on its website a list of exchanges where "XRP is available for purchase" (PX 500.20; PX 506.092), touted the number of XRP listings in its quarterly XRP Market Reports, and tweeted about new XRP listings on exchanges.  PX 501.06; PX 501.09; PX 501.10; PX 501.11; PX 501.12; PX 501.13; PX 506.046; PX 506.047; PX 506.086; PX 506.087; PX 506.089; PX 506.097.  The SEC further disputes the assertions on the grounds that Ripple employees attributed 25 new XRP listings on exchanges as "big achievements" for Ripple, acknowledging the work performed by Ripple's engineering team to integrate XRP on exchanges.  PX 645 at Tr. 30:20-31:6.

**Paragraph No. 74:** Ripple voluntarily and publicly reported its sales of XRP in quarterly market reports starting with the fourth quarter of 2016. See Ripple, Q4 2016 XRP Market Report (Jan. 24, 2017), https://web.archive.org/web/20170603164903/https://ripple.com/insights/q4-2016- xrp-markets-report/; Ripple, Q1 2017 XRP Markets Report (Apr. 18, 2017), https://web.archive. org/web/20170712084015/https://ripple.com/insights/q1-2017-xrp-markets-report/; Ripple, Q2 2017 XRP Markets Report (July 20, 2017), https://web.archive.org/web/20180509214545/https://ripple.com/insights/q2-2017-xrp-markets-report/; Ripple, Q3 2017 XRP Markets Report (Oct. 19, 2017), https://perma.cc/MME5-XXDR; Ripple, Q4 2017 XRP Markets Report (Jan. 28, 2018), https://perma.cc/G5K9-DG6K; Ripple, Q1 2018 XRP Markets Report (Apr. 25, 2018), https://perma.cc/7HFD-YFNE; Ripple, Q2 2018 XRP Markets Report (July 24, 2018), https://perma.cc/F9V9-KHW2; Ripple, Q3 2018 XRP Markets Report (Oct. 25, 2018), https://perma.cc/FQ5K-M84Q; Ripple, Q4 2018 XRP Markets Report

(Jan. 24, 2019), https://perma.cc/6VPU-VW48; Ripple, Q1 2019 XRP Markets Report (Apr. 24, 2019), https://perma.cc/N62F-Q8ZA; Ripple, Q2 2019 XRP Markets Report (July 24, 2019), https://perma.cc/G9TA-32LJ; Ripple, Q3 2019 XRP Markets Report (Oct. 18, 2019), https://perma.cc/XZ9B-JGW9; Ripple, Q4 2019 XRP Markets Report (Jan. 22, 2020), https://perma.cc/MS3M-PFVU; Ripple, Q1 2020 XRP Markets Report (Apr. 30, 2020), https://perma.cc/EV3V-MEBG; Ripple, Q2 2020 XRP Markets Report (Aug. 3, 2020), https://perma.cc/3KVN-7KJJ; Ripple, Q3 2020 XRP Markets Report (Nov. 5, 2020), https://perma.cc/W8H6-BMJJ; Ripple, Q4 2020 XRP Markets Report (Feb. 5, 2021), https://perma.cc/L2QB-LEWM; Ripple, Q1 2021 XRP Markets Report (May 6, 2021), https://perma.cc/A4YR-3VDN; Ripple, Q2 2021 XRP Markets Report (July 29, 2021), https://perma.cc/DE7V-ZCP8; Ripple, Q3 2021 XRP Markets Report (Oct. 29, 2021), https://perma.cc/4J6N-3B8T; Ripple, Q4 2021 XRP Markets Report (Jan. 28, 2022), https://perma.cc/VHK2-84ES; Ripple, Q1 2022 XRP Markets Report (May 2, 2022), https://perma.cc/UQ9Q-3WAR; Ripple, Q2 2022 XRP Markets Report (July 28, 2022), https://perma.cc/TH3S-2E2T; see also Ex. 38, Dep. Tr. of Breanne Madigan 110:2-16 (Ripple "used the XRP markets report to communicate to the market what was going on with respect to XRP" and "chose, before [the witness's time], to voluntarily provide information to the market regarding its holdings of XRP and any activity around it"); Ex. 4, Samarasinghe Tr. 175:8-24 (quarterly market reports "typically included," among other things, "the amount of XRP that was sold by Ripple").

**Response:** The SEC disputes the assertion in ¶ 74 that Ripple was not obligated to publicly disclose information regarding its XRP sales on the grounds that the SEC alleges that Ripple engaged in an unregistered offering of securities that require registration under the securities laws and disclosure of certain information that accompanies registration.  The SEC does not dispute the assertion in ¶ 74 that Ripple selectively disclosed information regarding its sales of XRP in its quarterly XRP Market Reports. However, the SEC further states that Ripple only disclosed the total amount of XRP sold per quarter in USD and did not publicly disclose the number of units sold, the cost per unit, or the terms of any of XRP sales agreements (including whether any agreements contained any sales restrictions). PX 501.01 through PX 501.16; PX 654 at RPLI_SEC 0503730. (member of Ripple's XRP Markets team stating, "our sales numbers [in the XRP Market Report] are not a good proxy for XRP put into the market…Also, there are starting to be commentary regarding the discrepancy between Ripple published sales numbers and Ripple distribution of XRP.").  Finally, the SEC disputes the assertions in ¶ 74 on the grounds that Ripple's quarterly XRP Market Reports

31

also do not disclose Ripple's non-monetary XRP sales, which, according to Ripple's financial statements, accounted for approximately ███ and ███ of Ripple revenue for 2019 and 2020 respectively. PX 202 at Fig. 9.

**Paragraph No. 75:** The vast majority of Ripple's total net outflows of XRP was distributed before August 2020; roughly 25 billion XRP were distributed by that date. See Ex. 11, Ferrell Rep. ¶ 109 (Ripple had distributed approximately 25 billion as of December 20, 2020) & Ex. 10 (total distributions of XRP not materially different as of August 2020). [FN 2 The figures reflected in Exhibit 10 include the units of XRP retained by Ripple's Founders]

**Response:** The SEC disputes the assertions in ¶ 75 on the grounds that the evidence cited does not support the assertion that Ripple distributed 25 billion XRP before August 2020.  The SEC further disputes the assertions on the grounds that Ripple's total net outflows of XRP as of August 2020 is roughly 45 billion XRP, which includes XRP distributed to Ripple's founders and is consistent with the amount reported by Ripple.  PX 715, Ferrell Rep. Ex. 10.

**Paragraph No. 76:** From the XRP Ledger's launch in 2012 to the filing of this litigation, more than 1.28 trillion XRP traded hands globally. See Ex. 2, D. Schwartz Decl. ¶ 12.

**Response:** The SEC does not dispute the assertions in ¶ 76.

**Paragraph No. 77:** Since at least 2017, Ripple's distributions of XRP have represented a small fraction of XRP's total overall trading volume. See Ex. 11, Ferrell Rep. ¶ 143 ("Ripple's sales of XRP represent a fraction of the overall purchases of XRP. In fact, a majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges. Since at least the second quarter of 2017, Ripple's monthly XRP distributions have been under 1% of the overall XRP trading volume reported by CryptoCompare."); see also XRP Markets Reports cited supra ¶ 74.

**Response:** The SEC disputes the assertion in ¶ 77 that Ripple's distributions "have represented a small fraction of XRP's total trading volume" on the grounds that the evidence cited (Ripple's quarterly XRP Market Report and Ferrell Rep., Defs' Ex. 11) only discuss Ripple's XRP sales and exclude other "outflows" of XRP by Ripple for non-monetary XRP sales, investments, employee compensation, vendors, charitable donations, strategic promotions, and other outflows. *See, e.g.,* PX 704; PX 705; PX 646; PX 647.  The SEC further disputes the allegations on the grounds

32

that all circulating XRP originated with Ripple and that Ripple's total net outflows of XRP as of

August 2020 is roughly 45 billion XRP, which includes XRP distributed to Ripple's founders and is

consistent with the amount reported by Ripple. PX 715, Ferrell Rep. Ex. 10.

**Paragraph No. 78:** A cryptographic escrow established in 2017 prevents Ripple from accessing and distributing more than 1 billion XRP from the escrow in any given month. See Ex. 8, Larsen Tr. 374:12-16; Ex. 24, Long Tr. 87:12-16; Ex. 11, Ferrell Rep. ¶ 119; Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 10 ("[i]n May 2017, Ripple publicly reported that it would . . . plac[e] a portion of its XRP into cryptographically-secured escrow contracts").

**Response:** The SEC does not dispute the assertions contained in ¶ 78.

**Paragraph No. 79:** The escrow makes only 1 billion XRP available for use by Ripple every month. See Ex. 11, Ferrell Rep. ¶ 119; Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 11 ("[I]n December 2017, Ripple implemented a cryptographically-secured escrow – a series of smart contracts on the XRP Ledger – that made only 1 billion XRP available for use by Ripple every month.").

**Response:** The SEC disputes the assertion in ¶ 79 that Ripple "uses" the XRP on the

grounds that Ripple sold and distributed a total of 45 billion XRP into the market or to third parties

since 2013.  PX 715 at Ex. 10.  The SEC disputes the assertion in ¶ 79 that 1 billion XRP is made

available from escrow every month on the grounds that Ripple held XRP outside of the escrow and

in "reserve" and that Ripple periodically distributed XRP held in reserve (as opposed to XRP from

the escrow) so Ripple could "maintain market positioning around the escrow" (PX 335), manage

"very bad optics from a dramatic change to our escrow return" and reflect "a more consistent usage

and escrow pattern," (PX 455); and "reinforce[] the message we are sending to the market that our

purchases are offsetting supply introduction, and coinciding with the Q3 XRP markets report

release" (PX 648).

**Paragraph No. 80:** Ripple has in fact distributed far less than the 1 billion that is permissible in any given month. See Ex. 11, Ferrell Rep. ¶ 119 ("I analyzed the monthly net outflow of XRP from Ripple divided by 1 billion XRP, the Escrow monthly limit. In the 12 months ending December 31, 2017, the monthly ratio ranged from -0.7% to 55.8% (22.3% on average). In the 12 months ending December 31, 2018, the monthly ratio ranged from 2.1% to 55.9% (17% on

average). On average, the ratio is less than 100%, which shows that Ripple consistently distributed less than one billion XRP.").

**Response:** The SEC disputes the assertions in ¶ 80 on the grounds that the evidence cited does not support the assertion because it does not include amounts greater than 1 billion XRP that Ripple distributed and/or committed to distribute to the following individuals and/or entities in connection with certain agreements: Ripple's founders (Larsen, McCaleb, and Britto) totaling 20 billion XRP; ███████ and ███████ totaling ███████; ███████ totaling ███████ XRP; Coil Technologies, Inc. totaling ███████; and ███████ totaling up to ███████. PX 649; PX 650; PX 715, Ferrell Rep. Ex. C.3 and Notes to Ex. 9; PX 651; PX 652; PX 653.  For many of these distributions, Ripple considered the XRP distributed as of the date Ripple incurred the commitment, which was the date of the agreement between Ripple and the intended recipient of the XRP.  PX 715, Ferrell Rep., Appendix C, ¶ 13.

**Paragraph No. 81:** Unused XRP released by the escrow has been locked up again at the end of the month by Ripple. See Ex. 9, Birla Tr. 183:19-23; Ripple, An Explanation of Ripple's XRP Escrow (Dec. 15, 2017), https://perma.cc/7SDX-E3W6 ("Any additional XRP leftover each month will be placed into a new escrow to release in the first month in which no escrow currently releases.").

**Response:** The SEC disputes the assertion in ¶ 81 on the grounds that the evidence cited does not support the assertion that "unused XRP released by the escrow…is locked up" since Ripple admitted that it held in "reserve" amounts of XRP that was released from escrow but were unused.  PX 655 at RPLI_SEC 0383243 ("Monica did have minor reservations about the reserve, particularly because of language in our announcement (We'll then return whatever is unused at the end of each month to the back of the escrow rotation)."   The SEC further disputes the assertions on the grounds that Ripple held XRP outside of the escrow and in "reserve" and that Ripple periodically distributed XRP held in reserve (as opposed to XRP from the escrow) so Ripple could "maintain market positioning around the escrow" (PX 335), manage "very bad optics from a

dramatic change to our escrow return" and reflect "a more consistent usage and escrow pattern" (PX 455), and "reinforce[] the message we are sending to the market that our purchases are offsetting supply introduction, and coinciding with the Q3 XRP markets report release" (PX 648).

**Paragraph No. 82:** Throughout 2018, Ripple's XRP sales never exceeded one-half of 1% (0.5%) of the global XRP trading volume. See Ripple, Q1 2018 XRP Markets Report (Apr. 25, 2018), https://perma.cc/7HFD-YFNE; Ripple, Q2 2018 XRP Markets Report (July 24, 2018), https://perma.cc/F9V9-KHW2; Ripple, Q3 2018 XRP Markets Report (Oct. 25, 2018), https://perma.cc/FQ5K-M84Q; Ripple, Q4 2018 XRP Markets Report (Jan. 24, 2019), https://perma.cc/6VPU-VW48.

**Response:** The SEC disputes the assertions in ¶ 82 on the grounds that: (i) the term "XRP sales" is vague and ambiguous; (ii) Ripple's quarterly XRP Market Reports include conclusory statements regarding Ripple's XRP sales amounts without providing the basis for such calculations; and (iii) the figures cited do not include Ripple's non-monetary sales of XRP (transactions where Ripple delivers XRP to customers for consideration other than cash or other monetary consideration), which Ripple did not report in any of its XRP Market Reports. The SEC further states that Ripple's programmatic sales of XRP: exceeded 0.5% of total XRP trading volume prior to Q1 2017; exceeded 2% of total XRP trading volume for seven out of the twelve months in 2015; exceeded 2% of total XRP trading volume for four out of the twelve months in 2016; and generally exceeded 1% of total XRP trading volume from Q1 2015 through Q2 2016.  PX 398 (Declaration of Christopher Ferrante, dated October 18, 2022) at ¶ 8, Exhibit 2; PX 703.

**Paragraph No. 83:** In the first quarter of 2019, Ripple's sales amounted to only 0.32% of the overall trading volume of XRP. See Ripple, Q1 2019 XRP Market Report (Apr. 24, 2019), https://perma.cc/N62F-Q8ZA.

**Response:** The SEC disputes the assertions in ¶ 83 on the grounds that: (i) the term "Ripple's sales" is vague and ambiguous; (ii) Ripple's quarterly XRP Market Report include conclusory statements regarding Ripple's XRP sales amounts without providing the basis for such calculations; and (iii) the figure cited does not include Ripple's non-monetary sales of XRP

(transactions where Ripple delivers XRP to customers for consideration other than cash or other monetary consideration), which Ripple did not disclose in any quarterly XRP Market Report. The SEC further disputes the assertions on the grounds that in 2019, Ripple's non-monetary XRP sales totaled approximately 30% of Ripple's revenues. PX 202 at Fig. 9 & n.60 (citing Ripple's Consolidated Financial Statements as of December 2019, RPLI_SEC 0301113-1160).

**Paragraph No. 84:** Since May 2020, essentially all of Ripple's sales of XRP – which were conducted with full disclosure to the SEC – have been to certain ODL customers that have sourced XRP directly from Ripple for cross-border transactions. See Ex. 20, Long Decl. ¶ 10.

**Response:** The SEC disputes the assertions in ¶ 84 on the grounds that the terms "Ripple's sales of XRP," "essentially all," and "full disclosure" are vague and ambiguous and the evidence cited does not support the assertions with any facts but instead consists of conclusory claims. The SEC further disputes the assertions on the grounds that Ripple's internal analysis shows that it sold and distributed a total 1.163 billion XRP from May through October 2020 and approximately 603 million XRP was sold in connection with ODL and XRP-O sales. PX 646. Moreover, other than its XRP sales, Ripple did not disclose, in its quarterly XRP Market Reports or elsewhere, the XRP it distributed from May 2020 through December 2020, which included other "outflows" of XRP by Ripple for non-monetary XRP sales, investments, employee compensation, vendors, charitable donations, strategic promotions, and other outflows. *See, e.g.*, PX 704; PX 705; PX 646; PX 647.

**Paragraph No. 85:** The price of XRP declined by approximately 70% in the days following the filing of the SEC's complaint in this action, wiping out approximately $15 billion in market value. See generally CoinMarketCap, XRP, https://perma.cc/D8WR-3TE7 (last visited Sept. 12, 2022) (decline from market cap of more than $25 billion on December 21, 2020 to more than $10 billion on December 23, 2020).

**Response:** The SEC does not dispute that the price of XRP and XRP's market capitalization declined in the days following the filing of the SEC's lawsuit, but disputes the assertions in ¶ 85 on the grounds that they are not supported by the evidence cited.

**Paragraph No. 86:** Nearly every known exchange accessible to U.S. parties de-listed XRP or blocked U.S. parties' access to it in the weeks following the SEC's filing of this lawsuit. See Ex. 20, Long Decl. ¶ 5 (de-listing and blocking by exchanges).

**Response:** The SEC disputes the assertions in ¶ 86 on the grounds that the evidence cited

does not support the assertions with any facts but instead consists of conclusory claims without any

factual support.  The SEC further disputes the assertions on the grounds that prior to December

2020, XRP was available for U.S. parties to trade using: the XRP Ledger; on certain digital asset

trading platforms in the U.S.; and on offshore exchanges that permitted trading by U.S. persons.

https://xrpl.org/decentralized-exchange.html; PX 16 (Birla Inv. Tr.) at 57:2-15; PX 500.27

(screenshot of https://xrpcharts.ripple.com/#/xrp-markets showing XRP trading volume on

Kraken and other U.S. digital asset trading platforms); PX 564; PX 565; PX 566.  The SEC further

disputes the assertions on the grounds that XRP is currently available for U.S. parties to trade using

the XRP Ledger.

**Paragraph No. 87:** As of December 20, 2020, Ripple had transferred roughly 25 billion XRP to various counterparties, including through XRP sales, giveaways, and purchases of goods and services. See Ex. 11, Ferrell Rep. ¶ 109 ("[a]s of December 20, 2020, Ripple's aggregate distributions were approximately 25 billion XRP").

**Response:** The SEC disputes the assertion in ¶ 87 on the grounds that the evidence cited

does not support the assertion that Ripple transferred 25 billion XRP as of December 20, 2020 since

that amount excludes the 20 billion XRP distributed to Ripple's founders.  PX 715, Ferrell Rep. Ex.

10.  The SEC further disputes the assertions on the grounds that as of December 20, 2020, Ripple

distributed roughly 45 billion XRP in connection with giveaways, XRP sales, non-monetary sales,

investments, employee compensation, vendors, charitable donations, strategic promotions, and

other outflows.  https://data.ripple.com/v2/network/xrp_distribution;

https://data.ripple.com/v2/network/xrp_distribution?descending=true;  PX 704; PX 705; PX 646;

PX 647; PX 715, Ferrell Rep. Ex. 10.

**Paragraph No. 88:** Ripple reports the amount of XRP it holds on its website. See Ripple, XRP – Utility for the new global economy, https://perma.cc/QRK3-2MMC (last visited Sept. 7, 2022) (click on "[t]he majority of Ripple's XRP supply is in escrow").

**Response:** The SEC does not dispute that Ripple's website currently includes figures for the "Total XRP Held By Ripple," "Total XRP Distributed," and "Total XRP Placed In Escrow," but disputes that the amounts reported on Ripple's website as "held by Ripple" and "distributed" are true and accurate on the grounds that Ripple admitted that it held in "reserve" certain amounts of XRP and that Ripple's decision to include these XRP amounts as distributed for reporting purposes was "somewhat arbitrary, and was determined largely by preferences at the time commitments were made." PX 650.

**Paragraph No. 89:** As of September 4, 2022, Ripple owns approximately 50.2 billion XRP (compared to 49.8 billion held by persons and institutions other than (and mostly unknown to) Ripple). See Ex. 20, Long Decl. ¶ 11; Ripple, https://perma.cc/QRK3-2MMC (last visited Sept. 12, 2022) (see bottom section with black background, expand the second point re: escrow).

**Response:** The SEC disputes the assertions in ¶ 89 on the grounds that the term "owns" is vague and ambiguous and the evidence cited does not support the assertions. The SEC also disputes the assertions in ¶ 89 that XRP not held by Ripple is held by "persons and institutions other than (and mostly unknown to) Ripple" on the grounds that: (i) the term "mostly" is vague and ambiguous; (ii) all circulating XRP originated with Ripple; and (iii) Ripple tracked XRP supply entering in the market on a weekly, monthly and quarterly basis, which included XRP sold and/or distributed by Ripple to Ripple's founders, Ripple employees, Ripple partners, and other third parties in connection with its XRP sales, non-monetary XRP sales, investments, employee compensation, vendors, charitable donations, strategic promotions, and other outflows. *See, e.g.*, PX 656; PX 659; PX 704; PX 705; PX 646; PX 647.

**Paragraph No. 90:** As of September 4, 2022, Ripple has only about 5.5 billion in XRP outside the escrow. See Ex. 20, Long Decl. ¶ 11.

**Response:** The SEC disputes the assertions in ¶ 89 on the grounds that Ripple, in its online reporting's, "arbitra[rily]" reported as "distributed" amounts of XRP that Ripple held outside of the escrow and in "reserve" wallets and that, at times, Ripple decreased the amount of XRP it reported as "distributed" by crediting that number with XRP Ripple held in reserve.  PX 650; PX 706.

**Paragraph No. 91:** Global XRP trading markets remain active, with 24-hour trading volumes approaching $1,000,000,000. See Ex. 20, Long Decl. ¶ 6.

**Response:** The SEC does not dispute the assertion in ¶ 91 that, at certain times, online crypto market data providers such as CoinMarketCap have reported 24-hour XRP trading volumes approaching $1 billion.  The SEC disputes the remaining assertions on the grounds that various third-party sources have "called into question reported volume in digital asset markets" and "suggest[ed] exaggerated numbers and overall inaccuracy in the way data is reported -- by up to 95%."  PX 701, available at https://ripple.com/insights/raising-the-bar-reporting-on-volume-and-sales-of-xrp/.   In response to these concerns about "misreported, falsified and inflated reported trading volumes," Ripple stopped relying on CoinMarketCap data as its volume benchmark when determining the company's XRP sales. PX 501.11, available at https://ripple.com/insights/q2-2019-xrp-markets-report/.

## D.    Ripple's Sales, Giveaways, and Payments of XRP

### 1.    Giveaways

**Paragraph No. 92:** Ripple in its early years (roughly 2013-2015) gave away more than 500 million XRP to early adopters and developers, before ending those programs due to abuse by scammers. No contracts accompanied these giveaways, and Ripple did not receive any consideration. See Ex. 20, Long Decl. ¶ 8; Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 56 (admitting "that the recipients of XRP in the Bounty Program did not pay money or property to Ripple"); see also, e.g., Ex. 8, Larsen Tr. 173:24-174:14 (Ripple terminated its initial plan to "give away ▇▇▇▇▇ XRP to the public" because it found that "giving away opened you up to too much abuse and spamming, too many fake accounts posing to be different individuals would take advantage of the giveaways once the currencies had value").

**Response:** The SEC does not dispute the assertions contained in ¶ 92.

39

**Paragraph No. 93:** Ripple has donated more than 2 billion XRP to charities and grant recipients, and Larsen has given away more than 2 billion to charity as well. See Ex. 20, Long Decl. ¶ 9; Ex. 14, Larsen Decl. ¶ 5; see generally Rippleworks, Our Story, https://perma.cc/6BJ4-VRMP (last visited Sept. 12, 2022); Rippleworks, Making a difference at home with Community Grants, https://perma.cc/CTZ9-BQFE (last visited Sept. 12, 2022).

**Response:** The SEC disputes the assertions in ¶ 93 on the grounds that the assertions that Ripple "donated" and Larsen "[gave] away" XRP to Rippleworks is inaccurate because Ripple maintained close control over Rippleworks and directed its activities to benefit Ripple and the XRP ecosystem:  For example, Ripple had Rippleworks invest in a venture fund (and Ripple equity holder) in an effort to "[g]enerate deal flow for Xpring" and "[f]oster the XRP ecosystem." PX 711; PX 688.  In a message between Larsen and the CEO of Rippleworks, Larsen described the Rippleworks investment as a Ripple contribution when he stated that "Ripple invested ███ into ████████████.. ███ was from Ripple directly, the additional ████ was from RippleWorks." PX 711.  Similarly, Garlinghouse and Ripple encouraged Rippleworks to invest in an XRP-denominated hedge fund closely affiliated with Ripple because such an investment would benefit "the overall XRP ecosystem." PX 713; PX 714; PX 709. When the CEO of Rippleworks raised potential concerns about self-dealing given Larsen's key role at Rippleworks and the fact that the investment might be viewed as benefitting Ripple, Griffin suggested to Garlinghouse that "I'm not really sure what else we can do other than just ask Chris [Larsen] to override." PX 713. Rippleworks ultimately agreed to invest in the hedge fund, PX 710 (Ripplework CEO confirming to Larsen and Garlinghouse that Rippleworks had signed the term sheet), after which Ripple coordinated the public rollout of the fund's launch. PX 712. Larsen also exercised control over the sale of Rippleworks' XRP.  *See, e.g.*, PX 694 (Larsen instructing GSR to pause Rippleworks' XRP sales); PX 699 (Larsen agreeing to "turn back on" Rippleworks XRP sales); PX 692 (Larsen instructing GSR to

"turn on" Rippleworks' programmatic sales of XRP); PX 690 (Larsen instructing GSR to "turn back on" Rippleworks' programmatic sales of XRP at a specified percentage of daily volume).

**Paragraph No. 94:** Ripple's donations were not in exchange for any consideration. Ripple made no promise to make efforts to increase the price of XRP; no promise that the price or value of XRP would increase; and no promise to pay out a share of any future profits. See Ex. 20, Long Decl. ¶ 8.

**Response:** The SEC does not dispute the assertions contained in ¶ 94.

### 2.   Exchange-Based Sales

**Paragraph No. 95:** Ripple has sold XRP on digital asset exchanges via market makers "programmatic[ally]," meaning through the use of trading algorithms. See Ex. 40, Expert Report of Alan Schwartz (Oct. 4, 2021) ("A. Schwartz Rep.") ¶¶ 18, 32-35, 89-104; Ex. 4, Samarasinghe Tr. 45:11-20 (explaining that "programmatic sales" means "Ripple used market makers such as GSR, ██████ to use algorithms to sell XRP across global digital asset exchanges"); see also Ex. 25, ██ Tr. 27:6-21 (explaining that GSR is "an algorithmic trading firm that specializes in crypto," such that most of its trading "is programmatic in nature").

**Response:** The SEC does not dispute the assertions contained in ¶ 95.

**Paragraph No. 96:** When a digital asset, such as XRP, is sold on exchanges, there is no contract or privity between the buyer and the seller. Rather, a buyer communicates to the exchange that it wants to buy the asset, and the exchange matches a blind sell offer with a blind buy offer; a prospective buyer does not, and cannot, solicit a specific potential seller, and a prospective seller does not, and cannot, target a specific potential buyer. See, e.g., Ex. 41, Expert Report of Yesha Yadav (Oct. 4, 2021) ("Yadav Rep.") ¶ 77 ("[E]lectronic order matching trading systems are, overwhelmingly, anonymous spaces. In other words, parties do not generally know in advance with whom they are trading. They cannot submit an offer with the express aim of trading with a specific party on the other side.") (footnote omitted); Ex. 11, Ferrell Rep. ¶ 143 ("[A] majority of XRP are not purchased directly from Ripple but are traded anonymously at the cryptocurrency exchanges."); Ex. 42, Dep. Tr. of Yesha Yadav ("Yadav Tr.") 195:15-196:23 ("It is a[n] absolutely cardinal rule of traditional marketplaces, modern electronic marketplaces, that pretrade anonymity be sacrosanct.").

**Response:** The SEC disputes the assertions contained in ¶ 96 on the grounds that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the facts asserted, the Ferrell Report and the expert report of Yesha Yadav ("Yadav Report"), is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

**Paragraph No. 97:** As a result, when selling XRP on exchanges, Ripple, Larsen, and Garlinghouse did not and could not know who was purchasing the XRP, and the purchasers did not

41

and could not know who was selling the XRP they purchased. See, e.g., Ex. 25, ██ Tr. 297:25-298:7 ("I have no way of knowing who is on the other side of the trades").

**Response:** The SEC does not dispute the assertions contained in ¶ 97.

**Paragraph No. 98:** Ripple entered into contracts with third parties that agreed to sell Ripple's XRP over digital asset exchanges and remit the sale proceeds to Ripple, less a fee. See Ex. 40, A. Schwartz Rep. ¶¶ 18, 32-35, 89-104 & Ex. D (setting forth and explaining Ripple's "Programmatic Contracts under which Ripple transfers possessory interests in units of XRP to the counterparty and the counterparty promises to sell those units of XRP to various third parties on one or more digital asset exchanges"); Ex. 43, RPLI_SEC 0507300; Ex. 44, RPLI_SEC 0537727.

**Response:** The SEC does not dispute the assertions contained in ¶ 98.

**Paragraph No. 99:** Ripple undertook no contractual obligations to exchange-based purchasers, and exchange-based purchasers received no rights in Ripple's business or right to demand anything from Ripple. See Ex. 40, A. Schwartz Rep. ¶ 33 ("Ripple either disclaims, or the Programmatic Sales Contracts contain no provision under which Ripple agrees to assume, any post-contractual obligations either to the counterparty or any third-party subsequent purchaser."); id. ¶ 35 ("Further, each of the Programmatic Contracts lacks any express provision or representation . . . that entitles the counterparty, as a result of holding XRP, to share in profits earned by Ripple or to receive profits from any other source[.]").

**Response:** The SEC does not dispute the assertions contained in ¶ 99.

**Paragraph No. 100:** Ripple's programmatic sales contracts contained a provision stating that the contract and any related documents constituted the entire agreement between the parties. See Ex. 40, A. Schwartz Rep. ¶ 34 & Ex. D ("Each of the Programmatic Contracts contains a provision stating that the agreement and any related documents constitute the entire agreement between the parties."); Ex. 43, RPLI_SEC 0507300 at -305, § 13.

**Response:** The SEC disputes the assertions contained in ¶ 100 on the grounds that they are

not supported by citation to evidence which would be admissible. The material cited to support the

facts asserted, the expert report of Alan Schwartz ("Schwartz Report"), is not admissible for the

reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz

admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report. PX

707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22. Schwartz did not even have access to the 1,700

contracts when he prepared his report and does not recall how many he had at that time. PX 571

(Schwartz Tr.) 41:5-18. Nor does Schwartz know who reviewed and categorized the more than

1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4.  Schwartz did not

do anything to verify the work of whoever reviewed and categorized those contracts.  *Id.* at 35:16-

36:4.  Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed,

and the "programmatic contracts" paragraphs of his report cited to support the assertions in ¶ 100

only identify *two* "programmatic" contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX

571 (Schwartz Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on

the ground that the two contracts specifically cited to support the assertions in ¶ 100 do not support

the proposition that *every* Ripple programmatic contract, or the programmatic contracts generally,

contain similar provisions.  The SEC further disputes the assertions on the grounds that they

purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 101:** Ripple's programmatic sales contracts lacked any provision promising
that Ripple would make efforts to increase the price of XRP. See Ex. 40, A. Schwartz Rep. ¶¶ 33, 35
& Ex. D (noting the absence or disclaimer of "any post-contractual obligations either to the
counterparty or any third-party subsequent purchaser" or any "express provision or
representation"); see generally Ex. 43, RPLI_SEC 0507300.

**Response:** The SEC disputes the assertions contained in ¶ 101 on the grounds that they are

not supported by citation to evidence which would be admissible.  The material cited to support the

facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion

to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of

the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10;

34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and

does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz

know who reviewed and categorized the more than 1,550 contracts listed in his report that he did

not personally review.  *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever

reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far

fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz

Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that

the contract specifically cited to support the assertions in ¶ 101 does not support the proposition

that *every* Ripple programmatic contract, or the programmatic contracts generally, lack similar

provisions.  The SEC further disputes the assertions on the grounds that they purport to encompass

agreements or contracts not specifically cited as evidence.

  **Paragraph No. 102:** Ripple's programmatic sales contracts lacked any provision otherwise
imposing post-sale obligations on Ripple. See Ex. 40, A. Schwartz Rep. ¶ 35 & Ex. D (noting that
"each of the Programmatic Contracts lacks any express provision or representation" "pursuant to
which Ripple promises to make efforts to increase the price of XRP"); see generally Ex. 43,
RPLI_SEC 0507300.

  **Response:** The SEC disputes the assertions contained in ¶ 102 on the grounds that they are

not supported by citation to evidence which would be admissible.  The material cited to support the

facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion

to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of

the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10;

34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and

does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz

know who reviewed and categorized the more than 1,550 contracts listed in his report that he did

not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever

reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far

fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz

Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that

the contract specifically cited to support the assertions in ¶ 102 does not support the proposition

that *every* Ripple programmatic contract, or the programmatic contracts generally, lack similar

provisions.  The SEC further disputes the assertions on the grounds that they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 103:** Ripple's programmatic sales contracts lacked any provision representing that the price of XRP would increase. See Ex. 40, A. Schwartz Rep. ¶ 35 & Ex. D (noting that "each of the Programmatic Contracts lacks any express provision or representation" "in which Ripple represents or warrants that the price or value of XRP will increase"); see generally Ex. 43, RPLI_SEC 0507300.

**Response:** The SEC disputes the assertions contained in ¶ 103 on the grounds that they are not supported by citation to evidence which would be admissible.  The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz know who reviewed and categorized the more than 1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that the contract specifically cited to support the assertions in ¶ 103 does not support the proposition that *every* Ripple programmatic contract, or the programmatic contracts generally, lack similar provisions.  The SEC further disputes the assertions on the grounds that they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 104:** Ripple's programmatic sales contracts lacked any provision entitling the counterparty, as a result of holding XRP, to share in profits earned by Ripple or to receive

profits from any other source. See Ex. 40, A. Schwartz Rep. ¶ 35 & Ex. D (noting that "each of the

Programmatic Contracts lacks any express provision or representation" "that entitles the

counterparty, as a result of holding XRP, to share in profits earned by Ripple or to receive profits

from any other source"); see generally Ex. 43, RPLI_SEC 0507300.

**Response:** The SEC disputes the assertions contained in ¶ 104 on the grounds that they are

not supported by citation to evidence which would be admissible.  The material cited to support the

facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion

to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of

the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10;

34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and

does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz

know who reviewed and categorized the more than 1,550 contracts listed in his report that he did

not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever

reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far

fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz

Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that

the contract specifically cited to support the assertions in ¶ 104 does not support the proposition

that *every* Ripple programmatic contract, or the programmatic contracts generally, lack similar

provisions.  The SEC further disputes the assertions on the grounds that they purport to encompass

agreements or contracts not specifically cited as evidence.

2.   **Wholesale Sales**

**Paragraph No. 105:** Ripple has sold XRP through sales to counterparties – typically,
institutional buyers and ODL customers – through arm's-length agreements that did not provide the
purchaser of XRP any right to demand or receive anything from Ripple beyond delivery of the

purchased XRP. See Ex. 40, A. Schwartz Rep. ¶¶ 18-31 & C; see also, e.g., Ex. 45, RPLI_SEC 0668885; Ex. 46, RPLI_SEC 0000517; Ex. 47, RPLI_SEC 0301016; Ex. 48, RPLI_SEC 0609008; Ex. 49, RPLI_SEC 0609563; Ex. 50, RPLI_SEC 0676713. [FN 3 In order to avoid unduly burdening the Court, Defendants are not filing copies of the more than 1,700 relevant contracts in support of the assertion of this paragraph and those that follow. Defendants are, however, prepared to provide copies of the more than 1,700 contracts, and to introduce all such contracts at trial, should the need arise.]

**Response:** The SEC disputes the assertions contained in ¶ 105 on the grounds that they are not supported by citation to evidence which would be admissible. The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report. PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22. Schwartz did not even have access to the 1,700 contracts when he prepared his report and does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18. Nor does Schwartz know who reviewed and categorized the more than 1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4. Schwartz did not do anything to verify the work of whoever reviewed and categorized those contracts. *Id.* at 35:16-36:4. Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed, and the "Sales Contracts" paragraphs of his report cited to support this Local Rule 56.1 statement only identify *six contracts* he personally reviewed. PX 707 ¶¶ 18-31; PX 571 (Schwartz Tr.) 26:20-28:23; 29:22-25; 114:9-18. The SEC further disputes the assertions on the ground that the six contracts specifically cited to support the assertions in ¶ 105 do not support the proposition that *each* of Ripple's sales contracts, or that the sales contracts "typically," lacked certain provisions. The SEC further disputes the assertions on the grounds that they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 106:** The contracts that governed these transactions (whether wholesale or direct) typically included provisions stating that the agreement and any subsequent documents related to an individual transaction (e.g., a Summary of XRP Purchase) constituted the entire agreement between the parties. See Ex. 40, A. Schwartz Rep. ¶ 29 & C ("The governing Sales

47

Contracts typically contain . . . a provision stating that the agreement and any subsequent documents related to an individual transaction (e.g., a Summary of XRP Purchase) constitute the entire agreement between the parties[.]"); Ex. 45, RPLI_SEC 0668885 at -891, § 7(c); Ex. 51, RPLI_SEC 0304341 at -344, § 9.7.

**Response:** The SEC disputes the assertions contained in ¶ 106 on the grounds that they are not supported by citation to evidence which would be admissible.  The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz know who reviewed and categorized the more than 1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that the contracts specifically cited to support the assertions in ¶ 106 do not support the proposition that *every* Ripple programmatic contract, or the programmatic contracts generally, contain similar provisions.  The SEC further disputes the assertions on the grounds that they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 107:** The contracts that governed these transactions typically contained an acknowledgement that the purchased units of XRP did not grant the purchaser any right to make any demand on Ripple. None included any provision entitling the counterparty to share in Ripple's profits as a result of holding XRP or obligating Ripple to undertake efforts to increase the price of XRP. See Ex. 40, A. Schwartz Rep. ¶ 29 & Ex. C ("The governing Sales Contracts typically contain . . . an acknowledgement that the purchased units of XRP do not grant the purchaser any right to make any demand on Ripple[.]"); see also id. ¶ 14 ("[T]he typical sales contract provides that 'all title to and risk of loss related to such XRP passes to the customer.' . . . Rather than assume any post-sale obligation to promote and increase the value of XRP, the typical Ripple sales contract warns the

customer that the future value of XRP depends on 'the continued willingness of market participants to exchange fiat currency for virtual currency.' ") (quoting Ex. 52, RPLI_SEC 0608975 at -977, § 3(c), and Ex. 45, RPLI_SEC 0668885 at -890, § 6(c)(v)); e.g., Ex. 45, RPLI_SEC 0668885 at -890, § 6(c)(v)); Ex. 40, A. Schwartz Rep. ¶ 60 (exemplar provision through which purchaser "'acknowledges and agrees that (i) the Purchased XRP do not represent a right to make any demand on [Ripple]; (ii) [Ripple] has no obligation to redeem or exchange the Purchased XRP for monetary value, goods, services or any other item; and (iii) [Ripple] is not responsible for any use by [the purchaser] or any third party of the Purchased XRP"') (quoting Ex. 45, RPLI_SEC 0668885 at -887, § 3(d)) (last alteration added); Ex. 11, Ferrell Rep. ¶¶ 36, 41.

**Response:** The SEC disputes the assertions contained in ¶ 107 on the grounds that they are not supported by citation to evidence which would be admissible.  The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz know who reviewed and categorized the more than 1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed, and the paragraphs of his report cited to support this assertion only identify *three contracts* he personally reviewed. PX 707 ¶¶ 14, 29, 60; PX 571 (Schwartz Tr.) 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that the contracts specifically cited by Defendants do not support the proposition that *each* of Ripple's sales contracts, or that the sales contracts "typically," contained or lacked these provisions.  The SEC further disputes the assertions on the grounds that they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 108:** Ripple's contracts lacked any express provision or representation that the price or value of XRP will increase. See Ex. 40, A. Schwartz Rep. ¶ 30 & Ex. C ("each of the

Sales Contracts lacks any express provision or representation . . . pursuant to which Ripple promises to make efforts to increase the price of XRP" or "in which Ripple represents or warrants that the price or value of XRP will increase"); see, e.g., Ex. 45, RPLI_SEC 0668885; Ex. 46, RPLI_SEC 0000517; Ex. 47, RPLI_SEC 0301016; Ex. 48, RPLI_SEC 0609008; Ex. 49, RPLI_SEC 0609563; Ex. 50, RPLI_SEC 0676713.

**Response:** The SEC disputes the assertions contained in ¶ 108 on the grounds that they are not supported by citation to evidence which would be admissible.  The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz know who reviewed and categorized the more than 1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that the contracts specifically cited to support the assertions in ¶ 108 do not support the proposition that *every* Ripple programmatic contract, or the programmatic contracts generally, lack similar provisions. The SEC further disputes the assertions on the grounds that they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 109:** A handful of contracts in which Ripple provided custody services imposed an additional obligation on Ripple to safeguard the custodied units of XRP and distribute them in accordance with the counterparty's instructions, but those contracts still conferred no further rights to make other demands on Ripple or to share in Ripple's profits, nor any obligation for Ripple to undertake efforts to increase the price of XRP. See Ex. 40, A. Schwartz Rep. ¶ 31.

**Response:** The SEC disputes the assertions contained in ¶ 109 on the grounds that they are not supported by citation to evidence which would be admissible.  The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz know who reviewed and categorized the more than 1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz Tr.) at 26:20-28:23; 29:22-25; 114:9-18.

### 4. Form of Payment

**Paragraph No. 110:** Ripple has used XRP as a currency to pay for services that it obtains from certain vendors and employees who are willing to accept XRP instead of or in addition to other currencies (such as U.S. dollars). See Ex. 40, A. Schwartz Rep. ¶¶ 36-40 & Ex. E (explaining Ripple's "Services Contracts," each of which "requires a third party to provide various services to Ripple at a price quoted in XRP," and identifying common types); see also, e.g., Ex. 53, RPLI_SEC 0890941; Ex. 54, RPLI_SEC 0898919; Ex. 55, GSR00010953; Ex. 56, RPLI_SEC 0899176; Ex. 57, RPLI_SEC 0899553; Ex. 58, RPLI_SEC 0633406.

**Response:** The SEC disputes the assertions contained in ¶ 110 on the grounds that they are not supported by citation to evidence which would be admissible.  The primary material cited to support the facts asserted, the Schwartz Report, does not contain any opinion that Ripple used XRP as a currency.  PX 707.  Indeed, the Schwartz Report identifies various Ripple contracts which acknowledge that "[v]irtual currency is not legal tender." *Id.* at ¶¶ 65, 120, 127, 164, 182, 198, 211. Moreover, Schwartz conceded that he is *not* "offering the opinion that XRP is a currency" and *not*

"offering any opinion as to whether XRP should be legally classified as a currency." PX 571 (Schwartz Tr.) at 80:14-23.

The SEC further disputes the assertion that Ripple used XRP "as a currency" when compensating employees or paying for services on the grounds that Ripple's practice of using XRP as employee compensation is akin to a company compensating its employees with stock or stock options in order to align company and employee incentives. *See* PX 202 (████ Expert Report) ¶ 9(f) ("Ripple used XRP in a similar manner as companies use stock. Ripple employees receiving XRP were incentivized to work together to increase the price of XRP similar to the incentives of employees at public companies who work to increase company share value."), ¶ 54 ("Companies also use equity or options on equity as a means to deliver substantial compensation to company executives and top managers. Ripple used and managed XRP in an almost identical capacity to pay Ripple executives and founders, as well as other key employees who sold significant amounts of XRP over time. Ripple employees who held XRP were incentivized to work together to increase the price of XRP and minimize downward pressure on the price of XRP in the same way that managers and executives holding company shares work to increase the share value of their company.") (citations omitted). For instance, Garlinghouse received XRP "Awards" that contained "vesting" provisions akin to stock option awards. PX 74 at GARL0000002, 03, 06, PX 75 at GARL00000010, 13. These XRP "Awards" included requirements that XRP's trading price and volume were above a minimum level for the award to vest, and contained Garlinghouse's representation that he was acquiring the awarded XRP "for investment purposes." PX 75 at GARL00000010-11, 16; PX 74 at GARL00000003, 05, 06, 08; PX 81 (Garlinghouse Dep. Tr.) at 345:2-348:2 (Garlinghouse received XRP bonuses for hitting certain business metrics). Likewise, members of Ripple's leadership team and board of directors who planned to trade XRP were required to submit "XRP Trading Plans"

that are similar to public company insider stock trading plans pursuant to SEC Rule 10b5-1.  *See* PX

569 (Ripple Employee and Board Member XRP Trading Plan Instructions); *see also*

https://www.sec.gov/files/10b5-1-fact-sheet.pdf.  Similarly, Ripple had insider trading policies

prohibiting employees from trading XRP using material non-public information, similar to public

company policies prohibiting insider trading of company stock.  SEC 56.1 ¶¶ 526-527 (citing PX

470, PX 471, PX 472).

Regarding Defendants' assertion that Ripple used XRP "as a currency to pay for services,"

the cited exhibits do not support that proposition.  For instance, Defendants' Exhibit 53 (D.E. 624-

53) contains restrictions on how Ripple's counterparty can use the XRP provided by Ripple,

including limiting the counterparty's use of XRP to only "Market Making Services" for at least one

year.  *Id.* at RPLI_SEC 0890954.  In Defendants' Exhibit 54 (D.E. 624-54), Ripple and its

counterparty likewise agree that the counterparty will "strictly" use the provided XRP for "market

maker activities" and that "[v]irtual currency is not legal tender."  *Id.* at RPLI_SEC 0898919, 24.  In

Defendants' Exhibit 56 (D.E. 624-56), Ripple and its counterparty agree that "[v]irtual currency is

not legal tender," and the counterparty "agrees to immediately convert to USD any XRP received

under this Section 4(d) in order to minimize the USD impact resulting from such conversion."  *Id.* at

RPLI_SEC 0899177, 182.  Similarly, in Defendants' Exhibit 57 (D.E. 624-57), Ripple and its

counterparty agree that "[v]irtual currency is not legal tender."  *Id.* at RPLI_SEC 0899555.  Federal

regulations define "currency" as:  "The coin and paper money of the United States or of any other

country that is designated as legal tender."  31 C.F.R. § 1010.100(m).  Defendants do not contend, or

proffer evidence, that any country has designated XRP as legal tender.  Accordingly, these

representations in the above contracts are inconsistent with the notion XRP was used as "currency."

**Paragraph No. 111:** In its market-making contracts, Ripple purchased market-making
services, such as the quoting of bid and offer prices for transactions in currency pairs of XRP and

various fiat currencies, and paid the market makers in XRP. See Ex. 40, A. Schwartz Rep. ¶ 38 & Ex. E (noting that "[t]he market-making services include, but are not limited to, quoting bid and offer prices for transactions in currency pairs of XRP and various fiat currencies," and include payments in the form of grants, loans, and leases of XRP); see Ex. 55, GSR00010953.

**Response:** The SEC disputes the assertions contained in ¶ 111 on the grounds that they are not supported by citation to evidence which would be admissible.  The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz know who reviewed and categorized the more than 1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the grounds that they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 112:** Ripple's services contracts lacked provisions obligating Ripple to take efforts to increase the price of XRP. See Ex. 40, A. Schwartz Rep. ¶ 42 & Ex. E (explaining that "each of the Services Contracts lacks any express provision or representation . . . pursuant to which Ripple promises to make efforts to increase the price of XRP"); id. ¶¶ 105-115 (analysis of exemplar market-making contract); id. ¶¶ 116-134 (analysis of exemplar product incentive contracts); id. ¶¶ 135-143 (analysis of exemplar employee and executive compensation contract); see id. ¶ 129 (quoting agreement in which counterparty "'acknowledges and agrees that (i) XRP do not represent a right to make any demand on [Ripple;] (ii) [Ripple] has no obligation to redeem or exchange XRP for monetary value, goods, services or any other item; and (iii) [Ripple] is not responsible for any use by [counterparty] or any third party of XRP that Ripple has delivered to [counterparty] under this Agreement'") (quoting Ex. 57, RPLI_SEC 0899553, -555, § 14) (last alteration added); see also, e.g., Ex. 53, RPLI_SEC 0890941; Ex. 54, RPLI_SEC 0898919; Ex. 55, GSR00010953; Ex. 56, RPLI_SEC 0899176; Ex. 57, RPLI_SEC 0899553; Ex. 58, RPLI_SEC 0633406.

**Response:** The SEC disputes the assertions contained in ¶ 112 on the grounds that they are not supported by citation to evidence which would be admissible. The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of the 1,700 Ripple contracts categorized in his report. PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10; 34:20-22. Schwartz did not even have access to the 1,700 contracts when he prepared his report and does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18. Nor does Schwartz know who reviewed and categorized the more than 1,550 contracts listed in his report that he did not personally review. *Id.* at 30:1-4. Schwartz did not do anything to verify the work of whoever reviewed and categorized those contracts. *Id.* at 35:16-36:4. Schwartz's report only identifies far fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz Tr.) at 26:20-28:23; 29:22-25; 114:9-18. The SEC further disputes the assertions on the ground that the contracts specifically cited to support the assertions in ¶ 112 do not support the proposition that *every* Ripple programmatic contract lack similar provisions. The SEC further disputes the assertions on the grounds that they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 113:** Ripple's services contracts lacked provisions representing that the price of XRP would increase. See Ex. 40, A. Schwartz Rep. ¶ 42 & Ex. E (explaining that "each of the Services Contracts lacks any express provision or representation . . . in which Ripple represents or warrants that the price or value of XRP will increase"); id. ¶¶ 105-115 (analysis of exemplar market-making contract); id. ¶¶ 116-134 (analysis of exemplar product incentive contracts); id. ¶¶ 135-143 (analysis of exemplar employee and executive compensation contract); see also, e.g., Ex. 53, RPLI_SEC 0890941; Ex. 54, RPLI_SEC 0898919; Ex. 55, GSR00010953; Ex. 56, RPLI_SEC 0899176; Ex. 57, RPLI_SEC 0899553; Ex. 58, RPLI_SEC 0633406.

**Response:** The SEC disputes the assertions contained in ¶ 113 on the grounds that they are not supported by citation to evidence which would be admissible. The material cited to support the facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion

55

to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of

the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10;

34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and

does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz

know who reviewed and categorized the more than 1,550 contracts listed in his report that he did

not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever

reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far

fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz

Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that

the contracts specifically cited to support the assertions in ¶ 113 do not support the proposition that

*every* Ripple programmatic contract lack similar provisions.  The SEC further disputes the assertions

on the grounds that they purport to encompass agreements or contracts not specifically cited as

evidence.

>   **Paragraph No. 114:** Ripple's services contracts lacked provisions entitling the counterparty
> to share in profits earned by Ripple or to receive profits from any other source. See Ex. 40, A.
> Schwartz Rep. ¶ 42 & Ex. E (explaining that "each of the Services Contracts lacks any express
> provision or representation . . . that entitles the counterparty, as a result of holding XRP, to share in
> profits earned by Ripple or to receive profits from any other source"); id. ¶¶ 105-115 (analysis of
> exemplar market-making contract); id. ¶¶ 116-134 (analysis of exemplar product incentive contracts);
> id. ¶¶ 135-143 (analysis of exemplar employee and executive compensation contract); see also, e.g.,
> Ex. 53, RPLI_SEC 0890941; Ex. 54, RPLI_SEC 0898919; Ex. 55, GSR00010953; Ex. 56,
> RPLI_SEC 0899176; Ex. 57, RPLI_SEC 0899553; Ex. 58, RPLI_SEC 0633406.

>   **Response:** The SEC disputes the assertions contained in ¶ 114 on the grounds that they are

not supported by citation to evidence which would be admissible.  The material cited to support the

facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion

to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of

the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10;

34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and

does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz

know who reviewed and categorized the more than 1,550 contracts listed in his report that he did

not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever

reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far

fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz

Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the ground that

the contracts specifically cited to support the assertions in ¶ 114 do not support the proposition that

*every* Ripple programmatic contract lack similar provisions.  The SEC further disputes the assertions

on the grounds that they purport to encompass agreements or contracts not specifically cited as

evidence.

### 5.      Ripple's Other Contracts

**Paragraph No. 115:** Examples of other contracts by which Ripple distributed its XRP
include Master Hosted Services Agreements, Loans and Promissory Notes, Custody Agreements,
RippleWorks Contracts, Settlement Agreements, Xpring Contracts, and Joint Venture Contracts. See
generally Ex. 40, A. Schwartz Rep. ¶¶ 18, 144-218; Ex. 59, RPLI_SEC 0272291; Ex. 60, RPLI_SEC
0239684; Ex. 61, MONEYGRAM_SEC_0005812; Ex. 62, RPLI_SEC 0000906; Ex. 63, RPLI_SEC
0895307; Ex. 64, RPLI_SEC 0314261; Ex. 65, RPLI_SEC 0265201; Ex. 66, RPLI_SEC 0576504;
Ex. 67, RPLI_SEC 0863819; Ex. 68, RPLI_SEC 0609230; Ex. 69, RPLI_SEC 0609222; Ex. 70,
RPLI_SEC 0443186; Ex. 71, RPLI_SEC 0991609; Ex. 72, RPLI_SEC 0796371; Ex. 73, RPLI_SEC
0266000.

**Response:** The SEC does not dispute the assertions contained in ¶ 115.

**Paragraph No. 116:** Some of Ripple's contracts provide that a buyer may obtain a refund
from Ripple as a remedy, but only if the sale does not occur. See Ex. 40, A. Schwartz Rep. ¶ 14.

**Response:** The SEC disputes the assertions contained in ¶ 116 on the grounds that they are

not supported by citation to evidence which would be admissible.  The material cited to support the

facts asserted, the Schwartz Report, is not admissible for the reasons set forth in the SEC's Motion

to Exclude, including: In preparing his report, Schwartz admits to having reviewed *fewer than 150* of

the 1,700 Ripple contracts categorized in his report.  PX 707 ¶ 7; PX 571 (Schwartz Tr.) 26:8-10;

34:20-22.  Schwartz did not even have access to the 1,700 contracts when he prepared his report and

does not recall how many he had at that time. PX 571 (Schwartz Tr.) 41:5-18.  Nor does Schwartz

know who reviewed and categorized the more than 1,550 contracts listed in his report that he did

not personally review. *Id.* at 30:1-4.  Schwartz did not do anything to verify the work of whoever

reviewed and categorized those contracts.  *Id.* at 35:16-36:4.  Schwartz's report only identifies far

fewer—*less than 40*—contracts he personally reviewed. PX 707 ¶¶ 32-34, 89-104; PX 571 (Schwartz

Tr.) at 26:20-28:23; 29:22-25; 114:9-18.  The SEC further disputes the assertions on the grounds that

they purport to encompass agreements or contracts not specifically cited as evidence.

**Paragraph No. 117:** None of Ripple's contracts granted post-sale rights to recipients as against Ripple or imposed post-sale obligations on Ripple to act for the benefit of those recipients. See Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answers to RFA Nos. 57-65 (admitting that XRP holders have no right to demand from Ripple, and Ripple has no obligation to give to XRP holders, any form of money, property, or dividends, or any participation rights in Ripple's business); Ex. 40, A. Schwartz Rep. ¶ 11 ("[T]he contracts I have reviewed do not obligate Ripple to perform any relevant post-sale actions at all.").

**Response:** The SEC does not dispute the assertions contained in ¶ 117.

**Paragraph No. 118:** Nothing in Ripple's contracts requires Ripple to pay, or entitles an XRP holder to demand, any share of Ripple's revenue, profits, or dividends, or "any other payment or consideration" from Ripple or any other common pool. See Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answers to RFA Nos. 57-72, 90.

**Response:** The SEC does not dispute the assertions contained in ¶ 118.

**Paragraph No. 119:** Ripple's equity can increase in value even as XRP decreases in price, such that XRP holders experience a loss when Ripple turns a profit. See Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 32 (admitting "that some XRP holders may experience losses on the fair market value of their XRP holdings during periods when Ripple has claimed positive income").

**Response:** The SEC disputes the assertion in ¶ 119 on the ground that the cited reference

does not support the assertion because Defendants' Exhibit 23, RFA No. 32, makes no reference to

"Ripple's equity" and refers instead to Ripple's claimed "positive net income."  The SEC further

notes that Ripple's equity value "is dominated by [its] XRP holdings," PX 698, and investors realized

that the price of XRP drives the "sotp [sum of the parts] valuation of ripple." PX 697.  For example,

one of the lead investors in Ripple's Series C equity funding round premised its investment decision

primarily on the basis of Ripple's large holding of XRP, PX 695 at NY-9875_T_00000002-4, and the

lead investor's analysis of Ripple's book value was based largely on the price of XRP. PX 695 at NY-

9875_T_00000004.

**Paragraph No. 120:** The price of XRP can go up when Ripple is unprofitable. See Ex. 23,
Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 31.

**Response:** The SEC disputes the assertion in ¶ 120 on the ground that the cited reference

does not support the assertion because Defendants' Exhibit 23, RFA No. 31, makes no reference to

Ripple being "unprofitable" and instead relates to "Ripple reduc[ing] efforts in business endeavors

related to XRP."

**Paragraph No. 121:** Ripple can experience losses or decreases in equity while XRP increases
in price and XRP holders realize gains. See Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs.
for Admis., SEC Answer to RFA No. 34 (admitting "that some XRP holders may experience gains
on the value of their XRP holdings during periods when Ripple experienced negative income").

**Response:** The SEC disputes the assertion in ¶ 121 on the ground that the cited reference

does not support the assertion because Defendants' Exhibit 23, RFA No. 34, makes no reference to

Ripple's "equity" and instead relates to Ripple's "net income."  The SEC further disputes the

assertion on the ground that Ripple's equity value "is dominated by [its] XRP holdings," PX 698,

and investors realized that the price of XRP drives the "sotp [sum of the parts] valuation of ripple."

PX 697.  As a result, XRP price increases are likely to increase the value of Ripple's equity.

**Paragraph No. 122:** The price of XRP can go down when Ripple turns a profit. See Ex. 23,
Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 33.

**Response:** The SEC disputes the assertion in ¶ 122 on the ground that the cited reference

does not support the assertion because Defendants' Exhibit 23, RFA No. 33, makes no reference to

Ripple "turn[ing] a profit" and instead relates to "the fair market value of the equity on Ripple's

balance sheet."

**Paragraph No. 123:** Since at least 2018, the price of XRP has correlated more closely with
the prices of Bitcoin and Ether – that is, the cryptocurrency market as a whole – than with
any action or statement of Ripple. XRP owners' "profits" (if any) thus result primarily from market
forces of supply and demand. See Ex. 11, Ferrell Rep. ¶¶ 90-106 (showing that variations in long-run
XRP price return can be explained by exogenous cryptocurrency market factors); see also Ex. 74,
Amended Expert Report of ███████████ ¶ 121 & Fig. 40 (Oct. 6, 2021) (conceding that, since at
least mid-2018, broader cryptocurrency trends explain more than 50% of XRP returns, and that, in
the final two full calendar quarters before the SEC filed this action (Q2 and Q3 2020), returns for
Bitcoin and Ether "can explain as much as almost 90% of XRP returns"). [FN 4 For the reasons
Defendants have explained, the Court should exclude ██████ testimony (as well as that of the SEC's
other experts). See ECF No. 547. Defendants cite ██████ reports only for the purpose of showing
that the facts described herein are undisputed, and they adhere to their previously expressed
objections to the admissibility of his opinions]

**Response:** The SEC disputes the assertions in ¶ 123 on the grounds that the cited

evidence does not support the assertions and because Ferrell's opinions should be excluded for the

reasons set forth in the SEC's Motion to Exclude.

The cited evidence does not support the assertions in ¶ 123 because no expert witness in

this case, including the cited experts—████ for the SEC, and Ferrell for Defendants—has

undertaken an analysis of *every* "action or statement of Ripple" to determine whether and to what

extent it was correlated with XRP price.  *See* PX 715 (Ferrell Report) ¶¶ 90-106 (analyzing the

correlation between XRP price returns and the price returns of various digital assets, including

Bitcoin and Ether); PX 500 (████ Report) ¶¶ 44-109 (analyzing the correlation between XRP price

returns and certain news that Ripple identified as important by publicizing it).  Without having

undertaken such analysis, no expert has a basis to determine whether XRP's prices are correlated

"more closely with" (i) "*any* action or statement of Ripple" (emphasis added) or (ii) "the prices of

Bitcoin and Ether."

Ferrell's opinion that "variation in long-run XRP price return can be explained by exogenous cryptocurrency market factors," *see* PX 715 (Ferrell Rep. ¶ 90), should be excluded because it is unreliable, for the reasons explained in the SEC's Motion to Exclude and ██████ rebuttal report, PX 525.  Ferrell's opinion also contradicts—rather than supports— ¶ 123's assertions regarding the correlation between XRP price and the price of Bitcoin and Ether because Ferrell's analysis for his Estimation Period 2 shows a *negative* correlation between XRP price returns and Bitcoin price returns and a statistically insignificant correlation between XRP price returns and Ether price returns. *See* PX 715 (Ferrell Rep.), Ex. 5.

Defendants' proffered evidence also establishes that XRP prices react to news about Ripple, as Defendants assert it is undisputed that, as a result of the SEC filing this case *against Ripple*, "[t]he price of XRP declined by approximately 70% in the days following the filing of the initial complaint, wiping out approximately $15 billion in market value." Defendants' Statement of Undisputed Material Facts (D.E. 623) ¶ 85 (citing CoinMarketCap data).

Defendants' citation to the ████ Report is unsupported by the text of the Report. ████ never opined that "broader cryptocurrency trends explain more than 50% of XRP returns" from mid-2018 forward because ████ never opined as to the explanatory value of "cryptocurrency trends" for any time period—the phrase never even appears within the ████ Report. PX 500 (████ Report). Further, ████ Report ¶ 121 & accompanying Figure 40 contradict—rather than support—the assertions of ¶ 123:

> [W]hen taken together, ETH returns and BTC returns can explain
> XRP returns in varying degrees over time. The adjusted R-squared of
> Model 5, plotted in Figure 40, illustrates this point. The R-squared
> measures how well a given set of control variables can explain the
> independent variable. An R-squared of 1 means that the control
> variables, taken together, can explain 100% of the variation in XRP
> returns. As illustrated in Figure 40, while BTC and ETH returns can

explain as much as almost 90% of XRP returns during Q2 and Q3 of 2020, they provide little explanatory power for XRP returns before late 2017. *On average, these two factors explain only about 40% of the variation in XRP returns.*

PX 500 (███ Report) ¶ 121 (emphasis added).

The cited portions of the ███ Report reflect ███ analysis of the correlation between XRP returns and the returns of other digital assets, measured on a daily basis. When ███ undertook an analysis to quantify the long-term impact of certain Ripple actions on XRP price, in his Supplemental Report that, he concluded that, in a period of over 2,000 days, without the abnormal returns associated with just 23 days of Ripple news, XRP's price would not have exceeded two cents. PX 505 (███ Supplemental Report) ¶ 9 & Figure 1.

### E.     The SEC's Positions

**Paragraph No. 124:** The SEC does not contend that XRP is a security on any basis other than it is an "investment contract." See Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answers to RFA Nos. 1-19.

**Response:** The SEC disputes the assertion contained in ¶ 124 on the ground that the SEC contends that Defendants' offers and sales of XRP constituted offers and sales of securities. SEC Am. Compl. (D.E. 46) at 12 ("Ripple Made Unregistered Offers and Sales in Connection with XRP Distributions"). The SEC does not dispute that it contends Defendants' offers and sales of XRP were securities because they were investment contracts.

**Paragraph No. 125:** When asked in discovery, the only contractual provisions the SEC identified to support (which appear in only a handful of Ripple's contracts) were (i) "lock ups and other sales restrictions" that bind the buyer in certain of Ripple's contracts with wholesale purchasers, and (ii) discounts in some of Ripple's wholesale contracts and contracts with digital asset platforms. E.g., Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 11, 13, 19-20, 22, 31.

**Response:** The SEC disputes the assertions contained in ¶ 125 on the grounds that the phrase "contractual provisions the SEC identified to support...were" is vague and ambiguous as

62

Defendants do not specify the proposition(s) for which the SEC purportedly was offering support through the cited references.

**Paragraph No. 126:** The SEC bases its claims instead on a list of public statements – most of which occurred in 2017, and the last of which occurred on August 3, 2020 (the date the Q2 2020 XRP Markets Report was published). Specifically, the SEC claims that Ripple publicly reported "it would control and restrict the timing and volume of Ripple's own XRP distributions and sales by placing a portion of its XRP into cryptographically-secured escrow contracts," Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 10; "its contracts with wholesale purchasers contained lock ups and other sales restrictions," id. at 11; "its efforts to create liquidity and demand for XRP by selling XRP directly to institutional investors and making it easier for these purchasers to buy, sell, and trade XRP," id. at 12, and "by partnering with digital asset trading platforms," id. at 13; and "its efforts to develop a use for XRP through its On-Demand Liquidity Product," id. at 14, and "its xPring initiative," id. at 15. The SEC also cites Ripple's statements that, "according to rules of the XRP Ledger, no additional XRP could ever be created or issued and as a result, an increase in demand for XRP would lead to an increase in the value and price of XRP," id. at 10, and, in Q2 2020, that it "had begun purchasing XRP in the secondary market to ensure 'a healthy, orderly XRP market,'" id. at 12. It contends that these statements, along with Ripple's "contracts with wholesale purchasers, digital asset trading platforms, and market makers[,] led XRP holders to believe that they would be able to sell XRP at a profit." Id. at 14.

**Response:** The SEC disputes the assertions contained in ¶ 126 on the ground that the purported "list of public statements" referenced is incomplete, and refers the Court to the public statements identified in Sections C, D, E, and M of the SEC 56.1 as well as PX 500 to PX 509. The SEC further disputes the assertions on the ground that the SEC's claims against Defendants are based on evidence other than Defendants' public statements, including Defendants' efforts to create a market for XRP and to sell or distribute XRP into that market, as outlined in SEC 56.1 Statement Sections B, C, F.

**Paragraph No. 127:** The SEC has alleged that Ripple deposited the funds it obtained from its own sales of XRP into specific bank accounts it owned and thus, according to the SEC, "pooled" those funds. See Ex. 39, Pl.'s Suppl. Resps. & Objs. to Ripple's Interrogs. at 43-44.

**Response:** The SEC does not dispute the assertions contained in ¶ 127.

## F.   Christian Larsen

**Paragraph No. 128:** Larsen is the current Executive Chairman, and former CEO, of Ripple. See Ex. 8, Larsen Tr. 49:9-18, 57:16-24; Ex. 1, D. Schwartz Tr. 27:10-14.

**Response:** The SEC does not dispute the assertions contained in ¶ 128.

**Paragraph No. 129:** On November 1, 2016, Ripple announced that Larsen had decided to transition from his operational role as CEO of Ripple to Executive Chairman of the Board of Directors to spend more time with his family, and that Brad Garlinghouse would be CEO effective January 1, 2017. See Ex. 75, RPLI_SEC 0042736; Ex. 76, Dep. Tr. of Bradley Garlinghouse ("Garlinghouse Tr.") 25:16-21.

**Response:** The SEC does not dispute the assertions contained in ¶ 129.

**Paragraph No. 130:** When the XRP Ledger was launched, a fixed supply of 100 billion of the token native to the XRP Ledger – what became known as XRP – was automatically generated. See Ex. 1, D. Schwartz Tr. 25:23-26:7.

**Response:** The SEC does not dispute the assertions contained in ¶ 130.

**Paragraph No. 131:** Ripple was granted 80 billion XRP, and McCaleb, Larsen, and Britto retained the other 20 billion of XRP. See Ex. 8, Larsen Tr. 165:24-166:11; Ex. 14, Larsen Decl. ¶¶ 2-3.

**Response:** The SEC does not dispute the assertions contained in ¶ 131.

**Paragraph No. 132:** Larsen retained approximately 9 billion XRP. See Ex. 8, Larsen Tr. 66:14-20; Ex. 14, Larsen Decl. ¶ 2.

**Response:** The SEC does not dispute the assertions contained in ¶ 132.

**Paragraph No. 133:** McCaleb retained approximately 9 billion XRP. See Ex. 14, Larsen Decl. ¶ 3.

**Response:** The SEC does not dispute the assertions contained in ¶ 133.

**Paragraph No. 134:** Britto retained approximately 2 billion XRP. See Ex. 14, Larsen Decl. ¶ 3.

**Response:** The SEC does not dispute the assertions contained in ¶ 134.

**Paragraph No. 135:** Larsen, McCaleb, and Britto retained this amount of XRP based on their understanding that bitcoin founder Satoshi Nakamoto also kept approximately 20% of the bitcoin in existence. See Ex. 8, Larsen Tr. 67:18-68:14.

**Response:** The SEC does not dispute the assertions contained in ¶ 135.

**G.    Bradley Garlinghouse**

**Paragraph No. 136:** Garlinghouse graduated from the University of Kansas with a Bachelor of Arts in Economics in 1994, and then attended Harvard Business School. See Ex. 77, In re Ripple

Labs Inc., NY-09875, Bradley Garlinghouse Testimony Tr. ("Garlinghouse SEC Test.") 12:5-9; Ex. 76, Garlinghouse Tr. 104:25.

**Response:** The SEC does not dispute the assertions contained in ¶ 136.

**Paragraph No. 137:** After graduating with a Master's in Business Administration from Harvard Business School in 1997, Garlinghouse was employed by several leading technology companies, including Yahoo! and AOL. Garlinghouse's roles at these companies focused on business strategy. At Yahoo!, Garlinghouse was the general manager of the group responsible for Yahoo!'s suite of communication projects, which included Yahoo! Mail and Yahoo! Messenger. See Ex. 77, Garlinghouse SEC Test. 13:16-14:4. At AOL, Garlinghouse was president of consumer applications and was responsible for product strategy and development. Id. 16:5-23.

**Response:** The SEC disputes the assertions contained in the first and second sentences of

¶ 137 on the grounds that Defendants do not cite any evidence to support the assertions.  The SEC

does not dispute the assertions contained in the third or fourth sentences of ¶ 137.

**Paragraph No. 138:** Garlinghouse was not involved in the creation of the XRP Ledger or its native currency (XRP), the founding of Ripple, the transfer of XRP to Ripple, or Ripple's early (i.e., before 2015) distributions and sales of XRP. See Ex. 17, Garlinghouse Decl. ¶ 2. Garlinghouse had not worked in the digital asset industry before interviewing for a position at Ripple in early 2015. See Ex. 77, Garlinghouse SEC Test. 27:12-21.

**Response:** The SEC does not dispute the assertions contained in ¶ 138.

**Paragraph No. 139:** After learning of the open Chief Operating Officer ("COO") position at Ripple from a recruiter, Garlinghouse met with Larsen, who at the time was Ripple's CEO. See Ex. 76, Garlinghouse Tr. 32:5-14; Ex. 77, Garlinghouse SEC Test. 25:2-6, 25:12-21.

**Response:** The SEC does not dispute the assertions contained in ¶ 139.

**Paragraph No. 140:** Ripple hired Garlinghouse as COO in April 2015. See Am. Compl. ¶ 17, ECF No. 46; Ex. 76, Garlinghouse Tr. 25:16-26:2.

**Response:** The SEC does not dispute the assertions contained in ¶ 140.

**Paragraph No. 141:** By the time Garlinghouse joined Ripple in April 2015, the XRP Ledger had been completed, see Am. Compl. ¶ 45, XRP was being used as a means of payment and a bridge currency, see Ex. 1, D. Schwartz Tr. 35:16-20, 37:5-15, 39:17-22, and XRP's market cap exceeded $270 million, see CoinMarketCap, Historical Snapshot – 12 April 2015, https://perma.cc/3Z8J-AW7J (last visited Sept. 12, 2022).

**Response:** The SEC disputes the assertion contained in ¶ 141 that XRP was used as a

"bridge currency" on the grounds that XRP is not and has never been a currency or used as a

currency or as a means of payment.  *See infra* SEC Counter 56.1 ¶¶ 289-297; SEC 56.1 ¶¶ 84-92, 719.

The SEC disputes the assertion that "the XRP Ledger had been completed" as of April 2015 on the

ground that Defendants cite solely to an allegation contained in a pleading, and not to any evidence,

to support this assertion.  The SEC does not dispute the remaining assertions contained in ¶ 141.

**Paragraph No. 142:** As COO, Garlinghouse was responsible for Ripple's operating strategy,
and he worked on building a commercial product using XRP to enhance cross-border payments for
financial institutions. See Ex. 77, Garlinghouse SEC Test. 34:9-15, 75:1-76:7, 77:11-20, 82:6-15.

**Response:** The SEC does not dispute the assertions contained in ¶ 142.

**Paragraph No. 143:** Garlinghouse became CEO of Ripple in January 2017 and remains in
that position today. See Am. Compl. ¶ 17.

**Response:** The SEC does not dispute the assertions contained in ¶ 143.

**Paragraph No. 144:** As CEO, Garlinghouse's duties include:
a. Managing Ripple's senior employees, see Ex. 77, Garlinghouse SEC Test. 33:13- 19;
b. Overseeing the development of Ripple's products, including ODL, which allows
customers to settle cross-border transactions in nearly real time using XRP, see Ex. 77,
Garlinghouse SEC Test. 36:10-14, 98:5-21; Ex. 9, Birla Tr. 20:18-21:17;
c. Developing and managing Ripple's strategic outlook, see Ex. 77, Garlinghouse SEC Test.
36:10-14;
d. Communicating with Ripple's board of directors and shareholders, see Ex. 77,
Garlinghouse SEC Test. 37:13-38:8, 38:21-39:1; Ex. 76, Garlinghouse Tr. 267:14-17;
e. Meeting with global regulators and central bankers about digital asset regulation and
discussing with them Ripple and its products, see Ex.77, Garlinghouse SEC Test. 43:20-44:1; Ex. 22,
Zagone Tr. 254:20-255:17; and
f. Meeting with potential investors in Ripple equity and helping to raise funds for Ripple's
Series B and Series C rounds, see Ex. 76, Garlinghouse Tr. 284:20-21; Ex. 77, Garlinghouse SEC
Test. 36:15-37:2; ECF No. 462 ¶ 78.

**Response:** The SEC disputes the assertions contained in ¶ 144 on the grounds that

Defendants omit from their description of Garlinghouse's duties as CEO the following: (1) directing

Ripple's efforts to distribute and sell XRP (e.g., SEC 56.1 ¶¶ 866, 1185-1200); (2) directing Ripple's

promotional efforts in connection with XRP (e.g., SEC 56.1 ¶¶ 401-420, 866); (3) directing Ripple's

efforts to market XRP as an investment in Ripple's efforts (e.g., SEC 56.1 ¶¶ 467-470, 866, 1146);

and (4) directing Ripple's efforts to create and maintain a liquid trading markets for XRP (e.g., SEC 56.1 ¶¶ 308-310, 312, 319, 326, 481, 506, 561, 866).

**Paragraph No. 145:** As COO and CEO, Garlinghouse has received compensation for his services from Ripple in various forms, including salary, Ripple stock options, and XRP grants. See Ex. 78, RPLI_02156366 (April 2015 Employment Agreement); Ex. 79, RPLI_SEC 0259758 (December 2016 XRP Unit Bonus Award); Ex. 80, RPLI_01708774 (May 2019 XRP Ledger Address Award).

**Response:** The SEC does not dispute the assertions contained in ¶ 145.

## H.   Digital Asset Exchanges

### 1.   Operation of Digital Asset Exchanges

**Paragraph No. 146:** A cryptocurrency exchange is a platform that facilitates transactions between potential buyers and sellers of virtual currencies. See Ex. 41, Yadav Rep. ¶ 57 ("Cryptocurrency exchanges permit users to buy and sell various cryptocurrencies and other digital tokens as well as to engage in a variety of strategies and transactions relating to crypto assets (e.g., derivatives, mining, yield farming).").

**Response:** The SEC disputes the assertions contained in ¶ 146 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

Finally, the SEC disputes the reference to "currencies." *See infra* SEC Counter 56.1 ¶¶ 289-97; SEC

56.1 ¶¶ 84-92, 719.

**Paragraph No. 147:** Since 2017, the majority of offers to sell and sales in the virtual currency markets have occurred on cryptocurrency exchanges. See Ex. 25, ▮ Tr. 28:8-21 ("Most of the trading volume in digital assets to date has been performed on what they call centralized exchanges."); id. 128:23-129:4 ("I believe 2017 was when this whole thing was the first kind of big explosion in activity").

**Response:** The SEC disputes the assertions contained in ¶ 147 on the ground that the cited

evidence does not support the assertion that "offers to sell" digital assets occurred on exchanges.

Further, the SEC disputes the assertions on the ground that the cited evidence does not support

Defendants' conclusory assertion that offers and sales of digital assets occurred on cryptocurrency

exchanges.  Finally, the SEC disputes the reference to "currency." *See infra* SEC Counter 56.1 ¶¶

289-97; SEC 56.1 ¶¶ 84-92, 719.

**Paragraph No. 148:** Cryptocurrency exchanges mirror the role, structure, and operating
principles of traditional exchanges, such as the Chicago Mercantile Exchange and the London Stock
Exchange. See Ex. 41, Yadav Rep. ¶¶ 27, 34 (with respect to traditional exchanges, "the CME
stipulates that all trading must occur on or through its trading facilities and in compliance with its
rulebook to be acceptable"); id. ¶ 41 (describing the London Stock Exchange); id. ¶ 58
("Cryptocurrency exchanges resemble traditional financial exchanges in important ways."); id. ¶ 59
(with respect to cryptocurrency exchanges, "[u]sers that wish to transact on an exchange are
generally required to agree to a set of pre-agreed set of rules and trading standards when they
apply").

**Response:** The SEC disputes the assertions contained in ¶ 148 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

Further, the SEC disputes the assertions on the grounds that crypto exchanges do not "mirror the

role, structure, and operating principles of traditional exchanges."  First, traditional exchanges must

comply with a number of requirements of the Securities Exchange Act of 1934 ("Exchange Act")

and SEC rules including rules governing fraud, manipulation, and dissemination of data.  15 U.S.C. §

78f, 78k-1; 70 Fed. Reg. 45529 (Jun. 29, 2005) (Regulation NMS).  Second, traditional exchanges are

self-regulatory organizations ("SROs"), 15 U.S.C. § 78c(a)(26).  As such, traditional exchanges are

required to have rulebooks and enforce their own rules on their members and persons associated

with their members, subject to SEC appellate review. 15 U.S.C. § 78f(b); 78s.  All SRO rulebooks

must be filed with the SEC and most changes to those rulebooks must be approved by the SEC.  15

U.S.C. §78s.  The SEC can bring an enforcement action against an SRO for failing to follow or

enforce its own rules.  15 U.S.C. §78s(g).  Third, membership in traditional exchanges is limited to

registered broker-dealers. 15 U.S.C. § 78f(c).  Registered broker-dealers have a number of

obligations, including capital requirements (17 CFR § 240.15c3-1), an obligation to safeguard

customer assets and securities (17 CFR § 240.15c3-3), record keeping obligations (15 U.S.C. §78q-1),

best execution obligations (Rule Regulation NMS, Rule 605), obligations to make disclosures about

order routing and handling (Regulation NMS, Rule 606), and obligations to address conflicts (17

CFR 240 (Regulation Best Interest)). *See infra* SEC Counter 56.1 ¶¶ 364-76.

**Paragraph No. 149:** Like traditional exchanges, such as commodities exchanges,
cryptocurrency exchanges typically operate as centralized forums for market participants to transact
pursuant to rules set by the exchange through its user agreements. See Ex. 41, Yadav Rep. ¶¶ 30, 59
("[C]ryptocurrency exchanges tend to . . . establish a core set of rules and standards for their
particular market.").

**Response:** The SEC disputes the assertions contained in ¶ 149 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

Moreover, the SEC disputes the assertions on the grounds that traditional exchanges, unlike crypto

exchanges, are SROs, 15 U.S.C. § 78c(a)(26), which are required to have rulebooks and enforce their

own rules on their members and persons associated with their members, subject to SEC appellate

review. 15 U.S.C. § 78f(b); 78s. All SRO rulebooks must be filed with the SEC and most changes to

those rulebooks must be approved by the SEC. 15 U.S.C. §78s. The SEC can bring an enforcement

action against an SRO for failing to follow or enforce its own rules. 15 U.S.C. §78s(g). *See infra* SEC

Counter 56.1 ¶¶ 364-77.

**Paragraph No. 150:** Cryptocurrency exchanges' rules include the mechanics and rules for
account creation, order placement, bid/offer matching, finality, and dispute resolution. See Ex. 41,
Yadav Rep. ¶¶ 59-60, 63, 65, 90.

**Response:** The SEC disputes the assertions contained in ¶ 150 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

**Paragraph No. 151:** Cryptocurrency exchanges and traditional exchanges provide predictability and certainty to users transacting on common and accepted terms. See Ex. 41, Yadav Rep. ¶¶ 30, 59 ("[O]ne of the key benefits of cryptocurrency exchanges is that they allow for trading with predictability, confidence, and certainty of outcome.").

**Response:** The SEC disputes the assertions contained in ¶ 151 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.  The SEC further disputes the assertions on the grounds that the terms "predictability" and "certainty" are vague and ambiguous.  The SEC further disputes the assertions on the grounds that trading on crypto exchanges is subject to fraud and manipulation.  PX 570 (Forbes.com, More than Half Of All Bitcoin Trades Are Fake (Aug. 26, 2022)); PX 568 (SEC Release re: Bats BZX Exchange, Inc. (July 26, 2018)) at 12-41.

**Paragraph No. 152:** Cryptocurrency exchange rules, like those of more traditional exchanges, govern the visibility, revocability, and acceptance of offers, in addition to the finality of trades. See Ex. 41, Yadav Rep. ¶¶ 24-48 (describing traditional exchanges); id. ¶¶ 57-66 (providing an overview of cryptocurrency exchanges, noting "[m]any cryptocurrency exchanges . . . contractually stipulate rules-of-the-road for order submission, matching, trade execution and settlement"); id. ¶ 70.

**Response:** The SEC disputes the assertions contained in ¶ 152 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. Moreover, the SEC disputes the assertions on the grounds that traditional exchanges, unlike crypto exchanges, are SROs, 15 U.S.C. § 78c(a)(26), which are required to have rulebooks and enforce their

own rules on their members and persons associated with their members, subject to SEC appellate review. 15 U.S.C. § 78f(b); 78s.  All SRO rulebooks must be filed with the SEC and most changes to those rulebooks must be approved by the SEC.  15 U.S.C. §78s.  The SEC can bring an enforcement action against an SRO for failing to follow or enforce its own rules.  15 U.S.C. §78s(g).  The SEC further disputes the assertions on the ground that the cited reference from the Yadav Report that "[m]any cryptocurrency exchanges . . . contractually stipulate rules-of-the-road for order submission, matching, trade execution and settlement" does not support the assertion. *See infra* SEC Counter 56.1 ¶¶ 364-77.

**Paragraph No. 153:** Cryptocurrency exchange rules are typically laid out in user agreements or other publicly available documentation about the exchange. See, e.g., Ex. 41, Yadav Rep. ¶ 60 (describing key elements of the Binance user agreement); id. ¶ 61 (describing elements of the Ascendex (BitMax) user agreement); id. ¶ 63 (examples of placing orders on Korbit and Binance); id. ¶ 64 (describing when orders matched); id. ¶ 65 (describing when orders are final); id. ¶ 90 (noting the user agreement sets out the process for disputes).

**Response:** The SEC disputes the assertions contained in ¶ 153 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

**Paragraph No. 154:** Most exchanges enable users from around the world to submit orders, often facilitating this cross-border trading by locating offices and computer servers globally. See Ex. 41, Yadav Rep. ¶ 41 (describing the London Stock Exchange's global outreach); id. ¶¶ 100, 102.

**Response:** The SEC disputes the assertions contained in ¶ 154 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.  The SEC further disputes the assertions on the ground that the cited evidence, relating to the London Stock Exchange, does not support the assertion relating to "exchanges" generally, including crypto

71

exchanges, because, as more fully explained in the SEC's Response to ¶ 148, crypto exchanges differ from traditional exchanges in several significant ways.  *See infra* SEC Counter 56.1 ¶¶ 364-77.

**Paragraph No. 155:** While an exchange may have servers in multiple locations, it is subject to the oversight of its host country. See Ex. 41, Yadav Rep. ¶¶ 40-41. For example, while the London Stock Exchange has local offices, including in the United States, the London Stock Exchange is governed by the rules of the United Kingdom, not the United States. See id. ¶ 40 ("[E]ven though [traditional and cryptocurrency exchanges] host and conduct extensive business on a cross-border basis, they remain subject to a domestic home base and regulatory system.").

**Response:** The SEC disputes the assertions contained in ¶ 155 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.  The SEC further disputes the assertions on the ground that the cited evidence, relating to the London Stock Exchange, does not support the assertion relating to "exchanges" generally, including crypto exchanges, because crypto exchanges differ from traditional exchanges in several significant ways. For example, "[i]n many instances, these platforms are operating outside of a [foreign] jurisdiction's regulatory perimeter, or are not in compliance with applicable regulatory requirements," and have essentially formed "a shadow crypto financial system." PX 636 (Feb. 2022 publication by Financial Stability Board) at 18; PX 635 (May 2022 publication by Monetary and Economic Department of the Bank for International Settlements) at 2.  Indeed, "many countries do not have conduct or prudential regulations in place that encompass the activities of crypto asset service providers," and "[t]he absence of effective supervision and regulatory frameworks can create regulatory arbitrage and curtail enforcement." PX 637(Oct. 2021 publication by International Monetary Fund) at 47. *See infra* SEC Counter 56.1 ¶¶ 364-77. The SEC further disputes the assertions on the ground that "host country" is vague and ambiguous.

**Paragraph No. 156:** In order to use a cryptocurrency exchange, users must deposit any cryptocurrencies they want to trade into custodial accounts, or "wallets," held on the exchange itself. Users who wish to sell cryptocurrencies must upload their assets to accounts (or "wallets") on the exchange, and only those assets held in wallets on that cryptocurrency exchange can be bought or sold on the exchange. See Ex. 41, Yadav Rep. ¶ 62 ("[E]xchanges require that a user apply to the exchange for an account and crypto-wallet(s) that are specifically hosted by the exchange, as opposed to a wallet or wallets on the underlying blockchains for the cryptocurrencies users wish to trade."); id. ¶¶ 67-68; Ex. 25, ▮ Tr. 288:22-289:21 (describing the process of GSR creating accounts on exchanges for wallets).

**Response:** The SEC disputes the assertions contained in ¶ 156 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

**Paragraph No. 157:** Sell or buy orders are processed by the exchange and matched automatically and instantaneously by the cryptocurrency exchanges' matching engines under their rules, resulting in a final trade. See Ex. 41, Yadav Rep. ¶¶ 37, 64 ("Orders, once matched, then become automatically binding in the [cryptocurrency] exchange's trading system."); id. ¶¶ 67-68; Ex. 25, ▮ Tr. 289:22-290:12 ("When an offer and a bid cross, a transaction occurs.").

**Response:** The SEC disputes the assertions contained in ¶ 157 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.  The SEC further disputes the assertions on the ground that the term "final trade" is vague and ambiguous. The SEC further disputes the assertions on the ground that any matching or clearing on a crypto exchange is separate from the transfer of the crypto asset on a blockchain, and the person who buys XRP through a crypto exchange takes ownership of the XRP only once the XRP is recorded on the XRP Ledger under the buyer's private key. *See* XRPL.org, *Cryptographic Keys* (2021), *available at* https://xrpl.org/cryptographic-keys.html; PX 12 at 12. *See infra* SEC Counter 56.1 ¶¶ 318-24.

**Paragraph No. 158:** Transactions on cryptocurrency exchanges settle instantaneously once trades are matched. See Ex. 41, Yadav Rep. ¶ 69; Ex. 25, ▇ Tr. 293:7-16 ("[I]n crypto, there is instantaneous settlement.").

**Response:** The SEC disputes the assertions contained in ¶ 158 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

**Paragraph No. 159:** The finalized trade is binding on the parties to the transaction. See Ex. 41, Yadav Rep. ¶¶ 71-72, 83-84, 89; Ex. 42, Yadav Tr. 156:12-14 ("It is a fundamental principle of exchange design that orders, when they match, become final and binding on the exchange."); Ex. 25, ▇ Tr. 296:15-20.

**Response:** The SEC disputes the assertions contained in ¶ 159 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that they are not supported by the cited evidence. The SEC further disputes the assertions on the grounds that parties may become bound before the time a trade is matched on an exchange. *See infra* SEC Counter 56.1 ¶¶ 298-337.  The SEC further disputes the assertions on the grounds that on at least one of the crypto exchanges analyzed by Yadav, parties become bound before the exchange matched their trades: "Revocation. When you give us instructions to purchase (buy) Digital Currency, you cannot withdraw your consent to that purchase." PX 702, Section 5.6 at RPLI_SEC 1078014.

**Paragraph No. 160:** Once a trade has been finalized, it is only the exchange – not the user – that retains the ability to modify, cancel, or reverse a trade. See Ex. 41, Yadav Rep. ¶¶ 37-38 (describing rules for modifying, canceling, or reversing trades on CME); id. ¶¶ 64-65 (noting that, in an example agreement, "Ascendex . . . retains the power to reverse trades and cancel orders in the event that the exchange suffers some form of system malfunction"); id. ¶ 65 ("Customers cannot cancel, modify or seek reversal of any trade that is marked by the exchange as 'complete,' 'under

review,' or 'pending.' "); id. ¶ 89; Ex. 25, ███ Tr. 296:15-20 ("[O]nce the bid and the offer ha[ve] crossed[,] the trade has occurred and you cannot reverse it.").

**Response:** The SEC disputes the assertions contained in Paragraph ¶ 160 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that Yadav acknowledged that she could not give a conclusive answer as to whether her opinions that "[o]rders, once matched, then become automatically binding in the exchange's trading system" was true in every instance. PX 683, Def. Ex.  42 (Yadav Dep. Tr.) at 152:22-153:15.

**Paragraph No. 161:** The finalized trade is recorded on the exchange, but it is not typically recorded on a blockchain or the XRP Ledger. See Ex. 41, Yadav Rep. ¶ 67 (describing that most cryptocurrency exchanges use "off-chain" settlement where "the exchange reconciles trades on its own books and records, rather than on the blockchain"); id. ¶ 68; Ex. 25, ███ Tr. 299:16-23 (explaining trades are final when recorded on an exchange, even if not validated by the nodes of the XRP Ledger).

**Response:** The SEC disputes the assertions contained in ¶ 161 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the grounds that the person who buys XRP through a crypto exchange takes ownership of the XRP only once the XRP is recorded on the XRP Ledger under the buyer's private key. PX 12 at 12; *see infra* SEC Counter 56.1 ¶¶ 318-24.

**Paragraph No. 162:** Instead, completed trades are recorded solely on the books and records of the relevant exchange, usually by moving assets into or out of a user's wallet. See Ex. 41, Yadav Rep. ¶¶ 45, 64, 78 ("Numerous user agreements . . . specifically describe the authority that the user confers on the exchange to execute an order on the user's behalf and to make subsequent debits and credits to their account."); id. ¶ 82 ("Because exchanges demand that users open an account and hold digital wallets with the exchange, . . . [a]n order to buy/sell a cryptocurrency . . . cannot exist

unless it can connect to the exchange that can settle it by updating the entitlements in the user's exchange account.").

**Response:** The SEC disputes the assertions contained in ¶ 162 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The

SEC further disputes the assertions on the grounds that the person who buys XRP through a crypto

exchange takes ownership of the XRP only once the XRP is recorded on the XRP Ledger under the

buyer's private key. *See* XRPL.org, *Cryptographic Keys* (2021) *available at*

https://xrpl.org/cryptographic-keys.html; PX 12 at 12; *infra* SEC Counter 56.1 ¶¶ 318-24. The SEC

further disputes the assertions on the ground that they are not supported by the cited evidence.

**Paragraph No. 163:** Offers to buy an asset at a particular volume and price are viewable and executable only on the exchange itself. See Ex. 41, Yadav Rep. ¶ 77 (for "any offer to materialize and become executable," the offer must "be published on the exchange's platform, or otherwise be entered into the exchange's systems").

**Response:** The SEC disputes the assertions contained in ¶ 163 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The

SEC further disputes the assertions on the ground that they are not supported by the cited evidence.

The SEC further disputes the assertions on the ground that offers made on crypto exchanges are

publicly viewable by internet users located across the globe.  *See, e.g.*, https://bittrex.com/trade/btc-

usd; https://www.bitstamp.net/markets/xrp/usd/

**Paragraph No. 164:** For an offer to sell to be viewable on an exchange by potential buyers, the cryptocurrency generally must already be pre-loaded in the seller's exchange account. An order to buy or sell "cannot exist unless it can connect to the exchange that can settle it by updating the entitlements in the user's exchange account." Ex. 41, Yadav Rep. ¶ 82.

**Response:** The SEC disputes the assertions contained in ¶ 164 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The

SEC further disputes the assertion on the ground that the first sentence of ¶ 164 is not supported by

any evidence.

**Paragraph No. 165:** Only once the above prerequisites (see supra ¶¶ 156-164) are met can orders be viewed by other users on the exchange, and sales take place. See Ex. 41, Yadav Rep. ¶¶ 77, 81 (until an "order [is] . . . actually entered into the exchange's systems . . . , the order is not visible to the exchange or any potential counterparties"); id. ¶¶ 82-83 ("an offer to trade is made on an exchange"); Ex. 25, ▮ Tr. 306:1-307:20 (a potential purchaser of XRP knows when an offer to sell XRP has been placed only when they see an offer in the order book of an exchange).

**Response:** The SEC disputes the assertions contained in ¶ 165 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

**Paragraph No. 166:** Unless and until the offers are published by cryptocurrency exchanges, no information about a seller's specific offers on an exchange is communicated to the market. See Ex. 41, Yadav Rep. ¶¶ 77, 79, 81.

**Response:** The SEC disputes the assertion contained in ¶ 166 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

**Paragraph No. 167:** No buyer can accept an offer that has not been published on an exchange. See Ex. 41, Yadav Rep. ¶¶ 77, 79, 81.

**Response:** The SEC disputes the assertion contained in ¶ 167 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertion on the ground that XRP buyers can—and did—accept offers to purchase directly from Ripple through over-the-counter transactions that were not published on an exchange.  *See, e.g.*, PX 168 ("XRP II, LLC was formed in July 2013 in order to sell units of Ripple's virtual currency ('XRP') to institutional and other accredited investors. It does not sell XRP through exchanges or trading platforms, but sells directly to customers based on terms agreed on a transaction by transaction basis.").  The SEC further disputes the assertion on the grounds that the assertion consists of expert opinion and Yadav's opinions relating to exchanges should be excluded for the reasons set forth in the SEC's Motion to Exclude.

**Paragraph No. 168:** Offers to buy or sell cryptocurrencies on exchanges are made on the exchanges themselves, as if the buyers and sellers were exchanging information and shaking hands there. See Ex. 41, Yadav Rep. ¶¶ 33, 83.

**Response:** The SEC disputes the assertion contained in ¶ 168 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertion that transactions on cryptocurrency exchanges are similar to "buyers and sellers… exchanging information and shaking hands there" on the ground that the cited reference does not support the assertion.  The SEC further disputes the assertion that offers to buy and sell "are made on the exchanges themselves" on the grounds that this assertion is contrary to the law and the evidence as explained below.  *See infra* SEC Counter 56.1 ¶¶ 298-337.

**Paragraph No. 169:** Participants on cryptocurrency exchanges are mostly anonymous. See Ex. 41, Yadav Rep. ¶ 77 ("[E]lectronic order matching trading systems are, overwhelmingly, anonymous spaces."); Ex. 42, Yadav Tr. 195:15-196:23 ("It is a[n] absolutely cardinal rule of traditional marketplaces, modern electronic marketplaces, that pretrade anonymity be sacrosanct.").

**Response:** The SEC disputes the assertion contained in ¶ 169 on the ground that the

assertions are not supported by citation to evidence which would be admissible. The material cited

to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the

SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts.

**Paragraph No. 170:** A prospective buyer on a cryptocurrency exchange does not, and
cannot, solicit a specific potential seller, and a prospective seller does not, and cannot, target a
specific potential buyer. See Ex. 41, Yadav Rep. ¶ 77; Ex. 42, Yadav Tr. 195:15-196:23; Ex. 25, █
Tr. 297:25- 298:7 ("I have no way of knowing who is on the other side of the trades").

**Response:** The SEC does not dispute the assertions contained in ¶ 170.

### 2.   Specific Exchanges at Issue

**Paragraph No. 171:** Larsen and Garlinghouse made offers to sell and sales on the following
foreign cryptocurrency exchanges: Binance, Bitfinex, Bitforex, Bithumb, Bitlish, BitMart,
AscendEX/BitMax, Bitrue, Bitstamp, Coinbene, Coinone, HitBTC, Huobi, Korbit, OKEx, Upbit,
ZB, and ZBG. See Ex. 81, Summary Exhibit of Larsen Trading Data ("Larsen Trading Summary");
Ex. 82, Summary Exhibit of Garlinghouse Trading Data ("Garlinghouse Trading Summary").

**Response:** The SEC does not dispute that Larsen and Garlinghouse sold XRP on the

exchanges listed in ¶ 171.  The SEC does not dispute that Larsen and Garlinghouse made at least the

amount of proceeds from their XRP sales reflected on Defendants' Exhibits 81 and 82.

The SEC disputes the assertions on the grounds that several of the platforms identified as

being "foreign" had indicia of being in the United States: for example, Bitstamp allowed U.S.

customers—including Larsen and Garlinghouse—to transact on its main platform, and Bitstamp

also has servers in the United States.  PX 13 at ¶ 120, 132; PX 394 (Larsen account information and

activity on Bitstamp); PX 411 (Garlinghouse account information and activity on Bitstamp).  As

another example, GateHub noted on its website that it had the "majority of the team operating from

Slovenia and USA." PX 673.

Moreover, at least 12 of the exchanges identified as "foreign" in ¶ 171 accepted U.S.

purchasers according to Ripple's own internal documents and documents prepared by one of

Ripple's key market makers. See, *See, e.g.,* PX 564; PX 565; PX 566; PX 567; PX 576 (Samarasinghe estimating that 75% of Ripple's OTC sales and sales to exchanges are sales to partners who accept U.S. customers, making "the assumption that all sales of XRP on such exchanges are to US persons in the absence of more conclusive data."). According to Ripple's market maker, the exchanges that accepted U.S. customers included Binance, Bithumb, Bitstamp, Coinone, Korbit, ZB, ZBG, and Coinbase. PX 564.  According to Ripple's internal tracking, Bitforex, AscendEX/Bitmax, Bitrue, Bittrex, HuobiPro, Kraken, Poloniex, and the XRP Ledger also accepted U.S. customers. PX 565; PX 566.  Per the foregoing, at least 70% of Larsen's claimed realized profits of $373 million between 2018 and 2020 reflected in Defendants' Exhibit 81 were obtained on U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.  Similarly, at least 82% of Garlinghouse's claimed realized profits of $164 million between 2017-2020 reflected in Defendants' Exhibit 82 were to U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.

Further, at least four of the exchanges identified as "foreign" in ¶ 171 are registered as "money service businesses" in the United States with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") with registration addresses in the United States listed in parenthesis: BitMart (California); AscendEX/BitMax (New York); and Korbit (Colorado), OKEx (Colorado). *See* <u>MSB Registrant Search | FinCEN.gov</u> *available at* <u>https://www.fincen.gov/msb-registrant-search</u>.

Paragraph 171 also incorrectly identifies as "foreign" the location of transactions made on certain of the identified platforms. The "Foreign Exchanges 2017" listed in Defendants' Exhibit 81 includes sales on several gateways, including Gatehub, Mr. Ripple, Rippex, Ripple China, Ripple Fox, Bitso, and Tokyo JPY. *See, e.g.,* PX 676  All transactions involving these platforms – including sales – are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway

itself.  *See, e.g.,* PX 764 at 3 (explaining that XRP Ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 2 (GateHub stating that "[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  According to the cited evidence, transactions on these gateways occurred prior to 2018.  Transactions on these gateways, which are confirmed and cleared on the XRP Ledger, occurred within the United States because transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177 ("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

The SEC further disputes the assertion contained in ¶ 171 that Garlinghouse and Larsen made "offers to sell on" the cryptocurrency exchanges on the ground that the cited references do not support the assertion and refer only to consummated sales.  The SEC further disputes the assertion on the grounds that this assertion is contrary to the law and the evidence as explained below.  *See infra* SEC Counter 56.1 ¶¶ 298-337.

The SEC further disputes that Defendants' Exhibits 81 (Larsen's claimed sales) and 82 (Garlinghouse's claimed sales) are a "summary" of "voluminous trading records," as they purport to be. Each cites as support for the "summaries" a handful of spreadsheets that were prepared by GSR at Larsen's and Garlinghouse's request in October 2020, and were largely not based on "trading records" kept in the ordinary course of business.  *See* PX 616 (in response to request for Larsen's historical bot trading data from 2015-2020, GSR responds that "We are working on this. The SEC requested it directly on Monday, and Brad's lawyers on Tuesday"); PX 611 (GSR says, "[w]e are

working on this still. We don't have access to data all the way back to 2015, but we should have it since mid-2018 at least. Even then, it's a big project to collate all the info and determine the relevant jurisdictions at the time"); PX 613 (internal GSR email discussing "compil[ing] as much as we can" in response to Defendants' requests for historical trading data); PX 618 (internal GSR email describing how creating the historical data (writing scripts, looking at old source code and emails) has "been a bit more challenging than I expected").

In addition, certain portions of Defendants' Exhibits 81 and 82 do not reflect trading "records" at all, but rather, an "estimate" of the amount of XRP Larsen and Garlinghouse sold on an exchange.  *See* Def. Ex. 87 ("PLEASE BEAR IN MIND SALES CONTAINED IN THIS TABLE ARE ESTIMATES.  EXACT FIGURES ARE NOT AVAILABLE AS WE RAN AN INTEGRATED SERVICE IN 2017 ANSD [sic] BEFORE.").

Finally, Defendants' Exhibits 81 and 82 appear to have been created by counsel as summaries pursuant to Federal Rule of Evidence 1006 but they do not satisfy that Rule because they do not summarize "voluminous" records as required by the Rule—citing a total of only eight documents combined—and are unaccompanied by any sworn declaration.

**Paragraph No. 172:** Larsen and Garlinghouse made offers to sell and sales on the following additional cryptocurrency exchanges: Bittrex, Coinbase, Kraken, and Poloniex. See Ex. 81, Larsen Trading Summary; Ex. 82, Garlinghouse Trading Summary.

**Response:** The SEC objects to the characterization of the cryptocurrency exchanges identified in ¶ 172 as "additional" on the ground that such a characterization suggests that the locations of these exchanges are distinguishable from the exchanges identified in ¶ 172.  The SEC also disputes the assertion contained in ¶ 172 that Garlinghouse and Larsen made "offers to sell" on the listed cryptocurrency exchanges on the ground that the cited references do not support the assertion and refer only to consummated sales.  The SEC further disputes the assertion that Larsen

and Garlinghouse made offers to sell and sales "on" the exchanges on the grounds that this assertion is contrary to the law and the evidence as explained below.  *See infra* SEC Counter 56.1 ¶¶ 298-337.

**Paragraph No. 173:** Larsen also made sales on the following exchanges: Bitso, RippleChina, RippleFox, GateHub, GateHub Fifth, Mr. Ripple, Rippex, RippleTradeJapan, SnapSwap, and Tokyo JPY. See Ex. Ex. 81, Larsen Trading Summary.

**Response:** The SEC disputes the assertion contained in ¶ 173 that Larsen "made sales" on the identified "exchanges" on the ground that the cited reference does not support the assertion and contains conclusory and incorrect allegations as to the nature of these platforms as well as the nature of sales made using these platforms.  The platforms identified in ¶ 173 are not "exchanges" but rather "gateways."  *See*, *e.g.*, PX 676 (internal Ripple spreadsheet identifying several platforms as "Ripple Gateways"); PX 764; PX 679 (press release identifying Bitso as a "Ripple Gateway").  All transactions involving these platforms—including sales—are confirmed and cleared on the XRP ledger rather than being "made" on the gateway itself  *See*, *e.g.*, PX 764 at 3 (explaining that XRP ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 2 (GateHub stating that "[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time. When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger]").  The SEC further disputes the assertion that Larsen made sales "on" the exchanges on the grounds that this assertion is contrary to the law and the evidence as explained below.  *See infra* SEC Counter 56.1 ¶¶ 298-337.

**Paragraph No. 174:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service, and public sources, Binance Holdings Ltd. ("Binance") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

83

**Response:** The SEC disputes the assertions contained in ¶ 174 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the grounds that Binance has indicia of being located in the United States.  Ripple internal documents show that Binance allows US customers. PX 564, 565, 566.  In internal documents, even Ripple assumed that "all sales of XRP on such exchanges are to US persons in the absence of more conclusive data."  PX 576.  Binance also has servers in the United States. PX 13 at ¶ 132. ██████████████ used this exchange for Ripple's liquidation program. PX 564.  *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").

**Paragraph No. 175:** The SEC is not asserting that Binance was incorporated in the United States. The SEC is not asserting that Binance was domiciled in the United States. The SEC is not asserting that Binance's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1031-1032, 1034.

**Response:** The SEC does not dispute the assertions contained in ¶ 175 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions

relating to Binance's incorporation, domicile, or principal place of business in other matters if and as

appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of

Reqs. for Admis., SEC Answers to RFA Nos. 1031-1032, 1034).

**Paragraph No. 176:** The SEC requested assistance from the Cayman Islands to obtain
documents and communications related to Defendants' trades from Binance and, in its request,
described Binance as "a digital asset exchange platform and company incorporated in the Cayman
Islands." Ex. 84, NYRO_RIPPLE_RFA_000143.

**Response:** The SEC disputes the assertions in ¶ 176 on the grounds that the evidence cited

does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance

from "the Cayman Islands."  The document labeled Ex. 84, NYRO_RIPPLE_RFA_000143, states

in part, "SEC staff seeks the [Cayman Islands Monetary Authority's] assistance in obtaining business

records and communications from Binance Holdings, Inc."

**Paragraph No. 177:** The SEC does not contend that the digital asset trading platform
operated by Binance is a "domestic exchange" as that term is used in *Morrison v. National Australia
Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for
Admis., SEC Answer to RFA No. 1037.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 177 based on

publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the Binance trading platform in other matters if and as appropriate, as reflected

in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC

Answer to RFA No. 1037).

**Paragraph No. 178:** Based on the place of incorporation, principal place of business,
registered office address, location referenced in the terms of service or user agreement, and public
sources, iFinex, Inc. Bitfinex, Inc. ("Bitfinex") has no indicia of being based in the United States. See
Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 178 on the ground that the

assertions are not supported by citation to evidence which would be admissible: the material cited to

support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's

Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC

further disputes the assertions on the ground that the phrases "location referenced in terms of

service", "public sources" and "indicia of being based in the United States" are vague and

ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia"

presented by Defendants omits the location of computer servers through which the exchange

actually operates.

Finally, the SEC disputes the assertions on the ground that Bitfinex has indicia of being

located in the United States: ██████████████ used this exchange for Ripple's liquidation

program. PX 564.  *See also* PX 585 (Ripple employee explaining that even when a top crypto

exchange purports not to accept US customers, "if you have a VPN, you can get around that

hurdle.").

**Paragraph No. 179:** The SEC is not asserting that Bitfinex was incorporated in the United
States. The SEC is not asserting that Bitfinex was domiciled in the United States. The SEC is not
asserting that Bitfinex's principal place of business was in the United States. See Ex. 83, Pl.'s
Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1049-1050,
1052.

**Response:** The SEC does not dispute the assertions contained in ¶ 179 based on publicly

available information obtained after conducting a reasonable inquiry of the record in this case to

date, limits its response to this Action, and reserves all rights to make allegations or assertions

relating to Bitfinex's incorporation, domicile, or principal place of business in other matters if and as

appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of

Reqs. for Admis., SEC Answers to RFA Nos. 1049-1050, 1052).

**Paragraph No. 180:** The SEC requested assistance from Hong Kong to obtain documents
and communications related to Defendants' trades from Bitfinex and, in its request, described
iFinex, Inc. as "headquartered in Hong Kong." Ex. 85, NYRO_RIPPLE_RFA_000150.

**Response:** The SEC disputes the assertions in ¶ 180 on the grounds that the evidence cited does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance from "Hong Kong."  The document labeled Ex. 85,  NYRO_RIPPLE_RFA_000150 states in part, that the SEC "requests the assistance of the Hong Kong Securities and Futures Commission."

**Paragraph No. 181:** The SEC does not contend the digital asset trading platform operated by Bitfinex is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1055.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 181 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the Bitfinex trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1055).

**Paragraph No. 182:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Noah Trade Ltd. ("BitForex") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 182 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia"

presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that Bitforex has indicia of being located in the United States: Ripple internal documents show that Bitforex allows US customers. PX 566. *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").

**Paragraph No. 183:** The SEC is not asserting that BitForex was incorporated in the United States. The SEC is not asserting that BitForex was domiciled in the United States. The SEC is not asserting that BitForex's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1058-1059, 1061.

**Response:** The SEC does not dispute the assertions contained in ¶ 183 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to BitForex's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1058-1059, 1061).

**Paragraph No. 184:** The SEC does not contend the digital asset trading platform operated by BitForex is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1064.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 184 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the BitForex trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1064).

**Paragraph No. 185:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, BGH One Ltd. ("Bithumb") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 185 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that Bithumb has indicia of being located in the United States:  Ripple internal documents show that Bithumb allows US customers. PX 564, PX 577.  In internal documents, even Ripple assumed that "all sales of XRP on such exchanges are to US persons in the absence of more conclusive data."  PX 576.  Crypto-Systems LLC used this exchange for Ripple's liquidation program. PX 564.  *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").

**Paragraph No. 186:** The SEC is not asserting that Bithumb was incorporated in the United States. The SEC is not asserting that Bithumb was domiciled in the United States. The SEC is not asserting that Bithumb's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1067-1068, 1070.

**Response:** The SEC does not dispute the assertions contained in ¶ 186 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to

date, limits its response to this Action, and reserves all rights to make allegations or assertions

relating to Bithumb's incorporation, domicile, or principal place of business in other matters if and

as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of

Reqs. for Admis., SEC Answers to RFA Nos. 1067-1068, 1070).

**Paragraph No. 187:** The SEC requested assistance from the Republic of Korea to obtain documents and communications related to Defendants' trades from Bithumb and noted in its request that Bithumb is a "digital asset trading platform[] based in South Korea." Ex. 86, NYRO_RIPPLE_RFA_000111.

**Response:** The SEC disputes the assertions in ¶ 187 on the grounds that the evidence cited

does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance

from "the Republic of Korea."  The document labeled Defendants' Exhibit 86,

NYRO_RIPPLE_RFA_000111 states in part, that the SEC "requests the assistance of the Financial

Services SEC of the Republic of Korea."

**Paragraph No. 188:** GSR identified Bithumb's country as Korea. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 188 on the ground that GSR's

chairman and co-founder ███████ testified, "even today [August 11, 2021], a lot of these well

known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 189:** The SEC does not contend that the digital asset trading platform operated by Bithumb is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1073.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 189 based on

publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the Bithump trading platform in other matters if and as appropriate, as

reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1073).

**Paragraph No. 190:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Bitlish Ltd. ("Bitlish") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 190 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates. *See* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").

**Paragraph No. 191:** The SEC is not asserting that Bitlish was incorporated in the United States. The SEC is not asserting that Bitlish was domiciled in the United States. The SEC is not asserting that Bitlish's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1076-1077, 1079.

**Response:** The SEC does not dispute the assertions contained in ¶ 191 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Bitlish's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1076-1077, 1079).

**Paragraph No. 192:** The SEC requested assistance from the United Kingdom to obtain documents and communications related to Defendants' trades from Bitlish and described Bitlish as "UK-based" in its request. Ex. 88, NYRO_RIPPLE_RFA_000118.

**Response:** The SEC disputes the assertions in ¶ 192 on the grounds that the evidence cited does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance from "the United Kingdom."  The document labeled Defendants' Exhibit 88, NYRO_RIPPLE_RFA_000118 states in part, that the SEC "requests the assistance of the United Kingdom Financial Conduct Authority."

**Paragraph No. 193:** The SEC does not contend that the digital asset trading platform operated by Bitlish is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1082.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 193 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the Bitlish trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1082).

**Paragraph No. 194:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, GBM Foundation Company Ltd. ("BitMart") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 194 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and

92

ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that this exchange has indicia of being located in the United States:  For example, in another action, the chief compliance officer of GBM Global Holding Company Limited submitted a declaration stating that its wholly-owned subsidiary Bachi.Tech, which is "incorporated in New Jersey" with "operations and employees in both New York and New Jersey", operates Bitmart.  *See* PX 689, *GBM Global Holding Co. Ltd. v. The Unidentified Individuals Listed on Schedule A*, 1:21-cv-6284-AKH (S.D.N.Y.)(Aug. 3, 2021) at D.E. 17.  *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").  Further, the SEC disputes this assertion on the ground that BitMart is registered as a "money service business" in the United States with FinCEN (with a California registration address).  *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search

**Paragraph No. 195:** The SEC is not asserting that BitMart was incorporated in the United States. The SEC is not asserting that BitMart was domiciled in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1085-1086. The SEC requested assistance from the Cayman Islands to obtain documents and communications related to Defendants' trades from BitMart and, in its request, described BitMart as "a digital asset exchange platform and company incorporated in the Cayman Islands." Ex. 89, NYRO_RIPPLE_RFA_000130.

**Response:** The SEC does not dispute the assertions contained in ¶ 195 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to BitMart's incorporation or domicile in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC

Answers to RFA Nos. 1085-1086).  The SEC disputes the assertions contained in this Paragraph in that the SEC did not request assistance from "the Cayman Islands."  The document labeled Defendants' Exhibit 89, NYRO_RIPPLE_RFA_000130, states in part, that the SEC "requests the assistance of the Cayman Islands Monetary Authority."

**Paragraph No. 196:** The SEC does not contend that the digital asset trading platform operated by BitMart is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1091.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 196 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the BitMart trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1091).

**Paragraph No. 197:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, BMXDM Technology Pte. Ltd. (currently called AscendEX, formerly called Bitmax) ("BitMax") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 197 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia"

presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that this exchange has indicia of being located in the United States:  Ripple internal documents show that BitMax allows US customers.  PX 565.  *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").  Further, the SEC disputes this assertion on the ground that BitMax/AscendEX is registered as a "money service business" in the United States with FinCEN (with a New York registration address).  *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search

**Paragraph No. 198:** The SEC is not asserting that BitMax was incorporated in the United States. The SEC is not asserting that BitMax was domiciled in the United States. The SEC is not asserting that BitMax's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1094-1095, 1097.

**Response:** The SEC does not dispute the assertions contained in ¶ 198 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to BitMax's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1094-1095, 1097).

**Paragraph No. 199:** The SEC requested assistance from Singapore to obtain documents and communications related to Defendants' trades from BitMax and, in its request, described BitMax as a "digital asset trading platform[ ] based in Singapore." Ex. 90, NYRO_RIPPLE_RFA_000124.

**Response:** The SEC disputes the assertions in ¶ 199 on the grounds that the evidence cited does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance

from "Singapore." The document labeled Defendants' Exhibit 90, NYRO_RIPPLE_RFA_000124, states in part, that the SEC "requests the assistance of the Monetary Authority of Singapore."

**Paragraph No. 200:** The SEC does not contend that the digital asset trading platform operated by BitMax is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1100.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 200 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the BitMax trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1100).

**Paragraph No. 201:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Bitrue Singapore Pte. Ltd. ("Bitrue") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 201 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that this exchange has indicia of being located in the United States:  Ripple internal documents show that Bitrue allows US customers.  PX 565.  *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").

**Paragraph No. 202:** The SEC is not asserting that Bitrue was incorporated in the United States. The SEC is not asserting that Bitrue was domiciled in the United States. The SEC is not asserting that Bitrue's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1103-1104, 1106.

**Response:** The SEC does not dispute the assertions contained in ¶ 202 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Bitrue's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1103-1104, 1106).

**Paragraph No. 203:** The SEC requested assistance from Singapore to obtain documents and communications related to Defendants' trades from Bitrue and, in its request, described Bitrue as a "digital asset trading platform[] based in Singapore." Ex. 90, NYRO_RIPPLE_RFA_000124.

**Response:** The SEC disputes the assertions in ¶ 203 on the grounds that the evidence cited does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance from ""Singapore."  The document labeled Defendants' Exhibit 90, NYRO_RIPPLE_RFA_000124, states in part, that the SEC "requests the assistance of the Monetary Authority of Singapore."

**Paragraph No. 204:** The SEC does not contend that the digital asset trading platform operated by Bitrue is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1109.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 204 based on publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the Bitrue trading platform in other matters if and as appropriate, as reflected

in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC

Answer to RFA No. 1109).

**Paragraph No. 205:** Based on the place of incorporation, principal place of business,
registered office address, location referenced in the terms of service or user agreement, and public
sources, Bitstamp Ltd. ("Bitstamp") has no indicia of being based in the United States. See Ex. 41,
Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 205 on the ground that the

assertions are not supported by citation to evidence which would be admissible: the material cited to

support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's

Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC

further disputes the assertions on the ground that the phrases "location referenced in terms of

service", "public sources" and "indicia of being based in the United States" are vague and

ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia"

presented by Defendants omits the location of computer servers through which the exchange

actually operates.

Finally, the SEC disputes the assertions on the ground that this exchange has indicia of being

located in the United States: Ripple internal documents show that Bitstamp allows US customers.

PX 564, 565.  Bitstamp allowed US customers – including Larsen and Garlinghouse –  to transact on

its main platform, and Bitstamp also has servers in the United States.  PX 13 at ¶ 120, 132; PX 394,

PX 411, PX 477, PX 685, PX 686, PX 687. ███████████ used this exchange for Ripple's

liquidation program. PX 564.  *See also* PX 585 (Ripple employee explaining that even when a top

crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that

hurdle.").

**Paragraph No. 206:** The SEC is not asserting that Bitstamp was incorporated in the United States. The SEC is not asserting that Bitstamp was domiciled in the United States. The SEC is not asserting that Bitstamp's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1112-1113, 1115.

**Response:** The SEC does not dispute the assertions contained in ¶ 206 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Bitstamp's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1112-1113, 1115).

**Paragraph No. 207:** GSR identified Bitstamp's country as Luxembourg, United Kingdom, or Slovenia. See  , GSR00000443.

**Response:** The SEC disputes the assertion contained in Paragraph 207 on the ground that GSR's chairman and co-founder [redacted] testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 208:** Employees at Bitstamp had email signatures indicating their address was in London. See Ex. 91, RPLI_01956976 [redacted], CEO of Bitstamp Ltd., email signature indicated Bitstamp was located in London).

**Response:** The SEC disputes the assertion contained in ¶ 208 on the basis that "employees at Bitstamp" is vague and ambiguous in that it could refer to all Bitstamp employees, and the cited reference to Defendants' Exhibit 91 (a document showing the Bitstamp chief executive officer using an email signature containing a London address) does not support the assertion.

**Paragraph No. 209:** The SEC does not contend that the digital asset trading platform operated by Bitstamp is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1118.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 209 based on publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the Bitstamp trading platform in other matters if and as appropriate, as

reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis.,

SEC Answer to RFA No. 1118).

**Paragraph No. 210:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, CoinBene Limited Vanuatu ("Coinbene") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 210 on the ground that the

assertions are not supported by citation to evidence which would be admissible: the material cited to

support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's

Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC

further disputes the assertions on the ground that the phrases "location referenced in terms of

service", "public sources" and "indicia of being based in the United States" are vague and

ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia"

presented by Defendants omits the location of computer servers through which the exchange

actually operates.  *See also* PX 585 (Ripple employee explaining that even when a top crypto

exchange purports not to accept US customers, "if you have a VPN, you can get around that

hurdle.").

**Paragraph No. 211:** The SEC is not asserting that Coinbene was incorporated in the United States. The SEC is not asserting that Coinbene was domiciled in the United States. The SEC is not asserting that Coinbene's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1175-1176, 1178.

**Response:** The SEC does not dispute the assertions contained in ¶ 211 based on publicly

available information obtained after conducting a reasonable inquiry of the record in this case to

date, limits its response to this Action, and reserves all rights to make allegations or assertions

relating to Coinbene's incorporation, domicile, or principal place of business in other matters if and

as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of

Reqs. for Admis., SEC Answers to RFA Nos. 1175-1176, 1178).

**Paragraph No. 212:** The SEC requested assistance from Singapore to obtain documents
and communications related to Defendants' trades from Coinbene and, in its request, described
Coinbene as a "digital asset trading platform[] based in Singapore." Ex. 90,
NYRO_RIPPLE_RFA_000124.

**Response:** The SEC disputes the assertions in ¶ 212 on the grounds that the evidence cited

does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance

from "Singapore."  The document labeled Defendants' Exhibit 90,  NYRO_RIPPLE_RFA_000124,

states in part, that the SEC "requests the assistance of the Monetary Authority of Singapore."

**Paragraph No. 213:** The SEC does not contend that the digital asset trading platform
operated by Coinbene is a "domestic exchange" as that term is used in *Morrison v. National Australia
Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for
Admis., SEC Answer to RFA No. 1181.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 213 based on

publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the Coinbene trading platform in other matters if and as appropriate, as

reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis.,

SEC Answer to RFA No. 1181).

**Paragraph No. 214:** Based on the place of incorporation, principal place of business,
registered office address, location referenced in the terms of service or user agreement, and public
sources, Coinone Inc. ("Coinone") has no indicia of being based in the United States. See Ex. 41,
Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 214 on the ground that the

assertions are not supported by citation to evidence which would be admissible: the material cited to

support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's

Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that this exchange has indicia of being located in the United States: Ripple internal documents show that Coinone allows US customers. PX 564, PX 577. In internal documents, even Ripple assumed that "all sales of XRP on such exchanges are to US persons in the absence of more conclusive data." PX 576. ██████████ ████ used this exchange for Ripple's liquidation program. PX 564. *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").

**Paragraph No. 215:** The SEC is not asserting that Coinone was incorporated in the United States. The SEC is not asserting that Coinone was domiciled in the United States. The SEC is not asserting that Coinone's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1184-1185, 1187.

**Response:** The SEC does not dispute the assertions contained in ¶ 215 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Coinone's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1184-1185, 1187).

**Paragraph No. 216:** The SEC requested assistance from the Republic of Korea to obtain documents and communications related to Defendants' trades from Coinone and, in its request,

described Coinone as a "digital asset trading platform[] based in South Korea." Ex. 86, NYRO_RIPPLE_RFA_000111.

**Response:** The SEC disputes the assertions in ¶ 216 on the grounds that the evidence cited

does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance

from "the Republic of Korea."  The document labeled Defendants' Exhibit 86,

NYRO_RIPPLE_RFA_000111, states in part, that the SEC "requests the assistance of the Financial

Services Commission of the Republic of Korea."

**Paragraph No. 217:** GSR identified Coinone's country as Korea. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 217 on the ground that GSR's

chairman and co-founder ███████ testified, "even today [August 11, 2021], a lot of these well

known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 218:** The SEC does not contend that the digital asset trading platform operated by Coinone is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1190.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 218 based on

publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the Coinone trading platform in other matters if and as appropriate, as

reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis.,

SEC Answer to RFA No. 1190).

**Paragraph No. 219:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Hit Tech Solutions Development Ltd. ("HitBTC") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 219 on the ground that the

assertions are not supported by citation to evidence which would be admissible: the material cited to

support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's

Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC

further disputes the assertions on the ground that the phrases "location referenced in terms of

service", "public sources" and "indicia of being based in the United States" are vague and

ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia"

presented by Defendants omits the location of computer servers through which the exchange

actually operates.

Finally, the SEC disputes the assertions on the ground that HitBTC has indicia of being

located in the United States: ████████████ used this exchange for Ripple's liquidation

program. PX 564.  *See also* PX 585 (Ripple employee explaining that even when a top crypto

exchange purports not to accept US customers, "if you have a VPN, you can get around that

hurdle.").

**Paragraph No. 220:** The SEC is not asserting that HitBTC was incorporated in the United
States. The SEC is not asserting that HitBTC was domiciled in the United States. The SEC is not
asserting that HitBTC's principal place of business was in the United States. See Ex. 83, Pl.'s
Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1202-1203,
1205.

**Response:** The SEC does not dispute the assertions contained in ¶ 220 based on publicly

available information obtained after conducting a reasonable inquiry of the record in this case to

date, limits its response to this Action, and reserves all rights to make allegations or assertions

relating to HitBTC's incorporation, domicile, or principal place of business in other matters if and as

appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of

Reqs. for Admis., SEC Answers to RFA Nos. 1202-1203, 1205).

**Paragraph No. 221:** The SEC does not contend that the digital asset trading platform
operated by HitBTC is a "domestic exchange" as that term is used in *Morrison v. National Australia
Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for
Admis., SEC Answer to RFA No. 1208.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 221 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the HitBTC trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1208).

**Paragraph No. 222:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Huobi Global Ltd. ("Huobi") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 222 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that this exchange has indicia of being located in the United States:  Ripple internal documents show that Huobi allows US customers.  PX 565. ███████████ used this exchange for Ripple's liquidation program. PX 564.  *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").

105

**Paragraph No. 223:** The SEC is not asserting that Huobi was incorporated in the United States. The SEC is not asserting that Huobi was domiciled in the United States. The SEC is not asserting that Huobi's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1211-1212, 1214.

**Response:** The SEC does not dispute the assertions contained in ¶ 223 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Huobi's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1211-1212, 1214).

**Paragraph No. 224:** The SEC does not contend that the digital asset trading platform operated by Huobi is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1217.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 224 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the Huobi trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1217).

**Paragraph No. 225:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Korbit, Inc. ("Korbit") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 225 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC

further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that this exchange has indicia of being located in the United States: Ripple internal documents show that Korbit allows US customers. PX 564; PX 577. In internal documents, even Ripple assumed that "all sales of XRP on such exchanges are to US persons in the absence of more conclusive data." PX 576. ████████████ used this exchange for Ripple's liquidation program. PX 564. *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle."). Further, the SEC disputes this assertion on the ground that Korbit is registered as a "money service business" in the United States with FinCEN (with a Colorado registration address). *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search

**Paragraph No. 226:** The SEC is not asserting that Korbit was incorporated in the United States. The SEC is not asserting that Korbit was domiciled in the United States. The SEC is not asserting that Korbit's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1220-1221, 1223.

**Response:** The SEC does not dispute the assertions contained in ¶ 226 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Korbit 's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1220-1221, 1223).

**Paragraph No. 227:** The SEC requested assistance from the Republic of Korea to obtain documents and communications related to Defendants' trades from Korbit and, in its request, described Korbit as a "digital asset trading platform[] based in South Korea." Ex. 86, NYRO_RIPPLE_RFA_000111.

**Response:** The SEC disputes the assertions in ¶ 227 on the grounds that the evidence cited does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance from "the Republic of Korea."  The document labeled Defendants' Exhibit 86, NYRO_RIPPLE_RFA_000111, states in part, that the SEC "requests the assistance of the Financial Services Commission of the Republic of Korea."

**Paragraph No. 228:** GSR identified Korbit's country as Korea. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 228 on the ground that GSR's chairman and co-founder ████████ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22-302:6.

**Paragraph No. 229:** The SEC does not contend that the digital asset trading platform operated by Korbit is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1226.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 229 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the Korbit trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1226).

**Paragraph No. 230:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Aux Cayes FinTech Co. Ltd. ("OKEx") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 230 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that OKEx has indicia of being located in the United States: ███████████ used this exchange for Ripple's liquidation program. PX 564.  *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle."). Further, the SEC disputes this assertion on the ground that OKEx is registered as a "money service business" in the United States with FinCEN (with a Colorado registration address). *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search

**Paragraph No. 231:** The SEC is not asserting that OKEx was incorporated in the United States. The SEC is not asserting that OKEx was domiciled in the United States. The SEC is not asserting that OKEx's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1238-1239, 1241.

**Response:** The SEC does not dispute the assertions contained in ¶ 231 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to OKEx's incorporation, domicile, or principal place of business in other matters if and as

appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of

Reqs. for Admis., SEC Answers to RFA Nos. 1238-1239, 1241).

**Paragraph No. 232:** The SEC requested assistance from Malta and Malaysia to obtain
documents and communications related to Defendants' trades from OKEx and, in its requests,
described OKEx as "a digital asset trading platform based in Malta" and "with offices in Malaysia."
Ex. 92, NYRO_RIPPLE_RFA_000137; Ex. 93, NYRO_RIPPLE_RFA_000163.

**Response:** The SEC disputes the assertions in ¶ 232 on the grounds that the evidence cited

does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance

from "Malta and Malaysia."  The document labeled Defendants' Exhibit 91,

NYRO_RIPPLE_RFA_000137, states in part that the SEC "requests the assistance of the Malta

Financial Services Authority."  Defendants' Exhibit 93, NYRO_RIPPLE_RFA_000137, states in

part that the SEC "requests the assistance of the Securities Commission of Malaysia."

**Paragraph No. 233:** The SEC does not contend that the digital asset trading platform
operated by OKEx is a "domestic exchange" as that term is used in *Morrison v. National Australia
Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for
Admis., SEC Answer to RFA No. 1244.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 233 based on

publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the OKEx trading platform in other matters if and as appropriate, as reflected

in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC

Answer to RFA No. 1244).

**Paragraph No. 234:** Based on the place of incorporation, principal place of business,
registered office address, location referenced in the terms of service or user agreement, and public
sources, Upbit Singapore Pte. Ltd. ("Upbit") has no indicia of being based in the United States. See
Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 234 on the ground that the

assertions are not supported by citation to evidence which would be admissible: the material cited to

support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's

Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC

further disputes the assertions on the ground that the phrases "location referenced in terms of

service", "public sources" and "indicia of being based in the United States" are vague and

ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia"

presented by Defendants omits the location of computer servers through which the exchange

actually operates.

**Paragraph No. 235:** The SEC is not asserting that Upbit was incorporated in the United
States. The SEC is not asserting that Upbit was domiciled in the United States. The SEC is not
asserting that Upbit's principal place of business was in the United States. See Ex. 83, Pl.'s Answers
& Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1256-1257, 1259. *See
also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to
accept US customers, "if you have a VPN, you can get around that hurdle.").

**Response:** The SEC does not dispute the assertions contained in ¶ 235 based on publicly

available information obtained after conducting a reasonable inquiry of the record in this case to

date, limits its response to this Action, and reserves all rights to make allegations or assertions

relating to Upbit's incorporation, domicile, or principal place of business in other matters if and as

appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of

Reqs. for Admis., SEC Answers to RFA Nos. 1256-1257, 1259).

**Paragraph No. 236:** The SEC requested assistance from the Republic of Korea to obtain
documents and communications related to Defendants' trades from Upbit and, in its request,
described Upbit as a "digital asset platform[] based in South Korea." Ex. 86,
NYRO_RIPPLE_RFA_000111.

**Response:** The SEC disputes the assertions in ¶ 236 on the grounds that the evidence cited

does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance

from "the Republic of Korea."  The document labeled Defendants' Exhibit 86,

NYRO_RIPPLE_RFA_000111, states in part, that the SEC "requests the assistance of the Financial

Services Commission of the Republic of Korea."  Furthermore, Exhibit 86 does not contain the quote "digital asset platform[] based in South Korea."

**Paragraph No. 237:** The SEC does not contend that the digital asset trading platform operated by Upbit is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1262.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 237 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the Upbit trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1262).

**Paragraph No. 238:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, ZillionByte Limited ("ZB") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 238 on the ground that the assertions are not supported by citation to evidence which would be admissible: the material cited to support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC further disputes the assertions on the ground that the phrases "location referenced in terms of service", "public sources" and "indicia of being based in the United States" are vague and ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia" presented by Defendants omits the location of computer servers through which the exchange actually operates.

Finally, the SEC disputes the assertions on the ground that ZB has indicia of being located in the United States: ███████████████ used this exchange for Ripple's liquidation program. PX 564.  *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports not to accept US customers, "if you have a VPN, you can get around that hurdle.").  Ripple internal documents show that ZB allows US customers.  PX 564, PX 577.  In internal documents, even Ripple assumed that "all sales of XRP on such exchanges are to US persons in the absence of more conclusive data."  PX 576.

**Paragraph No. 239:** The SEC is not asserting that ZB was incorporated in the United States. The SEC is not asserting that ZB was domiciled in the United States. The SEC is not asserting that ZB's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1265-1266, 1268.

**Response:** The SEC does not dispute the assertions contained in ¶ 239 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to ZB's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1265-1266, 1268).

**Paragraph No. 240:** The SEC does not contend that the digital asset trading platform operated by ZB is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1271.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 240 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the ZB trading platform in other matters if and as appropriate, as reflected in

the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC

Answer to RFA No. 1271).

**Paragraph No. 241:** Based on the place of incorporation, principal place of business, registered office address, location referenced in the terms of service or user agreement, and public sources, Zillion Biz Global Limited ("ZBG") has no indicia of being based in the United States. See Ex. 41, Yadav Rep. Table A.

**Response:** The SEC disputes the assertions contained in ¶ 241 on the ground that the

assertions are not supported by citation to evidence which would be admissible: the material cited to

support the fact asserted, the Yadav Report, is not admissible for the reasons set forth in the SEC's

Motion to Exclude, and the assertions are opinions of a purported expert and not facts. The SEC

further disputes the assertions on the ground that the phrases "location referenced in terms of

service", "public sources" and "indicia of being based in the United States" are vague and

ambiguous in the context. The SEC further disputes the assertions on the ground that the "indicia"

presented by Defendants omits the location of computer servers through which the exchange

actually operates.

Finally, the SEC disputes the assertions on the ground that ZBG has indicia of being located

in the United States: ███████████████ used this exchange for Ripple's liquidation program. PX

564. *See also* PX 585 (Ripple employee explaining that even when a top crypto exchange purports

not to accept US customers, "if you have a VPN, you can get around that hurdle.").

**Paragraph No. 242:** The SEC does not contend that the digital asset trading platform operated by ZBG is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1280.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 242 based on

publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the ZBG trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1280).

**Paragraph No. 243:** GSR identified Bitso's country as Mexico. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 243 on the ground that GSR's chairman and co-founder ▆▆▆▆▆▆ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 244:** The SEC requested assistance from Mexico and Gibraltar to obtain documents and communications related to Defendants' trades from Bitso and, in its request, described Bitso as a "Mexico-based digital asset trading platform." Ex. 94, NYRO_RIPPLE_RFA_000099; Ex. 95, NYRO_RIPPLE_RFA_000105.

**Response:** The SEC disputes the assertions in ¶ 244 on the grounds that the evidence cited does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance from "Mexico and Gibraltar" and the term "Bitso" is vague and ambiguous.  The document labeled Defendants' Exhibit 94, NYRO_RIPPLE_RFA_000099, is addressed to the Commission Nacional Bancaria y de Valores, and Defendants' Exhibit 95,  NYRO_RIPPLE_RFA_000099, is addressed to the Gibraltar Financial Services Commission and requests documents from The Badger Technology Limited.

**Paragraph No. 245:** The SEC is not asserting that GateHub Ltd. ("GateHub") was incorporated in the United States. The SEC is not asserting that GateHub was domiciled in the United States. The SEC is not asserting that GateHub's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1283-1284, 1286.

**Response:** The SEC does not dispute the assertions contained in ¶ 245 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to GateHub's incorporation, domicile, or principal place of business in other matters if and

as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1283-1284, 1286).

**Paragraph No. 246:** GSR identified GateHub's country as the United Kingdom or Slovenia. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 246 on the ground that GSR's chairman and co-founder ████ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 247:** GSR also identified GateHub Fifth's country as the United Kingdom or Slovenia. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 247 on the ground that GSR's chairman and co-founder ████ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 248:** The SEC does not contend that the digital asset trading platform operated by GateHub is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1289.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 248 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the GateHub trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1289).

**Paragraph No. 249:** GSR identified Mr. Exchange, Inc.'s (formerly known as "Mr. Ripple") country as Japan. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 249 on the ground that GSR's chairman and co-founder ████ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 250:** The SEC is not asserting that Mr. Ripple was incorporated in the United States. The SEC is not asserting that Mr. Ripple was domiciled in the United States. The SEC is not asserting that Mr. Ripple's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1292-1293, 1295.

**Response:** The SEC does not dispute the assertions contained in ¶ 250 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Mr. Ripple's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1292-1293, 1295).

**Paragraph No. 251:** The SEC does not contend that the digital asset trading platform operated by Mr. Ripple is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1298.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 251 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the Mr. Ripple's trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1298).

**Paragraph No. 252:** GSR identified RippleChina's country as China. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 252 on the ground that GSR's chairman and co-founder ██████ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 253:** The SEC is not asserting that RippleChina was incorporated in the United States.  The SEC is not asserting that RippleChina was domiciled in the United States. The SEC is not asserting that RippleChina's principal place of business was in the United States. See Ex.

83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1319-1320, 1322.

**Response:** The SEC does not dispute the assertions contained in ¶ 253 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to RippleChina's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1319- 1320, 1322).

**Paragraph No. 254:** The SEC does not contend that the digital asset trading platform operated by RippleChina is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1325.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 254 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the RippleChina trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1325).

**Paragraph No. 255:** GSR identified Rippex's country as Brazil. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 255 on the ground that GSR's chairman and co-founder ▮▮▮▮▮▮ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 256:** The SEC is not asserting that Rippex was incorporated in the United States. The SEC is not asserting that Rippex was domiciled in the United States. The SEC is not asserting that Rippex's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1301-1302, 1304.

**Response:** The SEC does not dispute the assertions contained in ¶ 256 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Rippex's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1301-1302, 1304).

**Paragraph No. 257:** The SEC does not contend that the digital asset trading platform operated by Rippex is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1307.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 257 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to the Rippex trading platform in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1307).

**Paragraph No. 258:** GSR identified RippleFox's country as China. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 258 on the ground that GSR's chairman and co-founder ███████ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 259:** The SEC is not asserting that RippleFox was incorporated in the United States. The SEC is not asserting that RippleFox was domiciled in the United States. The SEC is not asserting that RippleFox's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1310-1311, 1313.

**Response:** The SEC does not dispute the assertions contained in ¶ 259 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to

date, limits its response to this Action, and reserves all rights to make allegations or assertions

relating to RippleFox's incorporation, domicile, or principal place of business in other matters if and

as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of

Reqs. for Admis., SEC Answers to RFA Nos. 1310-1311, 1313).

**Paragraph No. 260:** The SEC does not contend that the digital asset trading platform
operated by RippleFox is a "domestic exchange" as that term is used in *Morrison v. National Australia
Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for
Admis., SEC Answer to RFA No. 1316.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 260 based on

publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the RippleFox trading platform in other matters if and as appropriate, as

reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis.,

SEC Answer to RFA No. 1316).

**Paragraph No. 261:** GSR identified RippleTradeJapan's country as Japan. See Ex. 87,
GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 261 on the ground that GSR's

chairman and co-founder ████████ testified, "even today [August 11, 2021], a lot of these well

known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 262:** GSR indicated that SnapSwap has a European-based website and
identified its country as Luxembourg. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 262 on the ground that GSR's

chairman and co-founder ████████ testified, "even today [August 11, 2021], a lot of these well

known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 263:** The SEC asked for assistance from Luxembourg in obtaining
documents from SnapSwap and, in its request, described SnapSwap as "Luxembourg-based." Ex. 96,
NYRO_RIPPLE_RFA_000157.

**Response:** The SEC disputes the assertions in ¶ 263 on the grounds that the evidence cited does not support the assertion.  As the cited reference shows, the SEC did not ask for assistance from "Luxembourg" and the term "SnapSwap" is vague and ambiguous.  The document labeled Defendants' Exhibit 96, NYRO_RIPPLE_RFA_000157, states in part, "SEC staff seeks the [Commission de Surveillance du Secteur Financier's] assistance in obtaining certain records from Luxembourg-based SnapSwap International S.A."

**Paragraph No. 264:** GSR identified Tokyo JPY's country as Japan. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 264 on the ground that GSR's chairman and co-founder ▮▮▮▮▮▮ testified, "even today [August 11, 2021], a lot of these well known exchanges, it's unclear where they're located." PX 26 at 301:22 - 302:6.

**Paragraph No. 265:** The SEC is not asserting that Tokyo JPY was incorporated in the United States. The SEC is not asserting that Tokyo JPY was domiciled in the United States. The SEC is not asserting that Tokyo JPY's principal place of business was in the United States. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1328-1329, 1331.

**Response:** The SEC does not dispute the assertions contained in ¶ 265 based on publicly available information obtained after conducting a reasonable inquiry of the record in this case to date, limits its response to this Action, and reserves all rights to make allegations or assertions relating to Tokyo JPY's incorporation, domicile, or principal place of business in other matters if and as appropriate, as reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answers to RFA Nos. 1328-1329, 1331).

**Paragraph No. 266:** The SEC does not contend that the digital asset trading platform operated by Tokyo JPY is a "domestic exchange" as that term is used in *Morrison v. National Australia Bank Ltd.*, 561 U.S. 247 (2010). See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1334.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 266 based on publicly available information obtained after conducting a reasonable inquiry of the record in this

case to date, limits its response to this Action, and reserves all rights to make allegations or

assertions relating to the Tokyo JPY trading platform in other matters if and as appropriate, as

reflected in the cited evidence (Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis.,

SEC Answer to RFA No. 1334).

**Paragraph No. 267:** There is no evidence in the record that, to the extent any of the above exchanges described supra ¶¶ 171 to 266 had U.S.-based subsidiaries, Larsen's and Garlinghouse's trades occurred on any such U.S.-based subsidiaries. Larsen's and Garlinghouse's trades occurred on any such U.S.-based subsidiaries.

**Response:** The SEC disputes the assertion contained in ¶ 267 on the ground that

Garlinghouse traded through a U.S.-based subsidiary of Bitstamp. PX 672 (Garlinghouse stating that

"it's worth noting that Bitstamp set up a US entity in the past 24 months and my account is now

held at Bitstamp USA").

## I.     Larsen's and Garlinghouse's Relationship with GSR

**Paragraph No. 268:** For both Larsen and Garlinghouse, the overwhelming majority of their offers to sell and sales on cryptocurrency exchanges were conducted by a foreign market maker called GSR. See Ex. 8, Larsen Tr. 70:4-20, 84:8-13; Ex. 82, Garlinghouse Trading Summary n.1; Ex. 25, █ Tr. 281:8-15 (since 2017, the "vast majority" of XRP transactions by Larsen and Garlinghouse were on cryptocurrency exchanges).

**Response:** The SEC objects to the characterization in ¶ 268 of GSR as a "foreign" market

maker on the ground that that the cited references do not support the assertion and because GSR

had entities and employees based in the United States, including a "main office[ ]" in New York. PX

668 at 1; *see also* PX 22 at 26-27 (confirming that GSR had "a couple entities in the United States"

including somewhere on the "order of 15" employees based in the United States).

**Paragraph No. 269:** GSR is a market maker that was contracted by Larsen and Garlinghouse to trade XRP and other digital assets. See Ex. 8, Larsen Tr. 84:23-85:4 (GSR was engaged prior to 2015); Ex. 97, GSR00008433 (Larsen Liquidity Agreement, dated March 5, 2015); Ex. 98, GSR00001645 (Larsen Continuing Liquidity Extraction Agreement, dated May 14, 2017); Ex. 99, GSR00000689 (Larsen Continuing Liquidity Extraction Agreement, dated January 24, 2020); Ex. 100, GSR00000681 (Garlinghouse Liquidity Agreement, dated December 18, 2017); Ex. 25, █ Tr. 141:5-10 (GSR sold XRP for Larsen and Garlinghouse).

**Response:** The SEC does not dispute the assertions contained in ¶ 269.

**Paragraph No. 270:** At all relevant times, GSR was incorporated in Hong Kong, Singapore, or Andorra. See Ex. 25, ███ Tr. 274:7-276:22.

**Response:** The SEC does not dispute the assertions contained in ¶ 270.

**Paragraph No. 271:** While GSR has a U.S. affiliate, this affiliate was not involved in the services GSR provided to Larsen and Garlinghouse. See Ex. 25, ███ Tr. 276:25-277:12; Ex. 4, Samarasinghe Tr. 314:19-315:11.

**Response:** The SEC does not dispute the assertions contained in ¶ 271.

**Paragraph No. 272:** None of GSR's U.S.-based personnel were traders, conducted trades for Larsen and Garlinghouse, or were otherwise involved in the services GSR provided. See Ex. 25, ███ Tr. 277:20-278:5; Ex. 4, Samarasinghe Tr. 314:19-315:11.

**Response:** The SEC does not dispute the assertions contained in ¶ 272.

**Paragraph No. 273:** The principal point of contact for Larsen's and Garlinghouse's sales of XRP was ███████. See Ex. 25, ███ Tr. 278:8-13 (confirming he was the "primary point of contact" for Larsen and Garlinghouse).

**Response:** The SEC does not dispute the assertions contained in ¶ 273.

**Paragraph No. 274:** ███ was domiciled in Malaga, Spain during the relevant period and conducted business from there. See Ex. 25, ███ Tr. 278:14-19.

**Response:** The SEC does not dispute the assertions contained in ¶ 274.

**Paragraph No. 275:** To transfer XRP to GSR, Larsen and Garlinghouse would first send XRP from a wallet on the ledger to a wallet that GSR designated to receive the XRP. These transfers were not sales to GSR. It paid no consideration to Larsen or Garlinghouse for the XRP. Instead, Larsen and Garlinghouse loaned XRP to GSR in order to make sales on their behalf. See Ex. 100, GSR00000681 (§§ 2.1-2.7); Ex. 97, GSR00008433 (§§ 2.1-2.7); Ex. 25, ███ Tr. 284:1-21, 285:14-288:6.

**Response:** The SEC disputes the assertions contained in ¶ 275 on the grounds that, as

explained more fully in the SEC's 56.1 Counter, the Individual Defendants' transfers of their XRP to

GSR did in fact constitute sales, whereby GSR obtained immediate "custody and control" of the

XRP and GSR's "right to payment vest[ed]" as soon as it took custody of the XRP. PX 612 §§ 2.3,

2.6; PX 615 §§ 2.3, 2.6. *See infra* SEC 56.1 Counter ¶¶ 298-337.

123

**Paragraph No. 276:** GSR exercised its discretion to determine where, when, and how to sell the XRP. See Ex. 97, GSR00008433, § 2.4 ("The decision about the volume of Loaned XRP that will be sold on a given day will be [GSR's], but [GSR] is required to take the reaction of the global XRP market to its sales activities into account as it sells the Loaned XRPs.").

**Response:** The SEC disputes the assertion in ¶ 276 on the ground that GSR did not have full discretion to "determine where, when, and how to sell the XRP" but instead followed specific parameters set forth by Larsen and Garlinghouse. *See, e.g.,* PX 26 at 292:13-21 ("The client gives us instructions to buy or sell or pause, and we execute that."); PX 691 (GSR requesting approval from Larsen to increase exposure to a specific exchange); PX 81 at 487:2-8 (Garlinghouse instructed GSR not to sell on U.S. exchanges). *See infra* SEC 56.1 Counter ¶¶ 298-337.

**Paragraph No. 277:** Larsen and Garlinghouse relied on GSR's expertise and only occasionally provided instruction regarding sales targets or to pause or resume selling. See Ex. 25, ▮ Tr. 292:6-293:3; Ex. 8, Larsen Tr. 126:14-17 ("I'm not a market maker. It's a complicated business, especially in these – these are sophisticated global markets. So I would defer to them."); id. 106:10-16 ("As far as directing, I'm more relying on their expertise."); id. 74:9-13 (similar); Ex. 101, GSR00021503; Ex. 41, Yadav Rep. ¶ 73 ("[I]t is commonplace for agents to have discretion in how they execute their client's instructions, particularly to account for volatile and shifting markets.").

**Response:** The SEC disputes the assertions in ¶ 277 on the grounds that, while under the agreements with GSR, Larsen and Garlinghouse were not required to provide additional sales instructions to GSR once they had transferred the XRP to GSR for sale to ultimate purchasers on crypto exchanges, Larsen and Garlinghouse did in fact continue to monitor the XRP markets and discuss liquidation strategies with GSR. *See, e.g.,* PX 26 at 292:13-21 ("The client gives us instructions to buy or sell or pause, and we execute that."); PX 691 (GSR requesting approval from Larsen to increase exposure to a specific exchange); PX 2 at 107:16-108:25 (Larsen stating that he "would decide whether or not to act on [GSR's] recommendations" and that he "directed the sales of XRP made using GSR's trading bot"); PX 81 at 487:2-8 (Garlinghouse instructing GSR not to sell on U.S. exchanges).

**Paragraph No. 278:** GSR executed trades on behalf of Larsen and Garlinghouse using algorithms (or "bots") that GSR developed and programmed, which decided how much to trade, when to trade, and the exchanges on which to trade. See Ex. 25, ▇ Tr. 115:15-17, 144:4-6, 290:16-291:1, 292:13-21, 312:5-313:6 (GSR executed trades using algorithms).

**Response:** The SEC disputes the assertion in ¶ 278 on the ground that GSR's algorithmic

bots were not the sole determinant of "how much to trade, when to trade, and the exchanges on

which to trade" because Larsen and Garlinghouse monitored the XRP markets and discussed

liquidation strategies with GSR. *See, e.g.*, PX 26 at 292:13-21 ("The client gives us instructions to buy

or sell or pause, and we execute that."); PX 691 (GSR requesting approval from Larsen to increase

exposure to a specific exchange); PX 693 (GSR requesting approval from Larsen to add specific

exchange in connection with his trading bot); PX 81 at 487:2-8 (Garlinghouse instructing GSR not

to sell on U.S. exchanges).

**Paragraph No. 279:** GSR used bots to make offers and sales on exchanges, and those bots were programmed to find the best possible execution price. See Ex. 25, ▇ Tr. 27:19-21, 62:2-63:23, 115:15-17 ("[T]he algorithm just cares about finding best execution, finding the best possible price."); id. 143:5-14 (GSR could adjust the algorithm for different clients); id. 312:9-12 (confirming trades were supposed to occur 24 hours a day, 7 days a week).

**Response:** The SEC does not dispute the assertions contained in ¶ 279.

**Paragraph No. 280:** The way "GSR would execute a trade on a cryptocurrency exchange [was] the same for Mr. Larsen and Mr. Garlinghouse." Ex. 25, ▇ Tr. 283:1-6.

**Response:** The SEC does not dispute the assertions contained in ¶ 280.

**Paragraph No. 281:** When GSR sold XRP on exchanges, it did not know the identity of the buyer and the purchasers did not know the identity of the seller. See Ex. 25, ▇ Tr. 150:22-25 (Q: "Did you have any understanding who was buying the XRP that you sold on either – on behalf of either Ripple, Mr. Larsen or Mr. Garlinghouse?" A: "No."); id. 297:11-16; Ex. 41, Yadav Rep. ¶ 77 ("[E]lectronic order matching trading systems are, overwhelmingly, anonymous spaces.").

**Response:** The SEC does not dispute the assertions contained in ¶ 281.

**Paragraph No. 282:** Similarly, Larsen and Garlinghouse did not know the identities of the buyers when GSR sold XRP on exchanges on their behalf. See Ex. 8, Larsen Tr. 88:7-23; Ex. 76, Garlinghouse Tr. 487:23-24 ("I don't know who the purchasers of my XRP are.").

**Response:** The SEC does not dispute the assertions contained in ¶ 282.

**Paragraph No. 283:** Larsen and Garlinghouse did not provide GSR with instructions to offer or sell XRP to any particular individuals at a particular price, or instruct GSR to execute specific offers and sales at precise times on designated exchanges. See Ex. 25, ▇ Tr. 162:12-17 (GSR was not restricted in the amount of XRP, other than sales targets); id. 292:13-21 ("The client gives us instructions to buy or sell or pause, and we executed that.").

**Response:** The SEC does not dispute the assertions contained in ¶ 283.

**Paragraph No. 284:** Unless and until GSR sold Larsen's and Garlinghouse's XRP on exchanges, Larsen and Garlinghouse could require that GSR return their XRP or that GSR stop the trading algorithm. See Ex. 25, ▇ Tr. 291:22-293:8 (before a trade is accepted, "[a]s soon as a client says stop, return the funds, we stop the bots"); id. 285:25-286:2 (if XRP is not sold by GSR, GSR must return it to clients).

**Response:** The SEC disputes the assertion in ¶ 284 on the grounds that Larsen's and Garlinghouse's agreements with GSR provide that Larsen or Garlinghouse can terminate the agreements "upon sixty (60) days' advance written notice to GSR" or "immediately upon notice to GSR if GSR breaches any of its obligations" under the agreements. PX 612 §§ 10.2, 10.3, PX 615 §§ 9.2, 9.3.

**Paragraph No. 285:** The vast majority of the sales GSR made on behalf of Larsen and Garlinghouse were done on foreign exchanges, from accounts at those exchanges maintained by GSR in its own name. See Ex. 82, Garlinghouse Trading Summary; Ex. 81, Larsen Trading Summary; Ex. 25, ▇ Tr. 289:14-21, 303:20-304:16.

**Response:** The SEC does not dispute the assertion in ¶ 285 that GSR traded from accounts under its own name at crypto trading platforms. The SEC disputes the remaining assertions in ¶ 285 on the grounds that several of the platforms identified as being "foreign" in Defendants' Exhibits 81 and 82 had indicia of being in the United States: for example, Bitstamp allowed U.S. customers—including Larsen and Garlinghouse—to transact on its main platform, and Bitstamp also has servers in the United States.  PX 13 at ¶ 120, 132; PX 394 (Larsen account information and activity on Bitstamp); PX 411 (Garlinghouse account information and activity on Bitstamp).  As another example, GateHub noted on its website that it had the "majority of the team operating from Slovenia and USA." PX 673.

Moreover, at least 12 of the exchanges identified as "foreign" accepted U.S. purchasers according to Ripple's own internal documents and documents prepared by one of Ripple's key

market makers. See, *See, e.g.,* PX 564; PX 565; PX 566; PX 567; PX 576 (Samarasinghe estimating that 75% of Ripple's OTC sales and sales to exchanges are sales to partners who accept U.S. customers, making "the assumption that all sales of XRP on such exchanges are to US persons in the absence of more conclusive data."). According to Ripple's market maker, the exchanges that accepted U.S. customers included Binance, Bithumb, Bittrex, Bitstamp, Coinone, Korbit, Kraken, Poloniex, ZB, ZBG, and Coinbase. PX 564.  According to Ripple's internal tracking, Bitforex, AscendEX/Bitmax, Bitrue, Bittrex, HuobiPro, Kraken, Poloniex, and the XRP Ledger also accepted U.S. customers. PX 565; PX 566.   Per the foregoing, at least 70% of Larsen's claimed realized profits of $373 million between 2018 and 2020 reflected in Defendants' Exhibit 81 were obtained on U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.  Similarly, at least 82% of Garlinghouse's claimed realized profits of $164 million between 2017-2020 reflected in Defendants' Exhibit 82 were to U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.

Further, at least four of the exchanges identified as "foreign" are registered as "money service businesses" in the United States with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") with registration addresses in the United States listed in parenthesis: BitMart (California); AscendEX/BitMax (New York); and Korbit (Colorado), OKEx (Colorado). *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search.

Defendants' Exhibits 81 and 82 also incorrectly identify as "foreign" the location of transactions made on certain of the identified platforms. The "Foreign Exchanges 2017" listed in Defendants' Exhibit 81 includes sales on several gateways, including Gatehub, Mr. Ripple, Rippex, Ripple China, Ripple Fox, and Bitso. *See, e.g.*, PX 676  All transactions involving these platforms –

including sales – are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself.  *See, e.g.*, PX 764 at 3 (explaining that XRP Ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 2 (GateHub stating that "[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  According to the cited evidence, transactions on these gateways occurred prior to 2018.  Transactions on these gateways, which are confirmed and cleared on the XRP Ledger, occurred within the United States because transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018. PX 13 at ¶ 177 ("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

The SEC further disputes that Defendants' Exhibits 81 (Larsen's claimed sales) and 82 (Garlinghouse's claimed sales) are a "summary" of "voluminous trading records," as they purport to be. Each cites as support for the "summaries" a handful of spreadsheets that were prepared by GSR at Larsen's and Garlinghouse's request in October 2020, and were largely not based on "trading records" kept in the ordinary course of business.  *See* PX 616 (in response to request for Larsen's historical bot trading data from 2015-2020, GSR responds that "We are working on this. The SEC requested it directly on Monday, and Brad's lawyers on Tuesday"); PX 611 (GSR says, "[w]e are working on this still. We don't have access to data all the way back to 2015, but we should have it since mid-2018 at least. Even then, it's a big project to collate all the info and determine the relevant jurisdictions at the time"); PX 613 (internal GSR email discussing "compil[ing] as much as we can" in response to Defendants' requests for historical trading data); PX 618 (internal GSR email

describing how creating the historical data (writing scripts, looking at old source code and emails) has "been a bit more challenging than I expected").

In addition, certain portions of Defendants' Exhibits 81 and 82 do not reflect trading "records" at all, but rather, an "estimate" of the amount of XRP Larsen and Garlinghouse sold on an exchange.  *See* Def. Ex. 87 ("PLEASE BEAR IN MIND SALES CONTAINED IN THIS TABLE ARE ESTIMATES.  EXACT FIGURES ARE NOT AVAILABLE AS WE RAN AN INTEGRATED SERVICE IN 2017 ANSD [sic] BEFORE.").

Finally, Defendants' Exhibits 81 and 82 appear to have been created by counsel as summaries pursuant to Federal Rule of Evidence 1006 but they do not satisfy that Rule because they do not summarize "voluminous" records as required by the Rule—citing a total of only eight documents combined—and are unaccompanied by any sworn declaration.

**Paragraph No. 286:** After consummating a sale, GSR would remit the proceeds to Larsen and Garlinghouse. See Ex. 99, GSR00000689 (§ 2.3); Ex. 100, GSR00000681 (§ 2.3); Ex. 76, Garlinghouse Tr. 180:7-9.

**Response:** The SEC disputes the assertion in ¶ 286 that the proceeds from a specific consummated sale were remitted by GSR to Larsen and Garlinghouse on the ground that this incorrectly characterizes the nature of GSR's trading activity.  GSR commingled the XRP of Larsen and Garlinghouse with that of Ripple and other Ripple individuals into one account, and the proceeds from the sales of that XRP were all held in one account at GSR. PX 26 at 142:12-21 ("[W]hen we performed the programmatic sales program, we didn't segregate all of the different accounts.  We would sell on behalf of Ripple and Mr. Larsen, for example, and the XRP would -- would be in one pot, it would be distributed to the exchanges where we were selling it.  The proceeds would come back to us, and then we would distribute the proceeds proportionately to however much Ripple and Mr. Larsen was intending to sell."), 143:19-25 (GSR's ▮ confirmed that

129

"all of the XRP from Ripple and all of the individuals was commingled in one account" and "all the

proceeds from the sales of all of that XRP was in one account").  As a result, proceeds from a

specific sale were not remitted to Larsen or Garlinghouse but were instead pooled by GSR with

other sales proceeds and then later distributed based on the daily sales volume percentages

established by each individual or entity.

**Paragraph No. 287:** GSR received compensation based on a commission from executed sales. It was not compensated based on prospective sales or offers. See Ex. 97, GSR00008433 (§ 2.6); Ex. 100, GSR00000681 (§ 2.6); Ex. 99, GSR00000689 (§ 2.6); Ex. 25, ▮ Tr. 286:12-287:3.

**Response:** The SEC disputes the assertions in ¶ 287 on the grounds that, under Larsen's

and Garlinghouse's agreements with GSR, "GSR's right to payment vest[ed] once GSR [took]

custody of" the XRP and that any XRP that is "not liquidated within twelve (12) months of delivery

will be delivered back to [the Individual Defendants], less GSR Compensation."  PX 612, PX 615 §§

2.6, 2.1.

**J.    Larsen's Uses of XRP**

**Paragraph No. 288:** Larsen has donated more than 2 billion XRP to a number of charities, including RippleWorks, Silicon Valley Community Foundation, GiveDirectly, DonorsChoose, the Khmer Buddhist Temple Foundation, San Francisco State University, Tipping Point Community, and Larkin Street Youth Services charity. See Ex. 14, Larsen Decl. ¶ 5; Ex. 102, LARSEN-SEC-LIT-00006428.

**Response:** The SEC does not dispute the assertions contained in ¶ 288.

**Paragraph No. 289:** In addition to charitable donations, Larsen sold XRP, principally on foreign exchanges through GSR. See Ex. 97, GSR00008433 (Larsen Liquidity Agreement); see infra ¶¶ 292-301; Ex. 81, Larsen Trading Summary.

**Response:** The SEC disputes the assertion contained in ¶ 289 that Larsen sold XRP

"principally on foreign exchanges" on the grounds that several of the platforms identified as being

"foreign" in Defendants' Exhibit 81 had indicia of being in the United States: for example, Bitstamp

allowed U.S. customers—including Larsen and Garlinghouse—to transact on its main platform, and

Bitstamp also has servers in the United States.  PX 13 at ¶ 120, 132; PX 394 (Larsen account

information and activity on Bitstamp); PX 411 (Garlinghouse account information and activity on

Bitstamp).  As another example, GateHub noted on its website that it had the "majority of the team

operating from Slovenia and USA." PX 673.

Moreover, at least 12 of the exchanges identified as "foreign" accepted U.S. purchasers

according to Ripple's own internal documents and documents prepared by one of Ripple's key

market makers. See, *See, e.g.,* PX 564; PX 565; PX 566; PX 567; PX 576 (Samarasinghe estimating

that 75% of Ripple's OTC sales and sales to exchanges are sales to partners who accept U.S.

customers, making "the assumption that all sales of XRP on such exchanges are to US persons in

the absence of more conclusive data."). According to Ripple's market maker, the exchanges that

accepted U.S. customers included Binance, Bithumb, Bittrex, Bitstamp, Coinone, Korbit, Kraken,

Poloniex, ZB, ZBG, and Coinbase. PX 564.  According to Ripple's internal tracking, Bitforex,

AscendEX/Bitmax, Bitrue, Bittrex, HuobiPro, Kraken, Poloniex, and the XRP Ledger also accepted

U.S. customers. PX 565; PX 566.   Per the foregoing, at least 70% of Larsen's claimed realized

profits of $373 million between 2018 and 2020 reflected in Defendants' Exhibit 81 were obtained on

U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.  Similarly, at least 82%

of Garlinghouse's claimed realized profits of $164 million between 2017-2020 reflected in

Defendants' Exhibit 82 were to U.S.-domiciled exchanges or other exchanges that accepted U.S.

customers.

Further, at least four of the exchanges identified as "foreign" are registered as "money

service businesses" in the United States with the U.S. Department of the Treasury's Financial

Crimes Enforcement Network ("FinCEN") with registration addresses in the United States listed in

parenthesis: BitMart (California); AscendEX/BitMax (New York); and Korbit (Colorado), OKEx

(Colorado). *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search.

Defendants' Exhibit 81 also incorrectly identify as "foreign" the location of transactions made on certain of the identified platforms. The "Foreign Exchanges 2017" listed in Defendants' Exhibit 81 includes sales on several gateways, including Gatehub, Mr. Ripple, Rippex, Ripple China, Ripple Fox, and Bitso. *See, e.g.*, PX 676  All transactions involving these platforms – including sales – are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself.  *See, e.g.*, PX 764 at 3 (explaining that XRP Ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 2 (GateHub stating that "[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  According to the cited evidence, transactions on these gateways occurred prior to 2018.  Transactions on these gateways, which are confirmed and cleared on the XRP Ledger, occurred within the United States because transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177 ("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

The SEC further disputes that Defendants' Exhibits 81 is a "summary" of "voluminous trading records," as they purport to be. Each cites as support for the "summaries" a handful of spreadsheets that were prepared by GSR at Larsen's and Garlinghouse's request in October 2020, and were largely not based on "trading records" kept in the ordinary course of business.  *See* PX 616 (in response to request for Larsen's historical bot trading data from 2015-2020, GSR responds that "We are working on this. The SEC requested it directly on Monday, and Brad's lawyers on

Tuesday"); PX 611 (GSR says, "[w]e are working on this still. We don't have access to data all the way back to 2015, but we should have it since mid-2018 at least. Even then, it's a big project to collate all the info and determine the relevant jurisdictions at the time"); PX 613 (internal GSR email discussing "compil[ing] as much as we can" in response to Defendants' requests for historical trading data); PX 618 (internal GSR email describing how creating the historical data (writing scripts, looking at old source code and emails) has "been a bit more challenging than I expected").

In addition, certain portions of Defendants' Exhibit 81 do not reflect trading "records" at all, but rather, an "estimate" of the amount of XRP Larsen and Garlinghouse sold on an exchange. *See* Def. Ex. 87 ("PLEASE BEAR IN MIND SALES CONTAINED IN THIS TABLE ARE ESTIMATES.  EXACT FIGURES ARE NOT AVAILABLE AS WE RAN AN INTEGRATED SERVICE IN 2017 ANSD [sic] BEFORE.").

Finally, Defendants' Exhibit 81 appears to have been created by counsel as a summary pursuant to Federal Rule of Evidence 1006 but they do not satisfy that Rule because they do not summarize "voluminous" records as required by the Rule—citing a total of only six documents— and are unaccompanied by any sworn declaration.

**Paragraph No. 290:** When Larsen sold XRP, he sold it for his personal benefit, not for Ripple's benefit. See Ex. 8, Larsen Tr. 69:23-70:12 (discussing Larsen's sales).

**Response:** The SEC disputes the assertion contained in ¶ 290 on the ground that Larsen intended for his XRP sales to be "constructive" to the XRP market, PX 2 at 71:7-74:20, and eliminate any "overhang" that depressed XRP's price due to market concerns about the size of the holdings of Ripple's founders. PX 2 at 92:20-93:17.  Ripple stood to benefit from Larsen's "constructive" selling efforts because it was the largest holder of XRP.  *See*, *e.g.*, PX 708 ("Ripple holds over 60 billion XRP.  Given the way that's being escrowed, Ripple will almost certainly be the largest holder of XRP for the foreseeable future.").

133

**Paragraph No. 291:** Larsen's proceeds from sales of his XRP have not been held by Ripple or combined with Ripple's corporate accounts. See Ex. 14, Larsen Decl. ¶ 4.

**Response:** The SEC disputes the assertion in ¶ 291 on the ground that GSR commingled Larsen's XRP with that of Ripple and other Ripple individuals into one account, and the proceeds from the sales of that XRP were all held in one account at GSR. PX 26 at 142:12-21 ("…when we performed the programmatic sales program, we didn't segregate all of the different accounts.  We would sell on behalf of Ripple and Mr. Larsen, for example, and the XRP would -- would be in one pot, it would be distributed to the exchanges where we were selling it.  The proceeds would come back to us, and then we would distribute the proceeds proportionately to however much Ripple and Mr. Larsen was intending to sell."); 143:19-144:25 (GSR's ███ confirmed that "all of the XRP from Ripple and all of the individuals was commingled in one account" and "all the proceeds from the sales of all of that XRP was in one account").

**Paragraph No. 292:** Prior to 2017, GSR sold Larsen's XRP only on exchanges that have no significant indicia of being in the United States. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion in ¶ 292 on the grounds that the cited reference contains conclusory and incorrect allegations as to the nature of these platforms as well as the nature of sales made using these platforms.  The platforms identified in Defendants' Exhibit 87 are not "exchanges" but rather "gateways."  *See*, *e.g.*, PX 676 (internal Ripple spreadsheet identifying several platforms as "Ripple Gateways"); PX 764 at 0995490 n.2 (describing "Ripple Gateways"); PX 679 (press release identifying Bitso as a "Ripple Gateway").  All transactions involving these platforms— including sales—are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself  *See*, *e.g.*, PX 764 at at 0995492 (explaining that XRP ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 2 (GateHub stating that "[p]ayments with

our gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  Transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177 ("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

The SEC also disputes the assertion in ¶ 292 that GSR's pre-2017 sales for Larsen occurred on entities that had "no significant indicia of being in the United States."  For example, SnapSwap – one of the entities listed in the cited reference – was based in the United States starting as early as 2013 and served as Ripple's "first U.S.-based gateway." *See*, *e.g.*, PX 680, PX 665, PX 666.  Ripple internal documents from that period similarly identified SnapSwap as being based in the United States. *See*, *e.g.*, PX 677.

**Paragraph No. 293:** In 2014, according to GSR, Larsen's XRP was sold on SnapSwap and RippleTradeJapan. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 293 on the ground that the cited reference does not support the assertion because it contains no information as to where Larsen's sales were actually made and because Larsen's XRP sales did not occur on these platforms.  Both SnapSwap and RippleTradeJapan were gateways.  See PX 764 at 7. All transactions involving these platforms—including sales—are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself  *See*, *e.g.*, PX 764 at 3 (explaining that XRP ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus

Ledger].”). Transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177 (“…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.”).

**Paragraph No. 294:** Neither SnapSwap nor RippleTradeJapan has any significant indicia of being in the United States. See supra ¶¶ 261-263.

**Response:** The SEC disputes the assertion in ¶ 294 that the platforms listed did not have “any significant indicia of being in the United States” on the ground that the cited reference does not support the assertion because it contains no information as to where Larsen's sales were actually made and because Larsen's XRP sales did not occur on these platforms.  Both SnapSwap and RippleTradeJapan were gateways.  *See* PX 764 at 7. All transactions involving these platforms— including sales—are confirmed and cleared on the XRP Ledger rather than being “made” on the gateway itself  *See, e.g.*, PX 764 at 3 (explaining that XRP ledger records transactions through a system of balances issued by gateways and “transactions conducted in Balances are confirmed and cleared in the Ripple Network”); PX 675 at 198172 (GateHub stating that “[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply send them ‘back’ via RCL [Ripple Consensus Ledger].”). Transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177 (“…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.”).

In addition, SnapSwap was based in the United States starting as early as 2013 and served as Ripple's “first U.S.-based gateway.” *See, e.g.*, PX 680, PX 665, PX 666. Ripple internal documents

136

from that period similarly identified SnapSwap as being based in the United States.  *See*, *e.g.*, PX 677 at 1.

**Paragraph No. 295:** In 2015, according to GSR, Larsen's XRP was sold on SnapSwap, RippleTradeJapan, Tokyo JPY, Bitstamp, Bitso, RippleFox, RippleChina, Mr. Ripple, and GateHub. See Ex. 87, GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 295 on the ground that the cited reference does not support the assertion because it contains no information as to where Larsen's sales were actually made and because Larsen's XRP sales did not occur on these platforms.  The entities listed in ¶ 295 were gateways.  *See* PX 764 at 7. All transactions involving these platforms— including sales—are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself  *See*, *e.g.*, PX 764 at 3 (explaining that XRP ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger]."). Transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177 ("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

**Paragraph No. 296:** None of the exchanges listed in ¶ 295 has any significant indicia of being in the United States. See supra ¶¶ 205-209, 243-266.

**Response:** The SEC disputes the assertion in ¶ 296 that the exchanges listed in ¶ 295 did not have "any significant indicia of being in the United States" on the ground that the cited reference does not support the assertion because it contains no information as to where Larsen's sales were actually made and because Larsen's XRP sales did not occur on these platforms.  The

entities listed in ¶ 295 were gateways. *See* PX 764 at 7. All transactions involving these platforms—

including sales—are confirmed and cleared on the XRP Ledger rather than being "made" on the

gateway itself  *See, e.g.*, PX 764 at 3 (explaining that XRP ledger records transactions through a

system of balances issued by gateways and "transactions conducted in Balances are confirmed and

cleared in the Ripple Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our

gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to

reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  Transactions

on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177

("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has

only included Ripple-operated validators, and so the list has been entirely US-based for most of its

existence.").

In addition, GateHub noted on its website that it had the "majority of the team operating

from Slovenia and USA." PX 673.

**Paragraph No. 297:** In 2016, according to GSR, Larsen's XRP was sold on Tokyo JPY,
Bitstamp, Bitso, RippleFox, RippleChina, Mr. Ripple, GateHub, and Rippex. See Ex. 87,
GSR00000443.

**Response:** The SEC disputes the assertion contained in ¶ 297 on the ground that the cited

reference does not support the assertion because it contains no information as to where Larsen's

sales were actually made and because Larsen's XRP sales did not occur on these platforms.  The

entities listed in ¶ 297 were gateways.  *See* PX 764 at 7. All transactions involving these platforms—

including sales—are confirmed and cleared on the XRP Ledger rather than being "made" on the

gateway itself  *See, e.g.*, PX 764 at 3 (explaining that XRP ledger records transactions through a

system of balances issued by gateways and "transactions conducted in Balances are confirmed and

cleared in the Ripple Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our

gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to

reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  Transactions

on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177

("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has

only included Ripple-operated validators, and so the list has been entirely US-based for most of its

existence.").

> **Paragraph No. 298:** None of the exchanges listed in ¶ 297 has any significant indicia of
being in the United States. See supra ¶¶ 205-209, 243-260, 264-266.

> **Response:** The SEC disputes the assertion in ¶ 298 that the exchanges listed in ¶ 297 did

not have "any significant indicia of being in the United States" on the ground that the cited

reference does not support the assertion because it contains no information as to where Larsen's

sales were actually made and because Larsen's XRP sales did not occur on these platforms.  The

entities listed in ¶ 297 were gateways.  *See* PX 764 at 7. All transactions involving these platforms—

including sales—are confirmed and cleared on the XRP Ledger rather than being "made" on the

gateway itself  *See*, *e.g.*, PX 764 at 3 (explaining that XRP ledger records transactions through a

system of balances issued by gateways and "transactions conducted in Balances are confirmed and

cleared in the Ripple Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our

gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to

reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  Transactions

on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177

("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has

only included Ripple-operated validators, and so the list has been entirely US-based for most of its

existence.").

**Paragraph No. 299:** Between 2017 and December 22, 2020, according to GSR, Larsen's XRP was sold on Binance, Bitfinex, BitForex, Bithumb, Bitlish, BitMart, AscendEX/BitMax, Bitrue, Bitstamp, Bittrex, Coinbase, Coinbene, Coinone, GateHub, GateHub Fifth, HitBTC, Huobi, Huobi Pro, Kraken, Korbit, Mr. Ripple, Rippex, RippleChina, RippleFox, OKEx, Poloniex, Tokyo JPY, Upbit, ZB, and ZBG. See Ex. 81, Larsen Trading Summary.

**Response:** The SEC disputes the assertion contained in ¶ 299 on the ground that the cited reference does not support the assertion because it contains no information as to where Larsen's sales were actually made and because Larsen's XRP sales did not occur on these platforms. The entities listed in ¶ 299 were gateways. *See* PX 764 at 7. All transactions involving these platforms—including sales—are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself *See, e.g.,* PX 764 at 3 (explaining that XRP ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time. When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger]."). Transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018. PX 13 at ¶ 177 ("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

**Paragraph No. 300:** The exchanges listed in ¶ 299, except for Bittrex, Coinbase, Kraken, and Poloniex, have no significant indicia of being in the United States. See supra ¶¶ 174-266.

**Response:** The SEC disputes the assertion in ¶ 300 on the ground that several of the entities listed (other than the four identified in ¶ 300) have indicia of being in the United States. For example, Bitstamp allowed US customers – including Larsen and Garlinghouse – to transact on its main platform, and Bitstamp also has servers in the United States. PX 13 at ¶ 120, 132; PX 394, PX

685, PX 411, PX 684, PX 686, PX 687.  In addition, Binance has servers in the United States. PX 13 at ¶ 132.

**Paragraph No. 301:** By dollar amount, of Larsen's total sales of XRP through GSR between 2017 and December 22, 2020, only 12.89% of the sales were made on exchanges with any indicia of being located in the United States. See Ex. 81, Larsen Trading Summary. The remaining 87.11% of Larsen's sales between 2017 and December 22, 2020 occurred on exchanges that have "no significant indicia of being located in the United States." Ex. 41, Yadav Rep. ¶ 106 & Table A; see also Ex. 81, Larsen Trading Summary.

**Response:** The SEC disputes the assertion contained in ¶ 301 that Larsen sold XRP on exchanges that have "no significant indicia of being located in the United States" on the grounds that several of the platforms identified as being "foreign" in Defendants' Exhibit 81 had indicia of being in the United States: for example, Bitstamp allowed U.S. customers—including Larsen and Garlinghouse—to transact on its main platform, and Bitstamp also has servers in the United States. PX 13 at ¶ 120, 132; PX 394 (Larsen account information and activity on Bitstamp); PX 411 (Garlinghouse account information and activity on Bitstamp).  As another example, GateHub noted on its website that it had the "majority of the team operating from Slovenia and USA." PX 673.

Moreover, at least 12 of the exchanges identified as "foreign" accepted U.S. purchasers according to Ripple's own internal documents and documents prepared by one of Ripple's key market makers. See, *See, e.g.,* PX 564; PX 565; PX 566; PX 567; PX 576 (Samarasinghe estimating that 75% of Ripple's OTC sales and sales to exchanges are sales to partners who accept U.S. customers, making "the assumption that all sales of XRP on such exchanges are to US persons in the absence of more conclusive data."). According to Ripple's market maker, the exchanges that accepted U.S. customers included Bittrex, Bitstamp, Coinone, Korbit, Kraken, Poloniex, ZB, and ZBG, and Coinbase. PX 564.  According to Ripple's internal tracking, Bitforex, AscendEX/Bitmax, Bitrue, Bittrex, HuobiPro, Kraken, Poloniex, and the XRP Ledger also accepted U.S. customers. PX 565; PX 566.   Per the foregoing, at least 70% of Larsen's claimed realized profits of $373 million

between 2018 and 2020 reflected in Defendants' Exhibit 81 were obtained on U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.  Similarly, at least 82% of Garlinghouse's claimed realized profits of $164 million between 2017-2020 reflected in Defendants' Exhibit 82 were to U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.

Further, at least four of the exchanges identified as "foreign" are registered as "money service businesses" in the United States with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") with registration addresses in the United States listed in parenthesis: BitMart (California); AscendEX/BitMax (New York); and Korbit (Colorado), OKEx (Colorado). *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search.

Defendants' Exhibit 81 also incorrectly identify as "foreign" the location of transactions made on certain of the identified platforms. The "Foreign Exchanges 2017" listed in Defendants' Exhibit 81 includes sales on several gateways, including Gatehub, Mr. Ripple, Rippex, Ripple China, Ripple Fox, and Bitso. *See, e.g.*, PX 676  All transactions involving these platforms – including sales – are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself.  *See, e.g.*, PX 764 at 3 (explaining that XRP Ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our gateways are processed via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  According to the cited evidence, transactions on these gateways occurred prior to 2018.  Transactions on these gateways, which are confirmed and cleared on the XRP Ledger, occurred within the United States because transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177

("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

The SEC further disputes that Defendants' Exhibits 81 is a "summary" of "voluminous trading records," as they purport to be. Each cites as support for the "summaries" a handful of spreadsheets that were prepared by GSR at Larsen's and Garlinghouse's request in October 2020, and were largely not based on "trading records" kept in the ordinary course of business.  *See* PX 616 (in response to request for Larsen's historical bot trading data from 2015-2020, GSR responds that "We are working on this. The SEC requested it directly on Monday, and Brad's lawyers on Tuesday"); PX 611 (GSR says, "[w]e are working on this still. We don't have access to data all the way back to 2015, but we should have it since mid-2018 at least. Even then, it's a big project to collate all the info and determine the relevant jurisdictions at the time"); PX 613 (internal GSR email discussing "compil[ing] as much as we can" in response to Defendants' requests for historical trading data); PX 618 (internal GSR email describing how creating the historical data (writing scripts, looking at old source code and emails) has "been a bit more challenging than I expected").

In addition, certain portions of Defendants' Exhibit 81 do not reflect trading "records" at all, but rather, an "estimate" of the amount of XRP Larsen and Garlinghouse sold on an exchange. *See* Def. Ex. 87 ("PLEASE BEAR IN MIND SALES CONTAINED IN THIS TABLE ARE ESTIMATES.  EXACT FIGURES ARE NOT AVAILABLE AS WE RAN AN INTEGRATED SERVICE IN 2017 ANSD [sic] BEFORE.").

Finally, Defendants' Exhibit 81 appears to have been created by counsel as a summary pursuant to Federal Rule of Evidence 1006 but they do not satisfy that Rule because they do not

summarize "voluminous" records as required by the Rule—citing a total of only six documents—and are unaccompanied by any sworn declaration.

In addition, the SEC disputes the percentage figures contained in ¶ 301 on the grounds that GSR commingled Larsen's XRP with that of Ripple and Garlinghouse into one account, and the proceeds from the sales of that XRP were all held in one account.  PX 26 at 142:12-21 ("…when we performed the programmatic sales program, we didn't segregate all of the different accounts.  We would sell on behalf of Ripple and Mr. Larsen, for example, and the XRP would -- would be in one pot, it would be distributed to the exchanges where we were selling it.  The proceeds would come back to us, and then we would distribute the proceeds proportionately to however much Ripple and Mr. Larsen was intending to sell."); 143:19-144:25 (GSR's █ confirmed that "all of the XRP from Ripple and all of the individuals was commingled in one account" and "all the proceeds from the sales of all of that XRP was in one account"). As a result, it is impossible to determine which specific sales on particular exchanges can be attributed to Larsen's XRP.  *See* PX 26 at 143:20-25.

The SEC further disputes the assertions on the ground that the Yadav Report is not admissible for the reasons set forth in the SEC's Motion to Exclude, and the assertions based on the Yadav Report are opinions of a purported expert and not facts.

## K.  Garlinghouse's Use of XRP

**Paragraph No. 302:** Garlinghouse has donated more than 3 million XRP to a number of charities, including Sacred Heart Schools, GiveCrypto.org, and the Peninsula Arts Guild. See Ex. 17, Garlinghouse Decl. ¶ 4 (describing XRP donation to Sacred Heart Schools, GiveCrypto.org, and the Peninsula Arts Guild).

**Response:** The SEC does not dispute the assertions contained in ¶ 302.

**Paragraph No. 303:** Garlinghouse first began selling XRP in April 2017. See Ex. 17, Garlinghouse Decl. ¶ 3.

**Response:** The SEC does not dispute the assertions contained in ¶ 303.

**Paragraph No. 304:** When Garlinghouse sold XRP, he sold it for his personal benefit, not for Ripple's benefit. See Ex. 76, Garlinghouse Tr. 182:25-183:2.

**Response:** The SEC disputes the assertion in ¶ 304 on the ground that Garlinghouse conducted his XRP sales in such a way as to complement the sales by Ripple and protect the integrity of the XRP market – of which Ripple was the primary beneficiary as the largest XRP holder. *See*, *e.g.*, PX 708, Schwartz June 26, 2017 Bitcoin forum post https://bitcointalk.org/index.php?topic=1381669.msg19780668#msg19780668 ("Ripple holds over 60 billion XRP.  Given the way that's being escrowed, Ripple will almost certainly be the largest holder of XRP for the foreseeable future...").  Garlinghouse's XRP was commingled by GSR with that of Ripple, Ripple's affiliates and donees, Larsen and Larsen's family, and other Ripple-related parties into one account; sold; and then allocated depending on the specific algorithm chosen by each client. *See* PX 26 at 143:20-25.  As a result, certain sales that might otherwise have benefited Garlinghouse individually were precluded in favor of an approach that benefitted all of these parties equally.  PX 26 at 249:7-250:2 ("…what we were trying to say here is that I totally understand how one of these entities might say, well, I want to sell all my XRP tomorrow . . . because they don't care about the other entities.  And because we [GSR] were doing all these XRP sales on behalf of all of these clients, we didn't want to let people – or have people tripping over themselves and trying to get ahead of the rest…And having a bird's eye view of all the different interests and being able to push back on some of these requests was a way that we tried to maintain an orderly market and minimize the long term impact on the price of XRP.").  In addition, Ripple exercised certain restrictions over Garlinghouse's sales to ensure that these transactions were done in the most beneficial way to the company.  For example, Garlinghouse was required to receive approval from the company for certain of his XRP sales.  *See*, *e.g.*, PX 667.  Ripple also changed the terms of

145

Garlinghouse's XRP options grant to minimize the tax impact to the company from Garlinghouse's sales.  PX 669 at 1-3.

**Paragraph No. 305:** Garlinghouse's proceeds from sales of his XRP have not been held by Ripple or combined with Ripple's corporate accounts. See Ex. 17, Garlinghouse Decl. ¶ 3.

**Response:** The SEC disputes the assertion in ¶ 305 on the grounds that GSR commingled Garlinghouse's XRP with that of Ripple and Larsen into one account, and the proceeds from the sales of that XRP were all held in one account at GSR.  PX 26 at 142:12-21 ("…when we performed the programmatic sales program, we didn't segregate all of the different accounts.  We would sell on behalf of Ripple and Mr. Larsen, for example, and the XRP would -- would be in one pot, it would be distributed to the exchanges where we were selling it.  The proceeds would come back to us, and then we would distribute the proceeds proportionately to however much Ripple and Mr. Larsen was intending to sell."), 143:19-144:14 (GSR's ▮ confirmed that "all of the XRP from Ripple and all of the individuals was commingled in one account" and "all the proceeds from the sales of all of that XRP was in one account").

**Paragraph No. 306:** Between April and December 2017, virtually all of Garlinghouse's sales of XRP were conducted on the foreign exchange Bitstamp. See Ex. 82, Garlinghouse Trading Summary n.1; supra ¶¶ 205-209 (Bitstamp has no significant indicia of being located in the United States).

**Response:** The SEC disputes the assertion in ¶ 306 that Bitstamp is a "foreign exchange" and that "Bitstamp has no significant indicia of being in the United States" on the ground that Bitstamp allowed US customers – including Larsen and Garlinghouse –  to transact on its main platform, and Bitstamp also has servers in the United States. PX 13 at ¶ 120, 132; PX 394, PX 685, PX 411, PX 684, PX 686, PX 687. Further, the SEC disputes this assertion on the ground that Bitstamp is registered as a "money service business" in the United States with FinCEN (with a New

146

York registration address).  *See* <u>MSB Registrant Search | FinCEN.gov,</u> *available at*

<u>https://www.fincen.gov/msb-registrant-search</u>

**Paragraph No. 307:** Beginning in December 2017, Garlinghouse relied on GSR to sell XRP on his behalf. See Ex. 82, Garlinghouse Trading Summary n.1; supra ¶¶ 205-209 (Bitstamp has no significant indicia of being located in the United States).

**Response:** The SEC does not dispute the assertions contained in ¶ 307.

**Paragraph No. 308:** Between April 2017 and the present, Garlinghouse sold XRP on the following foreign exchanges: Binance, Bitfinex, Bitforex, Bithumb, Bitlish, BitMart, AscendEx/BitMax, Bitrue, Bitstamp, Coinbene, Coinone, HitBTC, Huobi, Korbit, OKEx, Upbit, ZB, and ZBG. See Ex. 82, Garlinghouse Trading Summary; see supra ¶¶ 174-242.

**Response:** The SEC disputes the assertion contained in ¶ 308 that Garlinghouse sold XRP

on "foreign exchanges" on the grounds that several of the platforms identified as being "foreign" in

Defendants' Exhibit 82 had indicia of being in the United States: for example, Bitstamp allowed U.S.

customers—including Larsen and Garlinghouse—to transact on its main platform, and Bitstamp

also has servers in the United States.  PX 13 at ¶ 120, 132; PX 394 (Larsen account information and

activity on Bitstamp); PX 411 (Garlinghouse account information and activity on Bitstamp).  As

another example, GateHub noted on its website that it had the "majority of the team operating from

Slovenia and USA." PX 673.

Moreover, at least 12 of the exchanges identified as "foreign" accepted U.S. purchasers

according to Ripple's own internal documents and documents prepared by one of Ripple's key

market makers. See, *See, e.g.,* PX 564; PX 565; PX 566; PX 567; PX 576 (Samarasinghe estimating

that 75% of Ripple's OTC sales and sales to exchanges are sales to partners who accept U.S.

customers, making "the assumption that all sales of XRP on such exchanges are to US persons in

the absence of more conclusive data."). According to Ripple's market maker, the exchanges that

accepted U.S. customers included Bittrex, Bitstamp, Coinone, Korbit, Kraken, Poloniex, ZB, and

ZBG, and Coinbase. PX 564.  According to Ripple's internal tracking, Bitforex, AscendEX/Bitmax,

Bitrue, Bittrex, HuobiPro, Kraken, Poloniex, and the XRP Ledger also accepted U.S. customers. PX

565; PX 566.  Per the foregoing, at least 70% of Larsen's claimed realized profits of $373 million

between 2018 and 2020 reflected in Defendants' Exhibit 81 were obtained on U.S.-domiciled

exchanges or other exchanges that accepted U.S. customers.  Similarly, at least 82% of

Garlinghouse's claimed realized profits of $164 million between 2017-2020 reflected in Defendants'

Exhibit 82 were to U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.

Further, at least four of the exchanges identified as "foreign" are registered as "money

service businesses" in the United States with the U.S. Department of the Treasury's Financial

Crimes Enforcement Network ("FinCEN") with registration addresses in the United States listed in

parenthesis: BitMart (California); AscendEX/BitMax (New York); and Korbit (Colorado), OKEx

(Colorado). *See* MSB Registrant Search | FinCEN.gov, *available at* https://www.fincen.gov/msb-

registrant-search.

Defendants' Exhibit 82 also incorrectly identify as "foreign" the location of transactions

made on certain of the identified platforms. The "Foreign Exchanges 2017" listed in Defendants'

Exhibit 81 includes sales on several gateways, including Gatehub, Mr. Ripple, Rippex, Ripple China,

Ripple Fox, and Bitso. *See, e.g.,* PX 676  All transactions involving these platforms – including sales –

are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself.  *See,*

*e.g.,* PX 764 at 3 (explaining that XRP Ledger records transactions through a system of balances

issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple

Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our gateways are processed

via ILP [inter-ledger protocol] real-time.  When connectors need to reallocate funds, they simply

send them 'back' via RCL [Ripple Consensus Ledger].").  According to the cited evidence,

transactions on these gateways occurred prior to 2018.  Transactions on these gateways, which are

148

confirmed and cleared on the XRP Ledger, occurred within the United States because transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018. PX 13 at ¶ 177 ("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

The SEC further disputes that Defendants' Exhibits 82 is a "summary" of "voluminous trading records," as they purport to be. Each cites as support for the "summaries" a handful of spreadsheets that were prepared by GSR at Larsen's and Garlinghouse's request in October 2020, and were largely not based on "trading records" kept in the ordinary course of business. *See* PX 616 (in response to request for Larsen's historical bot trading data from 2015-2020, GSR responds that "We are working on this. The SEC requested it directly on Monday, and Brad's lawyers on Tuesday"); PX 611 (GSR says, "[w]e are working on this still. We don't have access to data all the way back to 2015, but we should have it since mid-2018 at least. Even then, it's a big project to collate all the info and determine the relevant jurisdictions at the time"); PX 613 (internal GSR email discussing "compil[ing] as much as we can" in response to Defendants' requests for historical trading data); PX 618 (internal GSR email describing how creating the historical data (writing scripts, looking at old source code and emails) has "been a bit more challenging than I expected").

In addition, certain portions of Defendants' Exhibit 82 do not reflect trading "records" at all, but rather, an "estimate" of the amount of XRP Larsen and Garlinghouse sold on an exchange. *See* Def. Ex. 87 ("PLEASE BEAR IN MIND SALES CONTAINED IN THIS TABLE ARE ESTIMATES.  EXACT FIGURES ARE NOT AVAILABLE AS WE RAN AN INTEGRATED SERVICE IN 2017 ANSD [sic] BEFORE.").

Defendants' Exhibit 82 appears to have been created by counsel as a summary pursuant to Federal Rule of Evidence 1006 but they do not satisfy that Rule because they do not summarize "voluminous" records as required by the Rule—citing a total of only four documents—and are unaccompanied by any sworn declaration.

**Paragraph No. 309:** Between April 2017 and the present, Garlinghouse sold XRP on the following other exchanges: Bittrex, Coinbase, Kraken, and Poloniex. See Ex. 83, Pl.'s Answers & Objs. to Defs.' Fifth Set of Reqs. for Admis., SEC Answer to RFA No. 1337 (admitting that the SEC is not asserting Garlinghouse sold XRP on any exchanges other than the ones listed in this paragraph and in ¶ 308).

**Response:** The SEC does not dispute the assertions contained in ¶ 309.

**Paragraph No. 310:** In total, 94.86% of the total proceeds from Garlinghouse's sales of XRP derived from sales on the foreign exchanges, and 5.14% of the total proceeds from these sales were on the other exchanges. See Ex. 82, Garlinghouse Trading Summary.

**Response:** The SEC disputes the assertion contained in ¶ 310 that Garlinghouse sold XRP on "foreign exchanges" on the grounds that several of the platforms identified as being "foreign" in Defendants' Exhibit 82 had indicia of being in the United States: for example, Bitstamp allowed U.S. customers—including Larsen and Garlinghouse—to transact on its main platform, and Bitstamp also has servers in the United States.  PX 13 at ¶ 120, 132; PX 394 (Larsen account information and activity on Bitstamp); PX 411 (Garlinghouse account information and activity on Bitstamp).  As another example, GateHub noted on its website that it had the "majority of the team operating from Slovenia and USA." PX 673.

Moreover, at least 12 of the exchanges identified as "foreign" accepted U.S. purchasers according to Ripple's own internal documents and documents prepared by one of Ripple's key market makers. See, *See, e.g.,* PX 564; PX 565; PX 566; PX 567; PX 576 (Samarasinghe estimating that 75% of Ripple's OTC sales and sales to exchanges are sales to partners who accept U.S. customers, making "the assumption that all sales of XRP on such exchanges are to US persons in

the absence of more conclusive data."). According to Ripple's market maker, the exchanges that accepted U.S. customers included Bittrex, Bitstamp, Coinone, Korbit, Kraken, Poloniex, ZB, and ZBG, and Coinbase. PX 564.  According to Ripple's internal tracking, Bitforex, AscendEX/Bitmax, Bitrue, Bittrex, HuobiPro, Kraken, Poloniex, and the XRP Ledger also accepted U.S. customers. PX 565; PX 566.  Per the foregoing, at least 70% of Larsen's claimed realized profits of $373 million between 2018 and 2020 reflected in Defendants' Exhibit 81 were obtained on U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.  Similarly, at least 82% of Garlinghouse's claimed realized profits of $164 million between 2017-2020 reflected in Defendants' Exhibit 82 were to U.S.-domiciled exchanges or other exchanges that accepted U.S. customers.

Further, at least four of the exchanges identified as "foreign" are registered as "money service businesses" in the United States with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") with registration addresses in the United States listed in parenthesis: BitMart (California); AscendEX/BitMax (New York); and Korbit (Colorado), OKEx (Colorado). *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search.

Defendants' Exhibit 82 also incorrectly identify as "foreign" the location of transactions made on certain of the identified platforms. The "Foreign Exchanges 2017" listed in Defendants' Exhibit 81 includes sales on several gateways, including Gatehub, Mr. Ripple, Rippex, Ripple China, Ripple Fox, and Bitso. *See, e.g.*, PX 676  All transactions involving these platforms – including sales – are confirmed and cleared on the XRP Ledger rather than being "made" on the gateway itself.  *See, e.g.*, PX 675 at 3 (explaining that XRP Ledger records transactions through a system of balances issued by gateways and "transactions conducted in Balances are confirmed and cleared in the Ripple Network"); PX 675 at 198172 (GateHub stating that "[p]ayments with our gateways are processed

via ILP [inter-ledger protocol] real-time. When connectors need to reallocate funds, they simply send them 'back' via RCL [Ripple Consensus Ledger].").  According to the cited evidence, transactions on these gateways occurred prior to 2018.  Transactions on these gateways, which are confirmed and cleared on the XRP Ledger, occurred within the United States because transactions on the XRP Ledger were validated by operators based entirely in the U.S until 2018.  PX 13 at ¶ 177 ("…for the majority of the XRP Ledger's existence up until June 2018, the default validator list has only included Ripple-operated validators, and so the list has been entirely US-based for most of its existence.").

The SEC further disputes that Defendants' Exhibits 82 is a "summary" of "voluminous trading records," as they purport to be. Each cites as support for the "summaries" a handful of spreadsheets that were prepared by GSR at Larsen's and Garlinghouse's request in October 2020, and were largely not based on "trading records" kept in the ordinary course of business.  *See* PX 616 (in response to request for Larsen's historical bot trading data from 2015-2020, GSR responds that "We are working on this. The SEC requested it directly on Monday, and Brad's lawyers on Tuesday"); PX 611 (GSR says, "[w]e are working on this still. We don't have access to data all the way back to 2015, but we should have it since mid-2018 at least. Even then, it's a big project to collate all the info and determine the relevant jurisdictions at the time"); PX 613 (internal GSR email discussing "compil[ing] as much as we can" in response to Defendants' requests for historical trading data); PX 618 (internal GSR email describing how creating the historical data (writing scripts, looking at old source code and emails) has "been a bit more challenging than I expected").

In addition, certain portions of Defendants' Exhibit 82 do not reflect trading "records" at all, but rather, an "estimate" of the amount of XRP Larsen and Garlinghouse sold on an exchange. *See* Def. Ex. 87 ("PLEASE BEAR IN MIND SALES CONTAINED IN THIS TABLE ARE

ESTIMATES.  EXACT FIGURES ARE NOT AVAILABLE AS WE RAN AN INTEGRATED

SERVICE IN 2017 ANSD [sic] BEFORE.").

Defendants' Exhibit 82 appears to have been created by counsel as a summary pursuant to

Federal Rule of Evidence 1006 but they do not satisfy that Rule because they do not summarize

"voluminous" records as required by the Rule—citing a total of only four documents—and are

unaccompanied by any sworn declaration.

In addition, the SEC disputes the percentage figures contained in ¶ 310 on the grounds that GSR

commingled Garlinghouse's XRP with that of Ripple and Larsen into one account, and the proceeds

from the sales of that XRP were all held in one account.  *See* PX 26 at 143:20-25.  As a result, it is

impossible to determine which specific sales on particular exchanges can be attributed to

Garlinghouse's XRP.  The SEC further disputes the assertion contained in ¶ 310 on the ground that

the cited reference does not support the assertion.

## SEC COUNTER-STATEMENT OF UNDISPUTED FACTS

A.      **Ripple, XRP, and the XRP Ledger**

(i)      **The Creation of XRP and the XRP Ledger**

1.      The people who created the XRP Ledger and XRP are also part of the group that founded Ripple. PX 6 (Schwartz Dep. Tr.) at 23:20-24:10, 43:17-24, 53:2-13, 55:23-56:13.

2.      Schwartz, one of the programmers of the XRP Ledger, testified under oath that it is "not really possible to answer" when XRP was created. PX 6 (Schwartz Dep. Tr.) at 25:11-14; PX 7 (Schwartz Inv. Tr.) at 61:1-8.

3.      Each time the XRP Ledger resets, there is a new "genesis" (or first) block for the XRP Ledger was created. PX 6 (Schwartz Dep. Tr.) at 26:8-15.

4.      As the native asset to the XRP Ledger, the 100 billion units of XRP created were originally represented in the XRP Ledger's genesis block. PX 6 (Schwartz Dep. Tr.) at 26:3-7.

5.      The XRP Ledger was reset at least once in late 2012, and some of its original blocks or ledgers were lost at or around that time. PX 6 (Schwartz Dep. Tr.) at 32:17-33:10.

6.      XRP had no use when it was created other than to validate transactions on the XRP Ledger and since no one was using the XRP Ledger when it was created, even that was not a use for XRP. PX 7 (Schwartz Inv. Tr.) at 60:12-25; PX 36 (Garlinghouse Inv. Tr.) at 186:17-187:4.

7.      The version of the XRP Ledger that was made open to the public went live in two phases in late 2012 and early 2013, at which point the XRP Ledger was operated by Jed McCaleb on three servers operating through Amazon's infrastructure. PX 7 (Schwartz Inv. Tr.) 63:13-64:19, 88:6-17; PX 6 (Schwartz Dep. Tr.) at 25:3-7, 32:17-35:13; PX 8 (Ripple RFA Responses) Nos. 10, 169.

8.      An agreement between Ripple's founders for the allocation of the initial 100 billion units of XRP dated on or about September 17, 2012, states: "It is anticipated that a total of 100 billion credits shall be recorded on the Official [XRP] Ledger." PX 557.

9.      Schwartz would not characterize who "owned" XRP at its inception because he believed the concept of "ownership" did not apply to that situation. PX 7 (Schwartz Inv. Tr.) at 149:12-150:19.

10.     Ripple stated publicly in decks distributed to investors that "Ripple Labs is the creator of Ripple," and that 100 billion units of XRP were created with the XRP Ledger. PX 53 at p. 17; PX 30.

11.     Ripple represented to British regulators that Ripple developed XRP. PX 556; PX 19 (Zagone Dep. Tr.) at 60:6-61:12.

12.     Ripple represented to New York state regulators that Ripple created the XRP Ledger. PX 47 at RPLI_SEC 0532027.

**(ii)    Ripple's Continued Work on the XRP Ledger**

13.     Ripple provided technical support for people who are building on top of the XRP Ledger. PX 7 (Schwartz Inv. Tr.) at 133:19-134:9.

14.     The XRP Ledger was in its "infancy" in 2013. PX 14 (Griffin Dep. Tr.) at 101:19-102:1; PX 53.

15.     Ripple and its team of engineers continued to work on improving the functionality, stability, and security of the XRP Ledger software, including by maintaining the XRP Ledger software with 16-17 full-time engineers, work on finding bugs, adding a long list of new features including security features added in response to various defects in the software that affected usability, performance, and security, including a complete rewrite of the payment engine on the XRP Ledger, and engineers working on the ledger that would prevent a takeover of the ledger by China. PX 7 (Schwartz Inv. Tr.) at 179:16-183:15; PX 6 (Schwartz Dep. Tr.) at 112:2-18; PX 81 (Garlinghouse Dep. Tr.) at 395:25-397:25, 399:7-401:24.

16.    Ripple engineers developed the time-lock/escrow feature on the XRP Ledger that was used to create Ripple's escrow of XRP. PX 7 (Schwartz Inv. Tr.) at 227:4-228:16.

17.    Schwartz and Ripple's programmers have changed the amount of XRP that must be "burned" to effect transactions. PX 6 (Schwartz Dep. Tr.) at 36:7-37:4.

18.    Ripple has a financial and reputational interest in the proper functioning of the Ledger. PX 6 (Schwartz Dep. Tr.) at 126:24-127:5; PX 47 at RPLI_SEC 532027 (Ripple's auditor noting "Ripple Labs created and maintains" the XRP ledger, and noting "presently, XRP has limited commercial use and is mainly held as a speculative investment by companies and individuals that expect it to rise in value as the ripple network expands" and also that "XRP represents one method by which ripple labs raises working capital.").

19.    Ripple provides a pathway for people interacting with the Ledger, such as crypto trading platforms, to easily contact a Ripple employee with the expertise to address issues, and the number of people with his level of expertise over the Ledger is small, limited to Ripple employees. PX 6 (Schwartz Dep. Tr.) at 170:14-171:24.

20.    Ripple pays bounties for people to find bugs on the XRP Ledger, and is the only person that Schwartz is aware to offer such rewards. PX 6 (Schwartz Dep. Tr.) at 186:15-187:15.

21.    In order for the XRP Ledger to properly function for a subset of nodes on the XRP Ledger, there needs to be overlap of somewhere between 80-90% of the nodes listed in each nodes "UNL." PX 6 (Schwartz Dep. Tr.) at 183:16-184:1.

22.    Ripple publishes a default list of nodes ("dUNL") that nodes on the XRP Ledger should listen to, this list is the default list programmed into the software, and the other two entities that publish UNL lists—Coil and the XRP Ledger Foundation—publish substantially the same list as Ripple's dUNL, and Ripple has commercial relationships or investments with those two entities,

156

as well as at least informal arrangements with other entities on the list, including the universities. PX 6 (Schwartz Dep. Tr.) at 125:8-134:5; PX 8 (Ripple RFA Responses) No. 178.

23.     Ripple and two entities Ripple funded (Coil & Gatehub) provided the capital to establish the XRP Ledger Foundation. PX 742 (Ripple RFA Responses) No. 616.

24.     Ripple funded Coil with XRP. PX 24 (Beard Dep. Tr.) at 66:12-20, 125:6-126:17; PX 740; PX 2 (Larsen Dep. Tr.) at 405:6-409:1.

25.     Even though historically there has been a concern over Ripple's stash of XRP and the "overhang" it creates on the price of XRP, there has never been a move by other nodes on the XRP Ledger to try to burn Ripple's 50 billion units of XRP, and Ripple does not even take any steps to prevent that from happening because it's "outrageous" to think that any participant in the XRP Ledger could try in part because Ripple has always acted in ways that has not harmed XRP holders in the market. PX 6 (Schwartz Dep. Tr.) at 201:8-207:25.

26.     XRP is still likely to remain Ripple's largest asset for years, Ripple will almost certainly hold a significant share of XRP for years, and the market does not expect Ripple to walk away from the XRP Ledger or XRP any time soon. PX 6 (Schwartz Dep. Tr.) at 297:3-298:19; 325:3-24.

27.     As of May 2021, Ripple was engaged in efforts to potentially increase the use for XRP, including with a team of engineers, which could increase demand for XRP. PX 6 (Schwartz Dep. Tr.) at 349:1-351:20.

28.     People have used the price of XRP as a proxy for the success of Ripple as a company and for the value of Ripple. PX 7 (Schwartz Inv. Tr.) at 117:25:119:4, 125:10-130:10.

### (iii)   Ripple's Copyrights, Trademarks, and Patents for XRP and the XRP Ledger

29.    Ripple had a copyright for the code for the XRP Ledger. PX 6 (Schwartz Dep. Tr.)

at 23:16-24:21; https://xrpl.org/faq.html.

30.    Ripple patented the consensus algorithm and other features of, or pertaining to, the

XRP Ledger. PX 639 at RPLI_SEC 102764; https://uspto.report/patent/app/20160224949 (patent

for "temporary consensus subnetwork in a distributed network for payment processing");

https://uspto.report/patent/app/20190251007 (patent for "Byzantine Agreement in Open

Networks").

31.    Ripple owned a trademark for "XRP." https://uspto.report/TM/85935696; PX 2

(Larsen Dep. Tr.) at 216:10-217:10.

### (iv)   Ripple Validators on the Unique Node List and Ripple's Control Over Changes to the XRP Ledger

32.    The only validators that have any consequence to the stable operation of the ledger

are those on the "Unique Node List" or "UNL." PX 641 (Transcript of RPLI_SEC 114103,

February 5, 2018 Internal Weekly Company meeting) at Tr. 20:18-23 ("So when you heard 500

validators or whatever, there's hundreds of validators on the network currently. But the ones that

really kind of are…designed to make sure that the network is operating stability [sic]…are the sub

net that's on the UNL").

33.    As of February 2018, the UNL was "maintained by Ripple" and that "transitioning

the trust from Ripple to an external…broader kind of list of external validators… is pretty intense

because you have to, essentially…verify that the people are who they say they are and that they're

actually able to run a validator…reliably." PX 641 at Tr. 20:09-20:16.

34.    As of December 2018, Ripple was "still a gatekeeper for the XRP Ledger open

source code repository (merge access)," which meant that only Ripple could integrate potential

changes to the code of the XRP Ledger. " PX 682 at RPLI_SEC 0574093; PX 457 (transcript of RPLI_SEC 1141099, December 10, 2019, Leadership Offsite meeting) at Tr. 23:3-17 (Schwartz stated: "[T]he market is looking to us to signal through our actions. And to be brutally honest…our actions have signaled to the market that we're converting our XRP to dollars as quickly as we can. I mean that's -- I don't want to over index on what negative people say, positive people are like we're in this for the long term. But like we're -- we're turning a lot of XRP into cash and we're using that -- that cash for all kinds of different things. And I think we need this kind of commitment to -- because we're the only people it can come from. Like, there's no other place where predictability and stability about supply and long term health can come from. There just -- because we just have this giant pile of XRP."); PX 457 at Tr. 12:1-10 (Ripple employee stated: "[R]ight now, there are people on the Ripple D team who are responsible for every single commit…yes, we do want to be in control of those commits for a while now.").

35.     As of December 2018, Ripple validators still made up more than 80% of the validators on the Unique Node List, which meant that Ripple could unilaterally approve changes to the XRP Ledger as well as "prevent a supermajority [of validators] from activating an amendment" to change the XRP Ledger. PX 682 at RPLI_SEC 0574093.

36.     Ripple first proposed the so-called 'Checks Amendment' from June 2020 and "developed it." PX 6 (Schwartz Dep. Tr.) at 151:15-22; 210:17-19.

37.     By the time the Checks Amendment was passed, Ripple developer ███████████, tweeted the following on or about June 12, 2020: "as [David Schwartz] and I said before, there are no reasons for voting against the Checks amendment; it was just the conservative position to take, in response to no exchanges/wallets having support for the feature." PX 670.

38.     In a tweet on or about June 6, 2020, Schwartz stated that Ripple didn't have "any significant reason" to vote against the Checks amendment. PX 678. Schwartz described his reaction to the amendment having been passed as: "Ripple didn't get its way, but we said whatever." PX 6 at 151:15-22.

### (v)     Ripple's Origination and Continued Contributions to the Domain XRPL.org

39.     Ripple originated the domain xrpl.org. PX 6 (Schwartz Dep. Tr.) at 163:11-22.

40.     In 2019, Ripple replaced the website https://developers.ripple.com with https://xrpl.org because the previous website "confused developers into thinking they were building on Ripple, not XRP Ledger." PX 640 at RPLI_SEC 0602120.

41.     The website xrpl.org states: Ripple will still play a significant role in managing and providing content for xrpl.org." https://xrpl.org/blog/2019/welcome-to-xrpl-org.html.

### (vi)     Ripple Funded and Supported the Growth of the XRP Ledger Foundation.

42.     Ripple provided funding and other "support" to the XRP Ledger Foundation. PX 642 (Transcript of RPLI_SEC 1100529, September 11, 2020 Ripple X All Hands meeting) at Tr. 19:7-20:5 ("Another initiative that we're really excited to push on for the rest of Q4 -- or Q3 -- and Q4 is the XRP Ledger Foundation...We're essentially...being...a resource as well as a kind of advisory consultant of sorts in order to help them ... grow and be more of an active participant in the community. So, what we've done is we've helped them set up funding for them to run infrastructure for the ledger...We're also...supporting them, with donation as well as advice on kind of what their strategic roadmap looks like.").

**B.   Ripple Made Efforts to Create Value for XRP.**

**(i)   Ripple Created and Funded xPring and Coil to Help Promote Uses for XRP Other than for Cross Border Payments.**

43.      Ripple funded efforts to create potential uses for XRP through Ripple's xPring initiative. PX 658; PX 457 (transcript of RPLI_SEC 1141099, October 10, 2019, Ripple Leadership Offsite) at 17:10-18:16 ("I think a big framework we want to think about is like what does this do for XRP overall, specifically around creating demand for XRP. So not just kind of like providing XRP to supply the market, but that they're going to use the XRP as like part of their application, generate more demand off of it through that initial supply of XRP and when you're providing the XRP, you're sort of getting a fly wheel started around liquidity and volume versus just providing funding. So I -- I think we're trying to kind of orientate some of our partnerships in the future around that as well.").

44.      Ripple funded efforts to create potential uses for XRP through an entity called Coil. PX 90 at 0392729-30; PX 643 (Transcript of RPLI_SEC 1141204), April 30, 2018 Weekly Company meeting) at Tr. 8:3-6 ("▆▆▆▆▆ and Ripple are going to be creating a new entity. It's going to be called Coil. A ton of work has gone into this and it's really going to focus on some of the other use cases around micropayments ...."); PX 644 (Transcript of RPLI_SEC 1141059, February 4, 2019 Weekly Company Meeting) at Tr. 14:1-14:14 ("COIL is a company that was spun out of Ripple and is … building out one of the really important Interledger use cases, which is streaming micropayments.").

45.      Ripple is a shareholder of Coil. PX 657.

**(ii)   Ripple Engaged in Efforts to Get XRP Listed on Exchanges.**

46.      Ripple entered into agreements with seven exchanges whereby Ripple agreed to provide XRP and/or cash incentives in exchange for making XRP available for trading to exchange users. PX 715, Ex. 13; PX 716, PX 717, PX 718, PX 719, PX 720, PX 721, PX 722.

47.     Breanne Madigan, Ripple's Head of XRP Markets, admitted that one of her responsibilities included a "mandate" around "liquidity" and "liquidity partnerships … focusing on engaging with market participants, like – like exchanges or lenders or prime brokers around XRP liquidity broadly speaking." PX 25 (Madigan Dep. Tr.) at 30:13-31:7.

48.     Madigan admitted that Ripple wanted "XRP trade[d] on more exchanges" and that having "many on ramps, off ramps" for XRP to trade was beneficial for the XRP market. PX 25 (Madigan Dep. Tr.) at 235:5-12; 147:19-148:7.

49.     The XRP Markets team set specific "goals" to "list" and "integrate" XRP or an XRP-related product on specific exchanges in 2019 and 2020. PX 376; PX 530; PX 548.

50.     Ripple employees attributed 25 new XRP listings on exchanges as "big achievements" for Ripple, acknowledging the work performed by Ripple's engineering team to integrate XRP on exchanges. PX 645 (Transcript of RPLI_SEC 1100505, Q2 2017 Company All Hands meeting, July 20, 2017) at Tr. 30:20-31:6.

**(iii)    Ripple Touted its Efforts to Get XRP Listed on Exchanges.**

51.     Garlinghouse tweeted the following on December 21, 2017: "$XRP is now on 50 exchanges around the world! Team Ripple will continue to champion additional listings to foster a vibrant and healthy XRP ecosystem and help deepen liquidity across fiat currencies. https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/"). PX 506.106.

52.     Ripple tweeted the following on December 21, 2017: "It's a priority for Ripple to have $XRP listed on top digital asset exchanges, making it broadly accessible worldwide. Excited to share $XRP is now listed on 50 exchanges and counting." PX 506.107.

53.     In its Q4 2017 XRP Markets Report, Ripple stated the following: "XRP also became available across more than 50 exchanges globally" and "[t]his increased global reach is the result of Ripple's continued investment in the XRP ecosystem...." PX 501.05.

54.     On May 18, 2017, Ripple published an article titled XRP Liquidity to Deepen with Listings on Six New Exchanges that stated: "Today we are pleased to share we have expanded our partnership with BitGo...which will see XRP listed on several leading digital asset exchanges...By working with a greater number of exchanges across different countries to list XRP, we can better serve the growing demand for global payments in both major currency corridors and emerging markets." PX 500.11.

55.     On December 21, 2017, Ripple published an article titled XRP Now Available on 50 Exchanges Worldwide that stated: "[W]e're proud to announce that XRP has gone from being listed on six exchanges earlier this year to more than 50 worldwide." PX 500.18.

56.     On January 18, 2018, Ripple published an article titled Top 9 Frequently Asked Questions About Ripple and XRP that stated: "In order to maintain healthy XRP markets, it's a top priority for Ripple to have XRP listed on top digital asset exchanges" and "Ripple has dedicated resources to the initiative so you can expect ongoing progress toward creating global liquidity." PX 500.20.

57.     On December 14, 2017, in a video posted on Ripple's website, Garlinghouse stated "[i]t's a very high priority for us to be listed more broadly." PX 500.28 (Transcript of Ripple Livestream, Ask Me Anything with Brad, December 14, 2017).

58.     In its Q2 2019 XRP Markets Report, Ripple stated that "XRP listings increased as Ripple has partnered with the top digital asset brokers and used inventory to serve as a backstop for XRP liquidity." PX 501.11.

59.     Ripple posted on its website a list of exchanges where "XRP is available for purchase." PX 500.20; PX 506.092.

60.     Ripple touted the number of XRP listings in its quarterly XRP Markets Reports and regularly tweeted about new XRP listings on exchanges. PX 501.06; PX 501.09; PX 501.10; PX 501.11; PX 501.12; PX 501.13; PX 506.046; PX 506.047; PX 506.086; PX 506.087; PX 506.089; PX 506.097.

61.     Prior to December 2020, XRP was available for U.S. parties to trade using the XRP Ledger, and on certain digital asset trading platforms that permitted trading by U.S. persons. https://xrpl.org/decentralized-exchange.html; PX 16 (Birla Inv. Tr.) at 57:2-15; PX 500.27 (screenshot of https://xrpcharts.ripple.com/#/xrp-markets showing XRP trading volume on Kraken and other U.S. digital asset trading platforms); PX 564; PX 565; PX 566.

62.     XRP is currently available for U.S. persons to trade using the XRP Ledger. https://xrpl.org/decentralized-exchange.html.

63.      XRP was available for U.S. parties to trade using crypto trading platforms. PX 585.

**(iv)     Ripple Tracked its XRP Distributions and XRP Supply Entering the Market.**

64.     Ripple's founders (Larsen, McCaleb, and Britto) committed to distribute XRP totaling 20 billion to themselves, referenced internally at Ripple as "founders shares." PX 649, PX 557.

65.     Ripple committed to distribute XRP totaling ████████ XRP to ██████████ and ████████ (████████). PX 650; PX 715, Ex. C.3 and Notes to Ex. 9.

66.     Ripple committed to distribute XRP totaling 1.08 billion XRP to ████████. PX 715, Ex. C.3 and Notes to Ex. 9.

67.     Ripple committed to distribute XRP totaling ████ XRP to Coil Technologies, Inc. PX 651 at 3, 5.

68.     Ripple committed to distribute XRP totaling up to ████ XRP to ██████ ████. PX 652 at RPLI_SEC 0609222; PX 653; PX 650.

69.     Ripple considered XRP as "distributed" as of the date Ripple incurred the commitment to distribute the XRP, which was the date of the agreement between Ripple and the intended recipient of the XRP. PX 715 ¶ 13.

70.     Ripple's non-monetary sales of XRP included transactions where Ripple delivers XRP to customers for consideration other than cash or other monetary consideration. PX 750 at 11.

71.     Ripple's non-monetary XRP sales accounted for approximately ████ and ████ of Ripple revenue for 2019 and 2020 respectively. PX 202 at 34, Figure 9, PX 750, PX 751.

72.     Ripple tracked XRP supply entering in the market by Ripple and third parties. PX 656; PX 659.

73.     Ripple tracked XRP supply entering in the market on a weekly, monthly, and quarterly basis, which included XRP sold and distributed by Ripple to Ripple's founders, Ripple employees, Ripple partners, and other third parties in connection with its XRP sales, non-monetary XRP sales, investments, employee compensation, vendors, charitable donations, strategic promotions, and other outflows. PX 704; PX 705; PX 646; PX 647.

74.     Ripple sold and distributed a total of approximately 1.163 billion XRP from May through October 2020. PX 646.

75.     Total net outflows of XRP as of August 2020 was approximately 45 billion XRP. PX 715, Ex. 10.

76.     Ripple's programmatic sales of XRP exceeded 0.5% of total XRP trading volume prior to Q1 2017, exceeded 2% of total XRP trading volume for nine out of the twelve months in 2015, exceeded 2% of total XRP trading volume for six out of the twelve months in 2016; and generally exceeded 1% of total XRP trading volume from Q1 2015 through Q2 2016. PX 398 (Declaration of Christopher Ferrante ("Ferrante Decl."), dated October 18, 2022) ¶ 8, Exhibit 2; PX 703.

**(v)     Ripple Held XRP in Reserve.**

77.     Ripple held in "reserve" amounts of XRP that it was committed to distribute pursuant to contractual agreements. PX 648; PX 650.

78.     Ripple held in "reserve" amounts of XRP that was released from escrow but were unused. PX 648; PX 706.

79.     According to Ripple's Controller, in January 2018, Ripple's marketing officer Monica Long stated that she had "minor reservations about the reserve, particularly because of language in our announcement (We'll then return whatever is unused at the end of each month to the back of the escrow rotation.)." PX 655.

80.     Ripple periodically distributed XRP held in reserve as opposed to XRP released from the escrow. PX 455; PX 648.

**(vi)    Ripple's Reporting of its XRP Distributions Online and in Quarterly XRP Markets Reports Obscured the True Amount of XRP Supply Entering the Market.**

81.     A member of Ripple's XRP Markets team stated that "our sales numbers [in the XRP Markets Report] are not a good proxy for XRP put into the market by Ripple…Also, there are starting to be commentary regarding the discrepancy between Ripple published sales numbers and Ripple distribution of XRP." PX 654.

82.     Ripple periodically distributed XRP held in reserve so Ripple could "maintain market positioning around the escrow" (PX 335), avoid "very bad optics from a dramatic change to our escrow return" and reflect "a more consistent usage and escrow pattern" (PX 455), and "reinforce[] the message we are sending to the market that our purchases are offsetting supply introduction." PX 648.

83.     The distinction between the "reserves" included versus excluded from Ripple's online reporting of XRP distributed was "somewhat arbitrary," reflecting Ripple's preferences. PX 650.

84.     At times, Ripple contemplated decreasing the amount of XRP it reported as "distributed" by crediting that number with XRP Ripple held in reserve. PX 706.

**(vii)    Ripple's Other Distributions of XRP**

85.     In or around November 2018, Ripple and Coil Technologies, Inc. ("Coil") entered into a Services and Marketing Agreement ("November 2018 Coil Agreement"), in which Ripple agreed, among other things, to pay a bi-monthly development service fee of ▮▮▮▮▮▮ XRP to Coil because "Ripple desire[d] for Coil to perform certain development services to promote technologies of interest to Ripple." PX 651 at 1, 3.

86.     In the November 2018 Coil Agreement, Ripple also agreed, among other things, to set aside ▮▮▮▮▮▮ XRP for marketing services for third-party projects that "utilize and/or promote the Interledger Protocol (the technology underlying components of Ripple's xCurrent, xRapid and xVia products) and XRP." PX 651 at 5.

87.     Garlinghouse signed the November 2018 Coil Agreement on behalf of Ripple. PX 651 at 13.

88.     In or around August 2018, Ripple entered into a Master XRP Custody Agreement with ████████. ("████████"), in which Ripple agreed, among other things, to custody ████████' XRP, free of charge to Ripple Works. PX 737 at 1, 8.

89.     In or around January 2016, Ripple entered into a memorandum of understanding with ████████. ("███ in which a joint venture company formed by the parties would be appointed by Ripple as the exclusive distributor of Ripple Connect within a defined territory of the company and the company would be primarily focused "on those lines of business related to the Ripple Connect." PX 735 at 1-3.

90.     In or around March 2016, Ripple entered into a Joint Venture Agreement with ███ in which the parties agreed, among other things, to appoint a joint venture company as the exclusive distributor of Ripple Connect in a defined territory, and to make reasonable efforts to "provide an exchange and custody for Xmarket XRP trading" through ███ "retail and institutional financial services platform." PX 736 at 1-2.

91.     In or around November 2018, Ripple entered into a Development and Integration Agreement with ████████. ("███ ("November 2018 ███ Agreement") because "Ripple desire[d] to work with ███ to promote ecosystem adoption of the XRP Ledger, XRP, … and [Interledger Protocol] by having ███ integrate XRP … and [Interledger Protocol] into [███ Components." PX 738 at RPLI_SEC 0266000.

92.     In the November 2018 ███ Agreement, ███ agreed to use its best efforts to, among other things, develop and integrate XRP into its company products, and in exchange, Ripple agreed to pay ███ in XRP worth up to ████████. PX 738 at RPLI_SEC 0266000-01.

93.     A slide entitled "Ripple Supply Introduction (in mm XRP, through 4/12)"— contained in a Ripple document dated April 20, 2020 and titled "XRP Supply – deeper dive" ("April

2020 XRP Supply Deck")—"br[oke] out all Ripple XRP distributions impacting circulating supply"
although it "omit[ted] fulfillment of certain commitments." PX 656 at 1, 3.

94.     The April 2020 XRP Supply Deck stated that, from the first quarter of 2019 through
the second quarter of 2020, Ripple distributed 937 million XRP to ███ PX 656.

95.     In the "Xpring and BD total" subsection, the April 2020 XRP Supply Deck stated
that, from the first quarter of 2019 through the second quarter of 2020, Ripple distributed ███
███ XRP to Coil Development Fund, ██████ XRP to ████████, ███████ XRP to
████████████, and 94 million to "Investment." PX 656 at 3.

96.     In the "ODL total" subsection, the April 2020 XRP Supply Deck stated that, from
the first quarter of 2019 through the second quarter of 2020, Ripple distributed 32 million XRP to
"Loan" "[p]rimarily [for] liquidity support"; ██████ XRP to ████ including "[i]ncentives,
milestone payments and FX rebates"; and 70 million XRP to pay or support users of ODL including
"[l]iquidity, exchanges, vol and FX incentives." PX 656 at 3.

97.     In the "Other total" subsection, the April 2020 XRP Supply Deck stated that, from
the first quarter of 2019 through the second quarter of 2020, Ripple distributed a total of 530 million
XRP for "[r]outine payroll, bonuses and Q2 exec comp, ████████ domain loan settlement, and
Ripplenet customer, product testing, [and] vendors." PX 656 at 3.

98.     In a slide entitled "Other Supply Introduction (in mm XRP, through 4/12)," the
April 2020 XRP Supply Deck stated that, from the first quarter of 2019 through the second quarter
of 2020, Ripple distributed a total of ████████ XRP in Coil scheduled payments, ████████ XRP
to ████████, 787 million XRP to R3, 1 million XRP in other options, and ████████ XRP to
████████. PX 656 at 4.

99.     The April 2020 XRP Supply Deck described volume incentives Ripple agreed to pay

███ in millions of XRP, "for hitting various targets of XRP transacted on ███ platforms." PX

656 at 9.

100.     The April 2020 XRP Supply Deck described discounted sales of XRP Ripple made

to ███ PX 656 at 12.

101.     Ripple tracked its 2020 "Supply Introduction" of XRP in connection to distributions

related to market maker lease, market maker fees, MGI – volume incentive, MGI – FX rebate, other

incentives and FX rebates, adoption marketing, and ODL lease under the category of "ODL total."

PX 646.

102.     Ripple distributed approximately ███████ XRP from May 2020 through October

2020 for Xspring and BD. PX 646.

        a.     Ripple did not prohibit recipients of XRP in the xPring initiative from reselling the

        XRP to obtain their own funds for their endeavors." PX 6 (Schwartz Dep. Tr.) at 392:18-

        393:2.

103.     Ripple tracked its 2020 "Supply Introduction" of XRP in connection to distributions

related to market maker lease, market maker fees, MGI – volume incentive, MGI – FX rebate,

adoption marketing, and ODL lease under the category of "ODL total." PX 646.

104.     Ripple's net sales totaled approximately 1.7 billion XRP in 2019. PX 704 at Summary

1.

105.     Ripple sold approximately 1.255 billion XRP in 2020. PX 704 at Summary 1.

106.     Ripple sold to ███ approximately 761 million XRP in 2019 and approximately 465

million XRP in 2020. PX 704 at Summary 1.

107.    Ripple sold approximately 180 million XRP in connection with institutional over-the-counter sales in 2019. PX 704 at Summary 1.

108.    Ripple sold approximately 789 million XRP in connection with its Wallet Send (formerly known as XRP-O or "XRP Origination") program in 2020. PX 704 at Summary 1.

109.    Ripple sold approximately 795 million XRP in connection with Programmatic Sales in 2019. PX 704 at Summary 1.

110.    Ripple distributed approximately ████ XRP in 2019 in connection with its xPring initiative (renamed RippleX). PX 704 at Summary 1.

111.    Ripple distributed approximately ████ XRP in 2020 in connection with its xPring initiative (renamed RippleX). PX 704 at Summary 1.

112.    Ripple distributed to Coil Development Fund approximately ████ XRP in 2019 and approximately ████ XRP in 2020. PX 704 at Summary 1.

113.    Ripple distributed to ██ and the ████████ approximately ██ ██ XRP in 2019 and approximately 134 million XRP in 2020. PX 704 at Summary 1.

114.    Ripple distributed to ████ approximately ████ XRP in 2019 and approximately ████ XRP in 2020. PX 704 at Summary 1.

115.    Ripple distributed to ████ approximately ████ XRP in 2019. PX 704 at Breakout 1.

116.    Ripple distributed to ████████ approximately ████ XRP in 2019 and approximately 10 million XRP in 2020. PX 704 at Breakout 1, Breakout 4.

117.    Ripple distributed to ██ approximately ████ XRP in 2019. PX 704 at Breakout 1.

118.    Ripple distributed to ▮▮▮ approximately ▮▮▮ XRP in 2019. PX 704 at Breakout 1.

119.    Ripple distributed in connection with "other investments" approximately ▮▮▮ XRP in 2019 and approximately 6 million XRP in 2020. PX 704 at Breakout 1, Breakout 4.

120.    Ripple distributed in connection with "ODL" approximately ▮▮▮ XRP in 2019 and approximately ▮▮▮ in 2020, which excludes XRP leases but includes fees paid to market makers and incentive, rebate, bonus, and marketing payments. PX 704 at Summary 1.

121.    Ripple distributed to MGI approximately ▮▮▮ XRP in 2019 and approximately 225 million XRP in 2020 in connection with "volume incentive," "Fx rebate," and "bonus" payments. PX 704 at Summary 1.

122.    Ripple distributed approximately ▮▮▮ XRP as incentive payments in 2019 to ▮▮▮ ▮▮▮ and others. PX 704 at Breakout 2.

123.    Ripple distributed approximately ▮▮▮ XRP as incentive payments in 2020 to ▮▮▮ ▮▮▮ ▮▮▮ ▮▮▮, and others. PX 704 at Breakout 5.

124.    Ripple distributed to ▮▮▮ ▮▮▮ and others approximately ▮▮▮ XRP as Fx rebates in 2019 and approximately 5 million XRP in 2020. PX 704 at Breakout 2.

125.    Ripple distributed to ▮▮▮ ▮▮▮ and others approximately ▮▮▮ XRP in 2019 and approximately ▮▮▮ in 2020 for "Adoption Marketing." PX 704 at Breakout 2, Breakout 5.

126.    Ripple distributed approximately ▮▮▮ XRP to ▮▮▮ in 2020. PX 704 at Breakout 5.

127.    Ripple distributed approximately ▮▮▮ as compensation and bonuses to Ripple employees from May 2014 through December 2018. PX 752 at 3, 4, 5, 7, 8.

128.     Ripple distributed as compensation and bonuses to Ripple employees approximately ▮▮▮▮▮▮▮▮▮ in 2019 and approximately ▮▮▮▮▮▮▮ in 2020. PX 704 at Breakout 1, Breakout 5.

129.     Ripple distributed approximately ▮▮▮▮ XRP to ▮ in 2019. PX 704 at Breakout 3.

130.     Ripple distributed to Coil approximately ▮▮▮▮▮ XRP in 2019 and approximately ▮▮▮▮▮ XRP in 2020 as compensation for "development services." PX 704 at Breakout 3, Breakout 6; PX 651 at 1.

131.     Ripple distributed to ▮▮▮▮▮ (▮▮▮▮▮) approximately ▮▮▮▮▮ XRP in 2019 and approximately ▮▮▮▮ XRP in 2020. PX 704 at Summary 1, Breakout 6.

132.     Ripple distributed to ▮▮▮▮▮▮ approximately ▮▮▮▮ XRP in 2015 and approximately ▮▮▮▮ XRP in 2017. PX 739.

## C.     Ripple's Distributions of XRP Provided Value to the Company.

133.     Ripple gave away XRP to advance its interest of having XRP distributed widely so that more people would sign on to Ripple's blockchain technology. PX 10 (Rapoport Dep. Tr.) at 58:8-23.

134.     Ripple's giveaways were part of Ripple's strategy to get XRP off of its balance sheet and into the hands of market participants, to create liquidity in the XRP markets and in the trading of XRP on the XRP Ledger. PX 10 (Rapoport Dep. Tr.) at 124:2-126:12; PX 44 at RPLI_SEC 0461860.

135.     Senior members of Ripple viewed the free giveaways as important to the company's business strategies. PX 10 (Rapoport Dep. Tr.) at 148:22-149:19.

136.     The goal of giving away XRP was to increase trading liquidity in the XRP market. PX 10 (Rapoport Tr.) at 125:24-127:5; PX 14 (Griffin Dep. Tr.) at 117:2-118:19.

137.    Ripple gave away XRP in order to create and increase liquidity in XRP. PX 14 (Griffin Tr.) at 117:2-12.

138.    When Ripple gave XRP to a company to build a business, it did so to extract value from the company and these distributions were valuable to Ripple in the context of the broader crypto markets. PX 7 (Schwartz Inv. Tr.) at 79:18-80:18, 163:21-164:24.

139.    Ripple did not prohibit the companies to which it gave XRP from re-selling it to obtain the funds they needed to run their business. PX6 (Schwartz Dep. Tr.) at 392:9-393:2.

140.    The companies that received XRP through the xRapid initiative as well as other recipients of XRP from Ripple simply resold it to fund themselves. PX 196; PX 195; PX 634 ¶ 12.

141.    In its 2019 Audited Financial Statements, Ripple explained that its "[n]on-monetary XRP transactions revenue consists of transactions where the Company delivers XRP to customers for consideration other than cash or other monetary consideration and is recognized upon delivery of XRP." PX 751 at 11.

**D.    Ripple's "On-Demand Liquidity" Software Product**

142.    Ripple describes itself as a "software" company. PX 15 (Birla Dep. Tr.) at 56:8-22.

143.    In 2014, Larsen stated publicly in an interview that Ripple is a software company. PX 504.14.

144.    Unlike other software companies, Ripple's software sales do not provide value to Ripple Labs, Inc.'s shareholders and are inherently loss leaders. PX 23 (Will Dep. Tr.) at 298:19-299:19; PX 537 at RPLI_SEC 269618.

**(i)    ODL Was Ripple's Only Product that Involved XRP.**

145.    Not all users of RippleNet use ODL. PX 17 (Long Dep. Tr.) at 142:3-9.

146.     RippleNet software does not use the XRP Ledger. PX 6 (Schwartz Dep. Tr.) at 236:9-12.

147.     RippleNet users who do not use ODL do not transact in XRP—xVia and xCurrent do not involve XRP. PX 17 (Long Dep. Tr.) at 142:5-13; PX 8 (Ripple RFA Responses) Nos. 85, 238.

148.     RippleNet does not need XRP to function. PX 15 (Birla Dep. Tr.) at 49:25-50:8.

149.     Customers first started using ODL, then known as xRapid, in late 2018. PX 15 (Birla Dep. Tr.) at 195:5-21.

150.     Ripple did not sell any product that involved XRP when Vias joined Ripple in November 2016. PX 20 (Vias Dep. Tr.) at 27:13-15.

151.     Nobody was using XRP for cross-border transactions in or around March 2017. PX 20 (Vias Dep. Tr.) at 116:9-19.

152.     ODL (formerly known as xRapid) was the only product Ripple sold that used XRP but Ripple did not sell XRP for ODL when it launched. PX 19 (Zagone Dep. Tr.) at 98:10-99:5.

153.     Ripple's products xVia and xCurrent did not use XRP or the XRP Ledger and each made no more than ▮▮▮▮▮ in revenue total throughout Garlinghouse's tenure at Ripple. PX 36 (Garlinghouse Inv. Tr.) at 67:7-73:6.

154.     Ripple's early strategy for finding a "use" for XRP was to use it as an intermediary asset on the Ledger, but while banks were *testing* the XRP Ledger, they weren't actually using it for live payments. Later, Ripple developed a product, xCurrent, that did not use XRP. PX 7 (Schwartz Inv. Tr.) at 189:5-191:15.

155.     Ripple began developing a product, ODL, in 2017, that could use XRP for the payment settlement, which did not launch commercially until late 2018. PX 7 (Schwartz Inv. Tr.) at

194:12-195:13; PX 539 (late 2015 discussion between Long and Larsen noting there is no

"articulated case for XRP" and discussing a "working group" to find potential use cases).

156.     Ripple did not sell XRP for the use cases that XRP may have had outside of ODL.

PX 17 (Long Dep. Tr.) at 35:22-37:7.

> **(ii)     Ripple Incurred Significant Expenses in Connection with ODL Without Which ODL Would Not Have Functioned.**

157.     Ripple paid certain market makers ███ basis points on certain ODL volume they

facilitated at certain times prior to December 22, 2020. PX 85 (Ripple RFA Responses) No. 595.

158.     Ripple paid certain ODL customers ███ basis points to cover certain trading fees and

spreads incurred during certain ODL transactions. PX 85 (Ripple RFA Responses) No. 596.

159.     Ripple paid market makers GSR and ██████████ to provide and create markets

on the MXN/XRP side of the ODL trade. PX 25 (Madigan Dep. Tr.) at 277:5-278:20.

160.     Ripple's market makers purchased Mexican pesos as part of their support of the

ODL product. PX 25 (Madigan Dep. Tr.) at 311:10-312:21, 315:21-316:12.

161.     Ripple entered into an agreement with GSR Markets to provide market making

services, including between XRP and the Mexican Peso. PX 8 (Ripple RFA Responses) No. 101.

162.     Ripple needed to pay market makers to support developing liquidity in the XRP

markets or the XRP markets would have been insufficiently liquid for ODL to function. PX 25

(Madigan Depo. Tr.) at 326:22-327:13.

163.     Without Ripple's market makers, there would not have been sufficient liquidity in

XRP markets in the most consequential corridor (the Mexican peso) for ODL (formerly known as

xRapid) to function properly. PX 36 (Garlinghouse Inv. Tr.) at 115:24-116:21.

164.     Ripple did not publicly disclose, including in its markets reports, all of the payments

it made to market makers to support ODL. PX 25 (Madigan Dep. Tr.) at 324:1-326:12.

165.     In January 2020, members of Ripple's XRP Markets and Data teams developed an "Average Cost of Liquidity Metric," so that Ripple could "track the costs that Ripple pays for the exchange liquidity that ODL requires." PX 620; *see also* PX 621 ¶ 48.

166.     Ripple created this "Average Cost of Liquidity Metric" because "[c]ontrolling costs as [Ripple] scale[s] ODL is essential to healthy growth." PX 620; *see also* PX 621 ¶ 48.

167.     RESERVED.

168.     As of January 2020, Ripple's "Average Cost of Liquidity Metric" included: (i) transaction fees, including "the originating and destination exchanges' fees and the XRP Ledger fee"; (ii) incentives that Ripple paid to customers and exchange partners, including "rebates to cover slippage (when the quoted price and the executed price differ) and FX difference (when the ODL and spot rate differ) for customers, as well as volume incentives for exchanges"; and (iii) incentives Ripple paid to market makers, including "fixed fees as well as variable fees based on the ODL volume" to which the market makers were counterparties. PX 620; *see also* PX 621 ¶ 48.

169.     As of January 2020, Ripple's "Average Cost of Liquidity Metric" "knowingly omit[ted]" other ODL-related costs borne by Ripple that were "not explicitly related to liquidity, such as customer volume incentives" and "loans to market makers." PX 620; *see also* PX 621 ¶ 48.

170.     As of January 2020, Ripple incurred a cost of ███ of the each ODL transaction in its corridor with the highest volume of transactions (USD/MXN). PX 620; *see also* PX 621 ¶ 49 & Table 5.

171.     In or around January 2017, Garlinghouse stated that Ripple does not get paid for cross-border payments. PX 528.

**(iii)    ODL Still Requires Use of Traditional Software Rails to Convert One Fiat Currency into Another Fiat Currency.**

172.    In connection with its work to support and service ODL, GSR bought fiat from an FX broker using working capital provided by Ripple. PX 26 (███ Dep. Tr.) at 18:24-22:13.

173.    The ODL product does not eliminate the use of the legacy financial system. PX 25 (Madigan Dep. Tr.) at 402:14-23.

174.    Ripple's market makers use the legacy financial system in connection with their ODL functions. PX 25 (Madigan Dep. Tr.) at 402:14-23.

175.    ODL transactions required the use of traditional cross-border and local payment rails to complete the transaction. PX 22 (Samarasinghe Dep. Tr.) at 54:19-55:11, 228:2-230:20; PX 145; PX 621 ¶ 28 & n.25; PX 559; PX 145; PX 456; *see also* PX 562 (internal Western Union email questioning the utility of fast inter ledger transfer of XRP if "you are still dependent on how long it takes the local payment rails, ie: 'the last mile' to process the payment").

**(iv)    Ripple Compensated ODL Customers for ODL's Greater Cost than Using Traditional Payment Rails to Effect Cross-Border Transactions.**

176.    If an ODL customer paid more using ODL to effect a transfer than it would have paid using the interbank FX markets, Ripple paid the ODL customer the difference between the ODL rate and the interbank FX rate. PX 15 (Birla Dep. Tr.) at 214:12-17.

177.    Garlinghouse stated that Ripple's goal in paying incentives to MoneyGram was to increase volume in usage of ODL. PX 36 (Garlinghouse Inv. Tr.) at 130:13-135:12.

178.    Schwartz explained that Ripple was still paying incentives to market makers to make markets in certain ODL-related corridors, but that when you are paying such incentives people are "suffering" your product, "you are not really proving that the use case is viable," you only "get the

appearance of activity and growth and progress, and you don't actually have it." PX 7 (Schwartz Inv. Tr.) at 212:2-216:17.

### (v)    ODL Customers Are Primarily Money Transmitters.

179.    ODL customers are not banks, but rather primarily remittance companies. PX 16 (Birla Inv. Tr.) at 182:19-183:25.

180.    Banks are not the target users for ODL and they never used XRP as a bridge currency on ODL. PX 7 (Schwartz Inv. Tr.) at 192:17-194:20; PX 6 (Schwartz Dep. Tr.) at 42:11-43:16.

181.    Historically, the majority of ODL customers have been money transmitters. PX 15 (Birla Dep. Tr.) at 204:2-206:9.

182.    Money transmitters, and not banks, were Ripple's target audience for ODL (formerly known as xRapid). PX 21 (Vias Inv. Tr.) at 298:16-299:6.

183.    Ripple's direct ODL customers prior to December 22, 2020 were corporate entities. PX 8 (Ripple RFA Responses) No. 90.

184.    Ripple did not sell any products that individuals would use, instead, Ripple's target audience for its marketing efforts was institutional, particularly financial institutions. PX 17 (Long Dep. Tr.) at 73:1-74:25.

185.    Long stated, in or around August 2017, that the statement "many banks are using XRP" put Ripple at "high risk" and needed correction, and "[i]f Brad [Garlinghouse] is saying banks are using XRP, that's a problem" and Long and Ripple's public relations agency would need to "manage him on that." PX 631.

(vi)     **Ripple Did Not Sell XRP for ODL Until Mid-2020 and then Bought Back XRP Sold.**

186.     Ripple was not selling XRP to ODL customers in or around May 2019. PX 25 (Madigan Dep. Tr.) at 47:17-21.

187.     Ripple's customers who used the ODL product from 2019 through May 2020 were not required to purchase XRP from Ripple. PX 8 (Ripple RFA Responses) No. 94.

188.     Before approximately May 2020, Ripple did not sell XRP to ODL customers for their use in ODL transactions. PX 8 (Ripple RFA Responses) No. 95; PX 81 (Garlinghouse Dep. Tr.) at 336:1-11.

189.     Ripple had concerns that introducing XRP into the market via XRP-O "at any significant scale" would be expected "to have a negative impact on XRP price." PX 25 (Madigan Dep. Tr.) at 340:19-351:17; PX 630; PX 185.

190.     Garlinghouse and others at Ripple were concerned after XRP-O launched that XRP-O sales could hurt the market for XRP. PX 81 (Garlinghouse Dep. Tr.) at 482:11-484:6.

191.     Ripple had concerns that selling a large amount of XRP at a low price could push XRP "over a cliff," and regarding other ways in which Ripple's sales of XRP might hurt XRP's price absent purchasing XRP. PX 632.

192.     Ripple intended to balance three primary concerns with respect to its sales of XRP via XRP-O: the stability of XRP, the "client experience" with ODL, and "corp[orate] cash needs," with the latter goal in and around July 2020 targeting total net annual XRP sales of $100 million. PX 25 (Madigan Dep. Tr.) at 382:10-388:8; PX 190; PX 626 at 5 (April 2020 internal Ripple presentation noting plan to "[u]se MGI ODL flows to help achieve XRP Origination revenue targets for 2020 ($300mm)").

193.     Because of its concerns about the impact of sales of XRP in connection with XRP-O on the XRP market, Ripple decided to execute purchases of XRP in the market. PX 22 (Samarasinghe Tr.) at 268:3-273:8.

194.     Ripple instructed GSR to make purchases of XRP on digital asset trading platforms in 2020. PX 85 (Ripple RFA Responses) No. 566.

195.     Ripple purchased approximately $45.55 million in XRP during the third quarter of 2020. PX 80 (Ripple Ans.) ¶ 220.

196.     Ripple engaged GSR to purchase XRP on its behalf. PX 26 (█ Dep. Tr.) at 177:7-182:15.

197.     In or around July 2020, Ripple Labs Singapore Pte. Ltd. entered into a master purchase agreement with GSR Markets Pte. Ltd., which stated the purpose of the agreement was that Ripple Labs Singapore Pte. Ltd. "may seek to purchase XRP from [GSR Markets Pte. Ltd.] to offset amounts of XRP that [Ripple Labs Singapore Pte. Ltd.] is selling to its own customers for their use in cross board payments via [Ripple Labs Singapore Pte. Ltd.]'s On Demand Liquidity product." PX 187.

198.     In or around July 2020, Ripple executed a trial period of XRP purchases in which it bought back 100% of the XRP volume that it sold in connection with XRP-O. PX 188.

199.     Ripple's purchases and sales of XRP were part of its efforts to have and maintain "fair and orderly markets" in XRP. PX 26 (█ Tr.) at 90:6-25, 131:14-132:8.

200.     According to GSR, Ripple bought XRP to have "fair and orderly" XRP markets and publicly made itself the buyer or seller "of last resort" for XRP. PX 26 (█ Dep. Tr.) at 90:9-25, 131:14-132:8, 167:17-25.

201.     Ripple stated in its second quarter 2020 XRP markets report:  "As more financial institutions leverage RippleNet's ODL service, more liquidity is added into the XRP market. That said, Ripple has been a buyer in the secondary market and may continue to undertake purchases in the future at market prices." PX 501.15, available at https://ripple.com/insights/q2-2020-xrp-markets-report/ (2Q20 Market Report).

202.     Ripple stated in its third quarter 2020 XRP markets report: "Ripple is purchasing – and may continue to purchase – XRP to support healthy markets." PX 501.16, available at https://ripple.com/insights/q3-2020-xrp-markets-report/ (3Q20 Market Report).

203.     Among the deposits and payments in the second half of 2020, Ripple's bank accounts at ▮▮▮▮▮▮▮▮▮▮ show deposits of proceeds from Ripple's XRP sales through Azimo and Viamericas, while Ripple was making payments of $70 million to GSR to purchase XRP. PX296; PX 759; PX 754; PX 763.

204.     XRP II, LLC Account No. X▮▮▮ (PX 296) shows that between June and December 2020, Ripple received approximately $41 million from Azimo, and $155 million from Viamericas, and during that period on September 30, 2020 transferred $77 million to Ripple Services, Inc. Account No. X▮▮▮. PX 759.

205.     Ripple Services Inc., Account No. X▮▮▮ (PX 759) received a September 30, 2020 deposit of $77 million from XRP II, LLC, which is immediately transferred to Ripple Labs Account No. X▮▮▮. PX 754.

206.     Ripple Labs Account No. X▮▮▮ (PX 754) received a September 30, 2020, $77 million deposit from Ripple Services Inc. Account No. X▮▮▮ and between July and November 2020, transferred $66 million to Ripple Labs Singapore Account No. X▮▮▮ (PX 763).

207.     Ripple Labs Singapore Account No. X████ received $66 million from Ripple Labs Bank Acct X████ between July and November 2020, and during that time made multiple payments to GSR totaling $70 million for Ripple's repurchases of XRP. PX 763.

**(vii)     XRP Trading Volume Attributable to ODL Was a Small Fraction of Total XRP Trading Volume.**

208.     From the fourth quarter of 2018 through the fourth quarter of 2020, quarterly XRP trading volume attributable to ODL as a percent of total quarterly XRP trading volume never exceeded ██, and was under ███ for every quarter except for the second quarter of 2020. PX 398 (Ferrante Decl.) ¶¶ 5-6, Exhibit 1 at 4.

209.     The total volume attributable to ODL, from October 2018 through December 2020, was ████ of total XRP market volume from August 2013 through December 2020. PX 398 (Ferrante Decl.) ¶ 9, Exhibit 3.

**(viii)     Ripple Paid MoneyGram to Use ODL.**

210.     In or around January 2020, the U.S.-based money transfer company called MoneyGram International, Inc. ("MGI" or "MoneyGram") accounted for approximately 90% of all ODL volume. PX 499 at RPLI_SEC 552757.

211.     In 2019, Ripple made equity investments in MGI for $50 million. PX 8 (Ripple RFA Responses) No. 106.

212.     Ripple invested $50 million in MGI and included additional investment incentives to incentivize MGI to use ODL. PX 36 (Garlinghouse Inv. Tr.) at 133:7-134:12.

213.     In or around February 2020, Birla confirmed publicly on Twitter that Ripple paid MGI over $11 million to use ODL. PX 506.118; PX 623.

214.     Ripple placed restrictions on MoneyGram's sales of XRP it received as incentive payments to use ODL to avoid such sales having an impact on the XRP market, including on its price and volume. PX 36 (Garlinghouse Inv. Tr.) at 144:3-145:2.

215.     Garlinghouse viewed "MoneyGram an extension of Ripple's activities by virtue of using XRP as an incentive" and accordingly placed restrictions on MoneyGram's sales of XRP. PX 36 (Garlinghouse Inv. Tr.) at 144:3-145:2.

216.     MoneyGram is among the top three money remitters in the world. PX 624 (Angelilli Dep. Tr.) at 30:18-25.

217.     MoneyGram conducted a series of pilot tests of ODL from February 2018 through March 2019. PX 634 (Decl. of Lawrence Angelilli, dated Mar. 14, 2021 ("Angelilli Decl.")) ¶ 6.

218.     MoneyGram's pilot tests of ODL showed that, although the speed of cross-border transactions was faster using ODL than traditional FX transactions, MGI experienced significantly higher trading costs using ODL than it did in using traditional FX trading and as a result, MoneyGram "concluded that the use of XRP in the ODL platform was cost prohibitive to MGI's business." PX 634 (Angelilli Decl.) ¶¶ 7-9.

219.     After MoneyGram piloted the use of ODL to effect cross-border transfers of fiat currencies, MoneyGram concluded that ODL's "technology wasn't mature or sufficient to support [MoneyGram's] needs" and MoneyGram did not "view it as a viable product" for MoneyGram's purposes. PX 624 (Angelilli Dep. Tr.) at 14:7-24.

220.     MoneyGram was responsible for the vast majority of all ODL activity from late 2018 through December 2020. *See* PX 621 ¶ 29 & Figure 2; PX 624 (Angelilli Dep. Tr.) at 76:19-77:8 (testifying that "[s]tarting in the spring of 2020, and through the end of the relationship" between

MoneyGram and Ripple, MoneyGram determined that MoneyGram's ODL transactions constituted in excess of 90 to 95 percent of …total volume on ODL.").

221.     Lawrence Angelilli is the Executive Vice President and Chief Financial Officer (CFO) of MoneyGram. PX 634 (Angelilli Decl.) ¶ 1.

222.     As part of his role as MoneyGram's CFO, Angelilli became familiar with Ripple, ODL, MoneyGram's transactions with Ripple, and MoneyGram's experiences using ODL to effect cross-border transfers of fiat currencies. PX 634 (Angelilli Decl.) ¶¶ 1, 5-44.

223.     In a meeting with Ripple executives, MoneyGram officials explained to ████████ ████, then Ripple's Senior Vice President of Institutional Markets, Corporate & Business Development, that it was familiar with ODL and "that it was not economically viable." PX 624 (Angelilli Dep. Tr.) at 14:25-15:24.

224.     Ripple offered to invest in MoneyGram, and entered into an equity investment agreement in or around June 2019, pursuant to which Ripple ultimately purchased $50 million worth of MoneyGram stocks and warrants. PX 624 (Angelilli Dep. Tr.) at 16:21-17:4, 179:21-180:6; PX 634 (Angelilli Decl.) ¶ 12.

225.     In or around June 2019, MoneyGram and Ripple also entered into a commercial agreement, in which Ripple agreed to make a number of payments to MoneyGram in connection with MoneyGram's use of ODL. PX 634 (Angelilli Decl.) ¶¶ 13-16.

226.     Pursuant to its commercial agreement with MoneyGram, Ripple agreed to "reimburse MGI sufficiently to be within 5 basis points of the prevailing Reuters Benchmark spot FX rate … on each transaction," which meant MGI would not incur the excessive costs of trading XRP that MGI had previously experienced in its pilots of ODL. PX 634 (Angelilli Decl.) ¶ 14.

185

227.     In order to ensure that the exchange rates charged by the ODL platform will be within 5 basis points of the prevailing Reuters Benchmark spot FX rate, Ripple agreed in the commercial agreement to pay "make-whole" payments if necessary, in XRP and withdrawn by MGI daily from a designated digital asset wallet. PX 634 (Angelilli Decl.) ¶ 22.

228.     Pursuant to its commercial agreement with MoneyGram, Ripple agreed to make the ODL platform available to MoneyGram Payment Systems ("MPSI"), a wholly-owned subsidiary of MGI, and to provide support services, both free of charge. PX 634 (Angelilli Decl.) ¶ 15.

229.     MGI did not pay any compensation to Ripple and had no obligation to do so under the commercial agreement with Ripple. PX 634 (Angelilli Decl.) ¶ 19.

230.     Pursuant to its commercial agreement with MoneyGram, Ripple agreed to pay MPSI certain amounts of XRP based on the volume of USD equivalent purchases that MPSI transacted using ODL: "Effectively, MPSI is compensated [by Ripple] for developing and bringing liquidity to the XRP marketplace." PX 634 (Angelilli Decl.) ¶ 16.

231.     Ripple initially agreed to pay MPSI an amount of XRP equal to $3.5 million if MPSI's XRP transaction volume using ODL met or exceeded $30 million before March 31, 2020. PX 634 (Angelilli Decl.) ¶ 23.

232.     An amendment to the commercial agreement executed in or around September 2019 accelerated the bonus from March 2020 to September 2019 if MPSI reached a transaction volume of $15 million. PX 634 (Angelilli Decl.) ¶ 25.

233.     An amendment to the commercial agreement executed in or around December 2019 added new bonus opportunities, adjusted certain bonus thresholds, and added a $5 million bonus payable to MGI at the end of 2019, as well as identifying MGI not as a customer of Ripple, but as Ripple's "Service Provider." PX 634 (Angelilli Decl.) ¶ 28.

234. MoneyGram sold the XRP it received as payments from Ripple within one trading day of receipt or as soon as practicable. PX 634 (Angelilli Decl.) ¶ 24.

235. Ripple represented to MoneyGram that "the majority of [Ripple's] efforts" were "focused on trying to increase liquidity in the markets" in which MoneyGram transacted. PX 624 (Angelilli Dep. Tr.) at 19:15-25.

236. MoneyGram's view, as expressed by its CFO, is that ODL was "not viable from its effectiveness as a ... product" because it "wasn't viable from a – a commercial standpoint, where [MoneyGram] would use it as an alternative to traditional foreign exchange markets." PX 624 (Angelilli Dep. Tr.) at 20:2-12.

237. Foreign exchange markets are typically very deep and liquid. PX 624 (Angelilli Dep. Tr.) at 31:16-23; PX 621 ¶ 27.

238. MoneyGram's transaction size permits it to have large efficient transactions in the foreign exchange markets. PX 624 (Angelilli Dep. Tr.) at 31:16-23.

239. When it began using ODL, MoneyGram theorized that ODL might not need to tie up capital to fund the settlement of transactions, but "[i]n practice, it didn't work that way" because "the introduction of [crypto asset] exchanges into the ODL process ... was actually extremely inefficient in terms of its impact on [MoneyGram's] working capital." PX 624 (Angelilli Dep. Tr.) at 41:3-19.

240. Even if exchange costs were theoretically lowered, MoneyGram's CFO believed that ODL would remain less efficient than traditional payment rails, both because trading on digital asset exchanges was expensive and the exchanges required MoneyGram to post collateral, so there was "no benefit to using the ODL service." PX 624 (Angelilli Dep. Tr.) at 41:23-42:18.

241.     MoneyGram employees had "repeated conversations" with Ripple employees "about the lack of cost-effectiveness" of ODL. PX 624 (Angelilli Dep. Tr.) at 44:4-45:11.

242.     MoneyGram shared with Ripple its "observations about higher costs incurred doing foreign doing foreign currency exchanges using the ODL product" "on numerous occasions," as it was a "regular agenda item" discussed "frequently" during Ripple's weekly meetings with MoneyGram. PX 624 (Angelilli Dep. Tr.) at 190:2-15.

243.     According to MoneyGram's CFO, Ripple was "highly motivated" to solve the problem of ODL's lack of cost-effectiveness because it was obligated to reimburse MoneyGram for certain ODL-related expenses as part of the parties "make-whole agreement," and as ODL "transactions became less and less efficient, the amount of the make-whole [that Ripple was obligated to pay MoneyGram] was going up." PX 624 (Angelilli Dep. Tr.) at 44:4-45:11; PX 626 (Ripple April 2020 ODL Account Review stating "Ripple is incurring ▇ of liquidity cost for every ▇ of incentives we pay MGI").

244.     According to MoneyGram's CFO, ODL's "reliability decreased over time, and it tended to become less reliable the more volume that [MoneyGram] w[as] putting through it." PX 624 (Angelilli Dep. Tr.) at 47:11-17.

245.     The FX cost associated with MoneyGram's cross-border transfers using traditional payment rails was approximately a half a basis point to one basis point for G10 countries, and between one and five basis points for non-G10 countries "[a]nd probably much closer to one." PX 624 (Angelilli Dep. Tr.) at 53:23-56:5.

246.     MoneyGram also incurs banking fees, including a wire transfer fee of approximately $15, in effecting cross-border transfers using traditional payment rails, where "the value of aggregation" is evident in that "if [MoneyGram is] trading $10 million of foreign exchange in one

day and [it is] not having costs per transaction, [banking fees] can be de minimis, because

[MoneyGram is] spreading the cost of those transactions across one large trade." PX 624 (Angelilli

Dep. Tr.) at 56:6-57:6, 58:5-11.

247.     Normally, all money remitters aggregate transactions transferring money across

jurisdictions, in the way that MoneyGram does. PX 624 (Angelilli Dep. Tr.) at 79:8-12.

248.     A money transmitter would not be able to effect remittance-by-remittance transfers

through ODL because of ODL trade failures and higher cost structure. PX 624 (Angelilli Dep. Tr.)

at 79:16-80:15.

249.     Even if ODL's failure rate were reduced, another money transmitter using ODL to

effect remittance-by-remittance transfers would not be able to compete with MoneyGram because

MoneyGram's foreign exchange rate would always be more favorable due to the larger size of its

foreign exchange transactions. PX 624 (Angelilli Dep. Tr.) at 80:16-82:2.

250.     When Western Union publicly stated that it had tried out Ripple and its product did

not work, MoneyGram's CFO surmised that Western Union likely arrived at the same result that

MoneyGram had when it piloted the use of ODL, "but [MoneyGram] signed a commercial

agreement that had indemnifications in it that shielded [MoneyGram] from those losses." PX 624

(Angelilli Dep. Tr.) at 89:23-90:23; *see also* PX 562.

251.     MoneyGram use of ODL, because it was indemnified by Ripple, was a "sort of a no-

downside agreement" for MoneyGram. PX 624 (Angelilli Dep. Tr.) at 90:24-91:8.

252.     XRP was not functioning as a currency as part of ODL, and rather "was functioning

as …a digital unit of measure that wasn't a currency." PX 624 (Angelilli Dep. Tr.) at 113:22-114:5.

253.    MoneyGram benefitted from using ODL only because they "were actually making money doing it because of the make-whole and the incentives" paid to MoneyGram by Ripple. PX 624 (Angelilli Dep. Tr.) at 115:6-22.

254.    Ripple paid "make-whole payments" to MoneyGram "to make MoneyGram whole for any additional costs …from the ODL transaction over and above what it would cost MoneyGram to do that transaction for the traditional payment route." PX 624 (Angelilli Dep. Tr.) at 149:5-11.

255.    The "make-whole" payments that Ripple made to MoneyGram included both the costs for using crypto trading platforms and paying fees and traditional foreign currency trading costs. PX 624 (Angelilli Dep. Tr.) at 149:12-20.

256.    Ripple's agreement to pay "make-whole payments" were "a deal point in the agreement" from MoneyGram's perspective and MoneyGram "would never have executed the agreement without it." PX 624 (Angelilli Dep. Tr.) at 191:8-14.

257.    Ripple paid "volume incentives" to MoneyGram, in the form of a "$110 million pool of incentives that were paid out based on a sliding scale of basis points against the volume of trading that we did on ODL." PX 624 (Angelilli Dep. Tr.) at 151:2-14.

258.    MoneyGram did not use RippleNet—which was "not ODL and didn't involve foreign exchange trades"—because RippleNet "didn't function satisfactorily." PX 624 (Angelilli Dep. Tr.) at 117:16-118:21.

259.    In or around June 2020, Ripple expressed a desire to further amend the commercial agreement to significantly reduce the volume transacted by MGI because "[t]he inability of Ripple to support the volume of [MGI's] trading, especially in [Philippine Pesos] and [Australian Dollars], resulted in widening of spreads required by counterparties to accept the higher volumes," which in

turn "increased the costs of the make-whole payments to MGI" paid by Ripple. PX 634 (Angelilli Decl.) ¶ 30.

260. In or around June 2020, the parties amended the commercial agreement, in which MPSI agreed to the XRP volume reduction and Ripple agreed to increase the percentage of transaction volume to be paid as fees to MGI. PX 634 (Angelilli Decl.) ¶ 31.

261. In or around June 2020, MGI understood based on its conversations with Ripple that the amendment was intended to significantly reduce Ripple's costs under the make-whole provision of the commercial agreement. PX 634 (Angelilli Decl.) ¶ 30; PX 626 at 4 (April 2020 internal Ripple presentation acknowledging "ODL is costly for Ripple" and "Ripple is incurring █ of liquidity cost for every █ of incentives we pay MGI").

262. From approximately January 1, 2020 through November 30, 2020, Ripple paid approximately $38.6 million in XRP to MPSI in fees and approximately $10.1 million in make whole payments. PX 634 (Angelilli Decl.) ¶ 33.

263. As of December 16, 2020, MoneyGram had reduced its ODL trading volume by approximately 90% at Ripple's request because Ripple viewed the payments it was making under the make-whole agreement as "problematic." PX 624 (Angelilli Dep. Tr.) at 130:18-132:22.

264. MoneyGram ultimately suspended its trading using ODL during December 2020 after MoneyGram hit the maximum under its quota system and would no longer earn any incentive for ODL trades conducted during the remaining month of December. PX 624 (Angelilli Dep. Tr.) at 130:18-132:22.

265. In or around December 2020, ODL was still "immature and not cost-effective" for MoneyGram. PX 624 (Angelilli Dep. Tr.) at 134:25-135:9.

266.     In or around December 2020, MoneyGram's CFO believed that "nothing had changed in terms of that [ODL] was immature and not cost-effective." PX 624 (Angelilli Dep. Tr.) at 134:25-135:9.

267.     MGI did not realize any cost savings from any reduction in working capital needs, or any other transaction-related cost savings, from its arrangement with Ripple. PX 634 (Angelilli Decl.) ¶ 36.

268.     MGI did not realize any such cost savings because of the off-market execution of FX trading on the ODL platform and the high level of fees required for each ODL transaction. PX 634 (Angelilli Decl.) ¶ 37.

269.     MGI repeatedly communicated to Ripple the lack of transaction-related cost savings from the ODL platform, without including Ripple's incentive payments. PX 634 (Angelilli Decl.) ¶ 41.

270.     Ripple was also repeatedly made aware of the lack of transaction-related cost savings from the ODL platform due to the large amount that Ripple was required to pay in make-whole payments to MGI, which it was tracking and proactively trying to reduce. PX 634 (Angelilli Decl.) ¶ 41.

271.     MGI's financial benefits from using ODL were "entirely due to the substantial incentive payments provided by Ripple to MGI." PX 634 (Angelilli Decl.) ¶ 42.

272.     MGI's CFO stated under oath that MGI's financial benefits from using ODL were "entirely due to the substantial incentive payments provided by Ripple to MGI." PX 634 (Angelilli Decl.) ¶ 42.

273.     When MoneyGram negotiated its agreement with Ripple, Ripple executives told MoneyGram that Ripple was "actively involved in promoting the use of XRP and making attempts to increase its value," "[m]eaning the price of XRP." PX 624 (Angelilli Dep. Tr.) at 165:7-166:15.

274.     Ripple explained to MoneyGram Ripple's theory that "by increasing the utility of XRP, it would result in a higher price of XRP" and that Ripple was "interested in working to increase the price of XRP." PX 624 (Angelilli Dep. Tr.) at 166:16-22.

275.     Ripple executives communicated to MGI that in order to increase the utility and impact the price of XRP, Ripple had "a series of investor conferences," "had a very active public relations campaign," and was "very aggressive in terms of their wanting to promote the Ripple and MoneyGram alliance," and explained to MoneyGram that this would "increase the value of XRP." PX 624 (Angelilli Dep. Tr.) at 166:23-167:8.

276.     ███████████████ stated at a MoneyGram board of directors meeting that Ripple was "actively attempting as part of [its] overall strategy to increase the price of XRP." PX 624 (Angelilli Dep. Tr.) at 198:24-199:25.

277.     During the course of negotiations between Ripple and MoneyGram, Garlinghouse stated that Ripple was "actively promoting the value" of XRP and "trying to make sure that the price of XRP increased." PX 624 (Angelilli Dep. Tr.) at 200:3-14.

278.     Ripple never disputed MoneyGram's assessment of the additional costs involved in using ODL. PX 624 (Angelilli Dep. Tr.) at 191:15-19.

279.     MoneyGram's CFO was aware of Ripple's "active Tweeting program," and Ripple at times made public statements that MoneyGram "believe[d] reflected inaccuracies on the MoneyGram relationship" and "mischaracterized the pricing effectiveness or the utility of ODL." PX 624 (Angelilli Dep. Tr.) at 198:13-23.

280.    MoneyGram employees saw Ripple's "Tweets or other public statements touting the cost-effectiveness of ODL" during the time that the size of the make-whole payments Ripple was making to MoneyGram was increasing. PX 624 (Angelilli Dep. Tr.) at 203:3-13.

281.    ODL would not have been viable for MoneyGram's business without the subsidies that Ripple paid MoneyGram. PX 624 (Angelilli Dep. Tr.) at 207:24-208:9.

282.    In an agreement between Ripple and MGI dated in or around December 2019, Ripple agreed to create a "slippage pool" to compensate MGI any time the quoted prices deviated from their realized trade prices, paid in XRP approximately every three days. PX 621 ¶ 46; PX 629.

283.    In addition to payments Ripple made directly to MoneyGram, ODL FX spreads were made artificially low because Ripple paid fixed and variable fees to market makers to minimize FX spreads for XRP trading pairs at ODL corridors, and without such payments, those FX spreads would have been higher. PX 621 ¶ 47; PX 620.

284.    A Ripple internal document stated that Ripple's payments to market makers for artificially reducing ODL FX spreads cost an additional 0.73% of transaction volume in the case of MoneyGram's usage of ODL. PX 621 ¶ 47; PX 626.

285.    When asked whether "Ripple's ability to do those trades 24/7 was a major plus of the ODL product," MGI's CFO responded that 24/7 trading "was particularly interesting to us in the beginning" and that MGI was "doing trades on Saturdays and Sundays and holidays when the banks were closed" but "stopped doing that because the trades became actually very expensive for [MGI]." PX 624 (Angelilli Dep. Tr.) at 46:16-47:2.

**(ix)    Miscellaneous**

286.     In or around April 2020, Garlinghouse proposed a plan that would increase use and adoption of XRP in part to "demonstrate (to people [l]ike the SEC) that XRP is not a security. PX 625.

287.     Ripple's former senior manager for XRP markets believed that ODL was not scalable because it requires partnering with low-quality exchanges with relatively poor technology in destination countries. PX 22 (Samarasinghe Dep. Tr.) at 35:7-14, 38:9-39:2; 282:1-283:25; PX 633.

288.     Ripple does not make money from ODL. PX7 (Schwartz Inv. Tr.) at 218:24-220:22.

**E.    Ripple Did Not Treat XRP as a "Currency" to Buy Goods or Services.**

289.     In 2012 when Schwartz was pitching Ripple to investors, "it would have been impossible to" pitch XRP as a substitute for currency "with any credibility," "there was just no reason to think that that would happen at that time." PX 7 (Schwartz Inv. Tr.) at 22:17-28:10.

290.     In 2017 Schwartz stated publicly on XRP Chat that Ripple was not pursuing the digital cash, peer to peer value exchange use case for XRP. PX 6 (Schwartz Dep. Tr.) at 68:7-70:17; 78:2-10; PX 743.

291.     After the 2015 settlement with the Financial Crimes Enforcement Network, pursuing a use case for XRP as a currency was "impossible." PX 6 (Schwartz Dep. Tr.) at 78:8-79:18; 86:4-87:25; PX 744.

292.     Schwartz stated publicly it did not make sense for people to hold crypto assets as currency or to "use them as money," a view he held up until his deposition in May 2021. PX 6 (Schwartz Dep. Tr.) at 80:13-81:10; 86:4-87:25; PX 745; PX 508.32.

293.     Ripple did not know what buyers were going to do with their XRP. PX 6 (Schwartz Dep. Tr.) at 38:18-39:4.

294.     Garlinghouse stated publicly that he did not view crypto assets as "currencies" with which you could buy goods or services, such as coffee at Starbucks. PX 503.13, 503.18, 503.19; PX 81 (Garlinghouse Dep. Tr.) at 219:4-222:15.

295.     Garlinghouse stated publicly that XRP was not a currency because G20 countries do not need a substitute for their currencies. PX 36 (Garlinghouse Inv. Tr.) at 189:7-192:17.

296.     Larsen sold his XRP for U.S. Dollars because you cannot use XRP to pay your taxes, and used less than 1% of his 9 billion units of XRP in exchange for goods and services. PX 2 (Larsen Dep. Tr.) at 92:20-94:22.

297.     There were no uses for XRP as a "currency" that buys goods and services (i.e., there was no "consumer use case" for XRP), such that Ripple was not focused on the "consumer" use case for XRP because all the consumer could do with XRP was "hold it or sell it for fiat"; in other words, consumers can only use XRP as a vehicle for speculation. PX 533 at RPLI_SEC 95174, 95218; PX 529; PX 538; PX 24 (Beard Dep. Tr.) at 110:15-112:7, 118:18-123:17.

**F.      The Individual Defendants Offered and Sold XRP in the United States.**

**(i)      The Individual Defendants Used GSR to Offer and Sell Their XRP.**

298.     Larsen entered into an agreement with GSR on or about March 5, 2015. PX 610.

299.     The 2015 agreement between Larsen and GSR provides that once Larsen transferred the XRP to GSR, "title to and risk of loss of" the XRP passes to GSR. PX 610 at § 2.7(b).

300.     The 2015 agreement between Larsen and GSR identifies GSR as the "purchaser" of the XRP that GSR would then resell on Larsen's behalf. PX 610 at Preamble (GSR000008433).

301.     The 2015 agreement between Larsen and GSR provides that Larsen and his "affiliates" do not have any obligation to redeem any XRP for any monetary value, or goods and services. PX 610 at § 2.7.2.

196

302.     Larsen entered into agreements with GSR on or about October 4, 2017 and January 24, 2020. PX 614; PX 612. Larsen was in the United States at the time he entered into those two agreements with GSR. PX 393 at 7-8.

303.     Garlinghouse entered into an agreement with GSR on or about December 18, 2017. PX 615 (together with PX 612 and PX 614, the "XRP liquidation agreements"). Garlinghouse was in the United States at the time he entered into that agreement with GSR. PX 454 at 7.

304.     Under the XRP liquidation agreements, Larsen and Garlinghouse instructed GSR "to liquidate XRP and extract maximum value in bitcoins or US Dollars." PX 614 at Preamble; *see also id.* § 1.3; PX 612 at Preamble & § 1.3; PX 615 at Preamble & § 1.3.

305.     The XRP liquidation agreements provide: "GSR will sell [the XRP]…in a series of liquidation transactions … at a price to be chosen at GSR's sole discretion," with the Individual Defendants "agree[ing] to hold GSR harmless and not dispute the price of any such sales made by GSR," and "direct[]" GSR where to deposit proceeds from the sales. PX 612 § 2.5; *see also* PX 614 § 2.5; PX 615 § 2.5.

306.     The XRP liquidation agreements provide: "GSR agrees to and will maintain custody and control of the [XRP] until the [XRP] are actually purchased according to the procedures described below…GSR will deposit any funds or Tokens compensation generated…into accounts at Bitstamp.com chosen by Customer. The applicable Loan will automatically terminate once GSR has repaid the Loan, all applicable Loaned Tokens have been liquidated using the process set out in Section 2.5 and GSR has deposited the proceeds in such applicable account or accounts." PX 614 § 2.3; *see also* PX 612 § 2.3; PX 615 § 2.3.

307.    The XRP liquidation agreements provide:  "As consideration for providing the Liquidity Extraction Activity, GSR will receive ██████████ of the [XRP]. GSR's right to payment vests once GSR takes custody of the [XRP]." PX 612 § 2.6; PX 614 § 2.6; PX 615 § 2.6.

308.    The XRP liquidation agreements provide that "GSR is responsible for all customer service related to the distribution or resale" of the XRP. PX 612 § 5; PX 614 § 5; PX 615 § 5.

309.    The XRP liquidation agreements provide that GSR is "not purchasing any [XRP] from [the Individual Defendants] to use such [XRP] as an End User." PX 612 § 6(e); PX 614 § 6(e); PX 615 § 6(e).

310.    The XRP liquidation agreements provide that if GSR "decides to sell the Loaned Tokens it purchases it will collect relevant Know Your Customer information." PX 612 § 6(g); PX 614 § 6(g); PX  615 § 6(g).

311.    The XRP liquidation agreements provide that Larsen or Garlinghouse can terminate the agreements "upon ██████████' advance written notice to GSR" or "immediately upon notice to GSR if GSR breaches any of its obligations" under the agreements. PX 612 §§ 10.2, 10.3; PX 614 §§ 9.2, 9.3; PX 615 §§ 9.2, 9.3.

312.    The XRP liquidation agreements provide: "[I]n order to perform its obligations under this Agreement GSR will be required to engage the services of certain third-party online platforms (including but not limited to Bitstamp.com) that allow trading of XRP and other digital assets…In the event any sum of Customer's funds are lost due to an insolvency issue at any such online trading platform, which insolvency issue occurred through no fault of GSR, which shall be deemed to occur wherein such online trading platform will not return funds within ██████████ of a request made in writing by GSR, GSR will have the right to transfer to Customer any claim or

portion of a claim it has against such trading platform as such claim relates to Customer's funds." PX 614 § 11.1; PX 615 § 11.1; *see also* PX 612 § 10.1.

313.     The XRP liquidation agreements provide: "Nothing in this Agreement shall be construed as creating an employer-employee or agency relationship, a partnership or a joint venture between the parties. Neither party will have any right, power or authority to bind the other party." PX 612 § 11.2; PX 614 § 12.2; PX 615 § 12.2.

> **(ii)     The Individual Defendants Used Domestic Means to Transfer Their XRP to GSR and to Obtain the Sale Proceeds from GSR.**

314.     Pursuant to these contracts, Larsen transferred 1.5 billion XRP ($495 million) and Garlinghouse transferred 167 million XRP ($104 million), from accounts at a U.S.-based crypto platform Bitstamp U.S.A., to GSR. PX 202 at 27-31 (¶¶ 36-40); PX 81 at 180:5-23; PX 394; PX 732.

315.     Each of the Individual Defendants' transfers of XRP was reflected on the XRP Ledger. PX 202 at App'x E.

316.     In October 2020, Garlinghouse's financial consultants determined that his Bitstamp account is an account with Bitstamp U.S.A. that is not a "foreign financial institution" and that the "wallet [he] hold[s] via GSR is not a foreign financial account." PX 438 at GARL_Civil_000806.

317.     To transfer their XRP to GSR, the Individual Defendants used their private cryptographic keys to digitally sign the transaction to transfer the XRP from the "address" they controlled to the "address" supplied by GSR. *See* XRPL.org, *Cryptographic Keys* (2021) *available at* https://xrpl.org/cryptographic-keys.html.

318.     A private key with respect to an address on a blockchain is a lengthy password known only to the person who controls a crypto asset which is tied to the address they control. PX 12 (Expert Report of ███████ ("███████ Report")) at 11-12 (§ 3.2). "As a fundamental

principle, whoever controls the private keys corresponding to a given address, controls [the crypto asset] pertaining to that address." *Id.*

319. The Bitcoin blockchain validation process is called "Proof-of-Work," and it consists of a "miner node" performing a "very large number of operations" in order to transmit a new block for the blockchain to all the other nodes. PX 12 at 11-15 (§ 3.2.1).

320. The Ethereum blockchain validation process was at the time of ████ Report "very similar" to Bitcoin's, and was also "Proof-of-Work." PX 12 at 18 (§ 3.3.1).

321. The XRP Ledger validation process is called a "Byzantine fault-tolerant (BFT) protocol," PX 12 at 21 (§ 4.1.2), and the process works iteratively by validator nodes sending messages to each other to propose transactions, and transactions becoming "confirmed" for a particular node when it receives a message from at least 80% of the nodes in that node's "unique node list." *Id.* at 34-35 (App'x B).

322. The XRP Ledger's list of "default" unique node lists includes 19 nodes run by Ripple or entities with which Ripple has a commercial relationship, including U.S.-based universities and entities. PX 12 at 32-33 (App'x A, Figures 2, 3).

323. The publication "How Bitcoin Functions As Property Law," by Eric D. Chason, published in the William & Mary Law School Scholarship Repository in 2019, states: "Owners of Bitcoin establish their ownership by what lawyers would call a 'chain of title,' or what [the creator of Bitcoin] called 'a chain of digital signatures.' Each transfer of Bitcoin resembles a deed of real estate, as the 'grantor' refers to the prior transaction under which she holds. Modern cryptography allows users to replace legal names and handwritten signatures with alphanumeric public addresses and digital signatures." PX 638 (Chason, 49 SETON HALL L. REV. 129, 138 (2019)) at 138.

324.     When the XRP Ledger "advances," (i.e., there is a new state of the ledger with changes in transactions that occur on the ledger) that occurs physically "*in each individual node participating in or moderating or participating in the process*"—each server advances the ledger for its own purposes, each individual server has to make the decision of advancing the XRP Ledger for its own purposes. PX 6 (Schwartz Dep. Tr.) at 61:4-62:23 (emphasis added).

325.     Larsen and Garlinghouse used U.S. domestic means to sell XRP with GSR. PX 81 (Garlinghouse Dep. Tr.) at 139:5-10, 140:4-22 (Garlinghouse used Signal to communicate with GSR); PX 732 (Larsen's communications with Bitstamp re transfer of his XRP to GSR logging in from the United States).

326.     Larsen has used his U.S.-based Bitstamp account to sell XRP. PX 2 (Larsen Dep. Tr.) at 157:2-158:7; PX 394.

327.     Larsen has a Gatehub address and sold XRP through that address. PX 2 (Larsen Dep. Tr.) at 159:10-23.

328.     Larsen has a Coinbase account that he opened in the U.S. PX 2 (Larsen Dep. Tr.) at 158:24-159:8.

329.     In or around March 2018, Garlinghouse explained to his tax advisers that he received XRP from Ripple, held it in wallets under his control and then moved his XRP to other wallets for the purpose of selling his XRP, including to the "GSR cold wallet which they then access to sell" the XRP, and that GSR then "move[s] USD to [his] bitstamp account – and [he] wire[s] $$ to [his] ███ bank account." PX 573.

330.     To sell the Individual Defendant's XRP, GSR "take[s] claim" of the XRP in a cold wallet constructed on the XRP Ledger, and from there GSR transfers it to accounts that *GSR* holds on crypto asset trading platforms, not the clients. PX 26 (███ Dep. Tr.) at 284:1-289:21; PX 573.

331.    To sell Individual Defendants' XRP, GSR sent the XRP from its Ripple "cold wallet" to a wallet maintained at the crypto trading exchange for the account of GSR, and all the proceeds of these sales were commingled with Ripple's sales proceeds until 2018. PX 26 (█ Dep. Tr.) at 141:5-144:11.

332.    From time to time, the Individual Defendants directed GSR from within the United States to pause or restart their sales of XRP and otherwise provided approval on how GSR administered the bots for Ripple and IDs. PX 728; PX 729 (Sept. 18, 2018 email from GSR to Garlinghouse stating "your bots will stay on unless you instruct us otherwise."); PX 730; PX 731 (Dec. 18, 2017 GSR asks Larsen if he agrees "to pause the bots and monitor until tomorrow?"); PX 733 (Aug. 15, 2016, █ tells GSR "Chatted with Chris and Brad. Let's change 2t from neutral to selling █."); PX 239 at RPLI_SEC 307781, PX 385, PX 386, PX 387 at RPLI_SEC 205601, PX 388, PX 389, PX 390; PX 2 (Larsen Dep. Tr.) at 157:17-25; PX 393 at 7-8; PX 454 at 6-9.

333.    When it came time to return trading proceeds to Larsen and Garlinghouse, GSR issued Bitstamp IOUs on the XRP Ledger, *i.e.*, "Bitstamp would issue an IOU on the Ripple Consensus Ledger for X amount of dollars, which Ripple or Mr. Larsen or whoever could redeem using Bitstamp." PX 26 (█ Dep. Tr.) at 144:14-22.

334.    Garlinghouse deposited the proceeds from his XRP into his account at Bitstamp and Garlinghouse would transfer those proceeds as U.S. dollars to his ████████ account in the U.S. Garlinghouse only ever traded his XRP for U.S. dollars. PX 81 (Garlinghouse Dep. Tr.) at 180:5-182:11.

335.    Larsen directed GSR to wire his trading proceeds in U.S. dollars to his U.S. bank account. PX 725; PX 575.

336.     Garlinghouse directed GSR to wire his trading proceeds in U.S. dollars to his U.S. bank account. PX 726.

337.     All proceeds of Garlinghouse's sales of XRP were deposited into Garlinghouse's bank accounts in the United States. PX 86 (Garlinghouse RFA) No. 192.

**(iii)    GSR Sold XRP on Crypto Trading Platforms in the United States and/or that Allowed U.S. Customers.**

338.     Larsen and Garlinghouse sold XRP on U.S.-based trading platforms. DX 81 (D.E. 624-81); DX 82 (D.E. 624-82) (listing sales on Bittrex, Coinbase, Kraken, and Poloniex).

339.     GSR sold XRP for both Larsen and Garlinghouse on platforms that accepted U.S. customers. *Compare* DX 81 (D.E. 624-81) & DX 82 (D.E. 624-82) *with* PX 564, PX 565, PX 566 (listing platforms that accepted U.S. customers).

340.     When Garlinghouse sold XRP on Bitstamp or through GSR, he could not know, and did not ask, to whom he was selling. PX 81 (Garlinghouse Dep. Tr.) at 24:24-25:15.

341.     Garlinghouse did not instruct GSR to restrict sales of his XRP to crypto platforms that did not accept U.S. purchasers until September 2020. PX 81 (Garlinghouse Dep. Tr.) at 487:2-15.

342.     Garlinghouse sold XRP anonymously on the crypto platforms. PX 86 (Garlinghouse RFA Responses) No. 176.

343.     Garlinghouse did not know the identity of all persons to whom he sold XRP. PX 86 (Garlinghouse RFA Responses) No. 179.

344.     Garlinghouse opened certain digital asset trading accounts in order to sell his XRP while he was located in the United States. PX 86 (Garlinghouse RFA Responses) No. 190.

345.     Larsen did not know where GSR sold his XRP, and assumed it was on overseas platforms but did nothing to confirm his assumption. PX 2 (Larsen Dep. Tr.) at 94:23-96:9.

346.     Larsen took no steps to ensure that his XRP did not land in the hands of U.S. investors. PX 2 (Larsen Dep. Tr.) at 88:22-89:2.

347.     Larsen took no steps to prevent the buyers of his XRP from reselling to U.S. investors, and did not restrict how the buyers of his XRP could resell his XRP. PX 2 (Larsen Dep. Tr.) at 88:22-89:2; 94:23-96:09; 102:19-103:6; 154:11-155:2.

348.     Larsen never instructed GSR to limit sales of his XRP to overseas platforms that prohibited U.S. purchasers. PX 2 (Larsen Dep. Tr.) at 102:19-103:6.

349.     ██ could not recall an occasion where the Individual Defendants instructed him to sell XRP to people who would commit not to resell to U.S. persons, and did not think that had occurred. PX 26 (██ Dep. Tr.) at 155:15-25.

350.     GSR could choose to trade on exchanges that did not accept U.S. purchasers, "[b]ut if [GSR] sell[s] XRP to Joe Block on this exchange and Joe Block turns around and withdraws it and sells it to an American, [GSR has] no way of controlling that." PX 26 (██ Dep. Tr.) at 157:4-7.

**(iv)     GSR Did Not Segregate the XRP It Sold on Behalf of Ripple, Larsen, or Garlinghouse.**

351.     Before sometime in 2018, GSR did not segregate XRP sales according to customer for Ripple, Larsen, and Garlinghouse. PX 26 (██ Dep. Tr.) at 141:5-144:11.

352.     All XRP to be sold by GSR on behalf of Ripple, Larsen, and Garlinghouse was in a single pot distributed across exchanges, the proceeds from XRP sales were pooled at GSR, and GSR then allocated the proceeds among Ripple, Larsen, and Garlinghouse pursuant to each of their XRP selling programs: "[D]ifferent clients had different sales targets that were all different percentages of the total trading volume. So, say, for example, Ripple was targeting 1 percent, and Mr. Larsen was targeting 1 percent, then they're both 50/50, and we would split the proceeds 50/50. If it was 1

percent and .1 percent, Ripple would get ten-elevenths, Mr. Larsen would get one-eleventh of the proceeds." PX 26 (███ Dep. Tr.) at 141:5-144:11.

353.    All of GSR's XRP sales on behalf of Larsen and Garlinghouse used the same overall algorithmic sales strategy as used for Ripple sales and GSR "didn't favor anybody. It was always the same." PX 26 (███ Dep. Tr.) at 142:12-23.

354.    Using its trading algorithms, GSR placed orders to sell with the crypto trading platform to be matched by offers to buy. If GSR's offers to sell XRP on behalf of Larsen and Garlinghouse were matched, the exchange would withdraw the XRP from GSR's wallet and return to GSR proceeds of the sale. PX 26 (███ Dep. Tr.) at 311:2-13.

355.    When GSR was selling XRP on behalf of Ripple, Larsen, and Garlinghouse, GSR was placing continuous offers to sell using an algorithm, 24 hours a day, seven days a week. PX 26 (███ Dep. Tr.) at 312:5-12.

356.    While GSR assigned Larsen and Garlinghouse their own bots, GSR traded XRP on behalf of all Defendants consistently with each other. PX 26 (███ Dep. Tr.) at 142:12-23.

357.    GSR executed its trading algorithms to disguise Defendants' XRP liquidation program to get best execution and prevent other market participants from front running trades which would lower execution price. PX 26 (███ Dep. Tr.) at 251:16-253:22.

358.    GSR bought XRP to improve execution price on sales for defendants, and provided passive orders for a lower cost, and spread its orders over multiple exchanges. PX 26 (███ Dep. Tr.) at 251:16-253:22.

359.    Because GSR was doing XRP sales on behalf of all Defendants and other Ripple employees, GSR "didn't want to let people -- or have people tripping over themselves and trying to

get ahead of the rest. [GSR] [h]ad to do it in some kind of a controlled fashion." PX 26 (█ Dep.

Tr.) at 249:3-250:9.

360.    █ was Larsen's and Garlinghouse's primary contact for their XRP sales. PX 26 (

Dep. Tr.) at 278:8-13.

361.    Larsen, or his executive assistant █ on his instruction, would transfer his

XRP to GSR's wallet for sales. PX 724; 727; PX 734.

362.    Garlinghouse used Signal to confirm his transfers of XRP to GSR and the logistics

of administering his sales. PX 81 (Garlinghouse Dep. Tr.) at 140:4-22.

363.    In or around June 2019, Garlinghouse told GSR that "I sent █ Xrp yesterday. Pls

confirm the balance is correct." PX 574.

**(v)    The Crypto Exchanges Through Which GSR Sold the Individual Defendants'
XRP Are Unregulated and Differ from Traditional Securities Exchanges in
Important Ways.**

364.    Ripple knew that its market makers—which were the same as the Individual

Defendants'—were selling their XRP on platforms that were not registered as "national securities

exchanges" under the Securities Exchange Act of 1934. PX 8 (Ripple RFA Responses) No. 235.

365.    Traditional securities exchanges must comply with a number of requirements of the

Securities Exchange Act of 1934 ("Exchange Act") and SEC rules including rules governing fraud,

manipulation, and dissemination of data. 15 U.S.C. § 78f, 78k-1; 70 Fed. Reg. 45529 (Jun. 29, 2005)

(Regulation NMS).

366.    Traditional securities exchanges are self-regulatory organizations ("SROs"), 15 U.S.C.

§ 78c(a)(26).

367. Traditional exchanges are required to have rulebooks and enforce their own rules on their members and persons associated with their members, subject to SEC appellate review. 15 U.S.C. § 78f(b); 78s.

368. All SRO rulebooks must be filed with the SEC and most changes to those rulebooks must be approved by the SEC. 15 U.S.C. §78s.

369. The SEC can bring an enforcement action against an SRO for failing to follow or enforce its own rules. 15 U.S.C. §78s(g).

370. Membership in traditional securities exchanges is limited to registered broker-dealers. 15 U.S.C. § 78f(c).

371. Registered broker-dealers have a number of obligations, including capital requirements (17 CFR § 240.15c3-1), an obligation to safeguard customer assets and securities (17 CFR § 240.15c3-3), record keeping obligations (15 U.S.C. §78q-1), best execution obligations (Rule Regulation NMS, Rule 605), obligations to make disclosures about order routing and handling (Regulation NMS, Rule 606), and obligations to address conflicts (17 CFR 240 (Regulation Best Interest)).

372. There are currently sixteen securities exchanges registered with the SEC as a "national securities exchange" under the Exchange Act. *See* https://www.sec.gov/divisions/marketreg/mrexchanges.shmtl *last visited* Oct. 16, 2022.

373. The publication "Banking in the shadow of Bitcoin? The institutional adoption of cryptocurrencies," by the Monetary and Economic Department of the Bank for International Settlements, dated May 2022, states: "[Crypto exchanges] provide platforms on which participants can trade and store cryptocurrencies and remain largely unregulated to date, essentially forming a 'shadow crypto financial system.' Compared to existing regulated exchanges for 'traditional'

financial assets, the regulatory and supervisory oversight of crypto exchanges – encompassing consumer protection, market integrity, trading, disclosure, prudential and addressing anti-money laundering (AML), combatting the financing of terrorism (CFT) – remains patchy at best." PX 635 at 2.

374.    The publication entitled "Assessment of Risks to Financial Stability from Crypto-assets" by the Financial Stability Board, dated February 16, 2022, states: "In many instances, these [crypto trading] platforms are operating outside the jurisdiction's regulatory perimeter, or are not in compliance with applicable regulatory requirements. Thus, these activities could fail to provide the market integrity, investor protection or transparency seen in appropriately regulated and supervised financial markets." PX 636 at 18.

375.    The publication entitled "Global Financial Stability Report" by the International Monetary Fund, dated October 2021, states: "[M]any countries do not have conduct or prudential regulations in place that encompass the activities of crypto asset service providers. And even though some jurisdiction require some type of registration or authorization process, the scope of such regulations in many cases is limited to AML/CFT. The absence of effective supervision and regulatory frameworks can create regulatory arbitrage and curtail enforcement." PX 637 at 47.

376.    Crypto trading platforms typically accept trades from or interaction with retail or natural persons, whereas registered national securities exchanges permit trading only by members (i.e., broker dealers and those associated with broker dealers). *See* SEC.gov | Statement on Potentially Unlawful Online Platforms for Trading Digital Assets, *available at* https://www.sec.gov/news/public-statement/enforcement-tm-statement-potentially-unlawful-online-platforms-trading; SEC.gov | Chairman's Testimony on Virtual Currencies: The Roles of the

SEC and CFTC, *available at* https://www.sec.gov/news/testimony/testimony-virtual-currencies-oversight-role-us-securities-and-exchange-commission

377.     Of the platforms in which Larsen and Garlinghouse sold XRP and which they claim are "foreign," the following are registered as "money service businesses" in the United States with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN") with registration addresses in the United States listed in parenthesis: BitMart (California); AscendEX/BitMax (New York); Bitstamp (New York), Korbit (Colorado), OKEx (Colorado). *See* MSB Registrant Search | FinCEN.gov *available at* https://www.fincen.gov/msb-registrant-search.

**G.    Defendants Fostered U.S. Investor Interest in XRP and Took Steps to Develop a Secondary Market that Would Allow U.S. Investors to Trade XRP and Provide Sufficient Liquidity for Defendants to Monetize their XRP.**

**(i)    U.S. Investors Contacted Ripple About How to Buy XRP.**

378.     In or around May 2017, a Florida resident used a Ripple.com contact form to ask Ripple where to buy XRP. PX 578.

379.     In or around May 2017, a Washington state resident asked Ripple when they will be able to purchase XRP from Washington state. PX 579.

380.     In or around April 2017, an individual asked Ripple whether they could buy XRP from New York state through Bitstamp and whether Bitstamp was the only way to purchase XRP. PX 580.

381.     In or around January 2018, an individual asked Ripple "what is the best platform to purchase XRP with an American bank account? My next question is can I easily transfer my XRP to CoinBase when it becomes available on the CoinBase platform?" PX 606.

382.     In or around January 2018, an individual told Ripple that they have tried to open accounts with Bitstamp and Gatehub and that "I want you guys to know and understand that the

XRP buying experience is horrible." The individual explained: "Though I like the XRP concept, I do not like the idea of not being able to purchase it easily from an American broker. Please fix this inaccessibility issue." PX 581.

383.    In or around March 2018, Ripple's head of investor relations emailed notes of a meeting with venture capital investors in the San Francisco Bay area, noting that investors asked "Will you list on CoinBase?" and "You seem to have two pieces to your company - the products vs XRP (that speculators are interested in)? How do they fit together?" PX 588.

384.    In or around May 2017, an individual asked Ripple "Is there a U.S. based exchange where I can purchase or trade XRP?" PX 593.

**(ii)    Ripple Responded to Direct Inquiries from U.S. Investors by Instructing them How to Buy XRP.**

385.    In or around March 2017, Griffin asked Vias to reach out to a U.S. investor to see if he was a "good candidate for XRP II" as in institutional OTC investor. That U.S. based investor explained that opening an account with Bitstamp requires sending funds "from a USA bank to a[n] East European bank that is very small and unfamiliar" and recommended that Ripple "list itself with guys like Coinbase and Gemini.Com for those of us who have 5+ figure accounts for trading crypto." PX 583.

386.    In or around December 2016, a U.S. based investor asked Ripple "What is the easiest way to buy XRP and transfer it to our GateHub account? I tried doing it through the tutorial on the Ripple site and its [sic] telling me I cant [sic] buy XRP for Tier O users at Kraken." Griffin responded: "Gatehub put this 'how to buy XRP at Gatehub' tutorial together by request. It's self-serve (but let me know if you have any trouble!)." PX 584.

(iii)     **Ripple Understood Investors in the United States Were Trying to Buy XRP and Sought to Make that Process Easier.**

387.     In or around October 2016, Zagone asked another Ripple employee how to respond to U.S. investor inquiries on how to buy XRP and the other Ripple employee responded, "I would direct them to the 'How to Buy XRP' page" and the "Kraken flow of funds through bitcoin is far from ideal, but we're working on improving it." PX 590.

388.     In or around April 2017, a Ripple employee asked Long to edit a proposed "XRP Marketing Plan - Q2 2017" to "emphasize how the ease of buying and storing XRP is important for speculators." PX 604.

389.     In or around August 2017, Samarasinghe and ███ discussed a U.S. investor complaint that some platforms restrict New York state residents entirely and that XRP was not available on platforms that did allow New York state residents to trade, and that this individual has to buy Bitcoin through Coinbase and then trade into XRP through Bittrex. ███ described this as presenting "megaaaaa headwinds" and Samarasinghe agreed, stating "We have to find a way to make it easier!" PX 586.

390.     In or around December 2017, Ripple's marketing team communicated with Fortune Magazine about its December 27, 2017 article titled "This Is Your Guide to Buying Ripple" and retweeted the link to the article:  "Have questions about how to buy $XRP? @Theledger has you covered. PX 582.

(iv)     **Ripple's Website Provided Instructions for How Purchasers Could Buy XRP, Including Purchasers in the U.S.**

391.     In or around March 2017, in a response to an individual asking why Ripple's website was not updated with a current news section for investors to get info about listing XRP (like Bittrex and Poloniex) and that such information would be valuable to "people [who] have no idea XRP can

be traded on those exchanges," Long responded "Open to calling out the availability of XRP at

other exchanges with compliance' blessing. Remember it got us in trouble when we'd 'advertise'

unlicensed exchanges in the past." Griffin inquired "what the traffic metrics are to 'buy xrp' on our

website?" PX 587.

392.     In or around January 2018, Ripple autoreplied to inquiries from individuals seeking

to buy XRP and included information on how to buy XRP from within the United States. PX 589.

393.     Ripple's web site provided instructions on how to buy XRP through Bitstamp,

Kraken, Gatehub Coinone, and btcxIndia. PX 595; PX 500.13.

394.     Ripple's website contained a page entitled "Ripple Sales XRP FAQ," which included

the following information in response to questions about "how to buy XRP" and "who provides

markets … to buy and sell XRP": "The best resource for how to buy XRP can be found on Ripple's

How to Buy XRP page;" "Digital currency exchanges have the most liquid XRP markets" to buy

and sell XRP; and "Here is a list of the most liquid XRP exchanges:

https://xrpcharts.ripple.com/#/xrp-markets." PX 597; PX 113 ("let's put out the tweets. I'm also

happy to add to the 'how to buy XRP' page on Ripple.com. Lastly, in future - let's have visibility into

what's coming down the pike so that we can promote 'to the moon'").

          **(v)     Ripple's XRP Market Reports Directed People Interested in Buying XRP to
                    Ripple's Website, and Ripple Tracked Traffic to Its Website.**

395.     In or around July 2019, Ripple's Q2 2019 XRP Markets Report directed readers to

"How to Buy XRP (https://www.ripple.com/xrp/buy-xrp/)." PX 598 at RPLI_SEC 1114455.

396.     In or around September 2016, an internal Ripple document entitled "Ripple.com

Report" stated "Google AdWords helps drive traffic to Ripple.com. The goal is to catch potential

clients in the moment as they search for relevant Ripple terms. Ad reach was expanded from North

America to Western Europe, Japan, Singapore & Thailand." PX 591 at RPLI_SEC 0701618.  This

document described "Ripple.com XRP Portal Goals" as including "drive buyer interest" and "segment XRP buyer audience from bank audience." PX 591 at RPLI_SEC 0701621.

397.     In or around September 2017, a Ripple employee told Garlinghouse that "'How to buy XRP' has been the most common type of request, and has grown through the year as an overall piece of the pie. Right now it makes up about a third of all requests." PX 592

398.     In or around January 2017, a Ripple employee told Griffin the announcement that XRP is now available on Bitstamp resulted in uptick of interest by Ripple subscribers, higher than average views of a related Ripple Insights article, a doubling of average XRP Portal daily traffic, and a record number of twitter retweets. Griffin responded, asking "where do we focus on the volume incentive (vs the fee rebate)?" PX 607

399.     In or around March 2017, a Ripple employee told Long that she had been working with Bitstamp to outline instructions on how to buy XRP in order "to add [the instructions] to the XRP Portal" and working to "identify ways to change it [to] Google's search." The employee noted that Vias was pushing hard to change the query to "How to Access XRP," which she rejects "given the impact on SEO." Long agreed, stating that "I see these guides as customer support," and "Totally agree about 'buy XRP' for SEO." PX 596.

400.     In or around April 2019, Ripple distributed internally an article stating that "more people in the US Googled "how to buy XRP" than "how to buy Bitcoin" last year. PX 594.

**(vi)     From 2016 to 2019, Defendants Worked to Get XRP Listed on Crypto Exchanges Worldwide to Increase Liquidity of the Secondary Trading Market for XRP.**

401.     In or around January 2017, Vias announced internally within Ripple Bitstamp's listing of XRP/USD and XRP/EUR trading pairs, explaining that this launch "also marks the introduction of our XRP Volume Incentive Program, specifically meant to bootstrap volume and

tighten spreads in support of payments. As a result of the program top market makers on Bitstamp, and other qualified exchanges, will add liquidity to newly listed fiat XRP pairs. Currently GSR and TKL are providing liquidity in XRP/EUR on Bitstamp, and we expect volume to grow steadily as market makers increase participation over the next few weeks. In the first 24-hours of trading on Bitstamp, XRP saw approximately $80K worth of volume traded https://charts.ripple.com/#/external-markets, surpassing Kraken (XRP/BTC). Importantly, this exclusively fiat volume, no XRP/BTC, already represents 16% of XRP's total fiat volume. Also, while Bitstamp's BTC volume profile is 90/10 USD/EUR, XRP's volume breakdown has been roughly 50/50 USD/EUR, a clear indication that our incentive program is driving volume where we need it." PX 608.

402.    In or around October 2017, Vias told a Bloomberg reporter that Ripple's goal was to increase XRP liquidity by increasing the number of exchange listings and increasing listings on OTC markets. PX 609 at ██████0163736.

403.    In or around November 2017, a Ripple employee recommended to Griffin that "we could do more to direct XRP fans to petition for Coinbase listing… Not only US investors, but also overseas investors are interested in this because 1) they could buy XRP on Coinbase by wiring money from overseas or using creditcard, and 2) more importantly, they want to see a price increase by getting XRP more exposed on major exchanges like Coinbase. The idea is to utilize our *strong* fan base more since Coinbase needs to listen to user voice. I think we could potentially do something like this for bitflyer too." Long responded:  "Yesterday was entirely dedicated to brainstorming for our 2018 plan. We spent a portion of our 'XRP demand gen' brainstorm thinking about how we can pressure Coinbase publicly." PX 541 at RPLI_SEC 0055020-21.

(vii)    **Ripple and GSR Sought to Increase the Number of Exchanges on which XRP Traded.**

404.    ██ testified:  "If you try to sell a large amount of XRP on one exchange that have insufficient liquidity, the price of XRP on that exchange would suffer as a result." PX 26 (██ Dep. Tr.) at 130:13-131:1.

405.    ██ testified, referencing Ripple's programmatic XRP sales, "the sales program was something that was a long-term program, right. We're trying to maintain fair and orderly markets during this time. We're trying to introduce a supply that is appropriate, proportional to the trading volume and interest in the market at the time." PX 26 (██ Dep. Tr.) at 131:17-25.

406.    GSR and Ripple wanted exchanges that reported real, as opposed to fake, volume and to ensure quick verifiable execution of XRP trades. PX 26 (██ Dep. Tr.) at 131:11-132:19.

407.    Garlinghouse testified that speculative interest in XRP and market trading volume drives liquidity. In answering whether speculative trading volume in XRP was important, Garlinghouse replied: "I think you need liquidity. Anything that drives liquidity is going to be constructive to what I'm calling a flywheel," and speculative interest in XRP drives liquidity. PX 81 (Garlinghouse Dep. Tr.) at 371:11-23.

408.    Garlinghouse testified that Ripple offered volume incentive and payments to at least six crypto exchange platforms. For example, Garlinghouse offered ██████ to Coinbase, a U.S. based exchange, to list XRP and Ripple offered $1 million to Gemini to list XRP. PX 81 (Garlinghouse Dep. Tr.) at 310:6-20; 312:23-313:15; 327:24-328:10.

409.    Garlinghouse believed that adding Coinbase as an exchange that listed as XRP provided more liquidity and was a "positive for the market." PX 81 (Garlinghouse Dep. Tr.) at 321:10-17.

**(viii)   Ripple Publicly Announced When New Exchanges Began to List XRP and Included Instructions on its Website Regarding Trading on Some of Those New Exchanges.**

410.    In or around December 2016, Ripple asked Bitstamp "to provide [Ripple] with instructions on how to manually buy/sell XRP on Bitstamp in advance of the launch" and stated that Ripple "would like to post the instructions on Ripple's XRP Portal on the day of the launch as well." PX 600.

411.    In or around January 2017, a Ripple employee informed Bitstamp about marketing plans to announce Bitstamp's new listing of XRP. Ripple planned to "update [its] current Ripple Insights article," to "highlight [Bitstamp's] participation in the XRP Incentive Program and reduced fee schedule, including ▮ until Feb 10, 2017." Ripple planned to "send an email to our Ripple Insights and XRP Portal subscribers (via our newsletter)," "[p]romote via Ripples Twitter, Reddit, Facebook and LinkedIn (XRP Chat will pick it up immediately)," and would "re-promote any of [Bitstamp's] social promotion as well." The Ripple employee also stated that Ripple would create a new "'How to Buy XRP on Bitstamp' page on [Ripple's] XRP Portal," and inquired whether there are "other opportunities for us to promote on your Web site (sic) (the fees in particular?)" PX 602.

412.    In or around February 2017, Long congratulated Griffin, attaching a Bitstamp announcement that: "Today we are launching XRP/BTC trading on our exchange, yet another pair to add to our roster. A digital asset that is native to the Ripple Consensus Ledger, XRP can now be traded with BTC, USD and EUR. To get things off to the best possible start for your XRP/BTC trades, we will be offering ▮ fees until 28 February 2017, a ▮ discount on fees until 31 March, and a ▮ discount on fees until 30 April. The XRP fee schedule will revert to normal as of midnight on 1 May 2017. Check out Ripple's handy guide on how to buy XRP on Bitstamp here 'How to buy XRP on Bitstamp.'" PX 603.

413.     In or around October 2017, in response to Exmo.com proposing to list XRP on its platform and seeking a mention on Ripple's "how to buy XRP" webpage, Vias explained that "we unfortunately aren't able to make announcements for each individual exchange we list. However, you're able to make any announcements you'd like and we can help with providing exposure on some of our social media accounts (i.e. Twitter re-tweets). Once we see volume we can also discuss adding Exmo to the How to Buy XRP page." PX 605.

414.     In or around July 2017, a Ripple senior web developer emailed Vias noting that "the 'how to buy XRP on Kraken' site page is out dated and may be on bitstamp or other exchanges too. https://ripple.com/xrp/how-to-buy-xrp-on-kraken/   You no longer need to buy bitcoin on kraken, you just need to select the XRP/USD pair or whatever fiat pair you want then trade for XRP! That's a lot easier and people will find it a whole lot easier to buy, which makes it easier for you guys to sell XRP to the masses!  Do you think we could get updated copy and screenshots for these how to buy guides?" PX 601.

415.     In or around November 2017, Garlinghouse tweeted that "Team Ripple is absolutely committed to building XRP liquidity" and "excited to share that Houbi (3rd largest exchange in China) is listing BTC I XRP tomorrow on Huobi Pro." PX 599; PX 561 (March 22, 2020 email from Samarasinghe to a market maker stating "our goal is to have redundant XRP sales presence on basically every major exchange that sells XRP, with priority for exchanges that we don't have a presence on").

416.     Larsen testified that "there are millions of people all over the world" who are passionate about XRP. PX 2 (Larsen Dep. Tr.) at 329:21-330:4.

**(ix)** **Between 2013 and 2020, Many of the Largest and More Established Crypto Exchanges Offered XRP Trading to U.S. Customers.**

417.    An internal Ripple spreadsheet dated in or around November 2019 listed XRP volume tracked by CryptoCompare attributable to exchanges that did not permit U.S. customers.  After including Bithumb and Korbit (identified by Ripple's market maker as exchanges that permit U.S. customer, see PX 564), more than  75% of all exchange traded XRP was available to U.S. purchasers. PX 565 at 1.

418.    Defendants were also able to sell on exchanges that purportedly did not accept U.S. investors. PX 577.

419.    CryptoSystems opened trading accounts to trade XRP on three South Korean Exchanges—Bithumb, Coinone and Korbit—in October 2018, many months after South Korea prohibited all non-South Korean residents from setting up and maintaining accounts on South Korean exchanges effective Jan 30, 2018. When a Ripple employee asked ▮▮▮▮▮▮▮ in September 2019 how it had "been able to continue trading on these exchanges?" Ripple's programmatic XRP trader at ▮▮▮▮▮▮ responded "ugh..not sure how to answer this ... basically we signed up Oct 2018 and have not been prompted to get off." PX 577.

420.    ▮▮▮▮▮▮ understood that part of the reason GSR sold XRP for Defendants on multiple exchanges was that "Ripple wanted to have a larger user base and to be known globally." PX 26 (▮ Dep. Tr.) at 55:23-56:7.

421.    Ripple decided on which exchanges GSR should sell XRP, and the number of exchanges on which Ripple could sell XRP increased significantly in 2017, which was something that Ripple wanted. PX 26 (▮ Dep. Tr.) at 128:12-129:9.

422.    GSR also purchased XRP in the market for Ripple in connection with Ripple's ODL product. GSR purchases were meant to counteract ODL flows that added XRP supply—a way to

return ODL to "XRP neutral" to prevent new supply from dragging down the price of XRP. PX 26 (█ Dep. Tr.) at 181:16-182:2.

423.   █ testified that GSR likely bought XRP back on Binance and OkEx because they had significant XRP trading volume. Binance is a U.S. exchange with a significant percentage of XRP trading volume. PX 26 (█ Dep. Tr.) at 191:12-192:2; PX 565

**(x)   Ripple Tracked, at Garlinghouse's Instruction, which Exchanges Prohibited U.S. Customers.**

424.   In or around May 2019, █████ emailed Samarasinghe, Vias, and others at Ripple, stating: "Per our conversation, I have worked on compiling some data on exchanges associated with our Ripple liquidation program. In the attached PDF file you will find a list which includes exchange names, corresponding 2018 Ripple liquidation volumes, and whether the exchanges allow US customers or not." The attachment to this email listed exchanges that allowed U.S. customers. PX 564.

425.   Internal Ripple spreadsheets tracked which exchanges accepted U.S. customers. PX 565, PX 566.

426.   In or around October 2019, Samarasinghe sent a slack message to another Ripple employee stating that Garlinghouse wanted to know "[w]hat percentage of total XRP sales are to US and non-US partners" and "what % of total sales to partners that allows US customers," purportedly because "We are exploring our tax treatment of XRP sales. If we sell XRP on exchanges without US customers, our tax basis is different than our tax basis on exchanges that allow US customers." PX 567.

427.   GSR was trying to give Defendants "best execution" and to sell XRP at the best possible price. PX 26 (█ Dep. Tr.) at 150:12-19.

428.   ██ testified: "If you try to sell a large amount of XRP on one exchange that have insufficient liquidity, the price of XRP on that exchange would suffer as a result." PX 26 (██ Dep. Tr.) at 130:13-131:1.

**(xi)   Defendants in Fact Sold XRP on Numerous Exchanges that Allowed U.S. Customers.**

429.   In or around May 2019, a ██████████ employee emailed Ripple employees, stating: "Per our conversation, I have worked on compiling some data on exchanges associated with our Ripple liquidation program. In the attached PDF file you will find a list which includes exchange names, corresponding 2018 Ripple liquidation volumes, and whether the exchanges allow US customers or not." PX 564.

430.   According to the attachment to the email sent by ██████████ in or around May 2019, Ripple sold XRP on the following exchanges that allowed U.S. customers: Binance, Bithumb, Bitstamp, Bittrex, Coinone, Korbit, Kraken, Poloniex, ZB, ZBG, BW, and Coinbase. PX 564.

431.   Ripple tracked which exchanges accepted U.S. customers.  PX 565; PX 566.

432.   In or around October 2019, Ripple employee Samarasinghe sent a slack message to another Ripple employee stating that Garlinghouse wanted to know "[w]hat percentage of total XRP sales are to US and non-US partners" and "what % of total sales to partners that allows US customers," purportedly because "[w]e are exploring our tax treatment of XRP sales. If we sell XRP on exchanges without US customers, our tax basis is different than our tax basis on exchanges that allow US customers." PX 567.

433.   In or around October 2019, Ripple employee Samarasinghe estimated in an email sent to Ripple employee Madigan that 75% of Ripple's OTC and programmatic (on exchange) sales were sales to partners who accepted U.S. customers, making "the assumption that all sales of XRP on such exchanges are to US persons in the absence of more conclusive data." PX 576.

434.     In or around September 2019, ██████████ reported to Ripple that notwithstanding South Korean law barring non-South Korean residents from opening accounts on South Korean exchanges effective Jan 30, 2018, ██████████ was permitted to open accounts on Bithumb, Coinone and Korbit exchanges "and have not been prompted to get off." PX 577.

435.     In or around September 2020, Samarasinghe explained in an internal Ripple Slack message how U.S. investors can circumvent trading restrictions on crypto asset exchanges that purport to exclude U.S. customers. PX 585.

**(xii)    Ripple and the Individual Defendants Had the Authority to Register Their XRP Offering in the United States, or, in the Alternative, Could Have Ensured that XRP Sold by Them Would Not Land in the Hands of U.S. Investors Through Restrictions on Sales and Resales—but they Did Not.**

436.     Garlinghouse, Larsen and Ripple's Board of Directors possessed the authority to file a registration statement to register their sales of XRP, but none of them did so. PX 2 (Larsen Dep. Tr.) at 143:5-144:17 (Ripple's board of directors could have limited how Larsen sold his XRP); PX 81 (Garlinghouse Dep. Tr.) at 26:19-27:11 (Garlinghouse and Ripple's board of directors had the authority to decide whether Ripple should file a registration statement); PX 81 (Garlinghouse Dep. Tr.) at 198:19-199:5 (Larsen had the power and authority as Executive Chairman of Ripple's board of directors to seek the filing of a registration statement); PX 81 (Garlinghouse Dep. Tr.) at 485:5-487:24 (Garlinghouse did not make any Reg D filings to exempt his sales of XRP).

437.     Garlinghouse conceded that while Ripple sometimes verified that it was selling XRP to accredited investors, he did not take any steps to verify the accredited status, if any, of purchasers of his offered XRP. PX 81 (Garlinghouse Dep. Tr.) at 485:5-487:24.

### I.   Miscellaneous

438.    In June 2017, Long, Larsen, and others at Ripple discussed the possibility of trying to claim that Ripple's sales of XRP were the first "Initial Coin Offering" of a crypto asset. PX 526; PX 741.

439.    In its commentary to a final rule published on June 5, 2020, the Consumer Financial Protection Bureau ("CFPB") referred to Ripple's "payments messaging platform to support cross-border money transfers as well as a virtual currency, XRP, which can be used to effect settlement of those transfers." Final Rule, Remittance Transfers Under the Electronic Fund Transfer Act, 85 Fed. Reg. 34,870, 34,880 (June 5, 2020), available at https://www.federalregister.gov/documents/2020/06/05/2020-10278/remittance-transfers-under-the-electronic-fund-transfer-act-regulation-e.

440.    Referring to the exchange of information, the report also stated that the CFPB "believe[d] that expanded adoption of SWIFT's gpi product or Ripple's suite of products could similarly allow banks and credit unions to know the exact final amount that recipients of remittance transfers will receive before they are sent." The report also stated that based on the CFPB's "market monitoring and experience as well as feedback the Bureau has received from banks, credit unions, and their trade associations …, the Bureau in the 2019 Proposal stated that it did not believe that it was likely in the short-to-medium term that the developments described above would be able to fully eliminate reliance on the correspondent banking network as the predominant method for banks and credit unions to send remittance transfers." The CFPB believed this shift was unlikely because "[t]here are thousands of financial institutions worldwide that could receive remittance transfers with new financial institutions being added to the network (or leaving the market) on regular basis," and "[i]t may be costly, excessively time-consuming, or otherwise difficult to enroll all or even most of

these institutions, especially the smaller ones" in new approaches like SWIFT's gpi product or
Ripple's suite of products. Final Rule, Remittance Transfers Under the Electronic Fund Transfer
Act, 85 Fed. Reg. 34,870, 34,880 (June 5, 2020), available at
https://www.federalregister.gov/documents/2020/06/05/2020-10278/remittance-transfers-under-
the-electronic-fund-transfer-act-regulation-e.

441.    In or around August 2017, Ripple Markets Inc. and ███████████████

██████████████ entered into a Programmatic Market Activity Agreement, in which, among

other things, ████ agreed to transact in XRP according to the programmatic schedule provided by

Ripple ("Programmatic Market Activity"), as such schedule may be amended from time to time (the

"████ Agreement"). PX 660.

442.    In the ████ Agreement, ████ agreed to maintain a segregated wallet or wallets

with locations on the Ripple Consensus Ledger to be used by ████ solely to transact

Programmatic Market Activity. PX 660 at 0063397.

443.    Per the ████ Agreement, ████ may maintain accounts at other third party digital

asset exchanges and ledgers in order to transact Programmatic Market Activity, if Ripple approved.

PX 660 at 0063397.

444.    In the ████ Agreement, Ripple agreed to fund ████ segregated wallet or wallets

in XRP amounts at Ripple's sole discretion for ████ use in connection with the Programmatic

Market Activity, and ████ agreed to remit proceeds back to Ripple. PX 660 at 0063397.

445.    In or around February 2017, Ripple Markets Inc. entered into a Market Maker and

Programmatic Market Activity Agreement with █████████████████████████████

("████████ Agreement").  PX 661.

223

446.     In the ███████ Agreement, Ripple agreed to maintain a segregated wallet with XRP to be used by ███████ to transact Programmatic Market Activity as outlined in this Agreement. PX 661 at 006553.

447.     In the ███████ Agreement, Ripple agreed to fund an XRP amount at its sole discretion and consistent with the Programmatic Market Activity plan, which Ripple would provide monthly. PX 661 at 006553.

448.     In the ███████ Agreement, ███████ agreed to determine the specifics of each transaction that together or separately satisfy the Programmatic Activity Plan, and would be not be required to use any particular exchange, gateway or location off the Ripple Consensus Ledger or any External Digital Asset Exchange. PX 661 at 006553.

449.     In or around March 2018, Ripple Markets Inc. and ███████████████████ ("███████") executed an Amendment to Crypto Systems Programmatic Market Activity Agreement ("███████ Amendment"). PX 662.

450.     In the ███████ Amendment, the parties agreed that Ripple may, at any time and in its sole discretion, direct ███████ to remit any portion of or all of the proceeds of ███████' Programmatic Market Activity, to Ripple in a payment method(s) directed by Ripple in its sole discretion, provided that ███████ shall transfer a portion of the proceeds, which constituted its fee, to its own wallet or account. PX 662.

451.     In the ███████ Amendment, the parties agreed that ███████' fee would constitute 2% of the proceeds, for the first $10 million in proceeds in the then-calendar month; 1% of the proceeds, for proceeds greater than $10 million but less than $20 million in the then-calendar month; and 0.5% of the proceeds, for any proceeds of $20 million or more in the then-calendar month. PX 662.

452.     In or around June 2017, Ripple Markets Inc. and GSR Holdings Limited entered into a Programmatic Market Activity Agreement ("GSR 2017 Agreement").  PX 663.

453.     In the GSR 2017 Agreement, GSR agreed to maintain a segregated wallet or wallets with locations on the Ripple Consensus Ledger to be used by GSR solely to transact Programmatic Market Activity, GSR was permitted to maintain accounts at other third party digital asset exchanges and ledgers in order to transact Programmatic Market Activity, provided that Ripple approved. PX 663 at 0008373.

454.     In the GSR 2017 Agreement, Ripple agreed to fund GSR's segregated wallet or wallets in XRP amounts at Ripple's sole discretion for GSR's use in connection with the Programmatic Market Activity, and GSR agreed to remit sale proceeds back to Ripple. PX 663 at 0008373-74.

455.     Ripple recognized revenues in connection with non-monetary XRP transactions of approximately $175 million in 2018, approximately $206 million in 2019, and approximately $227 million in 2020. PX 750 at RPLI_SEC 0301117; PX 751 at RPLI_SEC 0920433. "Non-monetary XRP transactions revenue consists of transactions where the Company delivers XRP to customers for consideration other than cash or other monetary consideration and is recognized upon delivery of XRP. Revenue for non-monetary XRP transactions is determined based on the value of consideration expected to be received from the customer. This is typically the value of the XRP delivered to the customer." PX 750 at RPLI_SEC 301125.

456.     Ripple produced to the SEC its audited financial statements for the years 2014-2020. PX 746, PX 747, PX 748, PX 749, PX 750, PX 751.

457.     Ripple held bank accounts at ███████████ through which it received sales proceeds from programmatic and over-the-counter (or institutional) sales, and made payments to

GSR to for its XRP repurchases, and incentive payments. PX 296 (transaction details for XRP II, LLC Account No. X███), PX 753 (transaction details for Ripple Labs Inc. Account No. X███); PX 754 (transaction details for Ripple Labs Account No. X███); PX 755 (transaction details for Ripple Labs Inc. Account No. X███); PX 756 (transaction details for Ripple Labs Inc. Account No. X███; PX 757 (transaction details for Ripple Labs Inc. Account No. X███; PX 758 (transaction details for Ripple Markets Inc. Bank Acct X███; PX 759 (Ripple Services Inc., Account No. X███); PX 760 (transaction details for Ripple Labs Inc. Account No. X███); PX 761 (transaction details for Ripple Labs Inc. Account No. X███); PX 762 (transaction details for Ripple Labs Inc. Account No. X███); PX 763 (transaction details for Ripple Labs Singapore Account No. X███).

458.    The article BusinessWire, CB Insights Reveals the Fintech 250 List at Future of Fintech, Bloomberg is dated June 29, 2017, which pre-dates the launch of ODL.

https://perma.cc/Z56N-6CSN

459.    Ripple's press release regarding Ripple Labs Awarded as Technology Pioneer by World Economic Forum is dated August 5, 2015, , which pre-dates the launch of ODL.

https://perma.cc/NLL6-PRY5

460.    The article American Banker, 20 Fintech Companies to Watch is dated October 12, 2015, which pre-dates the launch of ODL. https://perma.cc/2VWN-7UNC

461.    The article Blockchain 50: Billion Dollar Babies, Forbes refers to use of Ripple's products by "banks," which never used the ODL product.  https://perma.cc/99AP-LEZ5, PX 16 (Birla Inv. Tr.) at 182:19-183:25, PX 7 (Schwartz Inv. Tr.) at 192:17-194:20; PX 6 (Schwartz Dep. Tr.) at 42:11-43:16, PX 15 (Birla Dep. Tr.) at 206:10-207:7, PX 21 (Vias Inv. Tr.) at 298:16-299:6; *see also* PX 560.

462.     Between August 10 and December 6, 2020, Garlinghouse sold XRP through GSR. PX 765.

463.     When Ripple conveyed XRP to market participants, the contracts specified that "[v]irtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections." *See, e.g.*, PX. 329 (████████ Master XRP Commitment to Sell Agreement); PX 769 (GSR Master XRapid Market Maker Services Agreement); PX 770 (████████████████████ Master XRP Commitment to Sell Agreement); PX 771 (████████████ Master XRP Commitment to Sell Agreement).

464.     In February 2019, Ripple proposed writing a letter to a major financial publication in which it would clarify "points of confusion [it] run[s] into with many publications" about who created XRP and the XRP Ledger. An employee of the publication provided feedback to the draft letter, including: noting "the people who created the XRP ledger created a 'digital asset' … that became popularly known as a ripple"; that the letter by Larsen and Schwartz "established that two people involved in creating the cryptocurrency ripple/xrp then moved to start a company that later became known as Ripple"; and that "anyway, regardless, the people who created the 'digital' asset xrp contributed 80% to a new company" such that "it [didn't] feel to [the employee] like [the people who created XRP, and Ripple] are separate at all." PX 409 at RPLI_SEC 971233-971235.

465.     In response to the draft letter's suggestion that Ripple had "decided to rebrand to Ripple Labs, intentionally adding 'Labs' to the end to make sure there was clear separation between the private company and the digital asset," the financial publication's employee responded: "Okay, that's clear as mud. If you wanted to create clear separation between a private company founded by the same people who created the digital asset of the same name, you might have chosen a

completely different name for the company, like, say, pancakes. Pancakes and Ripple don't sound anything alike" and noted that Ripple was "the same name as the popular name for XRP." PX 409 at RPLI_SEC 971233-971235.

Dated:  New York, New York
          October 18, 2022

                                        /s/ Jorge G. Tenreiro
                                       Jorge G. Tenreiro
                                       Jon A. Daniels
                                       Elizabeth Goody
                                       Benjamin H. Hanauer
                                       Ladan F. Stewart
                                       Mark R. Sylvester
                                       Daphna A. Waxman

                                       *Attorneys for Plaintiff*
                                       SECURITIES AND EXCHANGE
                                       COMMISSION
                                       New York Regional Office
                                       100 Pearl Street
                                       New York, New York 10014
                                       (212) 336-9145 (Tenreiro)
                                       TenreiroJ@sec.gov

228