**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------------------x
**SECURITIES AND EXCHANGE COMMISSION,**          :
                                                                                       :
                               **Plaintiff,**          :          **20 Civ. 10832 (AT) (SN)**
                                                                                       :
                  - against -          :          **ECF Case**
                                                                                       :
**RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,**          :
**and CHRISTIAN A. LARSEN,**          :
                                                                                       :
                       **Defendants.**          :
                                                                                       :
-------------------------------------------------------------------------x

# PLAINTIFF SECURITIES AND EXCHANGE COMMISSION'S RESPONSE TO DEFENDANTS' STATEMENT OF ADDITIONAL MATERIAL FACTS PURSUANT TO LOCAL RULE 56.1(b)

Jorge G. Tenreiro
Jon A. Daniels
Elizabeth Goody
Benjamin H. Hanauer
Ladan F. Stewart
Mark R. Sylvester
Daphna A. Waxman

Attorneys for Plaintiff
SECURITIES AND EXCHANGE
COMMISSION
New York Regional Office
100 Pearl Street
New York, New York 10014
(212) 336-9145 (Tenreiro)
TenreiroJ@sec.gov

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, Rule 56.1 of the Local Rules of the United States District Court for the Southern and Eastern Districts of New York, and Section III.C.iii of this Court's Individual Practices, Plaintiff Securities and Exchange Commission ("SEC"), submits this Response to Defendants Ripple Labs, Inc. ("Ripple"), Christian A. Larsen ("Larsen"), and Bradley Garlinghouse's ("Garlinghouse," together "Defendants") Local Rule 56.1 Statement of Additional Material Facts in Opposition to Plaintiffs' Motion for Summary Judgment (D.E 663).[1]

---

[1] Citations to "SEC 56.1 ¶ __" are to the SEC's statement of undisputed facts (D.E. 629) in Support of its Motion for Summary Judgment.

Citations to "Def. 56.1 ¶ __" are to Defendants' statement of undisputed facts (D.E. 623).

Citations to "SEC Counter 56.1 ¶ __" are to the SEC's Counter-Statement of Undisputed Facts, below.

Citations to PX 1 to PX 200 are to Exhibits to the Declaration of Ladan F. Stewart in Support of the SEC's Motion for Summary Judgment dated September 13, 2022 (D.E. 630).

Citations to PX 201 to PX 400, PX 540, and PX 545 are to Exhibits to the Declaration of Mark R. Sylvester in Support of the SEC's Motion for Summary Judgment dated September 13, 2022 (D.E. 631).

Citations to PX 401 to PX 498, PX 515 to PX 523, and PX 541 to PX 544 are to Exhibits to the Declaration of Jorge G. Tenreiro in Support of the SEC's Motion for Summary Judgment dated September 13, 2022 (D.E. 627).

Citations to PX 500 to PX 509 are to Exhibits to the Declaration of Daphna A. Waxman in Support of the SEC's Motion for Summary Judgment dated September 13, 2022 (D.E 626).

Citations to PX 113, 398, 409, 456, 457, 499, 500, 505, 525, 526, 528, 529, 530, 532, 533, 535, 537, 538, 539, and PX 547 to PX 644 are to Exhibits to the Declaration of Ladan F. Stewart in Opposition to Defendants' Motion for Summary Judgment, dated October 18, 2022.

Citations to PX 645 to PX 771 are to the Exhibits to the Declaration of Mark R. Sylvester in Opposition to Defendants' Motion for Summary Judgment, dated October 18, 2022.

Citations to "[Last Name] Dep. __" are to the deposition transcripts, as indicated, of various witnesses, the full transcripts of which are also attached as Exhibits to D.E. 630.

Citations to "[Last Name] Inv. Tr. __" are to the transcripts of the investigative testimony of various witnesses, taken during the SEC's investigation into this matter before the filing of the complaint, the full transcripts of which are also attached as Exhibits to D.E. 630.

To the extent the SEC does not controvert particular assertions by Defendants, the SEC does not thereby concede that any such uncontroverted assertion constitutes a material or relevant fact, or that the cited evidence would be admissible at trial. Nor does it thereby admit the truth of those assertions for purposes other than resolution of this Motion. To the extent that the SEC does not controvert assertions that a witness testified to a particular fact, the SEC does not thereby concede that the witness is credible on that point or that the fact to which the witness testified is not disputed. The SEC does not hereby respond to the assertions of fact made in the subheadings.

## SEC RESPONSE TO DEFENDANTS' 56.1 STATEMENT OF ADDITIONAL MATERIAL FACTS

1602.    Jed McCaleb had the original idea for the XRP Ledger's consensus mechanism.  Ex. 1, D. Schwartz Tr. 118:11-20.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1602.

1603.    Ripple made no commitments in exchange for the 80 billion units of XRP it received from Ripple's founders.  Ex. 1, D. Schwartz Tr. 275:17-21 (explaining Ripple was "gifted" its XRP and "didn't have to spend capital or other types of funds in order to acquire it"); Ex. 15, O'Gorman Dep. Ex. AO-26, RPLI_SEC 0624327 at -331 ("[T]he creators of XRP gifted much of [the original 100 billion] XRP to the Company."); Ex. 8, Larsen Tr. 165:24-166:3 (Ripple was gifted 80 billion XRP).

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1603.

1604.    Many XRP purchasers bought XRP for use as a form of payment for goods and services.  See Ex. 167 (collection of more than 3,000 affidavits by individual XRP purchasers, more than 700 of which state:  "I have acquired XRP . . . [a]s a form of currency for payment for goods

---

Citations to PX 248, 403, 534, 553, 664, and 672 are to Exhibits to the Declaration of Mark R. Sylvester in Support of Plaintiff's Response to Defendants' Statement of Additional Material Facts, dated November 30, 2022 and submitted herewith.

Citations to "XQYY XRP Markets Report" are to the quarterly "XRP Markets Report" that Ripple published on its website starting in January 2017, indicating the number of the quarter and the year, the full copies of which are also attached as Exhibits to the Waxman Declaration.

Citations to "DX" or "Def. Ex." are to exhibits appended to Defendants' declarations (D.E. 624, 664, 665).

All other capitalized terms not defined herein shall have the meaning ascribed to them in the SEC's Brief in Support of its Motion for Summary Judgment (D.E. 628).

and/or services I provided; and/or . . . [a]s a substitute for fiat currency, utilized as a store of value, and/or to purchase everyday items such as food, clothing, and other retail purchases"); Ex. 168 (explanatory declarations describing this collection).

**Response:** The SEC disputes the assertions contained in ¶ 1604 on the grounds that the term "many" is vague and ambiguous and the assertions are unsupported by the cited evidence. The assertion that "many" XRP purchasers bought XRP to use as a form of payment is contradicted by record evidence, as the cited affidavits show only that a small number of individuals over a number of years may have acquired XRP in part for such purpose, compared with daily XRP trading volume of more than $600 million as of September 2022.  DX 20 ¶ 6.  The SEC further disputes that the cited evidence is sufficient to support the assertions contained in ¶ 1604 for the following reasons: (i) The cited affidavits claiming that XRP was acquired for consumptive use explicitly acknowledge that the XRP was also purchased for investment. Categories 2A, 2B, 5, and 6 of the affidavits all reflect XRP purchases with investment intent. *See, e.g.*, DX 167 Part 14 at 10 (entitled "XRP HOLDER AFFIDAVIT (INVESTOR/USER – CATEGORY 2A" and stating: "In addition to acquiring XRP for investment purposes, I have acquired XRP for non-investment reasons…."). (ii) The cited affidavits contain duplicative submissions from the same individuals, which at times contradict each other. *See, e.g.*, DX 167 Part 5 at 5 and Part 15 at 5-8 (five affidavits submitted by a single individual, containing conflicting assertions, *compare* Part 15 at 5 ¶ 5, when the individual "first acquired XRP, [he] was aware of the company Ripple...," *with* Part 15 at 6 ¶ 5, the "first time [he] purchased XRP I was completely unaware of a company called Ripple …."). (iii) The cited affidavits include those from individuals who purchased XRP after the filing of the Complaint, and accordingly are irrelevant to the claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020. *See, e.g.*, DX 167 Part 1 at 12, 24, Part 5 at 8, Part 6 at 4, 7, 12, Part 15 at 10, 13, 26. (iv) While many of the cited affidavits claim their signatories acquired XRP "[a]s a form of currency," no affiant claims to have actually used XRP as a currency, nor does

any affiant provide any information regarding when, for what purpose, or how much XRP was used as currency. *See, e.g.*, DX 167 Part 15 ¶ 10(a). (v) The cited affidavits contain the facially unreliable representation that the signatory "acquired XRP in the secondary market and not from Ripple Labs Inc. …, its executives, or affiliates."  *See, e.g., id.* ¶ 3. Given the pseudonymous nature of secondary market purchases, affiants cannot know who they bought XRP from any more than Ripple can know who it sold it to. *See* SEC 56.1 ¶¶ 627, 631-32, 652-53.

1605.   Many XRP purchasers, including users of Ripple's On-Demand Liquidity ("ODL") product, bought XRP for consumptive use rather than as an investment.  See Ex. 167 (collection of more than 3,000 affidavits by individual XRP purchasers, more than 300 of which state:  "I first acquired XRP for its utility . . . to transfer other digital assets, currencies, and/or send value to others utilizing the XRPL.  Digital assets like Bitcoin and Ethereum are too slow and/or too expensive to utilize as a bridge or transfer asset."); Ex. 168 (explanatory declarations describing this collection).

**Response:** The SEC disputes the assertions contained in ¶ 1605 on the grounds that the term "many" is vague and ambiguous and the assertions are unsupported by the cited evidence. The assertion that "many" XRP purchasers bought XRP to use as a form of payment is contradicted by record evidence, as the cited affidavits show only that a small number of individuals over a number of years may have acquired XRP in part for such purpose, compared with daily XRP trading volume of more than $600 million as of September 2022.  DX 20 ¶ 6.  The SEC further disputes that the cited evidence is sufficient to support the assertions contained in ¶ 1604 for the following reasons: (i) The cited affidavits claiming that XRP was acquired for consumptive use explicitly acknowledge that the XRP was also purchased for investment. *See, e.g.*, DX 167 Part 14 at 10 ("In addition to acquiring XRP for investment purposes, I have acquired XRP for non-investment reasons...."). (ii) The cited affidavits contain duplicative submissions from the same individuals, which at times contradict each other. *See, e.g.*, DX 167 Part 5 at 5 and Part 15 at 5-8 (five affidavits submitted by a single individual, containing conflicting assertions, *compare* Part 15 at 5 ¶ 5, when the individual "first

acquired XRP, [he] was aware of the company Ripple...," *with* Part 15 at 6 ¶ 5, the "first time [he] purchased XRP I was completely unaware of a company called Ripple ...."). (iii) The cited affidavits include those from individuals who purchased XRP after the filing of the Complaint, and accordingly are irrelevant to the claims or defenses in this case, which relate solely to Ripple's offers and sales of XRP prior to December 22, 2020. *See, e.g.*, DX 167 Part 1 at 12, 24, Part 5 at 8, Part 6 at 4, 7, 12, Part 15 at 10, 13, 26. (iv) While many of the cited affidavits claim their signatories acquired XRP "[a]s a form of currency," no affiant claims to have actually used XRP as a currency, nor does any affiant provide any information regarding when, for what purpose, or how much XRP was used as currency. *See, e.g.*, DX 167 Part 15 ¶ 10(a).

1606.   Many XRP purchasers were completely unaware of Ripple's existence when they purchased XRP.  See Ex. 167 (collection of more than 3,000 affidavits by individual XRP purchasers, more than 1,300 of which state that the affiant was "completely unaware of a company called Ripple" at the time the affiant purchased XRP); Ex. 168 (explanatory declarations describing this collection).

**Response:** The SEC disputes the assertions contained in ¶ 1606 on the grounds that the term "many" is vague and ambiguous, particularly when compared with the number of purchasers generating daily XRP trading volume of more than $600 million as of September 2022.  DX 20 ¶ 6. The SEC further disputes that the cited evidence support the assertions on the grounds that such affidavits contain duplicative submissions from the same individual, which are contradicatory on this specific point. *See, e.g.*, DX 167 Part 5 at 5 and Part 15 at 5-8 (five affidavits submitted by a single individual, containing conflicting assertions, *compare* Part 15 at 5 ¶ 5, when the individual "first acquired XRP, [he] was aware of the company Ripple...," *with* Part 15 at 6 ¶ 5, the "first time [he] purchased XRP I was completely unaware of a company called Ripple ...."). The SEC further disputes that the cited evidence support the assertions on the grounds that such affidavits include those from individuals who purchased XRP after the filing of the Complaint, and accordingly are irrelevant to the claims or defenses in this case, which relate solely to Ripple's offers and sales of

XRP prior to December 22, 2020. *See, e.g.*, DX 167 Part 1 at 12, 24, Part 5 at 8, Part 6 at 4, 7, 12, Part 15 at 10, 13, 26.  The SEC further disputes that the cited evidence support the assertions on the grounds that, while many of the cited affidavits claim their signatories acquired XRP "[a]s a form of currency," no affiant claims to have actually used XRP as a currency, nor does any affiant provide any information regarding when, for what purpose, or how much XRP was used as currency. *See, e.g.*, DX 167 Part 15 ¶ 10(a). The SEC further disputes that the cited evidence supports the assertions on the grounds that the cited affidavits contain the facially unreliable representation that the signatory "acquired XRP in the secondary market and not from Ripple Labs Inc. …, its executives, or affiliates." *See, e.g.*, *id.* ¶ 3. Given the pseudonymous nature of secondary market purchases, affiants cannot know who they bought XRP from any more than Ripple can know who it sold it to. *See* SEC 56.1 ¶¶ 627, 631-32, 652-53.

1607.   Around the time it was founded, Ripple issued millions of shares of common stock. Ex. 11, Ferrell Rep. ¶ 25 & n.30 (citing Ripple Labs, Inc., Consolidated Financial Statements, December 31, 2014 (RPLI_SEC 0090938, at 957)).

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1607.

1608.   Ripple's shares of common stock entitle holders to dividends if and when declared by Ripple's board.  Ex. 11, Ferrell Rep. ¶ 26.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1608.

1609.   Ripple has also issued convertible notes, preferred stock, and a warrant, each of which grants Ripple's counterparty certain rights against Ripple.  Ex. 11, Ferrell Rep. ¶¶ 27-32.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1609.

1610.   Purchasing XRP on the open market does not convey any right, based solely on their status as a holder of XRP, to receive payment directly from Ripple in any form.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 57.

**Response:** The SEC does not dispute that purchasing XRP on the open market typically does not convey any right, based solely on their status as a holder of XRP, to receive payment

directly from Ripple in any form, and disputes the remaining assertions contained in ¶ 1610 on the grounds that the cited evidence does not support such assertions.

1611.    Ripple is not obligated to pay fiat currency, XRP, or any other digital asset or commodity to any XRP holder, based solely on his or her status as a holder of XRP.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 58.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1611.

1612.    Holders of XRP are not entitled to receive any return of principal, dividend, interest, rent, royalties, license payments, lease payments, or any other payment or consideration from Ripple, based solely on their status as a holder of XRP.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 59.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1612.

1613.    Ripple is not obligated to share any return of principal, dividend, rent, royalties, license payments, lease payments, or any other payment or consideration to any holder of XRP, based solely on his or her status as a holder of XRP.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 60.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1613.

1614.    Buying a unit of XRP in the open market does not entitle a buyer to dividends, rents, return of capital, or the right to participate in managing the affairs of Ripple or to inspect its books and records.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 61.

**Response:** The SEC does not dispute that buying a unit of XRP in the open market does not typically entitle a buyer to dividends, rents, return of capital, or the right to participate in managing the affairs of Ripple or to inspect its books and records, and disputes the remaining assertions contained in ¶ 1614 on the ground that the cited reference does not support such assertions.

1615.    XRP holders do not receive any of or participate in Ripple's revenues, income, assets or performance solely on the basis of their status as XRP holders.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 62.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1615.

1616.    Ripple has no obligation to permit any holder of XRP, based solely on their status as a holder of XRP, to receive or participate, directly or indirectly, in Ripple's revenues, net income,

assets, or operating performance.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 63.

> **Response:** The SEC does not dispute the factual assertions contained in ¶ 1616.

1617.    No holder of XRP has any right, based solely on his or her status as a holder of XRP, to cause Ripple to repurchase, redeem, or exchange their XRP for any reason or for any purpose.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 64.

> **Response:** The SEC does not dispute the factual assertions contained in ¶ 1617.

1618.    Ripple does not owe fiduciary duties to holders of XRP.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 66.

> **Response:** The SEC does not dispute the factual assertions contained in ¶ 1618.

1619.    In the event of an insolvency, bankruptcy, termination, liquidation, dissolution, or winding up of Ripple, no holder of XRP has any right, statutory or otherwise, to receive a distribution of Ripple's assets net of liabilities, based solely on their status as a holder of XRP.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 69.

> **Response:** The SEC does not dispute the factual assertions contained in ¶ 1619.

1620.    No holder of XRP has any right, based solely on their status as a holder of XRP, to compel Ripple, or to vote or otherwise participate in any effort to require Ripple, to perform or refrain from performing any action with respect to managing the affairs, or conducting the operations, of Ripple.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 71.

> **Response:** The SEC does not dispute the factual assertions contained in ¶ 1620.

1621.    No holder of XRP, based solely on their status as a holder of XRP, acquired or obtained any right or power to direct, influence, or control the manner in which Ripple utilized the proceeds of Ripple's sales of XRP.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 72.

> **Response:** The SEC does not dispute the factual assertions contained in ¶ 1621.

1622.    No holder of XRP has any right, based solely on their status as a holder of XRP, to elect Ripple's directors.  Ex. 23, Pl.'s Answers & Objs. to Defs.' First Set of Reqs. for Admis., SEC Answer to RFA No. 75.

> **Response:** The SEC does not dispute the factual assertions contained in ¶ 1622.

1623.    XRP appears on Ripple's balance sheet as an intangible asset, not debt or equity (unlike how securities are treated).  Ex. 171, Expert Report of Peter Easton (Oct. 4, 2021) ¶ 10

("Ripple, and other companies holding cryptocurrencies (including XRP), account for those holdings as indefinite-lived intangible assets); id. ¶ 88 ("There is no balance sheet entry to record a liability or equity associated with the sale of XRP as a company would record upon issuing debt or equity securities.").

**Response:** The SEC disputes the assertion contained in ¶ 1623 on the ground that it consists of expert opinion and not record facts and Easton's opinions should be excluded for the reasons set forth in the SEC's omnibus motion to exclude Defendants' expert witnesses. (D.E. 536.)

1624.   Ripple has conducted sales of XRP through exchanges located outside of the United States.  Ex. 11, Ferrell Report ¶ 49 (citing RPLI_SEC 0809256); Ex. 25, █ Tr. 158:14-159:7, 302:8-305:12 (with the exception of four exchanges on which Ripple sold XRP that have some ties to the United States, "the rest of the exchanges [on which Ripple sold XRP] are located outside of the United States"); Ex. 41, Yadav Rep. ¶ 109 & Tbl. A.

**Response:** The SEC disputes the assertions contained in ¶ 1624 on the ground they rely Ferrell's and Yadav's expert opinions, which should be excluded for the reasons set forth in the SEC's omnibus motion to exclude Defendants' expert witnesses. (D.E. 536.)  The SEC further disputes the assertions contained in ¶ 1624 on the ground that the cited references do not support the assertions. The SEC disputes that the referenced paragraph of the Ferrell Report and the cited exhibit (RPLI_SEC 0809256), a market maker services agreement between Ripple and a market maker, demonstrate that Ripple conducted all or any particular portion of its sales of XRP on exchanges outside of the United States, as the cited evidence tends to show only that Ripple entered into a contract with a market maker to make a market on two specified crypto exchanges. The SEC further disputes that the referenced portions of █ testimony support the assertions contained in ¶ 1624 on the ground that █ did not testify to the specific locations of any foreign exchanges nor did he provide any basis for his determination that certain exchanges might be considered "foreign."  To the contrary, in the portion of █ testimony that immediately preceded the portion of the transcript cited in ¶ 1624, █ explicitly acknowledged that he did not know the actual physical location of any exchanges. When asked if, "after GSR started providing market making services to

Mr. Larsen on the exchanges," he was "generally aware of where physically the exchanges on which those trades took place were located," ▮ responded: "Not really, and it's going to sound strange, but even today, a lot of these well known exchanges, it's unclear where they're located."  PX 26 at 301:22-302:6. ▮ testimony regarding the locations of specific crypto asset exchanges was equivocal, suggesting that he generally lacked sufficient knowledge and information to make such determinations.  *See, e.g.*, PX 26 at 158:14-159:10; 302:13-303:13.

The SEC further disputes the assertions contained in ¶ 1624 on the grounds that record evidence contradicts Yadav's opinion that platforms identified in DX 41, Yadav Rep. Tbl. A were "located outside the U.S.," as many had indicia of being in the United States. Bitstamp allowed U.S. customers—including Larsen and Garlinghouse—to transact on its main platform and has servers in the United States.  PX 13 ¶¶ 120, 132; PX 394 (Larsen account information and activity on Bitstamp); PX 411 (Garlinghouse account information and activity on Bitstamp).  Several of the exchanges identified as "outside the U.S." in DX 41 accepted U.S. purchasers, according to Ripple's own internal documents and documents prepared by one of Ripple's market makers. *See, e.g.*, PX 564; PX 565; PX 566; PX 576 (Samarasinghe estimating that 75% of Ripple's OTC sales and sales on exchanges are sales to partners who accept U.S. customers, making "the assumption that all sales of XRP on such exchanges [that allow U.S. customers] are to US persons in the absence of more conclusive data"). According to Ripple's market maker, the exchanges that accepted U.S. customers included Binance, Bithumb, Bitstamp, Bittrex, Coinone, Korbit, Kraken, Poloniex, ZB, ZBG, BW, and Coinbase. PX 564.  According to Ripple's internal documents, Bitforex, AscendEX/Bitmax, Bitrue, Bittrex, HuobiPro, Kraken, Poloniex, and the XRP Ledger also accepted U.S. customers. PX 565; PX 566. Further, at least four of the exchanges identified as "outside the U.S." in DX 41 are registered as "money service businesses" in the United States with the U.S. Department of the Treasury's Financial Crimes Enforcement Network ("FinCEN"), with registration addresses in the

United States: BitMart (California); AscendEX/BitMax (New York); Korbit (Colorado); and OKEx (Colorado). *See* MSB Registrant Search | FinCEN.gov, *available at* https://www.fincen.gov/msb-registrant-search.

1625.   Ripple and its employees repeatedly disclaimed any obligations owed by Ripple to XRP holders.  See, e.g., Ex. 172, RPLI_SEC 0579742 ("there is no [] agreement with Ripple and holders of XRP:  we have never promised any profits or returns to holders of XRP"; "you don't have a contract with anyone simply by owning XRP.  You can't sue Ripple if you're unhappy about the price of XRP."); Ex. 112, Bitcoin Forum ("I think we've been pretty clear that we are not making any promises to manage XRP as a currency with any particular target value. . . .  We absolutely make no promises or representations about the value of XRP to the world in general."); Ex. 40, Expert Report of Alan Schwartz (Oct. 4, 2021) ¶¶ 11-17, 29-31, 33-35, 41-42, 54-55 (noting the disclaimers or absence of obligations owed by Ripple in Ripple's contracts); Defs.' 56.1 ¶¶ 99-109, 112-114, 117-118 (identifying sample contracts containing such disclaimers).

**Response:** The SEC disputes the assertions contained in ¶ 1625 on the ground that they rely on Schwartz's opinions, which should be excluded for the reasons set forth in the SEC's omnibus motion to exclude Defendants' expert witnesses. (D.E. 536.) The SEC further disputes the assertions contained in ¶ 1625 on the ground that the cited reference to Def. Ex. 112 does not support the assertion that Ripple "disclaimed any obligations owed by Ripple to XRP holders," and is contradicted by David Schwartz's statements in the same referenced Bitcoin Forum discussion that Ripple was legally required to maximize the value of XRP: "As a corporation, we are legally obligated to maximize shareholder value.  With our current business model, that means acting to increase the value and liquidity of XRP.  We believe this will happen if the Ripple network is widely adopted as a payment system.  We are pursuing multiple avenues at once.  One would expect increased demand to increase price."  Def. Ex.112.

1626.   Ripple sold XRP through distinct subsidiaries with distinct bank accounts and distinct business efforts.  Ex. 170, Declaration of Kristina Campbell (Dated Oct. 16, 2022) ¶ 4.

**Response:** The SEC disputes the factual assertions contained in ¶ 1626 because they are unsupported by the cited evidence, a declaration of Ripple's current Chief Financial Officer, who assumed the role in April 2021, after the filing of this action. Def. Ex. 170 ¶ 1. Campbell's

declaration does not purport to addresss all of Ripple's sales through all of its subsidiaries.  *See id.* ¶ 3

(stating that "[a]t various times between 2013 and 2020, a variety of Ripple subsidiaries sold XRP").

Campbell's Declaration also does not address the "business efforts" of the Ripple subsidiaries that

sold XRP or whether such efforts were "distinct."  *See generally id.*  The SEC does not dispute that

Campbell stated that "[e]ach Ripple subsidiary that sold XRP at various times maintained a separate

bank, digital asset exchange or XRP Ledger account to receive proceeds from its XRP sales. Each

Ripple subsidiary that sold XRP deposited or received revenues from its sales of XRP into its own

separate account." *Id.* ¶ 4.

The SEC further disputes the implied assertion in ¶ 1626 that there is no commonality

because Ripple subsidiaries maintained separate bank accounts. Ripple does not and cannot dispute

that it controlled its subsidiaries' bank accounts, D.E. 665-29 at ¶¶ 3-4, into which it funneled XRP

sales proceeds. Def. Ex. 170 ¶ 4.

1627.   At no time prior to December 22, 2020 (or at any time to date) did the SEC issue any
regulations concerning whether or when digital assets, or the sale of digital assets, constitute
"investment contracts" under the federal securities laws.  See, e.g., Ex. 158, SEC Answers to RFA
Nos. 447-449 (admitting the SEC never engaged in rulemaking, proposed rules, or promulgated
rules regarding whether digital assets would be considered securities); Ex. 173 (Oct. 4, 2022 law firm
analysis identifying no SEC regulations or proposed regulations regarding whether digital assets
would be considered securities); Ex. 174 (Sept. 2022 Bloomberg column noting that SEC "has not
issued any rules, or proposed any rules, or put anything on its rulemaking agenda, about adapting the
securities disclosure rules to crypto projects"); Ex. 175 (Oct. 13, 2022 letter from Sen. Hickenlooper
to Chair Gensler stating that "formal regulatory process is needed now" for digital assets and
"urg[ing] the SEC to issue regulations for digital asset securities through a transparent notice-and-
comment regulatory process").

**Response:** The SEC does not dispute the assertions contained in ¶ 1627.

1628.   At no time prior to December 22, 2020 (or at any time to date) did the SEC propose
regulations concerning whether or when digital assets, or the sale of digital assets, constitute
"investment contracts" under the federal securities laws.  See Ex. 158, SEC Answer to RFA No.
448.

**Response:** The SEC does not dispute the assertions contained in ¶ 1628.

1629.   The SEC issued no written, public regulatory guidance addressing whether or when the sale of digital assets constitutes securities until July 2017.  See, e.g., Ex. 158, SEC Answer to RFA No. 442; PX 245 (Feb. 2015 legal memo from Paul Hastings to Ripple stating, "[t]o date, the Securities and Exchange Commission has not taken a public position on whether virtual currencies are securities within the meaning of federal securities law"); Ex. 176 (Dec. 3, 2016 academic article recognizing that SEC had not addressed whether virtual currencies are securities); Ex. 177 (Aug. 9, 2017 analysis by well-respected law firm noting that DAO Report "marks the first time the regulator has found blockchain tokens sold in a public sale can be securities" although SEC still "did not draw a 'line in the sand' that defines which tokens are securities and which are not"); Ex. 178 (July 27, 2017 analysis by well-respected law firm noting that DAO Report was "the first time" SEC deemed a digital asset a security).

