## SECTION 3. RIGHT OF FIRST REFUSAL.

(a)  **Right of First Refusal**.  In the event that the Purchaser proposes to sell, pledge or otherwise transfer to a third party any Purchased Shares, or any interest in Purchased Shares, the Company shall have the Right of First Refusal with respect to all (and not less than all) of such Purchased Shares.  If the Purchaser desires to transfer Purchased Shares, the Purchaser shall give a written Transfer Notice to the Company describing fully the proposed transfer, including the number of Purchased Shares proposed to be transferred, the proposed transfer price, the name and address of the proposed Transferee and proof satisfactory to the Company that the proposed sale or transfer will not violate any applicable federal, State or foreign securities laws.  The Transfer Notice shall be signed both by the Purchaser and by the proposed Transferee and must constitute a binding commitment of both parties to the transfer of the Purchased Shares.  The Company shall have the right to purchase all, and not less than all, of the Purchased Shares on the terms of the proposal described in the Transfer Notice (subject, however, to any change in such terms permitted under Subsection (b) below) by delivery of a notice of exercise of the Right of First Refusal within 30 days after the date when the Transfer Notice was received by the Company.

(b)  **Transfer of Shares**.  If the Company fails to exercise its Right of First Refusal within 30 days after receiving the Transfer Notice, the Purchaser may, not later than 90 days after the Company received the Transfer Notice, conclude a transfer of the Purchased Shares subject to the Transfer Notice on the terms and conditions described in the Transfer Notice, provided that any such sale is made in compliance with applicable federal, State and foreign securities laws and not in violation of any other contractual restrictions to which the Purchaser is bound.  Any proposed transfer on terms and conditions different from those described in the Transfer Notice, as well as any subsequent proposed transfer by the Purchaser, shall again be subject to the Right of First Refusal and shall require compliance with the procedure described in Subsection (a) above.  If the Company exercises its Right of First Refusal, the parties shall consummate the sale of the Purchased Shares on the terms set forth in the Transfer Notice within 60 days after the Company received the Transfer Notice (or within such longer period as may have been specified in the Transfer Notice); provided, however, that in the event the Transfer Notice provided that payment for the Purchased Shares was to be made in a form other than cash or cash equivalents paid at the time of transfer, the Company shall have the option of paying for the Purchased Shares with cash or cash equivalents equal to the present value of the consideration described in the Transfer Notice.

(c)  **Additional or Exchanged Securities and Property**.  In the event of a Change in Control of the Company, any other corporate reorganization, a stock split, the declaration of a stock dividend, the declaration of an extraordinary dividend payable in a form other than stock, a spinoff, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Company's outstanding securities, any securities or other property (including cash or cash equivalents) that are by reason of such transaction exchanged for, or distributed with respect to, any Purchased Shares subject to this Section 3 shall immediately be subject to the Right of First Refusal.  Appropriate adjustments to reflect the exchange or distribution of such securities or property shall be made to the number and/or class of the Purchased Shares subject to this Section 3.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0046768

(d) **Termination of Right of First Refusal**. Any other provision of this Section 3 notwithstanding, in the event that the Stock is readily tradable on an established securities market when the Purchaser desires to transfer Purchased Shares, the Company shall have no Right of First Refusal, and the Purchaser shall have no obligation to comply with the procedures prescribed by Subsections (a) and (b) above.

(e) **Permitted Transfers**. This Section 3 shall not apply to (i) a transfer by beneficiary designation, will or intestate succession or (ii) a transfer to one or more members of the Purchaser's Immediate Family or to a trust established by the Purchaser for the benefit of the Purchaser and/or one or more members of the Purchaser's Immediate Family, provided in either case that the Transferee agrees in writing on a form prescribed by the Company to be bound by all provisions of this Agreement. If the Purchaser transfers any Purchased Shares, either under this Subsection (e) or after the Company has failed to exercise the Right of First Refusal, then this Agreement shall apply to the Transferee to the same extent as to the Purchaser.

(f) **Termination of Rights as Stockholder**. If the Company makes available, at the time and place and in the amount and form provided in this Agreement, the consideration for the Shares to be purchased in accordance with this Section 3, then after such time the person from whom such Shares are to be purchased shall no longer have any rights as a holder of such Shares (other than the right to receive payment of such consideration in accordance with this Agreement). Such Shares shall be deemed to have been purchased in accordance with the applicable provisions hereof, whether or not the certificate(s) therefor have been delivered as required by this Agreement.

(g) **Assignment of Right of First Refusal**. The Board of Directors may freely assign the Company's Right of First Refusal, in whole or in part. Any person who accepts an assignment of the Right of First Refusal from the Company shall assume all of the Company's rights and obligations under this Section 3.

## SECTION 4. OTHER RESTRICTIONS ON TRANSFER.

(a) **Purchaser Representations**. In connection with the issuance and acquisition of Shares under this Agreement, the Purchaser hereby represents and warrants to the Company as follows:

(i) The Purchaser is acquiring and will hold the Purchased Shares for investment for his or her account only and not with a view to, or for resale in connection with, any "distribution" thereof within the meaning of the Securities Act.

(ii) The Purchaser understands that the Purchased Shares have not been registered under the Securities Act by reason of a specific exemption therefrom and that the Purchased Shares must be held indefinitely, unless their sale or other transfer is subsequently registered under the Securities Act or the Purchaser obtains an opinion of counsel, in form and substance satisfactory to the Company and its counsel, that such registration is not required. The Purchaser

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.      RPLI_SEC 0046769

further acknowledges and understands that the Company is under no obligation to register the Purchased Shares.

(iii)　The Purchaser is aware of Rule 144 under the Securities Act, which permits limited public resales of securities acquired in a non-public offering, subject to the satisfaction of certain conditions. These conditions may include (without limitation) that certain current public information about the issuer be available, that the resale occur only after a holding period required by Rule 144 has been satisfied, that the sale occur through an unsolicited "broker's transaction," and that the amount of securities being sold during any three-month period not exceed specified limitations. The Purchaser acknowledges and understands that the conditions for resale set forth in Rule 144 have not been satisfied as of either the Date of Offer or the Date of Purchase and that the Company is not required to take action to satisfy any such conditions.

(iv)　The Purchaser will not sell, transfer or otherwise dispose of the Purchased Shares in violation of the Securities Act, the Securities Exchange Act of 1934, or the rules promulgated thereunder, including Rule 144 under the Securities Act. The Purchaser agrees that he or she will not dispose of the Purchased Shares unless and until he or she has complied with all requirements of this Agreement applicable to the disposition of Purchased Shares and he or she has provided the Company with written assurances, in substance and form satisfactory to the Company, that (A) the proposed disposition does not require registration of the Purchased Shares under the Securities Act or all appropriate action necessary for compliance with the registration requirements of the Securities Act or with any exemption from registration available under the Securities Act (including Rule 144) has been taken and (B) the proposed disposition will not result in the contravention of any transfer restrictions applicable to the Purchased Shares under applicable state law.

