# PX 238

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ x

                                        :
**SECURITIES AND EXCHANGE**              :
**COMMISSION,**                          :
                                        :
                            **Plaintiff,**   :     **20 Civ. 10832**
                                        :
**- against -**                          :     **ECF Case**
                                        :
**Ripple Labs, Inc., Bradley Garlinghouse,**  :
**and Christian A. Larsen,**              :
                                        :
                                        :
                                        :
                            **Defendants.**   :
                                        :
━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━━ x

**Expert Report of** ███████████

**October 4, 2021**

## I.     __INTRODUCTION__

At the request of the Securities and Exchange Commission ("SEC"), I have reviewed the Amended Complaint ("Complaint") in the matter of *SEC v. Ripple Labs, Inc., et al*., alleging that Defendants Ripple Labs, Inc. ("Ripple"), Bradley Garlinghouse ("Garlinghouse"), and Christian A. Larsen ("Larsen") engaged in unregistered offers and sales of a digital asset, XRP.  In the Complaint, the SEC contends Defendants' XRP offers and sales are "securities" transactions requiring registration as prescribed by the Securities Act of 1933.

The primary opinions offered in this report are summarized as follows:

- Based on industry custom and practice, which is informed by federal securities law, investors typically receive various important disclosures when they are offered to purchase the securities that a company sells in a public offering.

- Under industry custom and practice, once a company engages in a public offering, it must provide to the owners of its securities, and to any market in which the securities trade, various ongoing disclosures that inform these parties about the company and the securities it has publicly issued.

- An issuer that triggers the registration requirements for a public offering of securities under the securities laws typically expends significant resources in connection with that offering and in providing ongoing information to investors and markets following that offering.

- There are various best practices for practitioners to ensure compliance with the securities laws, including by working with regulators and others to achieve a high degree of comfort that their actions are in keeping with the securities industry's high standards of investor protection.

- Those who offer and sell certain digital assets have been and can come within the purview of the regulatory requirements of the federal securities laws.

- Based on industry custom and practice, and regulatory requirements, the Defendants would have been required to make various important disclosures to the public, including certain ongoing disclosures, assuming Ripple had registered its offer and sale of XRP as securities transactions.

This report also generally summarizes a number of regulatory requirements and industry practices, in order to provide context to and basis for the expert opinions expressed in this report. These include:

- A brief background and history of securities regulation as they pertain to new offerings of securities;

- The underlying animating principle of "full and fair disclosure" which forms the cornerstone of those regulations;

- A general description of the Securities Act of 1933 ("the '33 Act") and the Securities Exchange Act of 1934 ("the '34 Act") and how these laws are structured around initial and ongoing disclosure for the protection of the investing public;

- The requirement to register an offering of securities or qualify for an exemption from registration;

- A general description of what's contained in a registration statement;

- A description of regulations related to sales of securities by company affiliates and others;

- Protection of investors through disclosure of material information in initial offerings and on an ongoing basis;

- Important disclosures which are considered material by the SEC for investor protection; and

- How the framework of disclosure in the securities laws forms the basis and approach in regulating new and innovative products.

To prepare this report, I have applied the knowledge and experience that I have accumulated in my nearly 50 years of regulatory and consulting experience. My background as a former regulator and consultant enables me to review and detail various industry and regulatory conventions, standards, and norms that govern the issuance of securities to the investing public.

My opinions are based on my knowledge, experience, professional expertise, the materials cited herein, and review of the documents listed in Exhibit A attached to this report. The direct quotations that are particularly important to this opinion have been italicized for emphasis.

This report takes no position as to whether Defendants' XRP transactions involved offers and sales of "securities" as defined by the '33 Act or '34 Act. Rather, it explains the regulatory requirements for companies and their control persons when they invite public investors to purchase securities and the customary disclosures that protect public investors and maintain the integrity of the markets in which securities are traded. The report concludes by opining on certain of the disclosures Ripple, Garlinghouse, and Larsen would have been required to make assuming that Defendants' offers and sales of XRP were considered offers and sales of securities and that Ripple had registered those XRP offerings.

