disclosure requirements. As discussed above, a registration statement typically provides disclosures including, but not limited to:

- the terms of the securities being offered;
- who is selling the securities;
- disclosures regarding the company's business, financial condition, and management;
- amount of any monies intended to be paid to any promoter;
- how the company will use the proceeds of the offering;
- management statements and biographies, and details about executives' compensation; and
- audited financial statements for the company.

The SEC's Division of Corporation Finance reviews a registration statement for compliance with the disclosure requirements and the applicable accounting standards. It should be noted that registration with the SEC does not imply that the SEC "approves" any offer or sale of securities. Rather, the SEC conducts a detailed review to "monitor and enhance" compliance with the disclosure requirements and the applicable accounting standards.

A publicly offered security is generally not sold until the registration statement has been declared effective by the SEC staff. The Division of Corporation Finance will work with an issuer in assuring that the disclosures are complete and accurate. Once the Division is satisfied that the issuer has met the applicable criteria, the issue is declared "effective" and it may be sold to the investing public. The fact that the SEC declares a registration statement effective does not imply that the SEC staff have ruled on the quality of the investment, since the SEC staff does not judge, opine, or comment on whether the investment is good for investors. The Division of Corporation Finance review enhances investor protection by helping to ensure the thoroughness and quality of disclosure in the registration filing and thereby puts investors in a position where they have access to facts that bear on their investment decision.[5]

In short, the '33 Act's requirements of full and fair disclosure combined with the civil liability provisions of the Act and the SEC's detailed review of issuer filings provide a scheme of protection for the public investor. This protection is provided not by supervising the quality or appropriateness of securities being offered for investment, but by ensuring that the investor has sufficient information to make an informed investment decision.

### C. Securities Exchange Act of 1934

While the '33 Act regulates the process where a company offers and sells securities to public investors, the '34 Act primarily regulates the purchase and sale transactions that take place after securities offered and sold by the issuer have come to rest in the hands of the investing public. The '34 Act regulates that secondary market, notably, national securities exchanges and brokers and dealers. Most important to this opinion is that the '34 Act requires ongoing disclosures by

---

[5] See the link to *"Filing Review Process"* as contained in the Division of Corporation Finance Section of SEC.gov; https://www.sec.gov/divisions/corpfin/cffilingreview.htm.

12

companies that have publicly offered their securities. Should a company have a registration statement declared effective by the SEC, reach a certain size with a certain number of shareholders, or if it lists a class of its securities directly on a national securities exchange, it would then have to become a "reporting company" and comply with '34 Act regulations. Specifically, the '34 Act's ongoing disclosure obligations are generally triggered, and a company becomes a "reporting company," in one of the three following ways:

- **Securities exchange listing - Section 12(b)** – if an issuer qualifies a class of securities (*e.g.*, common stock or notes) for listing on a national securities exchange (*e.g.*, the NASDAQ, the New York Stock exchange ("NYSE") or another national securities exchange). When an issuer undertakes an initial public offering, it may also list its securities for trading on a national securities exchange.

- **Issuer size - Section 12(g)** - An issuer must register a class of securities under Section 12(g) of the '34 Act if that class of its equity securities (other than exempted securities) is held of record by either (i) 2,000 persons, or (ii) 500 persons who are not accredited investors and, on the last day of the issuer's fiscal year, its total assets exceed $10 million.

- **Public offering (no securities exchange listing) - Section 15(d)** - An issuer that files a registration statement under the '33 Act becomes subject to ongoing reporting under the '34 Act upon the effectiveness of the registration statement. The issuer will be obligated to continue to provide '34 Act reports covering at least through the end of the fiscal year in which its registration statement becomes effective.

To protect investors, the '34 Act requires "reporting companies" to, on an ongoing basis, disclose information that investors would find important in making investment decisions relative to secondary market trading. When investors trade in the secondary market, they trade on the assumption that the company is complying with these disclosure requirements.

"Reporting companies" make these periodic disclosures by filing annual reports on Form 10-K and quarterly reports on Form 10-Q. Reporting companies must also promptly disclose to the public certain specified corporate events on Form 8-K. Once filed, these reports are available to the public on the SEC's website.

