- Corporate strategies;
- Plans for using the funds raised;
- Risk factors;
- Management, including biographies and compensation;
- Whether existing holders of the digital asset are selling their assets in the offering;
- Dilution, including holdings, and cost basis for founders, officers and early investors;
- Nature of the secondary market for the digital asset, including marketing and promotional efforts;
- The company's financial condition, results of operations and ability to generate profits; and
- Audited financial statements and notes.

As previously noted, securities laws disclosures are primarily concerned with reducing the potential for exploiting informational asymmetries which exist between the management and promoters of the enterprise on the one hand, and investors and prospective investors on the other. Even in exempt offerings, the SEC has defined rules which protect investors through disclosure and the other steps noted above to ensure that that those who obtain securities in a non-public offering environment do not immediately resell their holdings to downstream investors who would otherwise need the disclosures ordinarily provided by registration. Consequently, the rigorous principles of disclosure which Congress defined in crafting the securities laws have been flexibly applied to protect investors, even in times of higher speculation and with the introduction of novel investments, breakthrough technologies, and new products.

The SEC's approach to digital asset investments has been consistent with its adaptive regulation of other new or exotic investment products. In fact, there are a long line of unique products, whose offer and sale the SEC and the courts have concluded involved "investment contracts" and therefore subject to federal securities laws. As previously noted, the '33 Act definition of a "security" includes "investment contracts," a purposefully broad concept which provides the flexibility needed to address all manner of offerings no matter how imaginative or novel.

It is customary that for those involved in securities regulation and compliance, a threshold question is frequently whether the investment product at issue is an "investment contract." When determining whether a company's efforts to raise capital involve the offering of securities, the landmark authority that securities regulators and market participants look to for guidance in this inquiry is SEC v. W.J. Howey Co., 328 U.S. 293 (1946), a case that dealt with citrus groves.[23] Securities professionals also look to the line of decisions that apply *Howey*'s guidance to find that a range of other non-traditional investment products' offer and sale involved "investment contracts." Such novel investment products whose offer and sale have triggered the federal securities laws include a wide range of instruments such as automobile trailers,

---

[23] In *Howey*, the Supreme Court observed that the definition of "investment contract" "embodies a flexible rather than a static principle, one that is capable of adaptation to meet the countless and variable schemes devised by those who seek the use of the money of others on the promise of returns." *Howey*, 328 U.S. at 299.

payphones, and whiskey.[24] This authority serves to guide market participants who seek to offer novel investment products. And it advises that simply because an investment product is new or unusual, that product can be subject to the federal securities laws, government regulation, and the above-described disclosure regime so long as the conditions laid out in *Howey* and later decisions are satisfied.

The next section of this report will discuss how these determinations are made using the regulatory framework discussed above. Industry professionals and market participants routinely analyze how that framework applies to offerings involving novel instruments, including, recently, digital assets.

### B. Securities Regulation Involving New Investment Products

Since the 1930s, the federal securities laws have regulated innovative or novel products that have been far removed from the plain vanilla stock or bond. Some products have literally changed major paradigms in the industry such as the creation of organized options exchanges, the trading of index funds, and other investment vehicles that were originally considered exotic when introduced. Indeed, Wall Street, and today, Silicon Valley have been very adept at creating new products that have not been previously regulated. Simply stated, innovation is not new on Wall Street, or Main Street.[25]

The SEC, in my observation over many years, has been particularly adept at keeping up with new and dynamic products both in the past and now in a digitally driven world. This is due to the fact that the SEC's approach to regulating new products has as its basis the above-described doctrines underlying the '33 and '34 Acts. This helps promote positive outcomes for investors. My observation is that when a company raises money from public investors, the approach to regulation and compliance has been consistent. The standards defined in Howey have stood the test of time, and as noted herein, have been capable of dealing with issues including those related to investments involving digital assets.

### C. Industry Practices Involving Innovative Products and the Applicability of the Existing Regulatory Framework

While the SEC has continued to apply its standards, how then does the industry typically deal with selling innovative investment products and not run afoul of regulators? Due to the previously mentioned notion of "caveat vendor," it is important to note that those who engage in the sale of such products will typically employ a team of advisors available to them to help manage the risk that they are operating within the framework of the law. Specifically, for companies contemplating raising funds from public investors, hiring lawyers, accountants,

---

[24] *See SEC v. Am. Trailer Rentals Co.*, 379 U.S. 594 (1965) (automobile trailers); *SEC v. Edwards*, 540 U.S. 389 (2004) (payphones); *Glen-Arden Commodities, Inc. v. Costantino*, 493 F.2d 1027 (2d Cir. 1974) (whiskey).

