# PX 242

Message

| | |
|---|---|
| **From:** | Chris Larsen ███ @ripple.com] |
| **on behalf of** | Chris Larsen <███ @ripple.com> [███ @ripple.com] |
| **Sent:** | 2/2/2013 10:01:28 AM |
| **To:** | ████████ com>] |
| **CC:** | ████████ ripple.com>]; Jed McCaleb [Jed McCaleb ███ @ripple.com>] |
| **Subject:** | Re: ripple |
| **Attachments:** | Dax Memorandum legal brief 2-12.pdf |

Hi ███

Nice speaking with you today. Attached please find the prior legal analysis referenced in the 9-12 memo.
Let's try to chat on Monday about final allocations and participants in possible.
Have a great weekend,
Chris

**CHRIS LARSEN** | CEO
**OpenCoin, INC.**
███ @ripple.com | www.ripple.com

███

On Fri, Feb 1, 2013 at 3:32 PM ████████ com> wrote:
Slides are very helpful....thanks.
When I created $5 IOUs for ███ & Chris I didn't need to pay a merchant $5 for each IOU as these slides indicate (which is why I didn't know a merchant was involved in that transaction). I thought I was just "extending trust" (ie. letting ███ and Chris either (a) buy something for $5 with an IOU where the seller was comfortable taking their IOU knowing if they didn't make good on their IOU that I'd pay, or (b) simply paying the seller with $5 they didn't have at the time because my $5 IOU backed it up).

So, is it true that one can only issue an IOU if they "purchase the IOU" from a gateway? To me, that's like posting earnest $ (ie. no counterparty risk because the gateway holds funds to back up the IOU), which is fine. If so, how does a gateway make $ on selling IOUs?

Jed's replies below are also helpful. Seeing slides for his points #3 & #4 below would probably help clarify (a) the nexus between xrp and IOUs (the mechanics of which are still vague to me), and (b) the nexus between different fiat currencies and xrps and IOUs (which is becoming more clear now).

9a PST tomorrow' great.

Thanks,
███

**From:** Chris Larsen ███ @ripple.com>
**Date:** Friday, February 1, 2013 6:11 PM
**To:** ████████ com>
**Cc:** ████████ @ripple.com>, Jed McCaleb ███ @ripple.com>
**Subject:** ripple

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

Jed and I look forward to chatting with you tomorrow. As I mentioned, anytime before 11am pst would be great. As a follow up to the question of simply showing how ripple works, attached please find two graphics of a merchant transaction involving IOUs, the first where the merchant settles immediately and the second where the merchant uses the IOU to pay someone else. Lots more work to do on the marketing front of course. Also, I passed on some of the questions you had about the network to Jed. Here are some of his thoughts:

Chris mentioned you had a question about what is providing the value
for the xrp in the event that no one holds them as a store of value.
There are a few things that will contribute to the price of xrp:
- XRP is used as the small transfer fee that you need to do anything
in the network. This means even if everyone ignores xrp as a currency
they will still need to occasionally buy it to pay the transfer fee.
- No counter party risk. xrp is the only currency in the system
without counterparty risk. This will surely make it valuable for some
people and in some situations.
- Bridging between connected groups. If A wants to pay B but there is
no line of trust between them then in order to complete the payment
the money is first converted to XRP and then converted to some other
currency on B's network and sent to B.
- Common base for the distributed exchange. In order to have any
degree of liquidity between pairs in the distributed exchange there
must be a common base pair. Otherwise you have to have offers for all
kinds of exotic pairs, CHF/ZAR, CHF/RUB, etc ... In normal forex this
is usually USD but it makes more sense to use XRP in the ripple
network.

Look forward to chatting tomorrow.
All the best,
Chris

**CHRIS LARSEN** | CEO
**OpenCoin, INC.**
██████ripple.com | www.ripple.com

*PRIVILEGED / CONFIDENTIAL*



February 8, 2012

TO:      Jed McCaleb
              Jesse Powell

FROM:   Dax Hansen
              Naomi Sheffield

RE:      **Legal Analysis and Recommendations Regarding NewCoin**

---

## I. INTRODUCTION

You ("**Founders**") are developing a decentralized, open, global, peer-to-peer, crypto currency software system ("**NewCoin**") that will distribute and track, in a distributed ledger, the ownership of a fixed number of units of value ("**Coins**") that may be used as a payment method for Internet commerce. You have asked us to review the proposed product and business structure, analyze the legal risks associated with NewCoin, and recommend steps to mitigate these risks. Please note that this memorandum is based on our initial review of NewCoin. Many of these legal risks require further review and analysis if NewCoin pursues a path in which such risks continue to exist. We look forward to discussing this analysis with you after you have had a chance to review this memorandum.

## II. DESCRIPTION OF NEWCOIN

Based on the draft business plan provided by Founders, we understand that Founders intend to structure NewCoin as follows:

- an open source software system that will distribute Coins to participants and track ownership in a distributed public ledger;

- Coins will be initially distributed 15% to individuals who invest in NewCoin ("**Investors**"), 15% to the NewCoin Foundation ("**Foundation**"), and 70% by the NewCoin Faucet ("**Faucet**") as evenly as possible to everyone on the Internet (we would like to discuss further with Founders the specific role that the Investors, Foundation, and Faucet will have with respect to NewCoin because these roles will affect the regulatory analysis included in this memorandum);

- merchants selling goods and services, such as Internet or mobile games, can accept Coins as payment for goods and services, and Coins can also be used for affiliate marketing, online gambling, tipping, and donations;

- no one individual or entity will own or administer NewCoin;

- Foundation will be a nonprofit trade organization that promotes the use of NewCoin; and

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.        RPLI_SEC 0287878

*PRIVILEGED / CONFIDENTIAL*

- Founders will raise $750,000 to fund the launch of NewCoin and Investors will receive Coins in return for their investment.

If this description is inaccurate in any way, please let us know, and we can update our analysis and recommendations.

### III. SUMMARY OF INITIAL CONCLUSIONS AND RECOMMENDATIONS

1. **Initial Conclusions**

   a. **Coins that are purchased are likely to be prepaid access.**  There is a risk that Coins will be subject to regulation as "prepaid access" under the Bank Secrecy Act, which regulates providers and sellers of prepaid access.  Coins that are sold at the time of issuance or later resold in a secondary market may fall within the definition of prepaid access, which is "access to funds of the value of funds that have been paid in advance and can be retrieved or transferred at some point in the future through an electronic device or vehicle…"  Because Coins represent a value, which a holder can retrieve or transfer at a later date to make purchases or trade, if Coins are paid for, they will likely be considered prepaid access.

   b. **If sold to Investors, Coins are likely to be securities.**  If sold to Investors who provide Founders with the capital necessary to launch and operate NewCoin, Coins will likely be considered securities and subject to regulation under federal securities laws.  Securities include investment contracts, which are investments in a common enterprise with the expectation of profits solely from the efforts of others.  If Coins are issued to investors who are providing Founders with the capital to launch and operate NewCoin, it is highly likely that they will be treated as securities.  If Founders issue Coins to an entity and sell stock in the entity to Investors, the risk that Coins themselves will be considered securities will be significantly less, but Founders will still be required to address securities law issues with respect to the entity.

   c. **Coins not initially sold may still constitute securities if sold at a later date.**  Even if Coins are not sold to Investors, there is some, lower, risk that Coins will be considered securities because they are sold on secondary markets at a later date.  If Coins are purchased and sold on the secondary market, individuals purchasing Coins may do so with the expectation of increased value caused by increased demand and limited supply.  To the extent that these Coins are purchased with an expectation of profit because of the efforts of Foundation and/or others promoting the Coins, there is a risk that Coins will constitute investment contracts and be subject to federal securities regulation.

