Case 1:20-cv-10832-AT-SN Document 637-45 Filed 09/13/22 Page 1 of 14

# PX 245

Message

**From:** @ripple.com]
on behalf of @ripple.com> ripple.com]
**Sent:** 9/18/2017 9:38:59 AM
**To:** Antoinette O'Gorman ripple.com]
**Subject:** 2015 Legal Opinion - XRP
**Attachments:** Ripple - Memo re XRP is not a Security (final)(81179661_1) _Paul Hastings June 2015.docx

ripple.com | ripple.com





## *MEMORANDUM*

**HIGHLY CONFIDENTIAL**
**ATTORNEY-CLIENT PRIVILEGED**

***date:*** February 27, 2015

***to:*** Ripple Labs

***from:*** [redacted]

***subject:*** Analysis of Whether XRP is a "Security" for the Purposes of Federal and State Regulation

This memorandum analyzes whether XRP falls under the definition of a "security" under federal and state securities laws and is therefore subject to regulation by federal and state securities agencies. This memorandum concludes that XRP likely should not be treated as a security under federal and state law. However, this memorandum notes that XRP presents more risk of being deemed a security than other virtual currencies by virtue of the close relationship between Ripple Labs and XRP. This memorandum suggests steps that Ripple Labs may take in promoting and selling XRP to reduce this risk.

### I. SCOPE AND RELIANCE

The conclusions contained in this memorandum are subject to the following limitations:

- Our legal analysis and conclusions are subject to (a) our understanding of Ripple Labs' current business model; (b) our familiarity with Ripple Lab's intent for future profit and growth, and (c) our understanding of XRP and its role in Ripple Labs' business model.

- The legal analysis is confined to the statutes and regulations expressly identified in the memorandum, and it does not consider whether the laws of any other jurisdiction affect the legality of the conduct analyzed.

- This memorandum is addressed to Ripple Labs for its own benefit and may not be relied upon by any other person or filed with any authority without the prior written consent of Paul Hastings LLP.

### II. BACKGROUND

For background, we briefly summarize below our understanding of decentralized convertible virtual currencies generally, XRP, the Ripple network, and Ripple Labs.

#### A. Decentralized Convertible Virtual Currencies

Virtual currencies are digital tokens that can be used as a medium of exchange and operate like "real" or fiat currency (*e.g.*, U.S. dollars or euros) in some environments. Virtual currencies, however, do not have all of the attributes of fiat currency. Unlike fiat currencies, virtual currencies do not have legal tender status in any jurisdiction, nor are they backed by a government or central bank.

A "convertible" virtual currency either has an equivalent value in fiat currency or acts as a substitute for money. A virtual currency is "decentralized" if it (1) has no central repository and no single administrator, and (2) may be obtained by a user's own computing or manufacturing effort.[1]

Common decentralized convertible virtual currencies (simply referred to as "virtual currencies" throughout this memorandum) include Bitcoin, Litecoin, Dogecoin, and XRP. Each virtual currency may have slightly different attributes and functionality depending on the underlying open source protocol on which it is based.

**B. The Ripple Network And Ripple Labs**

Ripple is an open source Internet protocol for accounting for financial balances held within and moved between ledgers. At its core, the Ripple network is a shared, public database. Within the database is a distributed ledger that tracks accounts and balances for all users.

The Ripple ledger does not hold or store funds, nor does it provide a mechanism for users to load or off-load traditional currency to or from the Ripple network. Instead, the ledger accounts for funds held by Ripple users called "gateways." A user can load funds to the Ripple network by providing traditional fiat currency to a gateway with which the user establishes a "trust line" (*i.e.*, via cash, payment card, or ACH). Once the user has loaded funds to the Ripple network via the gateway, the Ripple ledger reflects that the gateway owes that amount to the user. If the user withdraws the funds from the gateway, the amount reflected on the Ripple ledger will be reduced by the same amount.

Gateways are connected to each other by users electing to serve as "market makers." A market maker is a Ripple user that has trust lines with and funds deposited at multiple gateways. A market maker provides liquidity between gateways by setting bids at which it will accept funds at one gateway in exchange for making funds available at a different gateway. The protocol allows a user to send funds to other users through this network of users serving as gateways and market makers.

When a user sends funds to another user, the protocol finds the least cost path (based on the competing bids set by market makers) between the sender's gateway to the recipient's gateway through the network of market makers and gateways. The transfer is executed by updating the Ripple ledger to reflect the shift in obligations to the sending user, receiving user, and any involved market makers at each user's respective gateway(s). No funds actually move between any gateway but instead the ledger redistributes obligations at each gateway along the least cost path. The protocol supports the transfer of funds denominated in any fiat or virtual currency.

