# PX 247

Message

| | |
|---|---|
| **From:** | Phil Rapoport ██@ripple.com] |
| **Sent:** | 7/28/2015 2:07:35 PM |
| **To:** | ██████████@ripple.com>] |
| **Subject:** | Fwd: FW: Long Term Ripple Fund, LP - Offering Memorandum |
| **Attachments:** | XRP Fund PPM [Working Draft] (2).DOC; Change-Pro Redline - XRP Fund PPM [Working Draft]-206060711-v6 and XRP Fund PPM [Working Draft]-206060711-v7.pdf |

This might not be the latest version of the offering memorandum, but check "Withdrawal Rights" and "Withdrawal Queue" sections for what I was describing.

--------- Forwarded message ----------
From: **Phil Rapoport** ██@ripple.com>
Date: Sun, Mar 29, 2015 at 9:12 PM
Subject: Fwd: FW: Long Term Ripple Fund, LP - Offering Memorandum
To: ██████████@ripple.com>

--------- Forwarded message ----------
From: ██████████.com>
Date: Sun, Mar 29, 2015 at 12:47 AM
Subject: FW: Long Term Ripple Fund, LP - Offering Memorandum
To: Ripple Phil Rapoport <██@ripple.com>, Patrick Griffin <██@ripple.com>, Ripple Chris Larsen <██ripple.com>
Cc: Arthur Britto <██@gmail.com>, ██████████.com>, <██@ripple.com>, ██████████.com>

Hi team –

Just FYI, we are moving forward on our end with updated drafts. Please let us know if you have any comments. We are happy to have lawyers be on the call for you.

We look forward to working with you to finish custodian agreement and company trading policies. Then we can get this launched I think.

Congrats on the good work on this round of financing!

██████

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

# Withheld for Privilege

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0287557

PROSPECTIVE INVESTOR: _____
COPY NUMBER: _____

PROSPECTIVE INVESTORS ELECTING NOT TO
MAKE AN INVESTMENT ARE REQUESTED TO
RETURN ALL OFFERING MATERIALS TO THE FUND.

# Confidential Private Placement Memorandum

# [LONG TERM RIPPLE FUND, LP]

## Limited Partnership Interests

## [XRP Financial LLC]

## (Manager)

_____

## THESE ARE SPECULATIVE SECURITIES

_____

# [March] 2015

-i-

[LONG TERM RIPPLE FUND, LP]

LIMITED PARTNERSHIP INTERESTS

CONFIDENTIAL
PRIVATE PLACEMENT MEMORANDUM

## IMPORTANT NOTICES

THIS CONFIDENTIAL PRIVATE PLACEMENT MEMORANDUM, AS UPDATED OR SUPPLEMENTED FROM TIME TO TIME (THE "**MEMORANDUM**"), IS SUBMITTED IN CONNECTION WITH THE PRIVATE PLACEMENT (THE "**OFFERING**") OF LIMITED PARTNERSHIP INTERESTS ("**INTERESTS**") BY [LONG TERM RIPPLE FUND, LP] (THE "**FUND**") AND MAY NOT BE REPRODUCED OR USED FOR ANY OTHER PURPOSE. ANY PERSON WHO ACCEPTS DELIVERY OF THIS MEMORANDUM AGREES TO HOLD IT IN CONFIDENCE AND, IF THAT PERSON ELECTS NOT TO INVEST IN THE FUND, EITHER TO RETURN OR DESTROY IT ALONG WITH ALL DOCUMENTS RELATED TO THE FUND. THIS MEMORANDUM IS FOR THE EXCLUSIVE USE OF THE INDIVIDUAL OR ENTITY WHOSE NAME APPEARS ON THE COVER OF THIS MEMORANDUM, AND IS NOT TO BE SHOWN TO ANY PERSON OTHER THAN SUCH INDIVIDUAL'S OR ENTITY'S FINANCIAL OR LEGAL ADVISORS. REPRODUCTION OR DISTRIBUTION OF THIS MEMORANDUM, IN FULL OR IN PART, AND THE DISCLOSURE OF ANY OF ITS CONTENTS IS PROHIBITED. THIS MEMORANDUM CONSTITUTES AN OFFER ONLY IF A NAME AND MEMORANDUM IDENTIFICATION NUMBER APPEAR IN THE APPROPRIATE SPACES PROVIDED FOR ON THE COVER OF THIS MEMORANDUM, AND AN OFFER IS MADE ONLY TO THE PERSON NAMED (THE "**OFFEREE**").

IT IS ANTICIPATED THAT THE OFFERING AND SALE OF THE INTERESTS OFFERED HEREBY WILL BE EXEMPT FROM REGISTRATION UNDER THE U.S. SECURITIES ACT OF 1933, AS AMENDED (THE "**SECURITIES ACT**"), AND THE VARIOUS U.S. STATE SECURITIES LAWS, AND THAT THE FUND WILL NOT BE REGISTERED AS AN INVESTMENT COMPANY UNDER THE U.S. INVESTMENT COMPANY ACT OF 1940, AS AMENDED (THE "**INVESTMENT COMPANY ACT**"). THIS MEMORANDUM DOES NOT CONSTITUTE AN OFFER TO SELL OR A SOLICITATION OF AN OFFER TO BUY INTERESTS IN ANY JURISDICTION TO ANY PERSON TO WHOM IT IS UNLAWFUL TO MAKE SUCH OFFER OR SOLICITATION IN SUCH JURISDICTION. THE FUND IS NOT A COMMODITY POOL FOR PURPOSES OF THE COMMODITY EXCHANGE ACT, AS AMENDED (THE "**CEA**"), AND ITS MANAGER IS NOT SUBJECT TO REGULATION BY THE COMMODITY FUTURES TRADING COMMISSION (THE "**CFTC**") AS A COMMODITY POOL OPERATOR OR COMMODITY TRADING ADVISOR.

THE INVESTMENT MANAGER DOES NOT BELIEVE THAT THE FUND OR THE INVESTMENT MANAGER IS REQUIRED TO REGISTER AS A MONEY SERVICES BUSINESS WITH THE FINANCIAL CRIMES ENFORCEMENT NETWORK OF THE U.S. DEPARTMENT OF THE TREASURY ("**FINCEN**") OR OBTAIN A MONEY TRANSMITTER LICENSE OR SIMILAR LICENSE WITH THE BANKING DEPARTMENT OF ANY STATE, AND THEREFORE HAS NOT DONE SO. THERE IS A RISK THAT THE INVESTMENT MANAGER AND/OR THE FUND WILL BE CONSIDERED A MONEY SERVICES BUSINESS AND WILL BE REQUIRED TO REGISTER WITH FINCEN AND/OR OBTAIN MONEY TRANSMITTER LICENSES OR SIMILAR LICENSES FROM STATE BANKING DEPARTMENTS.

-ii-

THE AVAILABILITY OF EXEMPTIONS FROM APPLICABLE SECURITIES LAWS FOR THIS OFFER AND SALE OF THE INTERESTS DEPENDS IN PART ON THE QUALIFICATIONS AND INVESTMENT INTENT OF THE INVESTOR. THE INVESTOR WILL BE REQUIRED TO REPRESENT TO THE FUND THAT THE INVESTOR IS AN "ACCREDITED INVESTOR" AS DEFINED IN REGULATION D UNDER THE SECURITIES ACT AND A "QUALIFIED PURCHASER" UNDER THE INVESTMENT COMPANY ACT AND THE RULES PROMULGATED THEREUNDER, THAT THE INVESTOR IS ABLE TO BEAR THE ECONOMIC RISK OF THIS INVESTMENT FOR AN INDEFINITE PERIOD AND THAT THE INVESTOR IS ACQUIRING INTERESTS FOR ITS OWN ACCOUNT FOR INVESTMENT PURPOSES ONLY AND NOT WITH A VIEW TO ANY RESALE OR DISTRIBUTION OF THE INTERESTS.

THE INTERESTS ARE OFFERED EXCLUSIVELY TO FINANCIALLY SOPHISTICATED, HIGH NET WORTH AND INSTITUTIONAL INVESTORS CAPABLE OF EVALUATING THE MERITS AND RISKS OF AN INVESTMENT IN THE FUND.

THIS IS NOT AN OFFER OR INVITATION TO THE PUBLIC IN THE CAYMAN ISLANDS TO SUBSCRIBE FOR INTERESTS.

THE MASTER FUND IS NOT HEREBY OFFERING ANY SECURITIES AND ACCORDINGLY THIS OFFERING MEMORANDUM IS NOT TO BE REGARDED AS HAVING BEEN AUTHORIZED OR ISSUED BY THE MASTER FUND. THE MASTER FUND DOES NOT HAVE AN OFFERING DOCUMENT OR EQUIVALENT DOCUMENT.

