# PX 258

1

```
 1              UNITED STATES DISTRICT COURT

 2             SOUTHERN DISTRICT OF NEW YORK

 3    ----------------------------- )

 4    SECURITIES AND EXCHANGE       )

 5    COMMISSION,                   )

 6                Plaintiff,     )Case No.

 7       vs.                     )20 CV 10832 (AT)

 8    RIPPLE LABS, INC.; BRADLEY    )

 9    GARLINGHOUSE, and CHRISTIAN A.  )

10    LARSEN,                       )

11                Defendants.    )

12    ----------------------------- )

13

14       DEPOSITION OF WILLIAM HAROLD HINMAN, JR.

15                  WASHINGTON, D.C.

16                  JULY 27, 2021

17

18

19    REPORTED BY:  Tina Alfaro, RPR, CRR, RMR

20    _____
                    DIGITAL EVIDENCE GROUP
21              1730 M Street, NW, Suite 812
                   Washington, D.C. 20036
22                    (202) 232-0646
```

2

1          Videotaped deposition of WILLIAM HAROLD

2     HINMAN, JR., held at the offices of:

3

4               Kellogg Hansen Todd Figel & Frederick

5               1615 M Street, NW

6               Washington, D.C. 20036

7

8          Taken pursuant to notice before Tina M.

9     Alfaro, a Notary Public within and for the District

10    of Columbia.

11

12

13

14

15

16

17

18

19

20

21

22

3

```
 1    APPEARANCES:
           ON BEHALF OF THE PLAINTIFF:
 2         SECURITIES AND EXCHANGE COMMISSION
           BY: JORGE TENREIRO, ESQ.
 3             LADAN STEWART, ESQ.
               200 Vesey Street, Suite 400
 4             New York, New York 10281

 5    and
           SECURITIES AND EXCHANGE COMMISSION
 6         BY: BRIDGET FITZPATRICK, ESQ.
               MELINDA HARDY, ESQ.
 7             100 F Street, NE

 8             Washington, D.C. 20549

 9    and
           SIMPSON THACHER
10         BY: MEAGHAN KELLY, ESQ.
               PAUL GLUCKOW, ESQ.
11             900 G Street, NW
               Washington, D.C. 20001

12

13         ON BEHALF OF RIPPLE LABS:
           KELLOGG HANSEN TODD FIGEL & FREDERICK
14         BY: REID FIGEL, ESQ.
               ELIANA PFEFFER, ESQ.
15             1615 M Street, NW
               Washington, D.C. 20036
16    and
           DEBEVOISE & PLIMPTON
17         BY: MICHAEL PISEM, ESQ.
               919 Third Avenue
18             New York, New York 10022

19

20

21

22
```

4

```
 1    APPEARANCES:  (cont'd)

 2         ON BEHALF OF CHRISTIAN LARSEN:
           PAUL WEISS RIFKIND WHARTON & GARRISON
 3         BY: MARTIN FLUMENBAUM, ESQ.
               SARAH PROSTKO, ESQ.
 4             CARLY LaGROTTERIA (remote)
               1285 Avenue of the Americas
 5             New York, New York 10019

 6

 7         ON BEHALF OF BRADLEY GARLINGHOUSE:
           CLEARY GOTTLIEB STEEN & HAMILTON
 8         BY: MATTHEW SOLOMON, ESQ
               NICOLE TATZ, ESQ.
 9             JORGE LOPEZ, ESQ. (remote)
               NOWELL BAMBERGER, ESQ. (remote)
10             2112 Pennsylvania Avenue, NW

11             Washington, D.C. 20037

12

13    ALSO PRESENT:  Stu Alderoty (Ripple Labs)

14                   Deb McCrimmon (Ripple - remote)

15                   David Campbell (videographer)

16                   James Beall (hotseat)

17

18

19

20

21

22
```

[7/27/2021] Hinman, William Dep. Tr. 7.27.2021

```
1                        I N D E X

2                       EXAMINATION

3   WITNESS                                PAGE

4   WILLIAM HAROLD HINMAN, JR.

5        By Mr. Figel                      9

6        By Mr. Flumenbaum                 306

7        By Mr. Tenreiro                   369

8        By Mr. Flumenbaum                 381

9        By Mr. Solomon                    397

10       By Mr. Figel                      412

11

12                        EXHIBITS

13  HINMAN EXHIBITS                        PAGE

14  Exhibit 1                              11
         E-mail
15  Exhibit 2                              12
         E-mail
16  Exhibit 3                              13
         PowerPoint
17  Exhibit 4                              24
         Speech
18  Exhibit 5                              30
         Bio
19  Exhibit 6                              50
         Supreme Court's decision in SEC versus
20       Howey

21

22
```

```
 1                      EXHIBITS, CON'T

 2   HINMAN EXHIBITS                           PAGE

 3   Exhibit 7                                 68
         Printout from SEC Website
 4   Exhibit 8                                 83
         Blog posting
 5   Exhibit 9                                 118
         Press release
 6   Exhibit 10                                124
         6/14/18 speech
 7   Exhibit 11                                135
         Dow report
 8   Exhibit 12                                139
         Video clip
 9   Exhibit 13                                141
         Memo
10   Exhibit 14                                159
         E-mail
11   Exhibit 15                                170
         PowerPoint
12   Exhibit 16                                170
         E-mail
13   Exhibit 17                                180
         E-mail
14   Exhibit 18                                189
         E-mail
15   Exhibit 19                                199
         (Not described)
16   Exhibit 20                                204
         E-mail
17   Exhibit 21                                209
         Presentation
18   Exhibit 22                                209
         File comment letter
19   Exhibit 23                                210
         Davis Polk letter
20   Exhibit 24                                210
         Davis Polk lettre
21   Exhibit 25                                212

22        Hearing transcript
```

1                    EXHIBITS, CON'T

2    HINMAN EXHIBITS                              PAGE

3    Exhibit 26                                   220
          E-mail
4    Exhibit 27                                   223
          E-mail
5    Exhibit 28                                   245
          E-mail
6    Exhibit 29                                   262
          6/21/21 SEC privilege log
7    Exhibit 30                                   262
          7/14/21 SEC privilege log
8    Exhibit 31                                   262
          7/21/21 SEC privilege log 2
9    Exhibit 32                                   262
          7/25/21 SEC privilege log 1
10   Exhibit 33                                   262
          7/23/21 SEC privilege log 2
11   Exhibit 34                                   297
          E-mail
12   Exhibit 35                                   301
          E-mail
13   Exhibit 36                                   301
          SEC meeting notes
14   Exhibit 37                                   326
          Executive branch personnel public
15        financial disclosure report

16   Exhibit 38                                   328
          SEC policy
17   Exhibit 39                                   333
          1/16/18 office of ethics counsel
18        statement

19   Exhibit 40                                   338
          Settlement agreement
20   Exhibit 41                                   378
          Memorandum

21

22

8

1          THE VIDEOGRAPHER:  This is media No. 1 of

2   the videotaped deposition of William Hinman.  This

3   is in the matter of SEC versus Ripple Labs, et al.

