56

1    expert than any other of a group, but there was a

2    group of folks who were following the area.

3        Q.  Can you give me the names of those folks

4    as best you recall?

5        A.  The chief counsel of the division, David

6    Frederickson; Amy Starr, who was someone who was

7    following innovative securities offerings

8    generally; my counsel, Michael Seaman, S-E-A-M-A-N;

9    perhaps Lisa Kohl at that point; Tamara Brightwell

10    at the time was probably my counsel as well.

11        Q.  And if you had to pick one or two people

12    among the people you just identified as the most

13    knowledgeable, who would those people be?

14        A.  Probably David Frederickson and Amy Starr.

15        Q.  Directing your attention to

16    Mr. Frederickson, did Mr. Frederickson consider the

17    application of the federal securities laws to

18    Bitcoin or transaction in Bitcoins, to your

19    knowledge?

20        MR. TENREIRO:  I'm sorry.  Did he

21    consider -- I don't understand the question.  So I

22    don't know if I can --

```
1           MR. FIGEL:  I'll rephrase it.
2           You testified that you got an evolving
3    understanding about the expertise of some of the
4    members of your staff.  I'm now directing your
5    attention to Mr. Frederickson.  Did you come to
6    learn that Mr. Frederickson had considered the
7    application of the federal securities laws to
8    Bitcoin or transactions in Bitcoin?
9           MR. TENREIRO:  I think answer yes or no.
10      A.  I think he had considered it.
11      Q.  Same question with respect to Ether.
12          MR. TENREIRO:  Again, yes or no.
13      A.  I'm not sure, but I think he may have.
14      Q.  How about XRP?
15          MR. TENREIRO:  Yes or no, please.
16      A.  Don't know.
17      Q.  Again, if you can answer yes or no,
18   Mr. Tenreiro will permit it.  To your knowledge,
19   were members of the staff of the division of
20   corporation finance engaged in developing any work
21   product on the issue of whether Bitcoin or
22   transactions in Bitcoins were securities under the
```

58

```
 1    federal securities laws?

 2          MR. TENREIRO:  Answer yes or no is the

 3    instruction.

 4          A.  I believe so.

 5          Q.  And can you identify the work product?  In

 6    other words, I'm not asking what it was.  I'm just

 7    asking was there a memo, was there a file, was

 8    there someplace that the work product that you were

 9    aware of was kept or memorialized in some way?

10          A.  Again, what's the time frame we're talking

11    about because, you know --

12          Q.  Let's say the first six months after you

13    became the director.

14          A.  I had the impression, I don't recall

15    exactly, that a number of digital asset topics had

16    been considered by the folks we're talking about.

17    I'm not sure exactly what work product they

18    prepared.  I had the impression, again, that there

19    may have been some, but I don't have a specific

20    recollection of a particular memo.

21          Q.  And your testimony, just so the record's

22    clear, relates to the application of the federal
```

59

1   securities laws to Bitcoin or transactions in

2   Bitcoin, correct?

3        A.  Yes.  I think that was an issue that had

4   been thought about.

5        Q.  Now, directing your attention to Ether or

6   transactions in Ether, were you aware of any work

7   product that the staff of the division of corporate

8   finance had created that addressed the issue of

9   whether Ether or transactions in Ether were

10  investment contracts under the federal securities

11  laws?

12       MR. TENREIRO:  And that's a yes-or-no

13  question, please.

14       A.  No.

15       Q.  And does your no answer indicate that you

16  do not believe there was any such work product?

17       A.  You asked me if I knew of any work

18  product, and the answer was no.

19       Q.  So as you sit here today, you're not aware

20  of any work product that had been created by your

21  staff on the issue of whether Ether or transactions

22  in Ether were securities or investment contracts

60

```
 1    under the federal securities laws?

 2         A.  And, again, we're talking about the first

 3    six months of my tenure?

 4         Q.  Uh-huh.

 5         A.  No.

 6         Q.  Again, it may have happened, but as you

 7    sit here today, you're not aware of it?

 8         A.  Exactly.

 9             MR. FIGEL:  Okay.  I'm sorry.  We've had a

10    motion to take a break.  Is that all right?

11             MR. TENREIRO:  Whatever you want.

12             THE VIDEOGRAPHER:  Off the record at

13    10:04.

14                     (A short break was had.)

15             THE VIDEOGRAPHER:  Back on the record at

16    10:18.

17    BY MR. FIGEL:

18         Q.  Mr. Hinman, before we took a break you --

19    I'm directing your attention back to the one client

20    you had a general recollection of when you were at

21    Simpson Thacher.  You said you didn't remember the

22    client.  Do you remember the coin that was involved
```

1  in the advice you gave?

2        MS. KELLY:  Objection.

3        MR. GLUCKOW:  I'm afraid that that might

4  reveal the client, and I don't know why you would

5  need to know that for purposes of the deposition.

6  Obviously it's a situation where Mr. Hinman's

7  already indicated he's not even sure that the firm

8  ever took this on as a client.  So...

9        MR. FIGEL:  Let me ask a foundation.

10  Obviously you're going to follow your lawyer's

11  advice I assume.  Do you recall the name of the

12  coin that was at issue with respect to the client

13  or the prospective client --

14        MS. KELLY:  Answer yes or no.

15        MR. FIGEL:  -- that you testified about?

16     A.  No.

17     Q.  Do you remember the name of the associate

18  that you worked with that provided advice?

19        MR. GLUCKOW:  Again, if he tells the name

20  of the associate, it would be easy enough to figure

21  out who the client was, and for confidentiality

22  reasons I think that that's not appropriate and I'm

62

1    not sure why it would be necessary from your

2    perspective.

3           MR. TENREIRO:  Do you want to know if it's

4    related to Ethereum; is that what you're getting

5    at?

6           MR. FIGEL:  Well, what we are trying to

7    identify, which I think is a fair question, I don't

8    believe the names of parties to a representation is

9    privileged unless there's unusual circumstances,

10   and what I'm trying to make a record on is to the

11   type of issues that he would have provided guidance

12   on prior to the time he joined the SEC.

