1  mean?

2      Q.  I'm talking about digital asset versus

3  cryptocurrency, what is the substitute for a fiat

4  currency?

5          MR. TENREIRO:  Which of those two is?

6          MR. FIGEL:  Which of those two, yes.

7      A.  Again, depending on the nature of the

8  asset, you know, cryptocurrency would generally

9  refer to something that is meant to be a

10  substitute.  Whether it is or not, you know, that

11  sort of depends on how it's used.

12      Q.  Did you have that understanding on

13  June 14th, 2018 when you delivered your speech?

14          MR. TENREIRO:  What are you --

15          MR. FIGEL:  The difference between

16  cryptocurrency and digital asset.

17          MR. TENREIRO:  Yes or no, please.

18      A.  In terms of how those terms are generally

19  used, that would be a yes.

20      Q.  Now, focusing on your life prior to the

21  time you became the director of the division of

22  corporate finance, had you ever purchased any

113

1    cryptocurrency?

2         A.  No.

3         Q.  Had you ever purchased a digital asset?

4         A.  No.

5              MR. TENREIRO:  I'm just going to object to

6    the form.  Go ahead.  He answered.

7              MR. FIGEL:  Give me just one second.

8         Q.  And with respect to your ownership of

9    digital assets, did you own or control directly or

10   indirectly, i.e. through a fund or through a

11   third-party investment, any digital assets?

12             MR. TENREIRO:  Object to form.  He said he

13   has no ownership of digital assets.

14        A.  Not that I'm aware of.  I mean, money

15   funds today may have some digital assets that I'm

16   not aware of, but I have no specific digital asset

17   investments.

18        Q.  And has that always been true, I mean,

19   pre-SEC, during SEC, and currently?

20        A.  Yes.  The SEC had a policy against folks

21   owning digital assets for quite some time.

22        Q.  All right.  Prior to the time you joined

114

```
 1    the SEC, did you own any security that had been

 2    issued by a cryptocurrency enterprise?

 3         A.  Not that I'm aware of.

 4         Q.  Prior to the time that you joined the SEC,

 5    did you own any security issued by any digital

 6    asset enterprise?

 7         A.  Not that I'm aware of.

 8         Q.  And as you sit here today, do you own any

 9    securities -- by that I mean directly or

10    indirectly -- issued by a cryptocurrency

11    enterprise?

12         A.  Not that I'm aware of.

13         Q.  And as you sit here today, do you own any

14    security directly or indirectly issued by any

15    digital asset enterprise?

16         A.  Not that I know of.

17         Q.  I don't want to get into the specifics of

18    your financial arrangement with Andreessen

19    Horowitz, but I assume you do not have a

20    participatory interest in their cryptofund; is that

21    correct?

22         A.  Part of my role there will entitle me over
```

115

1    time to have a piece of the fund.

2         Q.  But as you sit here today, you do not?

3         A.  I don't have that, no.

4         Q.  I think the record is clear, but let me

5    just ask.

6         A.  Sure.

7         Q.  As you sit here today, you do not own

8    directly or indirectly any type of financial

9    interest in any security issued by a cryptocurrency

10   company or a digital asset; is that correct?

11              MR. TENREIRO:  Object to form.

12        A.  Not that I'm aware of, no.

13              MR. FIGEL:  Thank you.  Let's take a

14   break.

15              THE VIDEOGRAPHER:  Off the record at

16   11:21.

17                      (A short break was had.)

18              THE VIDEOGRAPHER:  Back on the record at

19   11:37.

20   BY MR. FIGEL:

21        Q.  Mr. Hinman, I just want to clarify one

22   portion of your prior testimony.  We were referring

116

1    to I believe your Simpson Thacher Web page.

2         A.  All right.

3         Q.  In which I asked you what the critical and

4    timely guidance that you provided was.

5         A.  Right.

6         Q.  And your testimony talked about -- I'm

7    quoting from the rough notes -- "I think the

8    division while I was there provided guidance in a

9    number of arenas" and went on.

10             Distinguishing between the division while

11   you were there and you personally, what did you

12   individually do to provide critical and timely

13   guidance on digital asset issues?

14             MR. TENREIRO:  Object to form.

15        A.  Okay.  One of the things that we -- that I

16   did in my role as the director where you had staff

17   doing a lot of things under my direction was to

18   form FinHub.  You know, Val Szczepanik was someone

19   who had a lot of experience in this area.  It

20   seemed to me there was a need to coordinate across

21   the divisions.  Val was a good person to do that

22   and to have a staff that would help field these

1   questions.  You know, there were enough questions

2   coming in and interest in the area that we wanted

3   to dedicate some folks to that.  You know, in terms

4   of things I personally did, that would be an

5   example.

6           Other examples are, you know, the

7   questions came up I think it was in early 2018 in

8   congressional testimony, you know, how is -- how

9   are you, Mr. Hinman, looking at this, and I spoke

10  about, you know, some of the issues that were

11  relevant to investor protection in the digital

12  asset space, the dangers of not having good

13  disclosures, information asymmetries I think I

14  spoke a little bit about.  At the same time the

15  division and the commission I felt wanted to

16  balance investor protection and the benefits of

17  innovation.

18          So I spoke quite a bit about that in that

19  context, and, again, you know, whenever I was out

20  speaking that was something I did individually.

21  Whenever I attended a meeting generally if I were

22  in attendance I would be leading the meeting.

