161

1      Q.  Do you recall attending a meeting on

2  December -- December 13th, 2017 with

3  representatives of █████████

4      A.  I don't have a specific recollection of

5  the date that I met with folks from █████████ or

6  participated in a meeting, but it's possible that

7  was the December 13th meeting, yeah.

8      Q.  And what was your understanding of the

9  reason that the division of corporate finance was

10  meeting with █████████

11      MR. TENREIRO:  And just -- I'm sorry.

12  Just answer without getting into the substance of

13  conversations with staff or the commissioners.

14      A.  To the best of my recollection, they were

15  coming in to discuss an idea around a blockchain

16  token and how the securities laws applied to that

17  enterprise.

18      Q.  And did the division of corporate finance

19  request the meeting or did █████████ request the

20  meeting?

21      A.  I don't remember us asking for a meeting

22  with them.  I would have guessed it would be the

162

```
1   other way around.
2        Q.  All right.  If you could look at Bates
3   ending in 445.
4        A.  Yeah.
5        Q.  You'll see that on that page at the top
6   there's an e-mail from ████████ with a ████████
7   e-mail address to Amy Starr on December 8th, 2017
8   at 6:17 p.m.
9        A.  Okay.
10       Q.  And you'll see under "Background" -- it's
11  a little hard to tell from this, but these appear
12  to be links that Mr ██████ provided to Ms. Starr in
13  advance of the meeting; do you see that?
14       A.  Yep.
15       Q.  And you'll see in the e-mail itself he
16  says at the last portion of the first paragraph of
17  the e-mail he's sending "some links to some of our
18  collective public thoughts on these issues."
19       A.  Okay.
20       Q.  And the issues as he describes it above
21  are issues involving blockchain tokens and
22  securities regulations.
```

163

1      A.  Okay.

2      Q.  Did you have an understanding in advance

3  of the December 13th meeting with ███████ as to

4  what specific issues involving blockchain tokens

5  and securities regulations they wanted to address?

6      A.  No, I don't have a recollection of a

7  specific set of topics.

8      Q.  This may be an unfair question, but I'm

9  going to ask it.  Do you have any recollection of

10  clicking on the links to these e-mails or reviewing

11  the documents that are associated with these links?

12          MR. TENREIRO:  He's not copied on the

13  e-mail, but go ahead.

14      A.  Yeah.  I was just going to say that.  I'm

15  not sure I got this e-mail, but I don't remember

16  clicking on any links.

17      Q.  Do you remember doing any reading before

18  the December 13th meeting?

19      A.  No, I don't.

20      Q.  So let's go to the meeting on December 13,

21  2017.  You attended a meeting on that date with

22  representatives of ██████████ correct?

164

```
 1              MR. TENREIRO:  Object to form.
 2         A.  Yeah.  I attended meetings where ███████████
 3    people were there.  Whether that was the
 4    December 13th meeting or some other meeting I
 5    really don't know.
 6         Q.  Do you have a recollection of the first
 7    meeting you attended with representatives of
 8    ████████████  putting aside the date?
 9         A.  I have a recollection of the first time we
10    met with them having discussions around this
11    project that they were interested in.
12         Q.  Just a couple foundational things.  Where
13    did that meeting occur?
14         A.  I think at the SEC.
15         Q.  And focusing on staff of the SEC, who
16    other than you attended that meeting?
17         A.  Again, it's pretty fuzzy at this point,
18    but it probably would have been Amy, Amy Starr,
19    possibly Val Szczepanik, possibly David
20    Frederickson --
21         Q.  It's hard to tell --
22              MR. TENREIRO:  Let him answer, please.
```

165

1      A.  One of my counsel would have probably gone

2   with me if I went to the meeting.  Which one is

3   hard to say.  Maybe John Ingram who was also in the

4   chief counsel's office.

5      Q.  So it sounds as though there were more

6   than two or three representatives of the SEC at

7   this meeting; is that correct?

