1    Mr. Kupor came in with I think a group of

2    folks, maybe some people from Perkins, maybe some

3    people from Cooley, you know, it's possible there

4    was someone from Andreessen, I don't remember that,

5    suggesting that perhaps there could be a safe

6    harbor developed for digital asset transactions.

7    Q.  And fair to say that there was no such

8    safe harbor at the time that Andreessen Horowitz

9    made that proposal, correct?

10    A.  Correct.

11    Q.  And during your tenure as the director of

12    the division of corporate finance did corp fin ever

13    issue such a safe harbor?

14    MR. TENREIRO:  Object to form.  Go ahead.

15    A.  No.  We felt a safe harbor would

16    potentially get away from the (inaudible) approach.

17    MR. TENREIRO:  I'm sorry.

18    THE REPORTER:  I'm sorry.  Get away

19    from --

20    MR. TENREIRO:  I'm just interrupting him

21    because I don't want him to get into --

22    MR. FLUMENBAUM:  The principle-based

198

1    approach is what he said.

2            MR. TENREIRO:  He said that.

3            THE REPORTER:  Hey, guys.

4            MR. FLUMENBAUM:  The record should reflect

5    what he said.

6            MR. TENREIRO:  Absolutely.

7            MR. FLUMENBAUM:  Principle-based approach,

8    and then you interrupted.

9            MR. TENREIRO:  Yes.  I just want to

10   caution Director Hinman not to discuss

11   deliberations with the staff.

12           THE WITNESS:  Got it.

13           MR. TENREIRO:  Sorry.  And thank you.

14   BY MR. FIGEL:

15      Q.  Why don't we try this.  Yes or no, did the

16   commission promulgate regulations that created a

17   safe harbor for the issuance of digital assets

18   during your tenure as the director of the division

19   of corporate finance?

20      A.  No.

21           MR. FIGEL:  All right.  Let's go to in the

22   outline it is tab UU, and we're up to 19.

1        MR. TENREIRO:  There's more here.

2                    (Hinman Exhibit 19 was marked

3                      for identification.)

4    BY MR. FIGEL:

5        Q.  Mr. Hinman, you have before you what's

6    been marked as Exhibit 19.  Have you seen this

7    document before?

8        A.  This may have been what was sent to us in

9    anticipation of the meeting we have been talking

10   about.

11       Q.  In connection with the proposal for a safe

12   harbor?

13       A.  I think so.

14       Q.  And were you familiar with the Venture

15   Capital Working Group?

16       A.  No.

17       Q.  But you were familiar with I believe Scott

18   Kupor?

19       A.  Right.

20       Q.  Is he a lawyer?

21       A.  I don't know.  I don't think so.  I think

22   he's a businessman.

200

```
1          Q.  I'd like to direct your attention to the
2     second full paragraph of page 1 of this document,
3     the sentence that begins with "The Howey case law";
4     do you see that?
5          A.  Yes.
6          Q.  Can you read into the record looks like
7     there are two sentences ending with "Investment
8     contract-type securities."
9          A.  Sorry.  Start with the second sentence and
10    go to where?
11         Q.  End with the phrase "contract-type
12    securities" just before the sentence that begins
13    "Under the Howey test."
14         A.  Got it.  Okay.
15              "The Howey case law is highly nuanced and
16    therefore challenging to interpret leading to
17    uncertainty.  As a general matter U.S. federal
18    securities laws were developed and have evolved
19    primarily for and around equity securities (and
20    other corporate obligations)."
21              Is that it?  Did you want me to read the
22    next sentence?
```

201

1    Q.  Yeah.  Read one more if you would.

2    A.  "There is much less clarity around

3    investment contract-type securities."

4    Q.  Fair to say that the views expressed by

5    the Venture Capital Working Group about clarity

6    with respect to the application of Howey was

7    different than what you testified to earlier?

8        MR. TENREIRO:  Object to form.

9    A.  I'd say this is somewhat different.  It

10   goes into issues beyond what I was talking about.

11   Q.  Do you agree that the Howey case law is

12   highly nuanced as of March 26, 2018?

13   A.  It can be depending on the facts you're

14   trying to apply it to.

15   Q.  And it can be challenging to interpret

16   leading to uncertainty; do you agree with that?

17   A.  Again, depending on the facts.

18   Q.  And do you agree with the statement "There

19   is much less clarity around investment contract-

20   type securities"?

21   A.  That's a pretty broad statement.  I think

22   you'd have to look at a range of things to

1    understand whether there's less clarity on all

2    investment contract securities.

3         Q.  Fair to say that the Venture Capital

4    Working Group thought that there was much less

5    clarity around the application of Howey to

6    investment contract-type securities, correct?

7              MR. TENREIRO:  Object to form.

8         A.  That's what they said in a paper asking

9    for a safe harbor, yes.

10        Q.  All right.  Directing your attention to

11   footnote 1 on this page, could you read that into

12   the record, please.

13        A.  "For example, the courts are not merely

14   divided but fractured with respect to the proper

15   application of the common enterprise prong of the

16   Howey test.  Moreover, the staff's position that

17   the common enterprise prong should not have

18   independent significance is part of the 'lore' of

19   securities laws known to some but not others."

20        Q.  Fair to say that the Venture Capital

21   Working Group expressed a view contrary to your

22   earlier testimony that it was generally understood

 1   among securities practitioners that the application

 2   of Howey to digital assets was well understood?

 3          MR. TENREIRO:  Object to form.

 4      A.  I think they're picking up a particular

 5   part of the Howey test and saying the courts

 6   haven't consistently interpreted that.  It's not a

 7   central part in my mind.

 8      Q.  Do you have an understanding as to whether

 9   under Howey an instrument or a transaction has to

10   meet all of the prongs in order to be viewed as an

11   investment contract?

12      A.  I think courts have held that it doesn't

13   have to meet every single prong.  Howey is one

14   articulation of when you have an investment

15   contract.  It's not the only case law in the area.

