251

1   do at the Tech GC National Summit?

2       A.  Speak about tokens, decentralized software

3   networks, and securities offerings.

4       Q.  And if I understand your prior testimony,

5   you were going to be interviewed my Ms. Kivitz and

6   Mr. Ammori?

7       A.  That's right.

8       Q.  And who were the attendees as you

9   understood it at the Tech GC National Summit?

10      A.  I think they were largely, as the name

11  sort of implies, general counsel involved in this

12  space.

13      Q.  Did you, in fact, attend the Tech GC and

14  were you interviewed by Ms. Kivitz and Mr. Ammori?

15      A.  I think I did.  And I don't remember her

16  asking as many questions as Marvin, but the two of

17  them I think were on stage.

18      Q.  And approximately how many people were in

19  attendance?

20      A.  These all kind of blend together, but I

21  would guess 50 to a hundred people.

22      Q.  And the attachment to the e-mail that you

252

1    were CC'd on lists questions that Ms. Kivitz and

2    Mr. Ammori were planning to ask you during their

3    interviews of you; is that correct?

4         A.  Yeah, I think so.

5         Q.  And looking at those questions, does that

6    refresh your recollection about what you learned on

7    or about October 25th, which looks like it's the

8    day before you attended the conference, about the

9    questions that they were going to ask you?

10             MR. TENREIRO:  Object to form.

11        A.  Yeah.  Could you repeat the question?  I'm

12   not sure I followed it.

13        Q.  I'll try again.

14             Does seeing the attachment to Exhibit 28

15   refresh your recollection about any questions you

16   were given in advance of the interview at the Tech

17   GC National Summit.

18        A.  Not really, but this looks like a set of

19   questions that might have been asked.  So...

20        Q.  Let me direct your attention now to

21   question 4.  You'll see the question is

22   "Mr. Hinman, you made huge news in the crypto world

1    in your talk on June 14th, 2018.  Thank you, thank

2    you for providing some guidance on your thinking

3    through that talk.  First, can you summarize the

4    key concepts for us."

5            Do you agree with the statement that your

6    speech was huge news in the crypto world?

7        A.  I think it was big news in the crypto

8    world.

9        Q.  And the response that is proposed to this

10   question includes several things that have been

11   crossed out.  The first one is it says "Several key

12   points, token and offering may be distinct.  Token

13   may be offered in a securities offering at some

14   point and the future offerings may be

15   nonsecurities.  Nonetheless, the touchstone of the

16   analysis is likely the Howey test prong regarding

17   an expectation of profits solely from the efforts

18   of others."  I'm going to stop there.

19           Did you direct Mr. Seaman to delete that

20   proposed response?

21           MR. TENREIRO:  I object to the form and

22   the characterization of this as a proposed

254

1    response.

2         A.   That's right.  This is not a proposed

3    response.  These are, I believe, subtopics for the

4    major heading.  These were additional questions

5    they were thinking of asking.

6         Q.   What is your basis for your testimony that

7    you understood that these were subtopics that they

8    proposed?

9         A.   Because when you read them all in context,

10   it's clear that they are sort of follow-on

11   questions.  If you read No. 2, for instance, it's

12   pretty clear that's another question they're going

13   to ask.

14        Q.   And focusing now on 4A --

15        A.   Right.

16        Q.   -- you'll see that it was deleted?

17        A.   Right.

18        Q.   And I will represent to you my

19   understanding is that Mr. Seaman deleted this

20   portion of the document.

21             MR. TENREIRO:  What's the basis of that

22   understanding, Reid?

255

1          MR. FIGEL:  Our review of the metadata.

2     If you look to -- depends how you present it, but

3     if you go to the second document, it says on some

4     version of it deleted by Michael Seaman.

5          MR. TENREIRO:  Okay.  I think there's no

6     foundation to that right now in the record, but go

7     ahead and ask the question.

8          MR. FIGEL:  Let's open the native file and

9     I'll try and show you because I think it's

10    important.

11         MR. TENREIRO:  Even if it is, you can ask

12    him if he directed Seaman to delete it, I mean,

13    does he remember that.

14    BY MR. FIGEL:

15         Q.  Did you direct Mr. Seaman to delete these

16    subtopics?

17         A.  I don't recall directing him to do that.

18         Q.  Do you have an understanding as to why he

19    deleted these subtopics?

20         MR. TENREIRO:  Without disclosing

21    deliberations or conversations.

22         A.  I don't have a specific recollection of

256

1    reading the particular deletion here.  I think he

2    may have been looking for a broader question rather

3    than something that was characterizing some of our

4    advice or our guidance in this area.  This looks

5    very narrow and we might not have agreed with the

6    premise of the question.

7        Q.  Well, do you agree that one of the key --

8    one of the key points of your June 14, 2018 speech

9    was that "The token and the offering may be

10   distinct.  The token may be offered in a securities

11   offering at some point and the future offerings may

12   be nonsecurities.  Nonetheless the touchstone of

13   the analysis is likely the Howey test prong

14   regarding an expectation of profit solely from the

15   efforts of others.  A sufficiently decentralized

16   network token does not rely on the efforts of

17   others"?

18           MR. TENREIRO:  Object to form.  Do you

19   want to break that up?  I mean --

20           MR. FIGEL:  No.

21           MR. TENREIRO:  It's impossible to answer

22   that.  Go ahead.

257

1          MR. FIGEL:  Do you disagree that that was

2     a key point of your June 14, 2018 speech?

3          MR. TENREIRO:  Object to form.

4          A.  I think that is too narrow a reading of

5     the speech.  I think it's -- again, I think why

6     Michael may have deleted this is the premise of

7     this was that these were the key items, and I think

8     it was reducing a five-page speech or six-page

9     speech, whatever it is, to one paragraph.

10         Q.  Turn the page, if you would, and go to

11    question 6.

12         A.  Yeah.

13         Q.  So you'll see in the portion of the e-mail

14    that's in different colors that, according to your

15    understanding, "The moderators suggested another

16    issue is that to the outside observer the SEC can

17    be opaque.  With all the divisions -- different

18    divisions and offices how do you know who to call?

19    You call ten different law firms, they give you ten

20    different answers, each of them has their own

21    particular spin.  It's like the white light of your

22    speech went through a prism and came out in ten

258

1    different colors of legal advice."

2          Let's just focus on those sentences.  Do

3    you know why -- did you direct Mr. Seaman to delete

4    that portion of the proposed question?

