308

```
 1            MR. FLUMENBAUM:  You may answer.
 2       A.  I didn't feel like the input was going to
 3  be worth the extra delay.
 4       Q.  So the only commissioner that you cared
 5  about was Mr. Clayton, correct?
 6            MR. TENREIRO:  Object to form.
 7       A.  That's not true.
 8       Q.  Do you know whether Mr. Clayton had a
 9  relationship with ████████ or Ether or any of the
10  entities in the Ether network prior to his joining
11  the SEC?
12       A.  Not that I'm aware of.
13       Q.  Are you aware that Sullivan & Cromwell
14  represented ████████
15            MR. TENREIRO:  Objection to form.  Go
16  ahead.
17       A.  I didn't know if they were a firm client.
18  I think some of the people at the ████████
19  meetings had a Sullivan & Cromwell background.  I
20  don't know if they were still there appearing as,
21  you know, the law firm for ████████  So I wasn't
22  aware if they -- of their relationship.
```

309

1       Q.  Didn't you talk to Rebecca Simmons

2  directly about ▮▮▮▮▮

3       A.  I don't recall that.

4       Q.  Didn't you get e-mails from Rebecca

5  Simmons about ▮▮▮▮▮

6       A.  Not that I recall.

7       Q.  And in response to a question from

8  Mr. Figel you mentioned that Mr. Clayton did not

9  instruct you to contact Mr. ▮▮▮▮▮ is that correct?

10       MR. TENREIRO:  Objection to form.

11       A.  That's right.

12       Q.  Did Mr. --

13       A.  That's my recollection.

14       Q.  Right.

15       Did Mr. Clayton at any time ask you to

16  meet with anybody relating to Ether or ▮▮▮▮▮ or

17  the Ethereum Foundation?

18       MR. TENREIRO:  So just discuss, you know,

19  if any final directive, but not any back and forth

20  you might have had with him about that question.

21       A.  I don't recall him giving me a directive

22  of that sort.

1      Q.  I'm not suggesting a directive.  Did he

2   suggest to you that it would be useful for you to

3   talk to the people behind ███████ and behind

4   Ether?

5          MR. TENREIRO:  I'm going to instruct the

6   witness not to answer that question.

7          MR. FLUMENBAUM:  On what basis?

8          MR. TENREIRO:  On deliberative process.

9   You're asking him if they had a conversation as to

10  whether this or that might be useful, and that's

11  deliberation.  If you are asking him for a final

12  directive, do this, don't do that, he can answer.

13         MR. FLUMENBAUM:  Did Mr. Clayton ever

14  suggest to you that it would be important to him

15  for you to talk to somebody for Ether or ████████

16         MR. TENREIRO:  I'm going to instruct the

17  witness not to answer that question on the basis of

18  deliberative process.

19         MR. FLUMENBAUM:  Did -- you mentioned the

20  Ethereum Alliance earlier today; do you recall

21  that?

22         A.  I think the Ethereum Enterprise Alliance?

311

1       Q.  Yes.

2       A.  I was asked questions about that.

3       Q.  Right.  And you said you were not aware

4  when you joined the SEC whether Simpson Thacher was

5  a member of that alliance, correct?

6       A.  I didn't know the alliance existed let

7  alone Simpson having any role with it.

8       Q.  When did you first learn that Simpson had

9  a role in the Ethereum Alliance?

10          MR. TENREIRO:  Object to form.

11          MS. KELLY:  Object to form.

12      A.  About a month or two after I left the SEC.

13      Q.  So while you were at the SEC it's your

14  testimony that you were totally unaware that

15  Simpson Thacher was a member of the Ethereum

16  Alliance?

17      A.  That's right.

18      Q.  When you did your due diligence on Ether,

19  did anyone review who the members of the Ethereum

20  Alliance were?

21          MR. TENREIRO:  Object to form.

22          MR. FLUMENBAUM:  You may answer.

312

1          A.  I didn't know the Ethereum Alliance

2     existed.  So --

3          MR. TENREIRO:  Wait a second.  Go ahead.

4          A.  -- let alone anyone doing diligence with

5     respect to the Ethereum Alliance.

6          Q.  In the due diligence that you were having

7     done before your speech no one mentioned to you the

8     Ethereum Alliance?

9          MR. TENREIRO:  Just answer yes or no.

10         A.  Well, I want to make sure he asks the

11    correct question.  I think it's the Ethereum

12    Enterprise Alliance.  You keep saying Ethereum

13    Alliance.  I think it's a --

14         Q.  Yeah.  I'm skipping the --

15         A.  I think it's a narrower focus than all

16    Ethereum.  I think it's for enterprise use.  That's

17    based on what I've learned since I left the SEC,

18    and your question about the Ethereum Enterprise

19    Alliance is what?

20         Q.  While you were doing your due diligence

21    for your speech no one mentioned the Ethereum

22    Enterprise Alliance to you?

313

1      A.  Not that I recall.

2      Q.  Did -- now, when you were doing your due

3  diligence did you learn what percentage of the

4  original Ether sales were owned by Mr. Buterin?

5      MR. TENREIRO:  Objection to form and first

6  let's take this one yes or no, please.

7      A.  I believe we did.

8      Q.  And what fact did you learn?

9      A.  I think we learned the amount, but I don't

10  recall the number.

11      Q.  Was it approximately 20 percent of the

12  initial offering?

13      MR. TENREIRO:  Object to form.  Go

14  ahead.

15      A.  I don't -- I don't recall.  So I'd be

16  speculating now.

17      Q.  But you knew that at the time you made

18  your speech?

19      A.  Yes.

20      MR. TENREIRO:  Sorry.  I object to form.

21  You knew what, the amount --

22      MR. FLUMENBAUM:  Yes.

314

1         MR. TENREIRO:  -- or the 20 percent?   He

2   knew the amount.

