358

1              MR. TENREIRO:  Objection, he's asked and

2      answered that many times.  He looked at public --

3      go ahead.

4          A.  Yeah.  Again, I think the staff did, you

5      know, the kinds of things we've already talked

6      about with the ███████ people, the calls we had

7      talking to market participants, reading materials

8      that are available on GitHub, Reddit, reading the

9      white papers around that.  I mean, there's a whole

10     slew of things.

11         Q.  What white papers?

12         A.  There are white papers around Ethereum

13     that were put out at the time of its formation, how

14     it would work, how the governance works, things of

15     that sort.

16         Q.  You concluded, did you not, that at the

17     time that it originally sold in 2014 that it

18     violated the securities laws, did you not?

19             MR. TENREIRO:  Don't answer that.  I'm

20     instructing the witness not to answer that question

21     unless you're asking him for what he stated in the

22     speech, in which case it speaks for itself.  But do

1    not discuss internal deliberations with your staff

2    about your staff's conclusion as to the application

3    of the securities laws to the 2014 transactions.

4         MR. FLUMENBAUM:  Didn't you state in your

5    speech that Ethereum or Ether may have violated the

6    securities laws when it first originally sold its

7    coins?

8         A.  I thought the speech said we were not

9    talking about that issue.  We were talking about

10   how Ethereum was transacted at that time, the time

11   of the speech, as we see it being offered at that

12   time.

13        Q.  Right, but you weren't looking back and

14   saying that it may have violated the law back in

15   2014?

16        MR. TENREIRO:  Object to form.

17        A.  Again, I think this -- I would let the

18   speech speak for itself on that topic.  I think we

19   just said we're not talking about that in this

20   speech.  We're talking about how we see it being

21   offered today.

22        Q.  Were you -- did you -- were you aware that

360

1    the statute of limitations still applied in 2018

2    for acts that occurred in 2014?

3            MR. TENREIRO:  Objection to form.

4        A.  I didn't analyze the statute of

5    limitations on that.

6            MR. FLUMENBAUM:  Let's take a short break.

7            THE VIDEOGRAPHER:  Off the record at 6:45.

8                    (A short break was had.)

9            THE VIDEOGRAPHER:  Back on the record at

10   7:00.

11   BY MR. FLUMENBAUM:

12       Q.  Just a few more questions.

13       A.  Perfect.

14       Q.  Take a look at your speech, Exhibit 10.

15       A.  Yes.

16       Q.  Take a look at page 3 and take a look at

17   the next-to-last paragraph.

18       A.  Yes.

19       Q.  "So when I look at Bitcoin today"; do you

20   see that?

21       A.  Right.  Yes.

22       Q.  And take a look at the third sentence.

361

1   You state "And putting aside the fundraising that

2   accompanied the creation of Ether."

3       A.  Right.

4       Q.  Do you see that?

5       A.  Yes.

6       Q.  What did you mean when you said "putting

7   aside the fundraising that accompanied the creation

8   of Ether"?

9       A.  I was not speaking to whether that was a

10  transaction in compliance with the securities laws.

11      Q.  And what was your understanding as to

12  whether or not the fundraising that accompanied the

13  creation of Ether violated or did not violate the

14  securities laws?

15          MR. TENREIRO:  I'm just going to caution

16  you not to disclose deliberations, but if you had

17  an independent understanding, you can give that.

18      A.  My understanding is that's really based on

19  discussions -- deliberations with the staff.  So

20  I'm not sure I can answer that.

21      Q.  And who did you have deliberations with?

22      A.  About this -- that particular topic?

362

1   Q. Yeah.

2   A. It would have been the same folks that

3 were involved in the speech.

4   Q. What was the factual basis for that

5 statement? What did you know happened?

6   A. The factual basis for the statement in the

7 speech or --

8   Q. Yeah, for the statement in the speech.

9   A. Well, I wasn't talking about it. I was

10 just saying I'm putting that aside.

11   Q. Well, you put it aside because you knew

12 something about it, correct?

13    MR. TENREIRO: Objection to form.

14   A. Actually I didn't want to get into that

15 because I hadn't really studied that. So I'm

16 putting that aside -- what I'm saying in the speech

17 is I'm putting that aside, not going there is what

18 I was saying.

19   Q. Did you have an understanding that Ether

20 in connection with the fundraising that accompanied

21 the creation of Ether had violated the securities

22 laws?

[7/27/2021] Hinman, William Dep. Tr. 7.27.2021

363

1              MR. TENREIRO:  Just answer yes or no.

2              MS. KELLY:  Objection to form.

3         A.  Did I have a view on that?

4         Q.  Yes.

5         A.  Yes, but not a view that was informed by a

6    complete analysis of that question.  I never had to

7    answer that question for anyone at the SEC.

8         Q.  But am I correct that you deliberately

9    wanted the market, the market participants that you

10   were talking to, to understand that you were not

11   stating that their initial fundraising was in

12   compliance with the securities laws?

13        A.  Yeah.  I said I'm putting that issue

14   aside.

15        Q.  But you did that for a purpose, correct?

16             MR. TENREIRO:  Object to form.

17        A.  What was the reason for phrasing it that

18   way?  I didn't want people to misunderstand the

19   speech as covering anything more than how we saw

20   Ether being offered at the time of the speech.

21        Q.  And were you making a decision -- a policy

22   decision not to go after Ether for what had

364

```
1    occurred at the original fundraising?

2          MR. TENREIRO:  Object to form.  No.

3    Rephrase that because you're really getting into

4    deliberative process.

5          MR. FLUMENBAUM:  I'm only focusing on what

6    he said and his own state of mind.

7          A.  Right.  So it's not for me to make that

8    decision whether to, as you said, go after Ether.

9    That's not something I would do as the director of

10   corporation finance.  That's an enforcement

11   question or a broader commission question.

12         Q.  So you -- you were not -- you were not

13   making a decision one way or the other on that

14   issue?

15         MR. TENREIRO:  You, Mr. Hinman, I'm going

16   to instruct you to answer to that question.

17         A.  Yes, and I'm trying to tell people I'm

18   putting that aside and sharing with you my

19   thoughts.  I'm putting aside any thoughts I had on

20   the initial fundraising.

21         Q.  So were you agreeing with the -- you know,

22   with the view that a digital asset can evolve over
```

365

1    time into a nonsecurity?

