# PX 300

# XRP II LLC
## SUMMARY OF XRP PURCHASE

## JUNE 9, 2016

The Purchaser is acquiring units of XRP, the Ripple Digital Asset on the following terms:

| | |
|---|---|
| Name of Purchaser: | ▓▓▓▓▓▓▓▓ |
| Purchaser Ripple Wallet Address: | ▓▓▓▓▓▓▓▓ |
| Total Purchased XRP Units: | 47,134,238 Units priced at $0.005304 (discounted from $0.005893) per Unit |
| Total Purchase Price: | $250,000.00 |
| Date of Purchase: | June 9, 2016 |

By signing below, the Purchaser and XRP II, LLC agree that the acquisition of the Purchased XRP is governed by the terms and conditions of the XRP Purchase Agreement and Attachment A of the XRP Purchase Agreement. These documents are attached to, and made a part of, this Summary of XRP Purchase. The Purchaser agrees to accept by email all documents relating to XRP II, LLC or this purchase and all other documents that XRP II, LLC is required to send Purchaser.

**PURCHASER:** ▓▓▓▓▓▓▓▓

Name: ▓▓▓▓▓▓▓▓
Title: CEO

**XRP II, LLC**

By: ▓▓▓▓▓▓▓▓
Name: ▓▓▓▓▓▓▓▓
Title: Manager

# XRP II LLC:

# XRP PURCHASE AGREEMENT

### SECTION 1. ACQUISITION OF XRP.

(a) **Transfer.** On the terms and conditions set forth in the Summary of XRP Purchase and this XRP Purchase Agreement, XRP II, LLC, a South Carolina LLC, regulated by the New York State Department of Financial Services ("**XRP II**") agrees to transfer to the Purchaser the number of XRP set forth in the Summary of XRP Purchase.

(b) **Consideration.** The Purchaser agrees to pay the Purchase Price set forth in the Summary of XRP Purchase for the Purchased XRP.

### SECTION 2. RESTRICTIONS ON TRANSFER.

**Transfer Restriction.** Neither the Purchased XRP nor any interest therein may be sold, pledged or otherwise transferred to any person from the Date of Purchase through July 10th 2016 (the "Lockup Period") unless that person also agrees not to re-sell or otherwise distribute the Purchased XRP to any other party during the Lockup Period. As between XRP II and Purchaser, the Purchaser shall be fully responsible for any use or further distribution of the Purchased XRP during the Lockup Period.

The Purchaser agrees that for sixty (60) days after the expiration of the ▇▇▇ day Lockup Period set forth in the paragraph immediately above (or between July 10, 2016 and September 10, 2016) the amount of Purchased XRP it may sell on a daily basis shall be limited to ▇▇▇ percent of the Average Daily Trading Volume for the week. The limitation on daily sales shall apply to any transfers executed outside of the Ripple Consensus Ledger, but shall not apply to transfers executed outside of the Ripple Consensus Ledger and other third-party exchanges that have an active market for XRP, so long as the transferee in such transactions agrees to limit re-sale or other distribution of the Purchased XRP in accordance with this limitation of ▇▇▇ percent of the Average Daily volume, when measured in combination with the sales of the Purchaser. The Parties agree that after September 10, 2016 Purchaser need no longer comply with the ▇▇▇ percent trading volume limitation set forth above.

### SECTION 3. TERMS AND CONDITIONS OF THE PURCHASE.

(a) **Payment.** Within two (2) business days after the Effective Date of this Agreement, the Purchaser shall pay the Purchase Price to XRP II in immediately available funds to one or more accounts specified by XRP II.

(b) **Taxes.** The Purchase Price for Purchased XRP is exclusive of any applicable taxes. To the extent any taxes are applicable on the sale of the Purchased XRP, the Purchaser shall be obligated to pay all applicable taxes. XRP II is not liable for any taxes that the Purchaser is legally obligated to pay in any jurisdiction which are incurred or arise in connection with or related to the Purchaser's business activities (under this Agreement or otherwise). To the extent that XRP II fails to collect any applicable taxes but it is later determined that taxes were collectable by XRP II, the Purchaser shall pay such applicable taxes to XRP II upon written notice sent by XRP II to Purchaser's address as set forth on the Summary of XRP Purchase.

(c) **Delivery.** Within one (1) business day after XRP II has received the full Purchase Price in accordance with sub-paragraphs (a) and (b) of this Section, XRP II shall transmit the Purchased XRP to the Purchaser via the Ripple Payment Network to the Ripple Payment Network address specified by the Purchaser.

(d) **Risk of Loss.** Upon XRP II's transmission of the Purchased XRP to the Purchaser or its designated recipient(s) title to and risk of loss of the Purchased XRP passes to the Purchaser. The Purchaser acknowledges and agrees that XRP II has no liability to Purchaser or any third party for any loss, theft or misuse of any Purchased XRP that XRP II has transmitted to the Purchaser (or its designated recipient(s)) pursuant to this Agreement. XRP II has no obligation under this Agreement to monitor or investigate the use or distribution of any Purchased XRP.

