# PX 310



September 18, 2017

Ladies and Gentlemen:

This letter agreement (this "<u>Agreement</u>") will confirm the agreement between XRP II, LLC ("<u>XRP II</u>"), a New York limited liability company, regulated by the New York State Department of Financial Services, and ███████████████████ ("███████") that, in exchange for good and valuable consideration, the sufficiency and receipt of which is hereby acknowledged, the parties shall be entitled to the contractual rights and other provisions set forth herein.

1. <u>Market Cap</u>. ███████ agrees that, so long as XRP II makes XRP, the digital asset native to the XRP Ledger, available for purchase by ███████ and the ███████████████████ (each, a "███████ Purchaser" or "Customer") on the terms set forth in this Agreement, ███████ will, and will cause each affiliate of ███████ and each fund, managed account or other investment vehicle managed by ███████ or affiliate of ███████ that invests in digital assets (each, a "███████ Investor") to, measure the market capitalization of XRP for purposes of such ███████ Investor's investment strategy to be equal to 100 billion multiplied by the Market Price (as that term is defined below) of XRP (the "<u>Market Cap Calculation</u>"), subject to any fiduciary responsibilities owed by ███████ or any affiliate of Stone Ridge to such Stone Ridge Investor.

2. <u>Purchase of XRP</u>. From time to time, XRP II may enter into transactions with a ███████ Purchaser, in which XRP II will agree to transfer XRP to such ███████ Purchaser, against the transfer of funds in U.S. dollar by such ███████ Purchaser to XRP II on the terms set forth in this Agreement. Each such transaction is referenced herein as a "<u>Transaction</u>" and, unless otherwise agreed in writing, is to be governed by this Agreement.

3. <u>Purchase Price</u>. XRP II agrees that, so long as a ███████ Investor measures the market capitalization of XRP for purposes of such ███████ Investor's investment strategy in accordance with the Market Cap Calculation, the price at which XRP II will sell XRP to a ███████ Purchaser will be equal to the Market Price at the time of purchase multiplied by the Discount Factor (the "<u>Purchase Price</u>"). As used herein, "<u>Market Price</u>" means, at any time, the price one unit of XRP is traded at such time against the USD asset on the exchange with the largest volume in the XRP/USD pair over the previous seven trading days, as reasonably agreed by the parties; and "<u>Discount Factor</u>" means a percentage equal to (i) 100% minus (ii) (a) for purchases occurring during 2017, ██% and (b) for purchases occurring during 2018, ██%.

4. <u>Purchase Capacity</u>. XRP II agrees that, so long as the Market Price is at least $██, XRP II shall make available for purchase by ███████ Purchasers, at such times and in such amounts as the ███████ Purchasers may reasonably request and to which XRP II consents (such consent not to be unreasonably withheld), up to an aggregate of (i) $███████ of XRP during 2017 and (ii) $███████ of XRP during 2018, in each case valued based on the Market Price at the time of purchase (the "<u>Purchase Capacity</u>"). In the event that XRP II, in its discretion, agrees to make XRP available for purchase by ███████ Investors on substantially the same terms as set forth in this Agreement, such XRP shall be applied against the Purchase Capacity. To the extent permitted by applicable law and subject to XRP II's standard customer diligence and screening procedures, XRP II agrees to work in good faith with ███████ to make XRP available for purchase by no more than three (3) ███████ Investors on substantially the same terms as set forth in this Agreement if the purchase of XRP by such ███████ Investor from a ███████ Purchaser would raise substantial legal or regulatory concerns for the ███████ Purchaser.

1



5. <u>Additional Terms and Conditions</u>. ▇▇▇▇▇▇ and XRP II agree to the additional terms and conditions set forth on the attached Exhibit A.

6. <u>Miscellaneous</u>:

   a. <u>Amendment</u>. Except as otherwise set forth herein, this Agreement may not be amended, waived or terminated without the written consent of ▇▇▇▇▇▇ and XRP II.

   b. <u>Successors and Assigns</u>. For the avoidance of doubt, the terms and conditions of this Agreement inure to the benefit of and are binding upon the respective successors and permitted assignees of the parties hereto; <u>provided, however</u>, that nothing herein shall permit either party to transfer or assign any rights hereunder without the prior written consent of the other party.

   c. <u>Governing Law</u>. This Agreement shall be governed by, and construed in accordance with, the laws of the State of New York, regardless of the laws that might otherwise govern under applicable principles of conflicts of law.

