PX 533

Message

From: Ryan Zagone [█████@ripple.com]
Sent: 6/24/2015 2:09:52 PM
To: █████████████████@ripple.com>]
Subject: Fwd: Ripple Labs response to █ request
Attachments: █ Final_RL_Response.pdf

---------- Forwarded message ----------
From: **Vijay Chetty** <██@ripple.com>
Date: Wed, Jun 24, 2015 at 3:59 PM
Subject: Ripple Labs response to MS request
To: █████████████████████████████
Cc: Patrick Griffin <███@ripple.com>, Phil Rapoport <██@ripple.com>, ████████
<██@ripple.com>, Antoinette O'Gorman <███████@ripple.com>

Hi █

Please find our full response to your list of questions attached. The 8 appendices contain relevant documents for many of the questions, and they are referred to in the respective answers.

As noted in the document, all material and answers are privileged and confidential, and subject to attorney-client privilege and attorney work product doctrine. The content in the document does not constitute legal advice.

Please let us know if you have any questions or would like more information.

Regards,
Vijay

Ripple Labs Inc.
Markets and Trading
Mobile: 
www.ripple.com  www.ripplelabs.com

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.        RPLI_SEC 0095167

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

**Ripple Due Diligence Questions and Document Request List (06.24.15)**

**Corporate Governance Structure**

1. Articles of incorporation and bylaws

Please see appendix 1.

2. Provide organizational charts for the following:
   a. All legal entities, including any non-US subsidiaries
   b. Board of directors and committee structure
   c. Advisory Committee
   d. Senior Management Team and committee structure
   e. Legal and Compliance Group

Please see appendix 2.

3. Identify and describe investors with ≥ 5% interest

Please see appendix 3.

**Financial Information**

4. Provide financial information including balance sheet and income statement (audited if available).

Please see appendix 4.

5. Describe Ripple's business model.

Ripple is an open-source protocol that exists as a public good. It is not owned by anyone. Ripple Labs, as a supporter of the Ripple protocol, provides professional services and a suite of closed-source software products that enable seamless integration with the protocol.

Ripple Labs' primary business consists of (1) professional services related to business use cases development, technology deployment and systems integration; and (2) building and licensing software to help financial institutions interact with the protocol.

Additionally, Ripple Labs has XRP holdings – the digital asset within Ripple – which may appreciate in value with increased use of the protocol.

6. Describe how Ripple generates revenues (is it through fees or by making markets)?

Ripple is an open-source protocol and does not generate revenues in and of itself.

1

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

Ripple Labs generates revenues by providing professional services and products for connecting to Ripple, including integrations, licensing software and building custom applications for users.

### Trade Mechanics

7. **Walk through each element of a transaction and settlement process, including parties, flows, and systems used. Identify parties to each leg of the transaction and settlement process.**

Please see appendix 5.

8. **Provide sample trade flows.**

Please see appendix 5.

9. **Identify all products traded on the Ripple platform. Is this just spot?**

We are only discussing spot FX transactions for the purposes of ▮▮▮▮▮ engagement with Ripple. Ripple Labs currently only supports spot FX transactions use-cases.

10. **Describe the transparency of bids, offers and traded prices.**

Bids and asks are placed in public order books and sorted by price. It is a fully transparent market.

   a. **How does the matching engine work?**

The code is open-source and auditable, yet we do not yet otherwise have documentation prepared explaining the matching engine.

11. **Is Ripple a dark pool?**

No. Ripple is a "lit" trading venue.

12. **Can ▮ specify who we get matched up with on trades?**

Not in all cases. As a market maker, ▮ controls the endpoint banks ("gateways") for which it wants to provide liquidity. The gateways in turn validate and authorize market makers. ▮ does not necessarily control which other market makers are authorized by the gateways. ▮ may be matched up with one of these unknown market makers in the order book. Unless ▮ requires the endpoint banks to disclose the identity of other participants, ▮ may not necessarily know the identity of other traders in the market (similar to how ▮ currently does not know the identity of every counterparty on a traditional exchange like NASDAQ).

13. **Can ▮ set credit limits?**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0095169

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

Yes. As a market maker, ▮ must explicitly specify the credit exposure it is willing to take with each counterparty. In Ripple, credit limits are established with "trust lines" that each entity makes with each of its counterparties. For example, ▮ may choose to hold up to $10mm USD issued by ▮ on Ripple. To do this, ▮ would initiate a trust line to ▮ establishing the currency and value limit. ▮ must authorize the trust line. Once approved, ▮ can revoke the trust line or change the limit in the future if desired.

