# PX 571

1              UNITED STATES DISTRICT COURT

2              SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                   Plaintiff,         )
6                                     ) Case No.
            vs.                       ) 20-civ-10832(AT)(SN)
7                                     )
     RIPPLE LABS, INC., BRADLEY       )
8    GARLINGHOUSE, and CHRISTIAN A.   )
     LARSEN,                          )
9                                     )
                   Defendants.        )
10   _____)

11

12              VIDEOTAPED DEPOSITION OF

13                   ALAN SCHWARTZ

14            Friday, February 11, 2022

15

16

17

18

19

20

21

22

23

     Reported by:
24   JEFFREY BENZ, RMR, CRR
     STENOGRAPHIC REPORTER
25   JOB No. 220211JBE

                                                          1

1

2

3

4          VIDEOTAPED DEPOSITION of ALAN SCHWARTZ, taken by

5     Plaintiff, at the offices of Debevoise & Plimpton, 919

6     Third Avenue, New York, New York, on February 11, 2022

7     commencing at 9:13 a.m., before Jeffrey Benz, a

8     Certified Realtime Reporter, Registered Merit Reporter

9     and Notary Public within and for the State of New York.

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

2

```
1   A P P E A R A N C E S:

2

3   FOR THE PLAINTIFF:

4       SECURITIES AND EXCHANGE COMMISSION
        200 Vesey Street, Suite 400
5       New York, New York  10281-1022
            BENJAMIN HANAUER, ESQ
6           DAPHNA WAXMAN, ESQ.
        Telephone: 212.336.0153
7       Email: hanauer@sec.gov
            waxmand@sec.gov
8

9   FOR DEFENDANT RIPPLE LABS:

10      KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, P.L.L.C.
        1615 M Street, N.W.
11      Washington, D.C.  20036
        BY:   REID M. FIGEL, ESQ.
12          GAVAN GIDEON, ESQ.
            ROBERT L. MOORE, ESQ. (Remotely)
13          ELIANA M. PFEFFER, ESQ. (Remotely)
            JUSTIN B. BERG, ESQ. (Remotely)
14      Telephone: 202.326.7918
        Email: rfigel@kellogghansen.com
15          ggideon@kellogghansen.com
            rmoore@kellogghansen.com
16          epfeffer@kellogghansen.com
            jberg@kellogghansen.com
17
                    -and-
18
        DEBEVOISE & PLIMPTON LLP
19      919 Third Avenue
        New York, New York   10022
20      BY:   BENJAMIN LEB, ESQ. (Remotely)
        Telephone: 212.909.6089
21      Email: bjleb@debevoise.com

22

23

24

25

                                                    3
```

```
 1   A P P E A R A N C E S: (Ctd.)

 2

 3   FOR DEFENDANT BRADLEY GARLINGHOUSE:

 4        CLEARY GOTTLIEB STEEN & HAMILTON LLP
          2112 Pennsylvania Avenue, NW
 5        Washington, D.C.   20037
          BY:   JORGE A. BONILLA LOPEZ, ESQ. (Remotely)
 6        Telephone: 202.974.1517
          Email: jbonillalopez@cgsh.com

 7

 8   FOR DEFENDANT CHRISTIAN A. LARSEN:

 9        PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
          1285 Avenue of the Americas
10        New York, New York   10019-6064
          BY:   SARAH J. PROSTKO, ESQ.  (Remotely)
11              CONNOR J. RITSCHARD, ESQ. (Remotely)
          Telephone: 212.373.2491
12        Email: sprostko@paulweiss.com
                 critschard@paulweiss.com

13

14   ALSO PRESENT:

15        ANA GUARDADO, Ripple Labs, Inc. (Remotely)

16        KYLE E. CHERMAK, Debevoise & Plimpton (Remotely)

17        JIM BAKER, Videographer

18

19

20

21

22

23

24

25
                                                      4
```

1                            INDEX

2  ALAN SCHWARTZ

3       Examination by:                        Page

4             MR. HANAUER                        6

5

6                          EXHIBITS

7  NUMBER           DESCRIPTION                 PAGE

8  Exhibit 1   Expert Report of Alan            16
                Schwartz, dated October 4,
9               2021

10 Exhibit 4   Supreme Court's Decision in      63
                Securities and Exchange
11              Commission v. W.J. Howey
                Co., et al.
12
   Exhibit 5   Transcript of Howey             55
13              litigation

14 Exhibit 8   XRP Purchase Summary            120

15 Exhibit 9   Bitstamp Wholesale Order        125

16 Exhibit 10  Agreement between Ripple and    131
                GSR Holdings Limited
17
   Exhibit 11  ███████ Agreement              142
18
   Exhibit 12  Copy of ███████ Agreement      148
19
   Exhibit 15  MoneyGram Agreement            156
20
   Exhibit 16  Loan Agreement                 158
21
   Exhibit 17  ████ Custody Agreement         161
22
   Exhibit 18  Copy of Custody Agreement      166
23
   Exhibit 20  Joint Venture Agreement        177
24              Between Ripple and ████
25 Exhibit 21  ██████ Contract                178

                                                    5

| | | |
|---|---|---|
| 09:12 | 1 | THE VIDEOGRAPHER:  Good morning.  We're now |
| 09:12 | 2 | on the record.  Today's date is February 11, 2022. |
| 09:12 | 3 | The time is 9:13 a.m.  This is Disk 1 of the video |
| 09:12 | 4 | deposition of Alan Schwartz, in the matter of SEC |
| 09:12 | 5 | versus Ripple Labs, et al. |
| 09:12 | 6 | My name is Jim Brady.  I'm the |
| 09:12 | 7 | videographer.  Today's court reporter is Jeff Benz. |
| 09:12 | 8 | We're both with Gradillas Reporting. |
| 09:12 | 9 | Today's deposition is taking place at |
| 09:12 | 10 | Debevoise & Plimpton, 919 Third Avenue, New York, |
| 09:12 | 11 | New York. |
| 09:12 | 12 | The attorneys' appearances will appear on |
| 09:12 | 13 | the transcript.  May I ask now that the court |
| 09:12 | 14 | reporter please swear in the witness. |
| 09:13 | 15 | ALAN SCHWARTZ, |
| 09:13 | 16 | called as a witness, having been first |
| 09:13 | 17 | duly sworn by Jeffrey Benz, a Notary |
| 09:13 | 18 | Public within and for the State of New |
| 09:13 | 19 | York, was examined and testified as |
| 09:13 | 20 | follows: |
| 09:10 | 21 | EXAMINATION BY MR. HANAUER: |
| 09:13 | 22 | Q.   Good morning, sir.  My name's Ben Hanauer. |
| 09:13 | 23 | I represent the SEC, who's the plaintiff in this |
| 09:13 | 24 | lawsuit. |
| 09:13 | 25 | Can you please state your name for the |

6

```
09:13   1    record.
09:13   2         A.    Alan Schwartz.
09:13   3         Q.    And, Professor Schwartz, is there any
09:13   4    reason why you cannot give accurate testimony today?
09:13   5         A.    No.
09:13   6         Q.    How many preparation sessions did you do
09:13   7    for today's deposition?
09:13   8         A.    Four, I think.  Three or four.
09:13   9         Q.    And when were they?
09:13  10         A.    Yesterday and Wednesday, and then a couple
09:13  11    of weeks ago we did a couple.
09:13  12         Q.    And when you say "we," who was present for
09:13  13    those preparation sessions?
09:13  14         A.    Mr. Figel, Mr. Gideon, and a gentleman
09:14  15    whose name I -- I never got Robert's last name.
09:14  16    There's another person, an employee of the firm, the
09:14  17    Kellogg Hansen firm.
09:14  18         Q.    And how long total did you spend preparing
09:14  19    for today's deposition?
09:14  20         A.    I would -- between 15 and 20 hours.
09:14  21         Q.    And in your preparation, did you review any
09:14  22    documents other than the ones cited in your
09:14  23    October 4, 2021, report?
09:14  24         A.    Yes, I did.
09:14  25              MR. FIGEL:  Start -- say yes -- answer yes
```

7

| | | |
|---|---|---|
| 09:14 | 1 | or no.  Give me a chance -- there may be some |
| 09:14 | 2 | privilege issues, so if you just give a pause after |
| 09:14 | 3 | Mr. Hanauer's question, please. |
| 09:14 | 4 | Q.   And what did you review other than the |
| 09:14 | 5 | documents cited in your report? |
| 09:14 | 6 | MR. FIGEL:  I direct you not to answer that |
| 09:14 | 7 | question based on attorney work product. |
| 09:14 | 8 | Q.   Did you review any deposition transcripts? |
| 09:14 | 9 | A.   No. |
| 09:14 | 10 | MR. FIGEL:  Again, let me -- let me give |
| 09:14 | 11 | you the instruction -- |
| 09:14 | 12 | THE WITNESS:  Okay. |
| 09:14 | 13 | MR. FIGEL:  -- but fine, start by answering |
| 09:15 | 14 | yes or no. |
| 09:15 | 15 | Q.   Have you ever been deposed or given |
| 09:15 | 16 | testimony in a lawsuit before? |
| 09:15 | 17 | MR. FIGEL:  You can answer. |
| 09:15 | 18 | A.   Yes. |
| 09:15 | 19 | Q.   How many times? |
| 09:15 | 20 | A.   Over the years -- hard to remember over the |
| 09:15 | 21 | years.  More than ten. |
| 09:15 | 22 | Q.   And I guess I should probably split that |
| 09:15 | 23 | up.  How many times have you been deposed in |
| 09:15 | 24 | connection with a lawsuit? |
| 09:15 | 25 | A.   Same answer. |

8

09:15  1       Q.   Around 10?

09:15  2       A.   Or more, 10, 12, something like that.

09:15  3       Q.   And beyond those depositions, how many

09:15  4   times have you given testimony in a lawsuit?

09:15  5       A.   Does that include an arbitration?

09:15  6       Q.   Yes.

09:15  7       A.   Four or five.

09:15  8       Q.   Generally speaking, what were the cases

09:15  9   about that you've testified in?

09:16 10       A.   They were in a variety of areas.  I've been

09:16 11   an expert in bankruptcy, corporate governance,

09:16 12   contracts, sales.

09:16 13       Q.   Have you ever offered expert testimony in a

09:16 14   case involving allegations of federal securities law

09:16 15   violations?

09:16 16       A.   No.

09:16 17       Q.   Have you ever testified as a fact witness?

09:16 18       A.   No.

09:16 19       Q.   How much of your professional time do you

09:16 20   spend working as a litigation expert or consultant on

09:16 21   one hand, as opposed to working as a law professor?

09:16 22       A.   Less than 5 percent, maybe less than

09:16 23   3 percent.

09:16 24       Q.   Has your expert testimony ever been

09:16 25   excluded for any reason?

9

| | | |
|---|---|---|
| 09:17 | 1 | A. Yes. |
| 09:17 | 2 | Q. Can you tell me about that, please. |
| 09:17 | 3 | A. It was -- it's hard to -- once I was an |
| 09:17 | 4 | expert in a dispute between oil companies, and a part |
| 09:17 | 5 | of my report was excluded on the ground that there |
| 09:17 | 6 | was economic analysis in it and I hadn't qualified as |
| 09:17 | 7 | an economic expert. |
| 09:17 | 8 | Q. And what case was that? |
| 09:17 | 9 | A. Well, I can't remember the name, but it was |
| 09:17 | 10 | between two big oil companies, involving oil leases |
| 09:17 | 11 | in Prudhomme Bay. |
| 09:17 | 12 | Q. Do you know what court that case was in? |
| 09:17 | 13 | A. What case. |
| 09:17 | 14 | I think that was in Washington, D.C. |
| 09:17 | 15 | Q. District -- federal court? |
| 09:17 | 16 | A. District court in Washington, D.C. |
| 09:17 | 17 | Q. Federal district court? |
| 09:18 | 18 | A. Yes. |
| 09:18 | 19 | Q. Has -- besides that occasion, has your |
| 09:18 | 20 | expert testimony ever been excluded for any other |
| 09:18 | 21 | reason? |
| 09:18 | 22 | A. Not that I can recall. |
| 09:18 | 23 | Q. Were you retained as an expert in a case |
| 09:18 | 24 | called Mason Capital versus Cayman Corp., in the |
| 09:18 | 25 | District of Connecticut? |

10

09:18  1        A.    Yes.

09:18  2        Q.    And you testified at a trial that took

09:18  3    place in that case in October 2005?

09:18  4        A.    I don't remember the date, but I did

09:18  5    testify in a trial.

09:18  6        Q.    And one of the subjects of your testimony

09:18  7    in that case was about your beliefs about the meaning

09:18  8    of Connecticut's Business Combination Act?

09:18  9        A.    I don't specifically recall, but I wouldn't

09:18 10    object to that characterization.

09:18 11        Q.    And in that case, did the court grant the

09:18 12    opposing side's motion in limine to preclude that

09:18 13    portion of your testimony?

09:18 14        A.    I think it did.

09:19 15        Q.    And the reason the court excluded that

09:19 16    portion of your testimony was because the court found

09:19 17    the constructions of statutes is a judicial task and

09:19 18    not a proper subject of expert testimony?

09:19 19        A.    I don't particularly recall why the court

09:19 20    excluded my re-- that part of my report.  I don't

09:19 21    recall what the judge said or whether the judge wrote

09:19 22    something down.

09:19 23        Q.    Any other instances where your testimony

09:19 24    was excluded?

09:19 25        A.    Not that I can recall.

11

| | | |
|---|---|---|
| 09:19 | 1 | Q.   Has a court ever expressed disagreement |
| 09:19 | 2 | with an opinion you expressed? |
| 09:19 | 3 | A.   I -- I'm not exactly sure how to answer |
| 09:20 | 4 | that question because I -- I expressed -- when I |
| 09:20 | 5 | testified, the court didn't always come out on the |
| 09:20 | 6 | side for which I was an expert. |
| 09:20 | 7 | Q.   So there are cases where you testified |
| 09:20 | 8 | where ultimately the other side prevailed in the |
| 09:20 | 9 | lawsuit? |
| 09:20 | 10 | A.   I think so. |
| 09:20 | 11 | Q.   You're a professor at the Yale Law School? |
| 09:20 | 12 | A.   That's correct. |
| 09:20 | 13 | Q.   Since when? |
| 09:20 | 14 | A.   1987. |
| 09:20 | 15 | Q.   And have you held any other employment |
| 09:20 | 16 | since 1987? |
| 09:20 | 17 | A.   I'm also a professor in the Yale School of |
| 09:20 | 18 | Management. |
| 09:20 | 19 | Q.   Any other employment over the past |
| 09:20 | 20 | 30 years? |
| 09:20 | 21 | A.   No. |
| 09:20 | 22 | Q.   Are you a member -- sit on any corporate |
| 09:20 | 23 | boards? |
| 09:20 | 24 | A.   I have sat on corporate boards. |
| 09:20 | 25 | Q.   Which ones? |

12

| | | | |
|---|---|---|---|
| 09:20 | 1 | A. |  |
| 09:20 | 2 | | |
| 09:21 | 3 | Q. | Are you still on any of those boards? |
| 09:21 | 4 | A. | No. |
| 09:21 | 5 | Q. | Why did you leave? |
| 09:21 | 6 | A. | I aged out. |
| 09:21 | 7 | | Well, actually I ages out of |
| 09:21 | 8 | | and                    .  We sold |
| 09:21 | 9 | | |
| 09:21 | 10 | Q. | Understood. |
| 09:21 | 11 | | And what's your date of birth, sir? |
| 09:21 | 12 | A. | 1940. |
| 09:21 | 13 | Q. | Are you licensed to practice law? |
| 09:21 | 14 | A. | Not currently. |
| 09:21 | 15 | Q. | When were you last licensed to practice |
| 09:21 | 16 | law? | |
| 09:21 | 17 | A. | Actually, I -- I'm going to give a little |
| 09:21 | 18 | bit of a complicated answer to that question.  I was |
| 09:21 | 19 | a member of the New York Bar.  I think that I let my |
| 09:21 | 20 | membership lapse. |
| 09:21 | 21 | | I think if you're a professor at an |
| 09:21 | 22 | accredited Connecticut law school for a certain |
| 09:21 | 23 | period of time, you become a member of the |
| 09:21 | 24 | Connecticut Bar. |
| 09:22 | 25 | Q. | So when did your New York law license |

13

| | | |
|---|---|---|
| 09:22 | 1 | lapse? |
| 09:22 | 2 | A.   I don't recall how long it takes for a |
| 09:22 | 3 | license to lapse, but I have not practiced law in |
| 09:22 | 4 | New York for a very long time. |
| 09:22 | 5 | Q.   Have you practiced law anywhere else? |
| 09:22 | 6 | A.   No. |
| 09:22 | 7 | Q.   Have you ever represented clients in court? |
| 09:22 | 8 | A.   No. |
| 09:22 | 9 | Well, I have when I was a practicing |
| 09:22 | 10 | attorney. |
| 09:22 | 11 | Q.   And when you say "a long time ago," is |
| 09:22 | 12 | there any way we can -- |
| 09:22 | 13 | A.   I left the -- yes, I left practice in 1969. |
| 09:22 | 14 | Q.   And when you did practice, did you have |
| 09:22 | 15 | areas of expertise or specialization? |
| 09:22 | 16 | A.   I was a litigator. |
| 09:22 | 17 | Q.   You are an expert in contract law? |
| 09:22 | 18 | A.   I think so, yes. |
| 09:22 | 19 | Q.   Do you consider yourself an expert in the |
| 09:22 | 20 | federal securities laws? |
| 09:22 | 21 | A.   No. |
| 09:23 | 22 | Q.   Are you qualified to offer expert testimony |
| 09:23 | 23 | on how courts interpret the term, "investment |
| 09:23 | 24 | contract," in cases applying the federal securities |
| 09:23 | 25 | laws? |

14

| | | |
|---|---|---|
| 09:23 | 1 | MR. FIGEL:  Objection.  You can answer. |
| 09:23 | 2 | A.   No, I'm not an expert in the federal |
| 09:23 | 3 | securities laws. |
| 09:23 | 4 | Q.   And will you be offering any such opinions |
| 09:23 | 5 | in this case about how courts interpret the term, |
| 09:23 | 6 | "investment contract," under the federal securities |
| 09:23 | 7 | laws? |
| 09:23 | 8 | A.   No. |
| 09:23 | 9 | Q.   Are you offering an opinion that under the |
| 09:23 | 10 | federal securities laws, investment contracts are |
| 09:23 | 11 | limited to common law contracts? |
| 09:23 | 12 | MR. FIGEL:  Objection. |
| 09:23 | 13 | A.   No. |
| 09:23 | 14 | Q.   Are you offering an opinion that investment |
| 09:23 | 15 | contracts under the federal securities laws cannot |
| 09:23 | 16 | contain representations beyond the four corners of |
| 09:23 | 17 | any common law contract? |
| 09:23 | 18 | A.   No, I'm not offering an opinion. |
| 09:24 | 19 | Q.   Are you offering an opinion whether any of |
| 09:24 | 20 | Ripple's offers or sales of XRP qualify for an |
| 09:24 | 21 | exemption from registration under the federal |
| 09:24 | 22 | securities laws? |
| 09:24 | 23 | A.   No. |
| 09:24 | 24 | Q.   Are you an expert in the field of |
| 09:24 | 25 | blockchain technologies? |

15

```
09:24   1        A.    No.

09:24   2        Q.    Are you an expert in the field of digital

09:24   3   assets or cryptocurrencies?

09:24   4        A.    No.

09:24   5        Q.    Before this case, have you ever worked on a

09:24   6   case involving digital assets or cryptocurrencies?

09:24   7        A.    No.

09:24   8        Q.    And I believe I tendered Exhibit 1.  It

09:24   9   should be sitting right in front of you.

09:24  10        A.    Yes.

09:24  11              MR. HANAUER:  Do you want to share with --

09:25  12   oh, you did.  Good.  Thank you.

09:25  13        Q.    And Exhibit 1, that's the expert report you

09:25  14   submitted in this case, on October 4, 2021?

09:25  15        A.    Yes.

09:25  16              (Expert Report of Alan Schwartz, dated

09:25  17        October 4, 2021, was marked Exhibit AS-1 for

09:25  18        identification, as of this date.)

09:25  19        Q.    And on page 65 of the report, is that your

09:25  20   signature?

09:25  21        A.    Yes, it is.

09:25  22        Q.    Did anyone assist you in the preparation of

09:25  23   your report?

09:25  24              MR. FIGEL:  Answer that question yes or no.

09:25  25        A.    Yes.
```

16

| | | | |
|---|---|---|---|
| 09:25 | 1 | Q. | Who? |
| 09:25 | 2 | A. | Mr. Figel. |
| 09:25 | 3 | Q. | Anyone else? |
| 09:25 | 4 | A. | No. |
| 09:25 | 5 | Q. | Did you write the whole report? |
| 09:25 | 6 | A. | Yes. |
| 09:25 | 7 | Q. | Was anything in the report written by |

09:25  8  Ripple's attorneys?

09:25  9      A.    No.

09:25 10      Q.    Did Ripple's attorneys direct you to write

09:25 11  anything?

09:26 12      A.    No.

09:26 13      Q.    Who prepared Exhibits C through F to your

09:26 14  report?

09:26 15      A.    I think employees of Mr. Figel's firm.

09:26 16      Q.    Do you know who?

09:26 17      A.    I think it was -- I think it is Robert --

09:26 18      Q.    Well, I don't want you to speculate.  Just

09:26 19  to the best of your knowledge, do you know who

09:26 20  prepared Exhibits C to F of your report?

09:26 21      A.    No.

09:26 22          MR. FIGEL:  Just so you know, it's not a

09:26 23  mystery, but I'm not allowed to testify.

09:26 24      Q.    Is there -- and -- just so I have that,

09:26 25  Mr. Figel is the only attorney who assisted you in

17

09:26 1    the preparation of your report?

09:26 2         A.    There were other attorneys on phone calls,

09:26 3    but Mr. Figel played the largest role.

09:26 4         Q.    Can you name any of the other attorneys?

09:26 5         A.    Gavan Gideon.

09:26 6         Q.    Anyone else?

09:26 7         A.    No.

09:27 8         Q.    Is there anything in your report that is

09:27 9    inaccurate?

09:27 10        A.    Not to my knowledge.

09:27 11        Q.    Just so we're clear for the record, when I

09:27 12   say "report," I'm referring to Exhibit 1.

09:27 13        A.    Yes.

09:27 14        Q.    Is there anything in your report that you

09:27 15   need to correct or supplement?

09:27 16        A.    Not -- not now.

09:27 17        Q.    Does your report contain -- well, do you

09:27 18   intend to supplement your report in the future?

09:27 19        A.    That would depend on events yet to occur.

09:27 20        Q.    Do you have any intention to at this time?

09:27 21        A.    No.

09:27 22        Q.    Does your report contain a complete

09:27 23   statement of all the opinions you will express in

09:27 24   this case?

09:27 25        A.    Yes.

18

| | | |
|---|---|---|
| 09:27 | 1 | MR. FIGEL:  Objection. |
| 09:27 | 2 | You can answer. |
| 09:27 | 3 | A.   Yes. |
| 09:27 | 4 | Q.   Does your report contain all the bases and |
| 09:27 | 5 | reasons for the opinions you are offering? |
| 09:27 | 6 | MR. FIGEL:  Objection. |
| 09:28 | 7 | A.   Yes. |
| 09:28 | 8 | Q.   Does your report identify all the facts and |
| 09:28 | 9 | data you considered in forming the opinions expressed |
| 09:28 | 10 | in your report? |
| 09:28 | 11 | A.   Yes. |
| 09:28 | 12 | Well, let me clarify. |
| 09:28 | 13 | I've had conversations about the nature of |
| 09:28 | 14 | crypto markets with various people, and I assume that |
| 09:28 | 15 | they -- they were informative for me, but they -- |
| 09:28 | 16 | those conversations aren't in this report. |
| 09:28 | 17 | Q.   Did you rely on any of those conversations, |
| 09:28 | 18 | in forming -- well, strike that. |
| 09:28 | 19 | Did you consider any of those |
| 09:28 | 20 | conversations, in forming the opinions you're |
| 09:28 | 21 | expressing in this case? |
| 09:28 | 22 | A.   No. |
| 09:28 | 23 | Q.   Besides the contracts which you |
| 09:29 | 24 | specifically refer to in the report, are all of the |
| 09:29 | 25 | facts and data that you relied on listed in Exhibit B |

19

**GRADILLAS COURT REPORTERS**
**(424) 239-2800**

09:29  1    to your report?

09:29  2         A.   Let me look at Exhibit B.

09:29  3              Yeah, that's the materials I considered.

09:29  4         Q.   And from Exhibit B, it looks like the only

09:29  5    document prepared by an attorney in this case that

09:29  6    you considered, was the SEC's amended complaint.

09:29  7         A.   That's correct.

09:29  8         Q.   Did you consider any of the SEC's

09:29  9    interrogatory responses?

09:30 10         A.   I considered them after this report was

09:30 11    written.

09:30 12         Q.   Which ones?

09:30 13         A.   I can't exactly remember.  I visited --

09:30 14    what's the name of the document that the SEC

09:30 15    submitted in response?  I read one document the SEC

09:30 16    prepared after I prepared this report.

09:30 17         Q.   So a single interrogatory response?

09:30 18         A.   Yeah, it was response to interrogatories.

09:30 19    That's -- I think it was.

09:30 20         Q.   Do those -- after reviewing those

09:30 21    interrogatory responses, does that in any way impact

09:30 22    the opinions you're offering in this case?

09:30 23         A.   No.

09:30 24         Q.   You considered the amended complaint in

09:30 25    this case in forming your opinions?

                                                              20

| | | | |
|---|---|---|---|
| 09:30 | 1 | A. | The SEC's amended complaint? |
| 09:30 | 2 | Q. | Yes, sir. |
| 09:30 | 3 | A. | Yes. |
| 09:30 | 4 | Q. | Did you read the whole thing? |
| 09:31 | 5 | A. | Yes. |
| 09:31 | 6 | Q. | Are you offering the opinion that any |

09:31  7  allegation in the complaint is untrue?

| | | | |
|---|---|---|---|
| 09:31 | 8 | A. | No. |
| 09:31 | 9 | Q. | Do -- so -- you said that after you wrote |

09:31 10  your report, you reviewed one of the SEC's
09:31 11  interrogatory responses.  After you signed your
09:31 12  report, have you reviewed any other documents or
09:31 13  information that are relevant to the opinions
09:31 14  expressed in your report?

09:31 15  MR. FIGEL:  You can answer if you
09:31 16  understand the question.

09:31 17  And don't identify what they are yet.

| | | | |
|---|---|---|---|
| 09:31 | 18 | A. | Yes. |
| 09:31 | 19 | Q. | And what documents are those? |

09:31 20  MR. FIGEL:  You can answer, but don't
09:31 21  reveal any documents that you were shown in
09:31 22  connection with your preparation for your testimony.

| | | | |
|---|---|---|---|
| 09:32 | 23 | A. | I looked at additional contracts of Ripple. |
| 09:32 | 24 | Q. | How many? |
| 09:32 | 25 | A. | Hundreds. |

21

09:32  1          Q.    And how would I be able to tell which

09:32  2   contracts you reviewed after signing your report?

09:32  3          A.    They wouldn't be -- they wouldn't be

09:32  4   referred to in my report.

09:32  5          Q.    Does your review -- are those documents

09:32  6   that you reviewed after signing your report in any

09:32  7   way relevant to your report?

09:32  8          A.    In any way, it's very broad.  I reviewed

09:32  9   them to see whether there were any inconsistencies

09:32 10   between the -- those contracts and my report.

09:33 11          Q.    And how many -- you said there are hundreds

09:33 12   that you reviewed?

09:33 13          A.    Yeah.  I think there were 1700 in total.

09:33 14          Q.    Well, there are 1700 listed in your report.

09:33 15   How many did you review after your report was signed?

09:33 16          A.    I can't remember.  A lot.

09:33 17          Q.    More than a hundred?

09:33 18          A.    Yes.

09:33 19          Q.    More than 200?

09:33 20          A.    Probably.

09:33 21          Q.    More than 500?

09:33 22          A.    Yes.  I -- yeah, more than -- yes.

09:33 23          Q.    And you reviewed the entirety of those

09:33 24   500-plus contracts?

09:33 25          A.    Yes.

22

| | | |
|---|---|---|
| 09:33 | 1 | Q.    Did you review more than 700 contracts? |
| 09:33 | 2 | A.    I -- I basically went through all of them, |
| 09:33 | 3 | in the binders that were submitted, that I had. |
| 09:33 | 4 | Q.    Who submitted binders to you? |
| 09:33 | 5 | A.    The Kellogg firm gave me binders and |
| 09:33 | 6 | informed me that those binders had Ripple contracts |
| 09:34 | 7 | in them, which they did. |
| 09:34 | 8 | Q.    Did they -- those binders have all 1700 |
| 09:34 | 9 | contracts? |
| 09:34 | 10 | A.    I didn't -- I didn't count them. |
| 09:34 | 11 | Q.    What's your best approximation of the |
| 09:34 | 12 | number of contracts you reviewed after signing your |
| 09:34 | 13 | report? |
| 09:34 | 14 | A.    Over a thousand. |
| 09:34 | 15 | Q.    All 1700 contracts cited in your report? |
| 09:34 | 16 | A.    It would be hard, honestly, to say every |
| 09:34 | 17 | one, but a very large proportion. |
| 09:34 | 18 | Q.    Do you still have those contracts? |
| 09:34 | 19 | A.    I do. |
| 09:34 | 20 | Q.    Do the opinions in your report rely on any |
| 09:34 | 21 | assumptions? |
| 09:34 | 22 | MR. FIGEL:  Objection. |
| 09:34 | 23 | A.    I would have to review my report, but I |
| 09:34 | 24 | don't think I made very many assumptions in it. |
| 09:35 | 25 | Q.    Did anyone ask you to make any assumptions, |

23

09:35 1   in preparing your report?

09:35 2              MR. FIGEL:  Start with answering yes or no.

09:35 3              THE WITNESS:  What?

09:35 4              MR. FIGEL:  Start by answering yes or no.

09:35 5        A.   No.

09:35 6        Q.   Will you be offering any opinions in this

09:35 7   case that are not contained in your report?

09:35 8        A.   No.

09:35 9        Q.   Will you be offering any opinions related

09:35 10  to the conduct of either of the individual defendants

09:35 11  in this case?

09:35 12       A.   No.

09:35 13       Q.   Will you be offering any opinion related to

09:35 14  industry custom or practice?

09:35 15       A.   No.

09:35 16             MR. FIGEL:  Objection.  You can answer.

09:35 17       Q.   Will you be offering an opinion related to

09:35 18  any of the defendants' affirmative defenses?

09:35 19       A.   No.

09:35 20       Q.   Will you be offering rebuttal testimony to

09:35 21  any of the SEC's experts?

09:35 22       A.   No.

09:36 23       Q.   Have you read any of the other expert

09:36 24  reports in this case?

09:36 25       A.   No.

                                                              24

09:36  1         Q.   How many hours did you work on this

09:36  2  engagement prior to completing your report?

