# PX 2

1

1   UNITED STATES DISTRICT COURT

2   SOUTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE )
    COMMISSION, )
5   )
    PLAINTIFF, )
6   ) Case No.
    vs. ) 20-Civ-10832(AT)(SN)
7   )
    RIPPLE LABS, INC., BRADLEY )
8   GARLINGHOUSE, AND CHRISTIAN )
    LARSEN, )
9   )
    DEFENDANTS. )
10  _____ )

11

12

13  HIGHLY CONFIDENTIAL

14  VIDEOTAPED DEPOSITION OF

15  CHRISTIAN A. LARSEN

16  Tuesday, September 14, 2021

17

18

19

20

21

22   Reported By:
23  KATHLEEN WILKINS,
     STENOGRAPHIC REPORTER,
24  CSR NO. 10068
     RPR-RMR-CRR-CCRR-CLR-CRC
25  JOB No. 210914KWI

2

1    VIDEOTAPED DEPOSITION OF CHRISTIAN A. LARSEN

2    BE IT REMEMBERED that on Tuesday,

3    September 14, 2021, commencing at the hour of

4    8:01 a.m. thereof, at Ripple Labs,

5    315 Montgomery Street, 8th Floor, San Francisco,

6    California, before me, Kathleen A. Wilkins,

7    RPR-RMR-CRR-CCRR-CLR-CRC, a Certified Stenographic

8    Shorthand Reporter, in and for the State of

9    California, personally appeared CHRISTIAN A. LARSEN,

10   a witness in the above-entitled court and cause,

11   who, being by me first duly sworn, was thereupon

12   examined as a witness in said action.

3

```
1    APPEARANCES OF COUNSEL

2    FOR THE PLAINTIFF:

3    SECURITIES AND EXCHANGE COMMISSION
      New York Regional Office
4    200 Vesey Street, Suite 400
      New York, New York 10281-1022
5    BY: MARK SYLVESTER, ESQ.
      JORGE G. TENREIRO, ESQ.
6    ROBERT MOYE, ESQ.
      Telephone: (212) 336-0153
7    Email: Sylvesterm@sec.gov
      tenreiroj@sec.gov
8    moyer@sec.gov

9    FOR DEFENDANT CHRISTIAN A. LARSEN:

10   PAUL, WEISS, RIFKIND, WHARTON & GARRISON
      1285 Avenue of the Americas
11   New York, NY 10019-6064
      BY: MARTIN FLUMENBAUM, ESQ.
12   KRISTINA A. BUNTING, ESQ.
      Telephone: (212) 373-3191
13   Email: Mflumenbaum@paulweiss.com
      Kbunting@paulweiss.com
14
      FOR THE DEFENDANT RIPPLE LABS:
15
      DEBEVOISE & PLIMPTON LLP
16   919 Third Avenue
      New York, New York 10022
17   BY: ANDREW J. CERESNEY, ESQ.
      CHRISTOPHER S. FORD, ESQ.
18   Telephone: (212) 909.6947
      Email: Aceresney@debevoise.com
19   csford@debevoise.com

20   FOR DEFENDANT BRADLEY GARLINGHOUSE:

21   CLEARY GOTTLIEB STEEN & HAMILTON
      One Liberty Plaza
22   New York, New York 10006
      BY: SAMUEL LEVANDER, ESQ.
23   Telephone: (212) 225 2951
      Email: Slevander@cgsh.com

24

25
```

4

```
 1    APPEARANCES (Continued)

 2    ALSO PRESENT:

 3    ███████████████        Ripple in-house counsel
        Madison Butko, Videographer
 4
        ZOOM PARTICIPANTS (Via Zoom Videoconference):
 5
        Daphna Waxman, Esq., Securities and Exchange
 6    Commission, for the Plaintiff; Jon
        Daniels, Esq., Benjamin J. Hanauer, Esq.,
 7    Laden Stewart, Esq., Nicole Forbes, SEC
        Paralegal
 8
        Lisa Zornberg, Esq.; Matt Hirsch, Esq.; Ashley
 9    V. Hahn, Esq., Debevoise & Plimpton, on
        behalf of Ripple and Ron Will
10
        Connor J. Ritschard, Esq.; Michael Gertzman,
11    Esq.; Robin Linsenmayer, Esq., Sarah J.
        Prostko, Esq., Paul, Weiss, Rifkind,
12    Wharton & Garrison LLP, for Christian A.
        Larsen
13
        Matthew C. Solomon, Esq.; Robin Linsenmayer,
14    Esq.; Michael E. Gertzman, Esq.; Nicole
        Tatz, Esq.; Jackie M. Brune, Esq.; Taylor
15    Bates, Esq., Cleary Gottlieb Steen &
        Hamilton LLP, for defendant Bradley
16    Garlinghouse

17    William Lee, Esq., WilmerHale

18    Jorge Bonilla

19

20

21

22

23

24

25
```

5

1 INDEX

2 INDEX OF EXAMINATIONS

3PAGE

4 Morning Session 10

Examination By Mr. Sylvester 11

5 Afternoon Session 236

6 INDEX OF EXHIBITS

7 EXHIBIT DESCRIPTION PAGE

8 Exhibit CL-1 Document entitled, "ORDER 35

INSTITUTING CEASE-AND

9 DESIST PROCEEDINGS

PURSUANT TO SECTION 8A OF

10 THE SECURITIES ACT OF

1933, MAKING FINDINGS,

11 AND IMPOSING A

CEASE-AND-DESIST ORDER"

12 (Not Bates stamped)

13 Exhibit CL-5 Typed document entitled, 277

"New Trends," Bates

14 stamped

LARSEN-SEC-LIT-00004066

15 through

LARSEN-SEC-LIT-00004067

16

Exhibit CL-7 Email from Chris Larsen 192

[9/14/2021] Larsen, Christian (revised) 9.14.2021

6

1       17 with attachment, Bates

2       stamped

3       18 LARSEN-SEC-LIT0000163

4       through

5       19 LARSEN-SEC-LIT0000202

6       20 Exhibit CL-9 Type-written Document 276

7       Bates stamped

8       21 LARSEN-SEC-LIT-0004050

9       22

10      23

11      24

12      25

7

```
1   INDEX OF EXHIBITS (Continued)

2   EXHIBIT DESCRIPTION PAGE

3   Exhibit CL-13 String of e-mails between 168
      Chris Larsen and ▇▇▇
4   ▇▇▇▇▇   Bates stamped
      RPLI_SEC 0400676 through
5   RPLI_SEC 0400684

6   Exhibit CL-26 String of e-mails Bates 358
      stamped RPLI-SEC 0057453
7   through RPLI-SEC 0057464

8   Exhibit CL-30 String of e-mails Bates 279
      stamped RPLI_SEC 0096888
9   through RPLI_SEC 0096889

10  Exhibit CL-32 String of emails between 386
      Chris Larsen and ▇▇▇▇
11  ▇▇▇▇   Bates stamped
      RPLI_SEC 0223292 through
12  RPLI_SEC 0223295

13  Exhibit CL-50 Email from Patrick 391
      Griffen to ▇▇▇
14  Bates stamped RPLI_SEC
      0057357 through RPLI_SEC
15  0057358

16  Exhibit CL-75 String of e-mails between 371
      Chris Larsen, Brad
17  Garlinghouse and ▇▇▇
      ▇▇▇   Bates stamped
18  RPLI_SEC 1027130 through
      RPLI_SEC 1027132
19
      Exhibit CL-86 String of e-mails Bates 225
20  stamped RPLI_SEC 0067047
      through RPLI_SEC 0067051
21
      Exhibit CL-87 Email from Chris Larsen 138
22  to ▇▇▇ CSR, Bates
      stamped
23  LARSEN_NAT_00000013

24

25
```

8

1   INDEX OF EXHIBITS (Continued)

2   EXHIBIT DESCRIPTION PAGE

3   Exhibit CL-101 String of e-mails between 136
    Chris Larsen and ████
4   ████       Bates stamped
    LARSEN_NAT_000000N27

5
    Exhibit CL-113 String of emails between 393
6   Chris Larsen, Brad
    Garlinghouse and Patrick
7   Griffin, Bates stamped
    RPLI_SEC 0055971 through
8   RPLI_SEC 0055972

9   Exhibit CL-114 String of e-mails between 114
    ████        and Chris
10  Larsen (Not Bates
    stamped)
11
    Exhibit CL-115 Document entitled, "ORDER 603
12  INSTITUTING
    CEASE-AND-DESIST
13  PROCEEDINGS PURSUANT TO
    SECTION 8A OF THE
14  SECURITIES ACT OF 1933,
    MAKING FINDINGS, AND
15  IMPOSING A
    CEASE-AND-DESIST ORDER"
16  (Not Bates stamped)

17  Exhibit CL-136 Letter to Meredeth Cross 22
    of WilmerHale from the
18  Daphna Waxman of the
    Securities and Exchange
19  Commission (Not Bates
    stamped)
20
    Exhibit CL-138 String of e-mails from 305
21  Chris Larsen to Brad
    Garlinghouse, with
22  attached article (Not
    Bates stamped)
23

24

25

9

1    INDEX OF EXHIBITS (Continued)

2    EXHIBIT DESCRIPTION PAGE

3    Exhibit CL-140 String of e-mails between 315
          ████████████ and Chris
4    Larsen, partially Bates
      stamped
5    LARSEN-SEC-LIT-00005494

6    Exhibit CL-148 Text message between ████ 330
          ████ and Chris Larsen
7    (Not Bates stamped)

8    Exhibit CL-157 Handwritten notes 120
      entitled, "Note to File,"
9    dated 9/20/18, Bates
      stamped
10   LARSEN-SEC-LIT-00007193
      through
11   LARSEN-SEC-LIT-00007194

12   Exhibit CL-158 String of e-mails between 343
      Chris Larsen and ████
13   ████████ Bates stamped
      RPLI_SEC 0235434

14
      Exhibit CL-160 String of e-mails Bates 321
15   stamped RPLI_SEC 0235147
      through RPLI_SEC 0235149

16
      Exhibit CL-178 String of e-mails from 300
17   Chris Larsen to ████████
      ████████ partially Bates
18   stamped
      LARSEN-SEC-LIT-00002045

19
      Exhibit CL-183 Email from Chris Larsen 97
20   to ████████████ (Not
      Bates stamped)

21
      Exhibit CL-193 Form 8949 entitled, 76
22   "Sales and Other
      Dispositions of Capital
23   Assets," Bates stamped
      LARSEN 00000102 through
24   LARSEN 00000158

25

[9/14/2021] Larsen, Christian (revised) 9.14.2021

1    INDEX OF EXHIBITS (Continued)

2    EXHIBIT DESCRIPTION PAGE

3    Exhibit CL-203 Document entitled, 155
      "DEFENDANT CHRISTIAN A.
4    LARSEN'S RESPONSES AND
      OBJECTIONS TO THE SEC'S
5    FIRST SET OF
      INTERROGATORIES"

6
      Exhibit CL-206 Text message from Chris 381
7    Larsen to Gene Sperling,
      Bates stamped
8    LARSEN-SEC-LIT-00002761

9    Exhibit CL-207 Text messages between 383
      Chris Larsen and Gene
10   Sperling, Bates stamped
      LARSEN-SEC-LIT-00002783
11   and
      LARSEN-SEC-LIT-00002781

12
      Exhibit CL-209 String of e-mails (Not 134
13   Bates stamped)

14   QUESTIONS WITNESS INSTRUCTED NOT TO ANSWER

15   PAGE LINE

16   15 8

17   349 18

18   352 18

19   402 5

20

21

22   *** EXHIBITS BOUND SEPARATELY ***

23

24

25

1    SEPTEMBER 14, 2021 8:01 A.M.

2    P R O C E E D I N G S

3    MORNING SESSION

4    THE VIDEOGRAPHER: This is the start of

5    08:00:50 Media Number 1 in the deposition of Chris Larsen --

6    08:00:53 THE WITNESS: Are you good with this mic

7    08:00:57 right here?

8    08:00:57 THE VIDEOGRAPHER: -- in the matter of

9    08:00:58 Securities and Exchange Commission v. Ripple Labs,

10   08:01:01 et al.

11   08:01:02 This is a matter pending before the United

12   08:01:04 States District Court, Southern District of New

13   08:01:06 York, Case Number 20-civ-10832(AT)(SN).

14   08:01:16 Today's date is September 14th, 2021,

15   08:01:19 and the time on the video monitor is 8:01 a.m.

16   08:01:24 I am your certified video operator today,

17   08:01:29 Madison Butko, contracted by Gradillas Court

18   08:01:30 Reporting.

19   08:01:31 This video deposition is taking place at

20   08:01:34 315 Montgomery Street, San Francisco, California.

21   08:01:38 Counsel, would you please identify

22   08:01:39 yourself for the record and state whom you

23   08:01:41 represent, starting with the questioning attorney.

24   08:01:44 MR. SYLVESTER: This is Mark Sylvester for

25   08:01:44 the plaintiff, the Securities and Exchange

12

1   08:01:45 Commission.

2   08:01:48 MR. TENREIRO: Jorge Tenreiro for the SEC.

3   08:01:52 MR. MOYE: Robert Moye, also for the SEC.

4   08:01:54 MR. FLUMENBAUM: Martin Flumenbaum and

5   08:01:54 Kristina Bunting, Paul, Weiss, Rifkind, Wharton &

6   08:01:55 Garrison, for Mr. Larsen.

7   08:02:01 MR. CERESNEY: Andrew Ceresney and Chris

8   08:02:02 Ford from Debevoise & Plimpton LLP for Ripple.

9   08:02:06 MS. ██████████████████

10  08:02:08 in-house counsel, Ripple.

11  08:02:11 MR. LEVANDER: Sam Levander, Cleary

12  08:02:13 Gottlieb Steen & Hamilton, for defendant

13  08:02:15 Brad Garlinghouse.

14  08:02:18 THE VIDEOGRAPHER: Okay. Will the court

15  08:02:19 reporter please swear in the witness.

16  08:02:30 CHRISTIAN A. LARSEN,

17  08:02:30 having been duly sworn,

18  08:02:30 was examined and testified as follows:

19  08:02:32 THE VIDEOGRAPHER: You may proceed.

20  08:02:33 EXAMINATION BY MR. SYLVESTER

21  08:02:33 BY MR. SYLVESTER:

22  08:02:33 Q. Good morning, Mr. Larsen.

23  08:02:34 A. Good morning.

24  08:02:35 Q. Please state your name for the record.

25  08:02:37 A. Chris Larsen.

13

1    08:02:37 Q. Are you represented by counsel here today?

2    08:02:39 A. I am.

3    08:02:40 Q. Who is your counsel?

4    08:02:41 A. Marty, right here.

5    08:02:45 Q. I'm Mark Sylvester. I'm asking questions

6    08:02:47 on behalf of the plaintiff, SEC.

7    08:02:49 I'm here with my colleagues in the room,

8    08:02:51 as you heard. Also, some of my colleagues are

9    08:02:53 joining via Zoom today.

10   08:02:55 MR. SYLVESTER: Before we get started, I

11   08:02:57 just want to put our stipulation on the record on

12   08:03:00 the parties that we're going to go for nine hours on

13   08:03:02 the record today.

14   08:03:03 Is there anything that counsel for the

15   08:03:05 defendants want to put on the record before we get

16   08:03:09 started?

17   08:03:10 MR. FLUMENBAUM: Just that an objection by

18   08:03:11 any defense counsel is on behalf of everyone.

19   08:03:16 MR. CERESNEY: Confidentiality.

20   08:03:19 MR. FLUMENBAUM: Yeah, we designate this

21   08:03:21 highly confidential at this point, and we will

22   08:03:23 review the transcript after it's received.

23   08:03:26 MR. SYLVESTER: Okay.

24   08:03:27 Q. Mr. Larsen, have you given testimony

25   08:03:35 before today?

14

```
 1   08:03:37 MR. FLUMENBAUM: You're going to have to
 2   08:03:38 slow down a little bit, Mr. Sylvester, because your
 3   08:03:40 words are not coming through clearly.
 4   08:03:43 MR. SYLVESTER: Could you hear me?
 5   08:03:43 THE WITNESS: It was a little fast. Could
 6   08:03:45 you repeat it, please?
 7   08:03:47 BY MR. SYLVESTER:
 8   08:03:47 Q. Have you given testimony before today?
 9   08:03:48 A. No.
10   08:03:49 Q. You've just given an oath to tell the
11   08:03:51 truth, and even though we're in a conference room,
12   08:03:53 not a courtroom, that's the same oath and you must
13   08:03:55 tell the truth today.
14   08:03:56 Do you understand?
15   08:03:58 MR. FLUMENBAUM: Objection as to form.
16   08:03:59 It's not for you to instruct the witness.
17   08:04:05 Please, just ask questions.
18   08:04:07 BY MR. SYLVESTER:
19   08:04:07 Q. It's important that the court reporter be
20   08:04:09 able to take down everything you and I say today, so
21   08:04:13 please let me finish a question before you start to
22   08:04:15 answer, and I'll do the same with your answers.
23   08:04:18 Okay?
24   08:04:19 A. Yes.
25   08:04:20 Q. For the record, you also have to give
```

1   08:04:23 verbal answers, not just a nod or head shake. Okay?

2   08:04:27 MR. FLUMENBAUM: Objection as to form.

3   08:04:27 Again, you don't have to instruct the

4   08:04:29 witness.

5   08:04:29 BY MR. SYLVESTER:

6   08:04:30 Q. Is there anything that might prevent you

7   08:04:31 from being able to answer my questions fully and

8   08:04:35 truthfully here today?

9   08:04:36 A. No.

10  08:04:36 Q. Did you take any steps to prepare for

11  08:04:38 today's deposition?

12  08:04:40 A. I did.

13  08:04:41 Q. What steps did you take?

14  08:04:43 A. I met with my counsel.

15  08:04:47 Q. Okay. About how much time did you spend

16  08:04:48 in preparation for today's deposition?

17  08:04:50 A. Maybe two Zoom call meetings and three

18  08:04:58 in-person meetings.

19  08:05:00 Q. Approximately how many hours did you spend

20  08:05:01 in total?

21  08:05:02 A. Those in-person were four to five hours

22  08:05:04 each.

23  08:05:05 Q. How about the Zoom meetings?

24  08:05:09 A. Couple hours.

25  08:05:09 Q. Each?

1    08:05:12 A. I believe so.

2    08:05:14 Q. Which lawyers did you meet with?

3    08:05:16 A. With my lawyer right here, Marty, and

4    08:05:20 Christina.

5    08:05:23 Q. Did you review any documents in

6    08:05:24 preparation for today's deposition?

7    08:05:27 A. Saw some documents, yes.

8    08:05:32 Q. About how many documents did you see?

9    08:05:34 MR. FLUMENBAUM: Objection.

10   08:05:35 Instruct you not to answer.

11   08:05:36 MR. SYLVESTER: How many, Marty?

12   08:05:37 MR. FLUMENBAUM: You're asking what -- you

13   08:05:39 know, work product. You're not entitled to the

14   08:05:44 total.

15   08:05:44 You know what the rules are.

16   08:05:46 MR. SYLVESTER: I do; that's why I'm

17   08:05:47 stopping and asking why --

18   08:05:49 MR. FLUMENBAUM: And I don't think "how

19   08:05:50 many" is an appropriate question.

20   08:05:51 MR. SYLVESTER: Just for the record,

21   08:05:52 you're instructing the witness not to answer the

22   08:05:53 question of how many documents you reviewed on the

23   08:05:56 basis of attorney-client privilege?

24   08:05:58 MR. FLUMENBAUM: And work product.

25   08:05:59 MR. SYLVESTER: Okay.

1    08:06:02 Q. Other than your lawyers, have you

2    08:06:03 communicated with anyone about today's deposition?

3    08:06:05 A. No.

4    08:06:08 Q. You're familiar with the defendant,

5    08:06:09 Ripple Labs?

6    08:06:10 A. I am.

7    08:06:10 Q. When I say "Ripple," I mean Ripple Labs.

8    08:06:12 Okay?

9    08:06:12 A. Yes.

10   08:06:13 Q. Okay. You know the SEC has filed a

11   08:06:18 complaint against Ripple?

12   08:06:19 A. I do.

13   08:06:19 Q. And that the complaint alleged that Ripple

14   08:06:22 violated the registration provisions of the

15   08:06:24 securities laws?

16   08:06:25 A. I understand that that is the complaint.

17   08:06:28 Q. You're familiar with XRP?

18   08:06:31 A. I am.

19   08:06:31 Q. XRP is a digital asset?

20   08:06:33 A. Yeah.

21   08:06:33 Could you maybe speak a little slower? I

22   08:06:37 want to make sure I hear.

23   08:06:39 Q. Understood.

24   08:06:41 XRP is a digital asset; is that correct?

25   08:06:44 A. XRP is a currency.

[9/14/2021] Larsen, Christian (revised) 9.14.2021

18

| 1 | 08:06:45 Q. Okay. |
| 2 | 08:06:48 You would not consider XRP to be a digital |
| 3 | 08:06:50 asset; is that true? |
| 4 | 08:06:51 A. All currencies are assets. It is a |
| 5 | 08:06:54 currency. |
| 6 | 08:06:55 Q. Okay. Is XRP a digital asset? |
| 7 | 08:06:59 A. XRP is a currency. |
| 8 | 08:07:01 Q. Right. But it's a yes or no. Is it a |
| 9 | 08:07:03 digital asset? |
| 10 | 08:07:04 MR. FLUMENBAUM: Please, it's not a |
| 11 | 08:07:05 yes-or-no question if it's not precise. |
| 12 | 08:07:09 So don't -- again, don't argue with the |
| 13 | 08:07:12 witness. Please, just ask questions. |
| 14 | 08:07:15 BY MR. SYLVESTER: |
| 15 | 08:07:15 Q. Is XRP a digital asset? |
| 16 | 08:07:17 A. All currencies are assets. XRP is a |
| 17 | 08:07:22 currency. |
| 18 | 08:07:23 Q. Is XRP digital? |
| 19 | 08:07:27 A. XRP exists in a digital format, yes. |
| 20 | 08:07:30 Q. Ripple has, from time to time, sold XRP; |
| 21 | 08:07:33 is that right? |
| 22 | 08:07:33 A. Yes. |
| 23 | 08:07:36 Q. Do you understand that the SEC has alleged |
| 24 | 08:07:37 that Ripple's sales of XRP were in violation of the |
| 25 | 08:07:41 registration provisions of the securities laws? |

1    08:07:45 MR. FLUMENBAUM: Objection as to form.

2    08:07:46 You may answer.

3    08:07:48 THE WITNESS: I understand that that's the

4    08:07:49 complaint.

5    08:07:49 BY MR. SYLVESTER:

6    08:07:49 Q. Did there come a time when you learned

7    08:07:52 that the SEC was investigating Ripple in connection

8    08:07:54 with its sales of XRP?

9    08:08:00 A. Yes.

10   08:08:01 MR. CERESNEY: I'm just going to instruct

11   08:08:02 the witness not to reveal discussions with counsel.

12   08:08:05 Obviously, we'll take it question by

13   08:08:07 question. But, obviously, you're treading into an

14   08:08:12 area where some of the information that the witness

15   08:08:15 may have received may well have come from counsel,

16   08:08:17 and I just want the witness to be careful not to

17   08:08:20 reveal information that he might have received from

18   08:08:22 counsel.

19   08:08:25 THE WITNESS: Can I interject just one

20   08:08:26 quick thing? Is it okay to take the masks off?

