# PX 10

1

<pre>
 1                  UNITED STATES DISTRICT COURT

 2                  SOUTHERN DISTRICT OF NEW YORK

 3

 4    SECURITIES AND EXCHANGE        )
      COMMISSION,                    )
 5                                   )
                      Plaintiff,     )
 6                                   ) Case No.:
              v.                     ) 20-Civ-10832(AT)(SN)
 7                                   )
      RIPPLE LABS, INC., BRADLEY     )
 8    GARLINGHOUSE, and CHRISTIAN    )
      LARSEN,                        )
 9                                   )
                      Defendants.    )
10    _____)

11

12

13      **HIGHLY CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

14

15                  VIDEOTAPED DEPOSITION OF

16                     PHILLIP RAPOPORT

17                  Thursday, July 22, 2021

18

19

20

21

22

23
      Reported by:
24    BRIDGET LOMBARDOZZI,
      CSR, RMR, CRR, CLR
25    Job No. 210722BLO
</pre>

2

```
1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE        )
     COMMISSION,                     )
5                                    )
                    Plaintiff,       )
6                                    ) Case No.:
          v.                         ) 20-Civ-10832(AT)(SN)
7                                    )
     RIPPLE LABS, INC., BRADLEY      )
8    GARLINGHOUSE, and CHRISTIAN     )
     LARSEN,                         )
9                                    )
                    Defendants.      )
10   _____)

11

12

13

14

15          Videotaped deposition of PHILLIP RAPOPORT taken

16   on behalf of Plaintiff, held at the offices of Debevoise

17   & Plimpton, 919 Third Avenue, New York, New York,

18   commencing at 9:03 a.m. and ending at 5:47 p.m., on

19   Thursday, July 22, 2021, before Bridget Lombardozzi,

20   CCR, RMR, CRR, CLR, and Notary Public of the States of

21   New York and New Jersey, pursuant to notice.

22

23

24

25
```

3

```
 1    A P P E A R A N C E S (Via Remote where indicated):

 2

 3

 4    For the Plaintiff:

 5

 6

 7           UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 8           NEW YORK REGIONAL OFFICE

 9           BY:  LADAN STEWART, ESQUIRE

10                JORGE G. TENREIRO, ESQUIRE

11                JON DANIELS, ESQUIRE (Remote)

12           200 Vesey Street

13           Suite 400

14           New York, New York  10281-1022

15           Telephone:  212.336.1060

16           Email:   stewartl@sec.gov

17                    tenreiroj@sec.gov

18                    jdaniels@sec.gov

19

20

21

22

23

24

25
```

4

```
 1    A P P E A R A N C E S (Continued):

 2

 3    For Defendant Ripple Labs Inc.:

 4

 5           DEBEVOISE & PLIMPTON LLP

 6           BY:  EROL GULAY, ESQUIRE

 7                LISA ZORNBERG, ESQUIRE

 8                LEYLA SALMAN, ESQUIRE (Remote)

 9           919 Third Avenue

10           New York, New York  10022

11           Telephone:  212.909.6000

12           E-Mail:  egulay@debevoise.com

13                    lzornberg@debevoise.com

14                    lsalman@debevoise.com

15

16                    -and-

17

18           KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

19           BY:  BETHAN JONES, ESQUIRE (Remote)

20           Sumner Square

21           1615 M Street, N.W.

22           Suite 400

23           Washington, D.C.  20036

24           Telephone:  202.326.7999

25           E-mail:  bjones@kellogghansen.com
```

1   A P P E A R A N C E S (Continued):

2

3   For Defendant Bradley Garlinghouse:

4

5           CLEARY GOTTLIEB STEEN & HAMILTON

6           BY:  TAYLOR BATES, ESQUIRE (Remote)

7                MICHAEL SCHULMAN, ESQUIRE (Remote)

8                ANNE BAKER, ESQUIRE  (Remote)

9           2112 Pennsylvania Avenue, NW

10          Washington, D.C.  20037

11          Telephone:  202.974.1500

12          E-mail:  Tbates@cgsh.com
                     mschulman@cgsh.com
13                   abaker@cgsh.com

14

15   For Defendant Christian A. Larsen:

16

17          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

18          By:  KRISTINA A. BUNTING, ESQUIRE

19               MICHAEL GERTZMAN, ESQUIRE (Remote)

20               EMILY GLAVIN, ESQUIRE (Remote)

21          1285 Avenue of the Americas

22          New York, New York  10019-6064

23          Telephone:  212.373.2491

24          E-mail:  kbunting@paulweiss.com
                     mgertzman@paulweiss.com
25                   eglavin@paulweiss.com

