1       A.   They were compensated --

2               MR. GULAY:  Objection.  Sorry.

3        Objection.  And can you just clarify which

4        market makers we're talking about?

5               MS. STEWART:  Well, I think his

6        last answer was generally about mark --

7        market makers during his time at Ripple so

8        I'm -- that's what I'm asking about.

9       A.   I don't recall the specifics of any

10   particular market-making agreement, but, in

11   general, they were similar.  And, in general,

12   they -- the compensation was an exchange for

13   fulfilling the agreement in its totality, not for

14   specific parts of the agreement.

15       Q.   Is it fair to say that the focus of the

16   agreement was on trading pairs that included XRP?

17               MR. HORTON:  Objection to form.

18               MS. BUNTING:  Objection.

19       A.   I would disagree with that.

20       Q.   And why would you disagree with that?

21       A.   Because I don't believe the focus was on

22   pairs that included XRP.

23       Q.   Was there a focus?

24               MR. HORTON:  Objection to form.

25               MR. GULAY:  Objection.

87

1          MS. BUNTING:  Objection.

2     A.   No.

3     Q.   So going back to PR-10 and looking at

4  the very bottom e-mail, which starts at the bottom

5  of the first page and runs to the second page,

6  which appears to be an e-mail from you to

7  Mr. ████, do you see that?

8     A.   Yes.

9     Q.   And you -- you say to Mr. ████ "As I

10 mentioned, government guidance has been sparse,

11 but here are two bitcoin-centric things that were

12 issued earlier this year."

13          Do you see that?

14    A.   Yes.

15    Q.   So this -- this suggests that you had an

16 earlier conversation with Mr. ████ is that

17 right?

18    A.   I recall having a number of phone calls

19 with him and this e-mail implies that we had a

20 phone call prior to this e-mail, yes.

21    Q.   Okay.  And what did you discuss with

22 Mr. ████ on the -- on the subject of government

23 guidance being sparse?

24    A.   I don't recall the specifics of our

25 conversations from 2013 apart from the fact that I

```
1    was providing a general overview of Ripple.
2         Q.   You say in the next sentence "We
3    emphasize that Ripple is different from bitcoin in
4    many ways."
5              Do you see that?
6         A.   Yes.
7         Q.   Okay.  What did you mean by that?
8              MR. GULAY:  I just want to pause
9         here and ask Mr. Rapoport to answer
10        without revealing the substance of any
11        privileged communications he may have had
12        with Perkins Coie or other counsel.
13   BY MS. STEWART:
14        Q.   And I would add to that the extent you
15   had passed on whatever communications you would --
16   you had had to third parties, like Mr. ████████
17   then I think your counsel would agree that you can
18   testify about those.
19             MR. GULAY:  Well, no, I don't
20        agree with that.  I think to the extent
21        your understanding of this language here,
22        that Ripple is different from bitcoin in
23        many ways, is derived from your
24        communications with counsel, then I would
25        instruct you not to testify.
```

89

1   BY MS. STEWART:

2       Q.   Can you testify without revealing

3   communications with counsel?

4       A.   Yes.

5       Q.   Okay.

6       A.   Can you repeat your question again?

7       Q.   I want to know what you meant when you

8   wrote "I'd reemphasize that Ripple is different

9   from bitcoin in many ways."

10      A.   I don't recall the specifics of this

11  conversation, but given the context of the e-mail,

12  I believe that this is referring to the fact that

13  bitcoin and XRP share similarities in being a

14  math-based digital asset; but the Ripple network

15  also includes IOUs or balances of iss -- of

16  issuers, which is unique to Ripple and not shared

17  by bitcoin, as well as a decentralized exchange

18  which bitcoin doesn't -- doesn't contain.

19              MR. TENREIRO:  Before we move on,

20          I just want to create a record on this

21          because we're having this and we continue

22          to have this.  You're instructing him not

23          to answer what counsel told him even if he

24          disclosed that to a third party?

25              MR. GULAY:  No.  We're talking

1          about the language in the e-mail here and

2          I think the question was what Mr. Rapoport

3          understood when he wrote that language.

4          And I'm -- I'm instructing him not to

5          testify to the extent that his

6          understanding of this language here

7          derives from his communications with

8          counsel.

9               MR. TENREIRO:  But if he conveyed

10         his understanding of that language to a

11         third party, he can then testify to it,

12         right?  Because he's disclosed it.

13              MR. GULAY:  Well, no, I mean,

14         obviously he -- you know, he conveyed this

15         white paper to third parties, and you

16         know, the -- the white paper has been

17         produced and is not privileged.  But,

18         like, to give you an example, to the

19         extent he had discussions with counsel

20         about this white paper and the preparation

21         of the white paper, we would assert

22         privilege over that.

23              MR. TENREIRO:  Absolutely.  But

24         if he disclosed the conversations with

25         counsel in conversations about the white

1    paper with the third party that's copied

2    in the e-mail, that's not privileged.

3              MR. GULAY:  I just don't under --

4    I don't understand what that means,

5    though.  Like, what's the scope of, you

6    know, the extent of, like, disclosing

7    conversations with counsel?  I don't

8    understand.

9              MR. TENREIRO:  The guy might have

10   asked him What did you mean by, you know,

11   bitcoin is different from XRP?  And he

12   might have answered.

