129

1      A.   If you were to track one unit of XRP

2   that was given away, how much it changed hands

3   after that point in time would be the velocity.

4      Q.   So velocity just means how much it gets

5   traded around between accounts?

6      A.   Correct.  How much volume.

7      Q.   And do you have an understanding of why

8   the XRP that was given away did not end up being

9   traded -- traded around between many accounts?

10              MR. GULAY:  Objection.

11      A.   At this point in time, my recollection

12   is that the XRP was generally given away for

13   nothing.  And my assumption was that the people on

14   the receiving end immediately sold it for dollars

15   or bitcoin or something else.

16      Q.   Okay.

17      A.   But I don't have any way to know what

18   the large number of the people on the other end

19   thought.

20      Q.   Was there a limit on the size of the

21   giveaways?

22              MR. GULAY:  Objection;

23    foundation.

24      A.   This was very early in my time at the

25   company, maybe the first month.  And so I wasn't

```
 1    privy to the discussion on the size of the

 2    giveaway.  I don't recall being part of that

 3    discussion.

 4         Q.   Do you recall if there was a limit one

 5    way or the other?

 6                   MR. HORTON:  Objection.

 7         A.   I remember discrete programs with the

 8    earmarks, numbers, attached to them in a large

 9    amount of experimentation at that time.

10         Q.   Okay.  Going down in -- in your e-mail

11    to where -- do you see where the -- the word

12    "volume" is in bold?

13         A.   Yes.

14         Q.   And it says "Volume equals:  One, amount

15    given away; and, two, ensuing trading volume in

16    receiving accounts."

17              Do you see that?

18         A.   Yes.

19         Q.   Okay.  Am I understanding correctly that

20    what you're saying here is that the XRP that's

21    given away, if that is then traded in other

22    accounts, it's -- it's the ensuing trading that

23    contributes to the volume?

24                   MR. GULAY:  Objection.

25         A.   My primary interest and focus was on
```

131

1    liquidity as the markets person.  And so when a

2    unit of XRP was given away, my focus was on

3    whether that giveaway resulted in increased volume

4    or not, and I viewed it to be more successful of a

5    giveaway if more volume ensued as a result.

6           Q.   Okay.  And is that why you say here that

7    "the ratio of these would be an interesting metric

8    for us to track"?

9           A.   That's correct.

10          Q.   Okay.  Did Ripple, in fact, track that

11   ratio?

12          A.   I don't recall tracking it.

13          Q.   Okay.  We've talked a lot today about

14   liquidity.  What does liquidity mean to you?

15               MR. GULAY:  Objection.

16          A.   I think the first few paragraphs of this

17   e-mail are a pretty good explanation of that.

18   That you can measure how liquid something is based

19   on how wide the market is, either the bid/ask

20   spread, and by how volume you can trade at those

21   levels.

22          Q.   Okay.  Is it fair to say that what

23   goes -- the factors that go into liquidity are

24   volume and price?

25               MR. HORTON:  Objection to form.

132

1    A.   I would say volume and size.  I'm sorry,

2    bid/ask spread and size.

3    Q.   Bid/ask spread and size.  Is size

4    different than volume?

5    A.   I think we're saying the same thing,

6    but -- but how -- how much size is available at a

7    given price or how much volume you can trade at

8    that price.

9    Q.   I understand.

10    So what you say here, how much volume

11   you can trade at those levels?

12   A.   Correct.

13   Q.   Okay.  So the sentence here at the top

14   of PR-4, your first sentence, that is an accurate

15   description of liquidity in your mind?

16   A.   Yes.

17   Q.   And just so it's in the record, it says

18   here "You typically measure how liquid something

19   is by talking about how wide the market is, i.e.,

20   bid/ask spread and how much volume you can trade

21   at those levels," yes?

22   A.   Correct.

23   Q.   Okay.  Was Ripple tracking the liquidity

24   of XRP?

25             MS. BUNTING:  Objection.

133

1       A.   At this point in time, there were

2   relatively crude tools to track market activity,

3   including XRP, but not limited to XRP overall, and

4   those tools improved over time.

5       Q.   Okay.  And did -- did Ripple use those

6   tools to track the liquidity of XRP?

7             MR. GULAY:  Objection.

8       A.   My recollection is those tools were

9   generally open source and publicly available, and

10  I used those tools to monitor activity in the

11  market, including, but not limited to, XRP's

12  liquidity.

13      Q.   What other activity did you monitor

14  while you were at Ripple?

15           THE REPORTER:  Repeat.

16      Q.   What other activity did you monitor

17  while you were at Ripple?

18      A.   I had an interest in all trading

19  activity on the network.  At this time bitcoin

20  against the dollar was a prominent trading pair

21  that didn't involve XRP, as one example.

22      Q.   Okay.

23          MR. HORTON:  Counsel, would now

24   be a good time for a break?

25          MS. STEWART:  Sure.

134

1             THE VIDEOGRAPHER:  Going off the

2     record at 12:01.

3           (Whereupon, a luncheon recess is

4     taken.)

