211

```
 1    time in my recollection were seeking regulatory

 2    clarity and hungry for regulatory clarity and

 3    there was very little guidance available at the

 4    time.

 5            Q.    And why were you sending Mr. ████ a

 6    link to Perkins Coie's website?

 7            A.    I observed that there was a lot of

 8    demand for legal advice and few law firms that

 9    were providing legal advice on the topic of

10    digital assets and I thought he would be

11    interested in knowing that as a lawyer.

12            Q.    Okay.  Did Mr. ████ and his firm at any

13    point provide legal services to Ripple?

14            A.    I don't know one way or another.  I'm

15    not aware of them providing any services to

16    Ripple.

17            Q.    So you said that -- that market

18    participants at the time were seeking regula --

19    regulatory clarity and were hungry for regulatory

20    clarity?  You said that a moment ago.  Do you

21    remember that?

22            A.    Yes.

23            Q.    During your time at Ripple, was Ripple

24    seeking regulatory clarity?

25                  MR. GULAY:  Objection;
```

212

1          foundation.

2          A.    Ripple was generally, in my recollection

3    and view, the most proactive firm in the digital

4    asset space, trying to promote a regulated

5    environment and approach, and was doing its best

6    to embrace regulation and seek regulatory clarity.

7          Q.    Okay.  And in what way was Ripple

8    proactive, as you said?

9          A.    Both through private discussions with

10   legal counsel as well as direct -- directly

11   seeking out members of the governance and

12   regulatory community to explain the technology and

13   explain what -- what was going on in the space

14   that Ripple saw happening.

15         Q.    Okay.  So during your time at Ripple,

16   which members of the governance and -- I forget

17   what words you used, but which regulators did --

18   did Ripple reach out to?

19               MR. HORTON:  Objection to form;

20        lack of foundation.

21         A.    I don't know the goings on of every

22   member of the company, but I know at a minimum,

23   Treasury, Federal Reserve, and certainly other

24   domestic and foreign regulators that are difficult

25   for me to recall on the fly.

213

1     Q.  During your time at Ripple, did Ripple

2 reach out to the SEC for regulatory clarity?

3         MR. GULAY:  Objection; lack of

4   foundation.

5     A.  I'm not aware whether Ripple did or did

6 not have conversation with the SEC.

7     Q.  Okay. And what is ▮▮▮▮▮▮?

8     A.  A charity organization.

9     Q.  And was the donation that's referenced

10 in your e-mail here to ▮▮▮▮▮ of XRP, was

11 that part of Ripple's distribution strategy?

12     A.  Yes. In general, Ripple had a

13 preference for charit -- charitably distributing

14 XRP if it was ignoring market impacts of its

15 actions.

16         THE REPORTER:  Repeat.

17     A.  In general, Ripple had a preference for

18 charitable distribution of XRP if it was ignoring

19 market impacts of its actions.

20     Q.  And what do you mean "if it was ignoring

21 market impacts of its actions"?

22     A.  As I mentioned earlier, giving away XRP

23 for zero I view harm -- in my view harmed

24 liquidity and price; but ignoring those impacts,

25 as some of the prior e-mails showed, Ripple had an

214

```
 1    interest in charitably distributing XRP.

 2         Q.   And why did it have such an interest?

 3         A.   I don't know.

 4         Q.   Did you discuss that issue with anyone

 5    at Ripple?

 6         A.   It's difficult to recall conversations

 7    from 2013 about that now.

 8         Q.   So you don't have a general

 9    understanding of -- of why they -- they preferred

10    charitable giving?

11              MR. HORTON:  Objection.

12         A.   My assumption is that the members of the

13    company looked favorably on altruistic acts.

14         Q.   Okay.

15              MS. STEWART:  Okay.  Can we look

16         at PR-19 next?  One-nine.  And that's

17         Bates numbered RPLI_SEC 88057 to 58.

18              (Whereupon, exhibit is presented

19         and marked SEC Rapoport Exhibit PR-19 for

20         identification.)

21              (Pause)

22         A.   Okay.  I've read this.

23    BY MS. STEWART:

24         Q.   Okay.  Looking at the -- the last e-mail

25    in the chain, which is your 8:54 p.m. e-mail.
```

