244

1          And so it was my view that selling OTC

2     had a negative impact both on the liquidity in the

3     market and the price of XRP.

4          Q.   And why were you telling Mr. ███ this?

5          A.   I was conveying my -- my views on the

6     market at the time.

7          Q.   Were you communicating to Mr. ███ that

8     the XRP that he would be purchasing would go up in

9     price once Ripple stopped doing OTC sales?

10               MR. HORTON:  Objection to form.

11          A.   As I said earlier, I thought the highest

12     probability of the outcome was that it goes to

13     zero, but I thought -- these were my -- my views

14     of the market at this given point in time.

15          Q.   Well, at this point in time you thought

16     that the -- the -- stopping the OTC sales would

17     have a bullish effect on price, right?

18          A.   Yes, I did think that there was a cause

19     and effect there.

20          Q.   Okay.  Did ███ ultimately buy this

21     $500,000 of XRP?

22          A.   From this e-mail, it seems like that

23     likely happened, but I don't recall if the

24     transaction was consummated.

25               MS. STEWART:  Okay.  Let's look

245

1          at another document, PR-40.

2                    (Whereupon, exhibit is presented

3          and marked SEC Rapoport Exhibit PR-40 for

4          identification.)

5                    MS. STEWART:  And PR-40 is Bates

6          numbered █████ 2297.  It's a one-page

7          document.

8                    (Pause)

9                    THE WITNESS:  Okay.  I've read

10         it.

11    BY MS. STEWART:

12         Q.   Okay.  So this -- this e-mail, PR-40,

13    appears to be one day after the e-mail we looked

14    at in PR-39.

15              Does this refresh your recollection as

16    to whether ████ bought $500,000 or whether it

17    ultimately bought a million dollars, or perhaps

18    these were separate transactions?  If you

19    remember.

20                    MR. HORTON:  Objection to form.

21         A.   Given that this was seven years ago, I

22    don't have specific recollection of -- of how

23    these days went down and whether these

24    transactions occurred.  From this e-mail, it looks

25    like they agreed to purchase $1 million worth of

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

246

1    XRP on September 11th, 2014.  I'm not sure if that

2    was in addition to or in -- you know, in lieu of

3    the prior day's e-mail.

4         Q.   Okay.  So this transaction that's

5    referenced in PR-40 includes a ████████████████

6    and ████████, is that right?

7         A.   That's what the e-mail says.

8         Q.   Okay.  And why was no lockup included

9    for this transaction?

10        A.   I don't recall what the circumstances

11   were surrounding the discussions outside of this

12   e-mail.

13        Q.   Was it your understanding that when

14   buying at a ████████████████████████████

15   ████ would immediately sell the XRP?

16             MR. HORTON:  Objection to form.

17             MS. BUNTING:  Objection.

18        A.   Generally speaking, I think there's a

19   lesser incentive to act that way if you hold more

20   of an asset because selling $100,000 immediately

21   could negatively impact the other ██████that

22   someone holds.  That's a general statement.  I

23   don't have any specific knowledge or recollection

24   about what -- what ████████ did to say.

25        Q.   Did you have any discussions with

247

1    Mr. ███ about what ████ intent was with respect

2    to the million dollars in XRP it was buying?

3        A.   I don't recall what discussions we did

4    or didn't have that day.

5        Q.   Do you recall discussions generally

6    with -- with him about what ███ intended to do

7    with the XRP it was purchasing?

8        A.   I do remember having a number of

9    discussions with him over the course of a long

10   period of time.  I don't remember whether or not

11   he expressed to me what his intent was with --

12   with the XRP that he purchased.

13       Q.   Whether or not he expressed it to you,

14   did you have an understanding of what his intent

15   was with respect to the XRP he was purchasing?

16       A.   I understood him to be a speculator.

17       Q.   Okay.  And did you understand him to be

18   a long-term speculator or a short-term speculator?

19            MR. HORTON:  Objection to form.

20            MS. BUNTING:  Objection.

21       A.   Based on the information available to me

22   at the time, I -- I viewed him as -- as a likely

23   long-term -- having a long-term interest in the

24   technology and a long-term speculator.

