274

1    than leaving that role to others who might have

2    less experience trading."

3         Do you see that?

4         A.   I do.

5         Q.   Okay.  Can you explain what you mean by

6    this?

7         A.   Sure.  In institutional trading, when

8    someone is buying or selling an asset, there's

9    generally a preference to minimize market impact,

10   which is to say minimize the footprint or the --

11   or the effect that one's buying or selling has on

12   the market price.  And someone inexperienced in

13   trading may not be able to do that effectively

14   whereas someone experienced, an experienced

15   institutional trader, is aware of techniques to

16   minimize the impact on the price.  And one such

17   technique would be using a specified percentage of

18   the overall volume.

19        Q.   And is that -- would the intent be to

20   alleviate some of the issues that you were

21   discussing before about the negative impacts on

22   liquidity and price and volume?

23             MS. BUNTING:  Objection.

24             MR. HORTON:  Objection.

25        A.   When you say "would the intent be" --

275

```
 1   can you rephrase the question?

 2       Q.   Sure.

 3            So would the benefit of having this type

 4   of algorithmic market making be to -- to alleviate

 5   some of the issues that you talked to -- talked

 6   about throughout today about -- about the negative

 7   impact that OTC sales have on liquidity?

 8                MS. BUNTING:  Objection.

 9       A.   I thought this was a more sensible and

10   more typical way to go about these transactions

11   than -- than OTC sales.

12       Q.   And why -- why is that?

13       A.   For a number of reasons.  One reason is

14   that it's programmatic so selling -- having a

15   third party sell 3 percent of volume consistently

16   I found to be preferable than having Ripple Labs

17   itself choosing discrete moments in time to

18   transact.  I thought doing this on an arm's length

19   basis was more customary for this sort of

20   transaction in financial markets generally.

21            And I thought that, as we discussed

22   earlier, having the volumes occur in the public

23   market I thought benefited my goal, the company's

24   goal, of encouraging a more liquid market.

25            And I thought that doing it as a
```

276

1   percentage of volume, particularly such a low

2   percentage of volume, was unlikely to have any

3   material impact on the market price and it was a

4   controlled way of effecting these transactions.

5       Q.   Okay.  And did Ripple look to have

6   similar relationships with other market makers?

7              MR. GULAY:  Objection.

8       A.   At points in time I do recall

9   contemplating whether other types of these

10  relationships should be pursued, but I'm not aware

11  of Ripple pursuing any other types of

12  relationship -- any other relationships of this

13  type with other firms.

14      Q.   But you had discussions about pursuing

15  similar relationships with other firms?

16      A.   I remember that was contemplated at

17  points in time, yes.

18      Q.   With which other firms?

19      A.   I think it was -- I recall generally and

20  broadly contemplating it, but I don't recall

21  taking steps to actually do it.

22      Q.   And -- and do you have an understanding

23  of why steps were not taken to actually do it?

24              MR. HORTON:  Objection to form.

25      A.   No, I don't recall.

277

| | |
|---|---|
| 1 | Q. And was the intent of this, the |
| 2 | market-making bot with GSR, as you say in your |
| 3 | e-mail, another way to monetize Ripple's XRP |
| 4 | holdings? |
| 5 | MS. ZORNBERG: I'm sorry, can |
| 6 | you -- can you read that question back? I |
| 7 | just didn't hear you. |
| 8 | MS. STEWART: Sure. |
| 9 | Q. Was -- was the intent of the GSR |
| 10 | market-making bot to monetize Ripple's XRP hold -- |
| 11 | holdings? |
| 12 | MR. HORTON: Objection to form. |
| 13 | A. The intent of the bot was to both buy |
| 14 | and sell making markets; but whereas a typical |
| 15 | market-making program would seek to be neutral and |
| 16 | have no position at the end of a period of time, |
| 17 | this bot sought to net sell XRP exchange for |
| 18 | dollars and that was the -- That was the goal of |
| 19 | it. |
| 20 | Q. Okay. So similar to the goal of the OTC |
| 21 | sales? |
| 22 | A. Yes. |
| 23 | MS. STEWART: Can I get 26 next? |
| 24 | Nicole, that's PR-26. |
| 25 | (Whereupon, exhibit is presented |

278

1      and marked SEC Rapoport Exhibit PR-26 for

2      identification.)

