# PX 14

1

1

1                 IN THE UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE               )
     COMMISSION,                           )
5                                          )
                        Plaintiff,         )  Case No.:
6              v.                          )  20-Civ-10832(AT)(SN)
                                           )
7    RIPPLE LABS, INC., BRADLEY            )
     GARLINGHOUSE, and CHRISTIAN           )
8    LARSEN,                               )
                                           )
9                       Defendants.        )
     _____)

10

11

12        **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

13

14                  VIDEOTAPED DEPOSITION OF

15                   PATRICK WARREN GRIFFIN

16                   Tuesday, June 29, 2021

17

18

19

20

21

22

23
     Reported by:
24   BRIDGET LOMBARDOZZI,
     CSR, RMR, CRR, CLR
25   Job No. 210629BLO

1                    IN THE UNITED STATES DISTRICT COURT

2                       SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE              )
     COMMISSION,                          )
5                                         )
                          Plaintiff,      ) Case No.:
6               v.                        ) 20-Civ-10832(AT)(SN)
                                          )
7    RIPPLE LABS, INC., BRADLEY           )
     GARLINGHOUSE, and CHRISTIAN          )
8    LARSEN,                              )
                                          )
9                         Defendants.     )
     _____)

10

11

12

13

14

15          Videotaped deposition of PATRICK WARREN GRIFFIN

16    taken on behalf of Plaintiff, held at the offices of

17    Debevoise & Plimpton, 919 Third Avenue, New York, New

18    York, commencing at 9:07 a.m. and ending at 6:00 p.m.,

19    on Tuesday, June 29, 2021, before Bridget Lombardozzi,

20    CCR, RMR, CRR, CLR, and Notary Public of the States of

21    New York and New Jersey, pursuant to notice.

22

23

24

25

1    A P P E A R A N C E S (Via Remote where indicated):

2

3    For the Plaintiff:

4

5

6          UNITED STATES SECURITIES AND EXCHANGE COMMISSION

7          NEW YORK REGIONAL OFFICE

8          BY:   JORGE G. TENREIRO, ESQUIRE

9                JON DANIELS, ESQUIRE

10         New York Regional Office

11         200 Vesey Street

12         Suite 400

13         New York, New York  10281-1022

14         Telephone:  212.336.1060

15         Email:    tenreiroj@sec.gov

16                   jdaniels@sec.gov

17

18

19

20

21

22

23

24

25

4

1    A P P E A R A N C E S (Continued):

2

3    For Defendant Ripple Labs Inc.:

4

5          DEBEVOISE & PLIMPTON LLP

6          BY:   JENNIFER COWAN, ESQUIRE

7                ANNA GRESSEL, ESQUIRE

8                DANIEL JOINER, ESQUIRE (Remote)

9          919 Third Avenue

10         New York, New York  10022

11         Telephone:  212.909.6000

12         E-Mail:  jcowan@debevoise.com

13                  argressel@debevoise.com

14                  dejoiner@debevoise.com.

15

16                     -and-

17

18         KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

19         BY:   ALEXANDER J. KING, ESQUIRE (Remote)

20         Sumner Square

21         1615 M Street, N.W.

22         Suite 400

23         Washington, D.C.  20036

24         Telephone:  202.326.7999

25         E-mail:  aking@kellogghansen.com

```
 1    A P P E A R A N C E S  (Continued)

 2

 3    For Defendant Bradley Garlinghouse:

 4

 5              CLEARY GOTTLIEB STEEN & HAMILTON

 6              BY:   MATTHEW C. SOLOMON, ESQUIRE

 7                    NICOLE TATZ, ESQUIRE (Remote)

 8                    JORGE BONILLA LOPEZ, ESQUIRE (Remote)

 9              2112 Pennsylvania Avenue, NW

10              Washington, D.C.  20037

11              Telephone:  202.974.1500

12              E-mail:  Msolomon@cgsh.com

13                       ntatz@cgsh.com

14                       jbonillalopez@cgsh.com

15

16    For Defendant Christian A. Larsen:

17

18              PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

19              By:   JUSTIN WARD, ESQUIRE

20                    CARLY M. LAGROTTERIA, ESQUIRE (Remote)

21              1285 Avenue of the Americas

22              New York, New York  10019-6064

23              Telephone:  212.373.2491

24              E-mail:  jward@paulweiss.com

25                       clagrotteria@paulweiss.com
```

6

1    A P P E A R A N C E S (Continued):

2

3    For the Witness:

4

5                KAPLAN HECKER & FINK LLP

6                BY:   JUSTIN R. HORTON, ESQUIRE

7                      SEAN HECKER, ESQUIRE

8                350 Fifth Avenue

9                Suite 7110

10               New York, New York   10018

11               Telephone:  646.889.3906

12               E:mail:  shecker@kaplanhecker.com

13                        jhorton@kaplanhecker.com

14

15   ALSO PRESENT:

16

17               DEBORAH McCRIMMON, Ripple

18               MATT TURSI, Videographer
                 Shereck Video Service
19

20               NICOLE FORBES, SEC

21               KYLE E. CHERMAK, Debevoise Law Clerk

22

23

24

25

```
 1                         INDEX
 2   WITNESS                              EXAMINATION
 3   PATRICK WARREN GRIFFIN
 4      BY MR. TENREIRO                        16
 5
 6
 7
 8                        EXHIBITS
     SEC-PG
 9   NUMBER               DESCRIPTION          PAGE
10   Exhibit 2   String of e-mails dated        24
11               December 21-22, 2020
12               RPLI_SEC 0336844-47
13
14   Exhibit 4   7/19/13 E-mail from Griffin    47
15               to  [         ] , et als
16               RPLI_SEC 0088242-99
17
18   Exhibit 5   11/30/20 E-mail from Griffin   59
19               to [      ]  with attachment
20               RPLI_SEC 0012359-68
21
22   Exhibit 6   11/29/13 E-mail from Griffin   61
23               to Rapoport with attachment
24               RPLI_SEC 0337666-73
25
```

8

```
 1                           EXHIBITS
        SEC-PG
 2      NUMBER           DESCRIPTION               PAGE

 3      Exhibit 7    5/9/13 E-mail from Griffin      29

 4                   to ███████ with attachment

 5                   RPLI_SEC 0070352-85

 6

 7      Exhibit 8    10/9/13 Message from            118

 8                   Griffin to Birla

 9                   RPLI_SEC 0331323

10

11      Exhibit 9    10/25/13 E-mail from Griffin     86

12                   to ████████████ w/attachment

13                   NO BATES, 20 pages

14

15      Exhibit 10   11/3/13 Message from            106

16                   Griffin to Larsen

17                   LARSEN-SEC-LIT 00003489

18

19      Exhibit 11   1/16/14 Messages from          122

20                   Griffin to Larsen

21                   NO BATES, 2 pages

22

23      Exhibit 13   5/8/14 Message from Griffin     132

24                   to Larsen, ████

25                   RPLI_SEC 0425911
```

```
 1                          EXHIBITS
        SEC-PG
 2      NUMBER            DESCRIPTION              PAGE

 3      Exhibit 18   11/30/15 E-mail from Long      140

 4                   to Griffin, Larsen

 5                   RPLI_SEC 0484565

 6

 7      Exhibit 20   1/12/16 Check-In from          168

 8                   Griffin to ████   ██████

 9                   NO BATES, 1 page

10

11      Exhibit 21   String of e-mails dated        227

12                   April 10, 2016

13                   RPLI_SEC 0205600-02

14

15      Exhibit 22   String of e-mails dated        232

16                   April 10-11, 2016

17                   RPLI_SEC 0307779-82

18

19      Exhibit 24   String of e-mails dated        173

20                   April 14-16, 2016

21                   RPLI_SEC 0038156-57

22

23      Exhibit 27   String of e-mails dated        182

24                   June 4-9, 2016

25                   NO BATES, 3 pages
```

10

| SEC-PG NUMBER | EXHIBITS DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 28 | String of e-mails dated June 14-16, 2016 RPLI_SEC 0348791-92 | 244 |
| Exhibit 29 | String of e-mails dated June 14, 2016 RPLI_SEC 0372426-27 | 244 |
| Exhibit 31 | 7/21/16 E-mail from Griffin to ███ SEC-██ RIPPLE 0009285 | 250 |
| Exhibit 38 | String of e-mails dated September 13, 2016 RPLI_SEC 0378113-15 | 329 |
| Exhibit 39 | 12/7/17 E-mail from ███ to Birla with attachment RPLI_SEC 0376173-76 | 311 |
| Exhibit 40 | String of e-mails dated August 5-6, 2016 GSR00014722-24 | 241 |

| | EXHIBITS | |
|---|---|---|
| SEC-PG NUMBER | DESCRIPTION | PAGE |
| Exhibit 42 | String of e-mails dated August 16, 2016 RPLI_SEC 0057039-40 | 254 |
| Exhibit 44 | String of e-mails dated January/February 2018 RPLI_SEC 0375653-54 | 279 |
| Exhibit 46 | 5/2/17 E-mail from █████ to ███ et als RPLI_SEC 0504481-82 | 299 |
| Exhibit 49 | Twitter Tweets December 16, 2017 NO BATES, 5 pages | 283 |
| Exhibit 50 | String of e-mails dated December 14-15, 2017 RPLI_SEC 0509224-27 | 287 |
| Exhibit 56 | String of e-mails dated October/November 2016 GSR00001264-67 | 306 |

12

EXHIBITS

| SEC-PG NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit 60 | String of e-mails dated November 1, 2016 GSR00005000-01 | 238 |
| Exhibit 65 | String of e-mails dated March/April 2017 RPLI_SEC 0509599-601 | 272 |
| Exhibit 67 | 3/28/17 E-mail from Griffin to ▮▮▮▮ w/attachment RPLI_SEC 0156968-85 | 161 |
| Exhibit 70 | String of e-mails dated April 8, 2017 RPLI_SEC 0031476-77 | 324 |
| Exhibit 72 | String of e-mails dated April 8, 2017 RPLI_SEC 0352285-87 | 314 |
| Exhibit 76 | String of e-mails dated April 2017 RPLI_SEC 0843640-42 | 185 |

13

```
 1                              EXHIBITS

 2      SEC-PG
        NUMBER               DESCRIPTION              PAGE
 3

 4      Exhibit 79   String of e-mails dated         333

 5                   November/December 2017

 6                   RPLI_SEC 0376309-10

 7

 8      Exhibit 80   String of e-mails dated         302

 9                   May 1-2, 2017

10                   RPLI_SEC 0762228-29

11

12      Exhibit 87   String of e-mails dated         293

13                   November 1, 2017

14                   RPLI_SEC 0539698-99

15

16      Exhibit 89   String of e-mails dated         209

17                   November 16, 2017

18                   RPLI_SEC 0395081-82

19

20      Exhibit 95   String of e-mails dated         267

21                   April 2017

22                   RPLI_SEC 0030278-80

23

24

25
```

14

```
 1                    DEPOSITION SUPPORT INDEX

 2

 3      DIRECTION TO WITNESS NOT TO ANSWER

 4         Page    Line

 5          - -none- -

 6

 7

 8      STIPULATIONS

 9         Page    Line

10          16      18

11

12

13      QUESTIONS MARKED

14         Page    Line

15          - -none- -

16

17

18      REQUEST FOR DOCUMENTS

19         Page    Line

20          - -none- -

21

22

23

24

25
```

```
 1                    -   -   -

 2                 9:07 a.m.

 3              June 29, 2021

 4                    -   -   -

 5              THE VIDEOGRAPHER:  We are on

 6      record and the time is approximately 9:07

 7      a.m. in the Eastern time zone.

 8              Today's date is June 29th, 2021.

 9      This is the video deposition of Patrick

10      Griffin in the matter of Securities and

11      Exchange Commission versus Ripple Labs,

12      Inc., et al., No. 10832, in the United

13      States District Court for the Southern

14      District of New York.

15              My name is Matt Tursi, legal

16      videographer with Gradillas Court

17      Reporting.  Today we're at the office of

18      Debevoise & Plimpton located at 919 Third

19      Avenue, New York, New York 10022.

20              All appearances will be noted on

21      the stenographic record.  The court

22      reporter is Bridget Lombardozzi with

23      Gradillas Court Reporting.

24              Will you please swear in the

25      witness.
```

```
 1              P A T R I C K   W A R R E N
 2         G R I F F I N, having been duly sworn,
 3         was examined and testified as follows:
 4              THE WITNESS:  Yes.
 5              THE REPORTER:  Thank you.
 6                 DIRECT-EXAMINATION
 7   BY MR. TENREIRO:
 8         Q.   Okay.  Good morning, please state your
 9   name for the record.
10         A.   Patrick Griffin.
11         Q.   Mr. Griffin, are you represented by
12   counsel today?
13         A.   Yes.
14         Q.   And who is that?
15         A.   Justin.
16         Q.   Okay.
17              MR. TENREIRO:  Shall we?
18              MS. COWAN:  Yes.  We're
19         designating the transcript and recording
20         of the deposition as confidential pursuant
21         to the protective order, and per
22         stipulation, an objection by one attorney
23         will be taken as an objection preserved
24         with respect to all parties.
25              MR. TENREIRO:  Great.
```

1    BY MR. TENREIRO:

2        Q.   Mr. Griffin, my name is Jorge Tenreiro.

3    I'll be asking questions today on behalf of the

4    plaintiff, SEC, in this case.

5             Mr. Griffin, you gave testimony to the

6    SEC in this matter in February of 2020, is that

7    correct?

8        A.   Yes.

9        Q.   Okay.  And did you provide truthful

10   testimony to the SEC on that occasion?

11       A.   Yes.

12       Q.   Since that testimony, have you given any

13   under -- any other under oath testimony?

14       A.   No.

15       Q.   Since you've done this before, I'll be

16   brief on the rules.  The most important thing is

17   that we try not to talk over each other and that

18   we wait for each other to complete -- to finish

19   speaking before speaking to create a clear --

20   clear record and that we give verbal answers

21   rather than shakes or nods of the head.

22             Throughout the day, I -- you know,

23   unless something else is explained, you know,

24   please don't tell me the substance of any advice

25   you got from lawyers at any time.

```
 1              Is there any reason why you cannot
 2    testify truthfully or accurately today?
 3         A.   No.
 4         Q.   Did you take steps to prepare for
 5    today's deposition?
 6         A.   Yes.
 7         Q.   What steps did you take without
 8    discussing the substance of conversation with
 9    lawyers?
10         A.   We -- just that we met with lawyers.
11         Q.   And how many hours would you say
12    approximately did you meet?
13         A.   Six approximately.
14         Q.   Was this virtually?
15         A.   It was in person.
16         Q.   In person.
17              Did it involve reviewing documents?
18         A.   It did.
19         Q.   Okay.  Who was present at the session?
20         A.   Everybody here, I believe.
21         Q.   Okay.  Except for us.
22         A.   I think there -- I think there were a
23    few other people, but from Debevoise.  I'm sorry,
24    yes, the -- yes, okay.
25         Q.   Several lawyers who are here.  You don't
```

1     necessarily remember exactly who was there --

2          A.    Correct.

3          Q.    -- correct?

4          A.    Correct, yes.

5                MS. COWAN:  For clarity of the

6          record, counsel for the individual

7          defendants were not present.

8                MR. TENREIRO:  Right.  Thank you.

9     BY MR. TENREIRO:

10         Q.    And, Mr. Griffin, where do you live

11    today?

12         A.    I live in California.

13         Q.    Okay.  Are you a citizen of the United

14    States?

15         A.    Yes.

16         Q.    Okay.  And are you employed?

17         A.    No, not currently.

18         Q.    When was the last time you were

19    employed?

20         A.    With Ripple, 2018.

21         Q.    And how was it that you came to work for

22    Ripple?

23         A.    Through an introduction to Chris Larsen.

24         Q.    By whom?

25         A.    The introduction was through my brother.

1    Q.   Okay.  And what was your title at Ripple

2  when you left Ripple?

3    A.   Senior vice president of business

4  development.

5    Q.   What were the time periods for which you

6  worked for Ripple?

7    A.   2013 to 2018.

8    Q.   And what was the title when you first

9  started at Ripple?

10    A.   Executive vice president, business

11  development.

12    Q.   And when you had that title, did you

13  report to Mr. Larsen?

14    A.   I did.

15    Q.   At some point in time, did you start

16  reporting to Mr. Garlinghouse?

17    A.   Yes.

18    Q.   When was that time approximately?

19    A.   2015 or '16.

20    Q.   And why did your reporting structure

21  change?

22    A.   It was just a restructuring of the

23  organization.

24    Q.   Okay.  While you were at Ripple, were

25  you one of Ripple's most senior executives?

```
1              A.    I was a senior executive, yes.

2              Q.    You were a senior executive?

3              A.    Yes.

4              Q.    Did that change at any time while you

5     were employed?

6              A.    No.

7              Q.    Why did you leave Ripple?

8              A.    I left Ripple -- lots -- changes and I'd

9     been there for some time and I think it was an

10    appropriate time to leave.

11             Q.    Would you say you're still on friendly

12    terms with the company?

13             A.    Yes.

14             Q.    And with Mr. Larsen?

15             A.    Yes.

16             Q.    And with Mr. Garlinghouse?

17             A.    Yes.

18             Q.    When you left -- do you have any XRP

19    today?

20             A.    No.

21             Q.    Have you ever owned any XRP?

22             A.    Yes.

23             Q.    How much -- how many units of XRP did

24    you own at the -- when you owned most?

25             A.    I -- I don't know the exact number.
```

1      Q.   And it sounds like -- have you ever sold

2 any XRP?

3      A.   Yes.

4      Q.   So did you sell all the XRP you owned?

5      A.   Yes.  There may be some -- a little bit

6 left, but for the most part, yes.

7      Q.   How did you sell it?

8      A.   I sold it through an exchange and

9 through a broker.

10      Q.   What exchange?

11      A.   Bitstamp.

12      Q.   What broker?

13      A.   Through a broker called GSR.

14      Q.   Who did you sell it to?

15      A.   I don't know.

16      Q.   How much did you sell it for?

17      A.   Different prices.

18      Q.   How much did you sell it for?

19      A.   I don't -- I don't know.

20      Q.   Okay.  I'll represent to you that in

21 your testimony, and we can look at it if you want,

22 you had said you had sold approximately

23

24         Does that -- that number sound -- does

25 that number sound ballpark accurate?

23

1          A.    Ballpark.

2          Q.    Since the testimony till today, do you

3     recall if you sold any more XRP?

4          A.    Yes, I have.

5          Q.    Okay.  And ballpark how much?  You know,

6     for how much?

