# PX 15

1

```
 1                UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE        )
     COMMISSION,                    )
 5                                  )
                    Plaintiff,      ) Case No.:
 6           v.                     ) 20-Civ-10832(AT)(SN)
                                    )
 7   RIPPLE LABS, INC., BRADLEY     )
     GARLINGHOUSE, and CHRISTIAN    )
 8   LARSEN,                        )
                                    )
 9                  Defendants.     )
     _____)
10

11

12                   **CONFIDENTIAL**

13

14              VIDEOTAPED DEPOSITION OF

15                   ASHEESH BIRLA

16              Wednesday, June 23, 2021

17

18

19

20

21

22

23
     Reported by:
24   BRIDGET LOMBARDOZZI,
     CSR, RMR, CRR, CLR
25   Job No. 210623BLO
```

2

```
 1                 UNITED STATES DISTRICT COURT

 2                SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE      )
     COMMISSION,                  )
 5                                )
                    Plaintiff,    ) Case No.:
 6           v.                   ) 20-Civ-10832(AT)(SN)
                                  )
 7   RIPPLE LABS, INC., BRADLEY   )
     GARLINGHOUSE, and CHRISTIAN  )
 8   LARSEN,                      )
                                  )
 9                  Defendants.   )
     _____)
10

11

12

13

14

15         Videotaped deposition of ASHEESH BIRLA taken on

16   behalf of Plaintiff, held at the offices of Debevoise &

17   Plimpton, 919 Third Avenue, New York, New York,

18   commencing at 9:21 a.m. and ending at 6:49 p.m., on

19   Wednesday, June 23, 2021, before Bridget Lombardozzi,

20   CCR, RMR, CRR, CLR, and Notary Public of the States

21   of New York and New Jersey, pursuant to notice.

22

23

24

25
```

3

```
 1    A P P E A R A N C E S (Via Remote where indicated):

 2

 3   For the Plaintiff:

 4

 5

 6         UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 7         NEW YORK REGIONAL OFFICE

 8         BY:  BENJAMIN HANAUER, ESQUIRE

 9              JORGE G. TENREIRO, ESQUIRE

10              MARK SYLVESTER, ESQUIRE

11         200 Vesey Street

12         Suite 400

13         New York, New York  10281-1022

14         Telephone:  212.336.1060

15         Email:    tenreiroj@sec.gov

16                   hanauerb@sec.gov

17                   sylvesterm@sec.gov

18

19

20

21

22

23

24

25
```

4

```
 1    A P P E A R A N C E S (Continued):

 2

 3    For Defendant Ripple Labs Inc.:

 4

 5          DEBEVOISE & PLIMPTON LLP

 6          BY:  LISA ZORNBERG, ESQUIRE

 7               ANNA GRESSEL, ESQUIRE

 8          919 Third Avenue

 9          New York, New York  10022

10          Telephone:  212.909.6000

11          E-Mail:  Lzornberg@debevoise.com

12                   argressel@debevoise.com

13

14                   -and-

15

16          KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

17          BY:  LILLIAN V. SMITH, ESQUIRE (Remote)

18          Sumner Square

19          1615 M Street, N.W.

20          Suite 400

21          Washington, D.C.  20036

22          Telephone:  202.326.7999

23          E-mail:  Lsmith@kellogghansen.com

24

25
```

5

1    A P P E A R A N C E S (Continued)

2

3    For Defendant Bradley Garlinghouse:

4

5            CLEARY GOTTLIEB STEEN & HAMILTON

6            BY:  MATTHEW C. SOLOMON, ESQUIRE

7                 JACKIE M. BRUNE, ESQUIRE (Remote)

8                 CALEB ROBERTSON, ESQUIRE

9            2112 Pennsylvania Avenue, NW

10           Washington, D.C.  20037

11           Telephone:  202.974.1500

12           E-mail:  Msolomon@cgsh.com

13                    jbrune@cgsh.com

14                    crobertson@cgsh.com

15

16   For Defendant Christian A. Larsen:

17

18           PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

19           By:  SARAH PROSTKO, ESQUIRE

20                MEREDITH DEARBORN, ESQUIRE (Remote)

21           1285 Avenue of the Americas

22           New York, New York  10019-6064

23           Telephone:  212.373.2491

24           E-mail:  sprostko@paulweiss.com

25                    mdearborn@paulweiss.com

6

```
 1    A P P E A R A N C E S (Continued):

 2

 3    For the Witness:

 4

 5            KAPLAN HECKER & FINK LLP

 6            BY:  SEAN HECKER, ESQUIRE

 7                 JUSTIN R. HORTON, ESQUIRE

 8            350 Fifth Avenue

 9            Suite 7110

10            New York, New York  10018

11            Telephone:  646.889.3906

12            E:mail:  shecker@kaplanhecker.com

13                     jhorton@kaplanhecker.com

14

15    ALSO PRESENT:

16

17            ███████████████    Ripple

18            ERIC NOLAN, Videographer
              Shereck Video Service
19

20

21

22

23

24

25
```

