# PX 18

1

```
 1              UNITED STATES DISTRICT COURT

 2              SOUTHERN DISTRICT OF NEW YORK

 3

 4   SECURITIES AND EXCHANGE         )
     COMMISSION,                     )
 5                                   )
                PLAINTIFF,           )
 6                                   )
           vs.                      ) Case No.
 7                                   ) 20-Civ-10832(AT)(SN)
     RIPPLE LABS, INC., BRADLEY      )
 8   GARLINGHOUSE, AND CHRISTIAN     )
     LARSEN,                         )
 9                                   )
                DEFENDANTS.          )
10   _____)

11

12

13

14                  CONFIDENTIAL

15                 DEPOSITION OF

16              ANTOINETTE O'GORMAN

17            Wednesday, August 4, 2021

18

19

20

21

22

23   Reported By:
     KATHLEEN WILKINS,
24   STENOGRAPHIC REPORTER, CSR 10068
     RPR-RMR-CRR-CCRR-CLR-CRC
25   JOB No. 210804KWI
```

1        VIDEOTAPED DEPOSITION OF ANTOINETTE O'GORMAN

2            BE IT REMEMBERED that on Wednesday,

3    August 4, 2021, commencing at the hour of 9:11 a.m.

4    thereof, at King & Spalding, 50 California Street,

5    Suite 3300, San Francisco, California, before me,

6    Kathleen A. Wilkins, RPR-RMR-CRR-CCRR-CLR-CRC, a

7    Certified Stenographic Shorthand Reporter, in and

8    for the State of California, personally appeared

9    ANTOINETTE O'GORMAN, a witness in the above-entitled

10   court and cause, who, being by me first duly sworn,

11   was thereupon examined as a witness in said action.

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

```
 1                      APPEARANCES OF COUNSEL

 2    FOR THE PLAINTIFF:

 3         SECURITIES AND EXCHANGE COMMISSION
           New York Regional Office
 4         200 Vesey Street, Suite 400
           New York, New York 10281-1022
 5         BY:  MARK SYLVESTER, ESQ.
                JORGE G. TENREIRO, ESQ.
 6         Telephone:  (212) 336-0153
           Email:  Sylvesterm@sec.gov
 7                  tenreiroj@sec.gov

 8    FOR ANTOINETTE O'GORMAN:

 9         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND
           AFFILIATES
10         One Manhattan West
           New York, New York 10001-8602
11         BY:  ALEXANDER C. DRYLEWSKI, ESQ.
           Telephone:  (212) 735-2129
12         Email:  Alexander.drylewski@skadden.com

13         SKADDEN, ARPS, SLATE, MEAGHER & FLOM LLP AND
           AFFILIATES
14         1440 New York Avenue, N.W.
           Washington, D.C. 20005
15         BY:  COLLEEN P. MAHONEY, ESQ.
           Telephone:  (202) 371-7900
16         Email:  Colleen.mahoney@skadden.com

17    FOR THE DEFENDANT RIPPLE LABS:

18         DEBEVOISE & PLIMPTON LLP
           919 Third Avenue
19         New York, New York 10022
           BY:  LISA ZORNBERG, ESQ.
20              ASHLEY V. HAHN, ESQ.
           Telephone: (212) 909.6947
21         Email:  Lzornbeg@debevoise.com
                   avhahn@debevoise.com
22

23

24

25
```

4

```
 1                  APPEARANCES OF COUNSEL (Continued)

 2     FOR DEFENDANT CHRISTIAN A. LARSEN:

 3          PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
            2001 K Street, NW
 4          Washington, D.C. 20006-1047
            BY:  MEREDITH DEARBORN, ESQ.
 5          Telephone: (628) 432-5117
            Email: mdearborn@paulweiss.com
 6
       FOR DEFENDANT BRADLEY GARLINGHOUSE:
 7
            CLEARY GOTTLIEB STEEN & HAMILTON
 8          2112 Pennsylvania Avenue, NW
            Washington, D.C. 20037
 9          BY:  MATTHEW C. SOLOMON, ESQ.
            Telephone: (202) 974-1500
10          Email: msolomon@cgsh.com

11     ALSO PRESENT:

12          ███████████   Ripple in-house counsel
            Madison Butko, Videographer
13
       ZOOM PARTICIPANTS (Via Zoom Videoconference):
14
            Daphna Waxman, ESQ., Securities and Exchange
15              Commission, for the Plaintiff; Jon
                Daniels, ESQ., Nicole Forbes, SEC
16              Paralegal

17          Thomas F. Allen, Esq., Skadden Arps, for the
                witness
18
            Connor J. Ritschard, Esq., Paul, Weiss, Rifkind,
19              Wharton & Garrison LLP, for Christian A.
                Larsen
20
            Maureen Gallagher Mentrek, Esq., Erol Gulay,
21              Esq., Counsel for Ripple, Debevoise &
                Plimpton
22
            Nicole Tatz, Esq., Jackie M. Brune, Esq.,
23              Cleary Gottlieb Steen & Hamilton LLP for
                defendant Bradley Garlinghouse
24
            Eliana M. Pfeffer, Esq., Kellogg, Hansen, Todd,
25              Figel & Frederick, PLLC, for Ripple Labs
```

1                              INDEX

2                     INDEX OF EXAMINATIONS

3    WITNESS:  ANTOINETTE O'GORMAN               PAGE

4    Morning Session                               8
     Examination By Mr. Sylvester                  9
5    Afternoon Session                           196

6                     INDEX OF EXHIBITS

7    EXHIBIT               DESCRIPTION           PAGE

8    Exhibit AO-1     LinkedIn Profile of         18
                      Antoinette O'Gorman
9
     Exhibit AO-2     String of e-mails Bates    129
10                    stamped RPLI_SEC 0221467
                      through RPLI_SEC 0221470
11
     Exhibit AO-3     Email from Antoinette      155
12                    O'Gorman to Patrick
                      Griffin, Bates stamped
13                    RPLI_AOG_00000005 through
                      RPLI_AOG_00000007
14
     Exhibit AO-4     Email from ▮▮▮▮▮ to        164
15                    ▮▮▮▮▮▮ Bates stamped
                      RPLI_SEC 1003530 through
16                    RPLI_SEC 1003531

17   Exhibit AO-5     Email from ▮▮▮▮            170
                      to Chris Larsen, et al.,
18                    with attachment, Bates
                      stamped RPLI_SEC 0223195
19                    through RPLI_SEC 0223225

20   Exhibit AO-7     Email from Antoinette      198
                      O'Gorman to Brad
21                    Garlinghouse, Bates
                      stamped RPLI_SEC 0763544
22                    through RPLI_SEC 0763545

23   Exhibit AO-8     String of e-mails Bates    176
                      stamped RPLI_SEC 0761766
24                    through RPLI_SEC 0761766

25

```
 1                    INDEX OF EXHIBITS (Continued)

 2      EXHIBIT                DESCRIPTION              PAGE

 3      Exhibit AO-9      Document entitled, "A        200
                          Securities Law Framework
 4                        for Blockchain Tokens"
                          (not Bates stamped)
 5
        Exhibit AO-11     Email from Antoinette        205
 6                        O'Gorman to Brad
                          Garlinghouse, Bates
 7                        stamped RPLI_SEC 0270756
                          through RPLI_SEC 0270757
 8
        Exhibit AO-13     Email from Antoinette        211
 9                        O'Gorman to Brad
                          Garlinghouse, Bates
10                        stamped RPLI_SEC 0095683
                          through RPLI_SEC 0095684
11
        Exhibit AO-17     String of e-mails Bates      252
12                        stamped RPLI_SEC 0793645
                          through RPLI_SEC 0793648
13
        Exhibit AO-18     Email from Antoinette        223
14                        O'Gorman to Brad
                          Garlinghouse, Bates
15                        stamped RPLI_SEC 0270740
                          through RPLI_SEC 0270741
16
        Exhibit AO-20     Email from Antoinette        256
17                        O'Gorman to Brad
                          Garlinghouse, Bates
18                        stamped RPLI_SEC 0270747
                          through RPLI_SEC 0270749
19
        Exhibit AO-23     String of e-mails Bates      260
20                        stamped RPLI_SEC 0762228
                          through RPLI_SEC 0762229
21
        Exhibit AO-24     Email from         to        277
22                        Antoinette O'Gorman,
                          Bates stamped RPLI_SEC
23                        1002029

24      Exhibit AO-25     String of e-mails Bates      281
                          stamped RPLI_SEC 0047976
25
```

INDEX OF EXHIBITS (Continued)

| EXHIBIT | DESCRIPTION | PAGE |
|---------|-------------|------|
| Exhibit AO-26 | String of e-mails Bates stamped RPLI_SEC 0624327 through RPLI_SEC 0624332 | 291 |
| Exhibit AO-27 | String of e-mails Bates stamped RPLI_SEC 0033524 through RPLI_SEC 0033530 | 301 |
| Exhibit AO-29 | Email from Antoinette O'Gorman, Bates stamped ████ 0000061 | 312 |
| Exhibit AO-30 | String of e-mails Bates stamped RPLI_AOG_00000001 through RPLI_AOG_00000002 | 325 |
| Exhibit AO-32 | String of e-mails Bates stamped RPLI_SEC 0083483 through RPLI_SEC 0083486 | 332 |
| Exhibit AO-34 | String of e-mails Bates stamped RPLI_SEC 0052598 through RPLI_SEC 0052600 | 340 |
| Exhibit AO-36 | String of e-mails Bates stamped RPLI_SEC 0888154 through RPLI_SEC 0888167 | 347 |
| Exhibit AO-39 | Email from Antoinette O'Gorman to ████ Bates stamped ████ ████ through ████ | 367 |
| Exhibit AO-44 | Memorandum from ████ to Ripple Labs, Bates stamped RPLI_SEC 1002118 through RPLI_SEC 1002129 | 164 |

```
 1   AUGUST 4, 2021                          9:11 A.M.
 2                  P R O C E E D I N G S
 3                     MORNING SESSION
 4           THE VIDEOGRAPHER:  This marks the
 5   beginning of File Number 1 in the deposition of
 6   Antoinette O'Gorman in the matter of SEC versus
 7   Ripple Labs, et al.
 8           This is a matter pending before the United
 9   States District Court, Southern District of New
10   York.  Case Number is 20-civ-10832 (AT)(SN).
11           Today's date is August 4th, 2021.  The
12   time on the video monitor is 9:11 a.m.
13           My name is Madison Butko, contracted by
14   Gradillas Court Reporting.
15           This video deposition is taking place at
16   50 California Street, San Francisco, California.
17           Counsel, will you please identify
18   yourselves for the record and who you represent?
19           MR. SYLVESTER:  This is Mark Sylvester for
20   the plaintiff, the Securities and Exchange
21   Commission.
22           MR. TENREIRO:  Jorge Tenreiro, also for
23   the Securities and Exchange Commission.
24           MR. DRYLEWSKI:  Alex Drylewski from
25   Skadden Arps for the witness.
```

1          MS. MAHONEY:  Colleen Mahoney from Skadden

2     Aarps for the witness.

3          MS. ZORNBERG:  Lisa Zornberg from

4     Debevoise & Plimpton on behalf of Ripple Labs.

5          MS. HAHN:  Ashley Hahn of

6     Debevoise & Plimpton on behalf of Ripple Labs.

7          MS. DEARBORN:  Meredith Dearborn, Paul

8     Weiss, for defendant Christian Larsen.

9          MR. SOLOMON:  Matthew Solomon, Cleary

10    Gottlieb, for Bradley Garlinghouse.

11          ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ for Ripple.

12          THE VIDEOGRAPHER:  Will the court reporter

13    please swear in the witness.

14                 ANTOINETTE O'GORMAN,

15              having been duly sworn,

16         was examined and testified as follows:

17          THE VIDEOGRAPHER:  You may proceed.

18                    EXAMINATION

19    BY MR. SYLVESTER:

20         Q.  Good morning, Ms. O'Gorman.

21         A.  Hello.

22         Q.  Please state your name for the record.

23         A.  Antoinette O'Gorman.

24         Q.  And are you represented by counsel here

25    today?

1        A.    I am.

2        Q.    Who is your counsel?

3        A.    Skadden.  Alex and Colleen here.

4        Q.    As you just heard, I'm Mark Sylvester on

5    behalf of the plaintiff, the SEC, here with my

6    colleague Jorge Tenreiro.  A few of my other

7    colleagues are listening in remotely.

8              MR. SYLVESTER:  Anything that counsel for

9    the witness or defendants, stipulations you want to

10   put on the record before we get started?

11             MS. ZORNBERG:  Yes.  Thank you.

12             On behalf of all defendants, we designate

13   the transcript of this deposition as "Confidential."

14   And then Ms. O'Gorman and her counsel and the other

15   defendants may elect to designate certain portions

16   as "Highly Confidential" sometime after the

17   deposition.

18             Also, I'd like to put on the record that

19   any objection made by Ms. O'Gorman's video counsel

20   or by counsel for any of the three defendants in the

21   case will preserve the objection on behalf of all

22   for efficiency so we don't have to replicate

23   objections.

24             MR. SYLVESTER:  Okay.  Thank you.

25        Q.    Ms. O'Gorman, have you ever given

1   testimony before?

2       A.   Never, no.

3       Q.   You've just given an oath to tell the

4   truth, and that's the same oath you would give in

5   court.  Even though we're here in a conference, you

6   are obligated to tell the truth today.

7           Do you understand?

8       A.   I do.

9       Q.   Is there anything at all that might

10  prevent you from being able to answer my questions

11  fully and truthfully today?

12      A.   I don't know what you mean by "anything,"

13  but I would imagine that I would be able to tell the

14  whole truth and nothing but the truth so help me

15  God.

16      Q.   Excellent.

17          Is there anything you can think of that

18  would impair your ability to tell us -- strike that.

19          Is there anything that you can think of

20  that would impair your ability to answer my

21  questions today?

22      A.   I don't believe so, but I suppose I should

23  tell you that ███████████████████████████████████

24  ████████████████████████████████████████████

25  ████████████████████████████████  But other than

1    that, no.

2         Q.   Do you believe that ████████████████

3    ████████████   will impair your ability to fully and

4    accurately answer my questions?

5         A.   I don't believe so, ████████████████

6    ██████████

7              MR. SYLVESTER:  Off the record, please.

8              THE VIDEOGRAPHER:  Okay.  We're off the

9    record at 9:15 a.m.

10             (Whereupon, a recess was taken.)

11             THE VIDEOGRAPHER:  This is the beginning

12   of File Number 2.

13             We're back on the record at 9:17 a.m.

14   BY MR. SYLVESTER:

15        Q.   Okay.  So back to the rules of the road.

16             It's important that the court reporter be

17   able to take down everything I say and everything

18   that you say.

19        A.   Yeah.

20        Q.   So to the best of our ability, I'll try

21   not to speak over you, and you try not to speak over

22   me.  Okay?

23        A.   Okay.

24        Q.   For the record, you have to give verbal

25   answers, so something more than a head nod or a head

```
1    shake.  Okay?
2         A.   Yeah.  Okay.
3         Q.   In answering my questions, please do not
4    tell me the substance of any conversations you've
5    had with counsel.
6              Do you understand?
7         A.   I do.
8         Q.   Okay.  Did you take any steps to prepare
9    for today's deposition?
10        A.   I did.
11        Q.   What steps did you take?
12        A.   I met with my counsel here, Skadden, Alex
13   and Colleen, on a number of occasions, and also met
14   with Debevoise & Plimpton on two occasions.
15        Q.   In total, about how much time did you
16   spend in preparing for today's deposition?
17        A.   I couldn't say exactly.
18        Q.   Was it a matter of hours?
19        A.   As opposed to?
20        Q.   Minutes.
21        A.   Oh, yeah.  Surely, yes.
22        Q.   More or less than ten hours?
23        A.   Couldn't say exactly.
24        Q.   More or less than five hours?
25        A.   I couldn't say, but yeah, more than five,
```

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

```
 1    surely.

 2         Q.   Ms. O'Gorman, you're familiar with

 3    Ripple Labs, one of the defendants in this case?

 4         A.   I am.

 5         Q.   You were Ripple's CCO for a time?

 6         A.   I was.

 7         Q.   And when I say, "CCO," you know I mean the

 8    chief compliance officer?

 9         A.   I do.

10         Q.   Great.

11              You're familiar with the term "digital

12    asset"?

13              MS. ZORNBERG:  Objection.  Form.

14              MR. DRYLEWSKI:  Objection.  Form.

15              THE WITNESS:  I would hope so, yeah.

16    BY MR. SYLVESTER:

17         Q.   Are you familiar with the term "XRP"?

18         A.   For sure.

19         Q.   XRP is a digit asset, correct?

20              MR. DRYLEWSKI:  Objection to form.

21              THE WITNESS:  It depends on which -- it

22    depends on how you want to categorize it, but a

23    digital asset is any form of something that has been

24    digitized, yeah.

25    / /
```

1   BY MR. SYLVESTER:

2       Q.   What's the highest level of education

3   you've completed?

4       A.   To postgrad.

5       Q.   I'm sorry, say that again?

6       A.   Postgrad.

7       Q.   Postgrad?

8       A.   Yeah.

9       Q.   What's your postgraduate degree in?

10      A.   In business administration.

11      Q.   And you have an undergrad degree as well?

12      A.   I do.

13      Q.   What's your undergraduate degree in?

14      A.   Bachelor of arts in languages,

15  specifically.

16      Q.   Are you a lawyer?

17      A.   No, I am not a lawyer.

18      Q.   Have you ever been a lawyer?

19      A.   Never, ever.

20      Q.   Have you ever gone to law school?

21      A.   Never, ever.

22      Q.   Prior to joining Ripple, did you do any

23  work related to digital assets?

24          MR. DRYLEWSKI:  Objection to form.

25          You can answer if you can.

1           THE WITNESS:  No.

2    BY MR. SYLVESTER:

3        Q.   Did you ever serve as a CCO anywhere

4    before Ripple?

5        A.   No.

6        Q.   In any of your jobs prior to joining

7    Ripple, did you ever have any responsibilities

8    involving compliance with the U.S. securities laws?

9        A.   No.

10           MR. DRYLEWSKI:  Objection to form.

11           Just give a pause after the question, give

12    me a chance to interject with any objections, and

13    make sure you don't start your answer before he

14    finishes his question so we have a clear record.

15           THE WITNESS:  No.

16    BY MR. SYLVESTER:

17        Q.   Are you employed now?

18        A.   No.

19        Q.   When did you leave your last employer?

20        A.   June 1st, 2021.

21        Q.   Who was your last employer?

22        A.   ▆▆▆▆▆▆▆▆▆▆

23        Q.   What kind of a business is ▆▆▆▆▆▆▆▆?

24        A.   ▆▆▆▆▆▆▆▆ is a fintech technology

25    software provider.  It also has a subsidiary that is

1    a bank, custodial bank, de novo bank, under --

2               (Reporter clarification.)

3               THE WITNESS:  -- New York DFS, Department

4    of Financial Services.

5    BY MR. SYLVESTER:

6        Q.  Is there any relationship between ▮▮▮▮

7    and Ripple?

8               MR. DRYLEWSKI:  Objection to form.

9               THE WITNESS:  There is, yes.

10   BY MR. SYLVESTER:

11       Q.  What's that relationship?

12       A.  The founder of ▮▮▮▮▮ was one of

13   the cofounders of Ripple Labs initially.

