1          Clayton is in office."

2          Do you see that?

3     A.   I do.

4     Q.   Who is Jay Clayton?

5     A.   He was the head of the SEC at the time.

6     Q.   Did you have a conversation with

7  Mr. Garlinghouse about whether Chairman Clayton

8  would opine on XRP?

9          MR. DRYLEWSKI:  Objection to form.

10         During the time she was at the company or

11 after she left?

12 BY MR. SYLVESTER:

13    Q.   Let's start with after you left.

14    A.   The question again?

15    Q.   Sure.

16         Did you have a conversation with

17 Mr. Garlinghouse about whether or not

18 Chairman Clayton would opine on XRP after you left

19 Ripple?

20    A.   I would say no, I didn't, because that's a

21 very specific question.  So no.

22    Q.   Okay.  Did you have a conversation with

23 Mr. Garlinghouse about whether or not Jay Clayton

24 would opine on XRP while you were a CCO of Ripple?

25         MR. DRYLEWSKI:  Objection to form.

1          I'm going to instruct you not to answer to

2     the extent it divulges communications with Ripple's

3     lawyers.

4          THE WITNESS:  I don't believe I can answer

5     that question in that context.

6     BY MR. SYLVESTER:

7          Q.   Okay.  Did you ever speak with

8     Mr. Garlinghouse about any meeting he had with

9     Chairman Clayton?

10         A.   No.

11         Q.   Do you have an understanding of whether or

12    not Mr. Garlinghouse ever met with Chairman Clayton?

13         MR. DRYLEWSKI:  Exclude from your answer

14    any communications that you had with Ripple's

15    counsel.

16         THE WITNESS:  The answer would be no.

17         MR. SYLVESTER:  Counsel, so if she learned

18    from counsel that Mr. Garlinghouse met from

19    Chairman Clayton, you're instructing her not to

20    answer on the basis --

21         MR. DRYLEWSKI:  I've asked her to exclude

22    from her answer the substance of any communications

23    she had between her and Ripple's counsel.

24         MR. SYLVESTER:  I just mean did she learn

25    of the fact of the meeting, though.

 1              MS. ZORNBERG:  So let me try to help here.

 2              As a yes-or-no question, from any source,

 3       did you ever learn one way or another whether

 4       Brad Garlinghouse had met with Jay Clayton?

 5              THE WITNESS:  And I said no.  And that was

 6       my answer.

 7       BY MR. SYLVESTER:

 8          Q.   Okay.  I wasn't sure --

 9          A.   I know.

10          Q.   Just so you know, Ms. O'Gorman, I'm not

11       trying to be an obstructionist, I wasn't sure if you

12       knew and were not answering on the basis of your

13       counsel's instruction.

14              Let's move on.

15          A.   Yeah.

16          Q.   Okay.

17              Do you have an understanding from any

18       source whether or not anyone at Ripple met with the

19       SEC prior to the filing of this lawsuit?

20              MR. DRYLEWSKI:  Object to form.

21              You can answer the question, but do not

22       divulge the substance of any communications you may

23       have had with Ripple's counsel.

24              THE WITNESS:  I did not, no.

25       / /

1    BY MR. SYLVESTER:

2        Q.    Okay.

3              Are you aware of anyone at the SEC ever

4    telling anyone at Ripple that the sales of XRP were

5    not the sales of securities?

6              MS. ZORNBERG:    Sorry.

7              MR. SYLVESTER:    I can do it --

8              MS. ZORNBERG:    Can you read that question

9    again?    I missed it.

10                   (Record read by the reporter

11             as follows:

12                   QUESTION:    Are you aware of

13             anyone at the SEC ever telling

14             anyone at Ripple that the sales of

15             XRP were not the sales of

16             securities?)

17             MS. ZORNBERG:    I think you can answer that

18   question as a "yes" or a "no" based on your personal

19   knowledge.

20             THE WITNESS:    Sure.

21             No, I'm not aware.

22   BY MR. SYLVESTER:

23        Q.    Okay.    Turning again to Exhibit AO3, the

24   second paragraph, do you see the phrase where you

25   write:

```
 1                    "Multiple ex-SEC

 2               regulators/lawyers arguing the

 3               Howey test in our favor"?

 4        A.    I do see that, yes.

 5        Q.    In that sentence, is "our favor" Ripple's

 6   favor?

 7        A.    It is.

 8        Q.    Okay.  And in that sentence, when you say

 9   "arguing the Howey test in our favor," are you

10   referencing application of the Howey test to XRP?

11        A.    To the best of my recollection, that would

12   be correct, yes.

13        Q.    Okay.

14               Going back in time to the time when you

15   read the December 2016 ████████ report --

16        A.    Okay.

17        Q.    -- at that point in time, did you

18   understand that the Howey test was what would be

19   applied to determine whether or not XRP was a

20   security?

21               MR. DRYLEWSKI:  I'm going to object to

22   form.  Calls for a legal conclusion.

23               I'm going to instruct the witness not to

24   divulge the substance of any communications that you

25   had with Ripple's lawyers.
```

1    If you can answer the question without

2 doing that, subject to Ripple's lawyer, you can

3 answer the question.

4    THE WITNESS:  I will preface it by saying

5 I'm not a lawyer, but yes, that was my

6 understanding.

7 BY MR. SYLVESTER:

8  Q. Is that an understanding that you obtained

9 from your review of the 2016     paper?

10  A. It may have been.  I just can't say.

11  Q. Okay.

12    Prior to the 2016     paper, can

13 you recall whether or not you had an understanding

14 that the Howey test is what would apply to the sales

15 of XRP?

16    MR. DRYLEWSKI:  Same objection --

17    MS. ZORNBERG:  Object to form.

18    MR. DRYLEWSKI:  -- same instruction.

19    THE WITNESS:  I would have to speculate on

20 that.  And if I were to speculate, I would say no --

21 no, I don't know.  I don't recall.

22 BY MR. SYLVESTER:

23  Q. Okay.  Let's turn to the second page of

24 AO3, please.

25    Ms. O'Gorman, do you see in the middle of

1  the page, there's a May 29th, 2019 email that you

2  appear to have sent to Mr. Garlinghouse?

3      A.   I do see that, yes.

4      Q.   Do you recall sending this email?

5      A.   I do.

6      Q.   Okay.  Is it fair to say that in this

7  email, you're conveying to Mr. Griffin certain

8  topics of conversation from a conversation you had

9  with Mr. Garlinghouse?

10          MS. ZORNBERG:  Object to form.

11          THE WITNESS:  It would be fair to say,

12  yes.

13  BY MR. SYLVESTER:

14      Q.   Okay.  Do you see the second paragraph

15  that starts:

16              "Anyway, we had a grand old

17          chat."

18      A.   Yeah.  Yes, I do.

19      Q.   Is the "we" in that paragraph you and

20  Mr. Garlinghouse?

21      A.   Yes.

22      Q.   The second sentence says:

23              "He mentioned Ripple's CFTC

24          strategy."

25          Do you see that?

1          A.    I do.

2          Q.    Is the "he" in that sentence

3     Mr. Garlinghouse?

4          A.    It is.

5          Q.    What was Ripple's CFTC's strategy

6     according to Mr. Garlinghouse?

7               MR. DRYLEWSKI:  Objection to form.

8               THE WITNESS:  I think I used the wrong

9     terminology there.  This was personal email,

10    meaning -- is it the strategy piece that you're

11    asking about?

12    BY MR. SYLVESTER:

13         Q.    Just what do the words "CFTC strategy"

14    mean as used by Mr. Garlinghouse or by you in this

15    email?

16              MR. DRYLEWSKI:  Object to form.

17              THE WITNESS:  Object to form.

18              It meant that CFTC was forming a committee

19    on the digital assets, and there was talk from

20    Patrick, not Brad, about him potentially being a

21    member on that committee, subject to a CFTC

22    agreement, of course, him being a subject matter

23    expert on blockchain technology and digital assets

24    having been at Ripple for many years.

25    / /

1  BY MR. SYLVESTER:

2      Q.   Is the "him" in that sentence Mr. Griffin?

3      A.   Patrick.  Patrick, yes.

4      Q.   Thank you.

5           MR. SYLVESTER:  Okay.  Let's move on to

6  Exhibit 4, please.

7               (Whereupon, Deposition Exhibit AO-4

8                was marked for identification.)

9           MR. SYLVESTER:  Jorge, will you also get

10 44, please?

11          MR. TENREIRO:  Sure.

12              (Whereupon, Deposition Exhibit AO-44

13               was marked for identification.)

14          ZOOM PARTICIPANT:  What number exhibit is

15 this exhibit, please?

16          MR. SYLVESTER:  It's 4, and also, 44.

17          MS. ZORNBERG:  4 and 44.

18          ZOOM PARTICIPANT:  Thank you.

19 BY MR. SYLVESTER:

20     Q.   So, Ms. O'Gorman, I'm just going to ask

21 you first to -- a question about Exhibit 4, which

22 appears to be a one-page email from Mr. ███ to you

23 sent on June 11th, 2015.

24          Do you see that?

25     A.   Mh-hmm.  I do.

1    Q.    Now, I'm going to represent for the record

2    that the attachment to this email was initially

3    withheld by Ripple's counsel for privilege.

4    A.    Okay.

5    Q.    But Ripple's counsel has since confirmed

6    that the attachment to this email is identical to

7    Exhibit 44 that you have in front of you, which it

8    was produced without a privilege assertion.

9    So for purposes of my questions, I'm going

10   to treat Exhibit 44 as the attachment to this email,

11   since it's an identical document.

12   A.    Fine.

13   Q.    Okay.  You received this email from

14   Mr.          about a month after you started at Ripple;

15   is that right?

16   A.    It says June of 2015, so it would have

17   been a number of months.  I started in February.

18   Q.    Thank you.

19   And attached to this email is a memo that

20   is entitled, "Analysis of whether XRP is a security

21   for the purposes of federal and state regulation."

22   That's Exhibit 44.

23   Do you see that?

24   A.    I do.

25   Q.    Okay.  Did you read this memo around the

1    time that you received the June 2015 email from

2    Mr. ███

3         A.    I have no recollection of reading this

4    memo.

5         Q.    Just to be clear, do you have any

6    recollection of reading the memo at any point in

7    time at your tenure at Ripple?

8         A.    I actually do not, no.  No recollection.

9         Q.    Okay.

10            Do you recall -- strike that.

11            Were you aware -- strike that.

12            Did you discuss your receipt of this memo

13   with anyone in around June of 2015?

14            MS. ZORNBERG:  Object to form.  And object

15   on grounds -- just to make a clear privilege record

16   of the position the company has taken, this memo has

17   been produced as a -- as a non-privileged document,

18   but, first of all, I think it's moot because she

19   doesn't remember reading it.  But any discussions,

20   if she had recalled, discussions with counsel about

21   the memo, we are still asserting privilege as to

22   that.

23            But with that caveat, please go ahead and

24   ask your questions.

25            MR. SYLVESTER:  I think we're on the same

1  page.

2      Q.    Apart from conversations with counsel, do

3  you recall discussing the existence of this legal

4  memo with anyone at Ripple?

5      A.    I do not recall, no.

6      Q.    Can you turn with me to the back page of

7  Exhibit 44, please.

8      A.    Sure.

9      Q.    The final sentence of the memo says:

10              "To mitigate these risks,

11          Ripple Labs should avoid touting

12          the potential profits that buyers

13          of XRP will derive from its

14          appreciation of value, and instead,

15          focus on its intrinsic utility."

16          Do you see that?

17      A.    I do.

18      Q.    Moving away from the memo, understanding

19  you didn't read it, or have no recollection of

20  reading it, while you were Ripple's CCO, did you

21  understand the substance of that sentence?

22          MS. ZORNBERG:  Object.

23          MR. DRYLEWSKI:  Object --

24          MS. ZORNBERG:  Objection.  That is an

25  entirely improper question.

1          MR. SYLVESTER:  Why?

2          THE WITNESS:  Because I didn't read it.

3          MR. DRYLEWSKI:  No, hold on.  There's no

4     question for you to answer right now.

5          MR. SYLVESTER:  I'm not sure why that's

6     improper.

7          MS. ZORNBERG:  Please restate your

8     question.

9          MR. SYLVESTER:  Okay.

10         Q.   Ms. O'Gorman, I read the final sentence to

11    you.  You heard that, correct?

12         A.   I did, yes.

13         Q.   While you were Ripple's CCO, did you

14    understand the substance of that sentence to be

15    true?

16         MS. ZORNBERG:  Objection.  Ridiculous

17    question.

18         MR. SYLVESTER:  I'm not sure what the

19    objection is, I mean, other than ridiculousness.

20         MS. ZORNBERG:  You're reading her sentence

21    now in 2021, by my watch, and you're saying, when

22    you were CCO five years ago, did you understand what

23    that sentence meant?

24         MR. SYLVESTER:  No, that's not what I

25    asked.

1        MS. ZORNBERG:  All right.  So put a

2    question that's sensible.

3    BY MR. SYLVESTER:

4        Q.   All right.  Let's try this again.

5             When you were Ripple's CCO --

6        A.   Yes.

7        Q.   -- did you understand that Ripple Labs

8    should avoid touting the potential profits that

9    buyers of XRP will derive from its appreciation of

10   value, and instead, focus on its intrinsic utility?

11        MS. ZORNBERG:  Object to form.

12             If you understand the question, you can

13   answer.

14             I'm also going to place an objection

15   because you're reading one sentence of a memo she

16   didn't read, you're purposely avoiding reading any

17   other sentence in that same paragraph, like XRP

18   is --

19        MR. SYLVESTER:  Counsel, please, enough,

20   no testimony.  That's twice.

21        MS. ZORNBERG:  I'm not testifying.

22        MR. SYLVESTER:  Please, don't.

23        MS. ZORNBERG:  I think it's an improper

24   line of questioning.

25        MR. SYLVESTER:  I think it's improper for

1    you to testify for the witness.

2              MS. ZORNBERG:  My objection is noted for

3    the record.

4              MR. SYLVESTER:  And my objection is your

5    testifying is noted.

6              THE WITNESS:  Well, I'm reading this

7    sentence directly from this memo, so I would have to

8    say no to that question.

9              MR. SYLVESTER:  Let's move on to

10   Exhibit 5, please.

11             (Whereupon, Deposition Exhibit AO-5

12             was marked for identification.)

13   BY MR. SYLVESTER:

14        Q.   So, Ms. O'Gorman, this is a rather lengthy

15   exhibit.  Let me start with this is an email from

16              ██████ at ████████ to Mr. Larsen and others

17   sent on July 10th, 2015.

18             You're not copied on this email, so my

19   question to you is just whether you're familiar with

20   the attachment, the 2015 Ripple Trade BSA/AMLOFAC

21   Risk Assessment?

22        A.   I'm familiar with it, yes.

23        Q.   Did you have a hand in preparing it?

24        A.   Yes.

25        Q.   Okay.  What was your role in the

1     preparation of that document?

2          A.   I was BSA officer at the time.

3          Q.   And specific to this document, did you

4     draft it?

5          A.   ██████████ drafted it.

6          Q.   And what was your role with respect to the

7     preparation of this document?

8               MR. DRYLEWSKI:  Objection to form.

9               THE WITNESS:  The oversight and inclusion.

10    BY MR. SYLVESTER:

11         Q.   Is there any reason to believe that

12    anything in this document is not accurate?

13              MR. DRYLEWSKI:  Objection to form.

14              For the record, this is a lengthy

15    document.

16              MR. SYLVESTER:  Yeah.

17              MR. DRYLEWSKI:  You're asking her to

18    confirm the accuracy of everything in this document

19    right now?

20              MR. SYLVESTER:  I'm asking more of a

21    process question.

22         Q.   Did you supply the information in this

23    document?

24              MS. ZORNBERG:  Object to form.

25              And has the witness taken time to actually

1   read the document sitting here?  And is that

2   something that you want her to do to answer the

3   question?

4           MR. SYLVESTER:  I don't want her to read

5   the entire document.  I would like to know what her

6   role was with respect to the document, and my

7   question was, did she supply the information in the

8   document?

9           MR. DRYLEWSKI:  Any of the information in

10  the document?

11          MR. SYLVESTER:  Yes.

12          MR. DRYLEWSKI:  If you can answer that

13  question -- and, again, feel free to familiarize

14  yourself again with it.  If you can answer that

15  question, go ahead.

16          I object to form.

17          THE WITNESS:  I assume you're talking

18  about the risk assessment piece here and not terms

19  with          number 1.

20          And number 2 --

21          MR. SYLVESTER:  Yeah, sorry, to clarify my

22  question, I just mean the attachment.

23          THE WITNESS:  Okay.

24          MR. DRYLEWSKI:  But feel free to look at

25  that attachment if you need to to answer that

1    question.

2    BY MR. SYLVESTER:

3         Q.    Did you supply any of the information in

4    this document?

5              MR. DRYLEWSKI:  Same objection.

6              MS. ZORNBERG:  Yeah.

7              THE WITNESS:  "Supply" is a big word here

8    in this case.  But did I participate in the

9    publication of this document and drafts thereof?

10             Yes, I did.

11   BY MR. SYLVESTER:

12        Q.    Okay.  Who else at Ripple, if any,

13   participated in the drafting of this document?

14        A.    Possibly -- it's a long time ago -- ███

15   ███ legal.

16             MR. DRYLEWSKI:  Object to the form of the

17   last question.

18   BY MR. SYLVESTER:

19        Q.    Moving away from the document, setting it

20   to one side --

21        A.    Okay.

22        Q.    -- I'm just asking you a question about,

23   in 2015, when you were Ripple's CCO.

24        A.    Okay.

25        Q.    Did you have an understanding that XRP at

```
1    that time had very limited commercial use?
2                MR. DRYLEWSKI:  Objection to form.
3                Exclude from your answer any conversations
4    you may have had with legal.
5                MS. ZORNBERG:  You also said in 2015 when
6    she was CCO.
7                So you want to direct her only to the
8    latter portion of the year?
9                Just can you fix a time, because she had
10   two different titles in that year?
11               MR. SYLVESTER:  Sure.  It's a good point.
12       Q.    Let's go with the entirety of 2015.
13               So while you were at Ripple, so February
14   through December of 2015, did you have an
15   understanding at that point in time that XRP had
16   very limited commercial use?
17               MR. DRYLEWSKI:  Same objection.
18               THE WITNESS:  That was my understanding,
19   yes.
20   BY MR. SYLVESTER:
21       Q.    Okay.  Same time period, February to
22   December 2015, did you have an understanding that
23   XRP was mainly held as a speculative asset?
24               MR. DRYLEWSKI:  Objection to form.
25               THE WITNESS:  No.  That would not have
```

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

1    been true.

2    BY MR. SYLVESTER:

3         Q.   In 2015, while you were at Ripple, what

4    was -- what were XRP's uses, other than speculation?

5              MR. DRYLEWSKI:  Objection to form.

6              THE WITNESS:  So let's talk about Ripple

7    Trade, which was a software, which was a software

8    view into XRP Ledger or the Ripple consensus ledger,

9    the blockchain technology under which XRP sat.

10   Ripple Trade used XRP.

11   BY MR. SYLVESTER:

12        Q.   How did Ripple Trade use XRP?

13        A.   XRP was the currency native to XRP Ledger,

14   so in viewing transactions conducted on XRP Ledger,

15   XRP would have been used as a medium of exchange by

16   regulatory users, and also, used as a postage stamp,

17   let's just say, for any transactions that were

18   conducted on XRP Ledger, or the consensus ledger, to

19   make sure that a little part of it was destroyed in

20   all transactions.

21             Depending on the amount of transaction

22   activity conducted on the Ledger at the time, the

23   value would increase or decrease.  The amount of XRP

24   destroyed would increase or decrease.

