1      A.   And internal Ripple employees.

2      Q.   Is that Ripple equity investors?

3      A.   Well, do you mean seed round, Series A,

4  Series B?

5      Q.   Sure.  Any -- any Ripple equity investors,

6  is that who you meant when you said, "certain

7  investors"?

8      A.   Yes, larger ones.

9      Q.   Did this email go out to any holders of

10  XRP?

11      MS. ZORNBERG:  Object to form.

12      THE WITNESS:  I mean, I can't say

13  specifically, but it went to Ripple employees, and

14  it went to others that I know had held XRP.  But I

15  couldn't state everybody.

16  BY MR. SYLVESTER:

17      Q.   Excluding Ripple employees, who else did

18  this email go to that was a holder of XRP?

19      A.   Well,      is one.

20      Q.   Any others?

21      A.   Let's see here.

22      Members of the board that had XRP, but I

23  don't know which ones did or didn't.

24      Q.   And why -- strike that.

25      This email is sharing a link to an op ed

1  you wrote in The Hill; is that right?

2       A.   That's right.

3       Q.   And that op ed was about regulation of

4  cryptocurrencies; is that right?

5       A.   That's right.

6       Q.   Okay.  And you sent this email to a number

7  of parties that you thought would be interested in

8  your op ed; is that right?

9       A.   That's right.

10       Q.   Okay.  Why is it, in your view, that a

11  Ripple equity investor would be interested in the

12  regulation of cryptocurrencies?

13            MR. DRYLEWSKI:  Objection to form.

14            THE WITNESS:  Well, it was -- our business

15  was cryptocurrency, and the regulation of

16  cryptocurrencies was something that everybody was

17  interested in, or should have been interested in.

18  BY MR. SYLVESTER:

19       Q.   And it was something Ripple was interested

20  in; is that right?

21       A.   Yes --

22            MR. DRYLEWSKI:  Objection to form.

23            THE WITNESS:  -- most certainly.

24  BY MR. SYLVESTER:

25       Q.   At the time of this email, February 2018,

1   did you have a sense of what would happen if the SEC

2   decided that XRP was a security?

3               MR. DRYLEWSKI:  Objection to form.  Calls

4   for a legal conclusion.

5               MS. ZORNBERG:  I would also instruct the

6   witness that while she may answer the question, you

7   should not include in any response discussions that

8   you had with counsel.

9               THE WITNESS:  Okay.

10              Could you repeat the question for me,

11  please.

12  BY MR. SYLVESTER:

13      Q.   Sure.

14              In February 2018, did you have a sense of

15  what would happen if the SEC decided that XRP was a

16  security?

17              MR. DRYLEWSKI:  The same objections.

18              THE WITNESS:  I wouldn't be able to answer

19  that question because that would have been based on

20  conversations with counsel.

21  BY MR. SYLVESTER:

22      Q.   Just asking the question in a yes-or-no

23  form.  In February 2018, yes or no, did you have a

24  sense of what would happen if the SEC decided that

25  XRP was a security?

1          MR. DRYLEWSKI:  Objection to form.

2          MS. ZORNBERG:  Same objections.  Also

3     object to "sense of."

4          THE WITNESS:  Oh, sorry.  I'm sorry, could

5     you repeat the question?

6     BY MR. SYLVESTER:

7          Q.   Sure.  Let me rephrase.

8               Yes or no; in February 2018, did you

9     understand what impact on Ripple's business -- what

10    the impact on Ripple's business would be if the SEC

11    decided that XRP was a security?

12         MR. DRYLEWSKI:  Objection to form.

13         MS. ZORNBERG:  You can answer if you had

14    an understanding.

15         THE WITNESS:  I had an understanding.

16    BY MR. SYLVESTER:

17         Q.   Okay.  And did you obtain that

18    understanding from any source other than counsel?

19         A.   No.

20         Q.   Again, in February 2018, did others at

21    Ripple have an understanding of what the impact on

22    Ripple's business would be if the SEC decided that

23    XRP was a security; yes or no?

24         MS. ZORNBERG:  Objection.

25         MR. DRYLEWSKI:  Objection to form.

```
 1              THE WITNESS:  Did I -- did I know who at
 2    Ripple may have known or --
 3    BY MR. SYLVESTER:
 4       Q.   Do you know if anyone else at Ripple had
 5    that understanding as well?
 6              MS. ZORNBERG:  Objection.
 7              THE WITNESS:  Oh, I don't know.  I don't
 8    know.
 9    BY MR. SYLVESTER:
10       Q.   Ms. O'Gorman, in paragraph 3 of your
11    email, the sentence that you write is:
12              "Case in point, financial
13              institutions using XRP to improve
14              the efficiency of global payments
15              within their existing compliance
16              frameworks is different and
17              deserves different regulatory
18              treatment than anonymous consumer
19              █████transactions or an████████ICO
20              with no real business."
21              Do you see that?
22       A.   Yes.
23       Q.   At the time of this email, what was the
24    different regulatory treatment that you thought, for
25    instance, an ████████ICO with no real business
```

1  deserved?

2          MR. DRYLEWSKI:  Objection to form.

3          THE WITNESS:  The utility of XRP in this

4  case to afford more efficient global payments meant

5  that it had -- it had utility, whereas something

6  like an ICO and ▮▮▮▮▮ with no real business would

7  be considered a security, in my opinion.

8  BY MR. SYLVESTER:

9      Q.  What is it about ▮▮▮▮▮ in your view,

10  that leads you to believe that it should be

11  considered a security?

12          MR. DRYLEWSKI:  Objection to form.  That

13  mischaracterizes the testimony.  It also calls for a

14  legal conclusion.

15          THE WITNESS:  Up to that point, ICOs were

16  mainly on ▮▮▮▮▮

17  BY MR. SYLVESTER:

18      Q.  Okay.

19          Ms. O'Gorman, why did you write this op ed

20  for The Hill?

21      A.  The marketing department asked me to.

22      Q.  Who in the marketing department?

23      A.  Monica Long.

24      Q.  Do you have an understanding of why

25  Ms. Long wanted you to write this op ed?

1          MR. DRYLEWSKI:  Objection to form.

2          THE WITNESS:  Just to get my name out

3     there.  More publications for me, the chief

4     compliance officer.

5     BY MR. SYLVESTER:

6          Q.   And if you had more publications as chief

7     compliance officer, would any benefit accrue to

8     Ripple from that?

9          MR. DRYLEWSKI:  Objection to form.

10          THE WITNESS:  No.

11     BY MR. SYLVESTER:

12          Q.   Did you share the op ed that you wrote for

13     The Hill with any crypto exchanges?

14          A.   I don't believe so, no.

15          Q.   Okay.  We discussed earlier that you read

16     the DAO report around the time it came out; is that

17     correct?

18          A.   I don't recall that, but yes, I did.

19          Q.   Okay.  When you read the DAO report, did

20     you think it had any relevance to your work as CCO

21     at Ripple?

22          MR. DRYLEWSKI:  Objection to form.

23          THE WITNESS:  To keep abreast of the

24     evolving matters, yes.

25     / /

322

1  BY MR. SYLVESTER:

2      Q.  When you say, "evolving markets," that

3  would include in the DAO report the application of

4  the securities laws to digital assets; is that

5  right?

6      A.  That's right.

7      Q.  Okay.

8          Did you, after reading the DAO report,

9  advise anyone at Ripple to do anything differently

10  based on your reading of the report?

11          MS. ZORNBERG:  Okay.  So I'm going to

12  instruct the witness that you can answer, but not

13  insofar as answering requires you to disclose

14  conversations with counsel.  Yeah.

15          MR. DRYLEWSKI:  And the answer to the

16  question is "yes," "no," "I don't know" or "I don't

17  recall."

18          THE WITNESS:  I don't recall.

19  BY MR. SYLVESTER:

20      Q.  Ripple settled an action with FinCEN in

21  May of 2015; is that right?

22      A.  That's right.

23      Q.  What, if any, was your role with respect

24  to that settlement?

25      A.  I was responsible for the remediation.

1          Q.   On a general basis, what did that

2     remediation entail?

3          A.   Oh, there are 11 points in the

4     remediation.  It entailed a look back.  It

5     entailed --

6               MR. DRYLEWSKI:  Just stay slow for the

7     court reporter.

8               (Reporter clarification.)

