# PX 19

1

1              IN THE UNITED STATES DISTRICT COURT

2                 SOUTHERN DISTRICT OF NEW YORK

3

4    SECURITIES AND EXCHANGE          )
     COMMISSION,                      )
5                                     )
                        Plaintiff,    ) Case No.:
6             v.                      ) 20-Civ-10832(AT)(SN)
                                      )
7    RIPPLE LABS, INC., BRADLEY       )
     GARLINGHOUSE, and CHRISTIAN      )
8    LARSEN,                          )
                                      )
9                       Defendants.   )
     _____)

10

11

12        **CONFIDENTIAL - SUBJECT TO PROTECTIVE ORDER**

13

14               VIDEOTAPED DEPOSITION OF

15                     RYAN ZAGONE

16              Tuesday, July 20, 2021

17

18

19

20

21

22

23
     Reported by:
24   BRIDGET LOMBARDOZZI,
     CSR, RMR, CRR, CLR
25   Job No. 210720BLO

2

1                  IN THE UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4   SECURITIES AND EXCHANGE          )
    COMMISSION,                      )
5                                    )
                      Plaintiff,     ) Case No.:
6              v.                    ) 20-Civ-10832(AT)(SN)
                                     )
7   RIPPLE LABS, INC., BRADLEY       )
    GARLINGHOUSE, and CHRISTIAN      )
8   LARSEN,                          )
                                     )
9                     Defendants.    )
    _____ )

10

11

12

13

14

15             Videotaped deposition of RYAN ZAGONE taken on

16   behalf of Plaintiff, held at the offices of Debevoise &

17   Plimpton, 919 Third Avenue, New York, New York,

18   commencing at 9:12 a.m. and ending at 6:17 p.m., on

19   Tuesday, July 20, 2021, before Bridget Lombardozzi, CCR,

20   RMR, CRR, CLR, and Notary Public of the States of New

21   York and New Jersey, pursuant to notice.

22

23

24

25

```
 1    A P P E A R A N C E S (Via Remote where indicated):

 2

 3    For the Plaintiff:

 4

 5

 6          UNITED STATES SECURITIES AND EXCHANGE COMMISSION

 7          NEW YORK REGIONAL OFFICE

 8          BY:  BEN HANAUER, ESQUIRE

 9               JORGE G. TENREIRO, ESQUIRE

10               JON DANIELS, ESQUIRE (Remote)

11               DAPHNA A. WAXMAN, ESQUIRE (Remote)

12          200 Vesey Street

13          Suite 400

14          New York, New York  10281-1022

15          Telephone:  212.336.1060

16          Email:   hanauerb@sec.gov

17                   tenreiroj@sec.gov

18                   jdaniels@sec.gov

19                   waxmand@sec.gov

20

21

22

23

24

25
```

4

```
1    A P P E A R A N C E S  (Continued):

2

3    For Defendant Ripple Labs Inc.:

4

5             DEBEVOISE & PLIMPTON LLP

6             BY:  ANDREW CERESNEY, ESQUIRE

7                  ANNA GRESSEL, ESQUIRE

8                  ASHLEY V. HAHN, ESQUIRE

9             919 Third Avenue

10            New York, New York  10022

11            Telephone:  212.909.6000

12            E-Mail:  aceresney@debevoise.com

13                     argressel@debevoise.com

14                     avhahn@debevoise.com

15

16                    -and-

17

18            KELLOGG, HANSEN, TODD, FIGEL & FREDERICK PLLC

19            BY:  COLLIN WHITE, ESQUIRE (Remote)

20            Sumner Square

21            1615 M Street, N.W.

22            Suite 400

23            Washington, D.C.  20036

24            Telephone:  202.326.7999

25            E-mail:  cwhite@kellogghansen.com
```

5

```
 1    A P P E A R A N C E S  (Continued):

 2

 3    For Defendant Bradley Garlinghouse:

 4

 5            CLEARY GOTTLIEB STEEN & HAMILTON

 6            BY:  SAMUEL LEVANDER, ESQUIRE

 7                 JACKIE A. BRUNE, ESQUIRE (Remote)

 8                 NOAH BAMBERGER, ESQUIRE (Remote)

 9            2112 Pennsylvania Avenue, NW

10            Washington, D.C.  20037

11            Telephone:  202.974.1500

12            E-mail:  slevander@cgsh.com
                       jabrune@cgsh.com
13                     nbamberger@cgsh.com

14

15    For Defendant Christian A. Larsen:

16

17            PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP

18            By:  JUSTIN WARD, ESQUIRE

19                 MEREDITH DEARBORN, ESQUIRE (Remote)

20                 CONNOR RITSCHARD, ESQUIRE (Remote)

21            1285 Avenue of the Americas

22            New York, New York  10019-6064

23            Telephone:  212.373.2491

24            E-mail:  jward@paulweiss.com
                       mdearborn@paulweiss.com
25                     critschard@paulweiss.com
```

6

1    A P P E A R A N C E S (Continued):

2

3    For the Witness:

4

5              KAPLAN HECKER & FINK LLP

6              BY:   JUSTIN R. HORTON, ESQUIRE

7                    SEAN HECKER, ESQUIRE

8              350 Fifth Avenue

9              Suite 7110

10             New York, New York  10018

11             Telephone:  646.889.3906

12             E:mail:  shecker@kaplanhecker.com

13                      jhorton@kaplanhecker.com

14

15   ALSO PRESENT:

16

17             ███████████        Ripple

18             DAVID SHERECK, Videographer
               Shereck Video Service
19

20

21

22

23

24

25

```
 1                        INDEX

 2    WITNESS                        EXAMINATION

 3    RYAN ZAGONE

 4        BY MR. HANAUER                    17

 5        BY MR. CERESNEY                  295

 6

 7                       EXHIBITS

 8            (EXHIBITS BOUND SEPARATELY)
      SEC
 9    NUMBER              DESCRIPTION              PAGE

10

11    Exhibit RZ-1 String of e-mails dated        61

12                6/24/15 with attachments

13                RPLI_SEC 0095167-82

14

15    Exhibit RZ-2 String of e-mails dated        72

16                September 1-2, 2015

17                ▮0001111-12

18

19    Exhibit RZ-3 3/21/16 E-mail from ▮          73

20                to ▮   et als

21                RPLI_SEC 0091249-52

22

23    Exhibit RZ-4 String of e-mails dated        78

24                December 2016-January 2017

25                RPLI_SEC 0049845-55
```

8

```
1                        EXHIBITS

2    SEC
     NUMBER              DESCRIPTION              PAGE
3

4    Exhibit RZ5    String of e-mails dated       222

5                   January 25, 2017

6                   RPLI_SEC 0060623-26

7

8    Exhibit RZ-7   1/30/17 E-mail from Zagone    104

9                   Slack messages

10                  RPLI_SEC 0302646-53

11

12   Exhibit RZ-8   1/31/17 E-mail from Zagone    117

13                  with attachments

14                  RPLI_SEC 0532018-91

15

16   Exhibit RZ-9   3/9/17 E-mail from Zagone     142

17                  to O'Gorman, et al

18                  RPLI_SEC 0763291

19

20   Exhibit RZ-11  5/5/17 E-mail from Zagone     229

21                  with attachment

22                  RPLI_SEC 0793710-17

23

24

25
```

```
 1                        EXHIBITS

 2    SEC
      NUMBER              DESCRIPTION              PAGE
 3

 4    Exhibit RZ-12 String of e-mails dated         86

 5                 June 2017

 6                 RPLI_SEC 0346910-19;

 7                 RPLI_SEC 0346934-45

 8

 9    Exhibit RZ-13 String of e-mails dated        125

10                 June 2017

11                 RPLI_SEC 0527779-84

12

13    Exhibit RZ-14 String of e-mails dated         92

14                 October 2017

15                 RPLI_SEC 0645510-11

16

17    Exhibit RZ-15 String of e-mails dated        160

18                 October 26, 2017

19                 RPLI_SEC 0047977-78

20

21    Exhibit RZ-16 Ripple 2018 GTM Countries:     234

22                 Reg Relations Engagement

23                 Plan

24                 RPLI_SEC 0801049-1111

25
```

```
1                         EXHIBITS

2    SEC
     NUMBER                DESCRIPTION              PAGE
3

4    Exhibit RZ-17 String of e-mails dated          163

5                  4/5/18 with attachment

6                  RPLI_SEC 0081610-16

7

8    Exhibit RZ-18 String of e-mails dated          152

9                  4/6/18 with attachment

10                 ███0003070-73

11

12   Exhibit RZ-21 8/8/18 E-mail from Zagone        239

13                 to Long, et al

14                 RPLI_SEC 0556451

15

16   Exhibit RZ-22 8/16/18 E-mail from Zagone       244

17                 to Garlinghouse

18                 RPLI_SEC 0431296-97

19

20   Exhibit RZ-23 9/4/18 E-mail from Zagone        254

21                 to Garlinghouse, et al

22                 RPLI_SEC 0431104-06

23

24

25
```

11

| 1 | EXHIBITS |

| 2 | SEC |
| | NUMBER | DESCRIPTION | PAGE |
| 3 |

4  Exhibit RZ-24  String of e-mails dated     262

5                 October 19, 2018

6                 RPLI_SEC 0766857

7

8  Exhibit RZ-25  String of e-mails dated     280

9                 January 7, 2019

10                ████0033297-98

11

12 Exhibit RZ-27  Target Markets for Reg       283

13                Relations + Marcomm Support

14                Presentation

15                RPLI_SEC 0733073-77

16

17 Exhibit RZ-29  String of e-mails dated      57

18                12/14 with attachment

19                RPLI_SEC 0914881-94

20

21 Exhibit RZ-30  5/21/15 E-mail from ████     135

22                with attachment

23                RPLI_SEC 0922232-82

24

25

1                          EXHIBITS

2    SEC
     NUMBER                  DESCRIPTION                PAGE
3

4    Exhibit RZ-31 E-mail string dated              138

5                  January 3, 2017

6                  RPLI_SEC 0908880-81

7

8    Exhibit RZ-33 12/20/17 E-mail from Ripple       95

9                  Insights forwarding

10                 12/20/17 Article

11                 RPLI_SEC 0916858-60

12

13   Exhibit RZ-34 String of e-mails dated          127

14                 February 2018

15                 RPLI_SEC 0916147-50

16

17   Exhibit RZ-36 5/12/18 E-mail from ▮▮▮▮         172

18                 ▮▮▮▮ to ▮▮▮▮ , et al

19                 RPLI_SEC 0441722-401

20

21   Exhibit RZ-37 6/5/18 E-mail from ▮▮▮▮          195

22                 to Zagone, et als

23                 RPLI_SEC 0915781-84

24

25

```
 1                          EXHIBITS

 2    SEC
      NUMBER               DESCRIPTION              PAGE
 3

 4    Exhibit RZ-38 6/8/18 E-mail from  ████████    199

 5                   to Zagone, et al

 6                   RPLI_SEC 0915756-58

 7

 8    Exhibit RZ-39 6/13/18 E-mail from             202

 9                  ████████   to Zagone, et al

10                   RPLI_SEC 0909076-78

11

12    Exhibit RZ-40 String of e-mails dated         208

13                   June 2013

14                   RPLI_SEC 090979-81

15

16    Exhibit RZ-41 String of e-mails dated         211

17                   October 2018

18                   RPLI_SEC 0923272-73

19

20    Exhibit RZ-42 String of e-mails dated         214

21                   November 2018

22                   RPLI_SEC 0905225-28

23

24

25
```

14

```
 1                          EXHIBITS

 2    SEC
      NUMBER              DESCRIPTION              PAGE
 3

 4    Exhibit RZ-43 12/21/18 E-mail from Zagone     273

 5                 to ████████ et al

 6                 RPLI_SEC 0923237

 7

 8    Exhibit RZ-45 String of e-mails dated         149

 9                 April 2017

10                 RPLI_SEC 0083483-86

11

12    Exhibit RZ-46 Printout of Text                289

13                 Messages 11-15-18

14                 RPLI_SEC 00000356

15

16    Exhibit RZ-47 String of e-mails dated         297

17                 January 2017 with

18                 attachments

19                 RPLI_SEC 0921020-29

20

21

22

23

24

25
```

15

```
 1                    DEPOSITION SUPPORT INDEX

 2

 3     DIRECTION TO WITNESS NOT TO ANSWER

 4        Page    Line

 5        52       9

 6        54       5

 7       244       3

 8

 9

10     STIPULATIONS

11        Page    Line

12        17      17

13

14

15     QUESTIONS MARKED

16        Page    Line

17        52       9

18

19

20     REQUEST FOR DOCUMENTS

21        Page    Line

22        - -none- -

23

24

25
```

1                    -   -   -

2                  9:12 a.m.

3                June 29, 2021

4                    -   -   -

5              THE VIDEOGRAPHER:   Okay.   We're

6       on the record.   Excuse me.   We're on the

7       record.   The time is approximately 9:12

8       a.m.   Today's date is Tuesday, July 20th,

9       2021.   This is the video deposition of

10      Ryan Zagone in the matters of

11      Securities -- Securities and Exchange

12      Commission versus Ripple Labs, et al.

13      Index number is 20-Civ-10832 in the United

14      States District Court, Southern District

15      of New York.

16              My name is David Shereck,

17      certified legal videographer with Shereck

18      Legal Video in association with Gradillas

19      Court Reporting of Glendale, California.

20              Today we're at the offices of

21      Debevoise & Plimpton located at 919 Third

22      Avenue, New York, New York.

23              All attorneys that are present

24      will be noted on the stenographic record.

25              The court reporter today is

1           Bridget Lombardozzi, also with Gradillas.

2           And will you please swear in the witness.

3                    R Y A N   Z A G O N E, having

4           been duly sworn, was examined and

5           testified as follows:

6                    DIRECT-EXAMINATION

7    BY MR. HANAUER:

8           Q.   Good morning.  My name is Ben Hanauer.

9    I represent the plaintiff, the SEC.

10                   MR. HANAUER:  Counsel, is there a

11          stipulation you want to put on the record?

12                   MR. CERESNEY:  Yes.  Just that

13          a -- an objection by one counsel is an

14          objection -- considered an objection for

15          all counsel.

16                   MR. HANAUER:  So stipulated.

17                   MR. CERESNEY:  And one other

18          thing while we're on the record, just that

19          the transcript will be marked

20          confidential.  The transcript is to be

21          marked confidential under our protective

22          order.

23   BY MR. HANAUER:

24          Q.   Sir, could you please state your name

25   for the record.

1          A.     Ryan Zagone.

2          Q.     Is there any reason you cannot give

3    accurate deposition testimony today?

4          A.     No.

5          Q.     And how many preparation sessions did

6    you have for today's deposition?

7          A.     I had a couple with my counsel and a

8    couple with Ripple's counsel.

9          Q.     And in total, how much time did you

10   spend preparing with attorneys for today's

11   deposition?

12         A.     A couple calls each.

13         Q.     Can you give me a --

14         A.     A couple hours on each call.

15         Q.     Okay.  Thank you.

16                Have you --

17                THE REPORTER:  Excuse me.  Could

18          the witness put the mic on your tie?  It's

19          hard to hear you.  Thank you.

20                THE WITNESS:  Is that better?

21   BY MR. HANAUER:

22         Q.     And have you ever been deposed or given

23   testimony in a lawsuit before?

24         A.     No.

25         Q.     Can you please tell me about any

 1    education you've had since high school?

 2         A.   I went to undergrad at a small liberal

 3    arts school in Mississippi.

 4         Q.   Which one?

 5         A.   Millsaps College.

 6         Q.   Is that the extent of your education

 7    since high school?

 8         A.   Yes.

 9         Q.   And did you graduate from college?

10         A.   I did.

11         Q.   And what did you major in?

12         A.   Economics.

13         Q.   Are you an attorney?

14         A.   No.

15         Q.   Have you ever been an attorney?

16         A.   No.

17         Q.   During what time period did you work for

18    Ripple Labs, Inc.?

19         A.   I joined in 2014, late 2014, and I left

20    in July 2019.

21         Q.   And going forward just to save some

22    time, do you understand if I say "Ripple," I'm

23    referring to the defendant in this case, Ripple

24    Labs, Inc.?

25         A.   Yep.

1      Q.   Okay.  And where did you -- where did

2  you work before Ripple?

3      A.   I started my career at the ██████

4  ████████████████████  Focused on policy and

5  economics.

6      Q.   And when you say started your career,

7  you did that right out of college?

8      A.   Correct.

9      Q.   And how long were you at the ██████

10 ██████

11     A.   Four years and nine months, around

12  there, under five years.

13     Q.   And what did you do for the ███

14 ██████

15     A.   I sat on the policy team analyzing

16  regulatory proposals from the Fed, FDIC and OCC.

17  And I did that for three years.  And then I left

18  there to go -- I was on the communications team,

19  focused on payments and mortgages.

20     Q.   And where did you work after that?

21     A.   I went to ██████ on their financial

22  services practice.

23     Q.   And what did you do at ██████

24     A.   I researched -- I was on a team that

25  looked at emerging issues for the banking

1   industry.  Focused on retail, then strategy and

2   payments.

3        Q.   Was that on the consulting side?

4        A.   It was a research team that worked with

5   consulting and advisory.

6        Q.   And how long were you at ████████ for?

7        A.   Two years.

8        Q.   Okay.  And where did you work at after

9   ████████

10       A.   Left ████████ and joined Ripple.

11       Q.   And after you left Ripple, where did you

12   go to work after that?

13       A.   I took a year off after Ripple, a year,

14   18 months off.  Had some side projects that I was

15   working on unrelated to Fintech.  And in September

16   2020 returned to the payment space.

17       Q.   And where -- where did you go to work

18   after --

19       A.   I worked at -- I'm sorry.

20       Q.   And I should have said this earlier.

21   One of the important things to remember during

22   this deposition is we can't speak over each other

23   for -- for the court reporter, so I would just ask

24   to please wait until I'm done asking my questions

25   before you start to answer and I'll try and do the

```
 1    same with you.
 2         A.   I joined a company called ██████████
 3    now referred to as ███████  We're an international
 4    payments company.  I lead our North America
 5    practice for our partnerships with banks.
 6         Q.   And does your cur -- and does your
 7    current employer do business with Ripple?
 8         A.   No.
 9               MR. CERESNEY:  Objection to form.
10         Q.   Has it --
11         A.   No.
12         Q.   Has your current employer done business
13    with Ripple since you started working there?
14         A.   No.
15         Q.   Why did you leave Ripple?
16         A.   My role was terminated.
17         Q.   And do you have an understanding why
18    your role was terminated?
19         A.   New leadership was brought in and my
20    understanding was they wanted to bring in new
21    people and move the role from New York to D.C.
22         Q.   And when you say "new leadership," who
23    was the new leadership that came in?
24         A.   New general counsel and new head of
25    regulatory relations.
```

```
 1        Q.   Were you terminated for cause?

 2             MR. CERESNEY:  Objection to form,

 3         foundation.

 4        Q.   You can answer.

 5        A.   I don't fully know what that means.  I

 6    had a strong performance record.

 7        Q.   So -- so it's your understanding that

 8    your -- the reason you were let go, it didn't have

 9    anything to do with your job performance, but the

10    new management wanted to bring in the new team?

11        A.   Correct.

12             MR. CERESNEY:  You need to pause

13         for a second so that I have a chance to

14         object.  That's fine.

15             THE WITNESS:  Okay.

16    BY MR. HANAUER:

17        Q.   Are you still friends with any Ripple

18    employees?

19        A.   Not current employees.

20        Q.   Who are you still friends with that used

21    to be a Ripple employee?

22        A.   There are four people that I stay in

23    contact with that are former employees.

24        Q.   Could you name them, please?

25        A.   Sure.  ███████████████████████
```

1      ███████████ from the media team and ███████

2      ██████ also from the media team.

3      Q.   Do you know ██████s last name?

4      A.   ████████

5      Q.   And are those the only current or former

6 Ripple employees that you are still friends with?

7      A.   Yes.

8      Q.   Have you had discussions with any of

9 those four individuals about this lawsuit?

10     A.   No.

11     Q.   Can you please describe how you came to

12 work at Ripple?

13     A.   While at ████████ in my last year there,

14 I began researching the way banks could use crypto

15 and blockchain technology.  We wrote a paper, did

16 some -- some internal research.  In that period, I

17 was meeting with different crypto and blockchain

18 companies.  One of those companies was -- was

19 Ripple.

20        So we began talking with them about the

21 ways -- my interest is in how banks could use the

22 debt.  Most of the companies in the space at this

23 time were very consumer focused.  So I developed a

24 relationship with -- with some folks at Ripple

25 that were based in New York.  That progressed over

1    about six months and over lunch they offered me a

2    role to come on full time.

3        Q.    And who was it at Ripple that offered

4    you the job?

5        A.    Patrick Griffin.

6        Q.    What was his job at Ripple?

7        A.    He was head of business development at

8    the time.

9        Q.    And when you joined Ripple, what was

10   your job title?

11       A.    It was head of research on the business

12   development team.

13       Q.    And what were your responsibilities in

14   that role?

15       A.    My role was to map out what type of

16   products we needed to build to work with banks and

17   financial institutions for cross-border payments,

18   to segment the market, and to research and

19   understand the pain points that banks faced.

20       Q.    And who did you report to in that

21   position?

22       A.    Patrick Griffin.

23       Q.    And how long did you hold that position

24   at Ripple for?

25       A.    I was in that position for nine months

1     to a year.

2         Q.    And then what was your next position at

3     Ripple?

4         A.    Then I moved to the regulatory relations

5     role.

6         Q.    And what specifically was your title at

7     that point?

8         A.    It was director of regulatory relations.

9         Q.    And who did you report to as director of

10    regulatory relations?

11        A.    Antoinette O'Gorman.

12        Q.    And is Ms. O'Gorman an attorney?

13        A.    No.

14        Q.    And who did Ms. O'Gorman report to?

15        A.    Brad Garlinghouse, the CEO.

16        Q.    And how long did you hold the role of

17    director of regulatory relations?

18        A.    Through the end of my term there.

19        Q.    Are you a Ripple shareholder?

20        A.    Yes.

21        Q.    Since when?

22

23

24

25

1    Q.    And how many shares do you currently

2    own?

3    A.    I currently own around █████

4    Q.    And did you continue to receive shares

5    over the course of your employment?

6    A.    I did.

7    Q.    Have you ever sold your -- any of your

8    Ripple shares?

9    A.    I have.

10   Q.    And how did you go about selling them?

11   Like, what markets were they on, if any?  How --

12   how did you make that happen?

13        MR. CERESNEY:  Objection to form.

14        You can answer.

15   A.    I sold my shares through a -- through a

16   broker, a third-party broker.

17   Q.    Okay.  So -- and I just want to make

18   sure I'm clear on this -- you received █████

19   shares over the course of your employment?

20   A.    No, by the time I left, I had vested

21   around █ to █████ shares.  I exercised about

22   █████ of them.

23   Q.    Okay.  And so when you sold your Ripple

24   shares, how much money did you receive for selling

25   them?

1    A.    Around ███████

2    Q.    And just so I'm clear, you still own

3    approximately ███████ shares?

4    A.    Correct.

5    Q.    Have you ever received XRP as part of

6    your compensation?

7    A.    Not as part of my compensation.

8    Q.    Have you obtained XRP in another way?

9    A.    I received XRP for reimbursements,

10   company reimbursements.

11   Q.    Like if you incurred business expenses,

12   you would be repaid -- or recompensated in XRP?

13   A.    Correct.

14   Q.    Is that the only way in which you've

15   obtained XRP?

16   A.    I've also bought XRP on the open market,

17   on an exchange.

18   Q.    And when did you buy XRP on an exchange?

19   A.    In 20 -- around 2017 or 2018, in that

20   time period.

21   Q.    And why did you buy XRP on an exchange?

22   A.    The -- the whole crypto market was going

23   up.  I wanted exposure to that.

24   Q.    You hoped that the XRP would rise in

25   value after you bought it?

1     A.    Correct.

2     Q.    Do you still own XRP?

3     A.    No.

4     Q.    When did you sell your XRP holdings?

5     A.    If -- two transactions:  The first in

6  20 -- in late 2018/early 2019 time frame and the

7  second in the summer of 2020.

8     Q.    Did you profit from your sales of XRP?

9     A.    On one transaction I did.

10     Q.    And how much money did you make?

11     A.    ████████████████████████

12  ████████████████████████████████████████████████

13  ████████████████████████████████████████████████

14  ████████████████████████████████████████████████

15  ████████████████████████████████████████████████

16  ████████████████████████████████████████████████

17  ████████████████████████████████████████████████

18  ████████████████████████████████████████████████

19     A.    Correct.

20     Q.    Going back to your -- your ownership of

21  Ripple shares, who did you sell your shares to?

22     A.    I -- I don't know.  It was through a

23  broker.

24     Q.    So as director of regulatory relations

25  at Ripple, can you tell me what your job

1  responsibilities were?

2      A.   The primary work in this role was to

3  work with our banks and their -- our banking

4  clients, the banks that were using our products,

5  and their regulators to get Ripple approved as a

6  vendor.  So we would go through vendor due

7  diligence and meet the vendor expectations of the

8  bank and their regulator.

9           The second portion of that role was to

10  drive policy that would support the use of

11  blockchain and crypto and Ripple's products within

12  the financial sector.

13      Q.   Did your responsibilities change over

14  time while you were director of regulatory

15  relations?

16      A.   No.

17      Q.   As part of your job responsibilities,

18  did you meet with regulators from various

19  countries?

20      A.   Yes.

21      Q.   When you met with regulators, was it

22  your practice to take notes of those meetings?

23      A.   Yes.

24      Q.   Did you save your notes?

25      A.   Yes.

1      Q.    And have you heard of something called

2    the Confluence system?

3      A.    At Ripple?

4      Q.    At Ripple, correct.

5      A.    Oh.  Yes.

6      Q.    And what's that?

7      A.    It's an internal website we used for

8    sharing notes or documenting details about Ripple.

9      Q.    And so when you took notes of your

10   meetings with regulators, did you upload those

11   notes to the Confluence system so that other

12   Ripple employees could review them?

13     A.    I wasn't a heavy user of Confluence.  I

14   took my notes in Google Docs and saved them in a

15   folder in Google, Google Drive.

16     Q.    Okay.  Do you know if your notes were

17   available to other Ripple employees to review?

18     A.    They were saved on the company drive so

19   other people may or may not have had access to it.

20     Q.    Were -- at the time you left Ripple,

21   were your meeting notes still saved on Google

22   Drive?

23     A.    Correct.

24     Q.    And I think I've been asking you about

25   notes of meetings with regulators.

```
 1              Were there other types of notes that you
 2    saved -- that you took and saved on Google Drive?
 3                   MR. HECKER:  Objection to form.
 4                   THE WITNESS:  Continue to answer?
 5                   MR. HECKER:  You can answer.
 6         A.   I generally stored all my notes on
 7    Google Drive.
 8         Q.   So it sounds like you took notes of
 9    meetings other than meetings with regulators?
10                   MR. HECKER:  Objection to form.
11                   You can answer.
12         A.   Correct.
13         Q.   Besides your deposition here today, have
14    you ever communicated with the SEC, its
15    Commissioners or its staff?
16         A.   No.
17         Q.   While you worked at Ripple, were you a
18    member of any organizations outside of Ripple?
19         A.   I was.
20         Q.   Which ones?
21         A.   I served on the steering committees for
22    the Federal Reserves Master Payments Task Force.
23    I was elected to -- elected to that role by the
24    industry.  So that was a board of -- I believe it
25    was 13 individuals who set the strategy for faster
```

1    payments in the U.S.

2              I served on the advisory boards for the

3    CSBS, the Conference of State Bank Supervisors.

4    It's actually a group of state bank regulators.

5    It was an advisory boards on innovation in

6    Fintech.

7         Q.   How did you come to be on that board?

8         A.   I -- I applied to that role and was

9    selected by CSBS.

10             And, third, I served as the -- as an

11   advisor to the Better Than Cash Alliance.  That's

12   an alliance at the United Nations to drive digital

13   payments in developing countries.

14        Q.   And can you tell me a little bit more

15   about the Federal Reserve task force you were on?

16        A.   Sure.  In 20 -- around 2017, the Federal

17   Reserve started a industry task force to drive

18   faster payments in the U.S., so improved payment

19   infrastructure.  It was about 300 participants

20   from the industry that signed up.  They recognized

21   a need to have a leadership committee to steer

22   this and created an open election.

