242

1    and bitcoin.

2        Q.   And why was Ripple stating that

3    publicly?

4        A.   There's often -- not often, but at times

5    there was, like, incorrect press reports saying

6    that XRP was a centralized digital asset. That

7    was incorrect. So we made efforts to ensure that

8    that was corrected.

9        Q.   And what was the significance of whether

10    XRP was centralized or decentralized?

11        A.   The -- there's an interest in the crypto

12    community for the assets that they decide to build

13    on, the open source community. There's an

14    emphasis on decentralization. So that was

15    important for us to show -- for Ripple to clarify

16    that Ripple does not control the XRP ledger.

17          And then secondly, the more technical

18    terms around the vendor due diligence

19    conversations, conversations around operational

20    resiliency and business continuity specific to a

21    new type of platform that is decentralized. That

22    was related to the xRapid conversations.

23        Q.   How did the centralization --

24    centralization versus decentralization, how did

25    that relate to the XRP security classification

243

1    issue?

2                MR. CERESNEY:  Objection; form.

3        A.    From what I recall, that was a piece

4    of -- we're exploring -- we're comparing bitcoin,

5    Eth and XRP.  Decentralization was a factor for

6    the Eth decision and we're exploring a similar

7    parallel with XRP.

8        Q.    And when you say "the Eth decision," do

9    you mean Mr. Hinman's speech in 2018?

10       A.    Yes.

11       Q.    And when you write in Exhibit 21 "Our

12   approach has been to show that BTC, ETH and XRP

13   are very similar," that's the approach with the

14   SEC arguing for the same classification?

15       A.    Right.

16       Q.    And was Ripple trying to convey to the

17   SEC in August 2018 that bitcoin, Ether, and XRP

18   are very similar?

19       A.    I wasn't involved in the SEC

20   discussions, so I'm not sure what the company was

21   trying to convey.  The Hinman speech was the

22   guidance that the market had, so we were building

23   off of that.

24       Q.    Well, you wrote about Ripple's approach

25   with the SEC.

1       A.    That was my understanding from counsel

2    of what the approach taken there was.

3       Q.    Did you have any understanding of the

4    approach taken with the SEC independent of your

5    communications with counsel?

6       A.    No.

7             MR. HANAUER:  Mr. Ceresney, are

8         you instructing the witness not to answer

9         questions about communications with

10        counsel regarding the approach Ripple was

11        taking with the SEC in August of 2018?

12            MR. CERESNEY:  Yes.

13            (Whereupon, exhibit is presented

14        and marked SEC Zagone Exhibit RZ-22 for

15        identification.)

16            MR. HANAUER:  And I just tendered

17        the witness a document labeled RZ --

18        Exhibit RZ-22, which has a Bates number

19        ending in 1296.

20   BY MR. HANAUER:

21      Q.    And is Exhibit RZ-22 a copy of an e-mail

22   and attachment you sent to Mr. Garlinghouse on

23   August 16th, 2018?

24      A.    That's right.

25      Q.    And do you see your e-mail refers to a

245

1    "Ripple and XRP one-pager handout used on the

2    Hill"?

3          A.    I do.

4          Q.    And are you referring to the document

5    attached to your e-mail?

6          A.    Yes.

7          Q.    And what did you mean by "handout used

8    on the Hill"?

9          A.    We were having -- I was having meetings

10   on Capitol Hill with House and Senate members and

11   their staff educating them on the future of

12   payments.  This was a handout that summarized our

13   points.

14         Q.    And in your meetings with members of

15   Congress and their staff, you were trying to

16   convey the message that XRP should not be

17   considered a security?

18         A.    No.  We were conveying a message that

19   this technology is the future of payments and it's

20   incumbent upon America to lead on that to remain a

21   global leader in finance.

22         Q.    So why are you writing that the

23   one-pager highlights why XRP should not be

24   considered a security?

25         A.    The meetings we had on the Hill were

1    about America's leadership in blockchain.

2           Q.   Were any of those meetings about

3    proposed legislation that would exclude XRP from

4    the federal -- the application of the federal

5    securities laws?

6           A.   From my memory and in rereading the text

7    here, the focus was on America's leadership by

8    resolving uncertainty of the -- regulatory

9    uncertainty.

10          Q.   Right.

11               And resolving regula -- and resolving

12   regulatory uncertainty, you're speaking about the

13   SEC XRP classification issue?

14          A.   Yes, that's -- that was one piece of

15   uncertainty.

16          Q.   And you want -- when you met with

17   members of Congress and their staff, you wanted to

18   convey Ripple's message that XRP should not be

19   subject to the federal securities laws?

20          A.   The outreach we did on the Hill was,

21   like, educational in nature.  So this is

22   blockchain.  It's important for our leadership,

23   particularly our national security, as this would

24   be future infrastructure for global payments.  We

25   wanted that to be American led.  So it was very

247

1    educational at the background of XRP and that we

2    need a -- a view, an American view, which we

3    thought global -- from a countrywide policy

4    perspective, that should be led by Congress to

5    chart out how America can be a leadership -- be a

6    leader on blockchain and crypto.

7         Q.   But the -- the result Ripple wanted was

8    for Congress to pass a law that excluded XRP from

9    the SEC's jurisdiction, right?

10        A.   The -- the result we wanted was America

11   to be a leader on this technology.  American

12   leadership on blockchain.  That encompasses -- or

13   the focus of that is policy that enables that

14   technology to grow.  So we -- we -- we look back

15   to the early days of the internet.  That was led

16   by -- the growth of the internet was led by a

17   public policy view from Congress and the President

18   at the time.  And we saw other countries putting

19   forth -- putting forth, like, holistic frameworks

20   for how they could be competitive on the future of

21   payments, particularly UK and Singapore.  And we

22   wanted America to be a part of that conversation.

23        Q.   Ripple wanted Congress to pass a law

24   that excluded XRP from the SEC's jurisdiction?

25              MR. CERESNEY:  Objection.

248

1       A.   No, those are your words.  So we wanted

2   America to lead on crypto and blockchain.  It's

3   the future infrastructure of our financial system.

4   We wanted America to be a leader there.

5       Q.   Okay.  And you -- you wanted Congress to

6   resolve regulatory uncertainty regarding XRP?

7       A.   We wanted Congress to create -- to point

8   the compass in the direction of where the U.S.

9   needed to go on blockchain and crypto assets.  So

10  creating a north star for the U.S. broadly

11  supports this technology.  We see it as a future

12  of our economy.  Very similar to the framework

13  that President Clinton put forth for the internet.

14      Q.   Did Ripple want Congress to pass any

15  laws related to the XRP securities classification

16  issue?

17      A.   That was not the focus of our Hill

18  engagement.

19      Q.   So what are you writing about to

20  Mr. Garlinghouse about the handout you used on

21  Capitol Hill highlighting why XRP should not be

22  considered a security?

23      A.   I -- I see the handout here and I see

24  that -- I see where I write that, highlighting why

25  XRP should not be considered a security.  That was

```
 1   not the focus of the handout nor the focus of
 2   our -- our conversations.  The -- how XRP -- XRP
 3   would be treated by the SEC was a much more
 4   in-depth discussions than the level of
 5   conversations we were having.
 6        Q.   And who did you meet with from Congress?
 7        A.   These were Hill staffers for different
 8   members of the financial services and Senate
 9   banking committee.
10        Q.   Did you ever meet with any of the
11   senators or congressmen yourself?
12        A.   Some, yes.
13        Q.   Who?
14        A.   Senator Cotton, Senator Sinema,
15   Representative Sherman.  There's a couple more in
16   there.  I can't recall their names.
17        Q.   And in any of your meetings with
18   senators, representatives, or their staffs, did
19   you convey the message that XRP should not be
20   considered a security subject to SEC regulation?
21        A.   That was not the focus of these
22   conversations.  They were -- no.  They were very
23   high level around ensuring American leadership on
24   blockchain.
25        Q.   And I'm not asking you about the focus.
```

1    I'm just asking if you ever conveyed to a senator,

2    a U.S. representative, or any of their staffs that

3    Ripple should not be considered a security subject

4    to SEC regulation?

