222

1    Bitfinex, and that's where you're going to trade all

2    of your other crypto.  But why don't you come off --

3    off that exchange onto this protocol and trade here

4    too?

5             You know, in particular, for a market

6    maker, that's really inefficient, because now you

7    have to have two pools of capital in two places.

8    You're locking up your opportunity because now you

9    have to have $1,000 at the exchange and $1,000 on the

10   protocol main markets.

11            So I always felt that that was the primary

12   reason why we were struggling to coalesce liquidity

13   on the protocol.  Just that there were these other

14   liquidity pool that wasn't participating in -- in the

15   protocol.

16            And even more so, it was fighting against

17   what -- that protocol for -- for capital.

18       Q.   You said that you've been following market

19   sentiment and there are some clear trends.  Are you

20   talking about trends in connection with market

21   sentiment?

22       A.   I don't -- I don't remember what I'm

23   referencing here.

24       Q.   Do you remember what trends?

25       A.   I don't.

223

1      Q.   Let's look at 117.

2          (Document titled How We Talk about XRP,

3     Bates 0624330 through -332, was marked MV

4     Exhibit 117 for identification, as of this

5     date.)

6      Q.   Mr. Vias, I'm showing you what's been

7   marked as MV 117, which is a document with a

8   Bates 0624330 through -332.

9          (Witness reviewing document.)

10    A.   Okay.

11    Q.   Have you ever seen this document before?

12    A.   I don't remember.

13    Q.   Have you ever discussed anything that's in

14  this document with any nonattorneys at Ripple?

15    A.   I don't remember.

16    Q.   Does this refresh your memory as to whether

17  you received any guidance on how to talk about XRP?

18        MR. HORTON:  Are you asking about guidance

19  from nonlawyers?

20        MS. WAXMAN:  Yes.

21        MS. COWAN:  Objection.

22    A.   I -- I don't remember seeing this document

23  before.

24    Q.   Did Ripple seek to avoid talking about XRP

25  as an investment?

224

1          MR. HORTON:  Objection to form.

2      A.   I don't know.

3      Q.   Did you understand that Ripple statements

4  to the market about XRP were important to the

5  question of XRP status?

6          MR. HORTON:  Objection to form.

7      A.   No.

8      Q.   On the second page at the top, it says, How

9  we talk about XRP and why it matters.

10         And then the second paragraph, second

11  sentence says, XRP is distinct from Ripple the

12  company, and XRP has a unique value separate from the

13  company.

14         Didn't we look at emails earlier today

15  where you or Ripple stated at that XRPs value was --

16  had -- XRPs price had moved in relation to Ripple

17  announcements?

18         MR. HORTON:  Objection.  Form.

19     A.   I'm sorry, I'm just -- maybe it's because

20  I'm tired, it's a long day, but I am having trouble

21  connecting that question to what's on the paper.

22     Q.   It says that XRP is distinct from Ripple

23  the company, and XRP has a unique value separate from

24  the company.

25         Do you agree with that statement, that --

225

```
1    do you agree with the statement that XRP has a unique
2    value separate from the company?
3         A.   Yes.
4         Q.   But earlier did you -- did you -- did you
5    believe that certain of -- certain Ripple
6    announcements had impacted XRP's price in the market?
7              MR. HORTON:  Objection to form.
8         A.   I don't remember testifying to that today,
9    no.
10        Q.   Did Ripple want to avoid SEC classification
11   of XRP?
12             MR. HORTON:  Objection to form.
13        A.   I don't know.
14        Q.   Would this have severely limited the
15   company and the founders' ability to sell XRP into
16   the market?
17             MR. HORTON:  Objection to form.
18        A.   I don't know.
19        Q.   Would this have severely limited the
20   company -- the company's and the founders' ability to
21   profit from the XRP?
22             MR. HORTON:  Objection to form.
23        A.   I don't know.
24        Q.   Were you told not to talk about XRP as an
25   investment?
```

226

1      A.   I don't remember that, no.

2           MS. WAXMAN:  Exhibit 88, please.

3           (Email exchange re: Application - for Your

4      Review and Signature, Bates 0034575, was marked

5      MV Exhibit 88 for identification, as of this

6      date.)

7      Q.   Mr. Vias, I'm showing you what's been

8  marked as MV 88, which is a document with

9  Bates 0034575.

10     A.   Okay.

11     Q.   Earlier today, we spoke about Ripple's work

12 in connection with exchanges.  Correct?

13     A.   Yes.

14     Q.   Market participants were asking you

15 questions about the legal status of XRP under the

16 federal securities laws.

17          MR. HORTON:  Objection to form.

18     A.   I don't remember.

19     Q.   Does MV 88 refresh your memory as to

20 whether Bittrex asked you questions about XRP's

21 status under the federal securities laws?

22     A.   So he's -- I mean, he's referencing here

23 the Howey analysis.  I'm assuming that has to do with

24 this securities laws, but I don't -- I don't exactly

25 know what the tie, Howey to the law, is.

