# PX 22

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   IN THE UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ---------------------------------------------------x

 3   SECURITIES AND EXCHANGE COMMISSION,

 4            Plaintiff,         Case No.
                                 20-civ-10832(AT)(SN)
 5       vs.

 6   RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,
     and CHRISTIAN LARSEN,
 7
              Defendants.
 8
     ---------------------------------------------------x
 9

10

11       ** CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER **

12

13                VIDEOTAPED DEPOSITION OF

14                 DINUKA SAMARASINGHE

15                  919 Third Avenue

16                 New York, New York

17                   June 9, 2021

18                    9:17 a.m.

19

20

21

22

23

24   Reported By:
     Cheryll Kerr, CSR
25   JOB No. 210609CK
```

1

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   IN THE UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
 2   ---------------------------------------------------x

 3   SECURITIES AND EXCHANGE COMMISSION,

 4              Plaintiff,        Case No.
                                  20-civ-10832(AT)(SN)
 5        vs.

 6   RIPPLE LABS, INC., BRADLEY GARLINGHOUSE,
     and CHRISTIAN LARSEN,
 7
                Defendants.
 8
     ---------------------------------------------------x
 9

10

11

12
         ** CONFIDENTIAL PURSUANT TO PROTECTIVE ORDER **
13

14

15

16       VIDEOTAPED DEPOSITION OF DINUKA SAMARASINGHE, held

17   at the offices of Debevoise & Plimpton, LLP, located

18   at 919 Third Avenue, New York, New York, before

19   Cheryll Kerr, CSR, a Certified Shorthand Reporter

20   and Notary Public, on Wednesday, June 9, 2021, at

21   9:17 a.m.

22

23

24

25
                                                          2
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   COUNSEL FOR PLAINTIFF:
 2   UNITED STATES SECURITIES AND EXCHANGE COMMISSION
     NEW YORK REGIONAL OFFICE
 3   BY: ROBERT MOYE, ESQ.
     BY:  JORGE TENREIRO, ESQ.
 4   BY:  JON DANIELS, ESQ.
     200 Vesey Street, Suite 400
 5   New York, NY  10281-1022
     Phone:  (212) 336-1060
 6   E-mail:  moyer@sec.gov
     E-mail:  tenreiroj@sec.gov
 7   E-mail:  danielsj@sec.gov
 8
     COUNSEL FOR DEFENDANT RIPPLE LABS, INC.:
 9
     DEBEVOISE & PLIMPTON LLP
10   BY:  LISA ZORNBERG, ESQ.
     BY:  JOY GUO, ESQ.
11   919 Third Avenue
     New York, NY  10022
12   Phone:  (212) 909-6000
     E-Mail:  lzornberg@debevoise.com
13   E-mail:  jguo@debevoise.com
14
                - and -
15
16   KELLOGG, HANSEN, TODD, FIGEL & FREDERICK, PLLC
     BY:  LILLIAN V. SMITH, ESQ.
17   Sumner Square
     1615 M Street, N.W.
18   Suite 400
     Washington, D.C.  20036
19   Phone:  (202) 326-7999
     E-mail:  lsmith@kellogghansen.com
20
21
22
23
24
25   (Continued on the next page)
```

3

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1   APPEARANCES:   (Cont.)

 2

     COUNSEL FOR DEFENDANT BRADLEY GARLINGHOUSE:
 3

     CLEARY GOTTLIEB STEEN & HAMILTON, LLP
 4   BY:  SAMUEL LEVANDER, ESQ.
     BY:  ALEXANDER JANGHORBANI
 5   2112 Pennsylvania Avenue, N.W.
     Washington, D.C.  20037
 6   Phone:  (202) 974-1500
     E-mail:  slevander@cgsh.com
 7   E-mail:  ajanghorbani@cgsh.com

 8

     COUNSEL FOR DEFENDANT CHRISTIAN A. LARSEN:
 9

     PAUL, WEISS, RIFKIND, WHARTON & GARRISON, LLP:
10   BY:  GRACE TIEDEMANN, ESQ.
     BY:  ROBIN LINSENMAYER, ESQ.
11   1285 Avenue of the Americas
     New York, NY  10019-6064
12   Phone:  (212) 373-3547
     E-mail:  gtiedemann@paulweiss.com
13   E-mail:  rlinsenmayer@paulweiss.com

14

     COUNSEL FOR WITNESS:
15

     KAPLAN HECKER & FINK, LLP
16   BY:  SEAN HECKER, ESQ.
     BY:  JUSTIN HORTON, ESQ.
17   350 Fifth Avenue, Suite 7110
     New York, NY  10118
18   Phone:  (929) 367-4578
     E-mail:  shecker@kaplanhecker.com
19   E-mail:  jhorton@kaplanhecker.com

20

     Also Present:
21

     Michael Bennett, Legal Videographer
22

23                   ***      ***      ***

24

25
                                                            4
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
1                              INDEX
2    WITNESS                                          PAGE
3    DINUKA SAMARASINGHE
4        Direct examination by Mr. Moye               16
5        Cross-examination by Ms. Zornberg            292
6        Redirect by Mr. Moye                         314
7        Cross-examination by Mr. Levander            314
8
9                            EXHIBITS
10   DS
     FOR ID           DESCRIPTION                     PAGE
11
     1                One-page e-mail chain with top   81
12
                      e-mail dated 1/14/14, from
13
                      ███████████████████████ com
14
                      to Phil Rapoport
15
     Exhibit 2        Eight-page e-mail chain with     84
16
                      top e-mail dated 11/24/15,
17
                      from Dinuka Samarasinghe to
18
                      ████████████ et al.
19
     Exhibit 3        Three-page e-mail chain with     95
20
                      top e-mail dated 10/11/16,
21
                      from Dinuka Samarasinghe to
22
                      ████████████ et al.
23
24
25   (Continued on the next page)
                                                           5
```

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                      EXHIBITS (Cont.)
 2   DS
     FOR ID         DESCRIPTION                      PAGE
 3
     Exhibit 4     One-page e-mail dated              103
 4
                   12/10/16, from        ripple.com
 5
                   to              ripple.com
 6
                   et al.
 7
     Exhibit 5     Nine-page e-mail chain with top    112
 8
                   e-mail dated 1/10/17, from
 9
                   Miguel Vias to Dinuka
10
                   Samarasinghe
11
     Exhibit 6     Two-page e-mail chain with         128
12
                   top e-mail dated 9/28/17,
13
                   from             to
14
                                      et al.
15
     Exhibit 7     Three-page e-mail chain            134
16
                   with top e-mail dated
17
                   11/2/17, from Miguel Vias
18
                   to Patrick Griffin
19
     Exhibit 8     One-page e-mail chain with         147
20
                   top e-mail dated 12/13/17,
21
                   from              to
22
                   Miguel Vias et al.
23
24
25   (Continued on the next page)
                                                            6
```

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                    EXHIBITS (Cont.)
 2   DS
     FOR ID           DESCRIPTION                    PAGE
 3
     Exhibit 9        One-page e-mail dated           153
 4
                      12/16/17, from Miguel Vias
 5
                      to ███████████████
 6
                      "Subject:  Stop Selling"
 7
     Exhibit 10       Three-page e-mail chain with    163
 8
                      top e-mail dated 1/31/18,
 9
                      from Dinuka Samarasinghe
10
                      to ████████    et al. and
11
                      attachment
12
     Exhibit 11       Three-page e-mail chain with    170
13
                      top e-mail dated 3/22/18,
14
                      from Dinuka Samarasinghe
15
                      to ███████████    et al.
16
     Exhibit 12       Thirteen-page e-mail chain      174
17
18                   dated 4/12/18, from ██████
19                   ████████    to Dinuka
20                   Samarasinghe, Bates Nos.
21                   RPLI_SEC 0198978 through
22                   RPLI_SEC 0198990
23
24
25   (Continued on the next page)
                                                        7
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                    EXHIBITS (Cont.)
 2  DS
    FOR ID        DESCRIPTION                     PAGE
 3
    Exhibit 13    Two-page e-mail chain with top   184
 4
                  e-mail dated 9/18/18, from
 5
                  █████████████ to Brad
 6
                  Garlinghouse et al.
 7
    Exhibit 14    One-page e-mail chain with top   194
 8
                  e-mail dated 7/17/19, from
 9
                  ████████████ to
10
                  ██████████████████████com
11
                  et al.
12
    Exhibit 15    Two-page e-mail dated 9/3/19,    199
13
                  from ███████████ to
14
                  ██████████@ripple.com,
15
                  Bates Nos. RPLI_SEC
16
                  0295504 through RPLI_SEC
17
                  0295505
18
    Exhibit 16    Two-page e-mail dated            217
19
                  10/15/19, from Breanne
20
                  Madigan to
21
                  ██████@ripple.com,
22
                  Bates Nos. RPLI_SEC
23
                  0518302 through 0518303
24
25  (Continued on the next page)
                                                      8
```

**CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER**

```
1                    EXHIBITS (Cont.)
2   DS
    FOR ID        DESCRIPTION                    PAGE
3
    Exhibit 17    Five-page e-mail chain with top  221
4
                  e-mail dated 11/16/19, from
5
                  ████████████ to ████████████
6
                  et al.
7
    Exhibit 18    Two-page e-mail dated 12/28/17,  158
8
                  from ████████████ to
9
                  ████████████ @ripple.com et al.,
10
                  Bates Nos. ████ 0039962
11
                  through ████ 0039963
12
    Exhibit 19    Five-page e-mail chain dated     238
13
                  1/10/20, from Breanne Madigan
14
                  to ████ @ripple.com, Bates
15
                  Nos. RPLI_SEC 0502500
16
                  through 0502504
17
    Exhibit 20    Six-page e-mail chain dated      48
18
                  1/12/20, from ████████████
19
                  to ████████████ et al.,
20
                  Bates Nos. RPLI_SEC
21
                  0504285 through 0504290
22
23
24
25  (Continued on the next page)
                                                    9
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                      EXHIBITS (Cont.)
 2   DS
     FOR ID         DESCRIPTION                     PAGE
 3
     Exhibit 21     Three-page e-mail chain with top  241
 4
                    e-mail dated 1/13/20, from
 5
                    Dinuka Samarasinghe to Ron Will
 6
                    et al.
 7
     Exhibit 22     19-page document entitled "Ripple  242
 8
                    Liquidity ODL & Market Maker
 9
                    Overview + Outlook for 2020,"
10
                    bearing Bates Nos. RPLI_SEC
11
                    050375 through 0503593
12
     Exhibit 23     Three-page e-mail dated           245
13
                    3/25/2020, from
14
                    ▮▮▮▮▮@ripple.com to
15
                    "[Slack Retention] Ripple - :
16
                    Private" et al., Bates Nos.
17
                    RPLI_SEC 0318645 through
18
                    0318647
19
20
21
22
23
24
25   (Continued on the next page)
                                                        10
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                        EXHIBITS (Cont.)
 2   DS
     FOR ID          DESCRIPTION                      PAGE
 3
     Exhibit 24      Two-page e-mail dated             249
 4
                     3/26/2020, from Dinuka
 5
                     Samarasinghe to  ████
 6
                     ████    et al., Bates Nos.
 7
                     RPLI_SEC 0492574 through
 8
                     0492575
 9
     Exhibit 25      Two-page e-mail chain with        252
10
                     top e-mail dated 3/29/2020,
11
                     from Dinuka Samarasinghe to
12
                     ████████    et al., Bates
13
                     Nos. RPLI_SEC 0479912
14
                     through 0479913
15
     Exhibit 26      One-page e-mail dated             257
16
                     4/8/2020, from  ████
17
                     ████   to Breanne
18
                     Madigan et al., "Subject:
19
                     Bitso Update"
20
21
22
23
24
25   (Continued on the next page)
                                                        11
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                        EXHIBITS (Cont.)
 2  DS
    FOR ID         DESCRIPTION                       PAGE
 3
    Exhibit 27     Eight-page e-mail chain with top   260
 4                 e-mail dated 4/15/20, from
 5                 Dinuka Samarasinghe to █████████
 6                 et al.
 7
    Exhibit 28     Four-page e-mail chain with top    263
 8                 e-mail dated 5/29/2020, from
 9                 ████████████ et al.
10
    Exhibit 29     Thirteen-page document entitled    266
11                 "XRP-O Supply Concerns," Bates
12                 Nos. RPLI_SEC 0301743 through
13                 0301755
14
    Exhibit 30     Four-page e-mail dated             273
15                 6/24/2020, from
16                 ██████████████ripple.com
17                 to █████ ripple.com et
18                 al., Bates RPLI_SEC
19                 0504550 through 0504553
20
    Exhibit 31     One-page e-mail dated              281
21                 8/25/2020, from Dinuka
22                 Samarasinghe to
23                 ████████@ripple.com
24
25  (Continued on the next page)
                                                         12
```

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
 1                         EXHIBITS (Cont.)
 2    DS
      FOR ID          DESCRIPTION                      PAGE
 3
      Exhibit 32      Two-page e-mail dated             284
 4
                      11/21/2020, from
 5
                      ███████████@ripple.com to
 6
                      ███████@ripple.com, Bates Nos.
 7
                      RPLI_SEC 0318653 through
 8
                      03180318654
 9
      Exhibit 33      Two-page e-mail dated             288
10
                      11/21/2020, from
11
                      ███████████@ripple.com to
12
                      ███████@ripple.com et al.,
13
                      Bates Nos. RPLI_SEC
14
                      0504585 through 0504586
15
      Exhibit 34      (Not Presented)
16
      Exhibit 35      One-page e-mail dated             227
17
                      7/1/19 from Dinuka
18
                      Samarasinghe to███████
19
                      ████████et al., Bates
20
                      No. SEC-██████████-
21
                      0048590
22
23                     ***      ***      ***
24
25
                                                        13
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:17   1              THE VIDEOGRAPHER:  We are now on the
        2         record.  The time is approximately 9:17 a.m.
        3         on June 9th, 2021.
        4              This is Video No. 1 of the video
09:17   5         deposition of Dinuka Samarasinghe, taken in
        6         the matters of Securities and Exchange
        7         Commission, plaintiff, versus Ripple Labs,
        8         Inc. et al., Case No. 20-civ-10832, in the
        9         United States District Court, Southern
09:18  10         District of New York.
       11              My name is Michael Bennett, legal
       12         videographer with Gradillas Court Reporters.
       13         Today, we are at the offices of
       14         Debevoise & Plimpton, located at 919
09:18  15         Third Avenue in New York, New York.  Would
       16         counsel please identify themselves?
       17              MR. MOYE:  I am Robert Moye, here for the
       18         SEC.
       19              With me in the room are two colleagues,
09:18  20         Jon Daniels and Jorge Tenreiro.  We also have
       21         various people on Zoom that are viewing as
       22         well.
       23              MR. HECKER:  Sean Hecker, from Kaplan
       24         Hecker & Fink, joined by my colleague, Justin
09:18  25         Horton, for Mr. Samarasinghe.
```

                                                              14

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:18   1              MS. ZORNBERG:  Lisa Zornberg, on behalf
        2         of Ripple, and I am joined by Joy Guo and Joe
        3         Bianco of Debevoise & Plimpton and Anna
        4         Guardado of Ripple.
09:19   5              MR. LEVANDER:  Samuel Levander, from
        6         Cleary, Gottlieb, Steen & Hamilton, on behalf
        7         of Bradley Garlinghouse.
        8              Joining me from Cleary Gottlieb by video
        9         is Alexander Janghorbani.
09:19  10              MS. LINSENMAYER:  Robin Linsenmayer, on
       11         behalf of Christian Larsen, from Paul, Weiss,
       12         Rifkind, Wharton & Garrison.
       13              I'm on the Zoom, and with me is my
       14         colleague, Grace Tiedemann.
09:19  15              THE VIDEOGRAPHER:  Thank you all very
       16         much.
       17              The court reporter is Cheryll Kerr, also
       18         representing Gradillas Court Reporters.  I
       19         would ask her to please swear in the witness.
09:19  20    D I N U K A   S A M A R A S I N G H E,
       21    called as a witness, having been duly
       22    sworn, was examined and testified
       23    as follows:
       24              THE SHORTHAND REPORTER:  Thank you.
09:19  25              Please proceed.
```

15

```
09:19   1                    DIRECT EXAMINATION

        2                    BY MR. MOYE:

        3

        4       Q.    Good morning, Mr. Samarasinghe.

09:19   5       A.    Good morning.

        6       Q.    Could you please state your name for the

        7    record?

        8       A.    Dinuka Samarasinghe.

        9       Q.    Thank you.  Are you represented by counsel

09:20  10    today?

       11       A.    Yes, sir.

       12       Q.    Who is your counsel?

       13       A.    Mr. Hecker and Mr. Horton.

       14       Q.    To your knowledge, does your counsel

09:20  15    represent any of the other witnesses in the case?

       16       A.    Yes.

       17       Q.    Okay.  Do you know who they are?

       18       A.    Miguel Vias, Asheesh Birla.  Those are the

       19    two that I am ...

09:20  20              (Thereupon, an informal discussion was

       21         held off the record.)

