# PX 23

1

1                    UNITED STATES DISTRICT COURT

2                    SOUTHERN DISTRICT OF NEW YORK

3

4     SECURITIES AND EXCHANGE          )
      COMMISSION,                      )
5                                      )
               PLAINTIFF,              )
6                                      ) Case No.
          vs.                          ) 20-Civ-10832(AT)(SN)
7                                      )
      RIPPLE LABS, INC., BRADLEY       )
8     GARLINGHOUSE, AND CHRISTIAN      )
      LARSEN,                          )
9                                      )
               DEFENDANTS.             )
10    _____)

11

12

13                        CONFIDENTIAL

14                 VIDEOTAPED DEPOSITION OF

15                        RON WILL

16                  Friday, July 30, 2021

17

18

19

20

21

22

23    Reported By:
      KATHLEEN WILKINS
24    STENOGRAPHIC REPORTER, CSR 10068
      RPR-RMR-CRR-CCRR-CLR-CRC
25    JOB No. 210730KWI

```
 1              VIDEOTAPED DEPOSITION OF RON WILL

 2              BE IT REMEMBERED that on Friday, July 30,

 3   2021, commencing at the hour of 9:03 a.m. thereof,

 4   at King & Spalding, 50 California Street,

 5   Suite 3300, San Francisco, California, before me,

 6   Kathleen A. Wilkins, RPR-RMR-CRR-CCRR-CLR-CRC, a

 7   Certified Stenographic Shorthand Reporter, in and

 8   for the State of California, personally appeared RON

 9   WILL, a witness in the above-entitled court and

10   cause, who, being by me first duly sworn, was

11   thereupon examined as a witness in said action.

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

3

```
 1                    APPEARANCES OF COUNSEL

 2    FOR THE PLAINTIFF:

 3         SECURITIES AND EXCHANGE COMMISSION
           New York Regional Office
 4         200 Vesey Street, Suite 400
           New York, New York 10281-1022
 5         BY:  DAPHNA WAXMAN, ESQ.
                MARK SYLVESTER, ESQ.
 6         Telephone:  (212) 336-0153
           Email:  Waxmand@sec.gov
 7                  Sylvesterm@sec.gov

 8    FOR RON WILL:

 9         KAPLAN HECKER & FINK LLP
           350 Fifth Avenue, Suite 7110
10         New York, New York  10118
           BY:  SEAN HECKER, ESQ.
11         Telephone:  (212) 763-0889
           Email:  Shecker@kaplanhecker.com
12
      FOR THE DEFENDANT RIPPLE LABS:
13
           DEBEVOISE & PLIMPTON LLP
14         919 Third Avenue
           New York, New York 10022
15         BY:  CHRISTOPHER S. FORD, ESQ.
                ANDREW J. CERESNEY, ESQ.
16         Telephone: (212) 909.6947
           Email: csford@debevoise.com
17                acersney@debevoise.com

18    FOR DEFENDANT CHRISTIAN A. LARSEN:

19         PAUL, WEISS, RIFKIND, WHARTON & GARRISON LLP
           2001 K Street, NW
20         Washington, D.C. 20006-1047
           BY:  MEREDITH DEARBORN, ESQ.
21         Telephone: (628) 432-5117
           Email: mdearborn@paulweiss.com
22
      ALSO PRESENT:
23
           Deborah McCrimmon, Ripple in-house counsel
24         Frank Quirarte, Videographer

25
```

```
 1      ZOOM PARTICIPANTS (Via Zoom Videoconference):

 2           JORGE G. TENREIRO, ESQ., Securities and
                  Exchange Commission, for the Plaintiff
 3
             Nowell Bamburger, Esq., Cleary Gottlieb Steen &
 4                Hamilton, for Bradley Garlinghouse

 5           Carly Lagrotteria, ESQ., Paul, Weiss, Rifkind,
                  Wharton & Garrison LLP, for Christian A.
 6                Larsen

 7           Bradley Oppenheimer, Kellogg, Hansen, Counsel
                  for Ripple
 8
             Jon Daniels, Esq., Counsel for SEC
 9
             Nicole Forbes, SEC Paralegal
10
             Kerri Matulis, SEC intern
11
             Dennis Coker
12
             Alex King
13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                        INDEX

 2                 INDEX OF EXAMINATIONS

 3   WITNESS:  RON WILL                    PAGE

 4   Morning Session                          9
     Examination By Ms. Waxman               11
 5   Afternoon Session                      177

 6                  INDEX OF EXHIBITS

 7   EXHIBIT              DESCRIPTION        PAGE

 8   Exhibit 1      String of e-mails between  134
                    Ron Will to
 9                             Bates stamped
                    RPLI_SEC 0095987 through
10                  RPLI_SEC 0095988

11   Exhibit 2      String of e-mails Bates     148
                    stamped RPLI_SEC 0395056
12                  through RPLI_SEC 0395058

13   Exhibit 4      Email from Ron Will to      154
                               Bates stamped
14                  RPLI_SEC 0068344

15   Exhibit 5      String of e-mails Bates     158
                    stamped RPLI_SEC 0644001
16                  through RPLI_SEC 0644002

17   Exhibit 6      String of e-mails dated     186
                    December 13th, 2017 and
18                  December 14th, 2017
                    (not Bates stamped)
19
     Exhibit 9      String of e-mails           161
20                  RPLI_SEC 0394831
                    through RPLI_SEC 0394835
21
     Exhibit 12     String of e-mails Bates     169
22                  stamped RPLI_SEC 038375
                    through RPLI_SEC 038376
23

24

25
```

6

1                    INDEX OF EXHIBITS (Continued)

2      EXHIBIT                 DESCRIPTION                    PAGE

3      Exhibit 19      Letter to ███████████          189
                       dated February 22, 2018,
4                      Bates stamped RPLI_SEC
                       0072060 through RPLI_SEC
5                      0072065

6      Exhibit 20      String of e-mails Bates           202
                       stamped RPLI_SEC 0398415
7                      through RPLI_SEC 0398416

8      Exhibit 22      String of e-mails Bates           214
                       stamped RPLI_SEC 0037144
9
       Exhibit 23      String of e-mails Bates           205
10                     stamped RPLI_SEC 0325639
                       through RPLI_SEC 0325645
11
       Exhibit 25      String of e-mails Bates           222
12                     stamped RPLI_SEC 0393381

13     Exhibit 27      String of e-mails Bates           230
                       stamped RPLI_SEC 0398398
14                     through RPLI_SEC 0398399

15     Exhibit 30      String of e-mails Bates           235
                       stamped RPLI_SEC 0393421
16                     through RPLI_SEC 0393423

17     Exhibit 31      Letter to ████                    198
                       and ███████████ dated
18                     March 27, 2018, Bates
                       stamped RPLI_SEC 0861659
19                     through RPLI_SEC 0861670

20     Exhibit 32      Email from Ron Will to            247
                       Brad Garlinghouse, with
21                     attachment, Bates stamped
                       RPLI_SEC 0432163
22
       Exhibit 34      String of e-mails Bates           250
23                     stamped RPLI_SEC 0063558
                       through RPLI_SEC 0063560
24

25

1                     INDEX OF EXHIBITS (Continued)

2    EXHIBIT              DESCRIPTION                    PAGE

3    Exhibit 38      Email from Ron Will to              253
                     Brad Garlinghouse, Bates
4                    stamped RPLI_SEC 0844620

5    Exhibit 40      String of e-mails Bates             257
                     stamped RPLI_SEC 0107663
6
     Exhibit 46      String of e-mails Bates             258
7                    stamped RPLI_SEC 0222488

8    Exhibit 51      String of e-mails Bates             264
                     stamped RPLI_SEC 0067826
9                    through RPLI_SEC 0067827

10   Exhibit 52      String of e-mails Bates             276
                     stamped RPLI_SEC 0262207
11                   through RPLI_SEC 0262211

12   Exhibit 58      Email from Ron Will to              291
                     Brad Garlinghouse, Bates
13                   stamped RPLI_SEC 0547339.

14   Exhibit 61      String of e-mails Bates             302
                     stamped RPLI_SEC 0269926
15                   through RPLI_SEC 0269931

16   Exhibit 70      String of e-mails Bates             296
                     stamped RPLI_SEC 0269649
17                   through RPLI_SEC 0269651

18   Exhibit 117     String of e-mails Bates             307
                     stamped RPLI_SEC 0845227
19                   through RPLI_SEC 0845228

20   Exhibit 146     String of e-mails Bates             225
                     stamped RPLI_SEC 0582856
21
     Exhibit 177     String of e-mails Bates             312
22                   stamped RPLI_SEC 0929710
                     through RPLI_SEC 0929713
23
     Exhibit 178     String of e-mails Bates             315
24                   stamped RPLI_SEC 0929488
                     through RPLI_SEC 0929489
25

```
 1                    INDEX OF EXHIBITS (Continued)

 2     EXHIBIT                 DESCRIPTION               PAGE

 3     Exhibit 182     String of e-mails Bates          320
                       stamped RPLI_SEC 0933484
 4                     through RPLI_SEC 0933486

 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
1    JULY 30, 2021                          9:03 A.M.

2                    P R O C E E D I N G S

3                      MORNING SESSION

4           THE VIDEOGRAPHER:  Good morning, ladies

5    and gentlemen.  This begins Volume 1, Disk Number 1

6    in the deposition of Ron Will.  It's in the matter

7    of Securities and Exchange Commission versus

8    Ripple Labs, Inc., Bradley Garlinghouse and

9    Christian A. Larsen.  It's being held in the United

10   States District Court for the Southern District of

11   New York, case number CIV-10832.

12          Today's date is July 30th, 2021.  Time

13   on the record is 9:03 a.m.  My name is

14   Frank Quirarte.  I'm your certified legal deposition

15   specialist contracted by Gradillas Court Reporting.

16   This video deposition is taking place at

17   50 California Street in San Francisco and was

18   noticed by the plaintiff.

19          At this time, will counsel and all present

20   please identify yourselves for the record.

21          MS. WAXMAN:  My name is Daphna Waxman, and

22   I represent the plaintiff, the SEC.

23          MR. SYLVESTER:  Mark Sylvester for the

24   SEC.

25          MR. HECKER:  Sean Hecker for Ron Will.
```

```
 1              MR. FORD:  Christopher Ford,
 2   Debevoise & Plimpton, for Mr. Will and Ripple Labs,
 3   Inc.
 4              MR. CERESNEY:  Andrew Ceresney,
 5   Debevoise & Plimpton, for Ripple and Mr. Will.
 6              MS. MCCRIMMON:  Deborah McCrimmon for
 7   Ripple Labs.
 8              MR. HORTON:  Justin Horton, Kaplan
 9   Hecker & Fink, for Mr. Will.
10              MS. DEARBORN:  Meredith Dearborn, Paul
11   Weiss, for Christian Larsen.
12              THE VIDEOGRAPHER:  Counsel on the phone.
13              MR. BAMBERGER:  Because nobody's in the
14   room on behalf of Bradley Garlinghouse, I'll enter
15   an appearance.
16              Nowell Bamberger, Cleary Gottlieb, on
17   behalf of Mr. Garlinghouse.
18              THE VIDEOGRAPHER:  Madam Court Reporter,
19   will you please swear in the witness.
20                     RON WILL,
21               having been duly sworn,
22         was examined and testified as follows:
23              MS. WAXMAN:  Counsel, are there any
24   stipulations you would like to put on the record
25   before we begin?
```

1          MR. FORD:  Yes.  We'll designate the
2    transcript of this deposition as confidential, and
3    we'll stipulate that an objection raised by one
4    counsel for the defendants or Mr. Will can be
5    attributed to all.
6          MS. WAXMAN:  Thank you.
7          EXAMINATION BY MS. WAXMAN
8    BY MS. WAXMAN:
9        Q.  Please state your full name for the
10   record.
11       A.  Ron Will.
12       Q.  Mr. Will, is there any reason why you
13   cannot give accurate testimony today?
14       A.  No.
15       Q.  Did you attend any prep sessions in
16   advance of this deposition?
17       A.  I met with counsel.
18       Q.  How many times did you meet with counsel?
19       A.  I had one conference call, total of two
20   conference calls and one in-person meeting.
21       Q.  And about how many hours in total did you
22   prepare with counsel?
23       A.  Roughly ten hours.
24       Q.  Okay.  And which counsel participated in
25   those meetings, those prep sessions?

```
 1           A.    Sean Hecker and --
 2                 MR. HECKER:  Mr. Horton.
 3                 THE WITNESS:  -- Mr. Horton and
 4      Mr. Ceresney and Mr. Ford.
 5      BY MS. WAXMAN:
 6           Q.    Did counsel for the individual defendants
 7      participate?
 8                 When I say "individual defendants," I mean
 9      did counsel for either Mr. Garlinghouse or
10      Mr. Larsen participate?
11           A.    No.
12           Q.    Did you review any documents in advance of
13      this deposition today?
14                 MR. FORD:  Just yes or no to that.
15                 THE WITNESS:  Yes.
16      BY MS. WAXMAN:
17           Q.    Approximately how many documents did you
18      review?
19           A.    I don't recall exactly.  Roughly two
20      dozen.
21           Q.    Did you review email communications?
22                 MR. FORD:  Again, just yes or no to that.
23                 THE WITNESS:  Yes.
24      BY MS. WAXMAN:
25           Q.    Did you review any of Ripple's financial
```

1    statements?

2           MR. FORD:  Again, yes or no.

3           THE WITNESS:  Yes.

4    BY MS. WAXMAN:

5       Q.   Okay.  Which financial statements did you

6    review?

7           MR. FORD:  I'm going to instruct the

8    witness not to answer on that.

9           MS. WAXMAN:  Based on?

10          MR. FORD:  Based on the fact that the

11   documents we chose to show him in prep is work

12   product.

13   BY MS. WAXMAN:

14      Q.   Other than the lawsuit brought by ▮▮▮▮▮

15   against Ripple, have you ever provided any other

16   sworn testimony?

17      A.   No.

18      Q.   Can you please tell me about any education

19   you have had since high school?

20      A.   Went to the University of Michigan.  I

21   have a degree in economics and Japanese studies.

22   Went to Dartmouth College, have an MBA.

23      Q.   Do you have any other professional

24   licenses?

25      A.   No.

1    Q.   What did you major in in college?

2    A.   Economics and Japanese studies.

3    Q.   Thank you.

4         Are you currently employed?

5    A.   Yes, I am.

6    Q.   And where do you work?

7    A.   ████████████

8    Q.   And is that a public company?

9    A.   No.

10   Q.   And when did you start?

11   A.   September of 2020.

12   Q.   And what is your title?

13   A.   Chief financial officer.

14   Q.   And where did you work before ████████

15   ████████

16   A.   Ripple Labs.

17   Q.   And what was your title there?

18   A.   Chief financial officer.

19   Q.   And when did you start with Ripple?

20   A.   November 2017.

21   Q.   And when did your employment end?

22   A.   September of 2020.

23   Q.   September 2020?  Okay.

24        When you were working at Ripple, did you

25   have a strong performance record there?

1    MR. HECKER:  Objection to form.

2  BY MS. WAXMAN:

3    Q.   You can answer.

4    A.   I believe so.

5    Q.   Did you have a good relationship with

6  management?

7    A.   Yes.

8    MR. HECKER:  Objection to form.

9    Just give me a beat.  Objection to form.

10    THE WITNESS:  Sorry.

11  BY MS. WAXMAN:

12    Q.   Why did you leave Ripple?

13    A.   Became interested in digital health during

14  COVID and found an opportunity to participate in a

15  digital health company as CFO.

16    Q.   That's why you went to work for ▮▮▮▮▮

17  ▮▮▮▮▮▮  it sounds like, but were there any reasons

18  why you no longer wanted to work for Ripple?

19    MR. HECKER:  Objection to form.

20    THE WITNESS:  No reason why I didn't want

21  to work for Ripple.

22  BY MS. WAXMAN:

23    Q.   Were you terminated?

24    A.   No.

25    Q.   Do you still maintain any contact with

```
 1    people at Ripple?
 2         A.   Infrequent.
 3         Q.   Okay.  And with whom?
 4         A.   Members of the finance team.
 5         Q.   And who are those people that you still
 6    keep in touch with that are members of the finance
 7    team?
 8              MR. HECKER:  Objection to form.
 9              You can answer.
10              THE WITNESS:  ███████
11    BY MS. WAXMAN:
12         Q.   Anyone else?
13         A.   No.
14         Q.   Do you still keep in touch with
15    Mr. Garlinghouse?
16         A.   No.
17         Q.   Do you still keep in touch with
18    Mr. Larsen?
19         A.   No.
20         Q.   Do you still keep in touch with any of the
21    leadership team at Ripple?
22         A.   No.
23         Q.   When did you learn that the SEC had filed
24    a lawsuit against Ripple?
25         A.   Late 2020.
```

1       Q.   Okay.  And since that time, have you had

2   any discussions with anyone who was either -- who is

3   either currently employed with Ripple or had been

4   employed with Ripple about the lawsuit?

5            MR. FORD:  Objection --

6            MR. HECKER:  And just instruct you, to the

7   extent you had discussions with counsel, it's just a

8   yes or no, but you can otherwise answer.

9            THE WITNESS:  Only discussions with

10  counsel.

11  BY MS. WAXMAN:

12      Q.   So I just want to clarify, other than

13  discussions with counsel, have you spoke about the

14  lawsuit with any current or former Ripple employee?

15      A.   Not that I recall.

16      Q.   Where did you work before Ripple?

17      A.   Right before Ripple, I worked for

18  ███████████

19      Q.   And what was your title?

20      A.   Chief financial officer.

21      Q.   And what were your responsibilities at

22  ███████████?

23      A.   I was responsible for accounting,

24  budgeting and analytics, sales finance, investor

25  relations.

```
1       Q.   Is          a public company?

2       A.          is a public company.

3       Q.   Was it a public company when you started

4    working there?

5       A.   Yeah, it was.

6       Q.   Where did you work before          ?

7       A.   Worked at              .

8       Q.   What is            ?

9       A.   It's a growth equity firm.

10      Q.   And what was your title there?

11      A.   Chief financial officer, chief compliance

12   officer and operating partner.

13      Q.   And when did you start working there?

14      A.   Middle of 2015.

15      Q.   And when did you end?

16      A.   About nine months later.

17      Q.   And why did you leave the firm?

18      A.   Opportunity at          , which was a

19   public company.

20      Q.   So you left Mainsail to work at          ?

21      A.   Left          to work at          .

22      Q.   Did you work at a company called

23            ?

