1     cryptocurrency overall, I don't recall having a -- a

2     very great understanding about the ecosystem.  So it

3     isn't likely I would have had a point of view.  I

4     was forwarding a presentation for a direct report

5     that -- to make sure they were in the loop on things

6     that were going on at the company.

7     BY MS. WAXMAN:

8          Q.   Did anyone tell you that the goal was to

9     get listed on Coinbase?

10         A.   I don't recall.

11              MS. WAXMAN:  Exhibit 5, please.

12              (Whereupon, Deposition Exhibit 5

13              was marked for identification.)

14    BY MS. WAXMAN:

15         Q.   Mr. Will, we're showing you what's been be

16    marked RW5, which is an exhibit with the Bates

17    RPLI_SEC 0644001.

18              Please take a moment to review it and let

19    me know when you're done.

20         A.   Okay.

21         Q.   Brad is -- why did Brad send this email?

22              MR. FORD:  Objection to form.

23    BY MS. WAXMAN:

24         Q.   Did he tell you why he sent this email?

25         A.   I don't know when I was copied into this

1    email.  I may have been copied in by Patrick.  I

2    don't recall the email specifically.

3         Q.   Did -- did Brad recommend making certain

4    disclosures regarding XRP purchases?

5              MR. FORD:  Objection to form.

6              THE WITNESS:  I don't recall why my part

7    of this email is about disclosures.

8    BY MS. WAXMAN:

9         Q.   And did you make a recommendation to Brad

10   as to whether the company should disclose that it

11   was purchased -- that it would purchase XRP?

12             MR. FORD:  Objection to form.

13             THE WITNESS:  I don't recall this

14   conversation.  This email exchange.

15   BY MS. WAXMAN:

16        Q.   At the top of the email, you say:

17                  "I don't favor being

18                  inconsistent with our public

19                  disclosures, but we have some

20                  leeway as an early stage company."

21             What did you mean by having leeway?

22             MR. FORD:  Objection to form and

23   mischaracterizes the document.

24             THE WITNESS:  As a private company, it is

25   fairly common, in my experience, that a company will

160

1    provide disclosures to investors or partners or

2    interested parties.  Those are not -- those don't

3    have to be consistent period over period.  You

4    can -- you can change around to -- at ███████,

5    at -- at my current company, we experiment with

6    different public disclosures as a normal course to

7    see what provides investors in the equity of our

8    company with useful information.

9    BY MS. WAXMAN:

10       Q.   Was that your view during your entire

11   tenure at Ripple with respect to what information

12   Ripple should disclose?

13            MR. HECKER:  Objection to form.

14            THE WITNESS:  As a private company that

15   was usually the lens that I looked at.  I think at

16   different points of time, it would depend on the

17   specific information that was involved.

18   BY MS. WAXMAN:

19       Q.   During your tenure at Ripple, did you ever

20   come to understand that Ripple purchased XRP from

21   the -- in the market?

22            MR. FORD:  Objection to form.

23            THE WITNESS:  I recall that there were

24   discussions about that.

25   / /

```
1    BY MS. WAXMAN:

2        Q.   And who did you have discussions with

3    about that?

4        A.   They were group discussions of the

5    executive team in the presence of counsel.

6        Q.   And did Ripple ultimately -- strike that.

7             Did you ever approve any transactions in

8    which Ripple purchased XRP in the market?

9        A.   I don't recall.

10            MR. FORD:  Objection to form.

11            THE WITNESS:  Sorry.

12            MR. FORD:  It's okay.

13            THE WITNESS:  Don't recall.

14            MS. WAXMAN:  Exhibit 9, please.

15             (Whereupon, Deposition Exhibit 9

16              was marked for identification.)

17            THE WITNESS:  Thank you.

18    BY MS. WAXMAN:

19        Q.   Mr. Will, I'm showing you what's been

20    marked RW9, which is an exhibit with the Bates

21    RPLI_SEC 0394831 through -835.

22             And I'm -- I'm going to ask you questions

23    on the first page.

24            MR. FORD:  Feel free to take time to read

25    through the whole email if that gets you through --
```

1          MS. WAXMAN:  Yes.  Take as much time as

2     you need.

3          MR. FORD:  So I'll just again note that

4     this is an email that has an attachment according to

5     its metadata on the top here and we haven't been

6     provided with the attachment.

7          Do you have it?  Are you going to show him

8     the attachment as well or just the email?

9          MS. WAXMAN:  I'm not going to show him the

10    attachment.

11          MR. FORD:  So I'll just put the same

12    objection on the record that you're showing him the

13    email without its full context.

14          Mr. Will, to the extent you feel like you

15    can answer Ms. Waxman's questions do so, but

16    recognize there's context here that you're lacking.

17          THE WITNESS:  Yeah.

18          Okay.

19    BY MS. WAXMAN:

20          Q.    Do you know who Arthur Britto is?

21          A.    Arthur Britto is one of the developers of

22    XRP.

23          Q.    Is he a Ripple employee?

24          MR. FORD:  Objection to form.

25          THE WITNESS:  He may have been over the

1    time period that I was there.

2    BY MS. WAXMAN:

3        Q.   And when you say he may have been, is

4    there any reason why you're unsure of his status?

5            MR. HECKER:  Objection to form.

6            THE WITNESS:  We had over 200 people on

7    payroll when I started.  We had close to 500 people

8    on payroll when I left.  I would say I don't know

9    exactly whether he was a contractor, an employee or

10   was just an advisor to the company.

11   BY MS. WAXMAN:

12       Q.   Do you know what role or responsibilities

13   he had?

14           MR. FORD:  Objection to form.  Foundation.

15           THE WITNESS:  I don't remember

16   specifically.  He was extremely knowledgeable about

17   cryptocurrency, and so we valued his input as an

18   advisor.

19   BY MS. WAXMAN:

20       Q.   And did you have any interaction with

21   Mr. Britto while you were at Ripple?

22       A.   Next to none.

23       Q.   Is Mr. Britto relaying certain concerns in

24   the email on the bottom of 0394832?

25           MR. FORD:  Objection to form and to the

1    characterization of the document.

2              THE WITNESS:  832.

3    BY MS. WAXMAN:

4         Q.   The bottom of the -- the email on Friday,

5    December 15th at 4:25 from Arthur Britto.  Can you

6    read that into the record?

7         A.   The -- starting with "Hi Brad"?

8         Q.   Please.

9         A.   "Here's a real life example of how we are

10   failing to communicate.  The impact being lack of

11   investment and the further spread of a negative

12   message.  This is -- this group in particular is

13   broadcasting a negative XRP message."

14        Q.   Did you understand Mr. Britto to be

15   talking about a lack of investment in XRP?

16             MR. FORD:  Objection to form.  Foundation.

17             THE WITNESS:  I don't believe -- I -- I

18   don't recall this exchange.  I don't believe I was

19   copied in at that point.  I don't remember reading

20   down to that point.

21   BY MS. WAXMAN:

22        Q.   Is there anything in the thread that would

23   make you believe that he's talking about Ripple

24   equity investors?

25             MR. FORD:  Objection to form.

1          THE WITNESS:  I don't really have a point

2     of view on that.  At the time, I don't -- I don't

3     believe I read it.  Don't recall, so ...

4     BY MS. WAXMAN:

5          Q.   Did you have an understanding of why Brad

6     forwarded the email to you?

7          MR. FORD:  Objection to form.

8          THE WITNESS:  General education.  I was a

9     new employee.  This was about a month after I had

10    started.

11    BY MS. WAXMAN:

12         Q.   And did he solicit any feedback from you,

13    either in writing or orally?

14         A.   I don't recall.

15         Q.   Did you provide any feedback?

16         A.   I don't recall outside of this email

17    exchange, but -- I don't recall.

18         Q.   Okay.  In the email, did you recommend

19    certain steps that the company could take to address

20    some of the concerns that Mr. Britto had

21    regarding --

22         MR. FORD:  Objection --

23    BY MS. WAXMAN:

24         Q.   -- broadcasting a negative XRP message?

25         MR. HECKER:  Objection to form.

```
 1   Foundation.
 2          THE WITNESS:  I don't remember this email
 3   exchange.  It appears, given the reading of the
 4   email that I wrote to Brad, that I was just setting
 5   up a construct to think about the problem compared
 6   to how a public company would educate investors
 7   about its equity.
 8   BY MS. WAXMAN:
 9      Q.   And why were you comparing Ripple's
10   efforts to what a public company does?
11          MR. HECKER:  Objection to form.
12   Foundation.
13          THE WITNESS:  I was trying to anchor in
14   something I had some knowledge of as I was getting
15   up to speed on crypto.
16   BY MS. WAXMAN:
17      Q.   Did you understand Ripple to be engaged in
18   similar efforts as a public company that looked to
19   raise funds from shareholders?
20          MR. HECKER:  Objection to form.
21   Foundation.
22          THE WITNESS:  We were a private company at
23   the time.  I was getting up to speed at the time.  I
24   don't specifically recall, you know, what the
25   marketing was at that time of -- of the company's
```

1    equity.

2    BY MS. WAXMAN:

3         Q.   Did you view XRP as a way for investors to

4    invest in Ripple?

5              MR. FORD:  Objection to form.

6              THE WITNESS:  In this email exchange I was

7    only trying to set up a comparable situation to try

8    to educate the discussion.

9    BY MS. WAXMAN:

10        Q.   Outside of this email, at any point in

11   time, did you view XRP as a way for investors to

12   invest in Ripple?

13             MR. FORD:  Objection to form.

14             THE WITNESS:  No.

15   BY MS. WAXMAN:

16        Q.   At the bottom of the email, you talk about

17   Ms. ▮▮▮▮   Can you read that paragraph into the

18   record?

19        A.   Starting with ▮▮▮▮?

20        Q.   Please.

21        A.   ▮▮▮▮ and I have created and are

22   executing on an IR strategy that we've presented to

23   Monica/Patrick.  I think it might make sense to have

24   some kind of regular IR

25   meeting/communications/dashboard.  Keep us all on

1    the same page, have clarity on strategy, issues,

2    prioritization, et cetera."

3        Q.   That's okay.  You can stop.

4        Are you talking about an IR strategy with

5    respect to communications and marketing specific to

6    XRP?

7        MR. FORD:  Objection to form.

8        THE WITNESS:  I don't specifically recall,

9    but that would be -- that would be not what I would

10    mean by IR.  IR, I would specifically mean, given my

11    experience at        and all the other private

12    companies I worked at, to mean the equity of Ripple

13    in this context.

14    BY MS. WAXMAN:

15        Q.   But isn't this email all about

16    broadcasting a negative XRP message and isn't this

17    email all about an investment in XRP, not --

18        A.   Most of this email --

19        MR. FORD:  Object -- object to the form.

20    Object to the characterization.  And, again, you

21    haven't given him the entire email because you

22    haven't given him the attachment.

23        So, Mr. Will, again, to the extent you can

24    answer the question based on what Ms. Waxman has

25    chosen to show, go ahead.

1          MR. HECKER:  Also just object on the

2    grounds it's argumentative.

3          You can answer if you understand it.

4          THE WITNESS:  Most of this email is, in my

5    review, about how we would market Ripple equity

6    going forward and an opportunity for me to build

7    some consensus around that with Brad as a new

8    employee.

9    BY MS. WAXMAN:

10        Q.   Did you ever recommend any action with

11   respect to marketing XRP?

12        A.   Not that I recall.

13          MS. WAXMAN:  And just for the record, the

14   attachment is called "Cannaccord, December 13th,

15   2017."  And I believe --

16          MR. HECKER:  Wait.  I'm sorry.

17          Okay.  Go ahead.

18          MS. WAXMAN:  Exhibit 12, please.

19            (Whereupon, Deposition Exhibit 12

20             was marked for identification.)

21   BY MS. WAXMAN:

22        Q.   Mr. Will, I'm showing you what's been

23   marked as Exhibit RW12, which is a document with the

24   Bates RPLI_SEC 038375 through -76.

25   / /

1          ZOOM PARTICIPANT:  Could you repeat the

2    exhibit number?

3          MS. WAXMAN:  0 -- 12.

4          ZOOM PARTICIPANT:  12.  Thank you.

5          THE WITNESS:  Okay.

6    BY MS. WAXMAN:

7          Q.   And ████████    reported to you?

8          A.      ████████  reported to me.

9          Q.   He was the controller?

10         A.   He was the controller.

11         Q.   Okay.  And why was he sending you this

12   email regarding escrow -- regarding XRP being

13   released from the escrow?

14         MR. HECKER:  Objection to form.

15   Foundation.

16         THE WITNESS:  ████  was involved with the

17   escrow process, and that's -- that's why he sent

18   this.

19   BY MS. WAXMAN:

20         Q.   In connection with Ripple's XRP holdings,

21   where did Ripple hold its -- where did Ripple hold

22   its XRP?

23         MR. FORD:  Objection to form.

24         THE WITNESS:  I'm not sure I'm clear on

25   the question.

171

1    BY MS. WAXMAN:

2         Q.    Earlier you testified that Ripple had over

3    60 billion XRP.  And you also testified that at some

4    point before you arrived, Ripple held a portion of

5    its XRP in escrow.  Did it hold any XRP outside of

6    the escrow?

7         A.    Yes.

8         Q.    Okay.  And how much XRP did it hold

9    outside of the escrow?

10        A.    It varies over time, but I recall roughly

11   ████████████    XRP at any given time.

12        Q.    And -- and why did it have a separate --

13   why did it hold XRP outside of the escrow?

14              MR. FORD:  Objection to form.

15              THE WITNESS:  It would be a variety of

16   reasons we would hold it outside of the escrow.  We

17   had commitments to provide XRP to partners.  So

18   those would be held outside of escrow.  Also any XRP

19   that we wanted to use in our product or for other

20   purposes, testing or experimentation, we would keep

21   outside of the escrow.  So we had to -- we -- we set

22   the amount of escrow so that it wasn't 100 percent

23   of the XRP.

24   BY MS. WAXMAN:

25        Q.    Did -- did Ripple publicly disclose when

```
 1   it would distribute or use XRP in the -- that was
 2   held outside of the escrow?
 3              MR. FORD:  Objection to form.
 4              THE WITNESS:  Ripple provided, if I
 5   recall, nearly real time, at least daily, if I
 6   recall, balance information of its holdings of XRP
 7   both in the escrow and outside of the escrow.
 8   BY MS. WAXMAN:
 9        Q.   Where was that information?
10        A.   On the website.
11        Q.   Okay.  Did -- in the -- in this -- going
12   back to this email, did -- did Mr. █████ propose
13   returning -- overstating Ripple's XRP usage?
14              MR. FORD:  Objection to form.
15              MR. HECKER:  Objection to form.
16              THE WITNESS:  He is --
17   BY MS. WAXMAN:
18        Q.   As it pertained to the escrow.
19              MR. HECKER:  Sorry.  Objection, form.
20              THE WITNESS:  █████████ appears -- and
21   this is two months after I joined, so I was getting
22   familiar with the escrow mechanics, as well as the
23   escrow itself, as well as crypto -- would be
24   responsible for making recommendations about how
25   much XRP we would move from the escrow and return to
```

 1    the escrow.

 2            And typically the move was predetermined.

 3    It was a billion units of XRP, but his

 4    recommendation would usually be about how much we

 5    would return to the escrow.

 6    BY MS. WAXMAN:

 7        Q.   Okay.  And did he -- did he recommend

 8    that -- what was his recommendation with respect to

 9    how much you should return to the escrow during this

10    particular period?

11            MR. FORD:  Objection to form.

12            THE WITNESS:  In the first sentence, it

13    appears he's recommending that we take 100 million

14    from escrow to our main wallet.

15    BY MS. WAXMAN:

16        Q.   And why -- and was that in excess of

17    projected usage?

18            MR. HECKER:  Objection to form.

19            MR. FORD:  Objection to form.

20            THE WITNESS:  The XRP that Ripple would

21    hold would be transparent to anyone on the website

22    to be able to view.  We didn't view it as this was

23    the only method that someone might be able to see

24    what our XRP usage was.  They had other ways to

25    figure that out.

1    BY MS. WAXMAN:

2        Q.    How -- how could someone figure out what

3    Ripple's XRP usage was?

4        A.    They could track our XRP balance on a

5    daily and even more frequent basis to see how much

6    XRP Ripple held.

7        Q.    And how would they -- would they need to

8    know which XRP wallets were being maintained by

9    Ripple in order to do that?

10        A.    Ripple, in my recollection, provided two

11    numbers on its website.  One was the amount that was

12    in escrow and one that was outside of escrow.  By

13    adding those two numbers up, you knew the total

14    amount of XRP that Ripple owned.

15        Q.    Okay.  At the top, you write -- you

16    respond to Peter's email.  You say:

17                "We may want to get the market

18            in the habit of seeing slightly

19            larger drawdowns each month so we

20            don't show our cards when we

21            increase it for something

22            strategic."

23            Are you talking about drawdowns of XRP

24    each month from the escrow?

25        A.    I recall that being, we would discuss if

175

 1    we needed a larger amount of XRP for a strategic

 2    reason, we would unfortunately be telegraphing that

 3    need if we only did it through the escrow release.

 4    So was there a rationale to not prerelease that

 5    information effectively as a private company by

 6    taking a -- a consistent but -- a consistent amount

 7    every month that was slightly in excess of what we

 8    might need to -- to build that buffer.

 9         Q.   And when you're talking about the market,

10    are you talking about XRP holders?

11         A.   In this context, yes.

12         Q.   Okay.  And why didn't you want to show

13    increases to the XRP market?  Were you -- were you

14    concerned how that would -- that information would

15    be -- how the market would react to that

16    information?

17              MR. HECKER:  Objection to the form of that

18    question.

19              THE WITNESS:  I don't remember

20    specifically in early 2018, but a typical concern

21    would be of more of a strategic competitive nature

22    to Ripple.

23    BY MS. WAXMAN:

24         Q.   What do you mean, a competitive nature to

25    Ripple?

176

1          A.    Ripple competes with other fintech

2     companies, cryptocurrency companies, and as a

3     payment company, other payment companies, if they

4     had knowledge that we might be doing something

5     large, for example, MoneyGram, then that was, as --

6     as I say here, showing our cards early.

7          Q.    Okay.

8               MS. WAXMAN:   Should we take a lunch break?

9               MR. HECKER:   Sure.

10               THE VIDEOGRAPHER:   We're going off the

11     record.   The time is 12:57 p.m.

12               (Whereupon, a lunch recess was taken.)

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1    JULY 30, 2021                          1:47 P.M.

 2                   P R O C E E D I N G S

 3                   AFTERNOON SESSION

 4           THE VIDEOGRAPHER:  Back on the record.

 5    The time is 1:47 p.m.

 6    BY MS. WAXMAN:

 7       Q.    Mr. Will, before we broke for lunch, you

 8    testified earlier about certain approval matrices

 9    that were used for decision-making at Ripple.  Is

10    that correct?

11       A.    Yes.

12       Q.    What decisions did those approval matrices

13    pertain to?

14           MR. FORD:  Objection to form.

15           THE WITNESS:  You typically have an

16    approval matrix for financial decisions, things that

17    had a financial implication.

