314

```
1              MR. FORD:  Objection to form.

2              THE WITNESS:  It -- it depends on other

3       factors.

4       BY MS. WAXMAN:

5          Q.   What other factors?

6          A.   Why we decided, the cash balance of the

7       company, whether we had secured any other

8       fundraising.  Those would be factors that we would

9       consider.  There are probably others.

10         Q.   Did you come to an understanding that

11      Ripple had -- had stopped selling XRP based on

12      feedback that it had received from the SEC during

13      the SEC's investigation?

14             MR. FORD:  Objection to form and to the

15      extent you can answer that without disclosing

16      conversations you may have had with counsel, you can

17      answer, but don't reveal any conversations you had

18      with counsel.

19             THE WITNESS:  I don't recall.

20      BY MS. WAXMAN:

21         Q.   Earlier we discussed how Ripple's XRP

22      sales were funding operations and exceeded revenues

23      from software sales.

24             Are you saying you -- you did not have a

25      discussion with anyone about stopping XRP sales
```

1    after November 2019?

2          MR. FORD:  Objection to form,

3    mischaracterizes the testimony and, again, to the

4    extent you had discussions with counsel, just don't

5    include those in your answer.

6          THE WITNESS:  I said that I don't recall

7    us being out of the market over that time period.

8    BY MS. WAXMAN:

9       Q.   Did -- do you recall Ripple pausing sales

10    for a significant amount of time?

11          MR. FORD:  Objection to form.

12          THE WITNESS:  I do not recall that.

13          MS. WAXMAN:  Exhibit 178.

14           (Whereupon, Deposition Exhibit 178

15            was marked for identification.)

16    BY MS. WAXMAN:

17       Q.   Mr. Will, I'm showing you what's been

18    marked as RW178, which is a document with the Bates

19    0929488.

20       A.   Okay.

21       Q.   Who is ███████████████

22       A.   I believe ███████████ is a junior

23    level corporate communications individual at Ripple.

24       Q.   And did you have any involvement with

25    Ripple's -- with finance listing of a perpetual swap

1    contract for XRP and USDT?

2        A.    I did not have any involvement with the

3    finance listing.

4        Q.    Did Breanne have any involvement with

5    that?

6            MR. FORD:  Objection to form.

7            THE WITNESS:  In her capacity as the head

8    of the XRP markets team, she would have had that

9    contact.

10   BY MS. WAXMAN:

11       Q.    Is that something she would have told you

12   about?

13           MR. FORD:  Objection to form.  Sorry.

14           THE WITNESS:  It would have come up during

15   our one on ones, I would presume.  I don't

16   specifically recall that coming up.

17   BY MS. WAXMAN:

18       Q.    Rachel talks about this -- talks about a

19   Binance win.  Do you understand what she means by

20   Binance win in relation to Binance listing a

21   perpetual swap contract for XRP and USDT?

22           MR. FORD:  Objection to form.

23           THE WITNESS:  I don't recall the email or

24   why she used the term "win," but Binance is the top

25   one or two largest cryptocurrency exchange in the

```
 1    world, so it would not be unusual that we would

 2    highlight something, you know, done by Binance that

 3    involved XRP.

 4    BY MS. WAXMAN:

 5         Q.   In the paragraph a few lines down, it

 6    says:

 7                   "The team worked with their

 8              head of listings and head of public

 9              relations to educate them on the

10              case for XRP and provided listing

11              support."

12              What support did Ripple provide to

13    finance?

14              MR. FORD:  Objection to form.

15              THE WITNESS:  I don't recall.

16    BY MS. WAXMAN:

17         Q.   Did the perpetual swap have anything to do

18    with the ODL product or the functioning of ODL?

19              MR. FORD:  Objection to form.

20              THE WITNESS:  I don't know what a

21    perpetual swap is.

22    BY MS. WAXMAN:

23         Q.   It's a -- did you -- do you know why

24    people would trade a perpetual swap?

25         A.   No.
```

318

1          Q.   What did -- was -- what question was

2          ███    asking you in this email?

