1       Q.  And did you always sell the XRP for

2  individuals for -- for something of value?

3       A.  Yes.

4       Q.  Throughout the period, GSR made efforts on

5  behalf of Ripple to maintain orderly markets for

6  XRP?

7           MS. ZORNBERG:  Object to form.

8           THE WITNESS:  Yes.

9  BY MS. WAXMAN:

10      Q.  And this was at Ripple's direction?

11      A.  Yes.

12      Q.  And what is your understanding of

13 maintaining an orderly market for XRP?

14          MS. ZORNBERG:  Object to form.

15          THE WITNESS:  At a high level, maintaining

16 an orderly market means being, you know -- I think

17 at the extreme, people talk about being the buyer of

18 last resort or the seller of last resort.  The idea

19 is that you reduce the frictions, make it easier for

20 people to enter and exit positions and try and

21 dampen excessive volatility.

22 BY MS. WAXMAN:

23      Q.  Going back to some questions we asked

24 before lunch, I asked you a series of questions

25 about whether or not you were restricted in any way

1    in how you sold XRP on behalf of Ripple and also on

2    behalf of the individuals.

3           Did you ever tell anyone at Ripple that

4    you were restricting Ripple's sales to particular

5    users?

6           MS. ZORNBERG:  Objection.

7           THE WITNESS:  No.  No.

8    BY MS. WAXMAN:

9       Q.   Same question for Mr. Larsen, did you ever

10   tell Mr. Larsen that you were restricting his sales

11   to particular users?

12      A.   No.

13      Q.   And did you ever tell Mr. Garlinghouse

14   that you were restricting his sales to particular

15   users?

16      A.   No.

17      Q.   Were Ripple's efforts publicly known --

18   Ripple's efforts to maintain orderly markets for XRP

19   publicly known, as far as you're concerned?

20          MS. ZORNBERG:  Object to form.

21          MR. HANIN:  Objection.

22          THE WITNESS:  Ripple published a -- I

23   believe a quarterly report where they summarized

24   their activities as way of being transparent.  So if

25   that's what you mean, then yes.

1    BY MS. WAXMAN:

2         Q.   Other than the quarterly report, did

3    Ripple publish any other information regarding its

4    efforts to maintain an orderly market?

5              MR. HANIN:  Objection.  Foundation.

6              MS. ZORNBERG:  Object to form.

7              MR. HANIN:  If you know.

8              THE WITNESS:  I don't recall.

9    BY MS. WAXMAN:

10        Q.   Did you ever discuss with anyone at Ripple

11   XRP's status under the U.S. securities laws?

12        A.   Yes.

13        Q.   And with whom?

14        A.   I don't recall any specific conversation

15   with any specific person, but over the course of

16   eight years, I presume that, you know, the topic

17   came up.

18        Q.   Generally, what did you discuss?

19        A.   As you can probably tell, I'm no legal

20   expert, so I wasn't exactly talking about any legal

21   minutia.  It was -- the type of conversations we

22   would have had were more typically -- well, we think

23   things are going -- from their side, we think things

24   are going well, we're working with the regulators,

25   and we're hoping, you know, that everything is going

1    to arrive at a satisfactory -- I don't know, end,

2    however you want to call it.  But, I -- you know,

3    we -- I did not have in-depth conversations with

4    Ripple about any legal merits or the case or

5    anything like that.

6         Q.    These discussions that you had, who did

7    you have them with?

8              MR. HANIN:  Objection.

9              THE WITNESS:  Depends on when.

10             (Reporter clarification.)

11             MR. HANIN:  I just objected and said it

12   was -- question had been asked and answered.

13             THE WITNESS:  When do you mean, Daphna?

14   Because depending on the year -- generally, most of

15   my conversations with Ripple were with the person

16   leading the markets team.  And the person who led

17   the markets team for I think the longest time is

18   probably Miguel Vias.  But after Miguel there was

19   Breanne.  Before Miguel, there were others.

20   BY MS. WAXMAN:

21        Q.    When was the first time that you had a

22   discussion with anyone at Ripple regarding XRP

23   status under be the U.S. securities laws?

24        A.    I really don't recall.

25        Q.    Was it prior to Miguel Vias joining

1    Ripple?

2         A.    I honestly don't recall.  Can you remind

3    me, when did Miguel join Ripple?

4         Q.    My understanding is he joined in

5    November 2016.

6         A.    It's entirely possible, but I have no

7    recollection.  I don't know when I had the first

8    conversation.

9         Q.    Do you have any recollection of any

10   specific conversations with any Ripple employees

11   regarding XRP's status under the U.S. securities

12   laws?

13             MS. ZORNBERG:  Objection.

14             MR. HANIN:  Same objection.

15             THE WITNESS:  No, I don't.  Probably

16   because they wouldn't have had much substance.  It

17   was more of a casual thing, like a ...

18   BY MS. WAXMAN:

19        Q.    Did Ripple ever disclose to GSR that it

20   was being -- under investigation by the SEC?

21             MS. ZORNBERG:  Objection.

22             THE WITNESS:  I don't -- I don't recall.

23   I don't know if Ripple told us or if we saw it in

24   the news.  I really don't know.

25   / /

1  BY MS. WAXMAN:

2      Q.    When did you -- when did you first learn

3  about the SEC's investigation?

4          MS. ZORNBERG: Objection. Foundation.

5          THE WITNESS: I -- I -- years ago. But I

6  don't know -- I don't have any recollection. I

7  can't say this particular date.

8  BY MS. WAXMAN:

9      Q.    Were you aware of the SEC's investigation

10  prior to the SEC filing a lawsuit against Ripple?

11      A.    Prior to December of last year?

12      Q.    Yes.

13      A.    Yes. Yes.

14      Q.    Okay. And were you aware of the SEC's

15  investigations during the period of time that GSR

16  sold XRP programmatically on behalf of Ripple?

17          MS. ZORNBERG: Objection.

18          THE WITNESS: I don't recall if I found

19  out before, during or after we sold XRP

20  programmatically.

21  BY MS. WAXMAN:

22      Q.    Did anyone at Ripple ever tell you that

23  there was a risk that XRP could be deemed a security

24  under U.S. securities laws?

25      A.    I mean, I don't recall.

```
1              MS. WAXMAN:  Exhibit 63.
2                   (Whereupon, Deposition Exhibit    63
3                   was marked for identification.)
4     BY MS. WAXMAN:
5         Q.    Mr.      , I'm showing you what's been
6     marked as Exhibit    63, which is a screenshot of --
7     and it's information contained in an Excel
8     spreadsheet that GSR produced in response to an SEC
9     subpoena.
10             MS. ZORNBERG:  So is there a reason
11    there's no Bates number on it?
12             MS. WAXMAN:  The Excel spreadsheet doesn't
13    have a Bates on it.
14             MS. ZORNBERG:  Okay.
15             MR. HANIN:  Are you representing that we
16    produced this, GSR produced this?
17             MS. WAXMAN:  Yes.  Yes.  And I can
18    probably pull up the Bates number after.
19        Q.    Do you recognize what's been marked as
20    63?
21        A.    I think this is a spreadsheet -- a
22    printout from a spreadsheet outlining the sales for
23    Bot 2h.
24        Q.    Is this something that GSR put together?
25        A.    I believe so.
```

1        Q.   Is this a summary of trades in Ripple's

2  trading Vibe for 2019?

3        A.   I think that's what it represents, yeah.

4  You can see on the left-hand column, the months in

5  2019, XRP sold, dollar received in exchange.

6  Mh-hmm.

7        Q.   How much XRP did Ripple sell in

8  October 2019?

9        A.   According to this spreadsheet, zero.

10        Q.   And how much did -- how much XRP did

11  Ripple sell programmatically in November 2019?

12        A.   Also zero.

13        Q.   And what about in December 2019?

14        A.   Also zero.

15        Q.   And did Ripple cease its programmatic

16  sales in the beginning of October 2019?

17        A.   From looking at the spreadsheet, one might

18  assume so. I'm guessing. I mean, I don't recall us

19  doing anything in 2020. It's possible, yeah, that's

20  when we stopped.

21        Q.   And why did Ripple stop selling XRP

22  programmatically in September 2019?

23        MS. ZORNBERG: Objection.

24        THE WITNESS: I -- I do not recall. I

25  don't know.

1    BY MS. WAXMAN:

2        Q.    Did Ripple ever tell you that the SEC had

3    asked it to stop selling XRP programmatically?

4            MS. ZORNBERG:   Objection.

5            THE WITNESS:   No.  No.  Not that I can

6    recall.

7    BY MS. WAXMAN:

8        Q.    Did Ripple ever provide you with a legal

9    opinion as to XRP's status under the U.S. securities

10    laws?

11        A.    I don't think so.

12        Q.    Did you ever ask Ripple whether they had

13    obtained a legal opinion on XRP status under the

14    U.S. securities laws?

15        A.    I don't remember if I asked it.

16        Q.    Did GSR ever hire an attorney to provide a

17    legal opinion on XRP status under the U.S.

18    securities laws?

19        A.    I don't remember.

20        Q.    Is that something you would remember?

21            MR. HANIN:   Objection.

22            THE WITNESS:   No, I don't remember.  I

23    know we received a legal opinion letter in

24    conjunction with our application for license in

25    Singapore under the MAS, which we discussed earlier.

175

```
 1    I do remember that instance, but I don't remember in
 2    the context of U.S.
 3    BY MS. WAXMAN:
 4        Q.   When you say you received a -- are you
 5    talking about a legal opinion as to XRP status under
 6    Singapore law?
 7        A.   Correct, yeah.
 8        Q.   And what prompted GSR to obtain that
 9    opinion?  And I want to say, I don't want you to
10    divulge any conversations you've had with your
11    counsel.  So if you can just answer that question
12    without --
13            MR. HANIN:  The question was fair.
14            THE WITNESS:  Part of the application
15    process for licensing under the MAS.
16    BY MS. WAXMAN:
17        Q.   And why did you need to obtain licensing
18    under the MAS?
19            MR. HANIN:  Objection.  Foundation.
20            THE WITNESS:  Because we were looking to
21    become regulated, and the MAS had a framework, and
22    we -- we wanted to opt into it.  This is one of the
23    requirements.
24    BY MS. WAXMAN:
25        Q.   And did GSR engage in any business related
```

```
 1    to Ripple in Singapore?

 2              MS. ZORNBERG:  Objection to form.

 3              MR. HANIN:  Objection to the --

 4              THE WITNESS:  I don't remember if we've --

 5    have we traded XRP on behalf of Ripple through our

 6    Singapore operating entity is what you're asking,

 7    right?

 8    BY MS. WAXMAN:

 9        Q.    Yes.

10        A.    I think the answer is yes.

11        Q.    Okay.  And what trading did you do on

12    behalf of Ripple?

13        A.    I -- I think -- and please forgive me if

14    I'm wrong -- but I think that we service ODL from

15    our Singaporean entity.

16        Q.    And when you say you service ODL from your

17    Singapore entity, what's -- what do you mean?

18    What --

19        A.    So in order to service ODL, we trade XRP

20    against Mexican peso, Philippine peso, et cetera, on

21    a number of different exchanges, and we do that from

22    our Singaporean entity.

23              MS. WAXMAN:  Exhibit 53, please.

24        Q.    Mr. ▮▮▮▮  I'm showing you what's been

25    marked ▮▮ 53, which is a document with the Bates
```

1  RPLI_SEC 0878012 through -019, which appears to be

2  an agreement titled "Master Purchase Agreement," an

3  executed one.  And it's dated July 3rd, 2020.

4          (Whereupon, Deposition Exhibit ▇ 53

5          was marked for identification.)

6  BY MS. WAXMAN:

7      Q.  Do you recognize what's been marked as

8  Exhibit 53?

9      A.  Yes.

10     Q.  And what is Exhibit 53?

11     A.  The master purchase agreement.

12     Q.  Who is -- if you turn to the last page,

13 it's signed by ▇▇▇▇     Who is that?

14     A.      ▇▇▇▇▇     is one of our directors.

15     Q.  And were you involved in negotiating this

16 agreement with Ripple?

17     A.  Yes, I think so.

18     Q.  Okay.  And what was the purpose of the

19 agreement?

20     A.  This agreement relates to purchases of XRP

21 that GSR did on behalf of Ripple.

22     Q.  And when did those purchases begin?

23     A.  I -- I don't recall.

24     Q.  Were they in or around December of 2020?

25     A.  I would presume so.  That's the date of

1    the agreement signature.

2         Q.   Why did Ripple want GSR to purchase XRP

3    during that time?

4              MS. ZORNBERG:  Objection.

5              MR. HANIN:  Objection.

6              You can give your understanding.

7              THE WITNESS:  I -- again, I -- there are

8    multiple reasons.  I don't know what was going

9    through Ripple's -- they didn't tell me specifically

10   why.

11   BY MS. WAXMAN:

12        Q.   Did you have any discussions with Ripple

13   as to why they would want you to purchase XRP in

14   connection with this agreement?

15        A.   Yes.

16        Q.   What was discussed?

17        A.   I remember at some point during the ODL

18   program -- you know, ODL is supposed to be net

19   neutral XRP, meaning you buy XRP on one exchange but

20   you sell it on the other.

21             At some point during the ODL program, I

22   believe that changed, and the first leg, the

23   origination leg, where the payment processor would

24   purchase the XRP stopped occurring -- it was my

25   understanding, on exchanges.  And the payment

1    processors were purchasing XRP directly from Ripple,

2    which -- that was how I understood it.  And so if

3    that happened, XRP would stop being XRP neutral.

4             You follow, right?

5        Q.   So that caused an increase in supply of

6    XRP entering the market?

7        A.   That would -- exactly.  That would --

8    whereas ODL was -- was -- call it XRP neutral

9    equilibrium, as soon as you source XRP in

10   origination leg, you start increasing the supply of

11   XRP.

12       Q.   You said -- did you mean ODL would stop

13   being XRP neutral?

14       A.   Yes.  What word did I say?

15       Q.   The transcript says XRP would stop being

16   XRP neutral.  Did you mean ODL?

17       A.   I meant ODL.  I'm sorry.

18       Q.   So how did that relate to the direction

19   or -- how did that relate to Ripple's ask for you to

20   start buying?

21       A.   Again, it's speculation on my part because

22   I wasn't told, this is why we're doing the buyback

23   program, but --

24             MS. ZORNBERG:  I'm going to object to

25   speculation.

1           MR. HANIN:  Don't speculate.  The -- the

2    initial question was different, but don't speculate.

3    BY MS. WAXMAN:

4        Q.  Based on your experience with Ripple

5    servicing the programmatic sales and servicing the

6    ODL product, what did you understand your role to be

7    in connection with these purchases?

8           MR. HANIN:  Objection.

9           THE WITNESS:  My role is execution agent.

10   BY MS. WAXMAN:

11       Q.  And what did you understand the reason for

12   not -- for the purchases -- what was your

13   understanding?

14          MR. HANIN:  If you have one.

15          THE WITNESS:  Like I said, I -- I don't

16   think Ripple ever told me, you're going to do these

17   purchases for reasons A, B and C.  Similarly is when

18   we were directed to sell, now we were being directed

19   to buy.

20   BY MS. WAXMAN:

21       Q.  What did you believe the purpose was?

22          MS. ZORNBERG:  Objection.

23   BY MS. WAXMAN:

24       Q.  I understand your qualification that you

25   didn't have -- that Ripple didn't tell you.  What

1  did you believe?

2          MS. ZORNBERG:  Objection.

3          THE WITNESS:  I don't -- I'm not sure how

4  I'm supposed to answer that question because I know

5  I'm not supposed to speculate.  I'm trying to be

6  accurate.

7  BY MS. WAXMAN:

8      Q.   I'm not trying -- I'm not asking you to

9  speculate on their -- what they thought.  I'm just

10  asking you about your own belief, your own personal

11  opinion.

12          MS. ZORNBERG:  Objection.

13          MR. HANIN:  If you have an opinion, you

14  can give it.  If you didn't have a view or opinion,

15  you shouldn't speculate.

16          THE WITNESS:  My -- my opinion was that

17  if -- like I said, I wasn't sure, but I was under

18  the impression that ODL was no longer XRP neutral.

19  It was adding supply.  And so this would be a way to

20  counteract that.

21  BY MS. WAXMAN:

22      Q.   Was the additional supply having -- did

23  you understand the additional supply to have a

24  negative impact on XRP's price?

25      A.   At a high level, whenever there is

1    incremental supply of any asset, you would expect it

2    to have an impact on the price.

3        Q.   And did you understand that the buy -- the

4    reason for the buying in 2020 was the same reason

5    that Ripple was directing you to buy in the earlier

6    time period?

7            MS. ZORNBERG:  Objection.

8    BY MS. WAXMAN:

9        Q.   In terms of how it would affect the price.

10           MS. ZORNBERG:  Objection.

11           THE WITNESS:  I mean, in general terms

12   if -- the same way if you're selling an asset, you

13   expect the price to go down.  If you're buying an

14   asset, chances are the price of the asset will go

15   up.  But ...

16   BY MS. WAXMAN:

17       Q.   Did Ripple ever tell you that it wanted

18   the price of -- that it wanted to use the purchases

19   to increase the price of XRP?

20       A.   No.

21       Q.   Did Ripple want the purchases to create

22   buying pressure?

23           MS. ZORNBERG:  Object to form.

24           THE WITNESS:  No.

25   / /

1    BY MS. WAXMAN:

2        Q.   Did Ripple want the purchases to stabilize

3    XRP's price?

4        A.   Again, I don't know what Ripple wanted.

5    I --

6        Q.   Did you ever express any concerns to

7    Ripple about purchasing XRP in connection with this

8    agreement?

9        A.   What do you mean by "concerns"?

10       Q.   Did you ever tell them not to move forward

11   with purchases?

12       A.   I don't think so.

13       Q.   Did you ever recommend any alternative

14   action to address the increase in supply of XRP in

15   the market?

16       A.   I don't -- I don't recall.

17           MS. WAXMAN:  I only have two copies of

18   this document.  I apologize.

19           MR. HANIN:  Must be very special.

20           MS. WAXMAN:  Can you mark this for me?

21           So it's Exhibit 66.

22           (Whereupon, Deposition Exhibit ▮ 66

23            was marked for identification.)

24           MS. DEARBORN:  Daphna, can you tell us the

25   Bates number?

[8/11/2021] ▮▮▮▮▮▮▮ Dep. Tr. 8.11.2021

1       MS. WAXMAN:  RPLI_SEC 0533153 through

2  -161.

3       Q.   Mr. Garlinghouse, these are screenshot --

4  Mr. ███  these are screenshots of messages from

5  Mr. Garlinghouse's cell phone?

6       MS. ZORNBERG:  Hold on one second.  Before

7  you start, can we get -- can we get it

8  electronically?

9       MR. TENREIRO:  Yeah.  Why don't we -- does

10  she have that electronically?

11       MS. WAXMAN:  No.

12       MR. TENREIRO:  Okay.  Let me send it

13  around, and while I do that, do you want to move on

14  to something else?

15       MS. WAXMAN:  Sure.  Sure.  We can just

16  hold on.

17       THE WITNESS:  This isn't -- this was Brad

18  with somebody else, right?

19       MR. HANIN:  Daphna, is this an exchange

20  involving ███?

21       THE WITNESS:  So no, he's not on the

22  email.  He's not a -- it's not a communication with

23  ███

24       MR. HANIN:  Okay.

25       MR. TENREIRO:  Let me get it so we can --

[8/11/2021] ███████ Dep. Tr. 8.11.2021

1   yeah. Let's move on to something else.