**Response:** The SEC disputes the assertions contained in ¶ 1629 on the grounds that the assertions are not supported by the cited evidence.  SEC Answer to RFA No. 442 addresses only the year 2012.  The remaining evidence cited in ¶ 1629 consists of opinions which constitute inadmissible hearsay.  Moreover, the SEC had issued written public guidance prior to July 2017. For example, in July 2013, the SEC filed a civil action against Trendon Shavers and Bitcoin Savings Trust, alleging, among other things, violations of Sections 5(a) and 5(c) of the Securities Act of 1933 ("Securities Act") in a scheme that involved, among other things, false promises of returns based on the defendant's "purported [bitcoin] market arbitrage activity, including selling [bitcoin] to individuals who wished to buy [bitcoin] 'off the radar,' quickly, or in large quantities."  *See* Compl. ¶ 4, *SEC v. Trendon T. Shavers et al.*, Civ. No. 4:13-cv-416 (E.D. Tex.), *available at* https://www.sec.gov/litigation/complaints/2013/comp-pr2013-132.pdf.

1630.   In a July 2013 investor alert titled, "Ponzi Schemes Using Virtual Currencies" ("July 2013 Investor Alert"), the SEC referred to bitcoin as a virtual currency, stating that: "[v]irtual currencies, such as Bitcoin, have recently become popular and are intended to serve as a type of money.  They may be traded on online exchanges for conventional currencies, including the U.S. dollar, or used to purchase goods or services, usually online."  Ex. 179 at 1.

**Response:** The SEC does not dispute the assertions contained in ¶ 1630.

1631.   The July 2013 Investor Alert did not refer to bitcoin or other virtual currencies as being securities.  Id.

**Response:** The SEC does not dispute the assertions contained in ¶ 1631.

1632.   On October 29, 2013, Larsen, on behalf of Ripple, met with members of the SEC and other U.S. regulatory agencies, and presented on Ripple's vision for a global payments system and cross-border payments based on blockchain technology ("October 29, 2013 Ripple Presentation to Regulators").   In addition to the SEC, representatives were present from the Federal Reserve Board, Federal Deposit Insurance Corporation, National Credit Union Administration, Consumer Financial Protection Bureau, Internal Revenue Service, Conference of State Bank Supervisors, Federal Trade Commission, FinCEN, Office of Foreign Asset Control, Federal Bureau of Investigation, and the U.S. State Department.   See Ex. 158, SEC Answer to RFA No. 490; Ex. 159, SEC Answers to RFA Nos. 491–492; Ex. 180, RPLI_SEC 0530419; Ex. 181, RPLI_SEC 0344268; Ex. 169, Declaration of Christian A. Larsen (Dated Oct. 18, 2022) ("SJ Opp. Larsen Decl.") ¶ 4.

**Response:** The SEC does not dispute that representatives of Ripple met with at least one member of the SEC and other U.S. regulatory agencies on October 29, 2013, and does not dispute that Larsen's Declaration states that he gave a presentation "[i]n October 2013 … to representatives of approximately 12 regulatory agencies." Def. Ex. 169 ¶ 4.   The SEC disputes the remaining assertions contained in ¶ 1632 on the grounds that the assertions are not supported by the cited evidence because Defendants' Exhibits 180 and 181, cited in support of the assertions as to who attended the meeting and what was presented, are emails sent either before or after the meeting by someone who may not have been at the meeting, which lack foundation and constitute inadmissible hearsay. Defendants cite no evidence that Defendants' Exs. 180 and 181 contain true and correct copies of the presentation given at the October 29, 2013 meeting.   The SEC further disputes the assertions in ¶ 1632 on the grounds that the cited evidence, the Larsen Declaration submitted in opposition to the SEC's motion for summary judgment (DX 169), is "a nonmoving party's self-serving statement" that, "without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment" because it is not sufficient to create a genuine dispute of material fact. *SEC v. Aly*, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))).

1633.   The presentation deck used during the October 29, 2013 Ripple Presentation to Regulators referred to XRP as a "new currency" and a "virtual currency"; explained that Ripple was a "venture-backed company that contributes code and promotes the Ripple protocol"; and outlined Ripple's planned next steps, including "[b]uilding team, utility and liquidity."  Ex. 180 at RPLI_SEC 0530423-24, -42; Ex. 169, SJ Opp. Larsen Decl. ¶ 4.

**Response:** The SEC disputes the assertions contained in ¶ 1633 on the grounds that the

cited evidence does not support such assertions because such evidence does not establish that

Defendants' Exs. 180 and 181 contain true and correct copies of the presentation deck used at the

October 29, 2013 meeting.

1634.   Following the October 29, 2013 Ripple Presentation to Regulators, an SEC staff member contacted Ripple to request a copy of the deck, which was provided.  Ex. 180, RPLI_SEC 0530419.

**Response:** The SEC does not dispute that an SEC staff member contacted Ripple to

request a copy of the presentation and that Ripple staff sent him a slide deck.  The SEC disputes the

remaining assertions contained in ¶ 1634 on the grounds that the cited evidence does not establish

that Defendants' Ex. 180 contains a true and correct copy of the presentation deck used at the

October 29, 2013 meeting.

1635.   During and after the October 29, 2013 Ripple Presentation to Regulators, the SEC did not provide any feedback or otherwise reach out to Ripple about the content of the presentation.  Ex. 169, SJ Opp. Larsen Decl. ¶ 4.

**Response:** The SEC disputes the assertions contained in ¶ 1635 on the grounds that

"provide any feedback… to Ripple about the content of the presentation" is vague and ambiguous,

and further disputes the assertions contained in ¶ 1635 on the grounds that the cited evidence, "a

nonmoving party's self-serving statement, without direct or circumstantial evidence to support the

charge, is insufficient to defeat a motion for summary judgment" because it is not sufficient to

create a genuine dispute of material fact. *SEC v. Aly*, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27,

2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent.*

*Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))).

1636.   In 2013, public understanding, including by law firms, was that the SEC had not taken a public position regarding whether it possessed jurisdiction to regulate the sale of bitcoin or other virtual currencies like XRP. See, e.g., Ex. 182 (May 3, 2013 article by technology company noting that SEC declined to respond to questions regarding whether "it had jurisdiction over Bitcoin trading," adding, "[t]he silence may be due to the fact that the SEC can exert little regulatory control over Bitcoin"); Ex. 183 (Dec. 3, 2013 CNN Money article stating that "payments [in bitcoin] are not . . . subject to regulation"); PX 243 at 0099466, -478 (Oct. 2012 Perkins Coie legal memo to Ripple noting the "lack of applicable case law" and pointing to the "small" risk that the SEC might "disagree[] with [its] analysis" that XRP "should not be considered securities."); Ex. 184 (Dec. 31, 2013 article by well-respected law firm stating that no federal regulators other than FinCEN had "issued guidance on the treatment of Bitcoins").

**Response:** The SEC disputes the assertions contained in ¶ 1636 on the ground that the assertion is an opinion, not a fact, and it is not supported by citation to evidence which would be admissible: the material cited to support the assertions are opinions and not facts.

1637.   On January 15, 2014, the SEC Office of Ethics Counsel ("OEC") circulated an internal document to SEC Staff stating that "[p]ursuant to discussions with the Divisions of Trading and Markets and Corporation Finance, the OEC has been informed that the status of Bitcoin as either currency or securities is undetermined at this time," and noting the existence of a "working group at the SEC that is making recommendations or exploring positions regarding whether or how to regulate bitcoin."  Ex. 185, SEC-LIT-EPROD-001345799 (emphasis added); Ex. 158, SEC Answers to RFA Nos. 310-312, 314.

**Response:** The SEC disputes the assertions contained in ¶ 1637 on the ground that the the cited reference does not support the assertion.  The assertion mischaracterizes a hypothetical proposition in Defendants' Exhibit 185 for a fact.  The Office of Ethics Counsel did not "note the existence" of any working group in Defendants' Exhibit 185.  The SEC does not dispute that Defendants' Exhibit 185 contains the statement "Pursuant to discussions with the Divisions of Trading and Markets and Corporation Finance, the OEC has been informed that the status of Bitcoin as either currency or securities is undetermined at this time."

1638.   On May 29, 2014, the Government Accountability Office ("GAO") submitted a report to the U.S. Congress on virtual currencies ("GAO Report"), in which it stated that "federal agencies' responsibilities with respect to virtual currency are still being clarified."  Ex. 144 at RPLI_SEC 1080005.

**Response:** The SEC disputes the assertions contained in ¶ 1638 on the ground that the

cited reference does not support the assertion.  Defendants' Exhibit 144 shows that a report entitled

"Virtual Currencies" and subtitled "Emerging Regulatory, Law Enforcement, and Consumer

Protection Challenges" by the Government Accountability Office ("GAO") went to the Senate's

Committee on Homeland Security and Governmental Affairs, and not to "the U.S. Congress."  The

SEC further disputes the assertions contained in ¶ 1638 on the ground that they mischaracterize the

cited evidence by omitting context.  The report states, in part, "While federal agencies'

responsibilities with respect to virtual currency are still being clarified, some virtual currency

activities and products have implications for the responsibilities of federal financial regulatory and

law enforcement agencies."

1639.   The GAO Report was publicly released on June 26, 2014.  GAO, Virtual Currencies:
Emerging Regulatory, Law Enforcement, and Consumer Protection Challenges,
https://www.gao.gov/products/gao-14-496.

**Response:** The SEC disputes the assertions contained in ¶ 1639 on the grounds set forth in

the SEC's response to ¶ 1638, in that the term "GAO Report" has been defined as "On May 29,

2014, the Government Accountability Office ('GAO') submitted a report to the U.S. Congress on

virtual currencies."   The SEC does not dispute that a copy of "Virtual Currencies: Emerging

Regulatory, Law Enforcement, and Consumer Protection Challenges" appears on the cited website

with the text "Publicly Released: Jun 26, 2014."

1640.   The GAO Report described XRP as "[o]ne of the more prominent examples" of a
virtual currency, and stated that it "is used within a decentralized payment system . . . [that] allows
users to make peer-to-peer transfers in any currency.  A key function of XRP is to facilitate the
conversion of one currency to another."  Ex. 144 at RPLI_SEC 1080004.

**Response:** The Commission disputes the assertions contained in ¶ 1640 on the grounds set

forth in the SEC's response to ¶ 1638, in that the term "GAO Report" has been defined as "On

May 29, 2014, the Government Accountability Office ('GAO') submitted a report to the U.S.

Congress on virtual currencies."   The SEC further disputes the assertions contained in ¶ 1640 on

the grounds that they mischaracterize Defendants' Exhibit 144's "description of XRP" by omitting

key portions of the cited language "describing" XRP.  The SEC does not dispute that Defendants'

Exhibit 144 states in part: "Other virtual currencies that have been created are not based on the

bitcoin protocol. One of the more prominent examples is XRP, which is used within a decentralized

payment system called Ripple. Ripple allows users to make peer-to-peer transfers in any currency. A

key function of XRP is to facilitate the conversion from one currency to another. For example, if a

direct conversion between Mexican pesos and Thai baht is not available, the pesos can be exchanged

for XRP, and then the XRP for baht. As of March 31, 2014, the total value of XRP was $878

million."

1641.   The GAO Report described both bitcoin and the XRP Ledger as "decentralized"
systems.  Id. at RPLI_SEC 1079998, RPLI_SEC 1080004.

**Response:** The SEC disputes the assertions contained in ¶ 1641 on the grounds set forth in

the SEC's response to ¶ 1638, in that the term "GAO Report" has been defined as "On May 29,

2014, the Government Accountability Office ('GAO') submitted a report to the U.S. Congress on

virtual currencies."   The SEC further disputes the assertions contained in ¶ 1641 on the grounds

that Defendants' Exhibit 144 does not reference the XRP Ledger at all, nor describe it as

"decentralized."  The SEC does not dispute that Defendants' Exhibit 144 states in part:  "One of

the more prominent examples is XRP, which is used within a decentralized payment system called

Ripple."

1642.   The GAO consulted the SEC in connection with preparing the GAO Report, and
the SEC reviewed a draft of the report before it was finalized and sent to Congress.  Ex. 158, SEC
Answers to RFA Nos. 513–516; Ex. 144 at RPLI_SEC 1079996.

**Response:** The SEC disputes the assertions contained in ¶ 1642 on the grounds set forth in

the SEC's response to ¶ 1638, in that the term "GAO Report" has been defined as "On May 29,

2014, the Government Accountability Office ('GAO') submitted a report to the U.S. Congress on

virtual currencies," and does not dispute the remaining assertions in ¶ 1642.

1643.   In May 2015, in a jointly issued Statement of Facts issued in connection with the settlement with Ripple, FinCEN, and the U.S. Department of Justice ("DOJ") wrote that XRP was a "virtual currency," that Ripple "provided virtual currency exchange transaction services," and that XRP II, LLC "engaged in sales of virtual currency to third parties."  Ex. 186, DOJ, Settlement Agreement, Attachment A (May 5, 2015); Ex. 187, FinCEN, "Assessment of Civil Money Penalty" (May 5, 2015), SEC-LIT-EPROD-000958592 ("Ripple Labs acted as a money services business" in its sales of XRP).

**Response:** The SEC disputes the assertions contained in ¶ 1643 on the grounds that the entire assertion is vague and ambiguous.  The SEC does not dispute that Exhibit 186 states in part, "Ripple Labs facilitated transfers of virtual currency and provided virtual currency exchange transaction services" and "As of the date XRP II engaged in sales of virtual currency to third parties in exchange for value, XRP II became subject to certain requirements under the Bank Secrecy Act and its implementing regulations, as described in Paragraphs 5 through 15 above."

1644.   The 2015 Settlement Agreement with the DOJ and FinCEN noted that Ripple was a money services business ("MSB") under FinCEN's regulations and expressly permitted future sales and distributions of XRP, including in secondary markets, provided they were conducted by a money services business registered with FinCEN and in compliance with federal laws and regulations applicable to money services businesses.  Ex. 186.

**Response:** The SEC disputes the assertions contained in ¶ 1644 on the grounds that the cited evidence does not support the asserted fact. The SEC does not dispute that the remedial framework for the 2015 Settlement Agreement provided in Defendants' Exhibit 186 is contained on pages 13-16 of Defendants' Exhibit 186. The remedial framework requires undertaking activities beyond those described in ¶ 1644, including, for example, paying fines and undertaking an external audit.  Moreover, Defendants' Exhibit 186 states in part, "This Paragraph does not provide any protection against prosecution for any future conduct by the Company. In addition, this Paragraph does not provide any protection against prosecution of any present or former officer, director, employee, shareholder, agent, consultant, contractor, or subcontractor of the Company for any violations committed by them." *Id.* at 4. Defendants' Exhibit 186 also expressly states: "This Agreement does not bind any other federal agencies." *Id.* at 5.

1645.   The SEC was aware of Ripple's settlement with the DOJ and FinCEN.  See, e.g., Ex. 188, SEC-LIT-EMAILS-000337960.

**Response:** The SEC disputes the assertions contained in ¶ 1645 on the grounds that the term "the SEC" is vague and ambiguous in that it could refer to the Commission itself, divisions or offices within the SEC, or past or present SEC employees.  The SEC does not dispute that at least one SEC employee received a Google Alert containing, among other headlines, a headline stating, "US Financial Crimes Enforcement Network (FinCEN) director Jennifer...settlement with Ripple Labs over violations of the Bank Secrecy Act." DX 188.

1646.   At a November 9, 2015 conference organized by the Federal Reserve Bank of San Francisco, attendees of which included Chris Larsen, Jennifer Shasky (the head of FinCEN at the time), representatives from the SEC, and staff from other regulators, Ms. Shasky spoke about how the settlement with the DOJ and FinCEN had made Ripple a more regulatory-compliant company and the SEC representatives did not object or provide any comment.  Ex. 8 (Larsen Dep. Tr.) at 294:16–295:11.

**Response:** The SEC disputes the assertions contained in ¶ 1646 on the grounds that the cited evidence does not support the asserted facts.  Larsen's testimony does not establish the date of the conference, who attended the conference, or what was said at the conference. The testimony relating to the conference lacks foundation and constitutes inadmissible hearsay.

1647.   In September 2015, the CFTC stated in a public order that "Bitcoin and other virtual currencies are encompassed in the definition and properly defined as commodities."  Ex. 189, In the Matter of Coinflip, Inc. et al., CFTC Docket No. 15-29 (Sept. 17, 2015) ("Coinflip Order").

**Response:** The SEC does not dispute the assertions contained in ¶ 1647.

1648.   The Coinflip Order received press attention and contributed to market participants and observers believing that virtual currencies were not securities.  See, e.g., Ex. 190 (law professor observing in Sept. 17, 2015 article that "[t]he [Coinflip] action puts to rest any notion that virtual currencies qualify as securities.  Otherwise, the Securities and Exchange Commission would be bringing this action, not the CFTC."); Ex. 176 (Dec. 2016 law review article observing that CFTC was "at the forefront" among U.S. regulators "interested in regulating … virtual currencies"); Ex. 191 (Sept. 2015 news article observing that CFTC had "declar[ed] that virtual currencies are deemed 'commodities' covered under existing law").

**Response:** The SEC disputes the assertions contained in ¶ 1648 on the ground that the assertion is an opinion, not a fact, and it is not supported by citation to evidence which would be admissible: the material cited to support the assertions are opinions and not facts.

1649.   In March 2017, an entity in the blockchain industry formally petitioned the SEC to propose and issue rules for the regulation of digital assets and blockchain technology, because of "the lack of regulatory clarity."  The SEC never acted on that petition. Ex. 192, SEC-LIT-EMAILS-000339669 at -000339674; Ex. 158, SEC Answers to RFA Nos. 450-451.

**Response:** The SEC does not dispute that in March 2017, the Secretary of the SEC received a petition for rulemaking from ███████████ of ███████████., and that it did not publish any proposed rule for notice and comment in response to the petition referenced in ¶ 1649. The Commission does not dispute that the letter states, in part, "As the operator of an ATS that uses blockchain technology, ████ is familiar with the lack of regulatory clarity with respect to the regulation of digital assets and blockchin technology." Ex. 192 at p. 4.  The SEC disputes the remainder of the assertions contained in ¶ 1649 because they mischaracterize the petition and the SEC's activities.

1650.   On July 25, 2017, the SEC issued the DAO Report along with a press release, an investor bulletin on "Initial Coin Offerings," and a joint statement by the Divisions of Corporation Finance and Enforcement.  Ex. 193, Rep. of Investigation Pursuant to Section 21(a) of the Sec. Exch. Act of 1934: The DAO, Release No. 81207 (SEC July 25, 2017) ("DAO Report"); Ex. 141, Press Release, "SEC Issues Investigative Report Concluding DAO Tokens, a Digital Asset, Were Securities" (July 25, 2017); Ex. 142, "Investor Bulletin: Initial Coin Offerings" (July 25, 2017); Ex. 143, Statement by the Divisions of Corporation Finance and Enforcement on the Report of Investigation on The DAO (July 25, 2017).

**Response:** The SEC does not dispute the assertions contained in ¶ 1650.

1651.   All four public documents referred to in Paragraph 1650 discussed the offers and sales of digital assets to raise capital or "fund development of a digital platform, software, or other projects," and referred to those offers, sales, or distributions as "Initial Coin Offerings."  See, e.g., Ex. 142.

**Response:** The SEC does not dispute the assertions contained in ¶ 1651.

1652.   The DAO Report was perceived by market participants as focused on capital-raising efforts by Decentralized Autonomous Organizations ("DAO"), in which purchasers of DAO tokens

receive voting rights and sometimes certain other rights in assets held by a DAO. Market participants did not perceive the DAO Report as being focused on well-established digital assets like bitcoin, ether, or XRP. SEC officials subsequently made public statements about the DAO Report that contributed to this public perception. See Ex. 194 at RPLI_SEC 1093343-44 (Dec. 2017 public statement by Chair Clayton posing "[a] key question for all ICO market participants: 'Is the coin or token a security?'" and noting that a significant concern that makes digital assets appear to be securities is when the asset offers "interests in a yet-to-be-built" system); Ex. 195 at RPLI_SEC 1096585-86 (Apr. 2018 Congressional testimony by Chair Clayton distinguishing between digital assets that are a "pure medium of exchange," which "has been determined by most people to not be a security," and "tokens, which are used to finance projects"); Ex. 196, SEC Division of Examinations, SEC Statement Urging Caution Around Celebrity Backed ICOs (Nov. 2017 SEC statement describing the DAO report as "warn[ing] that virtual tokens or coins sold in ICOs may be securities, and those who offer and sell securities in the United States must comply with the federal securities laws"); Ex. 197, Jay Clayton, Chairman's Testimony on Virtual Currencies: The Roles of the SEC and CFTC (Feb. 6, 2018) (Feb. 2018 Chair Clayton testimony that "there are cryptocurrencies that, at least as currently designed, promoted and used, do not appear to be securities"); PX 241 at ECF p.3 (June 2017 Hinman Speech distinguishing between ICOs promising "to create an innovative application of blockchain technology," which are likely securities, and sales of cryptocurrencies "once the network is up and running" after drawing initial funding from traditional sources, which are likely not securities); Ex. 198 (July 2018 article by well-respected law firm describing DAO Report as a meaningful step in the SEC's oversight "of the rapidly expanding ICO market"); Ex. 199 (Oct. 2017 article by well-respected law firm describing DAO report as the SEC "sharpening [its] focus on the rapidly developing market for ICOs").

**Response:** The SEC disputes the assertions contained in ¶ 1652 on the ground that no evidence has been offered in support of the assertions; and that evidence offered in support of the assertion regarding the impact of subsequent statements by SEC officials is an opinion, not a fact, and it is not supported by citation to evidence which would be admissible: the material cited to support the assertions are opinions and not facts. The SEC further disputes the assertion in ¶ 1652 that "[m]arket participants did not perceive the DAO Report as being focused on well-established digital assets like bitcoin, ether, or XRP" on the ground that it is contradicted by record evidence that Ripple's public relations agency specifically alerted Ripple to portions of the speech that could apply to XRP. PX 450.

1653.   Following the DAO Report, there was uncertainty and confusion among market participants and observers about when, if ever, a particular digital token would be regulated as a

security by the SEC, particularly if that token was well-established or not part of a DAO or ICO. See, e.g., Ex. 200 at SEC-SEC-E-0000120 (SEC-LIT-EMAILS-000470683) (Dec. 2017 letter from Sen. Ron Wyden to Chair Clayton urging "clear and consistent guidance"); Ex. 201 at SEC-LIT-EMAILS-000342985 ("SEC Meeting Memo") (Oct. 2018 memo to SEC Staff from securities lawyers citing "largely unprecedented" confusion, such that "lawyers, law firms and other gatekeepers" advising "cryptocurrency markets" often disagree on "whether the federal securities laws apply at all, or what the analysis is for determining whether instruments are securities"); Ex. 202 at SEC-LIT-EMAILS-000342644 (June 2018 letter to SEC by counsel for fintech company asserting that "the current U.S. regulatory environment does not provide clarity necessary to definitively determine which virtual currencies will be deemed securities by the SEC – or more importantly, which will not.").

Response: The SEC disputes the assertions contained in ¶ 1653 on the ground that it is not supported by citation to evidence which would be admissible: the material cited to support the assertions are opinions and not facts.

1654.    Some third-parties developed their own securities law "frameworks" to evaluate the risk of whether a particular digital asset was a security under Howey, and some of those frameworks were shared with the SEC.  Ex. 203 at SEC-LIT-EPROD-000959298-99 (Dec. 2017 emails from a blockchain software technology company to SEC sharing "Coinbase Securities Law Framework for Tokens" in advance of meeting); Ex. 204 at SEC-LIT-EPROD-000959456-62 (Dec. 2017 slide deck from blockchain software technology company highlighting the Coinbase "Framework"); Ex. 158, SEC Answer to RFA No. 568; Ex. 205 at SEC-LIT-EMAILS-000340369-70 (Dec. 8, 2017 email sharing "Coinbase Securities Law Framework for Tokens" with SEC); Ex. 274 (Sept. 2019 announcement by a well-respected law firm of third-party securities law framework developed because "industry participants have struggled when applying existing laws to the unique nature and characteristics of digital assets").

Response: The SEC does not dispute the assertions contained in ¶ 1654.

1655.    On December 11, 2017, in a publicly issued statement, Chair Clayton stated that "there are cryptocurrencies that do not appear to be securities," but did not name any.  Ex. 194 at RPLI_SEC 1093342 (emphasis added).

Response: The SEC does not dispute the assertions contained in ¶ 1655.

1656.    In 2017, the CFTC publicly issued a "Primer on Virtual Currencies," which stated that "virtual currencies are commodities."  Ex. 206 at SEC-LIT-EMAILS-000340302, -05; Ex. 158, SEC Answer to RFA No. 524.

Response: The SEC does not dispute the assertions contained in ¶ 1656.

1657.    By the end of 2017, more than 60 digital asset exchanges listed XRP.  See PX 500.20.

**Response:** The SEC disputes the assertions contained in ¶ 1657 on the grounds that the cited evidence does not support the fact asserted.  The cited evidence is a copy of a page from Ripple's website, dated January 18, 2018, which states, "XRP is available for purchase on more than 60 digital asset exchanges worldwide." PX 500.20.  The statement links to a December 21, 2017 Ripple webpage titled, "XRP Now Available on 50 Exchanges Worldwide." *See* PX 500.20; https://ripple.com/insights/xrp-now-available-on-50-exchanges-worldwide/

1658.   Not one of the more than 60 digital asset exchanges that listed XRP by the end of 2017 was registered with the SEC for the purpose of facilitating trading in digital assets.  Ex. 158, SEC Answer to RFA No. 570.

**Response:** The SEC disputes the assertions contained in ¶ 1658 on the grounds set forth in the SEC's response to ¶ 1657 as well as on the grounds that the cited evidence does not support the fact asserted.  The objects to the phrase "the more than 60 digital asset exchanges that listed XRP by the end of 2017" as vague and ambiguous.  The SEC's Answer to RFA No. 570 admitted only that "none of the digital asset platforms on which Ripple, Garlinghouse, or Larsen sold XRP prior to December 22, 2020 was registered with the SEC as a 'national securities exchange,' as defined in 15 U.S.C. § 78f." DX 158.

1659.   Prior to 2018, the SEC "had no trading policy regarding digital assets" that restricted SEC employees from buying and selling XRP and other digital assets.  See, e.g., Order, Sept. 21, 2021 (Netburn, J.), ECF No. 354 at 1; Ex. 207 at SEC-LIT-EPROD-001345801 (Jan. 16, 2018 memo to SEC employees from SEC Office of the Ethics Counsel stating that all digital asset transactions must be precleared and reported).

**Response:** The SEC does not dispute that the SEC's Office of the Ethics Counsel issued a memorandum to all SEC employees on the subject "Ethics Guidance Regarding Digital Assets" on January 16, 2018, as reflected in Def. Ex. 207. The SEC disputes the remaining assertions in ¶ 1659 on the grounds that the quoted language selectively quotes without context Magistrate Judge Netburn's comments on the contents of the parties' briefs related to a discovery dispute and is not a statement of fact. *See* D.E. 354 at 1 ("Defendants represent, and the SEC does not dispute, that

25

before the issuance of this memorandum, the SEC had no trading policy regarding digital assets.").

The SEC further disputes the assertions on the basis that the cited evidence contradicts the

assertions in ¶ 1659. *See* Def. Ex. 207 ("The current SEC Supplemental Ethics Regulations apply to

digital assets.").

1660.   On January 16, 2018, the SEC instituted an internal policy for its employees, which
would take effect on January 19, 2018, requiring SEC employees to "preclear" with SEC
administrators all transactions in digital assets prior to purchase or sale.  Ex. 207 at SEC-LIT-
EPROD-001345801; Ex. 158, SEC Answers to RFA Nos. 263–264.

**Response:** The SEC objects to the phrase "SEC administrators" as vague and ambiguous

and disputes the assertions in ¶ 1660 on that basis.  The cited evidence states "effective Jan. 19,

2018, SEC employees and members are required to preclear all digital asset transactions in [the

SEC's Personal Trading Compliance System] prior to purchasing or selling a digital asset." Def. Ex.

207.

1661.   On February 6, 2018, Chair Clayton testified before Congress that "there are
cryptocurrencies that, at least as currently designed, promoted and used, do not appear to be
securities," but did not identify any such cryptocurrencies by name.  Ex. 197, Jay Clayton, Virtual
Currencies: The Roles of the SEC and CFTC (Feb. 6, 2018) (emphasis added).

**Response:** The SEC disputes the assertion in ¶ 1661 on the grounds that the assertion

mischaracterizes the evidence by omitting additional context and to the extent it mistakenly implies

that the SEC or Chair Clayton believed that digital assets that exhibited some purported utility were

not securities.  The full quoted testimony is: "While there are cryptocurrencies that, at least as

currently designed, promoted and used, do not appear to be securities, simply calling something a

'currency' or a currency-based product does not mean that it is not a security.  To this point I would

note that many products labeled as cryptocurrencies or related assets are increasingly being

promoted as investment opportunities that rely on the efforts of others, with their utility as an

efficient medium for commercial exchange being a distinct secondary characteristic."