(v)　The Purchaser has received and has had access to such information as he or she considers necessary or appropriate for deciding whether to invest in the Purchased Shares, and the Purchaser has had an opportunity to ask questions and receive answers from the Company regarding the terms and conditions of the issuance of the Purchased Shares.

(vi)　The Purchaser is aware that his or her investment in the Company is a speculative investment that has limited liquidity and is subject to the risk of complete loss. The Purchaser is able, without impairing his or her financial condition, to hold the Purchased Shares for an indefinite period and to suffer a complete loss of his or her investment in the Purchased Shares.

(b)　**Securities Law Restrictions**. Regardless of whether the offer and sale of Shares under the Plan have been registered under the Securities Act or have been registered or qualified under the securities laws of any State or other relevant jurisdiction, the Company at its discretion may impose restrictions upon the sale, pledge or other transfer of the Purchased Shares (including the placement of appropriate legends on the stock certificates (or electronic

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.　　　RPLI_SEC 0046770

equivalent) or the imposition of stoptransfer instructions) and may refuse (or may be required to refuse) to transfer Shares acquired hereunder (or Shares proposed to be transferred in a subsequent transfer) if, in the judgment of the Company, such restrictions, legends or refusal are necessary or appropriate to achieve compliance with the Securities Act or other relevant securities or other laws, including without limitation under Regulation S of the Securities Act or pursuant to another available exemption from registration.

        (c)    **Market Stand-Off**.  In connection with any underwritten public offering by the Company of its equity securities pursuant to an effective registration statement filed under the Securities Act, including the Company's initial public offering, the Purchaser or a Transferee shall not directly or indirectly sell, make any short sale of, loan, hypothecate, pledge, offer, grant or sell any option or other contract for the purchase of, purchase any option or other contract for the sale of, or otherwise dispose of or transfer, or agree to engage in any of the foregoing transactions with respect to, any Purchased Shares without the prior written consent of the Company or its managing underwriter.  Such restriction (the "Market Stand-Off") shall be in effect for such period of time following the date of the final prospectus for the offering as may be requested by the Company or such underwriter.  In no event, however, shall such period exceed 180 days plus such additional period as may reasonably be requested by the Company or such underwriter to accommodate regulatory restrictions on (i) the publication or other distribution of research reports or (ii) analyst recommendations and opinions, including (without limitation) the restrictions set forth in Rule 2711(f)(4) of the National Association of Securities Dealers and Rule 472(f)(4) of the New York Stock Exchange, as amended, or any similar successor rules. The Market Stand-Off shall in any event terminate two years after the date of the Company's initial public offering.  In the event of the declaration of a stock dividend, a spinoff, a stock split, an adjustment in conversion ratio, a recapitalization or a similar transaction affecting the Company's outstanding securities without receipt of consideration, any new, substituted or additional securities which are by reason of such transaction distributed with respect to any Shares subject to the Market Stand-Off, or into which such Shares thereby become convertible, shall immediately be subject to the Market Stand-Off.  In order to enforce the Market Stand-Off, the Company may impose stop-transfer instructions with respect to the Purchased Shares until the end of the applicable stand-off period.  The Company's underwriters shall be beneficiaries of the agreement set forth in this Subsection (c).  This Subsection (c) shall not apply to Shares registered in the public offering under the Securities Act.

        (d)    **Rights of the Company**.  The Company shall not be required to (i) transfer on its books any Purchased Shares that have been sold or transferred in contravention of this Agreement or (ii) treat as the owner of Purchased Shares, or otherwise to accord voting, dividend or liquidation rights to, any transferee to whom Purchased Shares have been transferred in contravention of this Agreement.

## SECTION 5. SUCCESSORS AND ASSIGNS.

        Except as otherwise expressly provided to the contrary, the provisions of this Agreement shall inure to the benefit of, and be binding upon, the Company and its successors and assigns and be binding upon the Purchaser and the Purchaser's legal representatives, heirs, legatees, distributees, assigns and transferees by operation of law, whether or not any such

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.       RPLI_SEC 0046771

person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof.

## SECTION 6. NO RETENTION RIGHTS.

Nothing in this Agreement or in the Plan shall confer upon the Purchaser any right to continue providing services to the Company for any period of specific duration or interfere with or otherwise restrict in any way the rights of the Company (or any Parent or Subsidiary employing or retaining the Purchaser) or of the Purchaser, which rights are hereby expressly reserved by each, to terminate his or her Service at any time and for any reason, with or without cause.

## SECTION 7. TAX ELECTION.

The acquisition of the Purchased Shares may result in adverse tax consequences that may be avoided or mitigated by filing an election under Code Section 83(b). Such election may be filed only within 30 days after the date of purchase set forth in the Summary of Stock Purchase. The form for making the Code Section 83(b) election is attached to this Agreement as an Exhibit. **The Purchaser should consult with his or her tax advisor to determine the tax consequences of acquiring the Purchased Shares and the advantages and disadvantages of filing the Code Section 83(b) election. The Purchaser acknowledges that it is his or her sole responsibility, and not the Company's, to file a timely election under Code Section 83(b), even if the Purchaser requests the Company or its representatives to make this filing on his or her behalf.**

## SECTION 8. LEGENDS.

All certificates evidencing Purchased Shares shall bear the following legends:

"THE SHARES REPRESENTED HEREBY MAY NOT BE SOLD, ASSIGNED, TRANSFERRED, ENCUMBERED OR IN ANY MANNER DISPOSED OF, EXCEPT IN COMPLIANCE WITH THE TERMS OF A WRITTEN AGREEMENT BETWEEN THE COMPANY AND THE REGISTERED HOLDER OF THE SHARES (OR THE PREDECESSOR IN INTEREST TO THE SHARES). SUCH AGREEMENT GRANTS TO THE COMPANY CERTAIN RIGHTS OF FIRST REFUSAL UPON AN ATTEMPTED TRANSFER OF THE SHARES AND CERTAIN REPURCHASE RIGHTS UPON TERMINATION OF SERVICE WITH THE COMPANY. IN ADDITION, THE SHARES ARE SUBJECT TO RESTRICTIONS ON TRANSFER FOR A LIMITED PERIOD FOLLOWING THE EFFECTIVE DATE OF THE UNDERWRITTEN PUBLIC OFFERING OF THE COMPANY'S SECURITIES AND MAY NOT BE SOLD OR OTHERWISE DISPOSED OF BY THE HOLDER WITHOUT THE CONSENT OF THE COMPANY OR THE MANAGING UNDERWRITER. THE SECRETARY OF THE COMPANY WILL UPON WRITTEN REQUEST FURNISH A COPY OF SUCH AGREEMENT TO THE HOLDER HEREOF WITHOUT CHARGE."