## II.   QUALIFICATIONS

### A. Employment History

I have over ███████████████ y and consulti ███████████████████, I have served as the President of ████████████ Inc. located in ████████. In this capacity, I have been retained by various law firms, broker/dealers, and the government, mostly regarding trading and market related regulatory issues.  My areas of expertise include the NASDAQ, exchange-listed, and Over the Counter ("OTC") markets and the rules, regulations, customs, and best practices that govern those markets.  I have also testified as an expert on issues such as the role of market makers in OTC securities markets, best execution, suitability, market maker compensation, supervision, books and records, and the use of shell companies and reverse mergers in "pump and dump" schemes.  I have testified as an expert regarding the presence of unregistered securities distributions in manipulative schemes and the use of shell companies in reverse mergers as a way of going public.  My regulatory and consulting background has provided me with extensive expertise related to public and private offerings and the disclosures that customarily accompany both primary market and secondary market trading.

My consulting experience includes engagements by law firms, broker/dealers, foreign governments, stock exchanges, the SEC and the United States Department of Justice.  I have also been retained as an expert by defendants in several instances where they were the subject of actions brought by the federal government including the SEC.  Beyond my litigation related work, I also perform consulting services regarding securities regulation, compliance, and technology.  My work as a consultant has required me to remain current with respect to industry rules, regulations, policy, procedures, practices and customs.  One way I do so is to regularly review SEC, FINRA, and other securities industry resources, publications and research.

During my many years as an industry regulator, I have spoken as an industry expert on numerous topics including presentations before the SEC.  I have also spoken on many occasions to a wide range of industry groups and have participated in regulatory conferences and training programs for NASD,[1] SEC, and state securities authorities.  I have also provided training to the staffs of both the NASD and SEC regarding market surveillance procedures and techniques.

I have been featured in publications including *Wall Street & Technology*, *The Wall Street Journal*, and *Institutional Investor*, where I have been quoted as an authority on regulatory and technology issues.

Prior to my current position, I worked at NASDAQ for 5 years and NASD for 27 years, in various capacities, as described below.

From 1999 to 2004, I was Senior Vice President of Regulation and Controls for the NASDAQ Stock Market Inc.  In that capacity I was responsible for developing and recommending policies related to the regulation of NASDAQ, overseeing NASDAQ's regulatory budget, and monitoring

---

[1] The entity formerly known as the National Association of Securities Dealers, Inc., and now known as FINRA, is the primary self-regulatory authority for the securities industry.

the financial and operational performance of NASD pursuant to the regulatory services agreement between NASDAQ and NASD. I retired from NASDAQ in 2004 and started my own consulting firm.

From 1986 through 1999, I was Senior Vice President of Market Regulation for NASD. While in that role, I was the senior NASD executive in charge of regulatory oversight for both the OTC securities markets and the NASDAQ Stock Market Inc. In that regard, I established surveillance and examination policies and procedures for NASD in the area of small cap and microcap fraud. I also was actively involved in establishing regulatory policy for all trading practices in the NASDAQ Stock Market, the OTC Bulletin Board, and the OTC markets generally. I worked extensively with the SEC, the Securities Industry Association, and the Securities Traders Association in developing and enhancing regulatory policies and practices relating to better and more efficient equity markets.

When I assumed responsibility for market regulation in 1986, I oversaw the significant growth and effectiveness of the NASD's surveillance efforts, keeping pace with the overall growth of the NASDAQ and OTC markets. An immediate and continuing priority for the department was the focus on detecting and preventing fraud, primarily in the NASDAQ Small Cap, the OTC equity, and penny stock markets. I established a dedicated fraud unit to focus on the issues of market manipulation, including "pump and dump" schemes, "marking the close" activities, and other fraudulent devices such as "wash sales," and "matched orders." Working with my associates at NASD, many of the policies relating to fraud investigations and evidentiary standards in place today were developed during my tenure. My personal involvement in both the investigations and management of hundreds of fraud and manipulation cases have made me extremely knowledgeable as to the characteristics that are typically present in these types of cases, including cases where unregistered distributions have occurred.

I was also responsible for maintaining the integrity of prices that were publicly disseminated by the NASDAQ Stock Market to industry professionals and investors. In that regard I made assessments concerning the validity of prices being disseminated by data vendor services to the public. Where I determined the existence of prices that were not consistent with the then-quoted market or "clearly erroneous," I had the authority to remove those prices from the "tape" and from historical records.