These periodic and current reports contain disclosures similar to those in the registration statement, including the type of information that would help investors decide whether to buy, sell or hold the company's securities. Like a registration statement, these ongoing reports are designed to include information about the company's officers and directors, the company's line of business, audited financial statements, and management's discussion and analysis of the company's financial condition and results of operations (commonly known as the "MD&A"). The '34 Act also periodically requires a company to describe the record of its stock price and whether the company has made further distributions or sales of securities either privately or publicly.

13

**D. Ongoing '34 Act Disclosures**

If a company meets certain conditions, including by filing a registration statement that has become effective, the '34 Act contains disclosure requirements that provide investors with information on an ongoing basis. These include an obligation to file periodic reports with the SEC on Form 10-K (the annual report), Form 10-Q (quarterly), and current reports on Form 8-K.

The items typically included on a Form 10-K are similar to those that are found in a registration statement and contain important disclosures for current and potential investors. These include:

- A description of the company's business;
- Risk factors facing the company;
- Whether the company is being sued and a general description of the lawsuits;
- A description of the market for the company's securities and whether the company had engaged in repurchasing any of its securities;
- MD&A;
- Audited financial statements;
- A listing of the directors and executive officers of the company as well as executive compensation;
- A listing of major shareholders and their percent of ownership; and
- Related party transactions.

Form 10-Q provides interim, unaudited financial and other information between annual audits. Items include, among other things:

- Interim financial statements for each of three quarters following the end of the fiscal year;
- MD&A;
- Changes in Risks Factors from earlier reports;
- Unregistered Sales of Equity Securities and Use of Proceeds; and
- Any information required to be disclosed in a report on Form 8-K during the period covered by the Form 10-Q.

Form 8-K obliges "reporting companies" to report certain "material" events within four days of the triggering event. Form 8-K provides investors with disclosure of material information on a current basis as opposed to regularly scheduled reporting. Within the securities industry, information is regarded as "material" if there is a substantial likelihood that a reasonable investor

would consider the information important in making an investment decision.[6] The events below are some examples of material events requiring disclosure on Form 8-K.[7]

- The company acquires or disposes of a significant amount of assets, including a description of the terms of the transaction.

- Private sales of securities exceeding one percent (1%) of the company's outstanding shares of any class or 5 percent (5%) for issuers who qualify as smaller reporting companies. Public offerings registered with the SEC need not be disclosed.

- The issuer is required to disclose changes to any material compensation arrangements with certain executives.

- Changes with respect to any vendors or end users of any product or services if they represent material transactions to the enterprise.

- The company may also disclose other events that it believes to be material but are not specifically required by the item numbers specified on Form 8-K.

These three key reports are the foundation of the ongoing reporting framework for companies that publicly offer their securities, and provide continuing investor protection for investors when a security trades in the secondary markets.

In addition to corporate disclosures, company insiders who resell their securities in the secondary market may be required to file a Form 144 disclosing their personal transactions. Insider transactions are commonly monitored by investors, and can affect the price of a publicly traded security. This is because insiders have the most informed perspective, and insider selling could be interpreted by investors as a negative outlook for the company with a positive outlook implied if insiders are buying.

Without the required ongoing disclosures mandated by the '34 Act, the investing public is denied important information designed to inform their investment decisions, impacting the integrity of the marketplace.

---

[6] See SEC adopting release for Regulation Fair Disclosure, Release Nos. 33-7881, 34-43154, and notes 38, 39 (citing TSC Industries, Inc. v. Northway, Inc., 426 U.S. 438, 449 (1976)) ("Information is material if 'there is a substantial likelihood that a reasonable shareholder would consider it important' in making an investment decision. To fulfill the materiality requirement, there must be a substantial likelihood that a fact 'would have been viewed by the reasonable investor as having significantly altered the "total mix" of information made available.'")

[7] For a complete list of disclosable events see Form 8-K Instructions, pp. 4-22 on current Form 8-K (OMB approved form expiring 9/30/21).