[25] The defendants in Howey operated a hotel and developed orange groves in Florida, far from Wall Street. Their capital-raising scheme, however, was innovative.

compliance professionals, and consulting firms helps manage that risk since they are up to date with the regulatory environment and can advise their clients accordingly. It is extremely important that innovators surround themselves with the appropriate legal and compliance resources before engaging in offerings involving novel or innovative products. Based on custom and practice in the securities industry, an issuer cannot shift its responsibility for compliance to the regulator.

In December 2015 a prominent law firm issued a "Client Advisory" recounting digital asset enforcement actions brought by various government agencies to date. It concluded:

> *Recent enforcement actions demonstrate that existing laws and regulations apply with equal force to businesses and financial institutions transacting in cryptocurrency. Businesses built upon or using cryptocurrencies should be mindful to implement strict internal controls and compliance standards and comply with relevant regulatory requirements in order to build successful businesses outside of a regulators' crosshairs. No doubt in the coming years, cryptocurrencies will face increasing scrutiny and it behooves both businesses and legal practitioners to monitor the enforcement and regulatory landscape.*[26]

The same firm also advised that the SEC itself is a resource when businesses are in doubt as to the applicability of the law to digital asset related transactions and are concerned about regulatory liability:

> *"Much has been made of the need for certainty, and perhaps even innovation, in application various laws, including the US securities and commodities laws, to commercial activities relating to blockchain, cryptocurrencies and related technologies. After all, the applicable federal securities statute is 85 years old, and the seminal case, Howey, is more than 70 years old. That said, the SEC has not retreated from the application of existing precedent when examining [digital] token transactions…. We suggest, however, that it continues to be prudent for interested parties to seek guidance directly from the SEC staff before proceeding."*[27]

The SEC is an important resource for those seeking guidance should a particular set of facts, circumstances, or transactions potentially implicate the federal securities laws. The SEC's website, sec.gov, for example, is a resource for material related to current regulatory issues. The SEC provides practitioners the ability to conduct extensive research through their website which

---

[26] See Latham and Watkins LLP, Client Alert Commentary No. 1904, *Enforcement Trends in Cryptocurrency*, December 9, 2015. Available at: https://www.lw.com/thoughtLeadership/lw-enforcement-trends-cryptocurrency

[27] See "The Yellow Brick Road for Consumer Tokens: The Path to SEC and CFTC Compliance," as contained in Global Legal Insights- Blockchain and Cryptocurrency Regulation 1st Edition 2019, published by Global Legal Group Inc., London, UK. Available at: https://www.lw.com/thoughtLeadership/yellow-brick-road-for-consumer-tokens-path-to-sec-cftc-compliance

provides access to extensive information concerning the securities laws and their application.[28] The site also welcomes parties to engage the staff concerning legal issues, including whether a proposed transaction involves the offer and sale of securities, and whether a particular exemption from registration may be available.

The website provides the ability to research a variety of information including:

- Statutes (the Securities Laws) and Legislative History
- SEC Rules and Regulations;
- SEC Concept Releases
- SEC Interpretive Releases
- SEC Rulemaking
- SEC Policy Statements
- Staff Legal and Accounting Bulletins
- No-Action, Exemptive and Interpretive Letters
- SEC Proposed Rules
- SEC Final Rules
- Links to the Applicable Federal Register and Code of Regulation
- SEC Staff Interpretations
- Enforcement actions filed by the SEC
- Reports of Investigations[29]

For market participants uncertain whether their conduct, or proposed conduct, implicates the securities laws, input may be sought from the SEC staff directly. One way to do so is to request a "No-Action" letter from the SEC staff. No-Action letters analyze the particular facts and circumstances involved, discuss applicable laws and rules, and may provide guidance as to whether or not the SEC staff would recommend to the Commission to take an enforcement action against the requester based on the facts and representations described in the individual or entity's request.[30] The SEC staff sometimes responds, in the form of an interpretive letter, to requests for clarifications of certain rules and regulations.[31] The No-Action letter process is a routine and common practice for market participants to gain an understanding of whether their

---

[28] For a full description of the SEC's research availability through their website see, https://www.investor.gov/introduction-investing/investing-basics/role-sec/researching-federal-securities-laws-through-sec