   d. **Coins may become commodities.**  If people develop contracts for future delivery of Coins, they will likely be considered commodities under the Commodities Exchange Act.  Futures contracts for Coins, if developed, will be subject to regulation and enforcement by the Commodity Futures Trading Commission.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287879

*PRIVILEGED / CONFIDENTIAL*

e. **Exchanges may be money transmitters or currency exchangers**. Coin exchanges that facilitate Coin purchase and sale transactions between users likely will be deemed money transmitters under federal and state money transmitter laws to the extent they accept payment from user A to transfer to user B and accept Coins from user B to transfer to user A. Exchanges also may be deemed currency exchangers. While these exchanges will not exchange the currency of one country for the currency of another, they may be used to exchange the currency of country A for Coins and immediately exchange Coins for the currency of country B. In substance, this transaction is no different than exchanging the currency of country A directly for the currency of country B, and may result in regulatory scrutiny. Additionally, under state money transmitter laws, Coins may be considered payment instruments resulting in any party that sells or issues Coins being treated as a money transmitter.

f. **Coins are unlikely to be regulated under counterfeiting laws.** While commonly referred to as an alternative or crypto "currency," it is unlikely that Coins will be regulated under the federal laws regulating the issuance of coinage. Coins will not be metal coins or bars, and, we understand, will not be designed to be confused with currency of the United States or any other country. These characteristics will reduce the risk of Coins violating anti-counterfeiting and other currency laws.

g. **Founders and Foundation may be subject to illegal gambling regulations.** Promoting Coins for use in Internet gambling may lead the Coins to be categorized as gambling devices under state gambling laws, and a person is subject to criminal penalties for manufacturing gambling devices in violation of state laws. Additionally, if the Coins are promoted for the purpose of illegal gambling and then utilized to facilitate illegal gambling, NewCoin may be deemed to violate the federal Unlawful Internet Gambling Enforcement Act and/or treated as aiding and abetting illegal gambling.

h. **Accuracy in promotion of NewCoin will be necessary to avoid unfair and deceptive trade practices.** Unfair and deceptive trade practices are regulated on the federal and state levels. The language of the regulations is broadly written to flexibly address instances where consumers are misled or deceived. There does not appear to be anything inherently unfair or deceptive in the nature of NewCoin as proposed, but Founders and Foundation should carefully evaluate promotions and marketing of NewCoin to assure that users are aware of risks, as well as benefits, associated with the use of Coins.

i. **Founders and Foundation may face risk related to aiding and abetting illegal activities perpetrated using Coins.** If the Coins are promoted as a means of engaging in questionable or illegal online commerce, including but not limited to Internet gambling, copyright infringement, or purchasing pharmaceuticals illegally, NewCoin could be accused of aiding and abetting illegality. Moreover, even if NewCoin does not actively promote such uses, it could become caught in the crosshairs of regulators who do not understand that NewCoin has no control over Coins released into the market, nor does it have any direct financial interest in third-party transactions in which the Coins are used.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287880

*PRIVILEGED / CONFIDENTIAL*

    **j.** **Users of Coins will have obligations to comply with state and federal tax laws relating to transactions involving Coins.** Transactions using Coins will be subject to state sales taxes like any other transaction for goods and services. Income that a person receives in the form of Coins will be reportable income for state and federal income tax purposes. Users of NewCoin should be aware that they will be subject to the same tax liabilities using Coins as they would be in other circumstances.

## 2. Recommendations

In light of the initial conclusions summarized above and analyzed below, we recommend that the Founders take the steps below to reduce the regulatory risks associated with NewCoin. Even if Founders are willing to take the steps below, regulatory risk cannot be completely eliminated because existing laws and regulations can be broadly applied or interpreted to apply to emerging payment systems such as NewCoin.

    **a.** **Do not sell Coins.** The sale of Coins to Investors increases the risk that Coins will be considered investment contracts and will therefore be regulated as securities. It also increases the risk that the Coins will constitute prepaid access, causing Founders to be regulated as a money services business. These risks are not eliminated by simply not selling the Coins, but not selling the Coins reduces the risks of the Coins being categorized as a security or as prepaid access, and it reduces the direct connection between Founders and the sale of the Coins.

    **b.** **Accept Investment Through an Entity.** Founders should not accept investment in exchange for the issuance of Coins to Investors. If Founders require investment capital to launch NewCoin, this investment should be collected through an entity, and Investors can receive stock in the entity. This will separate the issuance of Coins from the investment of money, which will reduce the risk that Coins themselves will be treated as securities. Founders should, however, consider that a centralized entity, together with Foundation, increases the risk that NewCoin will be seen as a common enterprise, rather than a decentralized crypto currency system.

    **c.** **Do not collect fees.** Collecting fees for transactions using Coins requires a centralized party that receives payment. Having an entity or individual who controls NewCoin and collects the fees increases the risk that there is a common enterprise and that holders of Coins have an expectation of profit solely by the efforts of others for securities law purposes.

    **d.** **Take steps to avoid misleading purchasers or recipients of Coins as to their value or the risks associated with them.** Whether Coins are ultimately determined to be a security, prepaid access, currency, or any other product, Foundation should be careful in its approach to promoting and marketing NewCoin. It will be important that Foundation and Founders do not mislead participants, particularly with regard to the liquidity or safety of Coins.

    **e.** **Avoid stating or implying that the Coins are equivalent to or compete with USD or any other type of government issued currency.** United States government regulators of

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0287881

currency appear to be most concerned about fraud and confusion that results from the issuance of a currency that appears similar to or is represented in some way as United States dollars. There remains a risk that government regulators are also concerned with private currencies that become prominent and influence the value of USD, however, there has not been case law suggesting that this is their primary concern and the statutory language does not support enforcement action related to this broad competition concern.

f. **Do not advertise the Coins for use in illegal Internet gambling**. Both state and federal laws regulate Internet gambling, and there are specific requirements for companies that offer Internet games. Neither Founders nor Foundation should promote the Coins for use in illegal activities, and in particular should not promote the Coins for use as consideration in illegal Internet gambling.

g. **Do not promote the Coins for illegal or questionable uses, and educate the public and users that NewCoin does not oversee or otherwise control the use of the Coins.** Actively promoting the Coins for illegal or questionable purposes, or even overemphasizing the anonymity of the transactions, could result in regulatory scrutiny or accusations of aiding and abetting, i.e., knowingly facilitating, illegal activity. Founders and Foundation should make clear that its mission is to facilitate legal, legitimate online commerce. Moreover, if the Coins become a popular mechanism for consummating illegal transactions, government entities may focus their efforts on NewCoin under a mistaken belief that it controls or oversees these transactions because individual wrongdoers are difficult and costly to locate and prosecute. For this reason, Founders and Foundation should make a concerted effort to publicize the fact that they does not control or oversee third party transactions using the Coins, nor do they have any direct monetary interest in them.

h. **Do not use Coins in lieu of payment to employees**. To the extent that Founders or Foundation employ individuals to design, engineer, develop, promote, market, or maintain any aspect of NewCoin, payment of these individuals must comply with state wage and hour laws. Employees cannot be paid in Coins.

i. **Founders should consider publishing NewCoin usage conditions**. Founders should consider publishing usage conditions that describe their vision of how Coins are to be used. Even if there is no centralized entity to enforce the usage conditions, requiring NewCoin participants to acknowledge such usage conditions demonstrates Founders' interest in making the use, sale, exchange, and development of Coins as legitimate as possible.