Ripple Labs created the Ripple protocol, and it continues to support and promote the protocol in various ways. Ripple Labs contributes code to the protocol to help increase stability and security. Its developers build tools that help other developers build applications utilizing the protocol. And, it develops partnerships with financial institutions, such as banks and money transmitters, currency traders, and other users, which are engaged in building and expanding the Ripple ecosystem.

**C. XRP**

XRP, also known as Ripples, is a virtual currency that exists natively on the Ripple network. The inventors of the Ripple protocol created 100 billion XRP at its inception, and no more can ever be created

---

[1] *See Application of FinCEN's Regulations to Persons Administering, Exchanging, or Using Virtual Currencies*, FIN-2013-G001, at 5 (Mar. 18, 2013), http://fincen.gov/statutes_regs/guidance/pdf/FIN-2013-G001.pdf.

according to the protocol's rules.[2] XRP enables the protocol to solve two specific problems. First, it protects the network against abuse. Second, it serves as a bridge currency for increased liquidity on the network.

XRP protects the network by making it extremely expensive to perform a denial-of-service attack by spamming the Ripple network with either fake accounts or fake transactions. Each Ripple account is required to keep a small reserve of XRP worth a nominal amount. While this is a negligible amount for individual users, it is meant to be prohibitively expensive to amass a large number of fraudulent accounts to attack the network. In addition, when each transaction is processed, a very small amount of XRP is subtracted from the sender's account, which is destroyed and ceases to exist. When the network is under a heavy load, such as when under an attack, this fee rapidly increases. A supermajority of server operators can change how much XRP is destroyed per transaction so as to keep the transaction cost low in the case that the value of XRP significantly changes.

XRP also serves as a floating point that enables trading across all other forms of value lodged on the Ripple ledger. As the Ripple network grows, the number of currencies on the network will likely increase. For a single market maker, the number of currency pairs between that market maker and other users could become unmanageable. XRP can serve to simplify these exchanges because market makers will only need to quote their prices toward XRP rather than every single currency. In addition, as the Ripple network grows there will be increasingly complex and fragile paths needed to resolve transactions. Having all currencies liquid to XRP decreases the need for such complex paths. Thus, XRP functions as a useful liquid medium between all other currencies.

The inventors of the Ripple protocol gifted Ripple Labs 80 billion of the 100 billion XRP in existence, and Ripple Labs continues to hold a large amount of XRP (more than any other entity).[3] Unlike certain virtual currencies like Bitcoin that rely on "mining" to introduce new currency into the ecosystem, the Ripple ecosystem depends upon distribution of XRP by Ripple Labs and Ripple's inventors.[4] As part of its distribution plan, Ripple Labs sells XRP from its reserves to generate revenue to support its operations. Ripple Labs' business model is, in part, predicated on an appreciation of the XRP it holds. Ripple Labs predicts an increase in demand for XRP as XRP offers increased utility to users as the Ripple network expands.[5] Additionally, as the utility of XRP increases, it is likely that speculative purchasing of XRP will also increase the currency's value. Ripple Labs claims that it "hopes to make revenue from XRP" as the protocol is adopted.[6] Also, Ripple Labs has entered into agreements regarding the sell-off of XRP held by the protocol's inventors.[7]

---

[2] *See XRP Distribution*, Ripple Labs, https://www.ripplelabs.com/xrp-distribution (last visited Feb. 17, 2015).
[3] *Id.*
[4] *Id.*
[5] *See* Ripple Labs, *The Ripple Protocol: A Deep Dive for Finance Professionals*, at 23 (Nov. 2014), https://ripple.com/files/ripple_deep_dive_for_financial_professionals.pdf.
[6] *See* Ripple Labs, *The Ripple Protocol Primer*, at 12 (Aug. 2014), https://ripple.com/files/ripple_primer.pdf.
[7] *See Price of Ripple Plummets as Co-Founder Plans 9 Billion XRP Selloff*, CoinDesk (May 22, 2014, 22:50 GMT), http://www.coindesk.com/price-ripple-xrp-plummets-co-founde-9-billion-selloff.

## III. XRP IS UNLIKELY TO BE DEEMED A SECURITY UNDER EITHER FEDERAL OR STATE LAW

### A. XRP Is Likely Not Going To Be Deemed A Security Under Federal Law

Federal law analyzes the issue of whether a financial interest is a security under a test articulated by the U.S. Supreme Court less than a year after the formal end of World War II. The so-called *Howey*[8] test uses three factors to distinguish securities from other financial instruments. As explained below, XRP seems unlikely to be deemed a security under the application of the *Howey* test, though there is greater risk of XRP being deemed a security than certain other virtual currencies such as bitcoin.[9]

#### 1. Federal Law Uses A Multi-Part Test For Determining Whether An Instrument Is A Security

The primary U.S. federal securities acts, the Securities Act of 1933 and the Securities Exchange Act of 1934, regulate the offering and sale of securities and institutions within the securities industry. The Securities Act of 1933 defines "security" as follows:

> "The term 'security' means any note, stock, treasury stock, security future, security-based swap, bond, debenture, evidence of indebtedness, certificate of interest or participation in any profit-sharing agreement, collateral-trust certificate, preorganization certificate or subscription, transferable share, investment contract, voting-trust certificate, certificate of deposit for a security, fractional undivided interest in oil, gas, or other mineral rights, any put, call, straddle, option, or privilege on any security, certificate of deposit, or group or index of securities (including any interest therein or based on the value thereof), or any put, call, straddle, option, or privilege entered into on a national securities exchange relating to foreign currency, or, in general, any interest or instrument commonly known as a "security", or any certificate of interest or participation in, temporary or interim certificate for, receipt for, guarantee of, or warrant or right to subscribe to or purchase, any of the foregoing."[10]

Courts view the similar language defining a security in the Securities Exchange Act of 1934 as "virtually identical" and interpret cases discussing one definition as applicable to the other.[11,12]

---

[8] *SEC v. Howey*, 328 U.S. 293 (1946).
[9] This memorandum's analysis under federal securities laws is limited to the single question of whether XRP may be considered a "security."
[10] 15 U.S.C. § 77b(a)(1).
[11] *See* Securities Exchange Act of 1934, 15 U.S.C. § 78c(a)(10); *United Housing Foundation, Inc. v. Forman*, 421 U.S. 837, 847 n.12 (1975) (calling both acts "virtually identical" and interpreting both the Securities Act of 1933 and the Securities Exchange Act of 1934 in the same context).
[12] While courts generally interpret the definition of security in the Securities Act of 1933 and Securities Exchange Act of 1934 identically, the Securities Exchange Act of 1934 differs in that it also exempts from the definition "currency or any note." 15 U.S.C. § 78c(a)(10). Thus, one could make the argument that virtual currency is a "currency" and exempt from the reach of the federal securities acts. However, courts have largely ignored this language in interpreting the Securities Exchange Act of 1934. Moreover, one would also have to overcome the burden of establishing that virtual currency is in fact a "currency." Because virtual currency lacks the backing of a government and/or widespread acceptance as a medium

The Supreme Court first interpreted this language in a case involving contracts for the sale of slices of orange groves in central Florida. The Howey Co. operated a hotel in Lake County, Florida, near the groves, and it offered the guests the opportunity to purchase investment contracts in the groves. The contracts coupled the sale of a small slice of the grove (generally a single row of trees) with a lease back to Howey Co. and a share of the profits associated with the sale of the fruit from the trees net of the costs of caring for the trees, harvesting the oranges, *etc*.

Looking at the broad definition of quoted above, the Supreme Court concluded that the contracts were "investment contracts" within the meaning of the '33 Act. The Court justified this conclusion by offering a three-part test for distinguishing "investment contracts" from other contracts that has been known ever since as the *Howey* test which asks whether the contract (1) required the investment of money, (2) involved a "common enterprise," and (3) created an expectation of profits "solely from the efforts of others." In the years since *Howey* was decided, most of the discussion has focused on the second and third prongs of the test. The first prong—whether there has been an "investment of money"—is straightforward. It requires that the "purchaser [give] up some tangible and definable consideration in return for an interest that had substantially the characteristics of a security."[13] The "common enterprise" and "profits solely from the efforts of others" prongs are more difficult.

Over the past sixty plus years, courts have struggled to define what constitutes a "common enterprise."[14] Some courts hold that horizontal commonality is required, while others require vertical commonality, and yet others will accept either form of commonality.[15] Horizontal commonality is an investment "that involves the pooling of assets from multiple investors so that all share in the profits and risks of the enterprise."[16] Vertical commonality, on the other hand, exists when the "investor's fortunes are tied to the promoter's success rather than to the fortunes of his or her fellow investors."[17] And there are slight semantic differences even among courts that adopt one test or the other. The Ninth Circuit, for example, finds vertical commonality only when the investors' fortunes are "interwoven with and dependent upon the efforts and success" of the promoter.[18] Others require only that the well-being of investors to "be dependent upon the promoter's expertise."[19] Not surprisingly, decisions are often difficult to reconcile. For example, one court has held that discretionary commodity trading accounts were an offering of a security[20] while another court has held the opposite because the success of the promoter was not interwoven with the investor.[21]

The third component of the *Howey* test has also proved troublesome. Courts have generally identified two distinct elements in the third prong of the test: (a) the expectation of profits that come (b) "solely from the efforts of other." The expectation of profits refers to "the profits that investors seek on their investment" and traditionally takes the form of dividends or increased value of the investment.[22] The Supreme Court has found other forms of profit to be sufficient as well, such as periodic fixed payments to

---

of exchange—two components of most accepted definitions of "currency"—this would be an uphill argument.

[13] *Int'l Bhd. of Teamsters, Chauffeurs, Warehousemen & Helpers of Am. v. Daniel*, 439 U.S. 551, 560, (1979).