THE TRANSFERABILITY OF THE INTERESTS IS RESTRICTED PURSUANT TO THE TERMS OF THE AGREEMENT OF LIMITED PARTNERSHIP OF THE FUND, AS IT MAY BE AMENDED (THE "**PARTNERSHIP AGREEMENT**"), WHICH REQUIRES THE PRIOR WRITTEN CONSENT OF [     ], LLC (THE "**GENERAL PARTNER**") TO ANY TRANSFER. IT IS NOT ANTICIPATED THAT THERE WILL BE A MARKET FOR THE INTERESTS.

THE INTERESTS ARE SPECULATIVE, ILLIQUID, INVOLVE SUBSTANTIAL RISK AND CERTAIN MATERIAL CONFLICTS OF INTEREST (SEE "CERTAIN RISK FACTORS" AND "CONFLICTS OF INTEREST") AND SHOULD BE CONSIDERED ONLY BY THOSE PERSONS WHO CAN AFFORD THE RISK OF LOSS OF THEIR ENTIRE INVESTMENT.

NO OFFERING LITERATURE OR ADVERTISING IN ANY FORM WILL BE EMPLOYED WITH RESPECT TO THE OFFERING OF THE INTERESTS, EXCEPT THE INFORMATION CONTAINED HEREIN. THE OFFEREE MUST SUBSCRIBE FOR THE INTERESTS BASED SOLELY ON THE INFORMATION INCLUDED IN THIS MEMORANDUM, IRRESPECTIVE OF WHATEVER ADDITIONAL INFORMATION THE OFFEREE MAY RECEIVE FROM OTHER SOURCES (INCLUDING [XRP FINANCIAL, LLC] (THE "**INVESTMENT MANAGER**") AND/OR THE GENERAL PARTNER).

THE INTERESTS MAY BE PURCHASED SOLELY BY ELIGIBLE PURCHASERS, AS DESCRIBED HEREIN, SUBJECT TO PRIOR SALE, WITHDRAWAL, CANCELLATION OR MODIFICATION OF THE OFFERING WITHOUT NOTICE, AND ACCEPTANCE OF THE SUBSCRIPTION DOCUMENTS AND CERTAIN FURTHER CONDITIONS. THE FUND RESERVES THE RIGHT TO WITHDRAW, CANCEL OR MODIFY SUCH OFFERING AND TO REJECT SUBSCRIPTIONS IN WHOLE OR IN PART FOR THE PURCHASE OF ANY OF THE INTERESTS OFFERED. IN ADDITION, THE RIGHT IS RESERVED TO CANCEL ANY SALE IF SUCH SALE, IN

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.   RPLI_SEC 0287560

THE OPINION OF THE FUND OR ITS GENERAL PARTNER, WOULD VIOLATE APPLICABLE SECURITIES LAWS.

OFFEREES AND SUBSCRIBERS ARE URGED TO READ THIS MEMORANDUM CAREFULLY. ALL OFFEREES AND SUBSCRIBERS WILL BE OFFERED AN OPPORTUNITY TO TALK WITH THE INVESTMENT MANAGER TO VERIFY ANY OF THE INFORMATION INCLUDED HEREIN AND TO OBTAIN ADDITIONAL INFORMATION REGARDING THE FUND. THIS MEMORANDUM CONTAINS SUMMARIES OF CERTAIN DOCUMENTS, THE TERMS OF WHICH ARE CONTROLLING. ADDITIONAL MATERIALS WILL BE MADE AVAILABLE TO PROSPECTIVE INVESTORS FOR INSPECTION DURING NORMAL BUSINESS HOURS UPON REASONABLE REQUEST TO THE FUND OR ITS GENERAL PARTNER.

THE DELIVERY OF THIS MEMORANDUM OR ANY MATERIALS AVAILABLE UPON REQUEST DOES NOT IMPLY THAT THE INFORMATION CONTAINED THEREIN HAS NOT CHANGED SINCE THE DATE HEREOF.

EXCEPT AS DISCUSSED HEREIN, NO PERSON HAS BEEN AUTHORIZED BY THE FUND TO GIVE ANY INFORMATION OR TO MAKE ANY REPRESENTATION CONCERNING THE FUND OTHER THAN THOSE CONTAINED IN THIS MEMORANDUM IN CONNECTION WITH THE OFFERING DESCRIBED HEREIN, AND IF GIVEN OR MADE, SUCH OTHER INFORMATION OR REPRESENTATION MUST NOT BE RELIED UPON AS HAVING BEEN AUTHORIZED BY THE FUND. NO STATEMENT CONTAINED HEREIN WILL BE DEEMED TO MODIFY, SUPPLEMENT OR CONSTRUE IN ANY WAY THE PROVISIONS OF ANY DOCUMENT ATTACHED HERETO AS AN APPENDIX OR ANY OF THE LANGUAGE CONTAINED THEREIN, AND ANY STATEMENT MADE HEREIN WITH RESPECT TO ANY SUCH DOCUMENT IS QUALIFIED BY REFERENCE THERETO. THE OFFEREE MUST SUBSCRIBE SOLELY ON THE INFORMATION SET FORTH HEREIN.

THE OFFEREE IS NOT TO CONSTRUE THE CONTENTS OF THIS MEMORANDUM OR OF ANY PRIOR OR SUBSEQUENT COMMUNICATIONS FROM THE FUND OR ANY OF ITS EMPLOYEES OR AFFILIATES AS INVESTMENT, LEGAL OR TAX ADVICE. THE OFFEREE SHOULD CONSULT ITS OWN COUNSEL, ACCOUNTANT AND OTHER PROFESSIONAL ADVISORS AS TO LEGAL, TAX AND OTHER RELATED MATTERS CONCERNING ITS INVESTMENT.

THE INTERESTS ARE SUITABLE ONLY FOR A LIMITED PORTION OF A PORTFOLIO. IN MAKING AN INVESTMENT DECISION, INVESTORS MUST RELY ON THEIR OWN EXAMINATION OF THE FUND AND THE TERMS OF THE OFFERING, INCLUDING THE MERITS AND RISKS INVOLVED.

EXCEPT AS OTHERWISE NOTED, ALL REFERENCES HEREIN TO "$," "USD" OR MONETARY AMOUNTS REFER TO UNITED STATES ("U.S.") DOLLARS.

For Florida, U.S.A. Investors:

IF THE OFFEREE IS NOT A BANK, A TRUST COMPANY, A SAVINGS INSTITUTION, AN INSURANCE COMPANY, A DEALER, AN INVESTMENT COMPANY AS DEFINED IN THE INVESTMENT COMPANY ACT, A PENSION OR A PROFIT-SHARING TRUST OR A QUALIFIED INSTITUTIONAL BUYER (AS DEFINED IN RULE 144A UNDER THE SECURITIES ACT), THE OFFEREE ACKNOWLEDGES THAT ANY SALE OF THE INTERESTS TO THE OFFEREE IS VOIDABLE BY THE OFFEREE EITHER WITHIN THREE DAYS AFTER THE FIRST TENDER OF

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287561

CONSIDERATION IS MADE BY THE OFFEREE TO THE FUND, OR AN AGENT OF THE FUND, OR WITHIN THREE DAYS AFTER THE AVAILABILITY OF THAT PRIVILEGE IS COMMUNICATED TO THE OFFEREE, WHICHEVER OCCURS LATER.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0287562