4   This is in the United States District Court,

5   Southern District of New York, No. 20-CV-10832-AT.

6   This deposition is being held at 1615 M Street,

7   Northwest, Suite 400, Washington, D.C. on

8   July 27th, 2021.  The time on the video monitor is

9   approximately 9:12 a.m.

10          My name is David Campbell.  I am the legal

11   videographer from Digital Evidence Group.  The

12   court reporter is Tina Alfaro, the hotseat is James

13   Beall.  Both are with Digital Evidence Group.

14          Counsel, will you please identify

15   yourselves for the record after which the court

16   reporter will please swear in the witness and we

17   can proceed.

18          MR. FIGEL:  Reid Figel with Eliana Pfeffer

19   representing Ripple Labs.

20          MR. FLUMENBAUM:  Martin Flumenbaum with

21   Sarah Prostko, Paul Weiss Rifkind Wharton &

22   Garrison, representing Chris Larsen.

9

1          MR. PISEM:  Michael Pisem, Debevoise &

2     Plimpton representing Ripple Labs.

3          MR. ALDEROTY:  Stu Alderoty, General

4     Counsel, Ripple.

5          MR. SOLOMON:  Matthew Solomon, Cleary

6     Gottlieb, representing Brad Garlinghouse, and with

7     me is Nicole Tatz also from Cleary.

8          MR. TENREIRO:  Jorge Tenreiro on behalf of

9     Plaintiff, Securities and Exchange Commission.

10    With me are my colleagues Melinda Hardy, Bridget

11    Fitzpatrick, and Ladan Stewart.

12         MS. KELLY:  Meaghan Kelly with Paul

13    Gluckow from Simpson Thacher for the witness.

14                   (Witness sworn.)

15    WHEREUPON:

16              WILLIAM HAROLD HINMAN, JR.

17    called as a witness herein, having been first duly

18    sworn, was examined and testified as follows:

19                    EXAMINATION

20    BY MR. FIGEL:

21       Q.  Good morning, Mr. Hinman.

22       A.  Good morning.

1        MR. FIGEL:  There is one housekeeping

2    matter I'd like to discuss with Mr. Tenreiro with

3    respect to a document production just to put it on

4    the record early.

5        As I mentioned to you off the record but

6    we're now putting on the record, among the

7    discovery produced in this case were documents from

8    ████████████   We received documents in the original

9    production that lacked metadata.  We made a

10   supplemental request for documents that included

11   the metadata and we'll be using those documents

12   which were produced late last night in the

13   deposition, but because there seem to be some

14   inconsistencies in terms of date stamps and

15   attachments and things like that, I want to make

16   sure that Mr. Tenreiro has copies of the original

17   production just so we don't have any unnecessary

18   issues down the road about the version of the

19   document we're using.

20        So I'd like to ask the court reporter to

21   mark this document which bears the Bates Nos.

22   ████████████ a lot of zeros 1 through 10 as Hinman

1    Exhibit 1, and I'll represent this is a printed

2    copy of one of the original chain of e-mails that

3    we received from █████████

4                    (Hinman Exhibit 1 was marked

5                     for identification.)

6         MR. BEALL:  I'm going to need the tag

7    number.  This was part of the group that was given

8    to me this morning.

9         MR. FIGEL:  No, this is supplemental.

10   So...

11        MR. TENREIRO:  Mark and others that might

12   be on the phone, we'll send you copies later.

13        MR. FIGEL:  Oh, I'm sorry.  Actually I did

14   misspeak.  Just for the record, the documents we

15   are -- that I'm putting on the record now do not

16   correlate perfectly with the prior documents we

17   were going to use.  So we can talk about that off

18   the record, but --

19        MR. TENREIRO:  So these are my copies?

20   This is the whole thing?

21        MR. FIGEL:  There's one more.

22        MR. TENREIRO:  Okay.  Okay.  Got it.

1    MR. FIGEL:  The next document was produced

2    by ████████ with a Bates number ████████ ultiple

3    zeros 11.  It's a one-page document.  I ask that

4    the court reporter mark this as Hinman Exhibit 2.

5                    (Hinman Exhibit 2 was marked

6                    for identification.)

7    MR. TENREIRO:  This is also from last

8    night, Reid?

9    MR. FIGEL:  No.  These were the earlier

10   produced documents.  These were the ones that came

11   without the metadata.

12   MR. TENREIRO:  I see.  So these are the

13   earlier ones.  You don't have these available to

14   circulate to my colleagues?

15   MR. FIGEL:  It's okay.  We do.

16   And the third document does not bear Bates

17   numbers.  It was -- or actually it does.  It's hard

18   to read.

19   MR. TENREIRO:  000146.

20   MR. FIGEL:  So the third one is -- bears

21   Bates No. 00146 ████████ prefix and ends with

22   ████████ -000180, and this appears to be

1   attachments to the prior documents.

2         MR. TENREIRO:  Okay.

3         MR. FIGEL:  And I'll ask the court

4   reporter to mark this as Hinman Exhibit 3.

5                     (Hinman Exhibit 3 was marked

6                      for identification.)

7         MR. TENREIRO:  I mean, we can discuss -- I

8   don't see the designation of an attachment in

9   these, but, you know, when we look at it we can

10  talk about it.

11        MR. FIGEL:  I can explain it to you.  The

12  attachment on the e-mail does not correlate to the

13  title.