13          MR. TENREIRO:  He already gave you that.

14   He told you, you know, what they talked about.

15          MR. FIGEL:  Right, but I would know more

16   if I knew either the name of the client or the

17   coin.  If you're directing him not to provide that,

18   I understand.  I don't know that's an appropriate

19   privilege objection, but, you know, that's what

20   courts are for.

21          MR. GLUCKOW:  Again, because it was a

22   nonpublic -- because it was nonpublic advice, I'm

63

1      not comfortable with Mr. Hinman testifying to it.

2              So Mr. Hinman, unless you feel

3      differently, I would caution you not to reveal the

4      name of the associate which I think would reveal

5      the name of the client as well.

6          A.  Just to be clear, it's a former associate

7      who was in-house at the client.  So that would

8      identify the client.  It would be easy to identify

9      the client if you knew the name of this person.  So

10     I'm going to say no -- or can't answer.

11         Q.  Again, we will -- I think we've created

12     the record and, you know, just so the record's

13     clear, we don't believe that's an appropriate

14     privilege instruction, but we'll move on.

15             Before the break I was asking you about

16     whether you were aware in, say, the first six

17     months after you became the division director about

18     various work product that had been created.  Were

19     you aware of any work product that had been created

20     within the division of corporate finance as to

21     whether XRP or transactions in XRP were securities

22     or investment contracts under the federal

64

1    securities laws?

2           MR. TENREIRO:  Yes or no, please.

3           A.  No.

4           Q.  And by no does that mean you are not aware

5    of any such work product that had been created?

6           A.  Not that I recall.  The six-month time

7    frame I'd have to think about when did that extend

8    to.  That's starting to get into late 2017.  So I

9    think the answer is no.

10          Q.  All right.  When you left the SEC in

11   December of 2020, who did you consider the most

12   knowledgeable members of the division of corporate

13   finance with respect to the application of the

14   federal securities laws to transactions in digital

15   assets?

16          A.  This is within the division of corporation

17   finance?

18          Q.  Uh-huh.

19          A.  I think as I left Val Szczepanik and the

20   FinHub were still part of corporation finance.

21   They've now become an independent office.  So I

22   would identify Val as the most knowledgeable.

1       Q.  And other than Ms. Szczepanik, anyone else

2    that you considered particularly knowledgeable on

3    that issue?

4       A.  There were a number.

5       Q.  Give me the two or three other individuals

6    other than Ms. Szczepanik that you would consider

7    most knowledgeable?

8       A.  It's really the same group we talked about

9    before.

10       Q.  So Mr. Frederickson?

11       A.  Yes.

12       Q.  And Ms. Starr?

13       A.  Yes.  And others that I mentioned earlier.

14       Q.  All right.  Focusing now on the time frame

15    when you left the SEC.  We'll do essentially a

16    snapshot of your recollection, you know,

17    immediately before your resignation became

18    effective.  Were you aware of any work product that

19    had been generated by the division of corporate

20    finance as to whether Bitcoin or transactions in

21    Bitcoins were securities or investment contracts

22    under the federal securities laws?

66

```
1              MR. TENREIRO:  Yes or no, please.

2         A.  Can you clarify what you mean by work

3    product?  I mean, what would you included in work

4    product in your mind?

5         Q.  I mean in the broadest sense of

6    deliverables that a lawyer can -- can provide.

7    Memoranda, collection of facts, evaluation of

8    facts, policy papers.  Again, I'm not asking what

9    they are yet.  I just want to know whether --

10         A.  In that broad -- sorry.  In that broad

11    sense, yes.

12         Q.  And what specific work product had been

13    created on the issue of whether Bitcoin or

14    transactions in Bitcoins were securities or

15    investment contracts at the time you left?

16              MR. TENREIRO:  Wait a second.  So you're

17    asking him was it a memo or was it a video?

18              MR. FIGEL:  Correct.  Yes.

19              MR. TENREIRO:  Thank you.

20         A.  I would think there would be internal

21    correspondence among staff members that would

22    encompass Bitcoin in its characterization as to
```

1    whether it was a security or not at that point.

2        Q.  Are you aware of whether a memoranda on

3    that issue had been prepared?  You can answer yes

4    or no.

5        A.  No.

6        Q.  With respect to Ether, again, the time

7    frame just before you leave the SEC, were you aware

8    of any work product that had been created as to

9    whether Ether or transactions in Ether were

10   securities or investment contracts under the

11   federal securities laws?

12           MR. TENREIRO:  That's a yes or no,

13   please.

14       A.  Again, the time frame we're talking about

15   is created when?  I mean, I know it's what I knew

16   as I left the SEC, but when would this have been

17   created?

18       Q.  At any time -- in other words, it's a

19   snapshot of anything that had been created as of

20   the time you left.

21       A.  Yes.

22       Q.  And yes means you're aware of work

68

1  product?

2      A.  Yes.

3      Q.  Without telling me the substance of the

4  work product, what form did that work product take?

5      A.  Internal memoranda.

6      Q.  Anything else?

7      A.  Potentially e-mails.

8      Q.  Anything else?

9      A.  Well, if you consider speeches work

10  product, I would say there are speeches, statements

11  that probably refer to Ether.

12          MR. FIGEL:  For the hotseat on the line,

13  this is BB in the outline, and we're up to 7; is

14  that correct?

15          THE REPORTER:  Correct.

16              (Hinman Exhibit 7 was marked

17               for identification.)

18  BY MR. FIGEL:

19      Q.  I'll show you what I will ask the court

20  reporter to mark as Exhibit 7.

21      A.  Okay.

22      Q.  I'll represent to you that this is a

1    document that we printed off the SEC's Website, and

2    I believe it is a description on the Website about

3    the division of corporate finance.  Are you

4    familiar with this document?

5        A.  It looks familiar.  Now that you show it

6    to me, it looks like something that was on the

7    Website.

8        Q.  And you'll see it's -- in the lower right

9    it says "Modified September 27, 2019"?

10       A.  Right.

11       Q.  Had you reviewed this Web page during the

12   time of your service as the director of the

13   division of corporate finance?