118

```
 1            So a number of instances.

 2       Q.  Okay.  So picking up on your testimony

 3   with respect to Ms. Szczepanik --

 4       A.  Yes.

 5       Q.  -- I'd like to show you 9; is that

 6   correct?

 7            THE REPORTER:  Yes.

 8                    (Hinman Exhibit 9 was marked

 9                     for identification.)

10   BY MR. FIGEL:

11       Q.  What I'll ask the court reporter to mark

12   as Exhibit 9.  It's DD in the outline.  Again, I'll

13   represent to you this is a copy of a page on the

14   SEC's Website -- or available on the SEC's Website,

15   which I believe is the press release announcing

16   Ms. Szczepanik in the position that you just

17   described.

18       A.  Okay.

19       Q.  The date of this press release is

20   June 4th, 2018, correct?

21       A.  That's right.

22       Q.  And is that approximately the date on
```

1    which you appointed Ms. Szczepanik to be the senior

2    advisor for digital assets and innovation?

3        A.   That's the date it was announced.  She was

4    sort of functionally operating this way for some

5    time, but in terms of making a formal announcement

6    of it and creating the actual office, yes, June 4th

7    is about the time.

8        Q.   And that office was within the division of

9    corporate finance, correct?

10       A.   That's right.

11       Q.   So Ms. Szczepanik reported to you?

12       A.   That's right.

13       Q.   And this you testified to earlier I

14   believe was one of the examples of an action that

15   you spearheaded as described in the Andreessen

16   Horowitz blog post, correct?

17           MR. TENREIRO:  Object to form.

18       A.   This is an action that was done under my

19   direction.

20       Q.   But this would be an action that would

21   fall within the statement on Exhibit 8 that you

22   spearheaded the SEC's early work with digital

120

1    assets, correct?

2        MR. TENREIRO:  Object to form.

3        A.  You know, I guess it could.  It depends a

4    little bit what you mean by early.  I don't know

5    what the writer of that sentence meant by early,

6    but...

7        Q.  Well, at the time that you -- I'm sorry.

8    Were you finished?

9        A.  Go ahead.

10       Q.  At the time that you created this position

11   I believe you just testified it was because you

12   were receiving many inquiries about the application

13   of the federal securities laws to digital asset

14   transactions, correct?

15       MR. TENREIRO:  Object to form.

16       A.  We formed this because we felt it was

17   useful to coordinate the inquiries across the

18   different divisions.  Even though Val was in my

19   division, our division sort of took the lead on a

20   lot of the thinking in this area.  So she was

21   reporting to me.

22       Q.  But just so the record's clear, when you

1  say coordinate inquiries, you're referring to

2  inquiries from third parties to commission staff,

3  correct?

4      A.  That's right, as well as coordinate across

5  divisions.

6      Q.  Coordinate responses to the inquiries

7  across the division; is that --

8      A.  Or policy across the divisions, yes.

9      Q.  And fair to say that at that time you

10  understood that there was confusion and lack of

11  clarity among industry participants with respect to

12  the application of the federal securities laws to

13  digital asset transactions, correct?

14          MS. KELLY:  Object to form.

15          MR. TENREIRO:  I also object to form, and

16  also I'm going to instruct Mr. Hinman not to

17  answer -- to answer only to the extent he can

18  separate his understanding to the extent he gained

19  it from conversations with commission staff or

20  commissioners.

21      A.  Could you repeat the question?

22      Q.  Sure.

122

1      THE REPORTER:  Do you want me to read it

2    back?

3      MR. FIGEL:  No, I can see it.  I'm just

4    thinking if I can rephrase it to address

5    Mr. Tenreiro's concerns.

6      Q.  I'm asking for your state of mind, right?

7    I'm not asking for communications you had with any

8    other members of the staff.  At the time you

9    created the position of senior advisor for digital

10   assets and innovation you understood that there was

11   confusion and lack of clarity among industry

12   participants with respect to the application of the

13   federal securities laws to digital asset

14   transactions, correct?

15      MR. TENREIRO:  So, again, object to form,

16   but first of all, the foundation there was

17   confusion and lack of clarity, where is that in the

18   record, but most importantly as we discussed

19   before, you're asking him for his views.  But if

20   his views were formed because staff members of the

21   commission in the deliberative process explained

22   things to him, he cannot disclose that information

123

1    to you.  So if he has a view that he can uncouple

2    from that information or those conversations with

3    the staff and the commissioners, he can answer.

4         A.  I think there was a range of

5    understandings.  I think the securities bar didn't

6    have a lot of confusion or lacked clarity about

7    some of the core concepts.  There may be details of

8    particular offerings.  That's why we had FinHub,

9    people could come in and talk about the details of

10   what they wanted to do, but I think the securities

11   bar at this point sort of understood Howey applies.

12        Mr. TENREIRO:  To be clear, Howey applies

13   or how we apply?

14        THE WITNESS:  No.  The case Howey, SEC

15   versus Howey, was sort of the seminole case in this

16   area and was a good set of principles.  If you're

17   trying to sort this out, I think the bar at that

18   point had come to that conclusion.

19        Q.  Do you know Joe Hall from Davis Polk?

20        A.  I do.

21        Q.  Was he a member of the securities bar that

22   you referred to?

1      A.  Yes.

2                      (Hinman Exhibit 10 was marked

3                       for identification.)