8      A.  Yes.

9      Q.  And who do you recall attending from

10  ████████████

11     A.  Actually, the person I remember the most

12  is actually not at ████████  I think he was a

13  professor from the Brooklyn Law School named ████

14  ████ - or no, ██████████████.  I don't

15  remember if ████████ was at the first meeting or

16  not.  I think he was.  They had a fellow who was

17  either formerly with Sullivan & Cromwell or maybe

18  was with Sullivan & Cromwell at the time, a

19  technologist or two.  Yeah, it's pretty vague.

20     Q.  And during that meeting you were told in

21  substance that ████████ believed there were

22  circumstances in which "you may view a token as not

[7/27/2021] Hinman, William Dep. Tr. 7.27.2021

1    a security," correct?

2         MR. TENREIRO:  Object to form.  Told by

3    whom?

4         A.  Yeah.  Who said what to who?

5         Q.  Someone from ███████ stating in

6    substance "you may view a token as not a security."

7         MR. TENREIRO:  I object to form.

8         A.  I don't have a specific recollection of

9    that, but...

10        Can I just ask one clarifying question

11   about your last question?  When you said you were

12   told?

13        Q.  You attended the meeting?

14        A.  Right.

15        Q.  And so you would have heard from

16   representatives --

17        A.  So you're saying the you meaning me?

18        THE REPORTER:  Guys.

19        THE WITNESS:  Sorry.

20        Q.  Yes.

21        MR. TENREIRO:  Wait a second.  Wait a

22   second.  You attended the meeting.  Are you talking

167

1    about the meeting he recalls being the first one

2    without being tied to the state?

3            MR. FIGEL:  Yes.

4            MR. TENREIRO:  Okay.

5        A.  Yeah.  So I don't remember being told that

6    that was their view, but okay.

7        Q.  Do you recall any discussions at that

8    meeting, whenever it occurred, about circumstances

9    in which a digital asset -- whether it was unclear

10   as to whether a digital asset was a security?

11       A.  What I remember of the discussion was they

12   wanted to have some enterprise use a token as a

13   nominal sort of way to get in and out of a system

14   to, if I recall right, go to news stories or get

15   rewarded for posting news stories, but it would be

16   a self-contained system and I think the question

17   was could that be structured in a way where the

18   securities laws wouldn't be implicated.

19       Q.  Okay.  Other than that particular

20   application of digital asset technology, do you

21   recall any other discussions about whether in

22   certain circumstances a digital asset would not be

1    an investment contract or a security under the

2    federal securities laws?

3         A.  I don't have a specific recollection of a

4    broader sort of generic discussion.  It was -- what

5    I remember was the context of their project.

6         Q.  Did anyone from ███████ at that meeting

7    ask you or any member of the division of corporate

8    finance to make a determination that Ether was not

9    a security?

10        A.  No.

11        Q.  Did that topic come up at that meeting?

12        A.  No.

13        Q.  I know you don't recall the specific date,

14   but the e-mail suggests that there was a meeting on

15   December 13th.  As of December 13th, 2017 had you

16   contemplated -- contemplated making a speech as to

17   under what circumstances a digital asset may not be

18   a security?

19        A.  Not a specific speech, you know, like on

20   December 18th I'm going to make a speech.  I think

21   it was a topic that I knew we would be addressing

22   whenever we spoke to the public, just how the Howey

1    case applied to this area.

2         Q.  Had you started drafting the speech you

3    delivered on June 14th, 2018?

4         A.  I don't believe so.  That seems like a

5    long lead time.

6         Q.  Do you know whether there were any

7    documents created by division of corporate finance

8    staff that memorialized the substance of what

9    occurred at this first meeting?

10        A.  Not that I'm aware of.

11        Q.  I'm going to show you a document which

12   I'll ask the court reporter to mark as Exhibit 15,

13   OO.  Oh, and for the hotseat, it's a document we

14   received this morning that has an interim number of

15   OO.

16             MR. TENREIRO:  This will be 15, right?

17             THE REPORTER:  Correct.

18             MR. FIGEL:  Mr. Hotseat, I think what you

19   have up is the older version of OO.  If you could

20   put up the one from this morning.