16      Q.  Let me make sure I understand your

17   testimony.  Your understanding as you sit here

18   today is that it's not necessary to satisfy all of

19   the elements set out in the Howey test, is that

20   correct, in order to find a contract scheme or

21   transaction is an investment contract under the

22   federal securities laws?

204

1          MR. TENREIRO:  Object to form.

2      A.  My personal view is that you don't have to

3  satisfy every single prong, and there are examples

4  of that.

5      Q.  And that was your understanding on

6  June 14th, 2018 when you delivered your speech?

7      A.  That you didn't need to satisfy every

8  prong of Howey?

9      Q.  Yes.

10     A.  Yes.

11         MR. FIGEL:  I'm going to show you what's

12  in the outline as tab VV.  I guess we're up to 19?

13         THE REPORTER:  20.

14                (Hinman Exhibit 20 was marked

15                 for identification.)

16  BY MR. FIGEL:

17     Q.  Have you reviewed -- had a chance to

18  review the document?

19     A.  I have.

20     Q.  I believe you testified that you knew Joe

21  Hall at Davis Polk?

22     A.  I do.

205

1          Q.  He was a respected member of the

2     securities bar?

3          A.  Yes.

4          Q.  Do you recall receiving this e-mail from

5     Mr. Hall?

6          A.  Now that I see it.

7          Q.  You do recall that?

8          A.  Now that I see it again, yes.

9          Q.  Directing your attention to the phrase "We

10    have received and responded to two rounds of

11    comments focused exclusively on our Howey analysis

12    of the initial three assets in the fund's

13    portfolio, Bitcoin, Ether and Ripple"; do you see

14    that?

15         A.  Yes.

16         Q.  Do you have an understanding as to what

17    Mr. Hall was referring to when he wrote about two

18    rounds of comments focused on the application of

19    Howey?

20         A.  I think I do.

21         Q.  What's your understanding?

22         A.  I think the staff had asked him to provide

206

1    an analysis of how Howey might apply to those three

2    assets.

3        Q.  And fair to say from this that there was a

4    disagreement between the staff and Mr. Hall as to

5    how he applied to Bitcoin, Ether, and Ripple,

6    correct?

7        A.  I don't recall there being a disagreement.

8    You know, the way the comment process works it's

9    usually a question from the staff asking for

10   counsel's views.  I don't think it was resolved at

11   this point.

12       Q.  And what was it that you understood had

13   not been resolved at this point?

14       A.  The comment as to whether the portfolio

15   would be holding securities or other commodities.

16       Q.  And that's because there was a difference

17   of opinion between Mr. Hall and the staff as to

18   whether a fund that held Bitcoin, Ether, and Ripple

19   was holding securities, correct?

20       A.  Again, I don't think the staff had come to

21   a conclusion at this point.  I think they --

22   especially at this stage, but I think they were

207

```
 1   asking for his views.

 2        Q.  And when you say you don't think the staff

 3   had come to a conclusion at that point, what do you

 4   mean?

 5        A.  I think they were waiting to hear from

 6   Mr. Hall before they issued further comments.

 7        Q.  So at least as of April 23rd, 2018 the

 8   staff had not yet come to a view as to whether

 9   Bitcoin, Ether, and -- it should be XRP, but it

10   says Ripple was a security?

11        A.  No.  I'm saying they hadn't resolved

12   whatever the comment was.  I don't even know what

13   the comment was, why they were asking for his

14   analysis.

15        Q.  As of April 23rd, 2018 had the staff come

16   to a view as to whether Bitcoin was a security?

17        A.  I don't know if they had at that point.

18        Q.  As of April 23rd, 2008 --

19        A.  Probably.

20        Q.  I'm sorry.  Did you finish?

21        A.  I don't think the staff at corp fin has

22   ever expressly put out a view on that other than in
```

208

1    my speech in terms of Bitcoin as we see it being

2    offered at that time.

3        Q.  I'm not asking whether it put out a

4    statement.  I'm asking whether as of March 23rd,

5    2018 the staff of corp fin had come to a

6    determination as to whether Bitcoin was a security?

7            MR. TENREIRO:  Let's just answer that yes

8    or no.

9        A.  I believe they had a view.

10       Q.  And what was that view?

11           MR. TENREIRO:  Only disclose what was

12   expressed externally.  Otherwise don't answer.

13       A.  I believe the staff has -- I don't know

14   for sure if the staff has ever expressed as the

15   staff of the division of corporation finance, other

16   than my speech, a view on that topic.

17       Q.  And as of April 23rd, 2018 do you have an

18   understanding as to whether the staff of the

19   division of corporate finance had come to a view as

20   to whether Ether was a security?

21       A.  In April -- I do not believe they had.

22

209

1                        (Hinman Exhibit 21 was marked

2                           for identification.)

3    BY MR. FIGEL:

4        Q.  Mr. Hinman, I'm showing you a document

5    that is marked in the outline as ZZZ and which I

6    believe the court reporter will mark as Exhibit 21.

7                        (Witness reviewing document.)

8        A.  Okay.

9        Q.  Do you recall seeing this document within

10   a week or two of December 15, 2017?

11       A.  I think I did.

12                       (Hinman Exhibit 22 was marked

13                          for identification.)

14   BY MR. FIGEL:

15       Q.  I think we'll leave it alone with that.

16           I'd now like to show you a document that

17   will be marked as Exhibit 22 that's in the outline

18   as AAAA.

19                       (Witness reviewing document.)

20       A.  Okay.

21       Q.  Do you recall seeing Exhibit 22 before?

22       A.  I'm not sure if I read this file comment

210

1    letter.

2                        (Hinman Exhibit 23 was marked

3                          for identification.)

4    BY MR. FIGEL:

5        Q.  Let me now show you a document that's in

6    the outline as BBBB, and I'll ask the court

7    reporter to mark as Exhibit 23.

8                        (Witness reviewing document.)