5          MR. TENREIRO:  Object to form.

6          A.  I don't recall directing him to do that.

7    It's hard to tell from the way this document's

8    presented whether he added the statement "Another

9    issue is that to the outside observer is that the

10   SEC can be opaque.  With all the different

11   divisions and offices how do we know who to call."

12   That looks like that's something he added.  It was

13   probably trying to give me an opportunity to say

14   here's how you can get your answers -- answers to

15   questions you may have.

16         Q.  Do you believe that Mr. Seaman wrote "You

17   call ten different law firms, they give you ten

18   different answers"?

19         A.  No.  I think that is struck out in the

20   document I have in front of me.  So my guess is

21   that this is a very long three-paragraph, almost a

22   full page question, and he may have deleted it for

259

```
 1    any number of reasons.

 2         Q.  Fair to say that the moderators believe

 3    that "You call ten different law firms, they give

 4    you ten different answers," correct?

 5         MR. TENREIRO:  I'm just going to -- Reid,

 6    I'm going -- I'm going to just to note an

 7    objection.  Judge Netburn has ruled on your fair

 8    notice defense.  The focus is not on what the

 9    market participants believed.  It's an objective

10    test.  You're skating dangerously close in my

11    opinion to opening the door to what people

12    believed, including your client.  Go on if you'd

13    like.

14         MR. FIGEL:  Noted.

15         Can you answer my question?

16         A.  Sure.  I just want to make sure -- answer

17    the question?  Okay.

18         I don't know what the moderators thought

19    when they were coming up with these questions, what

20    was in their mind, if they thought It was a

21    colorful way to describe a question or ask a

22    question.  I don't really know what they had in
```

260

1  their mind.  It's hard for me to read somebody

2  else's mind.

3       Q.  But you have no reason to believe that

4  Mr. Seaman added that portion to this document,

5  correct, "You call ten different law firms" all the

6  way down to "Ten different colors of legal

7  advice"?

8       A.  No.  Again, I think this was a deletion,

9  but I don't know the history of the -- of the

10  questions, who initially drafted them, who changed

11  them, but my best guess would be that Mr. Seaman

12  added the language that's in red but not struck out

13  and struck the things that are struck.

14       Q.  All right.  Let's go to sub A on 6.

15       A.  Sub A on 6.  Okay.

16       Q.  Beginning with "Another issue" and ending

17  with "Different lawyers."  Do you have an

18  understanding as to whether Mr. Seaman added that

19  or whether Mr. Seaman deleted that?

20       A.  Again, I don't know the editorial history

21  here.  So my previous statement that I think he

22  probably struck things that are marked out and

1   added things that are just in red, but I don't have

2   firsthand knowledge of that.

3       Q. All right. Same question with respect to

4   the next portion of this, "New insights are based

5   on who can get a meeting or which lawyer says they

6   know someone in the right office. There have been

7   some efforts to avoid this and to try to bring the

8   conversations on this topic into an open forum and

9   find consensus on best practice." Do you have any

10   reason to believe that Mr. Seaman added this?

11       MR. TENREIRO: Object to form.

12       A. Same answer.

13       Q. And same set of questions all the way to

14   the bottom. Any information about who added the

15   language and who deleted it?

16       A. No. Again, I think things that are in red

17   such as "Do you have plans to issue more guidance"

18   were likely added by Mr. Seaman, and other things I

19   just don't know the editorial history.

20       Q. Do you know whether there was a video

21   recording made of your remarks at the Tech GC

22   National Summit on November 26th?

1        A.  I don't know.

2            MR. FIGEL:  How are you doing, Ms. Court

3    Reporter?

4            THE REPORTER:  I'm good.  Thanks for

5    asking.

6            MR. FIGEL:  We are now going to a section

7    that will be far less interesting than watching

8    paint dry.

9                        (Whereupon a discussion was had

10                        off the record.)

11                       (Hinman Exhibit 29,

12                        Exhibit 30, Exhibit 31,

13                        Exhibit 32, and Exhibit 33 were

14                        marked for identification.)

15   BY MR. FIGEL:

16       Q.  Mr. Hinman, I'm going to show you -- I'm

17   going to show you -- I'm going to show you a

18   document that is in the script as AAA and which

19   will now be 29.  The next exhibit is what's in the

20   script as BBB and which we will now mark as 30.

21   And what is now in the script as CCC and I'll ask

22   the court reporter to mark as Exhibit 31.  I guess

263

1     I should --

2              MR. TENREIRO:  The dates on the --

3              MR. FIGEL:  AAA, which is now 29, is the

4     SEC's June 21st, 2021 privilege log.  The document

5     that's marked as Exhibit 30 is the SEC's July 14th,

6     2021 privilege log.  This document which I'll ask

7     you to mark as Exhibit 31 is the SEC's July 21st,

8     2021 privilege log.

9              MR. TENREIRO:  Just to the extent there

10    was more than one on July 21st, I can't remember,

11    but for a little more clarity, it's a four-entry --

12    it's a four-entry log on July 21st.

13             MR. FLUMENBAUM:  It actually says on the

14    top "SEC Privilege Log 2."

15             MR. TENREIRO:  There you go, right.

16             MR. FIGEL:  I have there were two

17    additional ones that you produced on the 23rd.

18             MR. TENREIRO:  Right, but in terms of the

19    21st, as Marty correctly notes, this is log 2.  I

20    just want a clear record.  We're good.

21             MR. FIGEL:  Fair enough.

22             Next I'll ask the court reporter to mark

264

1    what's tab MM in the file and is the SEC's

2    July 23rd, 2021 privilege log 1, and the last one

3    is in the outline as tab NN and which we will -- NN

4    in the outline and will be 33 marked as an exhibit,

5    and this is the SEC's June 23rd, 2021 privilege log

6    1.

7            MR. TENREIRO:  July.

8            MR. FIGEL:  July.  Thanks.

9            MR. TENREIRO:  I believe it's privilege

10   log 2.

11           MR. FIGEL:  Do you want to state that for

12   the record?

13           MR. TENREIRO:  Yeah.  Just to be clear,

14   what you marked 32 is SEC privilege log 1 of

15   July 23rd, 2021.  What you're marking as 33 and

16   what I'm about to hand the court reporter is SEC

17   privilege log 2, July 23rd, 2021.  I'll note the

18   great care that went into formatting these

19   privilege logs as you can tell.

20           MR. FIGEL:  Designed for people with far

21   better eyes than mine.