3         MR. FLUMENBAUM:  He knew the amount.

4         MR. TENREIRO:  Whatever it was.

5   BY MR. FLUMENBAUM:

6      Q.  And did you know the value that

7   Mr. Buterin had at the time you made your speech?

8      A.  If I knew the amount, I would probably

9   also know the approximate value.

10      Q.  And you are aware that initially a portion

11   of Ether had been premined; is that correct?

12      A.  What do you mean by premined?

13      Q.  That prior to the initial offering they

14   had premined a certain amount of the coin Ether.

15         MR. TENREIRO:  Object to form.

16      A.  I'm not sure what you mean by premined.

17   Do you mean -- can you be more specific about what

18   you're trying to say?

19      Q.  You were aware, were you not, that there

20   were a concentration of miners involved in

21   connection with Ether, correct?

22         MR. TENREIRO:  Objection to form.

315

1      A.  I don't know what you mean by

2  concentration, but I think we tried to understand

3  what the mining network looked like.

4      Q.  And do you have an understanding that the

5  mining network was primarily in China?

6          MR. TENREIRO:  Objection to form.

7      A.  I'm not sure we made that conclusion.

8      Q.  Did you have information as to where the

9  mining network was predominant?

10      A.  I think we may have asked about that, but

11  I don't recall what we concluded.

12      Q.  Do you know today whether Ether is

13  predominantly mined in China?

14      A.  I don't.

15      Q.  Did it make a difference in your concept

16  of sufficiently decentralized if the concentration

17  of mining was greater in China?

18          MR. TENREIRO:  Just answer, you know, to

19  the extent there's a final view on that point when

20  you speak.  I think he's talking about the speech.

21      A.  At the time I gave the speech did I have a

22  view as -- or was that important to me as I gave

1   the speech?

2       Q.  Yes.

3       A.  I think that would have been a factor we

4   took into account.  I don't recall how much we

5   weighed it.

6       Q.  Well, who gave you the information as to

7   the concentration of mining?

8           MR. TENREIRO:  He already said he didn't

9   know that, but okay.  Object to form.

10      A.  On all these questions around the

11  diligence we did on Ethereum it was a variety of

12  folks on our staff talking to market participants.

13      Q.  Well, take a look at Exhibit 27.

14          MR. TENREIRO:  Marty, can you tell me what

15  it was so I can find it, please.

16          MR. FLUMENBAUM:  It's Exhibit 27.  It's

17  the series of e-mails that have the questions.

18          MR. TENREIRO:  They didn't give him

19  versions with numbers.

20          MR. FLUMENBAUM:  One of the questions is

21  are you familiar with any current concentrations or

22  lack thereof of holdings of Ether, what about

317

1    concentrations of mining power; is that correct?

2        A.  That is one of the questions.

3        Q.  Right.  And you asked that question on

4    June 7th, did you not?

5        A.  I don't know if I asked it or if other

6    staff members asked it, but these were the

7    questions we intended to ask.

8        Q.  And you asked it at a meeting on June 8th,

9    correct?

10       A.  Again, same answer.

11       Q.  Prior to June 8th did you have answers to

12   any of these seven questions?

13       A.  I think we had a sense of these and what

14   possible answers there may be, but I think a lot of

15   the diligence was trying to confirm our

16   understanding.

17       Q.  Well, after June 8th what did you do to

18   confirm whatever information you received from

19   Mr. Buterin and the others who were at your

20   meeting?

21          MR. TENREIRO:  And discuss only external

22   conversations or steps.

1          A.  Yeah, but I think he asked me what did I

2     or the SEC do.  I mean, some of this would have

3     been the staff looking at public documents.  You

4     know, with respect to Ethereum one of the things

5     that was somewhat compelling was it was fairly

6     transparent.  Most of the decisions and information

7     around the network were posted on places like

8     GitHub or Reddit.

9          Q.  So you looked at public documents?

10         A.  I believe that would be part of the

11    process.

12         Q.  And do you remember any of those public

13    documents that you looked at?

14         A.  I personally did not.

15         Q.  You had your staff look at it?

16         A.  Yes.

17         Q.  And did any of the documents that were

18    reviewed did they talk about the concentration

19    levels of mining and -- let's start with that.

20              MR. TENREIRO:  Actually, no.  Objection to

21    form and I'm going to instruct him not to answer.

22    He said he didn't look at the documents himself.

1   So if he knows what's in the documents, he got that

2   from deliberations with the staff about the speech.

3   So I'm going to instruct him not to answer the

4   question.

5           MR. FLUMENBAUM:  You're going to instruct

6   him not to answer that?

7           MR. TENREIRO:  He already told you he

8   didn't look at the documents.

9           MR. FLUMENBAUM:  What -- what did the

10  Buterin group, if I may call them that, say to you

11  at your meeting about the concentrations of mining

12  power?

13      A.  I don't recall the specific answers, but,

14  again, I think they were consistent with the work

15  the staff had done to that point.  You know, going

16  beyond that I'd have to get into some of the

17  deliberations.

18      Q.  I don't want you to -- I want to know what

19  they told you.  What did they say to you?  What

20  were their words?