2        A.  You're reading an awful lot into that

3    sentence.  I don't think I was specifically trying

4    to convey that point in that sentence.

5        Q.  Do you have a view as to what my

6    question -- on my question?

7        A.  A personal view as to whether something

8    that was offered originally as a security may later

9    become an item that's not?

10       Q.  Correct.

11       A.  I have a view that something can be

12   offered in a way where it's not a security, where

13   it is a security, and it can evolve to become one

14   or not become one.  So what this sentence is really

15   trying to do is talk about as we see Ether being

16   offered today.

17        So Ether being offered in a different way,

18   in the same way a CD being offered in a different

19   way can become a security, and that's all we're

20   trying to convey here is that the instrument itself

21   may or may not be a security depending on how it's

22   being offered.  A CD is not a security under the

366

```
 1    federal securities laws, but it can be offered --

 2        Q.  Why --

 3            MR. TENREIRO:  Wait, wait, wait.  You have

 4    to let him finish.

 5        A.  -- but it can be offered in a way it is.

 6    That was the Gary Plastic case, as you know.

 7        Q.  Why has the commission not adopted your

 8    view that sales of Ether today are not securities?

 9            MR. TENREIRO:  Objection to form and --

10    no.  I'm going to instruct him not to answer why

11    the commission has or has not done anything to the

12    extent he even knows that.  So let's move on or try

13    a different question.

14            MR. FLUMENBAUM:  Do you know why the

15    commission has not adopted your view that sales of

16    Ether are not securities today?

17            MR. TENREIRO:  Answer yes or no.

18        A.  Let me just clarify the question.  That

19    sales of Ether today, meaning today whatever

20    today's date is, are not or at any particular time?

21    I don't think --

22        Q.  From June 14th to the -- through your
```

367

```
 1      tenure as director of finance, why didn't the

 2      commission come out and agree with you?

 3           A.  I don't think the commission was presented

 4      with the question.  For the commission to take a

 5      view it has to have a meeting, you know, if it's

 6      done through a rulemaking notice and comment, have

 7      a formal vote.  The commission has not done that

 8      with respect to any particular sale of Ether, as

 9      far as I know.  I'm not there anymore.  So I don't

10      know what they're doing now.

11           Q.  Well, what about with respect to your

12      statement on Bitcoin?

13           A.  What about it?

14           MR. TENREIRO:  What's the question?

15           Q.  Same question as Ether.  Why has the

16      commission not adopted your --

17           A.  Same answer I think.

18           Q.  So is it just a question of not enough

19      time?

20           MR. TENREIRO:  Object to form.  That's not

21      what he said.

22           A.  Again, I don't think the issue has
```

368

1    presented itself at the commission level.

2        Q.  Do you -- when was the last time you had a

3    conversation with Mr. █████████

4        A.  I don't remember.  It's probably sometime

5    in 2018 or '19.

6        Q.  So did you have any conversations after

7    your speech with Mr. █████████

8        A.  I don't recall a specific conversation

9    with him after that, but possible.  I mean --

10        Q.  Did he call to say thank you?

11            MR. TENREIRO:  Object to form.

12        A.  No, he did not call to say thank you.

13        Q.  Did anyone from ██████████ r Ethereum give

14    you a call and say great speech?

15        A.  Not that I recall.

16        Q.  Mr. Clayton, though, said good speech,

17    right?

18        A.  Again, I don't have a specific

19    recollection of Jay saying good speech.  My

20    impression is that he thought it was a good speech,

21    yes.

22            MR. FLUMENBAUM:  That's all I've got.

369

```
 1          MR. TENREIRO:  Okay.  We can stay on and I

 2    can ask a few questions.

 3          MR. FLUMENBAUM:  I am specifically going

 4    to state for the record that if you ask him

 5    questions you run the risk of giving us the

 6    opportunity to ask questions again after you, and

 7    we will take your questions, to the extent it's

 8    valid, as a breach -- as asking questions that

 9    invade the deliberative process.

10          MR. TENREIRO:  Okay.  We've discussed this

11    before.  I don't agree, but can I proceed or do you

12    want a break?

13          MR. FLUMENBAUM:  I don't need a break.

14    Does anybody need a break?

15                        EXAMINATION

16    BY MR. TENREIRO:

17     Q.  Director Hinman, I think today you've been

18    shown some documents where law firms are presenting

19    materials to the staff of the division of

20    corporation finance.  Generally do you recall today

21    seeing some of those documents?

22     A.  Yes.
```

370

```
1          Q.  When these law firms provide the division

2     of corporation finance, you know, what -- do you

3     have an understanding as to why they're taking

4     legal positions as to certain issues in front of

5     the division?

6          MR. FLUMENBAUM:  Objection as to form.

7          A.  Generally I think they are advocating for

8     a client's position with respect to the issues.

9          Q.  Okay.  And do you have an understanding as

10    to whether, generally speaking -- actually, do you

11    have an understanding as to whether some of the

12    documents presented to you were by attorneys that

13    had been hired by clients to present positions to

14    you or whether they were instead sort of unbiased

15    observers of the market?

16         MR. FLUMENBAUM:  Objection as to form on

17    numerous grounds.

18         A.  So I'm sorry.  Could you repeat the

19    question?  I kind of lost it.

20         Q.  Do you have an understanding as to whether

21    some of the documents that were presented to you

22    were by attorneys that were acting on behalf of
```

371

1    clients that hired them or just instead as

2    objective observers of the market?