(e) **Purchaser Acknowledgement.** In addition, the Purchaser acknowledges and agrees that (a) the Purchased XRP do not represent a right to make any demand on XRP II, (b) XRP II has no obligation to redeem or exchange the Purchased XRP for monetary value, goods, services or any other item; and (c) that XRP II does not set terms of use applicable to the End User of the Purchased XRP.

(f) **Applicable Laws.** The Purchaser shall comply with all Applicable Laws, including all applicable domestic and foreign laws related to Anti-Money Laundering and anti-terrorist financing requirements, including the USA Bank Secrecy Act, as amended by the USA Patriot Act and the Financial Conduct Authority's Anti-Money Laundering regulations as well as the sanctions laws administered by the U.S. Department of the Treasury's Office of Foreign Assets Control, as applicable.

(g) **Responsibility to Purchaser's Customers.** Purchaser is responsible for all customer service and other issues or claims that relate to the distribution or sale of the Purchased XRP. The Purchaser shall make no representations or warranties to any other party concerning or on behalf of XRP II.

(h) **Publicity.** Neither party may issue any press releaser of make any other public statement with respect to this Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other party.

(i) **Confidentiality.** Confidential Information is the confidential and proprietary information of the disclosing party, and each party shall maintain all Confidential Information it receives in strict confidence and not disclose any Confidential Information to any third party or use any Confidential Information for any purpose other than the Performance of this Agreement. The obligations in this sub-paragraph are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the parties. Notwithstanding the foregoing or anything to the contrary contained herein, the receiving party may disclose, without notice to the disclosing party, Confidential Information pursuant to a request or regular or routine inspection by a governmental agency or regulatory agency.

(j) **Indemnification.** Purchaser shall defend, indemnify and hold harmless XRP II (and its employees, shareholders, directors and representatives) from and against any Claim or Loss to the extent such Claim or Loss is based on (a) any breach of provision of this Agreement by the Purchaser or caused by the Purchaser's employees, contractors, or agents, except for any and all claims, demands, losses, expenses, and liabilities arising out of or relating to XRP II's bad faith, gross negligence or willful misconduct in the performance of this Agreement and (b) any use, distribution or resale of the Purchased XRP by the Purchaser or by the Purchaser's employees, contractors or agents, except for any and all claims, demands,

losses, expenses, and liabilities arising out of or relating to XRP II's bad faith, gross negligence or willful misconduct in the performance of this Agreement.

(k) **Indemnification Procedure.** In connection with any Claim or Loss as described above, XRP II shall give the Purchaser prompt Notice of the Claim or Loss (however, that any delay in notification will not relieve the Purchaser of its obligation to indemnify, except and solely to the extent that the delay materially impairs the Purchaser's ability to defend the Claim or Loss. In addition, XRP II must cooperate reasonably with Purchaser in connection with the defense and settlement of the Claim or Loss, with Purchaser having the right to choose counsel. The Purchaser shall not enter into any settlement or compromise of any Claim or Loss without XRP II's prior written consent if such settlement or compromise arises from or is part of any criminal action, suit, or proceeding, or contains a stipulation to or admission or acknowledgement of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of XRP II, or otherwise required XRP II to refrain from or take material action (such as payment of fees). At its cost, XRP II has the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

### SECTION 4. DISCLAIMERS, LIMITATIONS AND RESERVATIONS.

(a) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, XRP II MAKES NO REPRESENTATIONS OR WARRANTIES IN RELATION TO THE PURCHASED XRP, THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

(b) XRP II SHALL NOT BE LIABLE TO THE PURCHASER FOR ANY INCIDENTAL OR CONSEQUENTIAL DAMAGES ARISING OUT OF THIS AGREEMENT, EVEN IF XRP II, LLC HAS BEEN ADVISED OF THE POSSIBILITY OF THESE DAMAGES (AND NOTWITHSTANDING THE FAILURE OF THE ESSENTIAL PURPOSE OF ANY REMEDY). XRP II'S ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED THE PURCHASE PRICE XRP II RECEIVES UNDER THIS AGREEMENT.

### SECTION 5. TERMINATION.

Without limiting any other right or remedy that XRP II may have at law or otherwise, XRP II may terminate this Agreement immediately upon Notice to the Purchaser if the Purchaser breaches any of its obligations under this Agreement, in particular its obligation to comply with applicable laws and regulations as set forth in Section 3 above.

### SECTION 6. MISCELLANEOUS PROVISIONS.

(a) **Choice of Law; Jurisdiction and Venue.** This Agreement shall be governed by, and construed in accordance with the laws of the State of New York, U.S.A., as such laws are applied to contracts entered into and performed in such State and without reference to any conflict of laws rules or provisions. The parties irrevocably consent to the non-exclusive jurisdiction and venue of the federal and state courts located in New York, New York, U.S.A. with respect to any claim, action or proceeding arising out of or in connection with this Agreement. The U.N. Convention on Contracts for the International Sale of Goods shall not apply to this Agreement.