*[Intentionally left blank]*

CONFIDENTIAL

RPLI_SEC 0389884

**IN WITNESS WHEREOF**, the parties have executed this Agreement as of the date first written above.

Very truly yours,



**AGREED AND ACCEPTED:**

**XRP II, LLC**

By: _____
Name: Brad Garlinghouse
Title: CEO

CONFIDENTIAL

RPLI_SEC 0389885

**EXHIBIT A. Additional Terms and Conditions**

### SECTION 1. PURCHASE OF XRP.

(a) **Confirmation**. Upon agreeing to enter into a Transaction and prior to the execution of such Transaction, XRP II shall promptly deliver to Customer via email a written confirmation of the Transaction (the "Summary of XRP Purchase") that contains the terms and conditions of the Transaction, including: the Customer's XRP address, the total XRP units subject to the Transaction (the "Purchased XRP"), and the Purchase Price. Unless the Customer countersigns the Summary of XRP Purchase and submits an electronic copy to XRP II, XRP II will not complete the Transaction. The countersigned Summary of XRP Purchase, together with the Agreement, shall constitute the terms agreed between the XRP II and the Customer with respect to the Transaction to which the Summary of XRP Purchase relates.

(b) **Payment; Expiration**. XRP II will complete a Transaction only in the event that the Customer countersigns the Summary of XRP Purchase within twenty-four (24) hours from the time XRP II sends such Summary of XRP Purchase to the Customer and Customer pays the total purchase amount based on the Purchase Price set forth in such Summary of XRP Purchase within two (2) business days from the business day on which XRP II sends such Summary of XRP Purchase to the Customer; if Customer fails to meet either of these deadlines, the terms of the Transaction as reflected in the Summary of XRP Purchase will expire; provided, however, such terms may be revived as if they had never expired in the event that the payment is made to XRP II and XRP II, in its sole discretion, chooses to complete the Transaction subject to those terms. If payment is made after the expiration of the Summary of XRP Purchase and XRP II chooses not to complete the Transaction, XRP II will promptly return the payment to the Customer.

(c) **Receipts; Cancellations and Reversals.** Following the completion of a Transaction, as recorded on the XRP Ledger, XRP II shall provide to the Customer a receipt that includes the following information: the name and contact information of XRP II, and the value and date of the transaction. Once completed, a Transaction cannot be cancelled, reversed, or changed.

### SECTION 2. TERMS AND CONDITIONS OF XRP PURCHASE.

(a) **Taxes**. The Purchase Price for Purchased XRP is exclusive of any applicable taxes. To the extent any taxes are applicable on the sale of the Purchased XRP, the Customer shall be obligated to pay all taxes applicable to the Customer. XRP II is not responsible for any taxes that the Customer is legally obligated to pay in any jurisdiction in which such taxes are incurred or arise in connection with the Customer's business activities (under this Agreement or otherwise). To the extent XRP II fails to collect any applicable taxes, and it is later determined that taxes should have been collected by XRP II, the Customer shall pay such applicable taxes to XRP II upon written notice to the Customer.

(b) **Delivery**. Within two (2) business days after XRP II has received the Purchase Price in immediately available funds from the Customer, XRP II shall use commercially reasonable efforts to deliver the Purchased XRP to the Customer's XRP address as specified by the Customer and reflected in the Summary of XRP Purchase. The date of transmission of the XRP will be the "Date of Purchase."

(c) **Risk of Loss**. Immediately upon XRP II's delivery of the Purchased XRP to the Customer, all title to and risk of loss related to such XRP passes to the Customer. The Customer acknowledges and agrees that XRP II has no liability to the Customer or any third party for any loss, theft or misuse of any XRP that XRP II has delivered to the Customer as provided in this Agreement.

1

(d)     **Customer Acknowledgement**. Customer acknowledges and agrees that (i) the Purchased XRP do not represent a right to make any demand on XRP II, (ii) XRP II has no obligation to redeem or exchange the Purchased XRP for monetary value, goods, services or any other item; and (iii) XRP II is not responsible for any use by the Customer or any third party of the Purchased XRP.