### 14. Given that this is a pre-funded market, how does Ripple ensure that a counterparty's funds are locked up at the relevant bank?

Ripple Labs does not provide any assurance of creditworthiness of any participants. Participants should rely on their own due diligence. Also, Ripple does not necessarily have to be a prefunded market. For example, ▮ may choose to extend a credit line to ▮ This could enable ▮ to start with a $0 balance account and draw down against the credit line to deliver funds for payments.

#### a. How does ▮ know which correspondent banks to pre-fund?

This is ▮ decision based on business needs of ▮ or its customers.

#### b. Who is at risk if a correspondent bank hasn't been pre-funded?

As mentioned above in 14, Ripple does not necessarily have to be prefunded. Balances issued by financial institutions are liabilities of those institutions. Most of these institutions are fractional reserve, so they are not inherently 100% "prefunded". Even if the bank requires 100% prefunding for Ripple market makers, there is still credit risk in many scenarios. If an endpoint ("gateway") bank defaults, the holders of its balances are at risk of potential loss. This risk can be accounted for in the funding and delivery quote posted by the market maker, just as is done today.

#### c. As the network grows, will clients that do not have a correspondent banking relationship with a Ripple gateway be allowed to transact? If so, do you anticipate any local market issues when a market opens and a number of movements in the local currency are contemplated?

We are confused by the meaning of the question. Gateway banks will provide proxy access to the Ripple network for their customers. The gateway bank – which can be either an existing correspondent bank or a respondent bank – controls who can or cannot use their service, just as an ACH-enabled bank today controls which customers are able to get proxy access to the ACH network to send payments.

### 15. How does one become a gateway bank and a market maker? What are the barriers to entry?

3

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                              RPLI_SEC 0095170

To become active on Ripple – as either a market maker or gateway – one would first create a Ripple account. Gateways and market makers are distinguished in how they use their account. A gateway issues balances into Ripple. (i.e. It has outstanding liabilities held by other participants on Ripple; it acts as a custodian.) What distinguishes a market maker is that it has relationships with multiple gateways and posts prices to buy and sell their balances.

As Ripple is an open protocol, there are no barriers to entry related to proprietary code or technology. Institutions simply integrate Ripple's open source code to participate.

Ripple does offer the ability for gateways to "authorize" accounts, which serves to create closed loop networks within the protocol. These are essentially networks of financial institutions, which can dictate their own rules and specific barriers to entry. This is the same functionality that exists with payment systems today. For example, the Federal Reserve and NACHA each have their own rule sets for their networks that use ACH. They decide whom to authorize as participants based on their own requirements, but each closed network exists on the same underlying technology. Meeting network-specific requirements would be an entry barrier if an institution was looking to join a network.

### 16. What is Ripple's on-going role in the platform, if any?

Ripple Labs is the primary contributor to the open and closed-source products that interface with Ripple. Ripple Labs plans to contribute code and products as long as FIs are willing to continue using our version of the software. Ripple Labs also provides professional services and engages in business development and regulatory outreach to build a compliant ecosystem around the protocol.

### 17. What is Ripple's role, if any, in the trade execution and settlement process?

Ripple Labs is a software and technology provider to financial institutions. Ripple Labs does not own or operate the Ripple protocol, but rather provides software solutions to help institutions integrate and use the technology. Ripple Labs would not have any anticipated role in trade execution or settlement. The financial institutions using the technology, along with the Ripple protocol itself, carry out these functions.

### 18. How are trades confirmed?

Trades are executed, fully settled, and confirmed in the instant that the ledger is updated. Confirmation of a trade and the transfer of ownership are simultaneous and observable on the open ledger. Software that analyzes the ledger can provide notifications and generate reports based on this data as needed.

### 19. Reversibility – explain how trades are reversed and error trades are handled.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                         RPLI_SEC 0095171

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

Transactions on the Ripple protocol are not reversible, the same as wire payments today. Rules between participants establish the circumstances when a payment should be returned, just as network rules function today. The returned transaction would just be another irreversible transaction in the opposite direction.

Reversing a transaction is not a function of the underlying settlement technology in Ripple or in today's existing payment rails. The governance and rules that the participants agree to dictate when, how and why transactions can be returned. Participants in Ripple can opt to use current rules from existing networks or decide to establish new governance between counterparties. This decision is fully up to the participants.