09:36  3              So from the time you got -- you signed your

09:36  4  engagement to the time you signed your report.

09:36  5         A.   35 to 40 hours.

09:36  6         Q.   And that includes preparing your report?

09:36  7         A.   Yes.

09:36  8         Q.   And it includes reviewing all the contracts

09:36  9  cited in your report?

09:36 10              MR. FIGEL:  Objection.

09:36 11         Q.   The answer is yes?  I'm sorry.  You need to

09:36 12  give a verbal answer.

09:36 13         A.   Yes.

09:36 14         Q.   How much time did you spend reviewing the

09:37 15  contracts that you received after you signed the

09:37 16  report?

09:37 17         A.   Maybe eight to ten hours.

09:37 18         Q.   How much money have you billed so far for

09:37 19  this case?

09:37 20         A.   Approximately $50,000.

09:37 21         Q.   Your rate is $1,200 an hour?

09:37 22         A.   Yes.

09:37 23         Q.   Is that your standard billing rate?

09:37 24         A.   Yes.

09:37 25         Q.   Since when?

25

09:37  1      A.   Since the last two or three years.

09:37  2      Q.   Have you ever charged that much per hour in

09:37  3  another case?

09:37  4      A.   Yes.

09:37  5      Q.   Have you ever billed more as an expert

09:38  6  witness than in this case?

09:38  7      A.   No.

09:38  8      Q.   So in preparing your report, how many

09:38  9  contracts did you personally review?

09:38 10      A.   I think about 140 to 150.

09:38 11      Q.   And how long did that review and analysis

09:38 12  take?

09:38 13      A.   I can't really recall what proportion of

09:38 14  the time I spent was spent writing or thinking or

09:38 15  reading or -- I just can't really break it down.

09:38 16      Q.   So, the 35- to 40-hour number you gave me a

09:38 17  couple minutes ago, that included both reviewing and

09:39 18  analyzing contracts and drafting your report?

09:39 19      A.   Yes.

09:39 20      Q.   Does your report identify the specific

09:39 21  140 contracts that you reviewed?

09:39 22      A.   I think my report refers to 17 in specific

09:39 23  contracts.

09:39 24      Q.   And if I wanted to know the remaining

09:39 25  120-plus contracts that you personally reviewed in

26

09:39  1    preparing your report, how would I figure that out?

09:39  2        A.    Well, the -- the difficulty is all these

09:39  3    contracts are very much like each other, so a way to

09:39  4    go about that would be to see what was supplied to me

09:39  5    before the date of my report.

09:40  6        Q.    Okay.  And unfortunately, I don't have that

09:40  7    information.  So what I'm trying to get at is, is

09:40  8    there any record of the 17 or so contracts that you

09:40  9    personally -- or -- I'm sorry.

09:40 10            Is there any record of the 140 contracts

09:40 11    you reviewed to prepare your report?

09:40 12        A.    I think if you did email discovery, you

09:40 13    would see that there were emails which would say

09:40 14    things like, We're sending you X, or we're sending

09:40 15    you Y.

09:40 16            MR. FIGEL:  I'm -- I'm sorry to interrupt.

09:40 17            I'm -- I'm allowing you to answer these

09:40 18    questions because he's interested, but be careful not

09:40 19    to reveal communications --

09:40 20            THE WITNESS:  No.

09:40 21            MR. FIGEL:  -- the substance of

09:40 22    communications with our firm and -- and you.

09:40 23            THE WITNESS:  Okay.

09:40 24        Q.    So, I -- I just want to make sure I have

09:41 25    this right.  So the 140 contracts you reviewed in

27

| | | |
|---|---|---|
| 09:41 | 1 | preparing your report, were those all emailed to you |
| 09:41 | 2 | by Ripple's counsel? |
| 09:41 | 3 | MR. FIGEL:  You can answer yes or no. |
| 09:41 | 4 | A.   No. |
| 09:41 | 5 | Q.   Okay.  So again, I'm just trying to figure |
| 09:41 | 6 | out which 140 contracts you -- you reviewed. |
| 09:41 | 7 | A.   Well, I -- I'm not trying to be evasive. |
| 09:41 | 8 | They sent me boxes with things in them that -- so |
| 09:41 | 9 | they weren't emailed. |
| 09:41 | 10 | Q.   So the 140 contracts you reviewed, were |
| 09:41 | 11 | those the only 140 contracts you got, or were they -- |
| 09:41 | 12 | from Ripple's counsel, or were they part of a larger |
| 09:41 | 13 | set? |
| 09:41 | 14 | MR. FIGEL:  Objection. |
| 09:41 | 15 | You can answer if you understand. |
| 09:41 | 16 | A.   They were obviously part of a larger set |
| 09:41 | 17 | because we have the full set. |
| 09:42 | 18 | Q.   Are you aware of any record showing the |
| 09:42 | 19 | specific 100 -- strike that. |
| 09:42 | 20 | Are you aware of any record that documents |
| 09:42 | 21 | the specific 140 contracts you personally reviewed |
| 09:42 | 22 | before signing your report? |
| 09:42 | 23 | A.   No. |
| 09:42 | 24 | Q.   Is there a way to figure that out? |
| 09:42 | 25 | A.   Yes. |

28

09:42  1      Q.    How?

09:42  2      A.    Well, I could go through my office in

09:42  3  New Haven and see what I had there.  And I would

09:42  4  check when I got what, because there were, as I said,

09:42  5  messages.

09:42  6            And ultimately, I could come up with the

09:42  7  ones I looked at before October 4 and the ones I

09:42  8  looked at after.

09:42  9      Q.    You have to -- is there -- did you take

09:42 10  notes of any of that, or would you have to go

09:42 11  basically on memory, I reviewed this before signing

09:42 12  my report, or I reviewed it after signing my report?

09:42 13      A.    Well, as I said, I'm not trying to be

09:43 14  evasive.  I have two offices, one in New Haven and

09:43 15  one in New York.  I did most of the work on the

09:43 16  report in New Haven, but -- but since then, I've been

09:43 17  mainly working in New York.

09:43 18            So I could go through my -- my New Haven

09:43 19  office would probably have a lot of the stuff I did

09:43 20  before the report, and my New York office would have

09:43 21  a lot of other stuff.

09:43 22      Q.    Do you have any records reflecting which

09:43 23  140 contracts you reviewed prior to signing your

09:43 24  report?

09:43 25      A.    No.

29

| 09:43 | 1 | Q.   Now, prior to signing your report, who |
|---|---|---|

09:43  1        Q.   Now, prior to signing your report, who

09:43  2   reviewed the other 1500-plus contracts cited in your

09:43  3   report?

09:43  4        A.   I don't know.

09:43  5        Q.   And prior to -- did you -- signing your

09:44  6   report, did you have any firsthand knowledge of the

09:44  7   contents of the contracts you did not review?

09:44  8        A.   No.

09:44  9        Q.   Did you give direction to anybody regarding

09:44  10  the 1500 plus contracts that you did not review?

09:44  11       A.   Yes.

09:44  12       Q.   Who did -- first of all, who did you give

09:44  13  direction to?

09:44  14       A.   By who --

09:44  15            MR. FIGEL:  You can answer.  Give names.

09:44  16       A.   To Mr. Figel, to Mr. Gideon, and to --

09:44  17  what's Robert's last name?

09:44  18            MR. FIGEL:  Can I answer?

09:44  19            Moore, M-O-O-R-E.

09:44  20       A.   Right.  To Mr. Moore.

09:44  21       Q.   And do you know if they were the ones

09:44  22  reviewing the contracts?

09:44  23       A.   Do I personally know?  No.

09:44  24       Q.   And what direction did you give them?

09:45  25       A.   I directed -- I directed them to look for

30

09:45  1   representative contracts in the categories that I

09:45  2   thought were germane.

09:45  3       Q.    And are those the categories identified in

09:45  4   your report?

09:45  5       A.    They are.

09:45  6       Q.    And did this occur -- this direction you

09:45  7   gave to counsel to categorize the contracts, was this

09:45  8   before or after you had reviewed the 140 contracts?

09:45  9       A.    Before.

09:45 10       Q.    Had you reviewed any contracts at the time

09:45 11   you gave counsel that direction?

09:45 12       A.    I think I re-- I reviewed a small number.

09:45 13       Q.    Like how many?

09:45 14       A.    I -- I can't recall how many.

09:45 15       Q.    Who came up with the categories?

09:46 16       A.    Me.

09:46 17       Q.    And how did you come up with those

09:46 18   categories before you had finished reviewing the

09:46 19   140 contracts?

09:46 20       A.    I had some understanding of Ripple's

09:46 21   business model, which led me to think that they had

09:46 22   contracts in these various categories.

09:46 23            And I wanted to see whether those contracts

09:46 24   would be relevant to any opinions that I was retained

09:46 25   to give.  And so essentially the process was I had a

31

| | | |
|---|---|---|
| 09:46 | 1 | small sample, and I wanted a bigger sample. |
| 09:46 | 2 | Q.   And how did you gain an understanding of |
| 09:46 | 3 | Ripple's business model? |
| 09:46 | 4 | A.   I -- as a general matter, I had a sense of |
| 09:47 | 5 | what cryptocurrency companies do, and I think I |
| 09:47 | 6 | had -- without revealing any substance, I had |
| 09:47 | 7 | conversations with counsel about, So what kind of |
| 09:47 | 8 | company is this, and so on. |
| 09:47 | 9 | Q.   So you learned about Ripple's business |
| 09:47 | 10 | model through communicating with counsel? |
| 09:47 | 11 | A.   I learned -- I learned about -- generally |
| 09:47 | 12 | learned about what cryptocurrencies do just because, |
| 09:47 | 13 | if you're interested in commerce and you were in |
| 09:47 | 14 | a -- a lead institution, you talk about these things |
| 09:47 | 15 | with people who know them. |
| 09:47 | 16 | And I wanted to confirm the general view I |
| 09:47 | 17 | had of this kind of industry with -- I wanted to see |
| 09:47 | 18 | whether this company was sort of like the others |
| 09:47 | 19 | that -- or basically a typical cryptocurrency |
| 09:47 | 20 | company. |
| 09:48 | 21 | Q.   What did you do to supervise the work of |
| 09:48 | 22 | the attorneys acting at your direction? |
| 09:48 | 23 | A.   I didn't directly supervise the attorneys. |
| 09:48 | 24 | Q.   What did you do to verify the accuracy of |
| 09:48 | 25 | their work? |

32

09:48  1     A.   Well, if -- if I wanted to see direct sales

09:48  2  contracts, and I had seen a couple before the

09:48  3  attorneys were going to get me more of them, I

09:48  4  essentially internally reviewed to see whether what I

09:48  5  was being shown were direct sales contracts, in that

09:48  6  category.

09:48  7     Q.   So for the contracts listed on Exhibits C

09:48  8  through F to your report, what did you do to verify

09:48  9  that those exhibits accurately categorized the

09:49 10  contracts?

09:49 11     A.   I'm not sure --

09:49 12     MR. FIGEL:  Objection.

09:49 13     You can answer.

09:49 14     A.   Also I'm not sure I understand that

09:49 15  question.

09:49 16     Q.   What did you do to make sure Exhibit -- to

09:49 17  verify that Exhibits C to F to your report -- well,

09:49 18  let me back up.

09:49 19     You -- you testified you did not prepare

09:49 20  Exhibits C to F to your report, correct?

09:49 21     A.   That's correct.

09:49 22     Q.   And you also testified you don't know who

09:49 23  prepared them?

09:49 24     A.   I don't have -- no -- I mean, I have a

09:49 25  suspicion, but I wouldn't want to testify that I

33

| | | |
|---|---|---|
| 09:49 | 1 | actually know. |
| 09:49 | 2 | Q.   So, what did you do to verify that these |
| 09:49 | 3 | Exhibits C to F are accurate? |
| 09:49 | 4 | A.   I'm not sure what you mean by "accurate." |
| 09:49 | 5 | Q.   Well, so, for instance, Exhibit C lists |
| 09:49 | 6 | hundreds of sales contracts. |
| 09:49 | 7 | A.   Yes. |
| 09:49 | 8 | Q.   What did you do to verify that each |
| 09:50 | 9 | contract listed on Exhibit C appropriately belongs to |
| 09:50 | 10 | be listed along with the other sales contracts? |
| 09:50 | 11 | MR. FIGEL:  Objection. |
| 09:50 | 12 | A.   I looked at a lot of them to see whether |
| 09:50 | 13 | they were sales contracts or not. |
| 09:50 | 14 | Q.   And that was the work you did after signing |
| 09:50 | 15 | your report? |
| 09:50 | 16 | A.   Some before, some after. |
| 09:50 | 17 | Q.   So, how many -- how many hours did you |
| 09:50 | 18 | spend -- well, let -- you -- just to take a step |
| 09:50 | 19 | back. |
| 09:50 | 20 | You said before you signed your report, you |
| 09:50 | 21 | had only looked at 140 contracts.  Right? |
| 09:50 | 22 | A.   Yes. |
| 09:50 | 23 | Q.   And then -- |
| 09:50 | 24 | A.   Approximately 140. |
| 09:50 | 25 | Q.   What did you do at the time you signed your |

34

| 09:50 | 1 | report to verify that the other 1500 contracts listed |
| 09:50 | 2 | on the exhibits to your report were accurately |
| 09:50 | 3 | categorized? |
| 09:51 | 4 | MR. FIGEL:  Objection. |
| 09:51 | 5 | A.   I didn't do -- the only way to verify -- |
| 09:51 | 6 | let me back up. |
| 09:51 | 7 | I asked the attorneys for a representative |
| 09:51 | 8 | sample of contracts in each of the categories that I |
| 09:51 | 9 | thought would be relevant, and I relied on the |
| 09:51 | 10 | attorneys to pick contracts in those categories that |
| 09:51 | 11 | would, when I looked at the entire universe, |
| 09:51 | 12 | accurately represent the entire universe. |
| 09:51 | 13 | Q.   And the result of that direction was the |
| 09:51 | 14 | Exhibits C to F to your report? |
| 09:51 | 15 | A.   Yes. |
| 09:51 | 16 | Q.   And before you signed your report, what did |
| 09:51 | 17 | you do to verify that Exhibits C through F were |
| 09:51 | 18 | accurate? |
| 09:52 | 19 | A.   I think I've answered this question, but if |
| 09:52 | 20 | you want me to try again, I'll try again. |
| 09:52 | 21 | Exhibits C through F are -- are the |
| 09:52 | 22 | universe.  When I wrote my report, I didn't see the |
| 09:52 | 23 | entire universe. |
| 09:52 | 24 | I relied on the attorneys to give me |
| 09:52 | 25 | contracts in these categories that would be accurate |

35

09:52  1    samples of the entire universe.

09:52  2         Q.    And did you do anything prior to signing

09:52  3    your report to verify the attorneys' work?

09:52  4         A.    No.

09:52  5         Q.    Is it your understanding that the

09:52  6    1700 contracts listed on Exhibits C to F of your

09:52  7    report reflect all of Ripple's offers and sales of

09:52  8    XRP at issue in this lawsuit?

09:53  9         A.    No.

09:53 10         Q.    How many offers and sales of XRP by Ripple

09:53 11    that are at issue in this lawsuit are not reflected

09:53 12    on Exhibits C to F of your report?

09:53 13              MR. FIGEL:  Objection.

09:53 14         A.    I don't --

09:53 15              MR. FIGEL:  You can answer.

09:53 16         A.    I don't know.

09:53 17         Q.    Do you know how many offers and sales of

09:53 18    XRP Ripple made between February 2013 and

09:53 19    December 2020 that are not reflected on Exhibit --

09:53 20    not reflected by one of the contracts on Exhibits C

09:53 21    to F of your report?

09:53 22              MR. FIGEL:  Objection.

09:53 23         A.    No.

09:53 24         Q.    Do you know whether Ripple made offers or

09:53 25    sales of XRP that were not reflected by written

                                                            36

| | | |
|---|---|---|
| 09:53 | 1 | agreement? |
| 09:53 | 2 | MR. FIGEL:  Objection. |
| 09:53 | 3 | A.   No. |
| 09:54 | 4 | Q.   If Ripple had offered or sold XRP but did |
| 09:54 | 5 | not document those offers or sales in a written |
| 09:54 | 6 | agreement, did you consider those offers or sales in |
| 09:54 | 7 | forming your opinions? |
| 09:54 | 8 | MR. FIGEL:  Objection. |
| 09:54 | 9 | A.   No. |
| 09:54 | 10 | Q.   Are you offering an opinion on any offer or |
| 09:54 | 11 | sale or transfer of XRP not reflected by one of the |
| 09:54 | 12 | contracts listed in your report? |
| 09:54 | 13 | A.   No. |
| 09:54 | 14 | Q.   Are you offering -- are you offering an |
| 09:54 | 15 | opinion on whether any computer code deployed on a |
| 09:54 | 16 | blockchain represents an enforceable contract? |
| 09:54 | 17 | MR. FIGEL:  Objection. |
| 09:54 | 18 | A.   No. |
| 09:54 | 19 | Q.   Are you offering an opinion on any of the |
| 09:54 | 20 | statements or representations made on Ripple's |
| 09:54 | 21 | website? |
| 09:54 | 22 | A.   No. |
| 09:55 | 23 | Q.   Did you consider any such statements or |
| 09:55 | 24 | representations in forming your opinions? |
| 09:55 | 25 | A.   The only ones that I considered were in |

37

09:55  1    your complaint and response to interrogatories.

09:55  2         Q.   Are you offering an opinion on any press

09:55  3    release or social media posting made by Ripple or its

09:55  4    personnel?

09:55  5         A.   No.

09:55  6         Q.   Have you spoken with any purchaser of XRP?

09:55  7         A.   No.

09:55  8         Q.   And do you own any XRP?

09:55  9         A.   No.

09:55  10        Q.   Do you own any digital asset or

09:55  11   cryptocurrency?

09:55  12        A.   No.

09:55  13        Q.   Have you ever?

09:55  14        A.   No.

09:55  15        Q.   Are you offering an opinion on any

09:55  16   purchaser or holder of XRP's motives or intentions?

09:55  17        A.   No.

09:56  18        Q.   And then in your report, you refer to

09:56  19   the -- the various -- let's just go to your report.

09:56  20   Can you go, please, to paragraph 5 on page 4 of your

09:56  21   report.

09:56  22        And I want to direct you just to the last

09:56  23   sentence of paragraph 4 -- I'm sorry -- paragraph 5,

09:56  24   the one that reads, Of those contracts, I have

09:56  25   personally reviewed more than 140 contracts that were

38

| | | |
|---|---|---|
| 09:56 | 1 | exemplars of the categories and subcategories set |
| 09:56 | 2 | forth in this declaration. |
| 09:56 | 3 | A. Yes. |
| 09:56 | 4 | Q. And who determined the -- those 140 |
| 09:57 | 5 | contracts were exemplars? |
| 09:57 | 6 | A. The attorneys. |
| 09:57 | 7 | Q. And who selected the 140 contracts that you |
| 09:57 | 8 | would review? |
| 09:57 | 9 | A. The attorneys. |
| 09:57 | 10 | Q. What direction, if any, did you give to the |
| 09:57 | 11 | attorneys who selected those 140 contracts for you? |
| 09:57 | 12 | A. I -- I think I've answered this question, |
| 09:57 | 13 | but -- to say again, I created the categories. And |
| 09:57 | 14 | so, for example, I said, I would like to see direct |
| 09:57 | 15 | sales contracts that were representative of the |
| 09:57 | 16 | direct sales contracts that Ripple sold XRP under. |
| 09:58 | 17 | Q. And just so I'm clear, you came up with |
| 09:58 | 18 | those categories before you started reviewing |
| 09:58 | 19 | contracts? |
| 09:58 | 20 | A. Well, I saw -- I had saw a few contracts at |
| 09:58 | 21 | the start, just to see what was going on. But the |
| 09:58 | 22 | very bulk of the contracts that I reviewed, I |
| 09:58 | 23 | reviewed after I communicated the categories to the |
| 09:58 | 24 | attorneys and had them do a search. |
| 09:58 | 25 | Q. And then following your initial review of |

39

09:58   1  the 140 contracts, you were provided with access to

09:58   2  all 1700-plus contracts listed in Exhibits C

09:58   3  through F?

09:58   4      A.   I guess I could see whatever I wanted to

09:58   5  see.

09:58   6      Q.   Well, you said you were -- in your report,

09:58   7  it says you were given access to those 1700.

09:58   8      A.   Yes.

09:58   9      Q.   If you just describe the access you were

09:58  10  given.

09:59  11      A.   I could ask the attorneys for contracts,

09:59  12  and they would provide them.

09:59  13      Q.   Were all of the contracts that you had --

09:59  14  were all the contracts that were provided to you,

09:59  15  were they provided to you in paper form or electronic

09:59  16  form?

09:59  17          MR. FIGEL:  Objection.

09:59  18      A.   The contracts were provided in paper form.

09:59  19      Q.   Were you given access to any sort of

09:59  20  database containing the contracts?

09:59  21      A.   No.  I was given the contracts.

09:59  22      Q.   In hard-copy form.

09:59  23      A.   Yes.

09:59  24      Q.   Were any contracts emailed to you?

09:59  25      A.   No.

                                                              40

| | | |
|---|---|---|
| 09:59 | 1 | Q.   And the contracts that you were physically |
| 09:59 | 2 | given copies of, was -- were they all the 1700 |
| 09:59 | 3 | contracts? |
| 09:59 | 4 | A.   I have all of them now. |
| 10:00 | 5 | Q.   Did you have all 1700 contracts before you |
| 10:00 | 6 | signed your report? |
| 10:00 | 7 | A.   No. |
| 10:00 | 8 | Q.   Just the 140? |
| 10:00 | 9 | A.   I don't recall how many I had.  But I |
| 10:00 | 10 | didn't have the full universe of 1700. |
| 10:00 | 11 | Q.   And when did you actually get the full |
| 10:00 | 12 | universe? |
| 10:00 | 13 | A.   I think it was in -- sometime after I |
| 10:00 | 14 | signed my report and when there was, I think the |
| 10:00 | 15 | earliest schedule depositions.  I recall the |
| 10:00 | 16 | depositions were scheduled for early January and then |
| 10:00 | 17 | were moved, and sometime before then and after my |
| 10:00 | 18 | report. |
| 10:00 | 19 | Q.   How many of the 1700 contracts did you |
| 10:00 | 20 | personally review? |
| 10:00 | 21 | MR. FIGEL:  Objection. |
| 10:00 | 22 | You can answer. |
| 10:00 | 23 | A.   I reviewed most of them. |
| 10:00 | 24 | I would say a very large percentage. |
| 10:00 | 25 | Q.   And in the course of that review, did you |

41

```
10:00  1    review all of those -- the entirety of each contract?
10:01  2         A.   No.
10:01  3         Q.   How many of the 1700 contracts did you not
10:01  4    read the entirety of?
10:01  5              MR. FIGEL:  Objection.
10:01  6         A.   I didn't -- I was looking for particular
10:01  7    things in those contracts.  So either they were there
10:01  8    or they weren't, so I didn't feel that I had to read
10:01  9    the entire document.
10:01 10              So I didn't.
10:01 11         Q.   And that's the case with all 1700
10:01 12    contracts.
10:01 13         A.   Some I read the -- there were some that I
10:01 14    had to read the entire document to get a sense of
10:01 15    what it was about.  There were others when, because
10:01 16    they were form contracts that were -- each one was
10:01 17    very much like the other, I just checked to make sure
10:01 18    that Contract 47, for example, was like Contract 46.
10:01 19         Q.   And again, you said that there were some of
10:01 20    the 1700 contracts you didn't review at all.
10:02 21    Correct?
10:02 22         A.   Well, that would be a pretty small
10:02 23    fraction.
10:02 24         Q.   But there are some.
10:02 25         A.   Well, to be exact, there were these big
```

42

10:02  1    binders.  I went through them.  It could be that I

10:02  2    turned pages inaccurately or my attention flagged for

10:02  3    a moment, but essentially my object was to go through

10:02  4    everything in the binder.

10:02  5         Q.   But not word for word.

10:02  6         A.   Well, I was looking for particular words.

10:02  7    If I saw them, I would read them.  If they were

10:02  8    absent, then I didn't have to read them.

10:02  9         Q.   So if a contract had a provision in it that

10:02 10    you weren't necessarily looking for, you may not have

10:02 11    reviewed that provision.

10:02 12         A.   Yes.

10:02 13         Q.   Of the contracts -- well, why didn't you

10:02 14    read all -- the entirety of all 1700 contracts?

10:03 15         A.   Because I was interested in whether Ripple

10:03 16    assumed any -- or whether there were words in any of

10:03 17    these contracts that would support an inference that

10:03 18    Ripple assumed post-sale obligations toward a buyer

10:03 19    of XRP.  And there was a question whether such words

10:03 20    were in any of these contracts or not, and I looked

10:03 21    to see whether they were.

10:03 22         Q.   So does that mean you reviewed every page

10:03 23    of each contract to make sure that those provisions

10:03 24    were not there?

10:03 25              MR. FIGEL:  Objection.

43

| | | |
|---|---|---|
| 10:03 | 1 | A.   No.  I didn't have to do that because, as I |
| 10:03 | 2 | said, they were form contracts.  So if in Contract 37 |
| 10:03 | 3 | these words would appear or not appear in a relevant |
| 10:04 | 4 | part of the contract, I would look at that.  For |
| 10:04 | 5 | example, I was interested in whether there were |
| 10:04 | 6 | disclaimers, so I would look for those. |
| 10:04 | 7 | Essentially, I searched these contracts |
| 10:04 | 8 | consistent with what I said in my report. |
| 10:04 | 9 | Q.   Of the contracts you reviewed, did any |
| 10:04 | 10 | contain a provision that you considered to be vague |
| 10:04 | 11 | or ambiguous? |
| 10:04 | 12 | A.   Not the -- not the words that I read. |
| 10:04 | 13 | Q.   And of the components of the contracts that |
| 10:04 | 14 | you did not review, how would you know whether they |
| 10:04 | 15 | contained terms that are vague or ambiguous? |
| 10:04 | 16 | A.   I wouldn't know that if I didn't read them. |
| 10:05 | 17 | Q.   So going back to -- you said you reviewed |
| 10:05 | 18 | a -- a relatively small amount -- you initially |
| 10:05 | 19 | reviewed a relatively small amount of contracts and |
| 10:05 | 20 | then came up with the categories described in your |
| 10:05 | 21 | report? |
| 10:05 | 22 | A.   Yeah. |
| 10:05 | 23 | Q.   Were Ripple's lawyers involved in coming up |
| 10:05 | 24 | with those categories? |
| 10:05 | 25 | MR. FIGEL:  You can answer yes or no. |

44

10:05  1        A.    No.   They were my categories.

10:05  2        Q.    Are the categories you selected the only

10:05  3   reasonable way to categorize the contracts identified

10:05  4   in your report?

10:05  5             MR. FIGEL:   Objection.

10:05  6        A.    I can't say they were the only reasonable

10:05  7   way.  They were the way I thought would be

10:06  8   illuminating with respect to the questions that I was

10:06  9   trying to answer.

10:06 10        Q.    So I take it, then, that certain of the

10:06 11   contracts could fall into a category that you did not

10:06 12   identify in your report?

10:06 13             MR. FIGEL:   Objection.

10:06 14        A.    Well, it's certainly possible.  But if you

10:06 15   look at my report, they were forming categories and

10:06 16   then a whole bunch of miscellaneous contracts.  So I

10:06 17   would not imagine that there would be much that would

10:06 18   be missing, but I can't say that there would be

10:06 19   nothing missing.

10:06 20        Q.    Could another expert in the field of

10:06 21   contract law reasonably come up with different

10:06 22   categories?

10:06 23             MR. FIGEL:   Objection.