21   08:08:31 MR. FLUMENBAUM: If you want to take your

22   08:08:32 mask off, you can.

23   08:08:33 THE WITNESS: Well, is that okay with you

24   08:08:35 guys?

25   08:08:35 We're all vaccinated, I believe, correct?

1    08:08:38 MR. SYLVESTER: It's fine by me.

2    08:08:41 THE WITNESS: Okay. Great. Thank you.

3    MR. SYLVESTER: Sure.

4    08:08:44 THE WITNESS: Feel free, as well.

5    08:08:46 MR. SYLVESTER: Is that all right with

6    08:08:47 you, Marty?

7    08:08:48 MR. FLUMENBAUM: I would prefer that

8    08:08:49 everybody else stay masked.

9    08:08:52 MR. SYLVESTER: Okay.

10   08:08:52 THE WITNESS: Sorry.

11   08:08:53 BY MR. SYLVESTER:

12   08:08:54 Q. When did you learn that the SEC was

13   08:08:57 investigating Ripple in connection with its sales of

14   08:08:59 XRP?

15   08:09:01 A. I believe that was the first half of 2018.

16   08:09:09 Q. How did you learn it?

17   08:09:10 MR. FLUMENBAUM: Objection as to form.

18   08:09:16 Mr. Ceresney has made it very clear that

19   08:09:18 if -- do you want to rephrase the question to take

20   08:09:23 out communications with counsel, make it much

21   08:09:26 easier?

22   MR. SYLVESTER: No. If he can't answer

23   08:09:28 the question because the answer is counsel, then you

24   08:09:31 can instruct.

25   08:09:32 MR. FLUMENBAUM: You can't answer the

[9/14/2021] Larsen, Christian (revised) 9.14.2021

21

1    08:09:34 question if it's based on communications with

2    08:09:38 counsel.

3    08:09:39 So if you can't exclude all communications

4    08:09:47 with counsel in connection with that, you can't

5    08:09:49 answer this question.

6    08:09:51 THE WITNESS: Okay, I can't delineate what

7    08:09:52 was counsel or what wasn't, so I'll follow the

8    08:09:56 advice of counsel.

9    08:09:57 BY MR. SYLVESTER:

10   08:09:57 Q. Were you aware, on or around April 24th,

11   08:10:00 2018, that the SEC had issued a document request to

12   08:10:04 Ripple?

13   08:10:04 A. Yes.

14   08:10:08 Q. Okay. Did you have a general

15   08:10:09 understanding of the topics of documents the SEC

16   08:10:12 sought from Ripple?

17   08:10:13 MR. FLUMENBAUM: Objection as to form.

18   08:10:20 THE WITNESS: Generally.

19   08:10:21 BY MR. SYLVESTER:

20   08:10:21 Q. Did you understand that the SEC sought

21   08:10:23 documents regarding Ripple's XRP sales?

22   08:10:27 A. Yes.

23   08:10:28 Q. And did you understand that the SEC

24   08:10:30 generally sought documents regarding XRP status

25   08:10:33 under the securities laws?

1   08:10:34 MR. FLUMENBAUM: Objection as to form.

2   08:10:37 THE WITNESS: Not that I recall.

3   08:10:39 BY MR. SYLVESTER:

4   08:10:39 Q. Now, this I'm asking just as a yes-or-no

5   08:10:44 question.

6   08:10:46 Did you have any communications with

7   08:10:47 counsel around April 24th, 2018, regarding the

8   08:10:49 SEC's document request?

9   08:10:52 MR. FLUMENBAUM: Are you asking

10  08:10:53 specifically on that date, April 24th?

11  08:10:56 MR. SYLVESTER: On or around.

12  08:10:58 MR. FLUMENBAUM: If you can answer that

13  08:10:59 question, please do so, either yes or no.

14  08:11:02 THE WITNESS: Can you repeat the question

15  08:11:03 again, please?

16  08:11:04 BY MR. SYLVESTER:

17  08:11:04 Q. Sure.

18  08:11:05 On or around April 24th, 2018, did you

19  08:11:07 have any communications with counsel regarding the

20  08:11:09 SEC's document request?

21  08:11:12 A. I don't recall.

22  08:11:19 Q. Did you ever have any communications with

23  08:11:20 counsel about the SEC's document request?

24  08:11:24 MR. FLUMENBAUM: Do you mean Ripple's

25  08:11:25 counsel, his counsel?

1    08:11:28 MR. SYLVESTER: That's the next question.

2    08:11:29 We can break it up.

3    08:11:35 Q. Did you have any conversations with

4    08:11:39 personal counsel regarding the SEC's document

5    08:11:40 request?

6    08:11:44 MR. FLUMENBAUM: If you can recall.

7    08:11:46 Objection as to form.

8    08:11:48 THE WITNESS: Yes.

9    08:11:49 BY MR. SYLVESTER:

10   08:11:49 Q. Okay. Were those conversations in the

11   08:11:52 first half of 2018?

12   08:11:56 A. I don't recall.

13   08:11:56 Q. Okay. Did you have any conversations with

14   08:11:58 Ripple's counsel in the first half of 2018 regarding

15   08:12:00 the SEC's document request?

16   08:12:04 A. I don't recall.

17   08:12:08 Q. Okay.

18   08:12:13 MR. SYLVESTER: Let's look at document --

19   08:12:14 Exhibit 136, please.

20   08:12:17 (Whereupon, Deposition Exhibit CL-136

21   08:12:36 was marked for identification.)

22   08:12:36 MR. SYLVESTER: They can pass them around.

23   08:12:48 For the record, document marked CL136 is

24   08:12:51 an April 13th, 2018 letter from Daphna Waxman from

25   08:12:57 the Securities and Exchange Commission addressed to

1    08:12:59 Ripple Labs.

2    08:15:43 THE WITNESS: Okay.

3    08:15:43 BY MR. SYLVESTER:

4    08:15:44 Q. Mr. Larsen, you've taken a couple of

5    08:15:46 minutes to review CL136; is that right?

6    08:15:49 A. Yes.

7    08:15:51 Q. Okay. Have you seen this document before

8    08:15:52 today?

9    08:15:52 A. Not that I can recall.

10   08:15:54 Q. Okay. The document's dated April 13th,

11   08:15:58 2018.

12   08:15:58 Were you aware of the existence of the

13   08:16:00 SEC's request that Ripple preserve documents on or

14   08:16:04 around April 13th, 2018?

15   08:16:05 A. Yes.

16   08:16:07 Q. How did you learn of the SEC's request?

17   08:16:10 MR. FLUMENBAUM: Objection.

18   08:16:10 Again, to the extent that you learned

19   08:16:13 about this through conversations with counsel, he's

20   08:16:17 not entitled to ask you that question. So if you've

21   08:16:24 learned it from outside of conversations with

22   08:16:26 counsel, you may answer.

23   08:16:27 THE WITNESS: I can't delineate whether or

24   08:16:29 not I heard it from somewhere else or from counsel.

25   / /

25

```
 1   08:16:32 BY MR. SYLVESTER:
 2   08:16:34 Q. What steps, if any, did you take to comply
 3   08:16:37 with the preservation request?
 4   08:16:41 A. All steps that were requested.
 5   08:16:45 Q. Requested by whom?
 6   08:16:47 A. Again, I'm not sure I can delineate
 7   08:16:49 between whether or not that was with counsel or not
 8   08:16:51 counsel.
 9   08:16:53 Q. Can you recall anyone other than your
10   08:16:55 counsel asking that you take any steps to comply
11   08:16:57 with the preservation request?
12   08:17:01 A. Do you mean personal counsel or company
13   08:17:04 counsel?
14   08:17:04 Q. Either.
15   08:17:07 A. Repeat the question again.
16   08:17:09 Q. Sure.
17   08:17:10 Other than counsel, did anyone else ask
18   08:17:12 you to take any steps to comply with the
19   08:17:14 preservation request?
20   08:17:19 A. I can't recall whether it was just counsel
21   08:17:21 or somebody else.
22   08:17:24 Q. What steps, if any, did you direct others
23   08:17:26 at Ripple to take to comply with the preservation
24   08:17:30 request?
25   08:17:31 A. I'm sorry, what steps did I take?
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

1    08:17:33 Q. What steps, if any, did you direct others

2    08:17:35 at Ripple to take to comply with the preservation

3    08:17:39 request?

4    08:17:42 A. Well, we would have --

5    08:17:45 MR. FLUMENBAUM: He's asking you a

6    08:17:46 specific question about you.

7    08:17:49 THE WITNESS: Right.

8    08:17:50 I can't recall.

9    08:17:52 BY MR. SYLVESTER:

10   08:17:54 Q. Did you direct anyone at Ripple to take

11   08:17:56 any steps to comply with the preservation request?

12   08:18:00 A. I can't recall.

13   08:18:02 Q. Okay. This is just a yes or a no.

14   08:18:06 Did you have any communications with

15   08:18:07 counsel regarding the SEC's document preservation

16   08:18:10 request?

17   08:18:13 MR. FLUMENBAUM: Objection.

18   08:18:13 Again, you can answer that either yes or

19   08:18:19 no.

20   08:18:19 Objection as to form.

21   08:18:21 But you may answer it yes or no.

22   08:18:24 THE WITNESS: I'm sorry, can you repeat it

23   08:18:25 again, please?

24   08:18:25 BY MR. SYLVESTER:

25   08:18:25 Q. Sure.

1    08:18:26 Did you have any communications with

2    08:18:28 counsel regarding the SEC's document preservation

3    08:18:31 request?

4    08:18:32 A. Yes.

5    08:18:32 Q. Which counsel did you speak with regarding

6    08:18:34 the document preservation request?

7    08:18:40 A. I can't recall.

8    08:18:43 Q. Approximately when were those

9    08:18:44 communications?

10    08:18:49 A. I can't recall.

11    08:18:49 Q. Were they within the first half of 2018?

12    08:18:57 A. I can't recall.

13    08:19:05 Q. Are you familiar with the term "Wells

14    08:19:08 submission"?

15    08:19:09 A. Yes.

16    08:19:10 Q. Are you aware that your counsel made a

17    08:19:12 Wells submission on your behalf prior to this

18    08:19:15 litigation being filed?

19    08:19:17 A. I don't know what that means. Can you

20    08:19:20 explain that, please, a little further?

21    08:19:23 Q. Which part of my question did you not

22    08:19:25 understand?

23    08:19:25 A. My understanding, Wells notices come from

24    08:19:29 the SEC to others, not the other way around.

25    08:19:32 Q. Do you have an understanding that on

1 08:19:33 occasion parties are given an opportunity to respond

2 08:19:36 to a Wells notice in writing?

3 08:19:43 A. I believe so. Yes.

4 08:19:45 Q. Do you know whether your counsel, in this

5 08:19:47 case, responded to a Wells notice issued by the SEC

6 08:19:50 to you in writing?

7 08:19:51 A. Yes.

8 08:19:52 Q. Okay.

9 08:19:52 A. Now I understand what you're saying.

10 08:19:57 Q. Just to clarify your answer, I know that

11 08:19:59 you now understand my question, but let's just ask

12 08:20:02 it again.

13 08:20:03 A. Sure.

14 08:20:04 Q. Are you aware of whether your counsel made

15 08:20:06 a Wells submission on your behalf prior to this

16 08:20:09 litigation being filed?

17 08:20:10 A. I'm aware that counsel made a response to

18 08:20:13 the SEC's Wells notice.

19 08:20:16 Q. I see.

20 08:20:18 Did you review that response before it was

21 08:20:20 submitted to the SEC?

22 08:20:20 A. Yes.

23 08:20:21 Q. Was it important to the -- that the

24 08:20:23 information supplied to the SEC and counsel's

25 08:20:26 response to the SEC's Wells notice was truthful?

29

1    08:20:29 A. Yes.

2    08:20:30 Q. Is there any reason to believe that

3    08:20:31 anything that counsel said to the SEC in its Wells

4    08:20:35 response was inaccurate?

5    08:20:36 MR. FLUMENBAUM: Objection as to form.

6    08:20:37 You may answer.

7    08:20:39 THE WITNESS: No.

8    08:20:42 BY MR. SYLVESTER:

9    08:20:42 Q. You have an undergraduate degree from San

10   08:20:45 Francisco State University; is that right?

11   08:20:47 A. Yes.

12   08:20:47 Q. What was your major?

13   08:20:48 A. International business and accounting.

14   08:20:55 Q. You also have an MBA?

15   08:20:58 A. I do.

16   08:20:58 Q. Your MBA is from Stanford?

17   08:21:01 A. That's right.

18   08:21:02 Q. Do you have any specialization in your MBA

19   08:21:05 program?

20   08:21:05 A. Stanford doesn't really have

21   08:21:08 specializations. It's a general program.

22   08:21:10 Q. Have you had any other postgraduate

23   08:21:12 education?

24   08:21:13 A. No.

25   08:21:13 Q. Any legal training?

1    08:21:15 A. No.

2    08:21:16 Q. You yourself are not a lawyer?

3    08:21:18 A. Would you mind maybe speaking a little

4    08:21:21 slower, please?

5    08:21:22 Q. Yes, sir.

6    08:21:22 A. I want to make sure I hear everything.

7    08:21:25 Q. Absolutely.

8    08:21:25 A. Could you repeat the question?

9    08:21:26 Q. Are you a lawyer?

10   08:21:27 A. No, I am not.

11   08:21:28 Q. Have you ever been a lawyer?

12   08:21:30 A. I have not been.

13   08:21:31 Q. Other than traffic violations, have you

14   08:21:34 ever been convicted of a crime?

15   08:21:36 A. No.

16   08:21:36 Q. You founded a company called E-Loan; is

17   08:21:39 that right?

18   08:21:40 A. Yes.

19   08:21:40 Q. You were with E-Loan from approximately

20   08:21:42 1997 to 2005; is that right?

21   08:21:50 A. The predecessor company was begun before

22   08:21:54 that, so even further back.

23   08:21:59 Q. Was E-Loan a for-profit enterprise?

24   08:22:02 A. It was.

25   08:22:03 Q. How did E-Loan make money?

[9/14/2021] Larsen, Christian (revised) 9.14.2021

1    08:22:06 MR. FLUMENBAUM: Objection.

2    08:22:06 Is there relevance to this question?

3    08:22:09 MR. SYLVESTER: There's no relevance

4    08:22:11 objections in a deposition. It's my record.

5    08:22:14 MR. FLUMENBAUM: Okay.

6    08:22:16 THE WITNESS: We made -- sorry, can you

7    08:22:19 repeat the question again just so --

8    08:22:21 BY MR. SYLVESTER:

9    08:22:21 Q. Sure.

10   08:22:22 How did E-Loan make money?

11   08:22:24 A. We made fees on mortgage loans that were

12   08:22:31 secured by customers, other sources of revenue as

13   08:22:35 well.

14   08:22:37 Q. Were you CEO of E-Loan?

15   08:22:40 A. I was.

16   08:22:40 Q. Was it important to you as CEO to

17   08:22:42 understand E-Loan's sources of revenue?

18   08:22:45 MR. FLUMENBAUM: Objection as to form.

19   08:22:46 You may answer.

20   08:22:50 THE WITNESS: Yes.

21   08:22:50 BY MR. SYLVESTER:

22   08:22:50 Q. Did E-Loan do an initial public offering

23   08:22:53 of shares while you were CEO?

24   08:22:55 A. It did.

25   08:22:56 Q. Did E-Loan file a registration statement

1    08:22:58 with the SEC during the time you were its CEO?

2    08:23:01 A. It did.

3    08:23:03 Q. Did you have any involvement with the

4    08:23:04 filing of E-Loan's registration statement with the

5    08:23:08 SEC?

6    08:23:08 A. Yes.

7    08:23:09 Q. What was your role?

8    08:23:10 A. Again, if you could speak a little slower,

9    08:23:13 please.

10   08:23:13 I'm sorry, could you repeat the question.

11   08:23:15 Q. Yes, sir.

12   08:23:17 Did you have any involvement with the

13   08:23:18 filing of E-Loan's registration statement with the

14   08:23:21 SEC?

15   08:23:23 A. Is your question whether or not I

16   08:23:26 personally filed it or that I helped write the S1?

17   08:23:31 Is that -- can you clarify that, please?

18   08:23:35 Q. Sure.

19   08:23:35 What was your role, if any?

20   08:23:39 MR. FLUMENBAUM: In what?

21   08:23:39 Would you --

22   08:23:40 BY MR. SYLVESTER:

23   08:23:40 Q. In connection with the filing of the

24   08:23:42 registration statement with the SEC.

25   08:23:45 A. Helping to produce that document.

33