6

1    A P P E A R A N C E S (Continued):

2

3    For the Witness:

4

5         KAPLAN HECKER & FINK LLP

6         BY:  JUSTIN R. HORTON, ESQUIRE

7              SEAN HECKER, ESQUIRE

8         350 Fifth Avenue

9         Suite 7110

10        New York, New York  10018

11        Telephone:  646.889.3906

12        E:mail:  shecker@kaplanhecker.com

13                 jhorton@kaplanhecker.com

14

15   ALSO PRESENT:

16

17        ██████████████  Ripple

18        LYRIC GUPTA, Cleary Gottlieb

19        NICOLE FORBES

20        DAVID SHERECK, Videographer
          Shereck Video Service
21

22

23

24

25

7

```
 1                      INDEX

 2   WITNESS                          EXAMINATION

 3   PHILLIP RAPOPORT

 4      BY MS. STEWART                        17

 5

 6

 7

 8

 9

10

11                     EXHIBITS

12   SEC
     NUMBER              DESCRIPTION           PAGE
13

14   Exhibit PR-2 10/9/13 E-mail from Rapoport      61

15              to Griffin with attachment

16              RPLI_SEC 0320652-63

17

18   Exhibit PR-4 String of e-mails dated           123

19              October 2013

20              RPLI_SEC 0012819-21

21

22   Exhibit PR-5 10/1713 E-mail from Rapoport      63

23              to Larsen with attachment

24              RPLI_SEC 0328413-32

25
```

8

```
 1                          EXHIBITS

 2    SEC
      NUMBER               DESCRIPTION              PAGE
 3

 4    Exhibit PR-6   String of e-mails dated        65

 5                   October 2013 with attachment

 6                   RPLI_SEC 0337822-42

 7

 8    Exhibit PR-8   String of e-mails dated        136

 9                   October 24, 2013

10                   RPLI_SEC 0038399-400

11

12    Exhibit PR-10 String of e-mails dated         82

13                   11/5/13 with attachment

14                   RPLI_SEC 0843205-13

15

16    Exhibit PR-12 String of e-mails dated         147

17                   November 2013 with attachment

18                   RPLI_SEC 0461857-66

19

20    Exhibit PR-15 String of e-mails dated         208

21                   November 2013

22                   RPLI_SEC 0842922-26

23

24

25
```

9

| 1 | EXHIBITS |
|---|---|

SEC
NUMBER                    DESCRIPTION                    PAGE

4   Exhibit PR-16 String of e-mails dated          102

5                  November 2013

6                  RPLI_SEC 0012356

8   Exhibit PR-19 String of e-mails dated          214

9                  January 4, 2014

10                 RPLI_SEC 0088057-58

12  Exhibit PR-20 String of e-mails dated          230

13                 January 2014

14                 RPLI_SEC 0088034-35

16  Exhibit PR-21 1/16/14 E-mail from Rapoport     234

17                 to ▇▇▇▇ et al

18                 SEC-▇▇▇▇-E-0072551

20  Exhibit PR-22 String of e-mails dated          238

21                 February 5, 2021

22                 RPLI_SEC 0012150-51

23

24

25

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

10

```
 1                        EXHIBITS

 2    SEC
      NUMBER                DESCRIPTION              PAGE
 3

 4    Exhibit PR-26 String of e-mails dated          278

 5                  May 2014

 6                  RPLI_SEC 0842618-20

 7

 8    Exhibit PR-27 String of e-mails dated          156

 9                  June 2014

10                  RPLI_SEC 0425895-900

11

12    Exhibit PR-32 7/22/21 E-mail from Rapoport     173

13                  with attachments

14                  ████████Ripple_0002422-28

15

16    Exhibit PR-34 String of e-mails dated          282

17                  July 2014

18                  RPLI_SEC 0882487-89

19

20    Exhibit PR-35 String of e-mails dated          166

21                  July/August 2014

22                  RPLI_SEC 0842611-14

23

24

25
```

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

1                        EXHIBITS

2     SEC
      NUMBER                  DESCRIPTION              PAGE
3

4     Exhibit PR-36 8/21/14 E-mail from Rapoport      182

5                   to ███████ et al

6                   RPLI_SEC 0842466-67

7

8     Exhibit PR-37 The Ripple Protocol:  A Deep      182

9                   Dive for Finance Professionals

10                  RPLI_SEC 0539465-511

11

12    Exhibit PR-39 String of e-mails dated           242

13                  September 10, 2014

14                  ████_0002320

15

16    Exhibit PR-40 String of e-mails dated           245

17                  September 11, 2014

18                  ████_0002297

19

20    Exhibit PR-41 String of e-mails dated           248

21                  September 2014

22                  ████_0001489-90

23

24

25

12

| SEC | | |
|-----|--|--|
| NUMBER | DESCRIPTION | PAGE |

EXHIBITS

Exhibit PR-44 String of e-mails dated     252
               September 25, 2014
               RPLI_SEC 0199575-76