13             MR. GULAY:  We're going to

14   instruct him not to answer.

15             MR. TENREIRO:  You're going to

16   instruct him not to answer.  Okay.  We're

17   going to reserve our rights.

18             MR. GULAY:  That's fine.

19             MR. TENREIRO:  Okay.  Go on.  And

20   also -- I just want to also point out for

21   the record that there has been a limited

22   waiver on the Perkins Coie memos

23   themselves, so, you know, we should also

24   keep that in mind.  But we obviously don't

25   agree with you that if he answered a third

1          party's question, What did you mean by

2          bitcoin is different than XRP? that that

3          conversation cannot be repeated here

4          because it's obviously not privileged.

5          But I -- I have your position.  We

6          disagree.

7                  MS. ZORNBERG:  I'll just add

8          that, you know, we can take it on a

9          case-by-case basis.  If you actually lay a

10         proper foundation for there being some

11         discussion between a third party, we're

12         happy to revisit it in the context of a

13         foundation being laid as to a particular

14         conversation.  I do think it needs to be

15         done on a case-by-case basis.

16                 MR. TENREIRO:  That's fair.

17                 MS. ZORNBERG:  In any event, the

18         witness said that he could answer the

19         question without revealing legal advice

20         that Ms. Stewart put to him and he did.

21         So I don't think there's an issue for this

22         particular instance.

23                 MR. TENREIRO:  Okay.

24    BY MS. STEWART:

25         Q.   Mr. Rapoport, was your statement here

1     that Ripple is different from bitcoin in many ways

2     related to the -- to the issue of government

3     guidance that you seem to be referring to in this

4     paragraph?

5               MR. GULAY: Same instruction

6        about your discussions with counsel.

7       A.   I don't recall my intent and whether or

8     not there's a link between those sentences.

9       Q.   Okay. I understand your testimony that

10    the technologies of bitcoin and -- and XRP are

11    different; but my question is, did you have an

12    understanding at this time, in 2013, that

13    regulatory guidance was different as to bitcoin

14    and XRP?

15               MS. BUNTING: Objection.

16               MR. GULAY: Same instruction

17        about discussions with counsel.

18       A.   That's a very broad question. Because

19    Ripple as a technology includes balances issued by

20    an issuer, as well as a decentralized exchange, my

21    understanding was and is that there are inherently

22    additional considerations as a result of those

23    things from a regulatory perspective that don't

24    apply to bitcoin.

25       Q.   And what are those additional

94

1    considerations?

2              MR. GULAY:  Objection; foundation

3         and same instruction about discussions

4         with counsel.

5         A.   I'm not a lawyer to really express that,

6    to answer that in a -- in a coherent way I think.

7         Q.   Well, but you -- you say that you have

8    an understanding that there are differences.

9              So do you have any general sense of what

10   the differences are?

11        A.   Well --

12             MS. BUNTING:  Objection.

13        A.   I generally understand that exchanges,

14   for example, have -- may have regulatory framework

15   applied to them.  And if one technology has a

16   built-in exchange and one doesn't, there may -- I

17   understood that there may be other considerations

18   that would apply.  But the specifics of those

19   considerations, I -- I don't profess to

20   understand.

21        Q.   Okay.  At the end of your -- your e-mail

22   to Mr. ███████  you say "Also, in case it's of

23   interest to you, this law firm has established

24   itself as the early expert in these technologies."

25    And you send a link to the Perkins Coie website.

1         Do you see that?

2     A.   Yes.

3     Q.   Okay.  And why did you send this link to

4  Mr. █████████

5     A.   Back in 2013 there was a limited number

6  of law firms with domain expertise in the digital

7  asset space.  And I think many people would find

8  it pretty daunting to get a friend -- you know, a

9  law firm without domain expertise in that area up

10  to speed to provide legal advice.

11         And so I found it -- I think people

12  found it helpful to be informed about which law

13  firms already had clients in the space and

14  familiarity with the space.

15     Q.   So are you suggesting to Mr. █████████

16  that -- that his client, Mr. █████████   engage

17  Perkins Coie?

18              MR. HECKER:  Objection.

19              MR. GULAY:  Objection.

20     A.   I wasn't making any kind of

21  recommendation or suggestion.

22     Q.   Okay.  So, again, I'm not sure I

23  understand what the purpose is of -- of sending

24  Mr. ████████  the Perkins Coie website link.

25              MS. BUNTING:  Objection.

```
 1              MR. HORTON:  Objection to form.

 2              MS. BUNTING:  What's the

 3        question?

 4  BY MS. STEWART:

 5        Q.   I want to know why you sent to

 6  Mr. ███████ this link to the Perkins Coie website.

 7              MR. HORTON:  Objection; asked and

 8        answered.

 9              MR. GULAY:  Objection.  He

10        answered that question.

11        A.   I believe I answered that question,

12  which is that I believed it helpful for someone

13  new to the space that would likely be seeking

14  legal representation about the space to be aware

15  of law firms that already had domain expertise in

16  the space.

17        Q.   At the time you sent this e-mail, was

18  Perkins Coie counsel for Ripple?

19        A.   I was not aware of which law firms were

20  officially engaged and not engaged by Ripple and

21  at what times.  I was aware of this memo and other

22  similar memos, but that was the extent of my

23  knowledge of Ripple's dealings with Perkins Coie.

24        Q.   So -- so fair to say at this time in

25  2013, you understood that Perkins Coie at some
```

1    point had been counsel to Ripple?