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

135

```
1                A F T E R N O O N   S E S S I O N

2                        THE VIDEOGRAPHER:  Okay.  Back on

3          the record at 12:50.

4                        Go ahead.

5     BY MS. STEWART:

6          Q.   Okay.  Mr. Rapoport, do you recall

7     before lunch we -- we looked at the -- the primer

8     that you had drafted and that you had sent to

9     Mr. ▇▇▇▇▇▇ that was PR-6?

10         A.   Yes.

11         Q.   Okay.  I think I forgot to ask you about

12    that document, whether there were other

13    individuals or firms that you sent the primer to.

14         A.   My recollection of this was broad --

15    this was a broadly used document for nontechnical

16    people that wanted to familiarize themselves with

17    Ripple basics.

18         Q.   Okay.  When was the last time you spoke

19    with Mr. Griffin?

20         A.   In the past month.

21         Q.   Okay.  Did you speak with him about this

22    litigation?

23         A.   No.

24         Q.   Did you speak with him about your

25    testimony?
```

136

1    A.    No.

2    Q.    Are you aware of whether Mr. Griffin has

3  been deposed in this matter?

4    A.    I was aware that it did happen, yes.

5    Q.    Okay.  Did Mr. Griffin tell you that he

6  was deposed in this matter?

7    A.    I was aware that he was in New York for

8  this matter and that was the extent of our

9  discussions about it.

10    Q.    Did you speak with him after his

11  deposition?

12    A.    I'm not sure exactly at what time during

13  his time in New York it happened.  And so I spoke

14  with him during his time in New York.  Whether

15  that was before or after, I'm not sure.

16    Q.    Okay.  Did you discuss with him at all

17  his testimony?

18    A.    No.

19          MR. HORTON:  Objection; asked and

20      answered.

21    Q.    Okay.

22          MS. STEWART:  We'll do 8.

23          Nicole, we're on PR-8.

24          (Whereupon, exhibit is presented

25      and marked SEC Rapoport Exhibit PR-8 for

```
 1            identification.)

 2                  MS. STEWART:  So for the record,

 3          PR-8 is Bates numbered RPLI_SEC 0038399 to

 4          400.

 5                  (Pause)

 6          A.   Okay.  I've reviewed this.

 7     BY MS. STEWART:

 8          Q.   Okay.  Have you seen this document

 9     before?

10          A.   No.

11          Q.   Okay.  Do you have any --

12          A.   Excuse me.  I saw this -- I clearly saw

13     this back in 2013 because my name is on the

14     e-mail, but I haven't -- I don't remember it and

15     haven't seen it since then.

16          Q.   Okay.  Do you have any reason to doubt

17     that you had this e-mail exchange with ███████

18     ████?

19          A.   No, and I -- no, I don't.

20          Q.   Okay.  Who is ███████████?

21          A.   He is a representative of ████████

22     █████████, which is a venture capital firm.

23          Q.   Okay.  And did ████████████████ have a

24     relationship with Ripple?

25          A.   My understanding is that ████████
```

138

1    ███████ was a seed round investor in Ripple.

2          Q.    Does that mean that their

3    relationship --

4          A.    Sorry, Ripple Labs, I should say.

5          Q.    Okay.  Thank you.

6                Does that mean that their relationship

7    with Ripple Labs preceded your tenure at Ripple?

8          A.    That's correct.

9          Q.    And what is it that you and -- and -- is

10   it Mr. ████?

11         A.    Yes.

12         Q.    Okay.  What is it that you and Mr. ████

13   are discussing in this e-mail?

14         A.    Mr. ████ and Chris Larsen, and it looks

15   like ██████████ who's an associate of

16   Mr. ████ had a discussion without me about a

17   strategy described here to trade in the market

18   with the intent to lose XRP.

19         Q.    Okay.  And in -- in the top e-mail, your

20   e-mail to Mr. ████ at the top of the document, you

21   say "Yes, we are all on the same page that this

22   will be a 'distribution' strategy where you are

23   expected to lose XRP to the market, and the loan

24   will be forgiven."

25                Do you see that?

139

1       A.   Yes.

2       Q.   Okay.  So what did you mean when you

3    wrote "distribution strategy" here?

4       A.   I remember the scenario and I remember

5    thinking it was a nonsensical idea at the time and

6    the strategy did not make sense to me to achieve

7    any goal at all.  But this was October 2013, when

8    I was relatively new at the company, and so I went

9    along with it largely because it was the CEO of

10   the company, Chris Larsen, encouraging this

11   interaction with two investors.  So I didn't think

12   it was my place to voice my -- my disagreement

13   with the strategy.

14       Q.   Okay.  What is your understanding of

15   what the strategy was supposed to achieve?

16       A.   In reading the e-mail, it sounds like

17   ████████████ had certain objectives described in

18   the e-mail, which he describes as "creating flow

19   to encourage the fundamental building blocks of

20   any market," or the market in this case.  So it

21   appears that he thought this would increase

22   liquidity in the market, this strategy.