215

```
 1        A.   Yes.

 2        Q.   Do you see that?

 3             Why did you write this e-mail?

 4        A.   I don't recall the discussions that

 5   preceded this leading me to send this e-mail.

 6        Q.   Did anyone ask you to write this e-mail?

 7        A.   I don't think the recipients would have

 8   asked me to provide this information to them.

 9        Q.   And who do you mean by "the recipients"?

10        A.   I think if ██████████ and ██████

11   ██████ were interested in this information, they

12   would ask their legal advisor.

13        Q.   Okay.  So then why were you sending them

14   this information?

15        A.   It's hard to -- for me to remember what

16   my motivation was on January 2014 at 8 p.m.

17        Q.   Okay.  Do you recall any conversations

18   with -- well, let me step back.

19             What is ██████████?

20        A.   ██████████ is an asset management firm.

21        Q.   Okay.  And why at this time were you

22   having conversations with Mr. ██████ and

23   Mr. ██████?

24        A.   At some point before or after this

25   e-mail, they were investigating and -- and
```

216

1    proceeded to start a separate unaffiliated Ripple

2    market-making firm that did business under the

3    name of ███████████, as I mentioned earlier.

4        Q.   Okay.  And in connection with that deal,

5    did you have conversations with -- with

6    Mr. ████████ or Mr. ████████ about the issues that

7    are referenced in your e-mail here in Exhibit

8    PR-19?

9            MR. HORTON:  Objection to form.

10       A.   Any -- like any prudent financial market

11   participant, I believe all of the market-making

12   firms that ultimately engaged in trading on Ripple

13   did some form of investigation around these

14   questions prior to starting to trade on the

15   platform.

16       Q.   Okay.  Well, did you have discussions

17   with -- with either Mr. ████████ and Mr. ████████ or

18   any other individual of the firms you were talking

19   to?  Did you have discussions about these issues?

20           MR. HORTON:  Objection to form.

21           MR. GULAY:  Objection to form.

22       A.   While it's difficult to recall specifics

23   of discussions, I do recall that every

24   market-making firm generally did some form of

25   regulatory investigation prior to commencing to

217

1  trade on the Ripple network.  And so I do recall

2  having -- I do generally recall having discussions

3  on this topic with many or most of the

4  market-making firms that ultimately moved forward.

5      Q.   Did any of the market-making firms

6  express to you that XRP may be a security?

7      A.   Each of them independently investigated

8  it, to my understanding, and all of them reached

9  the same conclusion, that it was not likely to be

10  considered a security.  And so the primary area of

11  further investigation was around money

12  transmission regulation, which is what people

13  generally thought was more potentially applicable.

14      Q.   Okay.  Did you convey the discussions

15  that you were having with these market-making

16  firms to others at Ripple?

17      A.   I'm sorry?

18      Q.   Did you convey these discussions we've

19  been talking about that you were having with

20  market-making firms to others at Ripple?

21          MR. HORTON:  Objection to form.

22      A.   It's difficult for me to recall whether

23  I did or I didn't.

24      Q.   So you start your e-mail, the bottom

25  e-mail, saying "I want to emphasize that I'm not a

1    lawyer, nor do I have expertise on these issues.

2    But here are some interpretations/excerpts I've

3    picked up after talking to a bunch of legal

4    experts (many of whom had" differ -- "differing

5    opinions, I might add)."

6            Who are the bunch of legal experts that

7    you talked to?

8        A.   I had a very large number of

9    conversations with a large number of people on the

10   topic of Ripple and so it's difficult for me to

11   recall who I would have talked to apart from

12   Ripple's internal counsel and Ripple's external

13   counsel.

14       Q.   How did it come that you undertook to

15   speak to all of these lawyers about these issues?

16               MS. BUNTING:  Objection.

17               MR. GULAY:  I just want to pause

18       here.  You can -- you can answer the

19       question, but I would just caution you not

20       to reveal the substance of any privileged

21       communications with Ripple's lawyers.