25       Q.   And what information are you referring

248

```
1   to?
2       A.   A synthesis of information from a number
3   of conversations over time.
4       Q.   Did Ripple place any restrictions on the
5   resale of the XRP that it was selling to ███?
6            MR. GULAY:  Objection;
7        foundation.
8       A.   I'm not aware of any restrictions that
9   Ripple placed on it, no.
10      Q.   Okay.
11           MS. STEWART:  Can you look at
12       PR-41 next, please?
13           (Whereupon, exhibit is presented
14       and marked SEC Rapoport Exhibit PR-41 for
15       identification.)
16           MS. STEWART:  And PR-41 is Bates
17       numbered ███ 1489 to 1490.
18           (Pause)
19           THE WITNESS:  Okay.
20   BY MS. STEWART:
21      Q.   Looking at the bottom e-mail in the
22   chain from Mr. ███ to you, which is on the second
23   page of the document, here he says "I believe I
24   can buy 4 MM by year end, I bought 3 MM USD
25   already."
```

249

1          Do you see that?

2     A.   Yes.

3     Q.   Does this refresh your recollection that

4  ▊ bought $3 million of XRP as of September 20,

5  2014?

6     A.   This e-mail implies -- certainly implies

7  that, yes.

8     Q.   Okay.  But you don't have a recollection

9  one way or the other?

10     A.   I don't recall whether he bought it from

11  Ripple, in the market through others or how -- how

12  and when or how much he purchased, no.

13     Q.   Okay.  Then looking at your response to

14  him, which is on the first page of the document,

15  you say "As I mentioned previously, we hope to

16  stop these 'OTC' sales after our funding round

17  officially closes and" we're no longer -- "we are

18  no longer reliant on XRP sales to help fund the

19  company (at least for a period of several" --

20  "several years)."

21          Do you see that?

22     A.   Yes.

23     Q.   Okay.  So -- and I think you said this

24  before, but is it the case that -- that OTC sales

25  at some point were -- were used to help fund

250

 1 | Ripple?

 2 |         MR. GULAY: Objection.

 3 |     A. Reading this e-mail, it -- it appears

 4 | that that was my belief at the time, yes.

 5 |     Q. Okay. And the next sentence, where you

 6 | say "I think the OTC sales hurt our efforts

 7 | elsewhere - it removes demand from the market and

 8 | also makes for lower volume," is that the same

 9 | concept that you've discussed already today about

10 | your view about OTC sales not being helpful for

11 | liquidity?

12 |     A. Yes.

13 |         MS. BUNTING: Objection.

14 |     Q. And then you say "If we satisfy every

15 | large buyer, then XRP will never rally."

16 |         What do you mean by that?

17 |     A. This is the same dynamic referenced in

18 | the preceding sentence and it was discussed about

19 | OTC sales dynamics.

20 |     Q. And were you explaining this -- this to

21 | Mr. ████be -- because, as a speculator, he wanted

22 | XRP to rally?

23 |         MR. HORTON: Objection to form.

24 |         MR. GULAY: Objection.

25 |     A. Reading the following paragraph, where I

1    asked "Do you have a sense of the size that the

2    Chinese buyers are interested in?  Perhaps we can

3    do a big final block before we close the OTC

4    window," it seems I may have been debating whether

5    we should force that buyer or encourage that buyer

6    to go into the market to purchase the XRP

7    independently of Ripple Labs.

8         Q.   And was that related to the desire to --

9    the desire for the XRP price to rally?

10              MR. HORTON:  Objection to form.

11        A.   As I said earlier, I -- I thought that

12   OTC sales hurt liquidity, market liquidity, as

13   well as price.

14        Q.   Did Ripple, in fact, stop selling XRP

15   after this funding round that's referenced in your

16   e-mail?

17              MR. HORTON:  Objection to form.

18        A.   I don't recall whether I had information

19   one way or another and I certainly didn't have

20   full transparency into Ripple's XRP sales to

21   answer that definitively.

22        Q.   Do you have a general memory as to

23   whether Ripple continued to sell XRP during your

24   tenure at Ripple?

25              MR. GULAY:  Objection.  What do

252

1          you mean, "selling XRP"?  OTC or just

2          generally?

3                    MS. STEWART:  Yes, I'm talking

4          about over-the-counter sales right now.

5          A.   I would be guessing because without more

6     information, I couldn't even tell you what the

7     date of the Series A round was given how much time

8     has passed.

9                    MS. STEWART:  Okay.  Can we look

10         at PR-44 next?

11                   (Whereupon, exhibit is presented

12         and marked SEC Rapoport Exhibit PR-44 for

13         identification.)