3              (Pause)

4              THE WITNESS:  Okay.

5  BY MS. STEWART:

6      Q.  Okay.  So -- I can't remember if I read

7  the Bates numbers for the record.  I don't think I

8  did.  PR-26 is Bates numbered RPLI_SEC 842618 to

9  20.

10       So I want to look at your e-mail to

11  Ms. Long at the top of page 1.

12       Who is Monica Long?

13      A.  She was -- I believe her title was head

14  of communications or something to that extent.

15      Q.  Okay.  And -- and here is -- is

16  Ms. Long -- Ms. Long is -- is forwarding you a

17  communication she's having with a reporter, is

18  that right?

19      A.  That's my understanding, yes.

20      Q.  Okay.  And you say to her in your e-mail

21  "I'd be careful saying XRP is not an investment

22  asset.  It certainly is and we're pitching it to

23  investors.  At the end of the day, our biz model

24  is predicated on people buying it.  We can still

25  say that we don't encourage investment in XRP or

1  hype it at all."

2        Do you see that?

3     A.   I do.

4     Q.   Okay.  Was that statement from you

5  accurate at the time in 2014?

6     A.   Is it okay if I parse the individual

7  statements in there?  There's a lot of statements.

8     Q.   Sure.

9     A.   So I do think it's accurate that we

10 don't encourage investment in XRP or hype it at

11 all.  And I think that's echoed by her e-mail at

12 the bottom to the reporter saying "I suggest not

13 encouraging readers to buy XRP, given that it is

14 more of an enabler than an investment asset."

15        I do think that it was accurate in the

16 early days of the company that our business model

17 is predicated on people buying it, meaning buying

18 XRP.  As I mentioned earlier, I think the seed

19 investors were investing in a company that was --

20 there was -- it was unclear where the technology

21 could be applied or would be applied in the

22 financial system and that the expectation of early

23 investors was that -- the business model was that

24 XRP may appreciate in value as a re -- as a result

25 of the technology being adopted.

1    The statement that "XRP is not an

2    investment asset," that doesn't seem like language

3    that I would typically use and so I believe that I

4    was likely mirroring her use of that language at

5    the bottom, but I'm not really sure what that

6    means in a -- I mean, you could buy it, but I'm

7    not really sure what -- what "investment asset"

8    means.

9         Does that answer your question?

10   Q.   Yes.  Thank you.

11        So you referenced in your prior answer

12   seed investors.

13        When were the seed investors that you're

14   referring to invest in Ripple?

15   A.   These are seed investors in Ripple Labs,

16   Inc. or OpenCoin Inc. at the time.

17   Q.   Uh-huh.

18   A.   I don't know the date that that

19   occurred.  It was likely in 2012 and predated my

20   time at the firm.

21   Q.   Okay.  So when you say here in 2014 "it

22   certainly is and we're pitching it to investors,"

23   you're not referring to seed investors, right?

24   A.   No.

25   Q.   Okay.  So you're referring to the

281

```
1    efforts that you are involved in in 2014 that

2    we've talked about throughout today, right?

3                 MR. GULAY:  Objection.

4                 MR. HORTON:  Objection to form.

5                 MS. BUNTING:  Objection.

6         A.   I believe this refers to conversations

7    with people that are interested in purchasing XRP.

8         Q.   Okay.  Did the seed investors in Ripple

9    Labs include Mr. Larsen?

10                MS. BUNTING:  Objection.

11                MS. STEWART:  What's the

12           objection?

13                MS. BUNTING:  What do you mean by

14           "seed investors"?

15                MS. STEWART:  Well, we've been

16           talking about seed investors.  It's his

17           term.

18                MS. BUNTING:  You can explain it

19           in the question as well.

20                MS. STEWART:  Well, I think he

21           understands it since he used it.

22                MS. BUNTING:  Well, I don't

23           think he can.

24    BY MS. STEWART:

25         Q.   Go ahead, you can answer.
```

282

1          A.   I'm not sure if he invested money in the

2     seed round of OpenCoin.