7          A.    Ballpark somewhere between ███ and --

8     around ████████

9          Q.    Okay.  Before you started working at

10     Ripple, what was your net worth?

11          A.    ████████.

12          Q.    It was not in the ███████████

13          A.    It was not, no.  I had student debt.

14          Q.    Okay.  Do you understand that one of the

15     issues in this case is whether XRP is a security

16     or was sold as a security subject to SEC

17     regulation?

18          A.    Yes.

19          Q.    Are you aware of anyone affiliated with

20     the SEC ever communicating to you that XRP was not

21     being sold as a security by Ripple?

22          A.    No.

23          Q.    Are you aware of anyone affiliated with

24     the SEC making any similar statement to anyone at

25     Ripple?

```
 1        A.   No.

 2                  MR. TENREIRO:  Can we take a look

 3          at Exhibit 2, please?

 4                  (Whereupon, exhibit is presented

 5          and marked SEC Griffin Exhibit PG-2 for

 6          identification.)

 7   BY MR. TENREIRO:

 8        Q.   So I'm going to show you what's been

 9   previously marked as PG-2.

10                  MR. TENREIRO:  There's four.

11          That will be one extra for Sean.  And

12          Bridget will get e-mailed copies.

13        Q.   Bates stamped RPLI_SEC 336844.

14                  MR. TENREIRO:  Sorry, we're one

15          short on this side.

16        Q.   This is a multipage e-mail.  Most of it

17   is e-mails from Mr. Garlinghouse.  I'm going to

18   ask you just to focus on the top part, but you can

19   read whatever you need for context.

20          I'm focused on an e-mail from you to

21   Mr. Garlinghouse and Mr. Larsen on December 22nd,

22   2020, "Re:  The SEC's attack on crypto in the

23   United States."

24        A.   Uh-huh.

25        Q.   Did you send that e-mail to them?
```

```
 1                        MR. HORTON:  Counsel, can we have
 2          a minute to --
 3                        MR. TENREIRO:  Oh, sorry.  Sorry.
 4                        (Pause)
 5     BY MR. TENREIRO:
 6          Q.    The question is, Mr. Griffin, did you
 7     receive the e-mails from Mr. Garlinghouse?
 8          A.    I received the e-mail December 21st.
 9          Q.    Did you respond with what is shown on
10     this exhibit?
11          A.    Yes.
12          Q.    Why did you respond with what is shown
13     on this exhibit?
14                        MR. HORTON:  Objection to form.
15                        You can answer.
16                        THE WITNESS:  Right.
17          A.    I responded simply to offer unsolicited
18     opinions.
19          Q.    When you say "I'm rooting for you," what
20     do you mean by that?
21          A.    For a positive outcome and a quick
22     resolution.
23          Q.    To the SEC litigation?
24          A.    Yes.
25          Q.    Okay.  Is that still true today, you're
```

```
 1   still rooting for them?
 2                   MR. HORTON:  Objection to form.
 3                   You can answer.
 4        A.    I'm -- I'm hoping for a resolution.
 5        Q.    Okay.  At the part -- at the top of the
 6   e-mail you say "Eth is an ICO.  They started by
 7   selling tokens to raise money."
 8                   Do you see that?
 9        A.    I do.
10        Q.    All right.  Didn't Ripple sell XRP to
11   raise money for its business?
12                   MR. HORTON:  Objection to form.
13                   THE REPORTER:  Repeat.
14        Q.    Didn't Ripple sell tokens, XRP, to raise
15   money for its business?
16                   MR HORTON:  Objection to form.
17                   MS. COWAN:  Would you be able to
18          just slow down a little?  I'm -- I'm
19          having trouble --
20                   MR. TENREIRO:  Sorry.
21                   MS. COWAN:  -- catching
22          everything and I'm sitting across the
23          table from you.
24                   MR. TENREIRO:  I'll try.
25                   MS. COWAN:  Thank you.  I
```

1      appreciate it.

2            MR. HORTON:  Assuming my

3        objection is noted, you can answer the

4        question.

5      A.   Okay.  Well, I think the premise here is

6    that Ethereum started by raising -- by selling

7    tokens before they launched the technology.  And

8    to initially fund and seed their operation, they

9    had sold tokens.  I don't remember what the time

10   period was.  It might have been 2013 or '14.  I

11   don't know -- I think the -- what the period

12   Ethereum launched.  And so I'm pointing out that

13   they raised money outside of having any technology

14   by selling the token.

15            Conversely, Ripple started out by

16   raising venture capital money against the equity

17   structures or the traditional venture type --

18            THE REPORTER:  Repeat the last

19        part.

20      A.   Ripple raised money by selling -- by

21   securing venture capital funding.

22      Q.   My question is, did Ripple sell XRP to

23   fund -- to raise money?

24      A.   Ripple sold XRP.

25            MS. COWAN:  Objection.

1    Q.   Did Ripple use the money it obtained

2  from selling XRP in part to fund its business?

3    A.   Yes.

4    Q.   Okay.  You next say "I have the Skype

5  history with Vitalik promoting and managing the

6  initial sale."

7        Do you see that?

8    A.   I do.

9    Q.   Why do you have that Skype history?

10   A.   There was a Skype forum.  I can't

11  remember what the name of it was.  Better Bitcoin

12  Business Alliance or something along those lines,

13  where he was on there talking about a token

14  offering and selling that.  And I was in that

15  forum.

16   Q.   Do you still have that Skype?

17   A.   You know, I -- I looked for it.  I

18  didn't -- I couldn't pull the history.  I think

19  that it's probably there, but I don't -- I wasn't

20  able to get it.

21   Q.   Okay.

22        MR. TENREIRO:  Let's take a look

23    at Exhibit -- let's do 7, please, Jon.

24   Q.   While -- while we get the exhibit,

25  Mr. Griffin, when you started at Ripple back in

1   2013, generally speaking, what were your

2   responsibilities?

3        A.   My responsibilities were largely

4   business development focused.

5        Q.   "Business development" means what?

6        A.   Securing partnerships and helping to

7   define the -- the business plan.

8             (Whereupon, exhibit is presented and

9   marked SEC Griffin Exhibit PG-7 for

10  identification.)

11  BY MR. TENREIRO:

12       Q.   Okay.  Now please take a look at Exhibit

13  Number 7.

14            So this is a document which is a

15  one-page e-mail, RPLI_SEC 70352, and attachments.

16       A.   Okay.

17       Q.   So focus on the e-mail, Mr. Griffin.

18  I -- I presume you don't remember sending an

19  e-mail in May 2013, but I -- I ask you if you have

20  any reason to doubt that you sent this e-mail.

21       A.   I do not, no.

22             MS. COWAN:  Do you need time to

23        look at the document?

24             THE WITNESS:  Yes.

25             (Pause)

1  A.  Okay.

2  Q.  Okay.  After having browsed through it,

3  any reason to doubt that you sent this e-mail in

4  this document?

5  A.  No.

6  Q.  Who are ███████████, ███████ -- I'm

7  sorry, who's ████████████?

8  A.  I -- I recall ████████ was a third-party

9  PR agent.  I think he -- that's what his -- his

10  job was.

11  Q.  Why was -- sorry.

12  A.  Go ahead.

13  Q.  Yeah.  Why were you sending it to a PR

14  agent?

15  A.  He -- he worked -- he was a contractor.

16  He worked for Ripple.

17  Q.  I see.  This document appears to be

18  entitled "Ripple for Gateway" based on the

19  attachment name.

20  A.  Okay.

21  Q.  Do you see that?

22  A.  Yes.

23  Q.  What -- what was the purpose of this

24  document?

25  A.  Okay.  Well, first and foremost, I -- I

```
 1    can't remember from May 2013 exactly what -- these

 2    documents went through so -- hundreds of

 3    iterations, if not thousands, so I can't remember

 4    exactly what the purpose of this document was.

 5         Q.   When you say "these documents," though,

 6    what are you talking about?

 7         A.   Documents that explain what it is that

 8    Ripple means for different participants in -- in a

 9    -- in the exchange -- ecosystem that was being

10    built.

11         Q.   So is it fair to say that in 2013, it's

12    a doc -- document that explained what Ripple means

13    for potential participants in the ecosystem?

14         A.   Yes.

15         Q.   Okay.  And you said the documents went

16    through iterations.

17              Were you involved in the preparation of

18    these iterations in any way?

19         A.   Sometimes, yes; sometimes, no.

20    Sometimes they were given to me from market -- as

21    marketing collateral.  And sometimes I was

22    involved in the creation of it and sometimes it

23    was the marketing team that would work on that and

24    I would work off of it.

25         Q.   Okay.  So if it came to you from the
```

```
 1   marketing team, for example, you might make edits
 2   to it?
 3                   MR. HORTON:  Objection to form.
 4        A.   Yes.
 5        Q.   Okay.  And did you distribute these
 6   sorts of documents outside of Ripple?
 7                   MR. HORTON:  Objection to form.
 8        A.   Yes.
 9        Q.   Why?
10        A.   Just going back to my earlier answer,
11   just to -- to explain what the technology was and
12   what it meant to different participants in our
13   ecosystem around the technology.
14        Q.   And if you -- you know, how -- how many
15   different third parties outside of Ripple did you
16   send these sorts of documents to?
17        A.   I don't know.
18        Q.   Would it be more than ten?
19        A.   Yes.
20        Q.   Okay.  Would it be more than 100?
21        A.   Yes.
22        Q.   Yes.  Okay.
23             As far as you knew, when you were
24   sending these documents outside of Ripple, were
25   there con -- were the contents of these documents
```

```
 1    truthful?

 2              MS. COWAN:  Objection.

 3         A.   I just want to make sure we're putting

 4    some parameters around "these documents."

 5              What do you mean -- as far as -- this is

 6    a document for gateways.

 7         Q.   Uh-huh.

 8         A.   So when I look at that, this is a

 9    document for endpoints that would provide onboard

10    and offboard access to the network.  Dozens, maybe

11    hundred of times we sent that out.

12         Q.   Okay.

13         A.   I just want to make sure I'm -- I'm

14    tracking where --

15         Q.   That's -- that's fair.

16              So just focusing on those documents that

17    you might have sent out that were explaining to,

18    you know, endpoints/gateways as you describe them

19    on the network --

20         A.   Uh-huh.

21         Q.   -- to the extent you -- you sent out

22    documents to them explaining the technology, were

23    the contents of the documents truthful --

24              MR. HORTON:  Objection.

25         Q.   -- as far as you knew?
```

34

```
1            MR. HORTON:  Objection to form.
2       A.   As far as I know.
3       Q.   Have you come to learn of anything since
4   then that might not have been truthful?
5       A.   No.
6            MR. HORTON:  Objection.
7       Q.   Now, other than gateways, is it fair to
8   say -- and we can look at them in a minute -- but
9   is it fair to say that there were other types of
10  potential participants in the ecosystem to whom
11  you sent these doc -- to whom you sent documents
12  around 2013 explaining, you know, the ecosystem or
13  Ripple's ideas around the technology?
14           MR. HORTON:  Objection to form.
15      A.   Yes.
16      Q.   And what were those other types?  So we
17  talked about gateways, you know, you know, people
18  provide on -- you know, on and off ramps,
19  essentially.  What were the other types of, you
20  know, generally groups of persons?
21           MR. HORTON:  Objection.
22        Objection to form.
23      A.   Well, we would have sent collateral
24  explaining what Ripple is to a few people.  We
25  would have a document similar to this for
```

1    investors, for example, in Ripple Inc.  Or I think

2    at the time, it was OpenCoin.  Yeah, OpenCoin.  So

3    that would have been one group.

4        We had a document for -- we would have

5    sent this out also to partners who maybe could

6    utilize the network.  Businesses really.

7        So I think payment networks, as it says

8    in the e-mail, who we'd been working with to

9    identify businesses that could benefit from the --

10    the technology and what the technology offered.

11        And that was the -- most of the focus.

12      Q.   All right.  Okay.  If you'd take a look,

13    please, at page 19 of the deck.  The Bates is

14    RPLI_SEC --

15      A.   Sorry, which slide?

16      Q.   19.  And the Bates is 70371.

17      A.   Okay.

18      Q.   It says "The Business Model Adoption of

19    the Ripple Currency."

20        Do you see that?

21      A.   I do.

22      Q.   Is that an accurate representation of

23    OpenCoin's business model at the time --

24          MR. HORTON:  Objection to form.

25      Q.   -- in May of 2013.

1          A.    Well, I -- I think -- the terminology of

2    "business model" is, I think, loosely applied

3    here.  But Ripple certainly stood to gain from the

4    utilization of the XRP by way of the XRP that it

5    held on balance sheet.  But I think that in 2013,

6    we had the idea of building a business around

7    selling software --

8          Q.    Okay.

9          A.    -- and software-related services.

10         Q.    Okay.  Is that reflected on this page?

11               MR. HORTON:  Objection to form.

12         A.    I don't -- I don't know.

13         Q.    Okay.  Where it says "OpenCoin will sell

14   to wholesale MSBs over time to funds itself," do

15   you see that?

16         A.    Yes.

17         Q.    What does MSBs mean?

18         A.    Money services business.

19         Q.    Okay.  And at the time that you sent

20   this document out to a, you know, PR contractor,

21   was it an accurate statement of OpenCoin's plan to

22   sell XRP wholesale MSB over time to fund itself?

23               MR. HORTON:  Objection to form.

24         A.    It could have been.

25         Q.    Why were -- do you see a graph that

1 compares the price of bitcoin to U.S. dollars?

2     A.   I do.

3     Q.   And the little comment bubble discusses

4 the price of bitcoin, how it started trading below

5 5 cents and then spiked to $30.

6         Do you see that?

7     A.   Uh-huh.

8     Q.   What was the purpose of including that

9 graph there?

10            MR. HORTON:  Objection to form.

11     A.   I can't -- I can't venture a guess as to

12 what we were thinking in 2013.

13     Q.   Sitting here today, you just don't know

14 what the purpose was?

15     A.   No.

16     Q.   All right.  Turn to page 30, please, of

17 the slide.  The Bates is 70382.  The title is

18 "OpenCoin Inc. Regulatory and Legal."

19         Do you see that?

20     A.   I do.

21     Q.   Do you recall that ████████████ had

22 advised OpenCoin as to certain regulatory and

23 legal issues --

24            MR. HORTON:  Objection --

25     Q.   -- surrounding its business back in

```
 1    2012, 2013?

 2                  THE REPORTER:  I'm sorry, repeat

 3         the question, please.

 4                  MR. HORTON:  I thought you were

 5         at the end of your question.

 6    BY MR. TENREIRO:

 7         Q.   Do you recall that Perkins Coie had

 8    advised OpenCoin Inc. about certain regulatory and

 9    legal issues that might arise relating to its

10    business back in 2012 and 2013?

11                  MR. HORTON:  Objection to form.

12         A.   Yes.

13         Q.   Okay.  Is this what that's referring to

14    on this page?

15                  MR. HORTON:  Same objection.

16         A.   I don't know.

17         Q.   Okay.  And you were -- is it fair to say

18    you were familiar with the substance of the

19    advice?

20                  MR. HORTON:  Objection to form;

21          lack of foundation.

22         A.   Yes.

23         Q.   Okay.  Have you read the Perkins Coie

24    memos?

25         A.   I -- I have read them, but it's a long
```

```
 1    memo with -- that covers a lot of -- of different
 2    territory.
 3         Q.   You're not a lawyer, right?
 4         A.   No.
 5         Q.   In terms of your educational background,
 6    which I skipped, could you just briefly tell me
 7    what it was?
 8         A.   I attended University of Pennsylvania
 9    with a degree in liberal arts.
10              THE REPORTER:  Degree in?
11         A.   Liberal arts.  History.
12         Q.   And that's your entire educational
13    background?
14         A.   Yes.
15         Q.   Okay.  The next page says, if you --
16    please turn to the next page where it says "Key
17    Regulatory Issues and Tactics."
18              The second bullet says "Although
19    currencies are specifically exempt from securities
20    law, virtual currencies such as bitcoin have not
21    received designation as currencies.  As such,"
22    this new -- "As such, is this new currency a
23    security?"
24              And then there's three, I guess, bullet
25    points that say "Will not be sold to users or
```

1    investors in the Corporation; Will be given away
2    for free to users; Will only sell to licensed
3    wholesale MSBs."
4          Do you see all of that?
5      A.   Yes.
6      Q.   Why was -- why were these statements
7    made in this presentation under "Key Regulatory
8    Issues and Tactics"?
9               MR. HORTON:  Objection to form;
10         lack of foundation.
11     A.   Oh, and by the way, I had a second
12   degree in Asian studies --
13     Q.   Okay.
14     A.   -- from the University of Pennsylvania.
15   So there you go.
16          I -- I think the first thing to point
17   out on this is that the -- this document really
18   ends at Slide 26.
19     Q.   Uh-huh.
20     A.   And -- okay.  Going back into 2013, I
21   don't -- I think that there's even page of this
22   when I was browsing that lists who was in the
23   company at that point.  I think there was, like,
24   six people at the company.
25          So there's not a huge amount of

1    resources and energy that is available to maintain

2    these documents and keep them up to speed.  And

3    that's just kind of the nature of early stage

4    start-ups.

5           And so the first thing I would point out

6    is that this is in -- in deep, buried in an

7    appendix at the end of the presentation.  And that

8    might have been carried other from previous

9    presentations and previous presentations before

10   that.  And through all the permutations, it may

11   have still been in there.

12          So I think it's important to sort of

13   call that out being there's only so many resources

14   that you have when you're a team of whatever we

15   were, six or so.  And -- yeah, I think it's

16   important context.

17        Q.   Sure.

18          Is it fair to say that at some point,

19   there was a belief or an understanding that to

20   deal with securities laws risks, three ways to

21   mitigate those risks were to not sell to users or

22   investors in the corporation, to give away free to

23   users, and to only sell to licensed wholesale

24   MSBs?  Even if that was not necessarily the

25   understanding at this point in May 2013, I hear

1    your point that, you know, things changed, there's

2    six of you, but is it fair to say that at some

3    point, that was an understanding?

4                MR. HORTON:  Objection to form.

5                MS. COWAN:  Objection.

6        A.   I don't -- I don't know.  I don't know

7    what was going on in the discussions in the

8    company in 2013.  I can't remember what was top of

9    mind.

10       Q.   Okay.

11       A.   As I -- again, going back to that

12   document, that document covers a lot of ground.

13   This is one of the many recommendations and

14   suggestions that I recall that document speaking

15   to.