7

```
 1                      INDEX

 2    WITNESS            EXAMINATION          PAGE

 3    ASHEESH BIRLA

 4                      BY MR. HANAUER          15

 5                      BY MS. ZORNBERG        246

 6

 7

 8                      EXHIBITS
      SEC-AB
 9    NUMBER            DESCRIPTION          PAGE

10

11    Exhibit AB-5 Printout of Slack messages   56

12               from April 2015

13               RPLI_SEC 0302577-79

14

15    Exhibit AB-6 String of e-mails dated     130

16               June 3, 2015

17               RPLI_SEC 0462305-06

18

19    Exhibit AB-7 String of e-mails dated     133

20               June 11-12, 2015

21               RPLI_SEC 0077378-80

22

23    Exhibit AB-8 2/19/16 E-mail from ███     115

24               with attachments

25               RPLI_SEC 0364717-41
```

8

|  |  | EXHIBITS |  |
|---|---|---|---|
| SEC-AB NUMBER |  | DESCRIPTION | PAGE |
| Exhibit AB-9 | 6/26/16 E-mail from Birla to Griffin, re XRP RPLI_SEC 0042714-15 | | 143 |
| Exhibit AB-10 | String of e-mails dated September 12-13, 2016 RPLI_SEC 0378104-06 | | 148 |
| Exhibit AB-11 | 10/3/16 E-mail from ████ to Griffin, ██████ RPLI_SEC 0040742 | | 84 |
| Exhibit AB-15 | String of e-mails dated March 2-3, 2017 RPLI_SEC 0352731-32 | | 88 |
| Exhibit AB-18 | String of e-mails dated April 7-9, 2017 RPLI_SEC 0352161-64 | | 97 |

9

```
 1                    EXHIBITS

 2    SEC-AB
      NUMBER              DESCRIPTION          PAGE
 3

 4    Exhibit AB-19  String of e-mails dated      153

 5                   April 13, 2017

 6                   RPLI_SEC 0018282

 7

 8    Exhibit AB-21  String of e-mails dated      184

 9                   May 2-3, 2017

10                   RPLI_SEC 0031435-36

11

12    Exhibit AB-22  5/12/17 E-mail from Birla     65

13                   to ██████  et als

14                   RPLI_SEC 0403585

15

16    Exhibit AB-23  String of e-mails dated      187

17                   November 27, 2017

18                   RPLI_SEC 0026664

19

20    Exhibit AB-24  String of e-mails dated      155

21                   November 29, 2017

22                   ████ 0044098-99

23

24

25
```

10

```
 1                         EXHIBITS

 2      SEC-AB
        NUMBER                DESCRIPTION           PAGE
 3

 4      Exhibit AB-25  12/7/17 E-mail from [REDACTED]    29

 5                     with attachments

 6                     RPLI_SEC 0376173-76

 7

 8      Exhibit AB-27  String of e-mails dated        107

 9                     December 22, 2017

10                     RPLI_SEC 0512337

11

12      Exhibit AB-29  String of e-mails dated        70

13                     June 20-26, 2018

14                     RPLI_SEC 0261294-97

15

16      Exhibit AB-30  String of e-mails dated        33

17                     8/20/18 with attachment

18                     RPLI_SEC 0439284-88

19

20      Exhibit AB-32  String of e-mails dated        35

21                     October 18-30, 2018 with

22                     attachment

23                     RPLI_SEC 0081034-40

24

25
```

[6/23/2021] Birla, Asheesh Dep. Tr. 6.23.2021

11

| 1 | EXHIBITS |
|---|---|

| SEC-AB NUMBER | DESCRIPTION | PAGE |
|---|---|---|
| Exhibit AB-37 | 7/23/19 E-mail from Birla to product managers RPLI_SEC 0200714-17 | 177 |
| Exhibit AB-42 | String of e-mails dated January 7-8, 2020 RPLI_SEC 0582869-70 | 160 |
| Exhibit AB-46 | Twitter Thread dated February 25, 2020 NO BATES, 1 page | 234 |
| Exhibit AB-50 | 7/3/20 E-mail from ███ to Birla, et al RPLI_SEC 0505553 | 170 |

12

```
 1                    DEPOSITION SUPPORT INDEX

 2

 3      DIRECTION TO WITNESS NOT TO ANSWER

 4        Page    Line

 5         - -none- -

 6

 7

 8      STIPULATIONS

 9        Page    Line

10        14      8

11        17      4

12        17      13

13

14

15      QUESTIONS MARKED

16        Page    Line

17         - -none- -

18

19

20      REQUEST FOR DOCUMENTS

21        Page     Line

22         - -none- -

23

24

25
```

[6/23/2021] Birla, Asheesh Dep. Tr. 6.23.2021

```
 1                       -  -  -

 2                    9:21 a.m.

 3                 June 23, 2021

 4                       -  -  -

 5            THE VIDEOGRAPHER:  Good morning.

 6       Today is Wednesday, June 23rd.  The time

 7       on the video monitor is now 9:21 a.m.

 8       We're here in New York City for the video

 9       deposition of Miss -- Mr. Asheesh Birla.

10       Please note that all microphones are

11       sensitive, pick up whispering, private

12       conversations and cell phone interference.

13       We ask you to please turn off all cell

14       phones, place them away from the

15       microphones as they can interfere with

16       deposition audio and video recording.

17       Audio and video recording will need to

18       take place unless all parties agree to go

19       off the video record.

20            This is Media Unit Number 1 of

21       today's recorded video deposition of

22       Mr. Asheesh Birla taken in the matter of

23       SEC, Securities and Exchange Commission,

24       versus Ripple -- Ripple Labs, Inc., et

25       al., filed in the U.S. District, Southern
```