14       Q.  How did you get the job at ▮▮▮▮

15       A.  One of the cofounders I mentioned, ▮▮▮▮

16   ▮▮▮▮ once he understood that I was leaving

17   Ripple, asked me would I join ▮▮▮▮

18       Q.  What were your duties at ▮▮▮▮

19       A.  Similar to those at Ripple.

20       Q.  Why did you leave?

21       A.  Which company?

22       Q.  ▮▮▮▮

23              MR. DRYLEWSKI:  Objection to form.

24              You can answer.

25              THE WITNESS:  I wanted to expand my career

1    further.

2    BY MR. SYLVESTER:

3        Q.   You mentioned that your duties at ███████

4    were similar to those at Ripple?

5        A.   I was -- yeah -- chief compliance officer.

6        Q.   Did you have any duties at █████████ that

7    had anything to do with compliance with the U.S.

8    securities laws?

9        A.   None.

10       Q.   Did you have any duties at ███████ that

11   had anything to do with the SEC?

12           MR. DRYLEWSKI:  Objection to form.

13           MS. ZORNBERG:  Objection.

14           THE WITNESS:  Yeah, I mean, if you want to

15   ask me that question, could you explain what you

16   mean?  Had anything to do with the SEC?

17           I mean, there are many topics that we

18   covered, so if you could be more specific, that

19   would be helpful.

20   BY MR. SYLVESTER:

21       Q.   Sure.

22           MR. SYLVESTER:  Let's look at Exhibit 1,

23   please.

24               (Whereupon, Deposition Exhibit AO-1

25               was marked for identification.)

1           MR. TENREIRO:  Shall I start here and ask

2   people to pass down?

3           MR. DRYLEWSKI:  That works.

4           MR. TENREIRO:  I'm going to keep one for

5   you.

6           Do you have enough for Kat?

7           MR. SYLVESTER:  I think we have eight

8   copies.

9           MR. TENREIRO:  One, two, three, four,

10  five, six, seven, eight.

11          You can share it down there.

12          MR. DRYLEWSKI:  Ms. O'Gorman, feel free to

13  take your time to review the entire document before

14  answering any questions about it.

15  BY MR. SYLVESTER:

16      Q.   Ms. O'Gorman, this is Exhibit AO1.  I'll

17  represent to you that Exhibit AO1 was obtained by

18  accessing your public LinkedIn profile.

19      A.   Okay.

20      Q.   Does this look familiar to you?

21      A.   Yes.

22      Q.   Did you supply the information in this

23  profile?

24          MR. DRYLEWSKI:  Again, feel free to

25  familiarize yourself with the entire document before

1   answering.

2          THE WITNESS:  The question was, did I

3   write this profile of myself on LinkedIn?

4   BY MR. SYLVESTER:

5          Q.  The question was, did you supply the

6   information?

7          A.  I did, yes.

8          Q.  Is the information in your LinkedIn

9   profile accurate?

10          A.  Yes, it appears to be on page 3 to 4 to 5,

11   and pages 1 and 2 I did not write, of course.

12          Q.  Right.  And just for the record, pages 1

13   and 2 appear to be links or photos?

14          A.  It looks like it's linked articles linked

15   by me, AOG.

16          Q.  Taking a look at the entry for chief

17   compliance officer for ▮▮▮▮▮▮▮  I'd like to direct

18   you to the last paragraph.  It reads:

19                "Advisor on FinCEN, NYDFS,

20          SEC, CFTC, and global regulatory

21          matters."

22          My question is, what did you advise on

23   pertaining to the SEC?

24          MR. DRYLEWSKI:  Objection to form.

25          THE WITNESS:  And just to be very clear

1    here, we're talking about ███████ in this instance,

2    which is the company that I had just left.

3    BY MR. SYLVESTER:

4        Q.    That's correct.

5        A.    Advising on whether or not certain

6    characteristics would require the company or any

7    subsidiary of the company to register with the SEC

8    for any matter.

9        Q.    To register with the SEC in what capacity?

10       A.    Potentially if we were introducing a new

11   token, potentially for following the guidance that

12   was issued by the SEC in 2018, the framework for

13   digital currencies or tokens, just to be a

14   touchpoint on that matter, including all other

15   regulators here in the U.S. and globally.

16       Q.    While you were at ███████ you examined

17   the framework that the SEC issued in 2018 regarding

18   digital assets; is that right?

19       A.    That is true.

20       Q.    And you examined that framework for the

21   purposes of applying it to a potential digital asset

22   offering by ███████ is that right?

23            MR. DRYLEWSKI:  Objection to form.

24            THE WITNESS:  That is not correct.  That

25   is not an accurate statement.

1           I looked at it because I was chief
2     compliance officer at Ripple at the time, but, also,
3     I would like to be very clear and categorically
4     state that I am not a lawyer, and so my analysis was
5     my own personal analysis of any regulation that
6     might be forthcoming or the guidance provided by
7     regulators either in the U.S. or globally.
8           MR. DRYLEWSKI:  Mark, just so we're clear
9     on the record, I think she said, "Ripple."  I'm not
10    sure if you meant █████████.
11          THE WITNESS:  I meant Ripple because it
12    came out in 2018.  I'm not quite sure of the date in
13    2018, but I was very --
14          MR. DRYLEWSKI:  The question here was
15    about █████████.
16          THE WITNESS:  Oh,  ████████  Oh, yeah, of
17    course I did.
18          As chief compliance officer, you have to
19    be aware of every forthcoming guidance or every
20    guidance that was issued or may be potential
21    regulation that may be forthcoming.  In order to
22    prepare for that, you have to comply.
23    BY MR. SYLVESTER:
24        Q.   Is what you just said regarding the
25    necessity as chief compliance officer of being aware

1    of specifically SEC guidance, is that true of your

2    time at ███████ and Ripple?

3        A.    I -- I --

4              MS. ZORNBERG:  Object to form.

5              MR. DRYLEWSKI:  Objection to form.

6              THE WITNESS:  I didn't say specifically

7    the SEC.  Any guidance from any regulator from any

8    jurisdiction, when it came to cryptocurrency, which

9    is global in nature.

10             So yeah, you have to be on your game, the

11   top of your game.

12   BY MR. SYLVESTER:

13       Q.    Would that guidance that you just

14   referenced in your answer include guidance from the

15   SEC?

16       A.    Of course.

17       Q.    So the record is clear, we're talking both

18   your time as CCO of Ripple and your time as CCO for

19   ███████?

20             MR. DRYLEWSKI:  Objection to form.

21             THE WITNESS:  Yes.

22             MR. DRYLEWSKI:  Just give it a pause.

23   It's fine.

24   BY MR. SYLVESTER:

25       Q.    Did ███████ ever offer a digital asset

1   while you were CCO?

2            MR. DRYLEWSKI:  Objection to form.

3            THE WITNESS:  No.

4   BY MR. SYLVESTER:

5        Q.   Now, going back to the period prior to

6   when you joined Ripple --

7            MS. MAHONEY:  Prior to when she joined

8   Ripple?

9            MR. SYLVESTER:  Correct.

10       Q.   -- did you know anything about the U.S.

11  securities laws?

12       A.   No.

13       Q.   Prior to joining Ripple, had you ever read

14  anything on the topic of the U.S. securities laws?

15       A.   No.

16       Q.   Prior to joining Ripple, did you have an

17  understanding that the sales of digital assets could

18  be sales of securities under U.S. law?

19            MR. DRYLEWSKI:  Objection to form.

20            THE WITNESS:  No.

21  BY MR. SYLVESTER:

22       Q.   Prior to joining Ripple, had you ever

23  spoken with anyone on the topic of how the U.S.

24  securities laws might apply to digital assets?

25       A.   No.

1           MR. DRYLEWSKI:  Objection to form.

2     BY MR. SYLVESTER:

3           Q.   Prior to joining Ripple, had you ever

4     heard of the Howey test?

5           A.   I may have.

6           Q.   What was your understanding, if any, of

7     the Howey test prior to joining Ripple?

8           MR. DRYLEWSKI:  Objection to form.  Calls

9     for a legal conclusion.

10          THE WITNESS:  It's a long time ago.  I

11    couldn't say prior to Ripple.

12    BY MR. SYLVESTER:

13          Q.   You couldn't say because you don't recall;

14    is that right?

15          A.   That's exactly right, yeah.

16          Q.   Prior to joining Ripple, did you ever

17    discuss with anyone whether XRP might be a security?

18          MR. DRYLEWSKI:  Objection to form.

19          THE WITNESS:  No.

20    BY MR. SYLVESTER:

21          Q.   Prior to joining Ripple, did you take any

22    steps to determine whether XRP might be a security?

23          MR. DRYLEWSKI:  Objection to form.

24          THE WITNESS:  No.

25    / /

1    BY MR. SYLVESTER:

2        Q.   Prior to joining Ripple, had you ever

3    considered whether XRP might be a security?

4        A.   No.

5            MR. DRYLEWSKI:  Objection to form.

6    BY MR. SYLVESTER:

7        Q.   You worked at Ripple from February 2015 to

8    May 2018; is that right?

9        A.   That is correct.

10       Q.   Okay.  How did you get the job at Ripple?

11       A.   So I had been working with a group -- a

12   consulting group called ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

13   that was associated with doing the risk and

14   compliance work for banks and other financial

15   institutions under various enforcement actions.

16           I was an independent consultant and did a

17   very short stint at Ripple in 2014 to help them

18   develop a transaction monitoring program in that

19   capacity.

20       Q.   You were a consultant to Ripple in 2014?

21       A.   I was a -- an independent consultant with

22   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ and they had an

23   engagement with Ripple at that time.

24       Q.   And did you have a role in that

25   engagement?

1       A.   I did.  I helped them develop the

2   transaction monitoring system, or the overarching

3   guidelines towards developing that in Q4 2014.

4       Q.   The transaction monitoring system that you

5   helped Ripple develop, transactions in what?

6       A.   The funds transfers.

7       Q.   In U.S. dollars, XRP, or something else?

8       A.   In -- in any -- in any denomination, fiat

9   or otherwise, yeah.

10       Q.   Including XRP?

11       A.   Yes, including any crypto digital asset.

12       Q.   You mentioned you were a consultant.

13           How did it come to be that you joined

14   Ripple?

15       A.   I think they might have been impressed

16   based on that engagement, I don't know, but a number

17   of months later, I received an email from ███████

18   ███████    at the time chief compliance officer at

19   Ripple, asking me if I would like to join the

20   company.

21       Q.   Was your engagement in 2014 as a

22   consultant to Ripple through ███████    the first

23   time you heard of XRP?

24       A.   Yes.

25       Q.   Okay.  And what, if anything, did you

1  learn about XRP as part of that consulting

2  engagement?

3          MR. DRYLEWSKI:  Objection to form.

4          And I'm going to instruct the witness not

5  to answer to the extent you're divulging any

6  communications that you had with any lawyers.

7          THE WITNESS:  Could you repeat the

8  question, please?

9  BY MR. SYLVESTER:

10     Q.   What, if anything, did you learn about XRP

11  as part of your consulting role with Ripple in 2014?

12          MR. DRYLEWSKI:  Same instruction.

13          THE WITNESS:  Yeah.  I find that hard to

14  recall.  There was so much to learn about blockchain

15  technology more broadly that I can't say how XRP

16  figured into that.

17  BY MR. SYLVESTER:

18     Q.   Did you have a conversation with

19  Ms. ██████ about XRP as part of your onboarding

20  process?

21     A.   I don't believe so.

22     Q.   Did you have a conversation with anyone at

23  Ripple about XRP as part of your onboarding process

24  at Ripple?

25          MR. DRYLEWSKI:  Same instruction I gave

1    before, exclude from your answer any communications

2    with lawyers.

3              THE WITNESS:  I -- I'm sure I did because

4    XRP was --                              so I must have

5    had discussions about XRP.  But to -- to what extent

6    or in what capacity, I don't particularly recall.

7              But if you could be more specific in your

8    questioning, maybe I could answer.

9    BY MR. SYLVESTER:

10       Q.                                      in

11   connection with your consulting work?

12       A.    No.

13       Q.                                  in connection

14   with your work at Ripple?

15             MS. ZORNBERG:  Object to form.

16             THE WITNESS:  In connection with my

17   agreeing to take on the position, yes.

18   BY MR. SYLVESTER:

19       Q.

20       A.    Yeah, I guess you could call it that.

21             MR. DRYLEWSKI:  Objection to form.

22             THE WITNESS:  Sorry.

23   BY MR. SYLVESTER:

24       Q.

25

1     A.                   I can only give you the

2  fiat amount.  I can't give you the XRP amount

3  because it went up and down.

4  time.

5     Q.

6     A.   I did.

7     Q.   When?

8     A.   I believe         - hmm -- 20 -- I

9  can't say for sure, but maybe 2019, 2020.  I'm not

10  100 percent sure when.

11          MR. DRYLEWSKI:  He's not asking you to

12  guess.

13          THE WITNESS:  Okay, yeah.

14  BY MR. SYLVESTER:

15     Q.   After you left Ripple?

16     A.   Oh, yeah.  Long since.

17     Q.   As part of your consulting role with

18            this engagement with Ripple, is that

19  where you learned that Ripple sold XRP?

20          MS. ZORNBERG:  Object to form.

21          MR. DRYLEWSKI:  Objection to form.

22          THE WITNESS:  That's a very, very

23  complicated and complex question.  It's not as cut

24  and dried as that.

25          I learned about XRP during that period of

```
 1    time, but I was there for a specific engagement,
 2    which was to develop a transaction monitoring
 3    system, and for a very specific period of time.
 4          So, you know, learning the ins and outs of
 5    anything during that period of time would have been
 6    secondary to my purpose, consulting at the time, so
 7    do you want to be more specific?
 8    BY MR. SYLVESTER:
 9       Q.   Was one of the transactions that your
10    system was monitoring Ripple's sales of XRP?
11       A.   No.
12       Q.   At what point in time did you learn that
13    Ripple sold XRP?
14       A.   Upon my engagement or employment at
15    Ripple, within months thereafter, obviously, the
16    ramp-up period.
17       Q.   How did you learn that?
18          MR. DRYLEWSKI:  I'm going to instruct the
19    witness not to answer to the extent it divulges the
20    substance of any communications you had with
21    Ripple's lawyers, inside or outside.
22          THE WITNESS:  Okay.
23          How did I learn what exactly?
24    BY MR. SYLVESTER:
25       Q.   How did you come to learn that Ripple sold
```

1  XRP?

2  　　　　　MR. DRYLEWSKI:  Same instruction.

3  　　　　　THE WITNESS:  Yeah.  So as a BSA officer

4  and subsequent CCO, chief compliance officer, at

5  Ripple, of course, I needed to understand the

6  business inside and out, so it would have been

7  within a period of time after my employment at

8  Ripple.

9  BY MR. SYLVESTER:

10 　　　　Q.  You said, as chief compliance officer, you

11 needed to know the business of Ripple inside and

12 out; is that right?

13 　　　　A.  I said, as BSA officer, which is what I

14 was first employed as when I first went to Ripple.

15 I was BSA officer until a period of time thereafter,

16 subsequently chief compliance officer.

17 　　　　Q.  Understood.  Thanks for the correction.

18 　　　　　About how long were you Ripple's BSA

19 officer?

20 　　　　A.  Appointed BSA officer from February 2nd,

21 2015 until -- I can't say exactly, but I would say

22 June 2015, generally.

23 　　　　Q.  When you were BSA officer, to whom did you

24 report?

25 　　　　A.  Karen Gifford, who was chief compliance

1    officer at the time.

2        Q.    Did Ms. ████████ leave that role?

3        A.    She did.

4        Q.    And you assumed her role?

5        A.    I did.

6        Q.    When you assumed the role of CCO at Ripple

7    around June 2015, to whom did you report?

8        A.    Chris Larsen.

9        Q.    For how long did you report to

10   Chris Larsen?

11       A.    Until Brad Garlinghouse assumed the CEO

12   role in 2016.

13       Q.    After Mr. Garlinghouse assumed the CEO

14   role in 2016, did you begin to report to

15   Mr. Garlinghouse?

16       A.    "Begin" is probably not the right word.

17             I had had weekly meetings with Brad up

18   until that point, but certainly, after he assumed

19   the CEO role, we were certainly -- I had weekly

20   meetings with Brad as CEO.  But I had had them prior

21   while he was COO.

22       Q.    When did your weekly meetings with

23   Mr. Garlinghouse begin?

24       A.    I would say probably from the -- his

25   employment, which was, I believe, four months after

1    my employment.  I made it a point to meet with him

2    on a weekly basis at my instigation.

3         Q.   Why did you instigate those weekly

4    appointments?

5         A.   I felt it was important to meet with all

6    members of the leadership team.  And he was coming

7    in as the COO of a financial-related fintech

8    technology software provider company, and I felt

9    that it was important that he and I communicate on a

10   regular basis.

11        Q.   Other than Ms. ███████  Mr. Larsen and

12   Mr. Garlinghouse, during your time at Ripple, did

13   you report to anyone else?

14        A.   No.

15             MR. DRYLEWSKI:  Objection to form.

16             THE WITNESS:  No, I did not.

17   BY MR. SYLVESTER:

18        Q.   From June 15th to the time that you left

19   Ripple, you were Ripple's CCO?

20        A.   Approximately.  I can't say exactly when

21   in June, but yes.

22        Q.   And CCO is a senior executive position at

23   Ripple?

24        A.   It was, yes.

25        Q.   What were your duties as CCO at Ripple?

1        A.    So yes, I had a number of duties on

2    distinct lines, I would say the three pillars, of

3    what I was responsible for.

4            Number one, building up the BSA officer

5    sanctions team, which included, let's just say,

6    FCPA, UK Bribery Act, that type of thing.  So being

7    responsible for that because XRP II, which was a

8    subsidiary, sold XRP, and it was a financial

9    institution regulated by New York DFS, Department of

10   Financial Institutions.  That was one pillar.

11           The second pillar was I headed global

12   regulatory relations, which was another function

13   that rolled up to me.

14           The third function was general compliance

15   matters, which included, as you can imagine -- and

16   if you want to ask me more questions, you can --

17   anything to do with compliance more broadly, things

18   like, you know, looking over cybersecurity, working

19   with product and engineering teams on how to build

20   out products that would be compliant globally with

21   payments regulation, and that type of thing.

22       Q.    What were your duties as head of global

23   regulatory relations?

24       A.    I headed the function.  It reported into

25   me.

1     Q.    What did you do in that capacity?

2           MR. DRYLEWSKI:  Objection to form.

3           THE WITNESS:  So in that capacity, I would

4     have met with regulators, talked about Ripple.  At

5     that time, and particularly initially, it was very

6     early days in crypto and blockchain technology, so

7     it was very educational to a large extent,

8     initially.

9           So to educate them on blockchain

10    technology, educate them on cryptocurrencies,

11    virtual currencies, digital assets, and whatever you

12    want to call it.

13          As regulators, they were very eager to

14    learn more about the technology at the time, very,

15    very different from anything they have been used to

16    in financial regulation up to that point in time.

17    BY MR. SYLVESTER:

18    Q.    Which regulators did you meet with?

19          MR. DRYLEWSKI:  Objection to form.

20          At any time?

21    BY MR. SYLVESTER:

22    Q.    During your tenure as head of global

23    regulatory relations.

24    A.    Oh, there were many.  Many, many.

25          I will give you an example of the

1    regulators that I met with, but it's not an

2    exhaustive list because there were so many.

3            I met with the FCA in the UK.  I met with

4    the FSA in Japan.  I met with the FDIC in the U.S.

5    I met with the CFTC.  I met with the Fed.  I met

6    with other bodies including the IMF, the ECB,

7    European Central Bank, International Monetary Fund

8    to be exact, many, many regulators.