25        Q.   When Ripple Trade was in existence, could

1    someone purchase XRP using Ripple Trade?

2         A.    No.

3              MR. DRYLEWSKI:  Sorry, let me jump in.

4              Objection to form.

5              MR. SYLVESTER:  Okay.  Let's move on to

6    Exhibit 8, please.

7                   (Whereupon, Deposition Exhibit AO-8

8                   was marked for identification.)

9    BY MR. SYLVESTER:

10        Q.    Actually, before we move on, let's just

11   pop back to our current exhibit, which is AO5.

12             Will you turn with me to page 6?

13             MR. DRYLEWSKI:  Page 6 of the attachment?

14             MR. SYLVESTER:  Yes.  I apologize, page 6

15   of the attachment, ending in Bates -3202.

16             THE WITNESS:  Okay.

17   BY MR. SYLVESTER:

18        Q.    Ms. O'Gorman, do you see the second

19   paragraph that starts with "The use of the network

20   remains nascent"?

21        A.    I do.

22        Q.    Okay.  The next sentence reads:

23                   "Currently, XRP has very

24                   limited commercial use and is

25                   mainly held as a speculative asset

1               by companies and individuals that

2               believe it will rise in value as

3               the Ripple network expands."

4          Do you see that?

5      A.   I do.

6      Q.   Do you have any reason to believe that

7   that sentence is inaccurate at the time it was

8   written?

9          MR. DRYLEWSKI:  Objection to form.

10          THE WITNESS:  In hindsight, yes, I do

11   believe it to be inaccurate, yes.

12   BY MR. SYLVESTER:

13      Q.   How -- if you know, how did the sentence

14   make it into this document?

15          MR. DRYLEWSKI:  Objection to form.

16          THE WITNESS:  I don't know how it made it

17   into the document.  I can't state.

18   BY MR. SYLVESTER:

19      Q.   At the time, in 2015, just to be clear, it

20   was your view that the statement that XRP is mainly

21   held as a speculative asset is not accurate?

22          MR. DRYLEWSKI:  Objection to form.

23          THE WITNESS:  I think I already answered

24   that, didn't I?

25   / /

1    BY MR. SYLVESTER:

2        Q.   So that was your view at the time?

3        A.   What --

4             MR. DRYLEWSKI:  Same objection.

5             THE WITNESS:   What was my view?  Sorry?

6             I said --

7    BY MR. SYLVESTER:

8        Q.   I think you testified that in hindsight,

9    the sentence is inaccurate?

10       A.   Yes.

11       Q.   So I'm just trying to clarify that.

12            Putting you back in 2015, you're at

13   Ripple, at that time, would you have thought that

14   this sentence is inaccurate?

15            MR. DRYLEWSKI:  Objection to form.

16            THE WITNESS:  Very hard to say in 2015.  I

17   don't recall.

18            MR. SYLVESTER:  Okay.  Let's move on to

19   the next one.

20       Q.   So, Ms. O'Gorman, while you take a look at

21   the document, I'll state for the record it's an

22   email chain.  The top email is from Ms. O'Gorman to

23   Mr. [redacted] dated October 31st, 2016.

24            ZOOM PARTICIPANT:  Exhibit number?

25            MR. SYLVESTER:  Eight.

```
 1              ZOOM PARTICIPANT:  Eight?

 2              MR. SYLVESTER:  That's correct.

 3              ZOOM PARTICIPANT:  Thank you.

 4    BY MR. SYLVESTER:

 5         Q.   Ms. O'Gorman, have you had a chance to

 6    review AO8?

 7         A.   I have.

 8         Q.   Okay.  Do you see near the bottom of the

 9    first page of Exhibit 8 an email from Patrick

10    Griffin in which he says:

11                   "Can XRP be both a currency,

12              FinCEN territory" -- excuse me --

13              "FinCEN territory and a commodity

14              CFTC territory?"

15         A.   I -- I see it.

16              I presume this is an email to Brad.  Is

17    it?

18         Q.   It's unclear from the chain who the

19    recipient is except the top email above that appears

20    to be you responding.

21              Do you see that?

22         A.   I do, yeah.

23         Q.   Okay.  And it's responding to Mr. Griffin

24    and a cc to Mr. Garlinghouse.

25              Do you see that?
```

1        A.   I do see that, yes.

2        Q.   Okay.  And can you please read to me the

3   first couple of sentences of your reply to

4   Mr. Griffin's question?

5        A.   So it's question:

6                "Can XRP be both a currency

7             FinCEN territory and a commodity

8             CFTC territory?"

9             I say:

10                "Yes, it can and more" --

11             (Reporter clarification.)

12             MR. DRYLEWSKI:  You have to read slower.

13   Not a problem.

14             THE WITNESS:  I'm reading from it.

15                "Yes, it can, and more.  IRS

16             is of the opinion that virtual

17             currency is property.  CFTC treats

18             it as a commodity.  FinCEN has

19             stated their opinion that virtual

20             currency operates as real currency

21             in some environments, and the SEC

22             may well come out on the side that

23             certain cryptocurrencies are

24             securities.  It's an interesting

25             conundrum and one that begs for a

1          more uniform regulatory approach at

2          the federal (and state levels) but

3          the probability of that ever

4          happening is extremely low."

5    BY MR. SYLVESTER:

6         Q.   Okay.  So as of October 2016, you're aware

7    that XRP could be classified as both a virtual

8    currency and a security; is that right?

9         MR. DRYLEWSKI:  Objection to form.  Calls

10   for a legal conclusion.

11   BY MR. SYLVESTER:

12        Q.   You can answer.

13        A.   So, yeah, it was -- already had been

14   stated by many regulators that it fell under their

15   purview.  There was a potential risk that XRP could

16   be considered a security.

17        Q.   Okay.  You state a number of things in

18   this paragraph, including the IRS's view, the CFTC's

19   view, FinCEN's view, and possibly the SEC's view.

20   Is that fair?

21        A.   That's fair, yeah.

22        Q.   How did you come to understand --

23        MS. ZORNBERG:  I'm just going to object to

24   "possibly the SEC's view."

25        I think it misstates what she wrote in the

1    email.

2    BY MR. SYLVESTER:

3        Q.    You wrote in the email:

4                "The SEC" --

5                (Reporter clarification.)

6    BY MR. SYLVESTER:

7        Q.    Ms. O'Gorman, you write in the email:

8                "The SEC may welcome out on

9            the side that certain

10           cryptocurrencies are securities."

11           Is that right?

12       A.    I did write that, yes.

13       Q.    Okay.  So my question is, how did you come

14   to that view?

15               MS. ZORNBERG:  Objection.

16               MR. DRYLEWSKI:  Objection to form.

17               I'm going to instruct the witness not to

18   answer to the extent it divulges the substance of

19   any communications that you had with Ripple's

20   lawyers, inside or outside counsel.

21               Do you understand?

22               MS. ZORNBERG:  Object to the term "view"

23   as I don't know what view you're referring to

24   specifically.

25               You can answer if you understand.

1   BY MR. SYLVESTER:

2      Q.   If you understand the question, you can

3   answer.

4      A.   Based on what Alex just said, I don't

5   think I can pull that apart from legal, so I can't

6   answer.

7      Q.   So this is an email that you wrote in

8   October 2016.

9      Can you recall an earlier occasion when

10   you expressed the view that XRP could be classified

11   differently by different regulators?

12      MR. DRYLEWSKI:  Objection to form.

13      THE WITNESS:  According to above, I may

14   have.  I don't know.

15   BY MR. SYLVESTER:

16      Q.   Other than yourself and counsel, are you

17   aware of anyone at Ripple taking any steps to learn

18   more about the potential classification of XRP as a

19   security under U.S. securities laws?

20      MR. DRYLEWSKI:  Object to form.

21      THE WITNESS:  Yes.

22   BY MR. SYLVESTER:

23      Q.   Who?

24      A.   For one, it would have been Ryan Zagone,

25   who reported directly to me, because I tasked him

1  with that.

2      Q.   When did you task Mr. Zagone with taking

3  steps to learn more about the potential for

4  classification of XRP as a security under the U.S.

5  securities laws?

6      A.   It --

7          MS. ZORNBERG:  And I would just -- just

8  pause.

9          To the extent that it involved any

10 communications with counsel or direction of counsel,

11 please exclude that from your answer.

12         THE WITNESS:  Yeah.

13         The way you word the question, I never

14 tasked him with classification.  I tasked him with

15 doing an analysis against the Howey test.

16         But that was a -- with counsel.  So ...

17         MS. ZORNBERG:  Okay.

18 BY MR. SYLVESTER:

19     Q.   When was this?

20     A.   I would say January of 2017, but I could

21 be wrong by a day or two or a week or two.

22     Q.   Was the genesis of this project your

23 review of the late 2016 ███████ paper?

24     A.   Yes.

25         MR. DRYLEWSKI:  Objection to form.

 1   BY MR. SYLVESTER:

 2        Q.   I'm a little confused about counsel's

 3   involvement, so let me ask.

 4        A.   Please.

 5        Q.   Did Mr. Zagone do the analysis with

 6   counsel; is that your testimony?

 7             MS. ZORNBERG:  So I think -- I think we're

 8   going to need a break.

 9             MR. SYLVESTER:  Okay.  To figure out

10   privilege?

11             MS. ZORNBERG:  Yeah.

12             THE WITNESS:  Okay.

13             MS. ZORNBERG:  And I guess the question

14   is, given the hour, that it's one o'clock, I don't

15   know if Ms. O'Gorman wants to take a lunch break?

16             MR. TENREIRO:  Let's finish this line,

17   though, right, and then we can take a lunch?

18             MS. ZORNBERG:  That's fine.

19             MR. TENREIRO:  Because this is very

20   discrete.

21             MS. ZORNBERG:  Yep.  Okay.  So then we'll

22   just step next door and come -- come right back.

23             THE VIDEOGRAPHER:  Off the record at

24   1:00 p.m.

25             (Whereupon, a recess was taken.)

```
 1              THE VIDEOGRAPHER:  Okay.  This is the

 2    beginning of File Number 6.

 3              We're back on the record at 1:04 p.m.

 4              MR. SYLVESTER:  Kat, would you mind

 5    reading back the last question I asked?

 6                   (Record read by the reporter

 7              as follows:

 8                   QUESTION:  Did Mr. Zagone do

 9              the analysis with counsel; is that

10              your testimony?)

11              MS. ZORNBERG:  Okay.  So let me just

12    interject on behalf of Ripple Labs, and make a

13    proffer based on our factual information, which is

14    that both Mr. Zagone and Ms. O'Gorman had

15    communications with            in connection with

16    that assignment, and so we -- we're gonna claim --

17    assert privilege and direct the witness not to

18    answer on substantive questions about the

19    assignment.

20              But you have -- you have the witness's

21    answer about the fact that there was such an

22    assignment.

23              MR. TENREIRO:  Can we have the time of the

24    assignment?  The date the assignment was given?

25              MR. SYLVESTER:  Did you say January --
```

1            THE WITNESS: I thought we said

2  January 2017.

3            MR. SYLVESTER: January 2017?

4            Yeah. Sorry.

5            MS. ZORNBERG: To the best of her

6  recollection.

7            THE WITNESS: Yeah. Yeah.

8            MR. TENREIRO: Well, you were giving a

9  proffer, so that's why I was asking.

10           MS. ZORNBERG: Yeah. I'm done with the

11  proffer, so anything else we'd have to take question

12  by question.

13  BY MR. SYLVESTER:

14     Q. Okay. Did you have any conversations with

15  Mr. Zagone about this assignment prior to the

16  involvement of Ripple's counsel?

17     A. I may have. I can't recall.

18     Q. Did you have any conversations with anyone

19  else at Ripple who was not a lawyer about your

20  assignment to Mr. Zagone prior to Ripple's counsel's

21  involvement?

22     A. Yes.

23     Q. Who?

24     A. Chris Larsen.

25           MS. ZORNBERG: I'm sorry, what was the

188

1    answer?

2              MR. SYLVESTER:  Mr. Larsen.

3              THE WITNESS:  Chris Larsen.

4              MR. DRYLEWSKI:  You said this is prior to

5    counsel's involvement?

6              I just want to make sure the timing is

7    clear because your answer to the question before was

8    you weren't sure.

9              I'm really just trying to make sure it's a

10   clear record here.

11             THE WITNESS:  Okay.  So I want to be very

12   clear here as well.

13             I spoke with Chris prior to speaking with

14   ████████ nd prior to tasking Ryan about this.  So I

15   did.

16   BY MR. SYLVESTER:

17        Q.   That's helpful.  Thank you.

18             The conversation that you had with

19   Mr. Larsen, is that the conversation we discussed

20   previously about the ████████ report?

21        A.   That's right.

22        Q.   Okay.  In that conversation, did you and

23   Mr. Larsen discuss undertaking this exercise of

24   trying to figure out how -- whether or not XRP might

25   be a security?

189

```
 1              MR. DRYLEWSKI:  Object to form.
 2              THE WITNESS:  The way you're
 3    characterizing it is not -- is not how it was.
 4              The article came out from
 5    saying that Bitcoin would not be considered a
 6    security and should not be considered a security.
 7    And so Chris asked me to look at it to make sure
 8    that XRP would also not be considered a security, to
 9    the best of my ability.  I'm not a lawyer, of
10    course, as you know.  Neither is Ryan.
11    BY MR. SYLVESTER:
12         Q.  Do you have an understanding at the time
13    of why Mr. Larsen asked you to undertake this task?
14              MR. DRYLEWSKI:  Objection to form.
15              THE WITNESS:  I mean, I can't speak for
16    Chris, but do you want --
17    BY MR. SYLVESTER:
18         Q.  If you have an understanding, if you know.
19         A.  He didn't tell me exactly why, but ...
20         Q.  Was it because you were CCO?
21              MS. ZORNBERG:  Object to form.
22              THE WITNESS:  Okay.  Yeah.  Yeah.  I don't
23    know.  But I was handling the FinCEN agreement.
24    Maybe he thought it was regulatory in nature.  I
25    couldn't say.  Regulations reported to me.
```

```
 1    BY MR. SYLVESTER:

 2         Q.   Okay.  Was the final result of

 3    Mr. Zagone's work with legal on the topic of the

 4    classification of XRP under the securities

 5    laws -- strike that.

 6              How, if at all, was the conclusion

 7    regarding the classification about XRP under the

 8    securities laws memorialized in a documentary form?

 9              MR. DRYLEWSKI:  Object to form.

10              THE WITNESS:  Yeah.  The conclusion is

11    very --

12              MS. ZORNBERG:  Hold on one sec.

13              Just to make sure, he's not asking you

14    about the substance of any report that involved

15    legal involvement.  He's asking you, do you know,

16    yes or no, if there was a document that embodied a

17    conclusion.

18              THE WITNESS:  Yes.

19    BY MR. SYLVESTER:

20         Q.   There was a document?

21         A.   There was.

22         Q.   Okay.  Who were the authors of that

23    document?

24              MS. ZORNBERG:  If you know, and he's not

25    asking you to speculate.
```

```
 1              THE WITNESS:  Yeah.  I couldn't say for
 2    sure.
 3    BY MR. SYLVESTER:
 4         Q.   Mr. Zagone was one of the authors?
 5         A.   Yes.  Absolutely.
 6         Q.   Was Mr.         one of the authors?
 7         A.   I don't remember.
 8         Q.   Ms.
 9         A.   I don't remember.
10         Q.   Can you recall sitting here today any
11    lawyer that was the author of that document?
12         A.   Could you show me the document?
13              It might state.  I don't really know.
14              MR. SOLOMON:  Except for when they ask
15    questions.
16              MR. TENREIRO:  We don't have the document.
17              THE WITNESS:  Oh, sorry.
18              I don't know.
19    BY MR. SYLVESTER:
20         Q.   What's the basis for your recollection
21    that lawyers were involved in the preparation of the
22    document?
23              MR. DRYLEWSKI:  Objection.
24              MS. ZORNBERG:  I think you're asking --
25    you're calling for privileged information.
```

```
 1              MR. SYLVESTER:  I'm just trying to figure

 2    out where the privilege attaches, because she

 3    doesn't recall any lawyers that were involved in the

 4    drafting of the document?

 5              THE WITNESS:  No.  No.  No.  No.  That's

 6    not what --

 7              MR. DRYLEWSKI:  Nothing to you right now.

 8    BY MR. SYLVESTER:

 9       Q.   You don't remember which lawyers were

10    involved, but you remember lawyers were involved; is

11    that right?

12              MR. DRYLEWSKI:  Are we questioning right

13    now?

14              Let's take a step back for a second.

15              MS. ZORNBERG:  Yeah.  I just want to go

16    slow here.

17              MR. SYLVESTER:  Sure.

18              MS. ZORNBERG:  Perhaps you can ask

19    Ms. O'Gorman, yes or no -- I mean, I've already made

20    the proffer based on facts that, you know, that

21    lawyers were involved in this assignment and were

22    consulted by both Mr. Zagone and by Ms. O'Gorman.

23              I think that's -- that's enough of a

24    predicate for privilege as to what your last

25    question was.
```

```
 1                MR. SYLVESTER:  Okay.

 2                THE WITNESS:  That is true.

 3                MR. SYLVESTER:  Okay.  Okay.

 4        Q.   So was the document that we're talking

 5   about that contains this analysis, was that document

 6   shared internally among Ripple?

 7                MS. ZORNBERG:  I'm going to object to

 8   form.

 9                I don't know if there's a better way to

10   state the question.

11   BY MR. SYLVESTER:

12        Q.   Sure.  Let's just take it person by

13   person.

14                Was that document shared with

15   Mr. Garlinghouse?

16        A.   To the best of my recollection, yes.

17        Q.   Was it shared with Mr. Larsen?

18        A.   To the best of my recollection, yes.

19        Q.   Was it shared with Mr. Larsen around the

20   time it was produced?

21        A.   To the best of my recollection, yes.

22        Q.   And was it shared with Mr. Garlinghouse

23   around the time it was produced?

24        A.   To the best of my recollection, yes.

25        Q.   Okay.  We talked about your conversation
```

1    with Mr. Larsen about the ▓▓▓▓▓▓▓ report.

2         To your knowledge, excluding legal, who

3    else at Ripple reviewed the ▓▓▓▓▓▓▓ report?

4         MR. DRYLEWSKI:  Objection to form.

5         You can answer that question to the extent

6    it doesn't divulge the substance of any

7    communications that you had with Ripple's lawyers,

8    in or outside counsel.  Understood?

9         THE WITNESS:  Mh-hmm.

10        Can I say "legal"?

11        MR. DRYLEWSKI:  If you can.

12        If you can answer the question without

13   revealing the substance of any communications with

14   counsel, then you can do it.

15        THE WITNESS:  Sure.

16        ▓▓▓▓▓▓▓ Patrick Griffin.

17   BY MR. SYLVESTER:

18        Q.   Okay.  Did you have any conversations with

19   Mr. Griffin about the ▓▓▓▓▓▓▓ report outside the

20   presence of counsel?

21        A.   Other than the fact that he had read it,

22   no.

23        Q.   Okay.

24        MR. SYLVESTER:  I think this might be a

25   good place to break for lunch, if that's all right

1     with the witness is she wants to take a break.

2              THE WITNESS:  Sure.

3              MR. DRYLEWSKI:  Is that okay with you?

4              THE WITNESS:  Yeah.

5              MR. SYLVESTER:  Let's go off the record.

6              THE VIDEOGRAPHER:  Off the record at

7     1:14 p.m.