9               THE WITNESS:  Making Ripple Trade a money

10    services business, financial institution.  It

11    involved audits, reports to regulators, conducting

12    customer identification on all Ripple Trade users.

13    BY MR. SYLVESTER:

14         Q.   Did you ever have any contact with anyone

15    at FinCEN?

16         A.   Yes.

17         Q.   Did you ever discuss with anyone at FinCEN

18    FinCEN's description of XRP as a virtual currency?

19              MR. DRYLEWSKI:  Objection to form.

20              THE WITNESS:  Did I discuss XRP's -- no, I

21    don't believe so.

22    BY MR. SYLVESTER:

23         Q.   Did anyone at FinCEN ever tell you that

24    because FinCEN considered XRP to be a virtual

25    currency, XRP could not be classified by the SEC as

324

1    a security?

2         A.    Did anyone at FinCEN tell me that?

3         Q.    Mh-hmm.

4         A.    No.

5         Q.    Did anyone at FinCEN, to your knowledge,

6    tell anyone at Ripple that because FinCEN considered

7    XRP to be a virtual currency, XRP could not be

8    classified by the SEC as a security?

9         A.    Not to my knowledge.

10        Q.    Okay.

11              Back in 2015, within the months

12   surrounding the FinCEN settlement, did you hear

13   anyone at Ripple express the opinion that because

14   FinCEN considered XRP to be a virtual currency, XRP

15   could not be classified by the SEC as a security?

16              MS. ZORNBERG:   I'll direct you not to

17   answer to the extent that doing so would disclose

18   conversations you had with counsel.

19              THE WITNESS:   Mh-hmm.

20              And the response is no.

21              MR. DRYLEWSKI:   I think we've been going

22   for awhile, so if there's a natural stopping spot,

23   do you want to take a break?

24              MR. SYLVESTER:   Let me just ask -- I just

25   asked about 2015.  I want to ask about the future

1    time frames, then let's take a break.

2              MR. DRYLEWSKI:  Okay.

3              All right for you?

4              THE WITNESS:  That's fine.  Yes.

5    BY MR. SYLVESTER:

6         Q.   Post 2015, but before you left Ripple, did

7    you ever hear anyone at Ripple express the opinion

8    that because FinCEN considered XRP to be a virtual

9    currency, XRP could not be classified by the SEC as

10   a security?

11        A.   I don't recall that at all.

12             MR. SYLVESTER:  Okay.  It's a good time

13   for a break now.

14             Thanks.  Off the record.

15             THE VIDEOGRAPHER:  Okay.  We're off the

16   record at 5:03 p.m.

17               (Whereupon, a recess was taken.)

18             THE VIDEOGRAPHER:  This is the beginning

19   of File Number 11.

20             We're back on the record at 5:22 p.m.

21             MR. SYLVESTER:  Let's go to Exhibit 30,

22   please.

23               (Whereupon, Deposition Exhibit AO-30

24                was marked for identification.)

25             ZOOM PARTICIPANT:  I didn't get an exhibit

1    number.

2         MS. ZORNBERG:  Three-zero.

3         ZOOM PARTICIPANT:  Three-zero?  Thank you.

4    BY MR. SYLVESTER:

5         Q.   Okay.  Exhibit 30 is an email chain.  The

6    top email is from Mr. Griffin to you, Ms. O'Gorman,

7    sent on June 25th, 2020.

8         Do you see that?

9         A.   I do.

10        Q.   Okay.  Have you had a chance to look at

11   the email, or do you need more time?

12        A.   No.  I've read it.

13        Q.   Okay.  The bottom email appears to be an

14   email from Mr. Garlinghouse with the subject line,

15   "Former CFTC chairman, XRP is not a security."

16        Do you see that?

17        A.   I do.

18        Q.   That email, in substance, seems to be

19   conveying Mr. ▮▮▮▮▮▮ publication regarding

20   XRP's status as a security; is that right?

21        A.   That's right.

22        MR. DRYLEWSKI:  Objection to form.

23   BY MR. SYLVESTER:

24        Q.   Okay.  Mr. Griffin emailed and you said:

25             "Did you understand why this

1          is important?"

2          Is that right?

3      A.   That's what he wrote, yes.

4      Q.   Do you have an understanding of why

5   Mr. Griffin reached out to you to ask why

6   Mr. ███████████ statement regarding XRP was

7   important?

8          MR. DRYLEWSKI:  Objection to form.

9          THE WITNESS:  I'm sorry, could you repeat

10   the question?

11   BY MR. SYLVESTER:

12     Q.   Sure.

13          Do you have an understanding as to why

14   Mr. Griffin reached out to you to ask why

15   Mr. ███████████ statement regarding XRP was

16   important?

17     A.   I don't.

18     Q.   Okay.

19          You respond:

20              "It means absolutely nothing.

21          CFTC has no jurisdiction whatsoever

22          over the XRP-as-a-security

23          conundrum."

24          Do you see that?

25     A.   I do.

328

1      Q.   Okay.  Why is it that the CFTC has no

2   jurisdiction over the XRP-as-a-security conundrum?

3            MR. DRYLEWSKI:  Objection to form.  Calls

4   for a legal conclusion.

5            THE WITNESS:  Because the SEC would make

6   that determination, if anyone.

7   BY MR. SYLVESTER:

8      Q.   You have an understanding that the CFTC

9   has regulatory oversight over commodities; is that

10  right?

11     A.   I do.

12     Q.   Did you ever express your view that

13  Mr. ███████ statement with regard to XRP means

14  nothing to the XRP-as-a-security conundrum to

15  Mr. Garlinghouse?

16     A.   I --

17           MS. ZORNBERG:  Object to form.

18           THE WITNESS:  I did not.

19  BY MR. SYLVESTER:

20     Q.   Did you ever convey that view to

21  Mr. Larsen?

22     A.   I did not.

23     Q.   Did you ever convey to Mr. Garlinghouse

24  generally the view that the CFTC has no authority to

25  classify or not classify XRP as a security?

1          MR. DRYLEWSKI:  Objection to form.

2          THE WITNESS:  I don't recall.

3   BY MR. SYLVESTER:

4      Q.   Did you ever convey the view that the CFTC

5   has no authority to classify or not classify XRP as

6   a security to anyone at Ripple?

7          MR. DRYLEWSKI:  Same objection.

8          THE WITNESS:  I don't recall.

9   BY MR. SYLVESTER:

10     Q.   Okay.  Other than counsel, did you ever

11  discuss with anyone at Ripple whether XRP is

12  properly characterized as a commodity?

13     A.   Is properly characterized as a commodity?

14     Q.   Yes.

15     A.   I don't recall specifically.

16     Q.   Have you had a view that XRP is properly

17  categorized as a commodity?

18         MR. DRYLEWSKI:  Objection to form.

19         THE WITNESS:  According to the CFTC, all

20  virtual currencies are considered commodities.

21  BY MR. SYLVESTER:

22     Q.   I guess, do you agree with that view as

23  applied to XRP?

24     A.   I'm not a lawyer.

25     Q.   Now, during your tenure at Ripple, did

330

1   Ripple make any public statements asserting that XRP

2   was a commodity?

3           MR. DRYLEWSKI:  Objection to form.

4           THE WITNESS:  The company may have.

5   BY MR. SYLVESTER:

6       Q.  Can you recall any?

7       A.  I don't recall.

8       Q.  Mr. Griffin asks you to opine on why

9   Ripple sent this email regarding Mr. ████████

10  statement.

11          Do you see that?

12      A.  I do, yeah.

13      Q.  Okay.  And you respond:

14              "Marketing fodder is my

15          guess."

16          Is that right?

17      A.  That's true.

18      Q.  When you say, "marketing fodder,"

19  marketing for what?

20      A.  Just marketing about Ripple.

21      Q.  Why is Mr. ████████ statement that XRP

22  is not a security marketing for Ripple?

23      A.  He came out on the side that XRP was not a

24  security.

25      Q.  And how is that statement of benefit to

1    Ripple in the market?

2              MR. DRYLEWSKI:  Objection to form.

3              THE WITNESS:  Many people have had that

4    same statement, and until the SEC concludes or

5    arrives or provides guidance, opinions matter.

6    BY MR. SYLVESTER:

7         Q.   Right.  I'm just trying to drill down on

8    "marketing fodder."