23             I put my name forth to represent the

24   technology sector, so everything from Google

25   through Visa.

```
 1                  I won that election and represented the

 2     technology industry on that steering committee.

 3          Q.   And did Ripple support your candidacy?

 4          A.   Yes.

 5          Q.   And do you know if the other technology

 6     companies who participated on the board, do you

 7     know if they coordinated with Ripple to try and

 8     get you elected?

 9                  MR. HECKER:   Objection to form.

10          A.   I -- I don't know what the other

11     companies did.  I reached out to my counterparts

12     at the other technology companies to let them know

13     I was running, let them know our views on

14     payments, to see if we aligned.  And then I was

15     elected from there.

16          Q.   Did personnel from any of the other

17     technology companies on the steering committee run

18     in that election?

19          A.   There were four seats that represented

20     the technology sector so I was one of four

21     representing.

22          Q.   Do you know how many candidates there

23     were for the -- those four technology sector

24     seats?

25          A.   I don't.
```

1        Q.   As Ripple's director of regulatory

2   relations, were you familiar with Ripple's

3   business?

4              MR. HECKER:  Objection to form.

5        A.   I was familiar with our -- our products

6   that we were selling.

7        Q.   Were you familiar with XRP?

8        A.   Yes.  Familiar in that it was a -- a

9   piece of technology that was within one of our

10  products.

11       Q.   And -- and just for the record, what is

12  XRP?

13       A.   XRP's a digital currency that Ripple

14  used within our liquidity product to connect

15  currencies more efficiently.

16       Q.   As Ripple's director of regulatory

17  relations, were you familiar with how Ripple

18  generated revenues?

19       A.   I was.

20       Q.   Did you ever act as a spokesperson for

21  Ripple?

22       A.   I did.

23       Q.   And did you ever make public

24  announcements about Ripple?

25              MR. CERESNEY:  Objection; form.

1      A.   I -- I never made a public announcement,

2   like, releasing news about Ripple.  I would repeat

3   news that our communications team had released.

4      Q.   Okay.  Repeat it to who?

5      A.   Either speaking at a panel or a

6   conference or on social media.

7      Q.   And when you spoke on a panel or at a

8   conference, you did so as a Ripple representative?

9      A.   Yes.

10      Q.   Did you ever provide interviews to the

11   media?

12      A.   I did.

13      Q.   And when you acted as a Ripple

14   spokesperson via social media, how did -- how did

15   that work?

16           MR. HECKER:  Objection to form.

17      A.   I used social media to share news about

18   the company, so press releases, new partners,

19   views on regulation that we saw coming forth.

20   There was talk around policy and how -- which

21   policy we needed to take for this new technology.

22      Q.   I don't want to get in -- into any

23   specifics of any conversation you had with an

24   attorney, but I -- I -- I just want to ask this

25   general question:  Have you ever received guidance

37

```
 1    from attorneys about how to talk about Ripple and
 2    XRP when speaking publicly on Ripple's behalf?
 3                    MR. HECKER:  So object to the
 4        form of the question.
 5                    But you can answer that question
 6        either yes or no if you understand it.
 7        A.    Can you repeat the question?
 8                    MR. HANAUER:  Can you read it
 9        back, please?
10                    (Whereupon, the record was read
11        back.)
12        A.    Yes.
13        Q.    And when did you start receiving that
14    guidance?
15                    MR. HECKER:  Objection to form.
16                    You can answer.
17        A.    I can't recall the exact date I started
18    receiving guidance from the legal team on XRP.
19        Q.    So I take it you received guidance
20    from -- well, did you receive guidance from
21    internal Ripple attorneys about how to speak
22    publicly about Ripple and XRP?
23                    MR. HECKER:  Same -- same
24        objections.
25                    You can answer that yes or no.
```

38

```
 1          A.    The -- the primary guidance I
 2    received --
 3                    MR. CERESNEY:  I think Mr. Hecker
 4           instructed you to answer that yes or no.
 5          A.    Oh, yes or no.  Yes.
 6          Q.    And who were the internal Ripple
 7    attorneys that provided you guidance about how to
 8    speak publicly about Ripple and XRP?
 9          A.    ███████████████████████████
10          Q.    Anyone else?
11          A.    Those are the two I recall.
12          Q.    What about outside attorneys, non--
13    non-Ripple attorneys?
14                    MR. HECKER:  Object to form.
15                    But you can -- you can answer.
16          A.    No.
17          Q.    Let me just make a better record.
18                Did you ever receive guidance from
19    non-Rip -- attorneys who didn't work at Ripple
20    about how to speak publicly about Ripple or XRP?
21          A.    No.
22          Q.    Did you ever receive guidance from
23    nonattorneys about how to talk about Ripple and
24    XRP when speaking publicly on Ripple's behalf?
25                    MR. HECKER:  Objection to form.
```

```
 1                    And I would just caution the
 2           witness that to the extent that a
 3           guidance was provided in discussions with
 4           counsel, that that would still be a
 5           privileged conversation.
 6                    So I think you should understand
 7           the question to be asking about guidance
 8           he received outside the presence of
 9           counsel about this topic.
10                    MR. HANAUER:  Yeah, that's fair.
11    BY MR. HANAUER:
12           Q.   You can answer.
13           A.   Yes.
14           Q.   And who provided that guidance?
15           A.   The communications team.
16           Q.   Who was on the communications team?
17           A.   It was a team run by Monica Long.  There
18    was a variety of people on that team.  It changed
19    over time.
20           Q.   And when did the communications team
21    start providing you guidance about how to talk
22    about Ripple and XRP when speaking publicly?
23           A.   When I began to serve as a public
24    spokesperson.
25           Q.   And when was that?
```

1   A. I believe that was around 2016.

2   Q. What did the communications team tell

3 you about how you should go about speaking about

4 Ripple and XRP when speaking publicly?

5   A. I received a public speaking packet, a

6 prep packet.  It generally had three topics in it:

7 Recent news that the company released so it could

8 stay current on -- on recent statements; two, what

9 competitors were doing; and, three, context on the

10 event.  There was generally an FAQ section at the

11 end about facts about Ripple.

12   Q. Did you ever receive guidance from

13 Ripple's public relations -- public relations

14 firms?

15   A. I did.

16   Q. Which firms?

17   A. █████████ is the primary one.  We had an

18 events team as well.████████████████

19   Q. Did you ever receive guidance from

20 nonattorneys about talking about XRP not being a

21 security or not being subject to regulation by the

22 SEC?

23     MR. HECKER:  Objection to form.

24     And the same -- same caveat

25   would apply.  Outside the presence of

1            counsel.

2        A.   No.

3        Q.   Did you ever receive guidance from

4    nonattorneys about the issue of whether XRP was a

5    security or not?

6                MR. HECKER:  Same -- same caveat.

7         You can answer.

8        A.   No.

9        Q.   Did you ever receive -- okay.

10                Did you ever receive guidance about how

11    to talk about Ripple and XRP as they relate to the

12    SEC?

13                MR. HECKER:  Are you -- are you

14         excluding discussions with counsel again?

15                MR. HANAUER:  Yes.

16        A.   No.

17        Q.   Did you ever provide guidance to Ripple

18    personnel about how to talk publicly about Ripple

19    and XRP as they relate to the SEC?

20        A.   I worked with legal to --

21        Q.   And --

22                MR. HECKER:  Yeah.

23        Q.   -- I -- I don't want to get into your

24    communications with -- with lawyers, so --

25                MR. HECKER:  Why don't -- why

```
 1              don't you start -- maybe answer that

 2              question with a yes or no.  And then maybe

 3              you can lay a foundation to try and make

 4              sure you're not capturing discussions with

 5              counsel.

 6    BY MR. HANAUER:

 7         Q.    Yeah.  So did you ever provide guidance

 8    to Ripple personnel about how to talk publicly

 9    about Ripple and XRP as they relate to the SEC?

10         A.    Yes.

11         Q.    Did you ever provide that guidance to

12    Ripple personnel outside the presence of counsel?

13         A.    No.

14         Q.    When you started working at Ripple, what

15    was your understanding of the SEC's position as to

16    whether the SEC considered XRP to be a security?

17         A.    When I started at Ripple, I was on the

18    business development team, so that was outside of

19    my focus.  I did not have an understanding of that

20    topic.

21         Q.    And at some point did you gain an

22    understanding that how the SEC viewed XRP was

23    important for Ripple?

24              MR. HECKER:  Objection to form.

25         A.    Yes.
```

1    Q.   Okay.  How did you gain that

2  understanding?

3              MR. HECKER:  And, again, you

4       know, to the extent that it's through

5       discussions with counsel --

6              THE WITNESS:  Uh-huh.

7              MR. HECKER:  -- that's privileged

8       and I'll instruct you not to answer that

9       question.

10   A.   Discussions with counsel in 2016 and

11  the -- a growing coverage in the media around how

12  digital assets would be classified.

13   Q.   Okay.  So outside of your communications

14  with counsel, when did you first learn that how

15  the SEC viewed XRP would be important for Ripple's

16  business?

17              MR. HECKER:  Objection to form;

18       foundation.

19   A.   In late -- I'd say it was in 2017.

20   Q.   And so in late 2017, what was your

21  understanding of the SEC's position as to whether

22  it considered XRP to be a security?  And, again, I

23  don't want to know anything that an attorney told

24  you.

25              MR. HECKER:  I'm not sure it's

1          possible to parse that.  He may have had

2          some discussion with counsel or may have

3          read about it in the press.  But if his

4          understanding is based on both, then it's

5          going to be difficult to tease out the

6          nonprivileged portion of it.

7                   MR. HANAUER:  Well, let's give it

8          a try.

9                   MR. CERESNEY:  Well, I'm going to

10         instruct you not to answer the question to

11         the extent that your understanding was

12         based on discussions with counsel in -- in

13         whole or in part.

14     A.    The media coverage was about digital

15 assets in general.  It wasn't specific to XRP.

16 And then my XRP knowledge came from legal.

17     Q.    So coming from the media, what was your

18 understanding in 2017 as to whether the SEC

19 considered XRP to be a security?

20                  MR. HECKER:  Objection to form;

21         foundation.  I think he just said that his

22         public discussion was based on digital

23         assets generally, not XRP.

24                  MR. HANAUER:  Yeah, that's fair.

25         I'll lodge a different question.

1    BY MR. HANAUER:

2        Q.    So what was your understanding in 2017

3    based on what you read in the media as to whether

4    the SEC considered digital assets to be

5    securities?

6        A.    The media coverage at the time was

7    asking what the proper regulatory framework should

8    be for crypto broadly.  There wasn't a specific

9    conclusion to come from them.  It was more of an

10   open question.

11       Q.    And in 2017, did you understand that

12   there was a public debate on the issue of whether

13   certain assets should be -- should be considered

14   securities by the SEC?

15                MR. CERESNEY:  Objection; form.

16       A.    Could you repeat the question, please?

17       Q.    Yeah.

18                In 2017, did you understand that there

19   was a public debate on the issue of whether

20   certain assets should be considered securities

21   by -- certain digital assets should be considered

22   securities by the SEC?

23       A.    In that time frame, the conversation was

24   more broad than just the SEC.  It was about how

25   countries should be treating digital assets and

46

```
 1   blockchain technology broadly and -- and
 2   generally.
 3       Q.   Was one of your responsibilities at
 4   Ripple to attempt to have the SEC decide that XRP
 5   was not a security?
 6            MR. CERESNEY:  Objection; form.
 7       A.   The engagement we did with regulatory
 8   bodies, with industry groups, was more on
 9   education about what XRP was and how it functions.
10   It was -- it was an education effort.
11       Q.   Did Ripple make efforts to try and
12   convince the SEC to decide that XRP was not a
13   security?
14            MR. CERESNEY:  Objection; form.
15            MR. HECKER:  Objection; form.
16       A.   I never met with the SEC.  I can speak
17   for myself.
18       Q.   And I appreciate that.  My question's a
19   little broader about meetings with the SEC or your
20   meetings with the SEC.  And that's -- did you have
21   an understanding of -- of whether Ripple ever
22   attempted to try and have the SEC decide that XRP
23   was not a security?
24            MR. HECKER:  Objection to form.
25            MR. CERESNEY:  I also want to
```

1    instruct you on this, that there could be

2    discussions with counsel.  I just want to

3    just make sure you're not revealing those.

4   A.  My engagement was around education of

5 what XRP was, the company's view.  And that edu --

6 that engagement was -- was broad in the industry.

7 It wasn't specific with the SEC.

8   Q.  Were you aware that other Ripple

9 personnel were meeting with the SEC?

10     MR. CERESNEY:  Again, I'd just

11    instruct you not to reveal information you

12    obtained from counsel.  So the question

13    should be interpreted as other than

14    discussions with counsel, were you aware

15    of that?

16   A.  No.

17   Q.  Did you ever talk to Mr. Garlinghouse

18 about his meetings with the SEC?

19   A.  No.

20   Q.  Did you ever communicate with

21 Mr. Garlinghouse about his communications with the

22 SEC?

23   A.  No.

24   Q.  Do you have any understanding of what

25 was said at any meeting between the SEC and anyone

1    from Ripple?

2            MR. HECKER:  Same -- same caveat.

3        A.   No.

4            MR. HECKER:  If you had awareness

5        through counsel, you are not to disclose

6        that.

7            MR. CERESNEY:  Also objection to

8        form.

9    BY MR. HANAUER:

10       Q.   Did you have any role in helping Ripple

11   personnel prepare for meetings with the SEC or its

12   staff?

13       A.   No.

14       Q.   Do you know who at Ripple interacted

15   with the SEC, its Commissioners or its staff?

16           MR. HECKER:  Same caveat.  You

17        can answer.

18       A.   Yes.

19       Q.   And who at Ripple interacted with the

20   SEC, its Commissioners or its staff?

21       A.   It's my understanding that Brad

22   Garlinghouse had engaged with the SEC along with

23   counsel.

24       Q.   Counsel for Ripple?

25       A.   Yeah.

1        Q.    What was your understanding of what

2    Mr. Garlinghouse was trying to accomplish when he

3    met with the SEC?

4              MR. HECKER:  Objection to form.

5              To the extent information you

6         have about those meetings or the

7         objectives of those meet -- those

8         meetings came from discussion with

9         counsel, those are privileged.

10             THE WITNESS:  Okay.

11       A.    That would be privileged.

12       Q.    So the only understanding you have of

13   what Mr. Garlinghouse was trying to accomplish

14   when he met with the SEC came through counsel?

15       A.    Yes.

16       Q.    Did anyone from Ripple ever try to get

17   the SEC, any of its staff or any of its

18   Commissioners, to publicly state that XRP was not

19   a security?

20             MR. HECKER:  Same caveats.

21       A.    Not that I was aware of.

22       Q.    Did Ripple ever seek a formal SEC

23   statement that XRP was not a security?

24             MR. WARD:  Objection to form.

25       A.    Not that I was directly aware.

1       Q.   What do you mean when you say "directly

2  aware" of?

3       A.   Not that I was aware of.

4       Q.   Did anyone ever -- anyone who wasn't an

5  attorney ever tell you that Ripple had tried to

6  seek a formal statement from the SEC that XRP was

7  not a security?

8             MR. CERESNEY:  Objection to form.

9       A.   No.

10      Q.   Do you know what an SEC no action letter

11  is?

12      A.   Yes.

13      Q.   And what's your understanding of an SEC

14  no action letter?

15      A.   It's a letter that a company can request

16  to get regulatory assurance that what they're

17  doing isn't out of line with the SEC rules.

18  They're not going to take action against you.

19      Q.   Did Ripple ever submit a no action

20  letter request to the SEC?

21             MR. CERESNEY:  Objection to form.

22      A.   Not that I recall.

23      Q.   Were you ever part of discussions not

24  involving attorneys on the issue of whether Ripple

25  should seek a no action letter from the SEC?

```
 1              MR. HECKER:  Objection to form.

 2        A.   Not that I recall.

 3        Q.   Did Ripple employ lobbyists to interact

 4   with the SEC?

 5              MR. CERESNEY:  I'm -- I'm going

 6         to let him answer this first question.  I

 7         want to put counsel on notice, though,

 8         that we're going to object to any

 9         questions about lobbying activities by

10         Ripple in light of Judge Netburn's order

11         on that issue.

12              MR. HANAUER:  That's understood

13         and I still may try and explore the issue

14         a little bit.

15              MR. CERESNEY:  You can.  We will

16         object and I'll instruct him not to

17         answer.

18        A.   So the question --

19              MR. CERESNEY:  If the question is

20         a yes or no, did they, then that's fine.

21         I'll let you ask that question.

22        A.   Did Ripple employ lobbyists to engage

23   with the SEC?

24        Q.   Correct.

25        A.   We employed lobbyists, but they were not
```

1    directed at the SEC.

2        Q.   Did Ripple employ lobbyists relating to

3    the SEC?

4            MR. HECKER:  Objection to form.

5        A.   The lobbyists we employed were focused

6    on the Hill and the various bills that were being

7    floated around how to classify blockchain or -- or

8    crypto frameworks.

9        Q.   And what did Ripple employ those

10   lobbyists to accomplish?

11           MR. CERESNEY:  I'm -- I'm going

12           to object on the basis that Judge Netburn

13           has ruled that lobbying activities by

14           Ripple are not relevant in this matter and

15           I'm going to instruct the witness not to

16           answer that question for that reasons.

17               Next question.

18           MR. HANAUER:  Okay.  Can you --

19           so you're not letting the witness answer

20           questions relating to the substance of

21           Ripple's lobbying efforts?

22           MR. CERESNEY:  Yes, in light of

23           Judge Netburn's June 15, 2021 order, in

24           which Judge Netburn said that "The SEC's

25           request to compel production of documents

1    related to Ripple's lobbying efforts is

2    denied.  As discussed in the Court's

3    earlier opinion and order denying access

4    to Ripple's privileged communications,

5    Ripple's fair notice defense centers on

6    activities of the SEC, not its own

7    behaviors," and citing a couple of things.

8    The last sentence says "In the same vein,

9    Ripple's lobbying efforts regarding the

10   status of XRP are not relevant; and any

11   relevancy argument is outweighed by the

12   burden of production."

13          In light of that ruling, we

14   would object to any questions about that

15   issue and I am instructing the witness

16   not to answer.

17          MR. HANAUER:  Okay.  Can you

18   please mark that portion of the testimony?

19   Thank you.

20          Will you instruct the witness

21   not to answer any questions related to

22   the substance of Ripple's lobbying

23   efforts?

24          MR. CERESNEY:  Yes.

25   BY MR. HANAUER:

1        Q.   Did Ripple employ any other consultants

2    other than lobbyists related to the SEC?

3                MR. HECKER:  Objection to form.

4        A.   No, not that I'm aware of.

5        Q.   Did Ripple make efforts to convince

6    Congress to pass legislation that would determine

7    that XRP is not a security?

8                MR. CERESNEY:  Objection.  Again,

9           this relates to lobbying efforts

10          presumably.  Are you asking about efforts

11          that don't relate to lobbying?  Is that

12          what you're asking?

13               MR. HANAUER:  Any efforts.

14               MR. CERESNEY:  Okay.  So I will

15          instruct the witness other than anything

16          that might relate to lobbying, are you

17          aware of any other efforts?

18               THE VIDEOGRAPHER:  No.

19               MR. HANAUER:  And you're

20          instructing the witness not to answer the

21          question as it relates to lobbying?

22               MR. CERESNEY:  Yes.

23       Q.   Did Ripple make lobbying efforts related

24   to the SEC directed to the executive branch?

25               MR. CERESNEY:  Objection.  Same

1          objection.  And if you're asking about

2          lobbying activities to the executive

3          branch, I'm going to instruct him not to

4          answer.

5                    MR. HANAUER:  Step one was a yes

6          or no.

7                    MR. CERESNEY:  Okay.  Why don't

8          you answer that yes or no.

9     A.    Did we make lobbying efforts directed at

10    the executive branch?  That was the question?

11    Q.    Correct.  Related to the SEC.  Lobbying

12    or -- let me start over.

13    A.    Okay.

14    Q.    Did -- did Ripple make lobbying efforts

15    relating to the SEC directed at the executive

16    branch?

17                   MR. CERESNEY:  And I'm just going

18          to object on form.

19                   You can answer it yes or no as

20          far as you know.

21    A.    No.

22    Q.    What is the Ripple protocol?

23    A.    The Ripple protocol or -- or the name

24    that was involved in XRP protocol was the

25    open-source ledger that -- that runs XRP.

1      Q.    So is the Ripple protocol and the XRP

2   protocol the same thing?

3      A.    The names have evolved over time.  How I

4   think about that is the XRP protocol is what --

5   what it would be today.

6      Q.    So are the term -- as you understand it

7   or as you use the terms, is the Ripple protocol,

8   does it mean the same thing as the XRP protocol?

9      A.    How I use the term is -- XRP protocol is

10   the code that runs the XRP ledger.

11      Q.    And how is that different from the

12   Ripple protocol?

13      A.    Ripple protocol could be the same thing.

14   It could be the name for our -- the company's

15   products.  The names have evolved significantly

16   over time and I'm not close to how they use the

17   terms today, how the company's using those terms

18   today.

19      Q.    Did Ripple create the Ripple protocol?

20             MR. HECKER:  Objection to form.

21      A.    Ripple did not create the XRP ledger,

22   XRP protocol, if that's what you're asking.

23      Q.    Did Ripple develop XRP?

24      A.    No.

25             MR. HANAUER:  Did you get an

1      answer?

2                   MR. HECKER:  He said no.

3                   THE REPORTER:  There's a delay.

4                   MR. HANAUER:  Oh, okay, I'm

5      sorry.  There we go.

6                   Twenty-nine.  There are going to

7      be leftovers, I'm quite sure.  Did you

8      get one for the court reporter?  There

9      are definitely enough.

10                  (Whereupon, exhibit is presented

11     and marked SEC Zagone Exhibit RZ-29 for

12     identification.)

13                  MR. HANAUER:  So I just tendered

14     the witness a document labeled Exhibit

15     RZ-29, which begins with a Bates number

16     ending in 4881.

17  BY MR. HANAUER:

18     Q.   And, Mr. Zagone, is Exhibit RZ-29 an

19  e-mail and an attach -- and attachment that you

20  sent to ███████ on December 18th, 2014?

21     A.   Correct.

22     Q.   And who is Mr. ████?

23     A.   Mr. ████ was also on the business

24  development team.

25     Q.   And you were forwarding Mr. ████ an

1    e-mail and attachment that Ripple had sent to the

2    British Treasury?

3         A.   That's correct.

4         Q.   And why was Ripple submitting

5    information to the British Treasury?

6              MR. CERESNEY:  I'd instruct the

7         witness just to take a moment to look at

8         the document.

9              (Pause)

10        A.   It appears the company was responding to

11   a call from -- for information from HM Treasury.

12        Q.   And HM Treasury, that's the British

13   Treasury?

14        A.   Correct.

15        Q.   And when Ripple submitted information to

16   the British Treasury, did Ripple provide truthful

17   and accurate information?

18        A.   I -- I assume so.

19        Q.   And I want to refer you to the page --

20   it's the second page of the submission, the page

21   ending in -- a Bates number ending in 883.  And

22   the second full paragraph says "Ripple Labs is the

23   parent company that created and supports the

24   Ripple protocol - an open-source, distributed

25   payment protocol for accounting for financial

1  balances held within and moved between ledgers.

2  The Ripple protocol enables payment in any fiat or

3  virtual currency, including the math-based virtual

4  currency developed by Ripple Labs, XRP."

5          Do you see that?

6      A.   I see that.

7      Q.   So Ripple was representing to the

8  British Treasury that Ripple developed XRP --

9              MR. CERESNEY:

10             MR. WARD:  Hold on for a moment.

11         I would just inform the sound isn't coming

12         through on the Zoom.

13             MS. GRESSEL:  Jorge, we just got

14         an e-mail.

15             THE WITNESS:  I wonder if it's

16         because I moved the mic.  Maybe?

17             MS. GRESSEL:  Can folks on --

18             MR. HECKER:  Are you able to hear

19         now?

20             MS. GRESSEL:  Maureen, if you

21         can see us --

22             MR. HANAUER:  Let's go off the

23         record, please.

24             THE VIDEOGRAPHER:  Off the record

25         at 10:05.

60

```
 1                    (Whereupon, a recess is taken.)

 2               THE VIDEOGRAPHER:  Okay.  Back on

 3          the record at 10:20.  Go ahead.

 4    BY MR. HANAUER:

 5          Q.   Mr. Zagone, before we went on the break,

 6    we were talking about Exhibit 29 and I had asked

 7    you to refer to the third page of the exhibit.

 8               The last question I asked before we went

 9    off the record is, did Ripple represent to the

10    British Treasury that Ripple developed XRP?

11                    (Pause)

12               MR. WARD:  Objection to form.

13          Q.   And if it helps, Mr. Zagone, I'm only

14    asking you about the second paragraph of the

15    letter.

16               MR. HECKER:  So to be clear, the

17          question is whether that -- that paragraph

18          includes a representation about that?

19               MR. HANAUER:  Did Ripple

20          represent to the British Treasury that

21          Ripple developed XRP?

22               MR. HECKER:  In that one

23          paragraph?

24               MR. HANAUER:  Correct.

25          A.   Just related to the one paragraph here,
```

61

```
1    this paragraph states:  "Ripple protocol enables

2    payments in any fiat or virtual currency,

3    including the math-based virtual currency

4    developed by Ripple Labs, XRP."

5         Q.   So Ripple represented to the British

6    Treasury that Ripple developed XRP?

7                   MR. HECKER:  Objection to form.

8                   MR. WARD:  Objection.

9                   MR. CERESNEY:  Objection to form.

10        A.   The statement here is that "including

11   the math-based currency developed by Ripple Labs,

12   XRP."  That's what it says.

13                  (Whereupon, exhibit is presented

14        and marked SEC Zagone Exhibit RZ-1 for

15        identification.)

16                  MR. HANAUER:  I'm tendering the

17        witness a document marked as Exhibit RZ-1,

18        beginning with a Bates number ending in

19        5167.

20   BY MR. HANAUER:

21        Q.   And before I ask you any questions about

22   the exhibit, was selling XRP part of Ripple's

23   business model?

24        A.   The business that I understood is we

25   were selling payment solutions, xCurrent and
```

1   xRapid, to banks.

2                 THE REPORTER:  Repeat the last

3       part.

4       A.    We were selling payment solutions,

5   xRapid and xCurrent, to banks.

6       Q.    Was that the only part of Ripple's

7   business model?

8                 MR. CERESNEY:  Object to form.

9       A.    The company sold XRP.  We were public

10   about that.

11      Q.    And how -- what do you mean, "The

12   company sold XRP"?

13      A.    The company held XRP and sold it.

14      Q.    So Exhibit RZ-1, that's an e-mail from

15   you to ████████████ forwarding an e-mail you

16   received from ████████████?

17      A.    I'm not sure how I received it.  I'm not

18   on -- listed on the e-mail thread, but I am

19   forwarding it to ██████

20      Q.    And you are also forwarding the

21   attachment to the e-mail?

22      A.    Correct.

23      Q.    And who is Mr. ██████

24      A.    Mr. ████ was on the markets team.

25      Q.    And do you see how Mr. ██████ s e-mail

```
 1    is going to someone at ████████████?

 2        A.   Correct.

 3        Q.   And what was -- what information was

 4    Ripple submitting to ████████?

 5                 MR. HECKER:  Objection;

 6         foundation.

 7        A.   I'd have to review the document to see.

 8        Q.   Okay.  Could you take a quick look?

 9             (Pause)

10        A.   These are responses to the questions

11    from ████████

12        Q.   And I guess why was Ripple interacting

13    with ████████?

14                 MR. WARD:  Objection to form.

15        A.   I -- I don't know exactly.

16        Q.   So in 2015 Ripple had significant XRP

17    holdings, is that right?

18        A.   Ripple had XRP holdings in 2015.

19        Q.   Did Ripple have the majority of the XRP

20    in existence in 2015?

21                 MR. CERESNEY:  Objection; form.

22        A.   I don't know.

23        Q.   And one of Ripple's goals was to

24    increase the use of XRP?

25                 MR. HECKER:  Counsel, are we
```

1            talking about this document or are we done

2      with this document?

3                  MR. HANAUER:  We're still on it.

4                  MR. HECKER:  Okay.

5                  MR. CERESNEY:  Objection to form.

6      A.    The goal of the company was we were

7      building a payment network, so the adoption of our

8      payment solutions.

9      Q.    And XRP was part of the way those

10     payment systems worked?

11     A.    XRP was a component of one of the

12     products that we sold.

13     Q.    And was it a goal of Ripple to increase

14     the use of XRP?

15                 MR. CERESNEY:  Objection.

16                 MR. HECKER:  Objection to form.

17     A.    The -- the goal of Ripple was to -- to

18     build a payment network and get broader adoption

19     of our -- of our products, xCurrent, xRapid, the

20     two primary products when I was there.

21     Q.    Did you understand that XRP could

22     appreciate in value as the use of XRP increased?