5              MR. HECKER:  Objection; asked and

6         answered.

7         A.    Not that I recall.  That's much more

8    detail than the high-level conversations we were

9    having.

10        Q.    Did Ripple employ lobbyists to attempt

11   to convince the SEC to decide that XRP was not a

12   security?

13        A.    Ripple employed lobbyists to engage on

14   Hill issues, bills that would come up.  In my

15   awareness, they were focused on the Hill.

16        Q.    Did Ripple employ lobbyists to attempt

17   to convince Congress to decide that XRP was not a

18   security and not subject to SEC jurisdiction?

19        A.    The work we did on the Hill and the work

20   we did with our lobbyists was -- was educational.

21   What is XRP?  What's the potential for the

22   technology?  It wasn't -- it was high level and

23   educational unless there was a bill that was

24   related to Ripple, which we would engage directly

25   on that bill.

1    Q.    Okay.  And what bills related to Ripple

2    or XRP did Ripple employ lobbyists for?

3    A.    We employed a lobbyist, the primary one

4    that I recall was a -- with the Senate banking

5    committee who had proposed AML rules for

6    cryptocurrency to ensure terrorist financing and

7    money laundering did not occur through the

8    technology.  We engaged with the Senate on that

9    bill.

10   Q.    Did Ripple employ lobbyists related to

11   the XRP securities classification issue?

12   A.    There was a bill that came out from the

13   House, from Representative Davidson.  We -- I

14   can't recall if we deployed a lobbyist to engage

15   with Davidson or not.

16   Q.    And what was that?

17   A.    The bill was a crypto framework.  It was

18   a bill that called for more clear classification

19   of digital assets in the U.S.

20   Q.    And was that bill from Congressman

21   Davidson to exempt -- would that bill have

22   exempted digital assets from regulation by the

23   SEC?

24   A.    I -- I can't recall.  And there were --

25   there were a variety of versions of that bill.

1    Q.    Did Ripple ever employ a lobbyist to

2    argue or to try and convince Congress to pass a

3    bill that would have excluded digital assets from

4    the SEC's jurisdiction?

5    A.    Not that I recall.

6    Q.    Did Ripple ever try to get -- did Ripple

7    ever make efforts to convince legislators to

8    influence the SEC?

9              MR. HECKER:  Objection to form.

10   A.    Not that I was aware of.

11   Q.    Did you have an understanding of whether

12   Mr. Garlinghouse was involved with Ripple's

13   lobbying efforts?

14   A.    Mr. Garlinghouse attended meetings with

15   me in D.C.  They were educational meetings on

16   Ripple and XRP.  And Mr. Garlinghouse had his own

17   meetings as well.

18   Q.    And did you attend meetings where

19   Mr. Garlinghouse and Mr. -- and lobbyists were

20   present?

21   A.    I attended some meetings with

22   Mr. Garlinghouse, yes.

23   Q.    And lobbyists?

24   A.    I believe so, yes.

25   Q.    And was the XRP securities

253

1    classification ever discussed at those meetings?

2        A.   I can't recall.

3        Q.   So the one-pager attached to Exhibit --

4    as part of Exhibit 22, did you prepare that

5    document?

6        A.   I contributed to parts of it, but I

7    didn't prepare the full document.

8        Q.   Who else was involved in its

9    preparation?

10       A.   We had a communications team -- a

11   communications firm that -- and a consulting firm

12   that we were working with.

13       Q.   Do you know what the names of those

14   firms were?

15       A.   The communications firm would be who we

16   were working with marcomm and their teams, so

17   taking those talking points.

18       Q.   Was that         ?

19       A.   I'm not sure who we were working with at

20   that time.          was one that we worked with.  So

21   some of these are just like facts around XRP that

22   I would have gotten from marcomm.

23            And then the other firm would be

24       Q.   And what was

25       A.   They were a strategy consulting firm in

254

1    D.C.

2                    MR. HANAUER:  Twenty-three.

3                    (Whereupon, exhibit is presented

4           and marked SEC Zagone Exhibit RZ-23 for

5           identification.)

6                    MR. HECKER:  Thanks.

7                    MR. HANAUER:  And I tendered the

8           witness Exhibit RZ -- or a document

9           labeled Exhibit RZ-23, beginning with a

10          Bates number ending in 1104.

11   BY MR. HANAUER:

12       Q.   And Exhibit RZ-23, is that an e-mail and

13   attachment you sent Mr. Garlinghouse on September

14   4th, 2018?

15       A.   That's correct.

16       Q.   And in your e-mail to Mr. Garlinghouse,

17   you reference a list of meetings for a trip to

18   D.C. September 25th to September 26th?

19       A.   Yes.

20       Q.   And that was a trip Mr. Garlinghouse was

21   making to Washington, D.C. to meet with various

22   government officials?

23       A.   That's correct.

24       Q.   Did you attend that trip?

25       A.   I can't recall.  I was in -- back and

1    forth to D.C. quite a bit in that time frame.

2        Q.    And it looks like there's also a trip

3    scheduled for September 18th?

4        A.    That's what it looks like, yes.

5        Q.    And did the -- well, I'll start, did the

6    September 18th trip take place?

7        A.    I can't recall.

8        Q.    What about the September 25th trip?

9        A.    I believe that did.  That did happen.

10       Q.    Okay.  What was the purpose of

11   Mr. Garlinghouse's trip to D.C. in September --

12   September 25th/26th, 2018?

13               MR. WARD:  Objection to form.

14       A.    We -- Brad was also engaging on the

15   theme of educating policymakers on the potential

16   for blockchain and crypto and positioning America

17   to be a leader on this technology.

18       Q.    And then do you see the -- the

19   attachment in Exhibit 23, the priorities for the

20   meetings?

21       A.    Yes, I see that.

22       Q.    Did you prepare that document?

23       A.    I did not.  I don't believe I did.

24       Q.    And this document contains a list of

25   meetings that Mr. Garlinghouse should prioritize

1   while in Washington, D.C.?

2        A.   Correct.

3        Q.   And then do you see that the SEC is

4   referenced in Meetings No. 1, 2, 3, 6 and 7?

5        A.   Yes, I see that.

6        Q.   Why was Ripple prioritizing these

7   meetings relating to the SEC?

8               MR. CERESNEY:  Objection.  There

9          are references to the SEC in a number of

10         these meetings.  I don't think it's

11         accurate to say that the meetings relate

12         to the SEC.  A number of them, for

13         example, mention the SEC attending.

14              MR. HANAUER:  Using the term

15         "related" broadly.

16              MR. CERESNEY:  Objection to the

17         creative use of the term "related."

18       A.   Can you repeat the question?

19       Q.   Sure.

20            Why was Ripple prioritizing all these

21   meetings where there's a reference to the SEC?

22       A.   I wouldn't say that we were prioritizing

23   these meetings.  Several of these references are

24   just that someone from the SEC will be there

25   alongside other attendees, number one.

257

1          Number two, similar.  It's listing out

2     the Financial Stability Oversight Council, which

3     the SEC is a member.  These aren't meetings

4     targeted at the SEC.  They're with other agencies

5     or groups.

6          Q.   But what's -- what's the significance of

7     the SEC being mentioned in all these meetings?

8          A.   We're giving Brad a -- I'm giving --

9     whoever wrote this and that I passed onto Brad is

10    giving him a heads-up of where the SEC will be

11    there.  This is in 2018, September.  I believe the

12    SEC has reached out to Ripple at this point or is

13    engaged in conversation.  So I'm giving him

14    awareness.