227

```
1            Sorry.  I apologize if that's random or not

2    clear.

3        Q.   Are you familiar with what is known as the

4    Howey test?

5            MR. HORTON:  Objection.

6        A.   Vaguely.

7        Q.   And what is the Howey test?

8            MR. HORTON:  Objection.

9        A.   As far as I understand it, it's the litmus

10   test for whether or not something's a security.

11       Q.   Okay.  And so does this refresh your memory

12   of whether Bittrex was asking questions about XRP's

13   status as a security?

14           MR. HORTON:  Objection.  Asked and

15   answered.

16       A.   Yeah.  I mean, I think ████ s -- he's

17   saying, I'm looking for a way to help our outside

18   counsel get more comfortable with the Howey analysis.

19   He doesn't specifically say it's about XRP but given

20   the email's to ████ and he was our lawyer, I'm

21   assuming it has to do with XRP.

22       Q.   So Bittrex wanted to know whether there was

23   a legal opinion regarding XRP?

24           MR. HORTON:  Objection to form.

25       A.   I don't know.
```

228

```
1        Q.   Was XRP status under the federal securities

2   laws important to digital asset platforms that were

3   looking to partner or list XRP?

4            MR. HORTON:  Objection to form.

5        A.   I don't know.

6            For all them, I don't know.

7        Q.   Did some of them ask questions about XRP

8   status under the federal securities laws?

9            MR. HORTON:  Objection to form.

10       A.   Yes.

11       Q.   Which ones?

12       A.   Oh, I won't remember them all off the top

13  of my head.

14       Q.   And people wanted to know what Ripple's

15  position was on that issue?

16            MR. HORTON:  Objection to form.

17       A.   Yes.

18       Q.   And what did you tell them?

19            MR. HORTON:  Objection.  Lack of

20  foundation.

21       A.   I usually told them to speak to legal.

22       Q.   Did you participate in conversations that

23  exchanges had with Ripple legal?

24       A.   At times.  Not often.  But at times, yeah.

25       Q.   Were these platforms concerned that XRP
```

229

1    could be deemed a security?

2          MR. HORTON:  Objection to form.

3      A.   I think so, yeah.

4      Q.   Isn't that why they sought clarification

5    from Ripple?

6          MR. HORTON:  Objection to form.

7      A.   I mean, I think that's why they wanted

8    clarification, writ large.

9      Q.   What did Ripple do to -- if anything, to

10   address these concerns that XRP could be a security?

11         MR. HORTON:  Objection to form.

12     A.   I don't remember in every case.

13     Q.   Do you remember what they did in the case

14   of Bittrex?

15     A.   Actually, I don't remember how this ended

16   up.

17     Q.   Do you remember what they did in any case?

18         MR. HORTON:  Objection.  Asked and

19   answered.

20     A.   In any case.

21     Q.   In any -- at any point.

22         MR. HORTON:  Same objection.

23     A.   Yeah, I mean, I think a few times we -- we

24   had, like, legal talk to their legal.  I don't

25   remember.

230

1    Q.   What did legal say in those conversations?

2         MR. HORTON:  Objection.

3    A.   I wouldn't have been part of all of the

4    conversations, I don't think.

5    Q.   The conversations that you were present,

6    what did legal say?

7    A.   I remember one in particular, which was the

8    ███

9         And in that conversation, our legal

10   basically walked the ███ lawyers through a document

11   we had, basically saying that XRP wasn't a security

12   and the rationale for it.

13        THE COURT REPORTER:  I'm sorry, was or

14   wasn't?

15        THE WITNESS:  Was not.

16   Q.   Did Ripple provide a legal opinion from a

17   law firm stating that XRP was not a security?

18        MR. HORTON:  Objection to form.

19   A.   I don't remember the -- what the document

20   was.  Actually, I don't -- I don't think I ever saw

21   it.

22   Q.   You don't think you ever saw the document

23   that legal provided?

24   A.   I don't think legal provided it ever.  On

25   the ███ call, I think they spoke to it.

231

1       Q.   And what -- when you say you don't think

2    they provided "it" ever, what are you referring to?

3       A.   To ████ folks.

4       Q.   What did Ripple tell ████ about XRP status

5    under the federal securities laws?

6            MR. HORTON:  Objection to form.

7       A.   On that call?

8       Q.   On any call.

9            MR. HORTON:  Objection.

10      A.   I don't know.

11      Q.   Specifically related to XRP status under

12   the federal securities laws.

13      A.   The only -- the only call that I remember

14   is the one that I'm referencing now, which is where

15   our legal was on the phone with their legal.  And all

16   I remember is, you know, our legal saying it's not a

17   security.  This is our rationale.  And we have a

18   document that says it.

19      Q.   And what document were they referring to

20   when they said, We have a document that says this?

21      A.   I don't know.

22      Q.   Was it a legal opinion from a law firm?

23      A.   I -- I can't say for sure.

24      Q.   Did any platform decide not to do business

25   with Ripple after you provided information regarding

1    Ripple's opinion about XRP status?

2          MR. HORTON:  Objection to form.

3      A.  I don't know.

4      Q.  Other than ███, did any other platform tell

5  you -- ask you about XRP status under the federal

6  securities laws?