       22    BY MR. MOYE:

       23       Q.    Okay.  Anyone else that you know of?

       24       A.    I'm not 100 percent sure.

09:20  25       Q.    Okay.  As I said earlier, my name is Robert
```

                                                          16

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:20 | 1 | Moye, and I will be asking you questions on behalf of |
| | 2 | the SEC, who is the plaintiff in this case. |
| | 3 | Have you ever given testimony in a deposition or at |
| | 4 | trial before? |
| 09:20 | 5 | A.    No, sir. |
| | 6 | Q.    Okay.  So let me just give you some |
| | 7 | guidelines so we can get a clear record on the court |
| | 8 | reporter's transcript. |
| | 9 | First of all, we shouldn't talk over each other, so |
| 09:21 | 10 | I need to let you finish your answers and please let me |
| | 11 | finish my questions before you jump in.  Does that work? |
| | 12 | A.    Yes, sir. |
| | 13 | Q.    Also, we -- we need verbal answers rather |
| | 14 | than a nod or shaking of the head, so you are doing good |
| 09:21 | 15 | so far, and from time to time, other lawyers may raise |
| | 16 | objections. |
| | 17 | When that happens, I have a choice.  I can either |
| | 18 | reframe or reword my question, or I can go ahead and ask |
| | 19 | you to answer what's already pending.  If you don't |
| 09:21 | 20 | remember, don't sweat it, because the court reporter can |
| | 21 | read it back.  At this point, I think Lisa wants to add |
| | 22 | something. |
| | 23 | MS. ZORNBERG:  Yes.  I just want to put |
| | 24 | on the record that for today's deposition, any |
| 09:21 | 25 | objection by Mr. Hecker or Mr. Horton or by |

17

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

|  |  |  |
|---|---|---|
| 09:21 | 1 | any of the lawyers for the three defendants in |
|  | 2 | the case will preserve the objection as to all |
|  | 3 | of us so we don't have to make duplicate |
|  | 4 | objections. |
| 09:21 | 5 | BY MR. MOYE: |
|  | 6 | Q.    Finally, I'm just looking for your best |
|  | 7 | recollections in this deposition.  I'm not looking to |
|  | 8 | inquire into any advice your lawyers gave you.  So if, |
|  | 9 | by some chance, I ask you a question that you think the |
| 09:22 | 10 | answer requires you to disclose that, don't do it. |
|  | 11 | Indicate that that would require disclosure of |
|  | 12 | conversations with your lawyer, and I will work around |
|  | 13 | that.  Does that work? |
|  | 14 | A.    Yes, sir. |
| 09:22 | 15 | Q.    Can you tell me what you did to prepare for |
|  | 16 | today's deposition?  Did you meet with counsel? |
|  | 17 | A.    Yes, I did. |
|  | 18 | Q.    Did you have any preparation sessions? |
|  | 19 | A.    Yes, I did. |
| 09:22 | 20 | Q.    How many? |
|  | 21 | A.    Around four. |
|  | 22 | Q.    Okay.  During any of these preparation |
|  | 23 | sessions, was anyone participating besides your lawyers? |
|  | 24 | A.    Yes. |
| 09:22 | 25 | Q.    At how many sessions? |

18

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:22 | 1 | (Pause.) |
| | 2 | THE WITNESS:  Yesterday's session, and |
| | 3 | I -- I think one before that. |
| | 4 | BY MR. MOYE: |
| 09:22 | 5 | Q.   Okay.  Do you know who those other people |
| | 6 | were? |
| | 7 | A.   Yes. |
| | 8 | Q.   Who were they? |
| | 9 | A.   Counsel for Ripple. |
| 09:22 | 10 | Q.   Do you know which lawyers for Ripple? |
| | 11 | A.   Ms. Zornberg. |
| | 12 | Q.   Okay? |
| | 13 | A.   Ms. Guo, and there was a gentleman in the |
| | 14 | room.  I forget his name. |
| 09:23 | 15 | Q.   Okay.  What about counsel for the individual |
| | 16 | defendants?  Were any of them in these preparation |
| | 17 | sessions? |
| | 18 | A.   Not to my recollection. |
| | 19 | Q.   Okay.  In those sessions that you attended |
| 09:23 | 20 | with -- |
| | 21 | In those sessions that were attended by lawyers |
| | 22 | from Ripple, can you tell me in general what it is you |
| | 23 | talked about? |
| | 24 | MR. HECKER:  Objection.  I'll instruct |
| 09:23 | 25 | you not to answer the question. |

19

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:23    1                    MR. MOYE:  Was there a joint privilege?
         2                    MR. HECKER:  There's -- a common interest
         3               covered our discussion in preparation for his
         4               deposition, yes.
09:23    5     BY MR. MOYE:
         6         Q.    Okay.  Without saying I agree with that, are
         7     you going to follow your lawyer's instruction not to
         8     answer that last question?
         9         A.    Yes.
09:23   10         Q.    Okay.  I just need to get that on the record.
        11         A.    Okay.
        12         Q.    Can you tell me what documents you looked at
        13     in preparation for your --
        14               Can you tell me, first of all, did you look at
09:23   15     documents in preparation for the deposition?
        16         A.    I did.
        17         Q.    Were there any documents that helped you
        18     remember things you couldn't remember before until after
        19     you had looked at the documents?
09:24   20         A.    There were several documents that may have
        21     refreshed my memory a little bit.
        22         Q.    Okay.  With regard to those documents that
        23     helped you remember things or refresh your recollection,
        24     can you tell me what kinds of documents they were?
09:24   25         A.    In general, e-mail exchanges.  There were
```

                                                                        20

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:24   1    some market color and market commentary that I had

2    produced.

3            Q.    Any internal Ripple documents or reports?

4                  MR. HECKER:  Objection to the form of the

09:24   5            question.  But you can answer, if you

6            understand it.

7    BY MR. MOYE:

8            Q.    Best you can.

9            A.    Could you rephrase?

09:24  10            Q.    Yeah.  I may not be getting the right kind of

11    documents, but were there any special reports about XRP

12    or market analysis that you looked at?

13                  MS. ZORNBERG:  Objection to form.

14    BY MR. MOYE:

09:25  15            Q.    You can answer.

16            A.    A lot of the market commentary, stuff that we

17    produced.

18                  (Thereupon, an informal discussion was

19            held off the record.)

09:25  20                  THE WITNESS:  Sorry.  There were analyses

21            on -- on XRP.

22    BY MR. MOYE:

23            Q.    Is there any single or couple of documents

24    that you remember as being particularly helpful in

09:25  25    preparation for the case and helping you remember?

                                                          21

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:25  1        A.    No, sir.

       2        Q.    Okay.  Do you have any understanding, even a

       3    general one, about what the SEC is alleging in this

       4    lawsuit?

09:25  5        A.    I am not a securities lawyer, but I have -- a

       6    general understanding.

       7        Q.    Just take your best shot.  What is your

       8    understanding in your own words?

       9        A.    My understanding is that the SEC alleges that

09:25 10    XRP is a security of Ripple.

      11                   (Thereupon, an informal discussion was

      12             held off the record with the shorthand

      13             reporter.)

      14    BY MR. MOYE:

09:26 15        Q.    Okay, and do you have any understanding --

      16    even a general one -- about the defendants' position

      17    specifically?

      18        A.    A general one, yes.

      19        Q.    What's that?

09:26 20        A.    That XRP is not a security.

      21        Q.    Do you have any personal interest in the

      22    resolution of that question or the outcome of this case?

      23        A.    No.

      24        Q.    Okay.  Do you currently own any XRP?

09:26 25        A.    I have several XRP wallets that have

                                                                    22

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:26   1   essentially the minimum funding amount that is

        2   essentially locked up and I have no access to.

        3       So there would be, say -- let's say, four or five

        4   XRP wallets that have ███ XRP in it that I am unable to

09:26   5   access.

        6       Q.   But four wallets is ███ -- you have ███ XRP?

        7       A.   Roughly.

        8              (Thereupon, an informal discussion was

        9          held off the record with the shorthand

09:27  10          reporter.)

       11   BY MR. MOYE:

       12       Q.   Let's talk briefly about your educational

       13   background.

       14       A.   Yes, sir.

09:27  15       Q.   Did you go to college?

       16       A.   Yes, sir.

       17       Q.   Where did you go to college?

       18       A.   Columbia College.

       19       Q.   Did you get a degree?

09:27  20       A.   Yes, sir.

       21       Q.   What did you study or what was the degree in?

       22       A.   The degree is a bachelor's in economics.

       23       Q.   Okay.  Did you do any graduate study?

       24       A.   Yes, I did.

09:27  25       Q.   Did you get any graduate degrees?

                                                                   23

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:27  1        A.    I did.

       2        Q.    From where?

       3        A.    Carnegie Mellon.

       4        Q.    In what?

09:27  5        A.    Computational -- master's of science and

       6    computational finance.

       7        Q.    Okay.  When did you get your undergraduate

       8    degree?

       9        A.    December -- undergraduate degree in May of

09:27 10    1996.

      11        Q.    Okay.  How about your graduate?

      12        A.    December of 2005.

      13        Q.    Okay.  Do you have any other graduate or

      14    advanced degrees?

09:27 15        A.    No, sir.

      16        Q.    Have you done any other graduate or advanced

      17    studies that did not result in a degree?

      18        A.    Yes.

      19        Q.    What was that?

09:28 20        A.    I did a preparation course for my master's of

      21    science, which was called a -- I got a certificate for a

      22    quantitative studies for finance program from

      23    Columbia College.

      24        Q.    When did you get that?

09:28 25        A.    2004.

                                                              24

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:28  1      Q.   Okay.  Let's talk briefly about your

2  employment history.  We will go into more details,

3  particularly with regard to Ripple, during the day.

4      Where are you employed right now?

09:28  5      A.   GSR Services USA.

6      Q.   And since when have you had that position?

7      A.   Since December 21st, 2020.

8      Q.   And what's your title?

9      A.   Director of Operations Americas.

09:28  10      Q.   Can you tell me generally what your

11  responsibilities are?

12      A.   Generally, I do a little bit of a lot of

13  things.  I do some trade operations.  I do some --

14  working cross functionality with different groups.  I've

09:29  15  done analysis.  I've done strategy.

16      I manage some of the younger employees.  I

17  currently manage internal operations for the ODL product

18  for GSR's market making.

19           (Thereupon, an informal discussion was

09:29  20      held off the record.)

21  BY MR. MOYE:

22      Q.   Okay.  Can you tell me generally what GSR

23  does?  What kind of company it is?

24      A.   GSR is a digital asset market maker.

09:29  25      Q.   For someone who reads this record who does

25

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:29  1    not know what a market maker or what digital assets are,

       2    is there any simpler way you can describe what GSR is?

       3         A.    GSR's primary mission is increasing the

       4    liquidity for digital assets, whether they be for token

09:30  5    projects or for exchanges, but it is growing into

       6    different areas of financial services for digital

       7    assets.

       8         Q.    Okay.  Where is your office for GSR?  Do you

       9    have an office that you work in for GSR?

09:30 10         A.    I -- no, sir.

      11         Q.    You work from home?

      12         A.    Yes, I do.

      13         Q.    Okay.  Does GSR have any offices in New York?

      14         A.    No.

09:30 15         Q.    Does GSR have any offices in the

      16    United States?

      17         A.    No.

      18         Q.    Where is GSR located?

      19         A.    GSR has several corporate entities.  One in

09:30 20    the UK.  One in Hong Kong.  One in Singapore.  We have a

      21    couple entities in the United States.

      22         Q.    What are the entities in the United States

      23    that GSR owns or operates?

      24         A.    There is GSR Services USA, LLC.  There's GSR

09:31 25    USA, LLC.  I am not familiar with the full corporate

                                                                26

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:31   1    structure.

        2        Q.    Okay.  With that caveat, do you know where

        3    those LLCs that you just mentioned, where they operate

        4    from or where they are located?

09:31   5        A.    GSR Services USA, LLC is a Wyoming entity.

        6    There's a Delaware entity.

        7                    (Thereupon, an informal discussion was

        8               held off the record with the shorthand

        9               reporter.)

09:31  10    BY MR. MOYE:

       11        Q.    And are there employees within the

       12    United States of GSR or those two LLCs that you

       13    mentioned?

       14        A.    Yes, there are.

09:31  15        Q.    And the people you manage?  Are they, for the

       16    most part, here in the United States?

       17        A.    Yes.

       18        Q.    Okay.  Could you give me some estimate of the

       19    people you work with for GSR here in the United States?

09:31  20    Are there five?  500?  What's the number?

       21        A.    No, it's -- it's on the order of ███.

       22        Q.    Okay.  Thank you.

       23        Do you still have any -- in your currency job at

       24    GSR, do you have any professional contacts with Ripple,

       25    the defendant in this case?

                                                                    27

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:32    1              MR. HECKER:  Objection to the form.  But
         2         you can answer.
         3    BY MR. MOYE:
         4         Q.   Does GSR work with Ripple?
09:32    5         A.   Yes.
         6         Q.   Okay.  Doing what?
         7         A.   Servicing ODL.
         8         Q.   Okay.  We're going to talk about ODL more in
         9    a minute.
09:32   10         Do you maintain any personal friendships or
        11    relationships with people that you worked with at
        12    Ripple?
        13         A.   Yes.
        14         Q.   Who are you close to?
09:32   15              MR. HECKER:  Objection to the form.
        16    BY MR. MOYE:
        17         Q.   Who are you friends with at Ripple?
        18              MS. ZORNBERG:  Objection to the form.
        19    BY MR. MOYE:
09:32   20         Q.   You can answer.
        21         A.   ███████████.  There's ████  -- I actually
        22    don't know how to pronounce his name all that well,
        23    but --███████      ████████████.  Still at
        24    Ripple?
09:33   25         Q.   Yes.
                                                              28
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:33   1              (Thereupon, an informal discussion was
        2          held off the record.)
        3              THE WITNESS:  I'm friendly with
        4    ████████████████████████████████████████████
09:33   5  BY MR. MOYE:
        6        Q.    Okay.  What about Brad Garlinghouse or
        7  Chris Larsen?  Do you have personal or social
        8  relationships with them?
        9        A.    No, sir.
09:33  10        Q.    Okay.  Where else have you worked, besides
       11  Ripple and GSR?
       12        A.    I've worked at ████████████████ out of
       13  college.  I've worked at a hedge fund called --
       14  initially called ████████████████████.  Then it
09:33  15  was called ████████████████
       16        Q.    Okay.  Stop there.  One at a time, so we can
       17  keep track.
       18        A.    Okay.
       19        Q.    Did you say, "████████████████"?
09:34  20        A.    Yes, sir.
       21        Q.    What did you do for them?
       22        A.    I was a registered representative and I
       23  essentially traded NASDAQ equities.
       24        Q.    Okay.  The next company you mentioned,
09:34  25  Oak Hill?
```

                                                          29

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:34   1        A.     ███████████████████
        2        Q.     What did you do for ████   ?
        3        A.     I managed -- I was on the Asian equities
        4    team, essentially managing a long/short quant equity
09:34   5    portfolio and other Asian equities.
        6        Q.     How long did you work at ████   or during what
        7    years?  What period of time?
        8        A.     I started in December of 1996.
        9               (Pause.)
09:34  10    BY MR. MOYE:
       11        Q.     Just general is fine.
       12        A.     Generally, two years, probably.  Around.
       13        Q.     Okay.  What about ████   How long did you
       14    work there?
09:34  15        A.     Also -- also around two years.
       16        Q.     From ████  , where did you work?
       17        A.     I moved to a company called ████████ .
       18        Q.     And what did you do for ████ ?
       19        A.     I worked on building high frequency equities
09:35  20    trading strategy on the Japanese equity markets.
       21        Q.     And how long did you work there?
       22        A.     I want to say about a year.
       23        Q.     Okay.  After that, where did you work?
       24        A.     ████████ .
09:35  25        Q.     And what did you do for ████ ?
```

30

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:35   1     A.    I worked on high frequency foreign exchange

       2    trading.

       3      Q.    For how long?

       4      A.    Close to -- close to four years.

09:35   5      Q.    Okay.  After       where did you work?

       6      A.   

       7      Q.    And how long did you work at      ?

       8      A.    Three years.

       9      Q.    What was your responsibility with     at

09:35 10           ?

     11      A.    Senior strategist.

     12      Q.    What is      , or what does      

     13    do?

     14      A.          was a prop trading company.

09:35 15      Q.    What does that mean in layman's terms, if you

     16    can?

     17      A.    They traded their own capital and attempted

     18    to increase that capital base through trading.

     19      Q.    Was       the last company you worked

09:36 20    for before joining Ripple?

     21      A.    Yes, sir.

     22      Q.    Okay.  So we will spend more time on GSR,

     23    Ripple, and       throughout the day.

     24      I understand that you left       in order to

09:36 25    join Ripple; is that right?

                                                          31

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:36   1      A.    I resigned ███████, not necessarily with

      2   the intention to join Ripple.

      3      Q.    How much after -- how long after your

      4   resignation did you join Ripple?

09:36   5      A.    I resigned in March and I joined Ripple in

      6   June.

      7      Q.    In June? Okay.

      8          (Thereupon, an informal discussion was

      9       held off the record with the shorthand

09:37 10       reporter.)

     11   BY MR. MOYE:

     12      Q.    Just to clarify, when you left ███████

     13   did you intend to join Ripple?

     14      A.    No.

09:37 15      Q.    Okay. So how is it that you came to work for

     16   Ripple? How did you hear about the opportunity? How

     17   did you go about applying?

     18      A.    I resigned on a Friday, and on the

     19   following -- two days later, Miguel Vias, who was head

09:37 20   of XRP markets at Ripple at the time, called me to gauge

     21   my interest in working with him -- working for him at

     22   Ripple.

     23      Q.    Why did you resign from ███████?

     24      A.    I was unhappy with my compensation.

09:37 25      Q.    Did you have another job lined up? Sounds

                                                                  32

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:37  1    like no.

       2         A.    I did not.

       3         Q.    Okay, and did Mr. Vias know of your intention

       4    to resign, do you think, before you actually did the

09:37  5    deed?

       6                    MR. HECKER:  Objection to the form of the

       7              question.

       8                    MR. MOYE:  Let me ask it again.

       9    BY MR. MOYE:

09:37 10         Q.    Did you tell Mr. Vias before you resigned

      11    from ▆▆▆▆▆▆▆▆ that that's what you intended to do?

      12         A.    No, I did not.

      13         Q.    Okay.  So after Mr. Vias contacted you, what

      14    was the next step in coming to work for Ripple?

09:38 15                    (Pause.)

      16                    THE WITNESS:  I -- I had a series of

      17              interviews with Ripple.

      18    BY MR. MOYE:

      19         Q.    Okay, and when did you receive your offer, do

09:38 20    you think?

      21         A.    Around May of 2017.

      22         Q.    And you joined in June; is that correct?

      23         A.    Yes, sir.

      24         Q.    What was your title when you joined Ripple?

09:38 25         A.    Senior manager, XRP markets.