24      A.   Yes, I did.

25      Q.   Okay.  When did you work at a company
```

1    called [REDACTED]?

2         A.   2011 to 2014.

3         Q.   Okay.  And what was your title there?

4         A.   Chief financial officer.

5         Q.   Okay.  And is that a public company?

6         A.   No.

7         Q.   Okay.  Was it ever a public company?

8         A.   No.

9         Q.   And did you ever work at [REDACTED]?

10        A.   Yes.

11        Q.   Okay.  And during what period of time did

12   you work at [REDACTED]

13        A.   2004 to 2011.

14        Q.   And what was your title at [REDACTED]?

15        A.   I started as director of finance, then

16   became vice president of finance, and then became

17   treasurer.

18        Q.   And when you started to work at [REDACTED] was

19   it a public company?

20        A.   Yes.

21        Q.   Do you have any experience taking a

22   company public or doing an IPO with a company?

23             MR. HECKER:  Objection to form.

24             THE WITNESS:  As an investment banker, I

25   took companies public.

1 BY MS. WAXMAN:

2     Q. And where were you working at the time?

3     A. █████████████

4     Q. And how many years ago was that?

5     A. I left ████████████ in late 2001, early

6 2002.

7     Q. And the -- your work history that we were

8 just talking now, were you ever involved in taking

9 any of those companies public?

10     A. Prepared ████████ to go public. We were

11 acquired by ██████

12     Q. And as part of your -- you said you

13 prepared ████████ to become public. What were

14 your responsibilities in connection with that?

15     A. Preparing the finance department for the

16 rigors of being a public company, being able to

17 produce financial statements on a timely basis with

18 the necessary rigor, preparing the budgeting and

19 analytics department so that you could forecast the

20 business accurately, things of that matter.

21     Q. Are there certain financial documents that

22 need to be prepared before a company goes public?

23     MR. HECKER: Objection to form.

24     THE WITNESS: That the company needs to be

25 prepared to provide or they -- they need to provide

1    a registration statement.

2    BY MS. WAXMAN:

3        Q.   And were you involved in drafting a

4    registration statement in connection with

5    ███████████████████████  becoming public?

6            MR. HECKER:  Objection to form.

7            THE WITNESS:  Don't recall us ever

8    drafting a registration statement.

9    BY MS. WAXMAN:

10       Q.   Do you know what information needs to be

11   disclosed in a registration statement?

12           MR. HECKER:  Objection to form.

13           THE WITNESS:  I'm familiar with what

14   information needs to be -- in a registration

15   statement.

16   BY MS. WAXMAN:

17       Q.   What business-related information needs to

18   be included in a registration statement?

19           MR. HECKER:  Objection to form.

20           THE WITNESS:  I'm not a SEC reporting

21   expert, but --

22   BY MS. WAXMAN:

23       Q.   Neither am I.  It's okay.

24       A.   -- business-related information would

25   include financial statements, typically you'd

1    include operating information, operating metrics, a

2    description of the business, risk factors, things

3    like that.

4        Q.   Do you know what a related-party

5    transaction is?

6        A.   Yes, I do.

7        Q.   What is it?

8        A.   Simply a transaction between any party

9    that has a relationship with the company in some

10   way.

11       Q.   And does public -- does a public company

12   need to disclose related-party transactions in their

13   registration statements?

14            MR. HECKER:  Objection form.

15            THE WITNESS:  I believe they do.

16   BY MS. WAXMAN:

17       Q.   Does a public company need to disclose

18   trading in company stock by executives?

19            MR. HECKER:  Objection to form.

20   Foundation.  Calls for legal conclusions.

21            You can answer if you understand it.

22            THE WITNESS:  Frequently, public companies

23   do provide that information for a subset of the

24   executives.

25   / /

1    BY MS. WAXMAN:

2         Q.   And does a public company -- you said a

3    public company needs to disclose certain risks

4    related to its business, correct?

5         A.   Typically, there's a section of the

6    registration statement that has risk factors.

7         Q.   Once a public company -- once a company

8    becomes public, are there certain reports that it

9    needs to file on a periodic basis?

10        MR. HECKER:  Same set of objections.

11   Calls for a legal conclusion.

12             You can answer if you understand it.

13   BY MS. WAXMAN:

14        Q.   From the perspective of a chief financial

15   officer.  That's where I'm asking the question.  I'm

16   not asking for any legal conclusion or any legal

17   advice that you may have gotten from a lawyer.

18        A.   A company needs to be prepared to provide,

19   typically, a 10-K, which is an annual -- an

20   annual-like report or it's released on an annual

21   basis; a 10-Q, which is a quarterly report; and 8-K

22   for any kind of material transactions.

23        Q.   And in your prior work experience, have

24   you ever prepared any of these financial documents?

25             MR. FORD:  Objection to form.

```
 1   BY MS. WAXMAN:
 2        Q.   You can answer.
 3             MR. FORD:  You can answer.
 4             THE WITNESS:  During the time period I was
 5   at          , I was involved with the preparation of
 6   the 10-Q.
 7   BY MS. WAXMAN:
 8        Q.   And for what purpose were you involved in
 9   the preparation of the 10-Q for the            ?
10             MR. HECKER:  Objection to form.
11             THE WITNESS:  I was the chief financial
12   officer.  I was signing the 10-Q.
13   BY MS. WAXMAN:
14        Q.   We just spoke about all these things that
15   a public company needs to report in a registration
16   statement.  We also spoke about periodic filings
17   that a company needs to make once they become a
18   public company, public reporting company.
19             Did Ripple disclose any of the things that
20   we just spoke about publicly?
21             MR. HECKER:  Objection to form.
22   Foundation.
23             THE WITNESS:  Ripple was not a public
24   company.
25   / /
```

```
 1    BY MS. WAXMAN:
 2         Q.   Did Ripple disclose any related-party
 3    transactions --
 4              MR. HECKER:  Same objection.
 5    BY MS. WAXMAN:
 6         Q.   -- publicly?
 7              MR. HECKER:  Same objection.
 8              THE WITNESS:  Ripple is not a public
 9    company, so there was no requirement to disclose
10    related-party transactions.
11    BY MS. WAXMAN:
12         Q.   So it did not disclose related-party
13    transactions?
14         A.   Not to my knowledge.
15         Q.   Okay.  Did Ripple disclose trading in
16    Ripple stock by its executives?
17              MR. FORD:  Objection to form.
18              THE WITNESS:  Ripple, to my knowledge, did
19    not publicly disclose trading activity.
20    BY MS. WAXMAN:
21         Q.   If they did, would that be something you
22    would know about?
23              MR. HECKER:  Objection to form.  Calls for
24    speculation.  Vague as to time period.
25              THE WITNESS:  In the time period I was
```

1   there, that would be, if we made a public

2   announcement, that would be something I would

3   typically be involved in.

4   BY MS. WAXMAN:

5       Q.   Does Ripple disclose any risks related to

6   its business?

7            MR. FORD:  Objection to form.

8            THE WITNESS:  Ripple's not a public

9   company, so my recollection is we did not publicly

10  disclose any -- any of the risks related to its

11  business.

12  BY MS. WAXMAN:

13      Q.   And did Ripple -- as part of the

14  registration statement, do public companies need to

15  disclose executive compensation?

16           MR. FORD:  Objection to form.

17           THE WITNESS:  To my knowledge, there are

18  requirements to disclose a subset of executive

19  compensation as part of the registration statement.

20  BY MS. WAXMAN:

21      Q.   And did Ripple disclose any executive

22  compensation?

23      A.   Ripple --

24           MR. FORD:  Objection.

25           THE WITNESS:  Sorry.

```
1              MR. FORD:  Objection to form.
2              THE WITNESS:  Ripple was not a public
3     company, so Ripple did not disclose executive
4     compensation.
5     BY MS. WAXMAN:
6         Q.   Was it your understanding that Ripple was
7     not required to provide any of this information
8     publicly because it was a private company?
9              MR. HECKER:  Objection to form.
10             MR. FORD:  Objection to form.  And to the
11    extent you can answer that without revealing any
12    conversations you had with counsel, you can answer.
13    But if your answer would be informed by
14    conversations you had with counsel, then I'll
15    instruct the witnesses not to answer.
16    BY MS. WAXMAN:
17        Q.   And, again, I'm just asking you in your
18    role as chief financial officer and in connection
19    with your -- your past prior experience as chief
20    financial officer for -- for private companies.
21             MR. FORD:  I'll repeat the instruction to
22    the witness not to answer to the extent it discloses
23    conversations he may have had with counsel.
24             MS. WAXMAN:  Will the reporter repeat the
25    question?
```

1          MR. HECKER:  Which one?

2          MS. WAXMAN:  The last one.

3               (Record read by the reporter

4          as follows:

5               "QUESTION:  And did Ripple

6          disclose any executive

7          compensation?")

8          THE REPORTER:  There were objections and

9     the clarification was.

10              (Record read by the reporter

11         as follows:

12              "QUESTION:  Was it your

13         understanding that Ripple was not

14         required to provide any of this

15         information publicly because it

16         was a private company?")

17         THE WITNESS:  I relied on conversations

18    with counsel around that.

19    BY MS. WAXMAN:

20    Q.   Did you ever discuss with anyone at Ripple

21    whether to disclose this information?  And, again,

22    other than with conversations -- I'm not interested

23    in any conversations you've had with counsel.

24         MR. HECKER:  So just to -- just so the

25    witness is clear, the question is whether you had

1     conversations outside the presence of counsel about

2     that topic.

3            THE WITNESS:  No.

4     BY MS. WAXMAN:

5       Q.   So Ripple didn't disclose this information

6     because it was a public company --

7            MR. HECKER:  Objection --

8     BY MS. WAXMAN:

9       Q.   -- because it was a private company?

10           MR. HECKER:  Objection to form.  Asked and

11    answered.

12           THE WITNESS:  Relied on conversations with

13    counsel, but as a private company, there was no

14    requirement.

15    BY MS. WAXMAN:

16       Q.   I don't want you to tell me --

17           MR. HECKER:  Move to strike the answer.

18    I'm not quite sure what the question was getting at,

19    but ...

20    BY MS. WAXMAN:

21       Q.   How did you come to work for Ripple?

22       A.   I knew Bradley Garlinghouse from ▮▮▮▮▮

23    and we were reconnected by a mutual acquaintance.

24       Q.   And did he introduce you to Ripple?

25       A.   Yes.

1    Q.   And who offered you the job?

2    A.   Brad Garlinghouse.

3    Q.   And when he first contacted you about the

4  position, what did he -- did he explain why he

5  wanted you to come work for Ripple?

6    A.   I don't recall the specifics of the

7  conversation.

8    Q.   Do you have -- did you have an

9  understanding of why he hired you?

10        MR. FORD:  Objection to form.

11        THE WITNESS:  I don't have a specific

12  understanding why he chose to hire me.  It was never

13  discussed.

14  BY MS. WAXMAN:

15    Q.   Did you have an understanding of what your

16  role would be --

17    A.   Yes, I did.

18    Q.   -- at the company?

19        And what was your understanding?

20    A.   I had experience as a private company,

21  high growth Silicon Valley CFO, and they needed

22  someone with that skill set.

23    Q.   And what skill set did Ripple -- what did

24  Ripple need that you could provide?

25        MR. HECKER:  Objection to form.

```
 1            THE WITNESS:  I was familiar with business

 2   models, fundraising, growth dynamics within high

 3   growth companies in Silicon Valley.

 4   BY MS. WAXMAN:

 5        Q.   What do you mean when you say "high growth

 6   company"?

 7        A.   In Silicon Valley, high growth companies

 8   have unique characteristics, typically venture

 9   capital backed, typically unprofitable, and

10   typically investing for future growth.

11        Q.   Was Ripple unprofitable --

12            MR. FORD:  Objection to form.  Are you --

13   BY MS. WAXMAN:

14        Q.   -- at the time you were hired?

15            MR. FORD:  Are you asking him what his

16   understanding was about the company before he joined

17   the company.

18            MS. WAXMAN:  Yes.

19            MR. FORD:  Okay.  If you have that

20   understanding.

21            You can answer.

22            THE WITNESS:  I assumed it was

23   unprofitable when I joined.

24   BY MS. WAXMAN:

25        Q.   Okay.  And did you ever discuss Ripple's
```

```
 1    profitability before or at the time you joined with
 2    Mr. Garlinghouse?
 3              MR. FORD:  Objection to form.
 4              THE WITNESS:  I recall discussing
 5    profitability --
 6    BY MS. WAXMAN:
 7         Q.   And --
 8         A.   -- at the time I joined.
 9         Q.   Okay.  And did you come to learn that
10    Ripple was not profitable?
11         A.   Yes.
12         Q.   Okay.  And did you discuss with
13    Mr. Garlinghouse why the company had not been
14    profitable?
15              MR. FORD:  Objection to form.
16              THE WITNESS:  It is very typical for
17    companies at that stage to be unprofitable, so we
18    did not specifically discuss why.
19    BY MS. WAXMAN:
20         Q.   Okay.  Is there anything specific about
21    Ripple's business that made -- that caused it to be
22    unprofitable?
23              MR. HECKER:  Objection to form.
24              MR. FORD:  Objection.
25              THE WITNESS:  At the time I joined?
```

33

BY MS. WAXMAN:

    Q.   Yeah.  I'm just talking about the time you joined, the time, you know, Mr. Garlinghouse approached you about the position.

    MR. FORD:  Same objection.

    THE WITNESS:  Ripple at the time, my understanding was it was building a payment network. Payment networks, similar to other networks, require counterparties on multiple sides to attract volume. And it -- it is typical that they are highly unprofitable at the early stages as they're trying to build volume.

BY MS. WAXMAN:

    Q.   At the time you left Ripple, was the company profitable?

    A.   On a net-income basis?

    Q.   Are you asking me?

    A.   Yes.  Just a clarification of what you mean by "profitable."

    Q.   From a very high level.  I mean, did it take in enough revenues to cover its expenses --

    MR. HECKER:  Objection --

BY MS. WAXMAN:

    Q.   -- at the time you left?

    MR. HECKER:  Objection to form.

1    Foundation.

2              THE WITNESS:  On a net-income basis, it

3    was profitable.

4    BY MS. WAXMAN:

5         Q.   Okay.  What about on a cash basis?

6              MR. HECKER:  Objection to form.

7              THE WITNESS:  On a cash burn basis, it was

8    also profitable, I recall.

9    BY MS. WAXMAN:

10        Q.   And in what year did it become profitable?

11             MR. HECKER:  Objection to form.

12   Foundation.

13             THE WITNESS:  Don't recall.

14   BY MS. WAXMAN:

15        Q.   During the periods where Ripple was not

16   profitable and going back to your early

17   conversations with Mr. Garlinghouse, did you come to

18   understand how Ripple financed its operations?

19             MR. HECKER:  Objection to form.

20             You can answer.

21             THE WITNESS:  My understanding at the time

22   was Ripple was financing its business through a

23   combination of venture capital at the time.

24   Investments from their Series B fundraising.

25   / /

35

```
 1    BY MS. WAXMAN:
 2        Q.    And when was the Series B?
 3              MR. FORD:  Objection to form.
 4              THE WITNESS:  I recall it being sometime
 5    in 2016.
 6    BY MS. WAXMAN:
 7        Q.    Before you accepted the job at Ripple, did
 8    you read anything about the company?
 9        A.    Recall spending time on their website.
10        Q.    And did you have an understanding of what
11    XRP was at the time?
12              MR. FORD:  Objection to form.
13              THE WITNESS:  I had no experience with
14    cryptocurrency so I did not have a good
15    understanding of XRP at the time.
16    BY MS. WAXMAN:
17        Q.    And when you spoke to Brad, at the time
18    that he hired you, did he tell you what XRP was or
19    how it fit into Ripple's business model?
20              MR. HECKER:  Objection to form.  Compound.
21              THE WITNESS:  I recall us having
22    discussions around that.  I don't specifically
23    recall the conversation, but I recall having a
24    conversation.
25    / /
```

1    BY MS. WAXMAN:

2         Q.   Okay.  And did you have an understanding

3    of how XRP fit into Ripple's business?

4              MR. FORD:  Objection to form.

5    BY MS. WAXMAN:

6         Q.   And this is at the time that he hired you.

7         A.   I don't believe I did.  Don't recall

8    having an understanding.

9         Q.   Did you come -- did you ever discuss with

10   Mr. Garlinghouse that Ripple maintained a very large

11   amount of XRP?

12             MR. FORD:  Objection to form.

13             THE WITNESS:  I recall that coming up in

14   my diligence of the company.

15   BY MS. WAXMAN:

16        Q.   Okay.  And how much XRP did the company

17   own?

18             MR. FORD:  Objection to form.

19             THE WITNESS:  Late 2017, Ripple owned

20   approximately 62 billion units of XRP.

21   BY MS. WAXMAN:

22        Q.   And did Ripple consider that a valuable

23   asset?

24             MR. FORD:  Objection to form.

25             MR. HECKER:  Objection.

37

```
 1              THE WITNESS:  In my discussions with Brad,
 2    Brad considered it a valuable asset.
 3    BY MS. WAXMAN:
 4        Q.   Okay.  And did Ripple sell its XRP to fund
 5    its operations?
 6              MR. FORD:  Objection.
 7              MR. HECKER:  What time period?  Are we
 8    talking about before he joined?
 9              MS. WAXMAN:  Yeah.  I'm still talking
10    about right at the time that he joined the company.
11              MR. FORD:  Objection to form.
12              THE WITNESS:  At the time I joined, I
13    don't recall prior to joining, Brad specifically
14    mentioning sales of XRP.
15    BY MS. WAXMAN:
16        Q.   When did you first -- did you -- at some
17    point, did you learn that Ripple sold XRP?
18        A.   After I joined, yeah.
19        Q.   And about how long after you joined did
20    you learn that Ripple sold XRP?
21        A.   Shortly after.
22        Q.   Okay.  And at some point, did you come to
23    learn why Ripple sold XRP?
24        A.   Yes.
25        Q.   And when did you come to learn why Ripple
```

38

```
 1    sold XRP?
 2         A.   Shortly after joining.
 3         Q.   Okay.  And who told you why Ripple sold
 4    XRP?
 5              MR. HECKER:  Objection to form.
 6    BY MS. WAXMAN:
 7         Q.   How did you --
 8         A.   I don't recall -- I don't recall anyone
 9    telling me.
10         Q.   How did you come to learn that Ripple sold
11    XRP?
12         A.   Reviewed the financial statements.
13         Q.   And what did the financial statements
14    indicate regarding Ripple's sales of XRP?
15         A.   Ripple sold XRP for cash.
16         Q.   And did the financial statements indicate
17    that Ripple's sales of XRP funded Ripple's
18    operations?
19              MR. FORD:  Objection.
20              MR. HECKER:  Objection to form.
21              THE WITNESS:  Sales of XRP are revenue,
22    according to generally accepted accounting
23    principles.  And they're a part the cash flow of the
24    company in addition to software revenues at the
25    time.
```

```
 1    BY MS. WAXMAN:
 2         Q.   At the time that you learned -- strike
 3    that.
 4              The -- what financial statements did you
 5    review that made you come to the realization that
 6    Ripple sold XRP?
 7         A.   I don't recall the specific financial
 8    statements, but as standard practice a finance
 9    department will provide monthly financial
10    statements, and I reviewed those monthly, and
11    quarterly financial statements.
12         Q.   Is that -- is it fair to say the financial
13    statements were one of the first things you reviewed
14    when you were hired at Ripple?
15              MR. FORD:  Objection to form.
16              THE WITNESS:  Financial statements are
17    typically one of the first things I review.
18    BY MS. WAXMAN:
19         Q.   And what did the financial statements --
20              MR. HECKER:  Ms. Waxman --
21    BY MS. WAXMAN:
22         Q.   -- tell you about XRP?
23              MR. HECKER:  Ms. Waxman?
24              MS. WAXMAN:  Yes.
25              MR. HECKER:  Can you just let him finish
```

1    his answer and slow down a little, you're jumping on

2    top of his answer.

3              MS. WAXMAN:  I apologize.

4         Q.   What did the financial statements tell you

5    about XRP?

6              MR. FORD:  Objection to form.

7              THE WITNESS:  It told me that they were a

8    revenue source for the company.

9    BY MS. WAXMAN:

10        Q.   And how did the XRP revenues compare to

11   revenues -- other revenues that the company had, if

12   they had any?

13             MR. HECKER:  Objection to form.

14             You can answer.

15             THE WITNESS:  The majority of revenue of

16   the company, around the time I joined, was from

17   sales of XRP.

18   BY MS. WAXMAN:

19        Q.   And did the company have any other

20   revenues at the time that you joined?

21             MR. FORD:  Objection to form.

22             THE WITNESS:  I don't specifically recall

23   the financial statements I reviewed in late 2017,

24   but in general, at that time, I recall that software

25   revenue was a small portion of revenue.