18    BY MS. WAXMAN:

19       Q.    Did you have more than one approval matrix

20    that you used?

21           MR. FORD:  Objection to form.

22           THE WITNESS:  I don't specifically recall

23    at Ripple if we did.

24    BY MS. WAXMAN:

25       Q.    Did you use -- did you use certain
```

178

1    approval matrices at Ripple in connection with

2    certain decisions?

3              MR. FORD:  Objection to form.

4              THE WITNESS:  I don't specifically recall.

5    It's very standard at a company to have a -- a

6    matrix or a process around what approvals require

7    the specific involvement of the CEO or the CFO.

8    BY MS. WAXMAN:

9         Q.   And was there a specific document where

10   the matrix was documented?

11        A.   Don't recall.

12        Q.   Did anyone else at the company use these

13   approval matrices, other than you?

14             MR. FORD:  Objection to form.

15             THE WITNESS:  Don't recall.

16   BY MS. WAXMAN:

17        Q.   If there -- would this document be used

18   outside of the finance department?

19             MR. FORD:  Objection to form.  He just

20   said he doesn't recall any documents.

21             THE WITNESS:  Don't recall.

22   BY MS. WAXMAN:

23        Q.   Did you have any discussions with anyone

24   regarding the approval matrices during your entire

25   tenure at Ripple?

```
 1              MR. FORD:  So if the answer to that
 2   includes discussion with counsel, I'd ask you not to
 3   disclose those.  But if you have other -- awareness
 4   of other discussions, you can answer.
 5              THE WITNESS:  Don't recall.
 6   BY MS. WAXMAN:
 7        Q.   Did you have any discussions with
 8   Mr. Garlinghouse about any approval matrices at
 9   Ripple?
10        A.   Don't recall.
11        Q.   What information was -- what information
12   was contained in the -- in the approval matrices
13   that were used at Ripple?
14        A.   I don't recall the specifics of the Ripple
15   approval matrix.
16        Q.   What information is generally contained in
17   an approval matrix?
18              MR. FORD:  Objection to form.
19              THE WITNESS:  At          for example, we
20   would have an approval matrix that, depending on the
21   type of transaction, would lay out the dollar
22   thresholds that various approvals were required.
23   BY MS. WAXMAN:
24        Q.   So would it have the name of a specific
25   individual at the company who would be required to
```

1    approve a certain transaction?

2        A.   I recall at the Yahoo, approval matrix, it

3    would be by title.

4        Q.   Did you have -- did the approval matrix

5    for Ripple assign certain responsibilities to

6    certain people who had certain roles at the company

7    at Ripple?

8             So, for example, you know, it wouldn't put

9    a person's name but would it provide for, you know,

10   the CEO to approve certain transactions?

11            MR. FORD:  Objection to form.

12            THE WITNESS:  I don't specifically recall.

13   BY MS. WAXMAN:

14       Q.   Other than you, did anyone else at Ripple

15   use this -- use approval matrices?

16            MR. FORD:  Objection to form.  Asked and

17   answered.

18            THE WITNESS:  Don't recall.

19   BY MS. WAXMAN:

20       Q.   Did you have an understanding whether

21   this -- the use -- the company was using approval

22   matrices before you came to Ripple?

23            MR. FORD:  Objection to form.

24            THE WITNESS:  At an early stage company,

25   like Ripple was, less than 200 employees, it would

1    be uncommon that they would have formalized the

2    approval process at that point.

3    BY MS. WAXMAN:

4        Q.   Is -- is that something you did when you

5    started with Ripple?

6            MR. FORD:  Objection to form.

7            THE WITNESS:  I don't recall specifically,

8    but that is something that I commonly do as part of

9    entering into a start-up as part of my job function.

10   BY MS. WAXMAN:

11       Q.   Do you -- I know you don't specifically

12   recall doing that at Ripple, but do you have a

13   general recollection of taking those sorts of steps

14   when you joined Ripple?

15       A.   In general, part of my role is to

16   formalize financial process.  So it would be part of

17   a playbook, if you will, of activities that I would

18   put in place at a start-up.

19       Q.   And is -- would you need the approval of

20   senior executives before you instituted certain

21   approval matrices?

22           MR. FORD:  Objection to form.

23           THE WITNESS:  You would want the alignment

24   of typically the -- the CEO and -- and others before

25   formalizing an approval matrix depending on how

182

1    specific it was.

2    BY MS. WAXMAN:

3         Q.   And did you discuss with either --

4    Mr. Garlinghouse -- the institution of certain

5    approval matrices at Ripple?

6         A.   Don't recall.

7              MR. FORD:  Objection to form.

8              THE WITNESS:  Sorry.  Sorry.

9    BY MS. WAXMAN:

10        Q.   And I apologize if I asked this already.

11   Did you draft -- do you approve certain -- I know

12   you don't specifically recall matrices at Ripple,

13   but did you have an -- who drafted those approval

14   matrices for Ripple?

15             MR. HECKER:  Objection to form.

16   Foundation.

17             THE WITNESS:  Typically, I would be

18   involved, if not specifically tasked, with coming

19   together with an approval matrix at a start-up.

20   BY MS. WAXMAN:

21        Q.   So if -- so at Ripple, you would have been

22   a primary drafter of any approval matrices at

23   Ripple?

24             MR. FORD:  Objection to form.

25             THE WITNESS:  There could be others that

1    were implementing it for nonfinancial processes, but

2    typically the CFO would be responsible for a

3    financial approval matrix.

4    BY MS. WAXMAN:

5        Q.   And what financial transactions needed to

6    be approved by the CEO?

7            MR. FORD:  Objection to form.

8            THE WITNESS:  I don't recall specifically

9    which transactions.

10   BY MS. WAXMAN:

11       Q.   Do you have a general understanding of

12   what transactions the CEO needed to approve with --

13   what financial transactions the CEO needed to

14   approve?

15           MR. FORD:  Objection to form.

16           THE WITNESS:  Typically a CEO at a

17   start-up would approve any acquisitions and any

18   material, financial transactions that either

19   obligated the company to provide funds or any kind

20   of major activities.

21   BY MS. WAXMAN:

22       Q.   Did the CEO need to approve any

23   acquisitions at Ripple?

24           MR. FORD:  Objection to form.

25           THE WITNESS:  It would be typically that a

184

1    CEO would specifically approve any acquisitions, and

2    above a certain size, the board would also be

3    involved with the acquisitions.

4    BY MS. WAXMAN:

5        Q.   And same question for financial

6    transactions that obligated the company to provide

7    funding.

8            MR. FORD:  Objection to form.

9    BY MS. WAXMAN:

10       Q.   Is that something that the CEO would need

11   to approve?

12       A.   CEO would be involved in approving

13   material financial transactions.

14       Q.   Were there any transactions that you could

15   approve without getting sign-off from the CEO?

16           MR. FORD:  Objection to form.

17           THE WITNESS:  I typically coordinated, if

18   not explicitly gained the approval of the CEO on any

19   material transaction.

20   BY MS. WAXMAN:

21       Q.   Would you need the specific approval of

22   any other senior executive at Ripple other than the

23   CEO?

24           MR. FORD:  Objection to form.

25           THE WITNESS:  Depends on the nature of the

185

1    transaction.

2    BY MS. WAXMAN:

3        Q.    Did Ripple custody XRP on behalf of third

4    parties?

5        A.    I don't recall.

6        Q.    Did Ripple ever custody -- enter into an

7    agreement with Coinbase whereby Ripple would

8    custody -- Coinbase would custody a portion of

9    Ripple's XRP?

10            MR. FORD:  Objection to form.

11            MR. HECKER:  Objection to form.

12            THE WITNESS:  Don't recall.

13   BY MS. WAXMAN:

14       Q.    Did you have an understanding as to why

15   Ripple would ask a third party to custody its XRP?

16            MR. FORD:  Objection to form.

17            MR. HECKER:  Objection to form.

18   Foundation.

19            THE WITNESS:  At the time -- I don't

20   recall now why.  At the time, I -- I may have.

21   BY MS. WAXMAN:

22       Q.    Did you -- did you have any involvement

23   with any agreements between Coinbase and Ripple

24   during your tenure?

25       A.    I don't recall.

```
 1              MS. WAXMAN:  Exhibit 6, please.

 2              (Whereupon, Deposition Exhibit 6

 3              was marked for identification.)

 4    BY MS. WAXMAN:

 5        Q.   Mr. Will, I'm showing you what's been

 6    marked RW6, which doesn't have a Bates stamp number

 7    on it.  It's an email string dated December 13th,

 8    2017 and December 14th, 2017.

 9              MR. FORD:  Daphna, do we know the Bates

10    number of the document?

11              MS. WAXMAN:  I don't know it right at the

12    moment, but we can get it for you.

13              THE WITNESS:  Okay.

14    BY MS. WAXMAN:

15        Q.   Do you know what this email is about?

16        A.   I don't recall the specific email

17    exchange, but it appears to be about a problem with

18    the escrow.

19        Q.   And what problem with the escrow?

20        A.   According to the --

21        Q.   On the top email.

22        A.   Yeah.  Sorry.

23              According to the email, in the exchange

24    between Brad,     Monica, about a month after I

25    joined the company, they discuss fixing a bug in how
```

1    we implemented the escrow.

2         Q.    And were people at the company concerned

3    of -- about disclosing the bug?

4         A.    I can't --

5              MR. FORD:  Object -- object to the form.

6              THE WITNESS:  I can't speak to whether

7    people at the company were concerned.

8    BY MS. WAXMAN:

9         Q.    Did you --

10        A.    I don't recall.

11        Q.    Did you make a recommendation regarding

12   what to publicly disclose about the incident?

13             MR. FORD:  Objection to the form of the

14   question.

15             THE WITNESS:  There's a sentence here that

16   I wrote back asking about:

17                  "Will it be obvious it was a

18             bug?  Can we say something like

19             we" -- in quotations, "we refined

20             the escrow?"

21   BY MS. WAXMAN:

22        Q.    Why did you recommend to say that Ripple

23   had refined the escrow instead of just disclosing

24   that a bug had occurred?

25             MR. HECKER:  Objection to form.

1    Foundation.

2              THE WITNESS:  Don't recall.

3    BY MS. WAXMAN:

4         Q.   Did you believe that Ripple had an

5    obligation to accurately report the incident?

6         A.   At the time, I don't recall having an

7    opinion about whether it needed to publicly

8    disclose.  Been at the company about a month at that

9    point.

10        Q.   Sitting here today, do you have an opinion

11   whether Ripple had an obligation to accurately

12   report the incident?

13             MR. FORD:  Objection to form.

14             THE WITNESS:  Don't have an opinion that a

15   private company has an obligation either way

16   about -- about this matter.  It was a heavily

17   technical matter.  The individuals that are involved

18   in it,          ██████████   was the engineering manager in

19   charge of the Ripple D team.  Himself and David

20   Schwartz were far more qualified to assess the

21   materiality of this technical issue.

22   BY MS. WAXMAN:

23        Q.   Did you have an understanding that people

24   were concerned about publicly disclosing the bug?

25             MR. HECKER:  Objection to form.

189

1          THE WITNESS:  I don't recall.

2          MS. WAXMAN:  Sorry.

3          Exhibit 19.

4              (Whereupon, Deposition Exhibit 19

5              was marked for identification.)

6     BY MS. WAXMAN:

7          Q.  Mr. Will, I'm showing you what's been

8     marked as Exhibit 19, which is marked R -- which has

9     the Bates RPLI_SEC 0072060 through -65.

10          MR. HECKER:  Counsel, is this document

11     attached to an email or does it appear on a

12     standalone basis in your files?

13          MS. WAXMAN:  I think it appears both ways

14     in our record.  It appears as an attachment, and it

15     probably likely appears as a standalone document.

16          Q.  But, Mr. Will, if you need -- if you can't

17     answer the question, please let me know.

18          A.  Okay.

19          Q.  Mr. Will, do you know an entity called

20     Bittrex?

21          A.  I believe they are an exchange of

22     cryptocurrency.

23          Q.  Okay.  And what is Exhibit -- what is

24     marked as Exhibit RW19?

25          A.  I don't recall --

190

 1            MR. FORD:  Sorry, just, again, to be

 2    clear, to the extent you can understand the context

 3    of this based on this document, which it looks like

 4    was sent via email, without the cover email, you

 5    know, do your best to describe it with what

 6    Ms. Waxman has shown you.

 7            THE WITNESS:  I don't recall this -- this

 8    memo.

 9    BY MS. WAXMAN:

10        Q.   Okay.  Did you ever have any

11    communications with Bittrex regarding the listing of

12    XRP on its platform?

13        A.   I don't recall any direct communications

14    with Bittrex.

15        Q.   Did you sign this letter?

16        A.   Yes, I did.

17        Q.   And would you have read the document

18    before you signed it?

19        A.   It would be my normal practice to read a

20    letter before signing it.

21        Q.   Okay.  And did you draft this letter?

22        A.   I don't believe I did.

23        Q.   Did someone draft this for you on your

24    behalf?

25        A.   It wouldn't be uncommon for a team of

1    individuals to draft a letter like this, and I would

2    review it and rely on their expertise before

3    signing.

4        Q.   Who drafted this letter?

5           MR. FORD:  Objection to form.

6           THE WITNESS:  I don't recall.

7    BY MS. WAXMAN:

8        Q.   And I know you don't recall the letter

9    specifically, but generally, what was the purpose of

10   this letter?

11         MR. HECKER:  Objection to form.

12   Foundation.

13         THE WITNESS:  I don't recall.

14   BY MS. WAXMAN:

15       Q.   Was XRP traded on the Bittrex platform in

16   February 2018?

17       A.   Don't recall.

18       Q.   Was Ripple ask -- was Bittrex asking you

19   to provide information regarding XRP status under

20   the federal securities laws?

21         MR. FORD:  Objection to form and, again,

22   I'm not sure if there's a cover email that would

23   provide that information.

24         Mr. Will, to the extent you know.

25         MS. WAXMAN:  If he can't answer the

1    question based on the document, he'll let me know.

2    BY MS. WAXMAN:

3        Q.   But if you can answer the question based

4    on what is in front of you, please do.

5        A.   I don't recall the context in which we

6    sent this email I signed, or this memo.

7        Q.   Are you familiar with any of the contents

8    in the document?  I know you don't recall sending

9    it, but are any of the contents something that

10   you've ever discussed with anyone at Ripple?

11       A.   I am familiar with some of the contents of

12   this letter.

13       Q.   And which parts?

14       A.   I'm familiar with Ripple's holding of XRP.

15       Q.   Where are you pointing to?  Oh, okay.  The

16   bottom of page 2?

17       A.   Mh-hmm.  Portions of part 1, part 2A, and

18   some of part 2B.

19       Q.   At the very top of the page, the second

20   paragraph --

21           MR. HECKER:  Sorry, which page?

22           MS. WAXMAN:  The first page.  Sorry.

23   BY MS. WAXMAN:

24       Q.   Can you read into the record the second

25   paragraph starting with "Addressing"?

1   A. "Addressing the substance of the

2 application, we believe it is important to clarify

3 basic tenets of digital asset XRP, namely that it is

4 not a product of Ripple and it is not a digital

5 asset that Ripple created or issued.  We believe

6 these are important distinctions with respect to

7 Securities and Exchange Commission guidance on

8 cryptocurrencies and when certain tokens may be

9 considered securities as part of our communication

10 with you.  We believe the genesis of XRP is an

11 important consideration."

12   Q. The first sentence, did you agree with

13 that statement that XRP is not a product of Ripple

14 and is not a digital asset that Ripple created or

15 issued?

16   A. At the time of this letter or now?

17   Q. At the time of this letter, let's start

18 there.

19   A. Yeah.  I don't recall at the time of the

20 letter.

21   Q. And what about now?

22   A. I believe that XRP is not a product of

23 Ripple and it's not a digital asset that Ripple

24 created.

25   Q. Who created XRP?

194

1              MR. FORD:  Objection to form.

2              THE WITNESS:  The developers of XRP.

3     BY MS. WAXMAN:

4         Q.   And aren't the developers of XRP the same

5     people who founded Ripple?

6              MR. FORD:  Objection to form.  Foundation.

7              THE WITNESS:  My understanding was they

8     developed XRP before the founding of Ripple.  There

9     was no Ripple when they founded XRP.

10    BY MS. WAXMAN:

11        Q.   But is -- I understand that.  But is there

12    overlap between the people who created Ripple and

13    the people who created -- people who created Ripple

14    and the people who created XRP?

15             MR. FORD:  Objection to form.

16             THE WITNESS:  I suppose.  I -- I wasn't

17    there, but yes, looks that way.

18    BY MS. WAXMAN:

19        Q.   Well, did you have an understanding of

20    who -- who founded Ripple at the time that you

21    joined Ripple?

22        A.   When I joined Ripple, no.  Shortly after,

23    I started understanding who founded Ripple.

24        Q.   Okay.  And do you have an understanding

25    now who were the founders of Ripple?

1          A.    Yes.

2          Q.    And who founded Ripple?

3          A.    Chris Larsen and Jeb McCaleb.

4          Q.    And -- and who created XRP?

5                MR. FORD:  Objection to form.  Asked and

6     answered.

7                THE WITNESS:  Chris Larsen, Jeb McCaleb,

8     Arthur Britto, David Schwartz.

9     BY MS. WAXMAN:

10         Q.    And the people who created XRP, did

11    they -- after they created it, did they move on to

12    join Ripple when it was founded?

13               MR. FORD:  Objection to form.

14               THE WITNESS:  I was not involved in August

15    of -- as this memo lays out, of 2012.  But my

16    understanding was that Chris and Jeb founded Ripple

17    after the creation of XRP.  And when I worked there,

18    David Schwartz was an employee of the company.

19    BY MS. WAXMAN:

20         Q.    So there was overlap between the people

21    who created XRP and the people who founded the

22    company?

23               MS. DEARBORN:  Objection to form.

24               THE WITNESS:  It appears that way.

25    / /

196