3               MR. FORD:  Objection to form.

4               THE WITNESS:  I have to read the email,

5     highlighted one question.  She appears to be asking

6     for a definition of what a perpetual swap is.

7     BY MS. WAXMAN:

8          Q.   Is she also asking how to highlight or

9     position this, quote, unquote, Binance win?

10              MR. FORD:  Objection to form.

11              THE WITNESS:  She doesn't appear in this

12    email to be asking for anything specifically, but

13    just letting us know if we had any edits or

14    feedback.

15    BY MS. WAXMAN:

16         Q.   Why did you add ███ into the discussion?

17         A.   ███ was a member of the executive team.

18    He's our generally counsel.  Wanted to make sure

19    that he was aware of this.

20         Q.   And why did you want him to be aware of

21    it?

22              MR. FORD:  Objection.  And to the extent

23    you can answer that without revealing any requests

24    for legal advice.

25              THE WITNESS:  It would not be uncommon at

1    a company that was expanding as rapidly as Ripple

2    was at the time for not all executives to be aware

3    of all transactions that were going on at the

4    company.

5            Given that ███ was a fairly junior

6    member of the corporate communications team, I

7    wanted to make sure that ███ I'm assuming, was

8    aware of that. And that's why, in normal course, I

9    may copy someone like ███ into an email.

10   BY MS. WAXMAN:

11       Q.  Were you concerned with highlighting the

12   Binance listing?

13       A.  I don't recall being --

14           MR. FORD:  Sorry.  Objection.  Are you

15   asking him if he had legal concerns?

16           MS. WAXMAN:  No.  No.  I'm not.

17           MR. FORD:  Okay.

18   BY MS. WAXMAN:

19       Q.  Did you have any concern with ███

20   highlighting the Binance win?

21       A.  I don't recall having any concern.  I

22   just -- I don't express any concern in this email.

23   I was just adding ███ into this discussion.

24           MS. WAXMAN:  Exhibit 182, please.

25   / /

1          (Whereupon, Deposition Exhibit 182

2             was marked for identification.)

3    BY MS. WAXMAN:

4          Q.   Mr. Will, I'm showing you what's been

5    marked RW182, which is the document with the Bates

6    0933484 through -486.

7          A.   Okay.

8          Q.   In or around August 2020, did you have

9    discussions with Mr. Garlinghouse concerning XRP

10   supply?

11         A.   I resigned Ripple in the middle of August

12   2020.  So I'd be surprised if after that date I had

13   discussions with Brad Garlinghouse about XRP supply.

14         Q.   Did you have discussions with

15   Mr. Garlinghouse before you resigned regarding XRP

16   supply?

17         A.   I did.

18         Q.   And what did you discuss with him?

19         A.   We had a set of analysis that we had

20   started pulling together, which is described in the

21   email of analysis that we were doing regarding

22   supply of XRP that we were able to glean from

23   sources that -- that we had figured out.

24         Q.   What -- what analysis in particular were

25   you doing in relation to the supply of XRP?  Were

1    you looking at any specific factor?

2            MR. FORD:  Objection to form.

3            THE WITNESS:  We were trying -- sorry.  We

4    were trying to get a better understanding of the

5    full picture that -- that was being inserted into

6    the XRP market as best we could.

7    BY MS. WAXMAN:

8        Q.   Were you trying to figure out whether XRP

9    increased in XRP supply with -- how the increased

10   XRP supply would impact the XRP market?

11       A.   Yes.  We were trying to see how much

12   supply was being introduced.

13       Q.   Did Mr. Garlinghouse have a concern that

14   additional XRP -- XRP supply was having a negative

15   impact on XRP price?

16           MR. FORD:  Objection to form.

17           THE WITNESS:  I can't speak to whether he

18   was concerned.  It seemed like analysis that we

19   should be doing if we were able to do it.