2           MS. ZORNBERG:  Thank you.

3           MS. WAXMAN:  We can just -- hold on.

4   Going back to Exhibit 53.

5           THE WITNESS:  Yeah.

6   BY MS. WAXMAN:

7       Q.  If you turn to the second page, section

8   2(b), in middle of the paragraph there's a sentence

9   that says:

10              "Customer represents and

11              warrants that it has received an

12              opinion from Singapore legal

13              counsel concluding that XRP is not

14              a 'security' as that term is

15              defined in Section 2(1) of the

16              Securities and Futures Act of

17              Singapore."

18          Did -- did GSR request the inclusion of

19   that in the agreement?

20      A.  I don't know.

21      Q.  Who was responsible for negotiating this

22   agreement with Ripple?

23      A.  Do you mean the business terms or the --

24   the legal term -- like --

25      Q.  Who would have negotiated the language in

1     this document?

2             MS. ZORNBERG:  Object to form.

3             THE WITNESS:  Counsel, internal or

4     external.

5     BY MS. WAXMAN:

6        Q.   Would anyone at GSR know -- who at GSR

7     would know why that was included?

8        A.   I would ask █████████

9        Q.   And who is that?

10       A.   ████ has been an internal legal resource at

11    GSR for a number of years now.

12       Q.   Okay.  Mr. ████ I want to show you what's

13    been previously marked as -- you can put that to the

14    side -- ████ 6.

15             (Whereupon, Deposition Exhibit ████ 6

16             was marked for identification.)

17             MS. WAXMAN:  Give me one second.  I'll

18    tell you the Bates.

19             Where is my copy?  ████ 6 is an email with

20    the Bates GSR_294.  It's an email from you dated

21    May 31st, 2016, to ████████████@ripple.com.

22    BY MS. WAXMAN:

23       Q.   Mr. ████ did you send this email?

24       A.   I believe so.

25       Q.   Now, the first sentence you've said, I've

1  compiled a few ideas regarding our conversation last

2  Friday on the impact of selling programs.

3          Are you talking about the impact of

4  selling programs on XRP price?

5          MS. ZORNBERG:  Object to form.

6          THE WITNESS:  I presume so, yes.

7          MS. WAXMAN:  Okay.  Thank you.

8          MR. TENREIRO:  We should have Exhibit 66.

9  Everyone here should have it?

10          MS. WAXMAN:  Okay.

11          MS. ZORNBERG:  How so?

12          MR. TENREIRO:  By email.

13          MS. ZORNBERG:  I haven't received it.

14  Maybe someone can forward it to me?

15          MR. TENREIRO:  Oh, I didn't send it to

16  you.  Lisa, Meredith, Kristina, Sam and Jonah.

17          MS. ZORNBERG:  Okay.  Received.

18          MR. TENREIRO:  Great.

19  BY MS. WAXMAN:

20      Q.   Okay.  Going back to Exhibit 66, you're

21  not a party to this exchange, but I do want to

22  direct you to the page with the Bates 533158.  My

23  understanding is this is a reference to

24  

25          Do you know who            is?

1          A.    Yes.

2          Q.    And who is ▮▮▮▮▮▮▮?

3          A.    Ex-colleague, friend.  I've known ▮▮ for

4    20-odd years.  He works with us at GSR.

5          Q.    And what is his relationship to GSR?

6          A.    ▮▮▮▮ is the ▮ in GSR from back in 2013,

7    because he introduced us to Ripple.  ▮▮▮ and I did

8    most of the work, but ▮▮▮ made the introduction, so

9    we gave him an initial.  When we wound down the

10   opcos in late '16, ▮▮▮ stopped being part of GSR,

11   and then he joined years later.

12               ▮▮▮ was still working at ▮▮▮▮▮ and

13   worked at another hedge fund, so he wasn't involved

14   in the business like we were.

15         Q.    In July 2020, what was ▮▮▮ involvement

16   with GSR?

17         A.    Full-time.

18         Q.    And where did he work?

19         A.    I think it was in Puerto Rico.

20         Q.    And was he involved -- did he have any

21   responsibilities related to Ripple at the time?

22         A.    Not really.  I'm surprised to see his name

23   come up because typically I was the person

24   interacting with Ripple.

25               MR. HANIN:  The name ▮▮▮ came up.  I

```
 1    don't know --
 2              THE WITNESS:  I'm not a thousand percent
 3    certain that this is the same ███  but yeah ...
 4    BY MS. WAXMAN:
 5         Q.   Did you ever discuss with ███ the master
 6    purchase agreement or purchasing XRP on behalf of
 7    Ripple?
 8         A.   I don't recall, but we're business
 9    partners.  Probably.
10         Q.   Did you ever discuss with ███ concerns
11    related to purchasing XRP on behalf of Ripple?
12         A.   Again, I don't recall.
13         Q.   The email says, ███ -- the text message
14    says:
15                   ███ came back - and after
16              discussing with outside counsel,
17              they mentioned some reg concerns
18              given their SEC inquiry and
19              suggested we may want to explore
20              other ways to do this creatively
21              that is more in line with our
22              current contract - i.e., using
23              derivatives, so, for example, we
24              could sell them puts and then buy
25              XRP in the open market to cover
```

 1          their short."

 2          Did you ever discuss with ███ using

 3    derivatives?

 4          MS. ZORNBERG:  Okay.  I'm going to object.

 5    Lack of foundation.  You're showing the witness a

 6    document that he's -- a communication he's not part

 7    of, asking him to comment on words that don't even

 8    purport to have been a summary of any communication

 9    with him.  And he's already said he's not even sure

10    if this is ███████████.

11          THE WITNESS:  The short answer is no, I

12    didn't -- I don't remember having a conversation

13    with ███ about using derivatives.

14    BY MS. WAXMAN:

15          Q.   Okay.  Did you ever have a conversation

16    with ███ concerning the master purchase agreement?

17          A.   I don't recall.  It stands to reason I

18    would, because, again, a new contract needs to be

19    discussed, and -- at the management team level,

20    but ...

21          Q.   I don't have any other questions related

22    to that document.

23          And did ███ have any involvement with the

24    purchasing of XRP on Ripple's behalf?

25          A.   Not in any meaningful way.  ███ is not --

1    the purchases were carried out programmatically.

2    They would have been done by the same quant trading

3    team and ops, and ▮▮▮ is not part of that.

4         Q.   Which platforms did GSR purchase XRP on in

5    connection with the agreement?

6              MS. ZORNBERG:  Object to form.

7              THE WITNESS:  I don't recall.  It

8    doesn't -- it doesn't stipulate it here?

9    BY MS. WAXMAN:

10        Q.   I don't believe so.

11        A.   I don't recall.

12        Q.   Did GSR sell -- purchase XRP on Binance

13   and OKEx on behalf of Ripple?

14        A.   It's entirely possible.  I can't confirm.

15   You mean in the context of the buyback?

16        Q.   Yes.

17        A.   In all likelihood, yes, because Binance is

18   the largest crypto exchange.  It's a natural place

19   for us to go execute the buyback, but I can't

20   confirm because I don't recall.

21        Q.   And would you have recommended -- strike

22   that.

23             Would you have recommended that Ripple

24   purchase on OKEx as well?

25             MS. ZORNBERG:  Object to form.

192

1              THE WITNESS:  It's possible.  OKEx also

2     has significant XRP trading volume.

3     BY MS. WAXMAN:

4         Q.   What is the current status of the buyback

5     program?

6         A.   As far as I know, it is -- we're not

7     executing any more XRP purchases, or we haven't in

8     quite some time.

9         Q.   And when did you stop buying XRP on behalf

10    of Ripple?

11        A.   I don't recall.

12        Q.   And why did you stop?

13             MS. ZORNBERG:  Objection.

14             THE WITNESS:  They must have told us to

15    stop.

16    BY MS. WAXMAN:

17        Q.   Was it -- at the time that they told you

18    to stop, was there additional supply entering the

19    market from ODL?

20             MS. ZORNBERG:  Objection.

21             THE WITNESS:  I don't -- I don't know and

22    the same way I didn't know at the beginning.

23    BY MS. WAXMAN:

24        Q.

25

[8/11/2021]            Dep. Tr. 8.11.2021

1      A.   ████

2          MS. DEARBORN:  Objection.

3  BY MS. WAXMAN:

4      Q.  ████████████

5          MS. DEARBORN:  You can answer.  The

6  relevance of this is highly -- it's definitely in

7  dispute and I think this is highly invasive, so

8  let's just take this question and answer.

9  BY MS. WAXMAN:

10     Q.

11     A.

12     Q.

13     A.

14

15     Q.

16

17     A.

18

19

20     Q.

21

22         MS. DEARBORN:  Object to form.

23         THE WITNESS:

24

25

[8/11/2021]        Dep. Tr. 8.11.2021

1

2

3

4

5          MS. DEARBORN:  Object to form.

6          THE WITNESS:  During what time period?

7   BY MS. WAXMAN:

8       Q.   During the entire time period.

9       A.   During --

10         MS. DEARBORN:  Same objection.

11         THE WITNESS:  I -- there were times when

12   we had multiple Bots connected to Mr. Larsen and

13   there were times when we didn't.

14   BY MS. WAXMAN:

15       Q.   And -- okay.

16         MS. WAXMAN:  Exhibit 34, please.

17         (Whereupon, Deposition Exhibit    34

18         was marked for identification.)

19   BY MS. WAXMAN:

20       Q.   Mr. Larsen [sic], I'm showing you what's

21   been marked as    34, which is an email exchange

22   from February 2017.  It's an email exchange, email

23   thread between you and Mr. Larsen.

24         MR. HANIN:  Is there a reason this

25   document has no Bates number?

1          MS. WAXMAN:  It was -- the way it was

2     produced and printed, it doesn't have a Bates number

3     on this document, but ...

4          MS. DEARBORN:  Objection.  We did not

5     produce documents without Bates stamps, so ...

6          MS. WAXMAN:  This was produced by GSR.

7          MR. HANIN:  Generally our documents were

8     produced with Bates stamps.  I'm not aware we

9     produced any document that didn't have a Bates

10    stamp, so I --

11         MS. WAXMAN:  I think the way it was loaded

12    may have been a native.  Strike that.  We'll get you

13    a Bates stamp number.

14         MR. TENREIRO:  Sounds like the

15    authenticity --

16              (Reporter clarification.)

17         MR. TENREIRO:  It sounds like your

18    authenticity objections are preserved.  Let's go on

19    and -- go on.

20    BY MS. WAXMAN:

21       Q.   Okay.  If you go to the second page on the

22    back, did Mr. Larsen direct you to -- to buy XRP on

23    February 18th, 2017?

24       A.   You're referring to the last message where

25    Chris says:

1          "Hi ▇▇▇ - on my Bot 4, could

2          you start buying as long as we're

3          below .006."

4     Q.   Yes.

5     A.   Yeah.

6     Q.   Why did he direct you to start buying XRP?

7          MR. HANIN:  Objection.

8          MS. DEARBORN:  Objection to form.

9          THE WITNESS:  Because he wanted to buy

10   XRP.

11   BY MS. WAXMAN:

12        Q.   And did you have an understanding why he

13   wanted to buy XRP?

14        A.   I'm afraid not.

15        Q.   Did Mr. Larsen want to buy in order to

16   increase the price of XRP?

17             MR. HANIN:  Objection.

18             MS. DEARBORN:  Objection to form.

19             THE WITNESS:  It's impossible for me to

20   know.

21   BY MS. WAXMAN:

22        Q.   The next email right above says, you say:

23               "We would recommend pausing 6t

24             before reversing 4t, otherwise,

25             they will likely cancel each other

```
 1              out."
 2                   And 4t is Mr. Larsen's bot?
 3         A.    Mh-hmm.
 4         Q.    And what is 6t?
 5         A.    6t was a Rippleworks bot.
 6         Q.    And why did you recommend pausing 6t
 7    before re -- before starting to buy in 4t?
 8         A.    I -- I don't recall.  This was
 9    four-and-a-half years ago.  My guess is at this
10    moment in time, the price of XRP had dropped
11    considerably, and Mr. Larsen wanted to step in and
12    provide -- well, I don't know why.  Either he's
13    buying back something he sold, he's stepping in to
14    provide support for the market.  There are a number
15    of different reasons why Mr. Larsen might want to --
16    to buy it.  But it seems counterintuitive to have
17    one bot selling and the other one buying at the same
18    time.
19         Q.    And when you say he wanted to -- he's
20    stepping in to provide support for the market, are
21    you talking about support for XRP price?
22              MS. ZORNBERG:  Objection.
23              MR. HANIN:  Objection.  Mischaracterizes
24    testimony.  That's not what he said.
25              THE WITNESS:  Mr. Larsen has significant
```

1    XRP holdings.  He can choose to buy or sell

2    depending on his market --

3    BY MS. WAXMAN:

4        Q.   I just want to understand what you meant

5    when you used the terms "provide support for the

6    market"?

7        A.   I guess I -- I would see his involvement

8    in a similar capacity to ours in the sense that, in

9    a very illiquid market, when there seemed to be

10   dislocations, and supply/demand imbalances.  I don't

11   know what happened on this particular day, but maybe

12   the price of XRP had dropped by 60 percent

13   overnight, and Mr. Larsen is stepping in to buy some

14   XRP because it's the right thing to do.

15       Q.   So when you talk about providing support

16   for the market, you're talking about price support?

17            MS. ZORNBERG:  Objection.

18            MS. DEARBORN:  Objection to form.

19            THE WITNESS:  Not so much price support,

20   but liquidity at a moment when it's needed.

21            MS. WAXMAN:  Just for the record, this

22   document is GSR_1004, has a Bates 1004 and 1005.

23       Q.   Going back to the document, did Mr. Larsen

24   take your recommendation to pause sales in 6t?

25       A.   I have no recollection.  But reading his

```
 1    message at 1614, he says:

 2              "Let's reverse Bot 6 as well."

 3         Q.   Did Mr. Larsen provide trade instructions

 4    for Bot 6t at other times as well?

 5              MS. DEARBORN:  Object to form.

 6              THE WITNESS:  I don't recall.  I don't

 7    think so.  I'm somewhat surprised to see this

 8    exchange.

 9    BY MS. WAXMAN:

10         Q.   Why are you surprised to see the exchange?

11         A.   Because we didn't receive directions from

12    Mr. Larsen that regularly, and 6t was Rippleworks

13    anyway.

14         Q.   Who provided trade instructions for 6t?

15         A.   Rippleworks.

16         Q.   Who from Rippleworks?

17         A.   ████████████

18         Q.   And would he provide those instructions in

19    writing?

20         A.   Yes, I think so.

21         Q.   And would he email those instructions

22    directly to you?

23              MR. HANIN:  Objection.

24              THE WITNESS:  It's entirely possible.

25    / /
```

1   BY MS. WAXMAN:

2       Q.   Would those instructions be something that

3   are part of the record?

4            MS. ZORNBERG:  Object to form.

5            MR. HANIN:  Objection.

6            THE WITNESS:  What do you mean?

7   BY MS. WAXMAN:

8       Q.   Strike that.

9            Would you keep a record of instructions

10  that you got from Mr. ███████ in connection with

11  trading in Bot 2?

12           MS. ZORNBERG:  Object to form.

13           MR. HANIN:  Objection.

14           THE WITNESS:  Do we -- we have emails with

15  Mr. ███████  Is that what you're asking?

16  BY MS. WAXMAN:

17      Q.   Yes.

18      A.   Yeah.

19      Q.   You said -- I'm going back to something

20  you said earlier.  You said Mr. Larsen would step in

21  to buy some XRP, quote, because it's the right thing

22  to do.

23           What did you mean by -- by that?

24      A.   Well, from my point of view, if I had a

25  whole bunch of XRP, and I had sold some at higher

1    prices and the price collapsed, I might step in and

2    buy back some of that XRP I had sold.  It's a normal

3    trading decision to make.

4         Q.   How much XRP did Mr. Larsen own, if you

5    know?

6         A.   I don't know.

7         Q.   Did he own a considerable size of XRP?

8              MS. DEARBORN:  Object to form.

9              THE WITNESS:  I believe he did, but I --

10   BY MS. WAXMAN:

11        Q.   Why would he want to increase his position

12   of XRP?

13             MS. DEARBORN:  Object to form.

14             THE WITNESS:  It's not necessarily because

15   he wants to increase his position of XRP.  But he

16   might have a view on price also.

17   BY MS. WAXMAN:

18        Q.   Going to the first page of the document --

19   you're already on -- that page of the document, did

20   Mr. Larsen authorize the use of funds from 6t to

21   purchase XRP in the market?

22             MS. DEARBORN:  Object to form.

23             THE WITNESS:  Not explicitly, but on his

24   message at 1614, he says:

25                  "Let's reverse Bot 6 as well."

```
 1   BY MS. WAXMAN:
 2       Q.   And then you write:
 3                "Understood.  We will utilize
 4            4t's 40K first, and if XRP price is
 5            still below .006, we will engage
 6            6t."
 7            He doesn't respond and then you confirm --
 8   send another email and you write:
 9                "We have exhausted 4T's funds
10            (42,000) and are now switching over
11            to 6t (approximately 100,000)."
12            MR. HANIN:  Objection to the form.  I'm
13   not sure there's a question and I'm not sure he
14   didn't respond, but ...  It is the next email in the
15   chain but it's three days later.
16   BY MS. WAXMAN:
17       Q.   So going back to my initial question, is
18   there any reason to believe that Mr. Larsen didn't
19   authorize the use of funds from 6t to purchase the
20   XRP?
21            MS. DEARBORN:  Object to form.
22            THE WITNESS:  Again, like I said, I don't
23   see him authorizing anything explicitly, but I do
24   see him directing us to reverse Bot 6.
25   / /
```

1    BY MS. WAXMAN:

2         Q.   And -- but did you start -- okay.  Did you

3    use funds from 6t to purchase XRP in the market?

4         A.   I presume so, given what I wrote on the

5    first email of this thread.

6         Q.   Would you have done that without seeking

7    permission from Mr. Larsen?

8         A.   Well, I should have seeked permission from

9    Mr.        I don't know if, over the course of the

10   three days between those two emails, that occurred,

11   a separate email or a phone call.

12        Q.   The email that's at 4:39?

13        A.   Yeah.

14        Q.   16 -- 1639, excuse me, you write:

15                  Again, "We will utilize 4t's

16             40,000 first, and if XRP price is

17             still below .006 we will engage

18             6t."

19             Did Mr. Larsen want his buying -- strike

20   that.

21             Was Mr. Larsen trying to target a specific

22   XRP floor price?

23             MS. DEARBORN:  Object to form.

24             THE WITNESS:  Well, the last email on this

25   thread, on the 18th of February, he says that he

```
 1   would like --
 2   BY MS. WAXMAN:
 3        Q.   No.   The first -- I believe that's the
 4   first email.
 5             MR. HANIN:   Let him finish, Daphna.
 6             THE WITNESS:   Did I get it wrong?   You
 7   know what I mean.   The email from the 18th of
 8   February, Chris is saying that as long as the price
 9   is below .006, he would like to be buying XRP.
10             MS. WAXMAN:   Okay.   Exhibit 37.
11               (Whereupon, Deposition Exhibit    37
12               was marked for identification.)
13   BY MS. WAXMAN:
14        Q.   Mr.        I'm showing you -- Mr.        I'm
15   showing you what's been marked as G --    37, which
16   is a document with the Bates GSR_796.   It's an email
17   chain from December 2017 between you and
18   Chris Larsen.
19             MS. DEARBORN:   Daphna, again, this
20   document doesn't appear to be produced with Bates
21   stamps.
22             MS. WAXMAN:   I just read it in the record.
23   It's GSR_796.
24             MS. DEARBORN:   Thank you.
25   / /
```

1    BY MS. WAXMAN:

2        Q.   Did you send -- strike that.

3             Did you recommend in December 2017 that

4    Mr. Larsen tactically increase XRP sales?

5        A.   Yes.

6        Q.   And what did you mean by "tactically

7    increase sales"?