1662.    In his February 6, 2018 testimony, Clayton also stated that "many of the U.S.-based cryptocurrency trading platforms have elected to be regulated as money-transmission services. Traditionally, from an oversight perspective, these predominantly state-regulated payment services had not been subject to direct oversight by the SEC or the CFTC."  Clayton did not say that any digital asset exchange listing XRP or any other virtual currency needed to register with the SEC as a broker-dealer or national securities exchange.  Id.; see also 15 U.S.C. § 78o (broker-dealer registration); 15 U.S.C. § 78l (national securities exchange registration).

**Response:** The SEC disputes the assertions in ¶ 1662 on the grounds that the assertions

mischaracterize the evidence by omitting additional context and to the extent they mistakenly imply

that Defendants did not receive fair notice or that the SEC needed to inform Ripple or any digital

asset exchange that made XRP available for trading of the SEC's investigation into Ripple's XRP

sales or of the SEC's views as to XRP status under the federal securities laws prior to bringing this

suit.  The full quoted testimony is: "It appears many of the U.S.-based cryptocurrency trading

platforms have elected to be regulated as money-transmission services.  Traditionally, from an

oversight perspective, these predominantly state-regulated payment services had not been subject to

direct oversight by the SEC or the CFTC. Traditionally, from a function perspective, these money

transfer services have not quoted prices or offered other services akin to securities, commodities and

currency exchanges."

1663.    On June 14, 2018, Hinman, then-Director of the SEC's Division of Corporation Finance, gave a public speech titled "Digital Asset Transactions: When Howey Met Gary (Plastic)" (the "Hinman Speech").  PX 241.

**Response:** The SEC does not dispute the assertions in ¶ 1663.

1664.    In the Hinman Speech, Hinman stated that transactions in a digital asset on a "sufficiently decentralized" network would not qualify as securities transactions.  He did not define "sufficiently decentralized."  PX 241 at ECF p. 4.

**Response:** The SEC disputes the assertions in ¶ 1664 to the extent they mischaracterize the

evidence by omitting additional context and to the extent they imply that Hinman did not explain his

use of the term "decentralization" (which he did).  In the speech, Hinman stated: "If the network on

which the token or coin is to function is sufficiently decentralized – where purchasers would no

longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful." The SEC further disputes the assertions in ¶ 1664 on the grounds that the assertions mischaracterize the evidence by omitting additional other context, including additional "not exhaustive" factors that market participants could consider when evaluating efforts of a third party in order to determine whether certain transactions qualify as securities transactions.

1665.    The term "sufficiently decentralized" used in the Hinman Speech did not previously appear in any of the laws or regulations within the SEC's jurisdiction, any court decisions applying the Howey standard, or any public SEC guidance, and the SEC has never offered a definition of "sufficiently decentralized." PX 241 at ECF p. 4; see also Ex. 208, Petition for Rulemaking – Digital Asset Securities Regulation Submitted by Coinbase Global, Inc. (July 21, 2022) at 12 (July 2022 Petition for Rulemaking requesting clarity about "[w]hat constitutes 'sufficient decentralization'" as that phrase was used in the Hinman Speech).

**Response:** The SEC disputes the assertions in ¶ 1665 on the grounds that they mischaracterize the evidence and mistakenly imply that Hinman did not explain his use of the term "decentralization" (which he did). Hinman stated: "If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful." The SEC disputes the assertions in ¶ 1665 on the grounds that the assertions mischaracterized the evidence by omitting additional other context, including additional "not exhaustive" factors that market participants could consider when

evaluating efforts of a third party and whether that third party "drives the expectation of a return."
PX 241 at 4-5.  The SEC further disputes the assertions in ¶ 1665 on the grounds that they imply
that the Coinbase's petition seeks "clarity" about the term "decentralization" and omits additional
context to understand the petition's purpose.  According to DX 208, the purpose of the petition is
to request that the "Commission propose and adopt rules to govern the regulation of securities that
are offered and traded via digitally native methods, including potential rules to identify which digital
assets are securities."  DX 208 also requested that the Commission "consider and seek public input
on" 11 questions related to the "classification of digital assets as securities," including the question
of "[w]hat constitutes 'sufficient decentralization' for purposes of transitioning from a security to a
non-security?"

1666.   Hinman also stated in the Hinman Speech that whether "the application [is] fully
functioning or in early stages of development" is relevant to whether a digital asset is an investment
contract.  PX 241 at ECF p. 6.

**Response:** The SEC disputes the assertions in ¶ 1666 on the grounds that the assertions
mischaracterize the evidence and omit additional context, including the fact that Hinman provided a
list of 7 possible features for "promoters and their counsels" to "consider, including whether "the
application is fully functioning or in early stages of development?" Hinman also stated that: "[t]his
list is not intended to be exhaustive and by no means do I believe each and every one of these
factors needs to be present to establish a case that a token is not being offered as a security. This list
is meant to prompt thinking by promoters and their counsel, and start the dialogue with the staff – it
is not meant to be a list of all necessary factors in a legal analysis."

1667.   Hinman also stated in the Hinman Speech that whether a "person or group retained
a stake or other interest in the digital asset such that it would be motivated to expend efforts to
cause an increase in value in the digital asset" was relevant to the investment contract analysis.  PX
241 at ECF p. 5.

**Response:** The SEC disputes the assertions in ¶ 1667 on the grounds that the assertions
mischaracterize the evidence and omit additional context, including the fact that Hinman provided a

list of 6 "factors to consider in assessing whether a digital asset is offered as an investment contract" and "whether a third party … drives the expectation of a return."  Two of the six factors state the following: "Is there a person or group that has sponsored or promoted the creation and sale of the digital asset, the efforts of whom play a significant role in the development and maintenance of the asset and its potential increase in value?" and "Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset? Would purchasers reasonably believe such efforts will be undertaken and may result in a return on their investment in the digital asset?"

1668.   Hinman also stated in the Hinman Speech that "putting aside the fundraising that accompanied the creation of Ether, based on my understanding of the present state of Ether, the Ethereum network and its decentralized structure, current offers and sales of Ether are not securities transactions.  And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value."  PX 241 at ECF p. 4.

**Response:** The SEC does not dispute the assertions in ¶ 1668.

1669.   Prior to Hinman's delivery of the Hinman Speech, various SEC officers and staff had provided comments and feedback to Hinman on drafts of the speech, including, among others:

A. On May 3, 2018, David Fredrickson sent an email to Hinman and others attaching a document titled, "When does a security stop being a security," which stated that "[l]ock-ups for developers/promoters" were an "indicia of a non-security digital asset."  Ex. 277 at SEC-LIT-EMAILS-000470972.

B. On May 25, 2018, Valerie Szczepanik, an associate director of the Division of Corporation Finance, wrote regarding the draft speech, "I almost think the less detail the better," and "[t]his is introducing a concept, that will probably generate much discussion, and so leaving room for that discussion is good I think."  Ex. 209 at SEC-LIT-EMAILS-000470992.

C. On June 6, 2018, the SEC's Division of Trading and Markets ("TM") asked Hinman to "please consider tying these factors more closely and explicitly to the Howey analysis."  Ex. 155 at SEC-LIT-EMAILS-000471133.

D. Commenting on one of the draft speech's factors, which read "Has this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset," TM wrote: "Why is this factor relevant and how would it be applied?"  Id.

E. On June 6, 2018, commenting on the draft speech's application of the federal securities laws to digital assets, TM wrote: "the relevant question . . . is whether a digital asset meets the legal standards of a security, not whether it warrants regulation as a security."  Id. at SEC-LIT-EMAILS-000471131.

F. On June 8, 2018, the SEC Office of General Counsel ("OGC") wrote, concerning the discussion of Ethereum in the Hinman Speech, "We are still discussing this internally.  We also want to hear what CF [Corporation Finance] learns from its anticipated conversation with [Ethereum co-founder Vitalik] Buterin."  Ex. 156 at SEC-LIT-EMAILS-000471184, -190.

G. The OGC proposed deleting one of the "factors to consider in assessing whether a digital asset is offered as an investment contract," commenting that it "does not seem relevant."  Ex. 156 at SEC-LIT-EMAILS-000471192.

H. On June 12, 2018, Brett Redfearn, then-Director of the SEC's Division of Trading and Markets, wrote to Hinman, "because the list of factors is so extensive – and appears to include things that go beyond the typical Howey analysis (e.g., hoarding) – we have concerns this might lead to greater confusion on what is a security."  Ex. 157 at SEC-LIT-EMAILS-000471315; Ex. 211, SEC-LIT-EMAILS-000471316 at 8.

I. On June 12, 2018, the OGC wrote:  "While we agree that a central purpose of the Securities Act is to address an information asymmetry, I think we worry that it does not follow that there is no longer an asymmetry once a network becomes decentralized . . . .  The fact that tokens on a sufficiently decentralized network are no longer securities – and no longer are required to register, with all the benefits to investors of registration – seems to point out what might be considered the 'regulatory gap' that exists in this space."  Ex. 152 at SEC-LIT-EMAILS-000471395, SEC-LIT-EMAILS-000471403.

J. On June 12, 2018, the OGC proposed deleting the speech's references to ether, writing, "[w]e still have reservations about including a statement directly about Ether in the speech," in part because the statement would make it "difficult for the agency to take a different position on Ether in the future."  Ex. 152 at SEC-LIT-EMAILS-000471404.

K. The OGC's June 12 comments also proposed changes to the "factors to consider in assessing whether a digital asset is offered as an investment contract," proposing to delete one of the factors because "[t]he SEC has rejected" the view reflected in that factor.  Ex. 152 at SEC-LIT-EMAILS-000471406.

L. The OGC's June 12 comments stated, with regard to the application of Howey to digital assets: "only the purchase of land and service contract was the purchase of a security (those who bought land only had not purchased a security)."  Ex. 152 at SEC-LIT-EMAILS-000471399.

**Response:** The SEC disputes the assertions in ¶ 1669 on the grounds that the assertions

mischaracterize the evidence by omitting additional context and to the extent they imply that the

SEC's internal, nonpublic discussions are relevant to whether Defendants received fair notice, which

they are not.  The SEC further asserts that internal comments reflect frank and informal deliberation among individual SEC staff, and do not necessarily reflect even the author's final, considered opinion as to any topic, much less the official position of the Commission.  As to paragraph (A), undisputed that the attached document has the stated title, but disputed on the grounds that quoted language omitted additional context, including the fact that the document lists "[l]ock-ups for developers/promoters" among a list of 6 "*possible indicia* of a non-security digital asset." (emphasis added).  As to paragraph (B), disputed on the grounds that quoted language omitted prefatory language.  The full quote is as follows: "Generally, I would add more detail where I indicated in the bubble.  I like the tone, and I almost think the less detail the better.  This is a introducing concept, that will probably generate much discussion, and so leaving room for that discussions is good I think.  As to paragraphs (C) and (D), undisputed. As to paragraph E, disputed on the grounds that the assertions mischaracterize the evidence by omitting additional context.  The full quote is: "the relevant question, as discussed throughout the rest of the speech, is whether a digital asset meets the legal standards of a security, not whether it warrants regulation as a security."  Undisputed as to paragraph (F).  As to paragraph (G), disputed on the grounds that omits additional context, including that the suggested deletion only applied to the first section of one factor, and that it mistakenly implies that commenter suggested deleting the entire factor.  As to paragraph (H), disputed on the grounds that the assertions mischaracterize the evidence by omitting additional context.  The full quote is:  "We appreciate your efforts to link these more closely to the factors in the Howey test.  However, because the list of factors is so extensive – and appears to include things that go beyond the typical Howey analysis (e.g., hoarding) – we have concerns this might lead to greater confusion on what is a security."

As to paragraph (I), disputed on the grounds that the assertions mischaracterize the evidence by omitting additional context.  The full quote is:  "While we agree that a central purpose of the

Securities Act is to address an information asymmetry, I think we worry that it does not follow that there is no longer an asymmetry once a network becomes decentralized. There likely are still people who have far more information (i.e., Buterin likely has far more information that retail purchasers of Ether). In fact, disclosure is likely to still be important to purchasers (and disclosure could help address the information asymmetry that is likely to continue to persist for some time after decentralization). But the bigger point is that it's no longer an investment contract once there are no 'efforts of others' to point to - plus, without a group in control, there's no one to hold responsible for providing the disclosure. The fact that tokens on a sufficiently decentralized network are no longer securities-and no longer are required to register, with all the benefits to investors of registration - seems to point out what might be considered the 'regulatory gap' that exists in this space." Undisputed as to paragraph (J). As to paragraph (K), disputed on the grounds that the assertions mischaracterize the evidence by omitting additional context. The full quote is: "We suggest deleting this. Although having a stake might show *control* (which could be useful for the Howey analysis), we worry that linking the stake to the person's *motivation* might appear to endorse the idea that there needs to be strict vertical commonality (i.e., that the interests of the promoter and the investor need to be aligned —that they'll both profit from the success of the enterprise). The SEC has rejected that view." As to paragraph (L), disputed on the grounds that the assertions mischaracterize the evidence by omitting additional context. The full quote is: "The Court found that only the purchase of land and service contract was the purchase of a security (those who bought land only had not purchased a security)."

1670.   Market participants and observers regarded the Hinman Speech as announcing a new "sufficiently decentralized" test by the SEC for digital assets. See, e.g., Ex. 212 at RPLI_SEC 1093406 (Jan. 2019 Blockchain Association article discussing the "sufficiently decentralized" SEC "standard" set forth in the speech); Ex. 202 at SEC-LIT-EMAILS-000342653-54 (June 2018 letter from well-respected law firm on behalf of digital asset company to SEC Staff evaluating digital asset under the "analytical framework" articulated in the Hinman Speech); Ex. 213 at SEC-LIT-EPROD-001748211-12 (Aug. 2018 submission by well-respected law firm to SEC Staff on behalf of digital

asset company stating that "as requested [the digital asset company] re-examined Director Hinman's Gary Plastic speech and other statements of the Staff" and is providing a memo summarizing how "Director Hinman's speech is applied to the … platform and tokens") (emphasis added); Ex. 214 at SEC-LIT-EMAILS-000466545-46, Ex. 215 at SEC-LIT-EMAILS-000466557-58 (Nov. 2018 communications from company to SEC Staff explaining why virtual currency not a security under Hinman Speech); Ex. 216 at 1 (Mar. 2019 letter from Chair Clayton to Rep. Ted Budd pointing to Hinman Speech as evidence that "the Commission has been transparent with the criteria used to determine whether a digital asset is . . . an investment contract"); Ex. 217 at SEC-LIT-EPROD-001463104 (Oct. 31, 2018 legal analysis submitted to SEC Staff by well-respected law firm on behalf of digital asset company in response to SEC staff "request[ing] that we provide a supplemental memorandum analyzing [digital asset] within the rubric of the factors outlined by [the Hinman Speech]."); Ex. 218, Jay Clayton, Testimony on "Oversight of the U.S. Securities and Exchange Commission" (June 21, 2018) at 14 (June 21, 2018 Chair Clayton Congressional testimony that the "[SEC] Corporation Finance Division Director recently further outlined the approach staff takes to evaluate whether a digital asset is a security").

**Response:** The SEC disputes the assertions in ¶ 1670 on the grounds that the term "market participants and observers" is vague and ambiguous and on the grounds that the cited evidence constitutes inadmissible hearsay. The SEC further disputes the assertions in ¶ 1670 on the grounds that the assertions mischaracterize the evidence as "announcing a new ... test by the SEC," in light of Defendants' prior assertion that Hinman is not a Commissioner, and thus cannot bind the SEC. Def. 56.1 Resp. ¶¶ 1039-40. The SEC further disputes the assertions in ¶ 1670 on the grounds that the assertions mischaracterize the evidence in that they imply that Hinman's speech suggested a departure from *Howey*, which it did not. *Howey* is referenced 12 times in Hinman's speech and the term "sufficiently decentralized" is only cited in reference to whether "purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts," which is a key tenet of *Howey*. PX 241. The SEC further disputes the assertions in ¶ 1670 on the grounds that the assertion that Hinman announced a "a new test...by the SEC" is not supported by the evidence cited because the SEC and lawyers who engaged with the SEC on behalf of clients continued to cite and discuss *Howey* or the *Howey* factors in their speeches, articles and submissions to the SEC, thereby acknowledging that *Howey* is still the appropriate

test.  *See, e.g.*, DX 216 at 2 (Chairman Clayton stating that "[w]e also apply tests developed through case law, including the well-established 'investment contract' test articulated by the Supreme Court in SEC v. Howey and its progeny, including United Housing Found, Inc. v. Forman.  As those cases explain, the 'touchstone' of an investment contract 'is the presence of an investment in a common venture premised on a reasonable expectation of profits to be derived from the entrepreneurial or managerial efforts of others.' The determination of whether a digital asset is an 'investment contract' depends on the application of Howey and its progeny to the particular facts and circumstances of the digital asset transaction."); DX 202 (submission from lawyer on behalf of client includes section titled "Investment Contracts Under Howey"); DX 213 at ██-SEC-000241 (lawyer on behalf of client asking SEC staff for confirmation that certain facts do "not cause [the SEC] to veer too much in your eyes into the 'efforts of others' prong of the Howey analysis.  We would like your concurrence that upgrades and updates to a platform...would not themselves be viewed as necessarily driving token price...."); DX 212 at RPLI_SEC 1093406-07 (article acknowledging the "traditional Howey factors discussed in the Hinman Speech" and that "[d]ecentralization is a theme that aligns with the Supreme Court's Howey Test."); DX 215 at SEC-LIT-EMAILS 000466558 and DX 214 at SEC-LIT-EMAILS 000466546 (email to the SEC from lawyer on behalf of client citing "properties that the SEC identified in the William Hinman Speech as being key to determining whether or not a digital asset is a security, including (1) whether a central third party's efforts are a key determining factor in the enterprise ...."); DX 217 (submission to the SEC from lawyer on behalf of client applying all 13 factors discussed in the Hinman Speech, which focused on whether a third party drives the expectation of a return.).

1671.   As of the date of the Hinman Speech, the XRP Ledger was decentralized.  Ex. 1 (Schwartz Dep. Tr.) at 27:23–28:5, 101:18–102:8.

**Response:** The SEC disputes the assertions in ¶ 1671 on the ground that the assertion is not supported by the cited evidence; is contradicted by record evidence, *see* PX 12 ████ Expert

Report); and is inconsistent with Defendants' previous litigation position that "decentralization" lacks any established meaning.  *See, e.g.*, D.E. 541 at 2 (decentralization "lacks any settled meaning—both under the securities law and in the computer science field").

1672.    After the Hinman Speech, many market participants and observers concluded that XRP was not a security.  See, e.g., Ex. 219, SEC-LIT-EPROD-000038987 (Feb. 2019 Coinbase email to SEC officials stating that Coinbase had decided to list XRP after identifying "credible arguments" that XRP was not a security); Ex. 116 (Feb. 2019 Coinbase blog post announcing that "Starting today, Coinbase supports XRP"); Ex. 220, SEC-LIT-EMAILS-000460257 (April 2019 legal memo from well-respected law firm to digital asset investment company determining that XRP was not a security); Ex. 221 at RPLI_SEC 0978762 (June 2020 article from former CFTC Commissioner assessing that XRP not a security); Ex. 149 (Sept. 2018 press release noting that digital asset exchange OKCoin listed five new cryptocurrencies, including XRP, described as "[a]n independent, decentralized digital asset.").

**Response:** The SEC disputes the assertions in ¶ 1672 on the grounds that "many market participants and observers" is vague and ambiguous.  The SEC further disputes the assertions in ¶ 1672 on the ground that the cited evidence does not support the assertions, i.e., Coinbase did not conclude "XRP was not a security," but rather, as a self-interested market actor with considerable financial incentive, identified "credible arguments" that it was not, and concluded that XRP "may permissibly be listed on [its] U.S. trading platform." *See* Def. Exs. 219, 116.  Similarly, Def. Ex. 149 does not express the conclusion that "XRP was not a security."

The SEC further disputes the assertions in ¶ 1672 on the ground that the cited evidence, an April 2019 legal memorandum, sets forth a conclusion (XRP was not a security) without acknowledging the limitations on that conclusion.  The memorandum itself recognizes its analysis of XRP was limited to publicly available information. *See* Def. Ex. 220 (the analysis of whether XRP "should be treated as a 'security' under the federal securities laws" was "based on information that we have been able to obtain from the public record.  Because the analysis in this memorandum is heavily fact dependent, to the extent the information we have relied upon is erroneous, or to the

extent additional information exists that we have not considered but that bears upon the analysis

contained herein, the conclusions contained in this memorandum may require modification").

The SEC further disputes the assertion that Def. Ex. 220 supports the assertions in ¶ 1672

on the grounds that the conclusions contained therein rely upon inaccurate "facts." *Compare, e.g.*,

Def. Ex. 220 at 4 ("even those participants who purchased XRP directly from Ripple Labs were

expected to be purchasing XRP for use, not for investment") *with* D.E. 663 ¶ 744 (undisputed that

"[b]efore approximately May 2020, Ripple did not sell XRP to ODL customers for their use in ODL

transactions"); *compare also* Def. Ex. 220 at 5 ("Ripple Labs did not arrange for immediate secondary-

market trading of XRP") *with* D.E. 663 ¶ 1198 (undisputed that six exchanges "had contracts with

Ripple related to their listing of XRP").

The SEC further disputes the implicit assertion in ¶ 1672 that "market participants and

observers" generally understood after the Hinman Speech in 2018 that XRP was not a security as

contradicted by record evidence. *E.g.*, PX 534 (crypto exchange employee stating in 2020:  "I'd like

to see a legal opinion that XRP is not a security.  I have asked Brad for that directly, and they had

wanted us to list XRP on our exchange and we required that, as well, but it was never provided.  We

have two very large firms that have told us they believe it is a security and the SEC has been quiet on

the issue.").

1673.   As of the date of the Hinman Speech, there was no consensus in the scientific
community as to how to define or measure "decentralization" within blockchain systems.  Ex. 222,
Neha Narula (@neha) (Director of the Digital Currency Initiative at the MIT Media Lab), Twitter
(July 15, 2018); see also Ex. 223 (Rebuttal Expert Report of Peter Adriaens) at 3-11; Ex. 224, A.R.
Sai et al., Taxonomy of Centralization in Public Blockchain Systems: A Systematic Literature Review,
58 INFO. PROCESS & MGMT. 1, 3, 30 (2021).

**Response:** The SEC disputes the assertions in ¶ 1673 on the ground that they are not

supported by admissible evidence, including because the expert report of Peter Adriaens is not

admissible for the reasons set forth in the SEC's Motion to Exclude (D.E. 536), including that the

Adriaens Report copies popular and industry publications without attribution; Adriaens did not

write large swaths of his report; and Adriaens did not have the technical expertise or understanding

of the term decentralization, such that these opinions lack foundation and constitute inadmissible

hearsay.

1674.    On June 15, 2018, one day after the Hinman Speech, Neha Narula, Director of the

Digital Currency Initiative at the MIT Media Lab, tweeted that she was "a little worried people from

government agencies are throwing around the word 'decentralization' like we know what it means or

how to evaluate it."  Ex. 222.

**Response:** The SEC does not dispute the assertions in ¶ 1674.

1675.    The Hinman Speech created uncertainty and confusion for market participants.  See,

e.g., Ex. 225 at SEC-LIT-EMAILS-000335178 (Oct. 2018 email from general counsel of blockchain

company outlining proposed questions to Hinman at upcoming event, including the observation

that "[E]very GC in this room can tell you the same story about an uncertain area of law.  You call

10 different law firms and they give you 10 different answers…. It's like the white light of your

speech went through a prism and came out in 10 different colors of legal advice."); Ex. 201 at SEC-

LIT-EMAILS-000342985 ("SEC Meeting Memo") (Oct. 23, 2018) (Oct. 2018 memo from securities

lawyers to SEC a few months after Hinman Speech citing "largely unprecedented" confusion in the

market about whether or when digital assets constituted securities); Ex. 208 at 12 (July 2022 Petition

for Rulemaking by Coinbase requesting clarity about "[w]hat constitutes 'sufficient decentralization'"

as that phrase was used in the Hinman Speech).

**Response:** The SEC disputes the assertions in ¶ 1675 on the ground that "uncertainty" and

"confusion" are vague and ambiguous as used in ¶ 1675. The SEC further disputes the assertions on

the grounds that they are not supported by admissible evidence and they mischaracterize the

evidence by omitting additional context.  DX 225 states: "We thank you very much for the guidance.

Now that everyone is level set -- let me tell you, there remains some uncertainty. It's not your fault--

you couldn't clarity everything at once.  But every GC in this room can tell you the same story about

an uncertain area of law.  You call 10 different law firms and they give you 10 different answers.

Each of them has their own particular spin.  It's like the white light of your speech went through a

prism and came out in 10 different colors of legal advice. One prominent lawyer told me that the

meaning of your speech is that Ethereum and Bitcoin are not securities --but everything else is and

everything new will be!"  According to DX 201 (SEC-LIT-EMAILS-000342987), the purpose of the
meeting and memo are as follows: "We are here to inform the Staff about what we consider to be
bad, and often dangerous, advice being provided by important cryptocurrency gatekeepers, and to
discuss with the Staff ways in which we believe the Commission and the Staff can: (i) support and
reinforce gatekeepers who are acting responsibly; and (ii) help gatekeepers who may be providing
bad advice to revise the advice they are providing."  According to DX 208, the purpose of the
petition is to request that the "Commission propose and adopt rules to govern the regulation of
securities that are offered and traded via digitally native methods, including potential rules to identify
which digital assets are securities."  DX 208 also requested that the Commission "consider and seek
public input on" 11 questions related to the "classification of digital assets as securities", including
the question of "[w]hat constitutes 'sufficient decentralization' for purposes of transitioning from a
security to a non-security?"

1676.   On or about November 1, 2018, a group of securities lawyers, speaking on behalf of
themselves as legal practitioners and not on behalf of any client, met in person with multiple senior
SEC officials to discuss the "extremely unusual" and "largely unprecedented" level of confusion in
the cryptocurrency markets that they noted in the SEC Meeting Memo, which they sent to the SEC
on October 23, 2018.  Ex. 158, SEC Answers to RFA Nos. 851-854, 856-858; Ex. 201 at SEC-LIT-
EMAILS-000342982.

**Response:** The SEC disputes the assertions in ¶ 1676 on the grounds that the assertions
mischaracterize the evidence by omitting additional context and to the extent they mistakenly imply
the purpose of the discussion "to discuss the 'extremely unusual' and 'largely unprecedented' level of
confusion in the cryptocurrency markets."  According to Def. Ex. 201 (SEC-LIT-EMAILS-
000342987), the purpose of the meeting and memo are as follows: "We are here to inform the Staff
about what we consider to be bad, and often dangerous, advice being provided by important
cryptocurrency gatekeepers, and to discuss with the Staff ways in which we believe the Commission

and the Staff can: (i) support and reinforce gatekeepers who are acting responsibly; and (ii) help

gatekeepers who may be providing bad advice to revise the advice they are providing."

1677.   The securities lawyers who met with SEC officials on November 1, 2018, included one former SEC lawyer whom Hinman testified at his deposition was "a respected member of the securities bar." PX 258 at 180:5–9.

**Response:** The SEC disputes the assertion in ¶ 1677 on the grounds that it mischaracterizes

the evidence.  In response the question a whether a certain individual is a "respected member of the

securities bar," Hinman stated "as far as I know" and did not provide any testimony regarding that

individual's past employment with the SEC.  The SEC further disputes the assertion on the grounds

that ¶ 1677 does not provide any evidence of this individual's former SEC employment.

1678.   The SEC Meeting Memo stated in part:

> Token issuers can speak to two different well-regarded, experienced law firms, and get diametrically opposite views on the current and future applicability of the federal securities laws. … Law firms as a whole, and even lawyers within law firms, often disagree about the application in practice of particular securities law provisions (e.g., does a company need to disclose a particular fact, does a particular activity cause a person to become an unregistered broker-dealer, etc.)  Lawyers, law firms and other gatekeepers, however, do not typically disagree on, for example, whether the federal securities laws apply at all, or what the analysis is for determining whether instruments are securities.  That, however, is the state of play among gatekeepers in the cryptocurrency markets today. Ex. 201 at SEC-LIT-EMAILS-000342985 (emphasis added); Ex. 158, SEC Answers to RFA Nos. 851–854, 856–858, 865–880.