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.     RPLI_SEC 0046772

All certificates evidencing the Purchased Shares acquired under this Agreement in an unregistered transaction shall bear the following legend (and such other restrictive legends as are required or deemed advisable under the provisions of any applicable law):

> "THE SHARES REPRESENTED HEREBY HAVE NOT BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED (THE "ACT") OR ANY SECURITIES LAWS OF ANY U.S. STATE, AND MAY NOT BE SOLD, REOFFERED, PLEDGED, ASSIGNED, ENCUMBERED OR OTHERWISE TRANSFERRED OR DISPOSED WITHOUT AN EFFECTIVE REGISTRATION THEREOF UNDER SUCH ACT OR AN OPINION OF COUNSEL, SATISFACTORY TO THE COMPANY AND ITS COUNSEL, THAT SUCH REGISTRATION IS NOT REQUIRED. IN THE ABSENCE OF REGISTRATION OR THE AVAILABILITY (CONFIRMED BY OPINION OF COUNSEL) OF AN ALTERNATIVE EXEMPTION FROM REGISTRATION UNDER THE ACT (INCLUDING WITHOUT LIMITATION IN ACCORDANCE WITH REGULATION S UNDER THE ACT), THESE SHARES MAY NOT BE SOLD, REOFFERED, PLEDGED, ASSIGNED, ENCUMBERED OR OTHERWISE TRANSFERRED OR DISPOSED OF. HEDGING TRANSACTIONS INVOLVING THESE SHARES MAY NOT BE CONDUCTED UNLESS IN COMPLIANCE WITH THE ACT."

If required by the authorities of any State in connection with the issuance of the Purchased Shares, the legend or legends required by such State authorities shall also be endorsed on all such certificates.

**SECTION 9. MISCELLANEOUS PROVISIONS.**

(a) **Choice of Law**. This Agreement shall be governed by, and construed in accordance with, the laws of the State of Delaware, as such laws are applied to contracts entered into and performed in such State.

(b) **Notice.** Any notice required by the terms of this Agreement shall be given in writing. It shall be deemed effective upon (i) personal delivery, (ii) deposit with the United States Postal Service, by registered or certified mail, with postage and fees prepaid, (iii) deposit with Federal Express Corporation, with shipping charges prepaid or (iv) deposit with any internationally recognized express mail courier service. Notice shall be addressed to the Company at its principal executive office and to the Purchaser at the address that he or she most recently provided to the Company in accordance with this Subsection (b).

(c) **Entire Agreement**. The Summary of Stock Purchase, this Agreement and the Plan constitute the entire contract between the parties hereto with regard to the subject matter hereof. They supersede any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof.

**SECTION 10. ACKNOWLEDGEMENTS OF THE PURCHASER.**

In addition to the other terms, conditions and restrictions imposed on the Shares acquired pursuant to this Agreement, the Purchaser expressly acknowledges being subject to

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.      RPLI_SEC 0046773

Sections 2 (Right of Repurchase), 3 (Right of First Refusal) and 4 (Other Restrictions on Transfer, including without limitation the Market Stand-Off), as well as the following provisions:

        (a)    **Waiver of Statutory Information Rights**. The Purchaser acknowledges and agrees that, until the first sale of the Company's Stock to the general public pursuant to a registration statement filed under the Securities Act, he or she will be deemed to have waived any rights the Purchaser might otherwise have had under Section 220 of the Delaware General Corporation Law (or under similar rights under other applicable law) to inspect for any proper purpose and to make copies and extracts from the Company's stock ledger, a list of its stockholders and its other books and records or the books and records of any subsidiary. This waiver applies only in the Purchaser's capacity as a stockholder and does not affect any other inspection rights the Purchaser may have under other law or pursuant to a written agreement with the Company.

        (b)    **Plan Discretionary**. The Purchaser understands and acknowledges that (i) the Plan is entirely discretionary, (ii) the Company and the Purchaser's employer have reserved the right to amend, suspend or terminate the Plan at any time, (iii) the transfer of the Purchased Shares does not in any way create any contractual or other right to receive additional awards under the Plan at any time or in any amount and (iv) all determinations with respect to any additional awards, including (without limitation) the times when awards will be granted, the number of Shares offered and the vesting schedule, will be at the sole discretion of the Company.

        (c)    **Termination of Service**. The Purchaser understands and acknowledges that participation in the Plan ceases upon termination of his or her Service for any reason, except as may explicitly be provided otherwise in the Plan or this Agreement.

        (d)    **Extraordinary Compensation**. The value of the Purchased Shares shall be an extraordinary item of compensation outside the scope of the Purchaser's employment contract, if any, and shall not be considered a part of his or her normal or expected compensation for purposes of calculating severance, resignation, redundancy or end-of-service payments, bonuses, long-service awards, pension or retirement benefits or similar payments.

        (e)    **Authorization to Disclose**. The Purchaser hereby authorizes and directs the Purchaser's employer to disclose to the Company or any Subsidiary any information regarding the Purchaser's employment, the nature and amount of the Purchaser's compensation and the fact and conditions of the Purchaser's participation in the Plan, as the Purchaser's employer deems necessary or appropriate to facilitate the administration of the Plan.

        (f)    **Personal Data Authorization**. The Purchaser consents to the collection, use and transfer of personal data as described in this Subsection (f). The Purchaser understands and acknowledges that the Company, the Purchaser's employer and the Company's other Subsidiaries hold certain personal information regarding the Purchaser for the purpose of managing and administering the Plan, including (without limitation) the Purchaser's name, home address, telephone number, date of birth, social insurance number, salary, nationality, job title, any Shares or directorships held in the Company and details of all options or any other entitlements to Shares awarded, canceled, exercised, vested, unvested or outstanding in the Purchaser's favor (the "**Data**"). The Purchaser further understands and acknowledges that the

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.      RPLI_SEC 0046774

Company and/or its Subsidiaries will transfer Data among themselves as necessary for the purpose of implementation, administration and management of the Purchaser's participation in the Plan and that the Company and/or any Subsidiary may each further transfer Data to any third party assisting the Company in the implementation, administration and management of the Plan. The Purchaser understands and acknowledges that the recipients of Data may be located in the United States or elsewhere. The Purchaser authorizes such recipients to receive, possess, use, retain and transfer Data, in electronic or other form, for the purpose of administering the Purchaser's participation in the Plan, including a transfer to any broker or other third party with whom the Purchaser elects to deposit Shares acquired under the Plan of such Data as may be required for the administration of the Plan and/or the subsequent holding of Shares on the Purchaser's behalf. The Purchaser may, at any time, view the Data, require any necessary modifications of Data or withdraw the consents set forth in this Subsection (f) by contacting the Company in writing.

## SECTION 11. DEFINITIONS.

(a)  "**Agreement**" shall mean this Stock Purchase Agreement.

(b)  "**Board of Directors**" shall mean the Board of Directors of the Company, as constituted from time to time or, if a Committee has been appointed, such Committee.