As Senior Vice President of Market Regulation for NASD, I was also responsible for initiating trading halts to permit NASDAQ listed companies to report material information to the marketplace. In that regard, I reviewed thousands of public statements and press releases to determine whether a trading halt should be imposed based on the materiality of the information. In analyzing the materiality of corporate news announcements, I made the final determination as to what information NASDAQ listed companies were required to disclose.

Prior to assuming responsibility for market surveillance in 1986, I held various managerial and executive positions for NASD. I began my career with the NASD in 1972 as a District Examiner in New York City, the NASD's largest district office conducting on-site inspections of broker-dealers for violations of NASD and SEC rules and regulations. I assumed various management positions within the district and was promoted to Assistant Director of the NASD's Washington,

D.C. district office in 1975. I served as the District Director of the NASD's Kansas City District in 1980 and I was Corporate Secretary for NASD from 1984 to 1986.

Throughout my career at NASD, I routinely worked on or supervised regulatory endeavors that dealt with and analyzed both public and private offerings and the disclosures that customarily accompany both primary market and secondary market trading. This includes working with NASDAQ issuers on a regular basis on issues regarding ongoing material disclosures and investigative matters related to initial and ongoing disclosure by NASDAQ and OTC companies.

I graduated from St. Francis College in Brooklyn, New York with a BA in English and completed 30 credits of graduate studies in English at St. John's University in Jamaica, New York. I also attended the New York Institute of Finance for two years and completed courses in brokerage accounting and recordkeeping, investment banking and finance.

My C/V and Resume are attached as Exhibit B to this report.

### B. Testimony and Publications – Last Ten Years

I have not authored any publications in the last ten years.

I have been granted "expert" status by several federal district courts and FINRA Arbitration panels. My experience testifying as an expert over the last 10 years is highlighted below:

- In February 2011, I was deposed in connection with *SEC v. Irwin Boock, et.al.*, No. 09 Civ. 8261 (S.D.N.Y.), a case involving the identity theft of dormant OTC companies, in which I was retained as an expert on behalf of the SEC. The areas of my expert opinion included NASDAQ operations, including how companies go public, stock splits, corporate reorganizations, trading symbols, transfer agents, and '33 Act Regulation S.

- In March 2011, I testified as an expert for the SEC in *SEC v. East Delta Resources Corp. et al.*, No. 10 Civ. 0310 (E.D.N.Y.), a case that involved the market manipulation of a small cap OTC company. I testified concerning the defendants' use of "wash trades" and "matched orders," "domination and control" of the market for an OTC security by the defendants, and the elements of a typical "pump and dump" operation, including unregistered distributions.

- In May 2012, I testified as an expert for the United States in a criminal jury trial, *U.S. v. Roger Lee Shoss, et al.*, No. 8:11-CR-366-T-30TBM (M.D. Fla.), regarding how companies go public, and the use of "shell" companies in schemes involving OTC securities and other manipulative practices in the OTC markets.

- In June 2017, I testified in a FINRA arbitration, *Charles Peter Wallace v. Morgan Stanley Smith Barney LLC, et al.* (Master Case No. 14-00259), on behalf of the claimant who alleged that he had been the subject of a wrongful termination. My testimony concerned Wallace's handling of an annuity transaction for a client and whether his actions were appropriate under FINRA rules.

- In May 2018, I was deposed as an expert in *SEC v. Luke C. Zouvas, et al.,* Civil No. 17-00427-phx-spl (D. Ariz.), where I was retained by the SEC to provide an expert opinion regarding the existence of characteristics of a pump and dump scheme. My opinions included the use of "shell" companies going public, their use in pump and dump schemes and the various artificial devices that typically occur in a pump and dump.

- In June 2019, I provided expert testimony in a criminal jury trial, *U.S. v. Homm, et al.,* No. 13 Crim. 183 (C.D. Cal.). I was retained by the United States and testified regarding the use of manipulative devices in a portfolio pumping scheme and other matters involving a broker/dealer and a hedge fund manager. The testimony included descriptions of devises such as wash and matched trading, marking the close and "portfolio pumping."

- In July 2020, I was deposed as an expert for the SEC in *SEC v. Spartan Securities Group, LTD.* Case No. 8:19-cv-00448-VMC-CPT (M.D. Fla.). In that case I provided an expert opinion with regard to the characteristics of entities known in the industry as "shell factories," issues related to compliance with SEC Rule 15c2-11, material disclosures on Form 211, and the role of transfer agents and promoters in commencing trading after a reverse merger.