15

E.  Secondary Offerings

A "Secondary" or "Follow-on" offering is a type of offering conducted after a company has already publicly offered its securities in a capital-raising offering, such as an IPO. Such offerings involve a company making additional securities available for sale to the public, should the company seek to raise additional capital. These types of offerings are sometimes referred to as "dilutive" since they increase the number of securities in circulation. Another type of secondary offering involves existing securities holders and does not require the creation of additional securities by the company. This type of offering is considered "non-dilutive" since these transactions involve existing securities holders selling their holdings to other investors.

Registration statements for follow-on and secondary offerings to the public contain disclosures equivalent to those in an IPO. The prospectus for these types of secondary offerings identifies the specific securities to be sold, including the identities of the sellers. This disclosure is important as the secondary offering may involve a major shareholder, such as a founder, CEO, or institutional investor selling their shares to the public. Typically, these secondary offerings involve securities of insiders and significant holders who received securities in, or prior to, the IPO. In the case of insiders reselling securities in a secondary offering, money raised from the sale goes directly to the sellers and not the company itself.

Other authorized securities are sometimes used to pay for services, or for employees or contractors who may accept securities as compensation. Securities paid as compensation to others, including employees, that were not covered in the original registration statement are "restricted" securities under the '33 Act and may not be resold to the public. These securities must therefore be registered to enable the company to issue securities for this purpose. This is typically done on a Form S-8 registration statement.

No matter the type of secondary offering, the securities to be offered are specifically covered by a registration statement. This ensures that each offering is accompanied by adequate disclosure. Again, disclosure remains the critical cornerstone behind regulations relating to sales of additional securities, including when insiders register their intent to resell their securities on the registration statement.

F.  '33 Act Exemptions and Underlying Rationale

Perhaps the best way to understand what constitutes a "public" offering is to understand the exemption provisions of the '33 Act and principles governing the availability of exemptions, as explained in a U.S. Supreme Court case.[8] In other words, we can understand what the elements of a "public offering" are by knowing what *it's not* and understanding the limitations and rationale behind these exemptive provisions.

---

[8] For those involved in securities regulation and compliance, the Supreme Court decision in Ralston Purina Co. remains landmark guidance in determining the standards necessary to avail oneself of the exemptive provisions of the '33 Act. See SEC v. Ralston Purina Co., 346 U.S. 119 (1953).

16

Section 5 broadly prohibits any transaction involving unregistered securities offerings.  Through exemptive provisions, however, Congress distinguished between (1) the distribution of securities to the public by a company or its control persons and (2) subsequent trading transactions in the market by investors.  Section 4(a)(1) of the '33 Act provides an exemption for a transaction "by a person other than an issuer, underwriter, or dealer" and is intended to exempt only trading transactions between individual investors with relation to securities already issued.  It is not intended as an exemption for public distributions of securities by issuers or their affiliates or agents.

Section 4(a)(2) provides an exemption for sales by the issuer not involving a public offering, sometimes called the "private offering" exemption.  Essentially, the premise of the Section 4(a)(2) exemption is that the protections afforded through registration and mandated disclosure may be unnecessary where the offering is made to a limited number of sophisticated investors who are able to "fend for themselves," *i.e.*, obtain relevant information from the company in determining whether to invest.  To protect public investors, a purchaser in a private exempt offering receives shares that may not be resold to the public unless an effective registration statement covers their resale or such resale qualifies for its own exemption.  Thus, a company may not privately offer shares to a conduit who intends to resell to the public.

Two general principles have been well-established in industry custom and practice relative to exemptions from registration.  First, the applicability of an exemption is not assumed, and those who claim the exemption must establish their entitlement to the exemption.  Second, the governing standard in determining whether an issue is a public offering is whether the persons to whom the offering is made are in such a position with respect to the issuer that they either actually have the information that a registration would have disclosed, or have access to such information.  If not, they will require the protections afforded by a registration statement.[9]  The fundamental principle of adequate disclosure discussed earlier continues to be the key factor underlying the exemptions.  Thus, the exemptive provisions under the '33 Act are premised on the notion of relief from the registration requirements when investors are sufficiently informed through other means such that registration is no longer necessary.  Only *those who are sufficiently informed do not need the protections afforded by the '33 Act.*

The following discussion is not meant to be a complete analysis of all private offering exemptions, but is provided with a view towards explaining the philosophy, principles, and regulatory best practices surrounding the exemptive provisions.