[29] For example, in July 2017 the SEC issued a Report of Investigation communicating to the public and market participants its views on the application of the securities laws, including the principles of Howey, to offers and sales of digital assets. *Report of Investigation Pursuant to Section 21(a) of the Securities Exchange Act of 1934: The DAO*, Release No. 81207, July 25, 2017. Available at https://www.sec.gov/litigation/investreport/34-81207.pdf

[30] See https://www.investor.gov/introduction-investing/investing-basics/glossary/no-action-letters

[31] *Id.*

proposed activity complies with the federal securities laws, including whether offers and sales of an instrument involves an "investment contract."[32]

Another, less formal, practice for market participants to gain insight into the SEC's view of their current or proposed conduct is to secure meetings with SEC commissioners or staff members. That said, based on industry custom and practice, market participants typically place less weight on the views of individual commissioners or staff members, who lack the authority to speak for the SEC or bind the Commission to their position. The same holds true for public statements by SEC officials who will issue disclaimers that their views are their own and not the Commission's, and do not have any legal force. In any event, it is common understanding in the securities industry that the SEC takes action based on a majority of the voting commissioners to consider an issue, no matter how vocal the opposition of any dissenting commissioner.

Another common practice for market participants unsure of how the SEC would consider whether their activity violates the securities laws is to review enforcement actions filed by the SEC and court cases adjudicating relevant issues in those actions. In my experience as a regulator, SEC Enforcement actions and adjudicated cases are a key source of guidance for practitioners since those decisions and settlements often include specific rationale as to the findings of the SEC or the courts and may directly relate to a set of facts that the practitioner seeks to address.

Additionally, a market participant can gain insight into the SEC's view of its conduct once it has become the subject of an inquiry or investigation by the SEC's Division of Enforcement. After receiving notice of such inquiry or investigation, a participant should have heightened awareness that its conduct may violate the securities laws and that it could become the subject of an enforcement action. For this reason, it is common practice in the industry for entities or individuals that become aware of enforcement investigations into their conduct to dialogue with enforcement and other SEC staff to determine whether a change in conduct or other corrective action should take place in order to become compliant with the securities laws.

**D. Enforcement Activity Involving Digital Assets**

The SEC has been active in bringing enforcement cases involving digital assets since July 2013, when it filed *SEC v. Trendon Shavers and Bitcoin Savings and Trust,* which dealt with a bitcoin related Ponzi scheme.[33] Prior to the end of 2020, the SEC brought 74 more enforcement actions

[32] It is my understanding that the Defendants in this case claim the SEC provided insufficient clarity and notice regarding its position as to whether offers and sales of digital assets, including XRP, violated the federal securities laws. Based on industry custom and practice, a prime means of ascertaining the SEC's position regarding their XRP transactions would have been for Defendants to submit a No-Action letter request to the SEC. For examples of some No-Action letters issued by SEC staff since 2002 that address whether an instrument or scheme involves a security, including an "investment contract," see: https://www.sec.gov/corpfin/corpfin-no-action-letters#2a1.

[33] Case No. 13-cv-00416 (E.D. Tex.).

related to digital assets, with the December 2020 lawsuit against Ripple being the third-to-last.[34] Defendants and respondents included digital asset issuers, brokers, exchanges, and other service providers. More than two thirds of these enforcement actions (52) alleged unregistered securities offerings involving digital assets.[35] Based on my experience as a regulator and industry custom and practice, this large number of cases involving digital assets provided guidance to market participants that the SEC is an active regulator in the digital asset space. These cases also provided guidance that, where appropriate, the SEC brings enforcement actions against issuers of digital assets that offer investments that meet the customary standards for an "investment contract."

## VI. POTENTIAL DISCLOSURES BY RIPPLE

Once again, it is important to note that full and fair disclosure to the investor is critical to our capital markets' success. With the backdrop and concepts noted above, this section provides an explanation of certain disclosures investors would customarily have been entitled to receive about Ripple and XRP if Ripple's offers and sales of XRP were registered. To be clear, I have not been asked to provide, and am not providing, an opinion as to whether Ripple's XRP transactions constituted offers and sales of securities. For purposes of this section of my report, I have been asked to assume that these transactions were in fact offers and sales of securities, and to provide an opinion on what disclosures Ripple would typically be required to make to the investing public if that was the case.