## V. LEGAL ANALYSIS

1. **Federal Money Services Business Laws**

   a. **Prepaid Access**

The regulations promulgated by the Financial Crimes Enforcement Network ("**FinCEN**") under the Bank Secrecy Act ("**BSA**") require providers of prepaid access to (i) register with FinCEN as a money services

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0287882

*PRIVILEGED / CONFIDENTIAL*

business;[1] (ii) develop an anti-money laundering policy;[2] (iii) implement customer identification procedures;[3] (iv) implement transaction record keeping;[4] and (v) report suspicious activity.[5]   "Prepaid access" is defined as "access to funds or the value of funds that have been paid in advance and can be retrieved or transferred at some point in the future through an electronic device or vehicle, such as a card, code, electronic serial number, mobile identification number, or personal identification number."[6]

The phraseology "funds or the value of funds" is not defined in the BSA regulations.  According to the Merriam-Webster Dictionary, "fund," refers to "a sum of money or other resources whose principal or interest is set apart for a specific objective."[7]   In other portions of the definitions of a money services business, the BSA regulations refer to funds in a list that includes currency and monetary instruments.[8]   The definition, as well as references within the BSA regulations, suggests that "funds" refer to some amount of monetary value.  The value of funds would therefore be access to a value equivalent to such monetary value.  Coins will not be denominated in USD, meaning the relative value between the Coins and the USD paid to purchase the Coins could vary over time.  However, FinCEN's position that prepaid devices redeemable for telephone minutes or songs,[9] which similarly may have value that varies against the USD, suggests that such variation against a specified monetary value may not be relevant to the analysis.  As such, it is likely that Coins satisfy this prong of the definition of prepaid access, namely that Coins provide access to the value of funds.

In addition to requiring that the prepaid device provide access to funds or the value of funds, the definition requires that the funds or value of funds be paid in advance.  The "paid in advance," provision will limit the application of the regulation of prepaid access to the extent that Coins are not purchased.  If Coins are actually sold by Founders, they will likely constitute prepaid access under the BSA regulations.  Coins distributed without consideration will still be distributed with the intent that later they will be purchased and resold through an exchange or through acceptance in commerce.  If Founders do not sell Coins to Investors, the Coins will not likely be prepaid access because they will not be paid in advance, however, FinCEN may take the position that later sales of Coins by exchanges, which collect payment in advance, make Coins prepaid access.

The provider of prepaid access is "the participant within a prepaid program that agrees to serve as the principal conduit for access to information from its fellow program participants."[10]   Acknowledging that some prepaid programs will not have a participant step up to act as the provider, FinCEN has indicated that in the absence of registration, the provider will be "the person with principal oversight and control over the

---

[1] 31 C.F.R. § 1022.380.

[2] 31 C.F.R. § 1022.210.

[3] *Id* at § 1022.210(d)(1)(iv).

[4] 31 C.F.R. § 1022.420.

[5] 31 C.F.R. § 1022.320.

[6] 31 C.F.R. § 1010.100(ww).

[7] *Merriam-Webster Dictionary* (2012), http://www.merriam-webster.com/dictionary/fund

[8] 31 C.F.R. § 1010.100(ff)(1) (referring to a dealer in foreign exchange as "a person that accepts the currency, or other monetary instruments, funds, or other instruments denominated in currency…").

[9] Department of Treasury Financial Crimes Enforcement Network, *Frequently Asked Questions Final Rule – Definition and Other Regulations Relating to Prepaid Access* (Nov. 2, 2011), *available at* http://www.fincen.gov/news_room/nr/html/20111102.html.

[10] 31 C.F.R. § 1010.100(ff)(4)(i).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287883

*PRIVILEGED / CONFIDENTIAL*

prepaid program."[11]  Given the current proposal by Founders, it is likely that Foundation or Founders will be considered the provider of prepaid access if the Coins are determined to be prepaid access.

There are certain arrangements involving the issuance and sale of prepaid access that do not constitute "prepaid programs," and therefore would not require registration of a provider of prepaid access.  These exceptions involve restricting the use and transfer of the prepaid access and limiting values of prepaid access held in a given account on a given day.[12]  The Coins will likely be considered open loop because the Founders intend the Coins to be accepted by a wide range of domestic and international merchants and other parties.  Closed loop prepaid access is "access to funds or the value of funds that can be used only for goods and services in transactions involving a defined merchant or location (or set of locations), such as a specific retailer or retail chain, a college campus, or a subway system,"[13] and prepaid access that does not fall within the definition of "closed loop" is open loop.  To qualify for the open loop exemption from a prepaid program, each NewCoin user identity would have to be limited such that it could not have a maximum value in excess of $1,000 and no more than $1,000 could be loaded, used or withdrawn on any day, and the Coins could not be transmitted internationally, transferred between or among users, or have additional funds loaded from non-depository sources.[14]  Given NewCoin's model, as an international open payment system without centralized controls, it is unlikely that NewCoin would be able to implement the restrictions necessary to make NewCoin exempt from the definition of a prepaid program without fundamentally changing the structure of NewCoin.

In addition to regulating providers of prepaid access, the BSA regulations also regulate sellers of prepaid access.  Sellers of prepaid access include "any person that receives funds or the value of funds in exchange for an initial loading or subsequent loading of prepaid access if that person sells prepaid access offered under a prepaid program that can be used before verification of customer identification."[15]  Because of the anonymity associated with NewCoin, it seems unlikely that customer identification will be verified prior to the sale of Coins.  Although value is never "loaded or reloaded" onto Coins, if Coins are found to be prepaid access, as discussed above, then Founders, Foundation, exchanges and other parties, risk being considered sellers of prepaid access for any Coins that they sell.  Sellers of prepaid access have the same regulatory requirements as providers of prepaid access with the exception of registering as a money services business.

To reduce the risk that Coins are considered prepaid access under the Bank Secrecy Act regulations Founders and Foundation should not sell Coins.

### b.  Money Transmitter

---

11 31 C.F.R. § 1010.100(ff)(4)(ii) (principal oversight and control means "(A) Organizing the prepaid program; (B) Setting the terms and conditions of the prepaid program and determining that the terms have not been exceeded; (C) Determining the other businesses that will participate in the prepaid program, which may include the issuing bank, the payment processor, or the distributor; (D) Controlling or directing the appropriate party to initiate, freeze, or terminate prepaid access; and (E) Engaging in activity that demonstrates oversight and control of the prepaid program.").

[12] 31 C.F.R. § 1010.100(ff)(4)(iii).

[13] 31 C.F.R. § 1010.100(kkk).

[14] 31 C.F.R. § 1010.100(ff)(4)(iii)(D).

[15] 31 C.F.R. § 1010.100(ff)(7).

79435-0001/LEGAL22442062.5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287884

*PRIVILEGED / CONFIDENTIAL*

In addition to regulating providers and sellers of prepaid access as money services businesses, the BSA regulations regulate money transmitters. A money transmitter is a person (a) that accepts "currency, funds, or other value that substitutes for currency from one person" and transmits "currency, funds, or other value that substitutes for currency to another location or person by any means" or (b) is "engaged in the transfer of funds."[16] The regulations expressly exclude from the definition of a money transmitter someone who only "provides the delivery, communication, or network access services used by a money transmitter to support money transmission services."[17] Founders have a low risk of being considered money transmitters because they do not accept Coins from one party to transmit to another, but rather NewCoin will be a product that provides the capability to allow for such transmission. Exchanges that facilitate Coin purchase and sale transactions have a greater risk of falling within the category of a money transmitter and being subject to the BSA regulations for money services businesses.