[14] *SEC v. SG Ltd.*, 265 F.3d 42, 49-50 (1st Cir. 2001) (noting that "[c]ourts are in some disarray").

[15] *Id.*

[16] *Id.*

[17] *Id.*

[18] *Id.*; *see also SEC v. Eurobond Exch., Ltd.*, 13 F.3d 1334, 1339 (9th Cir. 1994).

[19] *Id.*

[20] *SEC v. Cont'l Commodities Corp.*, 497 F.2d 516, 522 (5th Cir. 1974).

[21] *Brodt v. Bache & Co.*, 595 F.2d 459, 459-62 (9th Cir. 1978).

[22] *SEC v. Edwards*, 540 U.S. 389, 394 (2004).

owners of individual payphones.[23] Things that only exist in the virtual world can create expectation of profit, such as through capital appreciation.[24] In one case, a court concluded that "stock" in an online "game" that could be bought and sold with real money was a security.[25]

On the other hand, courts have tended not to find the existence of a security where purchasers are motivated by acquiring value that is distinct from the possibility of profit. For example, in *United Housing Foundation, Inc. v. Forman*, the buyers of "stock" in a housing co-op received an opportunity to live in and pay rent to that housing co-op.[26] The court determined that the utility of what the owners of the "stock" received and their motivation for purchasing the stock—namely a place to live—distinguished the "stock" from a security.[27] The court was persuaded in part by the fact that promotional materials did not sell shares in the co-op based on the prospect of a profit, but rather as a place to live.[28] Although, the fact that co-op was a non-profit also figured into the *Forman* court's analysis because no "profit" could be realized on the sale of the stock back to the co-op.[29]

Courts tend to approach the "solely from the efforts of others" dimension of the profits prong practically and not as a strict or literal limitation.[30] The critical inquiry is "whether the efforts made by those other than the investor are the undeniably significant ones, those essential managerial efforts which affect the failure or success of the enterprise."[31] For example, courts have found that pyramid schemes operating in large part on members' efforts to recruit new members satisfy this prong when strategy and form of those recruitment efforts are devised by central management.[32] One court also found the "solely" prong to be satisfied by a scheme in which investors purchased and raised chinchillas.[33] Although the profitability of the scheme depended largely on the efforts of investors because chinchillas are actually quite hard to raise, the court focused instead on what was ***offered*** in the investment contract. Investors were offered a chance to invest, expend minimal effort themselves, and instead profit from the significant efforts of others, namely the managers as they claimed to diligently search for more investment.[34]

### 2. XRP Should Fail The Generally Applicable Test For Identifying The Existence Of A Security Under Federal Law

XRP does not appear to be a security under the *Howey* test. Although purchasers of XRP invest money, they are not obtaining an interest in a "common enterprise," and they should not expect profits to arise "solely from the efforts of others." XRP likely satisfies the first prong of the *Howey* test because purchasing XRP does require an investment of money.

XRP should not satisfy the common enterprise prong of the *Howey* test. As discussed above, a common enterprise means one of two things: (1) the creation of a common pool of assets that supports value of the investment; or (2) the creation of a relationship between the promoter and the purchaser that ties the success of the investment to the skill or expertise of the promoter. Neither form of commonality

---

[23] *Id.*
[24] *SG Ltd.*, 265 F.3d at 53-54.
[25] *Id.* at 44-46.
[26] *Forman*, 421 U.S. at 842-43.
[27] *Id* at. 853-55.
[28] *Id.* at 854.
[29] *Id.* at 853-55.
[30] *Forman*, 421 U.S. at 852.
[31] *SEC v. Koscot Interplanetary, Inc.*, 497 F.2d 473, 483 (5th Cir. 1977).
[32] *Id.* at 484-86 (citing as very similar *SEC v. Glen W. Turner Enterprises, Inc.*, 474 F.2d 476 (9th Cir. 1973)).
[33] *Miller v. Cent. Chinchilla Grp., Inc.*, 494 F.2d 414, 415-17 (8th Cir. 1974).
[34] *Id.*

exists with XRP. Purchasers of XRP do not pool their assets in a common enterprise such that "all share in the profits and risks of the enterprise."[35] Although Ripple Labs may pool money from some purchasers to support its efforts to promote the Ripple protocol, the value of XRP is separate and apart from the profits or risks of Ripple Labs. The price of XRP is driven by supply and demand, its intrinsic value as a floating point for exchange and an instrument to protect against certain kinds of attacks on the Ripple protocol, and a host of other factors and actors, including users, exchangers, wallet providers, gateways, market makers, retail outlets (if they choose or decline to accept the currency), and financial institutions. For these same reasons, the value of XRP is not tied to the success of Ripple Labs (or vice versa). Ripple Labs can succeed financially through the sale of services related to the use of the protocol, and XRP could, at least theoretically, retain value even if Ripple Labs ceased to exist.