## FORWARD-LOOKING STATEMENTS

THIS MEMORANDUM INCLUDES FORWARD-LOOKING STATEMENTS. FORWARD-LOOKING STATEMENTS ARE STATEMENTS NOT BASED ON HISTORICAL INFORMATION AND THAT RELATE TO FUTURE OPERATIONS, STRATEGIES, FINANCIAL RESULTS OR OTHER DEVELOPMENTS. IN PARTICULAR, STATEMENTS USING VERBS SUCH AS "EXPECTED," "ANTICIPATE," "BELIEVE" OR WORDS OF SIMILAR IMPORT GENERALLY INVOLVE FORWARD-LOOKING STATEMENTS. WITHOUT LIMITING THE FOREGOING, FORWARD-LOOKING STATEMENTS INCLUDE STATEMENTS THAT REPRESENT THE BELIEFS OF THE INVESTMENT MANAGER, THE GENERAL PARTNER AND THE FUND CONCERNING FUTURE INFORMATION SUCH AS THE PERFORMANCE OF THE FUND. FORWARD-LOOKING STATEMENTS ARE NECESSARILY BASED UPON ESTIMATES AND ASSUMPTIONS THAT ARE INHERENTLY SUBJECT TO SIGNIFICANT BUSINESS, ECONOMIC AND COMPETITIVE UNCERTAINTIES AND CONTINGENCIES, MANY OF WHICH ARE BEYOND THE CONTROL OF THE INVESTMENT MANAGER AND THE GENERAL PARTNER AND MANY OF WHICH, WITH RESPECT TO FUTURE BUSINESS DECISIONS, ARE SUBJECT TO CHANGE. THESE UNCERTAINTIES AND CONTINGENCIES CAN AFFECT ACTUAL RESULTS AND COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM THOSE EXPRESSED IN ANY FORWARD-LOOKING STATEMENTS MADE HEREIN. WHETHER OR NOT ACTUAL RESULTS DIFFER MATERIALLY FROM FORWARD-LOOKING STATEMENTS MAY DEPEND ON NUMEROUS FORESEEABLE AND UNFORESEEABLE EVENTS OR DEVELOPMENTS, SOME OF WHICH MAY BE GLOBAL IN SCOPE, SUCH AS GENERAL ECONOMIC CONDITIONS AND INTEREST RATES, SOME OF WHICH MAY BE RELATED TO THE INVESTMENT FUND INDUSTRY GENERALLY, SUCH AS REGULATORY DEVELOPMENTS, AND OTHERS WHICH MAY RELATE TO THE INVESTMENT MANAGER, THE GENERAL PARTNER OR THE FUND SPECIFICALLY, SUCH AS RISKS ASSOCIATED WITH THE FUND'S INVESTMENT PORTFOLIO AND OTHER FACTORS.

-vi-

**TABLE OF CONTENTS**

SUMMARY OF PRINCIPAL TERMS ................................................................................................. 8

INVESTMENT APPROACH .......................................................................................................... 15

ADMINISTRATOR [Administrator to review] ................................................................................ 18

ELIGIBILITY ................................................................................................................................. 19

SUMMARY OF PARTNERSHIP AGREEMENT ....................................................................... 19

CERTAIN RISK FACTORS ......................................................................................................... 24

BROKERAGE ARRANGEMENTS .............................................................................................. 48

NET ASSET VALUATIONS [Administrator to review] .................................................................. 50

CONFLICTS OF INTEREST ........................................................................................................ 51

CERTAIN TAX CONSIDERATIONS.......................................................................................... 53

INVESTMENTS BY EMPLOYEE BENEFIT PLANS ................................................................ 60

ANTI-MONEY LAUNDERING REGULATIONS [Administrator to review] .................................. 62

GENERAL INFORMATION [Administrator to review] .................................................................. 63

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287564

## SUMMARY OF PRINCIPAL TERMS

The following is a summary of certain facts about a proposed offering of limited partnership interests (the "**Interests**") by [Long Term Ripple Fund, LP] (the "**Fund**"). For a more detailed description of the information referenced in this summary, prospective investors should review in detail this Confidential Private Placement Memorandum, as updated or supplemented from time to time (the "**Memorandum**"), the Agreement of Limited Partnership of the Fund, as amended and restated from time to time (the "**Partnership Agreement**"), and the Amended and Restated Agreement of Exempted Limited Partnership of [……. Master Fund, LP] (the "**Master Fund**"), as amended and restated from time to time (the "**Master Fund Partnership Agreement**"). Each of the Partnership Agreement and the Master Fund Partnership Agreement are incorporated herein by reference. Prospective investors also should carefully consider the information below under the heading "Certain Risk Factors."

### The Fund

| | |
|---|---|
| **The Fund** | [Long Term Ripple Fund, LP], a Cayman exempted limited partnership, was formed on [_____, 2015]. The Fund's registered office address is [                    ]. |
| **General Partner** | The Fund will be operated by [    ], a Delaware limited liability company, which serves as the general partner of the Fund (the "**General Partner**"). Under Cayman Islands law, the Fund does not have separate legal personality so the General Partner will enter into all contracts and otherwise take all actions (except as otherwise delegated by it) on behalf of the Fund. Therefore, references herein to the Fund taking an action should be read to mean the General Partner by and on behalf of the Fund. The General Partner also serves as the general partner of the Master Fund and the Offshore Fund (as defined below). The General Partner's business address is [                    ]. |
| **[Investment Manager/Sponsor]** | [XRP Financial LLC, a Delaware limited liability company] is the investment manager to the fund (the "**Investment Manager**"). The Investment Manager will provide investment advisory and investment management services to the Fund and the Master Fund pursuant to Investment Management Agreements between the Investment Manager and the Fund and the Master Fund, respectively, as amended from time to time (collectively, the "**Investment Management Agreement**"). The Investment Manager also will be the investment manager of the Offshore Fund. The Investment Manager's business address is [         ]. |
| **Master/Feeder Structure** | The General Partner has also formed [        , Ltd.], a Cayman Islands exempted company (the "**Offshore Fund**," and collectively with the Fund, the "**[Ripple Funds]**"), which will employ the same general investment strategy as the Fund. The [Ripple] Funds will invest substantially all of their assets in, and conduct all or substantially all of their investment and trading activities through, the Master Fund, a Cayman Islands exempted limited partnership. The [Ripple] Funds will share all items of |

-8-

profit, loss, income and expense of the Master Fund on a *pro rata* basis in accordance with their respective capital account balances in the Master Fund.  Except as the context otherwise requires, the term "Fund" herein also includes the Master Fund.  The General Partner, the Investment Manager and their affiliates may form other entities and/or permit other investors or existing entities to purchase interests directly in the Master Fund.  The General Partner, the Investment Manager and their affiliates may, also sponsor one or more additional investment funds or accounts, including funds and accounts that implement investment strategies almost identical or substantially similar to that of the Fund as part of their overall strategies.

**Investment Strategy**

The Fund will invest substantially all of its assets in XRP.  The Fund will only sell XRP to fund withdrawals and pay expenses and liabilities.  The Fund will not trade, buy, sell or hold XRP derivatives for any purpose.  Transactions in XRP will not be made on a leveraged, margined, or offer-financed basis. Through the investment program, Limited Partners in the Fund may indirectly participate in the XRP market without owning or controlling any specific XRP.

**The Offering**

**Capital Contributions**

The Fund will conduct a continuous offering and generally will accept subscriptions on any Business Day or such other dates as determined by the General Partner, in its sole discretion, as set forth in the Partnership Agreement. Subscriptions will be accepted in USD only and will be used to purchase XRP directly from Ripple Labs pursuant to the Memorandum of Understanding (the "**MOU**"). All purchases of XRP will occur at market price, determined [in accordance with the MOU.]  "**Business Day**" means, the 24-hour period beginning at 12:00 a.m. Eastern standard time through 11:59 p.m. Eastern standard time on any day on which banks in New York (and any other jurisdictions that the Investment Manager determines are required for the Fund to transact business on such day) are open for business.

The minimum subscription for a limited partner in the Fund (a "**Limited Partner**") is $[100,000] (the "**Minimum Subscription**"). The General Partner and the Limited Partners are collectively referred to herein as the "**Partners**."  In exchange for payment in full of the subscription amount, a Limited Partner will receive an Interest.

**Eligibility**

The Interests have not been, and will not be, registered under the U.S. Securities Act of 1933, as amended (the "**Securities Act**"), and must be acquired solely for investment purposes and without any view to a distribution thereof in violation of such laws. Offers of Interests will be made to U.S. taxable investors who are both

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC. RPLI_SEC 0287566

"accredited investors" under the Securities Act and "qualified purchasers" as defined in Section 2(a)(51) of the Investment Company Act of 1940, as amended (the "**Investment Company Act**"). In certain limited circumstances, the General Partner, in its sole discretion, may permit certain non-U.S. persons or U.S. tax-exempt investors that are "accredited investors" and "qualified purchasers" to also subscribe for Interests.

**Investment by the General Partner and the Investment Manager**

The General Partner and the Investment Manager may make capital contributions to the Fund in any amount they deem appropriate on any day on which a Limited Partner makes a capital contribution to the Fund; *provided, however*, that the General Partner and the Investment Manager may not make capital contributions if the Fund is closed to new investment, *provide, further*, that any such capital contributions made to the Fund will be subject to the regulatory minimum of $100,000, if applicable. Interests held by the General Partner and the Investment Manager may not be subject to, or may be subject to a reduced amount of, the Management Fee.

**Placement Fee**

[The Fund may appoint properly-registered, unaffiliated third parties to solicit investments for the Fund (each, a **"Placement Agent"**). Placement Agents may receive, in respect of investors introduced to the Fund, an upfront commission equal to a percentage of the amount invested in the Fund by any such investor (the **"Placement Fee"**). Placement Agents may also receive on an ongoing basis a portion of the Management Fee.]