14        MR. TENREIRO:  And certainly there were no

15  attachments to these.  Okay.  Thank you.

16        Before we get started with questioning,

17  you know, just a couple of quick stipulations that

18  we've discussed prior.  The first is that we're

19  going to designate the transcript as confidential

20  under the judge's protective order.  We will note

21  designations of confidentiality and highly

22  confidential after the deposition.

```
 1              The second is that the parties have
 2     stipulated, as we have done prior, again, that an
 3     objection by me or by Mr. Hinman's counsel
 4     preserves the objection both for the SEC and for
 5     Mr. Hinman.
 6              And the third is that the parties have
 7     agreed that by having Mr. Hinman sit for this
 8     deposition and testify, excuse me, as to certain
 9     questions the SEC is not waiving otherwise
10     applicable privileges or protections with respect
11     to documents it has withheld from production as
12     properly privileged or protected from disclosure,
13     and similarly that should Mr. Hinman disclose
14     information that is otherwise privileged or
15     protected, which I will instruct him not to do
16     today, that disclosure will not be deemed a waiver
17     by the SEC of the subject waiver or otherwise a
18     waiver of any applicable protection.
19              Is that okay with the parties?
20              MR. FLUMENBAUM:  Yes, insofar as we're
21     asking the questions.  If you ask Mr. Hinman
22     questions, then I believe you open him up to
```

```
 1   whatever deliberative process issues exist.

 2           MR. TENREIRO:  Okay.  I actually don't

 3   think that's true on the second half, but we're

 4   okay on the first half.  So let's keep it there and

 5   when we get to our questions we can discuss that.

 6           Reid, do you agree as well?

 7           MR. FIGEL:  I agree with the caveat

 8   expressed by Mr. Flumenbaum, but in general with

 9   respect to our questions, yes, that's our

10   agreement.

11           MR. TENREIRO:  Thank you.

12   BY MR. FIGEL:

13       Q.  Good morning, Director Hinman.

14       A.  Good morning.

15       Q.  Could you state your full name for the

16   record and spell it.

17       A.  William Harold Hinman, Junior.  So

18   H-I-N-M-A-N is the last name.

19       Q.  And where do you currently reside?

20       A.  In D.C.

21       Q.  The deposition's confidential.  So I'll

22   ask what is your current address?
```

1        MR. TENREIRO:  Let's just skip that.  What

2   do you need it for?  We can talk about what you

3   need it for, we can give it to him.  There's a lot

4   of interest in this case and I'd rather --

5        MR. FIGEL:  Fair enough.  All right, but

6   we have an understanding that --

7        MR. TENREIRO:  Plus it's counsel.

8        THE REPORTER:  We have to go one at a

9   time.

10       MR. FIGEL:  -- if asked, we will be

11  provided with the addresses if necessary.

12       MR. TENREIRO:  Yes.

13       MR. FIGEL:  We'll be provided with the

14  addresses of Mr. Hinman's residences.

15  BY MR. FIGEL:

16    Q.  Mr. Hinman, have you ever been deposed

17  before?

18    A.  Once.

19    Q.  And when was that?

20    A.  About 25 years ago.  So I don't remember

21  the exact date.

22    Q.  And, again, without getting into a lot of

1    detail, what was the general topic or subject of

2    the case in which you were deposed?

3        A.  It was -- as a company counsel I had given

4    a company advice with respect to transfers of

5    securities under 144, and that became an issue

6    between the company and the holder of the

7    securities.

8        Q.  Just a couple preliminary comments.  I'm

9    sure you're aware, but we do have a court reporter

10   as well as a videographer.  So we need verbal

11   answers to questions.  Head nods and --

12       A.  Okay.

13       Q.  -- less precise answers will not be clear

14   from the transcript and we obviously want to have a

15   clear record.  Obviously only one person can speak

16   at a time.  So please let me finish my question

17   before you give an answer, and give Mr. Tenreiro

18   sufficient time or your counsel sufficient time to

19   make an objection if they would like to do that,

20   particularly given we're going to be dealing with

21   some privilege issues.  Part of what we'll be doing

22   today is creating a record.

1      A.   Thank you.

2      Q.   Other than instructions on privilege, if

3  Mr. Tenreiro objects, that's not a basis for you

4  not to answer the question.  So he will note his

5  objection, but you're still required to give an

6  answer to my question.  Do you understand that?

7      A.   I do.

8      Q.   And then the less serious point, but if

9  you need a break, just let us know.  I think we'll

10 probably take a break about every hour, hour and a

11 half, but if you need one for any reason, just ask.

12 The only thing I would ask is you don't ask for a

13 break before you've answered a question that I've

14 put to you.

15     A.   Sure.  Thank you.

16         MR. TENREIRO:  Just to let him know,

17 though, that if he has a question on privilege we

18 might have to take a break.

19         MR. FIGEL:  Of course.  Fair enough.

20     Q.   And you're represented by personal counsel

21 today; is that correct?

22     A.   That's right.

1          Q.  And could you identify your counsel,

2     please.

3          A.  Simpson Thacher.

4          Q.  Are you also represented today by counsel

5     for the SEC?

6          A.  I don't believe so.

7               MR. TENREIRO:  Again, on the record as

8     we've explained before, we represent him in his

9     capacity as a former SEC official.  That's how we

10    represent him.

11              MR. FIGEL:  Fair enough.

12    BY MR. FIGEL:

13         Q.  And are you aware of the fact that the SEC

14    moved to quash your deposition today?

15         A.  I'm aware of that.

16         Q.  And you did not have your personal counsel

17    move to quash the deposition, correct?

18         A.  That's right.

19         Q.  Did you have time to prepare for your

20    deposition today?

21         A.  Yes.

22         Q.  Approximately how many hours did you spend

1    preparing for the deposition?

2         A.  I believe five or six hours.

3         Q.  And when -- when were those five or six

4    hours?

5         A.  Over the last couple of weeks, two

6    different occasions.

7         Q.  And were those preparation sessions done

8    in person or over Zoom or some other video

9    communication?

10        A.  We had a phone call and an in-person

11    session.

12        Q.  And who was present for -- let's

13    start with do you remember approximately when the

14    first prep session was?