14       A.  I don't remember specifically reviewing

15   this set of paragraphs, but I do remember reviewing

16   the Website generally, the corp fin part of the

17   Website.

18       Q.  And this isn't a reading test.  I'm just

19   trying to make a clear record.  Could you read out

20   loud for the record the last full paragraph of

21   Exhibit 7.

22       A.  I'm sorry.  The last full paragraph?

1      Q.  Yes.

2      A.  "The division also provides legal and

3  accounting advice and recommendations to the

4  commission and to the public."

5      Q.  You can stop there.  Is that an accurate

6  statement of the work of the division of

7  corporation finance during the time that you served

8  as the director?

9      A.  Actually I think it overstates what the

10  division does in terms of providing legal advice.

11  We're always careful to say we're not providing

12  legal advice to the public in terms of here's what

13  you need to do in this particular matter.  We may

14  provide our thoughts on how the law's applied to

15  particular fact patterns, to the extent you

16  consider a no action letter to be sort of our view

17  of a legal position and things like that, but I

18  don't think we would -- I don't think the division

19  would view itself as counsel to the public or

20  counsel to a particular member of the public, a

21  company.

22      Q.  Did you in your personal capacity provide

1    legal and accounting advice to the public?

2         MR. TENREIRO:  While he was a member --

3    while he was the director?

4         MR. FIGEL:  Yes.

5         A.  I don't believe so.

6         Q.  Did your responsibilities as the director

7    of the division of corporate finance include

8    meeting from time to time with lawyers and industry

9    participants to discuss legal and accounting issues

10   related to the application of the federal

11   securities laws to transactions in digital assets?

12        A.  Yes.

13        Q.  And can you describe -- if you don't

14   accept the characterization from the Web page, how

15   would you describe what service you were

16   provided -- providing as the director in these

17   meetings?

18        MR. TENREIRO:  Object to form and service,

19   but go ahead.

20        A.  In those meetings generally I think what

21   people are gleaning from that is how the staff and

22   how the director of the division views a particular

72

```
1    issue, the application of the law as to a

2    particular issue.  They're looking for our views,

3    how do you look at it.

4         Q.  And you would provide your views as you

5    just defined it to lawyers or industry participants

6    in these meetings, correct?

7         A.  That's right.

8         Q.  And just so the record's clear, you

9    personally met with lawyers and industry

10   participants to discuss the application of the

11   registration and exemption provisions of the

12   federal securities laws to digital asset

13   transactions, correct?

14        A.  Yes.

15        Q.  And as part of your duties as the director

16   of the division enforcement you provided public

17   statements as to the circumstances in which a

18   digital asset transaction could be a security or an

19   investment contract under the federal securities

20   laws, correct?

21             MR. TENREIRO:  Object to form.  What do

22   you mean as part of your duties?  Did you mean
```

```
 1    during his time there, or are you asking him for

 2    what his --

 3            MR. FIGEL:  Let me make sure you

 4    understand my question.  You were the director of

 5    the division of corporate finance, correct?

 6        A.  Right.

 7        Q.  And you had certain duties?

 8        A.  Right.

 9        Q.  And part of those duties included making

10    statements to the public, correct?

11        A.  Again, Jorge's point is sort of is it a

12    duty.  It's something that is often done by the

13    director, but I don't think there's any job

14    description that says you have to do this.

15        Q.  But, in fact, you did do that, correct?

16        A.  That's right.

17        Q.  So going back to my question just so the

18    record's clear --

19        A.  Yes.

20        Q.  -- as part of your actions as the director

21    of the division of corporate finance you provided

22    public statements as to the circumstances in which
```

74

```
1    a digital asset transaction could be a security or

2    investment contract under the federal securities

3    laws, correct?

4         A.  I provided my views on that topic, yes.

5         Q.  And you also provided those views in

6    meetings at the SEC with lawyers representing

7    clients or industry participants, correct?

8         A.  Yes.

9         Q.  And you supervised other staff members of

10   the division of corporate finance who also met with

11   lawyers and individuals involved in digital asset

12   transactions, correct?

13        A.  Yes.

14        Q.  And do you recall the names of staff

15   members of the division of corporate finance who

16   met with lawyers and industry participants to

17   discuss the application of the federal securities

18   laws to digital asset transactions?

19        A.  I certainly remember some of the names,

20   the names I've already talked about I think engaged

21   in those meetings.  There were probably a host of

22   others.
```

1          Q.  Well, just so, again, the record's clear

2     and just so you understand what I'm looking for, is

3     the individuals that you supervised within the

4     division of corporate finance who you knew were

5     meeting with lawyers representing companies or

6     representatives of companies as to the application

7     of the federal securities laws to digital asset

8     transactions?

9          A.  Right.

10         Q.  And was there a person that you understood

11    was meeting with your approval with the public on a

12    more frequent basis?  Let me ask the question

13    different.

14              Was there a staff member that you tasked

15    with conducting these meetings when you were

16    unavailable?

17         A.  Different staff members would attend

18    different meetings.  Val Szczepanik as the head of

19    the FinHub, you know, this innovative -- financial

20    center for innovation, I'm not quite sure of the

21    exact translation of FinHub, that was part of her

22    day-to-day work to engage those meetings, as well

1    as many others.

2         Q.  Was Ms. Starr someone who you understood

3    met frequently with third parties to discuss the

4    application of the federal securities laws to

5    digital asset transactions?

6         A.  She did meet on -- you know, I don't know

7    if frequent -- you know, define frequent, but I

8    think she met on a number of occasions with folks

9    in that area.

10        Q.  If it were possible to have a list of

11   every staff member of the division of corporate

12   finance who met with a third party and you had a

13   tally for meetings, who do you think would be at

14   the top of the list?

15        A.  Val.

16        Q.  Okay.  And who would be second?

17        A.  There are a lot of people that went

18   together to these meetings.  So hard to say.

19        Q.  Who in your mind would be the people who

20   would have met most frequently?

21        A.  Mr. Frederickson, you know, Ms. Starr, my

22   counsel Michael Seaman.  In the capacity as my

1    counsel and as deputy chief counsel Tamara

2    Brightwell, John Ingram, who is also in the chief

3    counsel's office, went to a number of these

4    meetings.  They all went to about the same

5    meetings.  They often went together.

6         Q.  And you understood that staff of the other

7    divisions at the SEC also meet with third parties

8    to discuss the application of the federal

9    securities laws to digital asset transactions,

10   correct?