4    BY MR. FIGEL:

5      Q.  Let me show you what I'll ask the court

6    reporter to mark as Exhibit 10, which is EE in the

7    outline.  Would you mind handing that to the court

8    reporter?

9      A.  Hand it to the court reporter?

10     Q.  Yes.

11          Mr. Hinman, I'm confident that you're

12   familiar with this document.

13     A.  I am.

14     Q.  I'll represent to you this is a copy of

15   your June 14th, 2018 speech that was taken off of

16   the SEC Website.  You'll see at the top it's

17   entitled "Speech," and it says "Remarks at the

18   Yahoo Finance All Markets Summit:  Crypto."

19          You were the author of this speech?

20          MR. TENREIRO:  Object to form.

21     A.  Yes.

22     Q.  And you were responsible for the content

1   of this speech?

2        MR. TENREIRO:  I object to form.

3        A.  Yes.

4        Q.  And you prepared this speech as part of

5   your duties as the director of the division of

6   corporate finance, correct?

7        A.  Again, I'm not sure I had a duty to

8   provide a speech, but I did do this speech while I

9   was the director, yes.

10       Q.  You prepared this speech as part of the

11  services you provided to the Securities and

12  Exchange Commission in your capacity as the

13  director of the division of corporate finance,

14  correct?

15       A.  I gave this speech while I was the

16  director of the division of corporation finance.

17       Q.  And you knew that this exhibit, we're now

18  talking about Exhibit 10, the document, was posted

19  on the SEC's Website, correct?

20       A.  Yes.

21       Q.  And you understood -- withdrawn.

22            And did you understand prior to the time

126

1    you delivered this speech that it would be posted

2    on the SEC's Website?

3         A.  I think I did, yes.  Normally we would

4    think about that in advance.

5         Q.  Was it your decision to post the speech on

6    the SEC's Website?

7         A.  Yes.

8         Q.  And tell me what the process is by which

9    you made the judgment or the determination to post

10   the speech on the Website.

11        MR. TENREIRO:  I'm going to instruct him

12   not to discuss deliberation with staff or

13   commissioners or their counsel.  So you might want

14   to rephrase.  I mean, the process by which he made

15   the judgment?  I don't know, but go ahead.

16        A.  Do you want to rephrase?

17        Q.  Why don't you try to answer my question.

18        A.  Could you repeat the question?

19        Q.  Sure.  I'll rephrase it slightly.

20        Why did you decide to post Exhibit 10 on

21   the SEC's Website?

22        MR. TENREIRO:  And just, you know, the

127

1    same instruction, but go ahead.

2        A.  Typically if I gave a speech while I was

3    the director I would have it posted just to

4    benefit, you know, the folks who wanted to see it

5    who couldn't go to the conference or hear the

6    remarks live.

7        Q.  And what benefit did you think folks who

8    didn't attend the conference would obtain from

9    having access to your speech?

10           MR. TENREIRO:  Same instruction,

11   Mr. Hinman.

12       A.  I think they would be able to see how the

13   division under my leadership was looking at these

14   issues.

15       Q.  And you didn't personally post the speech

16   on the Website, correct?

17       A.  That's right.

18       Q.  There was somebody in the IT department at

19   the SEC who would post it?

20       A.  That's right.

21       Q.  And did you review it before it was

22   posted, this version?

128

1        A.  I don't know if I reviewed the actual

2    document that was handed over to IT, but I would

3    have looked at -- I've looked at this speech many

4    times before then and my counsel may have been the

5    folks that delivered this to IT.

6        Q.  And presumably you had the opportunity to

7    review your speech prior to your testimony today?

8        A.  Yes.

9        Q.  Are there any statements in Exhibit 10

10   that you do not believe to be accurate as you sit

11   here today?

12       MR. TENREIRO:  Without disclosing

13   deliberations with the staff that might have

14   occurred after the speech was published on the

15   Website.

16       A.  I don't believe so.

17       Q.  So in other words, if you were releasing

18   the speech today and you were still serving as the

19   director of the division of corporate finance,

20   would you edit this speech in any way before you

21   gave it?

22       MR. TENREIRO:  Object to form.

1       A.  I might.  I mean, I'd have to go back and

2   read it and think about, you know, I probably could

3   have said something better or, you know, whatever,

4   added something, but I don't know if I -- I feel

5   good about this speech.  I don't have any desire to

6   edit the speech.

7       Q.  I'm sorry.  You do feel good about the

8   speech?

9       A.  I do, yes.

10      Q.  And you don't as you sit here today see a

11  need to edit the speech?

12      A.  No.  You can always improve something if

13  you read it again, but I don't see a need to do it.

14      Q.  And in the course of your -- I'm not

15  asking you about any communications you had with

16  counsel, but you testified you had the opportunity

17  to review the speech before your testimony today,

18  correct?

19      A.  That's right.

20      Q.  And in that review process did you see or

21  read anything in which you said I could have said

22  that better or differently?

130

```
 1        A.  I don't think so.

 2        Q.  Why did you give the speech, Mr. Hinman?

 3            MR. TENREIRO:  Without disclosing -- you

 4   know, so let's talk about the final decision only

 5   and let's keep it high level, please, without

 6   disclosing the reasons you might have discussed

 7   with staff of the SEC or commissioners.

 8        A.  Okay.  I was asked to attend the summit

 9   and to speak at the summit, and we agreed -- or I

10   agreed to do that.  You know, why I think I gave

11   it?  Because this is an area where people were

12   interested in knowing how the division was looking

13   at these issues.

14        Q.  And did you have an understanding as to

15   why people were interested in how the division was

16   looking at these issues?

17            MR. TENREIRO:  Do not discuss -- or

18   disclose understandings you might have derived in

19   the deliberations or conversations with staff or

20   commissioners.

21        A.  Based on my own meetings up to the date of

22   this speech with outside parties it seemed like
```

131

1    this was an area they, again, were interested in

2    knowing more about how the division itself felt

3    about this area.