21             MR. TENREIRO:  What you gave us has

22   Bates 273 and he had 273.

170

1          MR. FIGEL:  Oh, did he?

2          MR. TENREIRO:  Now he has up Exhibit 146,

3     which is Exhibit 3.

4          MR. FIGEL:  So let's go back to the one

5     you did have up then.  He was correct.  Sorry.

6                    (Hinman Exhibit 15 was marked

7                     for identification.)

8     BY MR. FIGEL:

9          Q.  Do you recall reading this document before

10    the meeting that you attended that you recall as

11    the first meeting you had with representatives of

12    ██████████████

13         A.  I don't recall that.

14                    (Hinman Exhibit 16 was marked

15                     for identification.)

16    BY MR. FIGEL:

17         Q.  I'm going to show you a document that I'll

18    ask the court reporter to mark as Hinman

19    Exhibit 16.  Again, you're not on this, but I think

20    for the record it will be useful.

21         A.  Okay.

22         MR. FIGEL:  And Mr. Tenreiro, I'll just

171

1    represent to you that our understanding of the

2    documents we got from ████████ last night suggests

3    that Exhibit 15, which is in front of Mr. Hinman,

4    was attached to this e-mail that has been marked as

5    Exhibit 16 and was transmitted by Mr. █████ to Amy

6    Starr on December 12th.

7         Q.  I don't have any questions for you on

8    that, Mr. Hinman, other than I'm just making a

9    representation that our understanding is this was

10   something that was circulated to the division of

11   corporate finance before the meeting.

12        A.  When you say "the meeting" --

13        Q.  Well, the meeting --

14        MR. TENREIRO:  There's no -- there's no

15   question on the record.  I don't have any -- I

16   don't have any -- you know, thank you for your

17   representation.  I don't think there's any question

18   pending.

19        MR. FIGEL:  There is not.

20        If you could take a look at --

21        MR. TENREIRO:  Just, you know, you do keep

22   saying "the meeting" and there's a little bit of

172

1    confusion here because, you know, he says he

2    doesn't remember attending this meeting.  I think

3    that's hopefully clear on the record to everybody.

4        MR. FIGEL:  Fair enough.

5    BY MR. FIGEL:

6        Q.  The meeting that you recall, do you recall

7    any discussion at the meeting of Exhibit 15?

8        A.  No.

9        Q.  Let me direct your attention to Bates

10   No. 280 -- ending 286 in Exhibit 16.  You'll see on

11   the left there's a reference to the blockchain

12   project at █████████████████ do you see that?

13       A.  Yes.

14       Q.  Is that the project that you testified to

15   earlier that Mr. █████ was affiliated with in some

16   way?

17       A.  I don't think so.  This seems more generic

18   than the thing I was referring to with specific,

19   you know, news focused token project.

20       Q.  Do you recall anyone stating to you at the

21   meeting that you recall in substance that the

22   purpose of what Mr. █████ was working on was to

173

1     explore the regulatory challenges raised by

2     blockchain technology?

3         A.  Do I recall someone saying that to me?

4         Q.  Yes.

5         A.  No.

6         Q.  In substance.

7         If you could look at the page of this

8     exhibit that ends with Bates 299.  Do you recall

9     seeing this page in connection with the meeting

10    that you recall?

11        A.  I don't recall this slide deck.  So

12    certainly not this page.

13        Q.  Do you remember anyone telling you in

14    substance that entrepreneurs and others lack

15    guidance on how to sell tokens that should not be

16    securities?

17        MR. TENREIRO:  From the outside, is that

18    what you're asking, someone from the outside

19    telling him that?

20        MR. FIGEL:  Yes.  Yes.  Sorry.

21        Did you understand my question,

22    Mr. Hinman?

174

1          A.  Why don't you repeat it.

2          Q.  I'm focusing you on the meeting that you

3     recall and Mr. Tenreiro's observation that you

4     don't remember the date, which I understand.  I

5     think the record's clear on that.  I'm now asking

6     you if you recall that during that meeting that you

7     remember you were told in substance that

8     entrepreneurs and others lack guidance on how to

9     sell tokens that should not be securities.