9        A.  Okay.

10       Q.  Do you recall seeing Exhibit 23 on or

11   about April 16, 2018?

12       A.  I don't remember specifically seeing this

13   format, but I may have seen the responses at some

14   point.

15       Q.  And what do you recall about the

16   responses?

17       A.  Specific recollection of this without

18   reading it, probably not that much.

19                       (Hinman Exhibit 24 was marked

20                         for identification.)

21   BY MR. FIGEL:

22       Q.  Let me show you a document that is in the

211

1    outline as CCCC and I'll ask the court reporter to

2    mark as Exhibit 24.  Mr. Hinman, I may have given

3    you the wrong document.  Are you looking at a

4    document submitted on behalf of ████████

5           MR. TENREIRO:  Yes.  Sorry.  For the court

6    reporter, I said yes, not him.

7           MR. FIGEL:  We actually do have a mistake

8    here.  Apologies.  The internal document code is

9    YYY.

10          MR. TENREIRO:  Okay.

11          MR. FIGEL:  And that should be 24.

12          MR. TENREIRO:  Well, this has been marked

13   24.  So let's mark it 25 maybe.

14          MR. FIGEL:  It's correct.  Just the

15   broadcasting is wrong.

16          MR. TENREIRO:  Ah.

17   BY MR. FIGEL:

18       Q.  Do you recall seeing this document on or

19   about April 8, 2019?

20       A.  I don't have a recollection of seeing this

21   document, no.

22

212

1              (Hinman Exhibit 25 was marked

2                   for identification.)

3    BY MR. FIGEL:

4        Q.  All right.  I am going to next show you a

5    document that's in the outline as Exhibit WW and

6    which I'll ask the court reporter to mark as

7    Exhibit 25.

8            MR. TENREIRO:  This is for the court

9    reporter, this is for you.

10                   (Witness reviewing document.)

11   BY MR. FIGEL:

12       Q.  You testified before the House

13   Subcommittee on Capital Markets on April 26, 2018,

14   correct?

15       A.  Yes.

16       Q.  And you had prepared written remarks that

17   you gave to the committee prior to your testimony,

18   correct?

19       A.  Yes.

20       Q.  And directing your attention to page 36,

21   the first page of the appendix to Exhibit 25.

22       A.  Page 36?

213

1    Q.  At the top, yes.

2    A.  Okay.

3    Q.  Do you see this is the prepared written

4    remarks you gave in connection with your testimony,

5    correct?

6         MR. TENREIRO:  Object to form.  I mean, he

7    has to look at that.

8                   (Witness reviewing document.)

9    A.  Okay.  Yes.

10   Q.  And if you look at the first full

11   paragraph on page 36, can you just read the first

12   sentence into the record, please.

13   A.  "Thank you for inviting me to testify

14   today on behalf of the U.S. Securities and Exchange

15   Commission (SEC or commission) about the division

16   of corporation finance's activities and

17   responsibilities.  Since arriving at the SEC in May

18   2017 I have felt privileged to serve alongside such

19   dedicated and talented individuals."

20   Q.  That's good.

21        You were testifying before the

22   subcommittee on behalf of the Securities and

214

1    Exchange Commission, correct?

2        A.  That's right.

3        Q.  These were not your private remarks?

4        A.  Unless I said so, these would have been --

5    these were my thoughts, but they were on behalf of

6    the commission.  So yes.

7        Q.  And what was the process within the

8    Securities and Exchange Commission that provided

9    the basis for you to be testifying before the

10   subcommittee on behalf of the SEC?

11       A.  "The process" meaning -- what do you mean

12   by "process"?

13       Q.  Well, your written remarks said that you

14   were testifying -- you just testified that you were

15   testifying on behalf of the SEC as opposed to in

16   your private capacity.

17       A.  Right.

18       Q.  I'm trying to understand if there was a

19   process within the SEC that --

20       A.  Right.

21       Q.  -- resulted in you testifying on behalf of

22   the Securities and Exchange Commission as opposed

215

1    to --

2         A.  Sure.

3         Q.  -- the representations you make in -- for

4    instance, in connection with your June 14, 2018

5    speech?

6         A.  Okay.

7              MR. TENREIRO:  I'm just going to instruct

8    the witness not to answer to the extent you're

9    asking him to disclose deliberations or the

10   deliberative process.  So --

11        Q.  I'm not asking for an authorization

12   process or a basis for him to make that

13   representation to Congress.

14        A.  Okay.  I think when someone in Congress

15   wants to hear from the SEC, they contact the

16   division of legislative affairs, they determine who

17   should appear in front of the committee.  And then

18   they generally ask the committee or the

19   subcommittee in this case what is it you're

20   interested in, and then they pick someone to go see

21   that committee.

22        Q.  So it's the office of legislative affairs

216

1   that allows you to testify on behalf of the

2   Securities and Exchange Commission?

3        A.  That's the process, yeah.

4        Q.  You were under oath when you gave these

5   remarks, correct?

6        A.  Yes.

7        Q.  And in addition to your written remarks

8   you actually gave oral testimony, correct?

9        A.  That's right.

10       Q.  If you could look at page 19.  You were

11   asked the following question by Congressman Emmer,

12   correct?  "How can we improve the regulatory

13   clarity for entrepreneurs here in the United States

14   so that their contribution to something that may

15   not be a security will not see enforcement actions

16   by the SEC?"

17           Can you read your response to that

18   question after the chairman's permission to give a

19   quick reply.

20       A.  "One of the things we do is meeting with

21   participants who have these ideas that think they

22   may have a token that shouldn't be regulated as a

217

1    security to work through with them how that may be

2    structured."

3         Q.  And you didn't disagree with the premise

4    of Congressman Emmer's question that there was a

5    need to improve the regulatory clarity of the

6    application of the securities laws to digital

7    assets, correct?

8              MR. TENREIRO:  Object to form.

9         A.  I just tried to answer the substance of

10    his question.  I wasn't going to debate with the

11    congressman whether things were clear or not.