22           You don't need to deal with these.  This

1    will mostly be colloquy between me and

2    Mr. Tenreiro.

3    BY MR. FIGEL:

4        Q.  Mr. Hinman, if you could look at what's

5    been marked as Exhibit 29.

6        A.  Sorry.  I don't have numbers on mine.

7    Could you help me a little bit.

8            MR. TENREIRO:  Yes, of course.  This one.

9            THE WITNESS:  Okay.  Yes, sir.

10       Q.  All right.  In the middle of the page one

11   of the wider rows is an entry that says June 4th,

12   '18 at 11:11 a.m. from you to a number of people;

13   do you see that?

14       A.  Yes.

15       Q.  Do you recall forwarding an e-mail

16   attaching a draft of your speech to the recipients

17   identified in that row?

18       A.  I don't have a specific recollection of

19   that, but this looks like that's what I did.

20       Q.  And you sent it to Lucas Moskowitz and

21   Sean Memon, correct?

22       A.  Yes.

1      Q.  Those are SEC employees working in the

2    office of the chairman?

3          MR. TENREIRO:  Object to form.  Were.

4          MR. FIGEL:  Fair enough.

5      A.  Yes.

6      Q.  Were as of June 18th?

7      A.  Yes.

8      Q.  June 4th, 2018.  I'm sorry.

9          I believe the record's clear on this, but

10   let's make it clear.  Michael Seaman, Valerie

11   Szczepanik are from the division of corporate

12   finance, correct?

13     A.  Yes.

14     Q.  And Brett Redfearn and Gary Goldsholle are

15   from trading and markets?

16     A.  That's right.

17     Q.  And Ms. Avakian and Mr. Peikin are from

18   the division of enforcement?

19     A.  That's right.

20     Q.  And I believe it's Ms. Jarsulic is from

21   the office of general counsel?

22     A.  That's right.

267

1      Q.  And Mr. Bartels is from the division of

2   investment management?

3      A.  That's right.

4      Q.  And you distributed your speech to SEC

5   employees in each of those divisions, correct?

6          MR. TENREIRO:  Object to form.

7      A.  Yes.

8      Q.  Did you circulate the draft of your speech

9   to enable you to get reactions from these

10  individuals as to the content of your speech?

11         MR. TENREIRO:  Just answer yes or no for

12  now, and then we can take it from there.

13     A.  Yes.

14     Q.  Do you recall whether the e-mail had text

15  in it, the cover e-mail?

16     A.  I don't recall.

17     Q.  Do you recall in general what you

18  specifically asked of the recipients of this e-mail

19  to do in response to the speech, the draft of the

20  speech?

21         MR. TENREIRO:  Yes or no, please.

22     A.  No.

268

1          Q.   In substance were you asking them to

2     review the speech for content?

3              MR. TENREIRO:  Yes or no.

4          A.   I don't recall the substance of the

5     e-mail.  So it's hard to know.

6          Q.   Do you recall receiving a response from

7     any of the recipients to your e-mail?

8          A.   I don't recall specifically receiving

9     them, but I'm sure many offered comments.

10         Q.   Do you recall any of the comments you

11    received from anyone in response to your June 4th,

12    2018 e-mail?

13         A.   Not specifically.

14         Q.   Do you recall generally that you received

15    edits to the draft of your speech?

16         A.   I believe so.

17         Q.   Do you recall any of the edits?

18         A.   No.

19         Q.   Based on the responses you received, did

20    you form an understanding in your own mind that the

21    substance of your remarks was not inconsistent with

22    any existing or contemplated policy of any of the

1    divisions that received a copy of the speech?

2            MR. TENREIRO:  Object to form.

3        A.  Could you repeat the question?  I'm

4    sorry.

5            MR. TENREIRO:  Two negatives.

6            MR. FIGEL:  I know.  It's hard.

7        Q.  Let me try this a different way.  Did you

8    have any responses that suggested that the content

9    of your speech was inaccurate or needed to be

10   changed?

11           MR. TENREIRO:  Okay.  I think we're going

12   to -- I think you're getting into deliberative

13   process now, you're asking him.  So we're going to

14   instruct him not to answer.

15           MR. FIGEL:  Okay.  That's what -- I'm

16   trying to find the line.

17           MR. TENREIRO:  You found it.

18           MR. FIGEL:  Okay.  Good.

19   BY MR. FIGEL:

20       Q.  Based on the responses you received to

21   your June 4th, 2018 e-mail, did you have any reason

22   to believe that any of the recipients of the e-mail

270

1  objected to you giving the speech?

2      MR. TENREIRO:  Again, I'm going to

3  instruct him not to answer based on deliberative

4  process privilege and attorney-client privilege and

5  potentially other protections.

6      MR. FIGEL:  All right.  So trying to cut

7  through this, Mr. Tenreiro, as I understand it,

8  other than the information you've allowed him to

9  testify to, any further questions I ask with

10  respect to what Mr. Hinman asked of the recipients

11  of the speech and any response that they gave

12  you'll direct him not to answer based on

13  deliberative process privilege; is that correct?

14      MR. TENREIRO:  I think that's correct, but

15  I'd have to hear the question.  I mean, any

16  question you might ask, you know, you got a lot of

17  answers about did he get comments, did he receive

18  them, did he forward it.  So we've allowed that.

19      The other answer to your question to me,

20  it's not just deliberative process.  There's also

21  communications with commissioners or theirs counsel

22  here.  So we're also asserting attorney-client.

271

1       MR. FIGEL:  I'm just trying to see if we

2   can short-circuit the foundation we need to lay for

3   future litigation.  I'm now deliberately asking

4   questions as to substantively what the responses to

5   his e-mail were.  Am I correct in understanding

6   that you will instruct him not to reveal any of the

7   substance of any of the responses that he may have

8   received?

9       MR. TENREIRO:  Yes.

10      MR. FIGEL:  Okay.

11      MR. TENREIRO:  To the extent he even

12  recalls them, but yes.

13      MR. FIGEL:  Based on that representation I

14  think we have a record as to where you're drawing

15  the line.

16  BY MR. FIGEL:

17      Q.  If you can answer these questions yes or

18  no.  Did your e-mail seek information from any of

19  these recipients about the legal status of offers

20  and sales of certain digital assets under the

21  United States securities laws including but not

22  limited to Bitcoin, Ether, XRP, Munchie tokens,

272

1   Paragon, Airfox tokens, REcoin, KIM, Grams, DOW

2   tokens, and other digital assets under the

3   U.S. securities laws?

4           MR. TENREIRO:  I'm going to instruct him

5   not to answer that question even yes or no.  You're

6   asking him for the substance of the communications,

7   what he's asking the staff and what he's asking

8   them for.  So I'm going to instruct him not to

9   answer.