21      A.  Again, I don't remember their words, but

22  they would have answered this question to the best

320

```
 1    of their ability.

 2         Q.  Well, did they -- did the issue of China

 3    come up during this conversation?

 4         A.  I don't specifically remember that.

 5         Q.  Now, you asked about current

 6    concentrations or a lack thereof of holdings of

 7    Ether; is that correct?

 8         A.  Yes.

 9         Q.  What did Mr. Buterin say were his -- was

10    his current concentration?

11         A.  I don't -- I don't recall what he said

12    about his own holdings.

13         Q.  And what about Mr. ███████

14         A.  Same thing.

15         Q.  You don't remember what he said?

16         A.  (Witness shaking head.)

17         Q.  What about the Ethereum foundation?

18         A.  I don't remember the numbers.

19         Q.  What about Ethereum Switzerland?

20         A.  Same thing.

21         Q.  Do you know who funds the Ethereum

22    foundation?
```

321

1          MR. TENREIRO:  Objection to form.

2     A.  I don't know specifically who funds it.

3     Q.  Did they talk about who funds the Ethereum

4  foundation?

5     A.  Well, my understanding was that they had

6  some Ethereum, but I don't know exactly how they

7  funded it.

8     Q.  Did -- were you aware that ▮▮▮▮▮▮▮▮

9  funded some on the Ethereum foundation?

10    A.  No.

11         MR. TENREIRO:  Objection to form.

12         THE WITNESS:  Sorry.

13         MR. TENREIRO:  No problem.

14         THE WITNESS:  No.

15    Q.  Did you have any understanding of what

16  percentage Buterin, ▮▮▮▮▮▮ the Ethereum Foundation,

17  and ▮▮▮▮▮▮▮▮ had together in terms of

18  concentration?

19         MR. TENREIRO:  Let's start with yes or no.

20    A.  All those people put together?

21    Q.  Yeah.

22    A.  I would have a sense of that, yes.

322

1          Q.  And what was the total concentration?

2          A.  I don't recall.

3          Q.  Was it greater than 30 percent?

4          A.  I don't recall.

5          Q.  You mentioned earlier that 30 percent

6     would have been a substantial number in your mind;

7     is that correct?

8               MR. TENREIRO:  Object to form.

9          A.  Did I mention that earlier?

10         Q.  I thought you did.

11              MR. TENREIRO:  Objection to form.  Marty,

12    he was talking about one person then.  You're

13    mischaracterizing what he said.  Go ahead.

14         A.  So I -- I don't think I said that, but

15    what's your question?

16         Q.  My question is was it your understanding

17    that together they had more than 30 percent?

18         A.  And I don't remember their holdings

19    together.

20         Q.  Did you make any changes in your speech

21    based on anything that you learned on June 8th?

22         A.  Not that I recall.

323

1          Q.  Now, you testified earlier that the SEC

2     had policy against owning digital assets for quite

3     some time; do you remember that?

4          A.  Do I remember testifying to that?

5          Q.  Yes.

6          A.  Yes.

7          Q.  And when did you first become aware that

8     the SEC had a policy against owning digital assets?

9               MR. TENREIRO:  Object to form and to

10    relevance.  This is way beyond what she ordered you

11    to ask him about.  Go ahead.

12         A.  When did I become aware of that policy?

13         Q.  Yes.

14         A.  While I was at the SEC, probably the first

15    year I was at the SEC.

16         Q.  When you joined the SEC in May of 2017 did

17    the SEC have a policy against owning digital

18    assets?

19         A.  I'm not sure.

20         Q.  Isn't it a fact that the policy against

21    owning digital assets wasn't instituted until 2018?

22              MR. TENREIRO:  Objection to form.

324

1      A.  I'm not sure that's right.

2      Q.  When do you think it was instituted?

3         MR. TENREIRO:  Objection to form.

4      A.  I think a policy was adopted probably

5 around the time you're suggesting, but prior to

6 that time I think if you had any financial interest

7 in something you were involved in you were to

8 recuse yourself or not have the interest.  So I

9 think the policies are broad enough to, you know,

10 stop people from having interest in assets that

11 they were involved in.

12      Q.  You're talking about two different things,

13 aren't you?  You're talking about a conflict of

14 interest policy as opposed to a policy against

15 owning digital assets, correct?

16         MR. TENREIRO:  Objection to form.

17      A.  I'm talking about policies that might

18 restrict someone from owning digital assets.

19      Q.  Did the policy against conflicts of

20 interest restrict people from owning digital assets

21 if they didn't have any conflicts of interest?

22         MR. TENREIRO:  Objection to form.

325

```
1              A.  I'm not sure how the policy would have
2      been applied at that point.
3              Q.  When -- you stated that you did not own
4      any digital assets, correct?
5              A.  Correct.
6              Q.  Did you own stock in any company that did
7      own digital assets?
8                  MR. TENREIRO:  Are you talking about at
9      the time at the SEC?
10                 MR. FLUMENBAUM:  Yeah.
11                 MR. TENREIRO:  Okay.
12             A.  Not that I'm aware of.
13             Q.  Did you own stock in Alibaba?
14             A.  No.
15             Q.  Did you own stock in Ant Financial?
16             A.  No.
17             Q.  Did you list Alibaba and Ant Financial on
18     your disclosure forms?
19             A.  I don't think so.
20             Q.  Maybe I'm wrong.  Let me mark --
21                 MR. FLUMENBAUM:  What's the next exhibit?
22                 THE REPORTER:  37.
```

326

1              (Hinman Exhibit 37 was marked

2                   for identification.)

3    BY MR. FLUMENBAUM:

4        Q.  Let me mark as 37 a series of executive

5    branch personnel public financial disclosure

6    reports I believe from 2017 through 2020.

7              MS. PROSTKO:  And for the hotseat, this is

8    document 058 that was sent earlier today.

9              MR. TENREIRO:  We're going to designate

10   the conversation about this as highly confidential.

11             MR. FLUMENBAUM:  Okay.

12             MR. TENREIRO:  Thank you.  Do you want me

13   to hand him this whole thing?

14             MR. FLUMENBAUM:  I handed him --

15             THE WITNESS:  I gave that to the court

16   reporter.