3          MR. FLUMENBAUM:  Objection as to form.

4          MR. FIGEL:  Objection.

5       A.  Generally people were -- if they were

6    counsel, they had been hired by someone to present

7    their views on their behalf.

8       Q.  Thank you.

9          Did you attend meetings while you were

10   director of the division of corporation finance

11   with representatives of Ripple in connection with

12   the SEC's staff's investigation of Ripple?

13      A.  Yes.

14      Q.  Approximately how many meetings?

15      A.  Probably four, maybe a few phone calls as

16   well.

17      Q.  Where were those meetings?

18      A.  Either in the SEC's offices or on Zoom

19   calls.

20      Q.  Was Mr. Garlinghouse at some of those

21   meetings?

22      A.  I think he may have been at one or two of

372

```
 1    the early meetings.

 2         Q.  What about Andrew Ceresney, do you know

 3    who that is?  Do you know who Andrew Ceresney is?

 4         A.  I do.

 5         Q.  Who is that in connection with this case?

 6         A.  I believe he was Ripple's counsel and

 7    formerly the director of the division of

 8    enforcement at the SEC.

 9         Q.  What about Meredith Cross?

10         A.  She's -- she attended some of these

11    meetings and is a partner at WilmerHale and

12    formerly held the same position I formerly hold,

13    director of the division of corporation finance.

14         Q.  Did you have meetings with either

15    Ms. Cross or Mr. Ceresney about the SEC staff's

16    investigation of Ripple's conduct?

17         A.  Yes.

18         Q.  Have you ever at any time told any

19    Ripple's representatives that you did not think

20    their offers and sales of XRP were securities

21    transactions?

22              MR. FLUMENBAUM:  Objection as to form, and
```

373

1    I'm specifically stating that if you enlisted an

2    answer, you're violating the process.

3            MR. TENREIRO:  No.  This is external.

4    External statements -- just you --

5            MR. FLUMENBAUM:  We're going to ask for

6    notes of his meetings.  You're opening the door to

7    things that you've claimed privilege on.

8            MR. TENREIRO:  You've asked for those

9    notes already.

10           MR. FLUMENBAUM:  We're going to get them

11   this time.  Go ahead.

12           MR. TENREIRO:  Have you ever, Mr. Hinman,

13   at any time told any Ripple's representatives that

14   you did not think their offers and sales of XRP

15   were securities transactions?

16           MR. FLUMENBAUM:  Objection as to form.

17   You may answer.

18       A.  No.

19       Q.  Have you ever told any Ripple

20   representative that the SEC itself or any of its

21   commissioners did not think that Ripple's offers

22   and sales of XRP were securities transactions?

374

1          MR. FLUMENBAUM:  Objection as to form.

2      A.  No.

3      Q.  Did you ever witness anyone at the SEC

4  tell any such thing to any Ripple representative

5  while you worked at the SEC?

6          MR. FIGEL:  Objection.

7          MR. FLUMENBAUM:  Objection as to form.

8      A.  No.

9      Q.  What did you tell Ripple's representatives

10  at these meetings about sort of your views?  And

11  only communicate what you told them externally.

12      A.  A number of things.  So that's a broad

13  topic, but when Meredith Cross came in with Andrew,

14  one of the purposes of that meeting as I understood

15  it was to try to bring the company into compliance

16  and to examine ways that that could happen.  So one

17  of the things I told them was the first thing you

18  need to do and I'm kind of surprised you haven't

19  done it already is stop selling XRP on an

20  unregistered basis publicly.

21          We also told them that we were concerned

22  about the asymmetries between what they -- what the

375

```
1    people at Ripple knew about the prospects for XRP

2    and what the market knew, and we explored with them

3    the idea of Ripple becoming a public company to

4    help reduce those asymmetries.

5              THE REPORTER:  Did you say "help reduce"?

6              THE WITNESS:  Help reduce those

7    asymmetries.

8         Q.  Anything else you recall generally that

9    you told -- that you told them at these meetings?

10        A.  Yeah.  I think I expressed concerns about

11   did investors have all the information that they

12   should have about the prospects and did they get

13   that on a timely basis.  I expressed the concern

14   about the lack of transparency.

15        Q.  These meetings, can you give us the time

16   frame for them approximately?

17        A.  I think they were the last couple of

18   years.  It was a pretty long process.  I don't

19   remember exactly when Meredith first got involved.

20   You know, Meredith as a capital markets lawyer

21   would be someone who would understand the

22   undertakings to become a public company, to provide
```

376

1    the disclosure, to bring the sales of XRP into

2    compliance.

3        Q.  But in terms of the years, I think you

4    said the last few years?  Are you talking about the

5    last few years of your tenure there?

6        A.  Yes.  I'm sorry.  Yeah.  So that would

7    have been probably -- I think some of these

8    meetings began in 2018 and some early meetings with

9    XRP representatives, general meetings, and then

10   meetings trying to figure out how XRP could come

11   into compliance were later, probably 2020.

12       Q.  Okay.

13           Now, setting aside meetings with other

14   members of any government, did you ever tell any

15   person outside of the SEC that you did not view

16   Ripple sales of XRP as securities transactions?  So

17   I'm talking about third parties only.

18       A.  No.

19           MR. FLUMENBAUM:  Objection.

20       Q.  Did you ever witness any person from the

21   SEC tell any person in the, again, outside world,

22   not U.S. Government or other governments, that the

377

1    SEC did not view Ripple's sales of XRP as

2    securities transactions?