(b) **Notice.** Any notice required by the terms of this Agreement shall be given in writing. It shall be deemed effective upon (i) personal delivery, (ii) via email if that email is acknowledged buy the

recipient in a timely manner, or (iii) deposited with Federal Express Corporation, with shipping charges prepaid. Notice shall be addressed to the Purchaser at its principal executive office and to the Purchaser at its home address.

      (c)    **Entire Agreement.** This Agreement constitutes the entire contract between the parties hereto with regard to the subject matter hereof. It supersedes any other agreements, representations or understandings (whether oral or written and whether express or implied) that relate to the subject matter hereof. Except for a writing signed by both parties, this Agreement may not be modified or amended. If any provision of this Agreement is held to be invalid, such invalidity will not affect the remaining provisions.

      (d)    **Successors and Assigns.** Except as otherwise expressly provided to the contrary, the provisions of this Agreement shall inure to the benefit of, and be binding upon, XRP II and its successors and assigns and be binding upon the Purchaser and the Purchaser's legal representatives, heirs, legatees, distributees, assigns and transferees by operation of law, whether or not any such person has become a party to this Agreement or has agreed in writing to join herein and to be bound by the terms, conditions and restrictions hereof. In addition, this Agreement is not intended to confer any right or benefit on any third party.

      (e)    **Relationship of the Parties.** Nothing in this Agreement shall be construed as creating an employer-employee or agency relationship, a partnership or a joint venture between the parties.

      (f)    **Non-Waiver.** The failure of either party to enforce any provision of this Agreement or to exercise any rights or remedies under this Agreement will not constitute a waiver of the party's rights to subsequently enforce the provision or exercise those rights or remedies. The remedies specified in this Agreement are in addition to any other remedies that may be available at law or equity.

# ATTACHMENT A
## Definitions

**CAPITALIZED TERMS NOT OTHERWISE DEFINED IN THIS AGREEMENT HAVE THE FOLLOWING MEANINGS:**

"**Applicable Laws**" means all applicable U.S. and foreign, national, federal, state, provincial or local laws, statutes, regulations, rules or court invoices, including without limitation: (a) state and federal laws related to banking, money transmission or sale of checks, currency exchange, anti-money laundering (including, but not limited to the U.S. Bank Secrecy Act), money service businesses, gift certificates/gift cards, unclaimed property, electronic funds transfers, consumer credit, usury, privacy and data security, and data breach remediation and notification; (b) state and federal laws related to customer identity verification and screening (e.g., the Office of Foreign Assets Control ("OFAC") list of Specially Designated Nationals; and (c) the Financial Modernization Act of 1999, also known as the "Gramm-Leach-Bliley Act."

"**Average Daily Volume**" means the amount for a given week calculated as the Weekly XRP Trade Volume for the week that commenced one week prior to the given week, divided by 7.

"**Claim**" means any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against XRP II, LLC (and/or one or more of its respective employees, shareholders, directors or representatives) by a person or entity other than Purchaser, or its affiliates or subsidiaries.

"**Confidential Information**" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (a) was previously known to the receiving party free of any obligation to keep it confidential, (b) becomes generally available to the public through no wrongful act, (c) is rightfully received from a third party under no obligation of confidence to such third party, (d) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, or (e) is required to be disclosed in invoice to comply with Applicable Laws, administrative process or governmental or court invoices; provided, however, that in a circumstance in which disclosure is compelled by Applicable Laws, administrative process or governmental or court invoices, the party that is subject to such compelled disclosure shall limit the disclosure to only that information that must be disclosed to comply with the invoice and shall give the other party prompt prior notice of such compelled disclosure so that the other party may seek to protect such information.

"**Effective Date**" means the effective date of this Agreement, as specified as purchase date on the Summary of XRP Purchase.

"**End User**" means any party who sends XRP to any other party through the Ripple distributed ledger.

"**Loss**" means any claim, cost, loss, damage, judgment, penalty, interest and/or expense (including reasonable attorneys' fees) arising out of any Claim.

"**Purchase Price**" means the purchase price for the Purchased XRP (as defined below) under this Agreement, as specified on the Summary of XRP Purchase.

"**Purchased XRP**" means the XRP purchased under this Agreement by Purchaser from XRP II, LLC on a wholesale basis, as specified on the Summary of XRP Purchase.

"**XRP**" means the units of the digital asset that are native to the Ripple distributed ledger.

"**Ripple distributed ledger**" means the decentralized, open source, global, peer-to-peer network that allows users to transfer XRP and other assets between Ripple distributed ledger accounts.

"**Weekly XRP Trade Volume**" means the total amount of XRP traded on the Ripple consensus ledger during a given week between Sunday 12:00:01am Pacific Time through the following Sunday at 12:00:00am Pacific Time. An XRP is considered traded if it moves from account A to account B within the same transaction as some other asset or currency becomes controlled by account A.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0000631