(e)     **Applicable Laws**. The Customer shall comply with all applicable laws, rules, and regulations, including, but not limited to, laws related to its activities and to its resale or distribution of Purchased XRP, if any. These laws include, but are not limited to, those related to sanctions and asset controls and the prevention of market manipulation, fraud and anti-money laundering.

(f)     **Publicity**. Neither party may issue any press release or make any other public statement with respect to the Agreement and its terms and conditions unless the content, timing and method of distribution of the press release or public statement has been approved in writing by the other party, except as may be required by applicable law.

(g)     **Confidentiality**. Each Party shall maintain all Confidential Information (as that term is defined below) it receives in strict confidence and not disclose any Confidential Information to any third party or use any Confidential Information for any purpose other than the performance of the Agreement, unless agreed upon in writing by the other Party. "Confidential Information" means the terms of this Agreement and any non-public information or materials provided by either Party to the other Party in connection with the performance of this Agreement, but does not include any information or materials that: (i) was previously known to the receiving party free of any obligation to keep it confidential, (ii) becomes generally available to the public through no wrongful act, (iii) is rightfully received from a third party under no obligation of confidence to such third party, (iv) is independently developed by the receiving party without reference to information which has been disclosed pursuant to this Agreement, (v) is requested by a regulatory authority with jurisdiction over the disclosing Party or its affiliates in connection with such regulatory authority's exercise of its audit, examination or supervisory powers, provided the disclosing Party shall use its reasonable efforts to obtain reliable assurance from such regulatory authority that it will afford confidential treatment to the Confidential Information and the disclosing Party shall make all reasonable efforts to give prompt written notice to the other Party, prior to such disclosure, of the nature and content of such disclosure, as well as the details of the regulatory authority to whom such disclosure has been made (unless such notification is prohibited by applicable law or such disclosure is a result of an examination by such regulatory authority); (vi) is disclosed in routine public filings required by applicable law; or (vii) is required to be disclosed in order to comply with all applicable laws, administrative process or governmental or court orders; provided, however, that a Party may disclose Confidential Information required to be disclosed by law, regulation, or a valid court order if that Party gives the other Party timely notice, unless legally prohibited, so that other Party may seek a protective order, confidential treatment, or other appropriate relief, and discloses only the portion of Confidential Information that is necessary to comply with such law, regulation, or order. The obligations in this section are in addition to, and do not supersede, any confidentiality and nondisclosure obligations provided in any other written agreement between the Parties.

(h)     **Indemnification**. Customer agrees to defend, indemnify and hold XRP II, its affiliates, and their respective employees, shareholders, directors, and representatives harmless and settle against any Claim (any claim, action, audit, investigation, inquiry or other proceeding brought or instituted against an indemnified Party hereto by a person or entity other than indemnifying Party, or its affiliates or subsidiaries) or Loss (any claim, cost, loss, damage, judgment, penalty, interest and/or expense arising out of any Claim), including attorneys' fees and any fines, fees or penalties imposed by any regulatory authority, arising out of or related to: (i) any violation of law by the Customer or the Customer's employees, contractors, or agents in connection with this Agreement, (ii) any breach of this Agreement by the Customer or the Customer's employees, contractors, or agents, and (iii) any use, distribution or resale of the Purchased

2

XRP by the Customer or by the Customer's employees, contractors or agents. Notwithstanding anything to the contrary in this Agreement, the Customer is not obligated to indemnify, hold harmless, or defend XRP II against any claims, demands, losses, expenses, and liabilities arising out of or relating to XRP II's gross negligence, fraud, or willful misconduct in the performance of this Agreement.

(i) **Indemnification Procedure**. In connection with any Claim or Loss, XRP II shall give the Customer prompt Notice of the Claim or Loss (however, that any delay in notification will not relieve the Customer of its obligation to indemnify, except and solely to the extent that the delay materially impairs the Customer's ability to defend the Claim or Loss). In addition, XRP II will cooperate with Customer in connection with the defense and settlement of the Claim or Loss, with Customer having the right to choose counsel. The Customer shall not enter into any settlement or compromise of any Claim or Loss without XRP II's prior written consent if such settlement or compromise arises from or is part of any criminal action, suit, or proceeding, or contains a stipulation to or admission or acknowledgement of any liability or wrongdoing (whether in contract, tort or otherwise) on the part of XRP II, or otherwise requires XRP II to refrain from or take material action (such as payment of fees). At its cost, XRP II has the right to participate in the defense or settlement of the Claim or Loss with counsel of its own choosing.