### 20. Describe the role of XRP in transactions.

XRP has two functions: (1) a security mechanism that is mandatory for all users and (2) a bridge between fiat currencies that is entirely optional.

Ripple deploys a digital currency, called XRP, as a security mechanism. In this way, XRP is similar to a postage stamp for each transaction. All account holders on Ripple are required to hold a small reserve of XRP. A small fraction of an XRP is destroyed with each transaction (ex: $0.000001). The small portion of the XRP that is destroyed is not a fee collected by anyone, rather a cost of using the Ripple technology.

Under normal network volumes, this XRP cost remains very small. However, in the event that a participant tries to overwhelm the network with disruptive activity – for instance with a denial of service attack – the Ripple technology will exponentially increase the cost of each transaction. This feature aims to quickly bankrupt the bad actor of its XRP reserve, prohibiting any additional traffic from its account.

In this role, XRP blocks a denial of service attack from overwhelming the network, ensuring security and stability of the Ripple infrastructure at a minimal cost to users.

XRP's second and optional role is as a bridge currency. Participants on Ripple can make markets directly between fiat pairs (e.g. EUR/USD) without using XRP as an intermediary or bridge currency. But some market makers may choose to use XRP as a bridge currency in some scenarios if it is operationally beneficial to them.

   a. Does ▮ have to hold XRP to be a market maker in the network?

Yes. ▮ would need a small amount of XRP for its reserve account. A very small amount (e.g. $10 worth) would be plenty, and Ripple Labs would be happy to provide this free of charge. If

5

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

this is an issue, we may be able to devise a method where Ripple Labs custodies the XRP on behalf of ▮ This option would need to be discussed further if it is necessary.

    b. **As a liquidity provider, when might ▮ need to provide liquidity in XRP?**

▮ would never need to, but in some cases ▮ may want to. For example, ▮ may not have bank accounts in India, but a corporate client may want to send a payment to India. ▮ would be unable to directly quote USD/INR, but ▮ could quote XRP/USD and another participant could quote XRP/INR. Ripple could bridge these two order books to synthetically create USD/INR liquidity. Use of XRP for this purpose is entirely optional.

    c. **If ▮ has to provide liquidity in XRP or hold XRP, does ▮ have to register with FinCEN as an MSB?**

FinCEN's definition of MSB excludes "banks and foreign banks". Regulatory and compliance implications would be derived from ▮ existing bank licensing.

    d. **Will market makers require any other licenses/registrations (e.g., NYDFS BitLicense)?**

Licensing requirements may vary depending on the market maker's existing status as a broker-dealer, bank, etc., as well as the nature of the relationship with other market participants.

    e. **How will you ensure that market makers have all required licenses/registrations?**

Given that Ripple is an open protocol, Ripple Labs cannot provide assurances that market participants are properly licensed. Participants are empowered to limit their interaction on the network to known counterparties with whom they are comfortable transacting in a compliant way.

  21. **Ripple Ledger**
    a. **Explain how the Consensus Process works and its scalability.**

Please see this link for more information: https://ripple.com/knowledge_center/the-ripple-ledger-consensus-process/

    b. **Can you show us what the ledger looks like?**

We provide a ledger explorer tool here: https://www.ripplecharts.com/#/graph There are other versions created by non-Ripple Labs developers as well.

  22. **Can ▮ trade outside the system and settle within the system? How would that work?**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.    RPLI_SEC 0095173

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

Two parties can agree to a trade and then send payments to one another. (E.g. ▊ sends counterparty $1.1mm; Counterparty sends ▊ €1mm). To achieve "payment vs. payment", it would require the use of a smart contract as escrow agent or the creation of a custom order book. In typical trades that occur on Ripple, payment vs. payment is the default.

### Legal Framework

**23. Provide copies of Ripple's Rulebook, Form Agreements, Disclaimers/Disclosures (including any disclosures to all clients/liquidity takers).**

Please see appendix 6 for sample Integrator and Bank agreements.

**24. In addition its MSB registration with FinCEN, identify any other state or federal licenses or registrations Ripple maintains or for which applications are pending.**

Ripple Labs is in the process of registering a subsidiary as a money transmitter and a virtual currency business in New York State. We are reviewing with counsel the need to apply for licenses in other jurisdictions.

   a. Identify any non-US licenses or registrations.
   b. How have you gotten comfortable that you have all required licenses/registrations?