10:06 24        A.    You know, of course, there's that

10:06 25   possibility.  But if you were a contracts expert and

                                                              45

| | | |
|---|---|---|
| 10:06 | 1 | interested in the questions that I was interested in, |
| 10:06 | 2 | it would be difficult for me to think that you would |
| 10:06 | 3 | come up with anything very differently from what I |
| 10:07 | 4 | came up with. |
| 10:07 | 5 | Q.   Could Judge Torres come up with different |
| 10:07 | 6 | reasonable ways to categorize the contracts? |
| 10:07 | 7 | MR. FIGEL:  Objection. |
| 10:07 | 8 | A.   I don't know. |
| 10:07 | 9 | Q.   Do you know who Judge Torres is? |
| 10:07 | 10 | A.   Not offhand. |
| 10:07 | 11 | Q.   The Article III judge in this lawsuit. |
| 10:07 | 12 | A.   I don't know what Judge Torres did. |
| 10:07 | 13 | Q.   Is there any reason why Judge Torres is not |
| 10:07 | 14 | qualified to interpret the contracts cited in your |
| 10:07 | 15 | report? |
| 10:07 | 16 | MR. FIGEL:  Objection. |
| 10:07 | 17 | A.   I don't know anything in particular about |
| 10:07 | 18 | Judge Torres. |
| 10:07 | 19 | Q.   What was your methodology for selecting the |
| 10:07 | 20 | categories and the criteria? |
| 10:07 | 21 | A.   As I said before, I was interested in |
| 10:07 | 22 | whether Ripple had obligated itself to perform |
| 10:08 | 23 | services post sale for the buyers of XRP, so I looked |
| 10:08 | 24 | for contracts in which such obligations might appear. |
| 10:08 | 25 | So, for example, they would or would not |

46

10:08  1    appear in a direct sales contract, and certain of the
10:08  2    contracts in which Ripple was a buyer of services
10:08  3    with another company, there might be a possibility
10:08  4    that there was a term in a contract like that that
10:08  5    would make an XRP buyer a third-party beneficiary, so
10:08  6    I looked at the service contracts to see whether such
10:08  7    a -- there were language that might support such an
10:08  8    inference.
10:08  9         I looked -- there were -- Ripple sold -- I
10:08  10   mean, there's a question I had, was whether Ripple
10:09  11   made only discrete sales of particular things or
10:09  12   whether they sold them in a way that is sometimes
10:09  13   customary where you make an agreement with a buyer
10:09  14   that from time to time, the buyer will submit orders,
10:09  15   and the terms of those orders will be the ones of the
10:09  16   master agreement.  So I was interested in whether
10:09  17   there were any contracts like that.
10:09  18        Q.   And -- and I'm sorry, because I'm -- I'm
10:09  19   not sure we're on the same page for -- for this
10:09  20   question.
10:09  21        I'm not talking about the different
10:09  22   features of the contracts, like a -- post obligations
10:09  23   or anything like that.  Just the -- basically the
10:09  24   categories you cite in your report, direct sales
10:09  25   contract, wholesale contract, programmatic contract,

47

| | | |
|---|---|---|
| 10:09 | 1 | loans, employee compensation, those categories.  What |
| 10:09 | 2 | was your -- |
| 10:09 | 3 | MR. FIGEL:  Objection.  Can I have just a |
| 10:09 | 4 | moment, Mr. Hanauer? |
| 10:09 | 5 | MR. HANAUER:  I just want to make sure I'm |
| 10:09 | 6 | seeing the question. |
| 10:09 | 7 | MR. FIGEL:  Well, you interrupted an answer |
| 10:10 | 8 | to the question, What was your methodology for |
| 10:10 | 9 | selecting the categories in, and the criteria.  And |
| 10:10 | 10 | he was giving an answer as to his -- the methodology |
| 10:10 | 11 | that he was giving. |
| 10:10 | 12 | And then you interrupted him and said what |
| 10:10 | 13 | you just said, which is, I'm not talking about the |
| 10:10 | 14 | different features of the contracts.  So I don't -- I |
| 10:10 | 15 | just want to make sure the witness has had an |
| 10:10 | 16 | opportunity to finish his answer with respect to the |
| 10:10 | 17 | methodology, which was the question that you posed. |
| 10:10 | 18 | A.   I was -- I thought I had answered that.  I |
| 10:10 | 19 | was looking for contract types which might contain |
| 10:10 | 20 | terms that would create a contractual expectation on |
| 10:10 | 21 | the part of a buyer of XRP.  Those provisions could |
| 10:11 | 22 | appear in various kinds of contracts, so I was |
| 10:11 | 23 | interested in what kinds of contracts there were. |
| 10:11 | 24 | Q.   I guess my question was -- or my question |
| 10:11 | 25 | now is, the categories you've identified, direct |

48

| | | |
|---|---|---|
| 10:11 | 1 | sales, programmatic, wholesale, employee |
| 10:11 | 2 | compensation, what was your methodology for coming up |
| 10:11 | 3 | with those general categories, selecting those |
| 10:11 | 4 | general categories? |
| 10:11 | 5 | A.    I think I've answered that question.    I |
| 10:11 | 6 | didn't have -- because I'm not sure what -- what you |
| 10:11 | 7 | mean in your question by a methodology. |
| 10:11 | 8 | I -- the overarching question that I was |
| 10:11 | 9 | trying to address was whether there was language in |
| 10:11 | 10 | contracts that Ripple used that would sustain the |
| 10:11 | 11 | particular inference, and I was interested in the |
| 10:11 | 12 | various kinds of contracts that might contain such |
| 10:12 | 13 | language. |
| 10:12 | 14 | Q.    And you split up those various kinds of |
| 10:12 | 15 | contracts into categories such as direct sales, |
| 10:12 | 16 | programmatic sales, loans? |
| 10:12 | 17 | A.    Right.    Yeah, there were -- yeah, there |
| 10:12 | 18 | were -- I think that's right. |
| 10:12 | 19 | Q.    So I guess what I'm trying to get at is, |
| 10:12 | 20 | you testified that you came up with the categories |
| 10:12 | 21 | after only reviewing a small amount of contracts, and |
| 10:12 | 22 | I guess, what was the methodology of deciding those |
| 10:12 | 23 | categories that you relayed to counsel and instructed |
| 10:12 | 24 | them on how to list in the appendix?  What was your |
| 10:12 | 25 | methodology, you know, of coming up with these |

49

| | | |
|---|---|---|
| 10:12 | 1 | categories before you started your more thorough |
| 10:12 | 2 | review of the contracts? |
| 10:12 | 3 | MR. FIGEL:  Objection. |
| 10:12 | 4 | A.   Well, it would be were there contracts of |
| 10:13 | 5 | Type A, were there contracts of Type B, were there |
| 10:13 | 6 | contracts of Type C. |
| 10:13 | 7 | Q.   And what was your methodology in coming up |
| 10:13 | 8 | with Type A, Type B, Type C? |
| 10:13 | 9 | A.   Well, for example, although I think I've |
| 10:13 | 10 | answered this, if Type A is a direct sales contract, |
| 10:13 | 11 | then I wanted to see a direct sales contract because |
| 10:13 | 12 | you might find a commitment to buyers in a direct |
| 10:13 | 13 | sales contract. |
| 10:13 | 14 | If it was a service contract, you might |
| 10:13 | 15 | find third-party beneficiary language in a service |
| 10:13 | 16 | contract. |
| 10:13 | 17 | The overarching question I was trying to |
| 10:13 | 18 | answer was whether there was -- there were terms or |
| 10:13 | 19 | phrases in any of these contracts that can sus-- |
| 10:13 | 20 | could sustain an inference that Ripple assumed |
| 10:14 | 21 | post-sale obligations toward buyers. |
| 10:14 | 22 | I really don't have anything else to say to |
| 10:14 | 23 | that, because I just asked for what -- is there a |
| 10:14 | 24 | contract like this, is there a contract like that. |
| 10:14 | 25 | Q.   And -- and I guess that's what I'm getting |

50

| | | |
|---|---|---|
| 10:14 | 1 | at.  When you -- when you relayed to counsel, said, |
| 10:14 | 2 | Are there direct sales contracts, are there service |
| 10:14 | 3 | contracts, are there loan contracts, what was your |
| 10:14 | 4 | methodology in choosing those various categories that |
| 10:14 | 5 | you asked counsel to find for you? |
| 10:14 | 6 | MR. FIGEL:  Objection. |
| 10:14 | 7 | A.   Because the -- contracts of that type might |
| 10:14 | 8 | or might not contain the language that I was |
| 10:14 | 9 | interested in. |
| 10:14 | 10 | Q.   How did you go about choosing those |
| 10:14 | 11 | specific types? |
| 10:14 | 12 | A.   I'm not sure I have more to say about that. |
| 10:14 | 13 | I mean, it might be -- I mean, there was some |
| 10:14 | 14 | back-and-forth in the sense of -- in the course of |
| 10:14 | 15 | discussions in which I said I wanted to see contracts |
| 10:14 | 16 | in various categories, I don't have a direct |
| 10:15 | 17 | recollection, but it wouldn't surprise me if somebody |
| 10:15 | 18 | said, Well, you know they were loans.  If anybody |
| 10:15 | 19 | said that to me, I'd say, Well, let me see those. |
| 10:15 | 20 | Q.   Did you ask to review any representations |
| 10:15 | 21 | beyond the four corners of a contract? |
| 10:15 | 22 | A.   No. |
| 10:15 | 23 | Q.   Why not? |
| 10:15 | 24 | A.   Because the question that was addressed -- |
| 10:15 | 25 | the question that was -- that I was retained to |

51

| | | |
|---|---|---|
| 10:15 | 1 | answer was whether there were contractual obligations |
| 10:15 | 2 | created, which I sought to answer by looking at the |
| 10:15 | 3 | contracts. |
| 10:15 | 4 | Q.   Was any documentation provided to you |
| 10:15 | 5 | showing the work that went into the preparation of |
| 10:15 | 6 | Exhibits C to F of your report? |
| 10:16 | 7 | A.   No. |
| 10:16 | 8 | MR. FIGEL:   Objection. |
| 10:16 | 9 | A.   No. |
| 10:16 | 10 | Q.   How are you doing on time?   We've been |
| 10:16 | 11 | going a little bit more than an hour and may be |
| 10:16 | 12 | logical. |
| 10:16 | 13 | A.   Maybe another half hour, and then I'll want |
| 10:16 | 14 | to do pushups. |
| 10:16 | 15 | MR. HANAUER:   That's fine. |
| 10:16 | 16 | MR. FIGEL:   That was not the answer I was |
| 10:16 | 17 | hoping for.   Does anybody else need a break? |
| 10:16 | 18 | THE WITNESS:   Well, we can do a break now. |
| 10:16 | 19 | It's okay, I don't care. |
| 10:16 | 20 | MR. FIGEL:   It's up -- it's up to you. |
| 10:16 | 21 | THE WITNESS:   I don't mind going for a |
| 10:16 | 22 | little while longer. |
| 10:16 | 23 | MR. FIGEL:   All right.   Well, you're the |
| 10:16 | 24 | guy that matters, so we're going to keep going. |
| 10:16 | 25 | Okay.   But whenever you -- whenever you need one, |

52

10:16  1    just let me know, okay?

10:16  2            THE WITNESS:  Well -- yeah, we've been

10:16  3    doing an hour.  Maybe a little bit more.

10:16  4        Q.   Okay.  So in your report you reference the

10:16  5    Supreme Court's decision in SEC versus

10:16  6    W.J. Howey Company?

10:16  7        A.   Yes.

10:16  8        Q.   You reviewed the Supreme Court's decision

10:16  9    in Howey before preparing your report?

10:16 10        A.   Yes.

10:16 11        Q.   Do you consider yourself an expert on how

10:16 12    courts have applied that decision?

10:17 13        A.   I don't know that anyone would be an expert

10:17 14    in how a court applied a particular decision.  I have

10:17 15    read some post Howey cases.

10:17 16        Q.   Did you consider any of the post Howey

10:17 17    cases in preparing your report?

10:17 18        A.   No, I did not.

10:17 19        Q.   Have courts provided more recent guidance

10:17 20    since the Supreme Court's Howey decision on how to

10:17 21    determine if transactions involve the offer or sale

10:17 22    of an investment contract?

10:17 23            MR. FIGEL:  Objection.

10:17 24        A.   I've read some cases, but I haven't --

10:17 25    there -- I am told that there are hundreds of cases

| | | |
|---|---|---|
| 10:17 | 1 | that apply Howey.  I have not read hundreds of cases. |
| 10:18 | 2 | Q.   In forming your opinions, did you consider |
| 10:18 | 3 | any court cases applying Howey? |
| 10:18 | 4 | A.   In forming my report, no. |
| 10:18 | 5 | Q.   And in forming your opinions, did you |
| 10:18 | 6 | consider the features of any contracts in cases |
| 10:18 | 7 | applying Howey to see how the court analyzed those |
| 10:18 | 8 | contracts to see if the financial instruments were |
| 10:18 | 9 | investment contracts? |
| 10:18 | 10 | MR. FIGEL:  Objection. |
| 10:18 | 11 | A.   Not in preparing my report. |
| 10:18 | 12 | Q.   In addition to reviewing the Supreme |
| 10:18 | 13 | Court's Howey decision, you also reviewed the lower |
| 10:18 | 14 | courts' opinions in the Howey litigation? |
| 10:19 | 15 | A.   Yes. |
| 10:19 | 16 | Q.   And you also read the transcript of record |
| 10:19 | 17 | before the Supreme Court? |
| 10:19 | 18 | A.   Yes. |
| 10:19 | 19 | Q.   Did you review all 134 pages of that |
| 10:19 | 20 | transcript of record? |
| 10:19 | 21 | A.   Yes. |
| 10:19 | 22 | Q.   How did you obtain it? |
| 10:19 | 23 | A.   I don't recall.  I -- I either got it from |
| 10:19 | 24 | my library, or the lawyers gave it to me.  I don't |
| 10:19 | 25 | recall how I came about getting it. |

54

10:19 1     Q.   And when I say Howey, I'm going to refer to

10:19 2  the Supreme Court's decision.

10:19 3     A.   Right.

10:19 4     Q.   Okay.

10:19 5         Howey involved two common law contracts.

10:19 6     A.   Howey just involved two contracts.  I don't

10:19 7  know what common law adds to that description.

10:19 8     Q.   That's fair.  Howey involved a land sale

10:19 9  contract and a service contract?

10:19 10     A.   Yes.

10:19 11     Q.   And you reviewed both of those contracts?

10:20 12     A.   Yes.  They were in the record, so I...

10:20 13         MR. HANAUER:  Exhibit 5.

10:20 14         MS. WAXMAN:  Sorry.

10:20 15         THE WITNESS:  A lot of paper in this case.

10:20 16         MR. FIGEL:  Do you want me to give him --

10:20 17         MR. HANAUER:  Yeah, the witness should have

10:20 18  one.

10:20 19         MR. FIGEL:  Okay, that's fine.  He should

10:20 20  have one, yes, I was just not sure about which one.

10:20 21        (Transcript of Howey litigation was marked

10:20 22     Exhibit AS-5 for identification, as of this

10:20 23     date.)

10:20 24     Q.   So I just tendered you Exhibit 5.  Is

10:20 25  Exhibit 5 a copy of the Howey transcript of record

55

10:21 1  that you reviewed?

10:21 2       A.    It seems to be.

10:21 3       Q.    And the two contracts at issue in Howey

10:21 4  that you reviewed, those are reflected on pages 11 to

10:21 5  20 of Exhibit 5?

10:21 6       A.    Yes.

10:21 7            (Witness reviewing document.)

10:21 8       A.    Yes.

10:21 9       Q.    And Exhibit 5 also contains stipulated

10:21 10 facts that the Supreme Court considered in deciding

10:21 11 Howey?

10:21 12      A.    Yes.

10:21 13      Q.    And that's on pages 5 to 11?

10:22 14      A.    Yes.

10:22 15      Q.    And you reviewed those stipulated facts?

10:22 16      A.    Once.

10:22 17      Q.    Is it your understanding that in addition

10:22 18 to -- so let me take a step back.

10:22 19            So the two contracts at issue in Howey were

10:22 20 a land sale contract and a services contract?

10:22 21      A.    Yes.

10:22 22      Q.    In addition to receiving the land sales

10:22 23 contract and the services contract, the investors in

10:22 24 the Howey case, they also received a sales talk from

10:22 25 representatives of the companies selling those

56

10:22  1    contracts?

10:22  2            MR. FIGEL:  Objection.

10:22  3        A.   I think they did.  I think this is in the

10:22  4    record.

10:22  5        Q.   And that sales talk is included on pages 20

10:22  6    to 28 of Exhibit 5?

10:22  7        A.   I don't recall the pages, but --

10:23  8            (Witness reviewing document.)

10:23  9        A.   That seems to be correct.

10:23 10        Q.   Just for your reference, on pages 8 to 9 of

10:23 11    Exhibit 5, in paragraph 12 it says, Attached hereto

10:23 12    in a part hereof, as Exhibit B 1, is a typical sales

10:23 13    talk employed by representatives as acting for the

10:23 14    two companies in effectuating sales.

10:23 15        A.   Yes.

10:23 16        Q.   And that's the same sales talk I just asked

10:23 17    you about?

10:23 18        A.   It seems to be, yes.

10:23 19        Q.   And you reviewed the sales talk in

10:23 20    preparing your report?

10:23 21        A.   I read everything here.

10:24 22        Q.   In Exhibit 5?

10:24 23        A.   Yes.

10:24 24        Q.   In determining whether an investment

10:24 25    contract existed in Howey, did the Supreme Court look

                                                              57

```
10:24   1   at the two contracts, the land sales contract and the
10:24   2   services contract, in isolation; or did the Supreme
10:24   3   Court consider them together?
10:24   4         MR. FIGEL:  Objection.
10:24   5      A.   I think the court collapsed the two into
10:24   6   one.
10:24   7      Q.   And is that one of the lessons from Howey,
10:24   8   that if multiple contracts govern a commercial
10:24   9   relationship, those multiple contracts should be
10:24  10   considered together to determine if an investment
10:24  11   contract exists under the federal securities laws?
10:24  12         MR. FIGEL:  Objection.
10:24  13      A.   I'm not offering an opinion on whether
10:24  14   something is or isn't an investment contract.
10:24  15      Q.   And when you say "investment contract," do
10:24  16   you mean investment contract as that term is
10:25  17   construed under the federal securities laws?
10:25  18      A.   Yes.
10:25  19      Q.   And going forward, if I use the term
10:25  20   "investment contract," will you understand that I'm
10:25  21   referencing that term as it's used under the federal
10:25  22   securities laws?
10:25  23      A.   Yes, so long as you understand that I'm not
10:25  24   giving an opinion on that issue.
10:25  25      Q.   That should make our time here a lot of
```

58

```
10:25   1   shorter.

10:25   2        A.    Good.

10:25   3        Q.    Are you offering an opinion on whether or

10:25   4   not the sales talk the investors received was a

10:25   5   component of the investment contract the Court in

10:25   6   Howey found exists?

10:25   7              MR. FIGEL:  Objection.

10:25   8        A.    The contracts speak for themselves; that

10:25   9   is, the contracts create obligations and duties.

10:25  10        Q.    But my question is, when determining

10:26  11   whether an investment contract exists, was the Court

10:26  12   just looking at the land sales and services contract

10:26  13   or was it looking also at the sales talk?

10:26  14              MR. FIGEL:  Objection.

10:26  15        A.    I assume the Court read the record.

10:26  16        Q.    Can I refer you now to your report, page 7,

10:26  17   paragraph 10.

10:26  18              I want to refer you to the first full

10:26  19   sentence on paragraph 7.

10:26  20        A.    Uh-huh.

10:27  21        Q.    Do you see -- what do you mean when you

10:27  22   write, In the commercial circumstances?

10:27  23              MR. FIGEL:  Objection.

10:27  24              That's not what it says.

10:27  25        A.    Yes.
```

59

10:27  1            It's -- it says what it says, if you have a
10:27  2  question about it.
10:27  3       Q.   That's what I tried to ask.  What did
10:27  4  you -- what did you mean when you write, In the
10:27  5  commercial circumstances?
10:27  6       A.   I didn't.  I wrote, The commercial context,
10:27  7  or -- in paren, or economic substance, closed paren.
10:27  8       Q.   I just want to make sure we're on -- this
10:27  9  is the top of page 7.
10:27 10       A.   Oh.
10:27 11            Well, I am -- you said paragraph 10.  Are
10:27 12  you referring to anything --
10:27 13       Q.   Yeah.  Paragraph 10 spills over from page 6
10:27 14  into page 7.  I apologize for not trying to get you
10:28 15  there.
10:28 16            Top of page 7, the first full sentence.
10:28 17       A.   Well, the first full sentence begins, The
10:28 18  two contracts in Howey considered together.
10:28 19            Is that the sentence you're --
10:28 20       Q.   Yes.  Yes, sir.  I'm asking you, when you
10:28 21  write, Considered together in the commercial
10:28 22  circumstances, what do you mean by "commercial
10:28 23  circumstances"?
10:28 24       A.   That they were selling orange groves.
10:28 25       Q.   Were the two contracts in Howey the only

                                                          60

| | | |
|---|---|---|
| 10:28 | 1 | factual basis for providing the investors the |
| 10:28 | 2 | prospect of an investment return? |
| 10:28 | 3 | MR. FIGEL:  Objection. |
| 10:28 | 4 | A.   If you're asking me what the investors were |
| 10:28 | 5 | thinking or what they relied upon, that's beyond the |
| 10:28 | 6 | scope of my report. |
| 10:28 | 7 | Q.   I'm asking you what they were told. |
| 10:29 | 8 | MR. FIGEL:  Objection. |
| 10:29 | 9 | A.   What they were told is in the record. |
| 10:29 | 10 | Q.   Right.  So my question is, is the only |
| 10:29 | 11 | factual -- so in Howey, the investors were led to |
| 10:29 | 12 | expect returns on their investment.  Correct? |
| 10:29 | 13 | A.   Yeah.  Everybody who makes an investment |
| 10:29 | 14 | anticipates a return. |
| 10:29 | 15 | I mean, they weren't doing it for nothing. |
| 10:29 | 16 | Q.   And what I'm asking is, the only factual |
| 10:29 | 17 | basis that the investors received to expect that |
| 10:29 | 18 | return, was it just the two contracts? |
| 10:29 | 19 | MR. FIGEL:  Objection. |
| 10:29 | 20 | A.   No.  The investors thought they were making |
| 10:29 | 21 | an investment in orange groves.  Whatever went into |
| 10:29 | 22 | that determination on the part of the investors is |
| 10:29 | 23 | what they considered. |
| 10:29 | 24 | Q.   But what was told them that would create an |
| 10:30 | 25 | expectation that they would profit? |

61

| 10:30 | 1 | MR. FIGEL:  Objection. |
| 10:30 | 2 | A.   I don't know what was told them.  But I |
| 10:30 | 3 | assume that they received a sales talk which would be |
| 10:30 | 4 | similar to the one in the record. |
| 10:30 | 5 | Q.   And in that sales talk, the investors were |
| 10:30 | 6 | told to expect profits from their investment? |
| 10:30 | 7 | A.   I think the investors were told that this |
| 10:30 | 8 | would be a good investment, which is what sellers |
| 10:30 | 9 | tell buyers. |
| 10:31 | 10 | Q.   Is it your understanding of Howey that one |
| 10:31 | 11 | requisite element to find an investment contract is |
| 10:31 | 12 | an expectation of profit by the investor? |
| 10:31 | 13 | MR. FIGEL:  Objection. |
| 10:31 | 14 | A.   If by "investment contract," you mean |
| 10:31 | 15 | something under the securities laws, I'm not |
| 10:31 | 16 | testifying to what elements add up to what a |
| 10:31 | 17 | securities law conclusion would be. |
| 10:31 | 18 | Q.   What provision of the land sales contract |
| 10:31 | 19 | or the services contract in Howey led investors to |
| 10:31 | 20 | expect substantial profits? |
| 10:31 | 21 | MR. FIGEL:  Objection. |
| 10:31 | 22 | A.   I don't know what led investors to expect |
| 10:31 | 23 | whatever the investors expected. |
| 10:31 | 24 | Q.   What from the land sales or the services |
| 10:31 | 25 | contract did the Supreme Court find gave investors an |

62

10:32  1   expectation of substantial profit?

10:32  2        A.   I don't think the Supreme Court said that.

10:32  3   I think the Supreme Court said that the return

10:32  4   that -- that the inventors could not realize a return

10:32  5   except for -- or at least importantly, for the

10:32  6   efforts of the Howey Company.

10:32  7             MR. HANAUER:   Daphna, could we do

10:32  8   Exhibit 4.

10:32  9             THE WITNESS:   If we're going to talk about

10:32 10   this, I -- this would be good time for me to take a

10:32 11   break, if that would be okay.

10:32 12             MR. HANAUER:   Perfect.

10:32 13             THE VIDEOGRAPHER:   Going off the record.

10:32 14   The time is 10:34.

10:33 15             (A recess was taken from 10:34 to 10:48.)

10:47 16             THE VIDEOGRAPHER:   Going back on the

10:47 17   record.   The time is 10:48.

10:47 18        Q.   Professor Schwartz, do you have Exhibit 4

10:47 19   in front of you?

10:47 20        A.   I do.

10:47 21             (Supreme Court's Decision in Securities and

10:47 22        Exchange Commission v. W.J. Howey Co., et al.,

10:47 23        was marked Exhibit AS-4 for identification, as

10:47 24        of this date.)

10:47 25        Q.   And Exhibit 4, that's a copy of the Supreme

                                                                    63

10:47  1    Court's decision in Howey that you reviewed?

10:47  2         A.   Yes.

10:47  3         Q.   I would like to refer you to the -- page 3

10:47  4    of the exhibit, the paragraph that starts with, 7

10:47  5    after 4 stars.

10:47  6              The one that begins, The purchasers, for

10:47  7    the most part, are nonresidents of Florida.

10:47  8         A.   Yes.

10:47  9         Q.   And then do you see a little bit further in

10:47 10    the paragraph, it says, they are attracted by the

10:47 11    expectation of substantial profits.  It was

10:47 12    represented, for example, that profits during the

10:47 13    1943-1944 season amounted to 20 percent and that even

10:48 14    greater profits might be expected during the 1944 to

10:48 15    1945 season?

10:48 16         A.   I do.

10:48 17         Q.   Were those representations about

10:48 18    substantial profits, were those contained in the land

10:48 19    sales contract?

10:48 20         A.   No.

10:48 21         Q.   Were they contained in the services

10:48 22    contract?

10:48 23         A.   No.

10:48 24         Q.   They were in the sales talk, though.

10:48 25         A.   Yes.

64

10:48  1        Q.    Did any of the contracts in Howey give the

10:48  2   buyer a right to share in the profits of any company?

10:48  3              MR. FIGEL:  Objection.

10:48  4        A.    Yeah.  I think they were entitled to share

10:48  5   in the profits from the sale of oranges.

10:49  6        Q.    Did any of the contracts give the buyer a

10:49  7   right to share in the profits of W.J. Howey Co. --

10:49  8   Company?

10:49  9        A.    No.

10:49 10        Q.    What about Howey-in-the-Hills Service,

10:49 11   Inc.?

10:49 12        A.    I don't think so.

10:49 13        Q.    Did any of the contracts in Howey give the

10:49 14   buyer voting rights in any company?

10:49 15        A.    No.

10:49 16        Q.    Did any of the contracts in Howey give the

10:49 17   buyer the rights to dividends for any company?

10:49 18              MR. FIGEL:  Objection.

10:49 19        A.    "Dividend" is a term of art.  If by

10:49 20   "dividends" you mean payouts a corporation makes to

10:49 21   shareholders, the answer would be no.

10:49 22        Q.    Are you offering an opinion on whether any

10:49 23   of Ripple's actions affected the value of XRP or

10:49 24   resulted in profits to XRP purchasers?

10:50 25        A.    No.

65

| | | |
|---|---|---|
| 10:50 | 1 | Q.   Are you offering any opinion whether |
| 10:50 | 2 | something affected or impacted the price of XRP? |
| 10:50 | 3 | MR. FIGEL:  Objection. |
| 10:50 | 4 | A.   No. |
| 10:50 | 5 | Q.   I'd like you to look at your report, |
| 10:50 | 6 | paragraph 11. |
| 10:50 | 7 | A.   Okay. |
| 10:50 | 8 | Q.   And do you see the sentence that says, I |
| 10:50 | 9 | was not able to identify a single contract that |
| 10:50 | 10 | included an express provision that obligated Ripple |
| 10:50 | 11 | to perform post-sale duties that could affect the |
| 10:50 | 12 | value of XRP or return profits to any person? |
| 10:51 | 13 | A.   Yes. |
| 10:51 | 14 | Q.   In your opinion, is an express provision |
| 10:51 | 15 | that obligates Ripple to perform post-sale duties |
| 10:51 | 16 | that could affect the value of XRP or return profits |
| 10:51 | 17 | to any person required to establish the existence of |
| 10:51 | 18 | an investment contract under the federal securities |
| 10:51 | 19 | laws? |
| 10:51 | 20 | A.   I have -- |
| 10:51 | 21 | MR. FIGEL:  Objection. |
| 10:51 | 22 | A.   -- no opinion on what would or would not |
| 10:51 | 23 | constitute an investment contract under the |
| 10:51 | 24 | securities laws. |
| 10:51 | 25 | Q.   And I'm just -- if you bear with me, I'm |

66

| 10:51 | 1 | going to ask you a series of fairly similar questions |
| 10:51 | 2 | that hopefully will save us a very significant amount |
| 10:51 | 3 | of time. |
| 10:51 | 4 | Are you offering the opinion that the |
| 10:51 | 5 | presence of any contractual provision or type of |
| 10:51 | 6 | contractual provision is required to establish the |
| 10:51 | 7 | existence of an investment contract under the federal |
| 10:52 | 8 | securities laws? |
| 10:52 | 9 | A.   No. |
| 10:52 | 10 | MR. FIGEL:  Objection. |
| 10:52 | 11 | Q.   Are you offering the opinion that the |
| 10:52 | 12 | absence of any contractual provision or type of |
| 10:52 | 13 | contractual provision is required to establish the |
| 10:52 | 14 | existence of an investment contract under the federal |
| 10:52 | 15 | securities laws? |
| 10:52 | 16 | MR. FIGEL:  Objection. |
| 10:52 | 17 | A.   No. |
| 10:52 | 18 | Q.   Are you offering the opinion that the |
| 10:52 | 19 | presence of any combination of contractual provisions |
| 10:52 | 20 | is required to establish the existence of an |
| 10:52 | 21 | investment contract? |
| 10:52 | 22 | MR. FIGEL:  Objection. |
| 10:52 | 23 | A.   No. |
| 10:52 | 24 | Q.   Are you offering the opinion that the |
| 10:52 | 25 | presence of any combination of contractual provisions |

67

| | | |
|---|---|---|
| 10:52 | 1 | precludes the existence of an investment contract? |
| 10:52 | 2 | MR. FIGEL:  Objection. |
| 10:52 | 3 | A.   No. |
| 10:52 | 4 | Q.   Are you offering the opinion that the |
| 10:52 | 5 | presence of any contractual provision or type of |
| 10:52 | 6 | contractual provision precludes the existence of an |
| 10:52 | 7 | investment contract? |
| 10:52 | 8 | MR. FIGEL:  Objection. |
| 10:52 | 9 | A.   No. |
| 10:52 | 10 | Q.   Are you offering the opinion that the |
| 10:52 | 11 | absence of any contractual provision or type of |
| 10:53 | 12 | contractual provision precludes the existence of an |
| 10:53 | 13 | investment contract under the federal securities |
| 10:53 | 14 | laws? |
| 10:53 | 15 | A.   No. |
| 10:53 | 16 | Q.   Did Ripple sell XRP only to people who |
| 10:53 | 17 | intended to use XRP for non-investment purposes? |
| 10:53 | 18 | MR. FIGEL:  Objection. |
| 10:53 | 19 | A.   I don't know the answer to that question. |
| 10:53 | 20 | That is, I'm -- I'm saying that I don't |
| 10:53 | 21 | know what any particular buyers intended. |
| 10:54 | 22 | Q.   Did the contracts in Howey suggest an |
| 10:54 | 23 | intention to convey third-party rights? |
| 10:54 | 24 | A.   I don't recall any language in those |
| 10:54 | 25 | contracts that would support that conclusion. |

68

| | | |
|---|---|---|
| 10:54 | 1 | Q.    In your report, you talk about Ripple's |
| 10:54 | 2 | business model. |
| 10:54 | 3 | Is that accurate? |
| 10:54 | 4 | A.    I don't recall where in my report I said |
| 10:54 | 5 | that, but if I -- |
| 10:54 | 6 | Q.    Page 8.  The last full paragraph of -- the |
| 10:54 | 7 | last full sen -- I'm sorry.  Page 8, the last full |
| 10:54 | 8 | paragraph of paragraph 12. |
| 10:54 | 9 | A.    I see that. |
| 10:54 | 10 | Q.    So what is Ripple's business model? |
| 10:54 | 11 | A.    That they create and sell cryptocurrency to |
| 10:55 | 12 | buyers and -- that's the story.  They create it and |
| 10:55 | 13 | sell it. |
| 10:55 | 14 | Q.    So Ripple created XRP. |
| 10:55 | 15 | A.    Yeah, and they sell it. |
| 10:55 | 16 | Q.    Are you aware that the vast majority of |
| 10:55 | 17 | Ripple's revenues come from selling XRP? |
| 10:55 | 18 | A.    I don't know where their revenues come |
| 10:55 | 19 | from. |
| 10:55 | 20 | Q.    Well, you just said their business model |
| 10:55 | 21 | was selling XRP. |
| 10:55 | 22 | A.    What I said was that their business model |
| 10:55 | 23 | doesn't require them to be a member of a network.  In |
| 10:55 | 24 | a variety of industries, networks are requisite to |
| 10:55 | 25 | how the industry functions.  Ripple essentially |

69

```
10:56  1    functions on its own.
10:56  2         Q.    You write in your report that, Ripple's
10:56  3    return does not depend on or confer any rights in a
10:56  4    third party.
10:56  5              Do you see that?
10:56  6         A.    I see it.
10:56  7         Q.    What do you mean by that?
10:56  8         A.    What I mean by that is so far as I can
10:56  9    tell, their return comes -- primarily comes from
10:56 10    selling XRP.
10:56 11         Q.    So when you say a third party, is someone
10:56 12    who purchases Ripple -- or is someone that purchases
10:56 13    XRP from Ripple a third party?
10:56 14         A.    No.
10:57 15         Q.    So, when you mean a third party, you mean
10:57 16    someone other than Ripple or the person or entity
10:57 17    that purchases XRP?
10:57 18         A.    There are industries in which there are
10:57 19    people in a network, or several parties get together
10:57 20    in a joint or common venture.  All I meant here was
10:57 21    that Ripple is just the maker and seller of a
10:57 22    product.
10:57 23         Q.    Are you offering an opinion whether
10:57 24    Ripple's products affected the price of XRP?
10:57 25         A.    No.
```

70

| | | |
|---|---|---|
| 10:57 | 1 | MS. PROSTKO:  Objection. |
| 10:57 | 2 | Q.   Are you offering an opinion on how the |
| 10:57 | 3 | liquidity of XRP affects its price? |
| 10:57 | 4 | MR. FIGEL:  Objection. |
| 10:57 | 5 | A.   I'm not offering an opinion on that. |
| 10:58 | 6 | MS. PROSTKO:  Sorry to interrupt, |
| 10:58 | 7 | interject.  I had an objection at the same time the |
| 10:58 | 8 | answer was being given to the question about the -- |
| 10:58 | 9 | are you offering an opinion about whether Ripple's |
| 10:58 | 10 | efforts affected the price of XRP, and I don't see |
| 10:58 | 11 | that noted on the rough transcript. |
| 10:58 | 12 | MR. FIGEL:  57:52. |
| 10:58 | 13 | Q.   Are you offering an opinion on whether uses |
| 10:58 | 14 | other than trading for investment purposes existed |
| 10:58 | 15 | for XRP? |
| 10:58 | 16 | MR. FIGEL:  Objection. |
| 10:58 | 17 | A.   No, I don't think so. |
| 10:58 | 18 | If it's not in my report, I don't -- I'm |
| 10:58 | 19 | not offering an opinion on it. |
| 10:58 | 20 | Q.   Does your report rest on the assumption |
| 10:58 | 21 | that there were uses for XRP, other than trading for |
| 10:59 | 22 | investment purposes? |
| 10:59 | 23 | MR. FIGEL:  Objection. |
| 10:59 | 24 | A.   No. |
| 10:59 | 25 | Q.   Can you please look at paragraph 13 of your |

71

10:59  1    report.