```
 1    08:23:46 Q. Did you have any role in deciding whether
 2    08:23:47 to file a registration statement?
 3    08:23:50 MR. FLUMENBAUM: Objection as to form.
 4    08:23:56 THE WITNESS: It's okay to answer?
 5    08:23:57 MR. FLUMENBAUM: Yeah, you may answer.
 6    08:23:58 I'm sorry.
 7    08:23:59 THE WITNESS: Yes.
 8    08:23:59 BY MR. SYLVESTER:
 9    08:23:59 Q. Okay.
10    08:24:02 What was your role in the decision-making
11    08:24:04 process?
12    08:24:04 MR. FLUMENBAUM: Objection as to form.
13    08:24:06 You may answer.
14    08:24:07 THE WITNESS: I was a member of the board,
15    08:24:08 and the board has to approve that.
16    08:24:13 BY MR. SYLVESTER:
17    08:24:13 Q. At the time that E-Loan filed its
18    08:24:16 registration statement with the SEC, did you have an
19    08:24:17 understanding that this was a step that E-Loan had
20    08:24:20 to take in order to issue securities?
21    08:24:22 MR. FLUMENBAUM: Objection as to form.
22    08:24:25 THE WITNESS: Yes.
23    08:24:30 BY MR. SYLVESTER:
24    08:24:30 Q. Prior to E-Loan's IPO, did you have an
25    08:24:34 understanding that a company typically needs to file
```

34

1    08:24:36 a registration statement with the SEC before issuing

2    08:24:39 securities to the general public?

3    08:24:40 MR. FLUMENBAUM: Objection as to form.

4    08:24:43 THE WITNESS: Yes.

5    08:24:45 BY MR. SYLVESTER:

6    08:24:45 Q. When did you acquire that understanding?

7    08:24:51 A. I don't recall.

8    08:24:56 Q. Do you believe you had that understanding

9    08:24:57 during your MBA program?

10   08:25:00 MR. FLUMENBAUM: Objection as to form.

11   08:25:07 THE WITNESS: Yes.

12   08:25:07 BY MR. SYLVESTER:

13   08:25:07 Q. You founded a company called "Prosper

14   08:25:09 Marketplace"?

15   08:25:10 A. Cofounded.

16   08:25:12 Q. And you were the CEO of Prosper from

17   08:25:15 approximately 2006 to 2012; is that right?

18   08:25:20 A. Yes.

19   08:25:21 Q. Okay. Was Prosper also a for-profit

20   08:25:25 enterprise?

21   08:25:26 A. It was.

22   08:25:26 Q. How did Prosper make money?

23   08:25:28 MR. FLUMENBAUM: Objection as to form.

24   Again, objection as to relevance.

25   But you may answer.

1    08:25:34 THE WITNESS: It made money on commissions

2    08:25:37 between -- on transactions.

3    08:25:45 BY MR. SYLVESTER:

4    08:25:45 Q. Was it important to you as CEO of Prosper

5    08:25:47 to understand Prosper's sources of revenue?

6    08:25:51 MR. FLUMENBAUM: Objection as to form.

7    You may answer.

8    08:25:54 THE WITNESS: Yes.

9    08:25:54 BY MR. SYLVESTER:

10   08:25:54 Q. During the time that you were Prosper's

11   08:25:56 CEO, the SEC concluded that Prosper sold

12   08:25:59 unregistered securities; is that right?

13   08:26:02 MR. FLUMENBAUM: Objection as to form.

14   08:26:04 You may answer, if you can.

15   08:26:09 THE WITNESS: There was a consent

16   08:26:12 agreement where we neither admitted or denied that

17   08:26:20 involved securities, but we consented to it so we

18   08:26:24 could move forward with our S1 for Prosper.

19   08:26:31 BY MR. SYLVESTER:

20   08:26:31 Q. You said Prosper offered to settle with

21   08:26:39 the SEC. Is that right?

22   08:26:40 MR. FLUMENBAUM: Objection as to form.

23   08:26:44 Record speaks for itself.

24   08:26:46 Please, ask a question.

25   08:26:50 MR. SYLVESTER: I did.

1    08:26:51 THE WITNESS: Sorry, could you repeat the

2    08:26:52 question, please?

3    08:26:53 BY MR. SYLVESTER:

4    08:26:53 Q. Sure.

5    08:26:54 Prosper agreed to settle the SEC's action;

6    08:26:56 is that right?

7    08:26:57 MR. FLUMENBAUM: Objection as to form.

8    08:26:59 You may answer.

9    08:27:00 THE WITNESS: We agreed to a settlement.

10   08:27:01 BY MR. SYLVESTER:

11   08:27:01 Q. And did you have any role in deciding

12   08:27:03 whether to submit an offer of settlement to the SEC?

13   08:27:06 A. Yes.

14   08:27:07 Q. What was your role?

15   08:27:12 A. I was a board member. The board had to

16   08:27:14 approve that.

17   08:27:16 MR. SYLVESTER: Let's take a look at

18   08:27:17 Exhibit 1, please.

19   08:28:20 (Whereupon, Deposition Exhibit CL-1

20   08:28:20 was marked for identification.)

21   08:27:31 THE WITNESS: Do you want these other

22   08:27:33 documents back?

23   08:27:34 MR. SYLVESTER: You can just hold them.

24   08:27:35 MR. FLUMENBAUM: Just pile them on top of

25   08:27:37 each other.

1    08:28:01 MR. SYLVESTER: For the record, Exhibit 1

2    08:28:02 is an Order Instituting Cease-And-Desist Proceedings

3    08:28:07 Pursuant To Section 8A of the Securities Act of

4    08:28:10 1933, Making Findings, and Imposing a

5    08:28:13 Cease-And-Desist Order. It's dated November 24th,

6    08:28:20 2008.

7    08:37:46 THE WITNESS: Okay.

8    08:37:46 BY MR. SYLVESTER:

9    08:37:47 Q. Mr. Larsen, you've taken a few minutes to

10   08:37:49 review the document; is that right?

11   08:37:50 A. Yes.

12   08:37:52 Q. If you look at page 2 of the document,

13   08:37:55 under the subheading, "Summary," it says:

14   08:37:59 "The loan notes issued by

15   08:38:00 Prosper pursuant to this platform

16   08:38:02 are securities and Prosper, from

17   08:38:05 approximately January 2006 through

18   08:38:07 October 14, 2008, violated

19   08:38:10 Sections 5(a) and (c) of the

20   08:38:13 Securities Act, which prohibit the

21   08:38:14 offer or sale of securities without

22   08:38:16 an effective registration statement

23   08:38:18 or a valid exemption from

24   08:38:21 registration."

25   08:38:22 Did I read that correctly?

1    08:38:23 MR. FLUMENBAUM: Objection as to form.

2    08:38:24 You may answer.

3    08:38:25 THE WITNESS: Yes.

4    08:38:26 BY MR. SYLVESTER:

5    08:38:32 Q. Mr. Larsen, did you review this document

6    08:38:34 in or around 2008?

7    08:38:38 A. Yes.

8    08:38:39 Q. At the time of this document, you were

9    08:38:40 aware that the SEC had concluded that Prosper's loan

10   08:38:44 notes were securities?

11   08:38:45 MR. FLUMENBAUM: Objection as to form.

12   08:38:46 Document speaks for itself.

13   08:38:49 THE WITNESS: We were aware of a

14   08:38:52 settlement offer.

15   08:38:57 BY MR. SYLVESTER:

16   08:38:57 Q. I'm asking specifically about the sentence

17   08:38:59 I just read. Were you aware of the SEC's conclusion

18   08:39:02 that Prosper's loan notes were securities?

19   08:39:05 MR. FLUMENBAUM: Objection as to form.

20   08:39:06 The document, again, speaks for itself.

21   08:39:08 It's part of -- you're reading something

22   08:39:10 that's part of an order where the party does not

23   08:39:14 admit --

24   08:39:19 MR. SYLVESTER: Sure.

25   08:39:19 MR. FLUMENBAUM: -- that sentence.

39

1    08:39:20 MR. SYLVESTER: I'm not asking for his

2    08:39:22 views. I'm asking whether he understood what the

3    08:39:24 SEC concluded at the time, his understanding, not

4    08:39:27 what the document says.

5    08:39:28 MR. FLUMENBAUM: Well, I don't believe

6    08:39:29 that's what you've asked, but you want to rephrase

7    08:39:32 your question?

8    08:39:32 I'll deal with that question one at a

9    08:39:35 time.

10   08:39:35 BY MR. SYLVESTER:

11   08:39:37 Q. At the time of this document, were you

12   08:39:38 aware that the SEC had concluded that Prosper sold

13   08:39:42 unregistered securities?

14   08:39:44 MR. FLUMENBAUM: Objection as to form.

15   08:39:45 The document speaks for itself.

16   08:39:50 BY MR. SYLVESTER:

17   08:39:50 Q. Go ahead.

18   08:39:53 A. I'm aware that this was the SEC's position

19   08:39:56 in the settlement offer.

20   08:39:59 Q. And when you say the "settlement offer,"

21   08:40:01 you tapped Exhibit 1.

22   08:40:03 Do you mean Exhibit 1?

23   08:40:05 A. Yes.

24   08:40:11 Q. At any point prior to November 24th,

25   08:40:17 2008, did you believe that Prosper's loan notes were

[9/14/2021] Larsen, Christian (revised) 9.14.2021

1    08:40:22 securities?

2    08:40:22 MR. FLUMENBAUM: Objection as to form.

3    08:40:24 You may answer.

4    08:40:25 THE WITNESS: No.

5    08:40:26 BY MR. SYLVESTER:

6    08:40:26 Q. At any point prior to November 2008, was

7    08:40:31 there any question in your mind as to whether the

8    08:40:33 loan notes issued by Prosper were securities?

9    08:40:37 MR. FLUMENBAUM: Objection as to form.

10   08:40:38 You may answer.

11   08:40:39 THE WITNESS: No.

12   08:40:40 BY MR. SYLVESTER:

13   08:40:40 Q. Okay. At some point prior to

14   08:40:43 November 2008, the SEC had initiated an

15   08:40:46 investigation of Prosper; is that right?

16   08:40:48 MR. FLUMENBAUM: Objection as to form.

17   08:40:51 You may answer.

18   08:40:52 THE WITNESS: They had initiated an

19   08:40:54 investigation of the entire industry.

20   08:40:56 BY MR. SYLVESTER:

21   08:40:56 Q. Including Prosper?

22   08:41:00 A. Prosper and Lending Club, which was the

23   08:41:02 other participant in the marketplace.

24   08:41:12 Q. Prior to the SEC's investigation of

25   08:41:13 Prosper and others, what efforts, if any, did you

1    08:41:16 take to undertake -- strike that.

2    08:41:19 Prior to November 2008, did you take any

3    08:41:21 efforts to figure out whether Prosper's loan notes

4    08:41:25 were securities?

5    08:41:25 MR. FLUMENBAUM: Objection as to form.

6    08:41:27 Objection as to relevance.

7    08:41:34 Again, I am instructing you not to answer

8    08:41:36 anything that you may have done with or without

9    08:41:39 counsel.

10   08:41:41 MR. SYLVESTER: With counsel, you mean,

11   08:41:43 right, Marty?

12   08:41:45 MR. FLUMENBAUM: With counsel. Yes. I'm

13   08:41:46 sorry.

14   08:41:48 THE WITNESS: Yeah. Extensive --

15   08:41:48 extensive work.

16   08:41:50 BY MR. SYLVESTER:

17   08:41:50 Q. What steps did you take?

18   08:41:54 A. Making sure that the marketplace was

19   08:41:58 consistent with loans that were not securities.

20   08:42:06 I think I can't delineate between other

21   08:42:10 steps and work with counsel. So I'll have to follow

22   08:42:13 my counsel's advice there.

23   08:42:18 Q. Mr. Larsen, can you explain what you mean

24   08:42:20 by "making sure that the marketplace was consistent

25   08:42:22 with loans that were not securities"?

1    08:42:25 A. Yes. Making sure that they were notes

2    08:42:31 under the banking regimes.

3    08:42:35 Q. What's the "they" in that sentence?

4    08:42:38 A. The notes.

5    08:42:39 Q. Issued by Prosper?

6    08:42:41 A. Yes. Sorry.

7    08:42:43 Q. Are you familiar with the term "no-action

8    08:42:46 letter"?

9    08:42:48 MR. FLUMENBAUM: Objection as to form.

10   08:42:49 You may answer.

11   08:42:51 THE WITNESS: Yes.

12   08:42:52 BY MR. SYLVESTER:

13   08:42:52 Q. Okay. Prior to November 2008, did anyone

14   08:42:56 at Prosper seek a no-action letter from the SEC in

15   08:43:00 connection with the question of whether Prosper's

16   08:43:02 loan notes were securities?

17   08:43:04 MR. FLUMENBAUM: Objection as to form.

18   08:43:05 You may answer.

19   08:43:06 THE WITNESS: Also, could you repeat the

20   08:43:07 prior question?

21   08:43:07 I think you used a word there that was not

22   08:43:10 correct.

23   08:43:10 BY MR. SYLVESTER:

24   08:43:10 Q. The prior question was: Are you familiar

25   08:43:14 with the term "no-action letter"?

1    08:43:16 A. No. Sorry, the one right before that.

2    08:43:18 Sorry.

3    08:43:19 Q. I'm sorry, sir, did you want to clarify an

4    08:43:21 answer? Because feel free.

5    08:43:23 A. Yes.

6    08:43:23 I think you said that notes that Prosper

7    08:43:26 issued. Prosper didn't issue notes. Prosper

8    08:43:30 allowed people to lend to other individuals.

9    08:43:36 Q. Okay. Just for the record, Exhibit 1

10   08:43:42 states the loan notes issued by Prosper pursuant to

11   08:43:45 this platform are securities.

12   08:43:46 You're aware that was the SEC's

13   08:43:48 conclusion; is that right?

14   08:43:49 MR. FLUMENBAUM: Objection as to form.

15   08:43:50 We keep -- you know, the document speaks

16   08:43:52 for itself, Mr. Sylvester. I don't know why you're

17   08:43:56 trying to put words -- we did not -- Prosper never

18   08:43:59 accepted the SEC's conclusion. And the SEC

19   08:44:04 specifically agreed that Prosper didn't have to

20   08:44:06 admit that.

21   08:44:08 MR. SYLVESTER: I once again asked him of

22   08:44:09 his awareness of the SEC's conclusion. It's not an

23   08:44:12 objectionable question.

24   08:44:15 MR. FLUMENBAUM: He said he's aware of the

25   08:44:16 cease-and-desist order.

```
 1    08:44:19 BY MR. SYLVESTER:

 2    08:44:19 Q. You can answer.

 3    08:44:20 A. I'm aware of the SEC's position. Did not

 4    08:44:23 agree with it.

 5    08:44:30 Q. Returning to the issue of the no-action

 6    08:44:31 letter, prior to November 2008, did anyone at

 7    08:44:35 Prosper seek a no-action letter from the SEC in

 8    08:44:38 connection with Prosper's business?

 9    08:44:41 A. No.

10    08:44:45 Q. Did anyone at Prosper contact the SEC with

11    08:44:50 respect to Prosper's business prior to

12    08:44:52 November 2008?

13    08:44:54 MR. FLUMENBAUM: Objection as to form.

14    08:44:55 Again, objection as to relevance.

15    08:44:57 You may answer, if you can.

16    08:45:06 THE WITNESS: I don't recall. Yeah, don't

17    08:45:08 recall.

18    08:45:09 BY MR. SYLVESTER:

19    08:45:09 Q. After Exhibit 1 but before you left

20    08:45:12 Prosper, did Prosper file a registration statement

21    08:45:16 with the SEC?

22    08:45:17 A. It did.

23    08:45:18 Q. Did you have any involvement with the

24    08:45:20 filing of the registration statement?

25    08:45:22 A. Yes.
```

45

1   08:45:22 Q. What was your role?

2   08:45:23 A. I was a board member, and it had to be

3   08:45:26 approved by the board.

4   08:45:35 Q. Why did Prosper decide to file a

5   08:45:37 registration statement?

6   08:45:39 MR. FLUMENBAUM: Objection as to form.

7   08:45:40 You may answer.

8   08:45:43 THE WITNESS: When the SEC decided they

9   08:45:45 wanted to regulate peer-to-peer lending, it was very

10  08:45:50 unclear how that was going to be done.

11  08:45:54 Concurrently, we were in extensive meetings with the

12  08:45:58 banking regulators -- federal banking regulators, in

13  08:46:02 particular, Sheila Bair, who was with the FDIC at

14  08:46:08 that point, which was necessary to get the OCC

15  08:46:11 involved in regulating the industry, which would

16  08:46:13 then be regulated as a banking product, notes.

17  08:46:17 And that had the support of folks like

18  08:46:20 Elizabeth Warren, who we met with extensively on

19  08:46:24 this issue. We felt like we were getting close on

20  08:46:26 that. And there didn't look to be an outcome for

21  08:46:32 the industry in continuing to -- shutting down, for

22  08:46:39 example, and stopping.

23  08:46:41 When Lending Club, which did shut down,

24  08:46:47 but, again, sort of had to because they were doing

25  08:46:50 the underwriting on loans Prosper never did. It was

1    08:46:54 up to each individual.

2    08:46:56 But once Lending Club's S1 was made

3    08:47:02 public, then the -- it was very obvious how the SEC

4    08:47:06 would regulate the industry, and that was the first

5    08:47:11 time that there was an indication that that would

6    08:47:13 have been an acceptable route forward.

7    08:47:18 So we immediately then went into the

8    08:47:22 process of also submitting an S1. First step in

9    08:47:27 doing that was a settlement agreement, which is what

10   08:47:31 occurred.

11   08:47:37 BY MR. SYLVESTER:

12   08:47:37 Q. Mr. Larsen, sitting here today, you're

13   08:47:39 familiar with what's known as the Howey test?

14   08:47:42 MR. FLUMENBAUM: Objection as to form.

15   08:47:44 THE WITNESS: Yes.

16   08:47:45 BY MR. SYLVESTER:

17   08:47:45 Q. Okay. Do you understand that the Howey

18   08:47:47 test is applied to determine whether certain offers

19   08:47:50 or sales constitute securities?

20   08:47:53 MR. FLUMENBAUM: Objection as to form.

21   08:47:54 You're actually asking for a legal conclusion.

22   08:47:57 In this case, we are going to assert that

23   08:48:00 the Howey test shouldn't even apply to XRP and other

24   08:48:05 digital assets like XRP.

25   / /

1    08:48:07 BY MR. SYLVESTER:

2    08:48:07 Q. Okay. You just testified that you have an

3    08:48:09 understanding of the Howey test. Is that right?

4    08:48:11 A. Yes.

5    08:48:12 Q. Okay. What's your understanding of the

6    08:48:15 Howey test?

7    08:48:15 MR. FLUMENBAUM: You're asking a layman to

8    08:48:18 give you something that the courts are still

9    08:48:23 struggling to determine. I don't think --

10   08:48:24 MR. SYLVESTER: Please don't coach the

11   08:48:25 witness with your objection.

12   08:48:27 MR. FLUMENBAUM: No, no, no.

13   MR. SYLVESTER: What's your objection?

14   08:48:29 MR. FLUMENBAUM: I don't think it's an

15   08:48:30 appropriate question to this witness. You're asking

16   08:48:30 for a legal --

17   08:48:31 MR. SYLVESTER: Are you instructing him

18   08:48:32 not to answer? Is it privileged?

19   08:48:34 MR. FLUMENBAUM: Well, to the extent that

20   08:48:38 your knowledge of the Howey test is based on

21   08:48:41 conversations with counsel, I'm instructing you not

22   08:48:45 to respond to that question.

23   08:48:46 To the extent that you have an

24   08:48:48 understanding independent of discussions with

25   08:48:53 counsel, I will, for what it's worth -- and I don't

1    08:48:56 think it's worth very much -- I will let you answer.

2    08:49:04 THE WITNESS: Yeah, I don't think I can

3    08:49:05 delineate what I know outside of counsel from what I

4    08:49:08 know from speaking with counsel, so I'll follow my

5    08:49:10 counsel's advice on that.

6    08:49:11 BY MR. SYLVESTER:

7    08:49:11 Q. Focusing just on timing, did you become

8    08:49:14 familiar with the Howey test in connection with the

9    08:49:17 SEC's action against Prosper?

10   08:49:19 MR. FLUMENBAUM: Objection as to form.

11   08:49:21 You're making an assumption that the Howey

12   08:49:23 test is a defined term that can be readily applied

13   08:49:29 in every situation, and that's just not the case.

14   08:49:32 Howey is a case. It's not a test.

15   08:49:35 There's no --

16   08:49:36 MR. SYLVESTER: Marty, I asked the witness

17   08:49:38 if he was familiar with the Howey test, and he told

18   08:49:40 me yes. I'm asking --

19   08:49:41 MR. FLUMENBAUM: What is the Howey test?

20   08:49:41 You tell me what the Howey test is.

21   08:49:44 MR. SYLVESTER: Marty, you're not deposing

22   08:49:45 me. We're deposing Mr. Larsen here today.

23   08:49:47 MR. FLUMENBAUM: Well, I'm objecting to

24   08:49:48 you using that phrase, "Howey test," because it's

25   08:49:50 not defined.

1   08:49:51 MR. SYLVESTER: The witness understood me.

2   08:49:52 MR. FLUMENBAUM: He understands that

3   08:49:53 there's a case named "Howey" that's relevant.

4   08:49:57 MR. SYLVESTER: I think he's capable of

5   08:49:58 testifying for himself.

6   08:49:59 MR. FLUMENBAUM: I think this is an unfair

7   08:50:01 question, Mr. Sylvester, and inappropriate.

8   08:50:05 BY MR. SYLVESTER:

9   08:50:06 Q. When did you become familiar with the

10   08:50:08 Howey test?

11   08:50:09 MR. FLUMENBAUM: Objection to the use of

12   08:50:10 the term "Howey test."

13   08:50:12 MR. SYLVESTER: Okay. Great.

14   08:50:13 THE WITNESS: I don't recall.

15   08:50:14 BY MR. SYLVESTER:

16   08:50:14 Q. Mr. Larsen, you cofounded Ripple?

17   08:50:17 A. Yes.

18   08:50:19 Q. That was in 2012?

19   08:50:22 A. That was in the second half of --

20   08:50:25 clarifying question: You're talking about what was

21   08:50:28 Opencoin?

22   08:50:29 BY MR. SYLVESTER:

23   08:50:30 Q. Ripple was previously known as Opencoin;

24   08:50:34 is that right?

25   08:50:34 A. That's right.

1    08:50:35 MR. FLUMENBAUM: Objection as to form.

2    08:50:35 Go ahead.

3    08:50:38 THE WITNESS: Could you repeat the

4    08:50:39 question, please?

5    08:50:40 MR. SYLVESTER: I think there's not one

6    08:50:41 pending.

7    08:50:46 BY MR. SYLVESTER:

8    08:50:46 Q. You were -- strike that.

9    08:50:48 You served as Ripple's CEO from

10   08:50:49 September 2012 until December 2016?

11   08:50:52 MR. FLUMENBAUM: Objection as to form.

12   08:50:55 THE WITNESS: I'm sorry, could you repeat

13   08:50:57 the dates, please?

14   08:50:58 BY MR. SYLVESTER:

15   08:50:58 Q. Sure.

16   08:50:58 You served as Ripple's CEO from

17   08:51:00 September 2012 until December 2016?

18   08:51:03 A. Yes.

19   08:51:06 Q. What were your duties as Ripple's CEO?

20   08:51:10 A. The duties of typical -- of a corporation.

21   08:51:17 Initially, a California corporation, and then

22   08:51:19 switched to a Delaware corporation.

23   08:51:22 Q. What were those typical duties?

24   08:51:27 A. Typical of a chief executive officer,

25   08:51:32 setting the -- helping to set the course of the

51

```
1    08:51:35 company, the tactics, the strategy and division, and
2    08:51:39 then making sure that we were consistent with the
3    08:51:47 desire of the board of directors and investors in
4    08:51:53 the company.
5    08:51:58 Q. As CEO, you reported to Ripple's board of
6    08:52:00 directors?
7    08:52:01 A. That's right.
8    08:52:03 Q. While you were CEO, you did not sit on
9    08:52:06 Ripple's board; is that right?
10   08:52:09 MR. FLUMENBAUM: Objection as to form.
11   08:52:10 THE WITNESS: I was on the board.
12   08:52:12 BY MR. SYLVESTER:
13   08:52:12 Q. While you were Ripple's CEO, you were also
14   08:52:14 a member of Ripple's board of directors; is that
15   08:52:18 right?
16   08:52:18 MR. FLUMENBAUM: Objection as to form.
17   08:52:20 You may answer.
18   08:52:21 THE WITNESS: Yes.
19   08:52:22 BY MR. SYLVESTER:
20   08:52:22 Q. As CEO of Ripple, all employees of Ripple
21   08:52:25 reported to you -- sorry?
22   08:52:26 A. Sorry. I just want to make sure -- you
23   08:52:29 know, catch every word. If you could slow it down
24   08:52:31 just a little bit, please.
25   08:52:33 Q. Yes, sir.
```

1    08:52:33 When you were CEO of Ripple, all of

2    08:52:35 Ripple's employees reported to you directly or

3    08:52:37 indirectly; is that right?

4    08:52:39 MR. FLUMENBAUM: Objection as to form.

5    08:52:42 THE WITNESS: Yes.

6    08:52:46 BY MR. SYLVESTER:

7    08:52:46 Q. When you were Ripple's CEO, did you give

8    08:52:48 reports to the board of directors from time to time?

9    08:52:51 A. Yes.

10   08:52:54 Q. Did you think it was important to provide

11   08:52:56 accurate information to Ripple's board?

12   08:52:58 MR. FLUMENBAUM: Objection as to form.

13   08:53:01 You may answer.

14   08:53:02 THE WITNESS: Yes.

15   08:53:02 BY MR. SYLVESTER:

16   08:53:02 Q. Did you provide accurate information to

17   08:53:04 Ripple's board?

18   08:53:05 A. Yes.

19   08:53:08 Q. Was the board, from time to time, provided

20   08:53:10 with presentations in connection with information

21   08:53:13 you conveyed to the board?

22   08:53:16 MR. FLUMENBAUM: Objection as to form.

23   08:53:17 You may answer.

24   08:53:18 THE WITNESS: Yes.

25   / /

1    08:53:19 BY MR. SYLVESTER:

2    08:53:19 Q. Who prepared those presentations?

3    08:53:22 A. I don't recall.

4    08:53:26 Q. If a presentation deck was going to the

5    08:53:28 board, did you review it beforehand?

6    08:53:30 MR. FLUMENBAUM: Objection as to form.

7    08:53:35 THE WITNESS: Generally.

8    08:53:42 BY MR. SYLVESTER:

9    08:53:42 Q. During the period that you were Ripple's

10   08:53:44 CEO, did you have any rights to appoint directors?

11   08:53:51 MR. FLUMENBAUM: Objection as to form.

12   08:53:52 You may answer.

13   08:53:53 THE WITNESS: Yeah. You have to specify a

14   08:53:56 time frame.

15   08:53:56 BY MR. SYLVESTER:

16   08:53:56 Q. Sure.

17   08:53:57 During -- at any point during your tenure

18   08:54:02 as Ripple's CEO, did you have the right to appoint

19   08:54:06 directors to Ripple's board?

20   08:54:07 A. Yes.

21   08:54:08 Q. Was there a period of time during the time

22   08:54:10 that you were Ripple's CEO where you did not have

23   08:54:13 such a right?

24   08:54:14 A. Yes.

25   08:54:14 Q. What was that period of time?

54

1   08:54:20 A. I don't recall the exact period of time.

2   08:54:23 Generally, from the founding. I can't recall when

3   08:54:29 that changed.

4   08:54:34 Q. At the time of Ripple's founding, did you

5   08:54:36 not have the authority to appoint directors to

6   08:54:38 Ripple's board?

7   08:54:39 MR. FLUMENBAUM: Objection as to form.

8   08:54:42 You're making statements. You're not

9   08:54:44 asking questions.

10   08:54:45 BY MR. SYLVESTER:

11   08:54:45 Q. Is that correct?

12   08:54:47 A. My understanding is I could appoint a

13   08:54:50 replacement for myself.

14   08:54:52 Q. Okay.

15   08:54:55 When did you first obtain the authority to

16   08:54:58 appoint a director to Ripple's board?

17   08:55:02 MR. FLUMENBAUM: Objection as to form.

18   08:55:05 THE WITNESS: Well, again, as I just said,

19   08:55:07 I could replace myself, is my understanding, at the

20   08:55:12 founding. Sometime thereafter, I acquired the right

21   08:55:16 to appoint other directors.

22   08:55:20 BY MR. SYLVESTER:

23   08:55:20 Q. At the point that you acquired the right

24   08:55:23 to appoint other directors, how many of Ripple's

25   08:55:26 directors were you able to appoint?

1    08:55:29 MR. FLUMENBAUM: Objection as to form.

2    08:55:30 You may answer.

3    08:55:32 THE WITNESS: Well, no board members were

4    08:55:34 ever appointed without the agreement of the rest of

5    08:55:38 the board.

6    08:55:39 BY MR. SYLVESTER:

7    08:55:39 Q. Okay. Understanding that, you testified

8    08:55:51 that you did have the right to appoint directors at

9    08:55:54 some point in time?

10   08:55:56 A. Yes. The technical ability to appoint

11   08:55:59 directors, but in no circumstance would I -- and

12   08:56:04 probably effectively could -- appoint directors

13   08:56:06 without the approval of the rest of the board.

14   08:56:09 Q. Okay. How many of Ripple's directors did

15   08:56:12 you have the technical ability to appoint when you

16   08:56:15 acquired the ability to appoint directors?

17   08:56:18 MR. FLUMENBAUM: Objection as to form.

18   08:56:19 You may answer.

19   08:56:20 THE WITNESS: I think that has to be

20   08:56:21 specific to exact time periods, because that did

21   08:56:26 change over time as well.

22   08:56:27 BY MR. SYLVESTER:

23   08:56:27 Q. Just starting with the -- you acquired the

24   08:56:30 ability to appoint a director. When was that?

25   08:56:33 A. I don't recall exactly.

[9/14/2021] Larsen, Christian (revised) 9.14.2021

1    08:56:34 Q. Okay. Regardless of what year it was,

2    08:56:37 just the first time that you acquired the ability to

3    08:56:40 appoint a director, how many directors could you

4    08:56:42 appoint?

5    08:56:44 A. I don't recall the exact number at that

6    08:56:47 period of time.

7    08:56:48 I know how many I have today.

8    08:56:50 Q. Okay. Maybe we'll work backwards.

9    08:56:52 A. Sure.

10   08:56:53 Q. How many directors do you have the

11   08:56:55 authority to appoint today?

12   08:56:57 A. I have the technical ability to appoint

13   08:57:02 seven. However, the Series A, Series B, Series C

14   08:57:11 also have rights. So effectively, though, you can't

15   08:57:16 really appoint directors without the approval of the

16   08:57:19 rest of the board. And that's how we've conducted

17   08:57:23 our board operations throughout.

18   08:57:29 Q. How many directors does Ripple have today?

19   08:57:34 A. It has nine directors.

20   08:57:38 Q. There was a time prior to today where you

21   08:57:40 had the ability to appoint a different number of

22   08:57:43 directors than seven. Is that right?

23   08:57:46 A. It has varied over time.

24   08:57:48 Q. Okay. When did you acquire the ability to

25   08:57:50 appoint seven directors?

57

1      08:57:54 A. I don't recall that exact date.

2      08:57:56 Q. Do you have a general time frame, a year?

3      08:58:00 A. I don't recall.

4      08:58:01 Q. Was it during the time you were CEO?

5      08:58:06 A. I don't recall.

6      08:58:08 Q. Okay. Prior to the time that you acquired

7      08:58:11 the ability to appoint seven directors, did you have

8      08:58:15 any ability to appoint directors?

9      08:58:17 MR. FLUMENBAUM: Objection as form. Asked

10     08:58:19 and answered.

11     08:58:19 THE WITNESS: Could you repeat the

12     08:58:20 question, please?

13     08:58:21 BY MR. SYLVESTER:

14     08:58:21 Q. Sure.

15     08:58:21 We don't know the date, but just prior to

16     08:58:23 the time that you acquired the ability to appoint

17     08:58:26 seven directors, did you have the ability to appoint

18     08:58:29 any directors?

19     08:58:31 A. I had the technical ability to appoint

20     08:58:34 other directors, but, again, practically, and how we

21     08:58:40 actually operated, all of the board members would

22     08:58:43 have to approve new board members.

23     08:58:46 Q. Immediately prior to the time in which you

24     08:58:48 acquired the right to appoint seven directors, how

25     08:58:51 many directors did you have the right to appoint?

58

```
1    08:58:54 A. I don't recall.