Exhibit PR-45 String of e-mails dated     272
               October 2014
               GSR00000208-09

Exhibit PR-51 String of e-mails dated     258
               October 30, 2014
               ██████0001955

Exhibit PR-52 String of e-mails dated     254
               October 2014
               RPLI_SEC 0199556-61

Exhibit PR-57 String of e-mails dated     297
               November 2014
               RPLI_SEC 0054769-71

13

```
1                          EXHIBITS

2     SEC
      NUMBER              DESCRIPTION              PAGE
3

4     Exhibit PR-65 12/21/14 E-mail from ███        261

5                  to Rapoport

6                  ███_0001848

7

8     Exhibit PR-66 String of e-mails dated        269

9                  January 2015

10                 RPLI_SEC 0096888-89

11

12    Exhibit PR-68 String of e-mails dated        265

13                 January 2015

14                 ███_0001803-05

15

16    Exhibit PR-74 String of e-mails dated        294

17                 January 2015 with attachment

18                 RPLI_SEC 0481363-75

19

20    Exhibit PR-78 10/23/18 E-mail from Rapoport   292

21                 to Larsen with attachment

22                 RPLI_SEC 0235399-407

23

24

25
```

14

1   PREVIOUSLY MARKED EXHIBITS

2

3   Exhibit PG-5 description                    107

4   Exhibit PG-6 description                     99

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

15

```
 1                 DEPOSITION SUPPORT INDEX

 2

 3     DIRECTION TO WITNESS NOT TO ANSWER

 4        Page    Line

 5         91       13

 6        296       19

 7

 8

 9

10     STIPULATIONS

11        Page    Line

12         17       15

13

14

15     PORTION MARKED HIGHLY CONFIDENTIAL

16        Page    Line

17        287        1

18

19

20     REQUEST FOR DOCUMENTS

21        Page     Line

22        - -none- -

23

24

25
```

```
 1                      -  -  -

 2                 9:03 a.m.

 3               July 22, 2021

 4                      -  -  -

 5              THE VIDEOGRAPHER:  Okay.  We're

 6      on the record.  The time is approximately

 7      9:03 a.m.  Today's date is Thursday, July

 8      22nd, 2021.  This is the video deposition

 9      of Phillip Rapoport in the matter of the

10      SEC versus Ripple Labs, et al.  Index No.

11      is 20-civ-10832 in the United States

12      District -- District Court in the Southern

13      District of New York.

14              My name is David Shereck,

15      certified legal videographer with Shereck

16      Video, in association with Gradillas

17      Court Reporting of Glendale, California.

18      We're located today at the offices of

19      Debevoise & Plimpton, located at 919

20      Third Avenue, New York, New York.

21              All counsel that are present

22      will be noted on the stenographic record.

23              The court reporter today is

24      Bridget Lombardozzi, also with Gradillas,

25      and will you please swear in the witness?
```

```
1              P H I L L I P   R A P O P O R T,

2         having been duly sworn, was examined and

3         testified as follows:

4                   THE REPORTER:  Thank you.

5                   You may proceed.

6                    DIRECT-EXAMINATION

7   BY MS. STEWART:

8         Q.   Good morning, Mr. Rapoport.

9         A.   Good morning.

10        Q.   Can you please state and spell your name

11   for the record?

12        A.   Phillip Rapoport.  P-H-I-L-L-I-P

13   R-A-P-O-P-O-R-T.

14        Q.   Thank you.

15                  MR. GULAY:  Just before we begin,

16         just to note two things.  One, an

17         objection by one counsel is an objection

18         for all counsel.  And, then, two, we are

19         designating the transcript and videotape

20         of this deposition as confidential under

21         the protective order.

22                  MS. STEWART:  Okay.  Thank you.

23   BY MS. STEWART:

24        Q.   Mr. Rapoport, are you represented by

25   counsel today?
```

1      A.    Yes.

2              MR. GERTZMAN:  I apologize, all,

3         for interrupting from the Zoom audience

4         here, but is it possible to have the Zoom

5         camera positioned so that we can see the

6         witness?

7              MR. TENREIRO:  Yeah.  Good point.

8         Can you see him?

9              MR. GERTZMAN:  Yes.  Thank you.

10             MR. TENREIRO:  Okay.

11    BY MS. STEWART:

12      Q.    Okay.  I'll try this again.

13            Are you represented by counsel today?

14      A.    Yes.

15      Q.    Okay.  Who is your counsel?

16      A.    Kaplan Hecker.

17      Q.    Okay.  I'm Ladan Stewart.  I'll be

18    asking questions here on behalf of the SEC.  With

19    me is my colleague Jorge Tenreiro.  Some of my

20    other colleagues are participating via Zoom.

21            Mr. Rapoport, have you ever testified

22    before?