2                MR. HORTON:  Objection to form.

3        A.    It's -- let me actually correct that

4    because I did have phone calls at times with

5    legal -- with Ripple's outside counsel, but the

6    specifics of which counsel and what time are

7    difficult for me to remember given how much time

8    has passed.

9        Q.    Okay.  But at the time of -- of this

10   e-mail exchange in PR-10, did you have an

11   understanding that PR Coie -- that -- that Perkins

12   Coie had acted as counsel to Ripple at some point

13   in the past?

14               MR. HORTON:  Objection to form.

15       A.    Based on this memo, my -- it's a

16   reasonable assumption that -- that that Perkins

17   Coie was engaged by Ripple, and so that would have

18   been my assumption today and at the time.

19       Q.    Okay.  And -- and I take it that's

20   because the -- the -- the memo says "Perkins Coie"

21   on top?

22               MR. GULAY:  Objection.

23       A.    Correct, though this is an unusual

24   document that says who can I contact for questions

25   and includes both Patrick Griffin of Ripple Labs

1    and █████████ of Perkins Coie, which isn't

2    typical of a legal memo.

3        Q.   Okay.  And why were you sending this

4    document entitled "White Paper" to Mr. ██████

5        A.   I don't recall what my thought process

6    was back in 2013, but I believe that at a minimum,

7    this document would help familiarize someone new

8    to this space with what some of the key questions

9    may be as they begin an investigation into the

10   space.

11       Q.   Did Ripple at any point sell XRP to

12   ████████████████?

13       A.   I don't believe so, but my recollection

14   is too fuzzy to say that definitively.

15       Q.   Did Ripple at any point sell XRP to

16   Mr. ████████ or any other company affiliated with

17   him?

18              MS. BUNTING:  Objection.

19              MR. HORTON:  Objection.

20              MR. GULAY:  Objection.  Just to

21        clarify, what time period are you talking

22        about?

23              MS. STEWART:  At any point during

24        Mr. Rapoport's tenure.

25              MR. GULAY:  Okay.

99

```
 1        A.   Same answer, which is I don't believe
 2   so, but my recollection is too hazy to say
 3   definitively no.
 4             MR. TENREIRO:  They're not
 5        collated correctly.
 6             MS. STEWART:  Nicole, the -- the
 7        next exhibit is PG-5 -- 6, sorry.  PG-6.
 8        That should be in a separate folder,
 9        Nicole.
10   BY MS. STEWART:
11        Q.   Okay.  So for the record, I've handed
12   you a document that was previously marked as PG-6,
13   and it's Bates numbered RPLI_SEC 0337666 through
14   673.
15             (Pause)
16        A.   Okay.  I've reviewed this.
17        Q.   Okay.  What is this document?
18        A.   I don't recall this document
19   independently, but based on the cover e-mail, it
20   appears to be a document that Patrick put together
21   to share with
22        Q.   Who is
23        A.   She's a            professor and
24                               who was an advisor to
25   Ripple at various points in time.
```

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

1       Q.    Was she an advisor to Ripple in 2013?

2       A.    I'm not sure of her official status, but

3    she certainly provided informal advice to us on a

4    number of occasions.

5       Q.    Okay.  And from -- from Mr. Griffin's

6    cover e-mail to you, it -- it -- it -- it seems

7    that he intends to send this document to

8    ████████████████

9          Is that -- is that your understanding?

10      A.    That's my understanding, yes.

11      Q.    Okay.  And what was the purpose of this

12   document that's attached to Mr. Griffin's e-mail

13   to you?

14               MR. GULAY:  Objection;

15     foundation.

16      A.    I don't recall the document, but from

17   reading it, it appears that it's a document aimed

18   at discussing distribution of XRP with ████████

19      Q.    Do you remember discussing that issue

20   with ████████

21      A.    I have a general recollection of

22   discussing that issue with her, yes.

23      Q.    What's your recollection?

24      A.    That we viewed her to be a very

25   intelligent thinker about systems and markets and

```
 1    that we viewed her advice on those topics as very

 2    valuable.

 3         Q.   And was this part of your and

 4    Mr. Griffin's efforts to develop a distribution

 5    strategy --

 6              MS. BUNTING:  Objection.

 7         Q.   -- for XRP?

 8         A.   We were interested in thinking about the

 9    most effective ways to get XRP into the world and

10    distribute it.

11         Q.   Okay.  Was -- is it fair to say that

12    that was a distribution strategy?

13              MR. GULAY:  Objection.

14         A.   I think an overall strategy was

15    discussed at times that specific tactics were not

16    well defined and the company continued to

17    experiment for most all of my time there.

18         Q.   Okay.  Is it fair to say that you were

19    developing a distribution framework for XRP as --

20    as seems to be the title of this document?

21              MR. GULAY:  Objection.

22         A.   This was a discussion document from what

23    I can tell.  And, yes, it appears to discuss a --

24    a framework around how the company could

25    distribute its XRP.
```

102

1      Q.   Okay.  Did you provide comments to

2    Mr. Griffin in this document?

3      A.   I don't recall whether I provided

4    comments on this document.  It's certainly a topic

5    we discussed at times.