23       Q.   And did you disagree with that?

24       A.   I did disagree with that.

25       Q.   And why?

140

1          A.   I actually viewed this as a liquidity

2     destructive action.  He describes "sweeping the

3     book back and forth," which what he means by that

4     is removing liquidity from what's posted in the

5     order book by buying and then selling and then

6     buying and then selling.  To me, that's the

7     opposite of building liquidity.  That's -- that's

8     removing liquidity from the market.

9          Q.   Okay.  Did you discuss your view with

10    Mr. ███

11         A.   As a newly hired employee put in this

12    discussion by the CEO of the company and speaking

13    to an investor, I didn't think it was my place to

14    dispute Mr. █████ views at this time.

15         Q.   Did you discuss your views with

16    Mr. Larsen?

17         A.   I don't recall if I did or I didn't.

18         Q.   Did you discuss your views with

19    Mr. Griffin?

20         A.   I don't recall.

21              MR. GULAY:  Sorry.  Just to

22         clarify, Mr. Rapoport, when you say

23         "speaking to an investor," did you mean an

24         investor in Ripple Labs, Inc.?

25              THE WITNESS:  Yes.  Mr. ████ was

141

1        an investor in Ripple Labs -- ▮▮▮▮▮▮▮

2    ▮▮▮▮▮▮▮▮▮ was an investor in Ripple Labs,

3        Inc.

4    BY MS. STEWART:

5        Q.    Okay.  And when you say in the sentence

6    that we just read, "we are all in the same page

7    that this will be a distribution strategy," who is

8    the "we" that you're referring to in that

9    sentence?

10       A.    I do recall having a conversation with

11   ▮▮▮▮▮▮ on the phone that I reference in this

12   e-mail.  I'm not certain whether the "we" refers

13   just to me and ▮▮▮▮▮▮▮ or the four people in

14   this e-mail.  The others are ▮▮▮▮▮▮▮▮ and

15   Chris Larsen.

16       Q.    Okay.  Do you agree with Mr. ▮▮▮ that

17   the "fundamental building blocks of any market are

18   speculators"?

19       A.    No.  I think speculators can play an

20   important role, but natural users of an asset can

21   be equally important as fundamental building

22   blocks of a market.

23       Q.    So is it fair to say that you think that

24   there's two fundamental building blocks of a

25   market?

142

```
 1              MR. HORTON:  Objection.

 2              MR. GULAY:  Objection to form.

 3       A.   I think the answer to that depends on

 4   how we define "speculators," but I think, in

 5   general, people transacting in an asset are either

 6   speculating in some form, whether short-term or

 7   long-term holders, or they have some natural need

 8   to purchase or sell the asset.  For example, an

 9   airline company has to buy jet fuel and the jet

10   fuel market can be speculators and natural users.

11       Q.   Okay.  So -- so together, the

12   speculators and the natural users would, in your

13   view, be the fundamental building blocks of any

14   market?

15              MR. HORTON:  Objection to form.

16       A.   Yeah, I think those are the primary

17   market participants of any market, yes.

18       Q.   And at the time in 2013, were there more

19   speculators than natural users in the Ripple

20   network?

21              MR. HORTON:  Objection to form.

22       A.   I don't know that I can answer that.  I

23   don't know that I know the answer to that.

24       Q.   Well, did you have a sense that more of

25   the -- of the people who were -- who are holding
```

143

1    XRP -- let me -- strike that.  Let me restart.

2            Did you have a sense that more of the

3    people who are buying XRP were buying it to

4    speculate on XRP as opposed to use XRP?

5                    MR. GULAY:  Objection to

6        foundation.

7                    MS. BUNTING:  Objection.

8        A.   Any user of the Ripple network needed a

9    small amount of XRP based on the network design of

10   using XRP as an anti-spam mechanism.  And I don't

11   think anyone has any way of knowing which users

12   were purchasing XRP for that purpose, for its

13   utility in -- in the network, or speculating on

14   it.

15       Q.   That's not something that Ripple

16   tracked?

17       A.   I'm not sure that there is a way to

18   track that because it's an open-source network

19   that anyone can participate in and it was --

20   there's, to my knowledge, no way to get that

21   information.

22       Q.   Okay.  Do you agree with Mr. █████

23   statement at the very end of his e-mail that a

24   controlled appreciation of XRP is what Ripple

25   wants?

1      A.    No.

2      Q.    And why not?

3      A.    To my knowledge, Ripple didn't have any

4   goals with respect to what the price of XRP should

5   or shouldn't do and that's what Mr. ████ seems to

6   be implying here.

7      Q.    So Ripple's goal, or at least one of

8   Ripple's goals, was not to take steps to

9   appreciate the price of XRP?

10              MR. HORTON:  Objection to form.

11     A.    I believe that the company sought to

12  increase usage of the Ripple network and improve

13  liquidity in the market; and it's my belief that

14  those actions could lead to an increase in XRP

15  price, but I don't think that that's a given and

16  that's an ancillary effect that is my belief.  And

17  so I don't believe the company had a direct goal

18  to influence the price of XRP.

19     Q.    Did the company have a goal to decrease

20  the price of XRP?