22       A.   As you can see from Exhibit PR-15, in my

23   conversations with ▮▮▮▮▮▮▮▮▮   I was generally

24   willing to talk to anyone who would listen about

25   Ripple, and that included people from a variety of

1    different professions, some of whom were legal

2    professionals.  So that's how I came to speak with

3    people who are not Ripple's counsel on the topic.

4         Q.   So I'm just trying to understand sort of

5    the chronology here.

6              Was it the case that you wanted to put

7    together this e-mail and then you went and sought

8    out lawyers to talk to or was it the case that

9    you'd already talked to lawyers among the various

10   other people you talked to and then you put that

11   information in this e-mail?

12              MS. BUNTING:  Objection.

13              MR. HORTON:  Objection to form.

14        A.   I independently looked up the legal

15   excerpts and had an interest in reading them on a

16   personal level that are referenced in this e-mail.

17   This isn't something somebody sent to me.

18              THE REPORTER:  Repeat the last

19        part.

20        A.   I independently looked up legal excerpts

21   or excerpts from -- from laws, I guess, that --

22   that I had a personal interest in understanding

23   and reading.  And this is not information that

24   someone else sent to me.

25        Q.   But in terms of the legal experts you

220

```
 1    talked to, the individuals, did you do that in

 2    order to put this document together or had you

 3    already done that as part of your job

 4    responsibilities?

 5              MR. GULAY:  Objection; calls

 6         for --

 7              MR. HECKER:  Objection.

 8              MS. BUNTING:  Objection.

 9    A.   As a matter of --

10              MR. GULAY:  Well, hold on.

11              MR. HECKER:  Go ahead.

12              THE WITNESS:  You want to --

13              MR. GULAY:  We -- I mean, I think

14         that calls for -- you know, if it's

15         requesting for legal advice, I think that

16         this calls for potentially privileged

17         information.  You know, the reason why he

18         wanted to seek advice from lawyers.

19              MS. STEWART:  Okay.  I'll --

20         I'll -- I'll rephrase the question.

21    BY MS. STEWART:

22    Q.   What I'm trying to understand is whether

23    you wanted to write an e-mail that you would then

24    send to third parties with -- with this

25    information and to do that, you sought out legal
```

1     experts.

2              Is that how it happened?

3                   MS. ZORNBERG:  Might I suggest a

4         short break?  Because maybe we can speak

5         to him and -- you know, or his counsel

6         can, to clarify what you're trying to get

7         at and find a way that he can answer in a

8         way that's comfortable without -- you

9         know, avoiding privilege issues.

10                  MS. STEWART:  That's fine.

11                  MR. TENREIRO:  Sure.  Just before

12        we go off the record, again, I mean, this

13        is an example of him saying to someone

14        else, most -- most lawyers I've spoken to.

15        So as we discussed this morning, I'm not

16        sure what the basis of asserting privilege

17        over what he's conveying to other people

18        is.  So let's go off the record and

19        discuss that, but I think that's what

20        she's trying to talk about so --

21                  MR. HORTON:  I think we heard the

22        questions differently.

23                  MR. TENREIRO:  Okay.  That's --

24        that's possible.  Sure.  But let's go off

25        the record and talk about it and see what

222

```
1          we can do.
2                    MS. STEWART:  Yeah.
3                    THE VIDEOGRAPHER:  Going off the
4          record at 3:19.
5                    (Whereupon, a recess is taken.)
6                    THE VIDEOGRAPHER:  Okay.  Back on
7          the record at 3:30.
8                    MR. GULAY:  Okay.  So, yeah,
9          we are prepared to make a -- a proffer
10          about this particular document in the
11          hopes that it will clarify things and for
12          further questioning.
13                    So prior to the date of the
14          e-mail, January 4th, 2014, Mr. Rapoport
15          had some discussions with Ripple's
16          lawyers as well as other attorneys who
17          were not representing the company at the
18          time, some of whom were his friends.  He
19          can't parse which discussions led to
20          which portions of the e-mail.  So, in
21          other words, he can't parse whether
22          discussions with Ripple's counsel led to
23          certain portions of this e-mail or his
24          understanding informing certain portions
25          of this e-mail as opposed to his
```

223

1       discussions with the non-Ripple

2       attorneys.