14                   MS. STEWART:  And PR-44 is Bates

15         numbered RPLI_SEC 199575 to 576.

16                   (Pause)

17                   THE WITNESS:  Okay.

18    BY MS. STEWART:

19         Q.   Okay.  So in this e-mail you are talking

20    with Mr. Larsen, Mr. Griffin, and others about a

21    deal with ███ that would bring their total XRP

22    purchase -- purchases to $10 million, is that

23    right?

24         A.   Yes.

25         Q.   Okay.  And -- and the deal would include

253

1    a ████████████ and a ████████████?

2        A.   Yes.

3        Q.   Okay.  And do you see in the first --

4    the second e-mail in the chain where Mr. Larsen

5    says "Yes, I'm moving forward here - the lockup is

6    great"?  Do you see that?

7        A.   Yes.

8        Q.   Did Mr. Larsen approve every OTC

9    transaction?

10              MS. BUNTING:   Objection.

11       A.   I only saw the details of what I thought

12   were a subset of the OTC transactions.  And I

13   generally recall Mr. Larsen approving them, but I

14   don't have a good enough memory to say he did or

15   did not approve every transaction that I was

16   involved in.

17       Q.   Okay.  And Mr. Larsen says here "the

18   lockup is great."

19              Do you have an understanding of what he

20   means by that?

21       A.   I think he preferred having a lockup in

22   place to having no lockup in place.

23       Q.   And what's your understanding of why he

24   preferred that?

25       A.   In general, I think we all shared a

254

1    preference for the price of XRP to rise rather

2    than fall and there was a risk that large holders

3    buying at a discount could sell at the market

4    price to arbitrage a smaller large profit or a

5    significant profit.

6              MS. STEWART:  Can we look at

7         PR-52 next?

8              And PR-52 is Bates numbered

9         RPLI_SEC 199556 to 561.

10             (Whereupon, exhibit is presented

11        and marked SEC Rapoport Exhibit PR-52 for

12        identification.)

13             (Pause)

14             MR. GULAY:  I just want to note

15        for the record there appears to be a page

16        missing.  It skips from 557 to 559.

17             MS. STEWART:  Okay.  I think

18        there was another attachment that was not

19        a substantive one that I didn't print, but

20        I can't be sure of that.

21             MR. GULAY:  Okay.  Noted.

22             THE WITNESS:  Okay.  I've

23        reviewed it.

24   BY MS. STEWART:

25        Q.   Okay.  So this appears to be an e-mail

255

1      from Mr. ███ to you that you then forward to

2      Mr. Larsen and others attaching the long-term

3      Ripple fund term sheet, is that right?

4          A.   Yes.

5          Q.   Okay.  So what is the long-term Ripple

6      fund?

7          A.   I'm not aware that the long-term Ripple

8      fund was anything.  It says it's yet to be formed,

9      manager and detail legal structures to be

10     determined by lawyers.  I believe as the e-mail

11     from Mr. ███ says, these are just thoughts.

12         Q.   Okay.  Was this fund something that you

13     were discussing with Mr. ███?

14         A.   I'm sure I discussed this after he

15     put -- discussed this with him after he put in the

16     time to draft it, yes.

17         Q.   Okay.  So can you just explain to me

18     what this fund -- well, strike that.

19              Did this fund ever come to be?

20         A.   Not to my knowledge.

21         Q.   Okay.  What -- what was supposed to be

22     the structure of this fund that you were

23     discussing with Mr. ███ both before and after

24     this -- this document?

25              MR. GULAY:  Objection to form.

256

1    A.    I recall that Mr. ████ had a general

2    desire to form some entity that would allow third

3    parties to get exposure through his entity to the

4    price of XRP.  I think he shares a lot of thoughts

5    in this attachment which I viewed in draft form

6    for discussion purposes.

7        Q.    And was Ripple interested in pursuing

8    such a fund with ████?

9                MR. GULAY:  Objection;

10        foundation.

11    A.    Based on my recollection, I would -- of

12    general circumstances at the company at the time,

13    I think the company would have been happy to have

14    a third party create an entity that purchases a

15    lot of XRP.

16        Q.    And why is that?

17    A.    Because it would have allowed the

18    company to monetize assets on its balance sheet.

19        Q.    And would it also -- would it also allow

20    the company to manetize -- monetize assets on its

21    balance sheet without some of the liquidity issues

22    that you have discussed surrounding OTC sales?