3          Q.   I'm sorry, say that again.

4          A.   I'm not sure whether or not he put

5     his -- his own money into the company.  He

6     invested his time, certainly.

7          Q.   Okay.

8               MS. STEWART:  Thirty-four,

9          please.

10               PR-34 is the next exhibit,

11          Nicole, and that's Bates numbered

12          RPLI_SEC 882487 to 89.

13               (Whereupon, exhibit is presented

14          and marked SEC Rapoport Exhibit PR-34 for

15          identification.)

16               (Pause)

17               THE WITNESS:  Okay.

18     BY MS. STEWART:

19          Q.   Okay.  So is it fair to say that -- that

20     in this e-mail, Ms. -- Ms. Long is forwarding you

21     a draft statement and then you're commenting on

22     that statement?

23          A.   Yes.

24          Q.   Okay.  And what was the purpose of this

25     statement?

283

1        MR. GULAY:  Objection;

2    foundation.

3        A.   This was a statement describing a

4    settlement or the restrictions that Jed McCaleb,

5    one of the founders of OpenCoin or Ripple Labs,

6    announcing restrictions that he was agreeing to on

7    his personal XRP holdings.

8        Q.   Okay.  And you say in your e-mail, I

9    guess in the third bullet that starts with "In

10   exchange for," do you see that bullet?

11       A.   Yes.

12       Q.   Okay.  You say sort of in the middle of

13   the paragraph:  "I'd think the main goal is to

14   restore confidence in the market that founders

15   won't dump, so people feel comfortable owning

16   XRP."

17            Do you see that?

18       A.   Yes.

19       Q.   Okay.  And what did you mean by that?

20       A.   Jed McCaleb was a significant holder of

21   XRP and he made an announcement at some point in

22   time prior to this date that he would sell his

23   significant holdings at a specific price, which I

24   think was done in a deliberately destructive way

25   to market confidence.

284

1          And this overhang resulting from that

2     was a frequent topic that came up over the period

3     of time that it existed.  And so that's -- my

4     sentence here is -- is in reference to that, that

5     backdrop.

6          Q.   And when you say "market confidence"

7     in -- in your prior answer, what are you referring

8     to?

9          A.   If the market is aware that there's a

10    very, very large seller at a certain price, it

11    stands to reason that the price would not likely

12    rise above that level without very, very

13    significant buying pressure.

14         Q.   Okay.  So a dump, like what you're

15    referring to here, by the founders would

16    negatively impact the price of XRP?

17              MS. BUNTING:  Objection.

18         A.   Selling -- public -- publicly announcing

19    of selling of very large holders negatively

20    impacts market prices.  That's generally true.

21         Q.   And that would negatively im -- impact

22    market confidence?

23         A.   Yes.

24         Q.   I want to shift gears a bit and talk

25    about your time at ███████████.

285

```
1              Can you remind me the -- the dates that
2     you were employed at ████████?
3                  THE WITNESS:  Is that...
4                  MR. HECKER:  Counsel, can you
5        make a proffer as to the relevance of his
6        ████████        time?
7                  MS. STEWART:  Sure.  Why don't we
8        go off the record?
9                  THE VIDEOGRAPHER:  Going off the
10       record.
11                 MS. ZORNBERG:  Why off the
12       record?
13                 MS. STEWART:  Because I don't
14       understand why I need a proffer to ask
15       questions.  I mean, they will concern XRP.
16                 MR. HECKER:  Okay.  Why don't you
17       start answering the question.
18                 MS. STEWART:  Okay.
19    A.   I started working there in --
20                 MR. GULAY:  Are we on the record?
21                 THE VIDEOGRAPHER:  Yeah.
22                 MR. GULAY:  Okay.
23    A.   I started working there in 2015.  And
24    the exact date when I stopped, I'd have to check
25    because there was a period of time when I stopped
```

286

1      going full-time and continued to have a noncompete

2      and provide services to the company, but it was

3      sometime around 2020.