16       Q.   And who prepared this document, the

17   presentation we're looking at?

18               MR. HORTON:  Objection to form.

19       A.   I don't know.

20       Q.   If you had prepared it, would you

21   have -- if you had prepared it, would you have

22   written the regulatory parts on your own or would

23   you have asked someone?  You know, what was your

24   practice back then?

25               MR. HORTON:  Objection to form.

1      A.   It's possible.  I don't know if I

2  authored it or would have authored it.

3      Q.  Was there someone available to you, you

4  know, to the extent you were drafting a document

5  to whom you could say, Hey, I need to put some

6  legal stuff in here.  Could you help out with

7  that?

8              MR. HORTON:  Objection to form.

9      A.  I believe we had outside counsel.  I

10  can't totally remember what the mix of resources

11  were available to us at the time.

12      Q.  As time went on, after May of 2013, did

13  it remain true that XRP was not sold to investors

14  in Ripple?

15              MR. HORTON:  Objection to form.

16      A.  In 2013, I'm not sure.

17      Q.  After 2013, did there come a time when

18  Ripple sold XRP to equity investors in Ripple?

19      A.  Yes.

20      Q.  After 2013, did it remain true that XRP

21  was only given away for free to users?

22              MR. HORTON:  Objection to form.

23      A.  No.

24      Q.  After 2013, did it remain true that

25  Ripple only sold XRP to licensed wholesale money

1    services businesses?

2              MR. HORTON:   Objection to form.

3         A.   No, it didn't -- you know, I want to --

4    no is the answer.   I would also want to point out

5    one other thing here.

6         Q.   Yes.

7         A.   2013, a little bit of time machine.

8    Ripple I believe at that time was the only effort

9    or project in the sort of blockchain category

10   outside of bitcoin.   And I think there were

11   several derivatives of bitcoin, but I -- I think

12   there were only a handful, like five other

13   projects that were happening.   And the other ones

14   were all based on the bitcoin system and Ripple

15   was really entirely new.

16             So there were a lot of questions about

17   regulations and there was a lot of uncertainty at

18   the time.   And it was a common discussion point

19   with anybody that we talked to.   It -- it came up.

20   What -- what's the regulatory status here and

21   what's going on?   I know there was a lot of

22   headline risk or questions around bitcoin at

23   that -- in 2013 and 2012 period.

24             So I think, you know, there were -- what

25   to focus on and where to focus on, it was just

1     very uncertain and ill-defined as to where the

2     questions really needed to be asked around

3     regulations.

4              So, I mean, when I look at this, I'm

5     not -- I just remember there being -- that being a

6     period of a lot of uncertainty around what

7     cryptocurrencies are and what they -- what they

8     mean and -- and how regulators view them.  And,

9     again, particularly in the context of the headline

10    risk associated with bitcoin, we were trying to go

11    and talk to real businesses, in particular money

12    service businesses, who had questions, who are

13    regulated businesses themselves and needed to have

14    some understanding of what this was and questions

15    to ask and how to look at it.

16             So I think even the -- the memo that was

17    provided by Perkins Coie or the advice that we

18    got, I -- I don't think they really clearly had a

19    full understanding of it as well.  It felt like it

20    was a stake in the ground to sort of start the

21    process of understanding what -- what the

22    questions were.

23        Q.   So just to unpack that a little bit, you

24    said it was a common discussion point, the

25    regulatory issues or uncertainty with people you

1  spoke to?

2      A.  It -- it came up, yes.  It definitely

3  came up.

4      Q.  Would you say frequently?

5      A.  It came up.

6      Q.  Was Mr. Larsen present at meetings when

7  that came up?

8              MR. WARD:  Object to the form.

9      A.  It's possible.  I don't remember.

10     Q.  But it came up to you?  People asked

11  you?

12     A.  Yes.

13     Q.  Okay.  And what steps did Ripple take to

14  provide answers about the regulatory uncertainty

15  that was being raised?

16             MR. HORTON:  Objection to form.

17     A.  I can't speak to what Ripple did or

18  didn't do.

19     Q.  But, you know, what steps did you take?

20             MR. HORTON:  Objection to form.

21     A.  I think what I -- what I tried to speak

22  to -- I mean, first, I -- I think documents like

23  this we spoke to -- sort of caveat emptor was

24  there's some uncertainty here and this is as best

25  we -- we understand how this space is -- is

1 moving, the direction this space is moving from a

2 regulatory perspective.

3   Q. What steps, if any, did you observe

4 others at Ripple taking to provide answers on the

5 regulatory uncertainty questions back in 2013?

6     MS. COWAN:  Objection.

7   A. I -- I can't remember.

8   Q. Okay.  What steps did -- if any, did

9 anyone at Ripple direct you to take in order to

10 provide answers or to find answers?

11     MS. COWAN:  Objection.

12   A. I -- I can't remember.

13   Q. Okay.

14     MR. TENREIRO:  So let's look at

15  No. 4 for a second.

16     (Whereupon, exhibit is presented

17  and marked SEC Griffin Exhibit PG-4 for

18  identification.)

19 BY MR. TENREIRO:

20   Q. And while you look at it, I'll just say

21 for the record it's a one-page e-mail, also with

22 attachments.  It starts at Bates 88242.

23   And I just want to -- I just want to

24 note for the record that I attached one of the two

25 attachments, although it has -- the e-mail has

1    two.

2              (Pause)

3         Q.   Okay, Mr. Griffin.  This appears to be

4    an e-mail from you to someone at ▮▮▮▮▮▮▮ July

5    19th, 2013.

6              Any reason to believe you did not send

7    the e-mail?

8         A.   No.

9         Q.   Okay.  The title of this presentation --

10   well, the -- the name of the file is "Ripple for

11   Gateways 7.13," but the first page actually says

12   "Financial Services."

13             Do you see that?

14        A.   I do.

15        Q.   I don't want to get into a comparison

16   right now to Exhibit 7 page by page, but what I

17   want to understand, and I think we talked about it

18   a little, is the difference between the gateways

19   and the financial services, financial services

20   buckets that we were discussing earlier.

21             So is ▮▮▮▮▮▮▮ one of those financial

22   services buckets?  That's my question.

23             MS. COWAN:  Objection.

24             MR. HORTON:  Objection.

25        A.   I don't know what ▮▮▮▮▮▮▮ is, how it

1    would be classified.  The document is intended for

2    the financial services business.  And I think we

3    would have classified them as ███████ -- as -- as

4    financial services business.

5         Q.   So financial -- just to be clear,

6    financial services might be a business that might

7    have some sort of use for the -- for the XRP

8    ledger as opposed to being an on -- you know, an

9    on or off ramp?  Is that the difference?

10        A.   Yes.

11             MR. HORTON:  Objection to form.

12        A.   Yes, I believe so.

13        Q.   And -- okay.

14             So going to page 19 again where it says

15   "The Business Model," this one is Bates RPLI_SEC

16   88287.

17        A.   Okay.

18        Q.   Do you see that?

19        A.   I do.

20        Q.   Okay.  You can compare this page if

21   you'd like, but, you know, again, it says

22   "Ripple's business model is based on the success

23   of its native currency.  OpenCoin will keep

24   between 25 to 30 percent of all currency created.

25   OpenCoin will occasionally sell to wholesale MSBs

```
 1   to fund itself."
 2            Do you see all that?
 3       A.   Uh-huh.
 4       Q.   And the reference to currency is to XRP?
 5                 MR. HORTON:  Objection to form.
 6       A.   I believe it is, yes.
 7       Q.   Okay.  And so, you know, Exhibit 7 was
 8   May of 2013.  Exhibit 4 is in July.
 9            Is it fair to say that a couple of
10   months later, in July of 2013, this was still an
11   accurate representation of Ripple's then-current
12   business model?
13                 MR. HORTON:  Objection to form.
14       A.   I can't speak to that, to the business
15   model of Ripple.
16       Q.   Do you have any reason to believe that
17   you would have sent out a deck to a third party
18   with inaccurate information?
19                 MR. HORTON:  Objection to form.
20       A.   No.
21       Q.   Okay.  Now here -- and here, if you
22   want, you might compare page 19.  Here there's a
23   graph comparing the price of XRP to the U.S.
24   dollar.  On page 19 of Exhibit 7, it was the price
25   of bitcoin to the U.S. dollar.
```

1          Why was the change made to the graph?

2      A.   I don't --

3              MR. HORTON:  Objection; lack of

4       foundation.

5              You can answer.

6      A.   I don't know.

7      Q.   Okay.  And do you know what the purpose

8  of the graph was?

9              MR. HORTON:  Same objection.

10      A.   I don't know.  Again, I'm going to sort

11  of set context.  This probably would have been the

12  very first time [            ] had ever spoken to

13  anybody about bitcoin, cryptocurrencies or

14  blockchain, 2013 of July.

15          So I think they -- they probably had --

16  would have likely had questions about crypt --

17  what are cryptocurrencies?  How do -- how do they

18  retain value?  How do they work?  They would have

19  also had questions about the regulatory

20  considerations.  And so I think that this deck is

21  more of an attempt at -- as much as to introduce

22  the space as -- as it is to introduce our -- our

23  company and what the technology was that we were

24  offering.

25      Q.   Would they have -- would they have had

1    questions about how to make money with this

2    technology?

3              MR. HORTON:  Objection to form.

4         A.   It's possible.

5         Q.   Well, as a -- as the head of business

6    development for Ripple at the time, did people ask

7    you questions about how can I make money with this

8    technology?

9              MR. HORTON:  Objection.

10        A.   They could have asked a -- a range of

11   questions.  They could have also asked how do we

12   save money or how do we build new services?  How

13   do we tap into new markets?  How do we reduce

14   costs?  I mean, there's -- there's a range of -- a

15   number of options, a number of ways that that

16   conversation can -- can take place.

17        Q.   So there's a number of ways in which --

18   there's a number of ways in which that

19   conversation can take place, but the conversation

20   is how do we make money essentially?  Is that what

21   you're saying?

22             MR. HORTON:  Objection to form.

23         That's not what his testimony is.

24        A.   No, that's not what I said.

25        Q.   Okay.  So then I'll have to ask you

```
1    again.  Did people ask you, as the head of
2    business development for Ripple at the time, how
3    can I make money with this technology?
4         A.   They -- along with all the other things
5    that I asked, it may have been one of the -- the
6    topics of discussion, is how do I make money?
7    But, again, I think that they would have been more
8    focused on how do I improve my business?  Because
9    I think that that was the approach we were taking
10   here.
11        Q.   Okay.
12        A.   I think that that's sort of laid out in
13   the first -- in the e-mail.  That basic story of
14   ▮▮▮▮▮▮▮▮  is to make profits on transfer fees,
15   support prepaid access, and remittance --
16              THE REPORTER:  Could you please
17         slow down.  Repeat.
18        A.   -- accept payment from new markets at no
19   cost.
20              So, I mean, there's -- there's a
21   whole -- whole range of different sort of
22   incentives for why they would want to think about
23   this and -- yeah.
24        Q.   So -- so, in other words --
25        A.   Just pros and cons, right.
```

1     Q.   Okay.  So just so I understand, your

2  pitch to ███████ as reflected in the front page

3  of the e-mail is the different ways for you to

4  make profits on transfer fees, support prepaid

5  access?  That's what you're setting out here?

6               MR. HORTON:  Objection to form.

7     A.   Again, it sounds like this is probably a

8  very early meeting, so we're trying to feel them

9  out.  We're trying to understand where are their

10 priorities, what are they thinking about?  What

11 are their -- what do they -- what did their boss

12 tell them to figure out with new technology?  And

13 so we don't know that and so we're just trying to

14 put some ideas out, like here, we think we can

15 have a discussion around these different areas

16 about how our technology can play into your

17 priorities.  We don't know what your priorities

18 are yet, so here are some possible areas for

19 discussion.

20    Q.   All right.  Going back to the graph,

21 though, on page 19, did third parties that you

22 spoke to while you were the head of business

23 development at Ripple around 2013 ask you about

24 the potential for these digital assets, these new

25 digital assets, to appreciate in value?

1          MR. HORTON:  Objection.

2      Objection to form.

3      A.   So -- okay.  So 2013, I think at that

4  point in time, it was very early and the

5  technology that Ripple was -- was in the market

6  talking about was an open-source technology.

7          And so I don't yet at that point --

8  there were -- there had not been a full product

9  stack built on top of it.  There wasn't really a

10  very clearly defined service.  I think we had sort

11  of the idea that we could build a business model

12  like Linux and Red Hat and that kind of

13  relationship where there's an open-source model --

14  a business that you can -- you can service.

15          And I think there -- there were

16  questions about the digital asset.  It's possible.

17  And to be -- to be honest, what I remember in a

18  conversation with a company like ███████ is

19  they didn't really want to spend too much time

20  talking about the cryptocurrency.  They wanted to

21  understand the technology underneath it because,

22  again, in 2013, to get in the door, you had to

23  sort of understand how to talk about bitcoin and

24  the risks associated with bitcoin in the headlines

25  in order for a substantial company like ███████

1    to -- to really be willing to have a conversation.

2        Q.   And so, again, in the context of these

3    conversations in 2013 where you're trying to

4    figure out, you know, what did their boss ask them

5    for and what are their questions, what was the

6    purpose of the graph showing the price of XRP to

7    U.S. dollars?

8                MR. HORTON:   Objection to form;

9         lack of foundation.

10       A.   I think just to show that there -- that

11   there's value in cryptocurrency.  And -- and,

12   again, I would say this -- this is a slide that

13   very well could have just been skipped over where

14   we were in the meeting where          may have

15   said let's keep going.  This is not what we're

16   here to -- we're here to talk about.  Again, going

17   back to the -- the slide here, the opening e-mail,

18   there's really no reference to cryptocurrencies at

19   all if you can --

20       Q.   But there's no -- you have no reason to

21   doubt this slide was, in fact, attached to the

22   e-mail, right?

23       A.   It -- yes.

24       Q.   Thank you.

25            The next slide, please, on Slide 20, it

1    talks about "OpenCoin is a for-profit corporation,

2    holding all of the XRP."

3            Do you see that?

4        A.   Okay, yes.

5        Q.   The part that "OpenCoin is a for-profit

6    corporation," was that true back then?

7                MR. HORTON:  Objection to form.

8        A.   I don't -- I don't remember what the

9    legal registration of the open -- of OpenCoin was

10   at the time.

11       Q.   Was OpenCoin a business trying to make

12   money back in 2013?

13               MR. HORTON:  Objection to form.

14       A.   Was it a -- I'm sorry, could you repeat

15   that?

16       Q.   To try and make money.

17               MR. HORTON:  Objection.

18       A.   Yes.

19       Q.   Did that change at any time before --

20   between 2013 and when you left?

21       A.   No.

22       Q.   Okay.  And just to be clear for the

23   record, OpenCoin was Ripple back in 2013, right?

24       A.   Yes.

25       Q.   Okay.  In 2013, did OpenCoin hold all of

1   the XRP?

2              MR. HORTON:  Objection to form;

3       lack of foundation.

4       A.   I don't believe so, no.

5       Q.   Why not?

6              MR. HORTON:  Objection.

7       A.   I don't -- I don't know why not.  I

8   think it was -- there was XRP out in the market.

9       Q.   By 2013, there was XRP out in the

10  market?

11      A.   Yes.  And I know the -- the origin of

12  the company -- or of the technology, the founders

13  had already taken some as well.  So I don't -- so

14  Ripple Inc. did not -- or OpenCoin here did not

15  have all of the XRP, no.

16      Q.   Some of it was in the market, some -- as

17  far as you recall, some of it was in the market,

18  some of it was with some founders?

19      A.   Yes.

20             MR. HORTON:  Objection to form.

21      Q.   Why doesn't this slide distinguish

22  between the founders and OpenCoin?

23             MR. HORTON:  Objection to form;

24       lack of foundation.

25      A.   I -- I don't know.

1       Q.   All right.  Let's move on to Exhibit 5.

2            (Whereupon, exhibit is presented and

3    marked SEC Griffin Exhibit PG-5 for

4    identification.)

5    BY MR. TENREIRO:

6       Q.   While we're pulling that, do you

7    remember someone by the name of ▮▮▮▮▮▮

8       A.   Yes.

9       Q.   Who is that?

10      A.   Economists at ▮▮▮▮▮▮  A Board member

11   of Ripple -- at Ripple.

12      Q.   How did you come to know her?

13      A.   I believe it was through Chris Larsen's

14   connection with ▮▮▮▮▮  He ran into her at

15   conference or knew her and then made some

16   introductions to us.

17      Q.   Okay.  Go ahead and take a look at the

18   exhibit, please.

19           MR. TENREIRO:  For the record,

20       this is a one-page e-mail with an

21       attachment from Mr. Griffin to ▮▮▮▮▮

22       November 30th, 2013, RPLI_SEC 12359.

23           (Pause)

24   BY MR. TENREIRO:

25      Q.   Mr. Griffin, did you have a conversation

1   with Ms. ▮▮▮ about the subjects discussed in the

2   attachment to this e-mail on or around November

3   30th, 2013?

4           MR. HORTON:  Objection to form.

5       A.  I don't remember, but from reading the

6   e-mail, it looks like I did.

7       Q.  Okay.  And the title is "Distribution"

8   -- the title of the slide is "Distribution

9   Discussion Themes."  The title of the attachment

10  appears to be "XRP Distribution Framework

11  PowerPoint Presentation."  Is that correct?

12      A.  Yes.

13      Q.  Did you --

14          MS. COWAN:  I don't think that's

15      what it says.

16          THE REPORTER:  I can't hear you.

17          MS. COWAN:  Sorry.  I don't

18      think that's what -- the subject is "XRP

19      Distribution Themes."

20          MR. TENREIRO:  The attachment

21      says "XRP Distribution Framework

22      PowerPoint Presentation."

23  BY MR. TENREIRO:

24      Q.  Did you author these slides?

25      A.  Did I -- excuse me?

1      Q.   Author these slides?

2                 MR. HORTON:  Objection to form.

3      A.   I don't know.

4      Q.   Who is Phil Rapoport?

5      A.   Phil Rapoport reported to me.  He worked

6   on -- he worked at Ripple.

7      Q.   Okay.

8                 THE REPORTER:  He worked on?  I

9       can't hear you?

10                 THE WITNESS:  He worked at

11       Ripple.

12      Q.   All right.  Any reason to believe that

13   the themes discussed here were not accurate as --

14   as -- as of the time of this presentation?

15                 MR. HORTON:  Objection to form.

16      A.   I -- I don't know.  I don't have a

17   reason to believe one way or the other.