14

```
 1          District of New York Court with the case

 2          index file docket number of

 3          20-civ-10832(AT)(SN).

 4              Today's deposition is being

 5          recorded at the law firm of -- offices of

 6          Debevoise Plimpton at 919 Third Avenue,

 7          New York, New York.

 8              I'm your videographer today,

 9          Eric Nolan, with Sheretz Video.  And

10          today's Madam Court Reporter is

11          Ms. Bridget Lombardozzi with Gradillas

12          Court Reporters.

13              Please neat -- note that neither

14          myself nor Ms. Court Reporter Lombardozzi

15          are related to any party in this action

16          or financially interested in the

17          financial outcome of this case.

18              At this time we typically have

19          all counsel present in the room and

20          anyone attending remotely please enter

21          their appearance, but per previous

22          agreement and stipulation, all

23          appearances will be provided via the

24          written record provided by the court

25          reporter.
```

1          At this time we'd ask the court

2     reporter to please swear in the witness,

3     after which we may proceed.

4          We are now on the video record.

5          A S H E E S H   B I R L A,

6     having been duly sworn, was examined and

7     testified as follows:

8          THE WITNESS:  Yes.

9          THE REPORTER:  Thank you.

10         You may proceed.

11         MS. ZORNBERG:  Sir, did you note

12    the time for the record?

13         THE VIDEOGRAPHER:  Yes.  The time

14    on the video monitor is now 9:24 a.m.

15         MS. ZORNBERG:  Thank you.

16          DIRECT-EXAMINATION

17   BY MR. HANAUER:

18       Q.  Sir, can you please state and spell your

19   name for the record?

20       A.  My name is Asheesh Birla.  First name

21   Asheesh, A-S-H-E-E-S-H, last name Birla,

22   B-I-R-L-A.

23       Q.  Good morning, Mr. Birla.  My name is Ben

24   Hanauer.  I represent the SEC, which is the

25   plaintiff in this lawsuit.

16

```
 1            Is there any reason that you cannot give
 2   accurate deposition testimony today?
 3        A.   No.
 4        Q.   How many preparation sessions did you
 5   have for today's deposition?
 6        A.   I don't know for certain, but around
 7   four -- four to five.
 8        Q.   And if you had to estimate the total
 9   amount of time you spent preparing for today's
10   deposition, what amount of time would that be?
11        A.   Ten -- ten to twenty hours around.
12        Q.   In total?
13        A.   In total.
14        Q.   And you provided testimony to the SEC in
15   the investigation that preceded this lawsuit?
16        A.   Yes, that is correct.
17        Q.   And that testimony was on or around
18   December 5th, 2019?
19        A.   Yes, I believe so.
20        Q.   Have you been deposed or provided
21   testimony in a legal proceeding since then?
22        A.   No.
23        Q.   And besides your testimony and your
24   deposition today and when I briefly introduced
25   myself to you in the elevator this morning, have
```

17

1   you communicated with anyone at the SEC, its

2   Commissioners or its staff?

3        A.   No.

4             MS. ZORNBERG:  Mr. Hanauer, if I

5        could just put on the record a stipulation

6        at this point for the parties.  We've

7        agreed, as in prior depositions, that an

8        objection to a question by any one of the

9        defense counsel or by Mr. Birla's

10       individual counsel here today will suffice

11       to preserve the objection for all

12       defend -- defendants in the action.

13             Also, I just would note for the

14       record our request to designate the

15       transcript as confidential.

16             MR. HANAUER:  Thank you.  And

17       agreed to your stipulation.

18             MS. ZORNBERG:  Thank you.

19   BY MR. HANAUER:

20       Q.   And, Mr. Birla -- am I saying your name

21   right?

22       A.   Yes.

23       Q.   Okay.  Thank you.

24             Mr. Birla, do you understand that one of

25   the issues in this lawsuit is whether XRP is a

18

1      security and subject to SEC jurisdiction?

2          A.   Yes.

3          Q.   Are you aware of anyone affiliated with

4      the SEC communicating to Ripple that XRP is not a

5      security?

6          A.   Not to my knowledge.

7          Q.   And if I refer to "Ripple," I'm

8      referring to Ripple Labs, Inc.

9               Do you understand that?

10         A.   Yes, I do.

11         Q.   You started at Ripple in September of

12     2013?

13         A.   Yes.

14         Q.   Are you one of Ripple's longest-tenured

15     employees?

16         A.   Yes, I am.

17         Q.   And what is your current title?

18         A.   General manager of RippleNet.

19         Q.   And how long have you held that title?

20         A.   Around -- around ten months, I believe.

21         Q.   And what are your current

22     responsibilities?

23         A.   Current -- my current responsibilities

24     include product management, sales, something

25     called customer success, which is the delivery of

1　the product and integration into our customers and

2　partners.  And then -- yeah, those are my main

3　responsibilities.

4　　　　Q.　And what was your title before you

5　became the general manager of RippleNet?

6　　　　A.　For a brief time, my title was -- can

7　you -- just prior to general manager of RippleNet

8　or --

9　　　　Q.　Yeah.  You told me that ten months ago

10　you got a new title and I'm asking you what your

11　title was before it changed to the current one.

12　　　　A.　Right before it was changed to general

13　manager of RippleNet, my title was vice president

14　of product and corporate development.