9        Q.   And just to give the court reporter a

10   little bit of a break, just slow down a little bit

11   when you're talking, especially when you're talking

12   acronyms.

13       A.   Yeah, the International Monetary Fund,

14   IMF; ECB, European Central Bank.  FCA was the

15   Financial Conduct Authority in the UK.  FSA was the

16   Financial Services Authority in Japan.  Et cetera.

17           I am not giving you an exhaustive list.

18   These are just many of the regulators we met with.

19       Q.   These are the ones that you recall today?

20       A.   No.  There are others.

21           Do you want me to really go through?

22       Q.   Yeah.

23       A.   It's going to take me a long time to

24   remember every single one of them.  There were many.

25           All I'm saying is it was a new area of

1    innovation at the time, and so regulators globally

2    were very, very interested in learning a lot more.

3    Many of them came to our officers since the meetings

4    were at their requests to learn more about

5    blockchain technology and virtual assets or

6    convertible virtual currency, or however you want to

7    categorize it.  Let's just say digital assets.

8         Q.   Did you personally ever meet with the SEC?

9         A.   Never, no.

10        Q.   Did you ever ask the SEC for a meeting?

11        A.   No.

12        Q.   Why not?

13        MR. DRYLEWSKI:  Objection to form.

14        I'm going to instruct you not to answer to

15    the extent that divulges the substance of any

16    communications you had with any of Ripple's lawyers,

17    inside counsel or outside counsel.

18        THE WITNESS:  Mh-hmm.

19        MS. ZORNBERG:  And so the record is clear,

20    Ripple makes that same objection.  And so be very

21    careful in answering.

22        And if you are unsure or you need a break

23    and you need to talk to Ripple counsel or your own

24    counsel, we can do that.

25        THE WITNESS:  Yeah.  Those discussions

1    would have involved legal, so I decline to answer

2    that question.

3    BY MR. SYLVESTER:

4        Q.   We talked about the three pillars of your

5    duties as CCO --

6        A.   Broad pillars, yes.

7            MR. DRYLEWSKI:  Let him finish the

8    question before you give an answer for the record.

9    BY MR. SYLVESTER:

10       Q.   Did -- were those three pillars your

11   responsibilities throughout your time as CCO or did

12   your duties vary over time?

13       A.   You'd have to be more specific.  When you

14   say, "vary," I don't know what you mean.

15       Q.   Were you always the head of global

16   regulatory relations while you were CCO?

17       A.   Yes.

18       Q.   Other than meeting with regulators, did

19   you have additional duties as the global head of

20   regulatory relations?

21       A.   Yes.  Yeah.  For sure, yeah.

22       Q.   What were those?

23       A.   So meeting with regulators was just one

24   aspect of it.  But it was also -- the broader aspect

25   of that was speaking at conferences and educating

1    parties, mostly regulators more broadly, on what is

2    a blockchain.  What is distributed ledger

3    technology.  What does cryptocurrency mean.  What is

4    digital assets.

5           It was far more nuanced than just meeting

6    with them.  But at the time -- and I, again, will

7    state that this was early 2015 -- the regulators

8    didn't understand to the extent that they do today

9    blockchain technology and virtual currency, digital

10   assets.

11      Q.   Was your role in meeting -- I'm sorry.

12      A.   Yeah.

13      Q.   Was your role in meeting with regulators

14   limited to the 2015 time frame?

15      A.   It was not, no.  It was my entire time as

16   CCO at Ripple.

17      Q.   Prior to meeting with regulators, what, if

18   anything, would you do to prepare for those

19   meetings, generally?

20          MR. DRYLEWSKI:  Objection to form.

21          And, of course, the instruction is, do not

22   divulge any communications with counsel -- with

23   Ripple's counsel, inside or outside.

24          THE WITNESS:  Mh-hmm.

25          To prepare, it was a -- I recall a deck

1    that would be presented to regulators and other

2    parties -- interested parties on blockchain

3    technology, on Ripple specifically, on, you know,

4    digital assets more broadly.

5            It was really at that stage, and even

6    later, educational in nature.

7    BY MR. SYLVESTER:

8        Q.    You mentioned preparing a presentation

9    deck.

10           Would you prepare that deck?

11       A.    It would have been prepared.  I would have

12   had to have reviewed, I presume, drafts at the time,

13   yeah.  But I did not prepare personally it, or

14   those.

15       Q.    Would someone that reported to you have

16   prepared those presentations?

17       A.    Yes.

18       Q.    And you would then review and approve them

19   before they were used in public?

20       A.    More often than not, yes, I would imagine.

21           Did the person who reported to me prepare

22   them?  Yes.

23           Would they have worked with counsel in

24   preparing those decks?  Possibly.  Certainly with

25   the marketing team and others at Ripple, yeah.

```
 1          Q.    Other than having any
 2    conversation -- strike that.
 3              Other than conversations you may have had
 4    with counsel, what, if anything, did you do to
 5    familiarize yourself with the relevant laws or
 6    regulations prior to meeting with regulators?
 7              MR. DRYLEWSKI:  Objection to form.
 8              And exclude from your answer any
 9    discussions that you had with Ripple's counsel and
10    exclude any activities that you did at the direction
11    of Ripple's counsel.
12              THE WITNESS:  Okay.
13              Can you repeat the question, please?
14    BY MR. SYLVESTER:
15          Q.    Other than conversations you may have had
16    with counsel, what, if anything, did you do to
17    familiarize yourself with the relevant laws or
18    regulations prior to meeting with regulators?
19              MR. DRYLEWSKI:  Same instruction to you.
20              THE WITNESS:  Thank you.
21              Other than my capacity as chief compliance
22    officer, there would have been nothing further that
23    I would have done.  But, obviously, as chief
24    compliance officer, I would have made it my business
25    to understand any pending -- any guidance, any
```

1    pending regulation, any guidance forthcoming or in

2    existence.

3    BY MR. SYLVESTER:

4        Q.   When you say, "guidance," what does

5    "guidance" mean in that sentence?

6        A.   "Guidance" means -- and I'll be very

7    specific here -- FinCEN issued guidance in 2013.  It

8    was guidance.  It was not a regulation.  It was not

9    law.  But it became absolutely fundamental to what

10   FinCEN governed at that time.

11            So it was called "guidance," and it's

12   still called "guidance."  It has not been enacted

13   into law.  So guidance was the issuances by

14   regulators that pertained to anything that might

15   have fallen under any purview at the time.

16       Q.   As CCO of Ripple, did you view it as part

17   of your job to keep up-to-date with regulators'

18   guidance?

19       A.   Most --

20            MR. DRYLEWSKI:  Objection to form.

21            THE WITNESS:  Most certainly, yes.

22   BY MR. SYLVESTER:

23       Q.   And does that include the SEC?

24            MR. DRYLEWSKI:  Objection to form.

25            THE WITNESS:  Are you saying would that

1    have included?

2    BY MR. SYLVESTER:

3        Q.   Did it.

4            MS. ZORNBERG:  Object to form.

5            THE WITNESS:  It would have included, yes.

6    BY MR. SYLVESTER:

7        Q.   Do you, sitting here today, have any

8    recollection, apart from counsel, of doing anything

9    to keep yourself up-to-date with SEC guidance while

10   you were Ripple's CEO -- COO?

11           MR. DRYLEWSKI:  Objection to form.

12           And instruct the witness not to answer to

13   the extent it will divulge any communications with

14   Ripple's counsel or activities that you undertook at

15   the direction of Ripple's counsel.

16           THE WITNESS:  Okay.  Could you repeat the

17   question, please?

18   BY MR. SYLVESTER:

19       Q.   Apart from any conversations that you had

20   with counsel, do you, sitting here today, have any

21   recollection of doing anything to keep yourself

22   up-to-date with SEC guidance while you were Ripple's

23   CCO?

24           MR. DRYLEWSKI:  Same objection.

25           Same instruction.

1             MS. ZORNBERG:  I'll also add an objection

2    to the term "SEC guidance," which is vague and

3    ambiguous.  It was nonexistent.

4             MR. SYLVESTER:  Okay.  Counsel, please

5    don't testify.

6             THE WITNESS:  That was exactly what I was

7    going to say.  There was no guidance issued from the

8    SEC at the time.

9             But it was my practice to make sure that I

10    was current with anything that had been issued by

11    any regulator at the time in association with

12    blockchain technology or digital assets, or crypto

13    more broadly, yes.

14             It was something I was -- although I'm not

15    a lawyer, it was something that was important for me

16    to understand and feel that I needed to understand

17    personally.

18             So yes, I would have associated myself or

19    have been -- read any guidance, had it been issued,

20    by any regulator during that time.

21    BY MR. SYLVESTER:

22      Q.  Setting aside conversations you may have

23    had with counsel and setting aside the term

24    "guidance," that category of documents --

25      A.  Okay.

1          Q.    -- was there anything that you can recall

2     doing at Ripple to educate yourself on how the SEC

3     viewed digital assets under the securities laws?

4               MR. DRYLEWSKI:  Object to form.

5               Instruct the witness not to answer to the

6     extent it would divulge the substance of any

7     communications you had with Ripple's counsel or any

8     activities you undertook at the direction of

9     Ripple's counsel.

10               MR. TENREIRO:  So since we've had that

11     instruction four times, I'd like to get a full

12     record on that.

13               So you're saying if a lawyer told her, you

14     know, read Howey, and she just reads Howey without

15     the lawyer, she just reads --

16               MS. ZORNBERG:  Hold on one moment.

17               There's supposed to be one speaker for the

18     SEC at the deposition.  Is it your intention,

19     Mr. Tenreiro, to jump in -- or I think Mr. Sylvester

20     should be the speaker for the SEC.

21               MR. TENREIRO:  I'm not asking her any

22     questions, Lisa, I'm just asking for a clarification

23     on the privilege assertion, which we've done at

24     other depositions.

25               I mean, you've also stipulated that one

1   objection would be for all parties and several

2   parties object.  So I think it can be a little

3   bit -- we can have a little latitude here as to who

4   is allowed to speak.  Otherwise, if we're going to

5   keep it to one objection, then one person should

6   object.

7              My question is, is the instruction -- I'm

8   not understanding the instruction on things she

9   might have done at the direction of counsel.  I

10  understand the instruction with respect to

11  conversations with counsel.

12             So I just want to be very clear that we

13  understand, if she -- you know, if she walked down

14  the street because a lawyer told her to do that,

15  she's not allowed to tell us that she walked down

16  the street?  That's my question.

17             MS. ZORNBERG:  I'm going to respond first

18  on behalf of the company.

19             There is -- it is valid to assert

20  privilege on a case-by-case, question-by-question

21  basis depending on the facts and circumstances of

22  the situation.

23             There are times that employees do things

24  at that instruction and direction of counsel.  And

25  what they do falls within the ambit of privilege.

1          So I would say let's take it question by

2    question.  But the general notion that she should be

3    careful and if there are things that she did at

4    direction of counsel, she should be alert to the

5    possibility of needing to consider, and the company

6    needing to consider whether that's privileged is

7    appropriate.  And we're happy to take it question by

8    question.

9          MR. TENREIRO:  Thank you.

10          THE WITNESS:  I have completely forgotten

11    the question.

12          MR. SYLVESTER:  Let's ask the court

13    reporter to read it back.

14          Would you mind reading back my last

15    question?

16              (Record read by the reporter

17              as follows:

18              QUESTION:  Setting aside

19              conversations you may have had

20              with counsel and setting aside the

21              term "guidance," that category of

22              documents was there anything that

23              you can recall doing at Ripple to

24              educate yourself on how the SEC

25              viewed digital assets under the

49

```
1              securities laws?)
2              MR. DRYLEWSKI:  Same objection.
3              Same instruction.
4              THE WITNESS:  On how the SEC viewed
5     digital assets, there was nothing forthcoming from
6     the SEC at the time.  So I cannot comment on that
7     particular aspect of the question.
8              But did I review the Howey test and how it
9     might apply?  Yes, I did.
10    BY MR. SYLVESTER:
11         Q.   When did you first review the Howey test?
12         A.   I -- I don't recall specifically when.
13         Q.   Was it within the first year you were at
14    Ripple?
15         A.   I don't know.
16         Q.   Was it within the last year you were at
17    Ripple?
18              MR. DRYLEWSKI:  Objection.  Asked and
19    answered.
20              THE WITNESS:  It was during my tenure at
21    Ripple, and other than that, I can't be specific.  I
22    don't want to be locked down.
23    BY MR. SYLVESTER:
24         Q.   Was there anything that you can recall
25    that prompted you to read the Howey test?
```

1     MR. DRYLEWSKI:  I'm going to object.

2     And I'm going to instruct you not to

3     answer to the extent it reveals or divulges the

4     substance of any communications you had with

5     Ripple's counsel, inside or outside.

6     THE WITNESS:  Can you repeat the question,

7     please.

8     BY MR. SYLVESTER:

9        Q.   Was there anything that you can recall

10    that prompted you to read the Howey test?

11       MR. DRYLEWSKI:  Same instruction.

12       Same objection.

13       THE WITNESS:  Mh-hmm.  To the best of my

14    recollection -- and this may not be exact -- it was

15    an article issued by ▮▮▮▮▮▮▮ in December 2016

16    that talked about Bitcoin would not be considered a

17    security, potentially, by ▮▮▮▮▮▮ and it was

18    brought to my attention by Chris Larsen at the time.

19    BY MR. SYLVESTER:

20       Q.   Mr. Larsen brought to your attention the

21    ▮▮▮▮▮▮ article?

22       A.   He did.

23       Q.   What did Mr. Larsen say about the ▮▮▮

24    ▮▮▮ article to you?

25       A.   He thought it was a very informative

```
 1    article.  It probably was one the first of its kind,

 2    and thought surely XRP would be considered in the

 3    same category as -- and I don't recall the article

 4    specifically, so I'm speaking from my memory here --

 5    that Bitcoin may not be considered a security, and,

 6    you know, surely XRP would not be considered a

 7    security, as well as other cryptocurrencies at the

 8    time, of which there were a few.

 9         Q.   In that conversation, did Mr. Larsen

10    express any view as to why he believed XRP would not

11    be considered a security?

12              MR. DRYLEWSKI:  Objection to form.

13              And I'm going to instruct you not to

14    answer to the extent that Mr. Larsen conveyed to you

15    the substance of any discussions that he had with

16    Ripple's counsel.

17              THE WITNESS:  I don't know what

18    discussions he may have had with Ripple's counsel,

19    but -- so can I answer this question?

20              MR. DRYLEWSKI:  In that case, maybe, Lisa,

21    should we take a break?

22              MS. ZORNBERG:  Yes.

23              MR. DRYLEWSKI:  Why don't we stop for a

24    second and discuss this.

25              MR. SYLVESTER:  Just to be clear, you're
```

1    going to consult with your counsel on the possible

2    privilege objection?

3              MR. DRYLEWSKI:  Privilege.

4              THE WITNESS:  Yes.

5              MR. SYLVESTER:  Okay.  Let's take a break.

6              THE VIDEOGRAPHER:  Off the record at

7    9:58 a.m.

8                   (Whereupon, a recess was taken.)

9              THE VIDEOGRAPHER:  This is the beginning

10   of File Number 3.

11             We're back on the record at 10:08 a.m.

12   BY MR. SYLVESTER:

13        Q.   So perhaps I'll reask the question.

14             In that conversation with Mr. Larsen, did

15   Mr. Larsen express any view as to why he believed

16   XRP would not be considered a security?

17             MR. DRYLEWSKI:  I'll give the same

18   instruction I gave last time.

19             THE WITNESS:  He did not.

20   BY MR. SYLVESTER:

21        Q.   What else, if anything, other than what

22   you've already testified, did Mr. Larsen say about

23   the            article?

24             MR. DRYLEWSKI:  Same instruction.

25             MS. ZORNBERG:  Object to form.

1          THE WITNESS:  I don't recall anything

2     specifically.

3     BY MR. SYLVESTER:

4          Q.   Other than anything we've already

5     discussed today, did any of your duties as CCO touch

6     upon compliance with SEC requirements?

7               MR. DRYLEWSKI:  Objection to form.

8               THE WITNESS:  Apart from what I stated

9     earlier, which was any guidance forthcoming or

10    anything to do with any forthcoming potential

11    regulation in any matter, it was something that I

12    was current on, no.

13    BY MR. SYLVESTER:

14         Q.   As CCO, you also kept yourself up-to-date

15    on current guidance, not just forthcoming guidance,

16    correct?

17         A.   That would be correct, yes.

18         Q.   And current law?

19         A.   I'm not a lawyer, so as it pertained to my

20    role as compliance officer, yes.  But I'm not a

21    lawyer, so ...

22         Q.   You would keep yourself up-to-date on the

23    current rules that applied to Ripple's business; is

24    that fair?

25               MR. DRYLEWSKI:  Objection to form.

1              THE WITNESS:  I think that would be fair,

2    broadly, yes.

3    BY MR. SYLVESTER:

4         Q.   As Ripple's CCO, did you view yourself as

5    having any role with respect to Ripple's compliance

6    with the U.S. securities laws?

7              MR. DRYLEWSKI:  Objection to form.

8              THE WITNESS:  Could you repeat the

9    question, please?  Sorry.

10   BY MR. SYLVESTER:

11        Q.   Sure.

12             As Ripple's CCO, did you view yourself as

13   having any role with respect to Ripple's compliance

14   with the U.S. securities laws?

15             MR. DRYLEWSKI:  Objection.

16             THE WITNESS:  I would say no.

17   BY MR. SYLVESTER:

18        Q.   Who at Ripple had that role?

19        A.   As a matter of course, it would have

20   clearly been legal.

21        Q.   Anyone else in senior management?

22        A.   If you want to interpret legal or law, it

23   would surely have fallen under legal.

24        Q.   As CCO, were there aspects of Ripple's

25   business that you needed to be familiar with in

1    order to do your job well?

2        A.    A very broad statement.  If you could be

3    more specific, I could answer, but broadly, yes, of

4    course.

5        Q.    Well, in your view as CCO, what aspects of

6    Ripple's business did you need to be familiar with

7    to do your job well?

8        A.    Very broad.  Can you be more specific,

9    really?

10       Q.    Sure.

11             Did you need to know how Ripple made

12   revenues?

13       A.    Yes.

14       Q.    How did Ripple make revenues while you

15   were CCO?

16       A.    You probably --

17             MR. DRYLEWSKI:  Objection to form.

18             THE WITNESS:  You probably have to ask the

19   CFO and others more well-versed in that matter than

20   I.

21             I was compliance, meaning compliance with

22   laws and regulations that had been issued and/or

23   being current on what might be forthcoming.

24             Revenue is completely separate, would fall

25   under the finance department.

1    BY MR. SYLVESTER:

2         Q.   I want to make sure I understand your

3    testimony, Ms. O'Gorman.

4              I asked, did you need to know how Ripple

5    made revenues?

6              And you said yes, correct?

7         A.   I didn't need -- sorry.  Thank you for

8    clarifying.

9              I didn't need to know.  It was not part of

10   my job.

11        Q.   Did you know?

12        A.   Broadly.

13        Q.   Broadly --

14        A.   Yeah.

15        Q.   -- how did Ripple make money?

16             MR. DRYLEWSKI:  Objection to form.

17             THE WITNESS:  Are you asking me how did

18   Ripple make money?

19   BY MR. SYLVESTER:

20        Q.   Yes, ma'am.

21        A.   Okay.  A number of different ways.

22             Obviously, Ripple is a financial

23   technology software company and made money as a

24   result of the products that were developed by the

25   company for global payments transactions using

1    blockchain technology.

2         Q.   Is it fair to sum up that answer as Ripple

3    sold software?