8              (Whereupon, a lunch recess was taken.)

```
 1    AUGUST 4, 2021                          1:57 P.M.

 2                    P R O C E E D I N G S

 3                    AFTERNOON SESSION

 4            THE VIDEOGRAPHER:  This is the beginning

 5    of File Number 7.

 6            We're back on the record at 1:57 p.m.

 7    BY MR. SYLVESTER:

 8        Q.   Okay.  Ms. O'Gorman, before we broke, we

 9    had a discussion about your talk with Mr. Larsen

10    after the ███████████ report came out.

11            Do you remember that?

12        A.   I do recall, yes.

13        Q.   Okay.  And in that conversation,

14    Mr. Larsen asked you to undertake an analysis of the

15    classification of XRP under the U.S. securities

16    laws; is that right?

17            MS. ZORNBERG:  Object to form.

18            THE WITNESS:  I wouldn't say an analysis.

19    He asked me to look into it.

20    BY MR. SYLVESTER:

21        Q.   I see.

22            Other than asking you to look into it,

23    what else do you remember him saying on that topic

24    in the conversation?

25            MR. DRYLEWSKI:  Objection to form.
```

1         Instruct the witness not to answer to the

2     extent that you know Mr. Larsen was conveying any

3     communications that he had with Ripple's counsel.

4            THE WITNESS:  Mh-hmm.  I think this is

5     asked and answered.  I said he read --

6            MR. SYLVESTER:  You sure you're not a

7     lawyer?

8            THE WITNESS:  -- the article that

9     concerned Bitcoin is not a security, and his point

10    was surely XRP would fall into that same category.

11    BY MR. SYLVESTER:

12       Q.   Okay.  Did you ask him why he wanted you

13    to undertake -- to look into it?

14       A.   No.

15       Q.   Did he provide you with any materials,

16    outside of the           report, to help you look

17    into it?

18       A.   No.  To the best of my knowledge, no.

19       Q.   We discussed earlier today that you

20    received a legal memoranda in about June of 2015.

21            Do you remember that?

22       A.   The one you presented to me, yes.

23            MS. ZORNBERG:  Object to form.

24            THE WITNESS:  I saw it today.  I don't

25    recall ever reviewing it before or receiving it.

1    BY MR. SYLVESTER:

2         Q.   Be that as it may, let me ask this:  Did

3    you ask Mr. Larsen why he wanted you to look into

4    this question of XRP's classification under the

5    securities laws in light of the fact that he already

6    had a legal memo on the topic?

7              MR. DRYLEWSKI:  Objection to form.

8              MS. ZORNBERG:  Objection.

9              THE WITNESS:  I did not, because I did not

10   know that he had a legal opinion at the time.

11   BY MR. SYLVESTER:

12        Q.   Is that because you didn't read the email,

13   the June 2015 email?

14             MS. ZORNBERG:  Objection.

15             MR. DRYLEWSKI:  Objection to form.

16             THE WITNESS:  May have been.  It may have

17   been.

18             MR. SYLVESTER:  Okay.  Let's look at

19   Exhibit 7, please.

20                  (Whereupon, Deposition Exhibit AO-7

21                  was marked for identification.)

22   BY MR. SYLVESTER:

23        Q.   So, Ms. O'Gorman, Exhibit 7 is a one-page

24   email from you to Mr. Garlinghouse dated

25   November 13th, 2016.

199

```
 1              Do you see that?
 2       A.    I see one dated November 21st.
 3              Is that the one you're referring to?
 4              MR. DRYLEWSKI:  The date on the email is
 5   November 21st, 2016 on the exhibit you just handed
 6   to me.
 7              MR. SYLVESTER:  Did you hand them 7?
 8              MR. TENREIRO:  I did.
 9              MR. SYLVESTER:  It is indeed.  Okay.  A
10   little bit of exhibit confusion.
11              Let's go off the record for a second.
12              MR. DRYLEWSKI:  Sure.
13              MS. ZORNBERG:  No, no, no.  Why should we
14   go off the record?  If you have exhibit confusion,
15   that should count against your seven hours.
16              Please proceed with the deposition.
17              MR. TENREIRO:  Okay.  Just keep a copy of
18   this one, please.
19              MR. SYLVESTER:  Yeah, keep a copy of this
20   one.  See if you can find this one.
21              Thanks.
22       Q.    Okay.
23              Were you ever asked, Ms. O'Gorman, to
24   prepare a rebuttal to          paper regarding
25   cryptocurrency as a security?
```

```
 1              MR. DRYLEWSKI:  Objection to form.
 2              Go ahead.
 3              MS. ZORNBERG:  I'm instructing the witness
 4    not to answer to the extent that it involves
 5    communications with counsel.
 6              THE WITNESS:  It did involve counsel, so I
 7    can't really answer that.
 8    BY MR. SYLVESTER:
 9         Q.   Okay.  The conversation with Mr. Larsen
10    that we've been discussing, in that conversation, he
11    did not ask you to prepare a rebuttal, did he?
12         A.   Oh, no.  Absolutely not.
13         Q.   Okay.
14              MR. SYLVESTER:  Jorge, let's try
15    Exhibit 9.
16              (Whereupon, Deposition Exhibit AO-9
17               was marked for identification.)
18              MR. SYLVESTER:  Yes.  Okay.
19         Q.   So, Ms. O'Gorman, Exhibit AO9 I can
20    represent to you was pulled from the internet quite
21    recently but bears a December 7th, 2016 date.
22              Can you see that?
23         A.   Yes.
24         Q.   Okay.  Is this the          ▮▮▮▮▮ paper that
25    we've been discussing?
```

1    MR. DRYLEWSKI:  Feel free to look through

2    the entire document and familiarize yourself before

3    answering any questions.

4         THE WITNESS:  Yeah, I ...

5         May have been, yes.

6    BY MR. SYLVESTER:

7    Q.   I'm sorry, I couldn't hear your answer.

8         What was it?

9    A.   I said, it may have been.

10   Q.   Does this look, in substance, to your

11   recollection, about like what the report was that

12   you read in December 2016?

13        MR. DRYLEWSKI:  Objection to form.

14        THE WITNESS:  To the best of my knowledge,

15   it does.

16   BY MR. SYLVESTER:

17   Q.   Okay.  If you'll turn to page 11 of the

18   attachment there, numbered at the bottom of the

19   page.

20        Do you see that Roman III analysis under

21   the Howey test?

22   A.   Oh, yeah -- sorry -- yes, I do.

23   Q.   Okay.  And to the best of your

24   recollection, this was the analysis of the Howey

25   test that was within the ████████ report that you

202

1    read?

2            MS. ZORNBERG:  Objection.

3            THE WITNESS:  Appears to be.

4    BY MR. SYLVESTER:

5        Q.   Ms. O'Gorman, can you turn with me to

6    page 18, please.

7            And do you see Romanette v there starting,

8    "We note"?

9        A.   Yeah.

10       Q.   Okay.  It says:

11              "We note the manner in which

12           the sale of a blockchain token

13           occurs, particularly" -- sorry.

14              "We note that the manner in

15           which the sale of a blockchain

16           token occurs, particularly the

17           promotion and marketing, may also

18           affect the expectation of profits

19           analysis."

20           Did I read that correctly?

21       A.   You're asking me?

22       Q.   Yeah.

23       A.   You seemed to, yes.

24           MR. TENREIRO:  We're on page 18.

25    / /

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

1    BY MR. SYLVESTER:

2        Q.    And do you recall reading, in sum or

3    substance, something similar in the

4    report in December of 2016?

5            MR. DRYLEWSKI:  Objection to form.

6            THE WITNESS:  I don't recall.

7    BY MR. SYLVESTER:

8        Q.    Okay.  Please turn with me to page 24 of

9    the document.

10           Page 24 appears to be labeled "Appendix A,

11   A securities law framework for blockchain tokens."

12           Do you see that?

13       A.    I do.

14       Q.    This appears to be -- do you see the

15   number of questions under -- in each of the headings

16   on this chart?

17       A.    I do.

18       Q.    Okay.  Do you recall looking at this

19   Appendix A in December of 2016?

20       A.    Vaguely, yes.

21       Q.    Do you recall that the           paper

22   set forth the scoring system for analyzing a digital

23   asset under Howey?

24       A.    I do, yes.

25       Q.    Did you ever undertake the exercise of

1    assessing XRP under this scoring system?

2        A.    I did not.

3            MS. ZORNBERG:  Objection.

4            Just -- just an instruction that to the

5    extent that -- you can answer to the extent your

6    answer does not implicate meetings or discussions

7    with counsel.

8            THE WITNESS:  It would have involved

9    legal.

10   BY MR. SYLVESTER:

11       Q.    Do you have an understanding as to whether

12   anyone at Ripple undertook the scoring analysis set

13   forth in Appendix A?

14       A.    I don't know of anyone.  I can only speak

15   for myself.

16       Q.    Okay.

17           MR. SOLOMON:  I was just informed nobody

18   can hear anything, just FYI from remote folks.

19           THE WITNESS:  It's muted.

20           MS. ZORNBERG:  Can folks on Zoom hear

21   anything?

22           MR. SOLOMON:  Somebody unmute and just say

23   "yes."

24           ZOOM PARTICIPANT:  We can hear, but we're

25   getting a lot of feedback.

1              MR. SYLVESTER:  Okay.

2              MS. ZORNBERG:  Okay.  I don't know what we

3      can do because there are a lot of technical issues

4      at K&S and the view in the room is that we have to

5      push forward with the deposition.

6              So on a break, we can address it, but

7      otherwise, we're just gonna keep going.

8              MR. TENREIRO:  Are you ready for that

9      exhibit?

10             MR. SYLVESTER:  Yes.  Let's move on to

11     Exhibit 11, please.

12                 (Whereupon, Deposition Exhibit AO-11

13                 was marked for identification.)

14     BY MR. SYLVESTER:

15         Q.   Ms. O'Gorman, Exhibit 11 --

16             ZOOM PARTICIPANT:  What's the

17     exhibit number?

18             MR. SYLVESTER:  Eleven.

19         Q.   Exhibit 11 appears to be an email from you

20     to Mr. Garlinghouse dated, hopefully, January 9th,

21     2017.

22             Do you see that?

23         A.   That's correct.

24         Q.   Great.

25             Was this email one of the emailed agendas

1    that you provided Mr. Garlinghouse weekly, as you

2    testified earlier?

3        A.    No, it's not.

4        Q.    I see.

5              Is there any special marking or words you

6    would use for an agenda when you provided that to

7    Mr. Garlinghouse via email?

8              MR. DRYLEWSKI:  Objection to form.

9              THE WITNESS:  It would have stated

10   "agenda."

11   BY MR. SYLVESTER:

12       Q.    Okay.  Ms. O'Gorman, do you see about five

13   rows down under item "XRP is not a security

14   research" and "Ripple talking points"?

15       A.    Mh-hmm.

16       Q.    Okay.  Then on the right-hand column, it's

17   corresponding to XRP is not security.  It says:

18                   "Summary document to be

19              completed by 1/13/17 for discussion

20              with          later in

21              January 2017 when our membership

22              kicks in.  Going to schedule

23              meetings with          AOG to

24              attend all discussions."

25              Do you see that?

1     A.   I do.

2     Q.   And you are AOG, correct?

3     A.   That's me.

4     Q.   Okay.  What was the summary document that

5  was being prepared for discussion with

6     A.   I think, if you see --

7          MS. ZORNBERG:  Hold on just one sec.

8          You can answer to the extent that you do

9  not reveal any communications with counsel.

10         THE WITNESS:  Okay.

11         Oh, God, can you repeat the question?

12  BY MR. SYLVESTER:

13    Q.   Sure.

14         What was the summary document that was

15  being prepared for discussion with

16    A.   It wasn't being prepared for discussion

17  with              It was just a document containing

18  the review or research that we had conducted on --

19  against the Howey test.

20    Q.   Is this the same document that Mr. Larsen

21  had asked you to prepare?

22         MR. DRYLEWSKI:  Objection to form.

23         THE WITNESS:  He hadn't asked me to

24  prepare this specific document, but it was in

25  response to his request.

```
 1     BY MR. SYLVESTER:
 2          Q.   And what's the discussion with ███████████
 3     referenced in this document?
 4          A.   The discussion with ██████████ is we had
 5     decided to donate funding to ████████ because
 6     they were very active in the cryptocurrency space.
 7          Q.   And this -- this document had something to
 8     do with that donation; is that right?
 9               MS. ZORNBERG:  Object to form.
10               THE WITNESS:  Didn't really have anything
11     to do with the donation.  Many cryptocurrency
12     companies provided funding to ███████████ and we
13     also wanted to be part of that.
14     BY MR. SYLVESTER:
15          Q.   Understood.
16               I'm just trying to figure out the meaning
17     in that sentence "for discussion with ██████████
18          A.   Yeah.
19          Q.   Did you or anyone at Ripple present your
20     analysis of XRP status under the Howey test to
21     anyone at █████████
22               MR. DRYLEWSKI:  Object to form.
23               THE WITNESS:  No, we did not.
24     BY MR. SYLVESTER:
25          Q.   Okay.  So this suggests that there was a
```

```
 1    summary document in the works to be completed prior
 2    to a ████████ discussion.
 3              Do you agree?
 4              MR. DRYLEWSKI:  Objection to form.
 5              THE WITNESS:  That is correct.
 6    BY MR. SYLVESTER:
 7         Q.   But I think what you're testifying to is
 8    that that document wasn't shared with ████████?
 9         A.   It was not, no.
10         Q.   Okay.
11              What exactly is the ████████ membership
12    that's referenced here?
13         A.   Funding provided to ████████.  It's a
14    nonprofit organization.
15         Q.   And Ripple purchased a membership?
16         A.   Donated funding towards the work they do.
17         Q.   How much money did Ripple donate around
18    January 2017 to ████████?
19         A.   ████.
20         Q.   Who authorized that donation?
21              MR. DRYLEWSKI:  Objection to form.
22              THE WITNESS:  Chris Larsen.
23    BY MR. SYLVESTER:
24         Q.   Did that donation have any connection
25    whatsoever with ████████ issuance of its report
```

1 in 2016?

2    MR. DRYLEWSKI:  Objection to form.

3    THE WITNESS:  I believe it was after the

4 report was issued in 2016.  So it wouldn't have been

5 connected to it.

6 BY MR. SYLVESTER:

7   Q.   Prior to the December 2016

8 report, had there been any contact between anyone at

9 Ripple and anyone at

10    MS. ZORNBERG:  Objection to form.

11    THE WITNESS:  Yeah, I can't say for sure.

12 BY MR. SYLVESTER:

13   Q.   To your knowledge.

14   A.   There might have been.

15   Q.   Had you had any contact with

16 prior to December 2016?

17   A.   I don't believe so, no.

18   Q.   Okay.  Prior to the donation to

19    after the December 2016    report,

20 had Ripple ever made an earlier donation to

21

22   A.   No.

23    MR. DRYLEWSKI:  Objection to form.

24    MR. SYLVESTER:  Okay.  Let's move on to

25 Exhibit 13, please.

1           (Whereupon, Deposition Exhibit AO-13

2            was marked for identification.)

3           MR. TENREIRO:  Thirteen, Nicole.

4           ZOOM PARTICIPANT:  Thirteen.

5   BY MR. SYLVESTER:

6       Q.   So Exhibit 13 is an email from you,

7   Ms. O'Gorman, to Mr. Garlinghouse dated

8   January 17th, 2017; is that right?

9       A.   That's correct.

10      Q.   Okay.  This is labeled "Compliance weekly

11  update as of 1/13/17."

12           Do you see that?

13      A.   I do.

14      Q.   Did you send Mr. Garlinghouse weekly

15  updates from the compliance department?

16      A.   I did.

17      Q.   And for what period did you send weekly

18  updates to Mr. Garlinghouse?

19           MR. DRYLEWSKI:  Objection to form.

20           THE WITNESS:  Until my departure from the

21  company.

22  BY MR. SYLVESTER:

23      Q.   Did you start them when you took the

24  position as CCO?

25      A.   No, it wasn't at that time.  This was

1    instigated sometime after that.

2         Q.   Approximately when was that?

3         A.   I -- I can't say for sure.  I couldn't

4    say.

5         Q.   Okay.  Do you see, Ms. O'Gorman, I think

6    nine rows down, we're back to XRP is not a security

7    research and Ripple talking points?

8         A.   Sure.

9         Q.   And then on the right-hand column, you

10   provide the update summary document not yet

11   complete.

12             Do you see that?

13        A.   I do.

14        Q.   And then in parens after that, it says:

15             "Pending response on timing

16        and terms of first-ever XRP

17        transaction from Chris L. and/or

18        David Schwartz."

19             Do you see that?

20        A.   Yes.

21        Q.   Is Chris L. Chris Larsen?

22        A.   That is correct.

23        Q.   Okay.  Why did you need to know the timing

24   in terms of Mr. Larsen's and Mr. Schwartz's

25   first-ever transaction in order to complete this

```
 1    project?
 2         A.    Honest to God --
 3              MR. DRYLEWSKI:  Hold on a second.
 4              MS. ZORNBERG:  I'm just going to interject
 5    that to the extent you have a recollection, you
 6    shouldn't -- you should answer only to the extent
 7    you're not providing any communications with
 8    counsel.
 9              MR. DRYLEWSKI:  Yeah.
10              THE WITNESS:  I have no idea.
11    BY MR. SYLVESTER:
12         Q.    The -- let's see.  The next sentence says:
13                   "Zagone to schedule Ripple
14              posturing/discussion with
15                      ater this month."
16         Do you see that?
17         A.    I do.
18         Q.    What did you mean by "posturing" in that
19    sentence?
20         A.    I meant that we were going to meet with
21                   at some point, and one of the items for
22    discussion was going to be the topic of XRP and the
23    Bitcoin article that they had written in
24    December 2016, one of many subjects.
25         Q.    Did you reach out to            to
```

1    schedule that meeting?

2         A.    No. Ryan did.

3         Q.    Mr. Zagone?

4         A.    Yes.

5         Q.    When did Mr. Zagone reach out to ▇▇▇▇

6    ▇▇▇▇ to schedule that meeting?

7         A.    I would say sometime in Q1 of 2017, but I

8    couldn't tell you the date.

9         Q.    This email was sent on January 17, 2017.

10             Do you recall if you reached out prior to

11   this email?

12        A.    He may have done. You'd have to ask Ryan,

13   Mr. Zagone.

14        Q.    Prior to Q1 of 2017, had anyone at Ripple

15   ever had a meeting with anyone at ▇▇▇▇▇▇▇

16        A.    I can only speak for myself. I didn't,

17   but persons may have.

18        Q.    Okay. To your knowledge, did Ripple's

19   donation to ▇▇▇▇▇▇▇ have anything to do with its

20   ability to get a meeting with ▇▇▇▇▇▇▇

21             MR. DRYLEWSKI: Objection to form.

22             THE WITNESS: Not at all, no.

23   BY MR. SYLVESTER:

24        Q.    Did the meeting with ▇▇▇▇▇▇▇

25   ultimately occur?

```
 1        A.   It did.

 2        Q.   Who attended?

 3        A.   Myself, Ryan,          from

 4              and                         from

 5        Q.   Anyone else?

 6        A.   That's to the best of my recollection.

 7        Q.   Sure.

 8              Prior to attending the meeting with

 9              did you discuss the upcoming meeting with

10   Mr. Garlinghouse?

11              MS. ZORNBERG:   I'm just going to jump in.

12              You can answer to the extent that your

13   answer does not reveal communications that you had

14   with legal or that you understood Mr. Garlinghouse

15   to have had with legal.

16              MR. DRYLEWSKI:   Do you understand?

17              THE WITNESS:   Mh-hmm, I do.

18              I cannot answer that question.

19   BY MR. SYLVESTER:

20        Q.   On the basis of that instruction?

21        A.   Yes, yeah.

22        Q.   Let me ask a yes-or-no question.

23              Prior to attending that meeting with

24              did you discuss the upcoming meeting with

25              at all with Mr. Garlinghouse?  Just yes
```

1    or no.