9              So is it your view that Mr. ████████

10   statement was of some benefit to Ripple?

11        A.   No.  I wouldn't say it was of some -- it

12   may have been of benefit to Ripple.  Sorry.

13             "Marketing fodder" meaning for him,

14   ████████████

15        Q.   I see.

16             Did you also view the former CFTC's

17   chairman's statement as marketing fodder for Ripple?

18             MR. DRYLEWSKI:  Objection to form.

19             THE WITNESS:  Marketing fodder for

20   ████████    no, I don't -- I don't believe it was

21   marketing fodder for Ripple.

22   BY MR. SYLVESTER:

23        Q.   Mr. Griffin responds to you:

24                  "I don't know, seems

25             desperate."

1          Do you see that?

2      A.   I do.

3      Q.   Do you have an understanding of what he

4  meant by "seems desperate"?

5      A.   I don't.

6      Q.   Okay.  During your tenure at Ripple, did

7  you ever hear anyone at Ripple express their view

8  that XRP was properly categorized as a commodity?

9          MR. DRYLEWSKI:  Objection to form.

10          THE WITNESS:  I don't recall.

11  BY MR. SYLVESTER:

12      Q.   Are you aware of anyone at Ripple, during

13  your tenure at Ripple, taking any steps to determine

14  whether XRP was a commodity?

15          MS. ZORNBERG:  Okay.  So I think that's a

16  yes or a no question, without disclosing any

17  substance of communications with counsel.

18          THE WITNESS:  The response would be no.

19          MR. SYLVESTER:  Okay.  Let's move to

20  Exhibit 32, please.

21          (Whereupon, Deposition Exhibit AO-32

22           was marked for identification.)

23          MR. TENREIRO:  Thirty-two.

24  BY MR. SYLVESTER:

25      Q.   Okay.  So, Ms. O'Gorman, Exhibit 32 is a

1    thread from Mr. ██████ to Mr. Griffin, cc Mr. Vias,

2    on the top email. And then I believe you're on the

3    CC line on the second email on the first page.

4           Do you see that?

5        A.   I do.

6        Q.   Okay. And there --

7           MR. DRYLEWSKI:  Not the second email on

8    the first page, just for the record. It looks like

9    there are some in between.

10          MR. SYLVESTER:  That's a fair point.

11       Q.   And, Ms. O'Gorman, turning to the second

12   page, the bottom of the second page of the exhibit,

13   the text in the box that says, "XRP team discussion,

14   ICOs, securities and commodities analysis," do you

15   see that?

16       A.   I do.

17       Q.   That appears on top of what looks to be to

18   me a meeting invitation. Is it that?

19       A.   It is.

20       Q.   Okay. Going back to the text box on the

21   bottom of page 2 of the exhibit, it says:

22              "ICOs are increasingly popular

23           and raise many regulatory

24           questions. While XRP is very

25           different from an ICO, Ryan, an

1            AOG, would like to share our

2            research with this team explaining

3            the importance about how we talk

4            about XRP."

5         Do you see that?

6      A.   I do.

7      Q.   Ryan is Mr. Zagone?

8      A.   That's right.

9      Q.   Did this meeting occur on or

10   about -- strike that.

11         Did this meeting occur sometime in April

12   of 2017?

13         MS. ZORNBERG:  So let me just interject.

14   Because I -- I believe the meeting that you're

15   asking about is the same one that we've subsequently

16   had testimony about where we also put the proffer on

17   the record.

18         MR. SYLVESTER:  I see.

19         THE WITNESS:  It is.

20   BY MR. SYLVESTER:

21      Q.   It is the same meeting?

22      A.   It is.

23      Q.   Okay.  I just want to clarify, because the

24   description is that Mr. ███████ and Mr. -- sorry --

25   and Ms. O'Gorman are providing the -- or, quote,

 1    sharing their research with the team.

 2         A.   Mh-hmm.

 3         Q.   Be that as it may, this is still the

 4    meeting where Ms. ████ also was part of the

 5    presentation?

 6         A.   Yes.  You can see her here.

 7              MR. DRYLEWSKI:  The witness is pointing to

 8    the last page here ending in Bates -485, under

 9    "Who."

10              MR. TENREIRO:  Right.  Lisa, maybe this

11    was missed from the proffer you gave.  I see -- I

12    see the list of people who were perhaps invited to

13    the meeting, or whatever she says they are.  But for

14    the proffer, I think you said earlier -- correct me

15    if I misunderstood you -- whatever they presented

16    involved conversations they had with counsel about

17    the analysis and then they're presenting something.

18              I just want to be clear, did Ms. ████ also

19    present at the meeting?  Because there's been a

20    little confusion on that point.

21              I think I understand the point where

22    Ms. ████ helps them prepare the contents, but did

23    Ms. ████ present as well?  Because --

24              MS. ZORNBERG:  I believe so.

25              MR. TENREIRO:  -- several documents we've

1    seen refer repeatedly to her and Mr. Zagone

2    presenting.

3              MS. ZORNBERG:  Yeah, and Ms. O'Gorman has

4    answered a few times on the record, and you can ask

5    her again, but she's answered a few times that, in

6    fact, Ms. ▓▓▓▓ was one of the speakers and

7    presenters at the meeting.

8              MR. TENREIRO:  Okay.

9              MS. ZORNBERG:  And just so the record's

10   clear, is that a correct statement?

11             THE WITNESS:  That is a correct statement.

12   BY MR. SYLVESTER:

13        Q.   Okay.

14             Ms. O'Gorman, on the first page, there's a

15   reference to recording .MP4.

16             Is that a recording of the meeting that

17   we've just been discussing?

18        A.   It appears to be.

19        Q.   Why was the meeting recorded?

20        A.   We always record -- recorded meetings.

21   Not always, but many -- oftentimes.

22        Q.   What's the criteria used to decide whether

23   or not to record a meeting?

24        A.   Mainly because if not everybody was

25   present at a meeting, a record of the meeting could

1    be provided and disseminated to various team members

2    who didn't attend, so we didn't have to present

3    untold numbers of times.

4         Q.   So what types of meetings were typically

5    recorded at Ripple?

6              MR. DRYLEWSKI:  Objection to form.

7              THE WITNESS:  All-hands meetings.

8    BY MR. SYLVESTER:

9         Q.   Was this meeting that is described in this

10   document as XRP team discussion, was that an

11   all-hands meeting?

12        A.   No.  That was a meeting with the XRP team.

13        Q.   I thought the meeting that we discussed

14   earlier was broader than the XRP team.

15        A.   It was.

16             So we had meetings with the XRP team, the

17   MarComm team, and various different customer success

18   team.

19        Q.   I see.

20             So just to make sure I understand your

21   testimony, you and Mr. Zagone had a series of

22   meetings.

23        A.   Yes.

24        Q.   One with the XRP team, one with the

25   MarComm team, one with the communications team.

1          A.    Mh-hmm.  Mh-hmm.

2          Q.    Any other teams I'm missing?

3          A.    Biz dev.  Sales.

4          Q.    Okay.

5                MS. ZORNBERG:  And just so the record is

6    clear, 'cause you just said, "you and Mr. Zagone," I

7    think you should establish, if you want to, that

8    legal was part of the whole series.

9                THE WITNESS:  Yes.

10   BY MR. SYLVESTER:

11         Q.    So for each of the meetings that we just

12   discussed, Ms. ████ was also in attendance?

13         A.    That's right, she was, and spoke.

14         Q.    You answered my next question.  Very nice.

15   You're getting good at this.

16               Did she -- for each of the meetings that

17   we just discussed, did Ms. ████ you know -- did she

18   provide legal advice?

19               MS. ZORNBERG:  Okay.  I'm going to

20   interject and I'm going to direct -- we've already

21   proffered that the purpose of these meetings was to

22   provide a view from legal and compliance.  So --

23               MR. SYLVESTER:  Here's the confusion,

24   Lisa.  I thought there was one -- I thought you just

25   told me there was one meeting, and then we searched

1    and got into it, and now there's a series of

2    meetings.

3            So I just want to make sure what you said

4    to us earlier, which I understood to be limited to

5    one meeting, is true of each and every one of these

6    meetings.

7            MS. ZORNBERG:  I think that may have

8    been -- I'm happy for it to be clarified.  I don't

9    know where that miscommunication crept in, but it's

10   clarified.