23                 MR. CERESNEY:  Objection; form.

24     A.    XRP -- I did understand that.

25     Q.    Did you agree with that?

1              MR. CERESNEY: Objection; form.

2       A.    The price of XRP and all the digital

3 assets are -- seem to be just flowing with the

4 market, market sentiment.

5       Q.    Did you agree that the price of XRP

6 would generally go up as the use of XRP increased?

7              MR. CERESNEY: Objection; form.

8       A.    Depends on the market conditions. It's

9 kind of hard to say. There was periods of greater

10 adoption of all digital assets, but the prices

11 were coming down.

12       Q.    What about long term?

13              MR. CERESNEY: Objection to form.

14              MR. WARD: Objection to form.

15       A.    It's a big hypothetical. There's so

16 many variables in what's guiding price. Greater

17 adoption generally would -- would -- greater

18 adoption would be greater demand. Demand is a

19 factor in price.

20       Q.    So can I ask you to look at the second

21 page of Exhibit 1? And do you see the last

22 paragraph before heading 6? And Ripple was

23 representing to    █████████   that XRP may

24 appreciate in value with increased use of the

25 Ripple protocol?

```
 1        A.   I see it says that.

 2        Q.   That's something that Ripple represented

 3   to                          ?

 4             MR. HECKER:  Objection to form.

 5        A.   It says that they appreciate in value

 6   with increased use of the protocol.

 7        Q.   And you agree with that statement?

 8        A.   I -- I didn't write this document.

 9        Q.   Do you agree with that statement?

10        A.   I agree that it may -- it may

11   appreciate.  It's a possibility with increased

12   use.

13        Q.   Did Ripple make efforts to increase the

14   price of XRP?

15             MR. HECKER:  Objection to form.

16             You can answer.

17        A.   No.

18        Q.   Did Ripple make efforts to increase the

19   use of XRP?

20        A.   We made efforts to educate people in the

21   market on XRP, how it worked, its advantages.  It

22   was -- it was -- to me it was, like, educational.

23        Q.   Did Ripple make efforts to create more

24   ways in which XRP could be used by market

25   participants?
```

1            MR. HECKER:  Objection to form.

2      A.    XRP's an open-source protocol, so

3   there's -- anyone can develop on it.  And we saw

4   that happening in that time frame.  So there was

5   factors outside of the company creating new ways.

6   The company was focused on the payment network.

7      Q.    When you say "the company," you mean

8   Ripple?

9      A.    Ripple, yeah.

10      Q.    And was Ripple focused on a payment

11   network that used XRP as part of that network?

12      A.    Yeah.

13      Q.    And was Ripple trying to promote the use

14   of a payment network that used XRP as part of that

15   network?

16            MR. CERESNEY:  Objection to form.

17            MR. WARD:  Objection.

18      A.    We were promoting a payment -- our

19   products, the payment network.  One of the

20   products used XRP as a liquidity tool.

21      Q.    How did Ripple generate revenues while

22   you worked there?

23      A.    When I was there, we sold contracts to

24   banks to use our payment products and we sold XRP.

25      Q.    And how did Ripple's revenues from

1    selling software and professional services compare

2    to its revenues from selling XRP?

3         A.   I -- I don't know.

4         Q.   Do you know whether Ripple generated

5    more revenues from selling XRP than it did from

6    selling software products and other services?

7         A.   I don't know definitively what the split

8    was.  I -- I only served on the business

9    development team for -- it was around nine months.

10        Q.   Did you have a general understanding?

11        A.   No, I didn't focus on the financials.

12        Q.   Did Ripple raise working capital by

13   selling XRP?

14             MR. WARD:  Objection to form.

15        A.   We sold XRP.  We funded the company

16   through traditional equity.  So we did -- when I

17   was there, we did a Series A and a Series B round.

18   Shortly after I left, we closed a C.

19        Q.   And how much money did Ripple bring in

20   from those funding rounds?

21        A.   I -- I can't recall.

22        Q.   Did Ripple also raise working capital by

23   selling XRP?

24             MR. HECKER:  Objection to form.

25             MR. CERESNEY:  Objection to form.

1    A.   We sold XRP.

2    Q.   Can I ask you to look at the page of

3    Exhibit 1 ending with 5178?  And do you see the

4    paragraph under the heading 2 where it says "XRP

5    II, LLC"?

6    A.   I see that.

7    Q.   And what was XRP II, LLC?

8    A.   It was a subsidiary of Ripple Labs that

9    sold XRP to institutional investors and market

10   makers.

11   Q.   What do you mean by "institutional

12   investors"?

13   A.   Institutions, not like retail, like you

14   or me, individuals, but institutional funds, the

15   professional business, or market makers.

16   Q.   And for the institutional investors

17   who -- they thought Ripple -- they thought XRP

18   would go up in value when they purchased XRP?

19   A.   I -- I don't know what -- what they

20   thought.

21   Q.   Well, what was your understanding of why

22   institutional investors were buying XRP from

23   Ripple?

24   A.   I think -- you have to ask them what --

25   what they were doing.  There was a lot of market

1  makers who were making markets on an XRP ledger.

2  There were -- and institutional investors.  So

3  either wanting exposure to crypto -- usually in

4  that time wanting exposure to crypto pretty

5  generally.

6      Q.   Meaning the institutional investors

7  wanted XRP as part of their investment portfolio?

8              MR. HECKER:  Objection to form.

9      A.   I mean, you would have to ask the

10 institutional investors why they were buying it.

11     Q.   Did you have an understanding of why the

12 institutional investors were buying XRP?

13     A.   I was not on the markets team.  I didn't

14 have an understanding.

15     Q.   What was your understanding of why

16 market makers were purchasing XRP from Ripple?

17     A.   To -- to make markets on the XRP ledger

18 and other -- other assets.  So buying and selling

19 for a margin.

20     Q.   And who was trading on those markets?

21     A.   They were open markets.  Anyone could

22 access and trade.

23     Q.   Do you have an understanding of why

24 people were trading XRP on those markets?

25             MR. HECKER:  Objection; form.

1       A.   I don't know -- not on XRP specifically.

2   Market makers generally buy and sell for margin,

3   kind of regardless of price, but they buy and sell

4   a lot.  They make a small margin on that.

5       Q.   Did Ripple pay market makers to make a

6   market in XRP?

7       A.   I don't know.

8       Q.   When Ripple sold XRP, did it place

9   restrictions on who the purchasers could sell XRP

10   to?

11       A.   I don't know.

12       Q.   Did Ripple know what the persons and

13   entities who purchased XRP would do with it after

14   they bought it from Ripple?

15       A.   I don't know.

16       Q.   And referring you back to that paragraph

17   on page 178 of Exhibit 1, do you see how it says

18   "All sales of XRP conducted by XRP II are for the

19   benefit of Ripple Labs, its ultimate parent

20   company, and represents one method by which Ripple

21   Labs raises working capital"?

22       A.   I see that.

23       Q.   When did Ripple stop raising working

24   capital by selling XRP?

25            MR. HECKER:  Objection to form.

1    MR. WARD:  Objection to form.

2        A.   I don't know.  I wasn't on the marketing

3    or finance team -- the markets or finance team.

4        Q.   What was ███?

5        A.   I don't know.  I can't recall.

6             (Whereupon, exhibit is presented

7        and marked SEC Zagone Exhibit RZ-2 for

8        identification.)

9             MR. HANAUER:  I'm tendering the

10       witness a document marked as Exhibit RZ-2

11       with a Bates number ending in 1111.

12   BY MR. HANAUER:

13       Q.   Do you see, is Exhibit RZ-2 an e-mail

14   from ███████ to ████████ copying you and

15   others, dated September 2nd, 2015?

16       A.   I see that.

17       Q.   And why don't you take a look at the

18   e-mail and see if that refreshes your recollection

19   about ████?

20            (Pause)

21       A.   Okay.

22       Q.   So does looking at Exhibit RZ-2 refresh

23   your recollection as to what ████ was?

24       A.   It does not.

25       Q.   Do you know what the XRP fund was?

1      A.  No.

2      Q.  Do you know if Ripple was selling XRP to

3  ███████?

4      A.  I don't know.

5      Q.  So besides institutional investors and

6  market makers, in 2016, who else was Ripple

7  selling XRP to?

8      A.  It was my understanding we were selling

9  to institutional investors and market makers.  I

10  don't have awareness outside of that.

11      Q.  Any other financial institutions?

12      A.  Not that we were selling to that I was

13  aware of.

14             (Whereupon, exhibit is presented

15       and marked SEC Zagone Exhibit RZ-3 for

16       identification.)

17             MR. HANAUER:  I tendered the

18       witness a document marked as Exhibit RZ-3,

19       starting with the Bates number ending in

20       1249.

21  BY MR. HANAUER:

22      Q.  And is Exhibit RZ-3 an e-mail ███████

23  ███████ sent to various folks at ███████ copying you and

24  others, on March 21st, 2016?

25      A.  Correct.

74

1     Q.   And there's an attachment to Mr. █████

2  e-mail as part of Exhibit RZ-3?

3     A.   Yes.  I see the attachment.

4     Q.   Who is █████████

5     A.   ████████████ was the controller on the

6  finance team.

7     Q.   For Ripple?

8     A.   For Ripple.

9     Q.   And why was Ripple interacting with █████

10 ████████

11          MR. WARD:  Objection to form.

12    A.   I don't know specifically.  I assume it

13 was part of a BD discussion.

14    Q.   And I want to refer you to the first

15 page of the attachment in the Exhibit RZ-3.  Do

16 you see under the heading "Request," it says "To

17 support Ripple's growth in the near term, the

18 company is seeking a bank partner to provide"

19 business banking -- "a business banking account

20 for a wholly owned subsidiary XRP II, LLC"?

21    A.   I see that.

22    Q.   So was XRP II looking for a bank?

23          MR. HECKER:  Objection to form.

24    A.   This shows that we're looking for a bank

25 partner, yes.  I recall that that was part of our

1    application to New York DSS for a virtual currency

2    license.

3        Q.   And then do you see on the bottom, the

4    last paragraph of the page ending in 250, it says

5    "XRP II, LLC would use this bank account to book

6    revenue and pay operating expenses from its

7    primary business activities:  Selling digital

8    assets to financial institutions and institutional

9    investors"?

10       A.   I see that.

11       Q.   And is it accurate that XRP II's primary

12   business activities in 2016 were selling XRP to

13   financial institutions and institutional

14   investors?

15            MR. HECKER:  Objection to form.

16       A.   To the best of my understanding, yes.

17       Q.   What was your understanding of the

18   financial institutions being described in this

19   memorandum?

20       A.   So we were working -- financial

21   institution being a bank, a bank that we were

22   working with that would be using that product.

23       Q.   And in 2016, why were banks -- what were

24   they doing with XRPs?

25            MR. CERESNEY:  Objection to form.

```
 1        A.   In 20 -- in 2016, we were undergoing --

 2   we had a series of proof of concepts and pilots

 3   going on with a number of banks that we were

 4   working with to -- this is in the company -- the

 5   company, Ripple Labs, at the time, we were

 6   experimenting with what the right -- well, I guess

 7   the optimal product design would be for

 8   connectivity and liquidity for payments.  So we

 9   had several pilots and proof of concepts going on

10   and it included XRP.

11        Q.   So if a bank was using XRP in 2016, it

12   would have been for a pilot or use of concept?

13        A.   In the 2014 to maybe early 2016 range,

14   somewhere in there, yeah.  My -- my memory of the

15   timeline is hazy at this point, but it had a

16   number of proof of concepts and pilots going on.

17        Q.   Were -- were banks using -- were banks

18   purchasing XRP from Ripple for purposes other than

19   pilot testing or use of concepts?

20        A.   I don't know.

21        Q.   In 2016 was XRP used by consumers?

22        A.   Yes.

23        Q.   Which consumers were using XRP in 2016?

24        A.   XRP was -- an XRP ledger open source,

25   you could acquire it from exchanges.  You could --
```

1     any consumer could go in and buy XRP or bitcoin,

2     either, on an exchange.

3         Q.    What uses for consumers did XRP have in

4     2016?

5         A.    This is in the early day of crypto.

6     There were people using it as -- the primary use

7     case for crypto at the time was using it as a

8     currency, so as a replacement for the U.S. dollar.

9     So people would be buying coffee or goods or

10    services with crypto.  So that would be a consumer

11    use case.

12        Q.    And I want to refer you to the last page

13    of Exhibit 1.  And do you see how the first

14    paragraph on the page ending in 1252 says "XRP as

15    a digital asset is not used by consumers and is

16    not a replacement for government issued money"?

17        A.    I see that.

18        Q.    Ripple was representing to XRP -- or

19    Ripple was representing to ▆▆▆▆▆ that XRP is not

20    used -- or was not used by consumers in 2016?

21        A.    That is meant -- what I -- what I

22    believe that's meant to say is that Ripple's use

23    of XRP in our products is not a direct-to-consumer

24    tool.  So it was meant really to distinguish

25    between X -- Ripple's use of XRP as its liquidity

```
1    bridge from what was happening in the majority of
2    the crypto market at this time where exchanges
3    sold crypto to replace the U.S. dollar.
4             So this was -- this was speaking to how
5    Ripple was using XRP.  We're not selling it to
6    consumers.  We're not using it to replace
7    government-issued money but rather to connect it
8    more efficiently.
9        Q.   How did the amount of XRP that Ripple
10   sold to institutional investors compare to the
11   amount of XRP Ripple sold for use in Ripple's
12   products?
13               MR. CERESNEY:  Objection to form.
14               MR. HECKER:  Objection to form.
15       A.   I don't know.
16               (Whereupon, exhibit is presented
17           and marked SEC Zagone Exhibit RZ-4 for
18           identification.)
19               MR. HANAUER:  I'm tendering the
20           witness a document that's been marked as
21           Exhibit RZ-4, which begins with a Bates
22           number ending in 9845.
23               MR. HECKER:  Mr. Zagone, when
24           you're reviewing it, you're kind of
25           humming to yourself.  We heard it.
```

1    BY MR. HANAUER:

2        Q.   And is Exhibit RZ-4 an e-mail and

3    attachment that you sent to ▮▮▮▮▮▮ on

4    January 6, 2017?

5        A.   That's correct.

6        Q.   And do you see how your -- the first

7    line of the exhibit says "To assist ▮▮ in their

8    application, I provided them with the attached

9    paper of info that had to provide for the

10   BitLicense"?

11       A.   I see that.

12       Q.   What was ▮▮▮

13       A.   ▮▮ was a Japanese company that we were

14   partnering with.  I believe we were -- at this

15   point, I can't recall if we were partnering with

16   them or -- yes, we were partnering with them,

17   ▮▮ Ripple ledger.

18       Q.   And what is the BitLicense you reference

19   in Exhibit RZ-4?

20       A.   The BitLicense was the New York

21   Department of Financial Services' virtual currency

22   license.

23       Q.   And why were you e-mailing Mr ▮▮▮▮ -

24   or why were you e-mailing ▮▮ the paper that you

25   provided in connection with the BitLicense?

1              (Pause)

2         A.    It says here, in Japan, there was a

3    draft version of the government ordinance for

4    cryptocurrencies to be licensed -- for crypto

5    exchanges to be licensed.  I believe they had to

6    provide background on the assets that they were

7    trading, one of which was XRP.  Since we were a

8    partner with ████ we provided them content on XRP.

9         Q.    And can I refer you to the page in

10   Exhibit 4 ending in 9852?

11        A.    I see it.

12        Q.    And did -- did you write this paper

13   titled "XRP Overview for ████?

14        A.    I can't recall if I wrote it myself or

15   pieced it together from other documents we had at

16   Ripple.

17        Q.    Was the information that Ripple was

18   providing to ███ in this paper truthful and

19   accurate?

20        A.    I -- I assume so, yeah.

21        Q.    Can I refer you to the -- the second

22   page of the paper?  And that's the one with the

23   Bates number ending in 853.

24        A.    Uh-huh.

25        Q.    And do you see in the last paragraph on

1    that page, it says "XRP II, LLC sells or transfers

2    XRP to financial institutions and accredited

3    investors who bring payment volume and/or FX

4    liquidity to Ripple"?

5         A.   I see that.

6         Q.   And in 2017, Ripple was selling XRP to

7    financial institutions and accredited investors?

8         A.   That was my understanding.

9         Q.   What did you understand the term

10   "accredited investors" to mean?

11        A.   This I got from the -- from our markets

12   and legal team.  I was not on the markets team.

13        Q.   Do you have an understanding of what the

14   term "accredited investor" means?

15        A.   An understanding that it's a -- it's a

16   defined class of investors who have a certain net

17   worth or income.

18        Q.   And who were the accredited investors

19   Ripple was selling XRP to in 2017?

20        A.   I don't know.

21        Q.   And when the paper talks about selling

22   XRP to financial institutions and accredited

23   investors who bring payment volume and/or FX

24   liquidity to Ripple, what does that mean when

25   speaking about the pay -- payment volume and/or FX

1    liquidity?

2              MR. HECKER:  Objection to form.

3         A.   I'm not certain.  I -- I got this

4    from -- this is -- that's not something that looks

5    like I -- that I recall writing.

6         Q.   Can I refer you to the last page of

7    Exhibit 4, please?

8         A.   Sure.

9         Q.   And under the heading "Supply of XRP,"

10   do you see it says "While buyers and sellers

11   determine the market price of XRP, the supply of

12   XRP is an important variable to consider when

13   valuing the asset"?

14        A.   I see that.

15        Q.   How did the supply of XRP affect its

16   price?

17        A.   Generally supply and demand drive price.

18   So if there's an increase or a decrease in supply

19   relative to an increase or decrease in demand, you

20   would see a change in price.

21        Q.   So if the supply goes up, all other

22   things being equal, what happens to the price?

23              MR. WARD:  Objection to form.

24        A.   If supply goes up and demand is -- is

25   the same, price would go down.

 1          Q.   And what if supply went down but demand

 2    stayed the same?

 3                    MR. WARD:  Object to form.

 4          A.   If supply went down, but demand stayed

 5    the same, price would go up.

 6          Q.   What if supply stayed the same and

 7    demand went up?

 8                    MR. WARD:  Object to form.

 9          A.   Price would go up.

10          Q.   What if supply stayed the same and

11    demand went down?

12                    MR. WARD:  Object to form.

13          A.   Price would go down.

14          Q.   Then do you see the second paragraph

15    where it says "As of December 26, 2016, Ripple

16    held approximately 63 billion of the 100 billion

17    XRP"?

18          A.   I see that.

19          Q.   What -- what did that mean?

20          A.   There were 100 billion XRP in existence.

21    Ripple held 63 billion of them.

22          Q.   And then do you see the next sentence

23    says "Ripple's distribution strategy, including

24    the timing, volume and pace of distribution, will

25    impact the supply and ultimately the value of

1  XRP"?

2      A.   I see that.

3      Q.   What did that mean?

4      A.   That as the company distributes or sells

5  XRP, either they sell it or give it away, that

6  will impact the supply -- it will increase the

7  supply and could impact the price, depending on

8  what happens to demand.

9      Q.   So how Ripple went about distributing

10  its XRP holdings could impact the price of XRP?

11           MR. CERESNEY:  Objection to form.

12      A.   Hypothetically it could, depending on

13  what happens with demand and general market

14  conditions.

15      Q.   And then do you see the next paragraph

16  says "Ripple aims to distribute XRP in a way that

17  supports a stable or strengthening value of XRP"?

18      A.   I see that.

19      Q.   Was that an aim of Ripple?

20      A.   It says Ripple -- it says "Ripple's aim

21  is to distribute XRP in a way that supports a

22  stable or strengthening value."

23      Q.   So did Ripple aim to distribute XRP in a

24  way that would cause XRP's price to stay the same

25  or go up?

1          MR. CERESNEY:  Objection to form.

2      A.   That's what I understand that statement

3  says.

4      Q.   And then the last sentence said -- says

5  "Ripple expects to see an increase in demand for

6  XRP that more than offsets the additional supply

7  that is injected into the market via sales of the

8  asset."

9          What does that mean?

10     A.   Seems to say our expectation for demand

11 would increase more than the additional supply.

12     Q.   So even though the supply of XRP was

13 going up, because the demand for XRP was going up

14 also, the price of XRP would not fall?

15         MR. CERESNEY:  Objection --

16         MR. HECKER:  Objection to form.

17     A.   The statement's saying that we were --

18 we were looking to be responsible with our own

19 transactions for -- to ensure a stable or

20 strengthening value of XRP.

21     Q.   And by "stable or strengthening value,"

22 you meant the price of XRP not going down?

23         MR. HECKER:  Objection to form.

24     A.   That's what we were -- I'm sorry.

25 That's what we were looking for, a stable or

86

```
 1    strengthening value, so not declining.  Not
 2    declining from our activity.
 3                    (Whereupon, exhibit is presented
 4            and marked SEC Zagone Exhibit RZ-12 for
 5            identification.)
 6                    MR. HANAUER:  And I just tendered
 7            the witness a document labeled as Exhibit
 8            RZ-12, which begins with a Bates number
 9            ending in 6910.
10    BY MR. HANAUER:
11        Q.    Is Exhibit RZ-12 an e-mail and
12    attachment that you sent to various people at MAS
13    on June 16th, 2017?
14        A.    That's correct.
15        Q.    What is MAS?
16        A.    That's the Monetary Authority in
17    Singapore, Central Bank of Singapore.
18        Q.    And there's a paper attached to the
19    e-mail you sent to the monet -- Monetary Authority
20    of Singapore titled "XRP Overview - Long-term
21    Vision and Short-term Tactics"?
22        A.    Correct.
23        Q.    Did you draft that paper?
24        A.    I can't recall if I drafted it or --
25    from scratch or if I -- it was pulled together
```

1   from existing materials.

2      Q.   You had a role in --

3      A.   I had a role in producing it.

4      Q.   And why were you providing this paper to

5   the Monetary Authority of Singapore?

6      A.   So MAS was and still is one of the

7   leading players, central banks, in looking at how

8   digital currency can be used within payments,

9   international -- particularly international

10   payments.  So we were engaging with them on a

11   series of experiments that they were doing.

12      Q.   And the information you provided to the

13   Monetary Authority of Singapore was truthful and

14   accurate?

15      A.   Correct.

16      Q.   And I'd like to refer you to page -- the

17   page ending in 942 labeled "Appendix 1."

18           Referring you to the second paragraph,

19   it says "XRP II, LLC.  This subsidiary sells XRP

20   to a limited" custer bay -- "customer base,

21   including financial institutions and accredited

22   investors."

23      A.   I see that.

24      Q.   Ripple was still selling XRP to

25   accredited investors in June of 2017?

1      A.   XRP II was -- that's the entity that

2  would sell to accredited investors and financial

3  institutions.  To the degree that it was or it

4  wasn't in that time frame, I don't know.

5      Q.   Was XRP selling -- was XRP II, LLC

6  selling XRP to accredited investors in June 2017?

7             MR. WARD:  Objection.

8      A.   If we -- that was the entity that -- XRP

9  II, LLC, is the entity that would sell XRP II.

10  It's sold to financial institutions and accredited

11  investors.  I don't know if transactions were

12  happening in that time frame.  If they were, they

13  would have happened through XRP II.

14      Q.   And just to be clear, your -- your paper

15  to the Monetary Authority of Singapore is dated

16  June 2017?

17      A.   Correct.

18      Q.   And I want to refer you to the -- the

19  next page ending in 943 where -- under the heading

20  "Supply of XRP."

21      A.   I see it.

22      Q.   And do you see the second paragraph

23  talks about "a cryptographically secured escrow

24  that manages the timing and release of" XRP?

25      A.   I see that.

1      Q.  Could you describe what that escrow

2  program was?

3      A.  The escrow program was a initiative to

4  take a significant portion of the company's XRP

5  and place it outside of control of the company,

6  like locked in an escrow.  On a certain period, a

7  certain amount of XRP would be released to the

8  company.  I can't recall what that period or what

9  the amount was.

10      The -- the effort came about, we were

11  seeing bad actors in the crypto space that were --

12  that held a lot of crypto and were dumping it at

13  will and walking away.

14      We wanted to give assurance to the

15  market that we were going to be a responsible

16  player and would not -- were not going to do that

17  with our own holdings.

18      Q.  So Ripple wanted to convey to the market

19  that Ripple would not flood the market with its

20  own XRP holdings?

21      A.  Correct.

22      MR. HANAUER:  Could we go off the

23    record, please?

24      THE VIDEOGRAPHER:  Yep.  Going

25    off the record at 11:10.

```
 1                    (Whereupon, a discussion is held

 2           off the record.)

 3                    THE VIDEOGRAPHER:  Okay.  Back --

 4           back on the record at 11:12.

 5                    Go ahead.

 6    BY MR. HANAUER:

 7           Q.   So the reason Ripple set up the escrow

 8    program was to address concerns for market

 9    participants that Ripple could dump large amounts

10    of its XRP holdings into the market?

11                    MR. CERESNEY:  Objection.

12                    MR. HECKER:  Objection to form.

13           A.   The -- there were bad actors in the

14    crypto space that were dumping their -- their

15    holdings and crashing prices of other cryptos.  So

16    we saw that as the -- the market became concerned

17    across all the cryptocurrencies that this could

18    happen.

19                    Ripple proactively set up the escrow to

20    give assurance to the market that we weren't going

21    to do that.  We were going to be a responsible

22    player.  We're locking this aside.  We're not

23    going to dump our holdings.  So it was a proactive

24    step we took.

25           Q.   And if Ripple had dumped large amounts
```

1  of XRP into the market all at once, would that

2  have negatively affected XRP's price?

3       A.   Yeah, there would be --

4            MR. CERESNEY:  Objection; form.

5       A.   That would be a -- a flood of supply

6  into the market.  Depending on what demand was at

7  the time, if demand was stable or unchanged, price

8  would go down.

9       Q.   How did the escrow program affect XRP's

10 price?

11           MR. CERESNEY:  Objection to form.

12      A.   When we announced the escrow program, it

13 was a reduction in supply and the price went up.

14 The market had more certainty around how we were

15 going to use or dispose of the XRP.

16      Q.   In June 2017, did Ripple continue to

17 distribute XRP in a way that would support or

18 increase XRP's price?

19           MR. HECKER:  Objection to form.

20      A.   The -- the guiding factor for Ripple was

21 not to have an impact on the price.  We -- we saw

22 that -- I saw that in the quarterly market reports

23 showing that our trading and -- not our trading,

24 our selling activity was only a small portion of

25 the trading that was happening.

```
1          Q.   In June 2017, did Ripple still aim to

2     distribute XRP in a way that supported a stable or

3     strengthening value of XRP?

4               MR. CERESNEY:  Objection; form.

5          A.   I -- I can't speak to the -- what the

6     marketing team -- the market -- the markets team

7     was doing during that time.

8          Q.   What were Ripple's -- you can put that

9     exhibit down.

10              What were Ripple's OTC sales?

11         A.   Over-the-counter sales.  I -- I don't

12    know much about them.

13         Q.   How did the over-the-counter sales

14    differ from XRP II, LLC's sales of XRP?

15         A.   I don't know.

16              MR. HANAUER:  Exhibit 14.

17              (Whereupon, exhibit is presented

18         and marked SEC Zagone Exhibit RZ-14 for

19         identification.)

20              MR. HANAUER:  I'm tendering the

21         witness a document that's been marked as

22         Exhibit RZ-14, which begins in a Bates

23         number ending in 5510.

24    BY MR. HANAUER:

25         Q.   Is Exhibit RZ-14 an e-mail exchange
```

1     between you and Miguel Vias dated October 9th,

2     2017?

3         A.    I see that, yes.

4         Q.    And do you see the third e-mail in the

5     chain, you write to Mr. Vias, "Question:  We seem

6     to be seeing a lot of OTC demand and sales.  By

7     selling OTC, that demand doesn't get captured on

8     exchanges or reflected in market prices.  Would we

9     be better off shifting some demand to exchanges

10    for XRP purchases?"

11               What are you writing about there?

12               MR. WARD:  Object to form.

13        A.    I'm not certain.  The rest of the e-mail

14    doesn't seem to be about OTC.  It doesn't seem to

15    be about OTC sales.  I'm asking if we -- if the

16    company should shift from selling OTC to

17    exchanges.  I'm asking mainly out of curiosity

18    for -- and I'm asking Miguel Vias, head -- he's

19    the lead for the markets team, about what the

20    impact of OTC versus exchange selling is as that's

21    new for me.

22        Q.    And -- and I guess, what was the

23    significance of selling XRP over the counter as

24    opposed to on an exchange?

25               MR. HECKER:  Objection to form.

1     A.    I -- from the question here at the time,

2  I don't seem to understand what the difference or

3  what the impact would be from OTC versus exchange

4  selling.  So I'm trying to ask Miguel to clarify

5  that.

6     Q.    And then Mr. Vias responds "This wasn't

7  a concern before, but coming to a head quickly, I

8  think we will put a cap on how much we sell OTC."