15         Q.   And at this point in time, September of

16    2018, Ripple was still trying to convince the SEC

17    to decide that XRP was not a security?

18         A.   In this time, Ripple and SEC were in

19    conversation.  I wasn't part of those

20    conversations.

21         Q.   All right.  But you had an understanding

22    that Ripple wanted -- in late 2018 Ripple was

23    trying to convince the SEC that XRP should not be

24    deemed a security?

25         A.   I don't know the nature of those

258

1    conversations, if we were trying to convince them

2    or if they were more educational in background and

3    scope.

4         Q.    What's the goal of those meetings?

5    What -- what could possibly be the goal of

6    Ripple's meetings with the SEC?

7               MR. HECKER:  Object.  Objection

8          to form; argumentative, foundation.  His

9          understanding of the meetings it sounds

10         from prior testimony came from counsel, so

11         I'm not sure how he can answer that

12         question.

13        Q.    I guess what's your -- what's your --

14   what was your understanding of what Ripple was

15   trying to accomplish in relations to the SEC in

16   late 2018?

17              MR. HECKER:  Again, to the extent

18         that your understanding, general

19         understanding of that, is not coming from

20         Ripple's lawyers.

21        A.    I understood outside of Ripple's lawyers

22   we were educating the SEC on XRP, its background,

23   and Ripple the company.

24        Q.    As the director of Ripple's regulatory

25   relations, what did you want to accomplish

259

1  vis-a-vis the SEC?

2      A.   So the SEC was an issue owned by our

3  legal team.  I was primary point for our clients

4  and their approval by their regulators to use our

5  products.

6      Q.   So let's look at Meeting No. 4,

7  "Davidson Cryptocurrency Roundtable."  And it says

8  that the objective of the meeting is to "help

9  shape the bill with suggestions that would keep

10 Ripple outside security classification."

11     A.   That's No. 4 you're referring to?

12     Q.   Yes.

13     A.   Yes.  There was a bill introduced by

14 Representative Maloney that would classify all

15 digital currencies as securities.  Representative

16 Davidson was planning a counter bill that would,

17 here I say more -- or this document says "have a

18 more pragmatic approach."

19     Q.   Did Ripple --

20     A.   So this was about crypto in general, the

21 broad market.

22     Q.   Right.

23          But do you see the part -- the

24 objective, "help shape the bills with suggestions

25 that would help keep Ripple outside security

260

1    classification"?

2        A.   Yes, I see that.

3        Q.   And was one of the Ripple's goals at the

4    time for Congress to pass legislation that would

5    result in XRP not being classified as a security?

6                MR. HECKER:  Objection to form.

7                MR. WARD:  Objection.

8                MR. CERESNEY:  You can answer.

9        A.   Yeah.  The scope of this meeting,

10   Maloney put forth a bill that would classify the

11   whole industry as securities.

12       Q.   Okay.  And did Ripple want that bill to

13   pass?

14       A.   No.

15       Q.   Did Ripple make any efforts to prevent

16   that bill from passing?

17       A.   We attended this roundtable.

18       Q.   And were you going to advocate -- at the

19   roundtable was Ripple going to advocate for or

20   against Representative Maloney's bill?

21               MR. HECKER:  Objection.

22       A.   We were advocating --

23               MR. HECKER:  Objection to form.

24               You can answer.

25       A.   We were advocating for, as it says here,

1  "a more pragmatic approach" than classifying the

2  whole industry as a security.

3      Q.   So Ripple was opposing Representative

4  Maloney's bill, right?

5      A.   Correct.

6      Q.   And Ripple was supporting Representative

7  Davidson's bill that would have exempted digital

8  assets from the federal securities laws?

9            MR. WARD:  Objection.  Misstates

10    the document.

11      A.   Yeah.  Davidson's bill called for, as he

12  put here, a more pragmatic approach to securities

13  classification.  The bill had several different

14  versions and was -- was edited substantially over

15  the time of its existence.

16          The -- it called for a review to ensure

17  a more practical and pragmatic approach than

18  classifying the whole industry as a security.

19      Q.   So I want to focus on the objective

20  piece.

21      A.   Uh-huh.

22      Q.   Was an objective of Ripple's that

23  Congress passed a law that would keep XRP from

24  being classified as a security?

25          MR. HECKER:  Same objections.

1      A.    The objective here was to push back on a

2  bill that would classify the whole industry,

3  including Ripple -- or including XRP, as a

4  security.

5      Q.    I get that, but I'm asking about the --

6  the counter bill that would exempt digital assets

7  from the federal securities laws.

8            Did Ripple support such a bill?

9      A.    I don't believe Davidson's --

10           MR. HECKER:  Hang on.

11           Objection; mischaracterizes the

12      document; asked and answered.

13           But you can answer again.

14     A.    I don't believe Davidson's bill exempted

15  assets from being securities.  I believe

16  Davidson's bill called for a more pragmatic

17  approach than classifying the whole industry as a

18  security.

19           MR. HANAUER:  Twenty-four.

20           (Whereupon, exhibit is presented

21      and marked SEC Zagone Exhibit RZ-24 for

22      identification.)

23           MR. HANAUER:  And Exhib -- I

24      tendered the witness a document labeled

25      Exhibit RZ-24 with a Bates number ending

1        in 6857.

2    BY MR. HANAUER:

3        Q.    Is Exhibit 24 a copy of an e-mail chain

4    ending with an e-mail you sent Mr. Garlinghouse on

5    October 18th, 2018?

6        A.    Correct.

7        Q.    And do you see how in the second e-mail

8    of Exhibit 24, Mr. Garlinghouse writes "We have

9    decided that as a next step in our goal to have

10   the SEC proactively say something, that we should

11   get meetings with each of them"?

12       A.    Yes, I see that.

13       Q.    What did you understand Mr. Garlinghouse

14   to mean by "our goal to have the SEC proactively

15   say something"?

16       A.    What I understand that line to mean was

17   have the SEC come forth and clarify the

18   classification of XRP.  Proactively say something

19   about XRP's classification.

20       Q.    And it was Ripple's goal to have the SEC

21   say that XRP was not a security, right?

22       A.    Our view was that it's not a security.

23       Q.    And Ripple's goal was to have the SEC

24   say that?

25       A.    Brad's note just says our goal was "to

264

1    have the SEC proactively say something."

2         Q.   Did you talk -- ever talk to

3    Mr. Garlinghouse about what he wanted the SEC to

4    say?

5         A.   I did not have that conversation with

6    Brad on that, no.  The conversa -- the context

7    here was that there was open uncertainty, there's

8    broad uncertainty in the market.  We had our view;

9    but as we had noted in previous documents, we were

10   looking for the SEC or a formal regulator to

11   provide clarity.

12        Q.   And so the SEC could have provided

13   clarity on the issue by either saying it

14   considered XRP a security or it did not consider

15   XRP a security, is that right?

16        A.   Those would be the two options.

17        Q.   And Ripple wanted the SEC to come out

18   and say it considered XRP not to be a security?

19             MR. WARD:  Objection.

20        A.   In this e-mail it says "our goal is to

21   have the SEC say something."

22        Q.   Right.

23             And you had just said there were two

24   options on what the SEC could say:  Either SE --

25   either XRP is a security or XRP's not a security.

1    Which one did Ripple want the SEC to

2    say?

3         A.    From the context of this e-mail, it was

4    --

5              MR. WARD:  Objection.

6              You can answer.

7              THE WITNESS:  Okay.

8         A.    From the context of this e-mail, it

9    looks like Brad is pushing -- he's decided that

10    the goal is to have the SEC say something to

11    remove the uncertainty.

12        Q.    Right.  And -- and I'm not trying to be

13    difficult here, but you just said there were two

14    things the SEC could have said to provide

15    certainty:  XRP's a security or XRP is not a

16    security.