7      A.  I don't --

8          MS. COWAN:  Objection.

9      A.  I don't remember.

10     Q.  Did HBUS ask you about XRP status under the

11  federal securities laws?

12     A.  I'm sorry, I don't know who that is.  I

13  don't know who HBUS is.

14     Q.  My understanding is it's the platform.

15     A.  Oh.  From what year?

16     Q.  I think I can show you a document.

17     A.  Yeah, I don't know.  It's not ringing a

18  bell.

19     Q.  Did ███ not move forward with an XRP index

20  due to the fact that Ripple could not provide -- or

21  did not provide it with a -- a legal opinion that XRP

22  was not a security?

23          MR. HORTON:  Objection to form.

24     A.  I don't know if that's why they didn't move

25  forward.

233

1        Q.   Did you have any understanding as to why

2   they didn't move forward with an XRP future?

3        A.   Because they didn't have an index.

4        Q.   Didn't the -- did you have any

5   understanding as to why the ███ didn't move forward

6   with an XRP index?

7        A.   I don't think I ever got the definitive

8   answer.

9        Q.   Did you have any understanding, even

10  though -- even if it wasn't definitive, what their

11  thinking was?

12       A.   No.

13       Q.   Did Gemini ever tell you that it could not

14  move forward with an XRP listing due to concerns that

15  XRP could be deemed a security?

16       A.   Not that I remember.

17            MS. WAXMAN:  Exhibit 89, please.

18            (Bittrex xRapid Partnership Agreement,

19       Bates Stamps 0158997 through 059004, was marked

20       MV Exhibit 89 for identification, as of this

21       date.)

22            MS. WAXMAN:  How much time do I have left?

23            THE VIDEOGRAPHER:  We're going to 5:54,

24  so -- what is that?  30 --

25            MR. TENREIRO:  38.

234

1          THE VIDEOGRAPHER:  Yeah, 38.

2          Q.   Mr. Vias, I'm showing you what's been

3     marked as MV 89, which is a document with the Bates

4     Stamp 0158997 through 059004.  And I'm going to ask

5     you about section 4, paragraph 3.  If you would just

6     focus on that.

7          A.   Indemnification?

8          Q.   Correct.

9               (Witness reviewing document.)

10         A.   Okay.

11         Q.   Do you recognize what's been marked as

12    MV 89?

13         A.   Do I recognize -- no, I don't remember

14    this.

15         Q.   This is a draft -- says it's a draft,

16    Bittrex-xRapid partnership agreement.

17              In the middle of section 4, paragraph 3,

18    there's a sentence that reads, For the avoidance of

19    doubt, indemnified claims shall not include any

20    claims of losses arising from Bittrex's listing of

21    XRP for transactions for purchase, trade, or sale by

22    its customers, or any claims or losses related to the

23    regulatory classification of XRP.

24              Is that a sentence that Ripple added to the

25    contract -- draft contract?

235

1          MR. HORTON:  Objection.  Lack of

2     foundation.

3          A.   I don't know.

4          MS. WAXMAN:  Exhibit 90, please.

5          (Bittrex xRapid Partnership Agreement,

6     Bates Stamps 0158397 through -404, was marked MV

7     Exhibit 90 for identification, as of this date.)

8          Q.   Again, I'm going to point you to section 4,

9     paragraph 3 of Exhibit 90, which has the

10    Bates 0158397 through 0158404.

11         A.   What am I looking at?

12         Q.   Section 4, paragraph 3, indemnification.

13    Same paragraph.

14         A.   Same paragraph.  Okay.  Sorry.

15         (Witness reviewing document.)

16         A.   Okay.

17         Q.   In this version, in this document, in that

18    paragraph, it looks like the sentence that I just

19    read is deleted.  Correct?

20         A.   Yes.

21         MR. HORTON:  Objection.

22         Q.   Did Bittrex delete that sentence?

23         MR. HORTON:  Objection.  Lack of

24    foundation.

25         A.   I don't know.

236

1      Q.   Did Bittrex want Ripple to indemnify them

2  if sales of XRP were deemed sales of securities?

3         MR. HORTON:  Objection.  Lack of

4  foundation.

5      A.   I don't know.

6      Q.   Did Bittrex understand there was a risk

7  that XRP could be deemed a security?

8         MR. HORTON:  Objection.  Lack of

9  foundation.

10     A.   I don't know.

11     Q.   Did you have any discussions with anyone at

12  Bittrex about Ripple providing any indemnification to

13  Bittrex related to regulatory issues?

14        MR. HORTON:  Objection.  Rack of

15  foundation.

16     A.   Not that I can remember, no.

17     Q.   You were involved with xRapid pilots?

18     A.   I was head of the team that was meant to

19  make them a reality, yeah.

20     Q.   And what were the purpose of xRapid pilots?

21     A.   Those were -- they were kind of proofs of

22  concept.  You run pilots with the customers to flesh

23  out the product, to see how it works, how it doesn't

24  work, what the customers like, what they don't like,

25  what you need to refine in order to get it

237

1    deployable, in earnest.