                                                                    33

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:38   1        Q.    And can you remember what was your
        2   compensation when you joined Ripple?
        3        A.    Roughly █████████ per year in cash with
        4   options to get up to ████████████████████████.
09:39   5        Q.    When you say, ███████████ " what did you
        6   mean by ████████████████ '?
        7        A.    ████████████████████████████
        8        Q.    Okay, and when you joined Ripple, what were
        9   your responsibilities?
09:39  10        You've already mentioned your title.  So day to
       11   day, what were you doing in your first -- in your first
       12   months with Ripple?
       13        A.    My first months at Ripple, I primarily worked
       14   on building out data analysis tools for the XRP markets.
09:39  15        Q.    Did your responsibilities change over time?
       16        A.    Yes, sir.
       17        Q.    Can you describe that in a general way?
       18        A.    My -- my responsibilities moved towards
       19   managing XRP programmatic sales, helping build out XRP
09:40  20   OTC trading, developing XRP lending programs from
       21   Ripple.
       22        Then to communicating internally about the markets,
       23   helping develop the ODL liquidities scaling program,
       24   managing ODL liquidity for Ripple.
09:40  25        Q.    Okay.  We're going to come back and spend
```

34

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:40  1  more time on each of these -- on some of these

2  responsibilities, but I want to find out, as best you

3  can recall, who you reported to or who -- who was your

4  supervisor during the different -- during your time at

09:41  5  Ripple?

6          A.     Initially, Miguel Vias.  Then Breanne

7  Madigan.

8          Q.     Okay, and why did you leave Ripple?

9                 (Pause.)

09:41 10                 THE WITNESS:  I grew increasingly

11                 frustrated with -- I grew increasingly

12                 frustrated largely because I grew increasingly

13                 cynical about the prospects of success for the

14                 company and the lack of growth in my role.

09:41 15  BY MR. MOYE:

16          Q.     Were there personal issues, or was it more

17  strategic, what you were describing?

18                 MR. HECKER:  Objection to form.

19                 Compound.

09:42 20  BY MR. MOYE:

21          Q.     Let me ask:  Did you have personal problems

22  with anyone at Ripple?

23                 MR. HECKER:  Objection to the form.

24  BY MR. MOYE:

09:42 25          Q.     You can answer.

35

```
09:42   1               (Pause.)
        2                   THE WITNESS:  There were a few people I
        3           don't think I had great working relationships
        4           with.
09:42   5   BY MR. MOYE:
        6       Q.   Okay.  What was your relationship like with
        7   Ms. Madigan?
        8       A.   I think we were able to work well together.
        9       Q.   Did you have --
09:42  10       Was your work being criticized or unfairly --
       11   unfairly represented, in your mind?
       12                   MR. HECKER:  Objection.
       13                   MS. ZORNBERG:  Objection to form.
       14   BY MR. MOYE:
09:43  15       Q.   If you understand what I was asking you, you
       16   can answer.
       17       A.   Perhaps rephrase the question.
       18       Q.   Did anyone tell you your work is not
       19   acceptable, your analysis isn't good, or "I disagree
09:43  20   with your conclusions"?
       21                   MR. HECKER:  Objection, but you can
       22           answer.
       23                   THE WITNESS:  Not to my recollection.
       24   BY MR. MOYE:
09:43  25       Q.   Okay.  When you said before you were
```

36

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:43    1   concerned about "the prospects of success of the
         2   company," could you elaborate on that, please?  What did
         3   you mean?
         4        A.    I don't believe that the architecture of the
09:43    5   ODL is ... has been designed in such a way that it is
         6   scalable.
         7                (Thereupon, an informal discussion was
         8           held off the record.)
         9   BY MR. MOYE:
09:43   10        Q.    Scalable?  And what do you mean by the term
        11   "scalable"?
        12        A.    Capable of growing like a network should
        13   grow, I guess.
        14        Q.    Do you think it was --
09:44   15        When you left the company, did you think it was
        16   capable of doing what the company hoped it would do?
        17        A.    Can you define "what the company hoped it
        18   would do"?
        19        Q.    Maybe not.  I was trying to rephrase "What's
09:44   20   scalable?"  You didn't think it was be intended by use
        21   by the company; is that fair?
        22                MR. HECKER:  Objection to form.
        23                MS. ZORNBERG:  Objection.
        24                THE WITNESS:  No.
        25
```

37

```
09:44    1   BY MR. MOYE:

         2       Q.    What did you mean by you "didn't think it

         3   could grow"?

         4               MR. HECKER:  Objection.

09:44    5               MS. ZORNBERG:  I don't think he used the

         6           word grow in that way.  He used "lack of

         7           growth" for his role.

         8   BY MR. MOYE:

         9       Q.    Tell me again what you saw as a problem with

09:45   10   the ODL product.

        11               MR. HECKER:  Objection to form.  You can

        12           answer.

        13               THE WITNESS:  ODL primarily partners with

        14           digital asset exchanges in decimation currency

09:45   15           countries, such as Mexico and the Philippines.

        16           Typically, these exchanges are not -- they

        17           have relatively poor technology.  They have

        18           relatively poor support.

        19               I don't believe they're institutionally

09:45   20           sound.  There's a wide -- you know, range of

        21           APIs that you have to connect to.  So

        22           ultimately, I believe they were partnering

        23           with low-quality exchanges across the global

        24           because those were available digital asset

09:46   25           exchanges, I found it hard to believe that it
```

38

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:46   1                  could gain a significant institutional
        2                  customer base.
        3      BY MR. MOYE:
        4           Q.    Thank you.
09:46   5           When you said you were concerned or cynical about
        6      your prospects of the success of the company, what did
        7      you mean by that?
        8           A.    I had a relatively low title at Ripple.  I
        9      didn't see prospects for any sort of advancement.
09:46  10           Q.    What about your compensation?  Were you
       11      satisfied with your compensation?
       12           A.    No.
       13           Q.    When you left Ripple, what were you making,
       14      approximately?
09:46  15           A.    Maybe roughly $      a year.
       16                  (Thereupon, an informal discussion was
       17            held off the record.)
       18      BY MR. MOYE:
       19           Q.    Okay, and in terms of bonuses or equity, were
09:47  20      you still getting that form of compensation in the same
       21      way you described when you joined?
       22                  MR. HECKER:  Objection to form.
       23                  MR. MOYE:  I know, that was bad.  Let me
       24            try again.
       25
```

                                                                    39

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:47 | 1 | BY MR. MOYE: |
| | 2 |     Q.    What kind of bonuses or equity compensation |
| | 3 | were you receiving or able to receive when you left? |
| | 4 |     A.    There were -- there were bonuses ███. |
| 09:47 | 5 | ████████████████████████████████████████. |
| | 6 |     Q.    Did you let any supervisors know you were |
| | 7 | unhappy with your opportunities for advancement? |
| | 8 |     A.    Breanne Madigan. |
| | 9 |     Q.    Okay, and what was her response or reaction? |
| 09:47 | 10 |         (Pause.) |
| | 11 |         THE WITNESS:  She expressed |
| | 12 |         disappointment that I felt that way and she -- |
| | 13 |         she gave me some guidelines in case I wanted |
| | 14 |         to advance my career at Ripple, some steps I |
| 09:48 | 15 |         should improve on. |
| | 16 | BY MR. MOYE: |
| | 17 |     Q.    Did you have any sense that Ms. Madigan or |
| | 18 | anyone at Ripple would prefer that you leave?  Did they |
| | 19 | take any steps to force you out? |
| 09:48 | 20 |     A.    Not to my knowledge. |
| | 21 |     Q.    Okay.  Did you let anyone else at Ripple know |
| | 22 | you were considering leaving before you actually left? |
| | 23 |         (Pause.) |
| | 24 |         THE WITNESS:  I don't recall. |
| | 25 | |

40

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:48   1   BY MR. MOYE:

        2       Q.    Did you tell Mr. Vias that you were -- let me

        3   rephrase that.

        4       Was Mr. Vias still at Ripple when you left?

09:49   5       A.    No, sir.

        6       Q.    Did you tell Mr. Vias, or any other person

        7   you worked with personally, that you were considering

        8   leaving Ripple?

        9               MS. ZORNBERG:  Objection to the form.

09:49  10   BY MR. MOYE:

       11       Q.    You can answer.

       12       A.    Yes.

       13       Q.    Did anyone who had previously worked for

       14   Ripple encourage you either to stay or to leave?

09:49  15               (Pause.)

       16               THE WITNESS:  I don't remember.

       17   BY MR. MOYE:

       18       Q.    Are you familiar with Ripple's product XRP?

       19               MS. ZORNBERG:  Objection.

09:49  20               MR. MOYE:  Try again.

       21   BY MR. MOYE:

       22       Q.    Are you familiar with the product XRP?

       23               MS. ZORNBERG:  Objection.

       24               MR. MOYE:  What's the objection, Lisa?

09:50  25               MS. ZORNBERG:  XRP is a digital asset.  I
```

41

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:50   1              don't know that you can call it a product.

        2                   MR. MOYE:  Well --

        3                   MS. ZORNBERG:  You can answer the

        4              question.

09:50   5                   MR. MOYE:  If the witness disagrees with

        6              me --

        7                   MS. ZORNBERG:  That's fine.

        8   BY MR. MOYE:

        9        Q.   Are you familiar with the product XRP?

09:50  10                   MS. ZORNBERG:  Objection.

       11                   THE WITNESS:  I'm familiar with XRP.

       12   BY MR. MOYE:

       13        Q.   What is XRP?

       14        A.   It is a digital asset.

09:50  15        Q.   Whose digital asset is it?  Who is the

       16   sponsor or originator or who launched XRP?

       17                   MR. HECKER:  Objection to the form of

       18              that question.

       19                   MS. ZORNBERG:  Objection to form.

09:50  20   BY MR. MOYE:

       21        Q.   You can answer.

       22        A.   My understanding that a -- it was -- it was

       23   developed by Arthur Britto and David Schwartz.

       24        Q.   Okay, and currently, which company has the

09:50  25   greatest interest in the success of XRP?

                                                                    42

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:50   1              MR. HECKER:  Objection to the form of the
        2         question.
        3              THE WITNESS:  My understanding is that
        4         it's Ripple.
09:50   5    BY MR. MOYE:
        6         Q.   Okay.  What does Ripple do with XRP, or what
        7    is Ripple's relationship with XRP?  How does it use it?
        8         A.   Ripple uses XRP in its cross-border product,
        9    ODL.
09:51  10              (Thereupon, an informal discussion was
       11         held off the record with the shorthand
       12         reporter.)
       13    BY MR. MOYE:
       14         Q.   Again, we will be more specific later, but
09:51  15    generally how does it use XRP in the ODL product?
       16         A.   In ODL, a payment institution will deposit
       17    fiat in one digital asset exchange, then Ripple uses XRP
       18    to facilitate a cross-border movement in value using XRP
       19    almost like a container ship.  So on the origination
09:51  20    exchange in ODL, the payment providers would essentially
       21    sell -- put a sell order -- a buy order for XRP for the
       22    amount that they wish to move.
       23         For XRP, they move XRP cross ledger to the adverse
       24    held by a destination exchange, and at the destination
09:52  25    exchange, there would be API called to sell that XRP for
```

43

09:52  1   the fiat of that local exchange.  It's moving value

2   cross-border without the use of the corresponding

3   banking network.

4             (Thereupon, an informal discussion was

09:52  5       held off the record.)

6   BY MR. MOYE:

7      Q.   Does Ripple sell any XRP?

8      A.   I don't know what Ripple does now with XRP.

9      Q.   Do you know if Ripple has ever sold XRP?

09:52 10     A.   Yes, Ripple has sold XRP.

11     Q.   Okay.  Does Ripple promote the use of XRP?

12         MR. HECKER:  Objection to form.

13   BY MR. MOYE:

14     Q.   You can answer.

09:53 15       (Pause.)

16         THE WITNESS:  Not to my knowledge.

17   BY MR. MOYE:

18     Q.   Does Ripple encourage market participants to

19   use XRP for the type of cross-border transactions you

09:53 20   were just describing?

21     A.   I don't believe so.

22     Q.   When you worked at Ripple, did Ripple sell

23   XRP?

24     A.   Yes.

09:53 25     Q.   Who did Ripple sell XRP to?

44

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
09:53  1                    (Pause.)
       2    BY MR. MOYE:
       3         Q.    To your knowledge?
       4         A.    Okay.  Ripple sold XRP to -- on open order
09:53  5    exchanges through market makers.  Ripple sold to OTC
       6    brokers.  Ripple sold XRP to ███     Ripple sold XRP to
       7    ██████████████ .
       8                    (Thereupon, an informal discussion was
       9              held off the record.)
09:54 10    BY MR. MOYE:
      11         Q.    Okay.  We're going to spend more time on
      12    this, but just so I understand what you said, let's talk
      13    about how Ripple made some of the sales.
      14         Are you familiar with the term "programmatic sales"
09:54 15    with your time at Ripple?
      16         A.    Yes, sir.
      17         Q.    What does that term mean to you?
      18         A.    Ripple used market makers such as GSR ███,
      19    ████████    to use algorithms to sell XRP across global
09:54 20    digital asset exchanges.
      21         Q.    And for those programmatic sales, who was
      22    buying the XRP from Ripple?
      23         A.    I don't know.
      24         Q.    Do you have any sense of the type of market
09:55 25    participants they were?
```

                                                                 45

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:55 | 1 | A.    Retail speculators. |
| | 2 | Q.    Okay.  Are you familiar with the term "OTC |
| | 3 | sales" from your time at Ripple? |
| | 4 | A.    Yes, sir. |
| 09:55 | 5 | Q.    What does that term mean to you? |
| | 6 | A.    OTC sales were sales of XRP to typically |
| | 7 | digital asset OTC brokers. |
| | 8 | Q.    And OTC, does that mean over the counter? |
| | 9 | A.    Over the counter. |
| 09:55 | 10 | Q.    That's a particular way of selling an asset? |
| | 11 | A.    That's correct. |
| | 12 | Q.    Okay.  Please continue.  What does that term |
| | 13 | mean? |
| | 14 | A.    So in the case of -- let's use an example |
| 09:55 | 15 | like ██████████████████████████ |
| | 16 | As an OTC partner of XRP II, once a master purchase |
| | 17 | agreement was in place, if ███████████████████ had |
| | 18 | interest in XRP for a certain size, they would contact |
| | 19 | the markets team, ask for a price for that size of XRP, |
| 09:56 | 20 | and if a price was agreed upon and confirmed, there |
| | 21 | would be a transaction. |
| | 22 | Q.    Thank you. |
| | 23 | And these OTC sales you were describing, what -- |
| | 24 | what is the type of individual or entity that would be |
| 09:56 | 25 | buying the XRP from Ripple? |

46

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:56 | 1 | A.    In these cases, largely digital asset OTC |
| | 2 | brokers. |
| | 3 | Q.    Okay.  For these programmatic sales and OTC |
| | 4 | sales, did a higher sale price benefit Ripple, as you |
| 09:57 | 5 | understood the transactions? |
| | 6 | A.    Yes. |
| | 7 | Q.    During the time you were at Ripple, do you |
| | 8 | have any sense or understanding of how much of Ripple's |
| | 9 | revenues came from XRP sales? |
| 09:57 | 10 | A.    Yes.  In terms of magnitude. |
| | 11 | Q.    Was that the majority? |
| | 12 | A.    I don't know other sources of income from -- |
| | 13 | Q.    So as far as you knew, it was -- it could |
| | 14 | have been 100 percent of Ripple's revenues. |
| 09:57 | 15 | MR. HECKER:  Objection. |
| | 16 | MS. ZORNBERG:  Objection to the form of |
| | 17 | the question. |
| | 18 | BY MR. MOYE: |
| | 19 | Q.    As you understood it? |
| 09:57 | 20 | A.    As far as I know. |
| | 21 | Q.    Okay.  Did you have any understanding of why |
| | 22 | digital asset brokers you described were buying XRP or |
| | 23 | what they intended to do with XRP when you bought it |
| | 24 | from Ripple? |
| 09:58 | 25 | A.    No, sir. |

47

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 09:58 | 1 | Q.     No idea at all? |
| | 2 | A.     No. |
| | 3 | Q.     Did you ever hear that they were buying it |
| | 4 | for speculative investors? |
| 09:58 | 5 | A.     No. |
| | 6 | Q.     We've talked a couple of times about ODL. |
| | 7 | Are you familiar with ODL? |
| | 8 | A.     Yes, sir. |
| | 9 | Q.     Can you tell me generally what ODL is and |
| 09:58 | 10 | what the O, D, and L stand for? |
| | 11 | A.     On demand liquidity. |
| | 12 | Q.     Okay. |
| | 13 | A.     Again, ODL was Ripple's cross-border product |
| | 14 | attempting to move value from one country to another, |
| 09:58 | 15 | from one fiat currency to another fiat currency, using |
| | 16 | XRP as the bridge. |
| | 17 | (Thereupon, a six-page e-mail chain dated |
| | 18 | 1/12/20, from ▮▮▮▮▮▮ to ▮▮▮▮▮▮ et |
| | 19 | al., Bates Nos. RPLI_SEC 0504285 through |
| 09:59 | 20 | 0504290, was introduced as DS Exhibit 20 for |
| | 21 | identification.) |
| | 22 | BY MR. MOYE: |
| | 23 | Q.     Okay.  I would like to take a look at a |
| | 24 | document, now.  I would like to show you what's been |
| 09:59 | 25 | marked as DS Exhibit 20. |

48

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

09:59  1       The "DS" is your initials, and the 20 is the

        2  numbers for the exhibits we're going to look at in this

        3  deposition.

        4             (Thereupon, an informal discussion was

09:59  5       held off the record.)

        6             MR. MOYE:  I just need to say something

        7       for the record right now.  What's been marked

        8       as DS Exhibit 20 --

        9  BY MR. MOYE:

09:59 10       Q.    Do you recognize that as an e-mail message

      11  from           at Ripple, dated January 12th, 2020

      12  to         with subject line "Trade Data - jump

      13  follow up."

      14       A.    That's what -- yes.

10:00 15       Q.    Okay.  Why don't you take a moment, and I'm

      16  going to direct -- when I ask you questions, I am going

      17  to direct you to some information that begins on page 3.

      18             (Thereupon, an informal discussion was

      19       held off the record.)

10:01 20             (Pause.)

      21  BY MR. MOYE:

      22       Q.    Let me know when you're ready.

      23       A.    I think I'm ready.

      24       Q.    Okay.  Do you recognize DS Exhibit 20 as a

10:02 25  chain of e-mails -- a whole chain of e-mails which

                                                  49

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:02    1    included you, which you received between January 10th

         2    and January 12th, 2020?

         3                    MR. HECKER:  Objection to the form of the

         4             question.  Unless I am misunderstanding, it

10:02    5             looks like he's only on the top e-mail.  Am I

         6             wrong about that?

         7                    MR. MOYE:  Fair point.

         8    BY MR. MOYE:

         9         Q.    This is a chain of e-mails extending over a

10:02   10    couple days.  You received the top e-mail; is that

        11    correct?

        12         A.    Yes.

        13         Q.    Okay.  So with that caveat, I would like to

        14    direct your attention to page 3, where ███████████ of

10:03   15    Ripple begins to describe a transaction, and the

        16    paragraph says:

        17         "Probably easier to go through the life cycle of an

        18    ODL payment here."

        19         Do you see that?

10:03   20         A.    Yes.

        21         Q.    Okay.  Basically, what I want to find out is

        22    if you agree or disagree the way that ██████████ is

        23    describing this transaction.