```
 1    BY MS. WAXMAN:
 2         Q.   And when you say a small portion of
 3    revenue, what percentage of the software sales --
 4    what percentage of the software sales were -- did
 5    that -- excuse me.
 6              What portion of the revenue was attributed
 7    to software sales?
 8              MR. FORD:  Objection to form.
 9              THE WITNESS:  Sorry.  Don't remember the
10    exact percentage at the time.
11    BY MS. WAXMAN:
12         Q.   How did the -- what about, can you give me
13    an approximate percentage?
14              MR. FORD:  Objection to form.
15              THE WITNESS:  In 2017, just to be clear?
16    Over 75 percent of the revenue came from sales of
17    XRP.
18    BY MS. WAXMAN:
19         Q.   What were Ripple's -- at the time that you
20    joined and that you first reviewed the financial
21    statements, what were Ripple's expenses?
22              MR. HECKER:  Objection to form.
23              THE WITNESS:  I don't recall the exact
24    amount.
25    / /
```

1    BY MS. WAXMAN:

2        Q.   Did Ripple generate enough revenue from

3    software sales to cover its expenses?

4            MR. FORD:  Objection to form.

5            THE WITNESS:  No.

6    BY MS. WAXMAN:

7        Q.   And where did the funds to cover Ripple's

8    expenses come from?

9            MR. FORD:  Objection to form.

10           THE WITNESS:  Combination of venture

11   capital fundraising that it had done prior to my

12   arrival, as well as the revenue from the sale of XRP

13   and the software revenue.

14   BY MS. WAXMAN:

15       Q.   Would the software revenue, by itself,

16   covered all of Ripple's expenses?

17           MR. HECKER:  Objection.  Asked and

18   answered two questions ago.

19           THE WITNESS:  In what time period?

20   BY MS. WAXMAN:

21       Q.   I'm talking about 2017.  When -- the time

22   that you joined.  You joined at the end of 2017.

23       A.   At the --

24           MR. HECKER:  Same objection.

25           You can answer it again.

[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

1           THE WITNESS:  At the early stages of the

2    development of RippleNet, the software revenue did

3    not cover the expenses.

4    BY MS. WAXMAN:

5        Q.   Okay.  What about in 2018; did the

6    software revenue cover expenses?

7           MR. FORD:  Objection to form.

8           THE WITNESS:  I don't recall that they

9    covered the full expenses of the company.

10   BY MS. WAXMAN:

11       Q.   And what about in 2019?

12          MR. FORD:  Objection to form.

13          THE WITNESS:  I don't recall.

14   BY MS. WAXMAN:

15       Q.   And what about in 2020?

16          MR. FORD:  Same objection.

17          THE WITNESS:  Don't recall.

18   BY MS. WAXMAN:

19       Q.   Is there any document that would refresh

20   your memory?

21       A.   Financial statements.

22       Q.   Which financial statements would you need

23   to review?

24          MR. HECKER:  For each of the years?  Is

25   that what you're saying or for the last one?

```
 1    BY MS. WAXMAN:

 2        Q.   It's probably the same document for each

 3    year.  So is there -- I mean, there are probably

 4    multiple documents that could refresh your memory,

 5    but is -- could you give me one document that would

 6    provide that information to refresh your memory?

 7              MR. FORD:  Objection to form.

 8              MR. HECKER:  Sorry.  You just asked him

 9    about '17, '18, '19?

10              MS. WAXMAN:  Yes.

11              MR. HECKER:  You're asking is there one

12    document that would refresh him for all the years?

13              MS. WAXMAN:  I'm asking him is there one

14    type of document.  For example, would the audited

15    financial statements refresh your memory, is there a

16    different document that you would have used while at

17    the company to refresh your memory.

18              THE WITNESS:  The audited financial

19    statements as well as the unaudited financial

20    statements over that time period would likely

21    provide that information.

22    BY MS. WAXMAN:

23        Q.   Thank you.

24              Did you have any experience with digital

25    assets before you came to work at Ripple?
```

1          A.   I did not.

2          Q.   Did you -- other than XRP, have you ever

3     owned any digital assets?

4          A.   Not that I recall.

5          Q.   How were you compensated when you worked

6     at Ripple?

7               MR. FORD:  Objection to form.

8               THE WITNESS:  I received a salary, a

9     bonus, equity in Ripple Labs, and I received a XRP

10    bonus.

11    BY MS. WAXMAN:

12         Q.   And what was your yearly salary at the

13    time you left the company?

14         A.   I don't recall.

15         Q.   Could you approximate?

16              MR. FORD:  Objection.

17              THE WITNESS:  Roughly          something

18    like that.

19    BY MS. WAXMAN:

20         Q.   And you said you received a bonus.  Did

21    you receive a cash bonus?

22         A.   Cash bonus.

23         Q.   And did you receive a cash bonus in 2020?

24         A.   For 2019 performance, you would receive a

25    bonus typically in the first quarter.  I believe I

1    received a cash bonus, yes.

2          Q.   And how much was the cash bonus?

3          A.   I don't recall a specific amount.  Roughly

4    ███ percent of salary.

5          Q.   You said you received Ripple equity.  When

6    did you receive Ripple equity?

7               MR. FORD:  Objection to form.

8               THE WITNESS:  As is typical when you join

9    a start-up, I received equity at the start of my

10   employment at Ripple Labs.

11   BY MS. WAXMAN:

12         Q.   And how many shares of Ripple equity do

13   you currently own?

14         A.   Do I currently own?

15         Q.   Yeah.

16              MS. WAXMAN:  Strike that.

17         Q.   How many did you receive during your

18   employment?

19         A.   Roughly -- I don't recall the exact

20   amount, but roughly ███████ shares.

21         Q.   And have you ever sold any of your Ripple

22   stock?

23         A.   Since leaving Ripple, I've sold a portion

24   of my Ripple shares.

25         Q.   And how many shares have you sold?

47

```
 1        A.    Roughly [REDACTED] shares.

 2        Q.    And where did you sell them?

 3        A.    On the secondary market.

 4        Q.    And did you profit from the sale?

 5        A.    I profited from the sale.

 6              MR. HECKER:  Objection to form.

 7              But you can answer.

 8   BY MS. WAXMAN:

 9        Q.    And how much did you make from the sale?

10        A.    Roughly [REDACTED].

11        Q.    And when did you sell them?

12        A.    In 2021.

13        Q.    What month?

14              MR. FORD:  Objection to form.

15              THE WITNESS:  Sometime in the last six

16   months.  Several transactions.

17   BY MS. WAXMAN:

18        Q.    You said you received XRP during your

19   employment?

20              MR. FORD:  Objection to form.

21              THE WITNESS:  I received a potential bonus

22   in XRP subject to my continued employment on an

23   annual basis.

24   BY MS. WAXMAN:

25        Q.    And when was the -- so did you ever
```

1    receive any XRP in connection with that agreement?

2        A.    I recall receiving XRP in connection with

3    that agreement in 2018 and in 2019.

4        Q.    And how much XRP did you receive in total?

5        A.    Pretax, I received an XRP bonus of

6    ██████████    units.

7        Q.    And have you ever purchased XRP in any

8    other -- on an exchange or through a broker?

9        A.    Not that I recall.

10        Q.    And did you ever receive any other XRP

11    from Ripple?

12        A.    Ripple gave a company wide bonus of XRP

13    that I recall receiving in 2018 to every employee,

14    so it's part of that.  I don't remember the specific

15    amount.  It was relatively small.

16        Q.    And of the ████████    that you received,

17    did you sell any of it?

18        A.    I recall selling it quickly after

19    receiving it.  I considered it part of my

20    compensation and ...

21        Q.    Did you receive it all at once?

22        A.    Yes.

23        Q.    And did you receive ████    or did you

24    receive -- was -- did you receive a less amount?

25        A.    It's considered compensation, so there's

1   withholding that the company makes based on the

2   dollar value that they received.  So I received a

3   portion of it.

4        Q.   And how did the company satisfy the tax

5   obligation in connection with this bonus?

6             MR. FORD:  Objection to form.

7             THE WITNESS:  Typically, the company would

8   provide the cash amount to federal IRS as well as to

9   California Franchise Tax Board.

10  BY MS. WAXMAN:

11       Q.   So would they withhold a portion of the

12  XRP, sell it for cash and then take the cash to

13  satisfy the tax obligation?

14            MR. HECKER:  Objection to form.

15            THE WITNESS:  I don't recall specifically

16  how we handled that on a -- on a bonus or payroll

17  basis, but we would -- we would provide cash.  The

18  cash would be fungible, so the cash could be from

19  any source.

20  BY MS. WAXMAN:

21       Q.   Okay.  And where did you sell the XRP?

22            MR. FORD:  Objection to form.

23            THE WITNESS:  I recall selling it through

24  GSR.

25  / /

1    BY MS. WAXMAN:

2        Q.    And what is GSR?

3        A.    GSR is a market maker, a cryptocurrency

4    market maker.

5        Q.    Did it have a relationship to Ripple?

6        A.    Yes, it did.

7        Q.    And what was GSR's relationship to Ripple?

8        A.    We used GSR for programmatic sales of XRP

9    at Ripple.

10       Q.    And when you say "programmatic sales of

11   XRP at Ripple," what do you mean?

12       A.    At Ripple, we sold XRP through GSR and

13   other firms relying on their algorithms and

14   relationships with exchanges around the world.

15       Q.    So GSR sold the XRP that we were talking

16   about earlier that appeared as revenue on the

17   financial statements?

18             MR. FORD:  Objection.

19             MR. HECKER:  Objection to form.

20   Foundation.

21             THE WITNESS:  They sold a portion of that

22   XRP.

23   BY MS. WAXMAN:

24       Q.    Was there another portion of XRP revenues

25   on the financial statement that GSR was not involved

1    in?

2            MR. HECKER:  Objection form.

3            You can answer.

4            THE WITNESS:  We had multiple

5    counterparties that were sold XRP.

6    BY MS. WAXMAN:

7        Q.    So not only sales of XRP into the market

8    through GSR, but there were other sales of XRP that

9    the company --

10       A.    Yes, there were.

11       Q.    -- engaged in?

12           MR. FORD:  Objection to form.

13   BY MS. WAXMAN:

14       Q.    Did the company sell XRP in private

15   transactions?

16           MR. FORD:  Objection to form.

17           THE WITNESS:  Ripple typically sold XRP in

18   two ways.  One was programmatic through companies

19   like GSR, and the other was what we called over the

20   counter to individual counterparties.

21   BY MS. WAXMAN:

22       Q.    Thank you.

23           So going back to your sales of XRP through

24   GSR, how did it happen that you sold your -- your

25   XRP through them?

```
 1        A.   I contacted GSR.  I recall signing a
 2   standard agreement.  I provided my XRP to them.
 3   They sold it over some time period and they provided
 4   cash.
 5        Q.   Why did you use a broker to sell your XRP?
 6        A.   I had --
 7             MR. FORD:  Objection to form.  Sorry.
 8             THE WITNESS:  Sorry.
 9             I had no experience in selling XRP
10   personally.
11   BY MS. WAXMAN:
12        Q.   Did anyone recommend that you use GSR to
13   sell the XRP?
14        A.   Not that I recall.
15        Q.   Were you aware of anyone else at the
16   company using GSR to sell their individual holdings
17   of XRP?
18        A.   I recall people mentioning it, but I don't
19   recall exactly who.
20        Q.   Were you aware that Mr. Garlinghouse was
21   using GSR to sell XRP?
22             MR. FORD:  Objection to form.
23             THE WITNESS:  I don't recall if I was
24   aware of that at the time that that I chose to use
25   them.
```

53

```
 1    BY MS. WAXMAN:
 2        Q.   How much did you profit from your XRP
 3    sales?
 4             MR. HECKER:  Objection to form.
 5             THE WITNESS:  It was compensation.  I
 6    considered it a bonus like any other -- like the
 7    cash bonus I also received.  I recall between both
 8    bonuses it being less than          dollars, but I
 9    don't recall the specific breakout between 2018 and
10    2019.
11    BY MS. WAXMAN:
12        Q.   Do you own any XRP now?
13        A.   No.
14        Q.   And as CFO, were you responsible for
15    approving all of Ripple's financial transactions?
16             MR. FORD:  Objection.
17             MR. HECKER:  Objection to form.
18             THE WITNESS:  I was involved with setting
19    the budget, the overall budget for the company.  If
20    an individual transaction or item was above a
21    certain threshold, then I would get involved.  I
22    don't specifically recall the dollar amount of that
23    threshold, though.  But I wouldn't -- I wouldn't be
24    involved in every transaction.
25    / /
```

1  BY MS. WAXMAN:

2       Q.   Well, let's take a step back.  What were

3  your general responsibilities as CFO of Ripple?

4       A.   I was responsible --

5            MR. FORD:  Objection to form.  Sorry.

6            THE WITNESS:  Sorry.

7            -- responsible for the accounting

8  department, the budgeting and analytics department,

9  the sales finance department, real estate, physical

10 security, and for small periods of time, I had the

11 XRP markets team reporting to me during my three

12 years.  So for a period in 2018 and I believe 2020.

13 BY MS. WAXMAN:

14      Q.   And for how many months in 2018 were you

15 responsible for the XRP markets team?

16      A.   Very short period in 2018.

17      Q.   Could you approximate how many months?

18      A.   I don't recall exactly.  Roughly three

19 months.

20      Q.   And in 2020, during what time period were

21 you overseeing the XRP markets team?

22      A.   Roughly from early in 2020.  The

23 individual who is responsible for that team departed

24 Ripple, so I took it over until I resigned.  So that

25 was -- resigned in August.  I left in September.

1    Q.   So from early 2020 through August, you --

2    A.   Was also responsible, I had about --

3  between all those teams, roughly 40 people reporting

4  up to me.

5    Q.   And who reported to you that worked in the

6  accounting department?

7    A.   Controller was ▮▮▮▮▮▮▮▮  Oh, I also

8  had tax.  Sorry.  Forgot that one.

9    Q.   Okay.  And anyone else in the accounting

10  department that reported directly to you?

11    A.   Not that I recall.

12    Q.   And what about in the budgeting

13  department?

14    A.   ▮▮▮▮▮▮▮▮▮▮

15    Q.   What was his role?

16    A.   He was the head of FP&A and sales finance.

17    Q.   So FP&A is not a familiar term to me.

18    A.   Financial planning and analysis.

19    Q.   Okay.

20    A.   So they're responsible for budgeting,

21  analytics, forecasting.

22    Q.   Did he have any responsibilities in

23  connection with preparing financial statements for

24  the company?

25    A.   Financial statements were typically fully

```
1    prepared by the accounting department.
2         Q.   So the controller would have
3    responsibilities for that?
4         A.   Yes.
5         Q.   And you said you had responsibilities
6    related to sales and finance.
7              Can you --
8         A.   Sales finance --
9              MR. HECKER:  You need to wait, let
10   Ms. Waxman finish her question.  Sorry.
11   BY MS. WAXMAN:
12        Q.   Yeah.  Can you explain to me what you mean
13   by sales finance?
14        A.   Sales finance is working with our
15   enterprise sales team to set territories, quotas and
16   commissions.
17        Q.   What is -- what do you mean by "enterprise
18   sales team"?
19        A.   The RippleNet -- RippleNet sales team sold
20   directly into banks, and payment providers are
21   payment solutions.  So we had a team of roughly -- I
22   forget the exact amount of enterprise salespeople
23   that reported into our head of sales, and we would
24   provide analytics around what those targets should
25   be for their sales activities, what compensation
```

1    should be.

2        Q.   Compensation for what?

3        A.   For the salespeople.

4        Q.   Were they paid commissions?

5        A.   The standard enterprise salesperson at

6    Ripple received a salary plus commission based on

7    achievement of enterprise sales goals.

8        Q.   And the enterprise products you are

9    talking about, those are -- were those connected to

10   the sales and software revenues we were talking

11   about earlier?

12           MR. FORD:  Objection to form.

13           THE WITNESS:  Yes.  They were.

14   BY MS. WAXMAN:

15       Q.   As CFO, did you have responsibility

16   related to XRP-specific transactions?

17           MR. FORD:  Objection to form.

18           THE WITNESS:  It would depend on the

19   materiality and size of that transaction.

20   BY MS. WAXMAN:

21       Q.   What XRP transactions were you involved

22   with as CFO?

23           MR. HECKER:  Objection to form.

24           THE WITNESS:  I wasn't personally involved

25   in any that come to mind.  I directed the efforts of

```
1    the XRP markets team, which executed the

2    transactions that Ripple was involved in.

3    BY MS. WAXMAN:

4         Q.    Did you have to approve the amount of XRP

5    that the sales team sold?

6              MR. HECKER:  Objection.  Form.

7              THE WITNESS:  The enterprise sales team

8    did not sell XRP.  They sold enterprise software.

9    The XRP markets team would rely on a quarterly

10   budgeting that we set for sales of XRP.

11   BY MS. WAXMAN:

12        Q.    And did you -- did -- did you help set

13   that quarterly budget?

14        A.    I worked with the FP&A team as well as the

15   executives of the company to create a budget each

16   year that we executed against.

17        Q.    And how did you determine the amounts that

18   Ripple -- how did you budget how much Ripple -- how

19   much XRP Ripple would sell?

20             MR. HECKER:  Objection.  Form.

21   Foundation.

22             MR. FORD:  Objection.

23             THE WITNESS:  We would look at what

24   activities we wanted to achieve in a given year,

25   hiring, corporate development, acquisitions,
```

```
 1    investments.  We would put together an overall
 2    budget of what was realistic.  We'd run scenarios on
 3    that, and based on that scenario analysis, we
 4    would -- as a component of that, we would determine
 5    a dollar amount of XRP to be sold.
 6    BY MS. WAXMAN:
 7         Q.   How did you determine what was realistic?
 8              MR. FORD:  Objection to form.
 9              THE WITNESS:  We would typically look at
10    historical evidence as one metric, and then work
11    with the individual teams within Ripple, the
12    enterprise sales team, for example, to determine how
13    many sales of our products at the time were
14    realistic and what revenue would be generated based
15    on the volume of those customers.  And then we'd
16    also consider how much XRP would -- would be a
17    component of that to sell.
18    BY MS. WAXMAN:
19         Q.   So I only want to talk about budgeting
20    with respect to XRP sales, not with respect to
21    software sales.  And I just want to make sure I
22    understand.  How did you budget for XRP sales?
23              MR. HECKER:  Objection to form.
24    Foundation.
25              THE WITNESS:  XRP sales were budgeted as
```

```
 1    part of the entire company budget.  We didn't look
 2    at it just on an XRP only -- XRP-sales only basis
 3    with debit in conjunction with the entire picture of
 4    the company which is traditionally how it's done.
 5    BY MS. WAXMAN:
 6         Q.   And how did you forecast how much XRP to
 7    sell during a certain period?
 8              MR. HECKER:  Objection to form.
 9              THE WITNESS:  We'd consider a variety of
10    factors.  Expenses of the company, potential growth
11    of the company during that time period.  Potential
12    acquisitions.  As well as the revenue that would be
13    coming in from the enterprise sales of the company.
14    BY MS. WAXMAN:
15         Q.   So would XRP sales be used to fund
16    expenses and the growth of the company and potential
17    acquisitions?
18              MR. HECKER:  Objection to form.
19              MR. FORD:  Objection.
20              THE WITNESS:  XRP sales would be a
21    component of the cash flow that we would use to fund
22    those -- those items.
23    BY MS. WAXMAN:
24         Q.   Were there any other items that you would
25    take into consideration when formulating the budget
```

```
 1   and when considering how much XRP Ripple would sell?