```
 1    BY MS. WAXMAN:
 2        Q.    At the very -- towards the bottom of the
 3    second page, the paragraph that starts with "The
 4    company," it says:
 5                    "The company continually
 6              reviews the guidance provided by
 7              regulators, including the SEC, and
 8              has invested in and received a
 9              legal memorandum from a reputable
10              law firm that supports a finding
11              that XRP is not a security under
12              U.S. law."
13              Did you have any understanding as to
14    whether Ripple had received a legal memo from a
15    reputable law firm supporting a finding that XRP is
16    not a security under U.S. law?
17                    MR. FORD:    So, again, to the extent your
18    understanding or your knowledge of those issues
19    derives from conversations you had with counsel, I'd
20    instruct you not to answer.    But if you can answer
21    that question without revealing conversations you
22    had with counsel, you can answer.
23                    THE WITNESS:    I can't answer that question
24    for the reason that Chris provided.
25    / /
```

1   BY MS. WAXMAN:

2       Q.   Did Ripple ever provide any third party

3   with a legal memo concerning XRP status under the

4   securities laws?

5           MR. FORD:   Objection to form and same

6   instruction to the witness.

7           THE WITNESS:   Don't recall.

8   BY MS. WAXMAN:

9       Q.   The very top of the page under the heading

10  "Digital assets and SEC guidance," it says:

11              "We understand that whether or

12          not a digital asset may be

13          considered a security is an

14          important consideration for many in

15          the digital asset ecosystem and

16          especially exchanges that list

17          cryptocurrencies."

18          Did you have any understanding why this

19  was important consideration for digital asset

20  platforming?

21          MR. HECKER:   Objection to form and, again,

22  same instruction about discussions with counsel.

23          THE WITNESS:   I don't recall any -- any

24  thoughts at the time.

25  / /

198

1    BY MS. WAXMAN:

2        Q.   Do you have any understanding currently as

3    to why this is an important consideration for

4    digital asset platforms?

5            MR. HECKER:  Same instruction.

6            THE WITNESS:  Not my area of expertise.

7            MS. WAXMAN:  Exhibit 31.

8            (Whereupon, Deposition Exhibit 31

9            was marked for identification.)

10   BY MS. WAXMAN:

11       Q.   Mr. Will, I'm showing you what's been

12   marked as RW31 which has the Bates RPLI_SEC 0861659

13   through -670.

14           Please take a look at it and let me know

15   when you're done.

16           ZOOM PARTICIPANT:  Could you repeat the

17   exhibit number, please.

18           MS. WAXMAN:  31.

19           ZOOM PARTICIPANT:  31?

20           MS. WAXMAN:  Correct.

21           THE WITNESS:  Okay.

22           MR. FORD:  Again, before we get started,

23   this appears to be a document sent by email, and so

24   we'll object to it to the extent you're not

25   providing him with the complete context of the

1    document.

2            Mr. Will, again, to the extent you can

3    answer Ms. Waxman's questions based on what's in

4    front of you.

5    BY MS. WAXMAN:

6        Q.   Can you please identify for the record

7    what Exhibit RW31 is?

8        A.   I don't recall this.

9        Q.   Well, I know you don't recall the specific

10   document, but can you just tell me what it is?

11           MR. FORD:  Objection to form.

12           MR. HECKER:  Objection to form.

13   BY MS. WAXMAN:

14       Q.   Is this a letter addressed to Bittrex

15   dated March 22nd, 2018?

16       A.   This is a letter addressed to Bittrex

17   dated March 22nd, 2018.

18       Q.   Did -- did you --

19       A.   I don't know the context in which it

20   was -- it was sent in.

21       Q.   Did you sign the letter?

22       A.   I appear to have signed the letter, I do

23   not recall signing the letter.

24       Q.   Did you read the letter before you signed

25   it?

1        A.    It would be my normal practice to review

2    materials before signing that were put together by

3    others at Ripple.

4        Q.    Did you have any discussions with anyone

5    at Ripple concerning Bittrex?

6        A.    I don't recall.

7        Q.    Did Ripple enter into any financial

8    transactions involving Bittrex?

9            MR. FORD:  Objection to form.

10            THE WITNESS:  I don't recall.

11    BY MS. WAXMAN:

12        Q.    If you turn to the second page of the

13    document, paragraph 6, titled "Indemnification," did

14    Bittrex request that Ripple indemnify the company

15    for regulatory risk?

16            MR. FORD:  Objection to form.

17            And, again, to the extent you can answer

18    that based on just this document?

19            THE WITNESS:  I don't recall.

20    BY MS. WAXMAN:

21        Q.    Did Bittrex ever express a concern that

22    XRP could be deemed a security under U.S. securities

23    laws?

24            MR. FORD:  Objection to form.

25            THE WITNESS:  I don't recall any direct

201

1    conversations I had with Bittrex.

2    BY MS. WAXMAN:

3        Q.   If you turn to paragraph 8.  8B, it says:

4                 "It is the company's position

5             that XRP does not meet the

6             definition of an investment

7             contract as that term has been

8             defined under the U.S. laws."

9             Did you ever communicate that view to

10   anyone at Bittrex?

11            MR. FORD:  Objection to form.

12            THE WITNESS:  I don't recall any

13   communication with Bittrex.

14   BY MS. WAXMAN:

15       Q.   Did you ever discuss with anyone at Ripple

16   whether commodity regulations applied to XRP?

17            MR. HECKER:  I'm sorry, at Ripple?

18            MS. WAXMAN:  Yes.

19            MR. HECKER:  Okay.  So that question you

20   should exclude from your answer any discussions you

21   had with legal counsel about the regulatory

22   treatment of XRP, if any.

23            THE WITNESS:  I don't recall any

24   conversations.

25   / /

202

```
 1    BY MS. WAXMAN:
 2         Q.   Did you have any conversations with anyone
 3    about -- at Bittrex regarding whether the
 4    commodities regulations apply to XRP?
 5              MR. FORD:  Objection.  Form.  Foundation.
 6              THE WITNESS:  I don't recall any direct
 7    conversations with Bittrex.
 8    BY MS. WAXMAN:
 9         Q.   Did you come to learn that others at
10    Ripple spoke to Bittrex about XRP status under the
11    securities laws?
12         A.   I don't recall.
13         Q.   Exhibit 20, please.
14              (Whereupon, Deposition Exhibit 20
15               was marked for identification.)
16    BY MS. WAXMAN:
17         Q.   Mr. Will, I'm showing you what's been
18    marked RW20, which is a document with the Bates
19    RPLI_SEC 0398415 through -16.
20         A.   Okay.
21         Q.   What prompted you to send this email to
22    Mr. Garlinghouse?
23              MR. HECKER:  Objection.  Foundation.
24              THE WITNESS:  I don't recall.
25    / /
```

```
 1    BY MS. WAXMAN:
 2         Q.   In February 2018, did ████████  take on a
 3    role related specifically to XRP?
 4         A.   I don't recall.
 5         Q.   Why was there confusion between ████████
 6    ████████  role and Miguel's role?
 7              MR. HECKER:  Objection to form.
 8              THE WITNESS:  I don't recall.
 9    BY MS. WAXMAN:
10         Q.   In February 2018, was ████████  directed
11    to tout XRP to potential institutional investors?
12              MR. HECKER:  Objection to form.
13    Foundation.
14              THE WITNESS:  Don't recall.
15    BY MS. WAXMAN:
16         Q.   Excuse me?
17         A.   Don't recall.
18         Q.   What was -- did you have any understanding
19    of what ████████  role would be in February 2018?
20              MR. HECKER:  I'm sorry.  What her role was
21    going to be?  Do you mean in the future or what it
22    was at the time of this document?  I apologize.  I
23    didn't understand.
24    BY MS. WAXMAN:
25         Q.   Did you have any understanding of what
```

1    Ms. Role -- ███████ role was going to be

2    following this email?

3        A.   I don't recall.

4        Q.   Did you have an understanding of what was

5    meant by the title XRP institutional liquidity?

6            MR. HECKER:  Objection to form.

7            You can answer.

8            THE WITNESS:  I remember that we

9    classified XRP institutional liquidity as our

10   efforts around improving liquidity in XRP.

11   BY MS. WAXMAN:

12       Q.   If you turn the page, there's a heading

13   that says "XRP institutional liquidity."

14           Are those -- do the subheadings accurately

15   describe what her role would be in connection with

16   XRP institutional liquidity?

17           MR. HECKER:  Objection to form.

18   Foundation.

19           THE WITNESS:  That appears to be her

20   proposal.  I don't recall if that's the full extent

21   of what XRP institutional liquidity would have been

22   or what her role ended up being.

23   BY MS. WAXMAN:

24       Q.   Did you have any reason to believe that

25   her role didn't include some sort of function in

1    connection with XRP institutional liquidity?

2         A.   I don't recall.

3              MR. FORD:  Objection to form.

4    BY MS. WAXMAN:

5         Q.   The bottom of the email, you write:

6                   "Reality is that with ███████

7              experience, she'll be more

8              effective in the XRP side than the

9              strategic IR function."

10             What did you mean by the XRP side?

11        A.   I don't recall specifically.

12        Q.   Did you mean that she should engage with

13   XRP potential investors?

14             MR. FORD:  Objection to form.

15             THE WITNESS:  Don't recall.

16             MS. WAXMAN:  Exhibit 23, please.

17              (Whereupon, Deposition Exhibit 23

18               was marked for identification.)

19             THE WITNESS:  Thank you.

20   BY MS. WAXMAN:

21        Q.   Mr. Will, I'm showing you what's been

22   marked as RW23, which is a Bates -- a document with

23   the Bates RPLI_SEC 0325639 through -45.

24        A.   Okay.

25        Q.   What is Exhibit 23?

1      A.   I don't recall the specific exhibit, but

2    appears an exchange between myself and the XRP

3    markets team.

4      Q.   And are they providing you with certain

5    information?

6      A.   They appear to be providing information

7    about the digital asset marketplace.

8      Q.   Were they providing you an update about

9    XRP's -- XRP and the XRP market?

10     A.   It appears that they are providing an

11   update on specifically around volume, XRP volume.

12     Q.   And did you receive these -- these updates

13   daily?

14     A.   I don't recall.

15     Q.   And what was the purpose of -- of the

16   update regarding XRP volume?

17         MR. FORD:  Objection to form.

18         THE WITNESS:  I don't recall specifically

19   why this update was provided.

20     Q.   Was XRP volume important to you?

21     A.   XRP volume --

22         MR. FORD:  Sorry, objection to form.  I

23   didn't realize that was the end of the question.

24         THE WITNESS:  XRP volume was important to

25   Ripple's products to ensure there was liquidity so

207

1    the products worked effectively.

2    BY MS. WAXMAN:

3        Q.   Which products were -- was XRP liquidity

4    important for?

5        A.   The product in 2018 was called xRapid.

6        Q.   And in February 2018, had xRapid been

7    launched for commercial use?

8            MR. HECKER:  Objection.

9            THE WITNESS:  Don't recall.

10           MR. HECKER:  Objection to form.

11   BY MS. WAXMAN:

12       Q.   And what was -- did -- were there any

13   trans -- XRP transactions running through xRapid in

14   February 2018?

15       A.   Don't recall, but it wouldn't be uncommon

16   to be thinking about a future product.

17       Q.   So volume, but why was volume important at

18   the time in February 2018 when there was no

19   xRapid -- when xRapid had almost no volume?

20           MR. HECKER:  Objection to form.  He just

21   answered that question.

22           THE WITNESS:  XRapid was on the product

23   roadmap.  It was discussed.  And so it wouldn't be

24   uncommon to make sure that the conditions that a

25   product would be successful would be discussed

1   before the product was publicly released.

2   BY MS. WAXMAN:

3       Q.   Was volume also important so that Ripple

4   could continue to sell XRP chatter into the market?

5           MR. HECKER:  Objection to form.  Asked and

6   answered.

7           THE WITNESS:  Volume was a component of

8   Ripple's ability to sell XRP.

9   BY MS. WAXMAN:

10      Q.   And if the volume dried up, could -- would

11  Ripple still be able to sell it to XRP?

12          MR. FORD:  Objection to form.

13          THE WITNESS:  Ripple typically, during the

14  time period I was there, sold a percentage of

15  volume.  So it would impact, potentially, the amount

16  of XRP that could be sold.

17  BY MS. WAXMAN:

18      Q.   On -- on the page with the Bates 0325643,

19  in the middle of the page, you write:

20              "The most concerning number on

21          the pages are volume."

22          Why was volume most concerning to you?

23          MR. FORD:  Objection to form and to the

24  characterization of the document.

25          THE WITNESS:  I don't recall specifically

1    why XRP volume was the most concerning.

2    BY MS. WAXMAN:

3        Q.   Were there any other factors about --

4    other factors that were important to you when

5    considering Ripple's XRP sales?

6            MR. HECKER:  Objection to form.  Are you

7    now going away from this document?

8            MS. WAXMAN:  Yes.

9            MR. HECKER:  Okay.

10           THE WITNESS:  Were there any other

11   factors -- make sure I understand the question.

12   Were there any other factors other than volume?

13   BY MS. WAXMAN:

14       Q.   Yeah.

15       A.   Yes.

16       Q.   And what other factors were important to

17   Ripple in the context of its sales?

18       A.   I don't recall all the factors that we

19   would consider since I left the company a year ago.

20   But we would consider things such as overall market

21   dynamics in the cryptocurrency marketplace.

22       Q.   And what do you mean by market dynamics?

23       A.   Bid-ask spread, public announcements being

24   made by public or industry executives, things like

25   that.

1          Q.    How would announcements by industry

2      executives impact Ripple's decisions with respect to

3      its XRP sales?

4          A.    If Jamie Dimon makes a public statement

5      about Bitcoin, it could -- it could impact our

6      decision-making about what we -- what we do at a

7      given point if we want to work with Jamie Dimon in

8      the future or -- it's just a factor that we would

9      consider.

10          Q.    Would it relate to any -- would it -- how

11      would that relate to how much XRP Ripple would sell,

12      a public announcement by an industry executive?

13          A.    It --

14              MR. HECKER:  Wait.  Sorry.  Objection to

15      the form of the question.  Now you're asking about

16      how much to sell as opposed to just factors you'd

17      consider in connection with selling?

18      BY MS. WAXMAN:

19          Q.    Well, I'll ask another question.

20              How did announcements in the market factor

21      into Ripple's decision-making about how much XRP

22      would sell?

23              MR. HECKER:  Objection to form.

24              THE WITNESS:  We would consider the

25      conditions in the marketplace.  So those could be a

1    factor that we would take into consideration.

2    BY MS. WAXMAN:

3        Q.   And if there was an increase in XRP

4    trading volume, would you increase Ripple's sales of

5    XRP?

6            MR. FORD:  Objection to form.

7            MR. HECKER:  Objection to form.

8            THE WITNESS:  Our sales of XRP were

9    typically governed by a combination of the budget

10   that we had allocated towards XRP sales for that

11   time period as well as the overall percentage of

12   volume as well as other factors that we had going on

13   at that time period.  There could be market dynamics

14   that we would also consider.

15   BY MS. WAXMAN:

16       Q.   And what market dynamics.  Would you

17   sell -- sorry -- strike that.

18            What market dynamics?

19       A.   What was going on in the marketplace.  So

20   we wouldn't just blindly sell into the marketplace.

21   We would be thoughtful about how we would and -- and

22   why and the amounts that we would sell.

23       Q.   If there was a rally for XRP, would you

24   recommend selling more XRP into the market?

25            MR. FORD:  Objection to form.