20   BY MS. WAXMAN:

21       Q.   Did you come to any conclusions as to

22   whether increase XRP supply was impacting XRP's

23   price?

24           MR. FORD:  Objection to form.

25           THE WITNESS:  I don't recall coming to any

322

```
 1    conclusion.
 2    BY MS. WAXMAN:
 3         Q.   Did you come to any hypothesis?
 4              MR. FORD:  Objection to form.
 5              THE WITNESS:  We had a few narratives that
 6    we were trying to investigate, but we did not come
 7    to any conclusion or the ability to prove any of
 8    them.
 9    BY MS. WAXMAN:
10         Q.   If you go --
11         A.   Some of those are laid out in the
12    questions at the beginning of this email thread.
13    This email was -- I -- this email was sent to
14    ▮▮▮▮▮▮▮▮▮▮▮▮ who was taking over my
15    responsibilities as I departed Ripple.
16              And so it was movement -- I was trying to
17    give him context with this email about the overall
18    analysis that was available if he decided to
19    continue that analysis.
20         Q.   On the first page of the email from ▮▮▮
21    ▮▮▮ to ▮▮▮▮▮▮▮▮, I see you're not cc'd
22    but it's eventually forwarded to you.  He says:
23                   "Ron has recognized that the
24                   number of things I was asked to
25                   'tell no one about' got out of
```

323

1          control (XRP comp executive

2          matters, XRP supply, SEC and

3          litigation support, et cetera.)"

4          Did you express that opinion to Mr. ▉▉▉

5          MR. FORD:  Objection to form.

6          THE WITNESS:  ▉▉▉▉▉▉  had been at

7    Ripple for seven years.  He had a tremendous

8    institutional knowledge in the organization.  He

9    also was recognized as a cryptocurrency expert, if

10   you will, at least by me, relative novice.  He was

11   also a cryptocurrency accounting expert, and so

12   there were a large number of items that he was the

13   single point of failure or single point of

14   responsibility for.

15          So one of the things we frequently talked

16   about was ▉▉▉  getting comfortable with delegating

17   those responsibilities to others on his team,

18   particularly as ▉▉▉  -- I believe he references in

19   this email, leaving Ripple after seven years.  He --

20   some time after I departed, then decided to also

21   leave Ripple, so he wanted to make sure there was a

22   smooth transition to ▉▉▉▉▉  and others on his

23   team by getting them involved in a lot of this

24   historic analysis that had been done so there

25   wouldn't be a big gap in understanding from both my

324

1     departure and his departure.

2     BY MS. WAXMAN:

3           Q.   Did you under -- have any understanding of

4     who told █████ not to talk about certain things?

5                MR. HECKER:  Objection to form.

6                MR. FORD:  Objection to form.

7                MR. HECKER:  Foundation.

8                THE WITNESS:  It would be very common at a

9     company the size of Ripple that matters related to

10    executive compensation or anything related to legal

11    support would not be discussed with anyone.

12    BY MS. WAXMAN:

13          Q.   Did you ever give Mr. █████ that

14    instruction?

15               MR. FORD:  Objection to form.

16               THE WITNESS:  I -- █████████ is a highly

17    qualified financial executive and has a good sense

18    about the requirement for confidentiality.

19    BY MS. WAXMAN:

20          Q.   The email says:

21                    "I was asked."

22               So it implies to me that someone asked him

23    and it wasn't something that he did on his own.

24               MR. HECKER:  Objection.

25    / /

1    BY MS. WAXMAN:

2          Q.   So do you -- did anyone else at Ripple

3    ever, you know, instruct him not to talk about

4    certain items?

5               MR. HECKER:  Objection.  Asked and

6    answered.

7               THE WITNESS:  Not in my presence, but it

8    would be very normal course for a controller at a

9    company like Ripple to have to keep a large number

10   of matters highly confidential and not share with

11   anyone, other than those directly on that team that

12   was involved with that project.

13              MS. WAXMAN:  Okay.  I think we've used our

14   time.  We're off the record.  Thank you.