8        A.   As I said in the email, the market seems

9    very frothy.

10       Q.   What is --

11       A.   Back in December of 2017, if I remember

12   correctly, it was -- we had that huge bull run in --

13   overall in crypto.  I can see in the other message,

14   I reference Korea, this is the famous Kimchi premium

15   that occurred.  There's a lot of retail lead buying

16   interest, particularly in South Korea.  Most digital

17   assets increased in value, and I think just what it

18   says, let's take the opportunity that there's a lot

19   of liquidity and higher prices, to sell some XRP.

20       Q.   When you said there was -- when you were

21   talking about the reference to Korea, you said

22   there's a lot of retail lead buying interest.

23            Are you talking about retail interest in

24   buying XRP?

25       A.   I think there was -- crypto kind of

1   exploded in Korea.  That's my understanding.  I'm no

2   expert on South Korea, but most digital assets

3   experienced huge price appreciations.  And those

4   price appreciations were even higher in Korea.  So

5   what ended up happening is that when you normalized

6   for the exchange rate, you would see that crypto

7   prices in Korea are actually 10, 15 in some cases 20

8   or 30 percent higher than outside of Korea.

9          Q.   Is that why you recommended that

10  Mr. Larsen increase sales?

11         A.   That's one of the reasons, yeah.

12         Q.   And would this be an opportunity for

13  Mr. Larsen to extract more USD from his sales?

14         A.   Well, again, if you sell more XRP and the

15  price of XRP is higher, by definition, you will

16  collect more USD or whatever other unit of value.

17         Q.   Did he accept the recommendation?

18         A.   I don't recall.

19         Q.   It says, "Let's try a constructive

20  increase," in the middle of the page.

21              What did you understand that to mean?

22         A.   We would probably increase the -- the

23  sales percentage on the bot.  But I don't recall

24  executing the change or how big it was.  That's why

25  I said I don't recall.

1          Q.   Okay.  Were there other instances where

2     you recommended to Mr. Larsen that he tactically

3     increase sales?

4               MS. DEARBORN:  Object to form.

5               THE WITNESS:  In all likelihood, yes.

6     BY MS. WAXMAN:

7          Q.   And when you made that recommendation, did

8     he agree to move forward?

9               MS. DEARBORN:  Object to form.

10              THE WITNESS:  I -- I don't recall.

11    BY MS. WAXMAN:

12         Q.   Did Mr. Larsen often use the term

13    "constructive increase"?

14         A.   Mr. Lars- --

15              MS. DEARBORN:  Object to form.  Sorry, I'm

16    trying to speak up from all the way over here.

17    Object to form.

18              THE WITNESS:  Mr. Larsen used the term

19    "constructive" many -- several times in

20    conversations with me.

21    BY MS. WAXMAN:

22         Q.   What did you understand that to mean?

23         A.   Fair and orderly is one of them.  The

24    other one is in the context of a selling program.

25    We're tasked with adding supply of something that

1    has very little liquidity.  If we add supply too

2    quickly, it will become destructive because there

3    isn't enough liquidity to absorb all of the supply.

4    So to me, constructive means the opposite of that.

5    Don't be heavy-handed in the selling.  Be measured

6    in the amount of supply that you're introducing into

7    the market.

8        Q.   Would -- and would that -- you said it

9    will become destructive.  Are you talking about

10   becoming destructive to the price?

11       A.   It will -- exactly.  It will -- if there's

12   very little liquidity and you increase the amount of

13   supply by a huge factor, that risk has to go

14   somewhere, and if there isn't enough liquidity,

15   eventually it will have a very detrimental impact on

16   the price of XRP.

17       Q.   So when -- so Mr. Larsen wanted you to be

18   constructive in terms of XRP price?

19            MS. DEARBORN:  Objection to form.

20            THE WITNESS:  I think what's important --

21   what I internalize is that Mr. Larsen was looking

22   for my guidance or our guidance from being the

23   market experts to introduce a supply of XRP that is

24   commensurate with the liquidity available at the

25   time.  Is that -- is that a word, "commensurate"?

1          MR. HANIN:  Commensurate.  Big word,

2    actually.

3          MS. WAXMAN:  Your English is excellent.

4    Better than mine.

5          Exhibit 45, please.  Oh, wait, Exhibit 54.

6          (Whereupon, Deposition Exhibit ███ 54

7          was marked for identification.)

8          MR. TENREIRO:  For the record, this is

9    Bates Christian Larsen 2177.

10   BY MS. WAXMAN:

11        Q.   Mr. ███, I'm showing you a text message --

12   a document that has -- I'm showing you

13   Exhibit ███ 54.  It's a text message from you to

14   Mr. Larsen dated July 7th, 2020.

15        A.   Mh-hmm.

16        MS. DEARBORN:  And for this, as for all of

17   them, we're taking SEC's representation that this is

18   an authentic copy of the document that was produced.

19   Obviously, we can't check it out right now.

20   BY MS. WAXMAN:

21        Q.   Mr. Larsen -- Mr. ███ can you read the

22   email to the -- into the record?

23        A.   "Good morning, sir.  Just to let you know

24   we were finally able to report your trade to the ███

25   SDR last night (first ever so it took some time to

1    adjust their default parameters)."

2        Q.   And what trade are you talking about in

3    the exhibit?

4        A.   I think this refers to us purchasing some

5    covered calls from Mr. Larsen.

6        Q.   And when did you begin to purchase covered

7    calls on behalf of Mr. Larsen?

8        A.   I don't recall the exact date.  I suspect

9    on or around the 7th of July date stamp that we

10    see in there.

11        Q.   And are you currently purchasing covered

12    calls on behalf of Mr. Larsen?

13        A.   No.

14        Q.   And what is the &#9608; SDR?

15        A.   The &#9608; is the &#9608;

16    &#9608;.  The SDR, is it the swap depository

17    something -- I don't remember the exact -- this is

18    where -- again, I'm not expert in this, forgive me

19    if I say something really stupid, but my

20    understanding is that when we did these derivative

21    transactions, we were supposed to report them into

22    the &#9608; SDR.

23        Q.   Did Mr. Larsen -- did you execute XRP

24    derivative transactions on behalf of Mr. Larsen?

25           MS. DEARBORN:  Object to form.

1            THE WITNESS:  No.  This was -- we did a

2    derivative transaction with Mr. Larsen.

3    BY MS. WAXMAN:

4        Q.   Okay.  And were you reporting it -- the

5    trade on behalf of Mr. Larsen?

6            MS. DEARBORN:  Object to form.

7            MR. HANIN:  Objection.

8            THE WITNESS:  I don't understand the

9    subtleties.  I don't know if we were reporting it

10   for us or for him.  I'm sorry.

11   BY MS. WAXMAN:

12       Q.   And did anyone direct you -- did

13   Mr. Larsen direct you to report the trade?

14           MS. DEARBORN:  Object to form.

15           THE WITNESS:  I don't recall.  I don't

16   know.  I -- no, I don't know.

17           MS. WAXMAN:  Exhibit 45, please.

18             (Whereupon, Deposition Exhibit ▮ 45

19             was marked for identification.)

20   BY MS. WAXMAN:

21       Q.   Mr. ▮  I'm showing you what's been

22   marked as ▮ 45, which is a document with the Bates

23   GSR_8741 through -8743.  It's an email chain from

24   August 15th, 2019.  The subject is "Re:  XRapid

25   market making"?

212

```
1          A.   I wasn't having my best day.

2          Q.   Why do you say that?

3          A.   The tone of the email is not very

4    professional.

5          Q.   What is the email about?

6               MR. HANIN:  Have you read the whole chain?

7               THE WITNESS:  Yeah.  Yeah.

8               I'm commenting within the management team.

9    Well,        has sent us an email pointing out

10   certain things going on in the Bitso order book, and

11   I am discussing it with the management team at GSR.

12   BY MS. WAXMAN:

13         Q.   Is this in connection with services -- is

14   this in connection with GSR's services related to

15   ODL?

16         A.   Yes.

17         Q.   Okay.  And at the top of the page, you

18   write:

19               "XRP [sic] has been running

20               for all of two weeks."

21         A.   XRapid --

22         Q.   XRapid.

23         A.   -- which is the old name for ODL.

24         Q.   And does this document refresh your memory

25   as to when you started to provide these services?
```

1      A.   I can infer now that we probably started

2    in August of 2019, right?

3      Q.   Is that a reference to when you started to

4    support ODL?  Or xRapid?

5      A.   Well, it seems like we -- I talk here

6    about the fact that we don't have a signed contract

7    in place.  So these orders that ▓▓▓▓ is

8    referencing, technically I don't know if it

9    constitutes us servicing a contract if there's no

10   contract in place.  We might have just -- it would

11   have been testing or, you know, testing the pipes

12   before we actually start providing the service.

13     Q.   Okay.  But going to the email from ▓▓▓▓

14   on the bottom, the second paragraph says:

15            "Given our call yesterday, we

16            wanted to reemphasize the

17            importance of fostering a market

18            environment where destination

19            xRapid XRP markets build up natural

20            liquidity over time.  If these

21            markets are unable to build up

22            actual liquidity over time, the

23            xRapid product [sic] will not be

24            something that Ripple will be able

25            to sustain."

1          Did you --

2          MS. ZORNBERG:  Just for the record, you

3     misread "project" as product in the last line.

4          MS. WAXMAN:  Apologies.

5     Q.    "If these markets are unable to build up

6     natural liquidity over time, the xRapid project will

7     not be something that Ripple will be able to

8     sustain."

9          Did you ever discuss with Ripple why

10    building natural liquidity was so important?

11    A.    Yes.

12    Q.    And what did you discuss?

13    A.    It's along the lines of what ▮▮▮▮▮▮ is

14    referring to here.  My understanding was that as

15    crypto markets continued to pop up and grow and

16    develop and they have more market participants

17    within them, they have more organic liquidity.  And

18    so the need for GSR to step in as a -- call it like

19    a back stop liquidity provider for -- for when these

20    payments are going through will reduce over time.

21         The organic participants in the Mexican

22    Bitso, for example, or Coins.ph in the Philippines,

23    they themselves will perform our role.

24    Q.    So the natural liquidity would come from

25    retail purchasers on the exchanges?

1        A.    Any market participant on the exchange who

2    may be purchasing or selling for any number of

3    different reasons, yeah.

4        Q.    Was it costly for Ripple to pay GSR to

5    provide liquidity for ODL?

6              MS. ZORNBERG:  Objection.

7              THE WITNESS:  How would you define

8    "costly"?  Like --

9    BY MS. WAXMAN:

10        Q.    Did Ripple ever tell you that it was

11    getting very expensive for them to pay GSR to

12    support ODL?

13              MS. ZORNBERG:  Objection.

14              THE WITNESS:  I don't recall them using

15    those words, no.

16    BY MS. WAXMAN:

17        Q.    Did -- did Ripple ever try to reduce the

18    amount it paid GSR for ODL services?

19        A.    Yes.

20        Q.    Okay.  And did they tell you why they

21    wanted to do that?

22        A.    No.  But -- no.

23        Q.    At the time of this email, were you

24    providing liquidity support in a particular

25    corridor, ODL corridor?

1      A.   Well, the email references the Bitso order

2    book, so that would have been the Mexican peso.  But

3    as I said earlier, sounds like we didn't have a

4    contract in place, so technically, I don't think we

5    were delivering a service; probably call this the

6    testing period that occurs before we do anything.

7      Q.   Going to your email at the top, the last

8    paragraph, you say:

9           "Making the changes they asked

10          for probably won't make any

11          difference to the development of

12          natural liquidity at Bitso."

13          What changes were they asking you to make?

14     A.   They were ask -- they -- I think they

15   believed that our -- we were putting up large bits

16   very close to fair value, and they were asking us to

17   back off so that there would be room for other

18   market participants to get in front of us.

19     Q.   And did you think that would create

20   natural liquidity?

21     A.   I'm not the proudest of what I wrote on

22   that last paragraph.  What          is saying is true.

23   If -- let me illustrate it this way:  If there's

24   only one tick between bid and offer, right, there's

25   no way anybody can get in the inside, right?  So

```
 1   there's no way any organic liquidity or anybody else
 2   is going to step inside and facilitate that payment.
 3   And what he's asking us, he's saying you guys are
 4   too close to the offer, you need to back off so that
 5   other guys can step in.  It make -- what he said
 6   made sense.  Like I said, I don't think I was having
 7   my best day.
 8        Q.   I understand that you -- the
 9   clarification, but your response was:
10              "If they really want liquidity
11           to improve, they should work with
12           Bitso to get more people trading on
13           the platform"?
14        A.   But that goes along with what I was
15   saying, right, that you need more people to get in
16   between best bid, best offer.  One way of doing that
17   is getting more people to trade on the platform.
18        Q.   And when you say more people, you're
19   talking about retail purchases of XRP?
20              MR. HANIN:   Objection.  Asked and
21   answered.
22              THE WITNESS:   It doesn't matter.   It
23   doesn't matter whether they're retail, pro tail
24   [sic], professional, institutional.  You just need
25   more participants.
```

218

1    BY MS. WAXMAN:

2         Q.   More investors in XRP?

3              MR. HANIN:  Objection.

4              MS. ZORNBERG:  Objection.

5              THE WITNESS:  I don't think it matters

6    whether they're investors, speculators.  More

7    participants.

8              MS. WAXMAN:  Exhibit -- Exhibit 64,

9    please.

10             (Whereupon, Deposition Exhibit █ 64

11             was marked for identification.)

12   BY MS. WAXMAN:

13        Q.   Mr. █   I'm showing you what's been

14   marked as -- it says █ 4 but it should be █ 64, and

15   it has the Bates RPLI_SEC 59885 through -59889.

16   Take a moment to look at it and let me know when

17   you're done.

18             At the bottom of the email on page 1, you

19   say:

20             "I'm still bearish."

21             Are you talking about being bearish on

22   XRP?

23        A.   I -- I don't recall, but I think it was a

24   more general statement, crypto in general.

25        Q.   Okay.  Setting aside the document, were

1    you bearish on XRP at this time?

2            MR. HANIN:  Objection.

3            THE WITNESS:  I have no way to remember.

4    I don't know.

5    BY MS. WAXMAN:

6        Q.    At the top of the email -- you say:

7                "I'm still bearish."

8            And ▮▮▮▮ asked:

9                "Any reason why you were still

10            bearish?"

11            First of all, just for the record, what

12    does it mean to be bearish?

13        A.    I think prices are going to go down.

14        Q.    So you're not confident in the success of

15    the asset?

16            MS. ZORNBERG:  Object to form.

17            THE WITNESS:  I think it's more likely

18    that the price of the asset in dollar terms is going

19    to go down rather than up.

20    BY MS. WAXMAN:

21        Q.    Okay.  And so ▮▮▮▮ asked, "Why are you

22    bearish?"  And then you write:

23                "Pervasive wash trading, lack

24            of adoption, turning 40 this year,

25            quitting smoking and drinking, et

 1              cetera."

 2              Are you talking about XRP?

 3        A.    No.  And that's why when you asked me the

 4    question before, I said I think it's a more general

 5    statement, because when I say "pervasive wash

 6    trading, lack of adoption," I'm referring to the

 7    overall market.  I'm not talking just about XRP.

 8              And, in fact, when you go to the next

 9    sentence, you can see:

10                   "No idea where the floor might

11              be.  The only thing I'm really

12              excited about holding is XRP right

13              now."

14              So I'm actually making a statement that I

15    think the overall market is going to drop, but XRP

16    doesn't look as bad as the overall market.

17        Q.    And why were you -- why did you have that

18    belief that XRP didn't look as bad as the overall

19    market?

20        A.    I don't remember what I was thinking four

21    years ago, but -- three years ago, but I see I

22    wrote:

23                   "Because I expect the ███ deal

24              to result in more sustainable

25              buying, especially while they don't

1          have permission to offer BTC or

2          BCH."

3     Q.   And why would the ▮ deal -- why did you

4     expect the ▮ deal to result in sustainable buying?

5     A.   If I remember correctly, ▮ was launching

6     their own virtual currency exchange, ▮ BC, and the

7     only crypto that they were going to offer to their

8     clients at the time was XRP.  So the only

9     transactions that could occur from that would be

10    people coming to buy XRP.

11    Q.   And the ▮ deal, that was a deal between

12    Ripple and ▮ ?

13    A.   I think by ▮ deal, I mean, ▮ launching

14    their virtual currency exchange.  GSR was retained

15    by ▮ years ago when they launched the virtual

16    currency exchange, and we were liquidity providers

17    for a certain period of time.

18    Q.   And did ▮ enter into an agreement with

19    Ripple to purchase XRP?

20    A.   I don't know.

21    Q.   Did you ever sell XRP on behalf of ▮ ?

22    A.   I don't think so.

23    MS. WAXMAN:  Exhibit 60, please.

24         (Whereupon, Deposition Exhibit ▮ 60

25         was marked for identification.)

1    BY MS. WAXMAN:

2        Q.   So this is very hard to read.  I

3    apologize.  This is how it was produced to us.  I'm

4    showing you what's been marked    60, which has the

5    Bates GSR -25392.

6            And is 42t in connection with a specific

7    individual, trading in 42t?

8        A.   Yes.

9        Q.   And -- and whose XRP do you sell through

10    42t?

11        A.   I believe it's Brad Garlinghouse.

12        Q.   And during 2020, did Mr. Garlinghouse sell

13    during the period from January until August?

14        A.   I think so.  No.  I'm sorry.  You're --

15    when I look at the middle of the page, I see a

16    year-to-date.  And it seems like the only -- the

17    first XRP sales start in August, and there was zero

18    in January and there's nothing in between, so I

19    assume that means that there were zero from January

20    until August.

21        Q.   And just taking a step back, do you

22    recognize what's been marked as    60?

23        A.   What this actually is?

24        Q.   Yeah.

25        A.   Yeah.  This is, I think, the daily emails,

1    or maybe this was a monthly one because it says

2    Month To Date, this we would send out to the clients

3    so they see the progress of the liquidation program.

4        Q.   Did GSR send daily trade reports for every

5    trade bot?

6        A.   I don't know that we did it for all the

7    clients.

8        Q.   Did you send Mr. Garlinghouse a daily

9    trade report for his trades?

10       A.   I don't remember.

11       Q.   Did you send Mr. Larsen a daily trade

12   report?

13       A.   Again, I don't remember.  And it's

14   possible that we did at some moment in and time then

15   we didn't.

16       Q.   If you didn't send it daily, how often

17   would you send information regarding their trading?

18            MR. HANIN:  Objection.

19            If you know.

20            THE WITNESS:  I think -- I know there were

21   dailies, there were monthlies.  I don't think there

22   were weeklies.

23   BY MS. WAXMAN:

24       Q.   I think I have a daily.

25            Did Mr. Garlinghouse tell you to stop

1  selling XRP in --

2      A.   I don't --

3      Q.   -- in 2020?

4      A.   I don't recall.  If anything, it looks

5  like he told us to start selling XRP in 2020.