**Response:** The SEC disputes the assertion in ¶ 1678 on the grounds that it mischaracterizes

the evidence by omitting additional context.  The full quote is as follows:  "Token issuers can speak

to two different well-regarded, experienced law firms, and get diametrically opposite views on the

current and future applicability of the federal securities laws, and on what steps the token issuer

needs to take to engage in a 'compliant' token offering.  To be clear, a token issuer that *wants* to do

the right thing and comply with the law may get advice from a well known and well-regarded

gatekeeper that is (we believe) simply wrong.  Even if that token issuer speaks to two gatekeepers

that provide different advice, that token issuer often has great difficulty determining which gatekeeper is correct.  That is not normal, and in fact this is largely unprecedented in our experience. Law firms as a whole, and even lawyers within law firms, often disagree about the application in practice of particular securities law provisions (e.g., does a company need to disclose a particular fact, does a particular activity cause a person to become an unregistered broker-dealer, etc.) Lawyers, law firms and other gatekeepers, however, do not typically disagree on, for example, whether the federal securities laws apply at all, or what the analysis is for determining whether instruments are securities.  That, however, is the state of play among gatekeepers in the cryptocurrency markets today. We want to discuss with you how we as responsible gatekeepers can better work in this environment, and things we think the Commission and the Staff can do (in addition to enforcement actions) to promptly and publicly better support responsible gatekeepers. We want to highlight why speed is so important.  We are aware of a large number of cyrptocurrency issuers - or 'token issuers' - that are receiving and often following what we consider to be bad securities law advice." Def. Ex. 201 at SEC-LIT-EMAILS-000342985-6.  The memo further stated: "We are here to inform the Staff about what we consider to be bad, and often dangerous, advice being provided by important cyrptocurrency gatekeepers, and to discuss with the Staff ways in which we believe the Commission and the Staff can: (i) support and reinforce gatekeepers who are acting responsibly; and (ii) help gatekeepers who may be providing bad advice to revise the advice they are providing."

1679.   Under a header reading "Confusion in the Token Markets" (bolded in original), the SEC Meeting Memo observed that "the vast majority of those [prior enforcement] cases have involved 'garden variety' fraud cases" and were inadequate to answer questions that securities lawyers were "often" asked by market participants, such as "[H]as the SEC in effect determined to grandfather tokens that are widely traded and held, much as the Staff has apparently decided that Bitcoin and Ether are not securities?" and "Has the SEC, especially after Director Hinman's Gary Plastics Speech, determined that many tokens are in fact not securities?"  Ex. 201 at SEC-LIT-EMAILS-000342992-93 (emphasis added).

**Response:** The SEC disputes the assertion in ¶ 1679 on the grounds that it mischaracterizes

the evidence. The memo does not state that prior enforcement actions "were inadequate to answer

questions that securities lawyers were 'often' asked by market participants." The full quoted text is as

follows: "We note that the Divison of Enforcement has brought a number of actions against token

issuers, although the vast majority of those cases have involved 'garden variety' fraud cases. There

are a large number of token issuers, many of them well known, that have followed practices

described above, apparently with the support of other gatekeepers.  Gatekeepers such as us are often

asked [the following] questions."

1680.   Until April 3, 2019, the SEC had never granted no-action relief relating to the offer
or sale of a digital asset, although it was requested to do so. Ex. 159, SEC Answer to RFA No. 465;
Ex. 158, SEC Answer to RFA Nos. 475, 480, 481; see also Ex. 140 (███████ Dep. Tr.) at 174:22–
185:5 (SEC's own purported expert witness repeatedly casting doubt on the viability of no-action
relief prior to 2019 during testimony).

**Response:** The SEC does not dispute that it never issued a no-action letter relating to the

offer or sale of a crypto asset prior to April 3, 2019, but disputes the remaining assertions in ¶ 1680

on the grounds that they mischaracterize the testimony of the SEC's expert, ███████ who testified

that the no action process provides "a high degree of comfort for a company to have a statement

from the SEC … because it's from the SEC directly" and that there is a "general practice in the

industry to take these steps to gain comfort and a high degree of confidence about moving forward

without running afoul of the rules and regulations."  Def. Ex. 140 at 183:7-15; 184:16-20. The SEC

further disputes that the cited evidence establishes that the contents of three no-action letter

requests related to the offer or sale of a digital asset. *See* Def. Ex. 158, SEC Answer to RFA Nos.

475, 480, 481.

1681.   On April 3, 2019, the SEC's Strategic Hub for Innovation and Financial Technology
issued a written framework "for analyzing whether a digital asset has the characteristics of one
particular type of security – an 'investment contract.'"  Ex. 226, SEC, Framework for 'Investment
Contract' Analysis of Digital Assets (Apr. 3, 2019), at 1 ("Framework").

**Response:** The SEC does not dispute the assertion in ¶ 1681.

1682.   The Framework stated that a digital asset is less likely to be considered a security if the "distributed ledger network and digital asset are fully developed and operational," if "[h]olders of the digital asset are immediately able to use it for its intended functionality on the network," and "if it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency."  Id. at 7-8.

**Response:** The SEC disputes the assertion in ¶ 1682 on the grounds that it mischaracterizes

the evidence.  The Framework provides a list of eleven characteristics of use or consumption, stating

that "no one" characteristic is "necessarily determinative."  Those factors listed include the

following:

- The distributed ledger network and digital asset are fully developed and operational.
- Holders of the digital asset are immediately able to use it for its intended functionality on the network, particularly where there are built-in incentives to encourage such use.
- The digital assets' creation and structure is designed and implemented to meet the needs of its users, rather than to feed speculation as to its value or development of its network. For example, the digital asset can only be used on the network and generally can be held or transferred only in amounts that correspond to a purchaser's expected use.
- Prospects for appreciation in the value of the digital asset are limited. For example, the design of the digital asset provides that its value will remain constant or even degrade over time, and, therefore, a reasonable purchaser would not be expected to hold the digital asset for extended periods as an investment.
- With respect to a digital asset referred to as a virtual currency, it can immediately be used to make payments in a wide variety of contexts, or acts as a substitute for real (or fiat) currency. This means that it is possible to pay for goods or services with the digital asset without first having to convert it to another digital asset or real currency.
- If it is characterized as a virtual currency, the digital asset actually operates as a store of value that can be saved, retrieved, and exchanged for something of value at a later time.
- With respect to a digital asset that represents rights to a good or service, it currently can be redeemed within a developed network or platform to acquire or otherwise use those goods or services.
- Relevant factors may include:
  - There is a correlation between the purchase price of the digital asset and a market price of the particular good or service for which it may be redeemed or exchanged.
  - The digital asset is available in increments that correlate with a consumptive intent versus an investment or speculative purpose.

43

- An intent to consume the digital asset may also be more evident if the good or service underlying the digital asset can only be acquired, or more efficiently acquired, through the use of the digital asset on the network.
- Any economic benefit that may be derived from appreciation in the value of the digital asset is incidental to obtaining the right to use it for its intended functionality.
- The digital asset is marketed in a manner that emphasizes the functionality of the digital asset, and not the potential for the increase in market value of the digital asset.
- Potential purchasers have the ability to use the network and use (or have used) the digital asset for its intended functionality.
- Restrictions on the transferability of the digital asset are consistent with the asset's use and not facilitating a speculative market.
- If the AP facilitates the creation of a secondary market, transfers of the digital asset may only be made by and among users of the platform.

Def. Ex. 226 a 7-8.

1683.   At the time the Framework was published in 2019, and for years prior, XRP and the XRP Ledger were fully developed and operational.  See Ex. 2, D. Schwartz Decl. ¶ 4.

**Response:** The SEC disputes the assertion in ¶ 1683 on the ground that the phrase "for years prior" is vague and ambiguous.  The SEC further disputes the assertion in ¶ 1683 on the ground that it is not supported by the cited evidence in that Schwartz does not state in his Declaration the XRP Ledger was "fully developed" at any point in time.  The SEC further disputes the assertions in ¶ 1683 as contradicted by record evidence that the XRP Ledger was entirely reset after Ripple's founding, which entailed the loss of some of its original blocks or ledgers.  *See, e.g.*, PX 6 (Schwartz Dep. Tr.) at 32:17-33:10; PX 563, available at https://archive.ph/ebzud.  The SEC further disputes the assertions in ¶ 1683 on the grounds that Ripple and its team of engineers, including Schwartz, have made efforts over the years to correct problems with the XRP Ledger, including on occasion when it stalled and was not "fully operational," and to improve the functionality, stability, and security of the XRP Ledger software. *See* PX 12 (█████Rep.) at 25; PX 7 (Schwartz Inv. Tr.) at 179:16-183:15; PX 6 (Schwartz Dep.) at 112:2-18. *See also* SEC Opp. ¶¶ 13-24.

1684.   At the time the Framework was published in 2019, and for years prior, holders of XRP could immediately use it for its intended functionality on the XRP Ledger.  See Ex. 2, D. Schwartz Decl. ¶ 4.

**Response:** The SEC disputes the assertion in ¶ 1684 on the ground that the phrases "for years prior" and "intended functionality" are vague and ambiguous. The SEC further disputes the assertion in ¶ 1684 on the ground that it is unsupported by the cited evidence, which does not address the "intended functionality" of XRP or the XRP Ledger. *See* Def. Ex. 2 ¶ 4. The SEC further disputes the assertions in ¶ 1684 on the grounds that it is contradicted by record evidence that XRP had no use when it was created other than to validate transactions on the XRP Ledger and, since no one was using the XRP Ledger when it was created, even that was not a use for XRP. PX 7 (Schwartz Inv. Tr.) at 60:12-25; PX 36 (Garlinghouse Inv. Tr.) at 186:17-187:4.

1685.   At the time the Framework was published in 2019, and for years prior, XRP could be immediately used to make payments in a wide variety of contexts and could act as a substitute for fiat currencies. Ex. 221 at RPLI_SEC 0978762; PX 6 at 242:18–243:1; Ex. 167 (collection of more than 3,000 affidavits by individual XRP purchasers, more than 700 of which state: "I have acquired XRP . . . [a]s a form of currency for payment for goods and/or services I provided; and/or . . . [a]s a substitute for fiat currency, utilized as a store of value, and/or to purchase everyday items such as food, clothing, and other retail purchases"); Ex. 3, Osler Rep. ¶¶ 13, 42 ("XRP can be used to pay for physical goods through online platforms including Bitcoin Superstore and Shopify and travel through Travala."); Ex. 5, Adriaens Rep. ¶ 130 (XRP can be used to pay for travel), App'x C (XRP can be used to pay for TOCA Coffee and Beliani Furniture); Ex. 9, Birla Tr. at 257:21-259:2 (using an early Ripple product, "in essence, you could go to this cafe next door and pay for your coffee in," among others, "XRP"); Ex. 20, Long Decl. ¶ 7 (several major charities currently do or have accepted XRP for donations); Ex. 2, D. Schwartz Decl. ¶ 9; ECF No. 124 (proposed intervenors' non-exhaustive list of publicly available use cases for XRP); Ex. 3, Osler Rep. ¶ 42 (noting that ODL has been commercially available since 2019); Affidavit of Eugene Kesselman in Support of Amicus Brief, Oct. 14, 2022, ECF No. 661-1 ¶¶ 18-19, 21 (TapJets Founder and CEO explaining that TapJets began accepting XRP as payment after May 2018); Brief of Amicus Curiae TapJets, Inc. In Support of Defendant Ripple Labs, Inc. Motion for Summary Judgment, Oct. 14, 2022, ECF No. 661 at ECF pp. 4-5, 7-8 (same).

**Response:** The SEC disputes the assertion in ¶ 1685 on the ground that the phrases "for years prior" and "wide variety of contexts" are vague and ambiguous; the cited evidence consists in part of expert opinion and not record facts; Adriaens's opinions cited herein should be excluded for the reasons set forth in the SEC's Motion to Exclude, including because the cited report consists of conclusory claims without factual support; Osler's opinions cited herein should be excluded for the

reasons set forth in the SEC's Motion to Exclude, including because the cited report consists of

conclusory claims without any factual support other than self-serving statements from Ripple's own

promotional materials; the cited evidence offered by proposed intervenors' (D.E. 124) is

inadmissible as the Court has ruled the proposed amici cannot offer evidence (D.E. 372 at 10-11);

and the cited evidence offered by Tapjets in its Amicus Brief is inadmissible as the Court has ruled

the proposed amici cannot offer evidence (D.E. 372 at 10-11). The SEC further disputes the

assertions in ¶ 1685 on the grounds that they are contradicted by record evidence that XRP had no

"uses" when the XRP Ledger was launched, and on the ground that Ripple never sold XRP in

connection with any purported use until mid-2020, when Ripple began selling XRP in connection

with its ODL product, and during which period Ripple also bought the XRP it sold for "use." *See*

SEC Opp. 56.1 ¶¶ 186-207; PX 8 (Ripple RFA Responses) No. 95. The SEC further disputes the

assertions in ¶ 1685 on the  grounds that it is contradicted by record evidence that XRP does not

have the functions or attributes of a currency.  *See* PX 248 ██████ Rebuttal Rep.) (D.E. 548, Ex.

32).

The SEC further disputes the assertion in ¶ 1685 on the ground that it is contradicted by

record evidence, in which Ripple admitted that XRP was "not intended to be used as a currency,"

and Garlinghouse admitted that he does not view XRP as currency. PX 503.13 at 24:8-25:2; PX

503.18 at 20:10-22; PX 503.19 at 8:25-10:1, 17:1-14. The SEC further disputes the assertions on the

ground that Garlinghouse admitted that "99.9 percent of all crypto trading is speculation today" and

"that's true within the XRP community." PX 503.25 at 22:12-17.

The SEC disputes the disputes the legal implications of the assertion in ¶ 1685 on the

ground that Ripple never offered or sold XRP as a currency and Ripple received years of legal advice

that, even if XRP were a currency, it could concurrently be regulated as a virtual currency, a

commodity, and a security. *E.g.*, SEC 56.1 ¶¶ 1010-11; *see also id.* ¶ 1003; PX 245 (Ripple would face an "uphill argument" to establish XRP is exempt from the securities laws as a "currency").

1686.   The differences between the Framework and the Hinman Speech added to confusion and the lack of regulatory clarity among market participants and observers.  PX 241 at ECF p. 4 (Hinman Speech containing "sufficiently decentralized" standard); Ex. 226 (Framework containing no mention of term "sufficiently decentralized"); Ex. 227 (Sept. 2019 CNBC column reporting that the Framework sent "conflicting signals" and created "uncertainty").

**Response:** The SEC disputes the assertion in ¶ 1686 on the ground that it is unsupported by the cited evidence, which it mischaracterized by quoting out of context.  The Hinman Speech did not purport to establish a "'sufficiently decentralized' standard."  Rather, in the speech, Hinman stated: "If the network on which the token or coin is to function is sufficiently decentralized – where purchasers would no longer reasonably expect a person or group to carry out essential managerial or entrepreneurial efforts – the assets may not represent an investment contract. Moreover, when the efforts of the third party are no longer a key factor for determining the enterprise's success, material information asymmetries recede. As a network becomes truly decentralized, the ability to identify an issuer or promoter to make the requisite disclosures becomes difficult, and less meaningful."  PX 241 at 3.  The SEC further disputes the assertion in ¶ 1686 on the grounds that the assertion mischaracterizes the evidence by omitting additional other context in the Hinman Speech, including additional "not exhaustive" factors that market participants could consider when evaluating efforts of a third party in order to determine whether certain transactions qualify as securities transactions. PX 241 at 4-5. *See also* Debevoise Update, SEC Framework and No-Action Letter Provide Guidance on Analyzing Whether a Digital Asset is a Security (Ripple's counsel asserting in April 2019 that "the Framework largely reiterates what market participants already understood to be the relevant factors for determining whether a digital asset is a security" and "largely reiterat[es] prior guidance"), *available at* https://www.debevoise.com/-/media/files/insights/publications/2019/04/20190411_sec_framework_and_no_action_letter.pdf.

The SEC disputes the assertion in ¶ 1686 on the ground that Def. Ex. 227 constitutes inadmissible hearsay.  The SEC further disputes the implication that Def. Ex. 227, a CNBC column, reflects the views of uninterested "market participants and observers," as contradicted by record evidence that Ripple's lobbying firm specifically "engaged" the author of the column to "raise awareness amongst [his] former colleagues and to *even reset the conversation when needed*." PX 553 at RPLI_SEC 0595022 (emphasis added).

1687.    Between June 2017 and December 2020, sophisticated market participants—including digital asset exchanges, financial institutions, investment firms, and digital asset market makers—reached the conclusion that XRP was likely not a security.  See, e.g., Ex. 228 at SEC-LIT-EPROD-000738402, -8422 (Dec. 2017 letter from global asset management firm to SEC based on legal analysis from well-respected law firm concluding that XRP was not a security); Ex. 229 at SEC-LIT-EPROD-000038987 (Feb. 2019 email from Coinbase to SEC sharing legal assessment concluding XRP was likely not a security); Ex. 220 at SEC-LIT-EMAILS-000460257 (Apr. 2019 legal memo from well-respected law firm for investment firm concluding that XRP was not a security); Ex. 230 at RPLI_SEC 1094857 (Nov. 2019 legal memo for digital asset market maker concluding that XRP was likely not a security).

**Response:** The SEC disputes the assertion in ¶ 1687 on the grounds that the term "sophisticated market participants" is vague and ambiguous.  The SEC disputes the assertion in ¶ 1687 on the ground that the evidence cited does not support the assertion.  In Def. Ex. 228, an investment fund represented to the SEC that its manager concluded XRP should not be treated as a security, although acknowledging that "XRP was inititally issued in an ICO" and relying on the incorrect factual assumption that "XRP exists primarily as a necessary input for the Ripple Network." *Id.* at SEC-LIT-EPROD-000738402-03. *See*  PX 503.25 at 22:12-17 (Garlinghouse admitting that "99.9 percent of all crypto trading is speculation today" and "that's true within the XRP community").  Def. Ex. 228 acknowledged the SEC might reach a different conclusion regarding XRP's status under the securities laws on the same facts.  *See id.* at SEC-LIT-EPROD-000738403 ("We also point out that to declare the [client] Fund's registration statement effective, the SEC need not take a position on whether … XRP is a security.").  The analysis in Def. Ex. 228 also

relied on incomplete facts regarding Ripple's sales of XRP, entirely omitting those sales to retail

purchasers on crypto asset exchanges. *See id.* at SEC-LIT-EPROD-000738416-17.

Def. Ex. 229 also contradicts the assertion in ¶ 1687, as it reflects that Coinbase determined

that "XRP has an elevated legal risk score of 4.25 under our scoring system, which per our internal

███████ process, prompted hightened scrutiny and diligence of XRP by both the legal department

and senior leadership.  Our review process concluded that XRP may pose an elevated risk of being

deemed a security in comparison to other digital assets that we currently support." DX 229 at SEC-

LIT-EPROD-000038987.

The SEC further disputes the assertion in ¶ 1687 on the ground that Def. Ex. 220, an April

2019 legal memorandum, is mischaracterized because it is quoted out of context—the memorandum

itself recognizes its analysis was limited to publicly available information.  *See* Def. Ex. 220 (the

analysis of whether XRP "should be treated as a 'security' under the federal securities laws" was

"based on information that we have been able to obtain from the public record.  Because the

analysis in this memorandum is heavily fact dependent, to the extent the information we have relied

upon is erroneous, or to the extent additional information exists that we have not considered but

that bears upon the analysis contained herein, the conclusions contained in this memorandum may

require modification").

The SEC further disputes that Def. Ex. 220 supports the assertions in ¶ 1672 on the grounds

that the conclusions contained therein rely upon inaccurate "facts."  *Compare, e.g.*, Def. Ex. 220 at 4

("even those participants who purchased XRP directly from Ripple Labs were expected to be

purchasing XRP for use, not for investment") *with* D.E. 663 ¶ 744 (undisputed that "[b]efore

approximately May 2020, Ripple did not sell XRP to ODL customers for their use in ODL

transactions"); *compare also* Def. Ex. 220 at ("Ripple Labs did not arrange for immediate secondary-

market trading of XRP") *with* D.E. 663 ¶ 1198 (undisputed that six exchanges "had contracts with Ripple related to their listing of XRP").

The SEC further disputes the assertion in ¶ 1687 on the ground that it mischaracterizes the conclusions within Def. Ex. 230, which was: "Based on the foregoing facts, representations, statements and assumption being correct at all relevant times and based on the discussion and analysis above, and subject to the comments, assumptions, reservations and qualifications in this letter, it is our understanding that, under presently reported rulings and statutes applicable to cases involving digital assets, securities and broker-dealers, it is more likely than not that Ripple's XRP will not be considered a security…." Def. Ex. 230 at RPLI_SEC 1094857.

The SEC further disputes the assertion in ¶ 1687 on the ground that it mischaracterizes the evidence with respect to Def. Ex. 230 by omitting that the firm's analysis regarding XRP's status under the securities laws relied wholly on assumptions provided by the firm's client, a self-interested market actor, without testing those assumptions or performing any additional inquiry. *See* Def. Ex. 230 at RPLI_SEC 109843 ("In rendering the analysis expressed below, we have assumed and/or relied upon, without any additional inquiry, the accuracy of the information provided by [client], the accuracy of the facts and descriptions set forth herein, and the accuracy and adequacy of the statements and representations made to us with respect to the factual matters set forth herein. For all purposes of this letter, we have assumed that the Factual Assumptions are true and accurate as of the date of this letter, and this office has taken, and will take, no independent steps to verify the accuracy of those statements.").

1688.   Some market participants shared with the SEC their legal analysis concluding that XRP was likely not a security. See, e.g., Ex. 228 at SEC-LIT-EPROD-000738402, -8422 (Dec. 2017 letter from global asset management firm to SEC based on legal analysis from well-respected law firm concluding that XRP was not a security); Ex. 229 at SEC-LIT-EPROD-000038987 (Feb. 2019 email from Coinbase to SEC sharing legal assessment concluding XRP likely was not a security); Ex. 158, SEC Answers to RFA Nos. 677, 678 (Apr. 2019 legal opinion from well-respected law firm for

digital asset investment firm provided to SEC); Ex. 230 at RPLI_SEC 1094857 (digital asset market maker provided Nov. 2019 legal opinion to SEC concluding that XRP likely not a security).

**Response:** The SEC does not dispute that SEC staff members received the documents cited in ¶ 1688 but disputes the remaining assertions on the grounds that the terms "some market participants" is vague and ambiguous and on the grounds that the assertion that "market participants" concluded that "XRP was likely not a security" mischaracterizes the evidence. In Def. Ex. 228, an investment fund represented to the SEC that its manager concluded XRP should not be treated as a security, although acknowledging that "XRP was inititally issued in an ICO" and relying on the incorrect factual assumption that "XRP exists primarily as a necessary input for the Ripple Network." *Id.* at SEC-LIT-EPROD-000738402-03. *See* PX 503.25 at 22:12-17 (Garlinghouse admitting that "99.9 percent of all crypto trading is speculation today" and "that's true within the XRP community"). Def. Ex. 228 acknowledged the SEC might reach a different conclusion regarding XRP's status under the securities laws on the same facts. *See id.* at SEC-LIT-EPROD-000738403 ("We also point out that to declare the [client] Fund's registration statement effective, the SEC need not take a position on whether … XRP is a security."). The analysis in Def. Ex. 228 also relied on incomplete facts regarding Ripple's sales of XRP, entirely omitting those sales to retail purchasers on crypto asset exchanges. *See id.* at SEC-LIT-EPROD-000738416-17.

Def. Ex. 229 also contradicts the assertion in ¶ 1688, as it reflects that Coinbase determined that that "XRP has an elevated legal risk score of 4.25 under our scoring system, which per our internal ███ process, prompted hightened scrutiny and diligence of XRP by both the legal department and senior leadership. Our review process concluded that XRP may pose an elevated risk of being deemed a security in comparison to other digital assets that we currently support." DX 229 at SEC-LIT-EPROD-000038987.

The SEC further disputes the assertion in ¶ 1688 on the ground that Def. Ex. 220, an April 2019 legal memorandum, is mischaracterized because it is quoted out of context—the memorandum

itself recognizes its analysis was limited to publicly available information. *See* Def. Ex. 220 (the analysis of whether XRP "should be treated as a 'security' under the federal securities laws" was "based on information that we have been able to obtain from the public record. Because the analysis in this memorandum is heavily fact dependent, to the extent the information we have relied upon is erroneous, or to the extent additional information exists that we have not considered but that bears upon the analysis contained herein, the conclusions contained in this memorandum may require modification").

The SEC further disputes that Def. Ex. 220 supports the assertions in ¶ 1688 on the grounds that the conclusions contained therein rely upon inaccurate "facts." *Compare, e.g.*, Def. Ex. 220 at 4 ("even those participants who purchased XRP directly from Ripple Labs were expected to be purchasing XRP for use, not for investment") *with* D.E. 663 ¶ 744 (undisputed that "[b]efore approximately May 2020, Ripple did not sell XRP to ODL customers for their use in ODL transactions"); *compare also* Def. Ex. 220 at ("Ripple Labs did not arrange for immediate secondary-market trading of XRP") *with* D.E. 663 ¶ 1198 (undisputed that six exchanges "had contracts with Ripple related to their listing of XRP").

The SEC further disputes the assertion in ¶ 1688 on the ground that it mischaracterizes the conclusions within Def. Ex. 230, which was: "Based on the foregoing facts, representations, statements and assumption being correct at all relevant times and based on the discussion and analysis above, and subject to the comments, assumptions, reservations and qualifications in this letter, it is our understanding that, under presently reported rulings and statutes applicable to cases involving digital assets, securities and broker-dealers, it is more likely than not that Ripple's XRP will not be considered a security…." Def. Ex. 230 at RPLI_SEC 1094857.

The SEC further disputes the assertion in ¶ 1688 on the ground that it mischaracterizes the evidence with respect to Def. Ex. 230 by omitting that the firm's analysis regarding XRP's status

under the securities laws relied wholly on assumptions provided by the firm's client, a self-interested

market actor, without testing those assumptions or performing any additional inquiry.  *See* Def. Ex.

230 at RPLI_SEC 109843 ("In rendering the analysis expressed below, we have assumed and/or

relied upon, without any additional inquiry, the accuracy of the information provided by [client], the

accuracy of the facts and descriptions set forth herein, and the accuracy and adequacy of the

statements and representations made ot us wwith respect to the factual matters set forth herein.  For

all purposes of this letter, we have assumed that the Factual Assumptions are true and accurate as of

the date of this letter, and this office has taken, and will take, no independent steps to verify the

accuracy of those statements.").

1689.   In December 2017, representatives from a global asset management firm met in
person with SEC staff members concerning a new "investment fund that holds a market-weighted
group of digital assets, initially bitcoin, ether, and XRP," and shared with the SEC its legal analyses
supporting the conclusion that XRP is not a security.  Ex. 228 at SEC-LIT-EPROD-000738402
(Dec. 15, 2017 letter to SEC concluding "that none of bitcoin, ether or XRP should be considered
an investment contract and none should therefore be treated as a security"); Ex. 158, SEC Answers
to RFA Nos. 760, 773; Ex. 231 at SEC-LIT-EPROD-000738360 (Dec. 2017 memo from well-
respected law firm concluding XRP should not be treated as security because, inter alia, "ownership
of XRP, like ownership of BTC and ETH, does not involve a 'common enterprise with profits to
come solely from the efforts of others.'"); Ex 278 at SEC-LIT-EPROD-000738336 (April 16, 2018
letter to SEC staff from well-respected law firm on behalf of global asset management firm stating:
"XRP is designed to have primarily consumptive uses, rather than serve as an investment vehicle.").

**Response:** The SEC does not dispute that on December 15, 2017, at least one SEC staff

member met with at least one ███████ representative, and that the SEC received the documents

marked Def. Exs. 228, 231, and 278, which reflect a single law firm's legal analysis regarding XRP

that it performed for its client, an investment fund, but disputes the remaining assertions on the

grounds that they mischaracterize the evidence by selectively quoting from the cited documents

without providing necessary context. In Def. Ex. 228, an investment fund represented to the SEC

that its manager concluded XRP should not be treated as a security, although acknowledging that

"XRP was initially issued in an ICO" and relying on the incorrect factual assumption that "XRP

exists primarily as a necessary input for the Ripple Network." *Id.* at SEC-LIT-EPROD-000738402-03. *See* PX 503.25 at 22:12-17 (Garlinghouse admitting that "99.9 percent of all crypto trading is speculation today" and "that's true within the XRP community"). Def. Ex. 228 acknowledged the SEC might reach a different conclusion regarding XRP's status under the securities laws on the same facts. *See id.* at SEC-LIT-EPROD-000738403 ("We also point out that to declare the [client] Fund's registration statement effective, the SEC need not take a position on whether … XRP is a security."). The analysis in Def. Ex. 228 also relied on incomplete facts regarding Ripple's sales of XRP, entirely omitting those sales to retail purchasers on crypto exchanges. *See id.* at SEC-LIT-EPROD-000738416-17.