(c)  "**Cause**" means (a) the unauthorized use or disclosure of the Company's confidential information or trade secrets, which use or disclosure causes material harm to the Company, (b) material breach of any agreement between the Purchaser and the Company, (c) a material failure to comply with the Company's written policies or rules, (d) a conviction of, or plea of "guilty" or "no contest" to, a felony under the laws of the United States or any State, (e) gross negligence or willful misconduct, (f) continuing failure to perform assigned duties after receiving written notification of the failure from the Company or (g) failure to cooperate in good faith with a governmental or internal investigation of the Company or its directors, officers or employees, if the Company has requested the Purchaser's cooperation.

(d)  "**Change in Control**" shall mean the consummation of a reorganization, merger or consolidation, or sale or other disposition of all or substantially all of the assets of the Company, or the acquisition of assets of another corporation or entity, or other similar transaction (each, a "Business Combination"), unless, in each case, immediately following such Business Combination (A) all or substantially all of the individuals and entities who were the beneficial owners of voting stock of the Company immediately prior to such Business Combination beneficially own, directly or indirectly, more than 55% of the combined voting power of the then outstanding shares of voting stock of the entity resulting from such Business Combination (including, without limitation, an entity which as a result of such transaction owns the Company or all or substantially all of the Company's assets either directly or through one or more subsidiaries,) and (B) at least a majority of the members of the Board of Directors of the entity resulting from such Business Combination were members of the Board of Directors of the Company at the time of the execution of the initial agreement or of the action of the Board providing for such Business Combination.

(e)  "**Constructive Termination**" shall mean (i) without the Purchaser's written consent, a reduction in the Purchaser's base salary, other than a reduction in salary that is

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.　　　　　RPLI_SEC 0046775

part of an expense reduction effort applied to the executive management team (defined as the Chief Operating Officer and the Chief Operating Officer's direct reports) generally and which results in a percentage reduction of the Purchaser's salary or bonus no greater than the greatest percentage reduction applied to at least one other member of the executive management team; or (ii) without the Purchaser's written consent, a relocation of the Purchaser's principal place of work to a location more than 50 miles away from the Purchaser's home prior to the relocation; or (iii) without the Purchaser's written consent the significant reduction of the Purchaser's duties or responsibilities when compared to the Purchaser's duties or responsibilities in effect immediately prior to such change; it is understood, however, that if, following a Change of Control pursuant to which the Company becomes part of a larger entity but remains a separate business entity, the Purchaser continues to be the general manager of such business entity (or a successor entity) and the Purchaser retains responsibility for managing the day to day operations of such business entity (even if the Company is a part of such larger entity and/or the Purchaser no longer reports to or interacts with the Board of Directors of either the Company or the acquiring entity or if the Purchaser no longer retains the title of Chief Executive Officer or Chief Operating Officer) such arrangements shall not be considered a Constructive Termination under the foregoing clause 2(b).

(f)  "**Company**" shall mean Ripple Labs Inc., a Delaware corporation.

(g)  "**Exchange Act**" means the Securities Exchange Act of 1934, as amended.

(h)  "**Immediate Family**" shall mean any child, stepchild, grandchild, parent, stepparent, grandparent, spouse, sibling, mother-in-law, father-in-law, son-in-law, daughter-in-law, brother-in-law or sister-in-law and shall include adoptive relationships.

(i)  "**Involuntary Termination**" means either (i) a Termination Without Cause or (ii) a Resignation for Good Reason.

(j)  "**Plan**" shall mean the Ripple Labs, Inc. 2014 Stock Plan, as amended.

(k)  "**Purchased Shares**" shall mean the Shares purchased by the Purchaser pursuant to this Agreement.

(l)  "**Purchase Price**" shall mean the amount for which one Share may be purchased pursuant to this Agreement, as specified in the Summary of Stock Purchase.

(m)  "**Purchaser**" shall mean the person named in the Summary of Stock Purchase.

(n)  "**Repurchase Period**" shall mean a period of 90 consecutive days commencing on the date when the Purchaser's Service terminates for any reason, including (without limitation) death or disability.

(o)  "**Resignation for Good Reason**" means a Separation as a result of the Purchaser's resignation within 12 months after one of the following conditions has come into existence without the Purchaser's consent:

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0046776

(i)     A reduction in the Purchaser's base salary by more than 10%;

(ii)    A relocation of the Purchaser's principal workplace by more than 40 miles that materially increases the Purchaser's one-way commute;

(iii)   A material diminution in the Purchaser's authority, duties or responsibilities, provided that a mere change in title following a Change in Control, that is not accompanied by a material diminution of authority, duties or responsibilities, will not give rise to a Resignation for Good Reason; or

(iv)    A breach by the Company of a material provision of a written agreement between the Company and the Purchaser.

A Resignation for Good Reason will not be deemed to have occurred unless the Purchaser gives the Company written notice of the condition within 90 days after the condition comes into existence and the Company fails to remedy the condition within 30 days after receiving such written notice.

(p)     **"Restricted Share"** shall mean a Purchased Share that is subject to the Right of Repurchase.

(q)     **"Right of First Refusal"** shall mean the Company's right of first refusal described in Section 3.

(r)     **"Right of Repurchase"** shall mean the Company's right of repurchase described in Section 2.

(s)     **"Separation"** means a "separation from service," as defined in the regulations under Code Section 409A.

(t)     **"Service"** means service as an Employee, Outside Director or Consultant.

(u)     **"Termination Without Cause"** means a Separation as a result of a termination of employment by the Company without Cause, provided the Purchaser is willing and able to continue performing services within the meaning of Treasury Regulation 1.409A-1(n)(1).

(v)     **"Transferee"** shall mean any person to whom the Purchaser has directly or indirectly transferred any Purchased Share.

(w)     **"Transfer Notice"** shall mean the notice of a proposed transfer of Purchased Shares described in Section 3.

**CONFIDENTIAL**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0046777

EXHIBIT I

## SECTION 83(b) ELECTION

The undersigned taxpayer hereby elects, pursuant to Section 83(b) of the Internal Revenue Code of 1986, as amended, and pursuant to Treasury Regulations Section 1.83-2, to include in gross income as compensation for services the excess (if any) of the fair market value of the shares described below over an amount paid for those shares.

A.　　The taxpayer who performed the services is:

　　　　Name:　　**Bradley Garlinghouse**

　　　　Address:

　　　　Social Security No.: _____

B.　　The property with respect to which the election is made is ▮▮▮▮▮ shares of the common stock of Ripple Labs Inc.

C.　　The property was transferred to the taxpayer on December 13, 2016.

D.　　The taxable year for which the election is made is the calendar year 2016.

E.　　The property is subject to a repurchase right pursuant to which the issuer has the right to acquire the property if for any reason taxpayer's service with the issuer terminates. The issuer's repurchase right lapses in a series of installments over a four-year period ending on January 1, 2021.