- In August 2020, I was deposed in *SEC v. Contrarian Press, LLC, et al.*, Case No. 16 Civ. 06964 (VSB) (S.D.N.Y.). In that case I was retained by the SEC to provide a rebuttal opinion relating to questions posed by the Defendant's expert relevant to a statistical analysis of certain price and volume movements during the Defendant's initial promotional campaign relevant to a recently formed microcap security.

- In July 2021, I provided expert testimony in a jury trial in *SEC v. Spartan Securities Group, LTD.* Case No. 8:19-cv-00448-VMC-CPT (M.D. Fla.). I testified on behalf of the SEC providing an expert opinion regarding characteristics of issues related to compliance with SEC Rule 15c2-11, material disclosures on Form 211, and the role of transfer agents, promoters, and others in creating 19 sham companies that would later be sold in a "shell factory" scheme.

### C. Compensation

I am being compensated at the rate of $400 per hour for this engagement. In accordance with recognized professional ethics, my professional fees for this service are not contingent upon the opinions expressed herein, or on the outcome of this matter.

## III.    INVESTOR DISCLOSURES AND OTHER REGULATORY REQUIREMENTS

Companies often start with a good idea or unique product or service. At times, future success may require an expansion of the current business. A company may want to finance key acquisitions, fund its business operations, retire existing debt, invest in research and

development, or add lines of business in an expanding market. This is when a business often considers the need to raise additional capital to provide the funding for its future plans.

While a company can privately solicit capital investment from other businesses and sophisticated investors like hedge funds and venture capitalists, those investors may demand outsized returns, discounted prices, or a significant control stake in the business. An attractive alternative for the company may be to seek public investors where the company can access a large pool of capital from diverse sources.

A company may solicit public investors in what is known as an Initial Public Offering (an "IPO"). In a traditional IPO, potential investors are solicited to provide capital to the company for its future business plans in exchange for shares representing an ownership in the company.[2] In purchasing shares from the company, the investor anticipates making a profit based on the efforts of company management to generate new business and revenue, which could increase the value of shares that may be traded in a secondary market. Those who participate in a traditional IPO now have invested in an enterprise where investors' monies are pooled and become part of the assets of the company for use as management sees fit.

The company's undertaking after a public securities offering is to manage the enterprise to produce profits for the company, which stands to benefit public investors who have provided their capital with an expectation that it will produce some type of return and that this success will result in price appreciation as the security trades in the secondary market.

Unlike sophisticated private investors who can have a greater say in the conduct of the enterprise, public investors are generally not proximate to the company and lack the same degree of access and control as those who can fend for themselves in efforts to protect their investment. Instead, the public investor who has been persuaded to invest in the company must rely on federally mandated disclosures to keep abreast of current developments and the financial performance of the company.

Investors take risk when they invest in an enterprise. One reason is that profits are derived through the efforts of those who run and manage the company and not those members of the public who have invested in the enterprise. Profits may take the form of distributions, i.e., dividends, but more often profits are made by investors through price appreciation of the securities in the secondary trading market where investors can buy and sell those securities. If the company is successful, the price for its securities in the secondary market may appreciate, making the investment more attractive to future investors. If the company does not fare well or is not perceived as being successful by the market, investors could lose money should the price of the company's securities fall.

---

[2] Most IPOs consist of common stock, however, they could consist of units that include both common stock and warrants to purchase additional shares. Some companies issue debt, preferred stock, multiple voting shares or units that include common stock and convertible debentures.

7

In order to protect public investors, our securities markets are heavily regulated. Federal securities law governs the process, and guides industry custom and practice, when companies seek investment by the public. These laws are designed to ensure that investors have the essential information necessary to make an informed investment decision. These laws are primarily disclosure-based. As such, they are not meant to be a predictor of success, failure, or whether the company is a good investment. Rather, the laws require the company to make certain disclosures to investors at various times. They ensure that investors have the opportunity to be informed of information relevant to their decision whether to risk their capital to invest in an enterprise. So, for example, the laws prescribe information to investors when a company first attempts to sell its securities to the public. The securities laws require the company to make additional disclosures after the public offering, when a company has widely dispersed its securities and those securities have come to rest in the hands of public investors. Those securities are then generally traded in a secondary market and are subject to ongoing disclosure requirements as described below.