The SEC has provided some criteria for who would generally be considered persons not needing the "protection of the Act," by adopting the concept of "accredited investor."[10]  The definition seeks to provide objective standards such as financial sophistication and ability to sustain a loss of the investment, in order to provide greater certainty about exempt offerings consistent with the guidance put forth in Ralston Purina.  This concept is an important one as it provides insight into who would then *need* the protections afforded under the '33 Act, i.e., non-accredited investors.

---

[9] These concepts are recognized in Ralston Purina Co., 346 U.S. at 125-127.
[10] Rule 501 promulgated under '33 Act Regulation D sets forth the definition of an "accredited investor."

17

Stated another way, a limited distribution to highly sophisticated investors, rather than a general distribution to other less well-informed investors, is not a public offering.

However, as the SEC stated over 50 years ago:

> "An important factor to be considered is whether the securities offered have come to rest in the hands of the initially informed group or whether the purchasers are merely conduits for wider distribution. It is essential that the issuer of the securities take careful precautions to assure that a public offering not result through resales of securities purchased in transactions meeting the tests set forth in the Ralston Purina case, for, if in fact the purchasers do acquire the securities with a view to distribution, the seller assumes the risk of possible violation of the ['33] Act and consequent civil and criminal liabilities."[11]

Among other factors to be considered is whether the ultimate purchaser is far removed from the issuer:

> "The transaction tends to become public when promoters begin to bring in a diverse group of uninformed friends, neighbors, and associates."[12]

The size of the offering is also relevant:

> "An offering of millions of dollars to non-institutional and non-affiliated investors or one divided, or convertible, into many units would suggest that a public offering may be involved."[13]

The method of distribution is also a consideration:

> "When the services of an investment banker, or other facility through which public distributions are normally effected, are used to place securities, special care must be taken to avoid a public offering…the use of the facilities of a securities exchange to place the securities necessarily involves an offering to the public."[14]

In addition to statutory exemptions, SEC rules provide "safe harbors" from registration under certain circumstances. Any sales of securities in reliance on these safe harbors depend on strict compliance with the terms and restrictions specified in the safe harbor rules. For example, control persons of the company may resell their securities to the public if they comply with, among other things, holding periods and restrictions on sale volumes over time. Another safe

---

[11] SEC Release 33-5121 "Use of Legends and Stop-Transfer Instructions as Evidence of Nonpublic Offering." (Dec. 30, 1970).
[12] SEC Release 33-4552 "Nonpublic Offering Exemption." (Nov. 6, 1962).
[13] SEC Release 33-4552 "Nonpublic Offering Exemption." (Nov. 6, 1962).
[14] SEC Release 33-4552 "Nonpublic Offering Exemption." (Nov. 6, 1962).

harbor covers a company's offers and sales made solely to accredited investors and certain sophisticated investors who meet certain standards.[15]

In short, in attempting to distinguish a private from a public offering, SEC rules look at the scope, size, and type of offering including whether the purchasers have an appropriate association with and knowledge of the issuer so as to not need the protections afforded by the '33 Act.  From a regulatory perspective, the key distinctions between a public and private offering relate to the question of whether the ultimate purchasers (such as less sophisticated members of the widespread investing public) need the protections associated with the full disclosure provided in a registered offering.

In addition to characterizing qualified purchasers, the SEC also prescribes other precautions that prevent issuers from engaging in public distributions without registration.  Such measures include holding periods before resale and taking reasonable precautions to prevent an unregistered distribution to public investors.[16]  In most private offerings, securities are restricted from resale and must be held for a specified period of time.  Additionally, restrictive legends placed on stock certificates must be removed before the security can be sold in the public market.[17]  These restrictions, along with rules applicable to market participants such as broker-dealers and transfer agents, help to curb immediate resales into the secondary market of any non-registered security and ensure that sales are not in fact part of a public distribution.