Because Ripple has been a private company, it did not make public SEC filings about the company or XRP. A prospectus and a registration statement would have been the customary way for the investing public to learn material facts surrounding Ripple and XRP if Ripple offered and sold securities to the public. Ripple did not file any prospectus, nor did it provide the periodic ongoing filings required once a company registers its offering. Without periodic reporting, as Ripple continued to offer and sell XRP investors would not be alerted to the ongoing status of the enterprise, the company's financial statements, MD&A, recent sales of securities, insider transactions, and new products or services.

In addition to all the routine corporate disclosures associated with public companies such as financial disclosure, results of operations, and executive compensation, there would be a number of other important disclosures that, in my opinion, would be material to investors with respect to Ripple and XRP. These disclosures include both initial and ongoing disclosures. Examples of notable disclosures would include:

---

[34] *SEC Cryptocurrency Enforcement, Q3 2013-Q4 2020*, Cornerstone Research, available at: https://www.cornerstone.com/Publications/Reports/SEC-Cryptocurrency-Enforcement%E2%80%94Q3-2013%E2%80%93Q4-2020.pdf. This report was issued by Cornerstone Research, an economic financial consulting firm, and lists the 75 digital asset related enforcement actions through 2020 as well as SEC Trading Suspension Orders, SEC Press Releases, SEC Public Statements, and SEC Investor Alerts dealing with digital assets.

[35] Id.

- Ripple's revenues generated from its XRP sales.
- Ripple's use of proceeds from its XRP sales.
- The amounts by which insiders will be compensated with XRP.
- Whether management is subject to XRP lock-up periods and dilution.
- Insider sales of XRP.
- Ripple's use of XRP to pay third party promotors, market makers and digital asset trading platforms to facilitate trading in XRP.
- Ripple's use of promotions, incentives and payments to Ripple's customers and third parties in developing its products and uses for XRP.
- Ripple's sales of XRP to institutional investors at substantial discounts to current XRP market price.

Without the benefit of registration and further periodic and current reporting, investors were deprived of what I believe were important disclosures which could have shone substantial light on the nature of XRP, Ripple, and Ripple's key employees.

## VII. CONCLUSION

It has been my observation over my career in securities regulation and compliance that the philosophy established by Congress in formulating the federal securities laws has served the investing public well while balancing the need for capital formation and investor protection. The concepts presented in this report have survived the test of time and remain relevant today notwithstanding the emergence of new and sophisticated investment products.

In that regard I have attempted to give the Court and jury the information which they may find useful in their deliberations of this case. Key concepts and opinions underlying this report are summarized as follows:

- Selling securities to the public requires that the offering be registered with the SEC.

- Registration provides for "full and fair disclosure" to investors in order that they may have the pertinent facts necessary to make informed investment decisions.

- The doctrine of full disclosure is grounded in the Securities Act of 1933 and the Securities Exchange Act of 1934 which were promulgated in response to the stock market crash of 1929.

- Critical disclosures are found in a registration statement and prospectus and cover such items as a company's operations, financial condition, executive compensation, use of funds raised, nature of the secondary market for shares, incentives paid to third parties for promotion, and consulting fees.

- Companies that have an effective registration statement for a class of securities must file continued disclosures including annual, quarterly, and timely disclosure of material information when it occurs.

- The private offering exemption is reserved for where investors are able to fend for themselves and do not need the protections of registration, and subject to volume limitations and resale restrictions on the securities sold in the offering to ensure what is characterized as private is not a disguised public offering. A public offering requires the full panoply of disclosures provided by registration.

- Where large amounts of securities are offered to investors with no limitations as to resale and end up in the hands of widespread public investors, this is a public offering with a need for registration.

- The SEC has brought many enforcement actions involving digital assets since 2013.

- There is a "safety net" of advisers available to those who bring new products to market and are unsure of the applicability of the federal securities laws. These include lawyers, consultants, accountants, and the SEC staff.

- There are substantial initial and incremental costs associated with publicly offering securities.

- Had Ripple registered its XRP offerings, the disclosures that would be required would be substantial and meaningful to investors both on an initial and ongoing basis.

**LIMITING FACTORS AND OTHER ASSUMPTIONS**

This report is delivered subject to the conditions, scope of engagement, limitations and understandings set forth in this report. The analysis and opinions contained in this report are based on information available as of the date of the report. I reserve the right to supplement or amend this report should any additional information become available, including, but not limited to, any expert reports submitted on behalf of the defendants, deposition transcripts, and other information unavailable as of the date of this report.

If I am called to testify, I may prepare, employ, or use demonstrative aids such as graphs, charts, or tables to assist in my testimony.