### c. Currency Exchanger

Lastly, the BSA regulations include foreign currency exchangers as money services businesses subject to anti-money laundering regulation. A foreign currency exchanger is "a person that accepts the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more countries in exchange for the currency, or other monetary instruments, funds, or other instruments denominated in the currency, of one or more other countries in an amount greater than $1,000 for any other person on any day in one or more transactions, whether or not for same-day delivery."[18] Because this category of money services business expressly contemplates that it is the currency of a country exchanged for the currency of another country, exchanges that operate and exchange Coins for the currencies of different countries may be able to claim that they fall outside of the definition because the Coins will not be a currency of any particular country. However, exchanges may face risk that, while not directly exchanging the currency of one country for the currency of another, Coins are simply being used as an instrument to create the same result. If this is the case, regulators may categorize NewCoin exchanges as currency exchangers.

### 2. State Money Transmitter Laws

Most states regulate entities that transmit money and require that they are licensed and bonded. Most states include "selling or issuing payment instruments" within the definition of money transmission.[19] Payment instruments are typically defined as "a check, draft, money order, traveler's check, or other instrument for the transmission or payment of money or monetary value…"[20] but most states provide exemptions for payment instruments that can be redeemed only for the goods and services of the issuer.[21] Coins may be considered an instrument for the transmission or payment of monetary value, which would result in any person who sells or issues Coins being a money transmitter. Founders and Foundation, however, when not selling the Coins, likely would only qualify as a money transmitter if they were "issuing" Coins. "Issue" is not usually defined in the state money transmitter statutes, but California has defined it with respect to a

---

[16] 31 C.F.R. § 1010(ff)(5).
[17] 31 C.F.R. § 1010(ff)(5)(ii)(A).
[18] 31 C.F.R. § 1010(ff)(1).
[19] *See, e.g.,* Ariz. Rev. Stat. Ann. § 6-1202; Cal. Fin. Code § 2003(o).
[20] *See, e.g.,* Cal. Fin. Code § 2003(q); Alaska Stat. § 6.55.990(19).
[21] *See, e.g.,* Ga. Code Ann. § 7-1-680(a)(1); N.J. Stat. Ann. § 17:15C-2.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287885

*PRIVILEGED / CONFIDENTIAL*

payment instrument as "the entity that is the maker or drawer of the instrument in accordance with the California Commercial Code and is liable for payment."[22]  Because neither the Founder nor the Foundation is liable for payment on the Coins, there is a strong position that, at least in California, neither is a money transmitter.

It is also common for states to include within the definition of a money transmitter someone who accepts money for the purpose of transmission or transmits money.[23]  Similar to the analysis under the Federal money transmitter definition, Founders have a low risk of being considered money transmitters because they do not accept Coins or money from one party to transmit to another nor, in any instance, do they transmit money.  However, exchanges, which allow people to buy and sell Coins directly from one person to another, have a greater risk of falling within the category of a money transmitter because they will transmit both Coins and money between the buyers and sellers.

### 3.  Securities

Under the Securities Act of 1933, the term security means:

> any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security," or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing.[24]

An instrument that does not fall within one of the traditional types of securities may nonetheless be regulated as a security if it constitutes an "investment contract."  An investment contract is a scheme involving (a) an investment (b) in a common enterprise (c) with the expectation of profits to come solely from the efforts of others.[25]  To the extent that Founders' issuance of Coins does not involve an investment of money, then there is a low risk that the Coins will be considered an investment contract.  The model of the Faucet, which will issue most Coins generally on the Internet without consideration, will keep the risk of treatment of the Coins as an investment contract low.  However, the current model, which contemplates that at least 15% of Coins will be given out in exchange for investment creates a high risk that the Coins will be treated as investment contracts and regulated as securities.  Even if all Coins are distributed by Founders without consideration, because most Coins will eventually be purchased on exchanges for

---

[22] *See, e.g.*, Cal. Fin. Code § 2003(k).

[23] *See* Draft Uniform Money Services Business Act § 102(17)(B) (1999).  The following states include the language "or transmitting," in their definition of money transmission: Arizona, Colorado, Connecticut, Georgia, Idaho, Illinois, Indiana, Maine, Minnesota, New Jersey, Oregon, and Tennessee.

24 15 U.S.C. § 77b(a)(1).

[25] *See S.E.C. v. W.J. Howey Co.*, 328 U.S. 293, 299 (1946).

79435-0001/LEGAL22442062.5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0287886

*PRIVILEGED / CONFIDENTIAL*

money, there remains a low risk that the purchase of Coins on exchanges will be considered an investment of money.

Courts have found that the common enterprise can arise from showing "'horizontal commonality': the tying of each individual investor's fortunes to the fortunes of the other investors by the pooling of assets, usually combined with the pro rata distribution of profits."[26] As the value of Coins increase, each person who purchased Coins will be proportionally better off, so individual holders of Coins receive their pro rata portion of the gains through an increased value in the Coins they hold if NewCoin succeeds. Some commentators have pointed out that Bitcoin does not have a common enterprise[27] because there is no centralized money-making entity that will be raising money, but rather many individuals separately participating in a decentralized program.[28] NewCoin has a greater risk of being seen as a common enterprise because there will be a specific entity, Foundation, which is responsible for the promotion and marketing functions of NewCoin. Also, because Foundation will hold 15% of the Coins, it will grow in value with the increased participation in NewCoin, so it will be participating and benefiting from the common enterprise. The common enterprise risk increases to the extent that there is an identifiable entity that is driving the promotion.

Founders and Foundation may expect that people will not purchase Coins solely with the expectation of profit, but rather to simplify or expedite transactions over the Internet. If Coins are purchased without an expectation of profit then they will not be considered an investment contract. However, if Bitcoin's model is exemplary, profit motivates purchasers of such virtual crypto currencies. The claim that there is no expectation of profit is weakened to the extent that Founders sell Coins to Investors for a specified amount of money. Such investment will be driven solely by the expectation that the Coins will develop value that exceeds the amount paid because the use of NewCoin expands and therefore the demand for the finite number of Coins will increase. Any expectation of profit will be driven by the efforts of others, as no individual holder of Coins will be putting any effort into increasing the value of Coins.

The 1934 Securities Act excludes from the definition of a security "currency or any note ... which has a maturity at the time of issuance of not exceeding nine months"[29] Courts have read the exemption for short term notes to be applicable to commercial paper, not investment securities.[30] Some commentators have explained that, like commercial paper, currency generally doesn't resemble a security because it is safe and liquid.[31] Coins, however, unlike traditional currencies, do not have these qualities of safety and liquidity because they will be neither backed by the full faith and credit of a national government nor widely accepted as a means of exchange. Coins, therefore, may be encompassed within what the Supreme Court explained as Congress's attempt to define a security "sufficiently broad to encompass virtually any instrument that might be sold as an investment."[32]

---

[26] *See Revak v. SEC Realty Corp.*, 18 F.3d 81, 87 (2d Cir. 1994).

[27] Reuben Grinberg, *Bitcoin: An Innovative Alternative Digital Currency*, 4:1 Hastings Sci. & Tech. L.J. 191, 199 (2011) [hereinafter *Grinberg*].

[28] *Grinberg*, 197.

[29] 15 U.S.C. § 78C(a)(10).

[30] *See Reves v. Ernst & Young*, 494 U.S. 56, 74 (1990) (Stevens, J., concurring).

[31] *See* Grinberg 203.

[32] *Reves*, 494 U.S. at 60-61.