XRP should also fail the third prong of the *Howey* test. Although purchasers of XRP would profit from an increase in its value, buyers do not necessarily purchase XRP with the expectation that XRP will rise in value. As noted above, XRP has independent utility as an instrument of trade, and it is possible for users of the protocol to derive value from XRP even if XRP does not increase in value over time. The intrinsic utility of XRP should be sufficient to defeat a claim that purchases of XRP are "solely" or even "largely" driven by the expectation that XRP will appreciate in value. Moreover, as described above, the connection between XRP's value and the efforts of Ripple Labs is highly attenuated. Instead, the value of XRP is supported by a fragmented and disjointed collection of users, market makers, gateways, and other institutions working together to form the Ripple ecosystem.

With that said, it is possible to build a superficial argument that, at first blush, would seem to support a conclusion that XRP satisfies the second and third prongs of *Howey*. Ripple Labs has a much closer connection to XRP than the participants in the Bitcoin ecosystem have to Bitcoin or the Bitcoin Foundation. At least initially, Ripple Labs and the founders of Ripple Labs owned all XRP. Moreover, Ripple Labs pools the money that it receives from the sale of XRP, and it uses those funds to promote and expand the Ripple ecosystem.[36] At various times, Ripple Labs has also claimed that its value is tied to the value of XRP, and it has used XRP to compensate early employees of Ripple Labs. It also exercised some control over the sale of XRP, restricting the ability of the founders to dispose of XRP to protect, at least in part, the value of XRP.

For the most part, however, Ripple Labs' public documents do not support a conclusion that XRP is a security. Ripple Lab's public materials largely tout the utilitarian attributes of XRP and, for the most part, do not discuss the potential benefits to users from future increases in the value of XRP. In addition, there is no contract between purchasers of XRP and Ripple Labs related to the future value of XRP, promising any return or dividends, or imposing further obligations on Ripple Labs to increase the value of XRP. The relationship between purchasers of XRP and Ripple Labs is more analogous to the owners of a common commodity. Anyone who holds the commodity has an interest, all else equal, in the future appreciation of the commodity, and that common interest does not generally support the conclusion that a commodity is a security.[37]

---

[35] *Id.*

[36] The relationship between XRP and Ripple Labs distinguishes XRP from certain other virtual currencies. Bitcoin, for example, does not have a single identifiable promoter. Rather, Bitcoin relies on miners to create and introduce new currency into the ecosystem. The Ripple ecosystem's reliance on the efforts of Ripple Labs—the single largest holder of XRP—to promote and expand the ecosystem, creates greater risk that XRP might be deemed a security as compared to other virtual currencies.

[37] *Cf. Johnson v. Nationwide Indus., Inc.*, 450 F. Supp. 948, 954 (N.D. Ill. 1978), *aff'd*, 715 F.2d 1233 (7th Cir. 1983) (rejecting the argument that a security existed because the investment value of a condominium complex depended in part on the efforts of the developers to manage commercial facilities related to the complex).

On balance, it seems unlikely that a court would conclude that XRP is a security under the *Howey* test. XRP has value independent of a common enterprise and utility independent of an investment purpose. And, Ripple's public materials that serve to attract purchasers largely reflect and promote these two attributes of XRP.

In order to help mitigate the risk of XRP being deemed a security, Ripple Labs should be extremely careful in promoting and selling XRP. Regulators will look to Ripple Lab's public documents and documents provided to potential purchases of XRP in applying the *Howey* test. As such, statements touting XRP as an investment opportunity and the potential profits that buyers may derive from XRP's appreciation in value would tend to support the argument that XRP functions as a security. In drafting these documents, Ripple Labs should focus instead on promoting XRP's intrinsic utility as instrument of trade.

### 3. The Approach Taken To Date By The SEC Is Consistent With The Conclusion That XRP Is Unlikely To Be Regarded As A Security

To date, the Securities and Exchange Commission has not taken a public position on whether virtual currencies are securities within the meaning of federal securities law. The SEC has, however, brought several securities cases related to investment schemes involving virtual currencies, and in those cases, it has taken the position that virtual currencies represent a form of value. Although the SEC could seek to define XRP or Bitcoin as a security at some point in the future, the treatment to date suggests that the SEC views virtual currencies as more akin to commodities than securities.