**Fees and Expenses**

**Organizational Expenses**

Unless otherwise determined by the General Partner, the Fund will bear all of its organizational expenses, either through direct payment or through reimbursement of the Investment Manager or its affiliates, including legal, accounting, printing, travel, "blue sky" filing fees, Cayman Islands filing fees including registration under the Exempted Limited Partnership Law, 2014 of the Cayman Islands, as amended from time to time (the "**ELP Law**") and the Mutual Funds Law (2013 Revision) of the Cayman Islands, as amended from time to time (the "**Mutual Funds Law**"), and other organizational costs incurred in connection with the formation and capitalization of the Fund and the Master Fund. If borne by the Fund, these organizational costs and expenses will be amortized on a straight line basis over 60 months beginning as of the commencement of operations (anticipated to be [ ], 2015), even though such treatment is a divergence from U.S. generally accepted accounting principles ("**GAAP**"). Each [Ripple] Fund will bear its own expenses and its share of the expenses of the Master Fund, *pro rata* in proportion to the net asset value of each [Ripple] Fund. The General Partner anticipates organizational and initial offering expenses will approximately be between $150,000

-10-

and $250,000.

**General Partner Expenses**   The General Partner (or another entity designated by the General Partner) will be responsible for and will pay, or cause to be paid, any Placement Fees and all ordinary office overhead expenses of the General Partner, including rent, supplies, secretarial expenses, stationery, charges for furniture and fixtures and compensation of security analysts and personnel, other than those specifically included as Fund Expenses (defined below).

**Fund Expenses**   The Fund will pay all expenses other than General Partner expenses, including legal, accounting, administration (including administration fees and fees of any risk aggregator), auditing, consulting (including, but not limited to, regulatory and information technology consulting) and other professional expenses, all regulatory costs and expenses (including those incurred in preparing applicable regulatory filings such as U.S. Securities and Exchange Commission (the "**SEC**") Form D), all expenses related to the offering of Interests (including legal fees relating to the preparation of offering materials and the negotiation of side letters), insurance, investment expenses such as commissions, order execution and management systems, research expenses (including research-related travel expenses), interest on margin accounts and other indebtedness, custodial fees and other reasonable expenses related to the purchase, sale or transmittal of Fund assets, telephone, computer, other communication expenses and any other expenses which the General Partner reasonably determines to be directly related to the investment of the Fund's assets ("**Fund Expenses**"). Each [Ripple] Fund will bear its own expenses and its share of the expenses of the Master Fund, *pro rata* in proportion to the net asset value of each [Ripple] Fund. The General Partner anticipates ongoing Fund Expenses will approximately be [ ]% per annum.

The Fund and the Master Fund will pay any extraordinary expenses or costs which they may incur (*e.g.*, litigation expenses or damages) and any indemnification obligations they may owe the General Partner, the Investment Manager, their respective affiliates or other parties, as applicable, as described herein.

**Management Fee**   Pursuant to the Investment Management Agreement, the Master Fund will pay to the Investment Manager on the first Business Day of each calendar quarter in advance, a management fee (the "**Management Fee**") equal to 1/4 of 1% of the net asset value of the Master Fund. The Management Fee will be pro-rated for partial periods, in the event that a Limited Partner withdraws on a date other than a calendar quarter-end.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287568

| | |
|---|---|
| **Distributions** | From time to time, the General Partner may elect to make distributions from the Master Fund to the [Ripple] Funds for distribution to their limited partners (each, a "**Master Fund Distribution**"). The General Partner, in its sole discretion, will determine the timing, amount and type of any Master Fund Distributions. Master Fund Distributions will be apportioned to the limited partners in the [Ripple] Funds on a *pro rata* basis in proportion to the net asset value of their capital accounts. |

<div align="center">

**Liquidity**

</div>

| | |
|---|---|
| **Withdrawal Rights** | Subject to the Lock-Up and Withdrawal Queue (each as defined below), each Limited Partner will be permitted as of any Business Day (a "**Withdrawal Date**") to make a complete or partial withdrawal of its Interest on written notice to the General Partner (the "**Withdrawal Notice**"), which will be placed in a Withdrawal Queue (as defined below). |
| | An Interest may not be withdrawn prior to the first Withdrawal Date occurring on or after the sixth month-end following the date such capital contribution was made (the "**Lock-Up**"). |
| **Withdrawal Queue** | [Generally, all Withdrawal Notices received by the Administrator with respect to each Withdrawal Date will be satisfied on a *pro rata* basis based on the amount of each Limited Partner's requested withdrawal as of such date. However, in the event that aggregate Withdrawal Notices from the Fund exceed [5]% (or such other amount as determined in the Investment Manager's sole discretion) (the "**Withdrawal Percentage**") of the median of the daily trading volume of XRP on the Exchanges during the previous 20 Business Days, the Investment Manager expects to limit withdrawals in excess of such amount. The Investment Manager, in its sole discretion, may choose to satisfy Withdrawal Notices in excess of the Withdrawal Percentage, as well as limit Withdrawal Notices below the Withdrawal Percentage. |
| | Withdrawal Notices received by the Administrator will generally be satisfied on a *pro rata* basis, based on the net asset value of each withdrawing Limited Partner's Interests with respect to each Withdrawal Date. Withdrawals will be allocated among the withdrawing Limited Partners *pro rata* according to the value of their respective holdings immediately prior to such Withdrawal Date. Any unhonored portion of a withdrawal request will remain invested in the Fund, and the remainder of the request will be treated as a request to withdraw as of the next Withdrawal Date, based on the liquidation of XRP and the offset of subscription proceeds (the "**Withdrawal Queue**"). The Investment Manager intends to liquidate XRP, subject to the Withdrawal Queue, in order to satisfy the portion of the withdrawal request(s) to be satisfied on a given Withdrawal Date; *provided*, that, in the |

<div align="center">

-12-

</div>

Investment Manager's sole discretion, the Investment Manager may use subscription proceeds to satisfy redemption requests in lieu of liquidating XRP. Cash proceeds from such liquidation shall be distributed to Limited Partners to satisfy such withdrawal requests. Limited Partners subject to an unhonored portion of a withdrawal request will remain invested in, and therefore still subject to the risks (including the credit, regulatory and operational risks of the exchange on which the Investment Manager sells the XRP to satisfy the withdrawal requests) of, and liabilities owed to, the Fund. The Withdrawal Date with respect to any withdrawal satisfied through sales of XRP will be the day on which such XRP are sold. For the avoidance of doubt, a Limited Partner will be redeemed from the Fund only with respect to the portion of its withdrawal request that has been satisfied, either through the liquidation of XRP or the offset of subscription proceeds, and shall remain a Limited Partner in the Fund with respect to any remaining portion of its investment.

| | |
|---|---|
| **Required Withdrawals** | The General Partner, in its sole discretion and upon at least [five] days' prior written notice, may require the withdrawal of all or any portion of the Interest of any Partner for any reason; *provided, however*, that the General Partner, in its sole discretion, may require the withdrawal of all or any portion of the Interest of any Partner at any time on no notice if certain events set out in the Partnership Agreement occur (any such required withdrawal under this paragraph, a "**Required Withdrawal**"). |
| **Transfers** | A Limited Partner is prohibited from assigning, selling, transferring, pledging, hypothecating or otherwise disposing of any of its Interest, except with the prior written consent of, and upon terms acceptable to, the General Partner. |

### Miscellaneous

| | |
|---|---|
| **Side Agreements** | The General Partner may, from time to time, amend, vary, waive or modify terms of the Partnership Agreement as the same pertain solely to a particular Limited Partner, and no such amendment, variation, waiver or modification will require the consent of any other Limited Partner; *provided, however*, that under no circumstances may the General Partner and a particular Limited Partner make any amendment, variation, waiver or modification that would reasonably be expected to have a material adverse effect upon any other Limited Partner. |
| **Periodic Reports to Limited Partners** | The Fund will provide to Limited Partners annual audited financial statements and unaudited monthly reports (including a statement showing any change in net asset value of the Fund and the value of such Limited Partner's Interest). |

-13-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

| | |
|---|---|
| **Fiscal Year** | The Fund's fiscal year end is December 31 (the "**Fiscal Year**"). |
| **Term** | The Fund will continue until terminated pursuant to the Partnership Agreement. |
| **Taxation** | The Fund intends to be classified as a partnership for U.S. federal income tax purposes. The Fund does not expect to be a publicly traded partnership taxable as a corporation. Accordingly, the Fund should not be subject to U.S. federal income tax. Rather, each Partner will be required to report on its own annual tax return such Partner's distributive share of the Fund's taxable income or loss. See "Taxation - Certain U.S. Federal Income Tax Considerations." |
| **Auditors** | [          ]. |
| **Prime Brokers** | [          ]. |
| **Administrator** | [ [] (the "**Administrator**")] |
| **U.S. Legal Counsel to the General Partner and the Investment Manager** | ▓▓▓▓▓▓ ew York, New York, U.S.A. |
| **Cayman Islands Counsel** | ▓▓▓▓▓▓ erves as legal counsel to the Fund and the Master Fund as to matters of Cayman Islands law only. |



| | |
|---|---|
| **Risk Factors** | All prospective investors, either individually or together with their professional advisers, must have the financial sophistication and expertise to evaluate the merits and risks of an investment in the Fund. The Interests are a speculative and illiquid investment and involve a high degree of risk. Investors must be prepared to lose all or substantially all of their investment in the Fund. See "Certain Risk Factors." |

-14-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0287571

# INVESTMENT APPROACH

## Investment Objective and Strategy

[The Fund will invest substantially all of its assets in XRP. The Fund will not trade, buy, sell or hold XRP derivatives for any purpose. Transactions in XRP will not be made on a leveraged, margined, or offer-financed basis. Through the investment program, shareholders in the Fund may indirectly participate in the XRP market without owning or controlling any specific XRP.