15        A.  About ten days ago approximately.  And who

16    was present?

17        Q.  Well, that was the one by phone, correct?

18        A.  No.  That was in person.

19        Q.  Okay.  And where was the in-person

20    meeting?

21        A.  At the SEC.

22        Q.  And who was present for that meeting?

1    A.  Basically the folks here except for the

2  last one, Lindy.  I've forgotten Lindy's last name.

3         MS. HARVEY:  Harvey.

4    Q.  But Ms. Fitzpatrick was present and

5  Mr. Gluckman and everyone?

6    A.  I'm trying to remember.  Paul was not

7  there as well.

8         MR. FIGEL:  I'm sorry.  Your last name?

9         MS. KELLY:  Meaghan Kelly.

10    Q.  Ms. Kelly was there?

11    A.  Yes.

12    Q.  Okay.  And how long did that session last?

13    A.  About four, four and a half hours I would

14  think.

15    Q.  Were you shown any documents in that

16  meeting?

17    A.  Yes.

18    Q.  Did any of those documents refresh your

19  recollection about events that you did not have a

20  recollection to before the meeting?

21    A.  I didn't remember the specific document,

22  but I generally remembered the topics covered and

1    the substance of the documents.

2        Q.  When was the next time you prepared -- you

3    met with counsel to prepare for your deposition?

4        A.  Our phone call I think was yesterday or

5    the day before yesterday.

6        Q.  Okay.  And where were you when that phone

7    call was made?

8        A.  At my home.

9        Q.  Was anyone present with you at your home?

10       A.  No.

11       Q.  And who was on the line?

12       A.  Jorge, Meaghan.  I'm not sure if Paul was

13   on the line, and I'm not sure exactly who else from

14   the SEC.

15       Q.  To your knowledge, was anyone on -- either

16   listening in on the meeting at the SEC or on the

17   phone call other than counsel from Simpson Thacher

18   and counsel for the SEC?

19       A.  No.

20       Q.  And were you shown any documents or were

21   you provided with documents in connection with the

22   phone session you had yesterday or the day before?

1      A.  I think there was an e-mail with the links

2   to speeches.

3      Q.  Other than links to speeches, any other

4   documents?

5      A.  Not that I recall.

6      Q.  All right.  Any circumstances or

7   situations that we should be aware of that would

8   prevent you from giving full and complete testimony

9   today?

10      A.  No, not that I'm aware of.

11          MR. FIGEL:  So we are now up to Hinman 4.

12   I'd like the court reporter to mark as an exhibit,

13   Hinman 4, a stipulation that was entered into by

14   the parties to this case, by Mr. Tenreiro, by

15   myself, and Mr. Solomon and Mr. Flumenbaum.  It's

16   to save you a little time with respect to

17   authenticating both your published remarks of your

18   speech on June 14th as well as a link to the

19   YouTube recording of your speech and also to a

20   letter that Chairman Clayton sent to Representative

21   Ted Budd on March 7th 2019.

22          MR. TENREIRO:  I'm sorry.  Who's giving

1    the witness his copy?

2          MR. FIGEL:  I'm not going to -- I'm just

3    putting this on the record.  I just want to have it

4    in.

5          MR. TENREIRO:  Absolutely.  I just want to

6    make sure I don't pass his copy down.

7          MR. FLUMENBAUM:  Is that Exhibit 4?

8          MR. FIGEL:  That's Exhibit 4, yes.

9                    (Hinman Exhibit 4 was marked

10                    for identification.)

11   BY MR. FIGEL:

12       Q.  Other than the people you identified at

13   your prep session and individuals directly

14   associated with Ripple or their representatives,

15   have you had communications with any other person

16   as to whether XRP or transactions in XRP were

17   securities under the federal securities laws?

18          MR. TENREIRO:  And you said other than

19   people you identified in your prep session, but I'm

20   going to include and I'm going to instruct him not

21   to answer other SEC staff members or commissioners

22   or SEC people to the extent there were discussions

1    that were deliberative.

2              With that instruction, please answer.

3        A.  Other than these deliberative discussions,

4    that's right.

5        Q.  So no, let's call them, third parties,

6    non-SEC employees, and nonrepresentatives of Ripple

7    in connection with meetings that you might have

8    had?

9              MR. TENREIRO:  I'm sorry, Reid.  Just for

10   third parties non-SEC employees.  Also no other

11   governmental, you know, I'm excluding that as well.

12   We're asserting privilege to the extent he had

13   those.  I'm not saying he did, but if he did, I'm

14   excluding those.

15             MR. FIGEL:  Okay.  Let's rephrase the

16   question and make a record.

17             Did you have communications with any

18   representatives of any government agency, foreign

19   or domestic, about whether XRP or transactions in

20   XRP were securities under the federal securities

21   laws?  Answer yes or no.

22       A.  Yes.

1      Q.  With whom?

2      A.  I believe the topic came up in connection

3  with some FSOC meetings, financial stability

4  oversight committee that I participated in.

5      Q.  And approximately when were those

6  meetings?

7      A.  The FSOC subcommittee on digital assets

8  was probably formed in 2018, and this topic -- I

9  don't have a specific recollection of this topic,

10  but I think this topic came up in the context of

11  those meetings that year.

12      Q.  And was there -- again, without getting

13  into the substance of the communications, was there

14  a policy or a determination that was being

15  discussed at the meeting that you just testified

16  to?

17      A.  In general the FSOC group was trying to

18  analyze the regulatory framework for digital

19  assets.  So, you know, different activities in the

20  area, different coins that had been issued were

21  frequently discussed.  So that's the context in

22  which that probably came up.