11        A.  That's right.

12        Q.  You never served as the division of

13   investment management, correct?

14            MR. TENREIRO:  I'm sorry.  Object to form.

15   You never served as the division?

16            MR. FIGEL:  As the director of the

17   division of investment management.

18        A.  No.

19        Q.  And you didn't make public statements

20   regarding the policies of the division of

21   investment management, correct?

22        A.  No.

[7/27/2021] Hinman, William Dep. Tr. 7.27.2021

78

```
1          Q.  And you didn't personally provide guidance

2     to third parties or to the public on behalf of the

3     division of investment management, correct?

4          MR. TENREIRO:  Object to form.

5          A.  No.

6          Q.  Okay.  You also didn't serve as the

7     director of trading and markets, correct?

8          A.  That's right.

9          Q.  And you didn't make public statements

10    about the policy of the director of the division of

11    trading and markets, correct?

12         A.  Not that I recall.

13         Q.  And you didn't provide guidance personally

14    to the public on behalf of the division of trading

15    and markets, correct?

16         MR. TENREIRO:  Object to form.

17         A.  I don't believe I did.

18         Q.  If I could just ask you to go back to

19    Exhibit 5, which is your bio on the Web page.  I

20    just want to make sure that I ask you one more

21    question on that.

22         A.  Sure.
```

79

1      Q.  As you review that do you see anything on

2   that document that's inaccurate or untruthful?

3      A.  I don't think so, no.

4      Q.  And any material omissions about your

5   professional background from that document?

6         MR. TENREIRO:  Objection to form.  Just

7   give him a second, please, just to look at it

8   again.  Thank you.

9              (Witness reviewing document.)

10      A.  This looks accurate to me.

11      Q.  I'd like to direct your attention now to

12   the second page, the first full paragraph, second

13   complete sentence.  "He also provided," could you

14   just read that into the record.

15      A.  "He also provided critical and timely

16   guidance to market participants on emerging issues

17   ranging from innovation such as direct listings and

18   digital assets and novel offerings such as direct

19   listings and special purpose acquisition offerings

20   to questions arising from the impact of COVID-19,

21   the effects of Brexit, the replacement of LIBOR,

22   and the disclosure of risk related to foreign

```
 1      issuers and emerging markets."

 2           Q.  And, again, that's an accurate statement?

 3           A.  Yeah.  Yeah, I think that's right.

 4           Q.  I'd like to direct your attention to the

 5      term "digital assets" in that sentence.  What was

 6      the critical and timely guidance you provided to

 7      market participants with respect to digital assets?

 8           A.  I think the division while I was there

 9      provided guidance in a number of arenas, meetings

10      with market participants, speeches, testimony in

11      front of Congress about the application of how the

12      division viewed the application of the federal

13      securities laws to digital assets.

14           Q.  We'll come to the meetings later.  Did you

15      consider your June 14th, 2018 speech an instance in

16      which you provided timely guidance to market

17      participants with respect to digital assets?

18           A.  I think it was a time when we provided

19      guidance to the marketplace, yes.

20           Q.  And in what respects was your June 14,

21      2018 speech critical and timely guidance?

22                MR. TENREIRO:  I'm going to object to the
```

81

```
 1    form.  You know, this is -- you can answer, but
 2    you're looking at Simpson's Website and you're
 3    assuming something that's not in evidence that
 4    they're referring to that speech.  But go ahead.
 5            MR. FIGEL:  Let's make sure the record's
 6    clear.  You just testified, if I understood your
 7    testimony, that you considered your June 14th, 2018
 8    speech an example of timely and critical guidance
 9    on digital asset transactions, correct?
10        A.  Yes.
11        Q.  Now I'm asking you what about that speech
12    in your opinion made it critical and timely
13    guidance?
14            MR. TENREIRO:  Don't disclose, you know,
15    deliberations with the staff of the SEC or facts
16    that you might have learned from your discussions
17    with the staff of the SEC or commissioners.
18        A.  Right.  Well, for that -- for that
19    particular speech I think it was a continuation of
20    some themes that had been articulated in the Dow
21    case, in my congressional testimony.  I'd have to
22    go back and look at times I spoke publicly whether
```

82

```
1    some of these things had been said before or not.

2    That speech in part because I think it was covered

3    by Yahoo News got a fair amount of publicity and

4    got more coverage than some of the earlier

5    discussions.

6         Q.  What in your mind was significant about

7    that speech?

8              MR. TENREIRO:  Again, same instruction not

9    to disclose.  If you can -- if you can answer that

10   question without revealing what's in your mind

11   because of discussions that you had with SEC staff

12   or commissioners.

13        A.  I think that speech, you know, provided a

14   framework for the marketplace to think about

15   digital asset offerings generally.  I tried to

16   provide things that would make an offering more

17   likely to be viewed as a security or less likely,

18   to provide contrast, and to give folks a sense of

19   the kind of thing that we did not think the

20   securities laws applied to.  We spoke about -- a

21   little bit about Bitcoin and more about Ether as

22   currently being offered, but trying to make clear
```

1    that depending on how it was being offered that

2    could still be a securities offering.  But trying

3    to provide examples.

4                        (Hinman Exhibit 8 was marked

5                        for identification.)

6    BY MR. FIGEL:

7        Q.  Needless to say, we'll come back to the

8    speech.  I'm going to shift gears for a moment.

9    I'm now going to show you a document that I will

10   ask to be marked as Exhibit 8, and for the hotseat

11   it's in the outline as UU.  I'm sorry.  UUU.

12          Are you familiar with Exhibit 8?

13       A.  Yes.

14       Q.  And what is Exhibit 8, Director Hinman?

15       A.  I think this was a blog posting that was

16   done by Andreessen Horowitz with respect to a

17   cryptofund they were just closing on.

18       Q.  As relates to you, do you see anything in

19   this document that is inaccurate or untruthful?

20          MS. KELLY:  Take a moment to read.

21       A.  Yes -- no, I don't see anything that's

22   inaccurate.  Sorry.