4        Q.  And in your own mind did you think that

5    delivering this speech would answer any open issues

6    with respect to the application of the federal

7    securities laws to digital asset transactions?

8            MR. TENREIRO:  So, again, even in his own

9    mind, if it's in his mind because it came from

10   conversations and discussions with staff, please

11   don't answer.  Please try to uncouple what you

12   learned from, you know, your deliberations with the

13   staff to answer his question.

14       A.  Okay.  I'm sorry.  Would you mind asking

15   me the question again?

16       Q.  In your own mind did you think delivering

17   this speech would answer any open issues with

18   respect to the application of the federal

19   securities laws to digital asset transactions?

20       A.  I think it would inform the marketplace of

21   how corporation -- the division of corporation

22   finance and I felt about these topics, but there's

132

1    a whole host of things covered here.

2         Q.  Did you think this -- withdrawn.

3              Did you believe this speech provided

4    clarity to the market with respect to the

5    application of the federal securities laws to

6    digitalize the transactions?

7              MR. TENREIRO:  So same instruction on

8    deliberative process and also object to form.

9         A.  I think it provided clarity as to how I

10   was looking at these issues.

11        Q.  And did you have an -- withdrawn.

12             Did you believe that was new information

13   to the marketplace?

14             MR. TENREIRO:  Same instruction.

15        A.  I think how I felt about things or the

16   framework I had in my mind was, you know, not --

17   wasn't something I had published in a speech

18   earlier.

19        Q.  And what about -- what are the things or

20   the framework that you had in your mind that you

21   communicated in the speech that you had not

22   published or stated earlier?

133

1      A.  Well, as I've mentioned before, a lot of

2   things that are in the speech have been covered in

3   earlier topics, the application of the Howey case

4   in general, our concern about information

5   asymmetries of people who were doing unregistered

6   offerings of tokens.  What's more new here is a

7   framework that was meant to help people analyze,

8   okay, this is what I'm doing, am I offering a

9   security and do the securities laws apply, or at

10   least how is corp fin, the director looking at that

11   issue.

12      Q.  And did you view that as guidance that you

13   were offering to the marketplace that had not been

14   made available in the past?

15      A.  I think the framework was -- you know, in

16   terms of articulating specific factors was probably

17   the -- although we had referred to those things in

18   talking to market participants, I'm not sure we had

19   ever given a speech with the framework laid out the

20   way it is here.

21      Q.  All right.  Just a ministerial point.  So

22   we have the written speech.  We've entered into a

134

1    stipulation with respect to the video, which I'm

2    not going to play for you in the interest of

3    respecting your time.

4         Was there a substantive difference between

5    the words you spoke on the video and the published

6    remarks in Exhibit 10?

7         MR. TENREIRO:  I'm just going to object.

8    I understand that you're trying to save time, but

9    he's not looked at it now.  If he recalls from, you

10   know, having reviewed it.  Otherwise they speak for

11   themselves and we have stipulated.  So go ahead.

12        A.  I'm not aware of a major substantive

13   difference.  I do think the oral speech was perhaps

14   a bit shorter than the written speech and I'm

15   pretty sure I didn't read these footnotes in a

16   speech, but may have run out of time and -- may

17   have gotten to nearly all of this, but may have had

18   to cut it a little short in the oral speech.

19        Q.  And in addition the video has questions

20   that you were asked by members of the audience that

21   is not reflected in the published remarks, correct?

22        A.  That's right, yeah.

135

1          Q.  To make Mr. Tenreiro's job a little easier

2     start by answering this question yes or no if you

3     can.  Did you have communications with anyone other

4     than the SEC staff about the substance of your

5     remarks in the June 14th, 2018 speech before you

6     gave it?

7          A.  By "SEC staff" you mean all the SEC

8     personnel?

9          Q.  Uh-huh.

10         A.  No, not on the substance.

11         Q.  You earlier testified to the Dow report,

12    correct?

13         A.  Yes.

14                    (Hinman Exhibit 11 was marked

15                     for identification.)

16    BY MR. FIGEL:

17         Q.  I'll show you what's been marked as

18    Exhibit 11, which in the outline is FF.  I'm sorry.

19    GG.  Again, this will be brief.

20         A.  Okay.

21         Q.  I'm not asking you for any communications

22    with anybody on the staff, but did you personally

136

1    participate in drafting the Dow report?

2        MR. TENREIRO:  Yes or no, please.

3        A.  Yes.

4        Q.  So fair to say that you had read and were

5    familiar with the Dow report at or about the time

6    it was issued on July 25th, 2017?

7        A.  That's fair.

8        Q.  And, again, start with a yes or no.  Did

9    you have communications with anyone other than SEC

10   staff members about the content of the Dow report

11   before it was issued on July 25th, 2017?

12       A.  No.

13       Q.  All right.  Remember -- excuse me.  You

14   testified earlier that you and the staff of the

15   division of corporate finance met on a relatively

16   frequent basis with lawyers and representatives of

17   companies that were doing business in the digital

18   assets space, correct?