10          A.  I don't have a specific recollection of

11     that being said to me at that meeting, no.

12          Q.  How about a general recollection?

13          A.  Well, you made a very specific statement.

14     Anything like that in terms of people lacking

15     guidance?

16          Q.  Uh-huh.

17          A.  No, I don't remember that coming up.

18          Q.  If you could turn the page to the next

19     page ending in Bates No. 300.

20          A.  Yes.

21          Q.  I take it this doesn't refresh your

22     recollection of seeing this slide deck, correct,

175

1   seeing this page?

2       A.  It doesn't.

3       Q.  All right.  Do you remember anyone stating

4   in substance at the meeting you remember that

5   entrepreneurs and investors may lack an

6   appreciation for regulatory risk?

7       A.  Not at that -- not at the meeting I do

8   recall, no.

9       Q.  How about more generally?  Do you remember

10  hearing from third parties that entrepreneurs and

11  investors lack an appreciation of the regulatory

12  risk of transactions in digital assets?

13      A.  I didn't hear something specifically

14  lacking an appreciation of regulatory risk.  I did

15  hear -- not at this meeting that we're talking

16  about, but in general that some people had the idea

17  that if you called something a token it wouldn't be

18  subject to the U.S. securities laws, that just by

19  naming it a token and by creating a digital token

20  you create an instrument that wasn't subject to

21  U.S. securities law regulation.

22      Q.  And that was a perception that you

176

1  understood that various lawyers and industry

2  participants had prior to the speech you delivered

3  on June 14th, 2018, correct?

4       MR. TENREIRO:  Object to form.

5      A.  I wouldn't say so much the lawyers, but

6  more people that were offering these ICO's were

7  under the impression that somehow by calling it an

8  ICO they didn't have to register.

9      Q.  Directing your attention back to the

10  meeting as you recall it, do you remember being

11  told in substance, in substance, not word for word,

12  entrepreneurs are not being provided with an

13  accurate picture of the penalties they may face

14  when engaging in a token sale?

15      A.  I don't recall that, no.

16      Q.  And do you recall being told at that

17  meeting in substance that purchasers of digital

18  assets may not recognize the risks they may be

19  acquiring -- withdrawn.

20      Do you recall being told at that meeting

21  in substance that purchasers may not recognize the

22  risk that they may be acquiring securities subject

1    to transfer restrictions?

2         A.  No, not at the meeting I recall.

3         Q.  Do you recall hearing that entrepreneurs

4    were not being provided with an accurate picture of

5    the penalties they faced in any other context other

6    than communications with SEC staff?

7         A.  No.

8         Q.  Do you recall being told in substance that

9    purchasers who acquired digital assets may not

10   appreciate the risks that they might be acquiring

11   securities subject to transfer restrictions?

12        A.  I have a recollection of folks were

13   concerned that purchasers of these assets didn't

14   realize that they were always -- you know, that

15   they might be securities and that they would --

16   there would be consequences if they had been

17   offered on an unregistered basis, including

18   transfer restrictions.

19        Q.  And when did you come to have that

20   understanding?

21        A.  I think that was early days where people

22   were buying ICO's that weren't registered and

178

1    somewhat naively buying an instrument that operated

2    like a security, but they didn't have the

3    disclosures that they would have had if it had been

4    done on a registered basis.

5        Q.  So the purchasers of these digital assets

6    didn't appreciate that they might be acquiring a

7    security?

8        A.  Correct.

9            MR. FIGEL:  Why don't we take another

10   break.

11           THE VIDEOGRAPHER:  Off the record at

12   12:54.

13                      (Whereupon, at 12:54 p.m., the

14                       deposition was recessed, to

15                       reconvene at 2:00 p.m., this

16                       same day.)

17

18

19

20

21

22

179

1            AFTERNOON SESSION  (1:59 p.m.)

2            THE VIDEOGRAPHER:   Back on the record at

3   1:59.