12        Q.  All right.  If you could turn to page 22,

13    and do you see -- I'll just read it to make it

14    easier for you.  This is your response to a

15    question from Congressman MacArthur.  You say "One

16    thing we are trying to do is provide as much

17    guidance as we can to the marketplace so we don't

18    have a chilling effect, but it is still something

19    that is being worked on by all agencies and we're

20    trying to coordinate to make sure we don't stifle

21    innovation."

22             MR. TENREIRO:  Wait a second, Reid, this

218

1    seems to be a response to the chairman's question,

2    Chairman Huizenga.

3          MR. FIGEL:  Did I miss that?

4          MR. TENREIRO:  I just want there to be a

5    clear record.  Towards the top it says "Chairman

6    Huizenga:  Thank you."

7          MR. FIGEL:  Thanks.  You're correct.

8          You gave that testimony, correct?

9       A.  Yes.

10      Q.  And you were under oath?

11      A.  Yes.

12      Q.  Was it true that you were trying to

13   provide as much guidance as you could to the

14   marketplace?

15      A.  Yes.

16      Q.  As of April 26, 2018 had the division of

17   corporate finance issued an interpretive relief

18   about the circumstances under which a digital asset

19   transaction would be an investment contract or a

20   security?

21      A.  Did you say "interpretive release"?

22      Q.  Uh-huh.

219

```
1        A.  No.

2        Q.  As of April 26, 2018 had the SEC --

3   withdrawn.

4        As of April 26, 2018 had the division of

5   corporate finance issued a regulation about the

6   circumstances under which a digital asset

7   transaction would be an investment contract or a

8   security?

9        A.  No.

10       Q.  And the division of corporate finance had

11  not engaged in any rulemaking activity about the

12  circumstances in which a digital asset transaction

13  would be a security, correct?

14       MR. TENREIRO:  I object to form and also

15  instruct the witness not to answer internal

16  deliberations about potential rulemaking.  Are you

17  talking about rulemaking activities externally such

18  as requesting notice of comments or --

19       MR. FIGEL:  Yes.

20       MR. TENREIRO:  Okay.

21       MR. FIGEL:  Public announcement of a

22  potential rulemaking as to when a digital asset
```

220

1      transaction would be viewed as a security under the

2      federal securities laws.

3          A.  No.

4          Q.  And that is all guidance that you could

5      have provided, correct?

6          A.  That's a form of guidance, yes.

7                          (Hinman Exhibit 26 was marked

8                           for identification.)

9      BY MR. FIGEL:

10         Q.  Director Hinman, I'm now going to show you

11     what's in the binder as tab YY and which I will ask

12     the court reporter to mark as Exhibit 26 I believe.

13                          (Witness reviewing document.)

14         A.  Okay.

15         Q.  Do you recall receiving this e-mail from

16     Ms. Szczepanik on May 16, 2018?

17         A.  This refreshes my recollection.

18         Q.  And you responded to that e-mail, correct,

19     at the top?

20         A.  Yes.

21         Q.  Any reason to believe this is not a true

22     and accurate copy of the e-mail that you exchanged

221

1    with Ms. Szczepanik on May 16, 2018?

2        A.  No.

3        Q.  Ms. Szczepanik wrote to you "Subject:

4    Buterin, listen to my panel," and then says "He

5    came up to me right after the panel and said he

6    really appreciated my remarks and would like to

7    talk to us at some point.  I said our doors are

8    always open."

9            Do you recall what panel Ms. Szczepanik

10   was speaking on --

11       A.  No.

12       Q.  -- on or about May 16, 2018?

13       A.  No.

14       Q.  And your response to her statement that

15   Mr. Buterin would like to talk to us at some point

16   and that you would -- the division of corporate

17   finance would appreciate the opportunity to talk

18   was to say "Terrific," correct?

19       A.  Yes.

20       Q.  And then you wrote "The ▇▇▇▇▇▇ folks

21   are very happy we are talking with him as well."

22   How did you know the ▇▇▇▇▇ folks were happy

222

1    that the division of corporate finance was speaking

2    to Mr. Buterin?

3         A.  I think I arranged the call with

4    Mr. Buterin to do our diligence through █████████

5         Q.  Did you have a call with Mr. Buterin?

6         A.  I think a few of us did together.

7         Q.  You were on that call?

8         A.  I think so.

9         Q.  Approximately when was that?

10        A.  Right around the time of this e-mail

11   actually.

12        Q.  And how did -- what did you -- withdrawn.

13            What did you hear on that call that

14   allowed you to form the impression that the

15   ███████████ folks are very happy that the division of

16   corporate finance was talking with Mr. Buterin?

17        A.  I think you're referring to my call with

18   Mr. ███████

19        Q.  I'm referring to the basis for your

20   statement --

21        A.  Right.

22        Q.  -- that the ███████████ - that you were

223

1   relating that the ███████ folks were happy that

2   the division of corporate finance --

3       A.  Right.  No, because we were talking

4   about --

5       Q.  -- were talking to Mr. Buterin.

6       A.  We were talking about the call with

7   Mr. Buterin.  There was a previous call with ████

8   ████████ and on that call he was happy to hear that

9   we were going to be talking to Buterin as we did

10  our diligence.

11      Q.  And what did you tell Mr. ███████ bout any

12  arrangements you had made to speak to Mr. Buterin?

13          MR. TENREIRO:  Objection to form, asked

14  and answered.

15      A.  Yeah.  I didn't tell ████████nything about

16  the arrangements.  I was asking ████ if he could

17  help us set up the call.

18                      (Hinman Exhibit 27 was marked

19                       for identification.)

20  BY MR. FIGEL:

21      Q.  I'd now like to show you what is marked as

22  ZZ in the outline and will be Exhibit 27.

224

1          Again, Mr. Tenreiro, I'll state for the

2     record that we understand that these e-mails were

3     all produced together and are therefore one

4     document.  That may not be accurate, but I do

5     believe they all relate to the same topic.