10          MR. FIGEL:  I'm trying to understand the

11  issue on which the deliberations were addressed.

12  In other words, there's pre-decisional and post-

13  decisional law that makes clear that certain

14  communications are subject to a privilege and

15  certain aren't.  I'm trying to understand whether

16  the decision or the information he was seeking

17  is -- was made in response to what I just read,

18  which, not surprisingly, is the e-mail you sent me.

19          MR. TENREIRO:  Yeah, I understand that,

20  but I think you can ask him if the commission was,

21  you know, generally deliberating the issues.

22          MR. FIGEL:  I get to ask the question I

1    want.

2            MR. TENREIRO:  That's true, but I get to

3    instruct him not to answer.  You asked him for the

4    specifics of the conversations.  So I'm going to

5    instruct him not to answer.

6    BY MR. FIGEL:

7        Q.  I'll try again.

8            Mr. Hinman, did the information you

9    requested from the various recipients of the

10   June 4th, 2018 e-mail relate to the legal status of

11   offers and sales of certain digital assets under

12   the United States securities laws?

13           MR. TENREIRO:  Just answer yes or no.

14       A.  I'm sorry.  Ask me the question again

15   because I -- that's a very broad question.  So I

16   want to make sure I answer it correctly.

17       Q.  The question is did the information you

18   requested from the various recipients of the

19   June 4th, 2018 e-mail relate to the legal status of

20   offers and sales of certain digital assets under

21   the United States securities laws?

22           MR. TENREIRO:  At a general level, yes or

274

1   no.

2       A.  At this point I believe it may have.

3   That's the best of my recollection.

4           MR. TENREIRO:  Reid, you're asking the

5   wrong person.  You know, we're asserting the

6   privilege and you can ask us to assert what we were

7   deliberating.  He's not the -- he cannot answer

8   that question without actually disclosing what they

9   were discussing.

10      Q.  Did the information you sought from the

11  recipients on your June 4th, 2018 e-mail relate to

12  the regulatory implications under the United States

13  securities laws of firms such as broker-dealers

14  holding Bitcoin?

15          MR. TENREIRO:  I'm going to instruct the

16  witness not to answer the question.

17          MR. FIGEL:  Did the information you sought

18  from the recipients of this e-mail, the June 4th,

19  2018 e-mail, relate to the application of the

20  regulatory regime of the Securities Act of 1933 to

21  various activities by issuers and underwriters?

22          MR. TENREIRO:  I'm going to instruct the

1    witness not to answer.

2              MR. FIGEL:  Did the information you

3    sought from the recipients of the June --

4              MR. FLUMENBAUM:  On what basis?

5              MR. TENREIRO:  On deliberative process,

6    attorney-client privilege, and on that last one the

7    attorney work product as well.

8              MR. FIGEL:  Mr. Tenreiro, you sent us an

9    e-mail in which you identified the topics.  I'm

10   readings from your e-mail.  Can I assume from the

11   colloquy we've had that you'll give the same

12   instruction with respect to each of the topics

13   identified in your e-mail?

14             MR. TENREIRO:  Yes.  As to the basis, you

15   know, it's a deliberative process as to all of

16   them, and there might be other privileges if you

17   want to go one by one.  Otherwise we can tell you.

18   BY MR. FIGEL:

19        Q.  Let me direct your attention to the entry

20   just below it.  It's the June 5th, 2018 e-mail from

21   Sean Memon to Jay Clayton and Lucas Moskowitz; do

22   you see that?

1      A.  Yes.

2      Q.  You were not copied on that e-mail, as far

3  as you know?

4      A.  As far as I know.

5      Q.  Mr. Memon was Mr. Clayton's chief of

6  staff; is that correct?

7      A.  At this point he was I believe his deputy

8  chief of staff.

9      Q.  And who is Mr. Moskowitz?

10      A.  At that time chief of staff.

11      Q.  Did you have any communications with

12  anyone in the office of the chairman about a

13  speech -- a draft of the speech you delivered on

14  June 14, 2018?

15      MR. TENREIRO:  Just answer yes or no,

16  please.

17      A.  Yes.

18      Q.  Who did you have communications with?

19      A.  In the chairman's office?

20      Q.  Yes.

21      A.  These three people.

22      Q.  All right.  Let's start with Chairman

1    Clayton.  Did you have direct communications, oral

2    communications with Chairman Clayton about the

3    content of the draft of your speech?

4           MR. TENREIRO:  Go ahead, yes or no.

5       A.  Yes.

6       Q.  When was the first such communication?

7       A.  I don't recall the first.

8       Q.  Do you recall any reactions Chairman

9    Clayton had to your speech?

10          MR. TENREIRO:  Just answer yes or no.

11      A.  Yes.

12      Q.  What were they?

13          MR. TENREIRO:  Do not answer that question

14   on the basis of deliberative process and attorney-

15   client.

16          MR. FLUMENBAUM:  What's the attorney-

17   client portion?

18          MR. TENREIRO:  He's -- you know, he's the

19   attorney for the commission, he's talking to one of

20   the members of the commission, and they're

21   discussing legal matters that might arise in

22   connection with the commission's, you know, mission

278

1    and statements.

2          MR. FIGEL: Did you receive any edits or

3    suggestions from Chairman Clayton about the content

4    of your draft speech?

5          MR. TENREIRO:  Just answer yes or no,

6    please.

7       A.  Yes.

8       Q.  What were they?

9          MR. TENREIRO:  I'll instruct the witness

10   not to answer on the basis of deliberative process

11   and attorney-client.

12         MR. FIGEL:  Did you accept any edits that

13   Chairman Clayton made?

14         MR. TENREIRO:  Answer yes or no.

15      A.  Yes.

16      Q.  Which edits did you accept?

17         MR. TENREIRO:  I'm going to instruct the

18   witness not to answer on the same basis as before.

19         MR. FIGEL:  Based on your communications

20   with Chairman Clayton, did you reach an

21   understanding as to whether Chairman Clayton

22   objected to you delivering the speech on June 14,

279

1  2018?

2          MR. TENREIRO:  Object to form and instruct

3  the witness to answer yes or no if you can.

4          A.  Okay.  Could you repeat it again, then.

5          Q.  Based on your communications with Chairman

6  Clayton, did you reach an understanding as to

7  whether Chairman Clayton objected to your

8  delivering the speech on June 14, 2018?