17             MR. FLUMENBAUM:  Oh yeah.  Take the whole

18   exhibit.

19             MR. TENREIRO:  Keep it with this.  Okay.

20   All right.

21   BY MR. FLUMENBAUM:

22       Q.  Are these your -- are these copies of your

327

1    financial disclosure forms, Mr. Hinman?

2         A.  I haven't flipped through all 50 pages,

3    but they look like they could be.  Probably are.

4         Q.  Let me -- let me refer you to page -- it's

5    the third page, it's on the back of the third page.

6    It says "For Filer's source of compensation

7    exceeding 5,000 in a year," and it lists Alibaba

8    and Ant Financial Services on that.

9              MR. TENREIRO:  Objection to form.  You

10   asked him if he owned stock.

11             MR. FLUMENBAUM:  Well, he can explain

12   what --

13        A.  What's your question?

14        Q.  Does this indicate that you own stock?

15        A.  No.

16        Q.  What does this indicate?

17        A.  That those firms -- those companies paid

18   Simpson Thacher fees while I was at Simpson

19   Thacher.

20        Q.  Thank you.

21             Let me show you a document which is dated

22   January 15, 2014 and it's SEC production

328

1   No. 1345799.  We'll mark this as -- what are we up

2   to?  38?

3         MS. PROSTKO:  38.  And for the hotseat

4   this is document 040.

5               (Hinman Exhibit 38 was marked

6                for identification.)

7   BY MR. FLUMENBAUM:

8      Q.  Have you ever seen this document before

9   today?

10      A.  I may have seen this.  I don't recall

11   specifically.

12      Q.  Am I correct, sir, that this is a policy

13   with respect to ethics conflicts among the staff,

14   correct?

15      A.  Right.

16      MR. TENREIRO:  Object to form.

17      Q.  And this policy doesn't prohibit anybody

18   from owning Bitcoin; isn't that correct?

19      MR. TENREIRO:  Objection to form and

20   mischaracterizing, the document speaks for itself.

21      A.  Does it prohibit owning Bitcoin?  I'm

22   sorry.

329

1       Q.  Yes.

2       A.  Well, again, looking at this quickly, "I

3   own Bit-" -- the document has a question, "I own

4   Bitcoin, have been assigned to part of a working

5   group at the SEC making recommendations with

6   respect to Bitcoin, can I do this."  "Answer:  No."

7   Then it goes on to cite parts of the U.S. code that

8   say federal employees are -- prohibits all federal

9   employees from working on any particular matter

10  where they may have a direct or particular effect

11  on the employees's financial interest, and then

12  they go on to give examples.

13      Q.  So am I correct, sir, that if you were not

14  involved in making recommendations as to how to

15  regulate Bitcoin, you would be able to own Bitcoin

16  by the SEC?

17          MR. TENREIRO:  Objection to form.  You're

18  asking him to give you a legal opinion --

19          MR. FLUMENBAUM:  Come on.  Object to form

20  and let's move on.  No speeches.

21      A.  I'm sorry.  Could you ask your question

22  again?

330

1     Q.  Yeah.  Does this refresh your recollection

2    that employees of the SEC unless they had a

3    conflict of interest were permitted to own digital

4    assets?

5         MR. TENREIRO:  Object to form.

6     A.  Again, if they were not involved in the

7    space in any way, which, you know, that's a pretty

8    broad -- SEC views these things pretty broadly.  So

9    potentially I think you could own Bitcoin if you

10   were involved in something completely away from it.

11     Q.  And would you actually need permission to

12   buy Bitcoin if you were in that position of not

13   having anything to do with the regulation of

14   Bitcoin?

15        MR. TENREIRO:  Objection to form.

16     A.  I'd have to refresh myself on the

17   securities clearance procedures.  If you buy

18   securities you're supposed to get them precleared.

19     Q.  And am I correct that digital assets were

20   not covered by the securities clearance form until

21   2018?

22        MR. TENREIRO:  Objection to form.

331

1          A.   Again, I'll take your word for that, but

2     I --

3          Q.   Didn't you help write the policy in 2018?

4               MS. KELLY:  Object to form.

5               MR. TENREIRO:  Object to form.  Go ahead.

6          A.   I don't remember specifically helping on

7     the policy.  I probably had conversations with

8     people on the staff about it.

9          Q.   I want to point your attention to also it

10    says in this document that the "OEC has been

11    informed that the status of Bitcoin as either

12    currency or securities is undetermined at this

13    time"; do you see that?

14         A.   Yeah.

15         Q.   And as far as you knew, that was true?

16              MR. TENREIRO:  Objection to form.

17         A.   With respect to the ethics office?  The

18    document speaks for itself.

19         Q.   Did there come a time that the status of

20    Bitcoin as either currency or securities changed?

21              MR. TENREIRO:  Objection to form.

22         A.   For what purpose?  For the purpose of the

1    policies or in general?  In what context?

2        Q.  Did the SEC ever determine that the status

3    of Bitcoin was either a currency or a security?

4            MR. TENREIRO:  Marty, objection.  He

5    wasn't even at the SEC then.  You're asking him

6    about 2014 policies.  This is just -- objection.

7            MR. FLUMENBAUM:  Go ahead.

8        A.  What's your question?

9        Q.  My question was did this -- did the status

10   of Bitcoin change at any time after 2014 as to

11   whether it was viewed as a currency or a security?

12       A.  For what purpose?

13           MR. TENREIRO:  Objection to form.

14       Q.  For any purpose.

15       A.  For purposes of the ethics rules I think

16   it looks like it may have, but I'm not sure they

17   were making a determination of the applicability of

18   the federal securities laws.  They were applying

19   the ethics rules they thought would be prudent to

20   have at the commission.

21       Q.  Well, at the time this was written were

22   the ethics rules applied to currencies?