3            MR. FLUMENBAUM:  Objection as to form.

4        A.  No.

5        Q.  Did you have a meeting with Chair Clayton

6    and representatives of Ripple sometime in 2018?

7        A.  I believe they came in to meet with the

8    chairman, yes.

9        Q.  Did you ever hear Mr. Clayton tell anyone

10   at Ripple that Mr. Clayton did not view Ripple's

11   transactions as securities transactions?

12           MR. FLUMENBAUM:  Objection as to form.

13       A.  No.

14       Q.  Did you ever hear Mr. Clayton give any

15   assurances to anyone at Ripple that the SEC would

16   determine that Ripple's sales were not securities

17   transactions?

18           MR. FLUMENBAUM:  Objection as to form.

19       A.  No.

20           MR. TENREIRO:  I'm going to mark -- I

21   guess Exhibit 41 will be the next one?

22           THE REPORTER:  Yes.

378

1                    (Hinman Exhibit 41 was marked

2                         for identification.)

3    BY MR. TENREIRO:

4         Q.  For the record, this is a memorandum SEC-

5    LIT-E-MAILS-456558.  The date is August 20, 2018.

6         A.  Okay.

7         Q.  Mr. Hinman, do you see this memorandum

8    says it's written from Sean Memon?

9         A.  Yes, I see that.

10        Q.  Who is that in 20 -- in August 2018?

11        A.  Deputy chief of staff to the chairman.

12        Q.  Okay.  Have you seen this memorandum

13   before?

14        A.  You showed them to me.

15        Q.  Okay.  And have you had a chance to read

16   it now?

17        A.  Yes.

18        Q.  Okay.  Do you -- are the statements in

19   this memorandum consistent with whatever

20   recollection you might have -- actually, do you see

21   that it says here that you attended a meeting on

22   August 20, 2018 with representatives from Ripple?

379

1    Do you see that part?

2         A.  Yes.

3         Q.  Do you have any reason to doubt that that

4    is true?

5              MR. FLUMENBAUM:  Objection as to form.

6         A.  No.

7         Q.  Having read the document, is whatever

8    stated here consistent with whatever recollection

9    you might have about what occurred at this meeting?

10             MR. FIGEL:  Objection.

11        A.  Let me finish reading.

12             It's consistent.

13        Q.  Okay.  And so just to be -- just to wrap

14   up on the prior point, setting aside this meeting

15   in this document, Director Hinman, I just want to

16   be sure I understood you.  You at some point told

17   Andrew Ceresney in his capacity as Ripple's

18   attorney that you thought the XRP transactions

19   might be problematic under the securities laws; is

20   that correct?

21             MR. FLUMENBAUM:  Objection as to form.

22   It's inconsistent with his testimony.

380

1          MR. TENREIRO:  Did you ever tell

2    Mr. Ceresney in his capacity as Ripple's attorney

3    that you thought that their transactions in XRP

4    might, you know, have an issue under the securities

5    laws?

6          MR. FLUMENBAUM:  Objection as to form.

7          MR. FIGEL:  The leading is really

8    inappropriate with the commission witness.

9          MR. TENREIRO:  Okay.  Can you answer,

10   please.

11      A.  Basically my answer would be what I

12   told -- what I remember telling Mr. Ceresney and

13   Meredith Cross about my views on XRP, that I viewed

14   it as a security and I viewed the continuing

15   offerings -- periodic offerings of XRP in a way

16   where they were not restricted in the way a

17   securities offering would be restricted and

18   therefore exempt or they weren't registered as a

19   problem under the securities laws.  If they were

20   interested into coming into compliance they should

21   start by stopping those sales.

22      Q.  Based on the meetings you attended and

381

1    your conversations with Ripple's representatives,

2    did you have any reason to believe that Ripple's

3    representatives did not understand the securities

4    laws principles that might apply to their conduct?

5            MR. FLUMENBAUM:  Objection as to form.

6        A.  I had no reason to believe they didn't

7    understand it.  Meredith was a very accomplished

8    securities lawyer.

9            MR. TENREIRO:  I don't have anything else.

10   Thank you.

11                   FURTHER EXAMINATION

12   BY MR. FLUMENBAUM:

13       Q.  Meredith Cross occupied your position as

14   head of corp fin?

15       A.  She did.

16       Q.  And she -- she said to you that in her

17   view XRP was not a security, correct?

18       A.  I don't think she ever said that to me.

19       Q.  She never said that to you?

20       A.  I don't recall her saying that, no.

21       Q.  Mr. Ceresney was head of enforcement at

22   the SEC?

382

1        A.   Yes.

2        Q.   And did he say to you that XRP was a

3   currency and not a security?

4        A.   I think he tried to make that argument,

5   yes.

6        Q.   He said that to you many times, correct?

7        A.   I don't remember him saying it many times.

8   You know, I think he was saying it could be viewed

9   as a currency.  I think he also understood the

10  issues with it being looked at -- excuse me -- it

11  could be looked at as a currency.  I think he also

12  understood why we felt it was a security.

13       Q.   Did he explain to you why he believed that

14  XRP was very similar to Bitcoin and Ether?

15       A.   He explained, yes, why he thought it could

16  be looked at that way, yes, in his view.

17       Q.   And did Ms. Cross explain to you that in

18  her view XRP also could look very similar to Ether

19  or Bitcoin?

20       A.   I don't think she did, no.

21       Q.   How many times did you meet with

22  Ms. Cross?

383

1          A.  I think twice.

2              MR. TENREIRO:  You're talking about in

3     connection with this case?

4          Q.  In connection with this case?

5          A.  Probably a meeting and a phone call or

6     two.  Maybe two phone calls.