### SECTION 3. DISCLAIMERS, LIMITATIONS AND RESERVATIONS.

(a) EXCEPT AS OTHERWISE EXPRESSLY SET FORTH IN THIS AGREEMENT, XRP II MAKES NO REPRESENTATIONS OR WARRANTIES IN RELATION TO THE PURCHASED XRP, THIS AGREEMENT OR ITS PERFORMANCE HEREUNDER, INCLUDING (WITHOUT LIMITATION) IMPLIED WARRANTIES OF MERCHANTABILITY, NON-INFRINGEMENT, FITNESS FOR A PARTICULAR PURPOSE, OR IMPLIED WARRANTIES ARISING OUT OF COURSE OF DEALING, COURSE OF PERFORMANCE OR USAGE OF TRADE.

(b) IN NO EVENT SHALL XRP II, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES, BE LIABLE TO THE CUSTOMER FOR ANY SPECIAL, INCIDENTAL, INDIRECT, INTANGIBLE, OR CONSEQUENTIAL DAMAGES OR DAMAGES FOR LOSS OF PROFITS, WHETHER BASED ON CONTRACT, TORT, NEGLIGENCE, STRICT LIABILITY, OR OTHERWISE, ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT, INCLUDING BUT NOT LIMITED TO AUTHORIZED OR UNAUTHORIZED TRANSACTIONS SUBJECT TO THIS AGREEMENT. XRP II, ITS AFFILIATES, OR ANY OF THEIR RESPECTIVE OFFICERS, DIRECTORS, AGENTS, EMPLOYEES OR REPRESENTATIVES' ENTIRE LIABILITY ARISING OUT OF OR IN CONNECTION WITH THIS AGREEMENT WILL IN NO EVENT EXCEED THE PURCHASE AMOUNT PAID BY CUSTOMER UNDER THIS AGREEMENT IN THE PRIOR THIRTY (30) DAY PERIOD BEFORE THE EVENT GIVING RISE TO THE CLAIM.

### SECTION 4. TERMINATION.

(a) **Termination by Mutual Consent**. The parties may terminate the Agreement by mutual written consent in their respective sole discretion.

(b) **Termination for Breach**. Without limiting any other right or remedy that XRP II may have at law or otherwise, XRP II may, in its sole discretion, terminate this Agreement immediately upon notice to the Customer if the Customer breaches any of its obligations under this Agreement, in particular its obligation to comply with applicable laws and regulations as set forth in Section 2 of this Agreement.

3

### SECTION 5. DISCLOSURES.

(a) The Customer acknowledges and agrees that Customer cannot cancel, reverse, or change any XRP transaction that has been completed, as recorded on the XRP Ledger, including as described in Section 1(c) of this Agreement.

(b) The Customer acknowledges and agrees that Customer is solely responsible for maintaining adequate security and control of any and all IDs, passwords, hints, personal identification numbers (PINs), secret keys or any other codes that s/he uses to access the Purchased XRP ("**Customer Credentials**"). Any loss or compromise of Customer Credentials may result in unauthorized access to the Purchased XRP by third-parties and the loss or theft of such XRP. **XRP II assumes no responsibility for any loss that the Customer may sustain due to compromise of Customer Credentials.**

(c) The Customer acknowledges the following material risks associated with virtual currency, including XRP:

(i) Virtual currency is not legal tender, is not backed by the government, and accounts and value balances are not subject to Federal Deposit Insurance Corporation or Securities Investor Protection Corporation protections.

(ii) Legislative and regulatory changes or actions at the state, federal, or international level may adversely affect the use, transfer, exchange, and value of virtual currency.

(iii) Transactions in virtual currency may be irreversible and, accordingly, losses due to fraudulent or accidental transactions may not be recoverable.

(iv) Some virtual currency transactions shall be deemed to be made when recorded on a public ledger, which is not necessarily the date or time that the transaction is initiated.