Ripple Labs will certainly apply for more licenses in other states such as California, Texas, Florida, etc. Ripple Labs has not yet determined the identity of all of the States in which it will seek to be licensed as a money transmitter.

**25. Is XRP afforded protections similar to other currencies under the UCC?**

Although we are not aware of statutory or case law on point, we expect that XRP would not be treated as a currency under Article 9 of the UCC, but rather as a "general intangible." That is the catchall classification of intangible assets, such as accounts, not otherwise classified. Assuming the UCC treats XRPs as general intangibles, ▊ would need to file a UCC financing statement in the location of the pledgor, typically the state of incorporation of organization.

We understand that there also may be an argument to treat XRP as a "financial asset" under Article 8 of the UCC, but we are not aware of any regulatory or judicial treatment of XRP as such to date. Under Article 8, lenders can perfect a security interest in an uncertificated financial asset, through a "control agreement" with the pledger.

We expect that future treatment of XRP and other virtual currencies by federal and state regulators and courts will impact this analysis, and we will structure the transactions on the basis of such treatment as it develops.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                    RPLI_SEC 0095174

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

    a. Would ▮ benefit from the binding nature of a trade executed on the Ripple Platform at the time of trade execution (the carveout to the Statute of Frauds for financial transactions)?

We expect that ▮▮▮▮ would benefit from the exception from the Statute of Frauds for qualified financial contracts for foreign exchange transactions effected using the Ripple protocol. Applicable states, including New York, California and Pennsylvania, do not require such contracts to be in writing to be enforceable, provided there is sufficient evidence that such contract has been made, and that the parties have signed a prior or subsequent written statement to be bound by the terms of a contract entered into by such means (i.e., electronic messages, telephonically, etc.).

26. **In the event of a bankruptcy of a trade counterparty involving XRP, is the trade a qualified financial contract that benefits from the bankruptcy safe harbors?**

Whether or not such agreements constitute securities contracts or transactions involving settlement payments is untested, and these transactions may not fall under the safe harbor protections of Section 546(e) of the Bankruptcy Code. However, from inception of the process through and including the payment of the funds at the conclusion of the process/transaction, MS should not be exposed to risk associated with counterparty insolvency or bankruptcy to the extent it acts as a mere conduit of the funds, transferred by the owner to the beneficiary. To the extent Morgan Stanley effects transactions as riskless principal, its counterparty risk could be mitigated by agreement with its counterparty financial institutions.

27. **When does legal settlement/payment finality occur for currencies sent through the Ripple Network?**

Legal finality of transactions in foreign exchange transactions typically occurs when the foreign exchange is recorded on the books and records of ▮ counterparty depository institution. We envision foreign exchange transactions effected by ▮ should settle on the books and records of such counterparties within a few minutes, in each case.

    a. Do you have any legal opinions to this effect?

Because the details of these transactions have not been determined, and transactions involving virtual currencies are currently uncertain, we do not have legal opinions on point. As we further detail the transactions, we would be happy to work with you and competent counsel to obtain legal opinions where necessary or appropriate.

28. **If trading anything other than deliverable spot on the Ripple Network, we will need to undertake Dodd Frank diligence (i.e., SEF registration, real time reporting, etc.)**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.   RPLI_SEC 0095175

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

Because we understand that only spot currencies (fiat and virtual) will be traded via the Ripple protocol, there should be no need for ▇ to undertake additional due diligence regarding reporting and recordkeeping obligations under Dodd Frank. If there are additional, specific products that ▇ is concerned with, we would be happy to address them.

### 29. If retail clients can use the Ripple Network, is Ripple a registered retail foreign exchange dealer?

Ripple Labs is not a registered retail foreign exchange dealer. The registration requirements for retail foreign exchange dealers arise when a person acts as counterparty or offers to act as counterparty to an off exchange transaction with a person who is not an eligible contract participant in either a foreign exchange derivative (e.g., futures contract, futures option contract, or options contract on foreign exchange); or a leveraged contract on foreign exchange. Because the foreign exchange transactions effected via the Ripple protocol do not fall into either of these categories, Ripple Labs does not need to register as a retail foreign exchange dealer.

#### a. Can we limit our trading to institutional-only accounts?

Through contract, ▇ should be able ensure that each counterparty to transactions on Ripple are eligible participants.