10:59  2            And then I want to refer you to the first

10:59  3    full sentence on page 9.

10:59  4        A.    Uh-huh.

10:59  5        Q.    It says, Rather, Ripple's promotional

10:59  6    actions are typical of the actions of most merchants

10:59  7    who are concerned with the aftermarket for the

10:59  8    products they sell?

10:59  9        A.    Yes.

10:59 10        Q.    What are Ripple's promotional actions that

10:59 11    you described?

11:00 12        A.    The ones I observed in the SI-- SEC's

11:00 13    complaint.

11:00 14        Q.    Anything else?

11:00 15        A.    No.

11:00 16        Q.    In forming your opinions, did you consider

11:00 17    how Ripple's promotional actions compare to the

11:00 18    promotional actions of firms offering and selling

11:00 19    securities to investors?

11:00 20        A.    No.

11:00 21        Q.    Do you see how, on page 9 of your report,

11:01 22    you reference De Beers, Rolex, and BMW?

11:01 23        A.    Yes.

11:01 24        Q.    Where did those examples come from?

11:01 25        A.    My knowledge of the world.

72

11:01 1     Q.   Did --

11:01 2     A.   Well, also, I own a Rolex and a BMW.

11:01 3          But I don't own any diamonds.

11:01 4     Q.   Did you come up with the De Beers example

11:01 5  on your own?

11:01 6     A.   Yes.

11:01 7     Q.   And if I told you that the example of

11:01 8  De Beers was listed in another expert report, would

11:01 9  you have any knowledge of that?

11:01 10    A.   No.

11:01 11    Q.   Does De Beers own and control the majority

11:01 12  of diamonds in existence?

11:01 13        MR. FIGEL:  Objection.

11:01 14    A.   I don't know De Beers' market share.

11:01 15    Q.   Do you have any reason to believe that

11:01 16  De Beers owns and controls the majority of diamonds

11:02 17  in existence?

11:02 18    A.   As I said, I don't know their market share.

11:02 19  I know that they control a lot of diamonds.

11:02 20    Q.   Does Rolex own and control the majority of

11:02 21  Rolex watches in existence?

11:02 22        MR. FIGEL:  Objection.

11:02 23    A.   Well, they don't control the aftermarket in

11:02 24  them.

11:02 25    Q.   And I guess that's my question, are there

73

11:02  1    more -- for using the Rolex example, are there more

11:02  2    Rolex sitting in Rolex's inventory or sitting in the

11:02  3    collection with people that purchase Rolexes?

11:02  4              MR. FIGEL:  Objection.

11:02  5         A.   I don't know the answer to that question.

11:02  6         Q.   And -- and it's the same question for

11:02  7    De Beers; who has more diamonds, De Beers in its

11:02  8    inventory, or all the other people in the world who

11:02  9    own diamonds put together?

11:02 10              MR. FIGEL:  Objection.

11:02 11         A.   As a matter of fact, I don't know the

11:03 12    relevant proportions.  People have been buying

11:03 13    diamonds for hundreds of years, so I would assume, if

11:03 14    I'm going to assume anything, that there are probably

11:03 15    more diamonds out there than the ones that De Beers

11:03 16    owns, but if you're asking me for a fact answer, I

11:03 17    don't know for a fact what any proportions are.

11:03 18         Q.   What -- what about for BMW?  Does BMW own

11:03 19    the majority of BMW cars in existence?

11:03 20              MR. FIGEL:  Objection.

11:03 21         A.   No.

11:03 22         Q.   Does Ripple own and control the majority of

11:03 23    XRP in existence?

11:03 24              MR. FIGEL:  Objection.

11:03 25         A.   I don't know the answer to that.

74

11:03   1        Q.   Are you familiar with the concept of

11:03   2   fiduciary duties owed by a company's management to

11:03   3   its owners?

11:03   4        A.   Yes.

11:03   5        Q.   Okay.  What does that concept mean to you?

11:03   6        A.   Well, if the owners are shareholders, the

11:03   7   manager's own duties of loyalty, care, and good faith

11:04   8   to the shareholders.

11:04   9             And those are fiduciary duties.

11:04  10        Q.   Did Ripple owe fiduciary duties to its

11:04  11   equity shareholders?

11:04  12             MR. FIGEL:  Objection.

11:04  13        A.   I don't know Ripple's corporate setup.  If

11:04  14   it was a corp-- a typical corporate setup, then the

11:04  15   answer would be yes, but I don't know for a fact what

11:04  16   their corporate setup is.

11:04  17        Q.   Do you know if Ripple has equity

11:04  18   shareholders?

11:04  19        A.   No.

11:04  20        Q.   Let's assume that Ripple did have or does

11:04  21   have equity shareholders.

11:04  22             If -- assuming that's the case, would

11:04  23   Ripple owe fiduciary duties to its equity

11:04  24   shareholders to increase the value of Ripple's

11:04  25   shares?

| 11:04 | 1 | MR. FIGEL:  Objection. |

11:04   1          MR. FIGEL:  Objection.

11:04   2      A.   No.

11:05   3      Q.   Why do you say that?

11:05   4      A.   Well, you're asking me about fiduciary

11:05   5  duties.  The fiduciary duties are to manage

11:05   6  carefully, to avoid conflicts of interest, to make

11:05   7  appropriate disclosures.

11:05   8          Companies don't promise shareholders --

11:05   9  usually don't promise shareholders returns.

11:05  10      Q.   I'm not asking about the promise of

11:05  11  returns.  But does management have a fiduciary duty

11:05  12  to make good-faith efforts to increase the value of

11:05  13  the company?

11:05  14          MR. FIGEL:  Objection.

11:05  15      A.   No, they don't have a fiduciary duty as

11:05  16  fiduciary duties are technically defined in corporate

11:05  17  law.  They have a contractual obligation, implicit in

11:05  18  the share contract, to manage in the best interest of

11:06  19  their shareholders.

11:06  20          THE WITNESS:  Did anybody else hear that?

11:06  21  I hope so.

11:06  22      Q.   And the obligation of management to act in

11:06  23  the best interests of a company's shareholders, does

11:06  24  that include the obligation to increase the value of

11:06  25  the company's shares?

76

| | | |
|---|---|---|
| 11:06 | 1 | MR. FIGEL:  Objection. |
| 11:06 | 2 | A.    Managers want to maximize share value. |
| 11:06 | 3 | Q.    Does that include an obligation to use |
| 11:06 | 4 | good-faith efforts to grow the value of the company's |
| 11:06 | 5 | assets? |
| 11:06 | 6 | MR. FIGEL:  Objection. |
| 11:06 | 7 | A.    Those are legal terms.  I -- there's -- |
| 11:07 | 8 | shareholder of a company doesn't have a right to any |
| 11:07 | 9 | particular level of effort on behalf of the managers. |
| 11:07 | 10 | That's why you write contracts with managers to |
| 11:07 | 11 | incentivize them. |
| 11:07 | 12 | Q.    And again, are you offering an opinion |
| 11:07 | 13 | about the expectations of any purchaser or holder of |
| 11:07 | 14 | XRP? |
| 11:07 | 15 | A.    No. |
| 11:07 | 16 | Q.    So going back to your report, paragraph 9, |
| 11:08 | 17 | do you see the sentence two-thirds of the way down |
| 11:08 | 18 | that begins, Ripple presumably also seeks to protect |
| 11:08 | 19 | the after-sale value of XRP for its own benefit? |
| 11:08 | 20 | A.    Paragraph? |
| 11:08 | 21 | Q.    Page 9. |
| 11:08 | 22 | A.    Oh, page 9. |
| 11:08 | 23 | MR. FIGEL:  Do you mind if I point it out |
| 11:08 | 24 | to him? |
| 11:08 | 25 | MR. HANAUER:  Yeah, of course. |

77

11:08  1          MR. FIGEL:  Beginning with "Ripple."

11:08  2          THE WITNESS:  Yeah.

11:08  3          (Witness reviewing document.)

11:08  4     Q.   Did you have a chance to review that

11:08  5 sentence?

11:08  6     A.   Yes, I have.

11:08  7     Q.   What do you mean by, Protect the after-sale

11:08  8 value of XRP?

11:09  9     A.   That XRP would not fall materially in

11:09 10 value.

11:09 11     Q.   What steps did Ripple take to protect the

11:09 12 after-sale value of XRP?

11:09 13          MR. FIGEL:  Objection.

11:09 14     A.   I don't know.

11:09 15     Q.   You don't know?

11:09 16     A.   Well, other than what I read in the SEC

11:09 17 report, my language in -- my expert report uses the

11:09 18 word "presumably."

11:09 19     Q.   And why would Ripple take steps to protect

11:09 20 the after-sale value of XRP?

11:09 21          MR. FIGEL:  Objection.

11:09 22     A.   You could be asking me one of two

11:09 23 questions.  One question you can be asking me is,

11:09 24 What is the subjective intention of the people who

11:09 25 run Ripple?

                                                        78

| | | |
|---|---|---|
| 11:09 | 1 | I have no idea what that would be. |
| 11:10 | 2 | If you're asking me whether someone who |
| 11:10 | 3 | sells a product that has an aftermarket wants to |
| 11:10 | 4 | protect the aftermarket, the answer would be yes. |
| 11:10 | 5 | Q.   Why would Ripple presumably want to |
| 11:10 | 6 | protect -- strike that. |
| 11:10 | 7 | Why would Ripple want to prevent the price |
| 11:10 | 8 | of XRP from declining materially? |
| 11:10 | 9 | MR. FIGEL:  Objection. |
| 11:10 | 10 | A.   XRP -- because XRP is a cryptocurrency.  If |
| 11:10 | 11 | you have a currency, you don't want a currency to |
| 11:10 | 12 | fall in value. |
| 11:10 | 13 | Q.   What do you mean by, If you have a |
| 11:10 | 14 | currency? |
| 11:10 | 15 | MR. FIGEL:  Objection. |
| 11:10 | 16 | A.   If I'm selling someone a unit of currency, |
| 11:11 | 17 | which they may later use in transactions, I would |
| 11:11 | 18 | like, as the seller of the -- the initial seller, |
| 11:11 | 19 | to -- to see whether a buyer of XRP could actually |
| 11:11 | 20 | transact in it for the buyer's benefit. |
| 11:11 | 21 | Q.   And I believe you testified earlier that |
| 11:11 | 22 | Ripple's business model was selling XRP, right? |
| 11:11 | 23 | A.   Yes. |
| 11:11 | 24 | MR. FIGEL:  Objection. |
| 11:11 | 25 | Q.   And that's another reason why Ripple |

79

| 11:11 | 1 | doesn't want the price of XRP to decline materially, |
| 11:11 | 2 | is because Ripple generates revenues from selling |
| 11:11 | 3 | XRP. |
| 11:11 | 4 | MR. FIGEL:  Objection. |
| 11:11 | 5 | A.   No.   It's -- if my revenue depends on |
| 11:11 | 6 | selling apples, I don't really care what the |
| 11:11 | 7 | post-sale value of an apple is. |
| 11:12 | 8 | Ripple is selling a currency.  A currency |
| 11:12 | 9 | is something that people use to exchange for |
| 11:12 | 10 | something else.  So Ripple would have an interest in |
| 11:12 | 11 | having people buy their currency; that is, people |
| 11:12 | 12 | would only buy Ripple's currency if they thought that |
| 11:12 | 13 | they could use it as a currency. |
| 11:12 | 14 | Q.   Are you offering the opinion that XRP is a |
| 11:12 | 15 | currency? |
| 11:12 | 16 | MR. FIGEL:  Objection. |
| 11:12 | 17 | A.   No.   I'm offering -- what am I offering an |
| 11:12 | 18 | opinion on, if anything? |
| 11:12 | 19 | No.   I -- what I know is that Ripple sells |
| 11:12 | 20 | XRP and that XRP is used as a currency. |
| 11:12 | 21 | Q.   Are you offering any opinion as to whether |
| 11:13 | 22 | XRP should be legally classified as a currency? |
| 11:13 | 23 | A.   No. |
| 11:13 | 24 | Q.   Could a third party benefit from Ripple's |
| 11:13 | 25 | conduct even if that third party was not made a |

80

```
11:13  1  beneficiary by virtue of a provision in any of
11:13  2  Ripple's contracts?
11:13  3         MR. FIGEL:  Objection.
11:13  4     A.   I think you'd have to make that question
11:13  5  more concrete.
11:13  6         I mean, I don't know what type of third
11:13  7  party you're talking about or what you mean by a
11:13  8  "benefit."
11:13  9     Q.   Well, you say in your report that you
11:13 10  couldn't find any provisions that would make a third
11:13 11  party a beneficiary of any of Ripple's contracts.
11:13 12  Right?
11:14 13     A.   I -- yes.
11:14 14     Q.   Are there ways that a third party could
11:14 15  benefit from Ripple's conduct, even if they weren't
11:14 16  described as a third-party beneficiary in any of
11:14 17  Ripple's contracts?
11:14 18         MR. FIGEL:  Objection.
11:14 19     A.   Well, if someone came to own Ripple and
11:14 20  Ripple increased in value, through any efforts of --
11:14 21  of -- if someone came to own XRP and XRP increased in
11:14 22  value, they would be happy about that.
11:14 23     Q.   Right.  So --
11:15 24     A.   They could own it through buying it, having
11:15 25  it be willed to them, giving it to them as a gift.
```

81

| | | |
|---|---|---|
| 11:15 | 1 | Q.   So hypothetical here:  Ripple sells XRP to |
| 11:15 | 2 | Party B.  There's nothing in the contract about any |
| 11:15 | 3 | other third party.  And then Ripple -- and then |
| 11:15 | 4 | Party B sells that same XRP to Party C. |
| 11:15 | 5 | If Ripple does something to create -- to |
| 11:15 | 6 | increase the value of XRP, does Party C benefit? |
| 11:15 | 7 | MR. FIGEL:  Objection. |
| 11:15 | 8 | A.   Yes. |
| 11:15 | 9 | Q.   Your report mentions the restatement of |
| 11:15 | 10 | contracts. |
| 11:15 | 11 | A.   Yes. |
| 11:15 | 12 | Q.   Does the restatement of contracts define |
| 11:16 | 13 | "investment contract" the same way as that term is |
| 11:16 | 14 | defined under the federal securities laws? |
| 11:16 | 15 | A.   I don't think the restatement mentions the |
| 11:16 | 16 | word "investment contract" or the concept. |
| 11:16 | 17 | Q.   Does the restatement of contracts govern |
| 11:16 | 18 | the determination of whether something is an |
| 11:16 | 19 | investment contract under the federal securities |
| 11:16 | 20 | laws? |
| 11:16 | 21 | MR. FIGEL:  Objection. |
| 11:16 | 22 | A.   No. |
| 11:16 | 23 | Q.   Did Ripple sell XRP to purchasers who |
| 11:16 | 24 | acquired it for investment purposes? |
| 11:16 | 25 | MR. FIGEL:  Objection. |

82

11:17  1       A.    I don't know to whom Ripple sold XRP.

11:17  2       Q.    Well, you talk about it in your report.

11:17  3       A.    Well, I mean, they -- I know they sold XRP.

11:17  4  But if you're asking me what the purpose was of any

11:17  5  particular buyer, I don't know what that purpose

11:17  6  would have been.

11:17  7       Q.    Did any of the contracts you reviewed say

11:17  8  what the purpose of the -- of the XRP purchases were?

11:17  9       A.    Not that I recall.  But I do recall some

11:17 10  contracts explicitly saying that the buyer wasn't

11:17 11  purchasing XRP for an investment purpose.

11:17 12       Q.    When an issuer of securities sells

11:17 13  securities to an investor, does the title and risk of

11:17 14  loss typically pass to the investor?

11:17 15             MR. FIGEL:  Objection.

11:18 16       A.    I -- I don't think that would be a standard

11:18 17  term in a contract of the type you described.

11:18 18       Q.    I'm not -- independent of any contract, in

11:18 19  an IPO -- do you know what an IPO is?

11:18 20       A.    Yes.

11:18 21       Q.    When someone buys a company's securities in

11:18 22  an IPO, who assumes the title and risk of loss

11:18 23  associated with those securities?

11:18 24             MR. FIGEL:  Objection.

11:18 25       A.    The buyer.

83

11:18  1       Q.    Under what circumstances did the -- does

11:18  2   the seller of securities retain title and risk of

11:18  3   loss after the security has been sold to an investor?

11:18  4             MR. FIGEL:  Objection.

11:18  5       A.    I don't think there are any such

11:18  6   circumstances; but if there are any, I don't have

11:18  7   them in mind.

11:19  8       Q.    Can I ask you to look at paragraph 14 of

11:19  9   your report.

11:19 10             Do you see the sentence that says -- near

11:19 11   the middle, Rather than assume any post-sale

11:19 12   obligation to promote and increase the value of XRP,

11:20 13   the typical Ripple sales contract warns the customer

11:20 14   that the future value of XRP depends on the continued

11:20 15   willingness of market participants to engage fiat

11:20 16   currency for virtual currency?

11:20 17       A.    Yes.

11:20 18       Q.    How many contracts did you review that

11:20 19   contain that disclaimer?

11:20 20       A.    I don't know exactly, but I would say that

11:20 21   that's a standard term in just about all of the

11:20 22   direct sales contracts that I looked at.

11:20 23       Q.    How many of those did you look at?

11:20 24       A.    I think I've said before that I don't have

11:20 25   a precise number of the contracts I reviewed in each

84

| 11:20 | 1 | category. |
| 11:20 | 2 | Q.    Then the next sentence, you write, The |
| 11:21 | 3 | service contracts in Howey set forth specific |
| 11:21 | 4 | contractually required value-affecting actions that |
| 11:21 | 5 | Howey had the unilateral ability to perform and that |
| 11:21 | 6 | were essential to enable the land purchaser to earn a |
| 11:21 | 7 | profit. |
| 11:21 | 8 | Why do you say that the Howey -- that the |
| 11:21 | 9 | Howey Company had the unilateral ability to harvest |
| 11:21 | 10 | and sell the oranges? |
| 11:21 | 11 | A.    Because the Supreme Court in the Howey case |
| 11:21 | 12 | said that a future of an investment contract was that |
| 11:21 | 13 | the investors' return depended -- and the |
| 11:21 | 14 | Supreme Court used the word "solely" -- on the |
| 11:21 | 15 | efforts of others. |
| 11:21 | 16 | And I wanted to -- so I -- that is my |
| 11:21 | 17 | interpretation of what the Supreme Court meant by |
| 11:21 | 18 | that, was that Howey had the ability to affect the |
| 11:22 | 19 | return in the way that the Supreme Court was |
| 11:22 | 20 | referring to. |
| 11:22 | 21 | Q.    Did the Howey Company have the unilateral |
| 11:22 | 22 | ability to harvest and sell the oranges? |
| 11:22 | 23 | A.    Under the service contract, I think they |
| 11:22 | 24 | were the only ones that could, because the buyers of |
| 11:22 | 25 | orange groves were precluded from entering onto the |

85

11:22  1    land to harvest oranges themselves.

11:22  2        Q.   So it's your read of Howey that the

11:22  3    purchasers of the land sale contract were not

11:22  4    required to -- or did not have the ability to harvest

11:22  5    their own oranges?

11:22  6        A.   I don't think they had the ability to

11:22  7    harvest their own oranges.  I think they were

11:22  8    entitled to a share of the return from the oranges

11:22  9    that the Howey Company picked.

11:23 10        Q.   But I thought the Howey companies told the

11:23 11    investors that they were under no obligation to use

11:23 12    Howey's services.

11:23 13        A.   Howey told investors -- Howey -- well, let

11:23 14    me back up.

11:23 15             Howey sold investors orange groves.  They

11:23 16    offered the investors a service contract that would

11:23 17    go along with the orange groves.  It's my

11:23 18    recollection that about 85 percent of the buyers

11:23 19    purchased service contracts from Howey, and

11:23 20    15 percent of the buyers did not.

11:23 21        Q.   And is it your understanding that the

11:23 22    15 percent of the investors in Howey who didn't

11:23 23    purchase the service contracts were not allowed to

11:23 24    enter the orange groves they purchased or harvest the

11:23 25    crop?

86

11:24   1          A.   I think I recall language -- but I can't be

11:24   2   very precise about this -- that the service contracts

11:24   3   Howey offered were typical of service contracts

11:24   4   offered in the industry.

11:24   5          Q.   Were there factors in Howey, beyond the

11:24   6   unilateral control of the Howey companies, that could

11:24   7   have affected the investors' actual profits or

11:24   8   expectations of profits?

11:24   9              MR. FIGEL:  Objection.

11:24  10          A.   I don't know anything that the Howey

11:24  11   Company did with respect to the value of oranges.

11:24  12          Q.   Well, we know, from the Supreme Court's

11:24  13   decision, that Howey led the investors to expect

11:24  14   profits.  Right?

11:25  15              MR. FIGEL:  Objection.

11:25  16          A.   We know that Howey said that if the future

11:25  17   was like the past, you would make money.

11:25  18          Q.   And part of the expectation of profits in

11:25  19   Howey came from the efforts of the Howey companies.

11:25  20   Right?

11:25  21          A.   Well, if the Howey Company didn't expend

11:25  22   any efforts under the service contracts, there

11:25  23   wouldn't have been any profits because there wouldn't

11:25  24   have been any oranges.

11:25  25          Q.   Were there factors other than the actions

                                                              87

11:25  1   of the Howey companies that could have affected the

11:25  2   investors' profits?

11:25  3             MR. FIGEL:  Objection.

11:25  4        A.   Yeah, there's a market in oranges.

11:25  5        Q.   So like if there's a deep freeze in

11:25  6   Florida, that could affect the investor's profits.

11:25  7        A.   Yeah.

11:25  8             Yeah, as I said, there's a market in

11:25  9   oranges.  That price of oranges is, I think, set by

11:26 10   supply and demand.

11:26 11        Q.   And so the factors affecting supply and

11:26 12   demand could affect the price -- or could affect the

11:26 13   Howey's investors' returns independent of the efforts

11:26 14   of the Howey companies?

11:26 15             MR. FIGEL:  Objection.

11:26 16        A.   I would put it this way:  The efforts of

11:26 17   the Howey companies were necessary for the investors

11:26 18   to receive a return but not sufficient.

11:26 19        Q.   And even if the Howey companies took all

11:26 20   the necessary steps to generate profits for the

11:26 21   investors, there were things outside Howey's control

11:26 22   that could have affected the -- the return to the

11:26 23   investors?

11:27 24             MR. FIGEL:  Objection.

11:27 25        A.   I mean, I'm not an expert in the oranges

                                                              88

| | | |
|---|---|---|
| 11:27 | 1 | industry so I'm -- I can't really be -- you know, |
| 11:27 | 2 | give any testimony about how that industry works. |
| 11:27 | 3 | I do know that there's a market in oranges |
| 11:27 | 4 | and that the price is set by supply and demand, and |
| 11:27 | 5 | so any one buyer or seller probably couldn't affect |
| 11:27 | 6 | the price by anything it did, but -- but I don't have |
| 11:27 | 7 | personal knowledge of that industry, so it wouldn't |
| 11:27 | 8 | shock me if some industry expert contradicted what I |
| 11:27 | 9 | just said. |
| 11:27 | 10 | Q.   Is it a -- a common feature of commercial |
| 11:27 | 11 | enterprises that external factors beyond the control |
| 11:27 | 12 | of management can affect the profits of the |
| 11:27 | 13 | enterprise and its investors? |
| 11:27 | 14 | A.   It depends on the enterprise. |
| 11:27 | 15 | Q.   What enter-- commercial enterprises are |
| 11:28 | 16 | immune from external factors beyond the control of |
| 11:28 | 17 | management affecting the company's profits? |
| 11:28 | 18 | MR. FIGEL:  Objection. |
| 11:28 | 19 | A.   No one's immune from the world, but you |
| 11:28 | 20 | have a lot more control over what goes on if you're a |
| 11:28 | 21 | monopolist than if you're working in a competitive |
| 11:28 | 22 | market.  So as I said, it would depend on industry |
| 11:28 | 23 | structure and other things. |
| 11:28 | 24 | Q.   Your report talks about how New York or |
| 11:28 | 25 | Delaware law governs many of the Ripple contracts? |

89

| 11:28 | 1 | A.    Yes. |

11:28  1       A.    Yes.

11:28  2       Q.    How many of the contracts described in

11:28  3  your -- documented in your report are governed by

11:29  4  New York and Delaware law?

11:29  5       A.    I don't know the precise number, but I

11:29  6  think a majority of them are.

11:29  7       Q.    How many of the contracts are governed by

11:29  8  California law?

11:29  9       A.    There are some, but it's my recollection

11:29  10  that that would be a relatively small fraction of the

11:29  11  full universe.

11:29  12       Q.    How many of the 1700 contracts identified

11:29  13  in your report are governed by a jurisdiction that

11:29  14  takes a different approach to the Four Corners Rule?

11:29  15            MR. FIGEL:  Objection.

11:29  16       A.    I don't know the number, but the California

11:29  17  contracts would definitely be one of those

11:29  18  jurisdictions.

11:30  19       Q.    What is the California approach to the

11:30  20  interpretation of integration clauses?

11:30  21            MR. FIGEL:  Objection.

11:30  22       A.    The California approach is that an

11:30  23  integration clause is evidence of the parties'

11:30  24  intention to make the contract the complete statement

11:30  25  of the rights and duties of the parties, but because

90

11:30  1    it is just evidence, it could be rebutted by other

11:30  2    evidence.

11:30  3         Q.   In this case, does the presence of an

11:30  4    integration clause in any of Ripple's contracts

11:30  5    preclude the court from considering representations

11:31  6    made outside the four corners of Ripple's contracts?

11:31  7         A.   If there is a merger or integration clause,

11:31  8    and you are in a jurisdiction such as New York or

11:31  9    jurisdictions that follow New York, a court would not

11:31 10    consider extracontractual representations when the

11:31 11    court is engaged on deciding what the contract --

11:31 12    what obligations the contract creates.

11:31 13         Q.   What about in an SEC enforcement action

11:31 14    alleging violations of the federal securities laws?

11:31 15         A.   I have --

11:31 16              MR. FIGEL:   Objection.

11:31 17         A.   I have no opinion on what a court would do

11:31 18    in that circumstance.

11:32 19         Q.   You write in your report that statutory

11:32 20    interpretation is within your field of expertise?

11:32 21         A.   Yes.

11:32 22         Q.   Is that the case?

11:32 23         A.   Well, I'm claiming it.

11:32 24         Q.   Is the interpretation of a statute

11:32 25    typically a legal question for the court to decide?

91

| | | |
|---|---|---|
| 11:32 | 1 | A.   Yes. |
| 11:32 | 2 | Q.   Are you opining that any statute at issue |
| 11:32 | 3 | in this case is ambiguous? |
| 11:32 | 4 | MR. FIGEL:  Objection. |
| 11:32 | 5 | A.   No. |
| 11:33 | 6 | Q.   Could you go to paragraph 16 of your |
| 11:33 | 7 | report. |
| 11:33 | 8 | So I want to refer you to the last word on |
| 11:33 | 9 | page 11, and then that sentence continuing on to |
| 11:33 | 10 | page 12. |
| 11:33 | 11 | A.   Uh-huh. |
| 11:33 | 12 | Q.   You write, Thus, under the standard |
| 11:33 | 13 | interpretive canon, the meaning of the word |
| 11:33 | 14 | "contract" in the statutory phrase "investment |
| 11:33 | 15 | contract" would be its common law meaning? |
| 11:33 | 16 | A.   Yes. |
| 11:33 | 17 | Q.   Does the Supreme Court say that in Howey? |
| 11:33 | 18 | A.   No.  The Supreme Court says that the |
| 11:33 | 19 | statute did not define the phrase "investment |
| 11:33 | 20 | contract," but it did not reach the question that I'm |
| 11:34 | 21 | talking about in my report. |
| 11:34 | 22 | Q.   Can an investment contract be established |
| 11:34 | 23 | by a scheme or transaction? |
| 11:34 | 24 | MR. FIGEL:  Objection. |
| 11:34 | 25 | A.   I -- I'm not a securities law expert. |

92

11:34  1      Q.   The determination of whether Ripple's

11:34  2  offers and sales of XRP, whether those offers and

11:34  3  sales violate the federal securities laws, is that

11:34  4  determination governed by the common law of contracts

11:34  5  or the federal securities laws?

11:34  6           MR. FIGEL:  Objection.

11:34  7      A.   That would be determined by the federal

11:34  8  securities laws.

11:35  9      Q.   So do you see paragraph 17 of your report,

11:35 10  the last sentence.

11:35 11           It says, It would follow that the contracts

11:35 12  Ripple uses to market XRP are distinguishable from

11:35 13  the contracts Howey used to market citrus groves?

11:35 14      A.   Yes.

11:35 15      Q.   In forming your opinions, did you consider

11:35 16  whether Ripple's representations on its website and

11:35 17  its social media posts are distinguishable or similar

11:36 18  to the sales talk from Howey?

11:36 19           MR. FIGEL:  Objection.