2    08:58:59 Q. Other than your current authority to

3    08:59:02 appoint seven directors, do you recall any other

4    08:59:08 time period where you had the ability to appoint

5    08:59:10 more directors?

6    08:59:11 MR. FLUMENBAUM: Objection as to form.

7    08:59:12 You may answer.

8    08:59:13 THE WITNESS: I don't recall.

9    08:59:15 BY MR. SYLVESTER:

10   08:59:15 Q. Do you remember any time period where you

11   08:59:17 had the ability to appoint fewer directors?

12   08:59:20 MR. FLUMENBAUM: Objection as to form.

13   08:59:20 You may answer.

14   08:59:25 THE WITNESS: I don't recall.

15   08:59:30 BY MR. SYLVESTER:

16   08:59:30 Q. When you were CEO of Ripple, who was

17   08:59:33 chairman of the board?

18   08:59:35 A. I was chairman of the board.

19   08:59:37 Q. Okay. So have you been chairman of the

20   08:59:39 board of Ripple from its founding until now?

21   08:59:42 MR. FLUMENBAUM: Objection as to form.

22   08:59:44 You may answer.

23   08:59:46 THE WITNESS: I don't recall who was the

24   08:59:50 chairman at founding, but I am chairman now.

25   / /
```

59

```
 1    08:59:53 BY MR. SYLVESTER:

 2    08:59:53 Q. Has there ever been a chairman of the

 3    08:59:55 board of Ripple other than you?

 4    09:00:00 A. I don't recall if Jed or myself -- at

 5    09:00:04 founding, Jed McCaleb was chairman.

 6    09:00:10 Q. Ripple is a for-profit enterprise?

 7    09:00:13 A. It's a for-profit enterprise, yes.

 8    09:00:15 Q. Ripple has always been a for-profit

 9    09:00:18 enterprise since its inception?

10    09:00:21 A. Yes.

11    09:00:21 Q. Does Ripple have shareholders?

12    09:00:23 A. It does.

13    09:00:23 Q. Are you a Ripple shareholder?

14    09:00:25 A. Could you just speak a little more slowly,

15    09:00:27 please?

16    09:00:28 Q. Yes, sir.

17    09:00:28 Go ahead.

18    09:00:30 A. Repeat, I'm sorry.

19    09:00:30 Q. Are you a Ripple shareholder?

20    09:00:32 A. I am.

21    09:00:32 Q. How long have you been a Ripple

22    09:00:33 shareholder?

23    09:00:34 A. Since the founding of the company.

24    09:00:37 Q. Okay. Do you have voting rights as a

25    09:00:40 Ripple shareholder?
```

1    09:00:41 A. I do.

2    09:00:44 Q. What percentage of voting rights do you

3    09:00:46 currently hold as a percentage of all shareholders

4    09:00:49 with voting rights?

5    09:00:50 A. Currently today?

6    09:00:51 Q. Sure.

7    09:00:52 A. I own over 50 -- just over 50 percent of

8    09:00:55 the voting -- of the votes.

9    09:00:59 Q. Prior to today, has there been a time in

10   09:01:02 which the percentage of voting rights you held as a

11   09:01:04 percentage of all shareholders' voting rights was

12   09:01:07 higher than approximately 50 percent?

13   09:01:11 MR. FLUMENBAUM: Objection as to form.

14   09:01:13 You may answer.

15   09:01:14 THE WITNESS: I don't recall.

16   09:01:14 BY MR. SYLVESTER:

17   09:01:14 Q. Was there a time when it was lower than

18   09:01:16 50 percent?

19   09:01:17 A. Yes.

20   09:01:18 Q. When was that?

21   09:01:20 A. At the founding of the company.

22   09:01:32 Q. Was that prior to when you became a

23   09:01:34 shareholder?

24   09:01:37 MR. FLUMENBAUM: Objection as to form.

25   09:01:39 THE WITNESS: I'm sorry, I don't

1   09:01:39 understand the question.

2   09:01:40 BY MR. SYLVESTER:

3   09:01:40 Q. Let me rephrase.

4   09:01:42 At the time that you purchased Ripple's

5   09:01:44 shares, did you have at least 50 percent of

6   09:01:48 shareholder voting rights?

7   09:01:49 MR. FLUMENBAUM: Objection as to form.

8   09:01:52 THE WITNESS: No, to the best of my

9   09:01:54 recollection.

10  09:01:57 BY MR. SYLVESTER:

11  09:01:57 Q. At what point after -- strike that.

12  09:02:01 At what point did you acquire at least

13  09:02:02 50 percent of Ripple's shareholder voting rights?

14  09:02:05 MR. FLUMENBAUM: Objection as to form.

15  09:02:07 THE WITNESS: I don't recall the exact

16  09:02:07 date.

17  09:02:09 BY MR. SYLVESTER:

18  09:02:09 Q. Were you CEO?

19  09:02:11 A. Yes.

20  09:02:24 Q. Does Ripple have independent directors?

21  09:02:26 A. It does.

22  09:02:29 Q. How does Ripple define the term

23  09:02:30 "independent director"?

24  09:02:32 MR. FLUMENBAUM: Objection as to form.

25  09:02:36 THE WITNESS: I don't know the exact

[9/14/2021] Larsen, Christian (revised) 9.14.2021

62

1    09:02:37 definition. I think that's a legal term.

2    09:02:45 BY MR. SYLVESTER:

3    09:02:45 Q. Do you know if Ripple has a

4    09:02:51 formal -- strike that.

5    09:02:52 Do you know if Ripple has a formal

6    09:02:55 definition of "independent director" in writing

7    09:02:58 somewhere?

8    09:02:59 MR. FLUMENBAUM: Objection as to form.

9    09:03:01 THE WITNESS: Yes.

10   09:03:01 BY MR. SYLVESTER:

11   09:03:01 Q. You can answer.

12   09:03:02 A. Yes, I'm sure we do.

13   09:03:04 Q. Okay.

14   09:03:11 During the time you were CEO, could you,

15   09:03:13 as a result of your voting power and position of

16   09:03:15 authority in Ripple, cause Ripple to enter into a

17   09:03:18 transaction?

18   09:03:18 MR. FLUMENBAUM: Objection as to form.

19   09:03:22 THE WITNESS: The technical ability, but

20   09:03:25 not the practical ability. If the board disagreed

21   09:03:29 with a transaction, it would not go through. That's

22   09:03:34 the way we run the company.

23   09:03:37 BY MR. SYLVESTER:

24   09:03:37 Q. During the time --

25   09:03:45 A. Sorry.

63

1    09:03:46 Q. Go ahead, please.

2    09:03:47 A. Also, importantly, the Series A, Series B

3    09:03:52 and Series C investors have protective provisions

4    09:03:56 which they could block a transaction even if the

5    09:04:00 independent board members wanted a transaction to

6    09:04:04 occur.

7    09:04:26 Q. When you say, "transaction," Mr. Larsen,

8    09:04:27 what do you mean?

9    09:04:29 MR. FLUMENBAUM: Objection.

10   09:04:29 That was your phrase, Mr. Sylvester. What

11   09:04:33 did you mean?

12   09:04:38 BY MR. SYLVESTER:

13   09:04:38 Q. Mr. Larsen said:

14   09:04:39 "Also, importantly, the Series

15   09:04:40 A, Series B and Series C investors

16   09:04:42 have protective provisions which

17   09:04:44 they could block a transaction even

18   09:04:46 if the independent board members

19   09:04:48 wanted a transaction to occur."

20   09:04:48 Let me ask my question.

21   09:04:50 What type of transaction?

22   09:04:52 A. Well, my assumption is, when you use the

23   09:04:54 word "transaction," you are meaning a change to the

24   09:04:57 status quo.

25   09:05:21 MR. SYLVESTER: Let's take a look at

[9/14/2021] Larsen, Christian (revised) 9.14.2021

64

1    09:05:22 Exhibit 115, please.

2    09:05:23 (Whereupon, Deposition Exhibit CL-115

3    09:05:37 was marked for identification.)

4    09:06:17 MR. SYLVESTER: Just for the record,

5    09:06:18 Exhibit 115 is an email Bates ending -181, from ███

6    09:06:23 ███ , addressed to Chris at Ripple, dated

7    09:06:25 September 9th, 2017.

8    09:08:17 THE WITNESS: Okay. I see it.

9    09:08:19 BY MR. SYLVESTER:

10   09:08:20 Q. Mr. Larsen, you see that this is -- this

11   09:08:24 Exhibit 115 is a thread of emails?

12   09:08:27 A. Yes.

13   09:08:28 Q. Okay. Someone named Ms. ███ asks, on

14   09:08:32 the first page:

15   09:08:33 "Could you and Chris, by

16   09:08:35 aggregating your voting power and

17   09:08:36 positions of authority in Ripple,

18   09:08:38 cause Ripple to enter into a

19   09:08:39 transaction?"

20   09:08:40 Do you see that?

21   09:08:41 A. I do.

22   09:08:42 Q. Okay. And do you see that you replied, as

23   09:08:44 to number 2, "Yes"?

24   09:08:50 A. I do.

25   09:08:53 Q. When you were Ripple's CEO, did you

1    09:08:55 receive a salary?

2    09:08:57 A. Yes.

3    09:08:59 Q. Was that paid in U.S. dollars?

4    09:09:01 A. It was.

5    09:09:02 Q. Okay. When you were Ripple's CEO, did you

6    09:09:05 receive any compensation other than salary?

7    09:09:10 A. What time period are you asking?

8    09:09:12 Q. At any point during your tenure as

9    09:09:14 Ripple's CEO, did you receive any compensation other

10   09:09:17 than salary?

11   09:09:18 A. Yes.

12   09:09:21 Q. Starting with 2013, did you receive any

13   09:09:24 compensation other than salary?

14   09:09:25 A. Not that I can recall.

15   09:09:27 Q. How about 2014?

16   09:09:30 A. I don't know the exact dates, but there

17   09:09:32 was a period when I did receive other compensation.

18   09:09:35 Q. What was that other compensation?

19   09:09:38 A. It was percentage of sales from XRP Fund

20   09:09:46 II LLC, I believe.

21   09:09:55 Q. What did XRP Fund II LLC to sell?

22   09:10:00 A. That sold XRP.

23   09:10:06 Q. And you received a set percentage of the

24   09:10:09 sales from XRP II LLC; is that right?

25   09:10:12 A. Yes.

1      09:10:12 Could I modify the --

2      09:10:18 Q. Please.

3      09:10:20 A. I believe there was some stock

4      09:10:23 compensation as well that would have been included

5      09:10:25 in compensation at some period of time.

6      09:10:31 Q. That's separate and apart from the

7      09:10:34 percentage of sales from XRP II?

8      09:10:37 A. Correct.

9      09:10:38 Q. Okay. Are you still paid a percentage of

10     09:10:46 sales from XRP II?

11     09:10:47 A. No.

12     09:10:49 Q. At what point did you stop receiving a

13     09:10:53 percentage of sales from XRP II?

14     09:10:56 A. I don't recall the exact date.

15     09:10:57 Q. Was it while you were CEO?

16     09:11:04 A. I don't recall.

17     09:11:08 Q. Was it within the past year?

18     09:11:11 A. No. It was well before the past year.

19     09:11:14 Q. Why did you stop receiving a percentage of

20     09:11:17 XRP II sales?

21     09:11:21 A. I don't recall exactly why. Could have

22     09:11:24 been tied to the change of -- changing from CEO to

23     09:11:32 chairman.

24     09:11:44 Q. Who made the decision that you stop

25     09:11:48 receiving a percentage of sales from XRP II?

1   09:11:54 A. I don't recall.

2   09:11:55 Q. Did you -- sorry.

3   09:11:58 A. Well, certainly agreed with that.

4   09:12:04 Q. You agreed with the decision to stop

5   09:12:06 receiving the percentage of sales; is that right?

6   09:12:07 A. Yes.

7   09:12:12 Q. Sitting here today, you own XRP; is that

8   09:12:14 right?

9   09:12:17 MR. FLUMENBAUM: Objection as to form.

10  09:12:19 You may answer.

11  09:12:20 THE WITNESS: I own a certain amount of

12  09:12:21 XRP.

13  09:12:23 BY MR. SYLVESTER:

14  09:12:23 Q. You received 45 billion XRP in 2012?

15  09:12:28 MR. FLUMENBAUM: Objection as to form.

16  09:12:31 THE WITNESS: Yes.

17  09:12:31 BY MR. SYLVESTER:

18  09:12:31 Q. Of that 45 billion that you received in

19  09:12:34 2012, you had retained 9 billion; is that right?

20  09:12:37 A. Correct.

21  09:12:39 Q. Did you provide any payment to anyone in

22  09:12:41 exchange for the XRP you received?

23  09:12:43 A. Excuse me. Are we finished with this

24  09:12:45 document?

25  09:12:46 Q. Sure. You can set it aside.

68

| 1 | 09:12:48 A. Thank you. |
| 2 | 09:12:49 Can you repeat the question, please? |
| 3 | 09:12:50 Q. Sure. |
| 4 | 09:12:51 Did you receive any payment -- |
| 5 | 09:12:52 sorry -- strike that. |
| 6 | 09:12:52 Did you provide any payment to anyone in |
| 7 | 09:12:55 exchange for the XRP you received in 2012? |
| 8 | 09:12:58 A. You mean payment of dollars or something |
| 9 | 09:13:00 like that? |
| 10 | 09:13:01 Q. Payment of any kind. |
| 11 | 09:13:02 MR. FLUMENBAUM: Objection as form. |
| 12 | 09:13:04 You may answer. |
| 13 | 09:13:08 THE WITNESS: Well, when you include, you |
| 14 | 09:13:12 know, labor in that, sort of being part of a team. |
| 15 | 09:13:20 BY MR. SYLVESTER: |
| 16 | 09:13:20 Q. How about any cash payment? |
| 17 | 09:13:23 A. No. |
| 18 | 09:13:25 Q. Okay. Why did you retain the 9 billion |
| 19 | 09:13:27 XRP? |
| 20 | 09:13:29 MR. FLUMENBAUM: Objection as to form. |
| 21 | 09:13:33 You may answer. |
| 22 | 09:13:34 THE WITNESS: So as project founders, of |
| 23 | 09:13:39 which there were three individuals, we determined |
| 24 | 09:13:45 that 20 percent was -- of all of the currency |
| 25 | 09:13:52 created was the appropriate number, given that's how |

[9/14/2021] Larsen, Christian (revised) 9.14.2021