23      A.    No.

24      Q.    Okay.  So let's run through some sort of

25    rules of the road just to make sure that we get a

1    clean record today.

2          So the first is that we have a court

3    reporter here who's transcribing everything that

4    we say to each other.  And to try to make her life

5    easier, please try not to speak over me and I'll

6    try not to speak over you.  So if you can wait for

7    me to finish my question before you answer, and

8    I'll do my best to, you know, let you finish your

9    answer before I ask my next question.  It's kind

10   of hard to do, but it helps to get us a clean

11   record.

12          Okay?

13     A.    Yes.

14     Q.    And in the same vein, it's important

15   that you give audible verbal answers to my

16   questions.  So shakes of the head or nods of the

17   head, that's not easy to transcribe into the

18   record.  So if you could answer yes or no and

19   things like that.  Okay?

20     A.    Understood.

21     Q.    If I ask you a question that you don't

22   understand, just let me know and I'll try to

23   rephrase it.

24          Any time you want a break, just ask me

25   and I'm happy to accommodate you.  I would only

1    ask that if there's a question pending, you answer

2    that question before we -- we break.  Okay?

3         A.   Yes.

4         Q.   Okay.  Any -- any questions before we

5    start?

6         A.   No.

7         Q.   Okay.  Great.

8              Is there any reason that you can't

9    testify truthfully or accurately today?

10        A.   No.

11        Q.   Okay.  Did you take any steps to prepare

12   for today's deposition?

13        A.   Yes.

14        Q.   What did you do?

15        A.   I spent approximately a half day in --

16   in this office with ███ and -- and a couple

17   hours on the phone.

18             THE REPORTER:  And?  I can't

19        hear you, sir.

20             THE WITNESS:  I'm sorry.

21        A.   I spent a couple -- a couple hours on

22   the phone and approximately a half day in this

23   office preparing.

24        Q.   And who was present during your

25   preparation session?

```
1            A.    Kaplan Hecker and Debevoise's
2       representatives.
3            Q.    Okay.  And were there people in this
4       room or other people?
5            A.    Yes.  Mainly the people in this room
6       were present.
7            Q.    Okay.  Was anybody on the phone?
8            A.    Yes, a number of participants were on
9       the phone.
10           Q.    Okay.  And you said you had a -- a half
11      day session and then a separate phone call?
12           A.    That's correct.
13           Q.    Okay.  Did you review any documents
14      during either of those sessions?
15           A.    Yes, we reviewed some documents.
16           Q.    Did any of the documents refresh your
17      recollection about any of the events?
18           A.    To some extent, yes.
19           Q.    And what were the documents that
20      refreshed your recollection?
21                    MR. GULAY:  Objection.  I just
22               want to pause to instruct Mr. Rapoport to
23               answer without disclosing the substance of
24               any privileged communications with
25               counsel.
```

1      Q.   Go ahead.

2      A.   Rereading e-mails, my own e-mails, you

3   know, refreshed my memory on certain things; but,

4   you know, generally speaking, it was a number of

5   years ago and -- and it's difficult to remember,

6   you know, seven -- or eight to -- six -- six to

7   eight years ago.

8      Q.   I understand.

9           Do you recall any of the e-mails that

10   refreshed your recollection?

11     A.   Some I recall clearly and some I have no

12   recollection of.

13     Q.   Okay.  So which e-mails do you recall

14   clearly?

15          MR. HORTON:  Objection.

16     A.   I generally --

17          MR. GULAY:  You can answer.

18     Q.   Okay.  You can answer.

19     A.   That's a general comment.  Even from

20   yesterday, it's hard to think about specific

21   e-mails.

22     Q.   Okay.  Do you currently reside in the

23   United States?

24     A.   I do.

25     Q.   Where do you reside?

1       A.   I live in ██████

2       Q.   Did you graduate from college?

3       A.   I did not.

4       Q.   Okay.  Did you attend college?

5       A.   I did.

6       Q.   And where did you go?

7       A.   I went to ████████████.

8       Q.   Okay.  But -- but you -- you didn't

9  officially graduate?

10      A.   No.

11      Q.   Okay.  When did you attend ████████?

12      A.   2001 to 2005.

13      Q.   I take it you don't have any

14  postgraduate degrees?

15      A.   No.

16      Q.   Can you take me through your employment

17  post your time at ████████?