6      Q.   Okay.  Do you remember discussing

7    this -- this deck, a draft of which is attached in

8    PG-6, with Mr. Griffin?

9      A.   I don't remember this e-mail or this

10    deck given the amount of time that's passed.

11      Q.   Okay.

12          MS. STEWART:  Can we look at

13     PR-16 next?

14          (Whereupon, exhibit is presented

15     and marked SEC Rapoport Exhibit PR-16 for

16     identification.)

17          MS. STEWART:  PR-16 is Bates

18     numbered RPLI_SEC 0012358.

19          (Pause)

20      A.   Okay.  I've reviewed this.

21      Q.   Okay.  Does this document refresh your

22    recollection that you provided comments to

23    Mr. Griffin on the deck that we were just looking

24    at?

25      A.   I see the responses and they're clearly

103

1    from me, but I don't have a specific recollection

2    of -- of this e-mail.

3         Q.   Okay.  Looking at the top e-mail from

4    you to Mr. Griffin dated 11/30/2013 and looking

5    at, I guess the fourth bullet point, you say "We'd

6    prefer to attract speculators who take a long-term

7    view and believe XRP demand will overwhelm supply

8    as commercial use of the network increases."

9              Do you see that?

10        A.   Yes.

11        Q.   What did you mean by this sentence?

12        A.   I was aware of the fact that some people

13   were speculating on the price of XRP.  And given

14   the choice, I would have preferred people who took

15   a long-term view on that.

16        Q.   Okay.  So let's unpack that a little.

17             How were you aware that some people were

18   speculating on XRP?

19        A.   Despite our efforts to focus

20   conversations on the protocol and not the digital

21   asset, as some of the e-mails you've already shown

22   indicate, at times people would e-mail us

23   indicating that they're speculating on the price

24   of XRP or speak to us or -- you know, along that

25   topic.

104

1    Q.   And why is it that you preferred

2    speculators who took a long-term view?

3    A.   Parsing this sentence, and I don't

4    recall what my thought process was when I wrote

5    this, but it appears that I'm referring to -- the

6    second sentence here says "If you believe 500

7    million people will eventually use Ripple, then

8    there's far less concern of an XRP supply

9    overhang."  And that refers to a concern that was

10   in the marketplace about -- not specific to

11   Ripple, but that applied to Ripple, a concern

12   about one holder holding a large amount of a

13   digital asset.

14         And so I interpret this comment to be

15   that you would not have that concern if you took a

16   very long-term view of the protocol and what may

17   become of the protocol.  You would not be

18   concerned about the supply overhang from one large

19   holder -- in this case Ripple -- holding a digital

20   asset.

21   Q.   Okay.

22         MS. ZORNBERG:  And Ripple there,

23      you're talking about Ripple Labs?

24         THE WITNESS:  I'm talking about

25      Ripple Labs, excuse me.

105

1    BY MS. STEWART:

2        Q.   Okay.  The next bullet, you say "Good BD

3  giveaways" will resul -- "will result in more

4  demand than supply.  The announcement of the

5  giveaway/partnership should generate demand."

6        Do you see that?

7        A.   Yes.

8        Q.   Okay.  What -- what did -- what does "BD

9  giveaways" mean as you use it in the sentence?

10       A.   "BD" refers to business development and

11  "giveaway" refers to the business development team

12  making a grant of XRP to somebody or some company.

13       Q.   Okay.  And when you say "The

14  announcement of the giveaway/partnership should

15  generate demand," are you referring to any

16  particular announcement or to announcements of

17  giveaways and partnerships in general?

18       A.   That's a general comment.

19           MR. GULAY:  Objection.

20       Q.   Okay.  So you -- you mentioned that you

21  were aware from e-mails, like some of the ones

22  we've looked at already, that certain people

23  were -- were speculating on XRP.

24       Do you remember that?

25       A.   Yes.

106

1          Q.    Okay.  Do you recall receiving e-mails

2     or having conversations with -- with particular

3     individuals or firms about them speculating on

4     XRP?

5                    MS. BUNTING:  Objection.

6          A.    I was generally aware -- I recall being

7     generally aware of that fact, but I don't recall

8     specific discussions, you know, from seven years

9     ago about it.

10         Q.    Do you recall discussions internally at

11    Ripple about individuals or firms who were

12    speculating on XRP?

13         A.    I recall a specific desire to focus our

14    discussions on the technology itself and away from

15    speculation on an XRP.

16         Q.    And why is that?

17         A.    Because we viewed speculation on XRP to

18    be a distraction from the core technology and the

19    use of the core technology.

20         Q.    But is it fair to say that speculation

21    was also helpful in building liquidity for XRP?

22                    MR. HORTON:  Objection to form.

23                    MS. BUNTING:  Objection.

24         A.    Building liquidity means getting more

25    volume.  So anything that gets more volume is

107

1    helpful to building liquidity.  And so speculator

2    trading creates volume, so, yes.

3         Q.   Okay.

4              MS. STEWART:  Let's look at a

5         document we've previously marked as PG-5.

6              Nicole, that's also in a

7         separate folder.

8              And for the record, PG-5 is

9         Bates numbered RPLI_SEC 0012359 through

10        12368.