21              MR. HORTON:  Objection to form.

22     A.    No, I don't think the company had any

23  goals with respect to the price of XRP whatsoever.

24     Q.    So the company had no goals one way or

25  the other with respect to the price of XRP?

145

1    A.    No.  Not that I'm aware.

2    Q.    This distribution strategy,

3  quote/unquote, that's referred to in your e-mail

4  with Mr. ▇▇▇ did Mr. ▇▇▇▇ firm, in fact,

5  pursue this strategy?

6    A.    Yes.  A version of this moved forward

7  shortly after these e-mails.

8    Q.    Okay.  And when you say "a version of

9  this," what do you mean?

10   A.    I don't recall the specifics of exactly

11 how it was conducted, but I do remember that XRP

12 was sent to a representative of ▇▇▇▇▇▇▇▇

13 and that representative traded in the market.  And

14 that's -- that's what I remember about it.

15   Q.    That representative of ▇▇▇▇▇▇▇▇

16 traded in the market and intentionally lost the

17 XRP?

18         MR. HORTON:  Object to form.

19   A.    What I remember is that that person

20 removed a lot of liquidity from the order books,

21 meaning that they bought and sold and bought and

22 sold.  I didn't have visibility or I don't have

23 recollection as to how much or what they lost

24 trading.

25   Q.    How much XRP was given to ▇▇▇▇▇

146

1    ███████?

2    A.  I don't have any recollection of this,

3  but the e-mail says ████████ XRP.

4    Q.  And do you know how much XRP ██████

5  ██████ lost?

6            MR. GULAY:  Objection.

7    A.  I don't have any recollection of whether

8  they made or lost money and how much.

9    Q.  And where -- where you say here in the

10  top e-mail that "the loan will be forgiven,"

11  what -- what is that a reference to?

12    A.  For reasons I don't think I fully

13  understood at the time, the company, when

14  distributing XRP in certain situations, was

15  treating it as a forgivable loan; that the -- XRP

16  would be transferred to somebody and then -- as a

17  loan, and that loan would be forgiven.  I'm not

18  sure of the reasoning behind that structure.

19    Q.  And did Ripple pursue this kind of

20  strategy with any other individual of the firm?

21            MR. HORTON:  Objection to form.

22    A.  I'm not aware of this type of trading

23  strategy being conducted again after this one

24  instance.

25    Q.  Did you have a concern in 2013 whether

147

1    this kind of trading strategy could constitute

2    market manipulation?

3                    MR. HORTON:  Objection to form.

4                    MR. GULAY:  Objection.

5        A.   I found it disruptive to the market.  I

6    didn't have concerns about market manipulation at

7    this time.

8        Q.   Sitting here today, do you have concerns

9    that this kind of strategy could constitute market

10   manipulation?

11                   MR. HORTON:  Objection.

12                   MR. GULAY:  Objection;

13         foundation.

14       A.   I don't have enough knowledge of the

15   legal meaning of that to really have an opinion

16   without advice.

17                   MS. STEWART:  Nicole, the next

18         exhibit is PR-12.

19                   And for the record, that's Bates

20         numbered RPLI_SEC 0461857 through 866.

21                   (Whereupon, exhibit is presented

22         and marked SEC Rapoport Exhibit PR-12 for

23         identification.)

24   BY MS. STEWART:

25       Q.   So, Mr. Rapoport, I plan to ask you

148

1   about your e-mail which is on the first page of

2   this document, but of course feel free to -- to

3   review the -- the rest of the e-mail chain.

4           (Pause)

5       A.   Okay.

6       Q.   Okay.  Is it -- is it fair to say that

7   this document is an internal discussion at Ripple

8   about the pros and cons of a bond auction as a way

9   to distribute XRP?

10                  MR. GULAY:  Objection.

11                  MR. HORTON:  Objection to form.

12      A.   I think this document is a general

13  discussion on how to get XRP off of Ripple's books

14  and into the market in various different ways.

15      Q.   Okay.  And the -- the title -- the "Re"

16  line of the e-mail, which I don't -- I don't think

17  you wrote, but it says "Giveaways versus auction

18  and pump priming."

19          Do you have a sense of what "pump

20  priming" means?

21      A.   I'm not sure what that means.

22      Q.   Okay.  So in the e-mail that you write

23  on the first page of the document, which is

24  November 24th at 9:16 a.m., the -- the second

25  paragraph of your e-mail says "The bond auction

149

1     structure does seem to cleanly solve our

2     self-imposed goal of getting XRP off our books

3     without immediately flooding the market with XRP

4     supply/price pressure."

5              Do you see that?

6        A.    Yes.

7        Q.    Okay.  And -- and was that -- was that

8     sentence accurate at the time you wrote it?

9        A.    I think so, yes.

10       Q.    Okay.  And where you say "our

11    self-imposed goal," who is -- whose self-imposed

12    goal are you referring to?

13       A.    In this e-mail chain, there's a

14    conversation between several senior members of the

15    company.  And it's -- I interpret this to reflect

16    a strong desire to distribute XRP into the

17    marketplace and get a significant amount of it off

18    of Ripple Labs' books with some disagreement about

19    what the best strategy is to do that.