3             The document does reflect

4       Mr. Rapoport's efforts to, you know,

5       share his then-present understanding of

6       these topics with ████████

7             He -- he did not -- for purposes

8       of this e-mail, he did not speak with any

9       attorneys for the -- for the purpose of

10      writing the e-mail or -- and he did not

11      ask any attorneys to review the e-mail,

12      so it doesn't reflect direct input of

13      attorneys.

14             So we think that you can -- you

15      know you can ask -- you can him

16      questions, but, you know, he just doesn't

17      have recollection of those privileged

18      communications with Ripple attorneys.

19             And, so, Mr. Rapoport, can you

20      just confirm that that accurately

21      reflects your understanding and

22      recollection of this e-mail and its

23      preparation?

24             THE WITNESS:  Yes, that's

25      correct.

224

1          MS. STEWART:  Okay.  Thank you.

2     That's helpful.

3   BY MS. STEWART:

4     Q.   So first focusing on the conversations

5   you had before this e-mail with Ripple's lawyers,

6   I don't want to know about the substance of those

7   conversations, but who were the lawyers that you

8   spoke with?

9     A.   Having seen ████████████ name on a

10  prior document from Perkins Coie, I remember his

11  particular name, but I don't otherwise recall the

12  names of specific attorneys outside of Ripple that

13  were -- that were engaged by Ripple in an official

14  capacity.

15    Q.   Do you remember any other law firms?

16    A.   I remember Paul Hastings was another law

17  firm that Ripple worked with at times.

18    Q.   And do you recall conversations with

19  Paul Hastings prior to this e-mail?

20    A.   I don't recall any specific

21  conversations with Paul Hastings or the timing of

22  those conversations.

23    Q.   Okay.  And were there also conversations

24  with Ripple's in-house lawyers?

25    A.   I had a number of conversations with

1    ████████████, who was, I believe, general counsel

2    internally for a period of time.  But, again,

3    specifics of those are -- are difficult to recall

4    given how much time has passed.

5         Q.   Okay.  And in terms of the other

6    attorneys who are not Ripple's attorneys, who did

7    you speak with?

8         A.   I can freshly remember ███████████,

9    which I would not have otherwise recalled had you

10   not just shown me this e-mail.  But I have a

11   number of friends who are attorneys and this was a

12   topic that was of personal interest to me even

13   prior to my time at Ripple Labs.  And so I had a

14   number of discussions with friends over the course

15   of a number of years.

16        Q.   Okay.  Do you recall the names of any of

17   those friends?

18        A.   Which friends were both attorneys and

19   that I had discussions with is, again, difficult

20   for me to -- to remember given how much time has

21   passed.

22        Q.   Okay.  So you say here in your e-mail,

23   under number 1, "Most lawyers whom I've spoken" --

24   I think that should be spoken with -- "seem quick

25   to agree that XRP is not a security."

226

1        Do you see that?

2        A.   I do.

3        Q.   Were there lawyers who were friends of

4    yours who you spoke with who -- who did think XRP

5    was a security?

6        A.   In my recollection, it was

7    unanimously -- everyone unanimously thought that

8    this was not really a critical question and that

9    XRP was clearly not likely to be a security.

10       Q.   Okay.  But you wrote in your e-mail

11   "most lawyers."

12            So what does that refer to?

13            MR. HORTON:  Objection.

14       A.   I don't recall the specific thought

15   process, but some of the lawyers I spoke with may

16   not have had a view or expertise on whether or not

17   something is a security, so they may not have had

18   any opinion at all.

19       Q.   Okay.  Now, you -- you -- you mentioned

20   that this topic was of general interest to you, is

21   that right?

22       A.   The regulation of digital assets was

23   broadly interesting to me, yes.

24       Q.   Okay.  Were there others at Ripple that

25   you're aware of who were also interested in this

227

1    topic?

2              MR. HORTON:  Objection to form.

3         A.   I would assume so, but I don't have

4    specific examples to reference on that.

5         Q.   Did you discuss this topic with others

6    at Ripple?

7         A.   I'm sure I did but I can't recall

8    specific conversations.