23                MR. HORTON:  Objection to form.

24                MR. GULAY:  Objection.

25    A.    That would depend on the details, which

257

1    are unknown in this hypothetical discussion.

2        Q.   Okay.  As -- as you -- did the

3    discussions with Mr. ██████ continue after this

4    document that we're looking at in PR-52?

5        A.   I believe Mr. ██████ had an ongoing

6    relationship with Ripple that extended beyond

7    this -- this e-mail.

8        Q.   So what would the benefit to Ripple be

9    of having a third party like this fund buy its XRP

10   versus the other distribution strategies that

11   we've talked about today, like the OTC sales or

12   the giveaways?

13              MR. GULAY:  Objection.

14              MS. BUNTING:  Objection.

15              MR. GULAY:  Calls for

16        speculation.

17       A.   Whether it would be beneficial or not

18   would depend largely on the details, which are

19   unknown.

20              MR. TENREIRO:  Just so you know,

21        Erol, the -- the missing page is called

22        "Attachment 2" and it's a blank page.

23              MR. GULAY:  Okay.

24              MS. STEWART:  Thank you.

25              Okay.  Can we look at 51 next,

258

1    please?

2              (Whereupon, exhibit is presented

3        and marked SEC Rapoport Exhibit PR-51 for

4        identification.)

5              MS. STEWART:  PR-51 is Bates

6        numbered ███ 1955.  It's a one-page

7        document.

8              (Pause)

9              THE WITNESS:  I've -- I've

10       reviewed this.

11   BY MS. STEWART:

12       Q.   Okay.  Looking at Mr. ███ e-mail to

13   you at the bottom of the page, he says "As I

14   think" -- "As I think through the utility of XRP,

15   a stable XRP and a more liquid XRP promotes

16   business."

17            Do you see that?

18       A.   Yes.

19       Q.   Do you agree with that statement?

20       A.   I find that to be an unclear statement,

21   unclear sentence.  Promotes what business?

22       Q.   Okay.  So you don't have an opinion

23   about that sentence?

24       A.   What do you understand "promotes

25   business" to mean here?  Then maybe I can answer

259

1  if I think it's true.

2      Q.   Well, I can't -- I can't provide

3  answers, so it's just your understanding of -- do

4  you have an understanding of what he means in this

5  sentence?

6      A.   I don't understand what that means.

7      Q.   Okay.

8      A.   So it's difficult for me to say if it's

9  true.

10      Q.   Okay.  Then a couple of paragraphs down,

11  Mr. ████ says "Lastly, if Ripple Labs is in the

12  market stabilizing XRP, it looks bad and is an

13  excuse for others to criticize Ripple.  But if a

14  third party buys on behalf of institutions, then

15  no one says nothing."

16          Do you see that?

17      A.   I do.

18      Q.   Okay.  Do you agree with Mr. ████

19  statement?

20      A.   I think this statement reflects Mr.

21  ████ thoughts and not the thoughts of anyone at

22  the company and certainly not my thoughts.

23      Q.   Okay.  Do you agree that if -- if Ripple

24  Labs is in the market stabilizing XRP, it looks

25  bad?

260

1          MR. GULAY:  Objection.

2      A.   I would certainly perceive it negatively

3  as a third party if I was aware that Ripple Labs

4  was in the market stabilizing XRP.

5      Q.   Was one of the goals of this fund that

6  was being discussed with Mr. ███ to stabilize the

7  price of XRP?

8          MR. GULAY:  Objection.

9      A.   Mr. ███ is clearly sending

10  unsolicited -- his unsolicited thoughts about this

11  topic, but it was not a goal of Ripple Labs to

12  have him do that.

13     Q.   And when -- when you respond

14  "Exactly - the fund can be as big as it wants to

15  be," and then you go on to say "RL will want to

16  supply the majority of it, but if the fund has

17  more demand than RL wants to provide, that's not

18  necessarily a problem," do you see that?

19     A.   Yes.

20     Q.   What's -- why -- well, first of all, RL

21  here refers to Ripple Labs?

22     A.   Yes.

23     Q.   Okay.  And when you say "Ripple Labs

24  will want to supply the majority of it," meaning

25  the fund, what is that statement based on?