4          Q.   Okay.  What is ███████████?

5              MR. HECKER:  Objection to form.

6          A.   ███████████ -- are you referring to

7      --

8          Q.   Not -- not the street.

9              What is ████████████████?

10         A.   ████████████████ is a

11     investment vehicle that ██████████ managed.

12         Q.   Okay.  Does ██████████ invest in

13     XRP?

14             THE WITNESS:  I'm sorry, I'm just

15         not --

16             MR. HECKER:  Shall we take a

17         two-minute break?  Why don't we take a

18         two-minute break, yeah.

19             THE VIDEOGRAPHER:  Okay.

20             MS. STEWART:  Okay.

21             THE VIDEOGRAPHER:  Going off the

22         record at 5:17.

23             (Whereupon, a recess is taken.)

24             THE VIDEOGRAPHER:  Okay.  Back on

25         the record, 5:22.

287

1          MR. HORTON:  Counsel, before you

2     begin resuming your questions, we make a

3     request that those questions and answers

4     about ████████ be designated highly

5     confidential under the protective order.

6          MS. STEWART:  Okay.

7  BY MS. STEWART:

8     Q.   So, Mr. Rapoport, did ████████

9  invest in XRP?

10    A.   Yes.

11    Q.   Does it currently invest in XRP?

12          MR. GULAY:  Objection;

13     foundation.

14    A.   I'm not aware of what it currently does

15  since I left the firm.

16    Q.   Okay.  As of the time you left the firm,

17  did it invest in XRP?

18    A.   It -- it had XRP holdings until the end

19  of my time at the firm to the best of my

20  knowledge.

21    Q.   Okay.  And why did ████████ invest

22  in XRP?

23          MS. BUNTING:  Objection.

24     Actually, withdraw.  Okay.

25    A.   The objective of the fund was to provide

[7/22/2021] Rapoport, Phillip Dep. Tr. 7.22.2021

288

1     diversified exposure to a basket of the -- of the

2     largest most liquid digital assets.

3          Q.   Was ███████████ goal to also at

4     least sell its XRP holdings and make money?

5               MR. HECKER:  Objection to form.

6          A.   ███████████████ was a

7     vehicle that allowed investors to get diversified

8     exposure to a broad basket of digital assets, and

9     it was up to those investors to decide when they

10    wanted to subscribe or redeem from that fund like

11    any other funds that an investment manager

12    manages.

13         Q.   Was ████████ investing in XRP in

14    order to use XRP?

15              MR. HORTON:  Objection to form.

16         A.   The objective of ████████████

17    ████████ fund was to provide investors with a

18    diversified exposure to a basket of digital

19    assets.

20         Q.   Okay.  So it was for investment

21    purposes, right?

22              MR. HORTON:  Objection to form.

23              You can answer.

24         A.   I think I can repeat the objective of

25    the fund again.  The objective was to provide

289

```
 1    investors with an exposure to a diversified basket

 2    of the largest most liquid digital --

 3                  THE REPORTER:  Repeat, please.

 4         A.   The objective of the fund was to provide

 5    investors with exposure to a diversified basket of

 6    the largest most liquid digital assets.

 7         Q.   Including XRP?

 8         A.   Including XRP.

 9         Q.   Has ███████████ interacted with the

10    SEC regarding its digital asset holdings?

11                  MR. HORTON:  Objection to form.

12         A.   I did not personally participate in any

13    interactions with the SEC during my time at █████

14    █████  but my understanding in speaking with other

15    employees was that the firm did interact with the

16    SEC about its digital asset holdings.

17         Q.   Okay.  And what is your understanding of

18    the nature of those interactions with the SEC?

19                  MR. HORTON:  Counsel, I assume

20          you're not asking about any understanding

21          that's derived from communications with

22          ███████ counsel.  I just want to

23          clarify that.

24                  MS. STEWART:  Correct.

25                  MR. HORTON:  To the extent you
```

290

1          can parse that out, you can answer the

2          question.