18      Q.   Okay.

19                 MR. TENREIRO:  Let's quickly take

20       a look at No. 6.

21                 (Whereupon, exhibit is presented

22       and marked SEC Griffin Exhibit PG-6 for

23       identification.)

24   BY MR. TENREIRO:

25      Q.   This is a November 29th e-mail from you

1      to Mr. Rapoport.  See if this refreshes your

2      memory as to whether you drafted it or not.

3              (Pause)

4          A.    Still no.  I don't know if I drafted it

5      or not.

6          Q.    Okay.  Do you see on Exhibit 6 where you

7      say "Before I send this to ████ let me know if

8      anything is missing.  She is working on an e-mail

9      for Chris and a broader distribution thesis and I

10     want to recap our phone call."

11             Did I read that accurately?

12         A.    Yes.

13         Q.    Okay.  So Exhibit 5, if we can turn to

14     the slides, you say on page 2 of the slide, "Goal

15     of Distribution" -- it says "Goal of Distribution:

16     Network growth, Raise funds for Ripple Labs

17     operations."

18             Do you see that?

19         A.    Yes.

20         Q.    Was that accurate, the goal of

21     distribution was to grow the network and to raise

22     funds for Ripple Labs' operations?

23                 MR. HORTON:  Objection to form.

24         A.    I think the e-mail -- or what this

25     document is doing is summarizing the conversation

 1   we had with Susan.

 2          Q.   So in the conversation with Susan, did

 3   someone at Ripple convey to her that the goal of

 4   the distribution was network growth and to raise

 5   funds for Ripple Labs' operations?

 6          A.   Well --

 7               MR. HORTON:  Objection to form.

 8               You can answer.

 9          A.   Okay.  Going -- stepping back, I don't

10   know what Susan -- ███████ involvement was at

11   Ripple at this point.  She may have been outside

12   the company.  I think she was.  So I think she was

13   just more interested in -- I think she was looking

14   at all things bitcoin and cryptocurrencies.  She's

15   a -- a marketplace expert.  I think that's her

16   field of economics.

17               And I think she was offering her views

18   on XRP, Ripple's strategy, and Ripple's holdings

19   of XRP and how to build a marketplace around

20   cryptocurrencies or really anything.

21          Q.   Why --

22          A.   So this would have been capturing a

23   discussion that we had where we were effectively

24   going to her to seek out her -- her expertise and

25   her views.  And this would have just basically

1  been a rehashing of what she had said.  She wasn't
2  working at the company at the time.
3      Q.  Okay.  So your -- your testimony is that
4  the presentation reflects what she had told you?
5      A.  I believe so.
6      Q.  Okay.  Why were you discussing with
7  ███ ███ her views on XRP, Ripple's strategy and
8  Ripple's holding of XRP and how to build the
9  marketplace around cryptocurrencies?
10             MR. HORTON:  Objection to form.
11             MR. TENREIRO:  What's the
12         objection, Justin?
13             MR. HORTON:  I don't think it's
14         clear that his testimony was that that's
15         the topic of their discussion.  I think he
16         was describing the relationship that they
17         had with her, but you can ask him a
18         question about it.
19             MR. TENREIRO:  Okay.
20  BY MR. TENREIRO:
21      Q.  Please answer.
22      A.  Please ask the question again.
23      Q.  Why were you discussing with ███ ███
24  her views on XRP, Ripple's strategy and Ripple's
25  holding of XRP and how to build the marketplace in

1    cryptocurrencies?

2                    MR. HORTON:  Same objection.

3        A.    Well, again, I can't remember the

4    substance of what we talked about with ███ in

5    2013.  I think there -- the technology that we

6    were working on, there were different components

7    to it and one of the big components was XRP.  And

8    so we wanted to -- and it plays a central role in

9    the system, and Ripple Inc. or OpenCoin at the

10   time had a large holding of it.  And how we sold

11   it or distributed it or whatever we did with it

12   had an impact on how ultimately the technology

13   would be adopted and the ecosystem built out.

14               So I think it's just one of the many

15   things that we were worried about or trying to

16   think through and we would have gone to her to get

17   her ideas or opinions about how to build a healthy

18   marketplace around something.  And here we wanted

19   to apply that to the cryptocurrency so we could

20   think through what the different ideas for

21   distribution of the XRP that Ripple Inc. or

22   OpenCoin at the time had.

23       Q.    When you said "It's just one of the many

24   things that we were worried about or trying to

25   think through and we had gone to her to get her

66

```
 1    ideas or opinions," who's "we" in that sentence?
 2        A.   Well, me, Phil, I think.  I think it was
 3    something that we were all -- everybody at Ripple
 4    was conscious of and thinking about.
 5        Q.   Was one of the things that everybody at
 6    Ripple was conscious of and thinking about was how
 7    to create a market for XRP?
 8             MR. HORTON:  Objection to form.
 9        A.   I wouldn't say how to create a market.
10    Just, you know, we -- again, I think we were
11    thinking about how to get gateways on the system,
12    how to connect financial players on the system.  I
13    mean, even down to the -- at that point, the
14    distinction between technology and business was
15    actually pretty -- pretty tightly coupled because
16    there -- it was so new.  And so I was even
17    thinking and talking about, you know, how to --
18    how that cryptography system works and how to, you
19    know, think through different cryptographic
20    solutions, how they apply in business contexts.
21             We were thinking about, as I said, a lot
22    of different aspects of this.  And even with the
23    new technology, there is -- an exchange was built
24    within it, how the exchange works, how people come
25    into the exchange.
```

 1            So this would have been one of -- one

 2    of -- yeah, one of many things that we were

 3    thinking through and trying to understand.

 4        Q.   "This" being what?  Create -- how to --

 5        A.   The XRP that we held and -- sorry.  I'll

 6    let you finish the question.

 7        Q.   No.  The question is you said "this

 8    would have been one of the many things we were

 9    thinking through."

10            And so what is "this" in your answer?

11        A.   Ripple's holdings of XRP, or, again, I

12    don't know if it was Ripple or OpenCoin at the

13    time, but, yeah.

14        Q.   In 2013, did Ripple -- did you have

15    conversations with others at Ripple about how to

16    create a market in XRP?  I understand you were

17    discussing a lot of things, but was one of the

18    things that you discussed with others at Ripple in

19    2013 how you could create a market for XRP?

20            MR. HORTON:  Objection to form.

21        A.   Again, I don't know that it was market.

22    You're using that -- you're saying "market."  I

23    don't know if it was market.  I think it was, you

24    know, how Ripple had a lot of -- had XRP and we

25    were trying to understand how we could sell it or

1   move it or distribute it in a way would have

2   created to the value of the overall network and

3   that would promote and help generate more adoption

4   and help to grow the ecosystem around it.

5       Q.   So one of the things you were discussing

6   at Ripple in 2013 was trying to understand how you

7   could sell, move, or distribute XRP to generate

8   more adoption for Ripple's network?

9              MR. HORTON:  Objection to form.

10      A.   For all -- for the technology

11  underpinning the XRP.

12      Q.   And that would be the XRP ledger?

13      A.   Yeah, it's taken a lot of different

14  names and I think the changes -- there have been

15  changes to the name, but I think at the time it

16  was the Ripple consensus ledger.

17      Q.   Right.  All right.  And is it fair to

18  say that in 2013, Ripple had two goals for its --

19  sorry.  Let me strike that and start again.

20             In the slide that we were looking at

21  where it says "Goal of Distribution," is that

22  distribution of XRP?

23             MR. HORTON:  Jorge, which exhibit

24        are you talking about?

25             MR. TENREIRO:  Exhibit 5, page

1           RPLI_SEC 16362.

2           Q.   Where it says "Goal of Distribution," is

3    that distribution of XRP?

4                MR. HORTON:  Objection to form.

5           A.   I don't see "Goal of Distribution."

6           Q.   I think you're on the wrong page.

7           A.   I might be.  Oh, sorry.  Okay.  This

8    page.  Okay.

9           Q.   Okay.  So "Goal of Distribution," is

10   that distribution of XRP?

11                MR. HORTON:  Objection to form;

12           lack of foundation.

13          A.   Again, I think going back to what this

14   document is, it's a recapping of the conversation

15   that we had with ████     It was -- again, I don't

16   believe she was working at the company at the time

17   or she was offering her views and her opinions.

18          Q.   So --

19          A.   We just wanted to make sure we

20   captured -- we understood what she had said and

21   we're playing it back to her.

22          Q.   To the extent she had offered a view or

23   opinion about goal of distribution, though, was

24   that distribution of what?

25                MR. HORTON:  Objection to form.

1      A.   This would have been distribution of

2    XRP.

3      Q.   Okay.  And so she --

4      A.   You know, actually -- yeah, I believe

5    that's distribution of XRP, yes.

6      Q.   So as best you recall based on this sort

7    of contemporaneous recording of what her views

8    were, two of the goals of distribution of XRP --

9    let me start again.

10          Whose goals would this be that she was

11   talking about?

12               MR. HORTON:  Objection to form.

13     A.   I -- I don't know.

14     Q.   Would they be Ripple's goals?

15               MR. HORTON:  Same objection.

16     A.   Again, it could have been a general

17   statement about how -- about cryptocurrencies or

18   anything.  But I believe that's all I can really

19   say.

20     Q.   How much time in 2013 did you spend in

21   your job sort of looking for general opinions

22   about cryptocurrencies as opposed to, you know,

23   Ripple's cryptocurrency?

24               MR. HORTON:  Objection to form.

25     A.   I don't know.  It would have been

1   something I would have thought about and sought

2   out.

3        Q.   And --

4        A.   Again, just going back to the premise,

5   there's only bitcoin at this point and a handful

6   of other technologies that utilize bitcoins,

7   underlying blockchain technology.  So this is a

8   totally new green space here.

9        Q.   Let's go on to the next page "Long Term

10   Stages of Ripple."  Just please read it to

11   yourself.

12           (Pause)

13        A.   Okay.

14        Q.   So in "Long Term Stages of Ripple" --

15   the prior page.  So summing up,  ▮▮  ▮▮▮▮

16   explained to you that there could be three faces

17   of value for XRP, is that correct?

18               MR. HORTON:  Objection to form.

19        A.   I don't remember.

20        Q.   Okay.

21        A.   That's what the document shows.  And,

22   again, I don't know -- yeah.

23        Q.   If you flip forward a couple pages to

24   where it says "Overhang Concerns."

25        A.   Uh-huh.

1          Q.   Sitting here today, what does "overhang

2     concerns" mean to you in the context of this slide

3     or this presentation?

4               MR. HORTON:  Objection to form.

5          A.   I believe -- overhang would speak to the

6     fact that -- that OpenCoin had a large holding of

7     XRP and that represented an overhang of supply.

8          Q.   And that was a concern as it's -- as

9     it's explained here on Bullet Point 2?  That could

10    be a concern, rather, for people?

11              MR. HORTON:  Objection to form.

12         A.   It -- I think it was something that we

13    wanted to -- to think through.  I don't --

14    concerned other people, I don't know.  But it was

15    one of the things we wanted to understand.

16         Q.   Over the course of the years at your

17    employment at Ripple, did you come to understand

18    that third parties, in fact, did have concerns

19    over Ripple's holdings of XRP?  The amount of

20    Ripple's holdings of XRP?

21              MR. HORTON:  Objection to form.

22         A.   Yes.

23         Q.   Okay.  And what was the source -- how

24    did you derive that sort of understanding?

25         A.   I think there were -- it was -- it was

1    mostly through -- I want to say cryptocurrency

2    media and forums and Twitter, social media.  I

3    think there was -- there was a -- a contingent of

4    cryptocurrency adopters who I think it's fair to

5    frame them as bitcoin maximalists who really

6    believed that bitcoin was the end all and the be

7    all and anything else needed to be effectively

8    attacked and there was a lot of misinformation

9    that was put out.  And one of those -- one of

10   that -- one of those talking points, if I could

11   say talking points loosely, was that Ripple had a

12   large amount of XRP and Ripple could sell its XRP

13   at any given moment, and that represented an

14   overhang of supply.  And I think that's what it's

15   referring to.

16        Q.   Was one of -- was the XRP escrow in part

17   a response to that sort of overhang concern?

18              MR. HORTON:  Objection to form.

19        A.   Yes.

20        Q.   Okay.  And you're saying that that

21   concern was had by bitcoin maximalists or -- just

22   by them or more broadly by people in the digital

23   asset space?

24              MR. HORTON:  Objection to form.

25        A.   I don't -- I don't know.  I'm just

```
 1    loosely characterizing them as that concern coming
 2    from that -- that corner of the cryptocurrency
 3    market.
 4         Q.   What other --
 5         A.   And I think it had --
 6         Q.   Sorry.
 7         A.   -- an outside impact.  It became a
 8    talking point that occurred a lot that we had
 9    to -- that we spoke to.
10         Q.   What -- what other -- what other things
11    did Ripple do with its business in response to
12    bitcoin maximalists?
13              MR. HORTON:  Objection to form.
14         A.   I don't -- I don't know what Ripple
15    does.
16         Q.   Well, what part -- how -- what
17    percentage of you work -- of your work did you do
18    in response to bitcoin maximalists' view of XRP?
19              MR. HORTON:  Objection to form.
20         A.   I don't know what percentage of my work
21    was -- I had a lot of different responsibilities
22    at Ripple.
23         Q.   Let's go through them just so that we're
24    clear because I've heard you say that a lot.
25              So what -- what are your -- what were
```

1    your general responsibilities at Ripple?

2         A.   Sure.  And it varied over time.

3         Q.   Please.

4         A.   And, I mean, at the beginning, it was

5    largely focused on securing partnerships, but it

6    was everything and it was other things as well.  I

7    mean, again, we're a small team.  Also involved

8    cleaning the dishes.

9              I mean, I -- and that evolved into

10   helping to establish a sales team around our

11   enterprise software products.  It involved

12   building out an integration team to support the

13   deployment of that software.

14             I also oversaw corporate development

15   efforts to secure acquisitions or sort of

16   inorganic growth strategies.

17             I helped to raise funding for the

18   business in the Series A and B and seed.  And I

19   was also involved in a -- in a -- the spin out of

20   a company or an effort that, which I can't

21   remember what it -- what it's called.  The spring.

22   I don't know what it was called when I -- when I

23   left.  I was there briefly for that.

24        Q.   What about managing Ripple's XRP sales?

25        A.   And -- and the sales of XRP, yes.  XRP

```
 1    markets team we had called them.

 2         Q.   What was your position in the XRP

 3    markets team?

 4         A.   I was -- they reported to me.

 5         Q.   Who reported to you?  Who was the head

 6    of that team?

 7         A.   At first it was Phil Rapoport and then

 8    it was Miguel Vias.

 9         Q.   Right.  Anything else?  Let's finish

10    this exhibit.  I know you probably want to break.

11              MR. HORTON:  Yeah.  If you've got

12         a few more questions on this exhibit.

13         Q.   Well, first, just anything else -- I

14    mean, you might remember something else.  Anything

15    else that were your responsibilities at Ripple

16    that we didn't cover?

17         A.   No.  I -- no.

18         Q.   I mean --

19         A.   I think that sounds -- sounds like it's

20    about -- it's about it.

21         Q.   Okay.  And earlier I had asked you

22    about -- separate from this exhibit, sort of if

23    you had come to learn over time that there were

24    some concerns out there, let's just say out there,

25    about Ripple's holdings of XRP and you said, you
```

1    know, Twitter, social media.  And my question,

2    just to close that out, is, is it fair to say at

3    time -- from time to time, you read those forum,

4    like Twitter and social media, and that is how you

5    derived that understanding?

6           MR. HORTON:  Objection to form.

7       A.   Yes.  I believe so, yes.

8       Q.   And now, just to finish on this exhibit

9    real quick, we can go to the next page.  It says

10    "Current Distributions."

11       A.   Okay.

12       Q.   It says "There are ways to increase

13    supply that create a bigger increase in demand."

14           So is that something that ██ ████

15    explained to you as the head of business

16    development at Ripple, ways to increase supply of

17    XRP that create a bigger increase in demand of

18    XRP?

19           MR. HORTON:  Objection to form.

20       A.   From what I can see here.  I can't -- I

21    don't remember this document; but reading the

22    document, the slide here, it looks that way.

23       Q.   The next page refers to "speculators."

24    It says "We'd prefer to attract speculators who

25    take a long-term view and believe XRP demand will

1    overwhelm supply as commercial use of the network

2    increases."

3              Do you see that?

4         A.   Yes.

5         Q.   Do you have any reason to believe that

6    the "we" in that sentence refers to ███ █████?

7              MR. HORTON:  Objection to form.

8         Q.   Let me say it differently:  Who does the

9    "we" in that statement -- in that sentence refer

10   to?

11        A.   I don't know.  It's a -- yeah, I

12   don't -- I don't know.

13        Q.   Okay.  And the last bullet point says

14   "If you are holding XRP, you should want RL to

15   retain XRP for business development.  Give

16   ourselves six months.  Speculators are speculating

17   on Ripple Labs."

18              Do you see that?

19        A.   I do.

20        Q.   Who is "ourselves" in the "give

21   ourselves six months" sentence?

22              MR. HORTON:  Objection to form.

23        A.   Presumably it's Ripple.

24        Q.   Okay.  And what -- what does it mean

25   here, "Speculators are speculating on Ripple

1    Labs"?

2              MR. HORTON:  Objection to form.

3         A.   I don't know.

4         Q.   Just sitting here today and reading it,

5    Mr. Griffin, what does that mean to you?  I

6    understand you don't recall the conversations in

7    2013, but what does this mean to you today?

8         A.   Well, I think this means to me -- I

9    don't know.  I mean, there's -- I'm not sure.

10   And, again, this is me or Phil capturing the

11   conversation we had with an advisor.  I think she

12   may have been an advisor at the time or she wasn't

13   even at the company.

14        Q.   Okay.  But you don't understand what it

15   means sitting here today, "Speculators are

16   speculating on Ripple Labs"?

17             MR. HORTON:  Objection; asked and

18        answered.

19        A.   I don't know because I think it's just

20   capturing a conversation that I had with an

21   outside advisor or person that was unaffiliated

22   with the business at the time.

23        Q.   Did you have a view in 2013 that XRP

24   speculators could be speculating on Ripple Labs?

25             MR. HORTON:  Objection to form.

1     A.   No.

2     Q.   Okay.  Did -- did you hear others at

3  Ripple express a view that speculators in XRP

4  might be speculating on Ripple Labs?