15　　　　Q.　And did you have different

16　responsibilities in that role than you do

17　currently?

18　　　　A.　Yes, I did.

19　　　　Q.　Could you tell us about that, please?

20　　　　A.　I managed product management.  And

21　product management is a function that worked with

22　customers, identified customer problems, and then

23　developed software applications to solve those

24　customer problems with a product team and a

25　engineering team.

1       Engineering team does not report into

2   the product function, but you -- you influence,

3   help organize and prioritize different feature

4   sets for product development.

5       Corporate development in that role was

6   helping identify investments that Ripple could

7   make to help further the -- the product and

8   RippleNet as a whole.

9       Q.   And -- and when you just described about

10  managing investments, that's a responsibility you

11  had prior to your job change ten months ago or

12  that's a responsibility you have now?

13      A.   That's not a responsibility I have now.

14  I had it for a brief period prior to becoming

15  general manager.

16      Q.   And so maybe this is a -- a good way to

17  try this.

18       Can you tell us how your job

19  responsibilities have changed since you provided

20  testimony to the SEC in December 2019?

21      A.   I don't exactly remember the dates of

22  the new title, but for -- I believe at the time

23  that I provided testimony, I was a senior vice

24  president of product and pretty much managed the

25  product -- product function.

1           Then after I believe I gave testimony, I

2      don't know the exact timing, but maybe six months

3      after, the corporate development function was

4      added for a brief period.

5           And then I believe the -- the timing was

6      around August of 2020-ish, I was -- my role

7      changed.  Corporate development was -- moved on to

8      another part of the organization.  And I then

9      became the general manager of RippleNet.

10          Q.   Who do you currently report to?

11          A.   I report to Brad Garlinghouse.

12          Q.   And Mr. Garlinghouse is Ripple's CEO?

13          A.   That is correct.

14          Q.   And how long have you reported directly

15     to Mr. Garlinghouse?

16          A.   More than -- I believe more than five

17     years.

18          Q.   And who did you report to before

19     Mr. Garlinghouse?

20          A.   Can you repeat the question, please?

21               MR. HANAUER:  Can you please read

22          back the question?

23               (Whereupon, the record was read

24          back.)

25          A.   I reported to Chris Larsen.

22

1          Q.    And at the time you reported to

2     Mr. Larsen, was he Ripple's CEO?

3          A.    Yes, I believe so.

4          Q.    Do you consider yourself to be a Ripple

5     senior executive?

6          A.    Yes.

7          Q.    And how long have you considered

8     yourself to be a senior Ripple executive?

9          A.    During most of my tenure at Ripple.

10         Q.    Since 2015?

11         A.    Since 2015.

12         Q.    Are you a Ripple board member?

13         A.    I am not a Ripple board member.

14         Q.    Do you regularly -- regularly attend

15    Ripple board meetings?

16         A.    I -- I attend a portion of the board

17    meeting on a regular basis.

18         Q.    And what portion is that?

19         A.    The product -- the product development

20    portion of the board -- board meeting.

21         Q.    So you basically come into the board

22    meeting, give a presentation about the -- the

23    function that you manage, and then you leave?

24              MR. HECKER:  Objection to form.

25              You can answer.

23

```
1        A.   I may stay for a few other slides and
2   during a natural break, you know, I'll -- I'll
3   depart.  But most of the time that I'm there, I'm
4   there to serve the purpose to inform the board
5   about product development.
6        Q.   Have you attended portions of Ripple
7   board meetings where financial matters are
8   discussed?
9             MS. ZORNBERG:  Object to form.
10            You can answer.
11       A.   If there's not a natural break, there
12  may be a few slides that I stick around for, but
13  we tend to -- to avoid disruptions in the board
14  and people shuffling in and out, I usually leave
15  at a natural break.  Sometimes that natural break
16  comes after the financial section; sometimes it
17  comes before the financial section.
18       Q.   Are you a Ripple shareholder?
19       A.   Yes, I am.
20       Q.   Since when?
21       A.   I don't know the exact dates.  It's --
22  it's likely one year after I started at Ripple.
23       Q.   So like 2014/2015?
24       A.   That's -- I believe that to be correct.
25       Q.   And how much Ripple shares do you own?
```

24

1          A.   I don't -- I don't recall the exact

2     amount, but there's been some, you know, splits in

3     the shares and so forth since I was provided my

4     grant.  So I'm not really sure the exact amount,

5     but it's somewhere -- somewhere between ██████

6     ██████████      shares.

7          Q.   And have you received Ripple shares

8     since the first initial grant you received?

9          A.   Yes, I believe so.

10          Q.   Can you tell us about the instances

11     where you received Ripple shares?

12          A.   Just for background, shares are usually

13     on a ████ year vest.  And with a lot of Silicon

14     Valley companies and tech companies, you're

15     provided what is known as a refresh grant before

16     your ████ years are -- are up.  I believe I

17     received at least one refresh grant somewhere

18     around 2017.  I believe that was my first refresh

19     grant.

20          Q.   Have you received a refresh grant since

21     then?

22          A.   I don't know for certain, but I don't

23     believe so.

24          Q.   And have you ever received Ripple stock

25     options?