4              MR. DRYLEWSKI:  Objection to form.

5              THE WITNESS:  That's -- yeah.  That's

6    very -- I wouldn't say that specifically.  It was

7    more nuanced than that, but yeah, that was one

8    aspect.

9    BY MR. SYLVESTER:

10        Q.   Did Ripple also sell XRP?

11        A.   Yes.

12        Q.   Did you have a sense of how much of

13   Ripple's revenues came from the sales of XRP versus

14   the sales of any other product?

15        A.   I did not.  It was not part of my

16   responsibility.

17   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

18   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

19   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

20   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

21   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

22        Q.   You mentioned earlier, Ms. O'Gorman, that

23   ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

24        A.   Mh-hmm.

25        Q.   Were you ever -- other than that ▮▮▮▮▮▮

58



1

2    A.

3    Q.   When?

4    A.   Maybe 2016, 2017.

5

6

7

8

9

10

11

12

13

14

15   Q.   In total?

16   A.   Yes.

17

18

19

20

21

22

23

24

25   Q.   Approximately how many shares of Ripple

```
1    were you issued in compensation in total?
2
3
4
5
6         Q.    And that's a number of options, not a
7    dollar value?
8         A.    That's the number of options, yeah.
9         Q.    Are you still an owner of those options
10   today?
11        A.    I am an owner of more than -- slightly
12   more than              I purchased -- exercised
13   those options.
14        Q.    Have you ever sold any Ripple options?
15        A.    Yes.
16        Q.    How did you do so?
17        A.    On the secondary market, I sold
18
19        Q.    You sold           of the options that
20   you were issued on the secondary market?
21        A.    Yeah, the shares that I had exercised.  So
22   options exercised, I sold           of those
23   shares.
24        Q.    Thank you.
25              Approximately, when was that?
```

1      A.   Second half of 2018.

2      Q.   Other than the ▮▮▮▮▮▮ in XRP, were

3 you ever compensated in XRP?

4      A.   No.

5      Q.   Have you ever purchased Ripple equity?

6      A.   Meaning did I exercise my options?

7      Q.   Great point.

8            Setting aside exercising your options, did

9 you ever purchase Ripple equity, say, in the

10 secondary market?

11      A.   Oh, yeah.  No.

12      Q.   Have you ever purchased XRP?

13      A.   No.

14      Q. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

15      A. ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

16            Why not?

17            MS. ZORNBERG:  Objection to form.

18            THE WITNESS:  Thank you.

19            Why not?

20            Why would I?

21 BY MR. SYLVESTER:

22      Q.   You testified earlier that you reported to

23 Ms. ▮▮▮▮▮ Mr. Larsen and Mr. Garlinghouse at

24 various times.

25      A.   I did.

1       Q.   Other than those three, who were the

2  Ripple employees that you frequently interacted with

3  during your tenure as CCO?

4        MR. DRYLEWSKI:  Objection to form.

5        THE WITNESS:  I would say the gamut of

6  Ripple employees, many, many of them.  But if you

7  want to be very specific about it, obviously,

8  leadership team members.

9  BY MR. SYLVESTER:

10      Q.   Who are those people?

11      A.   Legal, █████████ Prior to that, ████

12  ████ Patrick Griffin, head of biz dev.  Asheesh

13  Birla, head of product.  Monica Long, head of

14  marketing. ████████████████ head of operations

15  globally. ████████ head of engineering.  It

16  depends on particular time frames, but the head of

17  HR. ████████ head of customer success.

18  ████████ head of sales.

19        There may have been others that I'm not

20  recalling right now, but yeah, everyone on the

21  leadership team.

22      Q.   What duties, if any, as CCO did you have

23  with respect to Ripple's business development

24  activities?

25        MS. ZORNBERG:  Object to form.

1          You can answer, if you can.

2          THE WITNESS:  Okay.

3          I would review potential deals, deals

4    contemplated.

5    BY MR. SYLVESTER:

6      Q.   For what purpose would you review

7    potential deals?

8          MR. DRYLEWSKI:  Objection to form.

9          And instruct you not to answer to the

10   extent it divulges any communications with lawyers.

11         THE WITNESS:  For example -- I'll give an

12   example here -- banks that wanted to join RippleNet

13   compliance would conduct due diligence on those

14   banks to understand was there any enforcement

15   actions against them, was there anything that we

16   would need to be aware of prior to having banks that

17   wanted to license xCurrent software, which is

18   bank-to-bank software.  We would do that type of

19   thing.

20   BY MR. SYLVESTER:

21     Q.   And how about Ripple's marketing

22   activities; what duties, if any, as Ripple's CCO,

23   did you have with respect to Ripple's marketing

24   activities?

25     A.   Informal.

63

1     Q.   I'm sorry?

2     A.   Informal.

3     Q.   You had informal duties?

4     A.   Yes.  It wasn't set in stone.  It wasn't

5  part of my job description.  It wasn't ...

6     Q.   What were some examples of informal duties

7  that you had with respect to marketing?

8     A.   Reviewing maybe certain contemplated

9  announcements or certain contemplated log posts,

10  perhaps.

11        But that was not a formal duty of mine.

12     Q.   When you reviewed certain contemplated

13  announcements, for what purpose did you review

14  those?

15        MR. DRYLEWSKI:  Objection to form.

16        And exclude from your answer the substance

17  of any communications with lawyers, if any.

18        THE WITNESS:  So yes, I decline to answer

19  because a lawyer may have been involved.

20  BY MR. SYLVESTER:

21     Q.   All right.  Setting aside -- let's break

22  that down.

23        Setting aside any occasion where you can

24  recall a lawyer's involvement, I'm not asking about

25  that.

1      A.   Sure.

2      Q.   Can you recall another occasion where you

3    reviewed a contemplated announcement by Ripple?

4           MS. ZORNBERG:  That's a yes-no.

5           MR. DRYLEWSKI:  Yeah.

6           THE WITNESS:  Okay.  Yes.

7    BY MR. SYLVESTER:

8      Q.   Okay.  What was that occasion?

9      A.   Broadly, for language, to make sure

10   language was accurate and precise.

11     Q.   What language?

12     A.   It depended.  I'm saying broadly.  I

13   didn't review every single thing written by

14   marketing.  Let's be very clear on that front.  But

15   perhaps I did on certain occasions.

16     Q.   Of any contemplated announcement that you

17   can recall reviewing, what was the language

18   involved?

19          MR. DRYLEWSKI:  Object to form.

20          And I'm going to instruct you not to

21   answer to the extent your answer divulges the

22   substance of any communications with Ripple lawyers.

23          THE WITNESS:  Okay.

24          I don't recall.

25   / /

1    BY MR. SYLVESTER:

2        Q.    You also mentioned blog posts.

3              Again, setting aside any conversations you

4    may have had with counsel, what was the substance of

5    blog posts that you reviewed at Ripple?

6        A.    I honestly don't recall.  I'm speaking

7    very generally here.

8        Q.    Are there any other informal duties that

9    you can recall that you had with respect to

10   marketing?

11       A.    I don't recall specifically anything.

12       Q.    Do you have a general recollection of

13   doing anything else with respect to marketing?

14             MS. ZORNBERG:  Object to form.

15             MR. DRYLEWSKI:  Objection.

16             THE WITNESS:  No, not specifically.  It's

17   not something I focused on.

18   BY MR. SYLVESTER:

19       Q.    Do you recall any occasion when anyone

20   other than a lawyer at Ripple asked you to review a

21   contemplated public statement by Ripple?

22       A.    You mean apart from legal and apart from

23   marketing?

24       Q.    Just apart from legal.

25       A.    Apart from legal?

1       Q.   So Ms. Long, Mr. Garlinghouse, Mr. Larsen,

2   anyone else at Ripple who is not a lawyer?

3       A.   Who's not a lawyer.

4            Yeah, the marketing group may have asked

5   me to review.  I don't recall any specifics but

6   yeah.

7       Q.   Just to make sure I understand your

8   testimony, the marketing group may have asked you to

9   review a contemplated public statement by Ripple,

10   but sitting here today, you can't remember any of

11   the content of those public statements?

12       A.   No.  Absolutely not.

13            MR. DRYLEWSKI:  Objection to form.

14            THE WITNESS:  No.

15   BY MR. SYLVESTER:

16       Q.   While you were at Ripple, did you have any

17   interactions with someone named Mr. Ryan Zagone?

18       A.   He reported to me.

19       Q.   What was Mr. -- I'm sorry.

20            What was Mr. Zagone's role?

21       A.   He headed the regulations team at the

22   time.

23       Q.   During the time that you reported to

24   Mr. Larsen, how often did you typically speak with

25   him when you were reporting to him?

1      A.   On a monthly basis.

2      Q.   What topics, if any, did you typically

3   discuss?

4           MS. ZORNBERG:  Object to form.

5           You can answer.

6           THE WITNESS:  So to be clear, we were in

7   2015 here, so it was mainly the FinCEN, DOJ

8   enforcement action aspects.  And then others as they

9   came up.  But compliance, obviously, matters.

10  BY MR. SYLVESTER:

11     Q.   Did you email with Mr. Larsen when you

12  were reporting to him?

13     A.   I'm sure I did.

14     Q.   How frequently?

15     A.   I couldn't say.

16     Q.   Because you don't remember?

17     A.   I don't, no.

18     Q.   Do you know what Slack is?

19     A.   Yes.

20     Q.   Did you ever communicate with Mr. Larsen

21  via Slack?

22          MR. DRYLEWSKI:  Objection to form.

23          Any time?

24  BY MR. SYLVESTER:

25     Q.   Let's start with any time.

1        A.   At any time, I honestly don't recall.

2  It's not something that I would have used with

3  Chris, I don't think, but I may have infrequently

4  conversed with him over Slack.

5        Q.   Other than the conversation with

6  Mr. Larsen that we've already discussed about the

7  ████████████ report --

8        A.   Yeah.

9        Q.   -- were there any other occasions where

10  you talked with Mr. Larsen about the application of

11  securities laws to digital assets?

12          MS. DEARBORN:  Object to form.

13          And I'm sure that this objection is

14  coming, but I would instruct the witness not to

15  answer to the extent it reveals conversations with

16  Ripple's counsel or information that may have been

17  conveyed to Mr. Larsen solely through counsel.

18          THE WITNESS:  I'm going to have to ask you

19  to repeat the question.

20          MR. SYLVESTER:  Sure.

21          Yeah, Kat, would you go ahead and repeat

22  the question?

23          MR. DRYLEWSKI:  That's fine.  Let's get

24  the question.

25             (Record read by the reporter

1            as follows:

2                 QUESTION: Other than the

3            conversation with Mr. Larsen that

4            we've already discussed about the

5                        report, were there any

6            other occasions where you talked

7            with Mr. Larsen about the

8            application of securities laws to

9            digital assets?)

10            MR. DRYLEWSKI: Ms. O'Gorman, I'm going to

11 instruct you not to answer to the extent it divulges

12 the content of any communications with lawyers,

13 either your communications with lawyers or

14 Mr. Larsen's communications with any lawyers,

15 Ripple, inside or outside counsel.

16            THE WITNESS: Okay.

17            I may have. I don't recall.

18 BY MR. SYLVESTER:

19     Q. Just so the record's clear, this is a

20 yes-or-no question.

21     A. Okay.

22     Q. Did you have any conversations with

23 Mr. Larsen involving the application of the

24 securities laws to digital assets in which you

25 understand that what Mr. Larsen was conveying to you

1    was information that he learned from counsel?  Yes

2    or no.

3              MR. DRYLEWSKI:  You can answer that

4    question "yes," "no," "I don't know," "I don't

5    recall."

6              THE WITNESS:  I don't know would be the

7    most accurate answer here.  I don't know.

8    BY MR. SYLVESTER:

9        Q.   Moving on to the time that you reported to

10   Mr. Garlinghouse --

11       A.   Mh-hmm.

12       Q.   -- I think you mentioned you met with him

13   weekly; is that right?

14       A.   Legally?

15       Q.   Weekly.

16       A.   Oh, weekly.  Sorry.

17            Yes.  I did, yes.

18       Q.   Were those meetings person?

19       A.   Yes.

20       Q.   And you met with him weekly throughout the

21   time that you reported to him; is that right?

22       A.   Yes.

23       Q.   Okay.  What topics, if any, did you

24   typically discuss with Mr. Garlinghouse?

25              MS. ZORNBERG:  Object to form.

```
 1              MR. DRYLEWSKI:  Object to form.

 2              And I'm going to instruct you -- same

 3     instruction you've heard, exclude from your answer

 4     the substance of any communications with Ripple's

 5     lawyers or that you understand -- understood

 6     Mr. Garlinghouse had with any of Ripple's lawyers,

 7     inside or outside counsel.

 8              THE WITNESS:  Okay.

 9              I spoke with him on compliance matters.

10     BY MR. SYLVESTER:

11        Q.    Which compliance matters that you can

12     recall sitting here today?

13        A.    Any of the time --

14              MR. DRYLEWSKI:  Let me just say, I'm going

15     to give you the same instruction I just gave you.

16              Do you understand?

17              THE WITNESS:  Yes, I do.  I do.

18              Any compliance matter that I felt was

19     pertinent to raise during any of those weekly

20     meetings.

21              As you can imagine, "weekly" means a

22     number of different topics at any point in time.  I

23     can't say specifically any one.

24     BY MR. SYLVESTER:

25        Q.    Can you recall any topic that came up in
```

1    several weekly meetings?

2            MS. ZORNBERG:  Object to form.

3            MR. DRYLEWSKI:  Object to form.

4            And the same instruction I already gave.

5            THE WITNESS:  You know, you have to be

6    time-frame specific here.

7            Obviously, in the beginning, there was a

8    lot of FinCEN-related matters.  It was a lot of

9    remediation under the FinCEN/DOJ settlement.  Very,

10   very, you know, top of mind at that particular time.

11           So I'm just going to say compliance

12   matters.

13   BY MR. SYLVESTER:

14       Q.   After the FinCEN settlement was wrapped

15   up, were there any other topics that you can recall

16   that were frequent topics of conversations between

17   you and Mr. Garlinghouse?

18           MR. DRYLEWSKI:  Objection to form.

19           MS. ZORNBERG:  Object to form.

20           MR. DRYLEWSKI:  And same instruction I

21   gave before.

22           Do you remember the instruction or should

23   I repeat it?

24           THE WITNESS:  I do.  I remember the

25   instruction.

```
 1              MR. DRYLEWSKI:  Okay.
 2              THE WITNESS:  We had weekly meetings.  I
 3    would always provide an agenda, so you might have
 4    that information at hand.  I always emailed an
 5    agenda to Brad for discussion during those meetings,
 6    so I'm sure you have that information.
 7    BY MR. SYLVESTER:
 8         Q.   Prior to meeting with Mr. Garlinghouse,
 9    you would prepare an agenda for the meeting and send
10    it to him via email?
11         A.   Always.
12         Q.   Always.
13              And was it typically your practice to
14    cover that agenda with Mr. Garlinghouse in your
15    weekly meetings?
16         A.   Broadly, yes.  That was my intention,
17    whether we got to every matter ...
18         Q.   Other than those weekly agenda emails we
19    just discussed, did you email with Mr. Garlinghouse
20    while you were reporting to him?
21              MR. DRYLEWSKI:  Objection to form.
22              THE WITNESS:  Yes.
23    BY MR. SYLVESTER:
24         Q.   How frequently?
25         A.   Couldn't say.  Whenever I needed to.
```

1      Q.   Daily?

2           MS. ZORNBERG:  Object to form.  Asked and

3    answered.

4           THE WITNESS:  It could have been.  It may

5    not have been.

6    BY MR. SYLVESTER:

7      Q.   And did you ever communicate with

8    Mr. Garlinghouse via Slack?

9      A.   I'm sure I did, yes.

10     Q.   Approximately how frequently would you say

11   you communicated with Mr. Garlinghouse via Slack?

12          MR. DRYLEWSKI:  Objection to form.

13          THE WITNESS:  I honestly could not say.

14   BY MR. SYLVESTER:

15     Q.   Would you say that typically, it was at

16   least once a week?

17          MR. DRYLEWSKI:  Objection to form.

18          THE WITNESS:  I really couldn't say.  I

19   don't know.

20   BY MR. SYLVESTER:

21     Q.   Was it rare?

22          MR. DRYLEWSKI:  Objection to form.

23          MS. ZORNBERG:  Objection.

24          THE WITNESS:  I couldn't say.  I'm sure

25   you have those records.

```
 1    BY MR. SYLVESTER:
 2        Q.   Would you say that you communicated with
 3    Mr. Garlinghouse more over email or more over Slack?
 4             MR. DRYLEWSKI:  Objection to form.
 5             THE WITNESS:  I would say more over email.
 6    BY MR. SYLVESTER:
 7        Q.   Okay.  Did you ever communicate directly
 8    with Ripple's board of directors?
 9        A.   I did.
10        Q.   When were those occasions?
11             MR. DRYLEWSKI:  Objection to form.
12             Go ahead.
13             THE WITNESS:  Minimum, quarterly basis.
14    BY MR. SYLVESTER:
15        Q.   Did you present at Ripple's board of
16    director meetings?
17        A.   I did.
18        Q.   Broadly, what were the topics of those
19    presentations?
20             MR. DRYLEWSKI:  I'm going to object to
21    form.
22             MS. ZORNBERG:  Object to form.
23             MR. DRYLEWSKI:  I'm going to give you the
24    same instruction, exclude from your answer -- or
25    avoid divulging the substance of any communications
```

1    involving lawyers or any communications that others

2    gave to you that were -- that relayed the substance

3    of any communications with Ripple's lawyers.

4            Do you understand?

5            THE WITNESS:  I do.  Thank you.

6            I provided compliance updates to the board

7    on a minimum quarterly basis depending on the board

8    meeting scheduling.

9    BY MR. SYLVESTER:

10       Q.   Can you recall the topics of any of those

11   compliance updates that you provided to the board?

12           MR. DRYLEWSKI:  Same instruction.

13           THE WITNESS:  Mh-hmm.

14           Yes, I can.  It would have been any

15   updates with regard to the three areas that I was

16   responsible for, the three compliance areas that I

17   mentioned earlier.

18   BY MR. SYLVESTER:

19       Q.   One of those areas was global regulatory

20   relations?

21       A.   That's right.

22       Q.   Did you ever provide any updates to

23   Ripple's board of directors having anything to do

24   with the U.S. securities laws?

25       A.   Never --

1          MR. DRYLEWSKI:  Objection to form.

2          THE WITNESS:  -- that I recall.

3    BY MR. SYLVESTER:

4          Q.   Was counsel present at board of director

5    meetings?

6          A.   Always.

7          Q.   Have you ever used the messaging

8    application Signal to communicate with Ripple

9    employees?

10          A.   I don't even know what it is.

11          Q.   Why did you leave Ripple?

12          MR. DRYLEWSKI:  Objection to form.

13          THE WITNESS:  Over personal reasons.

14    BY MR. SYLVESTER:

15          Q.   Were you asked to leave?

16          A.   No.

17          Q.   Was the SEC investigating Ripple before

18    you left Ripple?

19          MR. DRYLEWSKI:  Objection to form.

20          Exclude from your answer the substance of

21    any communications you had with Ripple's lawyers.

22    If you can answer the question without doing that,

23    you can answer.

24          THE WITNESS:  Okay.

25          Not to my knowledge.

1    BY MR. SYLVESTER:

2        Q.   Moving for the time to the post-Ripple

3    time period.

4            MR. DRYLEWSKI:  And just for a second, it

5    seems like you're transitioning now, should we take

6    a break?