2        A.    Yes.

3        Q.    Okay.  How many discussions did you have

4    with him on that topic?

5        A.    Very hard to say.  I don't know.

6        Q.    Okay.  Prior to your meeting with ████

7    ████ -- again, just yes or no -- did you talk

8    about the upcoming meeting with Mr. Larsen?

9        A.    Yes.

10        Q.    How many times did you talk about the

11    meeting with Mr. Larsen?

12        A.    I can't say.  I don't know.

13        Q.    Did you prepare talking points for that

14    meeting?

15            MS. ZORNBERG:  Again, that would be a yes

16    or no without disclosure of any communications

17    involving the legal department or your

18    communications with the lawyers.

19            THE WITNESS:  Sure.

20            I don't recall.

21    BY MR. SYLVESTER:

22        Q.    Okay.  Do you recall if anyone prepared

23    talking points?

24        A.    I don't.  It was an informal discussion.

25        Q.    At your ████████ meeting -- strike

1   that.

2          When was the ████████████ meeting?

3          A.   I believe it was in March of 2017.   But

4   don't hold me to that.

5          Q.   At the March 2017 meeting with ████████

6   ████████ did you have a discussion with the ████████

7   ████████ olks about securities classification of

8   digital assets?

9               MR. DRYLEWSKI:   Objection to form.

10              THE WITNESS:   Yes.

11  BY MR. SYLVESTER:

12         Q.   What did you say?

13         A.   Honestly, I can't remember.

14              What do you mean, what did I say?   Maybe

15  ask me more specific.

16         Q.   Do you have a general recollection of what

17  you had to say to ████████████ on the topic of the

18  classification of digital assets under the

19  securities laws?

20         A.   I'm sure we discussed their article, which

21  was very Bitcoin-focused, but I honest to God don't

22  know what I said to them.

23         Q.   Did you take a position in the meeting

24  with ████████████ about whether or not XRP should be

25  classified as a security?

1            MR. DRYLEWSKI:  Object to form.

2            THE WITNESS:  I didn't say that it should

3    be classified as a security, no.

4    BY MR. SYLVESTER:

5        Q.   Did you say that it should not be

6    classified as a security?

7        A.   I didn't believe it to be a security.  I

8    may have stated that in the meeting.  I don't know.

9            But, again, I'm not a lawyer.  That was my

10   personal analysis.

11       Q.   You said that was your personal analysis?

12       A.   Yeah.  That was my view.

13       Q.   That XRP was not a security?

14       A.   That's right.

15       Q.   So just your personal analysis, nothing

16   you heard from a lawyer, what was your view -- how

17   did you come to that view that XRP is not a

18   security?

19           MS. ZORNBERG:  So we can take it -- take

20   it slow.  To the extent you can answer the question

21   without relying or invoking or communicating your

22   conversations with counsel, you may answer.

23           THE WITNESS:  I don't believe I can do

24   that, so I can't answer.

25   / /

219

1    BY MR. SYLVESTER:

2        Q.    Separate and apart from any communications

3    that you had with Ripple's counsel, did you

4    undertake -- you alone -- any analysis of whether or

5    not XRP was a security?

6        A.    No.

7        Q.    You testified earlier that you did not

8    believe XRP to be a security --

9        A.    That's right.

10       Q.    -- at this time.

11       A.    That's right.

12       Q.    And did -- I guess, was that view formed

13   totally from conversations with counsel?

14       A.    It was intricate -- intricately involved

15   in conversations with the legal department.

16       Q.    What, if anything, did you do, other than

17   talk to the legal department, to inform your view

18   that XRP was not a security?

19       A.    I reviewed the Howey test.

20       Q.    How did you undertake to review the Howey

21   test?

22       A.    I went --

23             MR. DRYLEWSKI:  Object to form.

24             THE WITNESS:  I went to the SEC website, I

25   reviewed it.  I reviewed the prior cases under the

```
1    Howey test, and I tried to draw a conclusion from

2    there, personally.

3    BY MR. SYLVESTER:

4        Q.   What, if anything, did you read on the SEC

5    website pertaining to the Howey test?

6        A.   That's a long time ago.  I don't recall.

7        Q.   Did you read the Howey opinion?

8        A.   I don't recall.

9        Q.   You mentioned that you also reviewed prior

10   cases under the Howey test?

11       A.   Yes, I did.

12       Q.   Was that around this time, January 2017?

13       A.   It would have been, yes.

14       Q.   Which cases did you recall?

15            MR. DRYLEWSKI:  Objection to form.

16   BY MR. SYLVESTER:

17       Q.   Which cases did you review?

18       A.   I don't recall.

19       Q.   Okay.  Going back to your meeting with

20            ██████████ in March of 2017, did anyone from ███

21   ████ express any views about XRP status under the

22   securities laws?

23       A.   A view?

24            ████████████████ was very familiar with the

25   Bitcoin blockchain and Bitcoin, but they didn't --
```

1    they weren't very familiar with XRP Ledger or XRP,

2    so there would have been no view associated with

3    whether it was or was not.

4        Q.    Did you provide -- strike that.

5             Did you or Mr. Zagone provide any

6    information to                  at that meeting to inform

7    their view about whether or not XRP should be

8    classified as a security?

9             MR. DRYLEWSKI:  Object to form.

10            THE WITNESS:  We had a chat about many

11   different things as part of that conversation.  This

12   was one topic, but it was very general and informal

13   in nature.

14   BY MR. SYLVESTER:

15       Q.    Okay.  Appreciating this was just one

16   topic --

17       A.    Yeah.

18       Q.    -- do you recall providing to

19   any information that might inform their view about

20   whether or not XRP should be classified as a

21   security?

22            MR. DRYLEWSKI:  Object to form.

23            THE WITNESS:  I don't recall.

24   BY MR. SYLVESTER:

25       Q.    Do you recall at the meeting with

1       ██████  discussing the Howey test at all?

2           A.   I don't recall.  I'm sure we did, but I

3       don't recall.

4           Q.   Why do you say, "I'm sure we did"?

5           A.   Because they had just written the paper.

6       We were doing our review or research into it.  I'm

7       sure it was raised.  I don't recall the specifics.

8           Q.   Did you convey to ██████████  your views

9       on the proper application of the Howey test to XRP?

10              MR. DRYLEWSKI:  Object to form.

11              THE WITNESS:  I don't believe I did.

12              They are lawyers.  I'm not.

13      BY MR. SYLVESTER:

14          Q.   The gentlemen from ████████  were

15      lawyers?

16          A.   Yes.

17          Q.   Did Mr. Zagone express any of his views

18      about the proper application of the Howey test to

19      XRP to █████████?

20              MR. DRYLEWSKI:  Objection to form.

21              THE WITNESS:  During that meeting, you

22      mean?

23      BY MR. SYLVESTER:

24          Q.   Let start with during that meeting, yes.

25          A.   He may have done.  I don't know.

```
1          Q.    What did he say?

2          A.    I don't recall.  Don't know.

3          Q.    Did you or Mr. Zagone at the ████████

4     meeting express Ripple's views on whether or not XRP

5     should be classified as a security?

6                MR. DRYLEWSKI:  Objection to form.

7                THE WITNESS:  I -- I don't recall.

8     BY MR. SYLVESTER:

9          Q.    You mentioned that ████████ had opined

10    that Bitcoin was not a security; is that right?

11         A.    I believe so, yes.

12         Q.    Do you recall whether or not there was a

13    discussion at the ████████ meeting comparing

14    Bitcoin to XRP?

15               MR. DRYLEWSKI:  Objection to form.

16               THE WITNESS:  I don't recall.

17    BY MR. SYLVESTER:

18         Q.    Do you remember discussing Ether at all at

19    that meeting?

20         A.    No.  Absolutely not.  I don't recall.

21    Maybe we did.  Don't recall.

22               MR. SYLVESTER:  Okay.  Let's move to

23    Exhibit 18, please.

24                    (Whereupon, Deposition Exhibit AO-18

25                     was marked for identification.)
```

224

```
 1    BY MR. SYLVESTER:

 2        Q.   Ms. O'Gorman, this appears to be an email

 3    from you to Mr. Garlinghouse sent on March 11th,

 4    2017; is that right?

 5             MR. DRYLEWSKI:  Feel free to review the

 6    entire document, familiarize yourself before you

 7    answer any questions about it.

 8             THE WITNESS:  Yes, March 11th, 2017.  I

 9    reviewed the document, yeah.

10    BY MR. SYLVESTER:

11        Q.   Okay.  Let me know when you're ready to

12    answer questions.

13        A.   Okay.

14             ZOOM PARTICIPANT:  What exhibit is this?

15             MR. SYLVESTER:  Eighteen.

16             ZOOM PARTICIPANT:  Eighteen?

17             MR. SYLVESTER:  That's right.

18             ZOOM PARTICIPANT:  Thank you.

19             MR. SYLVESTER:  Sure.

20             THE WITNESS:  I'm ready.

21    BY MR. SYLVESTER:

22        Q.   Okay.  Great.

23             You write under the heading -- strike

24    that.

25             The third bullet under the heading "Reg
```

 1    Relations Highlights" pertains to you and

 2    Mr. Zagone's meeting with                 that we've

 3    been discussing; is that right?

 4        A.   That's right.

 5        Q.   Okay.  Going back to that meeting, did

 6    anyone take notes at that meeting?

 7        A.   May have.  They may have.

 8        Q.   Do you recall taking notes of the meeting?

 9        A.   I don't recall taking notes, no.

10        Q.   Do you recall if Mr. Zagone took notes?

11        A.   He may have done, yes.

12        Q.   Did Mr. Zagone have a practice of storing

13    his notes in any particular place at Ripple?

14        A.   He did, yes.

15             MR. DRYLEWSKI:  Objection to form.

16             Sorry.

17    BY MR. SYLVESTER:

18        Q.   Where?

19        A.   An application, and I can't for the life

20    of me remember the name of it, contained notes on

21    meetings with regulators and others.  And that

22    subsequently went into some part of Ripple's

23    Confluence, I believe.  But I can't remember the

24    name of the application, but yes.

25        Q.   What's Confluence?

1      A.   It's an internal sharing of information at

2  Ripple.

3      Q.   So if Mr. ████ put his notes into his

4  usual storage location --

5      A.   Yeah.

6      Q.   -- would others at Ripple be able to

7  access those notes?

8      A.   No, they wouldn't.

9      Q.   Were you?

10     A.   Yes.

11     Q.   Who else besides you could access his

12  notes in that location?

13     A.   ████  He may have given access to others,

14  maybe legal, I'm not sure.

15     Q.   Who is ████?

16     A.   She reported up to Ryan through me.

17     Q.   Did -- after the ████ meeting,

18  outside of the email that we're looking at right

19  now, did you write any other summary of what took

20  place at the meeting?

21     A.   I did not.

22     Q.   Okay.

23      Outside of the email that we're looking at

24  right now, are you aware of any other summary of the

25  meeting that exists at Ripple?

```
 1              MR. DRYLEWSKI:  Objection to form.
 2              THE WITNESS:  I'm not aware, no.  To the
 3    best of my knowledge, at least.
 4    BY MR. SYLVESTER:
 5         Q.   Do you recall discussing the
 6    meeting with anyone on Slack?
 7         A.   I don't recall.
 8         Q.   Is it possible you did?
 9              MS. ZORNBERG:  Objection.
10              THE WITNESS:  It might be possible, yeah.
11    I don't know.
12    BY MR. SYLVESTER:
13         Q.   Turning back to the document at hand,
14    which is Exhibit 18, the third bullet says:
15                   "AOG and Ryan Z met with
16                   on 3/6 re Ripple's position
17              that XRP is not a security."
18              Does that refresh your recollection that
19    Ripple offered a position at that meeting that XRP
20    was not a security?
21              MR. DRYLEWSKI:  Objection to form.
22              THE WITNESS:  It was my opinion that it
23    was not a security, so I would imagine we discussed
24    that, amongst other things.
25    / /
```

1    BY MR. SYLVESTER:

2         Q.   Sure.

3              I think what I'm focusing in here is the

4    re line, so the meeting is re Ripple's position that

5    XRP is not a security.

6              Does that refresh you at all as to the

7    fact that it actually was discussed at the meeting?

8              MR. DRYLEWSKI:   Objection to form.

9              THE WITNESS:   Well, I know it was

10   discussed at the meeting.

11   BY MR. SYLVESTER:

12        Q.   I see.

13             And in the meeting, did you or Mr. Zagone

14   present Ripple's position that XRP is not a

15   security?

16             MR. DRYLEWSKI:   Object to form.

17             THE WITNESS:   "Present" is a strong word

18   there.

19             We spoke informally about it.  We didn't

20   present.

21   BY MR. SYLVESTER:

22        Q.   You spoke informally on the topic of

23   Ripple's position that XRP is not a security?

24        A.   That's right.

25        Q.   Okay.

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

229

```
 1                Okay.  So you write, immediately
 2    thereafter:
 3                     "Meeting went well."
 4            Do you see that?
 5        A.   I do.
 6        Q.   Okay.  And then after that, you write:
 7                     "However, XRP certainly has
 8             some 'securities type'
 9             characteristics, and we do need to
10             hone our playbook/messaging."
11            Do you see that?
12        A.   I do.
13        Q.   Who, if anyone, at the meeting with      █
14    █       said that XRP certainly has some
15    securities-type characteristics?
16            MR. DRYLEWSKI:  Objection to form.
17            THE WITNESS:  I don't know specifically
18    whether it was      █    or whether it was      █    from
19    █
20    BY MR. SYLVESTER:
21        Q.   Okay.  So one of the gentlemen from    █
22    █       told you and Mr. Zagone at the meeting that
23    XRP has some securities-type characteristics?
24        A.   It appeared that it may have certain
25    security-type characteristics.
```

```
 1          Q.   In your email to Mr. Garlinghouse here,
 2    you write:
 3                     "XRP certainly has some
 4                securities-type characteristics."
 5                Was anyone at the          meeting of
 6    the view that XRP certainly had securities type
 7    characteristics?
 8                MR. DRYLEWSKI:  Objection to form.
 9                THE WITNESS:  I can't remember the exact
10    language.  I see the word written here, but I --
11    "certainty" was not the word anyone would use around
12    that time.
13    BY MR. SYLVESTER:
14          Q.   Well, I appreciate that.  It's just that
15    you used it, so I'm trying to figure out --
16          A.   I know.
17          Q.   -- who had a certain belief, if anyone?
18                MR. DRYLEWSKI:  Objection to form.  Asked
19    and answered.
20                THE WITNESS:  Am I supposed to answer?
21                MR. DRYLEWSKI:  You have to answer it
22    again.
23                THE WITNESS:  Oh, sorry.
24    BY MR. SYLVESTER:
25          Q.   Sure.
```

```
 1        A.   I used the word "certainly."  That's what
 2    I wrote here.  But as I say, there was no certainty
 3    around it.  I don't know why I used that word.
 4        Q.   Okay.  What were the securities-type
 5    characteristics of XRP that were discussed at the
 6    ███████████ meeting?
 7             MR. DRYLEWSKI:  Objection to form.
 8             THE WITNESS:  I don't recall.  I don't
 9    recall.
10    BY MR. SYLVESTER:
11        Q.   Did you come away from the meeting with
12    ███████████ agreeing that XRP had securities-type
13    characteristics?
14             MR. DRYLEWSKI:  Objection to form.
15             THE WITNESS:  I didn't come away from the
16    meeting with ███████████ on that, but I -- no.  I
17    didn't come away from the meeting with that.
18    BY MR. SYLVESTER:
19        Q.   Did there come a point in time when you --
20    separate from the meeting with ███████████ where
21    you had the view that XRP had securities-type
22    characteristics?
23             MS. ZORNBERG:  One moment.
24             You can answer to the extent that you can
25    separate out your view from conversations you had
```

232

```
 1    with counsel or information provided by counsel that

 2    may have had to do with your discussions with

 3    counsel.

 4              THE WITNESS:  I don't believe I can answer

 5    the question.

 6    BY MR. SYLVESTER:

 7         Q.   Okay.  Limiting that question just to your

 8    reading of the ██████████ report -- you read the

 9    ██████████ report?

10         A.   I did.

11         Q.   Did you come away from your reading of the

12    ██████████ report, alone, with an understanding

13    that XRP had some securities-type characteristics?

14              MS. ZORNBERG:  I'm going to interject here

15    because we've already made a record and there's

16    already been testimony in this case that the

17    evaluation of the ██████████ report entailed

18    discussions with counsel both by Ms. O'Gorman and by

19    Ryan Zagone.

20              So I'm not sure that the premise of your

21    question can be answered.  Maybe you can rephrase

22    it.  But as it was asked, I would direct the witness

23    not to answer.

24    BY MR. SYLVESTER:

25         Q.   Did you obtain any understanding of XRP
```

1    having securities-type characteristics solely from

2    your reading of the ⬛⬛⬛⬛ report?

3              MR. DRYLEWSKI:  Object to form.

4              THE WITNESS:  It's very hard to pull that

5    apart from my discussions with legal.

6    BY MR. SYLVESTER:

7         Q.   You write, after the concluding part of

8    that sentence:

9                   "And we do need to hone our

10                   playbook/messaging."

11              Do you see that?

12         A.   I do.

13         Q.   What does "playbook" mean in that

14    sentence?

15         A.   The "playbook" means presentations that we

16    made externally and maybe -- mainly external

17    presentations where we talked about XRP and Ripple.

18    Educational in nature.

19         Q.   And did you come to the conclusion that

20    you needed to make changes to Ripple's playbook

21    based on what ⬛⬛⬛⬛ 's lawyers said at the ⬛⬛⬛

22    ⬛⬛⬛ meeting?

23              MR. DRYLEWSKI:  Objection to form.

24              THE WITNESS:  No.  That's not true.

25    / /

1    BY MR. SYLVESTER:

2         Q.   What was the basis for your conclusion

3    that we do need to hone our playbook/messaging?

4              MS. ZORNBERG:   Object to form.

5              MR. DRYLEWSKI:   And I'm going to instruct

6    the witness, to the extent that that divulges any

7    communications that you had with Ripple's lawyers,

8    inside or outside counsel, exclude that from your

9    answer.

10             THE WITNESS:   I would say generally, some

11   of the language that we had used in the past was not

12   precise.   It lacked clarity.   And it was more for

13   clarification purposes.