11           But for you to keep probing on whether

12   people were seeking legal advice, I am proffering to

13   you that the purpose of the meeting or meetings --

14           MR. SYLVESTER:  Meetings.

15           MS. ZORNBERG:  -- series of meetings was

16   to provide a view jointly from legal and compliance.

17   And that's -- that's --

18           MR. SYLVESTER:  Okay.  No, I understand

19   that.  It's fair of us to want to know that that

20   proffer that you gave extends to each and every

21   occasion?

22           MS. ZORNBERG:  Completely.  Completely

23   fair.

24   BY MR. SYLVESTER:

25       Q.   Okay.

1       Ms. O'Gorman, the top of this exhibit, 32,

2  from Mr. ▮▮▮▮ to Mr. Griffin, do you see that?

3       A.   I do.

4       Q.   Mr. ▮▮▮▮ opines:

5            "Key takeaway is about the

6            classification of digital assets as

7            a commodity versus security/ICO and

8            the correct messaging around that."

9       A.   Mh-hmm.

10      Q.   Do you see that?

11      A.   Mh-hmm.

12           MS. ZORNBERG:  You have to say --

13           THE WITNESS:  Oh, sorry.  Yes, I see that.

14  BY MR. SYLVESTER:

15      Q.   Okay.  Those were topics that were

16  discussed at the meeting called "XRP team

17  discussion"; is that right?

18      A.   They would have been.  Yes.

19           MR. SYLVESTER:  Okay.  Let's go to 34,

20  please.

21           (Whereupon, Deposition Exhibit AO-34

22            was marked for identification.)

23  BY MR. SYLVESTER:

24      Q.   And while Jorge is handing out the

25  exhibit, going back to Ripple's practice of

341

 1    recording some meetings --

 2         A.   Yes.

 3         Q.   -- were those recordings stored anywhere?

 4         A.   I wouldn't know where or how or -- I don't

 5    know.

 6         Q.   While you were at Ripple, were you able to

 7    access recordings of meetings?

 8         A.   Yes.

 9         Q.   How did you go about doing that?

10         A.   Through the Confluence page.

11         Q.   Okay.  And did you need to make a request

12    through the Confluence page or were you able to just

13    sort of navigate to wherever the recordings were

14    stored?

15         A.   I believe I was able to navigate to

16    wherever the recordings were stored.

17         Q.   And for how long would Ripple keep

18    recorded meetings?

19         A.   I don't know their process around that.

20         Q.   Okay.

21              MR. TENREIRO:   Thirty-four.

22    BY MR. SYLVESTER:

23         Q.   Okay.  So Exhibit 34 is an email thread.

24    The top email is from you to Ms. Long, cc others,

25    dated August 19th, 2016.

342

```
 1              Do you see that?

 2       A.    Yes.

 3       Q.    Okay.  Have you had a chance to review the

 4   document or do you need a minute?

 5       A.    I do need a minute, please.

 6       Q.    Okay.

 7              MR. DRYLEWSKI:  Feel free to take your

 8   time.

 9              THE WITNESS:  Okay.

10   BY MR. SYLVESTER:

11       Q.    So this email thread appears to be about a

12   new guide on buying XRP created by

13              Do you agree?

14       A.    That's what it appears to look like, yes.

15       Q.    Who is

16       A.    He was a Ripple employee.

17       Q.    What was his department?

18       A.                      Engineering, I believe.

19       Q.    Okay.  Ms. Long writes to you on the first

20   page of the exhibit:

21                  "Thank you for working with us

22              on this.  As you know, we're

23              putting more concentrated effort

24              into drumming up buyer interest in

25              XRP."
```

1         Do you see that?

2     A.  I do.

3     Q.  Why was Ripple putting more effort into

4  drumming up buyer interest in XRP in August of 2016?

5         MR. DRYLEWSKI:  Objection to form.

6         THE WITNESS:  I couldn't say.

7  BY MR. SYLVESTER:

8     Q.  Why not?

9     A.  I don't know.

10     Q.  Ms. Long writes "as you know" in the

11  email.

12         Did you -- did you ever correct her and

13  say, actually, I don't know?

14         MS. ZORNBERG:  Object to form.

15         THE WITNESS:  I don't -- I did not.

16         MR. DRYLEWSKI:  Objection.

17  BY MR. SYLVESTER:

18     Q.  Okay.  Do you recall having any

19  conversations with Ms. Long about the topic of

20  Ripple drumming up buyer interest in XRP after you

21  received this email?

22     A.  No, I don't recall.

23     Q.  Okay.  And Ms. Long is asking you in her

24  email whether you see a legal or compliance issue

25  with hosting a how-to-get-XRP guide on Ripple.com;

1    is that right?

2         A.    That's right.

3         Q.    Okay.  And what was your response?

4         A.    "No compliance issue there."

5         Q.    Okay.  And then the last sentence of your

6    email is:

7                   "The only question now is

8              whether or when Cracken will agree

9              to list XRP on their website."

10             Do you see that?

11        A.    That's true, yes.

12        Q.    At this time, Ripple wanted Cracken to

13   list XRP for sale on Cracken's website?

14        A.    That's right.

15             MR. DRYLEWSKI:  Objection to form.

16   BY MR. SYLVESTER:

17        Q.    Why?

18             MR. DRYLEWSKI:  Same objection.

19             THE WITNESS:  To make it easier for people

20   to buy XRP on exchanges.

21   BY MR. SYLVESTER:

22        Q.    Why did Ripple want to make it easy for

23   people to buy XRP on exchanges?

24             MR. DRYLEWSKI:  Objection to form.

25             THE WITNESS:  If they wanted to purchase

1    XRP, it needed to be listed.

2              MR. DRYLEWSKI:  Wait.

3    BY MR. SYLVESTER:

4         Q.   Why did Ripple want to make it easy for

5    people to purchase XRP?

6              MR. DRYLEWSKI:  Same objection.

7              MS. ZORNBERG:  Also, asked and answered.

8              THE WITNESS:  Oh, do I have to answer?

9              MR. SYLVESTER:  You do.

10             THE WITNESS:  Do I have to answer?

11             MS. ZORNBERG:  You can.

12             THE WITNESS:  Why did people -- I'm sorry,

13   could you --

14   BY MR. SYLVESTER:

15        Q.   Why did Ripple want to make it easy for

16   people to purchase XRP?

17             MR. DRYLEWSKI:  Objection to form.

18             THE WITNESS:  It was difficult to purchase

19   XRP outside of XRP II, the financial institution,

20   the subsidiary.

21   BY MR. SYLVESTER:

22        Q.   What kinds of individuals or entities

23   purchased XRP through XRP II?

24             MR. DRYLEWSKI:  Objection to form.

25             THE WITNESS:  Accredited investors.

1    BY MR. SYLVESTER:

2        Q.    And did accredited investors -- strike

3    that.

4              What kinds of purchasers used exchanges to

5    purchase XRP?

6              MR. DRYLEWSKI:  Objection to form.

7              THE WITNESS:  I can't say.

8    BY MR. SYLVESTER:

9        Q.    Were individuals who are not accredited

10   investors able to purchase XRP through XRP II?

11       A.    I don't believe so, no.

12       Q.    If an individual who was not an accredited

13   investor wanted to purchase XRP at this time, would

14   that individual have had to purchase it from an

15   exchange?

16             MR. DRYLEWSKI:  Objection to form.

17             THE WITNESS:  Yes.

18   BY MR. SYLVESTER:

19       Q.    Do you know if Ripple did, in fact, post

20   the how-to-get-XRP guide on Ripple.com?

21       A.    Yes.

22       Q.    Did it?

23       A.    Yes.

24       Q.    Did there ever come a time when Ripple

25   removed the guide from Ripple.com?

1          A.     Not to my knowledge.

2          Q.     Going back to the exchanges question, I

3     asked:

4                 "Why did Ripple want to be

5                 make it easy for people to purchase

6                 XRP?"

7                 And you said:

8                 "It was difficult to purchase

9                 XRP out of XRP II, the financial

10                institution, the subsidiary."

11         A.     Yeah.

12         Q.     And XRP II is sold to accredited

13    investors?

14         A.     That's right.

15         Q.     And nonaccredited investors could buy on

16    exchanges?