9     A.    I see that.

10    Q.    Why would capping OTC sales be

11  beneficial to Ripple?

12              MR. CERESNEY:  Objection; form.

13    A.    I don't know.  You'd have to ask Miguel

14  for details on that.

15    Q.    And then do you see in the bottom e-mail

16  from Mr. Vias and the subject's "XRP Market

17  Updates"?

18    A.    Uh-huh.  I see that.

19    Q.    Mr. Vias writes "XRP has been on quite a

20  roll over the last week," and then he talks about

21  the -- writes about the price increase.

22           Do you see that?

23    A.    I see that.

24    Q.    Was that -- was it a good thing for

25  Ripple when the price of XRP increased?

```
 1                    MR. CERESNEY:  Objection to form.
 2           A.    If the price of XRP increased, the
 3      holdings -- Ripple's holdings of XRP was more
 4      valuable.
 5           Q.    And that was good for Ripple?
 6           A.    Yes.
 7           Q.    Did Ripple ever make public
 8      announcements about the rising price of XRP?
 9                    MR. HECKER:  Objection to form.
10           A.    I can't recall.
11                    (Whereupon, exhibit is presented
12             and marked SEC Zagone Exhibit RZ-33 for
13             identification.)
14                    MR. HANAUER:  And I just tendered
15             the witness a document labeled RZ-33
16             beginning in a Bates number ending in
17             6858.
18      BY MR. HANAUER:
19           Q.    And is Exhibit RZ-33 an e-mail from
20      insights@ripple.com to you dated December 20th,
21      2017?
22           A.    That's correct.
23           Q.    And what is this Ripple -- or the Ripple
24      Insights or          @ripple.com?
25           A.    Ripple Insights, I believe it was a
```

1    newsletter that we -- that the company would send

2    out to people that are subscribed to it.

3         Q.   And did that newsletter go to only

4    Ripple internally or to members of the public,

5    also?

6         A.   I can't recall.  We had an internal

7    version that shared internal news, and I believe

8    there was an external subscription newsletter you

9    could -- you could subscribe to.  I don't recall

10   if this one was internal or external.

11        Q.   And do you see on the third page of

12   Exhibit RZ-33, the e-mail talks about Ripple's

13   price increasing 89 percent in a single day?

14        A.   I see that, yes.

15        Q.   Did Ripple convey price increases of XRP

16   to the public?

17        A.   I can't tell if this was the public

18   newsletter or not.  We had an internal one.  In

19   this e-mail, we seem to be capturing a news

20   article.

21        Q.   Do you see how the very last portion of

22   Exhibit RZ-33 provides Ripple's mailing address?

23        A.   I see that.

24        Q.   And does that give you any indication of

25   whether the Ripple Insights' e-mail went only to

```
1    Ripple internal employees?

2              MR. WARD:  Object to the form.

3         A.   You would have to ask the marketing team

4    what -- what this specific one was.  I just

5    received it.  I received a daily -- a daily e-mail

6    on recent news and this one as well.

7         Q.   To the extent that Ripple was promoting

8    XRP price increases to the public, did you have

9    any concerns about that?

10             MR. CERESNEY:  Objection.

11             MR. HECKER:  Objection to form.

12             MR. WARD:  Objection.

13        A.   Well, in this newsletter here, we're --

14   we're just quoting a news report it looks like.

15   CoinMarketCap.

16        Q.   To the -- to the extent that Ripple was

17   publicly announcing price increases of XRP, did

18   you have any concerns about that?

19             MR. CERESNEY:  Objection; form.

20        A.   I did not, no.

21        Q.   When you left Ripple, was On-Demand

22   Liquidity, or ODL, Ripple's primary product that

23   it sold to customers?

24        A.   When I left Ripple, we had two products,

25   xCurrent and xRapid.  We were in the midst of
```

1    evolving the branding of those products.  The

2    majority of the time I was there, it was xCurrent

3    and xRapid.

4         Q.   And did xCurrent use XRP as part of its

5    product?

6         A.   We did not.

7         Q.   And xRapid did use XRP to make that

8    product work?

9         A.   Correct.

10        Q.   Was xRapid the first product Ripple sold

11   for commercial use that used XRP?

12        A.   We had variants of xRapid leading up to

13   the product that we were selling when I left that

14   also used XRP.  That was the primary product

15   that -- that leveraged XRP technology.

16        Q.   Was xRapid the first Ripple product that

17   used XRP that Ripple sold to customers as opposed

18   to did pilot testing or proof of concept testing?

19             MR. CERESNEY:  Objection; form.

20        A.   That product is what we sold that used

21   XRP.  I can't recall if we had another name for it

22   before or after, but xRapid was the branding that

23   we were using when I was there.

24        Q.   And I guess was -- was xRapid the first

25   Ripple product in widespread commercial use that

99

1   used XRP?

2           MR. CERESNEY:  Objection; form.

3       A.   That was the primary product that used

4   XRP when I -- when I was there that we were

5   focused on banks.

6       Q.   And I guess was there a -- a product

7   before xRapid that was -- Ripple sold for

8   commercial use that used XRP?

9           MR. WARD:  Objection to form.

10      A.   Our product journey started with a

11  single product that we ran pilot testing, proof of

12  concepts.  As we evolved -- that single product

13  covered connectivity and liquidity.  As we evolved

14  the solution, we split those into two separate

15  products so we could specialize the tech used in

16  each:  One connectivity, one liquidity.

17          So there were times when we were selling

18  one solution.  In the early days, we called it

19  Ripple Connect.  It evolved into two separate

20  products.  XRP was a part of the early platform

21  when it was just one single product as well.

22      Q.   When did the first Ripple customers

23  begin using xRapid?

24          MR. WARD:  Objection to form.

25      A.   I don't a -- I'm sorry.  I don't recall

100

1    a specific date when it was launched.

2         Q.    Was xRapid the first Ripple product that

3    used XRP that made it beyond the pilot testing or

4    proof of concept stage?

5              MR. HECKER:  Objection to form.

6         A.    We -- we might have had other customers

7    in the early day that were full commercial

8    customers using that initial platform we used

9    beyond just a pilot.  I can't recall specifics.

10             MR. CERESNEY:  Can I just make

11        sure that we're talking here just about

12        the payments products?  Because there were

13        other products that were using XRP, so I

14        just want to make sure that the record is

15        clear on this.

16             MR. HANAUER:  I was asking about

17        products that used XRP.

18             MR. CERESNEY:  You mean all

19        products?

20             MR. HANAUER:  Correct.

21             MR. CERESNEY:  Because I think he

22        was focused on the xRapid-type products.

23        A.    So my work at Ripple was on the payment

24   products.  So xRapid, xCurrent, and the products

25   that led up to those -- those two.  I -- I didn't

1    have engagement with other products using X --

2    XRP.

3         Q.   Are you aware of Ripple selling products

4    that used XRP prior to xRapid?

5         A.   Ripple had other projects going on that

6    used XRP.

7         Q.   All right.  But did Ripple sell products

8    for commercial use using XRP before it began

9    selling xRapid?

10         A.   Not that I was involved in.  That could

11   have been for other parts of the BD team

12   potentially.

13         Q.   Can you name another product other than

14   XRP that Ripple sold that used XRP as part of the

15   product?

16         A.   There --

17              MR. WARD:  Objection.

18         A.   -- were other products on ongoing.  One

19   was TradeSafe, a trade finance platform that used

20   XRP.  It was built on the XRP ledger with the

21   Development Bank of Singapore and a few others.

22              So there were -- there was definitely

23   other experimentation happening on XRP ledger

24   using XRP.  I can't recall the commercial

25   arrangements to say if we sold that or not.

102

1          Q.    Are you aware of any Ripple products

2    that used XRP other than xRapid that entered

3    widespread commercial use?

4                 MR. HECKER:  Objection to form.

5          A.    My focus was on xRapid and xCurrent.  So

6    there was other stuff happening in that -- in the

7    company that I wasn't involved in, other products.

8    But my focus was specific to the payments

9    products.

10         Q.    Was xRapid commercially viable for

11   Ripple?

12                MR. HECKER:  Objection to form.

13         A.    I believe so, yes.

14         Q.    Did Ripple bring in more revenues from

15   xRapid than it spent developing xRapid?

16         A.    I don't know that --

17                MR. WARD:  Objection.

18         A.    I don't know the commercial terms of the

19   xRapid deals.

20         Q.    Was a liquid market in XRP needed for

21   Ripple's products that used XRP to work?

22         A.    Yes.  You would need a liquid market for

23   xRapid to work.

24         Q.    Why?

25         A.    You would need enough trading to be able

103

1  to process the payment from, say, U.S. dollar to

2  XRP and on the receiving end, say it's a payment

3  to Mexico, from XRP to Mexican peso.

4     Q.  When you worked at Ripple, did Ripple

5  attempt to create a liquid trading market for XRP?

6           MR. CERESNEY:  Objection; form.

7     A.  When I was at Ripple, we had a markets

8  team that worked with the broader market to ensure

9  the liquidity -- necessary liquidity was available

10  in the countries that were deploying xRapid.

11     Q.  And what efforts, specific efforts, did

12  Ripple make to create liquid trading markets in

13  XRP?

14           MR. HECKER:  Objection to form.

15     A.  I'm not certain.  That wasn't my role.

16     Q.  When did enough XRP liquidity first

17  exist for xRapid to be commercially viable?

18           MR. HECKER:  Objection to form.

19     A.  I'm not certain.  You'd have to ask the

20  markets team.

21     Q.  As of January 2017, was there enough

22  liquidity for XRP to -- to be -- to be used for

23  commercially viable cross-border payments?

24           MR. HECKER:  Objection to form.

25     A.  Depends on the corridors that we're

104

1    discussing.

2        Q.   U.S. Mexico?

3        A.   I'm not certain on what the liquidity

4    was for a Mexican peso to XRP in 2017.

5        Q.   What corridors was there sufficient

6    liquidity in for XRP to be used for commercially

7    viable cross-border payments in 2017?

8               MR. WARD:  Objection.

9        A.   I'm not certain.  My role was the

10   regulatory approvals for the banks.

11            MR. CERESNEY:  Why don't we do

12          one more document and then take a break no

13          matter whether the judge calls or not?

14          Because we've been going for awhile.

15            MR. HANAUER:  Sure.

16            (Whereupon, exhibit is presented

17          and marked SEC Zagone Exhibit RZ-7 for

18          identification.)

19            MR. HANAUER:  And I just tendered

20          the witness a document marked as Exhibit

21          RZ-7 beginning with a Bates number ending

22          in 2646.

23   BY MR. HANAUER:

24        Q.   And is Exhibit RZ-7, is that a copy of a

25   Slack chain that you were on and a file uploaded

105

```
 1    to that Slack chain?

 2         A.   That's correct.

 3         Q.   And the document beginning on the second

 4    page of Exhibit RZ-7, is that a paper you wrote

 5    called "XRP Overview for Regulators:  Long-term

 6    Vision and Short-term Tactics"?

 7         A.   That's correct.

 8         Q.   And do you see how on the first page of

 9    Exhibit RZ-7, the first entry in the Slack chain

10    you reference sending a paper to the Bank of

11    Mexico?

12         A.   Yes.

13         Q.   And had you, in fact, sent the XRP

14    overview for regulators' paper to the Bank of

15    Mexico in January of 2017?

16         A.   Yes, I did.

17         Q.   Why?

18         A.   I can't recall specifically on this

19    time.  We had engagement with Mexico over a number

20    of years.  Mexico came up through a Bank of

21    International Settlements meeting that was hosted

22    in Mexico City by the Bank of Mexico and I was

23    presenting on the future of payment infrastructure

24    with blockchain in digital assets.

25         Q.   And I'm sorry if I didn't hear you.
```

106

1          Who in Mexico were you providing this

2    paper to?

3          A.   The central bank.

4          Q.   The central bank?

5          A.   Yeah.

6          Q.   Did you provide this document to

7    regulators in other countries?

8          A.   I believe so.  It was our general

9    document on overview of XRP and xRapid.

10          Q.   And the information you provided in the

11    XRP overview for regulators paper was truthful and

12    accurate?

13          A.   It was.

14          Q.   So I want to refer you to the page

15    ending -- the third page of the paper, the one

16    ending with Bates number 649.

17          A.   I see it.

18          Q.   You see it says "Ripple is working to

19    create the necessary conditions needed for digital

20    assets to be used for liquidity.  We are pursuing

21    three short-term tactics to develop this liquidity

22    solution."

23          A.   I see that.

24          Q.   And the first one is "validating the use

25    case"?

1     A.   Yes.

2     Q.   Can you describe that, please?

3     A.   Validating the use case, we ran a trial

4 in the early days of the company with 12 banks and

5 another experimentation or consulting firm called

6 █████   And that trial was used -- trialing using XRP

7 to test the liquidity savings for international

8 payments.

9     Q.   Then what about "Driving regulatory

10 certainty"?  How was that a tactic to develop

11 liquidity?

12     A.   Yeah.  First we proved there was a valid

13 use case, which -- which we did.  The second step

14 for broader adoption was creating regulatory

15 certainty, that banks could adopt this type of --

16 of solution.  And so this was primarily my work

17 here, working with our banking clients and their

18 regulators, sharing we're meeting vendor due

19 diligence requirements.  We're okay to be

20 leveraged as a new vendor.

21        And, also, here, the -- securing a

22 virtual currency license for XRP II.

23     Q.   And then tactic three, "Creating market

24 liquidity"?

25     A.   Market liquidity was needed to be able

108

1   to process payments through XRP.  And here are

2   some bullet points on what the markets team was

3   doing to build that market liquidity, either build

4   it or -- or establish it through an ecosystem.

5        Q.   And then do you see on the next page,

6   there's a heading "Tactic 3:  Creating Market

7   Liquidity"?

8        A.   Yes, I see that.

9        Q.   And this section of the paper describes

10   Ripple -- Ripple's efforts to create a liquid

11   trading market in XRP?

12        A.   Yeah.  This section here talks about the

13   support we were doing for -- to drive liquidity in

14   the market.

15        Q.   And as one of the ways to drive

16   liquidity in the market, did Ripple pay its --

17             MR. HANAUER:  Let's go off the

18      record.

19             THE VIDEOGRAPHER:  Going off the

20      record at 11:41.

21             (Whereupon, a discussion was

22      held off the written record.)

23             MR. TENREIRO:  We're on the

24      record, Judge.

25             THE COURT:  Thank you.

1              MR. HANAUER:  Good morning, your

2        Honor.  This is Ben Hanauer with the SEC.

3        We are currently in the middle of the

4        deposition of Mr. Ryan Zagone, who was

5        Ripple's director of regulatory relations.

6        We understand that he had responsibility

7        related to Ripple's lobbying efforts as

8        they relate to the SEC.  And we started

9        asking questions related to Ripple's

10       lobbying efforts as they relate to the

11       SEC.  Counsel for Ripple objected, citing

12       the Court's relevancy rulings as to

13       written discovery and then instructed the

14       witness not to answer any questions

15       regarding the substance of the lobbying

16       efforts.  And at that point the SEC

17       requested Court involvement.

18              We understand the Court's ruling

19       as it related to document production and

20       we understand that was a burden issue.

21       Respectfully, your Honor, we have the

22       witness here for a seven-hour deposition,

23       so we don't think the -- the burden

24       exists.  But as a -- as a larger issue,

25       the fair notice defense is being played

```
 1          out not only by your Honor's rulings as
 2          they relate to discovery, but they're
 3          also -- that defense has been raised to
 4          Judge Torres on a motion to strike.  And
 5          the SEC feels it's appropriate to probe
 6          and explore that defense.  Namely, we
 7          believe that Ripple should -- cannot
 8          assert that defense in good faith when it
 9          was itself making lobbying efforts with
10          the goal of creating the very regulatory
11          uncertainty that Ripple claims existed at
12          the time.
13               And, your Honor, it's relevant,
14          Ripple's lobbying efforts are very much
15          relevant to the individuals'
16          scienter-based defenses to the extent
17          Defendants Garlinghouse and Larsen were
18          retaining lobbyists with the express
19          purpose of trying to get the SEC to say
20          XRP was not a security.
21               For those reasons, even in light
22          of the Court's relevancy and burden
23          rulings as they relate to written
24          discovery, the SEC believes it's very
25          much important to explore those topics at
```

1      Mr. Zagone's deposition.

2              MR. CERESNEY:  Your Honor, this

3      is Andrew Ceresney.  Just some brief

4      thoughts.  What -- what Mr. Hanauer said,

5      I'd just direct your Honor to -- I don't

6      know if you have it in front of you, but

7      the June 15th, 2021 ruling that your Honor

8      made on lobbying efforts, I would note

9      your last sentence of this ruling, the

10     final paragraph of that order, and it's

11     clear from the last sentence that your

12     Honor made a ruling both on relevance and

13     on burden.  So you said "In the same vein,

14     Ripple's lobbying efforts regarding the

15     status of XRP are not relevant; and any

16     relevancy argument is outweighed by the

17     burden of production."

18              And so from our perspective,

19     your Honor, and obviously you can speak

20     to this directly, but your prior ruling

21     ruled the lobbying efforts were not

22     relevant and you noted in that ruling

23     that the fair notice defense centers on

24     the activities of the SEC, not Ripple's

25     behaviors and cited in case law to

112

 1          support that.

 2                  And so, therefore, from our

 3          perspective, this questioning at the

 4          deposition, you've already ruled it's not

 5          relevant.  You ruled the documents can't

 6          be produced, and we don't believe it

 7          should occur.

 8                  I should note that Mr. Hanauer

 9          has already spent two plus hours and I

10          think is going to go all seven hours on

11          lots of other issues.  This is not the

12          central issue, I think, of the day.

13          Mr. Zagone covered regulatory regulations

14          more broadly and dealt with foreign

15          governments.  We're letting the SEC

16          explore all other areas.  This is the

17          sole area that we've -- we've instructed

18          the witness not to answer questions on,

19          other, obviously, than privilege.

20                  MR. HANAUER:  And if I may just

21          briefly respond, your Honor.  I would note

22          that in regards to Ripple's lobbying

23          efforts, the -- the only line of

24          questioning we -- we seek as to their

25          substantive efforts are those lobbying

113

```
 1              efforts as they relate to the -- the SEC

 2              and the issue of whether Ripple is a

 3              security -- or XRP is a security.

 4                   MR. CERESNEY:  And on that, your

 5              Honor, I would just note, I don't really

 6              know how to cabin that.  You know,

 7              lobbying efforts in general for

 8              legislation, you know, they could relate

 9              to whether something is a security or not.

10              But what regulatory classification, I

11              think that that's a false narrowing,

12              frankly.  I think, you know, all lobbying

13              probably relates to something in some

14              sense that might be related to SEC

15              activities.

16                   THE COURT:  Okay.  I'm going to

17              just ask for a few minutes just to review

18              that order.  If everybody can just take a

19              brief recess.

20                   MR. HANAUER:  Great.  Thank you.

21                   (Pause in the proceedings)

22                   THE COURT:  Okay.  I've had an

23              opportunity to review the docket and to

24              discuss the issue with my law clerk.  I'm

25              going to authorize the limited questioning
```

114

```
 1              here.  I think given that there is this
 2              pending motion before Judge Torres,
 3              obviously I've ruled in discovery about
 4              the fair notice defense, but that is an
 5              open question how she's going to interpret
 6              it.
 7                   I did, and I stand by my a
 8              ruling that for the purposes of document
 9              production, I think the relevancy is
10              sufficiently limited that the burden
11              outweighed the relevancy, and so I stand
12              by my decision with regard to the
13              document production.
14                   But if the SEC wants to spend
15              part of its time asking this witness
16              questions related to the lobbying
17              efforts, I'm going to authorize it.
18                   MR. CERESNEY:  Okay.  Your Honor,
19              is there any limitations in terms of -- of
20              depth or -- or burden here or is it -- is
21              it just questions of this witness of his
22              knowledge basically on these issues?
23                   THE COURT:  I'm not sure exactly
24              what you're asking me.  I'm certainly
25              going to allow the SEC to use its time as
```

115

 1          it sees fit, so I'm not going to limit the

 2          amount of time it can spend on this

 3          subject.  I don't know that it's intending

 4          to spend a whole lot of time on it, but

 5          I'm not going to limit it.  To the extent

 6          you're asking me about other witnesses

 7          that aren't before me, I'm not sure I want

 8          to make a ruling that's reflected in that

 9          way.

10                    MR. CERESNEY:  Okay.

11                    THE COURT:  Hopefully this

12          ruling gives the parties enough guidance

13          for future depositions.

14                    MR. CERESNEY:  Okay.  Thank you,

15          your Honor.

16                    MR. HANAUER:  Thank you, your

17          Honor.

18                    THE COURT:  Thank you,

19          everybody.

20                    (Whereupon, a recess is taken.)

21                    THE VIDEOGRAPHER:  Okay.  Back on

22          the record at 12:08.

23                    Go ahead.

24    BY MR. HANAUER:

25          Q.   Mr. Zagone, before we went off the

116

1    record, we were on Exhibit 7, on page 2650 of the

2    exhibit.

3                And do you remember I was asking you

4    questions about efforts Ripple made to create a

5    liquid market in XRP?

6         A.   I remember the topic, yeah.  I see that.

7         Q.   And one of the ways Ripple helped create

8    a liquid market in XRP was to pay exchanges to

9    list XRP on -- on those exchanges?

10               MR. HECKER:  Objection.

11        A.   Was that a question or --

12        Q.   Yeah, that's a question.

13        A.   Oh, I don't know.

14        Q.   You don't know whether Ripple paid

15   exchanges to list XRP?

16        A.   I don't --

17               MR. HECKER:  Objection.

18         Objection to form.  Asked and answered.

19        A.   I don't believe we did, but I'm not on

20   the markets team to handle the relationships with

21   the exchanges.

22        Q.   And did Ripple have volume incentive

23   programs for either exchanges or market makers?

24        A.   According to the diagram here, it did,

25   yeah.

117

1      Q.   Okay.  And how -- how did those work?

2      A.   I don't know.  The column here "Creating

3  Market Liquidity," No. 3, came from our markets

4  team.  So I captured that -- I got that

5  information from -- from them.

6      Q.   Okay.

7      A.   I was primarily focused on No. 2.

8      Q.   That was the "Driving Regulatory

9  Certainty"?

10     A.   Correct.

11     Q.   And your -- your role driving regulatory

12  certainty, did that have anything to do with

13  driving regulatory certainty as it relates to the

14  SEC?

15     A.   It related to Ripple as a vendor.  XRP

16  was part of xRapid.  So it would relate to the

17  classification of XRP.

18     Q.   When you say the "classification" as XR

19  -- "of XRP," you mean whether the SEC considered

20  XRP to be a security?

21     A.   How it would be classified in the U.S.,

22  commodity, security.  Yes.

23            (Whereupon, exhibit is presented

24      and marked SEC Zagone Exhibit RZ-8 for

25      identification.)

118

```
 1              MR. HANAUER:  I'm tendering the
 2         witness a document labeled as Exhibit
 3         RZ-8, which starts with a Bates number
 4         ending in 2018.
 5    BY MR. HANAUER:
 6         Q.   And before I ask you a question about
 7    that document --
 8         A.   Uh-huh.
 9         Q.   -- in 2017, was XRP used in any of the
10    software products that Ripple sold to banks?
11         A.   Prior to 2017?  Prior to 2017, all of
12    the products were built on XRP ledger.  We had one
13    platform that we were selling all of our -- we
14    were doing connectivity and liquidity on, so XRP
15    was included in that.  Over time we evolved the
16    solution to two separate products, xCurrent and
17    xRapid.  I'm not sure -- I can't recall the time
18    frame, the year -- the year when we made that
19    split.
20         Q.   And did -- did banks ever use the xRapid
21    product?
22         A.   The financial institutions did.  We --
23    we started rolling out the products -- you need
24    connectivity first to make a payment and liquidity
25    second.  Banks generally have a connectivity
```

1    problem, so we started them first with xCurrent.

2    It was, like, first you have to connect to make a

3    payment.  The strategy was get banks to adopt

4    xCurrent for connectivity.  As they mature, they

5    need liq -- they need to scale liquidity so then

6    we add xRapid.

7            For money services business, or

8    remittance companies, they don't have a

9    connectivity problem, but they can connect to

10   their own subsidiary overseas.  They have a

11   liquidity challenge.  So we started those -- that

12   client segment directly with xRapid.

13       Q.   Okay.  So I -- I get -- so were the --

14   the money transmitters, was that the -- the -- the

15   primary intended purchaser of the xRapid product?

16       A.    There were both banks and money

17   transmitters, would -- were intended to use

18   xRapid.  The money transmitters don't have a

19   connectivity problem, so they kind of fast track

20   right to xRapid.

21       Q.    And when did banks start using xRapid?

22       A.    The strategy was to build connectivity

23   first because they -- banks have a connectivity

24   problem today.  So they would use xCurrent first

25   to build connectivity.  And as they scaled to new

1   currencies or corridors, they need to scale

2   liquidity, they would add xRapid.

3       Q.   I'm -- I'm just trying to figure out

4   when did banks start using the xRapid piece?

5       A.   In my time, I was -- I left Ripple at a

6   time when the money services businesses were using

7   xRapid.  MoneyGram was one of the partners that I

8   was working with.  And banks were on the adoption

9   of xCurrent.  So we were -- the banks were then,

10  say, moving -- after I left, the strategy was they

11  would move on to xRapid.  I wasn't there for that.

12      Q.   Yeah.  And I just want to focus on

13  when -- when you were there.

14      A.   Yep.

15      Q.   So at the time you left Ripple, were

16  banks using xRapid?

17      A.   They were on the path to.

18      Q.   But had not yet started?

19      A.   You had to build a network with xCurrent

20  first for connectivity before you can use xRapid

21  for liquidity, and the banks were on the path to

22  use -- of adopting xCurrent.  So that was the

23  prerequisite to -- connectivity is the

24  prerequisite to xRapid.

25      Q.   And -- and I think I understand that.

121

```
 1    I'm just trying to get a clear answer.

 2         Had banks started using xRapid at the

 3    time you left Ripple?

 4         A.   They hadn't at the time -- that I recall

 5    at the time I left.  They were on the path to with

 6    the xCurrent adoption.

 7         Q.   Okay.  So let's talk about Exhibit 8,

 8    please.  And Exhibit 8 is an e-mail you sent to

 9    various people at DFS on January 31st, 2017?

10         A.   That's correct.

11         Q.   And what -- what is DFS?

12         A.   DFS is the New York Department of

13    Financial Services.  So they were XRP II -- they

14    were the regulator for their license.

15         Q.   And one of the things you were sending

16    DFS was a audit report?

17         A.   Correct.

18         Q.   And why were you sending an audit report

19    to DFS?

20         A.   I believe it was a required piece of our

21    license.

22         Q.   And what was the purpose of the audit?

23         A.   It looks like an AML audit.  So an audit

24    of our AML program and concerns -- and controls.

25         Q.   And A -- AML, that's anti-money
```

122

1    laundering?

2        A.    That's correct.

3        Q.    And the information Ripple sent to DFS

4    in this audit was truthful and accurate?

5        A.    I assume so.   I was not involved in the

6    audit and we used an external auditor for it.

7        Q.    So can I ask you to please turn to

8    page -- of the audit report -- ending in 2027?

9    And do you see the Section 2.1, "Business Model"?

10        A.    I see that.

11        Q.    And just take a moment to review that

12    section.

13            Do those three paragraphs accurately

14    depict XRP II's business model?

15            (Pause)

16                MR. CERESNEY:   I'm going to

17        object on form grounds.

18        A.    The piece I -- I don't think is correct

19    is that Ripple Labs created and maintains the

20    Ripple protocol, the Ripple Consensus Ledger.

21    If -- and the way they're using it here, Ripple

22    protocol means XRP ledger.

23        Q.    And beyond that, the section is

24    accurate?

25        A.    I would also clarify that XRP II is only

123

1   sold -- XRP to institutional investors and

2   financial institutions is the way I understood it.

3        Q.   Is there anything else in that section

4   that's not accurate?

5        A.   The last sentence "Presently XRP has

6   limited commercial use." I would argue the work

7   that the work we were doing in the pilots and in

8   development of xRapid was a commercial use of XRP.

9        Q.   And XRP II's auditor was representing to

10  New York regulators that XRP had limited

11  commercial use?

12                MR. WARD:  Objection to form.

13                MR. CERESNEY:  Objection to form;

14       foundation.

15       A.   The auditor wrote -- the auditor wrote

16  that it had limited commercial use.  I'm not

17  certain if -- what context they're writing that.

18  Is that within our product at the current time or

19  is that more broadly in the market?

20       Q.   And that the auditor also represented

21  that XRP is mainly held as a speculative

22  investment by companies and individuals that

23  expected to rise in value as the Ripple network

24  expands?