17             So based on what you just said, which of

18    those options did you want the SEC to go with?

19        A.    The e-mail is quite clear.

20             MR. WARD:  Objection.

21        A.    It says "to say something."  It doesn't

22    indicate a preference.

23        Q.    Did you understand Ripple had a

24    preference between those two options?

25        A.    We had a company view that it was not a

 1   security.

 2        Q.   And Ripple was trying to secure meetings

 3   with the SEC Commissioners with the goal of having

 4   the SEC state that XRP is not a security.

 5        A.   That's not what the e-mail says.

 6              MR. WARD:  Objection.  I mean,

 7         how many times can the same question be

 8         asked?

 9              MR. HANAUER:  Counsel, I'm not

10         asking him to read the e-mail.  I'm asking

11         him to state his view as a witness.

12        A.   This is an e-mail from Brad.

13        Q.   Right.

14        A.   That's a question for Brad, what he

15   meant by this context, what he meant by his

16   e-mail.

17        Q.   I'm just trying to take this in parts.

18   You can even put the e-mail down.  How about that?

19              In late 2018 was there certainty with

20   how the SEC viewed XRP?

21        A.   Not to my awareness.

22        Q.   Was there uncertainty with how the SEC

23   viewed XRP?

24        A.   I believe so, yes.

25        Q.   And the XR -- the SEC could have

1    provided certainty about XRP by making a statement

2    that XRP was a security or XRP wasn't a security?

3        A.   Those would be the options.

4        Q.   And did -- I think you just said Ripple

5    preferred the option of having the SEC say that

6    XRP was not a security?

7        A.   We had a belief that XRP was not a

8    security.

9        Q.   And Ripple wanted the SEC to say that

10   XRP was not a security?

11              MR. WARD:  Objection.

12       A.   I'm looking at this e-mail and it just

13   says "say something."

14       Q.   Put -- put the e-mail down.  Okay?  And

15   I'm sorry I raised my voice but I don't want to

16   tether you to the e-mail.  I'm just asking you

17   general questions from your perspective as

18   Ripple's director of regulatory relations.

19       A.   Yeah.  Our review was that XRP was not

20   --

21              MR. WARD:  Hold on.  I -- I

22       object to that question.

23              You can answer.

24       A.   The company's view was that XRP is not a

25   security.  We shared education broadly on the Hill

268

1    and with other policymakers, think tanks, about

2    XRP and our view.

3              The SEC is an independent organization.

4    It can create -- or it will make its own views.

5         Q.   And which view did Ripple want the SEC

6    to publicly announce, that Ripple -- that XRP was

7    a security or XRP was not a security?

8              MR. WARD:  Objection.

9         A.   We held a view that it was not a

10   security.  That was a view based off of work with

11   counsel, outside counsel providing guidance.

12   That's what we thought was accurate and that's

13   what we worked on.  We would have -- we would have

14   looked for the SEC to validate that view.

15        Q.   And that's why Ripple was trying to

16   secure meetings with the SEC commissioners in late

17   2018?

18             MR. WARD:  Objection.

19        A.   I can't say -- I can't make that

20   extension, no.  The meetings are directly related

21   to this e-mail from Brad saying he wants the SEC

22   to say something.  So to remove the uncertainty in

23   the market.  The SEC had already made actions

24   toward bitcoin, toward Eth, and the DAO.  We were

25   looking for a similar certainty as those other

1    assets.

2         Q.   And Ripple was looking -- Ripple's wish,

3    Ripple's desire, was that the SEC would provide

4    certainty by saying that XRP was not a security?

5                   MR. HECKER:  Objection; asked and

6         answered --

7                   MR. WARD:  Objection.

8                   MR. HECKER:  -- multiple times

9         now.

10        A.   Yeah, I've already answered this.  We

11   were looking for certainty.  The e-mail says we

12   wanted to work with the members, with the

13   commissioners, to proactively say something, much

14   like they did for XRP -- I mean, for Eth, bitcoin,

15   and the DAO, to remove the uncertainty.  This

16   doesn't indicate any direction of which we were

17   wishing the SEC to go.

18        Q.   All right.  And did you -- but I'm just

19   asking, did you have an understanding of which

20   direction Ripple was trying to get the SEC to go?

21        A.   I was not involved in those discussions

22   or those meetings.

23        Q.   Did you have any understanding of which

24   direction Ripple was trying to get the SEC to go

25   on on the securities classification issue?

270

1          MR. WARD:  Objection.

2      A.   I understood our view as a company.  I

3  understood from this e-mail context that we wanted

4  the SEC to say something.  That was all I

5  understood.

6      Q.   Okay.

7          MR. CERESNEY:  Should we take our

8      last break?  We've been going about an

9      hour.  We have kind of less than an hour

10     left.

11         MR. HANAUER:  Sure.  Can I finish

12     with this document?

13         MR. HECKER:  Sure.

14         MR. HANAUER:  Thanks.

15  BY MR. HANAUER:

16     Q.   And so in its efforts to get the SEC to

17  proactively say something about XRP, Ripple tried

18  to secure meetings between Mr. Garlinghouse and

19  the SEC commissioners?

20         MR. HECKER:  Objection to form.

21     A.   Correct.

22     Q.   And it looks like Mr. Garlinghouse had

23  already had a meeting with Mr. Clayton as of

24  October 2018?

25     A.   That's what it appears, yes.

1      Q.   Did you attend that meeting?

2      A.   No.

3      Q.   And did Mr. Garlinghouse convey to you

4  anything that Mr. Clayton told him at that

5  meeting?

6             MR. HECKER:  Outside the presence

7     of counsel.

8      A.   No.

9      Q.   Did Ripple --

10           MR. TENREIRO:  Wait, wait, wait.

11     Sorry.  If -- if Garlinghouse just repeats

12     what Clayton told them and just because

13     there's a lawyer there you're asserting

14     privilege and not letting him answer?

15           MR. HECKER:  I'm saying -- I'm

16     saying -- well, it's the company's

17     privilege, but you're obviously going to

18     be able to ask Mr. Garlinghouse about his

19     discussion with Commissioner Clayton.

20     Asking this witness, who only learned

21     about any of this through counsel, would

22     be -- would be a privilege issue.  So

23     yeah.

24           MR. TENREIRO:  Oh, I didn't

25     realize he only learned of it through

1          counsel.  We were asking --

2                  MR. HECKER:  I said -- my

3          objection was outside the presence of

4          counsel.  If he did, he can answer.  If

5          not, that's -- that's the problem.

6                  MR. CERESNEY:  I -- I think his

7          answer suggested that he didn't get a

8          report.  So if you want to just ask him

9          that question, we might be able to move

10         past this issue.

11                 MR. HANAUER:  Yeah.  Let's just

12         clear that up.

13                 THE WITNESS:  I did not get a

14         report from Brad from what his meeting

15         with Clayton was.

16                 MR. HANAUER:  Thanks.

17                 MR. CERESNEY:  Well, you do need

18         to have asked that question.

19    BY MR. HANAUER:

20         Q.  Did Mr. Garlinghouse secure meetings

21    with the other SEC Commissioners?

22         A.  There was an attempt to.  I don't know

23    if those meetings happened or not.

24         Q.  Do you know of any meetings other than

25    Clayton that Mr. Garlinghouse had with SEC

1    commissioners?

2          A.    I know we were targeting Peirce and

3    Roisman.  I don't know if we -- if he had those

4    meetings.

5          Q.    Okay.

6          A.    I can't recall.

7                    MR. HANAUER:  All right.  Let's

8          take a break.

9                    THE VIDEOGRAPHER:  All right.

10         Going off the record, 5:09.

11                    (Whereupon, a recess is taken.)

12                    THE VIDEOGRAPHER:  Okay.  Back on

13         the record, 5:24.