2         Q.   So proof-of-concept means to establish that

3    it actually works?

4              MS. COWAN:  Objection.

5         A.   No, not -- not that it actually works, but

6    how it works, how well it works.

7              I think by the time you get to a

8    proof-of-concept point, like you've -- you've tested

9    it enough to know that it -- it works.  It's just

10   does it work in the wild, if you will.

11        Q.   Or how well -- you're trying to test how

12   well it works.

13        A.   How well it works, yes.

14             MS. WAXMAN:  Exhibit 91, please.

15             (Email exchange re: Need Help ASAP -

16        Western Union, Bates ████ 0028696 through -697,

17        was marked MV Exhibit 91 for identification, as

18        of this date.)

19        Q.   Mr. Vias, I'm showing you what's been

20   marked as MV 91, which is a document with the Bates

21   ████ 0028696 through -697.

22             (Witness reviewing document.)

23        A.   Okay.

24        Q.   Were you involved with Western Union's

25   pilot of xRapid?

238

1      A.   I was.

2      Q.   And were you familiar with the results of

3    the xRapid -- the Western Union xRapid pilot?

4           MS. COWAN:   Objection.

5      A.   I don't remember.

6           I must have been, but I don't remember what

7    they were.

8      Q.   Did Western Union publicly comment about

9    the xRapid pilot with Ripple?

10          MR. HORTON:   Objection.

11     A.   I don't know.

12     Q.   Did Western Union say that the -- that the

13   use of XRP did not provide any cost savings?

14          MR. HORTON:   Objection to form.

15     A.   I don't know.

16     Q.   Your email at the top, what are you talking

17   about here?

18     A.   I'm responding to █████ email around some

19   Fortune article that was going to come out.

20     Q.   Regarding?

21     A.   ████████████ CEO saying they have not

22   seen any cost savings from xRapid.

23     Q.   You respond, quote, Cost savings were never

24   the goal of the pilot.

25          Did Ripple ever communicate that cost

239

1    savings were never the goal of the xRapid pilot?

2            MR. HORTON:  Object to form.

3        A.   I don't know.

4        Q.   Did Ripple publicly state that xRapid

5    pilots showed cost savings for customers?

6            MR. HORTON:  Objection.

7        A.   I don't know.

8        Q.   Well, could you infer that that's what they

9    were saying, that's why ████████████ had come out

10   and said that they did not experience any cost

11   savings?

12           MR. HORTON:  Objection to the form.

13       A.   I don't know.  I mean, the only mention of

14   cost savings in this email is the email from the

15   Fortune person, I think, to ████  And I -- I do not

16   know where he's getting the 40 to 70 percent, or

17   where that was released, or what he's referencing.

18       Q.   Did Ripple ever state that customers would

19   save between 40 and 70 percent by using XRP in

20   connection with xRapid?

21           MR. HORTON:  Objection to form.

22       A.   I don't know.

23       Q.   Then you go on to say, The purpose of the

24   pilot with ███ was to provide the utility, speed and

25   payment certainty with the understanding that if ████

[6/28/2021] Vias, Miguel Dep. Tr. 6.28.2021

240

1    wanted to go into production, we could, through

2    incentives, match or beat their cost.

3           Ripple never communicated publicly that it

4    would use incentives to match or beat costs, right?

5           MR. HORTON:  Objection to form.

6       A.   I don't know.

7       Q.   Then you go on to say, I think it's

8    important to restate the fact that xRapid is meant

9    for challenger payment providers without the reach

10   and sophisticated treasury options of a ████████

11          Ripple publicly stated that banks would use

12   xRapid.  Right?

13          MR. HORTON:  Objection to form.

14      A.   I don't know.

15      Q.   Then you go on to say at the bottom, As for

16   the 40 to 70 percent cost savings calculation, I

17   wasn't close to that release but ████ and ██████

18   should be able to help.

19          Did you ever see any analysis to back up

20   any claim that xRapid provided 40 to 70 percent cost

21   savings?

22          MR. HORTON:  Objection to form.

23      A.   I don't remember.

24      Q.   To your knowledge, did Ripple do any

25   analysis to verify the amount of cost savings that it

241

```
1    publicized?

2            MR. HORTON:  Objection to form.

3        A.   I don't remember.

4        Q.   Did these cost savings take into account

5    incentive payments that Ripple provided to users of

6    xRapid?

7            MR. HORTON:  Objection to form.

8        A.   I don't know.

9        Q.   When you left xRapid, in April 2020 --

10       A.   Ripple?

11       Q.   -- Ripple in April 2020, did you think

12   xRapid was scalable?

13           MS. COWAN:  Objection.

14       A.   Yes.

15       Q.   And why did you think it was scalable?

16           MS. COWAN:  Objection.

17       A.   I -- I thought all the necessary pieces

18   were there to create a scalable product.

19       Q.   At the time you left, were banks using

20   xRapid?

21       A.   Not that I know of.

22       Q.   And why were banks not using xRapid?

23           MR. HORTON:  Object to the form.

24       A.   I don't know.

25       Q.   Did you ever have conversations with
```

242

1    anyone -- with any banks about xRapid?