        24         So could you look at the first paragraph?  Do you

10:03   25    agree with what ███████████ describes in the first

                                                                    50

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:03   1   paragraph?
        2       A.    "First paragraph" meaning "MoneyGram wants to
        3   initiate a payment"?
        4       Q.    Yes.  Do you think MoneyGram is a fair
10:03   5   example to use to describe --
        6       A.    Yes, it is.
        7       Q.    -- an ODL transaction?
        8       Okay.  Next paragraph.  Do you agree with what he
        9   says in the next paragraph?
10:03  10               MS. ZORNBERG:  Can you clarify which
       11           paragraph, please?
       12               (Thereupon, an informal discussion was
       13            held off the record.)
       14   BY MR. MOYE:
10:03  15       Q.    Yes, "MoneyGram uses the ODL software"?
       16               MR. HECKER:  Sorry.  I apologize.  The
       17           first paragraph starts "Probably easier" and
       18           the second starts "MoneyGram wants to
       19           initiate."
10:04  20               MR. MOYE:  I think we jumped ahead.
       21               MR. HECKER:  Okay.
       22   BY MR. MOYE:
       23       Q.    I think the first paragraph sets up the
       24   example and then talks about MoneyGram, so let's look at
10:04  25   the final two paragraphs on this page, where he talks
```

51

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:04  1  about how MoneyGram is using the ODL.

2  Do you agree with how ███████ is describing a

3  typical ODL transaction with MoneyGram as he describes

4  in this transaction?

10:04  5  A.  To the best of my recollection.

6  Q.  Okay.  Anything in there that you think is

7  inaccurate?

8  MR. HECKER:  I am going to object to the

9  form of the question.  It's a hypothetical, so

10:04  10  I'm not sure how to agree or disagree with the

11  description.  But if you understand the

12  question, you're welcome to answer.

13  THE WITNESS:  Yeah, I should give you a

14  caveat.  My role here was on the liquidity

10:04  15  side --

16  BY MR. MOYE:

17  Q.  Yeah.

18  A.  -- not the product side.  So almost two sides

19  of the coin.  The product team would be responsible for

10:05  20  how the product or how the customer experienced the --

21  the order flow.  So my job was more the flip side in

22  terms of ensuring liquidity was available on the order

23  books, my -- so my -- I'm not an expert on the product

24  side.

10:05  25  Q.  Okay.  You're not an expert on all the

52

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:05  1  details.

2       As far as you understood, was there anything in

3  what you reviewed so far that you thought was an

4  accurate description of the process, as you understood?

10:05  5       A.    No, sir.

6       Q.    Okay.  So let me ask you some more general

7  hypothetical, and feel free to refer to DS Exhibit 20 on

8  page 3 and continuing on to page 4, if you find that

9  helpful.  Okay?

10:05 10       In this hypothetical that ████████ is describing,

11  would it be fair to say the first step in an ODL

12  transaction is that MoneyGram would initiate a payment

13  using SDL -- it's using ODL -- and sends U.S. dollars

14  from a bank to a digital asset exchange?

10:06 15       A.    No.

16       Q.    Okay.  What is the first step, as you

17  understand?

18       A.    MoneyGram needs to fund the origination

19  account with U.S. dollars.

10:06 20       Q.    Okay.  Would MoneyGram use ODL software to

21  get a quote that they can accept or reject?

22       A.    To my understanding.

23       Q.    Okay.  Would ODL use U.S. dollars in a

24  MoneyGram account to purchase XRP?

10:06 25            (Pause.)

53

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:06 | 1 | THE WITNESS:  To my understanding. |
| | 2 | BY MR. MOYE: |
| | 3 | Q.    Would ODL be used in terms of paying exchange |
| | 4 | of trading fee and a spread? |
| 10:07 | 5 | A.    The exchange would receive a fee through the |
| | 6 | execution of the orders. |
| | 7 | Q.    Okay, and then would the XRP be transferred |
| | 8 | on the ledger from the sending exchange to the receiving |
| | 9 | exchange? |
| 10:07 | 10 | A.    XRP would move from one wallet address on the |
| | 11 | XRP Ledger to another wallet address on XRP Ledger. |
| | 12 | Q.    And in the next wallet, would XRP be sold on |
| | 13 | the receiving exchange or by the receiving exchange? |
| | 14 | A.    XRP would be sold on the -- open order book |
| 10:07 | 15 | on the destination exchange. |
| | 16 | (Thereupon, an informal discussion was |
| | 17 | held off the record.) |
| | 18 | BY MR. MOYE: |
| | 19 | Q.    Would MoneyGram pay the receiving exchange a |
| 10:07 | 20 | trading fee and a spread? |
| | 21 | A.    To my understanding. |
| | 22 | Q.    And when the ODL product detects that a trade |
| | 23 | is complete, what would move from the receiving exchange |
| | 24 | and how would it move? |
| 10:08 | 25 | A.    My understanding is there would be a payout |

54

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:08  1  to the recipient's account using the SPEI network in

2  Mexico.

3       Q.     What is the SPEI network?

4       A.     I -- I'm not an expert on that.  I'm sorry.

10:08  5       Q.     Is it a local payment network?

6       A.     Yes, sir.

7       Q.     Could it be described as local rails?

8       A.     Yes.

9       Q.     So would local rails be used to get the

10:08 10  currency to -- or the value to the end recipient?

11       A.     That is my understanding.

12       Q.     Okay.  So just a clarification, in what form

13  is ODL being used for this transaction?  Is ODL the way

14  that this transaction takes place or is ODL a form of --

10:09 15  maybe you can say it better.

16       What is the essence of ODL's use for this exchange?

17  I mean, why is it necessary?

18           MR. HECKER:  Objection to form.

19           MS. ZORNBERG:  Objection.

10:09 20  BY MR. MOYE:

21       Q.     If you understand it, you can answer.

22       A.     ODL coordinates the APIs on the origination

23  exchange, the XRP Ledger, the destination exchange, and

24  the local payout rails.

10:09 25       Q.     And when you say "API," what do you mean by

55

```
10:09  1   "API"?
       2       A.    It's a computer's way of interfacing with the
       3   order books of each exchange.
       4       Q.    Okay.  All right.  Let's leave Exhibit 20 for
10:10  5   now and let's address briefly another topic before we
       6   mark some more exhibits.
       7       You've used the term "market maker" a number of
       8   times, and I think I have as well.  As you understand
       9   it, what does that term mean?
10:10 10       A.    As I understand, a market maker provides a
      11   two-sided quote on a given market for a large portion of
      12   a trading day.
      13                (Thereupon, an informal discussion was
      14           held off the record.)
10:10 15   BY MR. MOYE:
      16       Q.    Would it be correct to say market maker buys
      17   and sells stock continuously on the basis of prices that
      18   are publicly quoted?
      19                MR. HECKER:  Objection to form.
10:11 20                MS. ZORNBERG:  Objection, and object to
      21           the term "stock."
      22                MR. MOYE:  Fair point.
      23   BY MR. MOYE:
      24       Q.    Do you think market maker is a firm that both
10:11 25   buys and sells assets on a continuous bases at publicly
```

                                                                56

10:11  1    quoted prices?

2          A.    Doesn't necessarily have to be a firm, but

3    sure.

4          Q.    Okay.  How does a market maker make a profit?

10:11  5    A.    A market maker attempts to leverage its

6    connectivity.  So let's say they are -- in a

7    hypothetical example, a market maker would essentially

8    provide a buy price at which they believe they could

9    sell -- if executed at that price -- at a higher price.

10:11 10   Whether that is through a prediction model, whether

11   that is through leveraging its connectivity to other

12   exchanges, but they -- they attempt to typically make

13   the spread between their buy quote and their sell quote.

14         Q.    Is the spread the difference between the bid

10:12 15   and the ask or the buy quote and sell quote?

16         A.    Yes.

17         Q.    Okay, and is that how the market maker makes

18   a profit on the difference between the bid and the ask?

19         A.    In general.  The -- the timing is not

10:12 20   necessarily same.  So you can -- let's say you can

21   execute on the data time T, your quote -- ask quote is

22   that time T, but that's not necessarily the profit

23   you're making.  Your profit is T plus X.  When you're --

24   either the profit or loss that you're making is

10:12 25   dependent on the sale at T plus X that you actually exit

57

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:12 | 1 | the position. |
| | 2 | Q. Okay. Thanks for that clarification. |
| | 3 | Which market makers does -- has Ripple deal with, |
| | 4 | to the best of your knowledge? |
| 10:13 | 5 | A. In what capacity? |
| | 6 | Q. Well, you worked for ████████, you worked |
| | 7 | for Ripple and you worked for GSR. |
| | 8 | A. Yes. |
| | 9 | Q. You've already identified ████████ and GSR, |
| 10:13 | 10 | I believe, as market makers; is that correct? |
| | 11 | A. That's correct. |
| | 12 | Q. What other market makers are you aware of |
| | 13 | that Ripple has transacted with or dealt with? |
| | 14 | A. ██████████████████████ - |
| 10:13 | 15 | (Thereupon, an informal discussion was |
| | 16 | held off the record.) |
| | 17 | THE WITNESS: --████████████. |
| | 18 | Those are some off the top of my head. |
| | 19 | BY MR. MOYE: |
| 10:14 | 20 | Q. Okay. Would it be fair to say you learned |
| | 21 | about most of these market makers that Ripple dealt with |
| | 22 | through your work at Ripple? |
| | 23 | A. ████, I was aware of before joining Ripple, |
| | 24 | but the rest of them, yes. |
| 10:14 | 25 | Q. Okay. To the best of your knowledge, did |

58

10:14  1   Ripple ever ask market makers to restrict sales of XRP

       2   to certain categories of individual, for example, to

       3   banks or to non-US persons or to non-speculators?

       4        A.   Not to my knowledge.

10:15  5        Q.   Are you aware of any restrictions that Ripple

       6   asked market makers to impose to the sale of XRP?

       7        A.   Within programmatic liquidation of XRP, we

       8   asked our liquidation partners to follow certain

       9   restrictions on the percentage of daily volume,

10:15 10   traded -- that were reported on XRP volume.

      11        Q.   But did those restrictions have to do with

      12   volume only or were they restricted by the

      13   characteristics of the buyers?

      14             MR. HECKER:  Objection to the form of the

10:15 15        question.

      16   BY MR. MOYE:

      17        Q.   You can answer.

      18        A.   I am unaware of characteristics of the

      19   buyers.

10:15 20        Q.   For example --

      21             (Thereupon, an informal discussion was

      22        held off the record.)

      23   BY MR. MOYE:

      24        Q.   You weren't aware of Ripple ever asking its

10:15 25   market makers not to sell to non-US persons, right?

                                                              59

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:16   1          A.     Not to my knowledge.

        2          Q.     Not to sell to speculators, correct?

        3                  MR. HECKER:  Objection to the form of the

        4          question.

10:16   5                  THE WITNESS:  Not to my knowledge.

        6   BY MR. MOYE:

        7          Q.     Okay.  Do you know if market makers ever sold

        8   XRP to individuals or firms whose identities were

        9   unknown or shielded in some way?

10:16  10                  MS. ZORNBERG:  Object to form.

       11                  MR. HECKER:  Objection to the form of the

       12          question.

       13   BY MR. MOYE:

       14          Q.     You can answer.

10:16  15          A.     Not to my recollection.

       16          Q.     Did Ripple ever ask market makers, to the

       17   best of your knowledge, to impose any resale

       18   restrictions on anyone it was selling XRP to?

       19          A.     Not to my recollection.

10:16  20          Q.     To the best of your knowledge, did Ripple

       21   direct market makers to monitor the daily price and

       22   volume of XRP?

       23                  (Pause.)

       24                  THE WITNESS:  I'm not sure.

       25

                                                                60

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:17    1   BY MR. MOYE:
         2        Q.    To the best --
         3        Are you aware of Ripple ever giving instructions to
         4   market makers about when to buy XRP?
10:17    5        A.    When to?
         6        Q.    When to purchase or not purchase XRP?
         7        A.    Towards the -- towards the end of my
         8   employment of -- at Ripple, Ripple started a buyback
         9   program of XRP.  We instructed them to -- we instructed
10:17   10   GSR, who was conducting the buybacks of XRP, to start
        11   and stop.
        12        Q.    How about other market makers?  Did Ripple
        13   ever instruct            when to buy XRP or how much to
        14   buy XRP?
10:18   15        A.    Not to my recollection.
        16        Q.    How about in sales?  Did Ripple ever give
        17   instructions to market makers about how much XRP to
        18   sell?
        19        A.    Yes.
10:18   20        Q.    Did that occur when you were at          ?
        21        A.    Not to my recollection.
        22        Q.    Okay.  These restrictions --
        23        These sales restrictions that you were aware of --
        24   did the market makers generally follow Ripple's
10:18   25   instructions?
```

61

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:18   1        A.     Yes.
        2        Q.     Why would Ripple give market makers
        3   instructions about when or how much XRP to sell or to
        4   buy?
10:19   5        A.     Ripple provided a target percentage of daily
        6   volume for market makers to liquidate.  The idea was
        7   that if the percentage of traded volume was low enough,
        8   it would have relatively low or minimal market impact.
        9        Q.     By "market impact," do you mean impact on the
10:19  10   price?
       11        A.     Partially.
       12               (Thereupon, an informal discussion was
       13          held off the record.)
       14   BY MR. MOYE:
10:19  15        Q.     What else would it impact?
       16        A.     Liquidity.
       17        Q.     To the best of your knowledge, were any
       18   Ripple's instructions to market makers done with the
       19   intention of encouraging speculative investment in XRP?
10:20  20        A.     Repeat the question.
       21               MS. ZORNBERG:  Object to form.
       22   BY MR. MOYE:
       23        Q.     To the best of your knowledge, were any of
       24   Ripple's instructions to market makers to sell or buy
10:20  25   XRP done to encourage speculative investment?
```

62

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:20    1        A.    Not to my knowledge.

         2        Q.    As you understood or viewed those

         3   instructions, did any of those instructions have the

         4   effect of encouraging speculative investors?

10:20    5              MR. HECKER:  Objection to the form of the

         6        question.

         7              THE WITNESS:  Not to my understanding.

         8   BY MR. MOYE:

         9        Q.    Okay.  A few minutes ago, you used the term

10:20   10   "liquidity."  You may have used it before.  I'm sorry.

        11   But let's talk about liquidity, okay?

        12        A.    Yes, sir.

        13        Q.    What's your understanding of the meaning of

        14   the term "liquidity" in the context of the market for a

10:20   15   particular asset?

        16        A.    Essentially how easily -- easy and available

        17   a quote is for any given size for that particular asset

        18   to buy or sell.

        19        Q.    If a market is liquid, does it mean there are

10:21   20   ready and willing buyers and sellers?

        21        A.    Yes.

        22        Q.    Okay.  Does liquidity mean there are more

        23   sale orders than buy orders?

        24        A.    Not to my understanding.

10:21   25        Q.    Does liquidity measure the ease or
```

                                                              63

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:21  1    convenience of buying or selling an asset?

2           A.    That is my understanding.

3           Q.    Is liquidity affected by price?

4           A.    I believe so.

10:21  5    Q.    Generally, how would liquidity be affected by

6    price?

7           A.    Well, let's say -- let's say an asset is

8    going to zero, an asset going to zero --

9           Q.    You mean -- excuse me, you mean price?

10:22 10    A.    Yes.  Let's say an asset whose price is

11   monotonically decreasing to zero, that would be an

12   indication that there is less and less interest in an

13   asset.  Less and less interest would typically mean

14   lower liquidity.

10:22 15    Q.    What if the price is increasing

16   significantly, does that make a market less liquid or

17   illiquid, in your experience?

18                MR. HECKER:  Objection to the form.

19                THE WITNESS:  I don't think necessarily.

20                MR. MOYE:  Okay.  Let me flip the

21         question, then.

22   BY MR. MOYE:

23          Q.    If there is a problem with liquidity, if

24   there's less liquidity regarding an asset, in your

10:22 25   experience, does that mean the price is high or low?

64

```
10:22   1              MR. HECKER:  Objection to form,
        2          foundation.
        3  BY MR. MOYE:
        4      Q.    If you can answer.
10:23   5      A.    I'm not sure that I can answer.
        6      Q.    Let me try it this way:
        7      If the market for an asset has greater liquidity,
        8  how might that affect the price?
        9      A.    I don't think it's a direct correlation.
10:23  10      Q.    Is there any kind of correlation between
       11  liquidity and price, in your experience?
       12              MR. HECKER:  Objection to form.
       13  BY MR. MOYE:
       14      Q.    You can answer.
10:23  15      A.    I think if you extend my -- my initial
       16  example, if an asset is going to -- if an asset's price
       17  is going to zero, it's indicating lower and lower
       18  interest in that asset.
       19      If a price is increasing over time, not necessarily
10:24  20  at any given time, that typically means a greater
       21  interest in that asset and you can see higher liquidity
       22  for that asset.
       23      Q.    All right.  Let's be more -- a little more
       24  definitive.  When you were at Ripple, did you have any
10:24  25  responsibility for monitoring the price of XRP?
```

                                                              65

10:24  1        A.    I monitored a large number of quantitative
       2   metrics.
       3        Q.    Yeah.  You monitored a lot.  I understand
       4   that.  Let's pick out price.
10:24  5        A.    Yes.
       6        Q.    Among the things you did at Ripple, did you
       7   have responsibility for monitoring the price of XRP?
       8        A.    I certainly included price in a number -- in
       9   most analyses that I produced.
10:24 10        Q.    As part of your analysis?
      11        A.    Some -- some analysis, yes.
      12              MR. HECKER:  Wait.
      13              THE WITNESS:  Yeah.  My mistake.  I'm
      14          sorry.
10:24 15              MR. HECKER:  Just -- you need to wait for
      16          him to finish his question and then he will do
      17          the same.
      18              MR. MOYE:  I need to wait as well.  Let's
      19          try this again.
10:25 20   BY MR. MOYE:
      21        Q.    As part of your analysis of XRP while you
      22   were at Ripple, what, if anything, did you compare XRP's
      23   price to?
      24              (Pause.)
10:25 25              THE WITNESS:  I looked at the ratio of

                                                              66

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:25 1              XRP to be BTC's price.

2    BY MR. MOYE:

3         Q.    BTC is Bitcoin?

4         A.    Yes.

10:25 5         Q.    And when you say you "looked at the ratio,"

6    what were you looking at and how were you comparing

7    them?

8         A.    The ratio of XRP to Bitcoin essentially tells

9    you how many XRP you could exchange for one Bitcoin or

10:26 10    vice -- vice versa.

11        Q.    Okay.  Bitcoin typically have a higher price

12    than XRP?

13        A.    Yes, sir.

14        Q.    Much higher?

10:26 15        A.    Yes.

16        Q.    Okay, and was there a particular period of

17    time that you were comparing XRP to Bitcoin, or was that

18    one of your constant comparisons in your analysis?

19        A.    I believe that was a metric I used for --

10:26 20    consistently through my time at Ripple.

21        Q.    Okay, and just to clarify, in doing these

22    comparison or your data analysis at Ripple, you were

23    doing this with the intention to report to or contribute

24    to Ripple's understanding, correct?  You weren't doing

10:26 25    this analysis to keep it to yourself?