 2              MR. HECKER:  Objection to form.

 3   Foundation.

 4              THE WITNESS:  We'd take into consideration

 5   the enterprise sales of the company as well as

 6   potential fundraising that we might do during that

 7   time period.

 8   BY MS. WAXMAN:

 9       Q.   When did Ripple do fund -- fund raise, do

10   any fundraising?

11              MR. FORD:  Objection to form.

12              THE WITNESS:  Ripple completed a

13   fundraising in -- I believe it closed in late 2019.

14   BY MS. WAXMAN:

15       Q.   So during 2018, did Ripple raise any funds

16   from private investors?

17       A.   Not that I recall.

18       Q.   Going back to your responsibilities as

19   CFO, did you have any responsibilities related to

20   XRP loans?

21              MR. FORD:  Objection to form.

22              THE WITNESS:  I recall XRP loans being a

23   component of the activities of the XRP markets team

24   as well as the tax team.

25   / /
```

1    BY MS. WAXMAN:

2         Q.   Would you have to authorize or give any

3    approval in connection with loans of XRP?

4              MR. HECKER:  Objection to form.

5              THE WITNESS:  If they were above a certain

6    threshold, I -- I recall probably being involved,

7    yeah.

8    BY MS. WAXMAN:

9         Q.   And when you say you recall being

10   involved, did you have to approve any loan of XRP

11   above a certain threshold?

12        A.   Yeah, I recall being involved with

13   approving loans.  I don't specifically remember

14   which, but I remember being involved.

15        Q.   Mh-hmm.  And why would you approve those

16   loans?

17             MR. HECKER:  Objection to form.

18             THE WITNESS:  They were financial

19   transactions.  They would obviously appear in our

20   financial statements.  So as part of good corporate

21   governance, it would be typical to have a CFO

22   involved in a transaction like that.

23   BY MS. WAXMAN:

24        Q.   And how often would Ripple loan XRP?

25             MR. HECKER:  Objection to form.

1              THE WITNESS:  I don't recall the

2     specifics.

3     BY MS. WAXMAN:

4         Q.   What was the purpose of Ripple loaning

5     XRP?

6              MR. HECKER:  Objection to form.

7              THE WITNESS:  There would be situations

8     where, as I recall, counterparties would partner

9     with us to facilitate liquidity in specific markets,

10    and we would consider loaning them XRP as part of

11    that.

12    BY MS. WAXMAN:

13        Q.   And how would Ripple benefit from

14    providing a loan of XRP?

15             MR. HECKER:  Objection to form.

16    Foundation.

17             THE WITNESS:  Typically, it was targeted,

18    in my recollection -- and this is the situation I

19    mentioned around increasing liquidity in a specific

20    market.

21    BY MS. WAXMAN:

22        Q.   And when you say "increasing liquidity,"

23    what do you mean?

24        A.   Would increase XRP liquidity in a given

25    geographic market.

1           Q.   Would it increase total volume of XRP?

2           A.   It could increase total volume.  It could

3      also just increase the depth of the order book in a

4      market.

5           Q.   Did you have responsibilities related to

6      other XRP disbursements other than XRP loans?

7                MR. FORD:  Objection to form.

8                THE WITNESS:  If they were material, I

9      recall it being typical that I would be involved as

10     part of the approval process.

11     BY MS. WAXMAN:

12          Q.   And when you say "material," what -- what

13     do you mean?  How would you determine whether a

14     distribution of XRP was material?

15          A.   Typically, there is what's called an

16     authority matrix within a corporation and

17     transactions above certain sizes require the

18     approval of certain individuals.  I was part of that

19     authority matrix.  I don't remember the specific

20     table and thresholds that required CFO approval,

21     though.

22          Q.   So if there was a material XRP

23     transaction, you would have to approve it?

24                MR. FORD:  Objection to form.

25                THE WITNESS:  Typically, I recall if there

1   was a material transaction, it would -- it would

2   require the CFO approval if people were following

3   the normal procedures, yes.

4   BY MS. WAXMAN:

5       Q.   And when you would approve that

6   transaction, would you want to understand how Ripple

7   benefited from that transaction before you approved

8   it?

9           MR. HECKER:  Objection to form.

10          THE WITNESS:  I recall typically, yes.

11  BY MS. WAXMAN:

12      Q.   Okay.  And so if there was a material XRP

13  transaction, you would -- you would want the

14  transaction to benefit Ripple in some way before

15  approving it?

16          MR. HECKER:  Objection to form.

17          You can answer.

18          THE WITNESS:  Repeat the question.

19  BY MS. WAXMAN:

20      Q.   So if there was a material XRP

21  transaction, you would want the transaction to

22  benefit Ripple in some way before you would approve

23  it?

24          MR. HECKER:  Same objection.

25          THE WITNESS:  I recall typically I would.

1   BY MS. WAXMAN:

2       Q.   Now, did Ripple -- you provide XRP

3   incentive payments to third parties?

4           MR. FORD:  Objection to form.

5           THE WITNESS:  I don't recall the specifics

6   of XRP incentive payments.

7   BY MS. WAXMAN:

8       Q.   Do you know what I mean when I say "XRP

9   incentive payments"?

10          MR. HECKER:  Objection to form.

11          THE WITNESS:  I -- Ripple -- Ripple

12  provided it.  I recall that Ripple provided XRP

13  incentives to partners.  I assume that's what you're

14  talking about.

15  BY MS. WAXMAN:

16      Q.   And did you approve those XRP -- XRP

17  payments to partners?

18          MR. HECKER:  Objection to form.

19          THE WITNESS:  I recall that if they were

20  above a certain materiality threshold, I would

21  typically be involved in the approval.

22  BY MS. WAXMAN:

23      Q.   Okay.  And how did Ripple benefit by --

24  benefit from providing XRP incentives to certain

25  parties?

```
1                MR. HECKER:  Objection to form.  Vague.

2                THE WITNESS:  Depends on the individual

3      circumstances of that incentive payment.

4      BY MS. WAXMAN:

5           Q.   What circumstances did Ripple provide XRP

6      incentive payments to third parties?

7                MR. HECKER:  Objection to form.

8                THE WITNESS:  I left the company over a

9      year ago.  I don't recall the specifics of any

10     individual transaction.

11     BY MS. WAXMAN:

12          Q.   Did Ripple provide XRP incentive payments

13     to digital asset training platforms while you were

14     at the company?

15               MR. FORD:  Objection to form.

16               THE WITNESS:  Define "digital asset

17     trading platforms."  I'm not clear on that.

18     BY MS. WAXMAN:

19          Q.   I understand that term to be Coinbase

20     that's in San Francisco, any platform where a

21     user -- online platform where a user can buy, sell

22     or trade a digital asset, including Bitcoin, Ether,

23     XRP.

24          A.   I don't recall any specific incentive

25     programs around those platforms.
```

1    Q.   Do you recall generally Ripple providing

2  XRP incentive payments to third parties while you

3  were at XRP -- while you were at Ripple?

4          MR. HECKER:  Objection to form.

5          MR. FORD:  Objection to form.

6          THE WITNESS:  I recall incentive payments

7  being paid during my time at Ripple.

8  BY MS. WAXMAN:

9    Q.   And who did Ripple provide XRP incentive

10  payments to?

11          MR. FORD:  Objection to form.

12          THE WITNESS:  Other than to our partners,

13  I don't remember the specifics of any individual

14  transaction.

15  BY MS. WAXMAN:

16    Q.   And when you say "our partners," who are

17  you referring to?

18    A.   In -- in the general sense of people that

19  Ripple -- you know, entities that Ripple had a

20  business relationship with.

21    Q.   Did Ripple provide XRP incentives to

22  customers who use RippleNet?

23          MR. FORD:  Objection to form.

24          THE WITNESS:  I recall that we did provide

25  incentives to customers of RippleNet.

69

```
 1    BY MS. WAXMAN:
 2        Q.    And did you approve those XRP incentive
 3    payments to customers of RippleNet?
 4              MR. FORD:  Objection to form.
 5              THE WITNESS:  I would typically be
 6    involved in the approval of incentive programs, not
 7    the specific transactions themselves.
 8    BY MS. WAXMAN:
 9        Q.    Okay.  And why would you approve those
10    programs?
11              MR. HECKER:  Objection to form.  Vague.
12              THE WITNESS:  As CFO, you were typically
13    involved with the disbursement of funds.  And so as
14    part of that, as part of governance you would be
15    involved with the approval process of certain
16    programs.
17    BY MS. WAXMAN:
18        Q.    Now, before you approved the transaction,
19    would you want to know how Ripple would benefit from
20    the transaction?
21              MR. HECKER:  Objection to form.
22              THE WITNESS:  As a general matter, if it
23    required my approval, I would review the rationale
24    behind the transaction.
25    / /
```

```
 1    BY MS. WAXMAN:

 2         Q.    And what was --

 3               MR. HECKER:   Ms. Waxman, when you come to

 4    a point, can we take just a short break?

 5               MS. WAXMAN:   Yes.

 6         Q.    What was the rationale for providing XRP

 7    incentive payments to RippleNet customers?

 8               MR. FORD:   Objection to form.

 9               THE WITNESS:   In my recollection, the

10    rationale for providing incentives around RippleNet

11    were to increase volume on RippleNet as well as to

12    increase the number of participants on RippleNet.

13    BY MS. WAXMAN:

14         Q.    Did RippleNet involve the use of XRP?

15               MR. HECKER:   Objection to form.

16               THE WITNESS:   RippleNet, over time, also

17    included products.   In my recollection, that did

18    incorporate XRP.

19    BY MS. WAXMAN:

20         Q.    But the company provided XRP incentive

21    payments to customers of RippleNet who did not use

22    XRP, correct?

23               MR. HECKER:   Objection to form.

24               THE WITNESS:   In my recollection, XRP

25    incentives were uncommon on components of RippleNet.
```

1    Banks, for example, would not, in the early days,

2    use cryptocurrency as an incentive, for example.

3            MR. HECKER:  Is now a good time,

4    Ms. Waxman?  I -- I would like a bathroom break.

5            MS. WAXMAN:  Sure.  We're off the record.

6            THE VIDEOGRAPHER:  Going off the record.

7    The time is 10:13 a.m.  This marks the end of Media

8    Number 1.

9            (Whereupon, a recess was taken.)

10           THE VIDEOGRAPHER:  All right.  We're back

11   on the record.  The time is 10:29 a.m.

12   BY MS. WAXMAN:

13       Q.   Mr. Will, before we went off the record,

14   you had -- I understood you to say that you had

15   responsibilities related to XRP transactions?

16       A.   I had responsibility for the XRP markets

17   team which executed many XRP transactions.

18       Q.   And did you also have to approve certain

19   XRP transactions that were material?

20       A.   It would be typical that if a transaction,

21   whether dollars or XRP, was above a certain

22   materiality threshold, I would be involved.

23       Q.   And when -- what was your involvement?

24       A.   Depending on the size, I recall being

25   involved in either an explicit approval or just a

1   general review.

2      Q.   Okay.  Did you ever approve or have any

3   involvement in the use of XRP for employee

4   compensation?

5         MR. HECKER:  Objection to form.

6         THE WITNESS:  I was involved in the

7   general program to provide XRP to employees.

8   BY MS. WAXMAN:

9      Q.   When you say you were involved, can you be

10   a little more specific about your involvement?

11      A.   The accounting team, which reported to me,

12   was -- had responsibility for payroll.  And as part

13   of our payroll, we would allow employees the

14   opportunity to, instead of receiving dollars, to

15   receive XRP.  And they would handle those

16   transactions.

17      Q.   And what factors, if any, did you consider

18   in deciding whether to approve those transactions?

19         MR. HECKER:  Objection to form.

20         THE WITNESS:  I did not approve individual

21   transactions.  That program had been in place when I

22   arrived at Ripple, I recall.  I made sure that the

23   program was operating in a satisfactory manner for

24   employees, so I took employee feedback about the

25   program.  But it was on a day-to-day basis, executed

1    by the accounting team.

2    BY MS. WAXMAN:

3        Q.   And I know you -- the program predated

4    you, but did you have an understanding as to what

5    benefit there was to Ripple from the program?

6             MR. FORD:  Objection to form.

7             THE WITNESS:  I recall employees were

8    extremely interested in participating generally in

9    cryptocurrencies.  And as a component of that,

10   employees like to receive -- some employees -- like

11   to receive a portion of their payroll in XRP.

12   BY MS. WAXMAN:

13       Q.   Other than making employees happy, did --

14   do you have an understanding of whether there was a

15   specific benefit to Ripple?

16            MR. HECKER:  Objection to form.

17            THE WITNESS:  It was -- we -- in the

18   payroll department and the accounting department, we

19   viewed it equal to giving an employee cash.  It was

20   priced the same way.  The employee received no

21   specific economic benefit to receiving XRP.  It was,

22   as I recall, a response to an employee request.

23   BY MS. WAXMAN:

24       Q.   Did XRP-related compensation provide

25   employees an opportunity to participate in any

1    upside from the price of XRP?

2              MR. HECKER:  Objection to form.

3              THE WITNESS:  XRP that was provided

4    through payroll, I don't know what -- what employees

5    did with it once they received it.  So I don't -- I

6    can't speak to how the employees perceived it post

7    distribution.

8    BY MS. WAXMAN:

9        Q.   So are you saying you're not sure whether

10   the employee immediately sold at the time, or the

11   employee held it for -- for investment?

12             MR. FORD:  Objection to form.

13             THE WITNESS:  Yes.  We did not -- at least

14   in my recollection, we did not track the general

15   distributions and what happened to them afterwards.

16   BY MS. WAXMAN:

17       Q.   But did the -- if the XRP -- strike that.

18            Did you ever come to learn that certain

19   employees wanted to share in the potential upside of

20   XRP --

21             MR. HECKER:  Objection --

22   BY MS. WAXMAN:

23       Q.   -- by getting it as part of their

24   compensation?

25             MR. HECKER:  Objection to form.

```
 1              THE WITNESS:  As an early company in
 2   cryptocurrency, we had many employees who were
 3   extremely enthusiastic about XRP as well as Bitcoin,
 4   Ethereum and other alternative coins.  So I
 5   couldn't -- I couldn't really speak to their
 6   individual desires, though.
 7   BY MS. WAXMAN:
 8        Q.   Did you have any involvement or did you
 9   have to approve any -- the use of XRP for executive
10   compensation?
11              MR. HECKER:  Objection to form.
12              THE WITNESS:  Decisions about compensation
13   would typically originate from the human resources
14   department.  I would be involved as far as the
15   overall dollar amount of those transactions so that
16   they were included in our budget.
17   BY MS. WAXMAN:
18        Q.   Did you have any involvement in deciding
19   how much XRP to distribute to executives as part of
20   their compensation?
21              MR. FORD:  Objection to form.
22              THE WITNESS:  I recall being involved
23   in -- being part of those discussions, but I wasn't
24   an -- a decider of any specific amounts.
25   / /
```

1    BY MS. WAXMAN:

2        Q.   And who did you discuss that with?

3        A.   Typically, any matters related to employee

4    compensation would involve -- for executives would

5    involve the -- the head of HR at the time.  It could

6    have involved a compensation expert that we had in

7    house as well as, for executives, the CEO.  If it

8    was specific to the CEO, it would involve the board.

9        Q.   And what factors, if any, did Ripple

10   consider in deciding whether to provide XRP as

11   compensation to its executives?

12            MR. FORD:  Objection to form.

13            THE WITNESS:  It was considered in terms

14   of overall dollar amount of compensation.  In other

15   words, you know, if an employee was -- the market

16   rate for an employee, an executive, was a certain

17   amount, it was considered in the context of that

18   overall amount and whether or not that might be a

19   component of their overall compensation.

20   BY MS. WAXMAN:

21       Q.   And did you have an understanding of

22   whether there was a benefit to Ripple to providing

23   XRP as part of an executive's compensation package?

24            MR. HECKER:  Objection to form.

25            THE WITNESS:  We viewed -- from a finance

1    perspective and as -- as CFO, I viewed it as the

2    same as dollars.

3    BY MS. WAXMAN:

4        Q.   Did the company have any cost basis in

5    connection -- incur any costs in connection with the

6    use of XRP for executive compensation?

7            MR. HECKER:  Objection to the form of the

8    question.

9            MR. FORD:  Objection.

10           THE WITNESS:  The company would be

11   responsible for withholdings at market value for the

12   taxes related to any compensation, whether it's XRP

13   or dollars.  We would also be responsible, as I

14   recall, for the employer portion of taxes for any

15   compensation that was involved.  So roughly 7 to

16   10 percent of the amount the employer also is

17   responsible for.

18   BY MS. WAXMAN:

19       Q.   Was that a reason not to distribute XRP to

20   executives for compensation?

21           MR. HECKER:  Objection to form.

22           THE WITNESS:  It was a consideration.

23   BY MS. WAXMAN:

24       Q.   Did XRP -- did the -- did the XRP to

25   executives allow the executives to participate in --

```
 1    in the upside for -- the upside for XRP?
 2              MR. FORD:  Objection to form.
 3              MR. HECKER:  Objection to form.
 4              THE WITNESS:  It allowed them to -- as --
 5    as a recipient, to take the risk of the price in
 6    XRP, both upside and downside.  We typically set the
 7    amounts, like similar to my compensation, in either
 8    a dollar amount up front or in a number of units.
 9    Depending on which way it was structured, they --
10    they could potentially get upside benefit or
11    downside risk.
12    BY MS. WAXMAN:
13         Q.   Did you have any involvement or did you
14    have to approve the use of XRP for charitable
15    donations?
16              MR. FORD:  Objection to form.
17              THE WITNESS:  I don't recall being an
18    approver for charitable donations.  I recall being
19    in the -- in the flow, depending on the materiality.
20    In other words, I would be aware of those donations
21    and my team would help execute those transactions,
22    either the XRP markets team as well as the
23    accounting team.
24    BY MS. WAXMAN:
25         Q.   Did you approve any of those XRP
```

1    transactions?

2            MR. FORD:  Objection to form.

3            THE WITNESS:  The XRP transactions related

4    to charitable contributions.  I don't -- I don't

5    recall.

6    BY MS. WAXMAN:

7        Q.    And who would have to approve those

8    transactions?

9        A.    Depending on the materiality, typically,

10   you know, Brad Garlinghouse as CEO was involved in

11   the approval, depending on the materiality.

12       Q.    And did you have discussions with Brad

13   about using XRP for charitable donations?

14       A.    I don't recall specific discussions about

15   charitable donations.

16       Q.    Did you have a general understanding of

17   what factors Ripple considered in determining

18   whether to use XRP in connection with charitable

19   donations?

20           MR. FORD:  And here again, just if any of

21   these discussions were with counsel, I caution you

22   not to -- either not to answer if all of the

23   discussions were with counsel or not to get into

24   those discussions.

25           THE WITNESS:  I don't recall any specific

1    conversations around rationale behind charitable

2    contributions at Ripple.

3    BY MS. WAXMAN:

4        Q.   Did you have any involvement with the use

5    of XRP for investments?

6        A.   Depending on the materiality, I would be

7    involved in investment discussions, whether we used

8    dollars or XRP.

9        Q.   And would you approve any -- approve the

10   use of XRP for investments?

11           MR. FORD:  Objection to form.

12           THE WITNESS:  Depending on the

13   materiality, I recall being involved in part of the

14   approval process.

15   BY MS. WAXMAN:

16       Q.   And what factors, if any, did you consider

17   in deciding whether to approve the use of XRP for

18   investments?

19           MR. FORD:  Objection to form.

20           THE WITNESS:  Typically, whether we used

21   dollars or XRP, we viewed them similar.  We would

22   view the business rationale as the primary driver of

23   a transaction, regardless of how we paid for that

24   transaction.

25   / /

1   BY MS. WAXMAN:

2       Q.   In general, what was your -- did you have

3   an understanding of the benefit of Ripple using XRP

4   in connection with investments?

5           MR. HECKER:  Objection to form.  Vague.

6           THE WITNESS:  In general, we viewed

7   dollars and XRP in a similar way from a finance

8   perspective.  By "we," I mean, the finance

9   department and myself.

10  BY MS. WAXMAN:

11      Q.   As CFO, did you have any responsibilities

12  related to the release or return of XRP to and from

13  Ripple's escrow account?

14          MR. HECKER:  Objection to form.

15          MR. FORD:  Objection.

16          THE WITNESS:  I joined Ripple after the

17  escrow had been created or -- it actually was

18  created about a month after I joined.  But the

19  announcement about it I became aware of when I

20  joined.  I wouldn't be involved in any of the

21  mechanics.  That is all handled on the -- on the

22  ledger, I believe.

23  BY MS. WAXMAN:

24      Q.   I understand you didn't have any

25  involvement in the mechanics or the technical

82

```
 1    aspects of the ledger, but were you -- did you have

 2    any involvement related to how much XRP to release

 3    and/or return from the escrow --

 4              MR. FORD:  Objection to form.

 5    BY MS. WAXMAN:

 6         Q.   -- on a periodic basis?

 7              MR. FORD:  Objection to form.

 8              THE WITNESS:  As I recall, with regards to

 9    the escrow, the amount released is determined by the

10    structure of the escrow.  So it was effectively

11    preprogrammed that a billion XRP would release.