```
 1              THE WITNESS:  It would be -- if there was
 2      a rally in XRP, we would definitely discuss what the
 3      implications are of our current sales, at that point
 4      in time.
 5      BY MS. WAXMAN:
 6          Q.   And what would the implications be if
 7      there was a rally in XRP?
 8              MR. HECKER:  Objection to form.
 9              THE WITNESS:  Since we were typically
10      focused on the dollar amount, if by "rally," you
11      mean the price would increase, we would reduce the
12      amount of XRP that we would sell in terms of units.
13      BY MS. WAXMAN:
14          Q.   I'm -- when I talk about rally, I'm also
15      thinking about an increase in trade volume.
16          A.   Are you talking specifically --
17              MR. FORD:  Sorry, there isn't a question
18      pending.
19      BY MS. WAXMAN:
20          Q.   How would an increase in trade volume
21      impact Ripple's decision making regarding its XRP
22      sales?
23              MR. FORD:  Objection to form.
24              THE WITNESS:  If there was an increase in
25      trade volume, we would likely need to sell less over
```

213

1    a specific time period to achieve our cash flow

2    goals.

3    BY MS. WAXMAN:

4        Q.    Would you recommend that Ripple reduce its

5    positions?

6              MR. FORD:  Objection to form.

7              MR. HECKER:  Objection to form.

8              THE WITNESS:  Reduce -- on what -- on what

9    metric.

10   BY MS. WAXMAN:

11       Q.    Would you recommend Ripple reduce the

12   percentage of trade volume that it was selling?

13             MR. HECKER:  Objection to form.

14             THE WITNESS:  It might be -- it might come

15   up in the conversation.  We may stop our sales if we

16   hit our cash flow goal.  We may consider -- we would

17   consider the totality of the factors if we were, if

18   we had a change in circumstance, if we were

19   considering a large acquisition, if there was some

20   other dynamic, we might adjust our forecast and the

21   directions that we were giving to the team to sell

22   XRP.

23   BY MS. WAXMAN:

24       Q.    If you had a large acquisition and Ripple

25   needed more cash, would you instruct the team to

214

1    sell more?

2              MR. HECKER:  Objection to form.

3              MR. FORD:  Objection to form.

4              MR. HECKER:  Foundation.

5              THE WITNESS:  We may consider it depending

6    on the impact on the market.  I think the overall

7    goal was to make sure that there was a natural

8    balance of supply and demand so that Ripple's

9    activities wouldn't unduly impact the XRP price.  So

10   it would be a factor we discussed.  That would be

11   normal course.

12   BY MS. WAXMAN:

13        Q.   If Ripple had an opportunity to increase

14   its sales without impacting the market, is that

15   something that the team would have recommended?

16             MR. HECKER:  Objection to form.

17             THE WITNESS:  That would be something that

18   might be discussed, but I don't know unless I knew

19   all the factors that were occurring at that moment,

20   what our recommendation would be.

21             MS. WAXMAN:  Exhibit 25, please.

22   Actually, Exhibit 22.

23                  (Whereupon, Deposition Exhibit 22

24                   was marked for identification.)

25   / /

1   BY MS. WAXMAN:

2        Q.   Mr. Will, I'm showing you what's been

3   marked as RW22, which is a document with the Bates

4   stamp RPLI_SEC 0037144.

5        A.   Okay.

6        Q.   Do you know who ███████ is?

7        A.   ████ the COO, CFO of ███████.

8        Q.   Was ███████ a Ripple shareholder?

9        A.   They were a Ripple shareholder.

10       Q.   Okay.  And was he asking you about how to

11  value their equity -- Ripple equity position in

12  2017?

13       A.   I don't recall this email, but that's what

14  he appears to be asking.

15       Q.   Mh-hmm.  And at the time, how did you

16  respond?

17       A.   I would just read the email.  I don't

18  recall the email.

19       Q.   In 2018, did you have an understanding --

20  or did you -- did you have any view as to how Ripple

21  should value itself?

22            MR. HECKER:  In February, like at the time

23  of this.

24            THE WITNESS:  Yeah.  Four months after I

25  joined, I was still in learning mode and formulating

216

1    a thesis about how to look at the equity of Ripple.

2    BY MS. WAXMAN:

3        Q.   And what was your understanding of how to

4    view the equity of Ripple?

5            MR. FORD:  Objection to form.

6            THE WITNESS:  I discuss that we haven't

7    really dug into it, and beyond this high-level

8    framework that I propose -- haven't really thought

9    about it.  And I provided our 409A valuation.

10   BY MS. WAXMAN:

11       Q.   You said you were still in learning mode

12   in February 2018.  At what point did you exit

13   learning mode and did you feel that you were up and

14   running, so to speak?

15       A.   On what topic?

16       Q.   On any topic at Ripple.

17           MR. HECKER:  Objection to form.

18           MR. FORD:  Objection to form.

19           THE WITNESS:  I still don't know much

20   about cryptocurrency, so, you know, I think in the

21   areas of my responsibility, depending on the topic.

22   It's a complex and evolving area around accounting

23   treatment, around budgeting, around tax.  So it

24   depends on the area, the specific area.

25   / /

1    BY MS. WAXMAN:

2          Q.    In February 2018, did you have -- did you

3    believe that Ripple -- Ripple's valuation was based

4    on its XRP holdings?

5               MR. FORD:  Objection to form.

6               THE WITNESS:  As of what date?  As of the

7    date of this email?

8    BY MS. WAXMAN:

9          Q.    Yes.

10         A.    According to this email, which I don't

11   recall, it appears that was what I was proposing as

12   a high-level framework.

13         Q.    And why did you propose that as a

14   high-level framework at the time?

15              MR. FORD:  Objection to form.

16              THE WITNESS:  I don't recall.

17   BY MS. WAXMAN:

18         Q.    Do you understand what fiduciary -- what

19   company fiduciary duties are?

20         A.    At a high level, yes.

21         Q.    And did Ripple have a fiduciary duty to

22   its shareholders to maximize shareholder value?

23              MR. HECKER:  Objection to form.  Calls for

24   a legal conclusion.

25              THE WITNESS:  Yes.

1    BY MS. WAXMAN:

2        Q.   And how would Ripple maximize its

3    shareholder value in February 2018?

4           MR. HECKER:  Objection to form.

5           THE WITNESS:  I don't recall specific to

6    February 2018 how we would maximize shareholder

7    value.

8    BY MS. WAXMAN:

9        Q.   In general, did you have an understanding

10   of how Ripple could maximize shareholder value?

11       A.   In general, yes.

12       Q.   Yeah.  How?

13       A.   Ripple would maximize shareholder value

14   by -- as a -- as a kind of finance theory matter,

15   achieving a -- a -- a higher return on its -- on its

16   assets than -- than its cost of capital.

17       Q.   And what were Ripple's assets at the time?

18       A.   It had the technology it developed around

19   RippleNet.  It had cash.  And it had XRP.

20       Q.   And how would the company increase the

21   value of its XRP?

22           MR. FORD:  Objection to form.

23          THE WITNESS:  XRP price is determined in

24   an open market, so I didn't have a lot of thought

25   about it, how the price of XRP would be maximized by

219

1    Ripple's efforts.

2    BY MS. WAXMAN:

3        Q.    If Ripple's value was based primarily on

4    its holdings and Ripple had a duty to maximize value

5    for shareholders, why didn't you think about how to

6    maximize XRP price.

7            MR. HECKER:   Objection to form.

8            THE WITNESS:   Because the price of XRP is

9    determined in an open market that multiple

10   participants participate in.

11   BY MS. WAXMAN:

12       Q.    Did Ripple take any efforts to maximize

13   shareholder value by trying to increase XRP's price?

14           MR. FORD:   Objection to form.

15           THE WITNESS:   Not that I'm aware of.

16   BY MS. WAXMAN:

17       Q.    What efforts did Ripple take to maximize

18   shareholder value?

19           MR. FORD:   Objection to form.

20           THE WITNESS:   We tried to use the

21   resources we had, whether venture capital funding or

22   the XRP to develop products that we thought would

23   create long-term value for shareholders.

24   BY MS. WAXMAN:

25       Q.    And how did the resources from venture

1    capital's funding create -- create shareholder

2    value?

3            MR. HECKER:  Objection to form.

4    Foundation.

5            THE WITNESS:  Our view was by increasing

6    the number of participants on RippleNet and the

7    level of activity and volume of transactions on

8    RippleNet, that we would increase shareholder value.

9    BY MS. WAXMAN:

10       Q.   How would increasing the number of

11   transactions increase shareholder value?

12       A.   As the owner of the payment network,

13   RippleNet, by increasing the volume of activity, you

14   would increase the value of Ripple's assets.

15       Q.   Would the increased volume increase demand

16   for XRP?

17           MR. FORD:  Objection to the form.

18           THE WITNESS:  It could be a component

19   depending on the -- the network.

20   BY MS. WAXMAN:

21       Q.   Did -- did Ripple have an understanding

22   that increased demand in XRP would lead to increased

23   price --

24           MR. FORD:  Objection --

25   / /

1    BY MS. WAXMAN:

2        Q.   -- for XRP?

3            MR. HECKER:  Objection to form.

4            THE WITNESS:  At a high level, increased

5    demand of any asset, whether it's equity or currency

6    or cryptocurrency is going to result in the price

7    going up.

8    BY MS. WAXMAN:

9        Q.   Specifically, did people have that belief

10   with respect to XRP?

11           MR. FORD:  Objection to form.

12           THE WITNESS:  I can't speak to people's

13   beliefs.

14   BY MS. WAXMAN:

15       Q.   Did you believe that increased demand in

16   XRP would lead to an increase in price?

17           MR. FORD:  Objection.

18           THE WITNESS:  As a finance executive, I

19   believe that increased demand, all other things

20   being equal, will increase the price of that asset.

21   BY MS. WAXMAN:

22       Q.   As the CFO, did you believe that Ripple

23   should engage in efforts that would increase the

24   price of XRP so that Ripple could maximize

25   shareholder value for its shareholders?

1          MR. HECKER:  Objection to form of the

2     question.

3          THE WITNESS:  As CFO, I believed our

4     efforts should be focused on increasing volume of

5     activity on RippleNet and the value of our other

6     investments.

7     BY MS. WAXMAN:

8          Q.  But the volume on RippleNet would

9     ultimately lead to increased demands in XRP --

10         MR. HECKER:  Objection --

11    BY MS. WAXMAN:

12         Q.  -- correct?

13         MR. HECKER:  Objection to the form of that

14    question.  Asked and answered.

15         THE WITNESS:  Increased volume of XRP

16    would result in a more efficient RippleNet.

17    BY MS. WAXMAN:

18         Q.  Which would increase the value of Ripple's

19    shareholders stake.

20         MS. WAXMAN:  Exhibit 25.  Please.

21             (Whereupon, Deposition Exhibit 25

22             was marked for identification.)

23    BY MS. WAXMAN:

24         Q.  I'm showing you what's been marked as

25    RW25, which is a document with the Bates 0393381.

223

1          MR. FORD:  Again, just an objection to

2     providing this document without its attachment.

3          THE WITNESS:  Okay.

4     BY MS. WAXMAN:

5          Q.   What is this email about?

6          A.   I don't specifically recall this email,

7     but it appears to be a response from me to Zoe Cruz

8     about -- I'm assuming the 409A valuation that we

9     provided to her.

10         Q.   Did you ever have any discussions with

11    Ms. Cruz regarding contingency plans for the company

12    should XRP volume dry up?

13         MR. HECKER:  Objection to form.

14         THE WITNESS:  I don't recall.

15    BY MS. WAXMAN:

16         Q.   Did you ever discuss any contingency plans

17    with anyone else at the company?

18         MR. HECKER:  Objection to form.

19         THE WITNESS:  It would be normal practice

20    as part of a finance team to run multiple scenarios

21    of your budget, your forecast.

22    BY MS. WAXMAN:

23         Q.   Did the company have any contingency plans

24    should XRP volume dry up or get very low?

25         MR. HECKER:  Objection to form.

224

1          THE WITNESS:  I don't recall.

2     BY MS. WAXMAN:

3          Q.   Did others at the company also express the

4     view that Ripple needed to get XRP volume and

5     liquidity up?

6               MR. FORD:  Objection to form.

7               THE WITNESS:  I don't recall.

8     BY MS. WAXMAN:

9          Q.   Did you -- did senior leadership at Ripple

10    also have the view that Ripple needed to get XRP

11    volume and XRP liquidity up?

12              MR. FORD:  Objection to form.

13              THE WITNESS:  We had discussions.  I don't

14    specifically recall them, but we had discussions

15    around increasing the liquidity of XRP, particularly

16    in the markets where we were rolling out xRapid.

17    BY MS. WAXMAN:

18         Q.   And when were those discussions related to

19    xRapid?

20         A.   They happened -- I don't specifically

21    recall, but they happened during, I believe, 2018,

22    2019.

23         Q.   And -- let's look at something.

24              Exhibit 146.

25    / /

1    (Whereupon, Deposition Exhibit 146

2    was marked for identification.)

3  BY MS. WAXMAN:

4    Q.   We've been talking a lot about xRapid and

5  its timing and how many transactions were running

6  through XRP -- through xRapid at the time.  So I

7  want to show you some metrics for xRapid.

8    Showing you a document that's been marked

9  Exhibit RW146, which has the Bates 0582856.

10    Do you recognize what's on the second page

11  of this document?

12    A.   I believe it's our finance dashboard or a

13  section, a portion of our finance dashboard.

14    Q.   And what is -- and how do you use the

15  information that's in the -- on this chart?

16    A.   This provides information about operating

17  metrics for the company.

18    Q.   And it has three different sections.  It

19  says "Production deals signed," "Production deals

20  deployed," and then "Cumulative counterparty

21  payers."

22    What is the difference between a -- a

23  signed deal and a deployed deal?

24    A.   Signed deal is when we had a signed

25  contract with either a bank, a payment provider,

1  depending on the product.  A deployed deal is when

2  we had a certain number of transactions.  I

3  specifically forget.  I don't recall what the number

4  of transactions that were required to achieve

5  deployment but -- to be considered deployed, but it

6  was when our software was implemented and they were

7  in a production environment.

8      Q.   And how many -- and what is -- is ODL a

9  reference to xRapid?

10     A.   ODL -- xRapid, if I recall correctly,

11 became ODL.

12     Q.   Okay.  And how many deals were deployed in

13 connection with xRapid in 2016?

14     A.   Looks like none.

15     Q.   And how many deals were signed in

16 connection with xRapid in 2016?

17     A.   Looks like none.

18     Q.   And same questions for 2017.  How much

19 deals were deployed for xRapid in 2017?

20     A.   None.

21     Q.   And how many deals were signed for xRapid

22 in 2017?

23     A.   None.

24     Q.   And in 2018, how many deals were signed

25 for xRapid?

1        A.     Eleven.

2        Q.     And in 2018, how many deals were deployed

3    for xRapid?

4        A.     Looks like two.

5        Q.     And which customers were using -- which

6    two customers were -- had actual transactions with

7    xRapid in 2018?

8        A.     I don't recall.

9        Q.     So going back to that email in Exhibit 25,

10   were there -- does this refresh your memory whether

11   there were xRapid -- whether there was actual

12   transaction volume in XRP in connection with xRapid?

13           MR. HECKER:  Objection to form.

14   Foundation.

15           THE WITNESS:  I'm not clear which -- which

16   email.  25?

17   BY MS. WAXMAN:

18       Q.     Yeah.  I mean, I asked you why the company

19   needed to get XRP volume and liquidity up, and you

20   said it was in connection with xRapid.  But I think,

21   at that point, xRapid really had very little volume,

22   from what we can tell.

23           MR. HECKER:  Counsel, he's -- he's

24   literally testified four or five times today that it

25   was on a product ramp and where you'd be focused on

228

1    increasing liquidity for purposes of the product in

2    development.  I mean, are we going to do this every

3    time?

4              MS. WAXMAN:  Yes.

5              MR. HECKER:  I feel like it's like a

6    ridiculous waste of time.  He's literally already

7    given you that answer five times today.  Maybe I'm

8    undercounting.

9    BY MS. WAXMAN:

10        Q.   Do you have an answer?

11        A.   As part of a client signing a deal, they

12   would want to see that the product could work in an

13   environment.  So if we didn't build the liquidity in

14   the emerging markets, we would never be able to sign

15   deals with any clients.  So clients need to see the

16   volume and have confidence that the product would

17   work before signing up for ODL.

18        Q.   So the volume predated the actual use of

19   the product?  You needed to ramp up the volume

20   before someone could actually use the product; is

21   that what you're saying?

22        A.   I would say that that was part of the

23   general thesis of the environment that we needed to

24   create.  These are banks and payment providers who

25   do not sign contracts unless they are confident a

229

1    product works. And so they want to see the
2    conditions that allow a product to work before they
3    are signing a deal.

4        Q.   And what conditions were needed in order
5    for the xRapid product to work?

6        A.   Sufficient liquidity in the currency pairs
7    that they were concerned about. So it depended on
8    the specific client, but they would want to see
9    sufficient volume in XRP and the currency pairs that
10   they are concerned about before they would sign a
11   production deal.

12       Q.   So in the ramp up to xRapid, in the
13   lead-up of developing that product, did Ripple
14   engage in efforts to increase liquidity and volume
15   of XRP in certain corridors?

16       A.   I don't specifically recall. That
17   wouldn't report up to me. But it would not surprise
18   me.

19       Q.   And who would be responsible for that?

20       A.   Whoever was running the product during
21   that time period would typically be responsible for
22   that.

23       Q.   And why doesn't that surprise you that
24   someone at Ripple would have that function?

25       A.   That function or --

[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