15                   (Brief off-record discussion.)

16              THE VIDEOGRAPHER:  We're going off the

17   record at 6:02 p.m.

18                   (Whereupon, a recess was taken.)

19              THE VIDEOGRAPHER:  Back on the record.

20   The time is 6:06 p.m.

21              MR. FORD:  Nothing further.  Deposition is

22   over.  Thank you very much, Counsel.

23              THE VIDEOGRAPHER:  This concludes today's

24   deposition of Ron Will.  The master video of today's

25   deposition will remain in the custody of Gradillas

326

1    Court Reporting.   Time is 6:06 p.m.

2             (Deposition concluded at 6:06 p.m.)

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                        CERTIFICATE OF WITNESS

2

3

4          I, RON WILL, do hereby declare under

5          penalty of perjury that I have read the entire

6          foregoing transcript of my deposition testimony,

7          or the same has been read to me, and certify that

8          it is a true, correct and complete transcript of

9          my testimony given on July 30, 2021, save and

10         except for changes and/or corrections, if any, as

11         indicated by me on the attached Errata Sheet, with

12         the understanding that I offer these changes and/or

13         corrections as if still under oath.

14              _____ I have made corrections to my deposition.

15              _____ I have NOT made any changes to my deposition.

16

17    Signed: _____
                  RON WILL
18

19

20    Dated this _____ day of _____ of 20____.

21

22

23

24

25

328

```
 1                CERTIFICATE OF REPORTER
 2           I, Kathleen A. Wilkins, Certified
 3    Shorthand Reporter licensed in the State of
 4    California, License No. 10068, hereby certify that
 5    deponent was by me first duly sworn, and the
 6    foregoing testimony was reported by me and was
 7    thereafter transcribed with computer-aided
 8    transcription; that the foregoing is a full,
 9    complete, and true record of proceedings.
10           I further certify that I am not of counsel
11    or attorney for either or any of the parties in the
12    foregoing proceeding and caption named or in any way
13    interested in the outcome of the cause in said
14    caption.
15           The dismantling, unsealing, or unbinding
16    of the original transcript will render the
17    reporter's certificates null and void.
18           In witness whereof, I have hereunto set my
19    hand this day:
20    _____ Reading and Signing was requested.
21    _____ Reading and Signing was waived.
22      X     Reading and Signing was not requested.
23           _____
24           KATHLEEN A. WILKINS
25           CSR 10068, RPR-RMR-CRR-CCRR-CLR-CRC
```

329

1                          ERRATA SHEET

2        Deposition of:  RON WILL
         Date taken:  JULY 30, 2021
3        Case:  SEC v. RIPPLE LABS, INC., et al.

4        PAGE  LINE
         _____ _____  CHANGE:  _____
5                     REASON:  _____

6        _____ _____  CHANGE:  _____
                      REASON:  _____
7
         _____ _____  CHANGE:  _____
8                     REASON:  _____

9        _____ _____  CHANGE:  _____
                      REASON:  _____
10
         _____ _____  CHANGE:  _____
11                    REASON:  _____

12       _____ _____  CHANGE:  _____
                      REASON:  _____
13
         _____ _____  CHANGE:  _____
14                    REASON:  _____

15       _____ _____  CHANGE:  _____
                      REASON:  _____
16
         _____ _____  CHANGE:  _____
17                    REASON:  _____

18       _____ _____  CHANGE:  _____
                      REASON:  _____
19
         _____ _____  CHANGE:  _____
20                    REASON:  _____

21       _____ _____  CHANGE:  _____
                      REASON:  _____
22
         _____ _____  CHANGE:  _____
23                    REASON:  _____

24
         Signed_____
25       Dated_____

**Transcript Word Index**







[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

















[7/30/2021] Will, Ron Dep. Tr. 7.30.2021















[7/30/2021] Will, Ron Dep. Tr. 7.30.2021



[7/30/2021] Will, Ron Dep. Tr. 7.30.2021

