6      Q.   And when did he tell you to start selling

7  XRP in 2020?

8      A.   I don't know, but I can see from the

9  report that in August we sold some XRP on behalf of

10  Mr. Garlinghouse.

11      Q.   Did you have any understanding as to why

12  Mr. Garlinghouse didn't execute any trades in the

13  period between January and August 2020?

14          MR. LEVANDER:  Object to form.

15          THE WITNESS:  I don't recall.

16          MS. WAXMAN:  Exhibit 49, please.

17          (Whereupon, Deposition Exhibit     49

18            was marked for identification.)

19          MR. HANIN:  Daphna, before you get to this

20  document or your next question, it's 2:45.  So to

21  the extent you want to reserve 15 or however much.

22          MR. TENREIRO:  She's going to reserve ten.

23          MS. WAXMAN:  I'm just going to ask about

24  this document.  Then we'll stop.

25          MR. HANIN:  Perfect.

1       Q.   Mr. ▮, I'm showing you what's been

2  marked as ▮ 49, which is a document with the Bates

3  RPLI_SEC 0582440.  Again, I -- it's very hard to

4  read, and I apologize.  It was produced to us this

5  way.

6          MR. HANIN:  Not intentionally.

7          MS. WAXMAN:  It wasn't produced by you.

8          MR. HANIN:  And not by us.  Yes, there you

9  go.

10         THE WITNESS:  You can read this one.

11         MR. HANIN:  The last one was.

12  BY MS. WAXMAN:

13       Q.   Is this the daily report --

14       A.   This looks like the daily, yes.

15       Q.   -- that GSR would send to individual

16  clients?

17       A.   Yes.

18       Q.   And is this a copy of the daily report for

19  trading in Mr. Garlinghouse's Bot 42t --

20       A.   I believe so.

21       Q.   -- between October 20th, 2019 and

22  October 21st, 2019?

23       A.   Yes.

24       Q.   And on the left-hand side, there's a

25  column titled "Exchange."  Are these the list of

1    exchanges that GSR sold XRP on on behalf of

2    Mr. Larsen in --

3         A.   Mr. Garlinghouse.

4         Q.   -- Mr. Garlinghouse --

5         A.   Yes.

6         Q.   -- in October 2019?

7         A.   Yes.  Yes.

8         Q.   And it looks like for Bittrex and

9    Coinbase, certain payers have zero volume, and also

10   for Poloniex and Upbit, certain payers have zero

11   volume.

12              Is there any reason why GSR didn't execute

13   sales on those platforms and those payers at this

14   time?

15        A.   I don't remember why we would have traded

16   some crosses but not others within the same

17   exchange.  It's strange.

18        Q.   Did Mr. Garlinghouse ever direct you to

19   sell XRP on certain platforms?

20        A.   I don't recall any specifics, but I don't

21   think Mr. Garlinghouse ever told us not to sell in

22   any particular cross on some exchange, no.

23        Q.   Did Mr. Garlinghouse ever tell you not to

24   sell XRP on platforms that cater to U.S. users?

25        A.   I don't recall.

1      Q.   Was the XRP.USD cross available in

2    platforms outside the United States?

3      A.   When?  You mean on October 20th?

4      Q.   Sure.  Well, on October 20, 2019.

5      A.   Yeah.  I mean, you can see Binance had

6    a -- well, Binance had a tether cross, USDT.

7    Bitfinex had a USD cross, right?  Bitstamp XRP.USD.

8    Houbi, USD.  OKEx and Polo used tether.  Yeah.

9    There are multiple.

10     Q.   Are you currently selling XRP on behalf of

11   Mr. Garlinghouse?

12     A.   No.

13     Q.   And when did you stop selling XRP on

14   behalf of Mr. Garlinghouse?

15     A.   I don't remember when we stopped selling

16   XRP on behalf of Mr. Garlinghouse, but as I

17   mentioned earlier, within a few days of the SEC's

18   lawsuit, we ensured that we weren't trading XRP on

19   behalf of Americans or exchanges that catered to

20   Americans.

21     Q.   So after the SEC lawsuit, did you stop

22   selling XRP on behalf of Mr. Larsen?

23          MS. ZORNBERG:  Object to form.

24          THE WITNESS:  I can't remember if we were

25   still selling XRP on behalf of Mr. Larsen.  But

 1    if -- but if we were, we would have stopped then.

 2    BY MS. WAXMAN:

 3        Q.    Are you currently selling XRP on behalf of

 4    Mr. Larsen?

 5        A.    No.

 6        Q.    So your understanding is after the SEC

 7    lawsuit, you stopped selling on behalf of any U.S.

 8    clients and stopped selling XRP to any U.S.

 9    purchasers?

10        A.    And trading XRP on exchanges that catered

11    to U.S. entities or humans.

12        Q.    And why did you do that?

13        A.    Because it didn't feel like it was the

14    right thing to do.  We are -- as I mentioned hours

15    ago, our intention is to bring GSR onshore and be

16    regulated by the regulators in the U.S.  So going

17    against the SEC seemed like not the best way to go

18    about doing that.

19        Q.    And how would continuing to sell XRP be

20    going against the SEC?

21             MS. ZORNBERG:  Objection.

22             THE WITNESS:  I don't know how to answer

23    that question.  But the SEC made it very clear on

24    December 20, whatever it was, that they thought XRP

25    was a security, and that is a clear statement.  And

```
 1    if that is the case, then GSR has no business doing
 2    these transactions until we are a registered entity
 3    in the U.S.
 4              MS. WAXMAN:  So it's 2:50 now.  I'm going
 5    to reserve ten minutes after Ms. Zornberg or
 6    individuals' counsels ask questions.  Thank you.
 7              MS. ZORNBERG:  Shall we take a break?
 8              MR. HANIN:  Yes.  Let's take a --
 9              MS. ZORNBERG:  Ten-minute break --
10              MR. HANIN:  Ten minutes is perfect.
11              MS. ZORNBERG:  And start at 3:00.
12              THE VIDEOGRAPHER:  We're going off the
13    record at 2:50 p.m.
14              (Whereupon, a recess was taken.)
15              THE VIDEOGRAPHER:  We're going back on the
16    record at 3:03 p.m.
17              EXAMINATION BY MS. ZORNBERG
18    BY MS. ZORNBERG:
19         Q.   Mr.        good afternoon.  I'm
20    Lisa Zornberg.  I represent Ripple Labs, and I have
21    some questions for you.  Thank you for your
22    endurance today.
23              First, you were asked some questions by
24    the SEC about the original market making agreement
25    between Ripple Labs and GSR.  I'd like to show you
```

1    what's marked as Exhibit 100.

2                (Whereupon, Deposition Exhibit ▮ 100

3                  was marked for identification.)

4                MS. ZORNBERG:  For the record, it's a

5    document called "Market Making Agreement" entered

6    into as of the 31st of March, 2014, between Ripple

7    Markets, Inc. and GSR, ████████████████████.

8         Q.   Do you see that?

9         A.   Yes.

10        Q.   And I'll just point out that it -- the --

11   at the end, it looks like it's signed on behalf of

12   GSR (Market Maker) by ███████████ director.

13             Do you see that?

14        A.   Yes.

15        Q.   Okay.  Is this the initial market making

16   contract that you were referring to in your

17   testimony earlier today between GSR and Ripple?

18        A.   I think so, yes.

19        Q.   Let me direct your attention on the first

20   page of the document to the section at the top

21   called "Recitals."  And there are two recitals.

22   Recital A says that:

23                  "Company," which is -- which

24             is Ripple -- "desires to promote

25             liquidity of fiat and

1          cryptocurrencies within the Ripple

2          Network (defined below) by engaging

3          market maker to quote binding bid

4          and offer prices for virtual units

5          of value (defined below) within the

6          Ripple Network."

7          Do you see that?

8     A.   Yes.

9     Q.   Do you know -- and -- what -- well, let's

10 just take a look for a moment at the definition for

11 Ripple Network, which is on page 2. And it's

12 defined as:

13          "The decentralized, open

14          source, global payment network

15          operating on the Ripple protocol."

16          What was your understanding of what the

17 Ripple Network was? And I guess just --

18     A.   To --

19     Q.   Go ahead, please.

20     A.   Let me start by saying that I'm just a

21 retired oil trader, so I'm not exactly a world

22 eminence in cryptography. But to me, the Ripple

23 Network and the Ripple Consensus Ledger are

24 interchangeable.

25     Q.   Okay. So -- and was the Ripple Consensus

1    Ledger would also -- later became called the XRP

2    Ledger?

3         A.    I guess so.  I just haven't -- I don't

4    remember hearing that term as often, but yeah.

5         Q.    Okay.  If I refer to it collect -- you

6    know, just as the Ledger, will you understand what

7    I'm referring to?

8         A.    Yes, I think so.

9         Q.    Okay.  So back in 2014, around the time of

10   this agreement, did you view the Ledger as

11   innovative?

12        A.    Yes.

13        Q.    In what ways?

14        A.    I had never come across something like the

15   Ledger.  I remember showing my financial advisor how

16   it worked and creating a wallet and sending XRP and

17   everybody's look of amazement.  It was the first

18   time I had come across something like that.

19        Q.    And were you -- was the -- was the

20   Ledger -- did the Ledger contain a decentralized

21   exchange within it, if you know?

22        A.    The Ledger allowed -- so when we access

23   the Ledger, we were able to send, receive and

24   exchange different units of value.

25        Q.    Include --

1     A.   So in order to -- so you're exchanging

2   unit of value.  So from that point of view, yes, I

3   guess it is an exchange.

4     Q.   And you testified earlier, I believe, that

5   when you were -- when GSR was retained to provide

6   market making services on the Ledger, it was for

7   different crosses, some including XRP and some not?

8     A.   That's correct.

9     Q.   Okay.  And is that consistent with the

10  recital that we looked at on page 1 that says that

11  the company desires to promote liquidity of fiat and

12  cryptocurrencies?

13    A.   I think it's the same thing, right?  Fiat

14  would have been dollar, euro, I think there was GBP,

15  there was yen, CNY.  And then virtual

16  cryptocurrencies, there was XRP and Bitcoin.  And so

17  any combination of those different crosses, right?

18    Q.   Yeah.

19         Are you aware -- you testified earlier

20  that the Ledger was public?

21    A.   Yes.

22    Q.   Was it open source?

23    A.   I believe it was.

24    Q.   Are you aware that it was launched before

25  Ripple Labs was formed as a company?

1       A.   I don't recall.  I don't think -- I'm not

2    sure if I was aware.

3       Q.   Okay.  From it's -- from the time you

4    started working with the Ledger, was it capable of

5    facilitating cross-border payments?

6            MS. WAXMAN:  Objection.

7            THE WITNESS:  I wouldn't say payments, but

8    it would allow you to exchange euros for yen, for

9    example, so you could exchange different fiats.

10   BY MS. ZORNBERG:

11      Q.   Okay.  Mr. ████ you testified earlier that

12   your greatest amount of contact with Ripple over the

13   years has been with the markets team.

14           Do you recall that?

15      A.   Yes.

16      Q.   To what extent, if any, have you had

17   contact with Ripple's product team?

18      A.   Very, very little.

19      Q.   Okay.

20      A.   Can you remind me who is on the products

21   team?

22      Q.   I don't -- well, to what extent, if any,

23   did you have communications Asheesh Birla, for

24   example?

25      A.   I -- I think I've met Asheesh in person

235

```
 1   for all of three minutes in a -- waiting for an

 2   elevator.

 3        Q.   Okay.  You know that Ripple is a software

 4   company, right?

 5        A.   Yes.

 6        Q.   Would it be fair to say that you were not

 7   kept apprised of all of the efforts by Ripple's

 8   products team to develop software?

 9             MS. WAXMAN:  Objection.

10             THE WITNESS:  No.  I mean ...

11   BY MS. ZORNBERG:

12        Q.   Okay.

13        A.   I mean, would it be fair, yes, I think

14   that's a fair thing to say.

15        Q.   So you -- do you know what product Ripple

16   was developing in 2013?

17             MS. WAXMAN:  Objection.

18             THE WITNESS:  I -- I don't recall, but I

19   can't imagine I would have.

20   BY MS. ZORNBERG:

21        Q.   Okay.  Now, when the SEC questioned you

22   earlier without showing you this document,    100, I

23   think you gave your best guess that you started

24   making markets under a contract with Ripple in

25   fourth quarter of 2013.
```

1             This agreement is dated as of March 31st,

2     2014.  So just, what is your best recollection,

3     seeing the agreement, as to when GSR first began

4     making markets --

5             MS. WAXMAN:  Objection.

6     BY MS. ZORNBERG:

7         Q.   -- under contract?

8             MS. WAXMAN:  Objection.

9             THE WITNESS:  I think I said that we

10    started either Q4 of '13 or Q1 of '14.  In my mind,

11    I have this November of 2013 date.  That might have

12    been when we submitted our business plan or our

13    business proposal to Ripple.  And, obviously, it

14    seems like we didn't sign any agreement until the

15    31st of March of 2014.  I don't think there was

16    anything before this.

17    BY MS. ZORNBERG:

18        Q.   Okay.  All right.  You can put that aside.

19             Can I have tab 5, the next one?

20             I'm showing you, Mr. ███  Exhibit 101.

21             (Whereupon, Deposition Exhibit █ 101

22             was marked for identification.)

23    BY MS. ZORNBERG:

24        Q.   Okay.  For the record, Exhibit 101 is

25    entitled "GSR Memorandum of Understanding," and it

1　looks to be an MOU made on December 1, 2018, as the

2　effective date.

3　　　　　Do you recognize this document, Mr. ▮▮▮?

4　　　A.　Yes.

5　　　Q.　Okay.  It appears that your signature is

6　on the second page.

7　　　　　Did you sign it, electronically or

8　otherwise?

9　　　A.　That looks like me trying to replicate my

10　signature on DocuSign, yes.

11　　　Q.　All right.  Is this the MOU that

12　governed -- through which Ripple contracted GSR to

13　provide liquidity services for the testing of the

14　xRapid product?

15　　　　　MS. WAXMAN:  Objection.

16　　　　　THE WITNESS:  I believe that's exactly

17　what it is.  It's just an MOU.

18　BY MS. ZORNBERG:

19　　　Q.　Yeah.  And I'll direct your attention to

20　the whereas clauses.  The first one says:

21　　　　　　"Whereas, GSR is in the

22　　　　　　business of providing liquidity and

23　　　　　　programmatic trading services to

24　　　　　　blockchain companies and token

25　　　　　　issuers.  Whereas, Ripple has

1          launched a new product named xRapid

2          and is seeking the services of GSR

3          to provide liquidity during the

4          testing period of the product."

5          Do you see that?

6      A.   Mh-hmm.

7      Q.   Did GSR, in fact, provide liquidity

8  services for the xRapid product during the test

9  period?

10     A.   I believe so.

11     Q.   Okay.  What is your understanding of the

12 OD -- what the ODL product intended to accomplish?

13 And I'm going to refer to it as ODL.  As you

14 previously said, xRapid later became ODL.

15         But do you have an understanding of what

16 the purpose of the product was?

17     A.   Yes.

18     Q.   What was your -- what's your

19 understanding?

20     A.   My understanding is that ODL is supposed

21 to significantly reduce the time and cost involved

22 in sending FX payments, overseas or from overseas to

23 onshore.  I mean, it doesn't matter.

24     Q.   Okay.  Did you -- do you have a view as to

25 whether the ODL product, when it first came into

1   being, had an innovative value to it?

2           MS. WAXMAN:  Objection.

3           THE WITNESS:  I think when ODL came about,

4   and even today, it facilitated the movement, small

5   amounts of fiat from one currency to another.  And

6   that is something that, today, you simply cannot do

7   using the normal banking system.  So it was

8   innovative then, and in some ways, it still is

9   today.

10  BY MS. ZORNBERG:

11      Q.   Why is liquidity in XRP important to the

12  functioning of the ODL product?

13          MS. WAXMAN:  Objection.

14          THE WITNESS:  In order for the protocol to

15  work, there needs to be -- if you're sending money

16  from A to B, at A, you buy XRP with the originating

17  currency.  You can then send the XRP to the

18  destination exchange and sell it for the destination

19  local currency.

20  BY MS. ZORNBERG:

21      Q.   That's a very well-hydrated example.

22      A.   But -- so this movement of XRP is -- takes

23  a very short period of time.  You want the price of

24  XRP here in dollars to be as close as possible to

25  the price of XRP here in pesos so that the resulting

1    effected transaction is as close as possible to the

2    fair value of the dollar max cross.

3            If the bid offer spread on the origination

4    exchange were ten percent wide, when you -- the

5    payment provider purchased the XRP in the

6    origination exchange, they would already be

7    ostensibly 5 percent underwater.  Likewise, if then

8    they send the XRP over here and they sell it for

9    pesos and the best bid is 5 percent below fair

10   value, they could have locked in an FX transaction

11   that was 10 percent off market.

12           So you want both markets to be as tight as

13   possible.  And not just tight, but they need to have

14   sufficient depth, because if this order is too big,

15   maybe the first offer is very close to fair value,

16   but if there are no more offers until 5 percent

17   higher, when you come in to buy the XRP over here,

18   you're going to end up buying the XRP very

19   expensive.

20           Similarly, when you come over here and you

21   try and sell it, you need there to be enough bids,

22   otherwise you're going to work your way all the way

23   down the order book and, again, you're going to be

24   ten percent off market.

25       Q.   So liquidity mattered to ODL?

241

1          A.   Absolutely.

2          Q.   And a sign of liquidity is a tight spread

3     between bid and ask?

4          A.   That's the first one.  But having a take

5     wide bid offer for no size doesn't help either,

6     unless you're trying to send pennies at a time,

7     which is not the case.

8          Q.   Okay.  Were GSR's market making services

9     for the ODL product provided for certain corridors

10    where Ripple was first testing and then providing

11    ODL services?

12         A.   I believe so.

13              MS. WAXMAN:  Object.

14    BY MS. ZORNBERG:

15         Q.   And which corridors were those?

16         A.   Mexican peso at Bitso, Philippine pesos at

17    Coins.ph/Pro, AU -- Australian dollars at BTC

18    markets.

19         Q.   Okay.  So in other words, was Ripple

20    looking to contract GSR to provide liquidity where

21    it was most useful to its product?

22              MS. WAXMAN:  Objection.

23              THE WITNESS:  I presume so, yes.  I mean,

24    we weren't -- the ODL contract only covered these

25    exchanges, which my understanding is we're servicing

1    these rails that the payment providers were using.

2    BY MS. ZORNBERG:

3        Q.    And was the amount of liquidity -- let me

4    rephrase.

5              For GSR, in providing liquidity for the

6    ODL product, was the amount of liquidity needed

7    variable or static?

8        A.    By "amount of liquidity," do you mean the

9    size of the -- the depth that we were providing on

10   any particular order book?

11       Q.    Yes.

12       A.    It -- I mean, it varied.

13       Q.    Okay.  Did it -- and did it vary based on

14   particular -- for particular reasons?

15       A.    When we -- when we provide liquidity on

16   any given exchange, we're placing bids or offers, we

17   don't know when an order resulting from ODL is going

18   to interact with us.  And we don't know sometimes

19   when other market participants in any given exchange

20   might choose to interact with us.

21             You know, there -- there are even worse

22   cases where maybe our price oracles aren't perfectly

23   synced and people take advantage of the fact that

24   we're being slow in the exchange and they arb us

25   out.  It doesn't happen often, but it can happen.