The SEC further disputes the assertions in ¶ 1689 as relying on citations to legal conclusions, and not record facts. *See* Def. Ex. 231 at SEC-LIT-EPROD-000738360 (articulating legal conclusion regarding "common enterprise" element of *Howey*).

The SEC further disputes the citation to Def. Ex. 278 regarding XRP's "design" for consumption as contradicted by record facts. *See, e.g.*, PX 503.25 at 22:12-17 (Garlinghouse admitting that "99.9 percent of all crypto trading is speculation today" and "that's true within the XRP community").

1690.   During the December 2017 meeting referenced in Paragraph 1689, no one from the SEC told the global asset management firm that XRP was a security.  Ex. 158, SEC Answers to RFA Nos. 766, 767.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1690.

1691.   Subsequent to the meeting with the SEC in 2017 referenced in Paragraph 1689, the global asset management firm purchased XRP from Ripple. *See, e.g.*, Ex. 232, RPLI_SEC 0102900.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1691.

1692.   On February 14, 2019, Coinbase, a major U.S.-based digital asset exchange, sent its legal analysis concluding that XRP was not a security under the federal securities laws to SEC officials in advance of listing XRP on its trading platform. Ex. 229, SEC-LIT-EPROD-000038987-88.  In a cover email to the SEC summarizing the legal analysis, a Coinbase representative wrote: "Our review process also identified, in consultation with outside counsel, credible arguments that

XRP is not a security and thus may permissibly be listed on our U.S. trading platform." *Id.* at SEC-LIT-EPROD-000038987.

> **Response:** The SEC does not dispute that Coinbase sent SEC staff an email attaching Coinbase's "XRP legal assessment" on February 14, 2019 or that the quoted text appears in Defendants' Exhibit 229.  The SEC disputes the remaining assertions in ¶ 1692 on the grounds that they are unsupported by the cited evidence and omit language that shows that Coinbase did not "conclude[e] that XRP was not a security," but rather determined, applying Coinbase's scoring system, that XRP had a "*Howey* score" and "Overall legal score" each of 4.25 out of 5 (with 5 being most likely to be considered a security).  Defendants' Exhibit 229 further states: "XRP has an elevated legal risk score of 4.25 under our scoring system, which, per our internal ███████ process, prompted heightened scrutiny and diligence of XRP by both the legal department and senior leadership.  Our review process concluded that XRP may pose an elevated risk of being deemed a security in comparison to other digital assets that we currently support.  Our review process also identified, in consultation with outside counsel, credible arguments that XRP is not a security and thus may permissibly be listed on our U.S. trading platform."  Def. Ex. 229 at 38987-89.

1693.    On February 28, 2019, Coinbase listed XRP on its U.S. trading platform.  Ex. 116.

> **Response:** The SEC does not dispute the assertions contained in ¶ 1693.

1694.    The SEC did not inform Coinbase that it considered transactions in XRP to involve securities.  Ex. 158, SEC Answer to RFA No. 619.

> **Response:** The SEC does not dispute the assertions contained in ¶ 1694.

1695.    Coinbase continued to list XRP on its U.S. trading platform through the end of 2020, and de-listed XRP only after the filing of the complaint in this action.  Ex. 233, *Coinbase will suspend trading in XRP on January 19*, Coinbase Blog (December 28, 2020).

> **Response:** The SEC does not dispute the factual assertions contained in ¶ 1695.

1696.    On or about March 6, 2018, a digital asset investment company launched an investment trust that managed XRP holdings ("XRP Investment Trust").  Ex. 234.

**Response:** The SEC does not dispute the assertions contained in ¶ 1696.

1697.   Between 2018 and 2020, the SEC was aware that the digital asset investment company referenced in Paragraph 1696 had an investment vehicle that transacted in XRP.  Ex. 158, SEC Answer to RFA No. 693.

**Response:** The SEC does not dispute that certain SEC employees became aware in 2018 that ███████ had an investment vehicle that transacted in XRP and disputes the remaining assertions in ¶ 1697 as unsupported by the cited evidence.

1698.   On April 8, 2019, the digital asset investment company referenced in Paragraph 1696 obtained a legal opinion from a well-respected law firm in connection with the XRP Investment Trust that concluded that there were "reasonable grounds to conclude that XRP does not satisfy all the elements of the *Howey* Analysis and is therefore not a 'security' for purposes of the federal securities laws."  Ex. 220, SEC-LIT-EMAILS-000460257.

**Response:** The SEC does not dispute that the investment firm referenced in this paragraph obtained the referenced legal opinion or that the quoted text appears in Defendants' Exhibit 220. The SEC disputes the remaining assertions in ¶ 1698 on the grounds that the cited evidence, an April 2019 legal memorandum, is mischaracterized because it is quoted out of context. The memorandum itself recognizes its analysis was limited to publicly available information.  *See* Def. Ex. 220 at 1 (the analysis of whether XRP "should be treated as a 'security' under the federal securities laws" was "based on information that we have been able to obtain from the public record.  Because the analysis in this memorandum is heavily fact dependent, to the extent the information we have relied upon is erroneous, or to the extent additional information exists that we have not considered but that bears upon the analysis contained herein, the conclusions contained in this memorandum may require modification").

The SEC further disputes the assertion that Defendants' Exhibit 220 supports the assertions in ¶ 1698 on the grounds that the conclusions contained therein rely upon inaccurate "facts." *Compare, e.g.*, Def. Ex. 220 at 4 ("even those participants who purchased XRP directly from Ripple Labs were expected to be purchasing XRP for use, not for investment") *with* D.E. 663 ¶ 744 (undisputed that "[b]efore approximately May 2020, Ripple did not sell XRP to ODL customers for

56

their use in ODL transactions"); *compare also* Def. Ex. 220 at 5 ("Ripple Labs did not arrange for immediate secondary-market trading of XRP") *with* D.E. 663 ¶ 1198 (undisputed that six exchanges "had contracts with Ripple related to their listing of XRP").

1699.   The legal opinion referenced in Paragraph 1698 was authored by a lawyer whom Hinman testified was a respected member of the securities bar.  PX 258 (Hinman Dep. Tr.) at 205:1-3.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1699.

1700.   The SEC received a copy of the legal opinion referenced in Paragraph 1698 and advising that XRP was not a security.  Ex. 158, SEC Answer to RFA Nos. 677, 678.

**Response:** The SEC does not dispute that, as of August 23, 2019, certain SEC staff members received a copy of the legal opinion referenced in paragraph 1698. *See* Def. Ex. 158, SEC Answer to RFA No. 677. The SEC disputes Defendants' characterization of the evidence in ¶ 1700 on the grounds that the legal opinion did *not* advise "that XRP was not a security" and instead merely concluded: "that there are reasonable grounds for determining that XRP does not satisfy each prong of the *Howey* test, and thus there are reasonable grounds for concluding that XRP should not be considered an 'investment contract' or 'security' within the meaning of the Securities Act or the Exchange Act." *See* Def. Ex. 220 at 2.

The SEC further disputes the assertions in ¶ 1700 that the legal opinion "advis[ed] that XRP was not a security" on the ground that the referenced memorandum itself recognizes its analysis was limited to publicly available information.  *See* Def. Ex. 220 at 1 (the analysis of whether XRP "should be treated as a 'security' under the federal securities laws" was "based on information that we have been able to obtain from the public record.  Because the analysis in this memorandum is heavily fact dependent, to the extent the information we have relied upon is erroneous, or to the extent additional information exists that we have not considered but that bears upon the analysis contained herein, the conclusions contained in this memorandum may require modification").

The SEC further disputes the assertions in ¶ 1700 that the legal opinion "advis[ed] that XRP was not a security" on the ground that the referenced memorandum's conclusions rely upon inaccurate "facts." *Compare, e.g.,* Def. Ex. 220 at 4 ("even those participants who purchased XRP directly from Ripple Labs were expected to be purchasing XRP for use, not for investment") *with* D.E. 663 ¶ 744 (undisputed that "[b]efore approximately May 2020, Ripple did not sell XRP to ODL customers for their use in ODL transactions"); *compare also* Def. Ex. 220 at 5 ("Ripple Labs did not arrange for immediate secondary-market trading of XRP") *with* D.E. 663 ¶ 1198 (undisputed that six exchanges "had contracts with Ripple related to their listing of XRP").

1701.   On or about November 22, 2019, MoneyGram, Inc. ("MGI"), a cross-border payments and money transfer firm, submitted a letter to the SEC seeking pre-clearance of its accounting treatment of certain payments MGI received from Ripple in XRP in connection with MGI's use of ODL.  Ex. 158, SEC Answer to RFA No. 998.

**Response:**  The SEC does not dispute that its Office of the Chief Accountant received the letter referenced in ¶ 1701 on or about November 22, 2019. The SEC disputes Defendants' characterization of the evidence in ¶ 1701 on the grounds that the letter requested "pre-clearance from the [SEC's] Office of the Chief Accountant…of [MoneyGram, Inc.'s] accounting treatment related *to fees received from Ripple* Services Inc. ('Ripple') *to transact in the XRP cryptocurrency*." *See* Def. Ex. 158, SEC Answer to RFA No. 998 (emphasis added).

1702.   The MGI letter explained that MGI would receive certain payments from Ripple to support its use of XRP in certain transactions, that MGI would transact in XRP daily, and that the payments would vary depending on the volume of MGI's XRP transactions.  Ex. 158, SEC Answers to RFA Nos. 999–1001.

**Response:** The SEC does not dispute that the referenced letter requested pre-clearance from the SEC's Office of the Chief Accountant regarding MGI's "accounting treatment related to fees received from Ripple Services Inc. ('Ripple') to transact in the XRP cryptocurrency," and that the letter started in part: (i) "MoneyGram is providing the XRP marketplace with liquidity by executing purchases and sales of XRP on a daily basis in third-party exchanges. MoneyGram is being compensated by Ripple in XRP based on the amount of fiat currency transacted through the ODL

platform"; and (ii) "Depending on the volume of USD equivalent purchases of XRP ('Transaction Volume') that MoneyGram transacts during the term of the Commercial Agreement, Ripple Services will pay MPSI certain amounts of XRP as set forth in the Commercial Agreement." *See* Def. Ex. 158, SEC Answer to RFA No. 1001. The SEC disputes the remaining assertions contained in ¶ 1702 on the ground that the cited evidence does not support them.

1703.   The MGI letter attached the agreements that MGI had at that time entered with Ripple with respect to its use of the ODL product.  Ex. 158, SEC Answer to RFA No. 1002.

**Response:** The SEC disputes the assertions contained in ¶ 1703 on the ground that the cited evidence does not support the fact asserted. The cited evidence merely shows that the MGI letter had four attachments, including one labeled "Master Hosted Services Agreement." *See* Def. Ex. 158, SEC Answer to RFA No. 1002.

1704.   In and after November 2019, MGI continued to communicate with SEC staff members about the accounting treatment of the payments described in its initial letter.  Ex. 158, SEC Answer to RFA No. 1004.

**Response:** The SEC does not dispute that certain SEC staff members communicated with MoneyGram regarding the accounting treatment for certain payments MoneyGram received from Ripple, and disputes the remaining assertions contained in ¶ 1704 on the ground that the cited evidence does not support them.

1705.   MGI's proposed accounting treatment of XRP did not treat XRP as a security.  Ex. 171, Expert Report of Peter Easton (Oct. 4, 2021) ¶¶ 77–79.

**Response:** The SEC disputes the assertions contained in ¶ 1705 on the ground that the assertions are not supported by citation to evidence which would be admissible. The material cited to support the fact asserted, Easton's expert report (Def. Ex. 171), is not admissible for the reasons set forth in the SEC's motion to exclude (D.E. 536), including that Easton's opinions regarding XRP's accounting treatment are irrelevant to any claim or defense, and the assertions are opinions of a purported expert and not facts.

1706.   The SEC never objected to MGI's accounting treatment of XRP as presented in MGI's filings with the SEC, and it never informed MGI that XRP was a security or that MGI was violating the federal securities laws by engaging in transactions in XRP.  Ex. 158, SEC Answers to RFA Nos. 1006–1007.

**Response:** The SEC disputes the assertions contained in ¶ 1706 on the ground that the

cited evidence does not support the assertion that the SEC "never objected to MGI's accounting

treatment of XRP as presented in MGI's filings with the SEC." *See* Def. Ex. 158, SEC Answer to

RFA Nos. 1006-1107.

1707.   After November 2019, MGI continued to receive certain payments from Ripple to support its use of XRP in certain transactions and continued to transact in XRP in connection with its use of the ODL product.  *See* Ex. 235, Team Ripple, *Bitso and Ripple Are Delivering Friction-Free Exchange Across Latin America*, RIPPLE INSIGHTS (Mar. 5, 2020).

**Response:** The SEC disputes the assertions contained in ¶ 1707 on the ground that the

cited evidence does not support the facts asserted.  The cited evidence's only reference to MGI

[MoneyGram] is a statement by a crypto asset trading platform that the platform is "MoneyGram's

key exchange partner for remittances to Mexico." *See* Def. Ex. 235 at 3/7.

1708.   Bittrex is a digital asset exchange that listed XRP on its platform as of January 29, 2018.  Ex. 275, SEC Answer to RFA No. 248.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1708.

1709.   On or about January 29, 2018, representatives from Bittrex met with SEC officials for an in-person discussion ("Bittrex-SEC Meeting").  Ex. 236, ███████████ 0000027; Ex. 275, SEC Answer to RFA No. 238.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1709.

1710.   During the Bittrex-SEC Meeting, none of the SEC attendees expressed the view that XRP was a security, nor did any SEC attendee express the view that Bittrex should de-list XRP or consider de-listing XRP.  Ex. 275, SEC Answer to RFA No. 250-253.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1710, but states

that given the confidential nature of the SEC's investigation of Defendants, and the SEC's

prohibition against providing legal advice, it would have been improper for SEC staff to make the

statements referenced in ¶ 1710. *See* Def. Ex. 275, SEC Answer to RFA Nos. 250-253.

1711.   After the January 29, 2018 meeting with the SEC, Bittrex continued to list XRP until after the filing of the complaint in this action.  Ex. 237, Bittrex, *XRP market removal 01/15/2021*, BITTREX ZENDESK.

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1711.

1712.   The SEC received at least 57 unique inquiries from market participants between 2018 and 2020 about the regulatory status of XRP and never indicated in response to any of them that XRP was a security.  Ex. 159, SEC Answers to RFA Nos. 319–320, 343-344; Ex. 158, SEC Answers to RFA Nos. 322–337, 342, 345–439; *see also* Ex. 158, SEC Answer to RFA No. 560 (admitting that, prior to December 22, 2020, the SEC never publicly stated that it considered transactions in XRP to involve securities).

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1712, but states

that the cited evidence additionally provides that "SEC employees are not authorized to provide to

third parties any legal advice or opinion regarding the application of the securities laws to offers or

sales of any digital asset, including XRP." *See* Def. Ex. 158, SEC Answer to RFA Nos. 322–337, 342,

345–439. The SEC adds that many of the emails referenced in this paragraph were sent directly to

then-SEC Chair Clayton, who did not respond to the emails, and that a reasonable market

participant would not necessarily expect the head of the SEC to respond to individual investor

inquiries. *Id.*, SEC Answer to RFA Nos. 360, 363, 366, 369, 372, 375, 378, 381, 384, 387, 390, 393,

396, 399, 402, 405, 408, 411, 414, 417. The SEC additionally notes that federal regulations and the

SEC Enforcement Manual prohibited SEC staff from disclosing the nonpublic investigation into

Defendants that was ongoing at the time the SEC received the inquires referenced in this paragraph.

*See* 17 C.F.R. § 203.5 ("Unless otherwise ordered by the Commission, all formal investigative

proceedings shall be non-public."); SEC Enforcement Manual,

https://www.sec.gov/divisions/enforce/enforcementmanual.pdf, at 107 ("Since information

obtained or generated during [SEC] investigations is generally confidential, the staff should ensure

that its public statements and releases do not inadvertently disclose non-public information.").

1713.   On or about February 18, 2020, the SEC Division of Enforcement informed Ripple and Brad Garlinghouse, in written correspondence, that its pending investigation into Ripple "does not mean that we have concluded that anyone has violated the law."  ECF No. 172-1 at ECF p. 4.

**Response:** The SEC does not dispute that the letter referenced in ¶ 1713 contains the quoted text, but notes that the referenced letter was a form cover letter enclosing an investigative subpoena for documents and testimony directed to Garlinghouse. ECF No. 172-1 at ECF pp. 2-5.

1714.    As late as October 21, 2020, the SEC informed market participants in written correspondence that it had not made "a determination on whether the cryptocurrency XRP is a security" and would not comment on "whether the SEC will make a determination as to whether XRP is a security." Ex. 165; *see also* Ex. 238, RPLI_SEC 0580037 (Aug. 2019 email from Ripple business partner to Larsen and Garlinghouse reporting on meeting with Commissioner Peirce and her counsel, in which Peirce was asked "whether XRP is defined as coins or securities," and Peirce responded "that it will take a very long time for SEC to make this decision").

**Response:** The SEC disputes the assertions contained in ¶ 1714 on the ground that the cited evidence does not support the facts asserted. The only "written correspondence" from the SEC regarding XRP cited in support of this paragraph are emails between a single person and SEC staff in October 2020. *See* Def. Ex. 165. As for the other evidence cited in support of this paragraph (Def. Ex. 238), that email contains inadmissible hearsay, as it purports to describe statements made by an SEC Commissioner at a meeting the email's author did not attend. *See* Def. Ex. 238 ("█████ █████] had a meeting with Ms. Hester Peirce, Commissioner…He would like to share the discussions they had during the meeting as below….").  The SEC additionally notes that federal regulations and the SEC Enforcement Manual prohibited SEC staff from disclosing the nonpublic investigation into Defendants that was ongoing at the time the SEC received the inquires referenced in this paragraph. *See* 17 C.F.R. § 203.5 ("Unless otherwise ordered by the Commission, all formal investigative proceedings shall be non-public."); SEC Enforcement Manual, https://www.sec.gov/divisions/enforce/enforcementmanual.pdf, at 107 ("Since information obtained or generated during [SEC] investigations is generally confidential, the staff should ensure that its public statements and releases do not inadvertently disclose non-public information.").

1715.    As of December 2020, none of the more than 200 digital asset exchanges that listed XRP was registered with the SEC for the purpose of facilitating trading in digital assets.  *See* PX 81 at 300:23-25; Ex. 158, SEC Answer to RFA No. 570; Ex. 239, Team Ripple, *Q4 2020 XRP Markets Report*, RIPPLE INSIGHTS (Feb. 5, 2021).

**Response:** The SEC does not dispute the factual assertions contained in ¶ 1715.

1716.    SEC Commissioners have acknowledged the lack of regulatory clarity provided by the SEC regarding digital assets, including the following:

(a) On November 24, 2018, Commissioner Peirce stated, "One thing that I really would like to emphasize is that I think we're bringing enforcement actions, but we also need to provide some guidance that doesn't come in the form of enforcement.  And so I'm eager for us to maybe provide some guidance that comes in the form of guidance, not actually in enforcement action because I don't think that's the best way for people to understand our thinking."  Ex. 240, What Bitcoin Did podcast (Nov. 24, 2018), https://www.whatbitcoindid.com/podcast/the-secs-hester-peirce-on-regulating-cryptocurrencies.

(b) In April 2019, Commissioner Robert Jackson spoke publicly to an audience at the New York Financial Writers' Association and asked an audience member the following question about the SEC's position on the status of digital assets under the U.S. securities laws: "Do you think we've been clear enough about that?"  The audience member responded, "No," and Jackson said, "Yeah, yeah, I expected you'd say that."  Ex. 241 at RPLI_SEC 1141319.

(c) In June 2019, Commissioner Jackson publicly stated, "we have to take principles that are 80 years old, 90 years old, and apply them to this brand-new technology.  And we often disagree about exactly how to do that."  Ex. 242 at RPLI_SEC 1141366-67.

(d) In March 2021, Commissioner Peirce stated that "one of the main questions posed to the SEC [is] when is a digital asset a security?  Despite the frequency with which this question is asked, clear answers are rare.  The breadth of our statutory definition of the term 'security' and the complexity of the guidance the Commission has provided contribute to this lack of clarity. . . . The SEC staff has provided guidance to help people make these determinations, but the guidance is difficult to apply. . . ."  Ex. 244, Hester M. Peirce, Paper, Plastic, Peer-to-Peer, SEC (March 15, 2021).

(e) In July 2021, Commissioners Peirce and Roisman wrote that "[t]here is a decided lack of clarity for market participants around the application of the securities laws to digital assets and their trading[.]"  Ex. 245, Commissioner Hester M. Peirce and Elad Roisman, In the Matter of Coinschedule, SEC (July 14, 2021).

(f) In October 2021, Commissioner Peirce gave a speech in which she stated: "A fundamental area of conflict between the SEC and the public is how much legal clarity there is around digital assets …. The idea that there is clarity as to when crypto assets are securities must come as a surprise to the lawyers advising crypto projects that have struggled with this issue for years." *See* Ex. 246, Hester M. Peirce, Lawless in Austin, SEC (Oct. 8, 2021).

(g) In March 2022, Commissioner Peirce stated: "The Commission has refused, despite many pleas over many years, to provide regulatory guidance about how our rules apply to crypto-assets, so some of the responsibility for the lack of legal and regulatory clarity lies at our doorstep."  Ex. 247, Commissioner Hester M. Peirce, Response to Staff Accounting Bulletin No. 121, SEC (Mar. 31, 2022).

(h) In September 2022, Commissioner Uyeda stated: "Today, one big, difficult, and complex issue that is conspicuously absent from the Commission's published regulatory

agenda is how to regulate crypto assets and related services.  Market participants have expressed significant concerns regarding the lack of regulatory guidance in this space.  There is a widespread concern that the lack of predictability with regard to our regulation may encourage crypto firms to relocate to other jurisdictions." Ex. 243, Commissioner Mark T. Uyeda, "Remarks at the 'SEC Speaks' Conference 2022."

**Response:** The SEC disputes the assertions contained in ¶ 1716 on the ground that the

cited evidence does not support the facts asserted. While the SEC does not dispute that SEC

Commissioners made statements that included the excerpts quoted in this paragraph, the quotes

from the relevant time period (before this lawsuit) do *not* "acknowledge[] the lack of regulatory

clarity provided by the SEC regarding digital assets." (*See* subparagraphs (a), (b), and (c)). The SEC

further disputes the assertions in ¶ 1716 on the ground that the remaining quotes cited in support of

this paragraph post-date the filing of this lawsuit, and are accordingly irrelevant to any claims or

defenses. (*See* subparagraphs (d)-(h)). The SEC further asserts that the SEC takes action if the

majority of voting Commissioners agree on an issue, such that the views of dissenting

Commissioners cannot prevent agency action and are irrelevant to any claims or defenses in this

lawsuit.

1717.   Members of Congress have spoken about the lack of regulatory clarity regarding digital assets. *See, e.g.*, Ex. 248 (U.S. Rep. Tom Emmer stating in March 2021 that "[w]e just need more clarity, period … There's just an unreasonable level of uncertainty with the way the federal securities laws should be applied to transactions involving the sale of blockchain-based tokens."); Ex. 200 at SEC-SEC-E-0000120 (SEC-LIT-EMAILS-000470683) (Dec. 2017 letter from Sen. Ron Wyden to Chair Clayton urging "clear and consistent guidance"); Ex. 175 (Oct. 2022 letter from Sen. Hickenlooper to Chair Gensler stating that a "formal regulatory process is needed now" for digital assets and "urg[ing] the SEC to issue regulations for digital asset securities through a transparent notice-and-comment regulatory process.").

**Response:** The SEC disputes the assertions contained in ¶ 1717 on the ground that the

cited evidence does not support the fact asserted. While the SEC does not dispute that three

Members of Congress made statements that included the excerpts quoted in this paragraph, only the

first quote addresses "regulatory clarity" and that quote, along with the third quote, post-dates the

filing of this lawsuit and is accordingly irrelevant to any claims or defenses. (*See* subparagraphs (a),

(c)). The SEC additionally notes that the views of individual Members of Congress, regardless of time period, are irrelevant to any claims or defenses in this lawsuit.

1718.   Foreign regulators have concluded that XRP is not a security or is unlikely to be a security.  *See* Ex. 249 (Jan. 2021 article observing that Japan's securities regulator, the FSA, "has confirmed . . . that it views XRP as a cryptocurrency and not as security."); Ex. 250, Monetary Authority of Singapore, A Guide to Digital Token Offerings (May 26, 2020) (May 2020 non-binding guidance from Singapore explaining that "XRP would likely not be treated as a security").

**Response:** The SEC does not dispute that the Japanese regulator cited in ¶ 1718 provided guidance that it would not treat XRP as a security. The SEC disputes the remaining assertions contained in ¶ 1718 on the ground that the cited evidence does not support the fact asserted. Specifically Defendants' Exhibit 250 does not mention XRP, any guidance from Singapore regarding XRP, or contain the text quoted by Defendants. The SEC additionally notes that the two foreign regulators cited in this paragraph are not governed by the United States securities laws such that their views as to XRP's status as a security in their jurisdictions are irrelevant to any claim or defense.  *See, e.g.*, Def. Ex. 250 at 15 ("The treatment of a token under the Howey Test is not a consideration for deciding whether a token is a product regulated under the SFA [Singapore Securities and Futures Act]… [A company] must separately assess whether its offer of Token G in Singapore would comply with the securities laws administered by MAS [Monetary Authority of Singapore] despite its assessment of Token G under US laws").

1719.   Numerous U.S. federal agencies have publicly stated that XRP is a virtual currency. *See* Ex. 144 at RPLI_SEC 1080005 (GAO Report calling XRP a "prominent example[]" of a "virtual currenc[y] … not based on the bitcoin protocol"); Ex. 186 (FinCEN and DOJ calling XRP a "virtual currency").

**Response:** The SEC does not dispute that the three agencies referenced in ¶ 1719 referred to XRP as virtual currency in the context of the two cited exhibits.  The SEC disputes that the cited evidence establishes the statements of "numerous" U.S. federal agencies. The SEC further asserts that whether federal agencies not responsible for regulating securities referred to XRP as a virtual currency is irrelevant to any claim or defense in this lawsuit.

1720.   From 2013 through 2020, XRP was not considered a security under U.S. accounting principles.  *See* Ex. 171, Expert Report of Peter Easton (Oct. 4, 2021) ¶ 84 ("XRP does not have the characteristics of a security as defined by U.S. GAAP"); *id.* ¶ 91 ("it would be improper for Ripple to account for sales and transactions involving XRP as the offer and sale of securities under U.S. GAAP").

**Response:** The SEC disputes the assertions contained in ¶ 1720 on the ground that the

cited evidence does not support the fact asserted.  The cited portions of the Easton Report (Def.

Ex. 171) do not state that "XRP was not considered a security under U.S. accounting principles." To

the contrary, the Easton Report opines: "there currently is no authoritative U.S. Generally Accepted

Accounting Principles ('U.S. GAAP') directly applicable to the accounting for cryptocurrencies."

Def. Ex. 171 ¶ 10(ii). The SEC further disputes the assertions contained in ¶ 1720 on the ground

that the assertions are not supported by citation to evidence which would be admissible. The

material cited to support the fact asserted, the Easton Report, is not admissible for the reasons set

forth in the SEC's Motion to Exclude (D.E. 536), including that Easton's opinions regarding XRP's

accounting treatment are irrelevant to any claim or defense, and the assertions are opinions of a

purported expert and not facts.

1721.   From 2013 through 2020, XRP was not considered a security for purposes of U.S. tax law.  *See* Ex. 251, Expert Report of Bradley Borden (Oct. 4, 2021) ¶ 33 ("reasonable buyers and sellers of virtual currency such as XRP would not expect such currency to come within a federal income tax definition of securities").

**Response:** The SEC disputes the assertions contained in ¶ 1721 on the ground that the

cited evidence does not support the fact asserted.  The cited portion of Borden's expert report (Def.

Ex. 251) does not state that "XRP was not considered a security for purposes of U.S. tax law." *Id.* at

¶ 33 (opining as to the expectations of "reasonable buyers and sellers of virtual currency.")  The

SEC further disputes the assertions contained in ¶ 1721 on the ground that the assertions, which are

opinions of a purported expert and not facts, are not supported by citation to evidence which would

be admissible. The material cited to support the fact asserted, the Borden Report, is not admissible

for the reasons set forth in the SEC's Motion to Exclude (D.E. 536), including that Borden's

opinions regarding XRP's tax treatment are irrelevant to any claim or defense, Borden's opinions are unsupported *ipse dixit*, and Borden is unqualified to opine about virtual currencies.