F.　　The fair market value of such property at the time of transfer (determined without regard to any restriction other than a restriction that by its terms will never lapse) is ▮▮ per share x ▮▮▮▮▮▮▮▮▮▮

G.　　For the property transferred, the taxpayer paid ▮▮▮ per share × ▮▮▮▮▮▮ ▮▮▮▮

H.　　The amount to include in gross income is $0.

I.　　A copy of this statement was furnished to Ripple Labs, Inc., for whom taxpayer rendered the services underlying the transfer of such property.

J.　　This statement is executed on December 13, 2016.

_____　　　　_____
Signature of Spouse (if any)　　　　　　　　Signature of Taxpayer

*Within 30 days after the date of transfer of the property, this election must be filed with the Internal Revenue Service office where the taxpayer files his or her annual federal income tax return. The filing should be made by registered or certified mail, return receipt requested. The taxpayer must (a) include a copy of the completed form with his or her federal income tax return for the taxable year in which the property is transferred and (b) deliver an additional copy to the Company.*

　　　　　　　**CONFIDENTIAL**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.　　　　RPLI_SEC 0046778

# PARTIAL-RECOURSE PROMISSORY NOTE

December 13, 2016
San Francisco, CA

       FOR VALUE RECEIVED, the undersigned Borrower promises to pay to Ripple Labs Inc. (the "Company") at its principal executive offices the principal sum of ▮▮▮▮▮▮ together with interest from the date of this Note on the unpaid principal balance, upon the terms and conditions specified below.

       1.    **Term.**  The principal balance of this Note, together with all interest accrued and unpaid to date, shall be due and payable in full at the close of business on the seventh (7th) anniversary of the date of this Note, subject to earlier acceleration pursuant to Section 6 below and Section 8 of the Stock Pledge Agreement securing this Note (the "Pledge Agreement").

       2.    **Rate of Interest.**  Interest shall accrue under this Note on any unpaid principal balance at the rate of 1.47% per annum, compounded annually.

       3.    **Partial Recourse Obligation.**  Regardless of any collateral that may secure the Borrower's obligations under this Note, the Borrower shall initially remain personally liable for the payment of 51% of the initial principal balance of this Note (such portion, as adjusted hereunder, the "Recourse Account Balance"). With respect to such personal liability of the Recourse Account Balance, the Company shall have recourse to ___ units of XRP, equivalent to the value of the Recourse Account Balance based on the trading price of XRP as of the date of this Note, in addition to any Shares pledged pursuant to the Pledge Agreement, to satisfy the Borrower's obligations hereunder. For the avoidance of doubt, with respect to the outstanding balance of this Note that is in excess of the Recourse Account Balance, such amount is non-recourse and is secured only by the Shares.

       4.    **Prepayment.**  Prepayment of principal and interest may be made at any time, without penalty. Prepayments shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable, and any remainder applied to principal. To the extent that prepayments are applied to principal, such payments shall be applied first to reduce the Recourse Account Balance.

       5.    **Events of Acceleration.**  The entire unpaid principal sum and accrued interest under this Note shall become immediately due and payable upon the earliest:

       (a)    The date that is 90 days following the date on which the Borrower's continuous service with the Company terminates for any reason; provided that it shall become due immediately upon the date service terminates if the Borrower is removed from his position as a member of the Board under a stockholder-approved process constituting a for-cause removal;

                                                      **CONFIDENTIAL**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.       RPLI_SEC 0046779

(b)     The date when the Borrower disposes of all of the shares of the Company's Common Stock acquired by him or her with the proceeds of this Note (the "Shares"), including (without limitation) a sale of Shares to the Company;

(c)     The failure of the Borrower to pay when due the principal balance and accrued interest under this Note;

(d)     The latest date when repayment must be made in order to prevent a violation of Section 13(k) of the Securities Exchange Act of 1934, as amended;

(e)     The filing of a petition by or against the Borrower under any provision of the Bankruptcy Reform Act (Title 11 of the United States Code), as amended or recodified from time to time, or under any other law relating to bankruptcy, insolvency, reorganization or other relief for debtors;

(f)     The appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of the Borrower;

(g)     The execution by the Borrower of a general assignment for the benefit of creditors;

(h)     The insolvency of the Borrower or the Borrower's failure to pay his or her debts as they become due;

(i)     Any attachment or like levy on any property of the Borrower; or

(j)     The occurrence of an event of default under the Pledge Agreement.

6.     **Security.** The Borrower's obligations under this Note shall be secured by a first-priority security interest in all of the Shares. The Shares shall be pledged pursuant to the Pledge Agreement, all terms of which are incorporated herein by this reference. Regardless of any collateral that may secure the Borrower's obligations under this Note, the Borrower shall remain personally liable for the payment of the Recourse Account Balance under this Note.

7.     **Collection and Attorneys' Fees.** If any action is instituted to collect this Note, the Borrower promises to pay all reasonable costs and expenses (including reasonable attorney's fees) incurred by the Company in connection with such action (the "Costs") to the extent the Company is successful on the merits.

8.     **Waiver.** No previous waiver and no failure or delay by the Company or the Borrower in acting with respect to the terms of this Note or the Pledge Agreement shall constitute a waiver of any breach, default or failure of condition under this Note, the Pledge Agreement or the obligations secured thereby. A waiver of any term of this Note, the Pledge Agreement or of any of the obligations secured thereby must be made in writing and signed by a

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.          RPLI_SEC 0046780

duly authorized officer of the Company and shall be limited to the express terms of such waiver. The Borrower hereby expressly waives presentment and demand for payment when any payments are due under this Note.

        9.    **Conflicting Agreements.** In the event of any inconsistencies between the terms of this Note and the terms of any other document related to the loan evidenced by this Note, the terms of this Note shall prevail.

        10.    **Governing Law.** This Note shall be construed in accordance with the laws of the State of California (without regard to its choice-of-law provisions).

<div align="center">

**BORROWER:**

**Bradley Garlinghouse**

</div>

Signature of Borrower

Address:

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.      RPLI_SEC 0046781

## **EXHIBIT G**

### **FORM OF STOCK PLEDGE AGREEMENT**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.          RPLI_SEC 0046782

# STOCK PLEDGE AGREEMENT

In order to secure payment of all obligations of Bradley Garlinghouse (the "Borrower") to Ripple Labs Inc., a Delaware corporation (the "Company"), under the promissory note dated December 13, 2016, in the original principal amount of ▮▮▮▮▮ (the "Note"), the Borrower hereby grants to the Company a security interest in, and assigns, transfers and pledges to the Company, the following securities and other property:

(a)    The ▮▮▮▮ shares of the Company's Class A Common Stock delivered to and deposited with the Company as collateral for the Note (the "Shares"); and

(b)    Any and all new, additional or different securities or other property subsequently distributed with respect to the Shares that are to be delivered to and deposited with the Company pursuant to the requirements of Section 3 of this Agreement; and

(c)    Any and all other property and money that is delivered to or comes into the possession of the Company pursuant to the terms and provisions of this Agreement; and

(d)    The proceeds of any sale, exchange or disposition of the property and securities described in Subsection (a), (b) or (c) above.