These required disclosures rest on the premise that when a company solicits public capital, investors do not have access to the everyday workings of the company (unlike company insiders or sophisticated private investors who negotiate for ongoing access and information).

When a company issues securities and seeks to offer them to public investors, the company typically registers the offer and sale of those securities with the SEC and files what is called a registration statement, the heart of which is the "prospectus" or "offering circular." These required filings provide information about the company and its offering. The information provided in a registration statement includes the terms of the securities being offered as well as disclosure regarding the company's business, financial condition, management, and other matters that are key factors used by investors in deciding whether to invest. Other disclosures include risks faced by the business, how the company will use the proceeds of the offering, how the new offering might affect the price of securities already held, selected financial data, management statements and biographies, and details about executives' compensation. The registration statement also includes audited financial statements that show the company's financial condition and how the company makes and spends its money. The registration statement includes information about who is selling the securities. In an IPO, it may be the company offering the securities or it could be company insiders who are publicly selling off their existing stake, or some combination of the two.

Public investors rely on these required disclosures when deciding whether to provide capital to the company.

In a typical public offering, once investors have purchased securities or otherwise invested in the company's offering, they are now entitled to ongoing disclosures by the company, which is how public investors supervise their investment. Investors often then have the ability to trade their securities in the "secondary" trading market. The secondary market is extremely important to the capital raising function in that it provides public investors with the ability to liquidate their interests should they so choose. This gives investors the ability to profit from their investment if its price has gone up or avoid further loss if its price declines. The company's obligations to provide ongoing disclosures are designed to provide current information to the marketplace on

an annual and quarterly basis, and to provide additional information upon the occurrence of certain specified events.

Another important need for public disclosures is due to the fact that people who manage the company – sometimes called "insiders" – have access to important information that is not generally known to the public. These insiders often have their own stake in the company and/or in a particular venture that the company is pursuing, usually obtained before the company first goes public. A public offering allows for founders to exit and cash in on their personal holdings. Those insiders may also have received their stake when the company compensates them in whole or in part through issuing them securities. Since these positions are often acquired upon formation of the enterprise, the founders typically have a zero or extremely low-cost basis.

Disclosures about insider transactions provide important information to investors. This is particularly true for companies that have not previously publicly offered their securities and thus have no prior reporting history. Insiders of a company have first access to important information that could affect the company's investors and the price of the securities in the market ("asymmetry of information"). For this reason, it is crucial that the company share important information with investors or prospective investors, who are also stakeholders and are entitled to a detailed, truthful disclosure of material information regarding the enterprise. Therefore, the company must not only provide ongoing disclosures, but insiders are also typically required to file their own disclosures when they buy and sell their company's securities.

The federal securities laws are designed to put investors on an equal playing field and reduce information asymmetry, which in turn makes our markets among the most liquid and transparent markets in the world. There is a reason why investors and companies choose the United States markets – because our laws are robust and protect investors while promoting free flow of capital investment. When a company files a registration statement and makes a public offering of its securities, investors part with their money assured of the protections of federal law. This is a cornerstone of a functional economy – one where people can buy and sell assets over an impersonal exchange, and buyers and sellers do not have to transact with each other directly. This is what provides liquidity, and trust in this system is essential to the proper functioning of our capital markets.

Full and fair disclosure protects investors, which leads to greater investor confidence, more efficient markets, and as a result also lowers the cost of capital for the issuer of securities. Before these positive outcomes can occur, it is crucial that the highly effective framework, put in place by Congress, the SEC and the courts, not be circumvented and that issuers comply fully with all the requirements governing the issuance of and secondary market activity for securities. Conversely, investors and prospective investors who invest in unregistered securities offerings often lack the information and the significant protections envisioned by Congress when it determined that securities offerings be regulated by federal law.

To provide background to my opinions, below is a brief description of the statutory regulatory framework surrounding public securities offerings. In a heavily regulated industry such as the securities markets, industry custom and practice, including the activities of companies offering

securities and their management, is influenced strongly by the relevant statutes, rules, and their interpretation by the SEC and the courts.

## A.  Regulation of Securities Offerings

Prior to 1933, securities offerings were loosely regulated by states and lacked federal oversight. Congress first entered the field of securities regulation primarily in response to the stock market crash of 1929.  Congress recognized that one of the major causes of the crash was the widespread practice of offering and selling securities to unsophisticated investors who were defrauded out of their money.  Stock manipulation was widespread as was insider trading, wash and matched trading by "investment pools," and over-leveraging due to low margin rates.