The issuer, corporate insiders and affiliates are uniquely positioned since they have an asymmetry of information relevant to the company.  The SEC has thus imposed on issuers, affiliates and control persons certain obligations as they relate to the sale of securities into the public markets.  These obligations are there to ensure that the issuer refrain from selling securities to the public without the disclosure protections afforded by registration and periodic reporting so that, as an appellate court recognized, those "possessing superior access to information and the power to compel registration from abusing their privileged position to foist unregistered securities on an unwitting public."[18]

As previously stated, the above discussion is not meant to be a legal analysis or purport to be a complete rendering of the nuances of all available exemptions under the '33 Act.  It is meant to provide a description of the concepts that underlie the exemptions contained under the '33 Act and the regulatory efforts market participants customarily make to comply.  These are, in my opinion, in place to assure that the protections provided by the registration of each public offering of securities are reasonably afforded to purchasers, especially unsophisticated investors.

---

[15] For example see, 17 CFR 230.506(b)(2)(ii) ("Each purchaser who is not an accredited investor either alone or with his purchaser representative(s) has such knowledge and experience in financial and business matters that he is capable of evaluating the merits and risks of the prospective investment, or the issuer reasonably believes immediately prior to making any sale that such purchaser comes within this description.").

[16] See 17 C.F.R. § 230.502(d). Rule 502(d) defining "reasonable care."

[17] SEC Investor Bulletin:  Rule 144: Selling Restricted and Control Securities (January 16, 2013).

[18] SEC v. Platforms Wireless Int'l Corp., 617 F.3d 1072, 1090 (9th Cir. 2010).

19

Key concepts of the exemption framework that are essential to insure investor protection can be summarized as follows:

- *Investor requirements*, i.e., "accreditation," signifying that they possess the wherewithal to "fend for themselves" without the benefit of a registration statement. (See FN 15).

- *Holding periods* so that there is no immediate resale to the general downstream investor. (See FN 17).

- *Restrictive legends* as a further deterrent to immediate resale. (See FN 16).

- *Rules relating to sales by "insiders" and "affiliates"* including volume limitations and insuring that during resale '34 Act reporting rules are followed, and the public has current information available. (See FN 17).

- In certain cases disclosure continues to be present via private placement memoranda, filings of various forms with the SEC, certified or audited financial reports, and being current with '34 Act reporting requirements. (See, for example, '33 Act Form D).

In my opinion, when these criteria are *not* followed, the set of facts surrounding the transaction may look more like a *public offering* demanding the protections afforded by registration. Again, in industry custom and practice, a company's process for determining the availability of an exemption or safe harbor from registration must adhere to the conditions of the particular statutory provision or rule. The company should likewise look to the principle that exemptions under the '33 Act are appropriate under circumstances where the purposes of registration are otherwise satisfied or unnecessary. In enforcing the '33 Act's registration requirements and evaluating its exemptive provisions, the SEC has consistently emphasized the importance of full disclosure and investor protection.

IV. **A PUBLIC SECURITIES OFFERING IS A MAJOR UNDERTAKING WITH SUBSTANTIAL COSTS**

As discussed above, a company that seeks to access the public capital markets to raise funds needs to prepare a document, the registration statement, that complies with the SEC's disclosure requirements. Such an undertaking typically requires the assistance of professionals versed in corporate and securities laws, and accounting regulations, among other professional matters. It is this deliberative and time-consuming process, involving the time and expertise of seasoned professionals, that typically makes the registration of public offerings a costly and resource-intensive endeavor.

For example, a public securities offering typically involves significant changes to corporate, capital and management structures, and, as described above, a company will be subject to a number of rules, reporting, and disclosure obligations. This is why in a typical public securities offering, myriad resources are brought to bear before the decision is made to go public. Underwriters' commissions are typically 3.5%–7% of the proceeds of an IPO; expenses are

20

additional. Legal, accounting, printing, and filing fees associated with a public offering are typically quite costly. And, to the extent a company is subject to SEC periodic reporting requirements, it will face additional ongoing legal, accounting, compliance, and others costs associated with its regulatory obligations.