Respectfully submitted,



President, [redacted] Inc.

**EXHIBIT A: Litigation Documents Considered in Forming Opinions**

**Pleadings**

Plaintiff's Amended Complaint
Ripple's Answer to Amended Complaint
Ripple's Responses and objections to Plaintiffs Second Set of Interrogatories
Ripple's Responses and objections to Plaintiffs Fifth Set of Requests for Admission

**Documents Produced in Discovery**

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2020 and December 31, 2019, and the Independent Auditors Report for those years

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2019 and December 31, 2018, and the Independent Auditors Report for those years

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2016 and December 31, 2017, and the Independent Auditors Report for those years

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2015 and December 31, 2014, and the Independent Auditors Report for those years

Ripple Labs Inc. Consolidated Financial Statements as of December 31, 2014 and December 31, 2012, and the Independent Auditors Report for those years

Master XRP Lease Agreement between Ripple Payments Inc. and GSR Markets Limited dated September 9, 2019 (GSR00000640-56) and Amendment to that Agreement (GSR00000639)

Master XRP Purchase Agreement between Ripple Labs Inc. and SBI Virtual Currencies Co., Ltd. dated September 24, 2018 (RPLI_SEC 0492576-94)

Amendment #3 to Master Purchase Agreement between Ripple Labs Inc. and SBI VC Co., Ltd (RPLI_SEC 0492596-98)

Master xRapid Market Maker Services Agreement between Ripple Payments Inc and GSR Markets dated September 6, 2019 (GSR00000988-1002)

Programmatic Market Activity Agreement between Ripple Markets Inc. and GSR Holdings Limited dated June 1, 2017 (GSR00017429-35)

Amendment to the Programmatic Market Activity Agreement between Ripple Markets Inc. and GSR Holdings Limited dated March 2, 2018 (GSR00018580-81)

Fourth Amendment to Negotiable Promissory Notes between Ripple Payments Inc. and GSR Markets Limited dated March 31, 2020 (GSR00000037)

Signed Declaration of Lawrence Angelilli, Executive Vice President and Chief Financial Officer of Money Gram International Inc. dated March 14, 2021

Email dated March 26, 2020 from Dinuka Samarasinghe to Senad Prusac and others (RPLI_SEC 0492574-75)

Email dated May 29, 2020 from Dinuka Samarasinghe to Boris Alergant (RPLI_SEC 0503730-33)

**EXHIBIT B: C/V and Resume**

[redacted]

Cell: [redacted]
Office: [redacted]

**PROFILE**

[redacted] brings nearly 50 years of corporate lea d regulatory experience to his work as a consultant and securities industry expert. Mr. [redacted] retired in February of 2004 as e President of Regulation and Controls for the NASDAQ Stock Market. In that role Mr. [redacted] as NASDAQ's chief regulatory officer and liaison with NASD, its former parent. Mr. [redacted] had joined the NASDAQ Stock Market in 2001.

Formerly he was Senior Vice President of Market Regulation for NASD Inc. (the predecessor of FINRA) and was responsible for real-time and historical surveillance and regulation of all matters pertaining to The NASDAQ Stock Market and the U.S. Over-the-Counter market.

Mr. [redacted] played a leading role in establishing regulatory policy for all trading practices in The NASDAQ Stock Market and the Over-the-Counter Bulletin Board (OTCBB). He also worked extensively with the Securities and Exchange Commission, the Securities Industry Association and the Securities Traders Association in developing and enhancing policies and practices relating to the regulation and surveillance of equity markets.

Mr. [redacted] is a recognized leader in the area of technology enablement. Under his direction, Market Regulation became known as a leader in real-time and historical surveillance technology.

Mr. [redacted] has been featured in a number of magazine articles including Wall Street & Technology, the Wall Street Journal, and Institutional Investor, where he has been quoted as an authority on regulatory, surveillance and technology issues. He has also spoken publicly in conferences dealing with regulatory and technological matters.

Mr. [redacted] began his career with the NASD in 1972 as a District Examiner in New York, the NASD's largest district office. He quickly assumed various management positions within the District and was promoted to Assistant Director of the NASD's Washington, D.C. district office in 1975. He was named District Director of the NASD's Kansas City District in 1980. Prior to his assuming the responsibility for Market Surveillance in 1986, he held various managerial and executive positions including Corporate Secretary for the NASD.