79435-0001/LEGAL22442062.5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC. RPLI_SEC 0287887

Founders and Foundation should not provide Coins to Investors in exchange for their investment and should not participate in the sale of Coins in order to reduce the risk that Coins will be considered securities and regulated by the Securities Act of 1933 and the Securities Exchange Act of 1934.

### 4. Commodities regulation

The Commodity Exchange Act ("**CEA**") regulates the sale of a commodity for future delivery. Commodity means "wheat, cotton, rice, corn, oats…and all other goods and articles…and all services, rights, and interests…in which contracts for future delivery are presently or in the future dealt in."[33]  The CEA does not govern or apply in certain circumstances (other than section 5b or 12(e)(2)(B)) to transactions in delineated financial instruments (i.e., currencies) that are deemed to be "excluded commodities." The CEA provides an exemption for a transaction in an excluded commodity if: (i) the agreement, contract, or transaction is entered into only between persons that are eligible contract participants at the time at which the persons enter into the agreement, contract, or transaction; and (ii) the agreement, contract, or transaction is not executed or traded on a trading facility.  Although an argument might be fashioned that Coins are an excluded commodity under the CEA (which is unlikely as they are not backed by the full faith and credit of a national government), their sale to the general public would preclude reliance on the exemption noted above, potentially subjecting certain transactions in Coins to federal regulation.  While people will not immediately deal in futures or options contracts for Coins, to the extent that Coins mimic existing currencies, it is possible that futures or options contracts for Coins will be developed, and Coins may therefore fall subject to federal regulation under the CEA. The U.S. Commodity Futures Trading Commission (the "**CFTC**") regulates and enforces regulations relating to the sale of a commodity for future delivery.  Statutorily, it is unlawful for a person to cheat, defraud, make false reports or statements or otherwise willfully deceive or attempt to deceive a person in connection with a contract or sale of any commodity for future delivery.[34]  Additionally the CFTC requires registration from many parties engaged in the buying, selling, and promoting of commodities futures, including clearing organizations,[35] data repositories,[36] and intermediaries.[37]  Given the uncertainty of whether Coins would be deemed a commodity, and whether an active futures market for Coins will form, Founders and Foundation face a relatively low risk related to CFTC enforcement, and such risk can be addressed as it arises.  If an active futures and options market in Coins does form, and exchanges begin to deal in these contracts, then exchanges, as well as parties that promote the sale of futures contracts for Coins, may be required to register with the CFTC and face enforcement action for any inaccurate or deceptive promotion of Coins.

### 5. Federal Currency Regulation

---

[33] 7 U.S.C. § 1A(4).

[34]  7 U.S.C. § 6B(a)(2).

[35] 7 U.S.C. § 7a-1; 17 C.F.R. § 39.3.

[36] 7 U.S.C. §24a; 17 C.F.R. § 49.3.

[37] 7 U.S.C. § 6D; 7 U.S.C. § 6K; 7 U.S.C. § 6N (intermediaries required to register include (i) futures commission merchants who solicit or accept orders for futures contracts and accept money, securities or property to margin, guarantee, or secure any trades or contracts; (ii) introducing brokers who solicit and accept orders for futures contracts and does not accept any money, securities or property to margin, guarantee or secure any trades or contracts; (iii) commodity pool operator who engages in operations of a collective investment vehicle and solicits or accepts funds, securities or properties for the purchase of interests in the collective investment vehicle; and (iv) a commodity trading advisor who, for compensation, advises others or issues or promulgates analysis as to the value or advisability of trading in any futures or options contracts).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.          RPLI_SEC 0287888

*PRIVILEGED / CONFIDENTIAL*

### a. Counterfeiting

It is illegal in the United States to make, utter, or pass "any coins of gold or silver or other metal, or alloys of metals, intended for use as current money, whether in the resemblance of coins of the United States or foreign countries, or of the original design."[38]   In 2011, after many years of investigation and prosecution, Bernard von NotHaus was convicted of counterfeiting coin and passing, publishing and selling such coins when they were known to be false.[39]   At the time of the NotHaus conviction, the DOJ issued a press release explaining that

> Article I, section 8, clause 5 of the United States Constitution delegates to Congress the power to coin money and to regulate the value thereof.  This power was delegated to Congress in order to establish and preserve a uniform standard of value and to insure a singular monetary system for all purchases and debts in the United States, public and private.  Along with the power to coin money, Congress has the concurrent power to restrain the circulation of money which is not issued under its own authority in order to protect and preserve the constitutional currency for the benefit of all citizens of the nation.  It is a violation of federal law for individuals…or organizations…to create private coin or currency systems to compete with the official coinage and currency of the United States.[40]

While the press release suggests that the conviction was predicated on the illegality of creating a competing currency, the legal basis for the conviction was counterfeiting.  The Liberty Dollars included a $ sign, used the words "dollar," "USA," "Liberty," and "Trust in God."[41]   It is likely that the counterfeiting and fraud aspect of the Liberty Dollars, rather than the competition with United States currency, led to the conviction.[42]   Because the language of the counterfeiting statute exclusively addresses metal coinage or bars, it is likely inapplicable to the creation and distribution of Coins, which will be constructed of a string of code.

### b. Stamp Payments Act

The Stamp Payments Act of 1862 (**"Stamp Payments Act"**) states that, "whoever makes, issues, circulates, or pays out any note, check, memorandum, token, or other obligation for a less sum than $1, intended to circulate as money or to be received or used in lieu of lawful money of the United States, shall be fined under this title or imprisoned not more than six months, or both."[43]   Based on case law analyzing the Stamp Payments Act, one commentator has explained that it is unlikely to apply to anything that "(1) circulates in a limited area, (2) is redeemable only in goods, (3) does not resemble official U.S. currency and is

---

[38] 18 U.S.C. § 486.

[39] Superseding Bill of Indictment, *United States v. Bernard Von NotHaus*, Docket No. 5:09CR-27 (W.D.N.C. Nov. 17, 2010); Verdict Form, *United States v. Bernard Von NotHaus*, Docket No. 5:09CR27-V, (W.D.N.C. Mar. 18, 2011).

[40] Press Release, United States Attorney's Office, Western District of North Carolina, *Defendant Convicted of Minting His Own Currency* (March 18, 2011), *available at* http://www.fbi.gov/charlotte/press-releases/2011/defendant-convicted-of-minting-his-own-currency.

[41] *Id.*

[42] *Grinberg*, 191; Seth Lipsky, Op-Ed., *When Private Money Becomes a Felony Offense: The Popular Revolt Against a Declining Dollar Leads to a Curious Conviction*, Wall St. J. (Mar. 31, 2011) *available at* http://online.wsj.com/article/SB10001424052748704425804576220383673608952.html.

[43] 18 U.S.C. § 336.