The SEC has brought only one case to date related to virtual currency that has made it to judgment, *SEC v. Shavers*.[38] In that case, SEC claimed that Trendon Shavers, the promoter of the Bitcoin Savings and Trust ("BTCST"), was operating a ponzi scheme. Shavers solicited investors online through Bitcoin forums and online chat rooms promising interest rates as high as 7% a week.[39] These investors paid and saw their purported returns in bitcoin.[40] Shavers did not, however, hold the bitcoin provided by his investors separate from his own bitcoin. Instead, he used it to cover losses from his trading activities, to pay for personal expenses, and to pay off obligations to earlier investors.[41] Not surprisingly, the court agreed with the SEC that BTCST was a Ponzi scheme.[42]

In Shaver's case, the SEC did not argue that bitcoin itself was a security.[43] Instead, the SEC argued that bitcoin was a source of value sufficient to satisfy the first prong of the *Howey* test. Shavers challenged this argument twice over the course of the litigation. Both times, the court sided with the SEC, concluding that the use of bitcoin to fund an investment would satisfy the first prong of the *Howey* test. In its first opinion on the matter, the *Shavers* court more or less blindly accepted the assertion of the SEC that "Bitcoin is a currency or form of money, and investors wishing to invest in BTCST provided an investment of money."[44] In its later decision, the court looked at the issue in greater depth. It reviewed

---

[38] *SEC v. Shavers*, Case No. 4:13-CV-416, 2014 WL 4652121 (E.D. Tex. Sept. 18, 2014) (granting plaintiffs' motion for summary judgment or, in the alternative, for default judgment finding that Shavers violated federal securities law).
[39] *Id.*
[40] *Id.*
[41] *Id.* at *2-4.
[42] *Id.* at *3.
[43] *SEC v. Shavers*, Case No. 4:13-CV-416, at *15 (E.D. Tex. Aug. 26, 2014) (WESTLAW Docket # 78) (granting and denying in part defendants' motion to reconsider the court's prior decision on subject-matter jurisdiction and stating that "[n]o one is arguing that Bitcoin itself is the security at issue in this case, as noted by the SEC in its brief").
[44] *Id.*

the characterization of bitcoin by the IRS, FinCEN, the Texas Department of Banking, and the California State Legislature.[45] Although it found these regulatory sources to be of little help for purposes of characterizing bitcoin for purposes of federal securities law,[46] the *Shavers* court stood by its earlier decision that bitcoin represented a sufficiently definite source of value to satisfy the first prong of *Howey*.

The SEC has also pursued enforcement actions related to virtual currencies. The SEC brought one action against Erik Vorhees for the unregistered selling of securities where the investors paid in bitcoin.[47] In its cease and desist order, the SEC defined virtual currency in a footnote and did not characterize virtual currency as a security in that definition.[48] Rather, the securities at issue were the interests traded on a bitcoin stock exchange, not the bitcoin itself.[49] Another SEC enforcement action involving Bitcoin ended in settlement in December of 2014. The SEC fined a computer programmer who operated two online avenues for trading securities using virtual currencies.[50] The SEC contended these online programs should have been registered as broker-dealers or stock exchanges.[51] The programmer, Ethan Burnside, agreed to a settlement paying $68,000 in part for conducting unregistered offerings.[52] The SEC order did not characterize the selling of virtual currency itself as the security at issue but rather the interests in the organizations that traded.[53]

SEC Chairman Mary Jo White articulated a similar position in an exchange with the Senate in the summer of 2013. The Senate Committee on Homeland Security and Governmental Affairs asked Chairman White to explain the status of virtual currency under federal securities law.[54] In her response, Chairman White explained that "[w]hether a virtual currency is a security under the federal securities laws, and therefore subject to our regulation, is dependent on the particular facts and circumstances at issue."[55] After declining to take the position that virtual currencies are securities, Chairman White reiterated the same position the SEC took in *Shavers* that "interests issued by entities owning virtual currencies or providing returns based on assets such as virtual currencies likely would be securities and therefore subject to our regulation."[56]

These data points are not definitive by any stretch. But taken together, they suggest that the SEC has viewed virtual currencies, particularly Bitcoin, as sources of value rather than securities under

---

45 *Id.* at *12-14.
46 *Id.* at *14.
47 *See* In the Matter of Erik T. Voorhees, Admin. Proc. File No. 3-15902 (June 3, 2014), http://www.sec.gov/litigation/admin/2014/33-9592.pdf; Press Release, *SEC Charges Bitoin Entrepreneur With Offering Unregistered Securities*, SEC (June 3, 2014), *available at* http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370541972520#.VMcKOv54qHg.
48 *Vorhees*, at 2 n.1.
49 *Id.* at 2.
50 Press Release, *SEC Sanctions Operator of Bitcoin-Related Stock Exchange for Registration Violations*, SEC (Dec. 8, 2014), *available at* http://www.sec.gov/News/PressRelease/Detail/PressRelease/1370543655716#.VMhPFv54qHg.
51 *Id.*
52 *Id.*
53 *See* In the Matter of BTC Trading, Corp. and Ethan Burnside, Admin. Proc. File No. 3-16307 (Dec. 8, 2014), http://www.sec.gov/litigation/admin/2014/33-9685.pdf.
54 Letter from Mary Jo White, Chair, SEC, to Thomas R. Carper, Chairman, U.S. Senate Committee on Homeland Security and Government Affairs (Aug. 30, 2013) (on file with the Wall Street Journal), *available at* http://online.wsj.com/public/resources/documents/VCurrenty111813.pdf (at 13-15).
55 *Id.*
56 *Id.*

the Federal securities laws. However, the SEC appears to be monitoring this area very closely,[57] and has even establish a Digital Currency Working Group.[58] While the agency is generally restricted from deviating outside the bounds of the federal statutory and case law outline above, it could always take a more aggressive position on virtual currencies, particularly regarding those, like XRP, that raise more regulatory questions than Bitcoin.