The fund will sell equity interests to qualified investors that are interested in having exposure to XRP without owning it. Investors will be accredited investors and qualified investors, and equity interests will be offered and sold in private placement transactions. Investors will buy their equity interests in US and the fund will pay out redemptions in USD. The fund will buy and hold the virtual currency in its own name, not as a custodian for the investors. The value of equity interests will correlate to the net asset value of the virtual currency held by the fund.

The Fund has entered into an exclusive three year agreement with Ripple Labs, Inc. ("**Ripple Labs**") regarding the supply of XRP to the fund and other fund-related matters. Ripple Labs further agrees that that the Fund will be the sole channel through which any investment products relating to the over-the-counter sale of XRP during the agreed period as long as the Fund reaches an agreed upon milestone. The Fund will purchase XRP directly from Ripple Labs without volume restrictions[1] for subscriptions at the volume-weighted average price of Bitcoin on the Exchanges as of the end of any Business Day.

The Fund will: (1) not allow any person to fund the investment of another person (i.e., person A may not fund the purchase of equity interests by person B); (2) not permit transfers between accounts of investors[2]; or (3) not make payments to third parties on behalf of investors or others.

The Fund's investment program is speculative and entails substantial risks. There can be no assurance that the investment objectives of the Fund will be achieved. (See "Certain Risk Factors".)]

---

1 Note by AL: Up for negotiation again?

2 Note by AL: But we allow cross subscription and redemption?

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287572

# MANAGEMENT

**The General Partner**

The General Partner is a Delaware limited liability company and also serves as general partner of the Master Fund and the Offshore Fund. ████████ s the managing member] of the General Partner. The investment decisions are made exclusively by ████████ he chairman and chief investment officer] of the Investment Manager.

**The Investment Manager**

The Investment Manager, a Delaware limited liability company, is solely responsible the Fund and makes decisions on when and how much to invest in or withdraw from particular investments pursuant to the Investment Management Agreement.

[The Investment Manager is an affiliate of ████████ is a registered investment adviser with the SEC, and the Investment Manager of this Fund is a "relying adviser".]

**Chief Investment Officer**

The biography of the chief investment officer of the Investment Manager is set forth below:



**The Investment Management Agreement**

The Investment Manager provides discretionary investment advisory and investment management services to the Fund pursuant to the Investment Management Agreement. The Investment Management Agreement will remain in force for the life of the Fund unless terminated by either party thereto, without penalty, upon [61] days' prior written notice. However, if either party to the Investment Management Agreement breaches any provision thereto and receives notice from the non-breaching party of such breach, the Investment Management Agreement may be immediately terminated by the non-breaching party. The Investment Management Agreement will also terminate if either party thereto goes into liquidation or a receiver or provisional liquidator or administrator is appointed over such party's assets, or if all the Interests are withdrawn from the Fund.

The Investment Management Agreement provides that the Fund will indemnify and hold harmless the Investment Manager for itself and as trustee for each of its affiliates and their respective members, directors, employees and officers (each, an "**indemnitee**") against any expense, loss, liability or damage arising out of any claim asserted or threatened to be asserted against such indemnitee in connection with the Investment Manager's serving or having served as such pursuant to the Investment Management Agreement; *provided, however*, that an indemnitee will be entitled to indemnification against any such expense, loss, liability or damage only to the extent that such indemnitee acted in good faith and in a manner such indemnitee reasonably

-16-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC. RPLI_SEC 0287573

believed to be in or not opposed to the best interests of the Fund and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or its conduct was unlawful, and such indemnitee's conduct did not constitute fraud, bad faith, willful misconduct or gross negligence (as defined under the laws of the State of Delaware, U.S.A. ("**Gross Negligence**")). The indemnification and exculpation provisions in the Investment Management Agreement will not be construed as a waiver of any rights of the Fund or any Limited Partner under U.S. securities laws.

For the avoidance of doubt, pursuant to the Partnership Agreement, the Master Fund Partnership Agreement and the Investment Management Agreement, any trading errors resulting in losses made by the Investment Manager in good faith will not be a liability of the Investment Manager, but will be treated as a liability of the Fund, subject to the standard of liability set forth in "Summary of Partnership Agreement — Liability of General Partner Parties" below. Any gains recognized on trade errors will be for the benefit of the Fund; none will be retained by the Investment Manager.

The Investment Management Agreement between the Investment Manager and the Master Fund contains substantially similar terms as those described above.

**Conflicts Advisory Board**

The Fund may appoint a conflicts advisory board (the "**Conflicts Advisory Board**") which will be responsible for approving certain significant transactions between the Fund and the Investment Manager or its affiliates which are put to the Conflicts Advisory Board by the Investment Manager pursuant to the policies and procedures adopted by the Investment Manager. The Investment Manager and its affiliates are not obligated to obtain Conflicts Advisory Board approval for any transaction unless such approval is required by law. Such transactions may be approved by any single member of the Conflicts Advisory Board. Members of the Conflicts Advisory Board would be unaffiliated with the Investment Manager, although they may serve on the boards of directors or conflicts advisory boards of other funds managed or sponsored by the Investment Manager or its affiliates.

If the General Partner elects to appoint a Conflicts Advisory Board, the General Partner will appoint the members of the Conflicts Advisory Board, and any potential investor may contact the General Partner to ascertain the identity of the members of such Conflicts Advisory Board. Members of the Conflicts Advisory Board will serve from the date of their appointment until their retirement, resignation or removal by the General Partner. The Fund may fix the compensation of the members of the Conflicts Advisory Board as it deems fit. The Conflicts Advisory Board may be composed of one person or entity, or multiple persons or entities.

The Conflicts Advisory Board will be entitled to exculpation and indemnity to the same extent as the General Partner as described in "Summary of Partnership Agreement — Liability of General Partner Parties" below.

A member of the Conflicts Advisory Board may be a director or other officer or employee of any company that provides services to the Fund or in which the Fund may be interested and, unless otherwise agreed, no such member of the Conflicts Advisory Board will be accountable to the Fund for any remuneration or other benefits received thereby.

The Master Fund may appoint a conflicts advisory board with the same duties and that operates in substantially the same manner as the Fund's Conflicts Advisory Board.

-17-

## ADMINISTRATOR [Administrator to review]

The Fund expects to retain [    ], to provide certain administration services for the Fund, pursuant to a middle office administrative services agreement expected to be entered into among the Fund, the Offshore Fund, the Master Fund and the Administrator (the "**Administration Agreement**").

[The Administrator will be responsible for matters pertaining to the administration of the Fund, including, but not limited to: (i) processing subscriptions and withdrawals, including performing certain anti-money laundering duties; (ii) maintaining the Fund's register of Limited Partners; (iii) communicating with Limited Partners and disseminating periodic account statements; (iv) calculating the Fund's net asset value; (v) preparing periodic financial statements; (vi) computing Management Fees; (vii) liaising with and monitoring prime brokers; (viii) maintaining the Fund's books and records; and (ix) providing certain risk and other reports to the Investment Manager which may or may not be shared with investors. The Administrator will perform substantially the same duties for the Offshore Fund and the Master Fund.

The Master Fund will pay the Administrator customary fees for its services, including providing any reports to the Investment Manager. The Master Fund also will reimburse the Administrator for all reasonable out-of-pocket expenses incurred by the Administrator.