27

```
 1              MR. FIGEL:  And Mr. Tenreiro, I assume

 2    from your previous instruction that any questions I

 3    would ask Mr. -- Director Hinman about who said

 4    what to whom with respect to XRP or Ripple you

 5    would give the same instruction?

 6              MR. TENREIRO:  You are correct.

 7         Q.  And just so the record is clear, have you

 8    had communications with third parties -- and by

 9    third parties we use Mr. Tenreiro's formulation,

10    people other than SEC employees, other than

11    employees of other domestic or foreign governments,

12    or representatives of Ripple -- since you left the

13    commission as to whether XRP or transactions in XRP

14    is a security under the federal securities laws?

15         A.  No.

16         Q.  How are you currently employed?

17         A.  I'm a senior advisor for Simpson Thacher

18    as well as a group called AndVest as well as

19    Andreessen Horowitz, basically consulting

20    arrangements.

21         Q.  So you're a senior advisor to Simpson

22    Thacher?
```

28

```
 1        A.  Yes.
 2        Q.  And with respect to AndVest you said you
 3   were a senior advisor?
 4        A.  Yes.  AndVest, A-N-D-V-E-S-T.
 5        Q.  And is that a compensated position?
 6        A.  Just securities.
 7        Q.  You receive securities as compensation
 8   exchange --
 9        A.  It's a --
10        Q.  Let me finish my question.
11        A.  Sure.  Sorry.
12        Q.  You receive securities in exchange for
13   whatever advisory services you provide to AndVest;
14   is that correct?
15        A.  That's right.  I'm expected to provide ten
16   hours roughly a week of advisory services, and I
17   have shares in AndVest and some of their
18   subsidiaries that vest over time.
19        Q.  Okay.  And what was the third company or
20   entity to which you provide?
21        A.  Andreessen Horowitz.
22            THE REPORTER:  One more time.
```

1          THE WITNESS:  Andreessen Horowitz.  So

2     Andreessen, A-N-D-R-E-E-S-S-E-N, Horowitz.

3          Q.  And is that also -- do you receive

4     compensation for --

5          A.  Yes.

6          Q.  -- services provided to Andreessen

7     Horowitz?

8          A.  Yes.

9          Q.  And what is your relationship with

10    Andreessen Horowitz in terms of time commitment or

11    obligations with respect to --

12         A.  Roughly the same in terms of advisory

13    role, hours per week.

14         Q.  When did you first have communications

15    with Andreessen Horowitz about becoming an advisor

16    to Andreessen Horowitz?

17         A.  Probably in April of this year, maybe --

18    maybe May.

19         Q.  April of 2021?

20         A.  Yes.  Fairly recent.

21         Q.  And what about --

22         A.  Maybe even June.  Actually late May, early

1    June.

2         Q.  But no discussions prior to May or June of

3    2021?

4         A.  Correct.

5         Q.  And what about with AndVest?

6         A.  That was probably in February.

7         Q.  Of 2021?

8         A.  Maybe March.  Yes.

9         Q.  Do you maintain a residence in New York

10   City?

11        A.  No.

12                      (Hinman Exhibit 5 was marked

13                       for identification.)

14   BY MR. FIGEL:

15        Q.  I'd like to show you what I will -- so I'd

16   like to show you a document that I will ask the

17   court reporter to mark as Exhibit 5.  You can just

18   hand it over to him.

19        A.  Okay.

20        Q.  This was intended to save you a little

21   time.  I'm not sure it did.  I'll represent to you

22   this is a document we downloaded from the Simpson

```
 1     Thacher Website.  Have you seen this before?

 2          A.  Yes.

 3          Q.  Did you approve this before it was posted

 4     on the Simpson Thacher Website?

 5               MR. TENREIRO:  Object to form.  Go ahead.

 6          A.  I believe this or a draft similar to this.

 7          Q.  Does this accurately state your

 8     educational background?

 9          A.  Yes.

10          Q.  And does it accurately describe your areas

11     of professional expertise as a -- as a lawyer?

12          A.  I think so, yes.

13          Q.  And does it also accurately describe your

14     employment history before you joined the SEC.

15               I'll tell you what.  I'll withdraw the

16     question.

17          A.  Yeah.  I'm not sure it covers everything,

18     but what's there looks right.

19          Q.  Shortly after you graduated from law

20     school you joined Sherman & Sterling, correct?

21          A.  That's right.

22          Q.  And what was your area -- and you became a
```

1    partner in 1988?

2         A.  That's right.

3         Q.  And what were your areas of practice?

4         A.  Bank finance, corporate securities.

5         Q.  Were you ever a litigator?

6         A.  No.

7         Q.  You left Sherman & Sterling in

8    approximately 2000, correct?

9         A.  That's right.

10        Q.  And you joined Simpson Thacher as a

11   partner?

12        A.  That's right.

13        Q.  And then you resigned from Simpson Thacher

14   in approximately May of 2017 and assumed the duties

15   of the director of the division of corporate

16   finance, correct?

17             MR. TENREIRO:  Objection.

18             MS. KELLY:  Objection to form.

19        A.  I think I may have left Simpson earlier

20   than that.  I had retired as a full general partner

21   at the end of 2016, and then I thought my -- I had

22   a contractual relationship for one particular

1    matter after that and I think that -- I thought

2    that ended in March, but it may have been later.

3        Q.  And, again, at a very high level, what was

4    your area of practice while you were partner at

5    Simpson Thacher between approximately 2000 and when

6    you retired in 2016?

7        A.  Securities offerings.

8        Q.  Again, did you do any litigation?

9        A.  I would assist the litigators in matters

10   that were in my area.

11       Q.  Did you consider yourself a litigator?

12       A.  No.

13       Q.  Did you consider yourself to have

14   expertise in litigation?

15       A.  No.

16       Q.  At any time prior to the time that you

17   became the director of the division of corporate

18   finance did you represent any client engaged or

19   involved in digital asset transactions?

20           MR. TENREIRO:  Object to form.

21       A.  I don't think we had retained a specific

22   client.  There was an associate at the firm, a

1    former associate who had started working with a

2    digital asset company, and they wanted to --

3         MR. TENREIRO:  Wait a second.  Just don't

4    disclose, you know, any communications that might

5    reveal --

6         THE WITNESS:  Yeah.

7         MR. TENREIRO:  Thank you.

8         A.  They had questions of how they could

9    comply with the securities laws.  So they

10   consulted.

11        Q.  Can you identify the client?

12        A.  I don't remember the name of the client,

13   frankly, and it wasn't -- I don't think they ever

14   became a formal client.  It was more helping a

15   former associate think through some issues.

16        Q.  And, again, following Mr. Tenreiro's

17   admonition, I'm not asking for communications with

18   either the associate or with the client.  I'm just

19   asking the general area of the representation.