84

```
 1            MR. FIGEL:  Madam Court Reporter, is there
 2   a quick way to get to the bottom of the text?
 3            THE REPORTER:  There's a resume button.
 4   Are you good?
 5            MR. FIGEL:  I got it.  Thank you very
 6   much.
 7       Q.  Did you review this blog post before it
 8   went out?
 9       A.  I think I saw an earlier draft, but yes.
10       Q.  All right.  Do you see at the bottom of
11   the first page your name in bold?
12       A.  Yes.
13       Q.  Could you read for the record the first --
14   the first two sentences of that paragraph.
15       A.  The entire paragraph then?
16       Q.  Yep.
17       A.  Okay.  "Bill Hinman, the former director
18   of the Securities and Exchange Commission's
19   division of corporation finance, joins us as an
20   advisory partner.  Bill spearheaded the SEC's early
21   work with digital assets and made critical
22   contributions that provided clarity to companies
```

1    operating in the space.  Bill will provide valuable

2    insights to us and our portfolio companies as well

3    as play a key role in shaping the future regulatory

4    environment in which we and they operate."

5         Q.  Now, as I read this paragraph, it relates

6    to work that you did personally; would you agree

7    with that?

8              MR. TENREIRO:  Object to form.

9         A.  It says I spearheaded the early work,

10   which would mean I think they're talking about me

11   leading the work.

12        Q.  Fair enough.

13             So directing your attention to the

14   sentence you spearheaded the SEC's early work with

15   digital assets; do you see that?

16        A.  I do.

17        Q.  What early work with digital assets did

18   you spearhead while you were the director of the

19   division of corporate finance?

20        A.  So I'm trying to think about what was

21   going on when, but I think the -- one of the first

22   things might have been the Dow case, which was a

86

1    21A report issued by corp fin enforcement, I think

2    maybe division of investment management,

3    articulating why in that particular case the staff

4    viewed the offering done through the Dow as a

5    securities offering.  That was early -- there were

6    a number of ICO's that were happening at that time.

7    So I would have been talking to folks about those

8    as well.

9        Q.  Okay.  I'd like to focus on the verb

10   "spearheaded."  What specifically did you do --

11   withdrawn.

12        What early work at the SEC did you

13   personally spearhead that made critical

14   contributions and provided clarity with respect to

15   digital asset transactions?

16        MR. TENREIRO:  I'm just going to just

17   again caution the witness not to discuss

18   deliberative process communications.

19        A.  Yeah.  Some -- it's hard to answer without

20   getting into the deliberative process in terms of

21   who I talked about -- you know, who I talked to

22   what about, but --

87

1    Q.  I don't want to interrupt you, but just so

2    the record's clear's so I think we can navigate

3    Mr. Tenreiro's suggestion, I'm not asking you about

4    the communications.

5    A.  Yeah.

6    Q.  Think about it as, you know, what the

7    project was or what the output is that you

8    spearheaded, in other words, what effort?

9        MR. TENREIRO:  I understand, but the

10   problem is some of the projects might be things

11   that are part of the deliberative process that are

12   not final that have not been disclosed.  So that's

13   the genesis of my instruction.  I get that you're

14   trying to get not at the communications, but there

15   might be projects that are not being -- that are

16   being discussed as part of the deliberation.

17       So I have to repeat the instruction.  I

18   appreciate what you're trying to get at, but I have

19   to repeat the instruction.

20       MR. FIGEL:  With Mr. Tenreiro's

21   instruction, can you identify any actions or events

22   that you spearheaded that was the early work of the

[7/27/2021] Hinman, William Dep. Tr. 7.27.2021

88

```
 1    SEC with respect to digital asset transactions?
 2         A.  In terms of important work, I think the
 3    Dow as I talked about was something that I took a
 4    pretty significant role in.
 5         Q.  Anything else?
 6         A.  There were other ICO cases where folks
 7    would come to the division and ask for the
 8    division's views.  Again, I'm having a hard time
 9    not getting deliberative process, but there were
10    those types of things.  There was meetings with
11    market participants about, you know, how to do a
12    securities offering compliance, there were legal
13    groups that would come in, you know.  So if it was
14    something that involved digital assets in corp fin,
15    I was fairly involved.
16         Q.  Did you spearhead the SEC's early work in
17    enforcement actions with respect to ICO's?
18              MR. TENREIRO:  Object to form.
19         A.  I don't think it's fair to say I
20    spearheaded the enforcement work.  I think I played
21    a significant role in some of the enforcement cases
22    in terms of providing thoughts about how the
```

1    application of the securities law may be relevant.

2        Q.  Right.  So we'll put out the ICO

3    enforcement actions.  Anything else that you can

4    identify that you personally spearheaded as the

5    director of the division enforcement?

6            MR. TENREIRO:  Objection.  He was not the

7    director of the division of enforcement.

8            MR. FIGEL:  I'm sorry.

9            MR. TENREIRO:  I'm also objecting to

10   "spearheaded," by the way, just to be clear.  So

11   you might want to try a different word.

12           MR. FIGEL:  I'm using the word in the

13   document.

14           Mr. Hinman, I misspoke about the division

15   of enforcement.  While you were the director of the

16   division of corporate finance, can you identify any

17   other events, actions, statements that you

18   spearheaded that made a critical contribution or

19   provided clarity to companies operating in the

20   space?

21       A.  Any other while I was the head of the

22   division?

90

1          Q.  Right.  As I understand it, you identified

2     the Dow report?

3          A.  Right.

4          Q.  And I'm asking if there's anything other

5     than the Dow report and ICO enforcement actions?

6          A.  I'd have to go back and look at a time

7     line of all the public speeches I gave where this

8     topic was there, but this was a topic that was of

9     general interest to the marketplace.  So it was

10    usually something I would cover in a PLI discussion

11    of securities laws.  I'd have to go back and look

12    at my calendar to see when each of those happened

13    and that kind of thing.  There was a speech you

14    referred to already, there was staff guidance that

15    was put out in this area.

16         Q.  What was the staff guidance that you have

17    in mind?

18         A.  There was something called -- I have to

19    think about what the name was, but there was a

20    framework for analysis of issues in this area that

21    the staff published on the Website.

22         Q.  That was what FinHub I believe put out,

1    correct?

2         A.  FinHub which was then part of corp fin,

3    yes.