19       MR. TENREIRO:  Object to form.

20       A.  Yes.

21       Q.  And, again, a rough estimate.  Those

22   meetings occurred once or twice every week,

137

1    correct, during the time you were the director of

2    the division of corporate finance?

3           MR. TENREIRO:  Object to form.

4        A.  Yeah.  I don't -- I'm not sure once or

5    twice a week or, you know, more in one week and

6    less in -- that may be overestimating a little bit,

7    but -- and it changed over time.  So it's hard to

8    say.

9        Q.  Do you recall being interviewed by Chris

10   Brummer at a Georgetown Law School forum in which

11   you stated in substance that you and the staff of

12   the division of corporate finance met with industry

13   participants approximately once or twice a week?

14          MR. TENREIRO:  Object to form.

15       A.  I don't recall that, but I do remember

16   meeting with Chris.

17       Q.  My trusted aid has told me I misspoke and

18   the communication I'm talking about occurred at the

19   D.C. Fintech Week in 2018.

20       A.  Okay.

21       Q.  Does that refresh your recollection as to

22   whether you stated publicly that you and other

138

1    staff members of the division of corporate finance

2    met with industry participants about once or twice

3    a week to discuss digital asset issues?

4        A.  It doesn't refresh my memory, but that

5    number sounds about right maybe at that point in

6    time.

7            MR. FIGEL:  Mr. Hotseat, if you could cue

8    up tab HH to 10 minutes and 9 seconds to 10 minutes

9    and 14 seconds.

10           MR. TENREIRO:  Oh, I'm sorry.  Before we

11   get there, can you state on the record what we're

12   seeing since we're not going to get a printed copy

13   of this?  For example, one way that we could do

14   this that has worked in the past for YouTube is

15   e-mail us the address that he's showing, and that

16   way we all can be in agreement as to what address.

17   Or you've printed it?  Okay.

18           MR. FIGEL:  Yep.  Do you want to just hand

19   these out?  We can mark it as an exhibit.

20           MR. TENREIRO:  So mark it as 12 if you

21   want.

22           MR. FIGEL:  So we'll mark this as

139

1    Exhibit 12.  I don't know that you need to see it.

2    I'll read into the record this is a portion of a

3    video that is available at the YouTube address that

4    is reflected on Exhibit 12.

5                        (Hinman Exhibit 12 was marked

6                         for identification.)

7        A.  Do you know the date there?  I can't read

8    it.

9        Q.  November 5th, 2018, I believe.

10                       (Whereupon a discussion was had

11                        off the record.)

12       MR. FIGEL:  This is the problem with

13   modern litigation.

14       MR. TENREIRO:  Sure.

15       Q.  Do you recall whether you made remarks at

16   the D.C. Fintech Week before or after your

17   June 14th, 2018 speech?

18       A.  I think it was after, but I'm not a

19   hundred percent sure.

20       Q.  And I'll represent to you I believe it to

21   be, although I don't know that I can give you the

22   exact date.

140

```
 1        A.   Okay.
 2             MR. FIGEL:  So Mr. Hotseat, if you could
 3    just play these five seconds.
 4                        (Whereupon a video was played
 5                          for the witness.)
 6    BY MR. FIGEL:
 7        Q.   Any reason to think that that statement
 8    was not truthful and accurate at the time you made
 9    it?
10             MR. TENREIRO:  Hold on a second.  So,
11    Reid, I mean, we would have to see the whole video,
12    and I don't want to do that and put him through
13    this.  There are other parts of that video that
14    might clarify or explain, but -- you know, without
15    understanding and in the interest of saving time
16    I'm going to let him answer, but I'm going to note
17    that objection.  The speech, what he said there
18    will speak for itself.
19        A.   Yeah.  I think that's right at that point
20    in time.  Over time the frequency may have varied.
21        Q.   All right.  We talked about your calendar.
22    Are you aware of any other documents at the SEC
```

1    that would identify when meetings occurred with

2    members of the public with respect to the

3    regulatory status of digital assets?

4        A.  Other documents that would clarify when

5    meetings were held; is that what you asked?

6        Q.  Uh-huh.

7        A.  I would think there might be some, yes.

8        Q.  Okay.  What -- what would those documents

9    be?

10       A.  Folks may have kept notes of meetings,

11   might be on other people's calendars, yeah.

12       Q.  Was corp fin required to publish brief

13   memos reflecting meetings with third parties?

14           MR. TENREIRO:  Brief memos?

15           MR. FIGEL:  Brief memos, yes.

16           MR. TENREIRO:  I object to form.

17       A.  I don't believe so.  I think there might

18   be rules around rulemakings, but not general

19   meetings.

20                    (Hinman Exhibit 13 was marked

21                     for identification.)

22   BY MR. FIGEL:

1      Q.  I'd like to show you what I'll ask the

2    court reporter to mark as Exhibit 13.  Again, this

3    is a document we pulled off of the SEC Website that

4    the lawyers in Washington recognize.  Have you ever

5    seen a document in this format before, Mr. Hinman?

6           MR. TENREIRO:  Just give him a moment,

7    please.  Take your time reading it.

8                      (Witness reviewing document.)

9      A.  Okay.  Yes.  Have I seen a memo like this

10   before; is that the question?

11     Q.  Uh-huh.

12     A.  I don't think I've actually seen one from

13   investment management, but I've seen memos like

14   this.