4                    WILLIAM HINMAN,

5   the witness at the time of recess, having been

6   previously duly sworn, was further examined and

7   testified as follows:

8                    EXAMINATION

9                    (Resumed)

10  BY MR. FIGEL:

11       Q.  Good afternoon, Director Hinman.

12       A.  Hello.

13       Q.  Do you know Chris Austin, a partner

14  formerly at Orrick and now at Paul Hastings?

15       A.  I don't think so.

16       Q.  Do you know Jeff Cullen, a lawyer at

17  Linklaters?

18       A.  I don't think so.

19       Q.  Do you know someone named Lowell Ness at

20  Perkins Coie?

21       A.  It's ringing a faint bell, but don't

22  really -- I couldn't pick him out of a crowd.

180

1      Q.  Do you know Dixie Johnson at King &

2   Spalding?

3      A.  Same thing.  Sort of a faint bell, but I

4   couldn't pick her out of a line-up.

5      Q.  And Rob Rosenblum at Wilson Sonsini?

6      A.  Yes.

7      Q.  And Mr. Rosenblum is a respected member of

8   the securities bar, correct?

9      A.  As far as I know.

10      MR. FIGEL:  We're going to go to QQ in the

11   outline, and it should be 17 in the...

12                  (Hinman Exhibit 17 was marked

13                   for identification.)

14   BY MR. FIGEL:

15      Q.  Directing your attention to the last page

16   of the e-mail that ends with Bates No. 1454.

17      A.  Right.

18      Q.  That appears to be an e-mail you wrote to

19   ████████████

20      A.  Right.

21      Q.  Do you recognize that e-mail?

22      A.  It refreshes my recollection, yes.

181

1  Q. Any reason to think that's not a true and

2 accurate copy of an e-mail you sent on April 12th,

3 2018 to Mr █████████

4  A. No.

5  Q. And you said you greatly enjoyed meeting

6 with Mr. ████████nd his team a couple months ago.

7 Was there more than one meeting that you were

8 referring to in which you met with Mr. ████████ and

9 his team?

10   MR. TENREIRO: Object to form.

11  A. The only meeting I recall specifically

12 with ████ was the one I mentioned. But it feels

13 like we may have had more than one interaction, but

14 I just don't have a specific recollection of

15 multiple meetings.

16  Q. In your e-mail you wrote him that you were

17 "wondering if we could have a brief call in order

18 to discuss the possibility of another meeting"; do

19 you see that?

20  A. Right. Yes.

21  Q. Why were you reaching out to Mr. ████████ to

22 request another meeting?

182

1        MR. TENREIRO:  Just without disclosing

2   deliberations with staff or commissioners.

3        A.  It goes to something we were deliberating.

4   So I'm not sure I can answer without doing that.

5        Q.  If you go up the e-mail chain to

6   page 1453, you see Mr ████ says he's happy to get

7   on a call and he says "I can loop in members of our

8   internal legal team who have been in discussions

9   with you and your colleagues."

10       A.  Right.

11       Q.  Do you have a recollection of being in

12  discussions with members of Mr. ████ internal

13  legal team?

14       A.  The ones I mentioned earlier.

15       Q.  Then going up the e-mail chain at,

16  according to the e-mail, 6:13 p.m. you write back

17  to Mr. ████ The call's to set up a possible

18  meeting.  The meeting was to learn more about the

19  Ethereum support network."  What is it that you

20  wanted to learn about the Ethereum support network

21  from Mr. ████

22           MR. TENREIRO:  If you can discuss, for

1    example, what you might have explained to him such

2    as what the meeting was for rather than the

3    internal deliberations of what you wanted to know,

4    try to limit your answer to that.

5        A.  Okay.  Sort of what it says, we wanted to

6    know more about how the Ethereum support network

7    operated.

8        Q.  What specifically did you want to know

9    about the Ethereum support network?

10           MR. TENREIRO:  Same instruction.  Just,

11   you know, do you recall conveying something to him

12   about what specifically you wanted to know about

13   the Ethereum support network or someone from the

14   staff expressing something to them, for example?

15           MR. FIGEL:  Mr. Hinman, right now I'm just

16   asking about your state of mind when you wrote the

17   e-mail.