6               MR. TENREIRO:  Yeah.  I mean, I'll just

7     note that the Bates stamps are not sequential, but,

8     you know, we can figure out the authenticity point

9     later.

10              MR. FIGEL:  Okay.

11              MR. TENREIRO:  I'm just struggling, Reid,

12     because he's not copied on the first e-mail, but

13     then there appears to be another one where he's

14     copied.  So I'm just going to ask that the witness

15     have enough time to review the documents and then

16     we can ask the questions.

17              MR. FIGEL:  Fair enough.

18                    (Witness reviewing document.)

19        A.  Okay.

20        Q.  Did you participate in a telephone call

21     with the Ethereum Foundation I believe it would be

22     on June 8, 2018?

225

1        A.  I think I did.  I think that's where we

2    ended up having the call.  It looks like from this

3    e-mail chain it's going back and forth, but that

4    sounds right.

5        Q.  And you were on that call, correct?

6        A.  Let's just check.  There's another

7    statement here about a 1:00 p.m. call on June 25th,

8    but I did participate in a call with the Ethereum

9    folks, yes, (inaudible).

10        Q.  And according to the portion of this

11    exhibit that ends in 58 at the top --

12           MR. TENREIRO:  58 at the bottom.

13        Q.  I'm sorry, 58 at the bottom, yes, in

14    addition to you it was David Frederickson, Jonathan

15    Ingram, and Michael Seaman from corporate finance,

16    and Gary Goldsholle from trading and markets,

17    correct?

18        A.  Yeah.  That's who we thought was going to

19    participate in the call.  I don't know if others

20    were added on or came off that, but probably many

21    of those folks were on the call.

22        Q.  And directing your attention to Bates

226

1     number ending 9677.

2          A.  Yeah.

3          Q.  Mr. Seaman, who is your counsel, correct?

4          A.  Yes.

5          Q.  Wrote you and identified the participants

6     for the call from the Ethereum Foundation, correct?

7          A.  Yes.

8          Q.  And were those the individuals both from

9     the foundation and from Sidley Austin and Pryor

10    Cashman that participated in the call on June 8,

11    2017?

12         A.  The only folks I specifically remember on

13    this list would be Vytalik and Tom Kim.

14         Q.  If you could turn to the next page you'll

15    see there's a document that's entitled "Questions

16    for the call."

17         A.  Right.

18         Q.  Did you draft these questions?

19         A.  I think I might have with my counsel

20    probably.

21         Q.  And these questions were provided to

22    representatives of the Ethereum Foundation prior to

227

1    the call?

2        A.  I believe they were.

3        Q.  And they told you that they wanted the

4    "Focus to remain on the attached questions that we

5    previously provided to them"?

6        A.  I think that's what the e-mail says.

7        Q.  And, in fact, were these seven questions

8    discussed on the call?

9        A.  Best of my recollection, sure.

10       Q.  And you understood that they would not

11   entertain questions from the staff of the division

12   of corporate finance that went beyond these seven

13   questions, correct?

14       A.  I don't know if they would or wouldn't

15   have, if we even stuck to this, but the idea was to

16   give them notice so they could be prepared and this

17   was the substance of what we wanted to cover.

18       Q.  And as of June 8th, 2018 was your speech

19   essentially in final form?

20       A.  As of when?  I'm sorry.

21       Q.  June 8, 2018.

22       A.  It would have been close.

228

1    Q.  Do you recall whether you made any

2    modifications to the draft of your speech following

3    this meeting?

4        MR. TENREIRO:  Let's just answer that yes

5    or no, please.

6    A.  Yes.

7    Q.  Do you recall what facts you learned on

8    this phone call that caused you to modify your

9    June 18th speech -- June 14th speech?

10   A.  No, none of the facts on the call.

11   Q.  So there's nothing you learned on the call

12   from the Ethereum Foundation that caused you to

13   change the substance of the draft of your speech as

14   it existed on or about June 8, 2018?

15   A.  Not that I recall.

16   Q.  Do you recall when you were first invited

17   to speak at the Yahoo conference when you delivered

18   your June 14th speech?

19   A.  The date I was asked to do that?

20   Q.  Roughly.

21   A.  Probably a couple months ahead of time.

22   Q.  And who did you speak to that invited you

229

1    to give a speech?

2        A.  Who was it that invited me?

3        Q.  Yes.

4        A.  Frankly, I don't remember.  They may have

5    asked through my counsel.

6        Q.  Did -- did some third party suggest to you

7    what the substance of your speech would be or

8    should be?

9        A.  Not that I recall.

10       Q.  So in other words, it was an invitation to

11   give any speech that you elected to give; is that

12   correct?

13           MR. TENREIRO:  Object to form.  You asked

14   about substance, not the subject matter, but

15   okay.

16       A.  Right.  I mean, it was a digital asset

17   conference.  So that was going to be the focus,

18   but -- so they would have asked me if I wanted to

19   speak, you know, on that topic.

20       Q.  And did they give you any more guidance or

21   suggestions as to what specifically they would like

22   you to address on that topic?

1    A.  No.

2    Q.  If we could turn back -- just a second --

3  to Exhibit 10, which is the text of your speech.

4  Now, if you could, Director Hinman, look at page 4

5  of 6 of your speech.

6         MR. TENREIRO:  Wait.  I'm sorry.  Are you

7  going to get into the substance of his speech now?

8  I just want to make sure --

9         MR. FIGEL:  In a very limited way.

10         MR. TENREIRO:  Okay.

11         MR. FIGEL:  Do you want to take a break?

12         MR. TENREIRO:  No.  Go ahead.  If we need

13  it, we can stop.  Go ahead.

14         MR. FIGEL:  The only person who matters

15  would love a break.

16         MR. TENREIRO:  Let's do it.

17         THE VIDEOGRAPHER:  Going off at 3:12.

18                   (A short break was had.)