9          A.  Yes.

10         Q.  And what was that understanding?

11         MR. TENREIRO:  Instruct the witness not to

12  answer on the basis of deliberative process.

13         MR. FIGEL:  Without revealing your

14  communications with Chairman Clayton, did you have

15  an understanding that you were permitted to deliver

16  the speech on June 14, 2018?

17         MR. TENREIRO:  Object to form.

18         A.  There was nothing he told me that said

19  don't do the speech.  So Jay didn't give me, you

20  know, permission to give a speech.

21         Q.  Fair to say you would not have given the

22  speech if you thought Chairman Clayton didn't want

280

1    you to give the speech?

2         MR. TENREIRO:  Object to form.

3         A.  If Jay had said something about not

4    providing the speech, I would have tried to find

5    out why he felt that way and we'd have a good

6    discussion about it.

7         Q.  And did you have any such discussions with

8    Chairman Clayton in response to any concerns you

9    had as to whether he was not in favor of you giving

10   the speech on June 14, 2018?

11        MR. TENREIRO:  Object to the form, there's

12   no foundation for that question, and also instruct

13   the witness not to answer yes -- to only answer yes

14   or no.  Did you have any discussions I think.

15        A.  Yes.

16        MR. FIGEL:  Mr. Tenreiro, just so we have

17   a clear record, I can show various e-mails in which

18   his speech was circulated among members of the

19   chairman's office, including by members of the

20   division of corporate finance.  I assume that if I

21   were to ask him any questions about what the topics

22   were, the policies that were being discussed in

1    those e-mails, you would give the instruction for

2    him not to answer.

3            MR. TENREIRO:  Where did you get those

4    e-mails?  What e-mails are you talking about?  You

5    can show him entries on the privilege log.

6            MR. FIGEL:  I don't want to spend

7    everybody's time going down a bunch of entries.  I

8    just want to have a clear record that if I were to

9    ask him the questions about communications between

10   himself or other people in the division of

11   corporate finance and the chairman's office with

12   respect to his speech you will give the same

13   instruction as you've given in the past with

14   respect to the substance?

15           MR. TENREIRO:  With respect to the

16   substance we will instruct him not to answer or

17   reveal the substance of what's in the e-mails,

18   correct.

19   BY MR. FIGEL:

20       Q.  All right.  Director Hinman, now focus

21   your attention on the period of time after you

22   deliver your speech.  You're off the podium, you're

282

1    done.  Did you have any communications with

2    Chairman Clayton after you delivered your speech?

3          MR. TENREIRO:  Let's start with a yes or

4    no.

5         A.  Yes.

6         Q.  When was the first communication you had

7    with Chairman Clayton?

8         A.  I don't recall.  This speech was in

9    San Francisco.  He was in D.C.

10         Q.  What's the first instance you remember

11    having a direct communication with Chairman Clayton

12    through any media about the content of your speech?

13    I'm sorry.  About the delivery of your speech?

14         A.  I don't have a specific recollection of a,

15    you know, first conversation about it.  I really

16    couldn't tell you.

17         Q.  Did Chairman Clayton provide any reaction

18    to the speech that you delivered on June 14, 2018?

19          MR. TENREIRO:  Let's start with yes or no,

20    please.

21         A.  I think so.

22         Q.  What did he tell you?

1          MR. TENREIRO:  So let's -- let's be

2    careful here to not disclose deliberations about

3    policy or things the commission might be

4    considering.  I think he's asking you for reactions

5    generally, and you can answer that if that's what

6    the question is.

7          A.  I generally recall positive reactions.

8          Q.  Do you recall what about your speech he

9    thought was positive?

10          MR. TENREIRO:  There I'm going to instruct

11    you not to answer.

12          Q.  Did Chairman Clayton tell you in substance

13    that your speech was an effective communication of

14    commission policy?

15          MR. TENREIRO:  Go ahead.  Answer, please.

16          A.  Did he tell me that it was an effective

17    communication of commission policy?  I don't recall

18    him using those words.

19          Q.  In substance did he tell you that he

20    thought your speech accurately reflected commission

21    policy with respect to the issue of whether Ether

22    was a security?

284

1          MR. TENREIRO:  Just answer yes or no.

2      A.  I don't recall him saying that.

3      Q.  Do you recall anything more that he told

4   you that caused you to believe that he had a

5   positive reaction to your speech?

6          MR. TENREIRO:  Answer yes or no.

7      A.  Yes.

8      Q.  What else do you recall that he told

9   you?

10          MR. TENREIRO:  So, again, let's just -- at

11   a general level, let's start there.

12      A.  I think he said nice job basically, good

13   job with the speech.

14      Q.  And did you have communications with

15   Chairman Clayton beyond good job, positive

16   reaction?  In other words, did you discuss any of

17   the substantive issues with Chairman Clayton after

18   you delivered your speech?

19          MR. TENREIRO:  Let's start with yes or

20   no.

21      A.  Well, that's a very open-ended question.

22   So did I ever talk to Jay about some of the topics

285

1    that were covered in the speech after the speech?

2    Yes.

3        Q.  What were those communications?

4           MR. TENREIRO:  I'm going to instruct you

5    not to answer the question.

6           MR. FIGEL:  The basis?

7           MR. TENREIRO:  Deliberative process,

8    attorney-client, and attorney work product.

9           MR. FIGEL:  With respect to the

10   communications from Chairman Clayton that you

11   remember, what was the policy or agency

12   determination that those communications related to?

13          MR. TENREIRO:  Wait a second.  Reid, we

14   can go through this, but there's two -- your

15   question was very broad at the beginning.  Are you

16   still asking him about conversations about the

17   speech such as Clayton's reactions, or are you

18   asking him, you know, to the extent this speech

19   talks about Howey and its application to digital

20   assets did he talk to him about that subject

21   matter?

22          MR. FIGEL:  Mr. Tenreiro, you're putting

286

1    me in a position where I have to ask 20 questions.

2    I'm now asking if he recalls additional

3    conversations.  Now I'm trying to figure out what

4    they're about and whether you'll permit him to

5    reveal them.

6          MR. TENREIRO:  I have to -- for me to know

7    whether I can permit him to reveal them I just have

8    to understand if he recalls additional

9    conversations about what?  Could you ask the

10   question again.

11         MR. FIGEL:  Any of the issues that he

12   discussed in his speech on January 14, 2018.

13         MR. TENREIRO:  Okay.  So did you have

14   any -- go ahead, yes or no.