333

1           MR. TENREIRO:  Objection to form.

2      A.  Yes, if -- if you had a conflict.

3      Q.  But not if you were just buying fiat

4   currency, correct?

5           MR. TENREIRO:  Objection to form.

6      A.  I think I answered that.

7                      (Hinman Exhibit 39 was marked

8                       for identification.)

9   BY MR. FLUMENBAUM:

10     Q.  Let me show you a document we'll mark as

11  Exhibit 39, which is an office of ethics counsel

12  statement dated January 16th, 2018.

13     A.  Thank you.  Okay.

14          MR. TENREIRO:  Take a moment to look at

15  it.

16     Q.  Have you seen this document before, sir?

17                  (Witness reviewing document.)

18     A.  Yes.

19     Q.  Does this refresh your recollection the

20  first time -- this is the first time that the SEC's

21  supplemental ethics regulations applied to digital

22  assets?

334

1          MR. TENREIRO:  Objection to form.

2      A.  Again, I don't know the SEC's policies

3  prior to my time there or whether this was the

4  first instance, but I think this was one of the

5  first comprehensive treatments of the subject.

6      Q.  And am I correct that this -- that this --

7  ethics regulations do not prevent SEC employees

8  from buying digital assets; is that correct?

9          MR. TENREIRO:  Sorry.  I think -- I want

10  the record to reflect he said "I think this is one

11  of the comprehensive treatments of the subjects for

12  the ethics" and that was not reflected in the

13  record.

14          THE REPORTER:  Because they were talking

15  on top of each other.

16          THE WITNESS:  Sorry.

17          MR. FLUMENBAUM:  Sorry.

18      A.  What's your second question?

19          MR. FLUMENBAUM:  Can you repeat my

20  question.

21              (Record read as requested.)

22          MR. TENREIRO:  Object to form.

1         A.  I'd have to study it again, but I think

2    there's not an outright prohibition.  I think it is

3    similar to the (indecipherable) policy if there's a

4    conflict involved you shouldn't be owning the

5    asset.

6         Q.  And am I correct that preclearance is

7    permitted under this policy?

8         A.  Again, you've probably studied this

9    document more than I have.  I think it's -- I think

10   preclearance is required, yes.

11        Q.  Did you have any role in the creation of

12   this document or the policy?

13        A.  Not a very significant role.  This was

14   something that I remember the chairman's office

15   discussing, and I thought it was a good idea.

16        Q.  Did anyone consult with you as to whether

17   this impacted your views as to whether a digital

18   asset was a currency or a security?

19        A.  Did anyone ask me that?

20        Q.  Yeah.

21        A.  Or did it have that impact?  No.

22        Q.  Did you have to approve any SEC employees'

1   applications to purchase digital assets?

2       MR. TENREIRO:  Object to form.

3       A.  No.

4       Q.  Who would be responsible for that

5   approval?

6       A.  I think this office that generally reviews

7   people's security transactions.

8       Q.  Now, you testified earlier that at the

9   time you joined the SEC you had never heard of XRP,

10  correct?

11      A.  I don't think I had.

12      Q.  Had you ever heard of Ripple?

13      A.  I don't remember hearing of Ripple prior

14  to the SEC.

15      Q.  When do you recall first learn about

16  Ripple?

17      A.  I'm not exactly sure.  It's probably

18  sometime in 2017 or early '18.

19      Q.  And the same question with respect to XRP?

20      A.  Same answer.

21      Q.  Now, did -- were you aware that Ripple

22  entered into a settlement with the Department of

337

1    Treasury?

2              MR. TENREIRO:  Objection to form.

3         A.  Could you be more specific?

4         Q.  Well, were you aware that -- did you learn

5    at some point in 2017 or 2018 that Ripple had

6    entered into a settlement agreement with the

7    Department of Treasury in connection with its

8    operations?

9              MR. TENREIRO:  Let's limit that to things

10   you might have learned from outside parties such as

11   from Ripple's counsel, for example.

12             MR. FLUMENBAUM:  Well, I want to know if

13   he learned that fact from anybody.

14             MR. TENREIRO:  Let's answer yes or no,

15   then, if we're going to do --

16        A.  I think the first I had heard of that was

17   potentially in a meeting with XRP and its counsel

18   where they mentioned that.

19             MR. FLUMENBAUM:  Let me mark as Exhibit 40

20   a settlement agreement which was entered into in

21   2015.  This is 40?

22             THE REPORTER:  40.

338

```
 1                    (Hinman Exhibit 40 was marked

 2                       for identification.)

 3   BY MR. FLUMENBAUM:

 4        Q.  This is marked RPLI-SEC-1207 through 2021.

 5   My question for you is when was the first time that

 6   you saw this agreement?

 7        A.  I don't think -- today, right now.

 8        Q.  So as of -- prior to today you never saw

 9   this agreement?

10        A.  Not that I can recall, no.

11        Q.  I believe you testified earlier that you

12   were involved in FSOC and regulations relating to

13   other agencies; is that correct?

14        A.  That's right.

15        Q.  And you're aware that the Department of

16   Treasury has its own set of regulations governing

17   virtual currencies?

18            MR. TENREIRO:  Objection to form.

19        A.  I think there are statutes and rules that

20   different agencies administer with respect to money

21   laundering and know your customer.

22        Q.  Did you ever hear of a designation called
```

339

```
 1    money services business?
 2         A.  Money transfer business, money services
 3    business, yes.
 4         Q.  And are those under the exclusive
 5    regulation of the Department of Treasury?
 6              MR. TENREIRO:  Objection to form.
 7         A.  I don't think so, but exclusive meaning in
 8    that area of transferring money or that's the only
 9    regulator in the world they have to comply with?
10         Q.  Have you ever reviewed the regulations
11    relating to money service businesses?
12         A.  My understanding of money service
13    businesses would be that that's an area that often
14    is regulated at the state level, like the New York
15    Department of Financial Services if people are
16    transferring money, and if you are a public company
17    doing that you might have to comply with their
18    regulations and the SEC regulations and if you're a
19    part of a bank you'd have banking regulations.  So
20    there's a whole panoply of regulations that may
21    apply to somebody that's engaged in that business.
22         Q.  Did Ether -- was Ether subject to any
```

340

1    regulations from the Department of Treasury?