7          Q.  And the first meeting was in 2019?

8          A.  I believe so.

9          Q.  Was Mr. ███████ there at the same time?

10         A.  I don't know who he is.

11         Q.  You don't know who he is.  Who else was

12    present in your meeting with Ms. Cross?

13         A.  Sorry.  ███████  I do know who he is.

14    ███████ was there, yes.

15         Q.  ███████ was there.  Who else was there?

16         A.  Sorry.

17         Q.  Who else was there?

18         A.  I think there may have been another person

19    from their legal group and there might have been an

20    associate from WilmerHale that works with Meredith.

21    I don't know if Mr. Ceresney had others with him.

22         Q.  And who was there on behalf of the SEC

384

```
1     other than yourself?

2          A.  I think it was probably Val Szczepanik,

3     probably Michael Seaman, probably Amy Starr.

4          Q.  Is there a memo such as Exhibit 41 with

5     respect to that meeting?

6          A.  Sorry.  Is there a phone under there?

7     Sorry.

8          Q.  Is there a memo such as Exhibit 41 with

9     respect to that meeting?

10         A.  No.

11         Q.  Did any --

12         A.  Well, I shouldn't say that.  Not that I

13    know of.  I think some enforcement personnel were

14    there and they may have done a memo, but I don't

15    know.

16         Q.  Did you take any notes at that meeting?

17         A.  I don't think I did, no.

18         Q.  Did anybody take notes at that meeting on

19    behalf of the SEC?

20         A.  Possibly.

21         Q.  Who?

22         A.  I don't know who in that group would have
```

385

1     taken the notes.

2           MR. FLUMENBAUM:  We would call for any

3     notes that the SEC has with respect to that

4     meeting.

5           MR. TENREIRO:  Yeah.  We'll call for

6     Debevoise's notes too.

7           MR. FLUMENBAUM:  You raised -- you raised

8     this issue.

9           MR. TENREIRO:  I note your request, Marty.

10          MR. FLUMENBAUM:  Okay.

11    BY MR. FLUMENBAUM:

12       Q.  Mr. Hinman, wasn't the purpose of that

13    meeting in 2019 to see if there could be a

14    settlement of the ongoing investigation?  Wasn't

15    that the underlying purpose for that meeting?

16       A.  I think it was to try to bring the company

17    into compliance and that would have a good effect

18    on the enforcement action.

19       Q.  It was an attempt to find out what the SEC

20    was looking for in order to resolve the ongoing

21    investigation, correct?

22       A.  That may be how your clients viewed it.  I

386

1     viewed it as trying to bring them into compliance.

2          Q.  And did you also -- you met once with

3     Ms. Cross and then you had a phone call.  Who was

4     on that phone call with you?

5          A.  I don't have a specific recollection of

6     who was on the call other than -- there was a

7     meeting with the people I mentioned and then I

8     think there was a follow-up call I think on Zoom

9     with probably the same people, but, you know, one

10    or two differences possibly.

11         Q.  And were you aware that Ripple disagreed

12    with you in terms of the issue of information

13    asymmetries?

14             MR. TENREIRO:  Object to form.

15         A.  No.  Actually I don't think that was the

16    case.  I think they acknowledged that that was an

17    issue and they were exploring the idea of becoming

18    a public company to deal with that, which I think

19    they still are doing.

20         Q.  And that was something that you

21    encouraged, correct?

22         A.  That's right.

387

1     Q.  And were you aware that they published a

2  market watch document regularly?

3         MR. TENREIRO:  Let's just focus on the

4  conversations you might have had with them.

5         MR. FLUMENBAUM:  Are you aware of that?

6     A.  I'm not aware of them doing some -- I

7  don't know what you mean by market watch.  So I'm

8  not aware of that, no.

9     Q.  Were you -- were you aware of public

10  statements that Ripple made with respect to its

11  ownership of XRP?

12     A.  I was aware that they had made a number of

13  public statements about XRP, yes.

14     Q.  And did you ever interview any investors

15  who were -- who had bought XRP in the secondary

16  market?

17     A.  I did not.

18     Q.  Did any of your staff ever interview any

19  investors who bought XRP in the secondary market?

20     A.  I think they may have --

21         MR. TENREIRO:  Just object to form.

22  Sorry.

388

1      A.  I think they may have talked to market

2   participants, people who purchased XRP.

3      Q.  And am I correct that the investors that

4   you talked to did not have any complaints about

5   info -- information asymmetries, correct?

6          MR. TENREIRO:  Object to form.  He already

7   said he didn't talk to investors, Marty.  I'm going

8   to instruct him not to disclose whatever the staff

9   might have conveyed to him.

10          MR. FLUMENBAUM:  You raised this issue.

11          MR. TENREIRO:  And I'm instructing him not

12   to answer about anything that the staff has

13   disclosed to him in the context of the deliberative

14   process.

15          MR. FLUMENBAUM:  Did the staff tell you

16   that the people they talked to were not concerned

17   about market --

18      A.  No, they did not tell me that.

19      Q.  -- asymmetries?

20      A.  No, they did not.  Just the opposite.

21      Q.  Okay.  What did the staff tell you?

22          MR. TENREIRO:  No.  We're not going to let

389

1    him answer that.  There's work product here and

2    we've talked about external --

3            MR. FLUMENBAUM:  You raised the issue.

4            MR. TENREIRO:  I'm instructing him not to

5    answer.

6            MR. FLUMENBAUM:  Okay.

7            Did you ever meet with a lawyer by the

8    name of Deaton?

9        A.  I don't know.  Give me the full name.

10       Q.  I think it's Robert Deaton.

11       A.  I don't remember that.

12       Q.  John Deaton?  Do you know he's tried to

13   intervene in this case?

14       A.  No, I did not know about him.

15       Q.  Okay.  And do you know he represents a

16   group of XRP investors?