(v) The value of virtual currency may be derived from the continued willingness of market participants to exchange fiat currency for virtual currency, which may result in the potential for permanent and total loss of value of a particular virtual currency should the market for that virtual currency disappear.

(vi) There is no assurance that a person who accepts a virtual currency as payment today will continue to do so in the future.

(vii) The volatility and unpredictability of the price of virtual currency relative to fiat currency may result in significant loss over a short period of time.

(viii) The nature of virtual currency may lead to an increased risk of fraud or cyber attack.

(ix) The nature of virtual currency means that any technological difficulties experienced by XRP II may prevent the access or use of a customer's virtual currency.

(x) Any bond or trust account maintained by XRP II for the benefit of its customers may not be sufficient to cover all losses incurred by customers.

(d) If the Customer has any questions, needs assistance, or wishes to contact XRP II with a complaint, Customer may contact XRP II's Customer Support at complaints@ripple.com. If the

4

Customer is dissatisfied with the manner in which a complaint has been handled, or for any other reason, Customer can also refer the matter to the New York State Department of Financial Services ("**NYDFS**") located at: One State Street, New York, NY 10004-1511, USA. Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST). To file an electronic compliant with NYDFS, visit https://myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

(e) The Customer acknowledges and agrees that XRP II may share information concerning the Customer in accordance with XRP II's Privacy Policy Addendum (attached as Exhibit B) including, without limitation, sharing such information (i) with appropriate state and federal regulatory authorities in connection with the transactions contemplated by this Agreement, (ii) in response to a court or government order, and (iii) with other affiliates of XRP II in accordance with applicable laws. Lastly, the Customer agrees that XRP II may obtain and use such information as may be necessary for legitimate business needs in connection with the operation of XRP II and its affiliates to the extent consistent with the Privacy Policy Addendum.

### SECTION 6. MISCELLANEOUS PROVISIONS.

(a) **Notice.** Any notices under this Agreement shall be sent by certified or registered mail, return receipt requested, to the Notices address and party set forth below; provided, however, the Customer agrees and consents to receive electronically all communications, agreements, documents, notices and disclosures that XRP II provides in connection with this Agreement, including but not limited to the Summary of XRP Purchase, Transaction receipts, and any other disclosures or statements XRP II may be required under applicable law or regulation to make to the Customer. Notice shall be effective upon receipt.

(b) **Survival.** Termination or expiration of this Agreement shall not affect or limit any independent rights of a party in or to its Confidential Information under applicable laws.

(c) **Force Majeure**. XRP II shall not be liable for delays, failure in performance or interruption of service which result directly or indirectly from any cause or condition beyond its reasonable control, including but not limited to, any delay or failure due to any act of God, act of civil or military authorities, act of terrorists, civil disturbance, war, strike or other labor dispute, fire, interruption in telecommunications or Internet services or network provider services, failure of equipment and/or software, other catastrophe or any other occurrence which is beyond its reasonable control and shall not affect the validity and enforceability of any remaining provisions.

5

CONFIDENTIAL

RPLI_SEC 0389890

**EXHIBIT B. XRP II LLC Privacy Policy Addendum**

CONFIDENTIAL

RPLI_SEC 0389891

# XRP II LLC
# PRIVACY POLICY ADDENDUM

Last updated: May 2nd, 2017

We are committed to protecting your personal information and helping you understand how your personal information is being used.

This Privacy Policy Addendum describes how XRP II LLC ("XRP II") collects, uses, stores, shares, and protects your information whenever you use XRP II services. It supplements the Privacy Policy, available at https://ripple.com/privacy-policy/ (the "Privacy Policy"), which provides details on how your personal information may be collected, stored, protected, and used. You should carefully read the Privacy Policy and this Privacy Policy Addendum.

By using XRP II services, you consent to the practices described in the Privacy Policy and this Privacy Policy Addendum.

We may change this Privacy Policy Addendum from time to time. When we do make updates, we will send you an email notification.

## INFORMATION WE COLLECT ABOUT YOU

When you use XRP II services or transact with XRP II, we collect some important details about you such as your name, email, and public key. We also require you to provide additional information which we use to verify your identity and/or to manage risk, including your physical current address, date of birth, government-issued taxpayer identification number, a copy of an unexpired form of your government-issued identification, and/or other personal information, as needed. Sometimes we may need to request supplementary information to verify your identity or to meet legal and regulatory obligations. When that is necessary, we will ask you to provide such information.