### Compliance/BSA/AML/OFAC

### 30. Provide and inventory of all compliance related policies and procedures, on a legal entity basis.

Ripple Labs' general compliance-related P&Ps are as follows:

- Privacy Policy
- Code of Conduct
- Anti-Fraud Program

(If this does not fully satisfy the question, please let us know. We are unclear on the meaning of the question.)

### 31. Provide copies of BSA/AML/OFAC policies and procedures, on a legal entity basis.

*Note: This request item is applicable to financial institutions subject to regulation under the Bank Secrecy Act. At this time, Ripple Labs, Inc. ("Ripple Labs") wholly owns two money services business ("MSB" or non-bank financial institution ("NBFI") subsidiaries — Ripple Trade, LLC and XRP II, LLC – both of which are subject to BSA/AML/OFAC regulation requirements.*

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                    RPLI_SEC 0095176

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

An inventory of relevant BSA/AML/OFAC Programs/Policies and implementing procedures for each Ripple MSB subsidiary is listed below. Applicable BSA/AML/OFAC Program documents are attached separately in appendix 7.

1. **Ripple Trade LLC**

Ripple Trade, LLC was formed on May 28, 2015 in response to a Settlement Agreement with regulatory authorities to move the Ripple Trade service into a money services business ("MSB") entity, registered with the U.S. Treasury's Financial Crimes Enforcement Network ("FinCEN")[1]. Ripple Trade registered with FinCEN as a money services business on June 2, 2015.

**Ripple Trade BSA/AML/OFAC Program (see attached documents)**
- BSA/AML/OFAC Program/Policy (approved June 12, 2015)
- Compliance and Oversight Committee Charter (approved and adopted June 12, 2015)
- BSA/AML/OFAC AML Training Program

Ripple Trade: Inventory of BSA/AML/OFAC Procedures (*available upon request*)

*1- Customer On-boarding – (in draft)*
Ripple Labs has developed a customer identification tool to assist with identification for Ripple Trade users. Onboarding procedures will be finalized once the tool is launched (end June 2015). New customer onboarding was suspended, effective June 2, 2015, until this functionality is in place. Customer identification and basic customer due diligence processes include automated non-documentary verification of Ripple Trade users, KYC in accordance with Ripple Trade's BSA/AML/OFAC AML Program requirements, screening against Office of Foreign Assets Control ("OFAC") sanctions lists, as well as screening to identify Politically Exposed Persons (PEPs).

*2- OFAC Match Verification Procedures*
Describes OFAC screening methodology, match verification logic, procedures for escalation, further investigation, OFAC reporting and potential SAR filing when true matches are identified.

*3 - Monitoring, Investigations and SAR Guidelines (general)*
Describes available investigation tools, general alert, monitoring, and investigations procedures, SAR filing and follow-up reviews, law enforcement inquiries, and record retention requirements.

*4 – AML Transaction Monitoring Procedures – (in draft)*

---

[1] In May 2015, Ripple Labs and its wholly owned subsidiary XRP II entered into a Settlement Agreement with the Department of Justice and FinCEN.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                                                 RPLI_SEC 0095177

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

Production of monthly transaction monitoring reports will commence on July 1, 2015; related procedures will be finalized once report production begins.

*5 - BSA e-filing Procedures*
Describes BSA e-filing process, step-by-step SAR filing, and MSB registration renewal.

*6 - Unusual Activity Reporting ("UAR") - Internal*
Workflow and Ripple User Support procedures governing employee (internal) reporting of unusual activity to AML compliance staff for further investigation.

*7 - Law Enforcement Inquiries/Requests*
General and desktop procedures governing response to law enforcement requests for information, receipt of subpoenas, NSLs, etc.

*8 - 314(b) Request Procedures*
Describes Ripple Trade's participation in FinCEN's voluntary information sharing program (registered on June 3, 2015), incoming and outgoing request and response procedures, information sharing confidentiality, and record retention requirements.

*9 - External Review - Response Procedures*
Procedures governing management and tracking of actions to address/resolve findings or issues resulting from independent audit reviews or regulatory examinations of Ripple Labs BSA/AML/OFAC Programs.

*10 - Record Retention*
Lists record type and record retention schedule.