11:36 20      A.   No.

11:36 21      Q.   Will you be offering any such opinion?

11:36 22      A.   No.

11:36 23      Q.   Will you be offering an opinion on whether

11:36 24  any of Ripple's contracts are distinguishable from

11:36 25  any contract in any court case applying the Howey

                                                          93

11:36  1    decision?

11:36  2        A.    If I'm -- if I'm shown such a case and

11:36  3    asked for my views, I would give them.

11:36  4            But in the absence of being shown such a

11:36  5    case, I have no intention of giving any such opinion.

11:36  6        Q.    So when you considered a particular

11:37  7    contract, a particular Ripple contract, did you

11:37  8    examine all of the contracts between Ripple and its

11:37  9    counterparty that governed their commercial

11:37  10   relationship?

11:37  11           MR. FIGEL:  Objection.

11:37  12       A.    I'm not sure I understand that question.

11:37  13   If -- if -- if it -- if the question is did I read

11:37  14   every word in each of these contracts, I've testified

11:37  15   to that before.

11:37  16       Q.    And the answer's no?

11:37  17       A.    And the answer would be no.

11:37  18           Is there -- if you're asking me a different

11:37  19   question, I'm not quite sure I understand what that

11:37  20   would be.

11:37  21       Q.    And I'm sorry, because it is a different

11:37  22   question.

11:37  23           So when you were considering any specific

11:37  24   contract or -- that you discuss in your report, did

11:37  25   you examine all of the contracts between Ripple and

94

| | | |
|---|---|---|
| 11:37 | 1 | its counterparty governing their commercial |
| 11:37 | 2 | relationship or just the specific contract you |
| 11:37 | 3 | discussed in your report? |
| 11:38 | 4 | A.   Once again, I'm a little bit confused. |
| 11:38 | 5 | When I -- when I looked at the contracts referred to |
| 11:38 | 6 | in my report, or other ones, I was asking what the |
| 11:38 | 7 | legal relationship -- what the relationship was that |
| 11:38 | 8 | the contract created. |
| 11:38 | 9 | Q.   Right.  So -- well, let's assume that |
| 11:38 | 10 | Ripple -- well, so let's use the example of the |
| 11:38 | 11 | direct sales contract. |
| 11:38 | 12 | For a direct sales contract between Ripple |
| 11:38 | 13 | and its counterparty, how do you know that that sales |
| 11:38 | 14 | contract was the only contract governing the |
| 11:38 | 15 | commercial relationship between Ripple and its |
| 11:38 | 16 | counterparty? |
| 11:38 | 17 | A.   I don't know that. |
| 11:39 | 18 | Q.   So talking about the direct sales |
| 11:39 | 19 | contracts, are you offering an opinion on how |
| 11:39 | 20 | Ripple's direct sales of XRP were similar or |
| 11:39 | 21 | different than an IPO? |
| 11:39 | 22 | A.   No. |
| 11:39 | 23 | Q.   What about a secondary offering? |
| 11:39 | 24 | A.   In an IPO, you're selling securities.  A |
| 11:39 | 25 | security is a contract between the holder and the |

95

11:40  1    firm.

11:40  2            Ripple is selling a thing; that is, an item

11:40  3    of cryptocurrency, not a contract.

11:40  4            So there would be a major difference, if

11:40  5    I'm -- between selling a contract and selling a

11:40  6    thing.

11:40  7        Q.   Isn't that the ultimate legal dispute in

11:40  8    this case?

11:40  9            MR. FIGEL:   Objection.

11:40 10        A.   No, I don't think so.  You asked me whether

11:40 11    there was a similarity.  I said Ripple was selling an

11:40 12    item of currency.  In an IPO, you're selling

11:40 13    something different.

11:40 14        Q.   So you're opining that what Ripple sold was

11:40 15    not a security?

11:40 16            MR. FIGEL:   Objection.

11:40 17        A.   No.

11:40 18            No, I'm not opining that at all.

11:40 19        Q.   I think just said in an IPO, they sell

11:40 20    securities; in Ripple's case, they sell something

11:40 21    else.

11:40 22        A.   No.  In an IPO, you're selling a contract,

11:41 23    like a share of stock.  If you're selling an item of

11:41 24    cryptocurrency, that's sold under a contract.  It

11:41 25    isn't a contract.

                                                            96

11:41  1        Q.   In an IPO, can the issuer sell securities

11:41  2   directly to a counterparty for the counterparty's own

11:41  3   use?

11:41  4             MR. FIGEL:   Objection.

11:41  5        A.   I'm not an expert in that.

11:41  6        Q.   In a public or private securities offering,

11:41  7   can the issuer and its counterparty execute a single

11:41  8   master agreement containing the terms that would

11:41  9   apply to all subsequent sales of the issuer's

11:41 10   securities to the counterparty?

11:41 11             MR. FIGEL:   Objection.

11:42 12        A.   I'm not an expert in securities.  I do know

11:42 13   that companies that issue stock hold back stock that

11:42 14   they may later issue.  And if they later issue stock,

11:42 15   it would be under the same terms as the earlier

11:42 16   issue.

11:42 17             But I don't have an opinion on anything

11:42 18   else about that.

11:42 19        Q.   Can the issuer of securities agree to

11:42 20   exchange a defined quantity of securities with a

11:42 21   counterparty for a defined quantity of U.S. dollars?

11:42 22             MR. FIGEL:   Objection.

11:42 23        A.   I don't have an opinion on that.

11:42 24        Q.   Are you familiar with the term

11:43 25   "underwriter"?

97

11:43  1        A.   Yes.

11:43  2        Q.   And what's your understanding of the term

11:43  3   "underwriter"?

11:43  4        A.   Underwriter is an intermediary between the

11:43  5   company and an ultimate purchaser.

11:43  6        Q.   Are you offering an opinion -- I want to

11:43  7   ask you about the wholesale sales contracts you talk

11:43  8   about in your report.

11:43  9             Are you offering an opinion on whether the

11:43 10   wholesale sales contracts are different or similar

11:43 11   than underwriter contracts in a securities offering?

11:43 12             MR. FIGEL:   Objection.

11:43 13        A.   No, I'm not offering an opinion on that.

11:43 14        Q.   In a securities offering, can the issuer of

11:43 15   the securities sell securities to an underwriter

11:43 16   whose stated intent is to sell those securities to an

11:43 17   ultimate third-party purchaser in a transaction to

11:44 18   which the issuer is not a party?

11:44 19             MR. FIGEL:   Objection.

11:44 20        A.   I think the answer is "yes" to that.

11:44 21        Q.   Are you offering an opinion on whether the

11:44 22   wholesale sales contracts are different or similar

11:44 23   than broker-dealer contracts in a securities

11:44 24   offering?

11:44 25             MR. FIGEL:   Objection.

98

| | | |
|---|---|---|
| 11:44 | 1 | A.    No. |
| 11:44 | 2 | THE COURT REPORTER:  If you answered, I'm |
| 11:44 | 3 | sorry; I didn't hear it. |
| 11:44 | 4 | A.    No. |
| 11:45 | 5 | Q.    Can you look at paragraph 27, please, of |
| 11:45 | 6 | your report. |
| 11:45 | 7 | And you write about -- in the second full |
| 11:45 | 8 | sentence, you write about the wholesale sales orders. |
| 11:45 | 9 | The counterparty would expressly represent |
| 11:45 | 10 | and warrant that it was not purchasing XRP for any |
| 11:45 | 11 | investment purpose. |
| 11:45 | 12 | Do you see that? |
| 11:45 | 13 | A.    Yes. |
| 11:45 | 14 | Q.    Did the direct sales contracts have a |
| 11:45 | 15 | similar representation on the part of the purchaser? |
| 11:45 | 16 | A.    I don't think so. |
| 11:46 | 17 | But I have to check. |
| 11:46 | 18 | (Witness reviewing document.) |
| 11:47 | 19 | Q.    Can I continue? |
| 11:47 | 20 | A.    What? |
| 11:47 | 21 | Q.    May I continue? |
| 11:47 | 22 | A.    Yes. |
| 11:47 | 23 | Q.    I'm sorry.  I thought you were still -- |
| 11:47 | 24 | A.    No, no. |
| 11:47 | 25 | Q.    Do you know whether or not the wholesale |

99

| | | |
|---|---|---|
| 11:47 | 1 | contract counterparties marketed their XRP to third |
| 11:47 | 2 | parties for investment purposes? |
| 11:47 | 3 | A.    No. |
| 11:47 | 4 | Q.    Do you have any understanding of how the |
| 11:47 | 5 | wholesale contract counterparties marketed the XRP |
| 11:47 | 6 | they sold to third parties? |
| 11:47 | 7 | MR. FIGEL:  Objection. |
| 11:47 | 8 | A.    I have no direct knowledge of that. |
| 11:48 | 9 | Q.    You write in your report that the wholesale |
| 11:48 | 10 | sales contracts were only executed between |
| 11:48 | 11 | February 2013 and March 2016. |
| 11:48 | 12 | A.    Yes. |
| 11:48 | 13 | Q.    During that period of time, what uses |
| 11:48 | 14 | beyond investment purposes existed for XRP? |
| 11:48 | 15 | MR. FIGEL:  Objection. |
| 11:48 | 16 | A.    I don't know. |
| 11:48 | 17 | Q.    Do you know when Ripple's cross-border |
| 11:48 | 18 | payment software became commercially functional? |
| 11:48 | 19 | MR. FIGEL:  Objection. |
| 11:48 | 20 | A.    I don't know the date of that. |
| 11:49 | 21 | Q.    For the wholesale contracts, does it make |
| 11:49 | 22 | commercial sense for Ripple's counterparty to |
| 11:49 | 23 | purchase the XRP from Ripple if the counterparty does |
| 11:49 | 24 | not believe it can sell that XRP to a third party for |
| 11:49 | 25 | a higher price? |

100

| 11:49 | 1 | MR. FIGEL:  Objection. |

11:49  1          MR. FIGEL:  Objection.

11:49  2          A.   It's a wholesale contract in which the

11:49  3  buyer pays.  It would be irrational for the buyer to

11:49  4  believe that they couldn't resell for more than they

11:49  5  bought it for.

11:49  6          Q.   And in paragraph 28 of your report, do you

11:50  7  see how you discuss purchase letters of intent, where

11:50  8  Ripple would pay the counterparty a commission of

11:50  9  ██ to ██ percent of the XRP the counterparty sold?

11:50 10          A.   Yes.

11:50 11          Q.   By earning that commission, is Ripple's

11:50 12  counterparty -- is Ripple's counterparty profiting

11:50 13  off its XRP purchases?

11:50 14          MR. FIGEL:  Objection.

11:50 15          A.   I think that's a -- that's an ambiguous

11:50 16  question.

11:50 17          The counterparty is providing a service,

11:50 18  and its being paid a commission.  Whether the

11:50 19  counterparty's business is profitable or not, I have

11:50 20  no idea.

11:51 21          Q.   The counterparty's generating revenues

11:51 22  based on that commission, correct?

11:51 23          MR. FIGEL:  Objection.

11:51 24          A.   Well, yeah, the counterparty gets a

11:51 25  commission on sales, so it has to have sales.

101

11:51  1        Q.    And by paying those commissions, are

11:51  2    Ripple's efforts a cause of the counterparty's

11:51  3    revenues?

11:51  4              MR. FIGEL:   Objection.

11:51  5        A.    No.   The counterparty's revenues depend on

11:51  6    the market for XRP, which is a function of a whole

11:51  7    variety of factors that would affect price and

11:51  8    demand.   Ripple is just, as I said, buying services

11:51  9    and paying a commission.

11:52 10        Q.    Do you see how you discuss the -- the

11:52 11    contracts described in paragraph 28 required Ripple's

11:52 12    counterparty to sell XRP to third parties at or above

11:52 13    market price?

11:52 14              MR. FIGEL:   Objection.

11:52 15        A.    Yes, I see that.

11:52 16        Q.    Are you offering an opinion on whether that

11:52 17    requirement impacts the price of XRP?

11:52 18        A.    No.

11:52 19        Q.    Paragraph 29, you talk about the UCC.

11:52 20              Is that right?

11:52 21        A.    Yes.

11:53 22        Q.    Are you offering an opinion in this case

11:53 23    whether UCC Article 2 applies to the sales of XRP?

11:53 24        A.    No.

11:53 25        Q.    Are you offering an opinion whether any

                                                              102

11:53  1    part of the UCC applies to sales of XRP?

11:53  2            MR. FIGEL:  Objection.

11:53  3        A.   No.

11:53  4        Q.   Does the UCC -- the UCC, that's the Uniform

11:53  5    Commercial Code?

11:53  6        A.   Yes.

11:53  7        Q.   Does the UCC contain a provision regarding

11:53  8    the sales of securities?

11:53  9        A.   I think Article 8 contains -- regulates

11:53 10    security transactions.

11:53 11        Q.   Is the UCC's definition of "securities" the

11:53 12    same as the definition of "securities" under the

11:53 13    federal securities laws?

11:53 14        A.   I don't recall what Article 8 provides.

11:53 15        Q.   In a lawsuit alleging violations of the

11:53 16    federal securities laws, if there's a dispute between

11:53 17    the UCC and the federal securities laws, which one

11:54 18    controls?

11:54 19            MR. FIGEL:  Objection.

11:54 20        A.   The federal securities laws.

11:54 21        Q.   In this lawsuit, does the Court look to the

11:54 22    UCC or the federal securities laws to determine if

11:54 23    Ripple's XRP offers and sales involve securities?

11:54 24            MR. FIGEL:  Objection.

11:54 25        A.   The Court is going to look to whatever it

                                                              103

```
11:54   1   thinks is relevant.
11:54   2        Q.   Are you offering an opinion whether the
11:54   3   Court should look to the UCC or the federal
11:54   4   securities laws?
11:54   5        A.   No.
11:54   6        Q.   Is it a legal defense to an SEC enforcement
11:54   7   action that the financial instrument at issue does
11:54   8   not meet the UCC definition of a security?
11:54   9             MR. FIGEL:  Objection.
11:55  10        A.   I don't know the precise answer to that
11:55  11   question, but I would doubt it.
11:55  12        Q.   And do you see on paragraph 29, you list a
11:55  13   variety of terms that the Ripple sales contracts
11:55  14   typically contain?
11:55  15        A.   Yes.
11:55  16        Q.   Are you offering an opinion whether these
11:55  17   terms are also present in contracts for the sales of
11:55  18   securities in public or private offerings?
11:55  19             MR. FIGEL:  Objection.
11:55  20        A.   No.
11:56  21        Q.   And then do you see, in paragraph 30, there
11:56  22   are a list of bullet points, that -- of types of
11:56  23   provisions that you say that the sales contracts
11:56  24   don't have?
11:56  25        A.   Yes.
```

104

| 11:56 | 1 | Q. All things being equal, would the presence |
| 11:56 | 2 | of any of these provisions make a contract more or |
| 11:56 | 3 | less likely to be an investment contract under the |
| 11:56 | 4 | federal securities laws? |
| 11:56 | 5 | MR. FIGEL: Objection. |
| 11:56 | 6 | A. I don't have an opinion on that. |
| 11:56 | 7 | Q. You see in paragraph 32, you talk about |
| 11:56 | 8 | programmatic sales contracts? |
| 11:56 | 9 | A. Yes. |
| 11:56 | 10 | Q. Are you offering an opinion on how the |
| 11:57 | 11 | programmatic contracts are similar or different to |
| 11:57 | 12 | underwriter contracts in a securities offering? |
| 11:57 | 13 | A. No. |
| 11:57 | 14 | MR. FIGEL: Objection. |
| 11:57 | 15 | A. No, I'm not. |
| 11:57 | 16 | Q. Are you offering an opinion on how the |
| 11:57 | 17 | programmatic contracts are similar or different to |
| 11:57 | 18 | broker-dealer contracts in a securities offering? |
| 11:57 | 19 | MR. FIGEL: Objection. |
| 11:57 | 20 | A. No. |
| 11:57 | 21 | Q. For the programmatic sales contracts, does |
| 11:57 | 22 | it make commercial sense for Ripple's counterparty to |
| 11:57 | 23 | purchase XRP from Ripple if it does not believe it |
| 11:57 | 24 | can sell that XRP to a third party for a higher |
| 11:57 | 25 | price? |

105

11:57  1          MR. FIGEL:  Objection.

11:57  2      A.   I think there's a problem with your

11:57  3  question because in these agreements, they're not

11:58  4  selling XRP, they're just transferring it.

11:58  5      Q.   Do you see, in paragraph 33, how you say

11:58  6  that the programmatic sales contracts are consignment

11:58  7  contracts?

11:58  8      A.   I said in substance they're consignment

11:58  9  contracts.  Consignment agreements.

11:58 10      Q.   Are you offering an opinion on whether an

11:58 11  underwriter contract in a securities offering is a

11:58 12  consignment contract?

11:58 13      A.   No.

11:58 14          MR. FIGEL:  Objection.

11:58 15      Q.   Do you have an opinion on that?

11:58 16      A.   No.

11:58 17      Q.   Are you offering an opinion on whether a

11:59 18  broker-dealer contract in a securities offering is a

11:59 19  consignment contract?

11:59 20      A.   No.

11:59 21          MR. FIGEL:  Objection.

11:59 22          MR. HANAUER:  We're at noon, and we've been

11:59 23  going an hour and 15, I think.  I just want to check

11:59 24  to make sure you're okay.

11:59 25          THE WITNESS:  I could take a break.  When

                                                       106

| | | |
|---|---|---|
| 11:59 | 1 | will we break for lunch? |
| 11:59 | 2 | MR. HANAUER:  Let's go off the record. |
| 11:59 | 3 | THE VIDEOGRAPHER:  We're off the record. |
| 11:59 | 4 | The time is 12:00 p.m. |
| 11:59 | 5 | (Discussion off the record.) |
| 12:00 | 6 | (A recess was taken from 12:00 noon to |
| 12:00 | 7 | 12:13.) |
| 12:11 | 8 | THE VIDEOGRAPHER:  Going back on the |
| 12:11 | 9 | record, the time is 12:13. |
| 12:11 | 10 | MR. FIGEL:  Mr. Hanauer, before you begin, |
| 12:11 | 11 | could I just memorialize a -- an agreement we just |
| 12:11 | 12 | reached, which is that the normal practice, which is |
| 12:11 | 13 | an objection by one counsel, can serve to preserve |
| 12:12 | 14 | the objections of all parties? |
| 12:12 | 15 | MR. HANAUER:  So stipulated. |
| 12:12 | 16 | MR. FIGEL:  Thank you. |
| 12:12 | 17 | Q.   So, Professor Schwartz, your report talks |
| 12:12 | 18 | about various market maker contracts. |
| 12:12 | 19 | A.   Let me -- |
| 12:12 | 20 | Q.   In paragraph 38 of your report. |
| 12:12 | 21 | A.   Yes. |
| 12:12 | 22 | Q.   Are you offering an opinion whether or not |
| 12:12 | 23 | the securities -- strike that. |
| 12:12 | 24 | Are you offering an opinion whether the |
| 12:12 | 25 | issuer of securities is permitted to offer |

107

| | | |
|---|---|---|
| 12:12 | 1 | consideration to a market maker in exchange for the |
| 12:13 | 2 | market maker making a market in the issuer's |
| 12:13 | 3 | securities? |
| 12:13 | 4 | A.   No. |
| 12:13 | 5 | Q.   Are you offering an opinion whether the |
| 12:13 | 6 | issuer of securities is allowed to contract with a |
| 12:13 | 7 | market maker in a way that allows the issuer to set |
| 12:13 | 8 | terms for the market maker's sales of the issuer's |
| 12:13 | 9 | securities? |
| 12:13 | 10 | A.   No. |
| 12:13 | 11 | Q.   Do you see, in paragraph 39, you talk about |
| 12:13 | 12 | the product incentive contracts? |
| 12:13 | 13 | A.   Uh-huh.  Yes. |
| 12:14 | 14 | Q.   And I believe you talk about -- or are you |
| 12:14 | 15 | familiar with Ripple's On-Demand Liquidity product or |
| 12:14 | 16 | xRapid product? |
| 12:14 | 17 | A.   I know what it is. |
| 12:14 | 18 | Q.   And I believe that you classified contracts |
| 12:14 | 19 | related to that product as both product incentive |
| 12:14 | 20 | contract and master-hosted services contracts? |
| 12:14 | 21 | A.   Yes. |
| 12:14 | 22 | Q.   Are you aware that Ripple's On-Demand |
| 12:14 | 23 | Liquidity and xRapid contracts provided that Ripple |
| 12:14 | 24 | would pay incentives and rebates to the counterparty |
| 12:14 | 25 | for using On-Demand Liquidity or xRapid? |

108

| 12:14 | 1 | MR. FIGEL:  Objection. |
|---|---|---|
| 12:14 | 2 | A.    I am aware of contracts in which Ripple |
| 12:14 | 3 | made such agreements. |
| 12:15 | 4 | Q.    Are you aware that On-Demand Liquidity or |
| 12:15 | 5 | xRapid required Ripple's counterparty to purchase XRP |
| 12:15 | 6 | in order to transfer currency using Ripple's |
| 12:15 | 7 | software? |
| 12:15 | 8 | MR. FIGEL:  Objection. |
| 12:15 | 9 | A.    Will you repeat that question, please?  I'm |
| 12:15 | 10 | not sure I -- I followed the entire question. |
| 12:15 | 11 | (The record was read back.) |
| 12:15 | 12 | A.    I'm not aware of that. |
| 12:15 | 13 | Q.    And do you -- going to paragraph 46. |
| 12:16 | 14 | I think -- do you see how you talk about |
| 12:16 | 15 | the last sentence, Ripple also agreed to pay |
| 12:16 | 16 | MoneyGram certain market development fees and bonuses |
| 12:16 | 17 | in XRP if the transactions executed on Ripple's |
| 12:16 | 18 | platform exceeded specified volume thresholds? |
| 12:16 | 19 | A.    Yes. |
| 12:16 | 20 | Q.    Did those bonus provisions incentivize |
| 12:17 | 21 | MoneyGram to increase the volume of its XRP |
| 12:17 | 22 | transactions using Ripple's software product? |
| 12:17 | 23 | MR. FIGEL:  Objection. |
| 12:17 | 24 | A.    I don't know what "incentivize |
| 12:17 | 25 | MoneyGram" -- I mean, but those payments essentially |

109

12:17  1   were linked to volume so the more the -- the larger

12:17  2   the dollar volume of transactions MoneyGram made

12:17  3   through the ODL platform, the greater the bonus

12:17  4   payment.

12:17  5        Q.   Do you have an opinion on how MoneyGram

12:17  6   increasing the volume of its XRP transactions would

12:17  7   impact XRP's price?

12:17  8             MR. FIGEL:   Objection.

12:17  9        A.   No.

12:17  10       Q.   Are you offering an opinion whether ODL or

12:17  11  xRapid would be commercially viable for its users if

12:17  12  not for the rebates and incentives paid by Ripple?

12:18  13       A.   I have no opinion on that.

12:18  14       Q.   Can you go to -- so do you see on

12:18  15  paragraph 35 of your report.

12:18  16            You list five bullet points for the type of

12:18  17  provisions you say are absent from the programmatic

12:18  18  contracts?

12:18  19       A.   Yes.

12:18  20       Q.   And then compare that with paragraph 42.

12:19  21            There are three bullet points for

12:19  22  provisions you say are absent from the service

12:19  23  contracts.

12:19  24            Do you see that?

12:19  25       A.   Yup.

110

12:19   1          Q.    And so one of the bullet points that's in

12:19   2    paragraph 35, but not paragraph 42, is a provision

12:19   3    that creates an ongoing obligation owed by Ripple to

12:19   4    the counterparty with respect to any tran-- XRP

12:19   5    transfer pursuant to the contract?

12:19   6          A.    Yes.

12:19   7          Q.    So I take it from the absence of a bullet

12:19   8    point like that in paragraph 42, did you find such

12:20   9    provisions in the services contracts?

12:20  10          A.    I did not.

12:20  11          Q.    Then -- if that's the case, then why did

12:20  12    you not include that bullet point in paragraph 42?

12:20  13          A.    The -- they were different kinds of

12:20  14    contracts.  In the programmatic contracts, you're --

12:20  15    XRP was transferred, so -- so it could be -- it could

12:20  16    conceivably be possible if there would be some

12:20  17    obligation with respect to what was transferred.

12:20  18    But -- essentially transferred for resale.  So I

12:20  19    found no such provisions, so I said so.

12:20  20                Services contracts were a different kind of

12:21  21    agreement.

12:21  22          Q.    What about the bullet point from

12:21  23    paragraph 35, you -- provisions that impose on Ripple

12:21  24    any fiduciary or similar duty owed to the

12:21  25    counterparty?

111

12:21  1                      Were there provisions like that in the

12:21  2    services contract?

12:21  3          A.    No.

12:21  4          Q.    So if -- in paragraph 35, and in other

12:21  5    paragraphs of your report, you're listing all these

12:21  6    types of provisions that are not in the contracts.

12:21  7    Right?

12:21  8          A.    Right.

12:21  9          Q.    And you're doing the same thing with

12:21 10    paragraph 42.  Right?  The same type of exercise,

12:21 11    listing provisions that are not in the contract?

12:21 12          A.    Yes.

12:21 13          Q.    So what should we infer from the fact that

12:21 14    for some types of contracts, there are only -- you

12:22 15    only identify three types of provisions missing, but

12:22 16    for other types, of contracts, you identify four or

12:22 17    five types of provisions missing?

12:22 18          A.    It's a question of the --

12:22 19                MR. FIGEL:  Objection.

12:22 20                You can answer.

12:22 21                THE WITNESS:  Should I --

12:22 22                MR. FIGEL:  Yes, yeah, I just made the

12:22 23    record.

12:22 24          A.    It's a function of the kind of contract it

12:22 25    is.  So, for example, if I'm buying services, I can't

                                                                    112

```
12:22   1   possibly own a fiduciary obligation to the seller so

12:22   2   it's pointless to say there's no fiduciary

12:22   3   obligation.

12:22   4           But if I'm selling something, then a

12:22   5   fiduciary obligation may be attached to it.

12:22   6           So, I think the things that I said are a

12:22   7   function of the kind of contracts that there were.

12:23   8       Q.   Let's go to paragraph 56, please.

12:23   9           And you describe the          agreement as

12:23  10   a representative example of an XRP direct sales

12:23  11   contract?

12:23  12       A.   Yes.

12:23  13       Q.   What percentage of the direct sales

12:23  14   contracts did you personally review?

12:23  15           MR. FIGEL:  Objection.

12:23  16       A.   I can't recall what percentage.  I can only

12:23  17   recall that I reviewed a lot of them.

12:24  18       Q.   Did you review all the direct sales

12:24  19   contracts?

12:24  20       A.   I reviewed most of them because I reviewed,

12:24  21   as I previously testified, almost all of the

12:24  22   1700 contracts.  But if you're going to ask me what

12:24  23   percentage fell in each category, I would have

12:24  24   trouble recalling that.

12:24  25       Q.   And you didn't document that in any way.
```

                                                                    113

12:24  1    Correct?

12:24  2         A.    No.

12:24  3         Q.    Did you -- just so I have a better record,

12:24  4    did you document in any way which contracts you

12:24  5    reviewed and which ones you didn't review?

12:24  6         A.    Not in a systematic way.  I made notes

12:24  7    about some of the contracts to refresh my

12:24  8    recollection when I was writing a report.

12:24  9         Q.    Did you document in any way which contracts

12:24  10   you reviewed and which contracts you didn't review?

12:25  11        A.    Up to the date of -- up to the date of --

12:25  12   no, I didn't -- I'm trying to -- trying to actually

12:25  13   answer your question truthfully.

12:25  14             I just was looking at what -- at

12:25  15   representative samples of the various kinds of

12:25  16   contracts.  I didn't document the formal search

12:25  17   process on my part because I didn't do a formal

12:25  18   search process.

12:25  19        Q.    When you looked at the direct sales

12:25  20   contracts, what did you do to determine that the

12:25  21   contracts you reviewed were the only contracts

12:25  22   governing the commercial relationship between Ripple

12:25  23   and its counterparty?

12:25  24        A.    I don't know if they were the only

12:25  25   contracts that constituted a commercial relationship.