```
 1    09:13:55 much our understanding that Satoshi Nakamoto --
 2    09:14:01 obviously, not a real name -- whoever that person or
 3    09:14:05 persons are, was allocated in the Bitcoin protocol.
 4    09:14:17 BY MR. SYLVESTER:
 5    09:14:17 Q. So the basis of the three founders'
 6    09:14:19 decision to retain the 9 billion XRP --
 7    09:14:22 sorry -- strike that.
 8    09:14:23 The basis of the three founders' decision
 9    09:14:25 to retain 20 percent of all the XRP was based on
10    09:14:29 Satoshi Nakamoto's retention of approximately
11    09:14:33 20 percent of Bitcoin?
12    09:14:35 A. That's correct.
13    09:14:35 And, again, important to note that Satoshi
14    09:14:37 Nakamoto is likely not a real name.
15    09:14:42 Q. Understood.
16    09:14:42 Is that decision documented anywhere?
17    09:14:46 MR. FLUMENBAUM: Objection as to form.
18    09:14:46 What do you mean, "documented anywhere"?
19    09:14:53 THE WITNESS: Not that I can recall.
20    09:14:54 BY MR. SYLVESTER:
21    09:14:54 Q. What was the basis for your understanding
22    09:14:58 of how much Bitcoin was allocated to Satoshi
23    09:15:03 Nakamoto?
24    09:15:05 A. That's my understanding from discussions
25    09:15:09 with Jed McCaleb, who was early in the Bitcoin
```

1    09:15:14 ecosystem, and confirmed by many others over the

2    09:15:17 years.

3    09:15:21 Q. Approximately how much XRP do you own

4    09:15:23 today?

5    09:15:25 A. Approximately ▮▮▮▮▮▮▮▮

6    09:15:31

7    09:15:33

8    09:15:35

9    09:15:36

10   09:15:37

11   09:15:37

12   09:15:38

13   09:15:38

14   09:15:44

15   09:15:49

16   09:15:54

17   09:15:57

18   09:16:01

19   09:16:04

20   09:16:09

21   09:16:11

22   09:16:12

23   09:16:13 Q. Okay. Between 2012 and today, you've sold

24   09:16:23 some of your XRP; is that right?

25   09:16:24 A. Yes.

1    09:16:26 Q. You've also purchased XRP from time to

2    09:16:28 time between 2012 and today?

3    09:16:33 A. You know, rarely, but yes.

4    09:16:40 Q. When did you first sell any of your XRP?

5    09:16:45 A. This would have been the first half of

6    09:16:50 2013.

7    09:16:54 Q. You made approximately $450 million from

8    09:16:59 your sales of XRP by the end of 2020; is that right?

9    09:17:02 MR. FLUMENBAUM: Objection as to form.

10   09:17:04 You may answer.

11   09:17:05 THE WITNESS: Sounds approximately

12   09:17:06 correct.

13   09:17:13 BY MR. SYLVESTER:

14   09:17:13 Q. You make the decisions whether or not to

15   09:17:14 sell your XRP; is that right?

16   09:17:17 MR. FLUMENBAUM: Objection as to form.

17   09:17:18 You may answer.

18   09:17:21 THE WITNESS: Well, no. In the way that

19   09:17:23 we are using programmatic selling, we're relying on

20   09:17:29 the advice of professional market makers.

21   09:17:35 BY MR. SYLVESTER:

22   09:17:35 Q. Do you permit the market makers to make

23   09:17:38 the decision or do you make the ultimate decision as

24   09:17:40 to whether to sell your XRP?

25   09:17:42 MR. FLUMENBAUM: Objection as to form.

1    09:17:44 You may answer.

2    09:17:45 THE WITNESS: So obviously, my property,

3    09:17:46 but we rely on the expertise of market makers on

4    09:17:50 what would be a constructive amount that would not

5    09:17:55 impact the market.

6    09:17:56

7    09:17:56

8    09:17:59

9    09:18:03

10   09:18:06

11   09:18:09

12   09:18:11

13   09:18:14

14   09:18:17

15   09:18:18

16   09:18:22

17   09:18:25

18   09:18:26

19   09:18:28

20   09:18:37 BY MR. SYLVESTER:

21   09:18:38 Q. You mentioned that you rely on the

22   09:18:40 expertise of market makers on what would be a

23   09:18:42 constructive amount that would not impact the

24   09:18:44 market. Is that right?

25   09:18:46 A. Yes.

73

1    09:18:46 Q. What impact to the market would you like

2    09:18:50 to avoid when selling your XRP?

3    09:18:53 MR. FLUMENBAUM: Objection as to form.

4    09:18:54 You may answer.

5    09:18:57 THE WITNESS: Well, just that, that it

6    09:19:00 doesn't impact the market.

7    09:19:03 BY MR. SYLVESTER:

8    09:19:03 Q. Impact the market in what way?

9    09:19:07 A. Impact the market in a negative way.

10   09:19:11 Q. What negative way?

11   09:19:13 MR. FLUMENBAUM: Objection as to form.

12   09:19:15 THE WITNESS: Well, negative being not

13   09:19:16 constructive. So whether that's up or down, either

14   09:19:20 one of those, depending on circumstances, can be

15   09:19:23 constructive or not constructive. So is not

16   09:19:27 impacting is being constructive.

17   09:19:29 BY MR. SYLVESTER:

18   09:19:29 Q. Whether what is up and down?

19   09:19:31 MR. FLUMENBAUM: Objection as to form.

20   09:19:32 You may answer.

21   09:19:35 THE WITNESS: Whether price is up or down

22   09:19:37 or volume is up or down or sentiment is up or down.

23   09:19:42 Again, constructive is, I think, a guiding

24   09:19:47 principle.

25   / /

74

1   09:19:49 BY MR. SYLVESTER:

2   09:19:49 Q. Okay. So when selling your XRP, in your

3   09:19:56 view, it's not constructive if those sales would

4   09:20:00 impact the price of XRP; is that right?

5   09:20:02 MR. FLUMENBAUM: Objection as to form.

6   09:20:04 THE WITNESS: I think, generally, that's

7   09:20:05 the case.

8   09:20:07 BY MR. SYLVESTER:

9   09:20:07 Q. Okay. And when selling your XRP in the

10  09:20:13 past, you've tried to sell in a way that avoided

11  09:20:16 impacting the price of XRP; is that right?

12  09:20:18 MR. FLUMENBAUM: Objection as to form.

13  09:20:19 You may answer.

14  09:20:21 THE WITNESS: As I mentioned, that could

15  09:20:22 be price, that could be volume, that could be

16  09:20:24 sentiment.

17  09:20:26 You know, again, I think that's why you

18  09:20:29 want to rely on market makers for those

19  09:20:31 determinations. Very sophisticated, large global

20  09:20:35 marketplace.

21  09:20:35 BY MR. SYLVESTER:

22  09:20:35 Q. In selling your XRP in the past, your goal

23  09:20:41 has been to avoid impacting the price of XRP, the

24  09:20:44 volume of XRP, or the public sentiment regarding

25  09:20:47 XRP?

1   09:20:48 MR. FLUMENBAUM: Objection as to form.

2   09:20:53 Some of this has been asked and answered. That's a

3   09:20:56 compound question that you're asking.

4   09:21:08 BY MR. SYLVESTER:

5   09:21:08 Q. You can answer.

6   09:21:10 A. Yeah. That's actually not what I said.

7   09:21:13 You know, again, constructive is the

8   09:21:17 overriding objective. I'm giving you examples of

9   09:21:21 what that might be. But, again, I think that's

10  09:21:24 where a professional market maker -- those are very

11  09:21:27 complex global markets with lots of dynamism to it.

12  09:21:33 So I rely on kind of experts to make that

13  09:21:38 determination. I don't know if it's as simple as

14  09:21:41 just that, but those were examples.

15  09:21:43 Q. Sure.

16  09:21:46 If your sales negatively impacted the

17  09:21:48 volume of XRP, that would be something that is an

18  09:21:52 example of not constructive sales; is that right?

19  09:21:55 MR. FLUMENBAUM: Objection as to form.

20  09:21:57 THE WITNESS: Could be. It's hard to

21  09:22:00 tell.

22  09:22:00 BY MR. SYLVESTER:

23  09:22:00 Q. Is volume of XRP one of the metrics you

24  09:22:06 look to to determine whether or not the sales were

25  09:22:08 constructive?

1    09:22:09 MR. FLUMENBAUM: Object to -- objection as

2    09:22:10 to form.

3    09:22:11 THE WITNESS: Overriding is going to be

4    09:22:13 based on the opinion of the market makers that we

5    09:22:18 work with.

6    09:22:21 BY MR. SYLVESTER:

7    09:22:21 Q. Is volume one of the metrics that the

8    09:22:24 market makers that you work with examines?

9    09:22:28 MR. FLUMENBAUM: Objection as to form.

10   09:22:29 If you know.

11   09:22:30 THE WITNESS: I would assume that any

12   09:22:32 professional market maker is going to be keeping an

13   09:22:37 eye on volume as a metric.

14   09:22:39 BY MR. SYLVESTER:

15   09:22:39 Q. That market maker would also be keeping an

16   09:22:42 eye on price; is that right?

17   09:22:43 MR. FLUMENBAUM: Objection as to form.

18   09:22:44 THE WITNESS: I would assume any

19   09:22:45 professional market maker would be keeping an eye on

20   09:22:48 those metrics as well.

21   09:23:04

22   09:23:04

23   09:23:09

24   09:23:12

25   09:23:16

[9/14/2021] Larsen, Christian (revised) 9.14.2021

| | | |
|---|---|---|
| 1 | 09:23:17 | |
| 2 | 09:23:23 | |
| 3 | 09:23:23 | |
| 4 | 09:23:33 | |
| 5 | 09:23:34 | |
| 6 | 09:23:38 | |
| 7 | 09:23:40 | |
| 8 | 09:23:41 | |
| 9 | 09:23:43 | |
| 10 | 09:23:45 | |
| 11 | 09:23:45 | |
| 12 | 09:23:45 | |
| 13 | 09:23:47 | |
| 14 | 09:23:47 | |
| 15 | 09:23:53 | |
| 16 | 09:23:59 | MR. SYLVESTER: Let's take a look at |
| 17 | 09:24:00 | Exhibit 193, please. |
| 18 | 09:24:01 | (Whereupon, Deposition Exhibit CL-193 |
| 19 | 09:24:03 | was marked for identification.) |
| 20 | 09:24:53 | MR. SYLVESTER: For the record, 193 is a |
| 21 | 09:24:55 | document Bates labeled beginning Larsen and ending |
| 22 | 09:24:58 | in the number -102. And the last page of the |
| 23 | 09:25:04 | document is Larsen -158. |
| 24 | 09:25:55 | Q. And, Mr. Larsen, obviously, take your time |
| 25 | 09:25:57 | to familiarize yourself with the document, but the |

1    09:26:00 questions I have are going to be about the two pages

2    09:26:03 starting with Larsen -110 at the bottom.

3    09:26:07 A. -110. Okay. Let me finish the document,

4    09:26:25 then.

5    09:26:25 Q. Sure.

6    09:28:03 A. Okay.

7    09:28:03 Q. So, Mr. Larsen, this document was produced

8    09:28:07 to us as a single document.

9    09:28:09 On page beginning Larsen -110, there

10   09:28:14 appears to be a schedule of your XRP sales from

11   09:28:18 January 2015 through February 2020.

12   09:28:22 Do you see that?

13   09:28:22 A. Yes, I do.

14   09:28:24 Q. Was this schedule submitted as part of a

15   09:28:26 tax return?

16   09:28:29 A. I believe so.

17   09:28:32 Q. Is there any reason to believe that this

18   09:28:34 schedule of your sales that appears on Larsen -110

19   09:28:40 to Larsen -111 is inaccurate?

20   09:28:43 A. No.

21   09:28:47 Q. At the top of the schedule, there's a

22   09:28:49 header that says, "Total USD," "XRP Sold," "CL Sales

23   09:28:54 (95%)" and "average XRP over USD."

24   09:28:59 Do you see that?

25   09:29:00 A. Yes.

1    09:29:00

2    09:29:03

3    09:29:04

4    09:29:10

5    09:29:13

6    09:29:18 Q. Did you sell XRP at any point -- strike

7    09:29:21 that.

8    09:29:22 Did you sell XRP at any point after

9    09:29:25 February 2020?

10   09:29:33 A. After February 2020?

11   09:29:42 Q. (Nods head.)

12   09:29:43 A. I believe so.

13   09:29:44 Q. When -- strike that.

14   09:29:47 What months in 2020 did you sell XRP?

15   09:29:51 A. I don't recall the exact months.

16   09:29:54 Q. Okay. Have you sold XRP in 2021?

17   09:29:56 A. No.

18   09:29:57 Q. Okay. Did there come a time when you

19   09:29:59 stopped selling XRP?

20   09:30:00 A. Yes.

21   09:30:01 Q. When was that?

22   09:30:07 A. I believe it was -- well, I don't recall

23   09:30:09 the exact date. Had to do with this dispute that we

24   09:30:13 have.

25   09:30:13 Q. Had to do with the SEC's litigation?

1    09:30:18 A. The dispute we have going on with the --

2    09:30:21 with the agency, yes.

3    09:30:22 Q. Okay. So the reason that you stopped

4    09:30:26 selling XRP had something to do with the dispute

5    09:30:29 between Ripple and the SEC; is that right?

6    09:30:32 A. Yes.

7    09:30:33 Q. Okay. And that was in 2020; is that

8    09:30:35 right?

9    09:30:35 A. Correct.

10   09:30:38 Q. Okay. Was there ever any earlier period

11   09:30:41 where you stopped selling XRP because of anything

12   09:30:44 having to do with the SEC?

13   09:30:48 A. No, I don't recall.

14   09:30:52 Q. Do you recall whether -- strike that.

15   09:30:54 Was there any earlier period prior to 2020

16   09:30:56 where you stopped selling XRP for a period of time?

17   09:31:00 MR. FLUMENBAUM: Objection as to form.

18   09:31:04 THE WITNESS: I believe so.

19   09:31:06 BY MR. SYLVESTER:

20   09:31:06 Q. When was that?

21   09:31:08 A. I don't recall the exact dates.

22   09:31:16 Q. And just for clarity, sitting here today,

23   09:31:19 there's no link in your mind between those

24   09:31:21 historical stoppages of selling XRP and the SEC?

25   09:31:26 MR. FLUMENBAUM: Objection as to form.

1    09:31:28 You may answer.

2    09:31:28 THE WITNESS: What period are you talking

3    09:31:30 about?

4    09:31:30 BY MR. SYLVESTER:

5    09:31:30 Q. Any period prior to 2020.

6    09:31:33 A. Including when the beginning of your

7    09:31:36 investigation began?

8    09:31:39 Q. Sure.

9    09:31:40 A. So certainly not before the investigation.

10   09:31:43 I can't recall if after your investigation but

11   09:31:48 before 2020.

12   09:31:50 Q. Okay. Mr. Larsen, do you have an

13   09:31:58 understanding of the phrase "over-the-counter

14   09:32:03 transaction"?

15   09:32:04 A. Generally.

16   09:32:05 Q. Have you ever sold your XRP in an

17   09:32:06 over-the-counter transaction?

18   09:32:08 MR. FLUMENBAUM: Objection as to form.

19   09:32:10 You may answer.

20   09:32:10 THE WITNESS: Well, not in a U.S. context.

21   09:32:13 So I'm not sure how that would be characterized in a

22   09:32:17 jurisdiction like Japan, for example, but I think to

23   09:32:20 the intent of your question, yes.

24   09:32:23 BY MR. SYLVESTER:

25   09:32:23 Q. Have you ever sold your XRP in an

```
1    09:32:25 over-the-counter transaction to a U.S. person?

2    09:32:29 MR. FLUMENBAUM: Objection as to form.

3    09:32:30 You may answer.

4    09:32:31 THE WITNESS: Not to my knowledge.

5    09:32:37 BY MR. SYLVESTER:

6    09:32:37 Q. You sold your XRP to Japanese individuals

7    09:32:41 or entities; is that right?

8    09:32:42 A. Yes.

9    09:32:43 Q. Okay. Were you physically present in the

10   09:32:46 U.S. when you negotiated those sales?

11   09:32:48 MR. FLUMENBAUM: Objection as to form.

12   09:32:51 THE WITNESS: I believe so.

13   09:32:54 BY MR. SYLVESTER:

14   09:32:54 Q. Other than the sales to Japanese citizens

15   09:32:58 or entities that we just discussed, did you make any

16   09:33:02 other over-the-counter sales of XRP?

17   09:33:10 MR. FLUMENBAUM: Objection as to form.

18   09:33:11 THE WITNESS: There was, I believe, some

19   09:33:13 additional sales. I don't know what the citizenship

20   09:33:19 of that person would be -- definitely foreign -- or

21   09:33:25 where that person was exactly located.

22   09:33:30 So, again, I wouldn't know what the

23   09:33:33 jurisdiction would -- what their word for OTC would

24   09:33:36 be.

25   / /
```

1    09:33:37 BY MR. SYLVESTER:

2    09:33:37 Q. Okay. So there was an additional set of

3    09:33:40 sales that you made to a non-U.S. person?

4    09:33:42 A. Yes.

5    09:33:43 Q. Okay. And, again, were you physically

6    09:33:46 present in the U.S. when you negotiated those sales?

7    09:33:48 MR. FLUMENBAUM: Objection as to form.

8    09:33:49 You keep using the word "negotiated."

9    09:33:53 BY MR. SYLVESTER:

10   09:33:53 Q. You can answer the question.

11   09:33:55 A. I don't recall.

12   09:34:07 Q. So we've talked about sales to a Japanese

13   09:34:11 citizen or entity, another set of sales to another

14   09:34:14 non-U.S. citizen.

15   09:34:15 Were there any other over-the-counter

16   09:34:18 sales of XRP that you made?

17   09:34:20 MR. FLUMENBAUM: Objection as to form.

18   09:34:20 THE WITNESS: That's possible. That would

19   09:34:22 be, you know, infrequent.

20   09:34:24 BY MR. SYLVESTER:

21   09:34:24 Q. Okay. What other over-the-counter sales,

22   09:34:29 other than the two we just discussed, did you make?

23   09:34:33 MR. FLUMENBAUM: Objection as to form.

24   09:34:34 THE WITNESS: Yeah. I'm not sure if an

25   09:34:36 over-the-counter would be appropriate, like if a

```
 1   09:34:40 friend, you know, asked to buy some, for example.
 2   09:34:43 BY MR. SYLVESTER:
 3   09:34:43 Q. Sure.
 4   09:34:45 Let's just exclude sales on exchanges for
 5   09:34:47 the purposes of the remainder of the questions on
 6   09:34:52 this.
 7   09:34:52 Setting aside the Japanese individual
 8   09:34:55 entity, the other unnamed foreign individual, who
 9   09:34:58 else did you directly sell XRP to?
10   09:35:02 MR. FLUMENBAUM: Objection as to form.
11   09:35:05 THE WITNESS: Yeah. I can't -- I can't
12   09:35:06 recall exactly, but yeah.
13   09:35:08 BY MR. SYLVESTER:
14   09:35:08 Q. Did you ever sell XRP to a friend?
15   09:35:11 A. I believe so.
16   09:35:11 Q. Who?
17   09:35:14 A. I can't recall the -- the names.
18   09:35:16 Q. Were any of those friends U.S. citizens?
19   09:35:20 A. It's possible. Likely.
20   09:35:24 Q. Okay. And those transactions that we're
21   09:35:27 speaking of, were you in the United States -- strike
22   09:35:33 that.
23   09:35:34 Those transactions where you sold XRP to
24   09:35:38 friends, were you physically in the United States
25   09:35:39 when you made those sales?
```

1    09:35:43 MR. FLUMENBAUM: Objection as to form.

2    09:35:44 THE WITNESS: I can't recall.

3    09:35:44 BY MR. SYLVESTER:

4    09:36:19 Q. Mr. Larsen, you're familiar --

5    09:36:21 A. Do you want me to continue referring to

6    09:36:23 this?

7    09:36:26 Q. No, sir. We're done with that one.

8    09:36:28 You're familiar with a company known as

9    09:36:31 GSR?

10   09:36:32 A. Yes.

11   09:36:32 Q. Is GSR the market maker we -- you

12   09:36:36 testified about earlier?

13   09:36:38 A. I was referring to them, yes.

14   09:36:43 Q. Did you engage GSR to sell your XRP?

15   09:36:48 MR. FLUMENBAUM: Objection as to form.

16   09:36:49 You may answer.

17   09:36:50 THE WITNESS: I don't recall if I engaged

18   09:36:51 them or if they contacted me originally.

19   09:36:54 BY MR. SYLVESTER:

20   09:36:54 Q. At some point you entered into an

21   09:36:56 agreement with GSR whereby GSR -- let me start

22   09:37:05 again.

23   09:37:07 At some point you entered into an

24   09:37:09 agreement with GSR whereby GSR sold your XRP; is

25   09:37:13 that right?

86

```
1     09:37:13 A. Correct.

2     09:37:14 Q. When was that?

3     09:37:18 A. I don't recall the first exact date.

4     09:37:20 Before 2015, I -- I believe.

5     09:37:26 Q. Are you familiar with the term "digital

6     09:37:27 asset exchange"?

7     09:37:28 A. I've heard that term before.

8     09:37:32 Q. Okay. What is a digital asset exchange?

9     09:37:37 A. Well, I'm assuming it's referring to an

10    09:37:39 institution that engages in the exchange of

11    09:37:46 cryptocurrencies for other cryptocurrencies or other

12    09:37:50 fiat currencies generally.

13    09:37:53 Q. Did GSR sell your XRP on digital asset

14    09:37:55 exchanges?

15    09:37:58 A. That's my assumption, yes.

16    09:38:03 Q. Do you know one way or the other whether

17    09:38:05 or not GSR sold your XRP on digital asset exchanges?

18    09:38:08 A. Well, it could be other types of

19    09:38:10 institutions. I'm just not sure exactly. It's,

20    09:38:13 again, a very sophisticated institution in a very

21    09:38:16 sophisticated market.

22    09:38:26 Q. Okay. On occasion -- strike that.

23    09:38:43 You're aware that on occasion, GSR sold

24    09:38:45 your XRP through what we've just discussed, digital

25    09:38:49 asset exchanges?
```

1   09:38:51 MR. FLUMENBAUM: Objection as to form.

2   09:38:51 THE WITNESS: That's my assumption.

3   09:38:54 BY MR. SYLVESTER:

4   09:38:54 Q. But you don't know one way or the other?

5   09:38:59 MR. FLUMENBAUM: Objection as to form.

6   09:38:59 THE WITNESS: Well, again, I think I just

7   09:39:02 answered that. Sophisticated markets, sophisticated

8   09:39:07 institution. Is there another definition of some

9   09:39:12 process or institution that might be providing a

10  09:39:17 service to them that accomplishes the same thing? I

11  09:39:20 don't know.

12  09:39:20 Again, lots of different flavors of --

13  09:39:24 BY MR. SYLVESTER:

14  09:39:24 Q. Sure.

15  09:39:25 A. -- in different jurisdictions, Japan might

16  09:39:29 call it one thing, Singapore might call it another

17  09:39:32 thing.

18  09:39:32 Q. Fair.

19  09:39:32 I guess just expanding to any digital

20  09:39:34 asset platform in which the general public can

21  09:39:37 purchase digital assets, are you aware of GSR

22  09:39:40 selling your XRP on such a digital asset platform?

23  09:39:43 A. Well, again, I'm not trying to be

24  09:39:45 difficult here, but when you say, "open to any

25  individual," it certainly could be platforms that

[9/14/2021] Larsen, Christian (revised) 9.14.2021

```
 1    don't allow, for example, individuals but maybe only

 2    other institutions, just to be precise.

 3    09:40:08 Q. On the occasions when you directed GSR to

 4    09:40:11 sell your XRP, did you ever make any attempt to

 5    09:40:13 figure out who purchased the XRP from you?

 6    09:40:18 MR. FLUMENBAUM: Objection as to form.

 7    09:40:19 THE WITNESS: My assumption is that they

 8    09:40:21 were selling overseas.

 9    09:40:24 BY MR. SYLVESTER:

10    09:40:24 Q. Your assumption is that GSR was selling

11    09:40:29 XRP overseas?

12    09:40:31 A. Correct.

13    09:40:37 Q. Did you take any steps to restrict the

14    09:40:41 sales of your XRP to overseas persons?

15    09:40:45 MR. FLUMENBAUM: Objection as to form.

16    09:40:47 THE WITNESS: Well, GSR is an overseas

17    09:40:51 institution, and by far and away, the majority --

18    09:40:56 vast majority of volume in the XRP markets and

19    09:41:03 crypto markets in general is overseas and has been

20    09:41:08 overseas.

21    09:41:11 BY MR. SYLVESTER:

22    09:41:11 Q. Did you take any steps to ensure that the

23    09:41:15 XRP you sold was sold to non-U.S. persons?

24    09:41:19 MR. FLUMENBAUM: Objection as to form.

25    09:41:20 Asked and answered.
```

1    09:41:21 You can answer it again.

2    09:41:26 THE WITNESS: No. You know, again, XRP is

3    09:41:28 a currency. But, again, the vast majority of what

4    09:41:34 is happening in the market is overseas, and GSR is

5    09:41:38 an overseas operation.

6    09:41:41 BY MR. SYLVESTER:

7    09:41:41 Q. Have you ever made any attempt to find out

8    09:41:43 why any purchaser of your XRP, through GSR,

9    09:41:47 purchased the XRP?

10   09:41:49 A. I'm sorry, can you repeat the question,

11   09:41:50 please.

12   09:41:51 Q. Sure.

13   09:41:53 Have you ever made any attempt to figure

14   09:41:54 out why -- the reason why a purchaser of your XRP,

15   09:41:59 through GSR, purchased the XRP?

16   09:42:02 MR. FLUMENBAUM: Objection as to form.

17   09:42:06 THE WITNESS: No. And I believe GSR

18   09:42:08 really doesn't know that either.

19   09:42:14 BY MR. SYLVESTER:

20   09:42:14 Q. Why doesn't GSR know that either?

21   09:42:19 MR. FLUMENBAUM: Objection as to form.

22   09:42:22 THE WITNESS: I don't think that's the way

23   09:42:23 they operate.

24   09:42:25 BY MR. SYLVESTER:

25   09:42:25 Q. They don't acquire?

1    09:42:28 MR. FLUMENBAUM: Objection as to form.

2    09:42:31 THE WITNESS: Whether using other

3    09:42:33 platforms that's not their own platform.

4    09:42:38 BY MR. SYLVESTER:

5    09:42:38 Q. Just to clarify your answer, you said when

6    09:42:41 GSR is using other platforms, that's not GSR's

7    09:42:44 platform; is that right?

8    09:42:46 A. I believe they're using other -- to your

9    09:42:48 point, to shorten the definition -- digital assets

10   09:42:54 and currency exchanges.

11   09:42:57 Q. Okay. So when GSR sells your XRP via

12   09:43:02 another platform, that's not GSR's platform. GSR

13   09:43:07 doesn't make any inquiry about the reasons which any

14   09:43:10 of those purchasers purchased their XRP?

15   09:43:13 MR. FLUMENBAUM: Objection as to form.

16   09:43:13 We're speculating now and you're asking

17   09:43:16 the witness to speculate.

18   09:43:17 MR. SYLVESTER: I'm asking if he knows.

19   09:43:19 Q. If you know.

20   09:43:20 MR. FLUMENBAUM: Well, you didn't ask that

21   09:43:21 question.

22   09:43:22 THE WITNESS: Yeah. I don't know.

23   09:43:23 BY MR. SYLVESTER:

24   09:43:23 Q. Have you ever asked GSR to determine the

25   09:43:28 reasons for which any of your XRP purchasers

91

```
 1    09:43:31  purchased their XRP?

 2    09:43:33  MR. FLUMENBAUM: Objection as to form.

 3    09:43:35  THE WITNESS: No. But my understanding is

 4    09:43:38  that people are involved in the -- these currency

 5    09:43:44  markets as medium of exchange, for store value, unit

 6    09:43:51  of account, all the reasons that people would be

 7    09:43:53  interested in cryptocurrency markets.

 8    09:43:56  BY MR. SYLVESTER:

 9    09:43:56  Q. How did you acquire that understanding?

10    09:43:59  MR. FLUMENBAUM: Objection as to form.

11    09:44:01  You may answer.

12    09:44:02  THE WITNESS: Well, that's basically how

13    09:44:05  cryptocurrency markets have evolved in the world.

14    09:44:07  That's why -- that's in Bitcoin, Ethereum, XRP

15    09:44:11  are -- are popular in the world today.

16    09:44:15  BY MR. SYLVESTER:

17    09:44:15  Q. Is GSR -- strike that.

18    09:44:17  Has GSR ever conveyed to you that any

19    09:44:22  purchasers of your XRP conveyed to them that they

20    09:44:24  were purchasing for any of the reasons you just

21    09:44:28  mentioned, medium of exchange, store value, unit of

22    09:44:31  account?

23    09:44:32  MR. FLUMENBAUM: Objection as to form.

24    09:44:32  You can answer.