18      A.   Sure.  I spent approximately two years

19  at ████████████, approximately two years at

20  ████████████, approximately four years at ██████

21  ████████████, which is a broker-dealer, at which

22  point I went to Ripple in 2013 for approximately

23  two years.  Then I spent four years, four and a

24  half years or so, at a firm called ████████

25  ████████████████ firm, and since then I've been

24

```
1    self-employed working on a real estate project.

2         Q.   Okay.  And what did you do at ████████

3    ████████?

4         A.   I was an institutional salesperson in

5    equity derivatives, trading desk.

6         Q.   So you were a trader?

7         A.   I was a sales trader.

8         Q.   And what was your role at ████████?

9         A.   I was an institutional salesperson on

10   the cross asset sales desk.

11        Q.   And why did you leave ████████████████

12   for ████████?

13        A.   I perceived it to be a stronger firm

14   with better opportunity.

15        Q.   Okay.  And why did you leave ████████ for

16   ████████████████████?

17        A.   I wanted a more entrepreneurial business

18   environment in short.

19        Q.   Okay.  And what was your position at

20   ████████████████████?

21        A.   I was a principal and part of the

22   founding team of a small firm.

23        Q.   And what is ████████████████████████?

24        A.   We were a broker-dealer that published

25   market strategy reports and executed trades on
```

1    behalf of institutional investors like hedge

2    funds.

3         Q.   And during your time at ██████████

4    ████████ or █████████████████, did you have any

5    involvement with digital assets?

6              MR. GULAY:  Objection to form.

7         A.   None of those firms at the time formally

8    did anything with digital assets.  I did write --

9    publish some of my own commentary while at ███████

10   ██████████████ about digital assets.

11        Q.   Okay.  And what kind of commentary did

12   you publish?

13        A.   Very introductory primers to familiarize

14   institutional investors with what was then a

15   nascent space.

16        Q.   Okay.  Can you give me any more

17   information about what was included in your

18   commentary?

19        A.   The time period was pre-2013, so it was

20   an explanation of how bitcoin worked, what the

21   market dynamics were, and, you know, some guesses

22   about what the future may hold for bitcoin

23   specifically.

24        Q.   Okay.  I want to come back to your time

25   at Ripple, but -- but moving forward a little bit,

1   after Ripple, you said you went to ███████████ is

2   that right?

3        A.   That's correct.

4        Q.   And you were there for four and a half

5   years?

6        A.   Approximately, yes.

7        Q.   Okay.  And then you said that -- that

8   after ███████████ -- ███████████, you became

9   self-employed?

10       A.   That's correct.

11       Q.   Okay.  And so what is it that -- that

12  you do now as part of your self-employment?

13       A.   I pursued the entitlement and -- and

14  pursuing the construction of a real estate

15  project.

16       Q.   What is ███████████?

17       A.   ███████████ is the -- is -- is the d/b/a

18  name for the company that is -- they're doing

19  construction on a -- on our real estate project.

20       Q.   And what kind of real estate is it?

21       A.   It's a hotel project.

22       Q.   Okay.  When did you start work at

23  Ripple?

24       A.   In 2013.

25       Q.   Do you remember what month?

1       A.   I was initially a consultant in

2  approximately the summer of 2013 and I believe my

3  full-time employment began around fall of 2013

4  after several months of being a consultant.

5       Q.   How did you come to be a consultant for

6  Ripple?

7       A.   I was interested in working in the

8  digital asset space broadly and a friend

9  introduced me to Patrick Griffin and we discussed

10  ways that I might be helpful to the company.

11      Q.   Okay.  Did you know Patrick Griffin

12  before you were introduced to him?

13      A.   No.

14      Q.   And you said you were interested in the

15  digital asset space?

16      A.   Correct.

17      Q.   Why were you interested in the digital

18  asset -- asset space?

19      A.   I believed the technology was very

20  interesting and I thought that there was a

21  potential future where the market grew in size and

22  relevance.

23      Q.   Okay.  And who was the friend who

24  introduced you to Mr. Griffin?

25      A.   A person named ███████

1       Q.   And who is he?

2       A.   He's a mutual friend.

3       Q.   Does he have a connection with Ripple?

4       A.   No.

5       Q.   So you said that -- that you met with

6  Mr. Griffin sometime in the summer of 2013?

7       A.   I don't recall exactly when we met, but

8  it was sometime around then, yes.

9       Q.   Okay.  And before you started to work as

10  a consultant for Ripple in the summer of 2013, did

11  you meet with anyone else other than Mr. Griffin

12  from Ripple?

13      A.   I don't recall.

14      Q.   Okay.  And what do you recall about your

15  initial conversation or conversations with

16  Mr. Griffin before you became a consultant?

17      A.   They were focused on explanations of how

18  the technology worked, broadly how the Ripple

19  technology worked.

20      Q.   Okay.  And what did Mr. Griffin tell

21  you?

22      A.   I'm sorry, by "Ripple technology," I

23  mean the -- the Ripple Ledger.

24      Q.   Okay.

25      A.   He explained the consensus mechanism

1  that the Ripple Ledger uses, the decentralized

2  exchange and other -- other aspects, which at the

3  time were -- were not really recorded clearly for

4  a nontechnical person to read.