11             (Pause)

12        A.   Okay.  I've reviewed it.

13        Q.   Okay.  Is it fair to say that the

14   attachment to PG-5 reflects some of the comments

15   you gave Mr. Griffin in the last exhibit we looked

16   at?

17        A.   I see some of the same language

18   included, yes.

19        Q.   Okay.  So do you recall a conversation

20   with Ms. Athey after Mr. Griffin sent her this

21   deck in PG-5?

22        A.   I don't -- I -- I generally remember

23   speaking with Ms. █████ at various points in time,

24   but I don't remember the specific discussion or

25   anything about it.

108

1      Q.   Okay.  The cover e-mail in PG-5
2  references "Thank you for your time here.  We
3  really value your input.  As promised, here is a
4  summary of the themes we touched on during our
5  call on Wednesday."
6           Just to -- just to make sure, do you
7  remember the call that's referenced here with
8  Ms. ███?
9      A.   I don't.
10     Q.   Okay.  So looking at the -- at the deck,
11 on page -- on the second page of the -- of the
12 deck, which is Bates numbered on the bottom 12362,
13 where the title is "Goal of Distribution," do you
14 see that?
15     A.   Yes.
16     Q.   Okay.  And there's two bullets under
17 there.  The first is "Network growth."
18          Do you see that?
19     A.   Yes.
20     Q.   And what does that mean?
21     A.   This is such a sparse slide that I would
22 be guessing as to the meaning of -- you know, the
23 meaning that Patrick ascribed to this when he
24 wrote it.
25     Q.   Well, the -- the second bullet says

109

1     "Raise funds for Ripple Labs operation."

2            Do you see that?

3     A.   Yes.

4     Q.   Okay.  What does that mean to you?

5                MR. GULAY:  Objection;

6       foundation.  And just to clarify, what

7       does it mean to him sitting here today or

8       what did it mean to him at the time?

9  BY MS. STEWART:

10    Q.   Well, let's start with at the time that

11 you reviewed and commented on it.

12           What -- what did this mean to you?

13    A.   This was almost eight years ago and, you

14 know, one month into my tenure at the company.

15 I -- I really don't remember any specifics about

16 this interaction apart from what I'm looking at

17 today that you just showed me.

18    Q.   Okay.  Do you recall at the time, in

19 2013, having an understanding that one of the

20 goals of distributing XRP was to raise funds for

21 the operations of Ripple Labs?

22    A.   I was aware that the company received

23 revenue from the sale of XRP, yes.

24    Q.   Okay.  But -- but -- but I guess my

25 question is a little bit different.

1    Did you have an understanding that one

2  of the reasons that the company sold XRP was

3  specifically to raise money to fund its

4  operations?

5    MS. BUNTING:  Objection.

6    A.   I was aware that the company received

7  venture funding and also that the company took in

8  dollars from the sale of XRP.  I did not have

9  visibility or I do not recall having visibility

10  into the financial health of the firm and whether

11  this was required to fund operations or for other

12  reasons.

13    Q.   Okay.  Did you have an understanding in

14  2013 that one of the goals of distributing XRP was

15  to grow the Ripple network?

16    A.   Yes.

17    Q.   Okay.  And is it fair to say that the

18  bullet here "Network growth" refers to growing the

19  Ripple network?

20    A.   I think that seems like a reasonable

21  assumption, yes.

22    Q.   Okay.  Moving on to the next page, which

23  is Bates numbered 363 at the end, and this refers

24  to three phases of Ripple -- of Ripple's long --

25  I'm sorry.  Let me start again.

111

1              The title of this page is "Long-term

2     Stages of Ripple."

3              Do you see that?

4        A.   Yes.

5        Q.   And three phases are referenced here?

6        A.   Yes.

7        Q.   Okay.  Did you discuss these phases with

8     Mr. Griffin?

9        A.   I don't have any recollection of whether

10    we discussed it, but this e-mail implies that I

11    read this document and provided some feedback and

12    that a discussion with Susan was had.

13       Q.   Okay.  Phase 1, it says here, is titled

14    "Speculatively valuable."

15             Do you see that?

16       A.   Yes.

17       Q.   And it says "In this stage, XRP is new

18    and few adopters.  XRP is valuable among

19    speculators."

20             Do you see that?

21       A.   Yes.

22       Q.   Okay.  In 2013 what phase of these three

23    phases was Ripple in?

24             MR. GULAY:  Objection.

25       A.   I don't know that I'd characterize these

112

1    three phases from a discussion document as a

2    necessarily accurate depiction of the trajectory

3    of anything.

4        Q.   Okay.  Well, let me ask you, looking at

5    these three phases now, are these accurate?  Are

6    these accurate descriptions of the trajectory of

7    the Ripple network?

8                 MR. GULAY:  Objection.

9        A.   I would not describe -- use this

10   framework to describe Ripple.

11                MR. GULAY:  Just to clarify, are

12        you referring to Ripple Labs or Ripple

13        network?

14       A.   I would not use this framework to

15   describe anything.

16       Q.   Okay.  In this document, when it says

17   "Long-term Stages of Ripple," what does "Ripple"

18   mean?

19                MR. GULAY:  Objection;

20        foundation.

21       A.   I believe it refers to the network, but

22   it's a bit ambiguous.

23       Q.   Okay.  So your testimony is that you

24   don't think what's -- the phases that are listed

25   here is an accurate description of the Ripple

113

1   network?