20       Q.    So your statement in this e-mail is

21    based on the e-mails further down in the -- in the

22    chain of the document we're looking at?

23       A.    Based on this e-mail and --

24              MR. HECKER:  Objection to form.

25       A.    Based on this e-mail and my recollection

1  of the dynamics at the company at the time.

2      Q.   Okay.  Did you have discussions about

3  this self-imposed goal other than what's reflected

4  in this e-mail with -- with your colleagues at

5  Ripple?

6      A.   Yes.

7      Q.   And what were those discussions?

8      A.   I generally recall having discussions.

9  Given seven years have passed, I don't recall

10  specific discussions clearly.

11      Q.   What do you recall generally about the

12  discussions?

13      A.   I think this e-mail thread accurately

14  represents the fact that senior members of the

15  company viewed it as important to get XRP off the

16  books and that that was the goal in and of itself.

17  And there was discussion about whether that could

18  be done through a charitable process without the

19  company receiving economic benefit in exchange for

20  selling or giving away the XRP, but that there was

21  concern about harming the marketplace and

22  impacting liquidity in the marketplace if Ripple

23  Labs were to indiscriminately give away or donate

24  all the XRP versus employing other tactics like

25  the ones discussed in -- in this e-mail, including

151

1    selling XRP.

2        Q.   So the reason that Ripple didn't want to

3    give away all the XRP was that it didn't want to

4    negatively impact the liquidity?

5                MR. GULAY:  Objection.

6                MR. HORTON:  Objection to form.

7        A.   From early giveaways, it was evident

8    that the common result of a broad giveaway of XRP

9    was that the recipients immediately sold that XRP

10   and that that harmed market structure and the

11   price of XRP, neither of which were viewed to be

12   good outcomes.

13       Q.   Okay.  And in the sentence that we just

14   read in your e-mail, you say "XRP supply/price

15   pressure."

16           Do you see that?

17       A.   Yes.

18       Q.   What do you mean by "price pressure"?

19       A.   While Ripple Labs did not, to my

20   knowledge, take actions to impact what the price

21   of XRP was, Ripple Labs certainly had a preference

22   for the price to rise rather than fall given that

23   it was a significant holder.  And so in a similar

24   way to how ExxonMobil doesn't want to have its

25   actions collapse the price of oil since it's a

152

1    significant holder of oil, Ripple Labs was

2    cognizant of the fact that its actions in the

3    marketplace could have adverse consequences for

4    its balance sheet.

5        Q.    So you -- you say in the next sentence

6    in your e-mail, "I want to carefully consider all

7    of the other structured products that we can come

8    up with that could accomplish the same goal."

9            Do you see that?

10       A.    Yes.

11       Q.    Did you and others at Ripple carefully

12   consider other structured products?

13       A.    I know that we discussed a variety of

14   ideas.  I don't know.  We may disagree on what

15   "carefully consider" means.

16       Q.    But you discussed other structured

17   products that could accomplish the goal that we

18   were just talking about?

19       A.    Yes.  We discussed a large number of

20   ideas.

21       Q.    Okay.  Can you tell me about some of

22   those ideas that you discussed?

23       A.    The number of voices and tactics

24   described in this e-mail exchange I think are good

25   examples of the large number of out-of-the-box

1    ideas that were discussed, but given the amount of

2    time that's passed, the specifics of ideas are

3    difficult for me to recall.

4        Q.   Did Ripple pursue this bond auction

5    strategy?

6        A.   Not to my knowledge.

7        Q.   Were there any other structured products

8    that -- that Ripple used to distribute XRP?

9            MR. GULAY:  Objection.

10           To the extent you know.

11       A.   I'm not aware of Ripple acting as the

12   issuer of a structured product to distribute XRP.

13       Q.   You mentioned a moment ago that if

14   Ripple were to give away all of its XRP, that

15   would create liquidity issues.

16           Do I have that right?

17           MR. GULAY:  Objection.

18       Q.   I'm not trying to mischaracterize what

19   you said, but put it in your own words.  I just --

20   I have a follow-up question to that.

21       A.   When Ripple conducted straight giveaways

22   of XRP to large numbers of interested people, I

23   observed that to have an adverse impact on market

24   liquidity and price.

25       Q.   Okay.  Was the same true when Ripple

154

1    sold XRP?

2        A.    At times it was true and at times it was

3    not true.

4        Q.    Okay.  When was it true?

5        A.    When Ripple sold XRP at a discount to

6    market price, the purchaser could then go sell at

7    the market price and -- and make a quick profit.

8    And so that, in my view, had a similar neg --

9    adverse impact on liquidity and price.

10       Q.    Okay.  And so what were the instances

11   where it did not have a negative impact on

12   liquidity, the sales of XRP?

13       A.    Those were the two examples where I

14   thought there was an obvious negative impact and I

15   can't -- I think other instances did not have the

16   same negative impact to my current recollection.

17       Q.    So that was when XRP was sold either

18   with -- without a dis -- discount or with a

19   premium?