9         Q.   And -- and you said earlier, before our

10   break, that the market-making firms that you were

11   interacting with were doing their own due

12   diligence on these regulatory issues, is that

13   right?

14        A.   That's what I understood to be true,

15   yes.

16        Q.   Did -- did Ripple provide facts or other

17   information to those market-making firms as part

18   of their due diligence?

19              MR. GULAY:  Objection to form.

20        A.   I believe I shared certain documents

21   like the white paper that had Perkins Coie's logo

22   on the top of it that we -- that we looked at

23   earlier today.

24        Q.   Okay.  Any other facts or information

25   that you related in a more informal way, whether

228

1    over the phone or by e-mail or in person --

2                MR. HORTON:  Objection.

3                MR. GULAY:  Objection to form.

4        Q.   -- that would go into such an analysis?

5                MR. HORTON:  Objection to form.

6        A.   I viewed all of these firms and people

7    to be sophisticated financial market participants

8    who would have relied on their own due diligence

9    and analysis and not anything that I said beyond

10   maybe to help identify what the primary areas of

11   investigation could be.

12       Q.   And you go on in this document to -- to

13   talk about the fact that "XRP doesn't qualify as a

14   currency under the U.S. Treasury's definition," is

15   that right?

16       A.   That's what this -- that's what this

17   e-mail says.

18       Q.   Okay.  And what was this based on, your

19   conclusion?

20       A.   This was my current understanding

21   synthesizing a variety of conversations and things

22   that I had read.

23                MR. GULAY:  And the same

24         instruction about your discussions with

25         Ripple counsel.

229

1          THE WITNESS:  Understood.

2     BY MS. STEWART:

3          Q.   By sending this document to █████

4     █████ -- well, strike that.

5               By sending this document to Mr. ██████

6     and Mr. ████████ were you trying to provide

7     assurances to them about the regulatory landscape?

8                    MR. HORTON:  Objection to form.

9                    MS. BUNTING:  Objection.

10         A.   For context, I'd known both of these

11    people, you know, in excess of 10 and 20 years.

12    And so this was a conversation between friends

13    about a topic of mutual interest and was not meant

14    to provide assurances about anything.

15         Q.   But it was a topic of mutual interest

16    concerning a transaction that you were

17    contemplating, right?

18                    MR. HORTON:  Objection to form.

19         A.   It -- it was related to, yes.

20         Q.   Okay.

21                    MS. STEWART:  Can we look at 20

22         next?

23    BY MS. STEWART:

24         Q.   Sticking with PR-19 for a second, the

25    very last sentence on the first page of the

230

1    document where the sentence before says they --

2    "They also all specify that in order to be a

3    currency, it must be the legal -- "the legal

4    tender of some sovereign.  Pretty clear-cut."

5            Do you see that?

6        A.   I do.

7        Q.   What did you mean by "pretty clear-cut"?

8        A.   This is an e-mail that begins with "I

9    want to emphasize that I'm not a lawyer, nor do I

10   have expertise on these issues."  But in my

11   amateur reading of the excerpts that were attached

12   to this e-mail, I thought it was clear-cut from

13   the plain English reading of these that digital

14   assets are not currencies under the way I read

15   those definitions.

16       Q.   Okay.

17            (Whereupon, exhibit is presented and

18   marked SEC Rapoport Exhibit PR-20 for

19   identification.)

20              MS. STEWART:  PR-20 is Bates

21       numbered RPLI_SEC 88024 to 25.

22              MS. FORBES:  Could you repeat the

23       exhibit number, please?

24              MS. STEWART:  Twenty.

25              MS. FORBES:  Twenty?

1           MS. STEWART:  Yes.

2           MS. FORBES:  Thank you.

3           (Pause)

4           THE WITNESS:  Okay.  I've

5      reviewed this.

6  BY MS. STEWART:

7      Q.   Okay.  And who is ████████████████?

8      A.   ████████████████ is a representative of

9  a market-making firm, trading firm.

10     Q.   And is that ████████████?

11     A.   Yes.

12     Q.   Okay.  And what was the relationship

13  between ████████████ and Ripple at this time in

14  2014?