261

1          A.   I must have been making an assumption

2     about a dollar amount that the fund would be

3     interested in purchasing and making an assumption

4     that Ripple Labs would be interested in supplying

5     the majority of that dollar amount.

6          Q.   Did you -- did you discuss that with

7     anyone at Ripple?

8          A.   I don't recall the specific

9     circumstances surrounding this e-mail exchange.

10         Q.   Why did Ripple want to supply the

11    majority of the XRP for this fund?

12              MR. GULAY:  Objection.

13         A.   Again, I don't remember the specific

14    circumstances surrounding this e-mail exchange,

15    but I can presume that Ripple's interested in

16    getting XRP off its balance sheet and getting

17    dollars on to its balance sheet.

18         Q.   Okay.

19              MS. STEWART:  Can we look at

20         PR-65 next?

21              (Whereupon, exhibit is presented

22         and marked SEC Rapoport Exhibit PR-65 for

23         identification.)

24              (Pause)

25              THE WITNESS:  Okay.  I've -- I've

262

1      reviewed this.

2  BY MS. STEWART:

3      Q.   Do you remember receiving this e-mail

4  from Mr. ███ in December 2014?

5      A.   I -- I don't remember this e-mail, but

6  I'm looking at it and, you know, I was a party to

7  it.

8      Q.   Okay.  Do you recall having discussions

9  about the issues reflected in the e-mail with

10 Mr. ███?

11     A.   I don't remember specifically discussing

12 these issues with Mr. ███, but I do remember that

13 these were issues that were considered at various

14 times during my time with the company.

15     Q.   Okay.  Is -- is Mr. ███ here asking

16 that Ripple get a legal opinion that XRP is not a

17 security?

18              MR. HORTON:  Objection to form.

19     A.   In my recollection, Ripple did already

20 have a legal memo that gave us comfort that XRP

21 was not likely to be considered a security, and I

22 believe we sought another one after this which

23 said the same thing ultimately.

24     Q.   Okay.  And the legal memo that you're

25 referring to that -- that Ripple already had, was

263

1    that from Perkins Coie?

2         A.   I believe so, yes.

3         Q.   Okay.  Had you shared that legal memo

4    with Mr. ██?

5         A.   Reading this e-mail, it would imply he

6    had not seen it, but I don't recall if I shared it

7    or not.

8         Q.   Did you share that legal memo with

9    Mr. ██ after you received this e-mail that's

10   Exhibit PR-65?

11              MR. HORTON:  Objection to form.

12        A.   I apologize.  I just don't remember

13   seven years ago.

14        Q.   After you received this e-mail, you

15   sought another legal memo from another firm?

16              MS. ZORNBERG:  Objection.

17        A.   My recollection is that there was more

18   than one law firm that helped us investigate this

19   issue and came to the same conclusion, yes.

20              MR. GULAY:  I'm sorry, just to --

21         to pause again and caution you not to

22         reveal the -- any discussions with outside

23         counsel or the -- the outcome of any of

24         your discussions with outside counsel or

25         the conclusions of counsel.

1              THE WITNESS:  Okay.

2              MS. ZORNBERG:  I'd also like to

3        take a break.

4              MS. STEWART:  Okay.

5              MS. ZORNBERG:  Is now a good time

6        to take a short break?

7              MS. STEWART:  That's fine.

8              THE VIDEOGRAPHER:  Okay.  Going

9        off the record at 4:29.

10             (Whereupon, a recess is taken.)

11             THE VIDEOGRAPHER:  On the rec --

12       on the record, 4:45.

13   BY MS. STEWART:

14       Q.   So, Mr. Rapoport, I think you told me

15   before the break that you weren't sure whether you

16   sent the Perkins Coo -- the Perkins Coie memo to

17   Mr. ▆▆▆▆ is that right?

18       A.   Yes.  I'm not sure one way or another.

19       Q.   Okay.  Why did you retain Paul Hastings

20   to prepare a memo when you already had a memo from

21   Perkins Coie?

22             MR. GULAY:  Objection.

23             MR. HORTON:  Objection.

24             MR. GULAY:  Calls for privileged

25       communications.

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

265

1          You can answer to the extent it

2      won't reveal the substance of any

3      communications with outside counsel.

4      A.   I -- I don't believe I was ever the

5  person at Ripple Labs engaging any lawyer or law

6  firm.

7      Q.   Okay.

8          MS. STEWART:  Can we -- can we

9      look at Exhibit 68, please?