3              A.   ████████        in my understanding, had a

4      large number of innovative investment products and

5      had frequent discussions, in my understanding,

6      with the SEC on a wide variety of topics

7      concerning a number of different funds.  And,

8      again, I wasn't privy to these conversations.  But

9      based on how others relayed them to me, my

10     understanding is that ████████ sought guidance

11     about whether or not the digital assets held in

12     the fund were securities or not.

13             Q.   Okay.  And did ████████ receive such

14     guidance from the SEC?

15             A.   My understanding is that despite

16     significant attempts to receive that guidance, I'm

17     not aware that they received any guidance.  I

18     don't believe that the SEC provided any guidance

19     to ████████

20             Q.   Did the SEC provide any assurances to

21     ████████ that the digital assets in -- in the

22     ████████ fund were not securities?

23                  MR. HORTON:  Objection to form.

24             A.   To the best of my understanding --

25     which, again, I was not there to witness or hear

1   these conversations, so my understanding is

2   limited to information that was shared with me by

3   others -- I don't believe the SEC provided

4   guidance one way or another of what its views were

5   on -- on whether XRP or any of the other digital

6   assets were or were not securities.

7          Q.   Was Mr. Larsen a client of ███████

8   ████████████████████ during your time with ████

9   ████?

10              MR. HORTON:  Objection to form.

11         A.   █████████████████ funds a

12  specific investment vehicle and I don't believe

13  that Mr. Larsen personally invested in that

14  vehicle, but I do believe that he invested in

15  other investment products offered by ████████.

16         Q.   And what were those investment products?

17         A.   I didn't generally have granular

18  visibility on investor level holdings and

19  Mr. Larsen was no different in that respect, so I

20  don't know the answer.

21         Q.   Okay.

22              MS. STEWART:  Can we look at 78,

23         please?

24              MR. TENREIRO:  Yeah.

25              (Whereupon, exhibit is presented

292

1          and marked SEC Rapoport Exhibit PR-78 for

2          identification.)

3                    MS. STEWART:  So PR-78 is Bates

4          numbered RPLI_SEC 235399 through 407.

5                    (Pause)

6   BY MS. STEWART:

7          Q.   And, Mr. Rapoport, feel free to -- to

8   review the document in its entirety, but I'm not

9   going to ask you any details about the attachment.

10         A.   Okay.  Well, I've reviewed the cover

11  page.

12         Q.   Okay.  Why were you sending the ████████

13  ████████████████████  fund commentary to Mr. Larsen

14  in 2018?

15         A.   This was an automated e-mail that would

16  have gone to all investors in the fund.  So the

17  fact that he received this suggests to me that he

18  may have been an investor in the fund.  But,

19  again, I -- I didn't customarily focus on an

20  investor-level holding detail.  I was focused on

21  bigger-picture things.  But this is a -- an

22  automated e-mail that went to all investors and

23  some selected other parties.

24         Q.   Okay.  How many investors does the

25  █████████████████████████████  fund have?

293

1          MR. HORTON:  Objection to form.

2      At what -- at what period?

3      Q.   During your time with ████████

4      A.   On the order of ████████, but the exact

5  number I don't recall.

6      Q.   Okay.  Did you maintain a Ripple e-mail

7  address after you left Ripple?

8      A.   My recollection is that I lost access to

9  Ripple e-mail when I left the firm as is

10  customary.

11      Q.   Okay.  So going back to the memo we

12  discussed a little bit ago that Ripple got from

13  ████████ in 2015 --

14      A.   Yes.

15      Q.   -- you sent that memo to Mr. ████

16  correct?

17      A.   I don't recall whether I sent it to him.

18      Q.   You don't recall one way or the other?

19      A.   No.  I generally have very little

20  recollection of my e-mails from seven years ago.