5           MR. HORTON:  Objection to form.

6     A.   I don't remember what others said.

7     Q.   Okay.  Do you understand this sentence

8  to mean that speculators in XRP might be

9  speculating on Ripple Labs?

10          MR. HORTON:  Objection to form.

11    A.   I just -- I understand the sentence.

12    Q.   Okay.  Is that -- is that what it means

13  to you by reading it sitting here today?

14         MR. HORTON:  Objection.

15    A.   I'm sorry, is what -- I'm not following.

16    Q.   Well, it says "speculators."  I want to

17  make sure that -- my question was, does it mean

18  speculators in XRP are speculating on Ripple Labs?

19  Is that what you understand it to mean?

20         MR. HORTON:  Objection to form.

21    A.   As -- as I said, we're capturing a

22  conversation that we had with an outside advisor

23  and so I can't remember what the detail -- what

24  the nuance is there.

25     Q.   Okay.  Last page of the --

1      A.   I think that --

2      Q.   Sorry.

3      A.      -- it speaks very clearly, though,

4   to -- I think she's speaking to this idea that

5   there's different phases of the market and that

6   one of the initial phases is speculation and -- or

7   speculatively valuable.  And she kind of clears --

8   says here we don't want -- we prefer -- it says --

9   I don't know if that's Ripple or her idea as an

10  advisor, what her role is.  That's not the

11  long-term objective.

12     Q.   But maybe -- maybe I'm just asking a

13  very confusing question.  My simpler question is

14  speculators in what?

15          MR. HORTON:  Objection to form.

16     Q.   Is it speculators in XRP or something

17  else?  I understand --

18          MR. HORTON:  Hold on.  I'm going

19       to object to the question.  You've asked

20       him that question three or four times now.

21       He's given you his answer.

22     Q.   What is it speculators on?

23          MR. HORTON:  No.  Asked and

24       answered.

25     A.   XRP.

1      Q.   Okay.  The last page so we can go on a

2  break says "XRP Breakdown.  Founders 20 percent.

3  Ripple Labs 80 percent."  And then it says "RL

4  Equity 25.  Nonprofit distribution 55."

5           Do you agree with my understanding that

6  25 and 55 sum up to 80?

7      A.   Yes.

8      Q.   Okay.  So do you know why there's a

9  reference to RL Equity 25 percent here?

10          MR. HORTON:  Objection to form.

11     A.   No.  I don't -- I don't remember.  I

12 don't remember.  I mean, I just -- again, I go

13 back to context.  It's very early days.  I think

14 we're trying to understand how all this works and

15 how we're thinking through it all.  So, I -- yeah.

16 I don't think any of this is set in stone.

17     Q.   Okay.

18          MR. TENREIRO:  Let's go off.  Go

19      off the record, please.

20          THE VIDEOGRAPHER:  Going off the

21      record at 10:22 a.m. Eastern.

22          (Whereupon, a recess is taken.)

23          THE VIDEOGRAPHER:  We are back on

24      the record at 10:37 a.m. Eastern.

25 BY MR. TENREIRO:

1      Q.   Mr. Griffin, we were discussing, you

2    know, sort of the 2013 time frame.  I'm

3    paraphrasing an answer you gave me.  I'm not

4    saying exactly, but I think at some point, in

5    substance, you conveyed to me that you don't know

6    what Ripple, the company, was doing in 2013.  You

7    could speak for yourself, is that correct?

8      A.   Yes.

9      Q.   Who -- who -- who could speak to what

10   Ripple, the company, was doing in 2013?

11              MR. HORTON:  Objection to form.

12     A.   I don't know.

13     Q.   Is it -- is it Mr. Larsen only?

14              MR. HORTON:  Objection.

15              MS. COWAN:  Objection.

16     A.   I don't know.

17     Q.   Who knows?  Who would know the answer to

18   that question?

19              MR. HORTON:  Same objection.

20     A.   I don't know.

21     Q.   There were -- you know, we could go back

22   to the presentation, but I think you pointed out

23   to me there was a small number of people working

24   at -- at -- at Ripple at the time, right?

25     A.   Yes.

84

```
1          Q.   But you're saying you cannot speak to --
2     as one of its executive vice presidents, cannot
3     tell me what Ripple, the company, was thinking or
4     doing in 2013, is that correct?
5                MR. HORTON:  Objection.
6          A.   Right.  Ripple, I can't speak to what
7     Ripple was thinking, Ripple, the company.  I think
8     it was called OpenCoin at the time.
9          Q.   Could you speak to what OpenCoin was
10    thinking?
11               MR. HORTON:  Same objection.
12         A.   No.
13         Q.   Could you speak to what OpenCoin was
14    doing?
15         A.   No.
16         Q.   Okay.  Is it fair to say that in 2013,
17    one of the things you were doing on behalf of
18    OpenCoin was, you know, trying to develop
19    business?
20         A.   Yes.
21         Q.   And that included, for example, you
22    know, partnerships with third parties?
23         A.   Yes.
24         Q.   And that included, for example,
25    potentially selling XRP to third parties?
```

85

```
 1              MR. HORTON:  Objection to form.
 2         A.   I'm not sure.  Okay.  We're talking 2013
 3    time period?
 4         Q.   Yes.
 5         A.   I think XRP -- I think the context is
 6    very important here.  At that point, I think XRP
 7    was fractions of fractions of pennies.  I don't
 8    know what the price was, but it was as close to
 9    zero as I think you can get.  And the -- the
10    market as measured by volume was -- I think it was
11    trading in the hundreds of dollars a day, maybe
12    thousands.  So there really wasn't -- there really
13    wasn't any place to sell it even if we had wanted
14    to sell it.  I don't -- I don't remember that
15    being something that we were focused on because
16    there really wasn't an opportunity for it.  But
17    I -- that's my memory.
18         Q.   Separate of what -- separate from
19    whether you were focused on it, is it -- is it one
20    of the things you might have attempted to do, sell
21    XRP in 2013?
22              MR. HORTON:  Objection to form.
23         Q.   Even if it was just once.
24              MR. HORTON:  Same objection.
25         A.   That was -- in 2013, I -- my
```

1    recollection is that I was -- I was pretty focused

2    on developing partnerships and trying to

3    understand how the technology could be applied in

4    the business context.

5        Q.   So let's do Exhibit 9.

6             (Whereupon, exhibit is presented and

7    marked SEC Griffin Exhibit PG-9 for

8    identification.)

9             MR. TENREIRO:  This is a one-page

10            e-mail with an attachment called "Ripple

11            Primer."  I don't have a Bates.  It's the

12            native version that was in the production.

13            MS. COWAN:  Can you get us the

14   Bates number?

15            MR. TENREIRO:  I probably can't.

16   Not sitting here today.  I can get it to

17   you after.  It's in the production --

18            MS. GRESSEL:  Is it Ripple

19   production?

20            MR. TENREIRO:  No.  It's in the

21   production, I believe, from ████

22            MS. GRESSEL:  Oh.  And you have

23   not reproduced --

24            MR. TENREIRO:  We have.

25            MS. GRESSEL:  -- it to us with

```
1           the Bates ranges?  The SEC has been Bates

2           stamping all of its production to us.

3                    MR. TENREIRO:  Right.  It's just

4           that when I printed this one, it

5           printed -- the system printed the native,

6           which did not have the Bates, as opposed

7           to printing the image, which does have the

8           Bates.  It's just how it was printed.

9                    MS. GRESSEL:  But you believe we

10          have a copy that has a Bates stamp from

11          the SEC?

12                   MR. TENREIRO:  I'm as certain as

13          I can be that you do, yes.

14                   MS. GRESSEL:  Okay.

15                   MR. TENREIRO:  Jon tells me that

16          it's RPLI_SEC 320778.  Although I'll just

17          for the record note that what I gave the

18          witness does not show that number.

19                   MS. COWAN:  I'm sorry, can you --

20                   MR. TENREIRO:  320778.

21                   MS. COWAN:  So it is from the

22          Ripple production, not from the --

23                   MR. TENREIRO:  Well, no.  The one

24          I printed is not, but apparently it's also

25          in the Ripple production is what Jon just
```

 1      found.  I printed one that is from the

 2      third party's production and that's why it

 3      printed without a Bates number.  Does that

 4      make sense?

 5              MS. COWAN:  If you could also

 6      just get us a Bates number of the copy

 7      that you're using in the deposition.

 8              MR. TENREIRO:  Yeah.

 9              MS. COWAN:  That way we only made

10      any --

11              MR. TENREIRO:  Yes.  It's ▮▮▮▮▮

12      Ripple 3399.

13              MS. GRESSEL:  You said ▮▮▮▮▮

14      Ripple 3399?

15              MR. TENREIRO:  I think so.

16              While the witness is reading,

17      I'll just state again if I didn't for the

18      record, this appears to be an e-mail from

19      the witness to a number of people at

20      ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and to at least two

21      Ripple employees on or around October

22      25th, 2013.

23              (Pause)

24              MS. GRESSEL:  Okay.  We're still

25      looking for this on our end, but in the

1        meantime, could you have someone from our

2        team e-mail us the ▇▇▇▇ version of the

3        submission?

4               MR. TENREIRO:  What Nicole

5        e-mailed should be the one --

6               MS. GRESSEL:  It's not.  The

7        e-mail version isn't stamped either.

8               MR. TENREIRO:  No, the e-mail

9        version is unstamped just like this one.

10       It's not stamped because it's the -- it's

11       the original native document in color.

12       The Bates stamped version is -- Jon, can

13       you pull it maybe and go through that --

14               MS. GRESSEL:  Yeah.  I think it

15       would just be helpful.  Thank you.

16               MR. TENREIRO:  Okay.

17  BY MR. TENREIRO:

18       Q.   Mr. Griffin, having -- having reviewed

19  the document, do you have any reason to believe

20  you did not send this document on or around

21  October 25th, 2013?

22       A.   No.

23       Q.   And who is -- do you see the cc line

24  includes ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇?

25       A.   Yes.

1     Q.  Who is that?

2     A.  He's the founder of &#9608;&#9608;&#9608;&#9608; and I

3  think he went on to create &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;.

4          THE REPORTER:  I can't hear you,

5   sir.

6     A.  I think he went on to create &#9608;&#9608;

7  &#9608;&#9608;&#9608;&#9608;&#9608;&#9608;.

8     Q.  What is or was &#9608;&#9608;&#9608;&#9608; in 2013?

9     A.  I don't -- I don't know.

10     Q.  Well, is -- what is &#9608;&#9608;&#9608;&#9608;

11  &#9608;&#9608;?

12     A.  They're a digital currency business and

13  I think they -- they have a range of offerings in

14  the digital currency world.

15     Q.  What was the purpose of you sending this

16  presentation to -- or this document, rather, to

17  &#9608;&#9608;&#9608;&#9608; and others at his company?

18          MR. HORTON:  Objection to form.

19     A.  I don't remember what we were trying to

20  accomplish with this e-mail.

21     Q.  Having spent some time reading through

22  the document, do you have any reason to doubt the

23  accuracy of its contents?

24          MR. HORTON:  Objection to form.

25     A.  No.

1          Q.   Okay.  And you say -- in the cover page,

2     you say "There are a few areas we can work

3     together, but as a first step, we want to strike a

4     deal that includes XRP."

5               Do you see that?

6          A.   Yes.

7          Q.   Does that refresh your memory as to

8     whether, in 2013, on behalf of Ripple, you were

9     looking for deals that might include sales of XRP?

10              THE REPORTER:  Repeat, please.

11         Q.   Does that refresh your memory as to

12    whether, in 2013, on behalf of Ripple, you worked

13    to secure potential deals that included the sale

14    of XRP?

15              MR. HORTON:  Objection to form.

16         A.   I don't -- I don't remember.

17         Q.   Do you have any reason to doubt that in

18    2013, one of the things you might have been doing

19    on behalf of Ripple included seeking to sell its

20    XRP?

21              MR. HORTON:  Objection to form.

22         A.   No.

23         Q.   Okay.  On page 13 of the presentation,

24    at the bottom it says "Users of the Ripple network

25    are not required to use XRP as a medium of

1    exchange or as a store of value."

2          Do you see that?

3      A.   I do.

4      Q.   Is it fair to say around 2013, you know,

5    the XRP ledger or the Ripple consensus ledger, as

6    it was known, one of the things people could

7    potentially do on it was sort of exchange

8    different assets on it?

9      A.   Yes.

10     Q.   And is it fair to say that if people

11   wanted to do that, they did not need to use XRP as

12   a medium of exchange in connection with those

13   types of transactions as reflected in this

14   document?

15          MR. HORTON:  Objection to form.

16     A.   Yes, with the caveat being that there

17   was a security fee for -- to operate the network.

18   So any change to the system required that -- that

19   amount of -- an amount of XRP to be spent.

20     Q.   That de minimis amount of XRP drops was

21   required and is required to -- for the consensus

22   ledger to move forward, correct?

23          MR. HORTON:  Objection to form.

24     A.   Yes.

25     Q.   Beyond that, is it fair to say that the

1    Ripple network is currency agnostic as the

2    document reflects?

3         A.   So -- yes.

4         Q.   And has that fact changed, as far as you

5    know, from 2013 to the present?

6         A.   I don't -- I haven't checked in in three

7    or four years.  I'm not totally sure where it's at

8    today, but as far as I know.

9         Q.   By the time you left, was that -- had

10   that changed?

11        A.   No.

12        Q.   Okay.  Let's go to page -- sorry -- 17.

13   It says "About:  Ripple Labs Inc."

14             Do you see that?

15        A.   I do.

16        Q.   And the next page the, you know,

17   contacts are you and Mr. Rapoport?

18        A.   Yes.

19        Q.   Any recollection as to who drafted this

20   document?

21             MR. HORTON:  Objection.

22        A.   I don't know who was involved entirely.

23   I -- I certainly looked at it in its draft form

24   and I know Phil was involved in the drafting of

25   it, too.

```
1          Q.   Is it fair to say that you and
2    Mr. Rapoport were involved in the preparation of
3    these sorts of documents that we're looking at?
4                MR. HORTON:  Objection.
5          Q.   Like Exhibit 9.
6                MR. HORTON:  Objection to form.
7          A.   I can only remember what's directly in
8    front of me because it is.  So we -- we did -- we
9    did -- we were involved -- involved in the
10   drafting of this document.
11         Q.   Okay.  And sitting here today, you don't
12   recall if others might have been involved in the
13   drafting of the document?
14         A.   I don't -- I don't recall.
15         Q.   Okay.  The document says "Ripple Labs is
16   the creator of Ripple."
17              Do you see that?
18         A.   I do.
19         Q.   "Ripple Labs" there is a reference to
20   the company, is that correct?
21                MR. HORTON:  Objection to form.
22         A.   Ripple Labs is -- yes.
23         Q.   And --
24         A.   That's right.
25         Q.   And Ripple is a reference to the Ripple
```

1       consensus ledger, correct?

2           A.   I'm not a hundred percent sure.

3           Q.   Then it -- well, it follows by saying

4       "We developed the protocol and its distributed

5       payment network, and we now work to support and

6       promote its growth."

7           A.   Right.

8           Q.   Do you see that?  Do you see that?

9           A.   I do see that.

10          Q.   Okay.  Is that a reference to the Ripple

11      protocol?

12                   MR. HORTON:  Objection to form.

13          A.   I -- just one point of -- of

14      clarification I would want to make on this, which

15      is, you know, the technology was very complicated

16      to explain, which is why I think that this primer

17      was probably drafted in the first place.  And in

18      explaining it, you know, to -- to outsiders, I

19      think sometimes we would just -- in crea -- in

20      trying to explain the relationships of Ripple and

21      the technology versus the founders of the

22      technology, you sort of go a long way to not get

23      very much out of it and try to div -- to sort out

24      all of these nuances about Ripple Inc. being -- or

25      Ripple Labs creating Ripple or the founders of

1   technology creating Ripple.  To an outsider

2   reading it, trying to understand what it is,

3   it's just -- it's a detail that gets lost.

4         So I don't know if this is a conscious

5   decision or what was going on here to explain

6   that, but I do -- I do see it.  I don't believe

7   it's accurate.  But, yeah.

8      Q.   Why is it not accurate?

9      A.   As far as I know, Ripple, the

10   technology, was -- was being worked on prior to

11   the creation of the company.

12      Q.   And that's -- you're saying that's a

13   detail that sometimes was a nuance that you didn't

14   necessarily always explain?

15         MR. HORTON:  Objection to form.

16      A.   No, I didn't say that.  I just --

17   it's -- it was a nuance that I think was not

18   necessarily relevant in a business conversation.

19   So, like, for example, we talked about that

20   ██████████ discussion.  I don't think we could

21   ever get to a level of detail where they would

22   have had a question about something like that.

23      Q.   And were -- were there ever contexts

24   later in time after 2013 where that sort of level

25   of detail was something you did want to discuss?

1                MR. HORTON:  Objection to form.

2      A.   I don't remember.

3      Q.   Did there come a time while you were

4  working at Ripple where Ripple made efforts to

5  make statements about, you know, the sequencing in

6  time about, you know, the creation of the ledger

7  versus the creation of the company?

8                MR. HORTON:  Objection to form.

9      A.   It wasn't something that we really spent

10  a lot of time thinking about or focused on.

11      Q.   But my question was, did there come a

12  time when you were working at the company where

13  Ripple made efforts to make statements about the

14  sequencing in time of the creation of the ledger

15  versus the creation of the company?

16                MR. HORTON:  Objection to form;

17    asked and answered.

18      A.   I don't -- I don't remember.  I don't...

19      Q.   Okay.  Further down it says "Ripple Labs

20  hopes to make money from XRP if the world finds

21  the Ripple network useful and broadly adopts the

22  protocol."

23      Do you see that?

24      A.   I do.

25      Q.   Was that statement accurate as of 2013?

1              MR. HORTON:  Objection to form.

2         A.   I can't speak to Ripple Labs, but it

3    looks accurate.

4         Q.   Well, to the extent that you and

5    Mr. Rapoport put a statement that you then

6    distributed outside of Ripple, what work, if any,

7    did you do to make sure that this was an accurate

8    representation of Ripple's hopes in 2013?

9              MR. HORTON:  Objection to form.

10        A.   Can you ask that again, please?

11        Q.   To the extent that you and Mr. Rapoport

12   put a statement in this document that you then

13   distributed outside of Ripple, what work, if any,

14   did you do to make sure that this was an accurate

15   representation of Ripple's hopes in 2013?

16             MR. HORTON:  Same objection.

17        A.   I -- I don't even remember drafting

18   this, so I can't speak to the process of drafting

19   it.