25

```
 1        A.   Well, to be clear, the initial
 2   allocation and the refresh grant are stock
 3   options.
 4        Q.   And for either of those grants, have you
 5   exercised the options and purchased Ripple shares?
 6        A.   I have -- yes, I have purchased -- I've
 7   exercised the option.
 8        Q.   Both times?  Both grants?
 9        A.   That's not -- the mechanics of
10   exercising options do not depend on, like, the
11   grants, but I've -- I have exercised a number of
12   my options that I've -- I've received.
13        Q.   What is your understanding of how much
14   your Ripple stock is currently worth?
15        A.   I don't -- I don't track the Ripple
16   stock very closely.  It's -- it's -- I've heard of
17   ranges between     and     per share.
18        Q.   Is Ripple publicly traded?
19        A.   No, Ripple is not publicly traded.
20        Q.   So is it accurate that one of the roles
21   you've -- is it accurate that one of the roles
22   you've held at Ripple is managing the development
23   of Ripple's products?
24        A.   Yes, that is correct.
25        Q.   And you have also acted as a spokesman
```

1   or a spokesperson for Ripple?

2                   MR. HECKER:  Objection to form.

3                   You can answer.

4       A.   I -- I didn't have a formal title as

5   spokesperson, but I -- I spoke to press and other

6   media as part of my role.

7       Q.   And that's something you've done since

8   you started at Ripple?

9                   MR. HECKER:  Objection to form.

10                  You can answer.

11      A.   I -- I don't remember when I started

12  providing input into media, but it wasn't -- I

13  don't believe it was when I started.

14      Q.   By 2015 were you making public

15  announcements about Ripple's products?

16                  MR. HECKER:  Objection to form.

17      A.   Around 2015 I believe I started to talk

18  a little bit about not only, you know, Ripple

19  products but cryptocurrencies and blockchain

20  technology.  I don't know of exact timing, but

21  somewhere around 2015 seems right.

22      Q.   And since 2015 you've been providing

23  interviews to the media on behalf of Ripple?

24      A.   I don't -- I don't know if it's

25  around -- somewhere around 2015 I've -- I believe

27

```
 1   I was providing interviews on behalf of Ripple.

 2        Q.   I do not want to get into the specifics

 3   of any communications you've had with an attorney,

 4   but have you received guidance from attorneys

 5   about how to talk about Ripple and XRP when

 6   speaking to the media?

 7             MR. HECKER:  I'm going to object

 8        and instruct the witness that -- that

 9        question I think you can answer just yes

10        or no and then see if he has a follow-up

11        question.

12             And the question, if you

13        rephrase it, is just around the topic?

14        Whether he had discussions with counsel

15        about the topic of speaking to the media?

16             MR. HANAUER:  Guidance from

17        attorneys about how to talk about Ripple

18        and XRP when speaking to the media.

19             MR. HECKER:  And you're -- you're

20        expressly asking him about whether he's

21        had discussions with counsel about that

22        topic?

23             MR. HANAUER:  Correct.

24             MR. HECKER:  Okay.  So that's

25        just a yes or a no answer to that
```

1        question.

2        A.   No.

3        Q.   You've received guidance from

4    nonattorneys about how to talk about Ripple and

5    XRP when acting as a Ripple spokesperson?

6                MR. HECKER:  Objection to form.

7        A.   Can you repeat the question, please?

8                (Whereupon, the record was read back.)

9                MS. ZORNBERG:  Object to form.

10       A.   From my recollection, I -- I'm provided

11   a -- a brief prior to some media engagements that

12   go -- go through bullet points of how to describe

13   Ripple products and the problems they solve for --

14   for customers.

15       Q.   And that briefing you -- you just

16   described, you've received that from nonattorney

17   personnel at Ripple?

18       A.   Yes, I believe so.

19       Q.   And you've also received similar

20   guidance from the ███ public relations firm?

21               MS. ZORNBERG:  Object to form.

22       A.   At Ripple we use a -- a tool called

23   Google Docs and it's unclear if -- I'm not certain

24   if -- if ███ provided input into that document

25   or that was, you know, mostly provided by our

1    Ripple communications team.

2         Q.    Do you understand that ███ has

3    provided public relations guidance to Ripple and

4    its employees?

5         A.    Yes, I understand that.

6         Q.    One of the issues you received guidance

7    on from nonattorneys is about talking about XRP

8    not being a security subject to regulation by the

9    SEC?

10              MR. HECKER:   Objection to form;

11        foundation.

12        A.    Yes, I believe so.

13        Q.    When did you start receiving guidance

14   about how to talk about Ripple and XRP as they

15   relate to the SEC?

16              MR. HECKER:   Objection to form.

17        A.    Well, on -- on the Ripple side, I

18   don't -- I don't remember receiving, you know,

19   guidance on -- on -- on the SEC matter.  I don't

20   exactly remember the -- the dates.  Perhaps 18

21   months ago?  I'm not a -- I'm not a hundred

22   percent clear on the dates.

23              (Whereupon, exhibit is presented and

24   marked SEC Birla Exhibit AB-25 for

25   identification.)

30

1    BY MR. HANAUER:

2         Q.   Mr. Birla, I am passing you a document

3    that's been marked as Exhibit AB-25 beginning with

4    the Bates number that ends in 173.

5              Is Exhibit 25 an e-mail you received

6    from Ms. ███████████ on --

7                   UNIDENTIFIED SPEAKER:  This

8        meeting is being recorded.