7            MR. SYLVESTER:  How long have we been

8    going?

9            THE VIDEOGRAPHER:  Twenty-five minutes.

10           MR. DRYLEWSKI:  Twenty-five minutes total?

11           THE VIDEOGRAPHER:  No.

12           MR. DRYLEWSKI:  Since the last break, how

13   much total.

14           THE VIDEOGRAPHER:  One hour, eleven

15   minutes.

16           MR. SYLVESTER:  How are you feeling?

17           MR. DRYLEWSKI:  How are you feeling?  Do

18   you want to press on or do you want to take a break?

19           THE WITNESS:  Take a break, coffee.

20           MR. SYLVESTER:  Fine with me.

21           Off the record.

22           THE VIDEOGRAPHER:  Okay.  Off the record

23   at 10:34 a.m.

24               (Whereupon, a recess was taken.)

25           THE VIDEOGRAPHER:  This is the beginning

79

```
 1   of File Number 4.

 2              We're back on the record at 10:50 a.m.

 3   BY MR. SYLVESTER:

 4        Q.   Okay.  Ms. O'Gorman, so focusing now again

 5   on the time period after you left Ripple.

 6              Have you communicated with Mr. Larsen

 7   since leaving Ripple?

 8        A.   Yes.

 9        Q.   How many times?

10        A.   Couldn't say.

11        Q.   Because you don't remember?

12        A.   It was nothing I kept track of.

13        Q.   Sure.

14              Under ten?

15        A.   Couldn't say.

16        Q.   Under than 100?

17              MR. HECKER:  Objection to form.  Asked and

18   answered.

19              THE WITNESS:  I honestly couldn't say.

20   BY MR. SYLVESTER:

21        Q.   Okay.  Were any of those communications in

22   person?

23        A.   Yes.

24        Q.   How many times did you meet with

25   Mr. Larsen in person after leaving Ripple?
```

1         A.   A number of occasions.  I couldn't say

2    exactly.

3         Q.   Your in-person meetings Mr. Larsen after

4    leaving Ripple, did you ever discuss with him the

5    SEC's investigation of Ripple?

6              MR. HECKER:  Objection to form.

7              THE WITNESS:  I may have.  I don't recall.

8    BY MR. SYLVESTER:

9         Q.   What, if anything, do you recall

10   Mr. Larsen saying about the SEC's investigation of

11   Ripple after you left Ripple?

12             MR. HECKER:  Objection to form.

13             THE WITNESS:  You're assuming I know about

14   the SEC investigation.  I don't know what you

15   exactly mean by "investigation."  I don't know what

16   you're referring to.

17   BY MR. SYLVESTER:

18        Q.   Fair enough.

19             Do you have an understanding that in this

20   case, the SEC is the plaintiff and has sued Ripple?

21        A.   I do understand that, yeah.

22        Q.   Do you know that prior to the filing of

23   this lawsuit, the SEC investigated Ripple?

24        A.   I don't know that.

25             MR. HECKER:  Objection to form.

```
 1   BY MR. SYLVESTER:

 2        Q.   So focusing just on this litigation, which

 3   you're aware of, after you left Ripple, did you have

 4   any conversations with Mr. Larsen about the SEC's

 5   litigation against -- against Ripple?

 6        A.   No.

 7             MR. HECKER:  Objection to form.

 8             Just give me a moment --

 9             THE WITNESS:  Sorry.

10             MR. HECKER:  -- to object.

11   BY MR. SYLVESTER:

12        Q.   And I was speaking earlier about in-person

13   meetings.

14             Do -- since leaving Ripple, have you

15   spoken with Mr. Larsen on the phone?

16        A.   Yes.

17        Q.   About how often?

18        A.   I couldn't say.  I mean, I know him.  We

19   talk.

20        Q.   Regularly?

21             MR. HECKER:  Objection to form.

22             MS. ZORNBERG:  Objection to form.

23             THE WITNESS:  No.  I wouldn't say

24   anything -- you know, lined up schedules?  No.

25   / /
```

1    BY MR. SYLVESTER:

2         Q.   And do you ever communicate with

3    Mr. Larsen via email since leaving Ripple?

4         A.   I have, yes.

5         Q.   About how frequently?

6         A.   Very infrequently.

7         Q.   Okay.  Once again, in-person meetings,

8    phone calls and emails, since leaving Ripple, have

9    you ever communicated with Mr. Larsen about the

10   SEC's litigation against Ripple?

11        A.   Never.

12             MS. ZORNBERG:  Okay.

13             THE WITNESS:  Sorry.

14   BY MR. SYLVESTER:

15        Q.   Again, since leaving Ripple, any form of

16   communication, have you ever communicated with

17   Mr. Larsen about XRP status under the securities

18   laws?

19             MR. HECKER:  Objection to form.

20             THE WITNESS:  No.

21   BY MR. SYLVESTER:

22        Q.   Have you communicated with

23   Mr. Garlinghouse since you left Ripple?

24        A.   I think I answered that already, yes.

25        Q.   I apologize if I forgot your answer.

1          Have you met with Mr. Garlinghouse in

2     person since leaving Ripple?

3          MS. ZORNBERG:  Objection.  Asked and

4     answered.

5          You just asked a series of questions about

6     Mr. Garlinghouse.  Now you're asking questions about

7     Mr. Garlinghouse?

8          MR. SYLVESTER:  I asked about Mr. Larsen.

9          THE WITNESS:  You asked Garlinghouse --

10         MR. DRYLEWSKI:  There's no question

11    pending.

12         MS. ZORNBERG:  All right.  If I'm

13    mistaken, I'm mistaken.

14         MR. SYLVESTER:  No, I want to make sure --

15    let me ask the witness.

16    Q.    The last series of questions that I asked

17    you about post-Ripple communications, I had intended

18    to ask you about your communications with

19    Mr. Larsen.

20         Were you answering questions about

21    Mr. Larsen?

22    A.    I answered your direct questions about

23    Chris Larsen.  I also answered your direct questions

24    about Brad Garlinghouse.

25         But if you want to ask me an additional

1    question about Brad Garlinghouse, let's ask the

2    question.

3        Q.   Let me ask -- I just want to make sure the

4    record is clear --

5        A.   Sure.

6        Q.   -- and I don't quite understand where the

7    confusion is, so I'm going to reask a question that

8    I believe I just asked you.

9        A.   Okay.

10       Q.   After you left Ripple, did you have any

11   communications whatsoever with Chris Larsen about

12   the SEC's litigation against Ripple?

13           MR. DRYLEWSKI:  Objection to form.

14           THE WITNESS:  My answer is still no.

15   BY MR. SYLVESTER:

16       Q.   Okay.  Since leaving Ripple, did you have

17   any communications with Mr. Larsen about XRP's

18   status as a security?

19           MR. DRYLEWSKI:  Objection to form.

20           THE WITNESS:  No.

21   BY MR. SYLVESTER:

22       Q.   Okay.

23           I think we've established you have

24   communicated with Mr. Garlinghouse since you left

25   Ripple.

1    A.   Yes.

2    Q.   Have you met with him in person?

3    A.   Yes.

4    Q.   How many times?

5    A.   I can't say for certain.  But I have met

6  with him in person infrequently.

7    Q.   Have you communicated with

8  Mr. Garlinghouse via phone since leaving Ripple?

9    A.   Yes.

10    Q.   Approximately how many times?

11    A.   Couldn't say.

12    Q.   Would you say that you have communicated

13  with him by phone infrequently?

14        MR. DRYLEWSKI:  Objection to form.

15        THE WITNESS:  I would say that's a fair

16  assessment, yeah.

17  BY MR. SYLVESTER:

18    Q.   How about email; since leaving Ripple,

19  have you communicated with Mr. Larsen via email?

20    A.   Yes.

21    Q.   Have you communicated with

22  Mr. Garlinghouse via email more frequently than via

23  phone?

24        MS. ZORNBERG:  Object to form.

25        THE WITNESS:  I wouldn't say more or less,

1    but I have communicated with him via email.

2    BY MR. SYLVESTER:

3         Q.   Okay.

4              Again, all types of communications, in

5    person, phone, email, since leaving Ripple, have you

6    ever communicated with Mr. Garlinghouse about the

7    SEC's litigation against Ripple?

8              MR. DRYLEWSKI:  Objection to form.

9              THE WITNESS:  No.

10   BY MR. SYLVESTER:

11        Q.   Okay.  Have you ever communicated with

12   Mr. Garlinghouse since leaving Ripple specifically

13   about the SEC's litigation against Mr. Garlinghouse?

14             MR. DRYLEWSKI:  Objection to form.

15             THE WITNESS:  No.

16   BY MR. SYLVESTER:

17        Q.   And the same question for Mr. Larsen,

18   since leaving Ripple, have you ever communicated

19   with Mr. Larsen specifically about the SEC's

20   investigation -- sorry -- strike that.

21             Since leaving Ripple, have you

22   communicated with Mr. Larsen about the SEC's

23   litigation against Mr. Larsen?

24             MR. DRYLEWSKI:  Objection to form.

25             THE WITNESS:  No.

87

```
 1    BY MR. SYLVESTER:
 2         Q.   Okay.  Since leaving Ripple, have you
 3    communicated with Mr. Garlinghouse about XRP's
 4    status as a security?
 5              MR. DRYLEWSKI:  Objection to form.
 6              THE WITNESS:  No.
 7    BY MR. SYLVESTER:
 8         Q.   Which other Ripple employees, if any, have
 9    you kept in touch with since leaving Ripple?
10         A.   Do you want the exhaustive list?
11              I'll give you generally.
12         Q.   I'm interested in those with whom you've
13    communicated with, say, more than a couple times.
14         A.   Okay.  The leadership team members, some
15    of them.  Patrick Griffin, Asheesh Birla, Monica
16    Long,
17              My friends.  They were all my friends at
18    Ripple.
19         Q.   Okay.
20         A.   Others, I'm sure.
21         Q.   Since leaving Ripple, have you
22    communicated with any of the people that you just
23    mentioned about the SEC's litigation against Ripple?
24              MR. DRYLEWSKI:  Objection to form.
25              THE WITNESS:  No.
```

```
1    BY MR. SYLVESTER:
2        Q.   Since leaving Ripple, have you
3    communicated with any of the people that you just
4    mentioned about XRP status under the securities
5    laws?
6            MR. DRYLEWSKI:  Objection to form.
7            THE WITNESS:  I don't believe so.
8    BY MR. SYLVESTER:
9        Q.   Have you discussed the SEC's litigation
10   against Ripple with anyone since you left Ripple?
11           MR. DRYLEWSKI:  Objection to form.
12           THE WITNESS:  No.
13           MR. DRYLEWSKI:  Obviously exclude from
14   your answer any communications with anyone -- any
15   counsel, any lawyers.
16           THE WITNESS:  Yeah.  Okay.
17           Could you repeat the question, please?
18   BY MR. SYLVESTER:
19       Q.   Sure.
20           Aside from conversations you may have had
21   with counsel, have you communicated with anyone
22   about the SEC's litigation against Ripple since you
23   left Ripple?
24           MR. DRYLEWSKI:  Objection to form.
25           MS. ZORNBERG:  Objection to form.
```

1          You keep saying since she left Ripple, but

2     the litigation you're referring to was

3     December 2020, and she left in 2018.

4          MR. SYLVESTER:  Sure.

5          MS. ZORNBERG:  Could you just be more

6     precise?  Are you asking since the complaint was

7     filed in December 2020?

8          MR. SYLVESTER:  Yes.  I had assumed that

9     she knew about the SEC's investigation.  She didn't.

10    So I'm only asking about the litigation --

11         MR. DRYLEWSKI:  There's no question.

12         MR. SYLVESTER:  -- which she may have

13    learned of it between December 2020 and today.

14         MS. ZORNBERG:  Okay.

15         MR. DRYLEWSKI:  Is that clear?  Do you

16    understand?

17         THE WITNESS:  Yeah.  Since the lawsuit was

18    issued publicly, which is when I first became aware

19    of it.  Is that what you're asking me?

20    BY MR. SYLVESTER:

21         Q.   Now, I've lost the thread.  Yes.  Let me

22    ask you again.

23         MR. DRYLEWSKI:  Let him ask the question.

24         MR. SYLVESTER:  Okay.

25         THE WITNESS:  Okay.

```
 1    BY MR. SYLVESTER:
 2        Q.   Setting aside -- and I'm not asking about
 3    any communications that you've had with counsel.
 4             Since you left Ripple, have you
 5    communicated with anyone about the SEC's litigation
 6    against Ripple?
 7             MR. DRYLEWSKI:  Exclude from your answer
 8    any communications with counsel.
 9             MS. ZORNBERG:  Object to form.
10             THE WITNESS:  ███████████  who I -- with
11    whom I live.
12    BY MR. SYLVESTER:
13        Q.   Okay.  And what, if anything, have you
14    told ████████ about the SEC's litigation against
15    Ripple?
16             MR. DRYLEWSKI:  Objection to form.
17             MS. ZORNBERG:  Just one moment.
18             I just want to make sure, I don't --
19    individual counsel can take it up.  I don't know the
20    nature of the relationship, if there's any sort of
21    spousal privilege or, you know, common spousal
22    privilege, but just want to flag that.
23             MR. DRYLEWSKI:  Maybe we can take a quick
24    break?
25             MR. TENREIRO:  Let's move off of that.
```

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

1    Then we can come back after a break.

2              MR. DRYLEWSKI:  That's fine.

3    BY MR. SYLVESTER:

4         Q.   Okay.  Is [REDACTED] the only person you

5    have communicated with about the SEC's litigation

6    against Ripple, apart from your counsel?

7              MR. DRYLEWSKI:  Objection.

8              THE WITNESS:  Apart from my counsel or --

9    BY MR. SYLVESTER:

10        Q.   Apart from any counsel.

11        A.   Yes, that would be correct.

12        Q.   Okay.  I'm asking the following as a

13   yes-or-no question.

14             While you were at -- strike that.

15             Still yes or no.  While you were Ripple's

16   CCO, did you ever communicate with Ripple's counsel

17   about the application of the securities laws to XRP?

18             MR. DRYLEWSKI:  Object to form.

19             Unless counsel tells me otherwise, you can

20   answer that "yes," "no," "I don't know," "I don't

21   recall."

22             MS. ZORNBERG:  Agreed.

23             THE WITNESS:  Yes.

24   BY MR. SYLVESTER:

25        Q.   How many times?

1            MR. DRYLEWSKI:  Same objection.

2            You can answer if you know, or you can say

3   "I don't know" or "I don't recall."

4            THE WITNESS:  I don't know.

5   BY MR. SYLVESTER:

6      Q.  Was it more than once?

7      A.  I couldn't say.

8      Q.  So just to be clear, throughout your

9   entire tenure as CCO of Ripple, we now know that

10   you've spoken with counsel at least once about the

11   application of the securities laws to XRP, but you

12   don't know sitting here today whether it was more

13   than once?

14            MR. DRYLEWSKI:  Objection to form.

15            THE WITNESS:  Did you ask me was it more

16   than once?

17            MR. SYLVESTER:  Yes.

18            THE WITNESS:  Oh, did you?

19            Sorry, I thought you asked me how many

20   times.

21            MS. ZORNBERG:  Just so that we can make

22   progress and avoid any privilege issue, he's asking

23   you if you have any sense of the quantity of

24   times --

25            THE WITNESS:  Of times.

1          MS. ZORNBERG:  -- without getting into

2     substance, which he's not asking you about --

3          THE WITNESS:  Yeah.

4          MS. ZORNBERG:  -- and I think you can

5     answer that either with a number, if you know

6     specifically, or with a descriptor, like "a few,"

7     "many," "occasionally," "regularly."  Like -- but

8     just keep it to --

9          THE WITNESS:  Yeah.

10          MS. ZORNBERG:  -- a quantity.

11          THE WITNESS:  A quantity is as a number of

12     times.  I cannot state how many times but a number

13     of times, yes.

14     BY MR. SYLVESTER:

15          Q.  Would you say that you communicated on

16     this topic with counsel frequently?

17          MR. DRYLEWSKI:  Objection to form.

18          THE WITNESS:  Again, a number of times.  I

19     don't know what you mean by "frequently," but I did

20     discuss with counsel.

21     BY MR. SYLVESTER:

22          Q.  Would you say you communicated with

23     counsel on this topic regularly?

24          MR. DRYLEWSKI:  Objection to form.

25          MS. ZORNBERG:  Object to form.  Asked and

1    answered.

2    BY MR. SYLVESTER:

3        Q.    You can answer.

4        A.    Asked and answered.  I think I've told

5    you.

6            I can't tell you exactly how many times,

7    and I don't know if that was frequently or not.

8        Q.    When did you first -- this is calling for

9    a time period.

10        A.    Yeah.

11        Q.    When did you first speak with Ripple's

12    counsel about the application of the securities laws

13    to XRP?

14            MR. DRYLEWSKI:  You can answer that narrow

15    question in terms of the time period, if you know.

16    If you don't know --

17    BY MR. SYLVESTER:

18        Q.    You can tell me a date, you can tell me a

19    year, you can tell me towards the start of Ripple,

20    towards the end of Ripple.

21        A.    Mh-hmm.

22            I don't recall specifically.

23        Q.    Was it near the start of your tenure at

24    Ripple?

25        A.    I wouldn't say near the start, no.

1   Q. Was it near the start of your tenure as

2 CCO?

3   A. I wouldn't say near the start, no.

4   Q. Just so the record's clear, it's after the

5 tenure of your start as CCO?

6     MR. DRYLEWSKI: Objection to form.

7     THE WITNESS: That would be true, yes.

8 BY MR. SYLVESTER:

9   Q. Okay. Was it near the time that you left

10 Ripple?

11     MR. DRYLEWSKI: Objection to form.

12     THE WITNESS: It would be in advance of my

13 departure from Ripple.

14 BY MR. SYLVESTER:

15   Q. You left Ripple around May of 2018; is

16 that right?

17   A. That's correct.

18   Q. Did you first speak with counsel on this

19 issue in the first few months of 2018?

20     MR. DRYLEWSKI: Objection to form.

21     And just so we're clear on the record,

22 you're talking about the first time --

23     MR. SYLVESTER: Yes.

24     MR. DRYLEWSKI: -- or the last time?

25     MR. SYLVESTER: First.

1          MR. DRYLEWSKI:  Is that clear to you?

2          THE WITNESS:  So the first time --

3          MR. DRYLEWSKI:  And, again, don't divulge

4    any substance.  We're just talking about time

5    periods here to the extent you remember.

6          THE WITNESS:  Yeah.

7          The question was, did I first speak with

8    legal about this matter in 2018?

9    BY MR. SYLVESTER:

10        Q.   Yes, defining "this matter" as a

11   conversation about the application of securities

12   laws to XRP.

13        A.   In 2018?

14             It would have been prior to that.

15        Q.   Okay.  Again, without getting into any

16   substantive communications, which lawyers did you

17   speak with on the topic of the application of the

18   securities laws to XRP while you were at Ripple?

19             MR. DRYLEWSKI:  Just for the record, I'm

20   going to make sure to instruct you, do not divulge

21   the substance of any communications with any

22   lawyers.  Subject to company counsel's advice, you

23   can name the individuals in legal with whom you

24   spoke, to the extent you remember.

25             THE WITNESS:  Mh-hmm.

1           MS. ZORNBERG:  Agreed.

2     BY MR. SYLVESTER:

3           Q.   Go ahead.

4           A.        ████████████    in -- when I started,

5     2015, 2016.  ███████████     after ████████

6     departure.  I may have spoken with ███████████

7     ██████████    and I believe I also spoke with outside

8     counsel.