14   BY MR. SYLVESTER:

15        Q.   In your view, was that imprecision

16   something that you wanted to eliminate to decrease

17   XRP's securities-type characteristics?

18             MR. DRYLEWSKI:   Objection to form.

19             And same instruction.

20             THE WITNESS:   Yeah.

21             It was to be more clear in our language --

22   BY MR. SYLVESTER:

23        Q.   Okay.

24        A.   -- but not to --

25        Q.   Sorry, go ahead.

235

```
 1          A.   -- but not to limit or reduce anything.
 2          Q.   Did you come away from the █████████████
 3     meeting with a view that there was a risk that XRP
 4     might be classified as a security on the basis of
 5     what the ████████████ awyers told you?
 6               MR. DRYLEWSKI:  Objection to form.
 7               THE WITNESS:  Did I come away from the
 8     meeting with that?
 9               No, I didn't.
10     BY MR. SYLVESTER:
11          Q.   Did you think that the ████████████ lawyers
12     were wrong, that XRP did not have securities-type
13     characteristics?
14          A.   I --
15               MR. DRYLEWSKI:  Objection to form.
16               Go ahead.
17               THE WITNESS:  Okay.  I had raised that
18     there was always the potential.  There was a risk.
19     And absent guidance from the SEC, there was always
20     going to be that risk.
21     BY MR. SYLVESTER:
22          Q.   Specific to the securities-type
23     characteristics that the ████████████ awyers
24     identified, did you disagree with them that XRP had
25     those securities-type characteristics?
```

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

| | |
|---|---|
| 1 | MS. ZORNBERG:  Objection, foundation. |
| 2 | THE WITNESS:  Yeah, I don't recall.  I |
| 3 | honestly don't recall. |
| 4 | BY MR. SYLVESTER: |
| 5 | Q.   As a general matter, if I'm understanding |
| 6 | your email correctly, you and Mr. Zagone went to the |
| 7 | meeting, you spoke about Ripple's position that XRP |
| 8 | is not a security; is that right? |
| 9 | A.   That's right -- |
| 10 | Q.   Okay. |
| 11 | A.   -- amongst others. |
| 12 | Q.   Sure. |
| 13 | And                     expressed the view that |
| 14 | XRP certainly has some securities-type |
| 15 | characteristics; is that right? |
| 16 | MR. DRYLEWSKI:  Objection to form. |
| 17 | THE WITNESS:  They may have said certain |
| 18 | security -- securities-type characteristics.  They |
| 19 | didn't say, "certainly."  That's my word in this |
| 20 | document here. |
| 21 | BY MR. SYLVESTER: |
| 22 | Q.   And -- okay.  So my question is just, when |
| 23 |                    expressed their view that XRP has |
| 24 | securities-type characteristics, did you agree? |
| 25 | MR. DRYLEWSKI:  Objection to form. |

```
 1                   THE WITNESS:  I don't recall.  I honestly
 2    don't recall.
 3    BY MR. SYLVESTER:
 4         Q.   Do you recall whether you or Mr. Zagone
 5    expressed any disagreement at the meeting?
 6                   MR. DRYLEWSKI:  Objection to form.  Asked
 7    and answered.
 8                   THE WITNESS:  I don't recall.
 9    BY MR. SYLVESTER:
10         Q.   Okay.
11                   MR. SOLOMON:  I'm going to object, too.
12                   You keep infusing the assumption that the
13    people at the meeting said it had securities-type
14    characteristics, but you never asked her whether she
15    recalled what was said at the meeting by the people
16    there?
17                   MR. SYLVESTER:  I mean, I don't want to
18    get into colloquy.  I believe that's what she
19    testified.
20                   MR. SOLOMON:  I think the record is
21    confused, Mark.  You can clean it up or not, but
22    it's utterly confusing in the form.  So it's up to
23    you.
24    BY MR. SYLVESTER:
25         Q.   Did -- between the           meeting and
```

1    writing this email --

2        A.   Okay, yeah.

3        Q.   So it looks like a period of five days, if

4    I have my math right.

5        A.   It looks like it.

6        Q.   Did you consult with Ripple's counsel?

7        A.   I may have.

8        Q.   Okay.  Do you have any recollection of

9    doing so?

10       A.   No.

11       Q.   Okay.  Here, where you write:

12                "We do need to hone our

13            playbook and messaging."

14            Was that your idea?

15       A.   Yes.

16       Q.   Okay.  And the reason you wanted to

17   hone -- strike that.

18            The reason you recommended honing Ripple's

19   playbook and messaging was to correct, I believe you

20   said, a lack of precision; is that right?

21       A.   That's right.

22            MR. DRYLEWSKI:  Objection to form.

23   BY MR. SYLVESTER:

24       Q.   Okay.  What changes do you recall

25   suggesting to Ripple's playbook or messaging after

1     the [REDACTED] meeting?

2              MS. ZORNBERG: You can answer. You can

3     answer to the extent that your answer does not

4     reveal communications with counsel.

5              THE WITNESS: Okay. I can't answer that

6     question.

7     BY MR. SYLVESTER:

8        Q.    Based on Ms. Zornberg's instruction?

9        A.    That's right.

10       Q.    Did Ripple ultimately accept your

11    suggestion that it should hone its playbook and

12    messaging?

13             MR. DRYLEWSKI: Objection to form.

14             MS. ZORNBERG: And repeat the instruction

15    that you can answer the question if you understand

16    it, but without revealing communications with

17    counsel.

18             THE WITNESS: It wasn't a matter of

19    accepting anything.

20             Did they -- did Brad, for example?

21             I don't know. Do you want to be more

22    specific in your question.

23    BY MR. SYLVESTER:

24       Q.    Sure.

25             Did Mr. Garlinghouse agree with your

1    suggestion that Ripple needed to hone its playbook

2    or messaging?

3              MR. DRYLEWSKI:  Objection to form.

4              MS. ZORNBERG:  Standing instruction that

5    for all of these questions along this line, we would

6    instruct you not to answer to the extent that

7    your -- that you would be revealing communications

8    that you had or Brad Garlinghouse or other Ripple

9    employees had with counsel specific to this subject.

10             THE WITNESS:  Yeah.  I -- I'm unable to

11   answer that question.

12   BY MR. SYLVESTER:

13        Q.   Okay.  Based on Ms. Zornberg's

14   instruction?

15        A.   That's right.

16        Q.   The sub bullet under the section we've

17   been talking about refers to next steps.

18             Do you see that?

19        A.   Yes.

20        Q.   It says:

21                  "Next steps, scheduling an

22             educational meeting with XRP and

23             MarComm teams this coming week."

24             Do you see that?

25        A.   Yes.

241

1     Q.   What's the XRP team?

2     A.   XRP team was a new team at the time, newly

3  introduced team at Ripple, responsible for the XRP

4  markets.  Fell under -- I don't know who it was

5  under at the time.  Patrick Griffin.

6     Q.   At the time that you wrote this email,

7  what, if anything, did you think that the XRP team

8  should do to hone its playbook or messaging?

9        MR. DRYLEWSKI:  Objection to form.

10       MS. ZORNBERG:  And I would also interject.

11  I'm also just going to proffer to counsel for the

12  SEC so that you -- you can ask questions

13  accordingly, that there is a factual basis

14  establishing, in this case, that this witness,

15  Ms. O'Gorman's -- Ms. O'Gorman had privileged

16  communications with Ripple counsel on this topic,

17  that the meeting that suggested as a next step

18  involved Ripple's general counsel.  And so we're

19  going to have to take it question by question.  But

20  this is an area to which privilege extends.

21       MR. SYLVESTER:  Okay.  I appreciate your

22  proffer, and I think it is the right thing to do,

23  take it question by question.

24       This communication with Ms. O'Gorman and

25  Mr. Garlinghouse is obviously not privileged.

1       Q.   So I'm asking, as of this communication,

2    what your view was as to what steps, if any, the XRP

3    team should take to hone its playbook or messaging?

4            MS. ZORNBERG:  And you can answer that

5    question to the extent that -- first of all, he's

6    only asking you -- you're asking if she had a view

7    and what the view was?

8            You can answer it to the extent you're not

9    revealing communications with counsel.

10           MR. DRYLEWSKI:  Right.

11           THE WITNESS:  It was to make sure that the

12    language we used in any of our communications, be it

13    XRP team, be it MarComm, be precise in nature.

14    BY MR. SYLVESTER:

15       Q.   What was the imprecision, if any, that

16    needed to be corrected?

17           MR. DRYLEWSKI:  Objection to form.

18           And, again, the same instruction you've

19    been getting from Ms. Zornberg, exclude from your

20    answer the substance of any communications you may

21    have had with Ripple's lawyers on this topic.

22           THE WITNESS:  Yeah.  Yeah.  I won't be

23    able to answer that question.

24    BY MR. SYLVESTER:

25       Q.   Based on --

243

1          A.    That's right.

2          Q.    Just for the record, based on

3    Mr. Drylewski's instruction?

4          A.    Yes.

5          Q.    MarComm is the team headed up by Ms. Long?

6          A.    That's right.

7          Q.    And that's Ripple's marketing and

8    communications teams?

9          A.    That's right.

10         Q.    Okay.

11               You write:

12               "Some language used in the XRP

13               presentation at this week's

14               biweekly meeting was not ideal."

15               Do you see that?

16         A.    I do.

17         Q.    What was the language that was not ideal?

18         A.    Honestly, I have no recollection.

19         Q.    One of the components of the educational

20   meeting that you propose here is how to discuss

21   XRP/RCL generally and in presentations.

22               Do you see that?

23         A.    I do.

24         Q.    What's RCL?

25         A.    Ripple Consensus Ledger, subsequently

1    named XRP Ledger.

2         Q.   Okay.

3              As of the time of writing this email, what

4    advice did you intend to provide with respect to

5    discussing XRP or the Ripple Consensus Ledger?

6              MR. DRYLEWSKI:  Objection to form.

7              MS. ZORNBERG:  And answer only to the

8    extent you can -- you can answer about advice you

9    provided to the extent it did not involve any

10   communications with counsel.

11             THE WITNESS:  Based on this advice, I

12   cannot respond to that question.

13   BY MR. SYLVESTER:

14        Q.   I just want to make sure that we have the

15   timing right on that.  Because I think

16   Ms. Zornberg's instruction went to the

17   communications that you ultimately had at the

18   meeting.  And what I'm focused on is what you

19   planned to say as embodied in this email to

20   Mr. Garlinghouse.

21             So taking you to the date of this email,

22   writing this email to Mr. Garlinghouse --

23        A.   Sure.

24        Q.   -- what was it that you planned to advise

25   the XRP or -- sorry -- planned to advise the XRP or

1    MarComm teams regarding their discussion of XRP?

2              MS. ZORNBERG:  I don't -- you're making

3    assumptions about the sequencing of when counsel got

4    involved or how.

5              And if you're going to continue to press

6    that point, we need to take a break so that I can

7    consult on the extent to which we're asserting

8    privilege.

9              MR. DRYLEWSKI:  Let's take a break.

10             MR. SYLVESTER:  Let's take a break.

11             THE VIDEOGRAPHER:  Off the record at

12   2:50 p.m.

13               (Whereupon, a recess was taken.)

14             THE VIDEOGRAPHER:  This is the beginning

15   of File Number 8.

16             We're back on the record at 3:04 p.m.

17             MS. ZORNBERG:  Okay.  Mr. Sylvester, thank

18   you.  We took a break so that we could better assess

19   privilege in light of the last question or two that

20   you asked.  And I had already flagged that this

21   subject that's reflected of meetings and messaging

22   in AO18, we know is a -- is a subject where there

23   was counsel involvement.

24             So I think the easiest way to proceed is

25   for the witness, Ms. O'Gorman, to just tell you on

1    the record what her recollection is of when she had

2    discussions with counsel about the subject of this

3    sub bullet in relation to when it was sent to

4    Brad Garlinghouse. And that will help inform the

5    privilege assertion.

6                MR. SYLVESTER: I see.

7                And that's -- but just to be clear, there

8    are certain sections of this document that are

9    redacted that you're obviously claiming privilege

10   over, but you're not claiming privilege over what

11   Ms. O'Gorman said that's in the unredacted portions.

12               MS. ZORNBERG: What caused us to take a

13   break to talk about privilege was you asking her a

14   substantive question of what advice she had in her

15   mind to discuss -- to do at meetings or to discuss

16   with Brad Garlinghouse. That was along the lines of

17   the question. So it got into the substance.

18               The short of the answer, but I'd rather

19   you hear it from Ms. O'Gorman, that on any questions

20   about the substance of the advice, we would direct

21   her not to answer on grounds of privilege. And that

22   is because of her recollection that she was already

23   in communication with counsel about this subject.

24   And so any advice was informed by her communications

25   with counsel.

```
 1              But you're free to get -- without going
 2    into substance, you're free to hear from her
 3    directly that she was already in communication with
 4    counsel.
 5              MR. TENREIRO:  About this subject, this
 6    subject?
 7              MS. ZORNBERG:  The sub bullet here that's
 8    addressed.
 9              MR. SYLVESTER:  How to discuss XRP/RCL
10    generally in presentations?
11              MS. ZORNBERG:  Correct.
12              MR. SYLVESTER:  Okay.
13              Kat, would you mind reading back what I
14    asked.
15                 (Record read by the reporter
16                 as follows:
17                 QUESTION:  I just want to
18                 make sure that we have the timing
19                 right on that.  Because I think
20                 Ms. Zornberg's instruction went to
21                 the communications that you
22                 ultimately had at the meeting.
23                 And what I'm focused on is what
24                 you planned to say as embodied in
25                 this email to Mr. Garlinghouse.
```

```
 1              So taking you to the date of
 2          this email, writing this email to
 3          Mr. Garlinghouse, what was it that
 4          you planned to advise the XRP or --
 5          sorry -- planned to advise the XRP
 6          or MarComm teams regarding their
 7          discussion of XRP?)
 8          MS. ZORNBERG:  Direct the witness not to
 9   answer on privilege grounds.
10          And you are free, Mr. Sylvester, to get
11   from the witness and ask her followup questions
12   directly about the timing of her communications with
13   counsel.
14   BY MR. SYLVESTER:
15      Q.   When did you first communicate with
16   counsel on the topic of how Ripple should modify its
17   messaging regarding XRP?
18          MR. DRYLEWSKI:  Objection to form.
19          THE WITNESS:  It would have been before,
20   during and after the date of this email.
21   BY MR. SYLVESTER:
22      Q.   When you say, "before," was it around the
23   time that you read the          report?
24      A.   Would have been around that time.
25      Q.   Okay.  But we're not talking about a
```

1   further-back time period, like at the beginning of

2   your tenure as CCO, something along those lines?

3       A.   No, I don't think so.

4       Q.   As of the time of writing this email,

5   March 11th, 2017, did you have an understanding that

6   what Ripple said publicly was relevant to whether

7   XRP was classified as a security?

8           MR. DRYLEWSKI:   I'm going to object to

9   form.

10          I'm going to ask you to exclude from your

11  answer the substance of any discussions that you had

12  with legal counsel at Ripple, inside or outside

13  counsel.

14          THE WITNESS:   Can you repeat the question,

15  please.

16  BY MR. SYLVESTER:

17      Q.   Sure.

18          At the time of writing this email,

19  March 11th, 2017, did you have an understanding that

20  what Ripple said publicly was relevant to whether

21  XRP was classified as a security?

22          MR. DRYLEWSKI:   I'll add, it calls for a

23  legal conclusion.

24          THE WITNESS:   I wouldn't be able to

25  extricate that from the discussions with legal on

250

1    the matter.

2    BY MR. SYLVESTER:

3         Q.    You recommend in this email that Ripple

4    hone its playbook and messaging, correct?

5         A.    Recommend?

6               I state here that we need to.

7         Q.    What did Ripple hope to accomplish by

8    honing its playbook or messaging?

9               MR. DRYLEWSKI:  Objection to form.

10              THE WITNESS:  To be more precise --

11              MR. DRYLEWSKI:  Hold on.  Let me also

12   instruct that, to the extent your answer would

13   divulge any communications that you may have had

14   with Ripple's inside or outside counsel, exclude

15   that from your answer.

16              THE WITNESS:  I can't answer based on the

17   information provided by Alex.

18   BY MR. SYLVESTER:

19        Q.    Did the            report that you read

20   in December 2016 address the topic that what a

21   company said publicly was relevant to the analysis

22   of whether a digital asset would be classified as a

23   security?

24        A.    I don't recall.

25        Q.    You mention in the very last line of the

```
 1    sub bullet we've been discussing that there was
 2    language used at the XRP presentation at this week's
 3    biweekly meeting that was not ideal.
 4              Do you see that?
 5        A.   I do.
 6        Q.   I believe you testified you couldn't
 7    recall what that language was; is that right?
 8        A.   I couldn't.  There was -- every two weeks,
 9    there was a presentation.
10        Q.   As a general matter, at the time, what
11    sort of language, in your view, would have fallen
12    into that not-ideal bucket?
13              MR. DRYLEWSKI:  I'm going to instruct you
14    again not to answer to the extent that your answer
15    would divulge any conversations between you and
16    Ripple's counsel.
17              THE WITNESS:  I'm unable to answer that
18    question.
19    BY MR. SYLVESTER:
20        Q.   At the time of writing this email,
21    Ms. O'Gorman, why did Ripple, in your words, need to
22    hone its playbook or messaging?
23              MR. DRYLEWSKI:  Same objection.
24              And same instruction.
25              THE REPORTER:  I'm sorry, did you say
```

252

1    something?

2              THE WITNESS:  I said, asked and answered.

3              MR. DRYLEWSKI:  Objection to form.

4              And the same instruction I just gave you,

5    do not answer to the extent it would divulge any

6    communications -- the substance of any

7    communications between you and Ripple's lawyers.

8    BY MR. SYLVESTER:

9         Q.   Go ahead, sorry.

10        A.   I'm unable to answer that question.

11        Q.   Based on your counsel's instruction?

12        A.   That's right.

13        Q.   How did Ripple ultimately hone its

14   playbook and messaging?

15             MR. DRYLEWSKI:  Same objection.

16             Same instruction.

17             THE WITNESS:  Same answer.

18   BY MR. SYLVESTER:

19        Q.   And just for the record, you're unable to

20   answer based on your counsel's instruction?

21        A.   That's right.

22             MR. SYLVESTER:  Let's go to Exhibit 17,

23   please.

24             (Whereupon, Deposition Exhibit AO-17

25             was marked for identification.)

1    BY MR. SYLVESTER:

2        Q.   Ms. O'Gorman, while you're looking at the

3    document, I'll just state for the record, this is an

4    email thread where the top email is from you to

5    Mr. Zagone dated February 13th, 2017.

6            Do you see that?

7        A.   I do.

8        Q.   Let me know when you're ready to answer

9    questions, please.

10       A.   Sure.

11           ZOOM PARTICIPANT:   When you have the

12   exhibit number, could you --

13           MR. SYLVESTER:   Seventeen.

14           ZOOM PARTICIPANT:   One-five?

15           MR. SYLVESTER:   One-seven.

16           ZOOM PARTICIPANT:   One-seven.   Thank you.

17           MS. ZORNBERG:   Is the computer muted or

18   no?

19           THE WITNESS:   I'm ready.

20   BY MR. SYLVESTER:

21       Q.   Great.

22           Do you see the second sentence in the

23   first paragraph says:

24               "Note the reference to the

25           blogger's opinion on XRP management

```
 1              by a central authority pertinent to
 2              our discussion with ████████
 3              later this month."
 4                  Do you see that?
 5      A.    Mh-hmm, I do.
 6      Q.    This was written in February of 20- --
 7    sorry -- strike that.
 8              This was written on February 13th, 2017,
 9    to Mr. Zagone.
10              Do you believe this discussion with ████
11    ████████ ater this month was referring to the ████
12    ████████ meeting we were just discussing?
13      A.    I do.
14      Q.    Okay.  Did you discuss at the ████████████
15    meeting XRP's management by a central authority?
16      A.    I wouldn't have said --
17              ZOOM PARTICIPANT:  I can't hear anything.
18    Is anybody speaking?
19              MR. SYLVESTER:  Can you hear now?
20              THE WITNESS:  Sorry.
21              MS. ZORNBERG:  Can you email and let them
22    know there are Wi-Fi issues.
23    BY MR. SYLVESTER:
24      Q.    My question was, did you discuss at the
25    ████████████ meeting XRP's management by a central
```

255

```
 1   authority?
 2        A.   I -- I wouldn't have said, "management by
 3   a central authority."  That maybe was the blogger's
 4   words.
 5             We talked about the Ripple Consensus
 6   Ledger and XRP.
 7        Q.   What did you say at the
 8   meeting about the Ripple Consensus Ledger?
 9        A.   Simply that it was a blockchain-type
10   ledger technology similar but different from the
11   Bitcoin blockchain in that --
12        Q.   What did you say about XRP?
13        A.   It was a digital asset, currency native to
14   the --
15             ZOOM PARTICIPANT:  None of us can hear a
16   thing.
17   BY MR. SYLVESTER:
18        Q.   Go ahead.
19        A.   That XRP, it was a digital asset native to
20   the XRP --
21             ZOOM PARTICIPANT:  Sorry, we couldn't hear
22   you.
23   BY MR. SYLVESTER:
24        Q.   All right.  What did you say about XRP?
25             Would you mind starting again?
```

```
 1          A.   That it was a digital asset made of two
 2   XRP Ledger.
 3          Q.   What, if anything, did you discuss with
 4   ████████████   about the fact that XRP is a 100 percent
 5   pre-mined cryptocurrency?
 6               MR. DRYLEWSKI:  Objection to form.
 7               THE WITNESS:  I don't recall us discussing
 8   that.
 9   BY MR. SYLVESTER:
10          Q.   Did you -- strike that.
11               Did you discuss with ██████████ anything
12   with respect to Ripple, the company's role, and with
13   respect to XRP?
14          A.   I don't recall.
15          Q.   Okay.
16               MR. SYLVESTER:  Let's move to Exhibit 20,
17   please.
18                 (Whereupon, Deposition Exhibit AO-20
19                  was marked for identification.)
20   BY MR. SYLVESTER:
21          Q.   Exhibit 20 is an email from you to
22   Mr. Garlinghouse dated April 4th, 2017.
23               Do you see that?
24          A.   I do.
25          Q.   Okay.  And my questions are just on the
```

1    last bullet on the first page that carries over to

2    the bullets on the second page.