17         A.     That's right.

18         Q.     So Ripple was trying to make it easier for

19    nonaccredited investors to purchase XRP?

20                MR. DRYLEWSKI:  Object to form.

21                THE WITNESS:  That would be fair, yes.

22                MR. SYLVESTER:  Okay.  Let's move to

23    Exhibit 36, please.

24                (Whereupon, Deposition Exhibit AO-36

25                was marked for identification.)

```
 1    BY MR. SYLVESTER:
 2         Q.    So Exhibit 36 is an email from ███████
 3    ███████ - I'm not certain how to say her last name.
 4               Do you know, Ms. O'Gorman?
 5         A.    ███████████    I knew her as ███████████
 6         Q.    Okay.  Let's call her ████████████    for
 7    the purposes of this deposition.
 8         A.    Okay.
 9         Q.    From ████████    to ██████████    -
10         A.    Yeah.
11         Q.    -- and others, cc you.
12               Do you see that?
13         A.    I do.
14         Q.    This is dated July 13th, 2016.
15               Do you see that?
16         A.    2016, yes.
17         Q.    I'd like to ask you questions about the
18    attached Ripple code of conduct, December 2015.
19         A.    Okay.
20         Q.    Do you see that?
21         A.    I do.
22         Q.    Before we flip there, on the first page,
23    on the email, ████████████    says, in her second
24    paragraph:
25                    "I've added Antoinette to this
```

1               email strand as she authored much

2               of our code and may be able to

3               assist with questions specific to

4               that document."

5               Do you see that?

6          A.   I do.

7          Q.   Is it true that you authored much of

8     Ripple's code of conduct?

9          A.   Pardon me?

10         Q.   Is it true that you authored much of

11    Ripple's code of conduct?

12         A.   It is true.

13         Q.   Going to the attachment, the code of

14    conduct?

15         A.   Yes.

16         Q.   My questions -- it's a lengthy document.

17    My questions are going to be limited to the first

18    page, the introduction, and the section number 2

19    regarding insider purchase, sale and holdings of

20    XRP.

21              MR. DRYLEWSKI:  Notwithstanding that

22    representation, if there's any other part of this

23    document you want to review to familiarize yourself

24    with it, please feel free to do so.

25              THE WITNESS:  Okay.  Thank you.

1    BY MR. SYLVESTER:

2        Q.   So starting with the page --

3             MS. ZORNBERG:  Are you ready to --

4             THE WITNESS:  I'm not ready yet.

5             MR. SYLVESTER:  Take your time.

6             THE WITNESS:  I'm ready.

7    BY MR. SYLVESTER:

8        Q.   Okay.  Great.

9             On page 3 of the attachment, on the Bates

10   number ending -8158, the top of the page is the

11   introduction.

12            Do you see that?

13       A.   Yeah, I do.

14       Q.   The second paragraph says:

15                "This code of conduct applies

16            in its entirety to all Ripple

17            employees.  Certain provisions of

18            the code of conduct appropriately

19            extend beyond employees to cover

20            the board of directors,

21            contractors, founders, investors

22            and advisors," and then in parens,

23            quote, "(insiders.)"

24       A.   That's right.

25       Q.   Okay.

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

351

1          Turning to the section regarding insider

2     purchase, sale and holdings of XRP, which begins on

3     page 4 and continues on to page 5, at least.

4          A.   Sure.

5          Q.   Did you author this section regarding

6     insider purchase, sale and holdings of XRP?

7          A.   I believe so.

8          Q.   The first bullet on page 5, under

9     "Purchase and Sale of XRP," says:

10               "Insiders may not buy, sell,

11          recommend or trade XRP either

12          personally or on behalf of someone

13          else under circumstances that could

14          appear unfair to the wider Ripple

15          community and non-insiders

16          generally."

17          Do you see that?

18          A.   I do.

19          Q.   What are the circumstances in which

20     insiders' purchase or sale of XRP could appear

21     unfair to the wider Ripple community?

22          A.   I think I say it in the next sentence,

23     don't I?

24               "This includes situations in

25          which insiders have access to

352

1          information about Ripple" --

2                MS. ZORNBERG:  Slow it down so the court

3     reporter can get it.

4                THE WITNESS:  It says:

5                    "This includes situations in

6                    which insiders have access to

7                    information about Ripple or the

8                    Ripple protocol that has not been

9                    publicly announced and to which

10                   might reasonably affect a decision

11                   to buy or sell XRP."

12    BY MR. SYLVESTER:

13         Q.   Do you have an understanding as to why

14    Ripple had this policy governing its insiders

15    trading in XRP?

16         A.   Just a matter of good corporate hygiene.

17         Q.   Why is that?

18         A.   It's talking about ethics.

19         Q.   Why would it be unethical for an insider

20    to trade in XRP in circumstances where he or she had

21    access to information about Ripple or the Ripple

22    protocols that have not yet been publicly announced?

23                MR. DRYLEWSKI:  Objection to form.

24                THE WITNESS:  Could you repeat that

25    question?  Sorry.

1    BY MR. SYLVESTER:

2        Q.   Sure.

3             Why would it be unethical for an insider

4    to trade in XRP in circumstances where he or she had

5    access to information about Ripple or the Ripple

6    protocol that had not been publicly announced?

7             MR. DRYLEWSKI:  Same objection.

8             THE WITNESS:  I mean, you could say it

9    might be called insider trading or considered

10   insider trading, but I wouldn't say that

11   specifically.

12   BY MR. SYLVESTER:

13       Q.   Okay.  In the middle of the page, roughly,

14   it says:

15             "Following our examples of

16             situations in which it would be

17             inappropriate for insiders to buy,

18             sell, trade or recommend XRP."

19             Do you see that?

20       A.   I do.

21       Q.   Okay.  And the first bullet says:

22             "Prior to public announcements

23             of new bank partnerships"?

24       A.   Yes.

25       Q.   In that circumstance, why would it be

354

1    inappropriate for an insider to buy, sell, trade or

2    recommend XRP prior to the public announcement of a

3    new bank partnership?

4           MR. DRYLEWSKI:  Objection to form.

5           THE WITNESS:  A --

6           MR. DRYLEWSKI:  Let me just interject.

7           To the extent that your answer requires

8    you to divulge the substance of any communications

9    you had with Ripple's inside or outside counsel, I

10   would instruct you to exclude that from your answer.

11          THE WITNESS:  I would have to then -- I'm

12   not able to answer that question.

13   BY MR. SYLVESTER:

14       Q.   Okay.

15          Because of your counsel's instruction; is

16   that right?

17       A.   That's right.

18       Q.   Are all of the examples that are listed

19   under -- strike that.

20          Are all of the examples of situations in

21   which it would be inappropriate for insiders to

22   trade in XRP, were all of those examples provided to

23   you by counsel?

24          MS. ZORNBERG:  Can I interject here?

25          Could you ask a more basic question

1     about -- just to lay a foundation as to whether

2     she -- or we could take a break.  But I think -- I

3     don't think you've laid a proper foundation to ask

4     her about the bullets.  Maybe just ask some

5     foundational questions about the involvement of

6     counsel.

7     BY MR. SYLVESTER:

8         Q.   Did you draft the bullets that list

9     examples of situations in which it would be

10    inappropriate for insiders to trade XRP?

11        A.   I drafted it with counsel.

12        Q.   Okay.

13        A.   We worked on them together.

14        Q.   So these bullets, in your view, reflect

15    counsel's advice as to circumstances in which it

16    would be inappropriate?

17        A.   Yes.

18             MR. TENREIRO:  But just to be clear,

19    you're not claiming privilege over this code of

20    conduct.

21             So we might need to actually take a break

22    because I'm getting confused.  We have the code of

23    conduct but we can't ask questions about it?

24             MR. DRYLEWSKI:  The question was about the

25    reasoning behind the bullets --

1        MS. ZORNBERG:  Yes.

2        MR. DRYLEWSKI:  -- and on that, that

3    invoked the instruction, to the extent it divulges

4    the substance of communications with counsel, don't

5    answer.

6        MR. TENREIRO:  Okay.  So you're letting us

7    see the actual advice but not the reasons behind the

8    advice; that's what you're doing?

9        MS. ZORNBERG:  We have not -- the company

10   has not claimed privilege as to the code of conduct

11   that was issued to its employees.