25       A.   I see that they wrote that.

124

1      Q.    Did you --

2      A.    It's hard for me to say why people

3   bought XRP or crypto in general.  There are many

4   people in the market buying crypto from a more,

5   like, libertarian-type view where they just didn't

6   want to use the U.S. dollar.  Is that speculative

7   or not?  I -- I don't know.

8      Q.    But these are the representations

9   Ripple -- Ripple's auditors made to the New York

10  regulators?

11             MR. HECKER:  Objection.

12         Objection to form and the use of "Ripple's

13         auditors."

14     A.    This was the -- the audit report that

15  was provided to DFS.

16     Q.    When you worked at Ripple, was XRP used

17  primarily for trading?

18     A.    I -- I don't know how it was primarily

19  used.  Is that question in regards to the company

20  or in general?

21     Q.    I'm just asking you, during the time you

22  worked at Ripple, was XRP used primarily for

23  trading?

24     A.    I'm not -- I can't speak to the whole

25  market, how it was used.

125

```
 1        Q.    Let's look at Exhibit 13.

 2                    (Whereupon, exhibit is presented

 3        and marked SEC Zagone Exhibit RZ-13 for

 4        identification.)

 5                    MR. HANAUER:  And Exhibit RZ --

 6        I -- I'm sorry.  I tendered the witness an

 7        Exhibit labeled -- I tendered the witness

 8        a document labeled Exhibit RZ-17 (sic)

 9        starting with the Bates number ending in

10        7779.

11   BY MR. HANAUER:

12        Q.    Is Exhibit RZ-17 an e-mail chain ending

13   with an e-mail you sent Monica Long on June 19th,

14   2017?

15        A.    Are we on 17 or 13?

16        Q.    Oh.  Thirteen.  Thirteen.  I'm sorry.

17        A.    Okay.  Thirteen is an e-mail I sent to

18   Monica Long.

19        Q.    Okay.  And so I want to direct you to

20   the e-mail starting at the bottom of the first

21   page, the one from          at                    .

22                    (Pause)

23        A.    Okay.

24        Q.    It -- who is           at

25
```

126

1          A.   I don't recall who ███████ is. ████████

2    ██████████ was a communications or public relations

3    firm that we used at one time.

4          Q.   And do you see how Ms. ████████ -- or

5    Ms. ██████ is asking folks at Ripple if we can go

6    and -- if we can go ahead and share information

7    with Mint?

8          A.   I see that, yes.

9          Q.   And what was -- what was ████████

10         A.   ████████ was a website that looked -- I

11   believe it's the website that looked at financial

12   services offerings.

13         Q.   And then do you see right above

14   Ms. ████████ e-mail, ██████████ forwards that e-mail

15   to you and Ms. Long, asks if the submission to

16   ██████ is okay?

17         A.   I see that.

18         Q.   And then you make -- in the second

19   e-mail on the chain, you make two suggestions and

20   then you write "Otherwise, looks okay to me"?

21         A.   Yes, I see that.

22         Q.   And you were reviewing Ms. ████████

23   e-mail to make sure it was fine to -- to send to

24   ████?

25         A.   That's correct.

127

1    Q.  And so on the second page, do you see --

2    second page of the exhibit, in Ms. ███████ e-mail

3    under heading 4, she writes "XRP is available to

4    trade in 12 countries around the world.  Currently

5    it is used primarily for trading"?

6    A.  I see that.

7    Q.  Did you suggest any edits to the

8    response to Question No. 4?

9    A.  I did not.

10   Q.  Did you agree at the time, in June 2017,

11   that XRP was used primarily for trading?

12        MR. HECKER:  Objection to form.

13   A.  That was not a topic that I understood

14   enough to be able to make an edit on.

15        MR. HANAUER:  Exhibit 34.

16        (Whereupon, exhibit is presented

17        and marked SEC Zagone Exhibit RZ-34 for

18        identification.)

19        MR. HANAUER:  Okay.  I'm

20        tendering the witness a document labeled

21        as Exhibit RZ-34 beginning with a Bates

22        number ending in 6147.

23   BY MR. HANAUER:

24   Q.  And is Exhibit RZ-34 an e-mail chain

25   ending in an e-mail you sent to ███████████

128

1  on February 26, 2018?

2      A.   That's correct.

3      Q.   And who is -- is it Mr. or

4  Ms. ██████████

5      A.   Miss.

6      Q.   Miss ███████████

7           And what was Miss ████████████ position

8  at Ripple?

9      A.   She was on the business development team

10  in Europe.

11      Q.   And you're providing Miss ████████████ with

12  information about the history of the development

13  of the xRapid product?

14      A.   Yeah.   She was speaking on a panel and

15  she had requested some guidance on the XRP trial

16  that we were running which was -- led to xRapid.

17  And she was -- she had not been involved in that

18  trial.

19      Q.   And -- and you're talking about the

20  Ripple money transmittal software products that

21  used XRP?

22      A.   Correct.   We didn't have a name for it

23  initially, so I -- I short-handed a lot in my own

24  writings around just calling it XRP.   We didn't

25  have a name for the software solution yet.   It

1    became xRapid.

2         Q.   And you write that for that software

3    solution that used XRP in 2017, there was a proof

4    of concept stage involving 12 banks?

5         A.   That's correct.

6         Q.   And then in 2017, Ripple actually

7    started building the product that became --

8    eventually became known as xRapid?

9         A.   Correct.

10        Q.   And in 2018, Ripple eventually started

11   deploying that product for commercial use?

12        A.   According to this document, yes.

13        Q.   And at the time of your e-mail, February

14   2018, xRapid was still in its pilot testing stage?

15        A.   So we -- from this time on here, in

16   2018 -- we had finished the -- let's see.  We were

17   commercializing the -- the product.  The first

18   pilots had already been announced.  So we're in

19   the phase of rolling out that product through some

20   pilots.

21        Q.   By "pilot," you mean pilot testing?

22        A.   Correct.

23        Q.   Okay.  You -- you can put that down.

24             When did you first become aware that the

25   SEC could determine that XRP was a security and

1  subject to its jurisdiction?

2            MR. CERESNEY:  Objection; form.

3       A.    In late 2016, early -- or in 2017, I

4  believe.  Around there.

5       Q.    And how did you become aware of that?

6       A.    The -- the media and the market were

7  talking more and more about how to classify

8  digital assets.  So I noticed that and that --

9  that's how I -- came on my radar.

10      Q.    And what's your understanding of when

11 Mr. Larsen and Mr. Garlinghouse first became aware

12 that the SEC could determine that the -- that XRP

13 was a security subject to its jurisdiction?

14            MR. WARD:  Objection to form.

15            MR. CERESNEY:  Objection.

16      A.    I -- I don't know when they became

17 aware.

18      Q.    When did you first have a conversation

19 with Mr. Larsen on that issue?

20            MR. WARD:  Objection to form.

21            MR. CERESNEY:  Objection to form,

22       foundation.

23      A.    I did not have a conversation with Chris

24 on that issue.

25      Q.    Have you had conversations with

131

```
 1    Mr. Garlinghouse on the issue about the SEC,

 2    whether it could determine that XRP was a

 3    security?

 4         A.    I had conversations with Brad generally

 5    about XRP's classification, more -- even more

 6    globally than just the U.S.

 7         Q.    Now I'm going to focus on the -- the

 8    SEC --

 9         A.    SEC?

10         Q.    -- piece of it.

11         A.    That was a small -- maybe once or twice

12    we had conversations.  The topic of XRP in the

13    U.S., particularly with the SEC, was owned by

14    legal.  So I -- legal was in charge of that issue.

15         Q.    But you did have conversations with

16    Mr. Garlinghouse on the issue of SEC

17    classification of XRP?

18                   MR. CERESNEY:  Without the

19         presence of legal.  That's the question.

20                   THE WITNESS:  Yeah.

21         A.    Without the presence of legal, no.

22    There's one conversation that I had with Brad and

23    it was more around ensuring support for crypto and

24    blockchain in the U.S. and what we were doing from

25    a -- a general view around ensuring the U.S. could
```

132

1    be a leader on these technologies.

2       Q.   And --

3       A.   It wasn't specific to XRP and the SEC.

4       Q.   When was that conversation?

5       A.   That conversation was around the end of

6    2018.

7       Q.   And -- and I'm trying to be precise on

8    this question and I don't want to probe into any

9    substantive communications.

10          But you referenced having a conversation

11   with Mr. Larsen -- or, I'm sorry, Mr. Garlinghouse

12   and legal on the issue of XRP classification.

13          When did that conversation occur?

14              MR. HECKER:  Objection to form.

15              You can answer.

16      A.   Let me -- let me clarify.  I had a

17   conversation with Brad, or Mr. Garlinghouse, on

18   U.S. competitiveness on blockchain and crypto

19   assets.  That was a one-on-one call that we had.

20      Q.   And that was the one in late 2018?

21      A.   Correct.  That was the conversation with

22   Brad.  The rest of my conversations were with

23   legal.

24      Q.   Okay.  So did you ever have a

25   conversation with Mr. Garlinghouse, legal or --

1   well, did you ever have a conversation with

2   Mr. Garlinghouse where lawyers were present where

3   the subject of XRP's classification as a security

4   was discussed?

5               MR. CERESNEY:  And that's just a

6       yes or no.

7       A.   No.

8       Q.   And have you had conversations with

9   Ms. O'Gorman about the subject of XRP's

10  classification as a security?

11      A.   Yes.

12      Q.   And when did those conversations start?

13      A.   Those conversations started when I

14  became aware that this was an issue in that 2017

15  time frame.  So I raised it with her.  She was my

16  manager at the time.  So I raised the conversation

17  with her, the topic with her.

18      Q.   And what did you guys talk about?

19      A.   I raised that this -- it's a growing

20  topic in the media around how generally crypto

21  assets should be classified.  Uncertainty around

22  the framework in the U.S.  I asked if we had

23  guidance and she said we did and pointed me to our

24  legal team to get that.

25      Q.   Were you ever involved in promoting the

1  message that XRP should not be classified as a

2  security?

3          MR. CERESNEY:  Objection to form.

4          MR. HECKER:  Objection to form.

5      A.   I was involved in sharing educational

6  content around XRP and the company's view that it

7  was not a security.

8      Q.   When you say "sharing the company's

9  view," you mean sharing the company's view to the

10  public that XRP was not a security?

11     A.   Correct.

12     Q.   When did Ripple first learn that the SEC

13  was bringing lawsuits involving digital assets?

14          MR. HECKER:  Objection to form.

15     A.   I can't speak for the company, when the

16  company first learned.  So I don't know when the

17  company first learned.

18     Q.   How about you?  When did you first

19  learn?

20     A.   I first learned around the time -- there

21  was a number of cases, particularly around

22  celebrities promoting ICOs.  And that was when --

23  that's when the topic came up.  The exact time

24  frame I can't remember, but those are the types of

25  cases I remember seeing.

135

1              (Whereupon, exhibit is presented
2          and marked SEC Zagone Exhibit RZ-30 for
3          identification.)
4              MR. HANAUER:  I just tendered the
5          witness a document labeled Exhibit RZ-30,
6          which begins with a Bates number ending in
7          2232.
8   BY MR. HANAUER:
9       Q.   And Exhibit 30 is an e-mail that ███████
10  ████ sent you on May 21st, 2015?
11      A.   That's correct.
12      Q.   And do you see how she starts -- Ms. █████
13  starts her e-mail, "Ryan, thanks for talking to me
14  last week"?
15      A.   I see that.
16      Q.   In what capacity were you interacting
17  with Ms. █████
18      A.   I don't recall Ms. ████ or this e-mail.
19      Q.   Was she your -- was she Ripple's lawyer?
20              MR. WARD:  Objection.
21              MR. CERESNEY:  Objection to form,
22          foundation.
23      A.   I don't know.  I can't recall her.
24      Q.   Do you understand her to be providing
25  you legal advice in Exhibit RZ-30?

136

1          MR. WARD:  Objection.

2          MR. CERESNEY:  And -- and I

3      don't -- before you answer that, you

4      should at least look through it more than

5      you would otherwise.

6      A.    I did not understand her to be giving

7   legal advice to us at this time, no.

8      Q.    And do you see how Ms. ███    e-mail

9   references a generic slide deck that she had been

10  using to make continuing legal education credit

11  presentations?

12     A.    I see that.

13     Q.    Okay.  And is that slide deck what is

14  attached to her e-mail in Exhibit 30?

15         MR. WARD:  Objection.

16     A.    I see that.  It looks from the comments

17  here, she says "I really enjoyed your historical

18  perspective on the ███    all."  I gave a

19  presentation to the ███    team -- or ███

20  hosted on the evolution of blockchain and crypto

21  as a use -- as a tool for payments.  I recall

22  that.  It looks like she was looking for some of

23  the content I developed that was, like, payment

24  focused.

25     Q.    And -- and she's sending you a -- a

137

1    presentation attached to her e-mail, correct?

2        A.   Yeah.  She sent me one of her

3    presentations, yeah.

4        Q.   And I want to refer you to the page of

5    the presentation ending in 2247.  That page

6    contains a public statement by the then-chair of

7    the SEC, Mary Jo White?

8        A.   I see that.

9        Q.   And Mary Jo White was telling Congress

10   certain virtual currencies could be subject to SEC

11   regulation?

12                MR. WARD:  Object to the form.

13       A.   I see the -- the quote there.  In this

14   e-mail exchange -- I don't even think I read this

15   attachment.  I didn't ask for it.  She's just

16   voluntarily sending it to me as a -- I believe

17   like a pitch to become her client.  It wasn't

18   requested.  I didn't use it.

19       Q.   Did you read it?

20       A.   No.  I don't recall reading it.

21       Q.   Okay.  And then I just want to refer you

22   to the next page on the exhibit.

23            Were you aware that by 2015 the SEC had

24   brought enforcement actions involving investments

25   related to bitcoin?

1      A.   I can't recall.

2      Q.   If Ripple wanted to see what type of

3  cases the SEC was bringing, would that information

4  have been publicly available to Ripple?

5             MR. WARD:  Object to the form.

6      A.   If Ripple wanted to see what type of

7  cases the SEC was bringing?  It would be an SEC

8  press release, I'd assume.

9      Q.   Did you ever review the SEC website?

10     A.   They were not part of my scope of work.

11  That was the legal team.  No.  I did -- yes, I did

12  review the SEC website to learn about the issue --

13     Q.   What issue --

14     A.   -- learn about classification of digital

15  assets, but that was not my scope of work or

16  responsibility.

17     Q.   And when did you review the SEC website

18  to learn about the SEC's classification of digital

19  assets?

20     A.   I can't recall the first time I looked

21  at it or the frequency.  I recall reading the DAO

22  report when that came out.  That's what I recall.

23            MR. HANAUER:  Thirty-one.

24          (Whereupon, exhibit is presented

25      and marked SEC Zagone Exhibit RZ-31 for

139

1              identification.)

2                    MR. HANAUER:  I tendered the

3        witness a document labeled as Exhibit

4        RZ-31 with a Bates number -- beginning

5        with a Bates number ending in 8880.

6   BY MR. HANAUER:

7        Q.   And is Exhibit 31 a copy of an e-mail

8   chain ending with an e-mail from you to

9   Ms. O'Gorman on January 3rd, 2017?

10       A.   Correct.

11       Q.   And I want to refer you to the -- the

12  second e-mail in the chain, the one from

13  Ms. O'Gorman, where she writes "Note:  We will

14  also need to add XRP as not a security to the Q1

15  priorities (more of a January 2017 priority)."

16       A.   I see that.

17       Q.   What did you understand her to be

18  referring to?

19       A.   Let me take a look.

20            (Pause)

21       A.   So I'm asking -- she's asking for my

22  priorities for the year -- the quarter, I'm sorry.

23  And she's noting that we need to add XRP as not a

24  security to those priorities.

25       Q.   Okay.  And if you could explain that,

140

1    what that would mean as to how that's one of your

2    priorities?

3         A.   To assist legal in their analysis of the

4    issue.

5         Q.   And was that one of your priorities in

6    2017, January of 2017?

7         A.   It says "correct" on the security

8    issues, so, yes, it was incorporated into the

9    priorities.

10        Q.   And beyond working with legal on the

11   issue, was it also one of your priorities to work

12   with other departments at Ripple to give them

13   guidance on how to talk about XRP with the goal of

14   having XRP not be classified as a security?

15             MR. HECKER:  Objection to form.

16        A.   We -- my role there was sometimes

17   developing collateral for assisting        or

18        in building collateral, the general

19   counsels.  At times that was shared with others at

20   Ripple to educate them on the background of XRP,

21   how the XRP ledger works, and the company's view

22   on how it should be classified.

23        Q.   What do you mean -- you mentioned

24   collateral with the legal department?

25        A.   I mean like a paper or presentations,

1    some reference material.

2        Q.   Okay.

3             MR. HANAUER:  Could we go to...

4        Q.   Oh.  What efforts did you make in 20 --

5    in Q1 -- in the first quarter of 2017 on this

6    issue of whether XRP was classified as a security?

7             MR. HECKER:  Objection to form.

8        A.   I can't recall in that quarter what we

9    -- what we were doing -- or what I was doing.

10       Q.   How would -- what was your understanding

11   of how you would have met that priority?  How

12   would you have satisfied it?

13            MR. WARD:  Object to the form.

14       A.   Assist -- assist legal in what they

15   needed assistance with.  Building the collateral

16   or -- yeah.  My role there was building

17   collateral, sales -- or the sales deck, a

18   presentation, or content summarizing the work

19   legal had done.

20       Q.   Why did it matter to Ripple whether XRP

21   was classified as a security?

22            MR. HECKER:  Objection to form.

23            MR. CERESNEY:  And -- and on

24       this, I just want to caution you not to

25       share information you gathered from legal.

142

1     A.    We -- we didn't believe it was a

2     security.

3     Q.    But, I guess, what -- what's the

4     significance to Ripple whether XRP's classified as

5     a security or not?

6           MR. HECKER:  Objection to form.

7     A.    The -- the implications of it -- I'm not

8     a securities expert, so I -- I don't know.

9     Q.    Did you have any understanding of what

10    it would mean for Ripple if the -- if the SEC

11    classified XRP as a security?

12          MR. WARD:  Objection.

13          MR. CERESNEY:  Objection.

14          And -- and to the extent that

15          your understanding comes from discussion

16          with counsel, I'll instruct you not to

17          disclose that information.

18          THE WITNESS:  Okay.

19    A.    My understanding came from discussions

20    with counsel.

21    Q.    Did you have any understanding that

22    didn't come from discussions with counsel?

23    A.    No.

24          (Whereupon, exhibit is presented

25          and marked SEC Zagone Exhibit RZ-9 for

143

1          identification.)

2                    MR. HANAUER:  I tendered the

3          witness a document marked as Exhibit RZ-9

4          with a Bates number ending in 3291.

5     BY MR. HANAUER:

6          Q.   Is Exhibit RZ-9 a copy of an e-mail you

7     sent to Ms. O'Gorman and Mr. Vias on March 9th,

8     2017?

9          A.   Correct.

10         Q.   And you are forwarding them an article

11    from the American Banker?

12         A.   That's correct.

13         Q.   And the article talked about whether

14    certain digital assets should be classified as

15    securities?

16                   MR. WARD:  Object to the form.

17         A.   The article -- "Are Crypto 'Tokens'

18    Securities by Another Name?" is the title.  I

19    assume it's around how to classify crypto tokens.

20                   THE REPORTER:  Repeat.  Repeat.

21                   THE WITNESS:  Repeat my answer?

22                   THE REPORTER:  Yes, please.

23         A.   The title of the article is "Are Crypto

24    'Tokens' Securities by Another Name?"  So I assume

25    it's around the classification of crypto tokens.

144

1      Q.   And in sharing the article with

2   Ms. O'Gorman and Mr. Vias, you're telling them

3   that the article discusses whether Ethereum is a

4   security or not?

5           MR. WARD:  Object to the form.

6      A.   From the e-mail, it looks like the

7   article was focused on Ethereum.

8      Q.   And you're telling Ms. O'Gorman and

9   Mr. Vias is -- is whether Ethereum is a security

10  or not hinges on several factors, including how

11  it's discussed when being sold?

12          MR. WARD:  Object to the form.

13     A.   Correct, I say that.

14     Q.   What was your understanding of those

15  factors that determined whether a digital asset

16  was a security?

17          MR. CERESNEY:  And, again, here,

18      just to caution you not to share

19      information that you obtained through

20      discussions with counsel.

21     A.   My understanding of the securities issue

22  came from discussions with counsel.

23     Q.   Any other sources?

24     A.   News articles, I guess.

25     Q.   What did you learn from the news

145

1    articles?

2                    MR. CERESNEY:   To the extent you

3        can answer it --

4        A.    Yeah, I -- I can't recall.

5        Q.    Then you tell them "XRP is materially

6    different from Ethereum"?

7        A.    Yes.

8        Q.    How is XRP materially different from

9    Ethereum?

10       A.    In the -- how the platforms confirm

11   transactions is different.  One uses proof of

12   stake; the other uses proof of work.

13       Q.    How else were they materially different?

14       A.    Ethereum has some features where you can

15   create a smart contract on Ethereum, which XRP

16   ledger does not.  So the technical features are

17   different.

18       Q.    So did the -- based on your

19   understanding, did -- did the differences between

20   Ethereum and XRP, did it make Ethereum more like a

21   security or XRP more like a security?

22                    MR. HECKER:   Objection to form,

23        foundation.

24       A.    I'm not qualified to say either way.

25       Q.    And then you write at the end of that

146

1    second paragraph, "It does highlight the fact that

2    what we say and how we describe it is important"?

3         A.    Uh-huh.

4         Q.    What do you mean by that?

5              MR. WARD:  Object to the form.

6         A.    To ensure we're describing it

7    accurately.

8         Q.    Describing what?

9         A.    Our product and XRP.

10        Q.    And why is that important?

11        A.    To make sure the market has an accurate

12   understanding of XRP versus Ripple and the

13   difference between those two, the company and the

14   software.

15        Q.    Was how Ripple described XRP important

16   to the issue of whether XRP was classified as a

17   security?

18              MR. CERESNEY:  Object to the

19        form.

20        A.    My work there was to ensure we were

21   describing it accurately.  That Ripple was

22   describing itself and XRP accurately.  To the

23   degree it factored into is it a security or not

24   wasn't a -- was a guidance from legal.

25        Q.    And in the third paragraph you write

147

```
 1      "Antoinette and I want to host a roundtable with
 2      the XRP team to discuss this issue in detail"?
 3           A.   Uh-huh.
 4           Q.   What's the "XRP team" that you're
 5      referencing there?
 6           A.   I used XRP pretty broadly to capture
 7      xRapid.  So XRP team here would have been the
 8      xRapid team, so the product team, and the -- the
 9      teams that were supporting that product, be it
10      sales, ops, communications.
11           Q.   And you write "We want to arm the team
12      with an understanding of this issue for both XRP
13      and Ethereum"?
14           A.   Uh-huh.
15           Q.   What steps did you take to arm the team?
16           A.   We -- we made a presentation or
17      collateral, as we talked about previously, that
18      outlined XRP, particularly --
19                    MR. CERESNEY:  Let me just
20           caution you.  You can talk at a high level
21           about the topic of the collateral.
22                    THE WITNESS:  Okay.
23                    MR. CERESNEY:  But I wouldn't --
24           but please don't go beyond that because
25           we've claimed privilege on that collateral
```

148

1          as being influenced by discussions with

2          counsel.

3                    THE WITNESS:  True.

4          A.    So this -- this was -- I'm recalling

5     things now.  So This was an output of the Q1 2017

6     objectives.  The -- this is the work with legal on

7     summarizing their work into collateral.  We -- the

8     collateral we built compared ICOs -- it was really

9     more about ICOs than -- ICOs versus Ripple, how

10    they're different.

11         Q.    Did -- did this roundtable with the XRP

12    team take place?

13         A.    It did.

14         Q.    When?

15         A.    2017.  In 2017.  After this e-mail.

16         Q.    Who participated in the roundtable?

17         A.    The roundtable was led by ███████   I

18    assisted with the collateral in presenting some

19    points on the call.  The participants included XRP

20    markets teams or the markets team, the xRapid

21    product team, and communications.

22         Q.    And as of early March 2000 teen (sic),

23    had Ripple been accurately describing XRP in its

24    public communications with the market?

25         A.    Generally, I felt so, yes.

149

1        Q.   Then what was the need for the -- the

2   roundtable?

3        A.   We had an in -- we had a growing team.

4   This is the time when we had many new hires coming

5   onboard, particularly on the product and the comms

6   team.  So we wanted to ensure they had adequate

7   background on how -- what the company was, how the

8   products work.

9             And we note -- specifically we noted

10  there was incorrect articles in the media that

11  often conflated Ripple and XRP incorrectly.  And

12  we wanted to make sure that the comms team

13  understood what was correct and what was incorrect

14  so they weren't inadvertently repeating something

15  that was wrong.

16             MR. HANAUER:  Exhibit 45.

17             I'm going to do one more exhibit

18        on this topic and then get to lunch.

19             MR. CERESNEY:  Is that okay?

20             THE WITNESS:  Definitely.

21             (Whereupon, exhibit is presented

22        and marked SEC Zagone Exhibit RZ-45 for

23        identification.)

24             MR. HANAUER:  I tendered the

25        witness an exhibit labeled RZ-45,

150

1          beginning with a Bates number ending in

2          3483.

3     BY MR. HANAUER:

4          Q.    And you're not -- I don't believe you're

5     on -- a recipient of this e-mail, but I want to

6     refer you to the third -- second page of the

7     exhibit, the one ending in 3483 (sic).

8          A.    Uh-huh.

9          Q.    And do you see how there's a reference

10    at the very bottom to an "XRP team discussion,

11    ICOs, securities and commodities analysis"?

12              MR. HECKER:    Sorry.  And just to

13         be clear it's Bates 3484.

14              MR. HANAUER:    Thank you.  Thank

15         you, Counsel.  I haven't had my lunchtime

16         coffee.

17              MR. CERESNEY:    No worries.

18    BY MR. HANAUER:

19         Q.    This XRP team discussion, is that the

20    one that you just talked about when we were

21    discussing Exhibit 9?

22         A.    That's correct, yes.

23         Q.    And is that the one that Ms. ███████

24    attended?

25         A.    Yes.

```
 1         Q.    And then going to the very top of

 2    Exhibit 45, the first e-mail there, it says "Ryan

 3    put together a strong deck that summarizes the key

 4    points."

 5         A.    Uh-huh.

 6         Q.    Is -- do you understand that deck to be

 7    the collateral you referenced that you prepared

 8    for Ms. ████

 9         A.    Correct.

10              MR. HANAUER:  Okay.  Let's go off

11         the record.

12              THE VIDEOGRAPHER:  Okay.  Going

13         off the record at 1:03.

14              (Whereupon, a luncheon recess

15         was taken.)

16

17

18

19

20

21

22

23

24

25
```

152

```
 1                A F T E R N O O N   S E S S I O N

 2                    THE VIDEOGRAPHER:  Back on the

 3          record at 1:40 p.m.

 4                    Go ahead.

 5                    (Whereupon, exhibit is presented

 6          and marked SEC Zagone Exhibit RZ-18 for

 7          identification.)

 8                    MR. HANAUER:  I just tendered the

 9          witness a document labeled as Exhibit

10          RZ-18 starting with a Bates number ending

11          in 3070.

12   BY MR. HANAUER:

13          Q.    And Exhibit RZ-18, a copy of an e-mail

14   sent from            to Mr. Vias, copying you

15   and others, dated April 6, 2018?

16          A.    That's correct.

17          Q.    And who is Mr.

18          A.    Mr.        is a counsel at Ripple.

19          Q.    And some of the recipients of his e-mail

20   are from

21                What -- what is that?

22          A.          was a relationship that our markets

23   team maintained.  I'm not certain what they do.

24          Q.    And do you see how attached to the

25   e-mail to        is what appears to be a letter to
```

153

1    the United Kingdom Financial Conduct Authority?

2         A.   I can't tell who the letter is for

3    actually, who the letter is to.

4         Q.   Right, because that's redacted.  But

5    let's start off looking at the attachments line of

6    the e-mail on Exhibit RZ-18.

7         A.    Ah, okay.  I'm sorry.  I see it.  UK

8    FCA.

9              MR. HECKER:  Just for the record,

10        it looks like there's two attachments:

11        One is "letter(redacted).pdf" and the

12        other is "UK FCA comment letter."

13             Are you representing that the --

14        this attachment is the second attachment?

15             MR. HANAUER:  Well, that's a good

16        point.  Let's try and clear that up.

17   BY MR. HANAUER:

18        Q.   Do you have an understanding of what

19   this letter is that's attached to Mr. ████

20   e-mail?