14                    (Whereupon, exhibit is presented

15         and marked SEC Zagone Exhibit RZ-43

16         for identification.)

17    BY MR. HANAUER:

18         Q.    Mr. Zagone, before we went off the

19    record, I asked you whether Mr. Garlinghouse had

20    the opportunity to meet with any of the SEC

21    commissioners other than Chair Clayton and I think

22    you said you didn't recall?

23         A.    Correct.

24         Q.    I tender you an exhibit that's been

25    marked as -- or a document that's been labeled as

274

1    Exhibit RZ-43 with a Bates number ending in 3237.

2          And is Exhibit 43 an e-mail you wrote to

3    Mr. Garlinghouse on December 21st, 2018?

4          A.   Yes, I see that.

5          Q.   And do you see the second bullet point,

6    you reference "Commissioner Jackson, the last

7    remaining commissioner to meet"?

8          A.   I see that.

9          Q.   Does that refresh your recollection

10   whether Ripple had met with other SEC

11   commissioners?

12         A.   That does.

13         Q.   So, in fact, Ripple had met with

14   Chairman Clayton, it did meet with Chairman -- or

15   Commissioner Roisman?

16         A.   I can't recall specifically which ones

17   did or didn't happen.  From this e-mail it looks

18   like some meetings did happen.

19         Q.   So as of December 21st, 2018, Ripple had

20   met with four SEC commissioners?

21         A.   I'm not certain how many.

22         Q.   Well, you write "the last remaining

23   commissioner to meet."

24               MR. HECKER:  Objection to form;

25          argumentative.  Foundation.

1          A.    There was a series of meetings -- from

2     this, it looks like the last commissioner to meet,

3     Rob Jackson.  If that meant there were four

4     others, then there were four others.  I'm not

5     certain.

6          Q.    Yeah.  Counsel advised me the number was

7     fluid during the time so...

8          A.    Okay.

9          Q.    Did -- did you attend -- did Ripple ever

10    secure a meeting with Commissioner Jackson?

11         A.    I can't recall.

12         Q.    So the meeting with the other

13    commissioners referenced in Exhibit 43, did you

14    attend those meetings?

15         A.    No.

16         Q.    It's your understanding Mr. Garlinghouse

17    met with the commissioners?

18         A.    That would be my understanding from

19    seeing this, yeah.

20         Q.    And did Mr. Garlinghouse convey to you

21    what the commissioners said to him during those

22    meetings?

23         A.    He did not.

24         Q.    And was it your understanding that once

25    the Chair and at least two other commissioners had

 1    decided to vote together on a particular issue,

 2    the two members -- the two Commissioners in the

 3    minority could not prevent the commission from

 4    taking action on that particular issue?

 5                  MR. HECKER:  Objection to form;

 6         foundation.

 7         A.    Yes, I can see that.  I'm not a

 8    securities expert or an SEC expert.  That's -- I

 9    wasn't leading this engagement.  It was led by

10    others in our legal team who were.  My work was

11    with our clients, our banking clients.

12         Q.    But you understood that the -- the SEC

13    commissioners would vote on whether to take action

14    on specific issues, right?

15         A.    If there was an action brought to the

16    commissioners, they would vote.  If there's five

17    commissioners, it would be three to two, yeah.

18         Q.    Right.  And it was your understanding

19    that once three commissioners had decided to vote

20    a particular way, the two commissioners who didn't

21    vote that way could not prevent the SEC from

22    taking action?

23                  MR. HECKER:  Objection to form.

24         A.    That's how I understand.

25         Q.    And before the -- so in the period

1      between when Mr. Garlinghouse met with the SEC

2      commissioners and the SEC filing this lawsuit, did

3      the SEC make any announcements regarding XRP?

4           A.   Not that I'm aware of.

5           Q.   And what was your understanding of the

6      fact that Ripple had attempted to convince every

7      member of the SEC that XRP was not a security, yet

8      the SEC never made a pronouncement about XRP?

9                     MR. WARD:  Objection --

10                    MR. CERESNEY:  Objection to

11          form --

12                    MR. WARD:  -- form and

13          foundation.

14                    MR. CERESNEY:  -- and foundation.

15          I mean, there's built into your question,

16          Ben, a bunch of assumptions about those

17          discussions.

18                    Are you asking him to assume all

19          the things in your answer -- in your

20          question?

21     BY MR. HANAUER:

22          Q.   If you understand the question, you can

23     answer it.

24          A.   I understood that Brad was meeting with

25     commissioners.  I did not have a view or an

278

1    understanding of what the -- the outcome he was

2    seeking with that or an opinion on the fact that

3    they had not spoken out.

4           In many meetings these were

5    educational -- educational discussions.  So this

6    is who we are.  This is what we're doing.

7       Q.   And at the time of these meetings, you

8    understood that -- that Ripple was actually being

9    investigated by the SEC's Division of Enforcement?

10      A.   Yes, I understood that.

11      Q.   And you understood that even after these

12   meetings that Mr. Garlinghouse had with the SEC

13   commissioners, the SEC could ultimately decide

14   that it considered XRP to be a security?

15      A.   Yes, I understood that as a possibility.

16      Q.   And were you also aware -- were you

17   aware that there was going to be a presidential

18   election in 2020?

19              MR. HECKER:  We can stipulate to

20       that.

21              MR. HANAUER:  Just trying to lay

22       some foundation, Counsel.

23              MR. CERESNEY:  Although some

24       might prefer that there not be one.

25              MR. TENREIRO:  Okay.

279

```
 1    BY MR. HANAUER:
 2         Q.   So did you know that whoever won the
 3    2020 presidential election would have the ability
 4    to choose a new SEC chairperson?
 5         A.   Yes.
 6         Q.   And you knew that depending on who won
 7    the 2020 presidential election, whoever was the
 8    president at that point could choose a SEC chair
 9    who held the view that XRP was a security?
10              MR. HECKER:  Objection to form;
11         calls for speculation.
12              You can answer.
13         A.   That -- that was, like -- that's a
14    stretch that was not -- that I don't recall going
15    through my mind at the time.  Particularly in that
16    period, I was on my way out.
17         Q.   After Mr. Garlinghouse's meetings with
18    the commissioners, did you have a belief on
19    whether the XR -- the SEC would make a statement
20    regarding XRP's classification as a security?
21              MR. WARD:  Objection to form.
22              MR. CERESNEY:  Well, he's already
23         said he didn't know what happened at those
24         meetings.  So are you asking him -- I
25         don't understand.  Like, is it just a
```

1      timing thing?  After those meetings did he

2      think that?  Because he doesn't have any

3      idea what happened at those meetings.

4      He's already testified to that.

5          A.    Brad keep -- Brad keeps to himself.

6   He -- I did not get a readout on those meetings or

7   the other meetings that he took solo in D.C.

8                MR. HANAUER:   Twenty-five.

9                (Whereupon, exhibit is presented

10      and marked SEC Zagone Exhibit RZ-25 for

11      identification.)

12                MR. HANAUER:   I tendered the

13      witness a document labeled as Exhibit

14      RZ-25, starting with a Bates number ending

15      3297.

16   BY MR. HANAUER:

17          Q.    Is Exhibit 25 a copy of an e-mail chain

18   ending with an e-mail from you to █████████████

19   on January 7th, 2019?

20          A.    It is.

21          Q.    And who is Ms █████████████

22          A.    Ms. ███████ works in our

23   communications team or Ripple's communication

24   team.

25          Q.    And it looks like she's asking you to

281

1    make a tweet.

2        (Pause)

3        A.    Okay.  I've read it.

4             ████████    or Ms. ████████    shares a

5    potential tweet that says something if I feel

6    comfortable tweeting, I can, but if I'm on the

7    fence, it's not a must-do.

8        Q.    And she's advising you that the -- I

9    guess the article you're tweeting about is

10   critical of the SEC?