2        A.    Not that I can remember, no.

3        Q.    Did you ever raise any concerns while you

4    were at Ripple?

5            MS. COWAN:  Objection.

6        Q.    You can answer the question.

7        A.    Did I ever raise any concerns while I was

8    at Ripple?

9        Q.    Uh-huh.

10           MS. COWAN:  About anything?

11       A.    About anything?

12       Q.    Yes, about anything.

13       A.    About, like, the coffee being bad?

14       Q.    You don't seem like the person who would

15   raise that objection, that concern.

16           Did you raise any concerns concerning your

17   role while you were at Ripple?

18           MS. COWAN:  Objection.

19       A.    I don't remember.

20       Q.    Did you raise any concerns regarding

21   Ripple's XRP strategy while you were at Ripple?

22           MS. COWAN:  Objection to form.

23       A.    Yeah, I don't remember.

24       Q.    You said earlier that you left Ripple in

25   April 2020.

243

1         Why did you leave?

2         A.   You know, Brad and I sat down and we agreed

3    it was -- it was time to make a change.

4         Q.   Did Brad pressure you to leave?

5         A.   No.  I would say it was like 60/40, 65/35

6    Brad saying, Hey, I think it's time, and me agreeing.

7         Q.   And why did he think it was time for you to

8    leave?

9              MR. HORTON:  Objection to form.

10        A.   I don't know.

11        Q.   Did you receive poor performance reviews

12   from Brad?

13             MS. COWAN:  Objection.

14        A.   Brad was never my direct report, so no.

15   I -- I never received any poor -- or positive reviews

16   from Brad.

17        Q.   So why did he -- did he tell you when you

18   sat down with him -- what did he say at the time that

19   he sat down with you that you had this conversation,

20   about, Hey, it's time for you to leave?

21        A.   I think literally he said, Hey, I think

22   it's time for you to leave.

23        Q.   Did you ask him why he felt that?

24        A.   No.  I remember -- no, being a little sad

25   about it.  It wasn't -- that's not a comfortable

244

 1   thing to hear.

 2          But I also agreed.

 3      Q.  You agreed with what?

 4      A.  With -- that it was time to move on.

 5      Q.  Why was it time to move on?

 6      A.  So I had come back from paternity leave in

 7   October of 2020.  I went on pat leave in July, so I

 8   was gone for three months.  And I really

 9   disconnected, and I really wanted to spend time with

10   the family.

11          And when I came back, you know, ▮▮▮▮ who

12   I got along with very well, she was transitioning out

13   and wasn't really -- I don't think she ran the BD

14   team anymore, and the markets team was in a little

15   bit of flux.  And I -- I basically said to ▮▮ who

16   was my report, my direct report, I reported to him, I

17   said, look, I don't -- I don't see where I fit

18   naturally anymore, kind of on the rapid team, on the

19   markets team.  I would really like to incubate this

20   other idea around using the -- the balance sheet, the

21   XRP balance sheet, for prime brokerage.

22          And I really think it's a great use case

23   for the balance sheet.  Balance sheet just sits

24   there, does nothing.  I want to -- you know, I want

25   to explore this and see if we can either create a

245

1    spinoff or -- in -- in-house, however.

2           And I got the go-ahead to do that.  So I

3    spent three months, from October to -- two and a half

4    months, from October to, like, mid-Dec, basically

5    putting together that plan, the idea, prospective

6    team, doing research around the market, the

7    opportunity.  You know, I presented it to leadership,

8    and they said no.

9           That was mid-December.

10          And then the holidays happened.  And it

11   just -- it wasn't clear, sort of, where I -- now

12   what?

13          So when I sat down with Brad, it wasn't

14   wholly surprising, like it was -- my -- my role was

15   in flux.

16     Q.   What was your role before you left?

17     A.   So right before I left, I think my -- my --

18   my responsibility revolved fully around xRapid

19   partnerships and xRapid development.

20     Q.   Why was your role in flux?

21          Why was that role in flux?

22     A.   When I came back?

23          Well, partially because I had put it in

24   flux.  I said, I don't really want to do that

25   anymore; I want to focus on this idea.

246

```
1          So then at that point it had been six

2    months since I'd been away from kind of operational

3    responsibilities around xRapid partnerships.  That's

4    a long time to be away from the team.  It's hard to

5    integrate you back.  And, frankly, I didn't -- I

6    don't know if I wanted to do that.  I really wanted

7    to do this brokerage idea.

8          Q.   When you talk about Ripple's balance sheet,

9    are you referring to Ripple's XRP holdings?

10         A.   Yes.

11         Q.   And did you recommend that Ripple spin off

12   a prime brokerage for XRP?

13         A.   I don't know that that necessarily

14   recommended -- if I recommended the spinoff or

15   whether we did it in-house.  I think it was a

16   spinoff, yeah.  I think that's right, yeah.

17         Q.   And did you get feedback from Brad about

18   the idea?

19         A.   Yes.

20         Q.   And what was his feedback?

21         A.   His feedback was he wasn't sure the timing

22   was right.  He felt like it might distract the

23   organization from the core.  He was -- really -- you

24   know, he wanted to kind of drive the company towards

25   an IPO, and this might be distracting to that.
```

1        He also said he didn't think I was the

2    right person to do it.