67

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:26   1              MS. ZORNBERG:  Objection to form.
        2              MR. HECKER:  Objection to the form of the
        3          question.
        4              MR. MOYE:  I can try again.
10:26   5    BY MR. MOYE:
        6          Q.    As part of your analysis, including the
        7    comparison or price of XRP to Bitcoin, this analysis was
        8    passed along or shared with other people at Ripple,
        9    correct?
10:27  10          A.    That's correct.
       11          Q.    Okay.  Did you have any responsibility at
       12    Ripple, as part of your analysis, for monitoring the
       13    market liquidity for XRP?
       14          A.    Yes.
10:27  15          Q.    Okay, and what did you look at or how did you
       16    do that analysis, typically?
       17          A.    Typically, looking at volume -- reported
       18    volumes by exchange, by geographies.
       19          Q.    And did you compare XRP to any other product
10:27  20    or to any other standard in analyzing market liquidity?
       21          A.    Yes.
       22          Q.    What were you comparing it to?
       23          A.    Again, we looked at the liquidity of XRP, the
       24    volumes traded and the volumes reported traded by XRP,
10:27  25    the volumes traded on Bitcoin.
```

                                                                    68

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:27   1                    (Thereupon, an informal discussion was

         2              held off the record.)

         3    BY MS. ZORNBERG:

         4         Q.    And would I be correct that you would use

10:28   5    this -- you would use these same comparisons or same

         6    standard of comparisons during your whole time you were

         7    at Ripple for your analysis?

         8         A.    Yes, sir.

         9         Q.    And who would you share your analysis with

10:28  10    typically or who would you send up or report your

        11    analysis to?

        12         A.    There was a stretch of time I would produce a

        13    daily market snapshot on the digital asset markets.   I

        14    would produce weekly -- you know.

10:28  15         I would contribute to the weekly XRP markets

        16    presentation at the sales meeting every week and ad hoc

        17    market analyses.

        18         Q.    Who was part of the weekly sales meeting that

        19    you mentioned?

10:29  20         A.    Ripple GC was there.

        21         Q.    Who -- what's Ripple GC?

        22              MS. ZORNBERG:  It's okay.  It's not

        23         privileged to say in your experience over time

        24         who attended, but you should not get into the

10:29  25         content of what was discussed.

                                                                    69

| | | |
|---|---|---|
| 10:29 | 1 | THE WITNESS:  In general? |
| | 2 | BY MR. MOYE: |
| | 3 | Q.   Uh-huh. |
| | 4 | A.   Regular attendees were Brad Garlinghouse, |
| 10:29 | 5 | Chris Larsen, the CFO, the GC. |
| | 6 | Q.   General counsel? |
| | 7 | A.   Yes, sir. |
| | 8 | Q.   "CFO" is chief financial officer? |
| | 9 | A.   Yes, sir. |
| 10:29 | 10 | Q.   Who was that? |
| | 11 | A.   For a good portion of my time at Ripple, |
| | 12 | Ron Will. |
| | 13 | Q.   Ron Will?  Okay.  Who else? |
| | 14 | A.   The head of the markets team, so either |
| 10:29 | 15 | Miguel Vias or Breanne Madigan. |
| | 16 | Q.   Okay. |
| | 17 | A.   The -- towards the last, probably, year of my |
| | 18 | employment at Ripple I was no longer in that meeting, |
| | 19 | but my understanding is that that group had grown. |
| 10:30 | 20 | Q.   Okay. |
| | 21 | MR. HECKER:  When you reach a convenient |
| | 22 | break point, could we take a quick break? |
| | 23 | MR. MOYE:  Yeah.  Why don't we take a |
| | 24 | quick 10-minute break now? |
| 10:30 | 25 | MR. HECKER:  Great. |

70

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:30  1                (Thereupon, an informal discussion was

2           held off the record.)

3               THE VIDEOGRAPHER:  This will conclude

4           Video No. 1 in the deposition of

10:30  5          Dinuka Samarasinghe.

6               We are off the record at 10:30 a.m. on

7           June 9, 2021.

8               (Recess taken at 10:30 a.m.)

9               (Resumed at 10:47 a.m.)

10:47 10          THE VIDEOGRAPHER:  This is the beginning

11          of Video No. 2 in this deposition.  We are on

12          the record at 10:47 a.m., June 9th, 2021.

13 BY MR. MOYE:

14     Q.    Mr. Samarasinghe, in your work at Ripple, did

10:47 15 you have any responsibility for monitoring the

16 volatility of the XRP market?

17     A.    Yes.

18     Q.    How did you do that?

19     A.    I constructed a time series of the returns of

10:48 20 XRP, typically over the 30-day period and then measured

21 volatility from the return series.

22     Q.    Did you compare XRP's market volatility to

23 any other digital asset?

24     A.    Yes, sir.

10:48 25     Q.    Which asset?

71

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:48   1       A.      Ultimately, comparisons of volatility of XRP
        2   would be used against, most commonly, Bitcoin and Ether.
        3       Q.      Okay, and Ether is another digital asset?
        4       A.      Yes, sir.
10:48   5       Q.      Okay, and during what period of time?  Since
        6   the whole period of time you were at Ripple?
        7       A.      It -- volatility of XRP was a metric that we
        8   looked at regularly.
        9       Q.      And you regularly compared XRP's volatility
10:49  10   to that of Bitcoin and Ether?
       11       A.      Yes.
       12       Q.      Okay, and, again, did you share this
       13   information with other people at Ripple, as part of your
       14   normal work?
10:49  15       A.      It is something that I did share.  Regularly,
       16   I'm not sure about.  Certainly, if something was
       17   interesting about the volatility at some given time, I
       18   would report it.
       19       Q.      Okay.  To your knowledge, did Ripple ever
10:49  20   take steps to support or increase the market price for
       21   XRP?
       22       A.      Not to my knowledge.
       23               MS. ZORNBERG:  Objection, compound.  But
       24           you can answer.
10:49  25               THE WITNESS:  Not to my knowledge.

                                                                72

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:49   1   BY MR. MOYE:
        2        Q.    To the best of your knowledge, did Ripple
        3   ever take steps or attempt to increase the market
        4   liquidity for XRP?
10:50   5        A.    Yes.
        6        Q.    What did Ripple do?
        7        A.    One of the prime missions of the XRP markets
        8   team, under Miguel Vias, was to increase the liquidity
        9   of XRP.
10:50  10        Q.    How?  What did Ripple do?
       11        A.    The XRP markets team looked at XRP liquidity
       12   as -- because XRP was to serve a cross-border use case,
       13   Miguel Vias and I attempted to mirror the XRP markets
       14   like that of the foreign exchange markets.
10:50  15        As examples, we partnered with market makers by
       16   providing XRP loans and leases.  We tried to grow out
       17   the OTC market for XRP.
       18        Q.    Did Ripple ever pay market makers to maintain
       19   a particular spread?
10:51  20        A.    Yes.
       21        Q.    How did it do that?
       22        A.    Ripple partnered with certain market makers,
       23   as an example, ███████████████████ to provide a
       24   bid and ask across several different XRP markets with a
10:51  25   certain size available on the bid and ask with a
```

73

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:51  1    prescribed spread between the bid and ask.

       2         Q.    How was ███████████ compensated for succeeding

       3    in doing this?

       4         A.    ███████████ received XRP.

10:52  5         Q.    Do you know whether Ripple ever took similar

       6    steps with other market makers to maintain a certain

       7    spread?

       8                   MS. ZORNBERG:  Object to form.

       9    BY MR. MOYE:

10:52 10         Q.    You can answer.

      11         A.    Ripple did pay market makers to provide a

      12    spread, as an example, in ODL markets.

      13                   (Pause.)

      14    BY MR. MOYE:

10:52 15         Q.    Were you aware -- are you aware of any other

      16    digital asset for whom market makers are paid to

      17    maintain a spread?

      18         A.    Yes.

      19         Q.    What other digital assets?

10:53 20         A.    As an example, for -- you know, understanding

      21    the client base of GSR, GSR partners with a number of

      22    different token projects who acquire -- or who are asked

      23    for market making support on their tokens.

      24         Q.    What tokens were those?  Do you know?

10:53 25         A.    As an example, ███████████████.

                                                              74

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 10:54 | 1 | Q.   To your knowledge, does Bitcoin do this? |
| | 2 | A.   Not to my knowledge. |
| | 3 | Q.   Does Ether do this, to your knowledge? |
| | 4 | A.   Not to my knowledge. |
| 10:54 | 5 | Q.   Okay.  Going back to liquidity for a moment. |
| | 6 | To your understanding, do XRP holders in the market |
| | 7 | prefer more liquidity or less liquidity? |
| | 8 | MS. ZORNBERG:  Objection to the form. |
| | 9 | BY MR. MOYE: |
| 10:54 | 10 | Q.   You can answer. |
| | 11 | A.   I'm not sure. |
| | 12 | Q.   You don't have any idea one way or the other? |
| | 13 | MR. HECKER:  Objection to the form of the |
| | 14 | question, asked and answered. |
| 10:54 | 15 | MR. MOYE:  Let me rephrase this. |
| | 16 | BY MR. MOYE: |
| | 17 | Q.   Talking about an asset in general -- |
| | 18 | A.   Uh-huh. |
| | 19 | Q.   -- if the holder of an asset would like to |
| 10:54 | 20 | sell that asset of some point in time, would the holder |
| | 21 | of that asset, do you think, prefer that there be more |
| | 22 | liquidity or less liquidity in the market? |
| | 23 | A.   Holders of an asset, in general, would prefer |
| | 24 | greater liquidity for that asset. |
| 10:54 | 25 | Q.   Okay.  Do you think that also applies to XRP |

75

```
10:54   1    holders?

        2         A.    Yes --

        3         Q.    -- that in general, they would prefer more

        4    liquidity to less?

10:55   5         A.    Yes.

        6         Q.    Why is that?

        7         A.    It lowers the cross to enter or exit a

        8    position.

        9         Q.    Does it also mean that they could recoup what

10:55  10    they paid for the asset or, if you will, their

       11    investment in that asset?

       12              MR. HECKER:  Objection to form,

       13         foundation.

       14    BY MR. MOYE:

10:55  15         Q.    You can answer.

       16         A.    Not necessarily.

       17              (Pause.)

       18    BY MR. MOYE:

       19         Q.    Did Ripple, to your knowledge, take any

10:55  20    attempts to -- make any attempts to decrease the

       21    volatility of the XRP market?

       22         A.    Not to my knowledge.

       23         Q.    To the best of your knowledge, did Ripple

       24    make any efforts or attempts to stabilize the market

10:56  25    price of XRP, in other words, to stop it from going
```

76

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
10:56   1   lower?
        2        A.    I don't recall.
        3        Q.    Do you know how much XRP was in circulation,
        4   approximately, when you began working at Ripple?
10:56   5        A.    Define circulation.
        6        Q.    How much was available to be purchased when
        7   you began working at Ripple?
        8               MR. HECKER:  I'm going to object to the
        9          form of the question.  You can answer.
10:56  10               (Pause.)
       11               THE WITNESS:  I -- I don't recall.
       12   BY MR. MOYE:
       13        Q.    So without regard to a particular quantity,
       14   do you know how much -- do you know what the source of
10:57  15   XRP was that's in circulation now?
       16        In other words, how it got to the market?
       17               MS. ZORNBERG:  Object to form.
       18   BY MR. MOYE:
       19        Q.    You can answer.
10:57  20        A.    Ultimately, liquidations by Ripple or early
       21   holders of XRP.
       22        Q.    Would these those early holders include
       23   Mr. Garlinghouse and Mr. Larsen?
       24               (Pause.)
10:57  25               THE WITNESS:  I don't know that
```

                                                              77

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

10:57  1              Mr. Garlinghouse was an early holder of XRP.

       2    BY MR. MOYE:

       3        Q.    Would the early holders of XRP that sold it

       4    into the market include Mr. Larsen?

10:58  5        A.    To my understanding.

       6        Q.    Okay.  Do you know who holds the rest of --

       7    is there some XRP being held that is not in circulation?

       8        I apologize.

       9        A.    By circulation, available to be purchased?

10:58 10        Q.    Yes.

      11        A.    Can you define "available to purchase"?

      12        Q.    Maybe not technically.  What I'm trying to

      13    ask is:

      14        If someone wants to go to the market to buy XRP

10:58 15    now, is there a source or -- or funds of XRP that is

      16    being held that is not available to be purchased by

      17    people in the market?

      18        A.    Yes.

      19        Q.    In other words, does Ripple hold a bunch of

10:59 20    XRP?

      21        A.    Ripple holds a bunch of XRP that is in

      22    escrow.

      23        Q.    Okay.  What is the purpose of that escrow as

      24    you understand it?

10:59 25        A.    As I understand it, the escrow was put in

                                                              78

10:59  1    place to provide surety to digital asset speculators

2    that Ripple, the company, would not flood the market

3    with XRP.

4        Q.    As you understand that purpose, as you've

10:59  5    just described it, would another way of saying that mean

6    that Ripple's not going to sell so much that it crashes

7    the price held by other people?

8                MR. HECKER:  Objection to the form.  You

9          can answer.

10:59 10    BY MR. MOYE:

11        Q.    You can use your own words to answer, if you

12    like.

13        A.    Ripple would be prevented through a

14    cryptographic method from accessing enough quantity at

11:00 15    any given time to flood the market with XRP.

16        Q.    Do you view this as an effort or initiative

17    by Ripple to control or support -- not control.  Let me

18    take that back.

19        Do you view this escrow by Ripple as a way to

11:00 20    support or stabilize the market price?

21        A.    No, sir.

22        Q.    You mentioned "buybacks" earlier in your

23    testimony.  Did you have any understanding of whether

24    repurchases of XRP were an attempt to stabilize the

11:00 25    price of Ripple?

79

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:01   1                   MS. ZORNBERG:  Object to form.  You said,
        2             "price of Ripple."
        3                   MR. MOYE:  Thanks for the clarification,
        4             Lisa.
11:01   5   BY MR. MOYE:
        6        Q.   Do you view repurchases of XRP as an attempt
        7   to stabilize the price of XRP?
        8        A.   No.
        9        Q.   Let's talk about your experience in the
11:01  10   market in general without regard to XRP.
       11        Do you believe that restricting the quantity of
       12   assets that are available for sale can work to increase
       13   or support the price of an asset?
       14                   MR. HECKER:  Sorry.  Apologies.  Couldn't
11:01  15             hear.
       16                   THE WITNESS:  I have not seen an
       17             analogous event in any market that I've ever
       18             traded that is comparable to XRP escrow.
       19   BY MR. MOYE:
11:02  20        Q.   Do you believe the effect of the XRP escrow
       21   works to help support or maintain the price of XRP?
       22                   MR. HECKER:  Objection to the form of the
       23             question.
       24                   THE WITNESS:  I don't believe so.
       25

                                                              80
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:02   1   BY MR. MOYE:
        2        Q.   Do you think it drives down the price of XRP?
        3        A.   No.
        4        Q.   Okay.  One more clarification question.  Was
11:02   5   Mr. McCaleb also an early holder of XRP that sold XRP
        6   into the market?
        7        A.   That is my understanding.
        8        Q.   Okay.  Is there -- I would like to talk about
        9   some of your time at          so I am going to
11:02  10   mark -- I am going to show you an exhibit that's been
       11   marked as DS Exhibit 1.
       12             (Pause.)
       13             (Thereupon, a one-page e-mail chain with
       14          the top e-mail dated 1/14/14, from
11:02  15                              com to Phil Rapoport was
       16          introduced as DS Exhibit 1 for identification.)
       17   BY MR. MOYE:
       18        Q.   Please let me know when you've had a chance
       19   to look it over.
11:03  20        A.   I'm ready.
       21        Q.   Okay.  Do you recognize Exhibit DS Exhibit 1
       22   as an e-mail you sent while at                on
       23   Tuesday, January 14, 2014?
       24        A.   I do not recall sending this e-mail.  I have
11:04  25   no reason to doubt that I did.
```

81

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:04  1      Q.   Okay.  So I want to ask you about the

2   paragraph that begins with "To give you a little

3   background on myself."

4      Do you see that paragraph?

11:04  5      A.   Yes, sir.

6      Q.   As you sit here today, do you believe these

7   personal details were all correct, that at the time you

8   sent this e-mail, you've been trading currencies since

9   November 2009?

11:04 10      A.   Yep.

11      Q.   Was it also correct that you left a company

12   called ▮▮▮▮▮ at the end of February of 2013?

13      A.   Yes, sir.

14      Q.   I don't remember whether that was one of the

11:05 15   companies we discussed earlier, but okay.

16      Does this reflect the date of December 31, 2013,

17   when you officially started at -- actually, did you

18   officially start at ▮▮▮▮▮ on January 1st, 2014?

19      A.   Yes.

11:05 20      Q.   Okay.  Was this an e-mail that you sent in

21   order to begin the process of ▮▮▮▮▮ trading XRP?

22      A.   Again, I don't recall sending the e-mail, but

23   presumably.

24      Q.   Okay.  You say, at the last sentence, "We

11:05 25   should be up and ready to trade XRP in a matter of a few

82

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:05  1    weeks."

       2         Do you see that?

       3         A.    Yes.

       4         Q.    Do you recall or can you give me some general

11:05  5    idea of what ███████████ would have needed to do in order

       6    to be ready to trade XRP?

       7         A.    Yes.  We needed to incorporate digital assets

       8    into the pricing engine buildout connectivity to the --

       9    what was known as the Ripple Consensus Ledger, ensure

11:06 10    that order flow worked, that -- you know we were

      11    probably -- probably -- properly able to place orders,

      12    cancel orders, handle executions, handle partial

      13    executions, adjust our prices correctly, fit it into our

      14    pricing engine and then understand the movement of

11:06 15    capital to fund these accounts.

      16         Q.    Was there anything special about Ripple or

      17    XRP that you needed to learn at that time in order to

      18    make those steps happen or was this a general process?

      19         A.    The process I described is a general process.

11:07 20    Though "yes" to your question, there were many things

      21    that were, to my experience, unique to trading on -- at

      22    the Ripple Consensus Ledger, as it was known.

      23         Q.    What were the main differences or the main

      24    things that were unique about this sort of trading?

11:07 25         A.    Especially in 2014, the digital asset markets

                                                                  83

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:07  1    was very immature and largely dislocated from the

       2    general financial markets.

       3         For example, at the time it was very hard to get

       4    bank account if you're a crypto business or -- you know,

11:07  5    there's no such thing as a prime brokerage, there's no

       6    such thing as central clearing, there's no such thing as

       7    trade give-ups, so you had to work around these holes

       8    in -- that were missing to trade digital assets.

       9         Also, the custody and security of the digital

11:08 10    assets was very different than, say, currencies.  Beyond

      11    that, interfacing with the Ripple Consensus Ledger, as

      12    it was known -- now the XRP Ledger -- was unlike dealing

      13    with any exchange that any of us had ever dealt with.

      14         You know, typically with a foreign exchange, API,

11:08 15    you're dealing with a fixed interface, but in this case,

      16    we were looking at very different sort of information

      17    sets to build our APIs to.

      18         Q.   Had you worked -- either at ████████ or

      19    other places -- with trading other cryptocurrencies?

11:08 20         A.   No.

      21         Q.   Okay, so when you refer to "currency trading"

      22    here, are you referring to fiat currencies?

      23         A.   That's correct.

      24         Q.   Okay.

11:08 25              (Thereupon, an eight-page e-mail chain

                                                              84

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:08 | 1 | with the top e-mail dated 11/24/15, from Dinuka |
| | 2 | Samarasinghe to ███████████ et al., was |
| | 3 | introduced as DS Exhibit 2 for identification.) |
| | 4 | BY MR. MOYE: |
| 11:08 | 5 | Q.    All right.  Let's show you what's been marked |
| | 6 | as DS Exhibit 2. |
| | 7 | (Pause.) |
| | 8 | MR. MOYE:  So just as a housekeeping |
| | 9 | matter, I want to make sure you have access to |
| 11:09 | 10 | all these during question. |
| | 11 | But I don't want them to get spilled or |
| | 12 | lost or wet, so if there's some way that we |
| | 13 | could stack them neatly or put them off to the |
| | 14 | side if you're not using them, that's the best |
| 11:09 | 15 | thing. |
| | 16 | (Thereupon, an informal discussion was |
| | 17 | held off the record.) |
| | 18 | BY MR. MOYE: |
| | 19 | Q.    Please let me know when you've had a chance |
| 11:10 | 20 | to look over DS Exhibit 2. |
| | 21 | A.    I've read through my e-mail to ██████████ |
| | 22 | I have not had a chance to go through -- do you need me |
| | 23 | to go through the entire -- |
| | 24 | Q.    I don't.  I want to ask you about your |
| 11:11 | 25 | e-mail.  Okay. |

85

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:11   1      Do you recognize the top e-mail from DS Exhibit 2

        2   as an e-mail sent by you from ▓▓▓▓▓▓▓▓▓▓ on

        3   November 24, 2015 to ▓▓▓ ripple.com?

        4      A.    I do not recall sending the e-mail.  I recall

11:12   5   some of the thoughts behind this.  I have no reason to

        6   believe I didn't send this.

        7      Q.    Okay.  Fair enough.

        8      So I do want to ask you about your thoughts as

        9   expressed in the e-mail.  Can you look below to the

11:12  10   bottom part of the first page?

       11      It appears from what's written that on Monday,

       12   November 23rd, ▓▓▓▓▓▓▓ -- it looks like he sent a

       13   Google doc or shared a Google doc with you.  Do you

       14   think I am correct about that?

11:12  15      A.    (Nodding).

       16      Q.    Okay, and just the top says "XRP Value

       17   Prop & Incentive Whitepaper."  Do you see that?

       18      A.    Yep.

       19      Q.    Okay.  So we're not going to go through any

11:12  20   of it, but it appears to be five- or six-page,

       21   single-spaced letter describing the Value

       22   Proposition & Incentive program.

       23      Do you see that?

       24      A.    That's correct.

11:12  25      Q.    Okay.  So who is ▓▓▓▓▓▓▓?