12    We -- I would be part of a discussion on a monthly

13    basis about how much we would put back into escrow.

14    BY MS. WAXMAN:

15         Q.   Okay.  And who would participate in that

16    discussion?

17         A.   As I recall, it would be Brad

18    Garlinghouse, myself, and members of the accounting

19    team.

20         Q.   As CFO, were you responsible for preparing

21    or approving financial statements?

22         A.   I was involved not in the preparation, but

23    I would be involved in the -- the only financial

24    statements that are approved are the audited

25    financial statements, and I signed the management
```

1    rep letter typically for -- I don't specifically

2    recall the -- the details around that, but -- but I

3    remember signing the management rep letter related

4    to the audit of Ripple.

5         Q.   And were you also responsible for

6    preparing an annual budget for the company?

7         A.   I was involved with the preparation.

8         Q.   Did you review the final budget?

9              MR. FORD:  Objection to form.

10             THE WITNESS:  Yes.  I reviewed the final

11   budget.

12   BY MS. WAXMAN:

13        Q.   And with respect to the financial

14   statements, were those circulated to executives at

15   the company?

16             MR. FORD:  Objection to form.

17             THE WITNESS:  I don't recall the specific

18   distribution.  We -- we may have provided it to the

19   executives.

20   BY MS. WAXMAN:

21        Q.   Would Mr. Garlinghouse have reviewed the

22   audited financial statements?

23             MR. HECKER:  Objection to form.

24   Foundation.

25             THE WITNESS:  I don't specifically recall.

```
 1   BY MS. WAXMAN:

 2        Q.   Generally, do -- did you circulate the

 3   financial statements to Mr. Garlinghouse?

 4             MR. FORD:  Objection to form.

 5             THE WITNESS:  I recall we provided the

 6   financial statements to the board on a regular

 7   basis, and Brad, as a member of the board.  We would

 8   also provide him financial analysis on a -- on a

 9   fairly regular basis.

10   BY MS. WAXMAN:

11        Q.   What responsibilities did you have related

12   to Ripple's board of directors?

13        A.   Would help prepare the presentation and

14   agenda, and I would be involved in the presentation

15   of the financial results of the company as well as

16   any other finances-related special projects.

17        Q.   Did you regularly -- regularly attend

18   meetings?

19             MR. FORD:  Objection to form.

20             THE WITNESS:  I recall over the time

21   period I was CFO of Ripple, I attended the -- the

22   meetings.

23   BY MS. WAXMAN:

24        Q.   Did you attend entire meetings, or would

25   you only attend during the period where you would
```

1    present about financial matters?

2          A.    There was a portion of every board

3    meeting, as I recall, where the executives -- the

4    nonboard members would leave the room.  Otherwise, I

5    attended the majority of the board meeting.

6          Q.    And did you regularly communicate with

7    board members outside of board meetings?

8                MR. FORD:  Objection to form.

9                THE WITNESS:  I wouldn't say, as I recall,

10   regularly that I would communicate with board

11   members, outside of board meetings.

12   BY MS. WAXMAN:

13         Q.    Did you communicate with board members

14   outside of meetings?

15                MR. FORD:  Objection to form.

16                THE WITNESS:  I'd say infrequently, I

17   would communicate with board members.

18   BY MS. WAXMAN:

19         Q.    Are there any board members in particular

20   that you would communicate with?

21         A.    I recall having contact with Zoe Cruz.

22         Q.    Anyone else?

23         A.    Brad obviously is a board member.  I had

24   contact with Brad.  Chris Larsen as well is a board

25   member.  I had contact with Chris.  I don't believe

1  I had much contact with the rest of the board

2  outside of board meetings and reporting

3  responsibilities there.

4      Q.   And what was the purpose of your

5  communications with Ms. Cruz, outside of board

6  meetings?

7          MR. HECKER:  Objection to form.

8          THE WITNESS:  When Zoe Cruz arrived at --

9  on the board at Ripple, she asked to be brought up

10  to speed on the business and financials of Ripple.

11  So I spent time with her viewing the financial and

12  operating metrics of the company and -- and prior --

13  prior board meeting presentations so that she had

14  context around the -- the company.

15  BY MS. WAXMAN:

16      Q.   Other than -- was Ms. Cruz a board member?

17      A.   At the time, she was.

18      Q.   Other than being a board member, did she

19  ever hold any other role at Ripple?

20      A.   I recall that she was -- I don't know if

21  it was a specific title but a special advisor to

22  Brad Garlinghouse as CEO.

23      Q.   And during what period was she a special

24  advisor to Brad?

25      A.   I don't specifically recall when she left

1    the board and became the special advisor.  Roughly

2    beginning of 2020, I believe.

3          Q.    And was she brought on to advise on a

4    certain issue or topic?

5                MR. FORD:  Objection to form.

6                THE WITNESS:  I don't recall the specifics

7    around why she took that role.

8    BY MS. WAXMAN:

9          Q.    Did you have any conversations with her in

10   connection with that specific role?

11               MR. HECKER:  Objection to form.

12               THE WITNESS:  I don't recall any -- about

13   why she made the change to that role?

14   BY MS. WAXMAN:

15         Q.    No.  The question is, did you have any

16   conversations with Ms. Cruz about -- in connection

17   with her advisement to Mr. Garlinghouse?

18               MR. HECKER:  Objection to form.

19               THE WITNESS:  Zoe would attend meetings, I

20   recall, that I was involved in related to Ripple.

21   BY MS. WAXMAN:

22         Q.    Had anyone else from the board become an

23   advisor to Mr. Garlinghouse?

24               MR. FORD:  Objection to form.

25               THE WITNESS:  Not that I'm aware of.

```
 1    Other board members did provide, outside of their --
 2    their board meeting responsibilities, did provide
 3    guidance to the company at various points in time in
 4    areas of their expertise.
 5    BY MS. WAXMAN:
 6        Q.    And I apologize if I asked this already.
 7    What was the nature of the -- what was the specific
 8    issue that Ms. Cruz was brought in to advise about?
 9            MR. FORD:   Objection.
10            MR. HECKER:   Objection to form.
11    Foundation.
12            THE WITNESS:   I don't specifically recall
13    the nature.  ██████     obviously, given her
14    background, is -- and I believe she was the
15    copresident of ██████████   has a tremendous
16    amount of capital markets expertise.   So we valued
17    her experience.
18    BY MS. WAXMAN:
19        Q.    You said you interacted with Mr. Larsen
20    outside of board meetings, correct?
21        A.    Infrequently.
22        Q.    When would you -- when you say
23    "infrequently," what does that mean?   How often?
24        A.    My recollection, Chris came into the
25    office maybe once a month, and I would see him in
```

1    the hallway.  So it was pleasantries in the hallway,

2    is the extent of my recollection of our

3    conversations.

4        Q.   Did -- other than board meetings, did

5    Mr. Larsen regularly attend any meetings that you

6    were present at?

7        A.   I recall Mr. Larsen attending meetings?

8        Q.   Other than board meetings?

9        A.   Other than board meetings.

10       Q.   And were these meetings that you were

11   present at?

12       A.   Yes.

13       Q.   Okay.  What meetings did Mr. Larsen attend

14   other than board meetings?

15            MR. FORD:  Objection to form.

16            THE WITNESS:  We had an XRP markets

17   meeting that Mr. Larsen would dial into.

18   BY MS. WAXMAN:

19       Q.   Is that a weekly meeting that the XRP

20   markets team would discuss XRP sales at?

21            MR. HECKER:  Objection to form.

22            THE WITNESS:  It was a weekly meeting that

23   the XRP markets team would put together materials

24   about the cryptocurrency market of which XRP is a

25   part of.

1    BY MS. WAXMAN:

2        Q.   And what was Mr. Larsen's role at that

3    meeting?

4        A.   He was an attendee.

5        Q.   Did he participate in the discussions?

6        A.   I don't recall any specific input that

7    Chris provided at those meetings.

8        Q.   Did he have financial decision-making

9    authority over XRP sales by Ripple?

10            MR. FORD:  Objection to form.

11            THE WITNESS:  I don't recall him having

12   financing approval.  Typically, we communicated in

13   that meeting generally.  The board approved our

14   overall budget, board of Ripple.  Chris is a part of

15   that board.

16   BY MS. WAXMAN:

17       Q.   With respect to the XRP sales meetings,

18   did he provide his opinions on topics that were

19   being discussed during -- at the meeting?

20            MR. FORD:  Objection to form.

21            THE WITNESS:  I don't recall any input,

22   specific input of Chris Larsen in those meetings.

23   BY MS. WAXMAN:

24       Q.   Were there -- other than the XRP sales

25   meeting that you just spoke about, were there other

1    meetings that Mr. Larsen attended that you were

2    present at?

3         A.    Not that I recall.

4         Q.    Were there other meetings that he attended

5    that you did not participate in?

6              MR. FORD:  Objection to form.

7    BY MS. WAXMAN:

8         Q.    That you knew about, even though you

9    didn't participate.

10        A.    Not that I'm aware of.

11        Q.    What was your understanding of

12   Mr. Larsen's role during your tenure at the company?

13        A.    Chris was the founder, cofounder,

14   visionary.  He would speak to the employees about

15   the general vision of -- of Ripple, why it was

16   created.  He was the chairman of the board.  And he

17   was a large shareholder.

18        Q.    Did you ever discuss any financial

19   transactions with Mr. Larsen?

20             MR. FORD:  Objection to form.

21             THE WITNESS:  Only as part of his specific

22   board responsibilities:  So in other words, also

23   with the entire board present, as well as counsel.

24   BY MS. WAXMAN:

25        Q.    Did you have any meetings with Mr. Larsen

```
 1    one on one?
 2          A.   I don't recall any.
 3          Q.   Did you have any responsibilities related
 4    to Ripple equity shareholders?
 5               MR. FORD:  Objection to form.
 6               MR. HECKER:  Objection to form.
 7               THE WITNESS:  Yes.
 8    BY MS. WAXMAN:
 9          Q.   And what were your responsibilities
10    related to Ripple equity shareholders?
11          A.   I was part of a team that would administer
12    the capitalization table, so make sure ownership,
13    both direct ownership as well as any ownership
14    changes were reflected accurately.  I would be
15    involved in investor relations capacity with
16    shareholders when they reached out to us or if we
17    decided to proactively communicate with
18    shareholders.  Sometimes they needed, for their
19    accounting statements, a specific item.  I would
20    provide that item.
21          Q.   Did -- so is it fair to say that you did
22    communicate with Ripple's shareholders?
23               MR. FORD:  Objection to form.
24               THE WITNESS:  I did -- sorry.  I did
25    communicate with Ripple shareholders.
```

1   BY MS. WAXMAN:

2        Q.   Did any Ripple shareholders ever request

3   to see Ripple's financials, financial statements?

4        A.   I don't recall specifically, but I -- I do

5   recall generally that -- that shareholders did

6   request.  Certain shareholders had information

7   rights so they -- they could contractually request

8   under those rights to receive the information.

9        Q.   If the shareholder didn't have information

10  rights and they requested to see Ripple's financial

11  statements, would that be something you would share?

12            MR. FORD:  Objection.

13            MR. HECKER:  Objection to form.  Calls for

14  speculation.

15            THE WITNESS:  It would be discussed.  I

16  don't recall specifically how we handled every

17  individual matter, but it was -- we would -- we

18  would definitely consider it.

19  BY MS. WAXMAN:

20       Q.   Did you regularly share financial

21  information with shareholders that did not have

22  information rights?

23            MR. FORD:  Objection to form.

24            THE WITNESS:  I don't recall.

25  / /

```
 1    BY MS. WAXMAN:

 2        Q.   Would there be a reason not to share the

 3    financial statements with -- with Ripple equity

 4    investors?

 5             MR. FORD:  Objection to form.

 6             THE WITNESS:  I don't recall specifically

 7    to Ripple.  It is frequent, in my experience as CFO

 8    of a start-up, that many investors have conflicts of

 9    interest.  They make investments across the entire

10    space, so there could be competitive information

11    that could -- could limit your desire to provide

12    them information that you wouldn't want leaked to a

13    competitor.

14        Q.   Was there any information in Ripple's

15    financial statements that Ripple did not want to

16    disclose to its shareholders?

17             MR. FORD:  Objection to form.

18             THE WITNESS:  Not in my mind.

19    BY MS. WAXMAN:

20        Q.   Was there anything about the financial

21    statements that would have caused any Ripple equity

22    shareholders concern?

23             MR. FORD:  Objection to form.

24             MR. HECKER:  Objection.

25             THE WITNESS:  I can't speak to what would
```

1  cause them any concerns.

2  BY MS. WAXMAN:

3      Q.   Did you have a role in any private

4  fundraising that Ripple did?

5      A.   I was involved in the Series C fundraising

6  at Ripple.

7      Q.   And did you have any responsibilities

8  related to any strategic partnerships or investments

9  that Ripple did?

10          MR. FORD:  Objection to form.

11          THE WITNESS:  I was involved, as I recall,

12  in strategic partnerships.

13  BY MS. WAXMAN:

14      Q.   Which strategic partnerships were you

15  involved in while you were at Ripple?

16      A.   I specifically remember being involved

17  with MoneyGram.

18      Q.   And what was your involvement in the

19  MoneyGram strategic partnership?

20      A.   My team provided financial analysis, and I

21  was involved in the due diligence of MoneyGram.

22      Q.   And what was the partnership between

23  Ripple and MoneyGram?

24          MR. FORD:  Objection to form.

25          THE WITNESS:  I don't recall the specifics

1    of the transaction.  MoneyGram is a top two global

2    money transfer business.  We had talked about

3    partnering with MoneyGram really since my arrival at

4    Ripple in late 2017, early 2018.  As a company

5    focused on cross-boarder transactions, they are a

6    marquee partner to -- to -- to get.

7    BY MS. WAXMAN:

8        Q.  Did Ripple's board of directors have to

9    approve the partnership or any -- any deals with

10   Ripple -- with MoneyGram?

11           MR. FORD:  Objection to form.  And, again,

12   to the extent your knowledge on what Ripple's board

13   of directors had to do is based on discussions with

14   counsel, I direct you not to answer.

15   BY MS. WAXMAN:

16       Q.  And I'm not talking about legal advice.

17   I'm talking about a financial transaction and

18   whether or not you had to provide a recommendation

19   to the board to enter into the -- the transaction.

20           MR. FORD:  Same objection and same

21   instruction.

22   BY MS. WAXMAN:

23       Q.  You have -- so the question is, did

24   Ripple's board of directors have to approve any

25   partnership or any deals with -- with MoneyGram?

```
 1                    MR. FORD:  Same objection and same

 2       instruction.

 3       BY MS. WAXMAN:

 4            Q.   You can answer the question.

 5            A.   I would have relied on -- if -- if I can

 6       rephrase the question, did Ripple's board have a

 7       requirement to approve the transaction, I would rely

 8       on counsel for that requirement.

 9            Q.   I'll -- I'll ask another question.

10                 Did you -- what did Ripple enter into --

11       did Ripple invest in MoneyGram?

12            A.   I recall Ripple investing in MoneyGram.

13            Q.   And how much was the investment?

14            A.   I don't recall a specific dollar amount.

15            Q.   Was it around $50 million?  Objection to

16       form?

17            A.   I only remember the -- the percentage, and

18       it was roughly 10 percent.

19            Q.   10 percent of?

20            A.   Of the ownership of MoneyGram, is my

21       recollection.

22            Q.   Okay.  And so Ripple -- in exchange for an

23       investment, Ripple received 10 percent of MoneyGram?