```
 1        Q.   Why doesn't it surprise you that someone
 2   would be engaging in efforts to increase XRP volume
 3   and liquidity?
 4            MR. HECKER:   Objection to form.
 5            THE WITNESS:   Because it would be critical
 6   for the product to work effectively for our
 7   customers.
 8            MS. WAXMAN:   Let's take a break.   It's
 9   3:00 o'clock.   3:03.
10            THE VIDEOGRAPHER:   We're going off the
11   record.   The time is 3:03 p.m.
12            (Whereupon, a recess was taken.)
13            THE VIDEOGRAPHER:   Back on the record.
14   The time is 3:17 p.m.
15            MS. WAXMAN:   Exhibit 27.
16            (Whereupon, Deposition Exhibit 27
17            was marked for identification.)
18   BY MS. WAXMAN:
19        Q.   Mr. Will, I'm showing you what's been
20   marked as RW27, which is a document with the Bates
21   RPLI_SEC 0398398.
22        A.   Okay.
23        Q.   Did Ripple ever hire
24        A.   I don't recall.
25        Q.   Was there any discussion about potentially
```

231

1    hiring ██████?

2         A.   Don't recall.

3         Q.   Did you ever discuss with ████████

4    hiring █████?

5              MR. HECKER:  Objection to form.

6              THE WITNESS:  I don't recall.

7    BY MS. WAXMAN:

8         Q.   In the middle of the page, ████████

9    he's talking about operational benefits of using

10   XRP.  Is that your understanding?

11        A.   It appears so.  I don't specifically

12   recall this email exchange but that's what it

13   appears to say.

14        Q.   Towards the end of his email, at 12:16 he

15   says:

16              "I think the end result of

17              that analysis will be that we have

18              a lot of wood to chop before we

19              could credibly talk about providing

20              an operational benefit to one of

21              these targets with respect to XRP."

22              Did you know what he's talking about

23   there?  Did you have an under- -- strike that.

24              Did you have an understanding of what he

25   was talking about?

232

1          A.    Not specifically.

2          Q.    And in March 2018, did you have an

3     understanding of what benefit certain parties could

4     get from using XRP?

5          A.    From using xRapid, one of our products,

6     yes.

7          Q.    And what -- how -- what were the benefits

8     of using xRapid?

9          A.    Benefits of using xRapid was more

10    efficient cross border currency transfer.

11         Q.    And how did Ripple measure that

12    efficiency?

13              MR. FORD:  Objection to form.

14              THE WITNESS:  We looked at a variety of

15    factors.  It depended on the customer.  Some

16    customers valued the 24/7 nature of xRapid.  Some

17    customers valued the lack of a requirement to

18    prefund an account.  So the working capital benefit

19    of xRapid.  So it depended on the customer.

20    BY MS. WAXMAN:

21         Q.    And when you're talking about benefits

22    related to xRapid, are you talking about in

23    March 2018 or at some other time?

24         A.    I don't specifically recall in 2018

25    whether I -- those -- whether it was limited to

 1    those benefits or there were other benefits or that

 2    was a subset of benefits, but those were the

 3    benefits of xRapid, that I understood.

 4        Q.   Did you agree with his statement that

 5    Ripple had a lot of wood to chop before the company

 6    could credibly talk about providing operational

 7    benefits in connection with xRapid?

 8        A.   I don't recall this email exchange, so

 9    I -- I don't know if I agreed or disagreed at the

10    time of the email.

11        Q.   Separate and apart from this email, did

12    you have an understanding of what benefits would

13    come from xRapid in or around this March 2018?

14             MR. FORD:  Objection to form.

15             THE WITNESS:  I don't recall in March of

16    2018 exactly what factors I was considering around

17    operational benefits of xRapid.

18    BY MS. WAXMAN:

19        Q.   Your email to him says -- it says:

20                  "I'm in a rate guarantee

21             meeting - we're talking about

22             ███████ monthly guarantee for

23             ███████ to get them more

24             aggressive, foster deeper liquidity

25             in XRP markets in Mexico, et

1           cetera - before we do any

2           acquisition, why not just throw

3           money at customers already using

4           us."

5           Were you being sarcastic or was that

6    something you supported doing?

7           MR. FORD:  Objection to form.

8           THE WITNESS:  I don't specifically recall

9    this, but I believe I was being sarcastic.  ▮▮▮▮

10   ▮▮▮▮  and I had known each other at this point for

11   seven, eight years prior to Ripple.  Wouldn't

12   surprise me if we had a certain rapport.

13   BY MS. WAXMAN:

14       Q.   Did Ripple, in your words, throw money at

15   customers in order to increase use or adoption of

16   XRP?

17           MR. FORD:  Objection.

18           THE WITNESS:  At start-ups, it's not

19   uncommon that -- to increase an existing customer's

20   activity with the company that you would provide

21   additional incentives, perhaps, is what this looks

22   like.  One of the roles of the finance department is

23   to push back on situations like that to make sure

24   there's some rigor in the decision-making.

25   / /

1    BY MS. WAXMAN:

2        Q.   Did you ever push back on any

3    recommendations that Ripple provide certain

4    financial incentives to customers?

5        A.   I don't recall any specific examples, but

6    that would be a normal part of my role as CFO to

7    consider the financial cost as well as the financial

8    benefit of a specific transaction.

9             MS. WAXMAN:  Exhibit 30, please.

10            (Whereupon, Deposition Exhibit 30

11            was marked for identification.)

12            ZOOM PARTICIPANT:  What is the number of

13   the exhibit?

14            MS. WAXMAN:  30.

15            ZOOM PARTICIPANT:  Thank you.

16   BY MS. WAXMAN:

17       Q.   Mr. Will, I'm showing you what's been

18   marked as RW30, which is a document with the Bates

19   RPLI_SEC 0393421 through -423.

20       A.   Okay.

21       Q.   Now, do you recognize the email at the

22   very end from GSR?

23       A.   I don't recall that specific email, but I

24   recall that GSR would send us daily and weekly

25   updates that sometimes would get passed along to me.

236

1    Q.   And the daily updates pertaining to

2    Ripple's sales of XRP?

3    A.   I believe so.

4    Q.   And did you receive the daily updates

5    directly, or was this forwarded to you by somebody?

6    A.   I don't recall.

7    Q.   You don't recall if you got daily updates

8    from GSR regarding Ripple's XRP sales?

9    A.   It would be uncommon that a CFO would get

10   a daily update directly when we had an XRP markets

11   team that was responsible for pulling this

12   information together --

13   Q.   And who --

14   A.   -- for us.

15   Q.   Sorry.

16        Who would have forwarded this information

17   to you?

18   A.   Could have been anyone on the XRP markets

19   team that passed this along.

20   Q.   And when would they pass -- when would

21   they pass this information to you?

22        MR. FORD:  Objection to form.

23        THE WITNESS:  It -- it could be any reason

24   that they pass this along to me.  I don't

25   specifically recall why in this situation they did.

237

1    Could just be to keep me in the loop, or it could be

2    because it was a -- a quarter end summary, it

3    appears, or at least close to quarter end summary

4    that was provided in this email.

5    BY MS. WAXMAN:

6         Q.   Did you ever ask to receive updates

7    concerning GSR sales of Ripple's XRP?

8         A.   I typically received summary level

9    information, but I could have.  I don't recall

10   specifically, though, asking for GSR level detail.

11   I may have, though.

12        Q.   And when did you receive summary level

13   information?

14        A.   The XRP markets meeting on a weekly basis.

15   So we would always receive information there,

16   sometimes before the meeting, always during the

17   meeting.

18        Q.   Okay.  And did you make a recommendation

19   regarding Ripple's XRP sales after you had received

20   the information about GSR's XRP sales?

21        A.   It appears so.  I don't recall that

22   specific recommendation or email exchange.

23        Q.   And who was the recommendation made to?

24        A.   It appears to be made to Brad

25   Garlinghouse, CEO.

1          Q.    And what was the recommendation?

2          A.    The recommendation was this was discussed

3     at our one-on-one, potentially increasing the amount

4     we sell on a daily basis.

5          Q.    And why did you make the recommendation to

6     increase the amount of Ripple's XRP sales on a daily

7     basis?

8                MR. FORD:  Objection to form.  Misstates

9     the testimony.

10               THE WITNESS:  I don't recall specifically

11    why, but it would be in the normal course of

12    business that a CFO and a CEO would discuss a

13    component of the business like this and go back and

14    forth on potential ideas.

15    BY MS. WAXMAN:

16         Q.    Was there any reason why Mr. Garlinghouse

17    would not want to move forward with the CFO's

18    recommendation?

19               MR. HECKER:  Objection to form.

20    BY MS. WAXMAN:

21         Q.    Or strike that.

22               Was there any reason why Mr. Garlinghouse

23    would not want to move forward with the

24    recommendation to increase the amount of Ripple's

25    XRP sales?

1           MR. HECKER:  Objection to form.

2           THE WITNESS:  I don't specifically recall,

3    but there could be a variety of reasons why he -- he

4    wouldn't want to.  And the purpose of this was to

5    discuss and make sure we were aligned on the path

6    forward.

7    BY MS. WAXMAN:

8        Q.   Did he -- did -- were there any concerns

9    that you ever discussed with him concerning

10   increasing XR- -- Ripple's XRP sales?

11          MR. HECKER:  Objection to form.

12          THE WITNESS:  As part of my weekly

13   interaction with Brad, one of my responsibilities

14   was to discuss elements of our business, and XRP

15   sales was a component of that.  So we naturally

16   discussed alternatives on a frequent basis.

17   BY MS. WAXMAN:

18       Q.   Was Mr. Garlinghouse concerned about

19   disclosing increased sales of XRP by Ripple?

20          MR. HECKER:  Objection to form.

21          MR. FORD:  Objection to form.

22          THE WITNESS:  You'd need to ask Brad.  I

23   don't -- I don't specifically know if he was

24   concerned.

25   / /

1   BY MS. WAXMAN:

2       Q.   Did you have an understanding that he had

3   a concern about disclosing increased sales of XRP by

4   Ripple?

5           MR. HECKER:   Same objection.

6           THE WITNESS:   The information as well as

7   the specific activity related to increased sales was

8   a factor that we considered in our activities.

9   BY MS. WAXMAN:

10      Q.   You say the information as well as the

11  specific activity was a factor that Ripple

12  considered.

13          What do you mean by "the information"?

14      A.   The information that Ripple had increased

15  the amount of its sales from its prior level would

16  be part of the information that we considered.

17  Would the XRP marketplace try to glean some

18  information, since we publicly disclosed voluntarily

19  our disclosure of XRP sales, would they glean some

20  information about Ripple from the fact that we had

21  increased our sales.

22      Q.   So --

23      A.   So we took that into consideration as part

24  of our analysis always.

25      Q.   So the information you're talking about is

[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

1    the specific disclosure Ripple would make in

2    connection with its sales of XRP?

3                MR. HECKER:  Objection to form.

4                THE WITNESS:  It would be the fact that we

5    would disclose it as well as what the response of

6    the market may be and what people may read into that

7    change in behavior that we would consider.

8    BY MS. WAXMAN:

9         Q.   Okay.  And what response by the market

10   did -- was concerning to Ripple?

11               MR. FORD:  Objection to form.

12               THE WITNESS:  I wouldn't say that it -- it

13   was concerning.  I would say that it was a factor we

14   considered.  If it provided information perhaps that

15   we were going to make a large investment, we would

16   want to consider whether people would read into that

17   increased amount of sales as an indication that we

18   were about to do something strategic, for example.

19   So it could have a positive or a negative effect on

20   the market depending on the information that the

21   marketplace took from it.

22   BY MS. WAXMAN:

23        Q.   Could the market view the increased sales

24   by Ripple as Ripple dumping its XRP on the market?

25               MR. HECKER:  Objection to form.

242

1          THE WITNESS:  We had communicated to the

2     market that we were committed to be a -- a

3     responsible steward, but they -- they could

4     possibly, so it was part of our decision-making

5     factors to think about what the market may perceive

6     from any of Ripple's activities, as well as any

7     other participant in the marketplace's activities.

8     BY MS. WAXMAN:

9          Q.   You said Ripple had communicated to the

10    market to be a responsible steward.  What does that

11    mean?  What -- what's your understanding of what

12    that means?

13         A.   As a -- as a large holder of XRP, we took

14    that to mean that we took that responsibility

15    seriously.

16         Q.   What responsibility?

17         A.   The responsibility to not impact the price

18    of XRP differently than natural supply and demand.

19         Q.   At the top email, what are you writing to

20    Brad?

21         A.   I don't specifically recall the email, but

22    I lay out a variety of factors and considerations.

23         Q.   For what?

24         A.   For discussion.

25         Q.   About whether or not to increase Ripple's

243

1    sales of XRP at that time?

2        A.    For overall consideration about our XRP

3    strategy, XRP sales strategy, yes.

4        Q.    And did you tell him that you would

5    increase sales but monitor the sales so they would

6    have limited impact on XRP price?

7            MR. FORD:  Objection to form.

8            THE WITNESS:  I did not say that I would.

9    I said that one thing we could consider was the

10   intent, I believe, as I read this, that we could --

11   we could structure this many ways.

12   BY MS. WAXMAN:

13       Q.    And in -- in the -- under the third bullet

14   you say:

15               "Increasing rate could help

16               fund small (acqui-hire)

17               acquisitions as well as tax

18               liabilities (large XRP grants as

19               well as any, quote, unquote, Chris

20               transactions that result in cash

21               tax liabilities such as          or

22               Coil)."

23           What do you mean when you say, "Chris

24   transactions"?

25       A.    I don't recall specifically what I meant

244

1    by that.

2        Q.   Do you recall generally what you mean by

3    "Chris transactions"?

4        A.   No.

5        Q.   You say a couple of bullets down:

6            "We will be below our

7            expenses rate by the end of the

8            year."

9            Did you believe that the increase in

10   Ripple sales would -- was needed to cover Ripple's

11   expenses --

12           MR. FORD:  Objection --

13   BY MS. WAXMAN:

14        Q.   -- at that time?

15           MR. FORD:  Objection to form.

16           THE WITNESS:  I don't remember

17   specifically in early 2018.  I had been at the

18   company roughly five months.  But as CFO, one of the

19   considerations is always having sufficient funding

20   to continue to execute.

21   BY MS. WAXMAN:

22        Q.   At that time, had -- was Ripple's expenses

23   increasing?

24        A.   We were -- if I remember correctly, I

25   don't recall the specifics, but we were hiring a

1   significant amount of engineering and product talent

2   to build out RippleNet at that time.

3        Q.   At any point, did you recommend that

4   Ripple raise -- try to raise the amount of money it

5   got from software sales?

6        A.   I'm sure I did, as well as venture capital

7   fundraising and other sources of fundraising.  I

8   propose this kind of normal course of my discussions

9   with Brad and the board.

10       Q.   Okay.  And you propose to the board that

11  they increase the amount of money that they got from

12  software sales?

13       A.   To the board?  I don't remember

14  specifically discussing that.  But discussing,

15  overall, what potential funding sources there could

16  be I discussed with the board.

17       Q.   In connection with this email, why didn't

18  you raise that Ripple increase -- increase the

19  amount of money it got from software sales?

20            MR. HECKER:  Objection to form.

21  Foundation.

22            THE WITNESS:  I don't recall.

23  BY MS. WAXMAN:

24       Q.   Would the software sales be able to cover

25  Ripple's expenses at the time?

1       A.   At the time, the software sales, if I
2   recall correctly, were a -- we -- we were -- on the
3   basis of only the software sales, would not be able
4   to cover our expenses.
5       Q.   Then at the very and of the email you say:
6                "It's also a fairly painless
7            way to increase cash flow."
8            Are you talking about sales of XRP being
9   pain -- fairly painless?
10      A.   Sorry.  "Markets are volatile."  Okay.
11           I don't recall specifically what I meant
12  there.
13      Q.   Why would -- why is selling XRP -- why
14  would that be fairly painless way to increase cash
15  flow?
16      A.   I don't recall what I meant -- what I
17  meant there.  But in general, the activity around
18  selling XRP versus the activity around selling
19  RippleNet and software, there's a dramatically
20  longer sales cycle and cash flow collection cycle on
21  software sales than there would be on XRP sales.  So
22  it's just a matter of which one was, you know,
23  quote, unquote, easier from a financial perspective.
24      Q.   Did Ripple have trouble collecting fees in
25  connection with software sales?

247

```
 1        A.    Not that I recall.
 2              MS. WAXMAN:  Exhibit 32, please.
 3                 (Whereupon, Deposition Exhibit 32
 4                 was marked for identification.)
 5   BY MS. WAXMAN:
 6        Q.    Showing you what's been marked as RW32,
 7   which has the Bates RPLI_SEC 0432163, and the
 8   attachment is on the other side of the document.
 9              ZOOM PARTICIPANT:  Could you repeat the
10   exhibit number?
11              MS. WAXMAN:  32.
12              ZOOM PARTICIPANT:  32?
13              MS. WAXMAN:  Correct.
14              ZOOM PARTICIPANT:  3-2.  Thank you.
15              THE WITNESS:  Okay.
16   BY MS. WAXMAN:
17        Q.    Did Ripple ever provide XRP options to
18   certain executives?
19        A.    Ripple provided XRP grants that vested
20   over time to certain executives that I'm aware of
21   during my time -- that -- that were outstanding
22   during my time.  It may have provided options to
23   employees prior to my time at Ripple.
24        Q.    And at some point, did Ripple try to
25   renegotiate those agreements with -- strike that.
```

248

1           Did Ripple provide XRP grants to

2    Mr. Garlinghouse and Mr. Griffin?

3        A.   If I recall correctly, Ripple provided an

4    XRP grant to Brad and Patrick in 2016, is my

5    recollection.

6        Q.   And did you recommend that the company

7    renegotiate those contracts?

8        A.   Yes, I did.

9        Q.   And why did you make that recommendation?

10        A.   XRP grants were made to those individuals

11   when the price of XRP was roughly half a cent.  The

12   value of those grants had significantly increased.

13   When those grants vest, the company has a

14   withholding obligation and has to pay the cash tax

15   on those grants and then relay -- the way the grants

16   were written, relay the remaining XRP.  So they

17   expose the company to a potential cash liability

18   that was extremely volatile.

19        Q.   Did the company have to pay taxes on XRP

20   that it provided?

21        A.   Yes.  It had to pay cash taxes to the --

22   on the XRP grants that are provided.

23        Q.   And how did it satisfy those tax

24   obligations?

25        A.   From its cash balances.

1    Q.   And how did it generate the funds to pay
2    those taxes?
3    A.   Cash is fungible, so it was a combination
4    of venture capital fundraising, software sales, and
5    XRP sales.
6    Q.   Did Ripple ever disclose that it had
7    provided Mr. Garlinghouse and Mr. Griffin XRP
8    grants?
9    A.   I don't believe that there's a requirement
10   that they provide that information.  I don't believe
11   that they did.
12   Q.   Did the company ever renegotiate the XRP
13   contracts with either Mr. Garlinghouse or
14   Mr. Griffin?
15          MR. FORD:  Objection to form.
16          THE WITNESS:  I recall that we may have --
17   we -- we renegotiated, I believe, Brad's.  I
18   don't -- I don't specifically recall what we did
19   with Patrick.
20   BY MS. WAXMAN:
21   Q.   And did -- following the renegotiation,
22   did the company provide any XRP to Mr. Garlinghouse
23   in connection with the contract?
24          MR. FORD:  Objection to form.
25          THE WITNESS:  I don't recall exactly how

1   we renegotiated the contracts. We presented a -- a

2   subset, I believe, of these alternatives to the

3   board and the compensation committee of the board.

4   And the board, without my involvement, came to a

5   determination and we -- we executed that. I don't

6   specifically recall what the result of that was.

7   BY MS. WAXMAN:

8       Q.   And who were the members of the

9   compensation committee at Ripple?

10      A.   As I recall, at the time of this, which is

11  early 2018, it was definitely Chris Larsen. I don't

12  recall who the other members were of the

13  compensation committee.

14          MS. WAXMAN: Exhibit 34, please.

15          (Whereupon, Deposition Exhibit 34

16          was marked for identification.)

17  BY MS. WAXMAN:

18      Q.   Mr. Will, I'm showing you what's been

19  marked as RW34, which is -- has the Bates RPLI_SEC

20  0063558 through -60.

21      A.   Okay.

22      Q.   Do you know what        is?

23      A.   I don't recall.

24      Q.   Do you recall receiving this email from

25  Miguel Vias on April 7th, 2018?

1    A.    Don't recall.

2    Q.    Did ▮▮▮ ever express concerns that XRP

3  could be a security under securities laws?

4    A.    Don't recall being involved with ▮▮▮

5    Q.    Why would Miguel Vias send you this email?

6         MR. HECKER:  Objection.  Form.

7         THE WITNESS:  I don't know.

8  BY MS. WAXMAN:

9    Q.    Were you supervising Mr. Vias at the time?

10    A.    As CFO, if I asked a question to an

11  individual at Ripple, they would typically respond.

12    Q.    And why did you inquire, ask Mr. Vias why

13  ▮▮▮ was listing?

14    A.    I don't specifically recall why I asked.

15    Q.    In April 2018, did you have any

16  understanding as to whether ▮▮▮ decided not to move

17  forward with the listing because of concerns that it

18  had that XRP could be a security under federal

19  securities laws?

20    A.    Don't recall being involved.

21    Q.    Earlier we spoke about a recommendation

22  that you had made to Mr. Garlinghouse to increase

23  Ripple's XRP sales rates.  Was that a decision that

24  needed Brad -- Mr. Garlinghouse's approval?

25         MR. FORD:  Objection to form.  Misstates

252

```
 1    the testimony.
 2              THE WITNESS:  If we changed -- made a
 3    material change in our XRP sales, we would typically
 4    make sure that we informed several executives at
 5    Ripple.
 6    BY MS. WAXMAN:
 7         Q.   Did he specifically need to approve the
 8    recommendation?
 9              MR. FORD:  Objection to form.
10              THE WITNESS:  I don't recall at that time
11    whether he needed to specifically approve.  We had a
12    relatively small executive team and we liked to make
13    sure that each other were in the loop.
14    BY MS. WAXMAN:
15         Q.   Would you ever have moved forward with
16    that sort of recommendation without letting him
17    know?
18              MR. FORD:  Objection to form.
19              THE WITNESS:  Without letting him know,
20    no.
21    BY MS. WAXMAN:
22         Q.   Other than just wanting to keep everyone
23    in the loop, was there any other reason why you
24    would inform him of that?
25         A.   If it was a material transaction, I think
```

[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

1    that both Brad and other executives, including our

2    general counsel, should be aware.  Depending on the

3    materiality, they should also specifically approve.

4    Depending on the type of transaction, it might also

5    involve other areas of the company.

6              MS. WAXMAN:  Number 38, please.

7              (Whereupon, Deposition Exhibit 38

8              was marked for identification.)

9    BY MS. WAXMAN:

10        Q.   Mr. Will, I'm showing you what's been

11   marked RW38, which is a document with the Bates

12   RPLI_SEC 0844620.

13        A.   Okay.

14        Q.   Why did you send this email?

15        A.   I don't specifically recall sending this

16   email, but one of my functions as chief financial

17   officer is to ensure that board meetings are as

18   effective as possible.

19        Q.   And how would this make a board meeting

20   effective?

21        A.   I think that my goal would be to regularly

22   review the information that we provided the board as

23   well as, seems like some board members needed a

24   refresher on our overall strategy, according to

25   bullet point number 1.  And so as normal course of

254

1    my function, I would propose ideas of ways that we

2    could improve our board meetings over time.

3        Q.   And what was your understanding of

4    Ripple's strategy in April 2018?

5        A.   I don't recall specifically in April 2018.

6    My thoughts about Ripple's strategy.

7        Q.   Was the strategic to create value for XRP?

8        A.   I don't -- I don't recall what my view on

9    the strategy of the company was in April of 2018.

10       Q.   At any point in time, did you have a view

11   that the company's strategy was to create value for

12   XRP?

13       A.   I think the long-term value of XRP is a

14   component of the value of Ripple.

15       Q.   And so was part of Ripple's strategy to

16   create value for XRP?

17            MR. FORD:  Objection to form.

18            THE WITNESS:  I think one of the

19   strategies over my time at Ripple was to make sure

20   there was liquidity and utility for XRP, and that

21   would drive the value of XRP.

22       Q.   In the first bullet, can you read that

23   into the record?

24       A.        "More lead-in on our strategy

25            and overall view that it is about

1          the value of XRP, not the software

2          revenue right now - so driving

3          volume and velocity of XRP is the

4          key, how that starts with xCurrent,

5          and the next xVia/xRapid adoption,

6          et cetera.  Seemed like some (maybe

7          just         ) needed a refresher."

8     Q.    Why did you say that software revenues

9   were not part of the strategy of the company at that

10  time?

11          MR. HECKER:  Objection to form.

12          MR. FORD:  Objection to form.

13          THE WITNESS:  The specific part of this

14  email, which I don't recall, is that not the

15  software revenue right now.  And so the amount,

16  dollar amount of software revenue at that point in

17  April 2018 was not a primary indicator of the value

18  of the company or that we were creating on

19  RippleNet, given the early stage of RippleNet at

20  that point in April.

21  BY MS. WAXMAN:

22     Q.    Did the dollar amount of software revenue

23  ever become a primary indicator of the value of the

24  company at any point while you were with Ripple?

25          MR. HECKER:  Objection to form.

256

1          You can answer.

2          THE WITNESS:  I don't recall what the

3    value of the software revenue was, so I can't answer

4    that.

5    BY MS. WAXMAN:

6          Q.   I understand that you don't recall the

7    value -- the exact number, but at any point did the

8    dollar amount of software revenue, was it a primary

9    indicator of value for Ripple?

10          MR. HECKER:  Objection to form.  Vague.

11          THE WITNESS:  I would say in general that

12    the value of a network business at an early stage is

13    going to be -- a better metric of value would be the

14    volume of activity and the number of participants on

15    that network.

16    BY MS. WAXMAN:

17          Q.   Is any of that recorded, you know, the

18    increase in volume on the network and the increase

19    in the number of participants, does any of that get

20    recorded on Ripple's financial statements?

21          A.   It was a regular dashboard, which we

22    reviewed earlier, that we presented to the board of

23    directors.

24          Q.   But does it impact the income statement or

25    the balance sheet in any way?

1   A. It is uncommon in the types of companies

2 that I work for in Silicon Valley as early stage

3 companies that the accounting statements are used as

4 a primary indicator of value.

5   MS. WAXMAN:  Exhibit 40, please.

6    (Whereupon, Deposition Exhibit 40

7    was marked for identification.)

8 BY MS. WAXMAN:

9   Q. Mr. Will, I'm showing you what's been

10 marked as RW40, which is document with the Bates

11 stamp 0107663.

12   A. Okay.

13   Q. Do you know who ██████████ is?

14   A. I don't recall.

15   Q. Did you ever have any discussions about

16 concerns that ████ had that XRP could be deemed a

17 security under U.S. securities laws?

18   MR. FORD:  Objection to form.

19   THE WITNESS:  I don't recall.

20 BY MS. WAXMAN:

21   Q. Did anyone at the ████ ever express to you

22 a concern that XRP could be deemed a security under

23 U.S. securities laws?

24   A. I don't recall.

25   Q. Did ████ not move forward with an XRP

258

1    future -- XRP index because it was concerned that

2    XRP could be deemed a security under U.S. securities

3    laws?

4              MR. FORD:  Objection to form.

5              THE WITNESS:  I don't recall if they

6    proceeded, and I don't recall why, if they didn't

7    proceed, what was their rationale.

8              MS. WAXMAN:  Okay.

9              Exhibit 46, please.

10              (Whereupon, Deposition Exhibit 46

11               was marked for identification.)

12    BY MS. WAXMAN:

13         Q.   Mr. Will, I'm showing you what's been

14    marked as Exhibit RW46, which is a document with the

15    Bates RPLI_SEC 0222488.

16              ZOOM PARTICIPANT:  Exhibit 46, correct?

17              MS. WAXMAN:  Correct.

18              THE WITNESS:  Okay.

19    BY MS. WAXMAN:

20         Q.   Who is ███ ?

21         A.   I believe they are an early holder of XRP.

22         Q.   Were they also a Ripple shareholder?

23         A.   I don't recall.

24         Q.   Why did Mr. Vias send you this email

25    regarding ███ ?

259