1      Q.   So would the amount of liquidity needed

2   from GSR depend in part on the amount of

3   transactions customers wanted to put through ODL?

4           MS. WAXMAN:  Objection.

5           THE WITNESS:  I can see how there would be

6   a correlation between the size of the flows that

7   were coming from ODL and the amount of liquidity we

8   would have to, quote, unquote, guarantee on these

9   exchanges.

10  BY MS. ZORNBERG:

11     Q.   Since 2018, have -- have certain -- has

12  liquidity in any of these corridors that you

13  mentioned grown?

14     A.   The -- the organic liquidity at these

15  exchanges has improved since we started.

16     Q.   Can you -- can you flesh that out and

17  describe what you've observed?

18     A.   I think -- you can see it in the data.  In

19  general, most of these -- well, these exchanges that

20  we're referring to, Bitso, Coins.ph, BTC markets, in

21  the last two-and-a-half years have grown in terms of

22  their trading volume.  I don't have access to their

23  user data, but I suspect part of it comes from the

24  fact that they have more users.  They also offer

25  more products.  You know, like so many other things

1    in the space that are in flux and growing.

2        Q.   How has the organic growth of those

3    corridors affected the need for GSR services?

4            MS. WAXMAN:  Objection.

5            THE WITNESS:  I think that as organic

6    liquidity develops, the need for GSR to be providing

7    the liquidity necessary to ensure, affects

8    transactions at a fair market rate, that need

9    decreases.  And, in fact, I think we've seen it in

10   our data.  We -- we need -- Ripple keeps track of

11   our hit ratio, meaning we tell Ripple how much we

12   traded on this corridor, but then Ripple tells us,

13   well, X percent matched ODL.

14           That X percent over time has been

15   decreasing, I suspect because organic liquidity has

16   been developing in these markets.

17   BY MS. ZORNBERG:

18       Q.   Okay.  Other than Ripple Labs, for

19   approximately how many other clients in the digital

20   asset space has GSR provided liquidity services?

21       A.   Over ████.

22           MS. WAXMAN:  Is there a time period for

23   that?

24           THE WITNESS:  I understood it since 2013,

25   but ...

```
 1              MS. ZORNBERG:  That's fine.
 2         Q.   All right.  You've been asked some
 3    questions -- turning now to another subject.  You
 4    were asked some questions by the SEC about the GSR's
 5    services in providing programmatic selling of XRP on
 6    Ripple's behalf.
 7              MS. ZORNBERG:  Let me -- can I have
 8    Exhibit 103?
 9                   (Whereupon, Deposition Exhibit    103
10                   was marked for identification.)
11    BY MS. ZORNBERG:
12         Q.   Okay.  I'm showing you this document.
13              MS. ZORNBERG:  Do you have other copies of
14    it?  Okay.  There you go.
15         Q.   After you've had a moment to look at it,
16    please tell me if you recognize it.
17         A.   I remember it, yeah.
18         Q.   So what is this document, Mr.
19    Exhibit 103, which, just for the record, has a GSR
20    logo on the front page, a
21              logo on the front page as well?
22              MS. WAXMAN:  Objection.
23              THE WITNESS:  I believe this was a
24    document that GSR prepared for         I believe what
25    happened was         approached         and said, we know
```

```
1    that -- we think GSR's liquidity dating XRP on your

2    behalf -- I'm summarizing, and we think we can do it

3    better.  And they prepared an analysis of their

4    strategy, and they analyzed ours, and they came to

5    the conclusion that they were going to do it better.

6    And when we saw their analysis, we rebutted it, I

7    guess you would say.

8    BY MS. ZORNBERG:

9        Q.   Yeah.  Was the -- do you remember the year

10   in which this was sent over?

11       A.   No, I do not.  Are there any clues?

12       Q.   Well, I can represent to you that this

13   was -- this was sent -- this document, Exhibit 103,

14   was sent as an attachment to -- to

15   and others at GSR on June 11, 2019.

16            MS. WAXMAN:  Object.  And, Lisa, do you

17   have the cover email showing the -- that he actually

18   received this attachment or the email?

19            MS. ZORNBERG:  I don't think we need to

20   designate it.  For the record, if you want, I'll

21   give -- I can give you the Bates number of the cover

22   email.  It's -- it's GSR_14586.

23            THE WITNESS:  On the page that ends 301,

24   first sentence says:

25                 "The migration to our new tech
```

1              stack (ETA July 2019) will allow us

2              to take into account."

3          So this must have happened prior to that.

4      BY MS. WAXMAN:

5          Q.   Okay.  Sometime in 2019?

6          A.   I mean, maybe it was '18.  It was

7      definitely before --

8          Q.   Yeah.  Let me -- let me direct your

9      attention to page 5 of the document that has GSR --

10     I'll use the GSR Bates stamp.  It's got -91 at the

11     end.  And it's the page that has the header, "GSR

12     Current Liquidation Program."

13             Okay.  Let me direct your attention to the

14     third paragraph down, or the fourth, rather, where

15     GSR's document says:

16                  "Although our current

17                  execution strategy may not be

18                  perfectly optimized, it utilizes

19                  aggregation in a non-naive

20                  approach, which results in fair

21                  pricing for all participants

22                  (pareto optimality) and avoids

23                  material market impact in the short

24                  and long term."

25             Do you see that?

248

```
 1        A.    Yes.

 2        Q.    Is that an accurate statement?

 3        A.    I was hoping you wouldn't ask me that,

 4   because I don't -- I'm not sure I understand what

 5   pareto optimality means.  I don't think I wrote

 6   this.

 7        Q.    Okay.  That makes two of us.  But let's

 8   focus on the end of the sentence.

 9              Do you agree that as of when this was

10   prepared, GSR's execution strategy was one that --

11   to avoid material market impact in the short and

12   long term?

13              MS. WAXMAN:  Objection.

14              THE WITNESS:  Yes.

15   BY MS. ZORNBERG:

16        Q.    Okay.  And then in the next paragraph the

17   document states:

18                   "It is critical that the

19                   participants of the XRP liquidation

20                   program are not competing against

21                   each other."

22              And the following sentence says:

23                   "The priorities are the health

24                   of the ecosystem and minimizing

25                   market impact."
```

249

```
 1              Do you see that?
 2       A.    Yes.
 3       Q.    Can you just explain what it means to
 4   minimize market impact and why that was GSR's
 5   execution strategy?
 6              MS. WAXMAN:  Objection.
 7              THE WITNESS:  We had several entities
 8   looking to liquidate XRP through us.  All these
 9   entities have, some of them have bigger, some have
10   smaller amounts, but they all have significant
11   holdings of XRP, which are orders of magnitude
12   larger than the liquidity available in the market.
13              So what I was trying -- what we were
14   trying to say here is that I totally understand how
15   one of these entities might say, well, I want to
16   sell all my XRP tomorrow.  Well, if -- because they
17   don't care about the other entities.  And because we
18   were doing all these XRP sales on behalf of all of
19   these clients, we didn't want to let people -- or
20   have people tripping over themselves and trying to
21   get ahead of the rest.  Had to do it in some kind of
22   a controlled fashion.
23              And having a bird's eye view of all the
24   different interests and being able to push back on
25   some of these requests was a way that we tried to
```

1    maintain an orderly market and minimize the long

2    term impact on the price of XRP.

3            If we -- to put it another way, if we

4    had -- I don't remember specifics but I'm sure there

5    were times when some of these clients called, said,

6    well, you know, price of XRP just went up

7    30 percent, can we sell all of it?

8            No, we cannot, there is not enough

9    liquidity in the market to be able to do that.

10   BY MS. ZORNBERG:

11       Q.   In your experience dealing with

12   Ripple Labs, was Ripple supportive of the strategy

13   of selling in a way that avoided material market

14   impact?

15       A.   Yes.

16            MS. WAXMAN:   Objection.

17   BY MS. ZORNBERG:

18       Q.   Let me ask you to turn the page to page 7,

19   to the page that's titled "Unparalleled Experience."

20   And the next-to-last sentence says:

21               "Our number one goal is to

22            create and maintain a constructive

23            environment for XRP.  Unlike new

24            competitors, we are not trying to

25            make a quick profit by selling

1           XRP."

2           Do you see that?

3      A.   Yeah.

4      Q.   Did you view that as an accurate statement

5  as of 2019?

6      A.   Yes.  And it's tied to what I was just

7  saying on my previous comment.  We weren't trying to

8  maximize dollar revenues today or this week, but

9  rather create a long-term program that would allow

10  all of these large XRP holders to be able to

11  monetize their position over time in a thoughtful

12  manner.

13      Q.   Was the reference to "new competitors" a

14  reference to      ?

15      A.   In all likelihood, yes.

16      Q.   So what -- what methods did GSR use in

17  programmatically selling XRP on Ripple's behalf and

18  on behalf of other clients, selling XRP on behalf of

19  other clients to minimize the market impact?

20           MS. WAXMAN:  Objection.

21           THE WITNESS:  There's a wide range from

22  trying to -- part of it is trying to gauge what is

23  an appropriate amount of supply.  We discussed this

24  a few times earlier today.  We felt that tying it to

25  the amount of real trading volume was a reasonable

1    way to calibrate it.  Then in terms of how the

2    ██████████ actually execute the sales, I'll give

3    you, just to illustrate my point.  If -- if your

4    ██████████ just sends XRP to the exchange and as soon

5    as it hits the exchange just goes into the order

6    book and hits a bid and hits a bid and hits a bid

7    and hits a bid, that pattern is -- can be recognized

8    by the market participants.

9         If other market participants recognize the

10   pattern, chances are they will front run you.  If

11   they front run you, you're going to have a lower

12   execution price.

13        Another way where we improved the

14   execution price, as discussed earlier, was by

15   providing ████████████   ████████████████████

16   ████████████████████

17   BY MS. ZORNBERG:

18        Q.   Right.

19        A.   ████████████████████████████████

20   ████████████

21        A third way in which we improved the net

22   execution price, instead of -- most exchanges have

23   ████████████████████████████████████████████

24   ████████████████████████████████████████████

25   ████████████████████████████████████████████

253

          Q.    Was spreading out sales over various

exchanges another way to minimize market impact?

          MS. WAXMAN:  Objection.

          THE WITNESS:  Yes.  To the degree that if

you try and force too many sales through any one

given exchange, you end up with the underlying

problem of not enough liquidity.  There's only so

many market participants in any given exchange,

there's only so much capital they have available to

purchase XRP.  So you couldn't route all of the

sales to any one given exchange because you would

probably end up creating dislocations.

BY MS. ZORNBERG:

          Q.    You were asked some questions by the SEC

about Ripple being in favor of an orderly XRP

254

```
 1    market.
 2              Do you recall questions along those lines?
 3         A.   Yes.
 4         Q.   Okay.  To your knowledge, did Ripple ever
 5    make any promise to anyone that it, Ripple Labs,
 6    would maintain an orderly market in XRP?
 7              MS. WAXMAN:  Objection.
 8              THE WITNESS:  No.
 9    BY MS. ZORNBERG:
10         Q.   So if we could go to a few of the
11    documents that the SEC showed you, the first one I
12    want to call your attention to is -- sorry, just
13    give me one moment.  Okay.  ███-15.
14              Okay.  When the SEC was questioning you,
15    they called your attention only to the August 6th
16    2134, email that's second down from Patrick Griffin
17    where he wrote:
18                   "We saw the price was bid up
19                   pretty aggressively, fantastic."
20              And the SEC asked you about that sentence.
21              I want to direct you to your response to
22    Mr. Griffin right above it at the top of the email
23    where you wrote:
24                   "GSR purchased XRP today, but
25                   our purchases started after the
```

```
 1              first big move."
 2              Did you see that?
 3       A.     Yeah.
 4       Q.     What does that mean, that the purchases
 5    started after the first big move?
 6       A.     Well, Patrick -- Patrick is saying, we saw
 7    the price go up a lot, and he's basically -- his
 8    question is getting at is, was that because you guys
 9    were buying.  And my reply is, the price was already
10    on the way up by the time we started buying.
11       Q.     All right.  You can put that aside.
12              MS. ZORNBERG:  Can I have Exhibit 105.
13              Just one second.  You know what, I don't
14    think we need that exhibit.  We can put it aside.
15       Q.     Can we pull out the SEC exhibit that they
16    showed you, ▇ 53.  It's the master purchase
17    agreement.
18       A.     Sorry, getting there.  Here we go.
19       Q.     Take your time.
20       A.     Yeah.
21       Q.     Okay.  So you were asked some questions
22    about a period of time in 2020 when GSR executed
23    purchases of XRP on behalf of Ripple.
24              Do you recall that?
25       A.     Yes.
```

1    Q.   And -- and this exhibit, 53, was the

2    agreement that governed those purchases between GSR

3    and Ripple, right?

4            MS. WAXMAN:   Objection.

5            THE WITNESS:   I believe that's correct,

6    yes.

7    BY MS. ZORNBERG:

8    Q.   Let me -- let me direct your attention for

9    a moment to Section 2 on page 2 of this agreement.

10   And recognizing that I'm sure you did not draft the

11   agreement and that you're -- you're not a lawyer, I

12   do want to direct you to the Section 2A where it

13   says "Execution Parameters."

14           And do you see that it starts with this

15   sentence.   Quote:

16               "The company will ensure" --

17           And actually, let me pause here because

18   company here is defined as GSR

19   A.   Yeah.

20   Q.   Okay.   So GSR is the company.   And it

21   says:

22               "The company will ensure

23               orderly markets and avoid undue

24               market impact in relation to any

25               purchases under this agreement,

257

```
1                including by ensuring compliance

2                with the following parameters."

3                And then it goes on to list some

4     parameters.

5                Do you see that?

6        A.   Yes.

7        Q.   Is it fair to say that Ripple and GSR both

8     wanted those purchases to be conducted in a way that

9     avoided undue market impact?

10               MS. WAXMAN:  Objection.

11               THE WITNESS:  I think so.  Yes.

12    BY MS. ZORNBERG:

13       Q.   Can I ask you to take a look at

14    Exhibit    64.

15               MS. ZORNBERG:  Can you pull a copy of that

16    for me?

17               THE WITNESS:  Gosh, had to be the last

18    one.  Sorry.

19    BY MS. ZORNBERG:

20       Q.   Okay.  So this was one of the documents

21    the SEC marked earlier.  I want to direct your

22    attention to the next to last page, which is a

23    June 4, 2018, 12:04 p.m. email from

24                         to you.

25               Do you see it?
```

258

```
 1          A.   Sorry, I was looking --
 2          Q.   It's the next-to-last page.
 3          A.   Got it.  12:04, yeah.
 4          Q.   Okay.  And I want to direct your attention
 5     to the second paragraph in his email to you which
 6     says:
 7                    "Again, we want to be
 8               sensitive about targeting trading
 9               only against what is real volume.
10               If you see evidence of fake volume,
11               please let us know."
12               Do you see that?
13          A.   Yes.
14          Q.   Did Mr. █████████      as far as you
15     understand, share your desire to avoid trading on
16     fake volume?
17          A.   Absolutely.
18               MS. WAXMAN:  Objection.
19     BY MS. ZORNBERG:
20          Q.   Do you have any knowledge of Ripple
21     switching from █████████ to █████████
22     ████ out of a, you know -- well, let me just pause
23     there.
24               Do you have any information or knowledge
25     that that occurred?
```

1      A.   I know that the subject of fake volumes

2  was a very important one, and we -- GSR and Ripple

3  shared the view that we wanted -- we only cared

4  about real volumes.  And over time, we incorporated

5  whatever information or signals we could find to

6  help us better determine what we thought were real

7  volumes.

8          You mentioned         going to

9          I don't remember the specifics, but I

10  think       was the first aggregator, and

11  they came up with some measures of trustworthiness,

12  and we probably used that measure at first.  As

13  other reporting outlets became more sophisticated,

14  we incorporated their information into our

15  determination of what was real.

16      Q.   Do you -- were you ever told that Ripple

17  had switched to -- from       to

18          because it viewed the latter

19  as being more reliable?

20          MS. WAXMAN:  Objection.

21          THE WITNESS:  I don't remember the

22  specific date, but that was the philosophy by and

23  large, yes.

24  BY MS. ZORNBERG:

25      Q.   Okay.  You were asked some questions by --

1  by the -- let me -- let me ask you to pull out

2  ████-29.

3      A.   If I put them in order, this would go a

4  lot faster.

5          MR. HANIN:  I thought you were actually

6  calling them emails, but you said put them in number

7  order.

8          THE WITNESS:  Is this towards the

9  beginning or the end?

10         MS. ZORNBERG:  I think it was the middle.

11         MR. HANIN:  I put them in numerical order,

12  so I can do it for you.

13         THE WITNESS:  Okay.  I got it.

14         MS. ZORNBERG:  Your lawyer is not helping

15  you at all.

16         MR. HANIN:  I was helping myself.

17  BY MS. ZORNBERG:

18     Q.   All right.  Mr. ████  you were asked about

19  this -- parts of this email by the SEC, and I want

20  to go back over other parts.

21         First of all, just to level set, this is a

22  string of emails from November 2016.  Directing your

23  attention to page 2 of the email -- well, before I

24  direct your attention to certain language, I believe

25  you testified earlier, after looking at the email,

1    that you think that the reference to press in this
2    chain was a reference to the news that Chris Larsen
3    had stepped down as CEO to become chairman.
4            And at the bottom of page 2, you had --
5    you had pointed out Patrick Griffin's email at 1454:
6                "I'm only seeing positive
7                sentiment on the news:  General
8                feeling seems to be that Ripple is
9                doing well enough for Chris to take
10               that move."
11           Do you remember being asked about that
12   earlier today?
13       A.   Yeah.
14       Q.   Okay.  And then you were asked a number of
15   questions by the SEC about a reference above it to
16   Patrick Griffin's additional email.  But I want
17   to -- first I want to focus you on your -- what you
18   wrote on November 1st at 10:14 p.m. where you
19   wrote, quote:
20               "I am very surprised that the
21               price is reacting so well.  We will
22               continue to monitor closely as the
23               market continues to digest the
24               news.  I've never been so glad to
25               be wrong on a market call."

1          Do you see that?

2      A.   Yeah.

3      Q.   Is it fair to say that any expectation

4  that you had that price in XRP would go down in

5  reaction to the news proved incorrect?

6          MS. WAXMAN:  Objection.

7          THE WITNESS:  I think that's fair to say,

8  yes.

9  BY MS. ZORNBERG:

10     Q.   And to the extent that Patrick Griffin had

11 been preparing for possible purchases of XRP, if --

12 if the news affected price, he too was incorrect?

13         MS. WAXMAN:  Objection.

14         THE WITNESS:  Yes.  Because, as you can

15 see from his message on November 1st at 1529, he's

16 giving us instructions 'cause I guess he's also

17 expecting.

18 BY MS. ZORNBERG:

19     Q.   So Ripple was wrong in that instance, just

20 like you were wrong --

21         MS. WAXMAN:  Objection.

22 BY MS. ZORNBERG:

23     Q.   -- about how news might affect the market?

24         MS. WAXMAN:  Objection.

25         THE WITNESS:  I certainly was wrong.  And

1    Patrick, too, yes.

2    BY MS. ZORNBERG:

3        Q.    Okay.  Let me -- and by the way,

4    Ms. Waxman had asked you about Patrick's use of the

5    term "target floor" in that email.

6            Now, the SEC only showed you this one

7    email from November 2016 using the word target --

8    the term "target floor."  They haven't shown you any

9    emails today with similar language after 2016.