1722.    Larsen was Chief Executive Officer of Ripple from September 2012 through December 2016.  Ex. 8 at 49:16-18.

**Response:** The SEC does not dispute the assertions contained in ¶ 1722.

1723.    On November 1, 2016, Larsen announced he had decided to "transition to executive chairman of the board."  Ex. 75, RPLI_SEC 0042736.  In the announcement, Larsen stated that he was "look[ing] forward to moving beyond day-to-day operations to focus [his] energy on continuing to lead Ripple's strategic direction."  *Id.*  Larsen transitioned out of the CEO role because he wanted to spend more time with his two young sons, then ███████████.  *Id.*

**Response:** The SEC does not dispute the assertions contained in ¶ 1723.

1724.    Employees who had previously reported to Larsen stopped reporting to him when he became Executive Chairman.  Ex. 27 at 19:28-20:23 (Griffin stopped reporting to Larsen in 2015 or 2016); Ex. 24 at 29:21-30:7 (Long reported to Garlinghouse once he was CEO); Ex. 9 at 18:11-20:25 (Birla only reported to Larsen when he was CEO); PX 18 (A. O'Gorman Tr.) at 33:9-21 (O'Gorman stopped reporting to Larsen when he stepped down as CEO).

**Response:** The SEC does not dispute that Griffin testified he stopped reporting to Larsen in 2015 or 2016, Long testified she reported to Garlinghouse after he became CEO, Birla testified he reported to Larsen prior to Garlinghouse, and O'Gorman testified she reported to Larsen until Garlinghouse became CEO, as reflected in ¶ 1724, but disputes that Griffin or Birla stopped reporting to Larsen when Larsen became Executive Chairman on the ground that the cited Griffin and Birla testimony does not support such assertions. The SEC further disputes the assertion that any Ripple employees other than Long and O'Gorman "who had previously reported to Larsen stopped reporting to him when he became Executive Chairman" on the ground that the cited testimony does not support such assertions.

1725.    After he stepped down as CEO, Larsen no longer attended the XRP Sales Meetings on a regular basis.  Ex. 38 at 35:22-36:11 (regarding the XRP Sales Meetings, "Chris [Larsen] was there every week in the beginning for about the first year or so and then would attend periodically.");

Ex. 118, LARSEN-SEC-LIT-00003195 ("XRP sale call, join or skip?"); Ex. 119, LARSEN-SEC-LIT-00003196 ("Skip"); Ex. 120, LARSEN-SEC-LIT-00003197; Ex. 121, LARSEN-SEC-LIT-00003198 (same); Ex. 122, LARSEN-SEC-LIT-00003203; Ex. 123, LARSEN-SEC-LIT-00003204 (same); Ex. 124, LARSEN-SEC-LIT-00003241; Ex. 125, LARSEN-SEC-LIT-00003242 (same); Ex. 126, LARSEN-SEC-LIT-00003254; Ex. 127, LARSEN-SEC-LIT-00003255 (same); Ex. 128, LARSEN-SEC-LIT-00003274; Ex. 129, LARSEN-SEC-LIT-00003275 (same); Ex. 130, LARSEN-SEC-LIT-00003276; Ex. 131, LARSEN-SEC-LIT-00003277 (same).

**Response:** The SEC disputes the assertions in ¶ 1725 because the cited evidence does not support the assertions, including because the quoted testimony establishes that Larsen attended XRP sales meetings "on a regular basis" for a period of time after he was no longer CEO, and Defs. Exs. 120-131, at most, reflect seven occasions over a four-year period in which Larsen declined to attend an XRP sales meeting, which were held weekly. *See* PX 25 (Madigan Dep.) 35:22-36:5 (Ripple held weekly XRP sales meetings from at least May 2019 until early 2022); PX 20 (Vias Dep.) 35:4-19, 85:11-14, 369:5-12 (Vias attended weekly XRP sales meetings, and worked at Ripple from November 2016 to April 2020). The SEC further states that Vias testified that Larsen attended the weekly XRP sales meetings "regularly" and "while he was chairman of the board." PX 20 (Vias Dep.) 54:20-55:2, 55:17-22; 56:16-18; 57:11-13.

1726. Even when Larsen attended the XRP Sales Meetings, Larsen was not an active participant. Ex. 10 at 57:11-22 (describing Chris as a "listener" who "might ask a question or two.").

**Response:** The SEC disputes the assertions in ¶ 1726 on the grounds that "active participant" is vague and ambiguous, and because the cited testimony contradicts the assertion that Larsen was "not an active participant" as it reflects that Larsen asked questions at XRP sales meetings. Vias's testimony on the topic was also equivocal—he testified he "d[idn't] exactly remember" Larsen's participation at such meetings. PX 20 (Vias Dep.) 57:19-22.

1727. Larsen's approval was not necessary for the XRP Markets team to operate. Ex. 10, at 55:6-22 ("Did you need him to either approve or endorse anything that the XRP [] markets team did? A. No.").

**Response:** The SEC disputes the assertions in ¶ 1727 on the grounds that "operate" is vague and ambiguous, the assertions do not identify the applicable time period, and the cited

testimony does not address the "operation" of the XRP Markets team. To the extent the assertions
in ¶ 1727 suggest that Larsen did not direct or approve Ripple's sales of XRP, the record contradicts
such an assertion.  *See* PX 2 (Larsen Tr.) at 219:25–220:24 (as Ripple's CEO, Larsen had the
authority to decide whether Ripple would sell XRP); PX 46 at RPLI_SEC 0156975 (as a member of
Ripple's XRP Sales Committee, Larsen (with others) approved sales of XRP even after he was no
longer Ripple's CEO).

1728.   Outside of his periodic attendance at XRP Sales Meetings, employees had infrequent
interactions with Larsen.  Ex. 10 at 54:4-7 (Vias had infrequent contact with Larsen); PX 23 (R. Will
Tr.) at 88:19-89:3 (outside of Board meetings, he interacted with Chris "infrequently," "maybe once
a month," and the exchange was typically "pleasantries in the hallways"); Ex. 21 at 50:15-18 ("My
interactions with Larsen were infrequent and generally giving him a high-level perspective on what
we were doing with the Xpring initiative").

**Response:** The SEC does not dispute that Will and Beard testified as reflected in ¶ 1728,
but disputes the assertion that Vias had infrequent contact with Larsen because Vias later testified he
and Larsen attended weekly XRP sales meetings, *see* PX 20 (Vias Dep.) 54:4-55:2, and further
disputes that any Ripple employees other than Will and Beard "had infrequent interactions with
Larsen" on the ground that the cited evidence does not support such assertion.

1729.   When he became Executive Chairman, Larsen attended Board meetings, but he no
longer had day-to-day operational responsibility for the company.  Ex. 18 at 396:2-17 (Larsen
"shows up as a board member at board meetings, but his day-to-day responsibility was dropped").

**Response:** The SEC disputes the assertions in ¶ 1729 on the grounds that the cited evidence
does not support the assertion, because the cited exhibit does not contain the quoted language and
because it mischaracterizes the evidence, i.e., Schwartz's deposition testimony. Schwartz testified
that, even after Larsen resigned as CEO he was "almost as active as ever" and only "[g]radually, over
a period of time beginning sometime in 2018," a full year after his resignation, Larsen "stopped like
showing up every day." PX 6 (Schwartz Dep. Tr.) 396:2-17.

1730.   Larsen understood that Ripple took specific steps to ensure compliance with the
advice in the October 2012 Perkins Coie memorandum.  Ex. 8 at 252:19-253:15.

**Response:** The SEC disputes the assertions in ¶ 1730 on the grounds that the cited evidence does not support the assertion because Larsen testified Ripple took a single "step" as a result of the memo and further testified that Ripple made no changes to its marketing based on the memo. PX 2 at 252:19-253:15. The SEC further asserts that Larsen understood Ripple's conduct was not in compliance with the advice in the October 2012 Perkins Coie memorandum, including but not limited to because that memorandum stated that if XRP was "sold to Investors who provide Founders with the capital necessary to launch and operate [Ripple, then known as] NewCoin, [XRP] Coins will likely be considered securities and subject to regulation under federal securities laws," PX 242 at RPLI_SEC 0287879, and Larsen was aware that Ripple sold XRP and used the sale proceeds to fund its operations. *See* PX 2 (Larsen Dep Tr.) at 199:16–201:17 (Larsen knew that, at least "in some early presentations to investors in Ripple," Ripple told them that sales of XRP could be used to pay for Ripple's operations and Ripple did in fact use XRP sales to pay for its operations at least "from time to time"); PX 21 (Vias Inv. Tr.) at 164:16-165:6 (the fact that "most[]" of Ripple's revenue came from XRP sales was "common knowledge" among Ripple employees); PX 350 at 7 (Larsen stated in or around April 2014 that Ripple was "keeping 25% of…XRP…to cover the bills here"). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act of 1933.

1731. Between 2012 and the issuance of the DAO Report in 2017, Larsen was aware that the SEC did not express any concern with XRP or Ripple's activities. Ex. 169, SJ Opp. Larsen Decl. ¶ 6.

**Response:** The SEC disputes the assertions in ¶ 1731 because the cited evidence, "a nonmoving party's self-serving statement, without direct or circumstantial evidence to support the charge, is insufficient to defeat a motion for summary judgment" because it is not sufficient to create a genuine dispute of material fact. *SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016)

(quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))). The only evidence

cited in support of Larsen's assertion in his self-serving declaration that he was unaware that the

SEC "express[ed] any concern with XRP or Ripple's activities" is a single occasion in which an SEC

employee attended a "conference at which XRP and Ripple's business" purportedly were discussed

and the SEC employee did not speak.  *See* Def. Ex. 169 ¶ 6. The SEC further disputes that Larsen's

subjective beliefs as to the legality of his conduct have any relevance to his liability for violating

Section 5 of the Securities Act.

    1732.   Between 2012 and the issuance of the DAO Report, Larsen understood that the SEC
had not issued any public guidance on digital assets.  Ex. 169, SJ Opp. Larsen Decl. ¶ 6.

    **Response:** The SEC disputes the assertions in ¶ 1732 because the cited evidence, "a

nonmoving party's self-serving statement, without direct or circumstantial evidence to support the

charge, is insufficient to defeat a motion for summary judgment" because it is not sufficient to

create a genuine dispute of material fact. *SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9

(S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016)

(quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))). The only evidence

cited in support of Larsen's assertion in his self-serving declaration is his own testimony, and the

testimony transcript pages cited do not address the assertions in ¶ 1732. *See* PX 2 (Larsen Dep Tr.)

at 288:19-290:24. The SEC further disputes that Larsen's subjective beliefs as to the legality of his

conduct have any relevance to his liability for violating Section 5 of the Securities Act.

    1733.   Before the SEC issued the DAO Report, Larsen learned that FinCEN and the U.S.
Treasury Department issued guidance on cryptocurrencies.  Based on that guidance, Larsen believed
it was clear that FinCEN and Treasury were going to be the "key regulator" for cryptocurrency.  Ex.
8 at 275:7-24.

    **Response:** The SEC disputes the assertions in ¶ 1733 because the cited evidence consists of

self-serving testimony that was not situated in time "[b]efore the SEC issued the DAO Report" and

was not responsive to the question asked.  PX 2 (Larsen Dep Tr.) at 275:8 – 276:24. The SEC

disputes the assertions in ¶ 1733 further because the cited testimony is unsubstantiated by any

citation to any record evidence to any purported "guidance" Larsen received stating that FinCEN and the Department of Treasury "were going to be the key regulator for the industry," PX 2 (Larsen Dep. Tr.) at 274:8-276:15, and is not sufficient to create a genuine dispute of material fact. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005) (finding that the district court did not err in granting summary judgment to defendant notwithstanding the plaintiff's testimony "largely unsubstantiated by any other direct evidence"); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020) (plaintiff's "self-serving comments from her deposition after the filing of this lawsuit cannot create an issue of fact"); *Khudan v. Lee*, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016) ("Plaintiff's 'self-serving' and 'incomplete' testimony … is insufficient to create a genuine dispute of fact"). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1734.   Larsen understood Ripple's 2015 settlement with FinCEN and the Department of Justice as an "official United States government declaration that XRP is a currency" and therefore "exempt from the securities laws." Ex. 8 at 290:21-24, 291:11-15; Ex. 169, SJ Opp. Larsen Decl. ¶ 5.

**Response:** The SEC disputes the assertions in ¶ 1734 on the grounds that Larsen's self-serving testimony and declaration are not sufficient to create a genuine dispute of material fact.  *See SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))); *see also Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).  The SEC further disputes the assertions in ¶ 1734 on the grounds that Larsen's self-serving testimony and declaration are contradicted by record evidence demonstrating that Larsen received legal advice expressly informing him that although counsel was unaware of "the SEC taking any position on the issue of whether a virtual currency is itself a security," "one certainly can create a security by packaging virtual

currency." PX 403. *See also* PX 245 (2015 legal memo to Ripple Labs noted that a virtual currency could be deemed a security, stating "XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP"). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1735.   Shortly after the FinCEN settlement in 2015, Larsen and SEC personnel both attended a conference that discussed Ripple's experience with FinCEN.  During that conference, a representative from FinCEN stated that the settlement made Ripple "more regulatory compliant," and the SEC did not correct or challenge that statement.  Ex. 8 at 293:16-294:11.

**Response:** The SEC disputes the assertions in ¶ 1735 because the cited evidence consists of self-serving testimony that is not sufficient to create a genuine dispute of material fact, was not responsive to the question asked, and was too ambiguous to support the assertions in ¶ 1735.  *See* PX 2 (Larsen Dep. Tr.) at 295:4-8 ("And in that, her presentation, ███████, she did speak about how that experience specifically that we went through made us stronger -- made us more regulatory compliant, would have been a good thing for our company.").

1736.   Between 2012 and the filing of the Complaint, Larsen understood that XRP operated as a store of value.  Ex. 8 at 233:7-21.

**Response:** The SEC disputes the assertions in ¶ 1736 because the cited evidence consists of self-serving testimony that is not sufficient to create a genuine dispute of material fact, and the cited evidence does not support the assertion because Larsen did not testify as to any particular time period, including "[b]etween 2012 and the filing of the Complaint," in which he purportedly held the views asserted in ¶ 1736. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

73

1737.   Between 2012 and the filing of the Complaint, Larsen understood that XRP operated as a medium of exchange.  Ex. 8 at 233:7-21.

**Response:** The SEC disputes the assertions in ¶ 1737 because the cited evidence consists of self-serving testimony that is not sufficient to create a genuine dispute of material fact, and the cited evidence does not support the assertion because Larsen did not testify as to any particular time period, including "[b]etween 2012 and the filing of the Complaint," in which he purportedly held the views asserted in ¶ 1737. *See* PX 2 (Larsen Dep. Tr.) at 232:19-20. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1738.   Between 2012 and the filing of the Complaint, Larsen understood that XRP operated as a unit of account.  Ex. 8 at 233:7-21.

**Response:** The SEC disputes the assertions in ¶ 1738 because the cited evidence consists of self-serving testimony that is not sufficient to create a genuine dispute of material fact, and the cited evidence does not support the assertion because Larsen did not testify as to any particular time period, including "[b]etween 2012 and the filing of the Complaint," in which he purportedly held the views asserted in ¶ 1738. *See* PX 2 (Larsen Dep. Tr.) at 232:19-20. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1739.   Between 2012 and the filing of the Complaint, Larsen understood that "that people are involved in the – these currency markets as medium of exchange, for store value, unit of account, all the reasons that people would be interested in cryptocurrency markets."  Ex. 8 at 90:3-7.

**Response:** The SEC disputes the assertions in ¶ 1739 because the cited evidence consists of self-serving testimony that is not sufficient to create a genuine dispute of material fact, the testimony

was not responsive to the question asked, and the cited evidence does not support the assertion

because Larsen did not testify as to any particular time period, including "[b]etween 2012 and the

filing of the Complaint," in which he purportedly held the views asserted in ¶ 1739. *See* PX 2 (Larsen

Dep. Tr.) at 232:19-20. *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *Kunik v. New*

*York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*, No. 12-cv-8147,

2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).  The SEC further disputes that Larsen's subjective

beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of

the Securities Act.

1740.   Between 2012 and the filing of the Complaint, Larsen was aware that XRP could be
used to purchase goods and services.  Ex. 8 at 201:9-12, 203:12-16, 205:15-18 (describing business
expenses Ripple paid for with XRP).  Larsen himself used XRP to purchase goods and services on
occasion.  Ex. 8 at 93:6-8 (Larsen used XRP to purchase goods or services).

**Response:** The SEC disputes the assertions in ¶ 1740 because the cited evidence consists of

self-serving testimony that is not sufficient to create a genuine dispute of material fact, the cited

evidence does not support the assertion because Larsen did not testify as to any particular time

period, including "[b]etween 2012 and the filing of the Complaint," in which he purportedly held the

views asserted in ¶ 1740. *See* PX 2 (Larsen Dep. Tr.) at 232:19-20. *See Jeffreys v. City of New York*, 426

F.3d 549, 555 (2d Cir. 2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695

(S.D.N.Y. 2020); *Khudan v. Lee*, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

To the extent that ¶ 1740 is meant to assert that XRP generally, usually, or universally could be used

to purchase goods and services between 2012 and December 2020, such assertions are contradicted

by record evidence, including Larsen's testimony that, of the amount of his XRP he has transferred

for any purpose, he has used "[l]ess than 1%" to purchase goods or services. PX 2 (Larsen Dep. Tr.)

at 93:6-22. *See also* PX 503.13 at 24:16-23 (Garlinghouse stated publicly in 2018:  "I almost never use

the expression cryptocurrency. And the reason is today, these aren't currencies…. I can't buy coffee

with XRP. I'm using Starbucks as a random example. Currencies, traditionally, are something you

can use to transact efficiently and broadly."); PX 248 ███████ Rebuttal Rep.) at 21-30 (D.E. 548, Ex. 32) (opining that XRP does not have the characteristics of a currency or functions of money). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1741.    Between 2012 and the filing of the Complaint, Larsen understood that bitcoin and (after its launch) ether were the two digital assets that were most similar to XRP.  Ex. 8 at 182:22-183:14 (XRP "had exactly the utility Bitcoin had, Ethereum later had" when it was created), 233:7-21; Ex. 169, SJ Opp. Larsen Decl. ¶ 7.

**Response:** The SEC disputes the assertions in ¶ 1741 on the grounds that Larsen's self-serving testimony and declaration are not sufficient to create a genuine dispute of material fact.  *See SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))); *see also Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).  The SEC further disputes the assertions in ¶ 1741 on the grounds that the cited evidence does not support such assertions because Larsen did not testify that he viewed ether as among the assets most similar to XRP only "after [ether's] launch." The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1742.    Larsen understood from the 2018 speech by the then-Director of the SEC Division of Corporation Finance, Bill Hinman, that neither bitcoin nor ether were securities.  Ex. 169, SJ Opp. Larsen Decl. ¶ 8.

**Response:** The SEC disputes the assertions in ¶ 1742 on the grounds that Larsen's self-serving declaration is not sufficient to create a genuine dispute of material fact, and Larsen claimed to be unable to answer questions about this speech at deposition.  *See* PX 2 (Larsen Dep. Tr.) at 322:14-324:13.  *See SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch.*

76

*Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))).  The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1743.   Because Larsen considered bitcoin and ether to be the digital assets most similar to XRP, Hinman's declaration that bitcoin and ether were not securities reinforced Larsen's view that XRP was not a security.  Ex. 169, SJ Opp. Larsen Decl. ¶ 8.

**Response:** The SEC disputes the assertions in ¶ 1743 on the grounds that Larsen's self-serving declaration is not sufficient to create a genuine dispute of material fact, and Larsen claimed to be unable to answer questions about this speech at deposition. *See* PX 2 (Larsen Dep. Tr.) at 322:14-324:13.  *See SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))).  The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1744.   Larsen understood that multiple foreign regulators had determined that XRP was not a security.  *See* Ex. 8 at 312:9-13 ("It is crystal clear what the regulation is in enormous markets of Japan, Singapore, United Kingdom, Switzerland, UAE, who have made it crystal clear that XRP is a currency.").

**Response:** The SEC disputes the assertions in ¶ 1741 on the grounds that Larsen's self-serving testimony is not sufficient to create a genuine dispute of material fact.  *See Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir. 2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*, No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).  The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1745.   Between 2012 and the filing of the Complaint, Larsen understood that XRP holders did not have a right to Ripple's profits based on their ownership of XRP.  Ex. 169, SJ Opp. Larsen Decl. ¶ 9.

**Response:** The SEC disputes the assertions in ¶ 1745 on the grounds that Larsen's self-serving declaration is not sufficient to create a genuine dispute of material fact. *See SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1746.   Before the filing of the Complaint, Larsen understood that XRP holders did not have a right to Ripple's earnings based on their ownership of XRP.  Ex. 169, SJ Opp. Larsen Decl. ¶ 9.

**Response:** The SEC disputes the assertions in ¶ 1746 on the grounds that Larsen's self-serving declaration is not sufficient to create a genuine dispute of material fact. *See SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1747.   Between 2012 and the filing of the Complaint, Larsen understood that Ripple had no contractual or other obligations to XRP holders.  Ex. 169, SJ Opp. Larsen Decl. ¶ 10.

**Response:** The SEC disputes the assertions in ¶ 1747 on the grounds that Larsen's self-serving declaration is not sufficient to create a genuine dispute of material fact. *See SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))). The SEC further disputes that Larsen's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1748.   Between 2012 and the filing of the Complaint, Larsen understood that the proceeds from his personal sales of XRP were not combined with Ripple's corporate accounts.  Ex. 169, SJ Opp. Larsen Decl. ¶ 11.

**Response:** The SEC disputes the assertions in ¶ 1748 on the grounds that Larsen's self-

serving declaration is not sufficient to create a genuine dispute of material fact. *See SEC v. Aly*, No.

16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F.

Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616

(S.D.N.Y. 2016))). The SEC further disputes the assertions in ¶ 1748 on the grounds that it is

contradicted by record evidence: ███ principal of the market maker that Ripple and Larsen used to

sell their XRP, testified that from the start of GSR's retention to sell XRP for Ripple through in or

around 2017, GSR did not segregate accounts for Ripple and its employees. PX 26 (██ Tr.) at 141:5-

143:4. The SEC further disputes the assertions in ¶ 1748 on the grounds that Defendants were

unable to supply any record evidence to contradict the above-cited testimony of Ripple's market

maker, instead stating they "do not have an independent basis to admit or deny the truth of" such

testimony. D.E. 663 ¶ 649. The SEC further disputes that Larsen's subjective beliefs as to the

legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1749.   Between 2012 and the filing of the Complaint, Larsen understood that the proceeds
from other individuals' XRP sales were not combined with Ripple's corporate accounts.  Ex. 169, SJ
Opp. Larsen Decl. ¶ 11.

**Response:** The SEC disputes the assertions in ¶ 1749 on the grounds that Larsen's self-

serving declaration is not sufficient to create a genuine dispute of material fact. *See SEC v. Aly*, No.

16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F.

Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616

(S.D.N.Y. 2016))). The SEC further disputes the assertions in ¶ 1749 on the grounds that it is

contradicted by record evidence: ███ principal of the market maker that Ripple and Larsen used to

sell their XRP, testified that from the start of GSR's retention to sell XRP for Ripple through in or

around 2017, GSR did not segregate accounts for Ripple and its employees. PX 26 (██ Tr.) at 141:5-

143:4. The SEC further disputes the assertions in ¶ 1749 on the grounds that Defendants were

unable to supply any record evidence to contradict the above-cited testimony of Ripple's market

maker, instead stating they "do not have an independent basis to admit or deny the truth of" such

testimony. D.E. 663 ¶ 649. The SEC further disputes that Larsen's subjective beliefs as to the

legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

The SEC further disputes the legal implications of the assertions in ¶ 1749 on the grounds that they

rely on an incorrect legal standard for determining the existence of a "common enterprise."

1750.   Between 2012 and the filing of the Complaint, Larsen understood that Ripple did
not manage, operate, or control all parts of the XRP Ledger or any broader "XRP ecosystem." Ex.
169, SJ Opp. Larsen Decl. ¶ 12; Ex. 8, Larsen Tr. 398:2-6 ("The XRP Ledger is open-source
permissionless so anybody can integrate to it," just like the Bitcoin or Ethereum decentralized
ledgers).

**Response:** The SEC disputes the assertions in ¶ 1750 on the grounds that Larsen's self-

serving testimony and declaration are not sufficient to create a genuine dispute of material fact. *See*

*SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v.*

*Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp.

3d 609, 616 (S.D.N.Y. 2016))); *see also Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir.

2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*,

No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016). The SEC further disputes the

assertions in ¶ 1750 on the grounds that they are contradicted by record evidence demonstrating

that Ripple "manage[d], operate[d], or control[led] all parts of the XRP Ledger": Schwartz testified

that when the XRP Ledger launched, only three validator nodes—all operated by Ripple—

confirmed transactions on the XRP Ledger, PX 6 (Schwartz Dep. Tr.) at 33:22-34:9; the only

validators that have any consequence to the stable operation of the ledger are those on the "Unique

Node List" or "UNL," PX 641 (Transcript of RPLI_SEC 114103, February 5, 2018 Internal Weekly

Company meeting) at Tr. 20:18-23 ("So when you heard 500 validators or whatever, there's

hundreds of validators on the network currently. But the ones that really kind of are…designed to

make sure that the network is operating stability [sic]…are the sub net that's on the UNL"); for the

majority of the XRP Ledger's existence up until June 2018, the default validator list has only

included Ripple-operated validators, PX 13 at ¶ 177; and Ripple has at all times controlled the

validators included on its UNL, PX 641 (Transcript of RPLI_SEC 114103, February 5, 2018

Internal Weekly Company meeting) at Tr. 20:09-20:16. The SEC further disputes that Larsen's

subjective beliefs as to the legality of his conduct have any relevance to his liability for violating

Section 5 of the Securities Act.

1751.   Between 2012 and the filing of the Complaint, Larsen understood that other
individuals may have wanted the price of XRP to increase, but he was also aware that simply
wanting a higher price was true for a number of non-security assets.  Ex. 169, SJ Opp. Larsen Decl.
¶ 13.

**Response:** The SEC disputes the assertions in ¶ 1751 on the grounds that Larsen's self-

serving declaration is not sufficient to create a genuine dispute of material fact. *See SEC v. Aly*, No.

16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F.

Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616

(S.D.N.Y. 2016))). The SEC further disputes that Larsen's subjective beliefs as to the legality of his

conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1752.   Between 2012 and the filing of the Complaint, Larsen understood that the price of
XRP was associated with other cryptocurrencies, mainly bitcoin and ether, not with any particular
action by Ripple.  Ex. 169, SJ Opp. Larsen Decl. ¶ 14.

**Response:** The SEC disputes the assertions in ¶ 1752 on the grounds that Larsen's self-

serving declaration is not sufficient to create a genuine dispute of material fact. *See SEC v. Aly*, No.

16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F.

Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616

(S.D.N.Y. 2016))). The SEC further disputes the assertions in ¶ 1752 on the grounds that it is

contradicted by record evidence, including Defendants' own expert's (Ferrell's) opinion that, for his

second estimation period, XRP and Bitcoin price returns were *negatively* correlated and there was a

statistically insignificant correlation between XRP price returns and Ether price returns. *See* PX 715

(Ferrell Rep.), Ex. 5. The SEC further disputes that Larsen's subjective beliefs as to the legality of his

conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1753.   Between 2012 and the filing of the Complaint, Larsen understood that if Ripple
ceased to exist, XRP would continue to exist.  Ex. 169, SJ Opp. Larsen Decl. ¶ 15.

**Response:** The SEC disputes the assertions in ¶ 1753 on the grounds that Larsen's self-

serving declaration is not sufficient to create a genuine dispute of material fact. *See SEC v. Aly*, No.

16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F.

Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616

(S.D.N.Y. 2016))).  The SEC further disputes that Larsen's subjective beliefs as to the legality of his

conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1754.   Between 2012 and today, Larsen has maintained that XRP is a currency.  Ex. 8 at
16:24-17:5 ("All currencies are assets.  [XRP] is a currency."); 148:19-21 ("[XRP is] a currency, and it
has all the attributes of a currency."); 179:3-9 ("XRP was a currency, currencies are assets, so
currencies would be under the classification of assets on a balance sheet."); Ex. 169, SJ Opp. Larsen
Decl. ¶ 16.

**Response:** The SEC disputes the assertions in ¶ 1754 on the grounds that Larsen's self-

serving testimony and declaration are not sufficient to create a genuine dispute of material fact.  *See*

*SEC v. Aly*, No. 16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v.*

*Carter*, 210 F. Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp.