All of the foregoing securities, property and money are referred to herein as the "Collateral" and shall be accompanied by one or more stock power assignments properly endorsed to the Company by the Borrower. The Company shall hold the Collateral in accordance with the following terms and provisions:

1.    **Warranties**. The Borrower hereby warrants to the Company that the Borrower is the owner of the Collateral and has the right to pledge the Collateral and that the Collateral is free from all liens, advance claims and other security interests (other than those created hereby).

2.    **Rights and Powers**. The Company may, without obligation to do so, exercise one or more of the following rights and powers with respect to the Collateral:

(a)    Accept in its discretion, but subject to the applicable limitations of Section 7, other property of the Borrower in exchange for all or part of the Collateral and release Collateral to the Borrower to the extent necessary to effect such exchange, and in such event the money, property or securities received in the exchange shall be held by the Company as substitute security for the Note and all other indebtedness secured hereunder;

CONFIDENTIAL

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0046783

(b)     Perform such acts as are necessary to preserve and protect the Collateral and the rights, powers and remedies granted with respect to such Collateral by this Agreement; and

(c)     Transfer record ownership of the Collateral to the Company or its nominee and receive, endorse and give receipt for, or collect by legal proceedings or otherwise, dividends or other distributions made or paid with respect to the Collateral, but only if there exists at the time an outstanding event of default under Section 8 of this Agreement.

Any action by the Company pursuant to the provisions of this Section 2 may be taken without notice to the Borrower. Any costs or expenses (including attorneys' fees) reasonably incurred in connection with any such action shall be payable by the Borrower and form part of the indebtedness secured hereunder, as provided in Section 11.

As long as there exists no event of default under Section 8 of this Agreement, the Borrower may exercise all stockholder voting rights and shall be entitled to receive any and all regular cash dividends paid on the Collateral. Accordingly, until such time as an event of default occurs under this Agreement, all proxy statements and other stockholder materials pertaining to the Collateral shall be delivered to the Borrower at the address indicated below; provided, however, that if an event of default has occurred hereunder and is continuing, any or all Collateral may be registered, without notice, in the name of the Company or its nominee, and thereafter the Company or its nominee may exercise, without notice, all voting and corporate rights at any meeting of the stockholders of the Company, any and all rights of conversion, exchange or subscription, or any other rights, privileges or options pertaining to the Collateral, all as if the Company were the absolute owner thereof.

Any cash sums that the Company may receive in the exercise of its rights and powers under this Section 2 shall be applied to the payment of the Note and any other indebtedness secured hereunder, in such order of application as the Company deems appropriate. Any remaining cash shall be paid over to the Borrower.

3.     **Duty to Deliver**. Any new, additional or different securities that may now or hereafter become distributable with respect to the Collateral by reason of (i) any stock dividend, stock split or reclassification of the capital stock of the Company or (ii) any merger, consolidation or other reorganization affecting the capital structure of the Company shall, upon receipt by the Borrower, be promptly delivered to and deposited with the Company as part of the Collateral hereunder. Such securities shall be accompanied by one or more properly endorsed stock power assignments.

4.     **Care of Collateral**. The Company shall exercise reasonable care in the custody and preservation of the Collateral but shall have no obligation to initiate any action with respect to, or otherwise inform the Borrower of, any conversion, call, exchange right, preemptive right, subscription right, purchase offer or other right or privilege relating to or affecting the Collateral; provided, however, that the Company will notify the Borrower of any such rights of the Borrower to protect against adverse claims or to protect the Collateral against the possibility of a decline in market value. The Company shall not be obligated to take any action with respect

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.     RPLI_SEC 0046784

to the Collateral requested by the Borrower unless the request is made in writing and the Company determines that the requested action will not unreasonably jeopardize the value of the Collateral as security for the Note and other indebtedness secured hereunder.

The Company may at any time release and deliver all or part of the Collateral to the Borrower, and the receipt thereof by the Borrower shall constitute a complete and full acquittance for the Collateral so released and delivered. The Company shall accordingly be discharged from any further liability or responsibility for the Collateral, and the released Collateral shall no longer be subject to the provisions of this Agreement. However, any and all releases of the Collateral shall be effected in compliance with the applicable limitations of Section 7.

5. **Payment of Taxes and Other Charges.** The Borrower shall pay, prior to the delinquency date, all taxes, liens, assessments and other charges against the Collateral, and in the event of the Borrower's failure to do so, the Company may at its election pay any or all of such taxes and charges without contesting the validity or legality thereof. The payments so made shall become part of the indebtedness secured hereunder and, until paid, shall bear interest at the minimum per annum rate, compounded annually, required to avoid the imputation of interest income to the Company and compensation income to the Borrower under the federal tax laws.

6. **Transfer of Collateral.** In connection with the transfer or assignment of all or part of the indebtedness evidenced by the Note (whether by negotiation, discount or otherwise), the Company may transfer all or any part of the Collateral, and the transferee shall thereupon succeed to all the rights, powers and remedies granted the Company hereunder with respect to the Collateral so transferred. Upon such transfer, the Company shall be fully discharged from all liability and responsibility for the transferred Collateral. With respect to any Collateral not transferred, the Company shall retain all rights, powers, privileges and remedies provided herein.

7. **Release of Collateral.** Provided that (i) all indebtedness secured hereunder (other than payments not yet due and payable under the Note) has at the time been paid in full or cancelled and (ii) there does not otherwise exist any event of default under Section 8, the Shares, together with any additional Collateral that may hereafter be pledged and deposited hereunder, shall be released from pledge and returned to the Borrower in accordance with the following provisions:

(a) Upon payment or prepayment of principal under the Note, together with payment of all accrued interest to date, one or more of the Shares shall (subject to the applicable limitations of Subsections (d) and (e) below) be released to the Borrower within three business days after such payment or prepayment. The number of Shares to be so released shall be equal to the number obtained by multiplying (i) the total number of Shares held under this Agreement at the time of the payment or prepayment by (ii) a fraction, the numerator of which shall be the amount of the principal paid or prepaid and the denominator of which shall be the unpaid principal balance of the Note immediately prior to such payment or prepayment. In no event, however, shall any fractional Shares be released.

(b)     One or more of the Shares shall (subject to the applicable limitations of Subsections (d) and (e) below) be released for the sole purpose of effecting an immediate sale of the released Shares for cash, provided that the sales proceeds (up to the balance of principal and interest due under the Note) are provided directly to the Company to be used to satisfy the Note.

(c)     Any additional Collateral that may hereafter be pledged and deposited with the Company (pursuant to the requirements of Section 3) with respect to the Shares shall be released at the same time as the particular Shares to which the additional Collateral relates are to be released in accordance with the applicable provisions of Subsection (a) or (b) above.  Under no circumstances, however, shall any Shares or any other Collateral be released if previously applied to the payment of any indebtedness secured hereunder.