Lack of disclosure was a significant cause of the 1929 crash and Great Depression which followed.  More recent market "crashes" did not have the same severe consequences as the one in 1929, in part due to the scheme of federal regulation put into place in the 1930s.  As one observer put it:

> *First, one of the most immediate causes of the crash of the securities markets in the period from 1929 to 1932 was a lack of publicly available information concerning the companies whose securities were being traded. And second, the federal system of mandatory disclosure-the government's response to the 1929 crash-worked as it was designed to work.*[3]

In enacting the federal securities laws, Congress sought to reverse the prevailing rule of commerce – "caveat emptor – buyer beware."  Instead, Congress acted to require companies to provide truthful disclosures at the time securities were issued and hold companies and insiders liable for false disclosures.  Therefore, "caveat vendor – seller beware" became the warning to those who sought to access the public markets outside of the protections afforded by the laws that would be enacted by Congress.

To achieve these objectives, Congress created the framework of disclosure through the Securities Act of 1933 and the Securities Exchange Act of 1934.  Those Acts contain provisions that provide for registration of securities offerings with the SEC, and ongoing disclosure by companies when their securities are publicly traded in secondary markets.  They also provide the backdrop for the regulatory and compliance regime under which participants in the securities markets operate.

The Supreme Court described the central tenet of these two acts in 1963:

---

[3] C. Edward Fletcher III, *Of Crashes, Corrections, and the Culture of Financial Information What They Tell Us about the Need for Federal Securities Regulation,* 54 MO. L. REV. 3 (1989). Available at *https://scholarship.law.missouri.edu/mlr/vol54/iss3/2/*

> *"A fundamental purpose [of securities regulation] . . . was to substitute a philosophy of full disclosure for the philosophy of caveat emptor and thus to achieve a high standard of business ethics in the securities industry."*[4]

There are two principal purposes to the '33 and '34 Acts, the first being the registration provisions designed to require companies to fully disclose relevant information to public investors upon which rational investment decisions can be based. The second was to protect investors from deceit, misrepresentation, and fraudulent activities in the securities markets. Under the Acts, those involved in the process of offering and selling securities became liable for any material misrepresentations or omissions in their disclosures. If an investor is defrauded, the Acts enable them to file a lawsuit for recovery. The Acts also allow the SEC to bring enforcement actions against those market participants that defraud investors or otherwise violate the securities laws. The Acts' enforcement mechanisms thus incentivize the provision of fulsome disclosure.

The regulation and enforcement of these Acts is carried out in a framework that provides for collaboration between the government and the securities industry. The SEC is the government agency responsible for the primary regulation of the industry. FINRA is an industry funded "self-regulatory" organization with examination and enforcement powers. The individual stock exchanges also have regulatory authority over their members. The oversight is designed not only to ensure adequate disclosures but also to regulate the behavior of industry professionals. The result is a multi-layered structure designed to protect public investors.

## B. The Securities Act of 1933, Section 5

Under the '33 Act, issuers and underwriters (entities that assist the issuer by purchasing securities directly from the issuer or helping to sell its securities to investors) have a duty to disclose relevant information when offering or selling securities to the public or face regulatory and civil liability if they do not. Section 2(a)(1) contains the definition of security which includes conventional instruments such as stocks and bonds, but also includes the concept of an "investment contract," a term purposely broad in order to provide the protections of the Act beyond traditional investment vehicles to non-traditional ventures.

Once an instrument, scheme, or series of transactions meets the definition of a security, Section 5(a) of '33 Act mandates that it is unlawful for any person, directly or indirectly, to engage in the sale of securities in interstate commerce unless a registration statement is in effect as to a security. Section 5(c) of the '33 Act provides a similar prohibition against offers to sell, or offers to buy, unless a registration statement has been filed. Thus, both Sections 5(a) and 5(c) of the Securities Act prohibit the unregistered offer or sale of securities in interstate commerce.

The '33 Act provides the procedures for registration and general guidance on the type of information which must be disclosed. SEC rules provide more specific textual and financial

---

[4] SEC v. Capital Gains Research Bureau, Inc., 375 U.S. 180, 186 (1963).