The auditing firm PWC has on its website a tool for estimating the cost of an IPO. PWC has estimated that in an offering looking to raise $1 billion where the company's revenues were less than $100 million, the costs associated with an IPO would range between $46.7 million to $70.8 million.[19] PWC further estimates that a significant percent of costs associated with public offerings relate to costs for financial reporting, legal and regulatory compliance.[20] Other considerations are not monetary but are significant nonetheless. These can include corporate governance standards and answering to a public board of directors or shareholder activists.

As previously noted, public securities offerings are accompanied by disclosures allowing for public scrutiny of the company. Financial results, share price, management and director performance, executive compensation, corporate governance practices and insider transaction information will all be available to the public. So too will be the controlling or founding shareholders' percentage equity interest and voting interest. Also, founders' securities transactions are more restricted, as previously discussed, since transactions must now be made in compliance with various securities rules and regulations.

Because a company has obligations to the investors that purchase its securities, once a company offers its securities to the public the potential for investor lawsuits against the company and its directors and management is increased. Similarly, a company publicly offering or selling securities, and its insiders, can become subject to regulation by the SEC and, in the case of certain violations, criminal securities laws. The exposure to SEC or criminal liability greatly incentives a company to implement robust compliance programs, which can be very expensive depending on the size of the company or the nature of its operations.

The SEC has alleged that Ripple raised $1.38 billion dollars in sales of XRP. Assuming this figure is accurate and based on the estimation tool available on PWC's website, had Ripple sought to raise that capital via a traditional IPO, rather than selling XRP on an unregistered basis, this could have placed their estimated IPO costs, excluding underwriting fees (the largest component of a traditional IPO's cost), in excess of $10 million dollars. This figure does not include substantial recurring legal, accounting, and compliance costs associated with ongoing reporting obligations.

---

[19] See PWC.com: "Considering an IPO?, First, Consider the Costs." Available at https://www.pwc.com/us/en/services/deals/library/cost-of-an-ipo.html
[20] *Id.*

V. **DIGITAL ASSETS AND DISCLOSURE**

   A. **Background**

In recent years, a high degree of speculation in digital assets has fostered an atmosphere that many observers have likened to other highly speculative periods in investment history, e.g. the "Roaring Twenties," and the Internet or ".Com" era for example. In the same way, many retail investors buying digital assets are doing so with a high degree of speculation and an expectation of profit.[21]

Adam Ludwin, founder of *Chain*, an enterprise blockchain company started in 2014, points this out in his widely read "Letter to Jamie Dimon" first published in October 2017 which summarizes his view of the viability of crypto assets:

> *"there is a pervasive narrative out there that supports entrepreneurs looking to create new crypto assets. The idea is that by selling assets to users before your network launches, you create "evangelists" who will be early users and promoters you wouldn't otherwise have if there were no financial incentive to participate in your community.*
>
> *The problem with this line of thinking is that it conflates early investors with early users. The overlap between people who buy your crypto asset and the people who actually want to use the service you are building is likely very, very small, especially during market manias like this one."*[22]

I have found in my experience that, generally, the higher the degree of speculation, the greater risk associated with the investment. For this reason, more speculative investments increase the need for the type of disclosures associated with public securities offerings.

With the rapid growth of offers and sales of digital assets it is important to note that, where warranted, the application of the federal securities laws can provide important information to investors with the goal of enabling them to make informed investment decisions. Absent this critical step, prospective investors are denied such important disclosures about the company offerings and selling the digital assets, including:

- Explanation of the company's business;

---

[21] See EY research: initial coin offerings (ICOs), December 2017, available at https://assets.ey.com/content/dam/ey-sites/ey-com/en_gl/topics/banking-and-capital-markets/ey-research-initial-coin-offerings-icos.pdf; see also FINRA Investor Alert: Initial Coin Offerings (ICOs)—What to Know Now and Time-Tested Tips for Investors, August 16, 2018, available at https://www.finra.org/investors/alerts/icos-what-know-now.

[22] Letter to Jamie Dimon from Adam Ludwin, CEO of Chain, published October 16, 2017, available at ceresaig.com/wp-content/uploads/2017/11/A-Letter-to-JP-Morgan-Jamie-Dimon—Block-Chain-Crypto-FX.pdf.