When he assumed the role of Director of Market Regulation, it was a relatively small department of approximately 38 staff. He oversaw the significant growth and effectiveness of the NASD's surveillance efforts, keeping pace with the overall growth of the NASDAQ market. Since that

time the department has grown to its current level of over 300 individuals including significant legal and technology staff.

Mr. had full responsibility for real time and historical surveillance of both The NASDAQ Stock Market and all other OTC markets. During his tenure, he instituted a department within Market Regulation to deal exclusively with fraudulent trading practices in the OTC markets. The department was very successful in identifying and addressing major frauds within that marketplace.

He was responsible for the real time surveillance of the NASDAQ Stock Market Inc. including the authorization for trading halts for NASDAQ Companies who were disseminating material news. In that regard he worked daily with Nasdaq listed companies on disclosure obligations and the materiality of news.

More recently, he has been retained as an industry consultant and expert witness. As an industry expert he has testified in a number of proceedings regarding trading practices in the OTC market and unregistered distributions of securities.

After his SD, in February 2004, Mr. founded his own consulting company, Inc., which specializes in providing expert and consulting services to law firms, broker/dealers, US DOJ, the Securities and Exchange Commission, foreign governments and stock exchanges.

In addition to numerous consultancy assignments, Mr. has been granted expert status by the court in a number of jurisdictions over the past ten years.

He testified in March 2011 as an expert on behalf of the SEC in a bench trial before the U.S. District Court for the Eastern District of New York in SEC v. East Delta Resources Corp., et al.[1] There he testified concerning the use of wash and matched trades and other manipulative devices commonly used in market manipulations.

He testified in May 201 trial in the U.S. Middle District of Florida, Tampa Division, in US. v. Shoss, et al.[2] Mr. testified as an expert for the US government in the trading of securities and the use of reverse mergers as a method of going public.

He testified in June 2 riminal jury trial in the U.S. Central District of California in US. v. Homm, et al.[3] Mr. testified as an expert for the US government concerning the use

[1] In the United States District Court for the Eastern District of New York, Case No. 8:08-CV-10–0310.

[2] In the United States District Court for the Middle District of Florida, Tampa Division, No. 8:11-CR-366-T-30TBM.

[3] In the United States District Court for the Central District of California, 2:13-cr-00183-VAP.

of shell companies in market manipulations and the use of various manipulative devices such as "marking the close," "wash sales," and "cross trading."

In July 2021, He provided expert testimony in a jury trial in SEC v. Spartan Securities Group, LTD. Case No. 8:19-cv-00448-VMC-CPT (M.D. Fla.). He testified on behalf of the SEC providing an expert opinion regarding characteristics of issues related to compliance with SEC Rule 15c2-11, material disclosures on Form 211, and the role of transfer agents, promoters and others in creating 19 sham companies that would later be sold in a "shell factory" scheme.[4]

He is a graduate of St. Francis College in Brooklyn, New York and did extensive graduate studies at St. John's University in Jamaica, New York.

**PROFESSIONAL EXPERIENCE AND SELECTED ACCOMPLISHMENTS**

**President, [redacted] Consultant Inc.**
May 2004-present

Provides consultation and expert witness services as a securities industry regulatory expert to governments, broker/dealers and law firms including market surveillance technology and investigative procedures.

Areas of expertise include all market related issues particularly: market manipulation and fraud, underwriting, unregistered distributions, suitability, supervision and policies and procedures, FINRA and NASDAQ rules and regulations, FINRA disciplinary actions and arbitrations.

**NASDAQ INC.**
**Senior Vice President, Regulation and Controls, NASD Liaison**
Feb.2001- Feb. 2004

Was responsible for NASDAQ's relationship with NASD, its former parent. Oversaw the multi-million-dollar regulatory services contract with NASD and was responsible for managing NASDAQ's relationship with NASD, including the provision of market regulation services. Responsible for developing and recommending policies related to the regulation of NASDAQ, negotiating NASDAQ's regulatory budget and monitoring the financial and operational performance of NASD pursuant to the regulatory services agreement between NASDAQ and NASD.

**NASD Inc.**
Jan.1999-Feb.2001
**Senior Vice President, Regulatory Technology, NASD Inc.**

Was responsible for all line of business support and development of NASD regulatory technology. Responsible for the "business" oversight of the multi-million dollar outsourcing contract with EDS and strategic business, regulatory and technological direction.

---

[4] SEC v. Spartan Securities Group, LTD. Case No. 8:19-cv-00448-VMC-CPT (M.D. Fla.).