79435-0001/LEGAL22442062.5

-12-

*PRIVILEGED / CONFIDENTIAL*

otherwise unlikely to compete with small denominations of U.S. currency, or (4) is a commercial check."[44] Professor Ronald Mann, an expert in payment systems, has explained that the term "obligation" in the statute does not limit the list, and has made a statement regarding Bitcoin, which has a similar form factor to a Coin, that it "is pretty clearly a 'token,' albeit an electronic one, I would argue it is covered [by the Stamp Payments Act]."[45] NewCoin will circulate widely, be redeemable for any products in which merchants will accept it, may compete with small denominations of U.S. currency, and is not a commercial check. Because there is no requirement that merchants accept the Coins, it is unclear whether an "obligation" exists. There has not been a published court opinion interpreting the Stamp Payments Act since 1899.[46] Given the lack of recent prosecutions, and the low risk that Coins create an obligation, Founders and Foundation face a relatively low risk of enforcement under the Stamp Payments Act.[47]

### 6. Illegal Gambling

Many states have anti-gambling laws that make it a misdemeanor to sell, transport or manufacture a gambling device.[48] Under these statutes, the term "gambling devices" is typically broadly defined. For instance, in Colorado "gambling devices" include " any device, machine, paraphernalia, or equipment that is used or usable in the playing phases of any professional gambling activity,"[49] and in Washington "gambling devices" include "any device, mechanism, furniture, fixture, construction or installation designed primarily for use in connection with professional gambling."[50] Founders and Foundation incur some risk related to illegal gambling if Coins are categorized as gambling devices. While neither Founders nor Foundation can control use of the Coins, the risk of Coins being a gambling device increases if Founders and Foundation promote Coins for use in Internet gambling. Founders and Foundation should not advertise the use of Coins for Internet gambling or any illegal purpose. Additionally, under the Illegal Gambling Business Act "[w]hoever conducts, finances, manages, supervises, directs, or owns all or part of an illegal gambling business shall be fined…or imprisoned…or both."[51] While Founders and Foundation have not indicated intent to conduct an illegal gambling business, there is a risk that Coins that are used to finance illegal gambling will be seized and forfeited, which could cause instability to the NewCoin system.[52]

The Unlawful Internet Gambling Enforcement Act regulates designated payment systems, which are "system[s] utilized by a financial transaction provider that the Secretary or Board of Governors of the Federal Reserve System, in consultation with the Attorney General, jointly determine, by regulation or order, could be utilized in connection with, or to facilitate any restricted transaction."[53] A restricted transaction is a transaction or transmittal involving any credit, funds, instruments, or proceeds in

---

[44] *See Grinberg*, 185 (citing United States v. Van Auken, 96 U.S. 366 (1878), United States v. Monongahela Bridge Co., 26 F. Cas. 1292 (W.D. Pa. 1863 (No. 15796); United States v. Roussopulous, 95 F.977 (D. Minn 1899), and Stetinius v. United States, 22 F. Cas. 1322 (C.C.D.D.C. 1839) (No. 13387)).
[45] *Grinberg*, 189 (quoting Mann).
[46] *Grinberg*, 190.
[47] Please note that the penalties for violation are limited to a fine and a maximum of six months imprisonment. 18 U.S.C. § 336.
[48] *See, e.g.*, Colo. Rev. Stat. § 18-10-105.
[49] Colo. Rev. Stat. § 18-10-102(3).
[50] RCW 9.46.0241.
[51] 18 U.S.C. § 1955.
[52] *Id.*
[53] 31 U.S.C. § 5362(3).

79435-0001/LEGAL22442062.5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.　　　　RPLI_SEC 0287890

connection with a person's participation in unlawful Internet gambling.[54]  Participants in a designated payment system are required to "establish and implement written policies and procedures reasonably designed to identify and block or otherwise prevent or prohibit restricted transactions."[55]  The Department of Treasury and the Board of Governors of the Federal Reserve System have identified designated payment systems to include automated clearing house systems, card systems, check collection systems, money transmitting, and wire transfer systems.[56]  Unless the identification of designated payment systems is later modified, it is unlikely that NewCoin, Founders or Foundation would technically be subject to the blocking requirements of the Unlawful Internet Gabling Enforcement Act because Coins do not fall within one of the designated payments systems.

The Unlawful Internet Gambling Enforcement Act also regulates the ability for a person engaged in betting or wagering to knowingly accept from another person in connection with unlawful Internet gambling credit, an electronic fund transfer, a check, or proceeds from any other designated payment system.[57]  Unlawful Internet gambling means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law..."[58]  The definition of a bet or wager excludes participation in a game or contest if the participants do not stake or risk anything other than personal efforts or points or credits given by the game's sponsor free of charge that can be redeemed only for participation in games offered by the game's sponsor.[59]  Because it is intended that Coins be redeemed in an open marketplace, if an Internet gaming company, which was otherwise not engaged in Internet gambling, gave away Coins and accepted them as payment to play games, the payment of the Coins would constitute a wager (not falling within the exemption discussed above), and may draw such company within the realm of unlawful Internet gambling.  Founders and Foundation should carefully evaluate any use of Coins in Internet gaming situations.

### 7.  Consumer Protection, Unfair or Deceptive Trade Practices

Section 5 of the Federal Trade Commission Act ("**FTC Act**") prohibits "unfair or deceptive acts in or affecting commerce."[60]  An act or practice is deceptive if (1) there is a representation, omission, or practice; (2) the representation, omission, or practice is likely to mislead consumers acting reasonably under the circumstances; and (3) the representation, omission, or practice is material.[61]  A representation is material if

---

[54] 31 U.S.C. § 5362-5363.  Unlawful Internet gambling means "to place, receive, or otherwise knowingly transmit a bet or wager by any means which involves the use, at least in part, of the Internet where such bet or wager is unlawful under any applicable Federal or State law in the State or State or Tribal lands in which the bet or wager is initiated, received, or otherwise made."  31 U.S.C. § 5362(10).

[55] 12 C.F.R. § 233.5 (there is a safe harbor for compliance if a financial transaction provider participant "relies on the policies and procedures of the designated payment system that are reasonably designed to (i) Identify and block restricted transactions; or (ii) Otherwise prevent or prohibit the acceptance of the products or services of the designated payment system or participant in connection with restricted transactions; and (2) such policies and procedures of the designated payment system comply with the requirements of [the regulation].")

[56] 12 C.F.R. § 233.3.

[57] 31 U.S.C. § 5363.

[58] 31 U.S.C. § 5362(10)(A).

[59] 31 U.S.C. § 5362(1)(E)(viii).

[60] 15 U.S.C. § 45(a)(1).

[61] *See FTC v. Gill*, 265 F.3d 944, 950 (9th Cir.2001).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.     RPLI_SEC 0287891

it is of a kind usually relied upon by a reasonably prudent person.[62] Express claims, or deliberately made implied claims, used to induce the purchase of a particular product or service are presumed to be material.[63] Thus, if Founders or Foundation make material representations, whether express or implied, that are likely to mislead reasonably prudent consumers, then the Founders or Foundation, as applicable, will likely face liability under the FTC Act and applicable state consumer protection laws.[64]

To minimize risk, Founders and Foundation should be careful about how they market the Coins to consumers and to whom they market Coins. For example, if Founders or Foundation sell Coins, they should accurately describe the potential risk of purchasing the Coins.[65] Founders and Foundation should also note that if Founders and Foundation fail to comply with applicable laws relating to NewCoin, and the government takes action that results in the devaluation of Coins, consumers may claim that the promotion of NewCoin by Founders and Foundation, while failing to comply with applicable laws, was itself an unfair or deceptive trade practice.

### 8. Aiding & abetting unlawful activity

As long as NewCoin does not actively promote the use of the Coins for illegal or other questionable purposes, there is minimal risk that its conduct will subject it to aiding and abetting liability. Nevertheless, there is a risk that NewCoin could come under regulatory scrutiny if the Coins become a popular tool for illegal online commerce, as governmental entities have become increasingly aggressive in pursuing aiding and abetting charges/claims against companies involved in online commerce.

Aiding and abetting requires "first, that the principal committed the substantive offense charged, and second, that the [defendant] accomplice became associated with the principal's criminal endeavor and took part in it, *intending to assure its success.*"[66] "[A] defendant must willfully and knowingly have associated himself in some way with the crime, and willfully and knowingly have sought by some act to help make the crime succeed."[67] To prove an "association" with a crime, the government must provide both "proof of [defendant's] sufficient participation in the crime, as well as knowledge of it."[68] To prove that Founders aided and abetted a crime, the government would have to prove that: (1) some principal committed the underlying crime; (2) Founders knew it; and (3) Founders participated in it with the intent that the crime occur.