### B. XRP Is Unlikely To Be Deemed A Security Under State Law

State securities laws, or "blue-sky laws," also regulate securities transactions. As federal law adopted many of the same definitions and standards of pre-existing blue-sky laws, the definition of security for many states is generally identical to the analysis above.[59] a However, some states, including California, apply the so-called "risk capital test" in defining a security.[60,61] California strictly applies the risk capital test, but certain other states apply both the risk capital and *Howey* tests, or a hybrid of the two.[62,63]

The risk capital test requires that (a) an investor provide capital for a business venture or enterprise, (b) the capital be subject to the risks of the enterprise, and (c) the investor have no managerial control over the enterprise.[64] For example, in *Silver Hills Country Club v. Sobieski*, the California Supreme Court found a security to exist where a country club sold memberships to the club to help finance the club's expansion.[65] The purchasers of the memberships did not receive or expect any pecuniary benefit, only the use of the club.[66] Nevertheless, the court found there to be a security by virtue of the fact that "[o]nly because [a purchaser] risks his capital along with other purchasers can there be any chance that the benefits of club membership will materialize."[67] Thus, the risk capital test casts a wider net than federal securities law in that it regulates instruments where the expectation of profits is unclear or non-existent and regardless of whether any form of commonality exists.

The risk capital test will not find a security, however, when the purchaser's risk is adequately collateralized. In *Hamilton Jewelers v. Department of Corporations*, the court considered a program whereby a jeweler sold diamonds and customers had the option to buy and then sell back those

---

[57] *See, e.g.*, Investor Alert, *Bitcoin and Other Virtual Currency-Related Investments*, SEC (May 7, 2014), *available at* http://www.sec.gov/oiea/investor-alerts-bulletins/investoralertsia_bitcoin.html#.VMwBIP54qHj.
[58] *See* Dec. 8 Press Release,
[59] In New York, for example, courts generally apply the *Howey* test. *All Seasons Resorts, Inc. v. Abrams*, 68 N.Y.2d 81, 91 (1986).
[60] *See Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 815-16 (1961) (reversing a trial court's denial of a writ of mandate to compel the California Commissioner of Corporations to vacate an order forcing a halt in the sale of country club members).
[61] Other states that have adopted the risk capital test either through statute or case law include Hawaii, Georgia, and Michigan. *See State Commissioner of Securities v. Hawaii Market Center, Inc.*, 52 Haw. 642, 485 P.2d 105 (1971); Ga. Code Ann. § 97-102(a)(16); Mich. Stat. Ann. § 19.776(401)(1).
[62] *See State v. Brewer*, 932 S.W.2d 1, 23 n.13 (Tenn. Crim. App. 1996).
[63] This memorandum is meant to provide an overview of the general principles common among the states' securities laws. However, for purposes of this memorandum, we did not conduct a survey of every state's securities laws. The securities laws, including the nuanced application of the *Howey* and/or risk capital tests, may vary from state to state. Thorough analysis of each state's laws would be required to provide an opinion as to each state's potential regulation of XRP.
[64] *See Silver Hills*, 55 Cal. 2d at 815-16.
[65] *Id.* at 813-14.
[66] *Id.* at 813, 815-16.
[67] *Id.* at 815.

diamonds at cost plus interest years later.[68] The court determined that the risk capital test was not met because the buyer placed no "risk capital" with the jeweler as s/he received a diamond for fair market value.[69] Diamond buyers, rather than handing over their money and pooling their risk with the jeweler, traded their money for the collateral of the expensive diamond.[70]

It is unlikely that XRP would be considered a security under the risk capital test. Similar to purchasers in *Hamilton Jewelers*, purchasers of XRP acquire an asset at fair market value and do not "risk capital." Buyers of XRP are purchasing a valuable commodity with useful functions like its ability to facilitate low-friction transactions and its ability to protect the Ripple network. And, certain XRP purchasers immediately use the asset, and therefore are not "risking" anything at all.

Furthermore, the value of XRP is distinct from any capital pooled by Ripple Labs. Although Ripple Labs may help contribute to the value of XRP by supporting the Ripple protocol, the value of XRP is not defined by Ripple Labs, as further discussed above. This is distinguishable from the club memberships in *Silver Hills*, the value of which were significantly dependent upon whether the club was able to use pooled funds to expand.