The Administration Agreement, to be governed by the laws of the State of [New York, U.S.A.,] will provide that the Administrator will not be liable to the Fund for any loss, cost, expense, damage, liability or claim (collectively, "**Losses**") resulting from, arising out of, or in connection with its performance under the Administration Agreement unless such Losses were caused by fraud, gross negligence or willful misconduct of the Administrator or any of its affiliates. The Administration Agreement further will provide that the maximum aggregate liability of the Administrator and its affiliates in respect of any and all claims of any kind whatsoever, other than for fraud or willful misconduct, arising out of or related to the Administration Agreement, regardless of the form of action, for the term of the Administration Agreement will not exceed the sum that is equal to the aggregate fees paid or payable by the Fund in the immediately preceding 24 months of the Administration Agreement prior to such claim. In addition, under the Administration Agreement, the Master Fund will indemnify and hold harmless the Administrator and any of its affiliates against all Losses which are sustained or incurred or which may be asserted against the Administrator or any of its affiliates, arising out of their performance of services under the Administration Agreement to the Fund, the Offshore Fund or the Master Fund, other than by reason of fraud, Gross Negligence or willful misconduct of the Administrator or any of its affiliates.

In performing its contractual duties, the Administrator will rely on statements of holdings and pricing information, including estimates, issued by or on behalf of prime brokers, custodians, banks, counterparties retained on behalf of or providing services to the Fund. Under the Administration Agreement, the Fund will accept and acknowledge that the Administrator has no duty or responsibility to investigate these statements or to verify the content thereof and that the Administrator will not make independent judgements on the contents of these statements. The Fund will agree that in the event the Administrator suffers loss or liability as a result of reliance on statements issued by or on behalf of prime brokers, custodians, banks, counterparties retained on behalf of or providing services to the Fund, it will not hold the Administrator liable for such loss or liability unless such losses result from an act of Gross Negligence, fraud or willful misconduct on the part of the Administrator of its affiliates.

The Administrator will be a service provider to the Fund and will not be responsible for the preparation of this Memorandum or the activities of the Fund. The Administrator accepts no responsibility for any information contained in this Memorandum other than that contained in this section. In reviewing this Memorandum, the Administrator relied upon information furnished to it by the Investment Manager and the

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0287575

General Partner, and did not investigate or verify the accuracy and completeness of information set forth herein concerning the Fund, the General Partner, the Investment Manager, their affiliates and personnel. The Administrator is not an investment or other adviser to the Fund and will not participate in the investment decision-making process.

The General Partner and the Investment Manager are responsible for retaining prime brokers, custodians, banks, counterparties, auditors, lawyers and other service providers to the Fund. The Administrator has no duty or responsibility to perform any due diligence on, or review the performance of, these service providers. The Administrator accepts no liability for any losses to the Fund or any Limited Partner arising out of the appointment or retention by the Fund of any other service provider.]

## ELIGIBILITY

The Interests are offered only to U.S. taxable investors that are "accredited investors" under Regulation D of the Securities Act and "qualified purchasers" under the Investment Company Act and the rules promulgated thereunder. The Minimum Subscription is $[100,000]. In certain limited circumstances, the General Partner, in its sole discretion, may permit certain non-U.S. persons or U.S. tax-exempt investors that are "accredited investors" and "qualified purchasers" also to subscribe for Interests. In the event a non-U.S. person or a U.S. tax-exempt investor purchases an Interest, the Fund will provide such investor supplemental information, including additional tax disclosure.

In order to invest in the Fund, each prospective investor is required to complete and execute subscription documents in the form delivered to such person (the "**Subscription Documents**"). The execution and delivery of the Subscription Documents by a prospective investor constitutes a binding offer to purchase the Interest as set forth therein and an agreement to hold such offer open until it is either accepted or rejected by the Fund.

Prospective investors whose subscriptions are accepted by the Fund will be advised by the General Partner of the amount of, and the settlement date for, their capital contributions. Acceptance by the Fund of a prospective investor's subscription constitutes an agreement by the prospective investor to be bound by the terms of each of the Subscription Documents and the Partnership Agreement. The Fund reserves the right to reject any subscription in whole or in part or to allocate subscriptions in such a manner as it deems appropriate.

Although the Subscription Documents may be sent by facsimile, prospective investors should be aware of the risks associated with sending documents in this manner. The prospective investor bears the risk of the Subscription Document not being received or being illegible. Subscription funds will not be available to participate in the Fund until the original Subscription Document is received at the offices of the Administrator. None of the Fund, the General Partner, the Investment Manager or the Administrator will be responsible in the event any Subscription Document sent by facsimile is not received or is illegible.

More detailed information concerning the applicable suitability criteria is set forth in the Subscription Documents. In addition, each prospective investor must comply with the terms set forth in the "Anti-Money Laundering Regulations" section of this Memorandum.

## SUMMARY OF PARTNERSHIP AGREEMENT

The following summary of certain terms of the Partnership Agreement is not intended to be complete and is subject in its entirety to the actual provisions of the Partnership Agreement. Each prospective investor should carefully read the entire Partnership Agreement. Various provisions of the Partnership Agreement are also described elsewhere in this Memorandum.

-19-

 RPLI_SEC 0287576

**Purposes and Powers**

The purpose of the Fund is to invest, through the Master Fund, in securities and any other investments and to conduct any other activities incidental thereto and any other business, purpose or activity lawful under the ELP Law. The term "**securities**" is given its broadest possible meaning in the Partnership Agreement and includes, but is not limited to, traditional securities as well as swaps (including CDS), swaptions, collars, caps, floors and foreign exchange, interest rate, currency, commodity or other species of swap agreements, or other transactions with similar substantive or economic effect, forward contracts, futures contracts and options thereon, options contracts, commodities and other investments of all types and kinds. The Fund has broad powers to take any action necessary or advisable to carry out its purpose.

**Capital Accounts and Allocations**

The Fund will establish for each Partner a capital account for partnership accounting purposes. The initial balance of the capital account for each Partner will be the amount of the Partner's initial capital contribution to the Fund. Thereafter, the capital accounts of each Partner will be adjusted at the end of each Fiscal Period (as defined below) and described in detail in the Partnership Agreement. "**Fiscal Period**" means the period beginning on either the first day the Fund accepts subscriptions or the first day following the last day of the immediately preceding Fiscal Period, as the case may be, and ending on the earliest of (i) the date immediately preceding any subscription date, (ii) the date on which there are withdrawals, (iii) the last day of each calendar month, (iv) the date on which the Fund liquidates and (v) any other date determined by the General Partner.

At the end of each Fiscal Period, the balance of each capital account of each Partner at the beginning of that Fiscal Period will be: (i) increased by (A) any additional capital contributions by that Partner during that Fiscal Period, (B) the Partner's Partnership Percentage (as defined below) of profits (if any) during that Fiscal Period and (C) any amount otherwise credited to such Partner pursuant to the Partnership Agreement during that Fiscal Period; and (ii) decreased by (A) any amount of cash and the fair market value of any other property distributed to the Partner during that Fiscal Period, (B) the Partner's Partnership Percentage of losses and expenses (if any) during that Fiscal Period and (C) any amount otherwise charged against the Partner pursuant to the Partnership Agreement during that Fiscal Period. Notwithstanding the foregoing, if any U.S. federal, state or local laws or regulations prohibit a Partner from sharing in full or in part in the appreciation or depreciation in any asset held directly or indirectly by the Fund, or if such Partner's sharing in the appreciation or depreciation in any such asset would cause any other Person to be in violation of any such laws, rules or regulations, the General Partner may exclude, without any compensating adjustments, from such capital account all or any portion of such increase or decrease in net asset value that is attributable to such appreciation or depreciation.

However, as all or substantially all of the trading activities will be conducted by the Master Fund, most of the gains and losses from trading activities will be allocated at the Master Fund level amongst its capital accounts. Generally, gains will be allocated among capital accounts: first, *pro rata* among all partners in the Master Fund in proportion to their respective capital accounts until each capital account has been allocated an amount to recoup any prior losses, costs or expenses.

The General Partner may determine to treat any liability or expenditure of the Fund that becomes fixed or is incurred in a Fiscal Period subsequent to the Fiscal Period to which such liability or expenditure relates (the "**Prior Fiscal Period**") as either (i) arising in the Fiscal Period in which such liability becomes fixed or such expenditure is incurred or (ii) arising in such Prior Fiscal Period, in which case such liability or expenditure will be charged to Persons who were Partners during such Prior Fiscal Period (whether or not such persons are Partners during the Fiscal Period in which such liability is fixed or such expenditure is incurred) in

-20-

the proportion of such Partners' Partnership Percentage as of the beginning of such Prior Fiscal Period, and the Fund may, but is not obligated to, collect amounts previously distributed to such Persons equal to such liabilities or expenditures.