20        A.  Yeah.

21        Q.  Did you advise that client with respect to

22   whether transactions in digital assets -- and I

```
 1    mean that broadly -- tokens, ICO's, coins were

 2    subject to registration under the federal

 3    securities laws?

 4         A.  Yes, we did.

 5         Q.  And did you reach a conclusion on that?

 6         A.  Yes.

 7         Q.  And, again, at a high level, what was

 8    your -- what was your conclusion?

 9         A.  That they would need to comply with the

10    securities laws and register the offering or have a

11    good exemption.

12         Q.  And what stage of development was this

13    company?

14              MR. TENREIRO:  Object to form.  Also if

15    you can answer that without disclosing

16    communications, factual communications you learned

17    from your client, go ahead.

18         A.  I'm not sure exactly what stage they were

19    at.  So...

20         Q.  Do you recall whether the advice you

21    provided to this client was in connection with an

22    initial coin offering?
```

1     A.  I do recall.

2     Q.  And was it?

3     A.  Yes.

4     Q.  And so whatever advice you provided was to

5     a company that had not yet sold any coins or

6     tokens, correct?

7     A.  I'm not sure.  They may have already

8     raised some funds.  I don't know if they did it

9     through coins or some other method.

10     Q.  And at the time you were providing advice

11     had they developed a network or a product?

12         MR. TENREIRO:  Object to form.

13     A.  I believe they had something developed.  I

14     don't really remember the business plan that well

15     at this point, but they were midstream.

16     Q.  Okay.  All right.  Other than this client,

17     the unidentified client, were there -- did you

18     represent any other client that was engaged or

19     involved in digital asset transactions?

20     A.  Not that I recall.

21     Q.  Prior to the time you joined the SEC in

22     2017, how would you characterize your level of

```
1   expertise with respect to the application of the

2   federal securities laws to transactions in digital

3   assets?

4       A.  I was someone in the firm that people came

5   to with questions of that sort.  So, you know, sort

6   of in the middle.  It was new for everyone, but I

7   had taken an interest in it and had studied it a

8   little bit.  So probably above average, but no one

9   knew a whole lot.

10      Q.  And why is that no one knew a whole lot?

11      A.  Because the instruments were just being

12  shaped and formed and it was early days of this

13  activity.

14      Q.  And there had not been a lot of litigation

15  as to when a transaction in a digital asset would

16  constitute a security, correct?

17          MR. TENREIRO:  Object to form.

18      A.  I don't believe so.

19      Q.  Prior to joining the SEC in 2017 -- and

20  you can just say yes or no for now to avoid the

21  privilege issues -- had you personally represented

22  Andreessen Horowitz or any entity affiliated with
```

1    what is now Andreessen Horowitz?

2        A.  I don't think they were ever a client.

3    They might have been involved with matters I was

4    involved in, but I don't think they were a client.

5        Q.  And how about ███████

6        A.  No.

7        Q.  And how about the Etherium Foundation?

8        A.  No.

9        Q.  And I mean this in a very broad sense When

10   I talk about the Ethereum foundation and I'm

11   reading from language on their Website.  So if

12   you'll bear with me.

13       "The Ethereum Foundation is not a company

14   or even a traditional nonprofit.  Their role is not

15   to control or lead Ethereum, nor are they the only

16   organization that funds critical development of

17   Ethereum-related technologies.  The Ethereum

18   FoundationSo with that very amorphous, broad

19   definition of the Ethereum Foundation do you

20   believe you represented any company, individual, or

21   entity that was involved in the Ethereum Foundation

22   as I just described it?

39

1          MR. TENREIRO:  I'm sorry.  Objection to

2     form.  Go ahead.

3          A.  No.

4          Q.  And same questions with respect not to you

5     but to Simpson Thacher generally.  To your

6     knowledge, prior to May 2017 had Simpson Thacher

7     represented Andreessen Horowitz or any of their

8     affiliates?

9          MR. TENREIRO:  Object to form again.  Go

10    ahead.

11         A.  I don't know of Andreessen being a client

12    of the firm.

13         Q.  And how about ████████

14         A.  Same answer.

15         Q.  And same about the Ethereum Foundation in

16    the broadest definition of their conception of what

17    they are?

18         MR. TENREIRO:  Object to form.

19         A.  Same answer.

20         THE REPORTER:  Guys, you've got to slow

21    down a little, please.

22         Q.  To your knowledge, any time after May 2017

1    did Simpson Thacher represent Andreessen Horowitz

2    or any of its affiliates?

3         A.  So just to be certain, the time frame

4    you're talking about is after May '17 until now?

5         Q.  Yes.  After you joined the SEC, to your

6    knowledge, did Simpson Thacher represent Andreessen

7    Horowitz?

8         A.  No --

9             MS. KELLY:  Objection to form.

10        A.  -- not that I know of.

11        Q.  And is that true to the current -- to the

12   current day?

13        A.  Yes.

14        Q.  And what about ▮▮▮▮▮▮▮ith respect to

15   Simpson Thacher after May 2017.

16            MS. KELLY:  Objection to form.

17            MR. FIGEL:  I'll back up.  Withdrawn.

18            To your knowledge, after May 2017 did

19   Simpson Thacher represent ▮▮▮▮▮▮

20        A.  Not to my knowledge.

21        Q.  And to your knowledge, after May 2017 did

22   Simpson Thacher represent the Ethereum Foundation

1    or any entities or individuals generally affiliated

2    with the Ethereum Foundation?

3            MS. KELLY:  Objection to form, ambiguous.

4        A.  That's pretty broad.  I don't know all the

5    entities that are affiliated with them, but I'm not

6    aware of a connection between the firm and the

7    Foundation.

8        Q.  And I think I asked this, but just so the

9    record's clear, prior to the time that you had --

10   that you joined the SEC in 2017 had you represented

11   any other cryptocurrency company?

12           MR. TENREIRO:  Do you mean other than what

13   we talked about?

14           MR. FIGEL:  Yes.

15           MR. TENREIRO:  Okay.

16   BY THE WITNESS:

17       A.  Not that I recall.

18       Q.  Are you familiar with something known as

19   the Enterprise Ethereum Alliance?