4         Q.  Other than the framework, can you identify

5    any other guidance that the division of corporate

6    finance put out while you were director?

7         A.  You know, "any other" is broad, but,

8    again, some of the things that we did were I asked

9    Val to have office hours where she would go out and

10   make herself available to people who had any

11   questions in this space around the country, not

12   just people having to come to D.C. to do this.

13        Q.  Okay.

14        A.  Again, a number of speeches.  I think the

15   framework came out maybe in two bites where there

16   was something done at the time of the speech or

17   maybe even a little bit before the speech and then

18   in a little more plain English version and a longer

19   version after.  Yeah.

20        Q.  Now, directing your attention to the

21   phrase "critical contributions that provided

22   clarity to companies operating in the space."  Can

92

1    you identify what issues you are referring to here?

2    Withdrawn.

3          Can you identify what issues this document

4    refers to that you believe you provided clarity on

5    with respect to digital asset issues?

6          MR. TENREIRO:  Object to form.

7      A.  I think it's the things we've been talking

8    about.

9      Q.  Nothing else comes to mind when you're

10   talking about the clarity of an issue as opposed to

11   a speech or a more generic event?

12     A.  Well, again, I'm a little bit hamstrung by

13   not wanting to get into deliberative process.

14   That's internal.  In terms of external things,

15   there were a number of law firms that are active in

16   this space that would come and visit with the SEC,

17   you know, talk about the prospects for a no action

18   letter in a particular area.  We did do a number

19   of -- not number, a few no action letters in this

20   space for people who wanted to use a digital token

21   to have a business offering that they felt wasn't a

22   securities offering.  They would come to the SEC

1   and meet with my colleagues about does this look

2   like a security or something that could be done

3   without implicating the securities laws.  We did a

4   lot of that kind of activity.

5        Q.  Did you answer that question to lawyers

6   that came in to speak to you how can I do a -- I'm

7   sorry.  Withdrawn.

8             You said in substance, if I understand

9   your testimony, that law firms would come in and

10  meet with you and your colleagues and ask questions

11  does this look like a security or something that

12  would be done without implicating the securities

13  laws?

14       A.  Correct.

15       Q.  Can you be more specific about what the

16  issues were that these lawyers brought to you and

17  your staff?

18       A.  Well, the easiest ones to talk about would

19  be the ones where no action letters were issued.

20  There was a young man who had developed a coin to

21  be used on video sites that, you know, could be

22  exchanged and had some liquidity, but it didn't

94

1    look like an investment opportunity.  His counsel

2    put together a set of facts that was presented, and

3    the division agreed that that did not look like a

4    securities offering and they would recommend no

5    action to enforcement if they were to proceed with

6    that offering without registering.

7             Same thing in the digital token that was

8    designed to help people who were trying to charter

9    private jets without going through a lot of

10   background checks and without a lot of difficulty,

11   and it was a payment mechanism for that as well as

12   a way to simplify that process.  That again is

13   something we gave a no action letter on.

14            Then some folks would come in and we'd say

15   that you're kind of on your own here, you have to

16   decide for yourself, but that's not something we

17   could give you a no action letter on.  We would,

18   you know, provide that kind of dialogue, and then

19   they would potentially come back and revise it.

20        Q.  So the no action letters are public,

21   correct?

22        A.  That's right.

95

1          Q.  So any time the division of corporate

2     finance issued a no action letter that would be

3     publicly available?

4          A.  That's right.

5          Q.  So let's put aside interactions with

6     lawyers and the public that are requesting a no

7     action letter.

8          A.  Okay.

9          Q.  Do you recall other issues that were

10    brought to you and members of your staff about the

11    application of the federal securities laws to

12    digital asset transactions in which they sought

13    guidance without seeking a no action letter?

14         A.  Yes.

15         Q.  Tell me what you -- tell me what you

16    recall on that issue.

17         A.  Frankly, the one I recall the most clearly

18    is probably the one when XRP came in with a person

19    who had my position before me, as well as

20    enforcement counsel.  They were interested in is

21    there a way to restructure what we're doing to

22    bring it within compliance of the securities laws,

96

```
 1    and the first thing I said to them was you're

 2    continuing to offer XRP without any kind of

 3    restrictions that would apply as a securities

 4    offering.  If you want to come into compliance you

 5    have to stop doing that, and they understood that.

 6         Q.  All right.  Other than the issues with

 7    respect to Ripple, can you identify any other

 8    lawyers that came to you, not seeking a no action

 9    letter, but seeking guidance with respect to

10    transactions in digital assets?

11         A.  Yes.

12         Q.  What else do you recall?

13         A.  I remember specifically a group that came

14    in which included ████████      it included I think

15    some people that were not at ████████    They were

16    interested in an ERC-based token I believe that

17    would allow folks that are interested in swapping

18    news stories to create a -- I'm hesitating a little

19    bit because I don't want to talk so much about

20    somebody else's business idea, but they had a

21    business idea that would be mediated by a coin and

22    they were interested in learning how to do that in
```

```
 1    compliance with the securities laws.

 2         Q.  Any other lawyers representing --

 3    withdrawn.

 4         Any other lawyers you recall coming to you

 5    or members of the staff seeking advice on digital

 6    asset -- the application of the federal securities

 7    laws to digital asset transactions other than what

 8    you've testified to?

 9         A.  Yes.  I mean, this is a -- this is a big

10    topic at the SEC.  So there's lots of folks coming

11    in and asking for advice how to comply.  I don't

12    want to get into law firm names or -- unless you

13    think it's relevant, but, you know, other folks at

14    law firms would come in, talk about an idea that

15    would be embedded in a token, and there were a

16    number of folks that said we'd like to do this on a

17    registered basis because we think -- we recognize

18    it is a security and how would we best do that,

19    could we use regulation A, could we use form S1.

20         Because these were somewhat novel

21    securities there were questions around what's

22    material in terms of the disclosures you might have
```

1    to do in that context.  We had those kinds of

2    discussions with XRP specifically, if they were

3    going to register, what would the things be that

4    would be relevant.

5         Q.  Move to strike about XRP because I asked

6    you for your recollection of meetings that didn't

7    involve XRP or --

8         A.  I'm sorry.  I missed that.

9         Q.  There were frequent meetings; is that fair

10   to say?