15     Q.  I'll represent to you in a very generic

16   way that many administrative agencies have

17   requirements that when staff members meet with

18   third parties there's a publication of the meeting

19   in the public record.  Are you familiar generally

20   with that practice?

21           MR. TENREIRO:  Object to form.  Go ahead.

22     A.  Sorry.

143

1          My understanding was that is what is done

2     when there's a rulemaking where the meeting may be

3     relevant where people are potentially commenting on

4     the rulemaking, formal rulemaking, and that seems

5     to be the case here.

6          Q.  All right.

7          Now, using this as a template in the most

8     general sense, during the time that you were the

9     director of the division of corporate finance, did

10    corp fin publish memorandums reflecting meetings

11    with third parties?

12         A.  Generally?

13         Q.  In any circumstance.

14         A.  Sure.

15         Q.  In what --

16         A.  I would think so.  I wasn't responsible

17    for that, but I would imagine if there was a

18    rulemaking going on and there was a group that came

19    in to meet they would publish a memo.

20         Q.  Other than in the context of meetings to

21    discuss rulemaking, are you aware of any practice

22    within the division of corporate finance while you

144

1  were the director in which meetings with third

2  parties would be memorialized?

3       A.  And then published?

4       Q.  And published, yes.

5       A.  No.

6       Q.  Okay.  How about memorialized and not

7  published?

8       A.  Possibly.

9       Q.  And what is that document?

10      A.  I think there might be memoranda just

11 recording we had a meeting with XYZ so other people

12 who weren't there would understand what was

13 covered.

14      Q.  And was there a policy or practice within

15 the division of corporate finance while you were

16 the director with respect to making a written

17 record of what occurred in meetings between staff

18 of corp fin and third parties?

19           MR. TENREIRO:  Let's start with a yes or

20 no for that, please.

21      A.  Was there a policy in that regard?

22      Q.  I didn't mean to say policy.  Policy or

145

1    practice.

2         A.  I'm not aware of a formal policy.  I think

3    some people had practices of recording some outside

4    meetings just so they could share with their

5    colleagues what occurred.

6         Q.  Can you tell us, again, without what's in

7    the memo or what the meeting was in what

8    circumstances those memorandums would be prepared?

9         A.  Again, that's very wide ranging.  I mean,

10   the staff meets with a whole slew of folks on a

11   whole slew of issues, but, again, if the meeting

12   seemed like there was content there that others

13   would benefit from, someone might write up a memo

14   or an e-mail to help explain that to others.

15        Q.  All right.  And if you were -- if you were

16   asked to identify where within the division of

17   corporate finance one would look to find those

18   memos, what would you say?

19        A.  I don't know where the records of that

20   sort are kept.  You know, with e-mail today and

21   electronic records I would think most things are on

22   a server somewhere, but I couldn't tell you exactly

146

1    where.

2        Q.  Are you aware that a file or some digital

3    categorization or catalog in which memoranda

4    reflecting meetings with third parties would be

5    posted or stored?

6        A.  I am not aware of a hierarchy there or a

7    framework to record these in a specific spot, and I

8    would think it would vary considerably.  Maybe it

9    was a matter where enforcement was involved that

10   may be more formal, whereas maybe a less formal

11   meeting would be just an e-mail between folks

12   discussing what occurred.

13       Q.  So what were the processes within the

14   division of corporate finance when you were the

15   director to ensure that the statements made by

16   members of your staff to various third parties

17   would be consistent with statements made by other

18   members of the staff?

19           MR. TENREIRO:  Object to form.

20       A.  Well, one thing I almost always had one of

21   my counsel going to the meeting so I had a sense of

22   what was being said across the division.  We had --

147

```
 1    I don't know if it was weekly or biweekly senior

 2    staff meetings where one of the topics was

 3    consistency of messaging, whether it was in our

 4    reviews or no actions.  I had meetings with anyone

 5    who had delegated authority to provide a no action

 6    letter to preclear those with me if they were new

 7    or novel.  You know, there were a host of things.

 8    You know, the SEC has a number of internal controls

 9    in order to meet its mission that it needs to be

10    consistent.  So there are policies that it follows

11    so that everyone's on the same page.

12         Q.  Let me -- I think I got the notes down.

13    Let's start with your testimony about you typically

14    had counsel attend those meetings?

15         A.  Right.

16         Q.  Which counsel?

17         A.  As director I would have either two or

18    three people designated as my counsel.  Do you want

19    to know their names?

20         Q.  Yes, please.

21         A.  It varied over time.  I think when I first

22    got there it was Rolaine Bancroft, Michael Seaman,
```

148

1    and Tamara Brightwell.

2            THE REPORTER:  What was the first name?

3            THE WITNESS:  Rolaine Bancroft.

4        Q.  Were there other individuals who served as

5    your counsel that would attend these meetings other

6    than the three people as time went on?

7        A.  Yes.  Rolaine rotated off and it was Lisa

8    Kohl for a good portion of my time, K-O-H-L, Lisa,

9    and for whatever reason I'm blanking on Johnny's

10   last name.  I had another counsel Johnny who came

11   in toward the end.

12       Q.  And did you have a practice in which you

13   asked your -- withdrawn.

14           How did you learn from your counsel what

15   was discussed at these meetings with third parties?

16       A.  One addition to the last answer.  Quay

17   Garrison was also counsel for a while.

18           How did I become aware of what was

19   discussed?