18       A.  Right, but I had a state of mind that was

19   related to some deliberative things that we were

20   engaged in.  So I want to be careful that I don't

21   override what Jorge is telling me to do here.

22           We wanted to understand how the Ethereum

[7/27/2021] Hinman, William Dep. Tr. 7.27.2021

184

1    support network operated, how centralized was it,

2    you know, was this a private company behind it or

3    was this more decentralized than that, was this a

4    network where there were information asymmetries or

5    not, things of that sort.

6        Q.  And what was your understanding of the

7    term "Ethereum support network" as you use it in

8    this e-mail?

9        A.  By that I think I would be referring to

10    the people that authenticate Ethereum transactions.

11    There's nodes on the Ethereum network that affect

12    mined Ethereum by authenticating transactions.

13    There was a foundation that kept the software

14    up-to-date, there were GitHub discussion fora that

15    were dedicated to Ethereum as I recall.

16        Q.  Then you say in the next paragraph "I can

17    give you more background on a call if you like"; do

18    you see that?

19        A.  Sure.

20        Q.  Did you have a call with Mr. █████

21        A.  I don't remember having a call, but I may

22    have.

185

1    Q.  Did you communicate either directly or

2    indirectly through your staff to Mr. ████ about

3    what information you were seeking from him?

4    A.  I don't specifically recall saying

5    anything ahead of the meeting, but it's possible.

6    Q.  And did you, in fact, meet with Mr. ████

7    after this exchange of e-mails?

8    A.  I don't know if we had a meeting or a

9    call, no.  I would think we would have.

10   Q.  What's your best recollection about any

11   communications in whatever form you had with

12   Mr. ████ after April 12, 2018?

13   A.  I recall that -- and I don't remember if

14   it was ████ himself, but getting answers to

15   the questions that we were deliberating.

16   Q.  At any time did you or members of your

17   staff ask Mr. ████ directly or indirectly how many

18   units of Ether ████ owned?

19   A.  I don't think I asked that direct

20   question.  I think we would have asked that

21   question -- again, I don't want to get into

22   deliberations, but if we asked them, we asked them.

186

1       Q.  The question is what, if anything, do you

2  know about what ███████ reported to you or your

3  staff about their ownership of Ether?

4       MR. TENREIRO:  Sorry.  Maybe it's

5  better -- I thought it was better before.  External

6  communications -- external questions are fine.  So

7  if you sat there and asked them or heard someone

8  else ask them, we can talk about that, right?

9  Isn't that what you wanted?

10      MR. FIGEL:  Why don't you answer the

11  question as you understand it, and then we'll take

12  it from there.

13      A.  I think we learned whether it was through

14  questions I asked or staff that asked how much

15  Ethereum, if any, ███████ wned.

16      Q.  As you sit here today without telling me

17  how you learned it, what was your -- what is your

18  understanding as to how much Ethereu ████████

19  owned in April of 2018?

20      A.  As I sit here today I don't recall.

21  Sorry.

22      Q.  At any time did you or staff of the

187

1    division of corp fin ask anyone at ███████ how

2    many -- withdrawn.

3          At any time did you or members of corp fin

4    staff ask Mr. █████ n substance how many shares of

5    Ether the Ethereum Foundation owned?

6          MR. TENREIRO:  Reid, so that we can do

7    this clear, would you mind just asking him and then

8    the staff as separate questions because if there's

9    a communication that the staff had.

10          MR. FIGEL:  Fair enough.

11          Did you have any communications with ██████

12    ██████ s to how many shares of Ether the Ethereum

13    Foundation controlled?

14      Q.  I don't recall a specific, you know, Q&A

15    between me and him on that topic.

16      Q.  Do you know whether anyone on the staff of

17    the division of corporate finance asked Mr. ██████

18    how many shares of Ether the Ethereum Foundation

19    controlled?

20          MR. TENREIRO:  Let's start with a yes or

21    no on that one.

22      A.  Yes.

188

1       Q.   What facts did you understand the staff

2   learned from Mr. ▮▮▮▮ on that issue?