19         THE VIDEOGRAPHER:  We are back on the

20  record at 3:29.

21         MR. TENREIRO:  Reid, before we'd gone off

22  the record earlier I'd instructed Mr. Hinman not to

231

1    answer a question when you asked him in sum and

2    substance if Mr. Clayton had directed him to call

3    Mr. ███████    So we're going to withdraw that

4    instruction to the extent you want to ask it again.

5    And if you ask that question again, the instruction

6    is simply, you know, to answer whatever final

7    directive, if any, you might have gotten from

8    Mr. Clayton, but don't discuss any back and forth

9    you might have had with him about whether you

10   should be calling Mr. ███████

11          MR. FIGEL:  Give me just a second.

12          Do you mind if we go back off the record

13   for a second.

14          THE VIDEOGRAPHER:  Off the record at 3:31.

15                  (A short break was had.)

16          THE VIDEOGRAPHER:  Back on the record at

17   3:32.

18   BY MR. FIGEL:

19       Q.  Mr. Hinman, I'm going to ask you to go

20   back to Exhibit 17 so I can pose a question to you

21   that Mr. Tenreiro said you couldn't answer but now

22   he says you can.

232

1     A.  Okay.

2     Q.  Directing your attention to the e-mail you

3  sent to ███████ that's reflected on the page of

4  Exhibit 17 that ends with 1454, do you see "Wrote

5  to Mr. ████ at 2:06 p.m."?

6     A.  Yes.

7     Q.  Did Chairman Clayton ask you to reach out

8  to Mr. ████

9     A.  Not to my recollection.

10     Q.  All right.  Let's go back.  I think we

11  were on EE, which is your speech.

12     A.  All right.

13     Q.  All right.  Mr. Hinman, I'm directing your

14  attention to Exhibit 10, which is your speech.

15  Your speech included remarks that you included in a

16  declaration in support of Mr. Tenreiro's efforts to

17  quash your deposition in which you stated at

18  paragraph 11 "I began the speech with the following

19  disclaimer.  My remarks are mine alone, not

20  necessarily those of the commission, the

21  commissioners, or the staff."

22        Is that -- I'll represent to you that's

 1  what it says.  That was a statement you made under

 2  oath, correct?

 3          MR. TENREIRO:  Object to form.  Go ahead.

 4      A.  Yes.

 5      Q.  And when you said your remarks were yours

 6  alone, what did you mean by that?

 7      A.  That these would be my remarks.  We as a

 8  very standard practice whenever an SEC official

 9  speaks provide a statement to that effect.

10      Q.  Well, were these statements your

11  statements alone?

12          MR. TENREIRO:  These statements, Reid?

13          MR. FIGEL:  I'm sorry.  In Exhibit 10.

14      A.  The speech reflects my thoughts.  I'm

15  comfortable with the speech reflecting my thinking.

16      Q.  But were they your statements in your

17  individual capacity alone?

18          MR. TENREIRO:  Object to form.

19      A.  They are intended to be a speech of my

20  thoughts in the space.  Other people may share

21  similar views.

22      Q.  If I could direct your attention to page 4

234

1  of 6 of your speech and in particular the second

2  full paragraph on page 4 of 6 beginning with

3  "Promoters and other market participants"; do you

4  see that?

5      A.  Sure.

6      Q.  Could you read the first two sentences?

7      A.  "Promoters and other market participants

8  need to understand whether transactions in a

9  particular digital asset involve the sale of a

10  security.  We are happy to help promoters and their

11  counsel work through these issues."

12      Q.  That's it, two sentences.  Thank you.

13          Why did you say that promoters and other

14  market participants need to understand whether

15  transactions in a particular digital asset involve

16  the sale of a security?

17          MR. TENREIRO:  Without disclosing

18  deliberations.

19      A.  I think it's important for promoters,

20  other market participants to understand if they

21  involve the sale of securities so they can comply

22  with the security laws.

1      Q. The reason you had that belief was because

2 you understood that promoters and other market

3 participants did not understand whether

4 transactions in a particular digital asset involve

5 the sale of a security, correct?

6      MS. KELLY: Object to form.

7      MR. TENREIRO: Object to form.

8      A. No.

9      Q. Did you believe that promoters and other

10 market participants understood when transactions in

11 a particular digital asset involve the sale of a

12 security?

13      MR. TENREIRO: Same instruction about not

14 disclosing internal discussions.

15      A. I think what I was trying to say here is

16 that folks need to develop an understanding of how

17 what they're doing in this marketplace implicates

18 the securities laws.

19      Q. And that's because you felt they didn't

20 understand, correct?

21      MR. TENREIRO: Objection to form.

22      MS. KELLY: Objection to form.

236

```
 1          A.  I think some people were not following
 2     securities laws.  So perhaps maybe that was their
 3     excuse, they didn't understand.
 4          Q.  And some people didn't understand,
 5     correct?
 6               MR. TENREIRO:  Object to form.
 7          A.  It's hard for me to know what other
 8     people's frame of mind was, whether they really
 9     understood and said they were not and that was an
10     ease way to avoid compliance or whether they truly
11     didn't understand the law.
12          Q.  You didn't know one way or the other?
13          A.  I don't.
14          Q.  And the next sentence is "We are happy to
15     help promoters and their counsel work through these
16     issues."  When you're referring to "we," who are
17     you talking about there?
18          A.  The division.
19          Q.  So you're not speaking just on behalf of
20     yourself, you're speaking on behalf of the division
21     of corporate finance in that sentence?
22               MR. TENREIRO:  Object to form.  Go ahead.
```

237

1     A.  I think what I'm trying to say is as the

2  head of the division I would be happy if people

3  came to see us to talk through these issues.  I

4  think I can speak that, you know, my colleagues

5  there were also happy to have those opportunities.

6     Q.  All right.  If you skip down a sentence to

7  the sentence that begins "In addition we

8  recognize."  Can you read that sentence to the end

9  of -- that portion of your speech to the end of the

10  paragraph.