15      A.  Yes.

16      Q.  Tell me what those communications were.

17         MR. TENREIRO:  I'm going to instruct him

18   not to answer on the basis of deliberative process,

19   attorney-client, and attorney work product.

20         MR. FIGEL:  All right.  And I assume you

21   will give the same instruction if I ask him whether

22   any of the communications he had with Chairman

1    Clayton related to any of the topics that you

2    identified for us in your e-mail?

3            MR. TENREIRO:  I will give him that

4    instruction.  If you ask him, you know -- maybe I

5    can ask him later if the commission was working on

6    other matters, he can answer that question yes or

7    no.

8            MR. FLUMENBAUM:  Are you suggesting that

9    Mr. Hinman is acting as counsel to Mr. Clayton?

10           MR. TENREIRO:  I'm not.  He's acting as

11   counsel to the commission.

12           MR. FLUMENBAUM:  He's acting as counsel to

13   the commission?

14           MR. TENREIRO:  And also counsel to the

15   division of enforcement, you know, to the extent

16   that they consult with him and they obtain

17   information --

18           MR. FLUMENBAUM:  As director of corp fin

19   he's acting as counsel?

20           MR. TENREIRO:  The division of enforcement

21   is counsel to the commission.  We collect facts and

22   we collect advice from other people just like

1     lawyers do, and those are all protected by

2     attorney-client communications.

3                 MR. FLUMENBAUM:  You're claiming

4     privilege -- attorney-client privilege between

5     conversations with Mr. Hinman and Mr. Clayton, and

6     I don't see who the lawyer is in that situation.

7     Who's the lawyer?

8                 MR. TENREIRO:  They're both lawyers.

9                 MR. FLUMENBAUM:  I understand they happen

10    to be both lawyers, but they're not functioning as

11    lawyers.

12                MR. TENREIRO:  They are functioning as

13    lawyers.  They are functioning as lawyers.  They're

14    collecting information and they advise their

15    client, the commission.

16                MR. FIGEL:  Mr. Tenreiro, I'm trying to

17    explore with Mr. Hinman through you what the

18    particular policy or agency action you believe

19    these communications related to that you're

20    instructing him not to reveal.

21                MR. TENREIRO:  And I'm going to instruct

22    him not to reveal.  I think if you want to explore

289

1   that there's other means to explore that, including

2   through me separate from this deposition, including

3   through, you know, what our office of the general

4   counsel might say, et cetera.  I think he's not the

5   person with which to explore that because the

6   problem is you're tying the conversations he's

7   having about the substance of things as they might

8   relate to specific things we're considering.  So

9   you're going straight to the heart of the

10  deliberative process.

11          MR. FIGEL:  Well, just for the record,

12  Mr. Hinman knows what those communications are.  I

13  suspect you don't and I certainly don't.  He's in

14  the best position to testify whether those

15  communications related to any of the topics that

16  you identified on your e-mail.

17          Now if you're instructing him --

18          MR. TENREIRO:  He doesn't know my e-mail.

19          MR. FIGEL:  Well, I read it to him.  If

20  you're instructing him not to answer any of those

21  questions, we have our record.  I just want to make

22  sure that that's what the instruction is and that

1    the record's clear.

2         MR. TENREIRO:  I think that is the

3    instruction.  As I said, you can get at it in other

4    ways.  You're just asking it in a way that's

5    getting into the deliberative process.  If you want

6    to talk about whether the commission is discussing

7    or deliberating other matters in this space, I

8    think you can ask it like that separately and not

9    tie it to the substance of these documents.

10        Why don't we take a break and see if we

11   can clean that up.  That would be my suggestion.

12        MR. FIGEL:  Sure.  Let's go off the

13   record.

14        THE VIDEOGRAPHER:  Off the record at

15   4:35.

16                  (A short break was had.)

17        THE VIDEOGRAPHER:  Back on the record at

18   4:53.

19        MR. TENREIRO:  So before we went off the

20   record I just want to clarify, to the extent it

21   wasn't already clear, what the basis of our

22   objections are here.  You know, you're asking him

291

1    to testify about a privilege log he did not

2    prepare, about documents he has not seen of late or

3    that he does -- that he's said he has no

4    recollection about, and you're asking him to talk

5    about conversations that he doesn't recall, and

6    then you're tying that into trying to figure out

7    what issues the commission was deliberating after

8    the speech was given that might relate to or touch

9    on things discussed in the speech and digital

10   assets very generally.

11          As I mentioned before the break, you can

12   ask him whatever question you want as you said, but

13   you're free to ask him to tell you generally what

14   sorts of issues the SEC was discussing and we'll

15   let him answer that.  Beyond that we'll instruct

16   him not to answer to the extent you're trying to

17   tie a specific conversation in one of these logs

18   that he doesn't remember, hasn't seen to a specific

19   issue.  That's our position.

20          MR. FIGEL:  Let's go off the record.

21          THE VIDEOGRAPHER:  Off the record at

22   4:54.

292

1             (A short break was had.)

2             THE VIDEOGRAPHER:  Back on the record at

3       5:18.

4             MR. FIGEL:  In order to try and clarify

5       our areas of disagreement, when Mr. Hinman gave his

6       speech on June 14th, 2018 was there a decision as

7       to whether current offers and sales of Ether were

8       securities -- were not security transactions?

9             MR. TENREIRO:  Sorry.  You're you asking

10      me?

11            MR. FIGEL:  I'm asking the commission what

12      their position is.  Was there a decision on the

13      date of his speech that current offers and sales of

14      Ether were not securities transactions?

15            MR. TENREIRO:  His view, Mr. Hinman's view

16      as of that date was that offers and sales of Eth

17      were not securities transactions.

18            MR. FIGEL:  And was that a decision --

19            MR. TENREIRO:  By Mr. Hinman, yes.

20            MR. FIGEL:  All right.  Was that a

21      decision by the commission --

22            MR. TENREIRO:  No.

[7/27/2021] Hinman, William Dep. Tr. 7.27.2021

1    MR. FLUMENBAUM:  And you would not allow

2    him to answer any questions about communications

3    post speech involving whether sales of Ether was or

4    was not a security?

5    MR. TENREIRO:  To the extent they're

6    deliberative pre-decisional, that's correct.

7    MR. FLUMENBAUM:  Only talking post speech.

8    MR. TENREIRO:  Yes.  Yes, to the extent

9    they're after the speech but they're still

10    deliberative and pre-decisional as to other issues

11    including whether --

12    MR. FLUMENBAUM:  I'm limiting it

13    specifically to the Ether issue.