2          MR. TENREIRO:  Object to form.

3          A.  I don't know what Treasury had applied in

4    terms of their money laundering rules to Ether.  I

5    don't know off the top of my head.

6          Q.  And what about with respect to Bitcoin?

7          MR. TENREIRO:  Object to form.

8          A.  Same answer.  I'm not sure how they are

9    applying those rules to those two assets.

10         Q.  Now, you mentioned in response to

11   Mr. Figel's questioning that you were not aware of

12   any rulemaking proceedings that you were involved

13   in in connection with digital assets; is that

14   correct?

15         MR. TENREIRO:  Object to form.

16         A.  Rulemaking proceedings is very broad.  So,

17   you know, we did a lot of rulemaking while I was at

18   the SEC in my division and in other divisions.

19   Would they -- you asked broadly would they apply to

20   digital assets.  If someone was in the business of,

21   you know, mining Bitcoin or pick a digital asset

22   business and they were a registered company with

341

1   us, the rulemakings would be relevant to them in

2   terms of disclosures.  So you're asking a very

3   broad question.  If you mean are there specific

4   digital asset rules -- rulemakings that I was

5   involved in, I don't think we had a specific

6   rulemaking per se.

7       Q.  That's what I was getting at.

8       A.  Okay.

9       Q.  And you also mentioned no action letters?

10      A.  Right.

11      Q.  Were there any no action publicly -- no

12  action letters approved in 2017 that related to the

13  applicability of digital assets to securities laws?

14      A.  I don't know if anyone sought one in 2017.

15  There were some people trying to use blockchain

16  technology for stock transfers.  I don't know if

17  they got a no action letter, but some of that would

18  precede a little of my time all 2017.

19      Q.  Well, the first no action letter that I

20  see under your regime was in 2019.  Am I missing

21  something?

22          MR. TENREIRO:  Objection to form.

342

```
1        A.  I'd have to go back and look at the no

2   action letters to see, you know, each one that was

3   granted and dates.

4        Q.  Do you recall any that specifically

5   related to the applicability of the securities laws

6   to digital assets in 2017 or 2018?

7        A.  I don't remember when we issued the pocket

8   full of coins or there was a -- I forget the name

9   of it -- a jet token, what the dates of those are.

10  Maybe you do.

11       Q.  Is that the only one you remember?

12       A.  I think there were some others, but I

13  might have been less involved with those.  Again,

14  you asked very broadly if that applied to digital

15  assets.  So you were --

16       Q.  I changed the question slightly --

17       A.  Okay.

18       Q.  -- to involve the applications of

19  securities laws to digital assets.

20       A.  Again, I remember the two, and I'd have to

21  go back and do some work to see if there were

22  others that were relevant.
```

343

1      Q.  But there wasn't a plethora of no action

2   letters issued by the SEC in this space during your

3   tenure?

4          MR. TENREIRO:  Objection to form.

5      A.  I remember the ones I remember.  So...

6      Q.  The two?

7      A.  Yes.

8      Q.  Okay.

9      A.  Actually I think there might have been a

10  third, but, again, I'd have to go back and look.

11     Q.  Mr. Figel showed you the Dow report, that

12  was in 2017?

13     A.  Yes.

14     Q.  And that was issued a couple months after

15  you joined?

16     A.  Yes.

17     Q.  And what role did you play in the issuance

18  of that report?

19         MR. TENREIRO:  Just generally the role.

20     A.  I reviewed it, I commented on it, talked

21  to different members -- you know, enforcement about

22  it, talked to the chairman's office about it.

344

1          Q.  And -- and am I correct that that was the

2     first comprehensive report that was issued by the

3     SEC on this space?

4               MR. TENREIRO:  Objection to form.

5          A.  In terms of comprehensive report on this

6     space, I don't know if you can call it

7     comprehensive.  It was applying the law to the

8     facts of the Dow, which was a decentralized

9     exchange, and I don't think the SEC had dealt with

10    the concept of, you know, digital assets

11    transmitting across a decentralized exchange and

12    people investing in that prior to then.

13         Q.  So you didn't regard it as a comprehensive

14    report?

15         A.  I don't think it applied -- I don't think

16    it has every issue that may be relevant for folks

17    to consider in this space --

18         Q.  Was there --

19              MR. TENREIRO:  Let him finish, please.

20              MR. FLUMENBAUM:  I'm sorry.  I thought --

21    I thought you had.

22              Was there any report issued prior to the

345

1    Dow that you felt was more comprehensive?

2            MR. TENREIRO:  Object to form.

3        A.  Yeah.  Comprehensive with respect to a

4    decentralized exchange, no.  I'd have to go back

5    and look at things the staff did before I got there

6    to have a complete answer, but I haven't done that.

7        Q.  Did you -- you stated that you did not

8    mention in any of your due diligence meetings with

9    █████ nd Buterin that you were going to give a

10   speech relating to Ether; is that correct?

11       A.  Yeah.  I don't recall mentioning the

12   speech.

13       Q.  Do you know if their counsel was aware

14   that you were going to give a speech?