17       A.  No, I do not.

18           MR. TENREIRO:  Object to form.

19       Q.  Did anyone at the SEC ever interview

20   Mr. Deaton or his group of investors?

21           MR. TENREIRO:  Marty, you're going beyond

22   the scope of what I asked him.

1          MR. FLUMENBAUM:  I don't believe so.

2          MR. TENREIRO:  Go ahead, answer.  Well, if

3     you can.

4          THE WITNESS:  Ask me the question again.

5          MR. FLUMENBAUM:  Can you repeat it,

6     please.

7                    (Record read as requested.)

8     A.  No.

9     Q.  And --

10    A.  Not that I'm aware of.

11    Q.  Did you ever -- did the staff tell you

12    that outside investors complained about lack of

13    transparency?

14         MS. KELLY:  Object to form.

15    A.  I don't believe the staff told me that.  I

16    think I read articles about people being upset

17    about not knowing the full set of arrangements that

18    the company had with Western Union.

19    Q.  What articles did you read?

20    A.  Various articles, you know, in the

21    financial press about Western Union arrangements

22    the company may have had.

391

```
 1          Q.  So anything else, any other specific
 2   articles that troubled you in terms of
 3   transparency?
 4          A.  I don't remember articles on that point.
 5          Q.  So that's the only one you remember was
 6   Western Union?  And what year did that occur?
 7          A.  I think that was probably in 2018, but I'm
 8   not certain.
 9          Q.  And was there disclosure of Western Union
10   information after 2018?
11              MR. TENREIRO:  Object to form.
12          A.  I don't know what disclosure was made or
13   under what circumstances.
14          Q.  Now, you said you met with Ms. Cross
15   twice -- or met once and a telephone call once,
16   correct?
17          A.  That's the best of my recollection.
18          Q.  Right.  And when was the last time that
19   you talked to her about this case?
20          A.  I think it may have actually been in 2020,
21   mid 2020 possibly.
22          Q.  Wasn't -- isn't it a fact that you never
```

392

1    met with her about this case before 2019?

2            MR. TENREIRO:  Object to form, asked and

3    answered.

4        A.  Yeah.  I said I thought we started meeting

5    with the company in 2018 and that Meredith, when

6    she first showed up, it may have been 2019.

7        Q.  And you've met -- you met with

8    Mr. Ceresney more than once?

9        A.  I believe he was at the meetings with

10   Meredith and potentially some additional meetings.

11       Q.  Did you ever meet with Mr. Ceresney

12   without Meredith?

13       A.  I think at the -- toward the end of the

14   meetings that the SEC was having I don't remember

15   her participating.

16       Q.  Did -- you retired -- you resigned from

17   the SEC effective December 11, 2020; is that

18   correct?

19       A.  Yes.

20       Q.  And am I correct that you participated in

21   conversations about Ripple after that date?

22           MR. TENREIRO:  Object to form.

393

1      A.  Not that I recall.  Oh, there may have

2   been -- I was resigning on the 10th but on the

3   payroll I think through the 17th and I think I got

4   a call about the case while I was still formally

5   employed but I was not going -- you know, not

6   reporting into the office.

7      Q.  Didn't you participate in a meeting after

8   December 10th, after December 11th?

9      A.  Possibly.

10     Q.  And with whom did you participate?

11     A.  I don't recall the meeting that well.

12  There may have been one last attempt by the company

13  to work out a structure here.

14     Q.  Did you meet with the company after

15  December 10th or 11th or with Mr. Clayton after

16  December 10th or 11th?

17     A.  I don't remember meeting with Jay after

18  that time.

19     Q.  Did you meet with any member of the SEC

20  staff after that time with respect to Ripple?

21     A.  Well, when you say "meet," I don't think

22  we were physically meeting, but, you know, Zoom

394

1   calls, there may have been a Zoom call about Ripple
2   after the 10th and before I was completely off the
3   SEC payroll.
4       Q.  Well, you know the action was brought on
5   the 21st of December?
6       A.  Right.
7       Q.  And when was the last time that you
8   participated in any way in connection with the
9   decision to bring that action?
10       A.  It would have been in that week between
11   not going to the office or participating in
12   meetings of the staff and having my daily meeting
13   with them and the time I was off the payroll.
14   There were a number of matters not just related to
15   Ripple that, you know, over that period of time
16   even though I was not working, I suppose in effect
17   I was on vacation but still on the payroll, where
18   I, you know, would answer questions that people had
19   about my transition.
20       Q.  In your affidavit to the Court you used
21   the December 10th or 11th date as your last date at
22   the SEC.

395

1      A.  Okay.  That may be wrong.

2      Q.  Did -- did you -- were you aware that

3  former Commissioner Grundfest had submitted a

4  letter to the SEC?

5      A.  Yes.

6      Q.  And that was after you had retired from

7  the SEC, was it not?

8      MR. TENREIRO:  Object to form.  We're way

9  beyond what I talked to him about.

10      A.  Again, I don't know when he submitted a

11  letter.  I remember    -- now that you mention his

12  name, I remember    coming to some of these

13  meetings.  So whether he put the letter in before

14  or after the 10th or the 17th or the official last

15  date...

16      Q.  Did you see the letter that Mr. Grundfest

17  had I think it was the weekend before the decision

18  to bring suit against Ripple?

19      A.  I don't remember a letter that late in the

20  process.  I remember    being an advocate for the

21  company before then.