We will obtain from you certain information such as your expected transaction activity as well as "know-your-customer" (KYC) information as part of the customer onboarding process.

1

CONFIDENTIAL
RPLI_SEC 0389892

Additionally, we collect certain payment activity information from you when you transact with XRP II, such as transaction amount, date and time, and information related to the recipient for each transaction.

Finally, we may collect and retain any additional information that you disclose to our customer support team.

If you terminate your relationship with XRP II, please note that we will retain your personal information for a certain period of time in order to comply with certain legal obligations or, if applicable, to resolve disputes.

**HOW WE PROTECT AND STORE PERSONAL INFORMATION**

Throughout this Privacy Policy Addendum, we use the term "personal information" to describe information that can be associated with a specific person and can be used to identify that person. This Privacy Policy Addendum does not apply to personal information that has been anonymized such that it does not identify a specific user.

We take reasonable precautions, as described in this Privacy Policy Addendum, to protect personal information from loss, misuse, unauthorized access, disclosure, and alteration. We protect personal information by maintaining physical, electronic, and procedural safeguards that are designed to comply with applicable laws and regulations. The safeguards we may use include firewalls and data encryption, physical access controls to our buildings and files, and information access authorization controls. In some instances, in order to better secure personal information and use it in connection with the purposes described in the Privacy Policy and this Privacy Policy Addendum, certain personal data may be stored with a third-party service provider.

**HOW WE USE THE PERSONAL INFORMATION WE COLLECT**

Our primary purpose in collecting personal information is to provide you with a secure and efficient experience. In addition to the uses of information specified in the Privacy Policy, we and our affiliates may _also_ use personal information for additional purposes, including to:
- Process transactions and send notices about your transactions;
- Resolve disputes, troubleshoot problems, and deliver service update notices;

2

- Prevent and investigate potentially prohibited or illegal activities, and/or violations of our terms and conditions;
- Customize, measure, and improve XRP II services;
- Deliver targeted marketing and promotional offers (unless you opt out of receiving such communications by emailing us);
- Verify your identity by comparing your personal information against third-party databases; and
- Fulfill any other stated purpose for which the information was collected.

We do not sell or rent your personal information to third parties.

From time to time we may request your permission to allow us to share your personal information with third parties. If you grant us such permission, you may subsequently communicate to us any decision to opt out of having your personal information shared with third parties, or from allowing us to use your personal information for any purpose that is incompatible with the purposes for which we originally collected it or subsequently obtained your authorization.

**HOW WE SHARE PERSONAL INFORMATION WITH OTHER PARTIES**

In addition to sharing personal information as provided in the Privacy Policy, we and our affiliates may also share personal information with:

- Third party identity verification and screening services in order to prevent fraud and other illegal activity. This allows XRP II to confirm your identity by comparing the information you provide us to public records and other third party databases. These service providers may create derivative data based on your personal information that can be used solely in connection with provision of identity verification and fraud prevention services;
- Law enforcement, and officials, or other third parties when:
  o We are compelled to do so by a subpoena, court order, or similar legal procedure; or
  o We believe in good faith that the disclosure of personal information is necessary to prevent physical harm or financial loss, to report suspected illegal activity or to investigate violations of our terms; and
- Other third parties with your consent or direction to do so.

3

CONFIDENTIAL
RPLI_SEC 0389894

If you establish or use any XRP wallet or gateway services from a third party provider, any information that you share with that third party may be subject to their privacy policies.

## HOW YOU CAN CONTACT US ABOUT PRIVACY QUESTIONS

If you have questions regarding the Privacy Policy or this Privacy Policy Addendum, or with to contact us with a complaint, please contact XRP II Customer Support at complaints@ripple.com. If you are dissatisfied with the manner in which a complaint has been handled, you can also refer the matter to the New York State Department of Financial Services (NYDFS) located at: One State Street, New York, NY 10004-1511, USA. Tel: + (800) 342-3736 (Monday through Friday, 8:30 AM to 4:30 PM EST).
To file an electronic compliant with NYDFS, you can visit https://myportal.dfs.ny.gov/web/guest-applications/consumer-complaint.

4

CONFIDENTIAL

RPLI_SEC 0389895