---

2. **XRP II, LLC**
XRP II, LLC, a wholly owned subsidiary of Ripple Labs, Inc., is a FinCEN registered money services business (as of September 2013). XRP II engages in the sale and transfer of Ripple Labs' virtual currency, XRP, to third parties on a wholesale basis. All sales of XRP conducted by XRP II are for the benefit of Ripple Labs, its ultimate parent company, and represents one method by which Ripple Labs raises working capital.

**XRP II BSA/AML/OFAC Program (see attached documents)**
- BSA/AML/OFAC Program/Policy (last approved April 30, 2015)
- BSA/AML/OFAC AML Training Program (updated annually)

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.　　　　RPLI_SEC 0095178

**PRIVELEGED AND CONFIDENTIAL**
**SUBJECT TO ATTORNEY-CLIENT PRIVILEGE**
**AND ATTORNEY WORK PRODUCT DOCTRINE**

Inventory of BSA/AML/OFAC Procedures (*available upon request*):

*1- Customer On-boarding*
Step-by-step procedures describing XRP II's CIP and KYC processes for on-boarding new customers. Also describes XRP II's initial and ongoing OFAC and PEP screening processes.

*2- OFAC Match Verification Procedures*
Describes OFAC screening methodology, match verification logic, investigation and escalation processes, reporting to OFAC and potential SAR filing in instances of true match identification.

*3 - Monitoring, Investigations and SAR Guidelines*
Describes alert processes, investigation tools, general monitoring and investigations procedures, SAR filing and follow-up continued activity reviews, law enforcement inquiries, and record retention requirements.

*4 - Transaction Monitoring Procedures (desktop)*
Describes (manual) transaction monitoring conducted by AML Compliance staff (daily, monthly, quarterly monitoring), review process, and escalation procedures.

*5 - BSA e-filing Procedures*
Describes BSA e-filing process, step-by-step SAR filing, and MSB registration renewal.

*6 - Law Enforcement Inquiries/Requests*
General and desktop procedures governing response to law enforcement requests for information, subpoenas, NSLs, etc.

*7 - 314(b) Procedures*
Describes XRP II's participation in FinCEN's voluntary information sharing program under Section 314(b) of the USA PATRIOT Act, incoming/outgoing 314(b) request/response procedures, information sharing confidentiality, and record retention requirements.

*8 - Unusual Activity Reporting ("UAR") - Internal*
Workflow and Ripple User Support procedures governing employee (internal) reporting of unusual activity to AML compliance staff for further investigation.

*9 - AML External Reviews - Response Procedures*
Procedures governing management and tracking of actions to address/resolve findings or issues resulting from independent audit reviews or regulatory examinations of Ripple Labs BSA/AML/OFAC Programs.

*10 - Record Retention Procedures*
Lists record type and required retention schedule.

> **32. What types of entities are on the Ripple platform/can join the platform, e.g., HFT, retail?**

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.　　　　　　RPLI_SEC 0095179

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

Because Ripple is a decentralized, open-source ledger and payments network which allows users to transfer and exchange digital representations of currencies (including fiat and other decentralized digital) and commodities issued by network users, any person/entity can join.

The protocol also permits bilateral, real-time funds settlement. Ripple Labs provides integration services, among other things, for entities that wish to use the Ripple protocol.

The Ripple technology sits deep in the plumbing of the payments system, and is not intended to be something that large numbers of consumers interact with directly.

Since Ripple relates to funds settlement and not customer on-boarding, banks and other financial services providers integrating with or testing the Ripple protocol are able to do so while continuing to use the same systems and processes for CIP, CDD and EDD that they always have.

    a. **What is the account opening process – KYC, EDD, expected account activity, source of funds, OFAC screening?**

This question is applicable to customers of Ripple Trade, LLC and XRP II, LLC (Ripple Labs' MSB subsidiaries). As non-bank financial institutions (NBFIs), both MSB subsidiaries are subject to BSA/AML/OFAC regulatory requirements. Customer identification, KYC, EDD, expected activity and source of funds requirements, and OFAC sanctions screening processes are described in the BSA/AML/OFAC Program governing each entity (relevant documents attached in appendices 7 and 8).

    b. **What ongoing client due diligence process does Ripple undertake?**

As indicated in response to 31 above, due diligence is conducted on customers of Ripple Labs' regulated MSB entities: Ripple Trade and XRP II. Customer due diligence and enhanced due diligence processes are described in the BSA/AML/OFAC Program governing each entity (refer to attached Ripple Trade and XRP II Program documents in appendix 7).