114

| | | |
|---|---|---|
| 12:25 | 1 | Q.   What is ▮▮▮▮▮▮▮▮▮▮▮? |
| 12:25 | 2 | A.   It's a -- I don't know very much about |
| 12:26 | 3 | them.   They buy and trade. |
| 12:26 | 4 | Q.   Are you aware that ▮▮▮▮▮▮▮▮▮▮▮ is a |
| 12:26 | 5 | venture capital and private equity firm? |
| 12:26 | 6 | A.   No. |
| 12:26 | 7 | Q.   Are you aware that ▮▮▮▮▮▮▮▮▮▮▮ is an |
| 12:26 | 8 | investor in Ripple? |
| 12:26 | 9 | A.   I don't know anything about ▮▮▮▮▮ |
| 12:26 | 10 | ▮▮▮▮▮▮▮ business. |
| 12:26 | 11 | Q.   When you determined that the ▮▮▮▮▮▮ |
| 12:26 | 12 | agreement is a representative example of an XRP |
| 12:26 | 13 | direct sales contract, did you consider that ▮▮▮▮ |
| 12:26 | 14 | ▮▮▮▮ is an equity shareholder of Ripple? |
| 12:26 | 15 | A.   No. |
| 12:26 | 16 | Q.   How many direct sales contracts did you |
| 12:27 | 17 | personally review that did not involve an investor in |
| 12:27 | 18 | Ripple? |
| 12:27 | 19 | MR. FIGEL:   Objection. |
| 12:27 | 20 | A.   I have no idea. |
| 12:27 | 21 | Q.   Did you consider how the ▮▮▮▮▮▮ contract |
| 12:27 | 22 | is in any way different from a contract in which the |
| 12:27 | 23 | issuer of securities agrees to sell its securities |
| 12:27 | 24 | directly to an institutional investor? |
| 12:27 | 25 | MR. FIGEL:   Objection. |

115

| 12:27 | 1 | A.   No. |
| 12:27 | 2 | Q.   Are you offering an opinion that the |
| 12:27 | 3 | ▓▓▓▓ contract is different from a contract in |
| 12:27 | 4 | which the issuer of securities agrees to sell its |
| 12:27 | 5 | securities directly to an institutional investor? |
| 12:27 | 6 | MR. FIGEL:  Objection. |
| 12:28 | 7 | A.   Well, you would only say that under the |
| 12:28 | 8 | ▓▓▓▓ agreement, they're selling XRP, which itself |
| 12:28 | 9 | isn't a security. |
| 12:28 | 10 | Q.   You're offering that opinion in this case? |
| 12:28 | 11 | A.   Well, XRP is a thing, not -- I mean, you |
| 12:28 | 12 | asked me whether the contracts under which XRP is |
| 12:28 | 13 | sold are investment contracts.  I have no opinion |
| 12:28 | 14 | about that. |
| 12:28 | 15 | I just know that XRP is like a widget. |
| 12:28 | 16 | Q.   Are you offering the opinion that XRP is |
| 12:28 | 17 | not a security? |
| 12:28 | 18 | MR. FIGEL:  Objection. |
| 12:28 | 19 | A.   No. |
| 12:28 | 20 | Q.   Can a widget be a security? |
| 12:28 | 21 | MR. FIGEL:  Objection. |
| 12:28 | 22 | A.   I don't see -- I don't see how. |
| 12:29 | 23 | Q.   No matter the commercial circumstances? |
| 12:29 | 24 | MR. FIGEL:  Objection. |
| 12:29 | 25 | A.   I think there's a difference between a |

116

```
12:29  1   contract and a thing.
12:29  2        Q.   Can an orange grove be a security?
12:29  3        A.   Orange grove is a thing.
12:29  4        Q.   Can an orange grove be a security?
12:29  5        A.   Itself?  No.
12:29  6             I guess I would add that a car isn't a
12:29  7   security.  A TV isn't a security.
12:29  8        Q.   Can offers or sales of orange groves
12:29  9   constitute the offer and sale of securities?
12:29 10             MR. FIGEL:  Objection.
12:29 11        A.   I don't have an opinion on that.
12:30 12        Q.   Do you have an opinion on whether the offer
12:30 13   or sale of anything can constitute the offer or sale
12:30 14   of a security?
12:30 15             MR. FIGEL:  Objection.
12:30 16        A.   It would depend on -- it would depend on
12:30 17   the terms.
12:30 18        Q.   But are you offering an opinion in this
12:30 19   case?
12:30 20        A.   No.
12:30 21             MR. FIGEL:  Can I just add an objection?  I
12:30 22   mean the last question.
12:30 23             Thanks.
12:30 24        Q.   Can you look at paragraph 68, please.
12:31 25             And do you see that you said that the
```

117

```
12:31  1        █████████  agreement contains terms related to
12:31  2   restrictions on transfer of XRP by ████████████
12:31  3        A.   I recall saying that.  Is there a paragraph
12:31  4   that you are particularly referring to?
12:31  5        Q.   I'm --
12:31  6        A.   Oh, yeah.
12:31  7        Q.   Of your report, 68.  I'm sorry.
12:31  8        A.   Yes, okay.
12:31  9             (Witness reviewing document.)
12:31 10        Q.   Does the ████████ contract allow the
12:31 11   parties to set a period of time in which ██████████
12:31 12   cannot resell or otherwise distribute the XRP it
12:31 13   purchased from Ripple?
12:31 14        A.   Yeah, I recall that.
12:31 15        Q.   Does the ████████ contract allow the
12:32 16   parties to set a limitation on the amount of XRP
12:32 17   that -- or purchase from Ripple that █████████ can
12:32 18   sell on a daily basis?
12:32 19             MR. FIGEL:  Objection.
12:32 20        A.   I think there were sales restrictions.
12:32 21        Q.   And how many contracts did you review
12:32 22   containing restrictions on what Ripple's counterparty
12:32 23   could do with the XRP they obtained from Ripple?
12:32 24        A.   I don't have a number, but there were some
12:32 25   that had such wholesale restrictions.
```

                                                                    118

12:32  1          Q.   How many contracts did you review that

12:32  2   contained restrictions limiting the quantity of XRP

12:32  3   the purchaser could obtain to the amount needed for

12:32  4   the purchaser's non-investment purposes?

12:33  5               MR. FIGEL:   Objection.

12:33  6          A.   I don't recall.

12:33  7          Q.   How many contracts did you review

12:33  8   containing restrictions limiting Ripple's

12:33  9   counterparty from selling the XRP they purchased from

12:33 10   Ripple only to parties outside the United States?

12:33 11               MR. FIGEL:   Objection.

12:33 12          A.   I only recall reading a couple of contracts

12:33 13   like that.

12:33 14          Q.   How many contracts did you review limiting

12:33 15   Ripple's counterparty from selling the XRP they

12:33 16   obtained from Ripple only to accredited investors?

12:33 17          A.   I don't recall any such restrictions.

12:33 18          Q.   How many contracts did you review that

12:33 19   contained restrictions allowing Ripple's counterparty

12:34 20   to sell the XRP they obtained from Ripple only to

12:34 21   those third parties that would use XRP for

12:34 22   non-investment purposes?

12:34 23               MR. FIGEL:   Objection.

12:34 24          A.   I recall that there was such contracts.   I

12:34 25   don't recall the number.

119

| | | |
|---|---|---|
| 12:34 | 1 | MR. HANAUER:  Can you send Exhibit 8, |
| 12:34 | 2 | please. |
| 12:34 | 3 | (XRP Purchase Summary was marked |
| 12:34 | 4 | Exhibit AS-8 for identification, as of this |
| 12:34 | 5 | date.) |
| 12:34 | 6 | MR. HANAUER:  One for the court reporter, |
| 12:34 | 7 | please. |
| 12:35 | 8 | Q.    Is Exhibit 8 a copy of the XRP purchase |
| 12:35 | 9 | summary you reference in paragraph 69 of your report? |
| 12:35 | 10 | A.    Yes. |
| 12:35 | 11 | Q.    So do you see how there's a line for |
| 12:35 | 12 | lock-up period and daily sales limitations, on |
| 12:35 | 13 | Exhibit 8? |
| 12:35 | 14 | A.    Yes. |
| 12:35 | 15 | Q.    And are those the sales restrictions we |
| 12:35 | 16 | were just talking about or resale restrictions? |
| 12:36 | 17 | A.    Yes. |
| 12:36 | 18 | Q.    Did you review any documents, including |
| 12:36 | 19 | other summary of XRP purchases, that actually imposed |
| 12:36 | 20 | a lock-up period or daily sale limitation? |
| 12:36 | 21 | A.    Yes. |
| 12:36 | 22 | Q.    How many did you review? |
| 12:36 | 23 | A.    You know, I -- this may short-circuit it, |
| 12:36 | 24 | but I didn't really count.  So.  I -- if the answer |
| 12:36 | 25 | is, did I review a contract of a certain type or -- a |

120

| | | |
|---|---|---|
| 12:36 | 1 | few contracts or some contracts, the answer would be |
| 12:36 | 2 | yes.  If you're asking me whether it's 11 or 34, I |
| 12:36 | 3 | don't have an answer to that. |
| 12:36 | 4 | Q.   By setting a lock-up period or volume |
| 12:36 | 5 | restriction, could one of these XRP purchase |
| 12:36 | 6 | summaries add a substantive term to a direct sales |
| 12:37 | 7 | contract? |
| 12:37 | 8 | MR. FIGEL:  Objection. |
| 12:37 | 9 | A.   I would have to review the contract.  There |
| 12:37 | 10 | would be a question whether this was a modification |
| 12:37 | 11 | or not.  Modifications are not enforceable unless |
| 12:37 | 12 | they're supported by a separate consideration. |
| 12:37 | 13 | On the other hand, this document says it's |
| 12:37 | 14 | governed by the master agreement, and it could just |
| 12:37 | 15 | be filling in the blanks.  If it's filling in the |
| 12:37 | 16 | blanks, then it would be enforceable. |
| 12:38 | 17 | Q.   Are you -- sitting here today, are you |
| 12:38 | 18 | aware of the length of any lock-up period or daily |
| 12:38 | 19 | sales limitation governing any of Ripple's XRP sales |
| 12:38 | 20 | to          ? |
| 12:38 | 21 | A.   No.  I'm not aware -- I have a recollection |
| 12:38 | 22 | that they went through                 , but I don't |
| 12:38 | 23 | have any particular recollection. |
| 12:38 | 24 | Q.   And are you offering any opinion on how the |
| 12:38 | 25 | lock-up periods or daily volume limitations could |

121

```
12:38   1    affect the price of XRP?

12:38   2         A.   No.

12:39   3         Q.   So in paragraph 71 of your report, you say

12:39   4    that each of the direct sales contracts is in

12:39   5    substance similar to the relevant part of the

12:39   6    ████████    agreement?

12:39   7         A.   Uh-huh.   Yes.

12:39   8         Q.   What was your basis for saying that for the

12:39   9    sales contracts you did not personally review?

12:39  10         A.   I think the answer to that question is in

12:39  11    the first sentence of paragraph 71.

12:40  12              I don't have anything to add to my -- to

12:40  13    what the first sentence of paragraph 71 says.

12:40  14         Q.   So is the answer that for the contracts,

12:40  15    you didn't personally review your basis for

12:40  16    concluding that those contracts were in substance

12:40  17    similar to the ████████ agreement; the basis of that

12:40  18    was the work done by counsel?

12:40  19         A.   It was a combination of my work and work

12:40  20    done from counsel, acting at my direction.  I asked

12:40  21    counsel in particular, whether those contracts were

12:40  22    relevantly different.  I assume that my counsel knew

12:40  23    how to read a contract, too.

12:40  24         Q.   Are there any written communications on

12:41  25    that subject between you and counsel?
```

                                                                    122

12:41  1      A.    I don't recall any.

12:41  2      Q.    Do you see the list of bullet points, on

12:41  3  paragraph 71 of provisions you say that the direct

12:41  4  sales contracts typically contain?

12:41  5      A.    Yes.

12:41  6      Q.    Are there direct sales contracts listed on

12:41  7  Exhibit C that do not contain all those terms?

12:41  8      A.    Well, yeah, because some of the direct

12:41  9  sales contracts just were an exchange of a certain

12:41 10  number of XRP in return for price, but this contract

12:42 11  contemplates a series of sales.

12:42 12      Q.    Were there direct sales contracts that had

12:42 13  terms that created an ongoing obligation owed by

12:42 14  Ripple after delivery of the purchased units of XRP?

12:42 15      A.    I don't recall any such language that would

12:42 16  sustain an inference like that.

12:42 17      Q.    Then why is that bullet point missing from

12:42 18  paragraph 72?

12:42 19           MR. FIGEL:  Objection.

12:43 20      A.    I don't recall why it's missing, but I

12:43 21  would -- it is my recollection that you couldn't find

12:43 22  any such language in that contract.

12:43 23      Q.    Okay.  Let's go to paragraph 75, please,

12:43 24  where you talk about the wholesale sales contracts.

12:43 25           For the wholesale sales contracts, what did

                                                            123

12:43 1   you do to determine that the contracts you reviewed

12:43 2   were the only contracts governing the relationship

12:43 3   between Ripple and its counterparty?

12:43 4       A.   I didn't do anything.

12:44 5       Q.   What is Bitstamp?

12:44 6       A.   I don't know very much about the

12:44 7   business -- businesses of any of the buyers or a lot

12:44 8   of the buyers to these contracts because that was

12:44 9   beyond the scope of my report to know that.

12:44 10      Q.   Are you aware that Bitstamp is a digital

12:44 11  asset exchange?

12:44 12      A.   I think I knew that.  But as I said, I

12:44 13  wasn't asked to investigate or learn about the

12:44 14  business buyers; that is, what their businesses were.

12:44 15      Q.   Could the business of Ripple's counterparty

12:44 16  inform what they intended to do with the XRP they

12:45 17  obtained from Ripple?

12:45 18          MR. FIGEL:  Objection.

12:45 19      A.   Well, there were contractual restrictions

12:45 20  on what they could do.  I don't have direct knowledge

12:45 21  as to whether they adhered to those restrictions or

12:45 22  not.

12:45 23      Q.   But beyond the four corners of the

12:45 24  contract, if someone wanted to know what the

12:45 25  purchaser of XRP wanted to do with that XRP that they

124

12:45  1  purchased, would they want to know what the business

12:45  2  is of the person or entity that purchased the XRP?

12:45  3          MR. FIGEL:  Objection.

12:45  4      A.   Well, you're describing a -- a search.  If

12:45  5  I -- I want to know what Bitstamp was doing, I would

12:45  6  assume that someone would search in a rational way to

12:45  7  find out what Bitstamp was doing.

12:45  8      Q.   Did you perform any such searches?

12:46  9      A.   No.

12:46 10          MR. HANAUER:  Exhibit 9, please.

12:46 11          (Bitstamp Wholesale Order was marked

12:46 12      Exhibit AS-9 for identification, as of this

12:46 13      date.)

12:46 14      Q.   Is Exhibit 9 a copy of the Bitstamp

12:46 15  wholesale order referenced in paragraph 75 of your

12:46 16  report?

12:47 17      A.   I think it is.

12:47 18      Q.   Do you see the second paragraph of

12:47 19  Exhibit 9?  It says, This agreement governs the

12:47 20  purchase and sale of the purchased Ripple currency

12:47 21  specified below.

12:47 22      A.   Yes.

12:47 23      Q.   Why does it refer to whatever Ripple is

12:47 24  selling as purchased Ripple currency?

12:47 25          MR. FIGEL:  Objection.

125

12:47  1          (Witness reviewing document.)

12:48  2      A.   Can you repeat that question?  I just

12:48  3  was --

12:48  4          THE WITNESS:  Mr. Reporter, could you

12:48  5  please repeat that question.

12:48  6          (The record was read back.)

12:48  7      A.   I don't know.

12:48  8      Q.   And then, do you see on Exhibit 9 -- if we

12:48  9  go to Section 1.4 of that contract, which I believe

12:48 10  is on page 2 of Exhibit 9.

12:48 11      A.   Yes.

12:49 12      Q.   And one of the terms of the sale is that

12:49 13  Bitstamp represents that it will not resell or

12:49 14  otherwise distribute the Ripple currency to any party

12:49 15  if Bitstamp has actual or reasonable knowledge that

12:49 16  such other party intends to purchase or acquire the

12:49 17  Ripple currency as an investment.

12:49 18      A.   Yes, I looked at this section.

12:49 19      Q.   What is the purpose of such a provision?

12:49 20          MR. FIGEL:  Objection.

12:49 21      A.   I can only infer purpose from the words.  I

12:50 22  don't have any independent knowledge of what the

12:50 23  purpose is -- of the parties were in adopting

12:50 24  Section 1.4.

12:50 25      Q.   I'll take your reasonable inference.

126

| | | |
|---|---|---|
| 12:50 | 1 | What's that? |
| 12:50 | 2 | A.   Well, it -- my reasonable inference is that |
| 12:50 | 3 | they -- that Ripple wanted XRP to be used in commerce |
| 12:50 | 4 | rather than held. |
| 12:50 | 5 | Q.   And what do you mean by "used in commerce"? |
| 12:50 | 6 | A.   Used in transactions. |
| 12:50 | 7 | Q.   You mean used to facility cross-border |
| 12:50 | 8 | payments? |
| 12:50 | 9 | MR. FIGEL:  Objection. |
| 12:50 | 10 | A.   I don't know anything in -- as I said, I |
| 12:50 | 11 | don't have any independent knowledge, but the point |
| 12:51 | 12 | of a restriction like this would be that you want the |
| 12:51 | 13 | product to be used in various kinds of transactions. |
| 12:51 | 14 | I don't know whether they would be cross border or |
| 12:51 | 15 | not cross border. |
| 12:51 | 16 | Q.   When someone purchases digital currency off |
| 12:51 | 17 | a digital currency exchange, does the exchange have |
| 12:51 | 18 | any knowledge whether the purchaser intends to use |
| 12:51 | 19 | the digital currency for investment purposes? |
| 12:51 | 20 | MR. FIGEL:  Objection. |
| 12:51 | 21 | A.   I -- I don't know what particular people |
| 12:51 | 22 | from particular exchanges know, but that's not the |
| 12:51 | 23 | point of an exchange is to know what people use |
| 12:52 | 24 | what's being traded -- what purpose they have.  The |
| 12:52 | 25 | point of an exchange is to facilitate deals. |

127

12:52  1        Q.    And the Bitstamp wholesale order, that's

12:52  2   back from 2000-- or Exhibit 9, that's back from 2013?

12:52  3   That's when it was executed?

12:52  4        A.    That's the effective date.

12:52  5        Q.    And back in 2013, what noninvestment uses

12:52  6   existed for XRP?

12:52  7        A.    I don't know.

12:52  8        Q.    Were -- back in 2013, were any of Ripple's

12:52  9   products that used XRP in commercial operation?

12:52 10              MR. FIGEL:  Objection.

12:52 11        A.    I don't know that.

12:52 12        Q.    Are you offering an opinion that the

12:52 13   Bitstamp contract in Exhibit 9 is different from a

12:52 14   contract in which the issuer of securities agrees to

12:52 15   sell its securities directly to an exchange?

12:53 16              MR. FIGEL:  Objection.

12:53 17        A.    No.

12:53 18        Q.    And then, do you see on paragraph -- excuse

12:53 19   me, on Section 9.3 of Exhibit 9, the no third-party

12:53 20   beneficiaries?

12:53 21        A.    Yes.

12:53 22        Q.    Are you offering an opinion whether the

12:53 23   federal securities laws allow parties to an

12:53 24   investment contract to waive away the requirements of

12:53 25   the Securities Act of 1933?

128

12:53  1          MR. FIGEL:  Objection.

12:53  2      A.  No.

12:53  3      Q.  Do you have an opinion on that subject?

12:53  4      A.  No.

12:53  5      Q.  Can you look at paragraph 85 of your

12:54  6  report, please.

12:54  7          And you list a bunch of bullet points after

12:54  8  writing, Specifically, the wholesale contracts

12:54  9  typically contain.  And then you list various types

12:54  10 of provisions.

12:54  11         Do you see that?

12:54  12     A.  Yes.

12:54  13     Q.  Are there wholesale sales contracts listed

12:54  14 on Exhibit C to report that do not contain any of the

12:54  15 terms listed in those bullet points?

12:55  16     A.  I don't recall reading any such contract.

12:55  17     Q.  Then why are you using the word "typical,"

12:55  18 or "typically"?

12:55  19     A.  I'm using the word "typical" as a hedge

12:55  20 because at that point, I hadn't read every single

12:55  21 one.

12:55  22     Q.  And then in paragraph 86, where you say

12:55  23 that Each of the wholesale sales contracts listed in

12:55  24 Exhibit C lacks any express provision or

12:55  25 representation, you were relying on counsel to tell

129

```
12:55   1   you that for the contracts you didn't review?

12:55   2        A.   Yes.

12:56   3        Q.   Did any of the wholesale sales contracts

12:56   4   you reviewed, or have counsel review, contain a

12:56   5   provision restricting what someone who purchased XRP

12:56   6   from Ripple's counterparty could do with the XRP they

12:56   7   purchased?

12:56   8             MR. FIGEL:   Objection.

12:56   9        A.   I don't recall any such restriction.

12:56  10             MR. HANAUER:   Ready for lunch?

12:56  11             THE WITNESS:   Yes.

12:56  12             THE VIDEOGRAPHER:   Off the record.   The

12:56  13   time is 12:57.

12:56  14             (Luncheon recess at 12:57)

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25
```

130

```
12:56   1        A F T E R N O O N   S E S S I O N

12:56   2        (1:52)

12:56   3    ALAN SCHWARTZ

12:56   4        resumed, having been previously duly

12:56   5        sworn by a Notary Public, was

12:56   6        examined and testified further

12:56   7        as follows:

01:50   8            THE VIDEOGRAPHER:  We are going back on the

01:50   9    record.  The time is 1:52.

01:50  10    CONTINUED EXAMINATION BY MR. HANAUER:

01:50  11        Q.   Professor Schwartz, can you please look at

01:50  12    paragraph 89 of your report, where you talk about the

01:51  13    programmatic contracts.

01:51  14            And you reference an agreement between

01:51  15    Ripple and GSR Holdings Limited?

01:51  16        A.   Yes.

01:51  17        Q.   And is Exhibit 10, which I -- which should

01:51  18    be in front of you, is that a copy of the GSR

01:51  19    agreement referenced in paragraph 89 of your report?

01:51  20            (Agreement between Ripple and GSR Holdings

01:51  21        Limited was marked Exhibit AS-10 for

01:51  22        identification, as of this date.)

01:51  23        A.   I'm afraid I don't have Exhibit 10.

01:51  24            Oh, okay.  Now I have Exhibit 10.

01:51  25            Yes.
```

131

| | | |
|---|---|---|
| 01:51 | 1 | Q.   And when you looked at the programmatic |
| 01:52 | 2 | contracts, what did you do, if anything, to determine |
| 01:52 | 3 | that the contracts you reviewed were the only |
| 01:52 | 4 | contracts governing the commercial relationship |
| 01:52 | 5 | between Ripple and its counterparty? |
| 01:52 | 6 | A.   I didn't do anything. |
| 01:52 | 7 | Q.   What is GSR Holdings Limited? |
| 01:52 | 8 | A.   GSR -- I think it's a digital asset |
| 01:52 | 9 | exchange. |
| 01:52 | 10 | Q.   And did all of the programmatic contracts |
| 01:52 | 11 | you reviewed or had reviewed for you by counsel have |
| 01:52 | 12 | a digital asset exchange as the counterparty? |
| 01:52 | 13 | MR. FIGEL:   Objection. |
| 01:53 | 14 | A.   I think the answer is yes. |
| 01:53 | 15 | Q.   And do you see, on Exhibit 10, Section 2, |
| 01:53 | 16 | it says, GSR agrees to transact in XRP according to |
| 01:53 | 17 | the then current programmatic schedule provided by |
| 01:53 | 18 | Ripple, (programmatic market activity) subject to the |
| 01:53 | 19 | terms of this agreement? |
| 01:53 | 20 | A.   Yes. |
| 01:53 | 21 | Q.   And did you review any of the program -- |
| 01:53 | 22 | programmatic market activity schedules? |
| 01:53 | 23 | A.   I think I reviewed the one attached to the |
| 01:53 | 24 | GSR agreement. |
| 01:53 | 25 | Q.   Is that the only one? |

132

| 01:53 | 1 | A. I don't recall -- I -- I probably reviewed |
| 01:54 | 2 | one or two others, but I mainly focused on that one. |
| 01:54 | 3 | Q. And which one was the one -- which schedule |
| 01:54 | 4 | was attached to the programmatic -- the GSR |
| 01:54 | 5 | agreement? |
| 01:54 | 6 | A. Whichever the one was attached was the one |
| 01:54 | 7 | I looked at. |
| 01:54 | 8 | Q. And that's where I'm getting at, I'm not |
| 01:54 | 9 | sure there is one attached to the agreement, and I |
| 01:54 | 10 | don't see any listed in your report. |
| 01:54 | 11 | A. No, I think this is about -- I have a |
| 01:54 | 12 | recollection, but it may be in error, in one of the |
| 01:54 | 13 | large binders that I was given, I saw such a thing, |
| 01:55 | 14 | but -- but I can't right now reconstruct it. |
| 01:55 | 15 | Q. And you think you may have looked at one? |
| 01:55 | 16 | Just one? |
| 01:55 | 17 | A. I haven't looked at a lot of them. |
| 01:55 | 18 | Q. Do you know how many exist? |
| 01:55 | 19 | A. No. |
| 01:55 | 20 | Q. Do you know what they say, the program-- |
| 01:55 | 21 | the programmatic market activity schedules? |
| 01:55 | 22 | A. I think they -- they control the -- the |
| 01:55 | 23 | timing and distribution of Ripple. |
| 01:55 | 24 | I'm sorry. |
| 01:55 | 25 | Q. Do you need to take that? |

133

| | | |
|---|---|---|
| 01:55 | 1 | A.   I don't have to take it, I just wanted to |
| 01:55 | 2 | not take it. |
| 01:55 | 3 | Q.   And I think your answer was -- when I asked |
| 01:55 | 4 | you about what the programmatic market activity |
| 01:55 | 5 | schedules say, I think you responded, They control |
| 01:55 | 6 | the timing and distribution of Ripple? |
| 01:55 | 7 | A.   Of -- I mean of XRP. |
| 01:56 | 8 | Q.   And could your opinions about the |
| 01:56 | 9 | programmatic contracts change based on what's in the |
| 01:56 | 10 | schedules that you did not review? |
| 01:56 | 11 | MR. FIGEL:  Objection. |
| 01:56 | 12 | A.   Yeah, if there's anything inconsistent with |
| 01:56 | 13 | anything I said, that would -- and it was materially |
| 01:56 | 14 | inconsistent, my views would change. |
| 01:56 | 15 | Q.   And do you see, on Exhibit 10, I want to |
| 01:56 | 16 | refer you to Section 3. |
| 01:56 | 17 | The remittance of proceeds to Ripple. |
| 01:57 | 18 | A.   Yes. |
| 01:57 | 19 | Q.   So what is your understanding of how that |
| 01:57 | 20 | works? |
| 01:57 | 21 | MR. FIGEL:  Objection. |
| 01:57 | 22 | Q.   Of how GSR makes money off this contract. |
| 01:57 | 23 | MR. FIGEL:  Objection. |
| 01:57 | 24 | A.   What I infer from the contract is the |
| 01:57 | 25 | percent is a commission. |

134

```
01:57   1          Q.    Did you review any other programmatic
01:57   2    contracts that allowed Ripple's counterparty to
01:57   3    retain a portion of the proceeds from distributing
01:57   4    the XRP obtained from Ripple?
01:57   5                 MR. FIGEL:   Objection.
01:57   6          A.    I think I did, but I don't have a direct
01:57   7    recollection of that.
01:57   8          Q.    If I asked you to assume that Ripple's
01:58   9    efforts caused the price of XRP to increase, would
01:58  10    Exhibit 10 lead GSR to expect profits based on
01:58  11    Riffle -- Ripple's efforts?
01:58  12                 MR. FIGEL:   Objection.
01:58  13          A.    As I recall, your question was efforts to
01:58  14    increase the price.  Was that -- was that what you
01:58  15    said?
01:58  16          Q.    Yeah.  Assume -- and I know it's disputed
01:58  17    in this case.  But just assume that Ripple's efforts,
01:58  18    in fact, caused the price of XRP to increase.
01:58  19                 Okay?
01:58  20          A.    Yeah.
01:58  21                 And the question is, would that affect
01:58  22    GSR's return?
01:58  23          Q.    If that's the case, can GSR expect profits
01:58  24    off this contract in Exhibit 10 based on Ripple's
01:59  25    efforts?
```

135

| | | |
|---|---|---|
| 01:59 | 1 | MR. FIGEL:  Objection. |
| 01:59 | 2 | A.   I can't answer that question without |
| 01:59 | 3 | knowing what -- what you -- what Ripple would be |
| 01:59 | 4 | doing. |
| 01:59 | 5 | For example, increasing the price is |
| 01:59 | 6 | consistent with reducing the supply.  Since GSR gets |
| 01:59 | 7 | compensated on the basis of the sales it makes, if |
| 01:59 | 8 | supply shrunk, they would lose money rather than gain |
| 01:59 | 9 | it so that there would be a question as to what |
| 01:59 | 10 | Ripple was doing. |
| 01:59 | 11 | Q.   Could reducing the supply of XRP increase |
| 01:59 | 12 | its price? |
| 01:59 | 13 | MR. FIGEL:  Objection. |
| 01:59 | 14 | A.   Reducing -- this is an "other things equal" |
| 01:59 | 15 | question? |
| 01:59 | 16 | Q.   Correct. |
| 01:59 | 17 | A.   Other things equal, if the supply curve |
| 01:59 | 18 | shifts in, the price goes up, assuming demand is |
| 01:59 | 19 | unchanged. |
| 01:59 | 20 | Q.   So assuming demand is unchanged, if the |
| 02:00 | 21 | supply of XRP drops, the price of XRP goes up? |
| 02:00 | 22 | MR. FIGEL:  Objection. |
| 02:00 | 23 | A.   I mean, I can't say that as a matter of |
| 02:00 | 24 | fact.  It's a matter of theory.  If demand is |
| 02:00 | 25 | unchanged and the supply of an asset falls, the price |

136

02:00  1    of the asset should rise.

02:00  2         Q.   Are you aware of any efforts by Ripple, to

02:00  3    decrease the supply of XRP available to the

02:00  4    marketplace?

02:00  5              MR. FIGEL:  Objection.

02:00  6         A.   No.

02:00  7              MS. PROSTKO:  Objection.

02:00  8         Q.   Are you aware of Ripple's escrow program?

02:00  9         A.   Excuse me?

02:00 10         Q.   Are you aware of Ripple's escrow program?

02:00 11         A.   Yes, I think so.

02:00 12         Q.   What do you know about that?

02:00 13              MR. FIGEL:  Objection.

02:00 14         A.   I think it's an orderly market provision.

02:00 15         Q.   Can you elaborate, please.

02:00 16         A.   I don't have much more to say than that,

02:00 17    that it's -- it's an interest of any seller to insure

02:01 18    that -- essentially to reduce volatility.

02:01 19         Q.   Is that in the contracts, the escrow

02:01 20    program?

02:01 21              MR. FIGEL:  Objection.

02:01 22         A.   No.  It's what I infer from -- it's what --

02:01 23    what I would infer, but it is not so far as I can

02:01 24    tell in the contract.

02:01 25         Q.   Can you look at paragraph 101 of your

                                                              137

02:01  1    report, please.

02:01  2           And you -- just picking up halfway through

02:01  3    that first sentence, you write, I conclude that each

02:01  4    of the programmatic contracts is in substance similar

02:01  5    to the GSR agreement.

02:02  6        A.   Yes.

02:02  7        Q.   And at the time you wrote that, you were

02:02  8    relying on Ripple's attorneys to tell you about the

02:02  9    contracts that you did not personally review?

02:02 10        A.   Yeah.   I think I've testified to that.

02:02 11        Q.   And would that be the case for any contract

02:02 12    that you didn't personally review, you relied on

02:02 13    Ripple's attorneys to tell you whether they were

02:02 14    similar to the contracts you did review?

02:02 15           MR. FIGEL:   Objection.

02:02 16        A.   That's partly right.   I also asked whether

02:02 17    there were material differences.

02:02 18        Q.   So for any contract that you did not

02:02 19    personally review, you relied on Ripple's counsel to

02:02 20    tell you whether there were material similarities or

02:02 21    differences to the contracts that you had reviewed?

02:03 22        A.   That's correct.

02:03 23        Q.   And then, in staying with paragraph 1,

02:03 24    you're saying, after you -- strike that.   Going back

02:03 25    to paragraph 101, after you write that the

                                                              138

02:03  1    programmatic contracts are similar to the GSR

02:03  2    agreement, you write, Specifically, each of these

02:03  3    contracts contains a provision stating that the

02:03  4    agreement in any related documents constitute the

02:03  5    entire agreement between the parties?

02:03  6        A.   Yes.

02:03  7        Q.   Is that type of provision, that's an

02:03  8    integration clause?

02:03  9        A.   Yes, it is.

02:03 10        Q.   And why is it that an integration clause

02:03 11    makes all the programmatic contracts similar in

02:03 12    substance?

02:03 13            MR. FIGEL:   Objection.

02:04 14        A.   I didn't say that.

02:04 15        Q.   Well, you write -- the first sentence says

02:04 16    they're all similar in substance.   Paragraph 101.

02:04 17    Right?

02:04 18        A.   Yes.

02:04 19        Q.   And then the second sentence is,

02:04 20    Specifically these contracts all have integration

02:04 21    clauses?

02:04 22        A.   Yeah, that's an example of similarity.

02:04 23    Other examples of similarity are in paragraph 102.