25    09:44:35  THE WITNESS: Repeat the question again,
```

92

1    09:44:35 please.

2    09:44:36 BY MR. SYLVESTER:

3    09:44:37 Q. Sure.

4    09:44:38 Has GSR ever conveyed to you that any

5    09:44:41 purchasers of your XRP conveyed to GSR that those

6    09:44:45 purchasers were purchasing for the reasons you

7    09:44:49 mentioned, medium of exchange, store value, unit of

8    09:44:53 account?

9    09:44:54 MR. FLUMENBAUM: Objection as to form.

10   09:44:55 THE WITNESS: Not that I can recall, but I

11   09:44:56 think that's the widely held, you know, view in the

12   09:45:00 marketplace.

13   09:45:04 BY MR. SYLVESTER:

14   09:45:04 Q. When you purchased XRP, did you purchase

15   09:45:10 it for any of those reasons?

16   09:45:13 MR. FLUMENBAUM: Objection as to form.

17   09:45:21 THE WITNESS: Well, I like cryptocurrency

18   09:45:23 markets, so yes.

19   09:45:26 BY MR. SYLVESTER:

20   09:45:26 Q. Okay. Why did you exchange your XRP for

21   09:45:29 fiat?

22   09:45:33 MR. FLUMENBAUM: Objection as to form.

23   09:45:34 You may answer.

24   09:45:35 THE WITNESS: Well, you have to -- couple

25   09:45:38 reasons. One, you have to pay taxes in fiat. And

93

1    09:45:43 two, generally, I think people would consider the

2    09:45:51 amount of holdings that the founders of the project

3    09:45:54 had to be high and sort of overhang, and that it

4    09:46:03 would be constructive if that overhang was decreased

5    09:46:07 over time in a way that's constructive and didn't

6    09:46:11 have an impact on the market.

7    09:46:18 BY MR. SYLVESTER:

8    09:46:18 Q. Who are the people in that sentence?

9    09:46:20 You say people would consider the amount

10   09:46:23 of holdings of the founders. What people?

11   09:46:26 A. Well --

12   09:46:27 MR. FLUMENBAUM: Objection as to form.

13   09:46:28 You may answer.

14   09:46:29 THE WITNESS: Well, essentially, all

15   09:46:30 people. Again, there are enormous global markets,

16   09:46:36 so it's kind of a general people. People on earth,

17   09:46:40 if you will.

18   09:46:43 MR. FLUMENBAUM: Is this a good spot to

19   09:46:44 take a short break?

20   09:46:46 MR. SYLVESTER: Sure. That's fine.

21   09:46:47 MR. FLUMENBAUM: Let's take a five-minute

22   09:46:49 break.

23   09:46:50 THE VIDEOGRAPHER: Okay. This is the end

24   09:46:51 of file 1.

25   09:46:53 We're off the record at 9:46 a.m.

94

1    09:46:57 (Whereupon, a recess was taken.)

2    09:58:24 THE VIDEOGRAPHER: This is the beginning

3    09:58:25 of File Number 2.

4    09:58:26 We're back on the record at 9:58 a.m.

5    09:58:28 BY MR. SYLVESTER:

6    09:58:31 Q. Mr. Larsen, did you ever use your XRP to

7    09:58:35 purchase any goods or services?

8    09:58:38 A. Yes.

9    09:58:40 MR. FLUMENBAUM: Objection as to form.

10   09:58:40 You may answer.

11   09:58:42 THE WITNESS: Yes.

12   09:58:42 BY MR. SYLVESTER:

13   09:58:42 Q. Okay. Approximately how much of the XRP

14   09:58:50 that you've transferred out of the 9 billion have

15   09:58:54 you used to purchase goods or services?

16   09:58:56 MR. FLUMENBAUM: Objection as to form.

17   09:58:58 THE WITNESS: I don't recall the exact

18   09:58:59 amount.

19   09:59:00 BY MR. SYLVESTER:

20   09:59:00 Q. As an approximate percentage?

21   09:59:03 MR. FLUMENBAUM: Objection as to form.

22   09:59:06 THE WITNESS: Less than 1 percent.

23   09:59:10 BY MR. SYLVESTER:

24   09:59:10 Q. Have you ever taken any steps to restrict

25   09:59:22 any overseas persons who purchased your XRP from

95

1    09:59:26 selling the XRP to U.S. persons?

2    09:59:29 MR. FLUMENBAUM: Objection as to form.

3    09:59:30 THE WITNESS: No.

4    09:59:31 BY MR. SYLVESTER:

5    09:59:34 Q. Have you ever instructed GSR to sell your

6    09:59:36 XRP on any particular digital asset platform?

7    09:59:41 MR. FLUMENBAUM: Objection as to form.

8    09:59:42 THE WITNESS: Not that I can recall.

9    09:59:44 BY MR. SYLVESTER:

10   09:59:44 Q. Have you ever instructed GSR not to sell

11   09:59:46 your XRP on any particular digital asset platform?

12   09:59:50 A. Not that I can recall.

13   09:59:52 MR. FLUMENBAUM: Mr. Sylvester, your mask

14   09:59:55 is below your nose.

15   10:00:00 Thank you.

16   10:00:01 BY MR. SYLVESTER:

17   10:00:02 Q. At the time of instructing GSR to sell

18   10:00:04 your XRP, did you have an understanding of which

19   10:00:08 digital asset platform GSR would use to sell it?

20   10:00:15 MR. FLUMENBAUM: Objection as to form.

21   10:00:15 THE WITNESS: No.

22   10:00:15 BY MR. SYLVESTER:

23   10:00:17 Q. Have you ever come to an understanding of

24   10:00:19 which digital asset platforms GSR used to sell your

25   10:00:22 XRP?

[9/14/2021] Larsen, Christian (revised) 9.14.2021

96

1    10:00:25 MR. FLUMENBAUM: Objection as to form.

2    10:00:26 THE WITNESS: My assumption is that they

3    10:00:28 are overseas.

4    10:00:29 BY MR. SYLVESTER:

5    10:00:29 Q. Have you ever confirmed that assumption

6    10:00:33 one way or the other?

7    10:00:35 MR. FLUMENBAUM: Objection as to form.

8    10:00:37 You may answer.

9    10:00:38 THE WITNESS: No.

10   10:00:38 BY MR. SYLVESTER:

11   10:00:49 Q. Have you ever sold your XRP on Coinbase?

12   10:00:55 MR. FLUMENBAUM: Objection as to form.

13   10:00:56 THE WITNESS: Once Coinbase listed XRP, I

14   10:00:58 may have done a trial sale, but generally, I've

15   10:01:04 been -- I've had a programmatic buy of Bitcoin,

16   10:01:11 Ethereum and XRP every week while XRP was still

17   10:01:15 listed.

18   10:01:17 BY MR. SYLVESTER:

19   10:01:17 Q. You had a programmatic buy of Bitcoin,

20   10:01:21 Ethereum and XRP on Coinbase every week while XRP

21   10:01:25 was listed?

22   10:01:26 A. Correct.

23   10:01:27 Q. Okay. Have you ever sold your XRP on

24   10:01:30 Bittrex?

25   10:01:33 A. You mean through GSR?

[9/14/2021] Larsen, Christian (revised) 9.14.2021

97

1   10:01:36 Q. In any way.

2   10:01:38 MR. FLUMENBAUM: Objection as to form.

3   10:01:41 THE WITNESS: To the best of my knowledge,

4   10:01:42 not directly. I'm not sure if GSR uses them or not.

5   10:01:49 BY MR. SYLVESTER:

6   10:01:49 Q. We spoke earlier about your response to

7   10:01:57 the SEC's Wells notice.

8   10:01:59 Do you recall that discussion?

9   10:02:02 A. You mean with Prosper?

10  10:02:04 Q. I apologize.

11  10:02:05 We spoke earlier about your counsel's

12  10:02:07 response to the SEC's Wells notice as a part of its

13  10:02:11 investigation of this matter.

14  10:02:13 Do you recall that?

15  10:02:14 A. Yes.

16  10:02:17 Q. Was all of the information supplied in

17  10:02:19 that Wells submission about where you traded your

18  10:02:23 XRP accurate, to the best of your knowledge?

19  10:02:25 MR. FLUMENBAUM: Objection as to form.

20  10:02:27 Asked and answered.

21  10:02:29 You may answer it again.

22  10:02:30 THE WITNESS: To the best of my knowledge.

23  10:02:46 BY MR. SYLVESTER:

24  10:02:46 Q. Did you ever sell your XRP on Poloniex?

25  10:02:51 MR. FLUMENBAUM: Objection as to form.

1    10:02:52 THE WITNESS: To the best of my knowledge,

2    10:02:53 not directly. And I believe that GSR might have,

3    10:03:08 but I can't recall.

4    10:03:18 MR. SYLVESTER: Let's take a look at

5    10:03:19 Exhibit 183, please.

6    10:03:51 (Whereupon, Deposition Exhibit CL-183

7    10:03:51 was marked for identification.)

8    10:03:51 MR. SYLVESTER: So for the record,

9    10:03:52 Exhibit 183 is a compilation of what appear to be

10   10:03:59 text messages between you, Mr. Larsen, and Mr. █████

11   10:04:05 Q. Do you see that?

12   10:04:06 MR. FLUMENBAUM: Excuse me. Who produced

13   10:04:07 this?

14   10:04:11 MR. SYLVESTER: Either Ripple or

15   10:04:12 Mr. Larsen.

16   10:04:20 MR. FLUMENBAUM: Well, I think the first

17   10:04:22 document may be based on a privileged communication.

18   10:04:28 So this is 10/22/20.

19   10:04:39 MR. SYLVESTER: That's right.

20   10:04:39 So Mr. Larsen says --

21   10:04:43 MR. FLUMENBAUM: I see what the document

22   10:04:44 says. I'm just telling you this may be based on a

23   10:04:47 privileged communication.

24   10:04:48 MR. SYLVESTER: I'm not sure what "based

25   10:04:50 on a privileged communication" means in this

99

```
 1    10:04:52 context.
 2    10:04:52 Mr. Larsen is asking a --
 3    10:04:54 MR. FLUMENBAUM: Well, I think the request
 4    10:04:55 for information was at the direction of counsel.
 5    10:05:15 BY MR. SYLVESTER:
 6    10:05:22 Q. Mr. Larsen --
 7    10:05:23 MR. FLUMENBAUM: Do you remember when the
 8    10:05:24 Wells submission occurred, Mr. Sylvester?
 9    10:05:32 MR. CERESNEY: I believe it was late
10    10:05:33 October --
11    10:05:35 MR. FLUMENBAUM: Yeah.
12    10:05:35 MR. CERESNEY: -- from my recollection.
13    10:05:38 MR. SYLVESTER: Just to be sure, your
14    10:05:40 privilege assertion is this conversation between
15    10:05:42 Mr. Larsen and a third party is privileged?
16    10:05:45 MR. FLUMENBAUM: Well, what I am saying is
17    10:05:47 that this communication is based on a communication
18    10:05:50 that was privileged between me and Mr. Larsen.
19    10:05:53 And --
20    10:05:54 MR. SYLVESTER: Right. But Mr. Larsen
21    10:05:56 spoke to a third party. That communication between
22    10:05:58 Mr. Larsen and the third party --
23    10:06:00 MR. FLUMENBAUM: I understand that, but
24    10:06:01 I'm not going to let him answer questions that
25    10:06:03 relate to it.
```

100

1    10:06:03 You have this document. I don't know if

2    10:06:06 we're going to try to claw it back or not. But in

3    10:06:08 any event, it is what it is.

4    10:06:10 MR. SYLVESTER: Let me understand the

5    10:06:11 basis of your instruction.

6    10:06:12 MR. FLUMENBAUM: Go ahead.

7    10:06:12 MR. SYLVESTER: Well, let me ask the

8    10:06:14 question, and then you can object --

9    10:06:17 MR. FLUMENBAUM: Go ahead. Let me see

10   10:06:18 what your questions are.

11   10:06:21 MR. SYLVESTER: Okay.

12   10:06:21 Q. Mr. Larsen, do you have an understanding

13   10:06:23 of whether Poloniex was a U.S. exchange until

14   10:06:26 October 2019?

15   10:06:30 MR. FLUMENBAUM: Objection.

16   10:06:30 If you want to ask him whether he received

17   10:06:34 this email from Mr.        I'll let you ask him that.

18   10:06:40 BY MR. SYLVESTER:

19   10:06:40 Q. Mr. Larsen, did you send this text message

20   10:06:42 that's the first page of CL183?

21   10:06:48 MR. FLUMENBAUM: You may answer that

22   10:06:49 either yes -- yes or no.

23   10:06:51 THE WITNESS: Yes.

24   10:06:53 BY MR. SYLVESTER:

25   10:06:53 Q. Okay. And page 2 of CL183, did you

1    10:06:56 receive that text message from Mr. ▮▮▮

2    10:07:02 A. Not that I remember, but I see it here and

3    10:07:05 no reason to doubt it.

4    10:07:08 Q. Prior to October 22nd, 2020, did you

5    10:07:12 know whether or not Poloniex was a U.S. exchange?

6    10:07:15 MR. FLUMENBAUM: Objection as to form.

7    10:07:16 You may answer that question.

8    10:07:18 THE WITNESS: Well, Poloniex actually

9    10:07:20 wasn't -- it's a virtual exchange, existed.

10   10:07:28 The assumption -- you know, it was

11   10:07:31 overseas until it was bought by Circle, which was a

12   10:07:34 U.S. company, and then I think that they went

13   10:07:36 through a process of moving it to the U.S. until

14   10:07:38 they sold it or got rid of it in, I believe, 2019.

15   10:07:50 BY MR. SYLVESTER:

16   10:07:50 Q. Okay. So I want to make sure I understand

17   10:07:52 your answer.

18   10:07:52 Prior to this exhibit, prior to

19   10:07:54 October 2020, you had an understanding that Poloniex

20   10:07:57 was a U.S. company for a period of time but not

21   10:08:00 throughout its existence?

22   10:08:02 MR. FLUMENBAUM: Objection as to form.

23   10:08:02 That's not his understanding. That's not

24   10:08:08 what he testified --

25   10:08:09 MR. SYLVESTER: He can tell me.

102

```
1    10:08:10 MR. FLUMENBAUM: He just answered it. He

2    10:08:12 just answered it.

3    10:08:13 You want him to answer it again?

4    10:08:16 THE WITNESS: Can you repeat the question

5    10:08:17 again, please?

6    10:08:17 BY MR. SYLVESTER:

7    10:08:18 Q. Sure.

8    10:08:18 Prior to October 2020, was it your

9    10:08:20 understanding that Poloniex was a U.S. company for

10   10:08:22 some period of its existence?

11   10:08:25 MR. FLUMENBAUM: Objection as to form.

12   10:08:26 Inconsistent with his prior answer.

13   10:08:29 BY MR. SYLVESTER:

14   10:08:29 Q. You can answer.

15   10:08:31 A. So Poloniex was a very large global

16   10:08:34 exchange until it was bought by Circle, at which

17   10:08:39 time its volume pretty much completely shriveled up

18   10:08:44 and was sold by Circle at some point later.

19   10:09:16 Q. It's your understanding that GSR sold some

20   10:09:19 of your XRP through non-U.S. digital asset

21   10:09:22 platforms; is that right?

22   10:09:25 A. Yes.

23   10:09:26 Q. Okay. Did any of those non-U.S. digital

24   10:09:31 asset platforms permit U.S. purchasers?

25   10:09:35 MR. FLUMENBAUM: Objection as to form.
```

103

```
 1    10:09:37 THE WITNESS: I -- I don't know.

 2    10:09:39 BY MR. SYLVESTER:

 3    10:09:39 Q. Did you ever give instructions to GSR that

 4    10:09:45 your XRP only be sold on digital asset platforms

 5    10:09:50 that prohibited U.S. purchasers?

 6    10:09:52 A. No.

 7    10:09:53 MR. FLUMENBAUM: Objection as to form.

 8    10:09:53 THE WITNESS: Sorry.

 9    10:09:53 No.

10    10:09:59 MR. FLUMENBAUM: Your mask, Mr. Sylvester.

11    10:10:00 BY MR. SYLVESTER:

12    10:10:02 Q. Do you maintain records regarding your XRP

13    10:10:05 sales outside of GSR?

14    10:10:11 MR. FLUMENBAUM: Objection as to form.

15    10:10:14 THE WITNESS: Well, I'm sure I can get

16    10:10:16 those records.

17    10:10:17 BY MR. SYLVESTER:

18    10:10:17 Q. Sure.

19    10:10:18 Setting aside whatever records might be at

20    10:10:21 GSR, do you maintain any records of your sales of

21    10:10:24 XRP?

22    10:10:25 MR. FLUMENBAUM: Objection as to form.

23    10:10:29 BY MR. SYLVESTER:

24    10:10:29 Q. Do you understand the question?

25    10:10:31 A. Are you asking me whether I know where my
```

104

```
1    10:10:35 sales have been made?

2    10:10:42 Q. No. I'm only asking if you maintain

3    10:10:44 records of your XRP sales in any way separate from

4    10:10:47 GSR's records.

5    10:10:48 A. Yes.

6    10:10:49 Q. Okay. Where are those records?

7    10:10:55 MR. FLUMENBAUM: Objection as to form.

8    10:10:56 You may answer.

9    10:11:01 THE WITNESS: You mean -- I don't

10   10:11:02 understand the question.

11   10:11:03 Are you asking where --

12   10:11:05 BY MR. SYLVESTER:

13   10:11:05 Q. Where do you maintain them?

14   10:11:09 A. In computer files with -- with our tax

15   10:11:12 people.

16   10:11:16

17   10:11:18

18   10:11:25

19   10:11:28

20   10:11:31 BY MR. SYLVESTER:

21   10:11:31 Q. Okay.

22   10:11:31 Do you know whether the digital platforms

23   10:11:46 on which GSR sold your XRP restricted XRP purchasers

24   10:11:51 from reselling to US persons?

25   10:11:53 MR. FLUMENBAUM: Objection as to form.
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

105

1    10:11:55 Asked and answered.

2    10:11:55 You may answer it again.

3    10:11:57 THE WITNESS: Not -- not to my knowledge.

4    10:11:59 BY MR. SYLVESTER:

5    10:11:59 Q. Are you familiar with the term "trading

6    10:12:01 bot"?

7    10:12:02 A. I've heard that term.

8    10:12:04 Q. Okay. What is a trading bot?

9    10:12:10 A. I think the definition would depend on the

10   10:12:11 organization.

11   10:12:12 Q. Have you used a trading bot to sell XRP?

12   10:12:19 A. Are you asking whether or not I use GSR's,

13   10:12:22 what they call a "bot"?

14   10:12:25 Q. Have you directed the sale of XRP that was

15   10:12:29 executed using a trade bot?

16   10:12:31 MR. FLUMENBAUM: Objection as to form.

17   10:12:35 THE WITNESS: I just want to understand

18   10:12:36 the question.

19   10:12:36 BY MR. SYLVESTER:

20   10:12:36 Q. Sure.

21   10:12:37 A. Are you asking whether I directly would

22   10:12:40 define -- or what I would have called a "bot" or are

23   10:12:43 you asking whether or not I've used market makers

24   10:12:45 that use technology that they would refer to as a

25   10:12:48 "bot"?

[9/14/2021] Larsen, Christian (revised) 9.14.2021

106

1    10:12:49 Q. The latter.

2    10:12:50 A. Yes.

3    10:12:51 Q. Okay.

4    10:12:54 Are you familiar with the term

5    10:12:56 "programmatic sales" as it's applied to sales of

6    10:13:01 XRP?

7    10:13:02 MR. FLUMENBAUM: Objection as to form.

8    10:13:02 You may answer.

9    10:13:03 THE WITNESS: Yes.

10   10:13:04 BY MR. SYLVESTER:

11   10:13:04 Q. Does the term "programmatic sales"

12   10:13:06 generally mean sales of XRP made using a trading

13   10:13:09 bot?

14   10:13:10 MR. FLUMENBAUM: Objection as to form.

15   10:13:11 THE WITNESS: Again, that would depend on

16   10:13:12 the institution. GSR uses that term, "bot."

17   10:13:17 BY MR. SYLVESTER:

18   10:13:17 Q. When -- let me put it this way: When GSR

19   10:13:20 sold XRP using trading bots, is that something you

20   10:13:24 would consider to be programmatic sales?

21   10:13:27 MR. FLUMENBAUM: Objection as to form.

22   10:13:30 THE WITNESS: Yes, generally. That makes

23   10:13:32 sense.

24   10:13:32 BY MR. SYLVESTER:

25   10:13:32 Q. Okay.

107

1    10:13:32 Focusing on GSR's trading bots that GSR

2    10:13:37 used to sell XRP, are those bots programmed to sell

3    10:13:42 an amount of XRP based on a percentage of XRP

4    10:13:45 trading volume?

5    10:13:46 MR. FLUMENBAUM: Objection as to form.

6    10:13:48 You may answer, if you know.

7    10:13:50 THE WITNESS: That's my understanding,

8    10:13:51 yes.

9    10:13:51 BY MR. SYLVESTER:

10   10:13:51 Q. And from time to time, you directed GSR's

11   10:13:58 use of a trading bot to sell your XRP; is that

12   10:14:01 right?

13   10:14:01 MR. FLUMENBAUM: Objection as to form.

14   10:14:04 THE WITNESS: Had an ongoing relationship

15   10:14:06 with GSR. As far as directing, I'm more relying on

16   10:14:10 their expertise.

17   10:14:12 BY MR. SYLVESTER:

18   10:14:12 Q. So GSR would recommend a course of action

19   10:14:15 with respect to selling XRP?

20   10:14:18 A. That's --

21   10:14:19 MR. FLUMENBAUM: Objection as to form.

22   10:14:21 What time period are you talking about?

23   10:14:23 There's no -- there's no boundary in your question.

24   10:14:32 BY MR. SYLVESTER:

25   10:14:32 Q. I think we discussed that you started your

108

1    10:14:34 relationship with GSR to sell XRP in around 2015.

2    10:14:36 Is that right?

3    10:14:37 A. Yes. I think I said sometime before 2015.

4    10:14:43 Q. Sometime before 2015. I apologize.

5    10:14:46 And at some point, you stopped using GSR

6    10:14:49 to sell your XRP; is that right?

7    10:14:51 MR. FLUMENBAUM: Objection as to form.

8    10:14:54 THE WITNESS: That's right.

9    10:14:55 BY MR. SYLVESTER:

10   10:14:55 Q. Okay. Throughout that time period that

11   10:14:56 we've just discussed, approximately prior to 2015,

12   10:14:59 to the time that you stopped using GSR to sell XRP,

13   10:15:03 did GSR make recommendations to you as to whether or

14   10:15:07 not to sell XRP?

15   10:15:10 A. That's generally correct.

16   10:15:11 Q. Okay. And then when GSR made those

17   10:15:13 recommendations to you, you would decide whether or

18   10:15:15 not to act on the recommendations; is that right?

19   10:15:18 MR. FLUMENBAUM: Objection as to form.

20   10:15:20 THE WITNESS: That's generally correct.

21   10:15:24 BY MR. SYLVESTER:

22   10:15:24 Q. You directed the sales of XRP made using

23   10:15:32 GSR's trading bot known as "4t," 4t as in "Tom"?

24   10:15:37 MR. FLUMENBAUM: Objection as to form.

25   10:15:38 THE WITNESS: That's correct.

[9/14/2021] Larsen, Christian (revised) 9.14.2021

109

1    10:15:38 BY MR. SYLVESTER:

2    10:15:39 Q. Okay. What about 4p, as in "Paul"?

3    10:15:44 MR. FLUMENBAUM: Objection as to form.

4    10:15:46 THE WITNESS: I don't recall what that is.

5    10:15:46 BY MR. SYLVESTER:

6    10:15:46 Q. Okay. Did anyone other than you direct

7    10:15:50 trading of XRP using the trading bot known as 4t as

8    10:15:55 in "Tom"?

9    10:15:56 MR. FLUMENBAUM: Objection as to form.

10   10:15:57 THE WITNESS: Not to my knowledge.

11   10:15:59 BY MR. SYLVESTER:

12   10:15:59 Q. Did you ever give a direction to GSR to

13   10:16:09 pause 4t?

14   10:16:12 MR. FLUMENBAUM: Objection as to form.

15   10:16:15 THE WITNESS: Yes. Based on information I

16   10:16:17 would get from them.