5       Q.   Okay.  And then at some point you agreed

6  to work as a consultant for Ripple?

7       A.   That's correct.

8       Q.   And what were you doing in your role as

9  a consultant for Ripple?

10      A.   Generally speaking, making introductions

11 to many of the hedge funds with whom I had

12 existing relationships to act as a general

13 evangelist for the Ripple Ledger technology.

14      Q.   And when you say "general evangelist,"

15 what do you mean?

16      A.   At the time there was a budding interest

17 in digital assets broadly, but there wasn't much

18 understanding and there wasn't much awareness of

19 anything beyond bitcoin as a digital asset.  And

20 so there was, I think, value in having feedback

21 and awareness of the fact that the Ripple

22 technology -- Ripple Consensus Ledger technology

23 existed and hearing feedback from experienced

24 people in the financial market.

25      Q.   Okay.  And is this something that you

1   proposed to Mr. Griffin or that Mr. Griff --

2   Griffin proposed to you?

3               MR. GULAY:  Objection.

4     A.  I don't remember the genesis of it.

5     Q.  Was it an idea that you had before you

6   went to meet with Mr. Griffin, that it would be

7   good to introduce the technology to -- to hedge

8   funds?

9               MR. GULAY:  Objection.

10              MR. HORTON:  Objection to form.

11     A.  It would likely have been my idea

12   because I was actively seeking a -- a job and

13   try -- in the digital asset space and trying to

14   find where my skills would be most useful and

15   where I could, you know, find a job that I was

16   excited about.

17     Q.  Okay.  And at the time that you were

18   acting as a consultant for Ripple, were you still

19   employed by ███████████████

20     A.  I beli -- there may have been some

21   dovetailing, but generally speaking, it was after

22   I left ███████████████, when I was on a

23   noncompete with ███████████████.

24     Q.  Got it.  Okay.

25              And so during that summer in 2013 when

```
1    you were still in your consultant role, what is it

2    that you did on behalf of Ripple?

3         A.   That was a long time ago, so I don't

4    remember everything that I may have done, but

5    generally speaking, I was arranging meetings

6    and -- and bringing Patrick to meetings and the

7    two -- either he or the two of us were explaining

8    the Ripple Ledger technology to people in the

9    market.

10        Q.   And are these hedge funds that you're

11   meeting with or other types of institutions as

12   well?

13        A.   It's --

14             MS. BUNTING:  Objection.

15             MR. GULAY:  Objection.

16        A.   It's difficult to remember exactly who

17   we met with, but certainly there were hedge funds

18   amongst the group.

19        Q.   Okay.  And in those meetings, did the --

20   the institutions that you were meeting with

21   express interest?

22             MR. HECKER:  Objection to form.

23             MS. BUNTING:  Objection.

24        A.   Yes.

25        Q.   Okay.  What did they express interest
```

1 in?

2     A.   There was a broad but nascent interest

3 in digital assets broadly and this was an

4 innovative iteration of that and arguably the

5 first kind of major iteration beyond bitcoin and I

6 think people found that interesting.

7     Q.   So were -- were people expressing

8 interest to you in the digital asset itself or in

9 the technology or both?

10             MR. HORTON:  Objection.

11             MS. BUNTING:  Objection.

12             MR. GULAY:  Objection.

13     A.   We generally were explaining the

14 technology broadly and explicitly not focusing on

15 the digital asset itself, which is ancillary to

16 technology.

17     Q.   Other than the meetings that you just

18 described, do you remember anything else about

19 your work as a consultant in the summer of 2013

20 for Ripple?

21     A.   It's difficult to remember other

22 specifics given how long ago it was.

23     Q.   Okay.  How many meetings did you have in

24 that time, in the summer of 2013?

25             MR. GULAY:  Objection.

```
1        A.    It's difficult to say for certain.

2        Q.    Can you ballpark it at all?

3        A.    I would be guessing, I think.

4        Q.    Would you say more than a dozen?

5              MR. GULAY:  Objection.

6        A.    Somewhere between 10 and 30 if I had to

7   guess.

8        Q.    Okay.  And then at some point you became

9   a full-time employee of Ripple?

10       A.    That's correct.

11       Q.    And when did that happen?

12       A.    It was around the fall of 2013.

13       Q.    And how -- how did that come to be, that

14  you went from a consultant to a full-time

15  employee?

16       A.    I was fascinated by the technology and

17  found it to be incredibly innovative and decided

18  that I wanted to pursue this as my full-time use

19  of my time.

20       Q.    Before you became a full-time employee,

21  did you meet with others at Ripple to discuss your

22  employment?

23       A.    I believe just Chris Larsen.

24       Q.    And did you have a meeting with

25  Mr. Larsen?
```