2          A.   I don't view this as a particularly good

3   framework of anything.

4          Q.   Okay.  Do you agree that in 2013 XRP was

5   new and had few adopters?

6          A.   Yes.

7                MS. BUNTING:  Objection.

8          Q.   And do you agree that in 2013, XRP was

9   valuable among speculators?

10         A.   What does "valuable" mean in this

11  context?

12         Q.   Well, I'm -- I'm reading the words in

13  the document that you and Mr. Griffin prepared.

14  So in the context --

15               MR. HECKER:  Objection.

16               MR. GULAY:  Objection.  Just to

17        clarify his testimony, he said he did not

18        prepare the presentation.

19         Q.   Okay.  But you reviewed and commented on

20  the presentation, right?

21               MR. HORTON:  Okay.  Counsel, I

22        also want to object.  The document doesn't

23        say that XRP is valuable among speculators

24        in 2013.

25               MS. STEWART:  Well, I'm -- the

1       question I'm trying to understand is I

2       want to know at the time that -- that this

3       document was prepared, what phase did

4       Mr. Griffin and Mr. Rapoport believe that

5       the company -- or that Ripple -- the

6       Ripple network was in.

7 BY MS. STEWART:

8     Q.   So you're saying that you don't agree

9 with these phases. So I'm trying to ask the

10 question in a slightly different way and ask you

11 whether in 2013 XRP was valuable among

12 speculators.

13         MR. GULAY: Objection; asked and

14     answered.

15         MS. BUNTING: Objection.

16         MR. HORTON: Objection.

17         You can answer the question.

18     A.   If we take a dictionary definition of

19 valuable as something that -- I don't have a

20 dictionary in front of me, but something that

21 people will exchange money for, I think XRP had

22 some value to some people and those people were

23 primarily speculators or people who were -- sought

24 to use the network for other purposes, that they

25 would be required to purchase some XRP in order to

1    use the network.  And that would be reasons that

2    someone would ascribe a monetary value to a

3    digital ledger entry.

4        Q.   Okay.  In 2013 were there people who

5    used the Ripple network?

6        A.   Yes.

7        Q.   Okay.  For what purposes?

8            MR. GULAY:  Objection;

9         foundation.

10       A.   I'm not a -- I can't say definitively

11   all the purposes, but certainly people used the

12   Ripple network from a technologist experimenting

13   perspective as well as for exchanging one asset

14   for another type of asset.  For example,

15   exchanging bitcoins for dollars.

16       Q.   Okay.  Looking at the next page of this

17   presentation, which is Bates numbered 364, where

18   the header is "Goal of XRP Allocations," do you

19   see that?

20       A.   Yes.

21       Q.   Okay.  And do you see the first bullet

22   that says "Biggest goal is existential"?

23       A.   Yes.

24       Q.   Okay.  What does that mean?

25            MR. GULAY:  Objection; vague.

116

1          A.   I'm -- I'm not sure what that means to

2     be honest.

3          Q.   The second bullet that says "Reason for

4     doing anything is to grow the network," do you see

5     that?

6          A.   Yes.

7          Q.   What does that mean?

8               MR. GULAY:  Objection.

9          A.   I'm -- I'm not really sure what that

10    means specifically.  It's a very broad statement

11    that seems poorly crafted.

12         Q.   Do you recall when you initially

13    reviewed this presentation asking Mr. Griffin

14    what -- what these bullets meant?

15         A.   This appears to be one or two months

16    into my employment reporting to Mr. Griffin, and

17    so the nature of my comments was a subordinate

18    responding to, you know, the person they report

19    to.  So I wouldn't necessarily critique the -- you

20    know, parse every single sentence in the way that

21    I think you're suggesting.

22         Q.   Okay.  The next bullet, it says "Phase

23    1:  Striking partnerships for inorganic growth,"

24    and underneath that it says "Distribution is for

25    business development."

117

1      Do you see that?

2      A.   Yes.

3      Q.   Okay.  What does that mean?

4           MR. GULAY:  Objection.

5      A.   It seems to generally refer to a

6  strategy of distributing XRP to companies that aid

7  in the business development of -- in the

8  development of the Ripple network.

9      Q.   And -- okay.

10          The -- the next bullet says "Any

11 currency strategy should be geared to making Phase

12 2, 3, more successful."

13          Do you see that?

14     A.   I do.

15     Q.   And what does that refer to?

16          MR. GULAY:  Objection.

17          If you know.

18     A.   I don't know.  And, again, my -- my

19 feedback on this was limited to the nature of

20 feedback a subordinate would give to his new boss.

21 So I didn't pick apart every single bullet even if

22 I didn't fully understand what it meant after two

23 months at the company or however many months in

24 this was.

25     Q.   Okay.  Going on to two pages later,

118

1    12366 that says "Current Distributions" on top.

2         A.   Yes.

3         Q.   The first bullet says "There are ways to

4    increase supply that create a bigger increase in

5    demand."  And under it it says "Good BD giveaways

6    will result in more demand than supply.  The

7    announcement of the giveaway/partnership should

8    generate demand."

9              Do you see that?

10        A.   Yes.

11        Q.   Is this the idea that you had given

12   Mr. Griffin in the last exhibit that we looked at?

13        A.   Yes, this looks like the same language

14   from my e-mail.