20       A.    Correct.

21       Q.    Okay.  At the bottom of -- of the first

22   page of this e-mail that we're looking at, you say

23   "We want a sales team that can target -- "that can

24   target funds that specialize in thematic trades

25   with convex payouts."

155

1          Do you see that?

2     A.    Yes.

3     Q.    What do you mean by that?

4     A.    In my view, digital assets generally,

5  and XRP specifically, are largely binary outcomes,

6  meaning that if we look five or ten years into the

7  future, I think the price of a given digital asset

8  will likely be a lot more today or zero -- a lot

9  more than today or zero.  And that's what I mean

10  by a convex payout:  Something that is likely to

11  either just go to zero or have an exponential

12  rise.

13          And thematic trade I think is referring

14  to trading on a -- a theme.  I'm not quite sure

15  how to explain that.

16     Q.    Okay.  At this time in 2013, did you

17  think that XRP was going to go to zero or that it

18  would have exponential growth?

19               MR. HORTON:  Objection to form.

20               MR. GULAY:  Objection.

21     A.    Like most early stage technologies, I

22  thought that the higher probability was going to

23  zero and that a small probability of a high price

24  was possible and that that tends to be something

25  that characterized this type of convexity.

156

1    Q.   Okay.  And did that view of yours change

2    during your time at Ripple?

3    A.   No.  I think that was a view I held

4    throughout my time at Ripple.

5    Q.   Okay.

6         MS. STEWART:  Nicole, we're --

7         we're doing PR-27 next.

8         (Whereupon, exhibit is presented

9         and marked SEC Rapoport Exhibit PR-27 for

10        identification.)

11        MS. STEWART:  And PR-27 is Bates

12        numbered RPLI_SEC 425895 through 900.

13   BY MS. STEWART:

14   Q.   And, Mr. Rapoport, I'm going to ask you

15   questions on the first page of this document and

16   your -- your e-mail that continues on to the top

17   of page 2, but of course feel free to review the

18   entire document.

19        (Pause)

20   A.   Okay.  I've read it.

21   Q.   Okay.  So looking at -- at your e-mail

22   which starts sort of midway through the first page

23   of the document, where you say "Two concerns

24   here."

25        Are you there?

157

1       A.   Yes.

2       Q.   Okay.  So you say "On a 1 million"

3   dollar -- "1 million XRP transaction, there is

4   plenty of liquidity to easily purchase that amount

5   in the market.  When we sell directly to someone,

6   it hurts our goal of achieving critical mass on

7   the exchange because we're detracting from" --

8   we're de -- "we're detracting from market volume."

9            Do you see that?

10      A.   Yes.

11      Q.   Okay.  What do you mean by that?  Or

12  what did you mean by that?

13      A.   As a person focused on markets and

14  developing liquidity at the company, it was my

15  preference that the company did not sell over the

16  counter bilaterally to interested parties.  I

17  thought it benefited the goal of building a liquid

18  market to force all interested buyers or sellers

19  to transact in the market where the volume is

20  publicly visible, accessible to others, and will

21  ultimately encourage the development of a liquid

22  market.

23      Q.   So you would rather someone who wanted

24  to buy XRP do it on the exchange as opposed to

25  buying it from Ripple directly?

158

1    A.   Correct.  On the Ripple -- on the Ripple

2    Ledger itself at this time.

3    Q.   Okay.  And then you continue to say in

4    that paragraph, "We are also preventing XRP price

5    from rising, because the demand doesn't go to the

6    market."

7         Do you see that?

8    A.   Yes.

9    Q.   And what did you mean by that?

10   A.   Markets respond -- the price of the

11   market responds to the actions of buyers and

12   sellers.  And for a price to rise, there need to

13   be more buyers than sellers in the marketplace, in

14   the public marketplace.  And if any interested

15   buyer came and bought directly from Ripple, from

16   Ripple Labs, that was preventing that same

17   buyer -- or -- or substituting that buyer from

18   going into the market and otherwise lifting offers

19   to -- which would typically increase the price.

20   Q.   Okay.  Is that what you mean by that

21   last sentence of the paragraph, where you say "If

22   everyone can buy from us, the price will never go

23   up"?

24   A.   Correct.  Theoretically, if -- if every

25   buyer bought directly from Ripple Labs and only

159

1    the sellers went to the market, the price would

2    only go in one direction:  Down.

3        Q.   Okay.  And so am I understanding

4    correctly that you thought that over-the-counter

5    sales would hurt both volume and price?

6        A.   That's correct.

7        Q.   And then you go on to say in this

8    e-mail, "I'd question whether we should provide a

9    discount at all, even for large size.  It would

10   make more sense to me to offer a 5 percent

11   premium."

12           Do you see that?

13       A.   Yes.

14       Q.   Did Ripple, in fact, stop at some point

15   offering discounts on these types of XRP sales?

16              MR. GULAY:  Objection.  I assume

17        you mean during the time of his

18        employment.

19              MS. STEWART:  Yes.

20       Q.   All of my questions are during the time

21   of your employment.