15          MR. HORTON:  Objection to form.

16     A.   At some point, I'm not certain if it was

17  before or after the time stamp on this e-mail,

18  ████████████████ and his team became -- had -- had

19  a formalized relationship with Ripple as market

20  makers and received compensation for services.

21     Q.   Okay.  And am I correct that you send

22  the same e-mail that we had just looked at in

23  PR-19, you send that e-mail to ████████████████

24  and ████████ is that right?

25     A.   Yes, it looks like the same e-mail.

232

```
 1        Q.   Okay.  And why did you send this e-mail
 2   to Mr. ███████ and Ms. -- Mr. █████ -- is it
 3   Mr. █████?
 4        A.   Yes.
 5        Q.   Okay.
 6        A.   I personally found it interesting
 7   looking through the actual texts of -- of these
 8   definitions and how they're written.  And, again,
 9   this was a topic -- I was aware of the fact that
10   all of the firms did their own independent
11   investigation and I thought that -- I'm assuming.
12   I don't recall sending this specific e-mail, but
13   I'm assuming I thought they would find it
14   interesting to also read the actual language as
15   opposed to just speaking with legal professionals
16   as people would typically do when they
17   investigate.
18               THE REPORTER:  Repeat the last
19       part.
20        A.   As opposed to just speaking with legal
21   professionals as people typically do when they
22   investigate a matter.
23        Q.   And who is ████████████?
24        A.   ████████████ worked at a firm called
25   ████████ which was at times engaged by Ripple
```

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

233

1    Labs.

2         Q.   For what services?

3         A.   ████████████ was a -- is a regulatory

4    advisory firm.

5         Q.   And was there a call with Mr. █████████

6    and Mr. █████████?

7         A.   It appears from this e-mail that there

8    was a call together with ████████████.

9         Q.   And what was the nature of that call?

10        A.   I don't recall the specific discussion,

11   but my assumption is that we held a call for these

12   individuals to speak with ████████████ about his

13   area of expertise, which is regulatory issues.

14        Q.   What types of regulatory issues?

15        A.   I don't recall what was discussed on the

16   call and I don't frankly recall ████████████

17   specific background without looking it up.

18        Q.   And then you send, also, some FinCEN

19   guidance.  You send a link to FinCEN guidance in

20   this e-mail.

21             Do you see that?

22        A.   Yes.

23        Q.   Why did you send that?

24        A.   In my recollection, this was the primary

25   regulatory guidance that was available at the

234

1    time.

2        Q.   And then you say in the third bullet,

3    "This is a good summary of the legal landscape

4    from Katten."

5             Do you see that?

6        A.   I do.

7        Q.   Why did you send that link to

8    Mr. ███████?

9        A.   I don't recall the content of that link.

10       Q.   Other than the documents we've looked

11   at, PR-19 and PR-20, were there others -- other

12   third parties that you sent the legal definitions

13   to?

14       A.   Given that I sent it to two groups of

15   people, it's plausible that I sent it to others,

16   but I don't recall whether I did or didn't.

17            MS. STEWART:  Nicole, PR-21 next,

18       please.

19            (Whereupon, exhibit is presented

20       and marked SEC Rapoport Exhibit PR-21 for

21       identification.)

22            MS. STEWART:  PR-21 is Bates

23       numbered SEC-█████████-E-72551.  It's a

24       one-page document.

25            (Pause)

235

1              THE WITNESS:  Okay.  I've

2        reviewed this document.

3              MS. STEWART:  Okay.

4   BY MS. STEWART:

5        Q.   Who is ███████████?

6        A.   ████████████ was a representative of a

7   market-making firm called ████████████████

8        Q.   And who is ████████████████?

9        A.   He's an associate at the same firm.

10       Q.   Okay.  And did -- did this firm have

11  a -- a relationship with Ripple in 2014?

12       A.   Similar to the others.  I don't recall

13  whether the formalization of a relationship

14  occurred before or after this timestamp, but

15  eventually they did have a -- a similar formalized

16  relationship for market-making services with

17  Ripple --

18       Q.   And what did you say -- I'm sorry.

19       A.   With Ripple Labs.

20       Q.   Thank you.

21            What did you say the name of the firm

22  was?