10          (Whereupon, exhibit is presented

11      and marked SEC Rapoport Exhibit PR-68 for

12      identification.)

13          MS. STEWART:  And Exhibit 68 is

14      Bates numbered ███ 1803 to 05.

15          (Pause)

16          THE WITNESS:  I've reviewed this.

17  BY MS. STEWART:

18      Q.   And in the second e-mail in this chain,

19  you're telling Mr. ███ "FYI, Paul Hastings is

20  producing a memorandum for us which explains why

21  we don't believe XRP is a security.  ETA equals

22  January 23rd."

23          Do you see that?

24      A.   I do.

25      Q.   Okay.  Did Ripple retain Paul Hastings

266

1    to produce a memorandum in response to Mr. █████

2    request?

3                    MR. HORTON:  Objection.

4                    MR. GULAY:  Objection.  The --

5            the reason why Ripple retained Paul

6            Hastings would be privileged.

7                    MS. STEWART:  Well, let -- let's

8            start chronologically.

9    BY MS. STEWART:

10       Q.   Did Mr. -- did -- did Ripple retain Paul

11   Hastings to produce a memorandum after Ripple

12   received Mr. █████ e-mails in December and

13   January that we've looked at?

14                   MR. HORTON:  Objection to form;

15           foundation.

16       A.   I don't know when Ripple retained Paul

17   Hastings.

18                   MS. STEWART:  Okay.  And your --

19           your position, Erol, is that the reason

20           that Ripple retained Paul Hastings is

21           privileged?

22                   MR. GULAY:  Yes, the -- the

23           purpose of the legal advice sought from

24           Paul Hastings would be privileged.

25                   MS. STEWART:  So even -- even

267

```
1          the -- the purpose that you would put on a
2          privilege log, like the "re" line of the
3          engagement, you're saying is privileged?
4                    MR. GULAY:  Well, first, I don't
5          know if Mr. Rapoport would know that.
6                    Second, you know, yes, we
7          would -- we would assert that, you know,
8          the -- the legal advice that was sought
9          from Paul Hastings is obviously
10         privileged.
11                   MS. STEWART:  And -- and your
12         position doesn't change with -- with the
13         fact that the legal advice received from
14         Paul Hastings was ultimately provided to a
15         third party?
16                   MR. GULAY:  Well, I guess -- can
17         you clarify for us what questions you are
18         asking about?
19                   MS. ZORNBERG:  Hold on.  Can I --
20         can I interject?
21                   MR. GULAY:  Yes.
22                   MS. ZORNBERG:  We've produced to
23         you the Paul Hastings memo.
24                   MS. STEWART:  Uh-huh.
25                   MS. ZORNBERG:  You have that.
```

268

1          You can ask questions about that.  But

2          beyond the memo itself, if you're asking

3          this witness -- and I don't know if he has

4          any information even to give you in

5          response.  If you're asking him about

6          conversations he had or Ripple or Paul

7          Hastings, those do go to privilege.  I

8          think you should just take it question by

9          question.

10                 MS. STEWART:  So you would assert

11         privilege over conversations even though

12         the final product was -- was given to a

13         third party?  I'm just trying to make that

14         clear.

15                 MS. ZORNBERG:  Correct.

16                 MS. STEWART:  Okay.

17                 MR. TENREIRO:  And on the -- on

18         the reasons, so, you know, I decide -- I

19         wake up one morning and I say I need a

20         lawyer because I'm in trouble, that's

21         privileged?  You're asserting privilege

22         over that?  Or are you saying someone told

23         him to request a lawyer, that might be

24         privileged?

25                 MS. ZORNBERG:  This is too

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

269

1      hypothetical and it's well beyond what the

2      witness himself has said, which is he

3      doesn't know when Paul Hastings was

4      retained by Ripple.

5              MR. TENREIRO:  I don't think it's

6      hypothetical.  She asked him why did you

7      retain Paul Hastings? So you're --

8              MS. ZORNBERG:  And his answer was

9      he doesn't know when Ripple Labs retained

10     Paul Hastings.  I think we have to do this

11     question by question.

12             MS. STEWART:  Okay.  Can we look

13     at Exhibit 66, please?

14             (Whereupon, exhibit is presented

15     and marked SEC Rapoport Exhibit PR-66 for

16     identification.)

17             MS. STEWART:  Exhibit 66 is Bates

18     numbered RPLI_SEC 96888 to 889.