21      Q.   Okay.  Do you recall sending the memo to

22  anyone else outside of Ripple?

23      A.   I recall the existence of the memo, but

24  the content of it and whether or not I sent it and

25  to how many people, as you can imagine, is

294

1    difficult to recall from back in 2015 or whenever

2    it was drafted.

3         Q.   Okay.

4              MS. STEWART:   Let's look at

5         PR-74, which is Bates numbered RPLI_SEC

6         481363 through 75.

7              (Whereupon, exhibit is presented

8         and marked SEC Rapoport Exhibit PR-74 for

9         identification.)

10   BY MS. STEWART:

11        Q.   And I'm not going to ask you about the

12   contents of the attachment, just the e-mail.

13           (Pause)

14        A.   Okay.

15        Q.   Okay.  Does this e-mail refresh your

16   recollection that you sent a copy of the Paul

17   Hastings memo to Mr. ██████?

18        A.   Yes.

19        Q.   Okay.  Does it refresh your recollection

20   about whether or not you sent copies of this memo

21   to anyone else outside of Ripple?

22        A.   I do generally recall sharing memos on

23   this topic with others.  I don't recall to what

24   extent I shared this Paul Hastings memo versus the

25   Perkins Coie memo and, you know, how many people I

295

1    sent either of them to.

2        Q.   And which Perkins Coie memo are you

3    referring to?

4        A.   There was one document that we reviewed

5    earlier today that was marked white paper and had

6    ████████████ name on it.  I don't recall whether

7    that memo from 2013 or earlier or another one was

8    the one that I was sending seven years ago.

9        Q.   Do you recall sending a -- a legal

10   opinion from Perkins Coie to anyone outside of

11   Ripple?

12            MR. HORTON:  Objection to form.

13       A.   That's a very specific request that I

14   don't have recollection of.

15       Q.   Okay.  Are you aware of anyone else at

16   Ripple sending the Paul Hastings memo to any third

17   parties other than Mr. ████?

18       A.   I don't recall one way or another.

19       Q.   Did you have any discussions with anyone

20   at Ripple about sending the Paul Hastings memo to

21   third parties outside of Ripple?

22       A.   I would think I likely discussed it

23   prior to sending it to a third party.

24       Q.   Did you have discussions about sending

25   it to third parties in addition to Mr. ████?

296

1     A.   I don't recall.

2     Q.   I want to look back at Exhibit 65, which

3  should be in your stack.  That was the one-page

4  e-mail from Mr. ███ to you December 21st of 2014.

5     A.   I see it.

6     Q.   Okay.  Here -- here Mr. ███ says in the

7  third paragraph "If we can somehow get a legal

8  opinion, it will protect Ripple a ton.  And

9  especially we are in the process of settling with

10  FinCEN and DOJ.  We really do not need the SEC to

11  join the party."

12         Do you see that?

13     A.   I do.

14     Q.   Did Ripple obtain the Paul Hastings

15  legal memo that we're talking about to address

16  Mr. ███ concern that "we really do not need the

17  SEC to join the party"?

18            MR. HORTON:  Objection.

19            MR. GULAY:  Objection.  I'm going

20      to instruct the witness not to answer

21      because it calls for privileged

22      information.

23            MS. STEWART:  Okay.

24  BY MS. STEWART:

25     Q.   What did you understand Mr. ███ to mean

297

1   by the statement "We really do not need the SEC to

2   join the party"?

3                   MR. GULAY:  Objection; calls for

4       speculation.

5       A.   Beyond the plain reading of this e-mail,

6   I'm not sure what Mr. ████████ intention was.

7       Q.   Did you discuss that statement with him?

8       A.   I don't recall whether we discussed this

9   e-mail in person apart from these e-mails.

10      Q.   Okay.

11                  MS. STEWART:  Can we look at 57

12      now, PR-57?

13                  (Whereupon, exhibit is presented

14      and marked SEC Rapoport Exhibit PR-57 for

15      identification.)

16                  MS. FORBES:  To confirm, you said

17      57 or 67?