20        Q.   Generally speaking, outside of the

21   context of this document, to the extent that you

22   wanted to understand what Ripple's hopes were

23   before you made representations to the outside

24   world about Ripple's hopes in 2013, did you speak

25   to, for example, Mr. Larsen about Ripple's hopes

1  at the time?

2          MR. HORTON:  Objection to form.

3      A.  I would have spoken -- the -- so 2013 is

4  the first time -- first -- my first year at the

5  company.  It took several months to get -- get up

6  to speed on -- on all of this.  I would have

7  talked to different people at different points

8  along that journey.

9      Q.  Okay.  Who were the people along the

10  different points?

11     A.  Well, I would have talked to, for

12  example, Arthur Britto and David Schwartz to get a

13  better understanding of how the technology works.

14  And I would have talked to Chris Larsen about

15  different business partnership ideas, potential

16  investors in Ripple Inc.  It's -- it's a long time

17  ago.  I don't remember what the shape or color of

18  the conversation was --

19     Q.  To the --

20     A.  -- in 2013.

21     Q.  To the extent you wished to gain any

22  understanding about Ripple's hopes about how it

23  was going to make money, who would that

24  conversation have been with --

25          MR. HORTON:  Objection to form.

1     Q.   -- in 2013?

2     A.   It could have been with any -- any of

3 those people that I just mentioned.

4     Q.   Britto, Schwartz, and Larsen?

5     A.   Yeah.  Yes.

6     Q.   Anyone else?

7     A.   Well, certainly Jed McCaleb as well.

8     Q.   Okay.  Anyone else?

9     A.   No.

10    Q.   The next paragraph begins with "100

11 billion XRP was created with the Ripple protocol."

12          Do you see that?

13    A.   Yes.

14    Q.   Is it true?

15          MR. HORTON:  Objection to form.

16    A.   I believe so.

17    Q.   Ripple -- then it says "Ripple Labs

18 plans to gift 55 billion XRP to charitable

19 organizations, users, and strategic partners in

20 the ecosystem over time."

21          Do you see that?

22    A.   I do.

23    Q.   As far as you know, was that an accurate

24 representation of Ripple's then-current plans with

25 respect to XRP?

```
 1                 MR. HORTON:  Objection to form.

 2                 You can answer.

 3        A.    Yes.

 4        Q.    Okay.  Then it says "The company will

 5   retain a portion with the hope of creating a

 6   robust and liquid marketplace in order to monetize

 7   its only asset sometime in the future."

 8                 Do you see that?

 9        A.    I do.

10        Q.    As far as you know, is that an accurate

11   statement of Ripple's plans, then-current plans?

12                 MR. HORTON:  Objection to form.

13        A.    Yes.  I think Ripple hoped it could

14   benefit from an increase of liquidity around XRP

15   and in turn the asset that it held.  And, again,

16   for context, the market around XRP at that time

17   was next to -- next to zero.  Volume and price,

18   virtually nothing.

19        Q.    All right.  The bottom says "The Ripple

20   protocol is in its infancy."

21                 Do you see that?

22        A.    I do.

23        Q.    Is that true as of October 2013, that

24   the Ripple protocol was in its infancy?

25                 MR. HORTON:  Objection to form.
```

```
 1         A.   It sounds right.
 2         Q.   Then I'm going to skip a sentence and
 3    then the next sentence says "At Ripple Labs, we
 4    are working on many exciting new applications and
 5    the utility of the Ripple network will only grow."
 6              Is that statement true as of October of
 7    2013?
 8              MR. HORTON:  Objection to form.
 9         A.   Sounds -- sounds accurate.
10         Q.   Okay.  One second.
11              MS. COWAN:  Jorge, could I ask
12         that you just slow down a little bit in
13         asking the question?  Because as I said
14         before, I'm having trouble following.
15              MR. TENREIRO:  I will continue to
16         try my best.
17              MS. COWAN:  I appreciate that.
18         Thank you.
19              THE REPORTER:  Thank you.
20    BY MR. TENREIRO:
21         Q.   Mr. Griffin, when you started working at
22    Ripple, what was the market for XRP like?  You
23    touched upon it a little bit, but I'd like to talk
24    a little bit more about that.
25         A.   Okay.
```

103

```
 1                MR. HORTON:  Objection to form.
 2                You can answer.
 3        A.   I recall that the market was very small.
 4   I don't recall there was very much of a market.
 5        Q.   So -- and you're measuring that by
 6   volume?
 7        A.   By volume and price and everything.  I
 8   don't -- I don't think that there was -- I think
 9   it was sort of aspirational at best that there
10   would ever be a market around XRP.
11        Q.   Aspirational by whom?
12        A.   By the founders of the company, by me.
13        Q.   When were you granted your XRP, by the
14   way?
15                THE REPORTER:  When were you?
16        Q.   Granted your XRP?
17                MR. HORTON:  Objection to form.
18        A.   I received a grant -- when was I
19   granted?  I think in 2017.
20        Q.   And I think you said, again, roughly in
21   2013, maybe the daily volume was in the hundreds
22   or literally a hundred or a thousand dollars of
23   XRP?
24        A.   I don't know the exact number, but
25   that -- that sounds directionally correct.
```

1       Q.  And -- and the price roughly fractions

2   of pennies?

3       A.  Yes, that's what I recall.

4       Q.  Okay.  And there were a hundred billion

5   units of XRP created, is that correct?

6           MR. HORTON:  Objection to form.

7       A.  That's correct.

8       Q.  Some small amounts are burned for the

9   operation of the ledger, is that correct?  Was

10   that your understanding in 2013?

11       A.  Yes.

12       Q.  At the -- at the price and volume for

13   XRP in 2013, could that market support

14   cross-border payments by someone like MoneyGram?

15           MR. HORTON:  Objection to form.

16       A.  In -- in 2013?

17       Q.  Yes.

18       A.  I'm sorry, is the question about the

19   market dynamics around XRP or --

20       Q.  Yeah.  So the question just was at that

21   price and volume for XRP in 2013, for the order of

22   magnitude for those variables.

23       A.  Okay.

24           MR. HORTON:  Objection to form.

25           You can answer.

1    A.   Sorry, it's just not a straightforward

2    question to answer because presumably if there is

3    a -- the more utilization that maybe is going

4    across the system, you know, I think that -- I

5    think the theory goes at that time was that the

6    more volume in price that would -- would accrue to

7    the system, to XRP.  And so, yeah, I think -- I

8    think so.  I think the answer is yes.

9    Q.   So --

10   A.   So not 100 percent of all MoneyGram's

11   volume on, like -- like, you know, at the snap of

12   a finger, probably not, but I think there -- there

13   was a pathway to make that work.

14   Q.   There was a pathway to make it work in

15   2013?

16   A.   Possibly.

17   Q.   Okay.  And if that -- if that pathway

18   worked, the theory goes -- or at the time was that

19   more volume and price would accrue to the system?

20   A.   Yes.

21        MR. HORTON:  Objection to form.

22   Q.   As far as you know, did Ripple sell XRP

23   for cross-border payments in 2013?

24   A.   Not that I know of.

25   Q.   Okay.  Did Ripple take steps starting in

1   2013 to increase the amount of trading in the XRP

2   market?

3                   MR. HORTON:  Objection to form.

4        A.   I don't -- I don't recall.

5        Q.   Did Ripple take steps starting in 2013

6   that increased the amount of trading in the XRP

7   market?

8                   MR. HORTON:  Objection to form.

9        A.   No.

10       Q.   Well, did Ripple sell any XRP in 2013?

11                  MR. HORTON:  Objection.

12       A.   I don't remember.

13       Q.   Okay.

14                  MR. TENREIRO:  Let's look at

15          Exhibit 10 real quick.

16                  (Whereupon, exhibit is presented

17           and marked SEC Griffin Exhibit PG-10 for

18           identification.)

19   BY MR. TENREIRO:

20       Q.   So Exhibit 10 is a text message.  The

21   Bates is Larsen SEC Lit 3489.

22       A.   Okay.

23       Q.   Any reason to believe that you did not

24   send Mr. Larsen this message on or around November

25   the 3rd of 2013?

1          MS. COWAN:  Objection to form.

2     A.   No.

3     Q.   It refers to a charity here in New York.

4   Do you see that?

5     A.   I do.

6     Q.   What charity was that?

7               MR. HORTON:  Objection to form.

8               MS. COWAN:  Object to the form.

9     A.   I can't remember the name of the

10  charity.  ████████████████████

11    Q.   Did -- at the end, it says "█ XRP to

12  have this ability at their event."

13    A.   Okay.

14    Q.   Did you -- did Ripple provide ████████

15  ████████████████  XRP?

16              MR. HORTON:  Objection to form.

17    A.   I don't remember what the amount was.

18    Q.   Well, did Ripple provide any XRP to this

19  charity?

20    A.   Yes.  Ripple made a donation of XRP to

21  the charity.

22              MR. WARD:  I couldn't get my

23       objection in.  Objection.

24    Q.   The reference to "Phil has buyers

25  interested in buying XRP," do you see that?

1     A.   Yes.

2     Q.   Is that separate -- so different from

3   the charity; buyers are one group of people and

4   the charity is something else?

5          MR. HORTON:  Objection to form.

6     A.   It sounds -- it looks that way, but I

7   can't speak to what -- what exactly that means.

8     Q.   Does this refresh your memory as to

9   whether Ripple sold XRP in 2013?

10    A.   No.

11    Q.   Okay.  You say "They are a high-profile

12  organization with market-maker community."

13         Why would you highlight that --

14  highlight that in your text to Mr. Larsen?

15         MR. HORTON:  Objection to form.

16    A.   I can't remember a text message from

17  2013.

18    Q.   Did -- is one of the things you were

19  doing on behalf of Ripple in 2013 trying to

20  identify ways in which you could increase the size

21  of the XRP market?

22         MR. HORTON:  Objection to form.

23    A.   Yes.

24    Q.   And what were the other steps -- any

25  other steps you might have taken to do that?

109

```
 1                   MR. HORTON:  Objection to form.

 2        A.    We may have talked to trading firms

 3   about cryptocurrency.  That's kind of the activity

 4   I have a recollection of doing at that time.

 5        Q.    Why did -- well, did Mr. Larsen want to

 6   identify ways in which you could increase the size

 7   of the XRP markets in 2013?

 8                   MR. HORTON:  Objection to form.

 9                   MR. WARD:  Objection to form.

10        A.    I don't know what Chris was focused on.

11        Q.    Did Ripple want to do that?

12                   MR. HORTON:  Objection to form.

13        A.    Same answer.

14        Q.    So you can --

15                   THE REPORTER:  I didn't hear

16         that answer.

17        A.    Same answer.

18        Q.    Did you want to do that?

19        A.    Increase the market for XRP?  Yes.

20        Q.    As part of your work for Ripple?

21        A.    Yes.

22        Q.    Do you recall if anyone directed you to

23   do that or this is just something you wanted to do

24   on your own?

25                   MR. WARD:  Objection to form.
```

1      A.   I can't -- I don't know how that came

2   about.

3      Q.   Okay.  Why did you want to do that?

4          MR. WARD:  Objection to form.

5          MR. TENREIRO:  What's your

6      objection?  What's the objection?

7          MR. WARD:  What's the objection?

8          MR. TENREIRO:  Yes.

9          MR. WARD:  I think the witness

10     just testified unless I'm

11     misunderstanding that he didn't remember.

12     So I'm not sure how he could remember

13     why.

14         MR. TENREIRO:  He remembered --

15     okay.

16  BY MR. TENREIRO:

17     Q.   Please answer it.

18     A.   Please ask the question again.

19     Q.   Why did you want to do this?

20     A.   To help develop an ecosystem around XRP,

21  around cryptocurrency.

22     Q.   And why did you want to do that?

23     A.   Well, I think if you go -- I believe we

24  made reference to the previous document that spoke

25  at length about the bridge protocol and how -- how

1    XRP could be utilized to facilitate

2    cross-currency, cross-asset transactions.  To the

3    extent that that idea is possible, it requires

4    there to be a healthy and robust market of trading

5    price discovery for XRP and that requires market

6    participants like market makers to be actively in

7    the system buying and selling and making markets

8    for -- against XRP.

9            So that was kind of part of the -- the

10   value proposition for the whole technology.

11   That -- that's why I was focused on it.

12        Q.   The value proposition for the whole

13   technology, when you say "technology," are you

14   talking about Ripple's technology?

15              MR. HORTON:  Objection to form.

16        A.   I'm talking about the open-source

17   technology, the Ripple consensus ledger, which I

18   think is what it was called in 2013.

19        Q.   Okay.  And so the value proposition was

20   that there be a healthy and robust market of

21   trading price discovery?  Was that part of the

22   value proposition?

23        A.   The value --

24              MR. HORTON:  Objection to form.

25              You can answer.

1    A.    The value proposition was to facilitate

2  seamless transactions from one currency or one

3  system to another system.  And the more liquid XRP

4  was within this technology, within this protocol,

5  the more seamless those transactions could occur

6  both in terms of speed and cost.

7    Q.    Is it fair to say that throughout your

8  employment at Ripple, you took steps to increase

9  the liquidity of the XRP market?

10             MR. HORTON:  Objection to form.

11    A.    What I -- what I remember in my time at

12  Ripple is that whatever steps I took, there was no

13  direct linear cause and effect of anything that I

14  did to impact -- or anything that we did to impact

15  the market around XRP.

16    Q.    My question was, is it fair to say that

17  throughout your employment at Ripple, you took

18  steps with the hope of increasing the liquidity of

19  the XRP market?

20             MR. HORTON:  Objection to form.

21    A.    I -- I don't know what my hope was in

22  2013.

23    Q.    Throughout your employment at Ripple,

24  Mr. Griffin.

25             MR. HORTON:  Same objection.

1      A.   To increase the liquidity around XRP?

2   Yes.

3      Q.   Is it fair to say that throughout your

4   employment at Ripple, others at Ripple took steps

5   with the hope of increasing the liquidity of the

6   XRP market?

7           MR. HORTON:  Objection to form.

8      A.   I can't -- yes.  Yes.

9      Q.   Is it fair to say that throughout your

10  employment at Ripple, you understood that one of

11  the company's goals was to create a use for the --

12  you know, for XRP as a facilitator of

13  asset-to-asset transactions?

14          MR. HORTON:  Objection to form.

15     A.   Yes.

16     Q.   Okay.  Now, earlier we talked about the

17  hypothetical MoneyGram transaction in 2013.  I

18  think you said -- I'm going to paraphrase very

19  generally what you said -- but I think the

20  conversation was something along the lines of it

21  could have been done in 2013 that you transferred,

22  you know, from -- value from one asset to another

23  using the XRP.

24          Is that fair to say, that that was

25  theoretically possible in 2013?

```
 1                    MR. HORTON:  Jorge, I'm going to
 2          object to you rephrasing his prior
 3          testimony and asking him to affirm it.
 4          Can you just ask him a question about what
 5          he thought in 2013?
 6                    MR. TENREIRO:  Yeah.
 7     BY MR. TENREIRO:
 8          Q.   In 2013, you know, could MoneyGram
 9     effect cross-border payments with XRP as the
10     bridge currency?
11                    MR. HORTON:  Objection; asked and
12           answered.
13          A.   Yes.
14          Q.   Okay.  And -- but MoneyGram did not do
15     that in 2013 --
16                    MR. HORTON:  Objection.
17          Q.   -- is that correct?
18                    MR. HORTON:  Objection to form.
19          A.   I don't know.
20          Q.   As far as you know, did MoneyGram do
21     that in 2013?
22          A.   No.
23          Q.   Okay.  And in order for, you know, any
24     company -- I'm using MoneyGram simply as a
25     hypothetical, but in order for any company to
```

1    effect transfers of values in XRP, one

2    prerequisite -- in a systematic fashion, one

3    prerequisite was a market for XRP that had higher

4    volume and higher price than what you had in 2013,

5    correct?

6                    MR. HORTON:  Object.  Objection

7          to form.

8          A.    Well, in fact, to use the system,

9    there's no requirement to use the XRP.  So I think

10   the -- a lot -- the starting place for some of the

11   conversations we had with payment companies was

12   more about fiat-to-fiat transfers, so euros to

13   dollars or rupee to pounds or whatever the

14   conversation was.

15                  And the idea was that if the

16   technology -- if the volume started moving across

17   the system and there's a proliferation of

18   endpoints on the network, that the technology

19   that's needed within it could start to be utilized

20   without any -- any push.  It's just that -- that

21   there's sort of the native aspects of the XRP

22   would stand on its own.

23         Q.    Right.

24                  And so I understand that to use the

25   system, there's no requirement to use XRP.  I got

1    that part.

2           But my question was, if someone did want

3    to use XRP for these sort of transactions, is it

4    fair to say that -- in any system, if they were

5    going to use it in any systematic fashion as

6    opposed to theoretically, is it fair to say that

7    you needed higher volume for XRP trading than you

8    had in 2013?

9           MR. HORTON:  Objection to form.

10      A.   No.

11      Q.   Why not?

12      A.   XRP could be transferred directly from

13    one point to another without any volume.

14      Q.   Transferred from one point to another?

15      A.   Without any trading volume or activity.

16    Just like bitcoin is traded across the bitcoin

17    blockchain.  There's no exchange within bitcoin

18    and you can just transfer bitcoins around.  And

19    the same is true of XRP.

20      Q.   And did that occur in 2013?

21           MR. HORTON:  Objection.

22      A.   I don't know.

23      Q.   Okay.  Did Ripple sell any XRP so that

24    that could occur in 2013?

25           MR. HORTON:  Objection to form.

1          A.   I don't know.

2          Q.   As part of your work for Ripple with

3     respect to hoping to increase the trading in the

4     XRP market, was one of the things that Ripple did

5     was give away XRP?

6               MR. HORTON:  Objection to form.

7          A.   Yes.

8          Q.   And for what purpose?  Just to be clear,

9     did Ripple give away XRP?

10              MR. HORTON:  Objection to form.

11         A.   I think, again, just to gen -- to create

12    and help to create more liquidity around XRP.

13         Q.   And just to be clear, the reason to --

14    to create -- help create more liquidity around XRP

15    was what?

16         A.   Okay.  The more liquidity around XRP,

17    the more useful the network was for any

18    participant.  So there's a payment network using

19    the system and there's cheap spreads that can be

20    facilitated through XRP to any other endpoint.  It

21    just means that any sort of business can utilize

22    the system without having to have, you know, a

23    complicated web of direct pairings but instead

24    could just go through the XRP, which is native to

25    the system.  So it just sort streamlines the --

1    the operation of cross asset or cross currency

2    flows.