9         Q.   Mr. Birla, is Exhibit 25 an e-mail you

10   received from ███████████ on December 7th, 2017,

11   and its attachment?

12        A.   I believe so, yes.

13        Q.   And who is ███████████?

14        A.   ███████████ was the former vice

15   president of People.  "People" is a term that

16   encompasses the human resource function.

17        Q.   And do you see how Ms. ██████ writes

18   "Hi, all.  Thank you for volunteering to deliver

19   the Ripple pitch"?

20        A.   I see that, yes.

21        Q.   What is your understanding of the

22   "Ripple pitch" that Ms. ██████ is referring to?

23        A.   I don't know.

24        Q.   Do you see how the attachment to the

25   e-mail in Exhibit AB-25 is a document titled

1     "General Media Training FAQ"?

2          A.    Yes, I see that.

3          Q.    And this general meeting training FAQ is

4     a document for Ripple spokepersons to con --

5     consult before speaking with the media?

6                    MS. ZORNBERG:  Object to form.

7            And do you want to give him time to read

8            the document?  You haven't even laid a

9            foundation as to his familiarity with it.

10                   MS. GRESSEL:  Also, can the

11           exhibit be sent to the remote attendees?

12                   THE REPORTER:  I -- I can't hear

13           you.

14                   MS. GRESSEL:  I was just asking

15           if the exhibit could be sent to the remote

16           attendees.

17                   MR. TENREIRO:  Nicole, this is

18           Jorge.  If you can hear me, can you send

19           it to the e-mail I provided to, I think,

20     Mr. Marcus?

21                   MS. FORBES:  I already did.

22                   MR. TENREIRO:  So, Anna, she did.

23     D.J. Marcus.

24                   MR. MARCUS:  I just received it.

25           Thank you.

32

| | |
|---|---|
| 1 | MR. TENREIRO:  Thank you, Nicole. |
| 2 | BY MR. HANAUER: |
| 3 | Q.   And, sir, I don't think you need to |
| 4 | review -- read every word of the -- the document |
| 5 | to answer my question, but certainly take as much |
| 6 | time as -- as you're comfortable with. |
| 7 | MR. HECKER:  Yeah, I object to |
| 8 | the predicate.  If you're going to point |
| 9 | him to something in particular, then, you |
| 10 | know, he can familiarize himself |
| 11 | generally.  But if you're just going to |
| 12 | ask him to look at it, he should look at |
| 13 | it unless he's familiar with it. |
| 14 | MR. HANAUER:  Madam Court |
| 15 | Reporter, can you please read back the |
| 16 | question before the objections were |
| 17 | lodged? |
| 18 | MR. HECKER:  I assume you don't |
| 19 | mean the last question.  You mean the one |
| 20 | before that. |
| 21 | MR. HANAUER:  Before the |
| 22 | objections were lodged. |
| 23 | (Whereupon, the record was read |
| 24 | back.) |
| 25 | MR. HECKER:  Objection to form; |

33

1        foundation.

2   BY MR. HANAUER:

3        Q.   You can answer the question.

4        A.   So is the question is this a general

5   media training document?

6        Q.   The question is, is this document

7   something that Ripple spokepersons were supposed

8   to consult before speaking with the media?

9             MR. HECKER:  Objection to form;

10       foundation.

11       A.   I believe so.

12       Q.   And this general media training FAQ is

13  an example of the guidance you received about how

14  to talk about Ripple and XRP?

15            MS. ZORNBERG:  Objection; lack of

16       foundation.

17       A.   We received different kinds of

18  bulletins.  I'm not familiar with this bulletin,

19  but, yeah, we received, you know, different kinds

20  of bulletins and backgrounds for media

21  engagements.

22            (Whereupon, exhibit is presented and

23  marked SEC Birla Exhibit AB-30 for

24  identification.)

25            MR. TENREIRO:  Nicole, Exhibit

34

```
 1         30.
 2              MR. HANAUER:  I just passed to
 3         Mr. Birla a document marked -- an exhibit
 4         marked AB-30 beginning with the Bates
 5         number ending in 9284.
 6    BY MR. HANAUER:
 7         Q.   And, Mr. Birla, is Exhibit AB-30 an
 8    e-mail you received from              on August
 9    20th, 2018, as well as the attachment to the
10    e-mail?
11         A.   Yes, I believe so.
12         Q.   And who is                    ?
13         A.   I believe                  was an
14    employee at
15         Q.   And Ms.           is sending you briefing
16    material in advance of an interview you did for
17
18         A.   Yes, I believe so.
19         Q.   And I would like to refer you to the
20    first page of the attachment, the one ending in
21    Bates number 9285.  And I'd like to refer you to
22    the third bullet point from the bottom where the
23    document says "I saw your interview with
24            , where he suggests XRP is a security."
25              Do you see that?
```

35

1      A.   I -- I do see that.

2      Q.   And could you please just read to

3   yourself that bullet point and the next three

4   bullet points?

5           (Pause)

6      Q.   What you just read is an example of

7   guidance you received about talking about XRP in a

8   way that suggests it is not a security, correct?

9           MS. ZORNBERG:  Object to form.

10     A.   Can you repeat the question, please?

11          (Whereupon, the record was read back.)

12     A.   Yes, I believe that is true.

13          MR. TENREIRO:  Thirty-two,

14       Nicole.

15          (Whereupon, exhibit is presented and

16   marked SEC Birla Exhibit AB-32 for

17   identification.)