9                Do you want me to name the firm?

10          Q.   This is while you were at Ripple?

11          A.   Yeah.

12          Q.   Okay.  Yes, please.

13          A.   ██████████████

14          Q.   While you were at Ripple, did you speak

15    with any other outside counsel on this matter?

16               MS. ZORNBERG:  About any --

17               MR. SYLVESTER:  Sorry.  And you're right.

18          Q.   While you were at Ripple, did you speak

19    with any other outside counsel about the application

20    of the securities laws to XRP?

21               MR. DRYLEWSKI:  You can answer that

22    question with a "yes," "no," "I don't know," "I

23    don't remember."

24               THE WITNESS:  So just to be clear, you

25    mean any Ripple outside counsel?  What do you mean

```
 1    specifically?
 2             I presume you mean company outside
 3    counsel.
 4    BY MR. SYLVESTER:
 5        Q.   I do mean Ripple's outside counsel, yes.
 6        A.   No.
 7        Q.   Okay.  While you were at Ripple, did you
 8    speak with any personal counsel about the
 9    application of the securities laws to XRP?
10             MR. DRYLEWSKI:  Same instruction.
11             THE WITNESS:  No.
12    BY MR. SYLVESTER:
13        Q.   Okay.  You said that you spoke with
14    Mr.       on the topic that we're discussing.
15             When was Mr.       general counsel at
16    Ripple?
17        A.   As of February 2nd, 2015.
18        Q.   Then Mr.       eventually departed that
19    position?
20        A.   He did.
21        Q.   When?
22        A.   Sometime in 2016.  I don't know the exact
23    date.
24        Q.   While Mr.       was general counsel, did
25    you discuss with him the application of the
```

1    securities laws to XRP?

2              MR. DRYLEWSKI:  Objection to form.

3              I'm going to ask you to exclude from your

4    answer the substance of any communications you may

5    have had with Mr. ███ or any other lawyers at

6    Ripple.

7              THE WITNESS:  Okay.

8              So the question was, did I have

9    discussions with Mr. ███ on the application of

10   securities laws?

11   BY MR. SYLVESTER:

12        Q.   While he was general counsel.

13        A.   Yes.

14        Q.   While Mr. ███ was general counsel of

15   Ripple, did you have more than one conversation with

16   him about the application of the securities laws to

17   XRP?

18             MR. DRYLEWSKI:  Same instruction to you.

19   You can answer "yes," "no," "I don't know," "I don't

20   recall."

21             THE WITNESS:  Okay.  Yes.

22   BY MR. SYLVESTER:

23        Q.   Turning to the time that Ms. ███ was

24   general counsel, about how many conversations did

25   you have with Ms. ███ about the application of the

1    securities laws to XRP?

2              MR. DRYLEWSKI:  Objection to form.

3              You can answer that question if you recall

4    and only that question.

5              THE WITNESS:  Yeah, I honestly can't

6    recall.

7    BY MR. SYLVESTER:

8         Q.   More than one?

9         A.   There would have been more than one, yes.

10        Q.   Did Ms. ███ report to Ms. ███?

11        A.   She did.

12        Q.   About how many conversations did you have

13   with Ms. ███ about the application of the

14   securities laws to XRP?

15             MR. DRYLEWSKI:  Same instruction.

16             THE WITNESS:  I honestly couldn't say.

17   BY MR. SYLVESTER:

18        Q.   Because you don't remember?

19        A.   Yeah.  We had -- we had many

20   conversations, yeah.

21        Q.   About how many conversations did you have

22   with ███ about the application of the

23   securities laws to XRP?

24             MR. DRYLEWSKI:  Same instruction.  You can

25   answer just that question, if you know.

1          THE WITNESS:  One.

2     BY MR. SYLVESTER:

3          Q.   When did you speak with ████████?

4          MR. DRYLEWSKI:  Same instruction.  You can

5     answer that question if you recall.

6          THE WITNESS:  In 2018, sometime prior to

7     my departure.

8     BY MR. SYLVESTER:

9          Q.   Did you initiate the contact with ████

10    ████?

11         MR. DRYLEWSKI:  Objection to form.

12         You can answer that question with a "yes,"

13    "no," "I don't know," "I don't recall," subject to

14    company counsel.

15         MS. ZORNBERG:  Any -- the "you" there

16    is --

17         MR. SYLVESTER:  Ms. O'Gorman.

18         MS. ZORNBERG:  -- Ms. O'Gorman

19    individually.

20         Did you individually initiate the

21    conversation with ████████ yes or no, or I don't

22    remember.

23         THE WITNESS:  Yeah.

24         No.

25    / /

1    BY MR. SYLVESTER:

2        Q.    Do you know who did?

3        A.    I could hazard a guess, an educated guess,

4    but I don't know.

5        Q.    Okay.

6            MR. DRYLEWSKI:  The question was, do you

7    know who.

8            MR. SYLVESTER:  Yeah.  I don't want her to

9    guess.  If she knows, she knows.  If she doesn't,

10   that's okay.

11           THE WITNESS:  Exactly.  I don't know.

12   BY MR. SYLVESTER:

13       Q.    Okay.  Setting aside any lawyers, whether

14   inside or outside counsel, while you were Ripple's

15   CCO, did you ever communicate with anyone at Ripple

16   regarding the application of the securities laws to

17   XRP?

18           MR. DRYLEWSKI:  You can answer that

19   question "yes," "no," "I don't know," "I don't

20   recall."

21           And objection to form.

22           MS. ZORNBERG:  Can I just clarify, too?

23           You're asking her if she spoke with any

24   nonlawyers at Ripple?

25           MR. SYLVESTER:  That's right.

1           MS. ZORNBERG:  About that subject?

2           Okay.  You can answer -- you can answer

3      "yes" or "no" or "I don't recall."  Yeah.

4           THE WITNESS:  Yes.

5      BY MR. SYLVESTER:

6           Q.   Who?

7           MR. DRYLEWSKI:  Without divulging the

8      substance of any communications, conversations, you

9      can answer the question that was posed, if you know.

10          THE WITNESS:  I don't think I can answer

11     that question without divulging with respect to a

12     lawyer being present during those conversations.  I

13     don't think I can answer.

14     BY MR. SYLVESTER:

15          Q.   Okay.  Let me ask a different question.

16          A.   Okay.

17          Q.   Outside the presence of counsel, so you're

18     not talking to a lawyer --

19          A.   Yeah.

20          Q.   -- and a lawyer isn't there --

21          A.   Yeah.

22          Q.   -- did you have any conversations with

23     anyone at Ripple about the application of the

24     securities laws to XRP while you were Ripple's CCO?

25          MR. DRYLEWSKI:  Objection to form.

```
1              And you can answer that narrow question
2    that was asked, if you can.
3              THE WITNESS:  I would have to say I don't
4    recall.
5    BY MR. SYLVESTER:
6         Q.   Okay.  Other than conversations you had
7    with counsel and other than in meetings when counsel
8    was present --
9         A.   Yes.
10        Q.   -- during the time you were Ripple's CCO,
11   did you ever discuss with anyone at Ripple the
12   prospect of reaching out to the SEC regarding the
13   application of the securities laws to XRP?
14             MR. DRYLEWSKI:  I'm going to instruct you
15   not to divulge the substance of any communications
16   you had with Ripple's lawyers, inside or out, or
17   any -- the substance of any conversations that were
18   conveyed to you that you understand may have
19   included substance of communications with Ripple's
20   lawyers.  You can answer the question "yes," "no,"
21   "I don't know," "I don't recall."
22             THE WITNESS:  I would have to say it
23   involved legal, so I cannot respond.
24   BY MR. SYLVESTER:
25        Q.   Let me create a record.
```

1           Were there -- I'm just asking if these

2    conversations existed.

3        A.   Sure.

4           MR. SYLVESTER:  So you don't have to

5    instruct her not to answer anything farther than

6    that.  I want to see if there's anything within your

7    bucket of objections.

8        Q.   So were there conversations that took

9    place between you and others at Ripple who were not

10   lawyers and outside the presence of counsel about

11   the topic of the application of the securities laws

12   to XRP, yes, no?

13       A.   Yes.

14           MR. DRYLEWSKI:  You can answer "yes,"

15   "no," "I don't know," "I don't recall."

16           THE WITNESS:  Yes.

17   BY MR. SYLVESTER:

18       Q.   Okay.  And is the reason why you're not --

19   so who -- sorry, let me -- strike that.

20           Who?

21       A.   It would have been various parties at

22   Ripple.

23       Q.   Mr. Garlinghouse?

24       A.   Yes.

25       Q.   Mr. Larsen?

```
1         A.    Yes.

2              MS. ZORNBERG:  Object to form.

3    BY MR. SYLVESTER:

4         Q.    Did you understand the question?

5         A.    With whom did I speak about this --

6         Q.    Yes.

7         A.    -- outside of counsel being present at any

8    time or in any meetings?

9         Q.    Yes.

10        A.    Was that the question?

11        Q.    Yes.

12        A.    Okay.

13        Q.    Okay.  About how many times did you speak

14   with Mr. Garlinghouse outside the presence of

15   counsel about the topic of the application of the

16   securities laws to XRP while you were Ripple's CCO?

17             MR. DRYLEWSKI:  Objection to form.

18             THE WITNESS:  I honestly don't recall.

19   BY MR. SYLVESTER:

20        Q.    Approximately when was the first time you

21   had a conversation of this nature with

22   Mr. Garlinghouse?

23             MR. DRYLEWSKI:  Objection to form.

24             THE WITNESS:  I don't recall.

25   / /
```

```
 1    BY MR. SYLVESTER:

 2         Q.   Was it earlier than 2018?

 3              MR. DRYLEWSKI:  Objection to form.

 4              THE WITNESS:  Yes.

 5    BY MR. SYLVESTER:

 6         Q.   Was it as early as 2015?

 7              MR. DRYLEWSKI:  Same objection.

 8              THE WITNESS:  I don't recall.

 9    BY MR. SYLVESTER:

10         Q.   Is it fair to say that it could have been

11    as early as 2015, but you don't recall sitting here

12    today?

13              MR. DRYLEWSKI:  Objection to form.

14              MS. ZORNBERG:  Yeah.

15              MR. DRYLEWSKI:  Asked and answered.

16              She said she doesn't recall.

17              MS. ZORNBERG:  Yeah.  You're asking her to

18    speculate.

19    BY MR. SYLVESTER:

20         Q.   You can answer, if you can.

21         A.   I can't.  I really don't recall.

22         Q.   When was the first time that you talked to

23    Mr. Larsen outside the presence of counsel about the

24    application of the securities laws to XRP?

25              MR. DRYLEWSKI:  Objection to form.
```

1           THE WITNESS:  To the best of my

2    recollection, it would have been in December 2016,

3    January 2017.

4    BY MR. SYLVESTER:

5        Q.   What, if anything, sparks your

6    recollection that that is the time frame that you

7    spoke to Mr. Larsen about this issue?

8           MR. DRYLEWSKI:  Objection to form.

9           I'm instructing the witness not to answer

10   to the extent that it divulges the substance of any

11   communications that you had with Ripple's lawyers,

12   inside or outside counsel.

13          THE WITNESS:  Mh-hmm.

14          MR. DRYLEWSKI:  Okay.

15          THE WITNESS:  The impetus was an article

16   or a publication by            issued, I believe,

17   in December 2016.

18   BY MR. SYLVESTER:

19       Q.   About how many times did you speak with

20   Mr. Larsen outside the presence of counsel about the

21   application of the securities laws to XRP?

22          MR. DRYLEWSKI:  Objection to form.

23          THE WITNESS:  I couldn't say exactly.

24   BY MR. SYLVESTER:

25       Q.   Is that because you don't remember?

1         A.    Yeah, I don't.

2         Q.    Was it more than once?

3         A.    Yes.

4         Q.    Okay.  Other than Mr. Garlinghouse and

5    Mr. Larsen, who, if anyone, at Ripple did you speak

6    with outside the presence of counsel about the

7    application of the securities laws to XRP?

8              MR. DRYLEWSKI:  Objection to form.

9              You can answer that question if you know.

10             THE WITNESS:  I don't know.  I don't know.

11   BY MR. SYLVESTER:

12        Q.    Do you recall having any such

13   conversations?

14             MR. DRYLEWSKI:  Same objection.

15             THE WITNESS:  I recall, but I believe

16   legal was present.

17   BY MR. SYLVESTER:

18        Q.    I see.

19             Okay.  Focusing first on conversations

20   that you had with Mr. Larsen outside the presence of

21   counsel on the topic of the application of the

22   securities laws to XRP, is it your understanding

23   that everything that Mr. Larsen said to you in those

24   conversations on that topic was conveyed to him by a

25   lawyer?

```
 1              MR. DRYLEWSKI:  Object to form.

 2              MS. ZORNBERG:  Objection.  Yeah.

 3              THE WITNESS:  I have no idea.

 4              MR. DRYLEWSKI:  Just hold on.

 5              MR. SYLVESTER:  I'm just trying to

 6     understand the privilege objection.

 7              MS. ZORNBERG:  I understand.  There was

 8     already colloquy about this in the transcript

 9     where --

10              MR. SYLVESTER:  Right.

11              MS. ZORNBERG:  -- Ms. O'Gorman says she

12     did not know to what extent Mr. Larsen's statements

13     were informed by counsel.  And then --

14              MR. SYLVESTER:  I thought we were taking

15     it on a question-by-question basis.  So for this

16     particular question --

17              MS. ZORNBERG:  We are.

18              Ask the question again.  Let's see if we

19     can get through it.

20              MR. SYLVESTER:  Okay.

21       Q.    Focusing first on conversations that you

22     had with Mr. Larsen outside the presence of counsel

23     on the topic of application of the securities laws

24     to XRP, is it your understanding that everything

25     that Mr. Larsen said to you in those conversations
```

1 on that topic was conveyed to him by a lawyer?

2         MS. ZORNBERG: Yeah. Objection.

3         If you want to take it question by

4 question, I'll just make a suggestion.

5         The witness has already testified about

6 what she can recall of one conversation with

7 Mr. Larsen. And that's -- and she's given you --

8         MR. SYLVESTER: More than one.

9         MS. ZORNBERG: No. She previously

10 testified about one conversation with Mr. Larsen

11 related to the         article.

12         MR. SYLVESTER: Yes.

13         MS. ZORNBERG: She's given you the extent

14 of her recollection on that. You know, that's --

15 I'm proffering that, and she will correct or counsel

16 will correct.

17         But my understanding, she's given you the

18 extent of her recollection. If you want to do it

19 question by question, perhaps ask her if she recalls

20 specifically any other communications, and then we

21 can deal with it.

22         MR. SYLVESTER: Okay. Sure. Fair enough.

23         So what I've heard from the witness -- and

24 correct me if you heard something different -- is

25 that she said at least more than one conversation

112

1    with Mr. Larsen on this topic.

2              We have discussed one conversation about

3    the ▮▮▮▮▮▮▮ report.

4         Q.   Are we on the same page, Ms. O'Gorman?

5         A.   We are, yes.

6         Q.   Okay.  Great.

7              So we don't know because you don't

8    remember, I believe, how many other conversations

9    you had with Mr. Larsen on this topic; is that

10   right?

11        A.   That's correct.

12        Q.   Okay.  So it's a little difficult to ask a

13   question about a specific conversation, but -- so

14   I'm just going to have to ask categorically.

15             So categorically, setting aside the ▮▮▮▮

16   ▮▮▮▮▮▮ conversation -- do you know what I mean by

17   the "▮▮▮▮▮▮▮▮ conversation"?

18        A.   I do.  You mean the article published,

19   yes.

20        Q.   That's exactly right.

21             Setting aside that conversation with

22   Mr. Larsen, setting aside any conversation with

23   Mr. Larsen where counsel was present, is it your

24   understanding that everything Mr. Larsen told you on

25   the topic of the application of the securities laws

1    to XRP was relayed to him by counsel?

2              MR. DRYLEWSKI:  Objection to form.

3              THE WITNESS:  I could not say.  I do not

4    know.

5    BY MR. SYLVESTER:

6         Q.   Okay.  Great.

7              I'm going to ask the same questions about

8    Mr. Garlinghouse.

9         A.   Sure.  Sure.

10        Q.   Okay.  So for Mr. Garlinghouse, is there

11   anything like the              report, like a

12   specific publication that you read that you

13   discussed with Mr. Garlinghouse that you can recall?

14             MR. DRYLEWSKI:  Objection to form.

15   BY MR. SYLVESTER:

16        Q.   Do you understand my question?

17        A.   I do.

18        Q.   Okay.

19             MR. DRYLEWSKI:  Bless you.

20             THE WITNESS:  Yes.

21   BY MR. SYLVESTER:

22        Q.   Okay.  What was that publication or those

23   publications?

24        A.   It would have been anything that was

25   issued or publicly available on the SEC website or

1   enforcement actions taken by the SEC or anything

2   discussed by the SEC publicly that I was aware of.

3       Q.   How did you learn about what the SEC said

4   on its website?

5       A.   Internet articles, published cases.

6       Q.   Let me ask a better question.

7       A.   Okay.

8       Q.   Did you personally visit the SEC's

9   website?

10      A.   Yes.

11      Q.   How frequently?

12           MR. DRYLEWSKI:  Objection to form.

13           Anytime?

14  BY MR. SYLVESTER:

15      Q.   While you were CCO.

16      A.   On a number of occasions.  I can't say how

17  many.

18      Q.   Did you make it a practice to visit the

19  SEC's website regularly while you were CCO?

20           MR. DRYLEWSKI:  Objection to form.

21           THE WITNESS:  Well, it depends on how you

22  categorize "regularly," but I visited their website.

23  BY MR. SYLVESTER:

24      Q.   Would you say you visited the SEC's

25  website while you were CCO at least once every few

1  months?

2           MS. ZORNBERG:  Object to form.

3           You can answer, if you know.

4           THE WITNESS:  Okay.  I would say that's

5  true, particularly in later days.

6  BY MR. SYLVESTER:

7      Q.   Will you tell me what you mean by "later

8  days"?

9      A.   Later days during my tenure at Ripple, the

10 ICO matter with the SEC I was heavily involved in

11 and something that I was interested in.

12     Q.   I'm sorry, when you say the "ICO matter,"

13 what do you mean?

14     A.   Initial coin offerings.

15     Q.   Oh, sure.  I meant, was it a specific

16 initial coin offering matter or number of

17 enforcement actions?

18          I'm just trying to understand what you

19 mean.

20     A.   Oh, sorry.

21          MR. DRYLEWSKI:  Objection to form.

22          Just give me a moment to interject.

23          And I am going to instruct you that to the

24 extent your answer is informed by or would divulge

25 any communications you had with Ripple's lawyers, to

1    exclude that from your answer.  Do not communicate

2    them.

3    BY MR. SYLVESTER:

4        Q.   Just for clarity --

5        A.   Yeah.

6        Q.   -- the question doesn't call for that.

7           So we're talking about just you looking at

8    the SEC's website.

9        A.   Sure.

10        Q.   Okay.

11          MR. DRYLEWSKI:  I'm just making the record

12    clear.

13          MS. ZORNBERG:  No, no, no, I disagree.

14    The latest colloquy was asking her about what ICO

15    matters she was interested in --

16          MR. DRYLEWSKI:  Correct.

17          MS. ZORNBERG:  -- and so we would also

18    direct the witness, you can answer to the extent

19    you're not revealing communications with counsel.

20          THE WITNESS:  I would say it's very much

21    intertwined with the legal department, what I

22    reviewed at that time.

23    BY MR. SYLVESTER:

24        Q.   Okay.  Did anyone in legal -- I'm just

25    trying to understand.