3            Do you see those?

4            MR. DRYLEWSKI:  Feel free to read the

5    entire document to the extent you need to before you

6    answer any questions.

7            THE WITNESS:  I see it, yes.

8    BY MR. SYLVESTER:

9        Q.   Okay.  You write:

10               "Working with Patrick to

11           understand ████████████      ██████

12           ████████ onboarding."

13           Do you see that?

14       A.   I do.

15       Q.   What is ████████████

16       A.   It was an investment fund.

17       Q.   Was ████████████████ at the time of this

18   email contemplating purchasing XRP?

19           MR. DRYLEWSKI:  Objection to form.

20           THE WITNESS:  Yes.

21   BY MR. SYLVESTER:

22       Q.   The next bullet on the top of page 2 says:

23               "Facts received inconsistent

24           with their private placement

25           document.  Private placement doc

```
 1              contains inaccurate Ripple-related
 2              language and seems to point toward
 3              XRP being a security, which we
 4              obviously do not want."
 5         Is the "we" in "which we obviously do not
 6    want" Ripple?
 7         A.   It would be, yes.
 8         Q.   Okay.
 9              Why did Ripple not want language in this
10    document that seemed to point towards XRP being a
11    security?
12         A.   The language in the document --
13              MR. DRYLEWSKI:  Objection to form.
14              And I'll instruct you not to answer to the
15    extent it would divulge any communications that you
16    had with Ripple's lawyers at the time.
17              THE WITNESS:  The language in the document
18    was inaccurate.
19    BY MR. SYLVESTER:
20         Q.   Why was it inaccurate?
21              MR. DRYLEWSKI:  Same objection.
22              Same instruction.
23              THE WITNESS:  I can't recall exactly.
24    BY MR. SYLVESTER:
25         Q.   Did           ultimately purchase XRP?
```

1    A.   Yes.

2    Q.   Do you know if the language that you're

3    referencing in this exhibit was taken out of the

4    transaction documents?

5    A.   I can't recall.

6    Q.   Did anyone at Ripple ever talk to anyone

7    at ███████ about why this securities language had

8    been included in the transaction documents in the

9    first place?

10        MR. DRYLEWSKI:  Objection to form.

11        THE WITNESS:  I can't speak for anyone at

12   Ripple.  I can certainly speak for myself.  No.

13   BY MR. SYLVESTER:

14   Q.   Did anyone at Ripple ask anyone at

15   ████████ whether ██████ viewed XRP as a

16   security?

17        MR. DRYLEWSKI:  Objection to form.

18        MS. ZORNBERG:  Objection and asked and

19   answered.

20   BY MR. SYLVESTER:

21   Q.   Did you have any discussion with anyone at

22   Ripple regarding ██████ views as to whether or

23   not XRP was a security?

24        MS. ZORNBERG:  So you can answer to the

25   extent that it doesn't divulge communications you

```
 1    had with counsel.
 2            THE WITNESS:  Could you repeat the
 3    question, please?
 4    BY MR. SYLVESTER:
 5        Q.   Sure.
 6            Did you have any discussions with anyone
 7    at Ripple regarding          view as to whether
 8    or not XRP was a security?
 9            MS. ZORNBERG:  Objection.
10            And same instruction.
11            THE WITNESS:  I would have talked to
12    Patrick Griffin, maybe not specifically about that,
13    but, obviously, I clearly spoke to him about it.
14    BY MR. SYLVESTER:
15        Q.   Spoke to Mr. Griffin?
16        A.   Yeah, about the private placement
17    document.  I don't remember the specifics.
18            MR. SYLVESTER:  Let's move to Exhibit 23,
19    please.
20                (Whereupon, Deposition Exhibit AO-23
21                 was marked for identification.)
22            MR. SYLVESTER:  If you can hear me, that's
23    two-three.
24        Q.   Ms. O'Gorman, this is a thread of emails,
25    the top email of which is an email from you to
```

```
 1    Mr. Griffin on May 2nd, 2017.

 2            Do you see that?

 3        A.    I do.

 4        Q.    You'll let me know when you're ready to

 5    answer questions?

 6        A.    I sure will.

 7        Q.    Great.

 8        A.    I'm ready.

 9        Q.    Great.

10            You see the bottom email is Mr. Griffin

11    stating that he wants to put on your radar the

12    recent news around ICOs.

13            Do you see that?

14        A.    I do.

15        Q.    And then, the very bottom of his email, he

16    says:

17                "Chris L mentioned this and

18                wanted me to be sure it was

19                something we thought through."

20            Do you see that?

21        A.    I do.

22        Q.    Is that Mr. Larsen?

23        A.    It is.

24        Q.    Did you have any conversation with

25    Mr. Griffin around the time of this email about
```

1  Mr. Larsen's concerns that this was something that

2  Ripple was thinking through?

3          MR. DRYLEWSKI:  Objection to form.

4  Mischaracterizes the document.

5          THE WITNESS:  I think it says he mentioned

6  this.  I don't know of any concerns he had.

7  BY MR. SYLVESTER:

8      Q.  It seems from Mr. Griffin's email that

9  Mr. Larsen and Mr. Griffin had a conversation; is

10  that right?

11     A.  It seems to be the case.

12     Q.  Other than this email from Mr. Griffin to

13  you, did Mr. Griffin convey any other information

14  about what Mr. Larsen had said to him in that

15  conversation?

16          MS. ZORNBERG:  Object to form.

17          THE WITNESS:  I don't recall.  I doubt it.

18  BY MR. SYLVESTER:

19     Q.  Okay.  And you reply:

20              "Thanks Patrick, I have been

21          watching this for quite some time

22          now."

23          Do you see that?

24     A.  I do.

25     Q.  What's the "this" in this sentence?

1          A.   This, ICOs, initial coin offerings.

2          Q.   The next sentence that you write is:

3               "Ryan and I met with ████████

4          ████████ in late March on this very

5          subject."

6          Do you see that?

7          A.   I do.

8          Q.   Okay.  And that's your meeting with

9     Mr. Zagone and ████████ that we've discussed?

10         A.   That's right.

11         Q.   Did you discuss with ████████ ICOs?

12         A.   It says here that we did, so I would say

13    we must have.

14         Q.   Okay.  The next clause in that sentence,

15    you write:

16               "Clarifying a couple of points

17          in their January 2016 white paper

18          in our favor."

19          Do you see that?

20         A.   I do see that.

21         Q.   Okay.  And that's referencing you and

22    Mr. Zagone meeting with ████████ is that right?

23         MR. DRYLEWSKI:  Objection to form.

24         THE WITNESS:  That appears to be the case.

25    / /

264

1    BY MR. SYLVESTER:

2        Q.   Okay.  What points did you clarify with

3    ███████████   at your meeting with them?

4        A.   I have no recollection.

5        Q.   You also mentioned that you and Mr. Zagone

6    helped  ███████████  understand Ripple's position; is

7    that right?

8        A.   I think it's similar to what we talked

9    about earlier.  We talked and spoke about a number

10   of different things.  And we helped them get a

11   better understanding of Ripple.

12       Q.   Okay.  You write that you'll be meeting

13   with  ██████████████████  again at the  ████████████

14   strategy session in New York on May 20th?

15       A.   That's right.

16       Q.   Did that meeting happen?

17       A.   No, it didn't.

18       Q.   Why not?

19       A.   I broke my leg.

20       Q.   Oh, sorry to hear that.  Okay.

21            The next paragraph, you write:

22                "Ryan and I also delivered a

23            presentation.  We'll look at the

24            Howey test and ICOs."

25            Do you see that?

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

1      A.   I do.

2      Q.   That presentation was to MarComm, the XRP

3  team, customer support, ████ and ██████ last month;

4  that's right?

5      A.   That's right.

6      Q.   Was that presentation given by you and

7  Mr. Zagone alone?

8      A.   ██████ was also present in all of those

9  meetings.

10          MR. DRYLEWSKI:  Objection to the form of

11  the last question.

12          THE WITNESS:  ██████ being the GC.

13  BY MR. SYLVESTER:

14      Q.   Understanding that she was present, did

15  she deliver the presentation?

16          MR. DRYLEWSKI:  Objection to form.

17          THE WITNESS:  She was involved in the

18  delivery, yes.

19  BY MR. SYLVESTER:

20      Q.   In that she consulted on its content?

21          MR. DRYLEWSKI:  Objection to form.

22          THE WITNESS:  Certainly that, yes, but

23  also spoke at the meeting.

24  BY MR. SYLVESTER:

25      Q.   The nature of that presentation, according

```
 1    to this email, is how XRP could be evaluated under

 2    the Howey test; is that right?

 3         A.   That's right.

 4         Q.   Okay.  It says later that you were asked

 5    to present that same overview to the entire company.

 6              Do you see that?

 7         A.   I do, yeah.

 8         Q.   Ultimately, did you present the overview

 9    of the Howey test to the entire company?

10              MR. DRYLEWSKI:  Objection to form.

11              THE WITNESS:  It is unlikely, because I

12    had the broken leg, and so I couldn't walk.

13    BY MR. SYLVESTER:

14         Q.   What was the purpose of the presentation

15    that you and Mr. Zagone gave to the number of Ripple

16    teams listed here?

17              MS. ZORNBERG:  Okay.  You're asking about

18    purpose.  So -- on a -- on a presentation as to

19    which the company has asserted privilege.  So I

20    would -- I think the question is -- is -- do you

21    want to rephrase the question?

22              I mean, you're -- otherwise, I'm going to

23    instruct the witness not to answer to the extent

24    that the purpose was a subject that she discussed

25    with legal or which she had legal input.
```

```
 1    BY MR. SYLVESTER:

 2         Q.   So with that, can you answer?

 3         A.   No, I can't.

 4         Q.   Based on Ms. Zornberg's instruction?

 5              MR. TENREIRO:  How can we create a record

 6    of this?  Maybe we need to take a break because, you

 7    know, just because a lawyer is in the room doesn't

 8    make a conversation privileged.  She has to be

 9    expressing a desire for advice.

10              So if the presentation was, for example --

11    I don't know -- to educate the company, so here's my

12    views, at the very least, that would go in a

13    privilege log.

14              But you're not even letting us ask

15    questions about what the purpose was, so that's a

16    little bit problematic.

17              MS. ZORNBERG:  Let's state the specific

18    question.  Let me hear it again, and if we need to

19    take a break to supplement the record, we can do

20    that.

21    BY MR. SYLVESTER:

22         Q.   What was the purpose of the presentation

23    that you and Mr. Zagone gave to the Ripple teams

24    listed here in this exhibit?

25              MS. ZORNBERG:  And you're asking beyond
```

```
 1    what is actually stated in the unredacted portion of
 2    the email that we gave you, which is exactly the
 3    kind of thing that would be on a privilege log.
 4              It says that it's reviewing how XRP could
 5    be evaluated under the Howey test.  You have that in
 6    the record.
 7              So what beyond that are you looking for?
 8    Because I feel like the predicate has been
 9    established here, but what am I missing?
10              MR. TENREIRO:  Well, was she seeking legal
11    advice from Ms.       ?  Was she sitting there?
12              You can't just put a lawyer in the room
13    and privilege the conversation, and I think we know
14    that.
15              MR. DRYLEWSKI:  I don't think that's ever
16    been the testimony, though.  We just heard her say
17    that        was not just simply in the room.  She
18    was a co-presenter.
19              MR. TENREIRO:  Okay.  But then can we ask
20    her what she said and not what       said?
21              Unless she's seeking advice from
22    if she says something to       to seek advice, it's
23    fine.  But if she's saying something, just because
24           is there and also opens her mouth, that does
25    not make it privileged.
```

1          And we really don't want to have to come

2     back because this is very important, clearly.  I

3     think we -- it really behooves us to get to the core

4     of it here rather than have -- because this is

5     something we're going to have to ask her back on.

6               I think you're over-asserting here.  Maybe

7     I haven't heard the basis correctly.

8               MS. ZORNBERG:  I think you're taking a

9     quite extreme and mischaracterized view of the

10    record to date to try to intimidate a witness --

11              MR. SYLVESTER:  Oh, my God.

12              MS. ZORNBERG:  -- as to be, you know,

13    possibly be recalled.  I think that's inappropriate.

14              I'm happy to take a short break so that I

15    can talk with Ms. O'Gorman and her counsel and come

16    back and we'll deal with your issue.

17              MR. TENREIRO:  We're not trying to

18    intimidate any witness.

19              MR. SYLVESTER:  Absolutely not.

20              MS. ZORNBERG:  Thank you for saying that.

21              But by you sitting here many hours into a

22    deposition and making a record on the record in

23    front of the witness saying, this is something we

24    have to get to the bottom of or we're gonna have to

25    be back here with the witness, I think many people

270

1  in Ms. O'Gorman's seat would find that intimidating,

2  especially coming from an SEC attorney.

3          MR. TENREIRO:  I was saying it to you.

4          MS. ZORNBERG:  That should be an

5  off-the-record conversation, not in the presence of

6  a witness.

7          Okay.  We'll take a break now, and we'll

8  try to address your concern.

9          THE VIDEOGRAPHER:  Off the record at 3:35.

10          (Whereupon, a recess was taken.)

11          THE VIDEOGRAPHER:  This is the start of

12  File Number 9.

13          We're back on the record at 3:46 p.m.

14          MS. ZORNBERG:  Okay.  Counsel, we took a

15  break in light of certain questions and privilege.

16  You had asked for some further information so you

17  could assess the record regarding a privilege issue

18  relating to AO23.  So I'll make a proffer to you,

19  and we can go from there.

20          The document in question, AO23, refers to

21  a presentation and a deck that was used during that

22  presentation to departments or individuals at

23  Ripple.

24          Our understanding, based on facts and

25  based on Ms. O'Gorman's recollection, is that the

271

1     preparation for that presentation was done by
2     compliance in conjunction with the legal department.
3            The legal department was consulted on the
4     content of the presentation.  The deck that was used
5     was prepared in consultation with legal counsel at
6     Ripple.  The Howey analysis that ultimately was
7     reflected and incorporated into the deck was
8     informed by Ms. O'Gorman's communications with
9     ████████ and ████████ among others.
10           Ms. O'Gorman also recalls discussing it in
11    advance of the presentation with ████████, who
12    had shortly beforehand become the new general
13    counsel of Ripple.  Legal participated in the
14    meeting itself.  ████████ was present at the meeting
15    as a participant and spoke to the company
16    department.
17           And the purpose of the presentation was to
18    provide others in the company with a view from legal
19    and compliance together.
20           MR. TENREIRO:  View as to?
21           MS. ZORNBERG:  Among other things, what is
22    stated here, how XRP could be evaluated under the
23    Howey test.
24           So let me just pause for a moment to ask
25    Ms. O'Gorman if she agrees with the proffer that

272

```
 1    I've made on the record.

 2              THE WITNESS:  I agree.

 3              MS. ZORNBERG:  Okay.  On the basis of

 4    that, I think we've satisfied your inquiry.

 5              MR. SYLVESTER:  I agree.  Thank you.

 6              MS. ZORNBERG:  Okay.

 7    BY MR. SYLVESTER:

 8         Q.   Ms. O'Gorman, let's talk about who was at

 9    the meeting.  There's a list of teams here perhaps

10    that can guide your recollection of who attended.

11              So who attended the meeting that is the

12    topic of the second paragraph of AO23?

13         A.   MarComm is the marketing communications

14    department.  The XRP team is another team.  Customer

15    support.  ███████████████████████ and others,

16    there were also -- maybe that wasn't the prior month

17    but the sales team and biz dev.

18         Q.   Was Mr. Schwartz in attendance?

19         A.   I don't know about David.

20         Q.   Okay.  Were the heads of MarComm, the XRP

21    team and customer support present?

22         A.   Yes.

23              MS. ZORNBERG:  Object to form.

24              You can answer.

25    / /
```

273

```
 1   BY MR. SYLVESTER:

 2        Q.   The very last paragraph of your email to

 3   Mr. Griffin says:

 4                  "Note, the SEC has a

 5             50-person-strong working group

 6             dedicated to evaluating SEC's

 7             potential regulatory authority over

 8             certain digital currencies."

 9             Do you see that?

10             THE WITNESS:  I do, yeah.

11   BY MR. SYLVESTER:

12        Q.   How did you learn that?

13             MS. ZORNBERG:  Well, you can answer

14   without disclosing communications with Ripple

15   counsel.

16             THE WITNESS:  Okay.  I believe I may

17   have -- I'm -- actually, I don't recall exactly.

18   May have been the SEC website or an article online.

19   BY MR. SYLVESTER:

20        Q.   Did you, while you were Ripple's CCO, keep

21   yourself current on what, if anything, this SEC

22   working group was doing?

23             MR. DRYLEWSKI:  Objection to form.

24             THE WITNESS:  I didn't keep myself

25   current.  It was only if articles within written or
```

1    published on the matter.

2    BY MR. SYLVESTER:

3        Q.    Where did you read those articles?

4        A.    Online.

5        Q.    Sure.

6              Was there a particular website that you

7    visited that published those kinds of articles?

8        A.    It may have been the SEC's website.  I

9    couldn't say.

10       Q.    Okay.  Do you know the identity of any of

11   the people within the 50-person-strong working group

12   referenced in your email?

13       A.    I do not.

14       Q.    Did you ever try to determine who was a

15   member of those -- that group?

16       A.    I don't believe I ever did.

17       Q.    Okay.  Did you ever try to contact anyone

18   who was a member of that group?

19       A.    No.

20       Q.    Did you ever ask anyone on your team to

21   contact anyone in that group?

22       A.    No --

23       Q.    Why not?

24       A.    -- to the best of my knowledge.

25             MS. ZORNBERG:  Object to form.

275

```
 1              MR. DRYLEWSKI:  Objection to form.
 2              THE WITNESS:  Didn't -- I don't know why I
 3    didn't, but I didn't.
 4    BY MR. SYLVESTER:
 5         Q.   Did you ever consider the possibility of
 6    contacting this SEC working group?
 7              MR. DRYLEWSKI:  Objection to form.
 8              And I'm going to instruct you not to
 9    answer to the extent that it would reveal any
10    communications that you may have had with Ripple's
11    inside or outside counsel.
12              THE WITNESS:  I cannot answer that
13    question based on Alex's statement.
14    BY MR. SYLVESTER:
15         Q.   Did you ever instruct anyone not to
16    contact the SEC?
17         A.   Did I instruct anyone not to?
18              MS. ZORNBERG:  Answer "yes" or "no."  You
19    can answer that.
20              MR. DRYLEWSKI:  Yeah.
21              THE WITNESS:  No, I never did.
22    BY MR. SYLVESTER:
23         Q.   While you were Ripple's CCO, did you ever
24    ask anyone at Ripple to stop doing something that
25    they had been doing based on your understanding of
```

1  the securities laws?