12       MR. TENREIRO:  But is claiming privilege

13   over the reasons for having the code of conduct.

14       MR. DRYLEWSKI:  If that reflects the

15   substance of communication between Ms. O'Gorman and

16   counsel, then I've asked her to exclude that from

17   her answer.  That's all.

18       MS. ZORNBERG:  We're doing this question

19   by question and I --

20       MR. TENREIRO:  So am I.

21       MS. ZORNBERG:  -- and she has answered

22   every question so far that you've put to her about

23   the code of conduct.

24           The record is now clear that she --

25       MR. TENREIRO:  No, I'm not.

1          MS. ZORNBERG:  -- she drafted these

2     bullets in consultation with counsel and based --

3     and incorporating counsel's advice.

4          And the question from Mr. Sylvester

5     elicited that -- that advice and discussion with

6     counsel, which makes it privileged.

7          MR. TENREIRO:  I'm saying for the record,

8     you're making a selective assertion privilege here.

9     That's our position.

10          She declined to answer the question as to

11     why this is in there, but you're telling us the

12     advice, not the reasons for it.

13          That's a selective waiver.  Let's move on.

14          MS. ZORNBERG:  I don't understand your

15     objection.

16          MR. TENREIRO:  Our objection is that

17     you're selecting what we can look at but the company

18     is not asserting privilege over it, including this

19     document, and then not letting us probe as to why is

20     this in here, et cetera.

21          MS. ZORNBERG:  No, I disagree.  She's

22     answered every question on the document so far.

23          If you want to rephrase your question,

24     go -- try doing that.

25          MR. TENREIRO:  She already refused to

1    answer, Lisa, and she's not answered every question.

2           But we can ask it again.  She's going to

3    say, asked and answered.

4           MS. ZORNBERG:  Try the question again.

5           Some of these questions have not been a

6    monument of clarity, and we're doing our level best

7    to take it question by question and work out the

8    issues.  So please, ask again.

9           And just for the record, the code of

10   conduct itself is not legal advice.  The code of

11   conduct is a policy of the company.  And there's a

12   distinction between an issue -- a policy issued by a

13   company and legal advice obtained by the chief

14   compliance officer in drafting the policy.

15          Those are two separate things.

16   BY MR. SYLVESTER:

17       Q.   Okay.  Let's try this --

18       A.   Okay.

19       Q.   -- apart from conversations with counsel,

20   do you have an understanding of why it would be

21   inappropriate for insiders to trade XRP ahead of a

22   public announcement of a new bank partnership?

23          MR. DRYLEWSKI:  If you can answer that

24   question without divulging the substance of

25   communications that you had with Ripple's counsel,

1    then you can do so.

2            THE WITNESS:  I can't answer the question.

3    BY MR. SYLVESTER:

4        Q.   Great.

5            Generally, why did Ripple have an insider

6    trading policy?

7            MS. ZORNBERG:  Objection.  Asked and

8    answered.

9            You can answer, if you understand the

10   question.

11           THE WITNESS:  Why did Ripple have an

12   insider trading policy?

13   BY MR. SYLVESTER:

14       Q.   Yes.

15       A.   Do you mean this section here?

16           This isn't an insider trading policy.

17       Q.   Why did Ripple have the policy embodied

18   under the heading "Insider Purchase, Sale and

19   Holdings of XRP"?

20       A.   "Insiders" meaning the term on page 1, you

21   mean?

22       Q.   Well --

23       A.   Insider --

24       Q.   -- Ms. O'Gorman, you drafted the document.

25   I believe -- that's my reading of the document.  Is

1    it yours?

2         A.   That's right.

3         Q.   Okay.

4         A.   Yeah.

5              MS. ZORNBERG:   Please don't disparage the

6    witness.   You first questioned her by saying insider

7    trading policy, which was a mischaracterization of

8    the document --

9              MR. SYLVESTER:   She corrected me and I

10   pointed her to the heading.

11             Enough, Lisa.

12             MS. ZORNBERG:   Put the question.   This is

13   the final half an hour.   Please do not disparage the

14   witness.   It's been a long day.

15   BY MR. SYLVESTER:

16        Q.   Ms. O'Gorman, I appreciate your time.   If

17   whatever I said sounded to you like I was

18   disparaging you, I was not.

19             MR. DRYLEWSKI:   What was the question?

20   BY MR. SYLVESTER:

21        Q.   The question is, Ms. O'Gorman, you would

22   agree with me that Ripple has a policy called

23   "Insider Purchase, Sale and Holdings of XRP"; is

24   that right?

25        A.   Included in the code of conduct, yes.

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

1     Q.    Okay.  Fair enough.

2           Why does -- why did Ripple have this

3     policy included in its code of conduct?

4           MS. ZORNBERG:  Objection.  Asked and

5     answered.

6           But you can answer again.

7           THE WITNESS:  As -- because ethically,

8     it's part of the ethics of the company, and for good

9     corporate ethical matters it was included here.

10          "Insiders" refers to the definition on

11    page 1.  That was the point I was trying to make,

12    rather than insider trading, if you know what I

13    mean.

14    BY MR. SYLVESTER:

15          Q.    I understand.

16          I read it consistently with your answer.

17    I understand your answer now.

18          A.    Oh, good.  Okay.

19          Q.    Was Ripple concerned with what non-Ripple

20    employee purchasers of XRP -- strike that.

21          Was Ripple concerned about the perception

22    that Ripple insiders could trade on Ripple inside

23    information in XRP?

24          MR. DRYLEWSKI:  Objection to form.

25          MS. ZORNBERG:  Objection to form.

362

1          And you can answer so long as your answer

2   does not disclose communications with counsel.

3          THE WITNESS:  I can't answer that question

4   based on this comment.

5   BY MR. SYLVESTER:

6      Q.   Based on counsel's instruction?

7      A.   That's right.

8      Q.   Ms. O'Gorman, do you see under the second

9   bullet under "Purchase and Sale of XRP," it says:

10             "The company may, from time to

11          time, designate certain time

12          periods as restricted periods if

13          the judgment of executive

14          management" -- sorry -- strike

15          that -- "if in the judgment of

16          executive management, a coming

17          announcement or other event may

18          significantly affect the trading

19          price of XRP."

20          Do you see that?

21      A.   I do.

22      Q.   Okay.  While you were at Ripple, do you

23   recall any occasions where there were such

24   restricted periods in place?

25      A.   Not specifically.

363

1    Q.   Do you have a general recollection of

2   there being restricted periods in place during your

3   tenure at Ripple?

4    A.   A general recollection, yes.

5    Q.   Okay.  What announcements -- strike that.

6         What was the reason for those restricted

7   periods being put into place during your tenure at

8   Ripple?

9    A.   As stated here in this document.

10    Q.   I'm sorry, which portion of the document

11   are you directing me to?

12    A.   I'm sorry, the part you just read here.

13             "If in the judgment of

14         executive management, a coming

15         announcement or other event may

16         significantly affect the trading

17         price of XRP."

18    Q.   What announcement -- strike that.

19         What coming announcement prompted the

20   imposition of a restricted period in XRP?

21         MR. DRYLEWSKI:  Objection to form.

22         THE WITNESS:  It's stated in the document

23   here, prior to public announcements of new bank

24   partners, prior to public announcements relating to

25   adverse regulatory actions, prior to public

1    announcements regarding other significant

2    partnerships, financial coalition, and prior to

3    public announcements relating to CEO or founders'

4    XRP movement.

5    BY MR. SYLVESTER:

6        Q.   And during your tenure at Ripple, were

7    there restricted periods put into place for all of

8    those sets of circumstances?

9            MR. DRYLEWSKI:  Objection to form.

10           THE WITNESS:  I can't answer that with any

11    exactness.

12    BY MR. SYLVESTER:

13       Q.   Can you remember any occasion within your

14    tenure at Ripple where, for instance, there was

15    going to be a public announcement of a new bank

16    partner and Ripple management put into place a

17    restricted period?

18       A.   I don't recall.

19       Q.   Were these restricted periods documented

20    in any way?