21             MR. WARD:  Objection.

22        A.   Briefly looking at it, no, I don't.

23        Q.   Have you ever seen a letter like that

24   before?

25        A.   I do not recall seeing that before.

154

```
1          Q.   Okay.  So I want to ask you some
2    questions about -- about the letter.
3               Can you go to page ending in 072,
4    please?  Do you see the section that says "Digital
5    Assets and SEC Guidance"?
6                    MR. CERESNEY:  Again, Ben, just
7               for the record, the letter appears to
8               be -- it's got page 1 of the letter and
9               then it appears to skip to page 8 and then
10              page 9.  So this looks like an excerpt.
11                   MR. HANAUER:  Right.  And I can
12              represent this is exactly how -- you can
13              see from the Bates labeling this is
14              exactly how it was produced to us from --
15              from Ripple.
16                   MR. CERESNEY:  Yeah.  I just want
17              the witness to understand that it's an
18              excerpt.
19                   MR. HANAUER:  Yes, of course.
20                   MR. WARD:  And I'll also just
21              note for the record, again, there appears
22              to be another attachment that appears to
23              go along with this.
24         A.   So this does not look like the letter to
25    the FCA.
```

1          Q.    Okay.  What was the letter to the FCA?

2          A.    I can't recall without having seen it.

3          Q.    Were -- were you involved in writing the

4     letter -- writing a letter to the FCA in July

5     2017?

6          A.    I -- I could have been, but not seeing

7     the letter, I don't know.

8          Q.    Okay.  So do you see on page 3072 where

9     it says -- you know, that paragraph "Digital

10    Assets and SEC Guidance"?

11         A.    Yes.

12         Q.    Do -- do you see the reference to a case

13    called SEC v. W.J. Howey Company?

14         A.    I see that, yes.

15         Q.    Were you aware when you worked at Ripple

16    that the Supreme Court's decision in SEC v. Howey

17    provided a test for determining whether a

18    financial instrument is a security under federal

19    law?

20              MR. CERESNEY:  Objection to form.

21         I think that -- it's actually not a test

22         for whether a financial instrument is a

23         security.  It's a test for whether the

24         financial instrument is an investment

25         contract under federal law.

```
 1                    THE REPORTER:  I can't hear you,
 2          sir.
 3                    MR. CERESNEY:  It's a test not
 4          for whether it's a security but whether a
 5          financial instrument is an investment
 6          contract under federal law.  I assume that
 7          your question -- request means the same --
 8          similar question, but I want for the
 9          record to be clear.
10     BY MR. HANAUER:
11          Q.   You can -- you can answer it if you
12     understand.
13          A.   I'm aware of Howey.
14          Q.   And are you -- when you worked at Rip --
15     when you worked at Ripple, you were aware of
16     Howey, correct?
17          A.   Correct.  Yes.
18          Q.   And when you worked at Ripple, were you
19     aware that the SEC could use the Howey test to
20     determine whether XRP was a security or not?
21                    MR. CERESNEY:  Objection.
22                    And instruct you not to reveal
23          anything about discussions with counsel.
24          So if the only source of information to
25          answer the question is discussions with
```

157

1          counsel, then I instruct you not to

2          answer.

3          A.    My awareness of Howey came from -- came

4     from counsel.

5          Q.    You had mentioned you had read the Dow

6     report?

7          A.    The Dow report?  Yes, I read the Dow

8     report.

9          Q.    And the Dow report contained a

10    discussion of Howey?

11         A.    I can't recall what was in that report.

12         Q.    Were you aware that the Dow report

13    described certain factors that the SEC considered

14    when determining whether a digital asset is a

15    security?

16         A.    I -- I haven't looked at it since I read

17    it.  And it's been many years, so I can't recall.

18         Q.    Do you remember when you read it while

19    working at Ripple?

20         A.    I think I read it when it came out.

21         Q.    And that was in July 2017?

22         A.    That's the date that it was published.

23    I remember it coming out and it was pretty big

24    news.  We read it.

25         Q.    And after reading the Dow report, you

 1    were aware that the SEC determined that the

 2    digital asset described in that report was a

 3    security?

 4              MR. CERESNEY:  Objection to form.

 5        A.   I can't recall.  I read it, but the DAO

 6    report was -- DAO is very different from the XRP.

 7        Q.   And that's based on your own

 8    understanding or something you learned from

 9    counsel?

10        A.   In my -- in my own understanding, very

11    high level understanding of the DAO.

12        Q.   Okay.  So how -- how is the DAO token

13    different from XRP excluding what you've learned

14    from counsel?

15        A.   From my own understanding, XRP wasn't

16    created or didn't run as an organization, this

17    autonomous organization.  It was a payment -- we

18    were using it as a payments tool.  It's different

19    than the DAO, which was set up as an organization.

20        Q.   And when you read the Dow report, were

21    you aware that the SEC could eventually determine

22    that XRP was a security?

23        A.   That was not my understanding when

24    reading the DAO report.

25        Q.   I'm not asking your understanding of --

159

1    that you believed the SEC would determine XRP was

2    a security.  I guess, were you aware that the SEC

3    could eventually come to that determination?

4                MR. HECKER:  Objection; asked and

5         answered.

6         A.    Could the SEC examine XRP?

7    Hypothetically, yeah, they could.

8         Q.    And going to the -- the bottom of page

9    072 of Exhibit 18, do you see how it references "a

10   legal memorandum from a reputable law firm that

11   supports a finding that XRP is not a security

12   under U.S. law"?

13        A.    I see that, yes.

14        Q.    Do you have an understanding of what

15   that's referring to?

16        A.    Because we got -- our legal team got

17   counsel to examine if XRP is a security and they

18   found that it was not.

19        Q.    And have you seen any -- have you seen

20   such a memorandum?

21        A.    No, I saw -- from what I recall, I saw

22   summary points of the memorandum, but not the

23   actual memorandum.

24        Q.    Do you know what law firm provided that

25   memorandum to Ripple?

160

```
 1        A.   No.
 2                   (Whereupon, exhibit is presented
 3             and marked SEC Zagone Exhibit RZ-15 for
 4             identification.)
 5                   MR. HANAUER:  And I tendered the
 6             witness an exhibit labeled RZ-15, which
 7             begins with a Bates number ending in 47 --
 8             or, I'm sorry, ending in 47977.
 9   BY MR. HANAUER:
10        Q.   And is Exhibit RZ-15 a copy of an e-mail
11   chain ending with an e-mail you sent on October
12   26th, 2017?
13        A.   That's correct, yes.
14        Q.   And then the next -- do -- do you see
15   the -- there's an e-mail in Exhibit RZ-15 from a
16   ███████████ at HiTBTC.com?
17        A.   Yes, I see that.
18        Q.   What was HitBTC?
19        A.   I don't know.  It looks like this was
20   forwarded to me from the markets team.
21        Q.   Do you see there's a reference to
22   listing XRP on -- the words of the e-mail are "our
23   exchange"?
24        A.   Okay.  Yep.
25        Q.   Does this refresh your recollection
```

1   whether HI -- HitBTC was a digital asset exchange?

2       A.   It would seem so from the wording here,

3   but I -- I don't recall who HitBTC is.

4       Q.   And did you -- do you see that H --

5   HitBTC was telling Ripple that it would not list

6   financial instruments classified as securities on

7   its exchange?

8       A.   Yes, I see that.

9       Q.   And do you see that HitBTC wanted Ripple

10  to certify that XRP could not be classified as a

11  security by the SEC?

12      A.   Yes, I see that.

13      Q.   And you suggest forwarding this inquiry

14  to Ms. O'Gorman and Ms. ▮▮▮▮▮

15      A.   That's correct.

16      Q.   How did Ripple end up responding to

17  HitBTC?

18      A.   I don't know.

19      Q.   Did Ripple certify to HitBTC that XRP

20  could not be classified as a security by the SEC?

21            MR. HECKER:  Objection;

22       foundation.

23      A.   I don't know how we responded.  I

24  directed it to ▮▮▮▮ the general counsel -- I'm

25  sorry, legal team, and to Antoinette O'Gorman, the

162

1  compliance officer.

2      Q.   Do you have an understanding whether

3  HitBTC ultimately allowed Ripple to list XRP on

4  its exchange?

5      A.   I don't know.

6      Q.   Do you know if Ripple eventually listed

7  XRP on HitBTC exchange?

8      A.   I don't know.  I can't recall HitBTC.

9      Q.   Were there other exchanges that told

10  Ripple that the exchange could not list XRP if XRP

11  could be classified as a security?

12     A.   Not that I recall coming to me.  There

13  could have been others that came to the markets

14  team.

15     Q.   Are you aware of any?

16     A.   Not that I recall.  Not that came to me.

17     Q.   When was Ripple first able to get XRP

18  listed on a major United States exchange?

19          MR. CERESNEY:  Objection; form.

20     A.   What -- what would you consider major?

21     Q.   Well, okay.  When was Ripple first able

22  to get XRP listed on a United States digital asset

23  exchange?

24          MR. HECKER:  Same objection.

25          MR. CERESNEY:  The question was

163

1           when Ripple was able to get it listed --

2           is that the question? -- or when XRP was

3           listed on a major exchange?

4                     MR. HANAUER:  That's fair.

5    BY MR. HANAUER:

6           Q.   When -- when was XRP first listed on a

7    United States digital asset exchange?

8           A.   First that I became aware of a listing

9    was Bitstamp.  I'm not sure if that was the Europe

10   or the U.S. subsidiary of Bitstamp.  That was the

11   first one and that was in my early days at Ripple

12   in 2014, 2015.

13          Q.   And you don't know whether -- when --

14   when was -- when did XRP first get listed on a

15   U.S. exchange, U.S. based exchange?

16          A.   Bitstamp could have been a U.S.

17   exchange.

18                     MR. HANAUER:  Seventeen.

19                     (Whereupon, exhibit is presented

20          and marked SEC Zagone Exhibit RZ-17 for

21          identification.)

22   BY MR. HANAUER:

23          Q.   And -- and before you look at that

24   document, a couple minutes ago you were telling me

25   about -- I asked you about a law firm memo and you

164

1  said you had received a summary of that memorandum

2  but not the memorandum itself.

3      A.   I recall receiving bullet points that

4  summarized the memorandum, but I don't recall

5  receiving the memorandum.

6      Q.   Do you know who else at Ripple received

7  those bullet points?

8      A.   I -- I don't.

9          MR. HANAUER:  So I tendered the

10     witness a document labeled RZ-17,

11     beginning with the Bates number ending in

12     1610.

13     Q.   And is Exhibit RZ-17 a copy of an e-mail

14  chain ending with an e-mail you sent dated April

15  5th, 2018?

16     A.   That's correct, yes.

17     Q.   And do you see how the -- the e-mail

18  chain begins with Mr. ▮▮▮▮▮▮ forwarding you an

19  article he had received from the MIT Tech Review?

20     A.   I can't tell if I received this from

21  ▮▮▮▮▮▮ or if I was copied in from ▮▮▮▮▮▮

22     Q.   But at -- but at some point, you -- in

23  the chain, you received an MIT Technology Review?

24     A.   That's correct.  At some point I -- I

25  received this.

1      Q.   And I refer you to the page of the

2   exhibit, the third page of the exhibit, the one

3   with the Bates number ending in 612.

4          Do you see the paragraph that says --

5   begins "Also, hold on, is XRP a security?"

6      A.   I see that, yes.

7      Q.   And after that it says "So far, Ripple

8   has failed to land its token, called XRP, on a

9   major U.S. exchange"?

10      A.   I see that statement.

11      Q.   Was that statement accurate in April of

12   2018?

13      A.   I'm not certain.  I can't recall

14   when there was broader listings.  I would say the

15   statement's inaccurate because they're saying that

16   Ripple failed to do this, but for me, the

17   exchanges that I was aware of, you can openly list

18   XRP.  You don't have to come to Ripple.

19      Q.   But Ripple did -- I think you had talked

20   earlier about how -- how Ripple made efforts to

21   get XRP listed on exchanges?

22          MR. HECKER:  Objection to form.

23      A.   Ripple made efforts to ensure --

24   Ripple's work was focused on ensuring we had

25   enough liquidity to operate xRapid in a country.

 1   That ties back to the earlier slide we looked at

 2   with the stair steps.

 3            So that could -- yeah, the work we were

 4   doing was around ensuring there's a liquidity

 5   ecosystem to support there's xRapid.  We had

 6   enough liquidity to make an xRapid payment.

 7        Q.   Right.  And one of the things Ripple did

 8   in its efforts to create more liquidity was to

 9   attempt to get XRP listed on more exchanges?

10        A.   For -- for countries that I recall, it

11   was already listed.  So the work that we were

12   doing was connecting xRapid to that exchange where

13   it was listed already so that the exchange could

14   process an xRapid instruction and pay out.  I'm

15   not -- XRP was pretty openly listed in many

16   countries because there was already a regulatory

17   framework in place, particularly the ones we were

18   looking at:  Philippines, Mexico, UK.

19        Q.   In 2018, was Ripple openly listed on

20   United States exchanges?

21            MR. CERESNEY:  Objection; asked

22         and answered.

23        A.   I believe so, yes.

24        Q.   So did you disagree with the article's

25   contention that Ripple had failed to land its --

167

```
 1    had failed to land XRP on a major U.S. exchange?

 2         A.   I -- I do disagree with that.  I bought

 3    it from -- previous to this on a -- on a U.S.

 4    exchange.

 5         Q.   Which one?

 6         A.   I bought on -- I had an account on

 7    Bitstamp and I bought through Binan -- not

 8    Binance.  Genesis.

 9         Q.   When was that?

10         A.   2017.

11         Q.   And do you see how the article mentions

12    the SEC is still trying to determine which

13    cryptocurrencies meet the definition of a security

14    and which do not?

15         A.   I see that, yes.

16         Q.   And in April 2018 were you aware that

17    the SEC could eventually determine to consider XRP

18    as a security?

19         A.   I wasn't in a place to really judge what

20    risk we had with the SEC.  That was -- that was on

21    legal to decide.  It was ultimately legal.

22         Q.   But you understood there was some risk

23    the SEC could eventually determine that the XRP

24    was a security?

25              MR. HECKER:  Object.  Objection
```

```
 1          to form.
 2                    MR. CERESNEY:  And also instruct
 3          the witness to answer separate and apart
 4          from discussions with counsel.
 5          A.    I -- I understood our company's position
 6    was we felt it was not a security.
 7                Is there a hypothetical risk in there
 8    that SEC could?  I -- I wouldn't be able to say.
 9    I don't know.  I did not know enough to have an
10    informed view on that.
11          Q.    Did the SEC ever tell Ripple that XRP
12    was not a security?
13          A.    I never communicated with the SEC.
14                    MR. WARD:  Objection to form.
15          Q.    Were you aware of anyone from the SEC
16    telling that to anyone at Ripple?
17          A.    I wasn't aware.
18          Q.    And then going to the first page of
19    Exhibit 17, in your e-mail you write "The silence
20    from the company has created a void that others
21    are filling with whatever info they can find."
22          A.    Uh-huh.
23          Q.    "I've raised to marcomm the need for a
24    brief paper (two to three pages) that gives a
25    high-level summary of XRP's history and
```

169

```
 1    classification.  I feel we need to put a stake in
 2    the ground.  Currently there is not one, resulting
 3    in a lot of incorrect info."
 4         A.   I see that, yes.
 5         Q.   So are you writing that Ripple needs to
 6    do a better job conveying the message that XRP is
 7    not a security?
 8              MR. HECKER:  Objection to form.
 9         A.   I'm writing that the company had not
10    been -- not engaged publicly on history of XRP and
11    its classification.  And I felt we needed to
12    because the market was starting to create
13    incorrect information about that.  So incorrect
14    information on how XRP worked, a conflation
15    between XRP and Ripple.  We saw a lot of incorrect
16    press reports and I thought the -- my view was the
17    company should be more proactive and leaning
18    forward to address that.
19         Q.   Any of these issues related to XRP's
20    classification as a security?
21         A.   Its history and how it worked and I put
22    in here a classification.
23         Q.   Did marcomm -- what is marcomm?
24         A.   Marcomm was shorthand for the marketing
25    and communications team.
```

1          Q.    And did marcomm ever produce a -- a

2     paper that gave a high-level summary of XRP's

3     history and classification?

4          A.    I don't recall them producing a paper,

5     but they did become more -- more vocal on our

6     views.

7          Q.    And why did it matter to Ripple what the

8     market thought about XRP as it related to the

9     issue of whether XRP was a security or not?

10                   MR. HECKER:  Objection to form.

11         A.    Yeah, it mattered to me because the --

12    there was incorrect press reports coming about,

13    which -- and I saw a risk that there's more

14    incorrect information, the less likely a bank

15    would accurately understand what we were trying to

16    do, how the product worked, and engage with us.

17                   So I was interested in correcting what

18    we saw as incorrect reports to ensure we had

19    accurate information in the public.

20         Q.    Why were banks interested in the

21    classification issue of XRP being classified as a

22    security or not?

23         A.    If they were going to use a product --

24    if a bank was going to use a product that --

25    xRapid -- that leverages XRP, in my view they

1  would do their due diligence on that technology to

2  ensure that it met all the regulatory

3  requirements, et cetera.  Banks want to know the

4  rules of the road before they use that tech --

5          THE REPORTER:  Repeat the last

6      part.

7          THE WITNESS:  I'm going too fast.

8      Sorry.  Sorry.

9      A.    The -- a bank would want to ensure that

10  they know the rules of the road before they engage

11  that technology.

12          So it was important to me that they had

13  accurate information.

14      Q.    And -- and I -- why would it be

15  important to a bank whether XRP was classified as

16  a security or not?

17      A.    For me, it was important to a bank to

18  accurately understand what they were using, the

19  technology they were using, under their -- under

20  their due diligence policy.

21      Q.    So did marcomm end up preparing that

22  two- to three-page paper you were discussing in

23  Exhibit 17?

24      A.    I can't recall if we produced a paper,

25  but we did become more vocal on our view.

172

1          Q.   The law firm memorandum I had asked you

2     about, about XRP's classification as a security,

3     did Ripple ever share that memorandum with a bank?

4               MR. HECKER:  Objection;

5          foundation.

6          A.   I don't know.

7          Q.   Did you ever share it with the bank?

8          A.   I don't recall ever sharing it with a

9     bank.

10              (Whereupon, exhibit is presented

11          and marked SEC Zagone Exhibit RZ-36 for

12          identification.)

13              MR. HANAUER:  I've tendered the

14          witness --

15              MR. HECKER:  Sorry, just give me

16          one second.  The documents are not

17          sequentially numbered.  Is that intended?

18          I want to make sure.  It goes from 728 to

19          393.

20              MR. HANAUER:  Can we go off the

21          record?

22              THE VIDEOGRAPHER:  Going off the

23          record at 2:11.

24              (Pause)

25              THE VIDEOGRAPHER:  We are back on

173

1          the record, 2:12.

2   BY MR. HANAUER:

3          Q.   So is Exhibit 36, RZ-36, an e-mail you

4   and others received from ████████ on May 12th,

5   2018?

6          A.   Yes, that's correct.

7          Q.   And who is Ms. ████?

8          A.   Ms. ████ worked in the communications

9   team.

10         Q.   Was she part of the marcomm team?

11         A.   Exactly.

12         Q.   And do you see she's writing about

13  Blockchain Week New York City?

14         A.   Yes.

15         Q.   What was Blockchain Week New York City?

16         A.   Blockchain Week New York City was an

17  event that spanned a week based here in New York

18  where there were events around blockchain and

19  crypto that Ripple participated in.

20         Q.   Who were the -- some of the types of

21  people that attended the event?

22         A.   What time was this?  This was 2018.

23  From what I recall, these types of events -- I

24  don't recall this one specifically, but Blockchain

25  Week New York typically skews more towards the

1    bank crowds and banks' consultants, developers

2    building on blockchain and crypto technology.

3        Q.   Did members of the press attend these

4    events?

5        A.   Sometimes they did, yes.

6        Q.   Did regulators attend events like this?

7        A.   Potentially, yes.  I can't recall for

8    this specific one if there were or not.  For --

9    for many of these types of conferences or events,

10    they were open to regulators.

11        Q.   So do you see how in Ms. ███ e-mail,

12    she says "In case you missed our kickoff, remember

13    we have three goals in mind for events this week."

14        Did you attend the kickoff that she was

15    referring to?

16        A.   I don't believe I did, no.

17        Q.   And do you see the first bullet point or

18    the first goal Ms. ███ references is to "Further

19    clarify the distinction between Ripple and XRP"?

20        A.   Yes, I see that.

21        Q.   And why was -- what is your

22    understanding of why that was a goal of Ripple?

23        A.   To ensure that -- to ensure more

24    accuracy in the market.  What I recall seeing at

25    this time were either press reports or, more

1    broadly, it was like commentators on Twitter.

2    Crypto Twitter was kind of a growing thing that

3    were incorrectly talking around the technology.

4    It was Ripple, but also some other assets, too.

5    So there was an effort across the industry to

6    better inform people on the assets and how they

7    worked, including what Ripple was doing here.

8         Q.   So why was it important to Ripple that

9    the distinction between Ripple and XRP be

10   clarified?

11              MR. HECKER:  Objection to form.

12              You can answer.

13        A.   It was important for us to clarify

14   Ripple and XRP so people had an accurate

15   understanding.  So they knew -- they knew Ripple

16   and our products and they -- there was a

17   differentiation between XRP, that open-source

18   platform.  Particularly at a time when there was

19   other development happening on XRP and other

20   platforms.  A variety of use cases starting to

21   form in 2018, starting to see the industry expand.

22        Q.   Did it relate to the security

23   classification issue?

24        A.   From what I recall from this, it's more

25   about just being accurate, ensuring that the

176

1    market understood XRP versus Ripple.

2        Q.    Was there a market perception that XRP

3    and Ripple were synonymous?

4                MR. HECKER:  Objection to form.

5        A.    I think back in that day, I did feel

6    that there was confusion in the market on Ripple

7    versus XRP and the difference between the two.

8        Q.    And what was your understanding of how

9    that impacted the classification issue?

10                MR. HECKER:  Objection.

11        Q.    Security classification issue.

12                MR. CERESNEY:  Same objection.

13                You'd have to exclude from your

14          understanding information you got from

15          counsel.

16        A.    My approach to this, and even raising it

17    previously, it was more around ensuring that the

18    market accurately understood our products.  I

19    didn't -- I felt the need to ensure people knew

20    who we were, Ripple, we're a software company,

21    versus XRP, the technology we use in our product.

22    It was just like ensuring that they accurately

23    understood what -- what they were talking about.

24                I -- I grew concerned and -- and

25    frustrated when there was just incorrect press

1  reports conflating XRP and Ripple that hindered

2  our ability to sell to banks.  They just didn't

3  understand what we were doing.

4      Q.   I guess why did that -- why did that

5  make a difference?

6          MR. WARD:  Objection to form.

7      A.   Our goal was to build a payment network.

8  And if a bank couldn't understand what we were

9  doing or how the product worked, that wouldn't

10 enable sales or new partners.

11     Q.   And -- and I see where you're coming

12 from there, but I guess in -- in explaining to a

13 bank how xRapid worked or xCurrent worked, why is

14 it important for the bank to know that Ripple is

15 different than XRP?

16          MR. HECKER:  Objection to form.

17          MR. WARD:  Objection.

18          MR. CERESNEY:  Asked and answered

19      a few times.

20          THE WITNESS:  Answer?

21          MR. HECKER:  You can answer.

22     A.   Going through a vendor due diligence

23 review with a bank, they wanted to know exactly

24 what they're working with, how that technology

25 works, what their risks are, particularly around

178

1    operational resiliency and cyber security.  XRP is

2    one piece of the product.  They want to -- that's

3    a key part of that discussion.

4          So this is all -- my work here and the

5    approach here was all around ensuring the bank and

6    the market had an accurate understanding of this

7    technology.

8        Q.   And then I want to -- do you see how at

9    the bottom of the first page of Ms. █████████

10   e-mail, there's a section called "Important

11   Reminders"?

12       A.   I see that.

13       Q.   Then if can you flip to the second page,

14   please.

15         You see how Ms. ██████ is asking the

16   e-mail recipients to study key messages to Fast

17   Facts and FAQs?

18       A.   Yes, I see that.

19       Q.   And there's a link to a document?

20       A.   I see that.

21       Q.   And then on the page beginning -- or

22   with the Bates number ending in 5393.

23       A.   Yep.

24       Q.   Is that the key messages, FAQs and Fast

25   Facts that Ms. █████ is referring to?

179

1      A.   It appears so, yes.

2                MR. HECKER:  Objection.

3                MR. WARD:  Objection.

4                MR. CERESNEY:  Just for the

5         record, Ben, we produced this document

6         from Google Docs.  I can't necessarily

7         represent that it was the exact version

8         that was linked.  We think it's the

9         document, but it could be -- I mean, it

10        says updated May 8th, so, yeah, it's the

11        right time frame, but we can't represent

12        it's exactly that version.

13               MR. HANAUER:  Okay.

14   BY MR. HANAUER:

15        Q.   To the best of your understanding,

16   the -- the key messages, FAQ and Fast Facts

17   document is the one that was linked to Ms. ███

18   e-mail?

19        A.   The titles are the same from the

20   documents in the link, so it looks like it's the

21   same.

22        Q.   Who prepared the key messages, FAQs and

23   Fast Facts documents?

24        A.   This looks like it was prepared by our

25   marketing team.  The marketing team served as

180

1   the -- they synthesized news across the

2   organization.

3       Q.   And the key messages, FAQ, Fast Fact

4   document, that contains the messaging that Ripple

5   wanted to convey to the attendees at Blockchain

6   Week?

7       A.   That's what it appears from the e-mail.

8       Q.   And do you see the section that says

9   "What are your products"?

10      A.   Yes, I see that.

11      Q.   And it lists xCurrent, xRapid and xVia?

12      A.   Uh-huh.

13      Q.   So of those three products, was xRapid

14  the only one that used XRP?

15      A.   I believe so.  I forgot about xVia until

16  seeing this.  But xRapid was the one that was

17  predominantly focused on XRP.

18      Q.   How did xVia use XRP?

19      A.   I forgot about xVia until I had saw this

20  just now.  So I don't know if it did or not.  I

21  know xRapid was the one predominantly focused on

22  XRP.

23      Q.   And then do you see how the second

24  bullet point under xRapid, it says "Pilot tests

25  are ongoing with            MoneyGram" and

181

1    some other companies?

2        A.    Yes, I see that.

3        Q.    In May 2018 had Ripple deployed xRapid

4    for commercial use or was it still in pilot

5    testing phase?

6              MR. HECKER:  Objection to form.

7        A.    This doc says they're in pilot testing

8    as of May 2018.

9        Q.    And then can you go to page 5395?  You

10   see the section that says "Who Uses XRP Today?"

11       A.    Yes, I see that.

12       Q.    And the first bullet point says "Several

13   financial institutions are piloting XRP as a

14   liquidity solution"?

15       A.    Yes, I see that.

16       Q.    That refers to xRapid?

17       A.    Yes.

18       Q.    And then in parentheticals, it says

19   "(important to note:  The product is still in

20   beta)"?

21       A.    Yes.

22       Q.    What did that mean, that xRapid was

23   "still in beta"?

24       A.    Beta is a version of the software that

25   you use for testing and piloting before a full

1　launch.  So this is -- in our evolution of the

2　product, beta would be sort of like final test

3　version before the alpha version, which alpha is

4　full launch.

5　　　　Q.　And do you see on the page before that

6　at the bottom, the question -- or the section "How

7　Does Ripple Make Money?"

8　　　　A.　Uh-huh.

9　　　　Q.　And there are two bullet points.  One

10　talks about software sales and one talks about XRP

11　sales?

12　　　　A.　Yes.

13　　　　Q.　In May 2018 did Ripple generate revenues

14　other than by selling software and selling XRP?

15　　　　A.　Other than by selling software and XRP?

16　Not that I'm aware of.

17　　　　Q.　In May '18, May 2018, were Ripple's

18　software sales revenues sufficient to pay for its

19　expenses and operating costs?

20　　　　　　　　MR. WARD:  Objection to form.

21　　　　A.　I don't have any certain information on

22　that to be able to say yes or no.

23　　　　Q.　How did Ripple's software sales revenues

24　compare to its XRP sales revenues in May 2018?

25　　　　　　　　MR. HECKER:  Objection;

183

1          foundation, asked and answered.

2          A.   I don't know what the software sales

3     number totaled to be able to make a comparison.

4          Q.   Do you have any general understanding?

5               MR. HECKER:  Same objections.

6          A.   I don't know what the software and sales

7     revenue was.

8          Q.   Can you go to page 5398, please?  Do you

9     see the section that says "SEC/Security

10    Conversation"?

11         A.   Yes, I do.

12         Q.   And then there's some -- some bullet

13    points under that?