11       A.    She says "The piece is fairly critical

12   of the SEC, so defer to your judgment."

13       Q.    And you respond to her by saying "We are

14   being very cautious to not say anything that would

15   appear critical of the SEC right now"?

16       A.    Yes, I say that.

17       Q.    And why did Ripple want to not appear

18   critical of the SEC in January 2019?

19             MR. HECKER:  Objection to form.

20       A.    We haven't -- Ripple has an ongoing

21   discussion with the SEC regarding the

22   investigation.  So I felt it would be professional

23   not to openly criticize the SEC on social media

24   during that time.

25       Q.    And do you see at the very top of

282

1    your -- at the top of Exhibit 25, you write about

2    a bipartisan bill that was introduced that would

3    exempt crypto from the SEC?

4        A.   I see that, yes.

5        Q.   And you're writing about a bill that

6    would have exempted digital assets from SEC

7    regulations?

8        A.   Yes, I see that.

9        Q.   And did Ripple support that bill?

10       A.   It says we chose to stay silent on it.

11       Q.   Different -- different question.

12            Did -- did Ripple want that bill to

13   pass?

14       A.   I can't recall the bill.  Did we want a

15   bill like that to pass?  I believe it was a

16   follow-up to the Maloney bill which classified

17   everything as a security, and this is one of the

18   follow-up bills that was in response to that.

19            We didn't take a view on it.  We stayed

20   silent on it.  As I say, we're still silent on it.

21            We -- I would have preferred that

22   approach to policy than an approach that called

23   everything a security.

24       Q.   Did Ripple ever comment on that bill?

25       A.   I can't recall.  There was a variety of

283

1    bills floating around at the time.  Some were

2    introduced.  Some were just draft.

3              MR. HANAUER:  Twenty-seven.

4              (Whereupon, exhibit is presented

5         and marked SEC Zagone Exhibit RZ-27 for

6         identification.)

7              MR. HANAUER:  I've tendered the

8         witness a document labeled Exhibit RZ-27,

9         starting with a Bates number ending in

10        3073.

11   BY MR. HANAUER:

12        Q.   Once you've had a chance to review it,

13   I'll ask you, what is Exhibit 27?

14        A.   It's a -- it's a document identifying

15   areas that the regulatory relations team could

16   collaborate with the marketing team for additional

17   support.

18        Q.   Did you prepare it?

19        A.   I don't recall this document.  It -- I

20   don't recall the document.  It would have come

21   from me if it came from the regulatory relations

22   team.

23        Q.   And do you know when this document was

24   from?

25        A.   No, I don't.  I don't -- I don't see a

284

1    date on it.

2         Q.   And I didn't either, but do you see the

3    second page of the document where it talks about

4    key targets?

5         A.   I see that.

6         Q.   And do see Senator Sinema?

7         A.   Yes, I see that.

8         Q.   It's my understanding that she didn't

9    become a Senator until 2019.

10        A.   Correct.

11        Q.   So can we infer that this document,

12   RZ-27, is from sometime in 2019?

13        A.   That's a fair assumption, yeah.

14        Q.   And so do you see this -- this table on

15   the first page of Exhibit 27?  And do you see

16   the -- the box that says "United" -- in the

17   "United States" row, in the Y column, it says

18   "Support government relations efforts on

19   classification of XRP"?

20        A.   I see that.

21        Q.   What's that describing?

22        A.   How we can work with marcomm --

23   regulations and marcomm can work together for U.S.

24        Q.   To do what?

25        A.   To engage a democrat champion.

1      Q.   To do what?

2      A.   It says here for "holding back efforts

3   to engage the SEC."

4      Q.   And what did the -- in 2019 what did

5   Ripple want to do in regards to the SEC?

6      A.   We have our open discussions and we have

7   our -- the investigation with the SEC and Brad's

8   meetings.  So this would be aligning with that

9   activity.

10      Q.   Still trying to convey to the SEC that

11   XRP should not be classified as a security?

12           MR. WARD:  Objection to form.

13      A.   At this point, in 2019, discussions

14   are fair -- are becoming more mature between the

15   SEC and -- and Ripple.  They had been talking for

16   sometime.  This would be supporting that effort to

17   engage with the SEC.

18      Q.   And, again, in 2019, Ripple was still

19   trying to convince the SEC to decide that XRP is

20   not a security?

21           MR. WARD:  Objection to form.

22      A.   I know the company's view was XRP is not

23   a security.  I wasn't involved in any of the

24   meetings with SEC or with the commissioners, so I

25   can't say, like, what the context of that

1  conversation was. If they were pushing that or

2  not, I don't know.

3      Q.  The -- do you see where it says a unite

4  -- the second bullet point on the whole -- or the

5  first bullet point on the whole document, "United

6  States:  Support regulatory clarity of XRP with

7  the SEC"?

8      A.  I see that, yeah.

9      Q.  And what's the regulatory clarity with

10  the SEC that Ripple was trying to obtain?

11      A.  How XRP would be classified.

12      Q.  And then do you see on the next page,

13  page 2, it says "Goal:  Drive bipartisan pressure

14  on policymakers to ensure a positive

15  classification of XRP"?

16      A.  I see that.

17      Q.  And what was the positive classification

18  of XRP that Ripple had as its goal?

19      A.  So the company had a view that XRP was

20  not a security.  We viewed that as accurate.

21  There was also -- I talked about here, there were

22  several bills floating around that would classify

23  the whole industry in one way or another, security

24  or not.

25          The engagement in the U.S. was to drive

287

1    what we saw as positive or accurate classification

2    of XRP.

3        Q.   And then the next bullet point "We are

4    well positioned among republicans, but lack

5    democrat champions, limiting pressure on the SEC."

6        A.   I see that.

7        Q.   What's that about in terms of putting

8    pressure on the SEC?

9        A.   To provide clarity on XRP.

10        Q.   Was Ripple attempting to pressure the

11    SEC?

12        A.   We were looking for clarity from the

13    SEC.  I can't characterize the -- the context of

14    the conversations with the SEC.  I wasn't involved

15    in a single one.

16        Q.   And then under "Tactics," Ripple was

17    recommending to place articles in various

18    publications to support its position that XRP was

19    not a security?

20        A.   We were targeting publications to place

21    articles to elevate digital assets on the priority

22    list for democrats.  So driving awareness.

23        Q.   And Ripple wanted to put these

24    publications -- or place articles in publications

25    in Illinois, Arizona, California, Washington, D.C.

288

 1    and New Jersey?

 2         A.   Those were the targeted individuals

 3    there that we were looking with to -- to focus in

 4    on in that messaging, particularly messaging

 5    around the financial inclusion benefits of

 6    lowering the cost of remittances.  We thought

 7    that -- that messaging would resonate well with

 8    the democrats that were serving on the financial

 9    services committee.

10         Q.   So the key states, those were associated

11    with congressmen and women from those states?

12         A.   Correct.  There was a risk at this time

13    that crypto would become a -- a partisan issue,

14    which we did not -- Ripple did not see it that

15    way.  There were other industry trade groups that

16    also do not see it that way.  We wanted to ensure

17    that it was a more bipartisan issue, the ability

18    for crypto and blockchain to be used in payments.

19         Q.   When -- did -- did Ripple employ any

20    other tactics to influence congressmen other than

21    the ones identified on the second page of Exhibit

22    27?

23         A.   Aside from targeted publications?  Is

24    that what you're asking?

25         Q.   Correct.

289

1      A.   We engaged on the Hill.  The company

2    did -- attended or hosted members of Congress for

3    fundraisers, the standard stuff you would see from

4    a -- from a lobbying effort.

5      Q.   And at the time you left employment

6    with -- with Ripple, was Ripple still making

7    efforts to try to get the X -- the SEC to make a

8    statement regarding XRP's classification?