3        Q.    Who initially gave you the go-ahead?  You

4    said, initially, you got the go-ahead, but later in

5    December --

6        A.    I got the go-ahead to -- to -- you know,

7    flesh out the idea, but not to actually do it.

8        Q.    Who gave you the go-ahead to flesh out the

9    idea?

10       A.    I don't remember exactly.  I don't remember

11   how that happened.

12       Q.    And just briefly, how would you use

13   Ripple's XRP holdings as part of this business --

14   prime brokerage business?

15            MS. COWAN:  Objection.

16       A.    So prime brokerage business -- really

17   all -- all the PB is a very big balance sheet that

18   insulates customer from credit losses.  So if you

19   think of, like, two small hedge funds that want to

20   trade with each other but neither one of them has a

21   great credit.  And as a result, the -- their credit

22   teams and their legal teams can't agree for them to

23   trade.  Partially because of settlement issues.  It's

24   often who goes first.

25            And they won't extend any credit line, so

248

1    you have to -- you have to gross settle everything so

2    they won't net settle everything.  And it gets very,

3    very inefficient to trade with other folks.

4            So in FX, in the early '90s, banks saw this

5    as an opportunity and they started to basically

6    extend their balance sheet to their fund customers.

7            So what happens is a fund now, instead of

8    you and I trading directly with each other, we trade

9    with a third party that has better credit than both

10   of us.  So we'll trade with each other and then we

11   will give that trade up, name give up to the PB.  So

12   that at the end of the day, we're not settling with

13   one another.

14           I thought that that was -- there was an

15   analog to where cryptocurrency markets were at the

16   end of '19 and the early part of '20 to FX, and in

17   some respects, precious metals as well, in the early

18   '90s.

19           And other feedback I got back from the

20   market was that a PB would be fantastic because it

21   would solve a lot of issues, particularly around

22   settlement, because cryptos are the bare assets.  You

23   know, it's like we trade and it's like, Well, okay,

24   so send me the Bitcoin first.

25           And I'm like, Well, no.  Why don't you send

249

```
1    me the money first.
2          That's -- a prime brokerage solves that,
3    right, because a prime broker has better credit than
4    everybody.  And it's like, No, everybody is going to
5    settle with me first.  And then I'll disburse, right?
6          So the idea around the crypto -- the XRP
7    balance sheet is that it was the big -- I think it
8    still is the biggest balance sheet in all of crypto.
9    So that would be the tool that we could use to build
10   a trading business, a prime brokerage business where
11   folks would trade with the PB.
12         MR. HORTON:  Counsel, I just want to
13   clarify something on the record quickly.  Mr. Vias
14   stated a few moments ago that he came back from
15   paternity leave in October 2020, and I believe he
16   meant October 2019.
17         THE WITNESS:  Thank you.  Sorry about that.
18     Q.  Can you -- when you say you were talking
19   about the biggest balance sheet in crypto, are you
20   talking about Ripple's XRP holdings being the
21   biggest -- holdings that one entity holds?
22         MS. COWAN:  Objection.
23     A.  I believe so.  I believe that's the biggest
24   crypto balance sheet out there.
25     Q.  Upon leaving Ripple, did you agree to
```

250

1    provide anything in connection with the SEC's

2    investigation or litigation as part of your

3    separation from the company?

4            MR. HORTON:  Objection.  Form.

5        A.   I don't think so, no.

6        Q.   Are you paying for your representation by

7    counsel today?

8        A.   I am not.

9        Q.   Is Ripple covering your attorneys fees?

10       A.   Yes.

11       Q.   Did you receive any sources of contribution

12   from Ripple or any affiliated entity when you left?

13           MS. COWAN:  Objection.

14       A.   In terms of, like, severance?

15       Q.   Yes.

16       A.   Yes, I think I got ████████ severance.

17       Q.   Did you receive anything else?

18           MR. HORTON:  Objection to form.

19       A.   Not that I think recall, no.

20       Q.   Did you receive any XRP?

21       A.   No.

22           MS. WAXMAN:  Let's go off the record.

23           THE VIDEOGRAPHER:  Going off the record --

24           MS. WAXMAN:  5:40.

25           THE VIDEOGRAPHER:  -- at 5:40 p.m. Eastern.

251

1          (A recess was taken from 5:40 to 5:49.)

2          THE VIDEOGRAPHER:  We are back on the

3     record at 5:49 p.m. Eastern.

4     Q.  Mr. Vias, I'm showing you what's been

5     marked as Exhibit 71.  It's a document with the

6     Bates 0371769 through -771.

7          (Email exchange re: Increasing Retail

8          Support of XRP, Bates 0371769 through -771, was

9          marked MV Exhibit 71 for identification, as of

10          this date.)

11          (Witness reviewing document.)