                                                              86

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:13  1          A.          ███████████  was a member of Ripple's

       2    business development team.  I came to know him through a

       3    previous employee at Ripple named Phil Rapoport, who

       4    introduced us to ███████████, and ███████████  handled

11:13  5    some interfacing with market makers.

       6          Q.    Okay.  Now, as of November 24th, 2015, would

       7    it be correct that ███████████ had been trading XRP for

       8    more than a year?

       9          A.    That's correct.

11:13 10          Q.    Okay, and you'd been involved in that

      11    trading?

      12          A.    Yes, sir.

      13          Q.    Did you feel like at the time that you

      14    received this e-mail that you had a decent understanding

11:13 15    of what XRP was and how it was trading, at least up

      16    until that date?

      17          A.    Yes, sir.

      18          Q.    Okay.  Did you understand this Value

      19    Prop & Incentive Whitepaper to be a change or new

11:14 20    program that Ripple was considering or going to be

      21    rolling out and they wanted to get your thoughts on it?

      22          A.    I don't have much recollection of this paper

      23    at all.

      24          Q.    Okay.  So let's look at the very first two

11:14 25    things that ███████████ says in this whitepaper.  He

                                                              87

11:14   1    says:

        2       "Hey, guys.  This is our soon-to-be released XRP

        3    value prop and incentive whitepaper.  Please keep this

        4    strictly confidential.  We're soliciting feedback from a

11:14   5    core group of valued partners including yourselves prior

        6    to release."

        7       Do you see that?

        8       A.      Yeah.

        9       Q.      And then the next paragraph, he says:

11:14 10       "It would be great to get your feedback

      11    particularly on the broad incentive structure."

      12       Do you believe that you read the whitepaper and

      13    that was the bases for the thoughts that you

      14    communicated in the top e-mail?

11:14 15       A.      I believe that's true.

      16       Q.      Okay.  So let's talk about the responses or

      17    reactions that you had.

      18            MS. ZORNBERG:  I'm just going to object

      19            insofar as Mr. Samarasinghe has not read the

11:15 20            whitepaper.

      21            He has told you he has no or little

      22            recollection sitting here today, and so I have

      23            a standing objection to the extent you're

      24            asking him to comment on things without giving

11:15 25            him time to read the whitepaper.

                                                  88

11:15  1              MR. MOYE:  I understand.  That's noted.

       2    BY MR. MOYE:

       3        Q.    As best you recall, what is the first

       4    reaction or first response that you raise to him in your

11:15  5    e-mail?

       6        A.    I'm asking about the spread incentive

       7    function, that's the first thing I say.

       8        Q.    Okay.  You understand what spreads were and

       9    you understand what incentives were at this time,

11:15 10    correct?

      11        So was there something particular about this e-mail

      12    that you -- that you recall that you were struggling

      13    with to understand or -- or --

      14        A.    I don't recall.

11:15 15              MR. HECKER:  Wait, wait.  You need to let

      16              him finish his question.

      17              THE WITNESS:  I'm sorry.

      18              MR. HECKER:  But one of the reasons is

      19              because I was going to interpose an objection

11:16 20              at the end of that, in terms of the

      21              foundation, given that we're -- there's a

      22              little bit of a disconnect, since he hasn't

      23              looked to see what he's reacting to.  But go

      24              ahead.

      25

                                                                89

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:16   1   BY MR. MOYE:

2       Q.   I am only asking as best you recall.

3   Obviously, if you feel it would be helpful, we can refer

4   to different parts of it, but I really only want to

11:16   5   explore your responses based on your knowledge today, if

6   that's acceptable?

7       A.   That's acceptable.

8       Q.   Okay.

9       A.   My knowledge today, I -- I -- I understand

11:16   10   what a spread is.  I understand what an incentive is.  I

11   don't -- I don't recall how they are -- how it works

12   within this whitepaper.

13       Q.   Okay.  How about in the second paragraph of

14   your response?  Right in the middle, there's a sentence

11:16   15   that begins "It appears from this program, Ripple Labs

16   is not eliminating this cost" -- it was for two above --

17   "but distributing this cost to the market makers, and

18   away from the banks."

19       Do you see that?

11:17   20       A.   That's correct.

21       Q.   And then it continues -- your thoughts

22   continue a little bit longer in that paragraph.  Can you

23   give me the gist or the basics?  What is it you're

24   telling me here that you don't agree with or don't

11:17   25   understand?

90

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:17 | 1 | A.    My recollection -- |
| | 2 | MS. ZORNBERG:  Object to form. |
| | 3 | THE WITNESS:  My recollection here is |
| | 4 | that they are -- you know, for payment |
| 11:17 | 5 | providers, they're removing the requirement to |
| | 6 | prefund at a destination account to place -- |
| | 7 | to fund a cross-border payment.  My -- |
| | 8 | What I'm objecting here to is the fact |
| | 9 | that the payment provider no longer is able -- |
| 11:17 | 10 | is no longer required to produce the |
| | 11 | capital -- prefund the destination account; |
| | 12 | However, the market maker is and the |
| | 13 | market maker may not be able to do that as |
| | 14 | efficiently as the payment provider. |
| 11:18 | 15 | BY MR. MOYE: |
| | 16 | Q.    Now, when you raised this concern, this |
| | 17 | objection, as you said, were you talking do you think in |
| | 18 | general or were you thinking also specifically that |
| | 19 | ███████████ might have a difficulty with this program? |
| 11:18 | 20 | A.    I don't recall exactly, but I imagine both. |
| | 21 | Q.    Okay.  So both generally and specific to |
| | 22 | ██████████? |
| | 23 | A.    Correct. |
| | 24 | Q.    Okay.  How about the third question you |
| 11:18 | 25 | write -- without reading it out loud, but what is it |

91

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:18 | 1 | basically you're asking him to explain or clarify? |
| | 2 | A.    Without reading the whitepaper now or |
| | 3 | recalling, if the focus is to become more of an |
| | 4 | institutional product where institutions are |
| 11:19 | 5 | facilitating movement of XRP, I wanted to make sure that |
| | 6 | I understood how larger institutions could hold XRP or |
| | 7 | digital assets at that time. |
| | 8 | Q.    Okay.  Actually, I want to clarify.  I'm |
| | 9 | talking about the 5 percent issuance per year. |
| 11:19 | 10 | A.    Oh, that one? |
| | 11 | Q.    Yeah.  What's -- let me ask you if I |
| | 12 | understand this correctly. |
| | 13 | Were you asking him to clarify whether a plan to |
| | 14 | issue 5 percent XRP a year -- whether that 5 percent |
| 11:19 | 15 | included payments in XRP to the market makers, the |
| | 16 | liquidity providers? |
| | 17 | A.    I don't recall. |
| | 18 | Q.    Okay.  So let's go to the fourth paragraph, |
| | 19 | then.  What's the -- what's your basic concern or |
| 11:20 | 20 | objection here? |
| | 21 | MR. HECKER:  Objection to the form.  You |
| | 22 | can answer. |
| | 23 | THE WITNESS:  Given regulatory |
| | 24 | uncertainty around digital assets, I was |
| 11:20 | 25 | unclear how -- not just regulatory |

92

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:20    1                    uncertainty, but uncertainty from even
         2                    experienced market participants or digital
         3                    asset speculators on how to securely hold a
         4                    digital asset.  I wanted to understand how a
11:20    5                    regulated institution could hold a large
         6                    quantity of any digital asset.
         7     BY MR. MOYE:
         8          Q.   So you began this fourth thought, or fourth
         9     paragraph, by saying "Given that the focus of Ripple has
11:20   10     shifted entirely to the institutional side."
        11          How did you become aware that the focus of Ripple,
        12     as you described it, had shifted to the institutional
        13     side?
        14          A.   I don't recall.
11:21   15          Q.   Without regard to this whitepaper but looking
        16     back at your time at ▮▮▮▮▮▮▮ was there a time when
        17     you thought that Ripple changed the way it was focusing
        18     and shifted to the institutional side, as you say here?
        19                    MR. HECKER:  Objection to form.
11:21   20                    THE WITNESS:  I don't remember.
        21                    My recollection is that in the digital
        22                    asset space -- you know, Bitcoin as an
        23                    example -- was -- you know, a way to remove
        24                    trust in, say, central banks, regulators, and
11:21   25                    was essentially a way to work away from the

                                                                   93

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:21  1         existing system.

       2              I think my recollection is that my view

       3         on Ripple was a company that was trying to

       4         work with banks, with regulators, unlike other

11:22  5         digital assets.

       6    BY MR. MOYE:

       7         Q.    When you talked about institutional -- or

       8    institutions maybe not being able to hold XRP, were you

       9    talking about market makers or other kind of bank --

11:22 10    other kinds of institutions like banks?

      11         A.    I believe I was talking about other types of

      12    institutions like banks.

      13         Q.    Okay.  Let's go back to the first paragraph.

      14    The sentence I pointed out to you:

11:22 15         "Ripple Labs is not eliminating this cost but

      16    distributing it to market makers."

      17         Do you see that?

      18         A.    That's correct.

      19              MS. ZORNBERG:  Just for clarification,

11:22 20         that's not the first paragraph.

      21              MR. MOYE:  Thank you, Lisa.  Second

      22         paragraph.  The second question in the

      23         paragraph.

      24    BY MR. MOYE:

11:23 25         Q.    To the best of your understanding, was this

                                                              94

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:23  1    also an issue with respect to ODL?

       2           In other words, did the same concern about

       3    distributing the cost to market makers and away from the

       4    banks also apply to the ODL system?

11:23  5           A.    Yes.

       6           Q.    And why was that a concern?

       7           A.    My concern with that is that it is a market

       8    maker, especially a digital asset market maker is less

       9    efficient at delivering capital to -- especially local

11:23 10    fiat to destination digital asset exchanges.  Part of,

      11    you know, scaling liquidity for ODL, we require market

      12    maker support to provide -- to essentially source local

      13    fiat currencies such that it is available to support --

      14    to essentially -- yeah, support ODL payments that are

11:24 15    going into those corridors.

      16           Had typically, these destination digital asset

      17    exchanges have relatively low liquidity, not just

      18    relative to foreign exchange -- well, I mean, foreign

      19    exchange is orders of magnitude larger, but even digital

11:24 20    assets exchanges in general.

      21                 (Thereupon, a three-page e-mail chain with

      22              top e-mail dated 10/11/16, from Dinuka

      23              Samarasinghe to                  et al., was

      24              introduced as DS Exhibit 3 for identification.)

      25

                                                                      95

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:24  1    BY MR. MOYE:

       2         Q.    Okay.  Let's look --

       3         Let's look at another document.  I am going to show

       4    you what's been marked as DS Exhibit 3.

11:25  5                    THE WITNESS:  Could I have a quick

       6              bathroom break?

       7                    MR. MOYE:  Yeah.

       8                    MR. HECKER:  Of course.

       9                    THE VIDEOGRAPHER:  We are off the record.

11:25 10              The time is 11:25 a.m.

      11                    (Recess taken at 11:25 a.m.)

      12                    (Resumed at 11:32 a.m.)

      13                    THE VIDEOGRAPHER:  We are back on the

      14              record.  The time is 11:32 a.m.

11:32 15    BY MR. MOYE:

      16         Q.    Mr. Samarasinghe, before we go on to

      17    DS Exhibit 3, I have one follow-up question I neglected

      18    to ask you about Exhibit 2.

      19         Could you go back to that --

11:32 20         A.    Yes, sir.

      21         Q.    -- to what I called erroneously "the first

      22    paragraph" and it's really the second question you

      23    raise.

      24         So I've asked you a couple questions about your

11:32 25    statement, that Ripple is not eliminating the cost, but

                                                                    96

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:32   1   distributing it to market makers and away from the
        2   banks.
        3        To your understanding of this program, was Ripple
        4   proposing that the market makers would keep this cost
11:32   5   and, in other words, lower their earnings or their
        6   profitability, or was it your understanding that
        7   whatever additional cost the market makers would incur
        8   would be made up by Ripple?
        9                MS. ZORNBERG:  Object to form.
11:33  10                THE WITNESS:  Maybe -- perhaps rephrase
       11           the question.
       12   BY MR. MOYE:
       13        Q.    Yeah.  When you say that Ripple's
       14   transferring cost to the market markers and away from
11:33  15   the banks, did you think those costs would ultimately
       16   become the responsibility of Ripple under this new
       17   program?
       18        A.    I don't recall.
       19        Q.    Don't recall?  Okay.
11:33  20        How about with regard to the -- how about with
       21   regard to the ODL transactions that you've described, am
       22   I correct that in these ODL transactions, there's a need
       23   for the exchange to buy XRP in order for the ODL
       24   transaction to work?
11:33  25        A.    The Exchange is not buying XRP.
```

                                                             97

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:33  1          Q.    Who is buying the XRP?

2          A.    A market participant on the exchange.

3          Q.    So the one who wants to send or receive the

4    funds?  Is that what you mean by "market participant"?

11:34  5          A.    No.  Well, from your -- from your question,

6    it's unclear if you're talking about the entity sending

7    the payment.  The entity sending the payment --

8          XRP moves cross ledger in -- from their

9    perspective, right, so it's their XRP.  They sell that

11:34 10   XRP for local fiat to a market participant who exists on

11   the exchange.

12         Q.    Okay.  Is that sale or purchase of XRP

13   necessary or essential to the ODL transaction?

14                MR. HECKER:  Objection to form.

11:35 15                THE WITNESS:  So in ODL, the recipient of

16             the payment receives local fiat.

17   BY MR. MOYE:

18         Q.    Right.

19         A.    For it -- let's move backward.

11:35 20         For that recipient to receive local fiat, the

21   person -- the entity sending the payment needs to get

22   that local fiat, and it is sourced from that exchange

23   via a sale of XRP for local exchange -- fiat on that

24   exchange.  Following that reasoning, I believe that sale

11:35 25   is necessary for ODL.

98

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:35  1      Q.    Okay.  So maybe stated more broadly, do you
       2  agree that for an ODL transaction to work or function as
       3  intended, some market participant needs to purchase the
       4  XRP?
11:35  5      A.    That's correct.
       6      Q.    Okay.
       7      A.    Doesn't have to be one.
       8      Q.    Excuse me?
       9      A.    It could be multiple.
11:36 10      Q.    At least one?
      11      A.    At least one.
      12      Q.    At least one.  Okay.  Let's move on to
      13  DS Exhibit 3.  DS Exhibit 3 appears to be an e-mail that
      14  you sent from ███████ on October 11th, 2016 to
11:36 15  ████████████ at Ripple.
      16      Do you see that?
      17      A.    Yes, sir.
      18      Q.    Do you either remember this e-mail or have
      19  any -- do you remember this e-mail?
11:36 20      A.    I do not.
      21      Q.    Do you have any reason to doubt that you sent
      22  it?
      23      A.    No.
      24      Q.    Okay.  So in your own words, what are you
11:36 25  telling ████████ at this point in time?  What's the

                                                              99

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:36   1   purpose of this e-mail?
        2                   MS. ZORNBERG:  Object to form.
        3                   THE WITNESS:  The market-making contract
        4            that          had with Ripple included --
11:37   5            included a -- essentially, either a volume
        6            incentive or a participant rate incentive as
        7            part of the contract.
        8   BY MR. MOYE:
        9        Q.   Am I correct that as part of your contract
11:37  10   with Ripple, the more business -- the more transactions
       11   that          effectuates, it gets paid either in
       12   dollars or in XRP, the more business it does?
       13        A.   The more notional volume traded via XRP by
       14   the market -- by the market maker would receive an
11:37  15   incentive payment in XRP.
       16        Q.   Okay.  So are you essentially telling
       17            that according to your calculations, the
       18   payment to          needs to be higher, because the
       19   notional value was actually higher?
11:38  20        A.   Either the notional value or the
       21   participation number.
       22        Q.   But your numbers were higher than Ripple's,
       23   right?
       24        A.   Correct.
11:38  25        Q.   So          was entitled to some additional
                                                            100
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:38  1    compensation, correct?

2          A.    According to the e-mail.

3          Q.    And is that also based on your understanding,

4    that if the notional value is higher, there's more

11:38  5    compensation that would be due to ███████ ?

6          A.    It's either notional or participation rate, I

7    don't recall.

8          Q.    Could be either?

9          A.    Could be either.

11:38 10          Q.    Okay.  As I read the e-mails below in the

11   chain -- and feel free to refer to them -- it appears

12   you had to reach out to ███████ several times in

13   order to get Ripple's calculation of those numbers for

14   that quarter; is that correct?

11:39 15              (Pause.)

16              THE WITNESS:  That's how it appears.

17   BY MR. MOYE:

18          Q.    Did Ripple have problems getting you the

19   quarterly numbers that you needed for these

11:39 20   calculations?

21              MS. ZORNBERG:  Objection.  Sorry.  Were

22          you finished?

23              MR. MOYE:  Not quite.

24              MS. ZORNBERG:  Apologies.

25

                                                        101

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:39  1    BY MR. MOYE:

       2        Q.    Was it a normal thing for Ripple to have

       3    difficulties or encounter delays in getting you the

       4    numbers that you needed regarding the quarterly

11:39  5    compensation?

       6        A.    I don't know.

       7                MS. ZORNBERG:  Objection.

       8                THE WITNESS:  I don't recall.

       9    BY MR. MOYE:

11:39 10        Q.    Don't recall.

      11        So as you sit here today, you don't know whether

      12    this was a one-off problem or if this was common?

      13                MS. ZORNBERG:  Object to form.

      14                THE WITNESS:  I don't -- I don't

11:39 15            remember.

      16    BY MR. MOYE:

      17        Q.    With regard to the difference in the -- in

      18    your calculation from Ripple's calculation, did you have

      19    any understanding of why there would be a difference,

11:40 20    why those numbers wouldn't match, and why your numbers

      21    would be higher than Ripple's?

      22                (Pause.)

      23                THE WITNESS:  I -- I don't recall.

      24    BY MR. MOYE:

11:40 25        Q.    And at the time you were at ████████, would

                                                              102

GRADILLAS COURT REPORTERS
(424) 239-2800

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:40  1   you have regarded this as a significant problem, that

 2   there was a difference in Ripple's calculations from

 3   yours, or was this something that was not of any real

 4   consequence?

11:40  5                 MR. HECKER:  Objection to form.

 6                 MS. ZORNBERG:  Object to form.

 7   BY MR. MOYE:

 8       Q.   You can answer.

 9       A.   You know, I don't recall the incident, and it

11:40 10   does not -- I don't know what the difference was here,

11   so it may have been small.

12       Q.   Yeah.

13       A.   It may have been material, but I don't

14   really -- I don't have a recollection of this.

11:41 15               (Thereupon, a one-page e-mail dated

16           12/10/16, from     @ripple.com to

17                     @ripple.com et al., was introduced as

18           DS Exhibit 4 for identification.)

19   BY MR. MOYE:

11:41 20       Q.   Okay.  Let's look at what's been marked as

21   DS Exhibit 4.

22               (Pause.)

23               (Thereupon, an informal discussion was

24           held off the record.)

25

                                                    103

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:41 | 1 | BY MR. MOYE: |
| | 2 | Q.   Okay.  Have you had a chance to look at |
| | 3 | what's been marked as DS Exhibit 4? |
| | 4 | (Pause.) |
| 11:42 | 5 | THE WITNESS:  Yes. |
| | 6 | BY MR. MOYE: |
| | 7 | Q.   Okay.  Are you familiar with Slack? |
| | 8 | A.   Yes, I am. |
| | 9 | Q.   What is Slack? |
| 11:43 | 10 | A.   Slack is an application or web-based tool |
| | 11 | used for communications typically within a company, |
| | 12 | sometimes between a company and external parties. |
| | 13 | Q.   It's a message, correct? |
| | 14 | A.   Correct. |
| 11:43 | 15 | Q.   So it's not e-mail; it's not text?  It's -- |
| | 16 | A.   Correct. |
| | 17 | Q.   But it's in written form, correct? |
| | 18 | A.   Yes.  I mean, sometimes you can have |
| | 19 | documents.  You can have images, whatever. |
| 11:43 | 20 | Q.   It's electronic communication? |
| | 21 | A.   Correct. |
| | 22 | Q.   Okay.  This document's printout, subject says |
| | 23 | "[Slack Retention]" Ripple - Private," and it's from |
| | 24 | at a Ripple address. |
| 11:43 | 25 | Do you know who that was back in December of 2016? |

104

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:43 | 1 | A.    My understanding is ████████. |
| | 2 | Q.    Okay, and then there's "To" -- there's a |
| | 3 | number of individuals, including yourself.  Do you see |
| | 4 | that, "█████████? |
| 11:44 | 5 | Do you see your name there in the second line in |
| | 6 | the "To" group? |
| | 7 | A.    Yes. |
| | 8 | Q.    Okay, so it says "████████@Ripple.com." |
| | 9 | Do you see that? |
| 11:44 | 10 | A.    Yes. |
| | 11 | Q.    Okay, so did you have a Ripple e-mail address |
| | 12 | in December 2016? |
| | 13 | A.    I did not. |
| | 14 | Q.    Do you think this is a feature of Slack or |
| 11:44 | 15 | their messaging protocol that you're just named for |
| | 16 | purposes of this? |
| | 17 | A.    Possibly. |
| | 18 | Q.    Okay.  You're not working for Ripple at this |
| | 19 | time. |
| 11:44 | 20 | A.    No, I'm not working -- |
| | 21 | Q.    And you do not have a secret Ripple e-mail |
| | 22 | address? |
| | 23 | A.    I do not have a secret Ripple e-mail address. |
| | 24 | Q.    Nor a public e-mail address, to the extent |
| 11:44 | 25 | you were working? |

105

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:44    1        A.    No.
         2        Q.    All right.  Do you have any reason to doubt,
         3    though, you were part of this Slack messaging with these
         4    Ripple individuals in December of 2016?
11:44    5              MR. HECKER:  Sorry.  When you say, "a
         6         part of," do you mean did he receive --
         7              MR. MOYE:  That's what I mean.
         8              MR. HECKER:  -- while he was at
         9         ██████████?
11:44   10              MR. MOYE:  That's what I mean.
        11              MR. HECKER:  Do you know?
        12              THE WITNESS:  I don't remember how I
        13         communicated with Ripple five years ago.
        14    BY MR. MOYE:
11:45   15        Q.    All right.  So you're not shown as a sender
        16    in any of the messages in this chain.
        17        What I want to ask you about is your reaction or
        18    recollection, if you have one, to some of these
        19    messages.  Okay?
11:45   20        A.    Uh-huh.
        21        Q.    So in the middle, ████████ @ripple.com says:
        22        "Low volatility is great for payments, desired, but
        23    not great for speculative trading."
        24        And then ███ from Ripple says:
11:45   25        "At this stage, I might argue we desire more
```