24                    MR. FORD:  Objection to form.

25                    THE WITNESS:  As I recall, it received the
```

1    opportunity to invest higher than 10 percent, but

2    it -- it received roughly a 10 percent ownership

3    stake or 9-point something ownership stake in

4    MoneyGram as a result of the transaction.  That's my

5    recollection.

6    BY MS. WAXMAN:

7        Q.   And did you believe that this was a

8    worthwhile investment for Ripple to make?

9            MR. HECKER:  Objection to form.

10           MR. FORD:  Objection.

11           THE WITNESS:  I thought it was -- I

12   thought it was a worthwhile investment.

13   BY MS. WAXMAN:

14       Q.   And did you have any understanding what

15   the benefit was to Ripple in connection with the

16   investment?

17           MR. HECKER:  Objection to form.

18           THE WITNESS:  Yes.

19   BY MS. WAXMAN:

20       Q.   And what benefit did you understand?

21       A.   MoneyGram is a marquee top two global

22   money transfer business.  For a fintech company or

23   cryptocurrency company like Ripple, it was market

24   validation of our solution by a clearly

25   knowledgeable participant in money transfer.

1      Q.   Did it provide any financial benefit to

2    Ripple?

3           MR. HECKER:  Objection to form.

4           THE WITNESS:  It provided a critical

5    initial -- early partner for Ripple.  So I would say

6    over a long period of time, they would provide

7    financial benefit.

8    BY MS. WAXMAN:

9      Q.   And how would they provide a financial

10   benefit?

11          MR. FORD:  Objection to form.

12          THE WITNESS:  As a network, people choose

13   to decide, people being entities, banks, payment

14   providers, choose to decide a payment network based

15   on the -- the current participants as well as the

16   projected participants.  Having MoneyGram as a

17   marquee tenant, if you will, of RippleNet was a

18   major accomplishment for Ripple.

19   BY MS. WAXMAN:

20     Q.   I'm still not clear.  I want to go back.

21          So you said -- your testimony is you don't

22   recall the exact amount that Ripple invested in

23   MoneyGram?

24     A.   That's right.

25     Q.   Does 50 million -- around 50 million sound

100

```
 1    right to you?
 2              MR. FORD:  Objection to form.  Asked and
 3    answered.
 4              THE WITNESS:  Yeah.  I don't -- I don't
 5    recall specifics.  It could have been.
 6    BY MS. WAXMAN:
 7         Q.   Would you recall a $50 million investment
 8    for Ripple?
 9              MR. HECKER:  Objection to form.  If you
10    want to show him something to try to refresh his
11    memory, that would be one way of doing it.  But he's
12    asked your -- answered your question.
13              THE WITNESS:  Yeah, I don't recall the
14    specifics.
15    BY MS. WAXMAN:
16         Q.   Okay.  So I don't -- and what did Ripple
17    get in exchange for the investment that it made?
18              MR. HECKER:  Objection to form.
19    BY MS. WAXMAN:
20         Q.   Other than a 10 percent share in -- in
21    MoneyGram?
22              MR. HECKER:  Same -- same objection.
23              THE WITNESS:  In my experience in Silicon
24    Valley, it received a valuable asset by obtaining
25    MoneyGram as a customer.
```

1    BY MS. WAXMAN:

2        Q.   And how did Ripple obtain MoneyGram as a

3    customer?

4            MR. HECKER:  Objection to form.

5            THE WITNESS:  Through the equity

6    investment as well as the commercial partnership.

7    BY MS. WAXMAN:

8        Q.   And what was the commercial partnership?

9        A.   I don't remember the specifics of the

10   commercial partnership.

11       Q.   And was there any connection between the

12   equity investment and the commercial partnership?

13           MR. HECKER:  Objection to form.

14           THE WITNESS:  What -- what was the

15   question?

16   BY MS. WAXMAN:

17       Q.   Was there any relationship or connection

18   between Ripple's equity investment in MoneyGram and

19   the commercial partnership?

20           MR. HECKER:  Same objection.

21           THE WITNESS:  I don't recall the specifics

22   of the transaction between the -- and the

23   relationship between the equity investment and the

24   commercial partnership.

25   / /

1  BY MS. WAXMAN:

2      Q.   And as part of the commercial partnership,

3  was it your understanding that the commercial

4  partnership would provide a financial benefit to

5  Ripple?

6           MR. HECKER:  Objection to form.

7           MR. FORD:  Objection to form.

8           MR. HECKER:  Asked and answered.

9           THE WITNESS:  Yes.

10 BY MS. WAXMAN:

11     Q.   And -- and what financial benefit would

12 Ripple get from the commercial partnership?

13          MR. HECKER:  Objection to form.  Asked and

14 answered.

15          THE WITNESS:  Ripple would receive a

16 marquee customer on RippleNet.

17 BY MS. WAXMAN:

18     Q.   I understand that.  But was there a

19 financial benefit that you could see on the

20 financial statements from the commercial

21 partnership?

22          MR. HECKER:  Objection to form.

23          THE WITNESS:  It is not uncommon for an

24 early stage company to not be able to see the

25 benefit of an investment like the one Ripple made in

1    MoneyGram in the financial statements in a

2    short-term period.

3    BY MS. WAXMAN:

4        Q.    And what about the commercial agreement?

5    Were there any benefits that could be shown on the

6    fund -- did -- did Ripple receive anything in

7    connection with the commercial agreement that they

8    entered into with --

9        A.    We received --

10            MR. HECKER:    Wait.    Wait.    Wait.

11   Objection to form.    Asked and answered.

12   BY MS. WAXMAN:

13       Q.    Did Ripple receive anything in connection

14   with the commercial agreement that they entered into

15   with --

16            MR. HECKER:    Same objection.

17   BY MS. WAXMAN:

18       Q.    -- MoneyGram?

19       A.    We received MoneyGram as a critical

20   partner on RippleNet.

21       Q.    Okay.    And what benefit did Ripple get

22   from obtaining MoneyGram as a critical partner?

23            MR. HECKER:    Objection.    Asked and

24   answered twice previously.

25            THE WITNESS:    We received the potential to

1    obviously work with MoneyGram, which was top two

2    money transfer business in the world and all their

3    volume, as well as the benefit of winning new

4    customers who would either look to MoneyGram as

5    validation of Ripple's solution or want to partner

6    with MoneyGram.

7    BY MS. WAXMAN:

8         Q.    In connection with the commercial

9    agreement, did MoneyGram pay any fees to Ripple --

10             MR. FORD:  Objection.

11   BY MS. WAXMAN:

12        Q.    -- or did Ripple collect any revenues in

13   connection with the commercial agreement?

14             MR. FORD:  Objection.

15             MR. HECKER:  Objection to form.

16             THE WITNESS:  I don't recall the specifics

17   of the MoneyGram commercial partnership.

18   BY MS. WAXMAN:

19        Q.    Did the commercial -- commercial

20   partnership involve the use of xRapid by MoneyGram?

21             MR. FORD:  Objection to form.

22             THE WITNESS:  The commercial partnership

23   involved the use of xRapid, if I recall correctly.

24   BY MS. WAXMAN:

25        Q.    And what -- strike that.

1          Did you -- I'm going to change topics for

2     a moment.

3          Did you have any -- did you report to

4     Mr. Garlinghouse?

5          A.   During my time at Ripple, I reported to

6     the CEO, Brad Garlinghouse.

7          Q.   And how often did you meet with him?

8               MR. FORD:  Objection to form.

9               THE WITNESS:  Brad and I had a standing

10    weekly one-on-one meeting.  We also both

11    participated in a leadership meeting that involved

12    multiple participants.  We also would typically

13    participate in the XRP markets meeting.  So roughly

14    three times a week.  I also sat three desks away

15    from him, so it was kind of informal communication

16    while we were in the office.

17    BY MS. WAXMAN:

18         Q.   Other than those three meetings, did

19    you -- did he regularly attend any other meetings

20    that you were present at?

21         A.   As I recall, that was the bulk of it.

22         Q.   And did Mr. Garlinghouse have final

23    decision-making authority with respect to all of

24    Ripple's financial transactions?

25              MR. HECKER:  Objection to form.

1          THE WITNESS:  Mr. Garlinghouse, above a

2     certain materiality, would -- according to the

3     authority matrix, typically approve financial

4     transactions.  As far as overall, as you phrased it.

5     Overall, he wasn't involved in every transaction.

6     He was looking at the overall financial picture of

7     Ripple.

8     BY MS. WAXMAN:

9          Q.   But for certain material transactions, did

10    you require his approval?

11          MR. FORD:  Objection to form.

12          MR. HECKER:  Objection to form.

13          THE WITNESS:  Typically, depending on the

14    size of the transaction, if it was above a certain

15    materiality threshold, it would require the CEO's

16    approval, Brad's.

17    BY MS. WAXMAN:

18          Q.   And similar for certain XRP-related

19    transactions over a certain threshold did those also

20    require Mr. Garlinghouse's final approval?

21          MR. HECKER:  Objection to form.

22          THE WITNESS:  If they were of an ongoing

23    nature, he would approve them as part of either the

24    budget approval on an annual basis or a quarterly

25    basis.  If they were a specific nonrecurring nature,

1   it would depend on the materiality of that

2   individual transaction.

3   BY MS. WAXMAN:

4       Q.   And how would you determine whether a

5   specific transaction was material?  Would it be --

6   would you -- what factors would you consider?

7           MR. HECKER:  Objection to form.

8           THE WITNESS:  One factor would be the

9   dollar amount, as I recall.  The other factor would

10  be -- there could be other considerations depending

11  on the -- on the type of transaction.

12  BY MS. WAXMAN:

13      Q.   Earlier you testified that you

14  participated in XRP sales meetings, correct?

15      A.   The XRP markets meeting, a component of

16  that was a discussion of our XRP sales.

17      Q.   Okay.  Did you understand that Ripple's

18  sales were based on a percentage of total trading

19  volume?

20          MR. HECKER:  Objection to form.

21          THE WITNESS:  I recall that was one of the

22  factors that we would evaluate.

23  BY MS. WAXMAN:

24      Q.   And how did that factor -- how did that

25  factor into your decision-making process or the

```
 1   group's decision-making process?

 2              MR. HECKER:  Objection to form.

 3              THE WITNESS:  I can't speak to the group.

 4   I could speak -- I -- I viewed it as our goal should

 5   be to never impact the market with our activities.

 6   BY MS. WAXMAN:

 7        Q.   And when you say never impact the market,

 8   can you be a little more specific of what you mean?

 9        A.   Yeah.  We should strive to not change the

10   natural supply/demand dynamic of any market that we

11   were going to participate in.

12        Q.   So were you trying not to impact the price

13   of XRP with Ripple's --

14        A.   That would be one of the factors.

15        Q.   -- sales?

16              MR. FORD:  Sorry.

17              THE WITNESS:  Sorry.

18              MR. FORD:  Objection to form.

19              MR. HECKER:  You need to wait until

20   Ms. Waxman finishes.

21              THE WITNESS:  Finishes.

22   BY MS. WAXMAN:

23        Q.   Were there other things that you were --

24   other factors that you were considering besides --

25              MR. FORD:  Objection.
```

```
 1   BY MS. WAXMAN:
 2        Q.   -- you know, the impact on XRP price?
 3             MR. FORD:  Objection to form.
 4             THE WITNESS:  There could be other factors
 5   that we would consider, depending on the specifics
 6   of any individual transaction.
 7   BY MS. WAXMAN:
 8        Q.   Did you -- did you -- did -- were Ripple's
 9   sales based on a finite -- a -- a fixed percentage
10   of total trading volume?
11             MR. HECKER:  Objection.
12             MR. FORD:  Objection to form.
13             MR. HECKER:  Form.
14             THE WITNESS:  I don't recall it being a
15   fixed percentage over the entire three years I was
16   there.
17   BY MS. WAXMAN:
18        Q.   So it fluctuated up or down?
19             MR. FORD:  Objection to form.
20             THE WITNESS:  I recall that it -- it
21   likely moved over that time period.
22   BY MS. WAXMAN:
23        Q.   Okay.  And when did -- did Ripple ever
24   seek to increase the percentage -- the amount it
25   sold by increasing the percentage of total trading
```

1   volume?

2            MR. HECKER:  Objection to form.

3            THE WITNESS:  I don't recall specifically

4   any conversations about increasing the percentage.

5   BY MS. WAXMAN:

6       Q.   Did you personally ever recommend that

7   Ripple increase its XRP sales?

8       A.   Don't recall.

9       Q.   Did -- did you ever discuss in the sales

10   meetings whether to increase Ripple's XRP sales?

11           MR. HECKER:  Do you mean as a percentage

12   or do you just mean gross numbers?

13   BY MS. WAXMAN:

14       Q.   Well, it was -- my understanding was that

15   it was based on a percentage.  So if you were to

16   increase the -- the amount, you would be increasing

17   the percentage.

18           MR. HECKER:  Objection to form.  Lacks

19   foundation.

20           THE WITNESS:  As part of the XRP markets

21   meeting, we would review the amount of sales that

22   had been done historically on a variety of measures

23   and on a quarterly basis, our achievement versus

24   what we had forecast for that period of time.

25   / /

```
 1    BY MS. WAXMAN:

 2         Q.   Did you ever deviate from the forecast?

 3              MR. FORD:  Objection to form.

 4              MR. HECKER:  Form.

 5              THE WITNESS:  I don't recall specifically,

 6    but we may have.

 7    BY MS. WAXMAN:

 8         Q.   You had said that you would review the

 9    amount of sales that had been done historically on a

10    variety of measures on a quarterly basis and look at

11    your achievement versus what we had forecasted.

12              What do you mean by "achievement"?

13              MR. HECKER:  Objection to form.

14              THE WITNESS:  We would sell XRP for U.S.

15    dollars.  We would look at the amount of dollars as

16    part of our normal budgeting process where we

17    reviewed all of our results versus what we had

18    forecast we would have done over that time period.

19    BY MS. WAXMAN:

20         Q.   Were there times that you sold more than

21    you had forecasted?

22              MR. FORD:  Objection to form.

23              THE WITNESS:  Not that I recall.

24    BY MS. WAXMAN:

25         Q.   Were there times where you had sold less
```

1      than you had forecasted?

2               MR. FORD:  Objection to form.

3               THE WITNESS:  Not that I specifically

4      recall, but there might have been.

5      BY MS. WAXMAN:

6          Q.   And under what circumstances would you

7      sell less than what you had forecasted?

8               MR. FORD:  Same objection.

9               THE WITNESS:  If the volume -- volume in

10     cryptocurrency is difficult to predict.  XRP no

11     different than the rest of cryptocurrencies.  So

12     if -- if volume decreased, we may sell as a -- as a

13     dollar amount, a lower amount.

14     BY MS. WAXMAN:

15         Q.   But you would have the same percentage.

16     So if the volume decreased, then even -- you had

17     still keep the same percentage.  I'm talking about

18     were there times where you changed the actual

19     percentage of volume?

20              MR. FORD:  Objection.

21     BY MS. WAXMAN:

22         Q.   The percentage that Ripple would sell?

23              MR. HECKER:  Objection to form.

24              THE WITNESS:  There may have been.  Over

25     that three-year time period, there may have been.  I

```
 1   don't recall specifically.
 2   BY MS. WAXMAN:
 3        Q.   Earlier you said you had about 40 direct
 4   reports.  Did                    directly report to
 5   you, or          ?  I don't -- I'm not sure how to
 6   pronounce her name.
 7        A.                        did not -- I believe, for
 8   a short period of time, she may have directly
 9   reported to me, and then -- and then I believe, as I
10   recall, she moved into the XRP markets team.
11        Q.   And during what time did she report to
12   you?
13        A.   I -- I don't specifically recall.  She was
14   involved in Ripple equity investor relations as --
15   as part of the reason why she was reporting directly
16   to me.
17        Q.   Was she involved in investor relations
18   related to XRP purchasers?
19             MR. FORD:  Objection to form.
20             THE WITNESS:  During her time in the XRP
21   markets group, as I recall, she may have had contact
22   with potential buyers or -- buyers or sellers of
23   XRP.
24   BY MS. WAXMAN:
25        Q.   Did you hire                    ?
```

```
 1        A.   No.

 2        Q.   Who hired her?

 3             MR. FORD:  Objection to form.

 4             THE WITNESS:  I don't know.

 5   BY MS. WAXMAN:

 6        Q.   During the period that she didn't report

 7   to you, who did she report to?

 8             MR. FORD:  Objection to form.

 9             THE WITNESS:  If I recall correctly,

10   Miguel Vias.

11   BY MS. WAXMAN:

12        Q.   And you said that Ms. ████ may have had

13   contact with potential XRP buyers.

14             When did she have contact with potential

15   XRP buyers?

16             MR. FORD:  Objection to form.

17             THE WITNESS:  ████ would regularly

18   attend cryptocurrency conferences, as I recall, in

19   conjunction with David Schwartz, who was our chief

20   cryptographer at the time and became our CTO.  They

21   would attend conferences together, so ...

22   BY MS. WAXMAN:

23        Q.   Was Ms. ████ hired specifically to act as

24   an investor relations for XRP buyers?

25             MR. HECKER:  Objection to form.
```

1    Foundation.

2             THE WITNESS:  I don't know why ███████

3    ████████ was hired.  In my capacity, I used her

4    primarily as investor relations for Ripple equity

5    shareholders.  She organized our 2018 Ripple equity

6    investor conference.

7    BY MS. WAXMAN:

8        Q.   And were there other things that she did

9    while she reported to you?

10       A.   She may have.  I don't recall.

11       Q.   Who is ███████████ or ██████?  How do

12   you --

13       A.   ████████████ was the vice president of

14   corporate development over some time period at -- at

15   Ripple.

16       Q.   Did he report to you as well?

17            MR. FORD:  Objection to form.

18            THE WITNESS:  As I recall, he may -- he

19   may have, for a short period of time, in between

20   Patrick Griffin's departure and ███████████

21   arrival, which was a fairly short period of time.

22   BY MS. WAXMAN:

23       Q.   And who is ████████████?

24       A.   ████████████ was an employee involved in

25   general communications, as I recall it.

```
1          Q.   Did he report to you ever?

2          A.   I don't recall ███ reporting to me.

3          Q.   Did you have any involvement in hiring

4     Mr. ████?

5          A.   I had worked with ███████ at -- he was

6     an investor at ████████ through his involvement

7     with ████████████, so ...

8          Q.   Did you bring him -- recommend to bring

9     him on to Ripple?

10         A.   I was part of the interview team.

11         Q.   Did Breanne Madigan report to you ever?

12         A.   For a period of time of 2020, Breanne

13    reported to me.

14         Q.   And did Miguel Vias ever report to you?

15         A.   For a period, I recall -- I believe in

16    2018, for a short period of time, Miguel Vias

17    reported to me.

18         Q.   Did you have any involvement in -- in how

19    the company valued itself?

20              MR. FORD:  Objection to form.

21              THE WITNESS:  I was involved with the

22    discussions around potential valuation that

23    investors may be evaluating Ripple on.