```
 1              MR. FORD:  Objection to form.

 2              THE WITNESS:  I don't recall this email

 3     and I -- I would just be basing that on what I'm

 4     reading here.

 5     BY MS. WAXMAN:

 6         Q.   I know you don't recall the email, but do

 7     you recall generally Mr. Vias making a

 8     recommendation to you to buy XRP from the market in

 9     connection with        ?

10              MR. FORD:  Objection to form.

11              THE WITNESS:  No, I don't recall that.

12     BY MS. WAXMAN:

13         Q.   Did Mr. Vias ever recommend that Ripple

14     buy XRP in the market?

15         A.   I don't believe in this email he is

16     recommending that XRP buy from the market.  It looks

17     like he is suggesting we could have      sell

18     directly to      which appears to be

19           who was a shareholder.  But -- or that -- I

20     believe earlier he says software -- we could offer

21     to buy, "we" being Ripple, could buy the XRP from

22

23         Q.   And would that be in lieu of      selling

24     the XRP into the market?

25              MR. FORD:  Objection to form.
```

1          THE WITNESS:  I'm just assuming so from

2     the email.  I don't recall the email.

3     BY MS. WAXMAN:

4          Q.   And is this a proposal that you, a CFO,

5     would ever consider?

6          MR. FORD:  Objection.

7     BY MS. WAXMAN:

8          Q.   And when I say "this proposal," I mean

9     buying XRP from an XRP holder.

10          MR. HECKER:  Objection to form.

11          THE WITNESS:  As part of my normal

12     responsibilities, it would be -- it could be part of

13     my responsibilities to consider alternatives related

14     to XRP at Ripple, yes.

15     BY MS. WAXMAN:

16          Q.   But for what purpose would Ripple buy XRP?

17          MR. HECKER:  Objection to form.

18     Foundation.  Incomplete hypothetical.

19          THE WITNESS:  In general?

20     BY MS. WAXMAN:

21          Q.   Well, generally speaking, would there be

22     any situation where you would approve a transaction

23     in which Ripple would buy XRP either from an XRP

24     holder like ███ or buy XRP in -- in the secondary

25     market?

261

```
 1              MR. HECKER:  Objection.  Calls for
 2    speculation.
 3    BY MS. WAXMAN:
 4         Q.    It sounds like that specific
 5    recommendation was being made here.  I know you
 6    don't recall it, but generally speaking, why --
 7    would there be any situation where you would approve
 8    such a transaction?
 9              MR. HECKER:  Objection to form.
10              THE WITNESS:  I'd need to speculate on
11    what the market conditions were and all the factors
12    related to the specific transaction before I could
13    determine whether I would approve a transaction.
14    BY MS. WAXMAN:
15         Q.    Well, just from a high level.  I mean, the
16    company owned 60 billion XRP.  Why would it need
17    more?
18              MR. HECKER:  Objection to form.
19              THE WITNESS:  There -- there could be a
20    scenario where it made sense.  I'd just have to --
21    I'd have to lay out the entire scenario to figure
22    out whether or not it did in that specific
23    situation.
24    BY MS. WAXMAN:
25         Q.    Well, under what scenarios would you
```

1    approve a specific transaction for Ripple to buy

2    XRP?

3              MR. HECKER:  Objection.  Calls for

4    speculation.

5              THE WITNESS:  I'd need to speculate and

6    create a scenario.  I'm at a loss right now to do

7    that.

8    BY MS. WAXMAN:

9         Q.   Looking at this email, was Mr. Vias

10   concerned that sales of ▮▮▮ -- sales of XRP by ▮▮▮

11   would result in price pressure on XRP?

12             MR. HECKER:  Objection to form.

13   Foundation.

14             THE WITNESS:  I -- my recommendation from

15   this email is that we call ▮▮▮   That's -- I don't

16   know what Miguel meant by ▮▮▮ is panicking.  I

17   don't recall receiving this email.  I don't recall

18   the price at the time or the price impact of this

19   activity in August of 2018.

20   BY MS. WAXMAN:

21        Q.   You say at the top of the email:

22             "I think we are close to

23             DEFCON3, if not 4, recommend we

24             reach out to ▮▮▮ "

25             What do you mean we are close to DEFCON3

```
 1   if not 4?
 2        A.   I don't recall specifically what I meant
 3   by "DEFCON3 if not 4."        was a historic partner
 4   to Ripple.  They had a relationship with the company
 5   and its executives.  And I recommended, it appears,
 6   to just reach out to them.
 7        Q.   Well, are you talking about XRP price when
 8   you talk about we are close to DEFCON3 or 4?
 9             MR. HECKER:  Objection to form.
10             THE WITNESS:  I don't recall.
11   BY MS. WAXMAN:
12        Q.   And did you reach out to
13        A.   I don't recall how we handled this.
14        Q.   Did Ripple ever -- have you ever used the
15   phrase "DEFCON3," outside of this email?
16        A.   I may have.
17        Q.   And what do you understand that phrase to
18   mean?
19        A.   Just the level of urgency around the
20   situation is how I typically use it.
21        Q.   So the situation involving      had a high
22   urgency?
23        A.   I believe the DEFCON system goes to 5, so
24   DEFCON3 is right in the middle.
25        Q.   Fair enough.
```

264

1          MS. WAXMAN:  Exhibit 51, please.

2              (Whereupon, Deposition Exhibit 51

3              was marked for identification.)

4          ZOOM PARTICIPANT:  Can you repeat the

5     exhibit number?

6          MS. WAXMAN:  51.

7          ZOOM PARTICIPANT:  Five-one?

8          MS. WAXMAN:  Yes.

9      Q.   Mr. Will, I'm showing you what's been

10    marked as RW51, which has the Bates RPLI_SEC

11    0067826.

12     A.   Okay.

13     Q.   Who is              ?

14     A.   He was our primary contact related to

15         shareholding at

16     Q.   And the subject of this email says

17    "Futures update."

18          Do you know what that is in reference to?

19     A.   I believe it was in reference to the XRP

20    futures.

21     Q.   Did Ripple engage in efforts to create an

22    XRP index and future product with the    ?

23     A.   I don't believe that Ripple -- I don't

24    recall that Ripple developed a product with the

25     Q.   Did Ripple engage the    with respect to

1     the ▮ offering an XRP index and XRP futures

2     product for XRP?

3          A.   I recall that we wanted to know if they

4     were going to launch an XRP futures at the ▮

5          Q.   Did you have a conversation with

6     ▮ regarding that topic?

7          A.   I had a standing call with ▮ every

8     quarter.  They, I believe, had information rights

9     perhaps as an observer of the board.  I don't

10    specifically remember this, the conversation about

11    the futures, but it could have come up during that

12    conversation where I gave him an update on the

13    performance of the company.

14         Q.   Did the -- did the ▮ ever create an

15    index or launch an XRP future?

16         A.   I don't know.

17         Q.   Did you ever have discussions with

18    ▮ about any concerns about XRP being a

19    security under the federal securities laws?

20         A.   I don't recall.

21         Q.   You write:

22             "FYI I had a call with ▮

23          ▮ today at ▮  Told him we'd

24          like some answers of why we're so

25          far off timeline."

```
 1              Do you know what -- what are you talking
 2     about with respect to timeline?
 3          A.   I believe at one point in a conversation
 4     with ████ they had provided a preliminary timeline
 5     of when a future could launch.
 6          Q.   You go on to say:
 7                    "He blamed the lawyers, said
 8               he wasn't on the call and would get
 9               additional information for us.  He
10               said in the current environment at
11               ████ the lawyers rule the roost -
12               they are very risk adverse given
13               they are waiting approval on a
14               transaction and are under scrutiny
15               from the DOJ."
16               Then you say:
17                    "I was clear that this was a
18               major issue here - and needs a path
19               to resolution as nothing has
20               changed except for the better with
21               the SEC."
22               So just looking at the first part of the
23     sentence, "I was clear that this was a major issue,"
24     what -- what was a major issue?
25          A.   I don't specifically recall, but they were
```

267

1    a shareholder. ████████ was a partner of the company.

2    He -- and they had made -- they had proposed a

3    timeline to us and they had fallen off that

4    timeline.

5         Q.   So was the issue that they had -- were off

6    the timeline or was the issue relate to the SEC?

7              MR. HECKER:  Objection to form.

8              THE WITNESS:  I don't specifically

9    remember, but I would be surprised if it had

10   anything to do with the SEC.

11   BY MS. WAXMAN:

12        Q.   And when you're talk -- when you say

13   "needs a path to resolution as nothing has changed,"

14   is that a typo, nothing has -- should it be changed.

15             THE WITNESS:  I don't recall the email,

16   but seems like proper grammar.

17   BY MS. WAXMAN:

18        Q.   What -- what are you talking about when

19   you -- what are you referring to when you say "needs

20   a path to resolution"?

21        A.   Don't specifically recall the email, but

22   seems like getting back on the timeline to offer an

23   XRP futures.

24        Q.   Did you discuss with ████████ anything

25   about the SEC during that call?

```
 1          A.   I don't remember discussing the SEC with
 2   CME on that call.  I don't specifically remember
 3   that call, but it -- I would not discuss the SEC
 4   without counsel.
 5          Q.   Was counsel on this call?
 6          A.   No.  I don't recall counsel being on the
 7   call.
 8          Q.   Did you ever disclose the SEC's
 9   investigation into Ripple during that call?
10          A.   I don't recall -- I don't recall the call.
11   It would be very surprising to me if I disclosed
12   anything like that.  I -- I'm not even sure I was
13   aware of the investigation as of September 2018.  I
14   knew of the class action because those were public.
15          Q.   Well, earlier today you said that sometime
16   in 2018, you had first learned about the SEC's
17   investigation --
18          A.   Agreed.  Yeah.  I'm not exactly sure what
19   date.  It was three years ago.
20          Q.   Exhibit 52 -- wait, hold on for one
21   second, actually.
22               Are you familiar with an entity by name of
23   ████████?
24          A.   Yes.
25          Q.   Okay.  And what is ██████?
```

```
 1        A.      ████     is a boutique investment bank.

 2        Q.    And did Ripple ever hire ████

 3        A.    We engaged ████      to execute our

 4   fundraising.

 5        Q.    And at what period in time did you engage

 6   ████

 7        A.    I don't remember specifically when we

 8   signed the engagement letter.  I had a relationship

 9   with ████   at ████   that dated back to the '90s.

10   I had conversations with him, I believe, in 2018

11   about working with us. ████      and I

12   jointly started working with ████   likely late 2018

13   on the fundraising.

14        Q.    And when did the company determine that it

15   wanted to raise funds?

16        A.    Sometime during 2018.

17        Q.    And was there anything that prompted that

18   decision to raise funding?

19        A.    Typically, in Silicon Valley, both

20   employees and other investors rely on recent

21   investments in the company to be part of an

22   indication of the value of that company.  Ripple had

23   not done a fundraising since 2016, I believe.  Its

24   Series B had a valuation that was far below where,

25   you know, we thought valuation of the company should
```

270

1    be.

2        Q.   What did you think the valuation of the

3    company should be in -- at the time that you engaged

4    ▮▮▮▮?

5            MR. FORD:  Objection to form.

6            THE WITNESS:  We didn't have a specific

7    idea.  We just knew that it was higher than the

8    Series B valuation, which was roughly $2 a share and

9    about $300 million, if I remember correctly.

10   BY MS. WAXMAN:

11       Q.   And why did you have the belief that it

12   should have been higher?  What did you base that on?

13       A.   Variety of factors including discussions

14   with ▮▮▮▮ about what they thought they could raise

15   money for us at.  What valuation they could raise

16   money for us at.

17       Q.   Did you think that the company's valuation

18   should have been higher because XRP's price was

19   trading at a higher price?

20           MR. FORD:  Objection to form.

21           THE WITNESS:  Than in 2016 when we did the

22   fundraising?  We thought that might be a factor.

23   There were other factors we considered as well.

24   BY MS. WAXMAN:

25       Q.   Was that the primary factor for your

271

```
 1   belief that the valuation should be higher?

 2        A.   I wouldn't say it was a primary factor.

 3        Q.   Did it weigh heavily, in your

 4   understanding, as to the -- what the company should

 5   be valued at at the time?

 6             MR. HECKER:  Objection to form.

 7             THE WITNESS:  It was a --

 8             MR. HECKER:  Objection to form.

 9             THE WITNESS:  It was a factor.

10   BY MS. WAXMAN:

11        Q.   So what did          do in connection with

12   the engagement?

13        A.   As I recall, as would be standard, they

14   did a diligence of the company.  They helped in

15   determining and they decided who to do outreach,

16   which investors to approach.  They -- we provided

17   information about the company.  They packaged that

18   information up and approached investors in the

19   company.

20        Q.   What feedback did          get from

21   potential investors?

22             MR. HECKER:  Objection to form.

23   Foundation.

24             THE WITNESS:  I'd need to review the

25   specifics at the time.  I don't recall.
```

```
 1   BY MS. WAXMAN:
 2        Q.   And what feedback did ████████ provide you
 3   on their own after doing some due diligence on the
 4   company?
 5        A.   That they would be able to successfully
 6   raise capital for the company at a higher valuation
 7   than we had previously raised capital at.
 8        Q.   And did any deals come to fruition from
 9   any efforts from ██████?
10        A.   We closed the Series C in late 2019.
11        Q.   And who did you raise funds from in
12   connection with the Series C?
13        A.   ████████ and two other entities.  I forget
14   the -- the specifics, but it was led by ████████
15        Q.   Did it also include ██████████?
16        A.   It may have, yeah.
17        Q.   And did -- was ████████ an investor that
18   ██████ had presented to you?
19        A.   I don't recall that ████████ had
20   presented -- ██████ had presented ████████ to us.
21        Q.   Did Ripple terminate the engagement with
22   ██████ at some point?
23        A.   I do recall us terminating the engagement.
24        Q.   And did you have discussions about
25   terminating the agreement with ██████
```

```
 1              MR. FORD:  Objection to form.

 2              THE WITNESS:  Yes.

 3    BY MS. WAXMAN:

 4        Q.    Okay.  And did you have an understanding

 5    why Ripple terminated the agreement?

 6        A.    Felt like they poorly performed under the

 7    engagement.

 8        Q.    And did Ripple believe that they had poor

 9    performance?

10        A.    Yes.

11        Q.    And why?

12        A.    Limited understanding of the

13    cryptocurrency market, limited understanding of

14    fintech, limited ability of put us in front of

15    investors, get us investor meetings, and we ended up

16    finding the investor that we ended up proceeding

17    with on a fundraising.

18        Q.    How far did you get with          in the

19    process before you terminated the engagement?

20              MR. HECKER:  Objection to form.

21              THE WITNESS:  We received two term sheets,

22    I believe, in the summer of 2019.  But they were

23    unacceptable to the company.