10            MS. WAXMAN:   Objection.

11    BY MS. ZORNBERG:

12        Q.    As you sit here today, do you

13    specifically -- do you have any recollection of

14    Ripple discussing target floors in emails with you?

15        A.    No, I don't have any recollection.   Are

16    you asking like when was the last time I thought I

17    heard -- I mean ...

18        Q.    No.  You answered the question.

19            Okay.  I have only one more SEC exhibit

20    for you to dig out, and it's    13.

21        A.    Got it.

22        Q.    I'd like to ask you to turn to page 3 of

23    the email, which was not discussed earlier today,

24    though other parts of this chain were.  And I'd like

25    to direct your attention to the July 21, 2016 email

```
 1    that you wrote at 2:52.  It's in the middle of
 2    page 3.
 3         A.   Yes.
 4         Q.   Okay.  And in the email you wrote:
 5                   "Although market chatter has
 6              been very positive in the 72 hours
 7              following the news releases,
 8              trading volumes and XRP prices
 9              remain stagnant.  Market
10              capitalization rates are almost
11              unchanged from last week, though we
12              have seen a modest increase in
13              CNY."
14              Do you see that?
15         A.   Yes.
16         Q.   What's CNY?
17         A.   Chinese yuan.
18         Q.   All right.  Is this -- the portion of your
19    email that I just read to you, is that another
20    instance where a new release or news releases,
21    however positively received, from your perspective,
22    had -- did not impact trading volumes or XRP prices?
23              MS. WAXMAN:  Objection.
24              THE WITNESS:  That's -- that's what I'm
25    saying in this note, quite clearly, right?  There
```

1   has -- there has been positive market chatter

2   following news releases.  I don't remember what the

3   releases were.  But trading volumes and XRP prices

4   have not reacted to it.

5        In general, this issue of crypto being a

6   nascent market and having very little liquidity

7   means that there's an enormous amount of noise.  And

8   it's very difficult to point one way or the other.

9   And, you know, sometimes I guess in a more mature

10   market, you would expect, as real news comes to a

11   head, you would expect them to observe the price

12   follow, whereas in crypto, maybe it gets lost in the

13   wash.

14   BY MS. ZORNBERG:

15      Q.   All right.  You can put that document

16   aside.

17        I'd like to go back to a question and

18   answer you were asked by the SEC earlier today just

19   to clarify something.

20        You were asked -- you were asked about the

21   Ledger in gateways, some general questions about

22   that back in 2015.  And you gave an -- you gave an

23   answer, which the transcript will reflect, stating

24   that in 2015, "It wasn't easy to access Ripple and

25   that the more gateways there are, the more people

1   who can use Ripple."

2           That's what we -- on a break, we took from

3   the transcript.  What did you mean by your use of

4   the term "Ripple" in that answer?  What were you

5   referring to that it wasn't easy to access Ripple?

6       A.   You couldn't use the Ripple Network or the

7   Ripple Consensus Ledger.  You had to -- back then,

8   before XRP was listed on other exchanges, whatever,

9   you could transact on the Ripple Consensus Ledger by

10  depositing money into it via a gateway or

11  withdrawing it using a gateway.  So I was referring

12  to the Ripple Network or the Ripple Consensus

13  Ledger.

14      Q.   Okay.  Was the Ledger something that

15  existed separate and apart from Ripple Labs, the

16  software company?

17           MS. WAXMAN:  Objection.  Asked and

18  answered.

19           THE WITNESS:  Yes.

20  BY MS. ZORNBERG:

21      Q.   Mr. ███ is it fair to say that GSR cares

22  about operating its business in a legally compliant

23  manner?

24      A.   Absolutely.

25           MS. WAXMAN:  Objection.

1    BY MS. ZORNBERG:

2         Q.    And you --

3              MS. ZORNBERG:  What's the basis for the

4    objection?

5              MS. WAXMAN:  You're testifying for him.

6              MS. ZORNBERG:  That's not correct and the

7    transcript will reflect what it reflects.

8         Q.    Do you personally care about operating

9    GSR's business in a legally compliant manner?

10        A.    Very much so.

11        Q.    Without disclosing your communications

12   with counsel, has GSR, from time to time, consulted

13   with lawyers to ensure it was operating in a legally

14   compliant manner?

15             MS. WAXMAN:  Objection.

16             THE WITNESS:  Yes.

17   BY MS. ZORNBERG:

18        Q.    You also testified this morning that GSR,

19   whether through its management or its lawyers, had

20   reached out -- had met with the SEC, correct?

21        A.    Yes.

22        Q.    On approximately -- to your knowledge,

23   approximately how many times has GSR reached out to

24   the SEC since -- since GSR came into existence?

25        A.    The instance I described this morning was

1      the first time where we -- for want to have a better

2      expression, the open kimono thing, this is us, this

3      is what we do.  But I have had conversations with

4      the SEC prior to that, with Daphna last year.

5          Q.   Okay.  And other than the conversation

6      with Daphna last year and your meeting in

7      January 2021 with the SEC, are you aware of whether

8      GSR or its lawyers have reached out through phone,

9      in person or writing to the SEC on other occasions?

10               MS. WAXMAN:  Objection.

11               THE WITNESS:  I believe -- in fact, I hope

12     that the gentleman who we hired at the end of last

13     year, who's the CEO of GSR USA, is engaging with the

14     SEC and other regulators on our behalf and has been

15     doing so on a regular basis over the last eight or

16     nine months.

17     BY MS. ZORNBERG:

18         Q.   Without disclosing any communications

19     you've had with counsel, does GSR have regulatory

20     counsel?

21         A.   Yes.

22         Q.   Who is that?

23         A.   ███████████

24         Q.   Okay.  Who at ███████████, if you know?

25         A.   ██████ and -- and a gentleman who's ███

1    perhaps.

2         Q.   Close enough.  Close enough.

3              MR. HANIN:  ████████

4    BY MS. ZORNBERG:

5         Q.   Focusing your attention on the period of

6    time before December 22nd, 2020, when the SEC

7    filed the lawsuit against Ripple Labs, has -- had

8    the SEC ever communicated to GSR that it believed

9    GSR was violating U.S. security law?

10        A.   No.

11        Q.   Had the SEC ever communicated, prior to

12   December 22nd, 2020, to GSR that in the SEC's

13   view, XRP was a security?

14             MS. WAXMAN:  Objection.

15             MR. HANIN:  Objection to the foundation,

16   but ...

17             THE WITNESS:  I don't -- I don't recall.

18   I -- I don't recall if it came up.  If it -- if that

19   would have happened, it would have happened during

20   my conversation with Daphna, but I don't recall the

21   details of that conversation.  I do know that if --

22   I mean, it's something I would have remembered if --

23   to be blunt, if the SEC says we don't like this,

24   don't do it, we just won't do it.

25   / /

1    BY MS. ZORNBERG:

2        Q.   But the SEC never told you to stop --

3        A.   No.

4        Q.   -- transactions in XRP, correct?

5        A.   No.

6             MS. WAXMAN:   Objection.

7    BY MS. ZORNBERG:

8        Q.   And is that true to this day?

9        A.   I don't believe the XRP [sic] has told us

10   anything.  When we had that meeting in January we

11   told the people from the SEC that we were -- we had

12   stopped trading XRP on behalf of Americans and

13   exchanges that catered to Americans, et cetera.  We

14   were going to continue servicing ODL from our

15   Singapore entity facing off with Ripple's

16   Singaporean entity.  We felt it was important to be

17   up front about that.

18       Q.   In your prior answer, I think you called

19   the SEC XRP --

20            MR. HANIN:   XRP, yeah.

21   BY MS. ZORNBERG:

22       Q.   -- and I think they'll take great umbrage

23   to that.  Do you want to correct that?

24       A.   Yes.

25       Q.   You meant the SEC?

271

1        A.   Did I make the mistake again?

2             MR. HANIN:   This was a different

3    conflation, but no -- yes, obviously, he meant SEC,

4    not XRP.

5             THE WITNESS:   I'm sorry.

6             MS. ZORNBERG:   Feel free to change the

7    agency name, Ms. Waxman.

8             MS. WAXMAN:   We'll take it under

9    advisement.

10   BY MS. ZORNBERG:

11       Q.   Are you aware of jurisdictions outside the

12   United States that have declared that XRP is a

13   virtual currency not regulated by securities laws in

14   those countries?

15            MS. WAXMAN:   Objection.

16            THE WITNESS:   I believe Singapore is one

17   of those.

18   BY MS. ZORNBERG:

19       Q.   Are you aware of any jurisdiction outside

20   the United States that has, as of today, has

21   declared XRP is a security?

22       A.   No.

23            MS. WAXMAN:   Objection.

24   BY MS. ZORNBERG:

25       Q.   You mentioned earlier in your testimony by

1    the SEC that -- and if I get this wrong, please

2    correct me, but I think I heard you to say that part

3    of the meeting with the SEC in January entailed

4    telling them or expressing the view that the

5    regulations are unclear or that the framework

6    doesn't exist yet.

7              MS. WAXMAN:  Objection.

8    BY MS. ZORNBERG:

9        Q.   I don't want to misstate your testimony.

10   But -- so let me just put it this way:  From where

11   you sit operating GSR, do you have a view as to

12   whether the SEC's regulations or view of regulations

13   applicable to crypto exchanges in the digital asset

14   industry have been clear or unclear?

15             MS. WAXMAN:  Objection.

16             THE WITNESS:  I wouldn't know where to

17   draw the line in the sand between clear and unclear,

18   but we always welcome more clarity.

19             MS. ZORNBERG:  Why don't we take a short

20   break, if we could.

21             THE VIDEOGRAPHER:  Going off the record at

22   4:04 p.m.

23             (Whereupon, a recess was taken.)

24             THE VIDEOGRAPHER:  We're going back on the

25   record at 4:14 p.m.

 1              MS. DEARBORN:  Lisa, do you want to --

 2              MS. ZORNBERG:  I have nothing further from

 3    Ripple Labs.

 4                  EXAMINATION BY MS. DEARBORN

 5    BY MS. DEARBORN:

 6        Q.    Good afternoon, Mr. █████

 7        A.    Good afternoon.

 8        Q.    My name is Meredith Dearborn, I represent

 9    Chris Larsen.

10              You and I have never met, right?

11        A.    I don't think so.

12        Q.    Okay.  Me neither.

13              So we've talked about a variety of

14    different GSR entities or operations today.  Which

15    GSR entities, to your knowledge, were involved in

16    providing services to Mr. Chris Larsen?

17        A.    I believe GSR Holdings, which is a

18    misnomer, because it's not a holding company, but

19    GSR Holdings historically took care of XRP

20    programmatic liquidations, whereas GSR Markets was

21    the operating company from which we did, for

22    example, ODL, and I believe it's the operating

23    company from which we traded derivatives, so on.

24        Q.    Other than GSR Holdings and GSR Markets,

25    were any other GSR entities involved in providing

1    services to Mr. Larsen?

2         A.    I don't think so.

3         Q.    Is the same true of Mr. Garlinghouse?

4         A.    Yes.

5         Q.    And is the same true -- I'm sorry, go

6    ahead.

7         A.    I was just gonna say one more thing.  GSR

8    Markets, when I refer to GSR Markets, the first GSR

9    Markets was incorporated in Hong Kong.  Then we

10   cloned our operating companies in Singapore when the

11   MAS released their legal framework.  And that -- we

12   applied with our Singaporean operating companies,

13   just to be clear.

14        Q.    Thank you for the clarification.

15              And is the same -- is the same answer true

16   as to Ripple, that the only entities to provide

17   services to Ripple were GSR Holdings and GSR Markets

18   and the cloned entities --

19        A.    Whether Hong Kong -- I believe so, yes.

20        Q.    You've anticipated my next question, which

21   is where is GSR Holdings located?

22        A.    The original GSR Holdings was in Hong

23   Kong.  And we cloned it in Singapore, but we -- I

24   don't think we ever actually did anything with it.

25        Q.    Okay.  And where is GSR Markets located?

275

1          A.    Hong Kong and Singapore.

2          Q.    Okay.  Does GSR have computer services --

3    servers that it uses for its business?  And when I

4    speak about GSR, I'll just be speaking about those

5    two entities; is that fair?

6          A.    Holdings and Markets?

7          Q.    Yes, please.

8          A.    Okay.

9          Q.    Okay.  So do those two entities have

10   computer services that they use -- computer servers

11   that they use for their business?

12         A.    Yes.

13         Q.    Where are they located?

14         A.    All over the world.

15         Q.    Okay.  And when did those two entities

16   incorporate in Hong Kong and then in Singapore?

17         A.    In Hong Kong in the first half of 2017.

18         Q.    And when did they -- when were they cloned

19   in Singapore?

20         A.    At some point in 2020, I believe.  It

21   might have been earlier.

22         Q.    Thank you.

23         A.    Might have been 2019.

24         Q.    Thank you.

25               Before 2017, where -- were there any other

[8/11/2021]                    Dep. Tr. 8.11.2021

276

1   entities that provided Mr. Larsen, let's take

2   Mr. Larsen first, Mr. Larsen with services?

3       A.   Yes.  Before 2017, we were incorporated in

4   Andorra.

5       Q.   Where is Andorra?

6       A.   It's on the Pyrenees on the border between

7   Spain and France.

8       Q.   Okay.  It's in Europe?

9       A.   Yes.

10      Q.   Okay.  I had to look it up, actually.

11      A.   Not a lot of people know about it.

12      Q.   Okay.  So from 2013 --

13           (Reporter clarification.)

14           MS. DEARBORN:  2013.

15      Q.   From 2013, which is the start of GSR, I

16  believe you testified, to about 2017, when GSR moved

17  to Hong Kong, were all of the services that GSR

18  provided to Mr. Larsen done from Andorra?

19      A.   From an Andorran entity, yes.

20      Q.   Okay.  And is the same true of

21  Mr. Garlinghouse?

22      A.   Yes.

23      Q.   Okay.  And is the same true of Ripple?

24      A.   Yes.

25      Q.   Now, today, does GSR have any United

1    States-based subsidiaries or operations?

2        A.   We have a U.S. opco called GSR USA, I

3    believe.

4        Q.   At any point in time, have any of those

5    United States-based subsidiaries or operations ever

6    been involved in any services provided for

7    Mr. Larsen?

8        A.   No.

9        Q.   Have any of those subsidiaries or

10   operations been involved in providing services to

11   Mr. Garlinghouse?

12       A.   No.

13       Q.   Have any of those services or operations

14   been involved in providing services to Ripple?

15       A.   No.

16       Q.   Sorry, I misspoke.  Subsidiaries or

17   operations, but you understood that to be my

18   question?

19       A.   Understood.

20       Q.   Okay.  Does GSR have any U.S.-based

21   personnel?

22       A.   Today?

23       Q.   Mh-hmm.

24       A.   Yes.

25       Q.   Have any of those personnel been involved

1    in providing services for Mr. Larsen, to your

2    knowledge?

3         A.   I don't think so.

4         Q.   How about for Mr. Garlinghouse?

5         A.   No.

6         Q.   Or for Mr. -- or for Ripple?

7         A.   Now, yes.

8         Q.   Okay.  And you testified that you were the

9    primary point of contact for Ripple and for

10   Mr. Larsen and for Mr. Garlinghouse in providing

11   GSR's services.

12             Do I have that right?

13        A.   That's correct.

14        Q.   And you said you live in ▉▉▉▉

15        A.   Yes.

16        Q.   When you were performing services for any

17   of those three clients, from where were you

18   principally located?

19        A.   Typically ▉▉▉▉

20        Q.   Okay.  So we've spoken a little bit about

21   trades that GSR helped to effectuate on the XRP

22   Ledger, right?

23        A.   Yes.

24             MS. WAXMAN:  Objection.

25   / /

1   BY MS. DEARBORN:

2       Q.   And we've also spoken about trades that

3   GSR has helped to effectuate that are based on

4   exchanges, right?

5       A.   Yes.

6            MS. WAXMAN:  Objection.

7   BY MS. DEARBORN:

8       Q.   Okay.  I just want to get a sense of the

9   relative proportion of the trading activity that you

10  have conducted for, let's start with Mr. Larsen,

11  that were conducted on the Ledger versus on

12  exchanges.

13           So as a general matter, what is the --

14  how -- over the period -- over time from 2013 to

15  2019, what -- what -- just give me a sense of the

16  comparative volume of trades that were done on

17  exchanges versus on the Ledger?

18           MS. WAXMAN:  Objection.

19           THE WITNESS:  Since -- since 2013?

20  BY MS. DEARBORN:

21      Q.   Yes, please.

22      A.   Well, 2014, which is I guess when we

23  started, there -- I think there was only the Ledger,

24  so 100 percent of our trading activity was on the

25  Ledger.

280

1              By late '16, if I remember, from reading

2        the documents, we were already trading XRP on

3        Poloniex, I think it was.  If I remember correctly,

4        as soon as XRP started to appear on centralized

5        exchanges, the trading volume of XRP off Ledger

6        dwarfed the trading volume of XRP on Ledger, which

7        is also -- it's not specific to Ripple either.  Same

8        thing happened with others.

9              Q.   Yeah.  Is it fair to say that since 2017,

10       the -- all of the trading activity that you have --

11       that GSR has helped to perform for Mr. Larsen has

12       happened off Ledger?

13              MS. WAXMAN:  Objection.

14              THE WITNESS:  I believe so.

15       BY MS. WAXMAN:

16              Q.   And how about for Mr. Garlinghouse?

17              A.   I'm not sure we ever did anything on

18       Ledger for Mr. Garlinghouse.

19              Q.   And how about for Ripple?

20              A.   Similarly to Chris, I don't -- I don't

21       recall really doing anything on Ledger in years.

22              Q.   Okay.  And so since 2017, just so the

23       record is clear, at -- all of the trading activity

24       that you have performed for any of those three

25       clients have been done on cryptocurrency exchanges?

1          A.    Yeah.   I mean, yes, with the caveat that

2    we -- I'm sure we probably traded XRP over the

3    counter with somebody, so that didn't happen on an

4    exchange.

5          Q.    Okay.

6          A.    But it's -- we haven't done anything on

7    Ledger, I don't think.

8          Q.    Okay.   So if I revised that question to

9    say since 2017, the vast majority of the trading

10   activity that GSR has performed for any of those

11   three clients, Mr. Larsen, Mr. Garlinghouse or

12   Ripple, has been done on cryptocurrency exchanges --

13         A.    Yes.

14         Q.    -- would that be more accurate?

15         A.    That is correct.

16         Q.    Okay.

17               MS. WAXMAN:   Objection.

18   BY MS. DEARBORN:

19         Q.    So when trading XRP for a client like

20   Mr. Larsen, I believe you testified as to this, but

21   do I have it right that GSR is effectively acting on

22   those clients' behalf?

23               MS. WAXMAN:   Objection.

24               THE WITNESS:   That's my interpretation and

25   I'm their execution agent or whatever term you want

1    to -- technical term you would use.

2    BY MS. DEARBORN:

3        Q.   Okay.  So a client could decide to stop

4    trading if the client wanted to and GSR would

5    comply?

6        A.   Of course.

7             MS. WAXMAN:  Objection.

8    BY MS. DEARBORN:

9        Q.   Of course is your answer?

10       A.   Yes.  Of course.

11       Q.   Okay.  Would GSR ever undertake a trade

12   that its client told it not to do?