3d 609, 616 (S.D.N.Y. 2016))); *see also Jeffreys v. City of New York*, 426 F.3d 549, 555 (2d Cir.

2005); *Kunik v. New York City Dep't of Educ.*, 436 F. Supp. 3d 684, 695 (S.D.N.Y. 2020); *Khudan v. Lee*,

No. 12-cv-8147, 2016 WL 4735364, at *5 (S.D.N.Y. Sept. 8, 2016).

1755.   Between 2012 and today, Larsen has maintained that XRP is not a security.  Ex. 169,
SJ Opp. Larsen Decl. ¶ 16.

**Response:** The SEC disputes the assertions in ¶ 1755 on the grounds that Larsen's self-

serving declaration is not sufficient to create a genuine dispute of material fact.  *See SEC v. Aly*, No.

16-cv-3853, 2018 WL 1581986, at *9 (S.D.N.Y. Mar. 27, 2018) (quoting *Walker v. Carter*, 210 F.

Supp. 3d 487, 503 (S.D.N.Y. 2016) (quoting *JF v. Carmel Cent. Sch. Dist.*, 168 F. Supp. 3d 609, 616 (S.D.N.Y. 2016))).  The SEC further disputes the implication of ¶ 1755 and the cited evidence that Larsen believed XRP was not a security because he believed it is a currency as contradicted by record evidence that Larsen received legal advice expressly informing him that an issuer "certainly can create a security by packaging virtual currency." PX 403. *See also* PX 245 (2015 legal memo to Ripple Labs noted that a virtual currency could be deemed a security, stating "XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP").

1756.   In 2015, when Garlinghouse joined Ripple as COO, Ripple had already been developing products that used XRP.  ECF 46, Am. Compl. ¶ 17; Ex. 9, (Birla Dep. Tr.), at 22:7-11, 40:2-23 (reflecting that Birla joined Ripple in 2015 and "[s]ince [he] started at Ripple, [he has] developed products at Ripple, some of which leverage XRP"); Ex. 8 (Larsen Tr.) at 185:21-186:10 (Q: "… in the fall of 2013, was Ripple making any efforts to create applications that used XRP? A: "Yes").

**Response:** The SEC does not dispute that Garlinghouse joined Ripple as COO in 2015 or that, prior to 2015, Ripple made attempts to develop products that used XRP.  To the extent ¶ 1756 asserts that Ripple had developed marketable products that used XRP by 2015, the SEC disputes such assertion on the grounds that the cited evidence does not support such assertion.

1757.   By that time, there was a use case for XRP as a bridge currency.  Ex. 1 (Schwartz Dep. Tr.) at 41:22-42:10 (Q: "When did that use case as bridge currency come into existence, if at all? A: "I think … the use as sort of intermediary asset on the ledger was a very early idea, early 2013.").

**Response:** The SEC objects to "use case" and "[b]y that time" as used in ¶ 1757 as vague and ambiguous.  The SEC does not dispute that Schwartz testified that "the use [of XRP] as sort of intermediary asset on the ledger was a very early idea, early 2013," however, to the extent ¶ 1757 asserts that XRP was actually used as a bridge currency in 2015, the SEC disputes such assertion as unsupported by the cited evidence and contradicted by record evidence. *See* PX 6 at 42:11-25 (in response to the question of when the "idea" of using XRP as an intermediary asset "actually c[a]me to fruition such that banks might have used XRP as a bridge currency," Schwartz testified that

"[t]hey wouldn't have been able to do it …with something made by Ripple until xRapid went live");
PX 8, PX 85 (Ripple RFA Responses) Nos. 89, 587 (xRapid, the prior commercial name for the
product later known as "On Demand Liquidity" ("ODL"), became publicly available in October
2018).

1758.   By approximately 2014, XRP had started being used as a form of payment by third
parties.  Ex. 1 (Schwartz Dep. Tr.) at 39:13-22 ("Roughly 2014, XRP started being used essentially as
a means of payment.").

**Response:** The SEC disputes the assertion in ¶ 1758 on the ground that it is unsupported

by the cited evidence, which does not include any reference to use "by third parties," and on the

ground that it is contradicted by record evidence. *See* PX 503.13 at 24:16-23 (Garlinghouse stated

publicly in 2018:  "I almost never use the expression cryptocurrency. And the reason is today, these

aren't currencies…. I can't buy coffee with XRP. I'm using Starbucks as a random example.

Currencies, traditionally, are something you can use to transact efficiently and broadly."); *see also* PX

248 (⬛⬛⬛ Rebuttal Rep.) (D.E. 548, Ex. 32) at 21-30 (opining that XRP does not have the

characteristics of a currency or functions of money).

1759.   One of Garlinghouse's areas of focus when he joined Ripple in 2015 was to ensure
Ripple was complying with its settlement with FinCEN and DOJ.  Ex. 252, RPLI_SEC 0221653.

**Response:** The SEC disputes the assertions in ¶ 1759 on the grounds that it is unsupported

by the cited evidence, which reflects an exchange between Garlinghouse and Ripple's then-CCO

about possible business decisions that "might substantially change our obligations under the

settlement," with no reference to Garlinghouse's areas of focus or Ripple's compliance with its

settlement with FinCEN and DOJ.

1760.   Based on this settlement, Garlinghouse understood that XRP was regulated as a
currency.  Ex. 253, SEC-LIT-EPROD-000615887 ("XRP should be regulated as a currency.
FinCEN and the DOJ confirmed this in 2015"); PX 81 (Garlinghouse Dep. Tr.) at 278:14-279:25
(testifying that he found out about the FinCEN settlement "within the first few weeks of my tenure
at Ripple" and "I think any time a government is speaking authoritatively thought a court system
and describing something in a certain way, it provides a certain level of clarity … that the
government has said they view XRP as a virtual currency").

**Response:** The SEC disputes the assertions in ¶ 1760 on the grounds that they are

unsupported by the cited evidence in that Garlinghouse stated his preference that XRP "should be"

regulated as a currency, not his belief that it was, and that the assertions in ¶ 1760 are contradicted

by record evidence that Ripple received legal advice that virtual currencies could be offered and sold

as securities, PX 403 (an issuer "certainly can create a security by packaging virtual currency"); PX

245 (2015 legal memo to Ripple Labs noted that a virtual currency could be deemed a security,

stating "XRP presents more risk of being deemed a security than other virtual currencies by virtue of

the close relationship between Ripple Labs and XRP"); that Garlinghouse was personally advised by

Ripple's CCO that "XRP certainly has some 'securities-type' characteristics," PX 516; PX 86

(Garlinghouse RFA Responses) No. 207; and that Garlinghouse understood that XRP was not a

currency, *see* PX 503.13 at 24:16-23 ("I almost never use the expression cryptocurrency. And the

reason is today, these aren't currencies…. I can't buy coffee with XRP. I'm using Starbucks as a

random example. Currencies, traditionally, are something you can use to transact efficiently and

broadly."). The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his

conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1761.   Throughout his time at Ripple, Garlinghouse has spoken both publicly and privately
about the regulatory status of XRP with stakeholders, Ripple investors, Ripple colleagues, Ripple
employees, and friends.  *See, e.g.*, Ex. 253, SEC-LIT-EPROD-000615887 (email from Garlinghouse
to Ripple investors and advisors discussing, in part, the regulatory status of XRP); Ex. 254, SEC-
LIT-EPROD-000615905 (email from Garlinghouse to Ripple "shareholders, advisors, and friends"
discussing the regulatory status of XRP); Ex. 255, RPLI_SEC 0460887 (email from Garlinghouse to
Ripple employees discussing the same); PX 503.25 at 18:24-19:13 (interview transcript of
Garlinghouse discussing, in part, the same); PX 36 (Garlingouse Inv. Tr.) at 43:20-44:1
(Garlinghouse explaining that he views regulators as "part of the stakeholder group."newline).
Garlinghouse has never stated in any forum that he believed XRP is a security.  *Id.*

**Response:** The SEC does not dispute that throughout his time at Ripple, Garlinghouse has

spoken both publicly and privately about the regulatory status of XRP with stakeholders, Ripple

investors, Ripple colleagues, Ripple employees, and friends, and that, in the evidence cited,

Garlinghouse did not state that he believed XRP was a security.  The SEC disputes that

Garlinghouse has "never" stated "in any forum" that he believed XRP was a security on the grounds

that the cited evidence is not sufficient to support such an assertion because it does not purport to

encompass all of Garlinghouse's statements regarding XRP in any forum.

1762.   Garlinghouse has continuously expressed his view that XRP was not a security. *See, e.g.*, Ex. 256, RPLI_SEC 0065738 (explaining in 2018 letter to Coinbase why XRP is not a security); Ex. 257, RPLI_SEC 0054426 ("I've never said I don't 'believe' [XRP is] a security.  I've said that it's NOT a security.  There is an important difference there."); Ex. 258, RPLI_SEC 0626650 (stating in 2018 email that he "continue[s] to gather evidence that the SEC (and those tangential to the SEC) do NOT believe that XRP is a security."); Ex. 259, RPLI_SEC 0491179 (telling Ripple shareholders in 2019 that "it's very clear to me that XRP is not a security").

**Response:** The SEC does not dispute that Garlinghouse stated on the occasions reflected in

the cited evidence his view that XRP is not a security but objects to "continuously" as used in ¶

1762 as vague and ambiguous and therefore disputes that he has "continuously" expressed such a

view.

1763.   Ripple's Chief Compliance Officer, Antoinette O'Gorman, never told Garlinghouse that XRP was a security or that she believed XRP to have "securities-type characteristics."  Rather, O'Gorman told Garlinghouse that in a meeting with ██████████ when discussing "Ripple's position that XRP is not a security," a meeting participant raised that XRP "certainly has some 'securities-type' characteristics."  PX 252; PX 18 (O'Gorman Dep. Tr.) at 229:7-230:25 (Q: "Who if anyone at the meeting with ██████████ said that XRP certainly has some securities-type characteristics?"  A "I don't know specifically whether it was ████ or whether it was ████ from ████████."  … Q "So one of the gentlemen from ████████ told you and Zagone at the meeting that XRP has some securities-type characteristics?"  A "It appeared that it may have certain securities-type characteristics.").

**Response:** The SEC disputes the assertions in ¶ 1763 on the grounds that they are

contradicted by record evidence demonstrating O'Gorman told Garlinghouse that XRP "certainly"

had some attributes of a security.  After meeting with ██████████ "re: Ripple's position that XRP is

not a security," O'Gorman wrote Garlinghouse that the "[m]eeting went well; however, XRP

certainly has some 'securities-type' characteristics and we do need to hone our

playbook/messaging." PX 252. At deposition, O'Gorman attempted to distance herself from this

clear and contemporaneous statement of her belief that XRP "certainly has some 'securities-type'

characteristics," PX 252, but was unable to identify who at the ██████████ meeting, if not her, had

the view that XRP "certainly" had some characteristics of security. *See* PX 18 at 230:1-232:5.

O'Gorman declined to answer whether she ever personally held "the view that XRP had securities-type characteristics" on instruction from counsel asserting the attorney-client privilege. *See id.*

1764.    But O'Gorman herself did not agree that XRP had securities-type characteristics. PX 18 (O'Gorman Dep. Tr.) at 229:7-231:17 (Q: "Did you come away from the meeting with ▮▮ agreeing that XRP had securities-type characteristics?" A: "I didn't come away from the meeting with ▮▮ on that, but I – no.  I didn't come away from the meeting with that."). O'Gorman said "we do need to hone our playbook / messaging" for Ripple "to be more clear in [its] language."  PX 252; PX 18 (O'Gorman Dep. Tr.) at 234:2-21.

**Response:**  The SEC does not dispute that O'Gorman wrote Garlinghouse that the ▮▮ "[m]eeting went well; however, XRP certainly has some 'securities-type' characteristics and we do need to hone our playbook/messaging," PX 252, and testified that she wanted to Ripple to "be more clear in [its] language," PX 18 at 234:2-235:1, as reflected in part in ¶ 1764. The SEC disputes that "O'Gorman herself did not agree that XRP had securities-type characteristics" as contradicted by record evidence, including that she testified that she believed "there was always the potential" and "there was a risk" that XRP would be deemed a security, PX 18 at 235:11-20; when directly questioned as to whether she ever personally held "the view that XRP had securities-type characteristics," she declined to answer on instruction from counsel asserting the attorney-client privilege, PX 18 at 230:1-232:5; and she wrote to Garlinghouse in or around July 2018, stating: "In the U.S., XRP is and will be regulated … potentially as a security, all depending on facts and circumstances, and on how XRP it used – it's that simple." PX 664.

1765.    O'Gorman clarified that there was no "certainty" about XRP having "securities-type characteristics."  PX 18 (O'Gorman Dep. Tr.) at 231:1-3 ("I used the word 'certainly.'  That's what I wrote here.  But as I say, there was no certainty around it.  I don't know why I used that word.").

**Response:**  The SEC does not dispute that O'Gorman testified as reflected in ¶ 1765, but disputes the assertion that O'Gorman "clarified" her contemporaneous statement during her testimony, as the cited evidence demonstrates she was unable to provide any explanation of why she used the word "certainly" if she did not believe it to be true at the time, and because the assertions

in ¶ 1765 are contradicted by record evidence, including O'Gorman's testimony that she believed

"there was always the potential" and "there was a risk" that XRP would be deemed a security, PX 18

at 235:11-20; her refusal to answer whether she ever personally held "the view that XRP had

securities-type characteristics," PX 18 at 230:1-232:5; and her email to Garlinghouse in or around

July 2018 stating: "In the U.S., XRP is and will be regulated … potentially as a security, all depending

on facts and circumstances, and on how XRP it used – it's that simple." PX 664.

1766.   O'Gorman understood that XRP was not a security.  PX 18 (O'Gorman Dep. Tr.) at
217:23-218:3 ("Q: Did you take a position at the meeting with ▮▮▮▮▮▮ about whether or not
XRP should be classified as a security?  A: I didn't say it should be classified as a security, no.");
218:12-14 ("A: … That was my view. Q: That XRP was not a security? A: That's right.").

**Response:** The SEC disputes the assertions in ¶ 1766 as contradicted by record evidence,

including O'Gorman's contemporaneous statement that XRP "certainly has some 'securities-type'

characteristics," PX 252, her testimony that she believed "there was always the potential" and "there

was a risk" that XRP would be deemed a security, PX 18 at 235:11-20, and when directly questioned

as to whether she ever personally held "the view that XRP had securities-type characteristics," she

declined to answer on instruction from counsel asserting the attorney-client privilege, PX 18 at

230:1-232:5.  *See also* PX 18 at 218:5-25 (O'Gorman first testified she did not believe XRP was a

security based on her "personal analysis," but then declined to answer how she came to that view,

citing attorney-client privilege). O'Gorman also wrote to Garlinghouse in or around July 2018,

stating: "In the U.S., XRP is and will be regulated … potentially as a security, all depending on facts

and circumstances, and on how XRP it used – it's that simple." PX 664.

1767.   O'Gorman informed Garlinghouse only that there was a risk, without opining on the
magnitude or likelihood of such risk, that XRP could be deemed a security due to an absence of
guidance from the SEC.  PX 18 (O'Gorman Dep. Tr.) at 235:17-20 (O'Gorman testified that she
"raised there was always the potential.  There was a risk.  And absent guidance from the SEC, there
was always going to be that risk.").

**Response:** The SEC does not dispute that O'Gorman testified in part as reflected in ¶ 1767,

but disputes that this cited evidence supports the assertion that O'Gorman conveyed to

Garlinghouse "only that there was a risk, without opining on the magnitude or likelihood of such

risk" as the cited testimony does not address the scope of her communications with Garlinghouse

on the topic.  The SEC further disputes the assertions in ¶ 1767 as contradicted by record evidence,

including O'Gorman's contemporaneous statements to Garlinghouse, including that XRP "certainly

has some 'securities-type' characteristics," PX 252, and her statement that: "In the U.S., XRP is and

will be regulated … potentially as a security, all depending on facts and circumstances, and on how

XRP it used – it's that simple." PX 664.

1768.   Garlinghouse's view that XRP was not a security was based in part on his knowledge
that XRP had never been offered through an ICO, which was a common attribute of the entities
that had been subject to prior SEC enforcement actions regarding digital assets.  Ex. 260, "ICO =
IPO" Blog post, https://ripple.com/insights/icoipo-sec-right-regulate-initial-coin-offerings/ ("This
culling of the herd should not affect utilitarian assets like XRP, which can be used by payment
providers and banks to enable faster, more efficient cross-border payments.  The SEC ruling implies
that digital assets whose value is based on established use cases and not ambiguous promises, are
distinguishable from ICO tokens."); PX 503.06 at 7:18-22 ("ICOs, these initial coin offerings where
people are issuing tokens that are really more like securities than actually have a token that has utility
the way, you know, XRP solves a problem, it has utility in solving a payments problem."); Ex. 261,
Brad Garlinghouse and Cory Johnson, *Ripple Live: Ask Me Anything with Brad Garlinghouse and Cory
Johnson (2018)*, YouTube (Apr. 27, 2018), https://www.youtube.com/watch?v=6d3Czi4dgn0 ("I
think what you're seeing is an appropriate conversation because a lot of the activity in this space—
these are ICOs where the token has no utility, and I think you're going to find that the vast, vast,
vast, vast majority of them are, in fact, going to be deemed securities.  For me, nothing has really
changed, and I think it's clear that XRP should not be viewed as a security").

**Response:** The SEC does not dispute that Garlinghouse made the statements quoted in ¶

1768, but disputes the title of the July 28, 2017 blog post, which was "ICO=IPO: Why the SEC is

Right to Regulate Initial Coin Offerings," and disputes that Ripple's offering and sales of XRP were

materially distinguishable from ICOs, as reflected by record evidence that in June 2017, Long,

Larsen, and others at Ripple discussed the possibility of claiming that Ripple's sales of XRP were the

first "Initial Coin Offering" of a crypto asset. PX 526; PX 741. The SEC further disputes that

Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability

for violating Section 5 of the Securities Act.

1769.   After reviewing then-Director of Corporation Finance Bill Hinman's June 2018 speech "Digital Asset Transactions: When Howey Met Gary (Plastic)," Garlinghouse viewed XRP as being sufficiently decentralized so as not to be a security.  PX 241 (Director Hinman's June 2018 speech); Ex. 172, RPLI_SEC 0579742 ("On decentralization, Bill noted that where a network is sufficiently decentralized, purchasers cannot reasonably expect a third party to conduct essential managerial or entrepreneurial efforts. … in many ways, XRP's network is even more decentralized than Bitcoin and Ether" and proceeds to explain why); Ex. 163, RPLI_SEC 0905225 ( "[W]e should be emphasizing that (particularly in light of the statements from the SEC on BTC and ETH) it's very clear XRP is more decentralized that [sic] either BTC or ETH and that (amongst other evidence) makes it clear that XRP is not a security."); PX 81 (Garlinghouse Dep. Tr.) at 51:7-18 ("[T]he director of corporate (sic) finance, Bill Hinman, had given an in-depth speech. One of the topics he covered in that was that … ETH was not a security and, in large part, because of the decentralization of ETH, which I viewed – and I think others viewed as well – XRP in many ways is more decentralized than ETH.  And if decentralization was an important component of the SEC's determination that ETH was not a security, that seemed like a positive indicator for how the SEC may view XRP.").

**Response:** The SEC does not dispute that Garlinghouse made the statements quoted in  ¶ 1769 but disputes that they establish Garlinghouse's belief that XRP was "sufficiently decentralized so as not to be a security," in light of record evidence establishing that Ripple engaged in a concerted marketing and influence campaign centered on the claim that the XRP Ledger is purportedly decentralized and therefore XRP cannot be a security. *See, e.g.*, PX 409 at RPLI_SEC 0971233 (Larsen and Schwartz draft letter to ████ editor advocating the position that the XRP Ledger is decentralized).  The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1770.   In the speech, then-Director Hinman stated that "current offers and sales of Ether are not securities transactions.  And, as with Bitcoin, applying the disclosure regime of the federal securities laws to current transactions in Ether would seem to add little value."  PX 241.

**Response:** The SEC does not dispute the assertions in ¶ 1770.

1771.   In 2018, the SEC itself was struggling with how to determine how to apply the federal securities laws to digital assets in drafts and internal correspondence surrounding the speech. *See, e.g.,* Ex. 209, SEC-LIT-EMAILS-000470992 (May 25, 2018 email from Val Szczepanik to Frederickson and Seaman commenting on the initial draft, "I like the tone, and I almost think the less detail the better.  This is introducing a concept, that will probably generate much discussion, and so leaving room for that discussion is good I think."); Ex. 151, SEC-LIT-EMAILS-000470685 (June 4, 2018 email from Hinman to others at the SEC attaching draft speech "which suggests that we do not need to see a need to regulate Ether, as it is currently offered, as a security.  That language is in brackets and would be used if we all are in agreement.  We also have a call with Buterin [founder of Ethereum] later this week to confirm our understanding of how the Ethereum Foundation

operates."); Ex. 262, SEC-LIT-EMAILS-000471185 (June 8, 2018 comments from OGC, including "[w]e also want to hear what CF learns from its anticipated conversation with Buterin," and proposing to delete as a framework factor "[h]as this person or group retained a stake or other interest in the digital asset such that it would be motivated to expend efforts to cause an increase in value in the digital asset" because it "does not seem relevant"); Ex. 211, SEC-LIT-EMAILS-000471315, SEC-LIT-EMAILS-000471316 (June 12, 2018 draft markup from Brett Redfearn with comment, "We thought you were going to say that you don't believe ETH is a security.  We think that is a helpful message.  This statement, on the other hand, appears likely to create more confusion about the status of ETH.").

  **Response:** The SEC does not dispute that the documents cited in ¶ 1771, other than the

bracketed inserts, contain the quoted language, but disputes that "[i]n 2018, the SEC itself was

struggling with how to determine how to apply the federal securities laws to digital assets in drafts

and internal correspondence surrounding the speech" as unsupported by cited evidence—which  is

selectively quoted, without context, in ¶ 1771— and contradicted by other record evidence,

including but not limited to the SEC's issuance of the DAO Report in 2017, which unequivocally

expressed that offers and sales of digital assets were offers and sales of securities if the facts and

circumstances surrounding such offers and sales satisfied the *Howey* test. SEC Rel. No. 81207,

*available at* https://www.sec.gov/litigation/investreport/34-81207.pdf ("DAO Report") at 11-15,

17-18.


  1772. Garlinghouse proactively met with regulators in the United States to discuss Ripple and XRP's regulatory status, and these meetings further solidified his belief that XRP was not a security.  Ex. 138, SEC-LIT-EMAILS-000456558 (memorandum from a meeting between then-Chair Clayton, Director Hinman, and Garlinghouse); Ex. 263, RPLI_SEC 0235167 (email from Garlinghouse indicating that "my meetings in DC went very well and I continue to gather evidence that the SEC (and those tangential to the SEC) do NOT believe that XRP is a security."); PX 81 (Garlinghouse Dep. Tr.) at 46:22-47:2; 54:7-20; 55:1-14; 83:6-13; 213:9-12 (testifying that he met with "senior officials at governments around the world," and in the U.S. met with the Secretary of the Treasury, SEC Commissioners, the SEC Chair, and Congressional representatives).

  **Response:**  The SEC does not dispute that Garlinghouse testified that he met with the

officials referenced in ¶ 1772 and "senior officials at governments around the world" and does not

dispute the documents referenced in ¶ 1772 contain the quoted text, but disputes that the cited

evidence supports the assertion that such "meetings further solidified his belief that XRP was not a

security," which Garlinghouse characterized as "[e]vangelizing" for Ripple, PX 81 at 55:15-21,

including because then-Chairman Clayton informed Garlinghouse that their meeting was "not the proper forum" for discussing whether XRP "is or is not a security" and encouraged Garlinghouse to "continue [Ripple's] ongoing discussions with the staff of the Division of Corporation Finance," Def. Ex. 138, who ultimately conveyed to Ripple their view that Ripple's offers and sales of XRP violated the securities laws. PX 258 (Hinman Dep. Tr.) at 95:9-96:5, 374:9-20, 380:1-21, 415:6-416:12; PX 86 (Garlinghouse RFA Responses) No. 221.

1773.   Garlinghouse sought to meet with U.S. regulators, and SEC officials in particular, because he wanted to confirm his understanding that XRP was not a security, in light of Director Hinman's speech and other known enforcement actions to date.  PX 81 (Garlinghouse Dep. Tr.) at 97:24-98:10 ("Many people in the XRP community were concerned about the lack of clarity, including myself and felt that it was – given the clarity that had been provided to bitcoin and Ether  . . . we felt that it was only a step of responsibility – to the extent the SEC's mission is around orderly markets, I felt like the SEC should seek to provide that clarity.").

**Response:**  The SEC disputes the assertions referenced in ¶ 1773 on the grounds that the cited testimony does not support such assertions because it is quoted out of context and references, not Garlinghouse's meetings "with U.S. regulators, and SEC officials in particular," but Ripple's efforts to "seek[] from the SEC" a "statement that XRP is not a security," PX 81 at 95:9-98:10, and the quoted testimony further references Garlinghouse's purported desire for "clarity" from the SEC, not "confirm[ation of] his understanding that XRP was not a security."  Garlinghouse also publicly acknowledged that crypto industry actors claim "regulatory uncertainty" when they wish to "ignore SEC regulations." *See* PX 506.114 (Garlinghouse tweet: "In context of yesterday's SEC statement(s), I hear some in crypto talk about the current 'regulatory uncertainty.' What's uncertain?! SEC's statements have been consistent and clear. 'Regulatory uncertainty' is just a euphemism for 'we wish we could ignore SEC regulations.'").

1774.   Garlinghouse met with SEC officials between 2018 and 2019, including Chair Clayton, Commissioner Roisman, Commissioner Peirce, Commissioner Jackson, and Director Hinman.  PX 81 (Garlinghouse Dep. Tr.) at 46:22-47:2; 54:7-20; 55:1-14 (testifying that he had met with these SEC officials).

**Response:** The SEC does not dispute the assertions in ¶ 1774.

1775.   None of these SEC officials ever told Garlinghouse that XRP was a security, which solidified Garlinghouse's understanding that XRP was not a security.  PX 81 (Garlinghouse Dep. Tr.) at 56:25-57:16. ("In none of these meetings did … anyone ever say they viewed that XRP was a security.").

**Response:** The SEC disputes the assertions in ¶ 1775 on the ground that they are

contradicted by record evidence that Hinman told Garlinghouse and/or Ripple representatives in a

meeting in or around September 2019 that in order to become compliant with the federal securities

laws, Ripple needed to stop publicly offering XRP on an unregistered basis and without restrictions

and that that SEC staff was likely to conclude that it viewed Ripple's offers and sales of XRP as

securities transactions. PX 258 (Hinman Dep. Tr.) at 95:9-96:5, 374:9-20, 380:1-21, 415:6-416:12; PX

86 (Garlinghouse RFA Responses) No. 221. The SEC further disputes that Garlinghouse's

subjective beliefs as to the legality of his conduct have any relevance to his liability for violating

Section 5 of the Securities Act.

1776.   In his August 2018 meeting with then-Chair Clayton and Director Hinman, Garlinghouse stated that Ripple was in "purgatory" because the SEC had not made any explicit statement about the status of XRP, but had made statements that bitcoin and ether were not securities.  Ex. 276, SEC-LIT-EMAILS-000456558.  Chair Clayton "immediately stated that the meeting was not a proper forum for discussion about that topic" and "encourage[ed] the Ripple executives to continue its ongoing discussions with the staff of the Division of Corporation Finance." Ex. 276, SEC-LIT-EMAILS-000456558.

**Response:** The SEC disputes the assertion in ¶ 1776 that, in an August 2018 meeting with

then-Chair Clayton and Director Hinman, Garlinghouse stated that Ripple was in "purgatory

because the SEC had not made any explicit statement about the status of XRP, but had made

statements that bitcoin and ether were not securities" as contradicted by the cited evidence, which

reflects that Garlinghouse told then-Chair Clayton and Director Hinman "Ripple was in 'purgatory'

due to *uncertainty as to whether XRP*, the cryptocurrency with which Ripple is associated, *is or is not a*

*security*" Def. Ex. 276 (emphasis added).  The SEC does not dispute that Chair Clayton "immediately

stated that the meeting was not a proper forum for discussion about that topic" and "encourage[ed]

the Ripple executives to continue its ongoing discussions with the staff of the Division of

Corporation Finance." Def. Ex. 276.