(d)     In no event shall any Shares be released pursuant to Subsection (a), (b) or (c) above if, and to the extent that, the fair market value of the Shares and all other Collateral that would otherwise remain in pledge under this Agreement immediately after the release would be less than the unpaid balance of the Note (principal and accrued interest).

(e)     To the extent required by regulations of the Federal Reserve Board pertaining to margin securities, the number of Shares to be released pursuant to Subsection (a), (b) or (c) above shall be reduced.

8.     **Events of Default**.  The occurrence of one or more of the following events shall constitute an event of default under this Agreement:

(a)     Any default in the payment or performance of any obligation or any defined event of default under the Note;

(b)     The Borrower's failure to perform any obligation or agreement contained herein;

(c)     The discovery that any warranty made by the Borrower herein is incorrect, false or misleading in any material respect; or

(d)     Any attachment or like levy on any property of the Borrower.

Upon the occurrence of any such event of default, the Company may, at its election, declare the Note and all other indebtedness secured hereunder to be immediately due and payable and may exercise any or all of the rights and remedies granted to a secured party under the provisions of the Uniform Commercial Code (as now or hereafter in effect), including (without limitation) the power to dispose of the Collateral by public or private sale or to accept the Collateral in full payment of the Note and all other indebtedness secured hereunder.

Any proceeds realized from the disposition of the Collateral pursuant to the foregoing power of sale shall be applied first to the payment of reasonable expenses incurred by

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0046786

the Company in connection with the disposition, then to the payment of the Note and finally to any other indebtedness secured hereunder. Any surplus proceeds shall be paid over to the Borrower. However, in the event such proceeds prove insufficient to satisfy all obligations of the Borrower under the Note, then the Borrower shall remain personally liable for the resulting deficiency, but only to the extent of the recourse portion of the Note.

9. **Certain Waivers**. The Borrower waives, to the fullest extent permitted by law:

(a) Any right of redemption with respect to the Collateral, whether before or after sale hereunder, and all rights, if any, of marshalling the Collateral or other collateral or security for the Borrower's obligations under the Note;

(b) Any right to require the Company (i) to proceed against any other person or entity, (ii) to exhaust any other collateral or security for any of the Borrower's obligations under the Note, (iii) to pursue any remedy in the Company's power, (iv) to make or give any presentments, demands for performance, notices of nonperformance, protests, notices of protests or notices of dishonor in connection with any of the Collateral or (v) to direct the application of payments or security for any obligations of the Borrower under the Note; and

(c) All claims, damages and demands against the Company arising out of the repossession, retention, sale or application of the proceeds of any sale of the Collateral.

10. **Other Remedies**. The rights, powers and remedies granted to the Company and the Borrower pursuant to the provisions of this Agreement shall be in addition to all rights, powers and remedies granted to the Company and the Borrower under any statute or rule of law. Any forbearance, failure or delay by the Company or the Borrower in exercising any right, power or remedy under this Agreement shall not be deemed to be a waiver of such right, power or remedy. Any single or partial exercise of any right, power or remedy under this Agreement shall not preclude the further exercise thereof, and every right, power and remedy of the Company and the Borrower under this Agreement shall continue in full force and effect, unless such right, power or remedy is specifically waived by an instrument executed by the Company or the Borrower, as the case may be.

11. **Costs and Expenses**. All reasonable costs and expenses (including reasonable attorneys' fees) incurred by the Company in the exercise or enforcement of any right, power or remedy granted it under this Agreement shall, to the extent the Company is successful on the merits in the exercise or enforcement of such right, become part of the indebtedness secured hereunder and shall constitute a personal liability of the Borrower payable immediately upon demand and bearing interest until paid at the Company's bank interest rate then being earned by the Company on its deposits.

5

CONFIDENTIAL

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC. RPLI_SEC 0046787

12.     **Applicable Law.** This Agreement shall be governed by and construed in accordance with the laws of the State of California (except its choice-of-law provisions) and shall be binding upon the executors, administrators, heirs and assigns of the Borrower.

13.     **Arbitration.** Any controversy between the parties hereto involving the construction or application of any terms, covenants or conditions of this Agreement or the Note, or any claims arising out of or relating to this Agreement or the Note, or the breach hereof or thereof, will be submitted to and settled by final and binding arbitration in San Francisco, California, in accordance with the rules of the American Arbitration Association then in effect, and judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. In the event of any arbitration under this Agreement or the Note, the prevailing party shall be entitled to recover from the losing party reasonable expenses, attorneys' fees and costs incurred therein or in the enforcement or collection of any judgment or award rendered therein. The "prevailing party" means the party determined by the arbitrator to have most nearly prevailed, even if such party did not prevail in all matters, not necessarily the one in whose favor a judgment is rendered.

14.     **Severability.** If any provision of this Agreement is held to be invalid under applicable law, then such provision shall be ineffective only to the extent of such invalidity, and neither the remainder of such provision nor any other provisions of this Agreement shall be affected thereby.

IN WITNESS WHEREOF, this Agreement has been executed by the Borrower on December 13, 2016.

**BORROWER: Bradley Garlinghouse**

Signature of Borrower

Address:

Agreed to and Accepted by:

Ripple Labs Inc.

By: _____

Title: _____

Dated: December 13, 2016

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0046788

# AMENDED AND RESTATED PARTIAL-RECOURSE PROMISSORY NOTE

■■■■■■■

March 1, 2015
San Francisco, CA

FOR VALUE RECEIVED, the undersigned Borrower promises to pay to Ripple Labs Inc. (the "Company") at its principal executive offices the principal sum of ■■■■■■■ ■■■■■■■ together with interest from the date of this Note on the unpaid principal balance, upon the terms and conditions specified below.

1.  **Term.**  The principal balance of this Note, together with all interest accrued and unpaid to date, shall be due and payable in full at the close of business on the eighth (8th) anniversary of the date of this Note, subject to earlier acceleration pursuant to Section 6 below and Section 8 of the Stock Pledge Agreement securing this Note (the "Pledge Agreement").

2.  **Rate of Interest.**  Interest shall accrue under this Note on any unpaid principal balance at the rate of 1.47% per annum, compounded annually.

3.  **Partial Recourse Obligation.**  Regardless of any collateral that may secure the Borrower's obligations under this Note, the Borrower shall initially remain personally liable for the payment of 51% of the initial principal balance of this Note (such portion, as adjusted hereunder, the "Recourse Account Balance").  With respect to such personal liability of the Recourse Account Balance, the Company shall have recourse to _____ units of XRP, equivalent to the value of the Recourse Account Balance based on the trading price of XRP as of the date of this Note, in addition to any Shares pledged pursuant to the Pledge Agreement, to satisfy the Borrower's obligations hereunder.  For the avoidance of doubt, with respect to the outstanding balance of this Note that is in excess of the Recourse Account Balance, such amount is non-recourse and is secured only by the Shares.