To satisfy the knowledge requirement for aiding and abetting, the government must show the defendant had "more than merely a general suspicion that an unlawful act may occur."[69] Thus, the government would

---

[62] *FTC v. Amy Travel Serv. Inc.*, 875 F.2d 564 (7th Cir. 1989).

[63] *Thompson Medical Co.*, 104 F.T.C. 648, 816 (1984).

[64] *See FTC v. Transnet Wireless Corp.*, 506 F. Supp. 2d 1247, 1267 (S.D. Fl. 2007); *see also* 15 U.S.C. § 53(b).

[65] *See Transnet Wireless Corp.*, 506 F. Supp. 2d at 1267 (noting that defendants violated Section 5 of the FTC Act by making material misrepresentations regarding, *inter alia*, the potential earnings a consumer was likely to achieve by purchasing Defendants' Internet kiosks).

[66] *United States v. Perez-Melendez*, 599 F.3d 31, 40 (1st Cir. 2010) (emphasis added); *see also United States v. Campa*, 679 F.2d 1006, 1013 (1st Cir. 1982) ("Proving beyond a reasonable doubt that a specific person is the principal is not an element of the crime of aiding and abetting…The prosecution need only prove that the substantive offense had been committed by someone.").

[67] *United States v. Bailey*, 405 F.3d 102, 110 (1st Cir. 2005) (approving language from jury instruction).

[68] *United States v. Guerrero*, 114 F.3d 332, 342 (1st Cir. 1997).

[69] *United States v. Rosario-Diaz*, 202 F.3d 54, 63 (1st Cir. 2000).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.          RPLI_SEC 0287892

*PRIVILEGED / CONFIDENTIAL*

have to prove that Founders *knew* that Coins were being used to facilitate illegal activities. To reduce this risk, Founders and Foundation should be careful about how Coins are promoted and should not target illegal activities as markets of the Coins.

Inferences of knowledge may also be drawn from evidence suggesting that the substantive crime or scheme was apparent or foreseeable to the defendant, or evidence that a defendant was willfully blind to illegal activities or consciously disregarded evidence of it.[70] For example, *United States v. Lovin* held that the evidence was sufficient to sustain a conviction against an operator of websites that advertised prescription drugs and linked purchasers to doctors and pharmacists who filled prescriptions without in-person examinations. The court rejected the defendant's argument that he did not know the doctors were filling prescriptions illegally, reasoning that the operator had previously been involved with illegal drug distribution networks, had talked to the conspiracy's ringleader about the need to avoid government scrutiny, and knew the rate at which doctors were approving orders.[71] In contrast, if a defendant is not aware of a crime or could not foresee it, he cannot be convicted.[72] To minimize risk of liability, Founders will want to establish as much distance from any illegal industries as possible, and they should make clear in their mission statements, user guidelines, or other publications that they do not promote or condone use of the Coins for illegal activities, nor do they directly oversee, control, or financially benefit from transactions in which the Coins are used.

Even if the government can prove knowledge, it is unlikely that merely creating a product that is then used in illegal activities would be sufficient to show participation. A defendant can aid and abet a crime by failing to take an action only if that failure was "with the specific intent to fail to do something the law requires to be done."[73] Moreover, for aiding and abetting liability to be based on failure to act, there must be "a legal duty and not simply a moral duty." Founders and Foundation, by staying removed from illegal activities, advising against the use of Coins for illegal activities, and educating the public about their lack

---

[70] *See, e.g.*, *United States v. Llinas*, 373 F.3d 26, 31–33 (1st Cir. 2004) (evidence was sufficient to show defendant knew about conspiracy where she was present at conversation about drug purchase and later drove co-conspirator to purchase site); *United States v. Page*, 521 F.3d 101, 108–09 (1st Cir. 2008) (defendant found to have knowledge of conspiracy where co-conspirator used drug dealer slang familiar to defendant); *Otero-Mendez*, 273 F.3d at 52 (defendant properly convicted of aiding and abetting carjacking resulting in death where defendant knew principals were carrying guns); *United States v. Spinney*, 65 F.3d 231, 236–37 (1st Cir. 1995) (defendant accused of aiding and abetting armed bank robbery was "on notice of the likelihood" that weapon would be used in the robbery where defendant had major role in planning a daylight robbery); *United States v. Hernandez*, 218 F.3d 58, 66-68 (1st Cir. 2000) (rejecting defendant's argument that he did not know he was transporting drugs where defendant drove truck in a slow and evasive manner).

[71] 2009 U.S. Dist. LEXIS 101567, *9-12 (S.D. Cal. Oct. 30, 2009).

[72] *See, e.g.*, *United States v. Lovern*, 2009 U.S. App. LEXIS 29307, *6–7 (10th Cir. Sept. 9, 2009). In this case, the operation involved a rogue pharmacy that issued prescriptions over the Internet without an in-person consultation. The evidence showed that the technician may have known that the pharmacy was filling prescriptions over the Internet or filling fake prescriptions, and that this conduct may have been illegal; however, the government specifically charged the defendant with aiding and abetting distribution by pharmacists outside the normal scope of their profession. *Id.* at *26-30. *See also United States v. Rosario-Diaz*, 202 F.3d 54, 63–64 (1st Cir. 2000) (vacating convictions for aiding and abetting and conspiracy to commit carjacking resulting in death where defendants who arranged a robbery could not foresee that the robbery would involve carjacking and murder); *United States v. Ogando*, 547 F.3d 102, 108 (2d Cir. 2008) (reversing cab driver's conviction for conspiracy to import drugs, noting that the fact that defendant had frequent contact with conspiracy members merely showed that he was "a livery cab driver regularly used by members of this conspiracy.").

[73] *Bailey*, 405 F.3d at 110 n. 4 (approving language from jury instruction).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.            RPLI_SEC 0287893

*PRIVILEGED / CONFIDENTIAL*

of involvement in and control over third party transactions, will significantly reduce their risk of aiding and abetting illegal activity.

### 9. Tax Evasion

It is a felony to "willfully attempt in any manner to evade or defeat any tax" imposed by the Internal Revenue Service.[74] Furthermore, persons who conspire to "commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose," are subject to fines and imprisonment.[75] While Founders and Foundation may not have income tax exposure arising from the issuance of Coins, merchants, online retailers, and others who accept Coins in lieu of payments in USD or currencies of other countries will be responsible for reporting the income tax associated with such receipts. Bartering income is taxed at the fair market value of the goods and services exchanged, which would suggest that a merchant accepting Coins for a good is responsible to pay income taxes on the fair market value of the Coins, which is equal to the fair market value of the good exchanged for the Coins.[76] Founders and Foundation should make clear to participants that they will be responsible for tax liability associated with the acceptance of Coins.

In addition to federal income tax, people buying, selling and exchanging Coins will be responsible for state income tax and sales tax liability associated with such Coins. While state laws vary significantly, state income tax liability associated with the receipt of Coins in a given year will be calculated, in most states, similarly to the federal income tax calculation. For state sales tax purposes, the Streamlined Sales and Use Tax Agreement defines "Sales price" as "the total amount of consideration, including cash, credit, property, and services, for which personal property or services are sold, leased, or rented, valued in money, whether received in money or otherwise..."[77] This agreement has only been adopted by some states, and even in states where it has been adopted the definition of "sales price" may not be uniform. NewCoin should advise users of Coins to evaluate sales tax obligations related to accepting Coins just as such users would evaluate sales tax for transactions involving money.