### C. XRP Is More Likely To Be Characterized As A Commodity

XRP, like other virtual currencies, functions more like a commodity than a security. In general terms, commodities are basic goods that are interchangeable with other goods of the same type and that can be purchased and sold. Unlike securities which derive value from the expected profits of an underlying enterprise, the inherent qualities of the good and the demand for the good dictate a commodity's value. A virtual currency is a digital good that possesses qualities of security and transferability, the value of which is determined by what another person is willing to pay for it. XRP in particular has unique inherent value in being a necessary component to facilitate transactions across the Ripple network and as a bridge currency for liquidity.

The U.S. Commodity Futures Trading Commission (CFTC) regulates commodity futures and options markets. The Commodity Exchange Act (CEA) broadly defines the term "commodity"[71] and regulates the trading of commodity futures.[72] Statements from CFTC commissioners support the argument that virtual currencies are commodities. Although the CFTC has not taken an official position on virtual currency (much less XRP in particular), certain CFTC commissioners have made public statements suggesting that virtual currencies should be regulated as a commodities. In December 2014 during testimony before a U.S. Senate Committee, CFTC Chairman Timothy Massad, when discussing the topic of virtual currency, recognized that the CEA broadly defined the term "commodity" and that the

---

[68] 37 Cal. App. 3d 330, 332 (1974).
[69] *Id.* at 335-36.
[70] *Id.*
[71] *See* 7 U.S.C. § 1a(9). The CEA defines "commodity" as "wheat, cotton, rice, corn, oats, barley, rye, flaxseed, grain sorghums, mill feeds, butter, eggs, Solanum tuberosum (Irish potatoes), wool, wool tops, fats and oils (including lard, tallow, cottonseed oil, peanut oil, soybean oil, and all other fats and oils), cottonseed meal, cottonseed, peanuts, soybeans, soybean meal, livestock, livestock products, and frozen concentrated orange juice, and all other goods and articles, except onions (as provided by section 13–1 of this title) and motion picture box office receipts (or any index, measure, value, or data related to such receipts), and all services, rights, and interests (except motion picture box office receipts, or any index, measure, value or data related to such receipts) in which contracts for future delivery are presently or in the future dealt in."
[72] *See* 7 U.S.C. § 1 *et seq.*

agency's authority extends to derivate contracts based on a virtual currency.[73] Another CFTC Commissioner, Mark Wetjen, has repeatedly voiced his agreement with this view. For example, in November 2014, Commissioner Wetjen argued, in an opinion piece penned for The Wall Street Journal, that "[t]he definition of 'commodity' under the CFTC's authorizing statute could be read to include Bitcoin, in which case the CFTC would have authority to bring enforcement actions against anyone who attempts to manipulate the virtual currency."[74] Moreover, the CFTC has approved one company, TeraExchange, to offer a bitcoin derivative product,[75] which evidences the agency's implicit recognition of the virtual currency underlying the derivative product as a commodity.

Finally, the Internal Revenue Service (IRS) issued guidance that treats virtual currency as property for federal tax purposes and subject to the same general tax principles.[76] While this alone does not suggest that virtual currency (or XRP) is a commodity like other forms of property, the fact that the IRS has chosen not to tax virtual currencies like securities does support the argument that virtual currency (including XRP) has characteristics more akin to commodities than securities.

## IV. CONCLUSION

XRP is unlikely to be regulated as securities by federal and state governments. Virtual currencies such as XRP bear a greater resemblance to commodities than securities, and to this point, the federal agencies charged with regulating securities and commodities have treated them more like the latter than the former. With that said, XRP poses a slightly greater risk of being deemed a security than other forms of virtual currency because of the connection to Ripple Labs. To mitigate these risks, Ripple Labs should avoid touting the potential profits that buyers of XRP will derive from its appreciation of value and instead focus on its intrinsic utility.

---

[73] *See* Testimony of Chairman Timothy Massad before the U.S. Senate Committee on Agriculture, Nutrition & Forestry (Dec. 10, 2014), *available at* http://www.cftc.gov/PressRoom/SpeechesTestimony/opamassad-6.

[74] Mark Wetjen, *Bringing Commodities Regulation to Bitcoin*, The Wall Street Journal (Nov. 3, 2014, 7:14 PM), http://www.wsj.com/articles/mark-wetjen-bringing-commodities-regulation-to-bitcoin-1415060058.

[75] *See* Press Release, *CFTC Issues Notice of Temporary Registration as a Swap Execution Facility to TeraExchange, LLC*, U.S. CFTC (Sept. 19, 2014), http://www.cftc.gov/PressRoom/PressReleases/pr6698-13; *see also* TeraExchange, http://www.teraexchange.com (last visited Feb. 17, 2015).

[76] Notice 2014-21, IRS (Mar. 25, 2014), http://www.irs.gov/pub/irs-drop/n-14-21.pdf.