The "**Partnership Percentage**" associated with a Partner's capital account as of the beginning of a Fiscal Period, means the percentage determined by dividing the balance of such capital account at such time by the sum of the balance of all capital accounts at such time.

### Liability of Partners

Subject to applicable law, no Limited Partner will have any personal liability whatsoever, whether to the Fund, the General Partner or any creditor of the Fund, for the debts, expenses, liabilities or obligations of the Fund unless that Limited Partner otherwise agrees to that liability. Notwithstanding the ability of any Limited Partner to consult with the General Partner regarding the business of the Fund, as permitted by the ELP Law, and to act as provided in the Partnership Agreement, each Limited Partner will at all times retain the status, and freedom from liability, of a limited partner under the ELP Law. However, if, notwithstanding the terms of the Partnership Agreement, it is determined under applicable law that any Limited Partner has received a distribution that is required to be returned to or for the account of the Fund or Fund creditors, then the obligation under applicable law of any Limited Partner to return all or any part of a distribution made to that Limited Partner will be the obligation of that Limited Partner and not of any other Limited Partner. Any amount so returned by a Limited Partner will be treated as a capital contribution.

### Liability of General Partner Parties

The General Partner will be subject to all of the liabilities of a general partner in a Cayman Islands exempted partnership; *provided, however*, to the fullest extent permitted by law, none of the General Partner, the Investment Manager, their affiliates, or their respective partners, members, officers, employees, directors, managers, owners or agents (collectively, the "**General Partner Parties**," and each, a "**General Partner Party**") will be liable to the Fund or to any Limited Partner for (i) any act or omission taken or suffered by a General Partner Party in connection with the conduct of the affairs of the Fund that is reasonably believed by such General Partner Party to be in or not opposed to the best interests of the Fund, unless such act or omission resulted from fraud, bad faith, willful misconduct or Gross Negligence by such General Partner Party; (ii) any action or omission taken or suffered by any other Partner; or (iii) any mistake, negligence, dishonesty or bad faith of any broker or other agent of the Fund selected by a General Partner Party in good faith.

Any trading errors resulting in losses made by a General Partner Party in good faith will not be a liability of the General Partner Parties, but will be treated as a liability of the Fund, subject to the standard of liability set forth above. Any gains recognized on trade errors will be for the benefit of the Fund; none will be retained by the General Partner Parties.

The Partnership Agreement also provides that the Fund will indemnify and hold harmless each of the General Partner Parties (excluding any other limited partnership or pooled investment vehicle directly or indirectly organized, sponsored and/or managed by a General Partner Party) against any expense, loss, liability or damage arising out of any claim asserted or threatened to be asserted against such General Partner Party in connection with the General Partner Party's serving or having served as such pursuant to the Partnership Agreement; *provided, however*, that a General Partner Party will be entitled to indemnification against any such expense, loss, liability or damage only to the extent that such General Partner Party acted in good faith and in a manner such General Partner Party reasonably believed to be in or not opposed to the best interests of the Fund and, with respect to any criminal action or proceeding, had no reasonable cause to believe his or its conduct was unlawful, and such General Partner Party's conduct did not constitute fraud, bad faith, willful

-21-

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0287578

misconduct or Gross Negligence. The indemnification and exculpation provisions in the Partnership Agreement will not be construed as a waiver of any rights of the Fund or any Limited Partner under securities laws. The Master Fund Partnership Agreement similarly indemnifies the General Partner Parties.

**Management of Fund Affairs**

The Limited Partners take no part in the management of and have no voice in the operation of the Fund. Responsibility for managing the Fund and complete trading authority over its assets is vested solely in the General Partner (although the Fund invests all or substantially all of its assets in the Master Fund, and such trading authority for the Fund and the Master Fund is currently delegated to the Investment Manager pursuant to the Investment Management Agreement). To facilitate the execution of various documents by the General Partner on behalf of the Fund and the Limited Partners, the Limited Partners appoint the General Partner their attorney-in-fact by executing a power of attorney which is part of the Partnership Agreement.

**Non-Voting Interests**

The General Partner may, upon request, issue to Limited Partners admitted to the Fund non-voting Interests. Such Limited Partners will have all of the rights of other Limited Partners except they will have no right to consent to any amendments or to any other consent or vote permitted or required under the Partnership Agreement or under certain provisions of the ELP Law. That portion of any Interest held by a Limited Partner who has committed a "disqualifying event," as described under Rule 506(d) of Regulation D of the Securities Act, which is determined to be in excess of 19.99% of the aggregated Interests of the Limited Partners, will not have voting rights for that portion of its Interest in excess of 19.99% under the Partnership Agreement and certain provisions of the ELP Law, except in limited circumstances.

**Distributions**

From time to time, the General Partner may elect to make Master Fund Distributions from the Master Fund to the [Ripple] Funds, which the [Ripple] Funds (including the Fund) will pass on to their limited partners (including the Limited Partners). The General Partner, in its sole discretion, will determine the timing, amount and type of any Master Fund Distributions. Master Fund Distributions will be apportioned to the limited partners in the [Ripple] Funds on a *pro rata* basis in proportion to the net asset value of their holdings. Distributions to any Limited Partner will be distributed as follows:

[   ]

**Termination of the Fund**

The affairs of the Fund will be wound up and the Fund terminated upon (i) the death, commencement of liquidation or bankruptcy, or the withdrawal, removal or making of a winding up or dissolution order in relation to the last remaining general partner of the Fund or any other occurrence that would legally disqualify the last remaining general partner of the Fund, (ii) the General Partner's determination, in its sole discretion, to terminate the Fund or (iii) the ELP Law so requiring.

**Amendments**

The Partnership Agreement may be amended by affirmative approval of the General Partner and approval of Limited Partners owning more than 50% of the aggregate value of the Interests then entitled to vote (including, unless otherwise stated, the General Partner and its affiliates, to the extent they hold Interests) but without regard to Limited Partners issued non-voting Interests. The approval of the Limited Partners may be obtained by requiring Limited Partners to object in writing to a proposed amendment within a certain period of

-22-

time or they will otherwise be deemed to have consented.  Any amendment that would reduce an Interest in the Fund may only be made with the prior written consent of each Limited Partner adversely affected thereby. Notwithstanding the foregoing, the General Partner may amend the Partnership Agreement without the consent of the Limited Partners, at any time and without limitation, if every Limited Partner has a reasonable opportunity to withdraw from the Fund, if it provides not less than [45] days' written notice prior to effecting the amendment.

The General Partner may also make amendments to the Partnership Agreement without the consent of the Limited Partners, *provided* that such amendments do not adversely affect the rights and obligations of any Limited Partner and for other limited reasons as set forth in the Partnership Agreement.

No amendments may be made to the Partnership Agreement without the consent of the General Partner.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.

RPLI_SEC 0287580

## CERTAIN RISK FACTORS

***An investment in the Fund entails a high degree of risk and is suitable only for sophisticated persons who fully understand and are capable of bearing the risks of an investment in the Fund. In addition to the risk disclosure statements appearing at the beginning of this Memorandum and the other disclosures of risks set forth herein, prospective investors should consider the following risks before subscribing for Interests. The following list is not an exhaustive list of all risks that may arise with respect to an investment in the Fund.***

**Risks Relating to Government Oversight**

**Regulatory changes or actions may alter the nature of an investment in the Interests or restrict the use of XRPs or the operation of the Ripple protocol in a manner that adversely affects an investment in the Interests.**

As virtual currencies, such as Bitcoin, Litecoin, Dogecoin and XRP, have grown in both popularity and market size, the U.S. Congress and a number of U.S. federal and state agencies (including the Financial Crimes Enforcement Network of the U.S. Department of the Treasury ("**FinCEN**") the **SEC**, the Commodities Futures Trading Commission ("**CFTC**"), the Financial Industry Regulatory Authority ("**FINRA**"), the Consumer Financial Protection Bureau ("**CFPB**"), the Department of Justice, the Department of Homeland Security, the Federal Bureau of Investigation, the U.S. Internal Revenue Service ("**IRS**"), and state financial institution regulators) have begun to examine the operations of the virtual currency networks and virtual currency related businesses, their users and the exchange markets, with particular focus on (i) the extent to which virtual currencies can be used to launder the proceeds of illegal activities or fund criminal or terrorist enterprises, (ii) the safety and soundness of exchanges or other service providers that hold or transmit virtual currency for users and (iii) other risks to investors and consumers who hold and use virtual currency. On-going and future regulatory actions may alter, perhaps to a materially adverse extent, the nature of an investment in the Interests, the value of XRP or the ability of the Fund to continue to operate.