20       A.  Since I left the SEC I became aware of it.

21       Q.  And what is your current understanding of

22   what the Enterprise Ethereum Alliance is?

1      A.  I'm not exactly sure, but I think it's a

2    trade group of some sort that large enterprises

3    that want to understand Ethereum, you know, engage

4    with it to sort of be informed and, you know,

5    facilitate their work in that area.

6      Q.  And to your knowledge, is Simpson Thacher

7    currently a participant in the Enterprise Ethereum

8    Alliance?

9           MR. TENREIRO:  Object to form.

10     A.  I understand that the firm is a member.

11     Q.  Do you know when Simpson Thacher first

12   became a member of the Ethereum -- the Enterprise

13   Ethereum Alliance?

14     A.  I'm not sure.

15          THE REPORTER:  Can I get a spelling on

16   Ethereum.

17          MR. FIGEL:  E-T-H-E-R-E-U-M.

18          THE REPORTER:  Thank you.

19     Q.  I'd like to now direct your attention to

20   the period after you announced your retirement from

21   Simpson Thacher until you joined the SEC as a

22   director of the division of corporate finance?

1      A.  Okay.

2        Did you know Jay Clayton before you joined

3  the SEC?

4      A.  Yes.

5      Q.  And Mr. Clayton was a partner at

6  Sullivan & Cromwell, correct?

7      A.  That's right.

8      Q.  And how did you know him?

9      A.  I think we probably had run across each

10  other over the years.  Jay practices in the same

11  area as I do.  I don't remember a specific matter

12  other than Alibaba, the IPO for Alibaba.  He

13  represented the underwriters and I represented the

14  issuers.

15      Q.  Do you recall when you first met

16  Mr. Clayton?

17      A.  Personally I met him the night before

18  Alibaba started trading because he was at the

19  printer and we met at the printer.

20      Q.  Other than the Alibaba IPO, do you recall

21  any other transactions you worked on with

22  Mr. Clayton?

44

```
1        A.  I think after the Alibaba IPO while I was

2   still in practice he called me up about a matter

3   that involved a firm client and his client just to

4   clarify an issue.

5        Q.  And, again, without getting into the

6   substance of those communications, do you recall

7   which client that was?

8            MS. KELLY:  Objection, not relevant.  You

9   can answer.

10       A.  I don't have a firm recollection.  I have

11  a good guess, but I don't -- I wouldn't be certain

12  which client it was.  It was a private equity

13  client.

14       Q.  Not a cryptocurrency client or a digital

15  asset client?

16       A.  No.  It wasn't a digital issue.

17       Q.  Mr. Clayton appointed you to be the

18  director of the division of corporate finance,

19  correct?

20       A.  That's right.

21       Q.  How did that appointment come about?

22       A.  I had called Jay to congratulate him about
```

1    his being selected as chairman.  We had a

2    conversation, he asked me what I was doing, I said

3    I was retiring, and he said you're too young to

4    retire, why don't you become the direct- -- I'm

5    collapsing a couple conversations, but the gist of

6    it was you're too young to retire, why don't you be

7    the director of corporation finance.

8         Q.  And you resigned from the SEC in

9    approximately December of 2020; is that correct?

10        A.  That's right.

11        Q.  And why did you resign?

12        A.  I had always intended to basically do

13   about four years.  I had delayed my retirement, you

14   know, I'm now 66.  At the time I went into the SEC

15   I was 62, which is the age that I was thinking of

16   retiring.  So I delayed it for quite a while.  So I

17   thought four more years would be about as much as

18   I'd want to do.

19        Q.  I believe you testified generally about

20   this, but I'm going to ask a slightly more specific

21   question.  When you joined the SEC in May of 2017

22   did you consider yourself an expert in the

1    application of the federal securities laws to

2    digital asset transactions?

3            MR. TENREIRO:  Object to form.

4        A.  I don't think I was an expert.  I'm not

5    sure whether experts existed at that point.

6        Q.  Okay.  And why do you state that you

7    didn't think experts existed at that time?

8        A.  Because you asked about the application of

9    the securities laws to digital assets.  I think

10   digital assets were just emerging as a way to raise

11   funds or to potentially create an enterprise, and I

12   don't think people had completely thought through

13   all the ways the SEC -- the securities laws may

14   apply to that activity.

15       Q.  Prior to joining the SEC in May of 2017

16   had you participated in panels or webinars that

17   discussed the application of the federal securities

18   laws to digital asset transactions?

19       A.  No.

20       Q.  Have you written any client alerts about

21   the application of the federal securities laws to

22   digital asset transactions?

1      A.  No.

2      Q.  Had you created any work product that

3  analyzed or discussed the application of the

4  federal securities laws to digital asset

5  transactions?

6        MS. KELLY:  Objection.  Don't answer if it

7  reveals any privileged information.

8      A.  No.

9        MR. FLUMENBAUM:  I'm sorry.  Was that no?

10       THE WITNESS:  That's a no.

11     Q.  When you joined the SEC in May of 2017 had

12  you heard of Ether?

13     A.  Probably.

14     Q.  Do you recall in general what your level

15  of understanding about Ether was when you joined

16  the SEC in 2017?

17     A.  Probably basic.

18     Q.  By "basic" what do you mean?

19     A.  I knew it was a digital asset, had heard

20  that it was used to -- as fuel so people using that

21  coin could in effect have access to computer

22  resources to process smart contracts or other

1    functions on that network.

2        Q.  Had you gone through the -- let's call it

3    the mental exercise of considering how the federal

4    securities laws might apply to transactions in

5    Ether?

6            MR. TENREIRO:  Just to be clear, we're

7    still talking about before the SEC?

8            MR. FIGEL:  Yes.  Yes.

9        A.  I don't think it was specifically Ether.

10   It was more generally to digital assets.  I had

11   familiarized myself with the Howey case at that

12   point I believe.

13       Q.  But you hadn't gone through the mental

14   exercise of thinking -- withdrawn.

15           Other than what you testified to, did you

16   have an understanding of the basic facts about

17   Ether that would be relevant to the application of

18   the Howey test before you joined the SEC?