11        A.  Yes.  I mean, it was something that

12   happened with some frequency at the division.

13        Q.  And when lawyers or industry participants

14   came to you and asked for guidance, I believe you

15   earlier testified that the division of corporate

16   finance didn't provide legal advice, correct?

17        A.  That's right.

18        Q.  So how were you able to -- withdrawn.  Let

19   me try this differently.

20            Did you keep a calendar when you were at

21   the SEC?

22        A.  Yes.

99

```
 1        Q.  And can you describe the -- was it a paper
 2   calendar, technology, digital?
 3        A.  It was an on-line calendar.
 4        Q.  And did you keep it or did one of your
 5   assistants keep it?
 6        A.  A few people had access to it.  So
 7   different folks could either read it or in a few
 8   cases like my counsel could add to it.  And then I
 9   had an assistant who I think had the ability to add
10   or take off things from the calendar as they
11   changed.
12        Q.  And were meetings with lawyers
13   representing clients or industry participants with
14   respect to issues related to the application of the
15   federal securities laws to digital asset
16   transactions reflected on that calendar?
17        A.  Generally.  There might be a meeting that
18   would be on the calendar that I ended up not being
19   able to go to.  There might be meetings that came
20   up that staff had arranged that they would say, oh,
21   we're having a meeting, do you want to drop in,
22   things of that sort.  So in general it's a record
```

100

1    of the meetings that I either had or planned to

2    have, but probably not every single meeting I ever

3    had was on that calendar.

4        Q.  And presumably if you had that calendar in

5    front of you you could identify more specifically

6    some of the meetings you had with third parties in

7    which the application of the federal securities

8    laws to digital asset transactions was discussed?

9        A.  Possibly.

10        Q.  But as you sit here today, other than what

11    you've testified to previously, you don't recall

12    any other meetings, correct?

13        A.  You know, to recall every meeting I had

14    over a four-year period, I mean, I can tell you I

15    tried to describe the kinds of meetings and the

16    things we did.  I'm sure there were additional

17    meetings of importance that we had that just don't

18    come to memory right now, but as you say, if I had

19    a calendar in front of me I would probably remember

20    more of those.

21        Q.  All right.  Going back to Exhibit 8, the

22    paragraph under your bolded name also says that you

1    will "play a key role in shaping the future

2    regulatory environment in which we and they

3    operate."

4        A.   Right.

5        Q.   What actions have you taken on behalf of

6    the A16z cryptofund to shape future regulatory --

7    shape the future of the regulatory environment as

8    it relates to digital assets?

9            MR. TENREIRO:   Object to form.

10       A.   I don't want to get into confidential

11   Andreessen portfolio issues.  So it's very hard for

12   me to actually say that without getting into

13   something where I feel like a confidential matter

14   would be disclosed, but in the last few weeks --

15           MR. TENREIRO:   Wait a second.  Let's not

16   discuss attorney-client communications, work

17   product communications.  If there's anything

18   external, for example, that refers to regulatory,

19   if you've called someone outside of the company in

20   a nonconfidential manner, you can talk about that.

21   Otherwise let's move on.

22       A.   Yeah.  In general I've had conversations

102

1    with some of the -- their portfolio companies about

2    the application of the securities laws.  They want

3    to know how to comply.

4         Q.  You testified earlier you're an advisory

5    partner to the A16Z -- withdrawn.

6              You testified earlier that you're an

7    advisory partner to Andreessen Horowitz, I believe,

8    correct?

9         A.  Right.

10        Q.  Do you provide legal advice to Andreessen

11   Horowitz as an advisory partner?

12        A.  I'm still involved with Simpson.  So there

13   are situations where that can happen.

14        Q.  Do you consider the services you provide

15   to Andreessen Horowitz as an advisory partner to be

16   a representation of Andreessen Horowitz in your

17   capacity as a partner -- as a senior advisor to

18   Simpson Thacher?

19             MS. KELLY:  Object to form.

20        A.  Yeah.  Not unless they've engaged the

21   firm, there's consideration of those things, but at

22   this point I'm more giving them my direct advice.

103

1    But it's very early.  You know, this was June 15th,

2    I believe.

3         Q.  Has Andreessen Horowitz retained you as a

4    lawyer?

5         A.  They've hired me as a senior advisor.

6    It's the advisor to the fund.  So Andreessen

7    Horowitz Capital Management I think is the --

8         Q.  But did they retain you to provide --

9    withdrawn.

10              As an advisory partner to Andreessen

11   Horowitz have you formed an attorney-client

12   relationship with Andreessen Horowitz?

13              MR. TENREIRO:  Object to form.

14        A.  I am not certain as we speak, you know,

15   whether there's an attorney-client privilege there

16   or not.  The things that they ask me about are

17   legal questions generally.

18        Q.  You're familiar with the term "engagement

19   letter"?

20        A.  Yes.

21        Q.  As it relates to a law firm and its

22   clients?

104

1     A.  Uh-huh.

2     Q.  Have you entered into an engagement letter

3  with Andreessen Horowitz as part of your advisory

4  partner role at Andreessen Horowitz?

5     A.  I have a contract with them, not an

6  engagement letter.

7     Q.  Does that contract create an

8  attorney-client relationship in your judgment?

9        MR. TENREIRO:  Object to form.  You're

10  asking for a legal conclusion, but go ahead.

11     A.  I'm not sure.

12     Q.  Has Simpson Thacher executed an engagement

13  letter with Andreessen Horowitz in connection with

14  the advisory services you provide?

15     A.  Not that I'm aware of.

16     Q.  This is a deposition that's been

17  designated confidential.  I don't believe you have

18  established that you have a -- you have privileged

19  attorney-client communications with Andreessen

20  Horowitz.  So I'll put the question to you again

21  just so we have a record.  Mr. Tenreiro can direct

22  you whether to answer.

105

1         What have you done as an advisory partner

2    to Andreessen Horowitz to shape the future

3    regulatory environment in which Andreessen operates

4    with respect to digital assets?

5         MR. TENREIRO:  Before we get to an answer

6    and an objection, Reid, I'm just struggling with

7    the relevance of this.  He didn't talk to them when

8    he was working at the SEC.  This is after his SEC

9    life.  Why are we talking about what he's doing

10   now?  I just don't understand it.