20       Q.  Withdrawn.  Let me try to make this easier

21   for you.

22           You testified that your practice was to

149

```
 1    have your counsel attend the meetings with third

 2    parties, and let's just talk about narrowing it to

 3    meetings in which the application of the federal

 4    securities laws to digital assets and digital asset

 5    transactions were discussed.

 6        A.  Right.

 7            MR. TENREIRO:  Well, he didn't testify

 8    about that earlier.  So maybe you have to start

 9    from there.  He was talking generally.

10            MR. FIGEL:

11        Q.  Fair enough.  Was it your practice to have

12    your counsel attend meetings with third parties in

13    which there were discussions about the application

14    of the federal securities laws to digital assets

15    and digital asset transactions?

16        A.  Yes.

17        Q.  And how did you learn from your counsel

18    that attended these meetings that you did not

19    attend what occurred at those meetings?

20        A.  I met with -- when we were physically

21    going to the office prior to COVID their office was

22    across the hall from mine, and we would meet every
```

150

1    day and discuss anything of importance, including

2    meetings that were held with outside groups.

3    During COVID we didn't have as many meetings with

4    outside groups, but there would be phone calls.  I

5    had a daily call during COVID at 9:30 every day

6    with counsel and other senior officers to deal with

7    what was going on in the markets and any issues

8    that were of importance.

9         Q.  Other than oral reports, were there

10   written reports that you received as to what

11   occurred at these meetings?

12        A.  I think occasionally I would get an e-mail

13   or some report on what happened at the meeting.

14        Q.  Other than e-mails, was there -- to your

15   recollection, were memoranda prepared in which the

16   substance of what was discussed at a meeting would

17   be -- would be memorialized?

18        A.  I'm trying to remember.  I think there may

19   have been some written reports for the XRP

20   meetings.

21        Q.  Other than the XRP meetings?

22        A.  Probably, you know, some of the meetings

1    might have been telephonic meetings where

2    discussing some of the no action letters that I've

3    talked about, and in those cases I would get a more

4    formal here's where things stand, here's the draft

5    of the no action letter memorandum talking about

6    the no action letter, things like that.

7         Q.  Do you recall earlier I asked you about

8    ████████████

9         A.  Yes.

10        Q.  And you're familiar with ████████████

11   correct?

12        A.  Generally.

13        Q.  And you knew that ████████████ came and met

14   with you and other members of the staff to discuss

15   the application of the federal securities laws to

16   digital assets, correct?

17        A.  Yes.  They came to discuss some projects

18   that they had in mind that they wanted to do in

19   compliance with the laws, yes.

20             MR. TENREIRO:  For clarity of the record,

21   this is ████████████████████████

22             THE REPORTER:  Thank you.

152

1          MR. TENREIRO:  I'm just making sure that's

2     what you're asking about.

3          MR. FIGEL:  I believe it's capital C,

4     lower case, O-N-S-E-N-S-Y-S.

5          MR. TENREIRO:  Me too.

6          Q.  And you knew that ████████ was founded by

7     ████████ orrect?

8          A.  When I first met with him I'm not sure I

9     knew that, but eventually I think I figured that

10    out.

11         Q.  When do you think you figured out that

12    Mr. ████████ as a founder of ████████

13         A.  Probably after having met with him maybe

14    in the first meeting, the second time.  I'm not

15    even sure how many times we met with him, but

16    somewhere along the way that became clear.

17         Q.  And ████████ s affiliated with Ether,

18    correct?

19         MR. TENREIRO:  Object to form.

20         A.  I don't know if they have a formal

21    affiliation.  I think they -- other than ████████

22    ████████ nvolvement, but I don't know the nature of

153

1    their affiliation.  I know they try to help people

2    who are -- I think they are helping people who are

3    trying to develop digital assets that use the ERC20

4    protocol as part of the Ether network.

5              MR. TENREIRO:  Just also, Mr. Hinman's

6    testified that he met with him.  So I'm going to

7    allow this, but please just try to keep your

8    testimony to what you learned from them and not

9    from your staff in the deliberation, just to keep

10   that in mind.

11             THE WITNESS:  Okay.

12             MR. FIGEL:  Just for the record, I'm not

13   going to quibble with you, Mr. Tenreiro, but I

14   believe Mr. Hinman should be permitted to testify

15   about his own state of mind and his understanding

16   with respect to these questions without divulging

17   how he came to that understanding.

18             MR. TENREIRO:  Okay.  Well, let's -- he's

19   answering right now.  So let's go on.

20   BY MR. FIGEL:

21        Q.  You knew in December 2017 that ▮▮▮▮▮▮▮

22   was one of the founders of Ether, correct?

154

1          MR. TENREIRO:  Object to form.

2          A.  Again, I don't know the date that I became

3     aware of that, but somewhere along the way I became

4     aware that ███████ was the founder -- frankly, I

5     didn't know for sure he was.  You're saying he was,

6     that sounds right, but yeah.  Okay.

7          MR. TENREIRO:  Also, Reid, the founder of

8     Ether.  I mean, it's confusing.

9          THE WITNESS:  Did you say Ether?  I

10    thought you said ███████

11         Q.  No.  I'm now talking about Ether.

12         A.  Oh.  No, I don't know that.  Sorry.

13         Q.  As you sit here today, are you aware of

14    Mr. █████ elationship with the Ethereum

15    Foundation as I read the description of the

16    foundation earlier in the -- in the deposition?