3       A.   I think they learned the amount of

4   Ethereum that was held in the foundation.

5       Q.   And what was that amount?

6       A.   I don't remember.

7       Q.   Substantial?  De minimis?

8            MR. TENREIRO:   Object to form.

9       A.   I don't recall whether it was, you know,

10  substantial -- I don't know what you mean by

11  substantial in this context, you know, substantial

12  as a dollar amount or as a percentage of the

13  outstanding.  I think as a percentage of the

14  outstanding it was not substantial.

15      Q.   And by "not substantial" can you give me

16  an approximation of percentage of total

17  outstanding?

18      A.   You know, anything over 30, 40 percent

19  would seem substantial to me, but, you know, where

20  you draw that line, I'd want to know more.

21           MR. FIGEL:  All right.  This is PP in the

22  outline.  I think we are up to 18.

189

1              (Hinman Exhibit 18 was marked

2                    for identification.)

3    BY MR. FIGEL:

4         Q.  Do you recall receiving this e-mail from

5    Mr. Seaman on or about May 17, 2018?

6         A.  I don't have a specific recollection of

7    receiving it, but I'm sure I did.

8         Q.  Do you recall learning from Mr. Seaman in

9    substance that there was a Website that reported

10   that three entities controlled over 50 percent of

11   the voting/mining power of the ETH?

12        A.  Do I remember hearing that from

13   Mr. Seaman?

14        Q.  Why don't we start do you remember hearing

15   it at all prior to June 14?

16        A.  As I sit here today I wouldn't have been

17   able to recall that, but reading this e-mail seems

18   like that informs me of some views on that topic.

19        Q.  Do you consider --

20            MR. TENREIRO:  Alex (indecipherable), mute

21   your line, please?

22        Q.  Would the fact that three entities

190

```
1    controlled more than 50 percent of the voting or
2    mining power of Ether been relevant to the views
3    you expressed in your speech on June 14, 2018?
4            MR. TENREIRO:  Go ahead.
5        A.  That's relevant, yes.
6        Q.  What, if anything, did you personally do
7    to follow up on the question of whether three
8    entities controlled more than 50 percent of the
9    voting and mining power of Ether?
10           MR. TENREIRO:  Focus that on external --
11   did he say external?  No.  So just focus that on
12   external first, please, you know, do you recall.
13       A.  Things that we would have done externally
14   would be talking to people involved in the Ether
15   network.  I don't remember specifically doing that,
16   but in order to give the speech we would want to
17   understand that and we did a lot of diligence
18   before we did the speech.
19       Q.  So focusing just on the concentration of
20   voting and mining power, as you sit here today, are
21   you aware of any communications between the staff
22   of the division of corporate finance and any third
```

1    party as to the accuracy of the statement that

2    three entities controlled more than 50 percent of

3    the voting and mining power of Ether?

4         MR. TENREIRO:  As of the time of the

5    e-mail.

6         THE WITNESS:  Sorry.  I didn't hear you.

7         MR. TENREIRO:  As of the time of the

8    e-mail.

9    A.   Yes.

10   Q.   Or before your speech.

11   A.   Could you repeat that?  I lost the train.

12   Q.   Sure.

13        So focusing on the information about

14   concentration of voting and mining power --

15   A.   Right.

16   Q.   -- as you sit here today, are you aware of

17   any communications between the staff of the

18   division of corporate finance and any third party

19   as to the accuracy of the statement that three

20   entities controlled more than 50 percent of the

21   voting and mining power of Ether?  And the time

22   frame is prior to your June 14th speech.

192

1      A.  As I sit here today, I don't have a

2 specific recollection what they found in that area.

3      Q.  You said that there was a lot of due

4 diligence done by the staff prior to your speech?

5      A.  Yes.

6      Q.  What due diligence did the staff do with

7 respect to communications with third parties with

8 respect to any of the factual underpinnings of any

9 of the views you expressed on June 14, 2018?