11     A.  "In addition we recognize that there are

12  numerous implications under the federal securities

13  laws of a particular asset being considered a

14  security.  For example, our divisions of trading

15  and markets and investment management are focused

16  on such issues as broker-dealer, exchange and fund

17  registration, as well as matters of market

18  manipulation, custody, and valuation.  We

19  understand that the market participants are working

20  to make their services compliant with the existing

21  regulatory framework, and we are happy to continue

22  our engagement in this process."

238

1          Q.  And when you said in the portion you just

2     read "We recognize there's numerous implications,"

3     the "we" refers to the divisions of corporate

4     finance, trading and markets, and investment

5     management, correct?

6               MR. TENREIRO:  Objection to form.

7          A.  Yes.  I think I'm saying I believe we

8     recognize that.

9          Q.  And "we" are the three divisions I just

10     named?

11          A.  Yeah.  It's my view that we recognize

12     that, yes.

13          Q.  And the division of corporate finance

14     wasn't responsible for the regulation of

15     broker-dealer exchanges or fund registration,

16     correct?

17               MR. TENREIRO:  Object to form.  Go

18     ahead.

19          A.  The broker-dealer exchange -- generally

20     correct.

21          Q.  That's other divisions of the SEC,

22     correct?

239

1        A.  Generally correct.

2        Q.  And then when you said "We understand that

3    market participants are working to make their

4    services compliant with the existing regulatory

5    framework," you were referring to broker-dealers,

6    securities exchanges, and fund managers who are

7    registering funds, correct?

8              MR. TENREIRO:  Object to form.

9        A.  I was actually speaking about market

10   participants.  That would include the group you

11   just mentioned, but others as well.

12       Q.  So when you say "We understand" in that

13   sentence, the "we understand that market

14   participants are working," you're referring again

15   to the division of corporate finance, the division

16   of trading and markets, and investment management,

17   correct?

18       A.  I'm saying I believe that we understand

19   that, yes.

20       Q.  And you wouldn't have made those remarks

21   if you thought that the director of the division of

22   trading and markets had a different view, would

240

1    you?

2         MR. TENREIRO:  Object to form.

3         A.  I just said I believe -- when I said "we

4    understand," that was my statement of a belief that

5    I had that I understood that those folks were

6    engaged in those activities.

7         Q.  And you wouldn't have stated that belief

8    if you had an understanding that the division of

9    trading and markets had a different view, correct?

10        A.  No.

11        Q.  And the same thing with respect to the

12   statement you made that related to the division of

13   investment management, you wouldn't have made a

14   statement of belief if you thought the then

15   director of investment management didn't share your

16   views on the expression of this belief, correct?

17        MR. TENREIRO:  Object to form.

18        A.  Yeah.  If I -- if I didn't think the

19   director of investment management was focused on

20   those issues, I would not have said that.

21        Q.  So fair to say that when you made the

22   statements in this paragraph that you read, you

241

1    believed you were expressing the views of the

2    directors of three divisions, correct?

3         MR. TENREIRO:  Object to form.  That's not

4    what he said.

5         A.  I think I already answered that, but I

6    think what I was saying was that was my

7    understanding of how these other divisions are

8    operating in this space.

9         Q.  All right.  I want to go back to another

10   exhibit that we talked about before the break.  If

11   you could go to Exhibit 27.

12        A.  Which is?

13        MR. TENREIRO:  Looks like this.

14        Q.  This is the exchange of e-mails you had

15   with Sidley.

16        A.  Right.

17        MR. TENREIRO:  I'm going to find it for

18   him just because I wrote on it.

19        MR. FIGEL:  Sure.  You want a clean copy?

20        THE WITNESS:  If you have one handy.

21        MR. FIGEL:  Actually, Jorge, I don't mind.

22   Just --

1          MR. TENREIRO:  You don't mind if I show

2    him --

3          MR. FIGEL:  I do not.

4          MR. TENREIRO:  You're not going to ask for

5    my -- okay.

6          THE REPORTER:  Guys.

7          MR. TENREIRO:  So just for the record, to

8    be clear, I'm showing him my marked up copy.  Reid

9    will not ask for my marked up copy.

10   BY MR. FIGEL:

11        Q.  If I could direct your attention,

12   Mr. Hinman, to the portion of Exhibit 27 that bears

13   Bates No. 659.

14        A.  Okay.

15        Q.  And this is an e-mail from Thomas Kim to

16   your counsel, Michael Seaman, correct, dated

17   June 6, 2018 at 1:14?

18        A.  There are a few e-mails on that page.  I'm

19   sorry.

20        Q.  You have to actually look at the page

21   before, but I'm focused here at the very top, the

22   very top e-mail.

243

```
 1        A.  On page 659?

 2        Q.  It goes from 658 is what you actually see,

 3   the to and from and --

 4        A.  Mine says June.  Sorry.  Sorry.

 5        Q.  Did I say something else?  June 1st, 2018.

 6        A.  I think you said the 6th.  Gotcha.  We're

 7   on the same page literally.

 8        Q.  So Mr. Kim held a position at the SEC; is

 9   that correct?

10        A.  Formerly?

11        Q.  Formerly.

12        A.  Yes.

13        Q.  And what position did he hold?

14        A.  I think he was the chief counsel of the

15   division of corporate finance.

16        Q.  But he didn't serve under you; is that

17   correct?

18        A.  That's right.

19        Q.  He writes and says "Michael, I spoke to

20   our client in view of the staff's request.  How

21   about next Friday, June 8 at either 10:00 a.m.

22   Eastern time or 11:00 Eastern time for a conference
```

1    call?  Given the short time period to prepare for

2    the call, we would prefer to focus the discussion

3    on the seven or so questions that Bill posed to me

4    yesterday."

5           Do you recall having a conversation with

6    Mr. Kim on May 31st, 2018 in which you discussed

7    the questions that you wanted to pose to his

8    client?