14    MR. TENREIRO:  That's right.  So to the

15    extent there's conversations after the speech that

16    are deliberative and decisional -- and

17    pre-decisional as to the issue of Eth, we would not

18    allow him to answer.  And again, just to be clear,

19    it might be related to other decisions as well.

20    MR. FLUMENBAUM:  And -- and that would be

21    conversations that he may have -- may or may not

22    have had throughout his tenure -- rest of his

[7/27/2021] Hinman, William Dep. Tr. 7.27.2021

294

1    tenure as director of corp finance.  There's no end

2    to that claim of deliberative process, correct, on

3    that specific issue?

4            MR. TENREIRO:  On the Eth point the answer

5    is yes, there is no end, and I would encourage you

6    to ask him if that issue was generally still being

7    deliberated and he'll tell you a yes or no.  If you

8    want to ask him that, you can ask him that.

9            MS. FITZPATRICK:  I just want to clarify,

10   Marty.  I think you said conversations generally.

11   I don't have Livenote.  Conversations with third

12   parties are obviously different.  You're

13   assuming --

14           MR. FLUMENBAUM:  Yeah.  I'm excluding

15   that.

16           MS. FITZPATRICK:  -- not internal --

17           MR. FLUMENBAUM:  I'm talking about --

18           THE REPORTER:  Guys, one at a time.

19           MR. FLUMENBAUM:  Yes, I agree with you on

20   that.

21           MS. STEWART:  Can I also just read into

22   the record from paragraph 13 of Director Hinman's

295

1    declaration which says "To the best of my

2    knowledge, the commission had not taken at that

3    time and still has not taken any position or

4    expressed a view as to whether offers and sales of

5    Ether constituted offers and sales of securities."

6          MR. TENREIRO:  So I think Ms. Stewart's

7    point, I'll state it more bluntly, Reid.  It's

8    almost 6:00, you've had hours, and you've had that

9    in the record before today and you had it before we

10   even had the motion to quash.  So I really hope you

11   didn't bring him here just so that we can get on

12   the record what was already on the record.  Let's

13   go on.  Do you have other questions about our

14   position?

15         MR. FIGEL:  Yes.  When Mr. Hinman gave his

16   speech on June 14th, 2018 was there a decision as

17   to whether current offers and sales of Bitcoin

18   were -- were not securities transactions?

19         MR. TENREIRO:  By him, yes.

20         MR. FIGEL:  And by the commission?

21         MR. TENREIRO:  No.

22         MR. FIGEL:  By the agency.  I don't mean

1    by the commissioners.

2          MR. TENREIRO:  Yeah.  I mean, I think

3    we've stated this in the record before.  I think

4    there's been statements put out there by people who

5    work at the SEC about their views on the status of

6    Bitcoin sales, but as we've also told you in the

7    meet and confer process and discovery, the SEC has

8    never made a final determination as to the SEC's

9    position on the application of the federal

10   securities laws registration requirements to

11   transactions in Bitcoins as tokens.

12         MR. FLUMENBAUM:  So that would mean you

13   would invoke the deliberative process privilege if

14   we questioned him about conversations about Bitcoin

15   post speech with Mr. Clayton or any other member of

16   the SEC?

17         MR. TENREIRO:  Yes.

18         MR. FIGEL:  Why don't we go off the record

19   for a second.

20         MR. TENREIRO:  Okay.

21         THE VIDEOGRAPHER:  Off the record at 5:22.

22                  (A short break was had.)

1              THE VIDEOGRAPHER:  Back on the record at

2      5:25.

3                          (Hinman Exhibit 34 was marked

4                           for identification.)

5      BY MR. FIGEL:

6          Q.  I'm now going to show you a document

7      that's marked in the materials as KKK, and I will

8      ask the court reporter to mark as I believe it's

9      34.

10             THE REPORTER:  Correct.

11                         (Witness reviewing document.)

12     BY MR. FIGEL:

13         Q.  Have you had a chance to review that?

14         A.  Quickly.

15         Q.  You'll see that the cover e-mail that

16     bears Bates 5805 appears to be an e-mail from

17     Kristin Smith, Blockchain Association, to

18     Mr. Seaman and to you; do you see that?

19         A.  Yes.

20         Q.  Do you recall receiving this e-mail?

21         A.  No.

22         Q.  Do you recall receiving in any form the

298

1    attachment to the e-mail?

2        A.  No.

3        Q.  Are you familiar with the Blockchain

4    Association?

5        A.  Not very.

6        Q.  According to their Website they claim that

7    they're one of the "Leading advocacy groups in the

8    digital asset space whose goal is to improve the

9    public policy environment so that blockchain

10   networks will thrive in the United States."

11       Does that refresh your recollection at all

12   as to what the Blockchain Association is?

13       A.  It sounds like a trade association.

14       Q.  And they refer to themselves as the

15   unified voice of the blockchain in cryptocurrency

16   industry?

17       A.  Okay.

18       Q.  Does it refresh your recollection?

19       A.  Just -- just that someone active in the

20   space.  I don't really know them very well.

21       Q.  And if you see the attachment, they sent a

22   document that bears the caption the "Hinman token

299

1    standard, a reasonable framework for determining

2    when tokens are and are not securities."  Do you

3    agree that your June 14th, 2018 speech announced a

4    Hinman token standard?

5         A.  I guess people have called it that.  I

6    didn't intend it for to be called the Hinman

7    standard.

8         Q.  Putting aside the label, did you

9    understand that people would view your speech as

10   having announced a framework by which the division

11   of corporate finance would determine when tokens

12   are and are not securities?

13        A.  The speech and other guidance was intended

14   to share more generally the framework that the

15   division was using in thinking about these assets.

16        Q.  Did you disagree with the substance of

17   what is reflected in the attachment, which is your

18   speech announced a new framework for determining

19   when tokens are and are not securities?

20            MR. TENREIRO:  Object to form.

21        A.  Do I disagree that it announced a new

22   framework?  I think I would quibble with that a

300

```
1   little bit.  I think that's a framework many folks

2   were using at the time.

3       Q.  After your speech did third parties come

4   to the division of corporate finance and argue that

5   a digital transaction was not a security based on

6   the factors outlined in your speech?

7       A.  They would cite the factors and other

8   factors.

9       Q.  Did you accept that the factors set out in

10  your speech was the criteria by which the division

11  of corporate finance would evaluate whether a

12  digital asset transaction was a security?

13      A.  Generally.

14      Q.  And what do you mean by generally?

15      A.  There are other factors that may be

16  relevant that are not in the framework, things that

17  are more derived from the Gary Plastic case, for

18  instance.

19      Q.  Well, the factors that you outlined in

20  your speech that the Blockchain Association viewed

21  as the Hinman token standard was a new framework

22  that the division of corporate finance announced
```

301

1    through you and your speech, correct?