15           MR. TENREIRO:  Object to form.

16       A.  I don't know what counsel knew or didn't

17   know in terms of, you know, looking at a set of

18   conferences that were coming up and seeing that I

19   was speaking.

20       Q.  Did you mention it to Mr. Kim when you had

21   your one-on-one call with him?

22           MR. TENREIRO:  Object to form.

346

1          A.  I don't remember talking to him about it.

2          Q.  Well, your speech was coming up on

3    June 14th.

4          A.  Right.

5          Q.  The meeting with Buterin had been delayed,

6    you know, by then, correct?

7          A.  I think that's right if I recall the

8    e-mail I saw.

9          Q.  You were going to meet with him in May and

10   you were pushing to get a meeting together prior to

11   your speech, correct?

12          MR. TENREIRO:  Object to form.

13          A.  To the extent the speech was going to

14   speak about Ethereum and we wanted to make sure we

15   had as much information as possible about it, it

16   was useful to talk to them ahead of time.

17          Q.  And didn't you communicate that to

18   Mr. Kim?

19          A.  Again, I don't remember saying I needed to

20   talk to him about this speech.  We usually are

21   pretty careful about what we're going to say in

22   speeches before we actually give the speech.

347

1    That's just normal policy.  So I don't have any

2    recollection of doing that.  It wouldn't be my

3    policy to do that.

4         Q.  Did they have any -- to your knowledge,

5    did their lawyers know that you were going to give

6    a speech --

7              MS. KELLY:  Object to form.

8         Q.  -- about Ether?

9         A.  Again, I don't know what their lawyers

10   knew from sort of the public information that was

11   out there about the speech, but I don't believe so.

12        Q.  Did you authorize anybody in your staff to

13   tell the lawyers?

14        A.  Not that I recall, no.

15        Q.  When did you first announce that you were

16   going to give the speech at the conference on

17   June 14th?  When was that first --

18        A.  I don't think I ever --

19             MR. TENREIRO:  Object to form.

20        A.  I don't think I ever -- oh, sorry.  I

21   don't think I ever announced it.  I think maybe

22   Yahoo put something out, but I don't recall saying

348

```
 1    here's an upcoming thing I'm speaking at.

 2          Q.  Did any of the other four commissioners

 3    ask you why you had not sent a copy or a draft of

 4    your speech to them?

 5          MR. TENREIRO:  Object to form and

 6    objection on deliberative process grounds.

 7          MR. FLUMENBAUM:  What's deliberative about

 8    that?

 9          MR. TENREIRO:  You're asking him what four

10    commissioners told him about the copy of the

11    speech.

12          MR. FLUMENBAUM:  I'm asking did they

13    complain to him that they hadn't seen a copy of the

14    speech.  That's not deliberative.

15          MR. TENREIRO:  Did you -- well, you

16    haven't even established that he even talked to

17    them afterwards about the speech.  So why don't we

18    start there and see where we can go with this.

19          MR. FLUMENBAUM:  All right.  Do you recall

20    any conversations with any of the commissioners

21    other than Mr. Clayton about your speech?

22          A.  I would meet with the commissioners --
```

349

1    each commissioner individually periodically,

2    usually once every two to three weeks, sometimes

3    less or more depending on people's schedule, and I

4    believe after the speech it probably was a topic of

5    conversation.

6         Q.  Well, let's try to break it down in terms

7    of timing.  Did you have any conversations with any

8    of the four commissioners relating to the speech

9    prior to the speech?

10             MR. TENREIRO:  Yes or no.

11        A.  I may have.  You know, each one of them I

12   would have -- I don't remember a specific

13   conversation talking about the speech.  One of the

14   things I did in these periodic meetings with them

15   was tell them what I'm doing.

16        Q.  After the speech do you recall a

17   conversation with any of the four commissioners

18   about your speech?

19        A.  Generally I have a recollection that I

20   talked to folks about giving the speech.

21        Q.  All right.  Who do you recall talking to?

22        A.  I don't have a specific recollection of

1    speaking to, you know, Commissioner Roisman or it

2    would have been maybe Kara Stein at that point or

3    Commissioner Peirce, but I have a recollection of

4    generally talking about the speech with

5    commissioners in those meetings.

6         Q.  And what do you recall them saying to you

7    about the speech?

8              MR. TENREIRO:  So I'm going to instruct

9    you not to disclose deliberations or, you know,

10   conversations that are deliberative.  If they --

11   please.  If they, you know, expressed general

12   thoughts on the speech that are not, you know, good

13   job or things like you talked about earlier, you

14   can answer that, but do not disclose deliberations

15   about topics that, you know, commissioners or the

16   staff might be considering as they relate to the

17   speech if you can.

18        A.  Your question is what was the gist of

19   what --

20        Q.  What was the subject -- what was discussed

21   between you and any of the four commissioners that

22   you can recall about your speech?

351

```
 1        A.  Again, I don't have a specific
 2   recollection of any one commissioner and I having
 3   that conversation.  I have a general impression
 4   that I talked to them about it and that they
 5   generally were supportive of the speech.
 6        Q.  Nobody was critical of the speech?
 7        A.  Not that I recall.
 8        Q.  And no one complained to you that they
 9   would have liked to have seen a draft of it prior
10   to it being issued?
11        A.  Not that I recall.  Other guidance we put
12   out I've had that, you know, experience, but not
13   with this one that I recall.
14        Q.  Now, can you take a look Hinman
15   Exhibit 17.  This is, again, ███████ related.  This
16   goes to the April 2018 e-mails.  It's Exhibit 17.
17             MR. TENREIRO:  Is this the one with the
18   questions?
19             MR. FLUMENBAUM:  No.  It's a different
20   one.
21             MR. TENREIRO:  Do you have a clean one?
22   Okay.  Here's this one.  So SEC-LIT-E-MAILS-331453?
```

352

1      MR. FLUMENBAUM:  Yep.

2      MR. TENREIRO:  Okay.  Thank you.

3  BY MR. FLUMENBAUM:

4      Q.  Mr. Figel asked you about this e-mail.

5  Was it unusual for you to send an e-mail directly

6  to someone in Mr. ███████ position?