22      Q.  Do you remember receiving -- reading that

396

```
 1    letter before the decision to bring -- a letter in
 2    late December from Mr. Grundfest?  Didn't you read
 3    that letter?
 4          MR. TENREIRO:  Objection to form, asked
 5    and answered.
 6          A.  Again, I don't remember the letter per se.
 7    I do remember ███ being an advocate and submitting
 8    things on behalf of the company, but when in this
 9    processing he did that I don't have a clear
10    recollection.
11          Q.  My question was do you recall reading a
12    letter from Mr. Grundfest, you know, within the
13    week prior to December 21st?
14          MR. TENREIRO:  Objection, asked and
15    answered three times.
16          A.  Do I remember receiving a letter --
17          Q.  Or reading a letter from Grundfest to the
18    commissioners.
19          A.  No.  I don't remember reading a letter
20    from him to the commissioners, no.
21          MR. FLUMENBAUM:  Should we take a short
22    break before we decide if there's anything more?
```

397

1          MR SOLOMON:  I'm happy to ask a few

2    questions if that works.

3          MR. FLUMENBAUM:  Okay.  Great.

4          MR. SOLOMON:  Are you okay with that

5    break?

6          THE VIDEOGRAPHER:  Off the record at 7:36.

7                    (A short break was had.)

8          THE VIDEOGRAPHER:  Back on the record at

9    7:38.

10                    EXAMINATION

11   BY MR. SOLOMON:

12      Q.  Thank you for your indulgence.  I'll try

13   to be very brief.  I know we're all trying to get

14   out of here tonight.

15          Mr. Hinman, you were asked a series of

16   questions by Mr. Tenreiro about legal advice you

17   may have provided about whether XRP is a security.

18   Do you recall those questions?

19          MR. TENREIRO:  Objection to form.

20          MS. KELLY:  Objection to form.

21      A.  I don't remember him asking about legal

22   advice.  I remember him asking about conversations.

398

1       Q.  Do you remember him asking you whether you

2   told anybody that your view was XRP is not a

3   security?  Do you remember that?

4       A.  I remember him asking me what did I say to

5   the folks at XRP.

6       Q.  Do you remember him asking you whether you

7   overheard other people telling anybody from Ripple

8   that XRP was not a security.  Do you remember those

9   questions?

10      A.  Yes.

11      Q.  And do you remember your answer was that

12  no, you don't recall that?

13      A.  I don't remember anyone saying that,

14  right.

15      Q.  Okay.  And I think earlier in your

16  testimony you made clear that the division of

17  corporation finance is not in the business of

18  giving legal advice; is that correct?

19      A.  That's right.

20      Q.  And that contradicts obviously what's on

21  the Website which says that the division of

22  corporation finance, in fact, does give legal

399

```
 1    advice?

 2            MR. TENREIRO:  Object to form.

 3       A.  So I don't think what the division does is

 4    provide legal advice in the same way a lawyer

 5    advises a client.

 6       Q.  Okay.  Do you recall ever telling anybody

 7    associated with Ether or Ethereum or ████████ that

 8    you do not believe that Ether is a security?

 9            MR. TENREIRO:  You've asked and answered

10    this.  Move on.  We're stopping this.  This is

11    beyond what I talked about.  Move on.

12            MR. SOLOMON:  You can answer the question.

13            MR. TENREIRO:  Move on, Matt.

14            MR. SOLOMON:  You're instructing him not

15    to answer that question?

16            MR. TENREIRO:  Yes.  You're over your

17    seven hours, you're beyond what I talked to him

18    about.  Move on.

19            MR. SOLOMON:  Did you ever tell anybody

20    associated with Bitcoin that Bitcoin was not a

21    security, yes or no?

22       A.  Not that I recall.
```

```
1          Q.  Okay.  And do you remember anybody else at
2     the commission telling anybody associated in any
3     way with Bitcoin that Bitcoin is not a security?
4          A.  Anyone else meaning?
5          Q.  Anyone else from the commission.
6          A.  In the commission?
7          Q.  Sure.
8          A.  I think people discuss their views as to
9     whether Bitcoin --
10              MR. TENREIRO:  Sorry.  Sorry, no.  I think
11     he was asking you outside.
12                      (Simultaneous speaking.)
13              THE REPORTER:  Guys.
14              THE WITNESS:  What's your question?  I'm
15     sorry.
16          Q.  Did you or anybody else at the commission
17     during the time you were there ever tell anybody
18     associated in any way with Bitcoin that Bitcoin was
19     not or is not a security?
20              MR. TENREIRO:  Objection to form.
21          A.  We would have discussions with people at
22     the CFTC about --
```

401

```
1              MR. TENREIRO:  Don't discuss what other
2     government --
3         Q.  I said associated with Bitcoin.  Just a
4     yes or no whether you have that recollection.
5         A.  No.
6         Q.  Okay.  All right.
7              And you also mentioned some meetings that
8     you attended where, among others, my client Brad
9     Garlinghouse was present; is that right?
10        A.  Yes.
11        Q.  And you said you believe he may have been
12    present for one or two of those meetings?
13             MR. TENREIRO:  Object to form.
14        A.  Right.
15        Q.  Do you recall whether you had any
16    one-on-one meetings with any of the founders of
17    Ripple at any point in time ever?
18        A.  Not that I recall.
19        Q.  Do you recall having any one-on-one
20    meetings with my client, Brad Garlinghouse, at any
21    point in time in ever?
22        A.  Not a meeting.
```

402

1      Q.  Do you recall having a conversation with

2   him?

3      A.  I saw him at a conference and we exchanged

4   pleasantries.

5      Q.  Did you exchange any substantive

6   information with him?

7      A.  No.

8      Q.  Do you recall having any one-on-one

9   meeting or conversation with Christian Larsen -- he

10  is one of the founders, I just want to make sure

11  that we're clear on this -- at any point in time?

12     A.  No.

13     Q.  Do you recall having any one-on-one

14  conversation with anybody who worked at Ripple or

15  works at Ripple today, to your knowledge, at any

16  point in time that ever happened?

17         MR. TENREIRO:  Object to form.

18     A.  I think ████████ and I have had one-on-one

19  conversations.