**33. Transaction monitoring**

    a. **Describe internal controls and processes in place to monitor transaction activity for potentially suspicious activity, economic sanctions (OFAC), Funds Transfer and Funds Transfer Rules**

Due to the relatively low number of transactions and customers of XRP II, transaction activity is manually monitored by AML Compliance staff members on a daily, weekly, monthly and quarterly basis.

Ripple Trade, LLC has developed and is in the process of implementing transaction-monitoring scenarios to alert on funds sent to or from Ripple Trade users. Specifically, Ripple Trade has developed monitoring scenarios to identify:

- Users that send or receive value equivalent to $50,000 or more in a month.

13

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.　　　　　　　　　　RPLI_SEC 0095180

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

- Users that send or receive two or more individual transactions each totaling between $2,000 and $3,000 or between $8,000 and $10,000 USD in a seven-day period within a calendar month.
- Users that do not transact over the Ripple Network that undertake substantial activity from previously dormant accounts.
- Groups of transactions involving at least one Ripple Trade customer that within a one-hour period: originate from one sender and are sent to five or more receivers; or that originate from five or more senders and are sent to one receiver.

Monthly reporting will commence on July 1, 2015. Ongoing evaluation of report output may result in the development of additional transaction-monitoring scenarios.

Recent enhancements to Ripple Labs' global dynamic risk and analytical tools will further facilitate monitoring and investigation of suspicious transaction activity, transaction counterparty identification, flow of funds reporting, and degrees of separation reporting across the entire Ripple protocol.

    **b. Describe Ripple's Suspicious Activity Reporting process and controls, including any recent enhancements.**

For detailed description, please refer to the separate attachment titled "*Monitoring/Investigations/SAR Guidelines*" in appendix 7. Both MSB entities - Ripple Trade, LLC and XRP II, LLC - are subject to suspicious activity reporting (SAR) requirements in accordance with BSA reporting regulations.

**34. Provide a detailed description of the implementation, completion and outstanding work related to implementing the Remedial Framework agreed to between Ripple Labs, XRP II and FinCEN.**

Refer to separate attachment "*Settlement Agreement — Remedial Measures*" in appendix 8.

**35. Is Ripple subject to any ongoing state or federal investigations by law enforcement or other regulatory agency?**

No.

**36. Identify any material pending state or federal litigation.**

None at this time.

<u>Network and Protocol Security/Confidentiality and Privacy</u>

    **37. Who holds/secures public and private key information?**

14

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.    RPLI_SEC 0095181

PRIVELEGED AND CONFIDENTIAL
SUBJECT TO ATTORNEY-CLIENT PRIVILEGE
AND ATTORNEY WORK PRODUCT DOCTRINE

Each user of the Ripple network is responsible for securing his/her private key. Private keys can be hosted by a gateway or other institution. Public keys are publicly visible by design and do not need to be secured.

### 38. How is the Ripple protocol secured?

The protocol itself is continuously validating transactions through a network of secured servers reaching consensus. Ripple Labs controls who has access to modify official versions of the Ripple server code. Additionally, Ripple Labs is not aware of any incidents involving a loss of user funds due to insecure download of Ripple server software.

### 39. Describe the "integration" of the bank's account ledger into the Ripple Network.

On a high level, integration entails synchronizing the bank's GL with the Ripple ledger. When a balance is issued on Ripple, it must be immobilized in the GL to avoid a duplication of liabilities. The GL must also "listen" for transactions that happen on the Ripple ledger to adjust the GL to reflect the appropriate changes in ownership that occur on the Ripple ledger. Ripple Labs provides closed source software to financial institutions to simplify the integration process.

### 40. What assurances will ▇ have regarding the confidentiality of its trades/settlements through the Ripple Network?

The Ripple network (and more broadly, all major blockchain technologies known to us) are inherently public, meaning that anyone can choose to run a network node and download and view a copy of the ledger. The Ripple ledger is pseudonymous, meaning that participants are identified by alphanumeric strings (e.g. rEsIsy2S4oV89jPrwyAf8CBF6pHtXL6fsl). The actual identity of the party controlling the account is not known to network participants. It is the responsibility of the user to keep their identity confidential. There are no assurances of confidentiality when using the Ripple network.

FOIA CONFIDENTIAL TREATMENT REQUESTED BY RIPPLE LABS, INC.                                              RPLI_SEC 0095182