02:04 24        Q.   So I guess the -- the presence of

02:04 25    integration clauses is not what makes all of these

139

| | | |
|---|---|---|
| 02:04 | 1 | programmatic contracts the same; they just all happen |
| 02:04 | 2 | have to integration clauses? |
| 02:04 | 3 | A.   Well, they can't be the same because |
| 02:04 | 4 | they're different, logically speaking. |
| 02:04 | 5 | The contracts, I thought, were similar in |
| 02:05 | 6 | important respects, of which the presence of an |
| 02:05 | 7 | integration clause is one. |
| 02:05 | 8 | Q.   Do most commercial contracts between |
| 02:05 | 9 | sophisticated parties contain integration clauses? |
| 02:05 | 10 | A.   I can't answer that. |
| 02:05 | 11 | Q.   Well, you're an expert on contracts, right? |
| 02:05 | 12 | A.   There are maybe 20 million commercial |
| 02:05 | 13 | contracts a year.  If you're asking me whether |
| 02:05 | 14 | 2,417,312 have an integration clause, I'd say I don't |
| 02:05 | 15 | know the answer to that. |
| 02:05 | 16 | Q.   But, I mean, you studied contracts for a |
| 02:05 | 17 | long time, right? |
| 02:05 | 18 | A.   I have. |
| 02:05 | 19 | Q.   For most of the contracts you personally |
| 02:05 | 20 | reviewed between sophisticated parties, do those |
| 02:05 | 21 | contracts typically contain integration clauses? |
| 02:05 | 22 | A.   It would depend on the industry.  I don't |
| 02:05 | 23 | think they're in M&A contracts.  But they're in other |
| 02:05 | 24 | kinds of -- they're also not in a usual sales |
| 02:05 | 25 | contract.  But they tend to be in complicated |

140

| | | |
|---|---|---|
| 02:05 | 1 | agreements, such as construction contracts or the |
| 02:06 | 2 | agreements to construct a shopping center contract. |
| 02:06 | 3 | So it would depend on the context. |
| 02:06 | 4 | Sometimes you have one, and sometimes you don't. |
| 02:06 | 5 | Q.   Did any of the 1700 contracts you reviewed |
| 02:06 | 6 | or had counsel review in this case not contain |
| 02:06 | 7 | integration clauses? |
| 02:06 | 8 | A.   I think -- yes, I think I've seen some that |
| 02:06 | 9 | didn't. |
| 02:06 | 10 | Q.   What percentage generally of the contracts? |
| 02:06 | 11 | A.   I can't say without going over that sample |
| 02:06 | 12 | again. |
| 02:06 | 13 | Q.   Did any of the programmatic sales contracts |
| 02:06 | 14 | identified in your report contain a provision |
| 02:07 | 15 | restricting what someone who purchased XRP from |
| 02:07 | 16 | Ripple's counterparty could do with the XRP they |
| 02:07 | 17 | purchased? |
| 02:07 | 18 | MR. FIGEL:  Objection. |
| 02:07 | 19 | A.   No, I don't think so. |
| 02:07 | 20 | No. |
| 02:07 | 21 | Q.   Did you review any contracts between Ripple |
| 02:07 | 22 | and GSR where Ripple contracted with GSR to purchase |
| 02:07 | 23 | XRP in the secondary market? |
| 02:07 | 24 | A.   I don't recall that. |
| 02:07 | 25 | Q.   Did you consider any such contract in |

141

| | | |
|---|---|---|
| 02:07 | 1 | forming your opinions? |
| 02:07 | 2 | A.   I don't think so. |
| 02:08 | 3 | Q.   Okay.  Paragraph 105 discusses the |
| 02:08 | 4 | market-making contracts. |
| 02:08 | 5 | MR. HANAUER:  Can you send around 11, |
| 02:08 | 6 | please. |
| 02:08 | 7 | (GSS Agreement was marked Exhibit AS-11 for |
| 02:08 | 8 | identification, as of this date.) |
| 02:08 | 9 | A.   I think I have -- okay. |
| 02:08 | 10 | Q.   Is Exhibit 11 a copy of the GSS agreement |
| 02:08 | 11 | referenced in paragraph 105 of your report? |
| 02:09 | 12 | A.   I think so. |
| 02:09 | 13 | Q.   Any reason why you would say Exhibit 11 is |
| 02:09 | 14 | not a copy of the GSS agreement referenced in |
| 02:09 | 15 | paragraph 105 of your report? |
| 02:09 | 16 | A.   No. |
| 02:09 | 17 | Q.   When you looked at the market-making |
| 02:09 | 18 | contracts, did you do anything to determine that the |
| 02:09 | 19 | contracts you reviewed were the only contracts |
| 02:10 | 20 | governing the commercial relationship between Ripple |
| 02:10 | 21 | and its counterparty? |
| 02:10 | 22 | A.   No. |
| 02:10 | 23 | Q.   Independent of this case, have you reviewed |
| 02:10 | 24 | any contracts involving a market maker? |
| 02:10 | 25 | MR. FIGEL:  Objection. |

142

| 02:10 | 1 | A. | In my life? |

02:10  1        A.    In my life?

02:10  2        Q.    Yeah.

02:10  3        A.    I can't remember.  Probably, but I can't

02:10  4   remember for sure.

02:10  5        Q.    Can you name any today as you sit here

02:10  6   today?

02:10  7        A.    No.

02:10  8        Q.    Are you offering any opinion on how

02:10  9   Exhibit 11 is different or similar than any other

02:10 10   contract involving a securities market maker?

02:10 11              MR. FIGEL:  Objection.

02:10 12        A.    No, I'm not.

02:11 13        Q.    By contracting with market makers, did

02:11 14   Ripple help facilitate the trading of XRP?

02:11 15              MR. FIGEL:  Objection.

02:11 16        A.    I can infer such an intention from the

02:11 17   agreement.

02:11 18              Other than that, I don't have an answer.

02:11 19        Q.    What is the job of a market maker?

02:11 20        A.    To make a market.

02:11 21        Q.    And does making that market help facilitate

02:11 22   trading in whatever is being sold?

02:11 23        A.    Yes.

02:11 24        Q.    By contracting with market makers, did

02:11 25   Ripple help provide investors with a mechanism to

                                                              143

```
02:11  1    sell XRP at a profit?

02:11  2              MR. FIGEL:  Objection.

02:11  3              MS. PROSTKO:  Objection.

02:11  4        A.    I'm going to resist the last part of your

02:11  5    question.  They -- it provided an opportunity to

02:12  6    trade XRP.  Whether at a profit or not, I have no

02:12  7    idea.

02:12  8        Q.    So by contracting with market makers,

02:12  9    Ripple provided an opportunity for traders to trade

02:12 10    in XRP?

02:12 11              MR. FIGEL:  Objection.

02:12 12        A.    That is the purpose of -- of these

02:12 13    agreements.

02:12 14        Q.    And do you see on Exhibit 11 how the

02:12 15    agreement talks about a defined spread and a

02:12 16    deployment amount?

02:12 17        A.    Yes.

02:13 18        Q.    Did the other market-making contracts you

02:13 19    reviewed contain similar provisions?

02:13 20        A.    I can't recall right now.

02:13 21        Q.    In paragraph 108 of your report, you say

02:13 22    that the market-making contract provides that Ripple

02:13 23    will deliver 90 million XRP --

02:13 24        A.    Yes.

02:13 25        Q.    -- to GSS?
```

144

| | | |
|---|---|---|
| 02:13 | 1 | A.   Yes. |
| 02:13 | 2 | Q.   Is that 90 million XRP, is that |
| 02:13 | 3 | compensation to GSS, or is that for GSS to use in its |
| 02:13 | 4 | market-making activities? |
| 02:13 | 5 | MR. FIGEL:  Objection. |
| 02:14 | 6 | A.   The contract defines it as compensation. |
| 02:14 | 7 | Q.   Is there any restrictions in the GSS |
| 02:14 | 8 | agreement on what GSS can do with the 90 million XRP |
| 02:14 | 9 | it obtained from Ripple? |
| 02:14 | 10 | A.   I don't recall any such restrictions. |
| 02:14 | 11 | Q.   And since GSS is obtaining 90 million XRP |
| 02:14 | 12 | as compensation, does that incentivize GSS to make a |
| 02:14 | 13 | market for XRP at a higher price? |
| 02:14 | 14 | MR. FIGEL:  Objection. |
| 02:15 | 15 | A.   That's payment for GSR to make a market, |
| 02:15 | 16 | which is to say it's payment for GSR to do what they |
| 02:15 | 17 | do. |
| 02:15 | 18 | Q.   GSS? |
| 02:15 | 19 | A.   GSS, that is. |
| 02:15 | 20 | Q.   So -- but now -- once GSR -- once GSS |
| 02:15 | 21 | obtains that 90 million XRP -- |
| 02:15 | 22 | A.   Right. |
| 02:15 | 23 | Q.   -- it's in GSS's interest for that XRP to |
| 02:15 | 24 | be worth more. |
| 02:15 | 25 | MR. FIGEL:  Objection. |

145

```
02:15  1          A.    Not necessarily.

02:15  2          Q.    Why do you say that?

02:15  3          A.    Because if their intention is to convert it

02:15  4    immediately into dollars, they only care about the

02:15  5    price at the time they get it.

02:16  6          Q.    Do you know what GSS's intentions were to

02:16  7    do with the $90 million it obtained from -- or

02:16  8    90 million XRP it obtained from Ripple?

02:16  9          A.    No.

02:16 10          Q.    So can you look at paragraph 111 of your

02:16 11    report.

02:16 12                Again, I'd ask you to compare that with

02:16 13    paragraph 102.

02:16 14                And it looks like paragraph 102 contains a

02:16 15    bullet point that paragraph 111 does not, that

02:16 16    says -- discusses provisions that create an ongoing

02:17 17    obligation owed by Ripple to the counterparty?

02:17 18          A.    Yes.

02:17 19          Q.    Did you find any such provisions in the GSS

02:17 20    contract or market maker contracts?

02:17 21          A.    No.

02:17 22          Q.    So, again, why were you listing five bullet

02:17 23    points in paragraph 102 but only four bullet points

02:17 24    in paragraph 111?

02:17 25          A.    I can't recall why I did that, but I do
```

                                                                    146

| | | |
|---|---|---|
| 02:17 | 1 | know that there's no such language in Exhibit 10. |
| 02:17 | 2 | Q.    What about Exhibit 11? |
| 02:17 | 3 | A.    Which one is -- oh, Exhibit 11? |
| 02:17 | 4 | I don't -- I have -- 5, 4 -- oh.  This |
| 02:18 | 5 | is -- this is Exhibit 10. |
| 02:18 | 6 | MR. FIGEL:  Is that -- |
| 02:18 | 7 | A.    You referred to Exhibit 11, I don't think I |
| 02:18 | 8 | have an Exhibit 11. |
| 02:18 | 9 | MR. FIGEL:  I think it's in front of right |
| 02:18 | 10 | there. |
| 02:18 | 11 | A.    There's Exhibit 10. |
| 02:18 | 12 | Oh, this is Exhibit -- no, I didn't see |
| 02:18 | 13 | anything in that agreement either. |
| 02:18 | 14 | MR. FIGEL:  Just so the record's clear, do |
| 02:18 | 15 | you have Exhibit 11? |
| 02:18 | 16 | THE WITNESS:  I do.  It's right here. |
| 02:18 | 17 | MR. HANAUER:  Mr. Court Reporter, was I |
| 02:18 | 18 | asking a question about -- an authentication question |
| 02:18 | 19 | on Exhibit 11?  Just to make sure I have it. |
| 02:18 | 20 | (The record was read back.) |
| 02:19 | 21 | Q.    Okay.  Sorry about that, sir. |
| 02:19 | 22 | Just so I have this in the record, is |
| 02:19 | 23 | Exhibit 11 an accurate copy of the GSS agreement |
| 02:19 | 24 | referenced in paragraph 105 of your report? |
| 02:19 | 25 | A.    Yes. |

147

| 02:19 | 1 | Q. Thank you. |
| 02:19 | 2 | Did any of the market maker contracts you |
| 02:19 | 3 | reviewed contain a provision restricting what someone |
| 02:19 | 4 | who purchased XRP from the market maker could do with |
| 02:19 | 5 | the XRP they purchased? |
| 02:20 | 6 | MR. FIGEL:  Objection. |
| 02:20 | 7 | A.  No. |
| 02:20 | 8 | MR. HANAUER:  Exhibit 12. |
| 02:20 | 9 | (Copy of ▮▮▮▮ Agreement was marked Exhibit |
| 02:20 | 10 | AS-12 for identification, as of this date.) |
| 02:20 | 11 | Q.  While we're passing out exhibits, I will |
| 02:20 | 12 | ask you to refer to paragraph 116 of your report. |
| 02:20 | 13 | And once you've had a chance to review |
| 02:20 | 14 | Exhibit 12 I'll ask you, is Exhibit 12 a copy of the |
| 02:20 | 15 | Azimo agreement referenced in paragraph 116 of your |
| 02:20 | 16 | report? |
| 02:20 | 17 | A.  Yes. |
| 02:20 | 18 | Q.  And when you looked at the product |
| 02:21 | 19 | incentive contracts, did you do anything to determine |
| 02:21 | 20 | that the contracts you reviewed were the only |
| 02:21 | 21 | contracts governing the commercial relationship |
| 02:21 | 22 | between Ripple and its counterparty? |
| 02:21 | 23 | A.  No. |
| 02:21 | 24 | Q.  What is ▮▮▮▮ ? |
| 02:21 | 25 | (Witness reviewing document.) |

148

02:21 1       A.    ███████ is a company that -- well, I must

02:21 2    say, I don't know very much about ██████ but it

02:21 3    essentially does transactions in cryptocurrency in

02:22 4    various markets.

02:22 5       Q.    Do you know what type -- type or -- of

02:22 6    transactions or the purpose of the transactions?

02:22 7       A.    No.

02:22 8       Q.    And do you see how the preamble to

02:22 9    Exhibit 12 references a master-hosted services

02:22 10   agreement between Ripple and ███████

02:22 11      A.    Are you referring to my report or to

02:22 12   Exhibit 12?

02:22 13      Q.    Exhibit 12.  The preamble to Exhibit 12.

02:22 14      A.    Yes.

02:22 15      Q.    Did you review the master-hosted services

02:22 16   agreement between Ripple and ███████

02:22 17      A.    I don't recall doing so.

02:22 18      Q.    Do you know if ███████ was a user of Ripple's

02:23 19   ODL product?

02:23 20      A.    I don't know whether it was or wasn't.

02:23 21      Q.    Are you offering an opinion whether --

02:23 22   okay.  Let me try and help you out with this.  Let's

02:23 23   look at paragraph 117.

02:23 24            Can you just read that to yourself.

02:23 25      A.    Yes.

149

02:23  1             Oh, yes.  Yeah.  It -- that's -- I now --
02:23  2  it has refreshed my recollection.
02:23  3        Q.   Okay.  So I'll ask you again, was ███ a
02:23  4  user of Ripple's ODL product?
02:23  5        A.   Yes.
02:23  6        Q.   And you say that -- in paragraph 117, you
02:24  7  say, Ripple purchases services from ███ in exchange
02:24  8  for payment.
02:24  9        A.   Yes.
02:24 10        Q.   Does ███ also purchase services from
02:24 11  Ripple?
02:24 12        A.   Well, if it's using the ODL product, it
02:24 13  must purchase services, but I was referring to the
02:24 14  particular contract in Exhibit 12.
02:24 15        Q.   And you reference, in paragraph 117, how
02:24 16  the ███ agreement obligates Ripple to pay █ million
02:24 17  in XRP -- $ million worth of XRP --
02:24 18        A.   Yes.
02:24 19        Q.   -- in exchange for ███ meeting certain
02:24 20  milestones?
02:24 21        A.   Not milestones.  Well, yes, incentive
02:24 22  milestones, but then it's later defined in particular
02:25 23  as a number of transactions.
02:25 24        Q.   Are you offering an opinion whether it
02:25 25  would be commercially viable for ███ to use ODL

                                                              150

| | | |
|---|---|---|
| 02:25 | 1 | absent the incentives paid by Ripple? |
| 02:25 | 2 | MR. FIGEL:  Objection. |
| 02:25 | 3 | A.  No. |
| 02:25 | 4 | Q.  Can you look at paragraph -- or Section 4, |
| 02:25 | 5 | Exhibit A to Exhibit 12. |
| 02:26 | 6 | It's part of Exhibit 12 with a Bates number |
| 02:26 | 7 | ending in 182. |
| 02:26 | 8 | A.  Yes, I'm looking at that now. |
| 02:26 | 9 | Q.  And do you see that ▮ acknowledges that |
| 02:26 | 10 | virtual currency, including XRP, is not legal tender? |
| 02:26 | 11 | A.  Yes. |
| 02:26 | 12 | Q.  Did any of the contracts you reviewed treat |
| 02:26 | 13 | XRP as either fiat currency or legal tender? |
| 02:26 | 14 | MR. FIGEL:  Objection. |
| 02:26 | 15 | A.  No, I don't recall seeing any such |
| 02:26 | 16 | provisions. |
| 02:26 | 17 | Q.  Do you have an opinion whether XRP is |
| 02:26 | 18 | either legal tender or fiat currency? |
| 02:27 | 19 | MR. FIGEL:  Objection. |
| 02:27 | 20 | A.  I don't think it's either one. |
| 02:27 | 21 | Q.  So paragraph 124 of your report references |
| 02:27 | 22 | an agreement with -- references the ▮ |
| 02:27 | 23 | pilot agreement. |
| 02:28 | 24 | Do you see that? |
| 02:28 | 25 | A.  Uh-huh. |

151

| | | |
|---|---|---|
| 02:28 | 1 | Q.   And you conclude paragraph 124 by writing, |
| 02:28 | 2 | Ripple agrees to pay ▮▮▮ on a monthly basis, |
| 02:28 | 3 | ▮▮▮▮▮ of the aggregate value of XRP purchased or |
| 02:28 | 4 | sold by ▮▮▮ on Bitstamp using its algorithm? |
| 02:28 | 5 | A.   Yes. |
| 02:28 | 6 | Q.   By contracting with ▮▮▮ did Ripple help |
| 02:28 | 7 | facilitate the trading of XRP? |
| 02:28 | 8 | MR. FIGEL:  Objection. |
| 02:28 | 9 | A.   I don't know.  That's a question of fact as |
| 02:28 | 10 | to the effect of the agreement.  I don't have any |
| 02:28 | 11 | opinion on the effect of any of these agreements. |
| 02:29 | 12 | Q.   Going back to ▮▮▮ what purchases -- or |
| 02:29 | 13 | what services did Ripple purchase from ▮▮▮? |
| 02:29 | 14 | MR. FIGEL:  Objection. |
| 02:29 | 15 | A.   To use Ripple in -- to use XRP in |
| 02:29 | 16 | transactions in the specified markets.  Specified |
| 02:29 | 17 | countries, actually. |
| 02:29 | 18 | Q.   Did Ripple pay ▮▮▮ to buy and sell XRP in |
| 02:29 | 19 | the market? |
| 02:29 | 20 | MR. FIGEL:  Objection. |
| 02:29 | 21 | A.   I don't recall any contract provisions to |
| 02:29 | 22 | that effect. |
| 02:29 | 23 | Q.   And again, you did not review the master |
| 02:29 | 24 | services agreement between Ripple and ▮▮▮ |
| 02:30 | 25 | A.   I don't recall reviewing that particular |

152

02:30  1    one.

02:30  2         Q.   Can you look at paragraph 131, please.

02:30  3              And do you see how you write, the --

02:30  4    Specifically the product incentive contracts

02:30  5    typically contain, and then there are two bullet

02:31  6    points?

02:31  7         A.   Uh-huh.

02:31  8         Q.   So, similar question to what I was asking

02:31  9    you earlier about the integration clause.  Is it

02:31 10    the -- are you -- are you saying that all of the

02:31 11    products incentive contracts had the two provisions

02:31 12    listed in the bullet points on paragraph 31, or are

02:31 13    you saying that those two provisions are what make

02:31 14    the product incentive contracts similar in substance?

02:31 15              MR. FIGEL:  Objection.

02:31 16         A.   What makes the contracts similar are the

02:31 17    clauses they have in common and the clauses that they

02:31 18    in common lack.  So I'm not basing similarity on any

02:31 19    particular term.

02:31 20         Q.   Would you be able to find provision -- are

02:32 21    the two provisions listed in -- on the bullet points

02:32 22    in paragraph 131, are those common provisions in

02:32 23    contracts in a whole variety of industries?

02:32 24         A.   I guess I would answer it in this way.

02:32 25              With a lot of contracts, there is -- there

                                                                153

02:32  1    are few or no precontractual communications between

02:32  2    parties.  Example, in a typical sales contract, if

02:32  3    you want to ship TVs to a retailer, they're sold

02:32  4    under a standard contract, then retailer takes the

02:32  5    contract or it doesn't.

02:32  6              In other areas, there are discussions prior

02:32  7    to the making of a contract.  And that -- it's --

02:33  8    that creates an incentive to use a merger clause in

02:33  9    order to ensure that the enforceable promises people

02:33 10    make are in their written contract.

02:33 11         Q.   Did any of the product incentive contracts

02:33 12    identified in your report contain a provision

02:33 13    restricting what someone who purchased XRP from

02:33 14    Ripple's counterparty could do with the XRP they

02:33 15    purchased?

02:33 16              MR. FIGEL:  Objection.

02:33 17         A.   No.

02:33 18         Q.   Did any contract identified in your report

02:33 19    contain a provision restricting what someone who

02:33 20    purchased XRP from Ripple's counterparty could do

02:33 21    with the XRP they purchased?

02:33 22              MR. FIGEL:  Objection.

02:33 23         A.   No.  Maybe this is volunteering, but you

02:34 24    couldn't bind a party who wasn't -- an agent who

02:34 25    wasn't a party to a contract to do or not do things.

                                                              154

02:34 1      Q.   So, it would have been impossible for

02:34 2  Ripple to put restrictions on what the purchaser of

02:34 3  XRP from one of Ripple's counterparties could do with

02:34 4  the XRP purchased from the counterparty?

02:34 5           MR. FIGEL:  Objection.

02:34 6      A.   Well, Ripple could do what it did do.  It

02:34 7  could require the buyer of XRP to restrict the use by

02:34 8  parties down in the distribution chain.

02:34 9           And I think I recall provisions saying that

02:34 10  the buyer wouldn't sell to anyone who had an

02:34 11  investment purpose or the like.

02:35 12          But the most you could do is -- is to have

02:35 13  your -- is to require your counterparty to make

02:35 14  transactions with nonparties under certain terms so

02:35 15  that if the counterparty didn't do that, you could

02:35 16  sue the counterparty.

02:35 17     Q.   Did any of Ripple's contracts identified in

02:35 18  your report bind third parties that were not Ripple's

02:35 19  counterparties?

02:35 20          MR. FIGEL:  Objection.

02:35 21     A.   No.

02:35 22     Q.   Can we go to paragraph 135 where you talk

02:35 23  about the employee and executive compensation

02:36 24  contract.

02:36 25     A.   Yes.

155

02:36  1          MR. HANAUER:  Bless you.

02:36  2      Q.   Did any of the employee and executive

02:36  3  compensation contracts contain a restriction on what

02:36  4  the Ripple employee or executive could do with the

02:36  5  XRP they obtained from Ripple?

02:36  6          MR. FIGEL:  Objection.

02:36  7      A.   I don't think so.

02:36  8      Q.   Did you review any of Defendant

02:37  9  Garlinghouse's employee executive compensation

02:37 10  contracts with Ripple?

02:37 11      A.   No.

02:37 12      Q.   Did you review any of Defendant

02:37 13  Garlinghouse's contracts between him and Ripple?

02:37 14      A.   No.

02:37 15      Q.   Did you consider any of Defendant

02:37 16  Garlinghouse's contracts in forming your opinions?

02:37 17      A.   No.

02:38 18      Q.   Could you go to paragraph 144 of your

02:38 19  report, please.

02:38 20          (MoneyGram Agreement was marked Exhibit

02:38 21      AS-15 for identification, as of this date.)

02:38 22      Q.   Is Exhibit 15 a copy of the MoneyGram

02:38 23  agreement referenced in paragraph 144 of your report.

02:38 24      A.   Yes.

02:38 25      Q.   And when you looked at the master-hosted

                                                          156

02:39  1    services agreements, did you do anything to determine

02:39  2    that the contracts you reviewed were the only

02:39  3    contracts governing the commercial relationship

02:39  4    between Ripple and its counterparty?

02:39  5         A.   No.

02:39  6         Q.   Why was Ripple contracting with MoneyGram?

02:39  7              MR. FIGEL:  Objection.

02:39  8         A.   I don't know why, as a matter of fact, they

02:39  9    were contracting with MoneyGram.

02:39  10        Q.   And do you see how -- or can I refer you to

02:39  11   paragraph 147 of your report.

02:39  12        A.   Uh-huh.

02:40  13        Q.   Do you see how that discusses Ripple paying

02:40  14   rebates to MoneyGram?

02:40  15        A.   Yes.

02:40  16        Q.   Are you offering an opinion whether it

02:40  17   would be commercially viable for MoneyGram to use

02:40  18   Ripple's products, if not for the rebates and

02:40  19   incentives Ripple offered?

02:40  20             MR. FIGEL:  Objection.

02:40  21        A.   No.

02:41  22        Q.   Can I refer you to paragraph 160 of your

02:41  23   report, please.

02:41  24             (Loan Agreement was marked Exhibit AS-16

02:41  25        for identification, as of this date.)

157

| | | |
|---|---|---|
| 02:41 | 1 | Q.    Before I ask you about the loan agreements, |
| 02:41 | 2 | we just looked at the ████ agreement and the |
| 02:41 | 3 | MoneyGram agreement. |
| 02:41 | 4 | A.    Yes. |
| 02:41 | 5 | Q.    Why did you put them in different |
| 02:41 | 6 | categories? |
| 02:41 | 7 | A.    Because the loan is a different transaction |
| 02:41 | 8 | from -- |
| 02:41 | 9 | Q.    I'm sorry.  And I'm not trying to be |
| 02:41 | 10 | confusing or anything like that. |
| 02:41 | 11 | A.    No. |
| 02:41 | 12 | Q.    Before we get to the loan agreements, I |
| 02:41 | 13 | want to refer back to the last two sets of agreements |
| 02:41 | 14 | we looked at, the MoneyGram agreement and the ████ |
| 02:41 | 15 | agreement. |
| 02:41 | 16 | And my question is, why did you put them |
| 02:42 | 17 | into different categories? |
| 02:42 | 18 | A.    The -- because they had different |
| 02:42 | 19 | commercial purposes. |
| 02:42 | 20 | The ████ agreement, at least as I infer |
| 02:42 | 21 | from the words, was an agreement in which ████ is |
| 02:42 | 22 | being paid to conduct certain transactions. |
| 02:42 | 23 | In the MoneyGram agreement, MoneyGram was |
| 02:42 | 24 | using a service that Ripple provided.  So they were |
| 02:42 | 25 | different deals. |

158

| | | |
|---|---|---|
| 02:42 | 1 | Q.   Do you know if ▮▮▮ used a service that |
| 02:42 | 2 | Ripple provided? |
| 02:42 | 3 | A.   I don't know any more than what the |
| 02:42 | 4 | contract says. |
| 02:42 | 5 | Q.   The contract that you reviewed says? |
| 02:42 | 6 | A.   Yes. |
| 02:43 | 7 | Q.   So do you see Exhibit 16 in front of you? |
| 02:43 | 8 | A.   I do. |
| 02:43 | 9 | Q.   Is Exhibit 16 a copy of the loan agreement |
| 02:43 | 10 | referenced in paragraph 160 of your report? |
| 02:43 | 11 | A.   Yes. |
| 02:43 | 12 | Q.   What is ▮▮▮ or ▮▮▮? |
| 02:44 | 13 | A.   I'm not sure what ▮▮▮ is. |
| 02:44 | 14 | Q.   Do you know what their -- what ▮▮▮ |
| 02:44 | 15 | business is? |
| 02:44 | 16 | A.   Not right now, no. |
| 02:44 | 17 | Q.   Do you know what the businesses of the |
| 02:44 | 18 | other counterparties to the loan agreements |
| 02:44 | 19 | identified in your report are? |
| 02:44 | 20 | A.   I don't recall. |
| 02:44 | 21 | Q.   Do you know what the purpose of the loans |
| 02:44 | 22 | identified in your report were? |
| 02:44 | 23 | A.   I think ▮▮▮ is a financial |
| 02:44 | 24 | services company, which is about all I know about it. |
| 02:45 | 25 | I would infer from looking at the agreement |

159

```
02:45  1   that the goal was to have          use XRP, but I
02:45  2   don't know that as a matter of fact.
02:45  3       Q.   Was the loan agreement with
02:45  4   related to a broader commercial relationship between
02:45  5   Ripple and          ?
02:45  6            MR. FIGEL:  Objection.
02:45  7       A.   I don't know that.
02:45  8       Q.   Were -- do you know if any of the other
02:45  9   loan agreements identified in your report were part
02:45 10   of larger commercial relationships between Ripple and
02:45 11   the counterparty?
02:45 12       A.   I don't know that.
02:45 13       Q.   Do you know if Ripple paid
02:45 14   incentives, bonuses, or rebates as part of a broader
02:45 15   commercial relationship?
02:45 16            MR. FIGEL:  Objection.
02:46 17       A.   No.
02:46 18       Q.   Do you know if Ripple paid the other loan
02:46 19   and promissory note counterparties bonuses,
02:46 20   incentives, or rebates as part of a larger commercial
02:46 21   relationship?
02:46 22       A.   No.
02:46 23       Q.   Did Ripple reimburse          for the --
02:46 24   for the interest Ripple charged on the loan?
02:46 25            MR. FIGEL:  Objection.
```

160

| | | |
|---|---|---|
| 02:46 | 1 | A.   Well, there's no contractual obligation for |
| 02:46 | 2 | Ripple to do that.  If -- at least no contractual |
| 02:47 | 3 | obligation under the digital asset loan agreement. |
| 02:47 | 4 | Q.   Do you know if Ripple reimbursed |
| 02:47 | 5 | for the interest it charged on the loan? |
| 02:47 | 6 | A.   No. |
| 02:47 | 7 | Q.   Do you know if Ripple reimbursed any other |
| 02:47 | 8 | of the loan or promissory note counterparties for the |
| 02:47 | 9 | interest it charged? |
| 02:47 | 10 | A.   No. |
| 02:47 | 11 | Q.   Did the loan -- the         loan agreement |
| 02:47 | 12 | contain a provision restricting what         could |
| 02:47 | 13 | do with the XRP Ripple loaned it? |
| 02:47 | 14 | A.   Such a restriction would -- is not in the |
| 02:47 | 15 | contract. |
| 02:47 | 16 | Q.   Did any other of the loans or promissory |
| 02:47 | 17 | notes identified in your report contain restrictions |
| 02:47 | 18 | on what Ripple's counterparty could do with the XRP? |
| 02:48 | 19 | A.   I don't recall seeing any of them in this |
| 02:48 | 20 | type of agreement. |
| 02:48 | 21 | Q.   May I direct your attention to |
| 02:48 | 22 | paragraph 170, please. |
| 02:48 | 23 |          Custody Agreement was marked Exhibit |
| 02:48 | 24 |     AS-17 for identification, as of this date.) |
| 02:48 | 25 | Q.   And Exhibit 17, is that a copy of the |