17   10:16:20 BY MR. SYLVESTER:

18   10:16:20 Q. And when you told GSR to pause a trading

19   10:16:23 bot, that meant to stop the bot from continuing to

20   10:16:27 sell XRP; is that right?

21   10:16:29 MR. FLUMENBAUM: Objection as to form.

22   10:16:30 THE WITNESS: That's correct.

23   10:16:31 BY MR. SYLVESTER:

24   10:16:31 Q. Okay.

25   10:16:36 You said from time to time you would pause

110

1    10:16:41 a trading bot based on information you got from GSR.

2    10:16:44 Is that right?

3    10:16:46 MR. FLUMENBAUM: Objection as to form.

4    10:16:47 Asked and answered.

5    10:16:50 THE WITNESS: Yes.

6    10:16:52 BY MR. SYLVESTER:

7    10:16:52 Q. Okay. What types of information did GSR

8    10:16:54 provide to inform your decision about whether to

9    10:16:57 pause a trading bot?

10   10:17:01 A. They would relay market dynamics.

11   10:17:05 Q. Can you be more specific about what market

12   10:17:07 dynamics they would relay?

13   10:17:10 A. What is occurring in the market.

14   10:17:13 Q. In the XRP market?

15   10:17:16 A. Well, could be XRP, it could be other

16   10:17:19 components of the virtual currency markets.

17   10:17:26 Q. What components of the XRP market did GSR

18   10:17:29 relay to you to inform your decision about whether

19   10:17:34 or not to pause a trading bot selling XRP?

20   10:17:37 A. Generally, what would be consistent with

21   10:17:42 our instructions, to be constructive and not have

22   10:17:45 impact on the market.

23   10:17:53 Q. Did you direct XRP sales made using any

24   10:17:58 trading bot other than 4t?

25   10:18:00 MR. FLUMENBAUM: Objection as -- objection

111

1    10:18:01 as to form.

2    10:18:02 THE WITNESS: Sorry, can you ask the

3    10:18:03 question --

4    10:18:04 BY MR. SYLVESTER:

5    10:18:04 Q. Sure.

6    10:18:04 A. -- can you ask the question again, please?

7    10:18:07 Q. Did you direct XRP sales made using any

8    10:18:09 trading bot other than 4t?

9    10:18:17 A. Based on conversations that I might have

10   10:18:20 had with other parties that had bots that would have

11   10:18:27 given me permission to do so from -- at certain

12   10:18:30 times, yes.

13   10:18:33 Q. Okay. Which parties at times gave you

14   10:18:36 permission to direct trading of XRP using trading

15   10:18:39 bots?

16   10:18:46 A. Rippleworks, for example, in the early

17   10:18:51 days of -- of its development.

18   10:18:58 Q. What trading bot is associated with

19   10:18:59 Rippleworks?

20   10:19:01 A. I don't recall the -- the number sitting

21   10:19:04 here.

22   10:19:05 Q. Okay. Did Rippleworks have one or more

23   10:19:10 than one trading bot?

24   10:19:12 A. My understanding is they had a single one,

25   10:19:14 but they might have -- they might have additional

112

1   10:19:16 ones.

2   10:19:17 Q. Did anyone other than you direct

3   10:19:20 Rippleworks' sales of XRP using Rippleworks' trading

4   10:19:25 bot?

5   10:19:26 MR. FLUMENBAUM: Objection as to form.

6   10:19:27 What time period are you talking about?

7   10:19:30 MR. SYLVESTER: At any time period.

8   10:19:31 MR. FLUMENBAUM: Well, his testimony is

9   10:19:32 that there was a short time period that he did do

10   10:19:37 some direction. So --

11   MR. SYLVESTER: I asked who. Not what,

12   10:19:42 not when. Who?

13   10:19:46 THE WITNESS: I'm sorry, can you repeat

14   10:19:47 the question?

15   10:19:47 BY MR. SYLVESTER:

16   10:19:48 Q. Sure.

17   10:19:52 During the time that Rippleworks used the

18   10:19:54 trading bot to sell XRP, who, other than you,

19   10:19:58 directed that trading bot, if anyone?

20   10:20:03 A. Would have been the CEO of Rippleworks.

21   10:20:07 Q. That's ███████?

22   10:20:08 A. Correct.

23   10:20:12 Q. And did Mr. ██████ give those instructions

24   10:20:15 to GSR?

25   10:20:15 A. I believe that's the case.

[9/14/2021] Larsen, Christian (revised) 9.14.2021

1   10:20:19 Q. Did Mr. █████ consult you as to how to

2   10:20:22 direct Rippleworks' trading bot?

3   10:20:26 A. From time to time, as a board member.

4   10:20:29 However, there was a period of time that continues

5   10:20:32 where I have recused myself from that type of

6   10:20:40 discussion.

7   10:20:41 Q. When did that period of recusal start?

8   10:20:44 A. I don't recall the exact date. Sometime

9   10:20:46 in 2020, I believe.

10  10:20:49 Q. Okay. Did Mr. █████ ever -- ever instruct

11  10:20:54 GSR to sell XRP using Rippleworks' trading bot prior

12  10:20:58 to 2020?

13  10:20:59 A. I'm sorry, can you repeat the question?

14  10:21:03 Q. Sure.

15  10:21:03 Did Mr. █████ ever instruct GSR to sell

16  10:21:07 XRP using Rippleworks' trading bot prior to 2020?

17  10:21:11 A. Yes.

18  10:21:12 Q. Okay. Approximately how many times prior

19  10:21:20 to 2020 did Mr. █████ instruct GSR to trade XRP

20  10:21:27 using Rippleworks' trading bot?

21  10:21:31 MR. FLUMENBAUM: Objection as to form.

22  10:21:32 You may answer.

23  10:21:33 THE WITNESS: I don't know.

24  10:21:33 BY MR. SYLVESTER:

25  10:21:33 Q. Was it infrequent?

[9/14/2021] Larsen, Christian (revised) 9.14.2021

1    10:21:36 MR. FLUMENBAUM: Objection as to form.

2    10:21:41 Asked and answered.

3    10:21:42 THE WITNESS: Yeah, I'm not sure.

4    10:21:43 BY MR. SYLVESTER:

5    10:21:43 Q. Okay. Prior to 2020, did Mr. ████

6    10:21:50 typically consult you prior to providing any

7    10:21:53 instructions to GSR with respect to trading in XRP

8    10:21:58 using Rippleworks' trading bot?

9    10:22:01 MR. FLUMENBAUM: Objection as to form.

10   10:22:02 THE WITNESS: He might, from time to time,

11   10:22:06 let me know of a change.

12   10:22:23 BY MR. SYLVESTER:

13   10:22:23 Q. Other than 4t and Rippleworks' trading

14   10:22:29 bot, are there any other trading bots for which you

15   10:22:33 directed the sales of XRP?

16   10:22:38 MR. FLUMENBAUM: Objection as to form.

17   10:22:43 THE WITNESS: Well, when you say,

18   10:22:43 "direct," you mean where I had the authority on my

19   10:22:46 own?

20   10:22:47 BY MR. SYLVESTER:

21   10:22:50 Q. Where you gave the instruction to trade or

22   10:22:52 not trade.

23   10:22:54 ████████████████████████████

24   10:22:57 ████████████████████████████

25   10:23:04 ████████████████████████████

[9/14/2021] Larsen, Christian (revised) 9.14.2021

115

```
 1    10:23:05
 2    10:23:08
 3    10:23:11
 4    10:23:13
 5    10:23:16
 6    10:23:17
 7    10:23:22
 8    10:23:25
 9    10:23:29
10    10:23:29
11    10:23:32
12    10:23:45 MR. SYLVESTER: Let's look at Exhibit 114,
13    10:23:48 please.
14    10:23:49 (Whereupon, Deposition Exhibit CL-114
15    10:23:50 was marked for identification.)
16    10:24:04 THE WITNESS: Are you done with this
17    10:24:05 document?
18    10:24:08 MR. SYLVESTER: Yes.
19    10:24:40 MR. FLUMENBAUM: This document that you've
20    10:24:42 marked as Mr. Larsen 114, it doesn't have any Bates
21    10:24:48 stamp numbers.
22    10:24:49 MR. SYLVESTER: I see that. That was
23    10:24:51 unintentional on our part. We can provide them.
24    10:24:55 MR. FLUMENBAUM: Neither did the other
25    10:24:56 one. I mean, that's just not acceptable. We have
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

116

1    10:24:58 no idea where these came from, when you've produced

2    10:25:01 them.

3    10:25:05 MR. SYLVESTER: Let me ask Mr. Larsen if

4    10:25:06 he recognizes the document.

5    10:25:07 MR. FLUMENBAUM: Well, I would like a

6    10:25:09 Bates-stamped document that I --

7    10:25:11 MR. SYLVESTER: Okay. We can provide it.

8    10:25:13 MR. FLUMENBAUM: You know, who produced

9    10:25:14 this document?

10    10:25:15 MR. SYLVESTER: We can provide it.

11    10:25:17 MR. FLUMENBAUM: I've asked a question:

12    10:25:18 Who produced this document?

13    10:25:20 MR. SYLVESTER: I don't know off the top

14    10:25:21 of my head. It was either Mr. Larsen, Ripple or

15    10:25:23 GSR.

16    10:25:23 MR. FLUMENBAUM: Every document that

17    10:25:25 Mr. Larsen produced had a Bates stamp number.

18    10:25:28 MR. SYLVESTER: Okay. Then perhaps --

19    10:25:30 MR. FLUMENBAUM: And I believe every

20    10:25:30 document that Ripple produced had a Bates stamp

21    10:25:33 number. So --

22    10:25:34 MR. SYLVESTER: I can represent to you

23    10:25:34 that the Securities and Exchange Commission didn't

24    10:25:36 construct this document. We received it from one of

25    10:25:38 the three parties that I just told you.

1    10:25:40 We can get you the Bates stamp.

2    10:25:44 MR. FLUMENBAUM: Well, I hope this doesn't

3    10:25:49 continue during the course of this deposition.

4    10:25:50 I think this issue was raised once before,

5    10:25:53 about using non-Bates-stamped numbers -- documents,

6    10:25:57 and you promised it wouldn't happen again.

7    10:26:02 MR. SYLVESTER: Let's proceed.

8    10:26:06 MR. FLUMENBAUM: I'm reserving my rights

9    10:26:08 with respect to this document.

10   10:26:10 MR. SYLVESTER: Okay.

11   10:26:11 For the record, CL114 is a series of email

12   10:26:19 exchanges between yourself and ████████████.

13   10:26:23 Q. The top email is August 23rd, 2017; is

14   10:26:26 that right?

15   10:26:29 A. I don't recall it --

16   10:26:30 MR. FLUMENBAUM: Are you representing that

17   10:26:31 this is a full exchange of emails?

18   10:26:35 MR. SYLVESTER: I'm representing this is

19   10:26:36 the document as produced to us.

20   10:26:41 MR. FLUMENBAUM: All right.

21   10:26:42 THE WITNESS: Yeah, I don't recall it, but

22   10:26:44 no reason to doubt it.

23   10:26:45 BY MR. SYLVESTER:

24   10:26:46 Q. No reason to doubt you would receive an

25   10:26:48 email at ████@ripple.com; is that right?

118

```
1    10:26:54 A. That's correct.

2    10:26:54 Q. Okay. Now, who is Mr. ███?

3    10:26:56 A. He's the -- I believe, the managing

4    10:26:58 director as GSR, which is a market making

5    10:27:02 institution.

6    10:27:02 Q. Do you see where Mr. ███ writes, "███ is

7    10:27:04 asking us for an ETA on bot 6t restart. Please

8    10:27:09 advise"?

9    10:27:10 A. I do.

10   10:27:11 Q. Do you understand "███" to be ███████?

11   10:27:13 A. I assume that's correct.

12   10:27:14 Q. 6t is Rippleworks' trading bot; is that

13   10:27:17 right?

14   10:27:20 MR. FLUMENBAUM: Objection as to form.

15   10:27:21 THE WITNESS: No reason to doubt that.

16   10:27:22 BY MR. SYLVESTER:

17   10:27:22 Q. And here, Mr. ███ is asking --

18   10:27:25 MR. FLUMENBAUM: The question is not

19   10:27:26 whether you doubt it, the question is whether you

20   10:27:28 know it.

21   10:27:29 I don't want him to start showing you a

22   10:27:31 document that's unmarked, that has no way for us to

23   10:27:37 check the origin of here today, and you assume

24   10:27:42 stuff.

25   10:27:42 So just answer, please, what you know.
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

119

```
 1     10:27:45 THE WITNESS: Sure.
 2     10:27:46 I don't know.
 3     10:27:47 BY MR. SYLVESTER:
 4     10:27:49 Q. Were there occasions in which Mr. █████
 5     10:27:57 reached out to GSR to inquire when Rippleworks' bot
 6     10:28:02 could be restarted, and GSR reached out to you for
 7     10:28:07 your views?
 8     10:28:10 MR. FLUMENBAUM: Objection as to form.
 9     10:28:18 THE WITNESS: Sorry, can you repeat the
10     10:28:19 question?
11     10:28:21 BY MR. SYLVESTER:
12     10:28:21 Q. Sure.
13     10:28:22 Were there occasions in which Mr. █████
14     10:28:24 reached out to GSR to inquire when Rippleworks' bot
15     10:28:28 could be restarted, and GSR reached out to you for
16     10:28:31 your views?
17     10:28:33 MR. FLUMENBAUM: Objection as to form.
18     10:28:34 Are you asking whether he was present at
19     10:28:36 such a conversation?
20     10:28:37 MR. SYLVESTER: I'm asking if he knows
21     10:28:38 that.
22     10:28:43 MR. FLUMENBAUM: Objection as to form.
23     10:28:45 THE WITNESS: I think, occasionally, a GSR
24     10:28:49 might reach out to confirm something that ████ is
25     10:28:52 asking about.
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

120

```
 1    10:28:53 BY MR. SYLVESTER:

 2    10:28:53 Q. Why is that?

 3    10:28:55 MR. FLUMENBAUM: Objection as to form.

 4    10:28:59 THE WITNESS: Because that's the way, at

 5    10:29:00 this time,       conducted his authority as the CEO.

 6    10:29:07 BY MR. SYLVESTER:

 7    10:29:08 Q. When you say, "that's the way

 8    10:29:10 conducted his authority," what does that mean?

 9    10:29:13 MR. FLUMENBAUM: Objection as form.

10    10:29:15 THE WITNESS: That that's how he was

11    10:29:19 operating with GSR.

12    MR. SYLVESTER: Okay. For the record, the

13    10:29:25 Bates stamp of this document is LARSEN_NAT_0000041.

14    10:29:33 MR. FLUMENBAUM: Larsen, go ahead?

15    10:29:36 MR. SYLVESTER: N-A-T, as in "Tom," five

16    10:29:39 zeros and then 41.

17    10:29:49 BY MR. SYLVESTER:

18    10:29:49 Q. Have you ever directed the sales of XRP

19    10:29:51 using the Rippleworks bot of 24t?

20    10:29:55 A. I don't recall that number.

21    10:30:05 Q. Have you ever directed sales of XRP using

22    10:30:11 a trading bot for the benefit of

23    10:30:17 MR. FLUMENBAUM: Objection as to form.

24    10:30:19 THE WITNESS: No, I don't have the

25    10:30:21 authority to do that.
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

1    10:30:22 I believe you're talking about ███████

2    10:30:23 ████████████████████

3    10:30:28 BY MR. SYLVESTER:

4    10:30:28 Q. Okay. Have you ever directed trading of

5    10:30:30 XRP for ████████████████████

6    10:30:34 MR. FLUMENBAUM: Objection as to form.

7    10:30:36 THE WITNESS: No. I don't have the

8    10:30:37 authority to do that.

9    10:30:41 MR. SYLVESTER: Okay. Let's take a look

10   10:30:46 at Exhibit 157, please.

11   10:30:47 (Whereupon, Deposition Exhibit CL-157

12   10:30:47 was marked for identification.)

13   10:30:51 THE WITNESS: Are you finished with this

14   10:30:53 document?

15   10:30:53 BY MR. SYLVESTER:

16   10:30:55 Q. Yes, sir.

17   10:31:43 A. Okay.

18   10:32:35 Q. Mr. Larsen, Exhibit 157 is a -- two pages

19   10:32:41 of handwritten notes dated 9/2018; is that right?

20   10:32:45 A. Yes.

21   10:32:47 Q. Is this -- are these your handwritten

22   10:32:49 notes?

23   10:32:49 A. They are.

24   10:32:50 ████████████████████████████

25   10:32:53 ████████████████████████████

[9/14/2021] Larsen, Christian (revised) 9.14.2021

122



1    10:33:01

2    10:33:05  Do you see that?

3    10:33:06  A. I do.

4    10:33:06  Q. What's ▮▮▮ DAF?

5    10:33:10  A. ▮▮▮▮ stands for ▮▮▮▮▮▮▮▮

6    10:33:13  ▮▮▮▮▮▮▮ which is a Silicon Valley nonprofit.

7    10:33:18  "DAF" stands for donor-advised fund.

8    10:33:22  Q. Did ▮▮▮ DAF purchase XRP?

9    10:33:28  MR. FLUMENBAUM: Objection as to form.

10   10:33:29  THE WITNESS: Not to my knowledge.

11   10:33:31  BY MR. SYLVESTER:

12   10:33:31  Q. Okay.

13   10:33:31

14   10:33:38

15   10:33:41

16   10:33:43

17   10:33:48

18   10:33:51

19   10:33:55

20   10:33:57

21   10:33:59

22   10:34:02

23   10:34:02

24   10:34:05

25   10:34:07



| | |
|---|---|
| 1 | 10:34:07 |
| 2 | 10:34:09 |
| 3 | 10:34:09 |
| 4 | 10:34:13 |
| 5 | 10:34:15 |
| 6 | 10:34:22 |
| 7 | 10:34:23 |
| 8 | 10:34:24 |
| 9 | 10:34:28 |
| 10 | 10:34:30 |
| 11 | 10:34:32 |
| 12 | 10:34:33 |
| 13 | 10:34:33 |
| 14 | 10:34:39 |
| 15 | 10:34:42 |
| 16 | 10:34:43 |
| 17 | 10:34:44 |
| 18 | 10:34:46 |
| 19 | 10:34:48 |
| 20 | 10:34:51 |
| 21 | 10:34:52 |
| 22 | 10:34:54 |
| 23 | 10:34:54 |
| 24 | 10:35:02 |
| 25 | 10:35:04 |

124

| | |
|---|---|
| 1 | 10:35:05 |
| 2 | 10:35:06 |
| 3 | 10:35:09 |
| 4 | 10:35:18 |
| 5 | 10:35:22 |
| 6 | 10:35:24 |
| 7 | 10:35:26 |
| 8 | 10:35:28 |
| 9 | 10:35:34 |
| 10 | 10:35:35 |
| 11 | 10:35:39 |
| 12 | 10:35:43 |
| 13 | 10:35:44 |
| 14 | 10:35:45 |
| 15 | 10:35:46 |
| 16 | 10:35:48 |
| 17 | 10:35:50 |
| 18 | 10:35:51 |
| 19 | 10:35:53 |
| 20 | 10:35:54 |
| 21 | 10:35:55 |
| 22 | 10:35:58 |
| 23 | 10:36:00 |
| 24 | 10:36:00 |
| 25 | 10:36:03 |



[9/14/2021] Larsen, Christian (revised) 9.14.2021

125

| | |
|---|---|
| 1 | 10:36:07 |
| 2 | 10:36:08 |
| 3 | 10:36:10 |
| 4 | 10:36:12 |
| 5 | 10:36:12 |
| 6 | 10:36:16 |
| 7 | 10:36:17 |
| 8 | 10:36:20 |
| 9 | 10:36:23 |
| 10 | 10:36:26 |
| 11 | 10:36:27 |
| 12 | 10:36:30 |
| 13 | 10:36:31 |
| 14 | 10:36:36 |
| 15 | 10:36:40 |
| 16 | 10:36:42 |
| 17 | 10:36:45 |
| 18 | 10:36:47 |
| 19 | 10:36:50 |
| 20 | 10:36:55 |
| 21 | 10:36:56 |
| 22 | 10:36:59 |
| 23 | 10:37:03 |
| 24 | 10:37:05 |
| 25 | 10:37:07 |



[9/14/2021] Larsen, Christian (revised) 9.14.2021

126

| | |
|---|---|
| 1 | 10:37:13 |
| 2 | 10:37:14 |
| 3 | 10:37:15 |
| 4 | 10:37:16 |
| 5 | 10:37:20 |
| 6 | 10:37:20 |
| 7 | 10:37:20 |
| 8 | 10:37:22 |
| 9 | 10:37:25 |
| 10 | 10:37:28 |
| 11 | 10:37:31 |
| 12 | 10:37:35 |
| 13 | 10:37:39 |
| 14 | 10:37:42 |
| 15 | 10:37:42 |
| 16 | 10:37:43 |
| 17 | 10:37:43 |
| 18 | 10:37:46 |
| 19 | 10:37:46 |
| 20 | 10:37:49 |
| 21 | 10:37:50 |
| 22 | 10:37:54 |
| 23 | 10:37:57 |
| 24 | 10:37:59 |
| 25 | 10:38:00 |



[9/14/2021] Larsen, Christian (revised) 9.14.2021

127

1    10:38:10 When you make a determination whether or

2    10:38:12 not to sell your XRP, what factors do you consider?

3    10:38:21 A. Well, primarily is the market makers'

4    10:38:25 recommendation.

5    10:38:26 Q. And what factors play into the market

6    10:38:32 makers' recommendation?

7    10:38:35 MR. FLUMENBAUM: Objection as to form.

8    10:38:39 THE WITNESS: I mean, that's -- that's

9    10:38:42 based on their intelligence and technology and

10   10:38:46 capabilities.

11   10:38:49 BY MR. SYLVESTER:

12   10:38:49 Q. Do you have an understanding of what

13   10:38:51 factors they look at?

14   10:38:53 A. I actually -- I'm not a market maker.

15   10:38:56 It's a complicated business, especially in these --

16   10:38:59 these are sophisticated global markets. So I would

17   10:39:03 defer to them.

18   10:39:05 Q. Understanding that you defer to their

19   10:39:08 expertise, do you have an understanding of what

20   10:39:11 factors they consider when generating a

21   10:39:13 recommendation for whether or not you should sell

22   10:39:15 XRP?

23   10:39:17 MR. FLUMENBAUM: Objection as to form.

24   10:39:18 THE WITNESS: I don't, actually. I think

25   10:39:19 that's also very complex and very dynamic.

128

1    10:39:26 BY MR. SYLVESTER:

2    10:39:26 Q. Do you have an understanding whether or

3    10:39:31 not -- we'll use GSR -- strike that.

4    10:39:34 Do you have an understanding whether or

5    10:39:35 not GSR observed XRP market conditions prior to

6    10:39:38 making a market recommendation as to whether or not

7    10:39:41 you should sell XRP?

8    10:39:43 MR. FLUMENBAUM: Objection as to form.

9    10:39:43 THE WITNESS: That would be my assumption.

10   10:39:44 BY MR. SYLVESTER:

11   10:39:44 Q. Do you have an understanding of whether or

12   10:39:48 not GSR considers the price of XRP when deciding

13   10:39:51 whether or not to recommend that you sell XRP?

14   10:39:54 MR. FLUMENBAUM: Objection as to form.

15   10:39:56 THE WITNESS: It would be my assumption

16   10:39:57 that any market maker would look at those factors,

17   10:39:59 yes.