34

```
 1          A.   I believe we met in person as well as
 2     had phone conversations.
 3          Q.   Okay.  And what was the nature of those
 4     conversations?
 5                MS. BUNTING:  Objection.
 6          A.   It's difficult to remember what was
 7     discussed beyond the fact that they were
 8     introductory, getting-to-know-you conversations
 9     typical of, you know, an interview and new
10     employment.
11          Q.   Were you expressing to Mr. Larsen your
12     ideas for how you could contribute to Ripple doing
13     business?
14                MR. HORTON:  Objection to form.
15                MS. BUNTING:  Objection.
16          A.   It's difficult to remember.
17          Q.   What did Mr. Larsen tell you, if
18     anything, about Ripple?
19                MR. GULAY:  Objection.
20          A.   Again, it's very difficult to remember
21     the specifics of a conversation from 2013 at this
22     point.
23          Q.   I understand that.  And I'm not
24     necessarily looking for specifics, but do you have
25     a general memory of what it is that you and he
```

1    discussed?

2                    MS. BUNTING:  Objection.

3                    MR. HORTON:  Objection.  Asked

4        and answered.

5        A.   I think I was selling him on my

6    abilities and he was selling me on the prospects

7    of the company as is typical of -- you know, in an

8    interview situation.

9        Q.   Okay.  And when you say your

10   "abilities," your abilities to do what?

11       A.   At the time I felt that I would be the

12   most -- the person with the most markets

13   experience to join the company, which was

14   primarily developers and -- and other start-up

15   entrepreneurs that didn't come from specifically a

16   trading background and so I thought that would be

17   valuable to the company.

18       Q.   Okay.  Why would markets -- markets

19   experience be valuable to the company?

20       A.   A major component of the Ripple Ledger

21   technology is a decentralized exchange and

22   understanding market conventions is valuable in

23   creating a software that will adhere to those

24   conventions for the -- for the financial world and

25   not reinvent the wheel in a bizarre way that --

```
 1    that is nonstandard for -- for financial

 2    professionals.

 3         Q.   Okay.  What was your title when you

 4    started at Ripple?

 5         A.   Director of markets and trading.

 6         Q.   And did that title change at any point

 7    during your employment with Ripple?

 8         A.   At some point I became the head of

 9    markets and trading.

10         Q.   Did your responsibilities change along

11    with the title change?

12         A.   My responsibilities were largely the

13    same throughout, though when I received the head

14    of markets and trading title, I also joined the

15    management committee of the firm.

16         Q.   And when was that?

17         A.   I don't recall without researching it.

18         Q.   Do you recall if it was near the

19    beginning or near the end of your tenure?

20         A.   It wasn't near the beginning so it was

21    near the middle or the end, but the specific date

22    I don't recall.

23         Q.   Okay.  When you first started as

24    director of markets and tradings, who did you --

25    trading, who did you report to?
```

37

```
 1        A.   I reported to Patrick Griffin throughout
 2    my tenure at the firm.
 3        Q.   So even when you were the head of
 4    markets and trading, you continued to report to
 5    Mr. Griffin?
 6        A.   That's correct.
 7        Q.   Okay.  Did anyone report to you during
 8    your time at Ripple?
 9        A.   I had one report towards the latter half
10    of my time there.
11        Q.   And who was that?
12        A.   ███████████
13        Q.   And is that when you were head of
14    market -- markets and trading or it was -- it
15    started before that?
16             MR. GULAY:  Objection.
17        A.   I'm not sure exactly how those two dates
18    relate to one another.
19        Q.   Okay.  How many people were at Ripple
20    when you started in -- when you started as a
21    consultant in the summer of 2013?
22        A.   Less than 20, I believe.  Maybe 15.
23        Q.   And when you started as the director of
24    markets and trading, what did you understand that
25    your responsibilities would be in that role?
```

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

```
 1          A.   My primary responsibility was to recruit

 2     and onboard market-making firms, which is a type

 3     of trading firm, to participate in -- on the

 4     Ripple Ledger as market makers.  My secondary

 5     responsibility was educational in nature.

 6     Generally providing explanations and general

 7     evangelism of the technology within the -- the

 8     financial market world.

 9          Q.   And both of these -- these primary and

10     secondary responsibilities are things that you

11     discussed with Mr. Larsen before you began as

12     director of markets and trading?

13                    MS. BUNTING:  Objection.

14                    MR. HORTON:  Objection to form.

15          A.   They're things I discussed with Patrick

16     Griffin.  They may or may not have been discussed

17     with Chris Larsen.  I don't recall me discussing

18     directly or not.

19          Q.   Okay.  And did the nature of your

20     responsibility change over time during your tenure

21     at Ripple?

22          A.   No.

23          Q.   Did you have an annual salary while at

24     Ripple?

25          A.   Yes.
```

1      Q.   What was your salary?

2      A.   It was approximately ██████ a year.

3      Q.   And did you receive a bonus?

4      A.   I received equity-based compensation and

5  I received incentive-based compensation in XRP for

6  meeting performance goals.