15        Q.   Okay.  And then moving on to the next

16   page, Bates numbered 2367, that's titled

17   "Speculators."

18             Do you see that?

19        A.   Yes.

20        Q.   So do you see the first bullet, it says

21   "We'd prefer to attract speculators" who -- "who

22   take a long-term view and believe XRP demand will

23   overwhelm supply as commercial use of the network

24   increases"?

25        A.   Yes.

119

```
 1        Q.    Is that also an idea that you had given
 2   Mr. Griffin in your comments?
 3        A.    Yes, it looks like the same language.
 4        Q.    Okay.  And then you see the -- the third
 5   bullet, it says "If you are holding XRP, you
 6   should not want RL to retain XRP for business
 7   development."
 8             Do you see that?
 9                 MR. HECKER:  Objection.
10                 MR. HORTON:  Objection.  Counsel,
11        it doesn't say "you should not want."
12                 MS. STEWART:  Oh, I'm sorry.
13        Thank you.  I'll -- I'll rephrase that.
14   BY MS. STEWART:
15        Q.    It says "If you are holding XRP, you
16   should want RL to retain XRP for business
17   development."
18             Do you see that?
19        A.    Yes.
20        Q.    What does this sentence mean?
21                 MR. GULAY:  Objection.
22                 If you know.
23        A.    I'm not sure what Patrick meant by this
24   sentence.
25        Q.    What about the bullet under that says
```

120

1    "Give ourselves six months"?  Do you know what

2    that means?

3        A.   I'm not sure what that refers to.

4        Q.   What about the bullet under that that

5    says "Speculators are speculating on Ripple Labs."

6            Do you know what that means?

7            MR. HORTON:  Objection to form.

8        A.   I'm not sure what that's referring to.

9        Q.   Is it fair to say that someone who buys

10   XRP for speculative reasons is speculating that

11   Ripple Labs will do better and therefore XRP will

12   do better?

13           MS. BUNTING:  Objection.

14           MR. GULAY:  Objection to form.

15       A.   I think somebody buying equity in Ripple

16   Labs, Inc. would be betting that Ripple Labs will

17   do better.  I think someone buying XRP may or may

18   not be betting that Ripple Labs will do better.

19       Q.   Is it fair to say someone who is buying

20   XRP for speculative reasons is looking to Ripple

21   Labs to take steps to increase the price of XRP?

22           MR. HORTON:  Objection to form.

23           MS. BUNTING:  Objection.

24       A.   No, I don't believe that's true.

25       Q.   Okay.  In your conversations with the

```
 1   individuals and firms that you were looking for

 2   partnerships with, did you have discussions about

 3   what steps Ripple Labs would take in increasing

 4   XRP's liquidity?

 5              MR. HORTON:  Objection to form.

 6              MS. BUNTING:  Objection.

 7      A.   In a general sense, yes, we discussed

 8   the fact that people were aware of the fact that I

 9   was having discussions with other firms, similar

10   discussions with other firms, trying to recruit

11   and onboard them to provide liquidity.

12      Q.   Okay.  And is that something that was --

13   was important to the individuals and firms that

14   you were in discussions with?

15              MR. HORTON:  Objection to form.

16              MS. BUNTING:  Objection.

17      A.   Liquidity overall was important to those

18   firms and at times liquidity was appearing in

19   other places, like Korea, for example, without my

20   efforts or involvement, and -- but certainly they

21   valued my efforts and involvement as well.

22      Q.   Is it fair to say that they were looking

23   to Ripple to make those efforts and have that

24   involvement in increasing liquidity in the XRP

25   market?
```

122

1          MR. HORTON:  Objection to form.

2          MS. BUNTING:  Objection.

3      A.   I don't think they believed that Ripple

4  exclusively was responsible for building liquidity

5  in the network.

6      Q.   Okay.  But putting aside whether Ripple

7  was exclusively responsible for that, were they

8  looking to Ripple to provide -- to take steps to

9  provide that liquidity?

10         MR. HORTON:  Objection to form.

11         MS. BUNTING:  Objection.

12     A.   I'm not sure what they were looking for.

13  They were aware that I was doing that.

14     Q.   Did they ask you questions about what

15  steps Ripple was taking to provide liquidity?

16     A.   I don't recall if they asked me

17  questions about that.

18     Q.   Did you provide updates on what steps

19  Ripple was taking to provide liquidity?

20         MR. HORTON:  Objection to form.

21     A.   I did provide updates on important

22  developments in the marketplace.

23     Q.   Including what Ripple was doing to

24  provide liquidity?

25         MR. HORTON:  Objection to form.

123

```
 1        A.   When appropriate, those included things

 2   that Ripple was doing, yes.

 3        Q.   And did you provide those updates

 4   because you believed that that was information

 5   that the individuals and firms you were

 6   interacting with would want to know?

 7             MR. GULAY:  Objection.

 8        A.   I believe that those individuals and

 9   firms were interested in staying apprised of

10   market developments broadly, and so my updates to

11   them would have included relevant things that I

12   viewed as material, whether or not they included

13   Ripple Labs and sometimes they did include Ripple

14   Labs.

15        Q.   Okay.

16             MS. STEWART:  Nicole, the next

17        exhibit is PR-4.

18             (Whereupon, exhibit is presented

19        and marked SEC Rapoport Exhibit PR-4 for

20        identification.)

21             MS. STEWART:  And for the record,

22        PR-4 is Bates numbered RPLI_SEC 0012819

23        through 821.

24             (Pause)

25        A.   Okay.  I've reviewed this.
```

124

1   BY MS. STEWART:

2        Q.   Okay.  So looking at the -- the bottom

3   e-mail in this chain, which is an e-mail from --

4   from ██████████  do you see that?