22       A.   I didn't have responsibility for

23   Ripple's transactions with third parties.  And so

24   I saw and knew about a limited number of what I

25   believe to be the total number of transactions.

160

1    What I saw varied a lot over time.  I don't think

2    that there was a clear stopping point that I can

3    recall.

4         Q.   In -- in the e-mail sort of near the top

5    of the document from Arthur Britto, do you see

6    that, at 12:42 p.m.?

7         A.   Yes.

8         Q.   So Mr. Britto says "I think we're trying

9    to serve two types of purchasers:  One, bulk

10   purchasers for investment; two, bulk purchasers

11   for resale."

12             Do you agree with Mr. Britto's

13   statement?

14        A.   I think logically he describes the two

15   things that a person could do after buying an

16   asset:  They could hold it or they could sell it.

17   So I think, yes, that's logically true.

18        Q.   Okay.  But he doesn't mention here

19   people who are buying it to use it, right?

20        A.   What do you mean by "use it"?

21        Q.   To use it on the -- on the Ledger, on

22   the network.

23        A.   His e-mail doesn't explicitly refer to

24   that.  Parsing it, I think that there's two types

25   of use:  One is the anti-spam functionality and

1     the other is using it as a bridge currency to

2     trade for another asset.  Using it as a bridge

3     currency I guess is, in a sense, selling it,

4     but -- I'm a little confused by the question, but

5     this e-mail does not specifically refer to using

6     it, no.

7          Q.   Okay.  Was there wide use of XRP as a

8     brid -- bridge currency at this time in 2014?

9                    MR. HORTON:  Objection to form.

10                    MS. BUNTING:  Objection.

11        A.   It was a fairly nascent network and

12    technology at the time.  So I think in the global

13    sense, there wasn't broad use of Ripple for

14    anything at the time, but certainly there was some

15    use of XRP as a bridge currency.

16                    MR. GULAY:  I'm sorry.  When you

17         said "broad use of Ripple" --

18                    THE WITNESS:  Sorry.  XRP as a

19          bridge currency.

20        Q.   Would you say that -- that though there

21    was some use, it was de minimis?

22                    MR. GULAY:  Objection to form.

23                    MS. BUNTING:  Objection.

24        A.   There were certain technical features

25    that increased the use of XRP as a bridge currency

162

```
1    when implemented.  And I don't recall if this is
2    before or after that.  So it's difficult for me to
3    answer that question.
4         Q.   Well, let's take it back, then, to the
5    beginning of your time at Ripple.
6              Was there a time when the use of XRP as
7    a bridge currency was de minimis?
8         A.   Yes.
9              MR. GULAY:  Objection.
10        Q.   So in -- in this e-mail chain, the
11   e-mail right above, we're still on page 1,
12   Mr. Griffin says "Fully supportive of this view.
13   Adding ▮▮▮▮ and Chris."
14             Do you see that?
15        A.   Yes.
16        Q.   Do you recall if Mr. Larsen ever
17   expressed a view on this issue?
18             MS. BUNTING:  Objection.
19        A.   On what issue?
20        Q.   On the issue that's being discussed in
21   this e-mail chain.
22             MR. GULAY:  Objection to form.
23        A.   On the issue of selling at a discount?
24        Q.   Yes.
25        A.   I don't recall if Mr. Larsen had a
```

163

1    strong view one way or another on this issue.

2         Q.   Do you remember discussing it with him?

3         A.   I do generally remember having

4    discussions about it, yes.

5         Q.   Okay.  And so you don't recall if he had

6    a strong view.

7              Do you recall what his view was?

8         A.   I remember discussing it, but I don't

9    remember the substance of those discussions.

10        Q.   These types of -- well, let me take a

11   step back.

12             The -- the kind of sales that we're

13   talking about here, I think they're referred to in

14   the e-mail -- e-mail as "wholesale selling," is

15   that right?

16        A.   I see Patrick refers to it as "wholesale

17   selling" in this e-mail.

18        Q.   Okay.  How did you refer to it during

19   your time at Ripple?

20        A.   I would refer to these as

21   over-the-counter transactions --

22        Q.   Okay.

23        A.   -- or OTC.

24        Q.   And was -- was there any kind of

25   limitation in terms of -- of the size of -- of

164

1    these over-the-counter transactions while you were

2    at Ripple?

3                MR. GULAY:  Objection to form.

4        A.   I had visibility to a limited number of

5    the transactions that Ripple ultimately engaged in

6    and so I'm not sure of the answer to that --

7        Q.   Okay.

8        A.   -- companywide.

9        Q.   Were -- were these transactions

10   generally large transactions?

11               MS. BUNTING:  Objection.

12       A.   In this e-mail thread, there's a team of

13   people critical of the fact that a small

14   transaction is being conducted over the counter

15   and preferring them to be large transactions, and

16   that was a view that I held at the time.

17       Q.   Okay.  So is it fair to say that when

18   Ripple did engage in these types of

19   over-the-counter transactions, it generally

20   wouldn't have been for purposes of -- of currency

21   exchange, meaning small amounts that someone would

22   use on the Ledger?