23       A.   ████████████████ was the d/b/a.  I

24  don't remember the entity name.

25       Q.   And were they affiliated with ██████

236

A.    No.  Not to my knowledge.

Q.    Okay.  So what -- what is -- what are
you discussing in this e-mail that's Exhibit
PR-21?

A.    Without seeing other communications from
around that time, I don't remember the specifics
of what we were discussing.

Q.    When you say in your e-mail "We're
making progress in finding the right structure,"
what are you referring to?

A.    I do have a general recollection from
this time period being on the phone discussing tax
issues.  I don't remember the nature of the
question that we were trying to resolve.  But,
generally speaking, the area, the whole space had
a lot of questions around tax accounting treatment
and all sorts of other questions.  So this was not
uncommon.

MR. GULAY:  Here I just want to
caution you not to reveal the substance of
any privileged communications you may have
had with lawyers at Perkins Coie.

THE WITNESS:  Understood.

BY MS. STEWART:

237

1      Q.   Did you discuss with Mr. ███████ or

2   Mr. ███████ the nuances of your discussions with

3   Perkins and ███████, as you say in your e-mail,

4   when you say "I'd be happy to explain the nuances

5   over the phone"?

6                MR. GULAY:  Same objection.

7                MR. HORTON:  I'm also going to

8        object in that it's not clear that that's

9        what the e-mail says.

10               MS. STEWART:  Okay.  I'll --

11       I'll -- I'll restate the question.

12   BY MS. STEWART:

13       Q.   You say in your e-mail "I'd be happy to

14   explain the nuances over the phone if you're

15   interested."

16               Do you see that?

17       A.   Yes.

18       Q.   Did you, in fact, have a conversation

19   where you explained the nuances to Mr. ███████ and

20   Mr. ███████?

21       A.   I -- I really don't have recollection of

22   the overarching topic that this e-mail is -- is

23   fitting into to -- to answer that.

24       Q.   Okay.

25               MS. STEWART:  Can we do 22 next?

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

238

1          PR-22, please, Nicole.  And

2      that's Bates numbered RPLI_SEC 12150 to

3      51.

4              (Whereupon, exhibit is presented

5      and marked SEC Rapoport Exhibit PR-22 for

6      identification.)

7              (Pause)

8      A.   Okay.  I've reviewed the document.

9  BY MS. STEWART:

10     Q.   Okay.  Who is █████████████?

11     A.   Based on the content of this e-mail, it

12 appears it's a cold e-mail from the website.  I

13 don't believe I had any further interaction with

14 this person before or after this e-mail.

15     Q.   Okay.  You say in your e-mail to

16 Ms. █████████, "There are a lot of

17 legal/regulatory and licensing requirements

18 involved in the idea you described.  It's very

19 important that we remain 100 percent compliant and

20 friendly with regulators.  That is one (of

21 several) reasons that we generally give away XRP

22 to individuals and have not experimented with

23 selling it."

24          Do you -- do you see that?

25     A.   Yes.

239

1      Q.   Was it accurate as of February 2014

2   that -- that Ripple had not experimented with

3   selling XRP?

4      A.   I'd have to look back through some of

5   these documents to confirm that that -- if that is

6   true or not.

7      Q.   Okay.  When you joined Ripple in 2013,

8   was it the case that Ripple had not sold XRP?

9          MR. GULAY:  Objection.  Also, the

10      e-mail's not clear whether its refers to

11      selling it full stop or selling to

12      individuals.

13      A.   I don't have specific recollection of

14   writing this e-mail, but I'm assuming that this

15   reflected my understanding at the time based on

16   the information that was available to me as a

17   relatively new employee of the company.

18      Q.   Okay.  You say in your e-mails that

19   being friendly with regulators and 100 percent

20   compliant is one of several reasons that Ripple

21   does giveaways, is that right?