19             (Pause)

20             THE WITNESS:  Okay.

21  BY MS. STEWART:

22      Q.   Okay.  Who is ███████████?

23      A.   I'm not sure that I've ever spoken to

24  ██████████.  I can make a guess based on his

25  e-mail signature.

270

1          Q.   Do you have an understanding that he was

2      representing ████?

3          A.   I don't know the nature of their

4      relationship, but he appears to be a lawyer or

5      works at a law firm.

6          Q.   Okay.  So in this e-mail, Mr. --

7      Mr. ████ seems to be forwarding an e-mail to you,

8      Mr. Larsen, and Mr. ████ from Mr. ████ where

9      Mr. ████ says -- this is the second e-mail in

10     the chain -- "We don't know of the SEC taking any

11     position on the issue of whether a virtual

12     currency is itself a security."

13              Do you see that?

14         A.   I do.

15         Q.   Okay.  Do you recall discussing this

16     e-mail from Mr. ████ with anyone at Ripple?

17         A.   I don't remember discussing

18     Mr. ████ e-mail with anybody.

19         Q.   Okay.  Do you recall seeing

20     Mr. ████ e-mail at the time in January 2015?

21         A.   I don't recall the circumstances around

22     this e-mail, so, no, I don't recall seeing that

23     e-mail or not.

24         Q.   Okay.  Are you familiar with an entity

25     named GSR?

```
1        A.    I am.
2        Q.    Okay.  What is GSR?
3        A.    GSR is a market-making firm.
4        Q.    Okay.  And did GSR have a relationship
5   with Ripple?
6        A.    GSR had a similar relationship as the
7   other market makers that I mentioned that
8   provide -- provided market-making services and
9   received compensation for it.
10        Q.    Okay.  Did you have any involvement in
11   the GSR relationship?
12        A.    I did.
13        Q.    Okay.  What was your involvement?
14        A.    Similar to the other market makers, I
15   was the introducing party bringing -- making them
16   aware of Ripple and -- and working to formalize a
17   relationship with the firm.
18        Q.    Okay.  So -- so you were the introducing
19   party for GSR?
20        A.    Yes.
21        Q.    Okay.  And when was that?
22        A.    I don't recall the date, but it would
23   have been sometime in 2013 or 2014 based on my
24   recollection.
25        Q.    And did you have a relationship with GSR
```

272

1    before you came to Ripple?

2         A.   I knew some of the principals of GSR

3    prior to my time at Ripple, yes.

4         Q.   Okay.  Was there any difference between

5    GSR and other market makers in terms of the

6    services they provided or the nature of their

7    relationship with Ripple?

8                   MR. GULAY:  Objection to form.

9                   MS. BUNTING:   Objection.

10        A.   Initially there was no material

11   difference that I can recall, but over time, GSR

12   provided additional services beyond what some of

13   the other market makers were providing.

14        Q.   And what were these additional services?

15        A.   Programmatic selling of XRP.

16        Q.   And what does that mean?

17        A.   In this case, it refers to selling XRP

18   in the public market as a percentage of volume, as

19   a percentage of the overall markets volume.

20        Q.   Okay.

21                   MS. STEWART:  Can we look at 45,

22        please?

23                   PR-45, Nicole.

24                   (Whereupon, exhibit is presented

25        and marked SEC Rapoport Exhibit PR-45 for

273

1          identification.)

2                    MS. STEWART:  And PR-45 is Bates

3          numbered GSR 208 to 209.

4                    (Pause)

5                    THE WITNESS:  Okay.

6     BY MS. STEWART:

7          Q.   Okay.  So in the bottom e-mail, which is

8     on page 2 of this document, you -- you say "Per

9     RL's request, GSR (            is cc'd) has

10    developed a bot that will provide" liquid --

11    "liquidity as a market maker while net selling a

12    specified percentage of overall XRP volume."

13                    Do you see that?

14         A.   I do.

15         Q.   Is that what you were referring to a

16    moment ago?

17         A.   Yes.

18         Q.   Okay.  So what is a bot?

19         A.   It's short for robot, but in this case

20    refers to a software that places trades.

21         Q.   Okay.  And then you go on to say ""The

22    intent is to experiment with this as a more

23    structured way to monetize XRP holdings rather

24    than conducting OTC sales.  This way we

25    algorithmically control the market impact, rather