18                  MS. STEWART:  Fifty-seven.

19                  MS. FORBES:  Thank you.

20                  (Pause)

21                  THE WITNESS:  Okay.

22  BY MS. STEWART:

23      Q.   Okay.  The bottom e-mail in this chain

24  appears to be from a person named ████████.

25                  Do you see that?

298

```
1        A.   I do.

2        Q.   Do you know who that person is?

3        A.   I don't know who that person is.

4        Q.   Okay.  Is this -- I think you referred

5   to it before as like a cold request or something

6   of that nature that you received?

7        A.   It's unclear from this e-mail who was on

8   the initial e-mail thread, but this seems likely

9   to have been a cold -- cold e-mail.

10       Q.   Okay.  And how frequently did you

11  receive these types of cold e-mails?

12       A.   I recall that there was an account set

13  up to capture those, but I don't recall the volume

14  that were coming through.

15       Q.   Okay.  Do you have a ballpark for the

16  kind of volume?  Was it every day? every week?

17  every once in a while?

18       A.   I'd really be guessing.  I was getting a

19  large volume of e-mails in general directly and so

20  these were generally not the most -- the focus of

21  my day.

22       Q.   Did you respond to all of them?

23       A.   No.

24       Q.   Okay.  Was there some policy for when to

25  respond to these types of e-mails?
```

1      A.   No.

2      Q.   Okay.  Did you have a practice of which

3  e-mails you responded to and which you didn't?

4      A.   No.

5      Q.   Do you know why you responded to this

6  particular e-mail?

7      A.   I sporadically responded to certain

8  e-mails when I had the time and interest in doing

9  so.

10      Q.   Okay.  And you said that there was an

11  account set up to capture these types of e-mails?

12      A.   There was a distribution group, yes.

13      Q.   Okay.  Meaning that when the e-mails

14  came in, they went to a certain distribution

15  group?

16      A.   Correct.

17      Q.   And what was the name of that

18  distribution group?

19      A.   Partners@ripple.com.

20      Q.   So would those e-mails go to you and

21  certain other people at Ripple?

22      A.   I believe they went to the business

23  development team broadly.

24      Q.   Okay.  Looking at -- at the -- the top

25  e-mail in this chain where you -- you say to █████

300

1      ████████████ -- I'm not sure I'm saying that right.

2              Who is -- who is Mr. ████████?

3      A.   I believe his title was head of

4   developer relations.

5      Q.   Okay.  You say to him "It's not rocket

6   science.  This guy previously would have bought

7   from us directly.  We're growing volume and rising

8   price."

9              Do you see that?

10     A.   Yes.

11     Q.   Okay.  And then Mr. ████████ responds

12  "Yep, to the moon."

13             Do you see that?

14     A.   Yes.

15     Q.   Do you have an understanding of what he

16  meant by that statement?

17     A.   That's a colloquial -- colloquialism

18  often used humorously in the digital asset

19  community in meetings and the like.

20     Q.   To express what?

21     A.   To express a rising price.

22     Q.   Okay.  When you got these types of cold

23  requests that we're discussing, did you -- did you

24  do any -- any kind of due diligence or take any

25  steps to -- to ascertain why the person was

301

 1    looking to acquire XRP?

 2         A.   No.

 3         Q.   Was there a policy or practice at Ripple

 4    to take any such steps with respect to cold

 5    requests?

 6              MR. HORTON:  Objection; asked and

 7         answered.

 8         A.   There was no specific policy that I was

 9    aware of to inquire why someone was interested in

10    a particular thing.

11         Q.   Did anyone ever instruct you to inquire

12    as to why anyone was -- was interested in

13    acquiring XRP?  I'm sorry, I don't think I asked

14    that right.

15              Did anyone instruct you to inquire as to

16    the purpose of -- of someone looking to acquire

17    XRP?

18              MR. GULAY:  Objection.

19         A.   I don't recall receiving such

20    instruction.