3         Q.   Is it fair to say throughout your --

4    throughout your employment at Ripple, Ripple

5    desired to make the network more useful?

6              MR. HORTON:  Objection -- sorry.

7         Objection to form.

8         A.   I desired to make the -- the network

9    more useful.

10        Q.   Were there others at Ripple that shared

11   that desire, as far as you know, based on your --

12        A.   I can't --

13        Q.   -- conversations with your coworkers?

14        A.   You're asking me to speak to others and

15   I can't speak for other people.

16        Q.   Do you have any reason to believe that

17   your desire was contrary to the company's desire?

18             MR. HORTON:  Objection to form.

19        A.   No.

20        Q.   Okay.

21             MR. TENREIRO:  Let's look at

22        Exhibit 8, please.

23             (Whereupon, exhibit is presented

24        and marked SEC Griffin Exhibit PG-8 for

25        identification.)

```
 1   BY MR. TENREIRO:
 2        Q.   So this is a one-page document, RPLI_SEC
 3   331323.
 4             Mr. Griffin, do you see this document
 5   appears to reference a give-away program?
 6        A.   Okay.  I do see that.
 7        Q.   Is that give-away program with respect
 8   to XRP?  Is that fair?
 9             MR. HORTON:  Objection.
10         Objection to form.
11        A.   I have no idea.  I don't see the
12   document that this is referring to.
13        Q.   Do you see your comment where you say "I
14   like giving XRP to the poor because they don't
15   want it"?
16        A.   I do see that.
17        Q.   Okay.  So does that -- just reading this
18   edit page today, does that refresh your memory as
19   to whether the give-away program that you're
20   discussing is a give-away program with respect to
21   XRP?
22        A.   No --
23             MR. HORTON:  Objection to form.
24             You can answer.
25        A.   There's no way I can answer this because
```

[6/29/2021] Griffin, Patrick Dep. Tr. 6.29.2021

1    it's -- this is a comment on a document, on a

2    Google document.  I don't know what the document

3    is that it's referring to.  I have zero context

4    about what this is about.

5        Q.   Was there any other give-away program at

6    Ripple in 2013 other than with respect to XRP?

7             MR. HORTON:  Objection.

8        A.   No.

9        Q.   Okay.  Why did you say you liked giving

10   XRP to the poor because they don't want it?

11            MR. HORTON:  Objection.

12       A.   Same answer I'd give -- which I just

13   gave.  This is referring to a document and it's a

14   collaborative document, it appears, where there's

15   other people in the document.  The document's

16   being changed.  I don't know what the underlying

17   document is.  I can't speak to the comment.

18       Q.   Well, it's your comment, right, as far

19   as what this document reflects?

20       A.   Yes.

21       Q.   Okay.  Then you say "they don't want it,

22   will spend it and buy things they need with it,

23   and then market makers who do want it will buy it

24   on the cheap, plus, we are able to circulate the

25   currency, kind of a win-win all around."

1          Do you see all of that?

2      A.   I do.

3      Q.   Okay.  Was circulating the currency a

4   reference to circulating XRP?

5          MR. HORTON:  Objection to form.

6      A.   Again, you're -- you're asking me to com

7   -- to comment on a comment from a document in

8   2013.  Is it in 2013?  2013.  I don't -- I

9   remember working in these Google Docs.  It's

10  constantly changing.  I don't know how many other

11  people were in this document.  I don't know what

12  the purpose of this document was.

13         Sitting here today, I don't remember

14  even the give-away program and I -- let alone the

15  document, let alone the comment that begins the

16  document, all the changes that were happening in

17  the document.  I -- I don't really have a comment

18  on this.

19     Q.   Were there other currencies that Ripple

20  was circulating in 2013 other than XRP?

21         MR. HORTON:  Objection to form.

22     A.   I don't -- I don't know.

23     Q.   Okay.  Was one of the goals of Ripple's

24  XRP give-away programs was to give it to people

25  who would then, you know, transfer it in some

1    other way going forward?

2              MR. HORTON:  Objection to form

3         and lack of foundation.

4         A.   I don't know.

5         Q.   Below you say ""For consumers, we need

6    an easy way to redeem XRP."

7              MR. HORTON:  Objection.  I don't

8         think it's clear that that's his comment.

9              MR. TENREIRO:  Well, fair enough.

10        Q.   It says "For consumers, we need an easy

11   way to redeem XRP," and then it says "True."

12             Do you see that?

13        A.   Okay.  Yes.

14        Q.   What does "redeem XRP" mean?

15             MR. HORTON:  Objection to --

16        objection to form; lack of foundation.

17        A.   I don't know what the comment -- I don't

18   know if this is my comment or somebody else's

19   comment.  And I don't know.  I have no idea what

20   that means.

21        Q.   Okay.

22             MR. TENREIRO:  Let's look at

23        Exhibit 11, please.

24             (Whereupon, exhibit is presented

25        and marked SEC Griffin Exhibit PG-11 for

 1          identification.)

 2                  MR. TENREIRO:  This is a two-page

 3          text thread.  It has no Bates and I think

 4          that's because that was how it was

 5          produced to us.  You have a copy.

 6                  MS. COWAN:  Who produced this to

 7          you?

 8                  MR. TENREIRO:  One of either

 9          Larsen or Griffin.  I only get these the

10          night before the depo.

11                  MR. HORTON:  Well, I just -- in

12          view of that comment, Jorge, I'll just

13          represent that our productions are Bates

14          stamped, so this doesn't appear to be from

15          our production.

16                  MR. TENREIRO:  Right.  And I'll

17          represent to you that when we get

18          production at midnight, 24 hours before a

19          deposition, we have to look at native

20          files which are not actually Bates

21          stamped.  The images are.  I'm just

22          explaining to her why it was not Bates

23          stamped.

24                  MR. HORTON:  That's -- that's

25          fine.  It wasn't my intention to talk

```
 1            about this on the record.  You brought it

 2            up.  The reason you're getting productions

 3            when you're getting productions is when

 4            the subpoenas go out.  I don't think we

 5            should waste time on this.

 6                   MR. TENREIRO:  I agree.

 7    BY MR. TENREIRO:

 8        Q.   Do you have any reason to doubt that you

 9    sent these messages to Mr. Larsen, Mr. Griffin?

10        A.   No.

11        Q.   The first page references "We need to

12    talk about" XR spee -- "XRP spend through yhr

13    card." I don't know, do you know what "yhr" means?

14        A.   No.

15        Q.   Maybe it's a typo for the card?

16                   MR. HORTON:  Objection to form.

17        Q.   Is that fair?

18        A.   I have no idea what that is.

19        Q.   Okay.  You don't know what --

20        A.   I can't venture a guess as to what that

21    means.

22        Q.   You do -- do you have any recollection

23    at all about the ability to spend XRP with a card?

24        A.   Yes.

25        Q.   Okay.  So what -- is that a reference to
```

1    that?

2         A.    Well, I don't know what yhr is.  Is

3    that -- is that your question?

4         Q.    No.

5                MR. WARD:  I wasn't able -- I

6         was just going to object to the form

7         there.  I just couldn't get it in before

8         the answer started.

9                MR. TENREIRO:  Yeah.

10               MR. HORTON:  Jorge, if we could

11        just try to keep the pace a little slower

12        so that we can interject our objections

13        appropriately, he can hear your questions

14        and answer them --

15               MR. TENREIRO:  I think you're --

16        you're interposing your objections even

17        before I finish my questions.  In some

18        cases, it's fine.  Let's keep going.

19               MR. HORTON:  The reason for that

20        is that many of your questions have had

21        more than one question in one.  So when

22        you reach a question mark, I object to the

23        question.  If you're going to do a second

24        question at the same time, it may come

25        before that.  I think if you slow down,

```
 1          that will happen less.
 2                 THE REPORTER:  If everybody
 3          could slow down, that would be better for
 4          the record.
 5   BY MR. TENREIRO:
 6       Q.   Mr. Griffin, what is your memory of the
 7   ability to spend XRP on a card?
 8       A.   Is that we piloted -- I think that we --
 9   we created a pilot of a card and the pilot
10   being -- I think we created, like, a handful,
11   maybe five or six credit cards.  They were
12   actually debit cards as I -- as I recall that
13   could be spent through traditional credit card
14   rails, meaning          and     , wherein the
15   credit card -- the swiping of the credit card
16   would facilitate a drawdown of an XRP balance that
17   in real time could be traded for dollars which
18   would fund the -- the transaction through the
19   interchange rails that the credit card network
20   does.
21                 MR. TENREIRO:  For the record,
22          this document is Larsen SEC Lit 3499 to
23          3500.
24                 MS. COWAN:  Thank you.
25                 MS. GRESSEL:  34 --
```

1          MR. TENREIRO:  -- 99 to 3500.

2     BY MR. TENREIRO:

3          Q.   Okay.  And when you say "we create a

4     pilot of a card," who is "we"?

5          A.   OpenCoin or Ripple.  I don't know

6     what -- what it was called at the time.

7          Q.   How much XRP did Ripple sell to people

8     using these -- this pilot card?

9               MR. HORTON:  Objection to form.

10         A.   I -- I don't -- I don't remember that

11    being even a -- I don't know what you mean.

12         Q.   Did Ripple sell any XRP to people using

13    this card?

14              MR. HORTON:  Objection to form.

15         A.   I don't know.

16         Q.   Did the card ever go beyond the pilot

17    stage?

18         A.   I don't think so.

19         Q.   Okay.  Was the card one of the things

20    that Ripple was exploring at the time as

21    potential, you know, uses of this technology?

22              MR. HORTON:  Objection to form.

23         A.   I believe so.

24         Q.   And in the second text, you say "The

25    whole program can really only support about one to

1    two K per day of XRP without tanking the price of

2    XRP."

3              Do you see that?

4        A.   Okay.  I do.

5        Q.   Okay.  And why are you texting that to

6    Mr. Larsen?

7              MR. WARD:  Objection to form.

8        A.   I -- I don't know.  I -- I presume we're

9    talking about the -- the -- the limit that the

10   card can -- that the market, XRP market, can --

11   can handle.  So, again, this is the beginning of

12   2014.  The market, as I recall, was still very

13   small and there was only so much XRP that could be

14   moved through -- you know, through an open order

15   to facilitate a trade of XRP for dollars or euros

16   or whatever the card was -- was -- was using to

17   pay the -- the card networks.  And I think this is

18   referring to the -- to the -- how robust the XRP

19   market and liquidity around it was at the time.

20       Q.   So the reference to tanking the price of

21   XRP is a reference to how robust the XRP market

22   and liquidity around it was at the time?

23              MR. HORTON:  Objection to form.

24       Q.   Is that your testimony?

25              MR. HORTON:  Objection to form.

1    A.   I just -- it's just a question -- it's

2    just -- I think I'm just speaking to the available

3    liquidity for XRP at that time.

4    Q.   Is it fair to say --

5    A.   So --

6    Q.   Sorry.

7    A.   -- if the liquidity is small, then it

8    can have an impact on a number of things, price

9    being one of them.

10    Q.   Is it fair to say that you are concerned

11    that this credit card program could tank the price

12    of XRP if it was used for more than about one to

13    two K per day?

14              MR. HORTON:  Objection to form.

15              MR. WARD:  Objection to form.

16    A.   I don't know.

17    Q.   And do you -- let me just make sure I

18    understand.  The card pilot was so that the user

19    could -- could essentially spend money, you know,

20    buy goods and services?

21    A.   Yes.  Wherever ███ and ███████ are

22    accepted.  So, again, this is very early on.  I

23    mean, this is probably one of the first products

24    that were built on the cryptocurrency system.  I

25    mean, it was just a pilot.  And the premise here

1    was that we were -- we were really, I think,

2    focused on the decentralized exchange capability

3    within the Ripple consensus ledger.  And as I'm

4    going through this, what I recall is, in fact, it

5    wasn't just about XRP.  It was the ability to

6    spend any asset and have it processed against the

7    dollar based or, you know, traditional fiat

8    denominated credit card system in real time.

9        Q.   So just to be clear, did this pilot that

10   -- where you could use a card wherever          and

11                  are accepted was not ever, you know,

12   commercially developed by Ripple?

13       A.   I think -- I think it may have, in fact,

14   been                It was one of the traditional

15   credit card rails.  I'm not sure which one.

16            I'm sorry, could you ask your question

17   again?

18       Q.   Yes.

19            The pilot, where you could use a card

20   wherever one of the traditional credit card rails

21   were accepted, it was not ever commercially

22   developed by Ripple, correct?

23            MR. HORTON:  Objection to form.

24       A.   I believe that's correct.  I can't

25   remember how that -- where that went.

1      Q.  To the extent that it was not

2  commercially developed by Ripple, was one of the

3  reasons a concern that the credit card use could

4  tank the price of XRP?

5           MR. HORTON:  Objection to form.

6      A.  I don't -- I don't remember, but I will

7  go back to what was interesting -- what was the --

8  the sort of interesting aspect of the whole system

9  was that, in fact, it wasn't just about XRP.  I

10  think at the time I recall there was a -- an issue

11  or a goal on the system, for example.  And so

12  there was -- you could maintain -- you could carry

13  a goal balance and draw down against your goal

14  balance to pay your groceries.

15        There -- there are a lot of different

16  sort of use cases built within that.  I don't -- I

17  think XRP was -- would have been one of them, but

18  it wasn't the only thing.

19      Q.  Right.

20        So -- but my question was, to the extent

21  Ripple did not commercially develop this product,

22  was one of the reasons concerns that it could tank

23  the price of XRP?

24           MR. HORTON:  Objection to form.

25      A.  I don't remember what -- even if it was

1    commercially developed, let alone what the reason

2    was for it not being --

3         Q.   Okay.

4         A.   -- developed.

5              MR. TENREIRO:   Let's look at

6         Exhibit 13, please.

7              (Whereupon, exhibit is presented

8         and marked SEC Griffin Exhibit PG-13 for

9         identification.)

10             MR. TENREIRO:   This is a one-page

11        e-mail, RPLI_SEC 425911.   It appears to be

12        an e-mail on or around May 8th, 2014, from

13        Mr. Griffin to Mr. Larsen and ████████

14   BY MR. TENREIRO:

15        Q.   Mr. Griffin, the subject line is "XRP

16   injections."

17             Do you see that?

18        A.   Just give me one second, please.

19        Q.   Okay.

20        A.   Okay.

21        Q.   Okay.   The subject line of the e-mail --

22   by the way, do you have any reason to believe you

23   did not send this e-mail on or around May 8th,

24   2014?

25        A.   No.

1   Q. The subject line is "XRP injections."

2   Do you see that?

3   A. I do.

4   Q. Who -- or what XRP injections are you

5 referring to here?

6   A. I don't know.

7   Q. Would it be Ripple's injections of XRP?

8     MR. HORTON:  Objection to form.

9   A. I don't know.

10   Q. Okay.  You say "What can we do?  I'm

11 concerned that we lose speculator interest given

12 that XRP will never rise with someone always ready

13 to flood the supply any time there is good news."

14   Do you see that?

15   A. I do.

16   Q. Was your reference to "never rise" a

17 reference to never rise in price?

18     MR. HORTON:  Objection to form.

19   A. I don't see that there, no.  In fact, I

20 see the following sentence.  It was really focused

21 on liquidity.

22   Q. So was your reference to "will never

23 rise," will never rise in liquidity?

24     MR. HORTON:  Objection to form.

25   A. I can't remember.  That's what my

1    inference would be.

2        Q.    Okay.  "The speculators are good for

3    liquidity and provide 'fumes'" -- in quotes --

4    "for volume and market making."

5              Do you see that?

6        A.    I do.

7        Q.    What do you mean by "'fumes' for volume

8    and market making"?

9        A.    I don't --

10                  MR. HORTON:  Objection to form.

11       A.    I don't know.

12       Q.    "Losing them entirely could cause

13   problems for us."

14             Do you see that?

15       A.    I do.

16       Q.    Who is "us"?

17                  MR. HORTON:  Objection to form.

18       A.    I think this is referring to liquidity

19   going away and everything we've talked about today

20   in the use cases of the -- in facilitating the

21   cross currency transactions and cross asset

22   transactions and being able to seamlessly move

23   from one payment system to another payment system.

24   I mean, I think that's kind of the vision of the

25   company.  I'm sure you've heard people talking

1  about this idea on the internet of value.  None of

2  that's possible if there's no liquidity in the

3  system.  And so I believe that it's really just

4  referring to the larger premise around the value

5  prop -- the value proposition of the technology.

6      Q.  But just the "us," is that Ripple when

7  you say "us"?

8      A.  I don't --

9          MR. HORTON:  Objection.

10     A.  I don't know.  You've asked me that a

11 couple of times.

12         THE REPORTER:  I didn't hear

13     the -- I can't hear the last part.

14     A.  I don't know.

15     Q.  Is the "we" Ripple in this e-mail?

16         MR. HORTON:  Objection to form;

17     lack of foundation.

18     A.  I don't know.

19     Q.  Okay.  Who knows, Mr. Griffin, what you

20 were referring to when you were writing "we" and

21 "us" in this e-mail?

22         MR. HORTON:  Objection.

23     Objection to form.

24     A.  I don't know from -- what was meant in

25 the e-mail from 2014.

1     Q.   Okay.  "The speculators are good for

2   liquidity."  Is that speculators in XRP?

3                MR. HORTON:  Objection to form;

4          lack of foundation.

5     A.   I don't know.

6     Q.   What were XRP purchasers speculating on

7   in 2014, if anything?

8                MR. HORTON:  Objection to form.

9     A.   I can't speak to others' motivations.

10     Q.   What was your understanding of what

11   someone might -- I mean -- let me take a step

12   back.

13          At some point, you held XRP as well,

14   correct?

15     A.   Yes.

16     Q.   And you requested XRP from the company

17   as compensation, correct?

18     A.   Correct.

19     Q.   What were you hoping would happen to the

20   XRP that you obtained?

21     A.   More liquidity around XRP.

22     Q.   For what purpose?

23     A.   Well, for -- for me personally?

24     Q.   Yes.

25     A.   I wanted to make money.

1        Q.   So you could sell it -- sorry.

2        A.   I was hoping that the volume and -- and

3   price would rise and I could sell it.

4        Q.   So as a holder of XRP, your hope was

5   that the volume and price would rise.  Is that

6   fair?

7        A.   Yes.

8        Q.   Okay.  Is it fair to say that in 2014

9   you were concerned that we lose speculator

10  interest because of someone always ready to flood

11  the supply?