18   BY MR. HANAUER:

19     Q.   Mr. Birla, I just passed you a document

20   marked Exhibit AB-32 which starts with the Bates

21   number 10 --  ending in 1034.

22          MR. HECKER:  Do the remote

23       participants have it?

24          MR. TENREIRO:  I'm sure it's on

25       its way.

36

1          MS. DEARBORN:  Not yet.

2     BY MR. HANAUER:

3          Q.   And, Mr. Birla, is Exhibit AB-32 an

4     e-mail that was ending in a chain that was sent

5     from Monica Long to ▮▮▮▮▮▮ you and others on

6     October 30th, 2018?

7          MR. HECKER:  Objection to form.

8          A.   Yes, I believe so.

9          Q.   And who are ▮▮▮▮▮▮ and Monica Long?

10         A.   Monica Long is an employee at Ripple and

11    ▮▮▮▮▮▮ is an entrepreneur.

12         Q.   Did ▮▮▮▮▮▮ ever work at Ripple?

13         A.   She was a -- at one point a board

14    member.

15         Q.   A Ripple board member?

16         A.   A Ripple board member.

17         Q.   Was she a Ripple board member in October

18    2018?

19         A.   I don't know for certain.

20         Q.   And do you see how in the second e-mail

21    from the top on Exhibit 32, ▮▮▮▮▮▮ is asking

22    Monica for a copy of some of Ms. Long's and your

23    talking points?

24         A.   I see that.

25         Q.   And in response to ▮▮▮▮▮▮ e-mail,

37

1    Ms. Long e-mails her back and includes the

2    document attached to the e-mail in Exhibit 32?

3         A.   Yes, that's correct.

4         Q.   And that document begins on the page

5    with the Bates number ending 1035?  Do you see

6    that it says "▓▓▓▓▓▓▓?

7         A.   I see that.

8         Q.   And are these briefing materials you

9    received for an interview with the ▓▓▓▓▓▓▓

10   ▓▓▓▓?

11              MR. HECKER:  Objection to form;

12        foundation.

13        A.   I -- I don't believe these were -- are

14   you asking if these were my -- my briefing

15   materials for the ▓▓▓▓▓▓▓▓▓▓▓▓▓?

16        Q.   Correct.

17        A.   I don't remember speaking at the ▓▓▓

18   ▓▓▓▓▓▓▓▓▓conference.

19        Q.   So ▓▓▓▓▓refers to this document as

20   "Asheesh's talking points."

21              MR. HECKER:  Objection to form.

22        Q.   Do you know why she's doing that?

23              MR. HECKER:  Objection to form.

24        Q.   Or did you have an understanding of why

25   she did that?

38

```
 1                    MR. HECKER:  I'm sorry.

 2          Objection to form.

 3          A.   I don't know why she's asking.

 4          Q.   Have you seen these talking points

 5     before?

 6          A.   I've seen some of these talking points,

 7     but this -- this document in particular does

 8     not -- I do not recall this document in

 9     particular.

10          Q.   I'd like to refer you to the page of the

11     talking points ending with Bates number 1037.  And

12     I'd like you to please read under the section "Hot

13     Topics" and "Regulation."

14               (Pause)

15          Q.   Do you see how it says "If pushed on

16     commentating on whether or not XRP is a security:

17     Ultimately, this will be up to the SEC to decide"?

18          A.   I see that in the document, yes.

19          Q.   And this is guidance that came from

20     Ripple?

21                    MR. HECKER:  Objection to form.

22                    MS. ZORNBERG:  Objection; lack of

23          foundation.  He's already said he's not

24          familiar with this document.

25          Q.   You can answer the question.
```

39

1          A.   I -- I see the area in the document that

2     you're referring to, but I'm not familiar with

3     this document.  It does not look like this

4     document was prepared for me.

5          Q.   Was this a Ripple document?

6          A.   I'm not -- I'm not sure who prepared the

7     document, but it -- it appears to be a Ripple

8     document.

9          Q.   And did you understand in late 2018 that

10    the SEC could decide that it considered XRP to be

11    a security?

12               MR. HECKER:  Objection to form.

13         A.   Do you mind rephrasing the question?

14         Q.   In late 2018, did you have the

15    understanding that the SEC could ultimately decide

16    that it considered XRP to be a security?

17               MR. HECKER:  Same objection.

18         A.   I don't recall what I viewed in 2018

19    regarding SEC's viewpoint on whether XRP is a

20    security or not.

21         Q.   In 2018 were you aware that the SEC

22    could decide to sue Ripple for violating the

23    federal securities laws?

24               MR. HECKER:  Same objection.

25         A.   I was aware -- in 2018 I was aware of

1    the -- of a possibility, yes.

2        Q.   Since you started at Ripple, you've been

3    responsible for developing products that use XRP?

4              MR. HECKER:   Sorry.   Are we done?

5         We're done with this document?

6              MR. HANAUER:   Yes.   Thank you,

7         Counsel.

8        A.   Can you repeat the question, please?

9              (Whereupon, the record was read back.)

10       A.   Since I started at Ripple, I've

11   developed products at Ripple, some of which

12   leverage XRP.

13       Q.   So you were responsible for both

14   developing products that use XRP and developing

15   products that don't use XRP?