1      A.    Yeah.

2      Q.    Did anyone in legal ever direct you to

3  read the SEC's website?

4            MR. DRYLEWSKI:  I'm going to instruct the

5  witness not to answer that question.

6            THE WITNESS:  No.

7            MR. DRYLEWSKI:  Excuse me.  I instructed

8  you not to answer.

9            THE WITNESS:  Oh, did you?

10           MR. DRYLEWSKI:  That's fine.  The

11 answer -- that's -- that calls for privileged

12 information.

13 BY MR. SYLVESTER:

14     Q.    Okay.  Were there occasions where you

15 visited the SEC's website on your own initiative?

16           MR. DRYLEWSKI:  You can answer that

17 question "yes," "no," "I don't know," "I don't

18 recall."

19           THE WITNESS:  Yes.

20 BY MR. SYLVESTER:

21     Q.    Okay.  Were certain of those occasions

22 that we just spoke about for your last answer

23 related to ICO matters?

24           MR. DRYLEWSKI:  Objection to form.

25           THE WITNESS:  Yes.

```
 1   BY MR. SYLVESTER:

 2        Q.   Okay.  What do you recall learning on

 3   those occasions about ICO matters?

 4             MR. DRYLEWSKI:  Objection to form.

 5             THE WITNESS:  That's a huge question.

 6   BY MR. SYLVESTER:

 7        Q.   Anything that you can recall from your own

 8   visits to the SEC's website on your initiative.

 9             MR. DRYLEWSKI:  And I just want to make

10   the record clear here that in giving your answer to

11   this question, you need to separate out, if there

12   were any communications that you had with Ripple's

13   counsel that aided in your understanding of any of

14   this, to exclude that from your answer and not to

15   divulge it.

16             Do you understand?

17             THE WITNESS:  I do.  I do understand.

18             MR. DRYLEWSKI:  If you can separate that

19   out -- if it exists and you can separate it out, you

20   can answer that question.  If you can't separate it

21   out, then I'd instruct you not to answer.

22             THE WITNESS:  Yeah, I cannot separate

23   that.  I'm sorry.

24   BY MR. SYLVESTER:

25        Q.   Just so that I'm clear, you're not able to
```

```
 1    separate what you learned from visiting the SEC's
 2    website on your own initiative from what you learned
 3    from counsel on the topic of ICOs?
 4        A.   Yeah, I cannot do that.
 5        Q.   Is there any topic that you can recall
 6    learning from visits to the SEC website on your own
 7    initiative?
 8            MR. DRYLEWSKI:  Objection to form.
 9            THE WITNESS:  None that I can talk about
10    without pulling legal into the discussion.
11    BY MR. SYLVESTER:
12        Q.   Okay.  One of the things that you
13    mentioned earlier was enforcement actions.
14            Did you learn of SEC enforcement
15    actions -- well, strike that.
16            How did you learn of SEC enforcement
17    actions?
18            MS. ZORNBERG:  State an objection.  I
19    think, Mr. Sylvester, you used the term "ICO
20    enforcement action."  I could be mistaken, but --
21            MR. SYLVESTER:  I think it's the mask, SEC
22    enforcement actions.
23            MS. ZORNBERG:  Yeah.  I'm just not sure if
24    that's the witness who used that term or if you used
25    that term in a question.  But just put the question.
```

1            MR. SYLVESTER:  Sure.  Sure.  I thought it

2      was her.

3            Q.   Do you understand my question?

4            A.   Can you repeat it?

5            Q.   That's a great idea.  Okay.

6                 Do you have an understanding of what an

7      SEC enforcement action is?

8            A.   I do.

9            Q.   Okay.  Did you learn of any SEC

10     enforcement actions on any of the visits to the

11     SEC's website that you made on your own initiative?

12           A.   Yes.

13           Q.   Which actions were those.

14           A.   The DAO, the DAO matter, which also was a

15     reinforcement action.  The Kick matter, just as

16     examples.

17           Q.   Are there any other enforcement actions

18     that you learned of from your visit to the SEC's

19     website on your own initiative other than the two

20     you just told me?

21           MR. DRYLEWSKI:  Objection to form.

22                This is any time, Mark?

23     BY MR. SYLVESTER:

24           Q.   While you were CCO.

25           A.   On any topic ever.

1      Q.   That's a great question.

2           Just SEC enforcement actions relevant to

3    digital assets.

4           MR. DRYLEWSKI:  Objection to form.

5           THE WITNESS:  I've given those two

6    examples.  I really can't recall others.

7    BY MR. SYLVESTER:

8      Q.   The DAO report --

9           MR. DRYLEWSKI:  D-A-O.

10          THE WITNESS:  D-A-O.  Sorry, D-A-O.

11   BY MR. SYLVESTER:

12     Q.   The DAO report came out in July 2017; is

13   that right?

14     A.   That's my understanding, to the best of my

15   recollection, yes.

16     Q.   Did you read the DAO report when it came

17   out?

18     A.   Yes.

19     Q.   What, if any, steps did you take as CCO

20   after you read the DAO report?

21          MR. DRYLEWSKI:  Objection to form.

22          And I'm going to instruct you not to

23   answer to the extent that it calls for divulging the

24   substance of any communications with Ripple lawyers

25   or any direction by Ripple's lawyers, inside or

1   outside counsel.

2           Do you understand?

3           THE WITNESS:  I do.  I do.

4           It involved legal, so I don't believe I

5   can answer that.

6   BY MR. SYLVESTER:

7       Q.   Apart from any involvement of Ripple's

8   lawyers, you did not take any steps as CCO after you

9   read the DAO report; is that right?

10          MR. DRYLEWSKI:  Object to form.

11          And the instruction was any steps taken at

12  the direction of Ripple's lawyers.

13          THE WITNESS:  Any steps taken by me at the

14  direction of Ripple's lawyers, outside or inside?

15          MR. DRYLEWSKI:  He's asking you whether or

16  not you took any steps outside of communications

17  with Ripple's lawyers and outside of any steps that

18  you took at the direction of Ripple's lawyers.

19          And if it's intertwined, like we've been

20  talking about --

21          THE WITNESS:  It is.

22          MR. DRYLEWSKI:  -- steps that you took may

23  have been at the direction or arguably, in your

24  mind, in the direction of Ripple's lawyers --

25          THE WITNESS:  Sure.

```
 1                MR. DRYLEWSKI:  -- don't answer and don't
 2      convey the substance of that --
 3                THE WITNESS:  Yeah.
 4                MR. DRYLEWSKI:  -- and we can discuss.
 5                THE WITNESS:  Yeah.  And I think I will --
 6      the same answer as previously, it was intertwined
 7      with legal, so ...
 8      BY MR. SYLVESTER:
 9          Q.   Okay.  I just want to make sure I
10      understand.
11                I don't want to hear anything that a
12      lawyer told you.
13          A.   Yeah.
14          Q.   After reading the DAO report, did you take
15      any steps?
16                MR. DRYLEWSKI:  You can answer that
17      question "yes," "no," "I don't know," "I don't
18      recall."
19                THE WITNESS:  Well, I don't recall, I
20      think, is probably -- is the -- yeah.  I don't
21      recall.
22      BY MR. SYLVESTER:
23          Q.   Okay.  Just a yes-or-no question.
24                Did you discuss the topic of the DAO
25      report with any counsel at Ripple?
```

```
 1              MR. DRYLEWSKI:  So you can answer that
 2   question with a "yes," a "no," "I don't know," "I
 3   don't recall."
 4              THE WITNESS:  Yes.
 5   BY MR. SYLVESTER:
 6       Q.   Who?
 7              MR. DRYLEWSKI:  You can answer that
 8   question and you cannot divulge the substance of any
 9   communications.
10              THE WITNESS:  Oh, sure.  Sure.  Sure.
11   Sure.
12              Who in the Ripple legal department --
13   BY MR. SYLVESTER:
14       Q.   That's right.
15       A.   -- is that what you're asking me?
16                        and                  .
17       Q.   Did you have more than one conversation
18   with anyone in the Ripple legal department about the
19   DAO report?
20       A.   Yes.
21       Q.   About how many conversations did you have
22   with Ripple legal about the DAO report?
23       A.   I couldn't say.
24       Q.   Is that because you don't remember?
25       A.   I don't remember.
```

1          Q.   Setting aside any conversations where any
2     lawyer was present, did you have any conversations
3     with Mr. Garlinghouse about the DAO report?
4              MR. DRYLEWSKI:  You can answer that
5     question "yes," "no," "I don't recall," "I don't
6     know."
7              THE WITNESS:  Yes.
8     BY MR. SYLVESTER:
9          Q.   How many conversations did you have with
10    Mr. Garlinghouse about the DAO report?
11         A.   I don't know.  Honestly, don't recall.
12         Q.   Was it more than one?
13         A.   It may have been.  I don't recall.
14         Q.   What did you tell Mr. Garlinghouse about
15    the DAO report?
16             MR. DRYLEWSKI:  I'm going to object to
17    form.
18             And I'm going to instruct you not to
19    answer to the extent that what you said to
20    Mr. Garlinghouse was at the direction of Ripple's
21    lawyers or conveyed the substance of any
22    communications that you had with Ripple's lawyers,
23    inside or outside counsel.
24             MS. ZORNBERG:  Yeah, I would add to that
25    that I'd direct you not to answer if what you

1   communicated was informed by what you had discussed

2   with Ripple's lawyers.

3           THE WITNESS:  To be honest with you, the

4   bottom line is I don't remember.

5   BY MR. SYLVESTER:

6       Q.   What did Mr. Garlinghouse tell you about

7   the DAO report?

8           MR. DRYLEWSKI:  I'm going to object to

9   form.

10          And I'm going to instruct you not to

11  divulge the substance of anything that

12  Mr. Garlinghouse told you to the extent that you

13  understand it was informed by or reflected by

14  communications that Mr. Garlinghouse may have had

15  with Ripple's lawyers, inside or outside counsel.

16          Do you understand?

17          THE WITNESS:  I do.  I do.

18          I decline to answer in that case.  I don't

19  know.

20  BY MR. SYLVESTER:

21      Q.   I just want to clarify your answer because

22  you said, "I decline to answer" and "I don't know."

23          Is it that you did have such discussions

24  with Mr. Garlinghouse, he did say something, but

25  you're following your counsel's instruction not to

1   answer the question; is that right?

2          MR. DRYLEWSKI:  You can answer that "yes"

3   or "no."

4          THE WITNESS:  Okay.

5          MR. DRYLEWSKI:  You can answer that

6   question, are you saying you don't know or are you

7   declining to answer based on the instruction you

8   were just given?

9          MR. SOLOMON:  And, sorry, it was a

10  compound question.  You asked three questions.  Can

11  you just break it down and ask specific questions?

12          You put "discussions," plural.  Just ask

13  her simple, noncompound questions, please, so we can

14  get a clean record.

15  BY MR. SYLVESTER:

16      Q.   You talked to Mr. Garlinghouse about the

17  DAO report?

18      A.   I did.

19      Q.   Mr. Garlinghouse said something to you in

20  that conversation about the DAO report?

21      A.   That would be true, yeah.

22      Q.   I understand -- wait -- strike that.

23          Do you remember what he said?

24      A.   I don't.

25          MR. DRYLEWSKI:  You can answer that --

```
 1              THE WITNESS:  I don't know.

 2              MR. DRYLEWSKI:  -- "yes," "no" or "I don't

 3    know."

 4              THE WITNESS:  I don't.

 5    BY MR. SYLVESTER:

 6        Q.   Okay.

 7              Did you talk to Mr. Larsen about the DAO

 8    report?

 9        A.   I did.

10        Q.   Okay.  Do you recall what you told

11    Mr. Larsen?

12              MR. DRYLEWSKI:  You can answer that

13    question "yes," "no," "I don't recall."

14              THE WITNESS:  I don't recall, honestly.

15    BY MR. SYLVESTER:

16        Q.   Do you recall what Mr. Larsen told you

17    about the DAO report?

18              MR. DRYLEWSKI:  You can answer that

19    question "yes," "no," "I don't recall."

20              THE WITNESS:  I don't recall.

21    BY MR. SYLVESTER:

22        Q.   This conversation with Mr. Larsen about

23    the DAO report, was it around the time the DAO

24    report came out?

25        A.   Yes.
```

1       Q.   And the conversation that you had with

2   Mr. Garlinghouse about the DAO report, was that also

3   around the time the DAO report came out?

4       A.   Yes.

5       Q.   Great.

6            Other than counsel, Mr. Larsen and

7   Mr. Garlinghouse, did you talk to anyone else at

8   Ripple about the DAO report?

9       A.   I may have.  We -- I may have.

10      Q.   Sitting here today, can you remember any

11  such conversations?

12           MR. DRYLEWSKI:  It's a yes, no, I don't

13  know or I don't recall answer.

14           THE WITNESS:  I don't know.

15  BY MR. SYLVESTER:

16      Q.   While you were Ripple's CCO, did you ever

17  communicate with anyone outside of Ripple regarding

18  the application of the securities laws to XRP?

19           MR. DRYLEWSKI:  Objection to form.

20           THE WITNESS:  I hope not.  It would have

21  been a very boring conversation, but the answer is

22  that I don't believe so, no.

23           MR. SYLVESTER:  Let's look at Exhibit 2.

24             (Whereupon, Deposition Exhibit AO-2

25               was marked for identification.)

1    BY MR. SYLVESTER:

2        Q.   Ms. O'Gorman, I'll ask you to take a

3    minute to look at this email.

4            But for the record, the top email is from

5    Mr. Garlinghouse to Ms. Long, July 19th, 2018.

6            Couple emails down is your email from --

7    from yourself to Mr. Garlinghouse on July 19th,

8    2018.

9            Do you see that?

10           MR. DRYLEWSKI:  Take your time and feel

11   free to review the entire document before answering

12   any questions about it.

13           THE WITNESS:  Thank you.

14   BY MR. SYLVESTER:

15       Q.   And, Ms. O'Gorman, just let me know when

16   you're ready to answer questions, okay?

17       A.   Sure.

18       Q.   Okay.  Ms. O'Gorman, you've taken a few

19   minutes to review the document.  Are you ready to

20   answer questions?

21       A.   I am.

22       Q.   Great.

23           The first question is, do you recall

24   sending this email to Mr. Garlinghouse in July of

25   2018?

1       A.  I do.

2           MS. ZORNBERG:  Objection to form.

3           There are at least four emails in the

4  document.

5  BY MR. SYLVESTER:

6       Q.  There's an email -- Ms. O'Gorman, do you

7  see on page 1 of AO2 an email that you sent to

8  Mr. Garlinghouse on July 19th, 2018?

9       A.  I do.

10      Q.  Okay.  And as I mentioned, you took a few

11 minutes to read the document.

12          Is it fair to say that in your email to

13 Mr. Garlinghouse, you were taking issue with a few

14 items of his public statement?

15          MR. DRYLEWSKI:  Objection to form.

16          THE WITNESS:  I wouldn't say I was taking

17 issue, but I was commenting.

18 BY MR. SYLVESTER:

19      Q.  At the very bottom of the first page of

20 AO2, you write about the section in

21 Mr. Garlinghouse's email about global regulatory

22 progress.

23          Do you see that?

24      A.  I do.

25      Q.  Okay.  One of the things that you write

1    about is Mr. Garlinghouse's inclusion of a link to a

2    particular article.

3            Do you see that?

4        A.   I do.

5        Q.   Okay.  And that article, according to your

6    email, cites some random dude who looks all of about

7    16 years old and who apparently is convinced that if

8    FinCEN says XRP is a currency, then that's the end

9    of the securities argument.

10           Is that right?

11           MR. DRYLEWSKI:  Object to form.

12           THE WITNESS:  That's what I stated, yes.

13   BY MR. SYLVESTER:

14       Q.   After that you sentence, you write:

15               "It's just ridiculous."

16           Do you see that?

17       A.   I do.

18       Q.   Do you think that it's ridiculous to

19   assert that if FinCEN says XRP is a currency, then

20   that's the end of the securities argument?

21           MR. DRYLEWSKI:  Objection to form.  Calls

22   for a legal conclusion.

23           THE WITNESS:  Yes, I'm not lawyer, but in

24   my opinion, it was very narrow minded.

25   / /

```
 1   BY MR. SYLVESTER:
 2        Q.   Even ridiculous?
 3             MR. DRYLEWSKI:  Objection.  Same
 4   objection.
 5             THE WITNESS:  That's -- that's what I
 6   said.
 7   BY MR. SYLVESTER:
 8        Q.   Prior to this July 2018 email, had you
 9   ever expressed your opinion to anyone at Ripple that
10   this argument was ridiculous?
11             MR. DRYLEWSKI:  Object to form.
12             And I'm going to instruct you not to
13   answer to the extent it divulges the substance of
14   any communications you had with Ripple's lawyers,
15   inside or outside counsel.
16             THE WITNESS:  I think the term
17   "ridiculous" is something I used in this particular
18   email, so I wouldn't have counted it as ridiculous
19   to anyone other -- at any other time, possibly.
20             But if your question is -- what is your
21   question specifically?
22   BY MR. SYLVESTER:
23        Q.   Let's use the words that you used just
24   now.
25             Did you ever express to anyone at Ripple,
```

1    while you were CCO, that this argument that if

2    FinCEN says XRP is a currency, then that's the end

3    of the securities argument, was very narrow minded?

4              MR. DRYLEWSKI:  Objection.

5              And the same instruction, exclude from

6    your answer the substance of any communications you

7    had with Ripple's lawyers, inside or outside

8    counsel.

9              THE WITNESS:  I may have.

10   BY MR. SYLVESTER:

11       Q.  Can you recall sitting here today any such

12   occasion?

13             MR. DRYLEWSKI:  Same instruction.

14             THE WITNESS:  No.  Not specifically, no.

15   BY MR. SYLVESTER:

16       Q.  Do you have a general recollection of

17   speaking about this topic to anyone at Ripple who

18   was not a lawyer outside the presence of counsel?

19       A.  I do.

20       Q.  Who did you speak with about this topic?

21             MR. DRYLEWSKI:  Objection to form.

22             Just so we're clear on what the topic

23   is --

24             MR. SYLVESTER:  Fair enough.

25   / /

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

135

1          Q.   Setting aside conversations with counsel

2     and conversations where counsel were present, while

3     you were Ripple's CCO, who did you speak to about

4     the concept that if FinCEN says XRP is a currency,

5     that's the end of the securities argument?

6          A.   Well, you had said, "generally."  You

7     included "generally" in the question prior, which is

8     why I said I did.

9               I would have spoken to many on the

10    subject.  I just can't say with whom and when and to

11    what degree.

12         Q.   Did you have multiple conversations, while

13    you were Ripple's CCO, with others at Ripple who are

14    not attorneys, outside the presence of counsel,

15    about the concept that if FinCEN says XRP is a

16    currency, that's the end of the securities argument?

17              MR. DRYLEWSKI:  Object to form.

18              THE WITNESS:  The question is so bundled

19    here.  That's why I'm --

20              MR. DRYLEWSKI:  It's a very long question.

21    If you're confused by it, say so.

22              THE WITNESS:  It's not that I'm confused,

23    but you're asking me a very specific matter, which

24    is, you know, something taken out of this document.

25              Did I speak to them about whether or not

1      that was the end of the argument is something very

2      specific to my response to Brad in this case.  So

3      that's why I'm having trouble responding to your

4      question.

5              I think it needs to be broader than that.

6      But if you want me to say that that's the end of the

7      securities argument, if it was that conversation,

8      then I don't recall that conversation, no.