2          MR. DRYLEWSKI:  Objection to form.

3          MS. ZORNBERG:  Hold on just a moment.

4          That is a very broad and vague question,

5  and it's difficult -- look, if you understand the

6  question and you can answer it without divulging any

7  communications with counsel, Ms. O'Gorman, then you

8  can answer it.

9          MR. DRYLEWSKI:  And the question calls for

10  a yes, a no, I don't know or I don't recall.

11          THE WITNESS:  I don't recall.

12  BY MR. SYLVESTER:

13      Q.   Did you ever -- strike that.

14          We discussed earlier that, on occasion,

15  you reviewed Ripple's public statements before they

16  went out; is that correct?

17          MR. DRYLEWSKI:  Objection to form.

18          THE WITNESS:  Sometimes.

19  BY MR. SYLVESTER:

20      Q.   Okay.  Do you recall any occasion where

21  you made a revision to a draft Ripple public

22  statement based upon your understanding of the

23  securities laws?

24      A.   I don't recall.

25          MR. DRYLEWSKI:  Objection to form.

```
 1              I do want to instruct to you exclude from
 2    your answer anything you may have done at the
 3    direction of Ripple's counsel.
 4              THE WITNESS:  Okay.
 5              MR. SYLVESTER:  Let's look at 24, please.
 6              (Whereupon, Deposition Exhibit AO-24
 7               was marked for identification.)
 8    BY MR. SYLVESTER:
 9         Q.   So, Ms. O'Gorman, this is an email from
10    Ms.        to you on September 18th, 2017.
11              Do you see that?
12         A.   I do.
13         Q.   Okay.  And attached to this email is a
14    February 27, 2015 memorandum from the law firm
15              with the subject line "Analysis of whether
16    XRP is a security for the purpose of federal and
17    state regulation."
18              Do you see that?
19         A.   Yeah, I do.
20         Q.   Do you recall receiving this email in
21    September 2017?
22         A.   I don't.
23         Q.   Okay.
24              Do you recall in September 2017 whether
25    you read the attached legal memorandum?
```

```
 1            A.   I don't recall.
 2            MS. ZORNBERG:  For the record, is this the
 3    same attachment that you previously showed the
 4    witness and that she said she doesn't recall ever
 5    reading?
 6            THE WITNESS:  It is.
 7            Oh, sorry.
 8            MR. SYLVESTER:  She just answered you.
 9            MR. DRYLEWSKI:  So the answer is yes,
10    though, Mark?
11            MR. SYLVESTER:  The answer -- excuse me,
12    I'm not being deposed.  The witness answered the
13    question.  Let's move on.
14            MR. DRYLEWSKI:  All right.
15            MR. TENREIRO:  Well, Lisa, I'll just put
16    on the record, I think the first one was a draft,
17    that Erol had said to us was a draft, so I think
18    this one is -- maybe it's the same in sum and
19    substance --
20            MS. ZORNBERG:  This is why I'm asking you,
21    'cause I actually think it's the same one, and I'm
22    asking for clarification.  If it's not the same one,
23    maybe you could just clarify.
24            MR. SYLVESTER:  Sure.
25            My understanding -- I mean, the same one
```

1   is hard with an electronic document.

2           It's not the same file that was attached

3   to the earlier email.  My understanding from Erol is

4   that it was an identical document.

5           MS. ZORNBERG:  It's the same Bates

6   numbers.

7           MR. SYLVESTER:  Yes, right.  So --

8           MS. ZORNBERG:  We pulled them out.  It is

9   actually the same identical document that you've

10  already asked the witness about.

11          MR. TENREIRO:  So what's your question?

12          MS. ZORNBERG:  I'm just trying to help

13  clarify the record.  If Mr. Sylvester wants to ask

14  the same line of questions she already answered

15  about the same Bates number, he can, but we'll

16  object on the basis that it has been asked and

17  answered.

18  BY MR. SYLVESTER:

19      Q.   Okay.  Other than the document that we're

20  discussing here, the attachment to Ms. ████ email,

21  are you aware of the existence of any other legal

22  memoranda in Ripple's possession on the topic of XRP

23  status under the securities laws?

24          MS. ZORNBERG:  And that's a yes-or-no

25  question.  He's not asking for the substance of any

1    legal advice, just are you aware of others.

2              THE WITNESS:  Yes.

3    BY MR. SYLVESTER:

4         Q.   Did you become aware of the existence of

5    those others while you were at Ripple?

6         A.   Yes.

7         Q.   Who informed you that those legal

8    memoranda existed?

9              MS. ZORNBERG:  Just -- may I see -- maybe

10   ask, if you're using a plural.

11             MR. SYLVESTER:  Sure.

12             MS. ZORNBERG:  -- can you clarify --

13             MR. SYLVESTER:  I will.  Yes.  Sure.

14        Q.   Other than the            memo attached

15   to Exhibit 24, how many other memoranda addressing

16   the issue of whether XRP is a security are you aware

17   exists?

18        A.   I was aware of one other.

19        Q.   Okay.  Who told you that that legal memo

20   existed?

21        A.   It was written while I was at Ripple.

22             MR. DRYLEWSKI:  Hold on.  Don't answer

23   anything -- don't give any information other than

24   the question of who told you --

25             THE WITNESS:  Oh.

281

1          MR. DRYLEWSKI:  -- about the memo.

2          THE WITNESS:  ███████

3   BY MR. SYLVESTER:

4      Q.   Okay.  And who wrote the memo?

5           I'm asking which lawyer.

6           MS. ZORNBERG:  That's okay.

7           MR. DRYLEWSKI:  You can answer the

8   question, if you know, but only that.

9           THE WITNESS:  The law firm?

10          MR. DRYLEWSKI:  Yes.

11          THE WITNESS:  ██████████, I believe.

12  BY MR. SYLVESTER:

13     Q.   And when did ████████ prepare that

14  memo?

15     A.   2018.

16     Q.   Okay.  Did you read that memo?

17     A.   I read a draft.

18          MR. SYLVESTER:  Let's go to Exhibit 25,

19  please.

20          MR. TENREIRO:  Twenty-five.

21          (Whereupon, Deposition Exhibit AO-25

22           was marked for identification.)

23          ZOOM PARTICIPANT:  Twenty-five, correct?

24          MR. SYLVESTER:  Yes.

25  / /

282

```
 1          Q.   So, Ms. O'Gorman, this is an email from
 2     Mr. ████ to you and others dated October 26th,
 3     2017.
 4               Do you see that?
 5          A.   I do.
 6          Q.   Okay.  Let me know when you're ready to
 7     answer questions.
 8          A.   I'm ready.
 9          Q.   Okay.  Do you recall receiving this email?
10          A.   I don't.
11          Q.   Do you have any reason to doubt that you
12     did receive it?
13          A.   No.
14               MR. DRYLEWSKI:  Objection to form.
15               THE WITNESS:  No.
16     BY MR. SYLVESTER:
17          Q.   Do you know what Hit BC -- HitBTC is?
18          A.   An exchange.
19          Q.   Okay.  And do you see that a
20     representative of HitBTC appears to be asking
21     someone at Ripple to confirm the legal status of
22     XRP?
23          A.   That's correct.
24          Q.   Did Ripple ever make that certification to
25     HitBTC?
```

1          MR. DRYLEWSKI:  Objection to form.

2          THE WITNESS:  I don't know.  I can't say

3    for certain.

4    BY MR. SYLVESTER:

5          Q.    What steps, if any, did anyone at Ripple

6    take after receiving this email asking to confirm

7    the legal status of XRP?

8          MS. ZORNBERG:  Objection.  Lack of

9    foundation.

10         MR. DRYLEWSKI:  And instruct you not to

11   answer to the extent it would divulge any

12   communications that you had with Ripple's counsel,

13   inside or outside.

14         THE WITNESS:  I -- I can't answer the

15   question based on that.

16   BY MR. SYLVESTER:

17         Q.    Based on Mr. Drylewski's instruction?

18         A.    That's right.

19         MS. ZORNBERG:  Can I just ...

20         MR. SYLVESTER:  Let's go off the record.

21         THE VIDEOGRAPHER:  Okay.  We're off the

22   record at 4:02 p.m.

23             (Whereupon, a recess was taken.)

24         THE VIDEOGRAPHER:  This is the beginning

25   of File 10.

```
1              We're back on the record at 4:04 p.m.
2      BY MR. SYLVESTER:
3          Q.   Okay.  Ms. O'Gorman, did anyone at Ripple
4      respond to this email in any way?
5              MR. DRYLEWSKI:  Objection.  Asked and
6      answered.
7              And same instruction.
8              THE WITNESS:  Oh.  I can't answer that
9      question.  Legal was involved.
10     BY MR. SYLVESTER:
11         Q.   Okay.  That's not the question I'm asking,
12     though.
13             I'm asking if anyone at Ripple
14     responded -- a third-party communication responded
15     to HitBTC?
16             MR. DRYLEWSKI:  You can answer the
17     question to the extent you know the fact of whether
18     or not anyone at Ripple answered, but do not divulge
19     the substance of any communications you may have had
20     with Ripple's counsel on that topic, if there were
21     any.
22             THE WITNESS:  Okay.  Okay.
23             █████████  responded.
24     BY MR. SYLVESTER:
25         Q.   Okay.  Do you know what Ms. █████  told
```

285

1      HitBTC in response to this email?

2              MR. DRYLEWSKI:  I'm going to instruct you

3      not to answer to the extent that it would divulge

4      the substance of any communications you had with

5      Ms. ███ or any other of Ripple's counsel.

6              THE WITNESS:  Then I'm unable to answer

7      that question.

8              MR. SYLVESTER:  I just want to stop for a

9      second here and talk to Mr. Drylewski and also

10     Ms. Zornberg.

11             If Ms. ███ says to Ms. O'Gorman, I told

12     HitBTC XYZ, in my view, that's not a privileged

13     communication.

14             Do you disagree?

15             MS. ZORNBERG:  All right.  Let's take a

16     quick break.  I need to understand the factual

17     predicate for me to assess this.

18             MR. SYLVESTER:  Okay.  Understood.

19             THE VIDEOGRAPHER:  Off the record at 4:06.

20             (Whereupon, a recess was taken.)

21             THE VIDEOGRAPHER:  This is the start of

22     File Number 11.

23             We're back on the record at 4:14 p.m.

24             MR. DRYLEWSKI:  So, Mark, before we took a

25     break, you asked Ms. O'Gorman questions about any

286

1    conversations she had with ███████ about ██████ and

2    any questions about whether she understood anyone at

3    Ripple had responded to HitBTC.

4              Ms. O'Gorman would just like to clarify

5    her answers to those last two questions.  So if

6    you'd like to ask them again, Ms. O'Gorman can

7    answer them for you.

8              I'm also happy to give you a

9    representation, whichever you'd prefer.

10             MR. SYLVESTER:  Let's -- I'll ask them

11   again.

12             THE WITNESS:  Okay.

13   BY MR. SYLVESTER:

14        Q.   Do you understand whether anyone at Ripple

15   responded to HitBTC?

16        A.   I don't recall --

17        Q.   You don't know --

18        A.   -- specifically --

19        Q.   I'm sorry.

20        A.   -- specifically HitBTC.

21        Q.   Okay.  So just so I'm clear, you don't

22   know one way or the other whether Ripple responded

23   to this email?

24        A.   I don't recall this particular one, no.

25        Q.   Okay.

1          Do you recall any other occasion in which

2     Ripple was asked by an exchange for its views on

3     whether XRP was a security?

4               MR. DRYLEWSKI:  Objection to form.

5               THE WITNESS:  I have a general

6     recollection.

7     BY MR. SYLVESTER:

8          Q.   Which exchange asked for those views?

9          A.   I -- I wouldn't be able to say.  I

10    couldn't be specific.

11         Q.   Do you -- strike that.

12              What did Ripple say in response to any

13    exchange, setting aside HitBTC, that asked whether

14    XRP was a security?

15              MR. DRYLEWSKI:  Objection to form.

16              THE WITNESS:  Those matters were forwarded

17    to legal for response.

18    BY MR. SYLVESTER:

19         Q.   Okay.  Focusing just on communications --

20    your knowledge, if any, of communications between

21    Ripple and the exchanges.

22              When exchanges asked Ripple whether XRP

23    was a security, what was Ripple's response to the

24    exchanges?

25              MR. DRYLEWSKI:  Objection to form.

288

```
 1              THE WITNESS:  I believe the analysis

 2   provided that, based on reviewing the Howey test,

 3   was that, at that time, XRP was not considered a

 4   security.

 5   BY MR. SYLVESTER:

 6      Q.    To your knowledge, did Ripple ever make

 7   that statement to an exchange in writing?

 8              MR. DRYLEWSKI:  Objection to form.

 9              You can answer, if you know.

10              THE WITNESS:  They may have.  Legal,

11   meaning legal may have.

12   BY MR. SYLVESTER:

13      Q.    Sure.

14              I know you don't remember which exchanges

15   are involved, but around when was it that Ripple

16   made the statement that, based on reviewing the

17   Howey test, at that time, XRP was not considered a

18   security?

19              MS. ZORNBERG:  Objection.

20   Mischaracterizes the testimony.

21              I think the witness said that legal may

22   have, and that's not what your question just

23   implied.

24              MR. SYLVESTER:  I want to back up further.

25              I asked:
```

```
 1                    "When exchanges asked Ripple
 2               whether XRP was a security, what
 3               was Ripple's response to the
 4               exchanges?"
 5               And the witness said -- bless you --
 6                    "I believe the analysis
 7               provided, based on reviewing the
 8               Howey test, was that, at that time,
 9               XRP was not a security."
10          Q.   So as to that answer, just the latter
11     part, I just want to know when that happened.
12          A.   Over a period of time.
13               Are you looking for a time period?
14          Q.   Yes, exactly.
15          A.   Okay.  I would say -- I don't know
16     specifically when, but around this time, October of
17     2017.  Could have been a month before, month after.
18               MS. ZORNBERG:  No one's asking you to
19     guess.
20               THE WITNESS:  Yeah.  I don't know.
21     BY MR. SYLVESTER:
22          Q.   Around the time of October 2017 is
23     perfect.  That's just fine.
24               MS. ZORNBERG:  Object to saying,
25     "October 2017 is perfect."
```

 1              The witness is referring to an email for

 2    that date that she's already said she doesn't

 3    recall.

 4              MR. DRYLEWSKI:  The problem is you're

 5    asking for very specific answers to very general

 6    questions.

 7              If you don't remember the time period, say

 8    so.

 9              MR. SYLVESTER:  The witness has testified

10    to her answer.  Like, let's move on.

11         Q.   Ms. O'Gorman, going back to your answer,

12    which I will read back:

13                   "I believe the analysis

14                   provided, based on reviewing the

15                   Howey test, was that, at that time,

16                   XRP was not considered a security."

17              Do you recall giving that answer?

18         A.   I did.  I do.

19         Q.   Okay.  Great.

20              What was the basis for your belief that

21    that was the analysis provided?

22         A.   General recollection.

23         Q.   Did you ever participate in any of those

24    communications with the exchanges?

25         A.   I believe all of those matters were

1    handled by legal, to the best of my recollection.

2         Q.    So with respect to Ripple's response to

3    exchanges on this topic of whether or not XRP was a

4    security, did you observe Ripple's response in some

5    way, or did you hear about it from someone else?

6              MR. DRYLEWSKI:  Objection to form.

7              So again, this is just a general question

8    generally or are you talking about specific

9    instances?

10   BY MR. SYLVESTER:

11        Q.    Do you understand the question?

12             If you don't, then let's work on it.

13        A.    I do understand the question.

14        Q.    Okay.

15        A.    And I have just a general recollection.  I

16   couldn't say if somebody talked to me, if they -- I

17   just can't say.

18             MR. SYLVESTER:  All right.  Let's move to

19   Exhibit 26, please.

20                (Whereupon, Deposition Exhibit AO-26

21                 was marked for identification.)

22             MR. TENREIRO:  Twenty-six.

23             ZOOM PARTICIPANT:  The exhibit, please?

24             MR. TENREIRO:  Two-six.

25             ZOOM PARTICIPANT:  Excuse me?

292

1          MR. SYLVESTER:  Two, six.

2          ZOOM PARTICIPANT:  Your voice just went

3    totally black.

4          MS. ZORNBERG:  Two-six.

5          ZOOM PARTICIPANT:  Thank you.

6    BY MR. SYLVESTER:

7     Q.  All right.  Ms. O'Gorman, Exhibit 26 is an

8    email from ████████████████████████ at The

9    ████████████ CC to you and others, sent on

10   December 21st, 2017.

11         Do you see that?

12    A.  I do.

13    Q.  Okay.

14        Do you recall receiving this email?

15    A.  I do.

16    Q.  Do you see that the attachment to the

17   email is entitled "Subject:  How we talk about XRP,"

18   from your legal department?

19    A.  I do.

20    Q.  Okay.  Have you seen that attachment prior

21   to December 21st, 2017?

22    A.  I don't recall seeing it before then.

23    Q.  To whom, if anyone, at Ripple was this

24   attachment distributed?

25         MR. DRYLEWSKI:  Objection to form.

1           THE WITNESS:  Do you mean apart from the

2     people cc'd?

3     BY MR. SYLVESTER:

4           Q.   That's right.

5           A.   I wouldn't know.

6           Q.   Are you aware of any Ripple employee using

7     the term "Ripple XRP" -- strike that.

8                Ripple's XRP?

9           A.   They may have.

10          Q.   Did any Ripple employee ever use the term

11    "Ripple's XRP" in your presence?

12          A.   They may have.  I don't recall

13    specifically.

14          Q.   Okay.  During your tenure at Ripple, do

15    you recall anyone at Ripple saying, "We are working

16    hard to increase the price of XRP"?

17          A.   I don't.

18          Q.   And --

19               MS. ZORNBERG:  Mr. Sylvester, are you

20    referring in these questions to the document?

21               MR. SYLVESTER:  I'm just asking her -- I'm

22    asking her whether, from her recollection, she

23    recalls hearing anyone say these phrases.

24               MS. ZORNBERG:  Okay.

25    / /

1    BY MR. SYLVESTER:

2         Q.   I do want to clarify your last answer,

3    because I want to make sure I understand it.

4              You don't recall ever hearing anyone say

5    "We're working harder to -- hard to increase the

6    price of XRP"; is that right?

7         A.   I don't recall that, no.

8         Q.   Okay.  Do you recall anyone at Ripple

9    saying that XRP is a strong, long-term investment?

10        A.   I don't recall.

11        Q.   Okay.  While you were at Ripple, do you

12   recall anyone at Ripple referring to trading in

13   Ripple?

14        A.   I hope not.  I don't recall.

15        Q.   Okay.  And have you ever -- do you

16   recall -- strike that.

17             When you were at Ripple, do you recall any

18   Ripple employee saying, we're up a certain

19   percentage today, in a reference to the percentage

20   increase in XRP's price?

21        A.   I don't recall.

22        Q.   Did you -- while you were at Ripple, did

23   you ever hear any holders of XRP speaking about the

24   price of XRP?

25             MR. DRYLEWSKI:  Objection to form.

1          THE WITNESS:  I did.

2     BY MR. SYLVESTER:

3          Q.   Okay.

4               Who was it that you can recall that was a

5     holder of XRP speaking about the price of XRP?