21       A.   Not by me.

22       Q.   By anyone at Ripple?

23       A.   May have been.

24       Q.   How did Ripple management share with

25    employees that there was a restricted period put

```
 1    into place?

 2          A.    It would have been on a case-by-case

 3    basis.  I can't say.

 4          Q.    Can you recall if Ripple management

 5    conveyed that by email?

 6          A.    I cannot recall.

 7          Q.    By Slack?

 8                MR. DRYLEWSKI:  Objection.  Asked and

 9    answered.

10                THE WITNESS:  I don't know.

11    BY MR. SYLVESTER:

12          Q.    Did, from time to time, Ripple management

13    determine that a public announcement -- coming

14    public announcement could potentially impact XRP's

15    price?

16          A.    The question again, please.

17          Q.    Sure.

18                Did, from time to time, Ripple management

19    determine that a coming public announcement could

20    potentially impact can XRP's price?

21          A.    Yes.

22          Q.    And it's on those occasions that Ripple

23    management would choose to institute a restricted

24    period in the trading of XRP; is that right?

25                MR. DRYLEWSKI:  Objection to form.
```

1          THE WITNESS:  Generally, yes.

2     BY MR. SYLVESTER:

3          Q.   Okay.

4               Did there ever come a time when Ripple

5     stopped instituting restricted periods in trading in

6     XRP?

7          A.   Not that I know of.

8          Q.   Okay.

9               MR. SYLVESTER:  Let's go off the record

10    for a very quick break.

11              THE WITNESS:  Sure.

12              MR. SYLVESTER:  Thank you.

13              THE VIDEOGRAPHER:  Okay.  We are off the

14    record at 6:08 p.m.

15                   (Whereupon, a recess was taken.)

16              THE VIDEOGRAPHER:  This is the start of

17    File Number 12.

18              We're back on the record.  The time is

19    6:17 p.m.

20    BY MR. SYLVESTER:

21         Q.   Ms. O'Gorman, did you have any involvement

22    in the hiring of a head of investor relations for

23    Ripple?

24         A.   I did not.

25         Q.   Okay.  Did you have any involvement at all

1    in hiring?

2         A.   For my team.

3         Q.   Just for the compliance team?

4         A.   Yes, and also, I did some interviewing for

5    other teams as well.  We had a policy at Ripple that

6    people from various teams should interview certain

7    other teams.

8         Q.   Okay.

9              MR. SYLVESTER:  Let's go to Exhibit 39,

10   please.

11             (Whereupon, Deposition Exhibit AO-39

12              was marked for identification.)

13             MR. TENREIRO:  Thirty-nine.

14   BY MR. SYLVESTER:

15        Q.   So Exhibit 39 is an email from you to

16   Mr.          and others at Ripple dated

17   January 26th, 2018.

18             Do you see that?

19        A.   I do.

20        Q.   Okay.  Who is Mr.

21        A.        was a member of the marketing team.

22        Q.   Okay.  And Mr.          is writing you

23   about a Bloomberg reporter who is writing a story

24   about insider trading of cryptocurrencies; is that

25   right?

368

1          A.    That's what it looks like, yes.

2          Q.    Okay.  And one of the questions that

3     reporter appears to be asking is, "How does Ripple

4     protect investors from insider trading of XRP at

5     Ripple -- at Ripple?"

6                Do you see that?

7          A.    I do.

8          Q.    Okay.  And I think Mr          in the

9     paragraph after the next copies Ripple's current

10    statement regarding that issue; is that right?

11         A.    That's right.

12         Q.    Okay.  Current as of 2018?

13         A.    That's right.

14         Q.    And that statement says:

15                   "Ripple operates with the

16               imperative that employees must act

17               ethically and transparently with

18               respect to XRP transactions to

19               avoid perceptions that could impair

20               the integrity or reputation of the

21               XRP market."

22               Do you see that?

23         A.    I do.

24         Q.    Okay.  Why was Ripple concerned with

25    transparency with respect to XRP transactions?

1      MR. DRYLEWSKI:  Objection to form.

2      THE WITNESS:  I think I asked -- I

3   answered that already, didn't I?

4      I just thought it was good corporate

5   hygiene.

6   BY MR. SYLVESTER:

7      Q.   Okay.  Why was Ripple concerned with

8   perceptions that could impair the integrity or

9   reputation of the XRP market?

10      MR. DRYLEWSKI:  Objection to form.

11      THE WITNESS:  I'm not quite sure what he

12   meant here.

13   BY MR. SYLVESTER:

14      Q.   Did you have any role in drafting the

15   statement beginning with the words "Ripple

16   operates"?

17      A.   I don't believe so.

18      Q.   Do you know who did?

19      A.   I would imagine -- is it ███████

20      I don't know.

21      Q.   Okay.  And you respond:

22           "Hi, ████████ is working

23           with outside counsel for

24           CFTC-related guidance around our

25           position with respect to insider

370

1          trading going forward."

2          Do you see that?

3     A.    I do.

4     Q.    Okay. And then after that:

5              "Our prior code of conduct did

6          contain a clause that said the

7          company may, from time to time,

8          designate periods of trading

9          restrictions/blackouts, but that

10         was removed in the last revision,

11         December 2017."

12         Do you see that?

13    A.    Yes, I do.

14    Q.    Does that refresh you on whether the

15   restricted period provision was removed from the

16   Ripple code of conduct?

17         MR. DRYLEWSKI: You can answer that

18   question with a "yes," "no," "I don't know" or "I

19   don't recall."

20         THE WITNESS: Could you repeat the

21   question? Sorry.

22   BY MR. SYLVESTER:

23    Q.    Sure.

24         Does that refresh your recollection on

25   whether the restricted period provision was removed

1    from the Ripple code of conduct?

2        A.   It does refresh my memory.

3        Q.   Okay.  So was the restricted period

4    provision removed from the Ripple code of conduct in

5    December 2017?

6        A.   It was.

7        Q.   Whose idea was it to remove that

8    provision?

9            MR. DRYLEWSKI:  I think we're --

10           MS. ZORNBERG:  I'm going to --

11           MR. DRYLEWSKI:  Yeah.

12           MS. ZORNBERG:  Because it's -- it's

13   already clear from this document that counsel was

14   involved, I think you should first lay a predicate

15   and maybe ask who was involved generally in

16   discussion, not whose idea, which I think is

17   probably a bridge too far into privilege.

18           Why don't you just ask the more general

19   question of who was involved or whether      was

20   involved?

21   BY MR. SYLVESTER:

22       Q.   Was counsel involved in the decision to

23   remove the restriction provision from the Ripple

24   code of conduct?

25       A.   Yes.

1          Q.   Okay.

2               Was the restricted provision ever put back

3     into the Ripple code of conduct after December 2017?

4          A.   Not while I was there.  Not while I was

5     still a Ripple employee.

6          Q.   Okay.

7               We discussed earlier, Ms. O'Gorman, that

8     certain of Ripple's meetings were recorded; is that

9     right?

10         A.   That's right.

11         Q.   And that included all-hands meetings; is

12    that right?

13         A.   That's right.

14         Q.   Can you describe what you mean by

15    "all-hands meetings"?

16         A.   I can.

17         Q.   Would you, please.

18         A.   Yes.

19              All-hands meetings were the weekly

20    meetings on Mondays where everyone -- every employee

21    at Ripple attended either remotely by video or in

22    person in San Francisco headquarters.

23         Q.   Okay.  You said every employee of Ripple

24    attended?

25         A.   Yes.  Or if they were unable to attend, if

373

1    they were at meetings with clients or partners,

2    they -- that's why we took the video.

3         Q.   It's a video recording?

4         A.   It's a video recording, yes.

5         Q.   And what were the topics that were

6    typically covered at these all-hands meetings?

7              MS. ZORNBERG:  Object to form.

8              THE WITNESS:  God, everything and

9    anything.  General.  It was all very general.

10   People gave presentations.  General.

11   BY MR. SYLVESTER:

12        Q.   Okay.  Other than all-hands meetings and

13   the meeting with the various teams about -- that you

14   and Mr. Zagone and Ms. ████ ran, what other types of

15   meetings, if any, at Ripple were recorded?

16        A.   Trainings.

17        Q.   What kinds of trainings?

18        A.   For example, I was required to provide

19   annual training to the board, to all employees on

20   our BSA, AML and sanctions program, for example.

21        Q.   Okay.  Did -- did Ripple, when you were

22   CCO, have a document retention policy?

23        A.   I'm thinking here.  Sorry.

24             I believe so.

25        Q.   Okay.  What was Ripple's document

 1    retention policy?