14         A.   Yes, I see that.

15         Q.   Why was it important for Ripple to

16    include this SEC/security conversation section in

17    its briefing materials for Blockchain Week NYC?

18               MR. HECKER:  Objection;

19          foundation.

20         A.   Given the media reports that we saw

21    circulating at the time, some we -- we previously

22    saw, people were asking the company about it.

23    This is going to be a public -- public conference

24    that employees are attending.  So we put -- the

25    marketing team insert a section here to give the

1   employees attending the event some guidance on how

2   to respond to that accurately.

3       Q.   Respond to the issue about whether the

4   XRP is a security?

5       A.   To respond to questions that someone

6   might ask about X -- XRP's classification.

7       Q.   And do you see that the first bullet

8   point in that section says "Ultimately, this will

9   be up to the SEC to decide"?

10      A.   Yes, I see it.

11      Q.   And that's the message Ripple wanted to

12  give to market participants?

13      A.   That -- that's the first talking point

14  here.

15      Q.   And Ripple understood that the SEC could

16  ultimately determine that it did consider XRP to

17  be a security?

18              MR. HECKER:  Objection;

19       foundation.

20      A.   I can't speak for what marketing or --

21  or legal or whoever wrote this ultimately

22  understood.  Here we're saying it's up to the SEC

23  to decide.  They're the regulator.

24      Q.   And you shared that understanding,

25  right?

185

```
 1              MR. HECKER:  Same objections.

 2        A.   I was following the guidance that was

 3   received in the document.  I'm -- I'm not a

 4   securities expert, so I followed legal's advice.

 5        Q.   Well, this document is not from legal,

 6   correct?  It's from marketing?

 7        A.   Yes, from my understanding.  So my

 8   understanding was informed by legal, that they got

 9   it from legal.

10        Q.   And do you see the second bullet point

11   where it says "It's making headlines in recent

12   weeks, but it's not a new question"?

13        A.   Yes, I see that.

14        Q.   What's your understanding of what Ripple

15   marketing was trying to convey there?

16        A.   It looks like "it's" is referring to the

17   classification of XRP.

18        Q.   In May 2018 were you aware that

19   Ripple -- or let me start over.

20              In May of 2018, were you aware that the

21   SEC's enforcement division had begun an

22   investigation into Ripple?

23              MR. CERESNEY:  Objection; form.

24        A.   I became aware that the SEC engaged

25   Ripple at the time that I got --
```

186

```
 1              MR. CERESNEY:  Actually, hold on

 2         a second.  Are you aware of this

 3         information other than through discussions

 4         with counsel?

 5              THE WITNESS:  No.

 6              MR. TENREIRO:  Andrew, can I just

 7         clarify something on the record because

 8         this has come up twice today.  So are you

 9         going to instruct him not to answer if

10         counsel just relayed information, for

11         example, "the SEC said to me," and pass

12         that along?  Is that -- that the

13         instruction?

14              MR. CERESNEY:  I'm going to

15         instruct him not to answer on discussions

16         with counsel.  That's what I'm instructing

17         him on.

18              MR. TENREIRO:  Okay.  Including

19         if it's just passing on information?

20              MR. CERESNEY:  I'm not going

21         to -- I'm going to instruct him not to

22         convey discussions with counsel.

23              MR. TENREIRO:  Okay.  Thank you.

24         A.   I got that notification from counsel, so

25    that's...
```

1          MR. HANAUER:  And I'm not trying

2     to get into substance here.

3     Q.   At some point couns -- Ripple's counsel

4 advised you there was an SEC investigation into

5 Ripple?

6     A.   At some point, yes.

7     Q.   When did you first learn that?

8     A.   I learned that when I received a

9 document hold request, a document hold order.

10     Q.   Do you have any approximation of when

11 that occurred?

12     A.   I believe that was in 2018.

13     Q.   Did you have any responsibilities

14 related to the SEC investigation?

15     A.   No.

16     Q.   And once you became aware that the SEC's

17 enforcement division was investigating Ripple in

18 2018, were you aware that that investigation could

19 ultimately result in an enforcement action against

20 Ripple?

21          MR. CERESNEY:  Yeah, I'm going to

22     instruct the witness to only answer that

23     question with information he received from

24     somebody other than counsel.

25     A.   I have no other information.

1    Q.    Just taking a step back from this case,

2    this -- this lawsuit, this investigation --

3    A.    Uh-huh.

4    Q.    -- are you aware that the SEC's

5    enforcement division conducts nonpublic

6    investigations?

7    A.    Yes.

8              MR. CERESNEY:  Objection.

9    A.    I did know.

10    Q.    And are you aware that at the

11    conclusions of those investigations, the SEC's

12    enforcement division can recommend to the SEC to

13    take enforcement action?

14    A.    Generally speaking, yes.

15    Q.    Beyond your conversations with counsel,

16    who else -- beyond things you learned from your

17    counsel, who else at Ripple was aware of the SEC

18    investigation?

19    A.    Oh, I -- you would have to ask our legal

20    team.  They were notified.

21    Q.    Did you --

22    A.    I don't know.

23    Q.    Did you ever talk about the

24    investigation with any other Ripple employees?

25    A.    I didn't -- I didn't ask who they were

189

1    informing about the case.

2          Q.   Different question.

3               Did you ever discuss the fact that there

4    was an SEC investigation with other Ripple

5    employees?

6          A.   Yes.

7          Q.   Who?

8          A.   Primarily legal.  I was reporting in to

9    legal in this time.  So that was my team.

10         Q.   What do you mean, you were reporting in

11   to legal?

12         A.   The org structure, at this point I had

13   moved from reporting to Antoinette to reporting to

14   the general counsel.

15         Q.   What -- when did that take place?

16         A.   After Antoinette left.

17         Q.   And when did she leave?

18         A.   I believe she left in 2018.

19         Q.   Did you ever discuss the investigation

20   with -- the SEC's investigation with

21   Mr. Garlinghouse?

22         A.   Not the investigation specifically, no.

23         Q.   Did you ever discuss the SEC's

24   investigation with Mr. Larsen?

25         A.   No.

190

```
 1          Q.   And going back to Exhibit 36, that same
 2    page we were looking at, 5398 (sic), do you see
 3    the bullet point, "Is Ripple buying XRP's way onto
 4    exchanges?
 5          A.   Yes, I see that point.
 6          Q.   And what's your understanding of what
 7    that talking point is about?
 8          A.   There was talk in the general market
 9    about ICOs and coins paying exchanges to list
10    them.  And so this is a question targeted or
11    aiming at Ripple saying did Ripple buy XRP's way
12    onto an exchange.
13          Q.   And did Ripple pay exchanges to list
14    XRP?
15          A.   Not that I'm aware of, no.
16          Q.   Is there a bullet point here that says
17    Ripple is not paying exchanges to list XRP?
18          A.   There's not a bullet in this document at
19    this time, no.
20          Q.   Did Ripple provide incentives to ex --
21    to exchanges to list X -- to list XRP?
22               MR. HECKER:  Objection to form;
23        foundation.
24          A.   I don't know.
25               MR. HANAUER:  We've been going
```

1          about an hour.  Do you mind taking a

2          five-minute break?

3                  THE WITNESS:  Sure.

4                  THE VIDEOGRAPHER:  Going off the

5          record at 2:37.

6                  (Whereupon, a recess is taken.)

7                  THE VIDEOGRAPHER:  Okay.  Back on

8          the record at 2:49.

9    BY MR. HANAUER:

10         Q.    So, Mr. Zagone, before we went off the

11   record, do you remember us talking about in the --

12   the talking points you and other Ripple employees

13   got in -- in advance of the Blockchain Week New

14   York?

15         A.    I do.

16         Q.    And do you remember we were talking

17   about one of the talking points was on the SEC

18   security classification issue, the bullet point

19   was "Ultimately, it would be up to the SEC to

20   decide"?

21         A.    I do.

22         Q.    Did you ever convey that message when

23   you were speaking publicly about Ripple or XR --

24   XRP?

25         A.    I could have, yes.  It's possible that I

1   did.

2       Q.   How often did you convey that message?

3            MR. WARD:  Objection.

4       A.   I -- I spoke publicly maybe 20 times a

5   year, 20, 30 times a year, using our company

6   talking points, so that it's possible that I used

7   that talking point in a public speech.

8       Q.   How often did -- when you were speaking

9   publicly about Ripple and XRP did the SEC

10  securities classification issue come up?

11      A.   It was not a frequent question I was

12  asked on my panels, given the focus of my panels

13  were typically around payment infrastructure.  So

14  much more around payment focus.

15           So it wouldn't -- wasn't frequently.  If

16  it came up, I would be discussing Ripple's view,

17  to be held by Ripple that it was not a security.

18      Q.   And you also conveyed the message that

19  ultimately it would be up to the SEC to decide?

20           MR. WARD:  Objection.

21      A.   I could have given it's in our -- it was

22  in our talking point guide here.

23      Q.   So did you -- the -- the talking points

24  that were sent in advance of the Blockchain New

25  York event in May of 2018 --

1       A.    Uh-huh.

2       Q.    -- did you use those talking points or

3 study them in advance of your public speaking

4 about Ripple or XRP?

5             MR. HECKER:   Objection to form.

6       A.   I didn't speak at this event, I don't

7 recall.   I don't believe I spoke at this event.   I

8 was just attending.   So I -- I would -- I would

9 have reviewed these talking points ahead of

10 attending the event.

11       Q.   And I guess my question is beyond the

12 Blockchain New York City -- Blockchain Week New

13 York City --

14       A.    Uh-huh.

15       Q.   -- did you consult these talking points

16 in advance of your other public speaking

17 engagements?

18             MR. HECKER:   And -- and just so

19       the record's clear, do you mean this May

20       '18 version of the document?

21             MR. HANAUER:   Correct.

22       A.   I don't know if I referenced this

23 document in -- outside of this Blockchain Week.

24       Q.   Did you have a -- like a standard or a

25 form talking points that you used before your

194

1    speaking engagements?

2        A.    Before a speaking engagement, our

3    marcomm team would provide, like, a backgrounder

4    on the event.  It generally had FAQs similar to

5    this, context on the event and who the other

6    panelists were.

7        Q.    And the talking points you would receive

8    by marcomm in advance of your public speaking

9    events, did those talking points also include a

10   section about the SEC security classification

11   issue?

12       A.    It -- it would have depended if we

13   expected that topic to come up or not.

14       Q.    And I take it that if Ripple expected

15   the securities classification issue to come up,

16   your talking points would include a section

17   similar to what was in the -- the May Blockchain

18   Week talking points?

19              MR. HECKER:  Objection to form.

20       A.    It would have been a -- if we expected

21   the topic to come up, there would have been a

22   section on talking points around it.  To the

23   degree they matched these talking points or not, I

24   don't know.  It depended on the time.

25       Q.    Were they often similar?

1      MR. CERESNEY:  Objection; form.

2      A.   They were often similar.

3           (Whereupon, exhibit is presented

4      and marked SEC Zagone Exhibit RZ-37 for

5      identification.)

6           MR. HANAUER:  I'm tendering the

7      witness a document that's been labeled

8      Exhibit RZ-37, beginning with the Bates

9      number ending 5781.

10  BY MR. HANAUER:

11     Q.   And is Exhibit 37 a copy of an e-mail

12  you received from ███████████ on June 5th,

13  2018?

14     A.   That's correct, yes.

15     Q.   And Ms. ████████ she worked at ████

16  ████████

17     A.   Yes.  That's right.

18     Q.   And do you see the subject line, "Ripple

19  media tracking" and then there's the date?

20     A.   Yes.

21     Q.   Did ████████ frequently provide

22  media-tracking e-mails to Ripple personnel?

23     A.   Generally every morning we would receive

24  one.

25     Q.   And who besides you at Ripple would --

196

```
1    did you understand received these media-tracking

2    e-mails from ███████

3         A.   I understood that the public

4    spokespeople received these e-mails and that if

5    you -- if you wanted to receive it, you could

6    request it.  It was more open than just the

7    spokespeople.

8              THE REPORTER:  Repeat that.  I'm

9       sorry.

10        A.   It was more open than just the

11   spokespeople.

12        Q.   Do you have an understanding whether

13   Mr. Garlinghouse received the media-tracking

14   e-mails from ███████

15             MR. HECKER:  Objection.

16        A.   I don't know.

17        Q.   Did you consider him a public

18   spokesperson for Ripple?

19        A.   Yes.

20        Q.   And do you see the first paragraph of

21   Ms. ███████ e-mail?  She writes "Additionally,

22   the SEC appointed a senior advisor for digital

23   assets and innovation in an effort to better

24   regulate the market?

25        A.   Yes, I see that.
```

197

 1    Q.   And do you see on the page ending in

 2  783, after the heading "Crypto Chief"?

 3    A.   Yes, I see it.

 4    Q.   And -- and there's a -- a paragraph

 5  about Valerie Szczepanik?

 6    A.   Yes.

 7    Q.   And did you have any interactions with

 8  Ms. Szczepanik?

 9    A.   No.

10    Q.   What was your understanding of her

11  position at the SEC?

12    A.   That she would be leading an effort to

13  explore digital assets within the SEC.

14    Q.   Are you aware of anyone with Ripple ever

15  communicating with Ms. Szczepanik?

16    A.   I believe people from Ripple spoke with

17  Ms. Szczepanik, yes.

18    Q.   And who was that?

19    A.   I imagine now that I can -- our legal

20  team would have.  It's my understanding our legal

21  team.

22    Q.   Anyone else?

23    A.   Not that I know for certain.

24    Q.   And whoever at Ripple communicated with

25  Ms. Szczepanik, did they ever -- are you aware of

198

1   them ever asking her whether the SEC considered

2   XRP a security?

3                   MR. CERESNEY:  Let me just

4       instruct you not to discuss discussions

5       you may have had with counsel.

6       A.    I would have only learned that through

7   counsel.

8       Q.    Did Ripple have the opportunity, if it

9   wanted to, to ask Ms. Szczepanik whether the SEC

10  considered XRP to be a security?

11                  MR. WARD:  Objection.

12                  MR. CERESNEY:  Same -- same

13      instruction.  If you -- if you know about

14      what happened in the meetings with

15      counsel, same instructions.

16      A.    Yeah, I don't know.

17      Q.    And then can I ask you to take a look at

18  the first page of Exhibit 37?

19      A.    Uh-huh.

20      Q.    Do you see the heading "Ripple

21  Representatives"?

22      A.    Yes.

23      Q.    And then there's a reference to a class

24  action lawsuit?

25      A.    Yes, I see that.

1     Q.    When was Ripple first sued for allegedly

2    violating the federal securities laws?

3                    MR. WARD:   Objection.

4     A.    Just looking at the date of this e-mail

5    and who's representing us, I conclude it was in

6    2018.

7     Q.    And did you have an understanding of how

8    the result in that lawsuit could impact the SEC

9    securities classification issue?

10                    MR. HECKER:   Objection;

11           foundation and same instruction about your

12           understanding about the legal consequences

13           of the civil litigation or the SEC

14           investigation.

15     A.    I didn't.   At this point, my role was

16    focused on xRapid and our bank clients.   This --

17    these are issues handled by our legal team.

18     Q.    Did you have any involvement in the

19    private class action litigation?

20     A.    No.

21                    (Whereupon, exhibit is presented

22           and marked SEC Zagone Exhibit RZ-38 for

23           identification.)

24                    MR. HANAUER:   I just tendered the

25           witness a document labeled as Exhibit

1          RZ-38, beginning with a Bates number

2          ending in 5756.

3                    Excuse me.

4    BY MR. HANAUER:

5          Q.   And is Exhibit 38 a copy of an e-mail

6    you received from Ms. ████████ on June 8th, 2018?

7          A.   Yes, it is.

8          Q.   And do you see Ms. ████████ is advising

9    Ripple that it faces a second lawsuit regarding

10   XRP?

11         A.   Something you said?

12                    THE WITNESS:  Are we okay to go?

13                    MR. HECKER:  Yeah, go ahead.

14                    THE WITNESS:  Okay.

15         A.   I see ██████ sharing a news clipping

16   about another lawsuit that was filed against XR --

17   against Ripple.

18         Q.   And do you see in that same paragraph,

19   Ms. ██████ writes "Widespread doubt surrounding

20   cryptocurrency regulation has hindered trading, as

21   lawmakers prepare to crack down on the space"?

22         A.   I see that.

23         Q.   Was Ripple expecting a crackdown in the

24   digital asset space by the SEC in June 2018?

25                    MR. WARD:  Objection to form.

1        A.    Can you repeat the question, please?

2        Q.    Yeah.

3              In June 2018 was Ripple expecting or

4    anticipating a crackdown in the digital asset

5    space by the SEC?

6                    MR. WARD:   Same objection.

7        A.    I wouldn't have used the term

8    "crackdown" in the space.  There was uncertainty

9    in the market on what the regulatory framework for

10   digital assets was in the U.S.  There was --

11   especially compared to other countries.  Other

12   countries had explicitly named the classification

13   and the assets that fell into each.  We -- we

14   hadn't seen that done yet in the U.S.

15             So at this point, in the U.S., companies

16   were coming to their own opinion, but it wasn't

17   opinions that were from a regulatory agency that

18   we saw happening in other -- other countries.

19       Q.    So in other countries outside the United

20   States, regulators were stating that XRP was not a

21   security in their jurisdictions?

22       A.    That's correct, yes.

23       Q.    Did any regulators ever state that in

24   the United States as it related to XRP?

25       A.    XRP was given a classification in some

202

1    cases on what it was -- what it was viewed by

2    different regulators.  The FinCEN settlement

3    referring to it as currency, though we had not

4    seen explicit guidance from the SEC.

5         Q.    And did the FinCEN settlement mention

6    the SEC?

7         A.    I don't recall.

8         Q.    Was the SEC a party to the FinCEN

9    settlement?

10        A.    It was not part of the FinCEN

11   settlement.

12        Q.    Did you have an understanding of whether

13   SEC public statements were reducing trading

14   volumes in XRP?

15        A.    I didn't have an understanding to be

16   able to say if that was accurate or not.

17               MR. HANAUER:  Thirty-nine.

18               (Whereupon, exhibit is presented

19          and marked SEC Zagone Exhibit RZ-39 for

20          identification.)

21               MR. HANAUER:  So I'm tendering

22          the witness a document labeled Exhibit

23          RZ-39, beginning with a Bates number

24          ending in 9079 (sic).

25   BY MR. HANAUER:

203

1      Q.  And is Exhibit RZ-39 a copy of an e-mail

2  chain ending with an e-mail from  ███████████to

3  you on June 13th, 2018?

4      A.  That's correct, yes.

5      Q.  Who is Mr. ███████

6      A.  ████████████was head of our public

7  relations team.

8      Q.  And can I refer you to the second page

9  of Exhibit 39, a June 13th, 2018 e-mail from██

10  ████████

11      A.  Okay.

12      Q.  I hope -- I hope I'm saying her name

13  right.  But who is Ms. or Mr. ████████

14      A.  Ms. ████████was our delegate to manage

15  our work with our Japanese joint venture.

16      Q.  And do you see how she's writing about

17  an individual named ███████?

18      A.  Yes.

19      Q.  Who is ██████

20      A.  █████is ███████████he worked for

21  me.  He was head of our regulatory relations in

22  Asia-Pacific.

23      Q.  He reported to you?

24      A.  That's correct.

25      Q.  And it looks like he was speaking on a

204

```
 1    panel in Japan?

 2         A.    Give me a second to -- to review.

 3               (Pause)

 4         A.    Okay.

 5         Q.    So is        -- am I saying that right,

 6

 7         A.        (pronunciation).

 8         Q.

 9                     as going to be calling in to a --

10    a meeting with Japan's -- what's FSA?

11         A.    FSA is the regulator in -- the financial

12    services regulator in Japan.

13         Q.    And it looks like the FSA was going to

14    be having a meeting in June 2018?

15         A.    They held a conference on crypto assets.

16         Q.    And        was going to be calling in to

17    that meeting to speak on Ripple's behalf?

18         A.    Correct.

19         Q.    And why was he speaking on that panel?

20         A.    I can't recall why.  I assume we had

21    been invited to speak and he took it.

22         Q.    And Ms.             is advising --

23    advising you and        that Gary Gensler was going

24    to be speaking on the panel?

25         A.    That's correct, yes.
```

1    Q.   And at the time, Mr. Gensler was a

2    professor at MIT that studied digital assets?

3         A.   That's correct.

4         Q.   And this is the same Gary Gensler that's

5    currently the chairman of the SEC?

6         A.   That's correct.

7         Q.   And Ms. ██████ is advising you and

8    Sagar that Mr. Gensler could be speaking about XRP

9    and Ripple?

10        A.   That's correct.

11        Q.   And Ms. ██████ is actually sharing

12   with you and ████ a slide she understands

13   Mr. Gensler would present at the meeting?

14        A.   That's right.

15        Q.   And it was -- did you understand in June

16   2018 that Mr. Gensler had voiced his opinion that

17   XRP was a security subject to SEC regulation?

18        A.   Yes, I had seen Gensler speak publicly

19   before on that view.

20        Q.   And you heard him state his belief that

21   XRP was a security?

22        A.   I read an article that he was quoted in

23   citing that when he joined MIT Media Labs.

24        Q.   Have you ever attended any presentations

25   by Mr. -- where Mr. Gensler spoke?

206

```
 1        A.   I don't believe so.

 2        Q.   So on the second page of Exhibit 39, you

 3   write "███████ and I prepped today in anticipation

 4   of Gensler being anti-Ripple"?

 5        A.   Uh-huh.  Yes.

 6        Q.   So you helped ███████ prepare to address

 7   any statements Mr. Gensler would make about XRP

 8   being a security?

 9        A.   I prepped ███████ on correcting points

10   that we had seen Mr. Gensler use before that we

11   felt were inaccurate.

12        Q.   What did you tell ███████

13        A.   I can't recall specifics aside from

14   noting that we knew Gary was, in this language

15   here, "anti-Ripple."  We had seen an article that

16   he -- that he was featured in when he joined MIT

17   Media Labs that was critical of Ripple.

18             So we knew the tone -- my -- my prep

19   with ███████ was the tone of this is going to be

20   unfriendly to the Ripple position.  That's context

21   to help him prep so he's not blindsided by it.

22        Q.   And did you give him talking points

23   similar to the ones you -- you received in advance

24   of speaking engagements?

25             MR. HECKER:  Objection to form.
```

1    A.    No, I didn't.  That's why on -- on this

2    e-mail, I ask the marcomm team to share those

3    points with █████████

4    Q.    And then further up in the -- the e-mail

5    chain, or actually the first e-mail in the -- or

6    the top e-mail in Exhibit 39, Mr. ████████

7    actually does e-mail talking points to ████████

8    A.    Yes.

9    Q.    And these talking points are similar to

10   the ones that were sent out in advance of the

11   Blockchain New York Week meeting in May 2018?

12             MR. HECKER:  Objection to form.

13   A.    They look similar.

14   Q.    And for the SEC classification issue,

15   the first bullet point that was sent to Sagar was

16   "Ultimately, this will be up to the SEC to

17   decide"?

18   A.    That's correct.

19   Q.    And that was messaging that you wanted

20   Sagar to convey at the conference?

21             MR. HECKER:  Objection to form.

22   A.    That's messaging that our marketing team

23   provided to ████████

24   Q.    And did you agree with that messaging?

25   A.    I was relying on the messaging from our

208

1    company.

2        Q.    What's the Fortune article referenced in

3    Exhibit 39?

4        A.    Could you point me to where that is?

5        Q.    Yeah.  So it's actually in --

6        A.    Oh, I see the top one.

7        Q.    -- in two places.  It first appeared --

8    I first see it on the second page where you're

9    actually writing about prepping ▮▮▮▮ on how best

10   to address Mr. Gensler and the Fortune article.

11       A.    I -- I can't recall.  That might be the

12   article that Gary Gensler is featured in about

13   joining the MIT Media Lab where he was negative

14   about Ripple.

15            I also see "Fortune" at the top of the

16   chain here.

17                MR. HANAUER:  Forty.

18                (Whereupon, exhibit is presented

19           and marked SEC Zagone Exhibit RZ-40 for

20           identification.)

21                MR. HANAUER:  I'm tendering the

22           witness a document that's been labeled

23           Exhibit RZ-40 beginning with a Bates

24           number ending in 7079.

25   BY MR. HANAUER:

209

1      Q.   Is Exhibit RZ-40 a copy of an e-mail

2   chain ending in an e-mail Monica Long sent to

3   ██████ copying you and others, dated June 16th,

4   2018? Actually, strike that.

5         Exhibit RZ-40, that's a copy of an

6   e-mail ████ sent to Ms. Long, copying you and

7   others, dated June 16th, 2018?

8      A.   Yes, that's correct.

9      Q.   And first I just want to ask you about

10   the second e-mail in the chain on Exhibit 40.

11      A.   Uh-huh.

12      Q.   And that's Ms. Long providing additional

13   talking points that ████ should use going into

14   the Japan panel that ████ was speaking on?

15      A.   Give me one moment.

16      (Pause)

17      A.   Okay.  Could you repeat the question,

18   please?

19      Q.   So for the second e-mail in the chain on

20   Exhibit RZ-40, Ms. Long is providing ████

21   additional talking points that he should use at

22   the Japanese regulatory presentation where ████

23   and Mr. Gensler would be speaking.

24      A.   That looks like it, yes.

25      Q.   And then the top e-mail on Exhibit 40,

210

1    Sagar is actually briefing other folks at Ripple

2    about the Japanese regulatory panel presentation

3    he did with Mr. Gensler?

4         A.   That's correct.

5         Q.   And ███ wrote that on that -- at that

6    panel, Mr. Gensler expressed his belief that XRP

7    was a security?

8         A.   Yes.  He expressed -- Mr. Gensler

9    expressed a view that XRP and Ether were

10   securities.

11              THE REPORTER:  That XRP?  I can't

12        hear you.

13        A.   And Ether were securities.

14        Q.   And where does ███ write that

15   Mr. Gensler spoke about Ether being a security?

16        A.   Mr. Gensler had previously made a public

17   view that XRP and Ether were a security before

18   this conference. ███ here notes that ███

19   reminded the audience that Mr. Gensler's initial

20   view of Ether had since been proven wrong by the

21   SEC.

22        Q.   So did ███ write anywhere that at the

23   presentation, Mr. Gensler said Ether was a

24   security?

25        A.   He doesn't write that here, but

1   Mr. Gensler had been public about that before the

2   speech.

3        Q.   Okay.   And        wrote that after

4   Mr. Gensler talked,        conveyed to the Japanese

5   regulatory panel that only the SEC could decide

6   whether XRP was a security?

7        A.          e-mail says that he rebutted

8   Gensler's view and stressed that only the U.S. SEC

9   could decide whether XRP or any other digital

10  asset was a security.

11       Q.   And that was a talking point that Ripple

12  wanted its public spokespeople to convey?

13       A.   That was a talking point from the

14  communications guide.

15            MR. HANAUER:   Forty-one.

16            (Whereupon, exhibit is presented

17       and marked SEC Zagone Exhibit RZ-41 for

18       identification.)

19            MR. HANAUER:   So I tendered the

20       witness a document labeled Exhibit RZ-41,

21       which begins with a Bates number ending in

22       3272.

23  BY MR. HANAUER:

24       Q.   Is Exhibit RZ-41 a copy of an e-mail

25  chain ending with an e-mail Mr.        sent to you on

212

```
 1    October 17th, 2018?
 2         A.   That's correct, yes.   2018.
 3         Q.   2018.
 4         A.   Uh-huh.
 5         Q.   Thank you.
 6              And the second e-mail in Exhibit -- from
 7    the top in Exhibit RZ-41 is an e-mail that you
 8    wrote to Mr. █████ on October 16th of 2018?
 9         A.   Yep.
10         Q.   And Mr. █████ was going to be having
11    breakfast the next day with the new head of
12    Britain's Financial Conduct Authority?
13         A.   That's correct.
14         Q.   And you were trying to provide Mr. █████
15    with some information he should know in advance of
16    that meeting?
17         A.   That's right.
18         Q.   And I want to refer you on the second
19    page of Exhibit 41, the last bullet point.   You
20    start by talking about the security classification
21    issue in the United Kingdom?
22         A.   Yes.
23         Q.   And then at the end you write "In the
24    U.S., the rules require interpretation, so there's
25    uncertainty on the treatment today"?
```

1    A.    Yes.

2    Q.    What were you referring to there?

3    A.    In the UK, the UK regulator, the FCA,

4  had specifically said XRP is not a security by

5  their definition of a security.  The U.S.

6  regulators, the SEC, had not made an explicit

7  statement.  So I was saying that there's some

8  interpretation that's needed.  The companies

9  themselves would have to figure out if a digital

10  asset was a security or not since it's not

11  explicit to them.