9                MR. HECKER:  Objection to form.

10               You can answer.

11     A.   At the time that I left the company,

12   Ripple was still engaging with the SEC.  The

13   context or the -- the context of those

14   conversations, I don't know about.

15     Q.   At the time you left Ripple, had the SEC

16   made any announcements about whether or not it

17   considered XRP to be a security?

18     A.   No.  Not that I'm aware of.

19               MR. HANAUER:  One moment to

20          confer with my counsel.

21               (Pause)

22               (Whereupon, exhibit is presented

23          and marked SEC Zagone Exhibit RZ-46 for

24          identification.)

25               MR. HANAUER:  I just tendered the

1          witness a document labeled RZ-46 with a

2          Bates number ending in -- I think it's

3          356.

4   BY MR. HANAUER:

5          Q.   And is Exhibit RZ-46 a text exchange

6   between you and Mr. Garlinghouse?

7          A.   It is.

8          Q.   And which texts are from you and which

9   texts are from Mr. Garlinghouse?

10         A.   The text on the left at the top is from

11  Mr. Garlinghouse.  The two texts on the right, in

12  the lighter color, are from me.

13         Q.   And when Mr. Garlinghouse writes about

14  "getting the congressional letter sent to the

15  SEC," what did you understand him to be referring

16  to?

17         A.   We were engaged with Senator Cotton to

18  write a letter or write more than one letter.  One

19  letter was to the Federal Reserve.

20              The second letter here was to the SEC.

21         Q.   And what -- what was in that letter?

22         A.   The draft letter was around supporting

23  America's competitiveness, international

24  competitiveness, with blockchain and crypto

25  assets.

291

1      Q.   Did it have anything to do with the XRP

2   securities classification issue?

3      A.   The letter did talk about creating

4   clarity for crypto assets.  I can't recall if the

5   letter specifically said XRP or not.

6      Q.   And then the -- the bottom text talks

7   about the "Senate letter prepped to be sent next

8   week by Cotton and Van Hollen.  Both will raise it

9   to Clayton in his Senate hearing on December

10   11th."

11      A.   Yes.

12      Q.   What's that about?

13      A.   The -- that refers to the letter that we

14   were drafting with Cotton and -- and this was a

15   bipartisan one with Van Hollen.  We were going

16   back and forth with the -- Ripple and our

17   lobbyists were going back and forth with the --

18   Cotton and Van Hollen's offices around wording.

19          There was also a hearing coming up

20   December 11th that we were -- had provided some

21   questions to Cotton and Van Hollen to ask during

22   that hearing.

23      Q.   And why did you think that Senators

24   Cotton and Van Hollen would be asking specific

25   questions to Mr. Clayton at the Senate hearing?

1     A.   Cotton had taken an interest in national

2  security and America's leadership in

3  infrastructure which was keenly aligned with or

4  closely aligned with Ripple's own view.

5          Van Hollen was a -- we were engaged with

6  Van Hollen I believe on the financial -- the

7  financial inclusion aspects of these technologies,

8  so lowering the cost of remittances, both of which

9  we saw as advantages for the U.S. economy.  We

10 wanted to -- a key part of this was repeating

11 clarity from the SEC.  So removing uncertainty.

12 It was the position to raise that with Clayton

13 during that Senate hearing.

14    Q.   How did you know what the senators were

15 going to ask Mr. Clayton at his Senate hearing?

16          MR. HECKER:  Objection to form.

17    A.   It's common for lobbyists to provide

18 background information to the offices and to

19 provide potential questions to ask.

20    Q.   So that information about the questions

21 that the senators would ask, that was conveyed to

22 you by Ripple's lobbyists?

23          MR. HECKER:  Objection to form.

24          You can answer.

25    A.   Ripple's lobbyists would inform us of an

1　upcoming hearing, the types of content that would

2　be covered, and potential questions that we should

3　propose to those offices for -- to be asked during

4　the hearing.

5　　　　　MR. HANAUER:  That's all the

6　　　　questions we have.  Before we go off, I

7　　　　just want to put on the record that the

8　　　　SEC reserves its rights to move to compel

9　　　　on issues where Ripple asserted privilege,

10　　　　and also reserves its rights to seek a

11　　　　30(b)(6) witness on the issues where

12　　　　counsel instructed the witness not to

13　　　　share what he learned about what --

14　　　　Ripple's interactions with the SEC and

15　　　　other third parties.

16　　　　　MR. CERESNEY:  So those are both

17　　　　privilege issues because the latter was

18　　　　also a privilege issue.

19　　　　　MR. HANAUER:  And I'm not trying

20　　　　to argue it.  I just wanted to put a

21　　　　statement about our reservation of rights

22　　　　on those two issues while we were still on

23　　　　the record.

24　　　　　MR. CERESNEY:  Okay.  But -- but

25　　　　just for the record, on the privilege

294

1          issue, the judge has already denied your

2          request for -- to pierce the privilege

3          here.  And so there -- therefore, I don't

4          see a basis for -- nothing the witness has

5          said today provides any additional basis

6          for you to pierce the privilege.  I don't

7          know that you're suggesting that, but I

8          don't see anything more.

9                On a 30(b)(6) witness, the

10         objections today were not -- on the issue

11         that you just cited, were not because the

12         witness didn't necessarily have

13         knowledge.  It was because the

14         information he had was as a result of

15         discussions with counsel.  So it's the

16         same privilege issue as the initial -- as

17         the first issue you raised.

18               So I just want that clear.  It's

19         not a separate 30(b)(6) witness issue.

20               MR. HANAUER:  Okay.  And that's

21         the position you take.

22               MR. CERESNEY:  And from our

23         perspective, you've had the opportunity to

24         fully question him on these issues and

25         there's no basis for 30(b)(6).

1          Okay.  If you give us two

2     minutes, we'll convene and then come

3     back.  I will have at least one set of

4     questions.

5               THE VIDEOGRAPHER:  Going off the

6     record at 5:56.

7               (Whereupon, a recess is taken.)

8               THE VIDEOGRAPHER:  Okay.  Back on

9     the record, 6:07.

10              CROSS-EXAMINATION

11   BY MR. CERESNEY:

12     Q.   Great.  I just have a few questions for

13   you, Mr. Zagone.

14          First, in his final questioning of you,

15   Mr. Hanauer asked you about Exhibit RZ-46 and a

16   text message exchange between you and

17   Mr. Garlinghouse.

18          And this text message exchange

19   referenced letters that had been prepped for

20   Senator Cotton and Van Hollen.

21          One question:  Did -- did those letters

22   ever get sent as far as you know?

23     A.   No.

24     Q.   So, in other words, no letter, as far as

25   you know, was sent from these senators to Chair

296

1   Clayton?

2       A.   As far as I know, no letters were sent.

3       Q.   And as for the hearing that occurred

4   which is referenced here, the December 11th

5   hearing when Chair Clayton was to testify before

6   the Senate, what is your understanding as to

7   whether any questions were asked during that

8   hearing based upon any -- were any questions asked

9   at that hearing which Ripple's lobbyists had

10  discussed with the staff prior?

11              MR. HANAUER:  Objection.

12       Objection to form.

13      A.   Ripple's lobbyists had proposed

14  questions for that hearing, but to the best of my

15  knowledge, none of them were asked.

16              MR. CERESNEY:  Okay.  I want to,

17       then, show you what we'll mark as -- why

18       don't we mark it as Ripple Exhibit 1,

19       RZ -- Ripple RZ-1?

20              MR. HANAUER:  How about RZ-47?

21       There's nothing after that.

22              MR. CERESNEY:  Okay.  All right,

23       we'll do RZ-47.  We'll mark it as RZ-47.

24       And so if we can distribute that.

25              THE REPORTER:  Exhibit RZ-47.

1              (Whereupon, exhibit is presented

2         and marked SEC Zagone Exhibit RZ-47 for

3         identification.)