12     A.  Okay.

13     Q.  The top email you write, The retail use

14     case is one that has not panned out in any digital

15     currency.  Outside of places like Venezuela and

16     Zimbabwe and ICOs, to date, the only use for any

17     asset is pure speculation.

18          So in December 2017, you understood that

19     nobody was using XRP to buy goods and services?

20          MR. HORTON:  Objection to form.

21     A.  No.

22     Q.  Is your answer, no, you -- you -- you did

23     not believe that?

24          Or what was your understanding regarding

25     the retail use case for digital currency in

1    December 2017?

2          A.    So I thought that the majority of the --

3    the majority of the activity around digital

4    currencies was speculation.

5          Q.    Well, you say to date the only use case for

6    any asset is pure speculation.

7                And what do you mean by "retail use case"?

8          A.    So if you look at Dinuka's email, where

9    he's saying bring back -- promoting XRP is a

10   peer-to-peer digital asset, that's the retail use

11   case that he's talking about.  And that's what I am

12   referencing with respect to Zimbabwe and Venezuela.

13               You know, this like, peer-to-peer exchange

14   of a digital currency as payment, at that point,

15   hadn't really taken off anywhere.  So I was a little

16   skeptical.

17         Q.    Did others at -- did everyone at Ripple

18   also acknowledge that nobody was using XRP in that

19   way that you just described?

20               MR. HORTON:  Objection to form.

21         A.    First, I don't know that no one was using

22   it.  I just -- it wasn't a retail use case that

23   seemed to be taking off, if anybody was using it.  In

24   Venezuela and Zimbabwe, in particular, Argentina now

25   little bit, there's definitely use of crypto as

253

1    payment.  I don't know -- at the time, I don't think

2    that there was much going on outside of these two

3    places.

4         Q.   Did Ripple limit its sales to retail use in

5    Venezuela and Zimbabwe?

6              MR. HORTON:  Objection to form.

7         A.   We not sell in Zimbabwe and Venezuela, as

8    far as I know.

9         Q.   At the bottom of the email, you say, In my

10   opinion, what we need is more traction in its use

11   case and more exposure around that traction and for

12   XRP generally.

13             What do you mean by "more exposure around

14   that transaction"?

15             MR. HORTON:  Objection.  That's not the

16   email.

17             I think you said "transaction."

18        A.   Traction.

19             MS. WAXMAN:  Traction.  Thank you.

20        A.   I don't remember exactly what I meant by

21   this.

22        Q.   Was "more exposure" meant to mean more

23   market or more promotion?

24             MR. HORTON:  Objection to form.

25        A.   I think around the use case, we were

1  starting to get -- this is December '17.  I think we

2  had just done the pilots or were in the middle of the

3  pilots.  I felt like that was a really big step.  I

4  think at the time, it was the first -- it was the

5  first example of -- like -- real-world companies,

6  transacting real value not in some test net, but in

7  the real world.

8         Like, even the pilots, though, they were

9  small, it felt like a huge deal.  Because here you

10  had companies that were, in some instances, public,

11  had real businesses.  And here they were taking time,

12  energy resources to try this.  And they were doing so

13  in a way that wasn't -- so much of crypto projects

14  back then, everything was a pilot but it was in,

15  like, a closed loop, and it was completely

16  controlled.  We didn't do that.

17         So I felt like that traction was a big

18  deal.

19      Q.   Would increased exposure around that

20  traction help speculation for XRP?

21         MR. HORTON:  Objection to form.

22      A.   I don't know.

23      Q.   Well, why would you want to increase the

24  exposure at that time, if the only use for the asset

25  at the time was speculation?

255

1          MR. HORTON:  Objection.

2      A.   So when you -- when you're building

3   anticipation for a product like xRapid, especially as

4   you're targeting -- you know, payments companies,

5   they are highly regulated.  The margins aren't great.

6          You know, I think if -- if you approached

7   30 payments companies with something like this, you

8   know -- I don't know, I'm not going to speculate on a

9   number -- but you -- the 30 won't come along.  And

10  they'll all have different reasons for not coming

11  along.

12          So I think marketing that traction and

13  signaling that, Hey, I think this is working,

14  increases interest in the use case, increases

15  interest in the product and gets you some inbounds,

16  makes outbound conversations easier, and makes it

17  easier to point to things that are working so that

18  you're not constantly kind of running uphill with

19  conversations around using the product.

20      Q.   But it also increases speculation in XRP.

21          MS. COWAN:  Objection.

22          MR. HORTON:  Objection.

23          Is that a question?

24      A.   Question?

25      Q.   In your opinion, does this increased

256

1    exposure to Ripple's efforts to develop a use help

2    speculation?

3           MR. HORTON:  Objection to form.

4       A.   I don't know.

5           THE VIDEOGRAPHER:  Counsel, you have

6    four minutes left.

7       Q.   Exhibit 4, please.

8           (Email re: 2t off, 6t on, Bates GSR0017343,

9       was marked MV Exhibit 4 for identification, as

10      of this date.)