                                                                  106

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:45   1   speculative trading."

        2        Do you see that?

        3        A.    Yes.

        4        Q.    Okay.  As to the first sentence, did you have

11:45   5   any understanding, while you were at ▮▮▮▮▮▮▮▮, whether

        6   low volatility was great for payments?

        7        A.    While at ▮▮▮▮▮▮▮, I did not give much

        8   thoughts to payments.

        9        Q.    Okay.  Did you have any understanding, while

11:46  10   you were at ▮▮▮▮▮▮▮, whether low volatility is not

       11   great for speculative trading?

       12            (Pause.)

       13            THE WITNESS:  In my trading days, I would

       14            probably have believed that higher volatility

11:46  15            is better for speculative trading.

       16   BY MR. MOYE:

       17        Q.    Okay.  So with regard to the next phrase

       18   where Tim says, "At this stage, I might argue we desire

       19   more speculative trading," do you remember at any point

11:46  20   when you were at ▮▮▮▮▮▮▮, being told or having an

       21   understanding, that Ripple desired or might have desired

       22   that there be more speculative trading at XRP?

       23            MS. ZORNBERG:  Object to the form of the

       24            question.

       25

                                                          107

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:47   1    BY MR. MOYE:

      2         Q.    You can answer.

      3         A.    One of the functions of a market maker to

      4    provide tighter spreads is to reduce the cost for

11:47   5    speculators to enter or exit a position, essentially

      6    to -- you know, tighter spreads provided in markets can

      7    have -- can lead to essentially higher liquidity.

      8         Q.    And how does that relate to speculative

      9    trading?

11:47  10         A.    For a person to enter or exit a position, it

     11    becomes less expensive.  You have to -- you don't have

     12    to cross as large a spread.  You don't have to pay as

     13    much in -- in spread -- bid-out spread to actually get a

     14    position.

11:47  15         Q.    While you were at                 did you have an

     16    understanding or an impression that Ripple desired to

     17    have a tight spread in XRP?

     18         A.    Yes.

     19         Q.    Did you have an understanding or impression

11:48  20    that Ripple desired there to be speculative trading in

     21    XRP?

     22         A.    I don't recall.

     23         Q.    Not one way or the other?

     24         A.    I'm sorry?

11:48  25         Q.    Not one way or the other?

                                                            108

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | | |
|---|---|---|---|
| 11:48 | 1 | A. | I don't recall. |
| | 2 | Q. | Okay.  Let's look at the last statement -- |
| | 3 | A. | Uh-huh. |
| | 4 | Q. | -- in this exhibit, where ███ @ripple.com |
| 11:48 | 5 | says, "The low volatility is likely a symptom of not |
| | 6 | having enough MMs trading on this order book," do you |
| | 7 | see that? |
| | 8 | A. | Yes. |
| | 9 | Q. | Do you understand "MMs" to be market makers? |
| 11:48 | 10 | A. | Yes. |
| | 11 | Q. | Okay.  Do you have any reason to agree or |
| | 12 | disagree with the statement that back in December of |
| | 13 | 2016, Ripple viewed low volatility as likely a symptom |
| | 14 | of not having enough market makers trading on this order |
| 11:49 | 15 | book? |
| | 16 | | MR. HECKER:  I'm going to object to the |
| | 17 | | form of the question. |
| | 18 | | THE WITNESS:  But -- I don't know that I |
| | 19 | | agree with the -- with the statement.  If a -- |
| 11:49 | 20 | | let's say there aren't market makers in -- in |
| | 21 | | an order book, hypothetically, if a market |
| | 22 | | participant were to desire to enter into an |
| | 23 | | order book and there was relatively low |
| | 24 | | liquidity, an order could eat further into the |
| 11:49 | 25 | | order book, right, into the market depth one |

109

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:49 | 1 | way or the other. |
| | 2 | So you can certainly imagine a situation |
| | 3 | where a higher volatility is due to less |
| | 4 | liquidity in an order book. |
| 11:50 | 5 | BY MR. MOYE: |
| | 6 | Q.   Okay.  Let me try to rephrase this statement |
| | 7 | and see if you agree with it, because I'm not sure I |
| | 8 | fully understand what this statement is. |
| | 9 | Do you think ▮▮▮▮▮ @ripple was saying that -- was |
| 11:50 | 10 | suggesting that Ripple wanted to have more market makers |
| | 11 | trading on the order book? |
| | 12 | MR. HECKER:  Objection, foundation. |
| | 13 | BY MR. MOYE: |
| | 14 | Q.   You can answer, as best as you understand. |
| 11:50 | 15 | A.   As best I understand, that appears to be his |
| | 16 | sentiment. |
| | 17 | Q.   Okay.  Do you think this statement suggests |
| | 18 | that ▮▮▮▮ @ripple would prefer there to be higher |
| | 19 | volatility if there -- if Ripple was successful in |
| 11:50 | 20 | getting more market makers? |
| | 21 | MS. ZORNBERG:  Objection. |
| | 22 | BY MR. MOYE: |
| | 23 | Q.   You can answer. |
| | 24 | A.   Following the messages, it appears that he is |
| 11:50 | 25 | responding to ▮▮▮▮▮▮▮ who is saying that -- who is |

110

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 11:51 | 1 | arguing that Ripple desires more speculative trading and |
| | 2 | higher volatility. |
| | 3 | Q.    So at least as it appears to you, that Ripple |
| | 4 | would not mind there being higher volatility in the XRP |
| 11:51 | 5 | market because there might be more speculative trading? |
| | 6 | MR. HECKER:  Objection. |
| | 7 | BY MR. MOYE: |
| | 8 | Q.    Is that right? |
| | 9 | MR. HECKER:  Objection, foundation. |
| 11:51 | 10 | THE WITNESS:  It appears to me that they |
| | 11 | desire more speculative trading, or at least |
| | 12 | ███ does. |
| | 13 | BY MR. MOYE: |
| | 14 | Q.    Okay. |
| 11:51 | 15 | A.    I don't know if that is a sentiment shared by |
| | 16 | Ripple in general as a whole? |
| | 17 | Q.    Okay. |
| | 18 | MR. HECKER:  Counsel, just so the |
| | 19 | record's clear, is there a basis for believing |
| 11:51 | 20 | that this -- that he was, in fact, on this |
| | 21 | Slack chain while he was at ███████ or that |
| | 22 | he would have received this while he was at |
| | 23 | ██████? |
| | 24 | I just -- I don't know the answer to the |
| 11:51 | 25 | technical question.  I know that his -- |
| | | 111 |

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:52  1        there's a name for him with a Ripple address.

       2        I mean, do we have a reason to believe he

       3        would have seen this at the time?

       4             MR. MOYE:  Yeah.  All I can do is ask the

11:52  5        question --

       6             MR. HECKER:  No, no.  I am really asking

       7        for a proffer, because I don't think the

       8        record's clear as to whether we think he

       9        actually would have seen this.  I just don't

11:52 10        know.

      11             MR. MOYE:  Yeah.  The -- the fact is his

      12        name is on the exhibit certainly suggests he

      13        saw it.  I have no other reason to think he

      14        had --

11:52 15             MR. HECKER:  It's just an e-mail address

      16        that I don't think he had at the time, so

      17        that's why I'm asking the question.

      18             MR. MOYE:  I get it.  That's why I asked

      19        the question.

11:52 20             MR. HECKER:  Yeah, okay.  All right.

      21             (Pause.)

      22             (Thereupon, a nine-page e-mail chain with

      23        the top e-mail dated 1/10/17, from Miguel Vias

      24        to Dinuka Samarasinghe was introduced as DS

11:52 25        Exhibit 5 for identification.)

                                                        112

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:53   1    BY MR. MOYE:

        2        Q.    All right.  Let's look at DS Exhibit 5.  This

        3    one's going to take some work, so let me just start

        4    marching through.

11:53   5        A.    Okay.

        6        Q.    DS Exhibit 5 appears to be a chain of e-mails

        7    where the top e-mail was sent to you by Mr. Miguel Vias

        8    at Ripple on January 10th, 2017.

        9        Do you see that?

11:53  10        A.    Yes.

       11        Q.    Okay.  Were you corresponding with Mr. Vias

       12    by e-mail when you were at ████████ and he was at

       13    Ripple?

       14        A.    Yes, I was.

11:54  15        Q.    Okay.  So at the bottom of the first page,

       16    ████████.com says "Hello, Miguel.  Thank you

       17    for your e-mail yesterday."

       18        Do you see that?

       19        A.    Yes.

11:54  20        Q.    Okay.  I want you to look at, first of all,

       21    the two paragraphs under there and, let me know when

       22    you've had a chance to do that.

       23        A.    Two paragraphs starting "While we understand

       24    your points ... "?

11:54  25        Q.    Yeah.

                                                                    113

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:54  1          A.    Okay.

       2                (Pause.)

       3     BY MR. MOYE:

       4          Q.    Okay.  As best as you can recall, what are

11:55  5     you trying to communicate with Mr. Vias in these first

       6     two paragraphs of this e-mail?

       7          A.    So from reading further down in the e-mail

       8     chain, it appears that our market-making contract -- the

       9     market-making contract between ███████████ had lapsed or

11:55 10     expired, and we removed -- we stopped quoting XRP euro

      11     on GateHub.

      12          I have a recollection that Ripple communicated to

      13     us that XRP would be listed on the Bitstamp exchange,

      14     the XRP euro order book, and I recall rosy expectations

11:56 15     of XRP euro to be traded on Bitstamp, and I am

      16     expressing some doubts --

      17          Q.    Reluctance?

      18          A.    Uh-huh?

      19          Q.    Reluctance, perhaps?

11:56 20          A.    No.  Doubts.

      21                MR. HECKER:  Okay.

      22                THE WITNESS:  Sorry.

      23                MR. HECKER:  You should let him finish

      24          his answer.

11:56 25                THE WITNESS:  I'm sorry.  I apologize.

                                                            114

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:56   1                    MR. HECKER:  Okay.
        2                    THE WITNESS:  I'm expressing doubts that
        3              on exchange volumes for -- on Bitstamp volumes
        4              for XRP euro would be higher than that of
11:56   5              Bitcoin versus euro.
        6   BY MR. MOYE:
        7       Q.    Were your comments here limited just to --
        8   I'm sorry.  Was Bitstamp an exchange -- a new exchange,
        9   or a --
11:57  10       A.    Bitstamp is a digital asset exchange.  It was
       11   new-ish in 2017 compared to, say, the ███    I think it
       12   was a relatively longstanding digital asset exchange.
       13       Q.    Okay, and I'm --
       14       As best you recall, were your comments here
11:57  15   directed solely to working with Ripple on the new
       16   Bitstamp exchange, or were they directed to the
       17   preexisting relationship that ███████   had with Ripple
       18   on other exchanges?
       19                    MS. ZORNBERG:  Objection to "comments
11:57  20              here."  This is a multi-page document.
       21                    MR. MOYE:  Yeah.
       22   BY MR. MOYE:
       23       Q.    Just the comments on the top part of this
       24   e-mail we've talked about so far.
11:58  25       A.    All right.  So historically, █████████
```

115

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
11:58    1   market making for Ripple was primarily done on the RCL
         2   or, now, XRP Ledger.  This would have been a departure
         3   in that it would have been a centralized order book that
         4   was not the XRP Ledger.
11:58    5        Q.   Okay.  So a new way of doing business; is
         6   that correct?
         7        A.   Correct.
         8        Q.   Okay, and it sounds like you're expressing
         9   doubts or reservations about whether          would be
11:58   10   interested in pursuing that new way of doing business;
        11   is that right?
        12               MR. HECKER:  Objection to form.
        13               THE WITNESS:  It reads to me that I'm
        14           objecting to a contract proposal from -- from
11:58   15           Ripple to          to participate on the XRP
        16           order book on Bitstamp.
        17   BY MR. MOYE:
        18        Q.   Okay.  Could you review what's on the second
        19   page all the way down to where it says "Thank you,
11:59   20   Dinuka" for my next set of questions?
        21               (Pause.)
        22               THE WITNESS:  Okay.
        23   BY MR. MOYE:
        24        Q.   Okay.  So with regard to the thoughts you're
11:59   25   expressing down to the "Thank you, Dinuka," what are you
```

116

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

11:59  1    trying to communicate about the current volume incentive

2    program?

3        A.    So I think I -- I provide graphs of

4    essentially volume on order books that we had previously

12:00  5    provided market making quotes on, and then since the

6    contract expired and we stopped quoting on those order

7    books, I think I -- we showed a sharp reduction in

8    volumes being traded on those order books.

9        It looks like I am objecting to their proposal,

12:00 10    without having read the contract -- or without recalling

11    the contract --

12        Q.    Okay.

13        A.    -- to the proposed volume incentive program.

14        Q.    All right.  Now, I would like you to go

12:00 15    below, where you said, "Thank you, Dinuka" --

16        A.    Uh-huh.

17        Q.    -- and read the comments that you wrote on

18    Tuesday, January 10th, 2017.

19        A.    Yep.

12:00 20        Q.    So the bottom of page 2, to the top of

21    page 3, to the next set of e-mail where it says

22    "Removing        and Miguel."

23        A.    Yep.

24        Q.    So what are you communicating in the

12:01 25    paragraph that begins "And last, it isn't like XRP is a

117

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:01  1    hot commodity"?

2        A.    I'm writing this as a digital asset trader,

3    not as a member of Ripple.

4        Q.    Sure.

12:01  5        A.    But it looks like I am complaining about the

6    price of XRP.

7        Q.    That it's too low or too high?

8        A.    That it's low, or it had been going down.

9        Q.    Okay.  So with that caveat in mind, can you

12:01  10   add some context or help me understand what you mean --

11   what up meant when you said, parentheses, "Perhaps

12   Ripple needs to goose up the price to increase interest

13   before the launch"?

14       A.    What I meant was, you know, from the

12:01  15   perspective of ▮▮▮▮▮▮, the declining price of XRP

16   meant that our contract was getting worse -- the USD

17   notional of our contract was going lower and lower, and

18   we were getting increasingly frustrated about the

19   declining value of our services.

12:02  20       Q.    So when you said, "Perhaps Ripple needs to

21   goose up the price to increase interest before the

22   launch," at that time, how did you understand or imagine

23   that Ripple might be able to help the price of XRP

24   increase?

12:02  25                MS. ZORNBERG:  Object to form.