24    BY MS. WAXMAN:

25         Q.   And how did you believe that Ripple should
```

[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

1   value itself as a company?

2           MR. HECKER:  Objection to form.

3           THE WITNESS:  Over my time period there,

4   it probably evolved.  But it was a combination of

5   the value of RippleNet, the value of its investments

6   and the value of its XRP in various percentages.

7   BY MS. WAXMAN:

8       Q.   When you first joined Ripple, did any one

9   of those things play a bigger role in Ripple's

10  valuation?

11          MR. HECKER:  Objection to form.

12          THE WITNESS:  No.  No, they did not.

13  BY MS. WAXMAN:

14      Q.   How did Ripple's valuation evolve over

15  time?

16          MR. FORD:  Objection to form.

17          THE WITNESS:  We made more involvements.

18  MoneyGram, you mentioned.  But also our Xpring

19  initiative.  And then the value of RippleNet.  You

20  know, when I joined, it had a small number of

21  customers.  It -- it grew to many more customers

22  over that three-year period.  So that's how it

23  evolved.

24  BY MS. WAXMAN:

25      Q.   Other those -- than those things,

1    RippleNet, investments and XRP, anything else that

2    you considered as -- when you tried to value the

3    company?

4            MR. HECKER:  Objection to form.

5    Mischaracterizes testimony.

6            THE WITNESS:  Not that I recall.  There

7    may have been.

8    BY MS. WAXMAN:

9        Q.   In 2018, what was the value of RippleNet

10   to Ripple?

11           MR. FORD:  Objection to form.

12           MR. HECKER:  Objection to form.

13           THE WITNESS:  I don't recall us ever

14   running a specific valuation for RippleNet.

15   BY MS. WAXMAN:

16       Q.   And in 2018, what was the value of

17   Ripple's investments?

18           MR. HECKER:  Same objection.

19           THE WITNESS:  Don't recall.

20   BY MS. WAXMAN:

21       Q.   And in 2018, what was the value of

22   Ripple's XRP?

23           MR. HECKER:  Objection to form.

24           THE WITNESS:  Value of XRP changed over

25   the entire year.

1  BY MS. WAXMAN:

2      Q.  How did you determine a value of XRP?

3          MR. FORD:  Objection to form.

4          THE WITNESS:  Typically started with

5  the -- the price of XRP and the holdings of XRP at

6  that time period, and then applied a substantial

7  discount related to liquidity and particularly

8  because of the -- the escrow.  But also because of

9  the potential impact, if we were to sell it.  We

10 used analogies, valuation analogies to try to figure

11 that out.

12 BY MS. WAXMAN:

13     Q.  In 2018, did you think Ripple's valuation

14 was solely from its holdings of XRP?

15         MR. FORD:  Objection to form.

16         MR. HECKER:  Objection to form.

17         THE WITNESS:  No.

18 BY MS. WAXMAN:

19     Q.  What else did you consider, other than the

20 XRP in 2018?

21         MR. HECKER:  Objection to form.

22         MR. FORD:  Objection to form.

23         THE WITNESS:  Valuation of RippleNet, and

24 we were starting to build a portfolio of investments

25 as well.

1    BY MS. WAXMAN:

2        Q.   Why did you think the company should value

3    itself based on its XRP when -- strike that.

4            Did the XRP appear on the financial

5    statements?

6            MR. FORD:  Objection to form.

7            THE WITNESS:  The -- the XRP did not

8    appear on the balance sheet of Ripple.

9    BY MS. WAXMAN:

10       Q.   So why did you take the XR- -- Ripple's

11   XRP holdings into consideration when coming up with

12   a valuation for the company?

13           MR. HECKER:  Objection to form.

14           THE WITNESS:  The XRP doesn't appear on

15   the balance sheet of Ripple, because according to

16   generally accepted accounting principles it's based

17   on cost basis for an intangible asset of indefinite

18   life.  That means that when Ripple received the XRP,

19   it's the cost at that time, which was zero.  So it

20   was an accounting determination, which can be

21   frequently different from a valuation methodology.

22   BY MS. WAXMAN:

23       Q.   So even though the -- Ripple's XRP

24   holdings didn't appear on the financial statements,

25   you still thought its XRP holdings was an important

1   piece of the company's valuation?

2           MR. HECKER:  Objection to form.

3           THE WITNESS:  I thought that it was a

4   piece of the valuation of the company.

5   BY MS. WAXMAN:

6       Q.   Did you think it was the most important

7   piece of Ripple's valuation?

8           MR. HECKER:  Objection to form.

9           THE WITNESS:  I did not think it was the

10  most important piece.

11  BY MS. WAXMAN:

12      Q.   Other than Ripple's XRP holdings, what

13  provided value to the company?

14          MR. HECKER:  Objection to form.

15          THE WITNESS:  In my conversations with

16  investors, investors seemed to, as I recall, put

17  value on RippleNet as well as the portfolio of

18  investments.  So that's how we thought about it.

19  BY MS. WAXMAN:

20      Q.   You had conversations with investors who

21  valued RippleNet?

22      A.   We had conversations with investors about

23  their -- how they viewed their investment in Ripple

24  equity.

25      Q.   And how did investors come up with a

1   valuation for their investment?

2            MR. HECKER:  Objection to form.

3   Foundation.

4            THE WITNESS:  You'd need to ask the

5   investors.

6   BY MS. WAXMAN:

7        Q.    Did your --

8        A.    My conversations with them typically were

9   around the methodology versus the specifics.

10       Q.    And when you say conversations about the

11  methodology, are you talking about the formula you

12  told me earlier, price times holding minus some sort

13  of discount?

14           MR. HECKER:  Objection to form.

15           THE WITNESS:  Different investors use

16  different methodologies.

17  BY MS. WAXMAN:

18       Q.    What method -- did Ripple have a

19  recommended methodology?

20           MR. FORD:  Objection to form.

21           THE WITNESS:  I don't recall us having a

22  recommended methodology.

23  BY MS. WAXMAN:

24       Q.    While you were CFO, did you come up with a

25  valuation for Ripple's shares?

```
 1              MR. FORD:  Objection to form.

 2              THE WITNESS:  Not that I recall.

 3    BY MS. WAXMAN:

 4         Q.   Was that something that Ripple equity

 5    investors wanted to know?

 6              MR. FORD:  Objection to form.

 7              THE WITNESS:  In my experience as a CFO of

 8    multiple start-ups, investors make their own

 9    determinations about the valuation of their equity

10    holdings.

11    BY MS. WAXMAN:

12         Q.   Earlier we spoke about certain business

13    risks that would need to be disclosed in a

14    registration statement.  Did -- did you have any

15    understanding what business risks Ripple was subject

16    to?

17              MR. HECKER:  Objection to form.

18    Foundation.

19              THE WITNESS:  As a private start-up in

20    fintech, there's always execution risk that we

21    considered -- you know, that I considered.

22    BY MS. WAXMAN:

23         Q.   What do you mean, execution risk?  What

24    does that mean?

25         A.   Execution risk meaning the ability to
```

124

1    execute on your long-term plan of building a

2    financial network.

3        Q.   So what was the specific risk in

4    connection with Ripple?

5             MR. HECKER:  Objection to form.

6             You can answer.

7             THE WITNESS:  As any network, it was

8    getting sufficient market participants on both the

9    buy side and the sell side, or the receive and

10   the -- and the send across multiple currencies, as

11   well as volume of activity.

12   BY MS. WAXMAN:

13       Q.   Were there any other business risks to

14   Ripple?

15       A.   There likely were.  I don't -- I don't

16   specifically recall.

17       Q.   Were there any business risks specific to

18   XRP?

19            MR. HECKER:  Objection to form.

20            MR. FORD:  Objection.

21            THE WITNESS:  I don't recall.

22   BY MS. WAXMAN:

23       Q.   If Ripple -- if the volume of XRP

24   decreased, would that be a risk, a business risk

25   posed to Ripple?

1          MR. HECKER:  Objection to form.

2          THE WITNESS:  I could see that being a

3    risk, a risk to Ripple.

4    BY MS. WAXMAN:

5          Q.   And why would that be a risk?

6          A.   Depends on the specific circumstances, but

7    I could see that being a risk.  That would be

8    considered amongst all other risks, sure.

9          Q.   And if -- earlier we spoke about how

10    Ripple would sell XRP based on percentage of volume.

11    If volume decreased, would you sell less XRP?

12          MR. HECKER:  Objection to form.

13          THE WITNESS:  That would -- that would be

14    one of the implications of lower volume over a

15    specific time period.

16    BY MS. WAXMAN:

17          Q.   And if -- was there a regulatory risk with

18    respect to XRP status?

19          MR. HECKER:  Objection.  Objection to

20    form.

21          And to the extent your understanding of

22    regulatory risk comes from discussions with legal

23    counsel, we'd instruct you not to answer that

24    question.

25          THE WITNESS:  I relied on counsel.

1     BY MS. WAXMAN:

2         Q.   Did you have any conversations, outside of

3     conversations with counsel, concerning the -- the

4     risk that XRP could be -- a security or that

5     Ripple's sales of XRP needed to be registered with

6     the SEC?

7            MR. HECKER:  Objection to form.

8            You can answer that question to the extent

9     you had discussions outside the presence of counsel.

10           THE WITNESS:  I don't recall.

11           MR. FORD:  Just to add, to the extent

12     those conversations were not informed by your

13     discussions with counsel.

14           THE WITNESS:  I don't recall any

15     conversations that met that criteria.

16           MR. FORD:  Daphna, we've been going about

17     an hour, if now is time to take a short break.

18           MS. WAXMAN:  Sure.  We're off the record

19     at 11:37.

20           THE VIDEOGRAPHER:  We're going off the

21     record.  The time is 11:37 a.m.

22            (Whereupon, a recess was taken.)

23           THE VIDEOGRAPHER:  Back on the record.

24     The time is 11:50 a.m.

25     / /

```
1    BY MS. WAXMAN:
2         Q.   Mr. Will, are you aware that one of the
3    issues in this lawsuit is whether Ripple's sales of
4    XRP are securities -- are sales of unregistered
5    securities?
6              MR. FORD:  Objection to form.  And let's
7    start with a yes-or-no answer.
8              THE WITNESS:  Yes.
9    BY MS. WAXMAN:
10        Q.   And when did you first learn about an SEC
11   investigation into Ripple?
12             MR. FORD:  So, again, to the extent that
13   this gets into conversations or discussions you had
14   with counsel, let's not answer as to those.  If you
15   can answer without revealing discussions with
16   counsel, you can answer.
17             THE WITNESS:  Late 2020.
18   BY MS. WAXMAN:
19        Q.   And I just want to clarify --
20             MR. FORD:  Yeah, what was the question --
21   repeat, sorry, he may have answered it.
22   BY MS. WAXMAN:
23        Q.   During your time at Ripple, did you come
24   to learn about an SEC investigation into Ripple?
25   I'm now talking about the -- the lawsuit that was
```

1    filed at the end of 2020.

2         A.   Yes.

3         Q.   And when did you first come to learn about

4    an SEC investigation into Ripple?  And with the

5    caveat, I don't want to -- if you can separate that

6    from conversations you've had with counsel.

7         A.   2018, if I recall.

8         Q.   And what month in 2018?

9         A.   I don't recall.

10        Q.   Did you learn about the investigation soon

11   after Ripple became aware of it?

12             MR. FORD:  Objection to form.

13             MR. HECKER:  Objection to form.

14             THE WITNESS:  I don't recall when Ripple

15   specifically became aware of it.

16   BY MS. WAXMAN:

17        Q.   And who told you about the SEC

18   investigation into Ripple?

19        A.   Internal counsel.

20        Q.   Since the time that you learned about the

21   SEC investigation, are you aware of anyone

22   affiliated with the SEC communicating to anyone at

23   Ripple that XRP is not a security -- or that

24   Ripple's sales of XRP are not sales of securities?

25             MR. HECKER:  Objection to form.

1          THE WITNESS:  I don't -- I don't recall.

2     No.

3     BY MS. WAXMAN:

4          Q.   No.

5               Did Ripple disclose the SEC investigation

6     to third parties other than its own lawyers?

7               MR. FORD:  Objection to form.

8               THE WITNESS:  I recall us mentioning it to

9     our auditors.

10    BY MS. WAXMAN:

11         Q.   And when did you disclose it to your

12    auditors?

13         A.   2019.

14         Q.   And was there a specific reason that you

15    disclosed it to the auditor?

16              MR. HECKER:  Objection to form and same

17    instructions about discussions with counsel.

18              THE WITNESS:  It would be part of -- it's

19    called, I believe, client assurance.

20    BY MS. WAXMAN:

21         Q.   What does that mean, "client assurance"?

22         A.   When the accounting firms take on a new

23    client, particularly a Big Four accounting firm such

24    as Deloitte, they will have a due diligence process.

25    And as part of that process, they will ask a series

[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

1    of questions.  I believe it was in connection with

2    that due diligence process that we disclosed

3    discussions with the SEC.

4        Q.   And who was the auditor?

5        A.   ████████

6        Q.   And did Ripple change auditors in 2019?

7        A.   As is common for early-stage companies, we

8    moved to a Big Four auditor as part of our public

9    company readiness process.

10       Q.   And did you disclose the SEC investigation

11   to any other auditor prior to that time?

12            MR. FORD:  Objection to form.

13            THE WITNESS:  I don't recall.

14   BY MS. WAXMAN:

15       Q.   Did Ripple disclose the SEC investigation

16   to anyone else?  And, again, I'm not talking about

17   conversations with counsel?

18            MR. FORD:  Objection to form.

19            THE WITNESS:  I don't recall.

20   BY MS. WAXMAN:

21       Q.   Did Ripple disclose the investigation to

22   any digital asset trading platform?

23            MR. FORD:  Objection to form.

24            THE WITNESS:  I don't recall.

25   / /

```
1    BY MS. WAXMAN:
2         Q.   Did you ever disclose the investigation to
3    anyone?
4         A.   I don't recall disclosing it.
5         Q.   Did Ripple disclose the investigation to
6    any potential partners?
7              MR. FORD:  Objection to form.
8              THE WITNESS:  I don't recall.
9    BY MS. WAXMAN:
10        Q.   Did Ripple disclose the investigation to
11   the market in general?
12             MR. HECKER:  Objection to form.
13             THE WITNESS:  I don't recall.
14   BY MS. WAXMAN:
15        Q.   Would you have -- would -- is that
16   something a -- strike that.
17             Did any digital asset platform ever ask
18   you about XRP status under the federal securities
19   laws?
20             MR. FORD:  Objection to form.
21             MR. HECKER:  Objection to form.
22             THE WITNESS:  I wouldn't have been
23   involved in any direct communication as part of my
24   role at Ripple with an exchange.
25   / /
```

```
 1    BY MS. WAXMAN:
 2         Q.   Did you ever come to learn that a digital
 3    asset platform had inquired about XRP's status under
 4    the federal securities laws?
 5              MR. HECKER:  Objection to form.
 6    Foundation.
 7              THE WITNESS:  I don't recall.
 8    BY MS. WAXMAN:
 9         Q.   Did any market participant ever inquire,
10    ask Ripple as to XRP's status under the federal
11    securities laws?
12              MR. FORD:  Objection to form.
13              THE WITNESS:  They may have.  I don't
14    specifically recall.
15    BY MS. WAXMAN:
16         Q.   Did any -- any market participant ever
17    request that Ripple provide them with a legal
18    opinion stating that XRP was not a security?
19              MR. HECKER:  Objection to form.
20              THE WITNESS:  Don't recall.
21    BY MS. WAXMAN:
22         Q.   Did Ripple ever receive a legal opinion
23    from a law firm regarding XRP status under the
24    federal securities laws?
25              MR. FORD:  Objection to form and, again,
```

1    to the extent -- you know, to the extent this

2    reveals privileged information, you know, you can

3    answer to the extent you're aware yes or no, and

4    let's stop there.

5         THE WITNESS:  Don't recall.

6    BY MS. WAXMAN:

7         Q.   Did Ripple ever represent to any third

8    party that it had a legal opinion from a law firm

9    regarding XRP's status under the federal securities

10   laws?

11        MR. FORD:  Objection to form.

12        THE WITNESS:  Don't recall.

13   BY MS. WAXMAN:

14        Q.   Did you have communications with any

15   digital asset trading platforms regarding XRP's

16   status under the federal securities laws?

17        MR. FORD:  Objection to form.  Foundation.

18        THE WITNESS:  I don't recall any

19   conversations like that.

20   BY MS. WAXMAN:

21        Q.   Did some digital asset platforms decide

22   not to move forward with an XRP listing --

23        MR. FORD:  Objection --

24   BY MS. WAXMAN:

25        Q.   -- based on a concern that XRP could be

1   deemed a security?

2           MR. FORD:  Objection to form.

3           THE WITNESS:  I don't recall.

4           MS. WAXMAN:  Let's look at Exhibit 1.

5       Q.    Mr. Will, I'm showing you Exhibit RW1,

6   which is a document with the Bates 00 -- RPLI_SEC

7   0095987.

8           Please a take a moment to look at it and

9   let me know when you're done.

10          (Whereupon, Deposition Exhibit 1

11           was marked for identification.)

12          THE WITNESS:  Okay.

13  BY MS. WAXMAN:

14      Q.    Who was ██████████████?

15      A.    ███████████████ and I worked together at

16  Yahoo.  She was in the tax department.  She has

17  since been the head of tax at several start-ups.

18  And I was talking to ████ three weeks after I

19  joined Ripple to become our -- to consider becoming

20  our head of tax.

21      Q.    So you were contemplating hiring ████ at

22  Ripple?

23      A.    Yes.

24      Q.    Where did she work at the time that you

25  sent this email?

135

```
 1        A.   I don't recall.

 2        Q.   Where does she work now?

 3        A.   Don't know.

 4        Q.   And why did you send be this email to her?

 5        A.   It was part of the hiring process.  We

 6   would typically create case study and provide

 7   certain exhibits in a situation and see how a

 8   candidate would respond.  That was a standard part

 9   of a hiring process on my team.

10        Q.   So was -- were you seeking some sort of

11   recommendation with respect to a financial

12   transaction?

13             MR. HECKER:  Objection to form.

14   Foundation.

15             THE WITNESS:  No.  I was looking to see

16   how creative she might think about a situation as

17   part of the interview process at Ripple.

18   BY MS. WAXMAN:

19        Q.   And what situation did you pose to her?

20        A.   To think about, you know, what the tax

21   treatment of a loan of XRP should be.

22        Q.   Did she provide a response?

23        A.   I don't recall.

24        Q.   And at the time that you sent this email,

25   what -- how -- what was the tax -- how did Ripple
```

1    view the tax consequences of an XRP loan?

2            MR. FORD:  Objection to form.

3            THE WITNESS:  I was, at this point,

4    getting up to speed on -- we -- we had no in-house

5    resources around tax.  We were relying on external

6    advisors.  And so I actually don't recall how we

7    were treating it.  I was looking to see if she might

8    make a good candidate for a tax position given the

9    limited amount of available expertise.

10   BY MS. WAXMAN:

11      Q.   Did the tax treatment depend on whether or

12   not XRP was viewed as a security as part of the

13   transaction?

14          MR. HECKER:  Objection to form.

15   Foundation.

16          THE WITNESS:  I'm not a tax expert.  I was

17   looking to her to provide some guidance on how, from

18   a tax perspective, we should look at this --

19   BY MS. WAXMAN:

20      Q.   At the --

21      A.   -- three weeks after I joined the company.

22      Q.   If you turn the page, the very first part

23   of the chain at the very end, can you just read that

24   last paragraph into the record for me starting with

25   "unfortunately"?

137

```
 1          A.   "Unfortunately, we don't view XRP as a
 2     security; treating XRP as a security might help us
 3     on the tax side but it opens up a can of worms on
 4     the securities regulation side.  I'm also not sure
 5     XRP fits the description of a security for tax
 6     purposes or that it's in our interest to force it to
 7     fit.  It would be great if we could characterize the
 8     transaction as an asset lending transaction and get
 9     the same outcome."
10          Q.   The first part of the sentence, you say
11     "we don't view XRP as a security."  When you say
12     "we," are you talking about Ripple?
13          A.   I was talking about the finance
14     department.
15          Q.   And how did you come to that
16     understanding?
17          MR. HECKER:  Objection to form and, again,
18     counsel the witness that to the extent your
19     understanding comes from discussions with counsel,
20     you can answer that much, but not beyond that.
21     BY MS. WAXMAN:
22          Q.   I'll rephrase.
23          Did you have any discussions with anyone
24     at Ripple other than attorneys about their view of
25     XRP?
```

```
 1         A.   Not that I recall in my first three weeks.
 2         Q.   So who told you that was Ripple's view?
 3              MR. FORD:  Objection.  Misstates the
 4    testimony.
 5              THE WITNESS:  I don't recall specifically
 6    who in the legal department.
 7    BY MS. WAXMAN:
 8         Q.   Did you ever make similar representations
 9    to anyone outside of Ripple that Ripple didn't view
10    XRP as a security?
11         A.   I wouldn't consider this a representation.
12    This was a case study that we created for a
13    candidate, and the back and forth related to that
14    case study as part of an interview process.
15         Q.   So was this -- was that this -- was this
16    Ripple's view with respect to XRP status under the
17    federal securities laws?
18              MR. HECKER:  Objection to form.
19              MR. FORD:  Objection to form.
20              MR. HECKER:  Foundation.
21              THE WITNESS:  The "we" in this sentence is
22    myself as part of a finance department, as an
23    unqualified professional trying to create a case
24    study for a potential tax candidate who was also new
25    to cryptocurrency.
```

```
 1    BY MS. WAXMAN:
 2         Q.   I'm just trying to understand, is this a
 3    hypothetical view or the actual view of Ripple at
 4    the time that you sent this email?
 5              MR. HECKER:  Objection.  Asked and
 6    answered.
 7              THE WITNESS:  It's a hypothetical case
 8    study as part of an interview process that I
 9    provided to a candidate to assess her ability to
10    think creatively about tax matters.
11    BY MS. WAXMAN:
12         Q.   And so did you have an understanding --
13    I -- I heard your answer that you said that this was
14    part of a case study, but separate and apart from
15    that, did you have an understanding, at the time, of
16    Ripple's view of XRP under the federal securities
17    laws?
18              MR. HECKER:  Objection.  Foundation.
19    Asked and answered.
20              THE WITNESS:  I don't recall specific
21    conversations prior to this email.
22    BY MS. WAXMAN:
23         Q.   You go on to say:
24                   "Treating XRP as a security
25                   might help on the tax side, but it
```

1          opens up a can of worms on the

2          securities regulation side."

3          What did you mean by "it opens up a can of

4  worms on the securities regulation side"?

5          MR. FORD:  Objection --

6          THE WITNESS:  I don't recall -- sorry.

7          MR. FORD:  Objection to form and, again,

8  to the extent that your knowledge of that issue is

9  informed by discussions with counsel, let's go up to

10  that and not further.

11          THE WITNESS:  I don't recall.

12  BY MS. WAXMAN:

13      Q.   Is your knowledge -- was it a hypothetical

14  or was this actually the view of the company at the

15  time?  It wasn't informed by discussions with

16  counsel?

17          MR. HECKER:  You've asked that question

18  now a couple times and he's told you he doesn't

19  remember.

20          You can answer the question again.

21          THE WITNESS:  I don't recall.

22  BY MS. WAXMAN:

23      Q.   Would treating XRP as a security lead to

24  complications for Ripple?

25          MR. FORD:  Objection to form.