24    BY MS. WAXMAN:

25        Q.    And who did you receive the term sheets
```

274

```
1    from?
2         A.    █████ and ███████ if I recall.
3         Q.    And why were they -- why was the █████
4    term sheet unacceptable?
5         A.    I forget the specific reason why it was
6    unacceptable.  We presented both term sheets or at
7    least the █████ term sheet I specifically remember
8    presenting to the board as our recommendation,
9    giving both the term sheet as well as the █████ name
10   as an investor, and then we ended up not moving
11   forward with them.
12        Q.    Was there a specific reason why the
13   company decided not to move forward with █████?
14        A.    I don't recall.  Yeah, I don't recall
15   the -- the back and forth there.
16        Q.    And you said that you had received a term
17   sheet from ███████, correct?
18        A.    Correct.
19        Q.    And that term sheet was unacceptable as
20   well?
21        A.    Correct.
22        Q.    Why was it unacceptable?
23        A.    I forget the specifics.
24        Q.    What information did Ripple provide to
25   █████ as part of its due diligence?
```

1          MR. HECKER:  Objection to form.

2          THE WITNESS:  I'd need to review the --

3    their request of her diligence.  What would be

4    standard would be operating metrics, financial

5    information, as well as product roadmaps, investor

6    presentations that we had made historically.  So it

7    was likely some set of that information.

8    BY MS. WAXMAN:

9          Q.    Who was Ripple's primary contact for

10   ▆▆▆▆▆

11         A.    ▆▆▆▆▆

12         Q.    Who was the primary contact at Ripple?

13         A.    It was myself and ▆▆▆▆▆▆▆ who was

14   the head of corporate development at the time.

15         Q.    And what was your role in connection with

16   the engagement with ▆▆▆▆?

17         A.    As CFO, I -- both at my current position

18   and Ripple in prior positions, I'm primarily

19   responsible for fundraising activities and the

20   completion of fundraising activities.  So whether

21   it's pulling together the diligence materials,

22   whether it's the positioning of the company, I'll

23   either work on a standalone basis or I'll work with

24   an advisor like ▆▆▆▆

25              And in the case of ▆▆▆▆ we -- we

```
 1   outsourced some of that activity and leveraged their
 2   relationships with investors to get meetings and to
 3   package the company.
 4        Q.   As part of ████████ due diligence, was it
 5   important for them to understand all aspects of
 6   Ripple's business?
 7             MR. HECKER:  Objection to form.
 8             THE WITNESS:  Yes.
 9             MR. HECKER:  Ms. Waxman, when you come to
10   a convenient time can we take our last break?
11             MS. WAXMAN:  Sure.  I just have one
12   document related to ████  So if we don't -- you
13   don't mind, we'll just do that one.
14             MR. HECKER:  No.  Go for it.
15             MS. WAXMAN:  Exhibit 52.
16             MR. SYLVESTER:  Not DEFCON5.
17             MR. HECKER:  No, it's like a three and a
18   half.  I didn't know there were five levels.  I
19   didn't know there were halves.
20                (Whereupon, Deposition Exhibit 52
21                 was marked for identification.)
22             MS. WAXMAN:  I don't know about you guys,
23   but I've had three epidurals, so ... in my lifetime.
24             MR. HECKER:  Definitely not.
25             ZOOM PARTICIPANT:  What is the
```

1    exhibit number?

2              MS. WAXMAN:   52.

3              ZOOM PARTICIPANT:   Five-two?

4              MR. HECKER:   Yes.

5              ZOOM PARTICIPANT:   Sorry.  I couldn't

6    hear.  Five --

7              MR. HECKER:   Five-two.

8              ZOOM PARTICIPANT:  -- two.

9    BY MS. WAXMAN:

10        Q.   It's a -- it's a long email, so take your

11   time to -- to read the whole thing.

12        A.   Okay.

13        Q.   If you look on the second page of the

14   email in the middle of email on November 8th at

15   2:04 from ▓▓▓▓▓▓ it talks about a conversation

16   between you and Monica and ▓▓▓ regarding ▓▓▓▓▓

17        A.   I'm sorry, where specifically between --

18        Q.   Sure.  Right here.  I'm going to ask you

19   about this email.

20        A.   Okay.  Yeah.  I wasn't clear that I was

21   specifically -- I don't see my name as part of that.

22        Q.   No, you're not copied on the email but in

23   the middle of the email above the bold it says:

24              "What Monica, Ron and I

25              discussed after the call was

278

```
1                    building a narrative that was along

2                    the lines of" --

3         A.    Gotcha.

4         Q.    -- and then it has a list of one, two,

5    three, four.

6              MR. FORD:  Sorry, Daphna, I hate to

7    interrupt you but I think we lost the live sync.

8              THE REPORTER:  I can't get back on the

9    internet.

10             MR. FORD:  Oh, it --

11             THE VIDEOGRAPHER:  I think it timed out.

12   We had eight hours so now everyone has to sign back

13   in.

14             MR. FORD:  Oh, okay.  Do we -- do we just

15   all need to sign back in on --

16             THE REPORTER:  I can't get on.  So if I'm

17   not on nobody can get on.  I keep trying but it's

18   not working.

19             MR. HECKER:  Should we take just a quick

20   break and see if we can fix that or --

21             THE REPORTER:  Well, I --

22             MS. WAXMAN:  Let's go off the record for a

23   minute and then let's see if there's something we

24   could do.  But I -- I don't want to -- you know,

25   since there's an exhibit pending, I don't want to
```

1    leave the room.

2              MR. FORD: Yeah, we don't have to, see if

3    we can fix this quickly.

4              THE VIDEOGRAPHER: Okay. We're going off

5    the record. The time is 4:31 p.m.

6              (Whereupon, a recess was taken.)

7              THE VIDEOGRAPHER: We're back on the

8    record. Time is 4:36 p.m.

9    BY MS. WAXMAN:

10        Q.   Okay. Mr. Will, going back to that second

11   page, the email referencing a discussion between

12   you,        and -- and Monica, did you ever have

13   discussions with        regarding Ripple's

14   valuation?

15        A.   I don't specifically recall having a --

16   you know, when I had, but I likely had a

17   conversation with        about valuation and

18   valuation frameworks.

19        Q.   Did        tell you that it would be

20   difficult to achieve a valuation based on

21   software -- Ripple's software revenues?

22        A.   I don't recall specifically them saying

23   that. That wouldn't surprise me.

24        Q.   And why wouldn't it surprise you?

25        A.   Ripple's software revenues were relatively

```
 1   small.
 2        Q.   So you would agree with that statement?
 3             MR. HECKER:  Objection to form.
 4             THE WITNESS:  That -- I would agree that a
 5   multiple of software revenue would likely result in
 6   a low valuation.
 7   BY MS. WAXMAN:
 8        Q.   Did          -- did you ever discuss with
 9   Monica her discussions that she's had with investors
10   regarding Ripple's story and it being reliant on
11   retail speculation?
12             MR. HECKER:  Objection to form.
13             THE WITNESS:  I don't recall any
14   conversations with Monica about that.
15   BY MS. WAXMAN:
16        Q.   Do you recall any conversations in
17   general?
18        A.   With Monica about investors?
19        Q.   Mh-hmm.
20        A.   We may have discussed it.  Monica was the
21   head of marketing.  Was a long-time employee of
22   Ripple.  I believe she was one of the earliest
23   employees that was still at Ripple.  So we -- we
24   could very well have discussed investor
25   interactions.
```

1      Q.   Did investors believe that Ripple's story

2   was very reliant on retail speculation?

3             MR. FORD:  Objection to form.

4             MR. HECKER:  Objection to form.

5             THE WITNESS:  The investors that I spoke

6   with did not relay that to me.

7   BY MS. WAXMAN:

8      Q.   Did you have a belief or understanding

9   that the Ripple story was relying on retail

10   speculation?

11      A.   No.

12      Q.   What sort of narrative did you discuss

13   regard -- what sort of narrative did you discuss to

14   provide to potential investors regarding Ripple?

15      A.   In November of 2018 at this meeting?

16      Q.   Yeah.

17      A.   I don't recall.

18      Q.   Do you know what "three pillars" refers

19   to?

20      A.   I don't.

21      Q.   Have you ever heard that term used at

22   Ripple?

23      A.   I don't recall that term being used at

24   Ripple.

25      Q.   Have you ever seen any documents where

1  that three pillars is referenced?

2          MR. HECKER:  Other than this one, you

3  mean.

4          THE WITNESS:  I don't recall seeing that

5  reference.

6  BY MS. WAXMAN:

7     Q.  Based on the document, do you have an

8  understanding what the three pillars are?

9          MR. FORD:  Objection to form.

10          THE WITNESS:  I don't, actually.

11  BY MS. WAXMAN:

12     Q.  This is an email that someone from Ripple

13  drafted, right, ▮▮▮▮▮▮▮?

14     A.  Yes.

15     Q.  Okay.  And it says:

16              "Pillar number 1, to date the

17              value of XRP is highly reliant on

18              retail speculation (speculation

19              that is -- speculation that is

20              linked to, 1, belief in the value

21              of the underlying technology of

22              the XRP Ledger, and 2, the promise

23              of what is being built on the XRP

24              Ledger)."

25              Did you agree with that statement at the

1   time?

2          MR. HECKER:  Objection to form.

3          THE WITNESS:  I don't recall if I would

4   have agreed in November of 2018 to that.

5   BY MS. WAXMAN:

6      Q.   Do you agree with that now?

7          MR. HECKER:  I'm sorry, does he agree now

8   that -- at that time?

9          MS. WAXMAN:  No.

10     Q.   Do you agree now that the value of XRP is

11  highly reliant on retail speculation?

12         MR. FORD:  Objection to form.

13         THE WITNESS:  With just that part of the

14  sentence or the entire pillar?

15  BY MS. WAXMAN:

16     Q.   Let's just take the first part of the

17  sentence.

18     A.   Yeah.

19     Q.   Do you believe the value -- do you believe

20  today that the value of XRP is highly reliant on

21  retail speculation?

22         MR. FORD:  Objection to form.

23         THE WITNESS:  Right now, I have not spent

24  time looking at cryptocurrency since I left Ripple.

25  So I don't have an opinion about what is the --

1    driving the value of or what XRP is relying on.

2    BY MS. WAXMAN:

3        Q.   At the time you left Ripple, did you

4    believe that the value of XRP was highly reliant on

5    retail speculation?

6            MR. FORD:  Objection to form.

7            THE WITNESS:  I don't recall.

8    BY MS. WAXMAN:

9        Q.   The second part of the sentence, at the

10   time you left Ripple, did you believe that

11   speculation in XRP was linked to those two things

12   that are listed?

13           MR. FORD:  Objection to form.

14           THE WITNESS:  I don't recall believing

15   that.

16       Q.   Did you have -- did you have any reason to

17   believe that anyone else disagreed with this view?

18           MR. FORD:  Objection to form.

19           MR. HECKER:  Objection to form.

20           THE WITNESS:  Yeah, that's -- that's a

21   broad statement.  I don't -- I don't -- I don't

22   recall at the time that I left Ripple what others

23   thought about that statement.

24   BY MS. WAXMAN:

25       Q.   Well, does this statement seem odd to you,

1    is it -- for -- for ████████ to say?

2              MR. HECKER:  Objection to form.

3              THE WITNESS:  I don't -- I don't have an

4    opinion either way about whether it's odd or not.  I

5    just -- I don't really understand what he's getting

6    at here.

7    BY MS. WAXMAN:

8         Q.   Did you have an opinion whether it was

9    accurate?

10             MR. HECKER:  Objection to form.

11   Foundation.

12             THE WITNESS:  I don't have an opinion

13   about whether it's accurate.

14   BY MS. WAXMAN:

15        Q.   And you don't have an opinion or believe

16   that it was inaccurate; is that correct?

17             MR. HECKER:  Same objections.

18             THE WITNESS:  I think it's difficult to

19   understand what is driving speculation is the basis

20   of my lack of understanding here.

21   BY MS. WAXMAN:

22        Q.   Do you have any understanding what he's

23   talking about when he talks about the value of XRP

24   being highly reliant on retail speculation and that

25   speculation is linked to belief in the value of the

1   underlying technology of XRP and the promise of what

2   is being built on the XRP Ledger?

3       A.   Only -- only what he wrote.  I just -- I

4   seem to -- he seems to be expressing an opinion

5   about what his view is about what is -- what is

6   driving the value of XRP.

7       Q.   Did you understand that to be his personal

8   view or the view of the company?

9       A.   I don't recall.  I don't recall this

10   email.  I don't recall that to be -- whether it's

11   his personal view or -- or not, I can't speak to

12   that.

13       Q.   I know you don't recall the email itself,

14   but with respect to the value of XRP and -- and what

15   drove XRP value, that's what I actually want to

16   focus on now here.

17          So with respect to pillar number 2, can

18   you read that into the record for me?

19       A.   "Ripple is" --

20          MR. HECKER:  It seems like we're going to

21   be on this document for awhile.  He can answer this

22   question but can we take a break after this and then

23   you come back and keep going.  I mean, it's been

24   like 20 minutes since I asked for the break.

25          MS. WAXMAN:  That's not my fault.  We took

```
 1    a break for the --

 2              MR. HECKER:  No, I know.  I know.  I'm

 3    asking for the courtesy of a break.  There's no rule

 4    about not taking a break while you're in the middle

 5    of a document.

 6              But you can answer the question.

 7              MS. WAXMAN:  I just want to finish the

 8    document.  I think it will be more efficient.

 9         Q.   Can you read pillar number 2 into the

10    record?

11         A.   "Ripple is the leading company building on

12    the XRP Ledger (with five-plus years of work).  Our

13    software allows FIs to leverage blockchain

14    technology and XRP to solve difficult and expensive

15    problems with today's financial infrastructure."

16         Q.   Did you agree with that statement, "Ripple

17    is the leading company building on the XRP Ledger

18    (with five-plus years of work)"?

19         A.   I don't have an opinion about that.

20         Q.   You don't have an opinion about

21    Ripple's --

22         A.   That they have a lead-in?  I don't --

23              MR. HECKER:  You can't talk over each

24    other.

25              THE WITNESS:  I -- I don't consider myself
```

1    a cryptocurrency expert and capable of determining

2    whether they are -- Ripple is the leading company

3    building on the XRP Ledger.  There are many

4    companies building on the XRP Ledger, and that seems

5    like a -- you know, a -- an opinion.

6    BY MS. WAXMAN:

7        Q.   Did people -- did others at the company

8    have the opinion that Ripple was the leading company

9    building on the XRP Ledger?

10            MR. HECKER:  Objection to form.

11            THE WITNESS:  I don't recall.

12   BY MS. WAXMAN:

13       Q.   Pillar 3 talks about:

14               "Other companies are

15               innovating on the XRP Ledger.

16               Xpring was created to provide

17               infrastructure and investment to

18               support these companies."

19               Is that a correct statement regarding

20   Xpring?

21            MR. FORD:  Objection to form.

22            THE WITNESS:  As I recall, that was --

23   that was what I believe Xpring was -- created to do.

24   BY MS. WAXMAN:

25       Q.   Did you ever have any discussions with

289

```
 1    anyone at Ripple regarding Xpring's creation and its

 2    purpose?

 3         A.    As part of the executive team, Ethan Beard

 4    who ran the Xpring group, presented regularly on

 5    what they were going to focus on.  And it's very

 6    possible as of November 2018 this was the -- the

 7    mission of Xpring.  It may have evolved prior to

 8    that, may have changed afterwards, but this could

 9    very well have been Xpring's focus at that time.

10              MS. WAXMAN:  Okay.  Let's take a break.

11              THE VIDEOGRAPHER:  We're going off the

12    record.  The time is 4:48.

13                 (Whereupon, a recess was taken.)

14              THE VIDEOGRAPHER:  All right.  We're back

15    on the record.  The time is 5:04 p.m.

16    BY MS. WAXMAN:

17         Q.    Mr. Will, I want to take a look at

18    Exhibit 51, which we looked at earlier today.

19         A.    Sure.

20         Q.    And I want to point you to the last

21    sentence of the top email, starting with, "I was

22    clear that there was a major issue here."

23              What did you mean by --

24                 (Brief interruption.)

25    / /
```

1    BY MS. WAXMAN:

2        Q.   What does it -- what did you mean by

3    "nothing has changed except for the better with the

4    SEC"?

5            MR. FORD:   Objection to form, and to the

6    extent that statement reflects your understanding

7    based on conversations with counsel, just direct you

8    not to refer to those in your answer.

9            THE WITNESS:   I don't recall.

10   BY MS. WAXMAN:

11       Q.   Did anyone at Ripple tell you that things

12   had changed for the better with the SEC?

13           MR. FORD:   So, again, if that's referring

14   to someone, counsel, in-house or otherwise, just

15   don't include that in your response.

16           THE WITNESS:   I don't recall.

17   BY MS. WAXMAN:

18       Q.   Did Mr. Garlinghouse ever provide any

19   update to you regarding any of his interactions with

20   the SEC?   And, again, outside the presence of

21   counsel, of course?

22       A.   No.

23       Q.   Did Mr. Garlinghouse ever provide you with

24   any update regarding a potential settlement of the

25   SEC investigation?

291

```
1       A.    No.

2             MS. WAXMAN:    Exhibit 58.

3             (Whereupon, Deposition Exhibit 58

4             was marked for identification.)

5   BY MS. WAXMAN:

6       Q.    Before we go to that, did you have any

7   discussions with Mr. Garlinghouse at any time about

8   XRP's status under the federal securities laws, with

9   the caveat that the conversation didn't involve

10  counsel?

11            MR. HECKER:    Objection.  Asked and

12  answered.

13            THE WITNESS:   No.

14  BY MS. WAXMAN:

15      Q.    Mr. Will, I'm showing you what's been

16  marked RW58 which is a document with the Bates

17  RPLI_SEC 0547339.

18      A.    Okay.

19      Q.    Why did you send this email to Brad?

20      A.    I don't recall this email, but it appears

21  I sent it in October 2018.  Was the question when

22  or --

23      Q.    Why.

24      A.    Why.  Brad's asking for, it appears, my

25  input on the investor update and asked for some
```

1    ideas, it appears.  So I -- I came up with a few

2    ideas for us to consider.

3              MS. WAXMAN:  Let's go off the record for a

4    second.  The LiveNote is not working.

5              THE VIDEOGRAPHER:  We're going off the

6    record.  The time is 5:08 p.m.

7                 (Whereupon, a recess was taken.)

8              THE VIDEOGRAPHER:  Back on the record.

9    The time is 5:10 p.m.

10   BY MS. WAXMAN:

11       Q.   Mr. Will, you said that Mr. Garlinghouse

12   had asked you for some input on the investor update

13   and asked for some ideas.  Did you -- what ideas did

14   you provide him?

15       A.   I don't recall this email, but it looks

16   like I provided several ideas that are written here

17   in this email.

18       Q.   At the bottom of the email, it says:

19                 "Stating the obvious, but

20                 given the nascent state of the

21                 software business and the growth

22                 and expenses, not much to say

23                 around top line growth or margins."

24             What did you mean by -- what is -- what

25   were you referring to by "top line growth or

1    margins"?

2         A.    I don't specifically recall in the context

3    of this email, but frequently for a business in its

4    early stages, the revenue growth and margins are not

5    the best way to judge the potential future value of

6    that business and -- particularly for exchange-base

7    business models similar to what we were trying to do

8    with RippleNet.

9         Q.    Did the company experience any top line

10   growth in connection with its software products?

11        A.    I don't specifically recall that -- the --

12   the numbers, but I do believe it showed top line

13   growth over -- over those years, you know, 2017,

14   2018, 2019, in software revenue.  But I'd have to

15   check the financial statements to confirm that.

16        Q.    Okay.  Then you say:

17                   "We also don't want to discuss

18              XRP price or value of holdings."

19              Why didn't you want to discuss XRP price

20   or value of holdings?

21        A.    I thought -- I don't specifically recall

22   why not, but -- so I don't -- but I -- I don't

23   specifically recall why in October I said that.

24        Q.    Do you have a general recollection about

25   not wanting to discuss XRP price or value of

1    holdings?

2         A.   In general, I felt like any investor in

3    Ripple that was interested in the price of XRP could

4    get a real time price for XRP from any financial

5    source.  It was readily available on the internet.

6    So why did we need to provide information about XRP

7    price in an email that would soon be outdated.

8         Q.   Was there any other reason why you didn't

9    want to discuss XRP price or value of holdings with

10   potential investors or with investors?

11        A.   I think in general, we wanted to focus

12   investors on long-term value creation.  And so tying

13   them to a specific price in a moment in time didn't

14   seem like the best investor relations approach.

15        Q.   But didn't we discuss earlier that

16   Ripple's value was directly tied to its -- to the

17   value of XRP?

18        A.   Over the long --

19             MR. FORD:  Sorry, objection.  Misstates

20   the testimony.

21             THE WITNESS:  I believe what I said was

22   that over the long term, Ripple's value would be

23   tied to factors including the long-term price and

24   value of its holdings in XRP.

25    / /

1    BY MS. WAXMAN:

2        Q.    And what about in the short term?

3        A.    I think I would debate that people should

4    be focused on the short term when looking at,

5    particularly a private company equity stake.

6        Q.    Setting aside that issue, how -- what --

7    how would you recommend the equity shareholders

8    value Ripple in the short term?

9            MR. FORD:  Objection to form.

10           THE WITNESS:  Typically, for a private

11   company, there's no daily requirement to value their

12   equity stakes.  It's done on, you know, a quarterly

13   or annual basis.  So it -- the company doesn't trade

14   on any exchange.  There's no requirement to provide

15   a specific valuation at any given point in time,

16   which is why I guided investors typically to a

17   framework for valuation to consider.  The end of the

18   day, investors made the wrong determination about

19   how they wanted to value their Ripple stake.

20   BY MS. WAXMAN:

21       Q.    Did anyone at Ripple ever tell you

22   specifically not to discuss XRP price or value of --

23   of its XRP holdings?

24       A.    To clarify, in what context?

25       Q.    In any context.

[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

1       A.   I don't recall that.

2       Q.   Was there a concern that by talking about

3  XRP in this way, XRP could more likely be viewed as

4  a security under the federal securities laws?

5           MR. HECKER:  Objection to form.  Lacks

6  foundation.

7           THE WITNESS:  I don't recall that being a

8  consideration.

9           MS. WAXMAN:  Exhibit 70, please.

10          (Whereupon, Deposition Exhibit 70

11          was marked for identification.)

12           THE WITNESS:  Thank you.

13  BY MS. WAXMAN:

14       Q.   Mr. Will, I'm showing you what's been

15  marked as Exhibit 70, which is a document with the

16  Bates RPLI_SEC 0269649 through -51.

17           ZOOM PARTICIPANT:  Could you repeat the

18  exhibit number, please?

19           MS. WAXMAN:  70.

20           MR. HECKER:  Seven zero.

21           ZOOM PARTICIPANT:  I couldn't hear you.

22  Seven-zero.

23           THE WITNESS:  Okay.

24  BY MS. WAXMAN:

25       Q.   Who is             ?