13       A.   No.

14       Q.   Okay.  Now, we talked a lot about

15   programmatic trading or exchange trading in this

16   deposition, and I just would like to go sort of step

17   by step and figure out exactly what happens in each

18   one of the steps of a programmatic trade.

19             And by the way, just for terminology's

20   sake, would you prefer I use the term programmatic

21   trade or exchange trade or something else?

22       A.   I'm indifferent.

23       Q.   Okay.  Let's just call it an exchange

24   trade, a trade on a cryptocurrency exchange.

25       A.   Mh-hmm.

1      Q.   So, first of all, as of -- let's take

2   year-end 2019.  Is the way that GSR would execute a

3   trade on a cryptocurrency exchange the same for

4   Mr. Larsen and Mr. Garlinghouse and Ripple?

5            MS. WAXMAN:  Objection.

6            THE WITNESS:  Yes.

7   BY MS. DEARBORN:

8      Q.   Okay.  So if I just talk about the

9   clients, can we assume that I'm talking about all

10  three?

11     A.   The mechanics should be similar, yes.

12     Q.   Okay.  If there is a difference as to any

13  one of those three entities in the tradings and the

14  services that GSR provided, will you just let me

15  know?

16     A.   Yes.

17     Q.   Okay.  So first step, how does GSR come to

18  be in possession of XRP to be traded on the clients'

19  behalf?

20            MS. WAXMAN:  Objection.

21            MS. DEARBORN:  What's the basis for the

22  objection?

23            MS. WAXMAN:  It's a legal question.

24            MS. DEARBORN:  It's definitely not, but

25  okay.

284

```
 1        Q.   How does GSR come -- so does GSR come

 2   to -- somehow come to be in possession of XRP that

 3   belongs to a client?

 4        A.   So the client will send us XRP, we will

 5   receive it in a Ripple wallet.  We'll -- you know --

 6   I'm guessing the next question is going to be and

 7   then where does it go, right?

 8             So we receive it in a Ripple wallet.

 9   Typically --

10        Q.   Do you mind if I stop you there --

11        A.   Yeah, go ahead.

12        Q.   -- so we can talk about this stepwise.

13             Okay.  What do you mean by a Ripple

14   wallet?

15        A.   A wallet that is -- well, it's called a

16   Ripple wallet but it's basically some software that

17   allows you to take claim, if you will, or be able to

18   operate some XRP.  It's a construct on the Ledger.

19        Q.   And that's a wallet that GSR designates

20   for receipt of the XRP from the client?

21        A.   Correct.

22        Q.   Okay.  Have you heard the terms "cold

23   wallet" and "hot wallet" before?

24        A.   Yes.

25        Q.   What's the difference between the two?
```

1        A.    A cold wallet is not connected to any

2    information system, so it's off-line and ostensibly

3    safer than hot wallets which are more easily hacked.

4        Q.    So when the client first transfers XRP for

5    the purpose of GSR executing trades with it, is that

6    GSR designated wallet a cold wallet or a hot wallet?

7        A.    It's -- over time, it's changed.  I'm not

8    entirely certain.  I know that we don't like to

9    leave one XRP more than we need to in any hot wallet

10   or in any exchange, because whenever you do so, you

11   open yourself up to the risk of hack or theft.  So

12   all of the superfluous XRP is typically kept in a

13   cold wallet.

14       Q.    Okay.  So when the client sends GSR XRP to

15   a GSR designated wallet, at that moment, who owns

16   the XRP?

17       A.    I think the XRP is still owned by the

18   client.

19       Q.    In fact, does GSR ever take ownership of

20   the XRP through the entire trading process?

21            MS. WAXMAN:  Objection.

22            THE WITNESS:  Not to the best of my

23   knowledge.

24   BY MS. DEARBORN:

25       Q.    Okay.  And if XRP is not sold by GSR, does

1    GSR have to give that XRP back to the clients?

2        A.   Yes.

3        Q.   Okay.  In that circumstance, is there any

4    penalty for failing to sell -- failing to sell the

5    XRP?

6        A.   I --

7             MS. WAXMAN:  Same objection.

8             THE WITNESS:  I don't think so.  I don't

9    think I've seen that.  I don't think we've ever been

10   penalized for it, no.

11   BY MS. DEARBORN:

12       Q.   Okay.  So in order to come into possession

13   of the XRP into the GSR designated wallet for

14   trading, what, if anything, did GSR pay to its

15   clients at that moment?

16            MS. WAXMAN:  Objection.

17            THE WITNESS:  What did we pay our client?

18   BY MS. DEARBORN:

19       Q.   If anything.

20       A.   We didn't pay our clients anything.

21       Q.   Okay.  So GSR paid no interest rate to its

22   clients to come into possession of the XRP to be

23   traded?

24       A.   In the context of the programmatic sales,

25   I don't think we paid any interest, no.

1     Q.   And GSR didn't pay a fee to clients to

2   come into possession of the XRP to be sold?

3     A.   No.

4     Q.   Okay.  At this point, when the XRP is in a

5   GSR designated wallet, is GSR on risk in any way for

6   the XRP?

7           MS. WAXMAN:  Objection.

8           MR. HANIN:  If you understand.

9           THE WITNESS:  Do you mean if we were

10   hacked and the XRP disappear, would the risk be

11   ours?  I don't think so.

12   BY MS. DEARBORN:

13     Q.   Okay.

14     A.   No, it would not.

15     Q.   And I think we covered this, but does GSR

16   ever assume risk of being stuck with XRP that it

17   can't sell?

18           MS. WAXMAN:  Objection.

19           THE WITNESS:  I don't understand the

20   question because I don't see the risk.  If we don't

21   sell it, we simply return it.

22   BY MS. DEARBORN:

23     Q.   Right.  It's fair to say that XRP is just

24   passing through GSR's custody?

25           MS. WAXMAN:  Objection.

288

1            THE WITNESS:  The XRP is passing through

2    our software, yes.  To our ▮▮▮▮▮▮ and ...

3    BY MS. DEARBORN:

4        Q.   And, again, at this point, does GSR own

5    the XRP?

6        A.   I don't think so.

7        Q.   Okay.  At this point, when the GSR is --

8    when the XRP is in a GSR designated wallet, could

9    the client decide that it didn't want to trade its

10   XRP for any other currency at all?

11       A.   Of course.

12       Q.   A client could say, actually, give me back

13   my XRP?

14       A.   Yes.

15       Q.   Okay.  And GSR couldn't refuse at that

16   point, right?

17       A.   No.  I can't imagine, no.

18       Q.   Okay.  Now let's go to the second step.

19            So presumably the XRP has to get to the

20   exchanges somehow, right?

21       A.   Correct.

22       Q.   How does that happen?  How does the XRP

23   get to the exchanges?

24       A.   So exchanges typically have receiving

25   wallets.  They'll have a deposit address.  Typically

289

1    they'll have a destination that references our

2    account, and we would send the XRP from the wallet

3    that it was in into the exchanges wallet, and then

4    the exchange would notify us, oh, 100 XRP has

5    arrived.

6         Q.   Okay.  And, at that point, when the XRP is

7    in a receiving address wallet at the exchange, who

8    owns the XRP?

9              MS. WAXMAN:  Objection.

10              THE WITNESS:  I believe -- nothing's

11    changed.  The XRP is still owned by the client.

12    BY MS. DEARBORN:

13         Q.   Right.

14              And in layman's terms, does the client

15    sort of have an account at the exchange or how does

16    it work?

17         A.   No.  The account is ours.  We open up the

18    account.  Oftentimes we have -- the exchanges that

19    support this feature, we're able to create

20    subaccounts so that we don't commingle different

21    clients' funds.

22         Q.   Okay.  And how are buyers matched with

23    sellers at the exchanges?  What happens at the

24    exchange?

25         A.   There -- there is something called a

1    matching engine, which I know very little about.

2    When an offer and a bid cross, a transaction occurs.

3    I apologize for my ignorance, but --

4         Q.   I promise you you're less ignorant than

5    me.

6         A.   It's -- you know.

7         Q.   Okay.  I'm sorry, I didn't intend to cut

8    off your answer.

9         A.   There's an order book where there are a

10   whole bunch of different offers at different price

11   levels and with different sizes, and same on the bid

12   side.  And when those cross, transactions occur.

13        Q.   Okay.  And in -- what is GSR's role in

14   that process?

15        A.   In the context of the programmatic sales?

16   As described earlier, you know, we will send orders

17   to the exchange that will result in us selling a

18   certain amount of XRP over a certain amount of time.

19   The nature of those orders can change.  Typically

20   there has to be some

21

22

23

24        So -- but by and large, what we do is

25   send -- send, cancel, modify, receive orders that

1    result in us selling XRP for other units of value.

2        Q.   Got it.  And we've used -- you've used the

3    word "order."  Can you describe what an order is?

4        A.   An order?

5        Q.   Mh-hmm.

6        A.   An instruction to either buy or sell

7    something at a particular price for particular size.

8    Can also be to modify an order, but yeah.

9        Q.   Okay.  So in the context of a situation

10   where a client wanted to sell its XRP on an

11   exchange, would an order be effectively -- would

12   that be an offer price?

13       A.   Correct.

14            MS. WAXMAN:  Objection.

15            THE WITNESS:  You offer to sell.

16   BY MS. DEARBORN:

17       Q.   Okay.  And when is that offer or order

18   accepted?

19       A.   When there's a bid, the opposite order

20   that wants to purchase at least that much size at

21   that price.

22       Q.   Okay.  Now, before an offer is accepted,

23   could a client tell GSR, actually, I don't want to

24   trade this XRP anymore, I'd like it back?

25       A.   Yes.

292

1          Q.   Okay.  And it would be possible to stop

2     those trades before they happen when -- before a

3     trade was accepted, before an offer was accepted?

4          A.   Yes.  As soon as a client says stop,

5     return the funds, we stop the bots, if you will.

6          Q.   Okay.  And do the clients have ultimate

7     discretion in those offers, so if the client wants

8     to offer less or more, up 'til the point that the

9     offer is accepted, can the client modify that --

10               MS. WAXMAN:  Objection.

11    BY MS. DEARBORN:

12         Q.   -- that instruction?

13         A.   The client has no bearing over our

14    ███████████  which are proprietary in nature.  The

15    client gives us instructions to buy or sell or

16    pause, and we execute that.  But it's one thing to

17    tell us, let's sell 30 basis points of the last 24

18    hours total trading volume, which is a continuous

19    order, and it's another thing, you know, tweak the

20    way the offering ████████ works.  That doesn't

21    happen.

22         Q.   Got it.

23               But before the bid is accepted, could the

24    client modify their -- the amount of XRP, for

25    example, that they wanted to sell?

293

1          A.   Yeah, they could -- they could tell us to

2     pause, they could tell us to ratchet up or slow

3     down.  Yeah.

4          Q.   And the bid isn't -- or the sale isn't

5     final, at that point, right?

6               MS. WAXMAN:  Objection.

7               THE WITNESS:  Correct.  The sale is only

8     final when the bid and the offer cross.

9     BY MS. DEARBORN:

10         Q.   Okay.  So why do you say that?

11         A.   Because when -- in crypto, there is

12    instantaneous settlement.  When that bid and offer

13    cross, if we were selling XRP, we no longer have

14    that XRP.  Now we have Bitcoin or dollars or yen or

15    whatever it was that the buyer used to purchase the

16    XRP from us.

17         Q.   Okay.  So just to summarize that, it's

18    accurate to say that a sale that GSR makes on behalf

19    of a client on a third-party exchange, that sale

20    only becomes final after being -- after the offer

21    and the acceptance are matched?

22              MS. WAXMAN:  Objection.  You're calling

23    for him to make some legal conclusion.

24    BY MS. DEARBORN:

25         Q.   You can answer.

294

1          A.   That's my understanding.

2          Q.   Okay.  And you've been working in this

3     industry for at least seven years, right?

4          A.   (Nods head.)

5          Q.   So you have a -- I'm sorry, you have to

6     give a verbal answer.

7          A.   Yes.  Sorry.

8          Q.   So you have a pretty good understanding of

9     how the exchanges work, right?

10         A.   I think so.

11         Q.   And you advise clients on their strategies

12    for buying and selling cryptocurrencies on

13    exchanges?

14              MS. WAXMAN:  Objection.

15              THE WITNESS:  At a high level, yes, but

16    I'm not a quant trader.

17    BY MS. DEARBORN:

18         Q.   Okay.  Okay.  How does GSR know when a

19    sale of XRP to a buyer on an exchange has become

20    final?

21              MS. WAXMAN:  Objection.

22              THE WITNESS:  The exchange should send us

23    a fill.  So we're connected to the exchange via an

24    API.  We send buy and sell orders, modify, whatever

25    it is, to the exchange.  My understanding, and I'm

295

1    no expert, is that when that bid and that offer

2    cross, and there's a trade, the exchange is supposed

3    to report a fill to us and let us know that our

4    offer has now met a bid, the order has been canceled

5    and now we're in possession of something else.

6    BY MS. DEARBORN:

7        Q.   How do you access the record of that fill,

8    to use your word?

9        A.   I'm sorry, could you be more specific?

10       Q.   Sure.  I mean, do they send you an email

11   or do you log on to your account at the exchange?

12   How do you know?

13       A.   No.  It's via the API.  And -- I think

14   some exchanges might send end-of-day emails, but

15   it's rare.

16       Q.   Okay.  And where, to your knowledge, are

17   those final sales on the exchange recorded?

18            MS. WAXMAN:  Objection.  Lack of

19   foundation.

20            THE WITNESS:  You mean with regards to

21   the --

22            (Reporter clarification.)

23            THE WITNESS:  Do you mean where does the

24   exchange record them or where do we record them?

25   / /

296

```
 1    BY MS. DEARBORN:

 2         Q.   Where does the exchange record them, to

 3    your knowledge?

 4         A.   I presume that they record it on some

 5    server.  They also -- they're supposed to report

 6    those trades on a ticker tape.

 7         Q.   Got it.  And at what point in this whole

 8    process does the client no longer have the ability

 9    to stop a trade?

10              MS. WAXMAN:  Objection.

11              THE WITNESS:  After it's occurred.

12    BY MS. DEARBORN:

13         Q.   After the match on the exchange?

14         A.   Yes.  I mean ...

15         Q.   Okay.  When does GSR have the ability to

16    stop a trade, if the answer is any different?

17         A.   We can -- that's a different question.  We

18    can stop a trade whenever we want.  But once the bid

19    and the offer has crossed the trade has occurred and

20    you cannot reverse it.

21         Q.   Okay.  So once -- once that trade has

22    occurred, what happens next?

23         A.   In terms of?

24         Q.   So how -- so let's say there's been a

25    trade between XRP and Mexican pesos on an exchange.
```

1        A.    Mh-hmm.

2        Q.    How do the Mexican pesos then make their

3    way back to the client, if that's their final

4    destination?

5              MS. WAXMAN:   Objection.

6              THE WITNESS:   If the client wanted their

7    Mexican pesos, they would instruct Bitso, in this

8    case, the Mexican exchange, to withdraw pesos to

9    their account.

10   BY MS. DEARBORN:

11       Q.    Okay.  So we've talked a little bit about

12   the buyers of XRP on these exchanges.  And I believe

13   that you previously testified that GSR has no way of

14   knowing the identity of the buyer of the XRP.

15             Do I have that right?

16       A.    Correct.

17       Q.    Okay.  And so it's possible that that

18   purchaser could reside outside of the United States,

19   right?

20             MS. WAXMAN:   Objection.

21   BY MS. DEARBORN:

22       Q.    Let me rephrase.

23             Is it possible that that purchaser

24   would -- is -- let me rephrase again.

25             Do you have any way of knowing whether or

1    not that purchaser is a foreign buyer?

2              MS. WAXMAN:  Objection.

3              THE WITNESS:  I have no way of knowing who

4    is on the other side of the trades, but when we

5    try -- when we trade on exchanges that don't cater

6    to Americans, we do so with the expectation that

7    there are no Americans on the exchange.

8    BY MS. DEARBORN:

9        Q.   Okay.  And on any exchange, regardless of

10   whether it's a -- an exchange that caters to U.S.

11   buyers or not, you would have no way of knowing

12   where the buyer of XRP is located when they're

13   executing a trade on the exchange; is that fair?

14       A.   Correct.

15             MS. WAXMAN:  Objection.

16   BY MS. DEARBORN:

17       Q.   Okay.  And it's possible that the XRP that

18   is sold on those exchanges never makes its way back

19   into United States at all, right?

20             MS. WAXMAN:  Objection.

21             THE WITNESS:  Yes.

22   BY MS. DEARBORN:

23       Q.   Do you have any way of knowing one way or

24   the other?

25             MS. WAXMAN:  Objection.

299

```
 1              THE WITNESS:  No.
 2      BY MS. DEARBORN:
 3          Q.   All right.  If a sale of XRP is done on an
 4      exchange, is that sale recorded on the XRP Ledger?
 5          A.   No.
 6          Q.   That's why it's called an off-ledger
 7      trade?
 8              (Reporter clarification.)
 9              THE WITNESS:  No.
10      BY MS. DEARBORN:
11          Q.   Sorry, I believe the answer to that's why
12      it's called an -- let me ask that question.
13              Is that why it's called an off-ledger
14      trade?
15          A.   Correct.
16          Q.   Okay.  Is an exchange trade validated by
17      any of the nodes on the XRP Ledger?
18          A.   No.
19          Q.   Okay.  And even though the trade is not
20      recorded on the XRP Ledger, do you still consider
21      that exchange trade to be final?
22              MS. WAXMAN:  Objection.
23              THE WITNESS:  Yes, of course.
24      BY MS. DEARBORN:
25          Q.   Okay.  Why?
```

300

1    A.  It couldn't be any other way.  A

2    transaction is a transaction whether it occurs on

3    one exchange or on the Ledger, trade's a trade.

4        Q.  Now, turning to the Ledger for a moment,

5    depending on the circumstances, does the XRP Ledger

6    show transactions that are not sales?

7            MS. WAXMAN:  Objection.

8            THE WITNESS:  The XRP Ledger shows

9    movements.  Yes.

10   BY MS. DEARBORN:

11       Q.  Such as movements between one wallet and

12   another, right?

13       A.  Yes.

14       Q.  Okay.  So -- and that doesn't necessarily

15   mean that the XRP was sold from one buyer to

16   another, right?

17       A.  No.  Correct.

18           MS. WAXMAN:  Objection.

19   BY MS. DEARBORN:

20       Q.  And what are some of the other

21   possibilities involved in a transfer from one wallet

22   to another?

23       A.  I mean, why -- why do these transfers

24   occur?

25       Q.  That's a fair question.  It's a little bit

301

1    speculative.

2            So, you know, for example, would the XRP

3    Ledger potentially show a transfer between two

4    wallets on the Ledger that were held by the same

5    person?

6            MS. WAXMAN:  Objection.

7            THE WITNESS:  It could very easily, yeah.

8    BY MS. DEARBORN:

9        Q.   Okay.  Or a temporary -- a transfer from

10   one wallet to another that was just a temporary

11   transfer and the recipient would have to give it

12   back?

13           MS. WAXMAN:  Objection.

14           THE WITNESS:  Yes.  I mean, any number of

15   combinations.  It could be the same person,

16   different people.

17   BY MS. DEARBORN:

18       Q.   Okay.  So can you tell from activity on

19   the XRP Ledger whether ownership of XRP has passed

20   from one wallet to another?

21       A.   No.

22       Q.   Okay.  So after GSR started providing

23   market making services to Mr. Larsen on the

24   exchanges, were you generally aware of where

25   physically the exchanges on which those trades took

302

1    place were located?