1777.   Despite Garlinghouse asking that question, neither Chair Clayton nor Director
Hinman told Garlinghouse at the time that they considered XRP to be a security.  Ex. 276, SEC-
LIT-EMAILS-000456558.  In addition, neither Chair Clayton nor Director Hinman referred
Garlinghouse to the Enforcement Division.  Ex. 276, SEC-LIT-EMAILS-000456558.

**Response:** The SEC objects to the reference to "that question" in ¶ 1777 as vague and

ambiguous, and disputes that Garlinghouse asked any particular question at the referenced meeting

with Chair Clayton and Director Hinman on the grounds that it is not supported by the cited

evidence.  Def. Ex. 276. The SEC does not dispute that the cited evidence does not reflect that

Chair Clayton or Director Hinman referred Garlinghouse to the Enforcement Division. Def. Ex.

276.

1778.   Garlinghouse also met with Commissioner Roisman in November 2018 and recalls
"Commissioner Roisman very specifically saying 'I'm sorry you've even had to come here.'"  PX 81
(Garlinghouse Dep. Tr.) at 56:11-16; 78:17-23; 79:12-22.

**Response:** The SEC does not dispute that Garlinghouse met with Commissioner Roisman

in November 2018 or that Garlinghouse testified as reflected in the quoted text in ¶ 1778.

1779.   Garlinghouse understood Commissioner Roisman apologizing to him that he "even
had to come here" to mean that Commissioner Roisman did not believe XRP was a security.  PX 81
(Garlinghouse Dep. Tr.) at 56:5-16 ("I think that the confusion about the status of XRP he viewed
as not healthy for the market.").

**Response:** The SEC disputes the assertions in ¶ 1779 on the grounds that the cited evidence

does not support the assertion. The SEC further disputes that Garlinghouse's subjective beliefs as to

the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities

Act.

1780.   In the years since the filing of this lawsuit, SEC Commissioners Roisman and Peirce
have publicly acknowledged that "[t]here is a decided lack of clarity for market participants around
the application of the securities laws to digital assets and their trading[.]"  Ex. 245, *In the Matter of
Coinschedule*, SEC (July 14, 2021), https://www.sec.gov/news/public-statement/peirce-roisman-
coinschedule.  Commissioner Peirce has also said "Given how slow we have been in determining
how regulated entities can interact with crypto, market participants may understandably be surprised
to see us to come onto the scene now with our enforcement guns blazing" and "[t]he Commission

has refused, despite many pleas over many years, to provide regulatory guidance about how our rules apply to crypto-assets, so some of the responsibility for the lack of legal and regulatory clarity lies at our doorstep." Ex. 264, Commissioner Hester M. Peirce, *In the Matter of Poloniex, LLC*, SEC (Aug. 9, 2021), https://www.sec.gov/news/public-statement/pierce-statement-poloniex-080921; Ex. 247, Commissioner Hester M. Peirce, Response to Staff Accounting Bulletin No. 121, SEC (Mar. 31, 2022), https://www.sec.gov/news/statement/peirce-response-sab-121-033122.

**Response:** The SEC does not dispute that the documents cited in ¶ 1780 reflect the quoted

statements by Commissioners Peirce and Roisman.

1781.   As has Commissioner Uyeda, who stated, "Today, one big, difficult, and complex issue that is conspicuously absent from the Commission's published regulatory agenda is how to regulate crypto assets and related services.  Market participants have expressed significant concerns regarding the lack of regulatory guidance in this space.  There is a widespread concern that the lack of predictability with regard to our regulation may encourage crypto firms to relocate to other jurisdictions." Ex. 243, Commissioner Mark T. Uyeda, Remarks at the "SEC Speaks" Conference 2022, SEC (Sept. 9, 2022), https://www.sec.gov/news/speech/uyeda-speech-sec-speaks-090922.

**Response:** The SEC objects to the phrase "[a]s has Commissioner Uyeda" as vague and

ambiguous and disputes whatever that phrase is meant to assert on that ground.  The SEC does not

dispute that the document cited in ¶ 1781 reflects the quoted statements by Commissioner Uyeda.

1782.   Garlinghouse's view that XRP was not a security was also informed by his discussions with and actions taken by foreign regulators, such as the United Kingdom and Japan, who had come to the same conclusion. Ex. 265, @bgarlinghouse, Twitter (July 11, 2019, 6:23 PM), https://twitter.com/bgarlinghouse/status/1149444241686327296 ("applauding UK regulator, @TheFCA, for providing clarity and leadership on the classifications of digital assets. They recognize ETH has the features of a hybrid exchange / utility token (not a security token) and call out the similarities between ETH and XRP."); PX 503.25 at 18:24-19:4 ("It's very clear to me that XRP's not a security… other consequential regulatory bodies like the UK's … regulators of consequence have said that.  In Japan, they say that.  And Singapore."); PX 81 (Garlinghouse Dep. Tr.) at 63:1-9 (Q "You said 'other governments around the world have taken express clarifying views that XRP was a currency.'  As of the time you were having conversations with the SEC?"  A "I think that's right, yes.  I believe so." Q "Can you recall which ones?" A "Well, certainly the UK, Japan, and Singapore would all come to mind.").

**Response:** The SEC does not dispute that the documents referenced in ¶ 1782 contain the

text quoted therein, but disputes the assertion that "Garlinghouse's view that XRP was not a security

was also informed by his discussions with and actions taken by foreign regulators" on the grounds

that the cited evidence does not support the inference drawn therefrom.

1783.   Throughout his tenure at Ripple, Garlinghouse has met with foreign regulators. *See, e.g.*, Ex. 266, RPLI_SEC 0053629 ("In Q1, we hosted nearly 30 government briefings globally,

including meetings with the European Commission, U.S. Senate and House leadership, and several Treasury ministries."); PX 81 (Garlinghouse Dep. Tr.) at 83:9-13 (Garlinghouse testifying that he met with "senior officials at governments around the world").

      **Response:** The SEC does not dispute that the assertions in ¶ 1783.

      1784.   Garlinghouse was aware that XRP holders had no right to share in Ripple's revenue or profit and that owning XRP did not equate to any ownership in Ripple, which he repeatedly explained both privately and publicly. Ex. 253, SEC-LIT-EPROD-000615887 ("For XRP to be a security … it would have to represent ownership in a company, which it does not.); Ex. 256, RPLI_SEC0065738 (Letter to Coinbase signed by Garlinghouse explaining that "XRP does not represent a stake in any company, including Ripple. As described above, XRP was created before Ripple the company was formed. Thus, the value of XRP is separate from the profits, risks, or success of Ripple."); Ex. 172, RPLI_SEC 0579742 ("Securities are contracts: they're agreements between a company and its investors to provide ROI in exchange for the investor's capital. By contrast, there is no such agreement with Ripple and holders of XRP: we have never promised any profits or returns to holders of XRP . . . you don't have a contract with anyone simply by owning XRP."); Ex. 267, Brad Garlinghouse, *CB Insights Future of Fintech Ripple Brad Garlinghouse*, YouTube (June 21, 2018), https://www.youtube.com/watch?v=VfTuccTTbyc ("… is if you buy XRP, they don't think they're buying shares of Ripple. There's a company called Ripple. We are a private company. We have investors. People have bought shares of Ripple the company, but buying an XRP doesn't give you shares of Ripple. It doesn't give you access to dividends or profits that may come from Ripple.").

      **Response:** The SEC does not dispute that the documents referenced in ¶ 1784 contain the text quoted therein, but disputes the implicit assertion that an XRP purchaser must have a "right to share in Ripple's revenue or profit" or that or "any ownership in Ripple" is required for Ripple's offers and sales of XRP to be offers and sales of securities, as he was advised by Ripple's counsel and his Chief Compliance Officer that XRP could be deemed a security notwithstanding these characteristics. *See* PX 245 (2015 legal memo to Ripple Labs noted that XRP could be deemed a security, stating "XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP"); PX 252 (O'Gorman wrote Garlinghouse: "XRP certainly has some 'securities-type' characteristics and we do need to hone our playbook/messaging"); PX 664 (O'Gorman wrote Garlinghouse: "In the U.S., XRP is and will be regulated … potentially as a security, all depending on facts and circumstances, and on how XRP it used – it's that simple."). The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1785.   Garlinghouse also knew that Ripple had its own equity shareholders.  Ex. 253, SEC-LIT-EPROD-000615887 (email from Garlinghouse to Ripple investors and advisors discussing, in part, the regulatory status of XRP); Ex. 256, RPLI_SEC0065738 (Letter to Coinbase signed by Garlinghouse explaining that "XRP does not represent a stake in any company, including Ripple. As described above, XRP was created before Ripple the company was formed.  Thus, the value of XRP is separate from the profits, risks, or success of Ripple."); PX 503.20 at 5:6-8 ("…Ripple is a private company.  We have our shareholders."); Ex. 267, Brad Garlinghouse, *CB Insights Future of Fintech Ripple Brad Garlinghouse*, YouTube (June 21, 2018), https://www.youtube.com/watch?v=VfTuccTTbyc ("… [I]f you buy XRP, they don't think they're buying shares of Ripple.").

**Response:**  The SEC does not dispute that the assertions that Garlinghouse "knew that Ripple had its own equity shareholders" or that the documents referenced in ¶ 1785 contain the text quoted therein, but disputes that Def. Ex. 253 supports the assertion in ¶ 1785.  The SEC further disputes that the quoted assertion that "the value of XRP is separate from the profits, risks, or success of Ripple" on the ground that it is contradicted by record evidence. *See, e.g.*, PX 505 ███ Supplemental Report) ¶ 9 & Figure 1 (in a period of over 2,000 days, without the abnormal returns associated with just 23 days of Ripple news, XRP's price would not have exceeded two cents).  The SEC further disputes the implicit assertion that Ripple having equity shareholders has any relevance to whether Ripple offered and sold XRP as a security, as Garlinghouse was advised by Ripple's counsel and his Chief Compliance Officer that XRP could be deemed a security notwithstanding this circumstance. *See* PX 245 (2015 legal memo to Ripple Labs noted that XRP could be deemed a security, stating "XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP"); PX 252 (O'Gorman wrote Garlinghouse: "XRP certainly has some 'securities-type' characteristics and we do need to hone our playbook/messaging"); PX 664 (O'Gorman wrote Garlinghouse: "In the U.S., XRP is and will be regulated … potentially as a security, all depending on facts and circumstances, and on how XRP it used – it's that simple.").  The SEC further disputes that XRP purchasers "don't think they're buying shares of Ripple" as contradicted by record evidence of statements made to Ripple by individuals who purchased or were interested in purchasing XRP. *See, e.g.*, PX 197, PX 204, PX 208, PX 209,

PX 213, PX 216, PX 219, PX 220, PX 223, PX 224, PX 225, PX 227, PX 228, PX 229, PX 230, PX 231, PX 232. The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1786.   Garlinghouse knew that none of Ripple's proceeds from XRP sales were pooled with others.  Ex. 17, Garlinghouse Decl.

**Response:** The SEC disputes the assertions in ¶ 1786 on the grounds that they are contradicted by record evidence the Ripple's proceeds from XRP sales were pooled with the proceeds of Ripple employees' XRP sales through in and around 2017. PX 26 (███ Tr.) at 141:5-143:4, 143:15-25. The SEC further disputes the assertions in ¶ 1786 on the grounds that Defendants were unable to supply any record evidence to contradict the above-cited testimony of Ripple's market maker, instead stating they "do not have an independent basis to admit or deny the truth of" such testimony. D.E. 663 ¶ 649. The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1787.   Garlinghouse was also aware that Ripple owed no obligations, including contractual ones, to XRP holders. Ex. 172, RPLI_SEC0579742 ("Securities are contracts: they're agreements between a company and its investors to provide ROI in exchange for the investor's capital. By contrast, there is no such agreement with Ripple and holders of XRP: we have never promised any profits or returns to holders of XRP . . . you don't have a contract with anyone simply by owning XRP."); Ex. 256, RPLI_SEC0065738 (Letter to Coinbase signed by Garlinghouse explaining that "XRP does not represent a right for the holder to make any demand on any company, including Ripple.").

**Response:**  The SEC does not dispute that the documents referenced in ¶ 1787 contain the text quoted therein, but disputes the assertions in ¶ 1787 as contradicted by record evidence, including the contractual obligations Ripple owed to XRP holders who purchased XRP directly from Ripple.  *See, e.g.*, Def. Ex. 45, RPLI_SEC 0668885; Def. Ex. 46, RPLI_SEC 0000517. The SEC further disputes the assertions in ¶ 1787 as contradicted by record evidence reflecting that Garlinghouse understood his public statements regarding XRP's price could be consequential. *See* PX 671 (requesting that Ripple's public relations team review his Tweets for any occasions in which

Garlinghouse had "liked" "anything XRP price related"). The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1788.   Garlinghouse acknowledged that Ripple had XRP holdings and therefore from a capitalist perspective, an increase in XRP's price was in both Ripple's and its shareholders' interest. *See, e.g.*, PX 81 (Garlinghouse Dep. Tr.) at 382:16-20 ("I won't pretend not to be a capitalist. And if you own something, then you wanted the value of that to increase.").

**Response:** The SEC does not dispute the assertions in ¶ 1788.

1789.   In explaining how Garlinghouse thinks about XRP in relation to Ripple, he likens it to an "asset" that Ripple owns, just as Exxon owns oil and makes money by selling it.   PX 503.19 44:24-45:3 ("[XRP] is an asset [Ripple] own[s] in the same way, you know, look Exxon owns a lot of oil. Exxon's selling some of that oil and making money from doing that.").

**Response:** The SEC does not dispute that the quoted text appears in the document referenced in ¶ 1789 but disputes the inference that Garlinghouse's statement or state of mind has any relevance to whether Defendants sold XRP as a security, and in fact such statement was provided in answer to the question "How does Ripple make profit or not a profit?" PX 503.19 44:15-45:1.  The SEC further disputes that the cited evidence in ¶ 1789 is sufficient to support the assertion regarding "how Garlinghouse thinks about XRP in relation to Ripple" for all time and for all purposes, including because Garlinghouse was advised by Ripple's counsel and his Chief Compliance Officer that XRP could be deemed a security notwithstanding this circumstance. *See* PX 245 (2015 legal memo to Ripple Labs noted that XRP could be deemed a security, stating "XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP"); PX 252 (O'Gorman wrote Garlinghouse: "XRP certainly has some 'securities-type' characteristics and we do need to hone our playbook/messaging"); PX 664 (O'Gorman wrote Garlinghouse: "In the U.S., XRP is and will be regulated … potentially as a security, all depending on facts and circumstances, and on how XRP it used – it's that simple."). The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1790.   Garlinghouse also understood, however, that an alignment of incentives created by a company owning an asset does not mean that the underlying asset is a security.  PX 503.18 at 19:8-15 ("If you're a gold mining company you care about – you have a lot of reserves.  You care about the value of gold. If you're Exxon, you care about the value of oil.  So you know, we sell software to banks, we think about how to create value, both in that context, but also in the overall context of what's the value of the gold we have in the ground."); Ex. 268, Frank Chaparro and Brad Garlinghouse, *Brad Garlinghouse explains how regulatory uncertainty around XRP has affected Ripple*, The Block (Nov. 13, 2020), https://www.theblock.co/post/84550/brad-garlinghouse-podcast-xrp-ripple ("I mean, there are lots of commodities—lots of companies that have a commodity underlining: gold mining; oil companies; even diamonds, you know.  So, look, we are using XRP to solve a customer's problems and we think we are doing it well, and the business is growing quickly, and we're signing up customers; and we're signing up customers because we're solving a real problem. Do we think about—It would be silly to not acknowledge do we care about the overall value of XRP.  Do we care about the overall health of the XRP market?  Of course we do. It would be silly to try to pretend otherwise.  That being said … I think about it similarly as I think about Exxon and oil.  Exxon cares about the price of oil, for sure, but if you want… You could go by exposure, as an investor.  You could go by exposure to the price of oil, or you could choose to buy a security of Exxon's common stock.").

**Response:**  The SEC does not dispute that the quoted text appears in the document referenced in ¶ 1790 but disputes the inference that Garlinghouse's statement has any relevance to whether Ripple sold XRP as a security, and disputes that the cited evidence supports the assertion in ¶ 1790, which is a legal conclusion, in light of Garlinghouse's receipt of advice by Ripple's counsel and his Chief Compliance Officer that XRP could be deemed a security notwithstanding this circumstance. *See* PX 245 (2015 legal memo to Ripple Labs noted that XRP could be deemed a security, stating "XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP"); PX 252 (O'Gorman wrote Garlinghouse: "XRP certainly has some 'securities-type' characteristics and we do need to hone our playbook/messaging"); PX 664 (O'Gorman wrote Garlinghouse: "In the U.S., XRP is and will be regulated … potentially as a security, all depending on facts and circumstances, and on how XRP it used – it's that simple."). The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1791.   Garlinghouse's actions were aimed at developing Ripple's products, focusing on Ripple's customers and expanding Ripple's business for the benefit of Ripple's shareholders.  *See, e.g.*, Ex. 269, RPLI_SEC 0556099 (Ripple investor and advisor update email from Garlinghouse

indicating updates about "customer momentum" and "product momentum"); Ex. 259, RPLI_SEC 0491179 (Garlinghouse telling Ripple's shareholders that Ripple's "charter would be to enable the world to move value like it already moves information – enabling an Internet of Value" and that "[i]n pursuit of this charter and to return shareholder value, we identified and have been executing two strategies" consisting of building RippleNet and Xpring).

**Response:** The SEC does not dispute that the quoted text appears in the document

referenced in ¶ 1791 but objects to the phrase "Garlinghouse's actions" as vague and ambiguous as

used in ¶ 1791, and disputes the assertions in ¶ 1791 on that basis and on the grounds that the cited

evidence does not support the assertions in ¶ 1791 as it does not address the "aim" of

"Garlinghouse's actions."

1792.   This work involved thinking about Ripple's strategy and focusing its resources to sign up new customers and "to have clarity on what problem we were going to solve for our customers."  PX 36 (Garlinghouse Inv. Tr.) 34:7-15.

**Response:** The SEC does not dispute that the quoted text appears in the document

referenced in ¶ 1792 but objects to the phrase "[t]his work" as vague and ambiguous as used in ¶

1792 and disputes the assertions contained therein on those grounds.  To the extent that the

assertions in ¶ 1792 are meant to describe Garlinghouse's "work" throughout his tenure at Ripple,

including the period he has served as Ripple's CEO, the SEC disputes such assertions on the

grounds that the cited evidence does not support such assertions as it constitutes Garlinghouse's

response to the question "What were your roles and responsibilities as COO?"

1793.   In doing so, Garlinghouse's focus was not solely on XRP.  Rather, he considered "the most important metric" for measuring Ripple's success to be "bookings of software and services."  Ex. 270, SEC-SEC-E-0010269 at 22:18-22.  Garlinghouse explained to Ripple employees that "we can't let the XRP markets be a constant reflection of how we think we are performing."  Ex. 271, SEC-SEC-E-0010519 at 5:19-21.

**Response:** The SEC objects to the phrase "[i]n doing so, Garlinghouse's focus was not

solely on XRP" as vague and ambiguous as used in ¶ 1793 and disputes such assertion on that

ground.  The SEC disputes the assertion in ¶ 1793 that Garlinghouse "considered 'the most

important metric' for measuring Ripple's success to be 'bookings of software and services'" as the

cited evidence reflects that Garlinghouse stated in an internal Ripple meeting that, notwithstanding

his estimate that "software and services" constituted "[l]ike around 10 or 15%" of Ripple's business, he has "said, 'The most important metric *to grow* this business *is going to be* bookings of software and services'" DX 270, 22:13-22 (emphasis added). The SEC disputes the remaining assertions in ¶ 1793 because Defendants' selective quotation mischaracterizes the contents of Garlinghouse's speech to Ripple employees after XRP's price increased significantly, in which he stated he had "been stressed because every time the price of XRP goes up, the expectation on everyone in this room goes up. The expectations on [Garlinghouse] go up." PX 135, SEC-SEC-E-0010519 at 3:5-7. Garlinghouse stated "we can't let the XRP markets be a constant reflection of how we think we are performing" in the context of asking his employees to "do as I say, not as I do" because XRP's price increase was "incredibly distracting" and he was "the first to admit today, yes, I've checked XRP more today than I probably have in the last week combined." *Id.* at 4:25-5:3.

    1794.   In fact, on one occasion when the price of XRP was rallying, Garlinghouse met with Ripple employees and acknowledged the activity in the XRP markets but explained that he did not think "what's going on in the XRP markets is a direct reflection of everything going on at Ripple," and reminded them that Ripple "ha[s] customers. We have products that need to ship," and that XRP's rally is "distract[ing] us from the mission." Ex. 271, SEC-SEC-E-0010519 at 3:9-11; 5:5-10.

    **Response:**   The SEC does not dispute that the cited evidence reflects that Garlinghouse met with Ripple employees on an occasion when the price of XRP was increasing but disputes the remaining assertions in ¶ 1794 because Defendants' selective quotation mischaracterizes the contents of Garlinghouse's speech, in which he stated he had "been stressed because every time the price of XRP goes up, the expectation on everyone in this room goes up.  The expectations on [Garlinghouse] go up." PX 135, SEC-SEC-E-0010519 at 3:5-7. In this speech, Garlinghouse acknowledged the connection between Ripple's efforts and XRP's market success, analogizing it to Ripple "plant[ing] a seed …And that tree has started to grow.  What has happened now is the height of that tree has gotten really high." PX 135, SEC-SEC-E-0010519 at 3:15-22.  Garlinghouse reminded Ripple employees that Ripple "ha[d] customers" and had "products that need to ship"

because XRP's price rally reflected expectations of Ripple's employees and Ripple had "to invest" to "make sure we're in a position to deliver on those high expectations."  PX 135, SEC-SEC-E-0010519 at 4:11-17 ("So what stresses me out is the height of the tree, the expectations are really high.").

1795.   Garlinghouse was also aware that the value of XRP was not tied to Ripple's success in that XRP's value can decrease even when Ripple had a successful quarter. Ex. 266, RPLI_SEC 0053629 (email from Garlinghouse indicating that Ripple had its "best quarter ever" while "the entire crypto market, including XRP, was down over 70 percent").

**Response:** The SEC objects to "successful quarter" and "best quarter ever" as vague and ambiguous as used in ¶ 1795 and disputes the assertions in ¶ 1795 on those grounds and on the grounds that the cited evidence, an email from Garlinghouse, does not provide any information about Ripple's revenues or XRP's prices for the quarter it addresses. Ex. 266, RPLI_SEC 0053629. The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1796.   The SEC has admitted that "the fair market value of a unit of XRP could decrease while Ripple pursued its chosen course of business."  Ex. 23, SEC Response to Ripple's First Set of RFAs No. 30.

**Response:** The SEC does not dispute the assertions in ¶ 1796.

1797.   The SEC has also admitted that "the fair market value of a unit of XRP could increase while Ripple reduces its XRP-related business efforts."  Ex. 23, SEC Response to Ripple's First Set of RFAs No. 31.

**Response:** The SEC does not dispute the assertions in ¶ 1797.

1798.   Garlinghouse was aware that, since at least 2018, the price of XRP is highly correlated with the "overall crypto market."  PX 36 (Garlinghouse Inv. Tr) at 219:25-220:7 ("the price of XRP then and continues to be highly correlated with what's going on in the overall crypto market, and the performance tends to be much, much more correlated with what the rest of the crypto market is doing"); Ex. 172, RPLI_SEC 0579742 ("I think it's very clear that the price of XRP is much more correlated with the prices of other virtual currencies, like Bitcoin and Ether, than with any news about Ripple.").

**Response:** The SEC does not dispute the documents cited in ¶ 1798 contain the quoted language, but objects to the phrase "highly correlated" as vague and ambiguous as used in ¶ 1798 and disputes the assertions in ¶ 1798 on those grounds and on the grounds that they are contradicted by record evidence, including but not limited to Defendants' own expert's (Ferrell's) opinion, because Ferrell's analysis for his Estimation Period 2 shows a *negative* correlation between XRP price returns and Bitcoin price returns and a statistically insignificant correlation between XRP price returns and Ether price returns. *See* PX 715 (Ferrell Rep.), Ex. 5. The SEC further disputes the assertion that "the price of XRP is much more correlated with the prices of other virtual currencies, like Bitcoin and Ether, than with any news about Ripple" on the basis that it is contradicted by record evidence, including the ███ Supplemental Report, which demonstrated that, in a period of over 2,000 days, without the abnormal returns associated with just 23 days of Ripple news, XRP's price would not have exceeded two cents. PX 505 (███Supplemental Report) ¶ 9 & Figure 1. The SEC further disputes that Garlinghouse's subjective beliefs as to the legality of his conduct have any relevance to his liability for violating Section 5 of the Securities Act.

1799.   Garlinghouse did not know why any XRP purchasers decided to buy XRP.  PX 81 (Garlinghouse Dep. Tr.) at 372:4-373:13.

**Response:** The SEC disputes the assertions in ¶ 1799 on the ground that the cited evidence does not support such assertions, as Garlinghouse testified that he had not "taken the time to try to dissect why each person might choose to speculate in XRP" and acknowledged the possibility that some purchasers of XRP may have "chosen to buy it as an investment." PX 81 (Garlinghouse Dep. Tr.) at 372:4-373:13.

1800.   Garlinghouse was aware that third parties could develop additional use cases for XRP utilizing the XRP Ledger, and that Ripple was not the only entity doing so.  PX 503.11 at 16:17-17:4 (Garlinghouse also discusses "invest[ing] in support and partner[ing] with companies going after those other vertical use cases" for the XRP Ledger, such that Ripple is not the only participant in the "XRP ecosystem."); *see also* Amicus Brief of TapJets, Inc., ECF No. 661 (explaining XRP's use as currency in exchange for services).

**Response:** The SEC disputes the assertions in ¶ 1800 on the ground that Defendants'

selective quotation from PX 503.11 omits necessary context for Garlinghouse's statements,

including that Garlinghouse stated that he was "the most interested person, as CEO of Ripple, in

making sure the XRP ecosystem [wa]s successful," rejecting the notion that "Ripple could be

successful, but XRP would not be successful" because "at [Ripple's] core, [its] goal is to develop an

incredibly healthy XRP ecosystem" given that Ripple "own[s] about 60 percent of all XRP." PX

503.11 at 16:11-18. The SEC further disputes that the Amicus Brief of TapJets, Inc., supports the

assertions in ¶ 1800 regarding Garlinghouse's awareness on any date prior to October 14, 2022, the

date the brief was filed, as the brief itself does not address Garlinghouse's awareness of any fact.

1801.   Larsen and Garlinghouse's accounts were migrated from a U.K.-based to a U.S.-
based Bitstamp USA account in April 2020.  Ex. 272, BS-LTD-00000005 at 011.  Garlinghouse did
not make a withdrawal from his Bitstamp USA account until August 4, 2020.  Ex. 273, Bitstamp
USA_00000001 at 09-10.

**Response:**  The SEC does not dispute that Def. Ex. 272 states that, in April 2020, "all

accounts open with Bistamp [sic]," including Larsen's and Garlinghouse's accounts, "were migrated

to Bitstamp USA, Inc. in accordance with Business Transfer Agreement signed between Bitstamp

and Bitstamp USA Inc." but disputes that Larsen's and Garlinghouse's accounts "were migrated

from a U.K.-based ….account" as unsupported by the cited evidence.  The SEC does not dispute

that Def. Ex. 273 reflects a Garlinghouse debit from Bitstamp USA Inc. on August 4, 2020 but

disputes the remaining assertions in ¶ 1801 as unsupported by the cited evidence.

1802.   Defendants incorporate by reference their Local Rule 56.1 statement submitted in
connection with their motion for summary judgment, the facts in which demonstrate why the SEC
is not entitled to summary judgment (and why Defendants are entitled to summary judgment).  *See*
ECF No. 623.

**Response:** The assertions in ¶ 1801 are not statements of fact that require a response, but

the SEC disputes the assertions for the reasons stated in the SEC's motion for summary judgment

and opposition to Defendants' motion for summary judgment.

Dated: New York, New York
      November 30, 2022

                                        /s/ Jorge G. Tenreiro
                                     Jorge G. Tenreiro
                                     Jon A. Daniels
                                     Elizabeth Goody
                                     Benjamin H. Hanauer
                                     Ladan F. Stewart
                                     Mark R. Sylvester
                                     Daphna A. Waxman

                                     *Attorneys for Plaintiff*
                                     SECURITIES AND EXCHANGE
                                     COMMISSION
                                     New York Regional Office
                                     100 Pearl Street
                                     New York, New York 10014
                                     (212) 336-9145 (Tenreiro)
                                     TenreiroJ@sec.gov