4.  **Prepayment.**  Prepayment of principal and interest may be made at any time, without penalty.  Prepayments shall be credited first to Costs (as defined below), if any, then to accrued interest due and payable, and any remainder applied to principal.  To the extent that prepayments are applied to principal, such payments shall be applied first to reduce the Recourse Account Balance.

5.  **Events of Acceleration.**  The entire unpaid principal sum and accrued interest under this Note shall become immediately due and payable upon the earliest:

(a)  The date that is 90 days following the date on which the Borrower's continuous service with the Company terminates for any reason; provided that it shall become due immediately upon the date service terminates if the Borrower is removed from his position as a member of the Board under a stockholder-approved process constituting a for-cause removal;

 CONFIDENTIAL

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0046789

(b)     The date when the Borrower disposes of all of the shares of the Company's Common Stock acquired by him or her with the proceeds of this Note (the "Shares"), including (without limitation) a sale of Shares to the Company;

(c)     The failure of the Borrower to pay when due the principal balance and accrued interest under this Note;

(d)     The latest date when repayment must be made in order to prevent a violation of Section 13(k) of the Securities Exchange Act of 1934, as amended;

(e)     The filing of a petition by or against the Borrower under any provision of the Bankruptcy Reform Act (Title 11 of the United States Code), as amended or recodified from time to time, or under any other law relating to bankruptcy, insolvency, reorganization or other relief for debtors;

(f)     The appointment of a receiver, trustee, custodian or liquidator of or for any part of the assets or property of the Borrower;

(g)     The execution by the Borrower of a general assignment for the benefit of creditors;

(h)     The insolvency of the Borrower or the Borrower's failure to pay his or her debts as they become due;

(i)     Any attachment or like levy on any property of the Borrower; or

(j)     The occurrence of an event of default under the Pledge Agreement.

6.     **Security**. The Borrower's obligations under this Note shall be secured by a first-priority security interest in all of the Shares. The Shares shall be pledged pursuant to the Pledge Agreement, all terms of which are incorporated herein by this reference. Regardless of any collateral that may secure the Borrower's obligations under this Note, the Borrower shall remain personally liable for the payment of the Recourse Account Balance under this Note.

7.     **Collection and Attorneys' Fees**. If any action is instituted to collect this Note, the Borrower promises to pay all reasonable costs and expenses (including reasonable attorney's fees) incurred by the Company in connection with such action (the "Costs") to the extent the Company is successful on the merits.

8.     **Waiver**. No previous waiver and no failure or delay by the Company or the Borrower in acting with respect to the terms of this Note or the Pledge Agreement shall constitute a waiver of any breach, default or failure of condition under this Note, the Pledge Agreement or the obligations secured thereby. A waiver of any term of this Note, the Pledge Agreement or of any of the obligations secured thereby must be made in writing and signed by a

GDSVF&H\2048114.3                                  2                                  **CONFIDENTIAL**

duly authorized officer of the Company and shall be limited to the express terms of such waiver. The Borrower hereby expressly waives presentment and demand for payment when any payments are due under this Note.

9.    **Conflicting Agreements.** In the event of any inconsistencies between the terms of this Note and the terms of any other document related to the loan evidenced by this Note, the terms of this Note shall prevail.

10.   **Governing Law.** This Note shall be construed in accordance with the laws of the State of California (without regard to its choice-of-law provisions).

**BORROWER:**

**Restated on 7/3/2013**

Signature of Borrower

Address:

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0046791

# EXHIBIT I

## FORM OF DOMAIN NAME ASSIGNMENT AGREEMENT

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.      RPLI_SEC 0046792

CONFIDENTIAL

# DOMAIN NAME ASSIGNMENT AGREEMENT

This Domain Name Assignment Agreement ("Agreement") is effective as of _____, 2016 (the "Effective Date") by and between Christian Larsen ("Assignor") and Ripple Labs Inc., a Delaware corporation ("Assignee").

WHEREAS, Christian Larsen acquired the domain name known as "ripplecharts.com" from                    or a sum of $10,000; and

WHEREAS, Christian Larsen, pursuant to this Agreement, will transfer ownership of "ripplecharts.com" to Ripple Labs Inc.

1.      Assignment. Assignor hereby assigns, transfers and conveys to Assignee all right, title and interest in and to the domain name known as "ripplecharts.com" and all registrations related thereto (the applicable registry entities may be collectively referred to as the "Registry"), and any and all related or similar domain names, trade names, trademarks, service marks, and other related rights, along with all associated applications, registrations and goodwill (collectively, the "Domain Name"). Assignor further waives all claims it has to the Domain Name and agrees to cease all use of the Domain Name, as a domain name, trade name, trademark or service mark or otherwise, as of the date written above.

2.      Compensation; Covenant to Assign Back. Subject to the terms of this Agreement, Assignee shall pay Assignor $10,000.00 (or equivalent in XRP) in the form of a Promissory Note attached hereto as Exhibit A (hereinafter the "Transfer Fee") as total compensation for the Section 1 assignment and all other obligations, representations and warranties of Assignor hereunder. The Transfer Fee shall be due as set forth in the Promissory Note (the "Due Date"). Should the Transfer Fee not be paid in full by the Due Date, then Assignee shall assign all rights granted to it under Section 1 back to Assignor within ten (10) days after the Due Date.

3.      Further Assurances. Assignor shall assist Assignee in every proper way to evidence, record and perfect the Section 1 assignment and to perfect, obtain, maintain, enforce, and defend any rights assigned hereunder. Assignor shall perform all acts necessary to effect the re-registration of the Domain Name from Assignor to Assignee according to the Registry's policy and to record the assignment of any related trademark applications and registrations.

4.      Warranty. Assignor represents and warrants to the Assignee that: (a) Assignor is the sole owner of all rights, title and interest in the Domain Name, (b) Assignor has the right to make the Section 1 assignment, (c) Assignor has not previously transferred or licensed or waived or given any consent or right with respect to anything purportedly assigned hereunder; (d) Assignor is not aware of any third party allegation, claim, or suit with respect to the Domain Name or any other rights assigned hereunder; (e) Assignor does not presently own any other existing or pending registration(s) which are similar to the Domain Name (including but not limited to any secondary domains or any other substantially similar domains registered on any registry throughout the world); (f) Assignor agrees not to register, attempt to register, obtain, or use any domain name, trade mark, service mark or trade name substantially similar to the Domain Name anywhere in the world; and (g) Assignor shall not take any action to prevent or otherwise interfere with Assignee's or it's licensees' or successors' use of the Domain Name or any similar mark or name, and hereby covenants not to sue or otherwise assert against Assignee under any trademark or other proprietary rights Assignor has in the Domain Name or any underlying or similar trademark, service mark, or trade name. Assignor will indemnify Assignee from all damages, losses, expenses, settlements and attorneys' fees in connection with a breach or alleged breach of any of the foregoing.

1