### 10. Other Considerations

There are a number of other legal and non-legal issues that Founders and Foundation should consider when forming the NewCoin product and structure, including the following:

      **a. Foreign Regulation.** While this memorandum discusses United States regulation, Founders and Foundation should consider the risks of violating similar laws in all nations in which Coins are promoted, sold, and exchanged. For instance, Founders should consult with European counsel to determine whether Coins will be considered e-money and therefore regulated and requiring registration under the Electronic Money Institutions Directive ("**E-Money Directive**"). The E-Money Directive defines electronic money as "electronically, including magnetically, stored monetary value as represented by a claim on the issuer which

---

[74] 26 U.S.C. § 7201.

[75] 18 U.S.C. § 371.

[76] Internal Revenue Service, *Bartering Income* (July 11, 2011), *available at* http://www.irs.gov/businesses/small/article/0,,id=187904,00.html.

[77] Streamlined Sales and Use Tax Agreement, 136 (May 19, 2011).

79435-0001/LEGAL22442062.5

-17-

*PRIVILEGED / CONFIDENTIAL*

is issued on receipt of funds for the purpose of making payment transactions…and which is accepted by a natural or legal person other than the electronic money issuer."[78]  The risk of regulation likely is low because the value of Coins will be based on the NewCoin economy but not backed by Founders or the Foundation, and therefore there will be no claim on the issuer.  However, the risk should not be completely ignored because there are commentators who believe that crypto virtual currency, such as NewCoin, would be subject to the E-Money Directive.[79]

b.  **Nonprofit Entity.**  The Foundation, as currently proposed, may not meet the requirements for a nonprofit entity under state corporate laws.  Under Washington's nonprofit corporations statute there are limitations on what a nonprofit corporation can do, including prohibitions on the issuance of stock, the disbursement of income to members, directors or officers, and the lending of money to officers or directors.[80]  Foundation will hold 15% of the Coins.  While Founders have not indicated how Foundation would be structured, if the Coins owned by Foundation will be distributed to members, directors or officers of Foundation or if any income that Foundation receives from the Coins, or any other means, is similarly disseminated, then Foundation would likely be unable to form as a nonprofit entity under state law.

c.  **Tax Exempt.**  The Foundation would not likely qualify for tax exempt status as a business league.  There are numerous categories of entities that are exempt from federal income tax requirements.  Founders have suggested that Foundation will claim an exemption as a "trade organization."  The Internal Revenue Code, Section 501(c)(6), provides an exemption for "business leagues, chambers of commerce, real estate boards, boards of trade, and professional football leagues, which are not organized for profit and no part of the net earnings of which inures to the benefit of any private shareholder or individual."[81]  There are specific characteristics that are required of a 501(c)(6) organization, and some of these requirements may be difficult for Foundation to demonstrate.  The purpose of the organization must not be "to engage in a regular business of a kind ordinarily carried on for profit, even though the business is conducted on a cooperative basis or produces only sufficient income to be self-sustaining."[82]  It is likely that the Internal Revenue Service would deny Foundation's application as a business league because promoting and marketing digital currency is a type of activity that would, and has been, carried on by for-profit entities.  Foundation would then be responsible for distinguishing itself from such organizations that market and promote digital currencies for profit.  Also, the organization's "activities should be directed to the improvement of business conditions of one or more lines of business as distinguished from the performance of particular services for individual persons."[83]  Foundation would have to work to improve business conditions for Internet

---

[78] Directive 2009/110/EC, *Second Electronic Money Directive*, Tit. I, Art. 2, § 3 (2009).
[79] *See, e.g.*, Edwin Jacobs, *Bitcoin: A Bit Too Far?*, Journal of Internet Banking and Commerce, vol. 16, no. 2 (August 2011).
[80] RCW § 24.03.030.
[81] 26 U.S.C. § 501(c)(6).
[82] 26 C.F.R. §  1.501(c)(6)-1.
[83] 26 C.F.R. §  1.501(c)(6)-1.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287895

*PRIVILEGED / CONFIDENTIAL*

commerce or digital currencies, but it risks falling outside of the category of a 501(c)(6) if its purpose is to solely promote NewCoin.

    **d. Fees collected and redistributed.** Founders indicate that there will be a nominal fee for transactions effectuated using NewCoin. There are potential risks associated with this fee depending on who charges the fee and for what it is used. The collection of a fee for transactions presumes that there is some centralized party with control over the development of NewCoin and movement of Coins. Having a centralized entity increases regulatory risk under certain laws described above, such as securities regulation and prepaid access rules.

    **e. Hackers/security**. Founders and Foundation should consider risks associated with security breaches or hackers breaking into NewCoin, like what occurred with Bitcoin and Mt.Gox. While Founders and Foundation themselves may not have specific disclosure obligations arising from a breach resulting in a release of personal information, exchanges and other third party participants who aggregate and store Coins on behalf of individuals may face risk.

    **f. Promotional Coins and Expiration.** To the extent that Coins are considered prepaid access, Founders can issue unpaid, promotional Coins, which could expire, provided that proper disclosure is made. To the extent that Coins are considered prepaid access, they may also be regulated by the Federal CARD Act as a "general-use prepaid card," which is "a card, code or other device that is (i) issued on a prepaid basis primarily for personal, family, or household purposes to a consumer in a specified amount, whether or not that amount may be increased or reloaded, in exchange for payment; and (ii) redeemable upon presentation at multiple, unaffiliated merchants for goods or services, or usable at automated teller machines."[84] If Coins are general-use prepaid cards, then there will be limitations on expiring or imposing fees. However, Coins that are issued in connection with loyalty, award or promotional programs may expire provided that the expiration date is stated on the front of the card and it is indicated on the front of the card that it is issued for a promotional, award or loyalty purpose.[85] Because most Coins will be distributed initially for free through the Faucet, Founders can consider expiring these Coins after a certain period of time, provided such expiration is properly disclosed. Because Coins will not be issued in the form of a card, disclosure would need to be in a comparable location on the user interface that the holders of Coins view. Additionally, many state gift certificate statutes require issuers of promotional gift certificates or cards to indicate the expiration date on the front of the gift certificate or card, in capital letters, and in at least 10 point font.[86]

    **g. Employee Payment/Wage & Hour.** Founders and Foundation will need compensate the dedicated team of developers and business people in compliance with wage and hour requirements. Founders have indicated that NewCoin will have a dedicated team of

---

[84] 12 C.F.R. § 205.20(a)(3).

[85] 12 C.F.R. § 205.20(a)(4).

[86] *See, e.g.,* Cal. Civ. Code Civ. § 1749.5(d) (explaining that consumer protection laws do not apply to gift certificates distributed pursuant to an award, loyalty, or promotional program without any money or thing of value being exchanged if the expiration dates are printed on the face, in capital letters, in at least 10 point font).

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.    RPLI_SEC 0287896

*PRIVILEGED / CONFIDENTIAL*

developers and business people who support NewCoin.  Founders and Foundation will need to consider who employs this team and how this team will be compensated.  Having a volunteer team or compensating the team with Coins will both likely result in the violation of state wage and hour laws.  These laws generally require employers to pay non-exempt employees minimum amounts for hours worked, and these amounts can not generally be paid in anything other than legal tender of the United States or something readily convertible thereto.[87]

---

[87] *See e.g.,* RCW 49.46.010(2).

79435-0001/LEGAL22442062.5

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0287897