In March 2013 guidance, FinCEN took the position that any administrator or exchanger of convertible virtual currencies must register with FinCEN as a money transmitter (a form of money services business) and must comply with the anti-money laundering regulations applicable to money transmitters. FinCEN has also taken the position that mere "users" of virtual currency, as defined in its guidance, do not have to register as money transmitters and are not subject to FinCEN anti-money laundering regulations. The requirement that virtual currency exchangers that do business in the U.S. register with FinCEN and comply with anti-money laundering regulations may increase the cost of buying and selling XRPs and therefore may adversely affect their price. FinCEN has published additional interpretive letters elaborating on the original guidance, including a January 30, 2014 interpretive letter addressing certain virtual currency investment activities and providing that the investment in a virtual currency for the benefit of the investor itself is not, under the circumstances described in the interpretation, money transmission for purposes of the FinCEN regulations. However, the interpretation also notes that the provision of investment-related or brokerage services that involved the accepting and transmitting of virtual currency, or the exchange of virtual currency for currency of legal tender or another virtual currency would require additional analysis. On October 27, 2014, FinCEN published two more interpretive letters further elaborating on its March 2013 guidance. One letter indicated that a virtual currency exchange, even where it buys from customers for the exchange's inventory and sells to customers out of its own inventory, acting as a dealer rather than a broker, is nevertheless engaged in money transmission, under the circumstances described in the interpretation. The other letter indicated that a company that provides payment processing services by taking legal tender payments from customers of merchants and providing those merchants with payments in bitcoin is engaged in money transmission, under the circumstances described in the interpretation.

Similarly, local state regulators such as the California Department of Financial Institutions and the New York Department of Financial Services ("**NYDFS**") have also initiated examinations of virtual currency, virtual currency networks and virtual currency related businesses. A number of states, such as Idaho, New York, Virginia and Washington, are actively requiring virtual currency businesses to obtain licenses on a state-level as money transmitters or money service businesses. However, certain other state regulators, such as the Texas Department of Banking and Kansas Office of the State Bank Commissioner, have found that virtual currencies do not constitute money, and that transmission of virtual currencies does not constitute money transmission requiring licensure. The inconsistency in applying money transmitting licensure requirements to certain virtual currency businesses may make it more difficult for virtual currency businesses to provide services, which may affect consumer adoption of virtual currency and its price. On June 28, 2014, the Governor of the State of California signed into law a bill that removed state-level prohibitions on the use of alternative forms of currency or value.

On July 17, 2014, the NYDFS published a proposed comprehensive regulatory scheme for virtual currency businesses, called the "BitLicense." Prompted by concerns about the use of virtual currency in money laundering, consumer fraud and other criminal activity, the proposal represents one of the first attempts to comprehensively regulate virtual currency activities. In February 2015, The NYDFS published a revised proposed BitLicense regulation. Under the proposed regulations, most businesses involved in virtual currency transactions in or involving New York, excluding merchants (as well as consumers), would be required to apply for licenses from the NYDFS. The proposed regulations also have anti-money laundering, cyber security, consumer protection, and financial and reporting requirements, among others. Many commentators, including those who have published comment letters, have stated that if finalized as proposed, the regulations would profoundly impact the virtual currency industry, for example by creating significant compliance costs and high barriers to entry for new virtual currency businesses. Other states and countries are likely to look to the BitLicense regime when determining whether and how to regulate virtual currency-related activities. We cannot predict when the BitLicense regime may become effective. The BitLicense framework when finalized and effective may adversely affect the ability of consumers or businesses in New York to use virtual currency and the ability of virtual currency businesses in New York and elsewhere to operate effectively, and therefore may adversely affect the price of XRP.

A number of U.S. Federal Courts have ruled under various circumstances that bitcoins are forms of money. In August 2013, a ruling from a federal magistrate judge of the U.S. District Court for the Eastern District of Texas ruled that "Bitcoin is a form of currency or form of money," to support a finding that interests sold in a ponzi scheme in return for bitcoins were "securities." Similarly, two federal judges for the U.S. District Court for the Southern District of New York have found that bitcoins constitute money for purposes of federal criminal anti-money laundering laws. There is no indication yet that courts or regulators will reach a consensus on whether bitcoin or other virtual currency is money, especially under differing regulations and statutes that have different underlying purposes.

On February 20, 2014, the Conference of State Bank Supervisors ("**CSBS**") announced the formation of a Task Force to study the changing landscape of payment systems and the regulation thereof, including virtual currencies. In April 2014, the CSBS, together with the North American Securities Administrators Association released model consumer and investor guidance on virtual currencies ("Model Guidance") that cautions consumer and investors about risks associated with acquiring, holding and using virtual currencies, including volatility, risk of loss or theft, potential for criminal activities and the investigation of criminal activities to disrupt access to accounts, lack of regulation of certain participants in the market, and potential tax consequences. The warnings or others like them have been issued by a number of states, including Washington, Wisconsin, North Carolina, Nevada, Massachusetts, Michigan, New Hampshire, Alabama, Maryland, Maine, New Mexico, California, Florida and Hawaii. On December 16, 2014, CSBS issued a policy on virtual currency regulation in which it called for "activities involving third party control of virtual currency, including for the purposes of transmitting, exchanging, holding, or

-25-

otherwise controlling virtual currency," to be subject to state licensure and supervision. On the same date, CSBS issued for public comment a draft model state regulatory framework for virtual currency activities.

Currently, neither the SEC nor the CFTC has formally asserted regulatory authority over XRP, the virtual currency networks or XRP trading and ownership. On May 7, 2014, the SEC published an investor alert that highlighted fraud and other concerns relating to certain investment opportunities denominated in virtual currency and fraudulent and unregistered investment schemes targeted at participants in online bitcoin forums. A CFTC Commissioner stated publicly that the CFTC should consider regulating bitcoins. On October 9, 2014, the CFTC held a hearing on bitcoin that focused on the benefits of the Bitcoin Network and on the launch of TeraExchange, a platform for bitcoin derivative contracts that was approved by the CFTC. Although the SEC has taken action indicating that it has jurisdiction over securities that relate to bitcoin (for example, with respect to the Interests in this Fund), and the CFTC has taken action indicating that it has jurisdiction over certain bitcoin derivatives with respect to TeraExchange's platform, as of the date of this Memorandum, the Investment Manager is not aware of any rules that have been proposed to regulate virtual currency as a commodity or a security. To the extent that virtual currencies are determined to be a security, commodity or other regulated asset, or to the extent that a U.S. or foreign government or quasi-governmental agency exerts regulatory authority over virtual currency networks or virtual currency trading and ownership, trading or ownership in XRP or the Interests may be adversely affected.

FINRA issued an Investor Alert in March 2014 with respect to the speculative, regulatory and fraud related risks associated with bitcoins and virtual currencies.

In a report released publicly on June 26, 2014, the U.S. Government Accountability Office released a Report to the Committee on Homeland Security and Government Affairs. The report summarized regulatory, law enforcement and consumer protection assessments regarding virtual currencies. The report recommended that the CFPB participate in inter-agency working groups on virtual currencies to assess how the agency might address virtual currency-related consumer protection issues. The report echoed, in part, the SEC investor alert mentioned above. In August 2014, the CFPB issued a consumer advisory regarding the risks posed by virtual currencies. On November 13, 2014, the CFPB issued a proposed rule to regulate certain prepaid products, including certain mobile wallets and other emerging electronic payment technologies. In the preamble to the proposed rule, the CFPB stated that "the proposed rule may have potential application to virtual currency," but that the CFPB's analysis of the applicability of existing regulations and the proposed rule to virtual currencies and related products and services is "ongoing," and that the proposal is not intended to resolve those issues. To the extent that the CFPB determines that virtual currency is subject to either existing regulations or this proposed rule, the expense of transacting in XRP likely would increase, which could negatively affect the value of the Interests.

In testimony before the US Senate Committee on Agriculture, Nutrition and Forestry on December 10, 2014, CFTC Chairman Timothy Massad stated that the CFTC believed it had jurisdiction over derivative instruments such as futures and swaps based on virtual currencies. To the extent that virtual currencies themselves are determined to be a security, commodity future or other regulated asset, or to the extent that a US or foreign government or quasi-governmental agency exerts regulatory authority over virtual currency networks or XRP trading and ownership, trading or ownership in XRP or the Interests may be adversely affected.

To the extent that future regulatory actions or policies limit the ability to exchange XRPs or utilize them for payments, the demand for XRPs will be reduced. Furthermore, regulatory actions may limit the ability of end-users to convert XRPs into fiat currency (e.g., USD) or use XRPs to pay for goods and services. Such regulatory actions or policies would result in a reduction of demand, and in turn, the XRP

-26-