19       A.  No.

20       Q.  Had you heard of Bitcoin?

21       A.  Yes.

22       Q.  How would you characterize your

1   understanding of Bitcoin as of May 2017 just prior

2   to the time you joined the SEC?

3        A.  Basic.

4        Q.  And by "basic" what do you mean?

5        A.  Basically understood it was a digital

6   asset that transferred through cryptographic

7   addresses on a blockchain.

8        Q.  And, again, had you gone through the

9   mental exercise -- withdrawn.

10        Had you gone through the -- taken any

11   efforts to understand the facts that related to

12   Bitcoin that would inform the analysis of whether

13   the federal securities laws applied to transactions

14   in Bitcoin?

15        A.  No.

16        Q.  Prior to the time you joined the SEC had

17   you heard of XRP?

18        A.  I don't think so.

19        MR. FIGEL:  This will -- this will be

20   opaque, but we have someone who is monitoring the

21   screen and we had a request to put the documents

22   I'm going to be showing you up on the screen, but

1    because I didn't know what order we were going to

2    be offering the documents there's an internal

3    document.

4           So Mr. Hotseater, I'm showing Mr. Hinman a

5    document that is in the outline as Exhibit CC.  I'm

6    sorry.  AA.

7                    (Hinman Exhibit 6 was marked

8                     for identification.)

9    BY MR. FIGEL:

10     Q.  Do you have Exhibit 6 in front of you?

11     A.  The only thing I have is my bio.

12     Q.  So I show you what's been marked as

13   Exhibit 6.  I'll represent to you that I believe

14   this is the Supreme Court's decision in SEC versus

15   Howey.  I just want to follow up on your earlier

16   testimony that you said that prior to joining the

17   SEC you had familiarized yourself with Howey as it

18   may relate to digital assets, correct?

19     A.  I believe so.

20     Q.  Okay.  Approximately when was that?

21     A.  Probably mid 2016, late 2016 I believe.

22     Q.  And did you do that in anticipation of

1    becoming the director of the division of corporate

2    finance?

3        A.  No.

4        Q.  Again, without revealing any privileged

5    communications, what prompted you to read Howey

6    with a view to considering how it might apply to

7    transactions in digital assets?

8        A.  Again, the firm had a former associate who

9    had questions in this area.

10       Q.  So it was in connection with the

11   representation you testified to earlier?

12       A.  Yes.  As I say, I don't recall if the

13   firm -- if the firm ever took that person on as a

14   client or that person's company on as a client, but

15   we were trying to understand this area ourselves

16   and in connection with discussing things with her

17   we familiarized ourselves -- "we" being myself and

18   a few associates that were working with me,

19   familiarized ourselves with the law in the area.

20       Q.  All right.  Prior to joining the SEC had

21   you applied the Supreme Court's decision in Howey

22   to any facts that you had at that time about

1    Bitcoin?

2         A.  No.

3         Q.  Did you have a view as to whether -- prior

4    to joining the SEC as to whether Bitcoin was a

5    security?

6              MR. TENREIRO:  Object to form.

7         A.  I don't think so.

8         Q.  Did you have a view prior to the time you

9    joined the SEC as to whether transactions in

10   Bitcoin were investment contracts?

11        A.  I don't think so.

12        Q.  Prior to joining the SEC had you gone

13   through the effort of applying the Supreme Court's

14   decision in Howey to Ether?

15        A.  No.

16        Q.  Had you formed a view as to whether Ether

17   was a security?

18              MR. TENREIRO:  Object to form.

19              MS. KELLY:  Object to form.  The time

20   period isn't clear.

21              THE REPORTER:  Meaghan, I cannot hear you.

22   Sorry.

53

1          MR. FIGEL:  This whole line of questioning

2    I'm focusing based on communications I've had with

3    Mr. Tenreiro on your thought process before you

4    joined the SEC, but I understand the objection.

5          MR. TENREIRO:  My objection, Reid, is, you

6    know, you're asking him about the application to

7    Ether and, you know, I think we have -- I don't

8    think I understand what that means.  That's my

9    objection.

10          MR. FIGEL:  Prior to joining the SEC had

11    you gone through the effort to determine whether

12    under the Supreme Court's decision in Howey Ether

13    was a security?

14          MR. TENREIRO:  Object to form.

15      A.  I don't believe so.

16      Q.  And had you gone through the effort to --

17    had you come to a view as to whether Ether was a

18    security?

19          MR. TENREIRO:  Object to form again.

20      A.  No.

21      Q.  Had you come to a view as to whether

22    transactions in Ether were investment contracts

54

```
 1   under the federal securities laws?

 2        A.  No.

 3        Q.  And I believe you testified earlier but

 4   just so the record's clear, you had not gone

 5   through the exercise of applying Howey to XRP?

 6        A.  No.

 7        Q.  And you hadn't formed a view as to whether

 8   XRP was a security prior to the time you joined the

 9   SEC?

10        MR. TENREIRO:  Object to form.

11        A.  No.  I wasn't aware of XRP at that point.

12        Q.  Now I'd like to -- this will get trickier

13   for Mr. Tenreiro and me, but now I'm focusing on

14   the point at which you assumed your duties as the

15   director of the division of corporate finance.  So

16   you're now an SEC employee for these questions,

17   correct?  Do you follow me?

18        A.  I got you.

19        MR. TENREIRO:  Is this day one or do you

20   mean the whole period?

21        MR. FIGEL:  From whenever he got his badge

22   forward.
```

1           MR. TENREIRO:  Okay.

2       Q.  But I'm now going to focus on, you know,

3   your first few weeks before.  After you joined the

4   SEC in 2017, who did you consider the members of

5   the staff of the division of corporate finance that

6   you believed were most experienced in the

7   application of the federal securities laws to

8   digital asset transactions?

9       A.  When I first got there?

10      Q.  Uh-huh.

11      A.  When I first got there I didn't really

12  know the staff.  So I wouldn't have a view when I

13  first got there.

14      Q.  Well, as you -- as you assumed your duties

15  and became more familiar with the fact, did you

16  come to have a view as to who -- as to which staff

17  member of the division of corporate finance was

18  most experienced on the application of the federal

19  securities laws to digital asset transactions?

20      A.  Yes.

21      Q.  And who was that?

22      A.  I'm not sure any one person was more