11        We were both at the Court conference.

12   Judge Netburn made some rulings about why she

13   thought you needed to talk to him.  None of it has

14   to do with what he's doing today.  So I understand

15   that there's a designa- -- you know, a

16   confidentiality designation, but despite that, I

17   just don't see why we're talking to a former

18   director of the SEC about what he does after he

19   leaves the SEC.

20        You've asked him about whether he's

21   getting, you know, compensation related to Ethereum

22   or Ethereum-related partners, he's already answered

106

1    those questions.  So can you tell me anything else

2    about why we're talking about this right now?

3         MR. FIGEL:  I don't think I have to create

4    a record on relevance, but I will do it at a very

5    high level.  He has stated publicly on a number of

6    Websites that he is involved in, among other

7    things, shaping regulatory policy.  That seems to

8    be a fair question to -- that seems a fair basis

9    from which to ask him questions about what are the

10   open issues on regulatory policy that he intends to

11   address that weren't addressed when he was the

12   director of the division of enforcement.

13        MR. TENREIRO:  Thank you.  That's a

14   different question than what I heard you ask.  I

15   mean, open issues of regulatory -- you know, are

16   there -- where are the open issues on regulatory

17   policy that you intend to address?  I mean, I think

18   he probably can answer that question.

19        MR. FIGEL:  I'd like to make the record

20   the way I would like to make the record.  I think

21   I'm getting at the same issue but by asking for,

22   you know, facts as opposed to conclusions.

107

```
 1          MR. TENREIRO:  Right.  I just don't want
 2    to get into the confidentiality -- the confidential
 3    information of the current people he's working for.
 4    So that's what I'm trying to skirt around.  It's
 5    not relevant, but let's see what he can answer
 6    without him offering --
 7          MR. FIGEL:  Mr. Hinman, do you understand
 8    the question that I asked you, which is if you're
 9    going to follow Mr. Tenreiro's advice and not
10    identify the specific issue, I still would like to
11    know at whatever level of specificity you can
12    provide what key role you have played in shaping
13    future regula- -- shaping the future regulatory
14    environment as it relates to digital assets.
15          A.  Again, early days, you know, the issues
16    that are relevant today have moved quite a bit.  I
17    don't think people are as focused on is something a
18    securities offering or not.  I think they
19    understand that pretty well.  So the issues today
20    tend to be ones in DFIE, decentralized finance
21    exchanges, cryptocurrencies like fiat,
22    cryptocurrencies -- will the U.S. Treasury form,
```

1    you know, a cryptocurrency or a stable coin.

2          So there's a range of issues that are more

3    topical today that I would think they'll be

4    interested in discussing with me.

5      Q.  Do those topics include shaping regulatory

6    policy as to when transactions in digital assets

7    are investment contracts under the federal

8    securities laws?

9      A.  Again, I don't think that's the key issue

10   today.  I think people understand that pretty well.

11   I don't think there's a lot of shaping to do there.

12   I think the principles are pretty well understood.

13   So I think the issues are more decentralized

14   exchanges, again, fiat currencies being done in a

15   cryptographic way, not so much the old stuff.

16     Q.  So do you believe that the state of law

17   and regulation has evolved to the point where there

18   are no open issues with respect to the application

19   of the federal securities laws to digital asset

20   transactions?

21         MR. TENREIRO:  Let's start with a yes or

22   no on that, please.

109

```
1          A.  No.

2          Q.  And why not?

3              MR. TENREIRO:  Just don't -- don't

4     discuss -- I'm sorry.  Don't discuss your

5     communication -- you know, your thought processes

6     with the staff or the commissioners.

7          A.  When you say are there no open issues, I

8     think in the areas that I've talked about, which I

9     think are the more topical areas today, how, you

10    know, exchange rules apply to digital exchanges

11    that are decentralized, how laws may apply to a

12    stable coin or a fiat currency that's been done in

13    a digital manner, I think there's still questions

14    around that, but, you know, you asked a very broad

15    question, are there any open issues in this area,

16    and I think there are some.

17         Q.  Let's just make sure we're communicating.

18    We have an agreement on defined terms.  Do you have

19    an understanding what the term "digital asset"

20    means?

21         A.  Yeah.  I think that's a very broad term

22    too.  I mean, I think there's nothing that says --
```

110

1    there's no book that says a digital asset is this

2    or that, but I think people use it as shorthand to

3    mean things that may be recorded on the blockchain

4    for the most part, you know, transfers of assets

5    that are recorded on the blockchain, a blockchain.

6         Q.  Are you familiar with the term

7    "cryptocurrency"?

8         A.  Yes.

9         Q.  What's your understanding of the term

10   "cryptocurrency"?

11        A.  Again, I don't think there's a defined

12   specific term of art, but I think a cryptocurrency

13   would be an asset that generally would have a

14   stable value so it could be used as a currency and

15   transfer on the blockchain.  Some people would say

16   Bitcoin is, which obviously doesn't have a stable

17   value, but, again, it kind of depends on context

18   and how people are looking at that issue.

19        Q.  So fair to say there's still uncertainty

20   on the basic definition of what is and what is not

21   a digital asset, correct?

22             MR. TENREIRO:  Object to form.

1          MS. KELLY:  Object to form.

2      A.  I think because of the flexibility of the

3  blockchain mediated assets, you know, you could

4  make them into almost anything.  You need to look

5  at the facts and circumstances of a particular

6  asset to sort it out.  So is that uncertainty or is

7  that just someone's created something innovative

8  and you need to think it through in terms of how

9  the securities laws apply.

10      Q.  What is your understanding as to how a

11  cryptocurrency is different from a digital asset?

12          MR. TENREIRO:  Object to form.  Go

13  ahead.

14      A.  I think when people -- again, not solid

15  defined terms here, but I think when people refer

16  to a cryptocurrency versus a digital asset,

17  generally they're trying to talk about an asset

18  that may be a substitute for a fiat currency but

19  also recorded on the blockchain.

20      Q.  And what would be the substitute for the

21  fiat currency as you just testified?

22      A.  Like a U.S. dollar coin -- what do you