17         A.  I don't know the specifics of his

18    relationship, no, as I sit here today.

19         Q.  Were you aware in or about December 2017

20    that Mr.█████ according to press reports had a net

21    worth in excess of a billion dollars?

22         MR. TENREIRO:  Object to form.

155

1    A.  I did not know that.

2    Q.  Did you know that he was a successful

3 entrepreneur in the digital asset space?

4        MR. TENREIRO:  Object to form.

5    A.  I did not know that, no.  I didn't know

6 how successful or unsuccessful he was.  He was just

7 someone that was involved with that company as far

8 as I knew.

9    Q.  And you personally had communications with

10 individuals affiliated with ███████ on numerous

11 occasions when you were the director of the

12 division of corporate finance, correct?

13    A.  I'm not sure I would agree with numerous,

14 but I did have more than one conversation with

15 folks at ███████

16    Q.  We'll go through this, but what's your

17 recollection generally as to how many meetings you

18 had with representatives of ███████

19    A.  I would say probably four to five meetings

20 possibly.  I'm not sure they were all meetings, but

21 maybe a phone call.

22    Q.  Did Chairman Clayton ask you to

156

1    communicate with anyone at ████████ for any

2    reason?

3            MR. TENREIRO:  Sorry.  Just answer yes or

4    no.

5        A.  I don't recall.

6        Q.  You testified to communications,

7    face-to-face meetings and telephone calls.  Did you

8    have phone calls from a wireless phone or a

9    landline other than an SEC device with anyone at

10   ████████?

11       A.  Not that I -- I doubt that.

12       Q.  Any text communications with anyone at

13   ████████?

14       A.  No.

15       Q.  Any other forms of communications with

16   anyone affiliated with ████████ other than the

17   four or five meetings that you had just testified

18   to?

19       A.  I think I may have e-mailed one of --

20   well, you're asking ████████ I don't know anyone

21   at ████████ that I would have had any

22   communications other than e-mail and perhaps a

1    telephonic conference call.

2        Q.  All right.  And directing your attention

3    now you said you had some face-to-face meetings

4    with representatives of █████████

5        A.  Right.

6        Q.  Did those meetings occur anywhere other

7    than the offices of the SEC?

8        A.  No, I don't believe so.

9        Q.  Did you have any communications with

10   Chairman Clayton about the substance of any of the

11   meetings that you -- withdrawn.

12       Did you have any communications with

13   Chairman Clayton about any of your communications

14   with anyone affiliated with ███████████

15       MR. TENREIRO:  Director Hinman, please

16   answer yes or no.

17       A.  Yes.

18       Q.  On approximately how many occasions?

19       A.  Once or twice.

20       Q.  I'm going to ask the question, you're

21   going to give the instruction.

22       What did you say to him and what did he

158

1    say to you in those communications?

2            MR. TENREIRO:  All right.  So I'm going to

3    instruct the witness not to answer on the basis of

4    the deliberative process privilege, possibly other

5    protections, attorney-client certainly.  So please

6    don't answer that.  Let's move on.

7            MR. FIGEL:  Was there a policy or agency

8    determination that you discussed in your

9    communications with Chairman Clayton about the

10   meetings with ████████

11           MR. TENREIRO:  Yes or no.

12       A.  I just want to make sure I understand the

13   question.  Policy or agency determination?

14       Q.  Yes.

15       A.  So agency policy or agency determination?

16           MR. TENREIRO:  I object to form.  I think

17   you're asking -- you're using a legal term that

18   he's not understanding like you're asking it, but

19   go ahead.

20       A.  I don't believe so.

21           MR. FIGEL:  Give me just a second.  These

22   are the late breaking exhibits we had last night.

159

1          MR. TENREIRO:  Okay.

2          MR. FIGEL:  For the hotseat this would be

3     a document that you would have received this

4     morning that has -- that's marked JJ2, and I'll ask

5     the court reporter to mark this document as

6     Exhibit 14.

7                    (Hinman Exhibit 14 was marked

8                     for identification.)

9     BY MR. FIGEL:

10         Q.  Mr. Hinman, you're not on this e-mail.

11         A.  Uh-huh.

12         Q.  So you're free to read it if you'd like,

13    but I'll represent to you you're not on it.

14         MR. TENREIRO:  Reid, is this from last

15    night's production?

16         MR. FIGEL:  Yes.

17         MR. TENREIRO:  Okay.

18         MR. FIGEL:  I'll explain to Mr. Tenreiro,

19    you can correlate these to the earlier ones --

20         MR. TENREIRO:  The earlier ones being

21    Exhibits 1 through 3?

22         MR. FIGEL:  Yes.

160

BY MR. FIGEL:

    Q.  I believe you testified earlier, but what

was Amy Starr's responsibility on or about

December 7, 2017?

    A.  At that point I don't think the FinHub had

been set up which she later joined.  So I think she

was just a senior person in the division with

oversight of novel securities.

    Q.  Did you direct Ms. Starr to contact

Mr. ████ o set up a meeting with the division of

corporate finance?

    A.  I don't remember doing that.  It's

possible, but I don't have a specific recollection

of asking her to do that.

    Q.  If you'd take a look at the Bates No. 446

of Exhibit 14.

    A.  446?  Yeah.

    Q.  So on December 7th Ms. Starr writes to ████

████ and ████ and talks about meeting with

folks from the division of corporate finance and

says "The meeting currently is set for next week."

    A.  Okay.