10      A.  I think the staff got themselves informed

11 on how the decisions were made around the Ethereum

12 network, like governance, was that controlled by a

13 corporation or one specific entity or was it

14 more -- distributed more broadly to the holders of

15 the coins, things of --

16      Q.  Yeah.

17      MR. TENREIRO:  Let him finish.

18      A.  Things of that sort was all I was going to

19 say.

20      Q.  What third parties did you understand the

21 staff spoke to to get that information?

22      A.  I think they would have spoken to people

193

1    that were knowledgeable about the Ethereum network,

2    which would have included people at ███████████

3    people like Professor ████████   I'm not sure how

4    many people they spoke to.  They may have talked to

5    other agencies.  You know, this would be something

6    that they would talk to anyone who had any

7    knowledge of it.

8         Q.  Was the information they acquired as part

9    of the due diligence for your speech memorialized

10   in some fashion?

11        A.  Beyond sort of e-mails or discussions, I

12   don't believe so.  I don't remember a memo laying

13   it all out.

14        Q.  No central file of the due diligence that

15   supported the statements made in your June 14, 2018

16   speech?

17        A.  Not that I recall.

18        Q.  Did you tell Mr. ██████ at any time between

19   April 12, 2018 when you sent him the e-mail and

20   June 14, 2018 that you were planning to give a

21   speech in which you would announce that your

22   understanding was that transactions in Ether were

194

1    not securities?

2         A.  No.

3         Q.  Did you tell any third party, anyone

4    outside of the staff of the Securities and Exchange

5    Commission generally in the buildings, all of them,

6    that you intended to -- in advance of your speech

7    that you intended to announce that based on present

8    circumstances you did not believe that Ether was a

9    security?

10         A.  Not that I recall, and I would likely

11   recall that.

12         Q.  Did Chairman Clayton suggest that you

13   reach out to Mr. ████ prior to your April 12, 2018

14   e-mail?

15              MR. TENREIRO:  Object -- objection to

16   disclos- -- you know, disclosing communications

17   with Chair Clayton and directions that he might

18   have given him as part of the deliberative process.

19   So I'm going to instruct him not to answer.

20              MR. FIGEL:  All right.

21              Now, directing your attention to

22   communications with Andreessen Horowitz.  Did you

195

1    direct Mr. Seaman to contact Andreessen Horowitz in

2    or about March of 2018 to request a meeting?

3          A.  I don't remember doing that.

4          Q.  Prior to March 2018 did you personally

5    meet with representatives of Andreessen Horowitz?

6          A.  Prior to when?  I'm sorry.

7          Q.  March 28, 2018.

8          A.  I don't remember a meeting with them prior

9    to then.  But I did have meetings with a person who

10   is now there, but I don't think he was there at the

11   time.

12         Q.  Do you recall meeting with representatives

13   of Andreessen Horowitz in connection with their

14   suggestion that the division of corporate finance

15   formulate a safe harbor for the issuance of digital

16   assets?

17               MR. TENREIRO:  Objection to form.

18               MS. KELLY:  Objection to form.

19         A.  Could you repeat?  I'm sorry.

20         Q.  Do you recall meeting with representatives

21   of Andreessen Horowitz in connection with a

22   suggestion they made that the division of corporate

196

1   finance formulate a safe harbor for the issuance of

2   digital assets?

3         MR. TENREIRO:  Just object to form.

4         A.  Not with them, but with the person who I

5   just mentioned.  I didn't think he was with

6   Andreessen at that time.

7         Q.  Who is that person?

8         A.  His name is Scott Kupor, K-U-P-O-R.

9         Q.  What do you remember about any proposal

10  made by Mr. Kupor with respect to a safe harbor for

11  the -- for transactions in digital assets?

12        A.  One thing that I'd like to clear up a

13  little bit, when folks come in and ask for

14  consultations like that with the staff, we usually

15  tell them that we expect it to be confidential both

16  on their part and our part.  So I don't know if

17  it's appropriate for me to answer that in light of

18  that, but I'll look to direction from counsel.

19        MR. TENREIRO:  I think we should go on and

20  answer the question if you recall and we'll have

21  confidentiality designations.

22        THE WITNESS:  Okay.