9        A.  Now that I see this e-mail chain, yes.

10       Q.  And who was on that call?

11       A.  With Tom Kim where I posed the questions?

12       Q.  Yes.

13       A.  I think it was just possibly the two of

14   us.

15       Q.  Did you take any notes during that call?

16       A.  Not that I recall.

17       Q.  Did you have a prepared list of questions

18   that you referred to while you were on the call?

19       A.  I don't remember having a prepared list.

20   This is -- I can infer from the questions that are

21   attached at the end that somewhere along the way we

22   developed them into a list.

245

```
 1        Q.  So if I understand your testimony, you had
 2   a one-on-one private call with Mr. Kim looks like
 3   on May 31st, 2018 in which you identified the
 4   questions you wanted to ask his client?
 5        A.  Best of my recollection, there was no one
 6   else on the call.  My counsel might have been in
 7   the room for part of the call.  I just don't
 8   remember.
 9        Q.  And then we have the exchange later in
10   which the questions are prepared in written form
11   and sent, correct?
12        A.  That's what it looks like.
13            MR. FIGEL:  All right.  Let's go to the
14   tab in the outline HHH.  I believe we're at 28.
15                      (Hinman Exhibit 28 was marked
16                       for identification.)
17                      (Witness reviewing document.)
18   BY MR. FIGEL:
19        Q.  Mr. Hinman, I don't want to interrupt you,
20   but just for the record for Mr. Tenreiro since I
21   can see a wrinkle on his forehead, this reflects
22   two versions of the same document with different
```

246

1    presentations based on the metadata.  So one

2    effectively a red line which shows what was taken

3    out, and the other is essentially the same

4    information but put in balloon form on the margin.

5         MR. TENREIRO:  So you created this exhibit

6    from something we produced to you it seems like?

7    Because the cover e-mail only suggests one

8    attachment.

9         MR. FIGEL:  That's correct.  There's only

10   one attachment.  The metadata was in the native

11   file that you produced to us.  So how it's

12   presented depends on the software.

13        MR. TENREIRO:  I understand.

14        MR. FIGEL:  It's the same -- substantively

15   it's the same.  The presentation is just --

16        MR. TENREIRO:  I understand.

17        MR. FIGEL:  One shows a red line, which I

18   think is easier to read and to follow.  The other

19   is the way it presents in balloon form.

20        MR. TENREIRO:  It's a native, in other

21   words.  Understood.  I think, right?  Yeah.

22        A.  Can I understand that?  So the e-mail

247

1   attached --

2        Q.  I don't know.

3        A.  Maybe not.  The e-mail attaches one of

4   these attachments as an exhibit.  Which one is the

5   one that actually shows up when you open up the

6   e-mail?

7        Q.  I will try and represent to you what I

8   understand -- and my loyal aide will tell me when I

9   get the technical points wrong -- this was a

10  document that was produced to the Defendants in

11  discovery from the SEC.  It is an electronic

12  document effectively --

13       A.  Right.

14       Q.  -- with metadata as to the archeology, if

15  you will, as to how the document was modified.

16       A.  Right.

17       Q.  The native file allows it to be printed in

18  different formats, and so what you have here is the

19  same electronic information printed in different

20  formats.

21            MR. TENREIRO:  In two different formats.

22  So you have two.

248

1          MR. FIGEL:  But it's substantively the

2     same.

3          A.  Right.  But we're not sure if you open up

4     the e-mail which of the two you would see or would

5     you even see the red line?  I guess that was my

6     question.

7          Q.  I don't know that I can answer that.

8          A.  Okay.  I don't either.

9          Q.  So let me start with you'll see on the

10    page that ends with Bates 5281 --

11         A.  I don't have Bates numbers here.  Oh,

12    okay.  I do have that one.

13         Q.  -- there's an e-mail from your counsel,

14    Mr. Seaman, to someone named Marvin Ammori that

15    you're CC'd on.

16         A.  Right.

17         Q.  And what Mr. Seaman writes is "Marvin,

18    here are the questions with a couple revisions we

19    discussed earlier.  Please let me know if you have

20    any questions."

21         A.  Right.

22         Q.  As I understand it, you would have

1  received a copy of this e-mail since you were CC'd

2  on it with the attachment.  Do you recall receiving

3  the e-mail and some form of the attachment on or

4  about -- looks like it's October 25th, 2018?

5      A.  I don't have a specific recollection of

6  that.

7      Q.  Do you recall being invited to speak at

8  the Tech GC National Summit in New York City on or

9  about October 26, 2018?

10      A.  Yes.

11      Q.  And do you recall when you were invited to

12  speak at that -- to participate in the conference?

13      A.  No.  Probably, again, a month or two

14  ahead.

15      Q.  Directing your attention to the second

16  page -- and this does not bear a Bates number

17  because it wasn't produced as a document.

18      A.  Yeah.

19      Q.  Do you recognize the name Hilary Kivitz?

20      A.  From this, yes.

21      Q.  Who is Ms. Kivitz?

22      A.  She was one of the folks interviewing me.

250

1   It says here she's at A16z, which now that I see

2   this it's stirs a memory she may have been there.

3       Q.  And do you know Marvin Ammori?

4       A.  Yes.

5       Q.  And who is Mr. Ammori?

6       A.  He's a lawyer that, you know, has spoken a

7   lot in the crypto space.  I'm not really sure who

8   Pro Tool Labs is, but he was also someone

9   interviewing me.

10      Q.  A16z crypto is the Andreessen Horowitz

11  fund that you're currently a senior advisor to?

12      A.  Well, at this time the fund that I'm going

13  to be advising didn't exist, but this was a

14  predecessor fund.

15      Q.  And do you know whether Pro Tool Labs is

16  one of the companies sponsored by Andreessen

17  Horowitz?

18      A.  I don't know.

19          MR. TENREIRO:  I'll object to form.  Go

20  ahead.

21          THE WITNESS:  Sorry.

22      Q.  And what specifically were you invited to