2           MR. TENREIRO:  Objection to form.  He

3    already answered no to that question.

4        A.  I think, again, it was the first time that

5    particular framework was published.  So you could

6    call it a new publication, but I think the

7    framework itself, the principles underlying the

8    framework have been well known for a long time.

9        Q.  And following the speech the division of

10   corporate finance applied the framework that you

11   announced on June 14th in connection with their

12   evaluation of whether digital asset transactions

13   were securities, correct?

14       A.  Generally, but not always.

15                    (Hinman Exhibit 35 and

16                     Exhibit 36 were marked for

17                     identification.)

18   BY MR. FIGEL:

19       Q.  So I'm now showing you what is in the

20   outline as PPP and which I will ask the court

21   reporter to mark as Exhibit 35.  In light of the

22   concern about the time I'm going to also show you

302

1    what's in the outline as QQQ and which I'll ask the

2    court reporter to mark as Exhibit 36.

3                       (Witness reviewing document.)

4        A.   Okay.

5        Q.   You're not on Exhibit 35, but have you

6    seen that document?

7        A.   I don't remember seeing that e-mail.

8        Q.   And the attachment, do you recall seeing

9    that document?

10       A.   I don't.

11       Q.   All right.  You'll see on

12   Exhibit 35 -- let me back up.  Do you know Robert

13   Cohen in the division of enforcement?

14       A.   I do know Rob, yes.

15       Q.   And who is he?

16       A.   At the time I think he was, you know, a

17   staff member in enforcement.  He may have -- I

18   don't know the exact date, but there was a crypto

19   asset group and Rob may have been heading it at

20   that point.

21       Q.   And you'll see in the e-mail there's a

22   reference to setting up a potential meeting.  Did

303

1    you attend a meeting with Mr. Cohen and Ms. Johnson

2    and Mr. Rosenblum?

3        A.  I don't think so.

4        Q.  To your knowledge, did anyone from the

5    division of corporate finance attend a meeting with

6    Ms. Johnson, Mr. Rosenblum, and --

7        A.  I don't know.

8        Q.  Let's go to tab 36, and if you could take

9    a look at the page here that ends in 2983.  In

10   outline form it's direct your attention to D1.

11       A.  B1.

12       Q.  D as in David.

13       A.  I'm probably on the wrong page.  Give me

14   the page number again.

15       Q.  The Bates is 2983.

16       A.  Okay.

17       Q.  And the portion of the outline is the --

18   is D and D1, D and Romanette 1.

19       A.  My 2983 is -- okay.  So it's 85.  Oh, 85

20   on mine.

21           MR. TENREIRO:  There's two Bates.  That's

22   why it's confusing him.  I think it's from where it

1    says "From a petitioner's perspective," right?

2           MR. FIGEL:  Correct.  As I understand

3    your --

4        A.  All these pages are 83 except for the

5    specific page you're trying to get to is 85.

6        Q.  I believe the way the SEC produces

7    documents is the top one suggests a number that is

8    posted on all things that are connected, and then

9    the one below it is the sequential number.

10          MR. TENREIRO:  Your guess is as good as

11   mine.

12       A.  I think it's the other way around, but

13   that's okay.

14       Q.  If you could just read into the record D

15   and Romanette 1.

16       A.  "From a practitioner's perspective the

17   situation in the cryptocurrency markets is

18   extremely unusual.  Token issuers can speak to two

19   different well-regarded experienced law firms and

20   get diametrically opposite views on the current and

21   future applicability of federal securities laws and

22   what steps the token issuer needs to take to engage

305

1    in a compliant token offering."

2         Did you learn from any source on or about

3    October 23rd, 2018, you know, within weeks that

4    Ms. Johnson and Mr. Rosenblum had informed

5    Mr. Cohen in substance of the information you just

6    read?

7         A.  I don't remember ever hearing about that.

8         Q.  If you could read D Romanette 3-2 into the

9    record, please.

10        A.  "This is not normal and, in fact, this is

11   largely unprecedented in our experience."

12        Q.  Go down to 2, if you would.

13        A.  You want me to read the --

14        Q.  Yeah.  "Lawyers, law firms, and other

15   gatekeepers."

16        A.  So not the general one, the other one?

17   Okay.

18           "Lawyers, law firms, and other

19   gatekeepers, however, do not typically disagree on,

20   for example, whether federal securities laws apply

21   at all or what analysis is for determining

22   whether -- or what the analysis is for determining

306

1    whether instruments are securities."

2        Q.  Did you learn from any source on or about

3    October 23rd, 2018 that Ms. Johnson and

4    Mr. Rosenblum had expressed this view to Mr. Cohen

5    and others?

6        A.  I don't recall that, no, I don't think I

7    did.

8            MR. FIGEL:  Can we go off the record for a

9    second.

10           THE VIDEOGRAPHER:  Off the record at 5:39.

11                   (A short break was had.)

12           THE VIDEOGRAPHER:  Back on the record at

13   5:45.

14                   EXAMINATION

15   BY MR. FLUMENBAUM:

16       Q.  Good afternoon, Mr. Hinman.

17       A.  Hi.

18       Q.  I'm going back to the privilege logs that

19   Mr. Figel introduced.  They reflect that you sent

20   your speech to Mr. Clayton, correct?

21       A.  Among others, yes.

22       Q.  Did you send them to any other

1      commissioner other than Mr. Clayton?

2          A.  Not that I recall.

3          Q.  Did you care one way or the other what the

4      other commissioners thought about your speech?

5              MR. TENREIRO:  Objection to form.

6          A.  Did I care, yes.

7          Q.  Why didn't you send the speech to the

8      other four commissioners?

9              MR. TENREIRO:  Without discussing

10     deliberations, but I think you can answer that.

11         A.  Usually if we would provide a speech or

12     something to the other commissioners it could slow

13     the process down pretty significantly.

14         Q.  Slow your speech making process?

15         A.  The review process.

16         Q.  The review process for your speech?

17         A.  Yes.

18         Q.  So you didn't want to slow down your

19     review process for your speech even though you were

20     making significant statements about Ether and

21     Bitcoin in your speech?

22             MR. TENREIRO:  Objection to form.