7      MR. TENREIRO:  Object to form.

8      A.  What do you mean by his position?

9      Q.  Well, he was the head of the Ethereum

10 foundation, ████████ somebody who -- whose asset

11 you were investigating.

12     MR. TENREIRO:  I object to the form.

13     MR. FLUMENBAUM:  Well, I was trying to --

14     A.  I mean, he's the only person that fits

15 that category.  So yes.  I had not sent him an

16 e-mail earlier.

17     Q.  It appeared to me to be a pretty informal

18 kind of e-mail, "Dear ████

19     A.  Uh-huh.

20     MR. TENREIRO:  Object to form.

21     Q.  You'd only met him once before?

22     MR. TENREIRO:  Is there a question?

353

1   Object to form.

2        A.  What's the question?

3        Q.  Had you met him only once before?

4        A.  Maybe once or twice.

5        Q.  Were you friendly with him?

6        A.  Yes.

7        Q.  And where did you meet him once or twice

8   before the April 12th time?

9        A.  I believe they had come into the SEC.

10  April 12th?  Yes, I think they came in late '17,

11  yeah.  You may have something --

12       Q.  Was there an investigative file relating

13  to Ether?

14           MR. TENREIRO:  Just answer yes or no.

15       A.  I don't know.

16       Q.  Was there an investigative file relating

17  to Bitcoin?

18       A.  I don't know.  I don't know of one I

19  should say.

20       Q.  Did you ever see a file of documents

21  relating to Ether?

22           MR. TENREIRO:  Object to form.

354

1          A.   A file of documents relating to Ether?

2          Q.   Yes.

3          A.   What's that mean?

4          Q.   A folder of documents, a Redweld of

5     documents.

6               MR. TENREIRO:  Relating to Ether?  Not

7     just an investigative file, but anything to Ether?

8               MR. FLUMENBAUM:  Right.

9          A.   I don't recall a file of Ether documents.

10         Q.   Well, I'm trying to get a sense as to, you

11    know, where was the repository of information

12    relating to Ether prior to April of 2018.  Maybe

13    you can help me on that.

14              MR. TENREIRO:  Object to form.

15         A.   Again, I think we had met with Ether.

16    Staff would normally, you know, have collected

17    notes or thoughts on a meeting like that.  There

18    may have been a slide deck that people hung on to.

19    It would really be up to -- it wasn't usually my

20    role to keep the files.

21         Q.   I didn't expect you would.

22         A.   I know you don't.  I'm sorry.  So, you

355

1    know, it would generally be the folks that were

2    responsible for the meeting, whether that would be

3    Val Szczepanik or my counsel or chief counsel's

4    office.  Someone other than me would be keeping a

5    file.

6         Q.  Do you recall a slide deck relating to

7    Ether?

8            MR. TENREIRO:  Object to form.

9         A.  I saw a slide -- sorry.  I saw a slide

10   deck earlier, but it -- I didn't really recall

11   seeing that earlier.  A slide deck earlier today.

12   I don't remember seeing it prior to today.

13        Q.  Okay.  And do you have any recollection of

14   having seen a slide deck relating to Ether, the

15   Foundation, ▮▮▮▮▮▮▮  on or around April 2018?

16           MR. TENREIRO:  Object to form.

17        A.  Again, I don't know the dates.  I don't

18   remember this slide deck.  I think they had a slide

19   deck on the news idea that they had.

20        Q.  When you wrote your speech, you know, the

21   June 14th speech, did you have any documents in

22   front of you that Ether had given you?

356

```
 1              MR. TENREIRO:  Go ahead.

 2         A.  The first draft of that speech would have

 3    been done by my counsel most likely.  I think I may

 4    have outlined it for them or -- you know, I don't

 5    remember the exact process.  So I wouldn't be

 6    sitting down trying to pull together a bunch of

 7    things.  I'd be reading the draft.

 8         Q.  Which counsel do you recall drafted the

 9    original?

10         A.  I think probably Michael Seaman.

11         Q.  And did he give you the draft after he

12    finished it?

13         A.  We exchanged drafts over a period of time.

14         Q.  And did he show you any document --

15    factual documents that formed the basis for

16    whatever draft he gave you?

17              MR. TENREIRO:  Answer yes or no, please.

18         A.  No.

19         Q.  And do you know if he had any factual

20    documents at the time he prepared his draft?

21         A.  What do you mean by a factual document

22    here?  I'm not quite sure.
```

357

```
 1        Q.  Well, facts about Ether, about the
 2   Foundation, about -- about whether it's
 3   sufficiently decentralized.  I mean, you weren't
 4   making this stuff up, I assume?
 5        MR. TENREIRO:  Objection to form and only
 6   answer that question yes or no.
 7        A.  I guess no, I wasn't making it up.
 8        Q.  So there was some factual basis that
 9   somebody had that you were relying on?
10        MR. TENREIRO:  Objection to form.
11        A.  Yes.  There was a lot of diligence done,
12   again, before -- first of all, this speech relates
13   not just to Ether, let's just remember that.  It's
14   a broader speech than that.  It talks about all
15   kinds of other things, not just Ether.  But with
16   respect to the Ether matter, we wouldn't have just
17   made that up, as you say.  We did some diligence
18   and came to some thoughts around that that were
19   appropriate for the speech.
20        Q.  Was there any diligence that you can
21   recall other than the meeting that you had with
22   Buterin, et al., on June 8th?
```