20     Q.  One-on-one substantive conversation,

21  Mr. Hinman.

22         MR. TENREIRO:  Object to form.

403

1       A.  Possibly, but I don't -- you know, I don't

2    have a specific recollection, but ████████ nd I

3    spoke directly a few times.

4       Q.  Can you remember having a substantive

5    conversation with ████████ about Ripple's business

6    or anything germane to the investigation of Ripple

7    at any point in time just one on one?

8          MR. TENREIRO:  Object to form.

9       A.  Again, when ████████ visited the SEC he and

10   I would chat a little bit one on one, but I can't

11   remember the substance versus, you know, how in

12   depth we got with those conversations.

13      Q.  Okay.  So the answer is you don't remember

14   having a substantive one-on-one conversation with

15   ████████ at any point in time; is that fair?

16          MR. TENREIRO:  Object to form.

17      A.  I remember having conversations with

18   ████████ about some of the topics we've been talking

19   about today.  How substantive they are I don't

20   recall.

21      Q.  Okay.

22          And you also testified that you had a view

404

1    at some point in 2018 that sales of XRP may violate

2    the securities laws.  Is that what you testified

3    to?

4              MR. TENREIRO:  Object to form.

5         A.   That I had a view that their sales

6    violated securities laws?

7         Q.   Yes.

8         A.   Yes.

9         Q.   Okay.  And just to be clear, in 2018 there

10   was no preliminary injunctive relief that the

11   commission sought against Ripple in relation to any

12   sales of XRP; is that correct?

13        A.   That's right.

14        Q.   And that's true of 2019 also, correct?

15        A.   Correct.

16        Q.   And that's true of 2020 also, right?

17        A.   That's right.

18        Q.   In fact, the lawsuit wasn't brought

19   against Ripple in relation to any of its sales of

20   XRP until December 22nd, 2020, correct?

21             MR. TENREIRO:  Go ahead.  Object to form.

22   If you're going to keep asking him facts that are

405

```
 1    in the record, we're going to instruct -- we're

 2    going to finish the deposition and you can

 3    call Judge --

 4           MR. SOLOMON:  I'm trying to move through

 5    this quickly if you'll give me a few more minutes.

 6           MR. TENREIRO:  Matt, it is in the record

 7    when the lawsuit was filed.

 8           MR. SOLOMON:  Is that correct?

 9        A.  When this lawsuit was filed?

10        Q.  Yes.

11        A.  I've not examined the record.  So I don't

12    know the date --

13        Q.  Was it late December 2020?

14           THE REPORTER:  Guys.

15        A.  I don't -- I don't know.  I think it was

16    December 20, 22nd, somewhere in that range.

17        Q.  Fair enough.  And when that lawsuit was

18    brought there was no preliminary injunctive relief

19    sought in relation to sales of XRP; is that your

20    recollection?

21        A.  Not that I'm aware of.

22        Q.  No, there was no preliminary injunctive
```

406

1   relief sought at that time?

2        A.  I wasn't at the SEC at that time.  So not

3   that I was aware of.

4        Q.  Let's take a look at one document that

5   Mr. Tenreiro showed you which is an August 20, 2018

6   memorialization of one of the meetings that you

7   testified to where my client Brad Garlinghouse

8   attended.  Do you have that document in front of

9   you?

10       A.  I do.

11       Q.  Okay.  This looks like a post-speech

12  memorandum authored by two individuals, Sean Memon,

13  deputy chief of staff, and Brian Rabbitt, senior

14  policy advisor; is that right?

15       A.  Yeah.  I just want to --

16       Q.  Sorry.  This is just a one-page document.

17       A.  Yes.  Yes.

18       Q.  Okay.  And this memorandum, is there

19  anything about this that strikes you as inaccurate,

20  or does this seem to you to be an accurate

21  memorialization, albeit a summary memorialization,

22  of the meeting that you attended and testified

407

1    about on August 20th, 2018?

2        A.  Yes, it was a short meeting.  This seems

3    accurate.

4        Q.  Okay.  And to be clear, by August 20, 2018

5    you had delivered your speech to the marketplace

6    where you gave your view that neither Ether nor

7    Bitcoin are securities; is that correct?

8            MR. TENREIRO:  Object to form.

9        A.  Yes.

10       Q.  Okay.  And in this memo there was a

11   discussion involving my client and Schwartz.  Is

12   that David Schwartz?

13       A.  I believe so.  That's what the memo says.

14       Q.  Okay.  About Ripple's business in

15   technology, that's what the memo writes, right?

16       A.  Correct.

17       Q.  Okay.  And it looks like there's also a

18   notation that towards the end of the meeting

19   Garlinghouse briefly noted that Ripple was in

20   purgatory due to uncertainty as to whether XRP, the

21   cryptocurrency with which Ripple is associated, is

22   or is not a security.  Do you see that sentence?

1      A.  I do.

2      Q.  Okay.  So two individuals who attended

3  that meeting were reporting back to an internal

4  memo that at this point in time, August 2018, my

5  client had orally indicated that there was

6  uncertainty around the status of XRP.  That's what

7  this memo establishes, right?

8          MR. TENREIRO:  Objection to form.

9      A.  The memo says that.  It says what it says.

10      Q.  Do you have any reason to believe that the

11  memo inaccurately reflects what my client said

12  during that meeting?

13      A.  No.

14      Q.  Because Sean Memon and Brian Rabbitt

15  wouldn't put something in an internal memo the day

16  it happened if it was not accurate, right?

17          MR. TENREIRO:  Object to form.

18      A.  That's right.

19      Q.  I'm sorry.  What was your answer?

20      A.  That's right.

21      Q.  Thank you.

22          Then it goes on, the memo, to say "In