161

| | | |
|---|---|---|
| 02:49 | 1 | custody agreement referenced in paragraph 170 of your |
| 02:49 | 2 | report? |
| 02:49 | 3 | A.   Yes. |
| 02:49 | 4 | Q.   When you looked at the custody agreements |
| 02:49 | 5 | referenced in your report, did you do anything to |
| 02:49 | 6 | determine that those agreements that you reviewed |
| 02:49 | 7 | were the only contracts governing the commercial |
| 02:49 | 8 | relationship between Ripple and its counterparty? |
| 02:49 | 9 | A.   No. |
| 02:49 | 10 | Q.   So the counterparty to the ███ custody |
| 02:49 | 11 | agreement is an entity called ████████████ |
| 02:49 | 12 | A.   Yes. |
| 02:49 | 13 | Q.   What is their business? |
| 02:49 | 14 | A.   I don't know. |
| 02:50 | 15 | Q.   Do you know the businesses of any of the |
| 02:50 | 16 | other parties to the custody agreements identified in |
| 02:50 | 17 | your report? |
| 02:50 | 18 | A.   I don't recall. |
| 02:50 | 19 | Q.   And do you know what the purpose was of the |
| 02:50 | 20 | ███ custody agreement? |
| 02:50 | 21 | MR. FIGEL:   Objection. |
| 02:50 | 22 | A.   The customer had purchased XRP.  And it |
| 02:50 | 23 | wanted Ripple to essentially hold it for them, to be |
| 02:50 | 24 | the custodian of it for them rather than take |
| 02:50 | 25 | possession themselves. |

162

| | | |
|---|---|---|
| 02:50 | 1 | Q.   And do you know what ▮▮▮▮▮ |
| 02:50 | 2 | intended to do with the XRP Ripple loaned it? |
| 02:51 | 3 | MR. FIGEL:  Objection. |
| 02:51 | 4 | A.   No. |
| 02:51 | 5 | I think -- no, I don't. |
| 02:51 | 6 | Q.   And was the ▮▮ custody agreement |
| 02:51 | 7 | substantially similar to the other custody agreements |
| 02:51 | 8 | you reviewed? |
| 02:51 | 9 | A.   Yes. |
| 02:51 | 10 | Q.   So the ▮▮ custody agreement lays out the |
| 02:51 | 11 | terms for Ripple to custody XRP that ▮▮▮▮▮ had |
| 02:51 | 12 | previously purchased from Ripple? |
| 02:51 | 13 | A.   That is my understanding. |
| 02:52 | 14 | Q.   And why did ▮▮▮▮▮ originally buy XRP |
| 02:52 | 15 | from Ripple? |
| 02:52 | 16 | MR. FIGEL:  Objection. |
| 02:52 | 17 | A.   I don't know. |
| 02:52 | 18 | Q.   Can I ask you to look at paragraph 8 of |
| 02:52 | 19 | Exhibit 17. |
| 02:52 | 20 | A.   Uh-huh. |
| 02:52 | 21 | Q.   And after that first romanette, is ▮▮▮ |
| 02:52 | 22 | ▮▮▮ representing that its holding the XRP for |
| 02:52 | 23 | investment purposes? |
| 02:53 | 24 | A.   It's representing it has the authority to |
| 02:53 | 25 | hold XRP for investment purposes. |

163

| | | |
|---|---|---|
| 02:53 | 1 | Q. And do you know whether or not ████ |
| 02:53 | 2 | was, in fact, holding XRP for investment purposes? |
| 02:53 | 3 | A. No. |
| 02:53 | 4 | Q. How many of the other custody agreements |
| 02:53 | 5 | contained a similar provision where the counterparty |
| 02:53 | 6 | represented that it is authorized to hold XRP for |
| 02:53 | 7 | investment purposes? |
| 02:53 | 8 | A. I think they all did. |
| 02:53 | 9 | Q. Was the ██ custody agreement related to a |
| 02:53 | 10 | broader commercial relationship between Ripple and |
| 02:53 | 11 | ████ |
| 02:53 | 12 | A. I don't know that. |
| 02:53 | 13 | Q. Were the other custody agreements |
| 02:53 | 14 | identified in your report part of -- strike that. |
| 02:54 | 15 | Did you review any other contracts, |
| 02:54 | 16 | reflecting a broader commercial relationship between |
| 02:54 | 17 | Ripple and the counterparties to the other custody |
| 02:54 | 18 | agreements identified in your report? |
| 02:54 | 19 | MR. FIGEL: Objection. |
| 02:54 | 20 | A. No. |
| 02:54 | 21 | Q. Do you know if Ripple paid ████ |
| 02:54 | 22 | incentives, bonuses, or rebates? |
| 02:54 | 23 | MR. FIGEL: Objection. |
| 02:54 | 24 | A. No, I don't know whether they did or not. |
| 02:54 | 25 | Q. Do you know if Ripple paid incentives, |

164

| | | |
|---|---|---|
| 02:54 | 1 | bonuses, or rebates to the other counterparties of |
| 02:54 | 2 | the custody agreements? |
| 02:54 | 3 | MR. FIGEL:  Objection. |
| 02:54 | 4 | A.  No. |
| 02:54 | 5 | Q.  Did the ███ custody agreement contain a |
| 02:54 | 6 | provision restricting what ███████ could do with |
| 02:55 | 7 | the XRP that Ripple custodied? |
| 02:55 | 8 | A.  No. |
| 02:55 | 9 | Q.  Did the other custody agreements identified |
| 02:55 | 10 | in your report contain provisions restricting what |
| 02:55 | 11 | Ripple's counterparty could do with the XRP? |
| 02:55 | 12 | A.  Not to my knowledge. |
| 02:55 | 13 | Q.  How are you doing on breaks? |
| 02:55 | 14 | A.  Doing okay. |
| 02:55 | 15 | Q.  Doing okay.  All right.  Let's keep going. |
| 02:55 | 16 | Can I ask you to look at page -- I'm sorry, |
| 02:55 | 17 | paragraph 178 of your report. |
| 02:56 | 18 | And you reference that ███████ is a |
| 02:56 | 19 | charitable organization that provides grants and |
| 02:56 | 20 | other funding to Social Impact Ventures? |
| 02:56 | 21 | A.  Yes. |
| 02:56 | 22 | Q.  What is your basis for saying that? |
| 02:56 | 23 | A.  I think that -- that they were identified |
| 02:56 | 24 | as such in the contract. |
| 02:56 | 25 | MR. HANAUER:  Let's do Exhibit 18. |

165

| | | |
|---|---|---|
| 02:56 | 1 | (Copy of Custody Agreement was marked |
| 02:56 | 2 | Exhibit AS-18 for identification, as of this |
| 02:56 | 3 | date.) |
| 02:57 | 4 | Q.  Is Exhibit 18 a custody -- a copy of the |
| 02:57 | 5 | custody agreement identified in paragraph 178 of your |
| 02:57 | 6 | report? |
| 02:57 | 7 | A.  Yes. |
| 02:57 | 8 | Q.  I'll -- I'll return to my question, and -- |
| 02:57 | 9 | and what is your basis for saying that ███████ is |
| 02:57 | 10 | a charitable organization that provides grants and |
| 02:57 | 11 | funding to Social Impact Ventures? |
| 02:57 | 12 | A.  It's described as a foundation.  Foundation |
| 02:58 | 13 | is not a profit-making company.  So foundation's |
| 02:58 | 14 | usually charitable companies, which essentially make |
| 02:58 | 15 | grants. |
| 02:58 | 16 | I might have learned, in conversation about |
| 02:58 | 17 | this case, about Social Impact Ventures.  But it |
| 02:58 | 18 | was -- and I don't recall where I heard that, but it |
| 02:58 | 19 | was clear to me that -- just from reading the |
| 02:58 | 20 | agreement that we were not talking about a |
| 02:58 | 21 | profit-making enterprise as a counterparty. |
| 02:58 | 22 | Q.  Did you write the words, "A charitable |
| 02:58 | 23 | organization that provides grants and other funding |
| 02:58 | 24 | to Social Impact Ventures"? |
| 02:58 | 25 | A.  Yes, I did. |

166

```
02:58   1         Q.   Are you aware that the amended complaint in
02:58   2    this case alleges that Ripple and the individual
02:58   3    defendants used ███████████ as a mechanism to achieve
02:59   4    Ripple's goal of distributing XRP into the public
02:59   5    trading market and increase trading in XRP?
02:59   6         A.   I'm not aware of that.
02:59   7         Q.   Are you offering any opinion that
02:59   8    challenges those allegations?
02:59   9         A.   I don't have an opinion one way or the
02:59  10    other.
02:59  11         Q.   Are you offering any opinion challenging
02:59  12    the amended complaint's -- strike that.
02:59  13              Are you offering any opinion challenging
02:59  14    any of the amended complaint's allegations relating
02:59  15    to Rippleworks?
02:59  16              MR. FIGEL:  Objection.
02:59  17         A.   I would have to know what they were.
02:59  18         Q.   Well, you did review the complaint, the
02:59  19    amended complaint, correct?
02:59  20         A.   Yes.
02:59  21         Q.   And as you sit here today, are you refuting
03:00  22    any of the allegations about ███████████?
03:00  23         A.   No, that's not in my report.  I don't have
03:00  24    any -- any expert opinion on what Ripple and
03:00  25    ███████████ did.
```

167

```
03:00  1        Q.   Did the ███████ cus-- did Exhibit 18,
03:00  2   did that contain a -- does that contain a provision
03:00  3   restricting what ███████ can do with the XRP
03:00  4   Ripple custody?
03:00  5        A.   No.
03:00  6        Q.   Can you look at your report, paragraph 188,
03:00  7   please.
03:00  8             So do you see how paragraph 188 references
03:01  9   settlement agreements involving Ripple on one hand,
03:01 10   and on the other hand, ███████ Jed McCabe [sic],
03:01 11   Arthur Britto, ███████████████████?
03:01 12        A.   Yes.
03:01 13        Q.   Were those the only parties to settlement
03:01 14   agreements that you reviewed?
03:01 15        A.   I think so.
03:02 16        Q.   So in Exhibit 5 to your report, it looks
03:02 17   like there could be more than a hundred settlement
03:02 18   agreements.
03:02 19        A.   I don't know how many there were.
03:02 20        Q.   Well, you can look at Exhibit F to your
03:02 21   report.
03:02 22        A.   Yeah, I -- there were a lot of them.  I
03:02 23   don't -- you asked me, once again, about a specific
03:02 24   number.  I don't have a specific number.
03:02 25        Q.   And did the -- the settlement agreements
```

168

| 03:02 | 1 | on -- identified in Exhibit F to your report, did all |
| 03:02 | 2 | of those settlement agreements involve either |
| 03:02 | 3 | ███████  Jed McCabe, Arthur Britto, ████████ |
| 03:02 | 4 | ███████ |
| 03:03 | 5 | A.  I think so. |
| 03:03 | 6 | I don't recall any other parties. |
| 03:03 | 7 | Q.  Why were there so many settlement |
| 03:03 | 8 | agreements for only a handful of counterparties? |
| 03:03 | 9 | MR. FIGEL:  Objection. |
| 03:03 | 10 | A.  I don't know. |
| 03:03 | 11 | Q.  Did you review all the settlement |
| 03:03 | 12 | agreements contained on Exhibit F to your report? |
| 03:03 | 13 | A.  If they were an exhibit to my report, I |
| 03:03 | 14 | looked at them, or most of them, or almost all of |
| 03:03 | 15 | them. |
| 03:03 | 16 | Q.  After you signed your report. |
| 03:03 | 17 | A.  Some before, more after. |
| 03:04 | 18 | Q.  For ███████ what is that company's |
| 03:04 | 19 | business? |
| 03:04 | 20 | A.  I'm not sure. |
| 03:04 | 21 | Q.  And do you know what the purpose was of |
| 03:04 | 22 | ███████ original contractual relationship with |
| 03:04 | 23 | Ripple? |
| 03:04 | 24 | A.  No. |
| 03:04 | 25 | Q.  Do you know what Arthur Britto or ██████ |

169

| 03:04 | 1 | ███████ relationship was with Ripple? |
| 03:04 | 2 | A. No. |
| 03:05 | 3 | Q. What about ████████ |
| 03:05 | 4 | A. I know that ████████ was supposed to |
| 03:05 | 5 | provide certain services to Ripple. |
| 03:05 | 6 | Q. What services were those? |
| 03:05 | 7 | A. The contract describes them as ambassador |
| 03:05 | 8 | services. |
| 03:05 | 9 | Q. Are you able to fill in any more details on |
| 03:05 | 10 | what those ambassador services entailed? |
| 03:05 | 11 | A. No. |
| 03:05 | 12 | Q. Did any of the settlement agreements |
| 03:05 | 13 | identified in your report contain a provision |
| 03:05 | 14 | restricting what Ripple's counterparty could do with |
| 03:05 | 15 | the XRP Ripple provided? |
| 03:05 | 16 | MR. FIGEL: Objection. |
| 03:05 | 17 | A. I don't think so. |
| 03:06 | 18 | Q. So in paragraph 191, you say that the R3 |
| 03:06 | 19 | option sets out terms pursuant to which XRP2 grants |
| 03:06 | 20 | R3 HoldCo the right to purchase up 5 billion units of |
| 03:06 | 21 | XRP at a per-unit price of .8 -- of .85 cents. |
| 03:06 | 22 | Is that correct? |
| 03:06 | 23 | A. Yeah. |
| 03:06 | 24 | Q. And you understood XRP2 to be a subsidiary |
| 03:06 | 25 | of Ripple? |

170

| | | |
|---|---|---|
| 03:06 | 1 | A. Yes. |
| 03:06 | 2 | Q. Is the option to purchase point -- XRP at |
| 03:06 | 3 | .85 cents per unit, is that a significant discount to |
| 03:07 | 4 | Ripple's market price? |
| 03:07 | 5 | MR. FIGEL: Objection. |
| 03:07 | 6 | A. I don't know the answer to that. |
| 03:07 | 7 | Q. If you were to assume that .85 cents per |
| 03:07 | 8 | unit was a significant discount to market price, did |
| 03:07 | 9 | the ▇ option allow ▇▇▇▇ to profit from the XRP |
| 03:07 | 10 | it obtain-- purchased from Ripple if it immediately |
| 03:07 | 11 | sold that XRP into the market? |
| 03:07 | 12 | MR. FIGEL: Objection. |
| 03:07 | 13 | A. That's a two -- maybe you could break that |
| 03:07 | 14 | question down into two, because that was a pretty |
| 03:07 | 15 | long question. |
| 03:07 | 16 | Q. Okay. So the first part is the -- I asked |
| 03:08 | 17 | you if the -- the option price was a significant |
| 03:08 | 18 | discount to market price. |
| 03:08 | 19 | A. I said I didn't know the answer to that. |
| 03:08 | 20 | Q. Fair enough. |
| 03:08 | 21 | Now I'm asking you to assume that it was a |
| 03:08 | 22 | significant discount to market price. |
| 03:08 | 23 | A. Yes. |
| 03:08 | 24 | Q. If that's the case, does the ▇ option |
| 03:08 | 25 | allow Ripple's counterparty to profit off the XRP it |

171

| | | |
|---|---|---|
| 03:08 | 1 | purchased from Ripple if it turns around and sells |
| 03:08 | 2 | that XRP at market price? |
| 03:08 | 3 | MR. FIGEL:  Objection. |
| 03:08 | 4 | A.   Well, I mean, if -- if I could sell |
| 03:08 | 5 | something at $10 a unit in the market and you're |
| 03:08 | 6 | charging me $2 for it, I'm going to make $8 if I |
| 03:08 | 7 | resell it.  That seems to be -- so it's certainly -- |
| 03:08 | 8 | what you say is a possibility. |
| 03:08 | 9 | But in other words, this -- so far as I can |
| 03:08 | 10 | tell, these were -- this is another way to make a -- |
| 03:09 | 11 | to make a payment pursuant to a settlement agreement. |
| 03:09 | 12 | So instead of giving you a hundred dollars, |
| 03:09 | 13 | I give you the right to buy an asset for 50 you can |
| 03:09 | 14 | sell at a hundred dollars.  It seems as if that |
| 03:09 | 15 | was -- that there was just a settlement and that's |
| 03:09 | 16 | the way that ▇▇▇▇ is partially compensated.  But |
| 03:09 | 17 | that's all I know about it. |
| 03:09 | 18 | Q.   Would it make commercial sense for |
| 03:09 | 19 | ▇▇▇▇ to exercise the ▇ option if the market |
| 03:09 | 20 | price of XRP was below .85 cents per unit? |
| 03:09 | 21 | MR. FIGEL:  Objection. |
| 03:09 | 22 | A.   No. |
| 03:10 | 23 | Q.   Did you review -- so can I refer you to |
| 03:10 | 24 | paragraph 204 of your report, please. |
| 03:10 | 25 | A.   Yes. |

172

| | | |
|---|---|---|
| 03:10 | 1 | Q. And do you see how you say, In addition to |
| 03:10 | 2 | the ▮▮▮▮▮ settlement, I also reviewed the Britto |
| 03:10 | 3 | settlement agreement? |
| 03:10 | 4 | A. Yes. |
| 03:10 | 5 | Q. Did you review any other settlement |
| 03:10 | 6 | agreements other than the ones between ▮▮▮▮▮ and |
| 03:11 | 7 | Ripple and Arthur Britto and Ripple? |
| 03:11 | 8 | A. I don't recall doing that. |
| 03:11 | 9 | Q. Did you review any settlement agreement |
| 03:11 | 10 | between Ripple and Mr. McCaleb? |
| 03:11 | 11 | A. I don't recall reading that. |
| 03:11 | 12 | Q. Did the Britto settlement agreement allow |
| 03:11 | 13 | Mr. Britto to purchase XRP at a discount to market |
| 03:11 | 14 | price? |
| 03:11 | 15 | MR. FIGEL: Objection. |
| 03:11 | 16 | A. The contract does not give Mr. Britto any |
| 03:11 | 17 | such rights. If there are any extracontractual |
| 03:11 | 18 | rights, I don't know about them. |
| 03:12 | 19 | MR. HANAUER: How are you doing? |
| 03:12 | 20 | THE WITNESS: I'm okay. Well, it's -- we |
| 03:12 | 21 | could take a break for a little while. |
| 03:12 | 22 | MR. FIGEL: I think we should. |
| 03:12 | 23 | MR. HANAUER: Go off the record, please. |
| 03:12 | 24 | THE VIDEOGRAPHER: Off the record, the time |
| 03:12 | 25 | is 3:13. |

173

03:12  1             (A recess was taken from 3:13 to 3:39.)

03:37  2             THE VIDEOGRAPHER:  Back on the record.  The

03:37  3   time is 3:39.  And, Reid, just put your microphone

03:37  4   on.

03:38  5             MR. FIGEL:  Thank you.

03:38  6        Q.   Professor Schwartz, can I direct you to

03:38  7   paragraph 209 of your report where you're talking

03:38  8   about the Xpring contracts?

03:38  9        A.   Yes.

03:38 10        Q.   What was the Xpring program?

03:38 11        A.   Excuse me?

03:38 12        Q.   What was the -- and I'm not sure if I'm

03:38 13   saying this right.  What was the Xpring program?

03:38 14        A.   It's a program under which Ripple made

03:38 15   investments in other companies and which they

03:38 16   exchanged either cash or XRP for equity or services.

03:38 17        Q.   And what's your basis for saying that?

03:38 18        A.   The contract -- that's what the contracts

03:38 19   provided.

03:39 20        Q.   And do you know what the Xpring

03:39 21   counterparties intended to do with the XRP Ripple

03:39 22   provided them?

03:39 23        A.   Do I -- no, I don't know what they intended

03:39 24   to do.

03:39 25        Q.   Are you aware that the amended complaint in

                                                              174

```
03:39  1   this case alleges that Ripple used Xpring as a
03:39  2   mechanism to achieve Ripple's goal of distributing
03:39  3   XRP into the public trading market and increase
03:39  4   trading in XRP?
03:39  5        A.   Yes, I'm aware of that.
03:39  6             I want to amend what I said in the  ▮
03:39  7   contract.
03:39  8             THE COURT REPORTER:  I'm sorry.  In the
03:39  9   what?
03:39 10             THE WITNESS:  ▮
03:39 11             THE COURT REPORTER:  Thank you.
03:39 12        A.   ▮  promised to -- to develop and
03:40 13   integrate XRP, and to essentially, you know, get X--
03:40 14   increase XRP's use.  So...
03:40 15        Q.   That was the purpose of  ▮  contract
03:40 16   with Ripple?
03:40 17        A.   That's what they promised to use best
03:40 18   efforts to do.
03:40 19        Q.   So going -- is there anything else you need
03:40 20   to amend or correct?
03:40 21        A.   No.
03:40 22        Q.   So, I believe you said that you were aware
03:40 23   of the allegations in the amended complaint regarding
03:40 24   Xpring?
03:40 25        A.   Yes.  I read the amended complaint.
```

175

| | | |
|---|---|---|
| 03:40 | 1 | Q.   Are you offering any opinion that |
| 03:40 | 2 | challenges the amended complaint's allegations |
| 03:40 | 3 | regarding Xpring? |
| 03:40 | 4 | A.   No. |
| 03:40 | 5 | MR. FIGEL:   Objection. |
| 03:41 | 6 | Q.   Did the Xpring contracts contain a |
| 03:41 | 7 | provision restricting what Ripple's counterparty |
| 03:41 | 8 | could do with the XRP Ripple provided? |
| 03:41 | 9 | A.   Not to my recollection. |
| 03:41 | 10 | Q.   Did Ripple take any steps to restrict the |
| 03:41 | 11 | Xpring counterparties from reselling the XRP Ripple |
| 03:41 | 12 | provided them to the public? |
| 03:41 | 13 | MR. FIGEL:   Objection. |
| 03:41 | 14 | A.   No. |
| 03:41 | 15 | Not that -- no. |
| 03:42 | 16 | Q.   Can I refer you to paragraph 216 of your |
| 03:42 | 17 | report, please. |
| 03:42 | 18 | So you reference various joint venture |
| 03:42 | 19 | contracts? |
| 03:42 | 20 | A.   Yes. |
| 03:42 | 21 | Q.   And what did you do to determine that the |
| 03:42 | 22 | joint venture contracts you reviewed were the only |
| 03:42 | 23 | contracts governing the commercial relationship |
| 03:42 | 24 | between Ripple and its counterparty? |
| 03:42 | 25 | A.   I didn't do anything. |

176

```
03:43   1                    (Joint Venture Agreement Between Ripple and

03:43   2         ████    was marked Exhibit AS-20 for identification,

03:43   3         as of this date.)

03:43   4         Q.    Do you see how Exhibit-- I'm sorry.

03:43   5               Do you see on paragraph 216 of your report

03:43   6    references a joint venture agreement between Ripple

03:43   7    and ████

03:43   8         A.    Yes.

03:43   9         Q.    Is Exhibit 20 a copy of that joint venture

03:43  10    agreement?

03:44  11         A.    Yes.

03:44  12         Q.    What was the business purpose of the ████

03:44  13    joint venture?

03:44  14         A.    Essentially to distribute or increase

03:44  15    distribution of Ripple, in the territory defined

03:44  16    under agreement.

03:44  17         Q.    When you say "increase the distribution of

03:44  18    Ripple," do you mean the distribution of XRP?

03:44  19         A.    Yes, the distribution of XRP in Japan,

03:44  20    specifically.

03:44  21         Q.    By entering into the joint venture

03:45  22    agreement, did Ripple help facilitate the trading of

03:45  23    XRP?

03:45  24               MR. FIGEL:  Objection.

03:45  25         A.    The object was to have ████   I think it's
```

177

| | | |
|---|---|---|
| 03:45 | 1 | ███████ clients and future clients use XRP. |
| 03:45 | 2 | Q.   For what? |
| 03:45 | 3 | A.   For whatever purpose that they wanted to |
| 03:45 | 4 | use it. |
| 03:45 | 5 | Q.   Are you offering any opinion on what |
| 03:45 | 6 | anybody who obtained XRP from the joint venture |
| 03:45 | 7 | intended to do with it? |
| 03:45 | 8 | MR. FIGEL:  Objection. |
| 03:45 | 9 | A.   No. |
| 03:45 | 10 | Q.   Did the joint venture -- any of the joint |
| 03:45 | 11 | venture agreements contain a provision restricting |
| 03:46 | 12 | what could be done with any of the XRP Ripple |
| 03:46 | 13 | provided? |
| 03:46 | 14 | A.   No. |
| 03:46 | 15 | Q.   Can you look at paragraph 219 of your |
| 03:46 | 16 | report. |
| 03:47 | 17 | Do see how paragraph 219 of your report |
| 03:47 | 18 | references an entity called ██████ |
| 03:47 | 19 | A.   Yes. |
| 03:47 | 20 | Q.   And do you have Exhibit 21 in front of you? |
| 03:47 | 21 | A.   Yes. |
| 03:47 | 22 | (███ Contract was marked Exhibit AS-21 for |
| 03:47 | 23 | identification, as of this date.) |
| 03:47 | 24 | Q.   Is Exhibit 21 one of the ██████ contracts |
| 03:47 | 25 | referenced in paragraph 219? |

178

| | | |
|---|---|---|
| 03:47 | 1 | A.    Yes. |
| 03:47 | 2 | Q.    And what was the purpose of the |
| 03:48 | 3 | contemplated arrangement between Ripple and ██ ? |
| 03:48 | 4 | A.    ██ was supposed to create a -- a fund and |
| 03:48 | 5 | sell shares in it to investors. |
| 03:48 | 6 | And the fund was going to hold as an asset |
| 03:48 | 7 | XRP. |
| 03:48 | 8 | Q.    Is it your understanding that the potential |
| 03:48 | 9 | investors in the XRP fund would seek to profit off |
| 03:48 | 10 | their investment? |
| 03:48 | 11 | MR. FIGEL:  Objection. |
| 03:48 | 12 | A.    I think everybody seeks to profit off their |
| 03:48 | 13 | investment. |
| 03:48 | 14 | Q.    And you write in paragraph 219 that the |
| 03:48 | 15 | parties contemplated that interest in the fund would |
| 03:49 | 16 | be offered and sold in the United States pursuant to |
| 03:49 | 17 | an exemption from registration under the Securities |
| 03:49 | 18 | Act? |
| 03:49 | 19 | A.    Yes. |
| 03:49 | 20 | Q.    Would the interests in the ██ fund sold |
| 03:49 | 21 | to investors, would those have been securities under |
| 03:49 | 22 | the federal securities laws? |
| 03:49 | 23 | MR. FIGEL:  Objection. |
| 03:49 | 24 | A.    I don't have an opinion about that. |
| 03:49 | 25 | Q.    Do you know why the ██ fund was never |

179

03:49  1   established?

03:49  2         A.     No.

03:49  3               MR. HANAUER:   Can I take one minute to

03:49  4   confer with counsel.

03:49  5               THE VIDEOGRAPHER:   Going off the record.

03:49  6   The time is 3:51.

03:50  7               (Discussion off the record.).

03:50  8               THE VIDEOGRAPHER:   Back on the record.   The

03:50  9   time is 3:51.

03:50 10               MR. HANAUER:   Thank you very much,

03:50 11   Professor Schwartz.   We have no further questions at

03:50 12   this time.

03:50 13               THE WITNESS:   Okay.

03:50 14               MR. FIGEL:   And on behalf of Ripple, we

03:50 15   have no questions.

03:50 16               I'm not sure if anyone else on -- do

03:50 17   counsel for the other parties have any questions for

03:50 18   Professor Schwartz?

03:50 19               MS. PROSTKO:   No.   On behalf of Larsen

03:50 20   defendant, we have no questions, but we thank you

03:50 21   very much for your time today.

03:50 22               MR. BONILLA:   I have no questions, for

03:50 23   Defendant Garlinghouse.

03:50 24               MR. HANAUER:   Do you do the reserving

03:50 25   signature on the record here in New York?

180

```
03:50   1              MR. FIGEL:  Yes.

03:50   2              We will just assume it.

03:51   3              MR. HANAUER:  Okay.  Thank you.

03:51   4              THE VIDEOGRAPHER:  That concludes today's

03:51   5    deposition.  The time is 3:52.

        6              (Time noted: 3:52 p.m.)

        7

        8

        9

       10

       11

       12

       13

       14

       15

       16

       17

       18

       19

       20

       21

       22

       23

       24

       25
```

181

```
 1                    CERTIFICATE OF WITNESS

 2

 3

 4        I, ALAN SCHWARTZ, do hereby declare under

 5        penalty of perjury that I have read the entire

 6        foregoing transcript of my deposition testimony,

 7        or the same has been read to me, and certify that

 8        it is a true, correct and complete transcript of

 9        my testimony given on February 11, 2022, save and

10        except for changes and/or corrections, if any, as

11        indicated by me on the attached Errata Sheet, with

12        the understanding that I offer these changes and/or

13        corrections as if still under oath.

14             _____ I have made corrections to my deposition.

15             _____ I have NOT made any changes to my deposition.

16

17   Signed: _____

18           ALAN SCHWARTZ

19   Dated this _____ day of _____ of 20_____.

20

21

22

23

24

25

                                                          182
```

```
 1              C E R T I F I C A T E

 2

 3    STATE OF NEW YORK     )
                            )   Ss.:
 4    COUNTY OF NEW YORK    )

 5

 6        I JEFFREY BENZ, a Certified Realtime Reporter,

 7    Registered Merit Reporter and Notary Public within and

 8    for the State of New York, do hereby certify:

 9        That the witness whose examination is hereinbefore

10    set forth was duly sworn by me and that this transcript

11    of such examination is a true record of the testimony

12    given by such witness.

13        I further certify that I am not related to any of

14    the parties to this action by blood or marriage and that

15    I am in no way interested in the outcome of this matter.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17    this  14th  of  February  , 2022

18

19    _____

20    JEFFREY BENZ, CRR, RMR

21

22

23

24

25
```

183

```
1                          ERRATA SHEET

2    Deposition of: ALAN SCHWARTZ
     Date taken:  FEBRUARY 11, 2022
3    Case:  SEC v. RIPPLE LABS, INC., et al.

4    PAGE  LINE
                  CHANGE: _____
5    _____ _____  REASON: _____

6                 CHANGE: _____
     _____ _____  REASON: _____
7
                  CHANGE: _____
8    _____ _____  REASON: _____

9                 CHANGE: _____
     _____ _____  REASON: _____
10
                  CHANGE: _____
11   _____ _____  REASON: _____

12                CHANGE: _____
     _____ _____  REASON: _____
13
                  CHANGE: _____
14   _____ _____  REASON: _____

15                CHANGE: _____
     _____ _____  REASON: _____
16
                  CHANGE: _____
17   _____ _____  REASON: _____

18                CHANGE: _____
     _____ _____  REASON: _____
19
                  CHANGE: _____
20   _____ _____  REASON: _____

21                CHANGE: _____
     _____ _____  REASON: _____
22
                  CHANGE: _____
23   _____ _____  REASON: _____

24
     Signed_____
25   Dated_____

                                                          184
```