18   10:40:00 BY MR. SYLVESTER:

19   10:40:00 Q. When you say, "those factors," that

20   10:40:02 includes price?

21   10:40:03 A. That would be my assumption.

22   10:40:05 Q. Does it include volume?

23   10:40:06 A. It would be my assumption that any market

24   10:40:08 maker would look at that variable as well.

25   10:40:23 Q. Did you ever give GSR instructions as to

[9/14/2021] Larsen, Christian (revised) 9.14.2021

129

1    10:40:26 your goals with respect to XRP sales?

2    10:40:30 MR. FLUMENBAUM: Objection as to form.

3    10:40:31 You may answer.

4    10:40:32 THE WITNESS: Yes.

5    10:40:34 BY MR. SYLVESTER:

6    10:40:34 Q. What were those goals?

7    10:40:36 A. Well, in a word, to be constructive.

8    10:40:53 MR. SYLVESTER: Okay. Let's take a look

9    10:40:54 at Exhibit 114, please.

10   10:40:56 THE WITNESS: Are you --

11   10:40:57 MR. SYLVESTER: Done with that one, yeah.

12   10:40:59 Thank you.

13   10:41:01 We sure did already pass out 114.

14   10:41:17 BY MR. SYLVESTER:

15   10:41:17 Q. Can we go back to 114?

16   10:41:19 I think you probably have that in this

17   10:41:22 pile, sir.

18   10:41:26 A. Are you talking about this one here?

19   10:41:28 Q. Yes. That's right.

20   10:41:34 ZOOM PARTICIPANT: Are you going back to

21   10:41:35 115?

22   10:41:36 MR. SYLVESTER: 114.

23   10:41:38 ZOOM PARTICIPANT: 114?

24   10:41:40 MR. SYLVESTER: Yes.

25   / /

130

```
 1    10:41:40 Q. This is a document we have previously
 2    10:41:43 identified ending Bates -41.
 3    10:41:45 Mr. ███ writes at the bottom of the first
 4    10:41:50 page, "Hi, Chris, confirming Polo at 0.2%."
 5    10:41:55 MR. FLUMENBAUM: Where are you reading?
 6    10:41:57 I'm sorry.
 7    10:41:57 MR. SYLVESTER: At the bottom of page 1.
 8    10:42:01 One email up from the bottom.
 9    10:42:03 MR. FLUMENBAUM: Oh, okay.
10    10:42:07 BY MR. SYLVESTER:
11    10:42:07 Q. Do you see where I'm reading from,
12    10:42:09 Mr. Larsen?
13    10:42:10 A. Oh, at the top?
14    10:42:11 Q. No, at the bottom.
15    10:42:12 MR. FLUMENBAUM: I think he's starting in
16    10:42:13 the middle, where it's point 2, not point 1.
17    10:42:15 MR. SYLVESTER: Did I misspeak? I
18    10:42:17 apologize.
19    10:42:18 THE WITNESS: Yeah.
20    10:42:20 BY MR. SYLVESTER:
21    10:42:20 Q. Okay. Is Polo in this sentence Poloniex?
22    10:42:23 A. I assume so, yes.
23    10:42:25 Q. Okay. Mr. ███ asks, "Should I restart
24    10:42:28 tactical selling?"
25    10:42:29 Do you see that?
```

1   10:42:30 A. I'm sorry --

2   10:42:35 Q. It's the same spot at the bottom of the

3   10:42:37 page.

4   10:42:38 A. I see that.

5   10:42:39 Q. Okay. And do you see right on top of

6   10:42:42 where I was just reading from, you respond:

7   10:42:44 "Very importantly - don't want

8   10:42:46 to negatively impact market with

9   10:42:48 any tactical efforts - only if

10  10:42:50 constructive."

11  10:42:51 Do you see that?

12  10:42:52 A. I do.

13  10:42:53 Q. Okay. What does "tactical efforts" mean

14  10:42:56 in this email?

15  10:42:57 A. I assume it means programmatic. That's a

16  10:43:00 tactic.

17  10:43:04 Q. Just to make sure I understand your

18  10:43:05 answer, "tactical efforts" in this context means

19  10:43:08 programmatic sales of XRP?

20  10:43:10 A. Well, a tactic is kind of an execution

21  10:43:14 term, and programmatic being selling is a tactic.

22  10:43:19 Q. Sure. I take your point.

23  10:43:21 But as it applies to this particular

24  10:43:25 email, is that what it means?

25  10:43:27 A. To the best of my knowledge, yes.

132

```
 1   10:43:31 Q. You tell Mr. ███  "don't want to
 2   10:43:34 negatively impact market."
 3   10:43:36 Do you see that?
 4   10:43:36 A. I do.
 5   10:43:37 Q. What negative impact --
 6   10:43:38 MR. FLUMENBAUM: Wait, wait, wait, read
 7   10:43:39 the whole -- "with any tactical efforts - only if
 8   10:43:41 constructive" --
 9   10:43:43 MR. SYLVESTER: I did read the whole
10   10:43:44 thing. I'm just asking about that peculiar phrase.
11   10:43:48 Q. So among the things that you write, you
12   10:43:50 write, "Don't want to negatively impact market,"
13   10:43:53 correct?
14   10:43:54 A. Yes.
15   Q. Okay. What negative impact on the market
16   10:43:57 did you want to avoid?
17   10:43:59 MR. FLUMENBAUM: Object. Objection as to
18   10:44:04 form.
19   10:44:05 THE WITNESS: Well, I mean, exactly what
20   10:44:08 it says here. Negative would be not being
21   10:44:10 constructive.
22   10:44:13 BY MR. SYLVESTER:
23   10:44:13 Q. Okay. And understanding that
24   10:44:16 "constructive" is a broad term, what factors did you
25   10:44:22 not want to impact -- what market factors did you
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

```
 1    10:44:25 not want to impact with your XRP sales?

 2    10:44:28 MR. FLUMENBAUM: Objection as to form.

 3    10:44:29 Asked and answered.

 4    10:44:29 You've already asked him what he meant by

 5    10:44:32 "constructive" earlier.

 6    10:44:34 THE WITNESS: Well, yeah. My assumption

 7    10:44:36 is that          and GSR knows what a constructive

 8    10:44:42 environment is, what a not constructive environment

 9    10:44:45 is, and I want him to be constructive.

10    10:44:47 BY MR. SYLVESTER:

11    10:44:47 Q. Just focusing on your instruction, your

12    10:44:50 words, you don't want to negatively impact the

13    10:44:53 market, does that include avoiding any sales that

14    10:44:56 would negatively impact XRP's price?

15    10:45:00 MR. FLUMENBAUM: Objection as to form.

16    10:45:01 THE WITNESS: It means exactly what it

17    10:45:02 says there, is not being nonconstructive. Don't be

18    10:45:08 destructive.

19    10:45:09 BY MR. SYLVESTER:

20    10:45:09 Q. Right.

21    10:45:09 Would a destructive impact include

22    10:45:13 pressuring XRP's price negatively?

23    10:45:17 MR. FLUMENBAUM: Objection as to form.

24    10:45:18 THE WITNESS: Again, that's up -- up to

25    10:45:21          to recommend to us. But, again, our
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

134

1  10:45:25 objective is to not have an impact on the market.

2  10:45:29 And that is -- that would be constructive.

3  10:45:32 BY MR. SYLVESTER:

4  10:45:32 Q. When you say your objective -- our

5  10:45:34 objective -- strike that.

6  10:45:35 You just said, "our objective."

7  10:45:38 In the context of your sales of XRP, that

8  10:45:40 was your objective; is that right?

9  10:45:44 MR. FLUMENBAUM: Objection as to form.

10  10:45:44 I didn't follow your question.

11  10:45:52 THE WITNESS: Yeah. If you could repeat

12  10:45:53 that, please.

13  10:45:54 BY MR. SYLVESTER:

14  10:45:54 Q. Sure.

15  10:45:54 You said, Mr. Larsen, but, again, our

16  10:45:56 objective is to not have an impact on the market.

17  10:46:00 I just want to clarify that the "our" in

18  10:46:02 that sentence includes your sales of your XRP?

19  10:46:05 A. Yes, it does.

20  10:46:06 Q. Okay.

21  10:46:14 Did GSR ever recommend that you stop

22  10:46:17 selling XRP because the price of XRP was declining?

23  10:46:25 MR. FLUMENBAUM: Objection as to form.

24  10:46:27 THE WITNESS: GSR has recommended to pause

25  10:46:29 selling from time to time.

```
 1    10:46:33 BY MR. SYLVESTER:

 2    10:46:33 Q. Was one of the reasons that they

 3    10:46:34 recommended to pause selling from time to time that

 4    10:46:39 XRP's price was declining?

 5    10:46:42 MR. FLUMENBAUM: Objection as to form.

 6    10:46:43 THE WITNESS: Again, I don't know all of

 7    10:46:45 the variables he's going to put into that in making

 8    10:46:49 that determination.

 9    10:46:54 MR. SYLVESTER: Okay. Let's look at

10    10:46:55 Exhibit 209, please.

11    10:47:05 (Whereupon, Deposition Exhibit CL-209

12    10:47:06 was marked for identification.)

13    10:47:28 MR. FLUMENBAUM: For the record, let me

14    10:47:29 note that there's no Bates number on this document

15    10:47:32 again.

16    10:47:32 MR. SYLVESTER: We'll get it for you.

17    10:47:35 Q. This appears to be an exchange of emails,

18    10:47:38 one page, between Mr. Larsen and Mr. ▮▮▮ dated

19    10:47:43 December 14th, 2017.

20    10:47:44 Do you see that, Mr. Larsen?

21    10:47:46 A. Yes.

22    10:47:47 Q. Okay. Mr. ▮▮▮ writes:

23    10:47:49 "Market seems very frothy and

24    10:47:53 it might be a good opportunity to

25    10:47:54 tactically increase sales. Please
```

1    10:47:57 advise."

2    10:47:58 Do you see that?

3    10:47:58 A. Yes, I do.

4    10:47:59 Q. Do you have an understanding of what

5    10:48:01 Mr. ███ meant by "very frothy"?

6    10:48:04 A. I believe he is indicating that he had,

7    10:48:07 say, a booming market.

8    10:48:11 Q. What do you mean by "booming market"?

9    10:48:13 A. High volume.

10   10:48:19 Q. Just for context, this email is about your

11   10:48:22 sales of XRP; is that right?

12   10:48:26 MR. FLUMENBAUM: Objection as to --

13   10:48:28 objection as to form.

14   10:48:32 THE WITNESS: Yes, I believe so.

15   10:48:33 BY MR. SYLVESTER:

16   10:48:33 Q. Okay. And you say, "Let's try a

17   10:48:35 constructive increase"; is that right?

18   10:48:39 A. Correct.

19   10:48:41 MR. FLUMENBAUM: Just so the record's

20   10:48:42 clear, the first email says, "It's difficult to keep

21   10:48:46 up with demand. The buying in Korea keeps growing."

22   10:48:51 BY MR. SYLVESTER:

23   10:48:51 Q. Did you -- Mr. Larsen, following up on

24   10:48:56 that, did you understand that that was the buying of

25   10:48:59 XRP in Korea keeps growing?

```
 1    10:49:01 A. Yeah, that would be my assumption.

 2    10:49:03 Q. Okay.

 3    10:49:06 A. Although he certainly could be meaning

 4    10:49:08 crypto markets.

 5    10:49:31 MR. SYLVESTER: Let's look at Exhibit 101,

 6    10:49:32 please.

 7    10:49:34 (Whereupon, Deposition Exhibit CL-101

 8    10:49:35 was marked for identification.)

 9    10:49:35 BY MR. SYLVESTER:

10    10:49:58 Q. Exhibit 101 is a one-page email thread

11    10:50:03 between Mr. Larsen and              dated

12    10:50:07 May 25th, 2017.

13    10:50:10 Do you see that, Mr. Larsen?

14    10:50:11 MR. FLUMENBAUM: It's also to     GSR --

15    10:50:17 MR. SYLVESTER: That's right.

16    10:50:17 MR. FLUMENBAUM: -- the two recipients.

17    10:50:22 THE WITNESS: I see it.

18    10:50:22 BY MR. SYLVESTER:

19    10:50:26 Q. Okay. Mr.           GSR is

20    10:50:30       email address, correct?

21    10:50:32 A. Correct.

22    10:50:33 Q. Mr.     writes:

23    10:50:33 A. "Good morning, Chris,

24    10:50:35 We are continuing to observe

25    10:50:36 de-risking of XRP (into ETH,
```

138

```
1    10:50:40 Bitcoin and now ETC), so we believe

2    10:50:43 it is most constructive to halt

3    10:50:45 sales and allow the market to

4    10:50:46 consolidate above the (technically

5    10:50:49 important) 25c level.

6    10:50:50 "For good order sake, we

7    10:50:53 stopped 4t and 4p at 1:00 a.m. PT

8    10:50:58 today."

9    10:50:59 Do you see that?

10   10:50:59 A. I do.

11   10:51:00 Q. Is "25c" 25 cents?

12   10:51:03 A. I believe so.

13   10:51:04 Q. Do you have an understanding of what

14   10:51:05 de-risking of XRP means in this context?

15   10:51:13 A. Not entirely. Yeah. Not entirely.

16   10:51:17 Q. Mr.    writes to you that he's halted

17   10:51:19 sales of 4t and 4p; is that right?

18   10:51:22 A. Correct.

19   10:51:23 Q. Okay. And Mr.    writes that he's done

20   10:51:25 so to allow the market to consolidate above the

21   10:51:27 technically important 25-cent level; is that right?

22   10:51:32 A. I see that.

23   10:51:34 Q. Did you understand 25-cent to be a

24   10:51:35 reference to the price of XRP at that time?

25   10:51:40 MR. FLUMENBAUM: Objection as to form.
```

139

```
 1    10:51:40 THE WITNESS: I assume so.

 2    10:51:47 MR. SYLVESTER: Let's take a look at

 3    10:51:51 Exhibit 87, please.

 4    10:51:53 (Whereupon, Deposition Exhibit CL-87

 5    10:51:54 was marked for identification.)

 6    10:52:49 MR. SYLVESTER: Just for the record, while

 7    10:52:50 Mr. Larsen's reviewing that document, Exhibit 209 is

 8    10:52:53 Bates labeled LARSEN_NAT_0000049.

 9    10:52:59 BY MR. SYLVESTER:

10    10:53:02 Q. Okay. Back to Exhibit 87 --

11    10:53:05 MR. FLUMENBAUM: Can I ask a question, why

12    10:53:07 you're not using -- if you have the Bates stamp

13    10:53:10 number, why -- and how do you get this document

14    10:53:12 without the Bates stamp number?

15    10:53:14 MR. SYLVESTER: We can discuss that at

16    10:53:15 some other occasion.

17    10:53:17 MR. FLUMENBAUM: Well --

18    10:53:18 MR. TENREIRO: I can tell you, Marty.

19    10:53:19 When people produce documents, they

20    10:53:21 produce the native, which doesn't have a Bates

21    10:53:23 stamp, and then they produce an image, which

22    10:53:26 superimposes a Bates stamp on it, so my guess is

23    10:53:29 Mark printed the native version.

24    10:53:32 You know, our emails don't have Bates

25    10:53:34 until so someone puts them on them. So ...
```

```
 1   10:53:38 MR. FLUMENBAUM: Well ...
 2   10:53:39 BY MR. SYLVESTER:
 3   10:53:39 Q. Okay. Do you see Exhibit 87, Mr. Larsen?
 4   10:53:43 A. I do.
 5   10:53:44 Q. Okay. And this is an email exchange
 6   10:53:47 between you and Mr. ███ on February 18th, 2017; is
 7   10:53:50 that right?
 8   10:53:51 A. Yes.
 9   10:53:54 Q. Okay. Mr. ███ in the middle email,
10   10:53:55 writes, "Bot 6t (Ripple-works) is running at a rate
11   10:53:59 of 25K a week."
12   10:54:01 I take it "25K" is $25,000; is that right?
13   10:54:06 A. I believe so.
14   10:54:06 Q. Okay. And then he writes:
15   10:54:08 "We would recommend pausing 6t
16   10:54:11 before reversing 4t, otherwise they
17   10:54:13 will likely cancel each other out.
18   10:54:16 Please advise."
19   10:54:17 Do you see that?
20   10:54:18 A. I do.
21   10:54:19 Q. 4t is your trading bot for your XRP sales?
22   10:54:23 A. That's right.
23   10:54:23 Q. Does this refresh your recollection that
24   10:54:25 6t is Rippleworks' trading bot?
25   10:54:28 A. I believe that's correct.
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

141

1    10:54:31 Q. Okay. Mr. ▮ writes a recommendation to

2    10:54:36 pause 6t before reversing 4t, otherwise, the two

3    10:54:41 bots will cancel each other out.

4    10:54:44 Do you see that?

5    10:54:44 A. I do.

6    10:54:45 Q. Okay. Do you have an understanding of

7    10:54:46 what "cancel each other out" means in this context?

8    10:54:50 MR. FLUMENBAUM: Objection as to form.

9    10:54:56 THE WITNESS: I don't entirely understand

10   10:54:57 what -- the mechanics behind what he'd be looking at

11   10:55:04 there.

12   10:55:04 BY MR. SYLVESTER:

13   10:55:04 Q. At the time of this email, did you have an

14   10:55:06 understanding that Mr. ▮ was concerned that buying

15   10:55:08 with one bot and selling with another bot would

16   10:55:10 cancel out the impact on XRP's price?

17   10:55:17 MR. FLUMENBAUM: Objection as to form.

18   10:55:17 THE WITNESS: I don't know if he's

19   10:55:19 referring to price. No reason to assume that.

20   10:55:23 BY MR. SYLVESTER:

21   10:55:23 Q. What else might he be referring to?

22   10:55:26 A. I don't know.

23   10:55:27 MR. FLUMENBAUM: Objection as to form.

24   10:55:28 THE WITNESS: Again, I don't know. That's

25   10:55:29 his expertise.

[9/14/2021] Larsen, Christian (revised) 9.14.2021

142

```
 1    10:55:32 BY MR. SYLVESTER:
 2    10:55:32 Q. Have you ever traded options in XRP?
 3    10:55:36 A. Well, when you say, "traded," are you
 4    10:55:43 including writing options?
 5    10:55:46 Q. Yes.
 6    10:55:47 A. I have written options, covered calls in
 7    10:55:54 XRP.
 8    10:55:57 Q. Why have you written covered calls in XRP?
 9    10:56:03 MR. FLUMENBAUM: Objection as to form.
10    10:56:04 THE WITNESS: GSR and a number of other
11    10:56:08 sophisticated institutional cryptocurrency firms
12    10:56:16 began offering the ability to write covered calls,
13    10:56:20 earn a premium, the objective there being not
14    10:56:26 selling XRP but enjoying a premium by writing the
15    10:56:36 covered calls.
16    10:56:37 BY MR. SYLVESTER:
17    10:56:37 Q. Did you write covered calls through GSR?
18    10:56:39 A. Better way to, I think, say that is GSR
19    10:56:42 wrote covered calls and we provided the XRP for
20    10:56:46 that.
21    10:56:48 Q. Okay. Was there any entity other than GSR
22    10:56:50 that wrote covered calls for you for XRP?
23    10:56:53 MR. FLUMENBAUM: Objection as to form.
24    10:56:56 THE WITNESS: Not that I have used, but
25    10:56:58 there were other firms offering that service.
```

[9/14/2021] Larsen, Christian (revised) 9.14.2021

143

1    10:57:01 BY MR. SYLVESTER:

2    10:57:01 Q. Have there ever been any restrictions on

3    10:57:04 your ability to sell your own XRP?

4    10:57:08 MR. FLUMENBAUM: Objection as to form.

5    10:57:12 THE WITNESS: Could you be more specific

6    10:57:15 on that?

7    10:57:16 BY MR. SYLVESTER:

8    10:57:16 Q. Has any person or entity ever imposed a

9    10:57:20 restriction on you that restricted your ability to

10   10:57:24 sell your XRP?

11   10:57:25 A. You mean -- well, other than this dispute

12   10:57:33 we're having?

13   10:57:34 Q. Yes, aside from this.

14   10:57:36 A. Not to my knowledge, no.

15   10:57:39 Q. Go ahead.

16   10:57:40 A. One thing I do want to point out, if it's

17   10:57:43 okay, add to that question before --

18   10:57:45 Q. To add to your answer?

19   10:57:46 A. Yeah.

20   10:57:46 Q. Of course. Go ahead.

21   10:57:47 A. On the covered calls, important to know

22   10:57:49 that those were reported to the Chicago Mercantile

23   10:57:53 Exchange, you know, as commodity transactions.

24   10:57:59 Q. Okay.

25   10:58:04 So going back to restrictions on your

144

1 10:58:07 ability to sell XRP, Ripple has never imposed any

2 10:58:10 restrictions on your ability to sell XRP?

3 10:58:12 A. Not that I --

4 10:58:14 MR. FLUMENBAUM: Objection as to form.

5 10:58:14 BY MR. SYLVESTER:

6 10:58:14 Q. Could Ripple impose any restrictions on

7 10:58:16 your ability to sell XRP without your agreement?

8 10:58:19 MR. FLUMENBAUM: Objection as to form.

9 10:58:26 THE WITNESS: Are you asking whether or

10 10:58:27 not it's possible for the board of directors to pass

11 10:58:30 a resolution that would restrict -- is that what

12 10:58:35 you're asking?

13 10:58:36 BY MR. SYLVESTER:

14 10:58:36 Q. Without your support, yes.

15 10:58:39 MR. FLUMENBAUM: Objection as to form.

16 10:58:40 THE WITNESS: That board could certainly

17 10:58:41 pass something like that.

18 10:58:44 BY MR. SYLVESTER:

19 10:58:44 Q. Even if you voted against it?

20 10:58:49 A. Well, they could pass it, yeah. Sure.

21 10:58:51 Q. Okay. Have you ever -- setting aside

22 10:58:53 anything to do with the SEC, have you ever agreed to

23 10:58:57 any restrictions not to sell your XRP?

24 10:59:00 MR. FLUMENBAUM: Objection as to form.

25 10:59:04 THE WITNESS: Be more -- if you could be

145

1    10:59:06 more specific, please.

2    10:59:08 Are you asking whether or not I've ever

3    10:59:10 proposed restrictions?

4    10:59:12 BY MR. SYLVESTER:

5    10:59:12 Q. Let me ask -- what's the answer to that

6    10:59:17 question? Have you ever proposed restrictions on

7    10:59:19 your own ability to sell XRP?

8    10:59:22 MR. FLUMENBAUM: Objection as to form.

9    10:59:22 You may answer.

10   10:59:23 THE WITNESS: In the process of

11   10:59:25 negotiating with the other cofounder, Jed McCaleb,

12   10:59:30 we have talked from time to time to encourage a

13   10:59:36 settlement with him.

14   10:59:38 That was unsuccessful, however.

15   10:59:41 BY MR. SYLVESTER:

16   10:59:41 Q. Okay. So the result of those settlement

17   10:59:43 discussions was not that you agreed to any

18   10:59:45 restrictions on selling your XRP?

19   10:59:49 MR. FLUMENBAUM: Objection as to form.

20   10:59:50 THE WITNESS: That's correct. And the

21   10:59:52 final agreement that we concluded was not part of

22   10:59:55 that agreement.

23   10:59:57 BY MR. SYLVESTER:

24   10:59:57 Q. Okay. Did you ever agree not to sell XRP

25   11:00:01 when Ripple was buying XRP?