7      Q.   What was your equity-based compensation?

8      A.   I believe it was ████████ in the

9  company over a four-year vesting period, but my

10  recollection is fuzzy without looking at the

11  numbers again.

12      Q.   Do you still have equity in Ripple?

13      A.   I do still have my employee equity

14  compensation, yes.

15      Q.   The full amount of equity?

16      A.   I believe so, yes.

17      Q.   And do you know how much you have in

18  equity currently?

19      A.   It's difficult to say since it's a

20  private company and there's no visible market for

21  it.

22      Q.   Do you have a ballpark?

23      A.   I would be guessing.

24      Q.   Do you have a sense if it's in the

25  millions of dollars, in the tens of millions of

40

```
1    dollars, or something else?

2                MR. HORTON:  Objection.

3         A.   If I wagered a guess, I would say it's

4    about ███████  but, again, the -- I think the --

5    the prices even on a given day can vary by a

6    hundred percent depending on where the transaction

7    happens and who -- who transacts.

8         Q.   Okay.  And you're -- and you said you

9    had incentive-based compensation that was paid out

10   in XRP?

11        A.   Correct.

12        Q.   Okay.  And what was your incentive-based

13   compensation?

14        A.   I received -- my memory on the exact

15   number is fuzzy, but I believe a total of ████

16   ████████

17        Q.   And this is in total during your time at

18   Ripple?

19        A.   Correct.

20        Q.   Okay.  And what was this compensation

21   based on?

22                MR. HORTON:  Objection to form.

23        A.   It was a performance bonus in exchange

24   for signing up a specific number of market-making

25   firms during my time there.
```

41

```
 1        Q.   And what was the specific number?
 2             MR. GULAY:  Objection.
 3        A.   I believe it was five, but the specifics
 4   are hazy without researching it.
 5        Q.   So when did you get this incentive-based
 6   compensation?
 7        A.   It would have been towards the end of my
 8   time at Ripple.
 9        Q.   Do you still own XRP?
10        A.   Not any material amount.  I'm sure
11   accounts that I control still have a de minimis
12   amount, like in the tens of dollars, but it's
13   accidental.  There's no material amount that I
14   currently hold.
15             THE REPORTER:  "There's no
16        material amount that"?
17        A.   I don't cur -- there's no material
18   amount that I currently hold.
19        Q.   So you sold the ████████████ or so
20   XRP?
21        A.   That's correct.
22        Q.   Okay.  When did you sell it?
23        A.   It was over a period of several months.
24   The exact time I don't recall, but it would have
25   been around 2014, 2015.
```

1      Q.   Was it while you were still at Ripple?

2      A.   I don't recall whether my transactions

3  began while I was still at Ripple or immediately

4  after.

5      Q.   And how did you sell your XRP?

6      A.   Through -- through exchanges on the

7  Ripple Ledger.  I don't remember if that was

8  exclusively the way I did it given how much time

9  has passed, but that was predominantly how it was

10  done.

11      Q.   Which exchanges?

12      A.   I recall that Bitstamp was one of the

13  exchanges with significant liquidity at the time

14  that I used, but I don't recall if that was

15  exclusively what I used given how much time has

16  passed.  I -- I'm sure that I used others, but I

17  don't recall which.

18      Q.   And who did you sell it to?

19      A.   I don't know.

20      Q.   How much did you sell it for?

21      A.   Approximately ███████████ in

22  total, but the exact total I would have to check

23  to be certain of.

24      Q.   Other than that ███████ XRP,

25  have you at any point bought other XRP?

43

```
 1        A.   I regularly --
 2             MS. BUNTING:  Objection.
 3        A.   I regularly bought -- I regularly
 4   transacted on the network because I felt it was
 5   important to use the product to understand it
 6   better.  So I -- I made transactions regularly,
 7   not necessarily with a -- with an economic goal of
 8   any type.
 9        Q.   Well, what kinds of transactions?
10        A.   I thought it was important to make a
11   breadth of transactions given my role as head of
12   markets and trading to understand the system.  So
13   I would try and make all types of transactions to
14   understand things are working correctly and
15   understand if things can be improved.
16        Q.   Can you give me some examples of the
17   types of transactions you -- you made?
18        A.   Generally speaking, transactions on
19   Ripple, on the Ripple Ledger, are exchanging one
20   type of asset for another type of asset.  And so I
21   frequently transacted all types of assets for all
22   other types of assets to test the system, demo the
23   system, et cetera.
24        Q.   And were you doing this with your own
25   funds or with Ripple's funds?
```