5        A.   Yes.

6        Q.   And who is ████████?

7        A.   She was an employee at the company that

8   worked in product.

9        Q.   Okay.  And -- and do you see her e-mail

10  starts "Hey, Patrick, in the giveaway doc you

11  mentioned the 4 V's we need to track for each of

12  the giveaways - volume, velocity, volatility,

13  valuation."  Do you see that?

14       A.   Yes.

15       Q.   Okay.  Do you recall what the "giveaway

16  doc" is?

17       A.   I don't recall what that is.

18       Q.   Okay.  I think we talked about this

19  briefly a little while ago, but did Ripple from

20  time to time give away XRP?

21       A.   Yes.

22       Q.   Okay.  And those were called giveaways?

23       A.   Yes.

24       Q.   Okay.  So what is a giveaway?

25       A.   In the sense it was used at Ripple Labs

1   at the time, it was a distribution of XRP from

2   Ripple Labs to a group of market participants,

3   sometimes indiscriminately for anyone signed up,

4   and sometimes as a specific incentive for

5   something, like signing up for a new account or

6   some other goal.

7        Q.   Okay.  When it was done

8   indiscriminately, as you said, what was the

9   purpose of it?

10       A.   To get XRP into the hands of more people

11   and off Ripple's balance sheet.

12       Q.   Okay.  And what was the benefit to

13   Ripple of getting the XRP into the hands of more

14   people, if any?

15                MR. GULAY:  Objection;

16        foundation.

17       A.    In my understanding, given that a user

18   needs a small amount of XRP as an anti-spam

19   mechanism to use the network and given that Ripple

20   Labs had a goal of more people using the network

21   for utility, it was necessary for XRP to be

22   distributed into the hands of -- of people other

23   than Ripple Labs.

24       Q.   Was one of the goals of the giveaways to

25   increase XRP's liquidity?

126

1              MR. GULAY:  Objection.

2         A.    The goal of certain types of giveaways

3    was to increase the liquidity of XR -- the

4    liquidity on the Ripple network, broadly speaking,

5    including XRP.

6         Q.    Okay.  What types of giveaways were

7    intended to do that?

8         A.    It's debatable if this is called a

9    giveaway, but we compensated market makers in

10   exchange for providing quotes on the network and

11   we did that because we wanted to increase the

12   liquidity of the assets on the network.

13        Q.    Okay.  And why -- why do you say that

14   it's debatable if that's a giveaway?

15        A.    I think in colloquial terms at the

16   company that may have been referred to as a

17   giveaway even though that's technically

18   compensation for something, for providing a

19   service, market making.

20        Q.    Okay.  Other than the compensation to

21   market makers, were there other giveaways that

22   were intended to increase the liquidity of XRP?

23              MR. GULAY:  Objection.

24        A.    There were a number of different

25   giveaway strategies employed while I was there and

127

1    I wasn't always party to the goals of what that

2    strategy was; so there were some giveaways that

3    were intended to increase liquidity in the

4    marketplace and there were others with presumably

5    other goals irrespective of liquidity.

6          Q.   Okay.  Can you recall any giveaways

7    where goals were to increase liquidity of XRP?

8               MR. HORTON:  Objection to form.

9          A.   Apart from the market maker compensation

10   that I mentioned, I can't recall others.

11         Q.   Okay.  Going back to the document PR-4,

12   I want to look at your e-mail, which is on the

13   second page of the document, that's dated October

14   13, 2013, where it starts "Hi          "

15              Do you see that?

16         A.   Yes.

17         Q.   Okay.  So you say here, "Generally

18   speaking, I think a successful giveaway will have

19   at least one of two factors:  One, the XRP that

20   was given away has high velocity, i.e., it gets

21   traded around between many accounts, presumably

22   getting more users involved in Ripple and also

23   improving network volumetrics."

24              Do you see that?

25         A.   Yes.

128

```
1        Q.   Okay.  What did you mean by this?

2        A.   I think the sentence is clear.  Is there

3    something that should be clarified?

4        Q.   Okay.  I'll ask a more specific

5    question.  That's fine.

6             Was -- was -- was the point that you

7    were making here that the -- the giveaway would

8    increase the volume of XRP on the network?

9             MR. GULAY:  Objection.

10       A.   I had a view that a successful giveaway

11   would increase the volume or improve liquidity.

12   So the way you phrased the last question, I don't

13   view many of the giveaways as having achieved

14   that -- that goal.

15       Q.   You don't view many of -- of Ripple's

16   give -- giveaways as having achieved the goal of

17   increasing liquidity?

18       A.   Correct.

19       Q.   Okay.  And -- and why -- why -- why is

20   that?

21       A.   The XRP that was given away did not have

22   high velocity or get traded around between many

23   accounts in my view, my understanding.

24       Q.   What does it mean, it "did not have high

25   velocity"?
```