23               MR. HORTON:  Objection to form.

24       A.   Could you repeat the question?  I just

25   didn't understand exactly what you mean.

165

1      Q.   Sure.

2          Is it fair to say that when Ripple was

3   engaging in these types of over-the-counter

4   transactions, the sales of XRP, there were

5   generally large bulk sales, not the types of

6   small -- small volumes that someone who'd be using

7   XRP as a bridge currency would -- would need?

8             MS. BUNTING:  Objection.

9             MR. HORTON:  Objection to form.

10     A.   Again, I don't feel that I have the

11   information at the time even -- and I certainly

12   don't remember today, but didn't -- at the time

13   did not have enough visibility into the totality

14   of Ripple's transactions to understand that.  The

15   limited number of transactions I saw tended to be

16   larger transactions.

17          I wouldn't agree that use of a bridge

18   currency necessarily needs to be a small size.  I

19   think that could be a large or small size.

20     Q.   What about the -- the transactions for

21   preventing the -- the spam feature that you

22   referred to?  Would those be small or large?

23             MR. HORTON:  Objection to form.

24     A.   Generally speaking, those are very small

25   amounts that are designed to be low value in

1    dollar terms, but then a user of the network --

2    those fees scale to combat abuse.  And so an

3    attacker on the network would face escalating fees

4    which could turn out to be very large dollar

5    amounts and -- yeah.

6              MS. STEWART:  And, Nicole, the

7         next document is PR-35, which is Bates

8         numbered RPLI_SEC 0842611 through 614.

9              (Whereupon, exhibit is presented

10        and marked SEC Rapoport Exhibit PR-35 for

11        identification.)

12             (Pause)

13        A.   Okay.  I've reviewed this.

14   BY MS. STEWART:

15        Q.   Okay.  So I want to look at your e-mail

16   which is on page 1 of the document at 5:52 a.m.

17             Do you see that?

18        A.   Yes.

19        Q.   And I believe, and -- and please confirm

20   for me that you're responding to -- to some

21   questions in -- in the previous e-mail from

22   ██████████████

23        A.   Yes, it appears that way.

24        Q.   Okay.  And who is Mr. ████

25        A.   I don't recall interacting with this

167

1    person apart from seeing this e-mail.  But I see

2    in the e-mail signature that it says he worked for

3    ███████████████████

4         Q.   And do you know what that is?

5         A.   It's a venture capital firm.

6         Q.   And you -- you here are responding to a

7    question about the qualifications for wholesalers.

8              Do you see that?

9         A.   Yes.

10        Q.   And as it's used in -- in this e-mail,

11   the word "wholesaler," are you referencing the

12   over-the-counter sales that we talked about a

13   moment ago or something else?

14        A.   I don't remember what I was -- my

15   thought process when writing this e-mail, but I

16   see that ████████ used this terminology

17   "wholesale recipients" later in the chain.  It's

18   not terminology that I would typically use

19   independently, but I -- I suspect that I used his

20   language to not cause confusion in an e-mail

21   chain.

22        Q.   Okay.  But the type of transaction

23   you're talking about is an over-the-counter

24   transaction?

25        A.   Correct.

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

168

1       Q.   Okay.  So you say in the second

2   paragraph after the number 1, you say "In

3   addition, we occasionally receive inquiries from

4   individual investors looking to purchase large

5   amounts of XRP with no intention to resell to

6   third parties."

7       Do you see that?

8       A.   Yes.

9       Q.   So how many such inquiries do you recall

10   having received while you were at Ripple?

11       A.   Given that six, seven, eight years have

12   passed, it's difficult for me to put a number on

13   it even as an estimate.  I'd be guessing.  But I

14   do remember that it did occur.

15       Q.   Did it happen more than once?

16       A.   Yes.

17       Q.   Okay.  And -- and did these investors

18   express to you that they didn't have an intention

19   to resell to third parties?

20       A.   I believe this would be contrasting to

21   someone who's explicitly saying they intend to

22   sent to third -- sell to third parties, but I

23   don't recall having any kind of guarantee or

24   written agreement with somebody that they wouldn't

25   do that.

169

1      Q.   Meaning that there were some investors

2   who specifically told you that they did intend to

3   sell to third parties and there were some who

4   didn't tell you one way or the other?

5      A.   In this e-mail thread, it talks about

6   people who were "resellers."  And so I believe

7   this sentence is contrasting a purchaser who

8   doesn't intend to resell with someone who is

9   explicitly saying they are going to resell to

10   third parties.

11      Q.   Okay.  And -- and would you say that

12   most of the -- the individuals and firms you were

13   interacting with expressed to you that they did

14   intend to -- to resell the XRP?

15           MR. HORTON:  Objection to form.

16      A.   Too difficult for me to remember

17   specifics to really give an accurate answer to

18   that.

19      Q.   Did -- did Ripple place any restrictions

20   on the resale of XRP by these individuals and

21   firms that you were interacting with?

22           MR. GULAY:  Objection;

23       foundation.

24      A.   I recall certain discussions about

25   "lockups," but I was not aware of any mechanism