22      A.   That's what the e-mail says.

23      Q.   Okay.  Is that -- is that accurate?

24      A.   It was important for us to be compliant

25   and friendly with regulators.  And I assume the

240

1    sentence that says that this is one of several

2    reasons that we generally give away to

3    individuals -- that "we generally give away XRP to

4    individuals and have not experimented with selling

5    it," I assume that reflects my understanding at

6    the time.

7         Q.    Okay.  What are the other reasons that

8    Ripple was doing giveaways as opposed to selling

9    XRP at this time in 2014?

10        A.    As I mentioned earlier, at the inception

11   of the company, there was a desire to be

12   charitable and do good deeds with the -- the

13   assets that the company held.

14        Q.    Any other reason?

15        A.    None that I can think of currently.

16        Q.    One more question on the document that

17   we had looked at earlier, the e-mails that you had

18   forwarded to Mr. ███████ and to Mr. █████████,

19   PR-19 and PR-20.

20        A.    Yes.

21        Q.    Did you -- so I see that you copied

22   Mr. Griffin on both those e-mails.

23              Were others at the -- at the company

24   aware that you were sending these e-mails to third

25   parties?

Case 1:20-cv-10832-AT-SN Document 865-20 Filed 06/18/23 Page 32 of 34
Case 1:20-cv-10832-AT-SN Document 860-10 Filed 09/13/23 Page 242 of 345

241

1                    MR. HORTON:  Objection to form.

2           A.   No, I don't believe others would have

3     had any reason to know about these e-mails.  These

4     were a synthesis of my personal understanding

5     based on conversations I had.

6           Q.   Are you familiar with an entity called

7     ████████████████████████████████████?

8           A.   Yes.

9           Q.   Okay.  And is that entity known as ████?

10          A.   Yes.

11          Q.   Okay.  How did you come to know ████?

12          A.   I don't remember the specific genesis of

13    how we met, but at some point in time I met them

14    and -- and had numerous conversations over a

15    period of time about Ripple.

16          Q.   Had you met anyone from ████ before your

17    time at Ripple?

18          A.   No.

19          Q.   And what was the nature of ████

20    relationship with Ripple?

21          A.   ████  I believe, ultimately invested in

22    the equity of Ripple Labs, Inc. and also purchased

23    XRP, if I recall, but the specifics are difficult

24    to remember without researching it.

25          Q.   Okay.  Let's look at some documents and

242

1    maybe that will refresh your recollection.

2                    MS. STEWART:  Can we look at

3        PR-39?

4                    And PR-39 is Bates numbered ████

5        2320.  It's a one-page document.

6                    (Pause)

7                    THE WITNESS:  Okay.

8    BY MS. STEWART:

9        Q.   Okay.  So what is this e-mail exchange

10   between you and ████ about?

11       A.   I don't recall this independently, but

12   based on reading the e-mail, it appears that ████

13   was interested in purchasing ████ worth of

14   Ripple -- of XRP.

15       Q.   Of XRP.

16       A.   Yes.

17       Q.   And you say in your e-mail to Mr. ████

18   ████ at the bottom, you say "Our intention is to

19   completely stop these OTC transactions after our

20   funding round closes, and we generally view XRP to

21   be undervalued at these levels."

22            Do you see that?

23       A.   Yes.

24       Q.   What did you mean by this?

25       A.   The first clause I think agrees with

243

1    some of the other e-mails that we've looked at

2    today, which is that various individuals had

3    conveyed this intent to stop selling OTC after a

4    funding round closes.

5            And the second clause, it's difficult

6    for me to say without knowing the price on that

7    day and the events, you know, surrounding that

8    day.  My memory just isn't that good about market

9    activities in 2014.

10       Q.   Okay.  Okay.  The next sentence you say

11   "When we close the 'OTC window' and push everyone

12   into the market soon, we think it will have a

13   bullish effect on price going forward."

14           Do you see that?

15       A.   Yes.

16       Q.   And what did you mean by "bullish effect

17   on price"?

18       A.   We talked about this concept a little

19   bit earlier, which is that in a -- in any market,

20   if all the buyers purchase directly from an

21   entity, in a hypothetical scenario, if a hundred

22   percent of buyers purchase from an entity and only

23   sellers went to the market, there's no mechanism

24   for the price to ever go up.  It could only go

25   down.