21         Q.   When we were looking a couple exhibits

22    ago at the statement that Ms. Long had forwarded

23    you that you had commented on and you were talking

24    about Mr. McCaleb's announcement that he was going

25    to sell his XRP at a given price and you said that

302

```
 1    this created overhang, do you remember that?
 2         A.   Yes.
 3         Q.   Okay.  What did you mean by "overhang"?
 4         A.   I think I explained it in the previous
 5    answer.  What I meant by that term is that if
 6    there's a publicly announced large seller of a
 7    given asset at a specific price, market
 8    participants can reasonably infer that the price
 9    of that asset will not rise above that level until
10    all the selling -- the amount for sale was fully
11    consumed.  So that effect -- effectively creates
12    an overhang, meaning that the price is not likely
13    to rise above that level unless there's enough
14    buying demands to consume the amount for sale.
15         Q.   Okay.  And did Ripple take steps to
16    address this overhang?
17         A.   Are you asking about Jed McCaleb and his
18    selling specifically?
19         Q.   Sure.  Let's start with that.
20         A.   Ripple Labs entered into a settlement
21    with Jed McCaleb, so, yes.
22         Q.   And more generally with respect to
23    overhang, did Ripple take steps to address it?
24              MR. GULAY:  Objection to form.
25         A.   I believe after I left the company,
```

303

1    Ripple Labs put a significant percentage of its

2    holdings into escrow in part to address the

3    market's perception of an overhang.

4         Q.   Okay.  And -- and why was Ripple trying

5    to address the market's perception of an overhang?

6              MR. GULAY:  Objection; calls for

7         speculation.

8         A.   I was no longer with the company at the

9    time so it's hard -- not -- not really my place to

10   say.

11        Q.   Okay.  What about with respect to what

12   you testified the steps Ripple took with respect

13   to Mr. McCaleb's overhang?  Why did Ripple take

14   steps to address that overhang?

15             MR. GULAY:  Objection.

16        A.   I viewed Mr. McCaleb's actions to be

17   deliberately harmful to Ripple Labs and -- and I

18   thought that Mr. McCaleb sought to hurt the goal

19   of the company generally and this was one of a

20   number of other actions that he took.

21        Q.   So was the reasons for -- for Rip -- the

22   steps that Ripple took to restore market

23   confidence?

24             MR. HORTON:  Object to form.

25        A.   I believe, and I think the company

304

1    believed, that Jed's actions were harmful, and so

2    having him stop those actions were helpful to the

3    company.

4        Q.   Were harmful to the company?

5        A.   Yes.

6              MS. STEWART:  Okay.  I have no

7        further questions at this time.

8              MR. GULAY:  We have no further

9        questions.

10             THE VIDEOGRAPHER:  Okay.  All

11       right.  This concludes the video

12       deposition of Phillip Rapoport.  The time

13       is 5:47.  Going off the record.

14             (Whereupon, the deposition

15       concluded at 5:47 p.m.)

16

17

18

19

20

21

22

23

24

25

305

```
 1    STATE OF NEW YORK       )

 2                            ) ss:

 3    COUNTY OF NEW YORK      )

 4            I hereby certify that the witness in the

 5    foregoing deposition, PHILLIP RAPOPORT was by me duly

 6    sworn to testify to the truth, the whole truth and

 7    nothing but the truth, in the within-entitled cause;

 8    that said deposition was taken at the time and place

 9    herein named; and that the deposition is a true record

10    of the witness's testimony as reported by me, a duly

11    certified shorthand reporter and a disinterested person,

12    and was thereafter transcribed into typewriting by

13    computer.

14            I further certify that I am not interested in

15    the outcome of the said action, nor connected with nor

16    related to any of the parties in said action, nor to

17    their respective counsel.

18            IN WITNESS WHEREOF, I have hereunto set my

19    hand this 26 day of July, 2021.

20            Reading and Signing was:

21     ___ requested   ___ waived   _X_ not requested.

22

23

24          _____

25            BRIDGET LOMBARDOZZI, CSR, RMR, CRR
```

**Transcript Word Index**



