12               MR. HORTON:  Objection to form.

13       A.   I don't know.  I don't know what this is

14  referring to.

15       Q.   Is this referring to the overhang

16  concern we discussed earlier today?

17               MR. HORTON:  Objection to form.

18          He testified that he doesn't remember what

19           it's referring to.

20       A.   I don't know.

21       Q.   And the fumes, what does "fumes" mean?

22               MR. HORTON:  Objection to form.

23       A.   I also answered that.  I don't -- I

24  don't remember what that means.

25       Q.   Okay.  Sitting here today, what is your

1    understanding of what that means with respect to

2    volume and market making?

3                    MR. HORTON:  Objection to form.

4         A.    I can't venture a guess as to what that

5    means.

6         Q.    To the extent that you hoped, as a

7    holder of XRP yourself, that XRP would rise in

8    volume and price, what could generate these

9    increases in your mind?

10                   MR. HORTON:  Objection to form.

11        A.    Which increases?

12        Q.    Well, we can take volume and price

13   separately or together.  However you thought about

14   it.

15                   MR. HORTON:  Objection to form.

16        Q.    Let's start with increases in volume.

17   What could increase the volume?

18        A.    I think the utilization of the system

19   and adoption of the technology.  I think trading

20   activity.  Yeah.

21        Q.    And what could increase the price?

22        A.    Well, a fixed supply.  Any mix of those

23   things could have an impact on the price.

24        Q.    "Mix of those things" meaning the fixed

25   supply plus the utilization of the system and

1  adoption of the technology and trading activity?

2      A.  Yes.

3      Q.  Okay.  And while you were at Ripple, did

4  Ripple, you know, engage in work that -- to

5  increase the utilization of the system?

6          MR. HORTON:  Objection to form.

7      A.  Yes.

8      Q.  While you were at Ripple, did Ripple

9  engage in work to increase adoption of the

10  technology?

11          MR. HORTON:  Objection to form.

12      A.  I certainly did, yes.

13      Q.  And just for the record to be clear,

14  technology meaning?  What technology are we

15  talking about?

16      A.  It varied at different times.  So I know

17  in the -- in the very early 2013 period, we would

18  have been, frankly, putting on more of an

19  evangel -- evangelist role and saying here's the

20  open-source technology, here's all the benefits it

21  can use, and we can -- we can point you to

22  literature about how to integrate to the system.

23          And in later -- later in my time there,

24  we would have spoken to fully sort of full-stack

25  products that Ripple Inc. had built on top of the

1    technology that sort of more, I think, succinct --

2    succinctly defined the -- the value proposition

3    and how to integrate to it.

4        Q.   And then while you were at Ripple, did

5    Ripple take steps to increase the trading

6    activity --

7            MR. HORTON:  Objection.

8        Q.   -- with respect to XRP?

9            MR. HORTON:  Objection to form.

10       A.   I -- I can't speak to -- to Ripple.

11       Q.   Did you?

12       A.   To increase the trading activity?  What

13   does that mean?

14       Q.   You said trading activity.  Whatever you

15   meant in your answer.

16       A.   Yes, I think so.  Yes, that makes sense.

17       Q.   All right.

18           MR. TENREIRO:  Let's take a look

19       at Exhibit 18.  This is a little later in

20       time and it's a one-page e-mail.  RPLI_SEC

21       484565.

22           MR. HORTON:  Jorge, I think --

23       we're thinking about taking a break in

24       about ten minutes if that works for you.

25           MR. TENREIRO:  That's great.

1          MR. HORTON:  Okay.

2              (Pause)

3      A.    Okay.

4      Q.    Mr. Griffin, who is Monica Long?

5      A.    Well, VP of marketing at Ripple.  I

6  don't know what her role is at this point.

7      Q.    Is it fair to say you know her at least

8  based on your employment at Ripple?

9      A.    Yes.

10     Q.    Okay.  How -- how often would you see or

11  interact with her in connection with your

12  employment?

13     A.    Frequently.

14     Q.    For what purpose or purposes?

15     A.    Just staying coordinated.  We were both

16  on the leadership team.

17     Q.    Is it fair to say that it appears as if

18  she's drafting some sort of note for the Board of

19  Ripple?

20         MR. HORTON:  Objection to form.

21     A.    I don't -- I don't know what -- I can't

22  speak to what she's doing.

23     Q.    Just from reading it, do you understand

24  what she's doing?

25         MR. HORTON:  Do you mean as he

1          sits here today or does he remember --

2                    MR. TENREIRO:  Yes, as he sits

3          here today.

4          A.    I believe so.  I think so.

5          Q.    Did you come to present to Ripple's

6     Board on occasion throughout your employment at

7     Ripple?

8          A.    I did.

9          Q.    For what purpose or purposes?

10         A.    To provide updates.

11         Q.    On?

12         A.    Partnerships, what's -- what was

13    happening within the XRP market, investments, how

14    the sort of -- the financing was going with the

15    business, with venture capital.  Corporate

16    development updates, possible acquisition targets.

17         Q.    How often would you say you presented

18    roughly?

19         A.    I don't know.  Once or twice a year.

20    It -- it varied depending on what time period

21    you're talking about.

22         Q.    Was there any time period where it was

23    more frequent than once or twice a year?

24         A.    Sounds about -- where I was the most

25    active, maybe twice a year, sounds like.  I -- I

1    really can't remember, though.

2         Q.   To the extent that you made

3    presentations, is it fair you spoke at the -- to

4    the Board?  Is that fair?

5         A.   Yes.

6         Q.   Okay.  Did you take care in advance of

7    speaking to the Board to make sure you provided

8    truthful information to them?

9              MR. HORTON:  Objection to form.

10        A.   Yes.

11        Q.   And did you take care to make sure you

12   provided accurate information to the best of your

13   ability to the Board?

14             MR. HORTON:  Objection to form.

15        A.   Yes.

16        Q.   Okay.  Here Ms. Long references "What's

17   missing is the clearly articulated case for XRP."

18             Do you see that?

19        A.   I do.

20        Q.   Sitting here today, do you agree that in

21   November of 2015 a clearly articulated case for

22   XRP was missing?

23             MR. HORTON:  Objection to form.

24        A.   I don't -- I don't -- I can't speak to

25   Monica's e-mail.

144

1          Q.   No, right.  I'm not -- just if I ask you
2     sitting here today, agree or disagree with the
3     following statement, there was no clearly
4     articulated case for -- case for XRP in 2015?
5          A.   Oh, I definitely don't read that here.
6     What I read is -- is a message to the Board and
7     that perhaps a -- a clear message for the Board, I
8     mean, I think you view the Board as -- the Board
9     as people who can advocate for the business and
10    turn -- turn around and talk to it intelligently.
11    And so I think what -- my read of that is the
12    Board doesn't have the -- the wherewithal or the
13    talking points yet to under -- to turn -- turn
14    around and talk to their network.
15              And I believe the Board is pretty new
16    in -- I don't think there was a Board in 20 -- at
17    least there wasn't regular Board meetings in 2013
18    and '14.  So this is probably a pretty -- pretty
19    new Board at that point is my vague recollection,
20    but I can't remember.
21         Q.   Okay.  To the extent that's your reading
22    of this, do you agree or disagree that in 2014,
23    the Board did not have a, you know, clear message
24    that they could then articulate to their people?
25              MR. HORTON:  Objection to form.

1     A.   I don't know.  I mean, she was the

2  communications -- she was concerned with

3  communications presumably, but I can't speak to

4  what -- what her intention is here or what the

5  Board did or didn't know.

6     Q.   Later it says "We today released the

7  first paper in a series to illuminate this case."

8          Do you see that?

9     A.   Okay.

10     Q.   What was that paper?  Do you recall that

11  paper?

12     A.   No.

13     Q.   Okay.  Did you have any -- well, then it

14  says "Today's publication establishes the vision

15  for the internet of value, Ripple and XRP.  It's

16  geared toward XRP buyers who understand the risks

17  of the investment and are in it for the long

18  haul."

19          Do you see that?

20     A.   Okay.

21     Q.   Did you have any role in sort of

22  releasing a paper that establishes the vision for

23  the internet of value, Ripple and XRP to third

24  parties?

25          MR. HORTON:  Objection to form.

1      A.   Outside of the document you're showing

2    me?  I mean, you just -- you showed me a previous

3    exhibit where -- I think it was from 2013 where we

4    sort of laid all that out.

5        Q.   Maybe I should have -- I should have

6    framed it.  From November of 2015 onwards, did you

7    have a role in -- in engaging in the sort of

8    distributions of materials to third parties where

9    you might be laying out the vision for the

10    internet of value, Ripple and XRP?

11            MR. HORTON:  Objection to form.

12        A.   Okay.  Well, in fact, I would have had

13    less of a role because the marketing communication

14    function would have been more mature and more

15    established.  And so sort of laying it in silos

16    would have been clear -- more clearly defined.

17        Q.   Okay.  So to the -- so just generally,

18    maybe, it was more a marketing role at this point

19    and maybe going forward?

20        A.   It's possible.

21        Q.   Okay.  Did you have any role, though,

22    from November 2015 on going forward?  Any role at

23    all?

24        A.   I don't -- I don't --

25            MR. HORTON:  Object -- objection

1          to form.  Any role at all.

2          Q.    In distributing information for

3     materials to third parties where you might be

4     laying out the vision for the internet of value,

5     Ripple and XRP?

6                    MR. HORTON:  Objection to form.

7          A.    I don't remember.

8                    MR. TENREIRO:  All right.  Why

9               don't we take a break.

10                   MR. HORTON:  Sure.  Thank you.

11              Actually, before we go off the record, I

12              just -- I want to clarify one thing that

13              is on the record.  Jorge, you made a

14              comment about productions being made at

15              midnight, 12 hours before the

16              deposition --

17                   MR. TENREIRO:  Twenty-four hours.

18                   MR. HORTON:  Well, I just want

19              the record to be clear that we made two

20              productions on behalf of Mr. Griffin.

21              They were made two and four days before

22              today's deposition.  On Friday, June 25th

23              and Sunday, June 27th.  Today is Tuesday,

24              June 29th.

25                   MR. WARD:  We'll have an

148

```
 1           additional clarification from Mr. Larsen,
 2           but we can do that after the break.
 3                   THE VIDEOGRAPHER:  Going off the
 4           record at 11:46 a.m. Eastern.
 5                   (Whereupon, a recess is taken.)
 6                   (Record notes Mr. Hecker is now
 7           present.)
 8                   THE VIDEOGRAPHER:  We are back on
 9           the record at 12:06 p.m. Eastern.
10                   MR. WARD:  Before we resume, I
11           just wanted to make a clarification.  We
12           were discussing earlier Exhibit 11, which
13           was a document -- or I think two text
14           messages produced by Mr. Larsen with
15           terminal Bates numbers 3499 through 3500.
16           There was a statement made when we get
17           production at midnight, 12 hours before a
18           deposition, you have to look at data
19           native files which are not actually Bates
20           stamped.  I just wanted to clarify that
21           Mr. Larsen's most recent production was on
22           June 11th, at which time he represented
23           his document productions were
24           substantially complete.  The particular
25           documents produced -- or, rather,
```

1            introduced today as Exhibit 11 were

2            produced on May 24th, which is 36 days

3            ago.

4                    MR. TENREIRO:  Thank you.

5    BY MR. TENREIRO:

6        Q.   Mr. Griffin, in connection with your

7    employment at Ripple, does the term "OTC sales"

8    mean anything to you?

9        A.   Yes.

10        Q.   What does it mean?

11        A.   An OTC sale is over-the-counter sale.

12        Q.   Sale of what?

13        A.   XRP.

14        Q.   And why -- what's the reference to over

15    the counter?

16                    MR. HORTON:  Objection to form.

17        A.   I think the -- the idea of an O -- what

18    we -- I would have thought about an OTC as a sale

19    to a large purchaser of XRP.

20        Q.   And were you -- what was -- what, if

21    any, was your involvement with OTC sales of XRP

22    while you were employed at Ripple?

23        A.   I managed the team that was charged with

24    that responsibility.

25        Q.   And what -- what did your -- what were

1    your responsibilities in connection with Ripple's

2    OTC sales of XRP?

3        A.    My role was to approve -- or provide

4    updates, I think first and foremost, to the

5    leadership team or to Chris and Brad and the

6    finance teams about sales of XRP in

7    over-the-counter markets.

8        Q.    Did the team that you -- sorry.

9            Did the team that you -- did the team

10   that you managed, was one of their

11   responsibilities to identify potential OTC

12   purchasers of XRP?

13           MR. HORTON:  Objection to form.

14       A.    Yes.  Yes, that sounds right.

15       Q.    And was one of their responsibilities to

16   negotiate the potential purchases of XRP?

17           MR. HORTON:  Objection to form.

18       A.    Yes.

19       Q.    All right.  And is it fair to say that

20   you were also involved, at least as a manager of

21   that team, in identifying potential OTC purchasers

22   of XRP?

23           MR. HORTON:  Objection to form.

24       A.    Yes.

25       Q.    And is it fair to say that as a manager

1    of the team, you were also involved, to some

2    extent at least, in negotiating potential terms of

3    OTC purchases of XRP?

4                MR. HORTON:  Same objection.

5        A.    Yes.

6        Q.    And did there come a time during your

7    employment at Ripple where you became concerned

8    that OTC purchases of XRP could be depressing

9    XRP's price?

10               MR. HORTON:  Objection to form.

11       A.    I -- I don't remember.

12       Q.    You don't remember either way is what

13   you're saying?

14       A.    I don't remember that being -- that --

15   whether or not that became a concern, but -- OTC

16   sales affecting the price of XRP.

17       Q.    And just to be clear, I was asking about

18   whether it became a concern for you.

19       A.    That's what I was answering.

20       Q.    Okay.  And the -- the term "programmatic

21   sales," does that mean anything in the context of

22   your employment with Ripple?

23       A.    Yes.

24       Q.    And what does that mean?

25       A.    The sale of XRP in open order books on

152

```
1    exchanges.

2         Q.   Did you have any role with respect to

3    programmatic sales of XRP while you were employed

4    at Ripple?

5         A.   Yes.

6         Q.   What was your role?

7         A.   Helping to set targets with our -- the

8    brokers we used to sell XRP, coordinating with

9    finance teams to understand the cash needs that we

10   needed as a business, and working to understand

11   sort of the impact that our sales in open order

12   books were having in the market.

13        Q.   So let me take a couple of steps back.

14             Was it the same team of people that were

15   in charge of OTC sales that were in charge of

16   programmatic sales?

17             MR. HORTON:   Objection to form.

18        A.   It -- it was -- it was in the same team,

19   but the responsibilities were divided between

20   different team members.  And, of course, that

21   changed over the tenure of my seven years there,

22   six years there.

23        Q.   Who were the members of this team that

24   we're discussing?

25        A.   Well, the -- the leaders of those teams
```

1    were Phil Rapoport and then Miguel -- Miguel Vias

2    while -- while I was there.

3         Q.   And while you were there, you supervised

4    either Rapoport or Vias?

5         A.   Yes.

6         Q.   Other names that you might remember that

7    were members of these teams throughout your

8    employment at Ripple?

9              MR. HORTON:  Objection.  You said

10        "these teams."  Is there a particular team

11        you're asking about?

12             MR. TENREIRO:  Sorry.

13        Q.   The team.  The markets team.

14        A.   Dinuka and        are two others.

15        Q.           ?

16        A.   Yes.

17        Q.   Any others?

18        A.   Not that I can remember right now.

19        Q.   Okay.  And --

20             MR. TENREIRO:  Can I scroll this?

21        Can I scroll this?  I can?  Okay.  That's

22        okay.

23        Q.   You said you were -- one of the things

24    the team did was setting targets?  Did you say

25    that?

1      A.   Yes.

2      Q.   Targets for what?

3      A.   For what -- so we're -- specifically

4    we're talking about programmatic sales?

5      Q.   Yes.

6      A.   The objective of the programmatic sales

7    was to sell the XRP that we needed to sell with as

8    little footprint and light-weighted footprint on

9    the market that we could have.  So that's what we

10   meant by target.  And that was typically measured

11   against the overall volume in the market.  I think

12   it was percentage based.

13     Q.   So you wanted to have as little impact

14   on the volume as possible?

15          MR. HORTON:  Objection to form.

16     A.    No, that's not what I said.  Just as

17   little impact on the market, which I guess there

18   are several variables that would -- that that

19   could comprise.

20     Q.   What are those variables?

21     A.    Price, volume, and, I mean, it could

22   have other -- the -- the tightness of the spread

23   between the bid and the ask.  And I think there

24   are other -- yeah, I think that's sort of the

25   first tier concerns there.  Yeah.

1        Q.   Okay.  But when you mentioned

2    "footprint," is that -- you were talking about the

3    impact on the market?  Is that sort of

4    interchangeable?

5              MR. HORTON:  Objection to form.

6        A.   Yes.

7        Q.   Okay.  And in terms of -- I think you

8    mentioned revenue targets, is that correct, with

9    respect to programmatic sales?

10             MR. HORTON:  Objection.  I'm not

11        sure he said that.

12       A.   I don't know that I said that.

13       Q.   Okay.  Were -- was there revenue targets

14   with respect to programmatic sales?

15             MR. HORTON:  Objection to form.

16       A.   I don't know that -- that we had revenue

17   targets, but we -- we did have cash flow needs.

18       Q.   Cash flow needs.

19             And so you had involvement with setting

20   cash flow needs or determining what the cash flow

21   needs were?

22             MR. HORTON:  Objection to form.

23       A.   No.  I had more of an input on -- well,

24   I was more charged with executing and also

25   providing feedback on what I thought was

1    reasonable or not reasonable.

2         Q.   With --

3         A.   I was one of many voices in the room.

4         Q.   With respect to cash flow needs you

5    mean?

6         A.   With respect to cash flow needs derived

7    from -- cash flow derived from the sale of XRP.

8         Q.   Okay.  And who -- who -- who set the

9    cash flow needs derived from programmatic sales?

10                   MR. HORTON:  Objection to form.

11        A.   Typically the finance team.

12        Q.   Who was on the finance --

13        A.   Again, it would vary depending on what

14   time period you're talking about, but, yes, it

15   would include that.

16        Q.   Who was the finance team?

17        A.   Also changed -- you're asking me who ran

18   the finance team or --

19        Q.   Who was in the finance team when you

20   left Ripple?

21        A.   Ron Will was the CFO, and prior to Ron

22   Will, I believe            .  Yes, sounds

23   right.

24        Q.   All right.  Going back to the OTC sales,

25   I think you said OTC sales involved large