16       A.   Yes, I believe that to be correct.

17       Q.   And were those your main

18   responsibilities from the time you started at

19   Ripple?

20       A.   Product management at an early stage

21   company has a very vague and wide set of

22   responsibilities, but developing products was a

23   large part of those responsibilities.

24       Q.   Is a product called ODL currently

25   Ripple's primary product?

41

```
1        A.    ODL, which is known as -- it stands for

2    On-Demand Liquidity, is one of Ripple's products,

3    yes.

4        Q.    Would you consider it to be Ripple's

5    primary product?

6              MR. HECKER:  Objection to form.

7        A.    I -- I don't believe it is the primary

8    product.  It is one of many products that we offer

9    in the industry.

10       Q.    Would you consider ODL to be one of

11   Ripple's primary products?

12       A.    ODL is one of Ripple's important

13   products, yes.

14       Q.    And ODL, when it was initially released,

15   it was called xRapid?

16       A.    Over the years the precursor to ODL was

17   called a number of different things at Ripple.

18   One name was xRapid.  Other names were known as

19   RPP.  That stands for Ripple -- Ripple Payment

20   Protocol, I believe.  And then other names --

21   Rainmaker was another name.  There've been several

22   others that I -- I do not recall at this moment.

23       Q.    Why was ODL formerly called Rainmaker?

24              MR. HECKER:  Objection to form.

25       A.    It was an internal code name for the --
```

42

1    the product and I don't recall the origins of the

2    name.  This was early on at the company.

3        Q.   Do you understand the term "Rainmaker"

4    to refer to a person that brings in a lot of

5    business or money for an organization?

6        A.   I do not.

7             MR. HECKER:  I'm sorry, the

8        transcript says I do.  Did you say I do or

9        do not?

10            THE WITNESS:  I do not understand

11       that.

12       Q.   So what do you understand the term to

13   mean?

14       A.   I don't understand what the term means.

15   I didn't understand it in that context.

16       Q.   So you have no understanding why the

17   product was given that specific name?

18       A.   It was not given that name externally.

19   It was just an internal name on documents.  A

20   number of our products are given internal names

21   that have origins from potentially an engineer or

22   a product person that wrote something on a

23   document and it stuck with -- with it on the

24   document.

25       Q.   You -- did you come up with the term

43

1    "Rainmaker"?

2        A.   I don't believe so.

3        Q.   Was xRapid the first product that Ripple

4    sold for -- for commercial use that used XRP?

5        A.   The mechanics of -- of the licensing

6    model of -- you know, to my knowledge of xRapid

7    are such that the product isn't -- isn't licensed.

8    From my knowledge, the underlying framework known

9    as RippleNet is the licensed product.

10       Q.   Okay.  So it's my understanding that

11   xRapid would transfer one currency to another

12   currency using XRP to facilitate that transfer.

13            Is that accurate?

14       A.   The -- yeah, the -- the way the product

15   works is that it facilitates the liquidity or the

16   settlement portion from one currency to another by

17   leveraging exchanges around the world.

18       Q.   So in order for xRapid to work, it

19   needed to use XRP as part of that system, correct?

20       A.   That is correct.

21       Q.   Was xRapid the first product that Ripple

22   sold for commercial use that required XRP in order

23   for it to work?

24       A.   I believe that the actual product that

25   was sold was a product known as RippleNet, which

1    is also known as xCurrent in a prior form.  And

2    the mechanics of then adding on xRapid or ODL, I

3    don't believe that is a licensed product.

4        Q.   Was xRapid the first product that Ripple

5    sold for commercial use that involved XRP -- or

6    that used XRP for transferring one currency to

7    another?

8                MS. ZORNBERG:  Objection; asked

9        and answered.

10                You can answer.

11       A.   It was the -- xRapid was the first

12   service that was commercially deployed to

13   customers of RippleNet.

14       Q.   And was xRapid the first service that

15   Ripple offered that required XRP in order for it

16   to work?

17                MR. HECKER:  Objection to form;

18       asked and answered.

19       A.   Well, there was, you know, the RPP

20   product that I mentioned earlier.  That leveraged

21   XRP.  There were early products known as the

22   RippleCard that, you know, leveraged XRP.  There

23   was the ability to hold gold called XAU that

24   leveraged the XRP ledger.

25                There was a product that we developed,

45

```
1    an open-source tool that we developed, known as

2    Ripple Trade that leveraged XRP.

3            There were, you know, various SDKs --

4    SDKs stand for software development kits -- that

5    helped customers, partners, developers interface

6    with the XRP ledger.

7            There was a product called Ripple

8    Connect or -- Ripple Connect, Gateway D was

9    another name for it, that helped partners and

10   others issue digital assets on the -- sorry,

11   digital assets, tokens.  They're known as IOUs.

12   IOU is a -- is a token form on the XRP ledger.

13   And that -- yeah, and that product, to make it

14   easier, was called Gateway D and then Ripple

15   Connect after that.

16       Q.   Did any of the products you just named

17   require XRP in order to function properly?

18       A.   Yes, I believe so.

19       Q.   Which ones?

20       A.   Gateway D.  To create an account on the

21   XRP ledger, you needed XRP to function.  RPP

22   leveraged the XRP ledger and I believe the

23   decentralized exchange.  The RippleCard -- again,

24   the RippleCard was a credit card or -- actually, I

25   don't know if it's a credit card or a debit card,
```