9      BY MR. SYLVESTER:

10     Q.   Okay.  Do you recall having a conversation

11     with anyone at Ripple while you were Ripple's CCO

12     about whether or not FinCEN's reference to XRP as a

13     currency meant that XRP could not be classified as a

14     security?

15             MR. DRYLEWSKI:  Objection to form.

16             And exclude from your answer any

17     conversations with counsel at Ripple, inside or

18     outside counsel.

19             THE WITNESS:  Okay.

20             MR. DRYLEWSKI:  You can answer "yes,"

21     "no," "I don't know," "I don't recall."

22             THE WITNESS:  Yes.

23     BY MR. SYLVESTER:

24     Q.   With whom did you have those

25     conversations?

1        MR. DRYLEWSKI:  Same instruction.

2        THE WITNESS:  Brad Garlinghouse, the

3   leadership team, maybe others.

4   BY MR. SYLVESTER:

5        Q.   Mr. Larsen?

6        A.   I don't think so.  I can't say.

7        Q.   Who of the leadership team do you recall

8   discussing the topic of whether or not FinCEN's

9   reference to XRP as a currency meant XRP could not

10  be classified as a security?

11       MR. DRYLEWSKI:  Objection to form.

12       And for the record, you're only talking

13  about instances outside the presence of counsel?

14       MR. SYLVESTER:  That's right.  That's

15  right.

16       THE WITNESS:  And so, on that note, I

17  would just say legal was present at all leadership

18  team meetings, so ...

19  BY MR. SYLVESTER:

20       Q.   Okay.  When you were Ripple's CCO, did you

21  have any conversations with Mr. Garlinghouse on the

22  topic of whether or not FinCEN's reference to XRP as

23  a currency meant XRP could not be classified as a

24  security outside the presence of counsel?

25       MR. DRYLEWSKI:  You can answer that

1   question "yes," "no," "I don't know," "I don't

2   recall."

3           THE WITNESS:  Yes.

4   BY MR. SYLVESTER:

5       Q.   What did you say to Mr. Garlinghouse on

6   that occasion or those occasions?

7           MR. DRYLEWSKI:  I'm going to ask you to

8   exclude from your answer the substance of any

9   communications that you had with Mr. Garlinghouse

10  that reflected input or communications that you had

11  with Ripple's lawyers.

12          Do you understand?

13          THE WITNESS:  I do.  Thank you.

14          Okay.  You have to repeat the question

15  again, please.  Thank you.

16  BY MR. SYLVESTER:

17      Q.   What did you say to Mr. Garlinghouse on

18  that occasion or those occasions?

19          MR. DRYLEWSKI:  Same instruction.

20          THE WITNESS:  To the best of my

21  recollection, what I said to Brad was that XRP, or

22  crypto generally, could be considered property,

23  could be considered -- should be considered a

24  commodity, because the FTC had announced in 2015

25  that it would be considered a commodity in certain

1    circumstances.

2            FinCEN called it a "convertible virtual

3    currency." IRS called it "property." And there was

4    a potential that it could be deemed a security

5    depending on facts and circumstances and guidance

6    from the SEC.

7            There was a risk.

8    BY MR. SYLVESTER:

9        Q.   Okay. When was that conversation with

10   Mr. Garlinghouse that you just described?

11       A.   I couldn't say.

12       Q.   Was it -- was it in 2018?

13           MR. DRYLEWSKI:  Objection. Asked and

14   answered.

15           THE WITNESS:  Honestly, I couldn't say.

16   BY MR. SYLVESTER:

17       Q.   Was it near the settlement with FinCEN?

18           MR. DRYLEWSKI:  Same objection.

19           THE WITNESS:  I don't believe he was even

20   an employee at Ripple at the time.

21   BY MR. SYLVESTER:

22       Q.   Fair enough.

23           Do you recall if it was before or after

24   your conversation with him about the DAO report?

25           MR. DRYLEWSKI:  Same objection.

1          THE WITNESS:  Honestly, I have no idea.

2   BY MR. SYLVESTER:

3      Q.    Okay.

4          Ms. O'Gorman, your previous

5   answer -- strike that.

6          You write on page 2 of AO2:

7              "In U.S., XRP is and will be

8          regulated as property, as a

9          commodity, as convertible virtual

10         security and potentially as a

11         security all depending on facts and

12         circumstances and on how the XRP is

13         used.  It's that simple."

14         Is that correct?

15         MR. DRYLEWSKI:  Objection to form.

16         THE WITNESS:  I wrote that, yes.

17  BY MR. SYLVESTER:

18     Q.    When did you first come to the conclusion

19  that XRP may be regulated potentially as a security?

20         MR. DRYLEWSKI:  Objection to form.

21         You can answer the question, but I'm going

22  to instruct you, for this question and others that

23  may follow, not to divulge the substance of any

24  communications you may have had with Ripple's

25  lawyers, inside or outside counsel.

1          Do you understand?

2          THE WITNESS:  I do.  Yeah, I do.

3          So it would be very hard for me to answer

4     that question.

5     BY MR. SYLVESTER:

6          Q.   So my question, Ms. O'Gorman, was when.

7     When did you first come to the conclusion that XRP

8     may be regulated potentially as a security?

9          MR. DRYLEWSKI:  Objection to form.

10          You can answer the question, if you know.

11    The same instruction.

12          MS. ZORNBERG:  Also object to the term

13    "conclusion."

14          THE WITNESS:  Yeah, I was going to say, I

15    didn't conclude.  It wasn't in my jurisdiction to

16    conclude.  I'm not a lawyer.

17          So I can't answer that answer.

18    BY MR. SYLVESTER:

19          Q.   You stated in this email XRP may be

20    potentially regulated as a security, in sum and

21    substance; is that fair?

22          A.   That's fair.

23          MR. DRYLEWSKI:  Objection to form.

24    BY MR. SYLVESTER:

25          Q.   Okay.  Shall we call that a belief?

1         A.    That's very strong.  No, it was --

2         Q.    It's a statement.

3         A.    It was me, my personal opinion.

4         Q.    It's a view.

5         A.    It's a view.

6         Q.    Okay.

7         A.    Let's -- that's fine.

8         Q.    It's a view.

9               So when did you first come to the view?

10              MR. DRYLEWSKI:  Same instruction I gave

11   before.  You can answer the question, if you know.

12              MS. ZORNBERG:  I'm sorry, for the full

13   sentence, the view that it potentially could be

14   regulated as a security?

15   BY MR. SYLVESTER:

16        Q.    Yeah, I'll say it that way.

17              Ms. O'Gorman, when did you first come to

18   the view that XRP could potentially be regulated as

19   a security?

20              MR. DRYLEWSKI:  Same instruction.  You can

21   answer, if you know.

22              THE WITNESS:  I don't know.  I can't say.

23   BY MR. SYLVESTER:

24        Q.    It was during your tenure as CCO?

25        A.    Yes.

 1          Q.   Did you first start thinking about whether

 2    or not XRP might be regulated as a security after

 3    you read the December 2016 Coin Center report?

 4               MR. DRYLEWSKI:   Objection to form.

 5               THE WITNESS:   That would be a fair

 6    statement, yes.

 7    BY MR. SYLVESTER:

 8          Q.   What was it that you read in the

 9    December 2016 ▮▮▮▮▮▮▮ report, if anything, that

10    prompted you to begin thinking about whether or not

11    XRP could be regulated as a security?

12               MR. DRYLEWSKI:   Objection to form.

13               And I'm going to instruct you not to

14    divulge the substance of any communications you may

15    have had with Ripple's counsel, either inside or

16    outside counsel.

17               Do you understand?

18               THE WITNESS:   I do.

19               What was it about the report?

20               It was talking about Bitcoin being

21    potentially a security or not.

22    BY MR. SYLVESTER:

23          Q.   In your mind, how did that relate to XRP?

24               MR. DRYLEWSKI:   Same objections, same

25    instruction to you.

1        THE WITNESS:  Both were convertible

2    virtual currencies, so it had a bearing on the

3    matter, I thought.

4    BY MR. SYLVESTER:

5        Q.    Okay.  You mentioned here, Ms. O'Gorman,

6    that XRP may be regulated potentially as a security,

7    all depending on facts and circumstances; is that

8    right?

9        A.    That's right.

10       Q.    Okay.  What are those facts and

11   circumstances?

12            MR. DRYLEWSKI:  Objection to form.  Calls

13   for a legal conclusion.

14            I'm also going to instruct you not to

15   answer to the extent it divulges the substance of

16   any communications that you may have had with

17   Ripple's counsel, inside or outside.

18            Do you understand?

19            THE WITNESS:  I do.  I do.

20            So I would say I cannot answer that

21   question.

22   BY MR. SYLVESTER:

23       Q.    One of the things that you read that

24   discussed whether or not digital assets could be a

25   security was the            report, correct?

145

1          MS. ZORNBERG:  Object to form.

2          MR. DRYLEWSKI:  It's not popping up.  Hold

3     on one second.

4          MS. MAHONEY:  I'm frozen here.

5          Are you guys frozen?

6          MR. TENREIRO:  Just for a second, but it's

7     back.

8          MR. DRYLEWSKI:  Okay.  It's back.

9          THE WITNESS:  So one of the articles would

10    have been a ████████ publication, that's true,

11    yeah.

12    BY MR. SYLVESTER:

13        Q.   Okay.  From your review of the

14    December 2016 ████████ publication, did you learn

15    what, if any, facts and circumstances were relevant

16    to the securities analysis as it applies to digital

17    assets?

18         MR. DRYLEWSKI:  Objection to form.

19         If you can separate out and answer that

20    question without revealing the substance of any

21    communications you may have had with Ripple's

22    lawyers or anything you may have learned through

23    discussions with Ripple's lawyers on the topic, then

24    you can answer.  But if not, then I'm instructing

25    you not to answer the question on the grounds of

 1   privilege.

 2           Do you understand?

 3           THE WITNESS:  I do.  I do.

 4           On the grounds of privilege, I don't

 5   believe I can answer that question.

 6   BY MR. SYLVESTER:

 7       Q.   Okay.

 8           Since you left Ripple, have you read

 9   anything about the application of the securities

10   laws to digital assets?

11       A.   Yes.

12       Q.   Again, just through post-Ripple media

13   consumption, have you learned anything about what

14   facts and circumstances contribute to the securities

15   law analysis as it pertains to digital assets?

16           MR. DRYLEWSKI:  Object to form.

17           And I'm going to instruct you not to

18   answer on the same grounds that I just did.

19   Although you were not at the company anymore, if you

20   can't separate out what you learned from articles,

21   from what you learned through discussions and

22   communications with Ripple's lawyers when you were

23   CCO, I'll instruct you not to answer on the ground

24   of privilege.  If you can, then you can answer the

25   question that was posed.

```
 1              MS. ZORNBERG:  I'll just add an objection
 2      to form because the question is confusing.
 3              THE WITNESS:  Could I -- just a point of
 4      clarification, with any lawyer?  With any lawyer or
 5      just Ripple's lawyers?
 6              MR. DRYLEWSKI:  My instruction is with any
 7      lawyer.
 8              THE WITNESS:  With any lawyer?
 9              Yeah, I can't answer the question, then.
10      BY MR. SYLVESTER:
11          Q.  Back to the time period when you were
12      Ripple's CCO.
13          A.  Sure.
14          Q.  What steps, if any, did you take, other
15      than consulting lawyers, to determine whether XRP
16      might be a security?
17              MR. DRYLEWSKI:  Objection to form.
18              THE WITNESS:  What steps did I personally
19      take, knowing that I'm not a lawyer?
20              I -- I ...
21              MR. DRYLEWSKI:  I'm going to -- sorry,
22      give me a second.
23              Object to form.  Object to the use of the
24      word "determine."
25              And I'm going to instruct you not to
```

1    answer to the extent, beyond consulting with

2    lawyers, if there were any steps that you took at

3    the direction of lawyers, to exclude that from your

4    answer.

5              Do you understand?

6              THE WITNESS:  I do.  I do.

7              MR. DRYLEWSKI:  Do you need to hear the

8    question again?

9              THE WITNESS:  I understand the question.

10   I'm just going through things in my mind here.

11             It's hard for me to pull legal out of this

12   equation, so I cannot answer.

13             MS. ZORNBERG:  Can we take a break,

14   because there's a -- there's a privilege issue here

15   that I just want to review with her.

16             MR. SYLVESTER:  Yeah, of course.

17             MS. ZORNBERG:  That may be a document.

18             MR. SYLVESTER:  Off the record.

19             THE VIDEOGRAPHER:  Okay.  Off the record

20   at 11:59 a.m.

21             (Whereupon, a recess was taken.)

22             THE VIDEOGRAPHER:  This is the beginning

23   of File Number 5.

24             We're back on the record at 12:18 p.m.

25   / /

```
 1    BY MR. SYLVESTER:
 2         Q.   Ms. O'Gorman, turning your attention to
 3    Exhibit AO2 again, the third paragraph down on the
 4    second page start with a sentence:
 5                   "I'm sure legal is obtaining
 6              outside counsel opinion."
 7              Do you see that?
 8         A.   I do.
 9         Q.   Okay.  And in this paragraph, you advise
10    Mr. Garlinghouse to be sure that it's the right
11    outside counsel advising on XSpring investment
12    opportunities; is that right?
13         A.   That's true.
14         Q.   My reading of your advice to
15    Mr. Garlinghouse is that the preferred counsel for
16    this purpose would be Mary Jo White's SEC team; is
17    that right?
18         A.   That was what I was advising, yeah.
19         Q.   Why was Mary Jo White's SEC's team the
20    preferred counsel, in your view?
21              MR. DRYLEWSKI:  I'm going to instruct you
22    not to answer to the extent it divulges any
23    communications you had with Ripple's lawyers while
24    you were CCO or while you were at the company.
25              THE WITNESS:  Yeah.  So I can't answer
```

1    that question.

2    BY MR. SYLVESTER:

3         Q.    Because of Mr. Drylewski's instruction?

4         A.    That's right.

5         Q.    The next sentence in that paragraph, you

6    write:

7                    "If Ripple provides support to

8               ICO-type projects developed on XRP

9               Ledger (or the Ripple protocol as

10              highlighted in the FinCEN link

11              (bad)) -- it could mean that XRP

12              Ledger would need to register as a

13              'national exchange' with the SEC."

14              My question for you on that is, you refer

15    to something parenthetically as "bad."

16              What was bad in that sentence?

17        A.    So I can't talk specifically about it.  I

18    think -- I believe it might have been the link in

19    his article.

20        Q.    Meaning the link didn't work; is that

21    right?

22        A.    Meaning that it was referencing an article

23    in his email dated 2018, and I don't recall the link

24    myself specifically now.

25        Q.    Okay.  Turning to the first page of AO2,

1    it appears that Mr. Garlinghouse forwarded this

2    email from you to Ms. Long.

3           Would you agree with me?

4      A.    That's what it looks like.

5      Q.    Ms. Long writes:

6            "I love her, but can rebut

7            each of her points for you.  Would

8            prefer to do so live to save time."

9           Do you see that?

10     A.    I see that now, yes.

11     Q.    And do you see that Mr. Garlinghouse

12   appears to respond to Ms. Long with the word

13   "agree"; would you agree?

14     A.    That's what it looks like, yes.

15     Q.    Did Ms. Long ever contact you after you

16   left Ripple on any of the topics in this email?

17     A.    No.

18     Q.    Did Mr. Garlinghouse ever respond in any

19   way to this email rebutting any of the points that

20   you made?

21           MR. DRYLEWSKI:  Objection to form.

22           THE WITNESS:  That's a double question.

23   Do you want to be very specific here in what you're

24   asking me?

25           MR. SOLOMON:  I think she's confused

1    because Mr. Garlinghouse didn't say anything about

2    rebutting anything, maybe?

3              MR. SYLVESTER:  Oh, understand.

4              THE WITNESS:  You said did he ever --

5              MR. SYLVESTER:  Understand.  Sure.

6         Q.   Regardless of who said what, fair enough.

7              Did Mr. Garlinghouse ever respond to this

8    email?

9         A.   In what manner?

10        Q.   In any manner.

11        A.   Not directly, no.

12        Q.   Did he respond indirectly?

13        A.   We had a chat.  We had a call.  We

14   didn't -- we didn't discuss this email, though.

15        Q.   Okay.  So on the call you're referencing,

16   the topics that you wrote about in this email did

17   not come up?

18        A.   They did not, no.

19        Q.   Okay.

20             Did you -- this is while you were CCO at

21   Ripple.

22             Did you ever express the view to anyone at

23   Ripple that, because of the FinCEN settlement, XRP

24   could not be classified as a security?

25             MR. DRYLEWSKI:  Objection to form.

153

1          And instruct you not to answer to the

2    extent it divulges any communications that you had

3    with Ripple's counsel, inside or outside.

4          Do you understand?

5          THE WITNESS:  I do.  I do.

6          Can you repeat the question?

7    BY MR. SYLVESTER:

8        Q.   Sure.

9          While you were Ripple's CCO, did you ever

10   express the view to anyone at Ripple that because of

11   the FinCEN settlement, XRP could not be classified

12   as a security?

13       A.   No.

14          MR. DRYLEWSKI:  The same objection.  The

15   same instruction.

16          THE WITNESS:  Yeah.

17          No.

18   BY MR. SYLVESTER:

19       Q.   Okay.  Ms. O'Gorman, are you familiar with

20   a speech that the former director of the ICC's

21   corporation finance Bill Hinman gave in 2018?

22       A.   Yes.

23       Q.   That was after you left Ripple?

24       A.   I couldn't say exactly.  I think it was

25   prior to, but I don't know.

154

1          It was early in 2018, wasn't it?  I left
2    in April.
3          Q.   Did you ever discuss the
4    contents -- strike that.
5          Did you read the Hinman speech?
6          MS. ZORNBERG:  Can I make a request from
7    the SEC, since you know the date of the Hinman
8    speech, to just clear up the lack of recollection --
9          MR. SYLVESTER:  Sure --
10         MR. TENREIRO:  June 14, 2018.
11         THE WITNESS:  Okay.  So that was after I
12   left Ripple that I read it.
13   BY MR. SYLVESTER:
14         Q.   You did read the speech?
15         A.   (Nods head.)
16         Q.   Okay.  Did you ever communicate with
17   anyone at Ripple about the Hinman speech?
18         A.   I don't recall.  Not to my recollection.
19   No.
20         Q.   Do you recall if you had read the Hinman
21   speech prior to writing this July 19th, 2018 email
22   to Mr. Garlinghouse?
23         A.   No.  It had no bearing on the fact that
24   this was a response to the quarterly investor update
25   that Brad provided.

```
 1              MR. SYLVESTER:  Let's move on to

 2    Exhibit 3, please.

 3              MR. DRYLEWSKI:  Set that to the side.

 4               (Whereupon, Deposition Exhibit AO-3

 5                was marked for identification.)

 6              MR. DRYLEWSKI:  Thanks.

 7    BY MR. SYLVESTER:

 8         Q.   Ms. O'Gorman, I can see you're reviewing

 9    the email, so let me know when you're ready to

10    answer questions.

11         A.   Okay.  Thank you.

12              I'm ready.

13         Q.   All set?  Okay.  Great.

14              So this appears to be an email from you,

15    Ms. O'Gorman, to Patrick Griffin sent on June 4th,

16    2019.

17              Does that look right to you?

18         A.   That's what it appears to be, yes.

19         Q.   Okay.  Do you recall sending this email?

20         A.   I do.

21         Q.   Okay.  The second paragraph of the email,

22    you write:

23                   "So Brad says -- and I have to

24                agree -- that the SEC won't opine

25                on XRP being a security while Jay
```