6               MR. DRYLEWSKI:  Objection to form.

7               THE WITNESS:  I can't say anyone

8     specifically.  I don't recall.

9     BY MR. SYLVESTER:

10         Q.   Was it -- how did you come to learn that

11    there was an XRP holder that was speaking about the

12    price of XRP?

13              MS. ZORNBERG:  Objection.  Lack of

14    foundation.

15              THE WITNESS:  Oh, am I supposed to answer?

16    BY MR. SYLVESTER:

17         Q.   Yeah.  Go ahead, you can answer it again.

18              MS. ZORNBERG:  If you can.

19              THE WITNESS:  I'm sorry, can you repeat

20    the question?

21    BY MR. SYLVESTER:

22         Q.   Sure.

23              So I asked, while you were at Ripple, did

24    you ever hear any holders of XRP speaking about the

25    price of XRP?

296

1          And you said, I did.

2     A.    Um-hmm.

3     Q.    I'm just trying to figure out where you

4    heard XRP holders speaking about the price of XRP.

5     A.    They could have been just general

6    conversations, informal conversations.  Many at the

7    company owned XRP.

8     Q.    I see.

9          So when you answered my question you did

10   hear holders of XRP speaking about the price of XRP,

11   you were referencing Ripple employees; is that

12   right?

13         MR. DRYLEWSKI:  Objection to form.

14         THE WITNESS:  That's what I thought you

15   were asking, yes.

16   BY MR. SYLVESTER:

17    Q.    And what did those Ripple employees say

18   about the price of XRP?

19         MS. ZORNBERG:  Objection.  Lack of

20   foundation.

21         THE WITNESS:  Speaking very generally,

22   they might have said that XRP is X price today.

23   BY MR. SYLVESTER:

24    Q.    In what context did you have conversations

25   with Ripple employees about the price of XRP?

1            MR. DRYLEWSKI:  Objection to form.

2            THE WITNESS:  In what context?

3    BY MR. SYLVESTER:

4        Q.   Mh-hmm.

5        A.   Very informal.  You know, chatting.

6        Q.   How about the phrase, we're up X

7    percentage today, referring to the increase in XRP's

8    price, did you hear anyone at Ripple use that

9    phrase?

10       A.   I don't recall that, no.

11       Q.   Turning to the first page of this

12   attachment?

13           MS. ZORNBERG:  The first page of the

14   exhibit?

15           MR. SYLVESTER:  The first page of the

16   attachment to the email, so ending -4330.

17       Q.   Ms. O'Gorman, do you see where the fourth

18   paragraph starts with the word "To"?

19       A.   Yes.

20       Q.   Okay.  In that paragraph, the second

21   sentence says:

22               "So how we talk about XRP will

23               inform regulators' understanding of

24               XRP, which will in turn inform

25               their treatment of XRP."

298

1              Do you see that?

2      A.    Yes.

3      Q.    Okay.  The next sentence says:

4              "In particular, we want to be

5              careful that XRP isn't

6              misunderstood as a security

7              belonging to Ripple."

8              Do you see that?

9      A.    I do.

10     Q.    Are you aware, during your tenure at

11  Ripple, of any instances of anyone misunderstanding

12  that XRP was a security?

13             MR. DRYLEWSKI:  Objection to form.

14             THE WITNESS:  I'm not aware.

15  BY MR. SYLVESTER:

16     Q.    At the very bottom of the page that we're

17  looking at right now ending in -4330, the sentence

18  is:

19              "If you have any questions,

20              please reach out to legal or

21              compliance."

22              Do you see that?

23     A.    I do.

24     Q.    Did anyone at Ripple ever reach out to you

25  with questions about what they could or could not

1  say about XRP?

2          MR. DRYLEWSKI:  Objection to form.

3          THE WITNESS:  Not to my recollection.

4  BY MR. SYLVESTER:

5      Q.   Did -- do you -- did you ever discuss with

6  Mr. Garlinghouse what Ripple could or could not say

7  about XRP?

8          MR. DRYLEWSKI:  Objection to form.

9          MS. ZORNBERG:  I would also instruct that

10  you can answer the question, but not to the extent

11  that it involves disclosing conversations that

12  either you or Mr. Garlinghouse had with counsel.

13          MR. DRYLEWSKI:  The question calls for a

14  yes, no, I don't know, I don't recall.

15          THE WITNESS:  Yes.

16  BY MR. SYLVESTER:

17      Q.   During those discussions, was counsel

18  present?

19          MR. DRYLEWSKI:  Objection to form.

20          THE WITNESS:  Sometimes.

21  BY MR. SYLVESTER:

22      Q.   Okay.  Setting aside the occasions when

23  counsel was present, what, if anything, did

24  Mr. Garlinghouse ask you about what Ripple could or

25  could not say about XRP?

1          MS. ZORNBERG:  So hold on just a moment.

2          I think the preliminary question, just to

3    help, on the privilege record is whether you can

4    distinguish clearly in your mind conversations you

5    had with Mr. Garlinghouse on this subject when

6    counsel was present versus when counsel was not

7    present.

8          Are you able to do that in a way that's

9    specific to your recollection?

10         If not, I would direct the witness not to

11   answer.

12         THE WITNESS:  Mh-hmm.  I wouldn't be able

13   to do that, so I wouldn't be able to answer that

14   question.

15   BY MR. SYLVESTER:

16     Q.   Did Mr. Garlinghouse ever reach out just

17   to you with a specific question about what Ripple

18   could or couldn't say about XRP?

19         MR. DRYLEWSKI:  Objection to form.

20         THE WITNESS:  I don't recall.  He may

21   have.

22   BY MR. SYLVESTER:

23     Q.   Did Mr. Larsen ever reach out to you, just

24   you, with a specific question about Ripple -- what

25   Ripple could or couldn't say about XRP?

301

```
 1              MR. DRYLEWSKI:  Objection to form.

 2              THE WITNESS:  I don't recall.

 3              MR. SYLVESTER:  Let's move to 27, please.

 4              (Whereupon, Deposition Exhibit AO-27

 5              was marked for identification.)

 6   BY MR. SYLVESTER:

 7        Q.    So, Ms. O'Gorman, this is an email from

 8   you to                  and Ryan Zagone dated

 9   November 3rd, 2017.

10              Do you see that?

11        A.    I do.

12        Q.    Okay.  I should say, that's the top email

13   in a thread of emails.

14              Do you see that?

15        A.    I do.

16        Q.    Okay.  It appears that the bottom email is

17   Mr. Vias sending a message to Mr. Griffin discussing

18   Coinbase digital asset framework?

19        A.    That's what it appears to be, yes.

20        Q.    Apart from this email, do you recall

21   reading the Coinbase digital asset framework when it

22   was released?

23        A.    I do.

24        Q.    Okay.

25              And outside of this email, again, did you
```

1    discuss the Coinbase digital asset framework with

2    anyone at Ripple?

3            MR. DRYLEWSKI:  Objection to form.

4            And exclude from your -- well, objection

5    to form.

6            You can answer it "yes," "no," "I don't

7    know" or "I don't recall."

8            THE WITNESS:  Yes.  Yes.

9    BY MR. SYLVESTER:

10       Q.   Okay.  Did you discuss -- did you discuss

11   the Coinbase digital asset framework with anyone at

12   Ripple outside of counsel?

13       A.   Yes.

14       Q.   Who?

15       A.   Chris Larsen, Patrick Griffin,

16   Brad Garlinghouse.

17       Q.   Okay.  Starting with your conversation

18   with Mr. Larsen, what did you say to Mr. Larsen

19   about the Coinbase digital asset framework?

20       A.   I don't recall specifically.

21       Q.   What did Mr. Larsen say to you about the

22   Coinbase digital asset framework?

23            MR. DRYLEWSKI:  And I'm going to instruct

24   you not to answer to the extent that you understand

25   that Mr. Larsen was reflecting any substantive

1    conversations he had had with Ripple's counsel.

2            THE WITNESS:  I won't be able to answer

3    that question, then.

4    BY MR. SYLVESTER:

5        Q.    Based on counsel's instruction?

6        A.    That's right.

7        Q.    When was this conversation with Mr. Larsen

8    about the Coinbase framework?

9        A.    Around the time they came out with it, I

10   would imagine.

11       Q.    About the time that Coinbase released the

12   framework?

13       A.    That's right.

14       Q.    Did you have your conversations with

15   Mr. Griffin and Mr. Garlinghouse around that same

16   time period?

17       A.    Yes.

18       Q.    Moving to your conversation with

19   Mr. Griffin --

20       A.    Yeah.

21       Q.    -- what did you say to Mr. Griffin in your

22   conversation with him about the Coinbase framework?

23       A.    I don't recall.

24       Q.    Okay.  What did Mr. Griffin say to you?

25            MR. DRYLEWSKI:  Same instruction as the

1    last one.

2            THE WITNESS:  Yeah.  I don't recall.

3    BY MR. SYLVESTER:

4        Q.   Your testimony is you don't recall what

5    Mr. Griffin said to you; that's right?

6        A.   Mh-hmm.  That's true.

7        Q.   Moving on to your conversation with

8    Mr. Garlinghouse, what did you say to

9    Mr. Garlinghouse about the Coinbase framework?

10           MS. ZORNBERG:  You can answer as long as

11   you're not disclosing conversations with counsel.

12           THE WITNESS:  Mh-hmm.  I made him aware of

13   it.

14   BY MR. SYLVESTER:

15       Q.   What did you tell him about it?

16       A.   That a paper had been issued.

17       Q.   Anything else?

18       A.   I don't recall.

19       Q.   And what did Mr. Garlinghouse say to you

20   about the Coinbase framework?

21           MR. DRYLEWSKI:  Same instruction as last

22   time.

23           THE WITNESS:  Yeah.  I can't answer that

24   question on the advice of counsel.

25   / /

1    BY MR. SYLVESTER:

2        Q.    Coinbase's framework for digital assets

3    involved a rating system; is that right?

4        A.    That's true.

5        Q.    Okay.  What was the rating -- what was the

6    purpose of that rating system?

7            MR. DRYLEWSKI:  Objection to form.

8            THE WITNESS:  To determine whether or not

9    an asset could be considered a security.

10   BY MR. SYLVESTER:

11       Q.    Okay.  Are you aware of what rating

12   Coinbase gave XRP?

13       A.    I am not.

14       Q.    Were you aware -- understanding you're not

15   aware today, were you ever aware of the rating that

16   Coinbase gave XRP?

17       A.    I was not, no.

18       Q.    Do you know if anyone at Ripple was aware

19   of the rating that Coinbase gave XRP?

20           MR. DRYLEWSKI:  Objection to form.

21           THE WITNESS:  I was not aware.

22   BY MR. SYLVESTER:

23       Q.    Going back to your conversation with

24   Mr. Larsen on the topic of the Coinbase framework,

25   is it your understanding that what Mr. Larsen said

1    to you on the topic was informed with his -- by his

2    conversations with counsel?

3           MS. ZORNBERG:  And can I just also, to

4    help with this, I think here's what Mr. Sylvester is

5    trying to get at.  If you -- if you -- if you don't

6    remember what Mr. Larsen said to you at all, then

7    it's fine.  Then you should -- you can indicate

8    that.  If you --

9           MR. TENREIRO:  Wait.  You can't instruct

10   her -- you can't coach her like that.  She already

11   answered by saying, I cannot answer based on the

12   instruction.

13          MS. ZORNBERG:  I'm trying to clear up what

14   is not clear in the record, because she answered

15   based on an instruction without indicating whether

16   or not she recalled his answer but had a view that

17   it was informed by counsel or something else.

18          I'm actually trying to help you make a

19   clearer record.

20          MR. TENREIRO:  And maybe you shouldn't say

21   that in front of her.

22          But go ahead.

23          MS. ZORNBERG:  Okay.  Look, Ms. O'Gorman

24   knows she has an obligation to tell the truth.

25          If your truthful response is that you have

1    a recollection, you should say "yes" or "no," I have

2    a recollection that Mr. Larsen -- of what Mr. Larsen

3    said to me in response.

4            And then we can go to step two, which is

5    to have -- which we might have to take a break to

6    assess, but which is whether you have a basis to

7    understand that his statements to you were informed

8    by communications with counsel, which is what

9    Mr. Sylvester's trying to probe.

10           So I just think we should break it into

11   two pieces so we can better clarify the record and

12   any basis for privilege.

13           THE WITNESS:  And so where are we now,

14   Chris Larsen or Brad Garlinghouse?

15   BY MR. SYLVESTER:

16       Q.   Let's start with Mr. Larsen.

17       A.   Okay.

18       Q.   You had a conversation with Mr. Larsen

19   about the Coinbase report?

20       A.   I did.

21       Q.   Okay.  Do you recall what Mr. Larsen said

22   to you?

23       A.   I don't recall.

24       Q.   Okay.  Moving on to the conversation with

25   Mr. Garlinghouse about the Coinbase framework, do

1    you have a recollection of what Mr. Garlinghouse

2    said to you?

3         A.   I don't.

4         Q.   Okay.  Other than the three people that we

5    just mentioned, Mr. Griffin, Mr. Garlinghouse,

6    Mr. Larsen, did you talk with anyone else at Ripple

7    about the Coinbase framework?

8         A.   I don't recall.

9         Q.   Okay.  Turning back to the exhibit in

10   front of us, Mr. Vias says, in his second paragraph,

11   the last line:

12              "Either way, below are the

13              sections which stood out as

14              possibly challenging for XRP."

15        Do you see that?

16        A.   What page are we on now?

17        Q.   Sorry.  First page, bottom of the first

18   page --

19        A.   Okay.

20        Q.   -- second paragraph of Mr. Vias' email.

21        A.   I see that, yes.

22        Q.   Okay.  And then he goes on to list a

23   number of sections.

24              Do you see that?

25        A.   I do.

1      Q.   Do you recall ever discussing with

2 Mr. Vias whether these sections would be possibly

3 challenging for XRP?

4      A.   I don't recall any discussion with him on

5 this.

6      Q.   Sitting here today, do you believe that

7 the sections that Mr. Vias lists in his email

8 present possible challenges for XRP's classification

9 as a security?

10      MR. DRYLEWSKI:   Objection to form and

11 calls for a legal conclusion.

12      MS. ZORNBERG:   Also, object in that I

13 don't think the witness has been given the time to

14 read through the full document, which you're now

15 asking her to comment on today.

16      MR. SYLVESTER:   Yeah.   I wasn't asking her

17 about her read of the entire document; I was asking

18 her read just of Mr. Vias' email.

19      MS. ZORNBERG:   Objection.

20      THE WITNESS:   Could you repeat the

21 question, please.

22 BY MR. SYLVESTER:

23      Q.   Sure.

24      Do you believe that the sections that

25 Mr. Vias lists in his email present possible

1    challenges for XRP's classification as a security?

2            MR. DRYLEWSKI:  Objection to form.  That

3    calls for a legal conclusion.

4            THE WITNESS:  I -- based on this

5    information here, it's not enough information to

6    make any conclusion.  There's not enough here.

7    BY MR. SYLVESTER:

8        Q.   While you were CCO, did Ripple make any

9    efforts to list XRP on Coinbase?

10           MS. ZORNBERG:  Object to form.

11           THE WITNESS:  I was aware, yes.

12   BY MR. SYLVESTER:

13       Q.   Just for clarity, you were aware of the

14   efforts that Ripple made with respect to listing XRP

15   on Coinbase?

16       A.   I was aware that Ripple had spoken with

17   Coinbase.

18       Q.   Who at Ripple spoke with Coinbase?

19       A.   I can't say exactly, but I think it says

20   it here in this email, doesn't it?

21           Brad recently met with Coinbase's VP of

22   ops.

23       Q.   Did you speak with Mr. Garlinghouse about

24   his meeting with Coinbase?

25       A.   We may have discussed it at leadership

1    meetings.

2        Q.   What did Mr. Garlinghouse say about his

3    meetings with Coinbase?

4            MS. ZORNBERG:  You can answer only to the

5    extent that the conversation was not a conversation

6    that involved the seeking or discussion of legal

7    advice at the leadership meeting.

8            THE WITNESS:  So I don't think I can

9    answer that question.

10           MR. SOLOMON:  This is back to Lisa's

11   point.  She said, "We may have discussed it," and

12   then you asked, "What did Mr. Garlinghouse say?"

13           So there's a question in between those two

14   and up to you guys, but for clarity of the record,

15   you may want to consider asking it, because now it's

16   completely ambiguous.

17           The question would be, do you recall a

18   discussion at a leadership meeting with Brad on the

19   topic of a potential listing with Coinbase?

20           It's up to you.

21   BY MR. SYLVESTER:

22       Q.   Did Mr. Garlinghouse ever tell you

23   anything about his meetings with Coinbase?

24           MS. ZORNBERG:  Okay.  Again, you can

25   answer, but if your recollection is only at a

1   leadership meeting, then there have to be some more

2   predicate questions so we can assess the privilege.

3           Can I ask you, Mr. Sylvester, to start

4   with outside of leadership meetings does she recall?

5           MR. SYLVESTER:  Outside the presence of

6   counsel, how about that?

7           MS. ZORNBERG:  Okay.

8   BY MR. SYLVESTER:

9       Q.   Outside the presence of counsel, did

10  Mr. Garlinghouse ever convey to you what he said at

11  meetings with Coinbase?

12      A.   I don't recall.

13      Q.   Are you aware of any efforts that Ripple

14  made to persuade Coinbase that XRP was not a

15  security?

16          MR. DRYLEWSKI:  Objection to form.

17          THE WITNESS:  I'm not aware.

18          MR. SYLVESTER:  Let's move to 29, please.

19          (Whereupon, Deposition Exhibit AO-29

20          was marked for identification.)

21  BY MR. SYLVESTER:

22      Q.   Okay.

23          ZOOM PARTICIPANT:  Exhibit number?

24          MS. ZORNBERG:  Two-nine.

25          ZOOM PARTICIPANT:  Two-nine.  Thank you.

1    BY MR. SYLVESTER:

2         Q.   Ms. O'Gorman, I'm looking at Exhibit 29,

3    which is an email from you dated February 8th,

4    2018.

5              Do you see that?

6         A.   I do.

7         Q.   Have you had a chance to review this

8    document?

9         A.   I have.

10        Q.   Okay.  The "To" line is to undisclosed

11   recipients.

12             From the context of the document, do you

13   know to whom you sent this email?

14             MR. DRYLEWSKI:  Objection to form.

15             THE WITNESS:  I don't know.

16   BY MR. SYLVESTER:

17        Q.   Do you know if there was any internal list

18   within Ripple, like an email list, that was called

19   "Undisclosed Recipients"?

20        A.   I don't know of it.

21        Q.   Do you know whose email address

22   ████████ com is?

23        A.   Yes, I do.

24        Q.   Whose email address is that?

25        A.   ████████ the CEO.

314

```
 1        Q.   CEO of what?

 2        A.   Of ████

 3        Q.   And ████████ is on the Bcc line; is that

 4   right?

 5        A.   That's right.

 6        Q.   Why did you send this email via Bcc to

 7   ████████

 8             MR. DRYLEWSKI:  Objection to form.

 9             THE WITNESS:  I honestly have no idea why

10   I did that.

11   BY MR. SYLVESTER:

12        Q.   Excising the Bcc portion, why did you send

13   this email to ████████

14             MR. DRYLEWSKI:  Objection to form.

15             THE WITNESS:  Why did I?

16   BY MR. SYLVESTER:

17        Q.   Mh-hmm.

18        A.   He is an investor in Ripple.  He was -- I

19   sent it to members of the board, to certain

20   investors.

21        Q.   You sent this email to members of the

22   board?

23        A.   Yeah.

24        Q.   And you sent this email to certain

25   investors?
```