 2              MS. ZORNBERG:  If you recall.

 3              Object to form --

 4              THE WITNESS:  I don't --

 5              MS. ZORNBERG:  -- and lack of foundation.

 6              THE WITNESS:  I don't have it.

 7    BY MR. SYLVESTER:

 8         Q.   Do you recall that the policy contained a

 9    provision that Ripple would preserve certain

10    documents for certain periods of time?

11              MR. DRYLEWSKI:  Objection to form.

12              THE WITNESS:  I don't recall.

13              I didn't write it.

14    BY MR. SYLVESTER:

15         Q.   Did you ever review it when you were at

16    Ripple?

17         A.   I don't recall, no.

18         Q.   In whose department or which department

19    was the document retention policy?

20              MS. ZORNBERG:  Objection, lack of

21    foundation.

22    BY MR. SYLVESTER:

23         Q.   It seems like -- I can rephrase.

24              It seems like it wasn't part of your

25    duties as a compliance officer to maintain this

1    document; is that right?

2         A.   It is not, yes.

3         Q.   Whose job was it?

4         A.   It was legal's.

5              THE WITNESS:  Am I allowed to say that?

6              MS. ZORNBERG:  But objection to lack of

7    foundation.

8    BY MR. SYLVESTER:

9         Q.   Can we turn back briefly to Exhibit 26,

10   please.

11             So Exhibit 26 is this email from Ms.

12   to Ms.          is that right?

13        A.   That's right.

14        Q.   The attachment is a few-page document

15   called "How we talk about XRP" from your legal

16   department?

17        A.   That's right, yeah.

18        Q.   Do you recall any trainings at Ripple

19   containing the information in this document?

20             MR. DRYLEWSKI:  Objection to form.

21             THE WITNESS:  I don't recall any

22   trainings, no.

23   BY MR. SYLVESTER:

24        Q.   You testified earlier that

25                                               is

1   that right?

2        A.   I did.

3        Q.   ████████████████████████████

4        A.   Oh, God.  ███████████  I think.

5        Q.   That's  ███████████

6        A.   That's right.

7        Q.   Okay.  What was the total amount, if you

8   know?

9             MR. DRYLEWSKI:  Objection to form.

10            Is this necessary?

11            MR. TENREIRO:  (Nods head.)

12            MR. DRYLEWSKI:  Why?

13            MR. TENREIRO:  To show her -- can we talk

14   off the record so we don't discuss in front of the

15   witness?

16            MR. DRYLEWSKI:  Why don't we do that.

17            MR. SYLVESTER:  Let's go off the record.

18            THE VIDEOGRAPHER:  Off the record at

19   6:30 p.m.

20              (Whereupon, a recess was taken.)

21            THE VIDEOGRAPHER:  This is the beginning

22   of File 13.

23            We're back on the record at 6:33 p.m.

24   BY MR. SYLVESTER:

25        Q.   Okay.  Ms. O'Gorman, ████████████████

377

1  

2          MR. DRYLEWSKI: Objection to form.

3          THE WITNESS: I couldn't -- I couldn't

4 say. I don't know off the top of my head.

5 BY MR. SYLVESTER:

6      Q. You testified earlier that

7                    is that right?

8      A. That's right.

9      Q. Okay. Do you recall if it was worth more

10 than       at that time?

11      A. More?

12        No. That -- that was it.

13      Q.

14  

15          MR. DRYLEWSKI: Objection to form.

16          THE WITNESS: Yes.

17 BY MR. SYLVESTER:

18      Q. Okay. And

19         ?

20      A. That's right.

21      Q. Okay. During the period that

22              --

23      A. Yeah.

24      Q. -- from 2015 to 2019 or 2020,

25       did you have a preference that the price of

1    XRP go up?

2          MR. DRYLEWSKI:  Objection to form.

3          THE WITNESS:  I didn't have a preference.

4    BY MR. SYLVESTER:

5      Q.   Did you have a personal preference that

6    the price of XRP go down for that period?

7      A.   I didn't have a preference.

8      Q.   So you didn't care one way or the other

9    whether the price went up and down for the period

10   ███████████████

11         MR. DRYLEWSKI:  Objection to form.

12         THE WITNESS:  That's true.  It didn't

13   matter to me.

14         MR. SYLVESTER:  I believe that that is all

15   the questions I have for you, Ms. O'Gorman.

16         Does counsel want to confer about whether

17   or not anybody wants to ask the witness questions?

18         MS. ZORNBERG:  Nothing from Ripple,

19   actually.

20         MS. DEARBORN:  Nothing for Mr. Larsen.

21         MR. SOLOMON:  Nothing for

22   Mr. Garlinghouse.

23         MR. DRYLEWSKI:  Nothing from the witness's

24   counsel.

25         We will reserve the right to review the

1    transcript and to designate any portions as highly

2    confidential.

3              MR. SYLVESTER:  Great.

4              Ms. O'Gorman, thank you for your time.  We

5    appreciate it.

6              THE WITNESS:  Thank you.

7              THE VIDEOGRAPHER:  This concludes today's

8    deposition on August 4th, 2021.  We're off the

9    record at 6:35 p.m.

10             Master media will be retained by Gradillas

11   Court Reporting.

12             (Deposition concluded at 6:35 p.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

380

```
1                    CERTIFICATE OF WITNESS

2

3

4        I, ANTOINETTE O'GORMAN, do hereby declare under

5        penalty of perjury that I have read the entire

6        foregoing transcript of my deposition testimony,

7        or the same has been read to me, and certify that

8        it is a true, correct and complete transcript of

9        my testimony given on August 4, 2021, save and

10       except for changes and/or corrections, if any, as

11       indicated by me on the attached Errata Sheet, with

12       the understanding that I offer these changes and/or

13       corrections as if still under oath.

14            _____ I have made corrections to my deposition.

15            _____ I have NOT made any changes to my deposition.

16

17  Signed:  _____
                ANTOINETTE O'GORMAN
18

19

20  Dated this _____ day of _____ of 20____.

21

22

23

24

25
```

381

```
1                    CERTIFICATE OF REPORTER

2              I, Kathleen A. Wilkins, Certified

3      Shorthand Reporter licensed in the State of

4      California, License No. 10068, hereby certify that

5      deponent was by me first duly sworn, and the

6      foregoing testimony was reported by me and was

7      thereafter transcribed with computer-aided

8      transcription; that the foregoing is a full,

9      complete, and true record of proceedings.

10             I further certify that I am not of counsel

11     or attorney for either or any of the parties in the

12     foregoing proceeding and caption named or in any way

13     interested in the outcome of the cause in said

14     caption.

15             The dismantling, unsealing, or unbinding

16     of the original transcript will render the

17     reporter's certificates null and void.

18             In witness whereof, I have hereunto set my

19     hand this day:  August 6, 2021

20     ___x___  Reading and Signing was requested.

21     _____  Reading and Signing was waived.

22     _____  Reading and Signing was not requested.

23             _____

24             KATHLEEN A. WILKINS

25             CSR 10068, RPR-RMR-CRR-CCRR-CLR-CRC
```

[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021

1                          ERRATA SHEET

2        Deposition of:  ANTOINETTE O'GORMAN
         Date taken:  AUGUST 4, 2021
3        Case:  SEC v. RIPPLE LABS, INC., et al.

4        PAGE  LINE
         _____ _____  CHANGE: _____
5                     REASON: _____

6        _____ _____  CHANGE: _____
                      REASON: _____
7
         _____ _____  CHANGE: _____
8                     REASON: _____

9        _____ _____  CHANGE: _____
                      REASON: _____
10
         _____ _____  CHANGE: _____
11                    REASON: _____

12       _____ _____  CHANGE: _____
                      REASON: _____
13
         _____ _____  CHANGE: _____
14                    REASON: _____

15       _____ _____  CHANGE: _____
                      REASON: _____
16
         _____ _____  CHANGE: _____
17                    REASON: _____

18       _____ _____  CHANGE: _____
                      REASON: _____
19
         _____ _____  CHANGE: _____
20                    REASON: _____

21       _____ _____  CHANGE: _____
                      REASON: _____
22
         _____ _____  CHANGE: _____
23                    REASON: _____

24
         Signed_____
25       Dated_____

































[8/4/2021] O'Gorman, Antoinette Dep. Tr. 8.4.2021