12    Q.    And as of October 2018, had the SEC made

13  any statements about XRP?

14    A.    Not that I'm aware.

15    Q.    Did Ripple take any steps to obtain

16  clarity from the SEC on the issue of XRP's

17  classification as a security?

18            MR. WARD:  Objection.

19            MR. CERESNEY:  Objection.  Both

20        asked and answered and I think to the

21        extent he has any information about that

22        topic, it would come from counsel.

23    A.    I have nothing further to add.

24    Q.    So independent of what you -- your

25  communications with counsel, do you have any

214

1 | understanding of whether -- what Ripple did to

2 | obtain clarity from the SEC on the issue of XRP

3 | classifications?

4 |     MR. HECKER:  Same objection.

5 |   A.   That topic was owned by the legal team,

6 | not me.

7 |     MR. HANAUER:  Exhibit 42.

8 |     (Whereupon, exhibit is presented

9 |   and marked SEC Zagone Exhibit RZ-42 for

10 |   identification.)

11 |     MR. HANAUER:  I tendered the

12 |   witness a document labeled as Exhibit

13 |   RZ-42, which begins with a Bates number

14 |   ending in 5225.

15 | BY MR. HANAUER:

16 |   Q.   And is Exhibit RZ-42 a copy of an e-mail

17 | chain ending with an e-mail from

18 | to Mr. Garlinghouse, copying you, on November 3rd,

19 | 2018?

20 |   A.   Yes, that's right.

21 |   Q.   And I want to refer you to the third

22 | page of Exhibit 42.

23 |     Do you see how there's an e-mail from

24 |       at      to you?

25 |   A.   Yes.

215

1        Q.   And she's referencing a panel discussion

2  at Georgetown University?

3        A.   That's right.

4        Q.   And did you speak on a panel at

5  Georgetown University in November 2018?

6        A.   I did.

7        Q.   And who was Ms. █████?

8        A.   She was a reporter from ████████

9        Q.   How did you know her?

10       A.   Just from around the industry.  She was

11  writing about crypto and blockchain.

12        Q.   Had you previously given interviews to

13  her?

14        A.   Yes.

15        Q.   And Ms. ██████ was advising you that

16  Mr. Hinman was supposed to speak at the Georgetown

17  panel before you were supposed to speak?

18        A.   That's right.

19        Q.   And did you understand that Mr. Hinman

20  was the director of the SEC's Division of

21  Corporation Finance?

22        A.   I did.

23        Q.   And Ms. ██████ writes "Everyone's

24  waiting on an SEC pronouncement" regard -- "Re:

25  Classification of XRP"?

216

1      A.   Yep, I see that.

2      Q.   Was Ripple expecting a pronouncement

3    from Mr. Hinman at the November Georgetown event?

4      A.   Not that I was aware of.  I forwarded it

5    to our head of communications and Brad for more

6    context.

7      Q.   And who was the head of communications?

8      A.   ███████████████

9      Q.   And in November 2018, were you aware

10   that earlier in the year, Mr. Hinman had given a

11   speech where he stated his belief that Ether was

12   not currently being offered or sold as a security?

13     A.   I was, yes.

14     Q.   Had you read the speech?

15     A.   Yes.

16     Q.   Did you attend the speech when it was

17   given?

18     A.   No.

19     Q.   In Mr. Hinman's speech I just referred

20   to, did he mention XRP?

21     A.   Not that I recall.

22     Q.   So I want to now refer you to the second

23   page of Exhibit 42.

24     A.   Uh-huh.

25     Q.   And it looks like Mr. Garlinghouse is

1   giving you some guidance regarding the Georgetown

2   panel?

3       A.   Yes.

4       Q.   And he's instructing you not to engage

5   Mr. Hinman directly?

6       A.   Yes, I see that.

7       Q.   And he's -- Mr. Garlinghouse is

8   instructing you to use Ripple's most up-to-date

9   talking points?

10       A.   Yes.

11       Q.   And did those talking points contain a

12   section on the SEC securities classification

13   issue?

14       A.   I assume they did.  I don't have a copy

15   of this.

16       Q.   And we -- remember, we had looked at a

17   few previous talking points and e-mails where it

18   contains guidance from Ripple for Ripple

19   spokepersons to say it's up to the SEC to decide

20   whether XRP is a security?

21       A.   That's correct.

22       Q.   And it looks like Mr. Garlinghouse is

23   now advising you on November 2nd, 2018, not to use

24   that talking point anymore?

25       A.   Yes, I see that.

218

```
 1          Q.   Do you have an understanding of why
 2   Mr. Garlinghouse wanted you to not use that
 3   talking point at the panel Mr. Hinman was going to
 4   be speaking on?
 5               MR. WARD:  Objection to form.
 6          A.   I don't have the full context of why
 7   he's giving that instruction.
 8          Q.   Did you have an -- any understanding?
 9          A.   No.
10          Q.   Did you agree with him?
11          A.   I followed the instructions I got.
12          Q.   Well, did you think it was a good
13   instruction not to use the talking point about the
14   SEC ultimately deciding?
15               MR. HECKER:  Objection to form.
16          A.   I didn't have the context or -- or
17   expertise to say if that was good or not, so I was
18   just trusting what I was getting from leadership.
19          Q.   Then if you can go to the first page of
20   Exhibit 42, please?  And do you see how in the
21   November 3rd, 2018, 11:43 a.m. e-mail, Ms.
22   writes about the possibility of having an attendee
23   at the conference directly asking Mr. Hinman
24   whether he considered XRP to be a security?
25          A.   Yes, I see that.
```

219

1       Q.   And then you respond by telling her that

2   Ripple is going to have a consultant from ████████

3  ████████ at the event?

4       A.   Yes.

5       Q.   What was ████████

6       A.   FS Vector is a consulting firm focused

7  on FinTech based in D.C.

8       Q.   And what were they doing at the

9  Georgetown conference?

10      A.   I -- I assume attending it given the

11  Georgetown conference was about FinTech.  It was

12  relevant to them and their other clients.

13      Q.   And you said you ended up attending the

14  conference, right?

15      A.   I -- I spoke at this one, yeah.

16      Q.   And was it like a panel discussion where

17  a group of presenters were up on stage or was it

18  like more of a seriatim, speech after speech?

19      A.   It was in a lecture hall, multiple

20  stories, and there was a -- a panel or a dais at

21  the front.  Hinman spoke at a podium and then my

22  panel was four chairs, four or five chairs, on the

23  panel.

24      Q.   You were up on the podium, too?

25      A.   Up on the platform, yeah.

220

```
 1          Q.   On the platform.

 2               And did -- was there opportunity for

 3     attendees at the panel to ask questions of the

 4     speakers?

 5          A.   There was for my session.

 6          Q.   What about Mr. Hinman's?

 7          A.   I can't recall.  I was back stage.  I

 8     saw part of him and -- and then I went back stage

 9     to prep for my panel.  So I only saw the opening

10     bit of his.

11          Q.   Oh, so you were not on the same panel as

12     his?

13          A.   No.  Hinman gave a speech and then after

14     his speech, I was on a panel.

15          Q.   Okay.  Did you end up speaking with

16     Mr. Hinman at the conference or at the panel?

17          A.   I did not.

18          Q.   And did anyone ask -- well, Mr. Hinman's

19     speech at the conference, did he address XRP?

20          A.   I don't believe he did.  I was back

21     stage prepping with my panel, so I didn't hear his

22     speech as he was giving it.

23          Q.   Did anyone ever tell you that Mr. Hinman

24     mentioned XRP at the Georgetown conference?

25          A.   No.
```

1          Q.   And did any -- did this lobby -- I'm

2    sorry.

3               Did this consultant from ████████ did

4    they ask the question of Mr. Hinman whether he

5    considered XRP to be a security?

6          A.   I don't think we said actually engaged

7    ████████ to ask that question and I don't believe

8    they did.

9          Q.   And given all of this uncertainty about

10   the SEC's approach to XRP, why didn't either you

11   or Ripple's consultant ask Mr. Hinman at the

12   conference?

13              MR. HECKER:  Objection to form.

14         A.   I -- I don't know if Hinman was even

15   taking questions that day.  My panel took

16   questions.  I don't know about his.  His was a

17   speech, formal keynote speech, so I don't know if

18   he took questions or not.

19         Q.   Did you ever try and, like, seek him out

20   while you guys were both at the facility?

21         A.   No.  I was back stage in the green room.

22   I gave my speech and then left the event.

23         Q.   Did anyone from Ripple ever ask

24   Mr. Hinman whether he considered XRP to be a

25   security?

222

1          MR. HECKER:  Objection to form.

2          MR. CERESNEY:  And also --

3          MR. HECKER:  Same instruction

4     regarding discussions with counsel.

5          A.   Outside of counsel, did anyone ever?

6     I -- I don't know.  Not that I was aware.

7          Q.   Were you ever on any other panels or

8     meetings where you were there and Mr. Hinman was

9     there?

10         A.   Not that I remember.

11         Q.   Have you ever met him personally?

12         A.   No.

13             MR. HANAUER:  Five.

14             (Whereupon, exhibit is presented

15         and marked SEC Zagone Exhibit RZ-5 for

16         identification.)

17             MR. HANAUER:  I've tendered the

18         witness a document labeled Exhibit RZ-5,

19         beginning with a Bates number ending in

20         0623.

21    BY MR. HANAUER:

22         Q.   Is Exhibit RZ-5 a copy of an e-mail

23    chain ending in an e-mail you sent to ████

24    ████    on January 25th, 2017?

25         A.   That's right.

[7/20/2021] Zagone, Ryan Dep. Tr. 7.20.2021

223

```
 1        Q.   And who is Mr. ████████?
 2        A.   Mr. ██████ was on the business
 3   development team.
 4        Q.   At Ripple?
 5        A.   At Ripple.
 6        Q.   And do you see Mr. ██████ writes you in
 7   the second e-mail from the top of the chain, "Have
 8   any central banks said we would be comfortable
 9   with digital assets if they were used for XYZ
10   transactions?"
11        A.   I see that, yes.
12        Q.   And then you write -- respond
13   "Unfortunately, no.  In fact, several regulators
14   have said we are fine with everything except XRP"?
15        A.   I see that.
16        Q.   And who were the regulators that told
17   you that they were fine with everything except
18   XRP?
19        A.   Yeah.  So the context of this discussion
20   is around Ripple being approved as a vendor,
21   Ripple and our products being approved as a vendor
22   for the financial institutions to use.  So our
23   bank clients.
24             The -- in 2017 the com -- we only did
25   that type of regulatory engagement for a
```

224

1    commercial deal.  So, like, when a bank was

2    signing up to integrate and use one of our

3    products.

4              By this time in 2017, January 2017, the

5    focus of that engagement was xCurrent, the

6    connectivity solution that does not use XRP.  So

7    the regulatory engagement for approvals had all

8    been on xCurrent, not xRapid at this point.

9              That's -- given that, that's why it says

10   we have not had approval on XRP, meaning xRapid.

11        Q.   Oh, so when you're referring to XRP in

12   the first sentence on Exhibit 5, when you write

13   "XRP," you -- you wanted that term to mean xRapid?

14        A.   Yeah.  I used XRP in shorthand or

15   generally here to talk about the liquidity

16   solution since we didn't really have a name for it

17   aside from -- Project Xenon was the code name we

18   used for the trial with the banks.  And then we

19   had a variety of other names we used.  So I was

20   short-handing to say XRP meaning xRapid.

21        Q.   And who were the regulators that had

22   told -- conveyed to Ripple that they were fine

23   with everything except for xRapid?

24        A.   At this point, we would have engaged --

25   2017.  We would have engaged Spain, Mexico, U.S.,

225

```
 1    Japan, and UK, roughly in that regard, around
 2    using X -- a bank using xCurrent, the connectivity
 3    solution.
 4              So I'm saying in this e-mail, xCurrent
 5    regulators have been fine with.  We hadn't
 6    introduced xRapid with -- which uses XRP into
 7    those conversations, so we don't have a -- a
 8    definitive, like, thumbs up from a regulator that
 9    a bank can use that yet.  We hadn't brought that
10    into the discussion.
11        Q.   Did any regulators ever tell -- tell
12    Ripple that they were not okay with XRP, the
13    digital asset, as opposed to XRP meaning xRapid?
14        A.   No.  So this is, like, the -- the
15    context of this was very specific to xRapid
16    approved as a vendor to a financial institution.
17        Q.   Did any regulators ever express concerns
18    to Ripple about XRP, the digital asset?
19        A.   Not that I'm aware.
20        Q.   What was --
21        A.   What was the questions?  For me to say
22    there were "concerns," I would -- wouldn't use
23    that word.
24        Q.   What was Xenon?
25        A.   Xenon was a -- one of the pilots that we
```

1    ran with financial institutions using XRP and

2    xRapid.  So that was -- we had maybe 10 or 12

3    banks that were piloting what became xRapid.

4        Q.   And tell me about the regulatory

5    uncertainties that came out of that pilot program.

6        A.   So when -- an output of the project was

7    a list of areas to further invest in.  One was

8    around regulatory uncertainties.  That covered, as

9    I recall, things around the ability for a bank to

10   use a crypto asset, a virtual currency, within a

11   payment flow.  That was a primary one that our

12   takeaway was, like, is this okay to -- for a bank

13   to use, meaning things around disaster recovery,

14   financial stability, operational resiliency.

15   Your -- your typical vendor questions.

16       Q.   And was the lack of regulatory approval

17   the reasons that -- the reason that banks did not

18   want to adopt xRapid?

19            MR. HECKER:  Objection to form.

20       A.   That's not how I would describe it.

21   We -- we ran a pilot to learn.  One of the

22   learnings we had was we need to get more clear on

23   what risk regulators see when they use this type

24   of technology and how we mitigate those risks

25   within the solution.  So that was one of the

227

1    places we -- it was a lesson from that -- that

2    work.

3         Q.   And did any United States regulators

4    ever express a -- a view to Ripple on xRapid?

5         A.   Yes.

6         Q.   Could you tell me about that?

7              MR. HECKER:  And, sorry, just the

8         same caveat we've been giving you to the

9         extent the discussion is involving

10        counsel.

11        A.   We briefed the OCC annually, the OCC

12   being one of the banking regulators.  We briefed

13   them annually from 2017 or 2018 through the end of

14   my time there on both xCurrent and xRapid.  So

15   there was a -- general education meetings.  This

16   is -- the pilots are running, this is what we're

17   learning.

18             So there was a series of those meetings.

19   We had similar meetings with the Federal Reserve

20   that were more educational in context.

21             The second type of work we did around

22   xRapid was client specific.  So in the last nine

23   months of my time at Ripple, I worked on a deal

24   with MoneyGram.  MoneyGram was using xRapid.  My

25   head of the public announcement, part of my role

 1   was to brief MoneyGram's regulators ahead of time,

 2   introducing Ripple as a vendor to MoneyGram,

 3   letting them know what the product would be, what

 4   the flow of funds would be, and to show that we

 5   were proactively thinking around mitigating risk

 6   in the arrangement.

 7          We briefed the Texas, New York, and I

 8   believe California regulators.  We -- I also

 9   briefed the Conference of State Bank Supervisors.

10   The feedback from those -- those briefings was

11   that they had no issues and that we were clear to

12   proceed.

13       Q.   And did the SEC ever give Ripple a clear

14   to proceed message?

15       A.   The focus of this was around vendor due

16   diligence for the bank, for MoneyGram, the

17   financial institution.  So we were focused on

18   the -- MoneyGram's financial regulators.

19       Q.   Right.  And I -- I just want to make a

20   clear record on this.  You had listed some

21   regulators that had given Ripple the, I think your

22   words were, "clear to proceed" on xRapid.

23          Did the SEC ever give such a message or

24   approval Ripple regarding xRapid?

25                MR. HECKER:  Objection to form,

229

```
1          foundation.

2                    MR. CERESNEY:  Objection.

3          A.  I wasn't aware of any guidance from the

4     SEC to Ripple.

5                    MR. HANAUER:  Eleven.

6                    MR. HECKER:  Can we take a --

7                    THE WITNESS:  I'm okay.

8                    MR. CERESNEY:  You good?  You

9          know what?  Why don't we take five

10         minutes?

11                   MR. HANAUER:  Okay.

12                   MR. CERESNEY:  Off the record.

13                   THE VIDEOGRAPHER:  Going off the

14         record, 3:51.

15                   (Whereupon, a recess is taken.)

16                   THE VIDEOGRAPHER:  Okay.  We're

17         back on the record at 4:03.

18                   (Whereupon, exhibit is presented

19         and marked SEC Zagone Exhibit RZ-11 for

20         identification.)

21    BY MR. HANAUER:

22         Q.  Mr. Zagone, do you have Exhibit 11 in

23    front of you?

24         A.  I do.

25         Q.  And Exhibit 11 is a copy of an e-mail
```

230

```
1    that you sent to various Ripple personnel on May

2    5th, 2017?

3          A.   That's right.

4          Q.   And -- and the folks you were e-mailing,

5    was that Ripple's senior leadership?

6          A.   Yes, it was.

7          Q.   And you attached to your -- your e-mail

8    a document called "XRP Overview for Regulators"?

9          A.   Yes.

10         Q.   Okay.  And that's one of the documents

11   we've looked at earlier today?

12         A.   Yes.

13         Q.   And you write in your e-mail at the top

14   of Exhibit 11, under the -- after the "XRP" in

15   bold, "I've been busy driving XRP use case

16   discussions.  The narrative in the attached white

17   paper is working very well (except in the United

18   States)."

19              What did you mean when you wrote that

20   you were "busy driving XRP use case discussions"?

21         A.   The use case of how digital assets could

22   be used to connect fiat currencies more

23   efficiently.

24         Q.   And when you talk about XRP there, are

25   you using that interchangeably with the product
```

231

1    that would become xRapid?

2         A.    Correct, yes.

3         Q.    And what did you mean when you wrote

4    "The narrative in the attached white paper is

5    working very well (except in the U.S.)"?

6         A.    I can't recall that, what my logic was

7    there.

8               THE WITNESS:  Do you need me to

9         repeat that?

10              THE REPORTER:  No.

11        A.    I can't recall that and I don't --

12   there's not much context around it.

13        Q.    Who were you -- well, first of all, why

14   were you presenting use case discussions to the

15   United -- in the United States?

16        A.    So this is early 2017.  The -- this was

17   still an early day for crypto, particularly as it

18   was being adopted in institutional use cases.

19              So we -- we had a lot of effort -- I'd

20   say most of the market conversations, including

21   the regulatory conversations, were focused on the

22   consumer use of crypto.  It can be used instead of

23   the U.S. dollar or fiat currencies.  So consumers

24   using, say, bitcoin to buy their coffee.  We

25   wanted to ensure that one con -- the market

232

1   understood there were other use cases beyond

2   replacing fiat currencies, specifically Ripple's

3   XRP to connect fiat currencies more efficiently

4   and that regulation reflected that.

5        Q.   And were -- in May 2017 were you having

6   difficulty communicating those use cases in the

7   United States?

8             MR. WARD:   Objection to form.

9        A.   According to this e-mail, I was.

10       Q.   And who were you presenting those use

11  case discussions to in the United States?

12       A.   I can't tell if the clarification,

13  except in the U.S., if that was client-driven

14  to -- to banks or if that was meant to regulators.

15  I -- I can't recall.

16       Q.   Did you consider regulators to be your

17  clients?

18       A.   We did have some central banks that also

19  served as regulators that were our clients, yes.

20       Q.   Were U.S. banks Ripple's clients?

21       A.   U.S. banks were Ripple's clients, yes.

22       Q.   What U.S. banks were Ripple's clients?

23       A.   We had relationships with ███████

24  ███████ who served on our global payments steering

25  group.  That was the largest of our U.S. bank

233

1    clients.  We also had an engagement with ██████  I
2    also worked with ████████  U.S.
3         Q.   And what products or services did Ripple
4    sell to these U.S. banks?
5         A.   Is this specific to the 2017 time frame
6    or -- or more broadly?
7         Q.   More broadly.
8         A.   So we sold -- and I have to say I would
9    add MoneyGram to that list as well.  That came
10   later.
11          We were working with those -- all those
12   clients on xCurrent and xRapid.
13        Q.   And did Ripple ever sell xCurrent to --
14   to a U.S. bank -- or, I'm sorry.  Did Ripple ever
15   sell xRapid to a U.S. bank?
16        A.   We sold xRapid, our largest partner for
17   xRapid was MoneyGram.  Not a bank, but a financial
18   institution.
19        Q.   So which banks did Ripple sell xRapid to
20   in the United States?
21        A.   When I was leaving -- in my time at
22   Ripple, first in connectivity, which that was the
23   primary problem for banks.  We talked about that
24   earlier today.  So we sold them xCurrent first so
25   they could have connectivity.  After they

1    optimized that, they can add xRapid for liquidity.

2           MoneyGram and -- and money transmitters

3    don't have a connectivity problem, so they

4    basically fast track straight to the liquidity

5    solution, xRapid.  So that's why there's a

6    differentiation in how we deployed our product to

7    be at a bank versus a nonbank.

8        Q.   So I just -- are money transmitters

9    banks?

10       A.   No.  They're financial institutions.

11       Q.   So what banks did Ripple sell xRapid to?

12       A.   In my time there, we had not sold xRapid

13   to banks yet.  They were still deploying the

14   xCurrent solution, which is the prerequisite.

15              (Whereupon, exhibit is presented

16          and marked SEC Zagone Exhibit RZ-16 for

17          identification.)

18              MR. HANAUER:  I've tendered the

19          witness a document labeled Exhibit RZ-16,

20          beginning with the Bates number ending in

21          1049.

22   BY MR. HANAUER:

23       Q.   What is Exhibit 16?

24       A.   This is a regulatory -- a strategy plan

25   for my division at Ripple.

1       Q.   Did you -- what was your role in

2  preparing it?

3       A.   I created the steps.

4       Q.   And what does "GTM countries" mean?

5       A.   GTM stands for go to market.  So that's

6  where we were targeting launching our products.

7       Q.   And can I refer you to page 1058?

8       What -- what do these tables represent?

9       A.   These tables are a click-through showing

10  a timeline of our regulatory engagement for our

11  two products, xCurrent, and here XRP I'm

12  short-handing for xRapid.

13       Q.   Okay.  So on these tables in Exhibit 16,

14  XRP meant xRapid?

15       A.   Correct.

16       Q.   And when you refer to engagement status,

17  that means regulatory engagement status?

18       A.   Yes.

19       Q.   And for the United States, what

20  regulators were being covered by this -- what

21  would be referred to in this -- these tables?

22       A.   So for the U.S. -- I can't really tell

23  the colors we used here.

24       So this was focused on enabling a bank

25  or financial institution to go in to leverage our

236

1    product.

2              So the regulators that we would speak to

3    were the bank provincial regulators, so Federal

4    Reserve, FDIC, OCC, and the States.

5         Q.   And so let's look at the January 1, 2016

6    engagement status.

7         A.   Uh-huh.

8         Q.   For USA XRP, which of -- I think it's

9    not the -- the lighter shade of the three options,

10   but which of the two darker shades do you think is

11   reflected on that table for USA XRP?

12        A.   It's the far right color indicating we

13   either had limited engagement or that jurisdiction

14   has a negative view.

15        Q.   And what was -- what did that mean for

16   the USA as of January 1st, 2016?

17        A.   That we had limited engagement.  We --

18   in 2016 we hadn't engaged fully on the xRapid

19   product as we were still in development of that.

20   That was pretty much true of all the countries.

21        Q.   And then let's look at page 1059.

22             And can I -- why -- why were you using

23   XRP as shorthand for xRapid in these and other

24   documents?

25        A.   We didn't -- the name evolved over time

237

```
 1    and it kept switching.  So we had called it

 2    initially Liquidity Solution, moved to xRapid, it

 3    was rebranded to On-Demand Liquidity, or ODL.  It

 4    was evolving, and the product wasn't final.  We

 5    were still, particularly in 2016 -- what does this

 6    go through?  2019?  It was still evolving in here

 7    so to -- whereas xCurrent was a little more

 8    standard.  I just used shorthand.

 9         Q.    Okay.  So let's look at the 2017 table.

10               What's the engagement status for the

11    United States for XRP?

12         A.    It's moved to the middle color.  I

13    believe it was a yellow.  That indicates we've

14    done some initial engagement but more is needed.

15         Q.    I apologize.

16         A.    So that yellow color indicates we've

17    done initial engagement, more is needed.  We have

18    not had a client approved to use that product in

19    the jurisdiction yet.

20         Q.    And let's look at the next page, 1060.

21    Again I'll ask you about the table "USA XRP."

22    What was the engagement status?

23         A.    Unchanged.

24         Q.    And then the next page, 1061?

25         A.    For XRP or xRapid, again, unchanged.
```

1       Q.   Still no -- why was it that the goal was

2  not to -- was -- why was it that there was not a

3  goal to have xRapid approved in the United States

4  as of January 1st, 2019?

5       A.   We were working with MoneyGram in that

6  time period to integrate the product, to -- for --

7  by the way I color coded this, I wouldn't move it

8  to green until we had a client that was ready to

9  go with the product and we had engaged with the

10  regulator for approval.

11       As of January 1, 2019, we were -- we

12  were still -- we were working with MoneyGram on

13  the details of the deal, but we hadn't gone to the

14  regulator yet.

15       Q.   No regulatory approval yet?

16       A.   Correct.

17       Q.   And for MoneyGram, who was the reg --

18  who were -- who were the regulators that Ripple

19  was seeking approval from?

20       A.   We were targeting -- it would be

21  MoneyGram's regulators, which MoneyGram is

22  regulated by the States.  So the 50 State

23  regulators.  The State banking regulators.

24       Q.   Did the reg -- did -- Exhibit 16, did

25  that in any way refer or was intended to refer to

1   the SEC and its discussion of regulators?

2                MR. CERESNEY:  The whole exhibit?

3                MR. HANAUER:  The whole exhibit,

4       correct.  Actually, you know, let me

5       clarify that.  I don't need you to --

6                MR. CERESNEY:  Yeah, it's a

7       long --

8                MR. HANAUER:  -- read -- I don't

9       want you to have to look at the whole

10      exhibit.

11  BY MR. HANAUER:

12      Q.   The tables we talked about on pages 1058

13  through 1061, when you were speaking about

14  regulatory engagement, did these tables refer in

15  any way to the Ripple's regulatory engagement

16  efforts with the SEC?

17      A.   No.

18                MR. HANAUER:  Twenty-one.

19                (Whereupon, exhibit is presented

20      and marked SEC Zagone Exhibit RZ-21 for

21      identification.)

22                MR. HECKER:  Thanks.

23                MR. HANAUER:  I tendered the

24      witness a document labeled Exhibit RZ-21

25      with a Bates number ending in 6451.

240

BY MR. HANAUER:

    Q.   And is Exhibit 21 a copy of an e-mail you sent to Monica Long, ██████████ and ██████ ████████ on August 8th, 2018?

    A.   That's right, yes.

    Q.   And who is ██████████

    A.   I don't know ████████ He appears to work at ████████ which was a -- I believe a consulting firm that our -- a consulting firm or a PR firm that our communications team used.

    Q.   What's this discussion about a political inter -- Politico interview with ████████?

    A.   It looks like the story was about the risk of 51 percent attack against bitcoin.  That's an attack where a majority of the mining power take over the control of bitcoin.

    Q.   And who is ████████?

    A.   ████████ was the -- I believe his title is executive director of ████████ which is a think tank in D.C.

    Q.   And do you see right -- ████████ who we're trying to court, is a public spokesperson"?  Why -- why was Ripple trying to court Mr. ████ as a public spokesperson?

    A.   So ████ was seen as -- ████ and ████

1   ██████ were seen as thoughtful voice in the policy

2   circles in D.C. on a variety of issues.  They were

3   one of the first to speak publicly on policy

4   issues back in 2014/2015.

5        Q.   What -- what message did you want

6   Mr. ████ to convey publicly?

7        A.   Up until this point, ████████ had not

8   spoken about XRP.  So we were working with ████

9   ████ to integrate XRP into their -- into their

10  research network.

11       Q.   And then do you see in the

12  second-to-last paragraph, you write "Our approach

13  has been to show that BTC, ETH and XRP are very

14  similar"?  What are you referring to there?

15       A.   It appears that around the -- I'm

16  speaking that they're very similar in a state of

17  decentralization.  In that conversation,

18  decentralization is often brought up.  That

19  they're -- their BTC, ETH and XRP are all

20  decentralized assets.

21       Q.   And this was a -- a message that Ripple

22  was trying to convey to the public?

23       A.   Ripple was trying to convey a message

24  that -- not that we were trying.  Ripple was

25  stating that XRP is decentralized, much like Eth