4              MR. CERESNEY:  Did you give one

5         to Mr. Hanauer?  Did you give one to

6         Mr. Hanauer?

7              MR. TENREIRO:  Oh.

8              MR. HANAUER:  Thank you.

9              MR. TENREIRO:  Take as many as

10        you want.

11   BY MR. CERESNEY:

12        Q.   Mr. Zagone, take a look at this.  This

13   is an e-mail dated January 19th, 2017.  It's from

14   you to Antoinette O'Gorman, Bates number RPLI_SEC

15   0921020 to 1029.  I'll ask you to just take a look

16   at that e-mail and tell me whether you recognize

17   this exchange with Ms. O'Gorman.

18        (Pause)

19        A.   Okay.  I've reviewed it.

20        Q.   Okay.  I'm not really -- I'm not going

21   to focus really on the e-mail exchange except to

22   reference paragraph 3 where there's a reference to

23   a March 9th, 2016 response to the Department of

24   Financial Services, the New York Department of

25   Financial Services.

298

1          Actually, just by way of background,

2     what was Ripple's engagement with the Department

3     of Financial Services during this period in 2017?

4          A.   We were -- Ripple was applying -- let me

5     restate that.

6               XRP II, LLC, a subsidiary of Ripple, was

7     replying -- or applying to the New York DFS for a

8     virtual currency license.

9          Q.   And was that application in 2016?  Is

10    that when the application process occurred?

11         A.   Correct.

12         Q.   Did Ripple actually ultimately obtain

13    that BitLicense?

14         A.   Yes.

15         Q.   And what is a BitLicense -- what did it

16    allow Ripple -- XRP II -- actually, let me just

17    rephrase the last question.

18               Did XRP II obtain that BitLicense

19    eventually?

20         A.   Yes.

21         Q.   And what did the BitLicense allow XRP II

22    to do in New York State?

23         A.   To sell virtual currency.

24         Q.   So I want to just direct you to

25    paragraph 3 here which references a March 9th,

299

1    2016 response to the DFS.

2              Do you see that?

3         A.   I see that, yes.

4         Q.   And there were three attachments to this

5    e-mail and I want to direct your attention to the

6    attachment that is Bates stamped number 9211025,

7    which appears to be a March 9th, 2016 letter to

8    the DFS.

9              Do you see that?

10        A.   I see that.

11        Q.   And the letter appears to have been

12   written by a lawyer -- lawyer named ▮▮▮▮▮▮▮▮

13   from ▮▮▮▮▮▮▮▮▮

14             Who is ▮▮▮▮▮▮▮▮

15        A.   ▮▮▮▮▮▮▮▮▮▮▮   was Ripple's outside

16   counsel that was assisting us with XRP II's

17   BitLicense.

18        Q.   Okay.  And the first sentence of that

19   letter says "This is in response to your letter of

20   February 12th, 2016 to Ryan Zagone."

21             Do you see that?

22        A.   I see that, yes.

23        Q.   And just for completeness, if you look

24   at the first attachment to this e-mail, which is

25   Bates number 9211022, does that appear to be the

300

1    letter from February 12th, 2016, from the

2    Department of Financial Services to you?

3         A.   That does, yes.

4         Q.   Okay.  So this response dated March 9th,

5    2016, was in response to an original letter to

6    you?

7         A.   Yes.

8         Q.   Did you participate in drafting this

9    letter, March 9th letter, to the DFS?

10        A.   Yes.  I collected information internally

11   at Ripple and provided it to ███████████ to

12   draft into a letter.

13        Q.   And did you review this letter before it

14   was submitted?

15        A.   Yes.

16        Q.   Okay.  I want to direct your attention

17   to page 2 of the letter and I want to focus on

18   Section D of that letter and, in particular, the

19   second paragraph of Section D.  And I'll just read

20   what it says there.  It says "XRP II and Ripple

21   consider XRP a digital asset, not a currency.  XRP

22   is used within Ripple as a security mechanism and

23   a liquidity tool.  XRP is not intended to be used

24   as a currency."

25             Do you see that?

1       A.    I see that, yes.

2       Q.    What was your understanding of the

3    meaning of this portion of the letter?

4       A.    Here we were describing how Ripple --

5             MR. HANAUER:  Excuse me.  Excuse

6       me.

7             Objection.  Are you instructing

8       him to decouple what he learned from

9       counsel in providing that answer?

10            MR. CERESNEY:  No. I'm asking him

11      for the meaning of the letter that was

12      responding to a letter to him that the DFS

13      wrote and that he reviewed before it was

14      submitted.  So I'm asking him what the

15      letter means in his understanding.

16            MR. HANAUER:  And I would just

17      note for the same ques -- type of

18      questions, you were objecting on -- on

19      privilege grounds when I was asking him.

20            MR. CERESNEY:  No, I wasn't.  I

21      beg to differ.  You were asking different

22      types of questions.

23            MR. HANAUER:  We'll -- we'll let

24      the record speak for itself.

25            MR. CERESNEY:  You can.  I'm

 1        asking him for his interpretation of a

 2        letter that he reviewed in response to a

 3        letter that was written to him by the DFS.

 4   BY MR. CERESNEY:

 5        Q.   You can go ahead, Mr. Zagone.

 6        A.   This letter -- this was a time when --

 7   so here we're talking about Ripple's use -- like

 8   the use case of XRP within our product.  We're not

 9   using it -- Ripple's not using XRP as a currency,

10   like to buy your coffee with, but as a tool to

11   connect currencies more efficiently.

12             In 2016 the key topic in the market was

13   bitcoin is used as a currency replacing the U.S.

14   dollar, and here we're making the point that

15   Ripple's use of XRP is not to replace the U.S.

16   dollar, but to connect the U.S. dollar to other

17   currencies more efficiently.

18        Q.   Were you -- were you intend -- was this

19   letter intended, as far as you understood this

20   letter, to respond to -- to address the legal

21   classification of XRP as a currency?

22        A.   No.  This was about its use case.

23        Q.   And is this about XRP II's use case

24   of -- or Ripple's use case of XRP?

25        A.   Yes, this was about how Ripple was using

1    XRP in our product.

2         Q.   And just as a -- as a general matter,

3    are you aware of other XRP holders who had used

4    XRP as a currency during this period?

5         A.   Yes.  Out -- outside of Ripple's use of

6    XRP, there were people, individuals, using XRP as

7    a currency.  It is an open-source technology.  You

8    could access it on an exchange and use it however

9    you'd like.  So as a currency.

10                   MR. CERESNEY:  Okay.  I think

11        that is all we have.  No further

12        questions.

13                   MR. HANAUER:  No redirect.

14                   THE VIDEOGRAPHER:  Anyone else?

15        That's it?

16                   Okay.  All right.  This

17        concludes the video deposition of Ryan

18        Zagone.  The time is 6:17 and we're going

19        off the record.

20                   (Whereupon, the deposition

21        concluded at 6:17 p.m.)

22

23

24

25

304

STATE OF NEW YORK        )

                         ) ss:

COUNTY OF NEW YORK       )

        I hereby certify that the witness in the

foregoing deposition, RYAN ZAGONE was by me duly sworn

to testify to the truth, the whole truth and nothing but

the truth, in the within-entitled cause; that said

deposition was taken at the time and place herein named;

and that the deposition is a true record of the

witness's testimony as reported by me, a duly certified

shorthand reporter and a disinterested person, and was

thereafter transcribed into typewriting by computer.

        I further certify that I am not interested in

the outcome of the said action, nor connected with nor

related to any of the parties in said action, nor to

their respective counsel.

        IN WITNESS WHEREOF, I have hereunto set my

hand this 22nd day of July, 2021.

        Reading and Signing was:

____ requested   ____ waived   _X_ not requested.

        _____

                BRIDGET LOMBARDOZZI, CSR, RMR, CRR