11      Q.   Mr. Vias, I'm showing you what's been

12   marked as Exhibit MV 4, which is the document

13   GSR0017343.

14          While you're -- before you get that

15   document, are you familiar with an entity called

16   Rippleworks?

17      A.   Yes.

18      Q.   Okay.  And did you instruct Ripple's market

19   makers as to Ripple's -- Rippleworks' sales of XRP?

20          MR. HORTON:  Objection to form.

21      A.   Not that I can remember, no.

22      Q.   Take a look at MV 4.

23          Let me know when you're done.

24          This is an email to GSR.

25      A.   Uh-huh.

1    Q.  And, it's from you.  It's dated

2   December 2016.  You say, We are going to turn Ripple

3   bot 2T off, but please leave Rippleworks 6T on.

4        So you provided instructions to GSR for

5   Rippleworks' sales of XRP?

6        MR. HORTON:  Objection to form.

7    A.  So in this email -- and, again, three weeks

8   in, it's me and ███████  We don't have an operations

9   around this at all.

10        If I remember correctly, the way this works

11   is either ██████ or ████████ would have instructed --

12   and this is, again, before we had an instruction.  We

13   didn't have any meetings.  It was basically somebody

14   said, Hey, tell the market makers to turn off our

15   bots and leave Rippleworks on.

16    Q.  Would you turn off Ripple bots -- Ripple's

17   bots and leave Rippleworks' bots on?

18    A.  I don't know.

19    Q.  Why were you giving instructions relating

20   to Rippleworks' bot?

21        MR. HORTON:  Objection to form.

22    A.  I don't know.

23    Q.  Did you ever provide instructions

24   concerning Rippleworks' bots on any other occasion?

25        MR. HORTON:  Objection to form.

258

1          A.    I don't remember.

2               MS. WAXMAN:  Okay.  We don't have any more

3     questions.

4               Counsel, do you have any questions?

5               MS. COWAN:  We have no questions.

6               MS. WAXMAN:  We're off the record at 6:01.

7               THE VIDEOGRAPHER:  This concludes the

8     deposition for Miguel Vias for June 28, 2021.  We are

9     going off the record at 6:01 p.m. Eastern.

10              (Time noted: 6:01 p.m.)

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

259

1                        CERTIFICATE OF WITNESS

2

3

4          I, MIGUEL VIAS, do hereby declare under

5          penalty of perjury that I have read the entire

6          foregoing transcript of my deposition testimony,

7          or the same has been read to me, and certify that

8          it is a true, correct and complete transcript of

9          my testimony given on June 28, 2021, save and

10         except for changes and/or corrections, if any, as

11         indicated by me on the attached Errata Sheet, with

12         the understanding that I offer these changes and/or

13         corrections as if still under oath.

14             _____ I have made corrections to my deposition.

15             _____ I have NOT made any changes to my deposition.

16

17      Signed: _____
                     MIGUEL VIAS
18

19      Dated this _____ day of _____ of 20_____.

20

21      Sworn to and Subscribed before me,

22      this_____day of_____, 20_____.

23      _____
        Notary Public         My commission expires:_____
24

25

260

1                     C E R T I F I C A T E

2

3     STATE OF NEW YORK      )
                              )  Ss.:
4     COUNTY OF NEW YORK     )

5

6         I JEFFREY BENZ, a Certified Realtime Reporter,

7     Registered Merit Reporter and Notary Public within and

8     for the State of New York, do hereby certify:

9         That the witness whose examination is hereinbefore

10    set forth was duly sworn by me and that this transcript

11    of such examination is a true record of the testimony

12    given by such witness.

13        I further certify that I am not related to any of

14    the parties to this action by blood or marriage and that

15    I am in no way interested in the outcome of this matter.

16        IN WITNESS WHEREOF, I have hereunto set my hand

17    this 29th of June, 2021.

18

19    _____

20    JEFFREY BENZ, CRR, RMR

21

22

23

24

25

```
                                                               261

 1                            ERRATA SHEET

 2          Deposition of:  MIGUEL VIAS
            Date taken:  JUNE 28, 2021
 3          Case:  SEC v. RIPPLE LABS, INC., et al.

 4          PAGE  LINE
            _____ _____  CHANGE: _____
 5                       REASON: _____

 6          _____ _____  CHANGE: _____
                         REASON: _____
 7
            _____ _____  CHANGE: _____
 8                       REASON: _____

 9          _____ _____  CHANGE: _____
                         REASON: _____
10
            _____ _____  CHANGE: _____
11                       REASON: _____

12          _____ _____  CHANGE: _____
                         REASON: _____
13
            _____ _____  CHANGE: _____
14                       REASON: _____

15          _____ _____  CHANGE: _____
                         REASON: _____
16
            _____ _____  CHANGE: _____
17                       REASON: _____

18          _____ _____  CHANGE: _____
                         REASON: _____
19
            _____ _____  CHANGE: _____
20                       REASON: _____

21          _____ _____  CHANGE: _____
                         REASON: _____
22
            _____ _____  CHANGE: _____
23                       REASON: _____

24
            Signed_____
25          Dated_____
```