                                                        118

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:02 | 1 | BY MR. MOYE: |
| | 2 | Q.   You could answer. |
| | 3 | A.   I have no reason to believe that Ripple ever |
| | 4 | did goose up the price.  I think I was more venting |
| 12:02 | 5 | about the declining cost of our services. |
| | 6 | Q.   But you did choose the language that said |
| | 7 | "Perhaps Ripple needs to goose up the price," correct? |
| | 8 | A.   Yes. |
| | 9 | MS. ZORNBERG:  Objection. |
| 12:03 | 10 | BY MR. MOYE: |
| | 11 | Q.   Okay.  So let me ask a hypothetical. |
| | 12 | At that time when you were at ▮▮▮▮▮▮ and you |
| | 13 | were having this conversation, did you believe that |
| | 14 | restricting the pool of XRP that's available to purchase |
| 12:03 | 15 | on the market, if that could be done, might have helped |
| | 16 | increase the price? |
| | 17 | MS. ZORNBERG:  Objection. |
| | 18 | BY MR. MOYE: |
| | 19 | Q.   You can answer. |
| 12:03 | 20 | A.   I think you're going into escrow.  I had zero |
| | 21 | visibility into any indication that Ripple was even |
| | 22 | considering escrow. |
| | 23 | Q.   Okay.  Did you think Ripple announcing good |
| | 24 | news or progress to the public, hypothetically, could |
| 12:03 | 25 | help increase the price of XRP? |

119

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:03    1              MS. ZORNBERG:  Sorry.  "Hypothetically,"
         2         you said?
         3              MR. MOYE:  Yes.
         4              MS. ZORNBERG:  Objection to the
12:03    5         hypothetical.
         6              THE WITNESS:  I mean, hypothetically,
         7         historically, one would see that good news
         8         reported may lead to higher price in an asset.
         9              Interestingly enough, though, through the
12:04   10         early days of XRP -- you know, I think -- I've
        11         recalled message boards and believing it
        12         myself that good news reported by Ripple
        13         tended to be negatively correlated to XRP
        14         price.
12:04   15    BY MR. MOYE:
        16         Q.   At what point in time?
        17         A.   During my
        18         Q.   During your         time?
        19         A.   (Nodding).
12:04   20         Q.   All right.  Now, I would like you to turn
        21    over to -- I guess this is the fourth page.  Near the
        22    top, it says "Hi, Dinuka.  Best, Miguel."
        23         Do you see that?
        24         A.   Yes.
12:04   25         Q.   And then there's a number of paragraphs that
```

                                                              120

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:04    1   go below and also on the second and even the third page,
         2   so if I ask you any question about a particular
         3   paragraph, I'll direct you to it.
         4       A.   Okay.
12:05    5       Q.   But would you take a moment, please, and look
         6   at some of these paragraphs and see if you can confirm
         7   that some of these are paragraphs that Miguel Vias wrote
         8   and some are your responses?
         9            (Pause.)
12:05   10   BY MR. MOYE:
        11       Q.   Or maybe I have that backward, maybe some of
        12   these are your statements and some of these are
        13   Miguel Vias's responses.
        14       A.   It is unclear to me which -- where they're
12:05   15   separated, but like --
        16       For example, "I'm sorry to hear that and hope you
        17   will reconsider given my responses below."  Then
        18   immediately, it says "         has clearly been a good
        19   partner to Ripple."
12:06   20            MR. HECKER:   Sorry.  When you -- the
        21            court reporter's going to have a hand time
        22            hearing you.
        23            (Thereupon, an informal discussion was
        24            held off the record.)
        25
```

                                                                121

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:06 | 1 | BY MR. MOYE: |
| | 2 | Q.    Okay, so just looking at those first two |
| | 3 | paragraphs -- |
| | 4 | A.    Okay. |
| 12:06 | 5 | Q.    -- does the paragraph that says "While we are |
| | 6 | interested" -- Does that appear to be yours?  And the |
| | 7 | paragraph that says "I'm sorry that" -- does that appear |
| | 8 | to be a response by Mr. Vias? |
| | 9 | A.    It appears to be. |
| 12:06 | 10 | Q.    Okay.  So the next two paragraphs, does the |
| | 11 | paragraph that says "Although the program aims to |
| | 12 | incentivize liquidity" -- |
| | 13 | Does that appear to be your paragraph and does the |
| | 14 | following appear to be a response by Mr. Vias? |
| 12:06 | 15 | A.    The "although the program aims" paragraph |
| | 16 | appears to be my paragraph. |
| | 17 | Q.    Uh-huh, so I guess -- |
| | 18 | A.    Yes, and the -- yes. |
| | 19 | "While I agree" -- this appears to be a Miguel Vias |
| 12:07 | 20 | paragraph. |
| | 21 | Q.    Okay.  Let's look at the next paragraph.  "We |
| | 22 | also have concerns."  Does that appear to be yours? |
| | 23 | A.    That appears to be mine. |
| | 24 | Q.    Okay, and how about the next paragraph?  "It |
| 12:07 | 25 | might seem easy."  Is that yours or Mr. Vias'? |

122

```
12:07   1        A.      That appears to be Mr. Vias'?

        2        Q.      Okay.  The last paragraph on this page that

        3   rolls over onto the top of the next page, "Finally, the

        4   numbers of the contract" -- does that appear to be you?

12:08   5        A.      That appears to be me.

        6        Q.      Okay.  The next paragraph that starts out

        7   "BTC/EUR," is that also you?

        8        A.      That appears to be me.

        9        Q.      Okay.  The paragraph that begins "       ," is

12:08  10   that Mr. Vias?

       11               (Pause.)

       12               THE WITNESS:  It appears to be Mr. Vias.

       13   BY MR. MOYE:

       14        Q.      Okay.  So the next paragraph, "While we have

12:08  15   great faith in Ripple" --

       16        A.      Uh-huh.

       17        Q.      -- is that you?

       18        A.      That is me.

       19        Q.      And is the next paragraph, "          is a

12:09  20   professional" -- is that also you?

       21               (Pause.)

       22               THE WITNESS:  That appears to be me.

       23   BY MR. MOYE:

       24        Q.      Okay.  Please take a moment and review those

12:09  25   two paragraphs, the "While we have great faith" and a
```

123

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | | |
|---|---|---|
| 12:09 | 1 | the "█████████ is a professional" -- |
| | 2 | A.    Okay. |
| | 3 | Q.    -- and let me know when you have done that. |
| | 4 | (Pause.) |
| 12:09 | 5 | THE WITNESS:  Okay. |
| | 6 | BY MR. MOYE: |
| | 7 | Q.    What did you mean -- what were you trying to |
| | 8 | communicate in the first paragraph that begins "While we |
| | 9 | have had great faith in Ripple"? |
| 12:10 | 10 | A.    I don't remember. |
| | 11 | Q.    Okay.  Do you think you believed at the time |
| | 12 | you were making accurate statements? |
| | 13 | A.    Yes. |
| | 14 | Q.    Okay.  So do you think at the time you |
| 12:10 | 15 | thought the following statement was accurate? |
| | 16 | A.    Yes.  Since -- |
| | 17 | Q.    Let me read it.  Let me read it. |
| | 18 | A.    Sorry.  There was a pause. |
| | 19 | MR. HECKER:  No, but you don't know which |
| 12:10 | 20 | statement he's talking about. |
| | 21 | BY MR. MOYE: |
| | 22 | Q.    All right.  Right in the middle of the |
| | 23 | paragraph, "Since we have pulled our market making |
| | 24 | quotes, the market are far more sparse than they had |
| 12:10 | 25 | been with a large bias towards selling XRP." |

124

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:10   1        Do you see that?

        2        A.    Yes.

        3        Q.    Do you believe that was accurate at the time

        4   you wrote it?

12:10   5        A.    I believe so.

        6        Q.    And the next sentence, "It seems that only a

        7   small amount of XRP, you could move the market

        8   considerably to the downside."

        9        Do you see that?

12:11  10        A.    That's correct.

       11        Q.    Do you believe that was your -- that's an

       12   accurate statement of your impression at the time that

       13   you wrote this?

       14        A.    I believe so.

12:11  15        Q.    When you say, "a small amount of XRP, you

       16   could move the market to the downside," do you mean

       17   selling XRP?

       18        A.    Reading the statement, I believe that's what

       19   I meant.

12:11  20        Q.    Okay.  Going to the middle of the next

       21   paragraph, sentence that says "As currently structured."

       22   Do you see that?

       23        A.    Yes.

       24        Q.    Could you read that statement out loud,

12:11  25   slowly, for the court reporter?

                                                              125

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:11  1      A.    "As currently structured, all this program

      2  does is incentivize those in it to perform wash trades

      3  with each other up to the ▇▇▇▇ cap of the total

      4  volume."

12:11  5      Q.    Okay. At the time that you wrote this, did

      6  you believe that was an accurate statement of your

      7  understanding or impressions?

      8      A.    I believe so.

      9      Q.    Okay. What's your general understanding of

12:11 10  the phrase "wash trades" as you use it?

     11      A.    My general understanding of wash trades was

     12  essentially you self-deal. Otherwise, buy and sell to

     13  yourself for -- at the same price.

     14      Q.    Okay. So you can put aside from document for

12:12 15  now. I would like to ask you a couple of questions

     16  about your general impressions of Ripple.

     17      A.    Uh-huh.

     18      Q.    Now, I want to ask it about this same time

     19  period, so we're talking about January 2017 when you're

12:12 20  still at ▇▇▇▇▇ okay?

     21      In early 2017, was it your impression that Ripple

     22  was generating operating revenue, revenue for the

     23  company by selling XRP?

     24      A.    At this point, yes. I believed that Ripple

12:13 25  had been selling XRP to generate operating revenue.

                                              126

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:13   1          Q.    Do you have an understanding of the phrase
        2    "gateway liquidity"?
        3          A.    Yes.
        4          Q.    What, to your knowledge --
12:13   5          As you understand it, what is meant by the phrase
        6    "gateway liquidity"?
        7          A.    So XRP Ledger is a decentralized ledger,
        8    right?  You can compare that to something like a
        9    Coinbase, for example.  Coinbase is a centralized
12:13  10    exchange.  Now, if I wanted to trade on Coinbase, I can
       11    send a wire to Coinbase.  They will receive that wire in
       12    their bank account.  They can credit my account to trade
       13    how they saw fit.
       14          XRP Ledger is a decentralized exchange, so there's
12:13  15    no one to send a wire to necessarily, right, for XRP
       16    Ledger in general.  So you need to have a way to bring a
       17    representation of other assets onto this decentralized
       18    exchange, right?
       19                MR. HECKER:  Need to keep your voice up.
12:14  20                (Thereupon, an informal discussion was
       21            held off the record.)
       22                THE WITNESS:  "Exchange."  A gateway was
       23            an institution that functioned --
       24                (Thereupon, the requested portion of the
12:14  25            stenographic record was read back by the
```

127

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:14  1          shorthand reporter.)

       2                  THE WITNESS:  "Exchange."

       3                  MS. ZORNBERG:  Okay.  Thank you.

       4                  THE WITNESS:  So a gateway was an entity

12:14  5          that, say, set up either a bank account or

       6          another means to bring a representation of an

       7          asset onto the XRP Ledger.

       8                  As an example, ███████ would allow you

       9          to send them Bitcoin to a Bitcoin address and

12:15 10          they would create a Bitcoin IOU on the XRP

      11          Ledger.

      12                  So gateway liquidity had to do with the

      13          liquidity for a representation or -- or -- for

      14          that entity's representation of a certain

12:15 15          asset on the XRP order book.

      16  BY MR. MOYE:

      17      Q.  As you described that process, in early 2017,

      18  did you believe that Ripple was providing XRP to

      19  gateways in order to fund company operations?

12:15 20                  MS. ZORNBERG:  Objection to form.

      21                  THE WITNESS:  I don't recall.

      22                  (Thereupon, a two-page e-mail chain with

      23          top e-mail dated 9/28/17, from ███████ to

      24          ████████████████ et al. was introduced as DS

12:15 25          Exhibit 6 for identification.)

                                                            128

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:15   1   BY MR. MOYE:
        2       Q.   Okay.  Let's take a look at DS Exhibit 6.
        3   Please let me know when you've had a chance to look it
        4   over.
12:17   5       A.   Okay.
        6       Q.   Okay.  DS Exhibit 6 appears to be a printout
        7   of an e-mail from ██████████ at Ripple on
        8   September 28, 2017, to ██████████ at
        9   ██████████.com with you as a cc.
12:17  10       Do you see that?
       11       A.   I do see that.
       12       Q.   Now, we show you there with a
       13   ██████ripple.com e-mail address; is that right?
       14       A.   Yes, sir.
12:17  15       Q.   So at this time you are an employee at
       16   Ripple, and you are working underneath Mr. Vias; is that
       17   right?
       18       A.   That's correct.
       19       Q.   Okay, and what's your Ripple to ██████████ at
12:18  20   this point in time?
       21       A.   ██████████ was a -- he was -- he was an
       22   employee at Ripple.  Again, I had interface with him
       23   quite a bit while I was at ██████████.  He
       24   reported directly to Miguel Vias at the time, as did I.
12:18  25       Q.   Okay.  At this point in time, September of
                                                             129
```

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:18  1  2017, based on these e-mails, does it appear that Ripple
       2  is trying to form a relationship or do business with
       3  ███████████?
       4      A.    That's how it appears.
12:18  5      Q.    Does it appear ██████████████ is heading
       6  that effort?
       7                MS. ZORNBERG:  Object to form and
       8            foundation.
       9                THE WITNESS:  I don't know that he's
12:18 10            heading that effort, but he's participating,
      11            it looks like.
      12  BY MR. MOYE:
      13      Q.    Okay.  Do you know why you were part of
      14  this -- why you were copied on these e-mails?
12:19 15      A.    I don't -- I don't recall this e-mail
      16  exchange.
      17      Q.    Okay.  So with that caveat in mind, could you
      18  look at the bottom of the page -- bottom half of the
      19  page, where ██████████ writes "Hello Miguel and
12:19 20  ████ "
      21      Do you see that?
      22      A.    Yes.
      23      Q.    Okay.  So there's a paragraph that begins:
      24      "We can discuss cash payout at a later point if it
12:19 25  makes sense."  Why don't you read that paragraph to
```

130

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:19    1   yourself and let me know when you've had a chance to?
         2               (Pause.)
         3               THE WITNESS:  Okay.
         4   BY MR. MOYE:
12:19    5      Q.   Okay.  Do you know whether at this point in
         6   time Ripple was interested in doing business with
         7   ████████████████ ?
         8      A.   I don't recall.
         9      Q.   Do you know what ██████████████ is referring
12:20   10   to when he says "The cash business is obviously much
        11   large [sic] in the tens of billions in annual flow"?
        12      A.   Without recollection of this e-mail, I'm
        13   guessing this is ████████████████ remittance business.
        14      Q.   Their money transfer business?
12:20   15      A.   Correct.
        16      Q.   Okay.  Based on this e-mail and what you know
        17   about Ripple, he wouldn't be talking about Ripple's
        18   money transfer business?
        19               MR. HECKER:  Objection to the premises.
12:20   20          Since he doesn't remember the e-mail or the
        21          exchange, I'm not sure how he would base his
        22          answer on the e-mail, but ...
        23               MR. MOYE:  I think he's given an
        24          appropriate caveat.
        25
```

131

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:20   1   BY MR. MOYE:
        2        Q.    In the last sentence, ▮▮▮▮▮▮▮▮▮▮ says,
        3   "In general, there is only a very small portion of this
        4   business that is prefunded."
12:20   5        So for the purposes of this question, please
        6   assume -- and I could be wrong -- please assume "this
        7   business" means Mr. -- means ▮▮▮▮▮▮▮▮▮▮ business.
        8        A.    Uh-huh.
        9        Q.    Not Ripple's business.
12:21  10        Do you have any understanding of what
       11   ▮▮▮▮▮▮▮▮▮▮ meant when he said "There's a small
       12   portion of ▮▮▮▮▮▮▮▮▮▮ business that is prefunded"?
       13             MS. ZORNBERG:  Objection.
       14             THE WITNESS:  So my assumptions here are
12:21  15        that this is ▮▮▮▮▮▮▮▮▮▮ money remittance
       16        business.  From the e-mail, I would gather
       17        that this is -- he's talking about prefunding
       18        destination payout.
       19   BY MR. MOYE:
12:21  20        Q.    Okay, and is that the sort of business -- am
       21   I correct that that's a sort of business that Ripple
       22   does with its XRP -- I'm sorry -- that XRP is used for
       23   in the ODL transactions?
       24        A.    ODL was not live at the date of this -- this
12:21  25   e-mail.
```

                                                                    132

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:21  1       Q.    Was there a product -- I'm sorry. Not a

      2  product. Was there a method of doing business through

      3  XRP-O?

      4       A.    Not at this time.

12:22  5       Q.    Not at this point? Okay. Let me ask you a

      6  different question.

      7       Did you have an understanding of whether

      8  ████████████, having only a small part of its business

      9  being prefunded, as being good news for doing a

12:22 10  relationship with Ripple, or potentially bad news?

     11       A.    Could you repeat your question?

     12       Q.    Yes.

     13       A.    Or rephrase, perhaps?

     14       Q.    I will rephrase.

12:22 15       Was Ripple attempting to do business with

     16  ████████████, as best you can tell, in a -- through

     17  prefunded transactions?

     18             MR. HECKER: Objection, foundation.

     19             THE WITNESS: As best I could tell from

12:22 20         this e-mail record.

     21  BY MR. MOYE:

     22       Q.    Sorry? What was the last word you said?

     23       A.    From this e-mail record.

     24       Q.    That it would be yes, as best as you could

12:23 25  tell?

                                                       133

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

12:23  1        A.    Yes, as best as I could tell from this
       2   e-mail.
       3        Q.    Okay.  But you have no independent
       4   recollection one way or the other?
12:23  5        A.    No.
       6        Q.    All right.  You can put that aside.
       7               (Thereupon, a three-page e-mail chain with
       8            the top e-mail dated 11/2/17, from Miguel Vias
       9            to Patrick Griffin was introduced as DS
12:23 10            Exhibit 7 for identification.)
      11   BY MR. MOYE:
      12        Q.    All right.  Please take a look at what's been
      13   marked as DS Exhibit 7.
      14               MS. ZORNBERG:  Thank you.
12:23 15               (Pause.)
      16   BY MR. MOYE:
      17        Q.    DS Exhibit 7 is a chain of e-mails, the top
      18   of which is from            ripple.com to
      19   Patrick Griffin on November 2, 2017.  "Subject:
12:24 20   Forward:  Framework."
      21        But right below that is an e-mail from you to
      22   Mr. Vias, and so I would like you to read through that
      23   e-mail to yourself and let me know when you're done.
      24               (Pause.)
12:25 25               THE WITNESS:  Okay.
                                                              134

```
12:25   1   BY MR. MOYE:
        2        Q.    Okay.  Have you ever heard of something
        3   called a GDAX or G-D-A-X framework?
        4        A.    Yes.
12:25   5        Q.    Can you tell us what a GDAX framework
        6   generally is?
        7        A.    GDAX was a digital asset exchange related to
        8   Coinbase.  It was more Coinbase's, at the time,
        9   institutional digital asset exchange with an open order
12:25  10   book.  It had a framework upon which it claimed to base
       11   decisions whether or not to list a digital asset on its
       12   order books.
       13        Q.    Okay.  Based on this e-mail, does it appear
       14   that you were asked to evaluate whether XRP could be
12:25  15   listed on the GDAX exchange?
       16        A.    From this exchange, it appears that I'm asked
       17   to evaluate how XRP fits within this framework.
       18        Q.    Okay.  Is that separate from the question of
       19   whether it could be listed or is that part of the
12:26  20   consideration?
       21        A.    I don't have visibility as to how -- what --
       22   how closely GDAX followed their guidelines or what
       23   weights they put on any of these different criteria.
       24        Q.    Okay.  Fair enough.
12:26  25        So who asked you to take a look at the GDAX
```

                                                                    135

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

```
12:26   1   framework and compare it to Ripple and XRP?
        2                   MS. ZORNBERG:  Objection to the form.
        3                   THE WITNESS:  It appears Miguel Vias did.
        4   BY MR. MOYE:
12:26   5       Q.    Okay.  So looking at your e-mail that you
        6   sent to Mr. Vias, what is the -- what's the first
        7   comment you made about Section 1 of GDAX's mission and
        8   values?
        9       A.    The first comment I made is "Ripple may not
12:26  10   be considered fully decentralized, and Ripple consensus
       11   is not entirely trustless."
       12       Q.    What does that mean, in layman's terms?
       13       A.    I should give a caveat that I am not an
       14   expert in Byzantine fault tolerance consensus
12:27  15   mechanisms.  That would be, say, Arthur Britto or
       16   David Schwartz, so I'm giving my understanding at the
       17   time.
       18       Q.    Fair enough.
       19       A.    So this is Ripple may not be considered fully
12:27  20   decentralized.  I think the --
       21       The general view was that assets like Bitcoin and
       22   Ether were considered more "decentralized," and Ripple's
       23   consensus may not have been, and what I'm basing this on
       24   here at the time was Ripple -- there's something called
12:27  25   a Unique Node List, which is a list of validators that
```

136