```
 1                THE WITNESS:  I'm not qualified to answer
 2    that.
 3    BY MS. WAXMAN:
 4        Q.   Why do you say you're not qualified to
 5    answer that?
 6        A.   I think that's -- that's left to legal
 7    counsel.
 8        Q.   Would it create complications from a
 9    financial perspective?
10        A.   Not that I -- I'm aware of.
11        Q.   I know you're not an attorney, but earlier
12    we did speak about certain requirements for public
13    reporting companies.
14             So would Ripple need to register its sales
15    of XRP or sell XRP pursuant to an exemption if it
16    were to be deemed a security?
17             MR. HECKER:  Objection.  Calls for a legal
18    conclusion.
19             THE WITNESS:  I'm not qualified to make
20    that assessment.
21    BY MS. WAXMAN:
22        Q.   If you turn to the first page of the
23    email, at the very bottom,              asked you:
24                  "Are there any good articles
25                  out there that can help me
```

142

```
 1                    understand how XRP drives its

 2              value?"

 3                    At the time of this email, did you have an

 4       understanding of what drove XRP's value?

 5                    MR. HECKER:  Objection to form.

 6                    THE WITNESS:  I don't recall.

 7       BY MS. WAXMAN:

 8              Q.    You -- in the next email, you say:

 9                    "The website is probably the

10              best info available."

11              Are you talking about Ripple's website?

12                    MR. FORD:  Objection to form.

13                    THE WITNESS:  Don't recall.

14       BY MS. WAXMAN:

15              Q.    Did you believe that Ripple was the

16       central repository for information on XRP?

17                    MR. FORD:  Objection to form.

18                    MR. HECKER:  Objection to form.

19       Foundation.

20                    THE WITNESS:  At the time of this email?

21       BY MS. WAXMAN:

22              Q.    Yes.

23              A.    No.  I don't recall that.

24              Q.    At the very top of the email, you talk

25       about the purpose of the transaction, correct?
```

```
 1                    MR. FORD:  Objection to form.  Misstates
 2    the testimony.
 3    BY MS. WAXMAN:
 4        Q.   Will you read the -- into the record the
 5    top email?
 6        A.   Sure.  I was responding to her questions,
 7    one, two and three, further down in the email:
 8                    "We would be making the loan
 9                to increase the number of market
10                makers in XRP by providing them
11                access to XRP/liquidity.  We are
12                the XRP holder -- we have
13                60 billion."
14               (Reporter clarification.)
15               THE WITNESS:  Sorry.
16    BY MS. WAXMAN:
17        Q.   So what was the purpose of the loan
18    transaction?
19               MR. FORD:  Objection to form.
20               MR. HECKER:  Objection to form.
21               MR. FORD:  Misstates the testimony.
22               THE WITNESS:  There was no transaction
23    here.  This was a scenario that we were presenting
24    to a potential tax candidate, and it was the --
25    the -- a component of the scenario was that we would
```

1  be making the loan to increase the number of market

2  makers.

3  BY MS. WAXMAN:

4      Q.   Did Ripple ever loan XRP in order to

5  increase the number of market makers in XRP?

6          MR. FORD:  Objection to form.

7          THE WITNESS:  I don't recall.

8  BY MS. WAXMAN:

9      Q.   You don't recall Ripple ever loaning XRP?

10         MR. HECKER:  Objection to form.

11         MR. FORD:  Objection to form.

12         MR. HECKER:  It's a different question.

13         THE WITNESS:  I recall us making loans.

14  BY MS. WAXMAN:

15     Q.   XRP loans?

16     A.   We did -- I recall us making XRP -- we

17  would sometimes characterize them -- we rarely

18  characterize them as loans.  We typically

19  characterized, for tax purposes, as a lease.

20     Q.   And did these loans have any benefit to

21  any of the software products that Ripple sold?

22         MR. FORD:  Objection to form.

23         THE WITNESS:  In the context of this

24  scenario, they would increase XRP liquidity, which

25  would make xRapid or ODL work more efficiently.

```
 1    BY MS. WAXMAN:
 2         Q.   But at the time, in December 2017, did
 3    xRapid even exist?
 4              MR. FORD:  Objection to form.  Misstates
 5    the testimony.  Foundation.
 6              MR. HECKER:  And argumentative.
 7              THE WITNESS:  XRapid was on the product
 8    road map, I believe, if I recall correctly, in late
 9    2017.
10    BY MS. WAXMAN:
11         Q.   When you say on the product road map, did
12    it have any customers?
13         A.   At a high tech company at the stage at
14    Ripple was in late 2017, it would not be uncommon to
15    discuss what it would take for a product to be
16    successful.  And this was a component potentially of
17    the finance department's contribution to that
18    product being successful that we were thinking about
19    early on.
20         Q.   How could the -- how could it contribute
21    to the success of the product if the product wasn't
22    even in existence?
23              MR. HECKER:  Objection to form.
24    Argumentative.
25              THE WITNESS:  We had, at that point, if I
```

Case 1:20-cv-10832-AT-SN Document 869-33 Filed 06/13/22 Page 147 of 158

146

1    recall correctly, talked about how the product may

2    work and what it would require to work.

3    BY MS. WAXMAN:

4        Q.    So what benefit did the loan provide prior

5    to the product coming into existence?

6        A.    The hypothetical loan --

7            MR. FORD:  Objection.  Sorry.  Objection.

8    Objection to form.

9            THE WITNESS:  This was a scenario that we

10   presented in late 2017 to a potential tax candidate

11   that we ended up not moving forward with.  We -- it

12   is not uncommon at a high tech company to talk about

13   products well in advance of their release.  And we

14   were thinking about the potential necessary

15   attributes of the ecosystem to make the product

16   successful.

17           And a component of that for making xRapid,

18   at the time, which may -- may have been called

19   something else, was liquidity of the XRP market.

20   BY MS. WAXMAN:

21       Q.    Did increased liquidity in the XRP market

22   allow Ripple to sell more XRP?

23           MR. FORD:  Objection to form.

24           THE WITNESS:  The increased liquidity in

25   the context of this email would be in a specific

1  emerging market so that the liquidity between XRP

2  and a specific emerging market currency would be

3  increased.  It would not directly relate to the

4  increase in liquidity that may influence the amount

5  of sales that were possible.

6  BY MS. WAXMAN:

7      Q.   I understand that.  If the loan was in

8  connection with a specific market or a specific --

9  or in connection with xRapid, but -- but I'm talking

10  about loans prior to xRapid being used?

11          MR. HECKER:  Objection.  Are we talking

12  about this document or are you asking separate and

13  apart from this document?  The record is getting

14  very confused.

15  BY MS. WAXMAN:

16      Q.   Sure.  Separate and apart from this

17  document, did Ripple enter into XRP loans?

18      A.   Over what time period?

19      Q.   Over your entire tenure with Ripple.

20      A.   I recall that we did make loans.

21      Q.   Okay.  And did Ripple provide XRP loans

22  prior to XRP being launched?

23          MR. FORD:  Objection to form.

24          MR. HECKER:  Objection to form.  You don't

25  mean XRP.

```
 1   BY MS. WAXMAN:
 2        Q.   XRapid.
 3        A.   I don't recall.
 4        Q.   And what was the purpose of the XRP loans
 5   that Ripple entered into prior to xRapid being
 6   launched?
 7             MR. HECKER:  Just said he -- he just said
 8   he didn't recall whether they did that, so I don't
 9   know how he's supposed to answer that question.
10             THE WITNESS:  Yeah.  I don't recall.
11             MS. WAXMAN:  Okay.  Exhibit 2, please.
12             (Whereupon, Deposition Exhibit 2
13              was marked for identification.)
14   BY MS. WAXMAN:
15        Q.   Mr. Will, I'm showing you what's been
16   marked as RW Number 2, which has the Bates RPLI_SEC
17   0395056 through -58.
18             Please take a moment to look at it and let
19   me know when you're done.
20             And I'm going to ask you questions on the
21   very top email on the first page.
22        A.   Okay.
23        Q.   Why did Brad send you this email?
24             MR. HECKER:  Objection to form.
25             MR. FORD:  Objection to form.
```

1          THE WITNESS:  I can't speak to why Brad

2     sent me this email.

3     BY MS. WAXMAN:

4          Q.   Okay.  And did he tell you why?

5          A.   I don't recall anything other than what is

6     in here from December 2017.

7          Q.   Okay.  And in or around December 2017, did

8     you supervise █████████?

9          A.   I don't recall specifically.

10         Q.   Did you direct █████████ to push XRP in or

11    around this time?

12         A.   I directed --

13         MR. HECKER:  Sorry.  Objection to form.

14         THE WITNESS:  I directed -- I -- I gave

15    instructions to █████ that when she wrote the -- as

16    I recall, the monthly update for Brad to review,

17    that she highlight XRP.

18    BY MS. WAXMAN:

19         Q.   And why did you tell her to highlight XRP?

20         A.   I was three weeks, maybe four weeks into

21    the job, and I was considering different ways to

22    communicate to investors and -- and our partners.

23         Q.   The email says "told her to push XRP."

24              Does that mean promote the purchase of

25    XRP?

1          MR. HECKER:  Objection to form.

2     Foundation.

3          THE WITNESS:  I don't recall specifically.

4     I believe my intent was that she would highlight

5     XRP, which is about half the email.  The specific

6     attributes including technical superiority and the

7     use case of XRP.  So just educate -- educate our

8     partners and investors about XRP.

9     BY MS. WAXMAN:

10         Q.   Why would she need to educate Ripple

11    investors and partners about XRP?

12         MR. HECKER:  Objection to form.

13    Foundation.

14         THE WITNESS:  As I recall, we had -- we

15    had quite a few investors that invested in the

16    Series A and the Series B that had limited

17    understanding in cryptocurrencies.  And so I thought

18    it would be helpful to highlight the attributes of

19    XRP.

20    BY MS. WAXMAN:

21         Q.   Would those potential partners be

22    purchasing XRP?

23         MR. FORD:  Objection to form.

24         THE WITNESS:  This email was to educate

25    investors.  The investors in Ripple in the Series A

1   and the Series B, who were the investors that this

2   was -- this communication that Brad was going to

3   review before distribution outside of Ripple was --

4   some of them invested because of Ripple as a fintech

5   company.  Some of them invested for other reasons.

6   And so I thought it would be helpful to start

7   educating them about various attributes of the

8   company.  And in this specific communication, I told

9   her to highlight XRP.

10  BY MS. WAXMAN:

11      Q.   Did you think XRP was one of the most

12  important attributes of Ripple at the time?

13          MR. FORD:  Objection to form.

14          MR. HECKER:  Objection to form.

15          THE WITNESS:  I thought that we would

16  highlight a different attribute of Ripple in every

17  monthly email.  And this was part of a series.

18  BY MS. WAXMAN:

19      Q.   You mean a different attribute, a

20  different -- in different months?

21      A.   So the -- yeah.  Exactly.  So the next

22  month, we would highlight RippleNet.  The month

23  after that highlight a specific product or an

24  executive that we had hired.

25      Q.   Did you make that recommendation to anyone

1    at Ripple?

2         A.   I remember discussing it with Monica and

3    Brad as part of a general investor relations

4    discussion.

5         Q.   You also say in the very top of the email:

6              "Told her to push XRP to try

7              to educate investors and create

8              some evangelists."

9         Why did you tell her to create some

10   evangelists?

11        A.   It is helpful in private company

12   valuations and with investors to -- to create

13   investors who are knowledgeable about the attributes

14   of the company.  And that's just a technique for

15   investor relations.

16        Q.   Were you looking for her to create some

17   evangelists who would support XRP?

18             MR. FORD:  Objection to form.

19             MR. HECKER:  Form.

20             THE WITNESS:  This communication was

21   directed toward investors in Ripple equity.

22   BY MS. WAXMAN:

23        Q.   At the beginning of the sentence, you say,

24   "This is my bad."

25             Why do you write "my bad"?

```
 1          A.   I had been at the company three or four
 2    weeks.  I had directed an employee to take a certain
 3    approach with investor communications, and Brad had
 4    to spend, as he put it, you know -- I spent an hour
 5    rewriting this.  Felt bad about wasting his time.
 6          Q.   Did you have an understanding of what
 7    criticism Brad had with respect to your directive to
 8    push XRP?
 9               MR. FORD:  Objection to form.
10               THE WITNESS:  I -- I don't recall.
11    BY MS. WAXMAN:
12          Q.   Was Ms.        s role to engage with
13    potential institutions who would purchase XRP?
14               MR. FORD:  Objection to form.
15               THE WITNESS:  At this point in time, my --
16    my direction to her was to focus on investor
17    relations of Ripple equity investors.
18    BY MS. WAXMAN:
19          Q.   At any point in time, did she have a role
20    to engage with potential institutions who would
21    purchase XRP?
22               MR. FORD:  Objection to form.
23               THE WITNESS:  As part of her
24    participation, once she moved into XRP markets, that
25    may have been, but I don't specifically recall.
```

```
 1              MS. WAXMAN:  Exhibit 4, please.
 2                   (Whereupon, Deposition Exhibit 4
 3                   was marked for identification.)
 4     BY MS. WAXMAN:
 5         Q.   Mr. Will, I'm showing you what's been
 6     marked as RW4, which has the Bates RPLI_SEC 0068344.
 7              MR. FORD:  So I'm going to object to
 8     presenting him with only part of a document that on
 9     its face has an attachment without the accompanying
10     attachment.
11              MS. WAXMAN:  I'm not going to ask about
12     the attachment.  I'm just going to ask about what's
13     in the email itself.
14              MR. FORD:  That's fine, but he can't
15     necessarily understand the context of the email
16     without understanding the context of the attachment.
17     Do you have the context?
18              MS. WAXMAN:  No.  It's about 100 pages, so
19     I don't -- I don't have it.
20              MR. FORD:  Okay.
21              MS. WAXMAN:  I didn't print it out.
22              MR. FORD:  Then we'll just put an
23     objection on the record to not providing 100 pages
24     worth of context for the email when you're
25     questioning him about it, but go ahead.
```

1   BY MS. WAXMAN:

2       Q.   Mr. Will, are you familiar with the entity

3   Coinbase?

4       A.   I am familiar.

5       Q.   Okay.  What is Coinbase?

6       A.   My understanding is Coinbase is a

7   cryptocurrency exchange.

8       Q.   And did Ripple -- did XRP ever become

9   available for listing on Coinbase?

10          MR. FORD:  Objection to form.

11          THE WITNESS:  Over -- over what time?  Did

12  it ever?

13  BY MS. WAXMAN:

14      Q.   Yeah.

15      A.   I believe it did.

16      Q.   Okay.  And when did XRP become available

17  for trading on Coinbase?

18      A.   I don't recall.

19      Q.   You write in the email:

20              "Here's a presentation made to

21           Coinbase for last week's meeting.

22           It is in an RFP format.  Goal is to

23           get XRP listed.  Team felt it went

24           well."

25              As we've noted, you don't have the

156

1    attachment.  But did you have an understanding at

2    the time why Ripple wanted to get listed on

3    Coinbase?

4              MR. FORD:  Objection to form and, again,

5    to the extent you can answer that question without

6    the attachment in front of you, go ahead.

7              THE WITNESS:  Coinbase is a participant in

8    a cryptocurrency market.  It wouldn't strike me as

9    unusual that we would have discussions with them.

10   BY MS. WAXMAN:

11        Q.   So how would a listing on Coinbase be

12   beneficial to Ripple?

13             MR. FORD:  Objection to form.  Foundation.

14             THE WITNESS:  Coinbase was extremely well

15   funded.  It had a certain amount of stature within

16   cryptocurrency ecosystem.  They also provided a

17   significant amount of liquidity in cryptocurrency

18   trading.  And they were probably the most, if I

19   recall -- they were the most sophisticated player

20   and they've been the first to go public.  And so it

21   seems natural that we would want to have a

22   relationship with them.

23   BY MS. WAXMAN:

24        Q.   Would a listing of XRP on Coinbase have

25   led to more XRP trading volume?

1          MR. HECKER:  Objection to form.

2          MR. FORD:  Objection to form.

3          THE WITNESS:  It may.

4     BY MS. WAXMAN:

5          Q.   Was it your understanding that if XRP was

6     available for trading on Coinbase, it would increase

7     XRP's trade volume?

8          MR. FORD:  Objection to form.

9          THE WITNESS:  I don't recall at that point

10    of time having a point of view about that.

11    BY MS. WAXMAN:

12         Q.   You don't have -- you don't have an

13    opinion of what impact an XRP listing would have had

14    for Ripple in or around that time?

15         MR. FORD:  Objection to form.

16         MR. HECKER:  You're asking him if he now

17    has an opinion about what would have happened then?

18         MS. WAXMAN:  No.  I'm asking he -- I'm

19    asking him whether he had an opinion of what impact

20    an XRP listing would have.

21         MR. HECKER:  At the time?

22         MS. WAXMAN:  At the time.

23         MR. FORD:  Same objection.

24         THE WITNESS:  Four weeks after I joined

25    the company and was being introduced to