```
 1        A.  ▮▮▮▮▮▮▮▮        at the time that I was at
 2   Ripple, was the head of sales.
 3        Q.   Head of software sales?
 4        A.   Head of software sales at Ripple.
 5        Q.   Okay.  And why did you send this email to
 6   ▮▮  and --  ▮▮▮▮▮▮▮   and ▮▮▮▮▮▮▮ ?
 7        A.   ▮▮  sent us an email.  I don't
 8   specifically recall this email, but ▮▮  had sent us
 9   an email, it appears, in December before we set
10   annual targets, as he would frequently send us
11   emails complaining about his compensation and the
12   measures by which his compensation was being set.
13        Q.   And how was his compensation being set?
14        A.   His compensation was set on the number of
15   RippleNet sales, contracts that were signed by his
16   team.
17        Q.   And how did you respond to his complaints?
18        A.   I provided him with some context around
19   the difficulty at Ripple to estimate some of the
20   value given the lack of historical context and data
21   for some of the things he proposed.
22        Q.   As part of your response, you state:
23                  "What I find very interesting
24                  in your email is that not once do
25                  you mention XRP.  However, our
```

```
 1                    building [sic] of XRP is our 'north

 2                    star', and the -- the, all caps,

 3                    key driver of Ripple valuation."

 4                    Do --

 5                    MR. HECKER:  Objection to form.  Counsel,

 6         you misread "holding" as "building."

 7                    MS. WAXMAN:  Thank you.

 8              Q.    In December 2018, did you believe that

 9         Ripple's XRP holdings was the key driver of Ripple's

10         valuation?

11              A.    I don't recall that being my belief at the

12         time.

13              Q.    Do you have any reason to believe that

14         what you wrote in this email was not what you

15         believed?

16              A.    What my reason for likely including that

17         sentence was to push         to consider alternatives

18         to his request for an increase in his compensation.

19              Q.    And how could -- if you do go down to the

20         next paragraph, second to last sentence, you say:

21                    "Unlike every other software

22                    company, sales of Ripple does not

23                    sell the thing that directly

24                    derives shareholder value or cash

25                    flow at Ripple."
```

1           Again, in December 2018, what did you

2  believe drove shareholder value or cash flow at

3  Ripple?

4       A.   I don't recall what I thought in

5  September '18. But my intent typically with ███

6  ██████████ was to provide an alternative to his

7  requests for structures that would increase the

8  compensation of him or his team as part of their

9  software sales.

10      Q.   In the third paragraph, the second

11  sentence, you say:

12             "We sell software products

13             that are almost inherently loss

14             leaders to drive usage of a unique

15             digital asset."

16       What did you mean by the phrase "loss

17  leaders"?

18       A.   I don't recall what I specifically meant

19  there.

20      Q.   The end of that paragraph, you say:

21             "Building a swift replacement

22             may be a potential output of our

23             strategy and a helpful way to

24             position our product for customers

25             but is not a goal to maximize

1      value of our XRP stake."

2           Why did you feel that, you know, building

3    out a swift replacement was not a goal to maximize

4    value of Ripple's XRP stake?

5           A.    I don't specifically recall why I included

6    that sentence in there.  The intent of this dialogue

7    was to provide ███ with some context around his

8    proposal for an alternative compensation structure

9    for his sales team.

10          Q.    In the next paragraph, you talk about the

11   status of xRapid.

12               Was xRapid at scale in December 2018?

13               MR. FORD:  Objection to form.

14               THE WITNESS:  In December of '18, I don't

15   believe it was at scale.

16   BY MS. WAXMAN:

17          Q.    And what was the dollar amount of

18   transactions for xRapid in 2018, according to this

19   email?

20          A.    I don't specifically recall, but what the

21   email says is less than ████

22          Q.    And do you have any reason to believe that

23   what you wrote in the email was not true?

24          A.    I don't have any reason to believe that.

25          Q.    So if Ripple's -- if Ripple was internally

```
 1    trying to increase shareholder value by increasing
 2    the value of XRP, would it be reasonable for an XRP
 3    investor to look to Ripple to increase XRP's value?
 4              MR. HECKER:  Objection to form.  Calls for
 5    speculation.
 6              THE WITNESS:  No, I don't -- I don't have
 7    an opinion about that.
 8    BY MS. WAXMAN:
 9         Q.   And what steps did you recommend that
10    Ripple take to maximize shareholder value and
11    increase the value of XRP in December of 2018?
12              MR. FORD:  Objection to form.
13              THE WITNESS:  It appears in this I was
14    trying to reduce sales compensation costs by
15    reducing the compensation of ███ team.  And that
16    was the intent of this email.
17    BY MS. WAXMAN:
18         Q.   Did you, in the email, make a
19    recommendation of how Ripple could increase
20    shareholder value?
21              MR. FORD:  Objection to form.
22              THE WITNESS:  ███ as the head of sales
23    would not be someone that would be knowledgeable
24    about how to maximize shareholder value.  So my
25    intent in a communication like this would be more
```

1    around -- particularly in late 2018, which is when

2    sales compensation is typically set, would be around

3    driving his compensation to a more reasonable level.

4            MS. WAXMAN:  Exhibit 61, please.

5            (Whereupon, Deposition Exhibit 61

6              was marked for identification.)

7    BY MS. WAXMAN:

8        Q.   Mr. Will, I'm showing you what's been

9    marked RW61, which is a document that has the Bates

10   RPLI_SEC 0269926 through -931.

11       A.   Okay.

12       Q.   Do you recall this email?

13       A.   I do not recall this email.

14       Q.   In the middle of the email is Brad --

15       A.   On the second page?

16       Q.   Yeah.  Did you ever have any discussions

17   with Brad in which he recommended that Ripple share

18   more financial information?

19       A.   I don't remember discussions with Brad

20   about us to continue to consider our investor

21   relations approach, yes.

22       Q.   Did you also have discussions with Monica

23   about Ripple's investor relations approach?

24       A.   Yes.

25       Q.   And did you discuss with Monica what

1    information to provide to investors?

2        A.   I remember conversations that we had.  I

3    don't specifically remember the conversations, but I

4    can see the information that was proposed here in

5    the email.

6        Q.   And what did Monica propose?

7        A.   Monica, in this email, appears to be

8    proposing segmenting our audience.

9        Q.   And what information did she recommend

10   providing to certain investors?

11       A.   I don't recall providing -- recommending

12   providing -- segmenting our investors or providing

13   to a portion of our investors.  It appears here I

14   recommended providing a narrative with case studies

15   and other indications of progress.

16       Q.   Did you think it was worthwhile for Ripple

17   to provide financial data to investors?

18       A.   As a private company, Ripple is under no

19   obligation to provide, broadly, its financial

20   statements.  I also find, as a four-time CFO of

21   public and private companies, that -- and

22   particularly three times at a private company, that

23   it would be highly uncommon for a company to broadly

24   provide financial information of an earlier stage

25   company to their investors.

1          Q.   With respect to Ripple, did you think

2     providing financial information would be worthwhile?

3               MR. HECKER:  Objection to form.

4               MR. FORD:  Objection.

5               THE WITNESS:  By "financial information,"

6     do you mean our income statement?

7     BY MS. WAXMAN:

8          Q.   Yeah.  I'm referring to the financial

9     information, the financial reports that are

10    referenced in the email.  So the income statement

11    and the balance sheet and any other operating

12    metrics that are included in the financial

13    statements?

14              MR. HECKER:  Objection to form.

15              THE WITNESS:  There are typically no

16    operating metrics that are included in the financial

17    statements.  The financial statements, as are fairly

18    complex, require a substantial amount of context

19    around GAAP accounting treatment of cryptocurrency.

20    So I did not think, particularly at the -- at the

21    earlier stages, that that was the right way, or a

22    common way, to communicate with investors at a

23    company like Ripple.

24    BY MS. WAXMAN:

25         Q.   At the very bottom of the first page, you

```
 1    say that:
 2                    "Once public, we'll have to
 3              provide all of our financial
 4              information in detail which will
 5              create significant noise."
 6          What did you mean by "significant noise"?
 7          A.    Cryptocurrency accounting is an evolving
 8    area.  At that point in time, in late 2018, we had
 9    already started getting into the details of how
10    Ripple's financial statements would likely be
11    presented.  And as they evolved with general
12    accepted accounting principles and our work with
13    Deloitte, they were complex.
14          Q.    And other than being complex, were there
15    any other concerns about disclosing Ripple's
16    financials publicly?
17          MR. HECKER:  Objection to form.
18          THE WITNESS:  As a private company, it
19    would be highly uncommon for a company at this stage
20    to provide its financial statements publicly.
21    BY MS. WAXMAN:
22          Q.    Setting aside that it wasn't common, were
23    there any things about the financial statements that
24    you thought -- that were concerned -- that concerned
25    you?
```

1          MR. HECKER:  Objection to form.

2          THE WITNESS:  There was nothing in the

3  disclosures that concerned me, other than the

4  complexity and the lack of context that they would

5  provide to investors, as well as the requirement to

6  provide to investors.  I think also, we considered

7  whether, from a competitive standpoint, it would

8  potentially provide information to investors -- to

9  competitors that would put us at a competitive

10  disadvantage, since no other cryptocurrency

11  companies were publicly disclosing their financial

12  information.

13  BY MS. WAXMAN:

14     Q.   In number 2 you say -- you talk about the

15  income statement.  And in the middle of the

16  paragraph you say:

17          "Our gross and operating

18          margins as well as EBITDA don't

19          provide insight into our long-term

20          business model or profitability."

21          In October 2018, what was your

22  understanding of Ripple's business model?

23     A.   Ripple's business model was focused on the

24  long-term development of RippleNet.

25     Q.   And why wouldn't the income statement

307

1    reflect information about RippleNet?

2        A.   As is common in an early stage network, we

3    were yet to be able to monetize the network.  We

4    weren't generating substantial amounts of revenue

5    from the network.

6        Q.   Would the monetization of XRP be reflected

7    on the financial statements?

8             MR. FORD:  Objection to form.

9             THE WITNESS:  XRP sales were considered

10   revenue and would be part of the income statement.

11   BY MS. WAXMAN:

12       Q.   But any increase in value of XRP would not

13   be reflected on the income statement?

14            MR. FORD:  Objection to form.

15            THE WITNESS:  Without getting into the

16   granular detail of our financial statements at

17   Ripple, the increase in value in XRP would actually

18   be a decrease on the income statement for a variety

19   of complex reasons.

20            MS. WAXMAN:  Exhibit 117.

21              (Whereupon, Deposition Exhibit 117

22              was marked for identification.)

23            MS. WAXMAN:  Can you tell me the time?

24            THE VIDEOGRAPHER:  Sure.  6:34.

25   / /

1    BY MS. WAXMAN:

2        Q.   Mr. Will, I'm showing you what's been

3    marked RW117 which has the Bates RPLI_SEC 0845227

4    through -228.

5        A.   Okay.

6        Q.   Did the -- the bottom email references

7    certain regulatory triggers in connection with the

8    term sheet from ███████████ ; is that correct?

9        A.   Yeah, I don't remember this email, but it

10   appears to, yes.

11       Q.   Did the original term sheet with ███████

12   ███   include regulatory triggers?

13           MR. FORD:  Objection to form.

14           THE WITNESS:  I don't recall.

15   BY MS. WAXMAN:

16       Q.   Okay.  Did you have any discussions with

17   anyone at ███████████  about the inclusion of

18   regulatory triggers as part of a potential

19   investment?

20       A.   I don't recall.

21       Q.   Did you have any discussions with anyone

22   at Ripple, other than counsel, regarding regulatory

23   triggers as part of the deal?

24       A.   No.

25       Q.   What prompted the insertion of the

1   regulatory provisions by █████████

2           MR. HECKER:  Objection to form,

3   foundation.

4           MR. FORD:  Objection to form.

5           THE WITNESS:  I don't know.

6   BY MS. WAXMAN:

7       Q.   Was one of the reasons that the term sheet

8   with ███████████ -- was one of the reasons that the

9   term sheet with ██████████ was unacceptable was

10  because it included these regulatory triggers?

11          MR. HECKER:  Objection to form.

12          THE WITNESS:  In my experience doing

13  fundraisings, you look at the totality of the term

14  sheet to make a determination.  I don't specifically

15  recall why we rejected their proposal.  We were, as

16  the email lays out, already talking to ████████

17  about an alternative, but I -- I can't say that that

18  specifically was why we turned that down.

19  BY MS. WAXMAN:

20      Q.   Did you disclose the SEC's investigation

21  into Ripple to ██████████?

22      A.   I don't recall.

23      Q.   How did ██████████ -- did ████████████

24  become aware of the SEC investigation at any point

25  during the negotiations?

310

1          MR. HECKER:  Objection to form.

2     Foundation.

3          THE WITNESS:  I don't recall.

4     BY MS. WAXMAN:

5          Q.    Did you disclose -- was -- did ███████

6     have a concern that XRP could be deemed a security

7     under the federal securities laws?

8          MR. HECKER:  Objection to form.

9     Foundation.

10          THE WITNESS:  I think you'd have to ask

11    them.  I don't -- I don't know if they did have that

12    concern.

13    BY MS. WAXMAN:

14          Q.    You don't have an understanding as to why

15    they included this provision in the term sheet?

16          MR. HECKER:  Same objection.

17          THE WITNESS:  You'd have to ask ███████

18    ███ hy they included that.

19    BY MS. WAXMAN:

20          Q.    If XRP was deemed a security, would that

21    present a business risk to Ripple?

22          MR. HECKER:  Objection to form.  Calls for

23    speculation.

24          THE WITNESS:  I'm not a securities expert.

25    I don't feel like I'm qualified to answer that

1    question.

2    BY MS. WAXMAN:

3        Q.   Is there any reason why Ripple would not

4    want to treat XRP as a security?

5            MR. FORD:  Objection to form.

6            THE WITNESS:  I would have to -- it could

7    potentially impact the venues on which XRP would be

8    able to trade was -- was one consideration.

9    BY MS. WAXMAN:

10       Q.   Any other consideration?

11       A.   I don't recall.

12       Q.   With the caveat, I don't want you to

13   disclose any conversations you've had with counsel

14   about it.

15           If XRP were to be deemed a security under

16   U.S. laws, would that have any impact on the

17   functioning of any of Ripple's products?

18           MR. FORD:  Objection to form.  Again, to

19   the extent you can answer that without disclosing

20   any conversations you had with counsel.

21           THE WITNESS:  I can't answer that.

22   BY MS. WAXMAN:

23       Q.   Can you not answer because you had

24   conversations with counsel?

25       A.   The reasons -- because of the

1    conversations with counsel.

2          Q.    Setting aside conversations with counsel,

3    did -- did -- would XRP be -- status as a security,

4    have any impact on the functioning of xRapid?

5                MR. FORD:  Objection to form.

6                If you can set aside conversations with

7    counsel.

8                THE WITNESS:  At a product level?  I

9    wouldn't feel qualified to answer that.

10   BY MS. WAXMAN:

11         Q.    Who would be able to answer that question?

12         A.    Head of product, perhaps.

13               MS. WAXMAN:  177, please.

14               (Whereupon, Deposition Exhibit 177

15                was marked for identification.)

16   BY MS. WAXMAN:

17         Q.    I'm showing you a document that's been

18   marked RW177, which is a document with the Bates

19   0929710 through -713.

20               The top email is from you to Breanne

21   Madigan.  Who was Breanne Madigan at the time?

22         A.    November of 2018, Breanne Madigan was the

23   head of XRP markets, I believe.

24         Q.    I believe it's 2019.

25         A.    2019.  Sorry.

```
 1           Q.   Okay.  And you write, "given we are out of
 2      the market."  What are you talking about when you
 3      say we are out of the market?
 4           A.   I don't recall this email, but it appears
 5      from the second page that we are not selling XRP
 6      programmatically.
 7           Q.   Okay.  And for -- and were you selling XRP
 8      over the counter at that time?
 9           A.   I don't recall this specific email, but it
10      looks like, from this email, that the XRP sold was
11      also zero at that time.
12           Q.   Why did you hold XRP sales in November
13      2019?
14           A.   I don't recall.
15                MR. FORD:  Objection.
16                MR. HECKER:  Objection.
17                THE WITNESS:  I don't recall.
18      BY MS. WAXMAN:
19           Q.   Did Ripple continue to sell additional XRP
20      sales after November 2019?
21                MR. HECKER:  Objection to form.
22                THE WITNESS:  I don't recall.
23      BY MS. WAXMAN:
24           Q.   If Ripple had stopped selling XRP, would
25      that be of concern to you?
```

[7/30/2021] Will, Ron Dep. Tr. 7.30.2021