2           MS. WAXMAN:   Objection.

3           THE WITNESS:   Not really, and it's going

4    to sound strange, but even today, a lot of these

5    well known exchanges, it's unclear where they're

6    located.

7    BY MS. DEARBORN:

8       Q.   Okay.  So I actually am unfortunately

9    going to make you dig through your stack.  If I

10   could bring up ▮▮-42 please, which is an exhibit

11   that Ms. Waxman showed you during her questions.

12      A.   Okay.

13      Q.   Okay.  And Ms. Waxman asked you some

14   questions about the location of the exchanges that

15   are listed here.

16           Do you remember that testimony?

17      A.   I think so.

18      Q.   And she asked specifically whether any of

19   these were U.S.-based exchanges.

20           Do you recall that?

21      A.   Yes, I do.

22      Q.   And one of the exchanges that you

23   mentioned was Poloniex, right?

24      A.   Correct.

25      Q.   And you said that it was a U.S. exchange

303

1    at one point.  Do I have that right?  I don't want

2    to mischaracterize your testimony?

3         A.    Yes.  I said that.

4         Q.    What do -- what did you mean?

5         A.    Well, Poloniex was supposedly founded by a

6    gentleman from somewhere in Upstate New York.  And

7    from dealing with the people in Poloniex over the

8    years, I know their support staff was somewhere in

9    the northeast too.  So it seemed as though Poloniex

10   was operating from the United States, but I don't

11   know that I ever saw the Article of Incorporation or

12   I could confirm that in fact the company was based

13   in the U.S.

14        Q.    Okay.

15        A.    It might have been in one of these

16   Caribbean islands or -- yeah.

17        Q.    So Ms. Waxman asked you to identify the

18   exchanges on this list that were based in the United

19   States.

20              As to the remainder of the exchanges that

21   you didn't identify, to what extent, if at all, is

22   it your understanding that they are located outside

23   of the United States?

24              MS. WAXMAN:  Objection.

25              THE WITNESS:  I -- I think that the rest

[8/11/2021]              Dep. Tr. 8.11.2021

1    of the exchanges are located outside of the United

2    States.

3    BY MS. DEARBORN:

4         Q.   Okay.  To the best of your recollection,

5    sort of -- what ballpark percentage, approximately,

6    of Mr. Larsen's trades were executed on foreign

7    exchanges?

8         A.   Over the life of the selling program?

9         Q.   Yes, sir.

10        A.   On a dollar adjusted basis, not number of

11   trades?

12        Q.   We don't need --

13        A.   What matters is the dollars?

14        Q.   Mh-hmm.

15        A.   I would guess higher than ███ percent was

16   done offshore.

17        Q.   Okay.  Is the same true of

18   Mr. Garlinghouse?

19        A.   Yes.  I -- I would imagine it would be

20   similar.

21        Q.   Is the same true for Ripple's programmatic

22   sales?

23        A.   Probably.

24        Q.   Okay.  So is it fair to say that you --

25   that ███ executes cryptocurrency strategies on

1    behalf of your clients mostly on non-U.S. exchanges?

2              MS. WAXMAN:  Objection.

3              THE WITNESS:  Yes.  I guess that's fair.

4    BY MS. DEARBORN:

5        Q.   Okay.  And that's been true since the

6    exchanges came online?

7              MS. WAXMAN:  Objection.

8              THE WITNESS:  Yes.  I mean, our -- we've

9    always had a very light footprint in the U.S., and

10   we started trading on Coinbase much later than

11   everybody else.  A lot of our business was driven

12   out of Asia in the earlier years.

13             MS. DEARBORN:  Okay.  If we can take a

14   quick break, I might be fairly close to -- close to

15   wrapping up.  But let me confer and see whether we

16   have anything else.

17             MR. HANIN:  Sure.

18             THE VIDEOGRAPHER:  We're going off the

19   record at 4:50 p.m.

20             (Whereupon, a recess was taken.)

21             THE VIDEOGRAPHER:  We're going back on the

22   record at 5:12 p.m.

23   BY MS. DEARBORN:

24       Q.   Hello.  Just a few -- few more questions

25   for me.

1          So how -- going -- moving back to the

2     process of selling XRP on the cryptocurrency

3     exchanges.

4          A.   Mm-hmm.

5          Q.   So we talked a lot about the order or the

6     bidding process.

7          So how does a potential purchaser of XRP

8     know when an offer to sell XRP has been placed?

9          A.   They will see an offer in the order book.

10         Q.   What's the order book?

11         A.   So the order book is all of the bids and

12    offers for any particular cross.

13         Q.   And is that -- is that a record that the

14    exchange maintains?

15         A.   Well, it's -- yes, in the sense when you

16    log into the exchange, and you click that particular

17    cross, you will see all the best bids and all the

18    best offers.

19         Q.   Okay.

20         A.   And that is called the order book.  So if

21    a new offer pops up, somebody else puts in an offer,

22    you'll see another sell order on the exchange.

23         Q.   Got it.  So just to be clear, the offer

24    book is specific to each exchange, each exchange has

25    a different offer book?

1  A. Order book.

2  Q. I'm sorry, thank you, order book.

3   So each exchange has a different order

4 book?

5   MS. WAXMAN:  Objection.

6   THE WITNESS:  Each exchange has multiple

7 order books.  Each cross has its own order book.  A

8 cross would be, for example, XRP against dollars.

9 BY MS. DEARBORN:

10  Q. Okay.  But you couldn't look on one

11 exchange's order book and see an offer to sell XRP

12 made on a different exchange, for example?

13   MS. WAXMAN:  Objection.

14   THE WITNESS:  Generally, no, but there are

15 some exchanges that pool liquidity.  So you see an

16 offer on one exchange and, in fact, that offer is

17 occurring on another partner exchange.

18 BY MS. DEARBORN:

19  Q. Okay.

20  A. But it's not the norm.

21  Q. It's not the normal.  Okay.

22   MS. DEARBORN:  I have no further

23 questions.

24   Counsel for Mr. Garlinghouse.

25   MR. LEVANDER:  No questions on behalf of

308

```
 1    Mr. Garlinghouse.
 2              MS. ZORNBERG:  And by stipulation of the
 3    parties before now, the SEC has agreed to limit its
 4    rebuttal period to ten minutes.
 5              FURTHER EXAMINATION BY MS. WAXMAN
 6    BY MS. WAXMAN:
 7         Q.   Mr. ████, earlier you explained to
 8    Ms. Dearborn that a sale of XRP is finalized when a
 9    bid is hit, correct?
10         A.   When a bid crosses an offer.
11         Q.   And you were talking about sales in --
12    that GSR executed in relation to Mr. Larsen,
13    correct?
14         A.   I guess so, yes.
15         Q.   But at the time -- at the moment that the
16    bid was crossed, where was Mr. Larsen physically
17    located?
18              MR. HANIN:  Objection.
19              MS. ZORNBERG:  Objection to form.
20              MR. HANIN:  I don't know how he could know
21    that.
22              THE WITNESS:  I have no idea.
23              MS. DEARBORN:  And also misstates the
24    testimony.
25    / /
```

1    BY MS. WAXMAN:

2         Q.   Is it possible that Mr. Larsen was

3    physically located in the United States at the time

4    that the sale of XRP was finalized?

5         A.   I guess so.

6              MS. DEARBORN:  Objection to form.

7    BY MS. WAXMAN:

8         Q.   And at the moment that a sale was

9    finalized on behalf of Ripple, where was Ripple

10   physically located?

11             MS. DEARBORN:  Objection to form.

12             THE WITNESS:  I -- I mean, I guess Ripple

13   has always been located -- I don't know where a

14   company is located.  At their headquarters.

15   BY MS. WAXMAN:

16        Q.   Where is Ripple's headquarters?

17        A.   I believe it's San Francisco.

18        Q.   And did Ripple also maintain offices in

19   New York?

20        A.   Yes, they did.

21        Q.   And at the time that a sale of XRP is

22   finalized -- at the time that the sale of XRP for

23   Mr. Garlinghouse was finalized, where was

24   Mr. Garlinghouse physically located?

25             MR. LEVANDER:  Objection.

1           THE WITNESS:  I have no idea.

2    BY MS. WAXMAN:

3        Q.   At times was Mr. Garlinghouse physically

4    located in the United States?

5           MR. HANIN:  Objection.

6           MR. LEVANDER:  Same objection.

7           THE WITNESS:  I presume so, but I have no

8    idea.

9    BY MS. WAXMAN:

10       Q.   Okay.  When Mr. Larsen sells on an

11   exchange, does that mean -- does that sale

12   ultimately need to be reflected on the Ledger?

13          MS. ZORNBERG:  Objection.

14          THE WITNESS:  On the Ripple Consensus

15   Ledger?

16   BY MS. WAXMAN:

17       Q.   Yes.

18       A.   No, it doesn't.

19       Q.   So the sales that occur on centralized

20   exchanges, does the exchange ultimately send the

21   transaction to the Ledger?

22       A.   No.

23          MR. LEVANDER:  Objection.

24             (Reporter clarification.)

25   / /

1   BY MS. WAXMAN:

2       Q.   Does -- where does the XRP -- does the XRP

3   stay in Mr. Larsen's wallet when the sale is

4   finalized?

5            MS. DEARBORN:  Objection to form.

6            THE WITNESS:  No.

7   BY MS. WAXMAN:

8       Q.   What happens to the XRP following a sale?

9       A.   If -- if we're the ones offering the XRP,

10  and a buyer comes in and bids through our offer, as

11  soon as the bid crosses the offer, the XRP leaves

12  our wallet, goes to the buyer, and we receive

13  whatever the buyer was using to purchase the XRP.

14      Q.   Earlier we were talking about GSR services

15  in connection with ODL.

16           Isn't it true that when GSR provided

17  liquidity in connection with ODL, GSR had no way of

18  knowing if -- if the trade was in connection with an

19  ODL transaction?

20      A.   That's correct.

21      Q.   And didn't Ripple, after the fact, have to

22  tell GSR whether the trade had been in support of

23  ODL?

24      A.   That's correct.

25      Q.   And some of GSR's trading was, in fact,

1    not in support of ODL, correct?

2        A.   In the sense that we traded with other

3    market participants while we were making markets on

4    those exchanges, yes.  That's correct.

5        Q.   And when GSR was selling on behalf of

6    Ripple and Mr. Larsen and Mr. Garlinghouse, GSR was

7    selling continuously using an ▮▮▮▮▮▮▮ correct?

8        A.   Yes.

9        Q.   And those trades happen 24 hours a day,

10   seven days a week, correct?

11           MS. ZORNBERG:  Object to form.

12           THE WITNESS:  That was the goal.

13   BY MS. WAXMAN:

14       Q.   And if a -- if Ripple or Mr. Larsen or

15   Mr. Garlinghouse wanted to alter their trading or

16   stop their trading, wouldn't it take a bit of time

17   for that change to be incorporated into the

18   ▮▮▮▮▮▮

19       A.   We have what is effectively a kill switch.

20   Client calls, says stop, we stop.  However long the

21   communication took from the client, whether it was

22   an email or a phone call or ...

23       Q.   Setting aside the kill switch, if a

24   customer wanted to increase or reduce their trading,

25   would it take a bit of time to incorporate that into

1    the ▐▐▐▐▐▐▐

2              MS. ZORNBERG:  Objection.

3              THE WITNESS:  Do you mean like to adjust

4    the percentage of the previous -- yeah.  I mean,

5    it's editing a couple lines of code.  You have to

6    edit, you have to commit it.

7    BY MS. WAXMAN:

8         Q.   And what would you have to do to activate

9    a kill switch?

10        A.   You should know that nobody lets me touch

11   any buttons, but our quants -- our quants do have

12   kill switches for this very reason.  There are times

13   when -- when you're trading programmatically using

14   code, things can go wrong.  And very quickly, you

15   can start doing thousands and thousands of trades.

16   You need to have something to just turn it off

17   before the damage is too big.

18        Q.   Has GSR ever activated the kill switch for

19   any of the bots related to either Mr. Garlinghouse,

20   Mr. Larsen or Ripple?

21        A.   I'm sure that over the years, you know, if

22   we receive, from Ripple or Mr. Garlinghouse or

23   Mr. Larsen, instructions to stop, we stop as quickly

24   as we can.  So we would, you know, hit the kill

25   switch.

1       Q.  And going back to an earlier question, was

2  GSR offering trades via the         24 hours a

3  day, seven days a week?

4          MS. ZORNBERG:  Object to form.

5          THE WITNESS:  Were we offering trades?  Do

6  you mean placing offers to sell?

7  BY MS. WAXMAN:

8       Q.  Yes.

9       A.  Yes.

10      Q.  Ms. Zornberg earlier showed you

11  Exhibit 29, if you don't mind pulling that up.  And

12  she pointed out that your prediction regarding the

13  movement of the market was not correct?

14         Do you remember that?

15      A.  I remember her pointing it out, yes.

16      Q.  And she also pointed out something similar

17  with respect to Exhibit 13.

18      A.  Yes.

19      Q.  Do you remember that?

20         Putting aside the accuracy of your

21  prediction, did you still have the hope or

22  expectation that the news that are -- the news that

23  is -- the news that's reflected in the email would

24  have an impact on the XRP market?

25         MS. ZORNBERG:  Objection.

1            MR. HANIN:  Objection.

2            THE WITNESS:  I don't understand the

3     question.

4     BY MS. WAXMAN:

5         Q.   Did you believe the news could potentially

6     impact the market?

7         A.   I mean, I -- I presume.  That's why I said

8     what I said on these emails or whatever, yeah.

9         Q.   And also putting aside the accuracy of the

10    prediction, the accuracy of your prediction or the

11    accuracy of a prediction by Ripple, did Ripple

12    believe that the news could have an impact on the

13    XRP market?

14            MS. ZORNBERG:  Objection.

15            MR. HANIN:  If you know.

16            THE WITNESS:  I have no way of knowing

17    what Ripple believed, but I presume so.

18    BY MS. WAXMAN:

19        Q.   Earlier you testified that GSR had

20    operations within the United States, correct?

21        A.   GSR has operations in the United States,

22    yes.

23        Q.   Okay.  And does                        work

24    for GSR's U.S. operations?

25        A.   Yes.

316

1      Q.  Did        provide services to Ripple in

2 connection with ODL while he was employed by GSR's

3 U.S. operations?

4      A.  He -- he talks -- he coordinates with

5 Ripple.

6      Q.  So your testimony earlier to Ms. Dearborn

7 regarding whether GSR provides services to Ripple

8 through a U.S. entity is not --

9      A.  The timing was different there.  I see

10 where you're going with this, but       joined us

11 at the end of last year and has been doing a basic

12 support function for ODL.  But I didn't think -- can

13 we go back to the question that I had answered

14 supposedly wrongly.

15      Q.  Well, my question is -- and I just want to

16 do it quickly.

17      MR. HANIN:  You didn't answer any question

18 wrong.  You didn't answer any question wrong.

19 BY MS. WAXMAN:

20      Q.  My question is:  Did the U.S. GSR entity

21 provide any services to Ripple in connection with

22 ODL?

23      A.  Oh, I see.  I see.  I guess --

24      MS. ZORNBERG:  Object to form and maybe

25 fix a time.

1              THE WITNESS:  To the extent that I believe

2     ████████ is an employee of GSR USA, and that he has

3     had some communications with Ripple, I guess that's

4     correct that GSR USA had been involved.  But really,

5     the operating company for -- for ODL is GSR Markets.

6     It's not GSR USA.

7     BY MS. WAXMAN:

8          Q.   But does ████████ provide any support to

9     Ripple in connection with ODL?

10         A.   Basic communications with them, yes.

11              MS. ZORNBERG:  The end of ten minutes.

12              MS. WAXMAN:  I just have two more

13    questions, if that's okay.  I have three questions.

14    I just want to be --

15         Q.   Did the SEC ever communicate to you or

16    anyone else at GSR that XRP was not a security?

17         A.   No.

18         Q.   Did GSR ever call the SEC to inquire about

19    XRP's status under the U.S. securities laws?

20              MR. HANIN:  Objection.

21              THE WITNESS:  Well, I mean, when you say

22    call the SEC, like I would -- there's not a hotline

23    number, right.  But --

24    BY MS. WAXMAN:

25         Q.   There is.

1      A.   Oh, there is?  Oh.  But --

2           MS. ZORNBERG:  Objection.

3           MR. HANIN:  Yeah.  Same objection.  I'm

4    not aware of a hotline but all right.

5           MS. ZORNBERG:  I think that testimony

6    should count as one of your three questions.

7           THE WITNESS:  When -- when we spoke with

8    the SEC in January, we -- we tried to be as

9    transparent as possible in the hope that somebody

10   would give us some guidance.

11   BY MS. WAXMAN:

12      Q.   Were you aware of any agreement between

13   Mr. Larsen and Ripple in which he agreed not to sell

14   XRP during the period of time that Ripple was buying

15   XRP?

16           MS. ZORNBERG:  Objection.

17           THE WITNESS:  No.

18           MS. ZORNBERG:  That was three questions.

19           MS. WAXMAN:  Mr. ███, thank you very much

20   for your time today.  We have no further questions.

21           THE WITNESS:  Thank you, Daphna.

22           THE VIDEOGRAPHER:  That concludes today's

23   deposition.  We're going off the record at 5:27 p.m.

24           (Whereupon, the deposition concluded

25           at 5:27 p.m.)

319

```
 1                    CERTIFICATE OF WITNESS

 2

 3

 4          I, ████████████    do hereby declare under

 5      penalty of perjury that I have read the entire

 6      foregoing transcript of my deposition testimony,

 7      or the same has been read to me, and certify that

 8      it is a true, correct and complete transcript of

 9      my testimony given on August 11, 2021, save and

10      except for changes and/or corrections, if any, as

11      indicated by me on the attached Errata Sheet, with

12      the understanding that I offer these changes and/or

13      corrections as if still under oath.

14          _____ I have made corrections to my deposition.

15          _____ I have NOT made any changes to my deposition.

16

17  Signed: _____

18      ████████████

19  Dated this _____ day of _____ of 20____ .

20

21

22

23

24

25
```

```
 1                  CERTIFICATE OF REPORTER

 2            I, Kathleen A. Wilkins, Certified

 3    Shorthand Reporter licensed in the State of

 4    California, License No. 10068, hereby certify that

 5    deponent was by me first duly sworn, and the

 6    foregoing testimony was reported by me and was

 7    thereafter transcribed with computer-aided

 8    transcription; that the foregoing is a full,

 9    complete, and true record of proceedings.

10            I further certify that I am not of counsel

11    or attorney for either or any of the parties in the

12    foregoing proceeding and caption named or in any way

13    interested in the outcome of the cause in said

14    caption.

15            The dismantling, unsealing, or unbinding

16    of the original transcript will render the

17    reporter's certificates null and void.

18            In witness whereof, I have hereunto set my

19    hand this day:  August 13, 2021

20    _____ Reading and Signing was requested.

21    _____ Reading and Signing was waived.

22    ___x____ Reading and Signing was not requested.

23            _____

24            KATHLEEN A. WILKINS

25            CSR 10068, RPR-RMR-CRR-CCRR-CLR-CRC
```

321

ERRATA SHEET

Deposition of: ▮▮▮▮▮▮▮▮
Date taken: AUGUST 11, 2021
Case:   SEC v. RIPPLE LABS, INC., et al.

PAGE   LINE
_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

_____ _____   CHANGE: _____
                REASON: _____

Signed_____
Dated_____













